**EXHIBIT 11**

TO:     Thomas L. Gilevich, Assistant Chief Counsel
        Office of Legal Affairs
        California Department of Corrections and Rehabilitation

FROM:   Lindsay M. Hayes, Project Director
        National Center on Institutions and Alternatives

DATE:   August 16, 2011

RE:     **CDCR Suicide Prevention Consultation**

Please accept this memorandum as my opinion regarding several suicide prevention issues within the California Department of Corrections and Rehabilitation (CDCR). This memorandum also includes a slight revision of my preliminary opinions previously offered on January 30, 2011. These opinions and recommendations are made with the explicit intent for CDCR to strategize ways to systemically reduce both the number and rate of inmate suicides, as well as remove the suicide prevention requirements from *Coleman v. Brown.*

As of August 15, 2011, the CDCR has sustained 19 suicides for the year (with an estimated 28-29 such deaths projected thru the end of the year). In 2010, CDCR had 35 suicides, resulting in a suicide rate of 21.1 deaths per 100,000 inmates. In 2009, CDCR had 25 suicides, resulting in a suicide rate of 14.9 deaths per 100,000 inmates. In 2008, CDCR had 37 suicides, resulting in a suicide rate of 22.3 deaths per 100,000 inmates.

1)  **Review of 2010 Inmate Suicides**

I reviewed the Suicide Reports for 25 of the 35 inmate suicides during 2010. As a preface, it should be noted that these Suicide Reports, compiled by designated mental health suicide reviewers (MHSR), represent the strength of CDCR's Mental Health Services Delivery System. Per Program Guide requirements, the reviews are conducted by clinical psychologists with specific training and experience in this area. Each report contains an executive summary, review of circumstances leading to the suicide, medical autopsy/toxicology findings, background information, mental health history, medical history, institutional functioning, personality dynamics, precipitating events and pre-suicidal functioning, discussion/conclusions, and recommendations. The recommendations section includes identification of the problem area(s), quality improvement plan for each problem area, and required supporting documents for each problem area. Each preliminary Suicide Report is then reviewed and subsequently approved by the Division of Correctional Health Care Services (DCHCS)' Suicide Case Review Subcommittee.

The 25 reviewed Suicide Reports were extremely thorough and among the most comprehensive evaluations of inmate suicides that I have seen in correctional agencies throughout the country. The DCHCS and each MHSR should be strongly commended for their work.

However, the DCHCS's strength also reveals its greatest weakness in suicide prevention, i.e., documentation of a continuing and chronic problem in the identification and management of



inmates at risk for suicide. Following review of these 25 cases, I informally made the following calculations:

- 28% (7 of 25) of the cases involved problems with the emergency response to the incident, most of which were caused by either untimely responses in opening the cell door and initiating CPR and/or emergency equipment failure. However, it should also be noted, that a previous chronic problem of correctional officers failing to initiate CPR prior to the arrival of medical staff has perhaps been resolved, as few of the cases involved such an issue.

- 28% (7 of 25) of the cases involved inmates who committed suicide within hours or days following their discharge from suicide observation status,[1] or cases in which inmates either threatened suicide, expressed suicidal ideation, and/or had other suicide risk factors that did not result in their placement on suicide observation status. These cases were very troubling and will be discussed in more detail throughout this report.

- 16% (4 of 25) of the cases involved inmates who were found with either rigor mortis and/or the review determined that cell checks were not performed as required.

- 44% (11 of 25) of the cases involved inmates who were confined in Administrative Segregation Unit cells (ASU). This finding is not surprising and consistent with previous CDCR data indicating that there is a disproportionate number of inmate suicides occurring within ASU cells. However, as a result of this phenomenon, the CDCR instituted several corrective actions, including designating suicide-resistant intake cells in the ASU units, as well as requiring correctional officers to conduct cell checks at 30-minute intervals during the first 21 days of ASU confinement. However, my review of the suicide reports found that several inmates who committed suicide shortly after ASU placement were not placed in designated ASU intake cells and, as indicated above, several ASU inmates were not observed at 30-minute intervals as required.

- 68% (17 of 25) of the cases involved multiple problem areas, with recommendations for corrective action offered to mental health, medical, and correctional officials. In the remaining 32% (8 of 25) of the cases, either only minor deficiencies or no problem areas were found during the reviews.

---

[1] For purposes here, I am using the term "suicide observation" generally to include the CDCR terms "suicide precautions" and "suicide watch."

2) **Threshold for Placement on Suicide Observation is Set Too High**

According to *Chapter 10: Suicide Prevention and Response*, inmates identified at risk for suicide are placed on either of the following suicide observation levels:

- *Suicide Precaution,* "*when the inmate is in an MHCB because of high risk of attempting self- injurious behavior, but is not in immediate danger*"; and

- *Suicide Watch,* "*when an inmate is in an MHCB because of suicide risk and is in immediate danger of self-injurious behavior.*"

As written, a literal interpretation of these definitions requires the placement of an inmate on suicide observation status *only* if they are at high risk of attempting suicide and are in immediate danger.

The Suicide Risk Evaluation form (CDCR 744) is an excellent tool for the assessment of suicide risk and includes a listing of both chronic and acute risk factors, as well as protective factors. The evaluation form also includes a mental status exam, estimate of suicide risk, and treatment plan (if appropriate). Within the Estimate of Suicide Risk section, both Chronic Risk and Acute Risk are listed with corresponding boxes for risk level (Low, Moderate, and High). It could be argued that this matrix of risk level, while appropriate, is either not consistent with the definitions of risk behavior necessitating either Suicide Precaution or Suicide Watch, or potentially confusing to the clinician.

In fact, in comparing both the definitions of Suicide Precaution and Suicide Watch with the estimate of risk levels contained within the Suicide Risk Evaluation (SRE) form, a clinician could easily conclude that only an inmate scoring in the high category of acute risk would be placed on suicide observation status. The question then becomes, is this what DCHCS officials intended when developing the definitions of risk behavior necessitating either Suicide Precaution or Suicide Watch?

I would argue that the current definitions of risk behavior necessitating either Suicide Precaution or Suicide Watch are overly restrictive and exclude suicidal behavior that warrants placement under suicide observation status. For example, a clinician completing an SRE could conclude based upon acute risk factors, lack of protective factors, and troubling mental status exam that the inmate fell into the <u>moderate</u> acute risk for suicide category, yet because the inmate is not at high risk of attempting suicide nor in immediate danger according to the Program Guide, they will not be placed on suicide observation status. In fact, this is exactly what is happening within CDCR facilities. I reviewed various medical charts during tours of Mule Creek State Prison, Deuel Vocational Institution, and the California State Prison – Sacramento and found examples at each site in which inmates at moderate acute risk for suicide were discharged from suicide observation status in the MHCB. And, as stated above, 28% (7 of 25) of the reviewed Suicide Reports for 2010 involved inmates who committed suicide within hours or days following their discharge from suicide observation status.

In conclusion, it is my belief that the current threshold for placement of inmates on suicide observation status is set too high and unnecessarily and dangerously excludes a potentially suicidal inmate and/or inmate at moderate risk for self-injurious/suicidal behavior. As such, the definitions necessitating placement on both Suicide Precaution and Suicide Watch in *Chapter 10: Suicide Prevention and Response* should be revised to include this concerning behavior.

3)  **Recommended Changes to *Chapter 10: Suicide Prevention and Response***

I reviewed *Chapter 10: Suicide Prevention and Response* (2009 Revision) and offer the following changes:

- On page 11, under Peer Consultation: would recommend adding both "correctional staff" and "medical staff" as peers that need to be consulted.

- On page 11, bottom, and top of page 12: Why is this disclaimer necessary? Earlier in this section, it is stated peer consultation can be one of the most important clinical safeguards. In this paragraph, the statement reads that peer consultation is not always necessary. If peer consultation is one of the most clinical safeguards then it should always be necessary. I would recommend that this paragraph be deleted from the program guide.

- On page 12, under Suicide History Tracking: As offered on page 10 of this report, I strongly believe that the Mental Health Tracking System be expanded to include *all* inmates who have attempted suicide, engaged in self-injurious behavior, or otherwise been placed on suicide observation regardless of whether or not they are "high risk mental health inmate–patients' or current members of the MHSDS. This section should be revised accordingly.

- On page 12, third paragraph from the bottom reads "When an inmate–patient verbalizes suicidal ideation without other signs and symptoms of increased risk of suicide, the mental health clinician is responsible for evaluating any contributing environmental stressors and communicating with custody staff and supervisors regarding any potentially solvable custody issues." This paragraph is seemingly referring to inmates who are using the threat of suicide to gain cell relocation, i.e., are viewed as manipulative and/or malingering. My concern is that inmates who present as manipulative and/or malingering can still be suicidal and require placement on suicide observation status. I would recommend that this paragraph be reviewed again and clarified if necessary.

- On page 14, under Inmate and Cell Search, third paragraph from bottom of page: delete reference to "bed frames" being "removed" from the cell, as well as "on the floor." Insert narrative that all inmates on suicide observation status shall be provided with a suicide-resistant beds.


5

- On page 14, under <u>Inmate and Cell Search</u>: There is no narrative describing what other items or privileges (shower, out-of-cell time, telephone calls, visitation, etc.), if any, is permitted. In my tours of the visited facilities, I found very restrictive conditions for inmates that were on suicide observation status. All inmates were stripped of all clothing and possessions, and given only a safety smock. Except for being offered a shower every other day, they were confined to their cells at all other times, without consideration for out-of-cell time, telephone calls, visitation, etc. I was informed that these were correctional (not mental health) decisions.

  It would be my opinion that such a practice is overly restrictive and seemingly punitive. Confining a suicidal inmate to their cell for 24 hours a day only enhances isolation and is anti-therapeutic. Under these conditions, it is also difficult, if not impossible, to accurately gauge the source of an inmate's suicidal ideation. Take, for example, the daily scenario of a clinician interviewing an inmate on suicide observation status. The inmate has been in the cell for a few days, clothed only in a smock. He rarely has been out of the cell that has an incredibly foul odor because the inmate has not showered (even if it had been offered). The clinician then asks the inmate: "Are you suicidal?" Given the circumstances he finds himself in, the likelihood of an inmate answering affirmatively to that question, the result of which will be his continued placement under these conditions, is highly questionable.

  The management of inmates under suicide observation status can be a complex issue and would require further discussion within CDCR. However, I would argue that the decision to remove clothing and issue a safety smock to an inmate on suicide observation status should be determined on a case-by-case basis *by a mental health clinician*. In addition, unless contraindicated by a clinician following a suicide risk assessment, each inmate on suicide observation status should continue to receive regular privileges (e.g., showers, telephone, visiting, out-of-cell time, etc.) commensurate with their security level.

- On pages 15 and 16, revise definitions of both Suicide Precaution and Suicide Watch as discussed above.

- On page 16 and 17, within the boxes that indicates Guidelines for Clinician-Ordered Suicide Precaution and Suicide Watch: delete reference to "remove all furniture" and insert provision of suicide-resistant beds.

- On page 19, under <u>Discharge or Return</u>: I would argue that inmates sent to the OHU for suicide observation status should receive the same 5-day clinical follow-up as inmates placed in the MHCB for similar reasons. Therefore, delete the last sentence of the second paragraph that begins with "The inmate-patient may, depending on clinical determination, be placed on 5-day clinical follow-up...." and insert the following: "The inmate-patient shall be placed on the 5-day clinical

6

follow-up treatment plan and custody wellness check procedures as detailed below."

- On page 19, under both <u>Discharge or Return</u> and <u>MHCB Discharge</u>: I would recommend deleting the word "imminent" from the paragraphs. As previously detailed above, the lack of imminent or immediate danger of self harm should not be the only criteria for removal from suicide observation status.

- On page 20, at the bottom of the page, the sentence reads that "Custody shall conduct an hourly check of the inmate–patient's discharge from MHCB for the first 24 hours after discharge....If the custody checks are continued, the mental health clinician shall determine whether the checks are to be every hour, every two hours, or every four hours for the next 24–48 hours." I have several concerns regarding this paragraph. Its intent seems to suggest a transitioning from suicide observation status to general population, yet cell checks at 60-minute intervals does not seem like much of a transition. Utilizing the same rationale as the requirement to observe inmates at 30-minute intervals upon their placement into the ASU, the policy should be revised to require that inmates discharged from suicide observation status should be observed at 30-minute intervals upon return to their designated housing unit for a duration determined by the mental health clinician. (It is also concerning that there is program guide narrative regarding observation intervals of between two and four hours. Consistent with standard correctional practice throughout the country, an inmate should never be left unobserved for longer than 60 minutes.)

- On pages 21 and 22, under both the <u>Custody Protocol</u> and <u>Hanging</u> sections: There is reference to the term "if trained to do so" when referring to providing immediate life support by officers. It was my understanding that correctional officers within the CDCR were required to be trained in both first aid and CPR/AED and, if so, this term should be deleted from the program guide.

4) <u>Use of Outpatient Housing Units (OHUs) for Suicide Precautions</u>

According to *Chapter 5: Mental Health Crisis Bed* of the Mental Health Services Delivery System Program Guide, *"Not all crises require admission to the MHCB. Crisis episodes for some inmate–patients may be handled on an outpatient basis."* The overall treatment criteria for a mental health crisis bed includes meeting one of the following two criteria: 1) Treatment and monitoring are provided to any inmate who has *current* symptoms and/or requires treatment for the current DSM diagnosed (may be provisional) Axis 1 serious mental disorders... or 2) Medical necessity: Mental health treatment shall be provided as needed, after review by the Interdisciplinary Treatment Team (IDTT)....

In addition to the overall treatment criteria cited above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

- Marked impairment and dysfunction in most areas (daily living activities, communication and self interaction) requiring 24-hour nursing care; and/or

- Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

- These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

In addition, although *Chapter 5* does not explicitly detail conditions upon which MHCB and/or alternative housing can be utilized for inmate-patients requiring suicide observation, *Chapter 10: Suicide Prevention and Response* allows for the use of out-patient housing units (OHUs) to house suicidal inmates. According to *Chapter 10*, "The preferred location to place an inmate on Suicide Precautions or Watch status is in the MHCB, or in the OHU pending transfer to the MHCB.... Inmate/patients that are placed in the OHU for *continued assessment of suicide risk* or, in an MHCB for *active suicidal ideation, threats, or attempt*, shall have a note regarding progress toward the treatment plan goals and objectives recorded daily by a treating clinician in the Interdisciplinary Progress Notes section of the UHR.

There appears to be several issues for discussion regarding placement of inmate-patients on suicide observation within CDCR facilities. First, the *Mental Health Services Delivery System Program Guide* does not either explicitly endorse or exclude the use OHUs for inmates on suicide observation. In addition, the clarifying language to set certain criteria appears misleading. For example, *Chapter 10* attempts to distinguish use of OHU versus MHCB by suggesting that OHUs are utilized as a location to place an inmate for *continued assessment of suicide risk*, whereas the MHCB is reserved for *active suicidal ideation, threats or attempt*. This distinction is not helpful because the assessment of suicide risk occurs in both units, and inmates that are actively suicidal, expressing ideation or demonstrating self-injurious behaviors could be found in either unit.

In my opinion, the real differences between the two housing locations should be: 1) whether the inmate-patient meets the MHCB admission criteria, which at a minimum includes serious mental illness, and 2) the level of care necessary to treat the inmate-patient's suicidal behavior. As detailed below, not all inmates that appear to be suicidal, as demonstrated by suicidal ideation, gesture, and/or attempt are seriously mentally ill and require an in-patient level of care.

The second issue concerns the standard of care for treating and managing inmates on suicide observation in correctional systems throughout the country. MHCBs within the CDCR are noteworthy for providing a *licensed* 24-hour continuous nursing level of care. It has been my experience in consulting with numerous state departments of corrections throughout the country that not all inmates who are in need of treatment and management under suicide observation require a licensed 24-hour continuous nursing level of care. In fact, few if any, agencies provide in-patient treatment to all inmate-patients placed on suicide observation within the prison system.

For example, the New York State Department of Correctional Services (DOCS) provides 12 out-patient mental health satellite units within selective maximum security DOCs facilities. Each