satellite unit contains a Residential Crisis Treatment Program (RCTP) comprised of both crisis observation cells and dormitory beds. The vast majority of inmates placed on suicide observation are housed in these crisis cells and dormitory beds. The RCTP is not licensed and does not provide a 24-hour continuous nursing level of care. Inmate-patients in DOCS that require extended mental health care are committed to the Central New York Psychiatric Center (CNYPC), a 226-bed maximum security forensic hospital.

It should be noted that the recent settlement agreement in *Disability Advocates, Inc. v. New York State Office of Mental Health et al* [02-Civ. 4002 (GEL] outlines the specific use of RCTP beds for inmate-patients requiring suicide observation:

> a. Length of Stay. The use of observation cells should be no longer in duration than necessary to deal with the mental health crisis which caused the inmate-patient to be placed in observation. Defendants' goal shall be to keep inmates in observation cells for no more than four (4) days and there shall be a presumption in favor of releasing inmates from observation cells within four (4) days. However, any decision on when to release an inmate from an observation cell after more or less than any particular number of days is a clinical judgment. All cases in which an inmate is held over seven days in observation shall be referred to the CNYPC Clinical Director or designee for consultation.
>
> b. Suicide Watch. Constant 24-hour observation will be provided for inmates on suicide watch.
>
> c. Amenities. No inmate should be left in an observation cell without clothing, smock or paper gown, and a paper gown should only be used where there is a specific safety and security need. The specific amenities provided to an inmate in an observation cell must be determined on the basis of clinical need and safety and security considerations relating to the particular crisis involved in each case.
>
> d. Clinical Contact and Treatment. All inmates in observation cells will be seen by clinical staff every day, five days a week, and by nursing staff on two shifts every day, seven days a week. In addition, every inmate in an observation cell will be offered a minimum daily out-of-cell individual session with a therapist and/or psychiatrist, five (5) days a week, Monday through Friday, when this can be done without unacceptable risk to safety and security. Determinations of such unacceptable risk shall be documented in the mental health treatment record.

The entire agreement can be found at:
www.disabilityadvocates.info/complaints/DAIvOMHSettlement.pdf

Having been a consultant to both the New York State Department of Correctional Services (DOCS) and California Department of Corrections and Rehabilitation, I can state with confidence that use of the New York State DOCS' non-licensed RCTP for treating and managing most inmates on suicide observation is comparable to CDCR's use of the OHU program.

Returning to the CDCR, it would appear from the description of the MHCB admission criteria in *Chapter 5*, that not all potentially suicidal inmates, including those that threatened suicide, express suicidal ideation, and/or engage in non-lethal self-injurious behaviors warrant treatment within a mental health crisis bed. There are numerous reasons why inmates engage in self-injurious behaviors, including: 1) To cope with their environment -- it temporarily relieves intense feelings, tension, pressure, anxiety, and anger; 2) As an act of self-punishment in response to feelings of guilt, sexual or violent impulses, low self-esteem; 3) As a way to control and manage pain (unlike the pain experienced through physical or sexual abuse); and 4) To manipulate their environment, e.g., to gain a desired housing unit or cell relocation due to conflicts with other staff or inmates, etc. It is important to realize that not all of these behaviors reflect a serious mental illness.

Not all inmates who become suicidal are seriously and persistently mentally ill and require an in-patient level of care. As former special master J. Michael Keating said in his Report on Defendants' Plan to Expedite Access to a Mental Health Crisis Bed (MHCB) Level of Care in November 2001, "inmates with no mental health involvement may manifest temporarily symptoms of a mental disorder in the correctional environment, especially during the reception process. A rigid requirement to transfer immediately every agitated inmate who enters and OHU makes no sense. As long as the OHU transfers an inmate as soon as it becomes clear that he or she needs, for example a MHCB level of stabilizing care, the 72-hour observation period is acceptable." I would agree.

It should also be noted that while on site and touring several facilities, I learned that due to the shortage of MHCB beds within the system, inmate-patients were being transported offsite to other prison facilities that had MHCB beds. In some cases, transporting an inmate-patient on suicide observation from an OHU level of care on-site to a MHCB level of care off-site, perhaps several hours away, is contraindicated, interrupts the continuity of care, and is not in the best interests of the inmate-patient.

With that said, while I would support the decision to utilize out-patient housing units for the management of certain inmates on suicide observation, the current structure and environment of the OHUs would need to be revised. As you are aware, I toured the Mule Creek State Prison, Deuel Vocational Institution, and the California State Prison – Sacramento. Each of these facilities has an OHU, and both Mule Creek State Prison and California State Prison – Sacramento have MHCBs. The Deuel Vocational Institution is the only reception center in the CDCR system that does not have any mental health crisis beds.

I was quite concerned about the current conditions observed in the OHUs at each facility. The <u>Mule Creek State Prison</u> has an unlicensed mental health outpatient housing unit (MHOHU). Cells utilized to house inmates on suicide observation generally had poor lighting, visibility, and sanitation conditions (i.e., dirty floors and walls, non-sanitized mattresses, etc.).

At the <u>Deuel Vocational Institution</u>, inmates on suicide observation were housed in either OHU or the OHU Overflow unit located alongside the administrative segregation unit on L–Unit. The conditions within the OHU were quite bad, with poor lighting, visibility, and sanitation problems. I had difficulty observing inmates through the cell windows. Many cells contained tile

floors, with pieces of tile previously removed that could easily be utilized for self-injurious behavior. Clinical staff space was quite limited, with a converted cell being utilized as a staff office, storage area, and interview room. Conditions in the OHU Overflow were worse and quite deplorable. All of the inmates in this unit were on constant 1:1 observation with one certified nursing assistant (CNA) assigned to each inmate at significant expense to the CDCR due to the hazardous conditions of each cell. The OHU Overflow is situated in the same area as the ASU. Upon my entrance into the unit, there was a foul odor apparently left from the recent use of pepper spray. Due to this foul odor, many of CNAs were wearing face masks as they were observing each inmate. Similar to the OHU, each cell in the OHU Overflow had poor lighting, visibility, and sanitation. Each inmate was on lockdown status and clothed in a safety smock. It is difficult to understand how this environment is conducive to alleviating the symptoms of suicidal behavior and/or mental illness. In addition, by routinely subjecting an inmate-patient to these conditions, CDCR runs the risk of some suicidal inmate-patients denying any suicidal ideation during clinical interviews in order to avoid continuation of such harsh conditions.

At the California State Prison – Sacramento, I toured both a mental health crisis bed unit (which although unlicensed had receive a waiver to be a MHCB) and a OHU. Within the OHU, the same conditions existed with poor visibility, lighting, and sanitation. Cells in the unit also had hazardous ventilation grates that were conducive to a suicide attempt by hanging. While on the unit, I observed two mental health staff conducting cell-side assessments of inmates that were on suicide observation. I observed these assessments to be very brief, and neither clinician was utilizing the required Suicide Risk Evaluation (Form No. CDCR-7447). When inquiring as to why assessments were not being conducted in a private interview room, one clinician told me that the designated room was not available (although a subsequent inquiry determined that it was, in fact, available).

In addition, as previously stated, basic amenities and privileges for inmate-patients in each facility, such as protective clothing, out-of-cell time, showers, visits, telephone calls, other possessions, etc. are controlled, not by mental health staff but, by custody personnel. This is not appropriate for an OHU and in contrast to how MHCBs are managed. Such decisions should be made by clinical staff based upon the inmate-patient's individual treatment plan.

*In conclusion, it would be my opinion that although OHUs could effectively be utilized for the short-term treatment and management of certain inmate–patients on suicide observations not requiring an acute inpatient level of care, the CDCR would need to significantly upgrade the overall conditions of these units to provide an adequate level of care. For example, OHU cells should be suicide-resistant, contain adequate lighting, visibility into the cell interior, and sanitation (i.e., clean floors and walls, sanitized mattresses, etc.). Daily suicide risk assessments should be conducted with reasonable privacy and confidentiality in an interview room, with cell-side assessments avoided when possible. Nursing staff should also make twice daily rounds of the unit. Unless the inmate-patient has lost basic amenities/privileges as a result of a disciplinary sanction, all decisions regarding protective clothing out-of-cell time, showers, visits, telephone calls, other possessions, etc. should be made by mental health staff based upon the inmate-patient's individual treatment plan.*

*Finally, in an attempt to convince the Special Master, his experts, and the plaintiffs that OHUs could effectively be utilized for the short-term treatment and management of certain inmate–patients on suicide observation status not requiring an acute inpatient level of care, I would strongly recommend that the CDCR argue that it is proposing to lower the threshold for behavior that warrants placement on suicide observation status and, as such, will be in need of additional suicide-resistant cells to house these inmates. It is both impractical and unreasonable to expect that all these inmates will necessitate a MHCB-level of care and, therefore, would be more appropriately housed in an OHU.*

### 5)    Use of Suicide-Resistant Beds in the Correctional Treatment Centers' MHCBs

During my tour of prison facilities that contained correctional treatment centers with mental health crisis beds, I observed that *none* the inmate–patient rooms contained any beds. Upon inquiry, I was informed that hospital beds were automatically removed from the room when it was used as an MHCB for inmate–patients on suicide observation. The rationale for removing hospital beds was that they were hazardous for inmates who had a propensity for engaging in self-injurious behavior. While hospital beds may indeed be hazardous for suicidal individuals, the practice of withholding a bed from an inmate-patient is not an acceptable alternative and does not reflect the standard of care in correctional facilities throughout the country. The standard of care reflects that inmate–patients placed on suicide observation should be housed in a cell or room that is suicide-resistant and includes a bed that is suicide-resistant. Current CDCR policy allows for inmate-patients to be housed in a MHCB for up to 10 days, and forcing them to sleep on a mattress on the floor is, at a minimum, degrading and seemingly punitive, however unintentional it might be. As previously stated, it is difficult to understand how forcing an inmate to sleep on a mattress without a bed is conducive to alleviating the symptoms of suicidal behavior and/or mental illness.

Suicide-resistant beds are readily available to correctional facilities throughout the country, either through purchase from a private vendor or manufactured by the agency itself. While the plaintiffs have pointed to the use of ModuForm beds in several CDC facilities that house inmate-patients on suicide observation, I also observed suicide-resistant beds during my tour of non-MHCB areas that simply included bunk construction that was securely bolted to the floor and flush with the walls, with a metal skirt covering the entire bunk thus ensuring no anchoring points from which a ligature could be tied.

In conclusion, there is simply no security or therapeutic rationale for prohibiting inmates from having suicide-resistant bedding. Therefore, I would strongly encourage the CDCR to ensure that any inmate-patient placed on suicide observation is housed in a room or cell within a OHU or MHCB that contains a suicide-resistant bunk.

### 6)    Use of "ZZ" Cells for Housing Inmate-Patients on Suicide Observation

While touring the CDCR facilities, and in particular the California State Prison–Sacramento, I observed the use of "ZZ" cells for the housing of inmate–patients on suicide observation. Three

(3) inmates were observed in these cells at California State Prison–Sacramento during my tour. These cells are normally located outside common areas and/or corridors of housing units and were originally intended for the temporary housing of inmates in transit. They appear to more resemble temporary holding cells. I was informed that these ZZ cells were being utilized to house inmate-patients on suicide observation who were awaiting placement into the MHCB. These cells appeared very small and I was also told that an inmate–patient can remain in these holding cells under lockdown status for several days while awaiting an appropriate housing assignment. During this time, inmates are on constant 1:1 observation with a CNA assigned at significant expense to the CDCR due to the hazardous conditions of each cell. There is no discussion about utilizing ZZ cells for inmate-patients on suicide observation status in the *Mental Health Services Delivery System Program Guide*. Once the CDCR significantly upgrades the overall conditions of OHUs to provide an adequate level of care, I would strongly encourage the agency to prohibit the use of these ZZ cells for suicide observation.

### 7)   Expanded Use of the Mental Health Tracking System

CDCR currently has a Mental Health Tracking System i.e., a standardized automated system of record management and case tracking. During my on-site visit to CDCR headquarters, as well as various prison facilities, I was informed that the Mental Health Tracking System does not routinely collect data on *all* inmates who have attempted suicide, engaged in self-injurious behavior, or otherwise been placed on suicide observation.

It is extremely important for a clinician assessing suicide risk to not only gather self-reported information from the inmate–patient, but also any relevant information gathered from external sources, e.g., the Mental Health Tracking System. Although it is my understanding that the CDCR has expressed a willingness to collect historical data on previous suicidal behavior for inmate–patients who are *currently* in the Mental Health Services Delivery System (MHSDS), there has been a reluctance to collect such data for *all* inmates (i.e., non-MHSDS).

It is been my experience that a significant percentage of inmates who commit suicide in correctional facilities throughout the country are *not* on a mental health caseload at the time of their deaths. In fact, within the CDCR, it appeared that more than 42% of the inmate suicides during 2010 were non-MHSDS inmates. It has also been my experience that a number of prison suicide victims not only had a mental health history, but a history of suicidal and/or self-injurious behavior. In fact, CDCR's own data indicates that 48% of inmates who committed suicide during 2007 had a history of suicidal behavior.[2] This is a very significant finding.

I have recently been informed that the CDCR is committed to creating a new generated alert system for those inmates with a "High Acute Suicide Risk." This term was not defined and it was unclear how many current CDCR inmates would be classified under this status, nor whether it would include both MHSDS and non-MHSDS inmates. Nevertheless, it is strongly recommended that the CDCR begin utilizing the Mental Health Tracking System to collect data on *all* inmates (including non-MHSDS) who has been placed on suicide observation, to include

---

[2]Canning, R.D. (2009), *Annual Report of Suicides and Suicide Prevention in the CDCR for Year 2009*, Sacramento, CA: California Department of Correction and Rehabilitation.

13

inmates attempting suicide and/or engaging in self-injurious behavior. The collection of such data will serve as an invaluable tool for a mental health clinician's suicide risk assessment.

Quite frankly, it is difficult to see any downside to expansion of the Mental Health Tracking System to include all inmates (including non-MHSDS) who has been placed on suicide observation. The inclusion of data of all inmates who were on suicide observation status will not necessarily increase the number of inmates placed on suicide observation. The data will simply provide clinicians with more tools in their toolbox to assess current suicide risk, as well as decreasing potential liability to the CDCR.[3]


8)    **Suicide Prevention Training Curricula**

Several suicide prevention training curricula were reviewed, including the lesson plan entitled *Mental Health Services Delivery System* for the Basic Correctional Officer Academy. This lesson plan includes a 2.5-hour instruction on Crisis Intervention and Suicide Prevention. Although the lesson plan has very good content in these two subject areas, it was last revised in 2008 and is in need of revision. I would recommend adding the following sections: 1) self-injurious v. suicidal behavior and effectively dealing with manipulative inmates; 2) identifying inmates at risk for suicide despite their denial of risk; 3) updated research on CDCR suicides, and 4) identified problem areas and corrective actions from previous Suicide Review reports.

A 1-hour lesson plan for Health Care New Employee Orientation entitled *Suicide Prevention* was also reviewed. The content is adequate, but the 1-hour duration is not and wrongly suggests that health care employees need less suicide prevention training then correctional personnel. This workshop should be expanded to 2.5 hours and contain the same information as offered in the Basic Correctional Officer Academy lesson plan referenced above.

Finally, a 1-hour In-Service Training lesson plan entitled *Suicide Prevention* was reviewed. This lesson plan is designed for annual instruction to all CDCR employees. The content is very good, but the workshop should be expanded to 2 hours and include discussion of identified problem areas and corrective actions from previous Suicide Review reports.

It is my firm belief that the problem areas and corrective actions identified in individual Suicide Review reports are pertinent not only to the individual facilities that sustained the death, but to all CDCR facilities. Therefore, while ensuring confidentiality of inmate and facility names, all staff should have knowledge of these potential problem areas and recommended corrective actions. The most appropriate forums for presenting this knowledge are pre-service and annual training workshops.

---

[3] An effective argument could be made that, if an inmate committed suicide and their previous placement on suicide observation status was unknown to a clinician during an assessment, the State could be held liable in a wrongful death case for having knowledge of the information but not allowing clinicians easier access to the data.

9) **Local Suicide Prevention and Response Focused Improvement Team (SPR-FIT)**

*Chapter 10: Suicide Prevention and Response* sets out various specific responsibilities for the local Suicide Prevention and Response Focused Improvement Team (SPR-FIT). The following review of the Suicide Reports from the 2010 inmate suicides, it would appear that many of the deficiencies cited in each case, as well as the responsible parties for corrective actions, fall within the responsibility of the local SPR-FIT. One of the inherent responsibilities of the SPR-FIT system should be to systemically strive for a decrease in both the rate and number of inmate suicides, but that has not occurred. The question is - Why? It would be my opinion that CDCR needs to determine if the local SPR-FITs are functioning effectively, including whether they are operating as reactionary committees following a bad outcome or trying to proactively prevent a bad outcome. For example, each local SPR-FIT is required to meet at least monthly, with various responsibilities that include, but are not limited to, ensuring compliance with all CDCR policies and procedures, suicide prevention procedures, 5-day clinical follow-up treatment plans, etc. However, when I toured each of the three facilities, I observed numerous poor practices in the area of suicide prevention that should have previously been identified by each of the local SPR-FITs.

For example, at Deuel Vocational Institution, clinicians were utilizing an assessment form entitled "Suicide Risk Assessment," a slightly different version of the CDCR-mandated Suicide Risk Evaluation form that did *not* contain the treatment planning section. At Mule Creek State Prison, clinicians were utilizing a "psychiatric observation" status that required observation at 15-minute intervals for inmates that were being transitioned from Suicide Precaution/Suicide Watch, were at risk to others, and/or assessed as gravely disabled. Although this observation status level might be an excellent idea, it appears to be a local practice and not authorized within *Chapter 10: Suicide Prevention and Response*. Of interest, clinicians at the facility could not even point me to any locally written policy or description of the practice. At the *California State Prison – Sacramento*, I observed two different certified nursing assistants (CNAs) in *both* correctional treatment centers falsifying observation logs of inmates on suicide observation status (i.e., making notations on the forms for time intervals that had not yet occurred). In another unit, CNAs were utilizing an observation form that had staggered time intervals already pre-printed on the form that had been developed by the facility's nursing department. Finally, following review of medical charts at all three facilities, I had concerns regarding the adequacy of documentation on the SREs to justify discharge from suicide observation status. In several of the reviewed charts, SREs required for discharge from suicide observation status and 5-day follow-up progress notes were missing or never written.

In conclusion, most, if not all, of these deficiencies were easily observable and should not have been identified for the *first* time by an outside consultant. The fact that I easily identified these issues speaks to the questionable effectiveness of the local SPR-FITS at these facilities, and perhaps systemwide.

**10)** <u>**Use of Administrative Segregation Units for Suicide Observation**</u>

Although CDCR officials have entertained the possibility of utilizing administrative segregation unit (ASU) cells as an option for the housing and management of inmates on suicide observation status, given the current inadequate and inconsistent practices of effectively managing such inmates in the OHUs, it would appear premature to discuss an ASU option until the State has demonstrated good practices in other areas. In fact, if the State can eventually demonstrate to the Special Master, his monitoring team, and the plaintiffs that the OHUs are a viable alternative to MHCB placement for selective inmates, the option for utilizing ASU cells might not be necessary.

## Concluding Thoughts

Where does the CDCR go from here? It is my opinion that the State's ability to remove itself from the suicide prevention requirements of the *Coleman* case are predicated upon its ability to maintain a robust quality improvement program. The Suicide Review process of DCHCS's Suicide Case Review Subcommittee and mental health suicide reviewers is among its strengths, yet its inability to historically reduce the number of corrective actions in these cases and the corresponding questionable effectiveness of the local SPR-FITs is among the greatest weaknesses.