IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

        Plaintiffs,             No. 2:90-cv-0520 LKK JFM P

   vs.

EDMUND G. BROWN, JR., et al.,

        Defendants.       <u>ORDER</u>

_____/

By order filed January 17, 2013, the court directed the Special Master to file within fourteen days his expert's Report on Suicides Completed in the California Department of Corrections and Rehabilitation (CDCR) in Calendar Year 2011 (Report or 2011 Suicide Report).[1] Order filed January 17, 2013 (ECF No. 4297) at 2. Pursuant to that order, any objections to the 2011 Suicide Report were to be filed within fifteen days of its filing. <u>Id</u>. On January 25, 2013, the Special Master filed the Report (ECF No. 4308), prepared by his expert, Dr. Raymond Patterson. On February 11, 2013, defendants filed objections and a motion to strike or modify portions of the Report (Objections) (ECF No. 4326). On February 21, 2013, after receiving leave of court to do so (ECF No. 4337), plaintiffs filed an opposition to

---

[1] The order was precipitated by motions filed by defendants on January 7, 2013 to terminate this action and vacate the judgment and orders of this court (termination motion), and to modify or vacate the population reduction order of the three-judge court.

1  defendants' objections and motion to strike or modify the Report (Plaintiffs' Opposition) (ECF

2  No. 4350).  Defendants' objections and motion to strike or modify the Report are resolved

3  herein.[2]

4         As with their objections to the Special Master's Twenty-Fifth Round Monitoring

5  Report, defendants' principal objection to the Report is that it is not focused on a constitutional

6  standard.  See Objections at 1.  In this context, defendants assert that "[t]he Constitution requires

7  that the State establish a basic program to identify, treat, and supervise inmates with suicidal

8  tendencies; it does not mandate that the prisons eliminate all suicide risks."  Id.  Citing to their

9  termination motion, defendants contend that "California's prison system exceeds that standard

10 because the State has fully implemented and staffed a thorough, standardized suicide-prevention

11 and investigation program."  Id.  The termination motion is not before the court at this time.  The

12 court will consider defendants' arguments and evidence in support of the termination motion

13 when that motion is fully briefed and argued.

14 I.  Overall Objections to Statements in Report

15        Defendants interpose a number of specific objections to the Report.  Each is

16 addressed in turn.

17    A.  Total Number of CDCR Inmate Suicides in 2011

18        Defendants object to the finding that there were 34 inmate suicides in calendar

19 year 2011 and, on that basis, move to strike the finding "the rate of CDCR inmates suicides in

20 2011 was 21.01 per 100,000, which was essentially unchanged since 2010, when it was 21.1 per

21 100,000."  Objections at 6 (quoting Report at 1.)  Defendants contend that the conclusion that the

22 death of inmate HH "was more likely than not to have been a suicide" is "speculative and lacks

23 foundation."  Objections at 6.  In support of this contention, defendants note that the case was

24

25      [2]  On March 13, 2013, pursuant to this court's January 20, 2013 order (ECF No. 4319),
   the Special Master filed a report on inmate suicides completed in the CDCR in the first half of

26 2012 (ECF No. 4377).  Pursuant to the January 20, 2013 order, objections to that report are due
   ten days from its filing and will be resolved by separate order.

1   referred to the Solano County District Attorney's Office for criminal investigation, that the

2   CDCR suicide reviewer "could not conclude that the death was a suicide" and that "additional

3   information" in the case review for this inmate's death set forth in Appendix F of the Report

4   "reflects that the death may not represent a suicidal hanging." Id.

5          The case review for this inmate's death, set forth in Appendix F of the Report,

6   shows that there is sufficient evidence to support the finding. See Report at 282-290.  Included

7   in the case review is the fact that the death was processed as a possible homicide and "a CDCR

8   Form 7229-B report of inmate suicide to the suicide response coordinator at DCHCS was filed."

9   Id. at 287.  Defendants have tendered no evidence of the outcome of the criminal investigation,

10  nor any evidence that the death has been definitively ruled a homicide, nor any evidence that

11  Inmate HH's cellmate was prosecuted for homicide.  Dr. Patterson's finding that inmate HH's

12  death "was more likely than not to have been a suicide" is neither speculative nor without

13  foundation and this objection is therefore overruled.

14         Defendants' expert, Dr. Joel Dvoskin, states in his report that this death was

15  "declared a homicide by the coroner."  Dvoskin Response to 2011 Suicide Report, attached as

16  Ex. 1 to Declaration of Debbie Vorous (hereafter Dvoskin Resp.), filed February 11, 2013 (ECF

17  No. 4326-6), at 26.  In the Report's case review for inmate HH, Dr. Patterson noted first that the

18  coroner was to make a "final determination of the manner of death" and thereafter that "the

19  coroner's report did not state a manner of death."  Report at 284.  Dr. Patterson specifically

20  invited any additional information in this regard.  See Report at 290 ("Lastly, it is the Special

21  Master's reviewer's analysis that the assumption by CSP/Solano clinicians that this was a suicide

22  was correct. The pathologist's report of the autopsy as this death possibly being staged left an

23  open question that was never addressed by the pathologist in any of the documents that were

24  presented to bring closure, other than the death was from asphyxiation. *If there is additional*

25  *information based on the investigative services report or other investigations or analysis that*

26  *would suggest that this death was more likely a homicide or accident, that information should be*

1   *provided or disclosed for further review.*) (Emphasis added.)

2         The reason for the discrepancies concerning the coroner's report for this inmate's

3   death is not clear on the record before this court.  Moreover, those discrepancies must be

4   resolved prior to ruling on defendants' motion to modify the findings concerning the rate of

5   CDCR inmate suicides in 2011.  Good cause appearing, defendants will be directed to forthwith

6   file a copy of the final coroner's report for this inmate's death under seal and to provide a hard

7   copy to the Special Master.  Ruling on defendants' motion to modify the findings concerning the

8   rate of CDCR inmate suicides in 2011 is deferred pending review of the final coroner's report for

9   inmate HH's death.

10       B.  <u>Language Concerning 2011 Suicide Rate in CDCR Prisons and Comparison to Other

11   Suicide Rates</u>

12         Defendants move to strike language in the Report comparing the inmate suicide

13   rate in CDCR prisons unfavorably to other U.S. state prison systems and the U.S. federal prison

14   system and describing the suicide rate as "growing" and "worsening."  Objections at 6-7.  This

15   request essentially tracks objections and a request to strike made by defendants in response to the

16   Special Master's Twenty-Fifth Round Monitoring Report and will be denied for the reasons set

17   forth in this court's February 28, 2013 order. <u>See</u> Order filed February 28, 2013 (ECF No. 4361),

18   at 7-8.[3]  As set forth in that order, the question of whether defendants' suicide prevention efforts

19   are consistent with the requirements of the Eighth Amendment is reserved for hearing on

20   defendants' termination motion.

21   /////

22

---

23      [3]  Defendants also contend in the instant objections that there is "no evidence to support a presumption these allegedly higher rates 'are the result of inadequate or poor mental health

24   services.'"  Objections at 7 (quoting Dvoskin Resp. at 5).  This objection is overruled.  The Dvoskin Response does not stand for the proposition for which it is cited.  Rather, Dr. Dvoskin

25   states that "In order to determine the causes of [the higher inmate suicide rates in California], one must not presume that they are the result of inadequate or poor mental health services, and consider other alternative explanations as well."  Dvoskin Resp. at 5.

26

1    /////

2

3        C.  Language Concerning Total Number and Percentage of CDCR Inmate Suicides with
     "At Least Some Degree of Inadequacy in Assessment, Treatment, or Intervention" and Total
4    Number of Those that Were Foreseeable and/or Preventable

5            Defendants next move to strike findings that in 25, or 73.5% of 34 inmate

6    suicides in 2012 there was "at least some degree of inadequacy in assessment, treatment or

7    intervention" and that at least 24 of those inmate suicides were "foreseeable" or "preventable."[4]

8    Objections at 9.  Defendants contend generally that the Report's "resort to this classification

9    system is speculative, misleading, lacks foundation, and is irrelevant to the governing legal

10   standard."  Id. at 10.  In support of this general contention, defendants argue that (1) causation

11   for suicide should not be inferred from findings that a suicide was foreseeable or preventable; (2)

12   that Dr. Patterson has included suicides "where the foundation for the conclusion is lacking or is

13   speculative or subject to two reasonable clinical decisions"; and (3) that he has included

14   reference to degrees of inadequacy without evidence that the inadequacy caused the suicide.[5]  Id.

15   The first and third of these contentions raise questions concerning what evidence bears on the

16   question of defendants' compliance with the requirements of the Eighth Amendment.  They are

17   not bases for striking the challenged findings.  The second contention is addressed infra.

18            1.  Motion to Strike Language that 24 Suicides were Foreseeable or Preventable

19            Defendants contend that linking the two categories of analysis – suicides

20   involving some degree of inadequacy in assessment, treatment, or intervention, with suicides that

21   were "foreseeable" and/or "preventable" – "makes it difficult to determine whether and how the

22   _____

23        [4]  For the reasons set forth supra, the court leaves aside for the moment the question
     whether there were 33 or 34 inmates suicides in CDCR prisons in 2012 and the related question
24   of the percentages of suicides in each category.

25        [5]  Defendants also assert that the challenged findings "fail to recognize the State's
     systemwide attention to suicide prevention and investigation of suicides" and "draws no
26   established relationship between the 25 cases" and requirements of the U.S. Constitution.
     Objections at 10.  These arguments are for the termination motion, not the matters at bar.

                                            5

1   alleged failures may have contributed to the suicide" and that use of these "vague terms is

2   inherently misleading." Objections at 10. Defendants also contend that linking the findings

3   concerning inadequacy in assessment, treatment or intervention with findings concerning the

4   number of suicides that were foreseeable or preventable "creates an unfairly negative impression

5   of the State's mental health and suicide prevention" and "makes it difficult to determine whether

6   and how the alleged failures may have contributed to the suicide." Objections at 10 (citing

7   Dvoskin Resp. at 3).[6]

8           By their contention that the terms "foreseeable" and "preventable" are "vague",

9   defendants renew an objection that was overruled by this court almost ten years ago. See Order

10  filed July 25, 2003 (ECF No. 1536), at 5-6 (overruling defendants' objection to standards used to

11  monitor completed suicides); see also Fifth Suicide Report filed April 28, 2005 (ECF No. 1658),

12  at 2-3 (suicide report "continues to embrace the concept of 'foreseeable' and 'preventable'

13  suicides, concepts that have been discussed in considerable detail, reviewed and critiqued by the

14  parties and confirmed by the court as appropriate for purposes of analyzing the adequacy of the

15  defendants' suicide prevention efforts.").[7] The concepts are well-defined in this action.

---

16      [6] Citing to Dr. Dvoskin's response, defendants suggest that the "findings and
    recommendations" should be categorized as "institutional or systemic, based on the seriousness
17  of the error." Objections at 10 (citing Dvoskin Resp. at 3). Dr. Dvoskin suggests that there is a
    "much more useful" way of categorizing errors and improvements than by the findings of
18  whether a suicide was "foreseeable" and "preventable" as used by Dr. Patterson. Dr. Dvoskin
    writes:
19              Specifically, I continue to believe that findings and
                recommendations should be categories as institutional or systemic,
20              based on the seriousness of the error, and whether the error was:
                1) unrelated to the death; 2) speculatively or possibly related to the
21              death; 3) definitely related or contributory to the death; or 4)
                directly causal to the death (alleged or confirmed). An additional
22              category should include errors that were post-mortem, such as
                documentation or notification errors." This will clarify vague
23              terms such as "preventable," making it much more clear whether
                and how alleged failure may have contributed to a suicide.
24  Dvoskin Resp. at 2. However, Dr. Dvoskin has not used his proposed method of analysis in his
    review of the individual inmate suicides in 2011. See Dvoskin Resp. at 2.
25
26      [7] Neither party objected to the Fifth Suicide Report, and the recommendations contained
    therein were adopted by this court in an order filed June 10, 2005 (ECF No. 1668).

> The term "foreseeable" refers to those cases where information
> already available about an inmate indicates the presence of a
> substantial or high risk for suicide, which requires reasonable
> clinical, custody and/or administrative intervention(s).  Assessment
> of the degree of risk, whether high, moderate or low to none, is an
> important component in determining foreseeability.  In contrast to
> a high and immediately visible risk a "moderate" risk of suicide
> involves an ambiguous set of circumstances that requires
> significant clinical judgment based on adequate training and a
> timely assessment to determine the level of risk and the most
> appropriate and relevant interventions to prevent suicide.  As
> previously defined, those individuals evaluated as "low risk," "no
> risk" or "negligible risk" may require some degree of monitoring
> and subsequent evaluation, with appropriate notification of clinical
> and custody staff of the potential for self injury and/or suicidal
> ideation or activity.
>
> "Preventable" applies to those situation in which, if some
> additional information [had] been gathered and/or some additional
> intervention(s) taken, usually as required in existing policy, the
> likelihood of a completed suicide might have been reduced
> substantially.  These concepts of "foreseeable" and "preventable,"
> in turn, reflect the adequacy of the defendants' suicide prevention
> policies and procedures, training and the implementation and
> supervision of policies and procedures, as well as clinical
> judgment.

Fifth Suicide Report at 2-3; see also Eleventh Monitoring Report, filed June 10, 2003 (Doc. No.

1519), at 286.[8]  These definitions are included in the 2011 Suicide Report.  Report at 4-5.  Dr.

Patterson has also identified several possible interventions for inmates assessed at moderate risk

for suicide:

> Interventions may include but are not limited to changes in clinical
> level of care, placement on suicide precautions or suicide watch,
> and changes in housing including utilization of safe cells and
> transfers to higher levels of care, as well as clinically appropriate
> treatment and management services which may include but not be
> limited to increased contacts/assessments by mental health
> professionals, medication management review and changes, other

---

[8]  In addition, plaintiffs have shown that the terms are used by experts in the field of
correctional health care, including defendants' expert.  See Plaintiffs' Opposition at 5 (quoting
article co-authored by, inter alia, defendants' expert Joel A. Dvoskin and Jeffrey L. Metzner, an
expert for the Special Master in this action, setting forth "overriding obligation of  correctional
facilities "to protect inmates or detainees from foreseeable and preventable harm.").

> therapeutic interventions and measure, and/or changes in level of
> care, including short-term changes such as utilization of MHCBs
>
>  and/or longer term level-of-care changes including transfer to
> DSH programs.

Id. at 4.  He has also elaborated on the types of suicides that "may have been preventable."
These

> include not only cases in which additional information might have
> been gathered or additional interventions undertaken, but also
> cases involving issues with emergency response by custody and
> clinical staff.  The emergency response is reviewed not only by
> DCHCS mental health staff but also by DCHCS medical staff as
> part of the death review summary process, as well as by this
> reviewer.

Id. at 5.[9]  Defendants' suggestion that the terms "foreseeable" and "preventable" are vague is
frivolous.

If defendants are also contending that "inadequacy in assessment, treatment or
intervention" is "speculative, misleading or without foundation," Objections at 10, that
contention too is without merit.  Appendix F to the Report contains extensive and detailed case
reviews of each inmate suicide which describe, if found, inadequacies in assessment, treatment
or intervention in each case, as well as the basis for the determination that a suicide was
foreseeable, preventable, both, or neither.  In Section IIIC of the Report, Dr. Patterson describes
with specificity particular types of inadequacies in assessment, treatment, or intervention, with
citation to specific case reviews in Appendix F.  Report, at 9.  In Section IIID of the 2011
Suicide Report, Dr. Patterson states that the findings summarized in Section IIIC "were based on
the presence of information that was or should have been available to clinical staff" and that
"[t]hese suicides were, therefore, most probably foreseeable and/or preventable."  Id. at 10.
There is nothing "vague" or "misleading" about Dr. Patterson's analysis or the terminology that

---

[9]   As the court has previously found, the conclusion that an inmate suicide is
"foreseeable" and/or "preventable" is within the scope of Dr. Patterson's expertise.  See Order
filed November 23, 2009 (ECF No. 3731), at 12.

1   he uses. The basis for these findings is neither speculative, misleading, nor without foundation.

2   /////

3          The primary basis for defendants' motion to strike these findings is their

4   contention that the grouping together of all suicides that involved "at least some degree of

5   inadequacy in assessment, treatment, or intervention" and all the suicides that were "foreseeable"

6   or "preventable" is misleading.  See Objections at 10-11.  This argument goes to the weight to be

7   given particular findings in the Report in connection with this court's assessment of the

8   adequacy of defendants' suicide prevention program which, as discussed above, will be before

9   the court on defendants' termination motion.  It is not a basis for striking the challenged findings.

10          Finally, defendants contend that "the statistics lump together alleged errors by

11   CDCR personnel with those under the control of the *Plata* receiver" and that it "seems unfair" to

12   blame CDCR for things done by staff they have no control over.  Objections at 11 (citing

13   Dvoskin Resp. at 3.)  Elsewhere in the objections, defendants cite to two suicides, those of

14   inmates identified as J and S, in which they contend "the error in care was not under the control

15   of the State."  Objections at 21.

16          The case review for Inmate J in Appendix F of the Report includes three problems

17   identified by the CDCR suicide report for this inmate:  (1) the evening before Inmate J's suicide

18   a licensed psychiatric technician (LPT or psych tech) failed to follow through with necessary

19   contacts after Inmate J threatened self-harm; (2) "[t]he primary clinician missed weekly contacts,

20   including one due the week of the suicide"; and (3) intake information when Inmate J threatened

21   self-harm was not documented in the record, no suicide risk evaluation was completed "despite

22   the history of suicide attempts and ideation," and followup did not show that the inmate's

23   records from another prison had been reviewed.  Report at 121.  Defendants' contention that the

24   error in Inmate J's case was not made by staff in CDCR control is based on the error by the

25   psych tech.  See Objections at 15.  As noted above, the error by the psych tech was not the only

26   problem

1    /////

2    /////

3    /////

4    identified by CDCR in connection with this suicide.  Even if psych techs were completely

5    outside defendants' control,[10] the other two problems certainly involved CDCR staff.

6                    Defendants' assertion that Inmate S's suicide should not be attributed to

7    defendants is frivolous.  The objection, in its entirety, reads:

> This inmate suffered from a deteriorating medical condition
> including pain, serious weight loss, and inability to eat and
> maintain hydration.  (ECF No. 4308 at 199.)  The report states that
> this suicide 'appears to have been possibly foreseeable and highly
> likely preventable" had mental health clinicians deemed this
> inmate's medical condition a "risk factor" and had measure been
> taken by medical clinicians to collaborate with mental health
> clinicians.  (*Id*.)  Thus, it appears that "pain was the likely cause of
> his suicide," and that "more successful medical care may have
> likely prevented this man's suicide."  (Dvoskin Resp. to 2011
> Suicide Rep. at 19).

14   Objections at 18.  As defendants' objections describe, it is plain that the findings concerning this

15   inmate's suicide implicate both mental health staff under CDCR's control as well as medical

16   staff.  See also Appendix F at 199.

17                   Neither suicide cited by defendants involved inadequacies in assessment,

18   treatment, or intervention, or circumstances which rendered the suicide foreseeable or

19   preventable, that were attributable solely to staff over which CDCR had no control.  This

20   contention is without merit.

21                   For all of the foregoing reasons, defendants' motion to strike the Report's finding

22   that 24 suicides were "foreseeable" or "preventable" will be denied.

23                   2.  Inadequate Assessment in Clinical Assessment, Evaluation, and Treatment

---

24        [10]  It is not at all clear from the record that this assertion is true.  At a minimum,
defendants' suggestion that they have no control over the psych tech is called into question by
25   the fact that an Investigative Services Unit has referred the matter to CDCR's Office of Internal
Affairs.  Appendix F at 121.  However, the court need not resolve this question in order to
26   dispose of the objection at bar.

1    Defendants object and request to strike or modify the report's finding that "in 50

2    percent [or 17] of the suicide cases in 2011, inmate suicide risk evaluations were either not done,

3    or found levels of 'low' or 'no appreciable' risk of suicide, without adequate consideration of

4    risk factors, past history, and/or review of medical records."  Objections at 12.  Defendants

5    contend that "the analysis lacks foundation, is speculative (not judged by what was known at the

6    time of the decision), fails to connect the inadequacy to the suicide, blames the State for suicides

7    outside of its control, and disregards the State's systemwide attention to suicide prevention and

8    investigation of suicides."  Id.  Defendants interpose objections and requests to strike specific

9    findings in each of the seventeen cases.  Id.

10    First, the court here will only address defendants' contentions that Dr. Patterson's

11    analysis lacks foundation or is speculative.  The last three of defendants' five contentions go to

12    issues directly related to the pending termination motion.  As already discussed, those

13    contentions are not a basis for striking or modifying the Report, and nothing in this order affects

14    defendants' right to make all appropriate arguments of fact and law in connection with their

15    termination motion.

16    Second, the court observes that defendants' request to strike statements from

17    individual case reviews goes far beyond the challenged finding:  that in each case a suicide risk

18    evaluation was "either not done, or found levels of 'low' or 'no appreciable risk of suicide,

19    without adequate consideration of risk factors, past history, and/or review of medical records."

20    Instead, defendants challenge a variety of conclusions drawn by Dr. Patterson, primarily whether

21    a suicide was foreseeable or preventable.  See Objections at 12-21.[11]  As noted above, Dr.

22    Patterson is well-qualified to opine about whether a suicide was foreseeable or preventable.

23

_____

24    [11]  In some instances, defendants also seek an additional finding that there can be no
finding that the State was "deliberately indifferent" with respect to a particular suicide.  See, e.g.,
25    Objections at 13 (Inmate E), 14-15 (Inmates I and K), 16 (Inmate O).  Dr. Patterson was not
required to make determinations concerning deliberate indifference in the Report and
26    defendants' request for such modifications is denied.

1     In addition, defendants' expert, Dr. Dvoskin, stated in his response that "in

2     reviewing the individual cases, I agree with many of Dr. Patterson's findings, . . . [and] [e]ven

3     where we disagreed, in most cases there were simply two alternative and equally reasonable

4     ways to look at the case." Dvoskin Resp. at 2. Unless defendants are also contending that their

5     own expert's analysis of individual cases "lacks foundation", the objection is belied by

6     defendants'

7     own evidence and is frivolous. For that reason, and to the extent that this objection is different

8     from defendants' legal argument in support of their termination motion, it is overruled.

9          3. Non-Completion of Timely Custody Welfare Checks

10          Defendants' next objection and request to strike or modify findings concerns non-

11    completion of timely custody welfare checks. It is also frivolous. The challenged finding reads

12    in its entirety:

13          In five of the suicide cases in 2011, identified as inmates G, R, X,
             AA, and EE, *rigor mortis* had already begun prior to discovery of
14           the inmate's body.[12]  In three of the five cases, the inmate was
             housed in administrative segregation at the time of the suicide.
15           The onset of *rigor mortis* indicates that in these five cases at least
             two to four hours had passed since the time of death before the
16           bodies were discovered, underscoring the importance of timely
             welfare and custodial checks.

17

18    Report at 2-3 (footnote in original). Defendants contend inmate EE should not be included in

19    this group because his suicide was "not found to be foreseeable or preventable", that inmate X

20    should not be included in this group because he was not housed in a place where hourly custody

21    security checks or welfare checks were required, that the conclusions concerning inmates G and

22    R must be stricken because the State has corrected any errors in connection with those two

23    suicides, and the conclusion concerning inmate AA must be stricken because "any assertion that

24

25          [12]  *Rigor mortis* is defined as "the stiffness of joints and muscular rigidity of a dead body,
      caused by depletion of ATP in the tissues. It begins two to four hours after death and lasts up to
      about four days, after which the muscles and joints relax." COLLINS ENGLISH
26    DICTIONARY (2003 ed.)

1    errors may have contributed to this inmate's death are speculative."  Objections at 23.  None of

2    the objections raised are responsive to the facts reported by the Special Master's expert: all five

3    of these inmates were dead in their cells, undiscovered, for at least two to four hours.  Nor do

4    defendants' objections undermine Dr. Patterson's conclusion that these facts "underscore" the

5    /////

6    need for "timely welfare and custodial checks."  Report at 3.  The objection is overruled and the

7    request to strike the findings will be denied.

8                    4.  Timely and Appropriate Performance of Emergency Response Procedures

9                    Defendants object and move to strike inclusion of eleven of the sixteen suicide

10   cases identified by the Special Master's expert as cases in which "cardiopulmonary resuscitation,

11   including availability or use of the Automated External Defibrillator (AED) and/or use of first

12   aid, were not performed in a timely and/or appropriate manner."  Objections at 23 (quoting

13   Report at 3).  Defendants contend that three of the cases were suicides that were neither

14   "foreseeable" nor "preventable" so that inclusion of the cases as examples of untimely

15   emergency response is "unfair and misleading" and that in the other eight cases the report "fails

16   to relate – or inaccurately relates – the allegation of an untimely emergency response to any

17   finding of preventability."  Id.  To the extent that this objection is different from defendants'

18   legal arguments it is frivolous.  Defendants tender no evidence that calls into question the facts

19   reported by the Special Master's expert concerning the untimely and/or inappropriate use of CPR

20   and/or first aid in these cases.  The objection is overruled and the motion to strike or modify this

21   portion of the report will be denied.

22          D.  Compliance with Reporting Requirements

23                    Defendants move to strike the finding that "CDCR failed to comply with post-

24   suicide review and reporting timeframes in seven . . . cases in 2011" on the ground that there is

25   no evidence to support it.  Objections at 25.  Appendices A and B to the Report are charts which

26   show that in at least seven instances the Program Guide timeframes for suicide reports and/or

1   quality improvement plans were not met.  See Appendices A and B to Report (suicide reports for

2   Inmates B, D, G, H, L, N, O, P, Q, R, S, and U completed after sixty day period; quality

3   improvement plans for Inmates B, G, H, L, and Q completed after one hundred fifty day period).

4   Defendants acknowledge that they did not meet Program Guide timelines for quality

5   /////

6   improvement plans for three of the suicides on three occasions when quality improvement plans

7   were required.  Objections at 26.  The motion to strike will be denied.

8           Defendants also object to what they characterize as a complaint in the Report

9   "that CDCR's failure to timely upload suicide review materials is the root cause of his inability

10  to submit a comprehensive report on 33 suicides in 2011 until January 2013."  Objections at 27.

11  This objection mischaracterizes an extended discussion at pages 12-16 of the Report and is

12  overruled.

13  II.  Recommendations

14          Finally, in spite of the fact that their own expert concurs with the

15  recommendations in the Report, see Dvoskin Resp. at 2, defendants object to those

16  recommendations.  Defendants' objection is to continued federal court supervision and is

17  predicated entirely on arguments raised in their termination motion.  As an objection to the

18  Report itself it is overruled.  As the court has already noted, nothing in this court's orders

19  reviewing objections to the Special Master's Reports should be construed to preclude arguments

20  raised by defendants in their termination motion, which is not before the court at this time.

21  Whether the recommendations will become the subject of a further order of this court is deferred

22  pending resolution of the termination motion.[13]

23

24          [13]  In his response, defendants' expert Dr. Dvoskin states that "[t]he systemic
    recommendations in Dr. Patterson's report at pages 16-18 are reasonable and should assist the
    California Department of Corrections and Rehabilitation in its essential goal of preventing
25  suicides in the future."  Dvoskin Resp. at 2.  The court emphasizes that nothing in this order
    should preclude defendants from moving forward with action consistent with those
26  recommendations.

1            In accordance with the above, IT IS HEREBY ORDERED that:

2            1.  Defendants' objections to the 2011 Suicide Report are overruled;

3            2.  Except as expressly provided in this order, defendants' February 11, 2013

4    motion to strike or modify portions of the 2011 Suicide Report is denied; and

5

6            3.  Within five days from the date of this order defendants shall file under seal a

7    copy of the final coroner's report of the death of Inmate HH and provide a hard copy of said

8    report to the Special Master.

9            DATED: March 15, 2013.

10

11

12                                LAWRENCE K. KARLTON
13                                SENIOR JUDGE
                                  UNITED STATES DISTRICT COURT
14

15

16

17

18

19

20

21

22

23

24

25

26

                                      15