# Exhibit 1

Data Analysis Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
March 4, 2013

WEEKLY REPORT OF POPULATION
AS OF MIDNIGHT February 27, 2013

### TOTAL CDCR POPULATION

| | FELON/ OTHER #1 | CIVIL ADDICT | TOTAL | CHANGE SINCE 02/29/12 NO. | CHANGE SINCE 02/29/12 PCT. | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|---|
| A. TOTAL IN-CUSTODY | 132,296 | 138 | 132,434 | -8,695 | -6.1 | | | |
| I.   IN-STATE | 123,590 | 138 | 123,728 | -7,906 | -6.0 | | | |
|       (MEN, Subtotal) | 117,761 | 102 | 117,863 | -6,474 | -5.2 | | | |
|       (WOMEN, Subtotal) | 5,829 | 36 | 5,865 | -1,432 | -19.6 | | | |
| 1. INSTITUTIONS/CAMPS | 122,682 | 132 | 122,814 | -7,813 | -5.9 | 84,439 | 145.4 | 122,481 |
|     INSTITUTIONS | 119,014 | 132 | 119,146 | -7,360 | -5.8 | 79,959 | 149.0 | 118,243 |
|     CAMPS (CCC, CIW & SCC)* | 3,668 | | 3,668 | -453 | -10.9 | 4,480 | 81.9 | 4,238 |
| 2. IN-STATE CONTRACT BEDS | 673 | 6 | 679 | -65 | -8.7 | 2,679 | 25.3 | |
|     CCF PRIVATE | 601 | | 601 | 0 | - | 2,557 | 23.5 | |
|     PRISONER MOTHER PGM | 17 | | 17 | -4 | -19.0 | 47 | 36.2 | |
|     FRCCC (BAKERSFIELD) | 55 | 6 | 61 | +43 | +238.8 | 75 | 81.3 | |
| 3. DMH STATE HOSPITALS | 235 | | 235 | -28 | -10.6 | | | |
| II. OUT OF STATE (COCF) | 8,706 | 0 | 8,706 | -789 | -8.3 | | | |
|     ARIZONA | 4,476 | | 4,476 | -109 | -2.3 | | | |
|     MISSISSIPPI | 2,561 | | 2,561 | 0 | - | | | |
|     OKLAHOMA | 1,669 | | 1,669 | -680 | -28.9 | | | |
| B. PAROLE | 55,554 | 603 | 56,157 | -40,118 | -41.6 | | | |
|     COMMUNITY SUP (Active) | 53,083 | 603 | 53,686 | -31,902 | -37.2 | | | |
|     COOP CASES   (Active) #3 | 1,766 | | 1,766 | +244 | +16.0 | | | |
|     MNRP & NRP (Inactive) | 705 | | 705 | -8,460 | -92.3 | | | |
| C. NON-CDC JURISDICTION #4 | 1,172 | 0 | 1,172 | -233 | -16.5 | | | |
|     OTHER STATE/FED. INST. | 510 | | 510 | -1 | -0.1 | | | |
|     OUT OF STATE PAROLE | 494 | | 494 | -204 | -29.2 | | | |
|     OUT OF STATE PAL | 20 | | 20 | -18 | -47.3 | | | |
|     CYA-W&IC 1731.5(c) | | | | | | | | |
|     INSTITUTIONS #5 | 148 | | 148 | -10 | -6.3 | | | |
| D. OTHER POPULATIONS #6 | 9,807 | 90 | 9,897 | -2,950 | -22.9 | | | |
|     INMATES | | | | | | | | |
|     OUT-TO-COURT, etc. | 1,217 | 18 | 1,235 | -238 | -16.1 | | | |
|     ESCAPED | 206 | | 206 | -11 | -5.0 | | | |
|     PAROLEES (PAL/RAL) | 8,384 | 72 | 8,456 | -2,701 | -24.2 | | | |
| TOTAL CDCR POPULATION | 198,829 | 831 | 199,660 | -51,996 | -20.6 | | | |

| CHANGE FROM LAST WEEK | | | |
|---|---|---|---|
| A. TOTAL IN-CUSTODY | +11 | -8 | +3 |
|     (MEN, Subtotal) | +36 | -10 | +26 |
|     (WOMEN, Subtotal) | -8 | +2 | -6 |
| B. PAROLE | -450 | -6 | -456 |
| D.  PAROLEES (PAL/RAL) | +148 | -1 | +147 |

This report contains the latest available reliable population figures from OBIS.  They have been
carefully audited, but are preliminary, and therefore subject to revision.

*Figure excludes institution based camps.  Total persons in camps, including base camps, are 3,686.
Base camp at CMC is included in institution counts.

Report # TPOP-1W.  Questions: (916) 322-4255.

WEEKLY INSTITUTION/CAMPS POPULATION DETAIL                    MIDNIGHT February 27, 2013

| INSTITUTIONS/CAMPS | | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|
| **MALE** | | | | | | | |
| ASP | (AVENAL SP) | 4,819 | | 4,819 | 2,920 | 165.0 | 4,333 |
| CCC | (CAL CORRECTL CTR) | 4,734 | | 4,734 | 3,883 | 121.9 | 4,718 |
| CCI | (CAL CORRECTL INSTITN) | 4,530 | | 4,530 | 2,783 | 162.8 | 4,130 |
| CIM | (CAL INSTITN FOR MEN) | 4,626 | 2 | 4,628 | 2,976 | 155.5 | 4,455 |
| CMF | (CAL MEDICAL FACIL) | 2,327 | | 2,327 | 2,361 | 98.6 | 2,634 |
| CMC | (CAL MEN'S COLONY) | 5,030 | | 5,030 | 3,838 | 131.1 | 5,157 |
| CRC | (CAL REHAB CTR, MEN) | 3,319 | 93 | 3,412 | 2,491 | 137.0 | 3,381 |
| CAL | (CAL SP, CALIPATRIA) | 3,450 | | 3,450 | 2,308 | 149.5 | 3,833 |
| CEN | (CAL SP, CENTINELA) | 3,132 | | 3,132 | 2,308 | 135.7 | 3,483 |
| COR | (CAL SP, CORCORAN) | 4,486 | | 4,486 | 3,116 | 144.0 | 4,494 |
| LAC | (CAL SP, LOS ANGELES CO) | 3,743 | | 3,743 | 2,300 | 162.7 | 3,866 |
| SAC | (CAL SP, SACRAMENTO) | 2,382 | | 2,382 | 1,828 | 130.3 | 2,743 |
| SQ | (CAL SP, SAN QUENTIN) | 3,945 | | 3,945 | 3,082 | 128.0 | 3,710 |
| SOL | (CAL SP, SOLANO) | 3,961 | | 3,961 | 2,610 | 151.8 | 3,940 |
| SATF | (CAL SATF AND SP - COR) | 5,594 | 1 | 5,595 | 3,424 | 163.4 | 5,365 |
| CVSP | (CHUCKAWALLA VALLEY SP) | 2,702 | | 2,702 | 1,738 | 155.5 | 2,453 |
| CTF | (CORRL TRAING FAC) | 5,454 | 1 | 5,455 | 3,312 | 164.7 | 5,480 |
| DVI | (DEUEL VOCATL INSTITN) | 2,240 | 4 | 2,244 | 1,681 | 133.5 | 2,478 |
| FOL | (FOLSOM SP) | 2,435 | | 2,435 | 2,469 | 98.6 | 2,895 |
| HDP | (HIGH DESERT SP) | 3,480 | | 3,480 | 2,324 | 149.7 | 3,560 |
| IRON | (IRONWOOD SP) | 3,337 | | 3,337 | 2,200 | 151.7 | 3,275 |
| KVSP | (KERN VALLEY SP) | 3,772 | | 3,772 | 2,448 | 154.1 | 4,194 |
| MCSP | (MULE CREEK SP) | 2,868 | | 2,868 | 1,700 | 168.7 | 2,671 |
| NKSP | (NORTH KERN SP) | 4,709 | 1 | 4,710 | 2,694 | 174.8 | 4,397 |
| PBSP | (PELICAN BAY SP) | 2,884 | | 2,884 | 2,380 | 121.2 | 3,188 |
| PVSP | (PLEASANT VALLEY SP) | 3,521 | | 3,521 | 2,308 | 152.6 | 3,558 |
| RJD | (RJ DONOVAN CORR FACIL) | 3,503 | | 3,503 | 2,200 | 159.2 | 3,340 |
| SVSP | (SALINAS VAL SP) | 3,580 | | 3,580 | 2,452 | 146.0 | 3,484 |
| SCC | (SIERRA CONSERV CTR) | 4,769 | | 4,769 | 3,736 | 127.6 | 4,576 |
| VSPM | (VALLEY SP MEN) | 2,433 | | 2,433 | 1,980 | 122.9 | 1,932 |
| WSP | (WASCO SP) | 5,164 | | 5,164 | 2,984 | 173.1 | 4,997 |
| **MALE TOTAL:** | | **116,929** | **102** | **117,031** | **80,834** | **144.8** | **116,720** |
| **FEMALE** | | | | | | | |
| CIW | (CAL INST FOR WOMEN) | 2,008 | 16 | 2,024 | 1,398 | 144.8 | 2,042 |
| CCWF | (CENT CAL WOMEN'S FACIL) | 3,585 | 14 | 3,599 | 2,004 | 179.6 | 3,519 |
| FWF | (FOLSOM WF) | 160 | | 160 | 203 | 78.8 | 200 |
| **FEMALE TOTAL:** | | **5,753** | **30** | **5,783** | **3,605** | **160.4** | **5,761** |
| **TOTAL:** | | **122,682** | **132** | **122,814** | **84,439** | **145.4** | **122,481** |

Data Analysis Unit                                    Department of Corrections and Rehabilitation
Estimates and Statistical Analysis Section                                        State of California
Offender Information Services Branch                                                  March 4, 2013

WEEKLY REPORT OF POPULATION
NOTES
AS OF MIDNIGHT February 27, 2013

#1  Felon/Other counts are safekeepers, federal cases and inmates from
    other states, felons, county diagnostic cases and Youth Authority
    wards.

#3  Cooperative Cases are parolees from other states being supervised in
    California.

#4  Non-CDC Jurisdiction are California cases being confined in or paroled
    to other states or jurisdictions.

#5  Welfare and Institution Code (W&IC) 1731.5(c) covers persons under the
    the age of 21 who were committed to CDCR, had
    their sentence amended, and were incarcerated at the California
    Youth Authority for housing and program participation.

#6  Other Population includes inmates temporarily out-to-court, inmates in
    hospitals, escapees, and parole and outpatient absconders.

# Exhibit 2

**CCCMS cases for the week of FEB. 11, 2013**
**(Seats Requested / Provided for Endorsed Cases)**

| FROM | TO: AVE | TO: CCI | TO: CIM | TO: CMC | TO: CMF | TO: CRC | TO: COR | TO: WSP | TO: CTF | TO: FSP | TO: HDSP | TO: KVSP | TO: LAC | TO: MCSP | TO: NK | TO: PBSP | TO: PVSP | TO: RJD | TO: SAC | TO: SATF | TO: SCC | TO: SOL | TO: SQ | TO: SVSP | TO: VSP | Total Reqstd | Total Provided |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AVE | 0 | 2/0 | 4/3 | 0 | 0 | 4/2 | 1/0 | 0 | 2/0 | 2/2 | 0 | 0 | 0 | 1/0 | 0 | 0 | 2/2 | 0 | 0 | 2/0 | 0 | 0 | 0 | 0 | 2/0 | 22 | 9 |
| CAL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| CRC | 1/1 | 1/0 | 9/1 | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 1/0 | 0 | 15/0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 31 | 4 |
| CCI | 0 | 0 | 1/0 | 0 | 0 | 1/1 | 4/0 | 0 | 12/2 | 0 | 0 | 28/0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 2/1 | 5/0 | 0 | 0 | 0 | 0 | 0 | 54 | 5 |
| CEN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3/3 | 0 | 0 | 0 | 0 | 1/1 | 2/2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 6 |
| CMC | 14/0 | 9/0 | 3/1 | 0 | 1/0 | 1/0 | 0 | 0 | 23/0 | 1/1 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 7/0 | 3/0 | 0 | 1/1 | 0 | 0 | 0 | 65 | 3 |
| CMF | 0 | 1/0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 4 | 1 |
| COR | 0 | 4/0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 5/1 | 0 | 46/1 | 0 | 5/0 | 0 | 0 | 3/3 | 4/0 | 0 | 2/0 | 9/0 | 0 | 0 | 3/3 | 0 | 0 | 82 | 8 |
| CTF | 0 | 2/2 | 4/0 | 0 | 0 | 0 | 2/1 | 0 | 0 | 7/7 | 0 | 0 | 12/0 | 0 | 0 | 3/3 | 0 | 1/0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 33 | 13 |
| CVSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 1 | 1 |
| FSP | 0 | 1/0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 3/0 | 0 | 3/3 | 0 | 1/0 | 2/2 | 0 | 2/1 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 6 |
| HDSP | 1/0 | 9/0 | 0 | 0 | 2/0 | 0 | 2/0 | 0 | 1/0 | 1/1 | 0 | 2/0 | 8/0 | 0 | 0 | 12/0 | 3/0 | 0 | 4/0 | 14/0 | 0 | 0 | 0 | 9/0 | 0 | 68 | 1 |
| ISP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 1/1 | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 3 |
| KVSP | 0 | 5/0 | 0 | 0 | 0 | 1/0 | 15/0 | 0 | 2/0 | 0 | 0 | 1/1 | 12/2 | 0 | 0 | 5/5 | 0 | 40/0 | 12/0 | 0 | 0 | 0 | 0 | 2/1 | 0 | 95 | 9 |
| LAC | 0 | 5/0 | 0 | 0 | 0 | 1/0 | 6/0 | 0 | 5/0 | 0 | 0 | 0 | 0 | 28/1 | 0 | 0 | 4/0 | 5/0 | 0 | 10/2 | 26/0 | 0 | 0 | 4/4 | 0 | 94 | 7 |
| MCSP | 0 | 1/1 | 8/0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 6/1 | 5/0 | 0 | 0 | 0 | 1/0 | 8/8 | 35 | 10 |
| PBSP | 0 | 0 | 0 | 0 | 0 | 0 | 25/0 | 0 | 0 | 0 | 0 | 6/0 | 1/1 | 1/0 | 0 | 0 | 1/0 | 0 | 2/1 | 4/0 | 0 | 0 | 0 | 8/0 | 0 | 48 | 2 |
| PVSP | 9/2 | 13/0 | 0 | 0 | 1/0 | 2/0 | 28/0 | 0 | 8/3 | 10/10 | 0 | 12/5 | 0 | 6/0 | 0 | 0 | 0 | 12/2 | 1/0 | 7/1 | 11/0 | 1/1 | 0 | 0 | 38/13 | 159 | 37 |
| RJD | 4/2 | 5/0 | 4/1 | 0 | 0 | 6/1 | 2/0 | 0 | 6/0 | 0 | 0 | 3/0 | 1/1 | 0 | 0 | 1/1 | 2/0 | 0 | 6/0 | 7/0 | 0 | 0 | 0 | 1/0 | 1/0 | 51 | 6 |
| SAC | 0 | 2/1 | 0 | 0 | 0 | 0 | 10/0 | 0 | 0 | 1/1 | 0 | 10/0 | 2/1 | 4/0 | 0 | 0 | 4/4 | 1/0 | 0 | 4/0 | 4/0 | 0 | 0 | 9/3 | 0 | 52 | 11 |
| SATF | 0 | 0 | 4/2 | 0 | 0 | 1/1 | 12/0 | 0 | 11/0 | 0 | 0 | 0 | 2/2 | 5/1 | 0 | 0 | 2/1 | 4/0 | 0 | 0 | 16/0 | 0 | 0 | 10/4 | 4/4 | 71 | 15 |
| SCC | 1/0 | 1/0 | 4/1 | 0 | 0 | 2/0 | 0 | 0 | 1/0 | 0 | 5/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12/0 | 24 | 2 |
| SOL | 1/1 | 0 | 1/1 | 0 | 2/0 | 0 | 2/0 | 0 | 4/0 | 5/5 | 0 | 0 | 0 | 1/0 | 1/1 | 0 | 1/1 | 3/0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 1/0 | 23 | 9 |
| SQ | 0 | 0 | 1/0 | 0 | 0 | 1/0 | 0 | 0 | 3/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 |
| SVSP | 0 | 14/0 | 0 | 0 | 0 | 0 | 18/0 | 0 | 0 | 0 | 0 | 1/1 | 2/2 | 8/0 | 0 | 0 | 4/1 | 0 | 5/1 | 12/0 | 0 | 0 | 0 | 0 | 0 | 64 | 5 |
| CIM-RC | 0 | 0 | 0 | 0 | 0 | 5/5 | 1/0 | 0 | 4/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 0 | 1/1 | 1/1 | 0 | 0 | 13/13 | 27 | 20 |
| DVI-RC | 1/1 | 0 | 3/3 | 1/1 | 0 | 0 | 4/0 | 0 | 24/0 | 0 | 1/1 | 0 | 0 | 0 | 1/1 | 1/1 | 2/0 | 6/0 | 0 | 1/1 | 1/1 | 0 | 0 | 0 | 0 | 46 | 10 |
| NKSP-RC | 4/4 | 8/8 | 9/4 | 1/0 | 1/0 | 3/3 | 0 | 1/1 | 23/0 | 0 | 2/2 | 1/1 | 0 | 0 | 0 | 0 | 1/0 | 0 | 5/0 | 0 | 0 | 1/1 | 0 | 0 | 1/1 | 59 | 24 |
| SQ-RC | 0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 8/0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 2/0 | 1/1 | 0 | 0 | 0 | 1/1 | 16 | 2 |
| WSP-RC | 1/1 | 8/8 | 26/10 | 1/1 | 0 | 47/16 | 1/0 | 0 | 58/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3/1 | 0 | 33/0 | 0 | 1/1 | 0 | 1/1 | 2/2 | 183 | 41 |
| TOTAL: | 37/12 | 91/20 | 82/27 | 3/3 | 7/0 | 74/29 | 140/1 | 1/1 | 204/6 | 27/27 | 8/8 | 109/8 | 16/13 | 98/6 | 3/3 | 2/2 | 48/25 | 44/5 | 9/2 | 168/5 | 120/1 | 6/6 | 3/3 | 51/17 | 84/41 | 1435 | 271 |
| | TO: AVE | TO: CCI | TO: CIM | TO: CMC | TO: CMF | TO: CRC | TO: COR | TO: WSP | TO: CTF | TO: FSP | TO: HDSP | TO: KVSP | TO: LAC | TO: MCSP | TO: NK | TO: PBSP | TO: PVSP | TO: RJD | TO: SAC | TO: SATF | TO: SCC | TO: SOL | TO: SQ | TO: SVSP | TO: VSP | Total Reqstd | Total Provided |

*Final*

| 1435 | 271 |
|---|---|

DPRD2-49-000075

**EOP CASES ASSIGNED BUS SEATS FOR THE WEEK OF FEB. 11, 2013**
**(# Seats Requested / # Seats Provided for Endorsed Cases)**

| FROM: | TO: CMC | TO: CMF | TO: COR | TO: KVSP | TO: LAC | TO: MCSP III | TO: MCSP IV | TO: PBSP | TO: RJD III | TO: RJD SNY | TO: SAC | TO: SATF COD | TO: SATF SNY | TO: SVSP | TO: CCWF | TO: CIW | Total Reqstd | Total Provided |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 0 | 3 | 0 |
| CAL | 0 | 0 | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| CCC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CCI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 0 | 2 | 0 |
| CCWF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CEN | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CIW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CMC | 0 | 3/0 | 0 | 1/1 | 0 | 3/0 | 3/0 | 0 | 5/0 | 0 | 0 | 0 | 3/0 | 0 | 0 | 0 | 18 | 1 |
| CMF | 0 | 0 | 0 | 0 | 1/1 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 |
| COR | 0 | 0 | 0 | 0 | 1/1 | 7/0 | 3/0 | 0 | 0 | 3/0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 1 |
| CRC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 1/0 | 0 | 0 | 0 | 2 | 1 |
| CTF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2/1 | 0 | 0 | 0 | 2 | 1 |
| CVSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| FSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HDSP | 0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| ISP | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| KVSP | 0 | 0 | 0 | 0 | 0 | 4/0 | 2/0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 0 |
| LAC | 1/1 | 3/2 | 2/1 | 0 | 0 | 20/0 | 4/0 | 0 | 5/0 | 1/0 | 1/1 | 0 | 1/1 | 0 | 0 | 0 | 38 | 6 |
| MCSP | 0 | 0 | 2/2 | 0 | 0 | 0 | 0 | 0 | 0 | 3/0 | 0 | 0 | 32/0 | 0 | 0 | 0 | 37 | 2 |
| PBSP | 0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 4 | 2 |
| PVSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 2 | 0 |
| RJD | 2/2 | 0 | 0 | 0 | 0 | 12/0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 0 | 0 | 0 | 15 | 3 |
| SAC | 1/1 | 0 | 2/0 | 0 | 1/1 | 5/0 | 4/0 | 0 | 5/0 | 2/0 | 0 | 0 | 0 | 1/1 | 0 | 0 | 21 | 3 |
| SATF | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 1/0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| SCC | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 2 | 1 |
| SOL | 0 | 1/1 | 0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1 |
| SQ | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SVSP | 0 | 1/0 | 3/2 | 0 | 0 | 0 | 3/0 | 0 | 2/0 | 3/0 | 1/1 | 0 | 1/1 | 0 | 0 | 0 | 14 | 4 |
| VSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2/0 | 0 | 0 | 0 | 2 | 0 |
| CCWF-RC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 1 | 1 |
| CIM-RC | 0 | 0 | 0 | 0 | 0 | 3/0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 11/0 | 0 | 0 | 0 | 15 | 0 |
| DVI-RC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NKSP-RC | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/1 | 10/0 | 0 | 0 | 0 | 12 | 1 |
| SQ-RC | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 |
| WSP-RC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1/0 | 0 | 0 | 0 | 9/0 | 1/1 | 0 | 0 | 11 | 1 |
| TOTALS: | 5/5 | 8/3 | 11/7 | 1/1 | 5/4 | 58/0 | 21/0 | 0 | 23/0 | 15/0 | 3/3 | 2/2 | 79/4 | 2/2 | 0 | 1/1 | 234 | 32 |
| | TO: CMC | TO: CMF | TO: COR | TO: KVSP | TO: LAC | TO: MCSP III | TO: MCSP IV | TO: PBSP | TO: RJD III | TO: RJD SNY | TO: SAC | TO: SATF COD | TO: SATF SNY | TO: SVSP | TO: CCWF | TO: CIW | Total Reqstd | Total Provided |

Final

# Exhibit 3

**From:**          Eargle, Amy@CDCR
**Sent:**          Monday, February 11, 2013 9:04 AM
**To:**            Jones, Maria@CDCR
**Subject:**       Suicide Workgroup materials
**Attachments:**   Data Review Jan 2013.pdf

## CDCR SUICIDES: RESULTS OF RECENT ANALYSES

The DHCS Suicide Prevention Program has, over the last month, analyzed a variety of data collected as part of the suicide prevention program. We have focused on the years 2007 through 2012 since these six years have seen intense activity on suicide prevention, starting with the court-ordered plan to prevent suicides in administrative segregation units. Below is a summary of some of the findings from this recent review and analysis.

### Individual Characteristics of Inmates Who Have Died by Suicide

Since the beginning of 2007, there have been 195 suicides of inmates in CDCR. Of these deaths, 57% were in mainline housing units including dorms, celled housing, community correctional facilities, medical facilities within CDCR, and out of state facilities. Thirty-three percent occurred in administrative segregation and another 10 percent in other segregated settings (condemned, SHU, and PSU).

Sixty-three percent were participants in the MHSDS at the time of their deaths. The average age was forty.

Classification, offense, and term (Tables 1-3): Inmates at the Level IV classification level predominated among those who died by suicide. Of those classified (CDCR does not classify reception center and female inmates) 46% were Level IV, 21% Level III, 16% Level II, and only 5% were Level I. Since the beginning of 2007 seventy-seven percent of inmates who have died by suicide in CDCR were incarcerated for a violent crime (defined as a crime against a person). Eighteen percent were guilty of a sex crime.

Lengthy and life sentences predominated among those who committed suicide during this period. Seventy-one percent of the suicides were committed by inmates with lengthy (10 years or more), life-term (indeterminate life and life without parole), or condemned sentences. Thirty-four inmates had indeterminate life sentences and were eligible for parole. Of these, forty-one percent were housed in segregated settings at the time of their death. Seven condemned inmates died by suicide.

Administrative Segregation (ASU): Segregated settings have traditionally been considered higher risk settings when it comes to suicide. In particular, ASU has been a particular focus of suicide prevention efforts by CDCR going back over a decade. Despite a spike in the percentage of suicides in ASU in 2004, the average over the years has been about 35% of all suicides occur in ASU, with another 10% occurring in SHU, PSU, and on condemned units (see tables).

The 2006 court-ordered plan to reduce suicides in ASU focused on the first few days and weeks in ASU, requiring up to ten days in an "intake" cell and 30-minute welfare checks for the first three weeks. Data developed prior to the plan suggested that the first week to ten days was a critical period. Data collected since then on the length of stay in ASU prior to suicide have

reinforced this finding. Since the beginning of 2007, 49% of inmates who died by suicide in ASU had spent less than 21 days in ASU at the time of their death. For MHSDS inmates, 43% of CCCMS and 36% of EOP inmates had been in ASU 21 days or less at the time of their death. Thirteen MHSDS inmates and 12 non-MHSDS inmates had been in ASU less than 10 days at the time of death.

CDCR screens all inmates prior to placement and non-MHSDS inmates within 72 hours of entry to ASU. Health care staff administers the pre-placement screening and as yet the data on this is spotty because of the lack of clear rules for data entry in the institutions. The same problems have plagued tracking of the post-placement screening. DHCS Mental Health Program has recently directed the institutions to assure that this data is entered. A recent report from MHTS.net shows that of 8,629 inmates screened after entry to ASU, over 3,000 had negative screens, 434 were positive (referred for mental health evaluation) but over 5,000 were simply entered as "completed." (It should also be noted that only inmates who are not currently in the MHSDS are screened.) This result is complicated by the fact that on average only 58% of inmates entering ASU are reported as being screened. This low figure may be due to staffing problems, poor data entry, or misinterpretation of the MHTS.net business rules. In addition, in many institutions, the refusal rate for ASU post-placement screenings is high due to gang culture and other reasons. Currently the Mental Health Program HQ SPR FIT is planning to replace the current screening measure (which is grounded in DSM-III) and replace it with one that is shorter and targeted at distress and suicidality rather than general mental health needs.

Another measure of mental health services in ASU is the elapsed time from entry to first clinical interview (for MHSDS inmates). In 2012, over all institutions, the median length of time to first clinician visit in ASU was 4.9 days for CCCMS inmates and 2.8 days EOP inmates. These numbers are within program guidelines. When the institutions polled are limited to those with large mental health programs (typically EOP programs) the time to first visit for CCCMS drops to 3.6 days and for EOP to 2.3 days.

Finally, data collected by suicide evaluators found that many inmates who housed in ASU at the time of their deaths are placed there not for disciplinary reasons, but for safety reasons. Although there are many complexities surrounding these situations, it is worth noting that placement in ASU of already fearful inmates may only serve to make them even more fearful and anxious, which may precipitate a state of panicked desperation, and the urge to die.

Mental Health Issues (Table 4): Suicide is most commonly associated with serious mental disorders. In CDCR, more than half of all suicides are committed by inmates in the MHSDS. As of the end of 2012 over 75% of mental health inmates were diagnosed with one of the "Coleman" qualifying disorders (Schizophrenia, Bipolar Disorders, Major Depressive Disorder, and other psychotic and mood disorders).

2

The "sustainable process" has included clinical procedures to flag "high risk" inmates – typically those who qualify for treatment in DSH settings – particularly Intermediate Care programs. The Mental Health Program tracks these high-risk inmates and using these criteria reviewed the 2012 suicide deaths. Of the 18 inmates who died by suicide in 2012 and were participants in MHSDS, one had been identified as high risk by MHSDS criteria and at the time of his death was, in fact, housed in a DSH program. The 17 other MHSDS inmates had been screened several times in their IDTT's and had not met criteria for listing as "high risk." Two-thirds (12) of the MHSDS inmates who died by suicide were at the CCCMS level of care at the time of their death. (It should be noted that the term "high risk" does not necessarily denote high risk for suicide, but rather that the inmate may have met criteria for treatment in a DSH program.)

Medical Issues (Tables 5 & 6): Both in the community and in prison medical issues can raise the risk for self-harm and suicide. In CDCR, where medical morbidity is higher than in the community many inmates who commit suicide have co-morbid medical disorders and/or chronic pain issues. Among the 195 suicides in CDCR since the beginning of 2007, 51 inmates (26%) were identified as suffering from a chronic medical or painful condition. Of these, 13 were housed in ASU, four were condemned, three were housed in SHU, one was in a medical setting, and the remainder housed in mainline housing.

After several suicides involving chronic pain and medication issues were reviewed, the Mental Health Program found that almost one in seven (13.4%) MHSDS inmates were prescribed medications for pain. Of these inmates, over seven percent were prescribed opiate analgesics. As would be expected, the older age groups predominated: inmates 55 and older received 46% of all chronic pain medications prescribed MHSDS inmates, yet only comprised 13% of the total MHSDS population.

Suicide Trends (Figures 1-6): The CDCR Mental Health Program has considered suicide trends since the beginning of the *Coleman* monitoring of suicides, which began over ten years ago. Attached to this report are several charts which show trends in both rate and frequency of suicide overall in CDCR and also the trend in the percentage of total CDCR suicides.

Both the overall raw rate (Figure 1) and the frequency (Figure 3) of suicide in CDCR have trended upward since 2000. However, we believe that developments and changes in the CDCR and the Mental Health Program since the beginning of 2007 warrant a more fine-grained analysis.

Figures 2 and 4 show the raw rate and frequency broken into periods: 2000-2006 and 2007-2012. The year 2007 was chosen as the "break year" because: 1) between 2000 and 2006 the Department had a seven percent increase in inmate population, peaking at over 172,500 inmates in 2006 (almost 200% of design capacity); 2) 2007 was the first full year of the federal Receivership; 3) by the beginning of 2007 the Mental Health Program was filling many vacancies that had hampered efforts to meet policy guidelines; and 3) the number of beds for

3

higher levels of mental health care was beginning to increase. As can be seen, both the rate and frequency of suicide began to stabilize (denoted by decreasing fluctuation), and the trend began to flatten, and in the case of suicide frequency, decline.[*] Overall, then, 2000-2006 saw fluctuating rates and frequencies of suicide with an overall upward trend, while since the beginning of 2007 there has been an overall decrease in frequency and a flattening of the trend in rate.

ASU suicides show a similar pattern, although not as striking. Since 2000, the percentage of suicides occurring in ASU statewide has been less than 40%. There was an upward spike in 2004 that contributed to the upward trend. But since 2007, the percentage of suicides occurring in ASU has remained stable and with a "flat" trend.

Summary: The Mental Health Program believes that the frequency of suicide in CDCR institutions may be on the decline. There has been a negative trend in the last few years and an absolute decrease in frequency of almost ten percent in the last three years. This being said, long term rates can fluctuate and at least two more years of data are needed to see a clear trend.

Recent analyses reinforce evidence collected by the Mental Health Program over the last dozen years that long prison terms, medical problems, serious mental health problems, conviction for a violent crime, and high security classification are among the most important chronic risk factors for suicide for CDCR inmates. These factors (plus advancing age) are long-term characteristics of several thousand CDCR inmates that are not amenable to mental health interventions alone, but are more likely changeable through interventions that cross boundaries and require the collaboration of mental health, education, custody, and medical programs. For instance, over the past decade, a number of suicides have been linked to the "lifer" process – a number of inmates who have had a negative interaction with the Board of Parole Hearings or whose efforts to become suitable for parole have been set back by an incident have lost hope and committed suicide. The Lifer Work Group, which has recently been chartered, and includes many of the domains mentioned above, may directly and indirectly influence the lives of hundreds of inmates with many of these vulnerabilities. In addition, new programs such as depression screening in primary care clinics and continued public health prevention programs are needed to reach the non-mental health population in CDCR.

Robert Canning, Ph.D.                                   Chris Yi, B.A.
Suicide Prevention Coordinator                          Analyst
robert.canning@cdcr.ca.gov)

January 25, 2013

---

[*] The simultaneous increase in rate and decrease in frequency may seem anomalous, but the increase in rate is due to the approximate 30,000 inmate drop in prison population since AB 109 went into effect in late 2011.

4

Table 1. CDCR Suicides 2007-2012: Violent Commitment Offense

| Year | Violent Crime? | | |
|------|------|------|------|
| | Yes | No | n/a |
| 2007 | 80% | 20% | 0% |
| 2008 | 69% | 28% | 3% |
| 2009 | 72% | 28% | 0% |
| 2010 | 80% | 17% | 3% |
| 2011 | 79% | 21% | 0% |
| 2012 | 81% | 16% | 3% |
| Total | 77% | 21% | 2% |

Table 2. CDCR Suicides 2007-2012: Sex Offender

| Year | Sex Offender? | | |
|------|------|------|------|
| | Yes | No | n/a |
| 2007 | 20% | 80% | 0% |
| 2008 | 28% | 72% | 0% |
| 2009 | 12% | 84% | 4% |
| 2010 | 17% | 74% | 9% |
| 2011 | 18% | 79% | 3% |
| 2012 | 9% | 91% | 0% |
| Total | 18% | 80% | 3% |

Table 3. CDCR Suicides 2007-2012: Classification Level

| Year | Classification Level Breakdown | | | | |
|------|------|------|------|------|------|
| | I | II | III | IV | n/a |
| 2007 | 3% | 14% | 23% | 51% | 9% |
| 2008 | 11% | 22% | 17% | 31% | 19% |
| 2009 | 8% | 16% | 16% | 52% | 8% |
| 2010 | 3% | 14% | 23% | 43% | 17% |
| 2011 | 3% | 9% | 33% | 52% | 3% |
| 2012 | 3% | 19% | 13% | 53% | 13% |
| Total | 5% | 16% | 21% | 46% | 12% |

5

Table 4. MHSDS Inmates: Frequency of Diagnosis, as of 12/26/2012

| Total Number of Inmates in MHSDS | 30586 | | |
|---|---|---|---|
| **Serious Mental Illnesses** | **# of inmate-patients** | **% of MHSDS** | **Corresponding DSM IV codes** |
| Schizophrenia (All subtypes) | 1387 | 4.53% | 295.10, 295.20, 295.30, 295.60, 295.90 |
| Delusional Disorder | 144 | 0.47% | 297.1 |
| Schizophreniform Disorder | 7 | 0.02% | 295.40 |
| Schizoaffective Disorder | 2316 | 7.57% | 295.70 |
| Brief Psychotic Disorder | 14 | 0.05% | 298.8 |
| Psychotic Disorder NOS | 1976 | 6.46% | 298.9 |
| Major Depressive Disorders | 10295 | 33.66% | 296.30-36, 296.20-26 |
| Bipolar Disorder I | 2410 | 7.88% | 296.00-06, 296.40-46, 296.50-56, 296.60-66 |
| Bipolar Disorder II | 352 | 1.15% | 296.89 |
| Mood Disorder NOS* | 4269 | 13.96% | 296.90 |
| Total | 23170 | 75.75% | |
| Total without Mood Disorder NOS | 18901 | 61.80% | |
| *Not on the list of Serious Mental Illnesses in the Program Guide | | | |

Table 5. MHSDS Patients Currently Receiving Chronic Pain Medications

| Mental Health Level of Care | Total Population | Currently Receiving Chronic Pain Meds | Pct % | Adjuvant Med Only | Opioid Med Only | Opioid & Adjuvant |
|---|---|---|---|---|---|---|
| CCCMS | 27447 | 3843 | 14.0% | 1779 (6.5%) | 1612 (5.9%) | 452 (1.6%) |
| EOP or Higher | 5522 | 570 | 10.3% | 272 (4.9%) | 225 (4.1%) | 73 (1.3%) |
| MHSDS | 32969 | 4413 | 13.4% | 2051 (6.2%) | 1837 (5.6%) | 525 (1.6%) |

Table 6. MHSDS Patients Receiving Chronic Pain Medications, By Age Group

| Age Group Breakdown | Total Population | Currently Receiving Chronic Pain Meds | Pct % |
|---|---|---|---|
| 18-24 | 2432 (7%) | 47 | 1.9% |
| 25-34 | 8229 (25%) | 477 | 5.8% |
| 35-44 | 8786 (27%) | 1086 | 12.4% |
| 45-54 | 9057 (27%) | 1719 | 19.0% |
| 55-64 | 3718 (11%) | 925 | 24.9% |
| 65+ | 747 (2%) | 159 | 21.3% |
| MHSDS | 32969 | 4413 | 13.4% |

7

## Figure 1. CDCR Rate of Suicide, 2000-2012



**Suicide Rate**

NOTE: The rate for 2012 is higher than the rate for 2011 despite having one less suicide in 2012. This is because of the substantial drop in CDCR population due to AB 109, which took effect in late 2012. If the rate for 2012 had been calculated using the population from 2011, the trend for 2007-2012 would be almost flat, rather than slightly positive.

**Figure 2. Total CDCR Suicide Rate: 2000-2006 & 2007-2012, with trends**





Figure 3. Total Frequency of Suicides, 2000-20012, with trend



**Figure 4: Total Frequency 2000-2006 & 2007-2012, with Trends**



Figure 5. CDCR Suicides: Percent in ASU, 2000-2012, with trend

**Figure 6. Percent of Total CDCR Suicides in ASU, 2000-2006 & 2007-2012, with trends**



2000-2006 Pct. in ASU    2007-2012 Pct in ASU

# Exhibit 4

1

1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,            )
                                      )
5                     Plaintiffs,     )
                                      ) CASE NO.:
6            vs.                      ) S 90-0520 LKK-JFM
                                      )
7   EDMUND G. BROWN, JR., ET AL.,     )
                                      )
8                     Defendants.     )
    _____ )

9

10

11                  DEPOSITION OF

12            JACQUELINE MOORE, RN, PH.D.

13       THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

14               SAN FRANCISCO, CALIFORNIA

15

16

17

18

19   REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

20           THORSNES LITIGATION SERVICES, LLC

21

22

23

24

25

2

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4       RALPH COLEMAN, ET AL.,                )
                                              )
5                          Plaintiffs,        )
                                              ) CASE NO.:
6              vs.                            ) S 90-0520 LKK-JFM
                                              )
7       EDMUND G. BROWN, JR., ET AL.,         )
                                              )
8                          Defendants.        )
                                              )
9

10

11

12

13

14              The Deposition of JACQUELINE MOORE, RN, PH.D.,

15      taken on behalf of the Plaintiffs, before Megan F.

16      Alvarez, Certified Shorthand Reporter No. 12470,

17      Registered Professional Reporter, for the State of

18      California, commencing at 8:50 a.m., Thursday,

19      February 21, 2013, at the Rosen, Bien, Galvan &

20      Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21      Francisco, California.

22

23

24

25

3

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFFS:

3          BY:  AARON J. FISCHER, ESQ.
            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
4          315 MONTGOMERY STREET, 10TH FLOOR
            SAN FRANCISCO, CALIFORNIA 94104
5          415.433.6850
            415.433.7104 FAX
6          AFISCHER@RBGG.COM

7

   FOR DEFENDANTS:

8

9          BY:  DEBBIE J. VOROUS, ESQ.
            OFFICE OF THE ATTORNEY GENERAL
            STATE OF CALIFORNIA
10        1300 I STREET
            SACRAMENTO, CALIFORNIA 95814
11        916.324.5345
            916.324.5205 FAX
12        DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25

162

1    during your tours?

2          MS. VOROUS:  Let me clarify.  During her

3    tours -- not Mule Creek.

4    BY MR. FISCHER:

5        Q.   I recognize that the experts did not go to

6    Mule Creek.  But were there other similar treatments

7    settings that you observed at other institutions?

8        A.   Not that I'm aware of.

9        Q.   Not that you're aware of?

10        A.   Not that I recall.

11        Q.   In this photograph, there are three modules

12    filled with inmates with two clinicians conducting

13    one-to-one treatments.

14          Did you observe individual treatment being

15    conducted in this manner on any of your tours?

16        A.   Not that I recall.  Sorry.

17        Q.   Do you have any concerns about conducting

18    one-to-one treatment in such a setting?

19          MS. VOROUS:  Objection.  Lacks foundation.

20    Argumentative.

21          Go ahead.

22          THE WITNESS:  My concern would be the

23    confidentiality of the interview.

24    BY MR. FISCHER:

25        Q.   Because they're so close?

163

1      A.    Because they're so close.

2            And especially the -- inmate at the end has

3      nothing better to do than to listen.

4      Q.    Inmate on the left side is just listening?

5      A.    Right.

6      Q.    Would a more appropriate treatment space be an

7      individual office for these individual contacts?

8            MS. VOROUS:  Objection.  Lacks foundation.

9      Speculative.  Argumentative.

10           THE WITNESS:  Do you want an answer?

11     BY MR. FISCHER:

12     Q.    Uh-huh.

13     A.    If it was available.

14     Q.    You're aware from some of your tours that

15     individual treatment space is not available at some of

16     the institutions at this time?

17     A.    Yes.

18     Q.    Let me go back for one more minute to

19     Exhibit 13.

20           In your experience what is the impact that --

21     or the effect of having one-to-one contacts in a

22     nonconfidential setting similar to what you see here?

23           MS. VOROUS:  Objection.  Lacks foundation as

24     far as her experience in having this kind of experience.

25           THE WITNESS:  The inmate will not be as

268

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8          That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                    DATED: February 25, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

# Exhibit 5

1

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,            )
                                      )
5                    Plaintiffs,      )
                                      ) CASE NO.:
6            vs.                      ) S 90-0520 LKK-JFM
                                      )
7   EDMUND G. BROWN, JR., ET AL.,     )
                                      )
8                    Defendants.      )
                                      )
9

10

11                   DEPOSITION OF

12           JACQUELINE MOORE, RN, PH.D.

13      THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

14            SAN FRANCISCO, CALIFORNIA

15

16

17

18

19   REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

20         THORSNES LITIGATION SERVICES, LLC

21

22

23

24

25

2

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,              )
                                         )
5                        Plaintiffs,     )
                                         ) CASE NO.:
6           vs.                          ) S 90-0520 LKK-JFM
                                         )
7    EDMUND G. BROWN, JR., ET AL.,       )
                                         )
8                        Defendants.     )
     _____)

9

10

11

12

13

14          The Deposition of JACQUELINE MOORE, RN, PH.D.,

15   taken on behalf of the Plaintiffs, before Megan F.

16   Alvarez, Certified Shorthand Reporter No. 12470,

17   Registered Professional Reporter, for the State of

18   California, commencing at 8:50 a.m., Thursday,

19   February 21, 2013, at the Rosen, Bien, Galvan &

20   Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21   Francisco, California.

22

23

24

25

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFFS:

3            BY:  AARON J. FISCHER, ESQ.
                 ROSEN, BIEN, GALVAN & GRUNFELD, LLP
4            315 MONTGOMERY STREET, 10TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
5            415.433.6850
             415.433.7104 FAX
6            AFISCHER@RBGG.COM

7
     FOR DEFENDANTS:
8
             BY:  DEBBIE J. VOROUS, ESQ.
9            OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
10           1300 I STREET
             SACRAMENTO, CALIFORNIA 95814
11           916.324.5345
             916.324.5205 FAX
12           DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25

166

1        A.    Okay.

2        Q.    Are you aware?

3        A.    Yes.   Yes.

4        Q.    Okay.   Did you visit the administrative

5    segregation unit at CIM?   I think you said you did.

6        A.    Um.

7        Q.    Direct you to top of the 10266, top two

8    issues:   "EOP not transfer fast enough.   That's not

9    getting 10 hours RX" --

10        A.    Treatment.

11        Q.    "RX" is treatment?

12        A.    Treatment.

13        Q.    "Now nine in seg."

14              Were you documenting that there were nine EOPs

15    awaiting transfer in this segregation unit?

16        A.    Yes.

17        Q.    And they were not there for disciplinary

18    reasons; is that your understanding?

19        A.    Yes.

20        Q.    They were there because they were awaiting for

21    a bed to open?

22        A.    Yes.

23        Q.    Okay.   On the page just before that, 102620,

24    near the bottom you write:   "Lack of beds."

25              Is this related to same issue?

167

1        A.    Lack of beds in general population.

2        Q.    So there were lack of beds for EOP and there

3    were lack of beds for -- related to the general

4    population?

5        A.    Yes.

6        Q.    Were there more inmates than appropriate beds?

7        A.    Yes.

8        Q.    It's your understanding?

9              Were there more EOPs than appropriate beds in

10   the system?

11             MS. VOROUS:   Objection.

12   BY MR. FISCHER:

13       Q.    Trying to understand what your --

14       A.    More EOPs -- they couldn't transfer EOPs to

15   other institutions.

16       Q.    For lack of available beds?

17       A.    Lack of available beds.

18       Q.    Okay.  Do you recall, did you interview any of

19   the EOPs in segregation awaiting transfer when you were

20   at CIM?

21       A.    This -- these may have been the inmates on

22   page 102626.

23       Q.    Uh-huh.

24             Based on your interviews with these inmates,

25   were you able to reach an opinion as to whether they

168

1    were receiving appropriate level of care treatment?

2         A.    They were sick inmates.  They were very sick

3    inmates.  And --

4         Q.    Do you remember anyone specifically?

5         A.    No.  Just by what I'm -- I wrote down about

6    the fact that -- that they were hearing voices or that

7    they were having auditory hallucinations or that one

8    inmate was seeing signs of his grandmother.  They were

9    sick inmates; they needed to be somewhere else.

10        Q.    In your opinion, was the administrative

11   segregation unit an appropriate area for these inmates?

12             MS. VOROUS:  Objection.  Assumes that these

13   inmates were ad seg.

14             THE WITNESS:  If these inmates were in ad seg.

15   BY MR. FISCHER:

16        Q.    Based on your memory, you interviewed inmates

17   in ad seg?

18        A.    I thought these were the inmates in ad seg.

19   I'm not sure.  I'd have to look at the numbers to be

20   sure.

21        Q.    On the page after which you were reading where

22   it again says "Seg" at the top.  This is 102627.

23             About halfway down, it says "LOB" -- "Make a

24   note LOB."  Does that stand for lack of bed?

25             MS. VOROUS:  Are you asking her whether --

268

1                    CERTIFICATE OF REPORTER

2

3              I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                        DATED: February 25, 2013

21

22                        _____

23                        MEGAN F. ALVAREZ

24                        RPR, CSR 12470

25

# Exhibit 6

1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,              )
                                         )
5                        Plaintiffs,     )
                                         ) CASE NO.:
6            vs.                         ) S 90-0520 LKK-JFM
                                         )
7    EDMUND G. BROWN, JR., ET AL.,       )
                                         )
8                        Defendants.     )
     _____)

9

10

11                        DEPOSITION OF

12              JACQUELINE MOORE, RN, PH.D.

13         THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

14                 SAN FRANCISCO, CALIFORNIA

15

16

17

18

19   REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

20            THORSNES LITIGATION SERVICES, LLC

21

22

23

24

25

2

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,                )
                                           )
5                        Plaintiffs,       )
                                           ) CASE NO.:
6              vs.                         ) S 90-0520 LKK-JFM
                                           )
7    EDMUND G. BROWN, JR., ET AL.,         )
                                           )
8                        Defendants.       )
     _____)

9

10

11

12

13

14          The Deposition of JACQUELINE MOORE, RN, PH.D.,

15    taken on behalf of the Plaintiffs, before Megan F.

16    Alvarez, Certified Shorthand Reporter No. 12470,

17    Registered Professional Reporter, for the State of

18    California, commencing at 8:50 a.m., Thursday,

19    February 21, 2013, at the Rosen, Bien, Galvan &

20    Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21    Francisco, California.

22

23

24

25

3

1    APPEARANCES OF COUNSEL:

2    FOR PLAINTIFFS:

3              BY:   AARON J. FISCHER, ESQ.
                    ROSEN, BIEN, GALVAN & GRUNFELD, LLP
4                   315 MONTGOMERY STREET, 10TH FLOOR
                    SAN FRANCISCO, CALIFORNIA 94104
5                   415.433.6850
                    415.433.7104 FAX
6                   AFISCHER@RBGG.COM

7
     FOR DEFENDANTS:
8
               BY:   DEBBIE J. VOROUS, ESQ.
9                    OFFICE OF THE ATTORNEY GENERAL
                     STATE OF CALIFORNIA
10                   1300 I STREET
                     SACRAMENTO, CALIFORNIA 95814
11                   916.324.5345
                     916.324.5205 FAX
12                   DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25

1    components I looked at.

2         Q.    One of the audit tool components for your --

3         A.    For my criteria, yes.  And so the nurse

4    brought me to this meeting.

5         Q.    And so do I understand that your finding was

6    that there were more CCCMS prisoners than there were

7    staff to be able to do discharge planning, including

8    patrol medications with them?

9              MS. VOROUS:  Objection.  Misstates testimony.

10             THE WITNESS:  No, no, no.

11   BY MR. FISCHER:

12        Q.    Go ahead.

13        A.    No, no, no.  The parole meds were done

14   differently than the discharge planning.

15             My premise was that there weren't enough

16   discharge planners to fill out the social security

17   applications, make sure people had housing, other

18   therapies.

19        Q.    Various aspects of discharge planning were not

20   done for the CCCMS population?

21        A.    Correct.

22        Q.    Okay.  Thank you for clarifying.  Maybe I can

23   get my question correct this time.

24             Your finding was that there were more CCCMS

25   prisoners at CIM than there were staff available to do

1    discharge planning at the institution?

2              MS. VOROUS:  Objection.  Misstates her

3    testimony.

4              THE WITNESS:  Yes.

5    BY MR. FISCHER:

6         Q.   Okay.  And one last thing on CIM I wanted ask

7    you about in your notes on the final page, 102633.

8              Most of the way down next to No. 5, it says:

9    "Nurse UNFAM, SE, psy meds."

10             What does that note refer to?

11        A.   Nurses were unfamiliar with the side effects

12   of psychiatric meds.

13        Q.   I imagine that's on your radar because you're

14   a nurse?

15        A.   I asked them.

16        Q.   Why did you ask this question?

17        A.   I asked all the institutions.  That was one of

18   the criteria on my audit tool.

19        Q.   And here -- SE is side effects?

20        A.   Side effects.

21        Q.   And is this particular CIM of concern to you

22   in your analysis?

23        A.   Yes.

24        Q.   Why is that?

25        A.   Because it's a common practice that nurses

268

1                   CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8          That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                           DATED: February 25, 2013

21

22                   _____

23                   MEGAN F. ALVAREZ

24                   RPR, CSR 12470

25

# Exhibit 7

**From:**         Wheeler, (Ralph) David@CDCR
**Sent:**          Monday, February 04, 2013 2:34 PM
**To:**            Prudhomme, Catherine@CDCR
**Subject:**       FW:
**Attachments:**   SRE Mentoring Program Email.docx; SRE PEER MENTOR SCHEDULE 2013 3rd Edit.xlsx

FYI

D. Wheeler, PsyD
Chief Psychologist
California State Prison - Sacramento

916 985-8610 ext. 6105
916 628-5966 iPhone
916 294-3122 confidential fax
**ralph.wheeler@cdcr.ca.gov**

 **CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES** 

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only. Unauthorized access or distribution is prohibited by all applicable laws.*

**From:** Ponder, John@CDCR
**Sent:** Wednesday, January 30, 2013 8:45 AM
**To:** Wheeler, (Ralph) David@CDCR
**Subject:** FW:

SRE Mentor Program Model from MCSP.

**From:** Telander, Jim@CDCR
**Sent:** Wednesday, January 30, 2013 8:39 AM
**To:** Wagle, Rinata@CDCR; Branman, Eric@CDCR; Esposito, George@CDCR; Friel, Sally@CDCR; Laughlin, Debra@CDCR; Olson, Edward@CDCR; O'Meara, Marie@CDCR; Towner, Kristina@CDCR; West, George@CDCR; Anand, Karuna@CDCR; Colley, Jeremy@CDCR; Fowler, Fred@CDCR; Haspel, Thomas@CDCR; John, Biju@CDCR; Kecskes, Diane@CDCR; Lanzano, Gia-Evita@CDCR; Rose, Scott@CDCR; Smith, Michael W.@CDCR; Suskauer, Sheldon@CDCR; Wagle, Rinata; Young, Gregory@CDCR; Anderson, Carol(Psy.D.)@CDCR; Andres, Allison@CDCR; Andrews, Siara@CDCR; Arnold, Bob@CDCR; Babrah, Pritam@CDCR; Beckel, Debra@CDCR; Bressi, Dominique@CDCR; Coffin, Demetri@CDCR; Cordosi, David@CDCR; Custer, Oral@CDCR; Fang, Ko@CDCR; Fisher, Janelle; Keller, Kate@CDCR; Kim, Mike@CDCR; Landry, Robert@CDCR; Leigh, Sandra@CDCR; Liddell, Alysia@CDCR; Lisle, Douglas@CDCR; Meeker, Edward@CDCR; Minor, Shelly@CDCR; Montes, Melton@CDCR; Ortigo, Richard@CDCR; Pickering, Victoria@CDCR; Pifferini, Brian@CDCR; Ponder, John@CDCR; Scott, James D.@CDCR; Sutterfield, Kim@CDCR; Wilcox, Jean@CDCR; Wilcox, Lawrence@CDCR
**Cc:** Neuner, Suzie@CDCR; Dahl, Rick@CDCR; Davison, James@CDCR; Deans, Pamela; Gransee, Edith@CDCR; Heuer, Lori@CDCR; Kirkman, Julie@CDCR; Lintern, Ray@CDCR; Telander, Jim@CDCR; Wood, Patricia@CDCR
**Subject:**

All MCSP Clinical staff,

1

Welcome to the kick off for the SRE mentor program. Attached is a memo describing the program and a draft rough schedule for the first few months. Dr. Arnold and Dr. Andres will be heading up the project, and I expect that there will be some obstacles to work through, so your patience is appreciated. Mentors have been identified and trained, but will also be participating in being observed. I appreciate your anticipated cooperation in this process. Thank you.

*James (Jim) Telander, Psy.D.*
Chief of Mental Health
Chief Psychologist
Mule Creek State Prison
P.O. Box 409099
Ione, CA 95640
O: 209-274-4911 ext. 6794
C: 209-642-6177
jim.telander@cdcr.ca.gov

 

## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

**CONFIDENTIALITY NOTICE:** This e-mail message including attachments if any, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

2

To all MCSP mental health clinicians,

This is the introduction to the newly renamed Suicide Risk Evaluation Mentoring Program (SRE-MP), which was previously named the Proctoring and Mentoring Program (PMP). The program evolved from a Coleman Court Order that discovered that 82% of suicide risk assessments or evaluations revealed some deficiencies. Thus, the guidelines for the SRE-MP out of Headquarters are very intensive and detailed. This letter is to further aid in understanding and preparing for this important process.

The goals of SRE-MP are to provide a collegial environment for peer review and support during the completion of the *most challenging clinical tasks for any clinician-completing a suicide risk assessment*. In addition, this process will increase the protection against legal liabilities. It is important to remember this is a clinical process and not a disciplinary process. It is not an administrative task; the program is designed to further develop clinical skills and competence as well as confidence in doing suicide risk assessments and crisis interventions within CDCR.  Dr. Arnold and Dr. Andres will be heading up this project at this time.

There is a formal process that may include:

1. Routine review of completed SREs by SPR-FIT Coordinator (Dr. Arnold) and the SRE-MP Head Mentor Dr. Andres.
2. Initial assessment of existing suicide risk assessment skills via scheduled one-on-one mentoring meeting (s), by Dr. Arnold, Dr. Andres and a pool of others trained to be a mentor.
3. Utilizing the SRE Quality of Care Review Tool to guide the rating of existing suicide risk assessment skills.
4. Didactic training in completing suicide risk assessments and crisis interventions, including discussion of relevant research and literature.
5. Observing the mentor conduct one or more SREs for an at-risk patient during a suicide risk assessment/crisis intervention.
6. Completion of one or more SREs in the mentor's presence during a suicide risk assessment and crisis intervention of an at-risk patient.
7. Ongoing performance evaluation and feedback of the mentee's administration of the SRE with mentoring on the whole suicide risk assessment process.
8. Ongoing review by utilizing the SRE Quality of Care Review Tool until 80% compliance is reached.

As expected, the process of completing the requirements of this program will involve a significant degree of collaboration between the designated mentors and clinicians. Your patience and understanding is anticipated and appreciated as we initiate the SRE-MP program.

Until you are chosen as a mentee it is a good idea to be cognizant of your current approach to completing the SRE. If you would like any review and/or recommendations regarding the completion of SREs prior to your rotation as a mentee, Dr. Arnold and/or Dr. Andres would be happy to assist you.

Respectfully,

James Telander, Psy.D.
Chief of Mental Health/Chief Psychologist

# MCSP PEER MENTORING SCHEDULE 2013

## JANUARY

| Mentor | Mentee | Date Completed |
|---|---|---|
| Shirikian | J. Fisher | |
| | S. Leigh | |
| | C. Anderson | |
| Arnold | G. West | |

## FEBRUARY

| Mentor | Mentee | Date Completed |
|---|---|---|
| Andres | L. Wilcox | Week 1 |
| Arnold | K. Sutterfield | |
| Babrah | M. O'Meara | |
| | | |
| Bressi | K. Fang | Week 2 |
| Towner | G. Esposito | |
| Cordosi | K. Towner | |
| Deans | M. Montes | |
| Pifferini | E. Meeker | |
| | | |
| Scott | Anand | Week 3 |
| Wood | Rose | |
| Andres | R. Landry | |
| Arnold | E. Branman | |
| Babrah | Lanzano | |
| Bressi | R. Ortigo | |
| Colley | M. O'Meara | |
| | | |
| Cordosi | L. Wilcox | Week 4 |
| Deans | D. Bressi | |
| Pifferini | O. Custer | |
| Scott | R. Ortigo | |
| Wood | P. Babrah | |

## MARCH

| Mentor | Mentee | Date Completed |
|---|---|---|
| Andres | Anand | Week 1 |
| Arnold | Towner | |
| Babrah | Esposito | |
| Bressi | Kim | |
| Colley | Lanzano | |
| Cordosi | Custer | |
| Deans | Laughlin | |
| | | |
| Pifferini | B. John | Week 2 |

| | | |
|---|---|---|
| Scott | Anderson | |
| Wood | Esposito | |
| Arnold | Andres | |
| Andres | West | |
| Towner | Pifferini | |
| Bressi | Olson | |
| Colley | Babrah | |
| Deans | Lisle | |
| Scott | Anderson | |
| | | |
| Wood | Fang | Week 3 |
| Andres | Coffin | |
| Arnold | Beckel | |
| Babrah | Aspinall | |
| Bressi | Keller | |
| Colley | Wagle | |
| Cordosi | Olson | |
| Scott | Smith | |
| | | |
| Arnold | Coffin | Week 4 |
| Towner | Laughlin | |
| Babrah | Scott | |
| Cordosi | Haspel | |

**APRIL**

| Mentor | Mentee | Date Completed |
|---|---|---|
| Deans | Arnold | Week 1 |
| Pifferini | Friel | |
| | | |
| Scott | Beckel | Week 2 |
| Wood | Scott | |
| Babrah | Minor | |
| | | |
| Bressi | Montes | Week 3 |
| Scott | Friel | |
| Cordosi | Coffin | |
| Deans | Towner | |
| Pifferini | Laughlin | |
| | | |
| Colley | Kecskes | Week 4 |

# Exhibit 8



# California Department of Corrections and Rehabilitation Prison Capacity Planning

## FINAL REPORT

## ATTORNEY-CLIENT WORK PRODUCT

## October 3, 2011



**Pulitzer/Bogard & Associates, LLC**
8 Saratoga Street
Lido Beach, NY 11561
Tel (516) 432-5177
Fax (516) 432-3414
www.pulitzerbogard.com

Attorney-Client Work Product – Confidential

# Table of Contents

| Chapter/Section Heading | Page # |
|---|---|
| *List of Tables* | 1 |
| *Executive Summary* | 2-4 |
| I.   Introduction | 5-8 |
| II.   Capacity Methodology | 9-31 |
| III.   Pilot Reviews | 32-38 |
| IV.   Systemwide Application | 39-44 |
| V.   Recommendations and Next Steps | 45-47 |
| VI.   Participants/Resources | 48-49 |
| *Appendices* | 50-119 |

# List of Tables

| Table Number and Title | Page # |
|---|---|
| Table 1-1: Summary of Capacity Analysis | 4 |
| Table 2-1: ASCA Out of Cell (OOC) Time Survey Results | 18 |
| Table 2-2: CDCR Housing Capacity Standards and Potential Mitigation Matrix | 28 |
| Table 3-1: Receiver's Access to Care Data Applied to Pilot Tests | 35 |
| Table 3-2: Pilot Capacity Analysis Summary Table | 38 |
| Table 4-1: Summary of Capacity Analysis | 43 |
| Table 4-2: Summary of Capacity Analysis – Other Capacities | 44 |

# Executive Summary

The California Department of Corrections and Rehabilitation (CDCR) has for several decades measured its capacity using an approach referred to as Design Capacity. This approach is based on one inmate per cell, single bunks in dormitories, and no beds counted in capacity if the space was not designed for housing. When the State added 23 institutions to the correctional system between 1985 and 2005, the capacity of the new and expanded institutions was predicated on the Design Capacity concept.

The design capacity measure, however, has proven to be flawed for a variety of reasons. First, even with an enormous increase in capacity, single celling and bunking was never a reality, and from shortly after CDCR embarked on the major systemwide expansion the agency recognized that it would have to put more than one inmate in many cells and rely on double (and frequently triple) bunks in many dormitories as the systemwide population increased substantially. Second, national standards governing single celling, particularly those promulgated by the American Correctional Association (ACA), have changed markedly from the 1980's until today. Previous requirements for single celling and single bunking have been modified over time to the point that they are no longer considered to be the norm. In lieu of broad rules identifying which stratifications of inmates must be single celled (e.g., maximum custody, segregation, etc.), standards now emphasize decision making on an individual inmate basis, based on classification factors in determining the appropriate housing assignment.

In 2009, the Three Judge Panel in the *Coleman and Plata* cases issued a decision to limit systemwide overcrowding to 137.5% of Design Capacity as a primary mechanism designed to bring about improvements to health care.[1]

It was with this history that CDCR decided in 2010 to pursue a new, alternative approach to measuring capacity. In June of 2010, CDCR contracted with Pulitzer/Bogard & Associates (P/BA) to obtain expert advice and assistance "in determining a Manageable Operational Capacity (MOC)[2] for each prison based on established criteria and recognized industry standards." This effort was intended to provide CDCR with new management tools and established systems to better assess and measure the capacity of its 33 prisons individually, and as a system.

This approach was intended to be methodical, evidence based, supported by the ACA national standards, and consistent with (although not necessarily identical to) approaches used by other large state prison systems and the Federal Bureau of Prisons. The new approach would draw upon concepts and principles used by Federal Courts throughout the country. It was also to reflect key concerns of the *Coleman* and *Plata* courts concerning crowding in general, and also regarding access to medical and mental health care.

---

[1] *Coleman & Plata v. Schwarzenegger*, 2009 U.S. Dist. Lexis 76943 (Aug. 4, 2009)
[2] This term was subsequently changed to Prison Operating Capacity (POC).

This new methodology yields a primary capacity measurement-- Prison Operating Capacity (POC). POC is based first on the application of applicable ACA standards, but then allows for an adjustment to the standard based calculation where mitigation thresholds of out-of-cell activity are achieved. Although not all classifications are eligible for mitigation, most are and the potential impact of this paradigm on agency wide policy, operations and capacity planning and measurement is substantial. The main premise is that the sufficiency of living space is directly impacted by the number of hours an inmate is confined to that space and that increased out-of-cell activity has multiple benefits, including the positive effect of reducing density.

In 2011 the U.S. Supreme Court, in *Brown v. Plata,* accepted the use of Design Capacity as the measurement of capacity as it affirmed the Three Judge Panel's adoption of 137.5% of design capacity as the constitutional limit on capacity for the CDCR.[3] As such, this new approach to capacity planning is not intended to be indicative of a constitutional standard for defining the capacity of the CDCR's prisons. Rather, the results of this effort would represent solely a professional, standards-driven, policy informed approach to calculating capacity.

P/BA collaborated with a CDCR Working Group, which consisted of experienced staff representing decades of experience in institutional management, classification, facility design, mental health care, inmate programs, and security. P/BA took the lead in analyzing the current capacity methodology's shortcomings, conceptualizing the alternative approach, developing the information to support and inform the new approach, and in developing key documents to support the process of redefining how capacity may be viewed and measured in CDCR's institutions. Members of the Working Group took the lead on developing all the data collection tools, capturing the data during pilot tests at six prisons, and analyzing the data of those pilot tests. The Working Group also enlisted the support of a large group of officials from the Division of Adult Institutions (DAI), who provided the lion's share of the field work necessary to survey CDCR's 33 prisons using the tools associated with the new capacity methodology. The bulk of the quality assurance work and data analysis was performed by the Working Group as well.

CDCR executive and legal staff were briefed at key points in the developmental process relative to the methodology, the results of the pilot surveys at six institutions, and the findings obtained after application of the new methodology at all 33 CDCR prisons.

This report represents a first phase of the CDCR's new approach to capacity measurement and planning—the "what is." Beyond this point, should the State decide to fully pursue this methodology and adopt it as CDCR policy, there are myriad steps that need to be taken to achieve full implementation of both the methodological components of this approach as well as the inherent policy components. Recommendations for the next phase are included in Chapter V of this report.

Table 1-1 below illustrates how three calculated capacity figures- ACA, POC, and Potential Prison Operating Capacity (the maximum possible capacity that could be obtained if full mitigation was achieved at all housing units at all institutions) - compare with the existing CDCR's design capacity, the Supreme Court's cap (137.5% of design capacity) and the Department's current "overcrowding capacity."

---

[3] 563 U.S. __(2011)

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

## Table 1-1: Summary of Capacity Analysis

| Prison | ACA | POC | PPOC | Health Care Adjustment |
|---|---|---|---|---|
| CIW | 997 | 1,668 | 1,767 | 0 |
| CCWF | 1,099 | 1,596 | 2,558 | 0 |
| VSPW | 2,068 | 2,056 | 2,562 | 0 |
| **Female Sub Total** | **5,064** | **5,720** | **6,887** | **0** |
| CIM | 3,399 | 3,713 | 4,553 | 0 |
| SQ | 3,249 | 3,501 | 3,501 | 0 |
| DVI | 1,743 | 1,868 | 2,683 | 0 |
| RJD | 2,220 | 2,262 | 3,782 | 0 |
| NKSP | 2,984 | 3,094 | 4,899 | 0 |
| WSP | 3,431 | 3,540 | 5,507 | 0 |
| LAC | 2,392 | 2,494 | 4,034 | 0 |
| CCI | 2,836 | 3,326 | 3,776 | 0 |
| COR | 4,391 | 4,139 | 5,269 | 0 |
| SAC | 3,412 | 2,957 | 2,957 | 0 |
| HDSP | 3,434 | 3,379 | 4,279 | 0 |
| KVSP | 4,576 | 4,352 | 4,352 | 0 |
| PBSP | 3,384 | 3,275 | 3,275 | 0 |
| SVSP | 3,287 | 3,180 | 4,080 | 0 |
| CMF | 2,400 | 2,571 | 2,933 | 0 |
| CMC | 4,268 | 4,895 | 4,895 | 0 |
| SATF | 4,044 | 4,536 | 5,390 | 0 |
| CAL | 2,400 | 2,606 | 4,216 | 0 |
| CEN | 2,361 | 2,452 | 4,162 | 0 |
| MCSP | 1,796 | 1,909 | 3,039 | 0 |
| PVSP | 2,365 | 2,452 | 4,162 | 0 |
| ASP | 4,147 | 5,769 | 5,769 | 0 |
| CCC | 1,870 | 2,330 | 2,690 | 0 |
| CRC | 3,519 | 5,233 | 5,243 | 0 |
| SOL | 3,264 | 4,023 | 4,923 | 0 |
| LVSP | 2,531 | 3,428 | 3,428 | 0 |
| CTF | 3,553 | 3,886 | 4,998 | 0 |
| FSP | 2,132 | 2,244 | 2,532 | 0 |
| ISP | 2,286 | 2,386 | 4,096 | 0 |
| SCC | 1,651 | 2,030 | 2,390 | 0 |
| **Male Sub Total** | **89,627** | **97,750** | **121,813** | **-** |
| **Institution Sub Total** | **94,691** | **103,470** | **128,700** | **-** |
| **Off Site Camps*** | | | | |
| CIW | 320 | 320 | 320 | 0 |
| CCC | 2,150 | 2,150 | 2,150 | 0 |
| SCC | 2,010 | 2,010 | 2,010 | 0 |
| **Camps Sub Total** | **4,480** | **4,480** | **4,480** | |
| **Grand Total** | **99,171** | **107,950** | **133,180** | |

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# I. INTRODUCTION

Attorney-Client Work Product – Confidential

# I. Introduction

In June of 2010 the California Department of Corrections and Rehabilitation (CDCR) contracted with Pulitzer/Bogard & Associates (P/BA) to obtain expert advice and assistance "in determining a Manageable Operational Capacity (MOC)[4] for each prison based on established criteria and recognized industry standards." This effort was intended to provide CDCR with management tools and established systems to better assess and measure the capacity of its 33 prisons individually, and as a system.

Prior to the inception of this process, CDCR's capacity had long been determined using an approach referred to as "design capacity." This approach is based on one inmate per cell, single bunks in dormitories, and no beds counted in capacity if the space was not designed for housing. When the State added 23 institutions to the correctional system between 1985 and 2005, the capacity of the new and expanded institutions was predicated on the design capacity concept. All cells were assumed to be for only one inmate and all dormitories were assumed to house inmates on single bunks. During the course of this expansion program, a policy decision was made to expand infrastructure such as water, waste water and electrical systems to accommodate short-term overcrowding. In addition, two bunks and two lockers were placed in each cell. However, no additional program, support, treatment and/or health care space was included in the designs to accommodate an inmate population above design capacity.

Even with an enormous increase in capacity, single celling and bunking was not to become a reality, however, and from the start the CDCR recognized that it would have to put more than one inmate in many cells and rely on double (and frequently triple) bunks in many dormitories as the systemwide population increased substantially. The Department then began using a second capacity figure—Overcrowding Capacity—whereby inmates would be housed in excess of design capacity based on the application of a series of "overcrowding" percentages. These percentages of overcrowding permitted housing inmates in lower custody dormitories at 200%, higher custody general population and reception at 190% of design   capacity, while others would be housed at 100% of design   capacity based on the various classifications.

This has been the capacity measurement and institutional planning approach employed by CDCR for almost 30 years.  There are, however, several problems and limitations inherent in this approach.

The first problem is the fact that the design capacity was based on outdated notions of capacity determinations.  When the institutions were planned and built in the 1980s-1990s there was still some degree of acceptance that single celling was preferred and, in fact, national standards strongly encouraged that approach.  The 1990 edition of the Standards for Adult Correctional Institutions Standards of the American Correctional Association (ACA), on which CDCR based its designs, required single cells for all security levels, except for minimum custody.[5]  Since that time, the standards governing capacity of cells have changed significantly.  In 1991, the standards were

---

[4] This term was subsequently changed to Prison Operating Capacity (POC).
[5] ACA Third Edition ACI Standard 3-4128-1.

Attorney-Client Work Product – Confidential

changed to allow multiple occupancy cells for medium custody inmates;[6] the requirement for single celling segregation inmates was deleted in 2004; [7]and by 2005 the requirement to house maximum custody inmates in single cells was also eliminated.[8] ACA replaced the imperatives for single celling with a requirement that single cells be available when indicated by "a determination made by the classification system, medical diagnosis, or other professional conclusions."[9]

In other words, the foundation on which CDCR based its design capacity in the 1980s no longer existed by the 1990s and mid-2000s. Single celling is no longer the default expectation for measuring capacity according to national standards, yet it remains at the core of the CDCR's capacity measurement system. Thousands of cells that were rated for one inmate under the older standards could now potentially be used for two persons if the classification system deemed it appropriate and if certain space requirements were satisfied regarding unencumbered space.

A second significant problem with the CDCR's capacity measurement approach is the application of the "overcrowding" percentages. The use of the term overcrowding suggests that housing any more than one inmate in a cell is per se "overcrowding." But that, of course, is based on now defunct readings of national standards. Moreover, the allowable overcrowding percentages, as reflected in the CDCR's Overcrowding Capacity (OC), are arbitrary, with no foundation in contemporary standards or evidence based principles. Across the board percentages have served as a practical means to adjust the capacity to something that reflects actual inmate population needs, and wardens and other CDCR professionals have learned to live with these percentages, but those are different issues than defining capacity.

Compounding the inherent problem with relying on design capacity as a baseline and applying arbitrary overcrowding percentages is the fact that that this approach was used in the litigation arena, with the force of law. The August 2009 Opinion and Order of the Three Judge Panel cited extensive testimony concerning the "correct overcrowding percentage" that should be used, with some individuals arguing for 130%, others for 145%. The testimony before the Three Judge Panel focused, however, on percentages of crowding not based on design capacity but rather based on capacity measurements as used in other correctional systems that almost uniformly are higher than what they would be under strict application of design capacity. The Three Judge Panel, in turn, considered the various opinions about the "correct" percentage and decided to limit systemwide overcrowding to 137.5% of design capacity.[10] The Supreme Court's recent decision in *Brown v. Plata* accepted the use of design capacity without comment, and then affirmed the Three Judge Panel's adoption of 137.5%.[11]

It was with this history that CDCR decided in 2010 to pursue a new, alternative approach to measuring capacity. This approach was intended to be methodical, evidence based, supported by the ACA national standards, and consistent with (although not necessarily identical to) approaches

---

[6] ACA Fourth Edition ACI Standard 4-4132

[7] ACA 2006 Supplement clarifying ACI 4-4141

[8] ACA 2010 Supplement states that the standard 4-4131, which required single cells for maximum custody inmates, was deleted by the Standards Committee.

[9] ACA 2006 Supplement ACI 4-4133

[10] *Coleman & Plata v. Schwarzenegger*, 2009 U.S. Dist. Lexis 76943 (Aug. 4, 2009)

[11] 563 U.S. __(2011)

Attorney-Client Work Product – Confidential

used by other large state prison systems and the Federal Bureau of Prisons. The new approach would draw upon concepts and principles used by Federal Courts throughout the country. And, it was also to reflect key concerns of the *Coleman* and *Plata* courts concerning crowding in general, and also regarding access to medical and mental health care.

This new approach to capacity planning was not intended to suggest that it would be indicative of a constitutional standard for defining the capacity of the CDCR's prisons; the results of this effort represent solely a professional, standard driven, policy informed approach to calculating capacity.

For the past year, P/BA has been working in collaboration with a Working Group of CDCR professionals in developing a new paradigm for realistically calculating capacity within CDCR prisons. P/BA took the lead in analyzing the current capacity methodology's shortcomings, conceptualizing the alternative approach, developing the information to support and inform the new approach, and in developing key documents to support the process of redefining how capacity may be viewed and measured in CDCR's institutions.

The Working Group consisted of experienced CDCR staff, representing decades of experience in institutional management, classification, facility design, mental health care, inmate programs, and security. P/BA and the Working Group met numerous times and had myriad conference calls over the year and worked closely in all aspects of this effort. Members of the Group were not only partners in all aspects of the conceptual process, but they also took the lead on developing all the data collection tools, capturing the data during the pilot tests, and analyzing the data of those pilot tests. The Working Group also enlisted the support of a large group of officials from the Division of Adult Institutions (DAI), who provided the lion's share of the field work necessary to survey CDCR's 33 prisons using the tools associated with the new capacity methodology. The bulk of the quality assurance work and data analysis was performed by the Working Group as well.

CDCR executive and legal staff were briefed at key points in the developmental process relative to the methodology and results of the pilot surveys at six institutions.

This Report is the final product of the year-long effort. Subsequent sections of this Report will discuss the research into best national practices and national standards, the principles underlying the proposed capacity approach, the process of field testing the approach and the tools that were developed to measure capacity consistent with the new approach, the results of the pilot tests, the systemwide measurements and calculations of capacity, and the next steps required to institutionalize the new approach within CDCR.

Attorney-Client Work Product – Confidential

# II. CAPACITY METHODOLOGY

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# II. Capacity Methodology

### Goals and Objectives

In the early stages of the capacity planning project, P/BA and the Working Group discussed goals for the new capacity methodology. The goals that were mutually agreed to were as follows:

- Performance Standards Based on national standards- The Working Group determined that the methodology employ standards that were not merely static and quantitative, but also included a measure of "performance" i.e., that it be based on achieving certain levels of positive correctional performance that could be measured. In doing so, the idea was that the capacity methodology could serve as a catalyst to bring about positive changes in the prison system. At the same time, it was agreed that the performance measures and the standards developed or employed, should be based on national standards, most notably those promulgated by the American Correctional Association.

- Build on other systems' approaches- A goal for which there was unanimous consent was that the CDCR methodology draw upon and build on the experience of other large correctional systems. This would serve the dual purposes of allowing CDCR to benefit from the experiences of other like agencies, but also providing a measure of defensibility.

- Applicable to unique California issues and context- While the Working Group aimed to draw upon national standards and the experience of other correctional agencies, at the same time it was agreed that the methodology needed to be responsive and sensitive to the unique circumstances and context present in California. Positive (and negative) historical lessons learned needed to be considered along with issues such as the myriad consent decrees and court orders that govern or impact on many aspects of the CDCR's prisons' operations. Moreover, while this capacity methodology project was not viewed as a direct response to the Coleman/Plata case, at the same time there was a recognition that concerns or key concepts that emerged in that litigation should be incorporated into the methodology where appropriate.

- Safety of staff and inmates- Paramount in the minds of members of the Working Group was that the capacity methodology not jeopardize staff and inmate safety and, conversely, that it potentially be able to contribute to creating a safer environment in the prisons. These goals clearly took precedence over any ideas pertaining to achieving a particular target number for future bed capacity or any notions of maintaining the status quo relative to how the prisons currently operate.

- Fiscally sound/practical- While fiscal concerns were not the overarching concern driving the general concepts and specific decisions, at the same time the Working Group was clearly cognizant of and expressed concern about how to appropriately (and safely) maximize existing resources. One example of this concern arose during discussions about the continued use of very small cells. The CDCR currently has more than 8,000 cells that are less than 55 square feet, including more than 2,800 cells that are less than 40 square feet. In most cases, these

cells hold two inmates, even though they would not be large enough (per ACA standards) for even one inmate. The decision was made early on that while these cells would not be considered eligible for double bunking under the new methodology, at the same time they could not just be considered unusable and taken off line.

- Replicable- The Working Group identified replicability as another key requirement. CDCR staff, or outside entities, should be able to review the data on which capacity calculations were based and arrive at the same conclusions as staff that conducted the field assessments. This requires that the field documentation and calculation methods be relatively simple and that policies and procedures and automated systems be developed to support the system of assessing capacity.

- Focus on "what is"- One final note of introduction—CDCR will initially apply this methodology to assess the current state of capacity and out-of-cell activity in the prisons -- the "what is." In the course of applying the tools at each prison, it will become apparent that there may or may not be opportunities in the near future to alter practices related to out-of-cell time, or to repurpose housing areas for different classifications in order to increase capacity. The impediments to increased capacity, or the opportunities available to increase capacity -- the "what if," -- will be identified in the course of the initial round of capacity measurement at all institutions. The opportunities will then become the subject of policy decisions relative to resources and sound practices at each prison.

Ultimately, it was one additional goal that in many respects became the defining feature of the resultant capacity methodology. That goal was to have an essential component of the capacity methodology driven by program opportunities, access to services and out-of-cell activity. This focus proved to be unique relative to other large correctional agencies' approaches to measuring capacity, although substantial support was identified for it from a variety of other sources, including national standards, the California litigation, fiscal concerns, and staff and inmate safety considerations. Moreover, it was determined that there was a long history of Federal Courts considering out-of-cell time as an important consideration in crowding cases.

Each of these goals will be referred to or discussed further in subsequent discussions within this section of the Report.


### Survey of other System's Approaches

Prior to recommending a methodology to determine CDCR's capacity, P/BA proposed that a survey be conducted of the approaches to measuring capacities that are employed by other large states and the Federal Bureau of Prisons (FBOP). Review of these systems' approaches helped to inform the process that would be developed for CDCR by building on the experience of these other large correctional systems. This survey would also serve the dual purposes of allowing CDCR to benefit from the experiences of other like agencies and also providing a measure of defensibility.

P/BA began its research on capacity analysis approaches in other states by first reviewing the states identified in a Bureau of Justice Statistics (BJS) data report on State Prison Capacities for 2008.[12] The BJS list is limited by the fact that all states were not respondents (or only completed segments of their survey).

There were a number of state systems we identified for purposes of culling their methodological approach to capacity that also responded to the BJS survey using the BJS definitions and approaches in determining institutional capacity, namely:

Rated Capacity: the number of beds or inmates assigned by a rating official(s) within the jurisdiction.

Operational Capacity: the number of inmates that can be accommodated based on a facility's staff, existing programs, and services.

Design Capacity: the number of inmates that planners and architects intended for the facility.

Of the 10 states with the largest prison populations, the breakdown of how they determined their capacities as reflected in their responses to the BJS survey and definitions were as follows:

- California:  Operational and Design
- Florida: Operational and Design
- Georgia: Operational
- Illinois: did not respond to the survey
- Louisiana: Rated and Operational capacities
- Michigan: Operational
- New York: Rated, Operational and Design Capacities
- Ohio: Rated capacity
- Pennsylvania:  Responded to each category for capacity with the same figures/totals
- Texas: Rated, Operational, Design Capacities

Because the respondents may not have totally conformed with BJS's definitions for rated, operational or design capacity, P/BA proceeded to gather additional information from each of these states to determine:

- what specific methodology they utilized in arriving at their prison system capacities and,
- under what authority (state law/penal code, court orders, etc) were they acting

P/BA queried those same states with the following questions:

1.  What is your agency's definition of capacity?

---

[12] Sabol, William J. et al (April 2010). Prisoners in 2008, BJS Bulletin.

2. How has your agency determined its institutional capacities?
3. What are the specific criteria or formulas used in determining the capacity of your agency's institutions?
4. What is the particular type of analysis and/or process that your agency uses in determining its institutional capacity?
5. Are there any lessons learned concerning your agency's process in determining capacity?

P/BA received information from Florida, Michigan, Tennessee and Pennsylvania. Massachusetts was also included as P/BA had been a team member in a Statewide Master Plan that included establishing new capacities for all of the state's institutions.

In addition, P/BA researched how the Federal Bureau of Prisons calculates institutional capacity.

Two particularly salient findings emerged from the research that was conducted by P/BA. First, no other state or the FBOP relies exclusively on original design capacity at single celling to define institutional capacity as does California. Second, none of the states surveyed or the FBOP have a methodology that directly factors in health care to the overall equation in determining institutional capacity.

Additional general findings from this limited survey include:
- There is no standard definition of capacity or how an agency calculates its systemwide bed capacity
- Other states do not count short-term health care beds in calculations of their permanent capacity.
- Several states have different levels of capacity calculations that may exclude and/or include medical and segregation beds
- ACA standards are the basis of determining systemwide capacity for the majority of agencies surveyed
- All the agencies surveyed have facilities with a variety of inmate housing configurations including planned double or multiple occupancy cells and dormitories

Agency specific findings include the following:
- While Florida uses the term "Design Capacity" it is a measure derived as a result of litigation. The calculation uses a formula primarily based on available square footage per inmate and is not based on the number of cells or dormitory beds as originally constructed, as is the case with CDCR's Design Capacity.
- Massachusetts recently modified its design capacity definition and is moving to a new method of capacity calculation based on ACA standards and life safety.
- Pennsylvania employs four capacity calculations: "Operational Bed Capacity," "Maximum Bed Capacity," "Emergency Bed Capacity" and, "Fill to Bed Capacity." All are grounded in a set of ACA driven policy standards.
- Michigan uses "Rated," "Actual" and "Current" capacity to define their systemwide prison bed capacity. While their rated capacity is based on design capacity, their 'true' capacity calculations are based on several variables including the structure of the facility, its security

needs and capabilities, the type/custody of prisoner to be housed in that institution and how much space each prisoner needs to have based on ACA standards.

- Tennessee officially uses "Operating" (Designated) capacity which is based upon the number of total beds and their designated usage available to house inmates. Excluded from operating capacity special purpose beds such as medical, mental health, disciplinary segregation, protective custody, etc.
- The following are key factors that the Federal Bureau of Prisons utilizes in computing their systemwide bed capacity:
  - "Rated" capacity excludes beds designated for hospital/infirmary, administrative detention, and disciplinary segregation. Their "Total" capacity includes all beds.
  - The FBOP capacity calculations are grounded in the ACA standards but set overall square footage parameters depending on custody level. For example, for high security inmates, rooms, cells and cubicles, are rated as single occupancy if they are less than 75 square feet. If they are 75 square feet or more, but less than 120 square feet, 25% of rooms, cells and cubicles are rated for double occupancy, and 75% for single occupancy. If they are 120 square feet or more, the rated capacity is computed by dividing the total space of each sleeping area or unit by 80 square feet.
  - In multiple occupancy housing areas, if the room or dormitory is 120 square feet or more, rated capacity is computed by dividing the total space of each sleeping area or unit by 80 square feet.
  - Permanently converted housing (e.g. office space converted into housing) counts in the capacity calculations while temporary housing does not.
  - In planning new facilities, the FBOP provides adequate infrastructure, treatment, program and support spaces to accommodate the maximum rated capacity for the proposed facility, although this was not necessarily the case for some of its older prisons.

### Overview of the Proposed Methodology

P/BA and the Working Group reviewed the results and key findings of the survey of other systems to arrive at a methodology that was grounded in the experience of other large correctional systems yet tailored for the unique needs of the CDCR. The proposed methodology is described herein.

American Correctional Association (ACA) standards are the most widely accepted source of national standards and best practices.[13] Many state correctional departments rely on ACA standards as a basis for operational policies and procedures and physical plant design criteria, and a large number are also participating in the ACA accreditation process. In fact, CDCR has committed to seeking accreditation for three of its prisons. As such, a great deal of emphasis was placed on incorporating these standards into this CDCR capacity development process.

The three core components of the proposed methodology are as follows:

1. Determination of capacity using application of selected ACA standards;

---

[13] State prisons are governed by the Adult Correctional Institution standards (4th Edition and 2010 Supplement) of the American Correctional Association.

2. A process of adjusting (expanding) ACA capacity based on mitigation of living space standards via out-of-cell activity for selected inmate classifications;

3. Adjustments to capacity (limiting) where current medical and mental health care resources are deemed insufficient to meet the demands of the proposed capacity.

This approach draws directly on ACA standards concerning housing space and measurement of capacity. It also incorporates and expands the application of a long-standing construct in the ACA standards, which recognizes that the minimum amount of living space required is affected by the amount of time the inmate remains in his cell, i.e., the more time an inmate is confined to his cell or living area, the more space is needed for individual exercise and movement. The precise interplay and application of these standards in this methodology is unique and has been tailored to meet the CDCR's needs for a measurable and defensible baseline calculation of institutional (and systemwide) capacity.

Two key components of the ACA standards form the foundation for this methodology— unencumbered square footage and out-of-cell time as a mitigating factor. While the early versions of ACA standards for inmate housing established minimum cell sizes, for the past two decades there has been a shift towards requiring a certain amount of unencumbered square footage per inmate in cells or in multiple occupancy living environments such as dormitories and locked wards. Unencumbered square footage is defined by ACA as, "the amount of space available for each occupant that is free of equipment and fixtures and therefore available for circulating and in-cell exercise".[14]

Additionally, there has also been a long-standing premise in the ACA standards that more space is required in cells when inmates are confined to their cells for longer periods. Standards manuals dating back to the 1980s called for larger cells when inmates were confined to their cells for more than 10 hours a day because it was deemed necessary to allow for in-cell activity if out-of-cell time was limited. This has been reflected directly in the language of specific standards as well as a theme consistently incorporated in the comments accompanying standards, especially those governing segregation cells.[15] In fact, over time there has been a distinct trend in the standards to virtually eliminate any specific requirements for single cells, except under very broadly defined circumstances at the discretion of prison classification officials.[16]

The focus on out-of-cell access also has roots in the approach that many Federal Courts have applied in crowding litigation. Courts have consistently looked at out-of-cell time as a vital factor in determining whether crowding in housing areas is unconstitutional, i.e., they have been more likely to find unconstitutional crowding when inmates are double or triple celled in substandard sized

---

[14] This approach differs from that employed by the Federal Bureau of Prisons (FBOP), which establishes a set gross cell size for rooms and cells. The FBOP approach, set forth in a June 1997 BOP Program Statement, does not reflect the current ACA/ACI Standards' emphasis on unencumbered space.

[15] See ACA/ACI Standard 4-4132, which states: "When confinement exceeds ten hours per day, there are at least 80 square feet of total floor space per occupant."

[16] See ACA/ACI Standard 4-4133, which requires single cells "when indicated" for inmates with severe medical disabilities, seriously mentally ill inmates, sexual predators, and inmates likely to be exploited or victimized.

cells for many hours of the day with limited out-of-cell opportunities.[17]In other words, out-of-cell time has been found to be an important mitigating factor relative to cell size and multiple occupancy (or even single occupancy) of substandard sized cells.

The American Correctional Association is not the only professional organization that has emphasized the importance of out-of-cell activity and integrated this into specific standards. Drawing on the concerns articulated by many courts, the American Bar Association in 2010 issued a new set of standards governing correctional institutions.[18] Those standards specifically address the importance of out-of-cell time.[19]

The Working Group fully realized that there are barriers to maximizing out-of-cell activity in the CDCR prisons as a result of staff shortages, physical space limitations, and current practices that often interfere with out-of-cell opportunities. Nevertheless, the Group elected to proceed with out-of-cell activity as a critical component of the capacity measurement process despite the fact that these limitations would initially have a negative effect on expanding capacity.

Key aspects of the methodology described, include:

- It incorporates significant elements and long-employed constructs of the ACA Standards
- It draws on elements of capacity measurement approaches employed by the Federal Bureau of Prisons and several large state corrections systems.
- It reflects essential California regulatory and court driven requirements.
- It establishes a mechanism for mitigation of sub-standard living space based on out-of-cell activity.
- It establishes a capacity for each prison (Prison Operational Capacity or POC). and for the CDCR system as a whole. .
- In light of the *Plata/Coleman* litigation focusing on crowding and the impact it has on health care, this methodology includes access to medical and mental health care as an important capacity driving element of the Operational Capacity.

---

[17] Boston, J., & Manville, D., (2010) *Prisoners' Self Help Litigation Manual*. New York: Oceana. Pages 19-20.

[18] American Bar Association Standards on the Treatment of Prisoners, Third Edition, February 2010.

[19] Standard 23-3.6 Recreation and out-of-cell time

(a) To the extent practicable and consistent with prisoner and staff safety, correctional authorities should minimize the periods during the day in which prisoners are required to remain in their cells.

(b) Correctional authorities should provide all prisoners daily opportunities for significant out-of-cell time and for recreation at appropriate hours that allows them to maintain physical health and, for prisoners not in segregated housing, to socialize with other prisoners. Each prisoner, including those in segregated housing, should be offered the opportunity for at least one hour per day of exercise, in the open air if the weather permits.

(c) Correctional authorities should whenever practicable allow each prisoner not in segregated housing to eat in a congregate setting, whether that is a specialized room or a housing area dayroom, absent an individualized decision that a congregate setting is inappropriate for a particular prisoner. Prisoners should be allowed an adequate time to eat each meal.

- It excludes from capacity "non-traditional beds", i.e., living spaces that are currently in place in gymnasiums, day spaces and other areas not intended or designed for housing purposes.
- It also excludes from capacity specialized medical and mental health beds in which inmates typically spend 30 days or less.

While physical space is, of course an important component of capacity, this approach is a dynamic and multi-faceted one in that the calculation of capacity can expand or retract based on policy and resource decisions concerning out-of-cell time activities and health care resources. The new methodology views capacity not as a static figure, determined exclusively by reference to decades-old prison policy and design decisions, but rather it is dynamic in that it incorporates operational decisions and policies into the equation. It is intended to replace design capacity as the baseline against which overcrowding is measured with a more contemporary standard and best practices driven approach. While design capacity is a fixed measure, the determination of operational capacity is a more fluid one, subject to periodic changes as policy decisions, operational practices and physical resources impact on the core criteria.

### The ASCA Out of Cell Time Survey

In view of the Working Group's commitment to using out-of-cell time as an essential component of the new capacity methodology, it was decided that research into national approaches and norms relative to out-of-cell time would inform the process and decisions to be made concerning applicable thresholds. As such, the Working Group designed a survey instrument to capture information pertaining to policies and practices employed by other large correctional systems concerning the number of hours of out-of-cell activity afforded minimum, medium and maximum custody general population inmates (comparable to CDCR's Levels I-IV).

With the assistance of the Association of State Correctional Administrators (ASCA), the surveys were developed and sent to 49 states and the FBOP in October 2010. Preliminary responses were received back in December 2010 and additional follow up calls were made by CDCR Working Group team members and staff of DAI to gain additional information and clarifications. The follow-up process was important from a quality assurance perspective and that process concluded in March 2011. At the conclusion of this effort, CDCR received complete information from 13 states and the FBOP. This represented a 27% response rate, but more importantly the survey was able to capture out-of-cell data from those agencies housing the largest number of inmates in the Unites States, including Florida, New York, Pennsylvania, Texas and the FBOP. The results of the survey appear in the following table:

## Table 2-1: ASCA OUT-OF-CELL (OOC) TIME SURVEY RESULTS

| Agencies | Maximum Custody OOC (avg.in hrs) | Medium Custody OOC (avg.in hrs) | Minimum Custody OOC (avg.in hrs) |
|----------|----------------------------------|---------------------------------|----------------------------------|
| NY DOC   | 15   | 16    | 16   |
| MI DOC   | 8    | 11    | 15   |
| IN DOC   | 10   | 16    | 16   |
| PA DOC   | 8    | 9     | 9    |
| MO DOC   | 9    | 14    | 14   |
| MN DOC   | 13   | 13    | 15   |
| ID DOC   | 6    | 13.5  | 14   |
| SC DOC   | 14.5 | 14.5  | 14.5 |
| WV DOC   | 15   | 15    | 15   |
| FL DOC   | 11   | 11    | 11   |
| WY DOC   | 10.5 | 12.5  | 12.5 |
| KS DOC   | 12   | 14.5  | 15   |
| TX DOC   | 8.5  | 10.5  | 12   |
| FBOP     | 15   | 15    | 15   |
| Average  | 11.11 | 13.25 | 13.86 |

The data was thoroughly reviewed by the Working Group and a recommendation was made to the Secretary and the Executive Management team of CDCR that the average hours of out-of-cell time received in the survey (rounded) be adopted for those inmate populations where mitigation of the space standards was applicable. In those instances the minimum out-of-cell time threshold would be:

- Minimum Custody: 14 hours
- Medium Custody: 13 hours
- Maximum Custody: 11 hours

### Detailed Description of the Methodology

#### *What is Included in Capacity*

A condition precedent to measuring Prison Operating Capacity was for the CDCR Working Group to identify which classifications would be included in the determination of operational capacity. Drawing on the approaches used by other correctional agencies and professional organizations[20] it was decided that all classifications and housing categories would be included in determining the systemwide capacity with the exception of the following health care related housing:

- Mental Health Crisis Beds
- CTC or Infirmary Medical Outpatient Housing
- Mental Health Observation Cells
- Correctional Treatment Centers
- DMH state hospitals[21]
- General Acute Care Hospitals
- Hospice Beds

These categories were excluded either because of their temporary nature (generally less than 30 day placements) or because the beds are located within Department of Mental Health State hospitals or community public or private hospitals.

However, the decision was made to count Administrative Segregation beds as part of systemwide capacity. While some correctional systems do and others do not count this category as part of their capacities, the fact that inmates in these housing areas are generally not short-term or temporary placements in CDCR was a key reason for including them. Given the complexities of operating prisons in California, including the very long sentences, lack of statutory incentives for program participation due to mandatory sentencing and the high incidence of gangs, administrative segregation beds generally remain filled and are long-term placements.

Also excluded from capacity are those beds that are "temporary" in nature and have been located in gymnasiums, dayrooms or other locations that were not designed for or otherwise legitimately converted to appropriate housing space—the non-traditional or "bad beds." This decision by the Working Group mirrors the language which was incorporated into the AB 900 legislation. [22] In

---

[20] The Association of State Correctional Administrators (ASCA) defines operational capacity as follows: Total bed capacity across all DOC facilities throughout the agency on the last day of a given month. The capacity of a facility is the number of beds authorized for safe and efficient operation of the facility. Do not include beds reserved for discipline, investigations, infirmary, or other temporary holds because these beds are used for temporary or special purposes. When the special purpose(s) or circumstances do not apply, the beds are not occupied. Source: "ASCA Performance Standards, Measures, and Key Indicators, May 27, 2008" obtained at http://www.nicic.gov/Library/023147.

[21] These hospitals include ASH (Atascadero State Hospital), PSH (Patton State Hospital) and CSH (Coalinga State Hospital).
[22] http://www.leginfo.ca.gov/pub/07-08/bill/asm/ab_0851-0900/ab_900_bill_20070503_chaptered.html. The legislation noted that: "The purpose of beds constructed pursuant to this section is to replace the temporary beds currently in use, and they are not intended to house additional inmates. For the purposes of this section, "temporary beds" shall be defined as those that are placed in gymnasiums, classrooms, hallways, or other public spaces that were not constructed for the purpose of housing inmates."

addition, the former Governor, in an official proclamation, voiced serious objections to and concerns about the use of prison areas that were not intended for housing to be used as such.[23]

### *Calculating Prison Operating Capacity (POC)*

The foundation of this methodology is housing capacity and the availability of appropriately sized single cell or multiple occupancy living space. The proposed methodology here draws heavily on the ACA standards in that the focus is on unencumbered square feet per inmate (USF) requirements for each housing type and category of offender.

The first step in determining Prison Operating Capacity under this methodology is the application of ACA living space standards to existing housing areas for eligible classifications. The Working Group identified the current and/or more appropriate housing configurations (type of living arrangement) and the applicable corresponding ACA standard to be applied for each classification category. Architectural plans and field surveys were used to determine the capacity of each living space (cell, multiple occupancy cells, dormitory) in each housing unit in each of CDCR's 33 prisons. For single, double and multiple occupancy cells, scaled drawings (with field verifications) of the cells were used to analyze and calculate the amount of USF. For dormitories, the capacity is measured by applying a formula for total square footage required for each occupant, assuming ACA's 25 USF per person plus allocations for double stacked bunks, individual lockers and circulation areas to access the bunks. This calculated out to an average of 50 square feet total per inmate, including both unencumbered space and beds, lockers and a desk. [24]

The second step of the analysis focuses on out-of-cell time and corresponding mitigation impacts. In certain cases the ACA standard represents a floor, below which it would be inadvisable or inappropriate to suggest less space per person—in these cases the ACA standard for assessing capacity remains the standard and no adjustment is possible. A number of classification categories were determined to be exempt from mitigation because the nature of their confinement suggests that extensive out-of-cell activity is not practical. This is not to say that out-of-cell opportunities are not essential for inmates in administrative segregation, condemned housing, hospice, psychiatric services units (PSU) and for inmates in secure housing units (SHU). Rather, the methodology assumes that feasible out-of-cell procedures and practices will not be sufficiently extensive as to provide the mitigation necessary to adjust the ACA standard driven housing requirements. For these populations, then, the ACA standard becomes the POC, with no mitigation based adjusted space standard. It bears repeating, however, where no out-of-cell mitigation is feasible pursuant to this methodology that does not mean that out-of-cell time and activity should not be provided — it only means that the ACA standard-based housing capacity should not be adjusted as a result of that activity.

For other classifications of inmates, however, this methodology incorporates an element of mitigation based on out-of-cell activity in that it permits an adjusted (lesser) requirement for unencumbered square footage when the inmates are routinely allowed access to out-of-cell

---

[23] See, Prison Overcrowding State of Emergency Proclamation, October 4, 2006. ttp://gov.ca.gov/news.php?id=4278
[24] See Appendix 1 for an illustration of how the 50 square foot figure was calculated,

activities for a pre-determined number of hours a day. This approach recognizes that the potentially negative impacts of excessive spatial density[25], the result of putting too many people in too little space, can be mitigated by reducing the amount of time that people are actually in that space. By increasing out-of-cell activity, the inmates are less affected by density, even if the living space may be less than that called for in the ACA standards. It also reflects an awareness of the positive aspects of constructive activities in a prison setting and places a value on rehabilitation and reentry programming.

For purposes of the mitigation aspects in this approach, the following activities comprise out-of-cell time activity:

- "Inmate Services"- yard time, gym, dining, dayroom use, hobby crafts, visiting, family visiting, canteen, religious services and library.
- "Program Assignments"-substance abuse, education, vocational education, prison industries, support services jobs, self help groups and treatment services.
- "Healthcare"- group counseling, individual counseling, IDTT, sick call, treatment, medication management, dental, pill line, specialty services and recreation therapy.

The emphasis here is on *access* to *out-of-cell* activities as a means of mitigating density. As such, in-cell dining, education or any other activity that may be performed in the cell or cell-side does not meet the criteria set forth here. While there is clearly value associated with certain forms of in-cell programming, in-cell activities do not reduce housing density and, as such, they do not constitute mitigation and are not counted for these purposes.

One population potentially eligible for mitigation-EOPs-was carefully considered by the Working Group in terms of clinical indicators and amenability to double celling, whether under the applicable ACA standard or due to mitigation as a result of out-of-cell activity. Evidence based practice data was collected and showed that approximately 48% of EOPs were categorized as requiring a single cell ("S Suffix") by classification staff with input from clinical professionals. As such, the Working Group determined that double celling of EOPs in any housing unit, whether a function of ACA standards or achieved mitigation, would be limited to 50%.

It is important to note that other classifications were determined to not be eligible for mitigation because extensive out-of-cell opportunities are not practical or advisable, e.g., Administrative

---

[25] *Spatial density* refers to crowding that is mostly related to decreases in available space for any individual or group of individuals. *Social density* refers to conditions where increased crowding is a function of an increase in the numbers of people in a space and with whom any individual has to face and deal. These two concepts are clearly overlapping, e.g., housing two hundred inmates in a dormitory designed for 100 impacts both *Spatial* density (the available living space is reduced by half placing inmates very close to each other and minimizing circulation space) and *Social* density (one inmate has to interact and navigate among almost two hundred others rather than one hundred). Research on crowding has found that increased social density has more profound effects, especially on issues of special concern in corrections facilities, such as tension and aggression. That assumes, however, that spatial density is not also severe or unduly limited. Source: "Assessment of Strategies to Manage Crowded Direct Supervision Jails," *Unpublished Monograph prepared for the National Institute of Corrections*, D. Bogard and R. Wener, 2007.

Segregation.[26]  Although evidence based analysis of single cell requirements suggested that almost three quarters of this classification could be double celled, the Working Group determined that double celling for these populations, if permitted by ACA standards, would be limited to 50%, consistent with current CDCR policy.

Members of the Working Group developed an approach to calculating out-of-cell time as follows:

- It is to be determined on a housing unit by unit basis, within each facility and within each prison;
- It is based on the typical number of hours of "access" to out-of-cell activities;[27]
- It is measured by documenting typical out-of-cell time periods as derived from interviews with unit officers, review of unit logs, daily movement sheets, and program documents;
- It focuses on the "typical" inmates in a unit, not those on program restrictions or program enhancements

The precise method of calculating out-of-cell access for each eligible population involves a number of activities performed in each applicable housing unit of each prison.  Trained staff use a variety of techniques, including interviews, unit schedules, institutional schedules, post orders, unit logs and inmate assignment lists to collect and cross verify data in each location.  An out-of-cell data collection instrument was designed to capture this data and to guide the actual calculation of the average (mean) out-of-cell access for all inmates in the respective housing units.  A copy of this form is included with this report as an attachment.

When the calculated average out-of-cell time access for the inmates in a particular housing unit meets or exceeds the thresholds as set forth in the methodology , then the capacity of that specific area is adjusted accordingly (beyond the ACA capacity).  Conversely, when the average out-of-cell time falls below the threshold, the official capacity of the housing unit is limited to the ACA capacity.

An additional consideration, as discussed previously, is that some classes of housing will not be factored into the Prison Operating Capacity. "Non-traditional housing" areas including gymnasiums, dayrooms, warehouses, etc. will not be counted as capacity. In addition, housing that is considered temporary in nature—the agreed upon criteria was for 30 days or less—would be excluded from capacity.  Exclusion of these types of highly specialized, temporary medical and mental health beds is a routine practice in capacity calculating approaches employed by other jurisdictions.

---

[26] Administrative Segregation units all have an intake process that involves complex due process elements, disciplinary and classification hearing processes and investigative and case factor evaluations. Inmates are single celled during these intake processes as well as on a case-by-case basis using established Title 15 criteria after the intake process is completed.

[27] The Working Group determined that calculations would be based on weekdays only.  This is because the majority of staffing resources for inmate rehabilitation and program activities are assigned during weekdays and because other out-of-cell activities are available during weekends.

Attorney-Client Work Product – Confidential

In the case of adjusted USF standards predicated on out-of-cell time, the analysis was performed and sketches created to develop a reduced USF requirement that would still allow for sufficient space for inmates to circulate and engage in routine in-cell activities safely and appropriately. For example, the ACA space standard for a single cell is 80 total square feet, including 35 USF[28] ; this figure is based on an assumption that the inmate is confined to the single cell for many more hours per day than those housed in a multiple occupancy living space.[29] By contrast, the current ACA standard for multiple occupancy cells[30] requires a minimum of 25 USF per inmate. Although a lesser USF per person was used by ACA in the case of multiple occupancy cells, the fact that plumbing fixtures and desks are shared by the cell occupants still results in a significant amount of available space for in-cell activities such as exercise using that standard. In the case of this methodology, where out-of-cell time meets certain thresholds, an adjusted standard is applied in recognition of the economies of the shared space. Therefore, in a mitigated scenario with adequate out-of-cell time, a *total* of 25 USF (as opposed to that amount per person) is proposed in double and multiple occupancy cells to allow for sufficient room for circulation, in-cell exercise, sitting at a writing surface and for personal hygiene needs.

Therefore, while a cell might provide a total of 35 USF, which under strict application of ACA standards would mean its capacity was only one, this approach says that two inmates can be safely and appropriately housed in that cell (using a total of 25 USF) *if* they are routinely and typically permitted access to out-of-cell activities for a certain number of hours a day. In other words, out-of-cell mitigation would in effect expand the capacity of that cell from one to two inmates.

As stated above, the ACA standards require 25 unencumbered square feet per inmate in large multiple occupancy cells (those that are larger than a two-person cell) as well as in dormitories. In addition to the unencumbered square feet, the Working Group agreed that additional square feet per inmate be allocated in the calculations that accounts for the circulation area immediately adjacent to the inmate bunks and that provide direct access to these sleeping areas. Primary circulation corridors that access hygienic facilities, for example, were not included in these calculations. To facilitate the calculations in a variety of dormitory configurations that exist throughout CDCR, a formula was developed that incorporated the unencumbered square footage, as well as the space occupied by the bunks, lockers and a writing surface. The diagram in Appendix 1 illustrates the calculations based on a typical dormitory configuration, which resulted in an ACA compliant calculation of 50 square feet per inmate.

Similar, to the approach taken with inmates housed in cells, a mitigation formula was developed for application in housing areas with large multiple occupancy cells and/or dormitories in which out-of-cell eligibility thresholds are achieved. Appendix 2 is an illustration of how the calculations were performed for a dormitory where mitigation is achieved. The major difference between the ACA calculations and the mitigation formula is the unencumbered square foot per inmate. The

---

[28] ACA ACI-Standard 4-4133, revised August 2005.

[29] In fact for many years, ACA linked standard 4-4133 to be limited to those inmates who were confined for greater than 10 hours per day, including those inmates spending upwards of 23 hours per day in a cell where most daily living activities including eating, exercising and even programming would be occurring within the cell.

[30] ACA ACI-Standard 4-4132, revised January 2007.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

assumption is that a seven foot (7'-0") clearance between a pair of double bunks is sufficient to allow inmates from opposite bunks to perform a variety of physical actions when they are not in their bunks or in an adjacent day room area. These include sitting on the lower bunk, allowing two inmates to climb down from opposing bunks at the same time, or space to allow two inmates to exercise at the same time in the circulation spaces between the bunks. This translates into 14.2 unencumbered square feet per inmate. The total square feet per inmate, including the unencumbered square feet, bunks, lockers, a writing surface and adjacent circulation, is 37 square feet per inmate.[31]

The steps associated with the assessment of housing capacity are as follows:

1.  Identify classification of all housing spaces within a particular unit
2.  Exclude beds in temporary medical/mental health categories
3.  Exclude any non-traditional housing
4.  Measure dorm capacity and double/multiple occupancy cell capacity based on ACA's USF standard (25 s.f.) to determine ACA housing capacity
5.  Measure single cells based on ACA's 80 s.f./35 USF standard to determine ACA housing capacity
6.  Identify which housing areas and units, by classification, are eligible to be measured under the adjusted capacity due to the out-of-cell time mitigation standard for that classification category
7.  Quantify out-of-cell time access for eligible classifications
8.  Determine whether units are subject to special considerations as a result of lockdowns or modified programs
9.  Where a unit's occupants meet the out-of-cell mitigation standard, identify adjusted capacity (POC) by classification; if not, the ACA standard becomes the POC
10. Apply any health care adjustments as required (see discussion to follow)

A number of special methodological considerations were identified before and after the Pilot Tests (see Chapter III). These important issues were fully discussed within the Working Group and with the Executive Team. The issues were as follows:

*Calculation of Reception Capacity-* Subsequent to the pilot studies, the Working Group decided that there should be one departure from the use of out-of-cell time as the sole mitigating factor for cell size in reception housing areas. Reception housing was determined to be not easily amenable to out-of-cell activities and, in many respects, excessive out-of-cell activity can be viewed as undesirable from a security and safety perspective given how little is known about inmates during this portion of their incarceration. As such, the Working Group determined that adopting a standard that aims to minimize the overall duration that inmates spend in this status was preferable and potentially more practical than focusing on the issue of how many hours a day these inmates

---

[31] Since this mitigation standard falls below the 25 square feet per occupant required by ACA/ACI 4-4132, an accreditation audit will likely make a finding of non-compliance with that standard. However, CDCR will have sufficient justification (as set forth in this report) to qualify for a waiver or to select this standard as one eligible for "Discretionary Compliance."

can be out-of-cell. The decision, made in concert with the leadership of DAI, was to strictly apply ACA housing standards for reception inmates unless the institution is able to move inmates out of reception status and into a permanent institutional placement within 30 days, in which case adjustments could be made to cell capacity so as to expand capacity beyond the actual ACA standard. This approach draws directly on ACA Standards that require the reception process be completed within 30 days after admission.[32]

*Measuring capacity of small cells-* The CDCR currently has more than 8,000 cells that are less than 55 square feet, including more than 2,800 cells that are less than 40 square feet. In most cases, these cells currently hold two inmates, even though they would not be large enough (using USF per ACA standards) for even one inmate. These cells currently are used to house inmates in the following classifications: General Population, Administrative Segregation, and EOP's.

While use of these small cells is not acceptable in principle, the reality is that it is not practical to simply take them off line and remove them entirely from inclusion in CDCR's systemwide capacity. In this instance, this methodology would permit them to be used for *one inmate only*, even though they fall below the ACA standard and even where there is very limited out-of-cell time and no potential mitigation.

*Measurement of capacity in units subject to lockdowns or modified programs-* A difficult question arose during the field testing of the out-of-cell access instrument—how to calculate out-of-cell time when the unit is on lockdown or modified programming as a result of investigations of significant incidents, post-investigation limited movement control mechanisms or budgetary cutbacks respectively. Although only one prison (SVSP) was subject to such restrictions during the pilot tests, and the approach used there was to count out –of-cell activity as it currently existed due to the length of the limitations on movement. During the field tests at 33 sites, however, these circumstances were found at several prisons. The approach employed there was to focus on the duration of the out-of-cell limitations--when the restrictions had been imposed very recently (within the past few days), the out-of-cell activity schedule in place prior to the restrictions was used, while units that had been on restrictions for a longer time were evaluated based on the more limited out-of-cell activity schedule in place at the time of the field visit. In considering the results and evaluating the methodology after the pilot tests and field visits, P/BA and several members of the Working Group raised concerns about the need to better define and standardize the approach to evaluating out-of-cell activity in units subject to short-term or longer restrictions due to lockdowns or modified programs.

For purposes of calculating capacities for this Final Report and future capacity assessments, a decision was reached that a distinction be drawn between lockdowns and modified program and that the impact on capacity be determined differently. *Lockdowns* should refer to the limited timeframe during which inmates are confined to their cells or bunks in order to allow for a criminal investigation to occur. These investigations should normally require seven days or less to be completed, and units in this status during a capacity audit would be evaluated as if the "normal" schedule was in effect, i.e., out of cell time assessments for mitigation purposes would be

---

[32] ACA ACI-Standard 4-4287, revised January 2006.

Case 2:90-cv-00520-KJM-SCR   Document 4399-1   Filed 03/15/13   Page 79 of 342

measured based on the actual practice and documentation in place prior to the lockdown. *Modified program*, in contrast, would refer to restrictions placed on inmate out of cell activity and movement imposed for operational reasons such as security concerns and post-investigation separations of inmate subgroups or due to budget restrictions, staffing reductions, etc. Modified program is a program change that typically is of a significant duration, and thus out of cell time assessments for inmate housing units on modified program status would be determined by the out of cell activity levels observed and documented during the actual timeframe of the capacity assessment.

*Calculation of capacity in 270 degree dormitories-* Subsequent to the pilot studies a modification was made relative to the calculation of the 25 unencumbered square foot per inmate in dormitories, specifically those in the 270 degree configuration. In the case of a 270 degree dormitory, the tier space in front of the pony walls is included in the calculations, which has the effect of increasing the capacity of those areas.

*Inclusion of a factor for operational flexibility-* The Working Group determined that there was a need to incorporate into the POC a factor for "operational flexibility" to reflect the reality and accepted correctional practice that every bed cannot and should not be filled at all times. This is due to a variety of factors, including: the classifications and behavior profiles of inmates do not match perfectly with bed inventory or cell-mate compatibility; cells will occasionally be unusable due to maintenance reasons; and, because some bed space must be reserved to accommodate peaks in population levels. As such, a 5% operational flexibility factor[33] was applied to all general population celled and multiple occupancy celled housing units *that achieve maximum mitigation*. The 5% factor was also applied to any housing units where mitigation is not feasible yet where the strict application of the ACA standards would result in 100 % double occupancy, resulting in a scenario where no beds would be available for operational flexibility.[34]  The 5% factor was not applied to POC for housing units that did not achieve maximum mitigation, nor was it applied in dormitories because of the potential availability of sufficient second bunks to provide the necessary flexibility.

### Mitigation Matrix

The "CDCR Housing Capacity Standards and Mitigation Matrix." appears on the following page. This Matrix provides the essential criterion that is applied to determine both the ACA housing capacity and the Prison Operational Capacity for each classification and inmate sub-grouping, including:

---

[33] CDCR's current policy is to use a 5% vacancy/operational flexibility factor for celled general population housing, with no factor for dorms and program-specific figures for unique populations such as Security Housing Unit, Administrative Segregation Unit, and Enhanced Outpatient Program.

[34] For example, this situation arises primarily in the 180-design celled housing units where ACA capacity, due to the larger cell size, would allow for all cells to house two inmates in conformance with the ACA 25 square foot/inmate unencumbered square footage standard. Accordingly this would result in a maximum capacity of 256 inmates in a typical "180" housing unit that has 128 cells. Therefore, applying the 5 % Operational Flexibility factor in this scenario would result in housing a maximum of 243 inmates, leaving 13 available beds for operational flexibility.

- All current CDCR  housing assignment categories that are included in the capacity calculations
- Applicable ACA space standard for each housing type (except for reception where it is a duration in status driven standard)
- The required number of hours of out-of-cell time required for mitigation eligibility
- The adjusted space standard applied when mitigation eligibility is satisfied

It is worth noting that a number of the housing assignment categories have a N/A shown in the columns designating the number of hours of out-of-cell activity necessary for mitigation and the corresponding column identifying the adjusted space standard. As has been pointed out previously, certain housing categories are not eligible for this mitigation for a variety of reasons as follows:

- Requirements for space and programming for Mental Health housing operated by the Department of Mental Health (DMH) is governed by and licensed pursuant to Title 22;

- Housing categories including Administrative Segregation and Behavior Modification  are not subject to mitigation because of the inherent limits on out-of-cell time that cannot reasonably be increased to a point that it would be significant enough to qualify for mitigation;

- Housing categories including condemned housing, Psychiatric Services Unit (PSU) and Secure Housing Unit (SHU) must be single celled so additional out-of-cell time will not lead to adding a second inmate to the cell;

- The capacity of Camp program beds is driven not by square footage but rather by programmatic requirements established for fire fighting.

We must reiterate that ineligibility for mitigation does not suggest that out-of-cell opportunities are unnecessary or should not be maximized for inmates in that category based on programmatic and security considerations. It only means that, regardless of out-of-cell activity, additional inmates should not be added to a living area beyond what would be permitted under ACA standards or CDCR policy.

It is also noteworthy that two populations, EOPs and Administrative Segregation inmates (those housed in 180 design units), are subject to a policy derived cap of 50% double celling.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

**Table 2-2: CDCR Housing Capacity Standards and Potential Mitigation Matrix**

| CLASSIFICATION | Short Name | CURRENT CDCR HOUSING TYPE (Typical) | ACA HOUSING TYPE | ACA Standard | #SQUARES CRFT OF CELL FOR MITIGATION ADJUSTMENT | Approved Space Standard |
|---|---|---|---|---|---|---|
| Acute Psychiatric Program (DMH) | APP | Single cell | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| Administrative Segregation Unit | ASU | Single cell | Special Management Single (ACI: 4-4133) | 35 USF/occupant | N/A | N/A* |
| | ASU | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | N/A | N/A* |
| Behavior Modification Unit | BMU | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | N/A | N/A |
| Camp Program Beds | CMP | Dorm | Dorm (ACI: 4-4132) | N/A (per program need) | N/A | N/A |
| Condemned Housing | DR | Single Cell | Special Management Single (ACI: 4-4133) | 36 USF/occupant | N/A | N/A |
| Enhanced Outpatient Program | EOP | Double Cell | Double cell (ACI: 4-4132) | 25 USF/ occupant | 11,13 or 14 depending on custody level | 25 USF/cell* |
| | EOP | Multiple Occup. Cell | Mult. Occup. (ACI: 4-4132) | 25 USF/ occupant;(50 total sf/occupant) | 11,13 or 14 depending on custody level | 37 SF/person* |
| LI-GP | LI-GP | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 14 | 25 USF/cell |
| | LI-GP | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant;(50 total sf/occupant) | 14 | 37 SF/person |
| LII-GP | LII-GP | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 14 | 25 USF/cell |
| | LII-GP | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant;(50 total sf/occupant) | 14 | 37 SF/person |
| LIII-GP | LIII-GP | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 13 | 25 USF/cell |
| LIV-GP | LIV-GP | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11 | 25 USF/cell |
| Intermediate Care Facility (DMH) | ICF | Single cell | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| | ICF | Double cell | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| | ICF | Dorm | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| Protective Housing Unit | PHU | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11,13 or 14 depending on custody level | 25 USF/cell |
| Psychiatric Services Unit | PSU | Single Cell | Special Management Single (ACI: 4-4133) | 35 USF/occupant | N/A | N/A |
| Reception | RC | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | <30 days | 25 USF/cell |
| | RC | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant;(50 total sf/occupant) | <30 days | 37 SF/person |
| Substance Abuse Treatment Unit | SATU | Multiple Occup. Cell | Mult. Occup. (ACI: 4-4132) | 25 USF/ occupant | 11,13 or 14 depending on custody level | 37 SF/person |
| Secure Housing Unit | SHU | Single Cell | Special Management Single (ACI: 4-4133) | 35 USF/occupant | N/A | N/A |
| Transitional Housing Unit | THU | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11 | 25 USF/cell |
| Women | W | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11,13 or 14 depending on custody level | 25 USF/cell |
| | W | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant;(50 total sf/occupant) | 11,13 or 14 depending on custody level | 37 SF/person |
| | W | Multiple Occup. Cell | Mult. Occup. (ACI: 4-4132) | 25 USF/ occupant | 11,13 or 14 depending on custody level | 37 SF/person |

* No more than 50% of cells can be double cells.

Attorney-Client Work Product – Confidential

### Prison Health Care Capacity Adjustments (PHCC)

ACA's approach to capacity is predicated solely on housing space. While the CDCR capacity methodology reflects that approach in the first instance, the new methodology takes into account the *Plata* and *Coleman*[35] cases and the concerns that have been articulated by the courts relative to facility capacity and how it affects the delivery of healthcare services. Healthcare capacity is integrated here in several different contexts.

First, participation in medical and mental health activities is considered an out-of-cell activity for purposes of mitigation in the housing capacity analysis. Second, designated housing spaces for specialized medical and mental health offenders/patients are included as categories of housing and subject to a mitigation analysis. And third, access to health care will be considered an overriding capacity driver that can potentially limit housing capacity. In other words, once the Prison Operational Capacity (POC) is calculated, the issue then becomes whether the *existing* health care resources are sufficient to provide the required access for the proposed capacity. Health care capacity would be based on current space, staffing and availability of services and measured using access to medical and mental health data currently measured and produced by the Health Care Receiver.[36]

While there are limitations to the data contained in the Health Care Receiver's Monthly Healthcare Access data, nevertheless this data has been determined to be useful by the courts and the Office of Inspector General as long as the limitations to it are acknowledged, namely:

- The Receiver's data measures that an inmate arrived to a scheduled appointment; it does not measure ordered treatment that has not been scheduled.
- The access to care data collection methodology is inconsistent across CDCR in that some facilities ducat only scheduled appointments while others also include treatment that occurs within the housing unit.
- The Mental Health Tracking System, developed by CDCR, no longer captures access to care for individual mental health populations such as EOP or CCCMS.

Formulas were developed to calculate if and how much the access to care data will affect the POC if current healthcare resources (space, staffing, etc.) remain in place. The formulas include medical and mental health care access.

Once measured and the formula applied, if the health care resources and access to care data showed that resources are sufficient for the prison's current population/capacity, then it will be deemed likewise sufficient for a reduced capacity if that is the result of the new POC capacity calculation. If it is lower, then downward adjustments would be made to the POC only *in those areas and classifications where the access to care is insufficient.*

---

[35] The working group took the position that the *Perez* case, addressing dental care, does not impact on overall capacity or is not impacted by capacity in a manner that is directly measurable or sufficiently direct as to become an overall capacity driver.

[36] Monthly Health Care Access Quality Report, a report published by the Health Care Receiver on health care access for medical, mental health, diagnostic/specialty services and dental services.

The Working Group, with the advice of P/BA, determined that using 80% and above (moderate adherence) as an acceptable level of access to care; any percentage below this was considered unacceptable. Typically, the methodology required an average of three months of the Receiver's data (March through May 2011) to avoid making a determination based on an atypical one month percentage for that facility. If the percentages for that time period were considered unacceptable, further inquiries were made to determine the reason·

The calculation of current healthcare capacity in each facility included separate measures for medical and mental health care. To measure impact on the POC, it was important to identify the specific populations that are assigned to specific housing types or services.

### Healthcare Calculation If Applicable will be an Adjustment

The calculation is based on a proportional change equal to the proportion of the beds for that particular population. Therefore, if all inmates including those who are in designated medical or mental health beds receive ducats to go to sick call, then 100% of the occupancy of the facility was included in access to medical care with a focus on sick call. However if only a portion of the population is expected to have a particular access to care, and there are designated beds for that population, then access to that care was based only on the designated beds for that population or population specific capacity. Therefore, if there is an impact on the operational capacity it is likely to require adjustments of particular types of beds, not the entire population of the facility.

### Healthcare Calculations

Four separate calculation formulas were developed to address the access to health care for those inmate population groups in the prison system that could affect the final POC based on the capacity methodology:

- access to sick call for inmates housed in the general population;
- access to mental health care for CCCMS for those inmates receiving outpatient mental health care who are housed in general population;
- access to mental health care for EOP population, a specialized housing area of general population;
- access to care when there is overlap between medical and mental health care such as sick call and mental health care.

A decision tree was developed for each of the calculations,[37] including two calculations that address when there is an overlap between medical and mental health populations (such as sick call and CCCMS) to address any duplication.[38]

---

[37] See Appendices 4-9·
[38] See Appendices 10-11·

Attorney-Client Work Product – Confidential

Before applying any calculation, the Receiver's access to care statistics for a designated three month period are averaged to determine medical and mental health access to care statistics for each facility.

If the access to either medical or mental healthcare statistic is below the 80% threshold, the appropriate calculation for each population is then performed to assess whether there is a healthcare impact on the POC.

For each calculation, the essential question is whether the averaged percentage is 80% or above. If it is, there will be no impact on the POC. However, if the average is below 80%, further analysis of the Receiver's data is required to determine if the reason that access to care is below the acceptable percentage is due to custody issues, healthcare provider issues, other issues or a combination thereof.

A distinction must be drawn between the one population that has designated beds, i.e., EOP, and CCCMS that do not have designated beds but rather are simply a component of general population or other specialized housing categories. In keeping with the overall healthcare methodology, the premise is that if there is a reduced density of CCCMS, the existing staff will be better positioned to provide the necessary access to care for this population. As such, a reduction in the POC will presumably serve as a means to increase access to care for this population beyond the 80% threshold.

Attorney-Client Work Product -- Confidential

# III. PILOT TESTS

# III. Pilot Tests

Once there was general agreement concerning the new methodology to be employed for measuring institutional capacity, the Working Group decided that a series of pilot field surveys should be used to test the efficacy of the methodology. These pilot tests would allow for the identification of potential flaws in the process as well as offer an opportunity to test the instruments that would be used and set the stage for the full implementation of the methodology at all 33 institutions.

Six prisons were selected, comprising a sample of approximately 20% of all institutions. The sites were selected to satisfy several criteria, including representing different architectural styles, both male and female facilities, degrees of specialized healthcare environments, ranges of custody levels, and different facility sizes. The six prisons selected for the pilot tests were:

- Mule Creek
- Salinas Valley
- Duel Vocational Institute
- CCWF
- Avenal
- California Medical Facility

Prior to initiating the field tests, substantial preparation work was undertaken, including developing out-of-cell questionnaires and survey forms, collecting all available architectural plans for the subject prisons, and compiling advance measurements of dorms and cell areas from the plans so that the field component would serve as field verification. Wardens of the six prisons were notified that survey teams would be visiting and out-of-cell questionnaires were submitted ahead of time to allow for a degree of preparation by the prisons in advance of the actual site visit. Wardens were requested to have their executive teams available for an introductory meeting and to assign the necessary number of escorts to accommodate the survey teams.

The field tests were conducted jointly by representatives of the Working Group and P/BA staff in October and November 2010. The pilot teams were divided into two groups, with one group focusing on physical plant measurements and verifications and the other for interviews and data collections relative to out-of-cell activity and potential mitigation. Two to three days were allotted for each field visit, although it became apparent that longer periods would be required for certain prisons where there are numerous housing types and diverse inmate populations such as at CMF; in fact, pilot teams returned to CMF after the initial site visit to obtain additional information required to complete the pilot surveys.

All field tests began with a meeting with the warden and the executive team. A representative of the pilot team, a person with decades of line and top level operations experience, led the briefing which explained the purposes of the pilot tests, the activities that would occur, the locations to be visited, how prison staff would be affected by the survey work and what was required from officers assigned as escorts.

The "physical plant team," consisting of a P/BA representative, at least one Working Group/CDCR architect and typically accompanied by a representative of the prison's maintenance/physical plant staff, visited all housing areas to measure typical cells and dormitories and to validate information contained on architectural plans. The team also visited healthcare areas to review existing clinical and support spaces. (see discussion below)The "out-of-cell team," also comprised of a P/BA representative and two or more Working Group/CDCR operations representatives visited all housing areas that could potentially be eligible for mitigation due to out-of-cell activity time pursuant to the Capacity Methodology Matrix. The out-of-cell team interviewed unit officers (2nd and 3rd shift officers who had been assigned to that post and watch tour for at least 30 days) at their posts or in supervisor's offices when relief was available. The team reviewed the responses to questionnaires that had been submitted ahead of the filed visit, explained the objectives of the pilot tests, and queried the officers about a myriad of issues concerning out-of-cell activity and opportunities in that unit. The team did not rely exclusively on representations made by the officers and while in the unit, the team reviewed or requested secondary documentation of out-of-cell time, including:

- Log books
- Inmate assignment rosters
- Post orders
- Movement sheets
- Ducat lists
- Unit schedules
- Institutional schedules
- Program schedules
- Daily activity reports
- Inmate orientation manuals
- Group treatment schedules
- Master population count reports
- Architectural plans of all housing units

Salinas Valley State Prison (SVSP) was the only pilot test site prison with units on lockdown status or on a restricted modified program. Interviews determined both the current out-of-cell activities as well as what the unit schedule was before the lockdown/program modification was implemented. Because SVSP's lockdowns/program modifications had all been in place for several months, the out-of-cell time assessment was based on the program at the time of the site visit, i.e., very limited out-of-cell time, which was below the mitigation threshold.

Inquiries about access to medical and mental healthcare services were made at each pilot site. Of particular interest was which healthcare activities were ducated and which were not. The ducat lists are an important driver of the Receiver's data collection process. All health care areas were toured; clinicians and officers were interviewed about access to care, waiting lists, scheduling processes, barriers to inmate access to care, and improvements in access to care within the last year. Health care spaces were reviewed with attention to whether healthcare spaces were adequate for the number of inmates; whether healthcare space was being used for its original intent (healthcare spaces being used to provide healthcare services) and whether the healthcare spaces in use had

Attorney-Client Work Product – Confidential

been converted from space that had been designed for other purposes (such as program space, offices, closets, storage) but were now being used to provide healthcare services. While on-site, the field team collected schedules of medical and mental health care services and treatment programs, and lists of scheduled appointments and where available the most recent access to care data for that facility.

Following the field tests, numerous activities were conducted by the Working Group, in concert with P/BA, including initiation of an internal quality assurance process to review the validity of the data collected.[39]  Once there was confidence in the validity of the data, the Working Group:

- Developed accurate CAD drawings for square footage data
- Calculated out-of-cell time based on primary and secondary documentation
- Calculated ACA capacities
- Calculated adjusted capacities (where applicable) based on mitigation criteria and healthcare adjustments

With respect to the health care adjustments, P/BA relied on the Receiver's access to medical and mental health care data for August, September and October (the most recent available) and calculated each facility's mean access to care percentages. All six facilities were above the 80% threshold for medical care. Only one, SVSP, was below the threshold for mental health care at an average of 70%. When applying the healthcare adjustment to the proposed POC for EOP beds, it was determined that a further reduction of 26 EOP beds would be necessary to increase the access to care to the 80% threshold.

### Table 3-1: Receiver's Access to Care Data Applied to Pilot Tests

| Prison | | ASP | CCWF | CMF | DVI | MCSP | SVSP | |
|---|---|---|---|---|---|---|---|---|
| **Medical** | | | | | | | | |
| | Aug-10 | 90 | 94 | 96 | 91 | 98 | 88 | |
| | Sep-10 | 90 | 90 | 94 | 91 | 98 | 89 | |
| | Oct-10 | 89 | 94 | 97 | 92 | 98 | 88 | |
| | **Avg.** | 89.7 | 92.7 | 95.7 | 91.3 | 98.0 | 88.3 | |
| | | | | | | | | |
| **Mental Health** | | | | | | | | |
| | Aug-10 | 88 | 86 | 97 | 97 | 91 | 72 | |
| | Sep-10 | 88 | 88 | 95 | 97 | 94 | 67 | |
| | Oct-10 | 87 | 87 | 93 | 96 | 91 | 71 | |
| | **Avg.** | 87.7 | 87.0 | 95.0 | 96.7 | 92.0 | 70.0 | |

---

[39] This quality assurance effort was significantly expanded during the actual field survey of 33 institutions.  See Chapter IV for additional details in this regard.

### Lessons Learned

In addition to compiling the actual results of the pilot tests, the Working Group and P/BA used the pilot test process as a means of identifying lessons learned to be applied when the process was to be extended to all 33 institutions. Accordingly, a report was prepared by the Working Group and P/BA in December 2010 describing the results of the pilot tests and recommendations concerning any refinements that were required to enhance the methodology. The report was then presented to Secretary Cate and the executive staff showing the results of the capacity analyses for the five[40] pilot sites. It is also noteworthy that the preliminary findings as to mitigation for eligible categories of inmates and respective housing areas were based on an across the board threshold of ten hours for all eligible categories; this was because information from the ASCA surveys was still pending.

At the conclusion of the presentation, Secretary Cate asked the Working Group to identify what the potential Prison Operational Capacity would be for the six pilot prisons if all eligible out-of-cell mitigation could be realized. In other words, while the pilot effort identified the current POC based on existing mitigation practices (i.e., "what is"), the inquiry asked "what if" out-of-cell activities for eligible inmate classifications could be maximized in conformance with the mitigation matrix methodology and the capacity thereby fully realized. This theoretical construct was referred to as Potential Prison Operating Capacity (PPOC).

The Working Group and P/BA were also directed to establish unique out-of-cell mitigation thresholds for each of three primary custody levels, with fewer hours required for higher custody levels and more for lower ones, once the ASCA survey was finalized.[41]

In its efforts to calculate a PPOC for the six pilot institutions, the Working Group determined that there was a need to incorporate into the POC a factor for "operational flexibility" to reflect the reality and accepted correctional practice that every bed cannot and should not be filled at all times. This was due to a variety of factors, including: the classifications and behavior profiles of inmates do not match perfectly with bed inventory or cell-mate compatibility; cells occasionally are unusable due to maintenance reasons; and, because some bed space must be reserved to accommodate peaks in population levels. As such, the 5% factor was to be applied to any housing units where mitigation is not feasible yet where the strict application of the ACA standards would result in 100% double occupancy, resulting in a scenario where no beds would be available for operational flexibility (Prison Operational Capacity). For example, this situation arises primarily in the 180-design celled housing units where ACA capacity, due to the larger cell size, would allow for all cells to house two inmates in conformance with the ACA 25 square foot/inmate unencumbered square footage standard. There would be no mitigation possible because the cell already meets ACA standards for double capacity. Accordingly this would result in a maximum capacity of 256 inmates in a typical "180" that has 128 cells. Therefore, applying the 5% Operational Flexibility factor in this scenario would result in housing a maximum of 243 inmates, leaving 13 available beds for operational flexibility.

---

[40] Data for the California Medical Facility (CMF), the sixth pilot site, was not complete at that time.

[41] Based on the ASCA survey data, the methodology established the following custody-specific mitigation thresholds for out-of-cell time: 11 hours for maximum (Level IV), 13 hours for medium (Level III), and 14 hours for minimum (Level I and Level II)

The Potential Prison Operational Capacity reflects the highest possible capacity attainable if CDCR were to achieve full mitigation for eligible populations in every unit within a prison. For the same reasons expressed above, the Working Group decided that an operational flexibility factor would also need to be included in any PPOC calculation. (Note: the 5% factor was <u>not</u> applied to POC or PPOC for housing units that did not achieve maximum mitigation or to housing units not subject to mitigation). The summary table on the following page includes each of the capacity figures for the six pilot prisons, including the 5% operational factor where applicable.

Additional lessons learned fell into two groups: process changes and methodology changes. Process changes included:

- Consistency of field survey teams was essential to obtaining valid data
- Information obtained via interviews had to be verified through multiple forms of secondary data and documentation
- Consistent scripts and verbal instructions were necessary for interviews with line and supervisory institutional staff participating in the field surveys
- More time had to be budgeted for field surveys of larger and more complex prisons
- Adequate preparation time had to provided before the field surveys, and sufficient debriefing time after the field work was completed
- The six pilot prison sites needed to be reassessed along with the remaining 27 due to changes in methodology and processes.

Methodology changes included the following items, previously discussed in Chapter II:

- *Calculation of Reception Capacity*

- *Measurement of capacity in units subject to lockdowns or modified programs*

- *Calculation of capacity in 270 degree dormitories*

### Table 3-2: Pilot Capacity Analysis Summary Table

| Prison Acronym | Census (# inmates) on Day of Field Review | CDCR's Existing Design Capacity | CDCR's Existing Overcrowd. Capacity | ACA Capacity | Current Prison Operational Capacity (POC) | Current Prison Operational Capacity w/ 5% Operational Flexibility | Potential Prison Operational Capacity w/ 5% Operational Flexibility | Bed Differential Design Capacity vs. PPOC w/ 5% Operational Flexibility |
|---|---|---|---|---|---|---|---|---|
| MCSP | 3,742 | 1,700 | 3,138 | 1,797 | 1,909 | 1,888 | 3,138 | 1,438 |
| SVSP | 3,734 | 2,452 | 4,400 | 3,148 | 3,250 | 3,230 | 4,130 | 1,678 |
| DVI | 3,829 | 1,673 | 3,037 | 1,738 | 1,867 | 1,846 | 2,675 | 1,002 |
| CCWF | 3,810 | 2,004 | 3,921 | 2,002 | 2,002 | 2,002 | 2,472 | 468 |
| ASP | 6,113 | 2,920 | 5,776 | 3,225 | 4,413 | 4,197 | 4,197 | 1,277 |
| CMF | 2,575 | 2,297 | 3,680 | 2,430 | 2,580 | 2,551 | 3,050 | 753 |
| Totals | 23,803 | 13,046 | 23,952 | 14,340 | 16,021 | 15,714 | 19,662 | 6,616 |

Column headings are as follows:

Column 1: Prison Acronym – The six pilot institutions surveyed.

Column 2: Census (# Inmates) on Day of Field Review – The number of inmates at the prison on the first date the field review was conducted for each of the six pilot prisons.

Column 3: CDCR's Existing Design Capacity – For celled housing, one person per cell, regardless of the size of the cell. Per CDCR's Design and Policy Construction Guidelines, the minimum cell size is 80 square feet for new construction; CDCR's existing design capacity for dormitory housing is a single bed on the floor and, for new construction, 25 square feet of unencumbered floor space per occupant.

Column 4: CDCR's Existing Overcrowding Capacity – By policy, CDCR's existing prison capacity is derived by applying CDCR's standard overcrowding rates against design capacity. The standard overcrowding rate is 190% for celled general population housing and 200% for dormitories. Unique overcrowding rates also exist for various programs, housing types, and inmate populations.

Column 5: ACA Capacity – The calculated capacity based on the methodology as defined in standards 4-4129, 4-4132, 4-4133 and 4-4141 for Standards Compliant Bed Capacity (2010 *Standards Supplement, Adult Correctional Institutions*, 4th edition).

Column 6: Current Prison Operational Capacity (POC) – The calculated POC is the capacity based on application of the ACA standards coupled with mitigation variables for out-of-cell time for eligible inmate populations and inclusive of operational flexibility on the date the field review was conducted for each of the six pilot prisons.

Column 7: Current Prison Operational Capacity (POC) with 5% Operational Flexibility – The POC inclusive of a 5% factor for operational flexibility.

Column 8: Potential Prison Operational Capacity (PPOC) with 5% Operational Flexibility – The PPOC inclusive of a 5% factor for operational flexibility. The calculated PPOC is the capacity figure that would reflect the maximum possible mitigation adjustments for out-of-cell time and inclusive of operational flexibility.

Column 9: Bed Differential of Design Capacity vs. PPOC with 5% Operational Flexibility.

Attorney-Client Work Product -- Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# IV. SYSTEMWIDE APPLICATION

Attorney-Client Work Product – Confidential

# IV. Systemwide Application

### The Process

In December 2010, with the pilot test process complete and numerous lessons learned and methodological refinements made, the Secretary authorized the Working Group to commence with the capacity review at all 33 institutions. The field work was slated to begin in February 2011 with a June deadline established for a Final Report.

It was determined that staff of the Division of Adult Institutions (DAI) would take the lead on collection of out-of-cell information, while CDCR architectural staff assigned to the Working Group would continue to conduct the work associated with field measurements and confirmations relative to cell and dormitory sizes and occupancies. Members of the Working Group who led efforts to measure out-of-cell time during the six pilots were assigned to train DAI staff who would be conducting the extensive field work. This training not only focused on describing the activities that needed to occur at all institutions, but was intended to insure consistency of methods employed among and between teams in the field.

Between February and May, teams moved across the state to conduct capacity evaluation data collection. Four teams of DAI personnel completed site evaluations at seven prisons, while one team completed five institutions. Working Group representatives attended the initial field visits to continue the training process and then turned the work over completely to DAI teams.

The out-of-cell time information collection phase entailed site visits to each institution, collection of prison program information, collection of out-of-cell time data for each housing unit within the institutions, and collection of information on cell or dormitory conversions to accommodate disability placement program/disability placement wheelchair (DPP/DPW) inmates, mental health observation functions, or other uses such as office space, conference rooms, storage, etc.

At the conclusion of each site evaluation, the teams returned to their assigned prisons to evaluate the data collected and to transpose the out-of-cell time data into the OOC calculation worksheets. Once completed, the worksheets were submitted, along with all supporting documents to members of the Working Group who were charged with conducting the quality assurance process (see the description of this process below).

### Quality Assurance Program

A vitally important component of the process was the establishment and implementation of a quality assurance process for data collected in the field. The Working Group was fully cognizant of the fact that the information that would be generated about capacity would only be as good as the quality of the underlying data. As such, a process of reviewing the data collected from the field and the preliminary calculation performed by the DAI staff was established.

The CDCR architect assigned to the Working Group reviewed all architectural plans and dimensions received from the field, verifying the information and measurements. The quality assurance process revealed many discrepancies between plans and actual field conditions, even

among facilities that were allegedly identical. Valid information was crucial to the calculation of cell sizes, dormitories and establishing mitigated occupancies for eligible classifications. Additionally, this process resulted in creating an extraordinary data base of all the prisons surveyed as housing floor plans were accurately documented and dimensioned on CADD.

Members of the Working Group used the QA Checklists[42] to validate the field visit team calculations and supporting documentation. Conference calls were then conducted with each team to address discrepancies and areas requiring recalculation or follow-ups, after which documents were returned to the teams to make the necessary corrections. As each team completed their site evaluations, they met with the Working Group's QA leaders to finalize the QA process, which included a peer review process.

The quality assurance phase for out-of-cell data collection included the following tasks:

- Validating that all supporting documents for each institution were collected and available.

- Validating that all OOC worksheets and OOC calculation worksheets were completed and available.

- Completing a quality review of the OOC worksheets and OOC calculation worksheets.

- Comparing the data collected at the housing unit level with the institutions' inmate assignment rosters.

- Comparing the cell conversion information collected during the institution site visits with the building design information provided by the institutions' plant operations departments.

- Finalizing the OOC time calculations for each housing unit by inmate classification groups, program groups, release/recall times and meal/recreation functions.

- Validating the average number of OOC hours per inmate for each housing unit within each institution.

- Crosschecking the number of inmates listed on the housing unit OOC worksheets against the inmate assignment rosters to ensure that the number of inmates listed on the OOC calculation worksheet by classification category and program group was accurate.

- Crosschecking all release/recall times listed on the housing unit OOC worksheets with meal, recreation, and inmate assignment release/recall schedules to validate all OOC time calculations documented on the OOC time calculation worksheets.

An important component of this quality assurance process was that copious notes were taken to document all reviews of data, calculations that were returned to field reviewers for corrections or

---

[42] See Appendix 12.

Attorney-Client Work Product – Confidential

recalculations and all data validation steps and associated documentation were preserved for the record during this process.

### Findings

Once the quality assurance process was completed, members of the Working Group initiated the painstaking work of applying the methodology to calculate the ACA capacity, POC and PPOC for each of the 33 CDCR institutions. This process occurred during July through August 2011. CDCR staff collected, organized and analyzed all of facility data and determined the three capacity calculations for each housing unit of every institution and provided this information to P/BA. P/BA provided overview support for the quality assurance process and identified areas for which further inquiry or analysis was necessary. Once the POC's were finalized, P/BA then reviewed the corresponding access to care data for each institution to determine whether any healthcare adjustments to the POC were necessary for any prison with medical and/or mental health access to care falling below the acceptable threshold of 80% during the three month period of March through May, 2010.

In fact, only two prisons presented possible capacity adjustments due to sub-par access to care statistics—SVSP and Corcoran- and in both only access to mental health care were concerns. In both cases POC related capacity reductions already resulted in a revised capacity below the adjustment required to meet the 80% access to care threshold. At SVSP, the three month average access to mental health care was very low at 57.3% requiring a 22.7% reduction in EOP beds to meet the 80% threshold; however, the POC reduction was 72 beds or a 30.7% reduction. Therefore no further reduction was necessary to meet the access to care threshold.

An important caveat is necessary as it concerns the use of this data. Specifically, the capacity calculations prepared in this report have not considered the quality and condition of current housing areas in the prisons. While a substantial portion of CDCR's bed inventory is relatively new and in reasonable condition, there are also housing areas that are substandard. This could affect future POC or PPOC calculations and therefore should be further evaluated for during the next phase of the capacity planning project.

Table 4-1 below presents the results of the three types of capacity calculations for all 33 prisons.[43] It reveals that, based on the initial application of the new capacity methodology, the systemwide Prison Operating Capacity is currently 103,570. It also suggests that if full out-of-cell mitigation could be achieved systemwide, the PPOC could be as high as 128,700. While we recognize that this PPOC number exceeds the capacity of 109,519 beds in the *Plata* decision, it nonetheless serves to illustrate that CDCR can, by increasing out-of-cell activity, increase the current calculated POC at least as high as the systemwide population cap via application of this new methodology at all or selected CDCR prisons. Note that all three capacity figures above exclude 4,480 beds in off-site fire camps because the *Plata* decision did not address these beds.

---

[43] Summary calculation sheets for each of 33 prisons appear in Appendix 15.

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
FINAL REPORT – OCTOBER 3, 2011

### Table 4-1: Summary of Capacity Analysis

| Prison | ACA | POC | PPOC | Health Care Adjustment |
|---|---|---|---|---|
| CIW | 997 | 1,668 | 1,767 | 0 |
| CCWF | 1,999 | 1,996 | 2,558 | 0 |
| VSPW | 2,068 | 2,056 | 2,562 | 0 |
| Female Sub Total | 5,064 | 5,720 | 6,887 | 0 |
| CIM | 3,399 | 3,713 | 4,553 | 0 |
| SQ | 3,249 | 3,501 | 3,501 | 0 |
| DVI | 1,743 | 1,868 | 2,683 | 0 |
| RJD | 2,220 | 2,282 | 3,782 | 0 |
| NKSP | 2,984 | 3,094 | 4,899 | 0 |
| WSP | 3,431 | 3,540 | 5,507 | 0 |
| LAC | 2,392 | 2,494 | 4,034 | 0 |
| CCI | 2,838 | 3,326 | 3,776 | 0 |
| COR | 4,391 | 4,139 | 5,269 | 0 |
| SAC | 3,412 | 2,957 | 2,957 | 0 |
| HDSP | 3,434 | 3,379 | 4,279 | 0 |
| KVSP | 4,576 | 4,352 | 4,352 | 0 |
| PBSP | 3,384 | 3,275 | 3,275 | 0 |
| SVSP | 3,287 | 3,180 | 4,060 | 0 |
| CMF | 2,400 | 2,571 | 2,933 | 0 |
| CMC | 4,268 | 4,695 | 4,695 | 0 |
| SATF | 4,044 | 4,536 | 5,390 | 0 |
| CAL | 2,400 | 2,608 | 4,218 | 0 |
| CEN | 2,361 | 2,452 | 4,162 | 0 |
| MCSP | 1,796 | 1,909 | 3,039 | 0 |
| PVSP | 2,365 | 2,452 | 4,162 | 0 |
| ASP | 4,147 | 5,769 | 5,769 | 0 |
| CCC | 1,870 | 2,330 | 2,690 | 0 |
| CRC | 3,819 | 5,233 | 5,243 | 0 |
| SOL | 3,264 | 4,023 | 4,923 | 0 |
| CVSP | 2,531 | 3,428 | 3,428 | 0 |
| CTF | 3,553 | 3,886 | 4,998 | 0 |
| FSP | 2,132 | 2,244 | 2,532 | 0 |
| ISP | 2,286 | 2,386 | 4,096 | 0 |
| SCC | 1,551 | 2,030 | 2,390 | 0 |
| Male Sub Total | 89,627 | 97,750 | 121,813 | - |
| Institution Sub Total | 94,691 | 103,470 | 128,700 | - |
| Off Site Camps* | | | | |
| CIW | 320 | 320 | 320 | 0 |
| CCC | 2,150 | 2,150 | 2,150 | 0 |
| SCC | 2,010 | 2,010 | 2,010 | 0 |
| Camps Sub Total | 4,480 | 4,480 | 4,480 | |
| Grand Total | 99,171 | 107,950 | 133,180 | |

Attorney-Client Work Product -- Confidential

Table 4-2 below illustrates how the three calculated capacity figures-ACA, POC, and PPOC- compare with the existing CDCR's Design Capacity, the systemwide cap (137.5% of design capacity) and the Department's current "overcrowding capacity."

### Table 4-2: Summary of Capacity Analysis – Other Capacities

| Prison | DC | 137.5% of DC | OC | ACA | POC | PPOC | PPOC / DC (%) |
|---|---|---|---|---|---|---|---|
| CIW | 1,036 | 1,425 | 2,012 | 997 | 1,668 | 1,767 | 171% |
| VSPW | 1,960 | 2,723 | 3,897 | 2,068 | 2,056 | 2,562 | 129% |
| **Female Sub Total** | 5,020 | 6,903 | 9,830 | 5,064 | 5,720 | 6,887 | 137% |
| CIM | 2,976 | 4,092 | 5,410 | 3,399 | 3,713 | 4,553 | 153% |
| DVI | 1,681 | 2,311 | 3,053 | 1,743 | 1,868 | 2,683 | 160% |
| NKSP | 2,694 | 3,704 | 5,193 | 2,984 | 3,094 | 4,899 | 182% |
| LAC | 2,300 | 3,163 | 4,150 | 2,392 | 2,494 | 4,034 | 175% |
| COR | 3,116 | 4,285 | 5,266 | 4,391 | 4,139 | 5,269 | 169% |
| HDSP | 2,324 | 3,196 | 4,350 | 3,434 | 3,379 | 4,279 | 184% |
| PBSP | 2,380 | 3,273 | 3,426 | 3,384 | 3,275 | 3,275 | 138% |
| CMF | 2,297 | 3,158 | 3,680 | 2,400 | 2,571 | 2,933 | 128% |
| SATF | 3,424 | 4,708 | 6,635 | 4,044 | 4,536 | 5,390 | 157% |
| CEN | 2,308 | 3,174 | 4,368 | 2,361 | 2,452 | 4,162 | 180% |
| PVSP | 2,308 | 3,174 | 4,368 | 2,365 | 2,452 | 4,162 | 180% |
| CCC | 1,733 | 2,383 | 3,384 | 1,870 | 2,330 | 2,690 | 155% |
| SOL | 2,610 | 3,589 | 5,070 | 3,264 | 4,023 | 4,923 | 189% |
| CTF | 3,312 | 4,554 | 6,333 | 3,553 | 3,886 | 4,998 | 151% |
| ISP | 2,200 | 3,025 | 4,185 | 2,286 | 2,386 | 4,096 | 186% |
| **Male Sub Total** | 74,630 | 102,616 | 136,657 | 89,627 | 97,750 | 121,813 | 163% |
| **Institution Sub Total** | 79,650 | 109,519 | 146,487 | 94,691 | 103,470 | 128,700 | |
| | | | | | | | |
| **Off Site Camps⁴** | | | | | | | |
| CIW | 320 | 320 | 320 | 320 | 320 | 320 | |
| CCC | 2,150 | 2,150 | 2,150 | 2,150 | 2,150 | 2,150 | |
| SCC | 2,010 | 2,010 | 2,010 | 2,010 | 2,010 | 2,010 | |
| **Camps Sub Total** | 4,480 | 4,480 | 4,480 | 4,480 | 4,480 | 4,480 | |
| | | | | | | | |
| **Grand Total** | 84,130 | 113,999 | 150,967 | 99,171 | 107,950 | 133,180 | |

Attorney-Client Work Product -- Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# V. RECOMMENDATIONS AND NEXT STEPS

# V. Recommendations and Next Steps

In the wake of the decision by the U.S. Supreme Court in *Brown v. Plata*, it is a challenge at this juncture to clearly determine the next steps concerning the application of the methodology described herein and applied systemwide in the first half of 2011. That said, there are numerous directions that CDCR can possibly take relative to the application of this methodology. These include:

- Approach the Three Judge Panel to urge that this methodology be substituted for Design Capacity as the means by which to measure the capacity of the CDCR system;
- Apply the new methodology to the design of and determination of capacity for any new prisons to be constructed by the state or when significant renovations or modifications are made;
- Apply the lessons learned and the prison operational underpinnings of this new methodology, irrespective of whether it directly or indirectly impacts on calculations of capacity, to the CDCR system.

In addition, because the Supreme Court approached the 137.5% cap as a systemwide limit, leaving discretion to the State as to how to determine capacity at each institution, this new methodology may be used by CDCR to decide how to apportion inmates at individual institutions. By way of illustration, CDCR could allow for higher numbers above design capacity in prisons that meet the out-of-cell mitigation criteria while limiting those that do not.

In the event that CDCR determines that it can or will proceed with systemwide adoption and implementation of the new capacity methodology, there are a number of steps that must be considered. Since this is a point-in-time approach to measuring capacity, the process needs to be nimble so that re-calculations can occur pursuant to a schedule but also at reasonable junctures when changed circumstances dictate that a reassessment is appropriate and necessary due to changes in operations or physical plant. The following twelve major recommendations should be considered by CDCR:

1.  We recommend that CDCR utilize the POC's developed through this process as a basis for establishing minimum staffing levels for all CDCR prisons for budgetary planning for the upcoming fiscal year. Some adjustments may be necessary due to re-purposing of several prisons as a result of the re-alignment process.

2.  We recommend that CDCR identify an official or entity within the Department that will be responsible for maintaining the capacity measurement system and overseeing its ongoing implementation in practice.

3.  We recommend that responsibility for data collection rest with DAI but review, approval and reporting of CDCR's operational capacity rest with FPCM.

4.  We recommend that CDCR develop policy and procedures to govern the use of the capacity methodology and affix internal responsibility for the components of the process (e.g., capacity assessments/ data collection, approval, reporting) on an ongoing basis. Furthermore, we recommend that:

    a. there be a routine process by which  wardens advise DAI on an annual basis of any operational or physical changes that would trigger a new capacity assessment

    b. wardens be able to request on a quarterly basis a new capacity reassessment based on changed operational or physical plant considerations;

    c. institutions being considered for a mission change be re-evaluated based on the resources necessary to implement the PPOC for the new mission and population level;

    d. CDCR develop standardized forms to be used for out-of-cell time calculations, housing unit capacity calculations, and prison capacity calculations and that they are included in CDCR's operational capacity policy.

5. We recommend that CDCR's Office of Audits and Compliance complete the quality control assessment of any operational capacity assessments completed by DAI.

6. We recommend that CDCR develop a sustainable data base to manage this process.

7. We recommend that CDCR develop a training program to train staff at each prison, the associate directors and their staff, and selected staff within the Office of Audits and Compliance and FPCM to continue the updates of POC and PPOC. If possible the DAI personnel who conducted the initial surveys would be assigned to this effort on an on-going basis.

8. We recommend that CDCR complete a survey and analysis of all existing program space, support space and health care space to determine what enhancements are required to accommodate the POC or PPOC at each prison.

9. We recommend that CDCR consider the impact of how the original 12 prisons, with some original housing units more than 50 years old, will ultimately fit into the POC and PPOC capacity assessment process.

10. We recommend that CDCR conduct a staffing analysis at each prison to determine staffing requirements necessary to achieve the out-of-cell time mitigation thresholds with a target of reaching PPOC capacity levels at each prison.

11. We recommend that CDCR develop an overall strategy and departmental policy to minimize inmate idleness.

12. We recommend that CDCR revise the CDCR *Design & Construction Policy Guidelines* to establish housing standards in conformance with the criteria delineated in this report and establish thresholds for program, support and health care space to be incorporated into all new and existing facilities to support the potential prison operating capacity (PPOC).

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# VI. PARTICIPANTS/
# RESOURCES

# VI. Participants/Resources

The following professionals were active and essential participants in the development of the work that is described in this Final Report.

## CDCR Working Group

Carl Larson, Project Executive
James Derby, Project Coordinator
Steve Cambra
David Espinoza
David White
Ross Meyer
Suzanne Streater
Fountain Hutchison
Brian Lueth
George Giurbino
Mark Bertacchi
James Sammut

## CDCR Executive Staff

Mathew Cate, Secretary
Martin Hoshino, Undersecretary
Scott Kernan, Undersecretary
Ben Rice, Assistant Secretary
Chris Meyer, Senior Chief Deputy Secretary
Deborah Hysen, Chief Deputy Secretary
Terri McDonald, Director

## Pulitzer/Bogard & Associates

David Bogard
Curtiss Pulitzer
Judith Regina-Whiteley
Michael Gatling

# APPENDICES

# Appendices

| Appendix # | Name of Appendix | Page # |
|---|---|---|
| Appendix #1 | 50 square feet/Inmate Illustration/ACA Standard | 54-55 |
| Appendix #2 | 37 square feet /Inmate Illustration/Mitigation | 56-57 |
| Appendix #3 | Sample Housing Unit Out-of-Cell Time Calculation Worksheet | 58-59 |
| Appendix #4 | Health Care Adjustment to POC Medical Methodology | 60-61 |
| Appendix #5 | Health Care Adjustment to POC Sick Call Example | 62-63 |
| Appendix #6 | Health Care Adjustment to POC Mental Health CCCMS Methodology | 64-65 |
| Appendix #7 | Health Care Adjustment to POC-CCCMS Example | 66-67 |
| Appendix #8 | Health Care Adjustment to POC Mental Health EOP Methodology | 68-69 |
| Appendix #9 | Health Care Adjustment to POC EOP Example | 70-71 |
| Appendix #10 | Health Care Adjustment with Overlap between Medical and Mental Health Populations | 72-73 |
| Appendix #11 | Health Care Adjustment with Overlap between Medical and Mental Health Populations | 74-75 |
| Appendix #12 | Out-of-Cell worksheet and questionnaire instruction | 76-77 |
| Appendix #13 | Out-of-Cell Time Worksheet: Questions for Second Watch | 78-85 |
| Appendix #14 | Quality Assurance Review | 86-87 |
| Appendix #15 | Summary of the Capacity Calculations for all 33 Prisons | 88-121 |

Attorney-Client Work Product – Confidential

# APPENDIX #1

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
FINAL REPORT – OCTOBER 3, 2011

Appendix #1



SCALE: 1/4"=1'−0"

CALCULATIONS
11.832' x 16.888' = 199.819 SQ. FT. / 4 =
49.95 ~ 50 SQ. FT./ INMATE

| 50 SQ. FT. PER INMATE ILLUSTRATION | |
|---|---|
| STATE OF CALIFORNIA DEPT. OF CORRECTIONS AND REHABILITATION - RATED CAPACITY ASSESMENT | PULITZER & ASSOCIATES, LLC BOGARD |

Attorney-Client Work Product -- Confidential

# APPENDIX #2

Attorney-Client Work Product – Confidential

Appendix #2



SCALE: 1/4"=1'-0"

CALCULATION METHODOLOGY
1. MAINTAIN 7'-0" CLEAR BETWEEN BUNKS.
2. INCLUDE CIRCULATION IN ACHIEVING 100 USF.

USF CALCULATIONS: 7.0 x 8.832' (−5 SQ. FT. FOR DESK) = 56.824 SQ. FT.
3.598' x 12.0' = 43.176 SQ. FT.
TOTAL USF = 100 USF
TOTAL SF/ INMATE: 12.43' x 12.0' = 149.16 SQ. FT. / 4 = 37.29 SQ. FT.
~ 37 SQ. FT./
INMATE

| 37 SQ. FT. PER INMATE ILLUSTRATION |  |
|---|---|
| **STATE OF CALIFORNIA DEPT. OF CORRECTIONS AND REHABILITATION - RATED CAPACITY ASSESMENT** | |

Attorney-Client Work Product – Confidential

# APPENDIX #3

Appendix #3

## Housing Unit Out of Cell Time Calculation Worksheet

Prison ___SVSP___
Facility _D_
Unit ____4____
Date of Review ___10-20-10 & 11-17-2010___
Reviewer's Name ___D. Espinosa___
Officer Interviewed ___Gibbons___

| Out of Cell Release Period | Full-Time Assigned Program/work schedule | Full-time Assigned schedule OOC Time | Part-Time Assigned/Academic Ed/Leisure schedule | Part-time Assigned/Academ/Leisure schedule OOC time | Notes |
|---|---|---|---|---|---|
| Early Dayroom Activity | | | | | |
| Morning chow | 0700-0730 | 0.5 | 0700-0730 | 0.5 | Fed in dining room |
| Support Services - Treatment | 0900-1130/1300-1530 | 5 | | | Majority of workers return to H.U. |
| Morning Dayroom/Yard/Academics | | | 0900-1130 | 1.25 | Program every other day |
| Afternoon Dayroom/Yard/Academics | | | 1300-1530 | 1.25 | Program every other day |
| Evening Chow | 1600-1630 | 0.5 | 1600-1630 | 0.5 | Fed in dining room |
| Evening Dayroom/Yard | | | | | |
| Late Dayroom Activity | | | | | |
| TOTAL | | 6 | | 3.5 | |

| Unit Population Data | Total Number | Out of Cell Time | Notes | Calculation: # Inmates x out of cell time |
|---|---|---|---|---|
| Classification (s) | Level 4 | | EOP General Population | |
| Total Number of Inmates | 104 | | | |
| | | | | |
| Number of Orientation Inmates | 3 | 3.5 | · | 10.5 |
| Number of Close A Inmates | 10 | 3.5 | | 35 |
| Number of A2B Status Inmates | | | | 0 |
| Number of C Status Inmates | | | | 0 |
| Full Time Assigned Inmates (Daytime Workers) | 27 | 6 | Support Services-Treatment | 162 |
| Full Time Assigned Inmates Early/Late Workers | 29 | 8 | Support Services-Treatment | 232 |
| Part Time - Unassigned Inmates | 35 | 3.5 | Part time assignments (Academics)-Unassigned inmates | 122.5 |
| | | | | 562 |

| Average # Out of Cell Hours/Inmate | 5.4 |
|---|---|
| Mitigation standard | 10 |
| Mitigation Standard Met (Yes/No) | No |

Notes / Assumptions

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #4

# Appendix #4

***Appendix 4: Sick Call Adjustment to POC Methodology***

Institution: Date:

*Targeted Population: Sick Call* *Prison's Current Operational Capacity____*

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #5

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

Appendix #5



*Appendix 5: Sick Call Adjustment to POC EXAMPLE*

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #6

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning
Attorney-Client Work Product – Confidential
FINAL REPORT – OCTOBER 3, 2011

Appendix #6



Appendix 6: CCCMS Adjustment to POC Methodology

Institution: _____    Date: _____

CCCMS Population _____    Prison's Current Operational Capacity _____

What is the average of the last 3 month's mental health access to care percentage? _____

Is the percentage 80% or above?

Yes → No Impact on POC

No → Reason Percentage Below 80%?

Custody/Provider/Other? Explain:

Yes → What number of beds is impacted? [# CCCMS] is XX% of GP population

Was the prison operational capacity (POC) reduced from current operational capacity (OC)?

No    Yes →

Step 1: Proposed GP POC? _____ X  Current % of GP = proportional reduction of CCCMS population

Step 2: [Threshold %] minus [3 Month Average %] = XX %

Step 3a: Multiply today's CCCMS population by the XX% = reduction in beds required to meet the access to care threshold.

Step 3b: [Current CCCMS Population] minus [Proposed CCCMS Population] = CCCMS bed Reduction

Step 3c: Compare POC bed reduction to Access Threshold Requirement

No Healthcare Adjustment to POC ← Yes ←

No →

Step 4: [Required Reduction to Meet Threshold] – [POC Reduction] = Healthcare Adjustment to POC

The Adjusted POC is _____ ← Step 5: [Proposed POC] - [Healthcare Adjustment to POC] = Adjusted POC

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

# APPENDIX #7

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
FINAL REPORT – OCTOBER 3, 2011

Appendix #7



*Appendix 7: CCCMS Health Care Adjustment Example*

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #8

Appendix #8

*Appendix 8: EOP Health Care Adjustment to POC Methodology*

Institution:                                                                   Date:

*Designated EOP Population:*



Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

Attorney-Client Work Product – Confidential

# APPENDIX #9

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

Appendix #9



*Appendix 9: EOP Health Care Adjustment to POC*

Institution: SVSP                                                                Date: Spring 2011

*Designated EOP Beds: 264*

What is the average of the last 3 month's mental health access to care percentage? 57.3%

Non-ducated activities included?    Yes ←    Is this population included in this %?    → No    Document

Yes ←    Is the percentage 80% or above?    → No

No impact on POC

Reason Percentage Below 80%?

Custody/ Provider/Other? Explain: Combination

Yes

Was the EOP bed operational capacity reduced? ←    What is the current number of EOP designated beds? 264

No    Yes    EOP Designated POC: 192

Step 1: (80% threshold) minus ( 57.3 % three month average) = 22.7 %

Step 2: 264 EOP beds X .227 = 59.93 or 60 reduction in beds required to meet the access to care threshold of 80%.

Step 3a: (264 Current EOP Beds) minus (192 EOP POC) = 72 bed reduction
Step 3b: EOP POC reduction of 72 beds is greater than threshold reduction requirement of 60 beds (22.7%)
Step 3c: (Required Reduction to Meet Threshold % 60)- (POC Reduction 72) = No further reduction to EOP POC

No Healthcare Adjustment to POC ←    Yes

No

The adjusted POC is N/A ←    Step 4: (Proposed POC) - (Healthcare Adjustment to POC) = Adjusted POC

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #10

Attorney-Client Work Product -- Confidential

*California Dept. of Corrections and Rehabilitation -- Prison Capacity Planning*
**FINAL REPORT -- OCTOBER 3, 2011**

Appendix #10

***Appendix 10: Medical and Mental Health Population Overlap Adjustment to POC Methodology***
Institution:                                                                 Date:

*Targeted Population: Overlapping Populations*          *Prison's Current Operational Capacity* _____



Based on Sick Call, EOP and CCCMS populations previously calculated (Appendices 4-10) demonstrate that a POC adjustment is required for more than one healthcare population there is an assumption that populations overlap. The largest adjustment will be used with specific population(s) adjustments subsumed within that larger adjustment to avoid duplicating reductions. OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #11

Appendix 11

***Appendix 11: Medical and Mental Health Population Overlap Adjustment to POC Methodology***

Institution:                                                         Date:

*Targeted Population: Overlapping Populations*          *Prison's Current Operational Capacity_____*



If Sick Call, EOP and CCCMS populations previously calculated (Appendices 4-10) demonstrate that a POC adjustment is required for more than one healthcare population there is an assumption that populations overlap. The largest adjustment will be used with specific population(s) adjustments subsumed within that larger adjustment to avoid duplicating reductions. Despite adjusting for overlap, the bed reduction strategy will still need to meet the threshold requirement of the CCCMS and EOP populations pursuant to those calculations.

OC and POC statistics from CDCR Prison Calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #12

Appendix #12

There are three questionnaires attached to this e-mail titled 'out-of-cell tool worksheet'. There is a questionnaire for a first, second and third watch officer to complete. The questionnaires need to be printed out and delivered to each of the prison's housing units for completion. Since this is a snapshot in time, <u>the three questionnaires need to be completed on the same date for all housing units</u>. The day selected shall be a week day -- not Saturday or Sunday. Have the staff member complete the questionnaire reflecting the inmate movement on the date of review. The supporting documents listed below need to reflect the same date as when the questionnaire is filled out.

- Master count sheet -- snapshot of prison population
- Daily Movement Sheet -- inmate program movement/work release
- Daily Activity Report -- overview of prison activity (counts, meals, yard, etc.)
- Master ducat list -- depicts inmate participation in various medical/non medical programs
- EOP program schedule
- Weekly/monthly education schedule, religious and self help program schedules, dayroom or yard schedules for the week of the site visit
- Prisons 3% reduction plan -- details inmate program modification due to staff redirection
- Unlock Report (Inmate assignment roster) sorted by housing unit -- verify work schedules, work hours and number of participants per housing unit

Please place the completed questionnaires and supporting documents in binders grouped in the following manner:

- Questionnaires - first, second and third watch together for each housing unit, separated by facility and housing unit in alphabetical/numerical order
- Supporting documents in a separate binder or binders in the order listed above

In addition to completing the three questionnaires, please have the institution's DPP coordinator or other appropriate resource fill out the DPW and Modifications template (attachment titled DPW and Modifications Template). The purpose of this form is to identify and confirm all DPW beds in the prison (by specific location) and to identify any non standard modifications for the DPW beds (ex. two standard cells converted to one DPW cell, bunks removed, other). The other half of this template should be used to identify any unique physical plant modifications for non-DPW cells/dorms (ex. cells modified as observation/suicide watch cells, cells conversions to other uses). Please have this template completed and available to the mission-based team that will be touring the prison. The team will be validating the data during their field review of the housing units.

# APPENDIX #13

Appendix #13

## Out of Cell Time Worksheet

The intent of this Out of Cell Time Worksheet is to capture an accurate assessment of inmate out-of-cell time, or the time inmates are not restricted to their bunk areas for dormitory housing units. This information is important to CDCR in determining the actual (housing/program) capacity of this prison. It is requested that the staff member who is most familiar with the housing unit program complete this worksheet. Please print your name legibly on the bottom of the worksheet. A follow up interview could be necessary to verify the information you have provided.

Date of review: _____ / _____ / _____

Prison: __ _____ Facility: _____ Housing Unit: _____ (Name/Number)

## *Questions for Second Watch:*

### Early morning culinary workers

1. Release for this housing unit is at what time? _____ _____

2. How many days of the week does this activity occur? _____ _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____ _____

### Breakfast release

1. Do you cell feed the inmates? (Yes / No) If no, complete the following questions:

2. Breakfast release for this housing unit is at what time? _____

3. How many days of the week does this activity occur? _____

4. How many inmates are released for the breakfast meal? _____

5. What time do the inmates return from breakfast? _____

6. The duration of time out of the cell/dorm for the breakfast meal is? _____

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

Attorney-Client Work Product – Confidential

7. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____

## PIA Release

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____

## Academics

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____

## Work

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

**Work**

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____
3. How many inmates are released? _____
4. What time do the inmates return? _____
5. The duration of time out of the cell/dorm is? _____
6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

**Porters**

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____
3. How many inmates are released? _____
4. What time do the inmates return? _____
5. The duration of time out of the cell/dorm is? _____
6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

**Dayroom**

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____
3. How many inmates are released? _____
4. What time do the inmates return? _____
5. The duration of time out of the cell/dorm is? _____

**Dayroom**

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____

Attorney-Client Work Product – Confidential

3.   How many inmates are released? _____

4.   What time do the inmates return? _____

5.   The duration of time out of the cell/dorm is? _____

### Yard

1.   Release for this housing unit is at what time? _____

2.   How many days of the week does this activity occur? _____

3.   How many inmates are released? _____

4.   What time do the inmates return? _____

5.   The duration of time out of the cell/dorm is? _____

6.   When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower? (Yes / No)  Length of time? _____

### Yard

1.   Release for this housing unit is at what time? _____

2.   How many days of the week does this activity occur? _____

3.   How many inmates are released? _____

4.   What time do the inmates return? _____

5.   The duration of time out of the cell/dorm is? _____

6.   When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower? (Yes / No)  Length of time? _____

### Religious Services

1.   Release for this housing unit is at what time? _____

2.   How many days of the week does this activity occur? _____

3.   How many inmates are released? _____

4.   What time do the inmates return? _____

5.   The duration of time out of the cell/dorm is? _____

6.   When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Canteen

1.   Release for this housing unit is at what time? _____

2.   How many days of the week does this activity occur? _____

---

Attorney-Client Work Product -- Confidential

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____

### Visiting Program

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____ _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____

### Diabetic / Medication Line

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No) Are they allowed to shower or access the yard/dayroom (Yes / No)? Length of time? _____

### Diabetic / Medication Line

1. Release for this housing unit is at what time? ___,_____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Diabetic / Medication Line

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____
3. How many inmates are released? _____
4. What time do the inmates return? _____
5. The duration of time out of the cell/dorm is? _____
6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Medical / Mental Health Treatment

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____
3. How many inmates are released? _____
4. What time do the inmates return? _____
5. The duration of time out of the cell/dorm is? _____
6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Medical / Mental Health Treatment

1. Release for this housing unit is at what time? _____
2. How many days of the week does this activity occur? _____
3. How many inmates are released? _____
4. What time do the inmates return? _____
5. The duration of time out of the cell/dorm is? _____

Attorney-Client Work Product -- Confidential

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Medical / Mental Health Treatment

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____
6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Housing Unit Information:

*Number of cells: _____    Number of dorms: _____    Total bed count: _____*

### Inmate Information:

Please answer the below questions regarding the inmate population in the housing unit:

Total inmate count for the building/housing unit: _____.  Of the total count, how many are:

A1/A (assigned to a job) _____   A1/A (unassigned) _____   A2/B _____   Close A _____   C Status _____

CCCMS _____   GP _____   R/C GP _____   R/C SNY (SPU) _____

Name of person completing form: _____

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #14

Attorney-Client Work Product – Confidential

Appendix #14

## Criteria for Quality Control Review

**OOC Time Calculation Worksheets (typed forms)**

- Full-Time Assigned Program/Work Schedule
  - Are morning/evening chow times clearly identified?
  - PIA-Vocation-Support Services-Treatment hours accurately documented?
  - Dayroom/Yard opportunities accurately documented?
  - Is the 3% redirection (cost savings) factored in to the OOC times?
  - Did the notes clarify any discrepancies?
  - Are the notes clear and understandable?
  - Did the hours total up correctly?
- Part-Time Assigned/Academic Education/Leisure Schedule
  - Are morning/evening chow times clearly identified?
  - Morning/afternoon dayroom/yard/academic OOC accurately documented?
  - Are the education/academic days/hours accurately documented?
  - Is the 3% redirection (cost savings) factored in to the OOC times?
  - Did the notes clarify any release/recall time discrepancies?
  - Are the notes clear and understandable?
  - Did the hours total up correctly?
- Unit Population Data section
  - Is the prison classification level correct?
  - Does the total number of inmates listed match the Master Count Sheet?
  - Do the numbers in the Total Number column match the total number of inmates for the housing unit?
  - Are the OOC times accurate for each column (Ort/Close A/A2B/C)?
  - Are the full time assigned inmates clearly identified?
  - Are the part time / unassigned inmates clearly identified?
  - Are the notes clear and understandable?
- Notes / Assumption section
  - Do the notes clarify any discrepancies listed in the above categories?
  - Are the lockdown/modified program changes noted?
  - Is the 3% redirection (cost savings) explained in this area?
  - Does the number of inmates recorded on the OOC Time Calculation Worksheet, for each category, reconcile with the inmate assignment roster?
    - Orientation
    - Close A
    - A2B
    - C Status
    - Full Time Assigned (Daytime Workers)
    - Full Time Assigned (Early/Late Workers)
    - Part Time – Unassigned Inmates

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
**FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #15

Attorney-Client Work Product – Confidential

Appendix #15
(33 pages)

| Avenal State Prison | | | | |
|---|---|---|---|---|
| **Capacity Calculations** | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 4,132 | 5,659 | 5,659 | Level II General Population | Achieved mitigation threshold |
| 15 | 10 | 10 | Firehouse Dorm | Capacity Established by CDCR Program |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 4,247 | 5,769 | 5,769 | BED Totals | |
| | | 28 | Short-Term Health Care Beds | |
| | | 5,797 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**AVENAL STATE PRISON NOTES:**
A 18 Bed Infirmary is available for Short-Term Health Care needs.
Non-Traditional Housing Unit beds are not counted in capacity calculations.

Attorney-Client Work Product -- Confidential

| | | | Calipatria State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 200 | 200 | 200 | Administrative Segregation | Not subject to mitigation |
| 1,900 | 1,900 | 3,610 | Level IV General Population | Did not achieve mitigation threshold |
| 292 | 396 | 396 | Minimum Support Facility | Achieved mitigation threshold |
| 8 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 2,400 | 2,506 | 4,216 | BED Totals | |
| | | 18 | Short-Term Health Care Beds | |
| | | 4,234 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIPATRIA STATE PRISON NOTES:**
An 18-bed infirmary is available for short-term health care needs.

| | | | California Correctional Center | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Adminstrative Segregation | Not subject to mitigation |
| 400 | 400 | 760 | Level III General Population | Did not achieve mitigation threshold |
| 1,140 | 1,520 | 1,520 | Level II General Population | Achieved mitigation threshold |
| 220 | 290 | 290 | Minimum Support Facility | Achieved mitigation threshold |
| 10 | 20 | 20 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 1,870 | 2,330 | 2,690 | BED Totals | |
| | | 19 | Short-Term Health Care Beds | |
| | | 2,709 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double ceiling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA CORRECTIONAL CENTER NOTES:**
A 19 Bed OHU is available for Short-Term Health Care needs.
Non-traditional housing unit beds are not included in capacity calculations.

| California Correctional Institution | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 185 | 185 | 185 | Administrative Segregation Unit | Not subject to mitigation |
| 810 | 810 | 810 | Security Housing Unit | Not subject to mitigation |
| 500 | 500 | 950 | Reception Center Processing | Did not achieve mitigation threshold |
| 720 | 972 | 972 | Level II General Population | Achieved mitigation threshold |
| 605 | 849 | 849 | Level I General Population | Achieved mitigation threshold |
| 18 | 10 | 10 | Firehouse Dorm | Capaityestablished by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| 2,838 | 3,326 | 3,776 | BED Totals | |
| | | 21 | Short-Term Health Care Beds | |
| | | 3,797 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of Inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA CORRECTIONAL INSTITUTION NOTES:**
A 16 Bed Infirmary provides 16 OHU-swing beds for Short-Term Health Care needs.
Facility IV-A, housing unit H-48, Ad Seg, Section B, Cells 101, 102, 103, 104 & 105 have all furnishings removed for use as short term mental health crisis rooms.
Non-traditional housing unit beds are not included in capacity calculations.

| Central California Women's Facility | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 45 | 45 | 45 | Administrative Segregation Unit/Condemned | Not subject to mitigation |
| 356 | 356 | 510 | Reception Center Processing | Did not achieve mitigation threshold |
| 49 | 49 | 73 | Medium Security Enhanced Outpatient Program | Did not achieve mitigation threshold |
| 1,536 | 1,536 | 1,920 | Medium Security General Population | Did not achieve mitigation threshold |
| 13 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| 1,999 | 1,996 | 2,558 | BED Totals | |
|---|---|---|---|---|
|  |  | 45 | Short-Term Health Care Beds | |
|  |  | 2,603 | Total Potential Capacity | |

## STANDARD DEFINITIONS AND NOTES
**DEFINITIONS**

ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**

POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

## CENTRAL CALIFORNIA WOMEN'S FACILITY NOTES:

A 39 Bed Skilled Nursing Facility is available for Short-Term Health Care needs.
Facility A, Building 504 EOP/ASU/Condemned has 6 cells with furnishings removed and are used as Mental Health Crisis Beds. These cells are not counted in the Capacity Calculations.

| | | | Centinela State Prison | |
|---|---|---|---|---|
| | | | Capacity Calculations | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 200 | 200 | 200 | Adminstrative Segregation | Not subject to mitigation |
| 500 | 500 | 950 | Level IV General Population | Did not achieve mitigation threshold |
| 1,400 | 1,400 | 2,660 | Level III General Population | Did not achieve mitigation threshold |
| 254 | 342 | 342 | Minimum Support Facility | Achieved mitigation threshold |
| 7 | 10 | 10 | Firehouse Dorms | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 2,361 | 2,452 | 4,162 | Bed Totals | |
| | | 18 | Short-Term Health Care Beds | |
| | | 4,180 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CENTINELA STATE PRISON NOTES:**
An 18 Bed Correctional Treatment Center is available for Short-Term Health Care needs.
Non-Traditional housing unit beds are not included in capacity calculations.

Attorney-Client Work Product – Confidential

| | | | California Institution for Men | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 204 | 204 | 204 | Administrative Segregation Unit | Not subject to mitigation |
| 2,384 | 2,384 | 3,224 | Reception Center Processing | Did not achieve mitigation threshold |
| 630 | 849 | 849 | Level II General Population | Achieved mitigation threshold |
| 176 | 266 | 266 | Level I General Population | Achieved mitigation threshold |
| 5 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 3,399 | 3,713 | 4,553 | BED Totals |
| | | 80 | Short-Term Health Care Beds |
| | | 4,633 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA INSTITUTION FOR MEN NOTES:**
• 80 beds are available at CIM for short-term health care needs as follows:
o 44 medical out patient beds
o 36 mental health crisis beds

• Non traditional housing unit beds are not included in these capacity calculations.

• The second floor of South Dorm, CIM - minimum, is condemned, thus, will not be included in these capacity calculations.

• Pine Hall, CIM - minimum, was deactivated at the time of the DAI team review but will be included in these capacity calculations.

• Mariposa Dorm, CIM – West, was used as a recreation/education space at the time of the DAI team review, therefore, it will not be included in these capacity calculations as an inmate housing unit.

• Willow Hall, CIM – minimum, was used for RC processing/ad. seg. inmates. Willow Hall will be included as RC processing dorm in these capacity calculations.

• Birch Hall and Madrone Hall, CIM – RC Central, have cells with 47.8 gross square feet each, thus, can house a maximum of one inmate per cell.

• Birch Hall, CIM – RC Central, house RC processing/Level III general population inmates at the time of review. Birch Hall will be included as RC processing in these capacity calculations.

| California Institution for Women | | | | |
|---|---|---|---|---|
| **Capacity Calculations** | | | | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Ad Seg/R.C. Overflow | Not subject to mitigation |
| 110 | 110 | 209 | R.C. Processing | Did not achieve mitigation threshold |
| 47 | 70 | 70 | Medium security EOP (SCU) | Achieved mitigation threshold |
| 20 | 20 | 20 | Psychiatric Services Unit | Capacity established by CDCR, single celled unit |
| 720 | 1,368 | 1,368 | Medium security G.P. | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 997 | 1,668 | 1,767 | BED Totals | |
| | | 25 | Short-Term Health Care Beds | |
| | | 1,792 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA INSTITUTION FOR WOMEN NOTES:**
CIW has 25 beds available for short-term health care needs as follows: 7 OHU-swing beds, 8 correctional treatment center beds, and 10 mental health crisis beds.
Non-traditional housing unit beds are not included in capacity calculations.

Attorney-Client Work Product -- Confidential

| ACA | POC | PPOC | Custody Level & Program | Comments |
|---|---|---|---|---|
| | | | **California Men's Colony** | |
| | | | **Capacity Calculations** | |
| 314 | 309 | 309 | Administrative Segregation Unit | Not subject to mitigation |
| 570 | 570 | 570 | Level III Enhanced Outpatient Program | Small cells. |
| 1,500 | 1,500 | 1,500 | Level III General Population | Small cells. |
| 1,595 | 2176 | 2,176 | Level II General Population | Achieved mitigation threshold |
| 212 | 288 | 288 | Level I Minimum Support Facility | Achieved mitigation threshold |
| 64 | 40 | 40 | CDF Firecamp Dorm | Capacity established by CDF/CDCR Program needs. |
| 13 | 12 | 12 | Firehouse Dorm | Capacity established by CDCR Program needs. |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 4,268 | 4,895 | 4,895 | BED Totals |
| | | 57 | Short-Term Health Care Beds |
| | | 4,952 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double ceiling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA MEN'S COLONY NOTES:**
37 Bed General Acute Care Hospital is available for Short-Term Health Care needs.
42 Beds in Bldg D-7 are assigned as Mental Health Crisis Beds.  20 have all furnishings removed and therefore counted as Short-Term Health Care beds.
Cells 101 through 112 in ASU Central and all Cells in Bldgs 1-8 have 38.59 gross square feet each, thus, can only house one inmate per cell.
CMC West Dorms 28 and 34 were Deactivated during the DAI review, but are included in the Capacity Calculations.

Attorney-Client Work Product – Confidential

| | | | California Medical Facility | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 330 | 330 | 330 | Administrative Segregation | Not subject to mitigation |
| 332 | 332 | 332 | DMH Licensed APP, ITP, ICF | Capacity established by licensure standards |
| 162 | 162 | 162 | Medical Out Patient Units | Capacity established by CDCR policy |
| 283 | 302 | 422 | Level IV EOP | Only N-3 achieved mitigation threshold |
| 904 | 919 | 1,161 | Level III G.P./Medical/CCCMS | Only 4 dorms achieved mitigation threshold |
| 185 | 250 | 250 | Level II G.P. | Achieved mitigation threshold |
| 190 | 260 | 260 | Minimum Support Facility | Achieved mitigation threshold |
| 14 | 16 | 16 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| 2,400 | 2,571 | 2,933 | BED Totals | |
| | | 121 | Short-Term Health Care Beds | |
| | | 3,054 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP ceiled housing units are capped at a double ceiling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA MEDICAL FACILITY NOTES:**
• 121 rooms at CMF are available for short-term health care needs as follows:
    o Correctional Treatment Center    47
    o General Acute Care Hospital        7
    o Hospice Care                              17
    o Mental Health Crisis Care          50
                              Total        121

• DMH licensed APP, ICF, and ICF high security unit's capacities, at CMF, are established by licensure standards.

• Medical out patient housing unit's capacities, at CMF, are established by CDCR policy.

• Cells in T, U, and V wings have 37.55 gross square feet each, thus, only house a maximum of one inmate per cell.

• Typical cells in W wing have 42 gross square feet each, thus, only house a maximum of one inmate per cell.

*California Dept. of Corrections and Rehabilitation -- Prison Capacity Planning*
**FINAL REPORT -- OCTOBER 3, 2011**

| California State Prison Corcoran | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 300 | 300 | 300 | Adminstrative Segregation | Not subject to mitigation |
| 2,048 | 1,536 | 1,536 | Security Housing Units/PHU | 50% Cells double bunked per CDCR policy |
| 100 | 100 | 150 | Level III & IV EOP | 50% Cells double bunked per CDCR policy |
| 300 | 300 | 570 | Level IV General Population | Did not achieve mitigation threshold |
| 400 | 400 | 760 | Level III & IV General Population | Did not achieve mitigation threshold |
| 500 | 500 | 950 | Level III General Population | Did not achieve mitigation threshold |
| 727 | 995 | 995 | Minimum Supporly Facility | Achieved mitigation threshold |
| 16 | 8 | 8 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| 4,391 | 4,139 | 5,269 | BED Totals | |
| | 75 | 75 | Short-Term Health Care Beds | |
| | 4,214 | 5,344 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double ceiling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA STATE PRISON-CORCORAN**
A 75-bed General Acute Care Hospital is available for short term health care needs.
Non traditional housing unit beds are not included in capacity calculation
MSF buildings H01 and H03 were deactivated during the DAI field review. These two dorms are included in these capacity calculations.

Attorney-Client Work Product – Confidential

| California Rehabilitation Center | | | | |
|---|---|---|---|---|
| **Capacity Calculations** | | | | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 28 | 28 | 38 | Reception Center Processing | Deactivated |
| 3,700 | 5,070 | 5,070 | Level II General Population | Achieved mitigation threshold |
| 66 | 126 | 126 | CDF Fire Camp | Capacity established by CDCR/CDF Program needs |
| 25 | 9 | 9 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 3,819 | 5,233 | 5,243 | BED Totals | |
| | | 10 | Short-Term Health Care Beds | |
| | | 5,253 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA REHABILITATION CENTER NOTES:**
A 10 Bed Infirmary is available for Short-Term Health Care needs.
The second floor of building 104 (Dorm 400) has been converted to health care space, thus is not included in these capacity calculations.
Dorms 105, 112, 114, 206,208 and 302 were deactivated at the time of the DAI review. These dorms are included in these capacity calculations.

# Exhibit 9



# SPECIAL REPORT

**AUGUST 2009 RIOT AT THE
CALIFORNIA INSTITUTION FOR MEN**

## OFFICE OF THE
## INSPECTOR GENERAL

DAVID R. SHAW
INSPECTOR GENERAL

STATE OF CALIFORNIA
APRIL 2010



April 22, 2010

Matthew L. Cate, Secretary
California Department of Corrections and Rehabilitation
1515 S Street, Room 502 South
Sacramento, California 95814

Dear Mr. Cate:

Enclosed is the Office of the Inspector General's special report concerning the August 2009 riot at the California Institution for Men in Chino (CIM). The purpose of the special report was to identify the conditions and circumstances leading up to the riot and to evaluate the institution's and the department's actions in addressing the riot and re-establishing normal operations in the riot's aftermath.

The report concludes that despite being warned of the inherent risks of housing reception center inmates in the open dormitories of CIM's Reception Center West, the department took no substantive action to alleviate the security risks in that facility's design. Additionally, although the report concludes that CIM heeded warnings from past reviews and audits by enhancing its emergency medical preparedness, there are still areas in which CIM and the department could have improved their performance.

If you have any questions concerning this report, please contact Jerry Twomey, Chief Assistant Inspector General, Bureau of Audits and Investigations, at (916) 830-3600.

Sincerely,

David R. Shaw
Inspector General

cc:   Scott Kernan, Chief Deputy Secretary, Adult Operations, CDCR
      George Giurbino, Director, Adult Institutions, CDCR
      Michele Minor, Chief Deputy Secretary (A), Adult Programs, CDCR
      Kim Holt, External Audits Manager, CDCR

# Contents

Executive Summary ........................................................................................... 1

Recommendations ............................................................................................. 3

Background ........................................................................................................ 5

Objectives, Scope, and Methodology ................................................................ 10

Finding 1 ........................................................................................................... 11
   The Department of Corrections and Rehabilitation Failed to House a
   Suitable Inmate Population at Reception Center West

Finding 2 ........................................................................................................... 17
   Despite the Liabilities of the Facility's Design, CIM Staff Responded
   Effectively to the August 2009 Riot at Reception Center West

California Department of Corrections and Rehabilitation's Response
to the Special Report ......................................................................................... 27

# Executive Summary

At approximately 8:30 p.m. on Saturday, August 8, 2009, a riot involving more than 1,000 inmates occurred at the California Institution for Men's (CIM) Reception Center West facility (RC West). The rioting inmates caused damage so severe that seven of the eight housing units at the facility were rendered uninhabitable. During the four hours of fighting, the inmates fashioned weapons from a variety of materials on hand, including pieces of metal bed frames, shards of porcelain bathroom fixtures, glass from broken windows, broom handles, and broken wood. In the aftermath of the riot, nearly 200 inmates sustained injuries—including 54 that needed transportation to local hospitals for treatment.

---

## *Findings in Brief*

The Office of the Inspector General finds that:

- The Department of Corrections and Rehabilitation failed to house a suitable inmate population at CIM's Reception Center West

- Despite the liabilities of the facility's design, CIM staff responded effectively to the August 2009 riot at Reception Center West

---

Despite the inherent dangers of housing reception center inmates in an open dormitory setting—as was the case with RC West—the California Department of Corrections and Rehabilitation (CDCR) took no substantive action that could have prevented a riot of this magnitude. RC West's recent history included a riot in December 2006 involving about 800 inmates that required correctional staff twelve hours to contain. At least three more riots at RC West have occurred since then, leading up to the August 2009 riot that severely damaged the facility.

In addition to the history of significant riots at RC West, CDCR also received information from outside agencies warning against housing reception center inmates in an open dormitory setting. In a November 2007 report filed after touring the one of RC West's dormitories, the former director of the Texas Department of Corrections, Wayne Scott, declared, "The housing unit was a serious disturbance waiting to happen. If the prisoners wanted to take over the dorm they could do so in a second and no one would know." In November 2008, the Office of the Inspector General (OIG) also warned that "placing inmates with histories of disruptive or assaultive behavior in an open setting where they can roam freely and where fights among inmates can quickly escalate and spread creates a more dangerous environment for inmates and staff members."

Prior to April 2008, CDCR even received documentation from its own experts advising that the RC West facility should be replaced, as well as "negative documentation" issued by the Office of the State Fire Marshall, advising CDCR that RC West didn't meet building codes and fire safety requirements.

However, CDCR did not alleviate the risky security conditions inherent in RC West's design. Those conditions contributed to the severity and duration of the August 2009 riot. CDCR later acknowledged that less volatile inmates would be a more suitable population for RC West, and stated that it plans to place level-II inmates there to prevent a recurrence after it repairs the housing units.

In the absence of detailed contingency plans to house large numbers of inmates in the event of a major incident, CIM used holding cells and outdoor exercise areas to secure displaced inmates until beds could be found for them in the days immediately following the riot. Within 72 hours after the incident began, CDCR relocated the majority of RC West's 1,154 displaced inmates to an empty housing unit at nearby Heman G. Stark Youth Correctional Facility (Stark), and the remainder to other institutions.

Although the OIG had concerns regarding inadequate living conditions during the immediate post-riot period, CIM provided evidence that the prison generally provided inmates with food, medications, clothing, blankets, and hygiene supplies and found housing for most inmates within days of the riot. However, in the post-riot environment, the nature and extent of services provided to inmates clearly were less than would be provided under normal circumstances.

CDCR is now in the process of repairing the damaged housing units at an estimated cost of $5.2 million. CDCR also plans to convert Stark to an adult prison at an estimated cost of $130 million. Included in that estimate are plans for a new electrified fence, gun towers, buildings to house reception center inmates, and medical facilities.

In contrast to CDCR's inaction in addressing the on-going security risks inherent in RC West's design, CIM heeded the recommendations from outside agencies to enhance its emergency preparedness, and those actions likely reduced the number of inmates needing hospitalization during the August 2009 riot.

Days before the riot, staff learned of a particular inmate group's intention to cause an institution-wide riot. As a result, the prison's investigative staff searched key inmates and discovered handwritten notes instructing inmates to participate in a large-scale riot throughout the institution. In response, the prison placed the institution on modified program status to restrict inmate movement and added more employees on RC West to prepare for the potential disturbance. Nonetheless, given the structural limitations at RC West, the staff at CIM was unable to prevent the large, coordinated riot.

Once the riot started, the prison promptly activated an emergency operations center (EOC), which coordinated the response at all levels throughout the prison during the incident and in its aftermath. Overall, the OIG found that the prison had reasonably planned and prepared for such an emergency and coordinated its efforts with those of other prisons and community emergency service agencies to restore security and provide emergency medical care. About 200 inmates received injuries ranging from minor to serious. The prison's medical staff conducted triage and provided immediate medical attention to inmates as needed. During this time, custody staff was forced to conduct fingerprint identification of hundreds of inmates who lost or abandoned their identification cards.

By effectively executing its emergency medical response plan, CIM efficiently evaluated and treated many inmates' injuries, which minimized the number of inmates requiring treatment at outside hospitals. In addition, community emergency service agencies responded quickly, providing essential services that supplemented the institution's efforts and greatly assisted

CIM in containing the riot and giving medical care. Concurrently, CIM's crisis response team assembled and acted to regain control of the facility.

Nevertheless, several problems surfaced that indicate deficiencies in the prison's and in CDCR's emergency response. First, there were an insufficient number of armed correctional officers to provide security for inmates transported outside the institution for medical care. Second, CDCR personnel were unable to communicate by radio directly with the outside agencies on the scene because CDCR lacks access to radio frequencies compatible with outside agencies' frequencies. Third, CIM's lethal electric fence impeded a local fire department's efforts to suppress fires. Fourth, because CDCR's reliance on hard-copy ID cards, CIM was challenged to quickly identify inmates immediately following the riot. Fifth, CIM and CDCR's lack of a contingency plan to house large numbers of inmates in the event of a major incident resulted in delays in quickly placing inmates in replacement housing.

Finally, conflicting orders from one of CIM's managers delayed the tactical operations of CIM's crisis response team, a group of officers specially trained and equipped to respond to high-risk situations. The manager's actions interfered with the team's approved plan of operations and undermined established procedures.

### Recommendations

The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation:

- Proceed with its plans for changing RC West's mission so that it no longer houses reception center inmates, given its current open dormitory design. Even if the department changes the mission, the Office of the Inspector General questions the future use of RC West's dormitories to house the number of inmates (1,300) they held prior to the riot. Therefore, while we support the change in mission, if CDCR decides to house such numbers of inmates in these dormitories, we also recommend that it identify and complete all security and staffing modifications necessary to house those inmates safely.

- Ensure that emergency operation plans for CIM and all other prisons provide adequate housing, food, clothing, medical attention, and other essential services to large numbers of inmates who may be displaced by major events such as riots or natural disasters.

- Share critical lessons from the CIM riot that have universal application to the state's other prisons to help them improve their own emergency operations plans. Universally applicable lessons from the CIM riot include information on identifying inmates who no longer have ID cards, and information on identifying medical facilities with capacity to accept inmate patients.

The Office of the Inspector General further recommends that the California Institution for Men:

- Establish emergency operation procedures to assure that the institution can summon a sufficient number of trained and properly equipped peace officers to transport or escort injured inmates to outside medical care facilities.

- Provide for direct communication between its Emergency Operations Center and community emergency service agencies by obtaining compatible radios and radio frequencies or having representatives of key agencies present in the EOC.

- Obtain field-deployable equipment capable of rapidly identifying inmates who have become separated from their ID cards. Such equipment should be capable of using any combination of fingerprints, iris scans, or facial photos

- Establish in emergency protocols a means to access the data system that shows real-time availability and location of local hospital beds to enhance efficient transfer of injured inmates.

- Develop procedures and contingencies for fire suppression activities in the vicinity of a lethal electrified fence.

- During emergency response training, emphasize the importance of establishing a tactical command post near the emergency scene and of respecting the chain of command established by the Emergency Operations Plan.

## CDCR's Response

In its response, the department agreed with the findings of this report and expressed its intent to change RC West's mission from housing reception center inmates to that of housing general population inmates classified at a low security ("level II"). Further, the department stated that all deficiencies identified will be evaluated and addressed in a corrective action plan to be monitored by its Office of Audits and Compliance.

# Background

## Overview of the California Institution for Men

The California Institution for Men (CIM), located in Chino, San Bernardino County, opened in 1941 and is the California Department of Corrections and Rehabilitation's (CDCR) third-oldest adult institution. CIM serves as a reception center for male parolees returning to custody and felons newly committed to CDCR. Covering 1,600 acres, CIM is comprised of four separate self-contained facilities: Reception Center Central (RC Central), Reception Center West (RC West), Reception Center East (RC East), and a minimum support facility that houses inmate workers and those at the lowest risk for disruptive behavior. The separate facilities are one to two miles apart.

Through its three reception centers, CIM receives about 600 inmates weekly for initial screening and processing into the state prison system. These inmates are initially evaluated at RC Central, where employees apply CIM's local operational policy to assign inmates to each of its reception centers. Generally, inmates are classified into one of four "levels" using a point system based on various factors, including the inmate's commitment offense, sentence length and behavior while in custody. The classification score thus determines the security conditions under which an inmate can be housed.



Photo 1: View of RC West fence during fire.
Note helicopter providing illumination overhead.
(Source: Chino Valley Fire Department)

Generally, inmates evaluated as the highest safety and security risk, and those who are en route from one institution to another, are retained in RC Central. For example, inmates with histories of assaulting officers or other inmates are retained in RC Central's administrative segregation unit where their contact with other inmates is limited and their movement is restricted and closely controlled. Inmates with the next highest security needs are assigned to RC East, which contains mostly celled housing, while inmates with lower security needs are transferred to dormitories at RC West, where up to 1,500 inmates may live in eight open dormitories with two correctional officers supervising each dormitory. Inmates inclined to violence are best housed in celled facilities, which divide the population into smaller groups of inmates who live in contained units. Inmates at low risk for violence can be permitted to interact in larger numbers, living in larger, more open spaces like dormitories.



Above: Photo 2: View of RC West yard looking southeast at Laguna, Sequoia and Cleveland buildings. (Source: Office of the Inspector General, August 11, 2009)

Left: Figure 1: Site map of RC West (Source: CDCR)

*Photo point of view:*



RC Central often does not have enough beds for all inmates who arrive during the day, according to staff members working there. To avoid having to use temporary overflow holding cells at RC Central, staff members must quickly decide which inmates to transfer out, even though some inmates' classification information may be temporarily unavailable or incomplete when transfer decisions must be made. Thus, while classification staff strive to avoid doing so, inmates with disruptive tendencies may be transferred into the dormitory environment of RC West where the consequences of their negative behavior is magnified.

As a reception center, RC West's mission is to house inmates returning to prison for parole violations or convictions for new crimes, as well as inmates entering state prison for the first time. Accordingly, its inmate population is composed of approximately 1,300 inmates with a broad range of commitment offenses, gang affiliations, and behavioral histories.

Like the populations at all reception centers, the inmate population at RC West is not only varied but fluid: inmates typically remain in RC West for a relatively short period of time, ranging from 60 days to one year, until CDCR either transfers them to prisons more suitable to their particular security and treatment needs or releases them back to the community on parole. RC West's inmate population changes daily, thereby continually changing the population dynamics which may result in a potentially volatile mix of inmates living in relatively low security dormitories.

Yet another factor to be taken into account is that CIM is overcrowded. On August 5, 2009, CIM housed 5,867 adult inmates within the four facilities, nearly twice its design capacity of 2,976. On this same date, RC West held 1,335 inmates, which was more than twice its design capacity of 615.

Compounding the inmate overcrowding, CIM's buildings suffer from long-standing maintenance and repair shortfalls that may soon require replacement of many of these buildings. Among the worst of the buildings were the eight wooden barracks that housed inmates on RC West. Against this backdrop of overcrowding and deteriorating buildings, CIM has a history of critical incidents. In addition to the tragic death of one of its correctional officers at the hands of an inmate in 2005, riots in December 2006, March 2007, and in February and April 2008 disrupted the institution's operations, resulted in serious injuries, and required many staff hours to contain. In light of these incidents and structural deterioration, the OIG reported in its November 2008 audit of CIM that "CIM's condition will reach a level of degradation by 2014 that independent facilities management experts throughout the industry would recommend demolishing and replacing the entire institution."

Photo 3: Inside Mariposa Hall (Source: OIG, August 11, 2009)



**The August 8, 2009 Riot on the Reception Center West Facility**

At approximately 8:30 p.m., inmates on RC West began fighting in their dormitories, eventually forcing their way out to the yard, causing vastly outnumbered correctional officers — generally, two officers in each dormitory of nearly 200 inmates — to retreat for their own safety before returning with additional officers in organized skirmish lines. Rioting inmates damaged nearly all of RC West's housing units, rendering them uninhabitable. In fact, one of the buildings—Joshua Hall—was set on fire and destroyed. CDCR's damage assessment noted that nearly all of the windows in each unit were destroyed and that half of the exterior doors suffered damage. The riot left substantial damage to walls and doors separating day rooms from bunk areas, damage to some gas piping and electrical conduit and outlets, and broken pipes behind walls and ceilings. CDCR noted that porcelain fixtures in the bathrooms were heavily damaged, most having been removed and broken into pieces for use as weapons.



Photo 4: (left):
Inside Sequoia Hall

Photo 5 (bottom):
Borrego Hall.

(Source: OIG, August 11, 2009)



During the incident, inmates fashioned weapons from a variety of materials on hand, including shards of porcelain bathroom fixtures, pieces of metal bed frames, glass from broken windows, broom handles, and broken wood.

The fighting ended after four hours, quelled by the prison's correctional staff, with help from special teams sent from the California State Prison, Los Angeles County in Lancaster and the Richard J. Donovan Correctional Facility in San Diego County. Staff from several other prisons also arrived to render assistance. The area was completely secured by 7:00 a.m. on Sunday, August 9, 2009. Nearly 200 inmates sustained injuries during the riot, and medical staff from the prison and other responding agencies provided medical treatment. Fifty-four inmates suffering moderate to serious injuries required transportation to local hospitals.

Photo 6 (right): rear window of Mariposa Hall

Photo 7 (bottom): inside Mariposa Hall

(Source: OIG, August 11, 2009)





# Objectives, Scope, and Methodology

The purpose of this special review is to evaluate the August 8, 2009 inmate riot at the California Institution for Men, to examine the conditions and circumstances that may have caused it, and to evaluate CIM's and CDCR's actions to address the riot and meet the challenges of re-establishing normal operational processes. Representatives of the Office of the Inspector General's Bureau of Independent Review arrived on scene hours after the riot began, with additional staff arriving a few days later to gather information and observe the scene. These teams limited their review to the riot and the events taking place during the three days following it.

During the course of the review, the Office of the Inspector General performed the following procedures:

- Reviewed various laws, policies and procedures, and other criteria related to key systems, functions, and processes.

- Conducted physical inspections of various areas of the facility, including the riot scene.

- Reviewed institutional files, logs and other relevant documents.

- Interviewed appropriate senior management and other employees, including facility captains, housing unit officers, and records staff.

- Met with and obtained information from community emergency service providers.

- Observed activities and processes at the emergency operations center.

- Monitored the transport of inmates for purposes of medical treatment.

- Met with departmental employees responsible for facilities planning, maintenance, and construction projects.

- Talked with inmates affected by the riot.

# Finding 1

## The Department of Corrections and Rehabilitation Failed to House a Suitable Inmate Population at Reception Center West

CDCR ignored the dangerous incompatibility of RC West's open wooden dormitories, which had numerous security deficiencies including blindspots and no gun coverage, with a large population of reception center inmates who, for a variety of reasons, are typically housed in a celled environment. RC West's recent history included a riot in December 2006 involving about 800 inmates from five of the dormitories. That riot required correctional staff twelve hours to contain, and the prison's medical staff treated 66 inmates and sent 30 others outside the institution for emergency treatment. Other riots at the reception center included a March 19, 2007 incident involving 40 inmates, an incident involving 30 inmates on February 1, 2008, and a riot involving 200 inmates on April 4, 2008. All of these smaller riots were contained within a single dormitory.

In addition to the history of significant riots at RC West, CDCR also received information from outside sources warning CDCR against its use of RC West to house reception center inmates. In a November 2007 report that he filed in federal court after touring one of RC West's

Photo 8: Damage in Joshua Hall. (Source: OIG, August 11, 2009)







Photo 9 (top): Handmade weapon

Photo 10 (bottom): Weapon
fashioned from safety glass.

(Source: OIG, August 11, 2009)

dormitories, former director of the Texas Department of Corrections Wayne Scott asserted, "The housing unit was a serious disturbance waiting to happen. If the prisoners wanted to take over the dorm they could do so in a second and no one would know."[1]

In a November 2008 report, the Office of the Inspector General (OIG) warned, "Placing inmates with histories of disruptive or assaultive behavior in an open setting where they can roam freely and where fights among inmates can quickly escalate and spread creates a more dangerous environment for inmates and staff members."[2]

In an April 2008 document to CDCR requesting funds to replace the dormitories at RC West, CIM argued that both the Office of the State Fire Marshall and the Architectural and Engineering Section of CDCR reported that the buildings do not comply with California Building Codes for their current occupancy groups nor have fire alarm protection.

Despite these prior incidents and warnings, CDCR did not alleviate risky security conditions inherent in RC West's design, such as wooden construction, numerous blind spots, glass windows and porcelain bathroom fixtures that could be broken and used for weapons, and no fire suppression systems or gun coverage. Those conditions contributed to the severity and duration of the August 2009 riot.

In the aftermath of the riot, CDCR began repairing RC West's damaged housing units to their pre-riot condition, with minimal additional security upgrades. However, after inquiries by the OIG related to CDCR's October 5, 2009 Activation Proposal, which describes the future of the repaired RC West units, CDCR acknowledged that the design of RC West is not well-suited to house reception center inmates and stated that it plans to place level II inmates there after it repairs the housing units.

### The physical structure of RC West contributed significantly to the scope of the August 2009 RC West riot and hindered correctional staff in quelling the riot.

When it first opened, RC West's mission was to house fire camp inmates who are at relatively low risk for in-prison violence. Accordingly, RC West was designed without the safety and security features customarily built into facilities housing higher-risk inmates. For example, RC

---

1   Scott's report was filed in connection with his testimony before a three-judge panel convened for the *Coleman* and *Plata* cases to examine crowding in California prisons.
2   The entire report can be viewed at the following address:
http://www.oig.ca.gov/pages/reports/bai-audits.php   Click on the title, "Quadrennial and Warden Audit 2008-11 CA Institution for Men.pdf"

West's living units are wooden structures containing open dormitories filled with rows of bunk beds rather than individual cells. Over the years CDCR changed RC West's mission from a fire camp to a reception center, a change that required it to house a higher-risk inmate population. Yet CDCR did not change the facility's physical structure and inherent security features to accommodate the higher-risk population.

The open dormitory setting hampered the officers' ability to quickly suppress the riot and control the inmate violence. At the time of the riot, each of the eight dormitories on RC West housed between 100 to 200 inmates, yet was supervised by only two correctional officers. The dorms also lacked gun coverage—an elevated and secure area from which an officer can deploy lethal or less-than-lethal force. Considering these security weaknesses, there was little to deter the inmates from rioting. In contrast, at RC Central and RC East, almost all inmates are housed in separate celled units so that disturbances can be limited to a smaller number of inmates and quickly controlled. In his November 2007 report, former director of the Texas Department of Corrections Wayne Scott warned of the riot danger at CIM. In describing his tour of Cleveland Hall, one of RC West's dormitories, Scott wrote, "I saw 198 prisoners with only two officers to keep order, one in an office, with the other roving. Half of the dorm was in another building connected by the shower/bathroom area, and one room in the back was completely out of sight. It is impossible to provide any type of security or proper services under these circumstances."

The Office of the Inspector General also noted the potential risks associated with housing reception center inmates at the open dormitory setting of RC West. In its November 2008 report, the OIG noted that in an open dormitory setting where fights among inmates can quickly escalate and spread, it is difficult for officers to gain control of inmates who assault staff members or other inmates. In these dorms, inmates move freely in areas crowded with two-tier bunks and inmates' personal items, potentially obstructing the officers' line of sight and inhibiting the officers' ability to control volatile situations before they escalate to violence.

### After the August 2009 riot, CDCR sought repair funds and acknowledged the shortcomings of the RC West facility.

In response to our inquiries regarding the future of RC West, CDCR acknowledged that RC West was not suited to be a reception center and provided its Activation Proposal for repairing RC West's dormitories and housing a more suitable inmate population there. According to its Activation Proposal dated October 5, 2009, CDCR announced that it is taking steps to prevent a reoccurrence of an inmate disturbance of this magnitude. The proposal recognizes that "as demonstrated, the design of [RC West] is not best suited to house reception center inmates due to the wooden structure design." Accordingly, CDCR plans to change RC West's mission to house only non-reception center, level II inmates, up to 50 percent of whom may be inmates serving life sentences, a stable population more invested in maintaining order in their housing environment. CDCR's proposal argues that changing the facility's mission in this way would enhance security because such inmates would be appropriate for RC West, which would remain an open dormitory.

In September 2009, CDCR requested $7.2 million for repairing RC West's housing units and for responding to the riot. This amount includes $4 million to repair seven of the eight housing

units, $1.2 million to rebuild the housing unit that was damaged by fire, and $2 million for one-time operating costs relating to stopping the riot and transferring inmates, as well as other unspecified operational costs. CDCR's scope of repairs for seven of the eight housing units proposes to replace glass windows with safety glazing and install stainless steel toilets and basins instead of porcelain fixtures to minimize their potential for use as weapons. CDCR estimated that it could repair the first seven dormitories by the end of April 2010 and repair the eighth dormitory by mid-June 2010. However, the repairs will not change the overall design of the open dormitory setting.

### CDCR was challenged to find appropriate housing for RC West inmates in the aftermath of the riot.

Absent a detailed plan to house inmates displaced by such a large scale event, CIM resorted to use of holding cells and outdoor exercise areas to secure approximately 1,100 displaced inmates until beds could be found for them in the days immediately following the riot. While CIM's Emergency Operations Procedure contemplates the possibility of having to relocate large numbers of inmates, it simply states that inmates will be transported to "nearby local institutions" or "local county jails" without discussing the logistics involved in such an undertaking. Fortuitously, a nearby state youth correctional facility was nearly empty, and the August weather was generally conducive to temporarily containing inmates outdoors, otherwise the time required to provide displaced inmates with adequate housing and essential services might have been considerably longer than it was.

Based on inmate counts, by Monday, August 10, 2009 the number of inmates in holding cells and exercise areas had fallen from over 1,100 to just over 400 as inmates were moved to other prisons. On Tuesday, August 11, there were approximately 50 inmates remaining in holding cells and exercise areas awaiting housing. However, because the majority of inmates had lost or abandoned their identification cards, the records of inmate movements are limited to overall counts and generally do not track the movement of individual inmates during this period. CIM provided evidence that the prison took measures to supply the holding-cell inmates with food, medications, clothing, blankets, and hygiene supplies to the extent possible given the post-riot conditions, and found housing for most of the displaced inmates within three days of the riot. Nonetheless, for several days after the riot the normal services and privileges provided to inmates were interrupted.

In the aftermath of the riot, CDCR sent 1,154 inmates to five prisons throughout the state. The majority of these inmates went to the Heman G. Stark Youth Correctional Facility (Stark), located next door to CIM. Although built as a youth facility, Stark had celled housing available that was suitable to immediately house adult inmates. However, CDCR found that the facility had a number of shortcomings to address. For example, nearly 200 of the cells were equipped with only one bunk, but the number of adult inmates sent there required most of the cells in the housing unit to be double-bunked. Consequently, many inmates had to sleep on mattresses placed on the floor. Another drawback was that the small recreational yards adjacent to the housing unit lacked razor wire and other security features.

Figure 2: CDCR Relocated 1,154 Inmates After the Riot:



Heman G. Stark Youth Correctional Facility        mileage from CIM: 2

742 inmates

California Rehabilitation Center (Norco)        mileage from CIM: 15

114 inmates

Chuckawalla Valley State Prison        mileage from CIM: 180

1 inmate

Calipatria State Prison        mileage from CIM: 240

74 inmates

California Treatment Facility (Soledad)        mileage from CIM: 360

223 inmates

To address these issues, CDCR began short-term emergency modifications at Stark on September 15, 2009. According to CDCR's documents, these modifications included adding second bunks to 196 cells, installing razor wire and making access areas for the deployment of chemical agents to two group recreational yards.

On November 6, 2009, CDCR formally announced its plans to convert Stark to an adult prison. Ultimately, CDCR estimated that it would house roughly 1,800 general population inmates and approximately 940 reception center inmates at Stark at an estimated $441 million in related costs. As of December 2, 2009, this amount was comprised of $130 million for conversion costs, such as installing an electric fence, perimeter guard towers, and other security enhancements; $250 million for construction of a new reception center; and $61 million for construction of new mental health crisis beds.

## Recommendations

The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation:

• Proceed with its plans for changing RC West's mission so that it no longer houses reception

center inmates, given its current open dormitory design. Even if the department changes the mission, the Office of the Inspector General questions the future use of RC West's dormitories to house the number of inmates (1,300) they held prior to the riot. Therefore, while we support the change in mission, if CDCR decides to house such numbers of inmates in these dormitories, we also recommend that it identify and complete all security and staffing modifications necessary to house those inmates safely.

• Ensure that emergency operation plans for CIM and all other prisons provide adequate housing, food, clothing, medical attention, and other essential services to large numbers of inmates who may be displaced by major events such as riots or natural disasters.

# Finding 2

## Despite the Liabilities of the Facility's Design, CIM Staff Responded Effectively to the August 2009 Riot at Reception Center West

Using past experiences, current gang intelligence, and recommendations from outside agencies including the Office of the Inspector General, CIM improved its emergency operations procedures and was therefore better prepared to respond to the August 8, 2009 riot. However, as with the disturbances preceding it, the August 8, 2009 riot itself provided additional opportunities for CIM and CDCR to enhance emergency preparedness by learning from challenges that arose during the event.

**The California Institution for Men used lessons from previous incidents to improve its emergency medical response procedures.**

Past inmate riots and other emergencies identified weaknesses in CIM's emergency preparedness. These weaknesses were documented by CDCR, the Office of the Inspector General, and others in reports prepared in the aftermath of those incidents. Two major events that shaped CIM's emergency medical response procedures were the death of one its correctional officers in 2005, and a riot at RC West in December 2006.

On January 10, 2005, Correctional Officer Manual A. Gonzales was attacked and killed by an inmate at CIM's RC Central facility. The Office of the Inspector General's ensuing review uncovered serious deficiencies in CIM's emergency response, including insufficient medical supplies and equipment and the failure of medical professionals to act effectively in their life-saving efforts. Notably, CIM had not established an emergency operations center or instituted an emergency operations plan.[3] Our review also provided recommendations for improvements by CDCR, as well as by CIM.

After the December 2006 riot at RC West, CDCR's regional health care administrator wrote a January 2, 2007 memo to CDCR's Director of Correctional Health Care Services, critiquing the institution's medical response to that incident. The regional administrator noted that CIM's medical department did not maintain a list identifying the medical professionals to be contacted during emergencies, nor those responsible for contacting them. Further, the regional administrator found that medical staff had no policies or procedures for responding to mass-casualty events, and that poor communication between institution medical staff and community emergency service providers impaired the emergency response. The regional administrator also found that members of CIM's medical staff were not initially represented in the institution's emergency operations center (EOC), thus impairing critical communications between medical and custody personnel during the emergency.

---

3   The Office of the Inspector General reported on deficiencies associated with the January 10, 2005 murder of Manual A. Gonzales in a report, *Special Review Into the Death of Correctional Officer Manuel A. Gonzalez, Jr. on January 10, 2005 at the California Institution for Men*, March 16, 2005.

In response to these past shortcomings, on January 14, 2008, CIM adopted a local operating procedure entitled "Medical Emergency Response in Disastrous Situations." Its purpose is "[t]o establish a fast and effective medical response to mass casualties at CIM in the event of an incident or natural disaster." This procedure created an immediate and unambiguous command structure by identifying the Medical Emergency Incident Commander (MEIC) when an incident occurs. Under the procedure, the designated MEIC reports to the emergency operations center to coordinate the institution's medical response. The MEIC assesses the severity of the emergency, summons on-duty physicians and nurses, and may also contact off-duty physicians and place them on standby status.

In addition to establishing a medical command structure, the local operating procedure also directs responders to establish an on-site medical emergency command center, designates those responsible for delivering medical supplies and equipment to the emergency site, and gives guidelines for categorizing injuries (performing triage).

Subsequent to the stabbing of Officer Gonzales and the 2006 riot, CIM also increased its capacity to address medical emergencies. Recognizing the high cost of medical treatment and custodial

Photo 11: Medical personnel working in separate triage areas during the riot. (Source: Chino Valley Fire Department)



resources needed to send inmates outside the institution for medical care, CIM hired medical staff with emergency medical experience. According to CIM's director of nursing, the number of inmates transported by ambulance for outside emergency medical care has been reduced from about 60 per month to 15 per month. This increased capacity may be credited, in part, to the fact that CIM has hired nurses certified in advanced cardiac life support and who also possess either military emergency responder experience or a background in emergency room care.

Finally, key supervisors on CIM's medical staff worked with community emergency service agencies to improve coordination of services. Before the August 8, 2009 riot, for example, medical staff arranged a tour of the institution for the Chino Valley Fire District to enhance their knowledge of institution policies and familiarize them with barriers they might encounter in an actual emergency.

### Knowledge of building gang tensions and the potential for an upcoming incident increased the institution's state of alert.

On August 5, 2009, CIM's inmate appeals office received a handwritten note, referred to in inmate slang as a "kite." The kite indicated that one group of inmates would attack another group on the yard at RC East in retaliation for an earlier incident involving the same groups. After corroborating evidence was discovered the next day during routine searches by officers, members of CIM's Investigative Services Unit (ISU) deemed the kite to be credible.

CIM Institutional Gang Investigators (IGI) began interviews and cell searches of key inmates to learn more about the threat detailed in the kite and to institute appropriate steps to mitigate the threatened event. On August 6, 2009, IGI and ISU investigators conducted several searches resulting in the discovery of numerous additional kites. Two of the kites contained detailed instructions for inmates affiliated with a particular gang to strategically assault rival inmates institution-wide. The kites also indicated that the assaults were sanctioned by an influential inmate who later confirmed to ISU investigators that a major incident was planned in retaliation for an earlier altercation between the two groups. Following receipt of this information, CIM modified its inmate programs to limit and control inmate movement, and brought in additional staff in anticipation of violence.

The growing tensions led to a riot between the two rival gangs involving approximately 100 inmates in RC East on August 7, 2009. On the same day, RC Central had a riot involving approximately 20 inmates. These tensions escalated to a larger scale in RC West on the evening of August 8, 2009, involving over 1,000 inmates.

### The institution increased its staffing levels on RC West in response to growing tensions.

According to CIM's warden and chief deputy warden, CIM increased staffing levels on RC West on August 7, 2009, even before the riot occurred. The chief deputy warden indicated that CIM added "disturbance control" positions to RC West on each eight-hour shift, or watch,[4] in

---

4  Prison employees work around the clock in three shifts, or "watches." Generally, 1st watch is 10 p.m. to 6 a.m., 2nd watch is 6 a.m. to 2 p.m., and 3rd watch is 2 p.m. to 10 p.m..

Figure 3: CIM Officers on Duty by Watch.

Based on intelligence gathered in the course of duty, CIM increased staffing levels in the days preceding the riot (measurements taken on Saturdays preceding the riot).



preparation for the potential disturbance. Based on employee timesheets, at the time the riot started, there were six additional officers present at RC West.

We reviewed the employee time-keeping records for RC West for the period July 29, 2009 through August 8, 2009 and confirmed that CIM began to modify its staffing levels on August 7, 2009. Records confirm that the institution added one disturbance control position on Friday, August 7, 2009 during the second watch and three positions during the third watch. The institution continued to increase staffing levels on Saturday, August 8, 2009, the day of the riot. The OIG found that staffing levels on that day exceeded those of the two preceding Saturdays by 14 officers, as CIM added four officers at the beginning of the first watch, three at the beginning of second watch, and seven officers at the beginning of the third watch (see Figure 3).

Yet, given the physical design limitations of RC West, CIM was not able to prevent or even quickly contain the large coordinated riot, even with additional staff.

**The combined efforts of outside agencies and CIM's personnel resulted in an effective emergency response, but several challenges arose during the event.**

CIM effectively executed its emergency medical response plan, which likely minimized the number of inmates requiring treatment at outside hospitals. Meanwhile, community emergency service agencies responded quickly, delivering essential services complementing the institution's efforts, greatly assisting CIM in containing the riot, and providing medical care. At the same time, CIM's crisis response team assembled to regain control of the facility. However, several challenges surfaced during the coordinated response. These included an insufficient number of correctional officers to provide security for inmates traveling outside the institution for medical care, the inability to communicate directly with outside agencies because CDCR personnel lacked access to compatible radio frequencies, conflicting orders to the crisis response team from an institutional manager operating outside the EOC protocol, and

the lethal electric fence impeding a local fire department's efforts.

Preceding the August 8, 2009 riot, the medical staff at CIM refined their procedures for reacting to emergencies, hired staff qualified in emergency medicine, and planned effective responses to a mass casualty event. During the riot, with few exceptions, CIM's response to the disaster was competently executed, with no loss of inmate life. However, improvements are necessary in communications between CIM's responders and community resources, in identification of inmates during and following the riot, and in quickly determining where to send inmates to ensure continuity of medical services.



Photo 12: RC West's lethal electric fence initially impeded fire fighters' efforts. (Source: Chino Valley Fire Department)

**CIM's prompt activation of its emergency operations center (EOC) led to generally good coordination of medical efforts, but communication issues hindered its ability to coordinate medical efforts with outside agencies.**

CIM's chief medical officer and other medical staff were on heightened alert before the weekend of August 8, 2009. The medical officer on-call arrived at 8:00 p.m. on August 8, 2009 to review an x-ray, and had been alerted to stay near the institution by the chief physician. As he was leaving the institution at around 8:30 p.m., he heard an alarm. After learning that a riot had erupted in RC West, he called the chief physician and another doctor.

The chief deputy warden contacted the chief medical officer (CMO) at about 8:40 p.m. Upon arriving, the CMO assumed his duties as the medical coordinator in the EOC, which had been activated minutes after the riot began. By 10:00 p.m., several nurses had also responded, including all of the designated "first responder" nurses from the institution's clinics, along with supervising nurses who were initiating a triage process. Medical personnel established two triage areas, thereby keeping members of the rival factions separated.

CIM's medical personnel evaluated 1,127 inmates, determining 895 to be uninjured. Only 54 inmates were sent to outside medical facilities, returning to prison within days of the

riot. Of 232 inmates requiring treatment, all but the 54 transported to community hospitals received treatment from CIM physicians and nurses, prompting community emergency service responders to remark that there was not a single unnecessary transport. However, while CIM's medical staff provided good triage and treatment, some seriously injured inmates were not transported to outside hospitals for three hours or more because of an insufficient number of armed CDCR custody personnel to act as transport or escort officers. CDCR requires that each inmate transported to outside medical facilities must be escorted by two armed officers. Eventually, parole agents from the CDCR Office of Correctional Safety arrived to assist the institution's correctional officers in providing transport services.

CIM's emergency medical efforts were also hindered by communication issues. Community emergency service agencies arriving at the riot had no means of determining how many inmates required transportation for emergency care because emergency service responders were unable to communicate directly with the institution's medical staff inside the prison. This communication void occurred because local emergency service agencies did not have a



Photo13: Personnel from several agencies coordinating transportation of an inmate during the riot. (Source: Chino Valley Fire Department)

member representative in the prison's EOC. Because community medical responders initially did not know how many hospital beds and other resources would be needed, they were concerned about overwhelming local hospitals and clinics with potentially hundreds of riot casualties.

Eventually, the communication void was filled after CIM's Emergency Medical Services Liaison Nurse arrived sometime between 11:00 p.m. and midnight. He successfully resolved most communications issues and provided a more accurate assessment of the number of inmates likely requiring transportation to area hospitals. Community medical

providers, including receiving hospitals, commended the liaison nurse's work in coordinating inmate transports. They attributed his success to his pre-incident preparation with community providers and to his capable management during the incident.

The San Bernardino County Fire Dispatch Center also assisted in determining how injured inmates would be distributed to area hospitals by providing the institution information about available bed space at those hospitals. However, information that could have been provided to the hospitals about the number of injured inmates and the nature of their injuries was delayed because no one at the scene had access to the computerized tracking system used by the hospitals. CIM officials later learned that temporary access to the system can be provided in the event of future emergencies, thus facilitating CDCR's ability to provide and receive timely

Figure 4: Multiple Organizations Provided Assistance During the Riot

- *Chino Independent Fire District*
- 48 ambulances provided by *American Medical Response* (*Rancho Cucamonga, Victorville, Riverside, Redlands,* and *Irwindale* divisions)
- Four ambulances provided by *Cole Schaefer Ambulance Company*
- Two helicopter ambulances provided by *Mercy Air*
- *Arrowhead Regional Medical Center*
- *Chino Valley Medical Center*
- *Kaiser, Fontana*
- *Loma Linda University Medical Center*
- *Montclair Hospital Medical Center*
- *Pomona Valley Hospital Medical Center*
- *Redlands Community Hospital*
- *Riverside Community Hospital*
- *Riverside County Regional Medical Center*
- *San Antonio Community Hospital*
- *Chino Police Department*
- *Rancho Cucamonga Police Department*
- *Chino Hills Police Department*
- *Ontario Police Department*
- *San Bernardino County Sheriff's Department*

Photo 14: A fire crew suppresses the fire in Joshua Hall. (Source: Chino Valley Fire Department)



information using the hospital tracking system.

**CIM received effective and competent support from outside fire and law enforcement agencies responding to the riot, but had to overcome logistical and communication challenges.**

The response from community emergency service agencies included assistance from law enforcement, fire departments, and emergency medical resources. The institution contacted local law enforcement agencies within minutes after the riot began, and the Chino Valley Independent Fire District arrived with its first unit at 8:41 p.m.

Responding law enforcement agencies included the police departments from Chino, Rancho Cucamonga, Chino Hills, and Ontario, in addition to the San Bernardino County Sheriff's Department. Personnel from these departments provided valuable assistance outside the prison by placing patrol cars around RC West's perimeter in case inmates were able to get past the fence line, and by closing nearby thoroughfares to vehicle traffic until the institution re-established control of the yard. With this outside security coverage, CDCR officers were free to concentrate on containing the riot and providing transportation security for inmates evacuated to outside hospitals.

A patrol helicopter from the San Bernardino County Sheriff's Department also assisted by providing lighting and serving as an intelligence resource for those on the ground. Local law enforcement officers also

provided a valuable service by identifying inmates. Many of the inmates requiring transport to outside hospitals lacked identification cards, having lost or discarded them during the event. Identifying inmates is critical because law enforcement would be greatly disadvantaged in attempts to recapture unidentified inmates. To address this issue, local law enforcement agencies used portable fingerprint scanners to identify inmates before they were transported to outside hospitals. In addition, the identities of some inmates were corroborated by using mobile data terminals in local law enforcement patrol cars to access databases containing other identifying information, such as tattoos. Chino Valley Independent Fire District took the primary role in suppressing the fire in Joshua Hall, while engine companies from other local communities also responded and CAL Fire provided food for personnel assigned to the riot. Initially, fire fighters planned to shoot water from outside of the fence to suppress the fire in Joshua Hall, but the lethal electrified fence surrounding the area presented a safety concern. Once fire fighters gained access to the yard, they limited the fire damage to the building of the fire's origin.



Photo 15: Several agencies coordinate communications during the riot. (Source: Chino Valley Fire Department)

While local law enforcement and fire fighting agencies could communicate with one another on common radio frequencies, CDCR radio equipment does not allow CDCR employees direct communication with outside law enforcement, thereby delaying delivery of information. CDCR's access to local police and fire radio frequencies would provide for immediate communication during future events requiring aid from outside agencies.

**CIM's Crisis Response Team responded effectively, but was hampered by conflicting communications.**

The Crisis Response Team took about two hours to deploy from the time the riot was first reported during which the team's members traveled from home, obtained emergency equipment, participated in a situation briefing, and conducted a rescue operation. The team's subsequent activities were delayed for 45 minutes by conflicting orders given by different personnel at the scene.

CIM's Crisis Response Team (CRT) is a group of officers specially trained and equipped to respond to high-risk situations, such as inmate riots. In response to the riot, CIM requested assistance from other state prisons in the region. CIM deployed its CRT, which was later

reinforced by CRT members from California State Prison, Los Angeles County and the Richard J. Donovan Correctional Facility in San Diego County.

The CRT initially deployed at 10:35 p.m. and within minutes successfully rescued unharmed a correctional officer who had secured himself with 16 inmate workers inside the RC West kitchen. The CRT's tactical operations after the kitchen rescue were delayed due to conflicting orders. Following the kitchen rescue, the team received orders from the Emergency Operations Center (EOC), located in the prison's administration building, to clear the inmates from the Borrego Hall dormitory. Witnesses told the OIG that one of CIM's managers at the scene gave conflicting orders — redirecting the CRT from clearing Borrego Hall to another task. Upon receiving the manager's conflicting orders, a CRT team member contacted the EOC for confirmation of the new orders.

The CRT team waited approximately 45 minutes for confirmation until the field incident commander at RC West noted the team had not begun clearing Borrego Hall and ordered them to clear Borrego Hall as previously directed by the EOC. While the team was doing so, the manager separately questioned the field incident commander about not following the manager's order. The field incident commander responded by asserting his own authority under established emergency protocols and allowed the CRT to continue as he initially directed.

The conflicting orders and resulting delay likely would not have occurred if CIM had established an incident command post.

CIM's Emergency Operations Procedures specifically provide for an on-scene incident command post, stating, "in the event of a mass disturbance, the activation of a tactical command post near the site is essential for coordinating the efforts of on-site teams and maintaining direct contact with the EOC." CIM's Emergency Operations Procedures also establish the lieutenant on-duty at an incident scene as the designated field incident commander, responsible to the emergency commander in the EOC and responsible for controlling the disturbance and keeping the emergency commander apprised of the situation. Without the command post, the EOC and personnel at RC West worked independently and communicated with each other only minimally, thus allowing the manager's intervention to temporarily disrupt the CRT's operations until the field incident commander took charge pursuant to his designated role.

**Recommendations**

The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation share critical lessons from the CIM riot that have universal application to the state's other prisons to help them improve their own emergency operations plans. Universally applicable lessons from the CIM riot include information on identifying inmates who no longer have ID cards, and information on determining medical facilities with capacity to accept inmate patients.

The Office of the Inspector General further recommends that the California Institution for Men:

• Establish emergency operation procedures to assure that the institution can summon a

sufficient number of trained and properly equipped peace officers to transport or escort injured inmates to outside medical care facilities.

• Provide for direct communication between its Emergency Operations Center and community emergency service agencies by obtaining compatible radios and radio frequencies or having representatives of key agencies present in the EOC.

• Obtain field-deployable equipment capable of rapidly identifying inmates who have become separated from their ID cards. Such equipment should be capable of using any combination of fingerprints, iris scans, or facial photos

• Establish in emergency protocols a means to access the data system that shows real-time availability and location of local hospital beds to enhance efficient transfer of injured inmates.

• Develop procedures and contingencies for fire suppression activities in the vicinity of a lethal electrified fence.

• During emergency response training, emphasize the importance of establishing a tactical command post near the emergency scene and of respecting the chain of command established by the Emergency Operations Plan.

# California Department of Corrections and Rehabilitation's response to the special report

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION               ARNOLD SCHWARZENEGGER GOVERNOR

OFFICE OF THE SECRETARY
P.O. Box 942883
Sacramento, CA 94283-0001



April 13, 2010

Mr. David R. Shaw
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

Dear Mr. Shaw:

This letter is being submitted in response to the Office of the Inspector General's (OIG) report titled *Special Report: August 2009 Riot at the California Institution for Men* (CIM), dated April 2010. During this review, the main concern the OIG identified was that the California Department of Corrections and Rehabilitation (CDCR) housed an unsuitable inmate population at CIM's West Facility. Specifically, the OIG noted the potential risks associated with housing reception center inmates in an open dormitory setting and for not alleviating the risky security conditions inherent in this dormitory design. To mitigate that risk in the future, CDCR intends to house general population inmates, those classified as level II, in the West Facility dorms per the established criteria set forth in the California Code of Regulations. However, it should be noted that 92 percent of the reception center population housed in the West Facility met the criteria for level I-II housing prior to the riot.

CIM has employed both past experiences and recommendations from outside agencies to improve its emergency operations and we appreciate and thank the OIG for recognizing the tremendous effort achieved during this crisis. First, CIM's medical staff, administration, and mutual aid responders medically evaluated over 1,100 inmates efficiently and effectively, lessening the fiscal impact to transport inmates to outside hospitals. Secondly, CIM and staff statewide rapidly transferred 1,154 displaced inmates to other facilities within 3 days with little to no disruptions to the daily operations of CDCR. And thirdly, the overwhelming response from community emergency service agencies allowed CDCR officers to concentrate on containing the riot, resulting in an effective emergency response. While we recognize the lessons learned from this and prior emergency operations, we feel all those involved should be highly praised for this coordinated effort. We would like to commend CIM staff, CDCR staff statewide, and those local fire and law enforcement agencies that responded to the riot.

We would like to thank the OIG for your continued professionalism and guidance in the CDCR's efforts to improve its operations. All deficiencies identified will be evaluated and addressed in a corrective action plan submitted to CDCR's Office of Audits and Compliance for follow-up and monitoring. If you should have any questions or concerns, please call my office at (916) 323-6001.

Sincerely,

SCOTT KERNAN
Undersecretary, Operations



## SPECIAL REPORT

AUGUST 2009 RIOT AT THE
CALIFORNIA INSTITUTION FOR MEN

## OFFICE OF THE INSPECTOR GENERAL

David R. Shaw
INSPECTOR GENERAL

Samuel Dudkiewicz
CHIEF DEPUTY INSPECTOR GENERAL (A)

Jerry Twomey
CHIEF ASSISTANT INSPECTOR GENERAL

Howard Moseley
CHIEF ASSISTANT INSPECTOR GENERAL

William Shepherd
DEPUTY INSPECTOR GENERAL, IN-CHARGE

STAFF
Inez Azcona • Bryan Beyer • Chris Eagle
Jordan Esten • Larry Finney • Tom Hansen
Debra Maus • Steve Miller • Elva Nunez • Basil Richards
Neil Robinson • Kobia West

## STATE OF CALIFORNIA
APRIL 2010

WWW.OIG.CA.GOV

# Exhibit 10



# CALIFORNIA INSTITUTION FOR MEN
## QUADRENNIAL AND WARDEN AUDIT

## OFFICE OF THE INSPECTOR GENERAL

**DAVID R. SHAW**
**INSPECTOR GENERAL**

**STATE OF CALIFORNIA**

**NOVEMBER 2008**



November 20, 2008


Matthew L. Cate, Secretary
California Department of Corrections and Rehabilitation
1515 S Street, Room 502 South
Sacramento, California 95814

Dear Mr. Cate:

Enclosed is the Office of the Inspector General's audit report concerning the California Institution for Men (CIM) and the performance of its warden. The purpose of the audit was to satisfy our statutory requirement to audit each warden one year after appointment and to audit each correctional institution at least once every four years.

The report revealed that Warden Michael Poulos has a reputation for integrity and professionalism, and he has gained many supporters among the employees at CIM. Interviews and surveys reveal that most staff members feel Poulos is an effective leader who is usually accessible to the staff and responsive to institution problems. Further, many staff members cited improvements at CIM under Poulos' tenure, such as the reopening of a gymnasium formerly used for inmate housing and the rededicating of the Marine Technology Training Center. Managers also praise Poulos' performance as warden, giving him an average rating of "outstanding" on our survey.

Nevertheless, we found that staff members believe Poulos could do more to address CIM's poor maintenance and general state of disrepair, even though the infrastructure problems predate Poulos' arrival. Although he inherited a neglected institution that receives inadequate financial support from the department, our inspectors found areas where the warden could use his existing resources more effectively. For instance, our report recommends that Poulos continue his efforts to address plant operations vacancies, hold plant operations employees accountable for accurately reporting their time, and enforce a policy requiring a work order coordinator to reduce duplicate work orders.

The report contains the results of our review of CIM's operations and programs and presents six findings and 17 recommendations. In addition to the issues discussed above, other problem areas include weapons training and a lack of surveillance equipment for the institution's visiting yard.

Thank you for the courtesy and cooperation extended to my staff during the audit. Please call Bill Shepherd, Deputy Inspector General, In-Charge, at (916) 830-3600 if you have any questions.

Sincerely,

David R. Shaw
Inspector General


cc:    Michael Poulos, Warden, CIM
       Scott Kernan, Chief Deputy Secretary, Adult Operations
       Suzan Hubbard, Director, Division of Adult Institutions
       Kim Holt, External Audits Coordinator

Enclosure

# Contents

Executive Summary ........................................................................................ 1

Institution Overview...................................................................................... 4

Chapter 1: One-Year Evaluation of Warden Michael Poulos............................ 6

    Objectives, Scope, and Methodology ...................................................... 6

    Background of Warden............................................................................. 7

    Discussion of Warden's Strengths........................................................... 7

    Discussion of Warden's Criticisms......................................................... 10

    Warden's Response to Criticisms........................................................... 10

    Summary Discussion............................................................................. 11

Chapter 2: Quadrennial Audit Findings and Recommendations........................ 12

    Objectives, Scope, and Methodology .................................................... 12

    Finding 1.............................................................................................. 14

    **The department's available funding allocation to CIM for maintenance and repairs is inadequate to keep the institution in an acceptable state of repair.**

    Finding 2.............................................................................................. 22

    **Despite the formidable gap between available repair and maintenance funding for CIM and the institution's actual needs, CIM can still take actions to mitigate its infrastructure problems.**

    Finding 3.............................................................................................. 27

    **Staff at CIM's central reception center inappropriately approved some dangerous, high-risk inmates for housing in crowded dormitories.**

    Finding 4.............................................................................................. 32

    **CIM allows peace officers who have not attended mandatory quarterly firearms training sessions to assume armed posts at the institution and off-site in local hospitals.**

Finding 5................................................................................................ 40

**The visiting area for CIM's Minimum Support Facility accommodates hundreds of inmates and visitors, but the institution lacks an effective means of monitoring visiting activities to control the exchange of contraband.**

Finding 6................................................................................................ 43

**Supervisors are conducting fewer than half of the required fire/emergency evacuation drills in their work areas, which may leave employees and inmates ill-prepared to respond to a crisis.**

California Department of Corrections and Rehabilitation's Response............... 45

# Executive Summary

This report presents the results of an audit by the Office of the Inspector General (OIG) concerning the operations of the California Institution for Men (CIM) and the performance of its warden. The audit was performed under California Penal Code section 6126(a)(2), which requires the Inspector General to audit each warden one year after his or her appointment, and to audit each correctional institution at least once every four years.

Our team of inspectors examined CIM's operations and programs to identify problem areas and recommend workable solutions. The institution gave our inspectors full access to its records, logs, and reports. In addition, site visits allowed us to observe CIM's day-to-day operations. We also interviewed various staff members and inmates, and we surveyed three distinct groups: managers from CIM and the California Department of Corrections and Rehabilitation (the department), CIM employees, and key government and union stakeholders. In all, our inspectors made six audit findings and 17 recommendations, which are detailed in Chapter 2 of this report.

### *Warden Poulos is an experienced, effective administrator, but he must do more to address CIM's deteriorating infrastructure*

Warden Michael Poulos has nearly 30 years of experience with the California Department of Corrections and Rehabilitation, and this experience has made him a valuable asset to the department and to CIM. Interviews and surveys reveal that most staff members feel Poulos is an effective leader who is usually accessible to the staff and responsive to institution problems. Further, many staff members cited improvements at CIM under Poulos' tenure, such as the reopening of a gymnasium formerly used for inmate housing and the rededicating of the Marine Technology Training Center. Managers also praise Poulos' performance as warden, giving him an average rating of "outstanding" on our survey.

Nevertheless, we found that staff members believe Poulos could do more to address CIM's poor maintenance and general state of disrepair, even though the infrastructure problems predate Poulos' arrival. Although he inherited a neglected institution that receives inadequate financial support from the department, our inspectors found areas where the warden could use his existing resources more effectively. For instance, our report recommends that Poulos continue his efforts to address plant operations vacancies, hold plant operations employees accountable for accurately reporting their time, and enforce a policy requiring a work order coordinator to reduce duplicate work orders.

### *CIM's crumbling infrastructure causes hazardous working and living conditions while its limited available resources could be better leveraged*

While our evaluation of the warden's performance was mostly positive, staff surveys and interviews revealed that CIM's employees are deeply concerned about the institution's poor condition. CIM's most significant problems include an ineffective water treatment system, failing plumbing, dilapidated housing units, leaking roofs, and hazardous materials in need of removal. Unfortunately, many improvement projects approved by the department remain unfunded.

The department and the state Legislature are aware that CIM has fallen into an unacceptable state of repair due to years of neglect. However, the department received $96 million in fiscal year 2007–08 for maintenance and special repairs for all its facilities, and it only allocated an average of $4 million a year for maintenance and special repairs at CIM. An outside consultant hired by the department estimates that seven times that amount—$28 million annually—is needed to maintain CIM in its present "poor" condition, neither improving it nor allowing it to degrade further. Moreover, the consultant's data shows that, if funding is not dramatically increased, CIM's condition will reach a level of degradation by 2014 that independent facilities management experts throughout the industry would recommend demolishing and replacing the entire institution.

Despite CIM's funding gap for maintenance and repairs, we found that the institution has inefficiencies it could correct to maximize the effectiveness of its existing plant operations resources. Specifically, we discovered that CIM could aggressively recruit to fill plant operations vacancies, take full advantage of an established system for tracking and planning maintenance activities, and assign a work order coordinator to spot duplicate work orders. By correcting these existing inefficiencies and leveraging its available resources, CIM can reduce unnecessary work, allow supervisors to effectively manage maintenance activities, and provide objective evidence for the department's use in establishing equitable maintenance funding allocations to CIM.

### *Safety and security problems in some areas may endanger CIM employees, inmates, and the surrounding community*

Our inspectors made several findings related to safety and security problems at CIM. The most significant finding involved central reception center staff inappropriately approving certain inmates for open dormitory housing when those inmates' histories indicate they are better suited for celled housing. We found that staff members did not always follow procedures for reviewing inmates' classification scores to ensure those scores did not exceed the limit for dormitory housing. As a result, the staff members improperly placed some unsuitable inmates in crowded dormitories that are supervised by only two correctional

officers. Inmate disturbances can quickly escalate in these dormitories, making it difficult for officers to gain control of inmates who assault staff members or other inmates.

Quarterly weapons qualifications were another area of deficiency. Despite a process for identifying officers who fail to attend mandatory quarterly qualification sessions, many of these officers continue to work armed posts instead of being redirected to a non-armed post pending completion of the missed qualification session. In addition, the department continues to follow a November 2004 memorandum that permits peace officers who are not quarterly qualified to work armed posts through shift swaps or overtime. We feel that this practice conflicts with various California statutes and regulations, as well as department policies, which require officers to complete quarterly firearms training sessions before assuming armed posts. Further, regular qualification with a firearm helps an officer maintain his or her weapons skills. Allowing an officer to work an armed post without a current weapons qualification could endanger employees, inmates, and the public and expose the state to litigation if the officer uses deadly or less-lethal force.

Our audit also found that the visiting area for CIM's Minimum Support Facility lacks an effective means of monitoring visiting activities. Even though inmates often use visiting as an opportunity to smuggle contraband into the institution, only two officers are assigned to monitor the expansive visiting yard, which accommodates hundreds of inmates and visitors. In addition, there are no surveillance cameras to allow for continuous monitoring of suspicious activity. Video recordings could also serve as a resource to successfully identify visitors and inmates possessing or passing contraband.

Finally, we found that CIM's supervisors are conducting fewer than half of the required quarterly fire/emergency evacuation drills. Although we found that fire/emergency drill compliance has improved in the most recent quarters we examined, supervisors are still not conducting a significant number of drills. Clearly, fire/emergency drills prepare employees and inmates to respond quickly and safely during a fire or other emergency. Regular fire drills are especially critical for CIM, since the aging institution has inadequate fire sprinkler coverage, and high inmate turnover frequently introduces new inmates who must be prepared in case of a fire or other emergency.

# Institution Overview

The California Institution for Men (CIM) opened in 1941, making it the California Department of Corrections and Rehabilitation's third-oldest adult institution. Covering about 1,600 acres, CIM occupies more area than any other department institution. Moreover, CIM's layout is unique among the state's 33 institutions because it comprises four separate facilities that are not physically connected. As of June 30, 2008, CIM housed 6,052 adult inmates within the four facilities, or 203 percent of its design capacity of 2,976.

In 1941, CIM opened with inmates housed in two cellblock-style living units known as South Dorm and West Dorm within what is now known as the Minimum Support Facility (MSF), which covers about 62 acres and houses more inmates than any other MSF in the state—roughly 2,400 inmates. The MSF consists of 13 dormitory and cellblock housing units surrounded by a fenced perimeter with four gun towers. The MSF also housed inmates in the gymnasium to accommodate an overflow population until a recent decrease in population made this unnecessary. Also within the MSF's secured perimeter are the institution's fire department, plant operations, medical infirmary, substance abuse programs, and academic and vocational education programs.

In 1951, CIM opened a new Reception Center Central (RCC) facility. RCC processes reoffending parolees and newly committed inmates into the prison system. Reception Center West (RCW), opened in 1960, houses inmates in eight barracks-style, open-bay living units. Reception Center East (RCE), opened in 1974, is about a mile away from the other three facilities. Designed with cellblock housing, RCE houses protective custody, Level III,[1] and reception center inmates.

## Inmate Programs

CIM inmates may participate in various programs to prepare them for successful reintegration into the community. For example, inmates gain work experience participating in the plumbing, masonry, printing, landscaping, and carpentry vocational programs. In addition, inmates needing educational assignments are enrolled in programs for adult basic education, pre-release, and English as a second language. CIM also offers Arts in Corrections, Alcoholics Anonymous, Narcotics Anonymous, and religious programs. Inmates may also participate in CIM's substance abuse program, which can serve up to 400 inmates.

---

[1] The department has four general classification levels; Level I through Level IV is the range from the lowest to the highest security level.

## Prison Industry Authority Operations

The Prison Industry Authority (PIA) offers several work opportunities for CIM inmates. Eligible inmates may work in the PIA's juice packaging plant, which packages 3,500 gallons of juice a day for consumption in prisons and state hospitals. Inmates may also work in the PIA's laundry facility, which processes 500,000 pounds of clothing and linens a month for CIM, Lanterman and Patton State Hospitals, two other state prisons, and one youth correctional facility. In addition, on December 1, 2006, the PIA reopened its Marine Technology Training Center within the institution's secured perimeter. The training center's 11-month program trains inmates to become commercial divers in areas such as underwater construction, dam repair and maintenance, welding, harbor diving, and offshore oil drilling. Upon their release from CIM, training center graduates can earn salaries ranging from $50,000 to $100,000 a year when working in private industry.

## Budget and Staffing

For fiscal year 2007–08, Warden Mike Poulos managed an operating budget of about $183.6 million, which included 2,111 budgeted positions, of which 1,203 positions (57 percent) were custody staff. The table below summarizes CIM's budgeted and filled positions as of June 30, 2008. As the table shows, almost 94 percent of the authorized positions were filled.

**Staffing Levels at the California Institution for Men***

| Position | Filled Positions | Budgeted Positions | Percent Filled |
|---|---|---|---|
| Custody | 1,165 | 1,203 | 96.8% |
| Support | 320 | 345 | 92.8% |
| Medical | 269 | 297 | 90.6% |
| Trades | 169 | 191 | 88.5% |
| Education | 43 | 57 | 75.4% |
| Management | 16 | 18 | 88.9% |
| **Total** | **1,982** | **2,111** | **93.9%** |

Source: California Department of Corrections and Rehabilitation, COMPSTAT, 2nd Quarter 2008
(as of June 30, 2008), California Institution for Men
*Note: unaudited data

# Chapter 1:
# One-Year Evaluation
# of Warden Michael Poulos

California Penal Code section 6126(a)(2) requires the Office of the Inspector General (OIG) to audit each warden one year after his or her appointment, and to audit each correctional institution at least once every four years. To satisfy this requirement at the California Institution for Men (CIM), our inspectors audited the warden's performance and the institution's operations simultaneously.

## Objectives, Scope, and Methodology

To understand how employees and other stakeholders view the warden's performance, we surveyed three distinct groups. Specifically, we sent surveys to 34 officials at CIM and at the California Department of Corrections and Rehabilitation (the department). Of those surveys, we received 22 responses. We also delivered surveys to 204 CIM employees and received 58 responses. Finally, we sent surveys to 16 key stakeholders, including selected members of the Legislature, representatives of unions and associations, a local district attorney, and a court-appointed special master. However, we received only two responses.

Our staff inspected CIM to gain an understanding of the environment where the warden must perform. We also interviewed key staff members and reviewed the institution's records in the following areas:

- Health care
- Inmate discipline
- Inmate records
- Educational and vocational programs
- Receiving and release
- Perimeter security
- Procurement
- Housing units
- Inmate appeals
- Investigative services
- Inmate assignments
- Plant operations
- Inmate visiting
- Personnel assignment
- Training

We also inspected the areas operated by the Prison Industry Authority (PIA), which includes the juice packaging enterprise, the institutional laundry, and the Leonard Greenstone Marine Technology Training Center. Through our site visits and survey responses, we asked individuals throughout the institution to discuss the warden's performance. These individuals included members of the custody staff and the executive management team, union representatives, education and health care professionals, and representatives from the Inmate Advisory Council.

We also reviewed logs, reports, and other documents related to the warden's performance over the past year, including the results of our institutional audit contained in Chapter 2 of this report.

## Background of Warden

Michael Poulos began his career with the California Department of Corrections and Rehabilitation in 1980 as a correctional officer at the Deuel Vocational Institution. He eventually promoted to the rank of correctional captain at Avenal State Prison in 1993, and in 2002, he became a correctional administrator at the California Rehabilitation Center. In 2003, Poulos became chief deputy warden at California State Prison, Corcoran.

In 2005, he transferred to CIM as the acting warden after Correctional Officer Manuel Gonzalez was killed while on duty there. Governor Schwarzenegger appointed Poulos warden of CIM in June 2006.

## Discussion of Warden's Strengths

### *The warden is responsive in addressing problems*

Shortly before Poulos' appointment as acting warden, the OIG conducted a special review into Correctional Officer Manuel Gonzalez's death and released a report in March 2005 that listed 20 recommendations directed to the institution and 22 directed to the department. In December 2006, the OIG released a follow-up to the special review and found that, under Poulos' tenure, 15 of the 20 recommendations directed to the institution had been fully implemented, while the remaining five had been either substantially or partially implemented. In addition, the December 2006 follow-up review resulted in two more recommendations directed to the institution, both of which were found to be



**Madrone Hall, 2005**



**Madrone Hall, 2008**



**Madrone Hall, 2005**



**Madrone Hall, 2008**

fully implemented during the OIG's 2008 Accountability Audit.[2]

When we conducted the special review into the correctional officer's death at CIM in early 2005, it appeared that the institution's managers had little interest in the maintenance, cleanliness, and general appearance of the institution. Trash covered many areas, weeds were overgrown, and many windows were broken in inmate housing units. Under Poulos' leadership, however, routine maintenance and landscaping have improved, and the institution grounds appear cleaner. Although much work remains to improve maintenance at the aging institution, Poulos has made great strides despite limited financial resources.

### The warden has overseen other improvements at CIM

Further accomplishments during Poulos' tenure include reopening a gymnasium formerly used for housing inmates and now used for inmate recreation and rededicating the Leonard Greenstone Marine Technology Training Center, which prepares inmates for careers in the underwater construction industry. Thirteen inmates graduated from the training center in February 2008 after completing the yearlong course that included classes in general education, physics, diving medicine, blueprint reading, seamanship, and underwater welding.

Moreover, in March 2008, Poulos helped CIM acquire a Type 1 fire truck suitable for fighting structure fires to supplement the institution's Type 2 trucks that are primarily suited for fighting brushfires.

### Staff surveys rate Poulos as an effective leader

We received 58 responses from CIM staff members to the statement, "Considering all institutional challenges, the current warden is an effective leader." Respondents rated this statement on a 5-point scale with 5 indicating

---

[2] *Accountability Audit: Review of Audits of the California Department of Corrections and Rehabilitation, 2000-2006* (April 2008) may be found on the OIG's Web site: http://www.oig.ca.gov/reports/pdf/2008_Accountability_Audit_WEB_FINAL.pdf

"strongly disagree" and 1 indicating "strongly agree." Fifty-nine percent of respondents (34 of 58) agreed with this statement, while only 19 percent (11 of 58) disagreed. Twenty-two percent of respondents (13 of 58) were neutral. One correctional officer commented, "Overall, I think that the warden is doing a good job but we all still have some more work to do."

### Poulos is accessible to staff members

Several staff members we interviewed cited personal interactions with Poulos, describing him as "responsive and accessible" and "open, personable, and approachable." Thirty-eight percent of respondents (22 of 58) agreed with the statement, "The warden is accessible to you to discuss issues," while 26 percent (15 of 58) disagreed; the remaining 36 percent (21 of 58) were neutral.

### Poulos received a favorable overall rating from management

Twenty-three of the 24 individuals representing management and key stakeholders who responded to our survey provided an overall rating for Poulos. One declined to provide a rating.

**Warden's Overall Performance Rating**

| Rating | Respondents | Percentage |
|---|---|---|
| Outstanding | 16 | 70% |
| Very Good | 4 | 17% |
| Satisfactory | 3 | 13% |
| Improvement Needed | 0 | 0% |
| Unacceptable | 0 | 0% |
| **Total** | **23** | **100%** |

Twenty of 23 respondents (87 percent) rated the warden as either "outstanding" or "very good."

Survey results from this group also indicate a favorable overall rating for Poulos' management skills in six rating categories based on the following 1-to-5 scale, with 1 being the highest: "outstanding," "very good," "satisfactory," "improvement needed," and "unacceptable." The survey respondents' average rating of 1.43 corresponds most closely with a qualitative rating of "outstanding."

**Warden Rating of Management Skills and Qualities: Rating on a Scale of 1 to 5**

| Category | Average Response |
|---|---|
| Leadership | 1.35 |
| Communication | 1.48 |
| Decision Making | 1.64 |
| Organization/Planning | 1.74 |
| Relationships with Others | 1.48 |
| Personal Characteristics/Traits | 1.39 |
| **Overall Rating: Outstanding** | **1.43** |

## Discussion of Warden's Criticisms

### CIM and the department need to do more to address the institution's poor condition

As discussed in Chapter 2 of this report, CIM has fallen into an unacceptable state of disrepair due to years of neglect. Two questions on our staff survey concerned facility maintenance, asking respondents to agree or disagree with the statements that the institution's inmate and employee areas, respectively, are adequately maintained. Respondents disagreed more strongly with these two statements than with any others on the survey. Forty-nine of the 58 surveys returned to us included written comments, and 57 percent of those respondents (28 of the 49) remarked on the poor condition of the institution's plumbing, the lack of climate control, and other maintenance problems.

Poulos has been CIM's warden for a relatively short time, and infrastructure problems existed long before he came to the institution. Although he has made significant physical improvements since becoming CIM's warden, he cannot bring the institution into an acceptable state of repair without maximizing his available resources and working with the department to obtain much-needed additional resources, as is discussed further in Chapter 2.

## Warden's Response to Criticisms

In an October 23, 2008, discussion with OIG staff members, Poulos expressed his preference to address criticisms in writing. His four-page response included other topics, and we summarized the following comments from his response.

Poulos said that since his arrival at CIM in 2005, he has made many improvements with support from the department. He cited, for example, significant security enhancements to housing units at Reception Center Central, including solid-front cell doors in Cypress Hall and the administrative segregation units in Palm Hall, security mesh over open bars in cells and shower areas, and extended tier railing to prevent intentional or accidental falls from upper tiers. He noted that enhancements to secure outside cell windows at Reception Center East were completed, while Reception Center West now has fencing around individual housing units and is having fire alarm systems added. The institution's water denitrification plant is undergoing renovation and, when completed, will help to resolve many conditions related to bad water at CIM. The warden said that while he continues to address deficiencies, significant infrastructure projects have been approved but still await needed funding.

Poulos acknowledged that he could do more to ensure that his staff understands the reasons behind CIM's general state of disrepair. He said unfamiliarity with the

processes of obtaining project approvals and funding can cause frustration among staff members as they observe degraded facilities and critical repair needs that are not fixed immediately.

In addition, Poulos cited the difficulty of filling vacancies in plant operations as a critical obstacle to addressing infrastructure problems. He said CIM's challenging workload makes even recruiting employees from other institutions difficult because other institutions do not typically experience the maintenance challenges plaguing CIM.

Poulos emphasized that CIM's staff members remain committed to making CIM as safe as possible for staff and inmates, thus ensuring that the public and the surrounding communities are safe, which is his ultimate goal. He recognized the efforts of the institution's staff, saying that it is because of them that the institution continues to carry out the critical mission of the department as they perform under extraordinary conditions and circumstances.

## Summary Discussion

Poulos has nearly 30 years of experience with the California Department of Corrections and Rehabilitation, having worked his way though the ranks, from correctional officer to warden. His years of experience have made him a valuable asset to the department and to CIM, and staff interviews and surveys demonstrate that most staff members believe Poulos is an effective leader who is accessible and responsive to problems. Managers also praise his leadership skills, giving him an average rating of "outstanding" on our survey. Nevertheless, we found that staff members feel the warden could do more to address CIM's poor maintenance and general state of disrepair, even though the infrastructure problems predate Poulos' arrival.

In summary, Warden Michael Poulos is performing his duties well, despite inheriting a neglected institution that receives inadequate financial support from the department. We are confident that—with the support of his staff and the department—he can eventually address many of the problems facing CIM.

# Chapter 2:
# Quadrennial Audit Findings
# and Recommendations

## Objectives, Scope, and Methodology

We gained an understanding of CIM's mission, safety and security procedures, and management practices by reviewing applicable laws and regulations, department and institution policies and procedures, and other criteria related to key facility systems, functions, and processes. As detailed in Chapter 1, we also inspected the institution, observed its general operations, and interviewed employees and inmates during the warden evaluation process. In addition, we surveyed selected employees and key stakeholder groups, and we reviewed prior audit reports and statistical data that pertain to the institution.

After assessing the institution's operations and the survey results, we focused our audit on three areas:

- Institutional infrastructure
- Institutional safety and security
- Inmate programs

In conducting our work, we performed the following procedures:

- To determine why CIM's infrastructure is deteriorating structurally and operationally, we surveyed institution staff members, reviewed data and reports obtained from the plant operations and personnel staff, and interviewed various members of the headquarters staff. We also reviewed and evaluated data and reports obtained from the institution's Standard Automated Preventive Maintenance System (SAPMS), institution and department data compiled by an independent consultant, and data from other state agencies. Finally, we toured the institution's grounds and buildings. Findings 1 and 2 discuss our finding results and recommendations in this area.

- To determine whether CIM places appropriate inmates at its Reception Center West (RCW), we interviewed various institution and headquarters staff members and reviewed inmate information in the department's Offender Based Information System (OBIS) and Distributed Data Processing System (DDPS). Finding 3 discusses our finding results and recommendations in this area.

- To determine whether correctional officers in armed posts meet firearms proficiency requirements, we interviewed members of the in-service training and personnel assignment staff and examined the custody staff's employee roster, firearms training records, and post assignment histories. Finding 4 discusses our finding results and recommendations in this area.

- To determine whether CIM provides adequate security at the Minimum Support Facility's visiting area to minimize introduction of contraband, we conducted an unannounced site visit in April 2008 to observe the visiting officers' process for checking in visitors and the officers' ability to effectively monitor the visiting area. We also interviewed members of the investigative services unit and staff members responsible for supervising visiting. In addition, we reviewed daily incident reports related to incidents that occurred during visiting at various adult institutions. Finding 5 discusses our finding results and recommendation in this area.

- To determine whether CIM conducts quarterly fire/emergency evacuation drills, we interviewed fire department personnel and examined compliance reports summarizing quarterly fire evacuation drills and individual area fire evacuation drills. Finding 6 discusses our finding results and recommendation in this area.

## Finding 1

**The department's available funding allocation to CIM for maintenance and repairs is inadequate to keep the institution in an acceptable state of repair.**

For the past five years, the department has allocated an average of $4 million a year for maintenance and special repairs at CIM, an institution that suffers significant infrastructure problems. Yet a consultant hired by the department to assess the condition of CIM and other California prisons estimates that seven times that amount—$28 million annually—is needed to maintain CIM in its present "poor" condition, neither improving it nor allowing it to degrade further. The consultant's data shows that, if funding is not dramatically increased, the institution's condition will reach a level of degradation by 2014 that facilities management experts would recommend demolishing and replacing CIM. In addition, the department lacks a comprehensive data system on which to base maintenance funding allocations, and this lack of reliable data contributes to the underfunding of CIM's maintenance and repair needs.

### *The department contracted with an independent consultant to assess the physical condition of its adult prisons and establish the baseline funding level necessary to maintain them*

Vanderweil Facilities Advisors (VFA)[3] provided an independent assessment at each of the department's institutions, including CIM, to evaluate the condition of each institution's "assets" and estimate the costs to repair or replace them. "Assets" include buildings and related infrastructure such as electrical, plumbing, heating and cooling, and security systems.

In early 2008, VFA completed a detailed assessment of CIM's facilities. The assessment determined the condition of the institution's assets, identified repair priorities, and calculated each asset's anticipated repair cost. The assessment resulted in a "facility condition index" (FCI),[4] which the consultant calculated by dividing the cost to repair CIM's assets by the current replacement value of those assets as shown below:



$$FCI = \frac{\text{Near-term system renewal costs}[5] + \text{requirement costs}[6]}{\text{Asset current replacement value}[7]}$$

---

[3] According to its Web site, VFA is the leading provider of integrated software and services for facilities asset management and capital planning and has assessed assets for state correctional departments in Missouri, Virginia, and Idaho. Other clients include Raytheon, Bank of America, and Kaiser Permanente.

[4] The facility condition index (FCI) is an industry-standard index that measures the relative condition of a facility by considering the costs of deferred maintenance and repairs as well as the value of the facility.

[5] The near-term renewal costs are the costs of repairing those assets that will reach the end of their useful lives during the next fiscal year.

[6] Requirement costs are the costs of renewing, or repairing, assets that have already reached or exceeded their useful lives.

In simple terms, the FCI is a ratio of an asset's repair costs compared to its replacement value. The lower an asset's FCI, the better its overall condition. In general, as an asset's FCI approaches 1.00, it becomes more cost-effective to replace the asset rather than repair it.

The FCI is recognized in the facilities management industry as a useful means of measuring the condition of buildings and their component systems.

### CIM's overall FCI places it beyond "poor" condition, and many of its buildings rate far worse

The cumulative FCI for all of CIM's collective assets as of August 2008 was 0.409. However, VFA's ratings for CIM's individual assets show many rated at 0.60 and higher—the same index rating at which some experts recommend replacement. For example, seven of the 12 inmate living units within CIM's Minimum Support Facility are rated 0.70 and higher, with three scoring over 0.90. At CIM's Reception Center West (RCW), all eight living units have an FCI over 0.60. Although interpretation of the numeric ratings may vary, an FCI rating greater than 0.10 is considered within the industry to be "poor" while a rating of 0.60 or greater suggests the asset should be replaced. The following table illustrates the qualitative ratings associated with various FCI levels by 11 different facilities management entities.

**Facility Condition Index (FCI) Ratings Comparison**

| | FCI Rating Categories | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Excellent | Very Good | Good | Adequate | Fair | Poor | Very Poor | Replace |
| CDCR – VFA (contractor) | .00 – .05 | | .05 – .10 | | .10 | > .10 | | |
| U.S. Dept. of Energy, Oak Ridge National Laboratory | .00 – .02 | | .03 – .05 | .06 – .10 | .11 – .25 | > .25 | | |
| U.S. Office of the Architect of the Capitol | < .02 | | .02 – .05 | | .05 – .10 | > .10 | | |
| Portland, Oregon, Parks and Recreation | | < .05 | .05 – .10 | | .11 – .30 | .31 – .50 | > .50 | |
| Kentucky Council on Postsecondary Education | | | < .05 | | .05 – .10 | > .10 | | |
| Virginia State Council of Higher Education, George Mason Univ. | | | < .05 | | .05 – .10 | > .10 | | |
| National Assoc. of College & Business Officers | | | < .05 | | .05 – .10 | > .10 | | |
| Port of Seattle, Seattle Port Commission | | | < .05 | | .05 – .10 | .11 – .59 | | > .60 |
| NASA – Nextor (contractor) | .00 – .02 | .02 – .04 | .04 – .06 | | .06 – .10 | > .10 | | > .30 |
| University of Colorado, Boulder | | | | | | | | .30 |
| Santa Monica College – 3D/I (contractor) | | | < .10 | | < .10 | > .10 | | .50 |

---

[7] The asset replacement value is the current cost to replace an asset.

### *The department's current spending levels are inadequate and will lead to rapid degradation of CIM*

The following graph depicts the effect on the FCI of maintaining a $4 million specific annual level of funding for repair and maintenance of CIM, adjusted for annual inflation using a factor of 4.7 percent. This specific annual funding is based on the department's actual average allocations to CIM for repair and maintenance for fiscal years 2003–04 through 2007–08.



Based on the consultant's model, the department's present level of funding, if continued, will result in a steadily increasing FCI projected to exceed 0.60 by 2014. As noted above, industry experts recommend replacement of an asset when it reaches the 0.60 FCI level.

### *Maintaining CIM at its current condition will cost roughly a third of the department's annual maintenance and repair spending for its entire adult prison system*

The graph below projects the annual maintenance expenses that would be needed to maintain CIM's current FCI level of 0.409 without improving the institution or allowing it to deteriorate further. Simply maintaining CIM's present FCI at 0.409, according to the consultant's model, will require an investment of over $5 million

in 2010 and more than $142 million during the next five years, averaging over $28 million annually during that period.



This $28 million annual average need is significantly more than the $4 million currently allocated to CIM by the department, and in fact, represents nearly one-third of the department's entire maintenance and repair budget. Specifically, in fiscal year 2007–08, the department was allocated $49 million for maintenance and $47 million for special repairs for all its prisons.[8] According to the department's chief deputy secretary of facility planning, construction, and management, the department's estimated total current maintenance and special repair need is about ten times greater than its current allocation.

### The department lacks a centralized system to provide relevant, reliable, and complete data on which to base funding allocations to its prisons

According to a February 2007 report by the Legislative Analyst's Office (LAO),[9] the department lacks an objective and systematic maintenance funding method. The LAO's report noted that the formula used by the department to determine

---

[8] This amount does not include funds approved by the Legislature for capital outlay.
[9] *Analysis of the 2007–08 Budget Bill: Judicial and Criminal Justice,* February 2007, http://www.lao.ca.gov/analysis_2007/crim_justice/cj_05_anl07.aspx

each prison's maintenance allotment does not consider a prison's age, physical size, mission, or inmate population. Consequently, in the past the formula did not allocate resources in a way that ensured they were used in prisons that needed them the most. According to the department's chief deputy secretary of facility planning, construction, and management, beginning in fiscal year 2007–08 the department moved toward a more analytical method that involves examining unique characteristics and needs of individual institutions in considering budget allotments. The new method allocates funding after considering various institution factors, including acreage, square footage, age, environment, and inmate population.

Nonetheless, the lack of a comprehensive system in the past that considered a prison's mission, age, inmate population, and geography for allocating maintenance and repair funds has contributed to underfunding of CIM's maintenance needs. In turn, this underfunding leads to a growing deferred maintenance backlog and greater long-term costs. Deferred maintenance results when routine and preventive maintenance is inadequate and special repair projects are not accomplished as needed. If repairs to buildings and infrastructure components are constantly deferred, normal decay is accelerated; eventually, prisons will require more expensive investments, such as emergency repairs, capital outlay projects, or full replacement. Besides the risk of experiencing increased material and labor costs in the future, the long-term effects of deferring maintenance and repairs often include additional costs, such as loss of use of a facility or asset, and lawsuits over health or safety conditions.

### *Underfunding has left CIM with significant maintenance problems*

CIM's plant operations managers led us on a tour of the institution to show us examples of the most significant problems, including an ineffective water treatment system, failing plumbing, dilapidated housing units, leaking roofs, and hazardous materials in need of removal.

#### Water and plumbing



CIM sits on an underground aquifer from which it produces water to supply itself and the adjacent California Institution for Women, Heman G. Stark Youth Correctional Facility, and Prado Fire Camp, delivering roughly three million gallons of water daily during peak demand times. The area surrounding CIM previously consisted of dairies, and cow manure from the dairies

**Copper pipe clogged by mineral deposits at CIM**

left the groundwater high in nitrates. According to CIM's plant operations supervisor, high-nitrate water causes pipes to clog by forming a crystallized buildup that prevents normal water flow, especially in hot water pipes (see photo). The restricted water flow also requires water pumps to work harder, subjecting them to more frequent repair. Inmates routinely complain about lack of hot water and the related hygiene issues. CIM's widely spread campus provides more opportunities for the nitrate problem to manifest itself because water pipes travel over such a large area within the institution's 1,600 acres. Further, heat exchangers used to produce the institution's hot water require frequent cleaning to maintain the flow of hot water, diverting plant operations staff from other maintenance and repair projects.

A major factor in CIM's water quality problems is its failed denitrification plant. Built in 2000, according to the plant's supervisor, the plant is insufficient to mitigate CIM's nitrate levels. Water high in nitrates is associated with health


**Bathroom in Pine Hall dorm showing water damage from plumbing leaks**

problems in pregnant women, affecting the neighboring California Institution for Women, which must buy bottled water for its female inmate population at an approximate cost of $40,000 a month.

The high nitrate levels in CIM's water have also drawn the attention of the California Department of Public Health's Drinking Water Program enforcement unit, which visited the institution in 2007 and threatened enforcement action. According to an official from the Department of Public Health, the enforcement action could result in an order to cease-and-desist operations at the water plant if the condition is not fixed. According to the department's chief deputy secretary of facility planning, construction, and management, a construction project to repair the plant is currently underway, and the plant is expected to be operational in September 2009.

## Dormitories at Reception Center West
According to CIM's plant operations management, the Office of the State Fire Marshal and the department's Architectural and Engineering Section determined that none of RCW's eight housing units comply with current California building codes, nor do they have any fire protection systems. Consequently, the Architectural and Engineering Section recommended that CIM replace all eight housing units.

### Reception Center Central

CIM's current receiving and release building, Reception Center Central (RCC), lacks adequate space to safely and securely process the incoming inmate population. The original building design can no longer process the high volume of inmates efficiently. Prior building modifications to accommodate the increasing number of inmates have resulted in poor air circulation, cramped quarters, and line-of-sight problems resulting in blind spots that create safety issues for officers and inmates.

### Hazardous materials

The institution's environment contains significant levels of known allergens and hazardous materials. Lead paint and mold affect many structures, which lack modern air filtration systems and modern insulation, especially in inmate bathrooms. For example, lead paint chips can take on the form of dust that can be hazardous if inhaled. Asbestos, also recognized as a hazardous material, can be found in CIM's buildings. The proper removal of asbestos, lead, and other contaminants must meet federal government guidelines and can be an expensive and time-consuming process, but this process is required whenever repairs or renovations are performed on areas containing such materials. According to the department's chief deputy secretary of facility planning, construction, and management, the department has sought and obtained funding to add environmental staff to help prisons respond to hazardous materials.

### Roofing

Several living units require roof repairs to fix water leaks that, if not repaired, can lead to further structural damage and therefore increase overall repair expenses.

#### *CIM's infrastructure problems are familiar to department management and to the Legislature, but approved projects remain unfunded*

The department's former undersecretary of operations toured CIM in March 2006 while still the chief deputy director of the Division of Adult Institutions. In a subsequent memorandum to the deputy director of the department's Facilities Management Division, the then-chief deputy director wrote about the "painfully obvious [state] of the aging infrastructure within the institution. In fact, there are plumbing chase doors that are so dilapidated that the doors are literally hanging off their hinges and cannot be secured to the framing because of the prolonged rust and deterioration. In one unit, the sub flooring is rusted and the plumbing is so bad that the unit is



**Rusted subflooring, South Dorm**

not being used for inmate housing (South Dorm at the Minimum Support Facility).... Furthermore, there are serious calcification problems throughout the institution due to high nitrates in their water supply."

The memorandum further expresses the chief deputy director's desire to meet with the division chief of the Facilities Management Division to map out a strategic plan addressing CIM's needs. In the interim, the memorandum's author became the department's undersecretary of operations until August 2008, yet the number of approved but unfunded special repair projects at CIM reached 21 in May 2008, the highest of any prison in the department, totaling $9.6 million.

The Legislative Analyst's Office (LAO) also cited the department's infrastructure problems in its February 2007 report, recognizing the department's failure to maintain the infrastructure of its adult prisons. The LAO also reported that the state's failure to perform preventive maintenance is becoming a liability for the department as small problems grow and require more costly special repairs.

According to the department's chief deputy secretary of facility planning, construction, and management, the department has addressed some of the LAO's concerns by developing a Maintenance Services Branch to oversee plant operations, set standards, and ensure compliance statewide.

### *Recommendations*

The Office of the Inspector General recommends that the department secretary require that the California Department of Corrections and Rehabilitation:

- Develop and use reliable data on current and future maintenance and repair needs on which to base funding allocations and plan for maintenance and special repair expenditures. The VFA project will provide the groundwork for developing this information, but the department must commit to using the information to full advantage and to supplementing it with its own data collection and monitoring efforts.

- Direct the newly created Maintenance Services Branch to work with CIM to complete an analysis by December 2009 to determine whether performing the necessary repairs and modifications identified by VFA to bring present structures into a condition that meets the department's current needs is more cost-effective than constructing a new prison on CIM's present site.

## Finding 2

**Despite the formidable gap between available repair and maintenance funding for CIM and the institution's actual needs, CIM can still take actions to mitigate its infrastructure problems.**

While the funding gap, discussed in Finding 1, is a major factor contributing to CIM's infrastructure problems, CIM has inefficiencies it could correct to maximize the effectiveness of its existing plant operations resources. These inefficiencies include failing to fill plant operations vacancies, neglecting to take full advantage of an established system for tracking and planning maintenance activities, and allowing duplicate work orders to clutter its system. By correcting these problems, CIM can reduce unnecessary work, improve local supervisors' capacity to manage maintenance activities, and provide objective evidence for the department's use in establishing equitable maintenance funding allocations to CIM.

### CIM officials cite difficulties in hiring and filling vacant positions as a key factor limiting the institution's ability to address infrastructure problems

CIM's plant operations manager reported that as of July 22, 2008, CIM had 14 vacant positions in its plant operations unit, a 19 percent vacancy rate (14 of 73). According to the institution's personnel staff, two factors contribute to plant operations vacancies:

- Departmentwide examinations for plant operations positions are geared toward journey and supervisory levels, leaving the institution responsible for its own recruiting and hiring of entry-level plant operations employees. However, local response to open "spot exams" for entry-level plant operations positions has not been strong, and not enough candidates apply for the open spot exams.

- An emphasis on inmate medical care requires the personnel office to focus its recruitment and examination efforts on health care positions while neglecting recruitment of entry-level plant operations workers. Thus, there are no open certification lists for plant operations positions at CIM.

CIM's inability to fill its 14 vacant plant operations positions hinders the institution's ability to promptly address needed repairs and maintenance and places an additional burden on existing plant operations employees. Further, the inability to promptly respond to needed repairs contributes to the deterioration of the physical plant and ultimately increases costs.

### CIM's staffing vacancies, combined with a prevalence of emergency projects, challenge the maintenance staff's ability to perform preventive maintenance work

In its February 2007 report, the Legislative Analyst's Office (LAO) recognized that maintenance workers responsible for preventive maintenance at prisons are also tasked with performing emergency repairs, which take priority over preventive maintenance. We found this to be true at CIM.

Representatives at the institution and in various department divisions at headquarters said that reception centers such as CIM tend to suffer more abuse from inmates than other types of prisons. According to the representatives, inmates at reception centers stay for relatively short terms during their initial processing and thus have no incentive to keep their cells in working order, and they often act out by intentionally damaging their cells. As a result, CIM's plant operations staff must continuously repair inoperable cells to prepare them for occupancy by a flow of newly arriving inmates. Moreover, the institution's maintenance staff incurs what a plant operations supervisor termed "a ridiculous amount of overtime," which he said exceeded a half-million dollars in fiscal year 2006–07, while preventive maintenance is neglected altogether.

### Besides having plant operations vacancies, CIM may be receiving an inadequate allocation of such positions relative to its size and mission

We found that CIM, despite being the state's third oldest prison, is one of several prisons that had never received a baseline "staffing package," according to the Program Support Unit in the department's Division of Adult Institutions. Since the 1980s, the department has developed staffing packages for its prisons based primarily on inmate population. The staffing package determines the number of custody and support staff members allocated to each prison.

When compared to Kern Valley State Prison (KVSP), which was activated in 2005, CIM's staffing allocation appears inadequate. The following table compares the authorized staffing levels for plant operations for the two prisons.

**Comparison of CIM and KVSP Inmate Population to Plant Operations Positions Authorized**

| | CIM | KVSP | Difference |
|---|---|---|---|
| Inmate population as of March 31, 2008 | 5,925 | 4,734 | 1,191 |
| Plant operations positions authorized, fiscal year 2007–08* | 72.5 | 78.6 | (6.1) |
| Ratio of inmate population to plant operations positions | 81.7 | 60.2 | |

*Per Governor's Budget, Salaries Wages Supplement, FY 2008–09, as listed under "Facilities Operations" and omitting fire department, auto mechanic, and warehouse positions.*

Thus, while CIM houses 25 percent more inmates, KVSP has more authorized plant operations positions. Since the department's staffing packages consider inmate population the primary factor in allocating positions to an institution, this comparison suggests CIM is understaffed in plant operations positions. If the 60.2 inmate-to-staff ratio at KVSP were applied to CIM based on its inmate population, CIM would have 98 plant operations positions instead of 73.

Further, CIM is over 60 years old, yet it has fewer authorized plant operations positions than a three-year-old prison with fewer inmates and must use its plant operations staff primarily on emergency repair work while preventive maintenance is neglected. The inconsistent nature of the department's allocation of plant operations positions was also noted in the LAO's February 2007 report, which said that the complement of plant operations staff members established by the department for its individual prisons "is not based on any objective measure of their repair needs, such as their size, age, or mission." We discussed these issues with the department's chief deputy secretary of facility planning, construction, and management, who said that the department is actively pursuing a baseline adjustment to plant operations staff for all its institutions to take into account the age of each facility and its required maintenance needs.

### CIM does not fully use a computer system developed to track preventive maintenance, which may be contributing to its maintenance funding gap

The department implemented the Standard Automated Preventive Maintenance System (SAPMS) statewide in fiscal year 2001–02 to provide tracking, scheduling, recording, analysis, and retrieval of maintenance and operational data to manage institutional maintenance. Although data from this system is a factor in allocating maintenance funding, CIM is significantly underreporting the number of maintenance workers' hours.

The plant operations unit at each adult prison reports its SAPMS data through a local area network with the ability to produce comprehensive reports on the condition of all physical plant assets, as well as projections for preventive and corrective maintenance. The SAPMS also includes a time-tracking database to account for staff time worked, training time, and time off.

We found that CIM's plant operations staff falls far short of complete accountability in recording hours in the SAPMS database. We analyzed the hours recorded in CIM's SAPMS database for calendar year 2007 and concluded that the plant operations staff failed to account for 72,804 hours, or roughly 35 state personnel years.

CIM's Operational Procedure #031, *Maintenance Work Requests, Work Orders and Project Requests*, requires staff members to provide documentation of an

eight-hour workday, as well as any overtime, training, and time off, on the Plant Operations Daily Work Log. Completed work is to be recorded on this document to ensure tracking and accountability for all work performed by the plant operations staff. This document must be submitted to the plant operations office daily, with completed work orders recorded on the document, for SAPMS processing.

Assuming conservatively about 40 to 45 staff members charge hours to the SAPMS database during the year, we calculated the expected number of hours that should have been charged each month if each non-supervisory employee recorded 40 hours a week. We found that actual hours recorded in the SAPMS for 2007 totaled only 39,925, while our predictive test calculated 89,592 hours. When factoring in the 23,137 overtime hours charged by staff members, the unaccounted difference was even more significant, totaling 72,804 hours (89,592 expected regular hours, plus 23,137 overtime hours, minus 39,925 hours actually recorded), or approximately 35 personnel years. CIM's management cited frequent emergency repairs and overtime as significant barriers that prevent staff members from consistently recording their activity in the SAPMS.

This significant under-recording of activity leaves decision-makers with faulty data from which to make asset-allocation decisions and may negatively affect CIM's efforts to obtain funding for maintenance and repairs. The Facilities Management Division introduced a formula in fiscal year 2007–08 to allocate maintenance funding for each prison using a scoring system. According to the Facilities Management Division, the funding formula is based in part on past expenditures for which the SAPMS will serve as a primary source. By failing to record activity in the SAPMS, CIM is understating the maintenance and repair activity on which funding is based and consequently may not receive its full funding allocation from the department.

### *CIM's failure to follow its own operating procedure causes duplicate work orders and creates unnecessary work for the plant operations staff*

The plant operations analyst responsible for entering work orders into the SAPMS database showed us a stack of about 1,000 duplicate work orders accumulated from 2006 to 2008. Work orders not immediately recognized as duplicates are entered in the SAPMS database, causing the list of open work orders to be overstated and leading to unnecessary time spent by plant operations staff members, who may be dispatched to perform repairs that have already been completed.

CIM's Operational Procedure #031, *Maintenance Work Requests, Work Orders and Project Requests*, requires a designated work order coordinator for each facility in the institution. The work order coordinator is responsible for tracking

all maintenance work requests for his or her facility by maintaining a logbook and copies of all maintenance requests submitted, as well as assigning a tracking number to each request.

If CIM followed this operating procedure, duplicate work orders would be reduced significantly because the work order coordinator for each facility would be able to identify duplicates and prevent them from being submitted to plant operations for action.

### Recommendations

The Office of the Inspector General recommends that the warden at CIM:

- Continue to aggressively recruit and conduct examinations for plant operations positions to fill existing vacancies, soliciting assistance from department headquarters if necessary.

- Hold plant operations employees accountable for recording all of their time in the SAPMS database.

- Enforce the local policy requiring a work order coordinator at each facility to reduce duplicate work orders.

## Finding 3

**Staff at CIM's central reception center inappropriately approved some dangerous, high-risk inmates for housing in crowded dormitories.**

When staff members at Reception Center Central (RCC) approved some inmates to be housed at the institution's Reception Center West (RCW), they did not follow procedures for reviewing the inmates' classification scores to ensure those scores do not exceed the limit for RCW. As a result, the staff placed unsuitable inmates at RCW, where two correctional officers supervise about 200 inmates in each of seven open dormitories and about 100 additional inmates in another open dormitory. CIM's inmate eligibility criteria for RCW exclude certain inmates because their classification scores are too high or are unknown; a high classification score often results from repeated bad behavior while in prison. Moreover, in an open dormitory setting where fights among inmates can quickly escalate and spread, it is difficult for officers to gain control of inmates who assault staff members or other inmates.

### *CIM local policy clearly establishes inmate eligibility criteria for the institution's reception centers*

CIM receives about 600 inmates weekly at its RCC for initial screening and processing into the state prison system. Generally, inmates who represent the highest safety and security risk and those en route from one institution to another are retained at RCC. Transportation unit staff at RCC must evaluate the remaining inmates to identify those eligible for transfer to one of CIM's other two reception centers, Reception Center East (RCE) or Reception Center West (RCW).

CIM's local operational policy establishes criteria for inmate eligibility for each reception center. Inmates with higher security needs are moved to RCE, which contains mostly celled housing. Inmates with lower security needs are transferred to dormitories at RCW, where roughly 1,500 inmates live in eight open dormitories with two correctional officers supervising each dormitory. In these dorms, inmates move freely in areas crowded with two-tier bunks and inmates' personal items, potentially obstructing the officers' line of sight and inhibiting the officers' ability to control volatile situations before they escalate to violence.

An inmate's classification score, which is an indicator of the inmate's behavior in prison, is one criterion the officers at RCC must consider when assigning housing. The classification score is based on various case factors, including the inmate's sentence length and behavior while in prison. Points are added to an inmate's classification score when the inmate is found guilty of a serious rules violation. For example, an inmate found guilty of possessing a deadly weapon is assessed an additional 16 points. Points are subtracted when the inmate has no serious

disciplinary problems during annual review periods. California Code of Regulations, Title 15, section 3375(d) states that a lower placement score indicates lesser security control needs while a higher placement score indicates greater security control needs.

Inmates with a classification score higher than 35 or whose classification score is unknown are ineligible for placement at RCW. However, an inmate's prior classification score is not always known when RCC staff (which includes correctional counselors) must decide where to house the inmate. For parole violators, who comprise most of CIM's inmate population, the 35-point limit refers to their most recent classification score—their score at the time they last paroled. This score is retained with other information in the department's Distributed Data Processing System (DDPS). But according to a system analyst in the department's DDPS unit, an inmate's record in DDPS is archived upon parole. The analyst explained that in cases where a parole violator returns to the same reception center from which he last paroled, his record in DDPS is still available at that reception center. However, if a parole violator comes into a reception center after paroling from a different institution, his online DDPS record containing the previous classification score is not available to that reception center until the next day. After the reception center staff enters the inmate's arrival date and other information into DDPS, the system updates itself and restores the inmate's archived record during its overnight update process.

### Staff did not follow procedures that provide a safety net in instances when they must move inmates before knowing their classification scores

We reviewed the classification scores of inmates living at RCW on April 4, 2008, and on May 1, 2008, and we identified 19 inmates who should not have been housed at RCW because their classification scores were either too high or unknown. Specifically, ten of the 19 inmates had classification scores higher than 35, and the other nine inmates had a "999" code instead of a classification score, meaning their score was unknown. CIM's desk procedures for RCW do not allow such inmates to be housed at RCW. Although the inmates' scores were not available at the time the staff transferred the inmates, the staff did not follow up the next day when the scores became available.

RCC does not have enough beds for all inmates who arrive during the day, according to a CIM associate warden who previously managed operations there. To avoid having inmates spend the night in temporary overflow holding cells at RCC, staff members must decide which inmates to transfer out of RCC, although some of those inmates' classification scores may still be unavailable. The associate warden explained that because about 85 percent of the inmates who come into RCC remain there for at least 24 hours, their scores are available for staff members to review. The remaining 15 percent may not have their prior

classification scores available for consideration when staff members must decide which inmates can be transferred out of RCC.

Sometimes inmates must be transferred out of RCC on the same day they arrive because of capacity issues. If the inmates' previous classification scores are unavailable, staff members must evaluate other information about the inmates before initially approving them for RCW. Specifically, staff members told us that they evaluate historical information in the department's Offender Based Information System (OBIS) regarding inmates' movement within the prison system to identify case factors that may exclude them from RCW. For example, the information may show that before paroling, an inmate transferred to an outside hospital, to a medical clinic within the institution, or to an administrative segregation unit. Staff members use this information to identify inmates with histories of medical or mental health problems or other behavioral problems.

Staff members said they also consider the nature of the institution at which the inmate lived just before paroling. For example, disregarding all other exclusionary factors, most inmates who parole from Avenal State Prison are probably eligible for placement at RCW because most of Avenal's inmates are Level I or Level II, meaning their classification scores should not be higher than 27. However, Avenal also houses a small percentage of Level III inmates whose classification scores may be as high as 51, which is 16 points more than CIM allows for inmates at RCW. Thus, while the RCC staff makes an educated assessment of inmates' transfer eligibility, those assessments are not without risk.

To mitigate this risk, according to the staff, when it becomes necessary to transfer inmates to RCW before the inmates' classification scores are available, staff members follow a "safety net" process by reviewing those inmates' classification scores when they become available the next day. If staff members identify inmates whose scores are higher than 35, they immediately transfer them out of RCW. However, the staff did not follow this procedure for the 19 inmates we identified at RCW on April 4, 2008, and May 1, 2008, because these inmates had all been at RCW for more than one day. In fact, one inmate with a classification score of 82 was at RCW for over five weeks before the staff realized and transferred him to RCE.

When we discussed our audit findings with an associate warden, he suggested that the staff could use another system, called DECS (Disability and Effective Communication System), to check parole violators' classification scores. The associate warden explained that DECS has been available to the staff in CIM's receiving and release unit at RCC for several months. Unlike the Distributed Data Processing System (DDPS), DECS is designed to provide CIM the classification score on all returning inmates, not just those who paroled from CIM. The receiving and release unit staff use DECS to identify inmates with disabilities, but the transportation unit staff has not yet been required to use it.

### Even when inmates' classification scores are available, staff members do not always review them before deciding to transfer the inmates to RCW

We found that CIM staff members failed to check the classification scores of five of the 19 inmates before approving their transfer to RCW, even though the staff had ample time to do so. One inmate whose classification score was 38 was at RCC for six days before the staff transferred him to RCW. Four of the inmates with the 999 code were at RCC for more than 24 hours—one of them for seven days—before the staff transferred them to RCW.

When notified of the presence of inmates with classification scores over 35 points at RCW, one of CIM's chief deputy wardens remarked that because RCW's design includes an electrified perimeter fence, it qualifies as a Level III facility, so inmates with classification scores as high as 51 points can technically be placed there. However, by setting a lower score limit for the inmates it is willing to house at RCW, CIM's management recognizes the elevated risk of negative behaviors associated with higher-scored inmates, especially when such inmates are housed in a crowded dormitory supervised by only two correctional officers. While an electrified fence may mitigate escape attempts, it does little to prevent violent behaviors by the inmates living within its perimeter. Placing inmates with histories of disruptive or assaultive behavior in an open setting where they can roam freely and where fights among inmates can quickly escalate and spread creates a more dangerous environment for inmates and staff members. Incidentally, three of the 19 inmates we identified had classification scores above 52, exceeding the "technical limit" of 51 cited by the chief deputy warden. Department regulations require that inmates with scores of 52 and above be placed in a Level IV facility with additional security features, such as cells.

### CIM's local operational policy does not reflect the institution's current practice of using classification scores to evaluate inmates for placement at RCW

CIM revised its local operational policy establishing inmate eligibility criteria for its reception center facilities in January 2008, but the revision failed to delete references to "inmates' prior custody level" from the list of criteria—even though this information is no longer available. Since August 2006, DDPS no longer displays an inmate's prior custody level if it was rated below "maximum" at the time of parole. Moreover, CIM's written policy does not reflect its actual practice of using inmates' classification scores to determine which inmates can transfer to RCW. CIM's Operational Supplement requires the institution's management to ensure that staff members review policies annually and ensure that managers revise the policies as necessary to reflect department or institution operational needs. By not revising policies to ensure that they contain accurate information,

CIM's management is not clearly communicating its expectations to employees, which increases the possibility for errors to occur.

### Recommendations

The Office of the Inspector General recommends that CIM managers:

- Require transportation staff in the central reception center, who make the decisions to move parole violator inmates to RCW, to check inmates' classification scores in the Disability and Effective Communication System (DECS) before moving them. In instances when overcrowding in the central reception center forces the officers to transfer inmates to RCW before their classification scores are available, assign a staff member the responsibility of checking the scores the next day. If the staff member identifies an inmate who is not eligible for RCW, promptly transfer the inmate out of that facility, and hold the staff member accountable if any inmate with a classification score above 35 is found at RCW more than 24 hours after being transferred there.

- Ensure the institution's local operational policy for inmate eligibility at RCW is updated by deleting the reference to "prior custody level" and replacing it with relevant evaluation factors that may include classification score, behavioral history, and mitigating or aggravating factors.

## Finding 4

**CIM allows peace officers who have not attended mandatory quarterly firearms training sessions to assume armed posts at the institution and off-site in local hospitals.**

Although CIM has a process for identifying peace officers who fail to attend mandatory quarterly qualification sessions, many such peace officers continue to work armed posts instead of being redirected to alternate posts pending completion of quarterly qualification requirements. Furthermore, a departmentwide memorandum issued in November 2004 permits peace officers who are not quarterly qualified to work armed posts through shift swaps or overtime. This practice conflicts with various California statutes and regulations, as well as other department policies, which require officers to complete quarterly firearms training sessions before assuming armed posts. In addition, according to the department's Operations Manual, an officer who fails to attend or qualify at a quarterly session must be redirected to a non-armed post pending completion of the missed session. Allowing peace officers to work armed posts without completing the required quarterly qualification sessions endangers employees, inmates, and the public and exposes the state to litigation if such an officer uses deadly or less-lethal force.

### *Various statutes, regulations, and department policies require officers to complete quarterly firearms training sessions before assuming armed posts*

California Penal Code section 830.5(d) requires quarterly qualification for correctional officers assigned to armed posts. Likewise, Title 15, section 3276(a) of the California Code of Regulations states that only peace officers who have satisfactorily completed firearms training and who are currently qualified to fire department firearms will be assigned to armed posts. The department's Operations Manual section 32010.19.7 requires all department peace officers issued a department weapon as part of their regular or special assignment, such as armed posts, to "complete a proficiency course on a quarterly basis *prior to* assuming the post." [Emphasis added.] The department's Operations Manual requires the watch commander to assign *qualified* transportation officers to transportation details if unscheduled or emergency transportation needs arise. Finally, according to Operations Manual section 32010.19.10, peace officers must notify their supervisor upon assignment to an armed post if they have not met the requalification or quarterly proficiency requirement.

These policies also serve to restrict the activity of peace officers who fail to meet the quarterly firearms qualification requirements. Specifically, Operations Manual section 32010.19.5 states that officers will not be permitted to work in an armed

post or any other assignment that requires them to be armed until they meet the minimum requirements.

### CIM has established local procedures to enforce department policy

In a February 2, 2006, memorandum to custody staff, Warden Poulos designated four months (February, May, August, and November) as the quarterly firearms qualification months for CIM's correctional officers. Officers regularly assigned to armed posts as well as officers serving in armed posts as permanent intermittent and relief officers must attend a quarterly qualification session during each of these four months to work at an armed post during the three-month period immediately following the designated qualification month. For example, the February qualification sessions cover the quarter beginning March 1 and ending May 31. Similarly, the May qualification sessions cover the quarter beginning June 1 and ending August 30. Each officer is responsible for ensuring he or she maintains quarterly firearms qualification by attending the mandatory training in each of the four months. The In-Service Training (IST) Unit publishes the dates and times for each quarterly qualification session in the IST bulletin.

CIM's IST manager identifies the peace officers who fail to attend or fail to qualify at the mandatory quarterly qualification sessions and distributes an exception list at the weekly executive staff meeting to all associate wardens. The associate wardens distribute the information down the supervisory chain of command. The memorandum accompanying the list specifies that officers on the list are to be redirected to non-armed posts pending firearms qualification, and any officer who has met the quarterly qualification requirements should provide coverage for redirected officers. The IST armory sergeant prepares a letter of instruction for each peace officer on the exception list, provides the letters to the IST manager for review, and ensures that the employee relations officer receives the letters for distribution to the non-compliant officers.

### Although CIM identifies officers who fail to attend or pass mandatory quarterly qualification sessions, those officers continue to work armed posts

We reviewed the March 2008 time sheets of the 43 officers appearing on CIM's February 2008 exception list and found that 34 of the officers (79 percent) had worked in at least one armed post. These officers were out of compliance with CIM's policy because as of March 1, 2008, they failed to qualify at a range session during February 2008. For example, a vacation relief officer who worked four shifts at the gym observation post had not attended a qualification session since May 31, 2007, a period of nine months prior to March 1, 2008. Another vacation relief officer worked five gym gun shifts during March 2008, despite having no record of attending any qualification session from May 1, 2006,

through February 29, 2008, a 23-month lapse. Finally, two training relief sergeants worked armed posts despite appearing on the exception list. One sergeant worked two control shifts and one medical transportation shift even though the sergeant had not attended a qualification session since February 28, 2007, a 12-month lapse. The other sergeant worked three control shifts and two perimeter security shifts despite having not attended a qualification session since September 19, 2007.

Further, CIM supervisors are not working with the IST manager to ensure that subordinates meet the minimum qualification requirements. For example, 18 of the 34 officers working an armed post during March 2008—despite appearing on the February 2008 exception list—were relief officers supervised by the personnel assignments office. The personnel assignments office receives a copy of the exception list and should have redirected the 18 officers to non-armed posts until they made up the missed qualification session. In addition, five of the officers report directly to CIM's watch office, where the watch sergeant receives a copy of the exception list and should have redirected the five officers. Similarly, the remaining 11 officers reported to various facilities within CIM and should have received redirection instructions from their respective facility supervisors. These 34 officers violated a department policy (Operations Manual section 32010.19.10) requiring them to notify their supervisor at the time of assignment if they had not met the quarterly proficiency requirements.

We discussed our findings with CIM's security operations captain and chief deputy warden, and they both agreed that supervisors were not redirecting non-compliant officers as required. The captain also stated that supervisors were not checking the officers' weapons qualification cards. The day after our discussion, the security operations captain distributed a memorandum to all sergeants instructing them to review the weapons qualification card of each officer to ensure that current qualifications have been met. The memorandum also asked all supervisors assigned to the watch office to familiarize themselves with IST's exception list and to redirect any officers who have not met the qualifications.

### *The department allows officers who do not meet quarterly firearms qualifications to work armed posts under a department memorandum that contradicts state law*

The deputy director of the department's Institutions Division (renamed the Division of Adult Institutions) issued a November 4, 2004, memorandum to all regional administrators and wardens that allows officers who are not regularly assigned to armed posts to work such posts in overtime assignments. The memorandum also permits officers to swap or trade work assignments without regard to their firearms qualifications or training. According to the memorandum, officers working an armed post in overtime status or through shift swaps do so

voluntarily or temporarily and thus should not be required to quarterly qualify before assuming the armed post.

However, we believe that the November 2004 policy is contrary to the formal department rules and state law. As reported in our April 2008 accountability audit,[10] CIM was one of five institutions tested in our audit sample that allowed officers not quarterly qualified to assume armed posts under the departmentwide memorandum. While our April 2008 report took exception to the practice, the report did not evaluate the magnitude of the issue. To evaluate the issue at CIM, we analyzed data from CIM's timekeeping system for March 2008, the month following CIM's designated quarterly qualification month of February 2008, and found a significant number of officers working in armed posts who typically receive only one firearms training session a year.

On any given day, CIM must ensure that about 110 permanently assigned armed posts are filled, as well as a varying number of armed posts in local hospitals for medical guarding and medical transportation escorts, depending on the number of inmates requiring outside medical attention. CIM's timekeeping data revealed that on March 4, 2008, CIM filled 120 predetermined armed posts, 75 medical guard posts, and 19 medical transportation posts—214 armed posts in total. We analyzed the training records of officers working these posts on March 4, 2008, to determine the extent to which non-compliant officers worked in armed posts that day. We also determined the time elapsed since those officers' last qualification sessions. As shown in the following table, CIM's watch office filled 62 of the 214 armed posts (29 percent) with officers who had not met the quarterly firearms qualification requirement. Furthermore, nearly 67 percent of the officers assigned to medical guard posts in local hospitals had not met the quarterly qualification requirements.

---

[10] *Accountability Audit: Review of Audits of the California Department of Corrections and Rehabilitation, 2000–2006* (April 30, 2008) may be found on the OIG's Web site:
http://www.oig.ca.gov/reports/pdf/2008_Accountability_Audit_WEB_FINAL.pdf

**March 4, 2008, Analysis of Armed Posts**

| Type of Armed Post | Total Posts | Total Filled by Regular Quarterly Qualified Officers | Total Filled by Officers Not Quarterly Qualified | Percent Filled with Officers Not Quarterly Qualified | Range of Days Elapsed Since Last Qualification Session (for Officers Not Quarterly Qualified) |
|---|---|---|---|---|---|
| Predetermined | 120 | 110 | 10 | 8.3% | 34 to 356 days |
| Medical Guard | 75 | 25 | 50 | 66.7% | 34 to 674 days |
| Medical Transportation | 19 | 17 | 2 | 10.5% | 34 to 153 days |
| **Total** | **214** | **152** | **62** | **28.9%** | |

Source: CIM timekeeping system reports and watch sheets for March 4, 2008, and IST records for officers who worked on March 4, 2008.

The table above also highlights the large range of time elapsed between the 62 non-compliant officers' last qualification sessions and March 4, 2008. For many officers, the time elapsed since their most recent qualification session was well beyond a quarterly requirement. For example, officers assigned to work three tower posts had not been to a qualification session for 265, 293, and 300 days, respectively. In addition, an officer assigned to a front-gate post had not attended a qualification session for nearly a year. Officers working in medical guard posts on March 4, 2008, also had not attended a qualification session for long stretches of time. For example, two of the officers had no record of attending a qualification session from May 1, 2006, to February 29, 2008, over 20 months. Eleven of the officers had not attended a qualification session from 300 to 366 days—the remaining medical guard officers experienced lapses of 34 days to 293 days.

### Several officers who were out of compliance worked armed posts through shift swaps

To determine the extent to which CIM permits peace officers not quarterly qualified to swap shifts with officers regularly assigned to armed posts, we analyzed all shift swaps worked during March 2008. We found that 11 officers swapped into armed post shifts despite their lack of quarterly firearms proficiency. Five of the 11 officers had not participated in qualification training since at least September 19, 2007, over five months prior. These five included an officer who swapped into a tower position despite not attending a qualification for ten months at the time of the swap. Another officer swapped into a control post even though the officer had not participated in a qualification session since March 7, 2007.

### Medical transportation and medical guarding of inmates requires a significant number of armed officers—and many of these officers were out of compliance

CIM's watch office fills medical guard posts every day, and the number of officers assigned depends on the number and classification level of inmates requiring treatment at outside hospitals. We analyzed the timekeeping summary of all medical guard shifts worked in overtime status during March 2008 and found that 321 officers worked one or more such shifts even though the officers were not quarterly qualified. The elapsed time since each officer's last qualification session varied. For example, 21 of the 321 officers (6.5 percent) had no record of attending a qualification session during the period May 1, 2006, to February 29, 2008 (a 22-month lapse), and one officer had not attended a qualification session since September 13, 2006, 18 months earlier. In another example, 72 of the 321 officers (22.4 percent) had not participated in a qualification session for at least ten months as of March 1, 2008.

Our testing of medical transportation shifts revealed that 75 different officers not quarterly qualified worked one or more medical transport shifts on overtime status during March 2008. For example, four of the 75 (5.3 percent) had no record of attending a qualification session between May 1, 2006, and February 29, 2008. Ten of the 75 (13.3 percent) had their most recent qualification session at least ten months prior to March 2008. Further, 18 of the 75 (24 percent) had no record of attending a qualification session for at least eight months as of March 1, 2008.

### Despite assurances to the contrary, we found medical escort teams on which neither officer had met quarterly firearms qualifications

Various CIM officials, including the security operations captain and the chief deputy warden, told us that not all outside hospital posts are armed. For example, in situations where an inmate's custody level necessitates two officers to guard the inmate, only one of the two must be armed. Further, the officials emphasized that CIM's watch office sergeant would ensure that the armed officer would be a quarterly qualified officer. However, we reviewed the outside hospital correctional officer pairings from records maintained in the watch office for March 4, 2008, and found that 14 of the 34 outside hospital pairings were out of compliance with the quarterly qualification requirement. That is, neither of the "paired" officers met the quarterly qualification requirement. The time elapsed since each officer's last qualification session as of March 4, 2008, ranged from 48 days to one year. One pairing included officers who had not participated in a qualification session for at least ten months.

When we informed the security operations captain and the chief deputy warden that we planned to analyze the extent to which non-compliant officers work armed posts, the chief deputy warden agreed that it would be ideal to have all officers

quarterly qualified but said that it is not cost-effective to do so. The captain also said that it would be too expensive for CIM to require all officers to be quarterly qualified before assuming an armed post.

### Allowing officers to work armed posts without completing the required qualification sessions endangers employees, inmates, and the public and exposes the state to litigation if a non-compliant officer uses deadly force

Peace officers who have not demonstrated recent firearms proficiency may expose the state to litigation and endanger themselves or others if insufficiently trained. Inmate behavior is unpredictable, and the institution and the department assume great risk by allowing officers who have not satisfied quarterly qualification requirements to work in armed posts. Riots or fights involving inmates occur often enough that any officer in an armed post, including those assigned to medical transports or outside hospitals, may be called on to use deadly force. A recent incident in which an inmate from a Northern California prison escaped from his assigned bed at an outside hospital illustrates this risk. The inmate fled through the fire exit door as one officer drew a state-issued weapon and ordered the inmate to stop. The inmate refused to comply and ran into the hospital's parking lot. The officers ultimately regained control of the inmate without having to fire a weapon. However, the incident could have ended differently. Had the officer discharged the weapon in such a public area, the department's efforts to defend itself in any resultant litigation would have been further complicated because at the time of the incident the officer had gone ten months without a firearms proficiency qualification. Both CIM and the department must consider whether they are willing to continue assuming such risk through continued adherence to the November 2004 policy memorandum. In addition, CIM places itself and the department at risk when it does not enforce various statutes, regulations, and department policies concerning quarterly qualification requirements.

### Recommendations

The Office of the Inspector General recommends that the warden take the following actions to ensure that peace officers who assume armed posts have completed quarterly firearms qualification requirements:

- Instruct supervisors to periodically review the master roster to ensure their familiarity with peace officers assigned to armed posts and those who could be assigned to armed posts in a "relief" position.

- Instruct supervisors to examine the weapons qualification card of officers whose qualifications they are unfamiliar with to ensure assigned officers

meet the quarterly qualification requirements before assuming an armed post.

- Ensure that officers who receive a letter of instruction for failing to attend a quarterly qualification session sign and return the letter of instruction to the employee relations officer.

- Hold supervisors accountable for failing to redirect officers from armed posts when those officers fail to meet the quarterly qualification requirement.

- Use the monthly in-service training bulletin, or similar means, to emphasize to the custody staff that qualification must occur before assuming an armed post.

- Limit armed post assignments only to peace officers who complete a quarterly firearms qualification session as required in the department's Operations Manual section 32010.19.7.

- Allow officers who complete an annual qualification session during CIM's designated months of February, May, August, or November to work armed posts through special assignment in the three months following the annual qualification. For example, officers who complete annual qualification sessions during May would be eligible to work armed posts during June, July, or August. Moreover, officers who complete annual qualification sessions during a quarter would be eligible to work armed posts during the remainder of that quarter.

The Office of the Inspector General recommends that the department secretary repeal those provisions of the November 4, 2004, departmentwide memorandum that allow officers to assume armed posts without completing quarterly firearms qualification requirements.

## Finding 5

**The visiting area for CIM's Minimum Support Facility accommodates hundreds of inmates and visitors, but the institution lacks an effective means of monitoring visiting activities to control the exchange of contraband.**

The department recognizes the value of inmate visitation as a way for inmates to maintain family and community connections. However, effective monitoring of visiting is necessary because some inmates use visiting as an opportunity to smuggle drugs and other contraband into the institution. At CIM's Minimum Support Facility (MSF), only two officers are assigned to actively monitor visitor activities, and suspicious behavior may be missed because there are no surveillance cameras. The use of cameras would enable officers to scan various areas of the visiting yard and allow for continual observation of suspicious activity. In addition, video recordings could serve as an additional resource to the investigative services unit officers to successfully prosecute visitors and inmates found with drugs or other contraband.

### *Only two officers are assigned to monitor CIM's large visiting area*

The institution's MSF visiting area is an outdoor yard—roughly 183,000 square feet, or over 4 acres—and it contains 198 picnic tables arranged in two staggered rows under an awning. The tables stretch along the north, south, and east perimeter of the yard, surrounding a large grassy area divided by a walkway in the center of the yard. The west side houses vending machines, visitor restrooms, and a family picture-taking area.



**MSF Visiting Yard**

The visiting area allows for a maximum of 198 inmates at one time, with one inmate assigned to each table, and on some occasions, the number of visitors has exceeded 300, for a total of over 500 people in the visiting yard. Four officers work in the visiting yard. Two of these officers process the visitors and the inmates in and out of the visiting yard, and two officers roam the yard. Typically,

one of the two roaming officers stays near the picture-taking area and the nearby vending machine area to ensure that picture poses are appropriate and that children stay out of the vending machine area. This leaves only one officer available to walk among the visiting tables.

### Visiting is a gateway for contraband to enter an institution even though officers take security precautions

Officers make sure that each visitor walks through a metal detector, and they search visitors' personal belongings before allowing them to enter the visiting yard. In addition, officers ensure that each inmate undergoes an unclothed body search before he returns to the housing unit. However, officers do not always find contraband through these security measures alone. Visitors have successfully passed the initial security checks by hiding non-metal contraband items, and inmates have successfully passed the unclothed body search by either swallowing the items or otherwise secreting the items on their person. For instance, at one institution, officers observed three inmates hide unknown objects on their person. However, when officers conducted unclothed body searches they were unable to find anything on two of the three inmates. After placing one inmate on contraband watch and taking another to a hospital, officers eventually recovered the contraband, which turned out to be drugs. In another instance, an officer observed a female visitor pass what appeared to be contraband to an inmate while the visitor and the inmate kissed. The inmate was placed on contraband watch, and about two days later officers recovered five balloons of heroin from the inmate. In both instances, officer observation was vital to finding contraband that would not be detected by an unclothed body search. Although the MSF visiting officers observe and stop inappropriate behavior between inmates and their visitors and confiscate contraband, it is unlikely that two officers monitoring over 500 people could see every instance of suspicious or inappropriate behavior, especially if the conspirators watch the officers' whereabouts and wait for them to become distracted.

During our observation of a Saturday visiting day, we saw inmates and visitors taking advantage of the commotion caused by an announced, but unexpected, early termination of visiting. Some groups appeared to ignore the initial announcements to exit the visiting yard, others began to slowly gather their belongings and say their goodbyes, while still others began walking toward the exit gates. During the commotion, we observed some inmates and their visitors engage in excessive touching and kissing, violating the rules against prolonged physical contact. Although we did not observe anyone pass contraband, we, like the officers in the yard, could see only those inmates and visitors close to us.

Surveillance cameras in the visiting areas of other institutions have proven to be an effective enhancement to the security measures already in place. For example, during a video surveillance of visiting at one institution, officers observed an

inmate receiving a package from his visitor. As a result, officers confiscated a latex glove containing separately bundled packets of various drugs including heroin. The inmate admitted that he already swallowed another package that also contained heroin.

Taking additional preventive measures, such as using cameras in the MSF visiting yard, benefits the entire institution because some MSF inmates have access to the other facilities within CIM and thus have the opportunity to pass contraband to inmates in those facilities. For instance, some inmates live in the MSF but receive clearances allowing them to work on projects at all three of CIM's reception centers. Furthermore, according to officers from the investigative services unit, inmates have staged fights in an effort to be moved into the administrative segregation unit, located at Reception Center Central, with the intent to pass written correspondence or contraband to inmates housed there.

### Recommendation

The Office of the Inspector General recommends that the warden install surveillance cameras with video recording capabilities in the Minimum Support Facility's visiting area and allocate sufficient staff to operate the cameras and monitors.

## Finding 6

**Supervisors are conducting fewer than half of the required fire/emergency evacuation drills in their work areas, which may leave employees and inmates ill-prepared to respond to a crisis.**

We found that quarterly compliance reports for the fourth quarter of calendar year 2007 showed only 13 percent of CIM's reporting areas conducted any fire/emergency evacuation drills. Section 52090.19 of the department's Operations Manual states:

> Evacuation drills shall be held quarterly under varying conditions on all three watches by designated supervisors. Such drills shall be actual unless the drill would cause a security or unusual safety problem with removing the inmates. At the conclusion of fire drills, the area supervisor shall complete a DS 5003 [Fire/Evacuation Drill Report] indicating the necessary information, and forward a copy to the Fire Chief.

Conducting drills prepares employees and inmates to respond quickly and safely in the event of a fire or other emergent need to evacuate a building. CIM's age and state of disrepair, combined with inadequate fire sprinkler coverage throughout the institution, increases the importance of preparing employees to respond. In addition, inmate turnover at CIM introduces new inmates into living units frequently, and supervisors must conduct regular drills to ensure that newly arrived inmates are prepared in case of a fire or other emergency.

Although CIM's fire chief confirmed that compliance with the drill requirement improved during the first and second quarters of calendar year 2008, a significant number of drills are still not conducted. The following table illustrates an increasing compliance rate over three recent calendar quarters, but the most recent quarter reviewed still shows only a 43 percent compliance rate.

**Summary of Quarterly Drill Reports**

| Reporting Period | Drills Conducted | Drills Not Conducted | Drills Required | Noncompliance Percentage |
|---|---|---|---|---|
| 4th Quarter 2007 | 30 | 202 | 232 | 87% |
| 1st Quarter 2008 | 113 | 184 | 297* | 62% |
| 2nd Quarter 2008 | 169 | 128 | 297 | 43% |

*Redistribution of staff and inmates created additional reporting area requirements effective in the first quarter of calendar year 2008.
Source: CIM Fire Chief

According to a facility captain at CIM, drills are not being conducted because of a lack of supervisor awareness of the requirement and failure to document the drill and forward the information to the fire chief.

### Recommendation

The Office of the Inspector General recommends that the warden ensure that supervisors are aware of the quarterly fire/emergency evacuation drill requirement in their areas of responsibility, and that they document the drills and submit copies of documentation to CIM's fire chief as required in section 52090.19 of the department's Operations Manual.

# California Department of Corrections and Rehabilitation's Response

**OFFICE OF THE SECRETARY**

P.O. Box 942883
Sacramento, CA 94283-0001



November 17, 2008

Mr. David R. Shaw
Inspector General
Office of the Inspector General
P.O. Box 348780
Sacramento, CA 95834-8780

Dear Mr. Shaw:

We appreciate the opportunity to have met with representatives from the Office of the
Inspector General (OIG) to discuss the preliminary draft of your Quadrennial and Warden
Audit conducted at the California Institution for Men (CIM). We are pleased with your
acknowledgement of Warden Michael Poulos as an effective administrator who is
responsive to institutional issues, and we concur with this assessment. Warden Poulos
demonstrates innovation in managing the third oldest adult institution in California and
has been praised for his skills. He attributes his performance to the work commitment of
CIM staff.

While several areas of deficiency were identified in your report, we appreciate the
recognition by the OIG that funding needs for CIM, and indeed of all our prisons, are
inadequate to address the overall need to maintain our facilities. Nonetheless, the
California Department of Corrections and Rehabilitation (CDCR) is committed to
expediting special repair and maintenance projects and to diligently pursuing all avenues
to address unfunded needs.

Your report states that despite the disparity between funding for maintenance and repair
and the facility's actual needs, CIM could take independent action to mitigate its
infrastructure problems by aggressively recruiting for plant operations staff. You also
write that CIM is not taking full advantage of an established system for tracking and
planning maintenance activities. We agree that CIM encounters distinct difficulties in
recruiting and retaining experienced plant operations staff. To mitigate the risk of
underreporting the number of maintenance hours for the appropriate allocation of
maintenance funding, local procedures have been implemented and reinforced to ensure
accurate record maintenance and repair activity in the Standard Automated Preventive
Maintenance System.

In response to your concern regarding supervisors conducting fewer than half of the
required fire and emergency evacuation drills in work areas, CIM has emphasized the
importance of compliance with the quarterly fire and emergency evacuation drill
requirements. Complete and full compliance has been achieved for the 2008 third quarter
reporting period of CIM fire drills. Ongoing monitoring will be conducted to maintain
compliance.

Mr. David R. Shaw
Page 2

I would like to thank the OIG for allowing us the opportunity to provide comment on the deficiencies identified in your preliminary report. Your audit assists the Department in the refinement of processes and furthers compliance with applicable laws, rules, and regulations. All deficiencies identified will be addressed in a corrective action plan submitted to CDCR's Office of Audits and Compliance for follow-up and monitoring. If you should have any questions or concerns, please call my office at (916) 323-6001.

Sincerely,

MATTHEW L. CATE
Secretary

cc:     Michael Poulos, Warden, California Institution for Men

# Exhibit 11



California Correctional
Peace Officers
Association

**CCPOA**

R E P R E S E N T I N G
*CDCR PEACE OFFICERS*
*"THE TOUGHEST*
*BEAT IN THE STATE"*

755 Riverpoint Dr., Ste. 200 • West Sacramento, CA 95605-1634 • (916) 372-6060

December 16, 2011

Brigid Hanson, Assistant Secretary (A)
Office of Labor Relations
Department of Corrections & Rehabilitation
1515 S Street, North Building, Room 109
Sacramento, CA 95811

Re:    Implementation of Pilot Program for Alternative Treatment Option Models
       CCPOA NG #26085
       CDCR Log Number: 11-187

Dear Ms. Hanson:

We are in receipt of your notice letter dated December 5, 2011, and received in this office on
December 7, 2011. This notice is regarding the California Department of Corrections and
Rehabilitation (CDCR), Division of Adult Institutions' (DAI) intent to implement a pilot program
for alternative treatment option models, beginning with Corcoran's new ASU-EOP Hub
treatment facility, effective January 1, 2012, through January 1, 2014.

This letter is to request a Meet and Confer over the impact of the above-mentioned change to
the terms and conditions of employment of those Bargaining Unit 6 employees concerned.

Please advise Mike Lopez at (916) 372-6060, as to your earliest available meeting date.

Sincerely,

Steve J. Weiss
Chief of Labor
California Correctional
Peace Officers Association

SJW:cj
NG #26085/m&c.ltr

Enclosure
cc:    Jo Anne Billhimer
       Don Benegas
       Dave Sanders
       Executive Council

**OFFICE OF LABOR RELATIONS**

P.O. Box 942883
Sacramento, CA 95811-7243



December 5, 2011

· VIA FAX & CERTIFIED MAIL # 7008 0150 0001 2283 4366

Mr. Steve Weiss, Chief of Labor
California Correctional Peace Officers Association
.755 Riverpoint Drive, Suite 200
West Sacramento, CA 96505-1634

RE:    IMPLEMENTATION OF PILOT PROGRAM FOR ALTERNATIVE TREATMENT OPTION
       MODELS (CDCR Log #11—187-0)

Dear Mr. Weiss:

Effective on or about January 1, 2012, the California Department of Corrections and
Rehabilitation (CDCR), Division of Adult Institutions (DAI), intends to implement a pilot program
for alternative treatment option models.

The identified site will begin with Corcoran's new ASU-EOP Hub treatment facility. This pilot
program will remain in effect for a 24-month · period, from January 1, 2012 through
January 1, 2014, at which time it will lapse by operation of law or will be promulgated through
the Administrative Procedure Act.

The purpose of the pilot program is to establish benchmarks to measure the viability of a CDCR
modified variant of the New York Restart Chair, a chair used in group therapy and ·in which the
Inmate/Patients (I/Ps) are secured with restraints, as an Alternative Treatment Option Model
(ATOM) to the presently used Therapeutic Treatment Module (TTM), in terms of both security
and clinical functionality, during the therapeutic session. These benchmarks will be developed
into an assessment tool through collaboration between the Division of Correctional Health Care
Services (DCHCS), and the Division of Adult Institutions (DAI).

The criteria for participation in this pilot program are that candidates will be currently housed in a
participating Administrative Segregation Unit-Enhanced Outpatient Program (ASU-EOP) or
Psychiatric Services Unit (PSU) program in a selected institution(s). Under no circumstances
will I/Ps be evaluated, assessed, or chosen for transfer to a selected institution so they can take
part in this pilot program. The Interdisciplinary Treatment Team (IDTT), which includes custody
staff, will make decisions about whether an I/P should be excluded from the ATOM group. The
ATOM will be piloted using several different types of group activities, e.g., writing, reading, or
tactile exercises.

The purpose is to provide I/Ps with a more therapeutic environment during group and individual
counseling sessions that provides more direct, open contact with the clinician as well as the
other group participants, while maintaining a safe environment for all. Staff assigned to place
I/P's into and out of the ATOM chair shall be trained in the use of the ATOM chair prior to being
required to operate the chair.

This pilot project will remain in effect through January 1, 2014. Data will be collected along the way, including incidents and safety issues associated with both types of treatment models; program participation; and I/P, clinician, and custody satisfaction with the two types of treatment models.

If you believe this implementation creates impact to BU 6 members within scope of bargaining that is not covered by the BU 6 Memorandum of Understanding (MOU), please have your assigned staff person contact Dolores Slaton, Labor Relations Manager, at (916) 327-3405, within ten (10) business days from the date of this notice to identify available dates to meet. It would be extremely helpful, likely to both parties, if the California Correctional Peace Officer Association (CCPOA) would outline the areas of concern it would like to discuss. We appreciate your assistance in this regard.

In providing this notice, CDCR does not represent that this implementation is within the scope of bargaining or has any impact to the members of BU 6.

Respectfully yours,

BRIGID HANSON
Chief, Office of Labor Relations
California Department of Corrections and Rehabilitation

Enclosures:

cc:    Terri McDonald, Director (A), Division of Adult Services
       Dolores Slaton, Labor Relations Manager, CDCR Office of Labor Relations
       Stephen Booth, Labor Relations Officer, DPA
       Raul Lopez, Warden (A), COR
       Steven Bylund, Chief of Mental Health, COR
       Richard Warren, Labor Relations Advocate, COR

# Exhibit 12

## Group Therapy Schedule
## CCI Tehachapi
## 2/22/13

| Institution | Day/Time | Reason Name | Provider Name | Program |
|---|---|---|---|---|
| CCI | Thursday 11:30 AM Weekly | A-PSYCHO ED INSOMNIA - ASU | BROADDUS, D. ., PHD | ASU |
| CCI | Friday 9:00 AM Every other Week | Anger/Stress Management | DEAN, M. ., RT | 4A DINING HALL 2 |
| CCI | Friday 9:00 AM Every other Week | Anger/Stress Management | DEAN, M. ., RT | ASU |
| CCI | Tuesday 9:00 AM Every other Week | Anger/Stress Management | DEAN, M. ., RT | SHU |
| CCI | Tuesday 11:30 AM Every other Week | Anger/Stress Management | DEAN, M. ., RT | SHU |
| CCI | Friday 10:30 AM Every other Week | Grieving Group | DEAN, M. ., RT | SHU |
| CCI | Friday 11:30:00 AM Every other Week | Anger/Stress Management | DEAN, M. ., RT | SHU |
| CCI | Thursday 10:30 AM Weekly | A-HOUSES OF HEALING - SHU | HOLTROP, M. ., PSYD | SHU |
| CCI | Friday 12:30 PM Weekly | FAC C-JOURNELING GROUP | SEYMOUR, J. ., PSYD | FAC C  CHAPEL |

CCI 2

# Exhibit 13

## WEEKLY POPULATION SUMMARY

## CCI

| LOCATION | 2/21/13 | CCCMS | EOP | CRISIS EVALUATION CE | |
|---|---|---|---|---|---|
| LEVEL I SNY Facility E | All Housing Units | 207 | 1 | | |
| LEVEL II SNY Facility D | All Housing Units | 261 | 0 | | |
| GP SNY LEVEL III Facility C | All Housing Units | 269 | 2 | | |
| Facility B | | | | | |
| SHU | All Housing Units | 93 | 3 | | |
| INFIRMARY | All Housing Units | 6 | 1 | 1 | |
| Facility A | | | | | |
| ASU | Housing Units 6,7,8 | 101 | 5 | | |
| SHU | Housing Units 1,2,3,4,5 | 98 | 0 | | |
| | Grand Total= | 1035 | 12 | 1 | 1048 |

CCI 3

# Exhibit 14

# Position Statement on Segregation of Prisoners with Mental Illness

Approved by the Board of Trustees, December 2012
Approved by the Assembly, November 2012

"Policy documents are approved by the APA Assembly and Board of Trustees...These are...position statements that define APA official policy on specific subjects..." – *APA Operations Manual.*

Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/ psychiatric treatment) in appropriate programming space and adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.

© Copyright, American Psychiatric Association, all rights reserved.

The number of persons incarcerated in prisons and jails in the United States has risen dramatically during the past three decades, accompanied by a significant increase in prisoners with serious mental illness. Studies have consistently indicated that 8 to 19 % of prison inmates have psychiatric disorders that result in significant functional disabilities and another 15 to 20 % require some form of psychiatric intervention during their incarceration (1, 2).

Physicians who work in U.S. correctional facilities face challenging working conditions, dual loyalties to patients and employers, and a tension between reasonable medical practices and the prison rules and culture. In recent years, physicians have increasingly confronted a new challenge: the prolonged solitary confinement, or segregation, of prisoners with serious mental illness. This prevalent corrections practice and the difficulties in providing access to care in these settings have received scant professional or academic attention (3).

Segregated inmates are isolated from the general correctional population and receive services and activities apart from other inmates. For the purposes of this position statement, segregation refers to conditions of confinement characterized by an incarcerated person generally being locked in their cell for 23 hours or more per day (4). Inmates may be segregated for institutional safety reasons (administrative segregation), disciplinary reasons (disciplinary segregation), or personal safety (protective custody) (5). Correctional systems vary regarding the specific conditions of confinement in segregation units (e.g., one to two inmates in a cell, inmate access to a radio or television, other property restrictions, visitation privileges, etc.). The definition of "prolonged segregation" will, in part, depend on the conditions of confinement. In general, prolonged segregation means duration of greater than 3-4 weeks.

Several studies have shown that inmates with serious mental illness have more difficulty adapting to prison life than do inmates without a serious mental illness. Morgan, Edwards, and Faulkner (6) reported that seriously mentally ill prisoners were less able to successfully negotiate the complexity of the prison environment, resulting in an increased number of rule infractions leading to more time in segregation and in prison. Lovell and Jemelka (7, 8) found that inmates with serious mental illnesses committed infractions at three times the rate of non-seriously mentally ill counterparts.

Placement of inmates with a serious mental illness in these settings can be contraindicated because of the potential for the psychiatric conditions to clinically deteriorate or not improve (6, 10). Inmates with a serious mental illness who are a high suicide risk or demonstrating active psychotic symptoms should not be placed in segregation housing as previously defined and instead should be transferred to an acute psychiatric setting for stabilization.

## References

1. Metzner JL: Guidelines for psychiatric services in prisons. Crim Behav Ment Health 3:252–67, 1993
2. Morrissey JP, Swanson JW, Goldstrom I, Rudolph L, Manderscheid RW: Overview of Mental Health Services by State Adult Correctional Facilities: United States, 1988. Washington, DC: U.S. Department of Health and Human Services, publication (SMA)93-1993, 1993, pp 1–13)
3. Metzner JL, Fellner J: Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics. J Am Acad Psychiatry Law 38:104–8, 2010
4. American Psychiatric Association. Psychiatric Services in Jails and Prisons, 2nd Edition. Washington, DC: American Psychiatric Association, 2000
5. National Commission on Correctional Health: Standards for Mental Health Services in Correctional Facilities. Pages 60 – 61, 2008
6. Work Group on Schizophrenia: American Psychiatric Association practice guidelines: practice guideline for the treatment of patients with schizophrenia. Am J Psychiatry 154(suppl):1–63, 1997
7. Morgan DW, Edwards AC, Faulkner LR: The adaptation to prison by individuals with schizophrenia. Bulletin of the American Academy of Psychiatry and the Law, 21, 427-433, 1993
8. Lovell D, Jemelka R: When inmates misbehave: The costs of discipline. The Prison Journal, 76, 165-179, 1996
9. Lovell D, Jemelka R: Coping with mental illness in prison. Family & Community Health, 21, 54-66, 1998
10. Metzner JL, Dvoskin JA: An Overview of Correctional Psychiatry. Psychiatric Clinics N Am , 29: 761-772, 2006

© Copyright, American Psychiatric Association, all rights reserved.

# Exhibit 15

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Security Housing Unit | Mental Health Services Delivery System |

# CHAPTER 8
# Security Housing Unit

## A. INTRODUCTION

It is the policy of the Department of Corrections and Rehabilitation (CDCR) to provide inmates in a prison setting with prompt access to mental health services, regardless of their housing designation. Provision of mental health services within a Security Housing Unit (SHU) is part of the Mental Health Services Delivery System (MHSDS). Mental health services within a SHU are provided to all SHU inmate-patients in accordance with the inmate-patient's treatment needs and level of care. Services are designed to achieve symptom management through regular case management activities, medication administration and monitoring, crisis intervention, continuous monitoring for signs or symptoms of a serious mental disorder, and referral to a more intensive as needed.

The CDCR currently has four SHUs located at the institutions listed below. Inmates in the MHSDS receive services as indicated.

- Valley State Prison for Women (females only) – Inmates in this unit receive mental health services in conjunction with inmates in the Administrative Segregation Unit (ASU).

- California Correctional Institution – Inmates are provided Correctional Clinical Case Management Services (CCCMS). Inmates requiring the Enhanced Outpatient Program (EOP) are referred to a Psychiatric Services Unit (PSU) and transferred to an ASU EOP hub while awaiting PSU placement.

- California State Prison, Corcoran – Inmates are provided CCCMS in the SHU. Inmates requiring EOP services are referred to a PSU and transferred to the ASU EOP hub while awaiting PSU placement.

- California State Prison, Sacramento – Inmates are provided CCCMS in the SHU. Inmates requiring EOP services are referred to a PSU.

- Pelican Bay State Prison (PBSP) – Per exclusionary criteria from the federal court, inmates with one of the conditions listed below shall not be admitted to the PBSP SHU.

| Security Housing Unit | Mental Health Services Delivery System |

1. Documented diagnosis or evidence of any of the following Diagnostic and Statistical Manual IV – Axis 1 conditions currently in existence or within the preceding three months:

   **Schizophrenia (all sub-types);**
   **Delusional Disorder;**
   **Schizophreniform Disorder;**
   **Schizoaffective Disorder;**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal);**
   **Psychotic Disorder Not Otherwise Specified;**
   **Major Depressive Disorders;**
   **Bipolar Disorder I and II**

2. A diagnosed mental disorder that includes being actively suicidal.

3. A diagnosis of a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality that leads to significant functional impairment.

4. A diagnosis of "organic brain syndrome" that results in a significant functional impairment if not treated.

5. A diagnosis of a severe personality disorder that is manifested by frequent episodes of psychosis or depression and results in significant functional impairment.

6. A diagnosis of mental retardation.

7. A prior history, which suggests that the inmate will do poorly in the SHU. This includes inmates who have experienced psychotic symptoms that appear to be attributable to incarcerations in a SHU environment. These inmates are those for whom evidence exists of a deterioration in mental health which correlates with placement in SHU or SHU-like environments. Such diagnoses as "Brief Psychotic Episode," "Psychosis NOS," and "Major Depression" which have been assigned during periods of placement in SHU may, for example, be indicative of deterioration of mental health which accompanies SHU placement. Inmates whose history suggests such a causal relationship should be excluded from SHU.

8. A history which includes any of the following within the preceding three months:

   a. Medication prescribed to address any of the "at risk" mental health categories listed above.

| Security Housing Unit | Mental Health Services Delivery System |

b. Therapy and/or supportive services to address any of the "at risk" mental health categories listed above.

c. Frequent (e.g. at least weekly) monitoring for deterioration in mental health condition. This does not include situations in which repeated visits by mental health staff are attributable to repeated referral from the inmate or from custody staff but where no mental health condition is noted.

d. A history which includes a recurrent or "cyclic" mental health condition (e.g. Bipolar Disorder) where the inmate has not currently been symptom free for a period of time that is at least **twice as long** as the longest known period of active symptoms or known to demonstrate recurrent symptoms at intervals of approximately 6 months, would be considered as "positive" on this indicator until they had been symptom free for a continuous period of at least 12 months.

Where the results of the Unit Health Record (UHR) review reveal that any of the above conditions exist, the inmate must be removed from SHU within 96 hours of his arrival on that unit.

Where the results of the UHR review **do not** reveal the existence of any of the above conditions **and** there is evidence that the inmate has been evaluated with the existing 31 item mental health screen or other evaluation (documented on a CDCR 7386, *Mental Health Evaluation*) within the preceding 12 month period, the inmate may be housed in SHU.

Where the results of the UHR are equivocal (as where no clear diagnosis is established but where mental health contact and observations have suggested that symptoms consistent with one or more of the above conditions have been observed) or when no mental health evaluation (a 31 item mental health screen or completion of an evaluation documented on a CDCR 7386, *Mental Health Evaluation*) has occurred the preceding 12 month period, a mental health evaluation shall be conducted.

## B. PURPOSE

This chapter outlines program policies and provides institutional operational procedures to assure the effective delivery of mental health services to inmate-patients with serious mental disorders who, for custodial reasons, require housing in a SHU, according to California Code of Regulations, Title 15.

# Exhibit 16

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

b. The IDTT shall assess the inmate-patient's need for further medical, psychiatric, psychological, social work, and rehabilitative services; nursing services; education services; and transportation when developing the discharge plan. The plan ensures that needed services are available at the appropriate level of care.

c. The plan shall include participation by the inmate-patient to facilitate inmate-patient responsibility for his or her care and treatment.

d. The plan reflects appropriate coordination with and utilization of MHCB custody staff.

e. The plan includes documentation of contact with the Chief of Mental Health at the institution where the inmate-patient is being transferred.

f. Once the discharge plan is completed, referrals for appropriate aftercare placement shall be documented by an MHCB clinical staff member in the inmate-patient's treatment plan.

g. The assigned CCM or PC at the institution where the inmate-patient is being transferred is responsible for implementing the discharge plan.

h. Treatment shall continue for all inmate-patients clinically discharged until transferred.

**Discharge Criteria**

Criteria for discharge from the MHCB to an EOP or CCCMS program include:

- stabilization of the crisis behavior; and

- the ability to function in a less clinically structured environment.

Discharge criteria do not necessarily include complete resolution of symptoms but a resolution sufficient to allow continuation of treatment at a less intensive level of care.

Discharge to DMH inpatient care requires the clinical need for inpatient services of a duration greater than ten days.

**Procedure**

a. Upon completion of MHCB inpatient treatment, cases transferred to the MHCB as "Psychiatric and Return" shall be returned to the sending institution, unless the sending institution does not provide the level of care that the inmate-patient currently requires or the inmate-patient has any other case factor(s) that preclude return to the sending

| Mental Health Crisis Bed | Mental Health Services Delivery System |

institution. In those cases, the MHCB will transfer the inmate-patient to an institution that provides the appropriate level of care and security.

b. The MHCB discharge summary shall be completed by the attending psychiatrist or psychologist prior to release from the MHCB. This should include specific recommendations regarding follow-up visits with the CCM or PC and custody staff. The discharge summary, either handwritten or dictated, includes, but is not limited to, the MHCB course of treatment, current medications, response to treatment, condition at time of discharge, and detailed information regarding follow-up care needs. The inmate-patient's participation, which supports inmate-patient responsibility, shall also be included.

c. An inmate-patient shall be discharged only on the written order of the MHCB psychiatrist or psychologist.

d. Each institution with an MHCB shall appoint a Discharge Coordinator who is responsible for notifying the Chief of Mental Health or designee at the institution where the inmate-patient is being transferred of the pending discharge. The notification shall occur prior to discharge and shall include the inmate-patient's discharge summary, custody level, treatment needs, and any significant medical conditions. The Discharge Coordinator shall document the notification in the inmate-patient's discharge plan.

e. The Chief of Mental Health or designee at the institution where the inmate-patient is being transferred shall notify the assigned CCM or PC. If the inmate-patient does not have an assigned CCM or PC, one shall be assigned. If the inmate-patient was admitted to the MHCB for Suicide Precaution or Watch, the Chief of Mental Health shall also notify the mental health clerical staff responsible for the tracking system, clinical staff responsible for weekend or holiday coverage, and the Facility Captain of the housing unit to which the inmate-patient is being transferred so that the required clinical and custody evaluation can be scheduled.

f. No inmate-patient shall be discharged from the MHCB without an IDTT review, or in the event a new IDTT cannot be convened, a consultation with an IDTT member, such as a nurse.

g. At the time of discharge, the original inpatient record is retained at the MHCB institution. The inmate-patient's UHR shall be transferred to the receiving institution at the time of discharge. Certain documents from the Inpatient Record are copied and filed in the Inpatient section of the UHR. This includes copies of the Admission Record, History and Physical, Operative Reports, Physician Orders, Discharge Summary, Consultations, Progress Notes, and Diagnostic Reports.

# Exhibit 17

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

3. If requested by DMH, an inmate-patient who has withdrawn informed consent for mental health treatment or psychiatric medication, but for whom continued treatment is otherwise recommended, may be returned to CDCR after all other clinical and legal avenues to obtain authorization to treat have been exhausted, if the following two criteria have been met:

- Withdrawal of informed consent shall be demonstrated by seven calendar days of continuous refusal to take oral medication or 30 calendar days of continuous refusal to accept scheduled depo-injectable medication, and documentation of discussions between treating DMH psychiatrists and other team members and the patient regarding the risks and benefits of continuing medication.

- Documentation that the patient has not met criteria for involuntary treatment for at least the last seven calendar days.

### *Discharge Procedure*

1. Inmate-patients will be returned to the institution from which they came per the "psych and return" policy provided that institution can meet the level of care and security needs of the inmate-patient. Generally most inmate-patients will be returned to an institution that has an EOP. The EOP IDTT may decide to discharge the inmate-patient to a lower level of care after the initial 14-28 day evaluation period.

2. Inmates who are paroling and require ongoing treatment will be referred to the Parole and Community Services Division (P&CSD) Transition Case Management Program and to a Parole Outpatient Clinic or to a State hospital per Penal Code 2974.

3. DMH shall fax a copy of the Discharge Summary to the designated "DMH contact", of the receiving institution at the time of notification of discharge. DMH shall also call the receiving institution. The inmate-patient shall then be returned to the CDCR institution within five working days after the time of notification, or resolution of any appeal, whichever occurs later.

4. Appeals for denial of return to CDCR will be reviewed by the Coordinated Clinical Assessment Team (CCAT), Part V of this document.

5. Emergency returns to CDCR, shall be accomplished within twenty-four hours. Such returns will be with prior notification and approval by telephone of the CDCR institution's C&PR staff and Mental Health Program Director, or designee. DMH shall call the receiving institution to provide continuity of care including medication.

# Exhibit 18

# Mule Creek State Prison

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# MANAGEMENT REPORT
# Round XXV
# On-Site

# August 29-31, 2012

William Knipp
Warden

Lawrence Fong, MPH
Chief Executive Officer

James Telander, Psy.D.
Chief, Mental Health Services

DRPD 1 00356

## GLOSSARY OF TERMS

| Acronym | Term |
|---------|------|
| AIMS | Abnormal Involuntary Movement Scale |
| APP | Acute Psychiatric Program |
| ASU | Administrative Segregation Unit |
| CAP | Corrective Action Plan |
| CC | Correctional Counselor |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CHSA | Correctional Health Services Administrator |
| DMH | Department of Mental Health |
| DOT | Direct Observation Therapy |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| HC-POP | Health Care Population Oversight Program |
| HS | Hour of Sleep |
| I/P | Inmate-patient |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Inter Disciplinary Treatment Team |
| LGB | Local Governing Body |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| LOS | Length of Stay |
| LPT | Licensed Psychiatric Technician |
| MAR | Medication Administration Record |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MHQM | Mental Health Quality Management Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| MHTS | Mental Health Tracking System |

DRPD 1 00359

| OHU | Outpatient Housing Unit |
| PC | Primary Clinician |
| PSU | Psychiatric Services Unit |
| QIT | Quality Improvement Team |
| QM | Quality Management |
| QMC | Quality Management Committee |
| R&R | Receiving and Release |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| SPC | Suicide Prevention Coordinator |
| SPR-FIT | Suicide Prevention and Response-Focused Improvement Team |
| SRE | Suicide Risk Evaluation |
| UHR | Unit Health Record |
|  |  |

*Coleman* Site Visit, Round XXV
## MENTAL HEALTH MANAGEMENT REPORT
August 29-31, 2012
Mule Creek State Prison

### INSTITUTIONAL PROGRAM SUMMARY

**a. Overview of all the mental health programs at institution.**

The MHSDS at MCSP consists of seven (7) treatment programs:
1) Mainline (ML) Enhanced Outpatient Program (EOP)
2) ASU EOP program
3) ASU EOP HUB
4) ASU CCCMS
5) ML CCCMS
6) MHCB

ML EOP program is an intensive outpatient program designed to treat inmate-patients (I/Ps) via an interdisciplinary approach that includes psychologists, social workers, recreational therapists (RTs), psychiatrists, and licensed psychiatric technicians (LPTs) and offers a minimum of 10 hours a week of structured therapeutic activities. B Facility houses EOP I/Ps in 6 and 7 blocks, with a capacity for 360 I/Ps, mostly level II and III. A Facility houses EOP I/Ps in 5 block, with a capacity of 150 I/Ps, mostly level IV. EOP programming is also provided in ASU, in 12 block, C-facility.

The ASU EOP HUB program is designed to treat severely mentally ill I/Ps who are placed in the ASU. This program provides at least 10 hours of structured therapeutic activities per week.

The ASU CCCMS program is housed in C-Facility, block 12 and 13. The CCCMS population has averaged 80 I/Ps. Individual treatment is offered in *Coleman* treatment cells located on the dayroom floor.

The ML CCCMS program is housed in A, B, and C Facilities with over 1300 CCCMS I/Ps.

The CTC at MCSP consists of 10 beds, 8 of which are dedicated to MHCB. When MHCB is full, inmate/patients are housed in the MHOHU and transferred to MHCB as soon as beds become available. Referrals present to the Triage and Treatment Area (TTA) for evaluation for admission. Between 0600 and 1600 Monday to Friday, the I/P is seen by a staff psychiatrist or psychologist assigned to the TTA for emergency evaluations. After hours and on weekends, the registered nurse on duty evaluates the I/P and consults with the on-call psychiatrist via telephone for placement orders. The psychiatrist on-call completes an evaluation, including a thorough suicide risk evaluation, within 24 hours of admission.

DRPD 1 00361

Each inmate/patient attends MHCB IDTT within the first 72 hours of admission, weekly thereafter and on the day of release. Treatment plans are developed at IDTT consistent with the I/P's clinical needs.

**b. New Construction/Remodeling.**

Funds from AB 900 have been appropriated to construct a new ASU EOP treatment and office space building; planning is ongoing but a start date for construction has not been established.

MCSP will be installing suicide-resistant beds in its MHCB in July of 2012.

**c. New or Anticipated Mission Changes.**

There have been no significant mission changes at MCSP. Progress continues to be made in the deployment of various information technology applications, including the Mental Health Tracking System (MHTS.net), electronic unit health record (e-UHR), and Strategic Offender Management System (SOMS). MCSP has been working diligently to reconcile past methods for quality management and completion of audits with new methods via data analysis available through MHTS.net.

**d. Major Population Moves.**

As a result of AB 109 the population at MCSP has decreased about 500 inmates with less than half being in the MHSDS. At the present time, no reduction in mental health services is anticipated.

**e. New or Overflow Administrative Segregation or any other Specialized Housing Units.**

None anticipated

**f. Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements.**

Access to office and treatment space at MCSP has improved, with the exception of the treatment area for ASU EOP and ASU CCCMS.

The Chief Psychiatrist position is advertised but continues to be vacant. In addition a staff psychologist is acting as the senior psychologist supervisor for the ASU Mental Health Program.

MENTAL HEALTH ROSTER
**Institutional Mental Health Staffing and Telemedicine**

November 1-April 30, 2012
Mule Creek State Prison

Page 2 of 15

DRPD 1 00362

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 1 | 0 | 1 | 100% | 0 | 1.0 | 100% |
| Chief Psychologist | 1 | 1 | 0 | 0% | 0 | 0 | 0 |
| Senior Psychologist | 5 | 4.0 | 1 | 20% | 0 | 1.0 | 20% |
| Staff Psychiatrist | 11.5 | 7.25 | 4.0 | 35% | 3.65 | .35 | 3% |
| Staff Psychologist | 35 | 26.0 | 9.0 | 26% | 5.25 | 3.75 | 11% |
| Supervising Social Worker | 1 | 0 | 1.0 | 100% | 0 | 1.0 | 100% |
| Social Worker | 9.5 | 8.0 | 1.50 | 16% | 1.50 | 0 | 0% |
| Sup. Registered Nurse | 1.0 | 0 | 1.0 | 100% | 0 | 1.0 | 100% |
| Registered Nurse | 11.62 | 11.62 | 0 | 0% | 0 | 0 | 0% |
| Senior Psych Tech | 2.0 | 2.0 | 0 | 0% | 0 | 0 | 0% |
| Psych Tech | 26 | 22.50 | 3.5 | 13% | 4.0 | (.50) | 0% |
| Recreation Therapist | 8.15 | 8.0 | .15 | 2% | 0 | .15 | 2% |
| Clerical | 10 | 8.0 | 2.0 | 20% | 0 | 2 | 20% |
| Health Prog. Specialist I | 1.0 | 1.0 | 0 | 0% | 0 | 0 | 0% |
| Office Services Sup. II | 1.0 | 1.0 | 0 | 0% | 0 | 0 | 0% |
| Unit Supervisor | 1.0 | 1.0 | 0 | 0% | 0 | 0 | 0% |

Telemedicine

| Psychiatry telemedicine used? | Number of Hours Per Week |
|---|---|
| NO | N/A |

QUALITY MANAGEMENT

**Local Governing Body (LGB)**

DRPD 1 00363

The LGB is responsible for oversight of health care services and is the ultimate authority for all health care matters. The LGB was scheduled to meet five times during the monitoring period. Five of the five scheduled meetings achieved a quorum.

Attendance regularly includes the Chief Executive Officer for Health Care, Warden, Correctional Health Services Administrator, II (CHSAII), and the Standards and Compliance Coordinator. Agendas and minutes for these meetings are maintained in the Health Care Administrative Office in a Proof of Practice binder. Please see the minutes in the proof of practice binders for a description of the key activities and events addressed in the LGB during the reporting period. See Tab B for copies.

## Quality Management Committee (QMC)

The purpose of the QMC is to monitor, assess, and improve the quality of health care. During the reporting period the QMC met with a quorum six times. Agendas and minutes are available in the Proof of Practice binders in the Health Care Administrative Office. The QMC is chaired by the Chief Executive Officer and regularly attended by the Warden (or designee), Associate Warden for Health Care, the Correctional Health Services Administrator II, the Chief Physician Executive, Chief of Mental Health, Director of Nursing, and Chief Pharmacist. The QMC regularly collects reports from each service delivery area (e.g., pharmacy, nursing, and MHSDS). Presentations by each of the departments/subcommittees are data focused, and general communication/coordination issues are discussed. See Tab B for copies.

## Mental Health Quality Management Subcommittee (MHQM)

The purpose of the MHQM is to oversee mental health services, review program performance, and monitor, create and implement improvement efforts. The Chief of Mental Health or designee serves as Chair. MHQM is scheduled to meet 12 times. During the reporting period the MHQM met 12 times. A quorum was attained in 100% of the meetings during the reporting period.

## Peer Review

Since the last *Coleman* court monitor visit, MCSP has continued with a formal Peer Review coordinated by the Medical Chief of Staff, a psychiatrist, and a staff psychologist, to ensure quality in clinical care and documentation. Parameters monitored include dating and timing of notes, completeness of mental status examinations, treatment appropriate for diagnosis and legibility of records. Peer Review audits of both inpatient and outpatient mental health services at MCSP occurred quarterly, during this period:

Below is a description of the MCSP Peer Review Program:

*Peer Review Committees:*

Page 4 of 15

**Outpatient peer review** (covering clinicians working in CCCMS, EOP, and ASU) consists of peer reviews for psychologist, psychiatrists, and social workers.

**Inpatient peer review** (covering admissions to the CTC) consists of peer reviews for psychologists, psychiatrists, and medical doctors.

*Composition of Each Peer Review Committee:*

**Outpatient peer review** The composition of each peer review committee consists of all regular staff members working at MCSP in their clinical specialties. A small group of staff members are selected each quarter to assist the administrator in reviewing the chart notes of their peers. The group of reviewers changes every quarter.

**Inpatient peer review** The composition of each peer review committee consists of all regular staff members who are authorized to work in the CTC. A staff member from each specialty is selected each quarter to assist the administrator in reviewing the chart notes of their peers.

*Criteria for Review:*

**Outpatient peer review** Chart notes are quasi-randomly selected for review each quarter. The criteria for review include progress note time and date; legibility of note, signature, and title; whether the note includes a review of dangerous to self or others; an assessment of whether the Axis I diagnosis is consistent with documented symptoms. Finally, an additional two items are included for psychiatry – (1) whether medications are appropriate for the diagnosis, signs, or symptoms, and (2) there is documented justification for medication change.

**Inpatient peer review** Chart notes are quasi-randomly selected for review each quarter. The criteria for review for psychology and psychiatry include progress note time and date; legibility of note, signature, and title; whether the note includes a review of dangerous to self or others; an assessment of whether the Axis I diagnosis is consistent with documented symptoms. Finally, an additional two items are included for psychiatry – (1) whether medications are appropriate for the diagnosis, signs, or symptoms, and (2) there is documented justification for medication change. For medicine, the review consists of a number of items reviewed such as the history and physical exam.

Refer to Binder Tab B "Peer Review Forms" for copies of forms that are used for Outpatient and Inpatient Peer Reviews.

*How Feedback is presented to individual Clinicians:*

Individual clinicians review feedback if the reviewer noted any significant areas of concern. The (anonymous) review would be given to the individual clinician, with explanation, by the Program Administrator.

*The number of Peer Review Meetings for each discipline:*

**Outpatient peer review** There is no peer review meetings per se. The Program Administrator selects appropriate files and recruits peers from each discipline to assist in this process.

**Inpatient peer review** There was two (2) peer review meetings within the last six (6) months: January 12, 2012 (reviewing months October-December 2011) and April 26, 2012 (reviewing months January-March 2012).

*The Number of Clinicians Reviewed:*

DRPD 1 00365

**Forty Outpatient peer review and 6 Inpatient peer review** were conducted during the monitoring period, with the number of deficiencies appearing to be stable or declining and with reviewed charts deemed acceptable for clinical care.

## QIT Activities

There were a total of three Mental Health QITs active at some point during this reporting period. No new QITs were chartered during the review period. One QIT was resolved with final recommendations sent to the QMC during the review period. One QIT was resolved since the last management report.

QITs initiated:
None

QITs ongoing:

Mental Health Referral Event Entries and Outcome Resolutions
  • This QIT is to improve the timely resolution of Mental Health referrals
MHTS.net and e-UHR Agreement
  • This QIT is to improve agreement between entries in MHTS.net and the entries scanned into the e-UHR.

QITs resolved during monitoring period:

Mental Health Productivity Standards

MEDICATION MANAGEMENT, PSYCHOTROPIC MEDICATIONS (BINDER TAB C)

Unless otherwise noted, data reported in this section are derived from eUHR audits of 240 randomly selected inmate-patients.

The total number of inmates in the MHSDS receiving psychotropic medications at the end of the reporting period was 1243.

### Medication Continuity for New Arrivals (Inter-Institutional CDCR Transfers)

Based on a random sample of 260 charts audited, 69% of IPs receives their first dose of new or changed medications by the next calendar day. Audits have shown improvement from 45% increased to 85% since medications are no longer being filled through Central Fill, but are filled in house.

### Medication Continuity for Transfers (Intra-Institutional Transfers)

Based on a random sample of 232 charts, during the reporting period, 98% of I/Ps transferring within the institutions received their prescribed psychotropic medications without interruption.

DRPD 1 00366

This audit included those I/Ps discharged from the MHCB who received their psychotropic medications without interruption.

## Medication Continuity for Renewal of Orders/Bridge Orders

Based on a random sample of 240 charts, 99% of inmate-patients received timely renewals of their psychiatric medications. 1% of inmate-patients had a lapse in medication, based on no written medication orders.

## Lab Tests/Results for MHSDS Inmates

During the reporting period, 31 UHRs of inmates receiving the psychotropic medications of Cloazine, Depakote, and Lithium were reviewed. Of _the applicable cases, 86_% had laboratory tests ordered when clinically indicated. Psychiatrists reviewed results and documented clinical action in 100% of the cases with significant laboratory results. An Abnormal Involuntary Movement Scale (AIMS) must be completed every 6 months for each inmate prescribed psychotropic medications. During the reporting period, an AIMS was completed within the last 6 months in _100% of the 7 applicable cases

## Direct Observation Therapy (DOT) Medication Administration

At the end of the reporting period, 943 inmate-patients were prescribed psychotropic DOT medication. During pill lines, DOT medication administration procedures were followed 99% of the time.

## HS Medications (After 2000 Hours)

There are 596 MHSDS inmate-patients receiving HS medications as of the end of the reporting period. HS medications are delivered after 2000 hours. During the reporting period HS medications were administered after 2000 hours 100% of the time.

## Medication Non-Compliance Policies and Procedures

Based on the random sample of 231 charts during the reporting period, if an inmate-patient missed doses on 3 consecutive days, or greater than 50% in 7 days, there was a referral to the psychiatrist 87% of the time and 44% of non-compliance cases had documented follow-up appointments with a psychiatrist within 7 days of referral. This non-compliance, in part, is due to staffing shortages, but training is also being done to address repeated referrals, and how to reconcile appointments with medication refusals.

## The Medication Administration Record (MAR)

The audited UHRs contained the previous month's MARS 99% of the time, and 82% of UHRs contained MARs that were complete and legible.

## Timely Processing of Medication Orders

DRPD 1 00367

To verify timely processing, a random sample of 260 orders for DOT medications (MHSDS patients only) was selected. Guardian records the date orders were written and the manifest date (the date the pharmacy sent the medications to the pill window). 69% of changes and newly prescribed medications were received within 24 hours of the date the order was written. These medications are now being filled in house, which has improved service time.

**Informed Consent Forms**

Based on a random sample of 239 UHR's 82% of I/P's on psychiatric medications had an up-to-date consent forms. Consent forms expire annually.

**Pill Lines**

MCSP distributes all medications via Pill windows except in ASU which is done cell front. During the reporting period, the average pill line wait was 3 minutes 35 seconds. A supervisor personally observed a randomly chosen pill line and timed how long it takes inmate to reach front of line from back of line. Each point of service is observed once each month on 2nd watch and 3rd watch – a total of 600 observations were conducted during the reporting period.

**Hoarding/Cheeking Medications**

During the reporting period, there were 27 CDCR-115 Rules Violation Reports (RVRs) written explicitly for hoarding or cheeking medication. Refer to Tab J7.

**Parole medications process**

Currently, the Classification and Parole Representative notifies pharmacy of all paroling inmates at least 1 day in advance of release dates. During the reporting period, all I/Ps paroled with active prescriptions for psychotropic medications. 100% of existing orders were renewed for 30-days. Paroling inmates are required to sign for receipt for their parole medications. During the reporting period 97% signed manifests acknowledging receipt of their prescription medications.

MAINLINE CCCMS

**Timeliness of PC and Psychiatrist Contacts**

During the reporting period 1240 I/Ps were provided services in the ML CCCMS mental health program. Of these, 70% received an initial contact with their PC within 10 days during which time the Clinical Intake Assessment was completed. In addition 85% had their initial IDTT within 14 days of arrival or transfer into the program. Thereafter 90% received PC contacts at least once every 90 days (or more often if indicated), and 98% had a scheduled IDTTs at least annually (or more often if indicated). Institutional staff participated in the IDTT with the PC being present 99% of the time, psychiatrist 66% of the time, and I/P 99% of the time. Two of the IDTTs I/Ps failed to attend with an undetermined reason.

DRPD 1 00368

During the reporting period, 98% of inmates with prescriptions for psychotropic medications received timely psychiatry appointments. Reasons that inmates did not have timely psychiatry contacts included: 37% inmate refusal, 4% competing appointments 19% lock downs, and 40% clinician unavailability.

**Prerelease and Discharge Planning**

During the reporting period, 62 I/Ps in the CCCMS level of care paroled from the institution. Of these, 10 received parole planning.

MAINLINE ENHANCED OUTPATIENT PROGRAM (EOP)

During the reporting period, 97% of all new EOP admits were assessed and presented to the IDTT within 14 days of admission, at which point their initial treatment plan was completed and signed by the IDTT attendees. Once admitted to the program, weekly PC contacts (individual or group activity) took place 84% of the time, IDTTs took place at least every 90 days, 100% of the time, and treatment plans were updated at least every 90 days, 100% of the time. IDTTs were attended by their PC 99% of the time, by the psychiatrist 58% of the time, and the I/P 88% of the time. Reasons why the I/P failed to attend the IDTT or why an IDTT was cancelled included; 0% inmate refusal,17% scheduling issues (sick/furlough,), 0% lock downs, 0% lack of escort officers 0% competing appointments, 2% clinician unavailability and 81% were identified as completed with the patient absent. No clear reason was tracked for IP absences from these IDTTs, but training has been done to improve tracking of attendance for IDTTs.

During the reporting period, group therapy was provided for the I/Ps in the EOP LOC. Twenty eight different structured group topics were provided by the primary clinicians and 25 were offered by recreation therapists (RTs). Descriptions are available in TAB M of the binder. On average, I/Ps were offered 6.93 hours of structured therapeutic activity per week. During the reporting period, 16 I/Ps were provided a modified treatment plan. An individual search of each of these IPs records indicated that 100% received monthly IDTTs. This report is not available through MHTS.net.

**Prerelease and Discharge Planning**

During the reporting period 65 I/Ps in the EOP level of care paroled from the institution. Of these 74% received parole planning.

DEPARTMENT OF MENTAL HEALTH (DMH) REFERRALS

During this period, 332 I/Ps met one or more of the considerations for a higher LOC. Of the identified I/Ps, 5% were referred to DMH, 95% of I/Ps were not referred. At each institution, 25 I/Ps listed on the DMH non-referral log (or all I/Ps on the list if less than 25) were randomly audited. Of those audited, 98 % had a reason for non referral documented on the 7388-B, and 94 % had documented interventions to improve the I/P's level of functioning.

Page 9 of 15

During the reporting period, 17 referrals to DMH were completed: 10 ICF and 7 APP. 40 % of ICF referrals were completed within five working days; 86 % of APP referrals were completed within two working days and posted on SharePoint. The addition of a DMH coordinator has improved compliance by providing supervisors and clinicians with training and increased use of the e-UHR to improve documentation and completion of referral documentation.

During this time period no ICF or APP referrals were rejected by DMH and none were rescinded.

During the reporting period 34 I/Ps returned to the institution from DMH. DMH discharge summaries were received when the I/P returned to the institutions 100% of the time. Clinician-to-clinician contact took place within five working days of the I/P's return to the institution 26 % of the time. Five day follow-ups were completed 100% of the time for returning I/Ps.

MENTAL HEALTH CRISIS BED (MHCB)

The institution has an 8 bed, Mental Health Crisis Bed (MHCB) unit. Inmate-patients are received from internal referrals as well as from other institutions. During the reporting period, 53 referrals were received from within the institution and 1 referral was received from an outside institution.

During the reporting period, the total number of admission to the MHCB unit totaled 54. The average length of stay (LOS) was 9 days. The range was from 0 to 52 days. The number of I/Ps with a LOS longer than 10 days was 14. Reasons for LOS longer than 10 days included; 50% DMH referral awaiting a bed, 0% Keyhea in process, 14% clinically discharged awaiting bed, 0% clinically discharged awaiting transfer back to home institutions, 0 % starting a trial of new psychotropic medication. The percent retained for clinical reason was 36%. When I/Ps on the DMH waiting list were removed from the calculation, the average LOS in the MHCB was 6 days.

Prior to being admitted to the MHCB unit, 100% of the I/Ps admitted during regular working hours were administered a pre-admission screening. Once admitted to the MHCB unit they received their initial IDTT within 72 hours 100% of the time. Thereafter I/Ps were offered at least weekly IDTTs 98% of the time. IDTTs were attended by the PC 96% of the time, psychiatry 100%, CC-I 100% and nursing 100% of the time. Daily contacts by a licensed psychologist or psychiatrist occurred 94% of the time. Of the I/Ps that were admitted due to suicidal threats or behavior, 33% were administered an SRE at the time of placement and 48% received a SRE upon release from the MHCB. Low documentation of SRE delivery is due to documents not being provided to OT's for data entry. This report is now being submitted to SprFit for monthly review and action. 98% received a five day follow up after their release from MHCB according to our internal log. (Refer to Tab I3).

OUTPATIENT HOUSING UNIT (OHU

DRPD 1 00370

The institution has 6 OHU beds. During the reporting period there were 125 referrals to OHU and 125 placements. A total of 15 I/Ps housed in the OHU were referred to a MHCB and 15 were admitted. The average length of stay was 3 days, ranging from 0 to 55 days. There were 19 I/Ps with stays longer than 72 hours. Reasons for LOS beyond 72 hours included, 14% awaiting a bed in the MHCB, 29% administratively discharged and as a result of custody placement requirements were waiting for a bed, 0 % of I/P waiting for a bed due to a mental health LOC change, 57 % administratively discharged without changing custody factors or mental health LOC awaiting a bed.

While residing in the OHU, 78% of I/Ps received daily contact from a licensed psychologist or psychiatrist according to the On-Demand Contact Intervals report. (Refer to Tab F6) During the reporting period 99% I/Ps were placed in the OHU due to suicidality. Of those, 100% were administered a SRE at the time of placement and100% received and SRE upon release from OHU, and 100% received a five day follow-up upon their release.

ALTERNATIVE HOUSING

During the reporting period there were 4 I/Ps placed in alternative housing while waiting for a MHCB bed. No inmates were placed on suicide watch and 100% were placed on suicide precaution. None were transferred to a MHCB. The average LOS was 3.5 days, ranging from 0 to 5 days. Reasons for lengths of stay longer than 72 hours included clinical reasons. Of those I/Ps that were placed in alternative housing due to suicidal or serious self-injurious behaviors, 100% were administered a SRE prior to placement (those I/Ps entering after hours when a clinician is not available will receive a SRE by the next day). 100% of I/Ps received a five day follow-up upon their release.

ADMINISTRATIVE SEGREGATION UNIT (ASU)

During the reporting period there were 739 I/Ps housed in ASU programs: 298 at CCCMS level of care (LOC), 290 at EOP LOC and 151 non-MHSDS I/Ps. All patients entering ASU are to receive a nursing pre-placement screening (CDCR Form 128-MH-7). During the reporting period, audits done for this period indicate an average of 66% of the I/Ps received pre-placement screening prior to placement in the ASU setting, with a range from 50% to 85%. Due to the audits and training, these percentages has shown a gradual increase. None of the screenings were conducted in a confidential setting and the lack of confidential space on the ASU has been identified as an issue. Data on the placement of incoming I/Ps housed in identified safety cells is not tracked. However, the ASU has 3 intake cells which are used for up to 72 hours for intake I/Ps. If there are more intakes than cells, intake I/Ps are placed in regular cells. All I/Ps placed in ASU were reviewed for current MHSDS status within one working day following their placement in ASU, and prior to the 114D hearing. 100% of I/Ps received a mental health screening (31-item questionnaire) within 72 hours of placement. Custody documented 30-minute welfare checks during the reporting period 100% of the time, based on audits conducted by the custody supervisor.

DRPD 1 00371

## ASU-CCCMS

During the reporting period, 298 I/Ps entered the ASU CCCMS program. 91% of the I/Ps were assessed by a clinician within 10 working days. 96% of initial IDTTs were completed within 14 calendar days or prior to ICC, whichever occurred first. Subsequent IDTTs took place at least every 90 days, 99% of the time. 83% of IDTTs were attended by the primary clinician; 86% of IDTTs were attended by a psychiatrist, 100% of IDTTs were attended by the CC; and 65% of IDTTs were attended by the I/P. 100% of the reasons for I/P non-participation in IDTT was refusals.

During the reporting period, 97% of CCCMS I/Ps received at least weekly individual PC contacts, none of these were in a confidential setting. I/Ps are typically seen outside their cells in non-confidential therapeutic modules. Of the completed PC contacts, 34% were completed in the therapeutic modules. 66% of the PC contacts were seen cell-front. The reasons for cell front non-confidential contacts included 13% I/P refusals, 8% due to a staff decision; 79 % did not specify a reason. 99% of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every 90 days. Daily LPT rounds were documented on the CDCR Form 7230-MH 100% of the time. Daily ASU morning meetings between custody and clinical staff were documented 100% of the time.

## ASU-EOP (HUB)

During the reporting period, 290 I/Ps entered the ASU EOP. None of the I/Ps received a comprehensive assessment (7386) prior to the initial IDTT or within 14 calendar days of referral/identification. This is due to ASU staff had the belief this was not to be done. In addition compliance rules have been changed and training has been done consistent with the new compliance rules. 92% of initial IDTTs were completed within 14 calendar days or prior to ICC, whichever occurred first. Subsequent IDTTs took place at least every 90 days, 92% of the time. 87% of IDTTs were attended by the primary clinician; 89% of IDTTs were attended by the psychiatrist; 100% of IDTTs were attended by CC; and 75% of IDTTs were attended by I/P. During this reporting period, MHTS.net reports the reasons for I/P non-participation was due only to I/P refusals. Further training has been done with clinical and clerical staff to improve the accuracy of recording and inputting IDTT information.

During the reporting period the number of I/Ps that had LOS longer than 60 or 90 days can be reviewed in Binder Tab H. One hundred percent of those with a LOS longer than 90 days were reviewed every 30 days by the Classification & Parole Representative. Reasons for LOS longer than 90 days included: 36% were IPs with SHU terms more of than 90 days awaiting to be transferred, 15% were IPs waiting to transfer to GP SNY, 16% were IPs with SHU term less than 90 days, 16% were IPs with Rule Violation Report who were awaiting decisions by the DA, 7% were IP who were waiting for a CSR review for transfer, 5% were I/Ps who had been endorsed and pending transfer to Sac or PBSP PSU and 4% were IPs endorsed and awaiting transfer.

DRPD 1 00372

Of the I/Ps in the program during the reporting period, 95% received at least weekly individual PC contacts, There is no identified space on the ASU for confidential PC contacts, however, 2 of contacts took place in a confidential setting; 59% were out of cell, non-confidential contacts, and 41% of contacts were cell-front. Reasons for non-confidential cell front contacts included, 18% I/P refusals, 70% were unspecified; less than 1% were due to custody lockdowns; 2% were due to a lack of custody escorts and 9% were due to staff decision. 92% of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every 30 days. Daily LPT rounds were documented on the CDCR Form Progress Note 7230-MH 100% of the time. 92% of I/Ps were offered at least ten hours of structured therapeutic activities per week.

During the reporting period, the average number of I/Ps who refused more than 50% of offered treatment during a given week period was 26%. Refer to tab H16 for ASU EOP Fit Data Reports. Those I/Ps who refused more than 50% of offered treatment services, received daily PC contacts during the work week. An average of 6 I/P's per week were on a modified treatment plan. Daily ASU morning meetings between custody and clinical staff were documented 100% of the time.

**ASU-Non-MHSDS**

During the reporting period, 167 I/Ps entered ASU-Non-MHSDS program. All patients entering ASU are to receive a nursing pre-placement screening (CDCR Form 128-MH-7). During the reporting period, audits done for this period indicate an average of 66% of the I/Ps received pre-placement screening prior to placement in the ASU setting, with a range from 50% to 85%. Due to the audits and training, these percentages has shown a gradual increase. Custody documented 30-minute welfare checks 100% of the time. Nursing documented daily LPT rounds 100% of the time.

SUICIDE PREVENTION

The institution has an active Suicide Prevention and Response Focused Improvement Team (SPR-FIT). See Tab I, Section 1 to review SPR-FIT meeting minutes.

**Completed Suicides**

During the reporting period, there were no completed inmate suicides in the institution.

During the last two years there were no completed suicides in the institution.

**Attempted Suicides during the Reporting Period**

Of the 5 serious suicide attempts during the reporting period, 1 of them was by hanging, 2 were by lacerations, none were by overdose, and one was rope and abrasion related. One required outside hospitalization and all five were referred to an MHCB for acute mental health care services, with three being ultimately referred to a DMH facility.

DRPD 1 00373

On return to regular housing from a MHCB or OHU, 5-day follow-up was documented 92% of the time. A random sample of 10 Custody wellness checks was reviewed for 1st quarter 2012, showing a 70% completion rate.

Of the six SPR-FIT monthly meetings required during the reporting period, five monthly meetings were documented to have occurred. The SPC coordinates the monthly SPR-FIT. During the reporting period the agendas included review of suicide attempts, training on the 5-day observation procedure, and other local operations (See binder for more details).

During the reporting period, ongoing suicide prevention training consisted of both suicide refresher courses, and initial 6 hour suicide prevention curriculum for new employees.

The self-harm review process remains active. Since the last management report, 3 reviews have been completed and presented to the treatment teams and SPR-FIT for discussion. 1 review is in progress.

**Inmate Profile Procedure**

All inmate profiles are available on MHTS.net. Profiles for I/Ps on the ASU are pulled and discussed at the morning meetings, particular to individual suicide histories. These profiles are maintained for easy reference while the IP is housed on the ASU.

### RVR PROTOCOLS

During the reporting period, 694 MHSDS inmates at the institution received RVRs: 427 CCCMS, 267 EOP, 0 MHCB. 100% of the MHSDS I/P's at EOP and CCCMS LOC who were issued an RVR received a mental health assessment.

### USE OF FORCE

A table of all the Use of Force and Non-Use of Force incidents during the reporting period can be found in Tab M. Of the Use of Force Incidents, 88% occurred with MHSDS inmate-patients. For Non-Use of Force Incidents, 76% occurred with MHSDS inmate-patients.

### MENTAL HEALTH REFERRALS

- Emergent: Immediately
- Urgent: Within 24 hours
- Routine: Within five working days

During the reporting period, 2823 referrals were received and on the final day of the period, overall 70% were closed in a timely manner. Referral statistics (See Tab R) indicate that 90% of emergent referrals were seen the same day, 72% of urgent referrals were seen within 24 hours,

DRPD 1 00374

72% of routine referrals were completed in within 5 business days and 64% of medication non-compliance referrals were completed within 7 calendar days.

## MHTS.NET AGREEMENT AUDITS

The Agreement Audit was completed regularly during the reporting period. This audit examines agreement between MHTS.net entries and the eUHR documentation of those contacts. The audit also examined the eUHR to ensure that each documented clinician contact in the eUHR has a corresponding entry in MHTS.net.

Audits were conducted using methodology and tool provided by HQ. Audits in the monitoring period consisted of a review of approximately 600 contacts to determine if PC, psychiatrist, and IDTT documentation were present for each contact as reported in MHTS.net. Results ranged from an agreement rate of 70% to 83%, with a mean of 81%, with monthly agreements as follows: 11/11 – 79%; 11/12 – 79%; 1/12 82%; 2/12 – 79%p; 3/12 83%; 4/12 – 70%.

Discrepancies are generally due to either the clinicians not following the contact log procedures or clerical staff not entering the information correctly.

DRPD 1 00375

# Exhibit 19

# CALIFORNIA INSTITUTION FOR MEN

## CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

## MENTAL HEALTH SERVICES DELIVERY SYSTEM
## MANAGEMENT REPORT
## ROUND 25

October 1, 2011 to March 31, 2012

### GARY SANDOR
### WARDEN

### ROBERT HERRICK
### CEO

### VICTOR JORDAN, PH.D.
### CHIEF OF MENTAL HEALTH

SUBMITTED APRIL 25, 2012

DRPD 1 00095

# Table of Contents

Glossary of Terms ........................................................................................................... 4
Institutional Program Summary .................................................................................... 6
  Overview of all the mental health programs at institution ........................................ 6
    Mainline Correctional Clinical Case Management System (ML-CCCMS) ............ 6
    CIM-A (formerly RCW-Reception Center West) ................................................... 6
    CIM-C (formerly Reception Center East (RCE) ................................................... 6
    CIM-D (formerly Minimum Support Facility) ...................................................... 7
    Reception Center Enhanced Outpatient Program (RC-EOP) ................................ 7
    Mental Health Crisis Bed Program ....................................................................... 7
    Administrative Segregation .................................................................................... 8
    Reception Center Processing .................................................................................. 8
    Reception Center Correctional Clinical Case Management System (RC-CCCMS) ... 8
  New Construction/Remodeling ................................................................................. 8
  New or Anticipated Mission Changes. ...................................................................... 8
  Major Population Moves ........................................................................................... 8
  New or Overflow Administrative Segregation or any other Specialized Housing Units. ... 9
  Obstacles to Providing Mental Health Services and Adherence to Program Guide
  Requirements. ........................................................................................................... 9
Mental Health Roster ................................................................................................... 10
QUALITY MANAGEMENT ....................................................................................... 11
  Quality Management Committee (QMC) .................................................................. 11
  Mental Health Quality Management Subcommittee (MHQM) ................................. 11
  Peer Review ............................................................................................................. 11
  QIT Activities .......................................................................................................... 12
Medication Management, Psychotropic Medications .................................................... 13
  Medication Continuity for New Arrivals (Inter-Institutional CDCR Transfers) ....... 13
  Medication Continuity for Transfers (Intra-Institutional Transfers) ........................ 13
  Medication Continuity for Renewal of Orders/Bridge Orders .................................. 13
  Lab Tests/Results for MHSDS Inmates .................................................................... 13
  Direct Observation Therapy (DOT) Medication Administration ............................... 13
  HS Medications (After 2000 Hours) ......................................................................... 13
  Medication Non-Compliance Policies and Procedures .............................................. 14
  The Medication Administration Record (MAR) ........................................................ 14
  Timely Processing of Medication Orders .................................................................. 14
  Informed Consent Forms .......................................................................................... 14
  Pill Lines .................................................................................................................. 14
  Hoarding/Cheeking Medications .............................................................................. 14
  Parole medications process ...................................................................................... 14
Clinical Programs ......................................................................................................... 15
  Mainline CCCMS ..................................................................................................... 15
  Department of Mental Health (DMH) Referrals ........................................................ 15
  Mental Health Crisis Bed (MHCB) .......................................................................... 16
  Transitional Bed Housing (TBH) .............................................................................. 17
  Administrative Segregation Unit (ASU) .................................................................... 17
    ASU-CCCMS ......................................................................................................... 17

DRPD 1 00096

ASU-EOP............................................................................................................................... 17
ASU-Non-MHSDS ................................................................................................................ 18
Suicide Prevention .................................................................................................................. 18
SPR-FIT (Suicide Prevention Focused Intervention Team) ................................................. 18
Completed Suicides .............................................................................................................. 18
Attempted Suicides ............................................................................................................... 18
RVR Protocols ......................................................................................................................... 19
Use of Force ............................................................................................................................. 19
Reception Center...................................................................................................................... 20
RC CCCMS .............................................................................................................................. 20
RC EOP..................................................................................................................................... 20
Mental Health Referrals .......................................................................................................... 21
Agreement audit....................................................................................................................... 21

DRPD 1 00097

## GLOSSARY OF TERMS

| Acronym | Term |
|---------|------|
| AIMS | Abnormal Involuntary Movement Scale |
| APP | Acute Psychiatric Program |
| ASU | Administrative Segregation Unit |
| CAP | Corrective Action Plan |
| CC | Correctional Counselor |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CHSA | Correctional Health Services Administrator |
| DMH | Department of Mental Health |
| DOT | Direct Observation Therapy |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| HC-POP | Health Care Population Oversight Program |
| HS | Hour of Sleep |
| I/P | Inmate-patient |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Inter Disciplinary Treatment Team |
| LGB | Local Governing Body |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| LOS | Length of Stay |
| LPT | Licensed Psychiatric Technician |
| MAR | Medication Administration Record |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MHQM | Mental Health Quality Management Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| MHTS | Mental Health Tracking System |

DRPD 1 00098

| OHU | Outpatient Housing Unit |
|---|---|
| PC | Primary Clinician |
| PSU | Psychiatric Services Unit |
| QIT | Quality Improvement Team |
| QM | Quality Management |
| QMC | Quality Management Committee |
| R&R | Receiving and Release |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| SPC | Suicide Prevention Coordinator |
| SPR-FIT | Suicide Prevention and Response-Focused Improvement Team |
| SRE | Suicide Risk Evaluation |
| TBH | Transitional Bed Housing |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Record |

DRPD 1 00099

## INSTITUTIONAL PROGRAM SUMMARY

### OVERVIEW OF ALL THE MENTAL HEALTH PROGRAMS AT INSTITUTION.

#### Mainline Correctional Clinical Case Management System (ML-CCCMS)

##### CIM-A (formerly RCW-Reception Center West)

The Mainline CIM-A CCCMS program accommodates Level II SNY CCCMS patients serving a wide range of term periods, from short terms to life sentences. There are currently 2.5 Psychologists, 0.5 Clinical Social Worker (CSW), 0.5 Recreational Therapist (RT), 1 Psychiatrist, 1 Psychiatric Technician (PT) and a 0.5 time Senior Psychologist Supervisor (Program Director). Individual appointments, group therapy and parole planning are provided to this population.

During the monitoring period, the CCCMS population decreased from 315 to 276. A policy change in February 2012 changed the way CIM manages ML CCCMS patient-inmates who are converted to EOPs. These patient-inmates remain on the yard until they are endorsed and transferred to a ML EOP prison. CIM-A currently has 7 EOP's awaiting transfer to EOP LOC programs.

The population reached maximum capacity of 960 inmates by November 30, 2010. It has remained at maximum capacity during this reporting period. CIM-A receives approximately 2-5 new CCCMS intakes per week. CIM-A CCCMS program runs well. It is located in the Administration Building, which is air conditioned. Since there is a full time officer assigned to the program, the heat plan issues implemented in summer are not anticipated to be problematic.

##### CIM-C (formerly Reception Center East (RCE)

The Mainline CIM-C CCCMS program accommodates Level III SNY CCCMS patients serving a wide range of term periods, from short terms to life sentences. There are currently 2 primary clinicians (PCs). There is 1 psychologist, 1 clinical social worker (LCSW), 1 psychiatrist, 1.2 psychiatric technicians (PT) and a 0.5 time senior supervising social worker (Program Director). Individual appointments, group therapy and parole planning are provided to this population.

During the monitoring period, the mission of the RCE/CIM-C yard has changed. RCE was converted from a Reception Center Yard into a Mainline Yard. As a result, most of the population of inmates changed. Many were endorsed and moved to other prisons and some of the inmates/patients were endorsed as Level III, SNY inmates and stayed at CIM-C. On September 29, 2011, the CCCMS population was 220 and there were 122 EOP's on the yard. By March 29, 2012, the yard was fully transitioned into a Mainline Yard with Level III SNYs. There were approximately 793 Inmates on the yard. Of those, 161 were CCCMS and 4 were EOP. More recently, we have been receiving approximately 2-5 new CCCMS I/P's intakes per week. CIM-C currently has 4 EOP's awaiting transfer to EOP LOC programs.

DRPD 1 00100

### CIM-D (formerly Minimum Support Facility)

The Mainline CIM-D CCCMS program accommodates Level I, CCCMS patients serving relatively short sentences. There are currently 8 psychologists, 0.5 clinical social worker (CSW), 0.5 recreation therapist (RT), 2 psychiatrists, 1 psychiatric technician (PT) and a 0.5 time senior psychologist supervisor (Program Director). Individual appointments, group therapy and parole planning are provided to this population.

During the monitoring period, the CCCMS population on this yard decreased from 776 to 730.

As of March 29, 2012 there were approximately 2373 Inmates on the yard. Of those 730 were CCCMS. We have been receiving approximately 25-35 new CCCMS I/P's intakes per week. CIM-D currently has 6 EOP's awaiting transfer to EOP LOC programs.

### Reception Center Enhanced Outpatient Program (RC-EOP)

EOP I/Ps are located on Yard B (formerly Reception Center Central (RCC). During this reporting period, approximately 25-30 EOP inmates were housed on Yard B at any given time. Interim care services for RC EOP I/Ps at RCC are provided by two psychologists, one psychiatrist, one social worker and one recreation therapist. While in reception, groups and individual contacts occur on a weekly basis and medication management is conducted in the Yard B mental health clinic. Due to the relatively low number of EOP I/Ps, there are very few difficulties in both providing individual contact and groups. All EOP I/Ps are also scheduled to see the psychiatrist every 30 days or more frequently, if clinically indicated. IDTT's happen weekly with regular participation from CCI, nursing, and treatment team members.

### Mental Health Crisis Bed Program

The MHCB at CIM continues to operate as a 36-bed unit within an infirmary medical environment. The MHCB program has shown a consistently decreasing census as a result of the dramatic drop in EOP LOC inmate/patients at CIM. Transitional bed housing (TBH) units at CIM have been effectively closed since the end of September. Three clinical teams consisting of one psychologist, one social worker and one psychiatrist provide services to patients in the MHCB. Referrals are screened for admission through the Treatment and Triage Area (TTA). During regular business hours, the CIM-D clinic psychiatrist conducts intake evaluations. After hours, the psychiatrist on call (POC) conducts intake evaluations. Weekday morning meetings allow the treatment team to exchange clinical updates between shifts and plan services for the day. It is attended by all mental health disciplines, custody and a psychologist representative from ASU on Fridays. Special case conferences are convened, as needed, to address critical incidents, difficult cases and/or I/P's requiring expedited custodial processing. All I/Ps are offered an out of cell confidential contact with a clinician or IDTT each day. Currently the MHCB operates with an average daily census of about 20 and compared to 30 in May of 2011 and an average daily admission rate of 2.3 compared to 5.9 in May.

DRPD 1 00101

**Administrative Segregation**

The CIM ASU's mental health program provided services to approximately 602 I/Ps. An average of 19.2 I/Ps were at the EOP level of care and 84.3 were CCCMS. I/Ps were housed in Reception Center Central Cypress Hall, and Palm Hall. Birch Hall overflow was not used during the monitoring period. During this monitoring period, ASU was significantly impacted by staffing issues created by the AB109 mission change. Three psychologists and one social worker were displaced by the SROA process. This resulted in disrupted continuity and chronic understaffing of the program. Group treatment remained suspended throughout the monitoring period. As staffing patterns stabilize, it is anticipated that ASU will improve significantly and return to full programming.

**Reception Center Processing**

The Reception Center Processing program is staffed by three full time psychologists, who also share DDP and CCCMS case manager duties. As a result of AB109 mission changes, most arrivals to CIM are new commitments from Riverside County, as opposed to the parole violators received in the past. The vast majority of inmates are screened within 24 hours of arrival. 211 inmates were evaluated during the review period. A review of current programming indicates no significant changes over the previous monitoring period. The screening program continues to review the county jail transfer forms whenever available, as in the past monitoring period.

**Reception Center Correctional Clinical Case Management System (RC-CCCMS)**

There are approximately 150 inmates in the RC CCCMS program. All RC CCCMS I/Ps are seen at the 30-day mark after having been seen for their initial evaluation, and 90 days thereafter. In addition all CCCMS inmates who arrive at RCC from ASU, MHCB or any other facility or prison, are seen 30 days after arrival.

## NEW CONSTRUCTION/REMODELING.

There was no new construction or remodeling during the reporting period.

## NEW OR ANTICIPATED MISSION CHANGES.

One CIM mission change involved the repurposing of the Reception Center East Facility from a Reception Center into a Mainline Level Three General Population Sensitive Needs Yard Facility now referred to as Facility C. This facility now houses CCCMS Patient-Inmates and, occasionally, EOP Patient-Inmates pending transfer.

## MAJOR POPULATION MOVES.

There were several significant population moves during the reporting period due to the implementation of Assembly Bill (AB) 109. In October 2011, the intake of parole violators ceased. Intake remained closed until December 2011. Continuing since that time, CIM is, with few exceptions, primarily receiving new commitments from Riverside County. Between September 28, 2011 and April 11, 2012 there was an overall reduction of the CIM prison population of 898 inmates. Since the beginning of the October 2011 reporting period, there was an overall reduction of approximately 347 MHSDS Patient-Inmates. This reduction included

DRPD 1 00102

200 CCCMS, 128 EOP, and 19 MHCB Patient-Inmates. Also included among these reductions, were 4 ASU CCCMS and 17 ASU EOP Patient-Inmates.

### NEW OR OVERFLOW ADMINISTRATIVE SEGREGATION OR ANY OTHER SPECIALIZED HOUSING UNITS.

There were no new ASU overflow or SPU units.

### OBSTACLES TO PROVIDING MENTAL HEALTH SERVICES AND ADHERENCE TO PROGRAM GUIDE REQUIREMENTS.

There was a hiring freeze for Mental Health positions and, as a result of Assembly Bill 109, a reduction of 2.5 senior psychologist supervisor positions and 14 staff psychologist positions during the reporting period. Simultaneously, there was a reduction in the intake of Reception Center Inmates. The office services supervisor (OSSII) and health program specialist (HPSI) positions could not be filled due to the hiring freeze. This resulted in a significant reorganization of staff assignments throughout the institution and increased supervisory responsibilities.

DRPD 1 00103

MENTAL HEALTH ROSTER

**Institutional Mental Health Staffing and Telemedicine**

October 1, 2011 to March 31, 2012
California Institution for Men

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 1 | 1 | 0 | 0% | 0 | 0 | 0 |
| Senior Psychiatrist | 1 | 1 | 0 | 0% | 0 | 0 | 0 |
| Chief Psychologist | 1 | 1 | 1 | 0% | 0 | 0 | 0 |
| Senior Psychologist | 2 | 2 | 0 | 0% | 0 | 0 | 0 |
| Staff Psychiatrist | 15 | 12 | 3 | 20% | 0 | 0 | 20% |
| Staff Psychologist | 42 | 28 | 14 | 33% | 0 | 0 | 33% |
| Supervising Social Worker | 1 | 1 | 0 | 0% | 0 | 0 | 0% |
| Social Worker | 12 | 11 | 1 | 8% | 0 | 0 | 8% |
| Registered Nurse | 10.5 | 10.5 | 0 | 0% | 0 | 0 | 0 |
| Senior Psych Tech | 2 | 2 | 0 | 0% | 0 | 0 | 0 |
| Psych Tech | 15.5 | 15.5 | 0 | 0% | 0 | 0 | 0 |
| Recreation Therapist | 4 | 4 | 0 | 0% | 0 | 0 | 0 |
| Other (specify) | | | | | | | |

Telemedicine

| Psychiatry telemedicine used? | Number of Hours Per Week |
|---|---|
| NO | N/A |

DRPD 1 00104

# QUALITY MANAGEMENT

## Quality Management Committee (QMC)

QMC is the highest level healthcare committee in the institution. QMC's multidisciplinary committee members include senior representatives from all healthcare disciplines and custody. QMC meets twice per month and the standard agenda includes: old business/follow-ups, reports from all subcommittees, QIT status reports/discussion, and new business. The committee report format allows for an efficient review of actions taken and needed follow up. The QMC met 6 times and achieved quorum at all meetings during the reporting period.

## Mental Health Quality Management Subcommittee (MHQM)

The purpose of the MHQM is to oversee mental health services, review program performance, and monitor, create and implement improvement efforts. The Chief of Mental Health or designee serves as Chair. MHQM are scheduled to meet monthly. During the reporting period the MHQM met six times. A quorum was attained in 67% of the meetings during the reporting period.

### Peer Review

Based on consultation with the Chief Psychologist for Clinical Practice in Headquarters, CIM modified the Peer Review process from quarterly to semi-annual reviews. Peer review tools for both the psychology/social work disciplines and psychiatry were modified and piloted during the monitoring period. Feedback from clinicians utilizing the tool and the Peer Review Committee were incorporated into the modifications. Both tools were modified to focus on the completeness and quality of the Progress Notes for each discipline. Copies of the revised forms are available in the Proof of Practice Binder.

The Peer Review Committee is comprised of the Peer Review Coordinator/SPR-FIT Coordinator, a staff psychiatrist, a staff psychologist, and a clinical social worker. Meetings are scheduled monthly. During the monitoring period, four committee meetings were held. Two meetings were not held due to scheduling conflicts. Minutes of the meetings are available in the Proof of Practice Binder.

An analysis of the most recent peer review process appears to suggest some positive outcomes in terms of mental health service delivery with regard to completeness and accuracy in recording of clinical encounters via CDCR 7230-MH progress notes. For psychiatry, some areas of service delivery and documentation in need of some improvement appeared to include legibility for written notes and clarity of intervention plans. This general feedback was delivered to psychiatric staff during a recent meeting. For psychology, the peer review feedback tends to run very positive, with isolated and specific suggestions most often related to inclusion of more specific diagnostic information and/or clarification of interventions. For social work, the review feedback closely mirrors the general trends for psychology, with similar feedback regarding diagnostic clarity/specificity. Feedback was delivered electronically via email attachments to individual psychologists and social workers. Feedback regarding the tools and possible need for modification will be addressed in the upcoming Peer Review Committee meetings.

DRPD 1 00105

Copies of the current peer review tools and a summary of the previous and most recent review quantitative analysis and qualitative summary of feedback are included in the proof of practice binder.

## QIT Activities

One Mental Health QIT was active during this reporting period. No new QITs were chartered during the review period. One QIT, involving reconciliation of mental health evaluations with Unit Health Records, was resolved with final recommendations sent to the QMC during the review period. That QIT was resolved since the last management report. No QITs are ongoing.

DRPD 1 00106

## MEDICATION MANAGEMENT, PSYCHOTROPIC MEDICATIONS

The total number of inmates in the MHSDS who received psychotropic medications during the reporting period was 6577.

### Medication Continuity for New Arrivals (Inter-Institutional CDCR Transfers)

99.10% of new arrivals received medications by the next calendar day. This number includes all medications and it is obtained via MAPIP measure #4.

### Medication Continuity for Transfers (Intra-Institutional Transfers)

Based on our current MAPIP audit measure 5, 5a, 5b, 5c and 5da 95% of I/Ps transferring within the institutions received their prescribed psychotropic medications without interruption.

### Medication Continuity for Renewal of Orders/Bridge Orders

The current procedure for all I/P coming from other institutions is to have their medications continued automatically according to the received MAR. This occurs during the initial Receiving & Release health screening. Formulary medication are continued for the length of previous order and non-formulary medications are continued for 14 days only and the I/P is scheduled for follow up by a psychiatrist within one week. The maximum length of medication orders by psychiatrists is 90 days.

During the reporting period, 96.5% of inmate-patients received timely renewals of their psychiatric medications based on MAPIP measure 4, 2 and 2a.

### Lab Tests/Results for MHSDS Inmates

During the reporting period, 328 randomly selected eUHRs of inmates receiving psychotropic medications were reviewed following MAPIP guidelines. 100% had laboratory tests ordered when clinically indicated. The senior psychiatrist regularly reviewed lab results. Abnormal results and needed actions were discussed with staff. In addition, CIM conducted MAPIP audits with samples of 20 randomly selected inmate/patients measuring key indicators on a Quarterly basis. CIM shows consistently good performance on these indicators

An Abnormal Involuntary Movement Scale (AIMs) must be completed every 6 months for each inmate prescribed antipsychotic medications. During the reporting period, an AIMs was completed within the last 6 months in 86% of the 102 applicable cases.

### Direct Observation Therapy (DOT) Medication Administration

At the end of the reporting period, 19 inmate-patients were prescribed psychotropic DOT medication. During pill lines, DOT medication administration procedures were followed 99.81% of the time based on MAPIP measure 9.

### HS Medications (After 2000 Hours)

861 MHSDS inmate-patients received HS medications during the reporting period. HS medications are delivered after 2000 hours. During the reporting period HS medications were administered after 2000 hours 100% of the time based on MAPIP measure 7.

DRPD 1 00107

**Medication Non-Compliance Policies and Procedures**

During the reporting period, there was an average of 72.21% of Medication Non Compliance Policies and procedures section of MAPIP 9a and 9e. MAPIP measure 6 for medication non-compliance specific to psychiatric prescribed medication reflects 92.43%. The Medication Administration Record (MAR)

The audit reflected a 95.0% of audited MARs were appropriate reflecting appropriate medication distribution based on MAPIP measure 9b, 5a, 5b, 5d, 9a.

**Timely Processing of Medication Orders**

The audit reflected a 100% processing per MAPIP audit measure 3 under pharmacy. MAPIP measure 2 and 2a reflect 95.5% of newly processed orders were processed and patients subsequently medicated. MAPIP captures medication compliance < 24 regardless if it is medical or mental health, specific DOT only is not captured.

**Informed Consent Forms**

For inmate-patients on psychiatric medications, a random sample of 106 current eUHRs was reviewed. 80% of the records contained up-to-date consent forms. These findings revealed that a majority of the 20% deficiency was attributed to back-filed information from other institutions and forms filed in the incorrect tabs of the eUHR.

**Pill Lines**

Medications are typically distributed via pill lines with the exception of ASU areas. During the reporting period, the average pill line was open for approximately 2 hrs, all IP's received their medication with minimal wait times in each area.

**Hoarding/Cheeking Medications**

During the reporting period, there were 20 CDCR-115 Rules Violation Reports (RVRs) written explicitly for hoarding or cheeking medication.

**Parole medications process**

Currently, the Classification and Parole Representative notifies pharmacy of all paroling inmates at least 14 days in advance of release dates. During the reporting period, 869 I/Ps paroled with active prescriptions for psychotropic medications. One hundred percent of existing orders were renewed for 30-days. Paroling inmates are required to sign for receipt for their parole medications. During the reporting period, the following percentages of I/Ps signed manifests acknowledging receipt of their prescription medications:

- Yard A    87.5%
- Yard B    91.8%
- Yard C    92.5%
- Yard D    96.4%

DRPD 1 00108

## CLINICAL PROGRAMS

### MAINLINE CCCMS

**Timeliness of PC and Psychiatrist Contacts**

During the reporting period 1958 I/Ps were provided services in the Mainline CCCMS mental health program. Of these, 52% received an initial contact with their PC within 10 days, during which time the Clinical Intake Assessment was completed. In addition 54% had their initial IDTT within 14 days of arrival or transfer into the program. Indicators related to initial contacts were impacted by a CIM D yard housing unit where inmates underwent additional processing before transfer to their mainline housing. This issue was addressed during the monitoring period and is expected to show significant progress in the future. 99% received PC contacts at least once every 90 days (or more often if indicated), and 99% had a scheduled IDTT at least annually (or more often if indicated). Institutional staff participated in the IDTT with the PC being present 100% of the time, the Psychiatrist 98% of the time, the Correctional Counselor 60% of the time, and the I/P 94% of the time. Reasons why the I/P failed to attend the IDTT included refusals, lack of an interpreter and no shows. During the reporting period, 96% of inmates with prescriptions for psychotropic medications received timely psychiatry appointments.

**Prerelease and Discharge Planning**

During the reporting period, 177 I/Ps in the CCCMS level of care paroled from the institution. Of these, 69 received parole planning.

### DEPARTMENT OF MENTAL HEALTH (DMH) REFERRALS

Screening for higher levels of care is consistently completed in all IDTTs using the CDCR Form 7388B. During the six month reporting period a monthly audit was completed to monitor for consistent inclusion of all I/Ps to be assessed for possible elevation in level of care. The following report is based on data taken from this monthly report (internal review of 7388B/Screening for Higher Level of Care for all I/Ps who met at least one criterion but were not referred to Higher Level of Care/DMH), the monthly Referral/Non-Referral Log, and internal logs maintained by the DMH Coordinator.

The monthly audit of the 7388B/Screening for Higher Level of Care forms has remained relatively consistent over the monitoring period. There are anticipated changes with the audit tool and the process within the next 1-2 months. The current audit process consists of a review of 100% of all 7388-Bs where there is a positive response to any of the identified criteria. A 7388-B form is generated from every IDTT completed at CIM. A copy of all 7388-B forms where there is a positive response to any of the assessment criteria is then forwarded to the DMH Coordinator. On or before the fifteenth of each month the audit is completed for the 7388-Bs from the previous month (currently 100% inclusion). The results of this monthly audit are reported to the Mental Health Sub-Committee and the excerpt of the minutes of the DMH report is forwarded to Utilization Management staff at Headquarters. The anticipated changes to this process will be outlined in future reports.

During this period, 239 I/Ps (this includes multiple assessments for the same I/P if the I/P had more than one IDTT during the monitoring period) met one or more of the indicators for

DRPD 1 00109

consideration for a higher LOC. Of the identified I/Ps, 13 % were referred to DMH, 87 % of I/Ps were not referred. Of those not referred, 98% had a reason for non referral documented on the 7388B, and 94% had documented interventions to improve the I/P's level of functioning while remaining in the institution.

During the reporting period, 32 referrals to DMH were completed: 29 ICF and 3APP. Ninety three percent of ICF referrals, and 100% of APP referrals were completed within specified time frames and posted on SharePoint.

Once a bed was identified at a DMH facility, 100% of transfers took place within the specified time frames. Only one referral (3%) was rejected by DMH because of significant medical concerns that needed a primarily medical environment One referral (3%) was rescinded after the I/P was referred to an Acute care facility. The I/P later reconstituted very well and was able to be housed outside of the MHCB. He was eventually referred to ICF level of care and is currently in that program. There were a number of other referrals which did not result in a placement at DMH; Two (6%) of I/Ps paroled and six (18%) transferred to other CDCR facilities.

Thirty I/Ps that were referred to DMH care by CIM clinical staff were released from a DMH facility during the reporting period. Fifteen I/Ps were discharged to a different CDCR facility to either parole or continue their incarceration. Of the fifteen I/Ps that returned to CIM from DMH, DMH discharge summaries were received 100% of the time. Clinician to clinician contact took place within specified time frames of the I/Ps' return to the institution 93% of the time. Five day follow-ups were completed with 100% of returning I/Ps. One I/P (3%) re-referred to DMH within 30 days of their return to CDCR. This I/P was not accepted by DMH secondary to significant medical concerns.

## MENTAL HEALTH CRISIS BED (MHCB)

The institution has a 36 bed, Mental Health Crisis Bed (MHCB) unit. Inmate-patients are received from internal referrals as well as from other institutions. During the reporting period, 516 referrals were received from within the institution and 83 referrals were received from other institutions.

During the reporting period, admissions to the MHCB unit totaled 599. The average length of stay (LOS) was 6.17 days. The range was from 0 to 125 days. The number of I/Ps with a LOS longer than 10 days was 88. Reasons for LOS longer than 10 days included; 18% DMH referral awaiting a bed, 27% Keyhea in process, and 23% clinically discharged awaiting transfer back to home institutions. The remaining inmates were held over for primarily clinical reasons.

Once admitted to the MHCB unit, 84% received their initial IDTT within 72 hours of admission. Thereafter I/Ps were offered weekly IDTTs 74% of the time. Daily contacts by a licensed psychologist or psychiatrist occurred 68% of the time. A randomly sampled MHTS.NET/eUHR audit revealed that, of those I/Ps that were admitted due to suicidal threats or behavior, 100% were administered an SRE at the time of placement and 100% received a SRE upon release from the MHCB. 98% received a five day follow-up after their release from the MHCB.

DRPD 1 00110

## TRANSITIONAL BED HOUSING (TBH)

The TBH has existed in order to accommodate the great demand for MHCB beds within CIM as well as within the CDCR system. The CIM TBH was last activated officially on September 29, 2011. The TBH was erroneously activated for two days in early October (10-2-11 and 10-3-11), with three patient-inmates placed into Cypress Hall, despite available beds in the MHCB. Thereafter, the TBH remains closed.

## ADMINISTRATIVE SEGREGATION UNIT (ASU)

During the reporting period there were 491 participants in the MHSDS housed in ASU programs: 375 I/P's received care at the CCCMS level of care (LOC) and 116 at the EOP LOC. 1989 were non-MHSDS I/Ps. All patients entering ASU receive a nursing pre-placement screening (CDCR Form 7219). RN/PT staff monitor daily intake into ASU via Daily Movement sheets so that in the event that a patient is housed without going through proper processes, the patient will still be screened by the next day. Nursing staff are also responsible for ensuring medication continuity once the patient is identified.

Incoming I/Ps were always placed in identified safety cells, unless space was unavailable. This tended to occur most frequently on 1st Watch when it was difficult accommodate special needs (i.e. lower tier/lower bunk chronos, etc.). 100% of I/P placed in ASU were reviewed for current MHSDS status within one working day following their placement in ASU, and prior to the 114D hearing. Custody documented 30-minute welfare checks during the reporting period 97% of the time. Daily ASU morning meetings between custody and clinical staff were documented 93% of the time.

### ASU-CCCMS

375 I/Ps received care at the CCCMS level of care. 77% of the I/Ps were assessed by a clinician within 10 working days. 36% of initial IDTTs were completed within 14 calendar days. Subsequent IDTTs took place at least every 90 days, 79% of the time. Difficulty achieving timelines was primarily attributed to problems with referral and assignment procedures. A corrective action plan has been put in place and will be monitored over the next several months.

86% of I/Ps received at least weekly individual PC contacts, 36% of the time they were seen in a confidential setting; and 62% of the time they were seen cell-front. Reasons for non-confidential contacts included, 48% I/P refusals; 4% custody lockdowns; .3% lack of custody escorts; and 48% unspecified or staff decision. 96% of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every 90 days. All daily LPT rounds were documented on the CDCR Form 7230-MH.

### ASU-EOP

116 I/Ps received care at the EOP LOC. 72% of I/Ps received an initial assessment prior to the initial IDTT or within 14 calendar days of referral/identification. 43% of initial IDTTs were completed within 14 calendar days. Subsequent IDTTs took place at least every 90 days, 93% of the time. Difficulty achieving timelines was primarily attributed to problems with referral and assignment procedures. A corrective action plan has been put in place and will be monitored over the next several months.

DRPD 1 00111

The average LOS was 77 days and ranged from 11 to 118 days. 70% of I/Ps had LOS longer than 60 days. 50% had LOS longer than 90 days, of those 100% were reviewed every 30 days by the Facility Captain or CC-II. Four of these were endorsed to the ASU Hub and left CIM with a pending transfer. One was at CIM temporarily while en route to another institution.

Of the I/Ps in the program during the reporting period, 96% received at least weekly individual PC contacts, 36% of contacts took place in a confidential setting and 64% of contacts were cell-front. There were two instances of out of cell, non-confidential contacts. Reasons for non-confidential contacts included, 33% I/P refusals; 4% custody lockdowns; 1% lack of custody escorts; and 62% unspecified or staff decision. 87% of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every 30 days. Daily LPT rounds were documented on the CDCR Form Progress Note 7230-MH 100% of the time, and 30% of I/Ps were offered at least five hours of structured therapeutic activities per week.

Three I/Ps refused more than 50% of offered treatment during a given week period. The three I/Ps refusing more than 50% of offered treatment services did not receive daily PC contacts during the work week, and no I/Ps were given a modified treatment plan. There were several technical barriers regarding data entry into MHTS.NET that prevented identification of these I/Ps.

## ASU-Non-MHSDS

During the reporting period, 1989 non-MHSDS inmates were placed in ASU. All inmates placed in ASU received a timely nursing pre-placement screening (CDCR Form 7219), and all screenings were conducted in a confidential setting. Custody documented 30-minute welfare checks 97% of the time. Nursing documented daily LPT rounds 100% of the time.

## SUICIDE PREVENTION

### SPR-FIT (Suicide Prevention Focused Intervention Team)

CIM has an active Suicide and Response Improvement Team (SPR-FIT). See Proof of Practice Binder to review SPR-FIT meeting schedules, agendas, minutes and attendance logs.

### Completed Suicides

There were no completed inmate suicides in the institution.

### Attempted Suicides

Of the 5 serious suicide attempts during the reporting period, 2 of them were by hanging, 1 was by lacerations, 0 were by overdose, 1 was by swallowing razor blades, and 1 was by jumping from a tier. 3 required outside hospitalization and all 5 were referred to an MHCB for acute mental health care services, with 60% ultimately referred to a DMH facility and one was referred for Mainline EOP facility transfer.

DRPD 1 00112

For all MHCB psychiatric admissions, upon return to regular housing from a MHCB or MHOHU, full 5-day SPD follow-up was documented between 95.1% and 100% of the time. Custody wellness checks were completed as required 89.6% of the time.

The self-harm review process remains active. Since the last management report, zero reviews have been completed and presented to the treatment teams and SPR-FIT for discussion. Zero reviews are in progress, and Zero are awaiting return of the inmate–patient to the institution from DMH.

Suicide Risk Evaluations (CDCR 7447) in the MHCB were completed at the initial IDTT (within 24 hours unless the admission was on a weekend or holiday, in which case the I/P is on Suicide Watch until IDTT) 100% of the time Discharge SRE's were completed at the final IDTT when discharges were ordered,100% of the time.

**SPR-FIT Committee Meetings**
Of the six SPR-FIT monthly meetings required during the reporting period, 6 monthly meetings were documented to have occurred. The SPC coordinates the monthly SPR-FIT. During the reporting period the agendas included:
- Suicide Prevention Videoconferencing – Equipment and attendance improvement
- High Suicide Risk Alerts via MHTS.net – Incorporating and managing new source of risk data
- Serious Suicide Attempt Reviews – Continuing monitoring of systemic risks and reduction/management
- Revision and implementation process for OP 14 (Suicide Watch), with particular focus on expansion of SPD discharges to mainline yards and update of 5 day Follow-Up and Custody Wellness Checks
- Development, implementation, and monitoring of Suicide Risk Evaluation Proctoring & Mentoring Program
- Utilization and monitoring of CDCR's "High Risk/High Utilizer" List for specialized assessment and treatment enhancement

During the reporting period, ongoing suicide prevention training consisted of: (List all ongoing suicide prevention activities and training that took place during the reporting period)
- Suicide Risk Evaluations (CDCR 7447) – Training (to entire MH Staff)
  - Review of key SRE elements, goals, procedures, and documentation
- OP 14 (Suicide Watch) Revision and Implementation
  - Training on new discharge process and expansion to new mainline yards.

### RVR PROTOCOLS
During the reporting period, 1208 inmates at the institution received RVRs: 766 for GP Inmates, 362 CCCMS, 63 EOP, and 17 MHCB. 100% of the CCCMS, EOP and MHCB RVRs received a mental health assessment.

### USE OF FORCE
During the rating period there were a total of 233 Incidents in the Institution.

DRPD 1 00113

There were a total of 80 incidents involving the use of force, of those incidents 51 involved MHDS inmates. There were a total of 153 incidents not involving the use of force, of those incidents 78 involved MHDS inmates. A table of all the Use of Force and Non-Use of Force incidents during the reporting period can be found in the proof of practice binder.

## RECEPTION CENTER

All new arrivals with MHSDS histories are screened within 72 hours. The inmates arrive twice a week (Wednesday and Friday). Once they are done with their intake in R&R, they are escorted directly to the mental health annex that is across the hallway. If there are any screening packets left over, the inmate clerk knows to bring those inmates back the next day for screening, but this is a rare occurrence. This process ensures a near 100% completion rate within 72 hours for all inmates, not just prior MHSDS.

Initial Health Screenings were conducted on 100% of incoming inmates by nursing staff within 24 hours of arrival.

## RC CCCMS

This population is housed primarily in B yard. During the reporting period the percentage of RC I/Ps in the MHSDS has declined from 23% to approximately 9%. The average LOS was 77 days and ranged from 3 to 366 days. 36 % of I/Ps had LOS longer than 90 days. Reasons for lengths of stay longer than 90 days included:
- Pending RVR
- Pending possible prosecution by District Attorney
- Pending transfer to a Level III-SNY
- Pending transfer to a Level-IV-SNY-180
- Pending transfer to a Level IV-GP-180

Clinical contacts for the reporting period are contained in the RC CCCMS Case Manager Contacts audit (Tab N). 68% of I/Ps had initial contacts with their PC within 30 days of arrival. Subsequently, 95% had routine contacts with their PC at least every 90 days.

Those I/Ps that had prescribed psychotropic medications received psychiatry contacts at least every 90 days 99% of the time. Confidential contacts with the PC took place 99% of the time. Reasons for non-confidential contacts included: 100% I/P refusal.

## RC EOP

This population is housed primarily on B yard and over the reporting period has declined from 9% of the I/Ps in the MHSDS to approximately 2%. The average LOS was 91days and ranged from 4 to 180 days. 83 % of I/Ps had LOS longer than 60 days. Reasons for lengths of stay longer than 60 days was primarily due to I/Ps who were endorsed and awaiting transfer.

RC EOP I/Ps were seen weekly by their PC 79% of the time, and monthly by their psychiatrist 91% of the time. Confidential contacts with the PC took place 98% of the time. Reasons for non-confidential contacts included: 16% I/P refusal, 12% lock downs, and 72% staff decision

DRPD 1 00114

and unspecified. Subsequent to the initial contact I/Ps had IDTTs scheduled monthly 72% of the time. I/Ps were offered at least five hours per week of structured therapeutic activity 41% of the time.

## MENTAL HEALTH REFERRALS

- Emergent: Immediately
- Urgent: Within 24 hours
- Routine: Within five working days

During the reporting period, 2007 referrals were received and on the final day of the period, 99% were closed. Referral statistics indicate that 67% of urgent referrals were seen within 24 hours, and 89% of routine referrals were completed in within 5 business days. There were no emergent referrals generated during the monitoring period.

### AGREEMENT AUDIT

The UNH-MHT.net audit process has taken place on a monthly basis throughout the monitoring period. The audits have focused on documentation of mental health service provision (Primary Clinician Scheduled Contacts, Psychiatry Visits, IDTT, Group Treatment, etc.) for CCCMS, EOP, and MHCB level of care.

The audits have been completed according to proscribed procedure communicated from Sacramento via the DCHCS Mental Health Program. These procedures include methodology for random selection of CDCR#'s within each Level of Care and Location and utilization of a standardized method for auditing agreement between the UHR and MHTS.net documentation of contacts.

Each monthly audit is conducted via a two-way comparison of MHTS "completed" appointments for primary mental health care with the corresponding documentation of the encounter in the eUHR. Records are reviewed for the month two months prior to the review date (i.e. concordance rates for August are audited in October). 100 contacts generated out of a randomized procedure are audited each month, and the agreement rate is tabulated, with a goal of at least 90% agreement. Agreement rates for the six months during the monitoring period are: 93% (Aug'11); 97% (Sep'11); 95% (Oct'11); 95% (Nov'11); 92% (Dec'11); and 94% (Jan'12). The audit results and trends to date show a high correlation, suggesting a strong likelihood that MHTS.net data can be used to accurately monitor and audit mental health service provision.

| Audit Completed | Oct'11 | Nov'11 | Dec'11 | Jan'12 | Feb'12 | Mar'12 |
|-----------------|--------|--------|--------|--------|--------|--------|
| Month Audited | Aug'11 | Sep'11 | Oct'11 | Nov'11 | Dec'11 | Jan'12 |
| Agreement Rate | 93% | 97% | 95% | 95% | 92% | 94% |

DRPD 1 00115

# Exhibit 20

# CSP-CORCORAN

# MENTAL HEALTH
# MANAGEMENT REPORT

# ROUND XXV VISIT
# AUGUST 20, 2012 TO AUGUST 23, 2012

TERESA MACIAS
CHIEF EXECUTIVE OFFICER, HEALTHCARE

CONNIE GIPSON
WARDEN (A)

SUKHDEEP GREWAL, M.D.
CHIEF OF MENTAL HEALTH

ROBERT FISCHER, PH.D.
CHIEF PSYCHOLOGIST (A)

DRPD 1 00199

## GLOSSARY OF TERMS

| Acronym | Term |
|---|---|
| AIMs | Abnormal Involuntary Movement Scale |
| APP | Acute Psychiatric Program |
| ASU | Administrative Segregation Unit |
| CAP | Corrective Action Plan |
| CC | Correctional Counselor |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CHSA | Correctional Health Services Administrator |
| DMH | Department of Mental Health |
| DOT | Direct Observation Therapy |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| HC-POP | Health Care Population Oversight Program |
| HS | Hour of Sleep |
| I/P | Inmate-patient |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Inter Disciplinary Treatment Team |
| LGB | Local Governing Body |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| LOS | Length of Stay |
| LPT | Licensed Psychiatric Technician |
| MAR | Medication Administration Record |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MHQM | Mental Health Quality Management Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| MHTS | Mental Health Tracking System |

DRPD 1 00200

| OHU | Outpatient Housing Unit |
|---|---|
| PC | Primary Clinician |
| PSU | Psychiatric Services Unit |
| QIT | Quality Improvement Team |
| QM | Quality Management |
| QMC | Quality Management Committee |
| R&R | Receiving and Release |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| SPC | Suicide Prevention Coordinator |
| SPR-FIT | Suicide Prevention and Response-Focused Improvement Team |
| SRE | Suicide Risk Evaluation |
| UHR | Unit Health Record |
|  |  |

DRPD 1 00201

# *Coleman* Site Visit, Round XXV
# MENTAL HEALTH MANAGEMENT REPORT
August 20, 2012 through August 23, 2012
CSP-Corcoran (COR)

## INSTITUTIONAL PROGRAM SUMMARY

**Overview of all the Mental Health Programs at the Institution**

The MHSDS at California State Prison (CSP) - Corcoran consists of six treatment programs; the Mainline (ML) EOP program, the ASU EOP program, the ASU CCCMS program, the SHU CCCMS program, the ML CCCMS program, and the MHCB.

**The ML EOP** program is an intensive outpatient program designed to treat I/Ps who, for their own safety, require segregation from the general population. Treatment is provided by a number of disciplines, including psychologists, social workers, recreation therapists (RTs), psychiatrists, and LPTs offering a minimum of ten hours a week of structured therapeutic activities. The population served is housed in 3B01 with a cap of One hundred and fifty I/Ps.

During this reporting period, the ML EOP transitioned, along with the entire 3B yard, from a Level IV GP to a Level IV, SNY. The Level IV GP I/Ps transferred out and, at one point, there were only 30 Level IV SNY in the building. As the transition progressed, and Level IV SNY I/Ps arrived from other institutions, the population increased so that, on 6/29/12, there were One hundred and fourty five EOP SNY I/Ps in 3B01 and six additional in the MHCB. This program has seven PCs and one Psychiatrist.

Due to the change, and the inability to mix SNY and ML I/Ps, the EOP was severely limited in programming. For a time, several groups were canceled. While some programming continued in the housing unit, there were restrictions on interactions of I/Ps. In addition to the I/Ps housed in 3B01, there continued to be up to seventeen I/Ps housed in the 3C01 building. As the transition continued, these I/Ps were either transferred to another institution or integrated into the 3B01 building. At the end of June, there were still eight I/Ps in 3C01, with two of them scheduled to transfer early in July.

**The EOP Hub** is also designed to treat the more severe mental health EOP I/Ps who require segregation from the regular ASU/SHU I/Ps for their own safety. This program provides at least 10 hours of structured therapeutic activities per week. The EOP Hub provides case management and group therapy to the I/Ps. The EOP HUB has an authorized capacity of Ninety nine I/Ps, nine PCs and one Psychiatrist.

The 3A Gym has been converted to a treatment area. It has been retrofitted with six group treatment rooms and twelve individual modules. There is office space for the clinical staff including clinicians, LPTs, RTs, and the psychiatrist.

DRPD 1 00202

**A pilot project** was initiated on 4/2/12 involving the Alternative Treatment Module (ATOM) chair for group therapy. This is a trial project, which provides I/Ps with a possible alternative to the traditional treatment module. Training was provided to EOP HUB clinical staff and custody staff assigned to the 3A Gym. Each use of the ATOM chair group room requires a survey to be completed by clinical staff, custody staff, and the I/Ps after each usage. These surveys are compiled and presented to headquarters and institutional staff in a monthly teleconference. There is also an individual cubicle with one ATOM chair available for individual sessions.

**The ASU CCCMS** program is housed in 3A04, with an overflow into 3A03 and 3A05. The CCCMS population has averaged about one hundred and sixty I/Ps. Individual treatment is offered in *Coleman* treatment cells located on the dayroom floor, and no facilities for group treatment are available. This program has six PCs and one Psychiatrist. CSP-Corcoran also has a stand-alone ASU. While no CCCMS I/Ps are housed there, it is monitored seven days a week for I/Ps displaying mental health symptoms or new arrivals with a MHSDS LOC.

**The SHU CCCMS** program provides services to approximately four hundred and fifty CCCMS I/Ps, including approximately fifteen expired MERD I/Ps who receive more intensive services as they are considered on ASU status. This program has twelve and a quarter full time PCs and three part-time psychiatrists.

This program has had significant challenges with the availability of Health Care Escorts, which is discussed in detail in the section on "Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements."

**The ML CCCMS** program is housed on 3A, 3B, and 3C facilities with over five hundred CCCMS I/Ps. In addition, 3B and 3C are SNY facilities whose MHSDS population is often more demanding. This reporting period, 3B completed transitioning from a Level IV GP facility to a Level IV SNY facility, resulting in a total turnover of the yard with a large volume of intakes and initial IDTTs. As many as seventeen EOP SNY I/Ps have been housed on 3C due to their case factors, awaiting transfer to a more appropriate SNY EOP facility. A modified, more intensive program is offered to these I/Ps. There are currently five PCs and two Psychiatrists assigned to ML CCCMS.

**The MHCB unit** is in Unit C of the hospital with Twenty four single cells. Of those, Twenty three are available for I/Ps, and one houses a long-term medical I/P. In addition, there is one observation room that is used for an I/P in five-point restraint. Additional housing is available on the Med/Surg unit, Unit B, for overflow beds as an extension of the MHCB. The MHCB is established as a short-term intensive psychiatric unit for I/Ps requiring up to a Ten-day inpatient stay. Most I/Ps are hospitalized for danger to self (DTS), danger to others (DTO) or grave disability (GD). It is staffed Twenty four/ seven by overlapping clinical teams composed of Psychologists, Social Workers, and Psychiatrists. There are also two RTs, one of whom works full-time in the Crisis Unit; the other splits 0.75-time to Unit C and 0.25-time to Units A, B, and D (medical I/Ps). It is also staffed by nursing and custody with Correctional Counselors available two days per week for IDTTs.

**The DMH** Coordinator reviews all the 7388-Bs provided by the clinicians in conjunction with IDTT. All positive indicators are distributed weekly by the coordinator and discussed at program IDTTs. The 7388-Bs are reviewed by the Coordinator to ensure that positive indicators are listed on the form and that detailed explanations are given for both referrals and non-referrals. If referrals are not made, the modified treatment plan has to be indicated in the 7388-B. In CCCMS, I/Ps who are considered to need a higher level of care are most likely referred to EOP first.

In addition, we had a Behavioral Pain Management Program serviced by one clinician, which had to be suspended due to staffing pressures. We also have a Pre-release Program serviced by one clinician who focuses primarily on EOP I/Ps soon to be released on parole and under Post Release Community Supervision (PRCS). Licensed psychologists are also assigned to the Emergency Room on a rotating basis to provide prescreening of MHCB admissions and act in a gate-keeping fashion. In addition, coverage is maintained on a face-to-face basis until 2200 hours to insure appropriate I/Ps are admitted to the MHCB.

### New Construction/Remodeling

Funds have been appropriated through AB900 to construct a new EOP Hub treatment and office space building. Construction has begun on this project. It was initially scheduled for completion in January 2013, but is now scheduled for completion in March 2013.

### New or Anticipated Mission Changes

As indicated above, our 3B facility converted from a Level IV GP facility to a Level IV SNY facility last year. During this reporting period, the ML EOP program gradually built up to its cap of One hundred and fifty I/Ps. The CCCMS ML population was also impacted by this transition resulting in a total turnover of the yard with a large volume of intakes and initial IDTTs.

### New or Overflow Administrative Segregation or any other Specialized Housing Units

ASU1 and 3A04 are identified as our ASU, and Sections A and B of 3A03 houses our ASU EOP I/Ps. Section C of 3A03 is utilized as an overflow for both ASU CCCMS I/Ps and ASU EOP I/Ps. 3A05, housing our ML CCCMS program, has also been used on an as needed basis as an overflow ASU unit during the reporting period

### Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements

Modified programs have been in effect on 3A and 3B Facilities during the reporting period due to lockdowns. These have resulted in some disruption to mental health services (the Program Status Report is available in the Proof of Practice Binders – Tab O). The EOP ML program was unable to conduct groups for about two weeks on 3B facility due to lockdowns.

DRPD 1 00204

Access to care issues continue to impact treatment, particularly in the SHU CCCMS and ASU CCCMS programs. Over the reporting period, the limited escort resources have become further strained due to the increased demand from medical and dental services. In our SHU CCCMS program, both physician and registered nurse (RN) lines have increased, leaving a total of six two-man escort teams available for mental health appointments on the two Facilities serving twelve clinicians. This has resulted in longer wait times for clinicians providing therapeutic services

In ASU CCCMS, two escort officers provide services for six clinicians with mental health appointments for about One hundred and sixty I/Ps seen weekly. The one private office is used for medical lines. IDTT and ICC are now conducted on the dayroom floor in partitioned areas. This escort shortage has required innovative strategies to insure adequate mental health treatment is provided. Mental Health and Custody are working to increase the flexibility in the use of escorts, and ensure greater accountability of both escort and clinical staff

MENTAL HEALTH ROSTER

## Institutional Mental Health Staffing and Telemedicine

### January 1, 2012 to June 30, 2012
### CSP-Corcoran

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent (Contractors and Dual Appointments) | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 1 | 1 | 0 | 0% | 0 | 0 | 0% |
| Senior Psychiatrist | 0.5 | 0 | 0.5 | 100% | 0 | 0.5 | 100% |
| Chief Psychologist | 1 | 1 | 0 | 0% | 0 | 0 | 0% |
| Senior Psychologist | 4 | 4 | 0 | 0% | 0 | 0 | 0% |
| Staff Psychiatrist | 12.5 | 2.75 | 9.75 | 78% | 7.6 | 2.15 | 17.2% |
| Staff Psychologist | 33.5 | 32.75 | 0.75 | 2% | 2 | - 1.25 | -3.7% |
| Supervising Social Worker | 1 | 1 | 0 | 0% | 0 | 0 | 0% |
| Social | 17.4 | 13.0 | 4.4 | 25% | 2 | 2.4 | 14% |

Page 4 of 16

DRPD 1 00205

| Worker | | | | | | | |
|---|---|---|---|---|---|---|---|
| Registered Nurse | 43.92 | 41.92 | 2.0 | 4.5% | 0 | 2.0 | 4.5% |
| Senior Psych Tech | 4 | 4 | 0 | 0% | 0 | 0 | 0% |
| Psych Tech | 37.64 | 34.0 | 3.64 | 9.6% | 0 | 3.64 | 9.6% |
| Recreation Therapist | 10.5 | 10 | 0.5 | 4.8% | 0 | 0.5 | 4.8% |
| Other (specify) | N/A | | | | | | |

Telemedicine

| Psychiatry telemedicine used? | Number of Hours Per Week |
|---|---|
| No | N/A |

The staffing above represents the complement of staff and contractors present at the end of the monitoring period. The personnel documentation is available in the Proof of Practice Binders-Tab S.

QUALITY MANAGEMENT

**Local Governing Body (LGB)**

The LGB is responsible for oversight of health care services and is the ultimate authority for all health care matters. The LGB was scheduled to meet three times during the monitoring period. All of the scheduled meetings achieved a quorum. The agenda and minutes are available in the Proof of Practice Binders-Tab B.

**Quality Management Committee (QMC)**

The purpose of the QMC is to monitor, assess, and improve the quality of health care. During the reporting period the QMC met 10 times and a quorum was attained at all meetings. Agendas and minutes are available in the Proof of Practice binders-Tab B. The QMC is chaired by the Chief Executive Officer (CEO) and regularly attended by the Chief of Mental Health (CMH), Warden (or designee), Associate Warden (AW) Health Care, the CHSA II, Chief Medical Officer (CMO), the Chief Physician and Surgeon, Chief Nurse Executive, and Pharmacist-in-Charge. The QMC regularly collects reports from each service delivery area (e.g., Pharmacy, Nursing, Medical, Dental and Mental Health). Presentations by each of the departments/ subcommittees are data focused, and general communication/coordination issues are discussed.

**Mental Health Quality Management Subcommittee (MHQM)**

The purpose of the MHQM is to oversee mental health services, review program performance, and monitor, create, and implement improvement efforts. The CMH or designee serves as Chair.

DRPD 1 00206

MHQM is scheduled to meet twice a month. During the reporting period the MHQM met twelve times. A quorum was attained in all of the meetings during the reporting period.

## Peer Review

Currently all three clinical disciplines have active peer review committees: psychology, social work, and psychiatry. General procedures are outlined in the Healthcare Quality Management OP 1060.

### Psychology Peer Review

The Psychologist Peer Review Team consists of three psychologists, including the team leader. The psychologist supervisor of the peer review and the team leader discuss possible candidates for the peer review team, and the team leader then invites psychologists to participate. There has been little change in the reviewing team over the past six months. All psychologists are welcome to participate in the reviews each month.

These peer reviews are in the Proof of Practice Binders – Tab B.

### Psychiatry Peer Review

Peer review is done once a month and one psychiatrist is reviewed. The psychiatrist to be reviewed is picked at the previous meeting. This person in turn prepares a case and a brief written description of case or issues to be discussed. Then, on the last Tuesday of the month, the committee meets at 7:00 AM and the case is presented.
See Proof of Practice Binders – Tab B.

### Social Work Peer Review

The Social Work Peer Review committee has had difficulty getting started. A chair of the committee has been chosen and, for the last couple of months, has been setting up a format involving didactic and case presentation. These presentations would then be evaluated by their peers attending on a structured questionnaire (see Proof of Practice Binders-Tab B). No meeting has taken place at this point.

## QIT Activities

Two Mental Health QITs have been ongoing since the last *Coleman* audit; one (Emergency Referrals) has been added, and one (Medication Management) was finalized this reporting period.

**1. Medication Management QIT** – Initially this was developed as a standing QIT to look into issues concerning the administration of medication. Since then, it has become more formalized. The responsibility of the QIT is to examine the monthly MAPIP audit and address areas in which minimal standards are not met, often by further examining the issue and developing a corrective

DRPD 1 00207

action plan. This QIT was completed in February 2012 and the Final Recommendation Form is in the Proof of Practice Binder.

**2. EOP Hub Treatment Improvement Plan QIT** – This has been a standing QIT to examine specific EOP Hub interventions, collect data, and develop innovative treatment strategies to increase participation by the I/P population. This also entails a monthly teleconference involving all Hub institution to share ideas and strategies.

**3. MHTS/UHR Agreement QIT** – This QIT was initiated last year to examine discrepancies between documentation in the UHR or eUHR and tracking in the MHTS.net. The QIT was established to look into causes for any agreement issues and develop corrective action plans.

**4. Emergency Referrals QIT** – This QIT was established to evaluate the reasons for a low number of emergency referrals in the MHTS.net when we knew that more referrals had been made. The QIT will also generate suggestions for correcting the procedures so that we capture these referrals.

**Miscellaneous Audits:**

The audits here are those that are not specific to any program but extraneous to the reports provided in the MHTS.net. The data is available in the Proof of Practice Binders – Tab B.

**Program and Supervisory Chart Audits.** The Program audits were initiated in March 2009, and are currently conducted quarterly. Until recently, they had been conducted monthly. They are designed to ensure timelines and documentation requirements as outlined in the MHSDS Program Guide are met. Each audit is specifically tailored to meet the requirements for that specific program and may be completed by the line staff or supervisor of the program. Line staff is encouraged to participate as it can also act as an educational tool. The supervisory audit is completed by the supervisor of each program and is designed to look at the more qualitative aspects of documentation in the eUHR.

MEDICATION MANAGEMENT, PSYCHOTROPIC MEDICATIONS

The total number of inmates in the MHSDS receiving psychotropic medications at the end of the reporting period was one thousand four hundred and fourty one. A list of these inmates is available on request. Most of the data used in the below findings were obtained from the results of the MAPIP audits, and the audits as well as protocols are available in the Proof of Practice Binders – Tab C. Unless specifically indicated, the audits were conducted on non-MHSDS, as well as MHSDS I/Ps

**Medication Continuity for New Arrivals (Inter-Institutional CDCR Transfers)**

DRPD 1 00208

We did not have a methodology for capturing the total number of new arrivals on psychotropic medications. R&R keeps these records for one month only. Now a process has been established and is in place to capture this information in future. According to the last month's audit, 100 percent of the inmates in this category received their medications by the next calendar day.

### Medication Continuity for Transfers (Intra-Institutional Transfers)

Based on a random sample of twenty charts per month, during the reporting period, 98 percent of I/Ps transferring within the institutions received their prescribed psychotropic medications without interruption. One hundred percent of I/Ps discharged from the MHCB continued to receive their psychotropic medications without interruption.

### Medication Continuity for Renewal of Orders/Bridge Orders

During the reporting period, One hundred percent of I/Ps received timely renewals of their psychiatric medications. No I/Ps had a lapse in medication, resulting from medication expiration.

### Lab Tests/Results for MHSDS Inmates

During the reporting period, Twenty randomly selected UHRs of I/Ps receiving psychotropic medications were reviewed. Of nineteen applicable cases, eighty nine% had laboratory tests ordered when clinically indicated. Psychiatrists reviewed results and documented clinical action in eighty nine percent of the seventeen cases with significant laboratory results. An Abnormal Involuntary Movement Scale (AIMS) must be completed every six months for each inmate prescribed antipsychotic medications. During the reporting period, an AIMS was completed within the last six months in sixty eight percent of the nineteen applicable cases.

### Direct Observation Therapy (DOT) Medication Administration

We have Fourteen thousand eight hundred and ninety two psychotropic DOT medications prescribed at the end of the reporting period. During pill lines, DOT medication administration procedures were followed ninety nine percent of the time.

### HS Medications (After 2000 Hours)

There are four hundred and nineteen MHSDS I/Ps receiving HS medications as of the end of the reporting period. HS medications are delivered after 2000 hours. During the reporting period, HS medications were administered after 2000 hours One hundred percent of the time.

### Medication Non-Compliance Policies and Procedures

During the reporting period there was an average of Thirty notifications of non compliance per week and sixty three percent of non compliance cases had documented follow up appointments with the Psychiatrist within seven days of the referral.

### The Medication Administration Record (MAR)

DRPD 1 00209

The audited UHRs contained the previous month's MARS One hundred percent of the time, and hundred percent of UHRs contained MARs that were complete and legible.

**Timely Processing of Medication Orders**

Guardian records the date orders were written and the manifest date (the date the pharmacy sent the medications to the pill window). One hundred percent of changes and newly prescribed medications were received within twenty four hours of the date the order was written.

**Informed Consent Forms**

For I/Ps on psychiatric medications, a random sample of the current UHR contained up-to-date consent forms eighty one percent of the time per MAPIP. Consent forms expire annually.

**Pill Lines**

Medications are typically distributed via pill line in the ML CCCMS facilities. During the reporting period, the average pill line wait was Twenty eight minutes on 3B01 yard

In 3A03 both med lines started at 0720 and ended at 0845. These medications are passed cell to cell, no walk-up med line.

In 3A04 upper tier med line started at 0746 and ended at 0840. These medications are passed cell to cell, no walk-up med line.
In 3A04 lower tier med line started at 0729 and ended at 0830. These medications are passed cell to cell, no walk-up med line.

**Hoarding/Cheeking Medications**

During the reporting period, there were no CDCR-115 RVRs written explicitly for hoarding or cheeking medication.

**Parole medications process**

Currently, the Classification and Parole Representative notifies pharmacy of all paroling I/Ps at least fourteen days in advance of release dates. During the reporting period, One hundred percent of paroling I/Ps received a thirty day medication supply at the time of release. Paroling inmates are required to sign for receipt for their parole medications. During the reporting period, One hundred percent signed manifests acknowledging receipt of their prescription medications.

MAINLINE CCCMS

**Timeliness of PC and Psychiatrist Contacts**

DRPD 1 00210

During the reporting period four hundred and eighty nine I/Ps entered the CCCMS mental health program. Of these, fifty one percent received an initial contact with their PC within 10 days during which time the Clinical Intake Assessment was completed. In addition fifty percent had their initial IDTT within fourteen days of arrival or transfer into the program. This shortfall from the guideline standard was due in large part to the conversion of 3B Facility which has since been completed and so the issue has been rectified. Thereafter ninety two percent received PC contacts at least once every ninety days (or more often if indicated), and eighty five percent had scheduled IDTTs at least annually (or more often if indicated). Staff participated in the IDTT with the PC being present one hundred percent of the time, psychiatrist sixty seven percent of the time, and I/P ninety nine percent of the time. The only reason why the I/Ps failed to attend the IDTT was lock downs.

During the reporting period, ninety nine percent of I/Ps with prescriptions for psychotropic medications received timely psychiatry appointments. Reasons that inmates did not have timely psychiatry contacts included: one percent inmate refusal.

## Pre-release and Discharge Planning

During the reporting period, fourty four I/Ps in the CCCMS level of care were to parole from the institution according to HQ. Of these, twenty three received parole planning, five paroled or transferred before the parole date, twelve were not scheduled, one refused and one was a scheduling error.

MAINLINE ENHANCED OUTPATIENT PROGRAM (EOP)

During the reporting period, fifty nine percent of all new EOP admits were assessed and presented to the IDTT within 14 days of admission, at which point their initial treatment plan was completed and signed by the IDTT attendees. Again, this low figure was due in large part to the conversion of 3B Facility which has since been completed and so the issue has been rectified. Once admitted to the program, weekly PC contacts (individual or group activity) took place ninety eight percent of the time, IDTTs took place at least every ninety days, eighty four percent of the time, and treatment plans were updated at least every 90 days, sixty nine percent of the time. The issue is due to the quality of the Audit and staff training has been done. IDTTs were attended by their PC one hundred percent of the time, by the psychiatrist eighty six percent of the time, and the I/P eighty three percent of the time. Reasons why the I/P failed to attend the IDTT included; six percent I/P refusal, one percent scheduling issues (sick/furlough), and ten percent lock downs.

During the reporting period, group therapy was provided for the I/Ps in the EOP LOC. Group topics are listed in the Proof of Practice Binder. On average, I/Ps were offered 6.67 hours of structured therapeutic activity per week. Again, this low figure was due in large part to the conversion of 3B Facility which has since been completed and so the issue has been rectified.. During the reporting period, two I/Ps were provided a modified treatment plan. One hundred percent of those who received a modified treatment plan also received a monthly IDTT.
In July of 2012 we began to use individual treatment rooms in the EOP Treatment Building to provide confidential sessions for the I/Ps.

DRPD 1 00211

**Prerelease and Discharge Planning**

During the reporting period, seventeen I/Ps in the EOP level of care were to parole from the institution according to HQ.  Of these, eleven received parole planning, five paroled or transferred before the parole date, and one was not scheduled.

## DEPARTMENT OF MENTAL HEALTH (DMH) REFERRALS

During this period two hundred and seventy seven I/Ps met one or more of the indicators for consideration for a higher LOC. 244 I/Ps were brought to IDTT and were considered for higher LOC. Of the identified and who were brought to IDTT, 6.9 percent were referred to DMH, 93.1 percent were not referred.  During this period 886 IDTTs for all Levels of care were held.  This data includes I/Ps who were seen multiple times in IDTT during the reporting period.  All I/Ps were considered at IDTT for referrals to higher levels of care, and the 7388Bs were scrutinized by the DMH Coordinator for accuracy, completeness, and possible referral.   Twenty-five I/Ps listed on the DMH non-referral log (or all I/Ps on the list if less than twenty five) were randomly audited monthly.   Of those audited, one hundred percent had a reason for non-referral documented on the 7388B, and One hundred percent had documented interventions to improve the I/P's level of functioning.  This suggests that the DMH referrals were equally well managed and clinically accurate.

During the reporting period, seventeen referrals to DMH were completed: ten ICF and seven APP.  Thirty percent (three out of ten) of ICF referrals were completed within five working days, seventy two percent (five out of seven) of APP referrals were completed within two working days and posted on SharePoint.

During this time period none of the ICF or APP referrals were rejected by DMH and only one of the APP referrals was rescinded (fourteen percent).

During the reporting period twenty eight I/Ps returned to the institution from DMH.  DMH discharge summaries were received when the I/P returned to the institutions one hundred percent of the time on SharePoint.  Clinician-to-clinician contact took place within five working days of the I/P's return to the institution twenty nine percent (eight out of twenty eight) of the time.  Five-day follow-ups were completed One hundred percent of the time for returning I/Ps.

## MENTAL HEALTH CRISIS BED (MHCB)

The institution has a twenty four-bed MHCB unit.  I/Ps are received from internal referrals as well as from other institutions.  During the reporting period, three hundred and twenty seven

DRPD 1 00212

referrals were received from within the institution and sixty four referrals were received from other institutions.

During the reporting period, the total number of admission to the MHCB unit totaled three hundred and ninety one. The average LOS was 13.4 days. The range was from zero to sixty one days. The number of I/Ps with a LOS longer than ten days was forty eight according to HCPOP. Reasons for LOS longer than ten days included; six percent DMH referral awaiting a bed, zero percent Keyhea in process, forty percent clinically discharged awaiting bed, two percent clinically discharged awaiting transfer back to home institutions, four percent starting a trial of new psychotropic medication. The percent retained for clinical reasons including psychosis, suicidality, depression, poor response to medication treatment, ongoing agitation and mood swings was fourty eight percent. .

Prior to being admitted to the MHCB unit, One hundred percent of the I/Ps admitted during regular working hours were administered a pre-admission screening. Those I/Ps admitted after hours received their screening their screening the next morning. Once admitted to the MHCB unit they received their initial IDTT within seventy two hours of admission ninety three percent of the time. Thereafter, I/Ps were offered at least weekly IDTTs eighty two percent of the time. IDTTs were attended by the PC one hundred percent of the time, psychiatry ninety three percent, CC-I sixty four percent, nursing eighty percent of the time and I/P one hundred percent. Daily contacts by a licensed psychologist or psychiatrist occurred eighty four percent of the time. Of those I/Ps that were admitted due to suicidal threats or behavior, only nine percent were administered an SRE according to MHTS, However based on Audit of EUHR a One hundred percent of initial SRE were completed. Staffs were trained on data input and recording and this has been rectified. One hundred percent I/Ps received a SRE upon release from the MHCB. Ninety percent received a consecutive five-day follow-up after their release from the MHCB.

## Alternative Housing

We do not have Alternative Housing here. We only have a medical OHU that is not used for mental health. Alternative housing has never been used in the reporting period.

## ADMINISTRATIVE SEGREGATION UNIT (ASU)

During the reporting period, there were four hundred and seventy eight I/Ps that entered the ASU programs: one hundred and ninety six at CCCMS LOC, ninety three at EOP LOC and one hundred and eighty nine non-MHSDS I/Ps. All patients entering ASU are supposed to receive a nursing pre-placement screening. However, during the reporting period only fourty four percent of the I/Ps received pre-placement screening prior to placement in the ASU setting according to audits. Staff have been trained and QIT is being developed to address this issue. One hundred percent of the screenings that were conducted were conducted in a confidential setting. Those not receiving screenings typically came from the SHU. Incoming I/Ps were placed in identified safety cells One hundred percent of the time according to custody audits. One hundred percent

DRPD 1 00213

of I/Ps placed in ASU were reviewed for current MHSDS status within one working day following their placement in ASU, and prior to the 114D hearing. Sixty-four percent of I/Ps received a mental health screening (31-item questionnaire) within seventy two hours of placement. Staff have been educated regarding data entry and auditing procedures. Custody documented thirty minute welfare checks during the reporting period ninety nine percent of the time.

## ASU-CCCMS

During the reporting period, Six hundred and eighty one I/Ps entered the ASU CCCMS program. Seventy-seven percent of the I/Ps were assessed by a clinician within ten working days. Eighty percent of initial IDTTs were completed within fourteen calendar days. Subsequent IDTTs took place at least every ninety days, ninety six percent of the time. One hundred percent of IDTTs were attended by the primary clinician; ninety four percent of IDTTs were attended by a psychiatrist, zero percent of IDTTs were attended by the CC; The CC and supervisors have been notified. forty five percent of IDTTs were attended by the I/P. The only reason for non-participation included was I/P refusals.

During the reporting period, eighty eight percent of I/Ps received at least weekly individual PC contacts, thirty one percent of the time they were seen in a confidential setting, and sixty nine percent of the time they were seen cell-front. Reasons for non-confidential contacts included: sixty two percent I/P refusals, three percent lack of custody escorts, four percent other (clinician decision which includes running out of time, staff shortage and staff absence). Ninety-three percent of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every ninety days. Daily LPT rounds were documented on the CDCR Form 7230-MH One hundred percent of the time. Daily ASU morning meetings between custody and clinical staff were documented One hundred percent of the time.

## ASU EOP (HUB)

During the reporting period, six hundred and three I/Ps entered the ASU EOP. One hundred percent of I/Ps received a comprehensive assessment (7386) prior to the initial IDTT or within fourteen calendar days of referral/identification. Eighty-eight percent of initial IDTTs were completed within fourteen calendar days. Subsequent IDTTs took place at least every ninety days seventy nine percent of the time. One hundred percent of IDTTs were attended by the primary clinician; eighty three percent of IDTTs were attended by the psychiatrist; eighty three percent of IDTTs were attended by CC; and ninety six percent of IDTTs were attended by I/P. The only reason for non-participation was I/P refusals.

During the reporting period, Fifty-seven percent of I/Ps had LOS longer than sixty days. Thirty-three percent (twenty six I/Ps) had LOS longer than ninety days days; of those, ninety nine percent were reviewed every thirty days by the Facility Captain or CC-II. Reasons for LOS longer than ninety days included: sixteenendorsed awaiting transfer/bed availability, six pending DA referral/RVR, two out to court, one pending DRB, one pending ICC.

DRPD 1 00214

Of the I/Ps in the program during the reporting period, One hundred percent received at least weekly individual PC contacts, fifty four percent of contacts took place in an out of cell confidential setting, and fourty six percent of contacts were cell-front. Reasons for cell-front contacts included: twenty six percent I/P refusals; four percent custody lockdowns; and sixteen percent provider initiated which includes running out of time, staff shortage and staff absence. Ninety-two percent of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every thirty days. Daily LPT rounds were documented on the CDCR Form Progress Note 7230-MH One hundred percent of the time. Fifty-seven percent of I/Ps attended at least ten hours of structured therapeutic activities per week.

During the reporting period, the average number of I/Ps who refused more than fifty percent of offered treatment during a given week period was thirty four percent. I/Ps refusing more than fifty percent of offered treatment services received daily PC contacts during the workweek One hundred percent of the time, and One hundred percent of those I/Ps were given a modified treatment plan. Daily ASU morning meetings between custody and clinical staff were documented ninety five percent of the time. In addition, a list and description of groups being offered is available in the Proof of Practice Binders – Tab O.

### ASU Non-MHSDS

During the reporting period, four hundred and nine I/Ps entered ASU-Non-MHSDS program. Of those, One hundred percent received a timely nursing pre-placement screening (CDCR Form 7219), and One hundred percent of the screenings were conducted in a confidential setting. Custody documented thirty minute welfare checks One hundred percent) of the time. Nursing documented daily LPT rounds One hundred percent of the time.

During the reporting period, four hundred and nine I/Ps entered ASU-Non-MHSDS program. Of those, One hundred percent received a timely nursing pre-placement screening (CDCR Form 7219), and One hundred percent of the screenings were conducted in a confidential setting. Custody documented thirty minute welfare checks One hundred percent of the time. Nursing documented daily LPT rounds One hundred percent of the time.

### SHU CCCMS

During the reporting period, eight hundred and fifty seven I/Ps were admitted to the SHU-CCCMS. sixty two percent of the I/Ps had an initial IDTTs within fourteen calendar days. Subsequent IDTTs took place at least every ninety days, ninety five percent of the time. One hundred percent of IDTTs were attended by the primary clinician; seventy nine percent were attended by a psychiatrist, seventy nine percent were attended by the CC; One hundred percent were attended by the LPT; and fourty two percent of IDTTs were attended by the I/P. The only reason for non-participation included was I/P refusals. Ninety-three percent of I/Ps subsequently received contacts with their primary clinician at least once every thirty days, and ninety seven percent of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every

DRPD 1 00215

ninety days. Weekly LPT rounds were documented on the CDCR Form 7230-MH ninety three percent of the time.

SUICIDE PREVENTION

The institution has an active SPR-FIT. The SPR-FIT has continued to meet on a monthly basis. While the formal SPR-FIT Committee meets regularly on the fourth Tuesday of the month, the committee members, as well as all mental health clinicians and designated nursing and administrative staff, are encouraged to attend the SPR-FIT videoconference on the second Wednesday of each month.

Of the six SPR-FIT monthly meetings required during the reporting period, six monthly meetings occurred and were documented by minutes of the meeting. The SPC coordinates the monthly SPR-FIT. During these meetings, any completed suicides, serious suicide attempts, and the status of those I/Ps on the High-Risk Watch List are discussed, as well as any audits related to suicide prevention. The minutes and agendas during the reporting period are included in the Proof of Practice Binders-Tab I.

**Completed Suicides**

During the reporting period, there were no completed inmate suicides in the institution.

During the last two years there were no completed suicides in the institution.

**Attempted Suicides during the Reporting Period**

There were seven serious suicide/self harm attempts during the reporting period: one was by hanging; three were by lacerations; one was by overdose; one was by asphyxia; and one by swallowing a foreign body. Five required outside hospitalization and two were referred to the MHCB for acute mental health care services, with one ultimately referred to a DMH facility. Five continue on the High-Risk Watch List. All serious suicide attempts are discussed during the Emergency Medical Response Review Committee (EMRRC). These minutes are included in the Proof of Practice Binders – Tab T. These attempts are also listed in the Suicide Attempt Log.

On return to regular housing from a MHCB, five-day follow-ups were documented ninety five percent of the time. There were 304 MHCB discharges during this reporting period. Seventy were re-admitted or transferred and two were paroled. For the remaining two hundred and thirt two discharges, Ninety five percent of the five-day follow-ups were completed consecutively. The non-compliant five percent was restricted to weekend tracking errors.

Custody wellness checks were completed as required Eighty Six percent of the time, on average. An audit was completed during this reporting period to ascertain the percent completion of the three-day custody suicide prevention follow-up. This was determined by the presence of the Suicide Prevention Folder, which is completed by both custody and clinical staff. The percent completed, overall, is Eighty Six percent percent

DRPD 1 00216

Four of the five facilities ranged between eighty four percent and ninety eight percent. These results are available in the Proof of Practice Binders – Tab T.

### RVR PROTOCOLS

During the reporting period, three thousand two hundred and nine I/Ps at the institution received RVRs: eight hundred and seventy one for GP, five hundred and thirty one for CCCMS, ninety for EOP, twenty six for MHCB, and two hundred and eleven for ASU. One hundred percent of the EOP and MHCB RVRs received a mental health assessment.   In addition, two hundred and sixty eight of the CCCMS I/Ps and fourteen of the GP I/Ps received mental health assessments. Of the CCCMS inmates, seventy eight received A, B or C SHU-able offenses and four hundred and fifty three D, E, F offenses.  Documentation is in the Proof of Practice Binder.

### USE OF FORCE

A table of all the Use of Force and Non-Use of Force incidents during the reporting period can be found in Tab M.  Of the Use of Force Incidents, sixty eight percent occurred with MHSDS I/Ps.  For Non-Use of Force Incidents, sixty six occurred with MHSDS I/Ps.

### MENTAL HEALTH REFERRALS

- Emergent: Immediately
- Urgent: Within twenty four hours
- Routine: Within five working days

During the reporting period, three thousand two hundred and seventy nine referrals were received and on the final day of the period, ninety eight percent were closed.  Referral statistics (See Tab R) indicate that eighty nine percent of emergent referrals were seen the same day, fifty five percent of urgent referrals were seen within twenty four hours, and sixty eight percent of routine referrals were completed within five business days (MHTS.net's calculation uses calendar days rather than business days). This issue is being addressed through staff training.

### MHTS.NET AGREEMENT AUDITS

The Agreement Audit determines the degree of agreement between the MHTS.net tracking and documents relating to that contact in the UHR or eUHR.  Most recently we have been using the eUHR exclusively for these audits.  Each contact has to agree on the date, the provider type, the name of the provider, and the type of contact.  A total of six audits were conducted during the reporting period on all of the different programs.  A summary table is available in the Proof of Practice Binders – Tab B.

DRPD 1 00217

# Exhibit 21

**Glossary of Terms**

| Acronym | Term |
|---------|------|
| AIMS | Abnormal Involuntary Movement Scale |
| APP | Acute Psychiatric Program |
| ASU | Administrative Segregation Unit |
| CAP | Corrective Action Plan |
| CC | Correctional Counselor |
| CCCMS | Correctional Clinical Case Management System |
| CDCR | California Department of Corrections and Rehabilitation |
| CHSA | Correctional Health Services Administrator |
| DMH | Department of Mental Health |
| DOT | Direct Observation Therapy |
| EOP | Enhanced Outpatient Program |
| GP | General Population |
| HC-POP | Health Care Population Oversight Program |
| HS | Hour of Sleep |
| I/P | Inmate-patient |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| IDTT | Inter Disciplinary Treatment Team |
| LGB | Local Governing Body |
| LOC | Level of Care |
| LOP | Local Operating Procedure |
| LOS | Length of Stay |
| LPT | Licensed Psychiatric Technician |
| MAR | Medication Administration Record |
| MHCB | Mental Health Crisis Bed |
| MH-OHU | Mental Health-Outpatient Housing Unit |
| MHQM | Mental Health Quality Management Subcommittee |
| MHSDS | Mental Health Services Delivery System |
| MHTS | Mental Health Tracking System |
| OHU | Outpatient Housing Unit |
| PC | Primary Clinician |
| PSU | Psychiatric Services Unit |
| QIT | Quality Improvement Team |
| QM | Quality Management |
| QMC | Quality Management Committee |
| R&R | Receiving and Release |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| SPC | Suicide Prevention Coordinator |
| SPR-FIT | Suicide Prevention and Response-Focused Improvement Team |
| SRE | Suicide Risk Evaluation |
| UHR | Unit Health Record |

*Coleman* Site Visit, Round XXV

**MENTAL HEALTH MANAGEMENT REPORT**

Monitoring Period: December 1, 2011 thru May 31, 2012

Date of site visit: July 30th thru August 1st, 2012

**CALIFORNIA CORRECTIONAL INSTITUTION**

**Institutional Program Summary**

**Overview of all the mental health programs:** CCI recently realigned to be an all SHU on yard A with a small Administrative Segregation component (HU6-8) and no General Population inmates. Yard B is completely SHU. Currently we house minimum and medium SNY inmates on levels C, D, and E.  Yard C, no longer a reception center, houses security Level II inmates and is designated a SNY. Our RC program was discontinued 12/1/11. As of 4//5/12 we were designated a transgender cluster facility with selected mental staff, psychiatrist and psychologists, being sent to HQ for subject matter expert (SME) training in transgender issues.

**New Construction/Remodeling:** There is no construction or remodeling activity.

**New or Anticipated Mission Changes:** The small Reception Center ran on Yard III for many years has been closed and has been replaced with a SNY level III.

**Major Population Moves:** The realignment involved a major population move to transfer current inmates from our former reception yard to make room for the incoming medium (level II) security SNY population.

**New or Overflow Administrative Segregation or any other Specialized Housing Units:** Facility C (medium security 270 design yard) has been realigned to become an SNY facility. All other facilities remain as before. Level II Administrative Segregation is no longer active and inmates are no longer housed there.

**Obstacles to Providing Mental Health Services and Adherence to Program Guide Requirements:**

1. Labs continue to be challenging in two ways:
   Obtaining timely draws. The main fail point has been identified as getting the lab order to phlebotomists for scheduling. A new LOP was recently developed and implemented to resolve this problem. Ongoing MAPIP lab audits will prove whether or not the new LOP brings us up to threshold. Once the lab draw is scheduled the completion rate is well above 99%.
   Doing labs on required psychiatric medications. At this time labs are ordered on Lithium, Depakote, and Tegratol.
2. Timely psychiatric response to clinical referrals continue to be exigent, however; more recent innovations appear to have finally solved the problem and while we are encouraged we must remain guardedly optimistic until a larger pool of data can be analyzed.

Page 1 of 11

3. <u>CCI MH AB109 realignment staffing losses</u> amount to over 60% of clinical line staff and 70% of supervisory staff. CCI's CEO and Chief of MH services have launched discussions as to how to arrange clinical priorities in the face of diminishing staff. We expect that the next six months will give the MH program the full reading of realignment impact.

4. <u>Shortage of medical escort staff</u> have slowed the pace of clinical contacts and IDTT's on celled yards. Steps have been taken to remedy this. We have centralized our service delivery efforts on the ASU and SHU yards which has reduced some of the bottlenecks caused by escort shortage and this has helped immensely.

5. <u>Privacy</u> has been a problem on Level 3 (Facility C) due to no confidential treatment space but this has most recently has been solved by the CEO with some minor construction and the authorization of laptops.

## **Mental Health Roster**

### **Institutional Mental Health Staffing and Telemedicine**

December 1, 2011 thru May 31, 2012

(Note: Throughout the reporting period, AB109 resulted in incremental MH staff losses as described in #6 above. The below figures represent staffing at the conclusion of the reporting period.)

| Position | Positions Established | Positions Filled | Vacancies | Vacancy Rate | Full-Time Equivalent | Functional Vacancies | Functional Vacancy Rate |
|---|---|---|---|---|---|---|---|
| Chief Psychiatrist | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Psychiatrist | 1 | 0 | 1 | 100% | 0 | 0 | 100% |
| Chief Psychologist | 1 | 1 | 0 | 0 | | | |
| Senior **** Psychologist | 2 | 2 | 0 | 0 | | | |
| Staff Psychiatrist | 6.5 | 4 | 2.5 | 38% | 1.5 | 1.0 | 15% |
| Staff Psychologist | 15 | 15 | 0 | 0 | | 0 | 0 |
| Supervising Social Worker | 1 | 1 | 0 | 0 | | | |
| Social Worker | 6 | 3 | 3 | 50% | 1.0 | 2 | 33% |
| Registered Nurse | 1.0 | 1.0 | 0 | | | | |
| Senior Psych Tech | 2.0 | 2.0 | 0 | 0 | | | |
| Psych Tech | 16 | 16 | 0 | 0 | 0 | 0 | 0 |
| Recreation** Therapist | 2.5 | 1.0 | 1.5 | 40% | 0 | 1.5 | 40% |

Page 2 of 11

DRPD 1 00047

| Other (specify) | | | | | | | |
|---|---|---|---|---|---|---|---|

## Telemedicine

| Psychiatry telemedicine used? | Number of Hours Per Week |
|---|---|
| NO | N/A |

# Quality Management (Cross-reference Binder Tab B)

## Local Governing Body (LGB)

CCI does not have a LGB. The CEO and Warden act in this capacity.

## Quality Management Committee (QMC)

The purpose of the QMC is to monitor, assess, and improve the quality of health care. During the reporting period the QMC met six times with quorum requirements met. Agendas and minutes are available in the Proof of Practice binders in the Health Care Administrative Office. The QMC is chaired by the Chief Executive Officer designee and regularly attended by the Warden (or designee), Associate Warden for Health Care, the CHSA II, the Chief Physician Executive or designee, Chief of Mental Health or designee, Director of Nursing, and Chief Pharmacist. The QMC regularly collects reports from each service delivery area (e.g., pharmacy, nursing, and MHSDS). Presentations by each of the departments / subcommittees are data focused, and general communication/coordination issues are discussed.

## Mental Health Quality Management Subcommittee (MHQM)

The purpose of the MHQMC is to oversee mental health services, review program performance, and monitor, create and implement improvement efforts. The Chief of Mental Health or designee serves as Chair. MHQMC is scheduled to meet monthly. During the reporting period the MHQMC met six times. A quorum was attained in 100% of the meetings during the reporting period.

## Peer Review

A newly restructured Case Manager Peer Review Program for psychologists and LCSW's met twice during the reporting period. Peer Review at CCI consists of a quarterly evaluation of clinical documentation by the clinical staff, including psychologists, social workers and psychiatry. Each quarter, three to four clinicians of equal licensure, is confidentially assigned a peer to review by the chair of the Peer Review Committee. The clinician is requested to evaluate the quality of the documentation for up to three inmates, dating back several months depending on the inmate's current housing. The criteria for evaluation is provided on Peer Review Scoring Sheet that reviews items such as legibility, diagnosis, treatment plan, clinician summary, etc. The reviewing clinician is to evaluate if the quality of the evaluation is emerging, attains or exceeds CDCR minimum standards of documentation. The clinician is to review a variety of CDCR documentation including but not limited to 7230's, 7388 A and B, and 7386

Page 3 of 11

forms. If a clinician is found to score below 65% in meeting the minimum standards of required documentation, the Peer Review Chair will counsel the clinician regarding needed areas of improvement. CCI has undergone a significant number of staffing changes over the past several months and as a result a new Peer Review Chair has volunteered to head the program. The Peer Review Program for Psychologists and Social Workers has met twice over the past two quarters. A total of six Psychologists have reviewed six peers and two Social Workers have reviewed two peers.

### QIT Activities

There were a total of seven Mental Health QITs active at some point during this reporting period. Four new QITs were chartered during the review period. Four QIT were resolved with final summaries (or verbal reports) presented to the QMC during the review period. Input to the QMC may be found in QMC minutes.

### QIT /CAP's initiated:

1. Three-day custody suicide prevention follow-up: Formed and retired during review period. New LOP was created. Training was given to affected staff.
2. LPT rounding documentation in CDC114 and 114A, and in MH CDCR 7230's: Nursing QIT formed and resolved during reporting period. Nursing audits report the problem has been resolved.
3. Privacy on Facility B (4B): (custody task force comprised of CEO, CMH, Captain and AW for HCA). Formed and resolved during reporting period. Privacy issues on IV B have been achieved for IP's consenting to come out of cell for clinical contacts. Refusals occur and are seen cell-front.
4. 21-day 30-minute ASU welfare checks: QIT formed by custody and retired during reporting period. .

### QIT Unresolved:

1. Medication Management:
   a. Med continuity nursing CAP will be retired as resolved during next reporting because we have not gathered enough data at this juncture over a long enough date range.
   b. Med noncompliance notification CAP will be retired as resolved.
      i. Notification to PP is timely
      ii. Response by PC is timely
2. Parole Medications: Nursing QIT will be retired as resolved during next reporting period.
3. MH Labs: Newly developed LOP has been implemented. Problems continue yet improved.
4. Timely psychiatric response to clinical referrals: The solution appears at hand yet we do not have 6 month of good data yet so it must await final resolution.

### QIT resolved/retired during monitoring period:

1. RVR write-ups were audited and found to meet the requirements of discussing:
   a. The IP's MH status
   b. How that status affected RVR case disposition.

Page 4 of 11

DRPD 1 00049

2.  Three-day custody suicide prevention follow-up: Formed and retired during review period. Custody was resolved this issue due to the resolution of their piece of the problem (a newly developed LOP).
3.  LPT rounding documentation in CDC114 and 114A, and in MH CDCR 7230's: Formed and retired during reporting period as is determined not to be a problem any longer.
4.  21-day 30-minute ASU welfare checks (custody task force): Formed and retired by custody during reporting period.

## Medication Management, Psychotropic Medications (Cross-reference Binder Tab C)

### Total number of Caseload IP's on psychiatric medications

Data for this section was pulled from MHTS.net (Rx Grid). The total number of inmates in the MHSDS receiving psychotropic medications at the end of the reporting period was 594.

### Medication Continuity for New Arrivals (Inter-Institutional CDCR Transfers)

91% of the sampled 80 new arrivals received medications by the next calendar day. The reporting is on all medications of which psychotropics are a subset. MAPIP protocols were followed by nurse auditors as to methodology and sample size. An ongoing nursing Medication Management QIT continues to monitor conformity and reports to MHQSC regularly.

### Medication Continuity for Transfers (Intra-Institutional Transfers)

Based on a random sample of 80 charts, during the reporting period, 91% of I/Ps transferring within the institutions received their prescribed psychotropic medications without interruption.   100% of I/Ps discharged from the MHCB continued to receive their psychotropic medications without interruption. An ongoing nursing Medication Management QIT continues to monitor adherence to our guidelines.

### Medication Continuity for Renewal of Orders/Bridge Orders

During the reporting period, 100% of inmate-patients received timely renewals of their psychiatric medications. No inmate-patients had a lapse in medication based on no written medication orders.

### Lab Tests/Results for MHSDS Inmates

In accordance with MAPIP protocols, psychiatrists were the sole designated auditors of the lab function. CCI is below half-staffed with psychiatrists and to pull one off line to do lab audits would have pushed psychiatry farther and farther behind in terms of swelling clinical contact backlogs.

### Direct Observation Therapy (DOT) Medication Administration

At the end of the reporting period, 934 psychotropic medications were prescribed DOT to 594 IP's. Nursing audits report that during pill lines, DOT medication administration procedures were followed 95% of the time.

DRPD 1 00050

### HS Medications (After 2000 Hours)

There were 146 MHSDS inmate-patients receiving HS medications as of the end of the reporting period. HS medications are delivered after 2000 hours. During the reporting period HS medications were administered after 2000 hours 100% of the time.

### Medication Non-Compliance Policies and Procedures

During the reporting period, there was an average of 20 to 30 notifications of non-compliance per week, and 40% of non-compliance cases had documented follow-up appointments with a psychiatrist within 7 days of the referral. MAPIP protocols were followed by nurse auditors as to methodology and sample size (n=20). During the reporting period a psychologist stood in for the psychiatry followup contact resulting in full compliance with the 7 day contact requirement. Nursing MAPIP audits do not allow for a psychologist stand-in, thus the 40% followup rate. At the writing of this report a new procedure is being developed to bring the 7-day psychiatrist contact requirement into compliance. This procedure is currently in effect but we have no data as of yet.

### The Medication Administration Record (MAR)

The audited UHRs contained the previous month's MARS 96% of the time, and 100% of UHRs contained MARs that were complete and legible.

### Timely Processing of Medication Orders

To verify timely processing, a random sample of 30 orders for DOT medications (MHSDS patients only) was selected. Guardian records the date orders were written and the manifest date (the date the pharmacy sent the medications to the pill window). 100% of changes and newly prescribed medications were received within 24 hours of the date the order was written.

### Informed Consent Forms

For inmate-patients on psychiatric medications, the three most recent monthly audits of the current UHRs contained up-to-date consent forms 96%, 81%, 91% of the time respectively. UHR audits for medication consents are conducted during IDTT's which results in every UHR being audited at least annually. Consent forms expire annually.

### Pill Lines

In open movement yards, medications are typically distributed via pill line. During the reporting period, the average pill line wait was 2-10 minutes on yards D and E.

### Hoarding/Cheeking Medications

During the reporting period, there were 6 CDCR-115 Rules Violation Reports (RVRs) written explicitly for hoarding or cheeking medication.

Page 6 of 11

### Parole medication process

Currently, the Classification and Parole Representative notifies pharmacy of all paroling inmates at least 14 days in advance of release dates. During the reporting period, 60 I/Ps paroled with active prescriptions for psychotropic medications. 100% of existing orders were renewed for 30-days. Paroling inmates are required to sign for receipt for their parole medications. During the reporting period 100% signed manifests acknowledging receipt of their prescription medications.

## Mainline CCCMS

### Timeliness of PC and Psychiatrist Contacts

During the reporting period 1040 I/Ps entered the CCCMS mental health program. Of these, 88% received an initial contact with their PC within 10 days during which time the Clinical Intake Assessment was completed. In addition 91% had their initial IDTT within 14 days of arrival or transfer into the program. Thereafter 99% received PC contacts at least once every 90 days (or more often if indicated), and 100% had a scheduled IDTTs at least annually (or more often if indicated). PC was present 100% of the time, Psychiatrist 91.2% of the time, and I/P 51.6% of the time on celled units, and 86.6% of the time on open movement units. The reason the I/P failed to attend the IDTT: 100% inmate refusal. (Ongoing discussion is addressing the high refusal rate on the celled units and it appears that the high refusal rate on celled units had been driven by: 1) Ducats not going out the night before an appointment per guidelines. IP's were not given a heads-up for their appointments and were not prepared or ready for them when escorts showed up unannounced for their escort. This has been recently addressed and ducats are now going out per guidelines the night before a ducated appt; and 2) HU shot-callers putting out the word that IP's are not to meet with clinicians privately.)

During the reporting period, 98% of inmates with prescriptions for psychotropic medications received timely psychiatry appointments. Reason that inmates did not have timely psychiatry contacts: 100% inmate refusal.

### Prerelease and Discharge Planning

During the reporting period, 332 I/Ps in the CCCMS level of care paroled from the institution. Of these, 90% received parole planning.

## Mainline Enhanced Outpatient Program (EOP)
N/A

### Prerelease and Discharge Planning

During the reporting period 5 I/Ps in the EOP level of care paroled from the institution. Of these 60% received parole planning. The clinicians responsible for EOP parole release planning have received re-training on parole release planning policies and procedures.

DRPD 1 00052

## Department of Mental Health (DMH) Referrals (Cross-reference Binder Tab D)

During this period, 28 I/Ps met one or multiple criteria for a higher LOC. Of the identified I/Ps, 18% were referred to DMH, 82% of I/Ps were not referred. At each institution, 25 I/Ps listed on the DMH non-referral log (or all I/Ps on the list if less than 25) were randomly audited. Of those audited, 100% had a reason for non referral documented on the 7388B, and 89% had documented interventions to improve the I/P's level of functioning.

During the reporting period, 5 referrals to DMH were completed: 5 ICF and 0 APP. 80% of ICF referrals were completed within five working days. During this time period no DMH referral was denied or rescinded. During the reporting period 2 I/Ps returned to the institution from DMH.
Five day follow-ups were completed 100% of the time for returning I/Ps.

## Mental Health Crisis Bed (MHCB)

CCI has no MHCB program.

## Outpatient Housing Unit (OHU (Cross-reference Binder Tab F)

The institution has 8 MH designated OHU beds. During the reporting period there were 164 referrals to OHU and 125 admissions. A total of 54 I/Ps housed in the OHU were referred to a MHCB and 54 were admitted. The average length of stay was 5.34 days, ranging from 1 to 10 days. For those I/Ps with stays longer than 72 hours 100% were awaiting a bed in an MHCB.

OHU reports show 98% of I/Ps received daily contact with a licensed psychologist or psychiatrist seven days a week. MHTS.net reports indicate that 55% of I/Ps received daily contact from a licensed psychologist or psychiatrist. During the reporting period 71 I/Ps were placed in the OHU due to suicidality. Of those, the MHTS reports 64% were administered a SRE at the time of placement, 0% received and SRE upon release from OHU, and 62% received a five day follow-up upon their release. CCI's internal logs reflect 100% of admits received an SRE, 100% of discharging I/Ps received a SRE's, and 100% received 5-day follow-ups. CCI is looking into why there is such a large discrepancy between tracking system v. manual log figures. A contributing problem appears to be the unauthorized continued reliance on internal audit tools. In this case the reliance upon OHU tracking logs, which had been used to report data to the MHSCQM. Had this log use stopped the discrepancies would have been detected and rectified much earlier. Now only data from the .net system will be used to report data to MH subcommittee. We are studying the issue but it is not easy. Sometimes for example, a patient stays one day in the OHU; say Friday and is gone Saturday and has not even been seen by a Psychologist. Another contributing factor is loss of mh staff assigned to the OHU which has not been replaced.

### Alternative Housing

During the reporting period there was only one I/P placed in alternative housing for 1.9 days while waiting for an available appropriate placement. He was administered an SRE prior to placement. He was placed on suicide watch in IVB holding cell which has a body length bench, sink and toilet.

Page 8 of 11

DRPD 1 00053

## Administrative Segregation Unit (ASU) (Cross-reference Binder Tab H)

During the reporting period there were 1035 I/Ps housed in ASU programs: 284 at CCCMS level of care (LOC), 46 at EOP LOC and 705 non-MHSDS I/Ps. All patients entering ASU are to receive a nursing pre-placement screening. During the reporting period 82% of the I/Ps received pre-placement screening prior to placement in the ASU setting, and 100% of the screenings were conducted in a confidential setting. Incoming I/Ps were placed in identified safety cells 100% of the time. 100% of I/P placed in ASU were reviewed for current MHSDS status within one working day following their placement in ASU, and prior to the 114D hearing. 100% of I/Ps received a mental health screening (31-item questionnaire) within 72 hours of placement. Custody documented 30-minute welfare checks during the reporting period 99.99% of the time.

### ASU-CCCMS

During the reporting cycle, 101 I/Ps entered the ASU CCCMS program. 89% of the I/Ps were assessed by a clinician within 10 working days. 87% of initial IDTTs were completed within 14 calendar days or prior to ICC, whichever occurred first. Subsequent IDTTs took place at least every 90 days, 98% of the time. 100% of IDTTs were attended by the primary clinician; 92% of IDTTs were attended by a psychiatrist, 100% of IDTTs were attended by the CC; and 51% of IDTTs were attended by the I/P. In terms of patient non-participation it was due to I/P refusal 100 % of the time.

During the reporting period, 91% of I/Ps received at least weekly individual PC contacts, 59% of the time they were seen in a confidential setting; and 40% of the time they were seen cell-front. IP refusal was the reason for non-confidential contacts. Lack of ducats the night before and shot callers warning IP's against private contacts are viewed as significant regulators controlling the high number of refusals. 99% of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every 90 days. Daily LPT rounds were documented on the CDCR Form 7230-MH 100% of the time. Daily ASU morning meetings between custody and clinical staff occurred 5 days per week M-F and were documented 100% of the time.

### ASU-EOP HUB

CCI is not an EOP ASU Hub.

### ASU-Non-MHSDS

During the reporting period, 841 I/Ps entered ASU-Non-MHSDS program. Of those, 100% received a timely nursing pre-placement screening, and 100% of the screenings were conducted in a confidential setting. Custody documented 30-minute welfare checks 99.99% of the time. Nursing documented daily LPT rounds 99.7% of the time.

### Psychiatric Services Unit (PSU)

CCI is not a designated PSU institution.

## CCCMS SHU

DRPD 1 00054

During the reporting period, 311 I/Ps were admitted to the CCCMS-SHU. 84% of the I/Ps had an initial IDTTs within 14 calendar days or prior to the ICC whichever occurred first. Subsequent IDTTs took place at least every 90 days, 98% of the time. 100% of IDTTs were attended by the primary clinician; 92% were attended by a psychiatrist, 100% were attended by the CC; 87.5% were attended by the LPT; and 51% of IDTTs were attended by the I/P. IP refusal was the reason for I/P non-participation. (As contemplated above, high refusal rates on celled units are driven by ducats not going out the night before an appointment.) 96% of I/Ps subsequently received contacts with their primary clinician at least once every 30 days, and 96% of I/Ps prescribed psychotropic medications were seen by a psychiatrist at least every 90 days. Weekly LPT rounds were documented on the CDCR Form 7230-MH 100% of the time.

## RECEPTION CENTER

CCI was not a reception center during the reporting period.

## Suicide Prevention (Cross-reference Binder Tab I)

The institution has an active Suicide Prevention and Response Focused Improvement Team (SPR-FIT). See Tab I, Section 1 to review SPR-FIT meeting minutes.
Of the six SPR-FIT monthly meetings required during the reporting period, six monthly meetings were documented to have occurred. The SPC coordinates the monthly SPR-FIT. During the reporting period the agendas included: (See binder for more details)

- Proctor Mentoring program
- Managing significant staff reductions (66% loss of line staff; 70% supervisory staff) w/o sacrificing quality of SRE's and support of at risk IP's,
- New LOP re: Clinical/Custody communication
- Monitoring QIP items created after suicides
- Discussions of new employee orientation
- Discussions of the deleterious effects of AB109 inmate reductions and single celling risks

During the reporting period, ongoing suicide prevention training consisted of: monthly suicide prevention videoconferences; IST block and new employee training; Proctor Mentoring Program.

### Completed Suicides

During the reporting period, there was one inmate suicide in the institution for a total 4 over a period of two years.

**Attempted Suicides during the Reporting Period** Other than the one completed suicide there were no serious suicide attempts during the monitoring period. There were 2 self injurious behaviors with suicidal ideation; however the cuts were superficial. Neither of the I/Ps wounds required sutures and both were sent to a MHCB for further evaluation and stabilization.

On return to regular housing from a MHCB, 5-day follow-up was documented 100% of the time. Custody wellness checks were completed as required 79% of the time. Custody has gotten more training and under the guidance of our new HCAW there appears to be a renewed vigor towards total resolution of this problem. Five of the 6 required SPR-FIT meetings took place during this reporting period and

DRPD 1 00055

minutes are available for review on request. The meeting is called to order and coordinated by the SPC. During this reporting period Suicide Prevention training consisted of monthly suicide prevention videoconferences for professional staff and block training for new employee orientation ongoingly.

### Inmate Profile Procedure

Under the legacy MHTS for outgoing IP's two (2) Suicide Profiles were pulled by MHTS staff and sent to the respective receiving clinics for inclusion in the IP's transfer envelope. Arriving IP's were found to consistently have no profiles in their transfer envelope at CCI for distribution to the UHR and the Supervising Psychologist with a copy to the receiving clinician. Under MHTS.net profiles are available for pulling by any clinician receiving a new intake. Accordingly, the former clerical practice of pulling profiles for transfer ceased as an unnecessary step in the transfer process particularly in light of our recent staff losses.

## RVR Protocols (Cross-reference Binder Tab J)

During the reporting period, 661 inmates at the institution received RVRs: 449 for GP Inmates, 205 CCCMS, 7 EOP, 3 MHCB, and 71 ASU. 30% of the EOP and MHCB RVRs received a mental health assessment (MHA).  100% RVR's received by the MH program for a MH assessment were timely assessed and returned to custody for processing. The above noted 30% MHA rate was due to the MH program not receiving a referral for the MHA. We'll be taking this issue up at MHQMC for discussion.

## Use of Force (Cross-reference Binder Tab K)

A table of all the Use of Force and Non-Use of Force incidents during the reporting period can be found in Tab M.  Of the Use of Force Incidents, 49.5% occurred with MHSDS inmate-patients.  For Non-Use of Force Incidents, 39.1% occurred with MHSDS inmate-patients.

## Mental Health Referrals (Cross-reference Binder Tab P)

Emergent: Immediately    Urgent: Within 24 hours    Routine: Within five working days
During the reporting period, 4043 referrals were received and on the final day of the period, 3950 (98%) were closed.  Referral statistics (See Tab P) indicate that 100% of emergent referrals were seen the same day, 79% of urgent referrals were seen within 24 hours, and 82% of routine referrals were completed in within 5 business days (MHTS.net's calculation uses calendar days rather than business days). Please see earlier report sections that address timely referral contact problems.

## Agreement Audits

Agreement rates are measured monthly via a methodology developed at HQ and averaged 90.33% for the reporting period.

DRPD 1 00056

# Exhibit 22

*Article*

# Suicide Prevention in Administrative Segregation Units: What Is Missing?

Journal of Correctional Health Care
00(0) 1-8
© The Author(s) 2013
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1078345812474638
jcx.sagepub.com
⑤SAGE

## Heriberto G. Sánchez, PhD[1]

### Abstract

Suicide remains a problem in prison administrative segregation units. Preventing suicide requires more than following policies and procedures and making structural changes to these units. The primary reason for placement in administrative segregation units is for an alleged rule violation, which in some cases could also be a crime. Prisoners could also be placed there for protection from other prisoners or pending an investigation of their allegations of staff misconduct. From the moment a prisoner is handcuffed for placement in administrative segregation, clinical and custody staff must work together in a manner that communicates genuine concern for the prisoner's well-being. This requires developing empathic relationships, understanding the prisoner's unique circumstances, and recognizing changing dynamics that could lead to hopelessness and suicide. Staff must be able to view the situation, including short- and long-term consequences, from the inmate's perspective. The author offers 10 recommendations to help reduce suicide on these units.

### Keywords

prison, suicide, administrative segregation unit, risk assessment

Studies consistently show that administrative segregation units are high-risk settings for inmate suicide (Haney 2006; Hayes, 1995; Patterson & Hughes, 2008). Administrative segregation units are the jails within prisons where prisoners are isolated from the general population and housed alone, both of which can lead to feelings of loneliness and give genesis to suicidal thoughts (Van Ordern et al., 2010). If a prisoner's presence in the general inmate population poses an immediate threat to the safety of other inmates or staff, endangers prison security, or threatens the investigation of alleged serious misconduct or criminal activity, correctional staff will place the inmate in the administrative segregation unit. At the time of placement, the inmate is alleged to have violated a prison rule or committed a crime and is entitled to a due process hearing to determine his guilt or innocence. There are two other reasons for placement in the administrative segregation unit. If an inmate reports being threatened by other inmates or staff have information from other sources of a threat, they will

---

[1] California Men's Colony, California Department of Corrections and Rehabilitation, San Luis Obispo, CA, USA

**Corresponding Author:**
Heriberto G. Sánchez, PhD, California Men's Colony, California Department of Corrections and Rehabilitation, Highway 1 North, P. O. Box 8101, San Luis Obispo, CA 93409 USA.
Email: heriberto.sanchez@cdcr.ca.gov

Downloaded from        by Lindsay Hayes on February 22, 2013

place the inmate in the administrative segregation unit for his safety. Another reason is when an inmate makes allegations of misconduct against a staff member. In both of these cases, staff will retain the inmate pending an investigation and resolution of the issues.

A review of the literature failed to identify any articles that discuss suicide prevention in administrative segregation units. However, some states have addressed this problem. For example, in the California Department of Corrections and Rehabilitation, nursing staff conduct a prescreening of inmates prior to their placement in the administrative segregation unit, and mental health staff complete a mental health screen once they are placed into the unit (California Department of Corrections and Rehabilitation, 2009). A prisoner who does not pass these screens is referred for a comprehensive assessment, including a suicide risk evaluation with a mental health professional. Prisoners who are identified as at risk for suicide are referred to an inpatient setting where they receive mental health treatment. Once stabilized, they are placed back into the administrative segregation unit, where mental health staff continue to assess and treat them.

If the inmate passes the initial screening process, he will be housed in an intake cell within the administrative segregation unit. These cells are typically located near the custody staff office for ease of observation. These cells have been retrofitted to lessen the opportunities for suicide (e.g., removing towel racks that could be used for hanging). The prisoner remains in this cell for the first 72 hours. If the prisoner does not have safety concerns (enemies or history of in-cell violence), efforts are made to house him with a compatible cellmate since having a cellmate serves as a significant protective factor against suicide (Fazel, Cartwright, Norman-Nott, & Hawton, 2008; Patterson & Hughes, 2008).

Once a prisoner is placed in the cell, correctional staff give him a pamphlet that describes potential difficulties in adjusting to the administrative segregation unit, how this could affect his mental functioning, and how to ask for help. These pamphlets are available in both English and Spanish. Staff also provide reading assistance to inmates who score below a fourth-grade reading level. The education department provides a weekly list of inmates who score below this grade level. Officers conduct checks every 30 minutes for the first 21 days and document these checks in a log. Licensed vocational nurses or licensed psychiatric technicians with specialized training in recognizing mental health symptoms conduct daily rounds to identify prisoners having difficulties adjusting to the administrative segregation unit and will refer them to mental health clinicians for further evaluation. In addition, custody and mental health staff meet every morning to discuss new arrivals and identify inmates who are in need of mental health services.

Inmates are typically kept in their cells for 23 hours a day, coming out only for showers, exercise in fenced areas, and health care appointments. They also attend institutional classification committee reviews, which are held within 10 days of placement and at intervals of no more than 90 days afterward. The initial hearing addresses the segregation order to determine the need to retain the inmate in the administrative segregation unit for the reasons stated in the order. Subsequent reviews address the need for continued placement in this unit. Those inmates who are in the mental health program participate in psychological and recreational activities with mental health staff. Most prisoners find ways to cope with the isolation by exercising, writing, reading, or drawing. However, the typical prisoner has poor reading and writing skills, so this option is limited to a minority of the prisoners. Many prisoners engage in loud chatter as a way to deal with boredom. They spend time talking with other prisoners in adjacent cells through common air vents, or by yelling through the side of the cell door to other prisoners on the tier. For some prisoners, the loud noise level can add to the stress of being housed in this restrictive environment.

In response to the high number of suicides on these units, various changes were made to decrease stress in the administrative segregation unit (California Department of Corrections and Rehabilitation, 2009). In an effort to help prisoners cope with the boredom and isolation that can lead to sensory deprivation (Haney, 2006), prisons with electrical outlets in these units have allowed prisoners

Downloaded from          by Lindsay Hayes on February 22, 2013

to bring their radios and televisions with them when they are placed in the unit. Recreation therapists offer crossword puzzles and newspapers clippings on a daily basis. Other interventions include providing more out-of-cell time for newly admitted prisoners, and reducing the length of stay for all prisoners in administrative segregation unit, but especially for those with mental illness.

These efforts incorporate custody and mental health approaches to address the problem of suicides in administrative segregation units. However, these efforts appear insufficient to prevent suicides in these locked units. Addressing this problem requires an understanding of the prisoner's state of mind at the time of placement in the locked unit. The prisoner knows he is being placed in the administrative segregation unit because he is accused of violating a prison rule, which, in some cases, may also be a crime. Depending on the alleged rule violation, the consequences could be minor or severe. Once this is determined, the main concern is the long-term suicide risk associated with the length of time on the unit and the prisoner's ability to cope and function for the duration of the placement. Prisoners placed in the administrative segregation unit for their safety face similar stressors related to being isolated. They also may experience anxiety, fear, and paranoia associated with the initial safety concerns that led to their placement on this unit.

If the consequences for the alleged rule violation are potentially serious, then concern for suicide is more immediate. To assess the impact on the prisoner, staff must be able to anticipate the future from his perspective. The short-term consequences are clear. The prisoner will be housed in the administrative segregation unit pending a hearing on his alleged rule violation. However, the long-term consequences can be more serious and affect the prisoner in many ways. Often, the alleged violation will seriously impact the prisoner's program and personal life. He may lose special privileges, such as single-cell housing; have his job terminated; be transferred to a higher security prison; have his parole date changed; or even lose the opportunity to be released from prison. Each of these possible losses has to be analyzed in depth. For example, if the prisoner's family lives nearby, being transferred to a higher security prison may translate into fewer visits for the prisoner and greater expense to his family. A transfer could put his support system in jeopardy. The prisoner could also feel guilt and shame due to the extra burden he has placed on his family. By fully exploring the consequences of the alleged rule violation from the prisoner's perspective, staff can better understand the potential risk for suicide.

Ironically, the prisoner may not immediately realize the consequences of the alleged rule violation all at once, or if he does, it might take some time for him to fully understand the implications. Initially, the prisoner may believe he can "beat" the charges, or not think of the potential impact on his life if found guilty. The initial mental health screening may not identify any concerns upon admission and this would be a correct assessment. However, as the prisoner sits in his cell thinking, he may eventually come to understand his predicament. Since the situation is not static but is constantly changing, the initial assessment may not be correct on the following day. As the prisoner begins to analyze how the alleged transgression will impact many aspects of his life, his thoughts and emotions will begin to change. Thus, the "life span" and reliability of these mental health screens and suicide risk evaluations are very short in these types of fluid situations. This might explain why suicides still occur despite prisoners passing these screens and all of the efforts by mental health and custody staff. So on the first day in the administrative segregation unit, the prisoner appears fine and denies any suicidal thoughts, but on Day 4, he commits suicide. During the 4 days, he has had the opportunity to think of the long-term consequences of his behavior and reached a state of hopelessness that led to his decision to take his life. Understanding this constant mental fluidity of prisoners in the administrative segregation units is critical to preventing suicides, since recent studies show most suicides occur with in the first 3 weeks of placement (Patterson & Hughes, 2008).

Hayes (2007) wrote about suicide risk despite denial of suicidal ideation. He emphasized looking at the totality of the initial jail experience and how the various stressors can contribute to psychological symptoms and eventual suicide. Placement in the administrative segregation unit is similar

Downloaded from          by Lindsay Hayes on February 22, 2013

if viewed from the perspective that the incident leading to placement will change the prisoner's life. This is why suicide prevention should start at the time staff discovers the alleged rule violation. Every staff member involved in this initial process leading to placement in the administrative segregation unit should pay attention to the prisoner's behavior and statements, and report any concerns to the mental health staff who conduct the mental health screens. Suicide risk assessments should be completed for prisoners who screen positive for mental health problems. In addition, mental health staff should complete an assessment of the inmate's stressors and coping skills. This emphasis on the totality of the initial placement applies equally to prisoners who request protective custody. One of the biggest fears in correctional settings is being labeled a "snitch." This label becomes permanent throughout the prisoner's confinement and carries with it the fear of being assaulted.

Once staff can see this entire process from the prisoner's perspective, the focus should be on providing mental health counseling and support to help the prisoner deal with the serious implications of his alleged rule violation. Staff may need to be more involved in initiating this process since there continues to be the perception among newly committed prisoners that only the weak and "crazy" prisoners seek mental health services (Morgan, Rozycki, & Wilson, 2004). In addition, issues of confidentiality, particularly concerns about information being used against them, may be a deterrent to seeking help when prisoners face disciplinary charges. Understanding the fluid situation from the prisoner's perspective and considering possible beliefs about correctional mental health services will go a long way in preventing suicides in administrative segregation units. This will give staff the advantage of anticipating mental health problems and suicide risk, despite denials by the prisoner on initial and subsequent assessments. Staff can then intervene despite reluctance to ask for help.

By demonstrating sincere interest in the administrative segregation unit inmate, staff communicate empathy. For example, daily checks are more beneficial if staff demonstrate they know something about the prisoner's unique predicament and are able to ask questions about his situation. It is also through these interactions that staff will get a better assessment of how the prisoner is truly coping with his situation and identify prisoners at risk for suicide. Staff can use these opportunities to communicate a communal concern and communal effort among the prisoners that encourages them to report fellow prisoners who are having difficulties. All of these efforts will help combat the sense of isolation that is common in these units and that research has shown to be one of the strongest and reliable predictors of suicides (Van Ordern et al., 2010).

Prisoners will feel more comfortable asking for help when there is a history of positive staff-inmate interactions. Through the efforts discussed in this article, prison staff communicate understanding, empathy, and compassion at a time when the prisoner does not expect this type of response. These consistent positive encounters with various staff throughout the day may also increase a sense of connectedness that is important in preventing suicide (Van Ordern et al., 2010). Studies have demonstrated the importance of having a strong therapeutic alliance for successful therapy (Horvath & Symonds, 1991; Lambert & Barley, 2001; Orlinksy, Grave, & Parks, 1994). Research may eventually demonstrate a similar importance in the staff–prisoner relationship in preventing suicides, particularly in administrative segregation units.

Studies show that suicide is the most commonly encountered emergency for mental health professionals and creates more stress among clinicians than any other clinical situation (Jobes, 1995). In correctional settings, suicide assessment is more challenging because of the high numbers of self-injurious behaviors committed by prisoners and the difficulty in labeling these behaviors (Fagan, Cox, Helfand, & Aufderheide, 2010). Clinicians must distinguish between prisoners who have an intent to die and those who have no intent to die but still have mental health problems. In addition, there is the challenge of identifying prisoners who have ulterior reasons for self-harm behaviors, such as improving their situation (e.g., better housing) or escaping stressful situations (e.g., being threatened). Mental health professionals must develop intervention strategies that do not reward the prisoners' maladaptive behaviors while preventing actual stressful situations from becoming mental

Downloaded from                    by Lindsay Hayes on February 22, 2013

health crises. This is particularly relevant in administrative segregation units, where prisoners may try to use mental health problems, including self-harm behaviors, to avoid responsibility for their antisocial behavior, but also where stress can lead to real mental health problems.

Knoll (2010) provided recommendations for reducing the risk of suicide-related lawsuits for clinicians working in correctional settings. He noted that while clinicians are not expected to predict suicide, they are expected to use "reasonable professional judgment." He noted that clinicians can be sued for professional negligence for failure to perform an adequate suicide risk assessment, take appropriate precautions based on the risk, monitor someone identified as at risk for suicide on an adequate time interval, medicate properly, obtain an adequate history, and remove items that can be used for self-harm while under supervision for suicide risk. Clinicians can also be sued for allegations of civil rights violations based on the U.S. Constitution. The concept of deliberate indifference is based on the Eighth Amendment prohibition against cruel and unusual punishment (Hanser, 2002; Hayes, 1995). The assumption is that the violator was aware of the individual's need for mental health care and intentionally denied or delayed access to care. In the case of suicide, prison staff would have to know about the inmate's risk for suicide and do nothing to protect the inmate.

While there is little information on the number of individual lawsuits in correctional settings related to suicide, most class-action lawsuits regarding inadequate mental health care include suicide under the deliberate indifference standard (Hanser, 2002; Hayes, 1995). Regardless of the legal liabilities, suicides in prison create stress for staff and prisoners. First responders have to deal with a death scene that can be traumatizing, and there are numerous "survivors"—individuals who are affected by the suicide death (Bailly, Kral, & Dunham, 1999). Staff who knew the inmate are left to deal with the loss and ask themselves if there was anything they missed or could have done to prevent the suicide. If the inmate was a mental health patient, clinicians also have to deal with losing a patient, which sometimes involves self-doubt about the adequacy of their clinical interventions and fears of lawsuits (Farberow, 2005). Administrators are forced to reassess suicide prevention policies and procedures (Hayes, 1995). Prisoners who were friends or knew the deceased inmate mourn the loss of a fellow prisoner. Family and friends also go through the grieving process, which might include questions and doubts about whether their loved one committed suicide or was killed. The fact that one suicide can affect many is another reason why suicide prevention in prisons is important.

An understanding of the precipitants to suicidal behavior in the administrative segregation units will help in the development of prevention strategies. The psychological autopsy has been used to study suicides in correctional settings (Sanchez, 1999) and to make recommendations for improving suicide prevention policies, procedures, and mental health programs. These reviews attempt to identify presuicide risk factors, including stressors that contributed to the suicide. In addition, the importance of identifying the loss of protective factors has been noted in the literature (Sanchez, 2001). The loss of protective factors can be particularly detrimental to prisoners in administrative segregation units. Sanchez (1999) recommended using the psychological autopsy method to study attempted suicides, as well, since suicide attempts provide valuable information not available in a postmortem study. At the minimum, staff should inquire about what the prison system and staff could have done to prevent the suicide attempt. More importantly, this type of inquiry would give prison staff an opportunity to see the evolving dynamics that led to the suicide attempt from the prisoner's perspective. Case reviews for administrative segregation unit suicide attempts would be particularly beneficial in understanding how the high-stress environment contributes to these desperate behaviors.

## Recommendations

1. As part of the preadministrative segregation unit placement, assess the potential consequences for the prisoner due to his rule violation (e.g., shame, possible transfer, disruption of outside

Downloaded from          by Lindsay Hayes on February 22, 2013

support system due to transfer, negative impact on board hearing) from the prisoner's perspective. Then assess the prisoner's level of stress associated with placement on this unit and his ability to cope. Ask questions such as, "How will this rule violation impact you, your prison program, your safety, your board hearing, etc.?" "How will you handle this?" By placing oneself in the prisoner's shoes and asking these questions, potential problems can be identified. Include information received from staff involved in the pre-placement process. Identify salient events related to the administrative segregation placement process (e.g., outcome of disciplinary hearing) and assess the impact of these events on the prisoner's mental status and functioning. This process should also be followed for inmates placed in administrative segregation units for their safety or while pending an investigation into their allegations of staff misconduct.

2.  Designate an administrative segregation new arrival officer whose responsibilities include serving as a support system for new inmates and inmate-patients. This officer introduces himself and informs the inmate he will be checking with him throughout the day to see how he is doing. The officer can also "inoculate" the prisoner to seek help by stating it is not uncommon for prisoners to find this unit difficult—mentally and physically  -and the prisoner should let him know if he is having problems coping on this unit. Ideally, there would be a new arrival officer during each shift who is available to new arrivals during the first week on this unit. Housing new arrival prisoners in designated cells would make it easier for the new arrival officer to track these prisoners.

3.  Conduct daily mental health assessments and suicide risk evaluations during the first 5 days and at critical decision points that could have significant impact on the prisoner's life, such as the outcome of a serious rule violation. Initially, the focus should be on establishing baselines for psychiatric symptoms, such as frequency, duration, and severity; daily functioning in areas such as sleeping, eating, and use of time; and the presence or absence of suicidal thoughts. Once these baselines are established, follow-up evaluations can assess changes that warrant further attention. In addition, protective factors should be identified and assessed for their continued presence. In some situations, the support systems are conditional. For example, a prisoner's wife may promise to stay with the prisoner as long as he remains out of trouble in prison and committed to changing his life. In other situations, the prisoner sets the conditions, such as when he states he would not commit suicide while his parents are alive. Discussing protective factors with the prisoner also communicates interest for those individuals who are important to him and helps build and maintain a strong therapeutic alliance.

4.  Incorporate mental health counseling and supportive therapy during the first 21 days for prisoners identified as facing major changes in their lives due to the alleged rule violation and for prisoners who are having problems with placement on this unit. Inmates placed in administrative segregation units for their safety or for making allegations of staff misconduct may be under considerable stress and also require counseling. The frequency and duration of this intervention should be determined by the mental health professional.

5.  Use staff- prisoner contacts to communicate genuine concern. For example, the distribution of the administrative segregation orientation pamphlets should be a process involving a discussion of the pamphlet. When the new arrival officers distribute these pamphlets, they should reinforce concern for the prisoner's welfare and commitment to his safety. The officer can explain the purpose of the pamphlet and tell the prisoner he will come back later (after he has had a chance to read the pamphlet) to ask if he has any questions. If the prisoner cannot read, the officer can explain what is in the pamphlet. Staff should use other staff–prisoner contacts to communicate genuine concern for the prisoner (e.g., during classification meetings and disciplinary hearings).

Downloaded from     by Lindsay Hayes on February 22, 2013

6. Train custody staff to be vigilant for unusual behavior, such as a prisoner being awake in the middle of the night or signs a prisoner is making a hanging apparatus (e.g., torn bedding or clothes) and any other behavior that is out of the ordinary for that inmate (e.g., asking for writing materials when he has never done this before). The basic response to these situations is to engage the prisoner in conversation and ask about the unusual behavior.

7. Train administrative segregation staff to pay attention to how the prisoner is functioning (What does the prisoner do to occupy himself for 23 hours?). Officers should ask themselves whether the prisoner demonstrates the abilities and skills to occupy himself mentally and physically, and whether he can sustain administrative segregation unit placement for a prolonged time. They should be alert to changes in the prisoner's attitudes, mood, and behavior. For example, is the prisoner becoming hostile and angry, does he appear depressed and tired, has he been refusing meals or showers? If they are concerned about the prisoner's functioning, they should make a referral to mental health.

8. Imprint permanent signs on the cell walls that reinforce the value of each prisoner's life and provide instructions on how to get help if he is thinking about suicide.

9. Take extra precaution for high-risk prisoners, which include the mentally ill, prisoners with long sentences whose chances for parole could be jeopardized due to a serious rule violation, and prisoners who have safety concerns who may conclude they will eventually be attacked or killed by other prisoners. Prisoners who have a recent history of drug use, particularly those who are active alcohol and drug users in prison, should be considered high risk since they may undergo drug withdrawal shortly after being placed in the administrative segregation unit.

10. Encourage prisoners to help each other and to report prisoners who are having difficulty coping.

## Summary

Preventing suicides in administrative segregation units requires clinical and custody staff working together to implement policies and procedures in a manner that communicates genuine concern for the prisoners' well-being. Staff can communicate compassion and empathy by demonstrating an understanding of the prisoner's unique circumstances and viewing the prisoner's predicament from his perspective. Verbalizing this understanding, anticipating the fluidity of the administrative segregation unit experience, and providing supportive interventions communicates empathy and encourages help-seeking behavior. In addition, by paying close attention to unusual behavior and overall functioning, staff can identify prisoners who are having problems and intervene accordingly. Staff should make efforts to express their concern directly to the prisoner each time there is an intervention, so the prisoner makes the connection between staff's caring for his well-being and the actions taken to help him. Staff should take advantage of other interactions to reinforce a commitment to providing help. In the end, it is these empathic staff–prisoner relationships that demonstrate genuine concern that will help prevent suicides in administrative segregation units. Holding prisoners accountable for rule violations in a respectful and compassionate manner will also help staff–prisoner relationships and make for a safer prison environment.

### Declaration of Conflicting Interests

The author disclosed no conflicts of interest with respect to the authorship and/or publication of this article. For information about *JCHC*'s disclosure policy, please see the Self-Study Exam.

Downloaded from          by Lindsay Hayes on February 22, 2013

## Funding

The author received no financial support for the research, authorship, and/or publication of this article.

## References

Bailly, S., Kral, M., & Dunham, H. (1999). Survivors of suicide do grieve differently: Empirical support for a common sense proposition. *Suicide and Life-Threatening Behavior*, *29*, 256 271.

California Department of Corrections and Rehabilitation. (2009). *Mental Health Services Delivery System Program Guide, 2009 Revision*. Sacramento, CA: Statewide Mental Health Program.

Fagan, T. J., Cox, J., Helfand, S. J., & Aufderheide, D. (2010). Self-injurious behavior in correctional settings. *Journal of Correctional Health Care*, *16*, 48 66.

Farberow, N. L. (2005). The mental health professional as a suicide survivor. *Clinical Neuropsychiatry*, *2*, 13 20.

Fazel, S., Cartwright, J., Norman-Nott, A., & Hawton, K. (2008). Suicide in prisoners: A systematic review of risk factors. *Journal of Clinical Psychiatry*, *69*, 1721 1731.

Haney, C. (2006). *Reforming punishment: Psychological limits to the pains of imprisonment*. Washington, DC: American Psychological Association.

Hanser, R. D. (2002). Inmate suicide in prisons: An analysis of legal liability under 42 USC Section 1983. *The Prison Journal*, *82*, 459 477.

Hayes, L. M. (1995). *Prison suicide: An overview and guide to prevention*. Mansfield, MA: National Center on Institutions and Alternatives.

Hayes, L. M. (2007). Suicide risk despite denial (Or when actions speak louder than words). *Jail Suicide/Mental Health Update*, *16*, 1 10.

Horvath, A. O., & Symonds, B. D. (1991). Relation between a working alliance and outcome in psychotherapy: A meta-analysis. *Journal of Counseling Psychology*, *38*, 139 149.

Jobes, D. A. (1995). The challenge and the promise of clinical suicidology. *Suicide and Life-Threatening Behavior*, *25*, 437 449.

Knoll, J. L. (2010). Suicide in correctional settings: Assessment, prevention, and professional liability. *Journal of Correctional Health Care*, *16*, 188 204.

Lambert, M. J., & Barley, D. (2001). Research summary on the therapeutic relationship and psychotherapy outcome. *Psychotherapy*, *38*, 357 361.

Morgan, R. D., Rozycki, A. T., & Wilson, S. (2004). Inmate perceptions of mental health services. *Professional Psychology: Research and Practice*, *35*, 389 396.

Orlinksy, D. E., Grave, K., & Parks, B. K. (1994). Process and outcome in psychotherapy. In A. E. Bergin & S. L. Garfield (Eds.), *Handbook of psychotherapy* (pp. 257 310). New York, NY: Wiley.

Patterson, R. F., & Hughes, K. (2008). Review of completed suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004. *Psychiatric Services*, *59*, 676 682.

Sanchez, H. G. (1999). Inmate suicide and the psychological autopsy process. *Jail Suicide/Mental Health Update*, *8*, 3 9.

Sanchez, H. G. (2001). Risk factor model for suicide assessment and intervention. *Professional Psychology: Research and Practice*, *32*, 351 358.

Van Ordern, K. A., White, T. K., Cukrowicz, K. C., Braithwaite, S. R., Selby, A., & Joiner, T. E. (2010). The interpersonal theory of suicide. *Psychological Review*, *117*, 575 600.

Downloaded from    by Lindsay Hayes on February 22, 2013