# Exhibit 81



Transcript of the Testimony of:

# Tim Belavich, Ph.D.

Coleman v. Brown

February 22, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

COMPOSED OF THREE JUDGES PURSUANT TO SECTION 2284,

TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,

-vs-                    No. CIV S 90-0520 LLK-JFMP

EDMUND G. BROWN, JR,  et al.,

        Defendants.
_____/

MARCIANO PLATA, et al.,

        Plaintiffs,

-vs-
                    No. C01-1351 TEH

EDMUND G. BROWN, JR., et al.,

        Defendants.
_____/

DEPOSITION OF TIM BELAVICH, PH.D.

1            UNITED STATES DISTRICT COURTS

2            EASTERN DISTRICT OF CALIFORNIA

3

4

5   RALPH COLEMAN, et al.,

6

7            Plaintiffs,

8   -vs-                          No. CIV S 90-0520 LLK-JFM

9   EDMUND G. BROWN, JR,  et al.,

10            Defendants.
   _____/

11

12            DEPOSITION OF TIM BELAVICH, PH.D.

13

14

15

16

17   DATE:            February 22, 2013

18

19   TIME:            9:01 a.m.

20

21   LOCATION:        315 Montgomery Street, 10th Floor
                      San Francisco, CA

22

23   REPORTED BY:     Joanna Broadwell
                      Certified Shorthand Reporter
24                    License No. 10959

25

Tim Belavich, Ph.D.                                    February 22, 2013

```
1                    A P P E A R A N C E S :

2

3

4

5

6     For the Plaintiffs:

7             ERNEST GALVAN

8             ATTORNEY AT LAW

9             Rosen, Bien, Galvan & Grunfeld LLP

10            135 Montgomery Street, 10th Floor
              San Francisco, CA  94104-0390
11            (415)433-6830

12

13    For the Defendants:
              DEBBIE J. VOROUS
14            DEPUTY ATTORNEY GENERAL
              State of California
15            1300 I Street
              Sacramento, CA  95814
16            (916)324-5345

17   Also appearing:  Heather McCray and Margot Mendelson.

18

19                        --o0o--

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                                February 22, 2013

```
 1                        I N D E X

 2

 3  EXAMINATION BY:                              PAGE:

 4      Mr. Galvan                                   6

 5                  INDEX OF EXHIBITS

 6

 7          1    Notice of Deposition                9

 8          2    Correspondence from Brigid Hanson   19

 9               to Cliff Tillman dated 4-17-12.

10          3    Correspondence from Lindsay M. Hayes  22

11               to Dr. Belavich dated 1-8-13.

12          4    Memorandum from Lindsay M. Hayes to  31

13               Thomas L. Gilevich dated 8-16-11

14          5    Chapter 10 from "Suicide Prevention  47

15               And Response"

16          6    Photographs                         69

17          7    Photographs                         79

18          8    Document entitled Defendants' Amended  96

19               August 25, 2010 Updated Report on

20               Activities Taken Following the Court's

21               April 14, 2010 Order

22          9    Memorandum to William Knipp to      102

23               from Timothy Belavich dated 7-20-12.

24

25          10   Annual Report of Quality Improvement  111
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                 Plans in Suicide Reports for 2010
 2          11   Exhibit 1 to Vorous Declaration       120
 3          12   Management Report Round 25            137
 4                October 1, 2011 to March 31, 2012
 5          13   Glossary of Terms                     151
 6          14   Declaration of Tim Belavich           183
 7          15   Glossary of Terms                     198
 8          16   Memorandum from Timothy G. Belavich   209
 9                to Jonathan Copley dated 9-21-12
10          17   OHU Data May 2012                     211
11          18   Management Report Round 25            212
12                June 4-7, 2012
13          19   Memorandum from Timothy G. Belavich   219
14                to Anthony Lonigro
15          20   Photograph                            224
16          21   Photograph                            234
17          22   Photograph                            235
18
19
20
21                       --o0o--
22
23
24
25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    told you either in person or over the telephone about

2    Mr. Hayes' contract?

3         A.   Yes.

4         Q.   Good.  What did she tell you?

5         A.   She -- she did not tell me that we would not

6    be using his contract.  She told me that she could not

7    get any movement on whether we were using his contract.

8         Q.   She could not get any movement from whom?

9         A.   I don't know.

10        Q.   What does that mean to you, not getting any

11   movement?

12        A.   To me it meant that there was -- there were

13   individuals above her who were making the decision as

14   to whether or not we would use the contract.

15        Q.   And did she convey to you why those

16   individuals above her had decided not to use the

17   contract?

18             MS. VOROUS:  Objection.  Misstates his

19   testimony.  He's saying she'd get movement on his

20   contract, not that they wouldn't use his contract.

21             You can answer the question.

22             THE DEPONENT:  I've forgotten the question.

23   I'm sorry.

24             BY MR. GALVAN

25        Q.   Did she tell you why she couldn't get movement

1      Q.   I'm sorry.  On the fourth bullet point you'll

2   see that the document starts on Page 12, third

3   paragraph from the bottom.  So let's turn to Page 12 of

4   Exhibit 5.  And in Exhibit 4, the document says on

5   Page 12, 3rd paragraph from the bottom, reads, quote,

6   "When an inmate patient verbalizes suicidal ideation

7   without other signs and symptoms of increased risk of

8   suicide, the mental health clinician is responsible for

9   evaluation any contributing environmental stressors,

10   and communicating with custody staff and supervisors

11   regarding any potentially solvable custody issues,"

12   period, end quote.

13         "This paragraph is seemingly referring to

14   inmates who are using the threat of suicide to gain

15   cell relocation, i.e., are viewed as manipulative

16   and/or malingering.  My concern is that inmates who

17   present as manipulative and/or malingering can still be

18   suicidal and require placement on suicide observation

19   status.  I would recommend that this paragraph be

20   reviewed again and clarified if necessary."

21         Before today, were you made aware of this

22   recommendation?

23      A.   I don't know that -- if I was.

24      Q.   Is it possible that you -- that today is the

25   first time you became aware of this recommendation?

1        A.    I don't believe so.

2        Q.    It's your belief that you were made aware of

3    this recommendation earlier than today?

4        A.    Yes, but I can't say with certainty.

5        Q.    Do you recall doing anything in response to

6    being made aware of this recommendation?

7        A.    No.

8        Q.    As you look at this here today, do you have an

9    opinion as to whether this recommendation is correct?

10            MS. VOROUS:   Objection.   Lacks foundation.

11   Argumentative.

12            THE DEPONENT:   I wouldn't form an opinion

13   without input from my SMEs on this.

14            BY MR. GALVAN:

15       Q.    By "SMEs," you mean subject matter experts?

16       A.    I'm sorry, yes.   Capital S, capital M, capital

17   E.   Yes, subject matter expert.

18       Q.    Do you recall ever asking your subject matter

19   experts for their views on this?

20            MS. VOROUS:   Objection.   Asked and answered.

21            THE DEPONENT:   I don't recall asking them, but

22   I don't know if we've had conversations on this.

23            BY MR. GALVAN

24       Q.    Do you recall your subject matter experts ever

25   offering you their opinions or feedback on this

1    suicidal ideation or threats, right?

2        A.    That's correct.

3        Q.    So his recommendation was treat the OHU

4    discharges the same as the crisis bed discharges if the

5    person was in for suicide risk assessment, right?

6        A.    I can't say that for sure based on the

7    language of the program guide.

8        Q.    Okay.  Were you ever made aware before today

9    of this recommendation regarding clinical follow-up

10   after OHU discharge?

11       A.    I don't know if I was.

12       Q.    Do you have an opinion about this

13   recommendation?

14       A.    Not without receiving input from my SMEs.

15       Q.    Have you ever asked the subject matter experts

16   for that input?

17       A.    I don't know that I have.

18       Q.    Looking at Exhibit 4, Bates-number 70, which

19   is Page 6 of the exhibit, the consultant wrote in the

20   first full bullet point on the page, "On Page 19 under

21   both Discharge or Return and MHCB discharge, I would

22   recommend deleting the word, quote, imminent, end

23   quote, from the paragraphs, as previously detailed

24   about the lack of imminent or immediate danger of

25   self-harm should not be the only criteria for removal

 1    from suicide observation status."

 2            And going back to -- looking at Exhibit 5, the

 3    program guides chapter, the language he's talking about

 4    is in the bottom of Page 19 under MHCB discharge, "A

 5    psychiatrist or licensed psychologist in consultation

 6    with the IDDT shall write the order to discontinue an

 7    inmate patient from suicide precaution or suicide watch

 8    when the inmate is no longer in imminent danger of

 9    self-harm."

10            Were you ever made aware of this

11    recommendation to change the program guide?

12        A.   I don't recall if I was.

13        Q.   Do you have any opinion about this

14    recommendation as you read it today?

15        A.   Not without consulting with my SMEs.

16        Q.   Have you ever asked your subject matter

17    experts for such a consultation?

18            MS. VOROUS:  Objection.  Argumentative.  Lacks

19    foundation.

20            THE DEPONENT:  I don't think I have.

21            BY MR. GALVAN

22        Q.   Sticking with Exhibit 4, same page,

23    Bates-number 70, the next paragraph refers to the

24    program guide chapter, Exhibit 5, Page 20.  And looking

25    first at the program guide chapter, Page 20, last

Tim Belavich, Ph.D.                                          February 22, 2013

1    of Exhibit 4, at the bottom of the page that, quote,

2    "The conditions within the OHU were quite bad with poor

3    lighting, visibility and sanitation problems.  I had

4    difficulty observing inmates through the cell windows.

5    Many cells contained tile floors with pieces of tile

6    previously removed that could easily be utilized for

7    self-injurious behavior."

8        A.   Again, similar to my previous response, I was

9    made aware of issues like these, but I can't say that

10   there was any particular place connected with it.

11       Q.   And when were you made aware of issues like

12   these?

13       A.   I believe it was the spring of 2012.

14       Q.   Did you ask which prisons had these problems?

15       A.   I don't know if I asked which prisons had the

16   problems, but I also don't know -- I can't recall that

17   someone didn't say at place "X," this is a problem.  I

18   can't recall the conversations.

19       Q.   And these conversations in spring of 2012,

20   this is after you became deputy director?

21       A.   Yes.  Yes.

22       Q.   Did you direct the people who were giving you

23   the information to do anything about it?

24       A.   I believe so.

25       Q.   What did you tell them to do?

Page 66

1       A.    I recall instructing my regionals who I had in

2    place at that time to tour their facilities and to

3    inspect the OHU cells.

4       Q.    And did they report back to you on those

5    tours?

6       A.    I didn't instruct them to report back to me.

7       Q.    Go ahead.

8       A.    Because we had them work with one of my SMEs

9    to work on a directive to the field on cleanliness and

10   maintenance of OHU cells.

11      Q.    And was that a directive issue?

12      A.    Yes.

13      Q.    Going back to Exhibit 4, Bates-number 74, Page

14   10, still on the big -- the paragraph that continues on

15   the top of the page, about DVI, around the middle of

16   the paragraph -- actually, I'm sorry.  It's the

17   first -- the second complete sentence on that page.  He

18   says, "Conditions in the OHU overflow were worse and

19   quite deplorable.  All of the inmates in this unit were

20   on constant one-to-one observation with one certified

21   nursing assistant, CNA, assigned to each inmate at

22   significant expense to the CDCR due to the hazardous

23   conditions in each cell.  The OHU overflow is situated

24   in the same area as the OSU.  Upon my entrance into the

25   unit, there was a foul odor apparently left from the

Tim Belavich, Ph.D.                                    February 22, 2013

 1    to see the process.

 2        Q.    What process --

 3        A.    I'm not sure what this is hanging on the door

 4    handle.

 5        Q.    What process would make this appropriate?

 6        A.    I can't say with certainty without consulting

 7    my SMEs and the program guide.

 8        Q.    You visited this cell, right?

 9        A.    No.

10        Q.    You visited the ZZ cells in Sacramento?

11        A.    Yes.  I saw the ZZ cells.

12        Q.    And when you saw them, were you aware that

13    they were being used for suicide observation?

14              MS. VOROUS:  Objection.  Lacks foundation.

15    Assumes facts not in evidence.

16              THE DEPONENT:  When I saw them, they were not

17    being used for suicide observation.

18              BY MR. GALVAN

19        Q.    When did you see them?

20        A.    I want to say late October of 2012.

21        Q.    And when you say they were not being used for

22    suicide observation, you mean right at that moment when

23    you saw them?

24        A.    Yes.

25        Q.    Is it your testimony that these are not used

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

 1   medication 10 percent of the time is absolutely not.
 2   But an issue having to do with, you know, whether, you
 3   know, a chrono was appropriately dated or stamped, I
 4   don't know that that always has to hit at 90 percent.
 5        Q.   You mentioned the documentation that is
 6   required for the special master's institutional tours,
 7   I think.  Were you referring to the institutional tour
 8   documentation?
 9        A.   Well, no.  Just all of the documentation,
10   because there is institutional documentation as well as
11   there are monthly reports that we turn over.  But there
12   are also regular requests that we get on other issues
13   that we have quick turnaround and we try to comply
14   with.
15        Q.   But the institutional documentation is one of
16   them, one of the issues?
17        A.   Yes.
18        Q.   And in fact, you attached, I think as Exhibit
19   8 to your declaration, a sample institutional document
20   request.  There's no tabs on these, so it's a little
21   tricky to find Exhibit 8.
22        A.   I got it.
23        Q.   You got it.  Look at that.  So once -- if you
24   got rid of the special master and this reporting
25   requirement, I'm just looking at the things that are

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    audited here, and I just want to get a sense of what
2    you would stop doing.  So for example, would you stop
3    auditing medication management?  Would you stop having
4    the institutions produce documents about medication
5    management?
6         A.   No.  I believe we have a process in place
7    through MAPIT, M-A-P-I-T, all caps, that monitors that.
8         Q.   Okay.  So you would keep doing that?
9         A.   Or something similar to that.
10        Q.   Would you stop auditing DMH referrals?
11        A.   In what way?
12        Q.   Would you stop requiring the institutions to
13   produce reports to headquarters in the regular course
14   of business on their DMH -- I guess it's now DSH --
15   referrals?
16        A.   No.  I believe that's part of our sustainable
17   process that we've instituted and worked with the
18   special master on, and I believe it's quite successful.
19   So I believe that process makes sense.
20        Q.   So in the post Coleman world, you would
21   continue doing that?
22        A.   Yes.
23        Q.   Would you stop auditing Mental Health Crisis
24   Bed referrals?
25        A.   I don't believe so.  I'm not sure.  In what

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1    way are you asking that?

 2        Q.   Would you have the institutions produce to

 3    headquarters regular documents regarding the numbers of

 4    persons referred to crisis beds, their length of stay,

 5    their waiting times, those kinds of figures?

 6        A.   I already capture all that in headquarters.

 7        Q.   And you capture that institution by

 8    institution, right?

 9        A.   Yes.

10        Q.   And that's not particularly burdensome for

11    you, is it?

12        A.   It's not "not burdensome."  Sorry for being

13    double negative.

14        Q.   You would do it regardless of the Coleman?

15        A.   I believe it's important, yes.

16        Q.   And would you stop auditing in the post

17    Coleman -- once there was no special master

18    requirement, the use of mental -- I'm sorry.  Mental

19    Health outpatient housing units and other outpatient

20    housing units?

21        A.   No.

22        Q.   Would you stop auditing use of alternative

23    housing?

24        A.   No.

25        Q.   Would you stop auditing the length of stay of

Tim Belavich, Ph.D.                                    February 22, 2013

1    EOP patients in administrative segregation?

2         A.    No.

3         Q.    Would you stop auditing the question of

4    whether you have enough intake cells for recent

5    arrivals in segregation?

6              MS. VOROUS:  Objection.  Lacks foundation.

7              THE DEPONENT:  I don't know if I would or not.

8              BY MR. GALVAN

9         Q.    It's one of -- okay.  What would be the

10   considerations?  What -- how would you make that

11   decision?

12        A.    I would need to gather my stakeholders and

13   ask, you know, pros and cons of monitoring, the burden

14   of monitoring this or auditing this, you know, whether

15   it is an issue, whether it's a resolved issue.

16        Q.    Would you stop auditing or monitoring the

17   meetings of the suicide prevention review and -- I

18   can't remember the rest of the acronym -- FIT, the SPR

19   FIT committees at the institutions?

20        A.    I would change the auditing of those.

21        Q.    How would you change it?

22        A.    I don't -- I wouldn't -- I don't know that I

23   would make it so -- such a burden that every member is

24   at every meeting over a time period.  For example, I

25   know that's monitored.  I think that it can be

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                        February 22, 2013

```
 1        A.   I would probably monitor that.
 2        Q.   Would you monitor -- or would you have the
 3   institutions report to headquarters on their ability to
 4   provide group therapy as -- to schedule a certain
 5   number of hours of group sessions?
 6        A.   Yes, but I would do it differently.
 7        Q.   Would you have the institutions monitor or
 8   report to you on the time it takes to transfer someone
 9   to the psychiatric services unit?
10             MS. VOROUS:  Objection.  Lacks foundation.
11             THE DEPONENT:  Yes.
12             BY MR. GALVAN
13        Q.   Would you have the institutions report to
14   you -- report to headquarters on the time it takes to
15   transfer someone to an EOP administrative segregation
16   hub?
17        A.   I'm sorry.  What?
18        Q.   If you didn't have the Coleman special master
19   monitoring, would you still require the institutions to
20   report to headquarters on EOP and ASU hubs, including
21   length of stay, time to transfer in and out?
22             MS. VOROUS:  Objection.  Vague and ambiguous.
23   Lacks foundation.
24             THE DEPONENT:  I think I would have them
25   monitor that.
```

1        Q.    Including these cages, correct?

2        A.    If this is what the institution has

3    designated.

4        Q.    So it's your testimony that in order to

5    operate your system with the resources you've been

6    given, you still need to use these cages, correct?

7             MS. VOROUS:   Objection.   Misstates his

8    testimony.   Argumentative.

9             THE DEPONENT:   Yeah.

10            BY MR. GALVAN

11       Q.    I'm going to ask you another question.   Can

12   you walk out of this deposition today, pick up the

13   phone and order someone to stop using these cages or

14   not?

15       A.    I can walk out of here, make a phone call, and

16   those two cages would not be used.   Yes.

17       Q.    And why is it that you don't do that?   Why

18   isn't that the next thing you're going to do when you

19   leave here today?

20            MS. VOROUS:   Objection.   Lack of foundation.

21   Incomplete hypothetical.   Speculative.

22            THE DEPONENT:   I can't say that's not the

23   thing I'm going to do when I walk out of here.

24                        (Off the record from 5:00 p.m.

25                         to 5:12 p.m.)

Tim Belavich, Ph.D.                                    February 22, 2013

```
 1              CERTIFICATION OF DEPOSITION OFFICER

 2

 3          I, JOANNA BROADWELL, duly authorized to

 4     administer oaths pursuant to Section 2093 (b) of the

 5     California Code of Civil Procedure, hereby certify that

 6     the witness in the foregoing deposition was by me sworn

 7     to testify to the truth, the whole truth, and nothing

 8     but the truth in the within-entitled cause; that said

 9     deposition was taken at the time and place therein

10     stated; that the testimony of said witness was

11     thereafter transcribed by means of computer-aided

12     transcription; that the foregoing is a full, complete

13     and true record of said testimony; and that the witness

14     was given an opportunity to read and correct said

15     deposition and to subscribe the same.

16          I further certify that I am not of counsel or

17     attorney for either or any of the parties in the

18     foregoing deposition and caption named, or in any way

19     interested in the outcome of this cause named in said

20     caption.

21

22                    _____

23                    JOANNA BROADWELL

24                    CSR 10959

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 82



Transcript of the Testimony of:

# John Brim, M.D.

Coleman v. Brown

March 1, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                  )
                                        )
                    Plaintiffs,         )
                                        )CASE NO.:
         vs.                            )S 90-0520 LKK-JFM
                                        )
EDMUND G. BROWN, JR., ET AL.,           )
                                        )
                    Defendants.         )
_____)



DEPOSITION OF

JOHN BRIM, M.D.

FRIDAY, MARCH 1, 2013,  9:28 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

John Brim, M.D.                                    March 1, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                    Plaintiffs,      )
                                       )CASE NO.:
 6         vs.                         )S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                    Defendants.      )
     _____)

 9

10

11

12

13

14           The Deposition of JOHN BRIM, M.D., taken on

15   behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:28 a.m., Friday, March 1, 2013, at

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

John Brim, M.D.                                              March 1, 2013

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3             BY:  MICHAEL BIEN, ESQ.
                    JANE KAHN, ESQ.
 4                  AARON FISCHER, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5           315 MONTGOMERY STREET, 10TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
 6           415.433.6850
             415.433.7104 FAX
 7           MBIEN@RBGG.COM
 8
     FOR DEFENDANTS:
 9
               BY:  JAY C. RUSSELL, ESQ.
10           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
11           455 GOLDEN GATE AVENUE, 11TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94102-7004
12           415.703.5717
             415.703.5843 FAX
13           JAY.RUSSELL@DOJ.CA.GOV
14
               BY:  GEORGE MAYNARD, ESQ.
15                  FRANCIE D. CORDOVA, ESQ.
             STATE OF CALIFORNIA
16           DEPARTMENT OF STATE HOSPITALS
             1600 9TH STREET, ROOM 400
17           SACRAMENTO, CALIFORNIA 95814
             916.651.5300
18           916.651.3852 FAX
             GEORGE.MAYNARD@DSH.CA.GOV
19
20   FOR JOHN BRIM, M.D.:
21             BY:  KELCIE M. GOSLING, ESQ.
             MENNEMEIER, GLASSMAN & STROUD, LLP
22           PARK TOWER
             980 9TH STREET, SUITE 1700
23           SACRAMENTO, CALIFORNIA 95814
             916.551.2581
24           916.553.4011 FAX
             GOSLING@MGSLAW.COM
25
```

John Brim, M.D.                                          March 1, 2013

```
 1                    I N D E X

 2                INDEX OF EXAMINATIONS

 3

 4   Examination by Mr. Bien  ..........................6

 5   Examination by Mr. Russell  ....................102

 6   Examination by Mr. Bien  .......................131

 7

 8                     --o0o--

 9

10        EXHIBITS MARKED FOR IDENTIFICATION

11   No.              Description                    Page

12   Exhibit 1    Letter dated 1/23/13 from the ......11
                  Salinas Valley psychiatric staff
13                to Charles DaSilva

14   Exhibit 2    Letter dated 2/12/13 from ..........32
                  Salinas Valley psychiatric staff
15                to Charles DaSilva

16   Exhibit 3    California Correction Health ........39
                  Care Services, Memorandum dated
17                2/19/13 **CONFIDENTIAL**

18   Exhibit 4    Initial Inmate Death Report, .......46
                  Form 7229A, dated 12/3/12
19                **CONFIDENTIAL**

20   Exhibit 5    Welcome to Salinas Valley ..........47
                  Psychiatric Program
21                **CONFIDENTIAL**

22   Exhibit 6    Salinas Valley Psychiatric .........64
                  Program medication Analysis -
23                Summary Report, 7/1/11 through
                  12/31/11, Bates SVSP219
24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                        March 1, 2013

```
 1  Exhibit 7      Salinas Valley Psychiatric ..........65
                   Program Monthly Therapeutic
 2                 Medication Analysis, initial
                   Bates SVSP236 **CONFIDENTIAL**
 3
    Exhibit 8      DSH Number of seclusion episodes ....76
 4                 by Month and Facility, 2012

 5  Exhibit 9      Color photograph, Bates SVSP54  .....81

 6  Exhibit 10     Color photograph, Bates SVSP55  .....81

 7  Exhibit 11     Color photograph, Bates SVSP57  .....81

 8  Exhibit 12     Color photograph, Bates SVSP58  .....81

 9  Exhibit 13     Color photograph, Bates SVSP59  .....81

10  Exhibit 14     Color photograph, Bates SVSP61  .....81

11  Exhibit 15     Color photograph, Bates SVSP62  .....81

12  Exhibit 16     Color photograph, Bates SVSP56  .....83

13  Exhibit 17     Suicide Report Dated 6/17/11 .......93
                   **CONFIDENTIAL**
14
    Exhibit 18     DSH Actual Cost Savings ...........101
15                 Achieves, Fiscal Year 2011-12

16  Exhibit 19     Salinas Valley Psychiatric ..........98
                   Program Monthly Therapeutic
17                 Medication Analysis, 4-28-8 to
                   present, initial Bates SVSP220
18
19                        --o0o--
20
21
22
23
24
25
```

Page 5

John Brim, M.D.                                        March 1, 2013

```
 1          The feeling of the staff was that it was
 2   appropriate to inform the union of what was going on
 3   since this impacted our working conditions.
 4          Q.   Okay.  And who is Katherine Warburton?
 5          A.   She is the chief psychiatrist for the
 6   Department of State Hospitals.
 7          Q.   Okay.  And had you ever interacted with her
 8   directly?
 9          A.   No.
10          Q.   But you understood she was -- what did you
11   understand her position to be?
12          A.   Well, I understand her position to be in chain
13   of command for the psychiatrists and the highest person
14   in that chain who is a psychiatrist.
15          Q.   Were your -- when you wrote this letter in
16   January of 2013 --
17          MS. GOSLING:  Objection.  Misstates his
18   testimony.  He did not write the letter by himself.  I
19   assume you're saying "you" collectively, meaning the
20   signatories.
21          MR. BIEN:  I agree.
22   BY MR. BIEN:
23          Q.   I was referring to you in the plural.
24          A.   Yes, understand.
25          Q.   Okay.  When your group prepared this letter,
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                        March 1, 2013

```
 1   was your program relatively full of patients?
 2        A.   Yes.
 3        Q.   Okay.  And was there still pressure on --
 4   there's still new patients arriving?  Are there new
 5   admissions arriving?
 6        A.   Yes.
 7        Q.   I note on the top of the second page, in bold,
 8   the letter states:  "But we need to inform you that we
 9   will be working in a state of protest regarding our case
10   load and the rate of admissions.  We are also extremely
11   concerned about further attrition of psychiatrists which
12   seems very likely considering the present workload and
13   conditions."
14             Did you discuss -- let me just ask:  Why is
15   there a reference to admissions as being a factor?
16             MR. RUSSELL:  Objection.  Vague and ambiguous.
17             THE WITNESS:  My understanding is that there
18   was a general feeling -- and I -- I felt this way --
19   that we were under pressure from administration to move
20   the old people out -- the old patients out and take in
21   new patients so as to keep our waiting list down.
22             And many of the psychiatrists -- well, I would
23   say all -- felt that this was resulting in shorter stay
24   for the patients than historically had been the case.
25   And they felt that it was getting to the point that
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1   people were not staying in all cases at least as long as

 2   they needed to.  There was pressure from administration

 3   to get them out quickly so that new people could be

 4   brought in.

 5          That does impact the workload, because when a

 6   new person comes in, there's quite a bit of work to do

 7   on the part of the psychiatrist, research assessment, so

 8   on.  So as the number of admissions and discharges go

 9   up, that means more work for the psychiatrist.

10   BY MR. BIEN:

11       Q.   You suggest in the last paragraph that one way

12   to alleviate some of the pressure on the Salinas Valley

13   psychiatric program would be to reduce the flow of new

14   admissions; is that correct?

15       A.   Correct.

16       Q.   And did you have any response from the

17   administration to that suggestion?

18       A.   Not aware of any.

19       Q.   To your knowledge, are there still new

20   admissions arriving at Salinas Valley psychiatric

21   program?

22       A.   Yes.

23       Q.   In the first paragraph on the first page, you

24   refer to "a third psychiatrist scheduled to leave within

25   the past six weeks."

John Brim, M.D.                                          March 1, 2013

```
 1              You mentioned two that were leaving by
 2    retirement, Drs. Weinstein and Sial?
 3         A.   Yes.
 4         Q.   Who was the third?
 5         A.   Dr. Gaines, Gayle Gaines.
 6         Q.   Okay.  And that's someone who signed this
 7    letter?
 8         A.   Yes.
 9         Q.   Okay.  And what was happening with Dr. Gaines?
10         A.   She had accepted a job with the Department of
11    Corrections and was scheduled to leave us the end of the
12    January.
13         Q.   There's also a reference here to -- on the
14    first page, the third paragraph, to the Stockton
15    program.
16              And that -- I'm looking at the third paragraph
17    down.  It says:  "When administration visited our
18    facility recently to present the Stockton program."
19              Did you have a presentation to the staff at
20    Salinas Valley psychiatric program by Department of
21    State Hospital staff about the new program?
22         A.   Yes, we did.
23         Q.   Approximately when was that?
24         A.   I believe late December, early January.
25         Q.   There's also a reference here to -- I'm
```

John Brim, M.D.                                              March 1, 2013

1  turning to the last paragraph on the second page.  "We

2  understand that since SVPP is being downsized, then it

3  may be difficult to attract new psychiatrists."

4          Had you understood -- what were you told

5  about -- when were you first told that the Stockton

6  program was opening?  Was it in this presentation in

7  late December, or had you heard about that earlier?

8      A.   No, no.  It had been in the works for a least

9  a couple of years.

10     Q.   When do you first recall being informed that

11 the SVPP program was going to be downsized?

12     A.   I believe I found that out in the early part

13 of 2012.  I was not at SVPP at the time, but I had

14 contact with some people that were there, and they

15 mentioned that they had been informed that it would be

16 downsized --

17     Q.   Okay.

18     A.   -- quite radically.

19     Q.   And there's a reference in this, I believe the

20 same last paragraph, to the -- preparing to close C and

21 D yards.

22          Was that what you were informed?

23     A.   Yes.

24     Q.   So the programs on C and D yards would be

25 closed down, but the two 64-bed units would remain

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

```
 1   operating?
 2        A.   That's my understanding.
 3        Q.   Okay.  Were you given at any time a schedule
 4   for when this closure would take place?
 5        A.   Yes.
 6        Q.   And when were you told that?
 7        A.   We were told at the presentation by the
 8   Stockton folks that they would begin taking transfers
 9   from our program in later part of July 2013.
10        Q.   And did you understand what the pace of the
11   transition -- what did you understand from that
12   presentation about how the Salinas Valley psychiatric
13   program would be impacted by this transfer of patients?
14        A.   Well, we weren't given a firm schedule for how
15   fast the transfer would take place.  Staff was told that
16   they would all have an opportunity to apply for
17   positions with the Stockton program.
18             Those are the two things that stand out in my
19   mind from that meeting, yeah.
20        Q.   Did you understand that at some point in 2013
21   you were going to have to find another job either at
22   Stockton or somewhere else?
23        A.   Well, I don't think it was quite that clear
24   because there obviously would be 128 patients, I think,
25   left at Salinas Valley psych program, so they would
```

John Brim, M.D.                                                    March 1, 2013

1    require some staff.  And it wasn't clear, you know, who
2    might have an opportunity to stay, who might have to go.
3    That was an assumption that would be probably on a
4    seniority basis, but I wasn't really too involved in
5    that because I'm a contractor.  I come and go, you know,
6    pretty easily.
7         Q.   Okay.  Back on the first page there's a
8    reference to other mental health disciplines such as
9    social work, psychology, and rehab therapy.
10            Were you aware of the staffing levels in these
11   other disciplines at Salinas Valley?
12            MS. GOSLING:  Vague and ambiguous as to time.
13   I'm assuming when they wrote this letter.
14            MR. BIEN:  Yeah, in January 2013.
15            THE WITNESS:  Well, I knew from my own
16   experience on the D yard where I worked that the
17   disciplines were short of staff.  And I understood that
18   to be generally the case in all of the Salinas Valley
19   psych program units.
20   BY MR. BIEN:
21        Q.   Okay.  And did you -- in your personal opinion
22   did you feel that the shortage of other disciplines in
23   psychiatry was greater than it had been in times in the
24   past as of January 2013?
25        A.   It was certainly.

John Brim, M.D.                                                      March 1, 2013

```
 1              MR. RUSSELL:  Objection.  Vague and ambiguous.
 2    Lacks foundation.
 3              THE WITNESS:  It was certainly greater than
 4    two years I had spent in the program from 2009 to 211.
 5    BY MR. BIEN:
 6         Q.   Did any of the other staff in the other
 7    disciplines express to you personally their concern
 8    about the level of staffing in the D5/D6 unit where
 9    you're working?
10         A.   Yes.
11         Q.   And we're talking about the period since you
12    came back to Salinas Valley?
13         A.   Correct.
14         Q.   And what was said to you and by whom?
15              If you want to tell me just the person's
16    profession, that's fine with me.  I don't care about
17    their name.
18         A.   Okay.  Okay.  I can do that.
19              The social workers in particular were
20    concerned because they were stretched so thin.  It
21    involved having to cover more people than they felt
22    comfortable covering, having to, in some cases, cover
23    more than one case load.
24         Q.   What do you mean by "more than one case load"?
25         A.   One social worker would have to try to cover
```

John Brim, M.D.                                               March 1, 2013

 1   another case load that ordinarily would have its own

 2   social worker assigned to it.

 3       Q.   Did you discuss with a social worker that

 4   spoke with you any strategies to make sure that patient

 5   safety was protected in this kind of environment of

 6   short staffing?

 7       A.   The only strategy that I was aware of that we

 8   could pursue was to do the best we could with what we

 9   had.

10       Q.   Okay.

11       A.   And, of course, to keep administration

12   informed of the need for more manpower.

13       Q.   Okay.  Are you aware of any other disciplines

14   who, through their unions or groups, expressed concerns

15   about the staffing level at Salinas Valley psychiatric

16   program in December or January?

17       A.   Yes.  I know that nursing was very short.  And

18   I was told by nurses that they were making their concern

19   felt to administration.

20            The MTA staff also was short, and they also

21   were expressing to me concern about the vacancies in

22   their ranks.

23       Q.   Anyone tell you that there was a hiring freeze

24   that was limiting the ability of the institution to fill

25   vacant positions?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                                    March 1, 2013

1         A.    I remember reference to that, and then I
2    remember being told that there were exceptions to that
3    or there were ways of hiring people despite that.  I
4    really didn't know much about that.
5         Q.    Okay.  Were you ever informed that there were
6    limits on overtime work at the facility?
7         A.    Yes, I did hear that.
8         Q.    Okay.  And where did you hear that from?
9         A.    Some of the MTA staff, as I recall.
10        Q.    Okay.  Had it been your experience at DSH that
11   shortages were sometimes addressed by asking employees
12   to work overtime?
13        A.    Yes.
14        Q.    Do you recall who made the presentation about
15   the Stockton program?
16        A.    Well, I recall that Sterling Price, the
17   executive director, was there with some other members of
18   his staff.  I don't recall their names.
19        Q.    At the time of that presentation, did
20   anyone -- were you aware of any communications to
21   Mr. Price or anyone else from, you know, superiors in
22   the Salinas Valley program about the current levels of
23   staffing at the Salinas Valley psychiatric program?
24        A.    I was not aware.
25        Q.    Okay.  At the bottom of the first page of the

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

John Brim, M.D.                                        March 1, 2013

```
 1  letter there's a reference to a -- the first completed
 2  suicide at SVPP and that "Current staffing levels will
 3  create an unacceptable level of risk as far as patients'
 4  safety."
 5           Is it correct that there was a suicide at SVPP
 6  in late November of 2012?
 7       A.   I -- yes.  That's correct.
 8       Q.   Okay.  And that was in the C5/C6 unit?
 9       A.   Yes.
10       Q.   Did you participate in any discussions with
11  staff about the circumstances of that, I'm sure, very
12  troubling tragedy?
13       A.   No.
14       Q.   You never talked to anyone about the fact that
15  someone had committed suicide in C5/C6?
16       A.   Yes, I'm sure I talked to people about it.
17  But, you know, as far as there being any organized any
18  discussion at our meetings, no.  There was not that I
19  recall.
20           I'm sure there were, you know, references to
21  that, but that would have fallen under peer review and
22  that would have been taken up by, you know, an assigned
23  group of clinicians.  It wouldn't have been the subject
24  of general discussion in a psychiatry meeting.
25       Q.   Okay.  Just for the record, we're going to be
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

1  discussing some matters in this deposition that are

2  otherwise confidential.  There's a protective order in

3  the case.  I think everyone here is under it.  I'm going

4  to try not to use any patient names on the record.  If

5  we do, we can seal that part of the transcript.

6      A.    Okay.

7      Q.    And if there's any concern that you have, I

8  represent the person who committed suicide and the other

9  patients.

10     A.    Understand.

11     Q.    Mr. Russell's here for Department of

12 Corrections, we have Department of State Hospital people

13 here, and this is your lawyer.  We're all under the

14 protective order.  And I can assure that if we discuss

15 anything, we will treat it as confidential and -- but

16 obviously, any concerns that you have, please raise with

17 your attorney.

18          MS. GOSLING:  Mr. Bien, could we -- just

19 because I'm new to the case, could we go off the record

20 briefly so I could learn a little bit more about the

21 protective order and how that works?

22          MR. BIEN:  Sure.

23          (Off the record at 10:11 a.m. and back

24           on the record at 10:24 a.m.)

25

John Brim, M.D.                                              March 1, 2013

```
 1    BY MR. BIEN:
 2         Q.   Dr. Brim, you understand you're still under
 3    oath?
 4         A.   Yes, sir.
 5         Q.   When I asked you earlier about a statement
 6    made to you by another member of the D5/D6 clinical
 7    staff, you were reluctant to identify the person by
 8    name.
 9              Let me ask you:  Have you felt any pressure
10    to -- start again.
11              Do you have any fear of being retaliated
12    against as a result of your testimony here today?
13              MS. GOSLING:  Objection.  Relevance.
14              But you can go ahead and answer.
15              THE WITNESS:  Not really given my -- my
16    situation as a contractor at the end of my professional
17    life.
18    BY MR. BIEN:
19         Q.   What do you mean by "not really"?
20              MS. GOSLING:  Same objection.
21              You can go ahead and answer.
22              THE WITNESS:  Well, there was some discussion
23    at the Salinas Valley psych program as to what would
24    happen if the union sent this letter on to the Coleman
25    court as we rather expected it would.  And many of my
```

```
 1   colleagues expressed considerable apprehension about

 2   being singled out to give testimony, and they pointed

 3   out to me that I had sort of reached the end of my

 4   working life expectancy, didn't have a whole lot to

 5   lose.  And I agreed that they were probably right about

 6   that.

 7           And I don't know if that was a factor in my

 8   being designated to come here but...

 9   BY MR. BIEN:

10       Q.   So am I correct that you think it's possible

11   as a result of your testimony you will lose your ability

12   to work for Department of State Hospitals?

13           MS. GOSLING:  Objection.  I think that

14   misstates his testimony.

15           MR. RUSSELL:  Join.

16           THE WITNESS:  Do you want a response to that?

17   BY MR. BIEN:

18       Q.   Please.

19       A.   Well, I think the Department of State

20   Hospitals that's predecessor to DMH is a good department

21   and they try hard to be fair but the reality of human

22   behavior is it's always a possibility.

23       Q.   Okay.  You thought it was important

24   professionally to come forward and to make this

25   information public?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

```
 1              MS. GOSLING:  Objection.  Misstates his
 2    testimony.
 3              THE WITNESS:  I agree with your statement.  I
 4    did feel it was important.  And we all did, yeah.
 5    BY MR. BIEN:
 6         Q.   And why was that?
 7         A.   Because of our concern for the patients.
 8              And of course there was, you know, some
 9    concern for personal liability if things went bad.
10         Q.   There was a -- were you aware that Coleman
11    plaintiffs' counsel and psychiatric expert
12    Dr. Pablo Stewart inspected the Salinas Valley
13    psychiatric program, including the DSH program, in late
14    January of 2013?
15         A.   Yes, I heard about that.
16         Q.   Okay.  Who did you hear about it from?
17         A.   Some of the other staff members were talking
18    about it.  I didn't have any opportunity to interact
19    with any of the people that were visiting.
20         Q.   Were you aware of any instructions that were
21    given to staff concerning that tour?
22         A.   No.
23         Q.   Okay.  Did any of the psychiatrists who joined
24    you in writing this letter tell you that they were
25    unable to communicate with Coleman counsel during that
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                           March 1, 2013

1   tour about their concerns?

2       A.   I remember some discussion about how -- one or

3   two of the psychiatrists mentioning that they wished

4   they had been approached by Coleman, that they'd had an

5   opportunity to talk with them because they felt that

6   their concerns needed to be heard.

7            That's all I recall on that subject.

8            MR. BIEN:  I've asked the court reporter to

9   mark as Exhibit 2 a letter dated February 12, 2013,

10  again, signed by a group of psychiatrists at

11  Salinas Valley and addressed to Charles DaSilva.

12           (Plaintiffs' Exhibit 2 was marked for

13            identification.)

14  BY MR. BIEN:

15      Q.   Dr. Brim, can you identify this letter,

16  please?

17      A.   Yes.  This is a letter that I signed along

18  with seven of my colleagues.

19      Q.   And this was several weeks later after the

20  first letter?

21      A.   Yes.  It's dated February 12.  Uh-huh.

22      Q.   Between the time you sent the first letter on

23  January 23rd and the time you sent the second letter on

24  February 12, had you received any communication from the

25  administration at Salinas Valley psychiatric program

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                           March 1, 2013

1   about the issues you raised?

2            MR. RUSSELL:  Objection.  Vague and ambiguous.

3            THE WITNESS:  No.

4   BY MR. BIEN:

5        Q.   Did you ask Dr. Troncoso if he had received

6   any communications from Mr. DaSilva or anyone else about

7   the concerns raised in the January 23rd letter?

8        A.   Yes, we did.

9        Q.   What did he say?

10        A.   He said that he was reassured that

11   administration was working on the issue but, again, he

12   was given no role in recruiting.

13            He at that point resigned his position as

14   senior psychiatrist.

15        Q.   Did he explain to you why he resigned his

16   position as senior psychiatrist?

17        A.   No.

18        Q.   I notice there are eight signatories of the

19   second letter, and there were nine, I think, of the

20   first.

21        A.   Yes.

22        Q.   What happened?

23        A.   Dr. Gaines had left for her new job at that

24   point.

25        Q.   Had there been any decrease in the rate of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

1    admission to the program in the period January 23rd,

2    2013, and the time you sent the second letter,

3    February 12th, 2013, to your knowledge?

4         A.   Not at least for the unit that I was working

5    on.

6         Q.   Okay.  In the third sentence in the letter the

7    group says:  "Now, as you know, our psychiatry staffing

8    shortage has devolved from serious to crisis level."

9         A.   Yes.

10        Q.   What did you mean by that?

11             MR. RUSSELL:  Objection.  Vague and ambiguous.

12             THE WITNESS:  We meant that it had become a

13   crisis.

14   BY MR. BIEN:

15        Q.   Can you explain a little bit more about that?

16        A.   Yes.  I think the feeling among the group was

17   that things were bad three weeks prior.  Now they were a

18   lot worse.

19        Q.   Okay.  You state that "The psychiatry staff at

20   SVPP have unanimously determined that we cannot safely

21   manage more than 40 patients per psychiatrist."

22             Were you being asked at that point,

23   February 12, 2013, to manage more than 40 patients as an

24   individual psychiatrist?

25        A.   Beginning, I believe, the week after that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

1  letter was sent, we were scheduled to lose two more of

2  the eight psychiatrists.  And that would have meant,

3  let's see, five and three-quarter psychiatrists for

4  360 patients, which I believe works out to about roughly

5  60 per psychiatrist.

6      Q.   Who were the two more psychiatrists that were

7  scheduled to leave?

8      A.   Dr. Wei had announced that he was leaving, and

9  Dr. Kapadia had announced that he had a new job and was

10  going to be departing to take that up.

11      Q.   Where was Dr. Kapadia going?

12      A.   He was going to California training

13  facility -- or correction training facility at Soledad,

14  which is one of the CDCR prisons.

15      Q.   Okay.  And what about Dr. Wei?

16      A.   Dr. Wei was returning to China because of

17  family illness.

18      Q.   Okay.  And I assume that these doctors had

19  made the plan known to the administration, to your

20  knowledge?

21      A.   Yes.

22      Q.   What did the group mean by the fact -- the

23  quote in the last sentence, "We can only provide

24  emergency psychiatry services"?

25      A.   Well, we couldn't ethically abandon patients

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                              March 1, 2013

```
 1   out that in his experience it was feasible for the
 2   psychiatrists to rely on information from these other
 3   staff members about the patients rather than actually
 4   seeing the patients in order to make decisions about
 5   their treatment.
 6           It was suggested to him this would not be
 7   proper because it would be like operating on hearsay and
 8   we needed to have time and opportunity to interact with
 9   the patients ourselves in order to make responsible
10   decisions about their treatment.
11       Q.  Did you discuss with him reducing new
12   admissions to the unit to reduce the pressure?
13       A.  Yes.
14       Q.  Okay.  And what did you say to him and he say
15   to you about that?
16       A.  Well, it was pointed out that the more
17   admissions and discharges you have, the higher the
18   workload because a lot of the work is sort of
19   front-loaded and end-loaded on these patients.
20           He, you know, responded we had a
21   responsibility to provide our services promptly to those
22   in need, and we did have a waiting list although it was
23   relatively short at that point in time.
24           That was extent of the discussion on that.
25       Q.  Did he tell you how many people were on the
```

Page 38

John Brim, M.D.                                                    March 1, 2013

1    waiting list at that time?

2         A.   I believe there was a reference to the number

3    20 or so.

4         Q.   Okay.  Did he express to you that he was

5    unable to restrict admissions because of that waiting

6    list?

7         A.   There was discussion -- a statement on his

8    part that the court wanted people to be expeditiously

9    admitted to our facility.

10        Q.   Did he tell you that the governor represented

11   that there was no wait list in filings with the federal

12   court in January of 2013?

13        A.   No.

14             (Plaintiffs' Exhibit 3 was marked for

15              identification.)

16   BY MR. BIEN:

17        Q.   Let me show you what's been marked as

18   Exhibit 3 to your deposition.  This is going to be an

19   exhibit that's under seal because it's a peer review

20   kind of document and it's a suicide report concerning an

21   inmate who died of suicide at Salinas Valley psychiatric

22   program in late November of 2012.

23             He actually died in a hospital on

24   December 4th of 2012?

25        A.   Right.

John Brim, M.D.                                    March 1, 2013

1   inmate to his regular cell but restrict his possessions.

2   Sometimes one would limit the possession of sharp

3   objects.  Sometimes one would limit the possession of

4   sheets, blankets, things that can be converted pretty

5   easily into nooses.

6          So there are those other options, yes.

7      Q.   Are there options that involve nursing or

8   other staffing observations, frequency of observation,

9   for someone who's not in that observation cell on

10  suicide watch?

11         MR. RUSSELL:  Objection.  Vague and ambiguous.

12  Lacks foundation.

13         THE WITNESS:  I would say there is that

14  option.  It's not commonly used because all inmates are

15  checked every 15 minutes.  And typically when someone is

16  taken off of one-to-one observation, they go to the

17  every 15 minute that is standard for all inmates.

18  BY MR. BIEN:

19     Q.   Okay.

20     A.   Although, you know, in theory, you could say

21  every seven minutes or any time in between.

22     Q.   Okay.  Can you explain the every 15 minute

23  check that you understand happens in these units at

24  Salinas Valley?

25     A.   Nursing staff make rounds every 15 minutes and

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1  ascertain that every inmate under their care is
 2  breathing and appears alive and well.
 3       Q.   Okay.  And that's something that you rely on
 4  in your work, that that is happening?
 5       A.   Yes.
 6       Q.   Okay.  Are you aware of whether there are
 7  training on emergency response in your program at
 8  Salinas Valley psychiatric?
 9       A.   Yes.
10       Q.   And does that include procedures for what to
11  do if you find an inmate in the midst of a suicide
12  attempt?
13       A.   Yes.
14       Q.   I'm looking on -- are you aware of which staff
15  in the program are trained in CPR and emergency response
16  procedures?
17       A.   Everyone.
18       Q.   Okay.  If you look on page 2 of Exhibit 3,
19  Doctor.
20            In your understanding, do social workers have
21  the ability to sound an alarm themselves?
22       A.   Yes.
23       Q.   Is the alarm an electronic device?
24       A.   Yes.
25       Q.   Did you have one when you were in the unit?
```

```
 1        A.   Typically not, because there are other staff
 2   that do.
 3        Q.   Okay.  Is it your understanding that social
 4   workers do have alarms?
 5        A.   Yes.
 6        Q.   When you've -- as a treating psychiatrist at
 7   Salinas Valley psychiatric program since November of
 8   2012, have you ever had complaints from patients about
 9   the lack of privileges and lack of treatment in
10   Level 1 -- when they're on Level 1 status?
11        A.   Yes.
12             MR. RUSSELL:  Objection.  Vague and ambiguous.
13   Overly broad.
14   BY MR. BIEN:
15        Q.   Can you share that with me what?  Do you
16   recall?
17        A.   Typically patients complain that they have
18   more privileges at the prisons where they came from than
19   they're finding at Level 1 in our program, and they feel
20   like they've been deprived privileges by being sent to
21   our program.
22        Q.   Has a patient ever expressed to you that they
23   had more treatment groups, more hours of treatment when
24   they were in the CDCR prison than they had at your
25   program in Level 1?
```

John Brim, M.D.                                    March 1, 2013

```
 1        A.   Yes.
 2        Q.   Do you recall how you responded to these
 3   patients?
 4        A.   I told them I sympathized, I wished we could
 5   start their treatment plan immediately, but that we're
 6   required by CDCR to postpone their programming until
 7   they have their ICC.
 8        Q.   Okay.
 9        A.   Typically we offer to provide what we can in
10   the way of in-cell materials to help them occupy their
11   time.
12        Q.   Let me mark as -- I've already marked as
13   Exhibit 5 a document that appears to be a manual given
14   to patients at Salinas Valley psychiatric program.
15             This was mailed to us by a patient, and his
16   name is on the back.  So I'm going to put this in the
17   sealed section too.
18             I'm not going to ask a lot of detailed
19   questions, Doctor, but is this -- this appear to be a
20   copy of a manual that's distributed to patients at
21   Salinas Valley psychiatric program?
22        A.   Yes.
23        Q.   Okay.  And what's the purpose of distributing
24   this to patients, if you know?
25             MR. RUSSELL:  Objection.  Vague and ambiguous.
```

John Brim, M.D.                                          March 1, 2013

```
 1   Lacks foundation.
 2           THE WITNESS:  I would assume the purpose is to
 3   introduce them to the program.
 4   BY MR. BIEN:
 5       Q.   Okay.
 6           MS. GOSLING:  Don't assume.  Just state if you
 7   know.
 8   BY MR. BIEN:
 9       Q.   This is dated April 12.  To your knowledge,
10   has this -- is this manual -- this version of the manual
11   still in effect at this time?
12       A.   I don't know.
13       Q.   Okay.
14           MS. GOSLING:  Have you seen this before?
15           THE WITNESS:  I have not.
16   BY MR. BIEN:
17       Q.   Oh, you have not.  Okay.
18       A.   No.
19           MS. GOSLING:  Do you want him to look through
20   it?
21           MR. BIEN:  No, that's okay.
22   BY MR. BIEN:
23       Q.   You mentioned earlier in the Level 1 status
24   the patient has to be in cuffs when they leave their
25   cell; is that right?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                              March 1, 2013

```
 1        A.   Yes, it's my understanding.
 2        Q.   Okay.  And if someones -- patient is Level 1
 3   and they need to see their psychiatrist, where would you
 4   see them?
 5        A.   Typically at cellside.
 6        Q.   And what does that mean, "at cellside,"
 7   Doctor?
 8        A.   That means we go to the patient's cell and
 9   converse with them through the cell door.
10        Q.   Okay.  Is that how you do -- I assume in those
11   first couple of weeks, one of the things you're doing is
12   evaluating their need for psychotropic medication?
13        A.   Right.
14        Q.   And discussing side effects and reactions to
15   those medications?
16        A.   Right.
17        Q.   Are you concerned with the confidentiality of
18   such a communication that happens at cell front?
19        A.   Yes.
20        Q.   Why is that?
21        A.   It doesn't really afford confidentiality
22   because even though we try to keep our voices down, I
23   believe the people in the adjoining cells can probably
24   overhear.
25        Q.   In your opinion, why is confidentiality
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                      March 1, 2013

```
 1   important for these kind of communications for a
 2   psychiatrist with their patient?
 3            MR. RUSSELL:  Objection.  Vague and ambiguous.
 4            THE WITNESS:  Because it's often very
 5   sensitive material that people want to discuss or we
 6   need to ask about, and they have valid reasons for not
 7   wanting other people to know about it.
 8   BY MR. BIEN:
 9       Q.   Okay.  Have you ever expressed to anyone in
10   administration at Salinas Valley psychiatric program
11   your concern about confidentiality in communications
12   with patients in your work?
13       A.   Yes.
14       Q.   And can you recall when that was and what was
15   communicated?
16       A.   I would have to say on many occasions over the
17   years.
18       Q.   Do you recall any communications since
19   November of 2012?
20       A.   No.  I think by that point I had communicated
21   that concern so many times, I didn't seem much point in
22   repeating it.  Yeah.
23       Q.   When you had expressed it in the past, had you
24   communicated the option of having the patient removed
25   from their cell and brought to an office and meet
```

John Brim, M.D.                                         March 1, 2013

1   privately with you rather than doing cell front?

2           MS. GOSLING:  Objection.  Overly broad.  Vague

3   and ambiguous.  You're talking about a lengthy career.

4   BY MR. BIEN:

5       Q.   Okay.

6       A.   Yes.  And that routinely happens at least once

7   or twice for each patient because when they first come

8   in and meet the psychiatrist, they are brought out to an

9   interview room.  However, you know, MTA staff are

10  present during that time.  They are, however, treatment

11  staff and included in the confidentiality umbrella.

12          And there may be special occasions during the

13  remainder of the hospital stay where patients are able

14  to come out and be interviewed in a more confidential

15  setting.  And when they come for their treatment teams,

16  they're brought out of their cell, again interviewed in

17  a more confidential setting.

18          So there is some of that.

19      Q.   All right.  Do you have the option as a

20  psychiatrist you say, you know, "I'm not comfortable

21  with this.  I want all my contacts to be confidential"?

22          Can you -- do you feel like you could do that

23  since November of 2012 at Salinas Valley psychiatric

24  program?

25      A.   Since November of 2012, I have not raised that

Page 60

John Brim, M.D.                                                    March 1, 2013

1    issue again because I had raised it many other occasions

2    and I felt it would be pointless to raise it again.

3         Q.   In your opinion, was there sufficient staffing

4    in D5/D6 since November of 2012 to allow psychiatrists

5    who would insist to have all their contacts in

6    confidential spaces outside of cells?  Is there

7    sufficient staffing to provide that for psychiatrists

8    and their patients?

9              MR. RUSSELL:  Objection.  Vague and ambiguous.

10   Lacks foundation.  Calls for speculation.

11             THE WITNESS:  No.

12   BY MR. BIEN:

13        Q.   Okay.  Patients have raised with us, Doctor,

14   an issue which we didn't really understand.  We get

15   letters from prisoners all the time, and some of them

16   are -- seem a little bit -- some of them are seriously

17   mentally ill and we're not always sure of reality.

18             But we've heard from our clients that there's

19   insufficient laundry service, soap, clothing being

20   provided to them at the Salinas Valley psychiatric

21   program in the last few months.

22             Have you heard complaints like that?

23        A.   Yes.

24        Q.   Have you investigated them?

25        A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

1        Q.    What can you tell me about them?

2        A.    The DSH staff that I have talked to who had

3   personal knowledge of this confirm that there has been a

4   severe shortage of clean clothes, bedding, coats.  I

5   believe they've made every possible efforts to address

6   this.  They place the blame on CDCR, which has the

7   responsibility for their laundry.

8        Q.    When you say "they," is the staff, the DSH

9   staff that you spoke to about the subject?

10       A.    Yes.

11       Q.    Okay.  We've also heard complaints about food

12  service, the volume of food, amount of food, quality of

13  food.  Have you heard complaints about food service also

14  from patients?

15       A.    Yes.

16       Q.    And have you investigated them?

17       A.    Informally.

18       Q.    And what have you heard?

19       A.    Well, I've inspected the meals and I've been

20  around at feeding time.  I've observed the distribution

21  of the meals, the timing.  I haven't found any substance

22  to the inmates' complaint about the food.  I mean, you

23  know, it's a subjective thing how good it is, but it's

24  provided.  It appears to be hygienic.  And I know it's

25  under supervision of a registered dietician, so I assume

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   it's a balanced diet.

2       Q.   Do -- have you investigated whether or not

3   there will be restrictions on number of servings or

4   extra helpings of food?

5           MR. RUSSELL:   Objection.   Vague and ambiguous.

6   Lacks foundation.

7           THE WITNESS:   Yes.   As a medical facility,

8   there is a prescribed regular diet which includes a

9   certain quantity of food representing a certain number

10  of calories.   And that's only varied if there's a

11  medical diet ordered.   Medical diets are restricted in

12  the variety available.   But there are some.   And I

13  believe there religious diets.   I don't know the

14  details.

15  BY MR. BIEN:

16      Q.   I guess my question was not unclear.

17          Did you investigate whether there's been any

18  limitations beyond prescribed limitations on the amount

19  of food that can be provided to inmates in the program

20  at Salinas Valley in the last two months?

21      A.   I'm not aware of that.

22      Q.   Okay.   Are you aware that Salinas Valley

23  psychiatric program performs blood tests on arriving

24  patients from CDCR as a matter of routine?

25      A.   Yes.

John Brim, M.D.                                                    March 1, 2013

```
 1       Q.   And is one of the purposes -- do you
 2  understand what the purpose of those blood tests are?
 3       A.   Yes.
 4       Q.   What are they?  What are the purposes?
 5       A.   Well, psychotropic medication has some side
 6  effects that are harmful to the body, and blood tests
 7  can be used to monitor for these.  And we also
 8  frequently do blood levels of psychotropic medications
 9  both to gauge adequacy of the dose and to get an idea of
10  whether it's actually being consumed.  So those are two
11  of the purposes.
12            Of course, if there's a specific medical
13  problem, any necessary test for that -- for the
14  treatment of that will be ordered, too.
15       Q.   Let me show you mark as the next exhibit in
16  order, a document produced by Salinas Valley State
17  Prison in connection with a recent tour.  It has
18  production number SP -- SVSP219.  It's a one-page
19  document.  It says "Salinas Valley Psychiatric Program
20  Medication Analysis Summary Report."
21            (Plaintiffs' Exhibit 6 was marked for
22             identification.)
23            MR. BIEN:  Let me at the same time mark
24  Exhibit 7, another two-page document produced also in
25  connection with the recent tour.  SVSP236, 237.  And
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   this one has to be sealed, please.

2           (Plaintiffs' Exhibit 7 was marked for

3            identification.)

4   BY MR. BIEN:

5       Q.   Doctor, have you ever seen Exhibit 6 or a

6   report like Exhibit 6 that summarizes testing results by

7   facility?

8       A.   Yes.

9       Q.   Okay.  And is this something that's shared

10  with the psychiatric staff at Salinas Valley psychiatric

11  program?

12          I'm looking at 6.  This one.

13      A.   Oh, I'm sorry.

14          MS. GOSLING:  Does that change your answer?

15  BY MR. BIEN:

16      Q.   Yeah.  That's why I want to make sure.

17      A.   I've seen similar reports.  I don't believe

18  it's routinely distributed to psychiatrists, though.

19      Q.   You have seen similar reports about testing

20  and level reference levels?

21      A.   Yes.

22      Q.   Okay.  What does a reference level refer to,

23  if you know?

24          It's also on Exhibit 7 where the column is for

25  reference level.

John Brim, M.D.                                    March 1, 2013

```
 1    these were downloaded yesterday from the Department of
 2    State Hospital Web site.
 3              MS. GOSLING:  Do you want the witness to look
 4    through them?
 5              MR. BIEN:  Yeah.  Just take a...
 6              (Witness reviewing document.)
 7    BY MR. BIEN:
 8        Q.   Dr. Brim, this isn't a color chart, which is
 9    appears on the computer when I looked at it, but are you
10    able to discern the SVPP line on these various charts?
11    Look at the last two charts, staff injuries and patient
12    injuries.
13        A.   Yes, I can discern that.
14        Q.   Okay.  Have you ever had discussions during
15    your work at Salinas Valley psychiatric program about
16    the level of staff and patient injuries?
17              MR. RUSSELL:  Objection.  Vague and ambiguous.
18    Overly broad.
19    BY MR. BIEN:
20        Q.   Since November of 2012?
21        A.   Yes.
22        Q.   And can you tell me about any of those
23    discussions?
24        A.   I have noticed an increase in staff
25    assaults -- assaults by patients on staff -- over the
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                         March 1, 2013

1   last few months.  I've asked my colleagues if they were

2   seeing the same sort of thing and, they agree that it

3   seems to be increasing.

4        Q.   Okay.  And just for the record, these charts

5   cover the period January through September of 2012.

6             Is it -- has it been your experience that --

7   is it your perception that staff injuries have been

8   higher at Salinas Valley than in previous times that

9   you've worked at Salinas Valley?

10       A.   Yes.

11            MR. RUSSELL:  Objection.  Vague and ambiguous.

12   Lacks foundation.

13            MS. GOSLING:  Join.

14   BY MR. BIEN:

15       Q.   In any discussions with staff, did anyone

16   discuss with you perhaps the level of staff injuries

17   reflects understaffing in the Salinas Valley psychiatric

18   program?

19            MR. RUSSELL:  Objection.  Vague and ambiguous.

20   Overly broad.

21            THE WITNESS:  Yes.

22   BY MR. BIEN:

23       Q.   Okay.  And can you describe that conversation

24   and when that took place?

25       A.   No one conversation stands out in my mind; but

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

1    over the last couple of months when the psychiatrists

2    have gotten together in their meetings, there has been

3    ongoing discussion of the increasing dangerousness of

4    the situation, and a number of different psychiatrists

5    have touched on the fact that the injuries appear to be

6    up, relate that to staff not having the time they once

7    had to maintain contact with the patients, monitor how

8    they're doing, keep us informed so that we can do what

9    we can with their medication to help stabilize them.

10           And we ourselves have all, I think, expressed

11   concern that we're not able to take the time to have the

12   number of face-to-face contacts that we really would

13   like to have to feel comfortable that we are monitoring

14   the patients in the -- a safe and responsible way.

15        Q.   Administration ever inform you that

16   Salinas Valley psychiatric program in 2012 had a higher

17   level of staff and patient injuries than all other state

18   hospital programs?

19        A.   No.   Not to my knowledge.

20        Q.   Did Secretary Allenby discuss with you his

21   concern that -- of the high level of staff and patient

22   injuries that were occurring at Salinas Valley

23   psychiatric program at his meeting this week?

24           MR. RUSSELL:   Objection.   Vague and ambiguous.

25   Assumes facts not in evidence.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                                    March 1, 2013

```
 1              THE WITNESS:  Not as I recall.
 2    BY MR. BIEN:
 3        Q.   You assume that the secretary of the
 4    Department of State Hospitals is aware of the level of
 5    staff injuries and patient injuries in his facilities?
 6              MS. GOSLING:  Objection.  Calls for
 7    speculation.  Don't assume anything.
 8    BY MR. BIEN:
 9        Q.   You can answer the question.
10              MS. GOSLING:  Do you know?
11              THE WITNESS:  I would assume that, yes.
12    BY MR. BIEN:
13        Q.   That's part of his job, isn't it?
14        A.   I would assume so.
15              MR. BIEN:  Why don't we take lunch now?
16
17              (Whereupon the luncheon recess was taken
                 at 12:09 p.m.)
18
19                        --o0o--
20
21
22
23
24
25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                                    March 1, 2013

```
1                      CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                   DATED:  March 4, 2013

21

22                   _____

23                   MEGAN F. ALVAREZ

24                   RPR, CSR 12470

25
```

# Exhibit 83



Transcript of the Testimony of:

# **Joel Dvoskin, Ph.D., ABPP**

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312   |   F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                  Plaintiffs,       )
                                    )CASE NO.:
        vs.                         )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                  Defendants.       )
_____)



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                     Plaintiffs,       )
                                         )CASE NO.:
 6          vs.                          )S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                     Defendants.       )
     _____)
 9

10

11

12           The Deposition of JOEL DVOSKIN, PH.D., ABPP,

13   taken on behalf of the Plaintiffs, before Megan F.

14   Alvarez, Certified Shorthand Reporter No. 12470,

15   Registered Professional Reporter, for the State of

16   California, commencing at 9:14 a.m., on Wednesday,

17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,

18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,

19   California.

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  MICHAEL BIEN, ESQ.
                     AARON FISCHER, ESQ.
 4                   JANE KAHN, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5            315 MONTGOMERY STREET, 10TH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 6            415.433.6850
              415.433.7104 FAX
 7            MBIEN@RBGG.COM

 8
      FOR DEFENDANTS:
 9
                BY:  DEBBIE J. VOROUS, ESQ.
10            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
11            1300 I STREET
              SACRAMENTO, CALIFORNIA 95814
12            916.324.5345
              916.324.5205 FAX
13            DEBBIE.VOROUS@DOJ.CA.GOV

14              BY:   HEATHER L. McCRAY, ESQ.
              DEPARTMENT OF CORRECTIONS AND REHABILITATION
15            OFFICE OF LEGAL AFFAIRS
              1515 S STREET, SUITE 314 SOUTH
16            SACRAMENTO, CALIFORNIA 95811
              916.324.4123
17            916.327.5306 FAX

18

19

20

21

22

23

24

25
```

```
 1                       I N D E X

 2                   INDEX OF EXAMINATIONS

 3

 4    Examination by Mr. Bien  .........................6

 5                       --o0o--

 6

 7            EXHIBITS MARKED FOR IDENTIFICATION

 8    No.             Description                  Page

 9    Exhibit 1    Notice of Deposition and Request .....7
                   for Production of Documents
10
      Exhibit 2    Joel Dvoskin's contracts with .......16
11                 the State of California, initial
                   Bates DEXP103091
12
      Exhibit 3    Expert rates, Park Dietz & ..........35
13                 Associates, Inc.

14    Exhibit 4    "An Overview of Correctional ........54
                   Psychiatry," Jeffrey Metzner, MD
15                 and Joel Dvoskin, Ph.D., ABPP

16    Exhibit 5    Program Guide Overview - Mental ....149
                   Health Services Delivery System
17
      Exhibit 6    Joel Dvoskin's handwritten .........150
18                 notes, initial Bates 103258

19    Exhibit 7    Memo dated 8/16/11 from Lindsay ....163
                   Hayes to Thomas Gilevich, CDCR
20                 Suicide Prevention Consultation

21    Exhibit 8    Dr. Dvoskin's notes for ...........238
                   Sacramento, 2/29/12, initial
22                 Bates DEXP104255

23    Exhibit 9    Dr. Dvoskin's notes, initial ......239
                   Bates DEXP105100
24
      Exhibit 10   Dr. Dvoskin's notes from ..........239
25                 Corcoran, initial Bates
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1    Exhibit 11    Dr. Dvoskin's notes for CSP-LAC, ...239
                    initial Bates DEXP104464
 2
      Exhibit 12    Dr. Dvoskin's notes for Salinas ....239
 3                  Valley I, initial Bates
                    DEXP104514
 4
      Exhibit 13    Dr. Dvoskin's notes for CIM, .......239
 5                  initial Bates DEXP104421

 6    Exhibit 14    Dr. Dvoskin's notes for Pelican ....240
                    Bay, initial Bates DEXP104595
 7
      Exhibit 15    Dr. Dvoskin's notes for CMC, .......240
 8                  initial Bates DEXP104631

 9    Exhibit 16    Dr. Dvoskin's notes for SATF, ......240
                    initial Bates DEXP104657
10
      Exhibit 17    Dr. Dvoskin's notes for San .......240
11                  Quentin, initial Bates
                    DEXP104562
12
      Exhibit 18    Dr. Dvoskin's notes for CWF, .......240
13                  initial Bates DEXP104353

14    Exhibit 19    Dr. Dvoskin's notes for R.J. .......241
                    Donovan, initial Bates
15                  DEXP104335

16    Exhibit 20    Dr. Dvoskin's notes for ...........241
                    Centinela, initial Bates
17                  DEXP104320

18    Exhibit 21    Dr. Dvoskin's notes for CMF, .......241
                    initial Bates DEXP104283
19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   was $100,000?

2        A.   That's correct.

3        Q.   I'm sorry.  Going back to the second page of

4   the document, 103092.

5             You understood this was a contract for expert

6   witness services?

7             The first sentence there.

8        A.   That's what the contract says.

9        Q.   Okay.

10       A.   And so I proceeded on the -- you never know if

11  you're actually going to be an expert witness when you

12  start working on these, but that was the contract and

13  that was the way I proceeded.

14       Q.   You understood that you're being retained for

15  litigation purposes?

16       A.   Yes.

17       Q.   Okay.  And the field -- it describes your

18  field as psychology and prison administration?

19       A.   I think that's what they said, yeah.

20       Q.   Do you agree that's your field?

21       A.   Those are some of my fields.

22       Q.   Okay.  And if you go down to the last four

23  pages of this first part, starting with 103098, is that

24  a copy of your CV?

25       A.   At the time, yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    expert report itself?

2            I think you mentioned that you -- for part of

3    that time, you were meeting face-to-face with Dr. Scott

4    to work on the report.

5        A.   The vast majority of it.

6        Q.   Was that in Sacramento?

7        A.   Yes.

8        Q.   Okay.

9        A.   In his office.

10       Q.   Was that in December of 2012?

11       A.   I'm pretty sure it was.

12       Q.   Okay.  And do you know -- was that more than

13   one day?

14       A.   Yes.

15       Q.   Can you give me an estimate how many days that

16   was?

17       A.   At least two.  I think maybe three.

18       Q.   Did Dr. Scott have his assistants with him,

19   too, helping?

20       A.   No.

21       Q.   Okay.  Anyone else there with you besides you

22   and Dr. Scott?

23       A.   No.  A couple of times, like, his secretary

24   popped in the room, but not to work on the project with

25   us.

1      Q.    Okay.  And Dr. Moore was not present for this

2    process of writing a report?

3      A.    No.

4      Q.    Okay.  And I understood from -- we took her

5    deposition last week, early this week.  I don't

6    remember.

7           MS. VOROUS:  Last week.

8    BY MR. BIEN:

9      Q.    She had some illness in her family in

10   December; is that right?

11     A.    I don't remember.  She had some logistical

12   issues that made it more difficult to schedule with her.

13   I think her mom may have had some serious medical issue.

14     Q.    So you --

15     A.    And I think she was in car accident.  There

16   were several different things that made it more

17   challenging to get together with her.

18     Q.    Okay.  And how did you and Dr. Scott get input

19   from Dr. Moore into the report?

20     A.    Well, the attorney general -- whenever I'm

21   doing a report like this, I always ask the attorney

22   whether it's a plaintiff or a defense attorney.  What is

23   it that you're -- assuming we were in court, what would

24   you be likely to ask us on direct?  And we kind of build

25   the report around the referral questions.

1           So these -- what the AGs wanted was

2    essentially a robust report about our opinions regarding

3    the constitutionality of the mental health care in the

4    prisons we visited.

5           We had always had a exit conference at every

6    prison where we each went around and communicated our

7    findings pretty -- reasonably detailed to the warden and

8    the CEO and the mental health director of the prison.

9    So we knew what Dr. Moore's findings were at each of the

10   prisons, with one exception.  I believe Centinela she

11   was unable to join us, and I did some of that work

12   there.

13          I actually don't know whether she went back

14   there or not.  There was some -- we weren't clear

15   whether she was going to go visit Centinela or not.

16   With that exception, we knew what her findings were at

17   each prison.

18          And so we put those in the report essentially

19   as place holders, and then sent it to her.  Dr. Scott

20   e-mailed it to her and said, you know, "Did we quote you

21   right?  Add anything you want?  Delete anything that you

22   want."

23          And my recollection is that she told Dr. Scott

24   that she liked the report.  And she had some -- made

25   some additions, but I don't -- I actually don't remember

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    what her specific additions -- I don't think she had

2    many changes to what we had written.  But I think she

3    added some stuff, which is what we intended.

4        Q.   Did she provide written materials to you,

5    notes or findings about individual prisons?

6        A.   To me?  No.

7        Q.   Or to Dr. Scott?

8        A.   I don't believe so.

9        Q.   Okay.  So when it came time to write the

10   report, you and Dr. Scott wrote it.  You used your

11   recollection of her presentations at each of the exits,

12   and then you sent it to her for her review and approval?

13       A.   Yeah.  We were just trying to make it as easy

14   for her as we could, least amount of time-consuming

15   because we believed she was pretty tied up with some --

16   with things that made it -- would have made it difficult

17   for her to join us.  So we -- but we were very

18   encouraging of her to -- if there was something she

19   disagreed with, to change it.

20       Q.   Okay.  This is -- let me -- I'm going to hand

21   you a check for $2,100.  We're entitled to seven hours

22   of deposition today.  I'm sure we'll use it.  And that

23   way you don't have to send me an invoice.  And all I

24   need -- at some point you can sign -- give me your

25   taxpayer ID number.

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1   mean to imply in any way that he was not honorable or
2   competent.  He is both of those things.
3       Q.   Do you understand that he had been using the
4   same terms and analysis in all the reports that he's
5   done on this case?
6       A.   Yes.
7       Q.   Okay.  And so one reason that he may be doing
8   it that way is that that is the way it has been
9   consistently done on this case?
10          MS. VOROUS:  Objection.  Speculative.
11          You can answer.
12  BY MR. BIEN:
13      Q.   In other words --
14      A.   The question is:  Is it possible that he did
15  it because it's a bad habit?  Yeah.  I mean, I -- it's
16  not a particularly good reason to do something because
17  that's the way we've always done it, but it's -- I mean,
18  I don't know.  You have to ask him why he used that
19  language.
20          Perhaps he was explicitly asked to use that
21  language.  I don't find the language helpful for the
22  reasons I explained in my report.
23      Q.   Okay.  You're familiar with the work of
24  Lindsay Hayes?
25      A.   Very familiar.

1      Q.   And what's your -- do you have an opinion as

2    to his reputation in the field?

3      A.   I have written that Lindsay has saved many

4    lives.  He's a good man who -- who became impassioned

5    about jail suicide prevention before anyone cared about

6    it.

7           We worked together many, many years ago.  My

8    staff did the first statewide jail suicide prevention.

9    So I --

10     Q.   That was in New York?

11     A.   In New York.  We had some dealings with him at

12   that time.  I think he's incredibly knowledgeable.  Very

13   honorable.  Occasionally stubborn, but he's a good guy.

14   I love Lindsay, and I recommend him often.

15     Q.   Okay.

16     A.   I think very highly of him.

17     Q.   Okay.  You were aware during the course of

18   your work that Lindsay was working also with California

19   as a suicide prevention expert?

20     A.   Yes.

21     Q.   Okay.  And were you aware that he had prepared

22   a report for California and provided it to them?

23     A.   Yes.

24     Q.   When did you first become aware of Mr. Hayes'

25   report to California?

Joel Dvoskin, Ph.D., ABPP                                        February 27, 2013

1          A.   I don't remember exactly when.  It was

2    relatively early in the process, but I don't remember

3    when.  I had heard that he had written a report.

4          Q.   Was that report provided to you at any time?

5          A.   Yes.

6          Q.   Okay.  And when was it provided to you?

7          A.   In the last month.

8          Q.   Okay.

9          A.   I don't remember the exact date, but...

10         Q.   So it was in 2013?

11         A.   Yes.

12         Q.   Okay.  And that was -- was it before or after

13   you prepared your report in this case?

14         A.   It was after -- are you talking about the

15   report that Dr. Scott and I collaborated on?

16         Q.   Yes.

17         A.   It was after that.

18         Q.   And was it before or after you prepared your

19   reports -- your report about the 2011 suicides?

20         A.   After.

21         Q.   After that?

22         A.   Yes, sir.

23         Q.   So pretty recent?

24         A.   Yes.

25         Q.   Who provided the report to you?

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

 1  not believe that that study says that there are no

 2  long-term effects of segregation that are negative.  We

 3  were just, in that study, unable to identify them.  And

 4  there are some specific things in Colorado that may have

 5  been responsible for those particular findings.

 6      Q.   Again, rather than go into the details, is it

 7  still correct that at this time you think there's still

 8  not definitive research about whether or not long-term

 9  housing in segregation is dangerous and can cause

10  permanent harm to people?

11      A.   Yes.  I think that's still true.

12      Q.   Okay.  That means -- would you agree it's

13  possible that long-term housing in segregation does

14  cause psychological harm?

15      A.   Yes.

16      Q.   And you're less -- I think I interpreted this

17  correctly --

18      A.   I'm sorry.  Can I just clarify?  I took your

19  question not to mean that it necessarily does, but that

20  it could on -- for an individual.

21      Q.   Right.  That's correct.

22      A.   So the answer is yes.

23      Q.   And you're less -- I understood this article

24  to say that as to the mentally ill, there already has

25  been research and that it is harmful to -- for the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

 1   meeting.  The clinicians were able to ask for a private

 2   meeting if they felt it was appropriate even if the

 3   inmate didn't.

 4           So I think, in general, that they were trying

 5   to bring treatment to people that were in SHU that met

 6   their needs.

 7           And then -- again, I saw no exception to the

 8   belief -- to my belief that if someone became acutely

 9   psychotic or suicidal, that they would be removed from

10   their -- I didn't go track down people who weren't there

11   anymore.

12       Q.   Right.

13       A.   But I didn't see people who appeared to me --

14   now, keep in mind, I didn't hit every cell.  These were

15   randomly selected inmates that I talked with and

16   randomly selected cell blocks that I would talk to the

17   officers.

18       Q.   How many residents of the Corcoran SHU who

19   were CCCMS did you speak with?

20       A.   I don't remember.  I documented the ones that

21   were comfortable with my documenting their name.  I

22   always give people the choice if they want to speak and

23   not have their name associated with it.  So I don't

24   recall.  And in SHU, it would have been one by one.

25           And in some places I would talk to groups of

Page 88

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    inmates and just get kind of general opinions, but that

2    wouldn't have happened in the SHU.

3         Q.   You think it was -- can you give me any

4    estimate of how many people you talked to?

5         A.   I can't remember.  I'm sorry.

6         Q.   10?

7         A.   More than 10.

8         Q.   More than 20?

9         A.   Probably, but I'm not sure.

10        Q.   Okay.  Was it -- you think you did a

11   scientific study of how conditions were affecting the

12   mentally ill in the Corcoran SHU?

13        A.   No, I do not think that.

14        Q.   Okay.  So you didn't really answer in any way

15   the question that was opened in this article about what

16   the long-term effects of housing mentally ill are in a

17   SHU environment?

18        A.   That's correct.

19        Q.   Okay.  And you still believe that it's

20   possible that there are no long-term effects and it's

21   possible that there are long-term effects?

22        A.   What I believe -- let me distinguish between

23   what I believe versus what I think has been

24   scientifically or empirically demonstrated.

25             What I believe is that for some people there

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1  about was the one I just mentioned.  And nobody -- I

2  asked, "Has there been any cases in the last few months

3  where you tried to transfer somebody and were told no?"

4  And no one had one.

5      Q.   Okay.

6      A.   So it seemed to be -- I'm not sure about what

7  I'm about to say, but my general impression was it was

8  older information and that it may have been true

9  previously.  But I don't know that.

10     Q.   Okay.  You didn't go and review the last

11 10 rejections from Patton to evaluate them?

12     A.   I did not.

13     Q.   You didn't look to see whether it actually

14 said on the rejection, "This person meets our mental

15 health criteria but is, you know, too dangerous for us

16 to handle"?

17     A.   That's correct.

18     Q.   Okay.

19     A.   I didn't -- I just want to be clear I didn't

20 assess the Department of State Hospitals at all.

21     Q.   Okay.

22     A.   I -- I wasn't asked to do that.  So I don't

23 have any -- really any opinion at all about Patton or

24 any of the other DSH facilities.

25     Q.   I was going to ask you about that, Doctor.

Page 105

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          You understand that inpatient psychiatric care
2   for males in the Department of Correction is provided by
3   the Department of State Hospitals?
4          A.   With the exception of the crisis beds, yes.
5          Q.   Okay.  And you didn't -- as you sit here
6   today, you have no opinion about the quality of care
7   that's being provided inside of the Department of State
8   Hospital facilities?
9          A.   That's correct.
10         Q.   Okay.  And you didn't -- did you inspect any
11  of the Department of State Hospital facilities during
12  this time in California?
13         A.   If I remember correctly, we may have looked
14  briefly or not at the one at Salinas Valley, but I
15  honestly can't remember.  I didn't do any assessment of
16  the -- their treatment, their practices, their staffing,
17  any of that.
18         Q.   Right.
19         A.   And, to my knowledge, none of my colleagues
20  did either.
21         Q.   Okay.  When was the decision made that your --
22  you would not offer an opinion concerning Department of
23  State Hospitals?
24         A.   I was never asked to look at the Department of
25  State Hospitals.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   inmates who needed ICF care and doing this other

2   program?

3           MS. VOROUS:  Objection.  Lacks foundation.

4   Vague and ambiguous.

5           THE WITNESS:  The way you asked the

6   question --

7   BY MR. BIEN:

8       Q.   It was a terrible question.  Let me start over

9   again.

10      A.   Okay.

11      Q.   So you have no opinion, as you sit here today,

12  about the adequacy of the care being provided to death

13  row prisoners who may have needed ICF care?

14          MS. VOROUS:  Objection.  Misstates his

15  testimony.

16          THE WITNESS:  I wasn't asked to assess --

17  well, there was some talk about doing a separate

18  assessment of that program.  It was my understanding

19  that was the subject of some litigation or some lawyer

20  stuff.

21          I was then told, "We're not going to do that

22  right now.  We might do it at some time in the future."

23  So I didn't ask about that program for that reason.

24          I did talk -- I'm sure that many of the people

25  I talked to had something to do with that program, but I

Page 112

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1   didn't ask them about that program.
 2   BY MR. BIEN:
 3        Q.   Okay.
 4        A.   That's why the question was a little difficult
 5   to answer.
 6        Q.   As you sit here today, you don't have an
 7   opinion about -- one way or the other about the adequacy
 8   of that program which you didn't evaluate?
 9             Sort of an obvious question.
10        A.   In theory, the way it was described to me, it
11   could be okay; but I didn't see it, so I can't say that
12   it was okay.
13        Q.   Right.  Would you agree that it would be
14   inappropriate for California to -- assuming that there
15   were some men who needed ICF level of care, to not
16   provide access to it either at San Quentin, an
17   equivalent, or provide access to the ICF program run by
18   DSH?
19        A.   The question is virtually tautological.
20   People should get what they need.  ICF is bit of a
21   conundrum for me.  It's not something that most systems
22   have.
23             In New York, for example, we had a -- we had
24   crisis beds in the prison that are -- we called
25   satellite beds.  Then we had an inpatient hospital.  The
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1   average length of stay there was about 45 days.  It
 2   varied 30 to 60 days.  And then what you're calling
 3   intermediate care, we actually provided in units that we
 4   called intermediate care units, which were the model for
 5   your EOPs.  So the EOP is kind of an intermediate level
 6   of care.  That's the idea of it.
 7          So you guys -- California has kind of
 8   introduced this thing between acute inpatient and EOP
 9   that other places don't have.  So I don't think there's
10   a constitutional duty to do it since no one else does
11   it, but there is a constitutional duty to meet a
12   person's needs.
13          So if I looked at an inmate and said his needs
14   are not being met at an EOP, then he needs something
15   else.  However -- either you bring it to him or him to
16   it, but he needs whatever he needs.
17      Q.   Right.  In other words, the same principle you
18   said before.  I mean, you have to -- the system has a
19   duty to provide the level of care that someone needs,
20   either bring it to them or buy it on the outside or --
21   but you can't say because this person is sentenced to
22   death, he's not going to get the mental health care he
23   needs?
24      A.   Correct.
25      Q.   Okay.  You've written that "Timely access to
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   inpatient psychiatric hospitalization is an element of

2   an appropriate mental health program."

3           Is that correct?

4       A.   I don't recall specifically, but I'm sure I

5   did.

6       Q.   Yeah.  And you agree with that statement?

7       A.   I believe it, yes.

8       Q.   Okay.  And did you evaluate whether or not

9   prisoners in California were getting timely access to

10  inpatient psychiatric care?

11      A.   That was a bit of a moving answer, because

12  early on in our visits, the waiting list had previously

13  been even higher than when -- our first visit.

14          By our first visit, the waiting list had begun

15  to drop, but they continued to drop throughout this

16  project to the point where they're, as far as I know,

17  essentially nonexistent now.  And largely that had to do

18  with a couple of things.  One was the creation of

19  additional crisis beds, and the other one was the --

20  the -- there was a drop in the census from the

21  realignment.  But, whatever the reasons, the waiting

22  list appears to be pretty close to nonexistent.

23          And when I looked at the results of -- the

24  special master at CDCR did this project.  I forget what

25  they called it.

1   about words "acute" and "intermediate," because every

2   system uses those differently and I didn't assess the

3   actual care.

4          But if somebody's -- you know, there's a bunch

5   of ways --

6   BY MR. BIEN:

7      Q.   I'm just focusing on acute, and I'm focusing

8   on how California uses the definition.  And you

9   evaluated that issue.

10     A.   Yeah.  I would say -- well, the simpler answer

11  is that clinical judgments are presumptively

12  constitutional, but you're supposed to act on them.  So

13  if clinicians all agree that's what the person needs,

14  then that's what should happen.

15     Q.   Okay.

16     A.   I can't give you an exact amount of time, but

17  the sooner the better.

18     Q.   Would you be concerned if -- I know you have

19  disparaged the program guide and its standards, but the

20  program guide has a transfer guideline for APP.

21          Yes?

22     A.   I disparaged the program guide?

23     Q.   You've said that it is overly detailed and

24  gets in the way.

25     A.   No, no, no.  I -- I'm sorry to interrupt.

1   Please allow me to clarify.

2          Having great policies and procedures, I do not

3   disparage.  Being monitored for every one of your

4   policies and procedures is unheard of.

5          Q.   Okay.

6          A.   That's a very different thing.

7          The program guide is -- I mean, I criticized

8   the State for not having policies and procedures,

9   whatever it was, 12 years ago.

10         Q.   20.

11         A.   Geez.  Getting old so fast.

12         Q.   Me, too.

13         A.   But I just want to be clear.  I'm not opposed

14  to having great policies and procedures.  There are some

15  changes I would recommend in the program guide.  And the

16  inability -- the State's perceived inability to make

17  changes in the program guide is terrible, but I'm not --

18  I don't disparage the program guide.  If I led you to

19  believe that, I apologize.  That's not how I feel.

20         Q.   So the program guide has a transfer guideline.

21         A.   Uh-huh.

22         Q.   And I think the transfer guideline says not

23  more than 10 days for -- from the time of referral to

24  actual admission and, you know, physically moving the

25  patient to -- to an inpatient psychiatric bed.  In fact,

```
 1   don't think 10 days is an unfair expectation.
 2        Q.   So your understanding from the records you
 3   received and the information you received from
 4   Dr. Toche -- actually, she's not Dr. Toche, is she?
 5        A.   Toche.
 6             MS. VOROUS:   Toche.
 7   BY MR. BIEN:
 8        Q.   But she's not a doctor -- yes, she is.  She's
 9   a doctor.
10        A.   Sure she is.
11        Q.   Dr. Toche.  Excuse me.
12             -- and from -- I know you asked information
13   from the attorney general's office from time -- was that
14   there was no wait list for acute psychiatric care?
15        A.   No wait list beyond the parameters --
16        Q.   Beyond the 10 days or whatever it is.
17        A.   -- of the program guide.  I should have been
18   more clear.
19        Q.   So that was your understanding?
20        A.   Yes.
21        Q.   Okay.  That's part of the basis of your
22   opinion?
23        A.   Yes.
24        Q.   What about ICF care?
25             I know you've been talking about it, not quite
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          That's even with good documentation.  Where

2    you stand depends on where you sit.

3    BY MR. BIEN:

4        Q.    Do you recall being told that one of the

5    grounds for delaying admission to a DSH facility was

6    that the inmate had swallowed objects due to his

7    illness?

8          In other words, everyone agreed he needed

9    inpatient psychiatric care, but he had ingested some

10   substance or object?

11       A.    Someone told me that, and I believe I had a

12   note about it in my notes.  But I don't remember which

13   facility it was.

14       Q.    Did you investigate whether that was, in fact,

15   a barrier to access to DSH?

16       A.    What I -- yes.  And my recollection of what I

17   was told was that we -- they have to be medically

18   stable.  And that was the receiver.

19         So I didn't really get into it because it was

20   a medical question.  And I don't remember if I passed

21   that along to Dr. Scott or Dr. Moore or not.  But what

22   they told me was it's not true that if you swallow, you

23   can't come; but we got to make sure people are medically

24   stable before they're transferred.

25         And that's a very common principle in health

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1           In terms of the assessment or the monitoring

 2    of "Were people underserved?" I think that also came

 3    into the -- I'm not sure if you're referring to that as

 4    well.  That was probably a good thing to do once because

 5    it demonstrated that there were surprisingly few people

 6    that were undertreated.

 7           And then I really am not offering an opinion

 8    about the monitoring of that process, but I -- but I

 9    think some of the changes they made in the referral

10    processing probably were helpful.

11       Q.   Okay.  You understand that there had been --

12    that one of the issues that had been found by the court

13    in the past was that CDCR was not referring patients

14    that required a higher level of care to these inpatient

15    psychiatric programs?

16           MS. VOROUS:  Objection.

17           THE WITNESS:  You mean several years ago?

18    BY MR. BIEN:

19       Q.   Yes.

20       A.   Yes, I was told that.

21       Q.   And did you investigate yourself whether or

22    not -- let me start over.

23           As part of your work in California, did you

24    make an investigation as to whether or not there was an

25    unmet need for any kind of mental health care in CDCR?

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          A.    In general, yes.  I looked for undertreated,

2    untreated, and asked about undertreated and untreated

3    people every place I went.

4          Q.    What was your methodology for looking for

5    untreated or undertreated people?

6          A.    Variety of things.  When I visited -- depends

7    on the type of unit.  If it's lockdown units, it's a

8    little more challenging.  Let me start with those.

9              For locked units, I would ask the officers,

10   "Who is the -- if you had to pick the two most psychotic

11   or difficult or quirky or usual inmates" -- I would say

12   any euphemism that you want to use -- "who's your

13   all-star team of, you know, inmates that I, as a

14   psychologist, should be concerned about?"

15             And it's by far the best source of

16   information.  They never hesitate.  They tell me two

17   names, three names; sometimes one; sometimes five, and

18   then I go talk to those people.

19             I also then, typically, if they're -- usually

20   there's a few inmates that seem, on their face, to be

21   credible informants that are relatively reasonable, and

22   I might say to them, "Is there anybody you think I

23   should talk to?"

24             And they might say, "Cell 2," real quietly.

25             And in order to not throw them in, I'll see

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    somebody else and then eventually wander over to Cell 2.
 2              It's a good methodology for identifying who in
 3    that group is likely to need more than they're getting.
 4              In general population, I do it that way as
 5    well as by eyeballing people.  And if somebody appears
 6    to be disoriented or confused -- sometimes they turn out
 7    to be developmentally disabled or maybe they have a
 8    medical illness -- but you ask, say, "I notice you look
 9    a little confused.  How are you doing today?"  You start
10    a conversation with them.  And then, depending upon the
11    beginning of the conversation, I might look at their
12    record or might ask about them, or I might have an
13    in-depth conversation with them.
14              Then I do a lot of cell front, walking cell to
15    cell.  "How you doing?"
16              "Fine."
17              And often the person will say something, even
18    in that brief interaction, that leads me to believe that
19    I need to look further into them.
20              Or a cellmate will roll their eyes.  You know,
21    there's a variety of ways that you do it.  But I --
22    usually, the list I come up with is a pretty good
23    list --
24         Q.   Okay.
25         A.   -- of people who appear to need more treatment
```

 1   than they're getting.

 2        Q.   What about the people who are not in the

 3   mental health delivery system?  What work did you do to

 4   see whether or not they needed care?

 5        A.   I just told you.  That would have been in

 6   locked units that were not PSUs or hubs, but in ad seg.

 7   And I would walk the yard, if there was a yard.  For

 8   like -- for the women's facility, women all over the

 9   yard, I just wondered around.  "I'm a psychologist.  Got

10   any friends you think I should talk to?  How do you like

11   the doctors here?  If you have a problem, what do you

12   do?"

13             When I'm walking around the yard, I don't know

14   if they're CCC or not.  A lot will say, "Yeah, I'm CCC."

15             Then I'll ask them, "Do you know who your

16   primary clinician is?

17             "You mean Dr. Smith?  Yeah, she's really nice.

18             "How often do you see Dr. Smith?

19             "Whenever I want to, but she calls me out once

20   every 30 days or every 90 days, depending on the level

21   of care.

22             "Do you have a doctor?

23             "Yeah.  I can't remember his name.  That

24   Indian guy.  He's a short little guy.

25             "What's he like?

1          "He's really nice."  You know, or --

2          And frankly, I was shocked at the consistency

3    with which people knew their doctor and their primary

4    clinician and the generally high opinion that they

5    expressed of them.  It was shocking to me.  Better than

6    I've ever seen in a prison system.

7          Q.   Okay.  Let's go back to people who are -- so

8    this -- you felt that one of the things that you were

9    tasked to do was determine whether there was an unmet

10   need for mental health care in the California system?

11         A.   Yes.

12         Q.   And your opinion is that there is not?

13         A.   Well, I was asked to assess it in the context

14   of did I feel the system was constitutionally adequate

15   or not.  There's always unmet need.  No question about

16   it.

17         The -- if I had unlimited resources, there are

18   many things that you could do that would improve the

19   system and make it better.

20         But using my understanding of constitutional

21   minima as a criterion, then the answer is I think they

22   are meeting the constitutional obligations.

23         Q.   When you were part of the Scarlet Carp team,

24   one of the issues at that point was determining whether

25   or not California had an unmet need for mental health

```
 1              Steve Martin.
 2       Q.   You just turned to look at something?
 3       A.   On the next-to-the-last page, I actually --
 4  when I go into a big meeting, I have a habit of making a
 5  little seating chart so that I can remember -- there was
 6  a lot of new faces to me, and I wanted to make sure I
 7  remembered who people were.
 8              So as the people introduced themselves, I do
 9  it in the same -- I've been doing this for many years.
10       Q.   So you're on page 103262?
11       A.   Yes.
12       Q.   Okay.
13       A.   Do you want me to read the names to you?
14       Q.   Sure.
15       A.   Steve Martin.  Jim Scaramozzino,
16  S-C-A-R-M-A-Z-I-N-O, although I think that's a
17  misspelling.  I think there's an A missing there.
18              Judy Burleson, B-U-R-L-E-S-O-N.
19              Debbie Juarez, J-U-A-R-E-Z.
20              Pat McKinney, M-c-K-I-N-N-E-Y.
21              Jackie Moore.
22              Martin -- I think I spelled his name wrong.
23       Q.   Is that Martin Hoshino?
24       A.   Yeah.  I have A-S-H-I-N-O, but I think it's --
25       Q.   That's okay.  I don't need you to read what's
```

```
 1   there.  Let's just go over the names.
 2           Was it Debbie Vorous that was there rather
 3   than Juarez?
 4        A.  Oh, yes, it was.
 5           THE WITNESS:  You must not have spoken very
 6   loudly at the time.
 7   BY MR. BIEN:
 8        Q.  I'm just going to go through the names.  Tell
 9   me if I'm right.
10           Rick Subia, he's from Department of
11   Corrections?
12        A.  Yes.
13        Q.  And Katherine Tebrock, lawyer for Department
14   of Corrections?
15        A.  Yes.
16        Q.  Ben Rice, who's CDCR general counsel?
17        A.  Yes.
18        Q.  Cynthia Rodriguez?  It says "counsel at DMH."
19        A.  Yes.
20        Q.  And David Brice, another AG?
21        A.  Yes.
22        Q.  Gabriel Sanchez, another deputy AG?
23        A.  Yes.
24        Q.  And then Rodney Reed from UC Davis?
25        A.  Yes.
```

Joel Dvoskin, Ph.D., ABPP                         February 27, 2013

 1   wasn't clear, so I don't know what it refers to.

 2        Q.   What about the number at the bottom?  Is that

 3   a dollar sign?  Can you read what that says there?

 4        A.   "$42 million monitoring."

 5        Q.   What was that a reference to?

 6        A.   It was -- there was some discussion about the

 7   inordinate expense that went with the monitoring as

 8   opposed to care -- as opposed to approving care, that

 9   the monitoring itself bore an unprecedented expense.

10        Q.   Who informed you of that at the meeting?

11        A.   I would -- I don't remember which person, but

12   it could have been almost anybody in the room except for

13   the four of us and the two fellows.  It was, I think, a

14   widespread belief that monitoring costs were excessive.

15        Q.   Did they explain what they meant by

16   "excessive"?

17        A.   Too much.

18        Q.   Too much.  Too much relative to what?

19        A.   I inferred from the discussion that they

20   thought that the monitoring wasn't focused enough; that

21   it was micromanagerial in nature; that details were

22   being monitored at great expense.

23             There was a comment made that there were four

24   full-time attorneys working for the special master and

25   the -- that no one -- something to the effect of, "I

 1   have no idea what they do."

 2            There was expressed a belief that there was

 3   sort of a gotcha type of monitoring; that they would go

 4   and sort of try to find things wrong instead of sticking

 5   to the, you know, robust, simple things that the system

 6   itself agreed had needed to be fixed.

 7            There was an expression of a belief that it

 8   wasn't very fair; that the department had done a whole

 9   bunch of things to dramatically improve its mental

10   health services and wasn't really being given credit for

11   it.

12            That -- I think it's fair to say there was an

13   acknowledgement that there was a time when some of this

14   may have been necessary or appropriate, but that as the

15   system improved, that the monitoring should have shrunk

16   and the expense of the monitoring should have shrunk and

17   didn't.

18            I think that's a fair summary of the

19   conversation.

20       Q.   During your work from this time forward --

21   it's now been almost 18 months -- have you come to form

22   an opinion about the Coleman monitoring and whether it's

23   excessive or too expensive?

24       A.   Yes.

25       Q.   What is that opinion?

1       A.    I think that the -- the manner of monitoring,

2    it could be done very effectively at much less expense,

3    and it could be done -- I have enormous respect for the

4    experts that the special master has hired.  I don't know

5    every single one of them, but I know a fair number of

6    them and they're a great bunch.

7            I think that the manner in which the reports

8    are written where the special master doesn't quote them

9    but he rewrites what they said, and he says "the

10   monitor" to mean all of the individual experts.  I think

11   that's very problematic because it precludes a

12   discussion about, "Well, wait a second, there's a reason

13   why we do this and what if we did it a different way.

14   How would you recommend doing it?"

15           In my report, my response to the suicide

16   report -- and I fear that I hurt Ray's feelings, and it

17   wasn't my intention -- but I pointed out that getting a

18   report on suicide a year after the suicide doesn't help

19   anybody.  And Ray's response said, "That's not my fault,

20   that the State was slow getting me the information."

21           Well, whatever the reason is, it's a really

22   bad way to do business.  In my opinion, those questions

23   or findings should be communicated a couple days -- as

24   soon as they're known, within days.  So -- before the

25   investigation's completed so they can be built into the

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1    investigation.

2          I don't understand why anybody would do it

3    this way.  It just makes no sense to me.

4          And I also think that a bunch of details are

5    counted that either don't matter or, in some cases, are

6    actually counterproductive.

7          An example of that is that the IDTTs are so

8    prescripted that they're not -- at least at one facility

9    that told me that the special master specially praised

10   their IDTTs.  We hated them.  They did every single

11   thing right, but there was no meaningful conversation

12   with the inmate, which is the main purpose of it.

13         It was, you know, at some point you just take

14   a step back and you say do we really need to visit 25

15   facilities, because the things that -- that they think

16   are not okay are much more focused than that.  They --

17   you know, they allege that the suicide prevention

18   activities should be improved.  Some of those

19   recommendations I agreed with.

20         Most of that can be -- can be monitored

21   without ever getting on an airplane.  I mean, that

22   information could be electronically communicated to

23   Dr. Patterson.

24     Q.   So you thought that Dr. Patterson withheld

25   information through this process, whether or not

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1      Q.   To your knowledge, at the time you wrote your

2   expert opinion in January of 2013, had this been

3   implemented?

4      A.   I don't know.

5      Q.   Okay.  While you were touring the prisons, one

6   of the things that was happening, I think, during the

7   period when you were out there is the department was

8   installing suicide-resistant beds in the MHCB; is that

9   correct?

10      A.   Yes.

11      Q.   Is that correct, yes?

12      A.   Yes.

13      Q.   And did you see some MHCBs that had the beds

14   and some that had them about to be installed in the next

15   couple of months?

16      A.   Yes.  There were a few places that hadn't

17   installed the beds yet, but they were -- they said they

18   were expecting them shortly.  I don't remember the --

19   where or which ones but...

20      Q.   Okay.  Do you agree that -- with the

21   recommendation that suicide-resistant beds should be

22   installed in MHCBs?

23      A.   Not the ones they installed.  I wouldn't

24   have -- I mean, my understanding is they spent a fortune

25   on beds; that they could have made suicide-resistant

1    CDCR took various measures to be less punitive in its

2    procedures for people on suicide watch or observation?

3              MS. VOROUS:  Objection.  Lacks foundation.

4              THE WITNESS:  I don't remember using that

5    exact language, but it's a recommendation I frequently

6    make:  In general, that suicide watch should not be a

7    punitive experience, and whatever reasonable steps you

8    can take to make it feel less punitive to inmates are

9    good to do.

10   BY MR. BIEN:

11        Q.   Didn't you also recommend that if someone's on

12   one-on-one observation on suicide watch, that they

13   needn't take away the person's clothes in every case?

14        A.   Yes, I did.  And I think that.

15        Q.   And did you observe that at least in some

16   locations the practice was to universally take people's

17   clothes and then replace them with suicide smocks?

18        A.   Yes.

19        Q.   Okay.

20        A.   Not just in California.  That's a very common

21   practice nationally.

22        Q.   Okay.

23        A.   In fact, I'd say most -- more common than not.

24   It's relatively rare that people on suicide watch are

25   allowed to have their clothes, but I think they should

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1    and Lindsay thinks they should.

2         Q.   Is the fact that something is done other

3    places make it better or worse, in your mind?

4         A.   Not better or worse but it -- it -- depending

5    on the judge, it sometimes has important legal

6    implications.  So when I'm asked what the standard is, I

7    usually ask the court, "Do you want the prescriptive

8    standard, what do I think it should be, or the

9    descriptive standard of what" -- so if you ask what is

10   the standard of care, lawyers will tell you one of two

11   things:  Either what would a reasonably prudent

12   practitioner do under similar circumstances, or what

13   should.  And they can be very different answers, and

14   that's an example of that.

15        So I usually ask the judge which -- "How do

16   you want me to answer the question?"  So, in my opinion,

17   that shouldn't be the standard, but it is.

18        Q.   Okay.  So, in your opinion, you agree with

19   this recommendation that beds should be provided for

20   CDCR prisoners who are on suicide watch in MHCBs?

21        A.   Yes.

22        Q.   Okay.  And did CDCR inform you that they

23   disagreed with that recommendation and objected to it?

24        MS. VOROUS:  Objection.  Lacks foundation.

25   Vague and ambiguous.

1   enthusiastically.

2        Q.   Okay.  On the top of the next page, page 5 of

3   Mr. Hayes' report, he makes the recommendation that

4   other characteristics that he observed in units that

5   were doing suicide watch and observation could be

6   perceived as punitive because people were stripped of

7   their clothes, they had no -- they had reduced

8   privileges.  They weren't allowed access to shower,

9   out-of-cell time, telephone calls, and that he thought

10  CDCR should consider whether or not it could make those

11  conditions less punitive.

12        He was using the word "punitive" to mean not

13  like punishment but more like this would be perceived by

14  the prisoner who's receiving this suicide watch as being

15  a negative experience if you look at it from afar.  And

16  that, as I understood, Mr. Hayes was recommending that

17  CDCR look at these practices and see whether they could

18  be less restrictive and -- so that eventually suicide

19  watch would be viewed as less punitive.

20        Do you agree with that recommendation?  It was

21  a long question but --

22        A.   Yes.  I make the same recommendation in other

23  places.  It is a -- what Lindsay's recommending -- not

24  for the first time -- is a sea change, a fundamental

25  change in how suicide watch is done nationally.  And I

```
 1  agree with him.
 2          I think that those are the normal conditions
 3  of suicide watch, and I think -- Lindsay, myself, and
 4  others -- I think Ray and Jeff have probably --
 5  Ray Patterson and Jeff Metzner have made the same
 6  observation, that that's something that should be looked
 7  at and changed.  So I guess I do agree with him.
 8      Q.   Did you observe on your tours -- did you tour
 9  the OHUs?
10      A.   Yes.
11      Q.   Okay.  And when you toured the prison, you
12  viewed the OHUs along with all the other facilities?
13  OHUs being outpatient housing units.
14      A.   Yes.
15      Q.   And did you observe that in the OHUs they
16  didn't have beds?
17      A.   I can't remember for sure, but I think that's
18  right.
19      Q.   Did you ever see someone on suicide watch or
20  suicide observation in an OHU during your inspection?
21      A.   Yes.
22      Q.   Did you ever see someone on suicide watch or
23  observation in an ad seg unit during your inspection?
24      A.   Not that I can recall.  Suicide watch, not
25  that I -- well, they were -- they had made a change in
```

1   psychiatric technicians that worked for the receiver's

2   office, but they were -- they weren't officers.  Nursing

3   assistant or --

4        Q.   CNA?

5        A.   Correctional nursing assistants.

6        Q.   Right.  Did you ever observe them doing

7   suicide watch?

8        A.   Yes.

9        Q.   Okay.  And did you see them conversing with

10  the inmates and speaking with them?

11       A.   Let's see.  I think I saw both.

12            I know one -- I remember one, I want to say at

13  SAC, where the person, at least while I was there,

14  didn't talk to the inmate.  There was one where -- there

15  were a number of times when the inmate was asleep, so

16  obviously they weren't talking with them.  But the one I

17  was just remembering from SAC, I believe it was -- I

18  think the inmate was up.  I don't know if they were

19  talking before we got there or not.

20       Q.   Do you know that there's an instruction at

21  CDCR that certified nursing assistants are not to speak

22  to prisoners while on suicide watch?

23            MS. VOROUS:  Objection.  Lacks foundation.

24            THE WITNESS:  I did not know that.

25

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   BY MR. BIEN:

2        Q.    Would you agree that would be

3   countertherapeutic?

4        A.    Yes.  Just to be clear, you're talking about

5   prohibition against talking to them at all?

6        Q.    Yes.

7        A.    Yes, I would be opposed to that.

8        Q.    When you were at SAC, California State Prison

9   at Sacramento, did you observe the ZZ cells at that

10   facility?

11        A.    Yes.

12        Q.    What did you understand them to be?

13        A.    I assume we're talking about the same cells.

14   It's in the sort of a depot where they hold people while

15   they're waiting for transportation.  And there's several

16   officers in the area, and there's some cells that people

17   were held in -- sort of like a holding unit except they

18   were individual cells as opposed to a group holding tank

19   while they're waiting for their particular bus or

20   transportation.

21            When I was there, all of the inmates in those

22   cells had been there for at least a few hours.  And it

23   was my understanding that they were used for temporarily

24   housing people while they were waiting for the bus or

25   vehicle that's going to take them somewhere to pick them

Page 178

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

```
1   BY MR. BIEN:

2       Q.   Okay.  Coming back to your meeting in

3   Sacramento, Exhibit 6, if you pull that out.  It's your

4   handwritten notes.

5            MR. BIEN:  This is Aaron Fischer from my

6   office.

7            THE WITNESS:  Hi, Aaron.

8   BY MR. BIEN:

9       Q.   On page 2, could you -- there's some

10  discussion four rows down, they measure and report

11  120 items by level of care.

12           Was this some of the discussion that you

13  already talked about about the special master's

14  monitoring?

15      A.   Yeah.  I was just taking notes as they were

16  presenting the status of things.

17      Q.   Okay.  And, again, so they were -- I'll just

18  say complaining about the extent of the monitoring and

19  the detail orientedness of the monitoring; is that a

20  fair summary?

21      A.   Yeah, that's a fair summary.

22      Q.   What does it say at the top of the page?

23      A.   I was afraid you were going to ask me about

24  that.

25           It says:  "Judge Karlton hates State and AG."
```

1    And I probably wish I hadn't written that note, but I

2    think there was a general belief that any time there was

3    a disagreement between the special master and the State,

4    that the judge would simply agree with the special

5    master.  So that they didn't feel like it was a level

6    playing field, I guess, to put it -- and I wish I hadn't

7    written that.

8         Q.   You wrote it down because it was stated at

9    that meeting?

10        A.   Yeah, I believe so.

11        Q.   Do you know who said that?

12        A.   I do not.

13        Q.   How did you select the number of prisons --

14   the prisons that you toured?

15        A.   We had a meeting -- might have been that same

16   day or shortly thereafter -- where we -- we kind of sat

17   around, and I asked for a list of, like, which kind of

18   programs are at which programs.  And there were people

19   from CDCR there, and I asked them questions about, you

20   know, I say "I"; we all did.

21             All four of us weighed in about -- we wanted a

22   reasonable sample that would cover the types of programs

23   that existed.  We asked specifically for one prison that

24   didn't have much of anything.  I think we picked

25   Centinela for that.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

 1          And then people would give us -- "Here are
 2   some prisons that have this level of care."  And we
 3   said, "We've got to go see that one."
 4          As we began our trip, it became clear to us
 5   there were a couple places we should go see, Pelican Bay
 6   being an obvious choice because they had one of the two
 7   PSUs and we thought that we shouldn't not go to
 8   Pelican Bay.
 9          And then we wanted to revisit -- our first
10   visits were a little chaotic; we weren't sure what we
11   were doing.  We were still working on our methodology.
12   We went back to CMF, and I think we went back to SAC, if
13   I'm not mistaken.  I know we went back to CMF to make
14   sure that we had asked all the questions we needed to
15   ask.
16       Q.   So why didn't you go to 33 prisons?
17       A.   Expense.
18       Q.   Okay.
19       A.   It would have been a lot more money.
20       Q.   Okay.
21       A.   I shouldn't say that.  That was my assumption.
22       Q.   Okay.
23       A.   I don't think that was said to me, but I
24   didn't even ask the question because I assumed it would
25   be very, very expensive to do that.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                           February 27, 2013

1       Q.   Okay.  Did you think that going to 9 of the 33
2   prisons allowed you to make an opinion about the total
3   operations of the California Department of Corrections?
4            MS. VOROUS:  Objection.
5            THE WITNESS:  I think it's 13, isn't it?
6   BY MR. BIEN:
7       Q.   What's 13?
8       A.   All the ones we visited.
9       Q.   Okay.  How many did you go to?
10      A.   I thought we visited 13.
11      Q.   13 prisons.  Okay.  I have it all down.
12      A.   I'm sorry.  I know I wouldn't be able to list
13  all 13 for you.
14      Q.   I do have a list here.  Let's assume you went
15  to 13 prisons.
16      A.   I think it is.
17      Q.   Okay.
18      A.   But I'm willing to stand corrected if that's
19  incorrect.
20      Q.   On what basis do you feel that you can render
21  an opinion about the full California Department of
22  Corrections, which is 33 prisons right now plus 9,000
23  people out of state?
24      A.   I certainly don't -- I don't offer an opinion
25  about the people who are out of state.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1     Q.   Okay.

2     A.   For the rest of the prisons, in addition to

3   going to prisons, we talked to inmates who had been in

4   most of the prisons.  So if there had been any kind of

5   meaningful allegation that something was an outlier in

6   a -- while you're doing that, can I use the restroom

7   real quick?

8     Q.   Sure.

9          (Off the record at 2:32 p.m. and back on

10          the record at 2:36 p.m.)

11   BY MR. BIEN:

12     Q.   I think you were in the middle of an answer so

13   to be fair, I'd like to -- why don't you read back the

14   question and the answer?

15          (Record read as follows:

16          "QUESTION:   On what basis do you feel

17           that you can render an opinion about

18           the full California Department of

19           Corrections, which is 33 prisons right

20           now plus 9,000 people out of state?

21          "ANSWER:  I certainly don't -- I don't

22           offer an opinion about the people who

23           are out of state.

24          "QUESTION:  Okay.

25          "ANSWER:  For the rest of the prisons,

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1  court opinion that came out in the summer of 2009?

 2       A.   Regarding crowding?

 3       Q.   Yes.

 4       A.   Not that I recall in that meeting.  And it

 5  probably would have been the same answer because that

 6  really was the same question as what the Supreme Court

 7  addressed as I understand it, so...

 8       Q.   Okay.  Your expert report does not include the

 9  word "crowding" or "overcrowding," to my understanding;

10  is that correct?

11       A.   I don't remember using that word.

12       Q.   Okay.  Do you have an opinion concerning

13  whether California prisons -- let me back up.

14            Do you disagree with the Supreme Court

15  decision finding that crowding was the primary cause of

16  the ongoing constitutional violations in California

17  prisons?

18            MS. VOROUS:  Objection.  The overcrowding

19  issue is not something Dr. Dvoskin was asked to evaluate

20  or render opinions on in connection with this case.

21            THE WITNESS:  So shall I answer?

22  BY MR. BIEN:

23       Q.   Is that correct?  Dr. Dvoskin, did you

24  understand that you were asked not to render opinions

25  concerning crowding?

1        A.    No, that's not what she said and that's --
2        Q.    Okay.
3        A.    There's a difference between asking me not to
4    and not asking me to.  I was not asked to render an
5    opinion -- well, in this matter, I was not asked to
6    render an opinion.
7              Can we go off the record for a second?  I have
8    a question.
9              MR. BIEN:  Sure.
10             (Off the record at 2:43 p.m. and back on
11              the record at 2:44 p.m.)
12   BY MR. BIEN:
13       Q.    Do you have something you would like to
14   clarify?
15       A.    The AG office asked me sometime previously if
16   I might be an expert witness on that issue in Plata.
17   And I was not an expert witness for the State in Plata.
18       Q.    You mean the underlying three-judge court
19   trial?
20       A.    Yeah.  The technical answer to your question
21   was, well, I had been asked.  But what I think you meant
22   was in this matter was I asked, and I just didn't want
23   to give you a misleading answer.
24       Q.    So just to be clear so we have it all
25   straight, you're not rendering any opinions in your

```
 1    So, for example, there's prisons that are rated at
 2    single cell, but they're double celled, and they've
 3    taken the right steps in terms of infrastructure where
 4    it might be okay.  So if it's a fair rating -- it's an
 5    accurate rating of what the real capacity the prison is,
 6    then I would say, yes, 180 percent is by definition
 7    overcrowded.
 8    BY MR. BIEN:
 9         Q.   Did CDCR inform you at any time that they had
10    made a decision to overcrowd CCWF with women since the
11    time that you toured the prison?
12              MS. VOROUS:  Objection.  Lacks foundation.
13    Argumentative.
14              THE WITNESS:  No.
15    BY MR. BIEN:
16         Q.   Do you know that CDCR closed down Valley State
17    Prison for Women and moved the women from Valley State
18    across the street to CCWF since the time you toured
19    CCWF?
20         A.   I heard that there was going to be a
21    repurposing of a whole bunch of prisons, and I believe
22    that specifically -- that the -- I don't remember if I
23    knew the details, but that there was going to be some
24    reorganization of where women were housed and some
25    repurposing of facilities.
```

1        Q.   Okay.  Did they ask your opinion about whether

2   it would be okay to go above 180 percent for that

3   facility given you toured it and were prepared to render

4   an opinion about mental health care there?

5             MS. VOROUS:  Objection.  Lacks foundation.

6             THE WITNESS:  No.

7   BY MR. BIEN:

8        Q.   Assuming what I learned on the tour, that

9   staff represented they had received no additional mental

10  health staffing yet now are operating at over

11  180 percent, would you agree that your prior opinion

12  about the adequacy of care at CCWF needs to be

13  reevaluated?

14            MS. VOROUS:  Objection.  Lacks foundation.

15  Vague and ambiguous.

16            THE WITNESS:  I mean, I guess I would say that

17  my opinions are based upon the time I visited the

18  prison.  And I couldn't speak to -- if there's been

19  specific changes in the purpose, utilization of the

20  prison, its census, the nature of its census, then my

21  opinions apply to what it was like at the time I visited

22  it, not now.

23  BY MR. BIEN:

24       Q.   Would you be concerned if -- about the

25  adequacy of CCWF to deliver mental health care if it was

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1   much more willing to use mental health services than

2   men.

3            So we sort of, you know, overstaff women's

4   facilities.  And they were -- you know, their staffing

5   model is higher than it is for a male facility for that

6   reason, appropriately so.  But as far as where they

7   stand right now, I can't say.

8   BY MR. BIEN:

9        Q.   Okay.  So when you asked Dr. Toche about the

10  groups, did she tell you that there had been a

11  significant change in CCWF since the time you toured?

12       A.   Well, they had already told me that there was

13  going to be repurposing, but I didn't ask her about --

14  all I asked her was -- I was going over my notes.  I

15  said, you know, "That went from 100 to 15.  Do you know

16  what" -- and I think at the time, she might have even

17  been with us on the tour.  I can't remember.  But it was

18  said to me this was temporary.

19            So I think I wrote -- I either made a mental

20  note to check back and see where things stood.  I

21  asked -- I don't know if it was a few weeks later.  I

22  don't know if there had been that change or not.

23       Q.   She didn't volunteer the information to you?

24       A.   I don't remember her saying that.

25       Q.   And she didn't -- you have no idea about

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   whether or not 75 groups are being offered at CCWF

2   except for what from Dr. Toche told you?

3        A.   I think that's -- I think it was Dr. Toche.

4   I'm not sure, but...

5        Q.   You didn't go back?

6        A.   I did not go back.

7        Q.   Okay.  Were you informed by the attorney

8   general's office that there was an order in this case

9   requiring that they give notice before their experts do

10  inspections of the prisons?

11            MS. VOROUS:  Objection.  Lacks foundation.

12  Argumentative.

13            THE WITNESS:  If I was, I don't remember it.

14  BY MR. BIEN:

15       Q.   Okay.

16       A.   I was given an awful lot of documents.  If I

17  saw it, I don't recall it.

18       Q.   And did you -- were you ever informed that the

19  order states that the reason to give notice to the other

20  side is that the other side would have a chance to bring

21  an attorney and their own experts along on tours?

22            MS. VOROUS:  Objection.  Lacks foundation.

23  Argumentative.

24            THE WITNESS:  I don't know that.

25

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

```
 1   BY MR. BIEN:
 2        Q.   No one told you that?
 3        A.   No.
 4        Q.   Okay.  Well, no one told you the order -- no
 5   one told you that there was an agreement in this case by
 6   order and it's reflected in the order that the parties
 7   would give each other notice before they did prison
 8   inspections?
 9             MS. VOROUS:  Objection.  Lacks foundation.
10   Argumentative.
11             THE WITNESS:  I don't know anything about
12   that.
13   BY MR. BIEN:
14        Q.   Okay.  When you did your inspections in
15   Coleman originally, you were accompanied by plaintiffs'
16   counsel, were you not?
17        A.   I actually don't remember.  I know on some of
18   the tours I was accompanied by plaintiffs' experts.
19        Q.   I was going to say that, too.  And plaintiffs'
20   experts were along also on some of your tours?
21        A.   I think Don Specter was on some of the tours.
22   But it was a long time ago; I don't remember very well.
23        Q.   Okay.
24        A.   But I do remember making a tour with
25   Dr. Metzner and also with Dr. Haney, but I don't
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    remember if that was for Coleman or Madrid.

2        Q.   One of the methods you used to gather

3    information on your prison inspections was to interview

4    staff; is that correct?

5        A.   Yes.

6        Q.   And you also -- you also interviewed patients?

7        A.   Yes.

8        Q.   Okay.  And who gave you permission to

9    interview patients?

10           MS. VOROUS:  Objection.  Lacks foundation.

11   Argumentative.

12           THE WITNESS:  I guess I just interviewed them.

13   BY MR. BIEN:

14       Q.   Okay.  What did you say to a prisoner when you

15   interviewed them?

16       A.   I said, "Hi.  I'm Dr. Dvoskin.  I'm a

17   consultant to the State, trying to find out about the

18   mental health care in the prison.  If it" -- "Interested

19   in how you're doing.  Do you want to talk to me?"

20           Most of the time they said yes.

21           And then I said, "Well, do you know what level

22   of care you're at?  What services do you get?  Do you

23   know who your primary clinician is?  How often do you

24   see that person?  What do you think about them?"

25           Same sort of questions with the psychiatrist.

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

 1        Q.   Did -- you explained that you were working for
 2   the attorney general's office?
 3             MS. VOROUS:  Objection.  Lacks foundation.
 4             THE WITNESS:  I think I usually said the
 5   State.
 6   BY MR. BIEN:
 7        Q.   The State?
 8        A.   I may have said the attorney general, but I
 9   think I usually said the State.
10        Q.   Did you make a reference to the Coleman case?
11        A.   Almost always the inmates did.  They said --
12   the minute I said I was Dr. Dvoskin, they said, "Are you
13   Coleman?"
14             And I said, "Well, we're not the monitors.
15   We've been hired by the attorney general's office and
16   the department to look at the system and make
17   recommendations, but we don't work for the monitors.
18   That's a different thing."
19             And typically, inmates, when they say
20   "Coleman," they mean the special master and his experts.
21   At least that was my impression.
22        Q.   You understood that one of the things that
23   Coleman monitors do when they investigate the prisons is
24   speak to staff and speak to inmates; is that correct?
25        A.   I'm sure they do, knowing the monitors.

1        Q.    You've worked with Jeff Metzner, and you know

2     that he goes in and has different methods he uses to

3     evaluate programs; is that right?

4        A.    Yes.

5        Q.    And you've actually done that with him?

6        A.    Yes.

7        Q.    And he will walk in and pick some inmates out

8     and ask similar questions to what you did?

9        A.    I don't know what he does in Coleman.

10       Q.    Right.

11       A.    But typically that's what he does.

12       Q.    Okay.

13       A.    Typically, our methods are pretty similar.

14       Q.    Did you develop a list of people you wanted to

15    interview before walking into a unit, or did you use

16    more the method that you described earlier this morning

17    of kind of walking in and asking guards for help?

18       A.    Both.

19       Q.    Okay.

20       A.    Well, it wasn't just the officers; it was also

21    inmates.  I gave a more complete answer than that.

22             But often, in the initial meeting, I would --

23    we had a long -- usually almost a half-a-day discussion

24    of how things work, what sort of data did he keep,

25    what's your quality improvement process, who runs which

 1   committee, who's your SPR-FIT coordinate.  Those kinds

 2   of questions.

 3          In the course of that, I might ask a lot of

 4   different questions.  "What" -- "Was there any recent

 5   suicide attempts?  Is there anybody you're having a

 6   problem big with?"

 7          So occasionally I would have a name that I

 8   might scribble on the front page of my note.  That would

 9   be somebody I would look for.

10          Or in the course of the day, names would come

11   up through a variety of mechanisms.  I'd be talking to a

12   staff member that might say, "I had a really hard time

13   with inmate Joel."

14          And I'd say, "Where is he?  Could you look him

15   up for me, get his location?"

16          Then I'd find him and see him myself.

17   Q.   Okay.

18   A.   So it was a combination.

19   Q.   You weren't trying to do -- for example, you

20   could have a method where the State gave you a printout

21   of all the inmates that were in the prison on that day,

22   and you randomly selected every 10th or 20th, and then

23   made sure you those.  You didn't use a method like that?

24   A.   No.

25   Q.   Okay.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1      A.   That would have taken more time.  We had two

2   days for each prison, so that wouldn't have been a

3   realistic way to go about it.  It wouldn't have been any

4   better.  In my opinion, we got a really good picture of

5   the system.

6      Q.   When you said "random samples," you meant the

7   method you described?

8      A.   I would randomly pick inmates in the housing

9   unit or people I observed -- like I might walk past a

10  bunch of cells if I saw somebody who I thought I should

11  talk to or if another inmate mentioned their name.  So

12  it was both random and nonrandom.

13     Q.   You did exit interviews after -- at the end of

14  the day or at the end of the second day of each tour?

15     A.   Yes.

16     Q.   And for some of the prisons, did you go for

17  one day?  Or were they all two-day?

18     A.   I think they were all two days except for the

19  second visit to CMF.  And I think -- I can't remember

20  Centinela.

21     Q.   How about Centinela?

22     A.   That might have been one day.

23     Q.   Our records have one day for that.

24     A.   I think Centinela was one day.

25     Q.   Is it correct that on some of the visits you

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   were alone?  You went to Pelican Bay by yourself?

2        A.   No.  I didn't do any of them -- I don't think

3   I did any of them by myself.

4        Q.   Okay.

5        A.   I think Dr. Scott missed one day at Pelican --

6   no.  He couldn't make it to Pelican Bay.  His plane --

7   he literally couldn't get there.

8        Q.   That's what our records show, too.

9        A.   And I think that Dr. Moore also wasn't there.

10  I think it was just me and Steve Martin for Pelican Bay.

11       Q.   Okay.  And you already mentioned that

12  Dr. Moore didn't make it to Centinela, right?

13       A.   Yeah.

14       Q.   Okay.  Were there some prisons that

15  Steve Martin, to your knowledge, didn't go to?

16       A.   I -- no.  I think he made all of them.

17       Q.   Okay.  And you think Dr. Scott went to all the

18  ones except for that -- Pelican Bay?

19       A.   Yeah.  And he did Pelican Bay -- a lot of what

20  he did actually was interviews with the chief

21  psychiatrist and looking at records.  So he did

22  Pelican Bay; he didn't go to Pelican Bay.

23       Q.   He did it by telephone or --

24       A.   Yeah.

25       Q.   Were you given access to the electronic

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

 1  records system for CDCR as part of your work?

 2       A.   Technically, yes.  Practically, no.  It is a

 3  disaster.

 4       Q.   What --

 5       A.   I never had any success getting on it.  So

 6  when I wanted to see something, I just asked somebody to

 7  find it for me.

 8            So I was able to look at the EUHR for people,

 9  but I always had a guide because I found it very

10  difficult to use.  I would look for a treatment plan in

11  the treatment plan section, and the person would laugh

12  and say, "Well, might be there, but it might be

13  somewhere else."  And so we'd look in the "All Forms"

14  tab and just -- so it was pretty time-consuming.

15            I think I made pretty clear in my record I

16  cannot for the life of me understand why they don't have

17  electronic medical record.  It's inexplicable.

18       Q.   What do you mean?  They call that an

19  electronic medical record.

20       A.   No, they don't.  Nobody calls it that.

21       Q.   What do you --

22       A.   I don't know who said that, but not with a

23  straight face.  It is not an electronic medical record.

24       Q.   Okay.  What -- in your mind, what's the

25  difference between what you called an electronic medical

1    record and the EUHR system that you saw at CDCR?

2         A.   Well, first of all, it's very time-consuming

3    for clerical staff.  They have to scan documents into

4    it.  Documents are often difficult to read because

5    they're handwritten.

6              An electronic medical record is where

7    everything is electronic.  Forms are filled out

8    electronically.  They're instantaneously available.  You

9    don't have to wait for them to be scanned in.  They're

10   organized in a more useable fashion.  The -- where

11   things are filed isn't a matter of chance based on who

12   scanned it but, rather, the form itself is designed to

13   be in a predictable place.

14             This is not an electronic medical record.

15        Q.   Okay.  When I was touring the last couple of

16   weeks, I was also -- been in the prisons.  I had the

17   experience, and I assume from your notes that you had

18   the same experience, where you'd be in some unit and

19   the -- the electronic medical record wasn't available

20   because there was no computer.

21             Did you experience that when you were in CDCR?

22             In other words, to access the electronic

23   medical record, you need to have a computer attached to

24   the system.  That seems obvious, but...

25        A.   I quit asking about that early on.  So what I

1    would do is if I had questions that I needed to look up,

2    I would go back to office, and that way I could get a

3    guide, somebody who could sit with me for half hour or

4    an hour, whatever it took, and find the things.

5            So I would say, "I saw this guy, and he said

6    he wasn't seen in the last two months.  Can you look him

7    up?  I want to see if there's a progress note."  Things

8    like that.

9        Q.   Okay.  As one of your -- I know you made

10   recommendations to CDCR along the way, both at

11   individual prisons and other places, when you had these

12   meetings with CDCR officials.

13           Did you ever make a recommendation about

14   improving their medical records?

15           MS. VOROUS:   Objection.  Lacks foundation.

16           THE WITNESS:   I probably complained about the

17   lack of an electronic medical record 100 times --

18   BY MR. BIEN:

19       Q.   Okay.

20       A.   -- if I did it once, to anybody who would

21   listen, including you.  I just found it to be, you know,

22   a pain in the neck.  I mean, it's not CDCR, that's --

23   the receiver's in charge of that.

24       Q.   Okay.

25       A.   My very clear impression was that everybody

1      Q.   Okay.

2      A.   And if they're 9 hours, I would certainly -- I

3   mean, it -- this is -- as I said before, it's a bit of

4   an arbitrary number.

5           So if they're trying hard, the inmates feel

6   cared for, they're -- I could certainly see that it

7   would -- you know, if it's a reasonably therapeutic

8   environment and they're doing okay there, that's

9   constitutional, whether they're doing 10 hours or

10   8 hours.

11      Q.   What standard did you apply in evaluating an

12   EOP ad seg hub or a PSU which are both providing care

13   for the same level of patient in a high-security unit if

14   you were not using the 10-hour standard?

15      A.   Well, I -- the 10-hour standard was in my

16   mind, and I -- I -- it's just not -- it's not the

17   11th Commandment, but it's a meaningful benchmark, and I

18   agree with it.

19           But I looked at -- the standard I looked at

20   was whether or not there appeared to be deliberate

21   indifference to their serious medical needs or not.  And

22   so the 10 hours is one informative piece of data.  I

23   don't mean to diminish it; it's an important one.

24           But I also looked at the fact that inmates

25   overwhelmingly had a positive relationship with their

1   treaters, both the primary clinicians and their

2   psychiatrist, their interactions with the officers, and,

3   you know, how hard people were trying to get care to

4   people was part of the assessment.

5        Q.   How hard who was trying?

6        A.   The clinicians.

7             Were the officers cooperative advocates for

8   treatment or getting in the way of it?

9             There isn't a formula for this.  It is my

10  judgment.  It's a judgment call.

11       Q.   Okay.  Okay.  I notice that there are these

12  protocols or instruments that you guys developed to do

13  your work, but then it appears that -- I'm not sure how

14  they were used.

15            The audit tool.  Can you explain what the

16  audit tool was and how you used it?

17       A.   At the very beginning, the attorney's general

18  suggested to us that we should put together an audit

19  tool.

20            And kind of against my vote, it included a lot

21  of things that -- because they were being monitored by

22  the special master, I wanted to have a simpler, more

23  robust set of questions along the lines that I just

24  articulated to you.

25       Q.   Was there a plan at one point to actually fill

 1   out these audit tools and then calculate -- make up some
 2   mathematical calculations based on that that would be
 3   part of your opinion?
 4        A.   Absolutely not.  There was never an intention
 5   to quantify these things but to use them as guided
 6   judgment tool.  But I didn't find them helpful.  From
 7   the very beginning, I argued that there's no substitute
 8   for talking to inmates.  And that that's the most
 9   important thing to me, talking to inmates in a program
10   and asking them about it.
11        Q.   In some of the audit tools, I saw there was --
12   early on there was a list saying you should hit
13   10 inmates for this unit and five for this unit.  And
14   then later on in the audit tools, it seems like it said,
15   "Leave that blank.  Do whatever you thought was
16   appropriate."
17        A.   Yeah.  I think people came around to my way of
18   thinking as we visited several prisons, that -- that it
19   was it wasn't particularly helpful to do these, and it
20   was very time-consuming.
21             If I talked to an inmate and I say, "How often
22   do you see your primary clinician?" and the inmate says,
23   "Every week like clockwork," why do I need to go look in
24   the EUHR which takes me 45 minutes to find the last
25   progress note?  It's a waste of time.

```
 1              So that's how I did it.
 2       Q.   Okay.  I noticed in -- in your report -- and
 3  you repeated here today -- that you felt it was a
 4  significant factor that inmates you spoke to knew the
 5  names of their doctor and medication.  Is that correct?
 6       A.   And, even more importantly, that they
 7  expressed some positive feeling toward the person or a
 8  belief that the person cared about their well-being.
 9       Q.   Okay.  Can you -- did you calculate how many
10  of the inmates you spoke to knew their doctors' names
11  versus didn't know them?
12       A.   I wouldn't go by name.  If they said, "Oh, you
13  mean that short Indian guy?  I can't pronounce his
14  name," that was a yes.
15              It was so overwhelmingly positive that I
16  didn't need to count them.  It was well in excess of
17  80 percent of the people I talked to.  It might have
18  been 90 percent.
19       Q.   Did you actually calculate?
20       A.   No.
21       Q.   And did you calculate how many people knew
22  their medication versus how many didn't know it?
23       A.   The name of the medication, I can give you a
24  rough estimate.  I didn't calculate it, but it was over
25  50 percent.  But if you gave them credit for being in
```

February 27, 2013

 1   the ballpark, like, "He's got me on an antidepressant.

 2   I can't remember the name of it," that would be a yes.

 3   And then it would be over 80 percent of people.

 4       Q.    Okay.  And did you then take -- go to the EUHR

 5   and determine whether the information the inmate gave

 6   you was correct or incorrect about the name of their

 7   doctor or the name of the medication?

 8       A.    Yes and no.  I would -- I often -- when I met

 9   with treatment teams, I would ask the name of the doctor

10   who's responsible if it was by housing unit.  So I did

11   it enough to verify but not -- I didn't systematically

12   do that.

13       Q.    Is it correct you really didn't do that as a

14   practice?  I mean, I didn't go through all your notes,

15   but I don't see anything where you verified that the

16   inmates' recollection expressed to you of their

17   medication, their doctor, was verified by you or anyone

18   else.  Is that correct?

19       A.    No.  For the most part, I believed the

20   inmates.  If they talked about their doctor warmly, I

21   had no reason to doubt that they felt good about their

22   doctor.  And if they got his name wrong, it wouldn't

23   have changed my mind anyway.

24            The fact that somebody says, "Yeah, he's a

25   good doctor; he listens to me," is much more important

1    to me than whether he knew the doctor's name or not.

2           A lot of the doctors have hard names to

3    pronounce.  Often it was clear they were butchering the

4    name but that they had a good feeling about the

5    clinician or the physician.

6           Q.   On the bottom of page 11, you talk about

7    staffing.  You talk about -- you see that paragraph that

8    has a 1 on it?

9           A.   Yes.  Well, there's two of those.

10          Q.   You're right.  The bottom paragraph on the

11   page.

12          A.   Yes.

13          Q.   And you're talking about -- about the fact

14   that you encountered quite a few prisons on your tour

15   where it was expressed to you that they had staffing

16   shortages, right?

17          A.   Uh-huh.

18          Q.   Is that correct?

19          A.   Yes.  Sorry.

20          Q.   And then you talked about it overall there, in

21   this paragraph that goes over from pages 11 and 12, that

22   there were staffing shortfalls during the time that you

23   were touring the prisons.

24          A.   Yes.

25          Q.   Okay.  And were you aware there was a hiring

1  would take responsibility for those decisions, but they

2  also wouldn't say it was voluntary that they made cuts.

3  They might say, "There's not enough money to do all the

4  things that need doing, and I was forced to cut a lot of

5  things that I didn't want to cut."

6          When you use the word "voluntary" -- and

7  that's my answer to you.

8  BY MR. BIEN:

9      Q.   You were told that -- let me back up and try

10 this again.

11         What's your basis to say that the staffing

12 shortages that you saw in the California system, when

13 you inspected it, were unavoidable?

14     A.   Well, what I was referring to there is what I

15 said a minute ago, was that one of the main reasons for

16 staffing shortages where -- they had jobs.  The jobs

17 weren't taken, and they weren't frozen, but they

18 couldn't hire until the bumping process -- that's what I

19 was referring to -- until the bumping process was

20 completed.

21         And that's a state personnel law.  And I

22 suppose you could change that law, but that's what the

23 law is.  And it's not just in California; it's almost

24 everywhere where people have bumping rights as part of

25 the layoff procedure.

1     Q.   So in your opinion, if a staffing shortage at

2   a particular prison results from this public employment

3   law, then it doesn't count in a -- looking at whether or

4   not the care is constitutional?

5           MS. VOROUS:  Objection.  Misstates testimony.

6           THE WITNESS:  I didn't say that.  No, I don't

7   think that.

8   BY MR. BIEN:

9     Q.   Why did you include in your opinion the idea

10   that they're trying hard and it's not evidence of lack

11   of commitment?  Why is that relevant to your opinion?

12     A.   Because there's a subjective component to

13   deliberate indifference and trying matters.  It

14   doesn't -- it's not dispositive.  So if you're trying

15   hard, but you have one psychologist for 75,000 inmates,

16   you could still be deliberately indifferent as a state.

17   But that's not the same thing as saying "trying is

18   irrelevant."  It's not irrelevant.

19     Q.   What was your evidence that people were trying

20   hard to fill their vacant mental health positions?

21     A.   I talked at length with the leadership about

22   the issue of whatever I observed, what appeared to me to

23   be staff shortages, or what were complained of as staff

24   shortages.  I would typically ask Dr. Toche, "What's the

25   status of this?"

1          And she said, "You know, when the smoke
2    clears, the staffing plan is funded, and they'll have
3    enough staff to do it.  But right now they're right,
4    they don't; and we have to wait."
5          And then she would explain to me what the
6    process was and what the timing was regarding putting
7    the staff on.
8          Q.   What's your understanding about when the smoke
9    will clear?  How long do we have to wait?
10         A.   You know, I don't know the answer to that
11   because I think there are multiple waves of repurposes.
12   So it may be that it affects different prisons at
13   different times.  And I don't know the answer to that.
14              MR. BIEN:  Okay.  Let's take a break.
15              (Off the record at 3:51 p.m. with and
16               back on the record at 4:00 p.m.)
17              MR. BIEN:  I'm going to mark a series of
18   exhibits, several sets of handwritten notes.
19              First is Sacramento 2/29/12 on the front page,
20   the first page of which is DEXP104255.
21              (Plaintiffs' Exhibit 8 was marked for
22               identification.)
23              MR. BIEN:  And the next is three pages of
24   notes, first page of which is DEXP105100.
25

```
 1              (Plaintiffs' Exhibit 19 was marked for
 2                 identification.)
 3   BY MR. BIEN:
 4        Q.   Let me ask you about 19.
 5             Is that your notes or Ms. Moore's notes?
 6        A.   Mine.
 7        Q.   Those are yours?
 8        A.   Yeah.  I didn't have one of my yellow pads, so
 9   I wrote it on a 8 1/12-by-11.
10             MR. BIEN:  Next is Centinela, 104320 through
11   -34.
12             (Plaintiffs' Exhibit 20 was marked for
13                 identification.)
14             MR. BIEN:  And then I think I'm at the last of
15   this series.  CMF, 2/27/12, 104283 through -319.
16             (Plaintiffs' Exhibit 21 was marked for
17                 identification.)
18   BY MR. BIEN:
19        Q.   One question that I wanted to ask you before
20   we start looking at your notes a little bit is about one
21   of issues that you reviewed was emergency response for
22   attempted suicide.  Is that correct?
23        A.   Mainly, Jackie Moore did that.  I looked at it
24   in -- when I looked at the suicides in responding to
25   Dr. Patterson's reports.
```

```
 1        Q.   Okay.
 2        A.   It gives people a chance to say if they're in
 3   medical distress also.
 4        Q.   Do you understand that that function is
 5   traditionally performed by custody officers?
 6        A.   Yes.
 7        Q.   And you think that's appropriate?
 8        A.   Yeah.
 9        Q.   Okay.  And in CDCR, are welfare checks
10   performed in ad seg and SHU?
11        A.   Yeah.  I think they go once every hour in
12   ad seg and SHU to make sure the person's alive and to
13   give an opportunity to ask for something.
14        Q.   Okay.  Are you aware of a --
15        A.   Actually -- I'm sorry.  I didn't give you a
16   complete answer.  For the first 21 days in segregation,
17   I think it's every half hour.
18        Q.   Every half hour?
19        A.   Yeah.
20        Q.   Okay.  And Ms. Moore in her deposition
21   recommended --
22        A.   Dr. Moore.
23        Q.   -- sorry -- Dr. Moore, in her deposition,
24   recommended that CDCR adopt 30-minute welfare checks for
25   all prisoners in ad seg consistent with ACA standard
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    standards.
2              MS. VOROUS:  Objection.  Lacks foundation.
3    BY MR. BIEN:
4         Q.   Do you agree with that?
5         A.   I don't remember what the ACA standard is
6    about that.  But if Jackie said that, there's a very
7    good chance she's right.  She knows the standards pretty
8    well.
9              I'm not sure how much or what it would help.
10   It's not a bad idea.  It just costs -- you know, it's a
11   lot of staff time to do it.  I'm kind of neutral about
12   it.  Certainly not a bad idea.
13        Q.   You understand that in reviewing suicides,
14   which is one of your jobs, you reviewed some of the
15   completed suicides; is that correct?
16        A.   Yes, sir.
17        Q.   You saw cases where it was reported that the
18   inmate had rigor mortis at the time he was found?
19        A.   Yes.
20        Q.   Okay.  And you did some investigation -- I
21   could see from your notes -- as to what rigor mortis was
22   and what the details were; is that right?
23        A.   Yeah.  I did a little checking of -- my
24   recollection was that -- well, let me back up.
25              Rigor mortis is often misconstrued by lay

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    alive and begins emergency medical response?

2         A.   It theoretically could.  I'm aware of that

3    happening.  Very few times in my career that I've seen

4    that happen.  But it could if they got lucky.

5         Q.   You're -- very few times you've seen someone

6    saved to -- attempted suicide and their lives are saved?

7         A.   No.  No.

8         Q.   I didn't understand your testimony.

9         A.   Where an officer happened to see the guy

10   trying to kill himself and intervened quickly.  It

11   happens all the time when other inmates say, "There's a

12   man down," and they yell, and officers respond quickly.

13   I've seen lives saved many times like that.  But it's

14   much more common it would be an inmate than an officer,

15   unless the person was in an easily visible space.

16        Sometimes -- if there's a guy they're worried

17   about, they'll move him to the most visible cell, or

18   maybe there's a cell with a bigger vision panel and then

19   that, the officer might be likely to catch.

20        Q.   Just focus on the 30-minute welfare checks.

21        A.   Okay.

22        Q.   Do you agree that lives can be saved by -- if

23   California expanded 30-minute welfare checks to include

24   all prisoners who are mentally ill in segregation for

25   the time that they're in segregation?

1          A.   Yeah, I would say it could.

2          Q.   Would you also agree that approximately 40 to

3     50 percent of the suicides are people who are not

4     mentally ill?  Is that correct?

5          A.   I believe that's approximately right, yes.

6          Q.   You also agree it would be beneficial and save

7     lives for California --

8          A.   I'm sorry.  By "not mentally ill," I assume

9     you mean not identified mental health service

10    recipients.

11         Q.   That's correct.  That question was vague.

12              Would you also agree that it might save more

13    lives if California did 30-minute welfare checks for

14    everyone in ad seg?

15              MS. VOROUS:  Vague and ambiguous.  Lacks

16    foundation.

17              THE WITNESS:  It might.

18    BY MR. BIEN:

19         Q.   It's possible that somebody would be

20    identified early enough to open the cell and maybe stop

21    his bleeding or provide CPR or other emergency medical

22    services?

23         A.   It's possible.

24         Q.   Okay.  Do you disagree with the ACA standard

25    being 30 minutes as being an appropriate national

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    that.

2    BY MR. BIEN:

3        Q.   In the last five years, have you done a

4    systematic study of mental health delivery in any other

5    prison system in the United States?

6        A.   Well, Hawaii, I mainly work at the Oahu

7    Correctional Center, which is a jail.  But they have a

8    unified jail prison system.  I've looked at Oahu, which

9    is their big prison on Oahu.

10       Q.   My question is -- I'll go one by one:  Did you

11   do a systematic study of mental health care in the

12   Hawaii prison system in the last five years?

13       A.   I wouldn't say a systematic study, no.

14       Q.   Any other states in the last five years you've

15   done a study of their mental health delivery system to

16   see if it's constitutional?

17       A.   Well, Michigan, I think, is still within the

18   last five years, when I was the monitor there or one of

19   two monitors.

20       Q.   Okay.  And when was that done?

21       A.   I think we finished about three years ago.

22   Maybe four.

23       Q.   Okay.

24       A.   And it was four years before that.

25       Q.   Okay.

1       Q.   Okay.  Do you remember when you were at CIM

2   that you observed in the ad seg unit a large number of

3   mentally ill inmates who were there because they were

4   designated for sensitive needs?

5       A.   There were 12 of them in CIM in Charlie Unit.

6   And that was a sensitive need unit, and they were --

7   they weren't getting groups.  And I made a pretty strong

8   criticism of that, that -- as I recall, the mental

9   health director said, "Well, the clinicians in that unit

10  are really busy.  They got a lot of CCCs."

11          I said, "Well, you know, these guys are EOP.

12  You've got to give them EOP care."

13          That doesn't mean, by the way, that groups are

14  essential.  Groups are the most cost-effective way of

15  delivering care if you did an equivalent amount of

16  individual, but I didn't think they were doing that.

17      Q.   Okay.

18      A.   So they weren't neglecting the guys, but they

19  weren't giving them the EOP level of care, and they had

20  been deemed to need that.  So I was critical of that.

21          MS. VOROUS:  Can you show him where in the CIM

22  that you're referring to?

23          MR. BIEN:  I wish I could.

24          THE WITNESS:  I actually remember that one.

25

```
 1   BY MR. BIEN:
 2        Q.   If you can find the CIM one, you can look and
 3   refresh your recollection.
 4        A.   CIM is when I was in Charlie yard.
 5        Q.   Let me see if I can help you out here.
 6             MS. VOROUS:   CIM is Exhibit 13.
 7   BY MR. BIEN:
 8        Q.   Okay.   Let's see if I can help you out.
 9        A.   There's a note on page 10, 104449, the fourth
10   checkmark.   It says:   "Move EOPs out of here.
11   Prioritize."
12             That was related to the same observation, and
13   then...
14        Q.   Okay.   So let's look at that page.   Higher up
15   on that page it says:   "LOB no," with an exclamation
16   mark.
17             What were you referring to there?
18        A.   That stood for -- we just go figured that out
19   yesterday.   Just figured that out.
20        Q.   Also, on the next page, I see a reference to
21   LOB again.
22        A.   Got it.   Okay.   Thank you.
23             What that was was -- so if somebody was in
24   segregation for no other reason than there wasn't a bed
25   for them.   Lack of bed.
```

 1      Q.   LOB stands for lack of bed?

 2      A.   I don't know why I used an acronym.  I hate

 3  acronyms.  I think maybe they called it that status.

 4           Anyway, on the next page, what it says is -- I

 5  said, "Well, wait a second.  If I'm in seg just because

 6  I need a place to sleep, why am I confined to my house?

 7  Why can't I be treated like a regular old inmate if I

 8  haven't done anything?"

 9           And they said, "Oh, we do that."  If it's a

10  row of LOBs, they let them all out.

11           If it's interspersed because they didn't have

12  a bed next door to a seg inmate, then they said, "We

13  don't do it for them."

14           I think they were afraid of letting a seg

15  inmate out.

16           I said, "That's not okay.  Put signs on the

17  door.  Figure it out.  You shouldn't lock me down if I

18  didn't do anything.  It's not fair."

19      Q.   You understand when you visited CIM in May of

20  2012 that there was a -- a shortage of the particular

21  kind of beds that were necessary for these men who were

22  in -- called LOB?

23           MS. VOROUS:  Objection.  Lacks foundation.

24  Vague and ambiguous.

25           THE WITNESS:  Yeah.  I don't think they were

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   mentally ill.  They were just regular old inmates.  They

2   may have been CCC or not.  It was just a practice when

3   someone had just moved and there was no bed for them --

4   I don't think it was very long.

5            I said, "It ain't right.  If I didn't do

6   anything, open my cell.  Let me out on the yard, and

7   then I'll sleep in the bed.  Who cares where I sleep?"

8   BY MR. BIEN:

9        Q.   Did you call back to -- when you made

10  checkmarks on this, on 449 and the next page, does this

11  reflect issues you raised with the -- in the exit, or

12  did you call back to the institution?  What do the

13  checkmarks mean?

14       A.   Usually I check them off when I -- it might

15  mean that I want to include it in the mention of the

16  exit conference.  It might mean I want to mention it to

17  somebody.  I don't remember specifically what it was at

18  the time.

19       Q.   And you recall encountering people throughout

20  the system that were waiting for -- who were mentally

21  ill, either CCC or EOP, who were waiting for a transfer

22  to a place that was designed to provide housing and

23  treatment for their level of care?

24       A.   You talking about the ones that we were

25  mentioning before, the EOP inmates?

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

```
 1   BY MR. BIEN:
 2       Q.   The question is:  Did anyone tell you that?
 3   You say yes or no.
 4       A.   No.
 5       Q.   Okay.  Did anyone inform you that the governor
 6   has issued a proclamation about the same time the motion
 7   to terminate Coleman was filed declaring that
 8   overcrowding is no longer a problem in California and,
 9   therefore, we can bring back the 9,000 out-of-state
10   prisoners?
11       A.   No.
12       Q.   And did you --
13       A.   I might have seen that in the paper, but I
14   don't think anybody brought that to my attention.
15       Q.   Anybody bring to your attention what effect
16   bringing back the out-of-state prisoners would have on
17   California's bed planning for mental health?
18       A.   I haven't discussed that with anybody.
19            MS. VOROUS:  Objection.  Vague and ambiguous.
20   BY MR. BIEN:
21       Q.   Did you take that into account in forming your
22   opinion?
23       A.   I didn't when I wrote my opinions.  I didn't
24   even know that.  So, no, I didn't.
25       Q.   If you look a little farther down on 560, the
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1   last entry, can you read that?

 2        A.   "Lots of CCCMS groups canceled.  Not const"

 3   meaning not a constitutional issue.

 4        Q.   Why did you write "not constitutional" next to

 5   it?

 6        A.   Because the -- the groups for CCCMS aren't

 7   typically viewed as a constitutional mandate unless

 8   somebody for a particular reason needs a group.

 9        So I guess I will say I didn't think it's a

10   constitutional issue; but I think, as a matter of public

11   policy, it's good to do groups with people in CCC.  In

12   fact, it's good to do groups with inmates, period.

13        Q.   I never saw in the constitution any reference

14   to whether groups are necessary for CCCs.

15             MS. VOROUS:  Objection.  Argumentative.

16             Ask a question.

17   BY MR. BIEN:

18        Q.   I don't understand where the standard comes

19   from.  Where do you get the standard that groups are not

20   required for CCCMS inmates as a matter of law

21   constitutional law?

22        A.   Generally speaking, I'm unaware of anyplace

23   that has required for people that are stable on

24   medication to get more than that.  If they're doing

25   fine, then it's not -- it's my opinion.  It's not a

1   This had to do with the investigation of -- that staff

2   malfeasance was pulled out of the suicide unit and given

3   to internal affairs, and then that's the last that the

4   suicide folks heard of it.

5          And I thought they needed -- they don't need

6   to know all the details, but they at least need to know,

7   "Yeah, that's being investigated.  There was a problem.

8   It's been dealt with."  It can be vague, but they have

9   to -- there has to be some feedback loop.

10      Q.   On the top of -- I think it's page 4583 --

11      A.   Yeah, I got it.

12      Q.   -- when you write "REC," that means

13  recommendation?

14      A.   Yeah.

15      Q.   Okay.  And that -- can you read that

16  recommendation?

17      A.   "Recommendation:  Not necessary for all

18  inmates to be in module."

19      Q.   And did you recommend -- I've seen this a

20  couple times in your notes, Doctor, that CDCR consider

21  an individualized assessment as to whether or not

22  inmates need to be treated in modules rather than having

23  a blanket rule that applied to groups of inmates, like

24  in particular units or areas.

25      A.   Yes.

1      Q.   And why was that?

2      A.   Let me say there may be groups of inmates

3  where it's legitimate.  For example, somebody's in SHU,

4  I'm not particularly offended by putting everybody in

5  the module.  I don't think that you have to do it that

6  way, but it's reasonable.

7           If somebody's in ad seg for their personal

8  protection, it makes no sense whatsoever to me to

9  require them to be in a module.  So it should be an

10 advised assessment.

11     Q.   And the same in -- you have the same opinion

12 about MHCB and the use of modules in the MHCBs?

13     A.   Yes.

14     Q.   That should be individualized assessment?

15     A.   Yeah.  In fact, Dr. Scott did the modules more

16 than I did, but I would think it would be the minority

17 of cases where it would need a module.

18          If somebody's a danger -- the way I did it, if

19 somebody's a danger -- if somebody's a danger to

20 themselves and to others, then it's fine to put them in

21 a module.  But if they're just a danger to themselves,

22 then I don't get it.  I wouldn't do that unless there's

23 a good reason to do it.

24     Q.   If you turn to the next page, is that your

25 interview with an inmate?

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

 1   on a list."

 2        A.   Yeah.

 3        Q.   Okay.

 4        A.   And I checked that with other inmates and

 5   staff, and they all said that wasn't true.

 6        Q.   The next page, Jackson, on the bottom, says:

 7   "LPCs don't go cell to cell."

 8        A.   Yes.

 9        Q.   Right?

10        A.   That's why I asked.

11        Q.   So that was two different inmates, right?

12        A.   I take that back.

13             Several inmates made that allegation.  I asked

14   several different officers that weren't around each

15   other, and I asked a bunch of inmates, and it was my

16   conclusion that that wasn't true.

17        Q.   Okay.  Did you investigate any logs to confirm

18   whether or not that was happening?

19        A.   No, I didn't, because Dr. Moore was looking at

20   the rounds log.  And once -- if I hadn't gotten so many

21   people telling me it wasn't true, I might have looked.

22   But the inmates themselves told me, and they kind of,

23   you know, implied that the guys who were saying that

24   were complainers, I guess is the best way to put it.

25             I'm tired.  Trying to concentrate.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        Q.   The area you've starred, do you recall what
2   that refers to?
3        A.   That was so bizarre.  I can't really explain
4   it to you.
5             The officers were telling me, "We're required
6   to stay within X number of feet of the CTC because of
7   the licensing regulations.  So we can't move these
8   inmates.  We got to wait for two escorts to come even
9   though we're standing here."  And it was just -- years
10  ago I thought that the licensure of the CTCs was going
11  to be a problem, and that was an example.  So I starred
12  it.
13       Q.   Did you investigate the use of the cuffing
14  policy within CTCs, which inmates that the CDCR policy
15  concerned who has to be cuffed when they come out of
16  their cell and who doesn't?
17       A.   I did not.  Dr. Scott focused on the CTC, so I
18  didn't pay any attention.
19       Q.   Okay.  Can we take a look at the
20  Pelican Bay -- are you okay with time?
21       A.   20 to.
22       Q.   Okay.  Pelican Bay.
23       A.   Which one is that one?  Toward the end, right?
24            MS. VOROUS:  Exhibit 14.
25            THE WITNESS:  Got it.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1   prisons -- and I think we talked about this a little

 2   earlier today -- you saw some people who had SHU terms

 3   for nonviolent activities such as refusing a cellie?

 4            MS. VOROUS:  Objection.  Lacks foundation.

 5   Misstates testimony.

 6            THE WITNESS:  I was told that people were

 7   SHU'd for refusing cellie in several prisons, including

 8   by staff.  So I think it was true.

 9            I was also told about people given -- not SHU

10   terms, an ad seg because of a DA referral.  But I don't

11   know that any of them were nonviolent.  I didn't look

12   into those cases.

13   BY MR. BIEN:

14        Q.   Turn to 4603, please.

15        A.   Got it.

16        Q.   This was at Pelican Bay.  You were doing a

17   lot.  You were on your own there.

18        A.   I was literally jogging at Pelican Bay.  We

19   drove part of the time.  It was horrible.

20        Q.   Let me just ask you.

21            It seems to me that you were quite disturbed

22   about the MHCB unit at Pelican Bay.

23        A.   Well, yeah, that would be fair.  That might

24   even be mild.  I was exercised.

25        Q.   And when you came into the unit, someone told

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    you no one was on suicide precautions, and yet when you

2    walked in and looked around, there was people on suicide

3    precautions.

4        A.    One guy was in a stripped cell, but he wasn't

5    on suicide watch.

6        Q.    You wrote here -- can you read from

7    "Inmate Gordon"?

8        A.    "Inmate Gordon.  Suicidal.  Extracted from PSU

9    cell.  New inmate.  Suicide precaution.  We pay

10   attention to him.  They misspoke.  No one on suicide

11   precaution.  We don't use suicide precautions," meaning

12   we do suicide watch.

13          That would be fine if that was all it was.  I

14   wouldn't have had a problem with it.  The psychologist

15   didn't know who was on suicide status, and he was

16   responsible for that.

17          So the guy really was on suicide status but

18   hadn't been given SRE.  It was bad work, and they -- I

19   raised a fuss and it's been fixed.

20       Q.    Okay.  Go to 4605.

21          Is that where you saw the SRE problem?  "None.

22   Taken off a suicide watch for Williams."

23          (Witness reviewing document.)

24       A.    "Not much to live for but not actively

25   suicide" -- where you looking?

1      Q.    Top of 4605.

2      A.    Yeah.  DC suicide watch, 10/1/12, but they

3  hadn't done an SRE.  And there wasn't -- if they didn't

4  do an SRE, but there was a really good note that

5  indicated that a suicide risk evaluation was done, I

6  would say, "Yeah, you should use the SRE, but it's not

7  bad."

8           It was sort of the normal way that

9  psychiatrists and psychologists do it, which, in my

10 opinion, is not good enough.  You know, it needs to be

11 more systematic.  And the form they're using is good,

12 and they should use it.

13     Q.    This was a problem for you, that this man

14 hadn't had an SRE when he was taken off suicide watch?

15     A.    Yes.

16     Q.    You also said they saw every inmate in a

17 therapeutic module.

18     A.    Yes.

19     Q.    And you think that was also a problem that

20 should have been individualized?

21     A.    Yes.

22     Q.    On the next page, 4606, what's it say on the

23 top there?  "CTC is" --

24     A.    "CTC is, quote, just like SHU."

25     Q.    And what were you referring to there?

1          A.    That's what one of the inmates said to me, and

2     it was certainly too much like SHU.  They were locked

3     down.  They had an exercise pen.  Almost no one agrees

4     to go.  Usually -- it's not because people don't want to

5     get outside; it's because of some other reason.  It's a

6     hassle or -- I was -- that was probably the only unit

7     where I was the most unhappy.

8               And I spoke at length with Dr. Toche about it.

9     She understood and agreed.

10              They sent Dr. O'Meara, who is an expert at

11    suicide prevention, knows a lot about it and is the

12    regional director, was immediately dispatched to go up

13    there and attend to it.

14         Q.    You also noticed that all the inmates were

15    on -- in suicide smocks, even the ones not on suicide

16    watch.

17         A.    Yeah.

18         Q.    Did you see that in other inmates of the units

19    that you went to?

20         A.    No.

21         Q.    And you thought that was --

22         A.    Remember, I didn't do the CTCs most of the

23    state.  So you're going to have to ask Dr. Scott about

24    that.

25         Q.    Okay.

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                         DATED: March 1, 2013

21

22                         _____

23                         MEGAN F. ALVAREZ

24                         RPR, CSR 12470

25
```

# Exhibit 84



Transcript of the Testimony of:

# Lindsay M. Hayes

Coleman v. Brown

February 18, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

No. S 90-0520 LKK-JFM

- - - - - - - - - - - - - - - - - - - - - - - - -

RALPH COLEMAN, et al.,

Plaintiffs

vs.

EDMUND G. BROWN, JR., et al.,

Defendants

- - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LINDSAY M. HAYES

Monday, February 18, 2013 8:53 a.m.

Intelligent Office

265 Franklin Street, Boston, MA 02110

Reporter:  Janet M. McHugh, RMR, CRR, CLR

THORSNES LITIGATION SERVICES, LLC

```
 1    APPEARANCES:

 2

 3    ROSEN BIEN GALVAN & GRUNFELD LLP

 4    (By Michael W. Bien, Esquire)

 5    315 Montgomery Street, Tenth Floor

 6    San Francisco, California 94104-1823

 7    415.433.6830

 8    Counsel for the Plaintiffs

 9

10

11    STATE OF CALIFORNIA DEPARTMENT OF JUSTICE

12    (By Jay C. Russell, Supervising Deputy

13    Attorney General)              (Via Telephone)

14    455 Golden Gate, Suite 11000

15    San Francisco, CA 94102-7004

16    Counsel for the Defendants

17

18

19

20

21

22

23

24

25
```

Lindsay M. Hayes                                          February 18, 2013

```
 1               I N D E X
 2   WITNESS            DIRECT          CROSS
 3   LINDSAY M. HAYES
 4   By Mr. Bien          5
 5   By Mr. Russell                     144
 6
 7
 8               E X H I B I T S
 9   Number          Description              Page
10   Exhibit 1  Notice of Deposition
11              and Subpoena                    5
12   Exhibit 2  Vitae of Lindsay M. Hayes       7
13   Exhibit 3  Contract                        7
14   Exhibit 4  E-mail thread beginning with
15              Tuesday 1/08/13                 8
16   Exhibit 5  Report dated January 30, 2011   9
17   Exhibit 6  Report dated August 16, 2011    9
18   Exhibit 7  Five-page report dated
19              August 16, 2011                 9
20   Exhibit 8  Handwritten notes              10
21   Exhibit 9  Article entitled "Avoiding
22              Obstacles to Prevention"        16
23   Exhibit 10 Guide to Developing and Revising
24              Suicide Prevention Protocols
25              within Jails and Prisons        23
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                    February 18, 2013

```
 1                E X H I B I T S

 2   Number           Description              Page

 3   Exhibit 11 Document entitled "Guiding

 4              Principles to Suicide Prevention

 5              in Correctional Facilities"      25

 6   Exhibit 12 Article entitled "Review of

 7              Completed Suicides in the

 8              California Department of

 9              Corrections and Rehabilitation,

10              1999 to 2004"                    36

11   Exhibit 13 Photograph                       64

12   Exhibit 14 Photograph                       64

13   Exhibit 15 Three photographs                86

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   until December of 2010.

 2        Q.   What are 30-minute welfare checks?

 3        A.   30-minute welfare checks are simply cell

 4   checks made by correctional staff in particular areas

 5   of an institution, normally required in what is

 6   called special housing.  They could be mental health

 7   units.  They could be medical units.  They could be

 8   administrative and disciplinary Seg units.

 9        It's a standard practice in correctional

10   systems around the country, I will say outside of

11   California.  It's been a requirement of the ACA, the

12   American Correctional Association standards for as

13   long as I've read the ACA standards to conduct

14   30-minute checks in special housing units.

15        Q.   And are these -- who conducts these checks

16   under ACA standards?

17        A.   Normally, it's the officers.

18        Q.   Correctional officers?

19        A.   Correct.

20        Q.   And what are they looking for?

21        A.   They're looking for an inmate that's alive,

22   an inmate that's in their cell.  Those are the two

23   main -- main reasons why welfare checks are called.

24   That's why the term is called "welfare."  I think

25   that it's not used as a suicide observation, because

1       So, you know, whether they were uninformed or

2   not, I am not sure.  I just remember there was a

3   tremendous amount of resistance by the CDCR

4   personnel.

5       I think that there were some -- although most

6   of the CDCR representatives were clinicians, I think

7   there were also correctional officials that were at

8   this meeting, as well.

9       Q.   Okay.  Another issue that you discussed in

10  this 2006 declaration was treating non-disciplinary

11  inmates different from disciplinary inmates in

12  Ad-Seg.  Can you explain what that refers to,

13  Mr. Hayes?  I'm referring to Page 7 and 8 of your

14  declaration, beginning at Paragraph 16.

15      A.   I believe that there was a discussion that,

16  for a variety of reasons that I don't recall, that

17  there were non-disciplinary inmates being housed

18  within the Ad-Seg units.  And the concern was that

19  they were being managed as if they were disciplinary

20  inmates.

21      In other words, there was very little

22  movement.  In other words, lack of out-of-cell time.

23  Their property was limited.  So they were being

24  treated as if they were disciplinary inmates, but

25  they did not have disciplinary orders.

```
 1      And we were -- there was a discussion that
 2  this could also be one reason why there's a
 3  disproportionate number of suicides in the Ad-Seg
 4  unit, because inmates in these units were very
 5  frustrated, and their mental health was
 6  deteriorating, and their stress level was increasing
 7  because they're there for reasons other than
 8  discipline, and yet they're being treated it as if
 9  they were disciplinary inmates and being locked down
10  up to 24 hours a day and not being given yard and
11  normal property.
12      And that this -- and I think that there
13  was -- it wasn't an issue that I necessarily brought
14  up.  I think it was a general agreement amongst the
15  folks that were at this summit conference that
16  this -- this could perhaps be one of the reasons why
17  there was this disproportionate number of suicides
18  within the Ad-Seg unit.
19      Q.   Turning forward in time, could you take a
20  look at what's been marked as Exhibit 3, please,
21  which is the contract between National Center of
22  Institutions and Alternatives and CDCR.
23      A.   Yes.
24           (Witness complies.)
25      Q.   Can you explain how you came to be -- to
```

Page 46

 1        Exhibit 14.)

 2              MR. BIEN:  What numbers are those?

 3              COURT REPORTER:  Thirteen and fourteen.

 4   BY MR. BIEN:

 5        Q.   Mr. Hayes, I can represent to you I was

 6   present when these pictures were taken.  And these

 7   are pictures taken by CDCR staff, who accompanied

 8   plaintiffs' counsel and our experts on a tour on

 9   February 7, 2013.

10        Do you -- looking at this picture, does this

11   look like the MOHU cells that you observed at Mule

12   Creek State Prison during your tour?

13        A.   You know, my recollection is not that good

14   from two years ago.  They -- all these OHU cells look

15   pretty much the same to me.  But -- I mean, this is

16   reflective of there not any beds in them.

17        This cell is four concrete walls, a

18   sink-toilet combo, stainless steel commode, and

19   that's about it.

20        Q.   You expressed an opinion in your reports to

21   CDCR that MOHU -- cells such as this that's portrayed

22   in these photos should not be used for various

23   purposes.  Is that correct?

24              MR. RUSSELL:  Objection.  Vague,

25   ambiguous, ambiguous, overly broad, lacks

Lindsay M. Hayes                                        February 18, 2013

 1   foundation.

 2        A.   I think my specific opinion was in most of

 3   the cells that I observed for -- that were

 4   designated -- identified to me as being designated to

 5   house inmates on suicide observation, and most of

 6   these were in the OHU units, because I have probably

 7   a separate opinion for the crisis bed cells I saw,

 8   but for the OHU cells in all three facilities,

 9   including Mule Creek, the furnishings were so stark

10   and non-existent and the lighting and the sanitary

11   conditions were so poor that my opinion was that it

12   was unlikely -- that its stark presence is a

13   deterrent for inmates to come forth who are suicidal

14   and seek out mental health services or confide in

15   staff that they're suicidal because of the -- of the

16   treatment that they would receive once they were put

17   into the cells.

18        That basically, they were clothed in safety

19   smocks and not much else, not allowed to have many

20   possessions, if any, not allowed out of their cells

21   except to shower every other day.

22        So under those conditions, it's -- it's

23   difficult to believe that someone who was suicidal

24   was going to want to come back in there again if they

25   were -- if their suicidal ideation came back.  And,

Page 66

Lindsay M. Hayes                                    February 18, 2013

 1   housing.
 2        So when I heard that they were being
 3   used for a several-day length, then that became
 4   concerning enough for me to put this brief
 5   section in my report.
 6        Q.   Did the ZZ cells that you observed have
 7   beds in them?
 8        A.   Let me -- I don't think I address that
 9   within my report.  Let me see if I did within my
10   notes, if you could just bear with me for a second.
11   I don't see any reference to them in my notes.  I'm
12   sorry.
13        Q.   Okay.  During your observation of CDCR
14   prisons on these tours, did you encounter any CDCR
15   staff that were actually doing suicide watch of an
16   inmate on a one-to-one?
17        A.   Yes.  I observed the certified nursing
18   aides doing almost all of the watches.
19        Q.   And can you describe to me what you
20   observed?  What were they doing?
21        A.   I remember one housing unit very clearly,
22   because -- I believe it was at DVI, there's an OHU
23   overflow unit, which is on the other side of the
24   administrative Seg unit.  It's basically one unit
25   divided in half.

                                              Page 82

1      As I recall it, the left side was the
2  administrative Seg unit, and a series of linear
3  cells.  I don't know the length, but quite -- quite a
4  few.  And if you came on to the unit and took a
5  right, you would go through a door on to what is
6  referred to as the OHU overflow unit.
7      And when we walked in, I remember distinctly,
8  because there was this very foul smell when we walked
9  around the unit.  And it was -- I was told it was the
10  aftermath of pepper spray that was dispensed on
11  the -- in the administrative Seg side of it.  But it
12  had filtered on to the overflow unit.  And we walked
13  in, and it was rather surreal.
14      There were -- almost all the inmates -- I
15  think every single inmate that was housed on the
16  overflow unit was on suicide observation status, they
17  were all on a one-on-one status.  And there were --
18  each -- outside of each cell was a certified nursing
19  aide sitting in a chair or standing outside the cell.
20  And they were assigned to that individual inmate.
21  And there was a line of them.
22      If there were 10 or 15 or 20 of these aides,
23  they were all lined up down the linear cell block
24  area.  And all -- most of them had surgical masks on
25  because of the stench of the aftermath of this pepper

1  spray.  And it was just a surreal-looking visual.

2      Almost all the inmates were either sitting or

3  standing, facing outward, just looking out at us as

4  we're walking through or looking at the CNA or trying

5  to have a conversation with the CNA.

6      I -- when I inquired as to -- I had a number

7  of questions when I saw all this.  But one of them

8  was, why are all these inmates needing one-on-one?

9  And then I realized as I looked into one of these

10  cells that one of the reasons were that they were

11  very dangerous cells.

12      There was no lighting, if any.  There might

13  have been some minor lighting, but that could have

14  been just the light from the outside cell block.  You

15  could not see very clearly into the cells.

16      They were not suicide-resistant.  I believe

17  they did have bunks, but the bunks were very

18  dangerous, and there were unsafe ventilation grates.

19      So it was obvious that these cells were not

20  suicide-resistant, and, therefore, some of the

21  reasons why they were on one-on-one is because the

22  cells were unsafe, not necessarily that these inmates

23  were at the highest risk of suicide requiring

24  one-on-one status, but they were being housed --

25  because it was an overflow unit, they were being

```
 1           C E R T I F I C A T E

 2    COMMONWEALTH OF MASSACHUSETTS

 3    SUFFOLK, SS.

 4         I, Janet M. McHugh, a Registered Merit

 5    Reporter and a Notary Public within and for the

 6    Commonwealth of Massachusetts do hereby certify:

 7         THAT LINDSAY M. HAYES, the witness whose

 8    testimony is hereinbefore set forth, was duly sworn

 9    by me and that such testimony is a true and accurate

10    record of my stenotype notes taken in the foregoing

11    matter, to the best of my knowledge, skill and

12    ability.

13         I further certify that I am not related to any

14    parties to this action by blood or marriage; and

15    that I am in no way interested in the outcome of

16    this matter.

17         IN WITNESS WHEREOF, I have hereunto set my

18    hand this 19th day of February, 2013.

19

20                          _____

21                          JANET M. MCHUGH
                            Notary Public

22

23    My Commission Expires:

24    July 11, 2014

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 85



Transcript of the Testimony of:

# **Richard Johnson**

Coleman v. Brown

February 25, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

Richard Johnson                                    February 25, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                   Plaintiffs,        )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                   Defendants.        )
_____)



DEPOSITION OF

RICHARD JOHNSON

MONDAY, FEBRUARY 25, 2013,  8:58 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1                   UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,            )
                                       )
5                   Plaintiffs,        )
                                       )CASE NO.:
6          vs.                         )S 90-0520 LKK-JFM
                                       )
7    EDMUND G. BROWN, JR., ET AL.,     )
                                       )
8                   Defendants.        )
     _____)

9

10

11

12          The Deposition of RICHARD JOHNSON, taken on

13   behalf of the Plaintiffs, before Megan F. Alvarez,

14   Certified Shorthand Reporter No. 12470, Registered

15   Professional Reporter, for the State of California,

16   commencing at 8:58 a.m., Monday, February 25, 2013, at

17   the Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

18   Street, 10th Floor, San Francisco, California.

19

20

21

22

23

24

25

Richard Johnson                                        February 25, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  JANE KAHN, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, 10TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              JKAHN@RBGG.COM

 7

      FOR DEFENDANTS:
 8
                BY:  JAY C. RUSSELL, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              455 GOLDEN GATE AVENUE, 11TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94102-7004
11              415.703.5717
                415.703.5843 FAX
12              JAY.RUSSELL@DOJ.CA.GOV

13              BY:  MICHAEL STONE, ESQ.
                DEPARTMENT OF CORRECTIONS AND REHABILITATION
14              OFFICE OF LEGAL AFFAIRS
                1515 S STREET, SUITE 314 SOUTH
15              SACRAMENTO, CALIFORNIA 95811
                916.323.2929
16              916.327.5306 FAX
                MICHAEL.STONE@CDCR.CA.GOV

17

18    ALSO PRESENT:

19              MARC SHINN-KRANTZ, PARALEGAL

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                 INDEX OF EXAMINATIONS

 3

 4  Examination by Ms. Kahn  .........................7

 5

 6                      --o0o--

 7

 8         EXHIBITS MARKED FOR IDENTIFICATION

 9  No.              Description                 Page

10  Exhibit 1    Notice of deposition  ...............7

11  Exhibit 2    Excerpt from Chapter 5 of Mental ....47
                 Health Services Delivery System
12               Program Guide, 2009 Revision

13  Exhibit 3    Memorandum entitled "Use of ........49
                 Alternative Housing" dated
14               5/16/12

15  Exhibit 4    Excerpt from the Mental Health ......59
                 Services Delivery System Program
16               Guide, 2009 Revision

17  Exhibit 5    Alternative Housing Cell ...........69
                 Privatization Memo dated
18               12/12/12

19  Exhibit 6    Summary of cases in alternative .....71
                 housing 5/18/12 - 12/27/12
20
    Exhibit 7    Inmate data on mental health ........77
21               crisis bed referrals and
                 transfers **CONFIDENTIAL**
22
    Exhibit 8    January 4-January 10, 2013 ..........89
23               Statewide Alternative Housing
                 Hours Log, Bates SAC104
24
    Exhibit 9    Letter dated 2/1/13 from Timothy ....93
25               Belavich to Matthew Lopes
```

Richard Johnson                                            February 25, 2013

```
 1   Exhibit 10     Inpatient Psychiatric Aging ........109
                    Report 12/1/12 to 12/31/12
 2                  **CONFIDENTIAL**

 3   Exhibit 11     Summary of Interinstitutional ......112
                    Mental Health Crisis Bed
 4                  Referrals and Transfers, August
                    2008
 5
     Exhibit 12     Use of Outpatient Housing Units ....117
 6                  Directive dated 12/12/12

 7   Exhibit 13     Summary of Cases in Outpatient .....131
                    Housing Units May 1 - December
 8                  31, 2012

 9   Exhibit 14     Letter dated 1/16/13 from Debbie ...142
                    Vorous to Ernest Galvan and
10                  eclosed documents filed under
                    seal regarding the reports from
11                  12/1 through 12/31/12
                    **CONFIDENTIAL**
12
     Exhibit 15     OHU Admission Chart dated ..........153
13                  December 2012 **CONFIDENTIAL**

14   Exhibit 16     Coleman monthly report of ..........164
                    information requested and
15                  response to January 19, 1999,
                    Court order regarding staff
16                  vacancies, dated 1/3/13

17   Exhibit 17     Coleman monthly report of ..........169
                    information requested and
18                  response to January 19, 1999,
                    Court order regarding staff
19                  vacancies, dated 2/1/13

20   Exhibit 18     Weekly EOP population report for ...179
                    the week of 12/10/12
21
     Exhibit 19     Coleman monthly report of ..........187
22                  information requested and
                    response to January 19, 1999,
23                  Court order regarding staff
                    vacancies, dated 8/28/08
24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

 1   Exhibit 20      EOP and CCCMS in ad seg/SHU/PSU ....190
                     Placements greater than 90 days,
 2                   Coleman monthly report of
                     information requested and
 3                   response to January 19, 1999,
                     Court order regarding staff
 4                   vacancies, dated 2/1/13,

 5   Exhibit 21      Memo dated 9/7/12 from Timothy .....195
                     Belavich to Anthony Lonigro, et
 6                   al., report on Implementation of
                     Quality Improvement Plans for
 7                   the suicide of an inmate,
                     Pleasant Valley State Prison
 8                   **CONFIDENTIAL**

 9                        E X H I B I T S

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       Q.    And when DSH provides you with the pending

2    transfer list, what does that list look like?

3       A.    That lists each of the DSH hospitals or -- I'm

4    still going to -- even those in the CDCR prisons, can

5    refer to those as hospitals?

6       Q.    Please.

7       A.    Okay.  Then for each of the DSH hospital

8    settings that house our inmate patients, they have what

9    they call a BUM report, which is the -- it's the daily

10   utilization management reports.

11           And on those BUM reports, it has their pending

12   transfer list.

13      Q.    And does that show the date that the patient

14   was referred to DSH?

15      A.    I'm not familiar if every -- each of the

16   hospitals does because their BUM reports are different.

17   And for the information that we receive, which is

18   different -- for example, that those are from a -- one

19   of their hospitals versus in a CDCR institution, I know

20   that some of their BUM reports have that information,

21   but I can't confirm that they all do.

22      Q.    Does a BUM report show the date accepted?

23      A.    I don't think that's included in the

24   information that -- that we get for each of the BUM

25   reports, because the BUM report is a very -- it's a much

Richard Johnson                                    February 25, 2013

1    more comprehensive document that DSH has than what we

2    get the portion of for our placements.

3         And so -- so I -- I don't know if each of the

4    hospitals give us the information where it has the

5    accepted date for each of their patients.

6         Q.   So how do you know that this is a list of

7    prisoners that are pending transfer?

8         A.   The portion of the document that we work off

9    of is their face sheet, and on the face sheet it has

10   totals.  And so it will have like a column that says the

11   pending or referrals, and then they'll have a separate

12   column for the -- for any wait list, which would be

13   those above the -- beyond the Coleman time frames.  And

14   so it's like a summary information that -- that we

15   receive.

16        Q.   So you're receiving a summary of their

17   referral acceptance and wait list data?

18        A.   Correct.

19        Q.   Okay.  So, in other words, you do not have the

20   underlying data?

21        A.   I'm not sure because I -- for the portion -- I

22   haven't gone to each of the tabs and seen what available

23   is -- you know, which information is available for each

24   of the BUM reports, and so I cannot confirm that.

25        Q.   But what the -- DSH pending list is a --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

 1    the...

 2    BY MS. KAHN:

 3        Q.   Okay.  Okay.  Paragraph 13 of your

 4    declaration, you write that "As of December 17th, 2012,

 5    there were no inmates waiting for acute or inpatient

 6    care.  There were 13 inmates pending admission to acute

 7    care (accepted by DSH) but none had waited more than

 8    10 days, and there were 45 inmates pending admission to

 9    intermediate care (accepted by DSH), the majority

10    pending two weeks or less."

11            So what is the source of the data reported in

12    paragraph 13?

13        A.   In paragraph 13, it was the -- it was the BUM

14    reports generated by DSH.

15            MS. KAHN:  I think I'm going to mark one more

16    exhibit, now, and then I think we should take a break.

17            So this is Exhibit 4.

18            (Plaintiffs' Exhibit 4 was marked for

19             identification.)

20    BY MS. KAHN:

21        Q.   I just want to direct your attention to first

22    the fourth box -- no -- first, are you familiar with

23    this document?

24        A.   Yes, I am.

25        Q.   Okay.  What is this?

Richard Johnson                                    February 25, 2013

```
 1    those beds?
 2    BY MS. KAHN:
 3        Q.   Should a -- would -- what about logging
 4    prisoners who are placed in holding cells inside of a
 5    housing unit who have reported suicidality and are
 6    awaiting to be evaluated by a clinician for possible
 7    placement in an MHCB?  Should they be logged?
 8             MR. RUSSELL:  Objection.  Vague and ambiguous.
 9    Calls for speculation.  Lacks foundation.  Incomplete
10    hypothetical.
11             THE WITNESS:  And what I'm aware of is that in
12    the circumstances -- or in the policy and the training
13    directive, that if they're in a holding area because
14    there's not a mental health crisis bed available at the
15    institution, then that's when they should be logged on
16    to the alternative housing log.
17    BY MS. KAHN:
18        Q.   Okay.  Does HCPOP have a list of all
19    alternative placements used at each prison?
20        A.   No.
21        Q.   Why not?
22             MR. RUSSELL:  Objection.  Vague and ambiguous.
23    Lacks foundation.  Calls for speculation.
24             THE WITNESS:  For our placement purposes, it
25    doesn't matter to us, you know, because our oversight is
```

Page 67

Richard Johnson                                    February 25, 2013

1   with the placements and with the referral time frames.

2   And so it doesn't matter to us as far as meeting the --

3   being placed within transfer time frames where they're

4   housed in alternative housing.

5   BY MS. KAHN:

6       Q.   Okay.  Are you aware of whether mental health

7   program has a list of all alternative placements?

8            MR. RUSSELL:  Objection.  Vague and ambiguous.

9   Calls for speculation.

10           THE WITNESS:  No, I'm not aware if there's a

11   comprehensive list.

12  BY MS. KAHN:

13      Q.   Okay.  When were you last inside of a prison?

14      A.   Say 2012.  Could be down at CMF.  Was looking

15  at some of their new programs down at CMF.  And that's

16  the last that I remember being in a prison.

17      Q.   Have you ever seen any of the alternative

18  placement locations identified in the memorandum or

19  program guide section?

20      A.   I have been in many correctional treatment

21  centers, so I'm aware of some of their, like, triage

22  areas within the -- within the CTCs.  And I've been to

23  Mule Creek where they have, for example, their MOHU.

24      Q.   Do you have an opinion about whether this is

25  an appropriate location to house a suicidal prisoner?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

```
 1   accepted and has been waiting since then.  And the
 2   report is dated December 31st, 2012.
 3            Has he been waiting more than 10 days for
 4   placement in the acute program?
 5            MR. RUSSELL:  Objection.  Vague and ambiguous.
 6   Lacks foundation.  Calls for speculation.
 7            THE WITNESS:  And I'm not familiar with their
 8   report, and so I know -- I know how our data is
 9   calculated, but this is the first time that I've seen
10   this report and I would have to know more about it.
11   BY MS. KAHN:
12       Q.   Okay.  Is that your answer?
13       A.   Yes.
14       Q.   Mr. Johnson, I just want to remind you that
15   said as chief of health care placement oversight and the
16   program itself is responsible for tracking capacity and
17   census and wait list data for Department of State
18   Hospitals, correct?
19       A.   Correct.
20       Q.   And you've never seen this detailed data which
21   the Department of State Hospitals provides per court
22   order to the Coleman special master and plaintiffs'
23   counsel and filed with the court?
24       A.   I have not.
25       Q.   This is not provided to HCPOP?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

```
 1        A.   I don't remember seeing this report.
 2        Q.   And you filed a signed declaration with the
 3   court attesting to lack of wait list and stating that
 4   certain numbers of people have not been attesting to the
 5   waits on waiting -- the numbers of patients waiting to
 6   be admitted to these programs without being informed or
 7   provided with this data or that knowledge of this data?
 8        A.   DSH has told us that their official document
 9   on their census and wait list is their BUM reports that
10   come from the hospitals, and that's what we used to
11   compile our data.
12        Q.   Well, if you were aware that this report
13   existed, would you compile a different type of wait list
14   with that -- knowing that?
15             MR. RUSSELL:  Objection.  Vague and ambiguous.
16   Lacks foundation.  Calls for speculation.
17   BY MS. KAHN:
18        Q.   Would you investigate this data differently if
19   you were aware that the department compiled data that
20   showed the date of referral to an inpatient program?
21             MR. RUSSELL:  Objection.  Vague and ambiguous.
22   Lacks foundation.  Calls for speculation.
23             THE WITNESS:  I would look into it.
24   BY MS. KAHN:
25        Q.   Would you have signed a declaration that
```

```
 1   stated what it stated if you had this data in front of

 2   you and could have reviewed it?

 3               MR. RUSSELL:  Objection.  Vague and ambiguous.

 4   Calls for speculation.

 5               THE WITNESS:  I don't know.  It would depend

 6   on what I was informed what this report is and how it's

 7   collected.

 8   BY MS. KAHN:

 9        Q.   Do you want to read the entire report first?

10               Let me first take you to another page first.

11   Do you want to see the wait list for ICF?  Turn to

12   page 17.

13               Starting at 862, continues to the next page.

14   But the names from 862 through 885 have all been waiting

15   more than 30 days for admission to Salinas Valley

16   psychiatric program from the date of referral.

17               If you turn to page 23.

18               MR. RUSSELL:  There's no question pending.

19               THE WITNESS:  Okay.

20   BY MS. KAHN:

21        Q.   Turn to page 23, 1170 and 1171.  There are two

22   prisoners waiting for admission to Atascadero who were

23   referred more than 30 days ago and accepted.

24               I'll ask my question again.

25               If you had had full information available that
```

Richard Johnson                                    February 25, 2013

```
 1   is filed under seal and provided to plaintiffs, to the
 2   Coleman special master, which the attorney general's
 3   office was aware of, CDCR legal was aware of, if this
 4   information had been provided to you before you signed
 5   your declaration under penalty of perjury, would you
 6   have changed the statements that were made in your
 7   declaration?
 8            MR. RUSSELL:  Objection.  Vague and ambiguous.
 9   Lacks foundation.  Calls for speculation.
10            THE WITNESS:  And I cannot say that I would
11   change anything because we have these source documents
12   that the data comes from in coming to our data.  But if
13   I'm ever shown anything that differs from -- another
14   source of data that differs from our data, then it is
15   something I will look into or have my staff look into.
16   BY MS. KAHN:
17        Q.   Okay.  And do you feel like this data
18   contradicts what you said in your declaration?
19        A.   Not necessarily.
20        Q.   So you have to look into this data?
21        A.   Yes.
22        Q.   And you plan to look into this data?
23            MR. RUSSELL:  Objection.
24   BY MS. KAHN:
25        Q.   I'd like to refresh your memory of what you
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          Q.    Okay.  Have you been involved in any bed

2     planning meetings for CCC prisoners?

3          A.    Yes.

4          Q.    What were those or when were those?

5          A.    Those were -- they've been discussions during

6     the implementation of the workload study.  Then what was

7     the -- the prev-mix process.  You know, the prev-mix was

8     on our same time that the department does the fall and

9     spring projections.  And that's when we used to also

10    look at making the adjustments on the mental health

11    populations and then -- but that was based on the

12    preworkload study model.

13              And then under the -- and so now under the

14    workload study model, we're going to be doing something

15    similar but not identical to the prev-mix and so that's

16    the process I referred to earlier that we're just

17    beginning to, now that AB 109 is -- you know, the

18    conversions of the institutions are getting their

19    completion.  And so we're looking at the -- to see if

20    we're in balance with our CCCMS and EOP like you

21    referred to based on the new alignments of the

22    institutions.  And then to see if we need to make

23    realignments of our mental health staffing due to

24    AB 109.

25         Q.    This is your special assignment that you

1    referred to earlier in the depo?

2        A.   Yes.

3        Q.   So this will also be looking at whether there

4    are adequate number of, for example, SNY yards for CCC

5    prisoners?

6        A.   Yes.  That will be included.

7        Q.   That will be included.

8             And these meetings are ongoing?

9        A.   Yes.  And we're just at a point with the

10   AB 109 conversions getting to the tail end of their

11   conversions that we could really start sitting down and

12   working with -- and also the mental health staff will be

13   involved, you know, in those decisions along with DAI.

14   And so we're just beginning to -- even though it's been

15   the plan to do this for, you know, the planning

16   meetings, but we're finally at the point where things

17   are getting settled with the realignment conversions

18   that we can now address the mental health alignments.

19       Q.   Okay.

20            MS. KAHN:  I want to mark another exhibit.

21            (Plaintiffs' Exhibit 18 was marked for

22             identification.)

23   BY MS. KAHN:

24       Q.   Okay.  Are you familiar with this report?

25       A.   Yes.

 1   other issues with the data, too, which I'm not familiar

 2   with the details.

 3        Q.   Okay.  So this -- this particular section of

 4   this report identifies EOPs that are in nonhub

 5   institutions for more than 90 days.

 6             And, you know, if you could turn to DVI, it's

 7   a good example.  It's on R1017.  There are, you know,

 8   two prisoners housed there for 281 and 175 days.

 9             When you were speaking earlier about being

10   proactive, I guess the question is:  What does HCPOP do

11   with this data which is generated and provided monthly

12   to all sorts of parties to -- to ensure that EOPs who

13   should be transferred within 30 days to a -- well, let

14   me first ask you.  Does DVI have a hub?

15        A.   No.

16        Q.   Okay.  There are two EOPs here who have been

17   housed here, one for more than nine months and one for

18   close to six months.

19        A.   And --

20             MR. RUSSELL:  There's no question.

21   BY MS. KAHN:

22        Q.   Okay.  And so what would -- what is HCPOP's

23   role with regard to this data?

24        A.   Well, on list data is that we believe and the

25   mental health program believes that our other data banks

```
 1   are better, more accurate information than who is in
 2   the -- mental health who's in ad segs.  And so we use
 3   those to cross-check each other.
 4            When we have checked this data and there's
 5   been errors, like for the, you know, cases being on this
 6   list, and so the systems that we cross-reference with
 7   are the COMPSTAT and the mental health tracking system
 8   and our own -- and to some extent our SOMS, you know,
 9   information.
10       Q.   So you ignore this data?
11            MR. RUSSELL:  Objection.  Vague and ambiguous.
12   Lacks foundation.  Misstates testimony.
13            THE WITNESS:  No, I don't ignore it.
14   BY MS. KAHN:
15       Q.   Have you -- is this data reviewed?
16       A.   I'm not sure what our unit does with the
17   information, who sent this to Coleman.  So I would have
18   to verify.  I don't know if this is part of the data --
19   the information that are actually EOP CC3 uses.
20       Q.   But as chief, you're responsible for your
21   unit, correct?  You were in December.
22       A.   I was.
23       Q.   If you want to turn to page R1018 in Folsom.
24   Again, it's CIM.
25       A.   And the question?
```

Richard Johnson                                    February 25, 2013

```
 1            So the idea, just so I understand, is to come
 2   up with a plan that could meet all these needs and
 3   perhaps designate new prisons?
 4        A.   Or new --
 5        Q.   Yards?
 6        A.   Possibly new yards or even expand on some,
 7   like, for example, where we do have some capacity maybe
 8   to increase --
 9        Q.   Or increase --
10        A.   -- increase a program locally.
11        Q.   Okay.
12        A.   Then you could increase locally or you could
13   look at some other institutions, yards that could be
14   expanded or new yards and do a conversion.
15        Q.   But there's no new staffing plan that's being
16   developed with this, is there?
17        A.   No, no.
18        Q.   So it's the staffing plan that was developed
19   and will exist after you've completed this project?
20        A.   Correct.  And the staffing would just follow
21   where the census is.
22        Q.   Okay.  And so this is to address the changes
23   in population as a result of AB 109?
24        A.   That's correct.
25        Q.   Okay.  Is there a timeline for completing
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    this?

2         A.   Once again, not a deadline, but we'll be --

3    you know, we recognize the deed and so -- and I, you

4    know, discussed it with Tim and some others last week

5    because we're just starting to -- you know, the AB 109

6    is at a point now where at least I believe that we could

7    start actually looking at where we might be able to make

8    the adjustments.

9              And so we're identifying with the mental

10   health program right now, you know, with -- because we

11   have had meetings with DAI and the stakeholders in this

12   before, but the timing wasn't right because of all the

13   AB 109 conversions.  But just based on correspondence

14   I've had with the stakeholders in DAI and mental health

15   program, we all believe that it is the time to actually

16   start identifying the adjustments that need to be made.

17             And so we're looking at the data now, you

18   know, and setting up the, you know, meetings with who

19   will be the primarily drivers of this.

20        Q.   Who are the stakeholders?

21        A.   Stakeholders would be the mental health

22   program, which would be the population -- or the staff,

23   which is Dr. McAloon still has her hands in it,

24   Sharon McCarver, the regionals, because they know their

25   institutions.

```
 1        Q.    Right.
 2        A.    And it will be briefing, of course, you know,
 3   the -- Nathan, Judy, and Tim as we're going along.
 4              And then with DAI, they have Dennis Halverson
 5   who's there.  He's the new Ross Meier, so their
 6   population management chief.
 7              And then Becky Alkire is the chief of
 8   classification services.
 9              And so they're already -- we've already all
10   discussed it and there will be a meeting first at our
11   level just to say like this is the kickoff of actually
12   going forward with this and then we'll bring in other
13   secondary stakeholders as needed.
14        Q.    Are there any preliminary results about where
15   you think -- what you think needs to be done, or it's
16   too early?
17        A.    It will be primarily based on our population
18   management reports, like the EOP report that you showed
19   earlier.
20        Q.    Right.
21        A.    So using our own reports showing where we may
22   have a -- where our greatest demand is.
23        Q.    Okay.
24        A.    And then we'll go off to where our greatest
25   demand is and identify what the need is, you know, based
```

```
 1   on.  This is outpatient that we'll be doing this for.
 2        Q.   Right.
 3        A.   So it will be CCCMS and EOP.
 4             And then looking for the common ground.  I
 5   mean, we're all committed into finding the solutions to
 6   the need, but we always start off with a wish list that
 7   we all have that works best and then we try and find --
 8   you know, we come to a compromise wherever we need to.
 9   You know, the mental health will have its priority, ones
10   that they would like to expand to.  DAI will have their
11   priority list.  And then we start working together.
12        Q.   Does HCPOP create a report for CCC that's
13   similar to that EOP bed need report?
14        A.   There is a similar report.
15        Q.   Okay.  Just has never been provided?
16        A.   (Witness nods head.)
17        Q.   I appreciate this.
18             I guess the last thing I want to ask you is:
19   Is there anything that you feel at this point you'd like
20   to correct in your declaration?
21             MR. RUSSELL:  Objection.  Vague and ambiguous.
22   Overly broad.
23   BY MS. KAHN:
24        Q.   Well, we can go through each paragraph if
25   you'd like but if you want to take a moment, and I guess
```

Richard Johnson                                          February 25, 2013

```
 1                  CERTIFICATE OF REPORTER

 2

 3           I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8                That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13                I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                DATED:  March 7, 2013

21

22                       _____

23                       MEGAN F. ALVAREZ

24                       RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 86

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4    RALPH COLEMAN, et al.,        )
                                   )
5                                  )
              Plaintiffs,          )
6                                  )
                  vs.              )   No. Civ S 90-0520 LKK-JFM
7                                  )
     EDMUND G. BROWN, JR., et al., )   Volume I
8                                  )
                                   )   Page 1 - 300
9             Defendants.          )
     _____)

10

11

12              DEPOSITION OF

13              STEVE J. MARTIN

14          THURSDAY, FEBRUARY 28, 2013

15

16

17    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19   REPORTED BY:

20   HOLLY THUMAN, CSR No. 6834, RMR, CRR

21   ----------------------------------------------------------

22              JAN BROWN & ASSOCIATES

23        WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25              (415) 981-3498 or (800) 522-7096

1

1                        **I N D E X**

2   EXAMINATION BY:                                 PAGE

3   MR. BORNSTEIN                                      5
    MS. CESARE-EASTMAN                               295
4   Reporter's Certificate                           300

5           EXHIBITS MARKED FOR IDENTIFICATION

6   NO.              DESCRIPTION                    PAGE

7   Exhibit 1   Draft document headed "Use of Force    27
                Audit Tool [Steve]" (DEXP 102825
8               through -826)

9   Exhibit 2   Handwritten notes (DEXP 105127 through  59
                -658)
10

    Exhibit 3   Percentage of Use of Force and Non-Use  63
11              of Force Incidents Involving Mental
                Health Patients, 2011 June - November
12              (DEXP 105486)

13  Exhibit 4   Email chain, Martin to McKinney,        74
                November 9, 2012 (DEXP 010156)
14

    Exhibit 5   State of California Department of       76
15              Corrections and Rehabilitation
                Memorandum, September 12, 2012, to
16              Associate Directors - Division of
                Adult Institutions, Wardens (DEXP
17              009657 through -658)

18  Exhibit 6   Coleman Audit Best Practice           122
                Recommendations for Use of Force (DEXP
19              105138 through -143)

20  Exhibit 7   Handwritten notes (DEXP 105146)       207

21  Exhibit 8   Coleman Review, Round XXV, California  211
                Correctional Health Care Services
22              (DRPD 1 00450 through -479)

23  Exhibit 9   Handwritten notes headed "Telcon       235
                4/13/12" (DEXP 105149 through -150)
24

25  (Cont'd)

                                                        2

1  Exhibit 10  December 2011 Richard J. Donovan          243
                Correctional Facility document,
2               Operation Plan No. 66 (DEXP 105439
                through -448)
3
    Exhibit 11  Handwritten notes headed "RVR 3/28/12"    246
4               (DEXP 105489 through -490)
5   Exhibit 12  Rules Violation Report, 12-25-11,         250
                R.J.D.C.F. (DEXP 105497 through -505)
6
    Exhibit 13  2/15/12 email, McKinney to Dvoskin and    267
7               others (DEXP 000013)
8   Exhibit 14  Email chain, 12/12/2011, McKinney to      270
                Martin (DEXP 009583 through -584)
9
    Exhibit 15  March 17, 2011 State of California        281
10              Memorandum, Hunnicutt to Neotti (DEXP
                105453 through -454)
11
    Exhibit 16  May 12, 2011 State of California          282
12              Memorandum, Hunnicutt to Neotti (DEXP
                105455 through -456)
13
    Exhibit 17  July 18, 2011 State of California         283
14              memorandum, Hunnicutt to Paramo (DEXP
                105457 through -459)
15
    Exhibit 18  October 9, 2011 State of California       283
16              Memorandum, Hunnicutt to Paramo (DEXP
                105460 through -461)
17
    Exhibit 19  October 9, 2011 State of California       285
18              Memorandum, Hunnicutt to Paramo (DEXP
                105462 through -463)
19
    Exhibit 20  Handwritten notes headed "RJD Cont'd      287
20              3/28/12" (DEXP 105464 through -465)
21  Exhibit 21  Rules Violation Report, sent up on        291
                January 23, 2012 (DEXP 105506 through
22              -507)
23  Exhibit 22  Rules Violation Report: Mental Health     294
                Assessment Request - CDCR 115-MH
24              Supplemental Information Form for
                Hearing Officer, 12/22/11 (DEXP
25              105512)

3

```
 1                          --o0o--
 2          Deposition of STEVE J. MARTIN, taken by the
 3    Plaintiffs, at K&L GATES LLP, Four Embarcadero Center,
 4    Suite 1200, San Francisco, California 94111, commencing
 5    at 9:27 a.m., on THURSDAY, FEBRUARY 28, 2013, before me,
 6    HOLLY THUMAN, CSR, RMR, CRR.
 7                          --o0o--
 8                        APPEARANCES
 9    FOR THE PLAINTIFFS:
10         K&L GATES LLP
           Four Embarcadero Center, Suite 1200
11         San Francisco, California 94111
           415.249.1059
12         By:  JEFFREY BORNSTEIN, Attorney at Law
                jeff.bornstein@klgates.com
13              MEGAN F. CESARE-EASTMAN, Attorney at Law
                megan.cesare-eastman@klgates.com
14              RANJINI ACHARYA, Attorney at Law
15         ROSEN BIEN GALVAN & GRUNFELD LLP
           315 Montgomery Street, Tenth Floor
16         San Francisco, California 94104-1823
           By:  MICHAEL W. BIEN, Attorney at Law
17              415.433.6830
                (Present when indicated.)
18
19    FOR DEFENDANTS:
20         ATTORNEY GENERAL OF CALIFORNIA
           455 Golden Gate Avenue, Suite 11000
21         San Francisco, California 94102-7004
           By:  PATRICK RICHARD McKINNEY II
22              Deputy Attorney General
                415.703.3035
23              Patrick.McKinney@doj.ca.gov
24    ALSO PRESENT:  ELDON VAIL
25
```

4

1  discussed was the -- he wanted -- my particular role, he

2  wanted my best assessment of where the system was

3  relative to constitutional minimum.  I don't recall

4  whether we discussed at all what was motivating that

5  inquiry.  I certainly did not have the impression or do

6  not recall him saying, we are going to attempt to -- how

7  did you phrase it -- get out from under Coleman?

8       Q.  Uh-huh.

9       A.  No.

10      Q.  Were you surprised, then, when you read about

11  them filing a motion which is pending now?

12          MR. McKINNEY:  Objection.  Calls for

13  speculation, vague and ambiguous.

14          THE WITNESS:  No.  No, I was not surprised.

15          MR. BORNSTEIN:  Q.  Okay.  Why not?

16      A.  Well, Counsel, I've been in the business quite

17  some time in a variety of capacities, law-trained, legal

18  capacities in cases that were of this magnitude and

19  understand strategies in this arena.

20          And it doesn't take a rocket scientist to

21  figure out that if somebody is telling the State that

22  they're doing this or doing that, that they might use

23  that to then set a course of action.

24      Q.  In the course of your work, were you told that

25  there had been some sort of an agreement that there was

8

1   supposed to be notice to the plaintiffs about when you

2   as experts went into the prisons?

3       **A.   Oh, no.   That type of thing was never -- I**

4   **looked at it and understood that I was being retained --**

5   **or the discussions of retention were just as a**

6   **consultant that had utterly, mind you, nothing to do**

7   **with plaintiffs or courts or anything else.   It's --**

8   **having been in that position myself as Agency counsel**

9   **and Special Assistant Attorney General myself, we**

10  **routinely retained consultants on matters that -- for a**

11  **variety of reasons.**

12      Q.   Did you in your work -- would you agree that

13  the State's prison system is still overcrowded?

14          MR. McKINNEY:   Objection.   Vague and ambiguous,

15  vague as to time.

16          THE WITNESS:   That was not my charge, to make

17  that assessment.   But being acutely aware of the

18  Coleman/Plata case and knowing many of the actors and

19  experts, and trying to stay acquainted with the law, I

20  was certainly -- and having been through probably near a

21  thousand institutions for 40 years, as I was going

22  through the facilities, I was certainly attuned to signs

23  that I typically associate with overcrowdedness in a

24  constitutional sense.

25          MR. BORNSTEIN:   Q.   And what were those signs

9

1    that were you attuned to?

2         MR. McKINNEY:  Objection.  Vague as to time.

3         THE WITNESS:  Well, that the infrastructures

4    were compromised, the inmate movement is impeded by

5    shear numbers, that spatial densities are extremely

6    limited.  Staffing flow, staffing deficiencies.  There's

7    a whole myriad of signs an experienced person would look

8    for.

9         MR. BORNSTEIN:  Q.  And you weren't asked to

10   look for those things?

11        **A.  I was not.**

12        Q.  But in the course of your work, did you form an

13   opinion about whether the State's systems are -- prison

14   system is still overcrowded?

15        MR. McKINNEY:  Objection.  Vague and ambiguous.

16        THE WITNESS:  When you say an opinion, are you

17   asking for Steve Martin's observations of having gone

18   through some number of facilities relative to their

19   general operation?  I mean, I don't -- I want to be real

20   careful with what you're asking here.

21        I wasn't asked to render opinions on crowding.

22        MR. BORNSTEIN:  Q.  Right.  And now I'm asking

23   you, based on your training and experience and the

24   myriad of things that you've just told me about, whether

25   you have an opinion.

                                                          10

1    And that's how this originated.

2        Q.  So did the State prepare this audit tool for

3    you, or did you prepare it?

4        A.  No, we -- on this particular issue, when we got

5    to it, Patrick and -- I don't recall who all was present

6    or whatever, but the -- I said -- probably was very

7    quick to say, this is what I am going to look at, given

8    what you want me to do.  And they probably said, what is

9    it that you're going to look at?  And I said, 1, 2, 3,

10   4, 5, 6.

11       Q.  There's actually 9.

12       A.  Well, whatever.  You ought to share the entire

13   document with me, Counsel.

14       Q.  I mean to, and I apologize for not having it.

15   But I'm going to go get it for you.

16           MS. CESARE-EASTMAN:  It's on its way down.

17           THE WITNESS:  Is that like the check is in the

18   mail?

19           MR. BORNSTEIN:  Q.  No, we'll get it for you.

20   If you want to take a break until we get it --

21       A.  No, I know what's on there.  I did it.

22       Q.  How did you decide what -- let me ask it this

23   way:  Why didn't you go to all of the prisons in

24   California?

25       A.  Time, expense.

30

1    Q.   Okay.  So -- well, there certainly was enough

2    time, because you had -- you started in September of

3    2011, and this is February of 2013, I guess the last day

4    of February of 2013.  So you had time.  If -- is that --

5    you -- there certainly was enough time to do it.

6             MR. McKINNEY:  Objection.  Asked and answered.

7             THE WITNESS:  Counsel, are you intimately

8    familiar with my calendar and commitments?

9             MR. BORNSTEIN:  Q.  Ah.  So it was your

10   schedule?

11       **A.   Yeah.  I carry 20-plus cases at any given time,**

12   **monitoring four or five systems.  Don't be so cavalier**

13   **with my time.**

14       Q.   Was it -- how did you decide on the ones you

15   went to?

16       **A.   Good question.  With four experts, I think at**

17   **least two of -- well, three of us, three of us had**

18   **varying levels of working familiarity with the CDCR over**

19   **a variety of years and circumstances.  We had our own**

20   **ideas on institutions that we needed to visit and to set**

21   **a number where it could confidently be said that what**

22   **we've seen is representative, generally representative**

23   **of how the system is operating, save the possibility of**

24   **a rogue facility that's out there that we just didn't**

25   **get on our list and is inconsistent with observations we**

                                                          31

1    might render on others.

2         But generally, we wanted to get 10 to 12 to 13

3    facilities that we believed, as professionals, once we

4    went through them, would give us a fairly illustrative

5    representative idea of how the system was operating,

6    with respect to my particular issues, at least.

7         Q.  So from that sample size, you were then -- you

8    would then have a sense, I guess, of what you thought

9    was going on in all the prisons?

10        A.  It's better than a sense, because if you're --

11   in my areas -- I'm just going to speak to my areas.  But

12   if you've confirmed and established that a set of regs,

13   policies, procedures, are in place, and they're State

14   regs, and they're vigorously monitored both externally

15   and internally, and there's all these mechanisms and all

16   these reviews being done, you know, like OIG and the --

17   you know, whatever -- that if those are in place at 10

18   to 13 institutions, there is a very strong likelihood

19   they're in place at the remaining ones, save, you know,

20   the possible anomaly, the possible, you know, rogue

21   facility that just simply is -- whatever, is not abiding

22   by regs, which those tend to be -- in a system that has

23   this kind of scrutiny, you can't hide those too long.

24   So I doubt there's -- I'd be surprised if there's a

25   rogue facility out there that's abandoned the

                                                            32

1      Q.  No, I hear you.

2          The State's lawyers were with you when you did

3    it, though.  Right?

4      **A.  When I interviewed inmates?**

5      Q.  Yes.

6      **A.  Not necessarily -- you mean standing beside me?**

7      Q.  Well, they were in the facility --

8      **A.  Oh, yes.**

9      Q.  -- with you while you did it.

10          MR. McKINNEY:  That's a different question.

11          MR. BORNSTEIN:  Q.  Right?

12          MR. McKINNEY:  Compound.  Objection.  That's a

13    totally separate question you just asked.

14          THE WITNESS:  They were --

15          MR. BORNSTEIN:  Q.  Let me start over.

16          When you went on your tours, you were

17    accompanied by State Attorney Generals and CDCR lawyers.

18    Correct?

19      **A.  Not always CDCR lawyers.  I think almost all**

20    **instances, out of the AG's office.**

21      Q.  Was it Pat who was with you?

22      **A.  More often that not, but sometimes Deborah.**

23      Q.  Okay.

24      **A.  And there was a third.  I can't recall his**

25    **name.**

37

1    Q.   And they were with you in the units when you

2    went into the units.

3        MR. McKINNEY:   Objection.  Calls for

4    speculation.

5        THE WITNESS:   No.  Again, I operate

6    differently.  I don't like a lot of you folks around me.

7    It interferes with what I do, it compromises what I do,

8    and if there's any way I can avoid any of you, I

9    pointedly do.

10       And that -- I'm neutral on that.  That's

11   plaintiffs, defendants, anybody.

12       MR. BORNSTEIN:   Q.  So who took you around?

13   **A.   I had typically asked for a lieutenant, I asked**

14   **for a coordinator, I asked for a CDCR employee**

15   **intimately familiar with that facility.**

16   Q.   When you did your interviews with inmates,

17   where did those interviews take place?

18   **A.   Variety of settings.  I would do cell-front**

19   **interviews, I would call some out for particular-purpose**

20   **interviews, in a dedicated interview space.  Yard**

21   **interviews, common space, day-room interviews.  Quite a**

22   **variety of inmate interviews.**

23   Q.   Did the -- did you tell the inmates that you

24   were working on the Coleman matter?

25   **A.   Certainly those inmates that I specifically**

38

1   **represented to me by a fellow team member.**

2       Q.  And what was that?

3       **A.  That they were.**

4       Q.  And who was that who told you that?

5       **A.  Joel Dvoskin.**

6       Q.  And what did he say?

7       **A.  Basically that.**

8       Q.  And from your experience, wouldn't it be more

9   appropriate to make decisions based on the individual

10  inmate you're dealing with?

11      MR. McKINNEY:  Objection.  Vague and ambiguous,

12  argumentative.

13      THE WITNESS:  Well, I embraced the proposition

14  that -- well, I don't favor blanket rules applying to

15  segregated populations.  That is to say, if they're in

16  that population because they're recently, seriously,

17  frequently violent, that's one set of protocols.  If

18  they're separated because they need protection from the

19  general population, that's a separate set of protocols.

20      Very different protocols.  Oftentimes, that's

21  not made.  It's -- the overarching ADSEG dictates the

22  protocols.

23      MR. BORNSTEIN:  Q.  And there should be

24  separate protocols for the two populations you're

25  talking about.  Right?

44

1      MR. McKINNEY:  Objection.  Vague and ambiguous.

2      THE WITNESS:  What I think I just said.

3      MR. BORNSTEIN:  Q.  I just want to make sure,

4  because I've now got prison noise behind me.

5      And the problem is, when you mix those two

6  populations together in a unit -- which is what CDCR

7  does; isn't that right?

8      MR. McKINNEY:  Objection.  Assumes facts not in

9  evidence, argumentative, vague and ambiguous.

10      THE WITNESS:  What's the question?

11      MR. BORNSTEIN:  Q.  Isn't that what CDCR does,

12  they mix those populations together, at least according

13  to what the other experts told you that you're working

14  with?

15      **A.  That came up at a particular facility in a**

16  **conversation during the day, and I don't even know**

17  **whether I'm recalling it, you know, with accurate**

18  **detail.  So I don't know if there's a -- I certainly**

19  **can't render an observation or opinion on what CDCR is**

20  **doing as a general practice with respect to that issue.**

21      Q.  Assuming they are doing what I just said, is

22  that of concern based on your expertise?

23      MR. McKINNEY:  Objection.  Vague and ambiguous.

24  It's an incomplete hypothetical, argumentative.

25      THE WITNESS:  It would be.

45

1    MR. BORNSTEIN:  Q.  Why?

2    **A.  Well, because other than -- a PC inmate that**

3    **doesn't otherwise represent a threat to anybody, but**

4    **somebody is a threat to him, once you physically**

5    **separate him in a housing unit, then he ought to be**

6    **managed just like any other general population inmate.**

7    **There's no need to keep him locked up, if he's with like**

8    **offenders.**

9    Q.  Is it a sign of overcrowding if you are forced

10   to have your -- your inmate population in one unit in a

11   segregated unit because that's the only way you can

12   protect them?

13   MR. McKINNEY:  Objection.  Vague and ambiguous.

14   THE WITNESS:  Well, the critical operative word

15   there is, if you are forced to do it, that would be a

16   sign.  But I know any number of operations that have no

17   space issues that do it.  So again, you've got to dig

18   deeper.

19   MR. BORNSTEIN:  Q.  So it's both.  It -- it's

20   not right to do it.

21   **A.  It's not in my view correctionally sound and**

22   **appropriate to treat --**

23   Q.  Is it unconstitutional, in your opinion?

24   **A.  I believe it could be, if there are onerous or**

25   **punitive conditions, a de facto type of punishment when**

46

1    **the offender hasn't done anything.  Due process**

2    **implications, if nothing else.  If not Eighth Amendment.**

3        Q.  Like being confined in your cell for 23 hours a

4    day, for instance?

5            MR. McKINNEY:  Objection.  Vague and ambiguous,

6    argumentative.

7            THE WITNESS:  Yeah, because you're gay?

8            MR. BORNSTEIN:  Q.  Or because you have special

9    needs --

10       **A.  Or because you have special needs or whatever.**

11   **It could be a whole array of things, yeah.**

12           **If the effect of that is corporally, you know,**

13   **punitive, then I think there's an issue.**

14       Q.  In your views of the various facilities, you

15   went to some that had SHUs.  Right?

16       **A.  Yes.**

17       Q.  Did you notice that in -- if you got an inmate

18   in a SHU who comes out and then goes into ADSEG because

19   there's no space available in the SNY yard, isn't that

20   just more punishment for that inmate?

21           MR. McKINNEY:  Objection.  Lack of foundation,

22   lack -- hold on, Steve.  Lack of personal knowledge,

23   compound, vague and ambiguous, argumentative.

24           THE WITNESS:  Again, not just per se, no.

25           MR. BORNSTEIN:  Q.  Why not --

47

1    of what that incident is, they use MK-9, but I've not

2    ever seen that being carried on a person on line level.

3         Q.  And you're comparing it to what kinds of other

4    systems?  I mean, is California --

5         A.  I've been in so many.  I've probably been in

6    confinement operations in 40 of the 50 states.

7         Q.  So nobody else does it like this.

8         A.  Not that I recall.  I've never seen an MK-9

9    being standard issue on a line level.

10        Q.  What about in the last 5 years?

11        A.  No.

12        Q.  How many different kinds of institutions have

13   you been to in the last 5 years?

14        A.  I'd have to study that, but I typically during

15   a 12-month period find my way in between, you know, 5

16   and 10 facilities a year, so I -- you know, I could very

17   well have been in 30 to 50 facilities in the past 5

18   years, easily.

19        Q.  And you said you -- I think during the past

20   year you've been working on 20 different cases or

21   something?  Sorry, I didn't --

22        A.  It went down wrong.  I've got 20 different

23   client -- cases, yeah, if you will.

24        Q.  And are some of them -- I mean, are the -- can

25   you discuss which ones they are?

                                                    133

1    A.  Well, four or five of them are -- I'm a federal

2   court monitor in New York City jails, federal court

3   monitor in the state juvenile system in Ohio, federal

4   court monitor in state prison in Mississippi.  Those are

5   my monitoring.

6        I'm also working as an appointed expert in a

7   Taser class action case in the State of Ohio in Franklin

8   County, which is Columbus.

9        I've got a large class action use-of-force

10  litigation in LA County jail, I've got another LA County

11  jail use-of-force involving five plaintiffs damage case.

12  I've got cases in Louisiana.

13       Some I'm just not -- not coming to mind.

14   Q.  The LA County cases --

15   A.  Denver, an in-custody death case, use of force,

16  in Denver Jail.  Strip-search case in LA County Jail.

17       That gives you a good -- crowding conditions

18  case in Birmingham, Alabama, Jefferson County.

19   Q.  That's a good sample.

20       Speaking of strip-searching, is it in your

21  experience in the prison setting, something in a Level 4

22  facility, like an ADSEG or a Level 4 yard, would

23  there -- would it be common to strip-search an inmate

24  every time they come in or out of their cell?

25       MR. McKINNEY:  Objection.  Ambiguous, compound,

134

1  practice, you want to look -- obviously, in my view, you

2  should separate.  Because quite frankly, in

3  pattern-and-practice cases, I find unnecessary force to

4  typically be the problem that has to be addressed, you

5  know, through training, investigation, supervision, and

6  so forth.

7       Q.  Okay.  Let's turn to the first page of your --

8  well, with the -- 105138.  And the -- there are four

9  recommendations that you made regarding use of force.

10 Right?

11      A.  Yes.

12      Q.  Why didn't you include these in your report?

13      A.  Well, they're best practice, and counsel --

14 which I think appropriately -- can make that call.  I

15 mean, it's not my call; it's their call.  Wanted that

16 report limited to constitutional issues.  It's as simple

17 as that.

18      Q.  What -- well, let's talk about that.

19          So you told counsel that you found these things

20 and you thought they were important, they should be

21 changed.

22          MR. McKINNEY:  Objection.

23          MR. BORNSTEIN:  Q.  Right?

24          MR. McKINNEY:  Objection.  Vague and ambiguous.

25          THE WITNESS:  Yes, I think that's basically

                                                         147

1   correct.

2          MR. BORNSTEIN:  Q.  And counsel said to you,

3   well, are they constitutional, or is it best practices?

4          MR. McKINNEY:  Objection.  Vague and ambiguous,

5   argumentative.

6          THE WITNESS:  I probably categorized them as

7   such.

8          MR. BORNSTEIN:  Q.  At what point would it be

9   constitutional as opposed to a best practice?  Help me

10  to understand that.

11     A.  Well, this -- I mean, let me take number 2.

12          You know, where I say there's virtually no

13  guidance regarding use of the expandable baton.

14     Q.  Yep.

15     A.  If I'm finding frequent instances where it's

16  used unnecessarily or excessively, then that lack of

17  guidance is very close at hand to being

18  unconstitutional.  I mean, you've got to establish a

19  nexus, but I mean, I don't think it would take a great

20  leap of imagination to suggest they use it whenever they

21  want to.

22          Well, how are they able to do that?  Because

23  there's nothing that tells them they can't.

24     Q.  Well, you found numerous instances in which it

25  was used to intervene in inmate-on-inmate assaults, and

148

1    impose -- the classification people administratively

2    need to say, do we need to put him in a higher security

3    setting by reclassifying him close.

4         Q.  Did you review any of those classification

5    decisions as it related to mental health inmates who

6    were assessed with some, you know, recommendation by a

7    mental health person that, gee, you need to take this

8    into consideration, or yes, I think their mental illness

9    played a role in this, and you, you know, should

10   mitigate it?

11        Did you look at any of the classification

12   decisions that follow those RVR proceedings?

13        A.  You know, as they were referred for the ICC?

14        Q.  Uh-huh.

15        A.  No, I did not.

16        Q.  Is there a mental health component in the ICC

17   process?

18        A.  I hope so.

19        Q.  Well, do you know?

20        A.  No.

21        Q.  We know that there is in the RVR process,

22   because there's a whole written policy and procedure

23   about it.  Right?

24        A.  Yes.

25        Q.  Have you seen any written policy and procedure

186

1    about the classification process and -- as it results

2    from an RVR referral or finding?

3        **A.   I have not.   I just did not look in that, you**

4    **know --**

5        Q.   Is that a hole in the system?

6        MR. McKINNEY:  Objection.  Argumentative, calls

7    for speculation.

8        THE WITNESS:  It's a hole in my review that I

9    didn't look at it.

10       MR. BORNSTEIN:  Q.  Well, were you asked to

11   look at it?

12       **A.   No.**

13       Q.   Were you told that, well, this is only part of

14   this thing, part of the sanctions that might be imposed?

15       **A.   No, no, because -- Jeffrey, that's not a**

16   **sanction, and that's why I didn't look at it.**

17       Q.   Why is it not a sanction?

18       **A.   It's an administrative decision.   A**

19   **classification decision is an administrative decision**

20   **based entirely on objective variables.   It's not a**

21   **sanction.   It's not a penal decision.   It's an**

22   **administrative decision.**

23       Q.   Well, it can be penal.

24       **A.   It in effect can be, certainly.**

25       Q.   If you take someone --

187

1    **A.   Right.**

2    Q.   Okay.  So there's all sorts of reasons why

3    somebody might need an assistant.  Right?

4    **A.   Yes.**

5    Q.   And did you find a process in place to provide

6    them with assistance?

7    **A.   There is, but I did not go into that.**

8    Q.   Is it a formal process, or does it vary from

9    institution?

10   **A.   I think it's a -- I mean, there's formal regs.**

11   **I mean, there's regs that set that out, state regs.**

12   Q.   Isn't it at the discretion of the hearing

13   officer?

14           MR. McKINNEY:  Objection.

15           MR. BORNSTEIN:  Q.  Whether somebody gets a

16   Staff Assistant or not?

17           MR. McKINNEY:  Objection.  Calls for

18   speculation.  The witness has testified he didn't

19   examine this issue.

20           MR. BORNSTEIN:  Q.  Okay.  If you --

21   **A.   I don't know.  I just did not look at that.**

22   Q.   Okay.  Is that something that, though, ought to

23   be considered as part of a review of a disciplinary

24   process, what procedures are in place to help inmates

25   who need it?

240

1    Did you do that?

2    **A.   No.**

3    Q.   What do you think of this?

4    **A.   I -- not much.**

5    Q.   Why?

6    **A.   Well, it's -- it wasn't any revelation to me.**

7    **I mean, there's programs like that around the country.**

8    Q.   You agree with this, though, don't you?

9    **A.   Oh, yeah, yeah, I agree with the substance of**

10   **it, yeah.**

11   Q.   In other words, there should be a way for

12   inmates to gain additional privileges in segregation.

13   Right?

14   **A.   Yeah, I endorse it as a correctionally sound**

15   **approach, certainly.**

16   Q.   Does CCR?

17   **A.   I did not look at the operation of the programs**

18   **to the extent Joel did.   I know Joel and I bounced**

19   **around -- I know we had discussions about it, that he, I**

20   **think, believed there were some things that --**

21   **additional things could be done.**

22   Q.   And you agree, too, don't you?

23   **A.   As --**

24       MR. McKINNEY:   Objection.   Asked and answered.

25       THE WITNESS:   As a corrections professional,

272

1  yeah, I always supported programs that reduced the

2  length of stay in high-security environments, because

3  they're expensive, they're oppressive, or can be, and

4  they can become counterproductive if people are in there

5  too long.

6      So yeah, I endorse any program that can shorten

7  that.

8      MR. BORNSTEIN:  Q.  Okay.  So we've talked a

9  lot today about your basic opinions, which are, as far

10  as you're concerned, there's no constitutional violation

11  in the way in which the use-of-force is being

12  administered in the California prisons.  Is that right?

13      **A.  This is -- in a pattern and practice --**

14      Q.  In pattern and practice.

15      **A.  -- practice of excessive or unnecessary force,**

16  **I did not see that.  Did not find it.**

17      Q.  You found individual instances of use of force

18  that could be considered unnecessary or

19  unconstitutional.  Is that correct?

20      **A.  Correct.**

21      Q.  And you also found a review process for -- or

22  at least you agree that there is a review process that

23  needs to be improved.

24      MR. McKINNEY:  Objection.  That misstates the

25  opinion.

273

1          MR. BORNSTEIN:  Did we miss anything else?

2          MS. CESARE-EASTMAN:  Oh, I -- I'm sorry.

3          MR. McKINNEY:  You're not that through.

4          MR. BORNSTEIN:  Hold on.

5          THE WITNESS:  We're not quite done.  Go ahead.

6          MS. CESARE-EASTMAN:  Q.  Are you -- do you know

7    whether you're going to be provided any additional

8    materials or do any additional work between now and the

9    end of March?

10      **A.   I have not been advised that I will be required**

11   **to do anything.**

12       Q.  Okay.  And just to the extent that you do do

13   additional work in that time frame, I would reserve our

14   right to redepose you.

15       **A.   Of course.**

16          MR. BORNSTEIN:  Okay.  I think we're done,

17   subject to that.

18          (Time noted, 5:21 p.m.)

19                      --o0o--

20

21          _____

22          STEVE J. MARTIN

23

24

25

                                                        299

1    CERTIFICATE OF REPORTER

2         I, HOLLY THUMAN, a Certified Shorthand Reporter,

3    hereby certify that the witness in the foregoing

4    deposition was by me duly sworn to tell the truth, the

5    whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken

7    down in shorthand by me, a disinterested person, at the

8    time and place therein state, and that the testimony of

9    said witness was thereafter reduced to typewriting, by

10   computer, under my direction and supervision;

11        That before completion of the deposition review of

12   the transcript [] was [X] was not requested.  If

13   requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21

22   DATED: March 4, 2013

23

24                              _____
                                HOLLY THUMAN, CSR
25

                                                          300

# Exhibit 87



Transcript of the Testimony of:

# Christopher Richard Meyer

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,               No. S 90-0520 LKK JFM

            Plaintiffs,

      vs.

EDMUND G. BROWN, JR., et al.,

            Defendants.

                                    /




DEPOSITION OF CHRISTOPHER RICHARD MEYER




         DATE:          February 27, 2013

         TIME:          9:08 a.m.

         LOCATION:      ROSEN BIEN GALVAN & GRUNFELD
                        315 Montgomery Street
                        Tenth Floor
                        San Francisco, California

         REPORTED BY:   Mary E. Garland
                        Certified Shorthand Reporter
                        License Number 4721

Christopher Richard Meyer                                    February 27, 2013

```
 1                    A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         MARGOT KNIGHT MENDELSON, ESQ.
           JANE E. KAHN, ESQ.
 5         ROSEN BIEN GALVAN & GRUNFELD
           315 Montgomery Street
 6         Tenth Floor
           San Francisco, California 94104-1823
 7         (415) 433-6830

 8

 9    For the Defendants:

10         JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
           STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
11         OFFICE OF THE ATTORNEY GENERAL
           455 Golden Gate Avenue
12         11th Floor
           San Francisco, California 94102-7004
13         (415) 703-5717

14

           MICHAEL A. STONE, ATTORNEY III
15         CALIFORNIA DEPARTMENT OF CORRECTIONS AND
           REHABILITATION, LEGAL AFFAIRS
16         1515 S Street
           Sacramento, California 95811
17         (916) 324-1421

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                              February 27, 2013

```
1                      I N D E X

2

3    EXAMINATION BY:                              PAGE:

4        MS. MENDELSON                               5

5

6                    E X H I B I T S

7    Plaintiff's Exhibits:

8    1    Declaration Of Chris Meyer In Support     9
          Of Motion To Terminate Under The Prison
9         Litigation Reform Act [18 U.S.C. Section
          3626(b)] And To Vacate The Court's
10        Judgment And Orders Under Federal Rule
          Of Civil Procedure 60(b)(5)
11
     2    Exhibit #2 California Men's Colony 50     19
12        Mental Health Crisis Beds

13   3    Exhibit #9 Central California Women's     23
          Facility Treatment and Office Space for
14        Enhanced Outpatient Program-General
          Population
15
     4    Exhibit #5 California Medical Facility    25
16        Treatment and Office Space Project

17   5    Declaration Of Chris Meyer In Support Of  49
          Defendants' Ex Parte Request Re: Revised
18        Long-Range Mental Health Bed Plan

19   6    Twenty-Fifth Round Monitoring Report Of   60
          The Special Master On The Defendants'
20        Compliance With Provisionally Approved
          Plans, Policies, And Protocols
21
     7    E-mail string ending Sunday, December 02, 61
22        2012 3:36 PM, and attached document

23   8    Photograph labeled "CCWF 11"             62

24   9    Exhibit #6 California State Prison, Los   67
          Angeles County Treatment Space for Enhanced
25        Outpatient Program
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                February 27, 2013

```
1                            I N D E X
2
     Plaintiff's Exhibits:                                PAGE:
3
     10    Photograph                                       77
4
     11    Exhibit #10 Dewitt Nelson 375 Enhanced           79
5          Outpatient Program-General Population
           And 50 Enhanced Outpatient Program-
6          Administrative Segregation Unit beds
7    12    Order                                            87
8    13    Declaration of Chris Meyer In Support Of         88
           Defendants' Withdrawal Of Motion For
9          Reconsideration And Relief Re: The Dewitt
           Conversion Project; Request For Continued
10         Stay So That Defendants Can Submit A New
           Activation Schedule
11
     14    State Of California Capital Outlay Budget        136
12         Change Proposal (COBCP), Budget Year 2012-13
13   15    AB 900 Construction Update                       149
14   16    Report Period Ending: January 25, 2013,          150
           128 Psychiatric Services Unit (PSU) Beds,
15         California State Prison, Sacramento
16   17    Photograph labeled "SAC 146"                     151
17   18    California Institution For Men Quadrennial       156
           And Warden Audit, Office of the Inspector
18         General
19   19    Chino City Council, Tuesday, January 15,         160
           2013, Minutes
20
     20    CDCR/HCS Mental Health Permanent Treatment       164
21         and Office Space Availability for Spring 2012
22   21    CDCR Family Of Manuals Change Or Waiver          169
           Request Form, dated April 15, 2011
23
     22    Three-page document dated 1/16/2013              173
24
     23    Two-page document, untitled, beginning           178
25         "Type of Project"
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                              February 27, 2013

```
 1  with what I observed in the way of subcontractor
 2  coordination.
 3       Q.  At that stage, did you believe there would be
 4  delays due to the performance of the contractor?
 5          MR. RUSSELL:  Objection.  Vague and ambiguous.
 6          THE WITNESS:  I believe I asked my team to
 7  evaluate whether or not there would be delays of the
 8  project.  I did not specifically say due to contractor
 9  poor performance.
10  BY MS. MENDELSON:
11       Q.  And did your team do that?
12       A.  They did.
13       Q.  And so when did you become aware that there
14  were delays in the project?
15       A.  It doesn't work that way.
16       Q.  Okay.  Tell me how it works.
17       A.  If you're trying to estimate a year out when a
18  project's going to be done, it's a very, very difficult
19  thing to do.
20       Q.  I would imagine.
21       A.  We have -- we have good analytical tools,
22  critical path schedules, and other ways that we try to
23  determine if a project is going to complete when the
24  estimated date is.  Typically what happens is that I'll
25  become concerned by what I see.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          And in this case, it was enhanced by watching

2     the same contractor do the CIW project, looking at what

3     their level of completion was -- because these projects

4     are very, very similar -- at about the same point in

5     time, and then looking at what happened between that

6     point and the end of the project.

7          When I was convinced that I thought the

8     probability of the project being finished as currently

9     scheduled was very, very low, I then reported that to the

10    courts.  But the actual completion date of a project is

11    always a guess; and the further out you are, the harder

12    it is to guess on when it's going to be done.

13         Q.  Sure.  Okay.

14         Is it your role to predict how long the project

15    will take, or do you work with others on that?

16         A.  I have the final say on what gets reported as

17    to when a project will be completed.  And I spend time

18    with my staff.  If there's any inkling on their part

19    that a project may slip, I will usually work with them

20    to validate -- if there's ways that we can recover -- to

21    initiate the recovery, or if I don't believe it's

22    recoverable, to report to the courts.  But those are my

23    calls.

24         Q.  Sure.  What does "validate" mean in this

25    context?

1          THE WITNESS:  I believe the activation group

2     participates in it, but so do all sorts of other folks.

3     BY MS. MENDELSON:

4          Q.  And to the best of your knowledge, will the

5     EOP-ASU facility being built not service the EOP-GP

6     inmates that it was originally intended to service?

7          A.  That's a program question.  That's -- I have no

8     idea.

9          Q.  Okay.  Thank you.

10          I'm looking at paragraphs 17 and 18 of your

11     termination declaration.  Paragraph 17 discusses a

12     health care facility improvement project at Mule Creek

13     State Prison.  It says that on December 14th, 2012, the

14     PWB established that project.

15          Are you familiar with that project?

16          A.  From a global-scope position, yes.

17          Q.  And it says it includes a sub-project to design

18     and construct new AD SEG primary care and AD SEG EOP

19     mental health clinic for inmates housed in Facility C.

20          Do you know if there's an activation schedule

21     for that project yet?

22          A.  I doubt it.  It's -- we just got approval to

23     get started on it.  Activation schedules usually come a

24     little bit further in -- along in the design process.

25          Q.  So if was just established by the PWB, what

1    would the next steps typically be?

2         A.  Hire a designer.  Hire the various consultants

3    to evaluate whether or not they need to file an

4    environmental document on it.  And if we do, then to

5    start the CEQA process.

6            And then to have stakeholder meetings, to bring

7    in all of the stakeholders associated with it to scope

8    in detail exactly what the project needs are.

9         Q.  So is it fair to say there's not a projected

10   date for finishing construction yet?

11        A.  There may be a -- as was shown earlier in the

12   activation schedules, there may be -- and I believe

13   there is -- a conceptual schedule of how projects, all

14   of our projects, will lay out over the next three or

15   four years.  But, again, until we sit down and actually

16   design the building, we can't establish exactly how long

17   it's going to take and when we expect it to activate.

18   It's the difference between conceptual and detailed.

19        Q.  If it's been through the PWB, remind me, does

20   that mean that it's gotten funding?

21        A.  I don't know if these projects had to go to

22   PMIB; but as far as we're concerned, it's funded.  We're

23   out hiring designers and get going on it; so to me, that

24   means that we have funding.

25        Q.  Are you certain that the project will be

Christopher Richard Meyer                          February 27, 2013

 1  all the components of it.

 2      Q.  Sure.  So these improvement programs tend to be

 3  not specific to just one component, but, rather, involve

 4  various; is that correct?

 5      A.  Correct.  It's both mental health and health,

 6  dental, ADA.  So, yes, it involves many aspects of the

 7  total health care delivery.

 8      Q.  And like MCSP, is that now at the stage where

 9  designers are designing the buildings?

10      A.  We're -- I believe we've hired those designers,

11  and we're starting with preliminary stakeholder

12  meetings.

13      Q.  What's a preliminary stakeholder meeting?

14      A.  We bring in all the stakeholders and we say,

15  "Okay, we got some money, we have a mission, and let's

16  figure it out."

17      Q.  Do you attend those meetings?

18      A.  No, I do not attend those meetings.

19      Q.  But there's not yet a projected date for

20  completion?

21      A.  Oh, it's -- again, I would guess that there is

22  a conceptual date for the overall design and

23  construction period that -- from funding that that

24  project's going to take; but until we have a detailed

25  design, we will not have a detailed schedule.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    Q.  Do you know when the conceptual date of

2  completion is?

3    A.  It typically takes about a year to design a

4  project, but that can vary, depending on the complexity

5  and -- basically, on complexity of the project.

6         But the answer to your question is no.

7    Q.  And do you know what the projections for the

8  completion of the construction are?

9    A.  No, not off the top of my head.

10   Q.  Your termination declaration also mentions the

11  Dewitt.  Nelson Correctional Annex Project.  It says it

12  will add 1,133 beds, of which 953 will be health care

13  beds.  Let me pull out the activation schedule for that

14  one.  This will be No. 11.

15        (Plaintiff's Exhibit No. 11

16         marked for identification.)

17  BY MS. MENDELSON:

18   Q.  I see that you're listed on the top as the

19  "Responsible Person"?

20   A.  Yes.

21   Q.  What does the "Responsible Person" mean?

22   A.  It's the name that they put on the top of the

23  activation schedule.

24   Q.  That's the only meaning it has to you?

25   A.  It's -- that is, honestly, the only real

1   meaning that has to me.  Our Facilities group is

2   responsible for producing the report; it's done under my

3   general supervision.

4        Q.  So the "Responsible Person" doesn't refer to

5   the project, perhaps it just refers to the schedule; is

6   that what you're saying?

7        A.  When we present the activation schedule at the

8   court coordination meetings, if my name is on it, I

9   present --

10       Q.  Okay.

11       A.  -- if Deborah's name is on it, she presents.

12       Q.  Fair enough.

13            It says in your declaration that the Dewitt

14   project is scheduled to open with the first inmate

15   admission on February 17th, 2014, and to be fully

16   occupied by May 31st, 2014.

17       A.  Correct.

18       Q.  Is that still true, to the best of your

19   knowledge?

20       A.  It's -- projecting out a year is always tricky;

21   but, yes.  There are issues associated with that project

22   that I'm concerned about, but nothing that has risen to

23   the level that I'm yet ready to -- or may never --

24   decide that it's going to be impacted.

25            But right now, those are the dates that we're

1   planning and constructing to.

2          Q.   What kinds of issues have come up?

3          A.   We decided to put a single perimeter fence

4   around both CHCF and Dewitt Nelson, which makes the

5   endgame, the last month or so of the project, more

6   problematic, more difficult.

7              The contractors now will be going through a

8   secured institution to try and complete the punch list

9   work in Dewitt Nelson, rather than a freestanding

10  institution from CHCF.

11             So we have a group of people trying to figure

12  out when we can do the cutover to have the least impact

13  on construction -- it's a big impact.  If you go from

14  free access to now everybody has to go through a sally

15  port, it can impact it.  However, we have a bunch of

16  very smart people trying to figure out ways not to

17  impact it.

18         Q.   So the fence is already up, or is it planned to

19  go up?

20         A.   It's planned to go up for Dewitt Nelson.  We're

21  just completing the electric fence on CHCF, but we have

22  not yet started the electric fence on CHCF -- or on

23  Dewitt Nelson.  And then we will also have to breach the

24  fence at CHCF when we connect the two up for a single

25  perimeter.  So it's a tricky engineering and

Christopher Richard Meyer                              February 27, 2013

1   accelerations, there's a cost associated?

2       A.  Yes.

3       Q.  You pay to accelerate --

4       A.  You do.

5       Q.  -- is that correct?

6       A.  Yes.

7       Q.  You do.

8       A.  And if you don't manage it very intelligently,

9   you will spend the money and not get any schedule

10  improvement; and in some cases, you will actually get

11  the project slowing down.

12      Q.  Am I correct that you've presented at policy

13  meetings before, Coleman policy meetings?

14      A.  Yes.

15      Q.  What kind of things have you had to explain at

16  those meetings?

17      A.  Oh, probably the most extensive explanation was

18  the slip on CMC --

19      Q.  Okay.

20      A.  -- when made an independent evaluation, based

21  on a lot of study that I did, that the contractor's

22  projections of when he was going to be done were

23  unrealistic, and that I was not going to give the courts

24  unrealistic projections of when I thought things were

25  going to be done.

1          One of the issues that happened at CIW was, I

2     believe in the last six months of that project, the

3     project slipped a month every month.  Contractor would

4     give you his critical path schedule update, say he was

5     going to be done in two months; and then a month later,

6     he would give his update and say it's going to be done in

7     two months.  And there was no way that I wanted to go

8     through that again with CMC.

9          So I went out with staff, did a completely

10    independent analysis after visiting the project, and came

11    back to the court and said, "I know you're going to beat

12    me up, but I honestly don't think that this thing is

13    going to be done until July or -- June or July, or

14    something like that, of 2013."

15         Q.  So when you were at the policy meeting, was

16    your role to explain the sources of the delays?

17         A.  It was to explain the analysis that went into

18    my decision to forecast -- again, it's still a forecast

19    -- that there would be a delay in the project that was

20    significant.  And to do it as early as possible, as soon

21    as I truly believed that that was going to be the

22    reality.

23         Q.  And by "forecast," you mean -- what do you mean

24    by "forecast"?

25         A.  An analysis of when something in the future is

1    going to be done, when there's still hundreds, if not

2    thousands, of variables that can impact that completion

3    date.

4         And, you know, there is often disagreement

5    between experts and professionals when you're that --

6    there's just -- there's too many unquantifiable

7    variables in it.  But there -- I had enough concern with

8    what I saw on the project, that I did not believe that

9    the contractor's term schedule was realistic.

10        Q.  So then you sort of had a policy meeting,

11   trying to explain the exigencies of contracting to

12   people who don't know contracting?

13        A.  It actually went better than I thought it

14   would.  But, yes, I did the best I could to explain the

15   reasoning behind my forecast.

16        Q.  Who attends policy meetings?  I haven't been to

17   one myself.

18        A.  Everybody in the world.  It's a large group.

19   There's probably at least 25 or 30 people in the room.

20   And I don't know most of them.  But, yeah, it's -- I go

21   do my little construction thing, and then they're --

22        Q.  What kinds of questions do they have?

23            (Reporter requesting clarification.)

24            THE WITNESS:  -- and then they're off to their

25   policy decisions, so ...

1    changed, if I understand correctly, before they got to

2    you, anyway.  So it didn't matter that much to your

3    work; is that correct?

4          MR. RUSSELL:  Objection.  Vague and ambiguous.

5          THE WITNESS:  So, again, I pick it up when it's

6    funded and then I run with it.  And although I am aware

7    of discussions going on, I don't pay a lot of attention

8    to it, because I can't influence it.

9    BY MS. MENDELSON:

10         Q.  But then there are also cases where the plan

11   changes partway through, like the LAC rescope or the

12   CCWF rescope; is that correct?

13         A.  Not halfway through.  In the case of --

14         Q.  Okay.

15         A.  -- LAC, it was after it was done; and at CCWF,

16   it was before it started.

17         Q.  Is that challenging?

18         MR. RUSSELL:  Objection.  Vague and ambiguous.

19         THE WITNESS:  No more so than any other aspect

20   of construction.  It's, you know, a -- converting a

21   completed project is not nearly the level of effort as

22   it is building a new project.

23         And since -- you know, in the case of CCWF, I

24   think we had -- design was already going, so now we're

25   back to square one on design.  So it's a waste of money.

1  But from the process of design and construction, you

2  just move the starting point again and go through the

3  same process.

4  BY MS. MENDELSON:

5      Q.  But doesn't it suggest that no project will,

6  certainly, open until the minute it opens?

7          MR. RUSSELL:  Objection.  Vague and ambiguous.

8          THE WITNESS:  I would not -- I would not hire

9  or have working for me anybody that maintained the

10  position is "it happens when it happens."  It happens

11  when we manage it to happen, with a realistic intention

12  to the variables and risks associated with it.

13          So I do believe that management makes a

14  difference, and I believe it makes a big difference.

15  The key is to focus on the best management you can do to

16  deliver as quickly as possible.  That does not mean that

17  there won't be things that come up that mess up your

18  plan.

19  BY MS. MENDELSON:

20      Q.  Because you could have managed LAC perfectly,

21  but the end of the day, it didn't get to be the thing

22  that it was intended to be?

23      A.  I thought we did manage LAC perfectly.

24      Q.  Okay.  But at the end of the day, did it end up

25  being the thing you thought it would be?

```
 1              On page 7, there's a project schedule, item
 2    number 8.  It states here that the construction will be
 3    complete on May 2015, in May 2015.  It says that
 4    preliminary plans will start September 2012.
 5              Do these constitute the preliminary plans?
 6         A.   No.
 7         Q.   Do you know if the preliminary plans have
 8    started?
 9         A.   The project was approved, and we're -- we hired
10    the designers.  I don't know where -- I don't know where
11    they're at in the preliminary design at this point in
12    time, but they're working on it.
13         Q.   Do you think that it's realistic, May 5th,
14    2015, as a deadline for all 22 facilities?
15              MR. RUSSELL:  Objection.  Vague and ambiguous.
16    Lacks foundation.
17              THE WITNESS:  As I said previously, until we do
18    the site assessments and get into the detail, we have no
19    basis.
20    BY MS. MENDELSON:
21         Q.   Okay.  No basis for?
22         A.   Realistic, could it be done earlier?  I don't
23    know yet.  Is it going to take longer than that?  I
24    don't know yet.  We need to go do the individual site
25    assessments and put the design team on it.  It does not
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1   seem to me at all unreasonable that it could --
 2        Q.  Okay.
 3        A.  -- be done by this point in time.
 4        Q.  Okay.  Thank you.
 5             So the plan, as you understand it, has been
 6   through the PWB?
 7        A.  For med distribution, is funded.
 8        Q.  Not just as to specific sites, but the full
 9   roster?
10             MR. RUSSELL:  Objection.  Vague and ambiguous.
11   Lacks foundation.
12             THE WITNESS:  I would have to go look at
13   exactly what is approved.  But the fact that we started
14   on it, and it was a single program, is a pretty good
15   indication that --
16   BY MS. MENDELSON:
17        Q.  Okay.  Thanks a lot.
18        A.  -- we're going forward with everything.
19        Q.  Okay.  Great.
20             Let's turn back to your declaration for a
21   moment, your termination declaration, which would be
22   Exhibit 1.  I want to ask you a couple questions about
23   SAC; California State Prison, Sacramento, which we refer
24   to as "SAC."  Is that how you refer to it?
25        A.  Yeah, CSP SAC --

```
 1    of what they call the MHCBU, Mental Health Crisis Bed

 2    Unit, which is an unlicensed 20-bed space.

 3              Are you familiar with it?

 4        A.  I am not.

 5        Q.  Were you aware it existed?

 6              MR. RUSSELL:  Objection.  Vague and ambiguous.

 7              THE WITNESS:  I don't recall.

 8    BY MS. MENDELSON:

 9        Q.  Are you aware of any plans to close that unit?

10              MR. RUSSELL:  Objection.  Vague and ambiguous.

11    Lacks foundation.  Assumes facts not in evidence.

12              THE WITNESS:  I'm not aware of it, no.

13    BY MS. MENDELSON:

14        Q.  So I want to ask you a little bit -- no

15    exhibits here, just some questions -- about the

16    Condemned Inmate Complex at San Quentin that was

17    cancelled by Governor Brown in April 2011.

18              Are you familiar with the project?

19        A.  Yes.

20        Q.  Had you worked on the project?

21        A.  No.

22        Q.  Do you know if it had mental health capacity?

23        A.  I don't know.

24        Q.  Who would know that, in your department?

25        A.  The project director that managed the design
```

 1   phase of that would know that.

 2        Q.  So it had been through the design phase, to

 3   your knowledge?

 4        A.  The design was complete.

 5        Q.  So if we were looking at an activation

 6   schedule, where would we be on the activation schedule

 7   before it was cancelled?

 8             MR. RUSSELL:  Objection.  Vague and ambiguous.

 9   Lacks foundation.

10             THE WITNESS:  At the bid stage.

11   BY MS. MENDELSON:

12        Q.  At the bid stage.  So there had not been --

13   well, before I say that, let me look at an activation

14   report.

15             So before the bid stage is the funding request,

16   the legislative approval, the board approval, the loan

17   request; is this all correct?

18        A.  Yes.

19        Q.  Also the preliminary plans?

20        A.  Yes.

21        Q.  CEQA?

22        A.  Yes.

23        Q.  The Joint Legislative Budget Committee

24   approval?

25        A.  Yes.

1      Q.  And working drawings?

2      A.  Yes.

3      Q.  So to your knowledge, all those stages have

4  been completed?

5      A.  Yes.

6          MR. RUSSELL:  Objection.  Lacks foundation.

7  Calls for speculation.

8  BY MS. MENDELSON:

9      Q.  Did you know it was going to be cancelled

10  before it was cancelled?

11      A.  No.

12      Q.  You heard just at the same time as everyone

13  else?

14      A.  Yes.

15          MR. RUSSELL:  Objection.  Vague and ambiguous.

16  Lacks foundation.

17  BY MS. MENDELSON:

18      Q.  To your knowledge, are all projects subject to

19  cancellation by the governor, all construction projects

20  on CDCR sites?

21          MR. RUSSELL:  Objection.  Vague and ambiguous.

22  Lacks foundation.  Overly broad.

23          THE WITNESS:  I'm not an attorney, I don't know

24  what authority he has, but he's the boss.  He wants to

25  cancel it, it gets cancelled.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          THE WITNESS:  I would have to be aware of the

2    specific instance where it did.  And I'm not aware of a

3    specific instance where it did.

4    BY MS. MENDELSON:

5        Q.  Do you have concerns about the condition of

6    CIM?

7          MR. RUSSELL:  Objection.  Vague and ambiguous.

8          THE WITNESS:  I do.

9    BY MS. MENDELSON:

10       Q.  What are your concerns?

11       A.  Some of the special repairs at that project are

12   not at the state that I'd like to see.  So some of the

13   rep. replacements, some of the electrical distribution.

14   Not any worse than some of our other institutions, but

15   there is a need for some infrastructure repair and

16   maintenance at that institution.

17       Q.  Do you know of any on the books?

18          MR. RUSSELL:  Objection.

19          THE WITNESS:  I would have to go --

20          MR. RUSSELL:  Objection.  Vague and ambiguous.

21   Lacks foundation.

22          THE WITNESS:  Not without looking at the

23   reports.

24   BY MS. MENDELSON:

25       Q.  Would those kinds of repairs you described be

```
 1    major works?
 2             MR. RUSSELL:  Objection.  Vague and ambiguous.
 3    Lacks foundation.  Calls for speculation.
 4             THE WITNESS:  What do you mean by "major"?
 5    BY MS. MENDELSON:
 6        Q.  Well, earlier you said that you don't know of
 7    any major projects going on, scheduled construction or
 8    renovation projects, at CIM.  I'm wondering if --
 9        A.  So I'm referring to major capital outlay.
10        Q.  Mm-hm.
11        A.  I believe most -- major capital outlay is
12    defined by the dollar investment in the particular
13    project.  I'm not aware of any single repair items out
14    there that would be major capital outlay.  It'd probably
15    be a minor outlay or Section 6s.
16        Q.  Do you think CIM is in worse condition than
17    other prisons?
18             MR. RUSSELL:  Objection.  Vague and ambiguous.
19    Lacks foundation.  Calls for speculation.
20             THE WITNESS:  I think there are institutions
21    that are worse than CIM.
22    BY MS. MENDELSON:
23        Q.  Which ones?
24        A.  CRC.
25        Q.  CRC.  Any others?  You said "institutions."
```

 1       A.   Where did I get them, in the first place?

 2       Q.   Mm-hm.

 3       A.   Off the project list.

 4       Q.   Off the project list?

 5       A.   Mm-hm.

 6       Q.   What project list?

 7       A.   List of projects.

 8       Q.   You keep a running list of projects?

 9            MR. RUSSELL:  Objection.  Vague and ambiguous.

10            THE WITNESS:  Yes.

11  BY MS. MENDELSON:

12       Q.   You do?  Okay.

13            Is that the written list that you keep?

14       A.   No.  I mean, it's a piece of paper that I make

15  notes on; and I change it, and throw it out, and redo it

16  occasionally.

17       Q.   So you got these facts and figures from a piece

18  of paper that you change and throw away?

19       A.   Ah.  The draft of the declaration was prepared

20  by counsel.

21       Q.   Okay.

22       A.   I then had it vetted for facts, and figures,

23  and correctness.  I then reviewed it and edited it.

24       Q.   And Mr. Borg, you said, vetted it?

25       A.   Mr. Borg vetted it, in combination with

1  representatives from Department of Finance.

2      Q.  When you edited it, were you editing the

3  figures and facts at that stage?

4      A.  I did not edit the figures and the facts.

5      Q.  Okay.  So those came from first counsel, then

6  Mr. Borg?

7      A.  That's correct.

8      Q.  And does that include the dates of activation,

9  projected and past?

10     A.  It did.

11     Q.  Do you know what forms or documents they used

12  to get -- to vet those?

13     A.  I do not.

14     Q.  To get to --

15         MR. RUSSELL:  Who is -- I'm sorry.

16  BY MS. MENDELSON:

17     Q.  To vet them?

18         MR. RUSSELL:  Objection.  Vague and ambiguous.

19  Who is "they"?

20         MS. MENDELSON:  Mr. Borg and the Department of

21  Finance.  I'm sure you know that we made a request for

22  production related to any documents relied upon in the

23  declaration.

24         MR. RUSSELL:  And you've gotten them.

25  BY MS. MENDELSON:

```
 1        Q.  And so to go through:  Counsel would be
 2   responsible for the first draft.  Beyond that, it was
 3   not vetted by -- it was vetted by Dr. Borg and
 4   Department of Finance --
 5        A.  Dean Borg.
 6        Q.  Excuse me.
 7            -- Dean Borg and the Department of Finance --
 8        A.  Yes.
 9        Q.  -- and you're not sure according to which
10   document?
11        A.  Right.  I don't know what documents they use to
12   -- to vet it.  I would imagine it was PWB submission --
13   submittals.
14        Q.  Then when it came back to you, what did you
15   check it against?
16        A.  Statements that I was not comfortable with,
17   was, basically, what I checked it against.
18        Q.  What would make you uncomfortable with a
19   statement?
20            MR. RUSSELL:  Objection.  To the extent that
21   you can answer that without discussing attorney-client
22   privileged communications, you can answer.
23            THE WITNESS:  One statement referred to the
24   CHCF as a state-of-the-art facility.  I have no basis,
25   professional basis, to determine whether or not it was a
```

1    state-of-the-art facility, because that's a programmatic

2    call, not a construction call.  So I struck it from the

3    declaration.

4    BY MS. MENDELSON:

5        Q.  Okay.  Anything else?

6            MR. RUSSELL:  Objection.  Vague and ambiguous.

7    Lacks foundation.  Overly broad.

8            To the extent you can answer without discussing

9    attorney-client communications, you're free to answer.

10           THE WITNESS:  I'm not aware of any other

11   statements that I struck without talking to counsel

12   first.

13   BY MS. MENDELSON:

14       Q.  Okay.  So you said that you checked it against

15   statements you're uncomfortable with.  Did you check it

16   against any particular documents?

17       A.  No, I did not.

18       Q.  So you trusted that Dean Borg would get the

19   facts right?

20       A.  I did.

21       Q.  Would you say that you have personal knowledge

22   of all the facts, including prices, square feet, dates?

23       A.  "Personal knowledge."  These are facts of

24   record; we have records that have those facts.  Whether

25   or not I -- well, I have seen them, them all.  So, yes.

1    I would say the answer to that is yes.

2          Q.  You've seen all the records that --

3          A.  I have seen the square footages and I've seen

4    the prices.

5          Q.  When did you see those?

6              MR. RUSSELL:  Objection.  Overly broad.

7              THE WITNESS:  Over the last four years.

8    BY MS. MENDELSON:

9          Q.  In what kinds of documents?

10             MR. RUSSELL:  Objection.  Overly broad.

11             THE WITNESS:  Monthly reports.  Project

12   documents that go across my desk.

13   BY MS. MENDELSON:

14         Q.  What kind of project documents would they be?

15             MR. RUSSELL:  Objection.  Vague and ambiguous.

16   Overly broad.

17             THE WITNESS:  Occasionally there'll be a

18   submittal that goes over to Department of Finance that

19   will cross my desk, or a request from plaintiffs that

20   will cross my desk, related to basic information about

21   projects.  Also, some of this information is available

22   on the public websites, for square footage and cost.

23   BY MS. MENDELSON:

24         Q.  So I just want to clarify that the basis for

25   the facts in your declaration, that it was first created

1   by counsel, then Dean Borg vetted the facts and figures,

2   and --

3        A.  With the assistance of Department of Finance.

4        Q.  With the assistance of the Department of

5   Finance.

6        A.  Right.

7        Q.  You didn't go through the facts and figures

8   specifically to make sure they were correct?

9           MR. RUSSELL:  Objection.  Vague and ambiguous.

10  Misstates testimony.  Argument --

11  BY MS. MENDELSON:

12       Q.  Excuse me.  Did you go through --

13          THE REPORTER:  Excuse me.  One at a time.

14          MR. RUSSELL:  Please, don't interrupt me.

15          Objection.  Vague and ambiguous.  Overly broad.

16  Misstates testimony.  Argumentative.

17          THE WITNESS:  I rely on Dean to vet it, as I do

18  with many documents.  And if something catches my eye

19  when it hits my desk, I'll inquire about it.

20          There was nothing to lead me to believe that

21  anything that staff had prepared in the declaration --

22  or vetted in the declaration was anything but true and

23  accurate.

24  BY MS. MENDELSON:

25       Q.  So the documents that were relied on for this

 1  were not ones that you individually relied on?

 2          MR. RUSSELL:  Objection.  Vague and ambiguous.

 3  Misstates testimony.  Argumentative.

 4          If you understand the question, you can try to

 5  answer.

 6          THE WITNESS:  I don't know what particular

 7  documents they used to vet the draft.

 8  BY MS. MENDELSON:

 9      Q.  But in terms of the documents that you keep

10  personally, you said that there is a monthly report that

11  has the status of all projects, in various phases;

12  correct?

13      A.  That's correct.

14      Q.  And it's generated by all the people who work

15  on those projects?

16      A.  That's correct.

17      Q.  Okay.  And it's called monthly report?

18      A.  That's correct.

19      Q.  And that would include infill projects?

20      A.  It includes infill projects, that's correct.

21      Q.  Would it include renovations?

22      A.  It includes --

23          MR. RUSSELL:  Objection.  Vague and ambiguous.

24          THE WITNESS:  It would include any renovation

25  projects that are being run through our shop.

```
 1                 CERTIFICATION OF DEPOSITION OFFICER

 2

 3        I, MARY E. GARLAND, duly authorized to administer

 4   oaths pursuant to Section 2093(b) of the California Code

 5   of Civil Procedure, do hereby certify that the witness

 6   in the foregoing deposition was duly sworn by me to

 7   testify to the truth, the whole truth and nothing but

 8   the truth in the within-entitled cause; that said

 9   deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription under my direction; that the foregoing is

13   a full, complete and true record of said testimony.  And

14   that the witness was given an opportunity to read and

15   correct said deposition and to subscribe to the same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21        Executed March 7, 2013, at San Francisco,

22   California.

23

24

25                      MARY E. GARLAND, CSR 4721
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 88



Transcript of the Testimony of:

# Jacqueline Moore, R.N., Ph.D.

Coleman v. Brown

February 21, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                Plaintiffs,         )
                                    )CASE NO.:
        vs.                         )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                Defendants.         )
_____)



DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                    Plaintiffs,        )
                                         )CASE NO.:
 6        vs.                            )S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                    Defendants.        )
     _____)
 9

10

11

12

13

14           The Deposition of JACQUELINE MOORE, RN, PH.D.,

15   taken on behalf of the Plaintiffs, before Megan F.

16   Alvarez, Certified Shorthand Reporter No. 12470,

17   Registered Professional Reporter, for the State of

18   California, commencing at 8:50 a.m., Thursday,

19   February 21, 2013, at the Rosen, Bien, Galvan &

20   Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21   Francisco, California.

22

23

24

25
```

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  AARON J. FISCHER, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, 10TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              AFISCHER@RBGG.COM

 7
      FOR DEFENDANTS:
 8
                BY:  DEBBIE J. VOROUS, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              1300 I STREET
                SACRAMENTO, CALIFORNIA 95814
11              916.324.5345
                916.324.5205 FAX
12              DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                        I N D E X

2

3    Examination by Mr. Fischer  ........................7

4

5                         --o0o--

6

7            EXHIBITS MARKED FOR IDENTIFICATION

8    No.              Description                    Page

9    Exhibit 1    Notice of Deposition  ................7

10   Exhibit 2    Expert Witness Work, Moore & .......12
                  Associates

11

     Exhibit 3    Meeting notes of Dr. Moore, ........17
12                initial Bates DEXP102023

13   Exhibit 4    Report titled "Clinical ............29
                  Evaluation of California's
14                Prison Mental Health Services
                  Delivery System"

15

     Exhibit 5    E-mail, topmost dated 1/31/13 .......35
16                from Patrick McKinney to Joel
                  Dvoskin, Jackie Moore, Charles
17                Scott, Steve Martin, initial
                  Bates DEXP000021

18

     Exhibit 6    E-mail dated 12/5/12 from ..........49
19                Patrick McKinney to Charles
                  Scott, Bates DEX0007819

20

     Exhibit 7    Mental Health Services Audit ........65
21                Tool, San Diego, initial Bates
                  DEXP102436

22

     Exhibit 8    Mental Health Services Audit ........74
23                Tool, Salinas, initial Bates
                  DEXP102949

24

25

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

```
 1   Exhibit 9       Dr. Moore's notes for Central .......99
                     California Women's Facility,
 2                   initial Bates DEXP102775

 3   Exhibit 10      Dr. Moore's notes for R.J. .........104
                     Donovan, initial Bates
 4                   DEXP102389

 5   Exhibit 11      E-mail dated 8/21/12 from ..........135
                     Patrick McKinney to Joel
 6                   Dvoskin, Jackie Moore, Scott
                     Charles, Bates DEXP000024
 7
     Exhibit 12      Dr. Moore's notes for Sac ..........156
 8                   Folsom, initial Bates DEXP103007

 9   Exhibit 13      Color photograph  ..................161

10   Exhibit 14      Dr. Moore's notes for Chino, ......164
                     initial Bates DEXP102619
11
     Exhibit 15      Memo dated 8/16/11 from Lindsay ....195
12                   Hayes to Thomas Gilevich

13   Exhibit 16      Dr. Moore's notes for LAC-CSP, .....198
                     initial Bates DEXP102592
14
     Exhibit 17      E-mail dated 4/6/12 from Patrick ...210
15                   McKinney to Joel Dvoskin, Jackie
                     Moore, Bates DEXP000019
16
     Exhibit 18      Dr. Moore's notes for Old Men's ....214
17                   Colony, initial Bates DEXP102488

18   Exhibit 19      Dr. Moore's notes for SATF, .......225
                     initial Bates DEXP102546
19
     Exhibit 20      California SATF and State Prison ...229
20                   at Corcoran, Mental Health
                     Quality Management Subcommittee
21                   Minutes, dated 10/11/12, initial
                     Bates DEXP102578
22
     Exhibit 21      Mental Health Services Audit .......236
23                   Tool, Emergency Response,
                     initial Bates DEXP102801
24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1   Exhibit 22     Dr. Moore's notes for San ..........247
                    Quentin, initial Bates
 2                  DESP102526

 3   Exhibit 23     Dr. Moore's notes for Salinas ......249
                    State Prison, initial Bates
 4                  DEXP102919

 5

 6                          --o0o--

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1        A.   No.

 2        Q.   When was the last time you spoke with

 3   Dr. Dvoskin or Dr. Scott?

 4        A.   I spoke with Dr. Dvoskin prior to finalization

 5   of the report.

 6             I never spoke to Dr. Scott; I communicated

 7   with him by e-mail.

 8        Q.   What do you mean you never spoke with

 9   Dr. Scott?

10        A.   I didn't speak -- when we were working on the

11   report, I didn't -- the last time.  The last time I

12   spoke with Dr. Scott would have been during the last

13   site survey that we did.

14             MR. FISCHER:  Okay.  Mark as Exhibit 2.

15             (Plaintiffs' Exhibit 2 was marked for

16              identification.)

17   BY MR. FISCHER:

18        Q.   Do you recognize this document?

19        A.   Yes.

20        Q.   Can you tell me what it is?

21        A.   It's expert witness work that I've done in my

22   consulting practice.

23        Q.   Does it also include your CV?

24        A.   Yes, it does.

25        Q.   Okay.  And the publication section of your CV,
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1        Q.    On the middle of the page about halfway down,

2    it says "Overmonitoring."  And can you just read what

3    you have in that note?  The 11th line.

4        A.    "Overmonitoring in number of prisons looked

5    at."

6        Q.    What does that refer to?  Do you remember?

7        A.    There was a lot of monitoring going on in the

8    prisons, that they were going back several times looking

9    at things, that they felt -- whoever related this felt

10   that there was an overmonitoring on the part.

11       Q.    And this was someone from CDCR or the AG's

12   office?

13       A.    It was someone.  I don't know who.

14       Q.    Okay.  And they said they felt that there was

15   overmonitoring being done?

16       A.    Being done, yes.

17       Q.    Further down, you mention cost drivers, the

18   fourth line from the bottom.  It says "Cost Drivers."

19   Can you read the rest of that?

20       A.    "Attorneys and their own law firms and the

21   monitors."

22       Q.    Do you remember what this refers to?

23       A.    To the cost of the Coleman monitors and the

24   attorneys that are the -- that handle the reports.

25       Q.    What did they tell you about this

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1    specifically?
 2         A.   That they bill a lot of money.
 3         Q.   On the next page, 101026.
 4              On this page at the top says "Presiding Judge
 5    Karlton."
 6              Do you recall what they told you about
 7    presiding Judge Karlton at this meeting?
 8         A.   I think that's the judge on the case.
 9         Q.   What else did they tell you about him?
10         A.   Well, anything else I would have written down
11    if I thought that it was important.  I mean, they didn't
12    really tell me much.  This was the presiding judge.
13         Q.   And the fifth line says:  "Karlton does not
14    like state AG office."
15         A.   Yeah.  Someone said that, so I wrote it down.
16         Q.   Did they say anything else about that?
17         A.   No.  If they said something else, I would have
18    written it.  I'm a Catholic school schoolgirl; I write
19    down everything.
20         Q.   And the line below, can you read what the line
21    below says?
22         A.   "Rules of evidence not applied uniformly."
23         Q.   Do you recall what that is?
24         A.   It meant that sometimes the monitors would
25    pick certain things up at one institution and not bring
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1   the same things together at another institution.
 2        Q.   Here were they talking about the monitors or
 3   were they talking about the court?
 4        A.   I think -- I think it was the court.  It was
 5   the court.
 6        Q.   And so what did they -- what was being related
 7   as far as the court here?
 8        A.   That it was an uphill battle for the attorney
 9   general.
10        Q.   Two lines below what you just read, what does
11   that say?
12        A.   "Takes plaintiff's finding as truth."
13        Q.   And the next line?
14        A.   Words the plaintiff would use, like
15   "languishing" or "dying," you know, they were
16   descriptive terms that would be in a plaintiff's report.
17        Q.   This is again talking about Judge Karlton?
18        A.   Judge Karlton.
19        Q.   What was being related here?
20        A.   Other than what I have written here -- and
21   this was many, many, many months ago, and it was just an
22   overview meeting -- quite frankly, I never referred to
23   these notes again.
24        Q.   Do you remember this meeting?
25        A.   I remember being there.  I remember all of the
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1    improvement and suicide prevention.

2         Q.   What are these five bullet points?  What do

3    they represent?

4         A.   These were the areas that we reviewed.

5         Q.   Are these the five areas that you reviewed

6    based on your discussions with the other consultants and

7    with counsel?

8         A.   Yes.

9         Q.   Are there any other areas that you considered

10   including but did not?

11        A.   The only other area that I see that I looked

12   at that did not get into the report was an area on

13   restraints.

14        Q.   Do you know why it wasn't included?

15        A.   I think it was overlooked, that there was --

16   there were no issues with the restraint process.

17        Q.   You said it was overlooked?

18        A.   I may not have gotten it to them.  I may not

19   have seen that it was missing when I read the report.

20        Q.   Okay.  Had you decided that restraints were an

21   important issue for -- to be included in the report?

22        A.   I think we looked at it under rule violation

23   and reports.  And I did that section.

24        Q.   But that section is not in the report?

25        A.   No, but I take responsibility for not putting

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1    it there.
 2         Q.   Were you asked to look at any treatment or
 3    office space issues in completing your report?
 4         A.   We all did.  We all made site visits.
 5         Q.   Were you asked by CDCR counsel or the AG's
 6    office to look at treatment or office space issues
 7    related to mental health care?
 8              MS. VOROUS:  Vague and ambiguous as to what
 9    you mean by looking at treatment and office space
10    issues.
11              THE WITNESS:  I don't know what you mean.  I
12    mean, how big the things were, whether you could have
13    confidential meetings.  I'm not sure what you mean.
14    BY MR. FISCHER:
15         Q.   Were you asked to -- had you determined to
16    look at that issue at all at the prisons prior to doing
17    your site visit?  For example, confidentiality, what you
18    just said.
19         A.   No one asked us to look at anything prior to
20    doing our site visits.  We found our own findings while
21    we did our site visits.
22         Q.   Okay.  You said you started your site visits
23    in November 2011; is that correct?
24              MS. VOROUS:  Objection.
25              THE WITNESS:  We had our first meeting in
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   November -- the first site visit may have been in
 2   February.
 3   BY MR. FISCHER:
 4       Q.   This is not including the initial visit to
 5   Sac; is that correct?
 6       A.   Exactly.
 7       Q.   Okay.  Before I move ahead, in your report, is
 8   there any discussion of the overcrowding trial?
 9       A.   Not that I'm aware of.
10       Q.   You're aware that Supreme Court made their
11   decision in the overcrowding case in the summer of 2011?
12       A.   Yes.
13       Q.   Was there a decision not to include any
14   discussion of overcrowding in this report?
15           MS. VOROUS:  Objection.  The questions with
16   respect to overcrowding are beyond the scope of the
17   issue -- beyond the scope of the issues raised in the
18   motion to terminate and beyond the scope of what was
19   requested in terms of the expert consultancy in this
20   case.
21           Go ahead and answer if you can.
22           THE WITNESS:  We didn't look at overcrowding.
23   BY MR. FISCHER:
24       Q.   Did you think that overcrowding wasn't
25   relevant to the issues that you were asked to look at?
```

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

```
 1   BY MR. FISCHER:
 2        Q.   This is an e-mail dated July 20th, 2012, from
 3   Patrick McKinney with Dr. Moore, your name, in the "To"
 4   line along with Dr. Dvoskin, Dr. Scott, and Mr. Martin.
 5             Do you recall receiving this e-mail?
 6        A.   Yes.
 7        Q.   Mr. McKinney is one of the counsel that you
 8   worked with on this consultancy; is that correct?
 9        A.   Correct.
10        Q.   In the second paragraph under "Preparation of
11   Reports," Mr. McKinney writes in the third line:  "We
12   understand that you'll prepare separate reports."
13             Did you prepare separate reports?
14        A.   I prepared a draft report, but then we didn't
15   use it.  I had some errors in it.  But I started, and
16   you'll even find I was getting ready to do that because
17   my notes from R.J. Donovan were typed, which they hadn't
18   been.  So I started --
19        Q.   How many -- I'm sorry.?
20        A.   -- and then we decided that we weren't going
21   to do it this way.
22        Q.   When did that decision not to do it this way
23   occur?
24        A.   Sometime around September.
25        Q.   September 2012?
```

Page 36

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1          A.    Right.
 2          Q.    What was the reason for that decision?
 3          A.    They wanted all the reports together.
 4          Q.    Who wanted all the reports together?
 5          A.    The attorney general's office decided all the
 6   reports should be together.  And Steve Martin felt that
 7   his should be separate because it was so different.
 8          Q.    Did you feel that yours should be separate?
 9          A.    No.  I thought there was overlap on all of our
10   reports.
11          Q.    How many institutions had you drafted reports
12   for at that point?
13          A.    Eight.
14          Q.    Is any of the content for those reports not
15   included in the final joint report?
16          A.    There were, as in any draft report, at least
17   when I first do a report, I put everything in it,
18   whether it's relevant or not.  And then -- then I take
19   it out.  You know, this doesn't really belong, this
20   doesn't really mean anything, this isn't true.
21                But the content on these reports, in the final
22   report, I had a lot of it done.  So yes, they had it.
23                I mean, I gave it -- we talked about it.  We
24   met.  We discussed things.
25          Q.    Who is "we"?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1          So we looked at the same topic but from
 2     different angles.
 3          Q.   Are you qualified to give an expert opinion of
 4     the areas that you just mentioned Dr. Scott having
 5     reviewed?
 6          A.   No, I wouldn't have given an expert on the
 7     areas Dr. Scott reviewed.  The areas I reviewed were
 8     under the purview of nursing.
 9          Q.   And the areas that Dr. Scott reviewed are
10     under the purview of what?
11          A.   A physician or a psychiatrist.
12          Q.   Are there any other areas of the report for
13     which you feel that you were not qualified to give
14     individual expert opinion?
15          A.   I didn't work with the suicidality of the
16     inmates.  I reviewed the emergency response of the
17     suicide patients and other patients there.  And
18     certainly looked at the timeliness.  As far as suicide
19     prevention and adequacy of care, I relied on
20     Joel Dvoskin.
21          Q.   So the -- certain areas regarding suicidality
22     you feel you're not qualified to give individual expert
23     opinion on?
24          A.   I felt that -- yes, I don't think feel that
25     I'm a suicidal expert.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1       Q.   Any other areas of the report for which you
2  felt that you would not be individually qualified?
3       A.   There were areas where they looked at
4  consistency of diagnosis.  I don't diagnose.
5       Q.   Which sections of the report related to
6  consistency of diagnosis?
7       A.   I couldn't tell you what page it's on.  I know
8  it was a quality assurance indicator, and, you know, I
9  looked at it as a quality assurance indicator.  But I
10  know that -- I mean, I don't have this report listed out
11  as to what page each item is on.  I'd have to find it
12  for you.
13            But I know that Joel Dvoskin and Dr. Scott
14  looked at that issue.  And I may have pointed it out
15  from a quality assurance meeting and brought it to them,
16  and then they would have looked at medical records.
17       Q.   My question is, is which sections of the
18  report --
19       A.   Did I do?
20       Q.   Which sections of the report contain issues
21  related to consistency of diagnosis?
22            MS. VOROUS:  Asked and answered.
23            THE WITNESS:  I don't know.  I'd have to read
24  the whole report and find it for you.  I just can't tell
25  you just right now.

1   BY MR. FISCHER:

2       Q.   Would it be in several sections?

3            MS. VOROUS:  Same objection.  Asked and

4   answered.

5            THE WITNESS:  I don't know.  I don't even know

6   if it's in there.

7   BY MR. FISCHER:

8       Q.   Okay.  You said earlier that you were asked to

9   offer opinion as to whether the system was

10  constitutional; is that correct?

11      A.   Yes.

12      Q.   What are -- what is the measure of whether a

13  system is constitutional, in your opinion?

14      A.   Whether the inmates have access to care,

15  whether they have benefit of a physician judgment,

16  whether they receive the care that's ordered, and

17  whether or not there are no deliberate omissions in care

18  that would create harm to a patient.

19      Q.   Anything else?

20      A.   No.  That's what I would use.

21      Q.   Go through those.

22           First you said "access to care."  What do you

23  mean by "access to care"?

24      A.   The right of the inmate to access care when

25  they feel that they need it.

1       A.   Of course.

2            MR. FISCHER:  Exhibit 6.

3            (Plaintiffs' Exhibit 6 was marked for

4             identification.)

5   BY MR. FISCHER:

6       Q.   Exhibit 6 is another e-mail from Patrick

7   McKinney.  It appears to be a chart.  In one column,

8   date; the other column, institution.

9            Do you recognize the chart?

10      A.   Yes.

11      Q.   Or what it -- and what is the information

12  contained on that chart?

13      A.   That's the site visit that we went to.

14      Q.   Did you attend all of these site visits?

15      A.   I didn't always attend them when the group

16  went, as it said.  I went to California Women's on

17  June 26th and Corcoran on June 27th and 28toh.

18      Q.   And both of those were separate from Dr. Scott

19  and Dvoskin?

20      A.   Yes.

21           And I didn't go to the visit in Centinela.

22      Q.   Why didn't you go to Centinela?

23      A.   I had problems with my plane.

24           MS. VOROUS:  The plane had problems.

25           THE WITNESS:  The plane had problems, and I

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    didn't get in until very, very late that night, and the
2    group had already left.  And so I would have gotten up
3    early the next morning to go, but I would have had to
4    get up at 4:00 and they finally said to me don't bother.
5    BY MR. FISCHER:
6        Q.   Did you make an effort to return to Centinela
7    at a later date?
8        A.   No.  They told me that it was a very small
9    desert facility, and that they had done my part while
10   they were there.
11            And I didn't go to Pelican Bay either.
12       Q.   Why didn't you go to pelican bay?
13       A.   I was in an accident.
14       Q.   Did you attempt to return to Pelican Bay at a
15   later date?
16       A.   No.  I talked to Patrick about it.
17            MS. VOROUS:  Objection.
18            THE WITNESS:  No.
19   BY MR. FISCHER:
20       Q.   Is there a reason that you didn't go to
21   Pelican Bay at a later date?
22       A.   There weren't sufficient crisis beds or ad seg
23   beds.  It was a very small mental health area.
24       Q.   Defendants' counsel told you that?
25       A.   I actually saw a grid.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1      Q.   The other institutions listed on here, you did

2   attend on the dates identified?

3      A.   Yes.

4      Q.   Okay.  In your report on the tours, it says

5   that you and the other experts interviewed patients; is

6   that correct?

7      A.   Yes.

8      Q.   Can you just explain the process for

9   interviewing patients on the tour?

10     A.   My process was generally to interview inmates

11  that were housed in administrative segregation, although

12  at one point I interviewed inmates at Corcoran that were

13  housed in protective custody, protective housing because

14  it was right next to the ad seg units.

15     Q.   Is this the SHU, segregated housing unit?

16     A.   I think so.  It could be.

17     Q.   How many -- in the course of your consulting,

18  how many individuals patients would you say that you

19  interviewed inside CDCR?

20     A.   On each visit I tried to interview five

21  patients.

22     Q.   That's a total of about 50 patients?

23     A.   Yes.

24     Q.   And to -- say you're in an administrative

25  segregation unit.  How would you identify which patients

1   to interview?

2       A.   I asked the LPT to indicate which patients

3   were EOP patients and were receiving meds.  Or sometimes

4   the psychiatrist, if there was a psychiatrist on the

5   unit.

6       Q.   And then what was the process?

7       A.   I would get a vest, I would go up to where the

8   patient was, and introduce myself.

9       Q.   Okay.  At cell front?

10      A.   At cell front.

11           I would tell them who I was and why I was

12  there.

13      Q.   What did you say?

14      A.   "My name is Jackie Moore.  I'm a registered

15  nurse.  I'm working with the attorney general's office.

16  We're going to evaluate the quality of mental and health

17  care at this facility.  I'm going to ask you about a few

18  questions about your care.  Do you care to talk to me?

19  Will you answer my questions?"

20      Q.   Did you mention the Coleman case?

21      A.   No.

22      Q.   Is it --

23      A.   I don't believe so.  I don't know for sure.

24      Q.   What if -- did any inmates patients refuse to

25  speak to you?

 1      A.    Rarely.  If one did, then I would just find
 2  another.  Rarely.
 3      Q.    Do you recall any patients having questions
 4  about who you were?
 5      A.    No, because I told them.  They wanted to --
 6  sometimes, regardless of what I told them, they wanted
 7  to know if I was going to come to work there the next
 8  day.  Was I going to come back, you know, those kind of
 9  questions.  I mean, even though I told them, I'm not
10  sure they always comprehended.  You know, "Are you going
11  to be a new here?  You ought to come here."  I mean,
12  they would get to the part where I'm a registered nurse.
13  "Oh, yeah, we need nurses."
14      Q.    Is that what they said, "We need nurses"?
15      A.    That's what they would say to me.  "Oh, yeah,
16  we need new nurses."
17      Q.    Did you ask them what they meant by that?
18      A.    No.  I just laughed.  I would say, "No, that's
19  not why I'm here."
20            There was always someone in attendance with me
21  when I did the interview.  They stepped back; they
22  didn't stand right next to me.  I stood at the side of
23  the door so I could hear.
24      Q.    Uh-huh.  Who -- who would be with you?
25      A.    It could be the LPT.  It could be the nursing

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    supervisor if that's who was giving me the tour of the

2    grounds.

3         Q.   Was there ever a custody officer there with

4    you?

5         A.   Never.  Never.

6         Q.   Was there ever someone from the attorney

7    general's office with you?

8         A.   No, never.

9         Q.   Ever anyone from CDCR counsel?

10        A.   No, but one time the secretary watched me and

11   I didn't know it.

12        Q.   The secretary watched you?

13        A.   The secretary.

14        Q.   The Secretary Beard?

15        A.   No.

16        Q.   This is the previous secretary,

17   Secretary Cate?

18        A.   Yeah, but he wasn't standing right there.  He

19   was in the general area.

20        Q.   Where was that?

21        A.   Salinas.

22        Q.   Did he join you on the tour at Salinas?

23        A.   No.  He just -- he was standing in the middle

24   of this area, and I was interviewing an inmate.

25        Q.   When did you find out it was Secretary Cate?

1    back.  I mean, we always had to have an officer so that

2    we could have access to the inmate, but they were never

3    right there with us; they always were back.

4        Q.   Was it your understanding they were able to

5    hear the discussions?

6        A.   No, they couldn't hear the discussion.

7             I could barely hear the discussions.

8        Q.   Do you recall how -- Dr. Dvoskin would

9    introduce himself during these interviews?

10       A.   No, I don't.  It was early on.  And I don't

11   know how he introduced himself.

12            I'm sure I introduced myself the way that I

13   said I do because that's what I've done for 35 years.

14       Q.   Sure.

15       A.   That's what I do.

16            I know he introduced himself.  I don't know

17   what else he said.

18       Q.   At the end of the interviews, did any of the

19   patients ask how you were going to use the information

20   that you received?

21       A.   I told them, and sometimes I didn't even take

22   their names down because I didn't want to get into

23   individual people in trouble.

24            I told them that it was just an informal

25   survey.  I was just interested in their opinion about

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   how the care was going.  I asked them how long they had

2   been on the unit, how often somebody came by and talked

3   to them about their welfare, what the welfare checks

4   consisted of, how often they saw their primary

5   clinician, how often they saw their psychiatrist, how

6   often did they get to IDTT meetings.

7          Did they go to group therapy.  If they didn't

8   go, why didn't they go.

9          Were they on any medications.  Did they have

10  side effects of the medications.  Did they know what the

11  side effects were.

12         Did they know how to call mental health for an

13  emergency.  And did they know how to call -- how did

14  they get medical care, because I wanted to make sure the

15  mental health patients got medical care, too.

16     Q.   Sure.

17     A.   And then at the end, I would ask them to rate

18  them.  Sometimes they would give me a number.  Sometimes

19  they would say the care is great.  Sometimes they would

20  split the scores.

21     Q.   Did some patients say the care was not great?

22     A.   They never said that about mental health.

23  They did say that about medical.

24     Q.   Interesting.

25         Did you tell them you'd be writing a report at

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   the end of your tour?

2        A.   I told them that we were here in the

3   institution and that we were going to various housing

4   units and interviewing various inmates at random, and

5   that -- you know, they were just happened to be picked

6   and would it be all right.  I mean, I always asked for

7   permission before I just assumed that they were going to

8   talk to me.

9        Q.   Sure.

10        A.   And I didn't put down any particular inmate in

11   my report.

12        Q.   Okay.  But they didn't know you were there to

13   write a report at the end of your tour?

14        A.   They knew we were doing an evaluation of that

15   facility, so...

16        Q.   A few more questions and then we can take a

17   break.

18        A.   I mean, these inmates were so used to being

19   talked to.

20        Q.   They were used to being talked to?

21        A.   Yeah.  I mean, when I would walk through the

22   yard, they would sometimes say, "Oh, she's with

23   Coleman."

24        Q.   Who would say that?

25        A.   The inmates.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1          I mean, if they saw a suit, that was their
2    assumption.
3          Q.   Did any inmates ever mistake you for being
4    with the special master team for Coleman?
5          A.   I never asked them what they thought.
6          Q.   Okay.  You said that you asked them a number
7    of questions about their clinician and their
8    medications.  And in the report, I noticed that you said
9    that their knowing their clinicians or their medications
10   was unusual.
11              Do you recall that?
12         A.   I didn't think it was unusual.  I thought it
13   was great.
14         Q.   Thought it was great.
15              Did you think that it indicated that they were
16   receiving an appropriate level of care?
17         A.   Yes, because they knew who the people were.
18   They knew who they had access to.
19         Q.   Are you aware of any studies that show that
20   whether the patient knows their psychiatrist or their
21   primary clinician is a -- an appropriate measure for
22   quality of care?
23         A.   I'm not aware of quality assurance studies as
24   such.
25         Q.   Are you aware of any quality assurance studies

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    or any studies that validate that whether a patient

2    knows what medication they're on is a measure of quality

3    of care?

4         A.   I'm not aware of any studies, but my personal

5    opinion is is that that's a good thing.

6         Q.   Are you aware of any studies as to whether

7    they expressed positive or neutral feelings or mixed

8    scores as an appropriate measure of the quality of care?

9         A.   I think that that's a study that's done in

10   hospitals all the time.  They ask inmates about

11   satisfaction.

12        Q.   Okay.  Do you think if that a patient knows

13   his clinician's name or the medications that he's

14   receiving, that is he receiving an appropriate level of

15   mental health care?

16        A.   Yes.

17             MR. FISCHER:  Okay.  Let's take a five-minute

18   break.

19             (Off the record at 10:10 a.m. and back

20              on the record at 10:18 a.m.)

21   BY MR. FISCHER:

22        Q.   Dr. Moore, you mentioned that you thought

23   whether the patient knew the name of their clinician or

24   the medications they were receiving is an indication of

25   quality of care, correct?

1        A.    Yes.

2        Q.    And you asked those questions during your

3  interviews; is that right?

4        A.    Yes.

5        Q.    Did you follow up to confirm that what the

6  patients told you was correct?

7        A.    No, I did not.

8        Q.    Is there -- in other systems that you

9  reviewed, do you use the same method of determining

10 quality of care?

11       A.    No.  It depends on what I'm looking at.  I

12 might ask different questions.

13       Q.    What were you looking at here that led you to

14 use this line of questioning?

15       A.    I was looking to see that patients that were

16 in administrative seg were seen by their preliminary

17 clinicians once a week, seen by their psychiatrist every

18 30 days, that they went to IDTT meetings, that they were

19 offered group therapy, that they were receiving their

20 meds.  That was the first question I asked, "Are you

21 taking any medications?"

22       Q.    Did you review records of each of the people

23 you interviewed to confirm what they were telling you

24 was correct?

25       A.    If I had an inmate that complained to me about

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        Q.   Who is Nate Mills?

 2        A.   He was an IT person.

 3        Q.   With which office?

 4        A.   I don't know.

 5        Q.   With defense counsel?

 6             MS. VOROUS:  Objection.  Asked and answered.

 7   BY MR. FISCHER:

 8        Q.   Was Nate Mills an IT person for defendants'

 9   counsel?

10        A.   He was sometimes on our tours.  He helped us

11   with IT issues.

12        Q.   But you don't know what office he was from?

13        A.   No.

14        Q.   And what was the outcome of those discussions

15   as to whether to enter this -- the data into the audit

16   tool?

17        A.   At first we were going to put all the data

18   into the audit tools.  And the attorney general asked us

19   to fill out the audit tools.

20             But then we didn't do that.  And we decided

21   that we didn't want to be that specific in our report,

22   that we wanted to be more global.  So we didn't have to

23   go through and do each and every.

24        Q.   Was any data entered into a computer system

25   from the audit tool?
```

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1          A.   Not by me.

2          Q.   Are you aware if it was entered by any of the

3   other consultants?

4          A.   I don't know.

5          Q.   Why did you think that you wanted to be more

6   global and less specific?

7          A.   You'd have to ask the attorney general.

8          Q.   So that was the attorney general's decision?

9          A.   That we were going to have a broader report

10  rather than specific.

11         Q.   How much time did you spend making this audit

12  tool, you individually?

13         A.   I don't know.  I don't know how many days we

14  worked on it, because we had meetings in Sacramento and

15  then we had phone calls.  And I really don't know.  I'd

16  have to look at my invoices, and I might be able to tell

17  you.  But I couldn't tell you off the top of my head.

18         Q.   Would you say you spent more than 20 hours?

19         A.   I don't know.

20         Q.   Did you find the audit tool to be useful on

21  your tours?

22         A.   I used all of the questions.  I used this to

23  make sure that I asked every question.  Before I left an

24  area, I would say, "Wait a minute.  Let me look at my

25  audit tool and make sure I asked everything here."  And

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1   in that report?

2        A.   No.

3        Q.   Next one, quality management audit tool on

4   page 18.

5        A.   Yes.

6        Q.   This was an area you looked at?

7        A.   Yes.

8        Q.   Same thing with medication management?

9        A.   Yes.

10        Q.   And emergency response?

11        A.   Yes.

12        Q.   I want to turn back to Exhibit 4.  This is the

13   joint report.

14             Are there specific parts of this report that

15   you authored?

16        A.   Yes.  I contributed to it, yes.

17        Q.   Are there any sections in which you were the

18   primary author?

19        A.   No.

20        Q.   Who was the primary author?

21        A.   I don't know.  It could have been Dr. Scott or

22   Dr. Dvoskin.

23        Q.   You were not the primary author on any of the

24   sections?

25        A.   No.  I had input.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1        Q.   When revisions were made to the report, how
2    was that handled by the -- by the group?
3        A.   They sent an e-mail out with the draft of the
4    report.  They asked if we would review it and -- and
5    respond.
6        Q.   Were defendants' counsel included on those
7    e-mails?
8        A.   I believe I sent you the e-mails that I
9    received.  I can't recall without seeing them who was
10   included.
11       Q.   Were there times when it was just the experts
12   sharing information?
13       A.   I'm sorry.  Without seeing the e-mails, I
14   don't recall.
15       Q.   Okay.  Dr. Moore, take some time going through
16   some of the findings in your report.
17       A.   Okay.
18       Q.   Let's start on page 11 of the report.
19       A.   I'm going to use my copy, if you don't mind.
20   Unfortunately, I dropped it this morning on my way up.
21       Q.   Okay.  Let me know when you're ready.
22            MS. VOROUS:  I prefer that you use the
23   exhibit.  If you need to look at something, we can look
24   at it.  But use the exhibit.
25            THE WITNESS:  Okay.  It's going to take me

1        Q.    In your opinion?

2        A.    "Unavoidable" means it's unforeseen.  You

3   can't predict it.  Maybe there are insufficient staff in

4   the area.

5        Q.    Can unavoidable staff shortages affect mental

6   health care for prisoners?

7        A.    Yes.

8        Q.    In that same paragraph it says that -- the

9   temporary -- it says:  "Staffing shortages were

10  temporary unavoidable" -- "temporary and unavoidable."

11             Have you followed up on the staffing shortages

12  that you identified on your tours?

13       A.    Yes, I did.

14       Q.    Were they all temporary?

15       A.    Many of them were, yes.  They've hired other

16  people.  And they are instituting a program with

17  San Quentin for telemedicine.

18       Q.    Are you aware of any institutions where there

19  are still staff shortages?

20       A.    No, I have not done a staffing study of

21  California staffing.  I don't know that.

22       Q.    So you looked staffing at the time of your

23  tours?

24       A.    At the time of our tours.

25       Q.    Did you look at staffing of any of the

 1  facilities that you didn't tour?

 2      A.   No.

 3      Q.   How did you determine which institutions you

 4  were going to tour?

 5      A.   It was a collective decision made by the

 6  group, primarily by Steve Martin.

 7           I think we all had input, but Steve Martin

 8  made the final decision.

 9      Q.   Were there any institutions that you thought

10  were essential to visit?

11      A.   Most of the big ones that had crisis units.

12      Q.   Did defendants' counsel offer any input?

13           MS. VOROUS:  Objection to the extent that

14  calls for communications between Dr. Moore and your

15  attorney.  You're not to answer that question.

16  BY MR. FISCHER:

17      Q.   On page 12 at the top, it says:  "In our

18  opinion, the CDCR mental health staffing plan will

19  provide adequate resources to meet the mental health

20  needs of inmates."

21           MS. VOROUS:  So page 10 of the report or

22  page 10 of the --

23           MR. FISCHER:  I'm going to go off the report

24  numbers rather than the docket.

25           MS. VOROUS:  What page did you say?

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

 1        A.   Yes.

 2        Q.   And what about -- you said also affects the

 3   IDTT process.   What did you mean by that?

 4        A.   That may not have been true at Salinas.   That

 5   was true at another facility.

 6        Q.   That staffing shortages would affect IDTT

 7   meeting --

 8        A.   Yes.

 9        Q.   And how did it affect the IDTT meeting?

10        A.   The psychiatrist wasn't always present.

11        Q.   And you think the psychiatrist is an important

12   member of the interdisciplinary treatment team for

13   patients?

14        A.   Yes.

15        Q.   Were are they an important member?

16        A.   Because they make adjustments to the

17   medication.

18        Q.   And in the same paragraph, there appears to be

19   a suggested solution with the introduction of

20   telepsychiatry to support the efforts of the on-site

21   psychiatrists.

22             Was that a recommendation of the -- you and

23   the other consultants?

24        A.   I'm sure it was.

25        Q.   Did you make that recommendation?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1        A.   No, but I would have.

 2        Q.   What is the benefit of telepsychiatry in a

 3   place like Salinas Valley?

 4        A.   It's a difficult place for -- to recruit

 5   psychiatrists.  Psychiatrists routinely don't want to

 6   live there.  The inmates don't want to be transferred to

 7   another facility.  They don't like to leave their cell

 8   mate or cell block, whatever.  Telepsychiatry works

 9   very, very well in almost every prison system that I

10   know of in the United States.

11        Q.   When you say "works very well," what do you

12   mean?

13        A.   They use telepsychiatry for -- to do

14   psychiatry at remote facilities.

15        Q.   So to provide psychiatric --

16        A.   To provide psychiatric services.

17        Q.   Are you aware that telepsychiatry still hasn't

18   been instituted at Salinas Valley State Prison?

19             MS. VOROUS:  Objection.  Lacks foundation.

20             THE WITNESS:  I don't know.

21   BY MR. FISCHER:

22        Q.   Did you find out whether telepsychiatry has

23   been implemented there?

24        A.   No.  I was not asked to.

25        Q.   Okay.  Would that have been important

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   you discuss this with staff at the institution?

2         A.   Yes.

3         Q.   What did they tell you?

4         A.   They said that there were staffing shortages.

5   They were working on system to put in place where they

6   were tracking medication renewals.  In their QI meeting,

7   they were getting better.

8         Q.   Did you follow up after the tour at CMC to

9   find out whether a new psychiatrist had been hired?

10        A.   A new psychiatrist has been hired.

11        Q.   How many -- what -- how many psychiatrist

12  vacancies were at CMC?  Do you remember?

13        A.   I would have to look at my notes.

14        Q.   Was it more than one?

15        A.   I don't know.

16        Q.   Okay.  Number 8 on the same page, at the

17  Substance Abuse Treatment Facility, SATF.

18             It says:  "Mental health staff reported

19  dramatic mental health staffing shortages."

20             Did you observe this during your SATF tour?

21        A.   There was staffing shortages.  I'm not sure I

22  would use the word "dramatic."  I did observe IDTT

23  meetings where there was not a psychiatrist in

24  attendance.

25             That did not mean that the psychiatrist did

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   not adjust the patient's medication.  He just was not

2   present at the IDTT meetings.  It was another step that

3   they went to.

4        Q.   In your opinion, would it have been better for

5   the psychiatrist to be present with the other treatment

6   team members to discuss medication?

7        A.   It would have been better, but the care was

8   still rendered.

9        Q.   Okay.  You went to SATF in November?

10       A.   In November.

11       Q.   Are you aware of what efforts have been taken

12   to address the staffing shortages at SATF?

13       A.   No, I'm not.

14       Q.   Are you aware of whether any additional hiring

15   has been done?

16       A.   No, I'm not.

17       Q.   Okay.  Move forward to page 16, if that's

18   okay.

19            On page 16 near the bottom of the page it says

20   that the Central California Women's Facility, CCWF,

21   "We" -- the experts -- "were informed that only 15

22   groups were being offered to CCCMS female inmates

23   whereas nearly a hundred groups had previously been

24   provided."

25            Did you observe this on the tour?

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1        Q.   The specific number of hours you said you
2   don't know?
3        A.   Yes.
4        Q.   But to have access to some groups would be
5   appropriate -- would be necessary for CCCMS inmates?
6        A.   Yes.
7        Q.   And does this opinion apply in the CCCMS
8   general population?
9        A.   Yes.
10        Q.   And would it apply to CCCMS inmates in
11   segregation?
12        A.   CCCMS inmates in segregation, I don't believe
13   have groups at this point.  I'm not sure.
14        Q.   Do you think it's important for them to have
15   access to groups?
16        A.   Yes.  If they'll come out, yes.
17        Q.   Do you have concerns that in certain ASUs in
18   California prisons, there is no access to groups for
19   CCCMS prisoners?
20        MS. VOROUS:  Objection.  Overly broad.  Vague
21   and ambiguous.  Lacks foundation.
22        THE WITNESS:  I didn't evaluate the CCCMS
23   inmates, so it's very difficult for me to answer these
24   questions because Dr. Dvoskin did this.  And so I'm not
25   as familiar with this ground, and I feel uncomfortable

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   giving you answers.

2   BY MR. FISCHER:

3       Q.   You don't have any opinion as to whether

4   CCCMS --

5       A.   No, I don't.

6       Q.   -- inmates in ad seg require groups?

7       A.   No.

8            MS. VOROUS:  Let him finish his question.

9            THE WITNESS:  No, I have no opinion.

10  BY MR. FISCHER:

11      Q.   Okay.  Did you observe any other staffing

12  problems on the tours that you went on that we have not

13  already discussed?

14           MS. VOROUS:  Objection.  Vague and ambiguous

15  as to what -- "staffing problems."

16           Answer if you can.

17           THE WITNESS:  I don't recall any others.

18  BY MR. FISCHER:

19      Q.   Is it possible that there is another

20  institution that had staffing problems?

21           MS. VOROUS:  Objection.  Vague and ambiguous.

22  Lacks foundation.

23           THE WITNESS:  I don't recall without my

24  reports.

25           MR. FISCHER:  This is Exhibit 10.

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1    BY MR. FISCHER:
 2         Q.   Was part of your role with this consultancy to
 3    provide recommendation as to ways to improve care?
 4         A.   We did -- at each exit conference, we provided
 5    recommendations.
 6         Q.   At each institution there was an exit
 7    conference at which you provided recommendations?
 8         A.   Yes.
 9         Q.   Did you follow up after that exit conference
10    at any point to determine whether those recommendations
11    had been implemented?
12         A.   No.
13         Q.   Go back to page 102411, eighth line.
14              In your typewritten notes, you write:  "If
15    urgent problem, seen day of arrival.  If not, maybe seen
16    second or third day."
17              This is under the "Reception Center" heading.
18    What does this note mean?
19         A.   These are new intakes that were coming in.
20    They have 72 hours to complete the intake.
21              If the patient had an urgent problem, they
22    were seen that day.  If not, they may be seen the second
23    or third day.
24         Q.   Where did you get this information?
25         A.   Observed and reviewed 10 intake records.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          A.    Continuity.  I mean, continuity occurred; it
2     just took another step.
3          Q.    It was added workload for the nurses at the
4     institution?
5          A.    Yes.
6          Q.    Were the nurses complaining about their
7     workload?
8          A.    They're complaining about just this issue.
9          Q.    Which added to their workload?
10         A.    Just this issue.  And I can't say all the
11    nurses.  The nurse that I spoke to.
12         Q.    Okay.  Did you speak with any other nurses?
13         A.    I spoke to the nurses that were on duty on the
14    day that I was at the unit.
15         Q.    One more question, 102412, one page back.
16               You said that you -- you reviewed restraints,
17    the use of restraints?
18         A.    Yes.
19         Q.    Just below the middle of the page, it says:
20    "Level of restraints for IDTT meetings based on inmate's
21    behavior, which is very positive."
22               What did you mean by that?
23         A.    In a lot of the IDTT meetings, they would
24    bring inmates that were handcuffed behind them and they
25    would have to sit in a chair, you know, in front of

1    people or they would be put in therapeutic modules.

2         Q.   This in the crisis bed unit at RJD?

3         A.   This was in a IDTT meeting.  Not exactly sure

4    where it was.

5         Q.   Just up the page on there, it says:

6    "IDTT meetings crisis unit."

7         A.   So maybe it was a crisis unit.

8         Q.   I'm sorry.  So continue.

9         A.   And if the inmate was not an ad seg inmate,

10   and if they could behave, they walked into the room and

11   sat down.

12        Q.   And you thought that was a positive?

13        A.   I did.  I did.

14        Q.   Why is that?

15        A.   I think that the inmate felt good about being

16   able to walk in and sit down at a table without being

17   handcuffed.

18        Q.   Do you think it affects their participation --

19        A.   I do.

20        Q.   -- if patients are cuffed during IDTT meetings

21   in the crisis unit?

22        A.   Yes, I do.  Although some inmates need to be

23   cuffed.  I would never want to put staff safety in

24   jeopardy.

25        Q.   So, in this case, there was a judgment made as

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1   to whether the individual --

 2         A.    Could be cuffed or could come in freely.

 3         Q.    And you thought that was a positive practice,

 4   as you say?

 5         A.    That was my opinion.

 6         Q.    In the next line, you say:  "If inmate is an

 7   ad seg inmate, then would need to be restrained."

 8               Does this mean that --

 9         A.    If the inmate's an ad seg inmate, then they

10   have to be cuffed, period.

11         Q.    Was there any consideration as to why the

12   inmate was placed in ad seg?

13         A.    Well, there would have been some custody

14   violation for him to be in ad seg, the custody rule.

15         Q.    Are you aware that some inmates in ad seg are

16   there for their own safety?

17               MS. VOROUS:  Objection.  Lacks foundation.

18               THE WITNESS:  I only know what the rule is.

19   And no, I didn't know that.

20   BY MR. FISCHER:

21         Q.    Do you have any concerns about inmates in

22   ad seg for their own safety being cuffed when placed in

23   an MHCB or IDTT meeting?

24               MS. VOROUS:  Objection.  Vague and ambiguous.

25               MR. FISCHER:  Let me try again.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1    BY MR. FISCHER:
 2         Q.   In your opinion, do you think an individual
 3    assessment should be done for ad seg inmates placed in
 4    ad seg for their own safety as to whether they should be
 5    cuffed for MHCB, IDTT meetings?
 6         A.   Yes.
 7         Q.   Would the same apply for inmates coming from
 8    ad seg who have been placed in ad seg pending transfer
 9    to a general population or SNY yard?
10         MS. VOROUS:   Objection.   Lacks foundation.
11    Compound question.
12         THE WITNESS:   These are really getting into
13    questions you should be asking Joel Dvoskin.
14    BY MR. FISCHER:
15         Q.   Do you have an opinion on this?
16         A.   No.
17         Q.   Okay.   Were there any other institutions that
18    you visited for which you visited MHCBs at which they
19    had this positive practice of assessing an individual
20    where the individual needed to be cuffed for the IDTT
21    meeting?
22         A.   No.   That was the only one that I saw.
23         Q.   Okay.   And you observed IDTT meetings in the
24    other crisis units that you --
25         A.   As often as I could.
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1   places CDCR in the upper echelon of state prison mental
 2   health systems."
 3          What -- what was your methodology for reaching
 4   that conclusion?
 5       A.   For myself -- and I can only speak for
 6   myself -- it was the work that I have done in Indiana,
 7   North Carolina, Kentucky, New Mexico, Utah, Maine, and
 8   Delaware.
 9       Q.   And in all these institutions, you've looked
10   at the state prison mental health system?
11       A.   As part of the component of the review that I
12   was doing.  I looked at the entire state.  I wasn't just
13   hired to look at mental health.
14       Q.   So you listed seven states?
15       A.   I listed seven states.  I could probably list
16   more.
17          Puerto Rico.
18       Q.   Did you look at any current data from those
19   states to do a contemporary comparison between the state
20   mental health systems?
21       A.   I have data from those systems.  I have data
22   from North Carolina, New Mexico, Puerto Rico.
23       Q.   Did you use that data?
24       A.   And I have Indiana data that's current.
25          Did I use that data?  No.  I wasn't asked to
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1   do that.

 2          Q.   At the bottom of page 14, there's some

 3   discussion about the special master monitors.

 4              It states that the special master monitoring

 5   results, quote, in scrutiny not of constitutional

 6   standards but of the department's own policies and

 7   procedures.

 8              Are you aware that the program guide is a

 9   court-ordered remedy in the Coleman case?

10              MS. VOROUS:   Objection.   Lacks foundation.

11              THE WITNESS:   If you're telling me that, yes,

12   I am aware of that.

13   BY MR. FISCHER:

14          Q.   Do you have an opinion as to what the special

15   master should be doing instead of looking at the program

16   guide standards?

17          A.   I think the program guide standards or the

18   interpretation of the timelines might be too exacting;

19   that if someone is one day late, then they are in

20   noncompliance, where in the free world or in other

21   prison systems, they're not held to such rigid

22   requirements.

23          Q.   Do you have specific problems with the program

24   guide guidelines?

25          A.   In some of them, yes, I do.

1    the special master had asked for the same information?

2         A.   Or similar.

3         Q.   And was that information that you needed in

4    order to make your -- to form your opinions?

5         A.   I don't know what the special master asked

6    for.  I never looked at their binders.

7         Q.   Did the data that you and the other

8    consultants asked for, was that information that you

9    used in order to form your opinions in the case?

10        A.   It was information from the audit tools.

11        Q.   And that was information that you used in

12   order to reach your conclusions as to whether the care

13   is constitutional?

14        A.   Yes.

15        Q.   So my question is:  Is some of that same data

16   also data that the special master requests in their

17   monitoring?

18             MS. VOROUS:  Objection.  Asked and answered.

19             THE WITNESS:  I don't know what he asks for.

20   BY MR. FISCHER:

21        Q.   Okay.  You -- I understood that you just said

22   that some of the data they had already collected for the

23   special masters?

24        A.   That's what the staff said.

25        Q.   On the same page, it says:  "Second, any

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1    positive innovation that the department wishes to employ

2    to improve its services to inmates with mental illness

3    becomes a criterion against which their compliance is

4    measured."

5             Further down:  "This serves as a disincentive

6    to system improvements."

7             Were you told any examples of positive

8    innovations that were not implemented because of the

9    special master's involvement?

10        A.    Please redirect that question to Dr. Dvoskin.

11        Q.    Why am I redirecting that question to

12   Dr. Dvoskin?

13        A.    Because he would be the author of that.

14        Q.    He wrote that.  Okay.

15             Do you have a different opinion?

16        A.    No.  I just didn't write that.

17        Q.    Do you agree with this opinion?

18        A.    Yes.

19        Q.    Do you have any examples of any positive

20   innovations that weren't implemented because of special

21   master's involvement?

22        A.    No, I don't.

23        Q.    Okay.  Pages 15 and 16 under the section on

24   the correctional clinical case management system

25   patients, CCCMS -- CCCMS.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1          A.   These would not have been sections that I
 2   wrote.
 3          Q.   Did you interact with the CCCMS inmates?
 4          A.   Not specifically, no.
 5          Q.   Did you interact with CCCMS inmates in
 6   administrative segregation?
 7          A.   If they were there and I got them by accident.
 8   Usually I wanted the EOP inmates.
 9          Q.   You weren't interested in the CCCMS inmates?
10          MS. VOROUS:  Objection.  Misstates her
11   testimony.
12          THE WITNESS:  I was interested but, I was more
13   interested in the EOP patients.
14          Dr. Dvoskin had that responsibility.  You're
15   asking me about sections that I didn't review.
16   BY MR. FISCHER:
17          Q.   Okay.  I'm just trying to get a sense of which
18   sections those are.
19          A.   Do you want me to tell you the ones I
20   reviewed?
21          Q.   It will be easier as we go.  I don't want to
22   waste more time.
23          But this section on CCCMS you did not review,
24   you have no opinion --
25          A.   No.
```

1        Q.    -- on these issues?

2              And that's from page 15 to 16?

3        A.    Correct.

4        Q.    On page 16 is the EOP discussion.

5              Did you have any involvement on this?

6        A.    Yes.

7        Q.    You did.  Okay.

8              Did you write portions of this section, the

9    EOP section?

10       A.    I didn't write any of it.  Verbally told them.

11   And they wrote notes from their conversations with me

12   and dialogues of exit conferences.

13       Q.    Verbally told who?

14       A.    Dr. Dvoskin and Dr. Scott.

15       Q.    Okay.  So you didn't write this section or

16   anything --

17       A.    I didn't write anything on this report.

18       Q.    The report was finalized on January 4th.  In

19   the weeks prior to the finalization of the report, were

20   there any sections of the report that you felt

21   uncomfortable with?

22       A.    No.

23       Q.    There were none?

24       A.    No.

25       Q.    You agreed with -- with everything that

1   BY MR. FISCHER:

2       Q.   Doctor, this is an e-mail dated August 21st,

3   2012, from Patrick McKinney and your name is on the "To"

4   list.

5            Do you recognize this e-mail?

6       A.   Yes.

7       Q.   It provides an agenda for the August 21st

8   meeting at 1515 S Street.

9       A.   Yes.

10      Q.   Did you attend a meeting on August 21st in

11  Sacramento?

12      A.   Yes.

13      Q.   And on the agenda, the first item, 10:00 to

14  11:00 a.m., it says:  "Discussions concerning overall

15  systemic constitutional findings of the mental health

16  care system based on the 10 site visits.  Includes

17  representatives of the governor's office, CDCR,

18  Department of Finance, and Department of State

19  Hospitals."

20           Do you recall this meeting?

21      A.   Yes.

22      Q.   At this meeting, was -- were systemic

23  constitutional findings discussed?

24      A.   We discussed our findings.

25      Q.   At that point, there had been 10 site visits;

1   is that correct?

2       A.   Correct.

3       Q.   When was the decision made to go to three more

4   institutions?

5       A.   We only went to two more, but it was following

6   this meeting.  But I don't know exactly what date.

7       Q.   What was your understanding of why you went to

8   three more -- two or three more?

9       A.   I don't recall.

10          I do know there was a discussion.  I just

11  don't recall the reason.

12      Q.   Were you part of that discussion?

13      A.   Yes.

14      Q.   Did you indicate that you wanted to visit more

15  institutions?

16      A.   No, I didn't.

17      Q.   At that point, had you reached your conclusion

18  as to systemic constitutional findings?

19      A.   On the 10 sites or eight sites -- nine, I

20  guess, sites that I visited, yes.

21      Q.   What about as to the CDCR system as a whole?

22      A.   I felt that was constitutionally adequate.

23      Q.   What was your basis for finding the mental

24  health care at the institutions that you hadn't toured

25  constitutionally adequate?

1        A.   We did a sample of the institutions.  It was

2   never our intent to visit every single institution.

3        Q.   Did you ever ask to see any data from the

4   other institutions?

5        A.   No.

6        Q.   Prior to the final visits at CMC and SATF, you

7   had already made your conclusion that CDCR had not acted

8   with systemic deliberate indifference?

9        A.   I did, yes.

10        Q.   Did anybody go to Pelican Bay --

11        A.   Yes.

12        Q.   -- from the consultants team?

13        A.   Yes.

14        Q.   Who went?

15        A.   Joel Dvoskin.

16        Q.   Only Joel Dvoskin?

17        A.   Yes.

18        Q.   Was it your understanding that Dr. Dvoskin,

19   Dr. Scott had reached the same conclusion as to

20   constitutional care as of the August 21st meeting?

21        A.   Yes.

22        Q.   Did anyone ever question as to the necessity

23   of going to these other institutions?

24        A.   I'm not aware.  I don't recall.

25        Q.   Do you recall whose idea it was to go to the

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1    frequently.  The first time I saw it, I thought it was

2    good idea.

3         Q.   First time you saw it where?

4         A.   In Connecticut.

5         Q.   Why did you think it was a good idea?

6         A.   Because they could bring inmates out from

7    various classifications and have group therapy with them

8    and the inmates would feel safe, whereas they might not

9    be able to get this grouping of inmates together.

10        Q.   Is it your opinion that the therapeutic

11   modules can be overused, used in situations where

12   they're not required?

13             MS. VOROUS:  Objection.  Vague and ambiguous.

14   Lacks foundation.

15             THE WITNESS:  I don't know that.  I don't know

16   that they -- I'm trying to think if I saw group therapy

17   where they didn't use therapeutic modules.

18   BY MR. FISCHER:

19        Q.   In the California prisons?

20        A.   In the California prisons.

21        Q.   What about in the other states?  Philadelphia,

22   Connecticut, Indiana, North Carolina, Kentucky,

23   New Mexico, Utah, Maine, Delaware, Puerto Rico?

24        A.   Puerto Rico didn't use modules.  There was not

25   an emphasis on group therapy as there has been here in

 1   the state of California in many of the other states that

 2   I've gone to.

 3        Q.   What about individual treatment?

 4        A.   Individual treatment, yes.

 5        Q.   And did any of these other states use

 6   therapeutic modules for individual treatment?

 7        A.   No.

 8        Q.   And that's all the states that you --

 9   including Connecticut?

10        A.   I'm sorry.  I didn't hear you.

11        Q.   All the states other than California that

12   you've worked in the adult prisons have not used

13   therapeutic modules for individual treatment?

14        A.   Not that I can remember.

15        Q.   Okay.  First time you saw the therapeutic

16   module -- therapeutic modules here in California, what

17   was your -- what was your response?

18             MS. VOROUS:  Objection.  Vague and ambiguous.

19             If you can, answer that question.

20             THE WITNESS:  I refer to them as a cage.

21   BY MR. FISCHER:

22        Q.   Did you have any other opinions or thoughts

23   about their use?

24        A.   On one of my reports, I made some notations of

25   it.  It was a very early report.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1              (Plaintiffs' Exhibit 12 was marked for
 2               identification.)
 3          MR. FISCHER:  Exhibit 12.
 4  BY MR. FISCHER:
 5      Q.   Exhibit 12 are handwritten notes.  At the top
 6  it says "SAC Folsom."
 7           Does this refer to your CSP Sacramento tour on
 8  February 29 and March 1st?
 9      A.   Yes.
10      Q.   And I'll direct you to DEXP103015.
11           At the bottom, it says -- last four lines:
12  "Sometimes group's not dynamic.  Cages - terrible hard
13  metal stools.  Hard to be in cage for two hours."
14           Were those your impressions?
15      A.   I knew you were going to find this.
16           Yes.  I knew you were going to find this.
17  This was one of my early, early visits before I
18  understood the therapeutic modules.
19      Q.   This was one of your initial impressions of
20  the modules?
21      A.   Yes.  It may have been the first time.
22      Q.   The first time?
23      A.   That I had seen this -- these therapeutic
24  modules in California.
25      Q.   And so can you tell me a little more about
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1    during your tours?
 2              MS. VOROUS:  Let me clarify.  During her
 3    tours -- not Mule Creek.
 4    BY MR. FISCHER:
 5         Q.   I recognize that the experts did not go to
 6    Mule Creek.  But were there other similar treatments
 7    settings that you observed at other institutions?
 8         A.   Not that I'm aware of.
 9         Q.   Not that you're aware of?
10         A.   Not that I recall.
11         Q.   In this photograph, there are three modules
12    filled with inmates with two clinicians conducting
13    one-to-one treatments.
14              Did you observe individual treatment being
15    conducted in this manner on any of your tours?
16         A.   Not that I recall.  Sorry.
17         Q.   Do you have any concerns about conducting
18    one-to-one treatment in such a setting?
19              MS. VOROUS:  Objection.  Lacks foundation.
20    Argumentative.
21              Go ahead.
22              THE WITNESS:  My concern would be the
23    confidentiality of the interview.
24    BY MR. FISCHER:
25         Q.   Because they're so close?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        A.    Because they're so close.
 2              And especially the -- inmate at the end has
 3   nothing better to do than to listen.
 4        Q.    Inmate on the left side is just listening?
 5        A.    Right.
 6        Q.    Would a more appropriate treatment space be an
 7   individual office for these individual contacts?
 8              MS. VOROUS:  Objection.  Lacks foundation.
 9   Speculative.  Argumentative.
10              THE WITNESS:  Do you want an answer?
11   BY MR. FISCHER:
12        Q.    Uh-huh.
13        A.    If it was available.
14        Q.    You're aware from some of your tours that
15   individual treatment space is not available at some of
16   the institutions at this time?
17        A.    Yes.
18        Q.    Let me go back for one more minute to
19   Exhibit 13.
20              In your experience what is the impact that --
21   or the effect of having one-to-one contacts in a
22   nonconfidential setting similar to what you see here?
23              MS. VOROUS:  Objection.  Lacks foundation as
24   far as her experience in having this kind of experience.
25              THE WITNESS:  The inmate will not be as
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1   truthful or forthcoming with their issues.

2   BY MR. FISCHER:

3       Q.   And that would negatively affect the

4   treatment?

5       A.   That would affect the treatment.

6       Q.   Okay.  Move to page 19 of the report.

7            Subsection B versus the one EOP section,

8   states:  "At California Institution for Men, CIM.  There

9   were some inmates waiting for EOP special needs yards

10  beds reportedly housed in administrative segregation

11  unit for their own protection; not because they posed a

12  danger to others."

13           Did you observe this during your tour of CIM?

14      A.   I didn't look at special needs yards, so I

15  wouldn't be aware of this.

16      Q.   Did you observe any administrative segregation

17  units?

18      A.   Yes.

19      Q.   In any of the ad seg units, were inmates

20  waiting for EOP special need yard beds housed?

21      A.   I would have to look at my notes.  I don't

22  recall.

23           MR. FISCHER:  Exhibit 14.

24           (Plaintiffs' Exhibit 14 was marked for

25            identification.)

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

1         A.    Okay.

2         Q.    Are you aware?

3         A.    Yes.  Yes.

4         Q.    Okay.  Did you visit the administrative

5    segregation unit at CIM?  I think you said you did.

6         A.    Um.

7         Q.    Direct you to top of the 10266, top two

8    issues:  "EOP not transfer fast enough.  That's not

9    getting 10 hours RX" --

10        A.    Treatment.

11        Q.    "RX" is treatment?

12        A.    Treatment.

13        Q.    "Now nine in seg."

14              Were you documenting that there were nine EOPs

15   awaiting transfer in this segregation unit?

16        A.    Yes.

17        Q.    And they were not there for disciplinary

18   reasons; is that your understanding?

19        A.    Yes.

20        Q.    They were there because they were awaiting for

21   a bed to open?

22        A.    Yes.

23        Q.    Okay.  On the page just before that, 102620,

24   near the bottom you write:  "Lack of beds."

25              Is this related to same issue?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
1        A.   Lack of beds in general population.
2        Q.   So there were lack of beds for EOP and there
3   were lack of beds for -- related to the general
4   population?
5        A.   Yes.
6        Q.   Were there more inmates than appropriate beds?
7        A.   Yes.
8        Q.   It's your understanding?
9             Were there more EOPs than appropriate beds in
10  the system?
11            MS. VOROUS:   Objection.
12  BY MR. FISCHER:
13       Q.   Trying to understand what your --
14       A.   More EOPs -- they couldn't transfer EOPs to
15  other institutions.
16       Q.   For lack of available beds?
17       A.   Lack of available beds.
18       Q.   Okay.  Do you recall, did you interview any of
19  the EOPs in segregation awaiting transfer when you were
20  at CIM?
21       A.   This -- these may have been the inmates on
22  page 102626.
23       Q.   Uh-huh.
24            Based on your interviews with these inmates,
25  were you able to reach an opinion as to whether they
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

1    were receiving appropriate level of care treatment?

2         A.   They were sick inmates.  They were very sick

3    inmates.  And --

4         Q.   Do you remember anyone specifically?

5         A.   No.  Just by what I'm -- I wrote down about

6    the fact that -- that they were hearing voices or that

7    they were having auditory hallucinations or that one

8    inmate was seeing signs of his grandmother.  They were

9    sick inmates; they needed to be somewhere else.

10        Q.   In your opinion, was the administrative

11   segregation unit an appropriate area for these inmates?

12             MS. VOROUS:  Objection.  Assumes that these

13   inmates were ad seg.

14             THE WITNESS:  If these inmates were in ad seg.

15   BY MR. FISCHER:

16        Q.   Based on your memory, you interviewed inmates

17   in ad seg?

18        A.   I thought these were the inmates in ad seg.

19   I'm not sure.  I'd have to look at the numbers to be

20   sure.

21        Q.   On the page after which you were reading where

22   it again says "Seg" at the top.  This is 102627.

23             About halfway down, it says "LOB" -- "Make a

24   note LOB."  Does that stand for lack of bed?

25             MS. VOROUS:  Are you asking her whether --

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1            MR. FISCHER:  Yeah.
 2            THE WITNESS:  I don't know what LOB stands for
 3    anymore.
 4    BY MR. FISCHER:
 5       Q.   You don't recall or you didn't ask?
 6       A.   I don't remember anymore.  I don't know what
 7    my abbreviation was.
 8       Q.   Were you made aware that there were some EOP
 9    reception center inmates in the administrative
10    segregation unit?
11       A.   Yes.
12       Q.   Based on lack of beds?
13       A.   Yes.
14       Q.   If you go back to the first page, the cover
15    page of Exhibit 14, 102619, I just want to understand.
16    You wrote -- about halfway down it says:  "EOP 39 (15)
17    in MHCB"?
18       A.   Mental health crisis beds.
19       Q.   Does that note that 15 of EOPs -- 15 of the 39
20    EOPS at the institution were in the mental health crisis
21    beds?
22       A.   Yes.
23       Q.   Did you consider that to be a high number of
24    EOPs, high percentage of EOPs requiring mental health
25    crisis care?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    components I looked at.

2         Q.   One of the audit tool components for your --

3         A.   For my criteria, yes.  And so the nurse

4    brought me to this meeting.

5         Q.   And so do I understand that your finding was

6    that there were more CCCMS prisoners than there were

7    staff to be able to do discharge planning, including

8    patrol medications with them?

9              MS. VOROUS:  Objection.  Misstates testimony.

10             THE WITNESS:  No, no, no.

11   BY MR. FISCHER:

12        Q.   Go ahead.

13        A.   No, no, no.  The parole meds were done

14   differently than the discharge planning.

15             My premise was that there weren't enough

16   discharge planners to fill out the social security

17   applications, make sure people had housing, other

18   therapies.

19        Q.   Various aspects of discharge planning were not

20   done for the CCCMS population?

21        A.   Correct.

22        Q.   Okay.  Thank you for clarifying.  Maybe I can

23   get my question correct this time.

24             Your finding was that there were more CCCMS

25   prisoners at CIM than there were staff available to do

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1    discharge planning at the institution?

 2              MS. VOROUS:  Objection.  Misstates her

 3    testimony.

 4              THE WITNESS:  Yes.

 5    BY MR. FISCHER:

 6        Q.    Okay.  And one last thing on CIM I wanted ask

 7    you about in your notes on the final page, 102633.

 8              Most of the way down next to No. 5, it says:

 9    "Nurse UNFAM, SE, psy meds."

10              What does that note refer to?

11        A.    Nurses were unfamiliar with the side effects

12    of psychiatric meds.

13        Q.    I imagine that's on your radar because you're

14    a nurse?

15        A.    I asked them.

16        Q.    Why did you ask this question?

17        A.    I asked all the institutions.  That was one of

18    the criteria on my audit tool.

19        Q.    And here -- SE is side effects?

20        A.    Side effects.

21        Q.    And is this particular CIM of concern to you

22    in your analysis?

23        A.    Yes.

24        Q.    Why is that?

25        A.    Because it's a common practice that nurses

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1    know the side effects of the medication that they're

2    giving because very often you are the one that might

3    observe lithium toxicity in an inmate.

4        Q.   So it's important to be aware of the side

5    effects of the psych medications in order to ensure the

6    safety and well-being of those patients?

7        A.   Yes, sir.

8        Q.   Did you observe this problem at any other

9    institutions?  Do you remember?

10       A.   Yes.

11       Q.   Do you remember which institutions?

12       A.   All of them except San Quentin.

13       Q.   San Quentin?

14       A.   Knew the side effects.

15       Q.   They were good?

16       A.   They were good.

17       Q.   Did you raise this with -- at the exit

18   interviews?

19       A.   Each and every time.

20       Q.   Did this make it into your report?

21            Direct you to page 26 of your report,

22   Exhibit 4.

23            Tell me if I'm looking at the right -- bottom,

24   "Nursing Medication Management."  Just a short section.

25            Is that an issue you think could have been put

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1    in the report if you were writing it?

2         A.   I think I would have phrased it differently.

3         Q.   What would you have phrased differently?

4         A.   I would have made a recommendation that

5    nursing education emphasize the side effects of the

6    medication and that they have handouts or signs

7    available where they dispense the medications so these

8    things would be in front of them all the time.

9         Q.   All right.  Back on page 19 very briefly.  It

10   says:  "At Corcoran, inmates reported from the EOP

11   special needs yard that yard time was canceled for

12   various reasons on a relatively frequent basis."

13        You didn't visit the EOP special needs yard?

14        A.   No, I did not.

15        Q.   Were you aware of this issue at the

16   institution?

17        A.   No, I was not.

18        Q.   From a mental health perspective, is it

19   concerning to you, given your expertise, for EOPs to be

20   denied yard time?

21        A.   Yes.

22        Q.   And why is that?

23        A.   Inmates need to go outside, exercise,

24   socialize.

25        Q.   And the lack of that opportunity can adversely

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    Exhibit 15.
 2              (Plaintiffs' Exhibit 15 was marked for
 3               identification.)
 4    BY MR. FISCHER:
 5         Q.   This is from Lindsay Hayes, project director,
 6    National Center on Institutions and Alternatives, dated
 7    August 16th, 2011.  And it's re "CDCR Suicide Prevention
 8    Consultation."
 9              I assume you have not seen this document
10    before?
11         A.   No, sir.
12         Q.   And this is dated before you began your
13    consultancy?
14         A.   Yes.
15         Q.   Very shortly before; is that correct?
16         A.   Correct.
17         Q.   Is this a report that would have been -- you
18    would have considered in reaching your opinions had you
19    been given it earlier?
20              MS. VOROUS:  Objection.  She hasn't --
21              THE WITNESS:  I don't know.
22              MS. VOROUS:  -- hasn't read the report.
23              THE WITNESS:  I don't know.  I haven't
24    reviewed it.
25
```

```
 1   BY MR. FISCHER:
 2        Q.   Okay.  Based on your short review, does it
 3   look like something you would have considered?
 4        A.   I would have considered every document that I
 5   got.
 6        Q.   Including this one?
 7        A.   Including this one.
 8        Q.   On page 2, at the top, there's a finding of
 9   problems of emergency response to suicide, 7 of 25
10   suicides.
11             Would Lindsay Hayes' finding as to emergency
12   response been important to your consideration on that
13   topic in the course of your review?
14             MS. VOROUS:  Objection.  Speculative.  Lacks
15   foundation.
16             THE WITNESS:  It doesn't talk about emergency
17   response.
18   BY MR. FISCHER:
19        Q.   At the very top of page 2.
20        A.   "Following a review of these 25 cases, I
21   informally made the following calculations."
22             Oh, the emergency response incident.  Yes, I
23   agree with Lindsay Hayes with the emergency response
24   incident.
25        Q.   What do you agree?
```

Jacqueline Moore, R.N., Ph.D.                February 21, 2013

1      A.   That there were cases where the response was
2  not timely.
3      Q.   What days cases did you review?  From what
4  time period?  Do you remember?
5      A.   They're all in my report, every one of them
6  that I reviewed and from what time period from the time
7  that I first started doing these audits until the very
8  last one.
9           But these are in 2010.
10      Q.   Did you review more recent suicides?
11      A.   I reviewed -- if the case involved a suicide,
12  if the emergency response involved a suicide, I reviewed
13  it.
14           When I first started doing these audits, I
15  wasn't sure what I was supposed to do with these
16  emergency responses, so I would review medical emergency
17  responses as well.
18           As time went on, I became less interested in a
19  cardiac response or an asthma response, and I became
20  more familiar with the documents and I only went to look
21  for the mental health responses.
22      Q.   I see.  And you said you found problems with
23  emergency response as to the suicides -- as to the
24  suicides that you reviewed?
25      A.   Yes.  There were a few, yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1        Q.    And were there some as to the medical as well?

2        A.    Yes.

3        Q.    And do you know what -- do you remember what

4    time period you reviewed?

5        A.    Between 2011 and 2012.

6        Q.    And as you just noticed -- mentioned,

7    Lindsay Hayes' report covers 2010 suicide?

8        A.    Yes.

9        Q.    And you found problems with emergency response

10   in 2010?

11       A.    Yes.

12       Q.    And you found problems with emergency response

13   in 2011 and 2012?

14       A.    Yes.

15             MR. FISCHER:  Exhibit 16.

16             (Plaintiffs' Exhibit 16 was marked for

17              identification.)

18   BY MR. FISCHER:

19       Q.    Exhibit 16, at the top it says "LAC CSP."

20             Are these your notes from the Lancaster tour

21   that you did?

22       A.    LAC Lancaster, no.

23       Q.    Los Angeles County?

24       A.    Los Angeles County.

25       Q.    Is that correct?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        A.   CSP, yes.  Los Angeles.

 2        Q.   Okay.  I'm just going to -- what was the date

 3   of this tour?  I'm sorry.

 4        A.   May 3rd and 4th.

 5        Q.   Page 102630.  At the top, it says "Emergency

 6   Response"?

 7        A.   Yes.

 8        Q.   And do I understand correctly that below you

 9   reviewed specific cases involves emergency response?

10        A.   Yes.

11        Q.   I just want to go through those quickly.

12             The first one, about a third of the way down,

13   you write:  "No account for delay of time from custody

14   to nurse"?

15        A.   Yes.

16        Q.   Was that an example of a delayed response, if

17   I understand that correctly?

18        A.   Yes.

19        Q.   And on the next page, you review a particular

20   inmate's case and at the conclusion of that, on 102604,

21   about a third of the way down, you write:  "Inadequate

22   response time"?

23        A.   Yes.

24        Q.   That was your finding?

25        A.   Yes.
```

1      Q.   Next one, conclusion of the bottom of 102604,

2   you write:  "Response time adequate"?

3      A.   Yes.

4      Q.   On the next page you have another inmate

5   review.  And almost at the bottom -- am I reading

6   correctly?  It says:  "Response time adequate"?

7      A.   Yes.

8      Q.   Next page, another inmate review.  And you

9   write -- is that -- am I understanding correctly? --

10   "Adequate time"?

11      A.   Adequate time for the paramedics to arrive,

12   but I was critical that they didn't call 911 from the

13   yard or have 911 called.

14      Q.   So there was some delay you identified there?

15      A.   Some delay.  But once the paramedics were

16   called, they arrived.

17      Q.   They arrived quickly?

18      A.   They arrived quickly.

19      Q.   Two more on the final page.

20           First one halfway down says:  "Response time

21   inadequate.  Training staff involved complete first

22   responder"?

23      A.   Right.

24      Q.   What does that refer to?  If you recall.

25      A.   The nursing staff assigned to the suicide

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    watch activated a personal alarm where she should have

2    gone in and been the responder.  She could have done

3    both.

4         Q.   And that was a case of suicide in custody,

5    correct?

6         A.   I don't know if the patient committed suicide

7    or not.

8         Q.   It was an attempted suicide?

9         A.   It was attempted suicide.

10        Q.   And your finding was response time inadequate?

11        A.   Yes.

12        Q.   And then at the bottom, the final inmate, your

13   finding is:  "Responsive time inadequate"?

14        A.   Yes.

15        Q.   So of the seven cases that you reviewed from

16   your response at CSP LAC, five of the seven you found

17   inadequate emergency response time?

18        A.   Yes.

19        Q.   Is this consistent with what you saw at any

20   other institutions?

21        A.   Many of them.

22        Q.   Any specifically?  If you remember.

23        A.   Corcoran, if that's the gang -- very difficult

24   institution.

25        Q.   There were difficult --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

 1        Q.   Are you aware of any guidelines as to wellness

 2   checks in segregation environments?

 3        A.   Done by the LPT or by whom?

 4        Q.   Anything about NCCHC or ACA guidelines as to

 5   wellness checks in segregation.

 6        A.   Done -- performed by -- who do you want them

 7   to be performed by.

 8        Q.   Are you aware of who the guidelines say --

 9   what the guidelines say about that?

10        A.   The only guidelines that I'm aware of relating

11   to checks in segregation for suicide watches, and

12   those -- your inmates are not in segregation if they're

13   on suicide watch.

14        Q.   Are you aware of any national guidelines as to

15   welfare checks for all prisoners in segregation?

16        A.   They vary from 30 minutes to an hour to

17   15 minutes, depending upon -- depending upon the acuity

18   that the inmate is displaying.

19        Q.   Based on your expertise and experience, do you

20   have any opinion as to the appropriate practice as to

21   welfare checks in segregation?

22        A.   It's recommended that they be staggered, that

23   they not be done exactly at 30 minutes, only every half

24   hour.

25        Q.   Did you observe at some institutions problems

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

```
 1   with staggered welfare checks?

 2         A.   I never checked.

 3         Q.   You didn't look at that issue?

 4         A.   I didn't look at it.

 5         Q.   Are you aware of guidelines that welfare

 6   checks should be done regularly for all inmates during

 7   the entire period that they're in segregation?

 8         A.   Yes.  Yes.

 9         Q.   You're aware of that guideline?

10         A.   Yes.

11         Q.   Are you aware that CDCR has welfare checks

12   only for first 21 days?

13         A.   No, I'm not.

14         Q.   Do you have any opinion as to the

15   appropriateness of that policy?

16         A.   Based on just what you've told me?

17         Q.   Sure.

18         A.   I think it should be continued indefinitely,

19   that you should have welfare checks.

20         Q.   Welfare checks?

21         A.   Every day.

22         Q.   For all inmates in segregation?

23         A.   Yes.

24         Q.   For the entire time they're in segregation?

25         A.   Yes.
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

1       A.   Yes.

2       Q.   You can see that it goes from DEXP102775 to

3  102784.  Is that right?

4       A.   Yes.

5       Q.   And that -- I'm sorry -- one -- yeah.  And

6  then shortly after that is 102801 on Exhibit 21.

7            Are you able to -- I know that they're fairly

8  blank.  Are you able to confirm whether this is the CCWF

9  audit tool or not?

10      A.   Yes.  It has the CCWF medication -- medication

11  is stapled to the back at the end.

12      Q.   So this is the CCWF audit tool, Exhibit 21?

13      A.   Yes.

14      Q.   Okay.  Can I have you turn to DEXP102813?

15      A.   Yes.

16      Q.   On there, under "Administrative Segregation

17  Unit," did you write:  "No groups at ad seg"?

18      A.   Yes.

19      Q.   Does that remind you whether there are groups

20  in ad seg?

21      A.   Yes.

22      Q.   And there are not groups in administrative

23  segregation at CCWF?

24      A.   Yes.

25      Q.   Is this a barrier to appropriate treatment for

1    EOPs in the ad seg unit at CCWF, in your opinion?

2          MS. VOROUS:  Objection.  Misstates the content

3    of the document we're looking at.

4          The section that you're referring to, this

5    page 10283 -- 813 relates to general ad seg.  It does

6    not relate to the EOP ad seg hub.

7    BY MR. FISCHER:

8         Q.   Do you recall whether there was treatment at

9    any of the segregation units at CCWF?

10        A.   The unit that I went to, the ad seg unit that

11   I went to, also held the condemned women in it.  So I

12   don't know if it was the EOP ad seg or the general

13   ad seg.

14        Q.   On the next page of the exhibit, 102814, it

15   says under "EOP ASU Hub," it says:  "Meeting number of

16   hours of structured therapeutic activities offered per

17   week?"  You write "No."

18        A.   "None."

19        Q.   "None"?

20        A.   That's what written, "none."

21        Q.   Do you agree that the lack of structured

22   therapeutic activities in this unit was a barrier to

23   treatment to EOP women?

24        A.   Yes.

25        Q.   And CCCMS women at CCWF?

 1        A.    No.

 2        Q.    Did anybody look at emergency response for

 3   those 10 suicides, to your knowledge?

 4        A.    In 2010?

 5        Q.    The 2010 and 2011 suicides at CMC.

 6        A.    I looked at 2011.

 7              Let's take a look at -- the report -- the

 8   emergency response report that's there because I looked

 9   at some suicides.  Let's look at my reports.

10              MS. VOROUS:  Let him ask questions.

11   BY MR. FISCHER:

12        Q.    So you may have is your answer?

13        A.    He's do very well without me.

14        Q.    On page 31 under "Suicide Prevention," near

15   the bottom, Section B, Subsection 3, there's a finding

16   that the response to mental health-related emergencies

17   was timely and appropriate in each institution.

18              We discussed earlier -- is this a finding that

19   you disagree with?

20        A.    I disagree with it.

21        Q.    Did either Dr. Dvoskin or Dr. Scott look at

22   this issue, to your knowledge?

23        A.    Dr. Dvoskin did.

24        Q.    Dr. Dvoskin looked at it.

25              Did you ever discuss this issue with

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1   Dr. Dvoskin?

2        A.   If I had individual cases that I was concerned

3   with, yes, I brought them to his attention at the

4   facilities.

5        Q.   But in drafting the, report there was no

6   further discussion?

7        A.   No.

8        Q.   Go to page 33.

9             Subsection 4, this is on recommendations as to

10  suicide reports.  There's a recommendation:  "We

11  strongly recommend avoiding use of the term

12  'preventable' without a very specific and timely

13  explanation of the manner in which the suicide could

14  have been prevented."

15            Is this an issue that you looked at?

16       A.   No.  That was Joel Dvoskin.

17       Q.   Starting at the bottom of page 32, Section 1

18  through Section 15 on page 37.  Is this Dr. Dvoskin's

19  section to write?

20       A.   Yes.

21       Q.   Did you have -- are any of the opinions in

22  here something that you looked at, paragraphs 1 through

23  15?

24       A.   I read them.

25       Q.   Are any of these issues issues that you

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1    specifically looked at in the course of your review?

2        A.   I looked at the suicide response and the

3    timeliness of it.

4        Q.   And nothing else?

5        A.   Nothing else.

6        Q.   Okay.  Do you agree with this recommendation

7    that the use of "preventable" should be avoided in

8    reviewing completed suicides?

9        A.   I don't take suicide cases.  I wouldn't know

10   how to answer that.

11       Q.   Okay.

12       A.   In my private practice, in my consulting

13   practice.

14       Q.   Are you aware of whether attempted suicides

15   are tracked by CDCR?

16       A.   I had some statistical forms from some of the

17   sites.  I couldn't tell you what's been tracked at this

18   point.

19       Q.   Do you know whether attempted suicides are

20   tracked in individual's EUHRs?

21       A.   Yes.

22       Q.   Do you know?

23       A.   There would be a progress note.

24       Q.   Do you know whether they're tracked for

25   non-mental health case load prisoners?

Jacqueline Moore, R.N., Ph.D.                           February 21, 2013

1        Q.   What was your impression of the mental health
2   care being provided in the condemned unit?
3        A.   It was excellent.
4        Q.   It was excellent?
5        A.   It was excellent.
6        Q.   Were you aware of the -- the blanket ban of
7   condemned prisoners requiring intermediate care
8   inpatient hospitalization?
9        A.   No.
10        Q.   No?
11        A.   No.
12        Q.   Were you aware of the specialized program for
13   prisoners in the condemned unit requiring ICF inpatient
14   level of care?
15        A.   No.
16        Q.   Did you interview or review any records for
17   any inmates who had been identified as requiring ICF
18   inpatient level of care?
19             MS. VOROUS:  Objection.  Lacks foundation.
20             THE WITNESS:  Not that I was aware of.
21   BY MR. FISCHER:
22        Q.   Were you told anything about inpatient
23   access -- inpatient hospitalization access for the
24   condemned in San Quentin?
25        A.   No.  I interviewed the psychiatrist.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        Q.   Do you remember the psychiatrist's name?
 2        A.   He was on the unit.  He was housed on the
 3   unit.  He was a young psychiatrist.
 4        Q.   Okay.  Was it Dr. Monthei?
 5        A.   I don't know his name.
 6             He didn't bring up those issues.
 7        Q.   And you didn't know to ask?
 8        A.   I didn't know to ask.
 9        Q.   Do you have any opinion on any blanket ban to
10   an inpatient level of care for the condemned at
11   San Quentin?
12             MS. VOROUS:  Objection.  Lacks foundation.
13             THE WITNESS:  I would need to have more
14   information on what that policy meant.
15   BY MR. FISCHER:
16        Q.   And you haven't been provided information
17   other than what I just told you?
18        A.   Yes.
19             MR. FISCHER:  Okay.  23.
20             (Plaintiffs' Exhibit 23 was marked for
21              identification)
22   BY MR. FISCHER:
23        Q.   At the top it says "Salinas State Prison."  I
24   assume this refers to your handwritten notes for
25   Salinas Valley State Prison; is that correct?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          A.    Yes.

2          Q.    Okay.  When you were at Salinas Valley State

3    Prison, did you visit any of the DMH or DSH patients at

4    the facility?

5          A.    Yes.  There was one DMH facility that was on

6    the ground, but I was there very briefly only to find

7    out about the Clozaril inmates because that's where they

8    gave the Clozaril.

9          Q.    To inmates?

10         A.    For Salinas Valley.

11         Q.    For the Salinas Valley non-DMH inmates?

12         A.    Correct.

13         Q.    So did you look at any treatment issues in

14   DMH --

15         A.    No.

16         Q.    -- at SVPP?

17         A.    No.  I asked about the Clozaril patients.

18   They briefly showed me one of the wings just so if I

19   wanted to see it, and then I was out of there very

20   quickly.

21         Q.    Do you know whether Dr. Dvoskin or Dr. Scott

22   looked at the DMH treatment programs at SVSP?

23         A.    No, they didn't.

24         Q.    When you were at California Medical Facility,

25   CMF, did you or any of the other experts look at the DMH

1    inpatient treatment units at CMF?

2         A.    We saw the new unit.

3         Q.    Which new unit?  Do you recall?

4         A.    The new unit that they were building.

5         Q.    Is that the L3 ICF unit?

6         A.    Right.

7         Q.    Had it been activated when you were there?

8         A.    No.

9         Q.    Did you go to any of the operational DMH units

10   while you were there?

11        A.    No.

12        Q.    Neither did Dr. Dvoskin or Dr. Scott?

13        A.    As to my knowledge.

14        Q.    Okay.  Were you provided any information about

15   those treatment units at either SVPP or at VPP --

16   Vacaville Psychiatric Program at CMF?  I'm sorry.

17        A.    No.  We were told that that was not part of

18   our -- our mission was to look at the Department of

19   Mental Health.

20        Q.    Who told you that?

21        A.    In the beginning when we were discussing the

22   program, we were only looking at referrals.  We weren't

23   looking at the level of care provided by the Department

24   of Mental Health.

25        Q.    You were looking at referrals to --

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

```
 1        A.    No.
 2        Q.    Psychologist Craig Haney?
 3        A.    No.
 4        Q.    Psychiatrist Ed Kaufman?
 5        A.    I've seen the name.  I don't know if I know
 6   him.
 7        Q.    Okay.  What about Jeanne Woodford?
 8        A.    No.
 9        Q.    Former warden of San Quentin?
10        A.    No.
11        Q.    What about Eldon Vail?
12        A.    No.
13        Q.    Have you ever worked with Lindsay Hayes?
14        A.    Yes.
15        Q.    When was the last time that you worked with
16   Lindsay Hayes?
17        A.    It would have been in 2006 or '7.
18        Q.    What was the context of your work together?
19        A.    A county jail in Colorado had three suicides
20   in the course of a year.  And it was the client of a
21   company that I worked for, and I recommended that they
22   call Lindsay Hayes in to do an evaluation.
23        Q.    Evaluation of the suicide --
24        A.    And the process that was occurring at the
25   jail.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        Q.   You must have respected his expertise?

 2        A.   Yes.

 3        Q.   Did he provide some recommendations in that

 4   case?

 5        A.   Yes, and they were excellent.

 6        Q.   Do you know if they were implemented?

 7        A.   Yes, they were.

 8        Q.   Do you know the status of the suicide

 9   prevention program there at that facility now?

10        A.   I don't know because I left the company.  But

11   there was an article in the Denver Post that talked

12   about the positive response and, of course, the county

13   took all the credit for bringing Lindsay in.

14        Q.   Didn't mention you?

15        A.   No.

16        Q.   What was the name of the facility?

17        A.   Jefferson County -- Jefferson County Jail or

18   something along that line, a detention center.

19             MR. FISCHER:  Okay.  Let's take a short break.

20             (Off the record at 4:07 p.m. and back on

21              the record at 4:13 p.m.)

22   BY MR. FISCHER:

23        Q.   Dr. Moore, you said earlier that you've now

24   read the 25th report of the special master --

25        A.   Yes.
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4     Reporter, hereby certify that the witness in the

 5     foregoing deposition was by me duly sworn to tell the

 6     truth, the whole truth and nothing but the truth in the

 7     within-entitled cause;

 8               That said deposition was taken down in

 9     shorthand by me, a disinterested person, at the time and

10     place therein stated, and that the testimony of the said

11     witness was thereafter reduced to typewriting, by

12     computer, under my direction and supervision;

13               I further certify that I am not of counsel or

14     attorney for either or any of the parties to the said

15     deposition, nor in any way interested in the events of

16     this cause, and that I am not related to any of the

17     parties hereto.

18

19

20                              DATED: February 25, 2013

21

22                              _____

23                              MEGAN F. ALVAREZ

24                              RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8          That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                        DATED: February 25, 2013

21

22

23                        MEGAN F. ALVAREZ

24                        RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 89



Transcript of the Testimony of:

# **Charles Scott, M.D.**

Coleman v. Brown

March 8, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
         vs.                          ) S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA







REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                      Plaintiffs,    )
                                       )CASE NO.:
 6          vs.                        ) S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                      Defendants.    )
     _____)
 9

10

11

12

13

14          The Deposition of CHARLES SCOTT, M.D., taken

15   on behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:06 a.m., Friday, March 8, 2013, at the

19   UC Davis Immigration Law Clinic, Building TB-34, Davis,

20   California.

21

22

23

24

25
```

Charles Scott, M.D.                                          March 8, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  ERNEST J. GALVAN, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, TENTH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              EGALVAN@RBGG.COM

 7

      FOR DEFENDANTS:
 8
                BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
11              415.703.3035
                415.703.5843 FAX
12              PATRICK.MCKINNEY@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Charles Scott, M.D.                                          March 8, 2013

```
 1                     I N D E X
 2              INDEX OF EXAMINATIONS
 3
 4   Examination by Mr. Galvan  ........................7
 5
 6                    --o0o--
 7
 8          EXHIBITS MARKED FOR IDENTIFICATION
 9   No.            Description                     Page
10   Exhibit 1    Notice of Deposition  ...............15
11   Exhibit 2    Mental Health Services Audit .......38
                  Tool, initial Bates DEXP102436
12
     Exhibit 3    Mental Health Services Audit .......38
13                Tool, R.J. Donovan, initial
                  DEXP104219
14
     Exhibit 4    Compact Disc  ......................62
15
     Exhibit 5    Dr. Scott's site visit notes for ....63
16                CMF Vacaville, initial Bates
                  DEXP109710
17
     Exhibit 6    Standard Psychiatry Quality of ......92
18                Care Audit Tool, Dr. Joan
                  Gerbasi, initial Bates
19                DEXP109751
20   Exhibit 7    Dr. Scott's site visit notes for ....98
                  CMF, initial Bates DEXP109864
21
     Exhibit 8    Dr. Scott's site visit notes for ...101
22                CSP Sacramento, Folsom, initial
                  Bates DEXP109889
23
     Exhibit 9    E-mail dated 10/27/11 from .........121
24                Patrick McKinney to Joel
                  Dvoskin, Steve Martin, Jackie
25                Moore, and Charles Scott, Bates
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                                    March 8, 2013

```
 1   Exhibit 10    Collection of documents from .......162
                   Dr. Scott's Folsom file, initial
 2                 Bates DEXP109930

 3   Exhibit 11    Dr. Scott's site visit notes for ...164
                   Centinela, 3/27/12, initial
 4                 Bates DEXP109958

 5   Exhibit 12    Quality Management Audit Tool ......168
                   [Jackie], initial Bates
 6                 DEXP109984

 7   Exhibit 13    Compact Disc  .....................179

 8   Exhibit 14    Joint report filed by Joel .........194
                   Dvoskin, Jacqueline Moore, and
 9                 Charles Scott

10   Exhibit 15    Clozaril management screening ......239
                   form from Dr. Scott's CCWF
11                 folder, initial Bates DEXP110331

12   Exhibit 16    Department of State Hospitals ......249
                   Bed Utilization report as of
13                 1/31/13

14   Exhibit 17    Dr. Scott's site visit notes for ...253
                   R.J. Donovan, initial Bates
15                 DEXP109989

16   Exhibit 18    Dr. Scott's site visit notes for ...254
                   Chowchilla, initial Bates
17                 DEXP110138

18   Exhibit 19    Chowchilla psychiatry audit ........254
                   prior month overview, dated
19                 3/27/12

20   Exhibit 20    Dr. Scott's site visit notes for ...256
                   Corcoran 4/19/12, initial Bates
21                 DEXP110691

22   Exhibit 21    Dr. Scott's site visit notes for ...256
                   CIM 5/1/12, initial Bates
23                 DEXP110776

24   Exhibit 22    Dr. Scott's site visit notes for ...257
                   LAC 5/3/12, initial Bates
25                 DEXP110898
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          March 8, 2013

 1    Exhibit 23    Dr. Scott's site visit notes for ...257
                    San Quentin 5/23/12, initial
 2                  Bates DEXP111309

 3    Exhibit 24    Dr. Scott's site visit notes for ...257
                    Pelican Bay, initial Bates
 4                  DEXP111351

 5    Exhibit 25    Dr. Scott's site visit notes for ...257
                    SATF, initial Bates DEXP111490
 6
      Exhibit 26    Dr. Scott's notes from folder ......257
 7                  entitled "Computer Medication
                    Review," initial Bates
 8                  DEXP111569

 9    Exhibit 27    Dr. Scott's invoices and ..........258
                    payments with the attorney
10                  general's office, initial Bates
                    DEXP101995
11
      Exhibit 28    Dr. Scott's site visit notes for ...259
12                  Salinas Valley State Prison,
                    initial Bates DEXP110915
13
      Exhibit 29    UC Davis Worksheet: Human ..........259
14                  Research Determination

15    Exhibit 30    Dr. Scott's site visit notes for ...274
                    California Men's Colony, initial
16                  Bates DEXP111414

17    Exhibit 31    Color photograph, Bates MCSP14  ....274
18

19                           --o0o--

20

21

22

23

24

25

Charles Scott, M.D.                                    March 8, 2013

1    the psychiatric medication piece, I was also asked to

2    look at that.  For example, there were some IDTTs I

3    attended on an EOP and in some CCCMS settings to look at

4    the medication management and settings not isolated to

5    the mental health crisis beds.

6              To the degree that parole medications were

7    being provided to inmates upon release from the prison

8    and to the degree that there were quality assurance

9    monitoring relevant to psychiatry medication management,

10   I reviewed those as well.

11             And looked at the psychiatry meetings that

12   they had as part of their organization.  Also reviewed

13   if there were policies relevant to medication

14   management, such as Clozaril medication management

15   policy.  Had they developed a medication management

16   policy relevant to heat risk medications.  And were

17   issues related to the medication monitoring both at a

18   local and at a statewide level in place.

19        Q.   Anything else that was on your plate?

20        A.   Those were the primary issues.  There may have

21   been some isolated site-specific areas where I was

22   present or sitting in, but those were the primary areas

23   of my focus.

24        Q.   Do you recall what Dr. Dvoskin was tasked

25   with?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
1        A.    In general.

2        Q.    What were those things?

3        A.    Looking at the quality of mental health care

4   provided outside of the medication administration in the

5   different levels of care.  Doing a suicide review or

6   review of the suicide risk assessment management and

7   policies and procedures.

8              I've already talked about his involvement in

9   different levels of care and the provision of care at

10  those different levels.

11             He also met with and was -- the SPR-FIT

12  coordinators.  And to the degree that quality assurance

13  or improvement projects overlapped with the provision of

14  nonpsychiatric care, he may have reviewed that aspect as

15  well.

16             And, in general, access to care through the

17  different levels of care he was involved in assessing.

18       Q.    And what about Dr. Moore?

19       A.    My understanding of Dr. Moore was that she was

20  as a nurse looking at issues related to nursing

21  medication administration.  And that could include

22  medication refusals or sign-offs on medicines.

23             In some instances, checking with pharmacy

24  about parole medications and how that process was

25  administered.  Emergency response.  And also she may
```

Charles Scott, M.D.                                          March 8, 2013

 1   have had some involvement in the screening aspect as

 2   well.

 3        Q.   And was Dr. Martin -- Mr. Martin present at

 4   your meeting as well?

 5        A.   Yes.

 6        Q.   Would it be fair to say he was tasked with use

 7   of force and rules violations?

 8        A.   Yes.

 9        Q.   Were you asked to look at all at the inpatient

10   level of care at the Department of State Hospitals?

11        A.   No.

12        Q.   Do you recall if anyone was asked to look at

13   that?

14        A.   If they were, I wasn't present when that was

15   requested.

16        Q.   Were you asked to look at the impact of

17   overcrowding on the delivery of care?

18        A.   I was asked to look at, with the current both

19   staffing levels and prison population, was appropriate

20   care psychiatric care provided to inmates and was there

21   evidence that the California Department of Corrections

22   was deliberately indifferent to the inmates based on the

23   population at the time that I did the evaluation.

24        Q.   You had published at least one article about

25   the overcrowding decision in this case, right?

Charles Scott, M.D.                                      March 8, 2013

```
 1        A.    Yes.
 2        Q.    And what -- at that point, just at that first
 3   meeting, what methodology -- did you settle on a
 4   methodology?  Or were things left to be determined?
 5        A.    You're talking about the first meeting or in
 6   general?
 7        Q.    Just the first meeting for now.
 8        A.    At the first meeting, the best of my
 9   recollection, the detail of precise methodology wasn't
10   finalized there.
11        Q.    Did you have a general framework settled?
12        A.    A general framework, yes.
13        Q.    Can you describe that?
14        A.    General framework would be that we would tour
15   institutions that were representative of the CDCR at
16   large, meaning with different locations, different
17   programs.  And Mr. Martin would be reviewing primarily
18   the use of force.  Dr. Moore would be looking primarily
19   at issues related to nursing administration and
20   medication.  Dr. Dvoskin would be looking overall at
21   those institutions about the provision of mental health
22   care.  And I'd be focusing primarily on the psychiatric
23   medication management piece.
24        Q.    At that point, did your methodology include
25   any quantitative element; that is, would you be
```

1  collecting data and tabulating it in some way?

2      A.   I don't recall if on the very first meeting

3  there was an organized data collection procedure

4  finalized on the first meeting.

5      Q.   Okay.  Did you ever work up an organized data

6  collection procedure?

7      A.   Yes.

8      Q.   When did that happen?

9      A.   Over several months following that first

10 meeting, a tool to help look at different components

11 important to care, or potentially important to care, was

12 developed.  And my input was primarily into the

13 medication piece.  And to the degree that that also

14 related to the mental health crisis bed, I had input

15 into that as well.

16     Q.   And was the plan to tabulate data from that

17 collection and include it in your report?

18          MR. McKINNEY:  Objection.  Vague and

19 ambiguous.

20          THE WITNESS:  No, the plan wasn't to per se

21 include all the data collection pieces in the final

22 report.

23 BY MR. GALVAN:

24     Q.   What were you going to do with the data

25 collection pieces?

Charles Scott, M.D.                                              March 8, 2013

1          A.    Have them available for review should we have
2     an opinion that people would want to know the basis for
3     the opinion.
4          Q.    And did you actually do that?  Do you have
5     them available for review?
6          A.    I turned them over, I believe, yes.
7          Q.    When you say "turned them over" -- ask a
8     different question.
9                When you talk about having something for
10    review, do you mean something in which you -- you broke
11    out or rolled up the results of your tabulation in terms
12    of percentages or scores in some way?
13         A.    I provide the entire data set so someone could
14    verify it for themselves rather than rely on my own
15    summary.
16         Q.    Did you ever make your own summary?
17         A.    I have a general impression from having
18    reviewed the data.  So having been at the institutions
19    and collected the data, it's easy to learn it as you do
20    it.
21         Q.    Do you have a document with a summary of the
22    data?
23         A.    No, just what's in my head.
24         Q.    Is it possible -- or do you know whether
25    Dr. Bobb has a document with a summary of the data?

Charles Scott, M.D.                                    March 8, 2013

```
 1    ambiguous.
 2            THE WITNESS:  Not based on the IDT [sic] and
 3    the information shared during that IDT.  The answer is
 4    no.
 5    BY MR. GALVAN:
 6        Q.   Were you told at some point that there was no
 7    waiting list to go to APP?
 8            MR. McKINNEY:  Objection.  Vague and
 9    ambiguous.
10            THE WITNESS:  My understanding is that the
11    waiting list has been substantially decreased and
12    there's not a wait list for DSH acute care now.
13    BY MR. GALVAN:
14        Q.   When you say "now," what time period do you
15    mean?
16        A.   I would have to look at the grids over time to
17    see -- there's not a waiting list now.
18        Q.   Now, March 8th, 2013?
19        A.   Yes.
20        Q.   You testified earlier you haven't done any
21    work since you finished the report.
22            Did you want to clarify that?
23        A.   No.
24        Q.   Okay.  So you've consulted the DSH list --
25    waiting list for today, March 8th, 2013?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1   monitoring them for changes in weight or glucose.  But

2   to put your hands around an inmate and measure their

3   waist circumference and that being a requirement in a

4   correctional environment had some unique challenges as

5   far as who did it, when you do it, how you do it.

6           And so I knew that was part of the MAPIP audit

7   tool, and it was something the psychiatrists were aware

8   of at the different institutions as being a mandated

9   monitor and, at the same time, they were monitoring the

10  risk in other ways.

11       Q.   Was the MAPIP -- did CDCR psychiatrists, to

12  your knowledge, have input into what was included and

13  not included in MAPIP?

14       A.   I only know that they had MAPIP training.  And

15  I understand from my individual discussions with a

16  psychiatrist that after the MAPIP tool was created, they

17  did voice their opinions to the chief psychiatrist.

18       Q.   Okay.  Next page, very first word is

19  "Chaiken."  Is that Dr. Shama Chaiken?

20       A.   Yes.

21       Q.   And the note is:  "Chaiken does 0 IT audits"?

22       A.   No.  It's "QIT audits."

23       Q.   Okay.  Going down about two-thirds of the way

24  down, there's a note that starts:  "Lab goes to

25  where" -- and I can't read the rest of it.

Charles Scott, M.D.                                    March 8, 2013

```
 1        A.   "Lab goes to where it was ordered."
 2             And so, for example, if you're on the
 3   equivalent of a CTC and you order the lab, there's a
 4   possibility that some of the labs may go back to the
 5   CTC.  And the person, if they're no longer on that site,
 6   the piece of paper has to be scanned in.  So that's how
 7   it's different than an immediate electronic system where
 8   it would just appear.
 9        Q.   Was that a problem?
10             MR. McKINNEY:  Objection.  Vague and
11   ambiguous.
12             THE WITNESS:  Not necessarily.  I mean, if you
13   know what the lab is, if you're informed of the lab and
14   you have that knowledge, then it's not a problem.  But
15   it would be easier if it's scanned in automatically.  Or
16   part of it -- not even scanned, part of the electronic
17   system.
18   BY MR. GALVAN:
19        Q.   On the next page, 895, you have some notes
20   here at the bottom about a suicide case?
21        A.   Yes.
22        Q.   I'm not sure if this is all part of the same
23   note:  "400 Keyheas not staffed for here, 2602."
24             What's the significance of that note?
25        A.   Two separate notes.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        MARCH 8, 2013   AFTERNOON SESSION    1:09 P.M.
 2                        --o0o--
 3   BY MR. GALVAN:
 4        Q.   Doctor, there was -- we've talked earlier
 5   about the material that the attorney general would
 6   prepare for you in advance of your tours.
 7             MR. McKINNEY:  Just to clarify, we sent it.
 8   BY MR. GALVAN:
 9        Q.   Right.  The material that the attorney general
10   would send to you in advance of your tours.
11             MR. GALVAN:  I'd like to mark an Exhibit 9.
12             (Plaintiffs' Exhibit 9 was marked for
13              identification.)
14   BY MR. GALVAN:
15        Q.   Could you take a look, Doctor, at Exhibit 9?
16   This is an e-mail.  It says from Patrick McKinney to
17   Dvoskin, Martin, Moore, Scott, copying a couple of
18   people, including David Spagnolo.
19             He works for you?
20        A.   He works for the university.
21        Q.   What's his -- what was his role on this
22   project?
23        A.   He's an administrative assistant.
24        Q.   Skipping down to bottom of the e-mail.
25             Mr. McKinney wrote:  "In addition to these
```

1    documents, I have gathered a number of documents that

2    include current data from the 33 institutions and will

3    send them to you on a DVD."

4           Do you remember getting that DVD?

5    A.    No.  I remember that Mr. Spagnolo would print

6    out and hand me all hard copies of all documents

7    versus -- so if he got DVD, I never got it.  I instruct

8    him, so that I know the volume and the bulk of records,

9    to just print them all out and put them in a box for me.

10   So he may have gotten a DVD, but I know that I had hard

11   copies.

12   Q.    Did he even give you -- did he give you hard

13   copies also of spreadsheets that wouldn't print beyond,

14   you know, on one page, big long spreadsheets?

15   A.    Yes.

16   Q.    How did you work with those?

17   A.    You can position them.

18   Q.    Okay.  So you would never have seen, then, the

19   disc that came?

20   A.    That's correct.

21   Q.    This is the disc I got from the attorney

22   general with folders, as you can see here.  This CD is

23   Exhibit 4 in our transcript.

24          They divided it up for me by institution, so

25   had we started, for example, with CMF.  And as you can

1   see, there are a number of spreadsheets here.

2          I'm just going to look inside one of them and

3   maybe -- it may be that some of this looks familiar from

4   the hard copies you looked at.

5          So this one has -- it called CCCMS.3.ad seg in

6   addition to its Bates number, which is DEXP13765 to 67.

7          As you look across at these columns, Doctor,

8   does this look like something that David might have

9   printed out for you?

10      A.   Vaguely.  Many of the documents -- for

11  example, review of ad seg care was not my area that I

12  was working on.  My -- so my focus on was documents

13  related to medication management.

14      Q.   Also MHCB?

15      A.   And MHCB.

16      Q.   So if we look at one of the MHCB ones, for

17  example, there's one that's called MHCB.8, Bates

18  No. 23286 to 785.

19          First group, A through F, does this look like

20  something David might have printed out for you?

21      A.   Yes.

22      Q.   I'll just -- I'm going to go to the right and

23  look at some of the other columns.

24          Are you familiar with this term in Column F

25  7447MH?

1      A.    Not offhand, but I may have at the time.  I'm

2   not recalling what 7447 stands for.

3      Q.    Is that possibly the suicide risk evaluation,

4   7447?  I'll represent that it's the CDCR form for

5   suicide risk evaluation.

6      A.    Okay.

7      Q.    Does that sound possible?

8      A.    I don't know the number anymore.

9      Q.    When he printed these -- do you have any

10  understanding as to where this data came from?  Stop

11  moving it around.

12     A.    On a broad level, data entered through

13  MHTS.net is my general understanding.

14     Q.    What's your understanding of what MHTS.net is?

15     A.    It's a data tracking system for specific

16  monitors, and there's data entry relevant to those for

17  the individuals.

18     Q.    So, for example, this one with the 7447

19  suicide risk evaluation, would you review these, the

20  printouts, in advance of your tours for this purpose?

21     A.    I would see them.  What -- what I felt was

22  more productive and useful was to actually look on-site

23  at the mental health crisis bed, at the charts in front

24  of me, because it gave me more information than this

25  kind of grid did.  Then if I had questions about a

1   particular case, I could look further, whereas this

2   wasn't as easy to use.

3        Q.   Did you ask anyone, like Drs. Reid or Bobb, to

4   look at these for any anomalies or red flags?

5        A.   No.

6        Q.   As we look at this one, MHCB 88, so it has one

7   row for -- each row seems to be an event and you had

8   multiple rows for an inmate.  And then it seems like we

9   have something like five -- 5,800 rows, so it's a lot.

10       A.   Uh-huh.

11       Q.   And then you said the event seems to be the

12  completion of the suicide risk evaluation.  Does that

13  seem right?

14            MR. McKINNEY:   Objection based on counsel's

15  representation.

16  BY MR. GALVAN:

17       Q.   Based on my representation that 7447 --

18       A.   If 7447 stands for that.

19       Q.   And did you form any understanding as to what

20  this Column G with the zero percent, 100 percent means

21  in MHTS.net?

22       A.   Yes.

23       Q.   What does it mean?

24       A.   Did they have a compliance within a program

25  guide specified period of time.

Charles Scott, M.D.                                      March 8, 2013

 1          Q.   Still sticking with Exhibit 4 and the folder
 2     for Vacaville, which was the first place you went, I'm
 3     going to go to the one called DMH, has Bates No. 18735
 4     to 738.  This also seems to be arranged in rows with one
 5     row per -- sometimes an inmate has multiple rows,
 6     generally it's inmate and row and events.
 7               Do you remember seeing a printout of this that
 8     David might have made for you?
 9          A.   I believe those were the packets, yes.
10          Q.   Did you form an understanding as to
11     significance of this table?
12          A.   Yes.
13          Q.   What is its significance?
14          A.   What I think it's trying to communicate is how
15     many days a person may have been on an wait list to DMH.
16          Q.   And the wait days would be Column F?
17          A.   Those are the days some office technician
18     entered, yes.
19          Q.   Just looking here at the first screen, the
20     first entry for this Mr. Ackley, Row 2, 95 days waiting
21     for -- DMH intermediate psychiatric referral?
22               MR. McKINNEY:  Objection.  Calls for
23     speculation.
24     BY MR. GALVAN:
25          Q.   Is that what's entered on the chart?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1        A.    That's what's entered on the spreadsheet.

2        Q.    If we go down two more rows, we have 99 days;

3   is that right?

4        A.    That's what's entered on the spreadsheet.

5        Q.    Go down three more rows, 98 days?

6        A.    Correct.

7        Q.    But it's your testimony that you didn't ask

8   Drs. Bobb or Reid to examine this data for issues of red

9   flags?

10       A.    That's correct.

11       Q.    Second DMH is -- it's called DMH.1-2, Bates

12  No. 18731 to 734.

13             Do you remember seeing a chart like this

14  printed out?

15       A.    I believe that was in the stack of records,

16  yes.

17       Q.    Fair to say the difference between this one

18  and the one we just looked at, DMH, is that this is

19  acute care versus intermediate care?

20             MR. McKINNEY:   Objection.   Calls for

21  speculation.

22             THE WITNESS:   The Excel sheet I'm reading says

23  "DMH acute psychiatric referral" under the D column

24  event.

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

```
 1    speculation.
 2              THE WITNESS:  That's the number listed on that
 3    Excel sheet.
 4    BY MR. GALVAN:
 5         Q.   And then we've got Mr. Gutierrez, 30 days?
 6              MR. McKINNEY:  Objection.  Calls for
 7    speculation.
 8    BY MR. GALVAN:
 9         Q.   Right?
10         A.   That's the number on the Excel sheet.
11         Q.   We've got Mr. Pauley, 77 days?
12              MR. McKINNEY:  Objection.  Calls for
13    speculation.
14    BY MR. GALVAN:
15         Q.   Right.
16         A.   That's what it says, yes.
17         Q.   We've got Mr. Hill, 78 days, right?
18              MR. McKINNEY:  Objection.  Calls for
19    speculation.
20              THE WITNESS:  That's what it says on that
21    slide projection.
22    BY MR. GALVAN:
23         Q.   After you got this spreadsheet in advance of
24    your CMF tour, did you direct Drs. Bobb, Reid or anybody
25    to check whether these wait times were due to concurrent
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          March 8, 2013

1    medical care?

2        A.   No.   My focus of my part of the review was on

3    on-site medication management by the psychiatrist, not

4    as the expert reviewing the length of stay and wait

5    period for the acute care.

6        Q.   We were talking about CSP SAC, which was the

7    second location you went to.

8             Would it be correct that you reviewed

9    printouts made from spreadsheets for CSP SAC as well?

10       A.   Yes.

11       Q.   And if there were in here DMH grids that

12   showed long waiting times, your testimony would be the

13   same:  You didn't direct anyone to check into those

14   situations?

15       A.   Yes.  Because I testified earlier, my role was

16   to look at the psychiatric medication management, not at

17   DMH bed wait days.

18       Q.   And your role was also to look at MHCBs,

19   right?

20       A.   The care provided on the MHCB to the

21   individuals.

22       Q.   So if we go into the SAC folder here, we look

23   at MHCB.8, which is Bates No. 42285.

24             You see this spreadsheet looks similar to what

25   we looked at before for the 7477s for Vacaville that we

Charles Scott, M.D.                                    March 8, 2013

 1   looked at?

 2        A.   Yes.

 3        Q.   This looks like something that would have been

 4   printed out for SAC?

 5        A.   It's similar, yes.

 6        Q.   And it has -- Column H, it has the Text

 7   Box 10, the scoring of whether the -- whether the event

 8   was documented or not?

 9             MR. McKINNEY:  Objection.  Vague and

10   ambiguous.  Misstates prior testimony.

11             THE WITNESS:  It only has a compliance

12   percentage, as I understand it, if it was documented

13   within a compliance period in accordance with the

14   program guide.

15   BY MR. GALVAN:

16        Q.   Do you know what the compliance period is?

17        A.   I don't want to misstate off my memory.  So,

18   offhand, I'd pull the program guide.

19        Q.   Is it important to have a deadline to do a

20   suicide risk evaluation?

21        A.   As a general concept, yes.

22        Q.   Why?

23        A.   Depending on the case and depending on the

24   reason for referral to evaluate the person for risk of

25   suicide.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    Q.   If I go slowly down through Column H, you see

2    the first few are you've got group of 100 percent and

3    group of zeros?

4    A.   Yes.

5    Q.   Roughly the same size.

6         Then if I scroll slowly down, you see it's

7    true I'm scrolling for quite a while before I get to

8    another hundred?

9    A.   Many of them are the same patient.  So, for

10   example, they could be on a one-to-one, and they can be

11   refusing to answer the suicide risk evaluation but

12   they're being watched.  So the clinician will miss each

13   deadline because the person is refusing to speak, but

14   they maintain them on a suicide watch.

15        Therefore, they -- the compliance will report

16   as zero, but that doesn't reflect deliberate

17   indifference by the clinician.  So if the person will

18   not answer your question and you can't complete the SRE

19   but they're still on a watch or there's some other

20   reason, then you could have a zero but it doesn't mean

21   that they were deliberately indifferent.

22   Q.   If you look at Row 76 through Row 91 on

23   Bates 42285, you've got William Warren?

24   A.   Right.

25   Q.   He's got -- let's see.  Column F is the -- due

1    date, it's a date related to the event.  I don't know

2    what date it is.  But it seems to be that he gets a new

3    row every week, right?  9/11, 9/18, 9/25, 10/2, 10/9 all

4    the way up to Christmas, 12/25/2011?

5         A.   Right.

6         Q.   And every one of those is a zero, right?

7         A.   Yes.

8         Q.   So you're testifying it's possible that he

9    just kept refusing to participate, right?

10        A.   That's one possibility.

11        Q.   From September 11th to December 25th?

12        A.   He could have had a medical issue or reason.

13   It could have been done and not scanned in.

14             If they had during those two-month period of

15   time a deficit in office technician and then it wasn't

16   entered into the statewide database.

17             Various reasons why that could happen.

18        Q.   But you didn't -- when you went to SAC, or at

19   any time, you didn't check to see whether any of those

20   circumstances explained all these zeros in Mr. Warren's

21   part of the spreadsheet, right?

22        A.   I checked for people who were actually on the

23   mental health crisis bed to see if their suicide risk

24   evaluations were done appropriately.  I did not

25   investigate if there were administrative reasons through

1    office technicians that things were not scanned in.

2         Q.   So you checked the people who were there the

3    day you were there?

4         A.   Yes.

5         Q.   In general, these crisis bed units have

6    capacities of something like 20, 30 beds?

7         A.   In general.

8         Q.   You checked some sample from 20 or 30 people,

9    right?

10        A.   It depended on the site.  Yes.

11        Q.   But you had been given about -- at least on

12   this spreadsheet -- 828 admissions at least -- or 821

13   events?  Some people have many events.

14             MR. McKINNEY:  Objection.  Vague and

15   ambiguous.

16   BY MR. GALVAN:

17        Q.   Over a long period of time, right?

18             MR. McKINNEY:  Vague and ambiguous.  Compound.

19             THE WITNESS:  There was some information.

20   However, because there were various reasons why that

21   information may or may not accurately reflect the care

22   being given, I thought it was more important to review

23   the actual care delivered versus an Excel sheet that may

24   or may not be accurate.

25

Charles Scott, M.D.                                    March 8, 2013

```
 1   BY MR. GALVAN:
 2        Q.   Actual care delivered on the day you were
 3   there?
 4        A.   The days I was there, yes.
 5        Q.   On a day set out in a schedule in
 6   October 2011, right?
 7             MR. McKINNEY:  Objection.  Calls for
 8   speculation.
 9             THE WITNESS:  I don't know that the facility
10   knew we were coming.
11   BY MR. GALVAN:
12        Q.   They knew you were coming at least a month in
13   advance, right?
14             MR. McKINNEY:  Objection.  Calls for
15   speculation.
16             THE WITNESS:  I honestly don't know.
17   BY MR. GALVAN:
18        Q.   You and Mr. McKinney met and set the schedule,
19   right?
20        A.   No.
21        Q.   And you, Mr. McKinney, Dr. Moore, and
22   Dr. Dvoskin met and set the schedule, right?
23        A.   In general, we agreed upon dates where we
24   could be -- all be available.
25        Q.   And the schedule was set more than a week
```

Charles Scott, M.D.                                    March 8, 2013

```
 1   the witness.
 2            MR. McKINNEY:  Mr. Galvan --
 3            MR. GALVAN:  These objections are coaching the
 4   doctor into how to answer, and I really think it should
 5   stop.
 6            MR. McKINNEY:  I cannot disagree with you in
 7   more stronger terms.  The court has precluded the
 8   parties from presenting live testimony at the hearing on
 9   this matter.  This is my one and only chance to make a
10   record, and I will do so.
11   BY MR. GALVAN:
12       Q.   Focusing narrowly on the quality of MHCB care,
13   leaving aside medication, your evaluation of the
14   constitutionality of MHCB care, your method for doing
15   that evaluation was to examine information about a
16   sample of the patients present and being cared for in
17   the MHCBs on the day of your tour?
18            MR. McKINNEY:  Can you read that back, please?
19            MR. GALVAN:  Correct.
20            (Record read as follows:
21            "QUESTION:   Focusing narrowly on the
22             quality of MHCB care, leaving aside
23             medication, your evaluation of the
24             constitutionality of MHCB care, your
25             method for doing that evaluation was to
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1              examine information about a sample of

2              the patients present and being cared

3              for in the MHCBs on the day of your

4              tour?")

5          MR. McKINNEY:  Objection.  Vague and

6  ambiguous.  Compound.

7          THE WITNESS:  Sorry.  That was part of the

8  evaluation.

9  BY MR. GALVAN:

10     Q.   What was the rest of the evaluation?

11     A.   Interviewing actual inmates, sitting in on

12  IDTTs, interviewing staff, interviewing custodial

13  officers and for nursing staff, reviewing the actual

14  record at the time.

15     Q.   Breaking that down, the first thing you said

16  was interviewing inmates.

17          What inmates are you talking about?

18     A.   Inmates who were housed on the mental health

19  crisis bed.

20     Q.   On the day you were there?

21     A.   Yes.

22     Q.   Second part, IDTTs, which IDTTs are you

23  talking about?

24     A.   IDTTs that were occurring on the mental health

25  crisis beds.

1      Q.   For patients that were being cared for on the

2  day you were there?

3      A.   Some of the patients, they had pre-IDTT

4  meetings, so there would be informational sharing in

5  addition to the actual IDTT.  But it was related to

6  inmates who were on the crisis bed unit at the time.

7      Q.   Third one was records.  Records of patients

8  that were in the crisis bed unit on the day you were

9  there?

10      A.   Yes.

11      Q.   Any other records?

12      A.   EUHR records relevant to the patient prior to

13  their admission.  That would be an EUHR.

14      Q.   Which patients?

15      A.   The MHCB patients.

16      Q.   Who were being cared for on the day you were

17  there?

18      A.   Yes.

19      Q.   Any other records?

20      A.   Some components of MHTS.net.

21      Q.   For the patients being cared for on the day

22  you were there?

23      A.   Yes.

24      Q.   Fair to say, Doctor, based on all that you

25  just testified to under oath, that your review of

Charles Scott, M.D.                                    March 8, 2013

1   patient care was limited to the patients who were

2   present on the MHCB being cared for on the day you were

3   there?

4        A.   No.   And the reason is that many of the

5   medication reviews that I did of the over 130 had prior

6   MHCB admissions.   There's a special tab on EUHR.   So

7   those could be months or years before.   So, of those,

8   you can also look at MHCB admissions unrelated to the

9   day I was there.

10       Q.   So the second part, then, is the people you

11  were reviewing anyway for medication review, medication

12  monitoring.   If they had prior MHCB admissions, you

13  include them as the basis for your opinion on MHCBs?

14       A.   I would look at the care provided on the MHCB

15  and include that in my analysis, yes.

16       Q.   And for SAC, how many -- how many persons

17  would you estimate fell into that latter set that you

18  just described?

19       A.   Two or three.

20       Q.   Two or three.   Okay.

21            But you had this data that Mr. Spagnolo

22  printed out for you regarding care for the several

23  months prior to your tour during the period when the

24  institution had no notice that you were coming.   But you

25  did not direct Dr. Bobb, Dr. Reid, or anybody else to

1  review this data for any issues?

2           MR. McKINNEY:  Objection.  Compound.  Vague

3  and ambiguous.

4           THE WITNESS:  That was not my directive to

5  them, no.

6  BY MR. GALVAN:

7      Q.   Let's go back to Exhibit 8.  We're still in

8  SAC, CSP SAC.

9           On Bates No. 903, you have a note here.  Let's

10  see.  After -- about the sixth line down:  "Primary

11  clinician not present."

12           I think these notes are regarding an IDTT, it

13  says on the page before, right?

14      A.   In part.  They also did have on that day a

15  classification hearing they had to do, so one of these

16  may reflect -- I believe the warden was present for this

17  classification hearings, maybe a classification hearing.

18      Q.   So this note may not be about an IDTT?

19      A.   That particular one, because the warden is

20  present.

21      Q.   Okay.  Does it change your recollection if you

22  go back to the prior page and see under the line --

23  under the second line, it says "Initial IDTT"?  Is it

24  possible -- I don't know if we're still looking at the

25  same event or not.

Charles Scott, M.D.                                    March 8, 2013

1    provide because there can be a time period to turn them

2    over.  So that's something they're aware of and they're

3    caution about.

4           The next note is this individual told me that

5    they may get anywhere between two to three hundred

6    requests from the population or referral to them a

7    month, and the majority are routine.  So they felt that

8    they could see, and they did see, about five to six

9    referrals a day.

10       Q.   So a referral -- a referral in this context is

11   a request for services from an individual?

12       A.   It could be a request for services from an

13   individual.

14       Q.   And the transfers, are they mistaken because

15   people on the mental health case load aren't supposed to

16   go to Centinela?  Is that what "mistaken" means?

17       A.   I don't know their definition of "mistaken."

18       Q.   Keep 11 handy.  You might refer to it as we're

19   looking at the audit tool.

20           MR. GALVAN:  Mark Exhibit 12, please.

21           (Plaintiffs' Exhibit 12 was marked for

22            identification.)

23   BY MR. GALVAN:

24       Q.   So in your Centinela folder that they produced

25   was this version of a few pages from the audit tool

Charles Scott, M.D.                                        March 8, 2013

 1   where the entries are typed.

 2        A.   Yes.

 3        Q.   Was this your work filling this out?

 4        A.   Yes.

 5        Q.   Okay.  And was Dr. Moore absent, so you were

 6   doing the quality management part, too?

 7        A.   Correct.

 8        Q.   Okay.  Toward the bottom of the quality

 9   management part, you had typed:  "Psychiatrist can't

10   attend QA meetings"?

11        A.   Yes.

12        Q.   Is that a concern for you?

13             MR. McKINNEY:  Objection.  Vague and

14   ambiguous.

15             THE WITNESS:  No in this case because of her

16   review of the minutes, ongoing communication, input, and

17   being proactive vocal regarding the quality of the care,

18   it was not a concern to me.

19   BY MR. GALVAN:

20        Q.   And you also filled out the medication

21   management tool on page 29, which is Bates 986 of

22   Exhibit 12, one of your question in this part of the

23   tools is:  What the maximum length of bridge orders?

24             What is a bridge order?

25        A.   A bridge order is a description of a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

 1   know if any happened in these particular cases, but it
 2   can happen on some.
 3         The two fields to go through are general
 4   comments and diagnosis.  Those would typically put more
 5   information specific to general comments and diagnosis
 6   because the Bento box is bigger.
 7         MR. GALVAN:  I'd like to mark Exhibit 14.
 8         (Plaintiffs' Exhibit 14 was marked for
 9          identification.)
10   BY MR. GALVAN:
11      Q.   Exhibit 14 we took from the court file.  It's
12   the joint report that the State filed for you and
13   Dr. Dvoskin and Dr. Moore and...
14         So could you discuss the -- the process for
15   writing this report?  I'll ask you a few specific
16   questions about it.
17         I think you've already testified that the
18   process did not include you drafting a separate report
19   and then somehow putting them together, right?
20      A.   Yes.  Yes.
21      Q.   What was the process for drafting this?
22      A.   The process for drafting the report was
23   discussing our findings at each of the sites and then
24   summarizing those findings in a combined report.
25      Q.   And when did you actually start doing that?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

```
 1        A.    I don't know the exact date.  May have been in
 2   November, that time frame, of 2012.
 3        Q.    And did all three of you get together in one
 4   place to do this?
 5        A.    No.
 6        Q.    How did it work?
 7        A.    Joel Dvoskin and I were in the same place to
 8   do our portions of the report.  And then having created
 9   sort of the general format, the areas left for Dr. Moore
10   were for her to have her opinions represented.  And so
11   she was included in that process.
12        Q.    If you turn to page 7 of the joint report.
13              The first paragraph says at the end that "We
14   also reviewed data from studies conducted by CDCR and
15   the special master's team."
16              Do you remember specifically what data you
17   reviewed?
18        A.    I was aware -- I won't be able to cite you the
19   exact report, but there was a report that looked at
20   trying to identify underserved or unidentified inmates
21   in the CDCR system.  I don't know if the number was in
22   40s or the 70s, but it was a low number from that report
23   of individuals who were felt to require a higher level
24   of care or mental health treatment that had not been
25   identified.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1       Q.   On the next page, staffing discussion, last

2   sentence in the paragraph that continues at the top of

3   the page -- this is page 12 of Exhibit 14:  "Finally, in

4   our opinion, the CDCR mental health staffing plan will

5   provide adequate resources."

6            Did you review their CDCR mental health

7   staffing plan?

8       A.   That wasn't my role, no.

9       Q.   This is not a Dr. Scott part; that's a

10  Dr. Dvoskin part?

11      A.   Best I understand, yes.

12      Q.   So you don't have an opinion one way or the

13  other whether their staffing plan is good, bad,

14  inadequate, adequate?

15      A.   That's not exactly what I said.  As far as

16  psychiatric care, that even in those institutions that

17  identify there were -- the staffing of psychiatrists was

18  not at full level, they were still deliberately

19  indifferent to the mental health needs of inmates, and

20  they were providing constitutionally appropriate care.

21      Q.   But to the extent that this part of the report

22  expresses an opinion about a plan, a mental health

23  staffing plan, you didn't do any review of that plan to

24  determine whether that plan was adequate to meet

25  constitutional standards, right?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1      A.   That's correct.

2      Q.   Did you didn't do any review to determine

3  whether that plan was necessary to meet constitutional

4  standards?

5      A.   Correct.  I looked at the care currently

6  provided and did it meet constitutional standards.

7      Q.   Also on page 12 there's a discussion here

8  under numbered paragraph 4 regarding Los Angeles

9  County -- California State Prison Los Angeles County

10  regarding, quote -- I'm just going to quote it:

11          "Significant limitations on office and

12  interview space for the mental health staff,

13  particularly psychiatrists.  While these limitations

14  were not intentional or due to a lack of effort" -- I

15  just want to focus on those words, "intentional or due

16  to lack of effort."

17          How do you know whether the limitations were

18  intentional or not?

19      A.   This part was investigated or written by

20  Dr. Dvoskin.  I was aware that there were -- the office

21  space for psychiatrist was limited.  And then he did the

22  follow-up on that, and I did my medication reviews.

23      Q.   As far as you know, the limitations on the

24  office space for psychiatrists might have been

25  intentional?

1              MR. McKINNEY:   Objection.  Calls for

2      speculation.

3              THE WITNESS:   I have no evidence that they

4      were intentional.

5      BY MR. GALVAN:

6         Q.   But you don't know one way or the other

7      whether they were intentional or not?

8         A.   I didn't investigate that, so I have evidence

9      that they were one way or the other.

10        Q.   Were you informed that CDCR was building --

11     had a building project at LAC to eliminate this problem?

12        A.   Yes.

13             And the psychiatrist was aware of that as well

14     and felt that that would address their space problems.

15        Q.   And have you done anything to learn the

16     current status of that building project?

17        A.   No.

18        Q.   Would it change your opinion if you learned

19     the building project was not complete?

20        A.   Wouldn't change my opinion on the

21     constitutionality of the medication management and care.

22        Q.   On the same page, numbered Item 5, concerning

23     Salinas Valley State Prison.  First bullet point

24     discusses concerns expressed by the mental health

25     director regarding staffing and space shortages.

Charles Scott, M.D.                                    March 8, 2013

1    BY MR. GALVAN:

2         Q.   On the next page, page 13, there's a numbered

3    paragraph 6 regarding Pelican Bay.

4              You didn't actually go to Pelican Bay, right?

5         A.   That's correct.

6         Q.   Anything here about staffing shortages would

7    be Dr. Dvoskin's work?

8         A.   Correct.

9         Q.   And the next paragraph about California Men's

10   Colony says:  "Mental staff reported mental health

11   staffing shortages that adversely impacted their ability

12   to provide care to inmates."

13             Do you agree with that statement?

14        A.   That statement is, as I understand it, was in

15   part by the work Dr. Dvoskin did.  So I would let him

16   speak to that.  I didn't do that part of the

17   investigation.

18        Q.   And then the last paragraph on the page

19   discusses staff shortages at substance abuse treatment

20   facility.

21             Are you -- are you the author of this part?

22        A.   I was aware there were staffing shortages for

23   psychiatry.  And I did -- I did put this in the report,

24   yes.

25        Q.   When you say "this," you mean the part about

Charles Scott, M.D.                                    March 8, 2013

1   psychiatrist.  So this was the chart review part of it.

2        Q.   So when you spoke to an inmate, you didn't

3   enter those results in the Bento box?

4        A.   No.

5        Q.   On page 14 of the report, Exhibit 14, there

6   are discussion about comparison with other systems.

7   There's a heading, "Comparison With Other Systems."

8             What was your methodology for comparing CDCR

9   to other systems?

10       A.   This is primarily the work of Dr. Dvoskin.

11   However, I have worked as a treating clinician in both

12   jails, Hunt Correctional Facility in Louisiana, maximum

13   security facilities for inmates, and in the -- as a

14   military officer working with detained soldiers, and

15   also in a jail in Ohio.  So, for me, it was comparing

16   the experience of actually working in state correctional

17   systems and comparing those systems to the CDCR.

18       Q.   So let's break -- I want to break it down to

19   just talk about state correctional systems because that

20   what it says in the report here.

21       A.   Okay.

22       Q.   "Numerous state correction systems."

23            So you listed a few things, but I might have

24   missed it.  I'm not sure which of those were state

25   correctional systems.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1         So can you tell me which state correctional

2    systems have you worked in?

3         A.   Louisiana.

4         Q.   Okay.  So one state, Louisiana.

5              So the basis for your opinion that -- let me

6    look at the exact words.  The basis for your opinions

7    involving comparisons between CDCR and numerous state

8    correctional systems is a comparison been CDCR and

9    Louisiana?

10             MR. McKINNEY:  Objection.  Mischaracterizes

11   the report.  Mischaracterizes prior testimony.

12             THE WITNESS:  Only in part.

13   BY MR. GALVAN:

14        Q.   What other state correctional systems are you

15   comparing California to?

16        A.   Because I am asked to review care on

17   individual cases in state prisons in other states, I

18   have an opportunity to review both their policies and

19   procedures, the assessment process, and medication

20   management in different states.  So those would include

21   Florida, Illinois, Ohio, Alabama.  I believe Arizona.

22             And I also believe New Mexico.  I just

23   remembered a New Mexico case.

24        Q.   And all of those cases -- the Florida,

25   Illinois, Ohio, Alabama, Arizona, and New Mexico

 1  cases -- those were individual liability cases?

 2       A.   Combined.  They were individual liability,

 3  also constitutionality of care provided under

 4  Section 1983.  And then some involved ADA, American With

 5  Disabilities Act, allegations for violations.  But in

 6  addition to deviation from the standard of care, I

 7  believe they all involved constitutional of care as

 8  well.

 9       Q.   What was at issue in those cases was whether

10  there was liability for injury to an individual,

11  correct?

12       A.   Not an -- not alone, no.  That's not correct.

13       Q.   Let me ask the question differently.

14            Were any of these cases, cases for injunctive

15  relief?

16       A.   I would have to go back and review to see if

17  that was part of the complaint.

18       Q.   Were any of these cases, cases for money

19  damages?

20       A.   There may have been.  I'd have to look at the

21  actual complaint.

22       Q.   Did all of these cases involved the facts and

23  circumstances surrounding either the death of or injury

24  to an individual?

25       A.   In part but not solely.

Charles Scott, M.D.                                    March 8, 2013

1      A.    I did sit in on several EOP IDTTs and felt
2  that IDTTs were appropriate, engaged, and involved.  And
3  so that part of this opinion, I personally witnessed.
4      Q.    Does what you just said have anything to do
5  with transferring EOP inmates out of segregation?
6      A.    Well, you asked me to comment on "i."  And so
7  part of my opinion is relevant to "i."
8      Q.    Okay.  Focusing on the statement here that
9  there are efforts to expedite the transfer of EOP
10  inmates out of segregation, you have no basis for that
11  statement?
12      A.    No.
13      Q.    To the extent that there are statements in the
14  report about placing EOP inmates in segregation for
15  their own protection, that would be Dr. Dvoskin's work?
16  It Wouldn't be part of your study?
17      A.    That was his focus, not mine, that's correct.
18      Q.    So you wouldn't have any opinions about that?
19      A.    That wasn't the focus of my role as the expert
20  in this case.
21      Q.    When we get to chapter here, the section on
22  page 19 on the mental health crisis bed unit, would it
23  be fair to say that this section is your section?
24      A.    In part, but not in totality.
25      Q.    It starts by saying:  "At every prison visited

Charles Scott, M.D.                                    March 8, 2013

 1    with an MHCB or CTC, a member of our team assessed the

 2    program by doing several things."

 3              Is that true for Pelican Bay where you didn't

 4    go?

 5         A.   Yes.

 6         Q.   But you weren't there to interview randomly

 7    selected inmates, correct?

 8         A.   That's correct.

 9         Q.   Did Dr. Dvoskin do that for you?

10         A.   It was my understanding he did.

11         Q.   And he went to IDTT meetings and deducted

12    interviews?

13         A.   I don't have his notes in front of me.  I

14    can't speak to that.

15         Q.   But you did -- I saw in your notes -- review

16    medical records from Pelican Bay?

17         A.   Yes.

18         Q.   Did Dr. Dvoskin report to you about his

19    observation regarding the care at Pelican Bay?

20         A.   Yes.

21         Q.   Do you remember what he reported to you?

22         A.   He felt that there was confusion about the

23    technical term for a suicide watch versus suicide

24    precaution and that, in his experience having visited

25    there, that he did not find a suicide risk evaluation

Charles Scott, M.D.                                    March 8, 2013

1    So I don't know his knowledge of the medical database.

2         Q.   So when you see a phenomenon in the world like

3    someone being prescribed Haldol without a diagnosis, and

4    Axis 1 diagnosis, would the rule of parsimony apply in

5    terms of what the explanation is?

6         A.   I don't understand your question.

7         Q.   If you're given a choice between two

8    explanations for a phenomenon, one that requires a

9    certain multiplication of entities like hypothesizing

10   that the clinician has read some literature that says

11   that you have -- you could use this off-label use for

12   Axis 2, or you have a possible explanation that's more

13   parsimonious that requires fewer entities, i.e., that

14   they're simply short-staffed and can't get the job done,

15   why would you choose the less parsimonious explanation?

16           MR. McKINNEY:  Objection.  Compound.  Vague

17   and ambiguous.

18           THE WITNESS:  I like the word "parsimony,"

19   though.

20           First of all, Dr. -- with all due respect to

21   Dr. Dvoskin, he's not a physician and he -- his

22   understanding of the appropriateness for prescribing in

23   an acute setting Haldol would -- may not be -- I

24   wouldn't necessarily defer to him in that decision.

25           If you look at standard of care in emergency

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1    a lower level of observation is, in general, a good

 2    guideline.

 3            I think that follow-up after discharge from a

 4    mental health crisis bed to a lower level of care is

 5    also a general good guideline.

 6            So those would be the overall guidelines.  I

 7    also, though, understand that, for example, at RJD, they

 8    will go out, a team -- Dr. Laura Leard-Hansson and a

 9    psychologist -- and do the evaluations in advance even

10    of getting to the mental health crisis bed and can do

11    the suicide risk assessment.  Whether or not that's

12    entered into MHTS.net following the technical admission

13    would be an example of a very early SRE that may not get

14    coded for.

15    BY MR. GALVAN:

16        Q.   Going ahead to page 26 in the report.

17            There's a Roman III at the top, "Medication

18    Management," which is decided into two sections.

19    There's A, nursing medication management, and, B,

20    psychiatry medication management.

21            Is it correct to say that nursing medication

22    management would be Dr. Moore's section?

23        A.   On those prisons where she attended, I

24    believe, on one of my CMF visits, I also spoke on --

25    with the nursing staff and we reviewed my notes in --

1    relevant to that.

2         Q.   Did you do any review for Item No. 3,

3    potential hoarding of medication?

4         A.   No.

5         Q.   So this would all be on Dr. Moore's work?

6         A.   Correct.

7         Q.   And looking at B, this would be your section,

8    correct?

9         A.   Primarily, yes.

10        Q.   And your Conclusion No. 2 regarding

11   consistency with diagnosis would be based on -- the

12   basis for that would be your chart reviews that are in

13   your notes, your chart reviews that in the Bento box,

14   and your MAPIP reviews?

15             MR. McKINNEY:  Objection.  Mischaracterizes

16   prior testimony.

17             THE WITNESS:  In part with the MAPIP reviews

18   but also with interviews of inmates and in observing

19   IDTTs, the discussion of what their diagnosis and the

20   medication treatment.

21   BY MR. GALVAN:

22        Q.   And have you been -- with regard to No. 3,

23   you've discussed the difficulty of using the EUHR to

24   find lab results.

25             Have you received any follow-up information

Charles Scott, M.D.                                          March 8, 2013

1      Q.   Do you remember what your recommendations

2  were?

3      A.   Yes.

4      Q.   What were they?

5      A.   I remember that if the electronic record

6  system could be streamlined, that might -- or

7  information more easily accessed, that might help do

8  some of the audits.

9           I recommended that the MAPIP audits -- or

10  commented is better than the word "recommended" -- that

11  the MAPIP audits were monitoring psychiatric medication

12  in a very detailed manner, and that the amount of

13  medication monitoring that was currently being conducted

14  did not represent deliberate indifference for

15  psychiatric treatment.

16      Q.   Any other recommendations?

17      A.   No.  Those are the ones I recall.

18      Q.   Was there a point in the project where you

19  were sharing responsibility for reviewing suicide

20  prevention with Dr. Dvoskin?

21      A.   To the extent that I was looking at the mental

22  health crisis bed and suicide watches, but I wasn't

23  working on the suicide prevention piece.

24      Q.   Did you learn at some point that the CDCR had

25  commissioned a report from Lindsay Hayes on suicide

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    prevention?

2         A.    No, I don't -- I don't recall that.

3         Q.    Okay.  Even after your work was done, did you

4    learn about that?

5         A.    From Lindsay Hayes?

6         Q.    Yes.

7         A.    No, I'm not aware of -- I don't recall it.

8         Q.    Okay.  So you've never seen his report or

9    heard that there was a report?

10        A.    I read Dr. Dvoskin's report.  And if he

11   referenced it in that, then I would have had a reference

12   from reading his reports.

13        Q.    If I told you that he -- one of his

14   recommendations was that CDCR take steps to do two

15   things in conjunction with regard to the crisis beds,

16   one, lower the threshold for putting people on suicide

17   precautions, both watch and the other level, and in

18   order to deal with the increase, then, in people that

19   you need to watch, use the nonlicensed outpatient

20   housing units more for suicide precautions?

21        A.    Last bit again.

22        Q.    Use the nonlicensed outpatient housing more

23   and also -- I'll back up before I ask the question and

24   give you more background representation.

25             The way the system operates now, the guideline

Charles Scott, M.D.                                    March 8, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8          That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                    DATED:  March 11, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 90



Transcript of the Testimony of:

# **Diana Toche**

Coleman v. Brown

February 22, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          )CASE NO.:
          vs.                             ) S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____)



DEPOSITION OF

DIANA TOCHE

FRIDAY, FEBRUARY 22, 2013,  9:00 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,           )
                                      )
 5                   Plaintiffs,      )
                                      )CASE NO.:
 6         vs.                        ) S 90-0520 LKK-JFM
                                      )
 7   EDMUND G. BROWN, JR., ET AL.,    )
                                      )
 8                   Defendants.      )
     _____)

 9

10

11

12

13

14          The Deposition of DIANA TOCHE, taken on behalf

15   of the Plaintiffs, before Megan F. Alvarez, Certified

16   Shorthand Reporter No. 12470, Registered Professional

17   Reporter, for the State of California, commencing at

18   9:00 a.m., Friday, February 22, 2013, at the offices of

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

Diana Toche                                                    February 22, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  KRISTA STONE-MANISTA, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, TENTH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              KSTONE-MANISTA@RBGG.COM

 7
      FOR DEFENDANTS:
 8
                BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
11              415.703.3035
                415.703.5843 FAX
12              PATRICK.MCKINNEY@DOJ.CA.GOV

13              BY:  KATHERINE K. TEBROCK, ESQ.
                DEPARTMENT OF CORRECTIONS AND REHABILITATION
14              OFFICE OF LEGAL AFFAIRS
                1515 S STREET, SUITE 314 SOUTH
15              SACRAMENTO, CALIFORNIA 95811
                916.323.2929
16              916.327.5306 FAX
                KATHERINE.TEBROCK@CDCR.CA.GOV

17

18    ALSO PRESENT:

19              MARC SHINN-KRANTZ, PARALEGAL

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    I N D E X

 2              INDEX OF EXAMINATIONS

 3

 4   Examination by Ms. Stone-Manista  .................7

 5

 6                   --o0o--

 7

 8        EXHIBITS MARKED FOR IDENTIFICATION

 9   No.             Description              Page

10   Exhibit 1    Organizational chart dated .........11
                  February 2013, California
11                Department of Corrections and
                  Rehabilitation
12
     Exhibit 2    Letter dated 4/17/12 from Brigid ....17
13                Hanson to Cliff Tillman, Bates
                  DEXT103779 through 103787
14
     Exhibit 3    Declaration of Diana Toche  ........20
15
     Exhibit 4    Mental Health Services Audit .......52
16                Tool, Bates DEXP104219 through
                  104254
17
     Exhibit 5    Report titled "Clinical ............60
18                Evaluation of California's
                  Prison Mental Services Delivery
19                System"

20   Exhibit 6    Color photograph  ..................83

21   Exhibit 7    Color photograph  ..................87

22   Exhibit 8    Color photograph  ..................89

23   Exhibit 9    Pilot Program for Alternative ......94
                  Treatment Option Modules
24
     Exhibit 10   E-mail string, topmost dated .......113
25                1/8/13, RE: Suicide prevention
```

Diana Toche                                                   February 22, 2013

```
 1   Exhibit 11     Letter dated 7/18/12 from .........123
                    Benjamin Rice to Jane Kahn
 2
     Exhibit 12     Plaintiff Ralph Coleman's Third ....143
 3                  Request for Production of
                    Documents to Defendants Brown,
 4                  et al.

 5   Exhibit 13     Memo dated 7/31/12, Mental ........148
                    Health Program Position
 6                  Authority

 7   Exhibit 14     Executive Summary, Mental Health ...168
                    Program Hiring Progress and
 8                  Vacancy Reports, November 2012
                    Reporting Period
 9
     Exhibit 15     Executive Summary, Mental Health ...177
10                  Program Hiring Progress and
                    Vacancy Reports, December 2011
11                  Reporting Period

12   Exhibit 16     Correctional Health Care ...........189
                    Services Mental Health
13                  Institution Vacancies, Summary
                    by Institution by Classification
14                  as of December 2012

15   Exhibit 17     Notice of deposition  .............232

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              WITNESS INSTRUCTED NOT TO ANSWER

 2                                          Page   Line
                                            No.    No.
 3   Q.    When you had those conference calls ....55     5

 4         or meetings where they told you

 5         what they had found, how did they

 6         do that?

 7

 8   Q.    Will you tell me now what .............233    10

 9         recommendations Ms. Moore made in

10         those earlier meetings?

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Diana Toche                                                    February 22, 2013

1      Q.    What about Dr. Canning?  Do you remember

2  anything specifically that you discussed regarding the

3  report?

4      A.    No.

5      Q.    And Ms. Eargle or Dr. Eargle?

6      A.    Dr. Eargle.

7      Q.    Did do you remember anything you discussed?

8      A.    No.

9      Q.    Okay.  While we're on the subject of this

10  special master and his reports, turn to paragraph 9 of

11  your declaration.  You write there, on line 22, of this

12  page:  "The continued Coleman monitoring has

13  increasingly diverted attention and resources away from

14  the central goal of providing and maintaining the

15  constitutional level of mental health care."

16          What do you mean when you say "diverted

17  attention"?

18      A.    What I mean is that the load that's created by

19  the monitoring rounds and doing the monitoring and

20  providing the reports and the like is very -- is very

21  heavy.

22      Q.    Okay.

23      A.    That's a large lift for the institutions and

24  for the headquarters.  And so -- and in so that we have

25  to do that, it diverts attention from providing direct

Diana Toche                                          February 22, 2013

```
 1   patient care.
 2        Q.   So one example of that that you provide here
 3   is that there are, quote, onerous reporting obligations.
 4        A.   Whose quoted onerous?  Me?
 5        Q.   On line 34.
 6        A.   Okay.
 7        Q.   And also line 27.
 8        A.   Okay.
 9        Q.   What do you mean by "onerous reporting
10   obligations"?
11        A.   That it's -- you know, they ask for a lot of
12   information that is a heavy lift and a lot of extra
13   stuff --
14        Q.   What specifically --
15        A.   -- to gather.
16        Q.   I'm sorry?
17        A.   It's a lot of stuff to gather.
18        Q.   What specifically do they ask for?
19        A.   There's a whole request for -- for the
20   monitoring part.
21        Q.   And why --
22        A.   So I don't know specifically.
23        Q.   Do you know what in that request is new for
24   the special master?  What is --
25        A.   I don't know.
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Diana Toche                                              February 22, 2013

```
 1        Q.    Okay.  If the special master weren't there,
 2   you weren't requesting these things, do you know what
 3   information the institutions would cease -- would stop
 4   producing?
 5        A.    I don't know.
 6        Q.    Okay.  In the same paragraph, also line 25,
 7   you write:  "The clinical staff expended considerable
 8   resources preparing for prison visits."
 9             Do you know how much time is spent preparing
10   for those visits?
11        A.    Specifically?
12        Q.    What's your understanding?
13        A.    I understand it's a tremendous amount of time.
14        Q.    What do you mean by "tremendous"?
15        A.    A lot.
16        Q.    Can you give me a ballpark?
17        A.    No.
18        Q.    Does "a lot" to you mean 10 hours?
19        A.    No.
20        Q.    Do you believe that it's more than 10 hours?
21        A.    Yes.
22        Q.    Do you believe that it's more than 20 hours?
23             MR. MCKINNEY:  I'm going to object to that
24   question as vague and ambiguous.  I'm not sure if we're
25   talking about one institution or systemwide.  I just
```

Page 37

Diana Toche                                                    February 22, 2013

```
 1   want to be clear on that.
 2           You can answer.
 3           THE WITNESS:  I don't know the hours.  So you
 4   can keep naming hours, and I'll keep saying "I don't
 5   know."  To be honest, I don't know the hours.
 6   BY MS. STONE-MANISTA:
 7       Q.   But you know that it's a lot?
 8       A.   Yeah.
 9       Q.   Do you know what exactly is entailed in
10   preparing for those visits?  What does the institution
11   actually do?
12       A.   No.
13       Q.   Do you know what information the special
14   master requests that isn't prepared in the ordinary
15   course of business for those visits?
16       A.   No.
17       Q.   Do you know what information he requests that
18   can't be pulled out of existing databases?
19       A.   No.
20       Q.   Have you attended any of the special master's
21   monitoring tours?
22       A.   I believe so.
23       Q.   Do you recall what tour you might have
24   attended?
25       A.   Mule Creek.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                      February 22, 2013

 1          Q.   Did you, at any time after this e-mail, reach
 2     out to Mr. Hayes about his report?
 3          A.   No.
 4          Q.   So that e-mail was written on August 21st --
 5          A.   Uh-huh.
 6          Q.   -- and you were cc'd.  And the next e-mail
 7     thread from September 4th was Mr. Hayes' response to
 8     Dr. Belavich, again cc'ing you.
 9          A.   Uh-huh.
10          Q.   And then the next e-mail in the thread is from
11     January 8th, 2013, also from Mr. Hayes to Dr. Belavich
12     cc'ing you.
13               Do you recall receiving this e-mail in
14     January?
15          A.   Yes, I do.
16          Q.   When you received this e-mail, did you discuss
17     it with Dr. Belavich?
18          A.   I -- you know, I don't specifically remember
19     if I discussed it with him, but I'm sure that we
20     discussed it.  I mean, I -- but I don't remember
21     positively, but I'm sure we did.
22          Q.   Okay.  Between August 21st, at which time --
23     Dr. Belavich wrote:  "Please give us a few days to make
24     further contacts within CDCR so that we can contact you
25     and formulate ideas about potential consulting

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                                    February 22, 2013

1    opportunities for you with CDCR."

2              Between August 21st and January 8th of this

3    year, did you and Dr. Belavich -- did you reach out to

4    anyone within CDCR about further work from Mr. Hayes?

5         A.   I believe I discussed this with counsel, legal

6    counsel.

7         Q.   Do you recall with whom you discussed it

8    specifically?

9         A.   I think I talked about it with Debbie Vorous.

10        Q.   Beyond speaking with Ms. Vorous --

11        A.   But I'm not positive.  It could have been

12   Tom Gilevich as well since he was on the string.  So I'm

13   not sure.

14        Q.   So beyond speaking with counsel, from the

15   attorney general --

16        A.   Right.

17        Q.   -- did you reach out to anyone else within the

18   department about potential consulting opportunities for

19   Mr. Hayes?

20        A.   I don't remember.

21        Q.   Okay.  To your knowledge, did Dr. Belavich --

22        A.   I don't know.

23        Q.   -- reach out to anyone?

24             You don't know?

25        A.   I don't know.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1   broadly, but I may get some of the finer points not

 2   exactly right.

 3           And so I will say that we've always, in the

 4   mental health program, been focused on hiring what we

 5   call the big three:  The psychiatrist, the clinical

 6   social workers and psychologists.

 7       Q.   Right.

 8       A.   And when we were rolling out all the positions

 9   that were approved for the mental health staffing, along

10   with what was going to be happening with the realignment

11   and the shift of the inmate patients, that there --

12   begins with the voluntary transfer process.

13           So if there's a -- and they noticed based on

14   whatever.  I can't remember the specifics.  And so --

15   and so people can voluntarily transfer anywhere in the

16   state.  Statewide.

17       Q.   Okay.

18       A.   Once those people land, then options happen.

19   And then people are either given the right -- either

20   you're high enough on the seniority list and you

21   maintain your position, or there may be some bumping, or

22   you may go into a vacancy or something like that, but

23   that only happens within the county.

24       Q.   Okay.

25       A.   So if there are, let's say, five office

1    technicians in one county and there's only four spaces

2    for people to be at, then one person may eventually be

3    laid off.

4        Q.   Okay.

5        A.   Okay.  So during this time of the shuffling of

6    people, there might be small windows to fill, but you

7    have to -- you can't say you can voluntarily transfer to

8    these vacancies and then, in the meantime, been filling

9    those vacancies.

10          So when you asked "Is there a freeze?" -- I

11    mean, it's dependent on the point in time that you're

12    talking about and the classification and the county, and

13    that sort of thing.  Okay?  So it's a little bit more

14    complicated than yes or no.

15        Q.   I'm aware it's very complicated.

16        A.   I hope I explained that well.  But, you know,

17    we're not really ever supposed to talk about it, because

18    there's so many nuances with different bargaining units.

19    So I'm hoping that, broadly, I explained it well enough.

20        Q.   You mentioned that there might, in some cases,

21    be layoffs.

22          Are you aware of any layoffs that have

23    happened yet in 2013, just in the last two months?

24        A.   I believe we're close to something happening.

25        Q.   So to your knowledge, there may be layoffs

Diana Toche                                          February 22, 2013

```
 1        A.    Why you tell me what you think it is, and then
 2    I'll correct you.
 3        Q.    I've been trying and trying to figure out --
 4    so when I actually read those words "freeze exemption
 5    request process," that implies to me that there is a
 6    freeze from which an exemption must be requested.
 7              Is that -- am I wrong in that understanding?
 8        A.    Well, there's a process, and I think that
 9    might be the name; and there may or may not be a freeze
10    depending on where we are in the layoff process and the
11    clarification.
12        Q.    So where we are in space and time.
13        A.    Yeah.  And so what I'm saying is that if we
14    had to come up with a new name for the form and a new
15    form for all the different points in time, it would be
16    very confusing for the field.  So you stick the same
17    name and the same form.
18        Q.    Regardless of --
19        A.    Regardless of.
20        Q.    Okay.  That's interesting.  This is something
21    I've been trying to understand as well as everybody
22    else.
23              Are there particular -- we talked about it
24    kind of depends on where you are --
25        A.    Right.
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Diana Toche                                          February 22, 2013

 1    rough idea, across the system, of how many mental health
 2    positions are currently filled by the registry?
 3         A.   Personally, breakdown, I don't know.
 4         Q.   Okay.  Do you -- are you aware of any
 5    downsides to using people off the registry?
 6         A.   Currently, right now, no.
 7         Q.   Does use of the registry ever cause problems
 8    in -- I imagine you have to train people.  Is that ever
 9    a problem for an institution?
10         A.   That would be more in Dr. Belavich's realm.
11         Q.   As far as the actual use of registry?
12         A.   Management and use, yes.
13         Q.   Okay.  In the data we were looking at a little
14    bit ago, it mentions adjustments for new hires.
15              Can you explain that to me?
16         A.   It's my understanding the SCO is -- there's a
17    certain cutoff date for data, and then maybe people will
18    be hired after that and they wouldn't be captured in the
19    SCO data.
20         Q.   Okay.  That's interesting.
21              Okay.  So that sort of -- you mentioned
22    earlier there's kind of a pipe line.
23         A.   Kind of like a flux.
24         Q.   Okay.  I see that.  That makes sense.
25              And adjustments for long-term sick leave, I'm

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                                    February 22, 2013

 1   have they raised up something to my level to say

 2   something's wrong?

 3        Q.   Has a problem come to your attention?

 4        A.   They have not raised something up to my level.

 5        Q.   Okay.

 6        A.   They may be discussing something with Tim or

 7   regional.  I don't know.  But nothing has been raised up

 8   to my level.

 9        Q.   You haven't had further discussions with

10   Dr. Belavich about CMC specifically about staffing

11   shortages?

12        A.   About staffing at CMC?  I think that we always

13   have discussions about CMC, because we're also -- have

14   the new 50 beds being developed there.  So there's

15   discussions about staffing.

16        Q.   I see.

17        A.   So there's additional factors.

18        Q.   Okay.  What about department of state

19   hospital's facilities?  Do you get data about vacancies

20   at DSH facilities?

21        A.   Staffing vacancies, no.

22        Q.   You never review data about those facilities?

23        A.   No.

24        Q.   So you couldn't speak to, for instance,

25   staffing at SVPP or --

Diana Toche                                                    February 22, 2013

1         A.    43.75.

2         Q.    We talked a little bit earlier about

3    30 percent and the system could be adequate at

4    30 percent.

5              Do you think that SCC is running an adequate

6    program at 43.75 percent vacancies?

7              MR. MCKINNEY:   Objection.   Compound.   Calls

8    for speculation.   Argumentative.

9              THE WITNESS:   I would need -- I would actually

10   need to talk to Dr. Belavich to see what he has to say

11   about the care being provided here per the vacancy rate,

12   who's working here.

13   BY MS. STONE-MANISTA:

14        Q.    So you don't -- as we sit here today, you

15   don't have a personal opinion?

16        A.    Without all the facts -- because I -- I -- Tim

17   and I have discussed SCC, and so there's -- I know that

18   there's certain things about it.   And so I just -- you

19   know, I would prefer to talk to Tim before I answer that

20   question.

21        Q.    What have you and Dr. Belavich discussed about

22   SCC?

23        A.    About the personnel there and the -- and the

24   mental health caseloads and the like.   So I just would

25   be comfortable in discussing that with him more.

```
 1              MR. MCKINNEY:  Objection.  Vague and
 2    ambiguous.  Calls for speculation.  Calls for legal
 3    conclusion.
 4              THE WITNESS:  So I recently visited Pelican
 5    Bay -- well, not recently -- last year -- so it's been a
 6    new year -- and spoke with the CEO and the chief of
 7    mental health, and they showed me the -- their -- the
 8    program of how they're following it and how they're
 9    delivering care and how they're assessing themselves.
10    And Dr. Dvoskin was there as well.  And it was, you
11    know, of my opinion and of Dr. Dvoskin's opinion, while
12    we were there, that the care being delivered there was
13    adequate.
14    BY MS. STONE-MANISTA:
15         Q.   Was Dr. Dvoskin the only expert to come on
16    that tour?  Do you recall?
17         A.   Steve Martin was there as well.
18         Q.   So with respect to Pelican Bay, because you'd
19    recently visited or you visited last fall with
20    Dr. Dvoskin and Steve Martin, you're comfortable saying
21    that care there is adequate?
22         A.   Yes, because I went there myself.
23         Q.   So we've been talking through things.  It
24    sounds like there's a lot more information you would
25    like to have in front of you and a lot of conversations
```

 1   with Dr. Belavich.

 2           Is there anyone else on whom you rely in

 3   making these kinds of assessments about care at

 4   particular institutions other than Dr. Belavich?

 5       A.   Well, as I alluded to, is that we have -- we

 6   have the structure in the system and the processes.  And

 7   so for me, as the director of health care, I rely on

 8   Dr. Belavich, who's the director of the mental health

 9   program.  All right?  He has his direct reports that

10   report to him who he relies on.

11       Q.   I understand.

12       A.   And so in meetings I rely -- if we're in a

13   meeting about a specific subject matter, there may be a

14   SME that will also inform Dr. Belavich and myself for

15   further education or knowledge base, but it's not like

16   I'm going to go and contact someone at an institution, a

17   chief of mental health at an institution and circumvent

18   all these other people.  Because they --

19       Q.   Is that something you've ever done, contacted

20   a chief of mental health at an institution?

21       A.   Personally, I have -- I have, but then you

22   have to circle around and keep everybody in the loop.

23           So even before I was the director of health

24   care over dental health and mental, I was just the

25   director over the dental program.  Same structure.  You

Diana Toche                                          February 22, 2013

```
 1   have the -- you -- we had the regional structure and the
 2   regional structure reported to my associate director in
 3   that circumstance.   So relatively similar structure.
 4          It's not like I went down and talked to
 5   supervising dentists every day.   Okay?   I did do it, and
 6   then people got mad because then they're out of the
 7   loop.   Everybody needs to know what's going on, what's
 8   important.
 9          So if it's important enough to me to want to
10   reach down, then obviously I think that someone like Tim
11   would want to know, the regional would want to know.
12      Q.   Okay.   So when you wrote in your declaration,
13   quote, adequate numbers of mental health professionals
14   and administrators proactively diagnosis and treat
15   inmates' serious mental health needs, what was the basis
16   for that statement?
17      A.   For that statement.
18          So the basis for that statement is that
19   throughout 2012 I visited a number of institutions with
20   the Coleman experts, see the sustainable process.   I
21   visited numerous expert -- numerous institutions with
22   the DAG experts:   Dr. Dvoskin and Dr. Scott, Jackie
23   Moore.   And also receiving reports from the regionals as
24   they report out on the sustainable process and the care
25   being delivered.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                    February 22, 2013

1            And so, you know, personal observation,
2    reports, the wait list is at zero.  You know, the care
3    that I observed personally out at these institutions,
4    from the staff.  I mean, they care.  You got people
5    staying there as long as it takes.  They're -- this is a
6    dedicated staff dedicated to providing care.
7            So if we're there doing some sort of tour,
8    they're there staying late or coming in early so that
9    they can see the inmate patients.
10        Q.   So your visits to the institutions?
11        A.   My visits to institution, conversations with
12   the Coleman experts.
13        Q.   Okay.
14        A.   Conversations with the deputy attorney general
15   experts.  Conversations with the staff at the
16   institutions.
17        Q.   So just a second ago, before I forget, when
18   you said DAG experts, you meant deputy attorney general?
19        A.   Yes.
20        Q.   Okay.  We have acronyms for everything.
21            MR. MCKINNEY:  One acronym you didn't know.
22   BY MS. STONE-MANISTA:
23        Q.   Okay.
24        A.   I'm trying to distinguish between the experts.
25   It's hard, though.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                                     February 22, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8             That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13            I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                   DATED:  March 5, 2013

21

22                   _____

23                   MEGAN F. ALVAREZ

24                   RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com