# Exhibit 91

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213 (Rev 06/03)

| | |
|---|---|
| AGREEMENT NUMBER | 11-6459 |
| REGISTRATION NUMBER | eP 1182434 |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
**DEPARTMENT OF JUSTICE**

CONTRACTOR'S NAME
**JOEL A. DVOSKIN, Ph.D., A.B.P.P.**

2. The term of this Agreement is:   **9/1/11**   through   **6/30/12**

3. The maximum amount of this Agreement is:   **$100,000.00**   One Hundred Thousand Dollars and No Cents,

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | 1 page |
| Exhibit B – Budget Detail and Payment Provisions | 2 pages |
| Exhibit C* – General Terms and Conditions | GTC 610 |
| Check mark one item below as Exhibit D: | |
| ☒ Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement) | 3 pages |
| ☐ Exhibit - D* Special Terms and Conditions | |
| Exhibit E – Contractor's Resume | 4 pages |

DOJ Docket No.: **48170 286 CF1997CS0003**   DAG: **Patrick McKinney**

Case Name: **Coleman v. Brown**

*Items shown with an Asterisk (*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language/default.htm*

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | California Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.) **JOEL A. DVOSKIN, Ph.D., A.B.P.P.** | |
| BY (Authorized Signature)      DATE SIGNED (Do not type) 9/19/11 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING **JOEL A. DVOSKIN, Ph.D., A.B.P.P.** | **APPROVED** |
| ADDRESS **668 E. Weckl Place Tucson, AZ 85704-6076**   Telephone: **(520) 577-3051.** | OCT 26 2011 |
| **STATE OF CALIFORNIA** | |
| AGENCY NAME **DEPARTMENT OF JUSTICE** | DEPT OF GENERAL SERVICES |
| BY (Authorized Signature)      DATE SIGNED (Do not type) **OCT 18 2011** | |
| PRINTED NAME AND TITLE OF PERSON SIGNING **STEPHEN F. NAPOLILLO, Manager, Contracts Unit** | ☐ Exempt per: |
| ADDRESS **1300 I Street, 8th Floor Sacramento, CA 95814** | |

DEXP 103091

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213A (Rev 06/03)

| ☐ CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED | Pages | AGREEMENT NUMBER 11-6453 | AMENDMENT NUMBER 1 |
|---|---|---|---|
| | | REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
**DEPARTMENT OF JUSTICE**

CONTRACTOR'S NAME
**STEVE J. MARTIN, ESQ.**

2. The term of this Agreement is:  9/1/11  through  **6/30/13**

3. The maximum amount of this Agreement is:  **$ 100,000.00**  One Hundred Thousand Dollars and No Cents

4. The parties mutually agree to this amendment as follows. All actions noted below are by this reference made a part of the Agreement and incorporated herein:
This Amendment is effective as of 6/29/12.

- Change the termination date of the Agreement from 6/30/12 to 6/30/13.

All other terms and conditions shall remain the same.

Case Name: Coleman v. Brown
Docket No.: 48170 286 CF1997CS0003
DAG: Patrick McKinney

All other terms and conditions shall remain the same.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | | California Department of General Services Use Only |
|---|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.) STEVE J. MARTIN, ESQ. | | |
| BY (Authorized Signature) | DATE SIGNED (Do not type) 7/23/12 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING STEVE J. MARTIN, ESQ. | | |
| ADDRESS 8613 Adirondack Trail Austin, Texas 78759  Telephone: (512) 346-7607 | | *Exempt From DGS Approval Per DGS Exemption Letter No.52* |
| STATE OF CALIFORNIA | | |
| AGENCY NAME DEPARTMENT OF JUSTICE | | |
| BY (Authorized Signature) | DATE SIGNED (Do not type) | |
| PRINTED NAME AND TITLE OF PERSON SIGNING STEPHEN F. NAPOLILLO, Manager, Contracts Unit | | ☐ Exempt per: |
| ADDRESS 1300 I Street, Suite 820 Sacramento, CA 95814 | | |

DEXP 109511

## UNIVERSITY OF CALIFORNIA, DAVIS

BERKELEY · DAVIS · IRVINE · LOS ANGELES · RIVERSIDE · SAN DIEGO · SAN FRANCISCO



SANTA BARBARA · SANTA CRUZ

DEPARTMENT OF PSYCHIATRY
2516 STOCKTON BOULEVARD
SACRAMENTO, CA 95813
916-734-6870

UNIVERSITY OF CALIFORNIA/ DAVIS
MEDICAL CENTER, SACRAMENTO
2315 STOCKTON BOULEVARD ·
SACRAMENTO, CALIFORNIA 95817

October 8, 2012

Patrick McKinney
Deputy Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Ph: 415-703-5500

RE:   Coleman, et al. v. Brown, et al.
      DOJ Docket No.: 48170286CF1997CS0003
      Standard Agreement No. 11-8512

Dear Mr. McKinney,

Below is an itemized list of charges regarding the above named case for September 11, 2012
through October 5, 2012:

| Date | Service | Time | Rate (per hour) | Total |
|------|---------|------|-----------------|-------|
| 9/11/2012 | Record review / Report preparation | 8.00 hrs | $200.00 | $1,600.00 |
| 9/12/2012 | Travel – Sacramento to Vacaville | 0.75 hrs | $200.00 | $150.00 |
| 9/12/2012 | Consultation / Review | 5.00 hrs | $200.00 | $1,000.00 |
| 9/12/2012 | Travel – Vacaville to Sacramento | 0.75 hrs | $200.00 | $150.00 |
| 9/12/2012 | Consultation | 1.00 hrs | $200.00 | $200.00 |
| 10/1/2012 | Record review | 1.50 hrs | $200.00 | $300.00 |
| 10/2/2012 | Record review / Report preparation | 8.50 hrs | $200.00 | $1,700.00 |
| 10/3/2012 | Record review / Report preparation | 2.50 hrs | $200.00 | $500.00 |

| 10/5/2012 | Record review | 0.50 hrs | $200.00 | $100.00 |
| 10/5/2012 | Record review / Report preparation | 1.50 hrs | $200.00 | $300.00 |
| | Total: | 30.00 hrs | | $6,000.00 |

Please make the check payable to:   UC REGENTS

The appropriate tax I.D. number is:   94-6036494.  For tax reporting purposes, the income is reported as UC Regents NOT Charles L. Scott, M.D.

Please include on the check the reference number 01-016786876, and mail check to:

Cashier's Office
University of California, Davis
P.O. Box 989062
West Sacramento, CA  95798-9062

Respectfully submitted,

Charles L. Scott, M.D.
Chief, Division of Psychiatry and the Law
Professor of Clinical Psychiatry
Department of Psychiatry & Behavioral Sciences
University of California, Davis Medical Center – Sacramento

STATE OF CALIFORNIA
STANDARD AGREEMENT
STD 213A (Rev 06/03)

☐ CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED _____ Pages

| AGREEMENT NUMBER | AMENDMENT NUMBER |
|---|---|
| 11-8512 | 1 |
| REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
DEPARTMENT OF JUSTICE

CONTRACTOR'S NAME
Regents of the University of California, Davis

2. The term of this          09/01/11          through          06/30/13
   Agreement is:

3. The maximum amount     $ 100,000.00
   of this Agreement is:    (One Hundred Thousand Dollars and No Cents)

4. The parties mutually agree to this amendment as follows. All actions noted below are by this reference made a part of the Agreement and incorporated herein:

   • This Amendment is effective as of June 29, 2012

   • Extend the termination date of the Agreement from June 30, 2012 to June 30, 2013.

All other terms and conditions shall remain the same.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | | California Department of General Services Use Only |
|---|---|---|
| CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.) Regents of the University of California, Davis | | |
| BY (Authorized Signature) ✍ | DATE SIGNED(Do not type) 8-31-2012 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING ANNIE WONG, DIRECTOR, HEALTH SYSTEM CONTRACTS | | "Exempt from DGS Approval Per DGS Exemption Letter No.52" |
| ADDRESS Dept. of Psychiatry & Behavioral Sciences 7230 Stockton Blvd., 2nd Floor Sacramento, CA 95817 | | |

| STATE OF CALIFORNIA | | |
|---|---|---|
| AGENCY NAME DEPARTMENT OF JUSTICE | | |
| BY (Authorized Signature) ✍ | DATE SIGNED(Do not type) SEP 13 2012 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING STEPHEN F. NAPOLILLO, Manager, Contracts Unit | | ☐ Exempt per: |
| ADDRESS 1300 I Street, Suite 820 Sacramento, CA 95814 | | |

DEXP 102004

# Exhibit 92

| | |
|---|---|
| **From:** | McDonald, Terri@CDCR |
| **Sent:** | Sunday, January 27, 2013 6:41 PM |
| **To:** | Dickinson, Kathleen@CDCR; Stainer, Michael@CDCR; Allison, Kathleen@CDCR |
| **Cc:** | Acosta-Hoshall, Christina@CDCR |
| **Subject:** | FW: Suicide Compendium V5 |
| **Attachments:** | Suicide_Compendium_1-27-13_MJM_v5.pdf |

**Importance:**      High

FYI

Chris, please print

Thx

From: Toche, Diana@CDCR
Sent: Sunday, January 27, 2013 4:04 PM
To: Rice, Benjamin@CDCR; Hoshino, Martin N@CDCR; Beard, Jeff@CDCR; McDonald, Terri@CDCR
Subject: FW: Suicide Compendium V5

Attached please find the latest version in preparation for Tuesday's meeting. Please let me know if you would like additional clarification or information. MH is on stand by if needed.

Diana Toche, DDS
Director (A), DHCS
Deputy Director, Statewide Dental Program California Department of Corrections and Rehabilitation
501 J Street, Suite 400
Sacramento, CA 95814
916.691.0605 (desk)
916.764.4604 (B8)

From: Morrison, Michael@CDCR
Sent: Sunday, January 27, 2013 10:12 AM
To: Toche, Diana@CDCR; Rice, Benjamin@CDCR
Cc: Belavich, Tim@CDCR

1

Subject: Suicide Compendium V5

Good Morning, attached is version 5 with 25th round additions.  Please let me know if any other changes are needed.  The best way to sum up this project is to compare it to "herding cats."  Thank you for your patience.

Mike

Michael Morrison
Health Program Specialist
Statewide Mental Health Program
DHCS-CDCR
Mobile: 916-764-4996

| Compendium of Suicide Recommendations | | | | | |
|---|---|---|---|---|---|
| Completed: 24 | Ongoing: 9 | Total: 80 | | | |
| In Process: 29 | Unable to Proceed: 3 | | | | |
| Disagree: 13 | Non-Issue: 2 | | | | |
| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
| 2006 Court Order | Intake Cells | Ongoing | Each institution has intake cells, use of these cells is audited on an ongoing level.  When the audits yield bad results, it is addressed. | Work with DAI to ensure intake cells are being used appropriately; Ensure there are enough intake cells at each institution. | |
| 2006 Court Order | Retrofit Intake Cells | Completed | Addressed in 2008 Submittal | | |
| 2006 Court Order | Title 15 Requirements for out of cell time/priority | In Process | Auditing is difficult, numerous barriers to meet mandated hours. | Follow Up with DAI HQ Staff at MH/DAI ASU workgroup | |
| 2006 Court Order | Confidential MH interviews in ASU | Completed | Has been implemented at institutions where space permits. | | |
| 2006 Court Order | Reduction in Length Of Stay | Completed | Reviewed all inmate-patients in ASU for more than 30 days, reviewed COMPSTAT data and waiting lists for ASU transfer. Hubs has been reduced | | |
| 2006 Court Order | Return from court "Bad News" information | Completed | Addressed in 2012 Submittal | | |
| 2006 Court Order | Pre Placement Suicide Prevention Screening | Completed | Addressed in 2012 Submittal | | |
| 2006 Court Order | Post Placement Screening | Ongoing | Review on an ongoing basis from data from MHTS.Net | Continue to work with DAI Staff when issues arise | |
| 2006 Court Order | Daily Coordination | Completed | Addressed in 2012 Submittal | Daily huddles are occurring with ASU Sergeant and ASU MH Clinician; suicide information from MHTS.net is communicated with custodial staff | |
| 2006 Court Order | Minimum stay at EOP ASU Hubs | Ongoing | Monitored on an ongoing level using HCPOP data, minimum LOS is 60 days | Follow up with institutions to ensure minimum LOS is being met | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| 2006 Court Order | Auditing of Case Manager Review of Weekly Rounds Notes | Completed | Addressed in 2010 Submittal | | |
| 2006 Court Order | Audit of Screening refusals | Completed | Addressed in 2010 Submittal | | |
| 2006 Court Order | Audit of ASU Suicide Prevention | Completed | Addressed in 2010 Submittal | | |
| 2006 Court Order | Non-Disciplinary Segregation | Unable to Proceed | No plans to implement; have discussed the issue with custody and have identified barriers | | |
| 2006 Court Order | Custody Welfare Checks | Completed | Custody performs hourly welfare checks | Currently working with DAI to provide three welfare checks in 60 minutes instead of two | Initial recommendation was to have custody perform welfare checks, CDCR has implemented but is trying to increase frequency |
| 2006 Court Order | Double Celling | Ongoing | DAI reviews all inmate-patient suitability to be doubled celled | | |
| 2006 Court Order | Emergency Response | Completed | Addressed in 2010 Submittal | | |
| 2006 Court Order | Clinical Rounding | Completed | Addressed in 2010 Submittal | | |
| 2006 Court Order | Strike Team on site Reviews of ASU Bed Utilization | Completed/ In Process | Strike Team completed. | Modifications to departmental policy are being addressed in the MH/DAI ASU workgroup | |
| 2010 Court Order | SRE Mentor Program | Ongoing | Over 90 clinicians trained; Audit tool developed; Each institution has at least one primary mentor | Memorandum with specific timelines is currently being routed for approval prior to dissemination. Policy and Procedure currently en route to JCET. Will be monitored through QI process. | Recommendation stated to only mentor "new and unlicensed staff.," MH expanded to all staff who administer SRE's and mentoring and training is ongoing and cyclical w/peer consultation. |
| 2010 Court Order | Review and Revise Program Guide | In Process | MH has completed revisions and are currently with Debbie Vorous for review | Follow up with Debbie Vorous, once revisions are approved disseminate to field | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| 2010 Court Order | Improve Suicide Review Quality | Completed | Template revised, training implemented, additional reviewers trained | | |
| 2010 Court Order | Improve ISP Development | Completed | Process updated to ensure better collaboration with all institutional staff; DAI HQ is now involved with development of ISP prior to SCR | | |
| 2010 Court Order | Changes of conditions in ASU | Unable to Proceed | Pilot developed to change conditions in ASU at PBSP. Based on the findings from the pilot, this is unable to be rolled out statewide due to staffing and physical plant restrictions and conflict with DOM. | MH will still change as much conditions as possible, where possible. Example's are property privileges, provision of group treatment when space permitting, increase usage of Recreation Therapists, and problem-focused clinical treatment. | |
| 2010 Court Order | High Risk Inmate-Patient Management | Ongoing | Each institution has identified a "High Risk" specialist (mostly DSH Coordinators) | Follow Up with institutions with new policy in concordance with court requirements. | Overlaps with sustainable process |
| 2010 Court Order | Shared documentation with DSH | Completed | Created SharePoint Site | | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| Hayes Report | Problems with emergency response timeliness (based on review of 2010 suicides) | Non-Issue | Review of 2011 and 2012 suicides did not reveal this to still be a problem | Will continue to examine timelines through SCR process. | |
| Hayes Report | Inmate-patients committed suicide after discharge from observation status or Inmate-Patients threatened suicide, expressed SI and/or had other suicide risk factors that did NOT result in placement on suicide observation (based on review of 2010 suicides) | In Process | 2011 and 2012 suicides are being investigated to see if this is still true | Ensure that staff follow guidelines for what constitutes suicide observation. Will conduct audits and this will also be trained in the SRE mentoring program. | |
| Hayes Report | Inmate-patients found in rigor or review determined that cell checks not performed as required (based on reviews of 2010 suicides) | In Process | 2011 and 2012 suicides are being investigated to see if this is still true | Will follow up with DAI | |
| Hayes Report | Several ASU inmates who committed suicide were not in intake cells (based on reviews of 2010 suicides) | In Process | MH/DAI workgroup currently discussing issue | | |
| Hayes Report | 68% of cases involved multiple problem areas (based on review of 2011 suicides) | Completed | Rating system developed to determine if problems are systematic | | |
| Hayes Report | Threshold for placement on Suicide Observation is set too high | Disagree | Do not feel changes are appropriate. We do not support lowering threshold. | Ensure staff develop enhanced treatment plans for inmate-patients who have moderate risk. This will also be trained in the SRE mentoring program. | |
| Hayes Report | Revise definitions necessitating placement on SP or SW in PG. | In Process | Will clearly define Suicide Precaution and Suicide Watch; if revisions are not in those currently under review by Debbie Vorous, we will add them. | Confirm revisions to language have already been changed. If not, make the changes and resubmit for review. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| Hayes Report | Recommended changes to Chapter 10: page 11, under Peer Consultation, recommends adding "correctional staff" and "medical staff" as peers that need to be consulted. | Disagree | Peer consultation is specific to clinical consultation as it relates to mental health | Peer Consultation/Review is still being completed throughout the state. Will still consult and collaborate with custody and medical staff on an ongoing basis. | |
| Hayes Report | Recommended changes to Chapter 10: page 11, bottom and page 12, top. Additional language change on peer consultation. In one place it says that peer consultation can be one of the most important clinical safeguards and later it says it is not always necessary. He suggests deleting the latter. | In Process | If revisions are not in those currently under review by Debbie Vorous, we will add them. | Confirm revisions to language have already been changed. If not, make the changes and resubmit for review. | SRE mentoring program encourages peer consultation |
| Hayes Report | Recommended changes to Chapter 10: page 12, under Suicide History Tracking: Suggests expanding MHTS.net to include ALL inmates who have attempted suicide, engaged in SIB, or been placed on suicide observation regardless of whether or not they are "high risk mental health inmate-patients" or in MHSDS. | In Process | Any changes to MHTS.Net are required to be on a change list. This list is prioritized by a change control board. Need to determine whereabouts of change on the priority list. | Submit to change control board | All inmate's are in MHTS.Net. If suicide information has been entered into MHTS.Net, the information will follow the inmate no matter his/her level of care, even GP. |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|--------|----------------|--------|------------------|------------|-------|
| Hayes Report | Recommended changes to Chapter 10: page 11, Language change suggested. Currently reads, "When an inmate-patient verbalizes suicidal ideation without other signs and symptoms of increased risk for suicide, the mental health clinician is responsible for evaluating any contributing environmental stressors and communicating with custody staff and supervisor's regarding any potentially solvable custody issues." Refers to inmate who may be manipulating and/or malingering. Concern: Inmate-Patients who are manipulative or malingering can still be suicidal and require placement on suicide observation status. Recommends review and clarification. | In Process | Alteration of language currently being discussed | SRE mentoring program will address this | |
| Hayes Report | Recommended changes to Chapter 10, page 14, under Inmate and Cell Search, delete reference to "bed frames" being "removed" from the cell as well as "on the floor." Insert narrative that all inmates on suicide observation status shall be provided with suicide resistant beds. | In Process | Beds are in place. If Program Guide revisions are not in those currently under review by Debbie Vorous, we will add them | Confirm revisions to language have already been changed. If not, make the changes and resubmit for review. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| Hayes Report | Recommended changes to Chapter 10, page 14, under Inmate and Cell Search, no narrative describing items or privileges (shower, out of cell time, telephone calls, visitation, etc.), if any, is permitted. Found restrictive conditions for inmates on suicide observation status. No clothing - confined to cells at all other times - no visitation. Was informed these were correctional (not MH) decisions. Concern that inmates will say they are no longer suicidal in order to escape harsh conditions. | In Process | Agree that MHCB's are to restrictive, and property needs to be handled on a case by case basis. | Going to address with custody, will be culture change. Will also develop procedure consistent with how CHCF is handling their MHCB's, which is different than our current practice. | |
| Hayes Report | Recommended changes to Chapter 10, page 15 and 16, revise definitions of both Suicide Precaution and Suicide Watch (loosen definition) | Disagree | We do not plan on expanding either definition | Will ensure current definitions are clearly defined through SRE mentor program. | |
| Hayes Report | Recommended changes to Chapter 10, page 16 and 17, within the boxes that indicated Guidelines for Clinician-Ordered Suicide Precaution and Suicide Watch: delete reference to "remove all furniture" and insert provision of suicide-resistant beds. | In Process | If revisions are not in those currently under review by Debbie Vorous, we will ad them | Confirm revisions to language have already been changed. If not, make the changes and resubmit for review. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| Hayes Report | Recommended changes to Chapter 10, page 19, under Discharge and Return, argues that inmates sent to OHU for suicide observation status should receive same 5-day clinical follow-up as inmates placed in the MHCB for similar reasons. Suggest language changes to reflect this. | Completed/ In Process | This is implemented. Just need to confirm language is updated in Chapter 10 revision. | Confirm revisions to language have already been changed. If not, make the changes and resubmit for review. | All inmate-patients, not just those admitted for suicide observation, who are discharged from any crisis care receive a 5 Day Follow Up. |
| Hayes Report | Recommended changes to Chapter 13, page 19, under both Discharge and Return and MHCB Discharge, recommends deleting the word "imminent." Argues that lack of imminent or immediate danger of self-harm should not be the only criteria for removal from suicide observation status. | In Process | "Imminent" is a community standard, we will define better | Define more clearly through SRE mentoring program. | |
| Hayes Report | Recommended changes to Chapter 13, page 20, language regarding frequency of Wellness checks for MHCB discharges. Recommends frequency of greater than 60 minutes. | In Process | Currently working with DAI to provide three wellness checks in 60 minutes instead of two. | | |
| Hayes Report | Recommended changes to Chapter 10, page 21 & 22, under Custody Protocol and Hanging sections. Reference to term "if trained to do so" when referring to custody performing CPR. | Completed/ In Process | Staff have been trained. If revisions are not in, those currently under review by Debbie Vorous, we will add them. | Confirm revisions to language have already been changed. If not, make the changes and resubmit for review. | |
| Hayes Report | Use of OHUs for Suicide Precautions - lengthy discussion. Suggests using OHUs as crisis treatment areas for non SMI I/Ps. | Disagree | Plaintiffs do not support this; addressed in OHU memo | | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|--------|---------------|--------|-----------------|-----------|-------|
| Hayes Report | Use of OHUs - concern about cleanliness. | In Process | Vastly improved per regional administration site visits | Will be monitored through QI process | |
| Hayes Report | Use of OHUs - lower the threshold for crisis placement and utilize OHUs more | Disagree | Threshold for crisis placement is appropriate and do not believe it needs to be lowered. Plaintiffs also do not agree with use of OHU's. | MH will continue to monitor MHCB waitlist. MH believes a licensed facility it the most clinically appropriate placement for inmate-patients. | |
| Hayes Report | Use of Suicide Resistant Beds in MHCB's | Completed | | | |
| Hayes Report | Use of ZZ cells for housing inmate-patients on suicide observation. Suggests prohibiting their use for suicide observation. | Non-Issue | No longer an ongoing issue: MHCB's have been built, MHCB waitlist has decreased. | MH will continue to monitor MHCB waitlist. MH believes a licensed facility it the most clinically appropriate placement for inmate-patients. | |
| Hayes Report | Cadet Academy - add: 1. self-injurious v. suicidal behavior and effectively dealing with manipulative inmates 2. identifying inmates at risk for suicide despite their denial of risk; 3. updates | In Process | Curricla revised, we are currently reviewing MH components. QIP to be distributed statewide. | Develop best way to disseminate information | |
| Hayes Report | Suicide Prevention Training Curricula - HCNED - Expand to 2.5 hours and include above | In Process | Discussing training with CDHCS | Continue to work with CDHCS | |
| Hayes Report | Suicide Prevention Training Curricula - Annual IST. Good content but expand to include QIPs. | Disagree | IST is not the best method for this | Disseminate QIP; the best method for this would be through the local SPRFIT committees, who will then disseminate to all staff. | |
| Hayes Report | Local SPRFIT - Determine if they are functioning effectively, are they proactive? | In Process/Ongoing | Requesting minutes and assigned a staff member to review. | Minutes will be reviewed on a monthly basis and QIP's will be implemented for institutions who fail to meet the minimum requirements. Will be monitored through QI process. | |
| Hayes Report | ASUs for Suicide Observation - believes premature to discuss ASU as an option. | Disagree | Do not support use of ASU for Suicide Observation | Due to sufficient MHCB's, there is not a need to use ASU for Suicide Observation | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| Dwoskin Report | integration of MH, Custody and Medical | Completed | MH, Custody and Medical staff are now integrated throughout all steps of the SCR process. | | |
| Dwoskin Report | Serious issues need to be addressed immediately and should not wait for SCR | Completed | Training has been provided to all reviewers to capture serious issues, and these issues are addressed immediately and often before the SCR | | |
| Dwoskin Report | Requests for additional information and attention to recommendations should be issued directly from the Secretary's office. | Disagree | Requests will be elevated through chain of command, if necessary up to the Secretary's office | | |
| Dwoskin Report | All recommendations should be categorized according to a new scheme | Completed | Categorization scheme developed | | |
| Dwoskin Report | Informal recommendations should be followed up by HQ | Completed | HQ eliminating informal recommendations | | |
| Dwoskin Report | QIP usage - suggestion is to refer to QIP for the institution, and have numbered recommendations under the QIP plan. | Disagree | Change to current language will be confusing to field staff. | Will continue to follow current QIP process to alleviate confusion. Will be sure to define through SRE mentor program. | |
| Dwoskin Report | SCRs should be routed to receiver. Receiver receiving information only copies. | Disagree | Routing to Receiver, for signature, will cause delay and will result in failure to meet required timelines. | Informational copies will continue to be provided to the Receiver. | |
| Dwoskin Report | DRC not folded into SCR process. | Disagree | Can not fold DRC into SCR due to timelines. | Consultation with DRC will continue prior to completion of SCR. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| Dworkin Report | Special Master Reports on suicide available immediately | Unable to Proceed | Not an actionable item for CDCR | | |
| Dworkin Report | Issues in SCRs related to employee discipline, security group issues, institutional security, etc. | Disagree | Deferred to Internal Affairs, information is confidential. | Continue current process; receive number when case is assigned and are notified once it is completed. | |
| Dworkin Report | Reconsider "automatic" referrals to ASU in absence of a specific finding of danger. | In Process | Currently being discussed in MH/DAI ASU workgroup. | MH will review RVR and this may affect placement, also Captain reviews will result in discharge if inmate-patient is determined not to be a danger | |
| Dworkin Report | Interval between admission to ASU and first clinical contact. Former PC see an I/P within the same institution sooner than current policy mandates. If transfer to another institution, then use Tele-therapy or have another clinician make immediate contact. | In Process | Discussing feasible ways to implement. | CCCMS inmate-patient to be seen by next day after placements into ASU. | |
| Dworkin Report | Inmate-patient housed in ASU pending transfer to EOP should be placed at the front of the waiting list for transfer. | Disagree | There is already a priority placement list for inmate-patients awaiting transfer. CDCR stands behind the current list. | Will continue to use the current priority placement list for transfer. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|--------|---------------|--------|------------------|------------|-------|
| Dwoskin Report. | "The Department has made a significant effort to provide ASU inmates with the possibility of televisions in their cells, which can significantly decrease the distress inmates experience in segregation." | In Process | Currently being discussed in MH/DAI ASU workgroup. | This monitored and allowed where possible. Retrofitting other cells to provide electricity is cost prohibitive. | |
| Dwoskin Report. | When a recent DSH discharge commits suicide, CDCR should notify DSH to conduct its own investigation. Share investigations when complete. Formal notification and meeting to discuss findings. | Ongoing | First test case occurred 1/24/2013 at SVSP. | Will implement recommendation., CDCR to contact DSH. | |
| Dwoskin Report | Unable to gain access to medical record in one case. Due to no EMR. | In Process | eUHR implementation has helped with this issue. | CDCR is currently developing a "true" EMR which will void the issue identified. | |
| Dwoskin Report | Custody employees refuse to be interviewed. | In Process | All staff are encouraged to participate in interviews. If an issue arises where a staff refuses to be interviewed, it is raised through the chain of command. | Continue to work with DAI Staff when issues arise | |
| Dwoskin Report | Quality of SREs. | In Process/Ongoing | Addressed with SRE mentoring program | Memorandum with specific timelines is currently being routed for approval prior to dissemination. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| 25th Round | SRE Mentor Program is on partially implemented | Ongoing | Over 90 clinicians trained; Audit tool developed; Each institution has at least one primary mentor | Memorandum with specific timelines is currently being routed for approval prior to dissemination. Policy and Procedure currently en route to JCET. Will be monitored through QI process. | Recommendation stated to only mentor "new and unlicensed staff.," MH expanded to all staff who administer SRE's and mentoring and training is ongoing and cyclical w/peer consultation. |
| 25th Round | SPRFIT Meetings not meeting requirements | In Process/Ongoing | Requesting minutes and assigned a staff member to review. | Minutes will be reviewed on a monthly basis and QIP's will be implemented for institutions who fail to meet the minimum requirements. Will be monitored through QI process. | |
| 25th Round | Nine institutions did not provide data on if they had an ERRC during the reporting period | In Process | Eight of the Nine institutions have provided proof of practice that they are holding ERRC's. | The last institution, CMF, is expected to provide data on Monday 1/28/2013 | |
| 25th Round | 11 institutions did not provide data relative to CPR training during the reporting period | In Process | The institutions train CPR on an annual basis, the only way to get an accurate account of the staff that did not receive the training is to request the two years prior to the last day of the reporting period. It should be a very small number if any at all; at the most it would be around 10-30 staff at each institution and that number would put each institution above 90%. | Work with DAI to ensure institutions are holding trainings for CPR annually and that minimum attendance requirements are being met. | |

| Source | Recommendation | Status | Status Explained | Next Steps | Extra |
|---|---|---|---|---|---|
| 25th Round | Only three institutions were fully compliant with the conduct of five-day clinical follow ups for inmate-patients discharged from crisis care. | Ongoing | Based on data pulled from MHTS.Net for October 2012-December, 84% of the follow ups were completed on time. | Continue to monitor data from MHTS.Net to ensure five-day clinical follows up are being provided. | All inmate-patients, not just those admitted for suicide observation, who are discharged from any crisis care receive a 5 Day Follow Up. |
| 25th Round | "8 Staggering 30-minute welfare checks in administrative segregation has been an ongoing problem that, again, remained unresolved during the twenty fifth monitoring – only nine institutions completed these checks correctly." | In Process/Ongoing | "Staggering" has never been clearly defined. Institutions conduct periodic paper audits. | Monitor through QI process | |
| 25th Round | "Further, compliance levels for completion of the 31-item screen for newly-arriving inmates in administrative segregation have deteriorated, with only seven institutions compliant, as compared to 70 percent during the twenty-third round monitoring period. | In Process | Data from MHTS.Net is inaccurate and does not reflect the actual work performed. Have identified the data entry issue. | Develop and disseminate joint memorandum from MH and Nursing leadership to direct field on way to enter data correctly in MHTS.Net. Nursing staff provide the screenings, therefore the memorandum needs to be a dual signature. | |

**Acronyms:**

| | |
|---|---|
| MH – Mental Health | QIP – Quality Improvement Plan |
| QI – Quality Improvement (Specific to new process requested by Coleman Special Master) | LOS – Length of Stay |
| SRE - Suicide Risk Evaluations | DRC – Death Review Committee |
| SCR - Suicide Case Review | EMR - Electronic Medical Record |

# Exhibit 93

| | |
|---|---|
| **From:** | Jane E. Kahn <JKahn@rbgg.com> |
| **Sent:** | Friday, March 01, 2013 6:55 PM |
| **To:** | Coleman Team - RBG Only |
| **Subject:** | FW: Updated Activation Schedules |
| **Attachments:** | Activation Updates, March 1 2013.pdf.pdf |

---------------------------------------

**From:** Debbie Vorous[SMTP:DEBBIE.VOROUS@DOJ.CA.GOV]
**Sent:** Friday, March 01, 2013 6:54:45 PM
**To:** Kerry Courtney Hughes, MD; Patricia M. Williams; Haunani Henry;
Mary Perrien; Henry D. Dlugacz; Raymond F. Patterson, MD;
Kathryn Burns, MD, MPH; Paul Nicoll; Matt Lopes; Linda Holden;
Kristina Hector; Mohamedu Jones; Steve Raffa; kwalsh@pldw.com;
Jeff Metzner
**Cc:** Debbie Vorous; Steve Fama; Jane E. Kahn; Michael W. Bien
**Subject:** Updated Activation Schedules
**Auto forwarded by a Rule**


Dear Special Master Lopes:

Attached are Defendants' updated activation schedules for the court-ordered projects.

Thank you,



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally
privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review,
use or disclosure is prohibited and may violate applicable laws including the Electronic Communications
Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the
communication.

1

## *Coleman* Construction Activation Schedules
## Table of Contents

| | | |
|---|---|---|
| Exhibit #1 | Acronyms | 1 |
| Exhibit #2 | *California Men's Colony*<br>50 Mental Health Crisis Beds | 3 |
| Exhibit #3 | *Salinas Valley State Prison*<br>Treatment and Office Space Project | 7 |
| Exhibit #4 | *California State Prison, Sacramento*<br>128 Psychiatric Services Unit beds | 11 |
| Exhibit #5 | *California Medical Facility*<br>Treatment and Office Space | 15 |
| Exhibit #6 | *California State Prison, Los Angeles County*<br>Treatment Space for Enhanced Outpatient Program | 19 |
| Exhibit #7 | *California State Prison, Corcoran*<br>Treatment and Office Space for Administrative Segregation -<br>Enhanced Outpatient Program | 23 |
| Exhibit #8 | *Consolidated Care Center /*<br>*California Health Care Facility* | 27 |
| Exhibit #9 | *Central California Women's Facility*<br>Treatment and Office Space for<br>Enhanced Outpatient Program- General Population | 32 |
| Exhibit #10 | *Dewitt Nelson*<br>375 Enhanced Outpatient Program –<br>General Population and<br>50 Enhanced Outpatient Program-<br>Administrative Segregation Unit beds | 36 |

# Exhibit #1

## Acronyms

1

## Acronym List

| Term | Definition |
|------|------------|
| A/E | Architectural / Engineering |
| AB | Assembly Bill |
| ADA | Americans With Disabilities Act |
| ASU | Administrative Segregation Unit |
| CCC | Consolidated Care Center (also known as California Health Care Facility) |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEQA | California Environmental Quality Act |
| CHCF | California Health Care Facility (also known as Consolidated Care Facility) |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COBCP | Capital Outlay Budget Change Proposal |
| Compl. | Completed |
| Const. | Construction |
| COR | California State Prison, Corcoran |
| DGS | Department of General Services |
| DSH | Department of State Hospitals |
| DOF | Department of Finance |
| DPH | Department of Public Health |
| EOP | Enhanced Outpatient Program |
| FPC&M | Facility Planning, Construction & Management |
| ICF | Intermediate Care Facility |
| ISP | Ironwood State Prison |
| IWL | Inmate Ward Labor |
| JLBC | Joint Legislative Budget Committee |
| LAC | California State Prison, Los Angeles County |
| LAO | Legislative Analysts Office |
| LD | Liquidated Damages |
| MHCB | Mental Health Crisis Bed |
| N. O. D. | Notice of Determination |
| NTP | Notice To Proceed |
| OSHPD | Office of Statewide Health Planning and Development |
| PC | Penal Code |
| PIA | Prison Industry Authority |
| PMIA | Pooled Money Investment Account |
| PMIB | Pooled Money Investment Board |
| PP | Preliminary Plans |
| PSU | Psychiatric Services Unit |
| PWB | Public Works Board |
| Resp. | Responsible |
| SAC | California State Prison, Sacramento |
| SFM | State Fire Marshal |
| SM | Special Master |
| SMY | Small Management Yard |
| SVSP | Salinas Valley State Prison |
| TBD | To Be Determined |
| VSPW | Valley State Prison for Women |
| WD | Working Drawings |

# Exhibit #2

## *California Men's Colony*
## 50 Mental Health Crisis Beds

*3*

50 Bed Mental Health Crisis Facility (Licensed Facility) [1]

Report Period Ending:  February 25, 2013

| | |
|---|---|
| Responsible Person: | Deborah Hysen/CDCR |
| Address of Resp. Person: | 9838 Old Placerville Rd., Suite B Sacramento California |
| Project Architect: | Nacht and Lewis Architects |
| Location: | California Mens Colony, San Luis Obispo (CMC) |
| Funding Source: | AB 900 (GC 15819.40) |

Stephen Benson/DOF

915 L Street, Sacramento California 95814

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | | | | | | 3/13/09 | | | | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost, Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request, Submit to DOF for approval. | |
| Review Funding Request Package | | | | | 3/25/09 | 3/25/09 | | | | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | Funding request package completed on 3/25/09. |
| Legislative Approval of Scope, Schedule, and Cost | | | | | 4/10/09 | 4/10/09 | | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | |
| PWB Recognition of Project Scope, Cost, and Schedule | | 4/10/09 | 4/10/09 | | 4/10/09 | 4/10/09 | | | S. Benson | Upon legislative approval, obtain PWB recognition of Scope, Cost, and Schedule. | |
| Request Loan from PMIA | | 4/1/09 | 4/1/09 | | 4/1/09 | 4/1/09 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account. (PMIA) | |
| Approval of PMIA Funding | | 4/15/09 | 4/15/09 | | 4/15/09 | 4/15/09 | | 4/23/09 | Director of Finance, State Controller and State Treasurer | Submit Loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval. Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | Next loan renewal March 2010 and every year thereafter for the duration of the project. |
| Architectural/Engineering Contracting | | 4/15/09 | 4/15/09 | | 4/15/09 | 4/15/09 | | 4/23/09 | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contracts). | Notice to Proceed (NTP) issued 4/15/09. |
| Preliminary Plans | 251 | 4/20/09 | 4/15/09 | (5) | 12/27/09 | 12/28/09 | 1 | | K. Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | Preliminary plans are complete. |
| California Environmental Quality Act Compliance (CEQA) | 237 | 4/20/09 | 4/15/09 | (5) | 12/13/09 | 6/24/10 | 193 | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | Initial Study/Mitigated Negative Declaration public comment period ended 10/31/09. Delay due to responding to the large volume of public comments. NOD was filed 01/77/10. CCPOA filed litigation on 02/04/10. On 05/07/10, the case was transferred to the Eastern District Court. On 6/24/10, the parties to the CMC litigation stipulated to dismiss the action with prejudice. |
| JLBC Approval of Preliminary Plans | 45 | 12/28/09 | 12/28/09 | | 2/11/10 | 2/11/10 | | | JLBC | JLBC Approval. PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans. JLBC responded prior to 45-day review. | Design schedule accelerated 45 days, based on early JLBC package submittal. |
| PWB Approval of Preliminary Plans | 45 | 12/29/09 | 1/7/10 | 9 | 2/12/10 | 2/16/10 | 4 | | S. Benson | PWB Approval. | PWB meeting changed to 02/16/10. There is no impact to the overall project schedule. |
| Working Drawings (Construction Documents) | 187 | 2/15/10 | 2/17/10 | 2 | 8/21/10 | 9/29/10 | 39 | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval. Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months. Submit loan application to PMIB for approval. | WD's are complete. The Construction Manager is selected and the contract is in process. The added scope from the SFM has changed the planned complete date of WD's to 09/29/10. |

4

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bid and Award | 90 | 8/23/10 | 9/30/10 | 38 | 11/21/10 | 1/13/11 | 53 | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | The 53 days of delay was attributed to: a) SFM added scope (fire access road and modification to sally port gates; 39 days), and b) advertising, bidding & award of construction contract over the holiday period (14 days). |
| Construction [2] | 600 | 11/22/10 | 1/14/11 | 53 | 7/14/12 | | 226 | | K. Beland | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | The overall construction is approximately 94% complete.  Final site grading is almost complete. All gypboard has been installed.  Data cabling is complete on the 2nd floor.  Epoxy flooring is complete in the housing wings.  Paving of the access road around the new building is complete up to the secured perimeter.  The anticipated completion date ranges from 6/3/2013 to 9/3/2013.  CDCR continues to monitor the contractor's performance. |
| Hire Staff | 543 | 1/10/11 | 9/1/11 | 234 | 7/6/12 | | 234 | | M. McAloon E. Valenzuela | Advertise, Hire, and Train Staff. | Based on the construction delay above, the revised start date is 9/1/11 and revised completion date is 5/1/13. |
| Prepare Final Verified Office of Statewide Health Planning and Development (OSHPD) Reports | 600 | 11/22/10 | 1/14/11 | 53 | 7/14/12 | | 226 | | Chris Meyer | Including final as-built drawings. | See construction completion range above. |
| Self Certification | 15 | 7/16/12 | | 224 | 7/31/12 | | 209 | | Chris Meyer | | Based on the construction delay range above, the revised earliest start date is 6/4/13 and latest completion date is 9/18/13. |
| License Approval | 7 | 8/1/12 | | 208 | 8/8/12 | | 201 | | K. Martin E. Valenzuela | DPH Survey, DPH Approval. | Based on the construction delay range above, the earliest license start date is 5/3/13 and latest license start date is 8/5/13. |
| Activation | 56 | 8/9/12 | | 200 | 10/4/12 | | 144 | | M. McAloon E. Valenzuela | Initial staff occupancy, staff orientation, develop policies and procedures, stock supplies/inventory, placement of Group II equipment. | Based on the construction delay range above, the earliest activation start date is 5/3/13 and the latest activation start date is 8/5/13. |
| Patient Admissions | 56 | 8/9/12 | | 200 | 10/4/12 | | 144 | | M. McAloon E. Valenzuela | Assumes Patients will be admitted at a rate of six per week. | Based on the construction delay range above, the earliest first patient admission date is 7/5/13 and the latest first  patient admission date is 10/3/13. The earliest full facility occupancy is 8/9/13 and the latest full facility occupancy is 11/9/13. |

[1] Court Orders) filed 3/27/07, Docket No. #2173; filed 4/16/08, Docket No. #2757; and filed 10/20/06, Docket No. #1998
[2] Special Master shall receive updates on construction every 90 days.

Project:

CMC 50 Bed Mental Health Crisis Facility (Licensed Facility)

Lead Person Roster

| Name | | | Address | | |
|---|---|---|---|---|---|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Hysen | Deborah | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana  J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Martin | Kenneth | HCSHQ | 9838 Old Placerville Rd | Sacramento | 95827 |
| Meyer | Chris | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Valenzuela | Elvin | CDCR/CMC | P.O. Box 8101 | San Luis Obispo | 93409 |

*6*

# Exhibit #3

*Salinas Valley State Prison*
**Treatment and Office Space Project**

7

Project: Treatment and Office Space Project
Responsible Person: Deborah Hysen/CDCR
Address of Resp. Person: 9838 Old Placerville Rd., Suite B Sacramento California
Project Architect: Nacht and Lewis Architects
Location: Salinas Valley State Prison, Soledad (SVSP)
Funding Source: AB 900 (GC 15819.40)

Stephen Benson /DOF
915 L Street, Sacramento California 95814

Report Period Ending: February 25, 2013

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Schedule and Budget for AB 900 30 Day Funding Request Package | 111 | 10/19/09 | 10/19/09 | | 2/7/10 | 2/8/10 | 1 | | K. Beland | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| Review Funding Request Package | 30 | 2/8/10 | 2/8/10 | | 3/10/10 | 3/12/10 | 2 | | S. Benson | DOF review of funding request package. DOF prepares transmittal letter to legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost And PWB Recognition of Project Scope, Schedule, and Budget | 30 | 3/11/10 | 3/13/10 | 2 | 4/11/10 | 4/11/10 | | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Schedule, Budget. | |
| PWB Recognition of Project Scope, Cost, and Schedule | 1 | 4/12/10 | 4/12/10 | | 4/12/10 | 4/12/10 | | | S. Benson | Upon legislative approval, obtain PWB recognition of Project, Scope, Cost, and Schedule. | |
| Request loan from PMIA | 21 | 3/30/10 | 3/15/10 | (15) | 4/20/10 | 4/20/10 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | 1 | 4/21/10 | 4/21/10 | | 4/21/10 | 4/21/10 | | | Director of Finance, State Controller and State Treasurer | Submit Loan Documents to DOF and Obtain PWB Approval for Loan. Submit Loan application for initial design phase to PMIB for Approval. Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| Architectural/Engineering Contracting | 32 | 4/22/10 | 4/22/10 | | 5/24/10 | 6/24/10 | 31 | | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). | |
| Preliminary Plans | 187 | 5/25/10 | 6/25/10 | 31 | 11/28/10 | 11/19/10 | (9) | | K. Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | |
| California Environmental Quality Act Compliance (CEQA) | 205 | 4/22/10 | 4/22/10 | | 11/13/10 | 12/9/10 | 26 | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | The NOD was filed at the State Clearinghouse on 11/8/10. The 30-Day statute of limitations period expired on 12/9/10 with no public comment or litigation. There is no impact to the overall schedule. |
| JLBC Approval of Preliminary Plans | 45 | 11/29/10 | 11/19/10 | (10) | 1/13/11 | 1/13/11 | | | JLBC | JLBC Approval. PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans. | |
| PWB Approval of Preliminary Plans | 45 | 11/30/10 | 11/19/10 | (11) | 1/14/11 | 1/14/11 | | | S. Benson | PWB Approval. | |
| Working Drawings (Construction Documents) | 221 | 1/18/11 | 1/18/11 | | 8/27/11 | 8/11/11 | (16) | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval. | |

8

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bid and Award | 70 | 8/29/11 | 8/31/11 | 2 | 11/7/11 | 2/1/12 | 86 | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | Project was advertised on 8/31/11 and was re-advertised on 10/4/11 to avoid a potential protest due to ambiguous advertisement language. Pre-bid conference was held on 11/2/11 and bid opening was held on 11/21/11. The NTP for the construction contract was issued on 2/2/12. |
| Construction[2] | 630 | 11/8/11 | 2/2/12 | 86 | 7/30/13 | | | | K. Beland | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy. | The overall construction is approximately 62% complete. Roofing system, exterior security glazing, fire proofing, and EFIS System are complete. Rough electrical, plumbing, HVAC, security fence and high impact board installation is in progress. A time impact analysis settlement has been reached with the contractor, extending the project completion date from 9/8/13 to 9/19/13. There is no impact to the baseline activation schedule. |
| Hire Staff | 153 | 1/28/13 | | | 6/30/13 | | | | M. McAloon A. Hedgpeth | Advertise, Hire, and Train Staff. | Based on the construction delay above, hire staff will begin March 2013. |
| Activation | 63 | 7/31/13 | | | 10/2/13 | | | | M. McAloon A. Hedgpeth | Initial staff occupancy, staff orientation, stock supplies/inventory, placement of Group II equipment. | Based on the construction delay above, activation activities will start 8/20/13 and the building will be fully occupied on 9/23/13. |

[1] Court Order filed 1/4/10, Docket No. #3761

[2] Special Master shall receive updates on construction every 90 days.

**Project:**                     SVSP Treatment and Office Space Project

**Lead Person Roster**

| Name | | Address | | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 18 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Hedgpeth | Anthony | CDCR/SVSP | P.O. Box 1020 | Soledad | 93960 |
| Hysen | Deborah | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana  J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |

*10*

## Exhibit #4

*California State Prison, Sacramento*
**128 Psychiatric Services Unit beds**

| Project: | 128 Psychiatric Services Unit (PSU) Beds | | Report Period Ending: February 25, 2013 |
|---|---|---|---|
| Responsible Person: | Deborah Hysen/CDCR | | |
| Address of Resp. Person: | 9838 Old Placerville Rd., Suite B Sacramento California | Stephen Benson/DOF | |
| Project Architect: | Cannon Design | 915 L Street, Sacramento California 95814 | |
| Location: | California State Prison, Sacramento | | |
| Funding Source: | AB 900 (GC 15819.40) | | |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | 114 | 8/17/09 | 8/17/09 | | 12/9/09 | 12/9/09 | | | K. Beland | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| Review Funding Request Package | 33 | 12/10/09 | 12/10/09 | | 1/12/10 | 1/12/10 | | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 1/13/10 | 1/15/10 | 2 | 2/12/10 | 2/14/10 | 2 | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | |
| PWB Recognition of Project Scope, Cost, and Schedule | 1 | 2/16/10 | 2/16/10 | | 2/16/10 | 2/16/10 | | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | |
| Request Loan from PMIA | 20 | 1/27/10 | 1/27/10 | | 2/16/10 | 2/16/10 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | 1 | 2/17/10 | 2/17/10 | | 2/17/10 | 2/17/10 | | | Director of Finance, State Controller and State Treasurer | Submit loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval.  Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| Architectural/Engineering Contracting | 90 | 2/18/10 | 2/18/10 | | 5/19/10 | 8/13/10 | 86 | | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). | Additional A/E scope extended negotiations and contract development.  Negotiations are complete and the contract was executed on 8/13/10. |
| Preliminary Plans | 248 | 5/20/10 | 8/16/10 | 88 | 1/23/11 | 2/15/11 | 23 | | K. Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | The A/E design recovery schedule can recover 58 days in PP's.  This will target the April 2011 PWB for approval of the PP's.  PP's were completed 02/15/11.  Mitigation of the remaining delay will be evaluated in the WD and construction phases.  CDCR anticipates no impact to the overall schedule. |
| California Environmental Quality Act Compliance (CEQA) | 270 | 2/18/10 | 2/18/10 | | 11/15/10 | 12/21/10 | 36 | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | The NOD was filed with the State Clearing House on 11/16/10 and the litigation period expired on 12/21/10.  There is no impact to the overall schedule. |
| JLBC Approval of Preliminary Plans | 45 | 1/24/11 | 2/16/11 | 23 | 3/10/11 | 4/7/11 | 28 | | JLBC | JLBC Approval.  PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans. | The JLBC submittal was released on 2/18/11. |
| PWB Approval of Preliminary Plans | 45 | 1/25/11 | 2/17/11 | 23 | 3/11/11 | 4/8/11 | 28 | | S. Benson | PWB Approval. | PP's were approved by PWB on 4/8/2011. |
| Working Drawings (Construction Documents) | 180 | 3/14/11 | 4/11/11 | 28 | 9/10/11 | 9/21/11 | 11 | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | The A/E has addressed the SFM concerns and WD are complete.  There is no known impact to overall schedule. |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bid and Award | 80 | 9/12/11 | | | 12/1/11 | | | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | This task is no longer necessary with the use of IWL to perform construction. |
| Construction [2] | 480 | 12/2/11 | 11/28/11 | (4) | 3/26/13 | | | | K. Beland | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | The overall construction is approximately 58% complete.  Interior CMU block wall, structural steel and pan decking are complete.  Interior rough plumbing, electrical, HVAC, framing and roofing are in progress.  The completion date of 4/25/13 has been delayed due to weather and changed site conditions.  The revised completion date is 7/1/13. |
| Hire Staff | 150 | 9/27/12 | | | 2/24/13 | | | | M. McAloon T. Virga | Advertise, Hire, and Train Staff. | Based on the above revised construction completion date of 7/1/13, the revised Hire Staff date will start May 2013. |
| Activation | 60 | 3/27/13 | | | 5/26/13 | | | | M. McAloon T. Virga | Initial staff occupancy, staff orientation, stock supplies/inventory, placement of Group II equipment. | Based on the above revised construction completion date of 7/1/13, the revised activation start date is 7/2/13 with a phased patient activation commencing 8/1/13. |

[1] Court Order filed 1/4/10, Docket No. #3761

[2] Special Master shall receive updates on construction every 90 days.

**Project:**                                      SAC 128 Psychiatric Services Unit (PSU) Beds

### Lead Person Roster

| Name | | | Address | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Hysen | Deborah | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Virga (A) | Tim | CDCR/SAC | P.O. Box 71 | Represa | 95671 |

*14*

# Exhibit #5

*California Medical Facility*
**Treatment and Office Space Project**

15

Project: Treatment and Office Space Project
Responsible Person: Deborah Hysen/CDCR
Address of Resp. Person: 9838 Old Placerville Rd., Suite B Sacramento California
Project Architect: Nacht and Lewis Architects
Location: California Medical Facility, Vacaville (CMF)
Funding Source: AB 900 (GC 15819.40)

Stephen Benson/DOF
915 L Street, Sacramento California 95814

Report Period Ending: February 25, 2013

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | | | | | | 3/13/09 | | | | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| Review Funding Request Package | | | | | | 3/25/09 | | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 3/25/09 | 3/25/09 | | 4/24/09 | 5/7/09 | 13 | | S. Benson | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | LAO had concerns with building costs. |
| PWB Recognition of Project Scope, Cost, and Schedule | | 5/8/09 | 5/8/09 | | 5/8/09 | 5/8/09 | | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | Reduced costs at PWB per LAO concerns. |
| Request Loan from PMIA | | | | | | 3/26/09 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | 63 | 4/15/09 | 4/15/09 | | 4/15/09 | 6/12/09 | 58 | | Director of Finance, State Controller and State Treasurer | Submit loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval. Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | Loan request was made on 5/20/09 and was denied by PMIB on a 2-1 vote. Executive Order E 08/09-135 authorized General Fund loan for Preliminary Plans (PP). On 7/15/09 PMIB approved the loan for PP funding, and General Fund loan will be retired. There is no impact to design or overall schedule. |
| Architectural/Engineering Contracting | 82 | 6/18/09 | 6/18/09 | | 9/8/09 | 9/17/09 | 9 | | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). | Contract executed 09/17/09. No impact to overall schedule. |
| Preliminary Plans | 217 | 9/9/09 | 9/17/09 | 8 | 4/14/10 | 5/25/10 | 41 | | K. Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | Contract execution delayed start of PP and there is no impact to the overall schedule. PP phase is complete. |
| California Environmental Quality Act Compliance (CEQA) | 235 | 9/9/09 | 8/5/09 | (35) | 5/2/10 | 9/21/09 | (223) | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | Comment period complete, no protests filed. Accelerated time was gained by completing a less restrictive environmental document (Notice of Exemption vs. Initial Study/ Mitigated Negative Declaration). |
| JLBC Approval of Preliminary Plans | 45 | 4/26/10 | 5/27/10 | 31 | 6/10/10 | 7/9/10 | 29 | | JLBC | JLBC Approval. PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans | The JLBC submittal was released on 05/27/10. There is no impact to the overall schedule. |
| PWB Approval of Preliminary Plans | 45 | 4/27/10 | 5/27/10 | 30 | 6/11/10 | 7/12/10 | 31 | | S. Benson | PWB Approval. | PP's were approved by PWB on 07/12/10. |
| Working Drawings (Construction Documents) | 187 | 6/14/10 | 7/13/10 | 29 | 12/18/10 | 12/18/10 | | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval. Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months. Submit loan application to PMIB for approval. | |

16

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bid and Award | 70 | 12/20/10 | 12/20/10 | | 2/28/11 | 3/10/11 | 10 | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | |
| Construction [2] | 720 | 3/1/11 | 3/11/11 | 10 | 2/18/13 | | | | K. Beland | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy. Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months. Submit loan application to PMIB for approval. | The project is approximately 99.6% complete. CDCR received the final Certificate of Occupancy on 2/8/2013. The contractor is working on a few remaining punch list items and the project team has commenced contract close-out activites. |
| Hire Staff | 153 | 8/19/12 | | | 1/19/13 | | | | M. McAloon B. Duffy (A) | Advertise, Hire, and Train Staff. | Based on the Department's analysis of population realignment, no additional staffing will be needed. |
| Activation | 59 | 2/19/13 | 1/11/13 | (39) | 4/19/13 | 1/25/13 | (84) | | M. McAloon B. Duffy (A) | Initial staff occupancy, staff orientation, stock supplies/inventory, placement of Group II equipment. | Based on the revised construction completion date of 1/15/13, activation activities began on 12/10/12 and concluded on 1/25/13. A phased building activation and patient treatment started the week of 1/7/13. |

[1] Court Order's) filed 10/7/08, Docket No. #3072; and filed 10/18/07, Docket No. #2461

[2] Special Master shall receive updates on construction every 90 days.

17

Project:                                    **CMF Treatment and Office Space Project**

**Lead Person Roster**

| Name | | Address | | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Duffy | Brian | Chief Deputy Admin, CMF | 1600 California Drive | Vacaville | 95696 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana  J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Singh | Vimal J. | Warden, CMF | 1600 California Drive | Vacaville | 95696 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |

*18*

# Exhibit #6

*California State Prison, Los Angeles County*
**Treatment Space for Enhanced Outpatient Program**

| Project: | Enhanced Outpatient Program Treatment and Office Space [1] | | Report Period Ending: February 25, 2013 |
|---|---|---|---|
| Responsible Person: | Deborah Hysen/CDCR | Stephen Benson /DOF | |
| Address of Resp. Person: | 9838 Old Placerville Rd., Suite B Sacramento California | 915 L Street, Sacramento California 95814 | |
| Project Architect: | Nacht and Lewis  Architects | | |
| Location: | California State Prison, Los Angeles County, Lancaster (LAC) | | |
| Funding Source: | AB 900 (GC 15819.40) | | |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Schedule and Cost for AB 900 30 Day Funding Request Package | | | | | 4/23/09 | 4/23/09 | | | | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| Review Funding Request Package | 46 | 4/24/09 | 4/24/09 | | 6/9/09 | 6/9/09 | | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 6/10/09 | 6/9/09 | (1) | 7/9/09 | 7/9/09 | | | S. Benson | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Schedule, Cost. | |
| PWB Recognition of Project Scope, Cost, and Schedule | | 7/10/09 | 7/14/09 | 4 | 7/10/09 | 7/14/09 | 4 | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | PWB meeting rescheduled to July 14.  There is no impact to overall schedule. |
| Request Loan from PMIA | 67 | 5/5/09 | 5/5/09 | | 7/11/09 | 7/11/09 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | | 7/15/09 | 7/15/09 | | 7/15/09 | 7/15/09 | | | Director of Finance, State Controller and State Treasurer | Submit PMIA loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval.  Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| Architectural/Engineering Contracting | 82 | 7/16/09 | 7/16/09 | | 10/6/09 | 10/22/09 | 16 | | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). | Contract executed 10/22/09.  No impact to overall schedule. |
| Preliminary Plans | 229 | 10/7/09 | 10/23/09 | 16 | 5/24/10 | 5/25/10 | 1 | | K. Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | Contract execution delayed start of PP.  PP phase is complete. |
| California Environmental Quality Act Compliance (CEQA) | 235 | 10/7/09 | 8/5/09 | (63) | 5/30/10 | 9/21/09 | (251) | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | Comment period complete, no protests filed.  Accelerated time was gained by completing a less restrictive environmental document (Notice of Exemption vs. Initial Study/Mitigated Negative Declaration). |
| JLBC Approval of Preliminary Plans | 45 | 5/24/10 | 5/26/10 | 2 | 7/8/10 | 7/8/10 | | | JLBC | JLBC Approval. PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans. | The JLBC submittal was released on 05/26/10.  There is no impact to the overall schedule. |
| PWB Approval of Preliminary Plans | 45 | 5/25/10 | 5/26/10 | 1 | 7/9/10 | 7/12/10 | 3 | | S. Benson | PWB Approval. | PP were approved by PWB on 07/12/10. |
| Working Drawings (Construction Documents) | 203 | 7/12/10 | 7/15/10 | 3 | 1/31/11 | 11/29/10 | (63) | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | WD's are complete and were approved by the SFM 11/29/10.  The WD's and a request to use the IWL program for construction were approved by DOF on 01/25/11. |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bid and Award | 80 | 2/1/11 | N/A | N/A | 4/22/11 | N/A | N/A | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | This task is no longer necessary with the use of IWL to perform construction.  See WD comment. |
| Construction [2] | 440 | 4/25/11 | 3/14/11 | (42) | 7/8/12 | 6/11/12 | (27) | | K. Beland IWL | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | Construction of the originally scoped project is 100% complete.  However, the scope of this project is being revised from GP EOP to ASU EOP based on the Department's analysis of the impact of realignment on the mental health population.  The scope change was approved by the PWB on 1/11/13 .  The revised IWL date for completion of construction is 3/1/14. |
| Hire Staff | 151 | 1/9/12 | | | 6/8/12 | | | | M. McAloon S. McEwen | Advertise, Hire, and Train Staff. | Based on the Department's analysis of realignment on the mental health population, no additional staff will be needed. |
| Activation | 65 | 7/9/12 | 10/1/12 | 84 | 9/12/12 | | 166 | | M. McAloon S. McEwen | Initial staff occupancy, staff orientation, stock supplies/inventory, placement of Group II equipment. | Activation will take place in two phases. Temporary activation for placing staff in the Administrative half of the building was completed on 10/1/12.  Based on the above construction completion date of 3/1/14, the revised activation start date is 3/3/14 with patient activation commencing on 3/31/14. |

[1] Court Order(s) filed 10/18/07, Docket No. #2461; filed 10/20/06, Docket No. #1998
[2] Special Master shall receive updates on construction every 90 days.

**Project:**                                          LAC Enhanced Outpatient Program Treatment and Office Space

### Lead Person Roster

| Name | | | Address | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jack | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| McEwan | Scott | CDCR/LAC | 44750 60th Street West | Lancaster | 93536 |
| Matosantos | Ana J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| | | | | | |

**22**

# Exhibit #7

## *California State Prison, Corcoran*
## Treatment and Office Space for Administrative Segregation - Enhanced Outpatient Program

| | | | |
|---|---|---|---|
| Project: | EOP-ASU Treatment and Office Space (for 45 bed EOP-ASU) [1] | | Report Period Ending: February 25, 2013 |
| Responsible Person: | Deborah Hysen/CDCR | Stephen Benson/DOF | |
| Address of Resp. Person: | 9838 Old Placerville Rd., Suite B Sacramento California | 915 L Street, Sacramento California 95814 | |
| Project Architect: | HDR | | |
| Location: | California State Prison, Corcoran | | |
| Funding Source: | AB 900 (GC 15819.40) | | |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | 87 | 9/13/09 | 9/13/09 | | 12/9/09 | 12/9/09 | | | K. Beland | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| Review Funding Request Package | 33 | 12/10/09 | 12/10/09 | | 1/12/10 | 1/12/10 | | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 1/13/10 | 1/15/10 | 2 | 2/12/10 | 2/14/10 | 2 | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | |
| PWB Recognition of Project Scope, Cost, and Schedule | 1 | 2/16/10 | 2/16/10 | | 2/16/10 | 2/16/10 | | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | |
| Request Loan from PMIA | 20 | 1/27/10 | 1/27/10 | | 2/16/10 | 2/16/10 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | 1 | 2/17/10 | 2/17/10 | | 2/17/10 | 2/17/10 | | | Director of Finance, State Controller and State Treasurer | Submit loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval. Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| Architectural/Engineering Contracting | 90 | 2/18/10 | 2/18/10 | | 5/19/10 | 8/6/10 | | | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). | Additional A/E scope extended negotiations and contract development. Negotiations are complete and the contract was executed on 8/6/10. |
| Preliminary Plans | 220 | 5/20/10 | 8/6/10 | 78 | 12/26/10 | 1/23/11 | 28 | | K. Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | The A/E design recovery schedule recovered 45 days of the 79 days lost in the execution of the contract. PP's are complete. Mitigation of the remaining delay will be recovered in the WD and construction phases. CDCR anticipates no impact to the overall schedule. |
| California Environmental Quality Act Compliance (CEQA) | 270 | 2/18/10 | 2/18/10 | | 11/15/10 | 3/29/10 | (231) | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | Notice of Exemption officially filed on 02/22/10. Statute of limitations ended 3/29/10 with no comments. Accelerated time was gained by completing a less restrictive environmental document (Notice of Exemption vs. Initial Study/ Mitigated Negative Declaration). |
| JLBC Approval of Preliminary Plans | 45 | 12/27/10 | 1/24/11 | 28 | 2/10/11 | 3/10/11 | 28 | | JLBC | JLBC Approval. PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans | |
| PWB Approval of Preliminary Plans | 45 | 12/28/10 | 1/25/11 | 28 | 2/11/11 | 3/11/11 | 28 | | S. Benson | PWB Approval. | |

24

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Working Drawings (Construction Documents) | 203 | 2/14/11 | 3/14/11 | 28 | 9/5/11 | 9/9/11 | 4 | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | WD's are complete.  PWB approved project cost & use of IWL for construction on 9/9/11.  PMIB approved construction loan on 9/21/11. |
| Bid and Award | 73 | 9/6/11 | | | 11/18/11 | | | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | This task is no longer necessary with the use of IWL to perform construction. |
| Construction [2] | 450 | 11/21/11 | 11/8/11 | (13) | 2/13/13 | | 12 | | K. Beland | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy.  Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months.  Submit loan application to PMIB for approval. | The overall construction is approximately 75% complete.  Roofing and rooftop units are set in place.  Second floor rough-in for plumbing, electrical and HVAC is in progress.  CDCR is pursuing resolution of a potential protest on the procurement of the Fire Alarm system.  The construction completion date of 2/13/13 has been delayed due to inmate worker availability resulting from a prison riot and subsequent lockdown of the institution.  The revised completion date is 5/1/13. |
| Hire Staff | 150 | 8/17/12 | | | 1/14/13 | | | | M. McAloon C. Gipson | Advertise, Hire, and Train Staff. | Based on the Department's analysis of realignment on the mental health population, no additional staff will be needed. |
| Activation | 60 | 2/14/13 | | 11 | 4/15/13 | | | | M. McAloon C. Gipson | Initial staff occupancy, staff orientation, stock supplies/inventory, placement of Group II equipment. | Based on the revised construction completion date of 5/1/13, the activation start date will begin 5/2/13 with patient activation commencing 6/3/13. |

[1] Court Order filed 1/4/10, Docket No. #3781

[2] Special Master shall receive updates on construction every 90 days.

**Project:**                                    **COR ASU/EOP Treatment and Office Space**

**Lead Person Roster**

| Name | | Address | | | |
|---|---|---|---|---|---|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Gipson | Connie | Warden (A), CSP COR | 4001 King Street | Corcoran | 93212 |
| Hysen | Deborah | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |

# Exhibit #8

## Consolidated Care Center /
## California Health Care Facility

27

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Project: | California Health Care Facility (CHCF) / Consolidated Care Facility (CCC) [1,2] | | | | | | | | | Report Date: February 25, 2013 | |
| Responsible Person: | Chris Meyer/CDCR | | | | | | | | | | |
| Address of Resp. Person: | 9838 Old Placerville Rd., Suite B Sacramento California | | | | | Stephen Benson/DOF | | | | | |
| Project Architect: | Kitchell CEM   (Criteria Architect) | | | | | 915 L Street, Sacramento California 95814 | | | | | |
| Location: | Stockton, CA | | | | | | | | | | |
| Funding Source: | AB 900 (GC 15819.40) | | | | | | | | | | |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | 33 | 11/6/09 | 11/6/09 | | 12/9/09 | 12/9/09 | | | M. Meredith/ CPR | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| DOF Review and Approval of Design Build approach | | | | | 12/7/09 | 12/7/09 | | | S. Benson | Pursuant to Government Code Section 14661.1.i | |
| Review Funding Request Package | 32 | 12/10/09 | 12/10/09 | | 1/11/10 | 1/14/10 | 3 | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 1/12/10 | 1/15/10 | 3 | 2/11/10 | 6/11/10 | 120 | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | AB 552 was signed into law and the project was placed on the June PWB agenda. |
| PWB Recognition of Project Scope, Cost, and Schedule | 1 | 2/16/10 | 6/14/10 | 118 | 2/16/10 | 6/14/10 | 118 | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | |
| Request Loan from PMIA | 20 | 1/27/10 | 1/13/10 | (14) | 2/16/10 | 6/15/10 | 119 | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | 1 | 2/17/10 | 6/16/10 | 119 | 2/17/10 | 6/16/10 | 119 | | Director of Finance, State Controller and State Treasurer | Submit loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval. Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| California Environmental Quality Act Compliance (CEQA) | 31 | 10/20/09 | 10/19/09 | (1) | 11/20/09 | 6/29/10 | 221 | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | NOD filed 10/19/09; litigation period ended 11/18/09.  Protest filed 11/17/09.  Case was removed to Federal court 11/25/09. The litigation has been dismissed by an order adopted by Judge Lawrence Karlton on 06/29/10.  There is no remaining CEQA litigation pending against this project. |
| Select Bridging Architect | 18 | 2/18/10 | 6/17/10 | 119 | 3/8/10 | 8/2/10 | 147 | | M. Meredith | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s).  Assumes CM/Bridging Architect selected from pre-approved list. | FPCM in-house A/E design for IWL work for the IWL site prep work.  DLR is A/E for the abatement/demolition design. Kitchell CEM is selected as the Bridging/Criteria Architect.  The combination of multiple bid packages, acceleration of design and activation will mitigate the delay to the overall schedule. |
| Prepare Bridging Document | 136 | 2/16/10 | 6/17/10 | 121 | 7/2/10 | 2/7/11 | 220 | | M. Meredith | Includes development of basis of design, pre-qualification of Design-Build entities, preparation of Bridging Documents including performance criteria. | PP's for abatement/demolition were approved at the 12/13/10 PWB.  WD's are complete and were released for bid on 01/11/11. The Design-Build package # 1 RFP is complete.  Design-Build package #2 is complete and the RFP  was issued on 02/07/11.  The combination of phasing of multiple bid packages, acceleration of design and activation will mitigate the delay to the overall schedule. |
| PWB Approval | 45 | 7/2/10 | 12/13/10 | 164 | 8/16/10 | 1/14/11 | 151 | | S. Benson | PWB Approval of performance criteria | The Design-Build criteria was approved at the 01/14/11 PWB. |

28

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Design-Build Competition/Contractor Selection | 90 | 8/16/10 | 9/27/10 | 42 | 11/14/10 | 8/1/11 | 260 | | M. Meredith | Selection of Design-Build entities. Firms submit Design-Build proposals. CDCR evaluates and selects contractor. | The Granite Hensel Phelps Joint Venture for DB#1 was issued an NTP on 6/30/11, Clark/McCarthy Joint Venture was awarded DB#2 and started work 8/2/11. |
| Award Design Build Contract | 28 | 11/14/10 | 8/2/11 | 261 | 12/12/10 | 8/2/11 | 233 | | J. Cummings | Issue Notice to Proceed, Execute contract. | See comment on Design-Build Competition/Contractor Selection. |
| Design Build Duration [3,4] | 816 | 12/12/10 | 4/4/11 | 113 | 3/7/13 | | | | M. Meredith | Mobilize Design-Build Entity, Construction Manager, Inspector of Record. Finalize programming and complete drawings; Construct Project. Purchase and install Group II Equipment, Testing of Systems (Fire Alarm, Nurse Call, etc.)  Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy. This includes construction of the Design-Bid-Build portion of the project. | DB #1 started on 6/30/11, the contract completion date is 8/21/13.  Overall construction is approximately 90% complete.  Material Service Center  doors, hardware and finishes are complete.  Central plant is operating for the support of DB2's activities.  Fencing activities are ongoing.  Armory punch list is underway.  DB #2 started on 8/2/11, the contract completion date is 8/27/13.  Overall construction is approximately 89% complete.  Paving of roads continue. Concrete masonry continues at RN stations, and exterior wall activities, including windows, are ongoing.  Punch list activities began in first housing building.  The project team is continuing to evaluate opportunities to improve the overall schedule for a July 22, 2013 first patient/inmate. |
| Activation Planning/Workforce Development/Hire Staff/Procurement | 1041 | 2/17/10 | 6/15/10 | 118 | 12/24/12 | | 63 | | M. McAloon K. Baker | Schedule development, policy and procedures, workforce planning, advertise, hire and train staff, group II/III equipment planning and equipment certification, long lead items acquisition, contracts/vendors, labor relations, training.  This will impact DSH/CDCR/Receivers office and has to be coordinated between the three departments. DSH does not have the lead on this but will provide technical assistance and comply with the agreed upon dates. | Activities are currently underway.  Procurement and staff hires will be on a phased occupancy basis through October 2013 for the entire project. |
| Preparation of Final Verified Office of Statewide Health Planning and Development  (OSHPD) Reports | 816 | 12/13/10 | 4/4/11 | 112 | 3/8/13 | | | | M. Meredith | Including final as-built drawings. | See comment on Design-Build Competition/Contractor Selection.  Actual start date now added to schedule. |
| Self Certification | 7 | 3/8/13 | | | 3/15/13 | | | | C. Meyer | | |
| Licensing Application & Approval | 60 | 1/11/13 | | 45 | 3/12/13 | | | | K. Merlin K. Baker | DPH initial licensing survey.  Will license entire facility, suspend, then activate beds tied to a staff activation schedule. | Licensing surveys will be phased based on completion-turnover of the buildings and patient intake.  Projected dates for this activity to start is May 2013 and will conclude in March 2014. Licensing of mental health buildings will be coordinated to commence mental health patient admissions by 7/22/13. |
| Activation | 60 | 1/11/13 | | 45 | 3/12/13 | | | | M. McAloon K. Baker | Transitional training, initial staff occupancy, staff orientation, building acceptance/shakedown, furniture/fixture installation, stock supplies/inventory, placement of Group II equipment. | Activation will be on a phased occupancy basis as building construction completes, subject to SFM approval.  Projected dates for this activity are 5/22/13 to 7/19/13. |

29

| Primary Tasks | Duration (Cal Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to BM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Admissions | 279 | 2/12/13 | | | 12/9/13 | | | | N. McAbon / X. Baker | This will impact DSH/CDCR/CPHCS office and has to be coordinated between the three departments. DSH does not have the lead on this but will provide technical assistance. DSH expects to admit 5 inmate-patients per week for each licensed unit that is completely staffed due to clinical and safety reasons. | CDCR completed a focused analysis to determine whether start up delays that were encountered at the onset of the project will impact patient admissions dates. As a result, the revised patient admissions start date will change from 3/13/13 to 7/22/13. The target date for completion of mental health patient admissions is 12/9/13. DSH Note: DSH will make every effort to comply with the proposed timelines, but success is dependent on recruitment and staffing. |

This facility is intended to include 137 MHCB, 43 Acute, 412 ICF-H, and 1,110 non-mental health beds.

Court Order filed 1/6/10, Docket No. #3761.

Special Master shall receive updates on construction every 90 days.

Design-Bid-Build construction contract for abatement & demolition is in band

*30*

Project:                                California Health Care Facility (CHCF) / Consolidated Care Facility (CCC)

Lead Person Roster

| Name | | Address | | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Baker | Karen | CPHCS-Receiver's Representative | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Martin | Kenneth | CDCR | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Matosantos | Ana J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| Meredith | Michael | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Meyer | Chris | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| TBD | | Warden | | | |

*31*

# Exhibit #9

## *Central California Women's Facility*
### Treatment and Office Space for
### Enhanced Outpatient Program- General Population

*32*

| Project: | EOP-GP Treatment and Office Space | | | Report Period Ending: February 25, 2013 |
|---|---|---|---|---|
| Responsible Person: | Deborah Hysen/CDCR | | Stephen Benson/DOF | |
| Address of Resp. Person: | 9838 Old Placerville Rd., Suite B Sacramento California | | 915 L Street, Sacramento California 95814 | |
| Project Architect: | TBD | | | |
| Location: | Central California Women's Facility | | | |
| Funding Source: | AB 900 (GC 15819.40) | | | |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | 143 | 3/15/10 | 3/15/10 | | 8/5/10 | 8/2/10 | (3) | | K. Beland | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| Review Funding Request Package | 32 | 8/6/10 | 8/3/10 | (3) | 9/7/10 | 10/15/10 | 38 | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | DOF released the 30-Day notification to JLBC on 10/15/10. |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 9/8/10 | 10/18/10 | 40 | 10/8/10 | 11/12/10 | 35 | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | |
| PWB Recognition of Project Scope, Cost, and Schedule | 1 | 10/11/10 | 11/15/10 | 35 | 10/11/10 | 11/15/10 | 35 | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | PWB approved scope, schedule and cost on 11/15/10. Impact to overall schedule is under review. |
| Request Loan from PMIA | 20 | 9/29/10 | 10/13/10 | 14 | 10/19/10 | 10/13/10 | (6) | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | Funding was approved at the 12/15/10 PMIA meeting. |
| Approval of PMIA Funding | 1 | 10/20/10 | 10/14/10 | (6) | 10/20/10 | 12/15/10 | 56 | | Director of Finance, State Controller and State Treasurer | Submit loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval.  Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| Architectural/Engineering Contracting | 90 | 10/21/10 | 12/18/10 | 56 | 1/19/11 | 3/29/11 | 69 | | J. Cummings | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). | A/E NTP was issued on 3/29/11.  Project schedule recovered by restructuring A/E activities in PP & WD phases.  There is no impact to overall schedule. |
| Preliminary Plans | 218 | 1/20/11 | 3/30/11 | 69 | 6/26/11 | 9/22/11 | 27 | | K .Beland | Clinical/Architectural Programming, Schematic Design, Design Development, Design Review, Develop Initial Group II Equipment List, Update Staffing Requirements, Update Project Cost and Schedule, Prepare JLBC 45-day notice and PWB Preliminary Plan approval Submittal Package. | Pre-design activities commenced on 3/30/11. PP's are 100% complete. The revised PP completion date is 9/22/11.  See JLBC approval of PP's below. |
| California Environmental Quality Act Compliance (CEQA) | 270 | 10/21/10 | 11/15/10 | 25 | 7/18/11 | 11/23/10 | (237) | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | The Notice of Exemption was filed and the litigation period expired on 11/23/10.  Accelerated time was gained by completing a less restrictive environmental document (Notice of Exemption vs. Initial Study/ Mitigated Negative Declaration).  The method and required time were not reported in the 11/22/10 action plan and the appropriate "days behind" calculation is included in this report. |
| JLBC Approval of Preliminary Plans | 45 | 6/29/11 | | 546 | 10/13/11 | | 501 | | JLBC | JLBC Approval.  PC 7000 provides the JLBC a 45-day review period before PWB can approve preliminary plans. | The scope of this project has been revised based on the Department's analysis of the impact of realignment on the female mental health population.  The scope change was approved by PWB on 9/11/12 and preliminary plan submittal is targeted for release to JBLC on 2/28/13. |

33

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PWB Approval of Preliminary Plans | 45 | 8/30/11 | | 545 | 10/14/11 | | 500 | | S. Benson | PWB Approval. | The revised PP documents are complete and PWB approval is targeted for 4/15/13. There is no impact to the 9/26/13 completion of working drawings. |
| Working Drawings (Construction Documents) | 203 | 10/17/11 | | 497 | 5/7/12 | | 294 | | K. Beland | Complete Construction Documents, Obtain Regulatory Reviews (SFM, ADA, etc.), Finalize Group II Equipment List, Update Project Schedule and Cost, Prepare Approval of Working Drawings and Proceed to Bid Package and submit to DOF for approval. Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months. Submit loan application to PMIB for approval. | Based on 9/11/12 PWB scope change approval, the revised completion date for WD is 9/26/13. |
| Bid and Award | 90 | 5/8/12 | | 293 | 8/6/12 | | 203 | | K. Beland | Advertise for Bids, Hold Pre-Bid Conference, Receive Bids, Verify Lowest Responsive Bidder, Request DOF Approval to Award, Award Contract. | |
| Construction [1] | 450 | 8/7/12 | | 202 | 10/31/13 | | | | K. Beland | Mobilize Construction Contractor, Construction Manager, Inspector of Record, Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire alarm, Nurse Call, etc.), Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy. Submit loan documents to DOF and obtain PWB approval for loan for the project's cash needs for the next 12 months. Submit loan application to PMIB for approval. | Based on the 9/11/12 PWB scope change approval and subsequent to completion of WD, CDCR will provide a revised construction schedule once a project delivery method is selected. |
| Hire Staff | 151 | 5/3/13 | | | 10/1/13 | | | | M. McAloon D. K. Johnson | Advertise, Hire, and Train Staff. | |
| Activation | 60 | 11/1/13 | | | 12/31/13 | | | | M. McAloon D. K. Johnson | Initial staff occupancy, staff orientation, stock supplies/inventory, placement of Group II equipment. | |

[1] Special Master shall receive updates on construction every 90 days.

*34*

**Project:**                                     EOP-GP Treatment and Office Space

### Lead Person Roster

| Name | | Address | | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Beland | Keith | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Hysen | Deborah | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Johnson | Deborah K. | Warden, CCWF | 23370 Rd 22 | Chowchilla, CA | 93610 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |

*35*

# Exhibit #10

*Dewitt Nelson*
**375 Enhanced Outpatient Program –
General Population and
50 Enhanced Outpatient Program-
Administrative Segregation Unit beds**

Project: DeWitt Nelson Correctional Annex     Report Date: February 26, 2013
Responsible Person: Chris Meyer/CDCR
Address of Resp. Person: 9838 Old Placerville Rd., Suite B Sacramento California     Stephen Benson/DOF
Project Architect: Kitchell CEM (Criteria Architect)     915 L Street, Sacramento California 95814
Location: DeWitt Nelson, Stockton
Funding Source: AB 900 (GC 15819.40)

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to 5M | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Develop Scope, Cost, and Schedule for AB 900 30 Day Funding Request Package | 153 | 11/6/09 | 11/6/09 | | 4/8/10 | 4/8/10 | | | M. Meredith | Develop Preliminary Program, Conceptual Scope, Schedule, and Cost. Develop Preliminary Staffing Requirements. Prepare 30 Day Letter Funding Request. Submit to DOF for approval. | |
| DOF Review and Approval of Design Build Approach | | | | | | 10/22/10 | | | S. Benson | Pursuant to Government Code Section 14661.1.i | CDCR received approval for use of Design-Build from DOF on 10/22/10. |
| Review Funding Request Package | 32 | 4/9/10 | 4/12/10 | 3 | 5/11/10 | 5/13/10 | | | S. Benson | DOF review of funding request package. If package complies with applicable laws, the DOF prepares transmittal letter to the Legislature for approval. | |
| Legislative Approval of Scope, Schedule, and Cost | 30 | 5/12/10 | 5/14/10 | 2 | 6/11/10 | 6/11/10 | | | JLBC | DOF Review and Submission to the Legislature. Legislative Approval of Scope, Cost, and Schedule. | |
| PWB Recognition of Project Scope, Cost, and Schedule | 1 | 6/14/10 | 6/14/10 | | 6/14/10 | 6/14/10 | | | S. Benson | Upon legislative approval, obtain PWB recognition of Project Scope, Cost, and Schedule. | |
| Request Loan from PMIA | 21 | 5/26/10 | 6/11/10 | (14) | 6/16/10 | 6/16/10 | | | D. Borg | Submit Loan Documents to request loan from the Pooled Money Investment Account (PMIA). | |
| Approval of PMIA Funding | 1 | 6/16/10 | 6/16/10 | | 6/16/10 | 6/16/10 | | | Director of Finance, State Controller and State Treasurer | Submit loan application for initial design phase to Pooled Money Investment Board (PMIB) for approval. Note that PMIA loans are for the project's cash needs for the next 12 months and are renewed annually or more often, until the sale of lease revenue bonds. | |
| California Environmental Quality Act Compliance (CEQA) | 266 | 6/17/10 | 6/17/10 | | 3/9/11 | 1/28/11 | (40) | | B. Sleppy | Select Consultant, Negotiate/Execute Contract, Prepare CEQA Documents, Circulate/Comment Period, File Notice of Determination (N. O. D.), Litigation Period. | The NOD was filed 12/29/10. The 30-Day statute of limitations period expired on 01/29/11 with no public comment or litigation. The final EIR was approved on 12/30/10. |
| Select Bridging Architect | 18 | 2/16/10 | 6/17/10 | 119 | 3/8/10 | 8/2/10 | 147 | | M. Meredith | Select A/E firm, Negotiate Scope and Fee, Execute Contract(s). Assumes CM/Bridging Architect selected from pre-approved list. | Kitchell CEM was selected as the Criteria Architect. |
| Prepare Bridging Document | 249 | 6/17/10 | 8/3/10 | 47 | 2/21/11 | 8/11/11 | 171 | | M. Meredith | Includes development of basis of design, pre-qualification of Design-Build entities, preparation of Bridging Documents including performance criteria. | Bridging Documents are 100% complete. |
| PWB Approval | 45 | 2/22/11 | 6/30/11 | 128 | 4/8/11 | 8/12/11 | 126 | | S. Benson | PWB Approval of performance criteria. | PWB issued a conditional approval for the RFP design criteria at August 2011 PWB, consistent with concerns raised by the JLBC. As a condition of approval, CDCR needs to demonstrate the need for mental health and medical beds at Dewitt before a DB construction contract is awarded. |
| Design-Build Competition/Contractor Selection | 120 | 4/11/11 | 8/13/11 | 124 | 8/9/11 | 12/14/11 | 127 | | M. Meredith | Selection of Design-Build entities. Firms submit Design-Build proposals. CDCR evaluates and selects contractor. | The selection process was completed on 12/14/11 with Hensel Phelps Construction Company being announced as the selected firm. |

| Primary Tasks | Duration (Cal. Days) | Planned Start | Actual Start | Days (Ahead) Behind | Planned Complete | Actual Complete | Days (Ahead) Behind | Completion Certification to SM | Lead Person | Key Sub-Tasks | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Award Design Build Contract | 11 | 8/10/11 | 6/16/12 | 280 | 8/21/11 | 7/3/12 | 317 | | J. Cummings | Issue Notice to Proceed, Execute contract. | CDCR has evaluated the impacts of realignment on its prison population and has determined that this project is still necessary. On April 23, 2012, CDCR finalized and distributed an operational plan that reflects the construction of this project. PMIB approved construction loan on 5/16/12. The construction contract and the NTP was issued to Hensel Phelps Construction Co. on 7/3/12. |
| Design Build Duration [3] | 560 | 8/22/11 | 7/3/12 | 316 | 3/4/13 | | | | M. Meredith | Mobilize Design-Build Entity, Construction Manager, Inspector of Record. Finalize programming and complete drawings; Construct Project, Purchase and Install Group II Equipment, Testing of Systems (Fire Alarm, Nurse Call, etc.) Punch list, SFM Temporary Certificate of Occupancy and Final Certificate of Occupancy. | Based on a 7/3/12 NTP the revised construction completion date is 2/10/14. Miscellaneous demo within existing buildings continue. Site utility activities are ongoing. Installation of the stairs, metal decking and roof structures at guard towers are ongoing. Foundation activities for new EOP buildings continues. The overall percentage complete for design is 99% and construction is 22%. |
| Activation Planning/Workforce Development/Hire Staff/Procurement | 540 | 10/4/11 | | 510 | 3/27/13 | | | | M. McAloon K. Baker | Schedule development, policy and procedures, workforce planning, advertise, hire and train staff, group II/III equipment planning and equipment certification, long lead items acquisition, contracts/vendors, labor relations, training. This will impact DSH/CDCR/Receivers office and has to be coordinated between the three departments. DSH does not have the lead on this but will provide technical assistance and comply with the agreed upon dates. | Based on 7/3/12 NTP, the revised planned start date for pre-activation (i.e., advertising, interviewing, etc.) staff hiring is March 2013 and November 2013 for activation staff. |
| Preparation of Final Verified Office of Statewide Health Planning and Development (OSHPD) Reports | 560 | 8/22/11 | 7/3/12 | 316 | 3/4/13 | | | | M. Meredith | Including final as-built drawings. | Note: This activity is not applicable. Project is not a licensed facility. |
| Self Certification | 7 | 3/5/13 | | | 3/12/13 | | | | C. Meyer | | |
| Licensing Application & Approval | 45 | 3/13/13 | | | 4/27/13 | | | | | DPH initial licensing survey. Will license entire facility, suspend, then activate beds tied to a staff activation schedule. | Note: This activity is not applicable. Project is not a licensed facility. |
| Activation | 32 | 3/28/13 | | | 4/29/13 | | | | M. McAloon K. Baker | Transitional training, initial staff occupancy, staff orientation, building acceptance/shakedown, furniture/fixture installation, stock supplies/inventory, placement of Group II equipment. | Based on 7/3/12 construction completion, the revised activation start date is 1/10/14. |
| Patient Admissions | 112 | 4/28/13 | | | 8/18/13 | | | | M. McAloon K. Baker | . | Based on 2/10/14 construction completion, the revised start date for inmate-patient treatment is 2/17/14 and the facility will be fully occupied by 5/31/14. |

[1] This facility is intended to include 375 EOP, 50 EOP/ASU, and 708 non-mental health beds.

2 Special master shall receiver updates on construction every 90 days.

[3] Activation is contingent upon full activation of the California Health Care Facility construction project, which has a planned complete date of 12/31/2013.

**Project:**                              DeWitt Nelson Conversion

Lead Person Roster

| Name | | | Address | | |
|------|------|------|------|------|------|
| Last | First | Agency/Dept. | Street | City | Zip |
| Baker | Karen | CPHCS-Receiver's Representative | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Benson | Stephen | DOF | 915 L Street | Sacramento | 95814 |
| Borg | Dean | CDCR/FPC&M | 9839 Old Placerville Rd. | Sacramento | 95827 |
| Chiang | John | State Controller | 300 Capitol Mall, Suite 1850 | Sacramento | 95814 |
| Cummings | Jackson | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Lockyer | Bill | State Treasurer | 915 Capitol Mall C-15 | Sacramento | 94209 |
| Matosantos | Ana J. | Director, DOF | 915 L Street | Sacramento | 95814 |
| Meredith | Michael | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| Meyer | Chris | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| McAloon | Margaret | CDCR/DCHCS | 9271 Laguna Springs Dr. | Elk Grove | 95758 |
| Sleppy | Bob | CDCR/FPC&M | 9838 Old Placerville Rd. | Sacramento | 95827 |
| TBD | | Warden | | | |

*39*

# Exhibit 94

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE (REV 01/08) | IMS Mail Code: A15 |
| BUDGET YEAR 2012-13 | |

ORG CODE: 5225 COBCP NO. _____ PRIORITY: _____ PROJECT ID: 61 01.039

DEPARTMENT: California Department of Corrections and Rehabilitation _____

PROJECT TITLE: Statewide Medication Distribution Improvements _____

TOTAL REQUEST (DOLLARS IN THOUSANDS): S 25,303 _____ MAJOR/MINOR: MA

PHASE(S) TO BE FUNDED: PWC _____ PROJ CAT: PDC-HC _ CCCI/EPI· _____

SUMMARY OF PROPOSAL:

Existing medication distribution facilities do not allow for safe, efficient and effective distribution of medications and do not allow for compliance with federal and state infection control standards. Physical plant modifications are necessary to allow California Department of Corrections and Rehabilitation (CDCR) to provide the appropriately sized space with the proper infrastructure for secure distribution, infection control, environmentally controlled and secure medication storage. Construction of these improvements will increase staff productivity and safety and ensure the right inmate-patient receives the correct medication, the correct dosage, at the correct intervals.

This request proposes funding for design and construction of improvements to CDCR medication distribution facilities at 22 existing state prisons. The total estimated cost of this project is $25,303,000.

HAS A BUDGET PACKAGE BEEN COMPLETED FOR THIS PROJECT? (E/U/N/?): N

REQUIRES LEGISLATION (Y/N): N _____ IF YES, LIST CODE SECTIONS: _____

REQUIRES PROVISIONAL LANGUAGE (Y/N) N

IMPACT ON SUPPORT BUDGET: ONE-TIME COSTS (Y/N): N FUTURE COSTS (Y/N) N

FUTURE SAVINGS (Y/N): Y REVENUE (Y/N): N

DOES THE PROPOSAL AFFECT ANOTHER DEPARTMENT (Y/N): N IF YES, ATTACH COMMENTS OF AFFECTED DEPARTMENT SIGNED BY ITS DIRECTOR OR DESIGNEE.

SIGNATURE APPROVALS:

Dean Lu Borg 7/13/12

Dean L. Borg, Associate Director. CPPS

| PREPARED BY | DATE | REVIEWED BY | DATE |
|---|---|---|---|

Richard Kirkland, Corrections Srvcs. CCHCS

DEPARTMENT DIRECTOR        DATE

Deborah Hysen- Deputy Director. FPCM.

AGENCY SECRETARY        DATE

**DOF ANALYST USE**

DOF ISSUE # _____ PROGRAM CAT: _ PROJECT CAT: _ BUDG PACK STATUS: _____

ADDED REVIEW: SUPPORT: _ OTROS: _____ FSCU: _____ OSAE: _ CALSTARS· _

PPBA: _____            Date: _____

NARRATIVE, PAGE   1   OF   7

(DF)-151 Rev 01/08

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE  (REV 01/08) | IMS Mail Code: A15 |
| BUDGET YEAR 2012-13 | |

ORG CODE: 5225 COBCP NO. _____ PRIORITY: _____ PROJECT ID: 61 01.039

## A. PURPOSE OF THE PROJECT

Introduction:

The California Department of Corrections and Rehabilitation (CDCR) has insufficient space, or in some locations no space, to accommodate effective and efficient medication distribution to inmate-patients. The medication distribution areas that exist typically lack sinks, contributing to limited hand washing and increased infection control concerns. These medication rooms additionally lack Heating, Ventilation and Air Conditioning (HVAC) systems to control temperature, leading to spoilage and waste of certain medications.  In addition, inadequate space and the insufficient lighting leads to errors in medication preparation and administration.   Medication errors can lead to deterioration of a patient's medical condition and subject the Department to medical liability claims.   Proper, efficient, and timely medication distribution is one of the core components for treatment of medical ailments.  In order to provide safe, efficient, and effective medication distribution, physical plant modifications and improvements must be completed at all CDCR prisons.

Background/History:

The plaintiffs alleged in the case *Plata vs. Cate* that CDCR violated the cruel and unusual punishment clause of the Eighth Amendment of the United States Constitution and that CDCR medical services were deliberately indifferent to the serious medical needs of inmate-patients by failing to provide necessary health care services in a timely manner.  As a result, a Federal Court judge in 2006 placed the CDCR medical delivery system under a Federal Receiver.  CDCR and the Federal Receiver have developed a Health Care Facility Improvement Program (HCFIP) to address deficiencies in the out-patient health care delivery system.   Medication distribution is one of the primary program components.  The objective of this COBCP is to provide the physical plant modifications and improvements to allow timely medication distribution to inmate patients.

Medication distribution windows are the most efficient and secure method of medication distribution to General Population (GP) inmate-patients. Medication distribution activities must be coordinated with custody operations. Most prescribed medications require that they be administered with meals; therefore, requiring timely distribution at specific time periods.  In order to minimize impact on custody programs and allow inmates to participate in rehabilitative, custodial, educational, and vocational activities, each medication distribution cycle must be completed within a two-hour timeframe.   Time-motion studies were conducted by CDCR to determine the parameters required to accomplish timely medication distribution.  In the FY 10/11 Budget Act CDCR received additional Licensed Vocational Nurse (LVN) positions to provide medication distribution based on the results of the nursing medication distribution workload study. The workload study determined that one LVN can safely pass medications via a medication distribution window to up to 60 inmate-patients within a maximum two-hour period. One medication distribution window is required for · each 60 inmate-patients requiring medications during each two-hour medication

NARRATIVE, PAGE  2  OF  7

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE  (REV 01/08) | IMS Mail Code: A15 |
| **BUDGET YEAR 2012-13** | |

ORG CODE:__5225__ COBCP NO. _____  PRIORITY: _____ , PROJECT ID: __61.01.039___

distribution cycle.   There are three medication cycles per day; morning, noon, and evening.

In order to effectively provide custodial supervision over inmate movement during medication distribution, it has been determined that no more than four medication distribution windows shall be provided in order to provide for safe custodial coverage. This would equate to 240 inmate-patients per cycle or a maximum number of four medication distribution windows per facility.  In the event that the number of inmate-patients receiving medication per yard exceeds 240, CDCR plans to utilize a combination of strategies, including adjusting program scheduling or adjust housing assignments to equalize the medication workload.

The Medication Distribution Improvements addressed in this proposal will be based on the evaluation of the medication distribution work load by prison and yard compared to the existing medication distribution facilities existing at the prison. Improvements will be developed to address prototypical prison designs in a standardized fashion where ever possible. Institutions that are not prototypical will be provided with unique improvement solutions that address the medication distribution needs while being sensitive to custodial requirements of the prison.

Problem:
Currently there is insufficient (and in some instances, no) facility space and infrastructure in CDCR institutions to appropriately perform medication distribution activities. Lack of adequate medication distribution rooms and windows does not allow for timely, effective, and secure medication distribution. Without adequate medication distribution windows, nursing staff are exposed to safety risks daily as medication must be distributed from an open medication cart or podium on a housing unit dayroom floor, housing unit tier, or through an open doorway.  In addition, existing space is inadequately sized to accommodate proper distribution protocols and procedures. The space also lacks sinks in medication rooms violating infection control standards.  The spaces are also not equipped with HVAC temperature control systems leading to spoilage of medications, degradation of the medication's strength and inadequate clinical response to medications, and further health complications for the inmate-patient. The space also lacks appropriate secure storage for narcotics and needles. Data connectivity is also not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration.

Using the parameters established as part of the workload study, site assessments were performed at all 33 existing institutions to identify the conceptual scope of work necessary to provide the required improvements to address the existing deficiencies. The medication distribution improvements provided by this project will remedy existing deficiencies in medication distribution space and services at 22 prison facilities.  The remaining prison facilities are designated to be the initial prisons within the HCFIP program, and will receive medication distribution improvements within the scope of the HCFIP improvements planned at those facilities.

NARRATIVE, PAGE   3    OF  7

(DF)-151 Rev 01/08

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE   (REV 01/08) | IMS Mail Code: A15 |
| BUDGET YEAR 2012-13 | |

ORG CODE:_ 5225_ COBCP NO. _ ___ PRIORITY: _____ PROJECT ID: 61.01.039

The medication distribution improvements funded by this project are to be performed at the following prisons:

- San Quentin State Prison (SQ)
- Deuel Vocation Institution (DVI)
- North Kern State Prison (NKSP)
- Wasco State Prison (WSP)
- Central California Women's Facility (CCWF)
- Avenal State Prison (ASP)
- Calipatria State Prison (CAL)
- California Correctional Center (CCC)
- California Correctional Institution (CCI)
- California State Prison, Corcoran (COR)
- Centinela State Prison (CEN)
- Correctional Training Facility (CTF)
- Chuckawalla Valley State Prison (CVSP)
- High Desert State Prison (HDSP)
- Ironwood State Prison (ISP)
- Kern Valley State Prison (KVSP)
- Pelican Bay State Prison (PBSP)
- Pleasant Valley State Prison (PVSP)
- Substance Abuse Treatment Facility and State Prison (SATF)
- Sierra Conservation Center (SCC)
- Salinas Valley State Prison (SVSP)
- Valley State Prison (VSP)

## B. RELATIONSHIP TO THE STRATEGIC PLAN

This proposal supports Objective 3.3 of Goal 3 of the 2010-2015 CDCR Strategic Plan; Upgrade facilities to meet CDCR's space standards for custody, healthcare and rehabilitation and Objective 6.1 of Goal 6 of the Receiver's Turnaround Plan of Action; Provide for necessary clinical administrative and housing facilities.

## C. ALTERNATIVES

Alternative #1:     Design and construct medication distribution improvements in 22 prison facilities utilizing the AB 900 General Fund appropriation.

Project Advantages:
- Will provide modifications necessary to remedy existing deficiencies in medication distribution space allowing compliance with the Department's

NARRATIVE, PAGE   4    OF   7

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE   (REV 01/08) | IMS Mail Code: A15 |
| BUDGET YEAR 2012-13 | |

ORG CODE: 5225 COBCP NO. _____ PRIORITY: _____ PROJECT ID: 61.01.039

health care requirements and established nursing and pharmaceutical protocols.

- The improvements will support timely medication distribution to the inmate-patient population and provide safe, efficient and effective distribution of medications by staff.

- Will provide physical plant modifications necessary for CDCR to address deficiencies cited in the *Plata vs. Cate* case.

- As the full roll-out of HCFIP to all prisons will take 5-6 years, separating out these improvements will allow for a more timely solution to the medication distribution concerns currently experienced.

Project Disadvantages:
- None.

Estimated Project Cost: $25,303,000.

Funding Source: AB 900 General Fund Appropriation.


Alternative #2:   Include medication distribution improvements within the Health Care Improvement Program to be funded via Assembly Bill 900 lease revenue bond authority.

Project Advantages:
- None.

Project Disadvantages:
- Due to the phased roll-out of HCFIP, most prisons will not see improvements to their medication distribution facilities for 5-6 years from the initiation of HCFIP.
- LVN staff are currently available to perform medication distribution tasks in the prisons, but physical plant impediments are delaying timely access to care.
- Performing medication distribution improvements within the scope of HCFIP will delay these improvements by at least 18-24 months when compared to Alternative #1.

Estimated Project Cost: $25,303,000.

Funding Source: AB 900 Lease-Revenue Bond funding.


NARRATIVE, PAGE   5   OF   7

(DF)-151 Rev 01/08

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE   (REV 01/08) | IMS Mail Code: A15 |
| BUDGET YEAR 2012-13 | |

ORG CODE: 5225 COBCP NO. _____ PRIORITY: _____ PROJECT ID: 61.01.039

## D. RECOMMENDED SOLUTION

1. Which alternative and why?

   Design and construct improvements in prison medication distribution facilities at 22 prisons using the AB 900 General Fund appropriation. This alternative will provide these improvements on a much quicker schedule then if included in the scope of other HCFIP improvements for each prison.   These improvements will allow medication distribution to occur in a timely, safe, efficient and effective manner.

2. Detailed scope description.

   The scope of work is based upon the existing physical plant of the prison facility, and the medication utilization factors of the types of population housed at each facility. To the extent possible, prototypical design solutions will be used for similar physical plants. The scope of work at each facility may include a combination of the following components:

   - Renovation within existing support building to provide medication distribution workspace;
   - Construction within existing housing units to provide medication distribution workspace;
   - Construction of a new stand-alone building to provide medication distribution workspace.

   All of these improvements would include all or part of the following components: security upgrades to ensure safe storage of medications; HVAC and electrical improvements; casework, lighting and sinks for medication preparation; an injection room and window; medication distribution windows, data and telecommunications connectivity; and inmate drinking fountains. Please consult Attachment A for detailed scope information by each prison.

3. Basis for cost information

   Conceptual estimates developed by the CDCR Program Manager based upon field visits with CDCR staff and medical experts and use of prototypical design solutions have been used to estimate the costs.   See Attachment A for detailed cost information by each prison.

4. Factors/benefits for recommended solution other than the least expensive alternative.

   This proposal will assist CDCR in addressing a critical component of the *Plata vs. Cate* case, providing good faith and a reduction of legal fees related to court oversight.

5. Complete description of impact on support budget.

   Medication distribution activities in existing prisons are currently operated with existing budgeted staff. No new staff will be required based upon the construction conducted with this proposal.   Implementation of this proposal will lead to completion of one component of CDCR's responsibilities in the Health Care

NARRATIVE, PAGE   6   OF   7

(DF)-151 Rev 01/08

| STATE OF CALIFORNIA | DEPARTMENT OF FINANCE |
|---|---|
| CAPITAL OUTLAY | 915 L Street |
| BUDGET CHANGE PROPOSAL (COBCP) | Sacramento, CA 95814 |
| COVER PAGE    (REV 01/08) | IMS Mail Code: A15 |
| BUDGET YEAR 2012-13 | |

ORG CODE:_5225_ COBCP NO. _____ PRIORITY: _____ PROJECT ID: 61.01.039___

Facility Improvement Program and contribute to the reduction of future costs for attorneys and court experts.

6. Identify and explain any project risks.

This proposal contains no identifiable risks.

7. List requested interdepartmental coordination and/or special project approval (including mandatory reviews and approvals, e.g. technology proposals).

State Fire Marshal approval will be required.

8. Project Schedule

| Preliminary Plans- | Start September 2012 | Complete July 2013 |
|---|---|---|
| Working Drawings- | Start July 2013 | Complete November 2013 |
| Construction- | Start November 2013 | Complete May 2015 |

## E. CONSISTENCY WITH CHAPTER 1016, STATUTES OF 2002 – AB 857

1. Does the recommended solution (project) promote infill development by rehabilitating existing infrastructure and how? Explain.

   Not applicable as this project will be completed at an existing CDCR facility.

2. Does the project improve the protection of environmental and agricultural resources by protecting and preserving the state's most valuable natural resources? Explain.

   Not applicable as this project will be completed at an existing CDCR facility.

3. Does the project encourage efficient development patterns by ensuring that infrastructure associated with development, other than infill, support efficient use of land and is appropriately planned for growth? Explain.

   Not applicable as this project will be completed at an existing CDCR facility.

## ATTACHMENTS

Attachment A: Statewide Medication Distribution Improvements Scope/Cost Matrix

NARRATIVE, PAGE   7   OF   7

(DF)-151 Rev 01/08

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **San Quentin State Prison (SQ)** | | | | | | |
| North Block | Existing medication room is 80 SF. Medications and injections are passed through open doorways. There is insufficient counter space, distribution windows, and storage. There is no secure storage or drinking fountains. | Construct new medication distribution room with 4 windows, and an adjacent injection room with 1 window, at the exterior of North Block. Provide new data and telecom. Provide 4 sinks and 3 drinking fountains. | | | | |
| South Block | Medications are prepared and pre-packaged at the Upper Yard Health Care Building. Individually pre-packaged medications are then transported by cart across the open yard to the Carson and Donner IASU housing units. It is unsecure and inefficient to prepackage and cart medications across the institution. There are no drinking fountains. | Construct 2 new medication rooms utilizing existing holding cells at Neumiller. They will both include new casework. One room will include 4 windows, 1 sink, and 3 drinking fountains, the other will include 1 new window and 1 new drinking fountain; an existing window and sink will remain. Also included is 1 injection room. | | | | |
| **San Quentin State Prison (SQ)** | | **TOTAL** | $ 229,000 | $ 1,551,000 | $ 11,000 | $ 1,791,000 |
| **Deuel Vocational Institution (DVI)** | | | | | | |
| Wing C | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Renovate the existing custody office into a secure medication distribution room adjacent the housing unit entry door and the dayroom. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| Wing D | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Renovate the existing custody office into a secure medication distribution room adjacent the housing unit entry door and the dayroom. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| Wing E | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Renovate the existing custody office into a secure medication distribution room adjacent the housing unit entry door and the dayroom. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| Wing H | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Renovate the existing custody office into a secure medication distribution room adjacent the housing unit entry door and the dayroom. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| Wing J | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Renovate the existing custody office into a secure medication distribution room adjacent the housing unit entry door and the dayroom. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| East Hall | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Construct an enclosed medication distribution room on the housing wing adjacent to the shower, relocating the shower ramp. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| West Hall | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Construct an enclosed medication distribution room on the housing wing adjacent to the shower, relocating the shower ramp. It will include data and telecom, 1 window, casework and 1 sink, and a drinking fountain. | | | | |
| **Deuel Vocational Institution (DVI)** | | **TOTAL** | $ 74,000 | $ 768,000 | $ 11,000 | $ 853,000 |

7/11/2012
P:\CPR Facility Program - 7058\04, State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 1 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **North Kern State Prison (NKSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D, ASU HU 6 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| North Kern State Prison (NKSP) | | TOTAL | $       22,000 | $       221,000 | $       11,000 | $       254,000 |
| **Wasco State Prison (WSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D, ASU HU 6 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility H | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Wasco State Prison (WSP) | | TOTAL | $       44,000 | $       407,000 | $       11,000 | $       462,000 |
| **Central California Women's Facility (CCWF)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through windows and drinking fountain are not accessible. | Construct new medication distribution room in Building 703. Provide new data and telecommunication. Provide new casework, 3 windows, 2 sinks, and 2 drinking fountains. | | | | |
| Facility A, Bldg 504 | The existing space used for medication distribution in the housing unit is too small to accommodate the number windows needed by the EOP population. Medication and injections are required to be passed through an open doorway. There is no handwashing sink. | Construct new medication distribution room adjacent the dayroom with 2 windows, and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and 1 drinking fountain. | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and drinking fountain are not accessible. | Construct new stand-alone medication distribution room with 2 windows, and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and drinking fountain are not accessible. | Construct new stand-alone medication distribution room with 2 windows, and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and drinking fountain are not accessible. | Construct new stand-alone medication distribution room with 2 windows, and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| Central California Women's Facility (CCWF) | | TOTAL | $       228,000 | $       1,693,000 | $       11,000 | $       1,932,000 |

7/11/2012
P:\CPR Facility Program - T058\G4. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 2 of 14

Health Care Facility Improvement Program (HCFIP)
**Statewide Medication Distribution Improvements**
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Avenal State Prison (ASP) | | | | | | |
| Facility 1 | The existing medication space is too small to accommodate the medication distribution function of 1 window and is not large enough to accommodate a second window. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge the (E) medication room by expanding into the adjacent corridor alcove. Combine and renovate two vacated exam rooms into a 2nd medication distribution room. Provide data and telecom, casework and sink, 1 medication distribution window and 1 drinking fountain at each room. Install 1 injection window. | | | | |
| Facility 1, ASU HU | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility 2 | The existing medication space is too small to accommodate the medication distribution function of 1 window and is not large enough to accommodate a second window. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge the (E) medication room by expanding into the adjacent corridor alcove. Combine and renovate two vacated exam rooms into a 2nd medication distribution room. Provide data and telecom, casework and sink, 1 medication distribution window and 1 drinking fountain at each room. Install 1 injection window. | | | | |
| Facility 3 | The existing medication space is too small to accommodate the medication distribution function of 1 window and is not large enough to accommodate a second window. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge the (E) medication room by expanding into the adjacent corridor alcove. Combine and renovate two vacated exam rooms into a 2nd medication distribution room. Provide data and telecom, casework and sink, 1 medication distribution window and 1 drinking fountain at each room. Install 1 injection window. | | | | |
| Facility 4 | The existing medication space is too small to accommodate the medication distribution function of 1 window and is not large enough to accommodate a second window. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge the (E) medication room by expanding into the adjacent corridor alcove. Combine and renovate two vacated exam rooms into a 2nd medication distribution room. Provide data and telecom, casework and sink, 1 medication distribution window and 1 drinking fountain at each room. Install 1 injection window. | | | | |
| Facility 5 | The existing medication space is too small to accommodate the medication distribution function of 1 window and is not large enough to accommodate a second window. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge the (E) medication room by expanding into the adjacent corridor alcove. Combine and renovate two vacated exam rooms into a 2nd medication distribution room. Provide data and telecom, casework and sink, 1 medication distribution window and 1 drinking fountain at each room. Install 1 injection window. | | | | |
| Facility 6 | The existing medication space is too small to accommodate the medication distribution function of 1 window and is not large enough to accommodate a second window. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge the (E) medication room by expanding into the adjacent corridor alcove. Combine and renovate two vacated exam rooms into a 2nd medication distribution room. Provide data and telecom, casework and sink, 1 medication distribution window and 1 drinking fountain at each room. Install 1 injection window. | | | | |
| Avenal State Prison (ASP) | | TOTAL | $ 166,000 | $ 1,429,000 | $ 11,000 | $ 1,606,000 |

7/11/2012
P:\CPR Facility Program - T058\34. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 3 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **Calipatria State Prison (CAL)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, ASU HU 5 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Stand-Alone ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| **Calipatria State Prison (CAL)** | | **TOTAL** | $ 88,000 | $ 814,000 | $ 11,000 | $ 913,000 |
| **California Correctional Center (CCC)** | | | | | | |
| Facility C (Lassen ) | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C, ASU HU 4 (Lassen) | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Cascade | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) medical space in the Facility Support Building C by expanding into the adjacent space. Provide new data and telecom, new casework and 1 sink, 2 medication distribution windows and 1 injection room with window. Install 1 drinking fountain. | | | | |
| Sierra | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) medical space in the Facility Support Building C by expanding into the adjacent space. Provide new data and telecom, new casework and 1 sink, 2 medication distribution windows and 1 injection room with window. Install 1 drinking fountain | | | | |
| **California Correctional Center (CCC)** | | **TOTAL** | $ 66,000 | $ 593,000 | $ 11,000 | $ 670,000 |

7/11/2012
P:\CPR Facility Program - T058\34. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 4 of 14

Health Care Facility Improvement Program (HCFIP)
**Statewide Medication Distribution Improvements**
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **California Correctional Institution (CCI)** | | | | | | |
| Facility C (Facility III) | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, HU 1&2 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility A, HU 3&4 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility A, HU 5&6 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility A, HU 7&8 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility B, HU 1&2 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility B, HU 3&4 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility B, HU 5&6 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility B, HU 7&8 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| **California Correctional Institution (CCI)** | | **TOTAL** | $   124,000 | $   1,196,000 | $   11,000 | $   1,331,000 |
| **CSP - Corcoran (COR)** | | | | | | |
| Facility 3A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility 3A, ASU HU 3 & 4 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility 3B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |

7/11/2012
P:\CPR Facility Program - T05834. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 5 of 14

Health Care Facility Improvement Program (HCFIP)
**Statewide Medication Distribution Improvements**
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Facility 3B, HU 1 | The existing space used for medication distribution in the housing unit is too small to accommodate the number windows needed by the EOP population. Medication and injections are required to be passed through an open doorway. There is no handwashing sink. | Construct new medication distribution room adjacent the dayroom with 2 windows, and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and 1 drinking fountain. | | | | |
| Facility 3C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility 4A, HU 1L & 1R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4A, HU 2L & 2R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4A, HU 3L & 3R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4A, HU 4L & 4R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4B, HU 1L & 1R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4B, HU 2L & 2R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4B, HU 3L & 3R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility 4B, HU 4L & 4R | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Stand-Alone ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements. | | | | |
| CSP - Corcoran (COR) | | TOTAL | $ 202,000 | $ 1,936,000 | $ 11,000 | $ 2,149,000 |

7/11/2012
P:\CPR Facility Program - T056034, State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 6 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Centinela State Prison (CEN) | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, ASU HU 5 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Stand-Alone ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Centinela State Prison (CEN) | | TOTAL | $ 89,000 | $ 813,000 | $ 11,000 | $ 913,000 |
| Correctional Training Facility (CTF) | | | | | | |
| Central Facility Wing B | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing inmate restroom in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| Central Facility Wing C | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing inmate restroom in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| Central Facility Wing D | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing inmate restroom in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| Central Facility Wing E | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing inmate restroom in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| Central Facility Wing F | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing inmate restroom in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |

7/11/2012
P:\CPR Facility Program - T058\34. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 7 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Central Facility Wing G | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing inmate restroom in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| Central Facility Wing Y | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing barber shop in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| Central Facility Wing Z | Currently medications are distributed at each housing unit tier entrance across a non-secure cart. There is no handwashing sink, worksurfaces, or data connectivity. There is no secure storage and no drinking fountain. | Convert and renovate the existing barber shop in the housing unit to a medication distribution room. It will include data and telecom, casework and 1 sink, a drinking fountain and a secure pass-through window within the door. | | | | |
| **Correctional Training Facility (CTF)** | | **TOTAL:** | $ 50,000 | $ 627,000 | $ 11,000 | $ 688,000 |
| **Chuckawalla Valley State Prison (CVSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, ASU HU | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| **Chuckawalla Valley State Prison (CVSP)** | | | $ 89,000 | $ 778,000 | $ 11,000 | $ 878,000 |

7/11/2012
P:\CPR Facility Program - T059034, State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 8 of 14

Health Care Facility Improvement Program (HCFIP)
**Statewide Medication Distribution Improvements**
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **High Desert State Prison (HDSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Stand-Alone ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| **High Desert State Prison (HDSP)** | | **TOTAL** | $ 63,000 | $ 624,000 | $ 11,000 | $ 698,000 |
| **Ironwood State Prison (ISP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, ASU HU S | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| **Ironwood State Prison (ISP)** | | **TOTAL** | $ 83,000 | $ 778,000 | $ 11,000 | $ 878,000 |

7/11/2012
P:\CPR Facility Program - T058034, State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 9 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **Kern Valley State Prison (KVSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C, HU 8 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 160 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D, HU 7&8 (THU) | There is no existing space for medication distribution in the housing unit for the EOP population. Medication and injections are required to be passed across a non-secure cart on the dayroom floor or cell to cell instead of through a medication line. There is no handwashing sink. | Construct new space in the 160 housing unit dining room to accommodate 1 medication distribution room and 1 injection room, each with 1 window. Provide new data and telecom. Provide 2 sinks and drinking fountain. | | | | |
| Stand-Alone ASU Bldgs (Z) | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements. | | | | |
| **Kern Valley State Prison (KVSP)** | | TOTAL | $ 104,000 | $ 1,004,000 | $ 11,000 | $ 1,119,000 |
| **Pelican Bay State Prison (PBSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, HU 1 & 3 (locate in HU 1) | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 160 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |

7/11/2012
P:\CPR Facility Program - T05634. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 10 of 14

Health Care Facility Improvement Program (HCFIP)
**Statewide Medication Distribution Improvements**
Project / Cost Summary

| Institution (by yard) | | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|---|
| | Facility B, HU 1&2 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink, and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| | Facility B, HU 3 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate (E) enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink, and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| | SHU (2 wings) | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| | Stand-Alone ASU | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Pelican Bay State Prison (PBSP) | | | TOTAL | $ 82,000 | $ 856,000 | $ 11,000 | $ 949,000 |
| **Pleasant Valley State Prison (PVSP)** | | | | | | | |
| | Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| | Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| | Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| | Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, new casework and 1 sink, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| | Facility D, ASU HU 4 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| | Stand-Alone ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Pleasant Valley State Prison (PVSP) | | | TOTAL | $ 89,000 | $ 813,000 | $ 11,000 | $ 913,000 |
| **Substance Abuse Treatment Facility & State Prison (SATF)** | | | | | | | |
| | Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |

7/11/2012
P:\CPR Facility Program - T05834, State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 11 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility E | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility E, ASU HU 1 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility F | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility F, HU 3 | The existing space used for medication distribution in the housing unit is too small to accommodate the number windows needed by the EOP population. Medication and injections are required to be passed through an open doorway. There is no handwashing sink. | Construct new medication distribution room adjacent the dayroom with 2 windows, and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and 1 drinking fountain. | | | | |
| Facility G | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility G, HU 1 | The existing space used for medication distribution in the housing unit is too small to accommodate the number windows needed by the EOP population. Medication and injections are required to be passed through an open doorway. There is no handwashing sink. | Construct new medication distribution room adjacent the dayroom with 2 windows, and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and 1 drinking fountain. | | | | |
| Stand-Alone ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Substance Abuse Treatment Facility & State Prison | | TOTAL | $ 179,000 | $ 1,627,000 | $ 11,000 | $ 1,817,000 |

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| **Sierra Conservation Center (SCC)** | | | | | | |
| Facility A (Calaveras) | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and drinking fountain are not accessible. | Construct new stand-alone medication distribution room with 2 windows, and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| Facility B (Mariposa) | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and drinking fountain are not accessible. | Construct new stand-alone medication distribution room with 2 windows, and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| Facility C (Tuolumne) | The existing space used for medication distribution is too small to accommodate both the current LVN/OT staff and functions and the number of windows needed. There are no provisions to secure medications, no sink, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent Clothing Exchange. Provide new data and telecom, and 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C, ASU HU 2 (Tuolomne) | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements. | | | | |
| **Sierra Conservation Center (SCC)** | | **TOTAL** | $    139,000 | $    1,021,000 | $    11,000 | $    1,171,000 |
| **Salinas Valley State Prison (SVSP)** | | | | | | |
| Facility A | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility A, HU A5 | Construct new medication distribution room adjacent the dayroom with 2 windows, and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and 1 drinking fountain. | Construct new medication distribution room adjacent the dayroom with 2 windows, and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and 1 drinking fountain. | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |
| Facility C, ICF HU 5&6 | There is no existing space for medication distribution in the housing unit for the EOP population. Medication and injections are required to be passed across a non-secure cart on the dayroom floor or cell to cell instead of through a medication line. There is no handwashing sink. | Construct new space in the 180 housing unit dining room to accommodate 1 medication distribution room with 2 windows and 1 injection room with 1 window. Provide new data and telecom. Provide 2 sinks and drinking fountain. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate both the current LVN/OT functions and the number of windows needed. There are no provisions to securely store medications, insufficient sinks, and the pass-through window and drinking fountain are not accessible. | Renovate and enlarge (E) LVN/OT workstation by expanding into the adjacent storage room. Provide new data and telecom, new casework and 2 sinks, 1 additional medication distribution window and 1 injection window. Install 1 drinking fountain. | | | | |

7/11/2012
P:\CPR Facility Program - T058\34. State-Wide Medication Distribution\30-day letter\2012_0711 Statewide Med Distribution Table

Page 13 of 14

Health Care Facility Improvement Program (HCFIP)
Statewide Medication Distribution Improvements
Project / Cost Summary

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Facility D. HU 162 | The existing space used for medication preparation is too small to accommodate the medication preparation, nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate [E] enclosed space at salfyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Facility D. HU 558 | There is no existing space for medication distribution in the housing unit for the EOP population. Medication and reactions are required to be passed across a non-secure sail on the Dayroom floor or cell to cell instead of through a medication window. There is no handwashing sink. | Construct new space in the 180 housing unit dining room to accommodate medication distribution room with 2 windows and 1 injection room with 1 window. Provide new desk and telecom. Provide 2 sinks and drinking fountain. | | | | |
| Facility D. Bldg 168 | The existing space used for medication preparation is too small to accommodate the medication preparation nursing functions and storage needs. There are no provisions to securely store medications and no sink. | Renovate [E] enclosed space at sallyport of 180 housing unit. Provide new data and telecom. Provide sink and drinking fountain. Replace existing non-secure window with a secure medication distribution window. | | | | |
| Salinas Valley ASU Bldg | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate records-ing of medication administration. | Provide data and telecom infrastructure improvements | | | - | |
| **Salinas Valley State Prison (SVSP)** | | **TOTAL** | $ 164,000 | $ 1,614,000 | $ 11,000 | 1,809,000 |

**Valley State Prison (VSP)**

| Institution (by yard) | Problem Statement | Scope of Work | Design Estimate | Conceptual Construction Estimate | Due Diligence | Total Project Estimate |
|---|---|---|---|---|---|---|
| Facility A | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility A, ASU HU 4 | Data connectivity is not available for connection to information management systems for review of inmate-patient medical records and accurate recording of medication administration. | Provide data and telecom infrastructure improvements | | | | |
| Facility B | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and skirting fountain are not adequate. | Construct new stand-alone medication distribution room with 2 windows and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy to weather protection. | | | | |
| Facility C | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the pass-through window and drinking fountain are not adequate. | Construct new stand-alone medication distribution room with 2 windows and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| Facility D | The existing space used for medication distribution is too small to accommodate the number of windows needed. There are no provisions to securely store medications, no sinks, and the drinking fountain are not adequate. | Construct new stand-alone medication distribution room with 2 windows and an adjacent injection room with 1 window. Provide new data and telecom. Provide 2 sinks, 1 drinking fountain, and exterior canopy for weather protection. | | | | |
| **Valley State Prison (VSP)** | | **TOTAL** | $ 175,000 | $ 1,323,000 | $ 11,000 | 1,509,000 |

| | | **GRAND TOTAL** | $ 2,578,000 | $ 22,486,000 | $ 242,000 | $ 25,303,000 |

7/11/2012
HCFIP Facility Program - 705934, State-Wide Medication Distribution 90-day letter2012_0711 Statewide Med Distribution Table

Page 14 of 14

# Exhibit 95

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

Rick Johnson
February 25, 2013
**Exhibit No. 2**
Megan F. Alvarez
RPR, CSR No. 12470

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

hour care is needed, an inmate-patient shall be placed in a MHCB for continuous nursing care.

## B.  PROGRAM OBJECTIVES

The primary objective of the MHCB is to evaluate the symptoms associated with the crisis and provide initial stabilization and recommendations for follow-up care, post discharge. More specific objectives include:

1. To observe, monitor, and provide continuous nursing assistance to inmate-patients whose condition requires 24 hours or more to achieve stabilization.

2. To assess the inmate-patient's symptoms, formulate a provisional or differential diagnosis, and develop an initial treatment plan. This may include a medical/neurological evaluation or an initiation of referral for such.

3. To control symptoms of serious mental illness, using emergency medication when necessary.

4. To alleviate psychiatric distress with appropriate therapy or counseling.

5. To refer the inmate-patient for placement in an appropriate level of care.

6. To provide an alternative to hospitalization for inmate-patients whose condition allows placement within ten calendar days to a less intensive level of care.

## C.  POPULATION SERVED

**Overall Treatment Criteria**

Overall treatment criteria have been developed for the Mental Health Services Delivery System (MHSDS). An inmate must meet the criteria in either 1 or 2 below in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate who has *current* symptoms and/or requires treatment for the current Diagnostic and Statistical Manual (DSM) diagnosed (may be provisional) Axis I serious mental disorders listed below:

    **Schizophrenia (all subtypes)**
    **Delusional Disorder**
    **Schizophreniform Disorder**
    **Schizoaffective Disorder**

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

Brief Psychotic Disorder
Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)
Psychotic Disorder Due To A General Medical Condition
Psychotic Disorder Not Otherwise Specified
Major Depressive Disorders
Bipolar Disorders I and II

2. Medical Necessity: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by the Interdisciplinary Treatment Team (IDTT), for all cases in which:

**Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with, or suspected of having, a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

**Specific Treatment Criteria for MHCB**

In addition to the overall treatment criteria above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

- Marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or

- Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

- These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

**D. REFERRAL AND TRANSFER**

**Referrals**

An inmate-patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, shall be referred to a MHCB.

**MHCB Transfer**

If the institution does not have a MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be

| Mental Health Crisis Bed | Mental Health Services Delivery System |

transferred to a designated MHCB institution. The inmate-patient shall be transferred within 24 hours of referral.

(See Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 3, Health Care Transfer Process* and *Volume 6, Chapter 18, Transfer of Patient Health Records Within CDCR; Institution to Institution,* for specific requirements concerning transfers and Unit Health Records)

If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security. In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours. On weekends and after normal business hours, the mental health clinician on call or the physician on call at the referring institution shall contact the mental health clinician on call or the physician on call at other institutions to locate a vacant MHCB bed. **The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed.**

MHCB transfers shall be done under authority as "Emergency Medical Transfers" (Department Operations Manual [DOM] 62080.17). Since MHCB transfers are typically viewed as emergency moves, they do not require classification committee action or Classification Staff Representative (CSR) endorsement. MHCB transfers shall be done on a "Psychiatric and Return" basis.

Generally, the transfer process shall be initiated by the inmate-patient's psychiatrist, psychologist, or the Chief of Mental Health.

The transferring psychiatrist, psychologist, or Chief of Mental Health shall determine whether the inmate-patient is "medically cleared" to transfer. State law provides that, before a patient may be transferred to a health facility, the patient must be sufficiently stabilized to be safely transported. The transferring physician is responsible for determining whether the inmate-patient's condition will allow transfer. The CCR provides, in part, that a transfer or discharge may not be carried out if, in the opinion of the inmate-patient's physician, such transfer or discharge would create a medical hazard. The transferring physician must initially evaluate the relative benefits and risks associated with transporting the inmate-patient. The determination of whether the transfer creates an unacceptable risk or a "medical hazard" will depend upon the inmate-patient's condition, the expected benefits to the inmate-patient if he or she is transferred, and whether the risks to the inmate-patient's health are outweighed by the benefits.

The receiving facility must consent to the transfer. CCR, Title XXII, licensing standards provide that a patient shall not be transferred unless and until the receiving facility has

consented to accept the patient. Specifically, the CCR provides, in part, that no patient shall be transferred, or discharged for purposes of transferring, unless arrangements have been made in advance for admission to a health facility. Therefore, the transferring clinician must secure the receiving health facility's approval in advance for the inmate-patient's admission. The transferring clinician shall document in the inmate-patient's Unit Health Record (UHR) that approval was obtained and from whom.

Appropriate housing of inmate-patients pending MHCB transfer shall be determined by the sending institution and in the following order of preferred locations:

1. Inpatient beds

2. Outpatient Housing Unit

3. Outpatient Housing Unit overflow cells

4. Large holding cells with water/toilets including, but not limited to, "ZZ cells," "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.

5. Large holding cells without water/toilets such as "Contraband Cells" (not in a CTC licensed area)

6. Triage and Treatment Area or other clinic physical examining room

7. Other unit-housing where complete and constant visibility can be maintained

8. When none of the above are available, small holding cells (not in a CTC licensed bed area) that are designed for the inmate-patient to sit or stand may be used for up to four hours by which time consideration of a rotation to one of the above listed options shall have been considered and the outcome of such consideration documented. Inmate-patients shall be retained in sit/stand cells only with approval of the watch commander and notification of on-call clinical staff.

9. Holding cells within the licensed bed area of the CTC building (notification to Department of Health Services of an unusual occurrence is required)

All inmates-patients housed in one of the above sites while pending transfer to a MHCB shall be provided, at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock. If the inmate-patient subsequently attempts to use any or all of these items

| Mental Health Crisis Bed | Mental Health Services Delivery System |

to harm him or herself, a clinician may then order that one or more of these items be removed. Inmate-patients who are subsequently returned to their housing units shall receive appropriate clinical follow-up, which may include five-day custody and clinical wellness checks.

When an inmate-patient, identified as requiring MHCB care, is housed in an Outpatient Housing Unit, Administrative Segregation Unit, or any of the above sites, the HCPOP shall be notified of the need for MHCB placement.

**Procedure**

The Chief of Mental Health or designee at the sending institution shall contact the MHCB Clinical Director or designee at the receiving institution to obtain approval for the transfer.

In cases where the Clinical Director or designee at the receiving institution does not agree to the transfer, and the Chief of Mental Health at the sending institution believes the clinical need for transfer remains, the case shall be referred to the HCPOP and/or Mental Health Services at headquarters central office for assistance. If an agreement cannot be reached, the inmate shall be admitted and evaluated.

Upon receipt of approval to transfer, from the MHCB Clinical Director or designee at the receiving institution, the Chief of Mental Health or designee at the sending institution shall complete a CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance. Copies of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental,* shall be forwarded to the MHCB Clinical Director or designee at the receiving institution and the Classification & Parole Representative (C&PR) at the sending institution.

The C&PR at the sending institution shall forward a copy of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, to the C&PR at the receiving institution.

The Chief of Mental Health or designee, MHCB Clinical Director or designee, and the C&PRs at both the sending and receiving institutions shall communicate to ensure all health care/classification/transportation aspects are addressed. The escort needs for each transport are different given the variation of custody and health care concerns that may arise. At times, the transportation may be accomplished with just custody staff. However, occasions do arise when a combination of custody and clinical staff are needed to accompany an escort. This may occur when the inmate-patient has highly sensitive and varying medication needs or when the presence of a clinical staff member may substantially reduce decompensating or disruptive inmate-patient behavior during transportation.

| Mental Health Crisis Bed | Mental Health Services Delivery System |
|---|---|

The C&PR at the receiving institution shall contact the Classification Services Unit (CSU) for teletype transfer approval. The transfer approval shall be obtained from a CSR if available on site.

Documentation and classification of inmate-patients accepted for transfer to another institution shall be consistent with procedures outlined in the DOM. The sending institution shall clearly indicate on CDCR 135, *Inmate Transfer Record*, that the purpose of the transfer is for psychiatric treatment.
The inmate-patient shall be informed of the reasons for and destination of the transfer.

The Receiving and Release sergeant at the receiving institution shall notify the MHCB when the inmate-patient arrives. An inmate-patient who arrives by special transport because of urgent acuity shall be screened by a physician. If immediate admission is not possible, an inmate-patient shall be housed in an appropriate medical setting until a bed is available (CCR, Title XXII, Section 79789).

E.  **ADMISSION**

**Pre-admission Screening**

All inmate-patients referred to the MHCB shall receive a pre-admission screening for the purpose of determining the appropriateness of the admission to the MHCB program. During regular working hours, the screening shall be performed by a psychiatrist or a licensed psychologist privileged to practice in the MHCB, and documented in the Progress Notes. During weekends, holidays, and after normal business hours, the screening shall be performed by an on-site physician on duty or any other licensed health care staff. The pre-admission screening may be performed via telephone prior to transfer when the inmate-patient is at an institution without an available MHCB. An inmate-patient in crisis may be screened where the crisis occurs (such as in the cell), or in the emergency service area of the CTC/GACH/SNF, prior to admission to the MHCB.

All inmates attempting suicide and those having suicidal ideation or showing signs and symptoms of suicide potential will be evaluated by a mental health clinician (psychiatrist, psychologist, or Clinical Social Worker) on an emergency basis. Inmates referred to health care by custody because of suicide concerns, shall be immediately evaluated for suicide risk by a mental health clinician, which shall include a Suicide Risk Assessment Checklist (SRAC). On weekends, evenings, and holidays, the SRAC shall be performed by the Physician on Call (POC), Medical Officer of the Day (MOD), or Registered Nurse (RN) trained to administer the SRAC if mental health clinicians are not available. It is the responsibility of the Health Care Manager to establish procedures for suicide risk assessment by clinical staff outside of normal work hours. All SRACs shall be filed in the inmate-patient's UHR whether or not the inmate-patient is admitted to the MHCB. An inmate

# Exhibit 96

1 ☐ Statewide SPR FIT
Teleconference/Webinar
February 2011

Robert Canning, DCHCS
Kathleen O'Meara, DCHCS
Catherine Prudhomme, DCHCS

2 ☐ Agenda

3 ☐ HQ Projects
- Pocket card for custody and nursing
- Training issues
  - Proctoring
  - Assessment guide
  - Updated training for clinicians
  - Updating Program Guide
  - High risk patient project
- Program Guide updates

4 ☐ SPR FIT Coordinator Duties
and Workload Discussion
- How much time is spent on SPR FIT duties?
- How many coordinators have a CCCMS or EOP caseload?
- How to increase visibility of issue in institutions
- Partnering with custody

5 ☐ Revision of 31-Item
ASU Screener
- Right now:
  - General MH questionnaire
  - Only administered to non-MH inmates entering ASU
  - Some irrelevant questions
- Proposed
  - Focused on relevant psychological domains
  - Administered to all inmates entering ASU

6 ☐ Proposed Revision Timeline
- General outline developed by HQ SPR FIT (3/11)
- Work group creates pilot version (6/11)
  - SPR FIT coordinators
  - Chiefs
  - ASU clinicians

1

- Nursing representative(s)
- Pilot the proposed screener (7/11-8/11)
- Final version – (10/11)
- Approval & Implementation (12/11)

## 7 ☐ Suicide Attempt Work Group

- Re-start project this month
- Distribute materials to members
- Draft proposal for standard
- Pilot draft to 5-6 varied institutions
- Finalize
- Implement to field

## 8 ☐ Wrap Up & Closing

- Unfinished business
- Items for next meeting
- Date of next meeting
- Adjourn

2

DPRD2-27-000009

# Exhibit 97

PRISONER NAME
REDACTED

# Suicide Prevention and Response-Focused Improvement Team (SPR FIT)

## Meeting Agenda

Meeting Date: **Monday January 28, 2013**
Meeting Location: *Elk Grove Campus, G-2, MH Director's Conference Room*
Call-in Number: *877-213-1782, Participant Code 664226*
Meeting Time: 10:00 AM – 11:00 AM

Timekeeper: Robert Canning
Minutes: Alicia Aguilar

| Item | Who |
|---|---|
| Announcements, introductions, additions to the agenda | |
| New items | |
| Follow-up on ongoing items | |
|    1.  Update on proposal for new ASU screening tool (to replace 31-item questionnaire) | Canning |
|    2.  Changes to referral criteria for RC screening (from ████ suicide review) | Canning |
|    3.  Suicide prevention posters | Canning |
|    4.  Proctor-mentor program update | O'Meara |
|    5.  2011 Report from Special Master/ Other legal | Canning |
|    6.  Data project | Scholl |
|    7.  Auditing of ASU Pre-placement screening | w/ Nursing |
|    8.  Auditing of 30-minute ASU welfare checks | w/ DAI |
| Ongoing items (updates as needed until item closed) | |
|    1.  Training issues | Canning |
| 9.  Periodic (recurring) items | |
|    a. Suicide Prevention Videoconference agenda | Canning |
| 10.  Ongoing, Tabled, and Postponed Items | |
| 11.  Wrap-up and Other Business | |

Next Meeting:

Date:  February 11, 2013
Time: 10:00 AM
Location: **Elk Grove G-2 MH Director's Conference Room**

DCHCS Agenda Template 11-2-04.doc

# Exhibit 98

**From:** Canning, Robert@CDCR
**Sent:** Wednesday, October 10, 2012 9:32 AM
**To:** Chaiken, Shama@CDCR; Wheeler, (Ralph) David@CDCR; Switzer, Heidi@CDCR; Gauch, Gerardine@CDCR; Rushe, Regina H@CDCR
**Subject:** DRAFT of new ASU screener - comments requested

Greetings,

I'm writing to you because you all have extensive experience with the segregated housing environment in CDCR and the screening practices we currently use. Attached is a draft of a new screening instrument that we are proposing to pilot in a number of institutions around the state in hopes that it will be a better alternative and more effective screening measure than the current 31-item questionnaire.

Currently CDCR uses the 31-item Reception Center screening measure to screen for mental health needs within 72 hours of a non-MHSDS inmate's entry to ASU. This measure uses a subset of 14 items (the Referral Decision Scale) plus two more items focusing on suicidal thinking and history. Decision rules determine whether an inmate is referred.

The 31-item screener has never been validated in the CRCR setting, takes too long to administer, and does not address what we believe are the most important psychological factors effecting an inmate's behavior soon after entry into ASU: distress, isolation, loneliness, fear, and possibly thoughts of suicide.

We propose replacing the 31-item measure with this shorter, 12-item measure which combines two validated screeners: the Kessler Six (K6) and the Columbia Suicide Severity Rating Scale (C-SSRS). The K6 is a widely used scale of general distress that has high AUC's for detection of DSM disorders, and the C-SSRS is new validated measure of suicidal thinking and behavior that has been found useful in non-clinical settings. The C-SSRS is beginning to find its way into correctional settings and the K6 has been used on a trial basis in prisons in Illinois.

We also propose that the measure be used to screen all inmates placed in ASU rather than the current practice of only screening those who are not participants in the MHSDS. The rationale for this change is that historically the ASU screening was to determine mental health needs and since those in the MHSDS were already by default identified as needing mental health services, there was no need to screen them upon entry to ASU.
The current proposal assumes that anyone placed in ASU could be experiencing increased levels of distress and isolation thus we ought to identify these inmates quickly to be able to provide the services they may need.

When used together psychiatric technicians can quickly and easily screen for distress and suicidal thinking and make referrals. The structure of the instrument is algorithmic and if administered in a standardized fashion will facilitate, we believe, a better screening regimen in ASU.

I would be interested in ANY feedback you may have about this proposed screener – format, rules, page layout – anything. Thanks in advance for your help and if you have any questions, please let me know.

Thanks in advance.

Robert D. Canning, Ph.D.          Desk:    **(916) 691-0276**
Senior Psychologist Specialist     Cell:     **(530) 400-8965**
Statewide Mental Health Program    Fax:     **(916) 691-0534**
                                   mail:    robert.canning@cdcr.ca.gov

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictlyprohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

## Proposal for new ASU screening measure

Currently CDCR uses the 31-item Reception Center screening measure to screen for mental health needs within 72 hours of a non-MHSDS inmate's entry to ASU. This measure uses a subset of 14 items (the Referral Decision Scale) plus two more items focusing on suicidal thinking and history.  Decision rules determine whether an inmate is referred.

The 31-item screener has never been validated in the CRCR setting, takes too long to administer, and does not address what we believe are the most important psychological factors effecting an inmate's behavior soon after entry into ASU: distress, isolation, loneliness, fear, and possibly thoughts of suicide.

We propose replacing the 31-item measure with a shorter, 12-item measure which combines two short, validated screeners: the Kessler Six[1] (K6) and the Columbia Suicide Severity Rating Scale (C-SSRS).[2]  The K6 is a widely used scale of general distress that has high AUC's for detection of DSM disorders, and the C-SSRS is new validated measure of suicidal thinking and behavior that has been found useful in non-clinical settings.  The C-SSRS is beginning to find its way into correctional settings and the K6 has been used on a trial basis in prisons in Illinois.

We also propose that the measure be used to screen <u>all</u> inmates placed in ASU rather than the current practice of only screening those who are not participants in the MHSDS.  The rationale for this change is that historically the ASU screening was to determine mental health needs and since those in the MHSDS were already identified as needing mental health services by default, there was no need to screen them upon entry to ASU. The current proposal assumes that anyone placed in ASU could be experiencing increased levels of distress and isolation thus we ought to identify these inmates quickly to be able to provide the services they may need.

When used together (see page 2 for a draft of the measure) psychiatric technicians can quickly and easily screen for distress and suicidal thinking and make referrals. The structure of the instrument is algorithmic and if administered in a standardized fashion will facilitate a better screening regimen in ASU.

In the next year we will pilot the measure in approximately six institutions and then implement system-wide.

---

[1] Kessler, et al. (2002). Short screening scales to monitor population prevalences and trends in non-specific psychological distress. *Psychological Medicine 32*:959-976.
[2] Posner, et al. (2012). The Columbia-Suicide Severity Rating Scale: Initial validity and internal consistency findings from three multisite studies with adolescents and adults. *American Journal of Psychiatry 168*: 1266-1277.

# Exhibit 99

| | |
|---|---|
| **From:** | Chaiken, Shama@CDCR |
| **Sent:** | Thursday, October 11, 2012 2:42 PM |
| **To:** | Canning, Robert@CDCR |
| **Subject:** | RE: DRAFT of new ASU screener - comments requested |

This part is really clunky and could be difficult to follow:

**If NO to Question 8 or Question 9, Skip to Question 12 and stop.**
**If YES to Question 9, ask Questions 10 & 11, DO NOT ask Question 12.**

The instructions and scoring rules are a bit complicated for the staff who would be doing these screenings...

**Shama Chaiken, Ph.D.**
**Chief of Mental Health**
**California State Prison, Sacramento**
**Division of Correctional Health Care Services**

916-294-3160 Office
916-508-2047 Cell
916-294-3122 Fax
shama.chaiken@cdcr.ca.gov

 CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES** 

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.*

**From:** Canning, Robert@CDCR
**Sent:** Thursday, October 11, 2012 2:39 PM
**To:** Chaiken, Shama@CDCR
**Subject:** RE: DRAFT of new ASU screener - comments requested

Thanks.  But not in other ASU's?

Sorry for my somewhat brusque reply yesterday.

Did you take a look at the proposed screener? Do you think it is too complicated?

| Robert D. Canning, Ph.D. | Desk: | **(916) 691-0276** |
|---|---|---|
| Senior Psychologist Specialist | Cell: | **(530) 400-8965** |
| Statewide Mental Health Program | Fax: | **(916) 691-0534** |
| | mail: | robert.canning@cdcr.ca.gov |

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information  Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictlyprohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

 

CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

---

**From:** Chaiken, Shama@CDCR
**Sent:** Thursday, October 11, 2012 2:36 PM
**To:** Canning, Robert@CDCR
**Subject:** FW: DRAFT of new ASU screener - comments requested

SAC does a full SRE within 24 business-hours of arrival in ASU EOP, based on a local suicide prevention decision.  It's not a screen.  It's a full review of the inmate-patient's records, interview...etc.

**Shama Chaiken, Ph.D.**
Chief of Mental Health
California State Prison, Sacramento
Division of Correctional Health Care Services

916-294-3160 Office
916-508-2047 Cell
916-294-3122 Fax
shama.chaiken@cdcr.ca.gov

 

CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only. Unauthorized access or distribution is prohibited by all applicable laws.

---

**From:** Wheeler, (Ralph) David@CDCR
**Sent:** Thursday, October 11, 2012 6:01 AM
**To:** Chaiken, Shama@CDCR
**Cc:** Coss, Natalie@CDCR
**Subject:** RE: DRAFT of new ASU screener - comments requested

It isn't required but I instituted that change when I ran the Ad Seg EOP unit based on suicide statistics in Ad Seg units. I thought it a best practice.

David Wheeler, PsyD
Chief Psychologist
CSP-Sacramento

916 985-8610 x6105
916 628-5966 iPhone
916 294-3121 Confidential fax
ralph.wheeler@cdcr.ca.gov



CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only. Unauthorized access or distribution is prohibited by all applicable laws.

---

**From:** Chaiken, Shama@CDCR
**Sent:** Wednesday, October 10, 2012 5:10 PM
**To:** Wheeler, (Ralph) David@CDCR
**Subject:** Fwd: DRAFT of new ASU screener - comments requested

Do you know the history of why we do a full SRE within 24 hrs of placement in ASU EOP? I was not aware of this and don't think it's required by statewide policy.

Begin forwarded message:

**From:** "Coss, Natalie@CDCR" <Natalie.Coss@cdcr.ca.gov>
Case 2:90-cv-Natalie.Coss@cdcr.ca.gov 4404   Filed 03/15/13   Page 108 of 266
**To:** "Chaiken, Shama@CDCR" <Shama.Chaiken@cdcr.ca.gov>
**Subject: RE: DRAFT of new ASU screener - comments requested**

It's in our LOP, page 5 under Assessment and Treatment Planning.  It is a full SRE, not a screening. In the event the assigned clinician is on RDO, the backup performs the SRE to keep within the 24-hour time frame.  I am attaching the 2011 revision because the 2012 revision I sent forth months ago is apparently still awaiting signatures and is not yet on the server.  I can't speak to the length of time it takes someone to do it as that would likely vary by clinician...I can ask the staff if you would like for me to do so.

Natalie Coss, Ph.D.
Senior Psychologist Supervisor
AdSeg EOP program
California State Prison, Sacramento
(916) 985-8610 ext. 3175
natalie.coss@cdcr.ca.gov


CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.


-----Original Message-----
From: Chaiken, Shama@CDCR
Sent: Wednesday, October 10, 2012 12:02 PM
To: Coss, Natalie@CDCR
Subject: FW: DRAFT of new ASU screener - comments requested

Do you know why we do a SRE within 24 hours of arrival into ASU EOP (what policy/procedure requires it)?


Shama Chaiken, Ph.D.
Chief of Mental Health
California State Prison, Sacramento

4

916-294-3160 Office
916-508-2047 Cell
916-294-3122 Fax
shama.chaiken@cdcr.ca.gov

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.

-----Original Message-----
From: Canning, Robert@CDCR
Sent: Wednesday, October 10, 2012 11:57 AM
To: Chaiken, Shama@CDCR
Subject: RE: DRAFT of new ASU screener - comments requested

I am curious why a full SRE is done upon entry to ASU?

I actually think that screening instruments done well save time. It's a training and fidelity issue.

Also - what is the quality of the SRE done at entry to ASU? The last time I asked David how long people take to do an SRE and he said 15 minutes - which seems like a screening to me.

Robert D. Canning, Ph.D.          Desk:    (916) 691-0276
Senior Psychologist Specialist    Cell:    (530) 400-8965
Statewide Mental Health Program   Fax:     (916) 691-0534
mail:    robert.canning@cdcr.ca.gov

CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information  Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictlyprohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all

events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470

From: Chaiken, Shama@CDCR
Sent: Wednesday, October 10, 2012 11:40 AM
To: Canning, Robert@CDCR
Subject: FW: DRAFT of new ASU screener - comments requested

FYI – From Dr. Coss, supervisor of ASU EOP. We think a pre-screening, then a full SRE within 24 hours is sufficient without this additional workload.


Shama Chaiken, Ph.D.
Chief of Mental Health
California State Prison, Sacramento
Division of Correctional Health Care Services

916-294-3160 Office
916-508-2047 Cell
916-294-3122 Fax
shama.chaiken@cdcr.ca.gov<mailto:first.lastname@cdcr.ca.gov>

[cid:image005.jpg@01CDA6DC.1D88C150]

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only. Unauthorized access or distribution is prohibited by all applicable laws.

From: Coss, Natalie@CDCR
Sent: Wednesday, October 10, 2012 11:17 AM
To: Chaiken, Shama@CDCR
Subject: RE: DRAFT of new ASU screener - comments requested

I agree with your assessment about it duplicating suicide prevention efforts. I don't consider this instrument to be particularly user friendly in our setting in AdSeg EOP. Psych techs are going to have to spend more time wading through it to see that they are asking the right question (if no, proceed to this item, if yes, proceed to that one). My guess is that it will slow them down from their other job responsibilities. Additionally an SRE is done within 24 hours of the inmate-patient

6

coming into the unit by the PC

Natalie Coss, Ph.D.
Senior Psychologist Supervisor
AdSeg EOP program
California State Prison, Sacramento
(916) 985-8610 ext. 3175
natalie.coss@cdcr.ca.gov<mailto:natalie.coss@cdcr.ca.gov>

[cid:image002.jpg@01CDA6D6.A3D4D920]

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.

From: Chaiken, Shama@CDCR
Sent: Wednesday, October 10, 2012 9:55 AM
To: Anderson, Wendy@CDCR; Chatman, Cynthia@CDCR; Worrell, Wendy@CDCR; Coss, Natalie@CDCR
Cc: Franklin, Loretta@CDCR; Oloyede, Tutu@CDCR; Wheeler, (Ralph) David@CDCR
Subject: FW: DRAFT of new ASU screener - comments requested

Please review the attached draft of a possible new ASU Screen – to replace the 31-item questionnaire.  (Read the email below first)

I responded that I thought screening IPs currently included in MHSDS duplicates current suicide prevention efforts and is not necessary.  I also think the tool needs instructions about those who refuse to participate.

Please send any feedback to me by Friday 10/12.  Thanks!

Shama Chaiken, Ph.D.
Chief of Mental Health
California State Prison, Sacramento
Division of Correctional Health Care Services

916-294-3160 Office
916-508-2047 Cell

7

shama.chaiken@cdcr.ca.gov<mailto:first.lastname@cdcr.ca.gov>

[cid:image002.jpg@01CDA6D6.A3D4D920]

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only. Unauthorized access or distribution is prohibited by all applicable laws.

From: Canning, Robert@CDCR
Sent: Wednesday, October 10, 2012 9:32 AM
To: Chaiken, Shama@CDCR; Wheeler, (Ralph) David@CDCR; Switzer, Heidi@CDCR; Gauch, Gerardine@CDCR; Rushe, Regina H@CDCR
Subject: DRAFT of new ASU screener - comments requested

Greetings,

I'm writing to you because you all have extensive experience with the segregated housing environment in CDCR and the screening practices we currently use. Attached is a draft of a new screening instrument that we are proposing to pilot in a number of institutions around the state in hopes that it will be a better alternative and more effective screening measure than the current 31-item questionnaire.

Currently CDCR uses the 31-item Reception Center screening measure to screen for mental health needs within 72 hours of a non-MHSDS inmate's entry to ASU. This measure uses a subset of 14 items (the Referral Decision Scale) plus two more items focusing on suicidal thinking and history. Decision rules determine whether an inmate is referred.

The 31-item screener has never been validated in the CRCR setting, takes too long to administer, and does not address what we believe are the most important psychological factors effecting an inmate's behavior soon after entry into ASU: distress, isolation, loneliness, fear, and possibly thoughts of suicide.

We propose replacing the 31-item measure with this shorter, 12-item measure which combines two validated screeners: the Kessler Six (K6) and the Columbia Suicide Severity Rating Scale (C-SSRS). The K6 is a widely used scale of general distress that has high AUC's for detection of DSM disorders, and the C-SSRS is new validated measure of suicidal thinking and behavior that has been found useful in non-clinical settings. The C-SSRS is beginning to find its way into correctional settings and the K6 has been used on a trial basis in prisons in Illinois.

8

We also propose that the measure be used to screen all inmates placed in ASU rather than the current practice of only screening those who are not participants in the MHSDS. The rationale for this change is that historically the ASU screening was to determine mental health needs and since those in the MHSDS were already by default identified as needing mental health services, there was no need to screen them upon entry to ASU.
The current proposal assumes that anyone placed in ASU could be experiencing increased levels of distress and isolation thus we ought to identify these inmates quickly to be able to provide the services they may need.

When used together psychiatric technicians can quickly and easily screen for distress and suicidal thinking and make referrals. The structure of the instrument is algorithmic and if administered in a standardized fashion will facilitate, we believe, a better screening regimen in ASU.

I would be interested in ANY feedback you may have about this proposed screener – format, rules, page layout – anything. Thanks in advance for your help and if you have any questions, please let me know.

Thanks in advance.

Robert D. Canning, Ph.D.          Desk:    (916) 691-0276
Senior Psychologist Specialist    Cell:    (530) 400-8965
Statewide Mental Health Program   Fax:     (916) 691-0534
mail:      robert.canning@cdcr.ca.gov<mailto:robert.canning@cdcr.ca.gov>

CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictlyprohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.

[cid:image003.png@01CDA6D6.A3D4D920]

# Exhibit 100

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

| Reception Center | Mental Health Services Delivery System |
| --- | --- |
| Mental Health Assessment | |

# CHAPTER 2
## Reception Center Mental Health Assessment

### A. INTRODUCTION

The Reception Center (RC) program provides mental health assessment for all inmates committed to the California Department of Corrections and Rehabilitation (CDCR) and basic treatment for those inmates identified as having a serious mental disorder while awaiting transfer.

By enhancing and standardizing screening and evaluation efforts at the entry point into the institution system, the CDCR can best ensure that all inmates in need of mental health treatment are identified and provided necessary services at the earliest possible time. Early and easy access to care has been shown to have both therapeutic as well as fiscal benefits in managing mental illness at its lowest level of acuity. This is particularly true in the high stress environment of an institution setting.

This program utilizes clinical and clerical positions to achieve the following objectives:

1.   Provide a standardized system for universal screening of all inmates received in the CDCR for possible symptoms of mental disorder or suicide risk.

2.   Conduct in-depth clinical evaluations of individuals identified in the screening process for diagnosis of serious mental disorder, level of functioning, and necessary level of care.

3.   Through the Inmate Mental Health Identifier System, CDCR is able to track inmate-patients who have been identified as seriously mentally disordered and enrolled in one of the Mental Health Services Delivery System (MHSDS) levels of care. This information provides a management tool and is utilized in program planning.

It is important to emphasize that the population this program seeks to identify is defined as those inmates who are dysfunctional in the prison environment as a result of a serious mental disorder. Specifically, these are inmates with a Diagnostic and Statistical Manual (DSM) Axis I diagnosis, with current symptoms, or evidence of medical necessity. Inmates who are prescribed psychotropic medications are also included in MHSDS. Inmates suffering suicidal

# Exhibit 101

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Administrative Segregation | Mental Health Services Delivery System |
|---|---|

*Specific program objectives include:*

1. Continuation of care for inmate-patients with identified mental health treatment needs through regular case management activities and medication monitoring to enable inmate-patients to maintain adequate levels of functioning and avoid decompensation.

2. Daily clinical rounds of ALL inmates.

3. Mental Health screening of inmates who are not currently in the MHSDS caseload to identify mental health needs, and referral for further mental health evaluation as indicated.

4. Referral to a more intensive level of care for inmate-patients whose mental health needs cannot be met in the ASU, including expeditious placement into Mental Health Crisis Beds (MHCB) for inmate-patients requiring inpatient mental health care.

5. Mental health assessments and input into the classification decision-making process during ICC meetings, including the inmate-patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living (ADL), ability to understand Due Process proceedings, likelihood of decompensation if retained in ASU, recommendations for alternative placement, and any other custodial and clinical issues that have impact on inmate-patients' mental health treatment.

6. Mental health assessments and input into the adjudication of Rules Violation Report (RVR) hearing proceedings involving MHSDS inmate-patients. Mental health information includes the quality of the inmate-patients' participation in their current MHSDS treatment plan, mental condition that may have been a contributing factor in the alleged misbehavior, and the ability to comprehend the nature of the charges or participate meaningfully in the disciplinary process. Final housing decisions are made by the ICC after considering all relevant clinical and custody factors.

## D. **TREATMENT POPULATION**

Refer to the Treatment Criteria for the level of care in the MHSDS, Chapter 1, Overview Program Guide.

*Referral for Mental Health Services*

1. <u>Pre-placement mental health screening</u>: All inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in ASU (see <u>Inmate Medical Services Policy and Procedure</u>, *Volume 4, Chapter 16: CDCR 7219*). If an inmate screens positive on the CDCR 128-MH7, *ASU Pre-Placement*

| Administrative Segregation | Mental Health Services Delivery System |

*Chrono,* they are referred for a mental health evaluation on an Emergent, Urgent, or Routine basis, depending on their answers to the screening questions. After completion, the CDCR Form 128-MH7, *ASU Pre-Placement Chrono,* shall be placed in the mental health chrono section of the Unit Health Record (UHR). For Urgent and Routine referrals, the medical staff conducting the screening shall complete a CDCR 128-MH5, *Mental Health Referral Chrono,* and follow the referral process below.

2.  Current MHSDS inmate-patients: All inmates placed into ASU shall be reviewed for identification of current MHSDS treatment status by the time of the initial CDCR-114D, *Order and Hearing on Segregated Housing,* review. This shall occur on the first work day following an inmate's placement. Current MHSDS inmate-patients are identified by checking the ASU placements reported on the Institutional Daily Movement Sheet with the treatment identifier code in the Distributed Data Processing System (DDPS) or the Mental Health Tracking System (MHTS) for inmate-patient treatment cases. During the initial review, mental health staff will ensure the continuity of mental health care, including the delivery of prescribed medications. Upon inmate's placement into ASU, nursing staff shall transfer the inmate's Medication Administration Record to ASU, consistent with the post orders.

3.  Staff referral: Any staff member who observes possible signs or symptoms of a serious mental disorder shall refer an inmate for clinical evaluation by completing a CDCR 128-MH5, *Mental Health Referral Chrono.* The Referral Chrono shall be processed by following the referral process below. Any inmate who is observed to be a suicide risk, or in any other condition that requires crisis care, shall be immediately screened by the PC to assess the potential for suicide and, if appropriate, referral to the MHCB for admission.

4.  Inmates who receive a CDCR 115, *Rules Violation Report,* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

    •  CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*

    •  A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,

    •  For inmate-patients included in the MHSDS, to the inmate-patient's Primary Clinician

5.  Self referral: Inmates in ASU may request a clinical interview to discuss their mental health needs. These requests are made on a CDCR 7362, *Health Care Services Request.* Inmates shall receive the attached pamphlet, *"Administrative Segregation Inmate*

| Administrative Segregation | Mental Health Services Delivery System |
|---|---|

*Orientation Mental Health Guide*" (available in Spanish), within 24 hours of placement into ASU.

NOTE: When an IDTT determines that an inmate-patient requires treatment of exhibitionism, that inmate-patient's level of care shall be changed to CCCMS, Medical Necessity (or higher if appropriate), bypassing the standard referral process.

### *Referral process*

Mondays through Fridays, the following shall occur:

1. A health care staff member shall collect the CDCR 7362, *Health Care Services Request,* and staff referral forms each day from the designated areas.

2. Upon receipt of the collected forms, a Registered Nurse (RN)/Licensed Vocational Nurse shall initial and date each CDCR 7362, *Health Care Services Request,* and the CDCR 128-MH5, *Mental Health Referral Chrono.*

3. The CDCR 7362, *Health Care Services Request*, and the CDCR 128-MH5, *Mental Health Staff Referral*, shall be delivered to the designated program representative in mental health services, dental services, or pharmacy services for same-day processing.

On weekends and holidays, the following shall occur:

1. The Triage and Treatment Area RN shall review each CDCR 128-MH5, *Mental Health Staff* Referral, and CDCR 7362, *Health Care Services Request,* for medical, dental, and mental health services, shall establish priorities on an emergent and non-emergent basis, and shall refer accordingly.

2. If a mental health clinician is not available, the medical officer of the day (MOD), physician on call or psychiatrist on call shall be contacted.

Inmates will be seen by a mental health clinician, or on weekends, by the MOD, physician, or psychiatrist on-call within the clinically determined time frame.

- Emergent: Emergency cases will be seen immediately or escorted to the Triage and Treatment area

- Urgent: Urgent cases will be seen within 24 hours

- Routine: Other cases will be seen within five working days

---

**2009 REVISION**                                                                           12-7-4

| Administrative Segregation | Mental Health Services Delivery System |
|---|---|

## E. CLINICAL ROUNDS AND SCREENING

### *Clinical rounds*

A mental health staff member, usually a Licensed Psychiatric Technician (LPT), shall conduct rounds seven days per week in all ASUs to attend to the mental health needs of all inmates. The LPT shall make initial contact with each inmate placed into ASU within 24 hours of placement.

A morning "check-in" meeting between custody and clinical staff shall be held each day. At minimum, an ASU Sergeant and an assigned ASU Mental Health clinician (psychologist or social worker) shall attend the morning meeting. During the meeting, involved personnel shall identify new arrivals, discuss current behavioral issues and concerns, and share any pertinent information regarding new arrivals and/or at-risk inmates. Pertinent suicide risk information from the MHTS Suicide Tracking Report will be discussed. This meeting shall be documented in the ASU Log book and salient clinical information shall be documented in the UHR and, if necessary, a referral for mental health services shall be made at the appropriate level of urgency.

In order to establish contact and provide information, mental health staff shall attend to developing rapport with new inmates on the first day of mental health rounds.

Each institution is to ensure that effective communication is observed when inmates have limited ability to speak English or are hearing impaired. Interpreter services information shall be posted in all areas where phones may be used for that purpose, and all staff assigned to ASU shall be provided documented training regarding access and use of services and available translation equipment.

Those inmates not previously identified as having mental health treatment needs who exhibit possible signs and symptoms of serious mental disorders are referred, via CDCR 128-MH5, *Mental Health Staff Referral*, for clinical evaluation. Interaction shall be sufficient to ascertain the inmate's mental condition particularly during the first ten days. The LPT shall maintain an individual record of clinical rounds on both MHSDS and non-patients by initialing next to the inmate's name on the CDCR 114, *Isolation Log Book*, each time the inmate is seen. Any unusual findings that may require closer observation by custody shall be documented on the CDCR 114-A, *Daily Log*, on the same day of occurrence. For identified MHSDS inmate-patients, the LPT shall document a summary of daily clinical rounds on a CDCR 7230, *Interdisciplinary Progress Notes*, in the UHR on a weekly basis. Notes will be

clearly labeled as "Weekly Summary of LPT Clinical Rounds." If clinically indicated, the LPT may provide additional documentation.

| Administrative Segregation | Mental Health Services Delivery System |
|---|---|

*Screening Questionnaire*

All inmates who are not in the MHSDS and who are retained in ASU shall receive, within 72 hours of placement in ASU, a mental health screening interview utilizing the 31-question mental health screening questionnaire also used in the Reception Centers. The interview shall be conducted by a mental health clinician or trained nursing staff in private and confidential settings that afford confidentiality of sight and sound from other inmates, and confidentiality of sound from staff. Screening interview appointments shall be announced by custody staff as "health appointments" to avoid stigmatization and possible retribution by other inmates. Every effort shall be made to encourage inmates to attend these appointments.

The results of the questionnaire are evaluated either by hand-scoring or on an approved automated scoring system to determine the need for further evaluation. The scoring sheet shall be filed in the UHR. All inmates scoring positive on the questionnaire shall be referred to a mental health clinician to be seen within the clinically appropriate time frame. Emergent cases shall be seen immediately, Urgent cases shall be seen within 24 hours, all others shall be seen within 5 working days.

All referrals and results of evaluations are documented in individual inmates' UHR on approved forms and entered into the institutional MHTS. Decisions to provide treatment via placement into an outpatient program or MHCB shall be entered into DDPS.

## F. CLINICAL EVALUATION

Referral evaluations will be completed within the time frames listed above and consist of the following:

1. A review of the UHR and, if necessary, the Central File, shall be completed and documented on approved forms as a part of the assessment process. Past treatment needs, medications, and program placements shall be noted.

2. An individual clinical interview to determine the nature of the problem and a full mental status examination. The examination is documented on a CDCR 7386, *Mental Health Evaluation*, and placed into the UHR.

3. When necessary, as determined by the evaluating clinician in consultation with the IDTT, psychological and neuropsychological testing may be conducted as a part of the diagnostic assessment of all cases not previously identified as having mental health treatment needs (testing is discretionary for inmate-patients currently receiving care who have not previously undergone such testing). When suicidality is an issue, a suicide risk assessment shall be conducted using the Suicide Risk Assessment Checklist (SRAC).

# Exhibit 102



# Exhibit 103

12/16/11

Subject: Assessment of need for a higher level of care and CDCR's sustainable self-monitoring process (Coleman Case).

To:     Benjamin T. Rice, General Counsel

From:   Jeffrey A. Beard, PhD, Consultant

As a result of an order from the court on August 15, 2011 CDCR staff worked with the Coleman Special Master to develop and conduct an assessment process by December 9, 2011. This assessment process was focused on determining whether or not inmates in need of inpatient care were being identified, referred and transferred to such care in a timely manner. The court had great interest in such an assessment because prior assessments (Una in 2004 and MHARP in 2009) had found hundreds of inmates who needed such care but were not getting it. A secondary, but important part of the assessment process was to test CDCR's plan for a sustainable self-monitoring process for ensuring that inmates in need of such care are getting it on an ongoing basis. These two matters along with a plan addressing the inpatient (ICF) waitlist are seen as the major remaining components of this case.

CDCR staff and the special master initially agreed to use the annual Headquarters review portion of CDCR's proposed sustainable process to conduct an assessment of the DMH referral process at five institutions. However, during this part of the assessment the special master became concerned that the process was not "MHarpish" enough to satisfy the Judge's order. He came to this conclusion because the process allowed institutions to "re-do" documentation before the actual onsite review, and at some institutions these "re-does" were substantial.

As a result he added nine institutions to the assessment process making for a total of fourteen. For the added nine institutions, the same basic assessment process was utilized, except that the institutions did not receive prior notice of who would be reviewed and thus could not "re-do" documentation. Another factor in the

1

PLE
EXHIBIT ___9___
Date ___3-5-13___
Witness
BEARD ___

Beard-00114

special masters decision was that the fourteen institutions reviewed consisted of those institutions where most of the inmates needing referral to higher level care were found during MHARP.

The first five institutions were reviewed between 10/3/11 and 10/25/11. The second nine were completed from 11/8/11 to 12/8/11. I participated in thirteen of these reviews along with CDCR HQ staff, special master (for some) and his clinicians, and at a few institutions the plaintiffs as well.

Nine hundred sixty-six cases were reviewed by the special masters clinicians in the fourteen institutions, of those reviewed the clinicians only recommended 44 cases for DMH consideration. The institutions staff, after further review of 34 of these cases referred 18 inmates for inpatient care. Ten cases are still pending review by the institutions.

It should be noted that the special masters clinicians have been part of the monitoring process for years. They know most of the staff, the facilities and in some cases the inmates themselves. So they know where to look, and how to find potential problematic cases. Considering the process that they used and their knowledge of the facilities it is unlikely that they would have missed inmates who were languishing. The cases they did find were what I would term the "tough ones". These are the cases that institution staff are struggling with, often trying different interventions. They are cases that two clinicians can look at and come to a different conclusion on what is best for that person. Sometimes they are cases that if referred, they are unlikely to benefit (i.e. dementia, fetal alcohol syndrome). In virtually all of these cases the clinical staff at the institution were well aware of the case and were actively working with them.

Therefore, unlike UNA and MHART, inmates are not languishing without proper care. They are being appropriately worked with, identified and referred if needed, and then transferred to DMH for ICF care. The fact that the average referral rate has risen to 78 per month also supports the conclusion that the system is working. Whatever impediments existed in 2009 and earlier (high staff turnover rate, lack of training for clinicians, failure to refer because of large wait lists, etc.) appear to have been addressed.

2

Beard-00115

While inmates are being dealt with appropriately there are still documentation and data entry issues that exist at most institutions. In some cases they are substantial in nature. The problems found revolved around the automated MIITS.Net program, inadequate information in the eUHR and improper completion of the main treatment plan document, the 7388B. In most cases there are training issues involved (some training was actually completed during the review process), and in some there needs to be program changes to capture all the relevant information. There are some other issues that only affect one facility or are minor in nature. All of the problems found, however, can be fixed over the next few months by system changes, training and/or procedure changes at the institution level. I might also note that the problems found are consistent with what would be expected in the deployment of new systems (MHTS.net, eUHR) and forms (7388B) across a large system.

It is important that these changes be completed because most of the issues affect some aspect of documentation or data in the MIITS.net or eUHR. The institutions use both of these systems to manage the mentally ill inmates within their population. But more importantly, they are major components of the sustainable self-monitoring process developed by CDCR. If accurate data and documentation is not available in these systems then headquarters cannot properly monitor institution operations.

The third key piece to the Coleman case is the Wait list. As long as a wait list exists it will be difficult to get the court to let go of this case. CDCR's current plan to address the wait list is a good one, and should result in a surplus of inpatient beds when completed about 7/15/2012, if not before. The need for these types of beds fluctuates during the course of a year so any plan needs to account for this fluctuation, and I believe CDCRs plan will do so. In fact with only part of the plan in place the wait list has dropped below 100 and the wait time below 40 days. These numbers reflect substantial improvement in this important area.

The plaintiff's raised two other issues one during the San Quentin tour and the other at the all parties meeting on 12/9/11. While they are not part of the assessment process I note them here because if not addressed they could be used to

3

Beard-00116

try to extend the case and because I think they are easily addressed. The first revolves around inpatient care for condemned inmates who need a higher level of care. A year ago there were a number of inmates in the condemned unit that needed more care than a typical EOP program. CDCR initiated an enhanced program for these inmates but one short of an inpatient level of care. Over half of the inmates got better with this extra care. But about five did not improve. One possible way to deal with this is to start a small (5 or 6) bed inpatient program at San Quentin for these inmates. Since the need for MHCB's are going down under AB109 it would be easy to convert a few of these beds to provide this care. The facility is excellent, trained staff are available and they appear to have adequate staffing levels.

The second issue is that some institutions which have Ad. Seg. Hubs for EOP care have mixed non-mentally ill inmates in these units. This makes programming more difficult but the real problem is that inmates who are waiting for placement cannot get in because the beds are full. While they get some care at their current institution it is not to the level that they would get in the hub institution. Overcrowding largely caused this issue. AB109 is significantly addressing the overcrowding so those institutions with the EOP hubs should be able to move the non-mentally ill inmates out of these units. This would free up space and make this a non issue.

CDCR is currently identifying, referring and transferring inmates who need higher level care to DMH ICF programs. The wait list should be eliminated and adequate inpatient care capacity should be available by Spring/Summer 2012. From now to that point in time CDCR has ample opportunity to provide the training and make the changes necessary to ensure a viable sustainable self-monitoring process is in place. It would be my opinion that when the last two issues (wait list; sustainable process) are in place it would be time for serious discussions relative to ending Coleman. At that point I believe it would be very difficult to make a case that CDCR is not providing constitutionally adequate care to mentally ill inmates.

4

Beard-00117

I make this statement based upon the following facts:

1) I have reviewed MH policy and procedure and found them to be detailed and appropriate.

2) I have reviewed staffing levels, and observed the use of staff and found them to be if anything excessive.

3) I have observed MH program space in thirteen facilities and found it to range from marginally adequate in some facilities to substantial in others.

4) I have observed new MH program space and housing being constructed at a number of facilities, which will serve to significantly upgrade MH program space and housing. This will also give CDCR flexibility in conjunction with AB109 population reductions to not use some less desirable space.

5) I have also observed the MH program space being actively used for both group and individual programming in all the institutions visited.

6) Inmates who need higher level inpatient care are not languishing. Staff are actively working with them, they are getting appropriate care, staff are aware of the referral process, and they are referring when necessary. Those that are referred are being placed in DMH inpatient programs. A process is in place to deal with any problems that arise in the referral process.

Therefore except for the fact that some inmates who are referred for higher level care have to wait for DMH placement all the pieces of constitutionally adequate care are in place. The significantly shortened wait times coupled with the fact that many inmates who are waiting receive enhanced care while still in CDCR are beginning to mitigate the wait list issue. But within six months elimination of the wait list will make it a moot point. At the same time CDCR should have a sustainable process in place to ensure that the current level of care for mentally ill inmates is maintained and if not any breakdown is swiftly detected and corrected.

5

Beard-00118

# Exhibit 104

From:          O'Meara, Kathleen@CDCR
Sent:          Monday, January 28, 2013 8:59 AM
To:            Handian-Shirikian, Sylvia@CDCR
Subject:       Re: do not forward

Re-informed them of that -just got the sob story - were just too busy. It wasn't until I told dave that McCarver would jump start them TODAY that he said they would get back to me with dates

From: Handian-Shirikian, Sylvia@CDCR
Sent: Monday, January 28, 2013 08:29 AM Pacific Standard Time
To: O'Meara, Kathleen@CDCR
Subject: RE: do not forward

Clever way of saying they haven't done anything. They do know that we will have a court monitor with us next month for their major visit right?

**Sylvia Shirikian, Psy.D.**
Senior Psychologist Specialist
Northern Region
Statewide Mental Health Program
(916) 691-9905 Office
(916) 207-4300 Mobile
sylvia.shirikian@cdcr.ca.gov

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

From: O'Meara, Kathleen@CDCR
Sent: Monday, January 28, 2013 8:28 AM
To: Handian-Shirikian, Sylvia@CDCR
Subject: Re: do not forward

1

**From:** Handian-Shirikian, Sylvia@CDCR
**Sent:** Monday, January 28, 2013 08:25 AM Pacific Standard Time
**To:** O'Meara, Kathleen@CDCR
**Subject:** RE: do not forward

Does "in process" mean they did not pass the first time and require further mentoring? That's how I interpret it, in which case, there seems to be a problem at CMF

**Sylvia Shirikian, Psy.D.**
Senior Psychologist Specialist
Northern Region
Statewide Mental Health Program
(916) 691-9905 Office
(916) 207-4300 Mobile
sylvia.shirikian@cdcr.ca.gov

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

**From:** O'Meara, Kathleen@CDCR
**Sent:** Thursday, January 24, 2013 1:02 PM
**To:** Handian-Shirikian, Sylvia@CDCR
**Subject:** do not forward

How's this for meaningful? I asked them to get back to me with anticipated completion dates.

Not heard back from Telander on offer to send you there...

**From:** Huntington, Gretchen@CDCR
**Sent:** Thursday, January 24, 2013 11:59 AM
**To:** O'Meara, Kathleen@CDCR; Silbaugh, David@CDCR; Gerbasi, Joan@CDCR
**Subject:** RE: SRE Mentor Program status

Here's the list thus far from the MHCBF.

Gretchen Huntington, Psy.D.
Senior Psychologist, Specialist
PSY 23141
Higher Level of Care Team Coordinator
California Medical Facility
iPhone 707-471-8139
Phone 707-448-6841 ext 2515
Page 707-417-2154

**From:** O'Meara, Kathleen@CDCR
**Sent:** Wednesday, January 23, 2013 3:57 PM
**To:** Huntington, Gretchen@CDCR; Silbaugh, David@CDCR; Gerbasi, Joan@CDCR
**Subject:** RE: SRE Mentor Program status

Wow! Good start. If you can get me the MHCB by the end of the month, it would be much appreciated.

**From:** Huntington, Gretchen@CDCR
**Sent:** Wednesday, January 23, 2013 3:49 PM
**To:** Silbaugh, David@CDCR; Gerbasi, Joan@CDCR; O'Meara, Kathleen@CDCR
**Subject:** FW: SRE Mentor Program status

Here you go! I don't have the one for the MHCBF but this is for MHSDS.

Gretchen Huntington, Psy.D.
Senior Psychologist, Specialist
PSY 23141
Higher Level of Care Team Coordinator
California Medical Facility
iPhone 707-471-8139
Phone 707-448-6841 ext 2515
Page 707-417-2154

**From:** Silbaugh, David@CDCR
**Sent:** Wednesday, January 23, 2013 3:48 PM
**To:** O'Meara, Kathleen@CDCR
**Cc:** Huntington, Gretchen@CDCR; Gerbasi, Joan@CDCR
**Subject:** RE: SRE Mentor Program status

3

Hi Kathy,

Yes, we are making good progress. Gretchen will send you her log shortly.

Let me know what else you may need.

Thanks, Dave

**David Silbaugh, Ph.D.**
Chief Psychologist/Chief of Mental Health
Mental Health Services Delivery System
California Medical Facility
Office: (707) 453-7038
Blackberry: (707) 330-6778

 

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

---

**From:** O'Meara, Kathleen@CDCR
**Sent:** Wednesday, January 23, 2013 10:18 AM
**To:** Silbaugh, David@CDCR
**Cc:** Huntington, Gretchen@CDCR; Gerbasi, Joan@CDCR
**Subject:** SRE Mentor Program status

Hi Dave,

I trust the mentor program is off and running at this point. We need to have some proof of practice that it is happening and will continue to happen.

You may use the attached template for logging in the status of staff who have been mentored. Gretchen had a template a while back, I don't really care if you use the one she developed or this one (although I think the attached is a bit simpler and therefore probably easier)

Again, we are not collecting "scores," just whether or not the mentoring is completed.

If someone is actively being mentored just put "in process." For the upcoming months, please show the schedule indicating when all staff will be mentored.

Thanks,

Kathy

# Exhibit 105

| From: | Krista Stone-Manista |
|---|---|
| Sent: | Monday, December 10, 2012 2:26 PM |
| To: | Matt Lopes; Debbie Vorous; Donald Specter; diana.toche@cdcr.ca.gov; Benjamin Rice |
| Cc: | 'Walsh, Kerry F.'; Michael W. Bien; Debbie Vorous; Donald Specter; diana.toche@cdcr.ca.gov; Benjamin Rice; Holden, Linda E.; Mohamedu Jones; Steve Fama; Katherine.Tebrock@cdcr.ca.gov; Henry D. Dlugacz; Kerry Courtney Hughes, MD; Haunani Henry; Jeff Metzner; Mary Perrien; Steve Raffa; Kristina Hector; Misty Delgado; Coleman Team - RBG Only |
| Subject: | Coleman:  DSH Staffing Letter for 12/14/12 Meet and Confer [IWOV-DMS.FID6429] |
| Attachments: | Supplement re DSH staffing and suicide for December 2012 meet and confer, 12-10-12, 489-3.DOCX; State_Hospital_Financial_Activity_Report_2012.pdf; Cost Savings Report FY11-12_Final.pdf; Coleman - ICF Treatment at VPP and SVPP [IWOV-DMS.FID6429] |

Dear all,

Please find attached a letter from Michael Bien, with related references, regarding the agenda for Friday's meet and confer session.

Best,

Krista Stone-Manista

**Krista Stone-Manista**
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
(415) 433-6830
KStone-Manista@rbgg.com

CONFIDENTIALITY NOTICE: The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.



315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Michael W. Bien
Email: mbien@rbgg.com

December 10, 2012

VIA ELECTRONIC MAIL ONLY

Matthew A. Lopes, Jr.                    Debbie Vorous
*Coleman* Special Master                 Deputy Attorney General
Pannone Lopes Devereaux & West LCC       State of California
317 Iron Horse Way, Suite 301            Department of Justice
Providence, RI 02908                     1300 I Street
                                         Sacramento, CA 94244-2550

      Re:    *Coleman v. Brown*
               Agenda for Meet and Confer Meeting, December 14, 2012
               <u>Our File No. 0489-3</u>

Dear Matty and Debbie:

      Plaintiffs write to request an important item concerning inpatient psychiatric hospitalization to be discussed as part of the agenda for the meeting scheduled for December 14, 2012.

      We have received notification of the suicide on December 2, 2012 of a *Coleman* class member, Terry Wolfe (K-08158), housed at SVPP—the first suicide of a class member at a Department of State Hospitals ("DSH") facility in more than 5 years. While we do not yet know the details of this unfortunate death, we are concerned about the role that chronic DSH staffing shortages may have played in this suicide, and more generally, about the impact of serious understaffing on *Coleman* class members in DSH facilities throughout the State.

      While the number of patients in DSH facilities has remained at high levels, there have been many recent layoffs of clinical staff at DSH facilities. A notice from Acting Director Cliff Allenby, posted on the State Hospitals website earlier this year, stated that "the Department must eliminate 600 positions to meet its budgetary obligations." The Department's "Cost Savings Report" for Fiscal Year 2011-2012 reflects that 259.9 such positions were eliminated as part of a reduction of the ICF treatment team ratio from 1:25 to 1:35. (*See* attached report, "Department of State Hospitals, Actual Cost Savings Achieved, Fiscal Year 2011-12," at 1.) These staffing reductions occurred even though the average daily census at DSH facilities housing *Coleman* class members, including

[703502-4]

Matthew A. Lopes, Jr.
Debbie Vorous
December 10, 2012
Page 2


Coalinga, Patton, Salinas Valley, and Vacaville, increased in Fiscal Year 2011-2012 relative to the previous year.  (*See* attached report, "Department of State Hospitals Report on State Hospital Financial Activity," at 1.)

Alarmingly, as of November 1, 2012, there were 20 unfilled positions for licensed psychiatric technicians at Salinas Valley, the location of the recent suicide—a vacancy rate of 100%.  (Earlier data reflects that these LPT positions have long gone unfilled at Salinas Valley.)  In October, Salinas Valley suffered from an overall vacancy rate of 39%, or 36% after adjusting for the use of full-time contractors.  This is an even worse vacancy report than that we noted in a July 27, 2012 email to Defendants' counsel, when there was an overall functional vacancy report of 33% at SVPP.  (*See* attached email from Aaron J. Fischer, 7/27/12.)  At that time, we had received a number of disturbing reports from class members describing cancellation of groups, recreational therapy, and access to therapeutic yard as a result of staffing shortages.

While we highlight Salinas Valley as a result of the recent suicide there, chronic understaffing at DSH facilities is a severe problem affecting *Coleman* class members across the system.  High vacancy rates in critical staff positions persist across the DSH system.  The DSH Monthly Data produced to Plaintiffs for October 2012 indicated that as of November 1, 2012, there were 478.65 total vacant positions in *Coleman*-related jobs, for an overall vacancy rate of 12%.  This troubling situation is only slightly alleviated by the use of 120 full-time contract staff, which reduced the functional vacancy rate to 9%.

We hope to have a productive discussion regarding this serious ongoing concern.  We look forward to the meeting on December 14, 2012, and are available to answer any questions or concerns before that date.

<div style="text-align:center">

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Michael W. Bien*

By:  Michael W. Bien

</div>

MWB:ksm:amc
cc:     *Coleman* Special Master Team
        *Coleman* Co-Counsel
        William Downer, AG
        Heather McCray, CDCR Legal
        Michael Stone, CDCR Legal

[703502-4]



# Department of State Hospitals

# Report on State Hospital Financial Activity

# Fiscal Year 2011-12 Through Fiscal Year 2012-13

**CLIFF ALLENBY**
**Acting Director**

DEPARTMENT OF STATE HOSPITALS REPORT
ON STATE HOSPITAL FINANCIAL ACTIVITY

Executive Summary

FY 2011-12 and FY 2012-13
State Hospital Allotment and Expenditure Comparisons

The Department of State Hospitals (DSH) Report on State Hospital Financial Activity is enclosed.  The report is prepared in accordance with Item 4440-011-0001, Provision (15) of the Budget Act of 2012 which requires DSH to report State Hospital allotments and expenditures by October 15, 2012 and as part of the Governor's Budget and May Revision.  The report includes all State Hospital allotments and actual expenditures for FY 2011-12 and projected allotments and expenditures for FY 2012-13.

<u>Population Growth</u>

The chart below displays State Hospital population growth from 2009-10 to present. Since FY 2009-10, the State Hospital population grew at an average rate of 2.5 percent annually.

| | Average Daily Census | | | |
|---|---|---|---|---|
| | **2009-10** | **2010-11** | **2011-12** | **3-Year Annual Average** |
| ASH | 1,030 | 1,141 | 1,032 | 1,068 |
| CSH | 890 | 904 | 962 | 919 |
| MSH | 647 | 606 | 620 | 624 |
| NSH | 1,136 | 1,149 | 1,169 | 1,151 |
| PSH | 1,504 | 1,490 | 1,506 | 1,500 |
| SVPP | 232 | 232 | 347 | 270 |
| VPP | 251 | 286 | 312 | 283 |
| **Total** | **5,690** | **5,808** | **5,948** | **5,815** |
| Annual growth rate | 2.97% | 2.07% | 2.41% | 2.48% |

Expenditure Detail

FY 2011-12
- Initial DSH-Stockton activation began, generating expenditures related to core executive and clinical team hiring.
- Activation of DSH-Vacaville L-Wing began, generating expenditures related to staffing and operating expenses.

FY 2012-13
- Continued DSH-Stockton activation, including hiring remaining administrative and clinical staff.  Patient admissions will begin June 2013.
- Continued activation of DSH-Vacaville L-Wing.

Cost Savings

DSH implemented cost savings plans mid-year in FY 2011-12, generating $121.9 million in savings.  Full year implementation of cost savings proposals in FY 2012-13 is expected to generate $193.1 million in savings.

Contracts

Contracts managed at the Headquarters on behalf of the State Hospitals represent system-wide and specialty contracts.

- Human Resources – California Department of Personnel Administration, Cooperative Personnel Services

- Information Technology – Personal Duress Alarm System, California Department of Technology Services, AT&T DataCom

- Legal Representation – Various independent law firms, California Department of Justice

- Licensing – The Joint Commission, California Department of Public Health

- Miscellaneous – Disability Rights California; National Association of State Mental Health Program Directors Research Institute; California State University, Sacramento; Human Potential Consulting Group (Court Monitor)

State Hospital Position Detail

The State Hospital vacancy rate has decreased from FY 2011-12 by three percent. DSH is continuing recruitment efforts to further reduce the vacancy rate.

**Fiscal Year 2011-12**

| STATE HOSPITALS | FY 11/12 AUTHORIZED POSITONS | VACANT | % VACANT |
|---|---|---|---|
| ATASCADERO | 2173.3 | 241.9 | 11.13% |
| COALINGA | 1914.9 | 292.2 | 15.26% |
| METROPOLITAN | 1563.4 | 224.6 | 14.37% |
| NAPA | 2313.0 | 223.8 | 9.68% |
| PATTON | 2588.7 | 218.9 | 8.46% |
| STOCKTON | 0.0 | 0.0 | 0.00% |
| SALINAS | 733.0 | 300.0 | 40.93% |
| VACAVILLE | 570.3 | 145.9 | 25.58% |
| Totals | 11856.6 | 1647.3 | 14% |

**Fiscal Year 2012-13**

| STATE HOSPITALS | FY 12/13 AUTHORIZED POSITONS | VACANT | % VACANT |
|---|---|---|---|
| ATASCADERO | 2029.7 | 219.9 | 10.83% |
| COALINGA | 1880.3 | 153.2 | 8.14% |
| METROPOLITAN | 1359.8 | 115.2 | 8.47% |
| NAPA | 2245.8 | 211.5 | 9.42% |
| PATTON | 2385.5 | 153.7 | 6.44% |
| STOCKTON | 82.9 | 82.9 | 100.00% |
| SALINAS | 561.5 | 113.5 | 20.21% |
| VACAVILLE | 725.6 | 216.0 | 29.77% |
| Totals | 11271.1 | 1265.9 | 11% |

Assumptions:

FY 11-12 authorized positions based on Schedule 7A. Filled positions include 7A filled, contractor filled and temporary help.

FY 12-13 authorized positions based on 7A and blanket authorized as a result of the salary savings drill. Filled positions based on 7A, blanket filled, contractor filled and temporary help.

Vacant positions are counted as filled when offset by registry contractors to maintain required clinical staffing ratios during the recruitment process. Stockton State Hospital position recruitment is based on a phase-in schedule related to facility activation.

Staffing Ratios

DSH treatment team ratios for FY 2012-13 are 1:35 on average, effective December 2011. Treatment team ratios are dependent on patient acuity and may fluctuate to meet patient mental health treatment needs and ensure security of both staff and patients.

DSH implemented a 1:64 Physician/Surgeon ratio in December 2011, a change from the prior ratio of 1:62. The ratio achieved through streamlining documentation, allows physician/surgeons to increase their caseload. The ratio change allows DSH to maintain adequate patient staffing and comply with licensing requirements.

Capital Outlay Projects

For Fiscal Year 2012-13, the projected capital outlay projects are displayed below.

| HOSPITAL | PROJECT DESCRIPTION | DGS PROJECT NUMBER | CURRENT PHASE |
|---|---|---|---|
| MSH | New fire water line | 116367A | Construction |
| MSH | Roof replacement | 132302 | Construction |
| MSH/NSH | Fire sprinkler systems | 133197 | Working Drawings |
| NSH | New main kitchen | 122198 | Working Drawings |
| NSH | Fire alarm replacement | 133190 | Working Drawings |
| PSH | New main kitchen | 122189 | Working Drawings |
| PSH | New residential housing | 132595BP | Study |

| All State Hospitals | | | | |
|---|---|---|---|---|
| **Expenditure Comparison** | | | | |
| | | 2011-2012 | | 2012-2013 |
| | Allotment | Actuals | Allotment | Projections |
| **PERSONAL SERVICES** | | | | |
| **Salaries** | | | | |
| 003 | Salaries & Wages | 730,447,649 | 696,456,842 | 673,040,888 | 672,437,757 |
| 033 | Temp Help | 10,690,703 | 17,641,413 | 16,023,342 | 16,023,342 |
| 083 | Overtime | 79,174,622 | 93,353,342 | 81,989,237 | 81,883,104 |
| **TOTAL SH Salaries** | | 820,312,974 | 807,451,597 | 771,053,468 | 770,344,204 |
| **TOTAL Salaries (w/ Central Hospital Support)** | | 820,312,974 | 807,451,597 | 816,730,468 | 770,344,204 |
| **Staff Benefits** | | | | |
| 103 | OASDI | 24,462,781 | 22,083,432 | 19,829,016 | 19,792,720 |
| 106 | Retirement | 122,819,967 | 119,241,715 | 118,579,935 | 118,445,542 |
| 125 | Workers' Compensation | 29,030,854 | 29,151,077 | 29,094,820 | 29,084,153 |
| 127 | Industrial Disability Leave | 9,336,201 | 9,816,507 | 10,444,151 | 10,443,674 |
| 132 | Nonindustrial Disability Leave | 3,232,800 | 3,148,896 | 3,473,760 | 3,469,542 |
| 133 | Unemployment Insurance | 1,609,541 | 1,930,089 | 2,083,983 | 2,083,029 |
| 134 | Other | 89,402,227 | 92,720,120 | 95,599,199 | 95,540,906 |
| **TOTAL SH Staff Benefits** | | 279,894,371 | 278,091,837 | 279,104,864 | 278,859,567 |
| **TOTAL Staff Benefits (w/ Central Hospital Support)** | | 280,420,109 | 278,599,883 | 279,104,864 | 278,859,567 |
| **TOTAL PERSONAL SERVICES** | | 1,100,733,083 | 1,086,051,480 | 1,095,835,332 | 1,049,203,770 |
| Percent Change for Personal Services Expenditures | | | 2.1% | | -3.5% |
| **OPERATING EXPENSES & EQUIPMENT** | | | | |
| 311 | General Expense | 6,582,651 | 8,043,021 | 5,428,536 | 5,418,937 |
| 312 | Printing | 1,671,933 | 1,658,534 | 1,646,662 | 1,646,253 |
| 313 | Communications | 3,740,118 | 3,236,403 | 2,823,181 | 2,823,018 |
| 314 | Postage | 341,913 | 261,763 | 231,813 | 231,810 |
| 315 | Insurance | 760,767 | 940,366 | 1,001,283 | 1,001,279 |
| 317 | Travel-In-State | 982,526 | 1,094,413 | 1,092,192 | 1,091,852 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 447,815 | 367,052 | 466,255 | 465,334 |
| 323 | Facilities Operation | 8,617,082 | 8,973,731 | 7,556,366 | 7,555,276 |
| 352 | Special Repairs & Deferred Maint. | 1,428,217 | 1,268,634 | 1,594,756 | 1,594,756 |
| 324 | Utilities | 15,717,341 | 15,290,274 | 15,555,937 | 15,555,937 |
| 325 | C&PS-Interdepartmental | 6,905,215 | 6,930,995 | 7,500,686 | 7,500,509 |
| 326 | C&PS-External | 28,585,005 | 23,725,943 | 11,051,947 | 11,051,947 |
| 328 | Consolidated Data Centers | 406,338 | 310,035 | 338,417 | 338,226 |
| 329 | Data Processing/IT | 12,469,714 | 11,745,143 | 35,810,537 | 35,808,212 |
| 332 | Equipment | 2,096,092 | 2,750,308 | 1,141,468 | 1,140,589 |
| 413 | C&PS-External-Hlth & Med. | 32,397,557 | 34,425,143 | 31,747,378 | 31,719,834 |
| 418 | Outside Services/Other Services | 24,509,728 | 33,913,018 | 25,693,796 | 25,693,796 |
| 503 | Other-Clothing/Personal Supplies | 2,103,564 | 1,792,277 | 1,466,289 | 1,465,942 |
| 505 | Other-Recreation & Religion | 236,221 | 233,664 | 272,219 | 271,931 |
| 505 01 | BYCHOICE | 264,357 | 144,149 | 61,800 | 61,800 |
| 506 | Foodstuffs | 15,698,346 | 15,686,778 | 15,276,065 | 15,276,031 |
| 512 | Quartering & Housekeeping | 2,735,037 | 2,814,054 | 2,444,399 | 2,444,391 |
| 513 | Laundry | 3,597,390 | 3,232,962 | 3,001,240 | 3,001,240 |
| 514 | Misc Client Services | 2,082,647 | 1,886,134 | 1,828,928 | 1,828,928 |
| 516 | Chemicals, Drugs & Lab Supplies | 6,818,875 | 6,239,623 | 4,731,702 | 4,731,266 |
| 516 01 | Pharmaceuticals | 44,376,211 | 39,984,037 | 34,763,726 | 34,763,726 |
| 517 | Other-Educational Supplies | 115,789 | 117,246 | 49,011 | 48,889 |
| 520 | Other-Uniform Allowance | 313,336 | 343,947 | 560,872 | 559,900 |
| 524 | Other-Vehicle Operations | 921,661 | 1,154,360 | 1,075,434 | 1,075,352 |
| 444 | Interest & Penalties | 624,585 | 427,399 | 22,105 | 22,091 |
| 568 | Other-Not Otherwise Classified, Goods | 561,076 | 726,471 | 709,152 | 709,144 |
| 569 | Other-Not Otherwise Classified, Services | 328,052 | 1,201,632 | 389,518 | 389,518 |
| | Lottery | 0 | 29,000 | 0 | 0 |
| **TOTAL OE&E (w/ Central Hospital Support)** | | 228,466,165 | 230,948,508 | 217,333,668 | 217,287,711 |
| Percent Change for OE&E Expenditures | | | 13.8% | | -6.3% |
| **GRAND TOTAL: PS & OE&E** | | 1,329,199,248 | 1,316,999,987 | 1,313,169,000 | 1,266,491,481 |
| TOTAL Percent Change for PS & OE&E Expenditures | | | 4.2% | | -4.0% |

5

## Atascadero State Hospital
### Expenditure Comparison

| | | 2011-2012 | | 2012-2013 | |
|---|---|---|---|---|---|
| | | Allotment | Actuals | Allotment | Projections |
| **PERSONAL SERVICES** | | | | | |
| **Salaries** | | | | | |
| 003 | Salaries & Wages | 137,352,260 | 124,936,687 | 118,581,431 | 118,581,431 |
| 033 | Temp Help | 253,000 | 3,262,191 | 2,937,384 | 2,937,384 |
| 083 | Overtime | 3,104,031 | 11,417,087 | 11,226,304 | 11,226,304 |
| | **TOTAL Salaries** | **140,709,291** | **139,615,965** | **132,745,119** | **132,745,119** |
| **Staff Benefits** | | | | | |
| 103 | OASDI | 1,219,738 | 1,223,996 | 1,149,038 | 1,149,038 |
| 106 | Retirement | 21,785,246 | 21,058,236 | 19,954,462 | 19,954,462 |
| 125 | Workers' Compensation | 6,713,153 | 7,967,783 | 6,567,783 | 6,567,783 |
| 127 | Industrial Disability Leave | 2,247,197 | 2,468,786 | 2,468,786 | 2,468,786 |
| 132 | Nonindustrial Disability Leave | 689,685 | 992,945 | 992,945 | 992,945 |
| 133 | Unemployment Insurance | 255,000 | 428,881 | 428,881 | 428,881 |
| 134 | Other | 18,612,444 | 19,448,123 | 18,265,390 | 18,265,390 |
| | **TOTAL Staff Benefits** | **51,522,463** | **53,588,750** | **49,827,285** | **49,827,285** |
| **TOTAL PERSONAL SERVICES** | | **192,231,754** | **193,204,715** | **182,572,404** | **182,572,404** |
| | Percent Change for Personal Services Expenditures | | -0.6% | | -5.8% |
| **OPERATING EXPENSES & EQUIPMENT** | | | | | |
| 311 | General Expense | 600,000 | 672,975 | 672,975 | 672,975 |
| 312 | Printing | 190,000 | 178,538 | 178,538 | 178,538 |
| 313 | Communications | 449,000 | 485,538 | 485,538 | 485,538 |
| 314 | Postage | 48,200 | 36,286 | 36,286 | 36,286 |
| 315 | Insurance | 57,000 | 52,358 | 52,358 | 52,358 |
| 317 | Travel-In-State | 249,700 | 284,873 | 284,873 | 284,873 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 40,600 | 50,697 | 50,697 | 50,697 |
| 323 | Facilities Operation | 1,146,000 | 1,434,477 | 1,234,477 | 1,234,477 |
| 352 | Special Repairs & Deferred Maint. | 413,306 | 403,942 | 0 | 0 |
| 324 | Utilities | 2,650,978 | 2,277,207 | 2,277,207 | 2,277,207 |
| 325 | C&PS-Interdepartmental | 604,718 | 600,238 | 600,238 | 600,238 |
| 326 | C&PS-External | 165,900 | 128,452 | 128,452 | 128,452 |
| 328 | Consolidated Data Centers | 65,000 | 37,781 | 37,781 | 37,781 |
| 329 | Data Processing/IT | 1,520,000 | 1,391,209 | 1,391,209 | 1,391,209 |
| 332 | Equipment | 50,000 | 375,737 | 50,000 | 50,000 |
| 413 | C&PS-External-Hlth & Med. | 1,973,226 | 1,976,136 | 2,015,659 | 2,015,659 |
| 418 | Outside Services/Other Services | 8,369,284 | 9,344,208 | 5,467,229 | 5,467,229 |
| 503 | Other-Clothing/Personal Supplies | 221,468 | 267,737 | 273,092 | 273,092 |
| 505 | Other-Recreation & Religion | 18,148 | 22,134 | 22,134 | 22,134 |
| 505 01 | BYCHOICE | 23,400 | 23,398 | 0 | 0 |
| 506 | Foodstuffs | 2,365,000 | 2,225,261 | 2,366,388 | 2,366,388 |
| 512 | Quartering & Housekeeping | 367,200 | 352,011 | 359,052 | 359,052 |
| 513 | Laundry | 494,500 | 462,317 | 471,563 | 471,563 |
| 514 | Misc Client Services | 337,200 | 358,766 | 365,941 | 365,941 |
| 516 | Chemicals, Drugs & Lab Supplies | 500,000 | 596,993 | 608,933 | 608,933 |
| 516 01 | Pharmaceuticals | 9,260,000 | 7,057,700 | 4,467,155 | 4,467,155 |
| 517 | Other-Educational Supplies | 9,000 | 2,908 | 2,908 | 2,908 |
| 520 | Other-Uniform Allowance | 75,000 | 75,330 | 75,330 | 75,330 |
| 524 | Other-Vehicle Operations | 71,000 | 124,717 | 124,717 | 124,717 |
| 444 | Interest & Penalties | 9,766 | 9,766 | 0 | 0 |
| 568 | Other-Not Otherwise Classified, Goods | 120,000 | 76,224 | 76,224 | 76,224 |
| 569 | Other-Not Otherwise Classified, Services | 4,759 | 3,085 | 3,085 | 3,085 |
| **TOTAL OE&E** | | **32,469,353** | **31,388,998** | **24,180,038** | **24,180,038** |
| | Percent Change for OE&E Expenditures | | -38.6% | | -29.8% |
| **GRAND TOTAL: PS & OE&E** | | **224,701,107** | **224,593,713** | **206,752,442** | **206,752,442** |
| | TOTAL Percent Change for PS & OE&E Expenditures | | -5.9% | | -8.6% |

6

## Coalinga State Hospital
### Expenditure Comparison

| | | 2011-2012 | | 2012-2013 | |
|---|---|---|---|---|---|
| | | Allotment | Actuals | Allotment | Projections |
| **PERSONAL SERVICES** | | | | | |
| **Salaries** | | | | | |
| 003 | Salaries & Wages | 110,052,243 | 94,533,354 | 92,605,248 | 92,605,248 |
| 033 | Temp Help | 967,203 | 607,343 | 550,967 | 550,967 |
| 083 | Overtime | 10,300,000 | 9,470,596 | 5,071,800 | 5,071,800 |
| | **TOTAL Salaries** | **121,319,446** | **104,611,293** | **98,228,015** | **98,228,015** |
| **Staff Benefits** | | | | | |
| 103 | OASDI | 3,000,000 | 1,296,387 | 1,223,999 | 1,223,999 |
| 106 | Retirement | 16,595,241 | 15,985,889 | 15,706,604 | 15,706,604 |
| 125 | Workers' Compensation | 2,239,695 | 2,450,223 | 2,395,235 | 2,395,235 |
| 127 | Industrial Disability Leave | 994,182 | 1,032,127 | 1,032,132 | 1,032,132 |
| 132 | Nonindustrial Disability Leave | 670,508 | 568,261 | 568,260 | 568,260 |
| 133 | Unemployment Insurance | 291,532 | 457,067 | 457,200 | 457,200 |
| 134 | Other | 11,531,724 | 14,908,899 | 14,795,316 | 14,795,316 |
| | **TOTAL Staff Benefits** | **35,322,882** | **36,698,853** | **36,178,747** | **36,178,747** |
| **TOTAL PERSONAL SERVICES** | | **156,642,328** | **141,310,146** | **134,406,763** | **134,406,763** |
| Percent Change for Personal Services Expenditures | | | 5.0% | | -5.1% |
| **OPERATING EXPENSES & EQUIPMENT** | | | | | |
| 311 | General Expense | 604,062 | 616,114 | 554,042 | 554,042 |
| 312 | Printing | 217,562 | 354,011 | 318,612 | 318,612 |
| 313 | Communications | 503,646 | 675,731 | 675,732 | 675,732 |
| 314 | Postage | 98,005 | 35,589 | 35,585 | 35,585 |
| 315 | Insurance | 80,596 | 103,114 | 89,913 | 89,913 |
| 317 | Travel-In-State | 51,286 | 228,497 | 205,680 | 205,680 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 77,365 | 48,266 | 38,604 | 38,604 |
| 323 | Facilities Operation | 1,258,711 | 1,663,831 | 1,580,640 | 1,580,640 |
| 352 | Special Repairs & Deferred Maint. | 2,358 | 1,269 | 2,500 | 2,500 |
| 324 | Utilities | 2,142,331 | 2,980,296 | 2,980,296 | 2,980,296 |
| 325 | C&PS-Interdepartmental | 164,370 | 544,321 | 535,801 | 535,801 |
| 326 | C&PS-External | 3,500,000 | 33,138 | 18,144 | 18,144 |
| 328 | Consolidated Data Centers | 9,810 | 0 | 0 | 0 |
| 329 | Data Processing/IT | 230,054 | 563,029 | 494,556 | 494,556 |
| 332 | Equipment | 190,796 | 232,952 | 209,664 | 209,664 |
| 413 | C&PS-External-Hlth & Med. | 4,042,947 | 9,064,495 | 7,879,022 | 7,879,022 |
| 418 | Outside Services/Other Services | 8,102,701 | 16,211,616 | 12,711,612 | 12,711,612 |
| 503 | Other-Clothing/Personal Supplies | 235,657 | 315,320 | 283,788 | 283,788 |
| 505 | Other-Recreation & Religion | 14,614 | 70,729 | 63,000 | 63,000 |
| 505 01 | BYCHOICE | 62,020 | 42,483 | 8,800 | 8,800 |
| 506 | Foodstuffs | 2,207,540 | 3,062,581 | 3,062,580 | 3,062,580 |
| 512 | Quartering & Housekeeping | 38,100 | 311,086 | 295,536 | 295,536 |
| 513 | Laundry | 352,238 | 529,245 | 529,243 | 529,243 |
| 514 | Misc Client Services | 380,330 | 379,841 | 379,848 | 379,848 |
| 516 | Chemicals, Drugs & Lab Supplies | 3,570,161 | 2,807,943 | 1,124,788 | 1,124,788 |
| 516 01 | Pharmaceuticals | 0 | 2,782,524 | 3,776,847 | 3,776,847 |
| 517 | Other-Educational Supplies | 26,420 | 7,321 | 4,800 | 4,800 |
| 520 | Other-Uniform Allowance | 276 | 976 | 126,500 | 126,500 |
| 524 | Other-Vehicle Operations | 95,267 | 119,842 | 119,838 | 119,838 |
| 444 | Interest & Penalties | 290,794 | 35,197 | 8 | 8 |
| 568 | Other-Not Otherwise Classified, Goods | 0 | 64,705 | 58,284 | 58,284 |
| 569 | Other-Not Otherwise Classified, Services | 17,149 | 0 | 1,500 | 1,500 |
| **TOTAL OE&E** | | **28,567,166** | **43,886,062** | **38,165,763** | **38,165,763** |
| Percent Change for OE&E Expenditures | | | 8.8% | | -15.0% |
| **GRAND TOTAL: PS & OE&E** | | **185,209,494** | **185,196,208** | **172,572,525** | **172,572,525** |
| TOTAL Percent Change for PS & OE&E Expenditures | | | 5.9% | | -7.3% |

7

| Metropolitan State Hospital | | | | | |
|---|---|---|---|---|---|
| Expenditure Comparison | | | | | |
| | | 2011-2012 | | 2012-2013 | |
| | | Allotment | Actuals | Allotment | Projections |
| PERSONAL SERVICES | | | | | |
| Salaries | | | | | |
| 003 | Salaries & Wages | 101,498,417 | 90,481,670 | 86,667,283 | 86,667,283 |
| 033 | Temp Help | 260,500 | 5,160,658 | 4,265,524 | 4,265,524 |
| 083 | Overtime | 3,008,566 | 12,601,038 | 10,920,229 | 10,920,229 |
| | TOTAL Salaries | 104,767,483 | 108,243,366 | 101,853,036 | 101,853,036 |
| Staff Benefits | | | | | |
| 103 | OASDI | 5,101,472 | 5,009,141 | 1,203,594 | 1,203,594 |
| 106 | Retirement | 17,289,117 | 15,559,526 | 15,980,498 | 15,980,498 |
| 125 | Workers' Compensation | 6,748,051 | 5,736,907 | 6,561,794 | 6,561,794 |
| 127 | Industrial Disability Leave | 1,442,282 | 1,833,052 | 2,248,582 | 2,248,582 |
| 132 | Nonindustrial Disability Leave | 189,447 | 147,280 | 145,700 | 145,700 |
| 133 | Unemployment Insurance | 216,155 | 234,118 | 275,000 | 275,000 |
| 134 | Other | 11,284,752 | 11,254,260 | 14,933,690 | 14,933,690 |
| | TOTAL Staff Benefits | 42,271,276 | 39,774,285 | 41,348,858 | 41,348,858 |
| TOTAL PERSONAL SERVICES | | 147,038,759 | 148,017,651 | 143,201,894 | 143,201,894 |
| Percent Change for Personal Services Expenditures | | | 0.04% | | -3.4% |
| OPERATING EXPENSES & EQUIPMENT | | | | | |
| 311 | General Expense | 577,940 | 346,724 | 350,000 | 350,000 |
| 312 | Printing | 304,445 | 203,698 | 201,230 | 201,230 |
| 313 | Communications | 1,249,310 | 756,796 | 760,000 | 760,000 |
| 314 | Postage | 82,098 | 35,545 | 37,000 | 37,000 |
| 315 | Insurance | 125,217 | 167,522 | 175,000 | 175,000 |
| 317 | Travel-In-State | 459,807 | 295,779 | 304,445 | 304,445 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 80,652 | 55,359 | 56,000 | 56,000 |
| 323 | Facilities Operation | 2,025,849 | 1,834,630 | 1,168,000 | 1,168,000 |
| 352 | Special Repairs & Deferred Maint. | 198,688 | 79,366 | 700,000 | 700,000 |
| 324 | Utilities | 3,974,032 | 3,100,404 | 2,418,505 | 2,418,505 |
| 325 | C&PS-Interdepartmental | 592,683 | 416,692 | 402,187 | 402,187 |
| 326 | C&PS-External | 335 | 96,463 | 63,636 | 63,636 |
| 328 | Consolidated Data Centers | 136,028 | 76,478 | 72,945 | 72,945 |
| 329 | Data Processing/IT | 794,841 | 645,414 | 500,000 | 500,000 |
| 332 | Equipment | 19,211 | 219,121 | 30,000 | 30,000 |
| 413 | C&PS-External-Hlth & Med. | 1,009,897 | 1,461,917 | 1,521,517 | 1,521,517 |
| 418 | Outside Services/Other Services | 1,069,894 | 813,129 | 825,000 | 825,000 |
| 503 | Other-Clothing/Personal Supplies | 694,264 | 255,176 | 200,000 | 200,000 |
| 505 | Other-Recreation & Religion | 14,892 | 4,577 | 4,500 | 4,500 |
| 505 01 | BYCHOICE | 23,937 | 13,347 | 0 | 0 |
| 506 | Foodstuffs | 3,880,855 | 2,635,740 | 2,906,245 | 2,906,245 |
| 512 | Quartering & Housekeeping | 532,103 | 382,692 | 375,000 | 375,000 |
| 513 | Laundry | 1,400,652 | 991,256 | 768,434 | 768,434 |
| 514 | Misc Client Services | 340,117 | 249,371 | 250,000 | 250,000 |
| 516 | Chemicals, Drugs & Lab Supplies | 782,439 | 623,427 | 605,486 | 605,486 |
| 516 01 | Pharmacueticals | 9,216,211 | 5,986,020 | 4,968,000 | 4,968,000 |
| 517 | Other-Educational Supplies | 8,867 | 19,406 | 0 | 0 |
| 520 | Other-Uniform Allowance | 47,360 | 41,032 | 43,636 | 43,636 |
| 524 | Other-Vehicle Operations | 151,814 | 191,732 | 150,000 | 150,000 |
| 444 | Interest & Penalties | 72,242 | 19,849 | 18,433 | 18,433 |
| 568 | Other-Not Otherwise Classified, Goods | 11,483 | 48,046 | 44,166 | 44,166 |
| 569 | Other-Not Otherwise Classified, Services | 98076 | 95,754 | 92,416 | 92,416 |
| TOTAL OE&E | | 29,976,239 | 22,162,461 | 20,011,781 | 20,011,781 |
| Percent Change for OE&E Expenditures | | | 13.5% | | -10.7% |
| GRAND TOTAL: PS & OE&E | | 177,014,998 | 170,180,112 | 163,213,675 | 163,213,675 |
| TOTAL Percent Change for PS & OE&E Expenditures | | | 1.8% | | -4.3% |

## Napa State Hospital
### Expenditure Comparison

| | | 2011-2012 | | 2012-2013 | |
|---|---|---|---|---|---|
| | | **Allotment** | **Actuals** | **Allotment** | **Projections** |
| **PERSONAL SERVICES** | | | | | |
| **Salaries** | | | | | |
| 003 | Salaries & Wages | 136,640,474 | 143,324,697 | 136,489,485 | 136,489,485 |
| 033 | Temp Help | 360,000 | 70,525 | 279,330 | 279,330 |
| 083 | Overtime | 28,000,000 | 24,144,472 | 19,674,273 | 19,674,273 |
| | **TOTAL Salaries** | **165,000,474** | **167,539,694** | **156,443,088** | **156,443,088** |
| **Staff Benefits** | | | | | |
| 103 | OASDI | 6,479,454 | 6,221,273 | 5,964,654 | 5,964,654 |
| 106 | Retirement | 23,308,020 | 23,440,073 | 22,987,539 | 22,987,539 |
| 125 | Workers' Compensation | 5,551,035 | 5,712,195 | 6,044,606 | 6,044,606 |
| 127 | Industrial Disability Leave | 2,317,912 | 2,166,651 | 2,009,838 | 2,009,838 |
| 132 | Nonindustrial Disability Leave | 623,115 | 510,223 | 488,643 | 488,643 |
| 133 | Unemployment Insurance | 275,323 | 301,266 | 330,000 | 330,000 |
| 134 | Other | 17,904,986 | 17,494,324 | 17,465,377 | 17,465,377 |
| | **TOTAL Staff Benefits** | **56,459,845** | **55,846,006** | **55,290,657** | **55,290,657** |
| **TOTAL PERSONAL SERVICES** | | **221,460,319** | **223,385,700** | **211,733,745** | **211,733,745** |
| | Percent Change for Personal Services Expenditures | | **1.6%** | | **-5.5%** |
| **OPERATING EXPENSES & EQUIPMENT** | | | | | |
| 311 | General Expense | 1,550,000 | 3,377,196 | 1,001,170 | 1,001,170 |
| 312 | Printing | 355,605 | 316,911 | 362,897 | 362,897 |
| 313 | Communications | 350,000 | 217,512 | 262,468 | 262,468 |
| 314 | Postage | 25,000 | 65,789 | 44,964 | 44,964 |
| 315 | Insurance | 237,654 | 367,575 | 373,500 | 373,500 |
| 317 | Travel-In-State | 40,000 | 127,292 | 131,308 | 131,308 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 80,000 | 83,532 | 120,305 | 120,305 |
| 323 | Facilities Operation | 1,500,000 | 1,398,961 | 1,489,192 | 1,489,192 |
| 352 | Special Repairs & Deferred Maint. | 224,070 | 194,262 | 0 | 0 |
| 324 | Utilities | 4,000,000 | 3,984,013 | 4,879,929 | 4,879,929 |
| 325 | C&PS-Interdepartmental | 1,220,000 | 1,334,279 | 1,678,136 | 1,678,136 |
| 326 | C&PS-External | 3,000,000 | 2,270,620 | 1,525,370 | 1,525,370 |
| 328 | Consolidated Data Centers | 80,500 | 88,489 | 116,000 | 116,000 |
| 329 | Data Processing/IT | 1,200,000 | 1,141,463 | 1,191,361 | 1,191,361 |
| 332 | Equipment | 750,000 | 820,953 | 268,652 | 268,652 |
| 413 | C&PS-External-Hlth & Med. | 8,500,000 | 5,459,926 | 4,131,732 | 4,131,732 |
| 418 | Outside Services/Other Services | 25,000 | 11,891 | 29,951 | 29,951 |
| 503 | Other-Clothing/Personal Supplies | 238,000 | 244,633 | 263,134 | 263,134 |
| 505 | Other-Recreation & Religion | 38,000 | 29,863 | 55,171 | 55,171 |
| 505 01 | BYCHOICE | 60,000 | 19,942 | 53,000 | 53,000 |
| 506 | Foodstuffs | 2,500,000 | 3,054,317 | 3,084,658 | 3,084,658 |
| 512 | Quartering & Housekeeping | 200,000 | 181,441 | 174,500 | 174,500 |
| 513 | Laundry | 500,000 | 538,320 | 497,000 | 497,000 |
| 514 | Misc Client Services | 425,000 | 373,008 | 339,056 | 339,056 |
| 516 | Chemicals, Drugs & Lab Supplies | 1,100,000 | 1,308,916 | 1,496,122 | 1,496,122 |
| 516 01 | Pharmaceuticals | 10,400,000 | 8,696,350 | 6,947,712 | 6,947,712 |
| 517 | Other-Educational Supplies | 29,000 | 48,030 | 16,481 | 16,481 |
| 520 | Other-Uniform Allowance | 185,000 | 224,779 | 242,503 | 242,503 |
| 524 | Other-Vehicle Operations | 337,580 | 454,622 | 404,797 | 404,797 |
| 444 | Interest & Penalties | 150,000 | 275,795 | 0 | 0 |
| 568 | Other-Not Otherwise Classified, Goods | 344,395 | 497,246 | 492,722 | 492,722 |
| 569 | Other-Not Otherwise Classified, Services | 200,322 | 127,172 | 292,061 | 292,061 |
| **TOTAL OE&E** | | **39,845,126** | **37,335,098** | **31,965,852** | **31,965,852** |
| | Percent Change for OE&E Expenditures | | **3.7%** | | **-16.8%** |
| **GRAND TOTAL: PS & OE&E** | | **261,305,445** | **260,720,798** | **243,699,597** | **243,699,597** |
| | TOTAL Percent Change for PS & OE&E Expenditures | | **1.9%** | | **-7.0%** |

9

## Patton State Hospital
### Expenditure Comparison

| | | 2011-2012 | | 2012-2013 | |
|---|---|---|---|---|---|
| | | **Allotment** | Actuals | **Allotment** | Projections |
| PERSONAL SERVICES | | | | | |
| **Salaries** | | | | | |
| 003 | Salaries & Wages | 168,000,000 | 167,080,799 | 153,400,182 | 153,400,182 |
| 033 | Temp Help | 8,850,000 | 8,540,696 | 7,990,137 | 7,990,137 |
| 083 | Overtime | 24,013,000 | 25,751,879 | 21,645,645 | 21,645,645 |
| | **TOTAL Salaries** | 200,863,000 | 201,373,374 | 183,035,964 | 183,035,964 |
| **Staff Benefits** | | | | | |
| 103 | OASDI | 6,400,000 | 6,301,915 | 6,155,536 | 6,155,536 |
| 106 | Retirement | 28,500,000 | 28,389,526 | 26,816,332 | 26,816,332 |
| 125 | Workers' Compensation | 6,000,000 | 5,748,861 | 6,075,000 | 6,075,000 |
| 127 | Industrial Disability Leave | 1,780,000 | 1,739,485 | 2,093,198 | 2,093,198 |
| 132 | Nonindustrial Disability Leave | 670,000 | 600,219 | 877,442 | 877,442 |
| 133 | Unemployment Insurance | 500,000 | 431,803 | 500,000 | 500,000 |
| 134 | Other | 22,373,000 | 22,294,826 | 21,341,199 | 21,341,199 |
| | **TOTAL Staff Benefits** | **66,223,000** | 65,506,635 | 63,858,707 | 63,858,707 |
| **TOTAL PERSONAL SERVICES** | | **267,086,000** | 266,880,009 | 246,894,671 | 246,894,671 |
| | Percent Change for Personal Services Expenditures | | 0.9% | | -8.1% |
| OPERATING EXPENSES & EQUIPMENT | | | | | |
| 311 | General Expense | 950,000 | 925,131 | 1,099,960 | 1,099,960 |
| 312 | Printing | 525,000 | 483,717 | 495,000 | 495,000 |
| 313 | Communications | 930,000 | 874,660 | 591,544 | 591,544 |
| 314 | Postage | 85,000 | 82,172 | 74,526 | 74,526 |
| 315 | Insurance | 260,000 | 249,550 | 310,208 | 310,208 |
| 317 | Travel-In-State | 75,000 | 59,341 | 69,303 | 69,303 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 85,000 | 82,076 | 92,490 | 92,490 |
| 323 | Facilities Operation | 2,115,000 | 2,113,370 | 2,001,006 | 2,001,006 |
| 352 | Special Repairs & Deferred Maint. | 589,795 | 589,795 | 892,256 | 892,256 |
| 324 | Utilities | 2,950,000 | 2,948,354 | 3,000,000 | 3,000,000 |
| 325 | C&PS-Interdepartmental | 675,000 | 525,992 | 525,000 | 525,000 |
| 326 | C&PS-External | 875,000 | 862,021 | 835,000 | 835,000 |
| 328 | Consolidated Data Centers | 100,000 | 94,499 | 97,500 | 97,500 |
| 329 | Data Processing/IT | 965,000 | 921,118 | 1,300,000 | 1,300,000 |
| 332 | Equipment | 780,000 | 778,156 | 300,000 | 300,000 |
| 413 | C&PS-External-Hlth & Med. | 14,597,742 | 14,597,741 | 14,150,000 | 14,150,000 |
| 418 | Outside Services/Other Services | 0 | 0 | 0 | 0 |
| 503 | Other-Clothing/Personal Supplies | 700,000 | 675,315 | 420,000 | 420,000 |
| 505 | Other-Recreation & Religion | 125,000 | 75,405 | 95,000 | 95,000 |
| 505 01 | BYCHOICE | 95,000 | 44,980 | 0 | 0 |
| 506 | Foodstuffs | 4,725,000 | 4,713,166 | 3,850,000 | 3,850,000 |
| 512 | Quartering & Housekeeping | 1,550,000 | 1,543,990 | 1,200,000 | 1,200,000 |
| 513 | Laundry | 850,000 | 711,824 | 735,000 | 735,000 |
| 514 | Misc Client Services | 500,000 | 457,299 | 429,847 | 429,847 |
| 516 | Chemicals, Drugs & Lab Supplies | 825,000 | 806,348 | 860,000 | 860,000 |
| 516 01 | Pharmaceuticals | 15,500,000 | 15,461,443 | 14,604,012 | 14,604,012 |
| 517 | Other-Educational Supplies | 10,000 | 7,824 | 10,000 | 10,000 |
| 520 | Other-Uniform Allowance | 0 | 0 | 0 | 0 |
| 524 | Other-Vehicle Operations | 260,000 | 257,652 | 270,000 | 270,000 |
| 444 | Interest & Penalties | 96,000 | 85,675 | 2,654 | 2,654 |
| 568 | Other-Not Otherwise Classified, Goods | 15,000 | 10,913 | 10,000 | 10,000 |
| 569 | Other-Not Otherwise Classified, Services | 0 | 975,000 | 0 | 0 |
| | Lottery | 29,000 | 29,000 | 0 | 0 |
| **TOTAL OE&E** | | **51,837,537** | 52,043,527 | 48,320,306 | 48,320,306 |
| | Percent Change for OE&E Expenditures | | 8.0% | | -7.7% |
| **GRAND TOTAL: PS & OE&E** | | **318,923,537** | 318,923,536 | 295,214,977 | 295,214,977 |
| | TOTAL Percent Change for PS & OE&E Expenditures | | 2.1% | | -8.0% |

## Salinas Valley Psychiatric Program
### Expenditure Comparison

| | | 2011-2012 | | 2012-2013 | |
|---|---|---|---|---|---|
| | | Allotment | Actuals | Allotment | Projections |
| **PERSONAL SERVICES** | | | | | |
| **Salaries** | | | | | |
| 003 | Salaries & Wages | 38,013,372 | 37,668,072 | 36,678,679 | 36,678,679 |
| 033 | Temp Help | 0 | 0 | 0 | 0 |
| 083 | Overtime | 6,275,025 | 5,504,401 | 5,554,130 | 5,554,130 |
| | **TOTAL Salaries** | **44,288,397** | **43,172,473** | **42,232,809** | **42,232,809** |
| **Staff Benefits** | | | | | |
| 103 | OASDI | 203,334 | 201,125 | 196,585 | 196,585 |
| 106 | Retirement | 7,756,848 | 7,228,843 | 7,134,938 | 7,134,938 |
| 125 | Workers' Compensation | 809,966 | 692,635 | 656,702 | 656,702 |
| 127 | Industrial Disability Leave | 386,629 | 496,547 | 556,125 | 556,125 |
| 132 | Nonindustrial Disability Leave | 76,942 | 83,824 | 86,976 | 86,976 |
| 133 | Unemployment Insurance | 26,604 | 23,250 | 21,920 | 21,920 |
| 134 | Other | 4,508,671 | 4,373,061 | 4,460,923 | 4,460,923 |
| | **TOTAL Staff Benefits** | **13,768,994** | **13,099,285** | **13,114,169** | **13,114,169** |
| **TOTAL PERSONAL SERVICES** | | **58,057,391** | **56,271,757** | **55,346,978** | **55,346,978** |
| | Percent Change for Personal Services Expenditures | | 11.9% | | -1.7% |
| **OPERATING EXPENSES & EQUIPMENT** | | | | | |
| 311 | General Expense | 170,301 | 137,839 | 134,232 | 134,232 |
| 312 | Printing | 49,965 | 62,723 | 59,976 | 59,976 |
| 313 | Communications | 40,969 | 19,030 | 35,736 | 35,736 |
| 314 | Postage | 3,418 | 6,165 | 3,229 | 3,229 |
| 315 | Insurance | 0 | 0 | 0 | 0 |
| 317 | Travel-In-State | 80,161 | 71,653 | 71,243 | 71,243 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 52,954 | 26,731 | 39,663 | 39,663 |
| 323 | Facilities Operation | 11,164 | 2,080 | 1,961 | 1,961 |
| 352 | Special Repairs & Deferred Maint. | 0 | 0 | 0 | 0 |
| 324 | Utilities | 0 | 0 | 0 | 0 |
| 325 | C&PS-Interdepartmental | 215,466 | 112,297 | 105,962 | 105,962 |
| 326 | C&PS-External | 0 | 0 | 0 | 0 |
| 328 | Consolidated Data Centers | 0 | 0 | 0 | 0 |
| 329 | Data Processing/IT | 659,514 | 275,828 | 263,391 | 263,391 |
| 332 | Equipment | 117,137 | 230,936 | 217,731 | 217,731 |
| 413 | C&PS-External-Hlth & Med. | 0 | 0 | 0 | 0 |
| 418 | Outside Services/Other Services | 6,942,849 | 7,532,174 | 6,660,004 | 6,660,004 |
| 503 | Other-Clothing/Personal Supplies | 2,602 | 434 | 434 | 434 |
| 505 | Other-Recreation & Religion | 15,324 | 11,667 | 11,000 | 11,000 |
| 505 01 | BYCHOICE | 0 | 0 | 0 | 0 |
| 506 | Foodstuffs | 17,951 | 3,732 | 3,660 | 3,660 |
| 512 | Quartering & Housekeeping | 35,874 | 41,859 | 39,703 | 39,703 |
| 513 | Laundry | 0 | 0 | 0 | 0 |
| 514 | Misc Client Services | 100,000 | 67,849 | 64,236 | 64,236 |
| 516 | Chemicals, Drugs & Lab Supplies | 10,043 | 4,000 | 3,937 | 3,937 |
| 516 01 | Pharmacueticals | 0 | 0 | 0 | 0 |
| 517 | Other-Educational Supplies | 18,938 | 6,045 | 5,700 | 5,700 |
| 520 | Other-Uniform Allowance | 0 | 610 | 575 | 575 |
| 524 | Other-Vehicle Operations | 0 | 0 | 0 | 0 |
| 444 | Interest & Penalties | 4,433 | 0 | 0 | 0 |
| 568 | Other-Not Otherwise Classified, Goods | 65,196 | 28,801 | 27,197 | 27,197 |
| 569 | Other-Not Otherwise Classified, Services | 5,746 | 621 | 456 | 456 |
| **TOTAL OE&E** | | **8,620,005** | **8,643,075** | **7,750,025** | **7,750,025** |
| | Percent Change for OE&E Expenditures | | -16.9% | | -11.5% |
| **GRAND TOTAL: PS & OE&E** | | **66,677,396** | **64,914,833** | **63,097,003** | **63,097,003** |
| | TOTAL Percent Change for PS & OE&E Expenditures | | 8.1% | | -2.9% |

11

## Vacaville Psychiatric Program
### Expenditure Comparison

| | | 2011-2012 | | 2012-2013 | |
|---|---|---|---|---|---|
| | | Allotment | Actuals | Allotment | Projections |
| | **PERSONAL SERVICES** | | | | |
| **Salaries** | | | | | |
| 003 | Salaries & Wages | 38,890,883 | 38,431,563 | 42,987,314 | 42,409,570 |
| 033 | Temp Help | 0 | 0 | 0 | 0 |
| 083 | Overtime | 4,474,000 | 4,463,869 | 7,896,856 | 7,790,723 |
| | **TOTAL Salaries** | 43,364,883 | 42,895,432 | 50,884,170 | 50,200,293 |
| **Staff Benefits** | | | | | |
| 103 | OASDI | 2,058,783 | 1,829,595 | 2,077,293 | 2,049,374 |
| 106 | Retirement | 7,585,495 | 7,579,622 | 9,999,562 | 9,865,169 |
| 125 | Workers' Compensation | 968,954 | 842,473 | 793,700 | 783,033 |
| 127 | Industrial Disability Leave | 167,999 | 79,859 | 35,491 | 35,014 |
| 132 | Nonindustrial Disability Leave | 313,103 | 246,144 | 313,793 | 309,576 |
| 133 | Unemployment Insurance | 44,927 | 53,704 | 70,982 | 70,028 |
| 134 | Other | 3,186,650 | 2,946,627 | 4,337,303 | 4,279,010 |
| | **TOTAL Staff Benefits** | 14,325,911 | 13,578,024 | 17,628,124 | 17,391,204 |
| **TOTAL PERSONAL SERVICES** | | 57,690,794 | 56,473,456 | 68,512,294 | 67,591,497 |
| | Percent Change for Personal Services Expenditures | | 7.1% | | 16.4% |
| | **OPERATING EXPENSES & EQUIPMENT** | | | | |
| 311 | General Expense | 344,086 | 240,892 | 259,041 | 255,559 |
| 312 | Printing | 29,000 | 58,591 | 30,409 | 30,000 |
| 313 | Communications | 14,400 | 11,167 | 12,163 | 12,000 |
| 314 | Postage | 192 | 218 | 223 | 220 |
| 315 | Insurance | 300 | 247 | 304 | 300 |
| 317 | Travel-In-State | 20,000 | 20,627 | 25,341 | 25,000 |
| 318 | Travel-Out-of-State | 0 | 0 | 0 | 0 |
| 321 | Training | 28,000 | 17,256 | 68,496 | 67,575 |
| 323 | Facilities Operation | 111,630 | 82,476 | 81,090 | 80,000 |
| 352 | Special Repairs & Deferred Maint. | 0 | 0 | 0 | 0 |
| 324 | Utilities | 0 | 0 | 0 | 0 |
| 325 | C&PS-Interdepartmental | 8,100 | 87,553 | 13,177 | 13,000 |
| 326 | C&PS-External | 360 | 0 | 0 | 0 |
| 328 | Consolidated Data Centers | 15,000 | 12,788 | 14,191 | 14,000 |
| 329 | Data Processing/IT | 135,000 | 76,176 | 173,020 | 170,695 |
| 332 | Equipment | 188,953 | 92,452 | 65,421 | 64,542 |
| 413 | C&PS-External-Hlth & Med. | 2,273,745 | 1,864,927 | 2,049,448 | 2,021,904 |
| 418 | Outside Services/Other Services | 0 | 0 | 0 | 0 |
| 503 | Other-Clothing/Personal Supplies | 11,573 | 33,662 | 25,842 | 25,494 |
| 505 | Other-Recreation & Religion | 10,243 | 19,289 | 21,414 | 21,126 |
| 505 01 | BYCHOICE | 0 | 0 | 0 | 0 |
| 506 | Foodstuffs | 2,000 | 2,261 | 2,534 | 2,500 |
| 512 | Quartering & Housekeeping | 11,760 | 975 | 608 | 600 |
| 513 | Laundry | 0 | 0 | 0 | 0 |
| 514 | Misc Client Services | 0 | 0 | 0 | 0 |
| 516 | Chemicals, Drugs & Lab Supplies | 31,232 | 91,996 | 32,436 | 32,000 |
| 516 01 | Pharmaceuticals | 0 | 0 | 0 | 0 |
| 517 | Other-Educational Supplies | 13,564 | 25,712 | 9,123 | 9,000 |
| 520 | Other-Uniform Allowance | 5,700 | 1,220 | 72,328 | 71,356 |
| 524 | Other-Vehicle Operations | 6,000 | 5,795 | 6,082 | 6,000 |
| 444 | Interest & Penalties | 1,350 | 1,117 | 1,010 | 996 |
| 568 | Other-Not Otherwise Classified, Goods | 5,002 | 536 | 558 | 551 |
| 569 | Other-Not Otherwise Classified, Services | 2,000 | 0 | 0 | 0 |
| **TOTAL OE&E** | | 3,269,190 | 2,747,933 | 2,964,257 | 2,924,418 |
| | Percent Change for OE&E Expenditures | | 9.3% | | 6.0% |
| **GRAND TOTAL: PS & OE&E** | | 60,959,984 | 59,221,388 | 71,476,551 | 70,515,915 |
| | TOTAL Percent Change for PS & OE&E Expenditures | | 7.2% | | 16.0% |

| Stockton Psychiatric Program | | | | |
|---|---|---|---|---|
| **Expenditure Comparison** | | | | |
| | | 2011-2012 | | 2012-2013 | |
| | | N/A | N/A | Allotment | Projections |
| **PERSONAL SERVICES** | | | | | |
| **Salaries** | | | | | |
| | Salaries & Wages | | | 5,631,266 | 5,605,879 |
| | | | | | |
| | | | | | |
| | **TOTAL Salaries** | 0 | 0 | 5,631,266 | 5,605,879 |
| **Staff Benefits** | | | | | |
| | Staff Benefits | | | 1,858,318 | 1,849,940 |
| | Retirement | | | | |
| | Workers' Compensation | | | | |
| | Industrial Disability Leave | | | | |
| | Nonindustrial Disability Leave | | | | |
| | Unemployment Insurance | | | | |
| | Other | | | | |
| | **TOTAL Staff Benefits** | 0 | 0 | 1,858,318 | 1,849,940 |
| **TOTAL PERSONAL SERVICES** | | 0 | 0 | 7,489,584 | 7,455,819 |
| | Percent Change for Personal Services Expenditures | | | | |
| **OPERATING EXPENSES & EQUIPMENT** | | | | | |
| 311 | General Expense | | | 1,357,116 | 1,350,998 |
| 312 | Printing | | | | |
| 313 | Communications | | | | |
| 314 | Postage | | | | |
| 315 | Insurance | | | | |
| 317 | Travel-In-State | | | | |
| 318 | Travel-Out-of-State | | | | |
| 321 | Training | | | | |
| 323 | Facilities Operation | | | | |
| 352 | Special Repairs & Deferred Maint. | | | | |
| 324 | Utilities | | | | |
| 325 | C&PS-Interdepartmental | | | | |
| 326 | C&PS-External | | | | |
| 328 | Consolidated Data Centers | | | | |
| 329 | Data Processing/IT | | | | |
| 332 | Equipment | | | | |
| 413 | C&PS-External-Hlth & Med. | | | | |
| 418 | Outside Services/Other Services | | | | |
| 503 | Other-Clothing/Personal Supplies | | | | |
| 505 | Other-Recreation & Religion | | | | |
| 505 01 | BYCHOICE | | | | |
| 506 | Foodstuffs | | | | |
| 512 | Quartering & Housekeeping | | | | |
| 513 | Laundry | | | | |
| 514 | Misc Client Services | | | | |
| 516 | Chemicals, Drugs & Lab Supplies | | | | |
| 516 01 | Pharmacueticals | | | | |
| 517 | Other-Educational Supplies | | | | |
| 520 | Other-Uniform Allowance | | | | |
| 524 | Other-Vehicle Operations | | | | |
| 444 | Interest & Penalties | | | | |
| 568 | Other-Not Otherwise Classified, Goods | | | | |
| 569 | Other-Not Otherwise Classified, Services | | | | |
| **TOTAL OE&E** | | 0 | 0 | 1,357,116 | 1,350,998 |
| | Percent Change for OE&E Expenditures | | | | |
| **GRAND TOTAL: PS & OE&E** | | 0 | 0 | 8,846,700 | 8,806,817 |
| | TOTAL Percent Change for PS & OE&E Expenditures | | | | |

**Central Hospital Support**

Expenditure Comparison

| | | 2011-2012 | | | | 2012-2013 | |
|---|---|---|---|---|---|---|---|
| | | Allotment | Actuals | | | Allotment | Projections |
| PERSONAL SERVICES | | | | | | | |
| Salaries & Wages | | | | | | | |
| | | 0 | 0 | | L-Wing Funding | 3,000,000 | 0 |
| | | 0 | 0 | | FY 2012-13 PLP Reduction | 39,000,000 | 0 |
| | | 0 | 0 | | Reimbursements | 3,427,000 | 0 |
| | | 0 | 0 | | AB 756 20/20 Training Program | 250,000 | 0 |
| | TOTAL Salaries | 0 | 0 | | TOTAL Salaries | 45,677,000 | 0 |
| Staff Benefits | | | | | | | |
| | Staff Benefits | 525,738 | 508,046 | | Staff Benefits | | |
| | TOTAL Staff Benefits | 525,738 | 508,046 | | TOTAL Staff Benefits | 0 | 0 |
| TOTAL PERSONAL SERVICES | | 525,738 | 508,046 | TOTAL PERSONAL SERVICES | | 45,677,000 | 0 |
| OPERATING EXPENSES & EQUIPMENT | | | | | | | |
| 311 | General Expense | 1,786,262 | 1,726,150 | 311 | General Expense | 0 | 0 |
| 312 | Printing | 356 | 344 | 312 | Printing | 0 | 0 |
| 313 | Communications | 202,793 | 195,969 | 313 | Communications | 0 | 0 |
| 314 | Postage | 0 | 0 | 314 | Postage | 0 | 0 |
| 315 | Insurance | 0 | 0 | 315 | Insurance | 0 | 0 |
| 317 | Travel-In-State | 6,572 | 6,351 | 317 | Travel-In-State | 0 | 0 |
| 318 | Travel-Out-of-State | 0 | 0 | 318 | Travel-Out-of-State | 0 | 0 |
| 321 | Training | 3,244 | 3,135 | 321 | Training | 0 | 0 |
| 323 | Facilities Operation | 448,728 | 443,907 | 323 | Facilities Operation | 0 | 0 |
| 352 | Special Repairs & Deferred Maint. | 0 | 0 | 352 | Special Repairs & Deferred Maint. | 0 | 0 |
| 325 | C&PS-Interdepartmental | 3,424,878 | 3,309,623 | 325 | C&PS-Interdepartmental | | |
| | | | | | Legal | 950,262 | 950,262 |
| | | | | | Human Resources | 100,000 | 100,000 |
| | | | | | Licensing | 103,771 | 103,771 |
| | | | | | Miscellaneous | 300,000 | 300,000 |
| | | | | | IT | 2,186,152 | 2,186,152 |
| 326 | C&PS-External | 21,043,410 | 20,335,249 | 326 | C&PS-External | | |
| | | | | | Legal | 894,127 | 894,127 |
| | | | | | Human Resources | 22,325 | 22,325 |
| | | | | | Licensing | 143,789 | 143,789 |
| | | | | | Human Potential Consulting | 110,000 | 110,000 |
| | | | | | Liberty Healthcare | 4,064,982 | 4,064,982 |
| | | | | | Disability Rights of CA | 1,264,000 | 1,264,000 |
| | | | | | Sylmar Health | 1,282,122 | 1,282,122 |
| | | | | | Miscellaneous | 700,000 | 700,000 |
| 329 | Data Processing/IT | 6,965,305 | 6,730,906 | 329 | Data Processing/IT | | |
| | | | | | PDAS - MSH & PSH | 22,761,000 | 22,761,000 |
| | | | | | PDAS - NSH | 446,000 | 446,000 |
| | | | | | Psych. Program IT | 3,790,000 | 3,790,000 |
| | | | | | IT Misc. | 3,500,000 | 3,500,000 |
| 332 | Equipment | 0 | 0 | 332 | Equipment | 0 | 0 |
| 506 | Foodstuffs | 0 | -10,280 | 506 | Foodstuffs | 0 | 0 |
| 444 | Interest & Penalties | 0 | 0 | 444 | Interest & Penalties | 0 | 0 |
| 568 | Other-Not Otherwise Classified, Goods | 0 | 0 | 568 | Other-Not Otherwise Classified, Goods | 0 | 0 |
| 569 | Other-Not Otherwise Classified, Services | 0 | 0 | 569 | Other-Not Otherwise Classified, Services | 0 | 0 |
| TOTAL OE&E | | 33,881,549 | 32,741,354 | TOTAL OE&E | | 42,618,530 | 42,618,530 |
| | | | | | | | |
| GRAND TOTAL: PS & OE&E | | 34,407,287 | 33,249,400 | GRAND TOTAL: PS & OE&E | | 88,295,530 | 42,618,530 |

**Department of State Hospitals**

**Actual Cost Savings Achieved**

**Fiscal Year 2011-12**

**($ in millions)**

| Savings Proposal | Description | FY 2011-12 | | | | | |
|---|---|---|---|---|---|---|---|
| | | Dollar Target | Dollars Achieved to Date | % Dollars Achieved to Date | Position Reduction Target | Position Reduction Achieved to Date | % Position Reduction to Date |
| **Staffing Ratios** | | | | | | | |
| Revise ICF Treatment Team Ratio from 1:25 to 1:35. | Implement ratio adjustments while maintaining necessary staffing to address patient acuity. | $21.17 | $21.20 | 100% | 253.9 | 259.9 | 102% |
| Adjust Nursing Staff Percentage | Ratio shift to 70% Psych Tech/30% Registered Nurse for hospitals not already operating at the proposed level. Maintains adequate staffing as required by licensing. | $0.14 | $0.14 | 95% | 0.0 | 0.0 | 0% |
| **Staff Redirection** | | | | | | | |
| Redirect staff to units | Redirect staff from lower priority activities back to unit, reducing overtime/temp help costs. | $8.29 | $9.19 | 111% | 15.0 | 12.0 | 80% |
| Redirect security staff to additional grounds patrol | Redirect security staff from kiosks (NSH); close two CSH sports yards, reduce CSH package center operations. | $0.14 | $0.14 | 96% | 0.0 | 0.0 | 0% |
| **Eliminate/restructure programs/departments/services** | | | | | | | |
| Assessment Teams | Assessment teams not required by Civil Rights for Institutionalized Persons Act (CRIPA) Consent Judgment. Alternative classifications may be used to perform assessments when appropriate. | $0.09 | $0.05 | 56% | 2.0 | 1.0 | 50% |
| Positive Behavioral Support Teams | Establish one team per hospital for training new staff and providing consultation. | $2.03 | $1.63 | 80% | 17.0 | 13.0 | 76% |
| Modify By Choice program | Modify By Choice program to best serve each hospitals' patients based on the demonstrated effectiveness of By Choice as a treatment participation incentive. | $1.36 | $0.98 | 72% | 1.0 | 0.0 | 0% |
| Modify Mall Services | Hold Mall groups on the unit to decrease staffing needs off unit and address unit coverage for patients not attending mall groups. | $1.56 | $1.31 | 84% | 10.0 | 6.1 | 61% |
| Restructure various disciplines/departments | Reduce staffing for psychology, rehabilitation therapy, housekeeping, records management, medical services, Central Program Services, supervisory/lead discipline structure. | $2.59 | $3.48 | 134% | 22.0 | 20.0 | 91% |
| Discontinue Adult Education Program | Discontinue adult education programs; retain Special Education as required by law. | $0.60 | $0.46 | 77% | 14.8 | 11.8 | 80% |
| Contract for Pre-Employment Physicals | Services to be provided via contract with local clinics or personal physician. | $0.32 | $0.18 | 57% | 2.0 | 0.9 | 45% |
| Laboratory Services | Provide laboratory services during core business hours only (CSH) | $0.02 | $0.02 | 90% | 0.0 | 0.0 | 0% |
| **Streamline Documentation** | | | | | | | |
| Standards Compliance, Admission and Assessment Documentation | Streamline documentation requirements while maintaining licensing standards; revise frequency of patient treatment team conferences. | $6.93 | $6.71 | 97% | 3.0 | 2.0 | 67% |
| **Additional Savings Proposals** | | | | | | | |
| Nursing Staff Training | Provide up to two days annual training via alternative methods, i.e., web-based training. Eliminate dedicated staff for Psychiatric Technician 20/20 training program at ASH. Does not impact statewide program. | $1.57 | $1.18 | 75% | 0.0 | 0.0 | 0% |
| Physician On-Call, Psychiatric Medical Officer of the Day (PMOD), Medical Officer of the Day (MOD) | Modify on call, MOD, PMOD schedule for after hours | $2.80 | $1.95 | 70% | 0.0 | 0.0 | 0% |

**Department of State Hospitals**
**Actual Cost Savings Achieved**
**Fiscal Year 2011-12**
**($ in millions)**

| Savings Proposal | Description | FY 2011-12 | | | | | |
|---|---|---|---|---|---|---|---|
| | | Dollar Target | Dollars Achieved to Date | % Dollars Achieved to Date | Position Reduction Target | Position Reduction Achieved to Date | % Position Reduction to Date |
| Utilize alternate classifications | Transfer necessary functions to lower cost classifications. Patients will continue to receive current level of care and treatment. | $0.19 | $0.17 | 93% | 0.0 | 0.0 | 0% |
| Streamline Internal Investigations | Streamline current investigation process for abuse/neglect complaints while remaining compliant with timelines required by licensing. | $0.12 | $0.10 | 83% | 0.0 | 0.0 | 0% |
| Abolish Miscellaneous Vacancies | Abolish hospital vacancies. | $0.20 | $0.28 | 141% | 5.5 | 5.5 | 100% |
| HQ Redirected positions | Return redirected HQ administrative positions to the hospitals. | $1.94 | $1.75 | 91% | 0.0 | 0.0 | 0% |
| | | | | | | | |
| **Operating Expense Reductions** | | | | | | | |
| Misc. OE Reductions | Utilize existing hospital services more efficiently; revise external contracts. | $4.54 | $5.76 | 127% | 0.0 | 0.0 | 0% |
| | | | | | | | |
| **Pharmacy/Medical** | | | | | | | |
| Pharmaceuticals | Prescribe generic drugs when appropriate. | $2.00 | $1.18 | 59% | 0.0 | 0.0 | 0% |
| | | | | | | | |
| **System-wide Savings** | | | | | | | |
| Other one-time savings | | $64.00 | $64.72 | 101% | 0.0 | 0.0 | 0% |
| | **Grand Total, All Savings Proposals** | **$122.60** | **$122.60** | **100%** | **346.2** | **333.2** | **96%** |

**Department of State Hospitals**
**Actual Cost Savings Achieved**
**Fiscal Year 2011-12**
**($ in millions)**

| Savings Proposal | Description | FY 2011-12 | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | ASH | | CSH | | MSH | | NSH | | PSH | | SVPP | | VPP | | GRAND TOTAL | |
| | | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved | Dollars Achieved | Positions Achieved |
| **Staffing Ratios** | | | | | | | | | | | | | | | | | |
| Revise ICF Treatment Team Ratio from 1:25 to 1:35. | Implement ratio adjustments while maintaining necessary staffing to address patient acuity. | $3.52 | 17.70 | $2.55 | 0.00 | $0.23 | 2.00 | $1.43 | 14.70 | $0.92 | 8.00 | $9.79 | 170.50 | $2.76 | 47.00 | $21.20 | 259.90 |
| Adjust Nursing Staff Percentage | Ratio shift to 70% Psych Tech/30% Registered Nurse for hospitals not already operating at the proposed level. Maintains adequate staffing as required by licensing. | $0.04 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.10 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.14 | 0.00 |
| **Staff Redirection** | | | | | | | | | | | | | | | | | |
| Redirect staff to units | Redirect staff from lower priority activities back to unit, reducing overtime/temp help costs. | $6.88 | 2.00 | $0.05 | 0.00 | $1.33 | 0.00 | $0.15 | 0.00 | $0.78 | 10.00 | $0.00 | 0.00 | $0.00 | 0.00 | $9.19 | 12.00 |
| Redirect security staff to additional grounds patrol | Redirect security staff from kiosks (NSH); close two CSH sports yards, reduce CSH package center operations. | $0.00 | 0.00 | $0.14 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.14 | 0.00 |
| **Eliminate/restructure programs/departments/services** | | | | | | | | | | | | | | | | | |
| Assessment Teams | Assessment teams not required by Civil Rights for Institutionalized Persons Act (CRIPA) Consent Judgment. Alternative classifications may be used to perform assessments when appropriate. | $0.00 | 0.00 | $0.00 | 0.00 | $0.05 | 1.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.05 | 1.00 |
| Positive Behavioral Support Teams | Establish one team per hospital for training new staff and providing consultation. | $0.43 | 12.00 | $0.32 | 0.00 | $0.36 | 1.00 | $0.52 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.63 | 13.00 |
| Modify By Choice program | Modify By Choice program to best serve each hospitals' patients based on the demonstrated effectiveness of By Choice as a treatment participation incentive. | $0.07 | 0.00 | $0.17 | 0.00 | $0.06 | 0.00 | $0.36 | 0.00 | $0.33 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.98 | 0.00 |
| Modify Mail Services | Hold Mail groups on the unit to decrease staffing needs off unit and address unit coverage for patients not attending mail groups. | $0.05 | 2.10 | $0.00 | 0.00 | $0.28 | 2.00 | $0.08 | 2.00 | $0.91 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.31 | 6.10 |
| Restructure various disciplines/departments | Reduce staffing for psychology, rehabilitation therapy, housekeeping, records management, medical services, Central Program Services, supervisory/lead discipline structure. | $0.00 | 0.00 | $0.05 | 1.00 | $1.81 | 10.00 | $0.00 | 0.00 | $1.63 | 10.00 | $0.00 | 0.00 | $0.00 | 0.00 | $3.48 | 21.00 |
| Discontinue Adult Education Program | Discontinue adult education programs; retain Special Education as required by law. | $0.00 | 0.00 | $0.20 | 5.40 | $0.00 | 0.00 | $0.03 | 0.00 | $0.24 | 6.40 | $0.00 | 0.00 | $0.00 | 0.00 | $0.46 | 11.80 |
| Contract for Pre-Employment Physicals | Services to be provided via contract with local clinics or personal physician. | $0.14 | 0.90 | $0.04 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.18 | 0.90 |
| Laboratory Services | Provide laboratory services during core business hours only (CSH) | $0.00 | 0.00 | $0.02 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.02 | 0.00 |
| **Streamline Documentation** | | | | | | | | | | | | | | | | | |
| Standards Compliance, Admission and Assessment Documentation | Streamline documentation requirements while maintaining licensing standards; revise frequency of patient treatment team conferences. | $1.02 | 0.00 | $1.26 | 0.00 | $1.32 | 2.00 | $1.26 | 0.00 | $1.84 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $6.71 | 2.00 |
| **Additional Savings Proposals** | | | | | | | | | | | | | | | | | |
| Nursing Staff Training | Provide up to two days annual training via alternative methods, i.e., web-based training. Eliminate dedicated staff for Psychiatric Technician 20/20 training program at ASH. Does not impact statewide program. | $0.08 | 0.00 | $0.08 | 0.00 | $0.07 | 0.00 | $0.09 | 0.00 | $0.85 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.18 | 0.00 |
| Physician On-Call, Psychiatric Medical Officer of the Day (PMOD), Medical Officer of the Day (MOD) | Modify on call, MOD, PMOD schedule for after hours | $0.09 | 0.00 | $0.05 | 0.00 | $0.59 | 0.00 | $0.57 | 0.00 | $0.65 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.95 | 0.00 |
| Utilize alternate classifications | Transfer necessary functions to lower cost classifications. Patients will continue to receive current level of care and treatment. | $0.00 | 0.00 | $0.17 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.17 | 0.00 |
| Streamline Internal Investigations | Streamline current investigation process for abuse/neglect complaints while remaining compliant with timelines required by licensing. | $0.10 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.10 | 0.00 |
| Abolish Miscellaneous Vacancies | Abolish hospital vacancies. | $0.00 | 0.00 | $0.00 | 0.00 | $0.04 | 1.00 | $0.24 | 4.50 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.28 | 5.50 |
| HQ Redirected positions | Return redirected HQ administrative positions to the hospitals. | $0.26 | 0.00 | $0.65 | 0.00 | $0.00 | 0.00 | $0.55 | 0.00 | $0.22 | 0.00 | $0.08 | 0.00 | $0.00 | 0.00 | $1.75 | 0.00 |
| **Operating Expense Reductions** | | | | | | | | | | | | | | | | | |
| Misc. OE Reductions | Utilize existing hospital services more efficiently; revise external contracts. | $0.00 | 0.00 | $0.03 | 0.00 | $1.70 | 0.00 | $4.07 | 0.00 | $0.29 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $5.76 | 0.00 |
| **Pharmacy/Medical** | | | | | | | | | | | | | | | | | |
| Pharmaceuticals | Prescribe generic drugs when appropriate. | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.18 | 0.00 |
| **System-wide Savings** | | | | | | | | | | | | | | | | | |
| Other one-time savings | | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $64.72 | 0.00 |
| **Grand Total, All Savings Proposals** | | $12.68 | 34.70 | $5.78 | 6.40 | $7.84 | 19.00 | $9.44 | 21.20 | $8.67 | 34.40 | $9.87 | 170.50 | $2.76 | 47.00 | $122.60 | 333.20 |

| | |
|---|---|
| **From:** | Aaron Fischer |
| **Sent:** | Friday, July 27, 2012 11:17 AM |
| **To:** | Debbie Vorous; 'Craig Parker' |
| **Cc:** | 'William Downer'; Michael Stone; Coleman Special Master Team; Coleman Team - RBG Only; Steve Fama |
| **Subject:** | Coleman - ICF Treatment at VPP and SVPP [IWOV-DMS.FID6429] |
| **Attachments:** | VPP, High Custody ITC STEP Program Manual.pdf |

Debbie and Craig:

We write to express some of our concerns about the ICF treatment programs at Vacaville Psychiatric Program (VPP) at CMF and the Salinas Valley Psychiatric Program (SVPP), including: (1) limited treatment and programming due to staffing shortages and other factors; (2) lengthy stays at the Discretionary Program Status (DPS) level, and the resulting impact on patients' treatment and well-being, and the continued blanket use of restraints for all arriving ICF patients; and (3) reported instances of early discharges from the program and policies that have the effect of discouraging patients from expressing concerns about their treatment.

<u>Limited Treatment and Programming Due to Staffing Shortages</u>

We have recently received several disturbing reports regarding class members currently or recently in the ICF program in VPP's P-3 unit.  Identified problems include extremely limited group therapy and one-to-one clinical contacts, as well as lack of yard and out-of-cell time. Class members have been told many of these issues are the result of staff shortages in the program. We have received similar reports from SVPP patients regarding staffing issues, causing cancellation of groups and limited recreational therapy and yard.

Defendants' staffing data confirms significant staffing shortages at both VPP and SVPP.  See DMH Staffing Classifications/Vacancy Rate Report as of June 1, 2012 (**VPP functional vacancy rate** for psychologist: 23%, staff psychiatrist: 13%, rehabilitation therapist (recreation-safety): 38%, clinical social worker: 20%; **SVPP functional vacancy rate** for psych tech: 100%, psychologist: 17%, clinical social worker: 30%). VPP's and SVPP's overall functional vacancy rates, 22% and 33%, respectively, are much higher than those for other DMH programs (for which functional vacancy rates are between 5% and 15%).

<u>Lengthy Stays at DPS Level and Blanket Use of Restraints</u>

Class members have also reported being kept at the DPS level in DMH's STEP Program for lengthy periods of time, extending to 3-5 weeks or more (including several months in some reported cases).  While patients remain at the DPS level, they receive very limited out-of-cell time, are required to wear waist and ankle restraints when outside their cell, have no contact visits, have no canteen privileges, and get no access to outside yard. They further report that they are not allowed to attend group therapy and do not have regular clinical contacts.  Patients report that their mental health conditions are getting worse during these extended periods at the DPS level, and that they experience great difficulty coping with the reduced treatment, program restrictions, and the use of restraints.

We have previously raised our concerns about the practice of using restraints for all arriving ICF patients, as well as their often lengthy stays at the DPS level (*e.g.*, the parties' June 1 meet-and-confer and Jane Kahn's May 30 email).  Defendants have stated that their goal is to get ICF patients into the best possible treatment situation as quickly as possible, and that lengthy retention at the DPS level is unusual.  *See also* ICF MOU at 13 (requiring that "SVSP classification to clear inmate-patients for programming *shall not exceed* 10 working days from admission" (emphasis added)). The reports we have received suggest that lengthy DPS stays continue to occur more often than suggested.

We again state our objection to the non-clinical use of restraints in these inpatient units.  Established clinical requirements for restraints should inform the use of restraints, not blanket imposition of restraints upon admission.  *See, e.g.,* Program

Guide at 12-5-16 ("Restraints and/or seclusion shall be used only as a last resort and in response to an emergency to protect the inmate-patient and/or others from imminent harm, after less intrusive and non-physical interventions have been attempted or ruled out.")  At a minimum, timeframes for moving patients to higher levels in the STEP program, where use of restraints is not automatic and is instead informed by clinical factors, should be clearly established and very short.

<u>Early ICF Discharges and Policies that Discourage Patients from Expressing Treatment Concerns</u>

We have received reports regarding class members being discharged prematurely from the P-3 ICF program after submitting 602s regarding some of the issues described above.  Such early discharges can and do lead to costly and otherwise avoidable admissions into acute care beds. In addition, we have received reports that class members are not allowed to bring paperwork to the dayroom floor, a blanket prohibition that makes little sense and further discourages patients' documenting concerns about their treatment.

These reports are of great concern.  Defendants have made notable progress in addressing the waitlists for ICF level of care.  Lack of available treatment and programming in DMH's VPP and SVPP ICF programs (whether due to staff shortages or other reasons), along with the discharge of patients before it is clinically appropriate, serve to undermine the fundamental goal of Defendants' recent efforts – that is, to provide timely and clinically necessary inpatient treatment to patients requiring that level of care.

We request that Defendants review and provide a report on the issues discussed above.  Plaintiffs are available for a phone conference on these important matters.  We hope to work with Defendants and the Special Master to build on recent achievements in addressing barriers to appropriate inpatient care.

Thank you for your attention and efforts. We look forward to receiving your response.

Best,
Aaron J. Fischer, Esq.
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
Tel: (415) 433-6830
Fax: (415) 433-7104
afischer@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

# Exhibit 106

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Program Guide Overview | Mental Health Services Delivery System |
|---|---|

| From: | To: | |
|---|---|---|
| **Setting/Level of care** | **Setting/Level of Care** | **Timeline for Transfer** |
| RC/CCCMS | Mainline/ CCCMS | Within 90 days of referral; 60 days of referral if clinically indicated |
| RC/EOP | Mainline/EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Any setting/level of care | MHCB | Within 24 hours of referral |
| Any institution/ level of care | Any Acute DMH placement | Within ten days of referral, if accepted to DMH.   (Referral must be completed within two working days of identification. Transport must be completed within 72 hours of bed assignment) |
| Any institution/level of care | Any Intermediate Care DMH placement | Within 30 days of referral, if accepted to DMH.   (Referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required.   Transport must be completed within 72 hours of bed assignment). |
| Mainline (General Population)/ CCCMS | Mainline (General Population) /EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/CCCMS | CCCMS | Within 30 days if inappropriately transferred; otherwise 90 days of referral or 60 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/EOP | EOP | Within 21 days if inappropriately transferred; otherwise 60 days of referral or 30 days of referral if clinically indicated |
| EOP ASU | EOP ASU Hub | Within 30 days of ASU placement or referral to EOP level of care. |
| EOP ASU/ EOP ASU Hub | PSU | Within 60 days of endorsement to PSU |
| Outpatient Housing Unit | EOP | Within 30 days of endorsement to EOP |

# Exhibit 107



John Brim
March 1, 2013
Exhibit No. 8
Megan F. Alvarez
RPR, CSR No. 12470



## Department of State Hospitals
### Number of Seclusion Episodes by Month and Facility
### (per 1,000 Patient Days)
### 2012



|  | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASH | 2.74 | 2.46 | 2.85 | 2.90 | 2.43 | 1.99 | 2.65 | 3.95 | 2.52 | | | |
| CSH | 0.66 | 0.56 | 0.62 | 0.47 | 0.98 | 1.18 | 0.26 | 0.39 | 0.47 | | | |
| MSH | 0.15 | 0.28 | 0.15 | 0.80 | 0.15 | 0.00 | 0.15 | 0.35 | 0.26 | | | |
| NSH | 1.25 | 1.77 | 1.46 | 1.30 | 2.46 | 3.62 | 2.00 | 2.63 | 2.27 | | | |
| PSH | 0.02 | 0.18 | 0.09 | 0.04 | 0.09 | 0.20 | 0.11 | 0.06 | 0.00 | | | |
| SVPP | 2.65 | 2.13 | 3.35 | 3.51 | 2.52 | 5.80 | 5.20 | 5.17 | 3.16 | | | |
| VPP | 0.00 | 0.12 | 0.00 | 0.30 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | | | |



### Department of State Hospitals
### Total Hours in Seclusion by Month and Facility
### 2012



|  | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASH | 2173:11:00 | 1214:12:00 | 1885:59:00 | 1456:26:00 | 1232:37:00 | 834:13:00 | 1373:44:00 | 2654:20:00 | 1781:57:00 | | | |
| CSH | 21:29:00 | 23:03:00 | 27:30:00 | 20:09:00 | 34:29:00 | 137:36:00 | 37:23:00 | 16:14:00 | 19:23:00 | | | |
| MSH | 7:30:00 | 9:30:00 | 4:30:00 | 30:18:00 | 1:18:00 | 0:00:00 | 4:05:00 | 14:22:00 | 26:35:00 | | | |
| NSH | 389:18:00 | 561:08:00 | 410:26:00 | 292:49:00 | 578:05:00 | 835:51:00 | 753:57:00 | 569:59:00 | 726:19:00 | | | |
| PSH | 3:29:00 | 20:24:00 | 226:53:00 | 83:39:00 | 133:56:00 | 244:59:00 | 99:13:00 | 8:50:00 | 0:00:00 | | | |
| SVPP | 945:28:00 | 744:54:00 | 1896:02:00 | 1720:28:00 | 973:48:00 | 1696:14:00 | 2998:34:00 | 4144:42:00 | 2185:30:00 | | | |
| VPP | 0:00:00 | 1:50:00 | 0:00:00 | 5:00:00 | 0:00:00 | 0:00:00 | 2:00:00 | 0:00:00 | 0:00:00 | | | |



**Department of State Hospitals**
**Average Length of Time (Hours) in Seclusion by Month and Facility**
**2012**



| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASH | 24:41:43 | 16:24:29 | 20:43:30 | 16:10:57 | 15:36:10 | 13:27:18 | 15:58:25 | 20:44:13 | 22:33:23 | | | |
| CSH | 1:04:27 | 1:26:26 | 1:26:51 | 1:26:21 | 1:08:58 | 3:55:53 | 4:40:22 | 1:21:10 | 1:23:04 | | | |
| MSH | 2:30:00 | 1:54:00 | 1:30:00 | 2:01:12 | 0:26:00 | 0:00:00 | 1:21:40 | 2:03:09 | 5:19:00 | | | |
| NSH | 8:39:04 | 9:21:08 | 7:44:38 | 6:21:56 | 6:25:23 | 6:31:48 | 10:11:19 | 5:52:34 | 8:58:01 | | | |
| PSH | 3:29:00 | 2:33:00 | 56:43:15 | 41:49:30 | 33:29:00 | 27:13:13 | 19:50:36 | 2:56:40 | 0:00:00 | | | |
| SVPP | 32:36:08 | 33:51:33 | 51:14:39 | 46:29:57 | 37:27:14 | 28:44:59 | 53:32:45 | 74:00:45 | 68:17:49 | | | |
| VPP | 0:00:00 | 1:50:00 | 0:00:00 | 1:40:00 | 0:00:00 | 0:00:00 | 1:00:00 | 0:00:00 | 0:00:00 | | | |



### Department of State Hospitals
### Number of State Hospital Staff Injuries by Month and Facility
### 2012



| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASH | 4 | 1 | 8 | 8 | 6 | 1 | 2 | 2 | 2 | | | |
| CSH | 2 | 5 | 1 | 3 | 7 | 4 | 0 | 3 | 1 | | | |
| MSH | 2 | 3 | 5 | 2 | 0 | 0 | 4 | 1 | 1 | | | |
| NSH | 4 | 1 | 7 | 4 | 9 | 4 | 4 | 6 | 0 | | | |
| PSH | 4 | 11 | 5 | 7 | 6 | 10 | 7 | 5 | 8 | | | |
| SVPP | 2 | 0 | 1 | 1 | 6 | 3 | 4 | 17 | 12 | | | |
| VPP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |



**Department of State Hospitals
Number of Patient Injuries by Month and Facility
2012**



| | January | February | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASH | 1 | 2 | 0 | 0 | 0 | 2 | 0 | 1 | 1 | | | |
| CSH | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 3 | 0 | | | |
| MSH | 6 | 5 | 6 | 6 | 6 | 5 | 6 | 6 | 7 | | | |
| NSH | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |
| PSH | 0 | 3 | 0 | 2 | 2 | 2 | 1 | 1 | 0 | | | |
| SVPP | 8 | 8 | 11 | 7 | 5 | 7 | 18 | 9 | 10 | | | |
| VPP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | |

# Exhibit 108

Department of State Hospitals
Actual Cost Savings Achieved
Fiscal Year 2011-12
($ in millions)

| Savings Proposal | Description | ASH Dollars Achieved | ASH Positions Achieved | CSH Dollars Achieved | CSH Positions Achieved | MSH Dollars Achieved | MSH Positions Achieved | NSH Dollars Achieved | NSH Positions Achieved | PSH Dollars Achieved | PSH Positions Achieved | SVPP Dollars Achieved | SVPP Positions Achieved | VPP Dollars Achieved | VPP Positions Achieved | GRAND TOTAL Dollars Achieved | GRAND TOTAL Positions Achieved |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Staffing Ratios** | | | | | | | | | | | | | | | | | |
| Revise ICF Treatment Team Ratio from 1.25 to 1:35 | Implement ratio adjustments while maintaining necessary staffing to achieve patient acuity | $3.52 | 17.70 | $2.55 | 0.00 | $0.23 | 2.00 | $1.43 | 14.70 | $0.92 | 8.00 | $9.79 | 170.50 | $2.76 | 47.00 | $21.20 | 259.90 |
| Adjust Nursing Staff Percentage | Ratio shift to 70% Psych Tech/30% Registered Nurse for hospitals not already operating at the proposed level. Maintain adequate staffing as required by licensing. | $0.04 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.10 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.14 | 0.00 |
| **Staff Redirection** | | | | | | | | | | | | | | | | | |
| Redirect staff to units | Redirect staff from lower priority activities back to unit, reducing overtime/temp help costs. | $6.88 | 2.00 | $0.06 | 0.00 | $1.53 | 0.00 | $0.15 | 0.00 | $0.78 | 10.00 | $0.00 | 0.00 | $0.00 | 0.00 | $9.19 | 12.00 |
| Redirect security staff to additional grounds patrol | Redirect security staff from kiosks (NSH); close two CSH sports bands, reduce CSH package center operations. | $0.00 | 0.00 | $0.14 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.14 | 0.00 |
| **Clinical/Restructure programs/disciplines/services** | | | | | | | | | | | | | | | | | |
| Assessment Teams | Assessment teams not required by DSH Rights for Institutionalized Persons Act (CRIPA) Consent Judgment; discontinue units/functions may be used to perform assessments when appropriate | $0.00 | 0.00 | $0.00 | 0.00 | $0.05 | 7.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.05 | 7.00 |
| Positive Behavioral Support Teams | Establish one team per hospital for training new staff and providing consultation. | $0.43 | 12.00 | $0.32 | 0.00 | $0.36 | 1.00 | $0.52 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.63 | 13.00 |
| Modify IN Choice program | Modify IN Choice program to best serve each hospital patients based on the demonstrated effectiveness of IN Choice as a treatment participation incentive. | $0.07 | 0.00 | $0.17 | 0.00 | $0.06 | 0.00 | $0.36 | 0.00 | $0.23 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.36 | 0.00 |
| Modify Mall Services | Hold Mall groups on the unit to decrease staffing needs off unit and address unit coverage for patients not attending mall groups. | $0.05 | 2.10 | $0.00 | 0.00 | $0.29 | 2.00 | $0.06 | 2.00 | $0.91 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.31 | 6.10 |
| Restructure various disciplines/departments | Reduce staffing for psychology, rehabilitation therapy, housekeeping, records management, medical services, Central Program Services, supervisory/lead discipline structure. | $0.00 | 0.00 | $0.06 | 1.00 | $1.81 | 10.00 | $0.00 | 0.00 | $1.63 | 10.00 | $0.00 | 0.00 | $0.00 | 0.00 | $3.48 | 21.00 |
| Discontinue Adult Education Program | Discontinue adult education programs; retain Special Education as required by law. | $0.00 | 0.00 | $0.20 | 5.40 | $0.00 | 0.00 | $0.03 | 0.00 | $0.24 | 6.40 | $0.00 | 0.00 | $0.00 | 0.00 | $0.48 | 11.80 |
| Contract for Pre-Employment Physicals | Services to be provided via contract with local clinics or personal physician. | $0.14 | 0.90 | $0.04 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.18 | 0.90 |
| Laboratory Services | Provide laboratory services during non-business hours only (CSH) | $0.00 | 0.00 | $0.02 | 0.00 | $0.03 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.02 | 0.00 |
| **Streamline Documentation** | | | | | | | | | | | | | | | | | |
| Standards Compliance, Admission and Assessment Documentation | Streamline documentation requirements while maintaining licensing standards; revise frequency of patient treatment team conferences. | $1.02 | 0.00 | $1.25 | 0.00 | $1.32 | 2.00 | $1.28 | 0.00 | $1.84 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $6.71 | 2.00 |
| **Additional Savings Proposals** | | | | | | | | | | | | | | | | | |
| Nursing Staff Training | Provide up to two days annual training via alternative methods, (i.e., web-based training. Eliminate dedicated staff for Psychiatric Technician (30/0) training program at NSH. Class not impact statewide program. | $0.05 | 0.00 | $0.08 | 0.00 | $0.07 | 0.00 | $0.00 | 0.00 | $0.85 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.16 | 0.00 |
| Physician On-Call, Psychiatric Medical Officer of the Day (PMOD), Medical Officer of the Day (MOD) | Modify on call, MOD, PMOD schedule for after hours | $0.00 | 0.00 | $0.05 | 0.00 | $0.58 | 0.00 | $0.57 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.94 | 0.00 |
| Utilize alternate classifications | Transfer necessary functions to lower cost classifications. Patients will continue to receive current level of care and treatment. | $0.00 | 0.00 | $0.17 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.17 | 0.75 |
| Streamline Internal Investigations | Streamline current investigation process for abuse/neglect complaints while remaining compliant with timelines required by licensing. | $0.10 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.10 | 2.00 |
| Abolish Miscellaneous Vacancies | Abolish hospital vacancies. | $0.00 | 0.00 | $0.00 | 0.00 | $0.04 | 1.00 | $0.24 | 4.50 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.76 | 5.50 |
| HQ Redirected positions | Return redirected HQ administrative positions to the hospitals. | $0.26 | 0.00 | $0.60 | 0.00 | $0.00 | 0.00 | $0.55 | 0.00 | $0.22 | 0.00 | $0.08 | 0.00 | $0.00 | 0.00 | $1.76 | 5.80 |
| **Operating Expense Reductions** | | | | | | | | | | | | | | | | | |
| Misc. OE Reductions | Utilize existing hospital services more efficiently; revise external contracts. | $0.00 | 0.00 | $0.00 | 0.00 | $1.70 | 0.00 | $4.07 | 0.00 | $0.29 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $5.74 | 0.00 |
| **Pharmacy/Medical** | | | | | | | | | | | | | | | | | |
| Pharmaceuticals | Prescribe generic drugs when appropriate. | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $0.00 | 0.00 | $1.18 | 0.00 |
| **System-wide Savings** | | | | | | | | | | | | | | | | | |
| Other one-time savings | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $6.72 | 0.00 |
| | **Grand Total (All Savings Proposals)** | $12.46 | 34.70 | $5.78 | 6.40 | $7.64 | 15.00 | $9.44 | 21.20 | $8.47 | 34.40 | $9.87 | 170.50 | $2.76 | 47.00 | $122.90 | 121.20 |

John Brim
March 1, 2013

**Exhibit No. 18**

Megan F. Alvarez
RPR, CSR No. 12470

# Exhibit 109

THE SACRAMENTO BEE   sacbee.com

# Gov. Jerry Brown says federal prison oversight a waste of money

**sstanton@sacbee.com**

**Published Tuesday, Mar. 12, 2013**

On the eve of a showdown in federal court over the future of California's prisons, Gov. Jerry Brown is speaking out at length about his view that the state is being forced to waste millions of tax dollars on federal oversight that is no longer necessary.

"During the life of these lawsuits, the prison health care budget has gone from $700 million to $2 billion," Brown said in an interview with The Bee, his first on the issue since the state filed court documents in January seeking to regain control of its prisons.

"That money is coming out of the university, it's coming out of child care. It's a situation you wouldn't dream anyone would want."

The governor's comments came as lawyers prepare for a battle in Sacramento federal court later this month over whether the state is providing a constitutional level of mental health and medical care for inmates. Oral arguments are scheduled for March 27 on California's motion to terminate oversight of mental health care by U.S. District Judge Lawrence K. Karlton.

Another motion by the state, also filed in January, seeks to vacate or modify an order by a specially convened three-judge court to reduce inmate population. Oral arguments on that motion have not yet been scheduled.

In the interview, the governor revealed that he has been visiting with prison officials to discuss the issue and recently met with all of the state's wardens during a session in Galt.

"These are good people doing their level best," Brown said. "All the second-guessing and Monday-morning quarterbacking are just making the job more difficult. You've heard it. No matter what they do, it's wrong.

"That line is getting old, and it's not right. It's not Sunday school out there, but they're doing a hell of a job, and it's constitutional."

Brown and his administration have argued that California has solved its long-standing problems inside state prisons, where inmates once were warehoused in crowded gymnasiums and other areas.

Overcrowding, which the three-judge court found was the primary reason for unconstitutional health care in the prisons, once was so bad that the state's 33 adult institutions had double the number of inmates they were built to hold. The three-judge court decreed that overcrowding was preventing access to proper care and was responsible for an alarming number of inmate deaths.

Prisoner advocates say the situation remains dire, with the prisons still crowded and the

provision of mental health care - particularly efforts to reduce inmate suicides - woefully inadequate.

Case 2:90-cv-00520-LKK-JFM    Document 4404    Filed 03/15/13    Page 174 of 266

"I wish the governor was right," said Michael Bien, lead attorney for the inmates, who has spent years fighting for improvements in California's prisons. "That would mean a success for me.

"It would mean we haven't worked all these years for nothing. Unfortunately for everybody, California's prisons are far from free of constitutional violations."

The state is under orders from the three-judge court to reduce its inmate population to 137.5 percent of capacity by the end of the year, a feat that would require trimming prison population by about 9,000 inmates to a total of about 110,000. The 33 prisons were designed to hold about 80,000 inmates.

The governor contends the state is no longer guilty of "deliberate indifference" to the plight of inmates and that he believes the highest court in the nation will agree.

"Deliberate indifference is the constitutional standard, and that's not present in today's prisons in California," Brown said. "We are committed to keeping it that way, and it's not plausible to say otherwise.

"I have no doubt that if we can get this back before the (U.S.) Supreme Court, it will agree."

The high court affirmed the three-judge court's reduction order when it considered the issue in 2011.

Brown conceded that there were problems in years past, but said the state has made tremendous progress, particularly with his realignment program that assigns responsibility for low-level, nonviolent offenders to the counties. Since the court-ordered reduction in 2009, the state inmate population has dropped from about 150,000 to 119,000 today.

"I'm not arguing that the system was not seriously dysfunctional in years past," he said. "But that time is behind us. We've invested a massive amount of resources. Realignment is bringing the inmate population down.

"But if there's much additional reduction we're looking at far more serious offenders on the streets. Obviously, it isn't worth risking the welfare of our citizens."

He argued in the interview that federal oversight - which includes a Karlton-appointed special master and numerous lawyers and experts who work for him - has turned into a permanent industry with no end in sight. Court papers show the state has paid attorneys representing the inmates, the special master and his staff, and a court-appointed receiver who runs prison medical care and his staff hundreds of millions of dollars over the past 23 years.

"These people are collecting their hourly rates, flying out here to do whatever it is they do, eating peanuts and watching TV on the plane," the governor said. "When they get here, their usual hourly rate kicks in again. These guys are just rolling."

The governor said he has taken a personal interest in the issue, visiting prisons to get to the heart of the matter.

"I just talked to personnel at one prison that has 32 psychologists, 10 psychiatrists and 24 psychiatric technicians for 3,600 patients," he said. "That kind of firepower is not available to anybody who is not in prison.

"People who say prison officials are willfully looking on as inmates commit suicide are so far removed from reality they are not credible. They are wrongly accusing civil servants who are honest, hardworking employees trying to do a job."

Case 2:90-cv-00520-LKK-JFM Document 4404 Filed 03/15/13 Page 175 of 266

© Copyright The Sacramento Bee. All rights reserved.

Order Reprint

Share    Facebook    Twitter    **Share**    StumbleUpon    Email

# Exhibit 110

8/8/12
8/10/12

COLEMAN AUDIT BEST PRACTICE RECOMMENDATIONS FOR USE OF FORCE

1) Revisit referral/investigation requirements per Use of Force Regs 51020

> Discussion: Currently, pursuant to 51020.17.7, the only mandatory referral
> of an UOF incident must involve deadly force, death, great bodily injury
> (GBI), or serious bodily injury (SBI), see 51010.4 for definitions of GBI/SBI.
>
> Currently, pursuant to 51020.20, the only mandatory investigations
> conducted are for deadly force, death, GBI or SBI.
>
> Referral criteria should not be limited to death, deadly force, GGBI/SBI.
> Criteria should be expanded to include: unexplained injuries, impact strikes
> to lethal target areas (head, eyes, throat, spine or groin) regardless of
> seriousness of injury, incomplete/conflicting reports, and application of non-
> lethal weaponry that exceeds what would normally be expected for the type
> of force reported, e.g., unarmed inmate in cell subjected to great amounts of
> chemical agents via multiple delivery systems such as MK-9, MK-46 and –
> Grenades (see Corcoran, COR-04B-11-12-0793). Once one of these incidents
> is referred there should be an operating presumption that it will be
> investigated.

2) Currently, there is virtually no guidance in 51020 regarding the use of the expandable
baton.

> Discussion: The expandable baton is a tactical impact weapon deployed for
> self-defense typically when an officer is subject to active or targeted
> aggression by an inmate. If misused it is often converted into offensive
> weapon used for pain-compliance or an instrumentality of corporal
> punishment. I did not review any incidents in which I detected any such
> misuse; however, there were numerous instances in which it was used to
> intervene in inmate/inmate assaults (see RJD 101-11010-53). I take no firm
> position on such use other than to suggest adoption of some standard or
> training that will limit its use in such situations where other less potentially
> injurious means have been exhausted or are impractical or there is an
> immediate threat of SBI/GBI.

3) Currently, MK-9 OC cannisters are standard issue to line-level CO's. The MK-9 it is
classified as a "crowd management" delivery system (Defense Technology® Product Spec
Manual).

2

DEXP 105138

6

Discussion: 51020.15 Chemical Agents provides that: "Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the control objective." While I don't question the tactical deployment of a MK-9 cannister in an open area (yard, dayroom, gym, etc.) to intervene in a inmate/inmate assault, I do question the use of crowd control delivery systems into a cell of an unarmed or unbarricaded inmate. The current regs offer no guidance regarding when OC delivery systems may be used (51020.15.1 does suggest that when the MK-46 is used in cells that it be used with the wand applicator attachment in order to avoid soft tissue damage to the inmate). Finally, I suggest some consideration be given to adopting a procedure whereby OC cannisters are weighed before and after use.

4) I strongly endorse the recommendation made in the OIG Report on Use of Force, May 2012, wherein it was recommended that the Institutional Appeals Coordinator should notify the Use of Force Coordinator of all inmate appeals containing use of force allegations (see Report Recommendation #5, at page 21).

Discussion: "The OIG examined 268 allegations of unreasonable force reported through the adult institutions' inmate appeal process or through written or oral complaints from staff, members of the public, or inmates. Nearly half (121) of the allegations of unreasonable force in our examination escaped executive committee review..." (see OIG Report, at page 16).

3

DEXP 105139

COLEMAN AUDIT RVR PROCESS OBSERVATIONS

Audit Methodology:
–Reviewed approximately 440 RVR packets from 10 facilities
–Interviewed RVR hearing officers, RVR Coordinators, and clinicians at 8 of 10 facilities
–Reviewed all relevant LOPs and CDCR regs related to Mental Health Assessment Process
   for Rule Violations (RVR MH Process)
–Reviewed CDCR memoranda and local memoranda related to RVR MH Process
–Reviewed facility training materials and training records related to RVR MH Process
–Reviewed facility RVR reporting data
–Reviewed 22nd, 23rd, & 24th Monitor Reports related to RVR MH Process
–Reviewed CDCR Program Guide for MH Services Delivery System (2009 Revision),
   Attachment B-Inmate Disciplinary Process

Observations:
–The CDCR RVR MH Process establishes structured mechanisms to reasonably
accommodate inmates who while receiving mental health services, or may need such
services, are charged with disciplinary rule violations.
–The CDCR has established and implemented a correctional sound training program for
both hearing officers and clinicians who administer the RVR MH Process.
–Both hearing officers and clinicians routinely and consistently provide reasonable
accommodation to inmates whose mental health status requires consideration in
determining a fair disposition of the RVR.
–Of the approximately 440 RVR packets reviewed, only on rare occasions (less than 10),
did I find instances in which the Mental Health Assessment Request had not been
completed when required.
–Of the approximately 440 RVR packets reviewed, when clinicians determined that the
inmate's mental disorder appeared to contribute to the behavior that led to the RVR, and
that the hearing officer should consider mental health factors in assessing the peanlty,
reasonable accommodation was made to the charged inmate.

4

COLEMAN BEST PRACTICE RECOMMENDATIONS RVR PROCESS

1) Establish protocols for hearing officers and clinicians to meet periodically to discuss and resolve issues related to the RVR MH Assessment.

    Discussion: It is evident from interviews with the hearing officers and clinicians that they don't communicate in any ongoing fashion to address MH Assessment issues. Both hearing officers and clinicians related that they sometimes lack information about the respective assessment practices of the other group, e.g., some clinicians related they are not well acquainted with all the penalty options available to hearing officers. It is noted that the two groups at RJD routinely meet/confer and it was reflected in the quality of their RVR MH assessments.

2) The model for the RVR process at RJD should be closely examined for possible replication at all facilities.

    Discussion: RJD officials have developed a very comprehensive set of local operating procedures for the MH Assessment Process (see RJD Operational Plan #66, December 2011). Moreover, based on an interview with the RVR Coordinator (the Senior Psy Supervisor), he chose to create an Assessment Unit in order to have dedicated specialists in making such assessments. The benefits of such specialists were evident in both the consistency and quality of the RJD assessment process. The RVR Coordinator intends to conduct continuing in-service training for both hearing officers and clinicians at the facility.

3) The hearing officers should affirmatively state whether they modified or mitigated the penalties based on the MH Assessment (see also Recommendation #4, below).

    Discussion: In my review of the hearing packets it was not always clear whether the hearing officer modified or mitigated the penalties.

4) Consider revising the RVR: Mental Health Assessment Request (CDCR 115-MH (Rev. 06/06).

    Discussion: Question 2 on the form requires the clinician to express an opinion on whether the inmate's mental disorder appeared to contribute to the behavior that led to the RVR. Question 3 asks the clinician if there are any mental health factors the hearing officer should consider in assessing the penalty. My interview with both hearing officers and clinicians produced inconsistent answers on what the hearing officer should do when Question 2 is answered in the affirmative, and in turn, whether those mental health

5

DEXP 105141

factors had to be considered for purposes of Question 3.

I offer two possible recommendations to simply suggest ways to bring more clarity to the form. The second option would likely be the easiest to implement.

1). Revise Question #3 as follows: "If the answer to Question #2 is yes, explain the MH factors that the hearing officer should consider in assessing the penalties." This revisions would be accompanied by a requirement for the hearing officer in the Disposition Section of the Rules Violation Report-Part C, to document what, if any, modifications were made to the penalties assessed in response to the MH factors as identified in Question #2.

2) Currently, Question #3 requires the clinician to "Explain" only if he/she answers "yes." The "yes" should be deleted and an explanation should be provided regardless of whether the clinician answers "yes" or "no." This would be a means to address those situations in which the answer to Question #2 is in the affirmative.

6

DEXP 105142

*COLEMAN* AUDIT USE OF FORCE OBSERVATIONS

<u>Audit Methodology</u>:
- Reviewed approximately 220 use of force incident packets from 10 facilities
- Interviewed Use of Force Coordinators at 8 of 10 facilities
- Attended IREC meetings at 4 facilities
- Reviewed all relevant LOPs and CDCR regs related to use of force
- Reviewed OIG Use of Force Reports (2) which covered incidents from Sept 2010-Dec 2011
- Reviewed UOF data system-wide from 22nd, 23rd & 24th Monitoring Rounds
- Reviewed CDCR Program Guide for MH Services Delivery System (2009 Revision) and CDCR compliance reports re same

<u>Observations</u>:
- No pattern/practice of unnecessary/excessive force as relates to *Coleman* class inmates
- Identified 5 use of force incidents at 3 facilities (RJD/Corcoran/CSP-LA) in which there appeared to evidence of unnecessary/excessive force.
- None of the 5 incidents were referred for investigation
- 3 of the 5 involved baton strikes, 2 of which resulted in injuries to inmates
- 2 of the 5 involved possibly unnecessary/excessive OC spray
- All 8 Use of Force Coordinators are competent and perform their assigned tasks in timely fashion and are absolutely essential to the IERC review process
- The IERCs regularly meet and engage in substantive review of UOF incidents
- While the UOF administrative review process is multi-tiered and comprehensive, it results in very few referrals for investigation (see also, OIG Use of Force within CDCR, July-December 2011, at page 5)

distinguish unneces  vis-a-vis  excessiu

referm

1

DEXP 105143

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                     ---oOo---

4    RALPH COLEMAN, et al.,        )
                                   )
5                                  )
              Plaintiffs,          )
6                                  )
                   vs.             )   No. Civ S 90-0520 LKK-JFM
7                                  )
     EDMUND G. BROWN, JR., et al., )   Volume I
8                                  )
                                   )   Page 1 - 300
9              Defendants.         )
     _____)

10

11

12                 DEPOSITION OF

13                STEVE J. MARTIN

14            THURSDAY, FEBRUARY 28, 2013

15

16

17     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19   REPORTED BY:

20   HOLLY THUMAN, CSR No. 6834, RMR, CRR

21   -----------------------------------------------------------

22                JAN BROWN & ASSOCIATES

23        WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25            (415) 981-3498 or (800) 522-7096

                                                          1

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1                         I N D E X

2   EXAMINATION BY:                                     PAGE

3   MR. BORNSTEIN                                          5
    MS. CESARE-EASTMAN                                   295
4   Reporter's Certificate                              300

5           EXHIBITS MARKED FOR IDENTIFICATION

6   NO.                    DESCRIPTION                  PAGE

7   Exhibit 1    Draft document headed "Use of Force     27
                 Audit Tool [Steve]" (DEXP 102825
8                through -826)

9   Exhibit 2    Handwritten notes (DEXP 105127 through   59
                 -658)
10

    Exhibit 3    Percentage of Use of Force and Non-Use   63
11               of Force Incidents Involving Mental
                 Health Patients, 2011 June - November
12               (DEXP 105486)

13  Exhibit 4    Email chain, Martin to McKinney,         74
                 November 9, 2012 (DEXP 010156)
14

    Exhibit 5    State of California Department of         76
15               Corrections and Rehabilitation
                 Memorandum, September 12, 2012, to
16               Associate Directors - Division of
                 Adult Institutions, Wardens (DEXP
17               009657 through -658)

18  Exhibit 6    Coleman Audit Best Practice             122
                 Recommendations for Use of Force (DEXP
19               105138 through -143)

20  Exhibit 7    Handwritten notes (DEXP 105146)         207

21  Exhibit 8    Coleman Review, Round XXV, California    211
                 Correctional Health Care Services
22               (DRPD 1 00450 through -479)

23  Exhibit 9    Handwritten notes headed "Telcon        235
                 4/13/12" (DEXP 105149 through -150)
24

25  (Cont'd)

                                                          2

# Exhibit 111

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Wednesday, January 23, 2013

**Name**    Charles DaSilva,
Executive Director, Salinas Valley Psychiatric Program
**Address**  31625 Highway 101,
Soledad, CA 93960

Executive Director DaSilva,

As staff psychiatrists, we are writing you collectively to express our serious concern about the level of staffing at SVPP. At the end of January, we will have lost our 3rd psychiatrist in the past (6) weeks.

This will leave us only (7) full-time psychiatrists, including a senior, plus 1 part-time psychiatrist, covering (6) Units that average about 60 beds each. Other disciplines such as social work, psychology, and rehab therapy have 15 to 16 staff covering the same number of patients. The SVPP census issued today shows that there are 351 patients in the program. Across the (6) Units we have also been averaging about (2) to (3) admissions and discharges per Unit per week.

The DSH standard for Stockton and elsewhere is a (15) patient caseload for a team that does admissions, with about (2) admissions per week. When administration visited our facility recently to present the Stockton program, we were told that a 15 patient caseload would also be the standard at SVPP as well as Stockton. At present we have been averaging a caseload of about (40) with (2) admissions per week, and all psychiatrists are taking admissions. Some psychiatrists are already covering (60) patients daily, (4) times the accepted standard. We find a caseload of (40) to be unsafe, and a caseload of (60) is even more perilous.

As psychiatrists, we are united in our belief that the level of staffing currently present is not safe or appropriate for an ICF level of patient care. We believe that it potentially creates an unsafe situation for both staff and patients. When patient safety is at stake, we cannot in good conscience continue to take on a higher and higher caseload without making you aware of our concerns. In November, 2012 SVPP had its first completed suicide. Current staffing levels will create an unacceptable level of risk as far as patient safety.

We will continue to do our best for every patient, under every

<div style="border:1px solid black; text-align:center">
John Brim
March 1, 2013
**Exhibit No. 1**
Megan F. Alvarez
RPR, CSR No. 12470
</div>

circumstance. *But we need to inform you that we will be working in a state of protest regarding our caseload and the rate of admissions.* We are also extremely concerned about further attrition of psychiatrists, which seems very likely considering the present workload and conditions.

We understand that since SVPP is being downsized that it may be difficult to attract new psychiatrists. However, in the past, staff from other facilities have been brought in on a temporary basis. This would be a tremendous help. We also believe the situation could be made significantly better through a reduction in admissions as we scale back and prepare to close C and D yards.

Thank you for listening to our concerns.

Sincerely,

Joel Badeaux, MD

John Brim, MD

Gayle Gaines, MD

Minhas Kapadia, MD

Muhammad Saleem, MD

Mary Stoller, MD

Ariel Troncoso, MD

Lei Wei, DO

Indu Aramandla, MD

Position   Staff and Senior Psychiatrists
Division   DSH SVPP

cc:   Katherine Warburton, DO, Chief Psychiatrist, DSH
      Nereyda Rivera, UAPD

**Exhibit 112**

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Tuesday, February 12, 2013

**Name**      Charles DaSilva,
              Executive Director, Salinas Valley Psychiatric Program
**Address**   31625 Highway 101,
              Soledad, CA 93960

Dear Executive Director DaSilva,

This letter will confirm our verbal communication to you during the psychiatry
meeting today. We alerted you to the severe psychiatry staffing shortage in our
letter of three weeks ago. Now, as you know, our psychiatry staffing shortage has
devolved from serious to crisis level. With three more psychiatrists leaving in the
near future we must take urgent action. After extensive discussion and
consideration, the psychiatry staff at SVPP have unanimously determined that we
cannot safely manage more than 40 patients per psychiatrist. We will not abandon
additional patients beyond this limit, but can provide only emergency psychiatry
services for such additional patients.

Thank you.

Sincerely,

Joel Badeaux, MD                          Ariel Troncoso, MD

John Brim, MD                             Lei Wei, DO

Minhas Kapadia, MD                        Indu Aramandla, MD

Muhammad Saleem, MD                       Mary Stoller, MD

cc:   Katherine Warburton, DO, Chief Psychiatrist, DSH
      Nereyda Rivera, UAPD

> **John Brim**
> March 1, 2013
> **Exhibit No. 2**
> Megan F. Alvarez
> RPR, CSR No. 12470

# Exhibit 113

National Center on Instutions and Alternatives
Rate Sheet
Fiscal Year 2010/11 through 2013/14

| National Center on Institutions and Alternatives | | | | | | | | | Agreement Number: 5600001125 |
|---|---|---|---|---|---|---|---|---|---|
| California Department of Corrections and Rehabilitation Budget Rate Sheet | | | | | | | | | Exhibit B.1 |
| | FY10/11 | Due Dates | FY11/12 | Due Dates | FY12/13 | Due Dates | FY13/14 | Due Dates | TOTAL |
| Initial (Year Zero): Preliminary document review. Deliverable 1a (16 hours @ $300.00/hr) | $ 4,800.00 | 9/15/2010 or within 18 days of award | | | | | | | $ 4,800.00 |
| Initial (Year Zero): Headquarters site visit. Deliverable 1b & 1d (16 hours @ $300.00/hr) | $ 4,800.00 | 10/30/2010 | | | | | | | $ 4,800.00 |
| Initial (Year Zero): Institution site visits (four CDCR and DMH facilities). Deliverable 1c (24 hours @ $300.00/hr) | $ 7,200.00 | 1/1/2011 | | | | | | | $ 7,200.00 |
| Initial (Year Zero): Consultatnt will deliver a report with findings and recommendations 30 days after final site visit. Deliverable 1e (24 hours @ $300.00/hr) | $ 7,200.00 | 2/1/2011 | | | | | | | $ 7,200.00 |
| Year One Follow-Up: Document Review. Deliverable 2a (8 hours @ $300.00/hr) | | | $ 2,400.00 | 7/15/2011 | | | | | $ 2,400.00 |
| Year One Follow-Up: Headquarters Site Visit. Deliverable 2b (8 hours @ $300.00/hr) | | | $ 2,400.00 | 8/30/2011 | | | | | $ 2,400.00 |
| Year One Follow-Up: Institutional site visits. Deliverable 2c (24 hours @ $300.00/hr) | | | $ 7,200.00 | 11/30/2011 | | | | | $ 7,200.00 |
| Year One Follow-Up: Consultant will deliver a follow-up report with findings and recommendations 30 days after final site visit. Deliverable 2d (24 hours @ $300.00/hr) | | | $ 7,200.00 | 3/1/2012 | | | | | $ 7,200.00 |
| Year Two Follow-Up: Document review. Deliverables 3a (8 hours @ $300.00/hr) | | | | | $ 2,400.00 | 7/15/2012 | | | $ 2,400.00 |
| Year Two Follow-Up: Distance consultation with Mental Health Program Headquarters. Deliverables 3b (8 hours @ $300.00/hr) | | | | | $ 2,400.00 | 8/30/2012 | | | $ 2,400.00 |
| Year Three Follow-Up: Document review. Deliverables 4a (8 hours @ $300.00/hr) | | | | | | | $ 2,400.00 | 7/10/2013 | $ 2,400.00 |
| Year Three Follow-Up: Distance consultation with Mental Health Program Headquarters. Deliverables 4b (8 hours @ $300.00/hr) | | | | | | | $ 2,400.00 | 07/20/2013-08/30/2013 | $ 2,400.00 |
| Total | $ 24,000.00 | | $ 19,200.00 | | $ 4,800.00 | | $ 4,800.00 | | $ 52,800.00 |
| | Grand Totals | | | | | | | | $ 52,800.00 |

Δ π EXHIBIT ___3___

Deponent. HAYES

Date 2/18/13  Rptr

WWW.DEPOBOOK.COM

updated 2/24/10

Case 2:90-cv-00520-LKK-JFM   Document 4404   Filed 03/15/13   Page 192 of 266
National Center on Institutions and Alternatives   Agreement Number: 5600004 25
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit A
Scope of Work

## Suicide Expert Consultant Services for CDCR's Suicide Prevention Program

### I.   INTRODUCTION

The National Center on Institutions and Alternatives (NCIA) shall provide a comprehensive and system-wide review of the California Department of Corrections and Rehabilitation (CDCR)'s Suicide Prevention Program. This consultation will directly respond to the *Coleman* court's stated concerns about the CDCR's suicide review process and other aspects of suicide prevention in the department. This consultation will directly contribute to resolution of the *Coleman* litigation.

### II.   BACKGROUND

Suicide crosses all professional and organizational boundaries of the CDCR.   A successful suicide prevention program in the CDCR environment targets all inmates, all staff, and all levels of custody.   In the last ten years the CDCR has experienced an increase in the rate of suicide.  For most years in the last decade the suicide rate in the CDCR has exceeded the national rate of suicide among state prisoners. Recently the CDCR has stumbled in the timeliness of its suicide reviews and the adequacy of the responses to these reviews by institutions and the CDCR as a whole.  The recognition of and response to suicide risk in the correctional environment is one of the most important and difficult tasks for mental health staff, yet it is apparent from the CDCR's own reviews of suicide and those of the *Coleman* court's suicide expert that assessments are often subpar and inadequate, leading to poor follow-up and trajectories that may contribute to an eventual suicide. In addition, the CDCR has struggled with how to assure that local policies, procedures, and practices reflect departmental standards and are consistent across institutions.  Finally, the ability of the CDCR to adequately track, monitor, and prevent suicide attempts has eroded until at the current time the CDCR has no active database of suicide attempts and no plan to systematically collect data on attempts as a way to better understand who may and who may not attempt, and ultimately complete a suicidal act.   These factors have contributed to the CDCR's inability to make progress toward an exit from the *Coleman* litigation.  The Contractor's experience (more than 25 years) with correctional suicide prevention programs will allow the CDCR to make immediate, short-term, and long-term changes in its suicide prevention program to begin to decrease the overall rate of suicide over the long-term.  This consultation will allow the CDCR to implement a more effective suicide prevention policy and demonstrate to the *Coleman* court its resolve to deal with a issue that impedes its ability to resolve the litigation.

### III.   CONTRACTOR RESPONSIBLITIES

As a special court monitor, a National Institute of Corrections grantee, and consultant to state correctional systems, the Contractor has developed a framework to allow state correctional systems to more effectively meet the problem of the suicide of inmates and resolve litigation.   The Contractor will apply eight critical components of a suicide

Case 2:90-cv-00520-LKK-JFM   Document 4404   Filed 03/15/13   Page 193 of 266
National Center on Institutions and Alternatives    Agreement Number: 5600001123
California Department of Corrections and Rehabilitation (CDCR)              Exhibit A
Scope of Work

prevention policy[1] (staff training, identification/screening, communication, housing, levels of supervision, intervention, reporting, and follow-up/mortality review) to his consultation with the CDCR.  The Contractor will be retained for a period of three years.  The consultation will include an initial consultation resulting in comprehensive recommendations, and three annual follow-up consultations.

## IV.    **TASKS**

Due to the complexity of evaluating suicide prevention programs in correctional settings, and because the full extent of changes secondary to recommendations may not be apparent for several years, the full consultation will extend over a three year period: an initial consultation and three annual follow-up consultations (year one follow-up on-site and the remainder via document review and teleconference).

The initial consultation (FY 2010-2011) will require Contractor to first review documents provided by the CDCR concerning current policies, its review process, court documents pertaining to suicide prevention, and examples of suicide evaluations, recommendations derived from the reviews, and the responses of institutions to the recommendations.

Following the review of documents, the Contractor will visit the CDCR headquarters for on-site consultation with senior clinical and custodial staff to discuss current suicide prevention policies, training protocols (with staff from the Office of Training & Professional Development), custodial/mental health liaison processes, facilities construction and planning, and current suicide review policies and practices.

The Contractor will then visit several institutions to review suicide policies and procedures in action.  He will visit high security institutions, institutions with significant mental health missions, and institutions that experienced increased numbers of suicides in recent years.  The purpose of these visits will be to meet with staff, review local practices and their contexts, and discuss possible recommendations.

Finally the initial visit will close with a second visit to the CDCR's headquarters to discuss preliminary recommendations and identified problem areas.

A report with recommendations will be delivered to the CDCR approximately one month after the end of the on-site visit.

The one-year follow-up will include a document review of changes made pursuant to the report's recommendations, annual suicide and suicide attempt data, and new and revised policies/procedures.  It will be followed by a three-day site visit: one day at CDCR headquarters and two days in institutions.  A follow-up report will be delivered approximately after the site visit.

---

[1] This protocol was developed in accordance with both Standard 4-4373 of the American Correctional Association's *Standards for Adult Correctional Institutions* (2003) and Standard P-G-05 of the National Commission on Correctional Health Care's *Standards for Health Services in Prisons* (2003).

National Center on Institutions and Alternatives
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit A
Scope of Work

Case 2:90-cv-00520-LKK-JFM Document 4404 Filed 03/15/13 Page 194 of 266 Agreement Number 8800094 25

The year-two follow-up will consist of document review and a distance consultation with senior clinical and custodial staff followed by a report approximately one month after the consultation.

The final (year three) consultation will again consist of a document review and distance consultation with the CDCR staff. A final report and recommendations for long-term changes will be delivered one month following the final consultation.

## V.   DELIVERABLES

### 1)  FY 2010-2011: Initial Consultation (7 days)

a)  Preliminary Document Review (2 days)

Due Date: 09/15/2010 or within 15 days of award of contract

b)  Headquarters Visit (1 Day)

Due Date: 10/30/2010 or within 45 days of initial review

c)  Site Visits (3 Days)

i)    California State Prison, Sacramento & Folsom State Prison
ii)   California Medical Facility (CDCR & DMH)
iii)  Mule Creek State Prison

Due Date: 01/01/2011 or within 90 days of HQ on-site consultation

d)  Headquarters Visit (1 Day)

Due Date: 01/15/2011 or within 15 days of Institution site visits.

e)  Report and recommendations (30 days after site visit)

Due Date: 02/01/2011 or within 30 days of Institution site visits.

### 2)  FY 2011-2012: Year One follow-up consultation (5 days)

a)  Document Review (1 Days)

Due Date: 07/15/2011 or within 15 days of new fiscal year

b)  Headquarter Visits (1 Day)

Due Date: 08/30/2011 or within 45 days of document review

National Center on Institutions and Alternatives   Agreement Number: 5600001215
California Department of Corrections and Rehabilitation (CDCR)                    Exhibit A
Scope of Work

    **c)** Site Visits (3 days)

        Due Date:  11/30/2011 or within 90 days of HQ consultation visit

    **d)** Year One Follow-up Report

        Due Date:  03/01/2012 or within 30 days of last Institution on site visit.

**3) FY 2012-2013: Year Two follow-up consultation (2 days)**

    **a)** Document Review (1 Days)

        Due Date:  07/15/2012 or within 15 days of new fiscal year.

    **b)** Headquarter Distance-Consultation (1 Day)

        Due Date:  08/30/2012 or within 30 days of document review

**4) FY 2013-2014: Year Two follow-up consultation (2 days)**

    **a)** Document Review (1 Days)

        Due Date:  07/10/2013 or within 10 days of new fiscal year.

    **b)** Headquarter Distance Consultation (1 Day)

        Due Date:  07/20/2013 or within 10 days of document review

        Final Report for Project Due 08/30/2013 or within 30 days of Consultation.

## VI.   CDCR RESPONSIBILITIES

1. The CDCR shall identify a Program Manager for this contract.
2. The CDCR shall provide the Contractor with the data necessary to complete the scope of this project.
3. The CDCR shall make staff available as needed to provide support and other assistance.
4. The CDCR shall be responsible for reviewing deliverables detailed under the Contractor's Responsibilities.
5. The CDCR shall identify the positions and/or classifications to participate in this project; and upon identification shall notify the Contractor.
6. The CDCR shall responsible for all travel arrangements during the site visits.

National Center on Institutions and Alternatives
California Department of Corrections and Rehabilitation (CDCR)
Scope of Work

## VII.  DEPARTMENT OF CORRECTIONS AND REHABILITATION CONTACT INFORMATION

Should questions or problems arise during the term of this contract, the Contractor should contact the following offices:

**Billing/Payment Issues:**
> Headquarters Accounting Services
> Phone Number:  (916) 255-2042
> Fax Number (916) 255-5418

**CDCR Program Manager**
> Robert D. Canning, Ph.D.
> Senior Psychologist Specialist, and
> Suicide Prevention Coordinator
> Statewide Mental Health Program
> Division of Correctional Health Care Services (DCHCS)
> Phone: (916) 322-4344
> Email: robert.canning@cdcr.ca.gov

**General Contract Issues:**
> Services Contract Management Branch
> Phone Number:  (916) 255-5612
> Fax Number:  (916) 255-6187

# Exhibit 114



# Office of the Inspector General

Robert A. Barton
*Inspector General*

State of California

# Initial Report on Use of Force within the California Department of Corrections and Rehabilitation

November 2011



## EXECUTIVE DIGEST

### _Summary_

In _Madrid v. Hickman_ (filed over a decade ago), subsequently re-designated _Madrid v. Cate_, the federal court found that Department of Corrections and Rehabilitation (department) officials had permitted and condoned the use of excessive force against inmates in violation of the Eighth Amendment of the United States Constitution. The court further found that department internal affairs investigations into alleged staff misconduct were pursued not to ascertain the truth, but to avoid finding officer misconduct as often as possible. As a result of those findings, in 2007 the federal court asked the Office of the Inspector General (OIG) to monitor the department's use-of-force review process. Since that time, the department has made significant progress in appropriately addressing use-of-force issues, resulting in the federal court removing its oversight of the department and officially dismissing the _Madrid_ case in 2011. In doing so, however, the court expressed concerns about potential regression to the prior unconstitutional practices and encouraged the department to honor its commitment to reform and continue OIG oversight of the department.

This report provides an analysis of the department's use-of-force practices from September 2010 through June 2011. To create this use-of-force report, the OIG obtained relevant data concerning incidents involving force. The OIG also conducted a comprehensive analysis of the department's use-of-force review process by attending use-of-force review committee meetings at adult institutions and parole regions, as well as, through document-based structured reviews of use-of-force incidents.

In August 2010, the department, with OIG input, implemented a new use-of-force policy, conducted statewide use-of-force training, and focused significant resources to make the new policy work. Although this report indicates that the department's use-of-force review process is plagued with delays, sometimes experiences incomplete reviews, and has some inefficiencies, the institutions' review committees determined that 91 percent of the incidents reviewed were in compliance with the _new_ use-of-force policy. For all incidents considered, the OIG concurred with the committees' final decision 90 percent of the time. Overall however, the data and observations contained in this report demonstrate the need for continued improvements in policy, uniform application of policy, and continued oversight related to the execution of the process.

### _Results in Brief_

There were over 6,300 reported use-of-force incidents which occurred in the department during the reporting period. Although in most cases the OIG concurred with the department's use-of-force committee in finding the use-of-force appropriate, in a number of instances improper conduct by department staff created or contributed to the incident necessitating the use of force. A sampling of other significant results from the monitoring data include: incident commanders in three quarters of the institutions did not request clarification for at least half of the incidents reviewed; one adult parole region did not hold any use-of-force review committee meetings despite having reported use-of-force incidents; the overall average time for reviewing a use-of-force incident was 51 days, which was outside the department policy of 30 days; and, on average the department complied with the policy regarding video taped interviews with inmates alleging unnecessary or excessive use of force only 70 percent of the time.

_Conclusion and Recommendations_

Through analysis of the available use-of-force data and observations while performing contemporaneous monitoring, the OIG provides the following five conclusions and recommendations for the department to consider further improving and refining the department's use-of-force practices and policies:

1. THE DEPARTMENT SHOULD DISTINGUISH BETWEEN NON-COMPLIANCE WITH THE USE-OF-FORCE POLICY VERSUS NON-COMPLIANCE IN OTHER DEPARTMENT POLICIES.

    Use-of-force critiques often conclude that staff actions were out of policy for reasons unrelated to the use-of-force policy. As a result, the OIG observed inconsistent decisions not only between institutions, but within the levels of review within the same institution.

    ➢ _The OIG recommends that the department reviewers continue to identify and address issues arising during a use-of-force incident related to other policies and procedures within the department, but distinguish between non-compliance with use-of-force policy and non-compliance with other department policies._

2. THE DEPARTMENT SHOULD ENSURE ALL USE-OF-FORCE REPORTS ARE COMPLETE, ACCURATE, AND DOCUMENTS ARE SUBMITTED TIMELY PRIOR TO FINAL REVIEW DECISIONS.

    Almost all of the institutions and facilities made policy decisions based on inadequate reports. Thus, in most incidents involving force, the department made determinations about whether uses of force complied with policies, regulations and applicable laws without complete information.

    ➢ _The OIG recommends that the department provide better training for report writing and insist on greater accountability for its reviewers. In particular, the department should focus on the first level manager review as the data suggests these managers consistently failed to request clarifying information needed to determine policy compliance._

3. THE DEPARTMENT SHOULD ENSURE USE-OF-FORCE EXECUTIVE REVIEW COMMITTEES ARE HELD IN COMPLIANCE WITH DEPARTMENT POLICIES.

    Adult parole regions I and II held limited use-of-force review meetings, while the Richard J. Donovan Correctional Facility did not have its use-of-force review committee evaluate each use-of-force incident.

    ➢ _The OIG recommends that all parole regions be required to hold use-of-force meetings. Further, the department should either require all institutions to review each incident as the use-of-force policy requires, or amend the policy to allow lower levels of force a more efficient review._

4.  THE DEPARTMENT SHOULD ENSURE THAT USE-OF-FORCE VIDEO RECORDED INTERVIEWS BE CONDUCTED IN A MANNER THAT IS CONSISTENT WITH POLICY.

In instances where a video recording was required by department policy, a recording was conducted pursuant to policy on average only 70 percent of the time.

➢ *The OIG recommends the department make efforts to increase its compliance with the use-of-force video recording policy. In particular, the department should address the complete lack of compliance with this policy at more than one adult institution.*

5.  THE DEPARTMENT SHOULD ENSURE APPROPRIATE TRAINING FOR PEPPER SPRAY USE DURING CELL EXTRACTIONS, INCLUDING GUIDELINES FOR ASSESSING EXPOSURE ELEMENTS, TIME, AND EFFECTIVENESS.

Great disparities exist within the department related to the use of pepper spray for cell extractions. Although current training requires officers to use only the amount of chemical agents reasonable to gain compliance, the department does not have clear guidelines establishing what is a reasonable amount of pepper spray or a reasonable amount of time between pepper spray applications.

➢ *The OIG recommends that the department provide additional guidelines regarding the use of pepper spray during cell extractions. These guidelines should include: how to assess whether or not the inmate received an adequate exposure to pepper spray; the amount of time to let the pepper spray take effect once adequate exposure has been achieved before initiating additional applications; and how to determine when pepper spray is ineffective and another use-of-force option should be considered.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

USE-OF-FORCE PROCESS OVERVIEW ................................................................ 2

MONITORING METHODOLOGY .......................................................................... 3
Institutional and Facility Use-of-Force Review Committee Attendance .................... 3
Structured Reviews ........................................................................................... 3
Regulation and Policy Review ............................................................................. 4

DIVISION OF ADULT INSTITUTIONS.................................................................... 4
Unreasonable, Unnecessary, or Excessive Use of Force ......................................... 5
Deadly Force ..................................................................................................... 6
Types of Force................................................................................................... 6
Effectiveness of Use of Force.............................................................................. 7
Use-of-Force Reports ......................................................................................... 8
Institutional Use-of-Force Reviews....................................................................... 8
Timeliness of Reviews...................................................................................... 10
Video Recorded Interviews................................................................................ 10

DIVISION OF ADULT PAROLE OPERATIONS ...................................................... 10

RECOMMENDATIONS....................................................................................... 11
Recommendation 1: The department should distinguish between compliance with
the use-of-force policy versus non-compliance in other department policies ........... 11

Recommendation 2: The department should ensure use-of-force reports are
complete, accurate, and documents are submitted timely prior to final review
decisions........................................................................................................ 12

Recommendation 3: The department should ensure use-of-force executive review
committees are held in compliance with department policies................................. 13

Recommendation 4: The department should ensure that video recorded interviews
be conducted in a manner that is consistent with policy....................................... 13

Recommendation 5: The department should ensure appropriate training for pepper
spray use during cell extractions, including guidelines for assessing exposure
elements, time, and effectiveness ...................................................................... 13

APPENDICES
Appendix A: Acronyms for Adult Institutions....................................................... 14
Appendix B: Incidents Involving Force - Adult Institutions...................................... 15
Appendix C: Effective Use of Force - Averages by Types of Force ......................... 16
Appendix D: Timeliness of Reviews – Adult Institutions......................................... 18
Appendix E: Statewide Review Summary – Adult Institutions................................. 19

## INTRODUCTION

In 1990 a group of inmates incarcerated at Pelican Bay State Prison filed a class action civil rights lawsuit, *Madrid v. Cate*. Subsequently, in 1995 United States District Court Judge Thelton E. Henderson found that department officials had permitted and condoned the use of excessive force against inmates in violation of the Eighth Amendment of the United States Constitution. The court further found that department internal affairs investigations into alleged misconduct were pursued not to ascertain the truth, but to avoid finding officer misconduct as often as possible. As stated by Judge Henderson, "[a] meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, the prison's policies and procedures become dead letter."

> "A meaningful disciplinary system is essential, for if there are no sanctions imposed for misconduct, the prison's policies and procedures become dead letter."
>
> *Honorable Thelton Henderson*

During the 1990s, the department's use-of-force policies and practices fell under heavy scrutiny by the courts and the Legislature because of the significant number of inmates that had been shot and killed by correctional officers in the California state institutions. Between 1989 and 1994, California correctional officers shot and killed more than 30 inmates, as compared to only six inmates who were shot and killed in all other state and federal prisons combined. In some cases, inmates engaging in fist fights without weapons were shot, while in other cases officers shot victims or bystanders rather than the perpetrators. During Senate hearings in 1998, which included an independent review panel of deadly force experts, legislators concluded that department management had failed to appropriately address the situation.

As the court noted in *Madrid*, custody personnel are in constant contact with a difficult and often openly hostile inmate population. Officers have a myriad of weapons and significant manpower at their disposal, and are required to exercise effective control over the inmates under their supervision. In addition, the physical environment within penal institutions "reinforces a sense of isolation and detachment from the outside world, and helps create a palpable distance from ordinary compunctions, inhibitions, and community norms."

As a result of these findings, in 2007 the federal court requested that the OIG's Bureau of Independent Review attend the department's use-of-force review committee meetings to: provide public transparency; assure the court and the public that use-of-force reviews are adequate; and, when appropriate, ensure cases are forwarded to the department's Office of Internal Affairs for investigation or approval to take action without further investigation. Since the OIG's use-of-force monitoring commenced, the department has, with OIG input and court approval, revised and updated its use-of-force regulations and some corresponding policies beginning in August 2010.

This report covers the OIG's monitoring of the department's use-of-force process from September 2010 through June 2011. Force is most often used by the department in the adult institutions which, at the end of this reporting period housed over 160,000 inmates and employed approximately 30,000 peace officers authorized to use force. Further, at times, parole agents supervising adult parolees engage in the use of force. This report addresses the use-of-force review process only for the adult programs and parole. The report does not address use-of-force in the Division of Juvenile Justice because that process is currently being reviewed by court appointed experts.

**USE-OF-FORCE PROCESS OVERVIEW**

The department is tasked with maintaining the safety and security of staff, inmates, wards, and visitors. At times, this responsibility results in the reasonable use of force by officers. On many occasions, the use of force is justified and necessary. For example, force may be necessary to stop an inmate from attacking another inmate or staff member, to stop a riot, or to take a parolee into custody.

The department defines language usage in the use-of-force policy in the following way:

- <u>Reasonable Force</u> – Reasonable force is the force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.
- <u>Unnecessary Force</u> – Unnecessary force is the use of force when none is required or appropriate.
- <u>Excessive Force</u> – Excessive force is the use of more force than is objectively reasonable to accomplish a lawful purpose.

Department policy requires that, whenever possible, verbal persuasion or orders be attempted before resorting to force. When verbal persuasion is ineffective, staff may use force. Use-of-force options are not executed in any particular sequence; rather staff chooses the force options he or she reasonably believes will stop the particular threat. Staff is only authorized to use reasonable force.

Any department employee who uses force, or observes another employee use force, is required to report the incident to a supervisor *and* submit a written report prior to being relieved from duty. After the report is submitted, the review process begins. This is multi-tiered and also seeks to identify any necessary follow-up action regarding the incident. If deadly force is used, or if any force is used that could have caused death or great bodily injury, the incident is reviewed by the department's Deadly Force Review Board (DFRB) and monitored by the OIG. During the time the DFRB review is pending, all other reviews specific to the case cease until the DFRB process has been completed. Moreover, certain use-of-force incidents are also reviewed at the division and executive level of the department.

Per department policy, use-of-force options include but are not limited to the following:

(a) Chemical agents

(b) Hand-held batons

(c) Physical strength and holds: A choke hold or any other physical restraint which prevents the person from swallowing or breathing shall not be used unless the use of deadly force would be authorized.

(d) Less-than-lethal weapons: A less-than-lethal weapon (figure 1) is any weapon not likely to cause death. A 37mm or 40mm launcher and any other weapon used to fire less-lethal projectiles is a less lethal weapon.



Figure 1

(e) Lethal weapons: A firearm is a lethal weapon because it is used to fire lethal projectiles. A lethal weapon is any weapon that is likely to result in death.

## MONITORING METHODOLOGY

The OIG reviews identified use-of-force incidents utilizing two primary methods: attendance at select use-of-force review committee meetings and document based structured reviews. The OIG participates as an active stakeholder in, and monitors, the department's promulgation of new use-of-force regulations and policies.

### _Institutional and Facility Use-of-Force Review Committee Attendance_

OIG representatives attend select use-of-force review committee meetings at all adult institutions statewide. Prior to attending these meetings, the department provides the OIG with the incident package, which includes the report of the incident, the staff reports regarding the incident, and any medical evaluations of inmates, and in limited circumstances, staff involved in the incident. The OIG evaluates all departmental reviews completed prior to the meeting and makes independent conclusions as to the appropriateness of the use of force. During the meeting, the OIG observes the review process and engages in contemporaneous oversight by raising concerns about the incidents, asking for clarifications if reports were inconsistent or incomplete, and engaging in discussions with the committee about the incidents. Through this process, the OIG draws independent conclusions about whether the force used was in compliance with policies, procedures, and applicable laws and whether the review process is thorough and meaningful. When appropriate, the OIG recommends that an incident be referred to the department's Office of Internal Affairs for investigation or approval to take action based on the information already available. In the event that the OIG has a significant disagreement with the decision made by the institution, or parole region, the OIG may elevate the issue to higher level department managers.

### _Structured Reviews_

The OIG performs random structured reviews for incidents where the OIG did not attend the use-of-force committee meetings but evaluated video recordings, officer reports, and the documented conclusions of the department's review process. The OIG evaluates staff compliance with use-of-force policies before, during, and after the incident. In addition, the OIG evaluates whether or not each application of force effectively stopped the threat that led to the need for force, and whether staff actions contributed to the need to use force. If the OIG discovers an issue during a structured review, the OIG alerts the institution or parole region and seeks further review of the incident. As a result of the OIG's structured reviews, certain incidents are placed back on the use-of-force review

committee calendar to address issues raised by the OIG. If the OIG does not consider the issue resolved, it may be elevated to higher level management.

*Regulation and Policy Review*

In addition to monitoring the use-of-force review process in the department, the OIG participates as an active stakeholder in, and monitors, the department's promulgation of new use-of-force regulations and policies. In this capacity, the OIG has reviewed amendments to the department's regulations and Operations Manual regarding the Division of Adult Institutions and continues to review proposed policies for the Division of Adult Parole Operations. The OIG monitors the department's ongoing effort to promulgate regulations specific to the use of deadly force by the department in its institutions and out in the community.

**DIVISION OF ADULT INSTITUTIONS**

In the ten month reporting period, the department, through the Daily Information Reporting System (DIRS), reported a total of 6,295 incidents involving force at institutions housing adult inmates. Of these 6,295 incidents, the OIG monitored 34 percent of the incidents by attending use-of-force review committee meetings and completing structured reviews. Specifically, the OIG attended 176 use-of-force meetings, where a total of 995 incidents were evaluated and further completed 1,173 structured reviews for a total of 2,168 incidents evaluated by the OIG.

The department found the use of force employed by staff complied with department policies in 1,816 of the 2,168 incidents and that staff did not comply with department policies in 182 of the incidents. Many of the remaining 170 incidents were brought to committee in order to meet the 30-day requirement for review, but were not actually ready for review.

In 106 incidents the OIG monitored, staff actions created or contributed to the need to use force. For example, policy violations related to the use of restraints or unauthorized inmates allowed to enter restricted areas resulted in the need to use force. Some incidents resulted in adverse actions if a policy was violated and serious injury resulted. The OIG also influenced the committees' recommendation to the warden for 259 of the incidents by requesting clarification, investigations, or employee training. When performing reviews, the OIG concurred with the department's committee decision 90 percent of the time.

> The OIG influenced the committees' recommendation to the warden for 259 of the incidents by requesting clarification, investigations, or employee training.

The department groups the adult institutions into primary missions: female programs, which classifies and houses all female inmates; reception centers, which evaluate and classify incoming male inmates; high security-males, which house the most dangerous male inmates; and general population-males, which provide dormitory and in-cell housing for lower security male inmates. 4,692 total use-of-force incidents occurred within the high security and reception center missions, while only 374 incidents occurred in the female programs mission.

Female programs and general population missions present lower percentages of use-of-force incidents compared to reception centers and high security missions when considering statewide inmate population. With an average population of 9,309 inmates per month, female programs mission comprised 6 percent of the statewide average monthly inmate population as well as 6 percent of the reported use-of-force incidents. General population missions averaged 56,757 inmates per month and comprised 39 percent of the statewide inmate population with only 20 percent of the reported use-of-force incidents.



Figure 2a

When comparing these missions with the high security and reception center missions, the data suggests a disparate difference. High security mission institutions averaged 47,506 inmates per month and comprised 32 percent of the statewide inmate population with 42 percent of the reported use-of-force incidents. Reception center mission institutions averaged 34,230 inmates per month and comprised 23 percent of the statewide inmate population with 32 percent of the reported use-of-force incidents.



Figure 2b

Figures 2a and 2b illustrate average inmate population and reported use-of-force incidents in each mission.

### *Unreasonable, Unnecessary, or Excessive Use of Force*

The department's Office of Internal Affairs received 89 requests for investigation from the adult institutions related to use-of-force incidents. Of the 89 requests, there were allegations of misconduct against 200 officers. 63 of the allegations were alleged to be unreasonable uses of force. Other significant allegations included the failure to report the use of force and unnecessary or excessive force causing injury. On the following page, figure 3 provides a table summarizing the types of allegations received for investigation.

| Allegation | Total | Percentage |
|---|---|---|
| Unreasonable use of force | 63 | 26% |
| Failure to report use of force witnessed | 87 | 35% |
| Failure to report own use of force | 47 | 19% |
| Unnecessary/excessive force likely to cause injury | 27 | 11% |
| Undetermined/ other | 22 | 9% |
| *Total Allegations included in 89 Requests* | *246* | *100%* |

Figure 3

*Deadly Force*

In addition to evaluating allegations of unnecessary or excessive force, the department Office of Internal Affairs takes preliminary charge of investigations involving the use of deadly force, and any use of force resulting in death or great bodily injury. In this reporting period, the department referred eight allegations to the Deadly Force Investigation Team (DFIT), which subsequently conducted criminal and administrative investigations. These DFIT investigations are, by policy, required for every use of deadly force because of the severity of the potential consequences.

*Types of Force*

An incident requiring the use of force may involve more than one application of force and the use of different types of force. For example, during a riot, officers may use chemical agents, expandable batons, and less-than-lethal force to address different threats as the riot escalates. The 1,173 incidents monitored in the structured review process by the bureau included 3,271 separate applications of force.

In the reporting period, adult institutions used chemical agents in 46 percent of the applications of force, while physical force was used in 36 percent of the applications of force. All other types of force were each used in less than 10 percent of the applications of force, for a cumulative total of 18 percent.



Figure 4

Figure 4 illustrates the relative percentage of types of force used in the adult institutions from bureau monitored structured reviews.

When each mission is examined separately, the most prevalent type of force is different depending on mission. Physical force and chemical agents are used most often in the adult institutions, regardless of the mission. There are minor variations depending on mission. Significantly, there were no instances of deadly force or less-than lethal force in female programs. Figure 5 includes data of instances monitored and illustrates the types of force used in each mission.



| | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
|---|---|---|---|---|---|
| ☐ Reception Centers | 43.82% | 36.33% | 10.45% | 9.08% | 0.32% |
| ■ Female Programs | 41.27% | 53.97% | 4.76% | 0.00% | 0.00% |
| ☐ General Population - Males | 37.38% | 47.20% | 7.13% | 8.06% | 0.23% |
| ☐ High Security - Males | 29.66% | 51.49% | 6.89% | 10.80% | 1.17% |

Figure 5

A list of the adult institutions, along with their acronyms can be found in <u>Appendix A</u>. For a comprehensive list of the types of force used in the reporting period at each of the department's adult institutions, please refer to <u>Appendix B</u>.

*Effectiveness of Use of Force*

Along with the types of force, the OIG examined the effectiveness of each application of force. To do so, the officer's description of the need for force was compared with the inmate's reaction to the force. The OIG then determined whether the use of force was effective in stopping the threat that justified the use of force. If more than one officer simultaneously used force on an inmate and the threat stopped, the force was considered effective for each application of the simultaneous force. If the goal of gaining compliance from the inmate was not met, the force was considered ineffective for all applications of the simultaneous force. The reason effectiveness must be considered is to determine whether subsequent applications of force were necessary.

The OIG evaluated 3,271 applications of force incidents and found physical force the most effective 78 percent of the time. Chemical agents were effective 61 percent of the time, while less-lethal force and use of the baton were only effective 40 percent of the time. Deadly force was effective 60 percent of the time. Two examples of instances where deadly force is not effective are:

1. The officer fired a shot which did not hit any person and the threat that required deadly force continued; or

2. The officer shot the intended target, but the threat continued because the injury was not sufficient enough to stop the suspect's actions.

Figure 6 illustrates the statewide relative averages for effectiveness for the five types of force.



Figure 6

Monitoring revealed a disparity in the techniques applied in the use of chemical agents, specifically pepper spray, when forcibly removing inmates from cells. The department is inconsistent in their use of pepper spray for cell extractions. In reviewing several cell extractions with similar case factors, the use of pepper spray ranged from a single application with a waiting period to numerous applications of pepper spray over a short period of time. According to department training, the amount of pepper spray, and the amount of time between applications has an impact on the effectiveness of this type of force. However, the amount used and the time waited before finding it ineffective varied widely amongst the reviewed incidents. For a comprehensive list of the effectiveness of the types of force used during the reporting period at each of the department's adult institutions, please refer to Appendix C.

*Use-of-Force Reports*

As part of its structured reviews, staff reports were evaluated for an adequate description of the circumstances that led to force and a sufficient description of the force used. Staff reports for 1,173 incidents were evaluated. The OIG found that on average 96 percent of all reports reviewed adequately described the *need* for force, but only 66 percent appropriately described the *actual* force used during the incident. For example, at Folsom State Prison, 100 percent of the reports reviewed adequately described the need for force, but only 37 percent adequately described the force used during the incidents. More favorable results were found at the California Chuckawala Valley State Prison, with 100 percent of the reports adequately describing the need for force and 92 percent appropriately documenting the force used.

*Institutional Use-of-Force Reviews*

At each level of review, the reviewer is tasked with evaluating reports, requesting necessary clarifications, identifying deviations from policy, and determining whether the use of force was within policies, regulations, and applicable laws. The levels of review are: the initial review conducted by the incident commander; the first level management review conducted by a captain; the second level management review conducted by an associate warden; and the final level of review where the incident is reviewed by the use-of-force review committee, with the ultimate determination made by the institution head or designee.

Of the 1,173 incidents for which structured reviews were conducted, the OIG found failures to identify issues at every level of the review process.

The incident commander is responsible for evaluating all officer reports for quality, accuracy, content, and request clarifications when reports have missing or conflicting information. The incident commander determines compliance with policy, procedure, and applicable law. The incident commander, at the initial review, found 531 incidents had missing or conflicting information at the time of determination regarding policy compliance. Of the 531 incidents, the incident commander requested clarification for 28 percent of the incidents. After requesting clarifications, the incident commander addressed deviations in 22 percent of the incidents reviewed. Overall, incident commanders in most of the adult institutions failed to address clarifications or policy deviations at least half of the time. A complete failure to request clarifications at this initial level of review was evident at Folsom State Prison, where incident commanders requested necessary clarifications in none of the incidents the OIG reviewed. On the other hand, Pelican Bay State Prison incident commanders requested clarifications in almost all of the reports with missing or conflicting information.

> Incident commanders in most of the adult institutions **did not** address clarification or policy deviations at least half of the time.

Within the first level management review, the quality of reports is evaluated to ensure the use of force was properly documented and reviewed. First level management review requires an in-depth analysis to determine if the force described in the incident package was within policy. At the initial first level management review, deviations were addressed in 27 percent of the incidents reviewed. At this level, reviews identified issues missed in a third of the cases reviewed. The second level management review is the final level of review before the completed incident package is sent to the use-of-force coordinator. This level of review includes an in-depth analysis to determine if the force used was in compliance with policy, procedure, and applicable law. After this level review, incidents are referred for investigation, when applicable. At the second level management review, there were identified missed problems in over a quarter of the cases. This cumulative average for the second level management review was significantly impacted by 7 of the 33 adult institutions not addressing any issues. Within first and second level management reviews, problems were addressed on average in 21 percent of the cases for incidents at all institutions.

By the time the incident package reached the use-of-force review committee and institution-head level review, 25 percent of the incidents reviewed by the OIG still had issues not previously addressed by the review process. This final level of review only addressed outstanding issues in a third of the incidents where issues still existed. This statewide average was impacted by eight institutions where reviewers at this level identified less than 20 percent of the missed policy deviations or the need for clarifications. In five institutions, managers identified all of the clarifications or policy deviations not previously addressed by the time the last review was conducted.

> In five of the institutions, managers identified all of the clarifications or policy deviations not previously addressed by the time the last review was conducted.

The OIG found inconsistent standards utilized by the various reviewers to determine whether a use-of-force incident complied with department policy. Some reviewers found a use-of-force

incident not in compliance if any department policy was violated, while other reviewers found an incident to violate policy only if the use-of-force policy was implicated.

*Timeliness of Reviews*

According to the department's Operations Manual, use-of- force incidents should normally be reviewed within 30 days. This includes all levels of the review process, as well as obtaining any necessary clarifications. For the 1,173 structured reviews the OIG conducted, the overall average time for review from the time of incident to the time of completion at the institutional head level was 51 days. Total average review time exceeded 80 days at several of the adult institutions with only three institutions meeting the 30 day threshold. Delays can compromise the department's ability to take disciplinary action. If misconduct is not timely identified, the department is precluded from taking disciplinary action regardless of the egregiousness of the misconduct. For a list of all adult institutions regarding the timeliness of reviews, please refer to Appendix D, and for a statewide review summary, please refer to Appendix E.

*Video Recorded Interviews*

Video recorded interviews are required by the department's use-of-force policy if the inmate has alleged unnecessary or excessive use of force or if the inmate has sustained serious bodily injury that could have been caused by a use of force. The video recording should be completed within 48 hours of discovery of the injury or allegation. If the inmate refuses to be video recorded, the department's Operations Manual requires staff to record the refusal.

In the structured reviews, 165 incidents were identified as requiring video recorded interviews. The OIG found 115 incident recordings were conducted according to policy guidelines. Although the statewide average for compliance with the video recording policy was 70 percent, only 11 institutions conducted video recordings according to policy 100 percent of the time. At two of the institutions, none of the video recordings met policy requirements.

## DIVISION OF ADULT PAROLE OPERATIONS

The Division of Adult Parole Operations is divided into four regions and responsible for supervising over 100,000 parolees. The adult parole regions reported 74 incidents statewide involving the use of force. In parole regions I and II, there were 43 incidents involving force and in parole regions III and IV, there were 31 incidents. Although with the highest number of use-of-force incidents, only one use-of force review meeting was held in parole region II, while parole region I held no meetings. At the OIG's urging that these important meetings take place, parole regions I and II have asserted that they will now conduct the required use-of-force review meetings.

The OIG attended 19 meetings and completed structured reviews of all 74 use-of-force incidents occurring in the parole regions. Within 74 incidents, there were 271 applications of force. The OIG found that the two reviewed incidents involving use of the baton and one incident of deadly force by parole agents were found to be 100 percent effective. The OIG found that physical force was 78 percent effective, while chemical agents were effective only half of the time.

Figure 7 provides a summary of the type and effectiveness of the force used in the parole regions.

The structured reviews revealed that 98 percent of parole agents' use-of- force reports adequately described the need to use force. However, only 74 percent of parole agents' use-of- force reports provided an appropriate description of the force used.



| | Physical Force | Chemical Agents | Expandable Baton | Deadly Force |
|---|---|---|---|---|
| ☐ Not Effective UOF | 55 | 8 | 0 | 0 |
| ■ Effective UOF | 196 | 8 | 2 | 1 |
| ☐ Percent Effective | 78% | 50% | 100% | 100% |

Figure 7

Statewide, unit supervisors failed to request clarifications for inadequate reports in three quarters of the incidents while only addressing 15 percent of missed issues and policy deviations. The next level of reviewers addressed the remaining deficiencies in only 18 percent of the incidents. The final level of reviewers in the parole regions failed to address issues in more than 23 percent of incidents they reviewed, with a total of 15 incidents left unaddressed after the final review.

Figure 8 illustrates the results of the adequacy of reports initially submitted by parole agents and the percentage of incidents for which supervisors and managers addressed inadequate reports or policy deviations. The table also includes the total days the review process took from the date of the incident to the date the last reviewer signed his or her review.

| Parole Region | Parole Agent Reports | | Requested Clarification | Clarifications or Policy Deviations Addressed | | Total Days for Review |
|---|---|---|---|---|---|---|
| | Incidents Evaluated | All Reports Adequate | Unit Supervisor | District Administrator | Hiring Authority | Total Days for Review |
| Region I | 22 | 88% | 22% | 8% | 0% | 49 |
| Region II | 21 | 94% | 33% | 25% | 0% | 19 |
| Region III | 11 | 35% | 0% | 10% | 27% | 102 |
| Region IV | 20 | 78% | 40% | 50% | 0% | 168 |
| *Statewide* | *74* | *74%* | *24%* | *23%* | *7%* | *85* |

Figure 8

## RECOMMENDATIONS

The OIG makes the following recommendations:

1. THE DEPARTMENT SHOULD DISTINGUISH BETWEEN NON-COMPLIANCE WITH THE USE-OF-FORCE POLICY VERSUS NON-COMPLIANCE IN OTHER DEPARTMENT POLICIES.

   Use-of-force critiques often conclude that staff actions were out of policy for reasons unrelated to the use-of-force policy. As a result, inconsistent decisions were made not only between institutions, but within the levels of review within the same institution. The OIG recommends that the department provide instruction to use-of-force reviewers, and clarify the

use-of-force review questions to ensure decisions are made utilizing a department-wide standard focusing on the use-of-force policy. The OIG also believes that it is important for the department reviewers to identify and address issues arising during a use-of-force incident related to other policies and procedures within the department. However, there should be a clear distinction between determining compliance with the use-of-force policy and identifying issues related to compliance with other department policies and procedures. Figure 9 provides an example of how the same facts are applied differently and result in a different compliance finding.

| QUESTIONS | ANSWER EXAMPLE A | ANSWER EXAMPLE B |
|---|---|---|
| 1. *Were staff actions PRIOR to the use of force in compliance with departmental standards and policy?* | **No**, staff actions were out of policy because an officer used his radio instead of activating his personal alarm device. In addition, an officer failed to properly apply handcuffs. | **Yes**, staff actions were in compliance to the use of force policy. However, an officer used his radio instead of activating his personal alarm device. In addition, an officer failed to properly apply handcuffs. |
| 2. *Were staff actions DURING the use of force in compliance with departmental standards and policy?* | **No**, the control booth officer violated policy by opening the fire doors creating an unsafe condition. | **Yes**, officers used a reasonable amount of force to address the threat and affect custody. However, the control booth officer created an unsafe condition by opening the fire doors. |
| 3. *Were staff actions AFTER the use of force in compliance with departmental standards and policy?* | **No**, staff failed to record 15 minute welfare checks on the holding cell log while the inmate was in the holding cell pending a new housing assignment. | **Yes**, staff actions were in compliance with the use of force policy. However, staff failed to record 15 minute welfare checks on the holding cell log while the inmate was in the holding cell pending a new housing assignment. |

Figure 9

2. <u>THE DEPARTMENT SHOULD ENSURE USE-OF-FORCE REPORTS ARE COMPLETE, ACCURATE, AND DOCUMENTS ARE SUBMITTED TIMELY PRIOR TO FINAL REVIEW DECISIONS.</u>

The vast majority of the institutions and facilities made policy decisions based on inadequate reports and staff reports frequently omitted important descriptions of how the force was applied. Staff in a position to witness force often did not initially submit a report with their observations as required by policy. Thus, in most incidents involving force, the department made determinations about whether uses of force complied with policies, regulations and applicable laws without complete information. As the reasonableness of the use of force is fact sensitive to each situation, it is imperative that complete information be obtained and that reviews address any inconsistent or incomplete information in the use-of-force incident documentation. Therefore, the OIG recommends that the department provide better training for report writing and insist on greater accountability for its reviewers. In particular, the department should focus efforts on first level review as the data suggests that managers consistently failed to request further information needed to determine policy compliance.

3. THE DEPARTMENT SHOULD ENSURE USE-OF-FORCE EXECUTIVE REVIEW COMMITTEES ARE HELD IN COMPLIANCE WITH DEPARTMENT POLICIES.

Adult parole regions I and II combined held limited use-of-force review meetings. Appropriately reviewing whether each use of force complies with department policy is critical to effectively manage use-of-force by the department and to identify potential misconduct by staff. The OIG recommends that these parole regions be required to hold meetings for all incidents of force.

Richard J. Donovan Correctional Facility does not have its use-of-force review committee evaluate each use-of-force incident. Instead the vast majority of incidents are simply signed off by supervisors and managers. The OIG recommends that the department either require all institutions to review each incident as the use-of-force policy requires or amend the policy to allow certain incidents to be finalized through management review, and provide appropriate criteria with OIG input.

4. THE DEPARTMENT SHOULD ENSURE VIDEO RECORDED INTERVIEWS BE CONDUCTED IN A MANNER THAT IS CONSISTENT WITH POLICY

Video recording was conducted only 70 percent of the time where it was required by department policy. As the purpose of video recordings is to preserve critical evidence related to allegations of use-of-force, the OIG recommends the department make efforts to increase its compliance with the video recording policy. In particular, the department should address the complete lack of compliance with this policy at more than one adult institution.

5. THE DEPARTMENT SHOULD ENSURE APPROPRIATE TRAINING FOR PEPPER SPRAY USE DURING CELL EXTRACTIONS AND SHOULD INCLUDE GUIDELINES FOR ASSESSING EXPOSURE ELEMENTS, TIME, AND EFFECTIVENESS

Pepper spray is a chemical agent that causes tearing of the eyes, impaired vision, coughing, difficulty breathing, burning sensation, and inflammation of the skin. When used to remove an inmate from a cell, the use of pepper spray may avoid the need to use physical force against the inmate. Although current training requires officers to use only the amount of chemical agents reasonable to gain compliance, the department does not have clear guidelines establishing what is a reasonable amount of pepper spray or a reasonable amount of time between pepper spray applications. In reviewing use-of-force incidents, we discovered great disparities in the use of pepper spray for cell extractions during which the department forcibly removes an inmate from a cell. The OIG recommends that the department provide additional guidelines regarding the use of pepper spray during cell extractions. These guidelines should include: how to assess whether or not the inmate received an adequate exposure to pepper spray; the amount of time to let the pepper spray take effect once adequate exposure has been achieved before initiating additional applications; and how to determine when pepper spray is ineffective and another use-of-force option should be considered.

**APPENDIX A:  Acronyms for Adult Institutions**

| | Adult Institutions Location | *City* |
|---|---|---|
| **ASP** | Avenal State Prison | Avenal |
| **CCC** | California Correctional Center | Susanville |
| **CCI** | California Correctional Institution | Tehachapi |
| **CIM** | California Institution for Men | Chino |
| **CIW** | California Institution for Women | Frontera |
| **CMF** | California Medical Facility | Vacaville |
| **CMC** | California Men's Colony | San Luis Obispo |
| **CRC** | California Rehabilitation Center | Norco |
| **COR** | California State Prison, Corcoran | Corcoran |
| **LAC** | California State Prison, Los Angeles County | Lancaster |
| **SAC** | California State Prison, Sacramento | Represa |
| **SQ** | California State Prison, San Quentin | San Quentin |
| **SOL** | California State Prison, Solano | Vacaville |
| **SATF** | Substance Abuse Treatment Facility & State Prison at Corcoran | Corcoran |
| **CAL** | Calipatria State Prison | Calipatria |
| **CEN** | Centinela State Prison | Imperial |
| **CCWF** | Central California Women's Facility | Chowchilla |
| **CVSP** | Chuckawalla Valley State Prison | Blythe |
| **CTF** | Correctional Training Facility | Soledad |
| **DVI** | Deuel Vocational Institution | Tracy |
| **FOL** | Folsom State Prison | Represa |
| **HDSP** | High Desert State Prison | Susanville |
| **ISP** | Ironwood State Prison | Blythe |
| **KVSP** | Kern Valley State Prison | Delano |
| **MCSP** | Mule Creek State Prison | Ione |
| **NKSP** | North Kern State Prison | Delano |
| **PBSP** | Pelican Bay State Prison | Crescent City |
| **PVSP** | Pleasant Valley State Prison | Coalinga |
| **RJD** | Richard J. Donovan Correctional Facility | San Diego |
| **SVSP** | Salinas Valley State Prison | Soledad |
| **SCC** | Sierra Conservation Center | Jamestown |
| **VSPW** | Valley State Prison for Women | Chowchilla |
| **WSP** | Wasco State Prison | Wasco |

**APPENDIX B:  Incidents Involving Force - Adult Institutions**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Applications of Force** | | | | | | | |
| **Adult Institutions** | | | | | | | |
| Institution | Mission | Incidences of Force | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
| CCWF | Female Offenders | 72 | 29.17% | 66.67% | 4.17% | 0.00% | 0.00% |
| CIW | Female Offenders | 55 | 38.18% | 54.55% | 7.27% | 0.00% | 0.00% |
| VSPW | Female Offenders | 62 | 58.06% | 38.71% | 3.23% | 0.00% | 0.00% |
| ASP | General Population | 49 | 42.86% | 57.14% | 0.00% | 0.00% | 0.00% |
| CCC | General Population | 45 | 42.22% | 42.22% | 4.44% | 8.89% | 2.22% |
| CMC | General Population | 153 | 60.13% | 33.99% | 5.88% | 0.00% | 0.00% |
| CMF | General Population | 68 | 39.71% | 58.82% | 1.47% | 0.00% | 0.00% |
| CRC | General Population | 84 | 58.33% | 36.90% | 4.76% | 0.00% | 0.00% |
| CTF | General Population | 46 | 50.00% | 43.48% | 0.00% | 6.52% | 0.00% |
| CVSP | General Population | 27 | 25.93% | 51.85% | 22.22% | 0.00% | 0.00% |
| FOL | General Population | 125 | 12.00% | 64.00% | 6.40% | 16.80% | 0.80% |
| ISP | General Population | 73 | 1.37% | 57.53% | 21.92% | 19.18% | 0.00% |
| PVSP | General Population | 76 | 50.00% | 26.32% | 9.21% | 14.47% | 0.00% |
| SCC | General Population | 23 | 34.78% | 52.17% | 0.00% | 13.04% | 0.00% |
| SOL | General Population | 87 | 22.99% | 52.87% | 9.20% | 14.94% | 0.00% |
| CAL | High Security | 87 | 18.39% | 63.22% | 2.30% | 14.94% | 0.00% |
| CCI | High Security | 76 | 48.68% | 30.26% | 11.84% | 9.21% | 0.00% |
| CEN | High Security | 112 | 11.61% | 60.71% | 9.82% | 14.29% | 3.57% |
| COR | High Security | 182 | 43.41% | 51.65% | 1.65% | 3.30% | 0.00% |
| HDSP | High Security | 107 | 15.89% | 56.07% | 0.00% | 18.69% | 9.35% |
| KVSP | High Security | 183 | 32.79% | 45.90% | 5.46% | 15.85% | 0.00% |
| MCSP | High Security | 84 | 13.10% | 50.00% | 23.81% | 13.10% | 0.00% |
| PBSP | High Security | 143 | 24.48% | 62.94% | 4.20% | 7.69% | 0.70% |
| SAC | High Security | 144 | 47.92% | 33.33% | 9.72% | 9.03% | 0.00% |
| SATF | High Security | 94 | 30.85% | 43.62% | 13.83% | 11.70% | 0.00% |
| SVSP | High Security | 67 | 19.40% | 79.10% | 0.00% | 1.49% | 0.00% |
| CIM | Reception Centers | 125 | 25.60% | 57.60% | 2.40% | 13.60% | 0.80% |
| DVI | Reception Centers | 143 | 52.45% | 31.47% | 16.08% | 0.00% | 0.00% |
| LAC | Reception Centers | 99 | 52.53% | 27.27% | 9.09% | 11.11% | 0.00% |
| NKSP | Reception Centers | 158 | 42.41% | 27.22% | 14.56% | 14.56% | 1.27% |
| RJD | Reception Centers | 183 | 58.47% | 27.87% | 8.74% | 4.92% | 0.00% |
| SQ | Reception Centers | 90 | 26.67% | 51.11% | 11.11% | 11.11% | 0.00% |
| WSP | Reception Centers | 149 | 38.93% | 40.27% | 10.07% | 10.74% | 0.00% |
| **SUMS** | | **3,271** | | | | | |

**APPENDIX C:  Effective Use of Force – Averages by Type of Force**

| Averages by Type of Force | | | | | | |
|---|---|---|---|---|---|---|
| Adult Institutions | | | | | | |
| Institution | Instances Evaluated | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
| ASP | 49 | 21 | 28 | 0 | 0 | 0 |
| *Effective* | | 62% | 89% | | | |
| CAL | 87 | 16 | 55 | 2 | 13 | 0 |
| *Effective* | | 87% | 47% | 50% | 15% | |
| CCC | 45 | 19 | 19 | 2 | 4 | 1 |
| *Effective* | | 84% | 90% | 0% | 50% | 100% |
| CCI | 76 | 37 | 23 | 9 | 7 | 0 |
| *Effective* | | 72% | 78% | 67% | 29% | |
| CCWF | 72 | 21 | 48 | 3 | 0 | 0 |
| *Effective* | | 91% | 85% | 33% | | |
| CEN | 112 | 13 | 68 | 11 | 16 | 4 |
| *Effective* | | 100% | 63% | 73% | 31% | 25% |
| CIM | 125 | 32 | 72 | 3 | 17 | 1 |
| *Effective* | | 69% | 51% | 100% | 30% | 0% |
| CIW | 55 | 21 | 30 | 4 | 0 | 0 |
| *Effective* | | 100% | 53% | 25% | | |
| CMC | 153 | 92 | 52 | 9 | 0 | 0 |
| *Effective* | | 47% | 52% | 11% | | |
| CMF | 68 | 27 | 40 | 1 | 0 | 0 |
| *Effective* | | 93% | 55% | 100% | | |
| COR | 182 | 79 | 94 | 3 | 6 | 0 |
| *Effective* | | 79% | 35% | 33% | 83% | |
| CRC | 84 | 49 | 31 | 4 | 0 | 0 |
| *Effective* | | 78% | 64% | 0% | | |
| CTF | 46 | 23 | 20 | 0 | 3 | 0 |
| *Effective* | | 96% | 55% | | 100% | |
| CVSP | 27 | 7 | 14 | 6 | 0 | 0 |
| *Effective* | | 86% | 64% | 67% | | |
| DVI | 143 | 75 | 45 | 23 | 0 | 0 |
| *Effective* | | 84% | 49% | 13% | | |
| FOL | 125 | 15 | 80 | 8 | 21 | 1 |
| *Effective* | | 93% | 59% | 25% | 33% | 100% |
| HDSP | 107 | 17 | 60 | 0 | 20 | 10 |
| *Effective* | | 82% | 68% | | 25% | 60% |
| ISP | 73 | 1 | 42 | 16 | 14 | 0 |
| *Effective* | | 100% | 83% | 62% | 43% | |
| KVSP | 183 | 60 | 84 | 10 | 29 | 0 |
| *Effective* | | 57% | 63% | 40% | 38% | |

## Averages by Type of Force (continued)

### Adult Institutions

| Institution | Instances Evaluated | Physical Force | Chemical Agents | Expandable Baton | Less-Lethal Force | Deadly Force |
|---|---|---|---|---|---|---|
| LAC | 99 | 52 | 27 | 9 | 11 | 0 |
| *Effective* | | *96%* | *74%* | *22%* | *73%* | |
| MCSP | 84 | 11 | 42 | 20 | 11 | 0 |
| *Effective* | | *64%* | *79%* | *15%* | *46%* | |
| NKSP | 135 | 67 | 43 | 23 | 23 | 2 |
| *Effective* | | *79%* | *44%* | *44%* | *39%* | *100%* |
| PBSP | 143 | 35 | 90 | 6 | 11 | 1 |
| *Effective* | | *89%* | *34%* | *17%* | *36%* | *100%* |
| PVSP | 76 | 38 | 20 | 7 | 11 | 0 |
| *Effective* | | *79%* | *50%* | *43%* | *64%* | |
| RJD | 183 | 107 | 51 | 16 | 9 | 0 |
| *Effective* | | *78%* | *71%* | *75%* | *68%* | |
| SAC | 144 | 69 | 48 | 14 | 13 | 0 |
| *Effective* | | *84%* | *77%* | *21%* | *23%* | |
| SATF | 94 | 29 | 41 | 13 | 11 | 0 |
| *Effective* | | *76%* | *63%* | *23%* | *55%* | |
| SCC | 23 | 8 | 12 | 0 | 3 | 0 |
| *Effective* | | *100%* | *92%* | | *33%* | |
| SOL | 87 | 20 | 46 | 8 | 13 | 0 |
| *Effective* | | *80%* | *59%* | *50%* | *23%* | |
| SQ | 90 | 24 | 46 | 10 | 10 | 0 |
| *Effective* | | *96%* | *72%* | *80%* | *50%* | |
| SVSP | 67 | 13 | 53 | 0 | 1 | 0 |
| *Effective* | | *100%* | *70%* | | *0%* | |
| VSPW | 62 | 36 | 24 | 2 | 0 | 0 |
| *Effective* | | *83%* | *58%* | *100%* | | |
| WSP | 149 | 58 | 60 | 15 | 16 | 0 |
| *Effective* | | *71%* | *70%* | *40%* | *69%* | |
| **SUM** | 3271 | 1192 | 1508 | 257 | 293 | 20 |
| **Averages** | | 78.19% | 60.94% | 40.07% | 41.29% | 60.00% |

**APPENDIX D: Timeliness of Reviews – Adult Institutions**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Timeliness of Reviews** | | | | | | |
| **Adult Institutions** | | | | | | |
| **Institution** | **Incidents Evaluated** | **Incident Commander** | **1st Level Manager** | **2nd Level Manager** | **Institution Head/ IERC** | **Total Days for Review** |
| ASP | 30 | 5 | 7 | 12 | 14 | 38 |
| CAL | 31 | 4 | 9 | 4 | 17 | 33 |
| CCC | 19 | 3 | 6 | 6 | 49 | 63 |
| CCI | 27 | 1 | 7 | 5 | 28 | 41 |
| CCWF | 29 | 1 | 10 | 7 | 32 | 49 |
| CEN | 38 | 3 | 7 | 6 | 25 | 41 |
| CIM | 34 | 2 | 14 | 1 | 24 | 41 |
| CIW | 22 | 3 | 9 | 10 | 27 | 54 |
| CMC | 30 | 3 | 21 | 10 | 25 | 59 |
| CMF | 30 | 6 | 18 | 8 | 18 | 49 |
| COR | 43 | 3 | 10 | 7 | 16 | 37 |
| CRC | 28 | 1 | 6 | 4 | 15 | 26 |
| CTF | 23 | 1 | 4 | 4 | 23 | 31 |
| CVSP | 13 | 1 | 5 | 2 | 19 | 26 |
| DVI | 46 | 1 | 3 | 3 | 21 | 27 |
| FOL | 40 | 1 | 6 | 4 | 27 | 38 |
| HDSP | 38 | 8 | 9 | 2 | 23 | 43 |
| ISP | 35 | 1 | 10 | 6 | 61 | 78 |
| KVSP | 62 | 2 | 15 | 8 | 51 | 77 |
| LAC | 37 | 1 | 9 | 5 | 66 | 80 |
| MCSP | 27 | 1 | 8 | 5 | 34 | 48 |
| NKSP | 47 | 2 | 9 | 8 | 21 | 40 |
| PBSP | 52 | 15 | 7 | 7 | 27 | 58 |
| PVSP | 28 | 4 | 9 | 14 | 37 | 64 |
| RJD | 71 | 2 | 9 | 11 | 66 | 87 |
| SAC | 43 | 1 | 9 | 5 | 23 | 39 |
| SATF | 39 | 1 | 9 | 13 | 26 | 49 |
| SCC | 16 | 1 | 7 | 6 | 46 | 60 |
| SOL | 32 | 2 | 20 | 10 | 47 | 79 |
| SQ | 43 | 1 | 9 | 5 | 70 | 85 |
| SVSP | 37 | 2 | 9 | 4 | 71 | 85 |
| VSPW | 26 | 1 | 6 | 8 | 21 | 36 |
| WSP | 57 | 2 | 10 | 7 | 14 | 33 |
| **SUM / AVGS** | **1173** | **3** | **9** | **7** | **33** | **51** |

*(Timelines were rounded to the nearest day)*

**APPENDIX E: Statewide Review Summary – Adult Institutions**

| Institution | Officer Reports | | Requested Clarifications | Clarifications or Policy Deviations Addressed | | |
|---|---|---|---|---|---|---|
| | Incidents Evaluated | All Reports Adequate | Incident Commander | 1st Level Manager | 2nd Level Manager | Institution Head |
| ASP | 30 | 64.3% | 30.0% | 0.0% | 33.3% | 100.0% |
| CAL | 31 | 70.1% | 40.0% | 20.0% | 11.1% | 22.2% |
| CCC | 19 | 84.2% | 0.0% | 0.0% | 0.0% | 100.0% |
| CCI | 27 | 55.6% | 17.6% | 84.6% | 50.0% | 100.0% |
| CCWF | 29 | 72.4% | 12.1% | 0.0% | 30.0% | 16.7% |
| CEN | 38 | 36.8% | 8.3% | 12.1% | 4.5% | 38.1% |
| CIM | 34 | 73.5% | 33.3% | 62.1% | 0.0% | 25.0% |
| CIW | 22 | 60.0% | 50.0% | 0.0% | 20.0% | 50.0% |
| CMC | 30 | 50.0% | 12.1% | 46.2% | 14.3% | 22.2% |
| CMF | 30 | 79.3% | 62.1% | 58.3% | 44.4% | 87.1% |
| COR | 43 | 44.2% | 8.3% | 13.6% | 22.2% | 62.1% |
| CRC | 28 | 67.9% | 22.2% | 18.2% | 0.0% | 0.0% |
| CTF | 23 | 65.2% | 0.0% | 0.0% | 0.0% | 12.1% |
| CVSP | 13 | 92.3% | 0.0% | 0.0% | 0.0% | 0.0% |
| DVI | 46 | 95.5% | 92.6% | 16.7% | 20.0% | 33.3% |
| FOL | 40 | 37.1% | 0.0% | 3.8% | 0.0% | 8.0% |
| HDSP | 38 | 50.0% | 47.4% | 33.3% | 50.0% | 50.0% |
| ISP | 35 | 48.6% | 26.3% | 53.8% | 16.7% | 33.3% |
| KVSP | 62 | 56.5% | 3.4% | 11.5% | 0.0% | 64.3% |
| LAC | 37 | 70.3% | 16.7% | 37.1% | 20.0% | 33.3% |
| MCSP | 27 | 59.3% | 9.1% | 9.1% | 10.0% | 30.0% |
| NKSP | 47 | 57.4% | 34.8% | 85.7% | 83.3% | 50.0% |
| PBSP | 52 | 95.7% | 90.9% | 40.0% | 25.0% | 50.0% |
| PVSP | 28 | 59.3% | 8.3% | 45.5% | 66.7% | 50.0% |
| RJD | 71 | 54.9% | 8.8% | 2.9% | 2.9% | 5.9% |
| SAC | 43 | 48.8% | 13.0% | 13.0% | 10.0% | 5.3% |
| SATF | 39 | 56.4% | 0.0% | 16.7% | 6.7% | 26.7% |
| SCC | 16 | 43.8% | 11.1% | 44.4% | 20.0% | 100.0% |
| SOL | 32 | 71.9% | 57.1% | 33.3% | 12.1% | 0.0% |
| SQ | 43 | 86.0% | 30.8% | 7.7% | 30.8% | 46.2% |
| SVSP | 37 | 100.0% | 80.0% | N/A | 100.0% | 66.7% |
| VSPW | 26 | 80.8% | 0.0% | 50.0% | 75.0% | 100.0% |
| WSP | 57 | 59.6% | 30.4% | 66.7% | 33.3% | 75.0% |
| **AVGS** | **1173** | **64.19%** | **27.87%** | **26.68%** | **16.35%** | **33.33r%** |

# Exhibit 115



| | |
|---|---|
| **From:** | Michael W. Bien <MBien@rbgg.com> |
| **Sent:** | Wednesday, February 20, 2013 5:03 PM |
| **To:** | Armstrong Team - RBG only |
| **Subject:** | FW: Coleman discovery [IWOV-DMS.FID25914] |
| **Attachments:** | AH DATA 1-28.xlsx; AH DATA 1-32.xlsx; AH summaries1-23.pdf; AH Summary 1-32.pdf; AH Summary May-Nov 2012.pdf |

---------------------------------------------

**From:** Jay Russell[SMTP:JAY.RUSSELL@DOJ.CA.GOV]
**Sent:** Wednesday, February 20, 2013 5:02:06 PM
**To:** Aaron Fischer
**Cc:** Patrick McKinney; William Downer; Maneesh Sharma; Debbie Vorous;
Coleman Team - RBG Only; Steve Fama;
Katherine@CDCR Tebrock (katherine.tebrock@cdcr.ca.gov);
Schwartz, Jennifer@CDCR (jennifer.schwartz@cdcr.ca.gov)
**Subject:** RE: Coleman discovery [IWOV-DMS.FID25914]
**Auto forwarded by a Rule**


Aaron –

In response to your email message below, documents responsive to Plaintiffs' second request for production are being delivered to your office overnight for delivery tomorrow.  As you are surely aware, William Downer, who has been coordinating document responses, is at Kern Valley today accompanying Plaintiffs' counsel and experts during their inspection.  When Mr. Downer returns to the office, documents responsive to the third request will be reviewed, Bates stamped, and then delivered to your office on February 22.

During our telephone conference last Friday, Defendants agreed to use their best efforts to provide further responses to Plaintiffs' requests, but made no promises to provide documents by today.  Indeed, during the telephone conference, you demanded that documents be provided by Thursday February 21, *not* today.  Moreover, at no time during that call did you place any particular primacy in documents responsive to requests 76 through 78.  For you to now ask for production of these document within hours of your email below, sent yesterday afternoon at 3:00 p.m., is simply unreasonable.

In any event, we are completing preparation of documents responsive to requests numbers 76 and 77, and they should be included in the delivery to your office on Friday.  At this juncture, CDCR has determined there are no further documents responsive to request 78 that are not already in Plaintiffs' position.  In addition, I am attaching to this email documents in native format documents that are responsive to request number 76.  (A second email with remaining documents will immediately follow this transmission.)  These have *not* been Bates stamped but, as stated above, will be included in the formal production provided to your office on Friday.  To that end, if you intend to use any of these documents during Mr. Johnson's deposition on Monday, I ask that the Bates stamped version of these documents be introduced into the record, rather than the unmarked documents that accompany this email.

Should you have any questions, please contact me.


**From:** Aaron Fischer [mailto:AFischer@rbgg.com]
**Sent:** Tuesday, February 19, 2013 3:03 PM
**To:** Jay Russell

1

**Cc:** Patrick McKinney; William Downer; Maneesh Sharma; Debbie Vorous; Coleman Team - RBG Only; Steve Fama
**Subject:** RE: Coleman discovery [IWOV-DMS.FID25914]

Jay,

I am following up on Friday's meet and confer regarding *Coleman* discovery. I know that you and Maneesh are making further inquiries as to a number of Plaintiffs' requests for production for which Defendants had initially indicated in their written responses that they would not produce responsive documents (RFPs 28, 31, 33, 35, 38, 39, 40, 47, 53, 59, 60, 61, 64, 65, 83, 84, 90, 91, 92, 93, 94, 95, 96, 99). Please let me know the status of these follow-up inquiries as soon as possible and no later than tomorrow, 2/20. Please also let me know when we can expect to receive the privilege log you agreed Defendants would produce for all RFPs, as appropriate.

As we agreed, Defendants will produce in *native format* all responsive charts and other documents that cannot be practically viewed in PDF or hard copy form.  Plaintiffs agreed to this on the understanding that Defendants would promptly re-produce any other documents, upon Plaintiffs' request, in native format as appropriate.

We have yet to receive any production of documents responsive to Request Sets 2 and 3; we requested that we receive all or the bulk of the production by tomorrow, 2/20.  As you know, the court-ordered discovery cut-off is 10 days from now, and production must move forward without delay. Depositions of Defendants' declarants begin *this week*.  If we have not received a sufficient production in advance of these depositions, we may have to continue certain depositions over to a second day. For example, we must have produced, by Noon tomorrow (2/20), *all documents responsive to RFPs 76-78*.

In an effort to reduce the burden of discovery on Defendants, we agreed to provide search terms and custodians in order to narrow the search for documents responsive to RFPs 48, 81, and 85.  We expect to provide that information shortly.

Thank you for your attention and ongoing efforts. Let me know if you have any questions about the above.

Many thanks,
Aaron


Aaron J. Fischer, Esq.
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
Tel: (415) 433-6830
Fax: (415) 433-7104
afischer@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Jay Russell [mailto:Jay.Russell@doj.ca.gov]
**Sent:** Friday, February 15, 2013 10:21 AM
**To:** Aaron Fischer

**Cc:** Patrick McKinney; William Downer; Maneesh Sharma
**Subject:** RE: Coleman discovery [IWOV-DMS.FID25914]

Aaron – Are you available for a telephone conference with Maneesh Sharma of our office and me at 11 am?

Also, responses to the third set of Requests for Production were served both via email and regular mail last night.

Jay C. Russell
Supervising Deputy Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
415.703.5717
415.703.5843 Facsimile
jay.russell@doj.ca.gov

---

**From:** Aaron Fischer [mailto:AFischer@rbgg.com]
**Sent:** Thursday, February 14, 2013 5:39 PM
**To:** Debbie Vorous; William Downer
**Cc:** Lisa Ells; Coleman Team - RBG Only
**Subject:** Coleman discovery [IWOV-DMS.FID25914]

Debbie and Sonny,

We would like to meet and confer regarding Defendants' responses to Plaintiffs' Second Set of Requests for Production of Documents. Please let me know when you are available on Friday for a phone call.

Also, we have not yet received responses to Plaintiffs' Third Set of Requests for Production of Documents, which are due today pursuant to the Court's order.  When can we expect those to arrive?

Thank you,
Aaron

Aaron J. Fischer, Esq.
ROSEN BIEN GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
Tel: (415) 433-6830
Fax: (415) 433-7104
afischer@rbgg.com
www.rbgg.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbgg@rbgg.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**SUMMARY OF CASES IN ALTERNATIVE HOUSING**
*May 18, 2012 - December 27, 2012*

| Week | Total in Alt Housing | Referred to HC-POP for MHCB | % Referred | Not Referred to HC-POP | % Not Referred | Hours in Alt Housing | | | | Total in Alt Housing 24 hrs or less | % in Alt Housing 24 hrs or less |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | High | Low | Median | Mean | | |
| **1** May 18 - May 24 | 81 | 48 | 59% | 33 | 41% | 170.00 | 0.58 | 20.87 | 32.39 | 47 | 58% |
| **2** May 25 - May 31 | 92 | 43 | 47% | 49 | 53% | 170.00 | 1.50 | 20.25 | 31.25 | 61 | 66% |
| **3** June 1 - June 8 | 71 | 42 | 59% | 29 | 41% | 70.00 | 0.00 | 22.60 | 28.09 | 41 | 58% |
| **4** June 9 - June 14 | 81 | 47 | 58% | 34 | 42% | 78.75 | 0.00 | 15.71 | 17.55 | 62 | 77% |
| **5** June 15 - June 21 | 68 | 44 | 65% | 24 | 35% | 84.25 | 0.67 | 18.79 | 21.03 | 50 | 74% |
| **6** June 22 - June 28 | 71 | 51 | 72% | 20 | 28% | 63.42 | 0.00 | 19.25 | 22.51 | 48 | 68% |
| **7** June 29 - July 5 | 82 | 64 | 78% | 18 | 22% | 63.42 | 0.32 | 19.43 | 22.09 | 59 | 72% |
| **8** July 6 - July 12 | 77 | 65 | 84% | 12 | 16% | 82.15 | 0.20 | 19.33 | 25.33 | 49 | 64% |
| **9** July 13 - July 19 | 76 | 62 | 82% | 14 | 18% | 57.75 | 0.50 | 20.25 | 21.15 | 52 | 68% |
| **10** July 20 - July 26 | 104 | 85 | 82% | 19 | 18% | 96.17 | 1.23 | 21.18 | 27.94 | 66 | 63% |
| **11** July 27 - Aug 2 | 79 | 63 | 80% | 16 | 20% | 84.25 | 0.08 | 21.00 | 25.87 | 47 | 59% |
| **12** Aug 3 - Aug 9 | 75 | 58 | 77% | 17 | 23% | 49.50 | 0.03 | 16.67 | 20.32 | 54 | 72% |
| **13** Aug 10 - Aug 16 | 117 | 108 | 92% | 9 | 8% | 106.00 | 0.03 | 18.83 | 23.71 | 78 | 67% |
| **14** Aug 17 - Aug 23 | 81 | 72 | 89% | 9 | 11% | 50.65 | 0.25 | 20.13 | 22.03 | 59 | 73% |
| **15** Aug 24 - Aug 30 | 116 | 113 | 97% | 3 | 3% | 90.22 | 1.48 | 19.80 | 24.46 | 79 | 68% |
| **16** Aug 31 - Sep 6 | 94 | 87 | 93% | 7 | 7% | 105.55 | 0.92 | 23.37 | 29.90 | 51 | 54% |
| **17** Sep 7 - Sep 13 | 99 | 91 | 92% | 8 | 8% | 106.58 | 1.50 | 20.67 | 25.91 | 57 | 58% |

**SUMMARY OF CASES IN ALTERNATIVE HOUSING**

*May 18, 2012 - December 27, 2012*

| Week | Total in Alt Housing | Referred to HC-POP for MHCB | % Referred | Not Referred to HC-POP | % Not Referred | Hours in Alt Housing | | | | Total in Alt Housing 24 hrs or less | % in Alt Housing 24 hrs or less |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | High | Low | Median | Mean | | |
| **18** Sep 14 - Sep 20 | 99 | 88 | 89% | 11 | 11% | 69.33 | 0.52 | 18.75 | 20.70 | 71 | 72% |
| **19** Sep 21- Sep 27 | 95 | 83 | 87% | 12 | 13% | 61.95 | 0.25 | 17.50 | 19.65 | 67 | 71% |
| **20** Sep 28 - Oct 4 | 80 | 67 | 84% | 13 | 16% | 44.60 | 0.33 | 17.67 | 18.59 | 61 | 76% |
| **21** Oct 5 - Oct 11 | 58 | 52 | 90% | 6 | 10% | 44.58 | 2.08 | 18.33 | 18.81 | 46 | 79% |
| **22** Oct 12 - Oct 18 | 67 | 53 | 79% | 14 | 21% | 51.50 | 0.52 | 17.58 | 17.06 | 55 | 82% |
| **23** Oct 19 - Oct 25 | 87 | 80 | 92% | 7 | 8% | 38.25 | 1.50 | 16.50 | 16.33 | 74 | 85% |
| **24** Oct 26 - Nov 1 | 75 | 67 | 89% | 8 | 11% | 45.58 | 4.65 | 17.75 | 19.18 | 61 | 81% |
| **25** Nov 2 - Nov 8 | 47 | 42 | 89% | 5 | 11% | 43.50 | 0.25 | 19.46 | 21.09 | 32 | 68% |
| **26** Nov 9 - Nov 15 | 48 | 43 | 90% | 5 | 10% | 44.08 | 2.58 | 17.61 | 17.95 | 40 | 83% |
| **27** Nov 16 - Nov 22 | 54 | 40 | 74% | 14 | 26% | 84.72 | 0.30 | 20.44 | 22.50 | 37 | 69% |
| **28** Nov 23 - Nov 29 | 41 | 36 | 88% | 5 | 12% | 64.50 | 0.50 | 21.18 | 22.57 | 26 | 63% |
| **29** Nov 30 - Dec 6 | 57 | 39 | 68% | 18 | 32% | 48.83 | 0.83 | 15.42 | 15.37 | 49 | 86% |
| **30** Dec 7 - Dec 13 | 49 | 38 | 78% | 11 | 22% | 42.67 | 2.25 | 18.88 | 19.99 | 38 | 78% |
| **31** Dec 14 - Dec 20 | 47 | 40 | 85% | 7 | 15% | 43.92 | 0.18 | 19.75 | 21.11 | 37 | 79% |
| **32** Dec 21 - Dec 27 | 61 | 48 | 79% | 13 | 21% | 44.58 | 1.50 | 18.42 | 20.53 | 46 | 75% |
| **TOTAL** | 2429 | 1959 | 81% | 470 | 19% | | | | | 1700 | 70% |
| **AVG/WK** | 76 | 61 | 81% | 15 | 19% | 71.91 | 0.86 | 19.17 | 22.28 | 53 | 70% |

February 4, 2013

**SUMMARY OF CASES IN ALTERNATIVE HOUSING**
*May 18, 2012 - December 27, 2012*

| Week | MHCB Placement | No MHCB Placement | TOTAL CASES | % Placed |
|------|------|------|------|------|
| **DISPOSITION OF CASES IN ALTERNATIVE HOUSING** | | | | |
| **1** May 18 - May 24 | 49 | 32 | 81 | 60% |
| **2** May 25 - May 31 | 39 | 53 | 92 | 42% |
| **3** June 1 - June 8 | 36 | 35 | 71 | 51% |
| **4** June 9 - June 14 | 43 | 38 | 81 | 53% |
| **5** June 15 - June 21 | 35 | 33 | 68 | 51% |
| **6** June 22 - June 28 | 40 | 31 | 71 | 56% |
| **7** June 29 - July 5 | 42 | 40 | 82 | 51% |
| **8** July 6 - July 12 | 43 | 34 | 77 | 56% |
| **9** July 13 - July 19 | 38 | 38 | 76 | 50% |
| **10** July 20 - July 26 | 55 | 49 | 104 | 53% |
| **11** July 27 - Aug 2 | 47 | 32 | 79 | 59% |
| **12** Aug 3 - Aug 9 | 35 | 40 | 75 | 47% |
| **13** Aug 10 - Aug 16 | 78 | 39 | 117 | 67% |
| **14** Aug 17 - Aug 23 | 44 | 37 | 81 | 54% |
| **15** Aug 24 - Aug 30 | 58 | 58 | 116 | 50% |
| **16** Aug 31 - Sep 6 | 64 | 30 | 94 | 68% |
| **17** Sep 7 - Sep 13 | 55 | 44 | 99 | 56% |
| **18** Sep 14 - Sep 20 | 57 | 42 | 99 | 58% |
| **19** Sep 21 - Sep 27 | 53 | 42 | 95 | 56% |
| **20** Sep 28 - Oct 4 | 36 | 44 | 80 | 45% |
| **21** Oct 5 - Oct 11 | 32 | 26 | 58 | 55% |
| **22** Oct 12 - Oct 18 | 32 | 35 | 67 | 48% |
| **23** Oct 19 - Oct 25 | 41 | 46 | 87 | 47% |
| **24** Oct 26 - Nov 1 | 37 | 38 | 75 | 49% |
| **25** Nov 2 - Nov 8 | 24 | 23 | 47 | 51% |
| **26** Nov 9 - Nov 15 | 22 | 26 | 48 | 46% |
| **27** Nov 16 - Nov 22 | 26 | 28 | 54 | 48% |
| **28** Nov 23 - Nov 29 | 26 | 15 | 41 | 63% |
| **29** Nov 30 - Dec 6 | 28 | 29 | 57 | 49% |
| **30** Dec 7 - Dec 13 | 32 | 17 | 49 | 65% |
| **31** Dec 14 - Dec 20 | 27 | 20 | 47 | 57% |
| **32** Dec 21 - Dec 27 | 27 | 34 | 61 | 44% |
| **TOTAL** | 1301 | 1128 | 2429 | 54% |
| **AVG/WK** | 41 | 35 | 76 | 54% |

**SUMMARY OF CASES IN ALTERNATIVE HOUSING**
*May 18, 2012 - December 27, 2012*

| Week | DISPOSITION DETAIL OF CASES REFERRED TO HC-POP | | | | DISPOSITION DETAIL OF CASES NOT REFERRED TO HC-POP | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Transferred to MHCB | Intra-Inst MHCB Placement | Rescinded (Deemed no MHCB, Outpatient Placement) | TOTAL REFERRED | Intra-Inst MHCB Placement | Deemed no MHCB, Outpatient Placement | DMH | Parole | TOTAL NOT REFERRED |
| 1 May 18 - May 24 | 22 | 14 | 12 | 48 | 13 | 19 | 0 | 1 | 33 |
| 2 May 25 - May 31 | 13 | 8 | 22 | 43 | 18 | 31 | 0 | 0 | 49 |
| 3 June 1 - June 8 | 14 | 11 | 17 | 42 | 11 | 18 | 0 | 0 | 29 |
| 4 June 9 - June 14 | 13 | 21 | 13 | 47 | 9 | 25 | 0 | 0 | 34 |
| 5 June 15 - June 21 | 19 | 9 | 16 | 44 | 7 | 17 | 0 | 0 | 24 |
| 6 June 22 - June 28 | 23 | 8 | 20 | 51 | 9 | 11 | 0 | 0 | 20 |
| 7 June 29 - July 5 | 25 | 10 | 29 | 64 | 7 | 11 | 0 | 0 | 18 |
| 8 July 6 - July 12 | 14 | 25 | 26 | 65 | 4 | 8 | 0 | 0 | 12 |
| 9 July 13 - July 19 | 29 | 6 | 27 | 62 | 3 | 11 | 0 | 0 | 14 |
| 10 July 20 - July 26 | 25 | 26 | 34 | 85 | 4 | 15 | 0 | 0 | 19 |
| 11 July 27 - Aug 2 | 29 | 15 | 19 | 63 | 3 | 13 | 0 | 0 | 16 |
| 12 Aug 3 - Aug 9 | 12 | 18 | 28 | 58 | 5 | 12 | 0 | 0 | 17 |
| 13 Aug 10 - Aug 16 | 39 | 35 | 34 | 108 | 4 | 5 | 0 | 0 | 9 |
| 14 Aug 17 - Aug 23 | 12 | 29 | 31 | 72 | 3 | 6 | 0 | 0 | 9 |
| 15 Aug 24 - Aug 30 | 33 | 24 | 56 | 113 | 1 | 2 | 0 | 0 | 3 |
| 16 Aug 31 - Sep 6 | 30 | 32 | 25 | 87 | 2 | 5 | 0 | 0 | 7 |
| 17 Sep 7 - Sep 13 | 23 | 28 | 40 | 91 | 4 | 4 | 0 | 0 | 8 |
| 18 Sep 14 - Sep 20 | 24 | 28 | 36 | 88 | 5 | 6 | 0 | 0 | 11 |
| 19 Sep 21 - Sep 27 | 22 | 27 | 34 | 83 | 4 | 8 | 0 | 0 | 12 |
| 20 Sep 28 - Oct 4 | 13 | 19 | 35 | 67 | 4 | 9 | 0 | 0 | 13 |
| 21 Oct 5 - Oct 11 | 23 | 5 | 24 | 52 | 4 | 2 | 0 | 0 | 6 |
| 22 Oct 12 - Oct 18 | 11 | 17 | 25 | 53 | 4 | 10 | 0 | 0 | 14 |
| 23 Oct 19 - Oct 25 | 17 | 23 | 40 | 80 | 1 | 6 | 0 | 0 | 7 |
| 24 Oct 26 - Nov 1 | 20 | 15 | 32 | 67 | 2 | 5 | 1 | 0 | 8 |
| 25 Nov 2 - Nov 8 | 14 | 9 | 19 | 42 | 1 | 4 | 0 | 0 | 5 |
| 26 Nov 9 - Nov 15 | 15 | 7 | 21 | 43 | 0 | 5 | 0 | 0 | 5 |
| 27 Nov 16 - Nov 22 | 12 | 8 | 20 | 40 | 6 | 8 | 0 | 0 | 14 |
| 28 Nov 23 - Nov 29 | 12 | 11 | 13 | 36 | 3 | 2 | 0 | 0 | 5 |
| 29 Nov 30 - Dec 6 | 9 | 9 | 21 | 39 | 10 | 8 | 0 | 0 | 18 |
| 30 Dec 7 - Dec 13 | 13 | 13 | 12 | 38 | 6 | 5 | 0 | 0 | 11 |
| 31 Dec 14 - Dec 20 | 13 | 10 | 17 | 40 | 4 | 3 | 0 | 0 | 7 |
| 32 Dec 21 - Dec 27 | 17 | 6 | 25 | 48 | 4 | 9 | 0 | 0 | 13 |
| TOTAL | 610 | 526 | 823 | 1959 | 165 | 303 | 1 | 1 | 470 |
| AVG/WK | 19 | 16 | 26 | 61 | 5 | 9 | 0 | 0 | 15 |

# Exhibit 116

| From: | Yi, Chris@CDCR [Chris.Yi@cdcr.ca.gov] |
|---|---|
| Sent: | Thursday, December 27, 2012 3:14 PM |
| To: | Laura Ceballos; Belavich, Tim@CDCR; Debbie Vorous |
| Cc: | Johnson, Jennifer (HCS)@CDCR; Stanley, Nathan@CDCR; Jefferson, Cathy@CDCR; Holcomb, Lisa@CDCR; Greene, Andrew@CDCR |
| Subject: | RE: LOS Data |
| Attachments: | Outlier Analysis.xlsx |

Hello,

I added my findings from examining outliers to relevant areas below (in red).  For the queries with a number of hits in the hundreds or even thousands, I picked a small sample of cases with extreme LOS numbers among outliers to see if there was any major reason for the delay.

For more detailed information, please refer to the attached excelsheet, which contains the following tabs:
- CCCMS-EOP at Desert awaitg txfr (corresponds to #1, 2, and 3 below)
- RC awaiting txfr to CCCMS (#5 "without CDCR"; #4 is the combination of #5 and #6)
- RC awaiting txfr to EOP (#6 "without CDCR")
- ML awaiting txfr to EOP (#8)
- Pending txfr from RC to ML EOP (#9)

I do not have access to SOMS, so almost all of my analysis for outliers came from looking at each inmate's patient record individually in MHTS and browsing through transaction/movement history.

Please let me know if there are any questions.

Thank you,
Chris

**From:** Yi, Chris@CDCR
**Sent:** Wednesday, December 26, 2012 5:00 PM
**To:** Ceballos, Laura@CDCR; Belavich, Tim@CDCR; 'Debbie.Vorous@doj.ca.gov'
**Cc:** Johnson, Jennifer (HCS)@CDCR; Stanley, Nathan@CDCR; Jefferson, Cathy@CDCR; Holcomb, Lisa@CDCR; Greene, Andrew@CDCR
**Subject:** RE: LOS Data

Hello all,

I re-queried and calculated the median, as requested.  Please note that some of the numbers have been updated. (Please scroll down to the original message from Dr. Ceballos.)  Since some of the files containing query results are rather large, I am not attaching any of them in this e-mail, but you can find those files at the following location (in our unit share drive):

\\accounts\HCS\HQ\Main\Public\Mental Health\Chris Yi\LOS Data

Tomorrow, I will calculate and analyze outliers (either 2 or 3 standard deviation from the mean) and report the results.

Thank you,

**Chris Yi**
AGPA
Policy Support

1

**Statewide Mental Health Program**
**Division of Health Care Services**
**Phone: 916.691.9937**
**E-mail:** Chris.Yi@cdcr.ca.gov

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

**From:** Johnson, Jennifer (HCS)@CDCR
**Sent:** Wednesday, December 26, 2012 10:58 AM
**To:** Ceballos, Laura@CDCR; Belavich, Tim@CDCR; 'Debbie.Vorous@doj.ca.gov'
**Cc:** Stanley, Nathan@CDCR; Jefferson, Cathy@CDCR; Holcomb, Lisa@CDCR; Yi, Chris@CDCR; Greene, Andrew@CDCR
**Subject:** RE: LOS Data

Thanks All.  I will have Chris work on this.  Thanks.

**Jennifer Johnson**
Chief, Policy Support
Statewide Mental Health Program
Division of Health Care Services
Office  916.691.0265

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

**From:** Ceballos, Laura@CDCR
**Sent:** Wednesday, December 26, 2012 10:47 AM
**To:** Belavich, Tim@CDCR; 'Debbie.Vorous@doj.ca.gov'
**Cc:** Stanley, Nathan@CDCR; Jefferson, Cathy@CDCR; Johnson, Jennifer (HCS)@CDCR; Holcomb, Lisa@CDCR
**Subject:** Re: LOS Data

Okay. So Jen- it looks like we will need Chris to re run some of the data. The excel spreadsheets I forwarded at least cover some of it but not all.

**From:** Belavich, Tim@CDCR
**Sent:** Wednesday, December 26, 2012 10:43 AM Pacific Standard Time
**To:** Debbie Vorous <Debbie.Vorous@doj.ca.gov>
**Cc:** Ceballos, Laura@CDCR; Stanley, Nathan@CDCR; Jefferson, Cathy@CDCR; Johnson, Jennifer (HCS)@CDCR; Holcomb, Lisa@CDCR
**Subject:** Re: LOS Data

I think it will be a stronger and more sound argument. And it will look better so we don't have to play with dropping outliers.

Timothy G. Belavich, Ph.D., MSHCA, CCHP,
Deputy Director (A),
Statewide Mental Health Program

Office: 1-916-691-0296
Mobile: 1-661-857-1948

On Dec 26, 2012, at 10:39 AM, "Debbie Vorous" <Debbie.Vorous@doj.ca.gov> wrote:

Tim, I agree.  If it is possible to run the median numbers, please do.  Thank you!

**From:** Belavich, Tim@CDCR [mailto:Tim.Belavich@cdcr.ca.gov]
**Sent:** Wednesday, December 26, 2012 10:37 AM
**To:** Debbie Vorous
**Cc:** Ceballos, Laura@CDCR; Stanley, Nathan@CDCR; Jefferson, Cathy@CDCR; Johnson, Jennifer (HCS)@CDCR; Holcomb, Lisa@CDCR
**Subject:** Re: LOS Data

I hate to say this but are you better off reporting the median so you can take those outliers into account and thy don't have the weight on the total.

Tim

Timothy G. Belavich, Ph.D., MSHCA, CCHP,
Deputy Director (A),
Statewide Mental Health Program

Office: 1-916-691-0296
Mobile: 1-661-857-1948

On Dec 26, 2012, at 10:32 AM, "Debbie Vorous" <Debbie.Vorous@doj.ca.gov> wrote:

> Thank you Laura.  Jennifer, can you please have Chris check the outliers as Laura notes
> below.  Thank you.
>
> **From:** Ceballos, Laura@CDCR [mailto:Laura.Ceballos@cdcr.ca.gov]
> **Sent:** Monday, December 24, 2012 2:50 PM
> **To:** Debbie Vorous
> **Cc:** Stanley, Nathan@CDCR; Belavich, Tim@CDCR; Jefferson, Cathy@CDCR; Johnson,
> Jennifer (HCS)@CDCR; Holcomb, Lisa@CDCR
> **Subject:** LOS Data
>
> Hi, Debbie.
>
> Below is the LOS data requested.
>
> **Reference: Page 2, Section 5.  Transfers from Desert Institutions. All LOCs.**
>
> From August 1-November 30, 2012, the average LOS for inmates at the CCCMS and EOP
> LOCs awaiting transfer to a MHSDS institution was 53.0 days, with a range of .3-122
> days.
>
> File:  1 - LOS of CCCMS and EOP inmates at Desert Institutions.xlsx
> - Average LOS  = 27.2
> - Median LOS = 22.2
> - Range:  0 - 122
>
> **Summary:**
> - From 8/1/2012 to 11/30/2012, 98.44% of CCCMS and EOP LOC
>   inmates had LOS within the policy required transfer times
>   (CCCMS – 90 days; EOP – 60 days).

3

**Breakdown: CCCMS Inmates at Desert Institutions**

Of the CCCMS inmates, the average LOS was 27.5 and the range was 1-122 days.

Of those CCCMS inmate with a LOS of 77.2 or higher (outliers although I did not statistically determine this) – one inmate with 122 days LOS as of Nov. 30, is still at a desert institution (ISP). This inmate is SNY.

All others were transferred to other institution. Data appears to accurate for all of these inmates.

File:  2 - LOS of CCCMS inmates at Desert Institutions.xlsx
- Average LOS  = 27.5
- Median LOS = 23.4
- Range:  0 - 122

**Summary:**
- From 8/1/2012 to 11/30/2012, 98.39% of CCCMS LOC inmates had LOS within the policy required transfer time (90 days).

- Among four cases where the LOS was greater than 90days, three inmates were still at their desert institution, and one inmate moved to SAC.  Two of the four inmates are SNY.

**EOP Inmates at Desert Institutions:**

The Average LOS from August 1-Nov. 30, 2012 was 18.4 days, with a range of 17.6 to 35.9 days.

There were no significant outliers in this data set.

File: *3 - LOS of EOP inmates at Desert Institutions.xlsx*
- Average LOS  = 18.4
- Median LOS = 13.7
- Range:  0 - 35.9

**Summary:**
- From 8/1/2012 to 11/30/2012, 100% of EOP LOC inmates had LOS within policy required transfer times (60 days).

**Reference: Page 3, RC Transfers to ML MHSDS Programs.**

From August 1, 2012 to November 30, 2012, the average LOS inmates at the  RC awaiting transfer to a ML CCCMS or EOP program was 123.2 days.  Due the large size of this data, the range was not available.  **This can be hand counted if necessary but will take a significant amount of time.**

**NOTE:  When I ran with every institution (including CDCR) selected in the "institution" part of the query window, I got 123.2, but when I ran without CDCR selected (but all the institutions selected), I got a different result.  I thought CDCR should be unselected when querying for all the institutions.  Please advise on which data to use.**

4

File: 4 (without CDCR)- LOS for inmates at RC waiting transfer to ML CCCMS or EOP.*xlsx*

- Average LOS = 84.1
- Median LOS = 49.8
- Range: 0 - 1697

File: 4 (with CDCR)- LOS for inmates at RC waiting transfer to ML CCCMS or EOP.*xlsx*

- Average LOS = 123.2
- Median LOS = 59.6
- Range: 0 - 1697

## Breakdown: CCCMS RC inmates awaiting transfer

The average LOS from August 1, 2012, to Nov. 30, 2012 for RC inmates awaiting transfer to a CCCMS program was 90.1 days. Due to the large size of this data, the range was not available. This can be hand counted if needed.

File: 5 (without CDCR) - LOS for inmates at RC waiting transfer to ML CCCMS.*xlsx*

- Average LOS = 90.1
- Median LOS = 53.9
- Range: 0 – 1150

Timeline:      8/1/2012 to 11/30/2012

Summary:

| | |
|---|---|
| Total # of inmates in RC awaiting to transfer to ML CCCMS Program | 6572 |
| # of inmates in RC (awaiting to transfer to CCCMS) whose LOS is greater than 90 days | 2078 |
| # of inmates with LOS less than 90 | 4494 |
| % of inmates in RC transferred within policy required transfer times to ML CCCMS program (90 days): | 68% |
| | |
| Total # of cases (LOS greater than 90 days): | 2078 |
| # of cases checked: | 50 |
| # of 1s (SNY) | 37 |
| # of 0s (non-SNY) | 13 |
| % of inmates requiring and moving to SNY | 74% |

- Based on the sample size of 50 cases with most extreme LOSs, SNY appears to a major reason for the delay.

File: 5 (with CDCR) - LOS for inmates at RC waiting transfer to ML CCCMS.*xlsx*

5

- Average LOS = 130.1
- Median LOS = 64.3
- Range: 0 - 1697

The average LOS from August 1, 2012 to Nov. 30, 2012 for RC inmates awaiting transfer to an EOP program was 35.9 days, with a range of .2-122 days.

File: 6 (without CDCR) - LOS for inmates at RC waiting transfer to ML EOP.xlsx

- Average LOS = 37.8
- Median LOS = 23.3
- Range: 0 - 891

Timeline:

|  | 8/1/2012 to 11/30/2012 |
|---|---|

Summary:

| Total # of inmates in RC awaiting to transfer to ML EOP Program | 849 |
|---|---|
| # of inmates in RC (awaiting to transfer to EOP) whose LOS is greater than 60 days | 213 |
| # of inmates with LOS less than 60 days | 636 |
| % of inmates in RC with LOS within policy required transfer times to ML EOP program (60 days): | 75% |
|  |  |
| Total # of cases (LOS greater than 60 days): | 213 |
| # of cases checked: | 30 |
| # of 1s (SNY) | 22 |
| # of 0s (non-SNY) | 8 |
| % of inmates requiring and moving to SNY | 73% |

- Again, waiting for SNY appears to a major reason for the delay.

File: 6 (with CDCR) - LOS for inmates at RC waiting transfer to ML FOP.xlsx

- Average LOS = 68.9
- Median LOS = 32.6
- Range: 0 - 891

I did not check the outliers. If needed, Jennifer Johnson is prepared to have Chris Yi complete this on Wed.

Reference: Page 4, Section 9, Current data regarding transfer timelines for EOP.

1. Inmates pending transfer from ML CCCMS to an EOP Program

How Data were run: We ran the LOS report for Dec. 17. Because the computer doesn't know the different between an inmate who is in ML housing and in an actual EOP program vs. one who is pending arrival to an official EOP program (both designation are ML EOP: ML is ML housing and EOP is LOC), we selected only institutions that DO NOT have an EOP program. Keep in mind inmates who are pending placement in an official EOP program who are at an institution that DOES HAVE an EOP are excluded from this sample.

As of December 17, 2012 (we ran one week prior to allow data entry time), the average LOS for inmates at a ML program awaiting transfer to an EOP program was 50.4 Range: 0.1 – 271.5

File: 7 - LOS for inmates at ML prog waiting transfer to EOP.xlsx

- Average LOS = 50.4
- Median LOS = 27.4
- Range: 0.1 – 271.5

Timeline:        12/17/2012

Summary

| | |
|---|---|
| Total # of inmates in ML awaiting to transfer to ML EOP Program | 42 |
| # of inmates in ML (awaiting to transfer to EOP) whose LOS is greater than 60 days | 13 |
| # of inmates with LOS less than 60 days | 29 |
| % of inmates in ML with LOS within policy required transfer times to an EOP program (60 days): | 69% |
| | |
| Total # of cases (LOS greater than 60 days): | 13 |
| # of cases checked: | 13 |
| # of 1s (SNY) | 9 |
| # of 0s (non-SNY) | 4 |
| % of inmates requiring and moving to SNY | 69% |

- Again, waiting for any SNY slot to open up appears to a major reason for the delay.

I did not check the outliers on this data.  If needed, Chris can do so on Wed.

2. Inmates pending transfer from Desert Institutions to ML EOP
How data were run: We ran the LOS (beta) report for Dec. 17. Desert institutions were selected and EOP LOC.

As of Dec. 17, the average LOS for inmates housed at Desert Institutions awaiting EOP was 6.6 days.  There was only one inmate awaiting transfer at this time.

7

File: *8 - LOS for inmates at Desert Institutions awaiting EOP.xlsx*

- Average LOS = 6.6
- Median LOS = 6.6
- **Range: No range (sample size of 1)**

I checked all inmates with a LOS greater than 60 days (current requirement). Of those 12 cases, 6 were SNY, 2 were in the MHCB, one has since transferred to an EOP program (on 12/19, just outside of the parameter of this report – total LOS was 273.5 days for this I/P- top of our range), and the remaining three were still pending and no evidence of data problems was identified.

**I did not check the outliers for this but if needed Chris can do so on Wed.**

### 3. Inmates pending transfer from RC to a ML EOP.

As of Dec. 17, the average LOS for inmates housed at a reception center awaiting transfer to an EOP was 43.7 days, with a range of .1-283.3 days.

File: *9 - LOS for inmates at RC awaiting transfer to EOP.xlsx*

- Average LOS = 43.7
- Median LOS = 28.8
- Range: 0.1 – 283.2

Timeline:   12/17/2012

Summary:

| Total # of inmates pending transfer from RC to a ML EOP | 152 |
|---|---|
| # of inmates whose LOS is greater than 60 days | 39 |
| # of inmates with LOS less than 60 days | 113 |
| % of inmates in RC with LOS within policy required transfer times to a ML EOP (60 days): | 74% |

| Total # of cases (LOS greater than 60 days): | 39 |
|---|---|
| # of cases checked: | 11 |
| # of 1s (SNY) | 0 |
| # of 0s (non-SNY) | 11 |
| % of inmates requiring and moving to SNY | 0% |

- Based on all the cases I checked, I could not tell why these inmates have not been moved as of 12/17. Except for one inmate who was moved from SQ to SAC and placed in ML EOP, all the other ones were still at their institution and in RC.

8

**I did not check the outliers for this but if needed Chris can do so on Wed.**

I will be out the rest of the week but Jennifer knows what is needed and has said she will pass this along to Chris as needed. I will try to also check my blackberry but will not be on it constantly.

Thank You,

Laura Ceballos, Ph.D.
Chief Psychologist, Quality Management
CDCR-DCHCS Mental Health Program
(916) 691-0308

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit 117

Presiding Judge Karlton - 1990 Present
Handles all issues in Coleman
Judge Mueller - review "pay of master"
Judge Wanlelle

Karlton - does not like state DF appeal
rules of evidence not applied -
conformity
takes plaintiff findings as truth

e.g. languaging & dying -
constitute - DVM rule, want lots
projects on board - build more
beds, incapacity, suicide
goal - focus on system - not place judge

Consultants Rules -
spreadsheets - outstanding events Coleman)
cashless, agreements
look at constitutional requirements
medial - clearly states right of MT

DEXP 102026

# Exhibit 118

DR VERBRUGGE

- CCCMS   350:1
- AD . SEG
  - DB — Nol (NINE NAW)
- SUICIDE — ALL IN STRIPPED CELL
- ✓ MOVE EOP'S OUT OF HERE
  - PRIORITIZE
- ✓ NO SEG REFUSALS (X 5)(Q I)
- ✓   "    "   MIRAM
- ✓ TX PLANS SPARSE IN AD SEG
- ✓ "Responsible person is the inmate"
- ✓ Can't remove from CCCMS for 8 months post crisis
  - ⇒ More to far EOP
- ✓ EACH MOVE = NEW ADMISSION

# Exhibit 119

9      Seg

830  make sounds to clean on
130    enhanced sounds
① Get roster in morning of whose
② 5 day FU - if released from MH
      Crisis see for 5 day
③ self referrals
get roster from Prison worker
have alpha roster
    housing "

SPT do ad seg assessment -
   needs a 35 questions comes to them
   from R&R -
    if go from East & west yard
      go thru R&R -
LOB - have meals out, use different
    yard, appt medical
MH request usually verbal -
if issue documents on security log -
ad seg staffed LPC - 5pm -
no nursing staff -
  once x wk see MH clinician
    psychiatrist 1-x4 wks
      unless & meds
    Psy lines - M-W-F doctor
      Follow-up appts -

DEXP 102627

# Exhibit 120

Have lost 14 psycologists &
    2 mental health supervisors

reduction in supervisory less
    ability to do oversight —

    non clinical positions (OTurr)

caught up ō EWHR —
    may be

Deb Login knows EWHR

Biggest challenge:

    LOB — lack of bed lock ups
    lack of general pop beds here —
    300 beds overflow may
    go into Ad Seg.

Do Ad Seg Ad Seg housing
    has to used by
        Ad Seg rules even
    if not actual Ad Seg
        client —

# Exhibit 121

②

Judge Karlton
   Nates state & N6.

New Audit Tool

Pgm guide has 550 things          Things the master
                                  Special monitors me
They measure + report 120 items
        by level of care

Dashboard Indicators = 6
CEO Runs medical at each prison - "Warden is not
                                      in the game"
∴ Net is now 80+% accurate

_____

RVR = Rules Violation Report
I/m's at lower level of care    CCCMS
        Clenical assessment
Did forensic evals for all
Now doing AB +C offenses
Plaint + Monitor wanted more included eg lots of
                                       RVR's

AD seg
     people waiting 90 days  Seg → GP

_____
Detailed use of force
No taser

**DEXP 103259**

# Exhibit 122

**Patrick McKinney**

| From: | Jackie Moore <moor143@attglobal.net> |
|---|---|
| Sent: | Thursday, February 14, 2013 8:58 AM |
| To: | Patrick McKinney |
| Subject: | FW: Report |

**From:** Joel Dvoskin [mailto:joelthed@aol.com]
**Sent:** Monday, December 10, 2012 9:36 AM
**To:** moor143@attglobal.net; charles.scott@ucdmc.ucdavis.edu
**Cc:** Debbie.Vorous@doj.ca.gov; Patrick.McKinney@doj.ca.gov
**Subject:** Report

Dear Jackie and Charles -

Charles sent the draft report to Patrick today. It included a lot of what Jackie reported at exit conferences. This will give them a pretty good idea of where the team is headed, and meets the Governor's Office's deadline. Jackie, I'd suggest two steps. First, as soon as it's possible and convenient, read what we've written to make sure that we haven't misquoted your overall findings. The sooner you can do this the better, but it won't take too long. Then, when you have more time, you can add whatever needs to be added.

I wish we had all been given a little more time, but I understand. Our original plan was a good one, but then the Governor's Office and the Attorney General's Office decided that they needed the report sooner than we had anticipated. A lot of the facility-by-facility work that Charles and I had done on our part became moot. Anyway, they were really nice about it, as always, but we were told that Dec. 10 was a "drop-dead" date for a draft of the report. I think we've met that deadline, and look forward to seeing Jackie's additions to the final report as soon as she can get them completed.

Jackie, I hope that your friend's surgery goes well.

I've copied this note to Patrick and Debbie as well, so they can let us know when they will need Jackie's additions and our final edit of the report.

Warm holiday regards to all,
Joel

Joel A. Dvoskin, Ph.D., ABPP (Forensic)
University of Arizona College of Medicine

1

DEXP 103070

# Exhibit 123

E X E C U T I V E    S U M M A R Y

# The Future of California Corrections

*A blueprint to save billions of dollars, end federal court oversight and improve the prison system*

## INTRODUCTION

For years, California's prison system has faced costly and seemingly endless challenges.  Decades-old class-action lawsuits challenge the adequacy of critical parts of its operations, including its health care system, its parole-revocation process, and its ability to accommodate inmates with disabilities.  In one case, a federal court seized control over the prison medical care system and appointed a Receiver to manage its operations.  The Receiver remains in place today.  The state's difficulty in addressing the prison system's multiple challenges was exacerbated by an inmate population that—until recently—had been growing at an unsustainable pace.  Overcrowded prison conditions culminated in a ruling last year by the United States Supreme Court ordering the California Department of Corrections and Rehabilitation to reduce its prison population by tens of thousands of inmates by June 2013.  At the same time that prison problems were growing, California's budget was becoming increasingly imbalanced.  By 2011, California faced a $26.6 billion General Fund budget deficit, in part because the department's budget had grown from $5 billion to over $9 billion in a decade.

To achieve budgetary savings and comply with federal court requirements, the Governor proposed, and the Legislature passed, landmark prison realignment legislation to ease prison crowding and reduce the department's budget by 18 percent.  Realignment created and funded a community-based correctional program where lower-level offenders remain under the jurisdiction of county governments.  In the six months that realignment has been in effect, the state prison population has dropped considerably—by approximately 22,000 inmates.  This reduction in population is laying the groundwork for sustainable solutions.  But realignment alone cannot fully satisfy the Supreme Court's order or meet the department's other multi-faceted challenges.

This plan builds upon the changes brought by realignment, and delineates, for the first time, a clear and comprehensive plan for the department to save billions of dollars by achieving its targeted budget reductions, satisfying the Supreme Court's ruling, and getting the department out from under the burden of expensive federal court oversight.

### *Saving Billions of Dollars*

Given the ongoing budget problems facing California it has become increasingly important to reexamine the mission and priorities of the corrections system.  With dedicated funding directed to county

governments to manage lower-level offenders, realignment allows the state to focus on managing the most serious and violent offenders. And it allows counties to focus on community-based programs that better promote rehabilitation. Not only is this good corrections policy, but it also allows the state to achieve significant budgetary savings from a department whose share of General Fund expenditures had grown from 3 to 11 percent over the last 30 years.

### CDCR Percentage of State General Fund Expenditures in 1979-80



### CDCR Percentage of State General Fund Expenditures in 2008-09



One of the primary benefits of realignment is the ability of the department to comply with the Supreme Court's order without releasing tens of thousands of inmates or building costly new prisons. Absent realignment, and given the public safety risk associated with releasing offenders early, the state would have had to build up to nine new prisons and house more inmates in private contract facilities in order to comply with the Supreme Court's order. Instead, the Administration is now proposing legislation to eliminate approximately $4.1 billion of the lease revenue bond authority in Assembly Bill 900. Eliminating this bond authority and no longer needing to build new stand-alone prisons will avoid $2.2 billion annually in new operating costs and facility debt service costs.

In addition to billions of dollars in avoided costs, upon full implementation of realignment, the department's annual budget will be

reduced by $1.5 billion through reduced expenditures associated with declining offender populations and new efficiencies. Consequently, the department's budget will account for approximately 7.5 percent of state General Fund expenditures in the future. All departmental operations, including headquarters and administration, have reassessed their budgets to correspond with the smaller offender populations being served in prison and on parole. As a result of the declining populations, the state will be able to save nearly half a billion dollars by closing the California Rehabilitation Center—one of its oldest, most costly, and inefficient prisons to operate—and ending contracts for out-of-state prison facilities. The savings contemplated in this plan will be attained by safely reclassifying inmates, housing inmates in facilities that are commensurate with their custody level, and working to reduce recidivism. Capitalizing on the opportunities created by realignment will create a safer, more effective correctional system, and allow the state to regain control of its prison system by satisfying federal court requirements.

Combining the actual budget savings with the avoided expenditures that would have been required without realignment, over a ten year span the state will have saved and avoided over $30 billion in General Fund costs that may now be used to help balance the state budget or for other critical areas such as education and health care.



**Fiscal Impact from Realignment**
(Dollars in thousands)

### *Realignment is Reducing Prison Crowding and Facilitating Compliance with the Supreme Court's Order*

Between 1986 and 2006, California's prison population soared from approximately 60,000 inmates to an all-time high of 173,479 inmates.  At its peak, the inmate population had grown to more than double the designed housing capacity, forcing the department to house close to 20,000 inmates in gymnasiums, dayrooms, and other nontraditional housing areas—often in triple-bunks.  To help alleviate the overcrowded conditions, an executive order was issued in late 2006 that authorized the department to involuntarily transfer inmates to privately-owned prisons out-of-state.  Since then, the department has housed an annual average of about 10,000 inmates in other states.

The United States Supreme Court ruling in 2011 ordered the department to reduce prison crowding to 137.5 percent of the prison system's design bed capacity by June 2013.  In the interim, the court ordered the department to meet incremental crowding-reduction targets at six-month intervals.  The Court's final population requirement equates to a reduction of over 40,000 inmates from the department's all-time high just a few years ago.

Few options are available to satisfy the Supreme Court's order.  Releasing tens of thousands of dangerous felons onto the streets would endanger public safety.  And spending taxpayer dollars the state does not have to build several more costly prisons would be fiscally irresponsible.  A safer and less expensive alternative—realignment—was proposed by the Administration, adopted by the California Legislature, and went into effect on October 1, 2011.  Under realignment, lower-level offenders serve their sentences locally, and lower-level offenders released from state prison are supervised by local probation officers instead of state parole agents.  Offenders who have been convicted of violent, sex-related, or other serious offenses continue to serve their sentences in prison.  Realignment also ends the revolving door of parole violators returning to prison for only weeks or months at a time by having them serve their revocation terms in local jails rather than state prison.

Since realignment took effect, the department's offender population has dropped by approximately 22,000 inmates and 16,000 parolees.  Crowding has been reduced from a high of over 200 percent of design capacity to just 155 percent today.  The state achieved the first of its four court-ordered population-reduction benchmarks on time and has already met its second, two months early.  The thousands of makeshift beds in gymnasiums and dayrooms that the department has been forced to use for years are now gone.

(right) *Before and after photographs of the gymnasium at the California Institution for Men show the dramatic effect realignment has had on reducing nontraditional housing*





### Even After Realignment, Serious Challenges Remain

Although the state's prison population continues to shrink, realignment alone will not be enough to bring the department into compliance with the Supreme Court's order. The department's newly released spring population projections suggest that although the state will meet the December 2012 court-ordered population target, it will fall a few percentage points short of meeting the final benchmark of 137.5 percent of design capacity in June 2013. The new projections indicate that the prison population will drop to about 141 percent of design capacity by June 2013. Assuming the current projections remain accurate, the additional measures in this plan will be needed to satisfy the Supreme Court's order.

Realignment itself is also creating new issues that must be addressed and managed. For example, under realignment, less serious offenders who were housed in prison camps and dormitories are now under local jurisdictions, but more serious offenders have remained in the department's celled housing units. This is resulting in increasingly uneven staffing ratios and uneven distribution of inmates throughout the state's prisons. Moreover, the 9,500 inmates being housed outside of California in expensive private facilities should be brought back. California should be housing these inmates in its own prisons and investing the money in California where jobs are needed. This plan adjusts prison housing and reforms the inmate classification system to accommodate the realities of the remaining prisoner population.

The reduction in overcrowding brought about by realignment will also not completely solve the department's other challenges—although it will help tremendously. Realignment, for example, will do nothing to address limitations in existing clinical treatment space. Improving

this space as contemplated in this plan will enable the department to provide court-ordered health care services to a greater number of inmates within existing prisons instead of building costly new treatment facilities.

The measures contained in this plan will complete the substantial progress the department has made in showing the federal courts that it can ensure legally- acceptable conditions of confinement. This will allow the department to free itself from the Receivership and the numerous class-action cases in which it is entangled. These cases disrupt democratic principles by shifting control away from the state and to federal courts, make managing prison affairs more difficult, and impose enormous fiscal costs. The state spends millions of dollars each year in class-action litigation costs alone. This plan, combined with the effects of realignment, will put California in a position to end these lawsuits as soon as possible.

This Plan Addresses the Department's Remaining Challenges and Will Allow California to Satisfy Federal Court Requirements, Achieve Significant Savings, and Maintain an Effective Prison System for Years to Come

This plan will allow the department to satisfy the Supreme Court's order, end the class-action cases, maintain an effective prison system, and achieve significant savings. The key components will accomplish the following:

**Improve the Inmate Classification System.** As a result of research produced by a panel of correctional experts and input from seasoned professionals, the department is modifying its classification system. The modified system will enable the department to safely shift about 17,000 inmates to less costly housing where they can benefit from more access to rehabilitative programs. These modifications will begin to be implemented within six months, and they will eliminate the need to build expensive, high-security prisons.

**Return Out-of-State Inmates.** The department began sending inmates out-of-state when overcrowding was at its worst in 2007. Currently, there are more than 9,500 inmates outside of California. The department will be able to bring these inmates back as the prison population continues to drop, classification changes are made, and additional housing units are constructed at existing facilities. Returning these inmates to California will stop the flow of taxpayer dollars to other states, and is expected to save the state $318 million annually.

**Improve Access to Rehabilitation.**  This plan enables the department to improve access to rehabilitative programs and place at least 70 percent of the department's target population in programs consistent with their academic and rehabilitative needs.  Increasing access to rehabilitative programs will reduce recidivism by better preparing inmates to be productive members of society.  In doing so, it will help lower the long-term prison population and save the state money.

The department will establish reentry hubs at certain prisons to concentrate program resources and better prepare inmates as they get closer to being released.  It will also designate enhanced programming yards, which will incentivize positive behavior.  For parolees, the department will build a continuum of community-based programs to serve, within their first year of release, approximately 70 percent of parolees who need substance-abuse treatment, employment services, or education.

**Standardize Staffing Levels.**  Realignment's downsizing has left the department with uneven, ratio-driven staffing levels throughout the system.  Continued use of these increasingly outdated staffing ratios as the inmate population declines would be costly and prevent efficient operations.  This plan establishes new and uniform staffing standards for each institution that will enable the department to operate more efficiently and safely.

**Comply with Court Imposed Health Care Requirements.**  In recent years, numerous measures have been implemented that have significantly improved the quality of the department's health care system.  The Inspector General regularly reviews and scores the department's medical care system, and these scores have been steadily rising.  In addition, the capacity of the health care system will soon increase.  Slated for completion during the summer of 2013, the California Health Care Facility in Stockton is designed to house inmates requiring long-term medical care and intensive mental health treatment.  Its annex, the DeWitt Nelson Youth Correctional Facility, will open in the summer of 2014 to create a unified Stockton complex, allowing both facilities to efficiently transition inmate-patients between the two, while avoiding transportation and security costs as well as the need for expensive services in community hospitals and clinics.  These projects, in addition to ongoing mental health and dental projects and new plans to increase medical clinical capacity at existing prisons, will satisfy court imposed requirements.

**Satisfy the Supreme Court's Order to Reduce Prison Crowding.**
As previously mentioned, the department's newly released spring
population projections suggest that the department may fall a few
percentage points short of meeting the final court-ordered crowding-
reduction benchmark even with realignment.  In June 2013, the
department's prison population is projected to be at 141 percent of
design capacity rather than the 137.5 percent goal identified by the
Supreme Court.  The additional measures proposed in this plan will
allow the state to seek and obtain from the court a modification to raise
the final benchmark to 145 percent of design capacity.  Otherwise,
alternatives such as continuing to house inmates out-of-state will have
to be considered.

In its order, the Supreme Court contemplated that appropriate
modifications to its order may be warranted.  The Court explained
that as the state implements the order, "time and experience" may
reveal effective ways of ensuring adequate health care—other than
through population reductions.  The state "will be free to move" the
Court for modification of the order on that basis, and "these motions
would be entitled to serious consideration."  This plan sets forth
necessary reforms to satisfy this order as well as other court imposed
requirements related to the provision of health care services.

The reduced prison population has already substantially aided the
department's ability to provide the level of care required by the courts.
As the population further declines, the department's ability to provide
the required level of prison health care will continue to improve.
New health care facilities and enhanced treatment and office space
at existing prisons will enable the department to maintain a health
care system capable of providing this level of care for a higher density
prison population than the Court originally contemplated.  This plan
will provide critical support for the state's ability to satisfy the Supreme
Court's order without having to maintain expensive out-of-state prison
beds or release inmates early.

Realignment has provided California an historic opportunity to
create not just a less-crowded prison system, but one that is safer, less
expensive, and better equipped to rehabilitate inmates before they are
released.  This plan seizes on that opportunity.  Each of the following
sections describes key aspects of a prison system that combines the
inmate reductions achieved in realignment with a facility-improvement
plan that will enable a more efficient inmate health care delivery
system.  This is the prison system that best serves California.

