1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   PRISON LAW OFFICE
    1917 Fifth Street
3   Berkeley, California  94710-1916
    Telephone:    (510) 280-2621

    MICHAEL W. BIEN – 096891
    JANE E. KAHN – 112239
    ERNEST GALVAN – 196065
    THOMAS NOLAN – 169692
    AARON J. FISCHER – 247391
    MARGOT MENDELSON – 268583
    KRISTA STONE-MANISTA – 269083
    ROSEN BIEN
    GALVAN & GRUNFELD LLP
    315 Montgomery Street, Tenth Floor
    San Francisco, California  94104-1823
    Telephone:    (415) 433-6830

8   JON MICHAELSON – 083815
    JEFFREY L. BORNSTEIN – 099358
9   LINDA L. USOZ – 133749
    MEGAN CESARE-EASTMAN – 253845
    K&L GATES LLP
10  4 Embarcadero Center, Suite 1200
    San Francisco, California  94111-5994
11  Telephone:    (415) 882-8200

    CLAUDIA CENTER – 158255
    THE LEGAL AID SOCIETY –
    EMPLOYMENT LAW CENTER
    180 Montgomery Street, Suite 600
    San Francisco, California  94104-4244
    Telephone:    (415) 864-8848

12  Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

16  RALPH COLEMAN, et al.,

17          Plaintiffs,

18      v.

19  EDMUND G. BROWN, Jr., et al.,

20          Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' EVIDENTIARY
OBJECTIONS TO DEFENDANTS'
EXPERT REPORTS AND
DECLARATIONS**

Judge:   Hon. Lawrence K. Karlton
Date:    March 27, 2013
Time:    10:00 a.m.
Crtrm.:  4

[757094-1]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................................... v

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 1

I.    APPLICABLE LEGAL STANDARD ................................................................ 1

II.   DEFENDANTS' EXPERT REPORTS FAIL TO MEET THE
REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 26,
FEDERAL RULE OF EVIDENCE 702 AND 703, AND *DAUBERT* ...................... 2

    A.   THE TERMINATION EXPERTS ARE NOT QUALIFIED TO
RENDER LEGAL OPINIONS ................................................................ 2

    B.   THE TERMINATION EXPERTS CONDUCTED SECRET
INSPECTIONS OF CDCR PRISONS IN VIOLATION OF THIS
COURT'S ORDERS AND CONDUCTED UNPROFESSIONAL
AND UNETHICAL INTERVIEWS WITH REPRESENTED CLASS
MEMBERS OUTSIDE THE PRESENCE AND WITHOUT THE
CONSENT OF PLAINTIFFS' COUNSEL .................................................. 2

    C.   THE EXPERT REPORTS ARE PREMISED UPON AN IMPROPER
FOUNDATION ................................................................................... 6

        1.   Defendants' Termination Experts Were Provided with
Unprofessional, Inappropriate and Biased Information about
This Court and Its Special Master That Prejudiced Their Work .......... 7

            (a)   The Experts Were Primed with Fallacious and
Slanderous Opinions about this Court and Its Special
Master ......................................................................... 7

            (b)   Defendants' Unsubstantiated Attack on the Special
Mastership and Its Role in This Proceeding Is Further
Evidence of Deliberate Indifference ............................... 8

        2.   Defendants' Experts Accepted Factual Assertions of Defense
Counsel Without Verification, and Were Denied Vital
Information By Counsel ...................................................................... 9

            (a)   Suicide Prevention ...................................................... 10

            (b)   Disciplinary Procedures .............................................. 11

            (c)   False Excuses For Every Instance of Inadequate Care ........... 11

            (d)   "Lack of Bed" Segregation Assignments ..................... 12

    D.   DEFENDANTS' EXPERTS DID NOT USE A RELIABLE
METHODOLOGY .............................................................................. 13

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

1.    Defendants' Experts Abandoned Their "Audit Tool" in Favor of a Formless and Amorphous "Global" Approach ........................... 13

2.    Defendants' Experts Methods Cannot Withstand Even Minimal Scrutiny ............................................................................ 14

3.    Defendants' Experts Apply a Vague and Meaningless Standard of "Constitutionality" ........................................................ 16

E.    THERE IS NO BASIS FOR DEFENDANTS' EXPERTS' SYSTEMIC CONCLUSIONS ................................................ 18

1.    The Experts Visited Only 13 Prisons and Cannot Establish Either the Validity of Their Sample or a Basis for Drawing Systemwide Conclusions from It ........................................ 18

2.    The Termination Experts Failed to Visit ANY DSH Facilities or Address Inpatient Psychiatric Hospitalization .............................. 20

3.    The Experts Failed to Report on Their Visit to San Quentin or on the Adequacy of Mental Health Care for Condemned Prisoners ............................................................................ 20

4.    The Experts Offered No Opinions about Overcrowding .................. 21

F.    THE JOINT REPORT FAILS TO MEET THE DISCLOSURE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 26 ...................................................................................... 21

III.    THE CDCR OFFICIAL'S DECLARATIONS FAIL TO MEET THE REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 602 ............ 26

A.    Declaration of Rick Johnson ........................................................ 26

B.    Declaration of Diane Toche ........................................................ 27

C.    Declaration of Tim Belavich ........................................................ 29

D.    Declaration of Laura Ceballos ...................................................... 29

1

**TABLE OF AUTHORITIES**

2

Federal Cases

3

*Adams v. United States*,
    No. 4:CV 03-49-BLW, 2011 U.S. Dist. LEXIS 63775 (D. Idaho May 29, 2011).. 21,
4    22

5

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ........................................................................................................ 9
6

*Cabrera v. Cordis Corp.*,
7    134 F.3d 1418 (9th Cir. 1998) ............................................................................... 13, 14

8

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) ......................................................................... 3
9

*Daubert v. Merrell Dow Pharms., Inc.*,
10    509 U.S. 579 (1993) ............................................................................................. passim

11

*Hangarter v. Provident Life & Accident Ins. Co.*,
    373 F.3d 998 (9th Cir. 2004) ................................................................................... 2
12

*In re Silberkraus*,
13    336 F.3d 864 (9th Cir. 2003) ................................................................................... 9

14

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ................................................................................................. 13
15

*Lyman v. St Jude Med. S.C., Inc.*,
16    580 F. Supp. 2d 719 (E.D. Wis. 2008) ................................................................... 9

17

*Nunex v. BNSF Ry. Co.*,
    No. 09-4037, 2012 U.S. Dist. LEXIS 97411 (C.D. Ill. July 13, 2012) ................... 22
18

*Paine v. Johnson*,
19    No. 06 C3173, 2010 U.S. Dist. LEXIS 16978 (N.D. Ill. 2010) ............................... 2

20

*Perez Librado v. M.S. Carriers*,
    No. 3:02-CV-2095-D, 2004 U.S. Dist. LEXIS 12203 (N.D. Tex. June 30, 2004) .. 21
21

*Thurston v. Schwarzenegger*,
22    No. 1:08-cv-00342-AWI-GBC (PC), 2011 U.S. Dist. LEXIS 16419 (E.D. Cal. Feb.
    18, 2011)................................................................................................................. 16
23

*TK-7 Corp. v. Estate of Ihsan Barbouti*,
24    993 F.2d 722 (10th Cir. 1993) ................................................................................. 7

25

*United States v. Peoples*,
    250 F.3d 630 (8th Cir. 2001) ................................................................................... 26
26

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
27    395 F.3d 416 (7th Cir. 2005) ................................................................................... 14

28

1

<u>State Cases</u>

*Hernandez v. Vitamin Shoppe Indus., Inc.*
   174 Cal. App. 4th 1441 (App. Ct. 2009) ...................................................... 6

*Kleiner v. First Nat'l Bank*,
   751 F.2d 1193 (11th Cir. 1985) .................................................................. 6

*Truitt v. Superior Court*,
   59 Cal. App. 4th 1183 (App. Ct. 1997) ...................................................... 6

<u>Rules</u>

ABA Model Rules of Professional Conduct, Rule 4.2 ...................................... 6

Fed. R. Civ. P. 37(c)(1) ................................................................................ 24

Fed. R. Evid. 602 ............................................................................ 26, 28, 29

Fed. R. Evid. 702 ................................................................................... passim

Fed. R. Evid. 703 ......................................................................................... 2, 6

Fed. R. Evid. 26 ................................................................................. 2, 22, 24

Rules of Professional Conduct of the California State Bar, Rule 2-100 ............... 6

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ACA | American Correctional Association |
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP or Ironwood | Ironwood State Prison |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LVN | Licensed Vocational Nurse |

| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |
| SM | Special Master in the *Coleman* case |
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | **Tuberculosis** |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

1    **INTRODUCTION**

2    The opinions of Defendants' termination experts should be given little or no weight.

3    Over the course of more than a year, Defendants sent four experts on inspections of a total

4    of 13 California prisons.  The experts submitted two reports—a Joint Report signed by

5    Drs. Dvoskin, Moore, and Scott (the "Joint Report"), and a single report signed by expert

6    Steve Martin (the "Martin Report").  (Docket No. 4275-4 Exs. 1 and 2, respectively.)  The

7    experts put their names to garbled, confused expert reports lacking any proper foundation,

8    premised upon no apparent methodology, irredeemably tainted by unethical interviews

9    with mentally ill inmates in flagrant disregard of prior orders of this Court, and presenting

10   conclusions that utterly fail to address the critical issues.

11   Defendants also submitted five declarations by five senior CDCR officials, each of

12   whom swore under oath to their personal knowledge and preparation to testify to the

13   matters contained therein.  (Docket Nos. 4275-2, 4275-3, 4276, 4278, 4277.)  Plaintiffs set

14   forth herein our specific objections to paragraphs and statements within the declarations of

15   Laura Ceballos, Diana Toche, Rick Johnson, and Tim Belavich.

16   **ARGUMENT**

17   **I.    APPLICABLE LEGAL STANDARD**

18   Expert witness testimony may only be admitted if it will assist the trier of fact to

19   determine a fact at issue.  Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509

20   U.S. 579, 589-91 (1993).  The trial court must examine proffered expert testimony for

21   reliability, determining whether there exists any "objective, verifiable evidence that the

22   testimony is based on 'scientifically valid principles.'"  *Daubert v. Merrell Dow Pharms.,*

23   *Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("*Daubert II*").  Expert opinion must make

24   rational connections between conclusions and evidence. The Court is the gatekeeper to

25   determine whether the data is appropriately connected to the opinions.  *General Elec. Co.*

26   *et al., v. Joiner*, 522 U.S. 136, 146 (1997); *see also Domingo ex rel. Domingo v. T.K.*, 289

27   F.3d 600, 607 (9th Cir. 2002).  While the *Daubert* test does not require that all expert

28   testimony be developed outside the litigation and subject to scientific peer review, where

1  such indicia of reliability are lacking, the expert must explain how he or she reached his

2  conclusions based on a reliable methodology.  *Lust By and Through Lust v. Merrell Dow*

3  *Pharm., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996).

4  **II.    DEFENDANTS' EXPERT REPORTS FAIL TO MEET THE
         REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 26,
5         FEDERAL RULE OF EVIDENCE 702 AND 703, AND *DAUBERT***

6      **A.    THE TERMINATION EXPERTS ARE NOT QUALIFIED TO
              RENDER LEGAL OPINIONS**

7

8          Defendants' experts opine that "CDCR is not acting with systemic deliberate

9  indifference to inmates' serious mental health care needs."  (Joint Report at 8.)  They are

10  not legal or constitutional experts, however, and fail to demonstrate that they are qualified

11  to offer legal opinions.  Even if they were, although expert witnesses may offer opinions

12  that embrace ultimate factual issues in a case, they may not opine as to the ultimate legal

13  conclusions at issue, which are the province of the court.  *Hangarter v. Provident Life &*

14  *Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004).  Dr. Dvoskin should be well

15  aware of this principle, as his opinion that a defendant's actions did constitute deliberate

16  indifference was excluded by an Illinois federal court in 2010 precisely because it

17  constituted an inadmissible "purely legal conclusion[]."  *Paine v. Johnson*, No. 06 C3173,

18  2010 U.S. Dist. LEXIS 16978 at *10-11 (N.D. Ill. 2010).

19      **B.    THE TERMINATION EXPERTS CONDUCTED SECRET
              INSPECTIONS OF CDCR PRISONS IN VIOLATION OF THIS
20            COURT'S ORDERS AND CONDUCTED UNPROFESSIONAL AND
              UNETHICAL INTERVIEWS WITH REPRESENTED CLASS
21            MEMBERS OUTSIDE THE PRESENCE AND WITHOUT THE
              CONSENT OF PLAINTIFFS' COUNSEL**

22

23          Defendants retained their four termination experts in Fall 2011 and sent them on

24  prison inspections from February through November 2012.  In August 2012, Defendants

25  told the three-judge court that it would be "premature" to undertake inspections of the

26  prison health care system before March 2013, and thereby blocked Plaintiffs' attempts to

27  open discovery.  By August 2012, Defendants' experts had already conducted secret

28  inspections of ten CDCR prisons.  (*Compare* Defs.' Resp. to Aug. 3, 2012 Order at 9,

1    8/20/12, Docket No. 4226 *with* Martin Report at 7 (termination expert tour schedule with

2    10 tours complete by May 2012).)

3        Plaintiffs were not notified of any of these site inspections.  Defendants thereby

4    violated an order of the three-judge court requiring Defendants "to provide plaintiffs ...

5    with reasonable notice of any scheduled site inspection by a defense expert, and counsel

6    for plaintiffs ... will be permitted to attend and observe any such inspection." (*Plata*

7    Docket No. 2495.)[1]  Violation of this order deprived counsel and Plaintiffs' experts, and

8    ultimately, this Court, of the ability to observe and analyze the experts' methodology, their

9    independence, to understand what they saw and did not see, who they spoke with and who

10   they avoided, what documents and records they inspected and copied and what documents

11   they ignored and left behind.

12       This Court has previously acknowledged the importance of joint inspections and a

13   shared and undisputed basic factual record to its ability to evaluate expert opinions on their

14   merits.   (*Id.* at 4:9-15 (referring to "common factual baseline" of observations, and

15   importance of plaintiffs' counsels presence during inmate/patient interviews to

16   "minimize[e] potential conflicts").)  In the prison tours conducted prior to the original

17   *Coleman* trial, "plaintiffs' experts and defendants' experts [including Dr. Dvoskin] used

18   the same methods and worked in teams." *Coleman v. Wilson*, 912 F. Supp. 1282, 1303

19   n.22 (E.D. Cal. 1995).   Defendants' secret program of inspections deprived the Court of

20   this important benefit, needlessly multiplied and complicated this already complex

21   proceeding, and undermined principles of fundamental fairness.

22       But Defendants' experts, with the full blessing of the Attorney General's Office and

23   CDCR in-house counsel, went one giant step further over the line:  Each of the experts, as

24   an integral part of their investigation, approached represented parties, members of the

25   _____

26   [1] This Court has previously reminded Defendants of the applicability of this precise order to the
     underlying *Coleman* litigation.  (Order, 8/1/11, Docket No. 4050 (explaining that Defendants'
27   objection to its reference to orders of the three-judge court "is off the mark").)

28

1  *Coleman* class, *without* the knowledge or permission of Plaintiffs' counsel – their

2  attorneys – and interviewed our clients, persons with serious mental illness, about the

3  matters at issue between the parties, access to mental health care, and the custodial

4  disciplinary process and use of force.  Each of the experts (a lawyer, psychiatrist,

5  psychologist and registered nurse) relied on prisoners' statements as evidence in support of

6  their opinions.

7        These improper interviews with *Coleman* class members violate the well-

8  established process for discovery that is intended to protect the interests of all involved by

9  ensuring a common factual basis.  The three-judge court has recently reiterated the

10  importance of having all parties present at site inspections in this litigation:  "Likewise,

11  Defendants' counsel stated at oral argument that they must attend Plaintiffs' monitoring

12  visits because they represent prison staff who have a right to have their attorney present

13  when opposing counsel visit.  The same rationale applies to Plaintiffs' counsel, who

14  represent prison inmates with whom Defendants' consultants may wish to speak."  (Order,

15  2/21/13, *Plata* Docket 2546 at 4.)

16        The attorneys evidently never informed the experts of the existence of any court

17  orders governing site inspections in this case, (*see, e.g.*, Dvoskin Dep. at 203:7-206:25[2];

18  Martin Dep. at 8:24-9:11), but rather permitted them to enter the prisons without notice to

19  Plaintiffs' counsel and speak with staff and inmates alike without a fraction of the intense

20  scrutiny given to Plaintiffs' experts when they engaged in similar site inspections.

21  (*Compare* Moore Dep. at 51:4-54:11 (informal prisoner interviews) *and* Martin Dep. at

22  37:15-38:9 (testifying that he doesn't "like a lot of you folks around me.  It interferes with

_____

24  [2] The excerpted deposition testimony cited throughout this brief is filed with the Court via the Declaration of Michael W. Bien, filed this date. Bien Decl. Ex. 80, Beard Deposition Excerpts;

25  Bien Decl. Ex. 81, Belavich Deposition Excerpts;  Bien Decl. Ex. 83, Dvoskin Deposition Excerpts;  Bien Decl. Ex. 84, Hayes Deposition Excerpts;  Bien Decl. Ex. 85, Johnson Deposition

26  Excerpts;  Bien Decl. Ex. 86, Martin Deposition Excerpts;  Bien Decl. Ex. 88, Moore Deposition Excerpts; Bien Decl. Ex. 89, Scott Deposition Excerpts; Bien Decl. Ex. 90, Toche Deposition

27  Excerpts.  Full copies of the transcripts of the depositions have been transmitted to the Court.

1    what I do, it compromises what I do") *with* Expert Declaration of Craig Haney, 3/14/13,

2    Docket No. 4378 ("Haney Expert Decl.") ¶ 231 (had to work surrounded by 10-15 defense

3    representatives) *and* Expert Declaration of Eldon Vail, 3/14/13, Docket No. 4385 ("Vail

4    Expert Decl.") ¶ 24 (escort of 10 or 11 at every facility).)  It is surprising that the experts,

5    who have many years of combined experience as forensics litigation experts, and Dr.

6    Dvoskin, who previously conducted tours in this litigation, failed to inquire if it was proper

7    for them to interview *Coleman* class members without the presence of Plaintiffs' counsel.

8           Not only this, but the experts – three of whom are experienced clinicians who

9    should have no difficulty understanding basic principles of informed consent –failed to

10   properly identify themselves to the prisoners and apparently allowed the prisoners to

11   assume that they were "*Coleman*," members of the court-appointed Special Master's team

12   of experts, who frequently conduct similar but legitimate interviews of prisoners in the

13   course of their work.  Dr. Dvoskin, for example, told inmates that he was "trying to find

14   out about the mental health care in the prison" and was "interested in how you're doing."

15   (Dvoskin Dep. at 203:7-206:25.)  Dr. Moore, who stated that she interviewed a total of

16   about 50 *Coleman* class members, at least identified herself as "working with the attorney

17   general's office," but identified her task as evaluating "the quality of mental and health

18   care at this facility" without mention of the *Coleman* case or her retention with respect to

19   it.  (Moore Dep. at 51:4-54:11.)  When inmates ask her how she was going to use the

20   information she had obtained from them, Dr. Moore misrepresented to them that the

21   experts' inspections were "just an informal survey" regarding "their opinion about how the

22   care was going," rather than revealing her true purpose.  (Moore Dep. at 57:18-60:5.)  Dr.

23   Moore also indicated that the inmates on the prison yards "would sometimes say, "Oh,

24   she's with *Coleman*," but that this apparently did not raise any concerns for her about the

25   likelihood that she was being mistaken for a member of the Special Master's team or for

26   Plaintiffs' counsel.  (*See id.*)  In sum, the experts appear to have been completely

27   unconcerned with any ethical obligations that they might have to ensure that the inmates to

28   whom they were speaking understood their identities or their purpose.

1    Not only did the inexcusable ex parte interviews of *Coleman* class members thus

2   violate the experts' professional ethical obligations, they also violated Defendants'

3   counsels' obligations as members of the State Bar of California.  These interviews, which

4   were conducted with the full knowledge and endorsement of a whole suite of senior

5   Deputy Attorneys General and CDCR in-house counsel, constitute indirect

6   communications with represented parties in the absence of their attorneys.  A lawyer is

7   forbidden from communicating "directly or indirectly about the subject of the

8   representation with a party the member knows to be represented by another lawyer in the

9   matter."  Rules of Professional Conduct of the California State Bar, Rule 2-100; *see also*

10  ABA Model Rules of Professional Conduct, Rule 4.2 ("a lawyer shall not communicate

11  about the subject of the representation with a person the lawyer knows to be represented by

12  another lawyer in the matter").  Members of a certified class qualify as "represented

13  parties" who may not be contacted for litigation purposes without violating Rule 2-100.

14  *Hernandez v. Vitamin Shoppe Indus., Inc.*, 174 Cal. App. 4th 1441, 1459-60 (App. Ct.

15  2009); *see also Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1206-07 (11th Cir. 1985).

16  Communications with represented parties via investigators or experts qualify as prohibited

17  "indirect communications" under the rule.  *Truitt v. Superior Court*, 59 Cal. App. 4th 1183,

18  1187-88 (App. Ct. 1997).  These inappropriate and authorized communications with

19  represented and vulnerable parties by Defendants' termination experts were used to elicit

20  statements relied upon by all of Defendants' termination experts.  These ethical violations

21  provide a separate and independent ground to sanction Defendants and their counsel, to

22  give no weight to these "expert" reports, and to order other appropriate relief.

23  **C.   THE EXPERT REPORTS ARE PREMISED UPON AN IMPROPER FOUNDATION**

24

25   Expert opinions are admissible only if the facts or data relied upon are of a type

26  reasonably relied upon by experts in the particular field.  This permits experts to review

27  information from a variety of sources, including evidence such as hearsay that would not

28  otherwise be admissible in court.  Fed. R. Evid. 703.  It does not permit experts to rely

1  upon information not generally considered relevant and reliable in their fields.  *See id.*

2      **1.      Defendants' Termination Experts Were Provided with**
           **Unprofessional, Inappropriate and Biased Information about**
3           **This Court and Its Special Master That Prejudiced Their Work**

4      From day one, Defendants' termination experts were fed unreliable and inaccurate

5  information and opinions by the Attorneys' General and CDCR in-house counsel, which

6  the "experts" knowingly and willingly swallowed.  The experts cannot plausibly assert that

7  counsels' views about the fairness of this Court, the validity of court orders, and the

8  alleged "excesses" of the court-ordered monitoring processes are a type of information

9  generally and reasonably relied upon by experts in their respective fields, yet they appear

10  to have not only accepted the assertions of counsel at their very first meeting in October

11  2011 as gospel (all completely irrelevant to their purported task of assessing whether

12  CDCR's mental health system currently meets constitutional standards) but to have

13  presented them to this Court as scientifically valid "expert opinion."  Where, as here,

14  experts have "failed to demonstrate any basis for concluding that another individual's

15  opinion" on matters critical to the expert's testimony is reliable, the testimony must be

16  excluded.  *TK-7 Corp. v. Estate of Ihsan Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).

17      **(a)      The Experts Were Primed with Fallacious and Slanderous**
           **Opinions about this Court and Its Special Master**
18
      The experts were told the following at their first meeting at CDCR headquarters:
19

20  •    "Judge Karlton hates State and AG."  (Dvoskin Dep. 183:17-25; Bien Decl.
           Ex. 121, Dvoskin Dep. EX. 6 AT DEXP 103259 (notes of Dr. Dvoskin);
21           Moore Dep. 21:13-15; Bien Decl. Ex. 117, Moore Dep. Ex. 3 at DEXP
           102026 (notes of Dr. Moore).)
22
  •    That "any time there was a disagreement between the [S]pecial [M]aster and
23           the State, that the judge would simply agree with the special master" such
           that Defendants "didn't feel like it was a level playing field."  (Dvoskin Dep.
24           at 183:22-184:10.)

25  •    "Rules of evidence [are] not applied uniformly" by this Court such that "it
           was an uphill battle for the attorney general" because this Court "takes
26           plaintiff's finding as truth."  (Moore Dep. 21:13-22:12; Bien Decl. Ex. 117,
           Moore Dep. Ex. 3 at DEXP 102026 (meeting notes of Dr. Moore).)

27  •    That "the monitoring wasn't focused enough; that it was micro managerial in
           nature; that details were being monitored at great expense," including a
28           dollar figure of "$42 million monitoring"  (Dvoskin Dep. at 155:15-156:11.).

1    The purpose of expert witness testimony under the Federal Rules is to assist the trier

2  of fact, here, the Court – not to permit counsel's slanderous comments about the Court and

3  its Special Master to appear in the record dressed up as so-called expert opinions.  But the

4  Joint Report filed with this Court on January 7, purporting to be expert opinion and

5  testimony, parrots back many of these same assertions in many of the same words: that the

6  Special Master's level of monitoring is "unprecedented," (Joint Report at 14), that the

7  scrutiny undergone by CDCR is "comprehensive, detailed, and micro managerial," (*id.*),

8  that the Special Master's monitoring is a burden on the institutions and a disincentive to

9  innovation, (*id.* at 15), and that the presence of the Special Master prevents the Department

10  from asserting leadership.  (*Id.*)  If the termination experts made any efforts whatsoever to

11  verify counsel's complaints about the costs and time burdens of the Special Master's

12  monitoring, there is no evidence of those efforts in their reports.

13              **(b)    Defendants' Unsubstantiated Attack on the Special
                         Mastership and Its Role in This Proceeding Is Further**
14                       **Evidence of Deliberate Indifference**

15    Defendants' Termination Motion and supporting declarations, as well as the reports

16  and testimony of Defendants' termination "experts," are replete with misguided and

17  unfounded attacks on the Mastership and its work.  This Court's February 28, 2013 Order

18  denying Defendants' objections to the Special Master's 25th Report and motion to strike,

19  is equally applicable here.

20              The foregoing demonstrates the fallacy in defendants' pervasive objection
              that the Special Master is not monitoring with reference to a constitutional
21            standard.  To this point in the remedial phase of this action, defendants'
              Program Guides have been defendants' plan, approved by this court, to
22            remedy the Eighth Amendment violations identified in this court's 1995
              order.
23

24  (Docket 4361 at 6:13-16.)  Defendants and their termination experts even go so far as to

25  blame the Mastership for deficiencies in mental health care due to Defendants' own

26  failures to provide appropriate clinical staffing and continued failures to remedy the

27  ongoing constitutional violations.  (Defs. Motion to Terminate, Docket No. 4275, ("Defs.

28  Motion") at 27:4-6 ("[R]equired attendance at meetings is among the reasons why the

1   State is prevented from providing even more effective mental health care to inmates.").)

2   Dr. Toche, now the Director of Health Care Services, opined in her declaration that care

3   would improve if staff could stop paying attention to *Coleman* monitoring.  (Docket 4275-

4   3 at 3:20-4:2.)  She was able to provide no credible foundation for this opinion when

5   questioned under oath.  *See* Part III.B, *infra*.

6       The Joint Report writers, as instructed by defense counsel on day one, joined in the

7   attack on the Mastership with gusto, criticizing the Mastership for "monitor[ing] virtually

8   every policy and procedure," making CDCR "subject to scrutiny that is more

9   comprehensive, detailed and micro managerial than any correctional mental health system

10  that has preceded it," and causing CDCR staff to "spend an inordinate amount of time

11  gathering data and preparing for visits from the Special Master's office; time that could be

12  better spent in the provision of care."  (Joint Report at 14-15.)  The Special Master is also

13  blamed by the termination experts for stifling innovation, interfering with the CDCR's

14  operations, and the weakness of CDCR leadership.  *Id.*

15          **2.      Defendants' Experts Accepted Factual Assertions of Defense
                      Counsel Without Verification, and Were Denied Vital
16                    Information By Counsel**

17      Where an expert does not independently verify the data upon which he relies, his

18  opinion "'is not supported by sufficient facts to validate it in the eyes of the law,'" and thus

19  cannot pass the tests of Rule 702 and *Daubert*.  *In re Silberkraus*, 336 F.3d 864, 871 (9th

20  Cir. 2003) (quoting and citing *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,

21  509 U.S. 209, 242 (1993)); *see also Lyman v. St Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719,

22  726 (E.D. Wis. 2008) (expert "should have independently verified the reliability of the

23  data" provided to him, "as opposed to accepting it at the word of" counsel).

24      Plaintiffs present just a few examples of this problem, although the expert reports

25  are riddled with it.  First, as to access to acute inpatient psychiatric care at DSH facilities,

26  the experts were informed by the attorney general's office that there was no waitlist

27  beyond the parameters of the program guide.  (Dvoskin Dep. at 122:12-23.)  But this is

28  untrue, as Defendants' own data reveals.  (*See* Pls.' Opposition to Defendants' Motion to

1   Terminate ("Pls. Opp. Br.") Section IV.E.1; Bien Decl. Ex. 73.) When the experts found

2   that DSH was blocking psychiatric patients for medical reasons,  the experts accepted

3   Defendants' information that any such policy was the fault of the *Plata* Receiver and

4   outside the control of CDCR, and took the inquiry no further.  (Dvoskin Dep. at 138:14-

5   24.)  Neither of these informational flaws precluded the experts from opining that "CDCR

6   has a reasonably functioning system for providing ready access to appropriate care once an

7   inmate's serious mental health issues are identified."  (Joint Report at 11.)

8                           **(a)      Suicide Prevention**

9           The termination experts were not provided with the August 2011 Report of CDCR's

10  suicide prevention consultant, Lindsay Hayes, documenting serious deficiencies in

11  CDCR's suicide prevention program, and making numerous recommendations to address

12  the problems, until *after* the filing of their expert reports with this Court in January 2013,

13  (Dvoskin Dep. at 49:17-50:17), or not at all, (Scott Dep. at 271:24-272:12), even though

14  suicide prevention was a major topic of the mental health experts' joint report and even

15  though they praised CDCR mental health leadership for its cooperation and

16  "transparency," (Martin Report at 13), in sharing internal documents and information,

17  (Joint Report at 32).  The testimony of Mr. Hayes, his complete Report (that Defendants

18  also refused to provide to the Special Master or Plaintiffs' counsel) and extensive evidence

19  demonstrating that Defendants have willfully ignored numerous recommendations by Mr.

20  Hayes, Dr. Patterson, Dr. Dvoskin and others is filed herewith.  If implemented, these

21  remedies would likely reduce CDCR's extremely high suicide rate.  Since Defendants'

22  counsel chose not to provide the termination experts with this report, it is impossible to say

23  whether it would have affected their glowing conclusions about the programs that Mr.

24  Hayes found so badly flawed.[3]

25  _____

26  [3] Defendants' experts testified at their depositions that they thought very highly of Mr. Hayes and

27  his qualifications, further indicating that his recommendations may have altered the outcome of
    their analysis.  (*See, e.g.*, Moore Dep. at 258:13-259:13 (testifying that she respected Hayes's

28  (footnote continued)

[757094-1]

1    **(b)    Disciplinary Procedures**

2    Mr. Martin's foundation is also undermined by significant omissions.  He praises

3    CDCR's disciplinary process, even though he testified that a number of relevant policies,

4    such as those regarding the classification process subsequent to an RVR finding, were not

5    provided to him.  (Martin Dep. at 186:25-187:12.)  He also did not review the staff

6    assistant process for disciplinary hearings, although he was vaguely aware of applicable

7    state regulations on the issue.  (Martin Dep. at 240:2-11.)  Mr. Martin, like his colleagues,

8    confined his review and analysis to the universe set out for him by Defendants' counsel.

9    **(c)    False Excuses For Every Instance of Inadequate Care**

10   Throughout the system, Defendants' termination experts found serious problems on

11   their inspections, and papered them over with statements like: "As of the writing of this

12   report, this situation has been rectified."  (Joint Report at 21.)  On examination, however,

13   the termination experts admitted that they had no direct personal knowledge as to whether

14   the problems had been rectified.  (Dvoskin Depo. at 202:9-203:6; 294:21-297:13; Moore

15   Depo. at 93:18-94:24; 97:16-98:16; 112:1-12.)

16   The termination experts discovered during their tour of CCWF in the Spring of

17   2012 that, due to what they were told were "temporary staff shortages," significant

18   cancellations of therapy programs for the mentally ill female prisoners had occurred (a

19   reduction from 100 groups to 15).  (Joint Report at 16.)  They ignored this deficiency

20   because "CDCR has addressed this issue, and reports that there are now 75 groups being

21   offered."  (*Id.*)  That information from "CDCR," provided late in 2012, was probably false

22   and was definitely incomplete and misleading.  The termination experts were *not* informed

23   that, after they had toured CCWF (and blessed it as "constitutional"), Defendants decided

24   to save more money through Realignment by converting the adjacent Valley State Prison

25   for Women to a men's prison even though the result was dramatic and severe

26   _____

27   expertise and that his recommendations in a prior case "were excellent"); Dvoskin Dep. at 48:23-49:14 ("Lindsay has saved many lives ... I think he's incredibly knowledgeable.").)

28

1   overcrowding of CCWF to over 185% of capacity, and major increases in *Coleman* class

2   members with no increases in mental health staffing.  Dr. Dvoskin agreed that his opinions

3   about CCWF were out of date without this information.  (Dvoskin Depo at 199:9-200:22.)

4   Plaintiffs' expert inspected CCWF on February 8, 2013 and found extreme overcrowding,

5   harsh conditions, severe understaffing and a dangerous mixing of EOP, death row and ad

6   seg populations in a single unit and mixing of EOP and Reception Center prisoners in a

7   second unit.  *See* Expert Declaration of Edward Kaufman, 3/14/13, Docket No. 4379

8   ("Kaufman Expert Decl.") ¶¶ 26-28, 53-54.

9                              (d)      **"Lack of Bed" Segregation Assignments**

10              Defendants' termination experts discovered EOP prisoners housed in CIM's harsh

11   administrative segregation unit "for their own protection[,] not because they posed a

12   danger to others," due to a shortage of EOP SNY beds.  (Joint Report at 19.)  They glossed

13   over this serious shortage and dangerous practice because "[a]t the time of this report, we

14   were told that there was no longer a waiting list for transfer of inmates to an EOP

15   program."  (*Id.*)  The information that the termination experts relied on was, in fact,

16   unreliable and false:  Defendants' own records establish that there is today and always has

17   been a shortage of EOP beds at various security levels and custody requirements.  (*See* Pls.

18   Opp. Br. Section E.1; Bien Decl. Ex. 72.)  When Plaintiffs' experts inspected CIM on

19   February 12, 2013, they found EOP and CCCMS prisoners in great distress, still trapped in

20   the administrative segregation unit waiting for Defendants to resolve the shortage of EOP

21   and CCCMS SNY beds.  The CIM custody staff running the unit have even named this

22   large group, "LOB's," which they explained means, *Lack of Beds*.  (Haney Decl. ¶¶ 143-

23   53; Kaufman Expert Decl. ¶¶ 96-98.)  Dr. Dvoskin, Dr. Scott and Dr. Moore each noted

24   the CIM "LOB" designation in their own handwritten notes made during CIM inspections.

25   (Dvoskin Dep. at 260:14-262:7; Bien Decl. 118, Dvoskin Dep. Ex. 13 at DEXP 104449;

26   Moore Dep. at 168:21-169:13; Bien Decl. 119, Moore Dep. Ex. 14 at DEXP 102627; Bien

27   Decl. 120, Scott Dep. Ex. 21 at DEXP110783.)

28

## D.   DEFENDANTS' EXPERTS DID NOT USE A RELIABLE METHODOLOGY

The termination experts failed to apply any scientifically legitimate methodology. Expert witnesses need not follow any specific methodology, but must generally demonstrate that "the principles and methodology used by the expert ... are grounded in the methods of science." *Domingo*, 289 F.3d at 605 (citing *Daubert*, 509 U.S. at 592-95). "[T]he trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (alterations in original).  The *Daubert* inquiry is designed to "make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.  There is no such rigor apparent here.

Defendants' experts' reports never set forth a clear methodology or explanation of the process by which they reached their individual or joint conclusions, in any particular or general respect.  Nor were any of the experts able to describe an organized, consistent methodology, or to explain the principles underlying their work, during their depositions. In presenting conclusions divorced from even their own data collection process, the experts fail to identify any objective source for their methodology or to "demonstrate that [they] followed a scientific method embraced by at least some other experts in the field." *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998).   It is Defendants' burden to demonstrate that their experts' methods and opinions meet the requirements of *Daubert* and Rule 702.  *Lust By and Through Lust*, 89 F.3d at 598.

### 1.   Defendants' Experts Abandoned Their "Audit Tool" in Favor of a Formless and Amorphous "Global" Approach

First, although the existence of an "audit tool" by which Defendants' experts tracked their findings at each prison they visited is never mentioned in either of the reports, various iterations of the tool were provided in discovery and discussed at length during depositions of the experts.  (*See, e.g.*, Dvoskin Dep. at 225:15-229:5; Moore Dep. at 68:14-

69:10 (testifying that "[a]t first we were going to put all the data into the audit tools... .

And we decided we didn't want to be that specific in our report, that we wanted to be more

global").)  There is no apparent explicable reason – certainly no reason satisfying

*Daubert's* "intellectual rigor" requirement – why Defendants' experts would have

abandoned an objective, detailed instrument that they developed in favor of a vague,

formless subjective analysis based on unclear premises and without any apparent guiding

methodology.  In fact, Jeff Beard, then a consultant and now the Secretary of the CDCR,

found during his first tour accompanying the Defendants' termination experts that they

"seemed a little bit disorganized" and felt that the audit tool should be enhanced, not

abandoned.  (Beard Dep. at 223:5-224:14.)  During depositions, Defendants' experts could

offer almost no concrete, data-driven specifics about any aspect of their review and

analysis.  (*See, e.g.*, Dvoskin Dep. at 225:15-229:5 (initial plan to review fixed numbers of

inmates in each unit later abandoned); *id.* at 207:14-209:12 (no consistent method of

selecting interviewees).)  Dr. Scott started and then abandoned a database on medication

management and MHCB care—putting data in, but decided to take no summaries out,

testifying that any summaries are "in my head."  (Scott Dep. at 31:5-32:23).)  "An opinion

based on such unsubstantiated and undocumented information is the antithesis of the

scientifically reliable expert opinion admissible under *Daubert* and Rule 702."  *Cabrera*,

134 F.3d at 1423.  The resulting reports do not present conclusions arrived at via testable

and replicable methods.  *See Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416,

419 (7th Cir. 2005).

### 2.    Defendants' Experts Methods Cannot Withstand Even Minimal Scrutiny

Second, certain inferences can be made about Defendants' process in reaching their

conclusions from the statements in their reports and at depositions; all of these inferences

further support the conclusion that no consistent, falsifiable, scientifically-appropriate

methodology was used in preparing the Joint Report.  For example, the Joint Report

repeatedly offers the assertion that inmates in various treatment settings and at various

levels of care "knew the name of their" clinicians and medications as a basis for finding

that the care offered was adequate.  (*See, e.g.*, Joint Report at 14, 16, 18, 20, 22, 23, 24,

25.)  Unsurprisingly, Dr. Moore was unaware of any studies that supported the use of a

patient's knowledge of his clinicians' names and medications as an appropriate measure by

which to gauge quality of care.  (Moore Dep. at 60:19-61:16.)  During his deposition,

however, Dr. Dvoskin testified that even that "standard" was unscientific at best: he

"wouldn't go by name" but only sought to see whether the inmate could offer a vague

description of their clinicians.  (Dvoskin Dep. at 227:9-14.)  He further testified that he did

not "systematically" check to determine whether the information offered by the inmate was

accurate, but that he for the most part relied upon whether the inmates "talked about their

doctor warmly" as a measure of assessing the inmate-clinician relationship.  (Dvoskin Dep.

at 228:8-229:5.)  As to the inmates' information about medications, presented to this Court

as a categorical statement that inmates "knew the type and purpose of the medication they

were taking," Joint Report at 14, Dr. Dvoskin testified that a "ballpark" statement about a

whole category of psychiatric drugs sufficed.  (Dvoskin Dep. at 227:21-228:3.)  He also

made no effort to verify the information reported against inmates' medical records.  (*Id.* at

228:13-18; *see also* Moore Dep. at 61:21-62:7 (no verification of inmate medication

reports).)  Rather than supporting the assertion that inmates know their clinicians' names

and medications, therefore, the actual methodology employed by Defendants' experts

demonstrates only that inmates were able to describe a person – who may or may not have

been their doctor, a mental health doctor, a psychiatric technician, or a mental health

professional at the institution in question at all – and were able to name a category of

medication of some plausible psychiatric use.  The Joint Report thus highly and repeatedly

touts an untrue fact that has no meaning in evaluating quality of mental health care.

　　　　As a second example, the Joint Report repeatedly opines that the experts were

unable to find "inmates who needed a higher level of care and were not identified."  (Joint

Report at 18, 20.)  The basis for this sweeping, system-wide conclusion appears to have

been that the experts would ask officers on the housing unit who were their most

"psychotic or difficult or quirky or unusual inmates" and would ask other inmates for suggestions about individuals to whom they should speak.  (Dvoskin Dep. at 140:21- 144:6.) Defendants point to no established, accepted scientific method by which asking custody officers in particular units at 13 prisons to identify "quirky" inmates, and finding the inmates so identified to be receiving a suitable level of mental health services per some undefined and unexplained standard, permits experts to conclude that there are no inmates anywhere in the CDCR system who are in need of a higher level of care.  These are only two of many examples of how the undescribed and untethered process by which Defendants' experts conducted their review resulted in an improper and inappropriate report upon which this Court cannot rely.  *See*, *e.g.*, *Thurston v. Schwarzenegger*, No. 1:08-cv-00342-AWI-GBC (PC), 2011 U.S. Dist. LEXIS 16419 at *40-41 (E.D. Cal. Feb. 18, 2011) (holding that Defendants' expert witness' opinion was not based on reliable methodology because, among other things, his conclusions were based on a statistical study that did not "describe the methodology of selecting prisoners to be tested" or "state how many prisoners were tested").

### 3.    Defendants' Experts Apply a Vague and Meaningless Standard of "Constitutionality"

At prison after prison, despite finding serious and even "dramatic" shortages of clinical staff, especially psychiatrists (Joint Report at 11-13, 16) and numerous substantial problems that should be "addressed," (Joint Report at 13, 16, 28, 37), Defendants' termination experts blessed every prison they saw with the verdict:  "constitutional."

Just what "constitutional" mental health care is and how it is measured turned out to be quite fuzzy, to say the least.  The constitution requires only "some care," no particular number of hours or types of mental health treatment are necessary (*see* Dvoskin Dep. at 275:25-276:14) – anything goes, delays in transfers to higher levels of care, specific timelines for medication renewal, or clinical staffing ratios are not relevant, we are told by these "experts," and certainly not the specific standards adopted by CDCR in their mental health program guides, which are too detailed to be monitored, (Dvoskin Dep. at 118:18-

1   119:4), and require far more than the "constitutional standard," whatever that may be.

2        The "constitutional standard" requires, apparently, only what other prison systems

3   do, not what Defendants' termination experts know *should* be done. (*See, e.g.*, Dvoskin

4   Dep. at 170:15-171:17.)  And subjective good intentions, like working "diligently" (Joint

5   Report at 1) and "even harder than usual," (*id.* at 12) apparently cancel out systemic

6   deficiencies caused by overcrowding, delays in access to care, shortages of staff or

7   inadequate treatment space or housing.  What the termination experts know *should* be done

8   by Defendants to address deficiencies in the mental health delivery system, and what they

9   recommended to CDCR officials as important changes to the system in order to provide

10  appropriate mental health care, suicide prevention or custodial use of force and discipline

11  of the mentally ill, are recharacterized not as requirements but as "best practices."  (*See*

12  Martin Dep. at 147:7-148:7 (testifying that with regard to his use of force

13  recommendations, documented in his notes, counsel made "that call" to limit his report "to

14  constitutional issues").)  Defendants' termination experts were instructed by defense

15  counsel *not* to include these recommendations in their expert reports.  (*See id.*)  Indeed,

16  Martin issued CDCR a series of written recommendations about highly troubling issues

17  related to the Use of Force and rules violations procedures, including CDCR's failure to

18  investigate claims of excessive or unnecessary force against inmates, officers'

19  inappropriate use of "crowd control delivery systems" of chemical agents into cells of

20  unarmed inmates, and an absence of appropriate guidance for the use and "misuse" of

21  expandable batons.  (*See* Bien Decl. Ex. 110 (*Coleman* Audit Best Practice

22  Recommendations for Use of Force) at DEXP105138-DEXP105139.)  Despite being well

23  aware of CDCR's excessive use of force against inmates and problematic practices for

24  eliciting mental health input into the RVR process, Mr. Martin submitted a declaration to

25  the Court that simply glossed over all these major deficiencies and signed his name to a

26  selective and misleading statement of facts and opinions.  (Martin Report; *see also* Vail

27  Expert Decl. ¶¶ 40, 47-49, 57, 73-75 (commenting on Mr. Martin's written

28  recommendations and CDCR's failure to implement them).)

1    By following counsel's instruction to remove all recommendations that might

2 make CDCR look bad, the termination experts drained their report of any utility as an

3 objective fact-finding tool for the Court.  *Daubert* and the Federal Rules require more than

4 that expert testimony be appropriately based upon legitimate facts and a supportable

5 methodology – it also requires that "the evidence or testimony 'assist the trier of fact to

6 understand the evidence or to determine a fact in issue.'"  *Daubert*, 509 U.S. at 591

7 (quoting and citing Fed. R. Evid. 702).  The "anything goes" definition of constitutionality,

8 combined with the removal of any objective findings regarding ongoing problems that

9 need fixing, renders these reports unhelpful to this Court.

10   **E.      THERE IS NO BASIS FOR DEFENDANTS' EXPERTS' SYSTEMIC
              CONCLUSIONS**

11

12        **1.      The Experts Visited Only 13 Prisons and Cannot Establish Either
                  the Validity of Their Sample or a Basis for Drawing Systemwide
                  Conclusions from It**

13

14    Although they had a full 15 months to do their work, the termination experts were

15 permitted to visit only 13 out of 33 prisons, and no DSH facilities, because to do more

16 would have been too expensive.[4]  (*See* Martin Dep. at 30:22-32:6; *see also* Dvoskin Dep.

17 at 184:15-185:25.)

18    To the extent that Defendants' attorneys selected which prisons would be visited

19 and when to visit them, experts cannot select samples for study merely at the party's "say-

20 so." *CDW LLC v. NETech Corp.*, No. 1:10-cv-0530-SEB-DML, 2012 U.S. Dist. LEXIS

21 140340, at *29 (S.D. Ind. 2012).  To the extent, as it appeared during depositions, that

22 Steve Martin was the primary selector of the prisons visited (*see* Moore Dep. at 88:3-15),

23 the other experts offer no explanation for why Mr. Martin's selections of sites to visit

24 satisfied any relevant criteria for purposes of sample selection within their different fields.

25 _____

26 [4] In contrast, Plaintiffs' experts retained in January 2013, after Defendants filed this surprise

27 motion, inspected 11 prisons in five weeks, plus two more prisons in January and February 2013
    in connection with a related case against CDCR.

28

1   And it appears that some of the visits made no impact upon the experts' conclusions in any

2   event, as at least Dr. Moore had already reached her conclusion that CDCR was not acting

3   with deliberate indifference even prior to the visits to CMC and SATF in the fall of 2012.

4   (Moore Dep. at 136:22-138:24.)

5           The reports do not say how the experts draw systemwide conclusions from one-or-

6   two day visits to only 13 of 33 prisons.[5]  Neither report explains whether the relevant

7   scientific communities find such samples acceptable, or described the process of

8   extrapolation by which the prisons reviewed were made to substitute for a true and

9   comprehensive review of the entire system.  Perhaps that is because, at best, the scientific

10  extrapolation process consisted of inquiring of individual prisoners about the care they had

11  received at the 20 California prisons that Defendants' experts did not bother to visit, and

12  accepting those anecdotal reports as scientifically valid inputs.  (Dvoskin Dep. at 186:20-

13  187:7 ("For the rest of the prisons, in addition to going to prisons, we talked to inmates

14  who had been in most of the prisons.").)  Unsurprisingly, the experts were unable to testify

15  at deposition that they had a professional practice of reaching such conclusions based on

16  such samples.  Nor were they able to point to any relevant expertise that would have

17  provided them with the credentials to make such sweeping judgments and systemwide

18  conclusions on the basis of their fragmentary and piecemeal reviews.  (*See* Dvoskin Dep.

19  at 257:3-22 (only systematic study within last five years while serving as court monitor in

20  Michigan); Martin Dep. at 133:25-134:18 (discussing various institutions which he

21  monitors, with Mississippi the only statewide example); Moore Dep. at 121:18-122:1

22  (testifying that although she has experience working in other states, she did not use and

23  was not asked to use current data from those states for comparison); Scott Dep. at 208:5-

24  210:8 (testifying to various states in which he has reviewed individual cases).)

25  _____

26  [5] In fact, not all of the experts signing the Joint Report bothered to visit even all of the prisons in
    this limited sample.  Dr. Moore did not visit Centinela.  (Moore Dep. at 49:14-50:10), or Pelican

27  Bay, (*id.* at 50:11-18); Dr. Scott also did not visit Pelican Bay. (Scott Dep. at 204:2-8).

28

**2.  The Termination Experts Failed to Visit ANY DSH Facilities or Address Inpatient Psychiatric Hospitalization**

The experts ignored the existence of DSH inpatient facilities to which mentally ill *Coleman* class members in need of the highest levels of mental health care are sent.  Defs. Motion at 9 n.4 ("The experts did not evaluate the inpatient programs operated by the Department of State Hospitals.").  They were not even asked to assess the care provided at DSH facilities and did not visit any such facilities, even though they were aware that inpatient psychiatric care for *Coleman* class members is provided in such facilities.  (*See, e.g.*, Dvoskin Dep. at 105:13-106:25; Moore Dep. at 251:13-24.)  This glaring omission of inpatient care occurred even though the experts inspected two prisons, CMF and SVSP, that each include within their walls hundreds of inpatient psychiatric beds, operated by Defendant DSH.  (*See* Moore Dep. at 250:24-251:24.)

**3.  The Experts Failed to Report on Their Visit to San Quentin or on the Adequacy of Mental Health Care for Condemned Prisoners**

Even within the prisons themselves, the experts failed to offer any analysis of or opinions about certain of the places that they did manage to visit, like San Quentin, home to nearly 700 condemned California inmates.  The experts' reports do not mention the words "condemned" or "death row" at all, despite the fact that the issue of whether the most mentally ill individuals on death row are to be provided with access to inpatient care when they require such care has been one of the most discussed and most disputed issues between the parties.  Certain of the experts were not even aware that this was an issue, testifying during deposition that despite the San Quentin site inspection, they were unaware of the blanket prohibition on transfers of condemned inmates to intermediate inpatient care.  (Moore Dep. at 248:6-249:18.)  Dr. Dvoskin testified that although he was aware of this issue and "there was some talk about doing a separate assessment of that program," he was then told not to perform that evaluation, and so did not ask any questions about that program while at San Quentin.  (Dvoskin Dep. at 112:11 -113:1.)

Not only did Defendants' experts omit any review of these and other parts of the

1    system, they did not conduct any kind of orderly longitudinal study on the basis of which

2    they could possibly opine that, day in, day out, across the state, in a whole range of care

3    and custody settings, the CDCR is providing constitutional care to *Coleman* class

4    members.  Extensive longitudinal data was provided to them, but they ignored every long-

5    term measure—especially when the data showed obvious systemic problems.  (*See, e.g.*,

6    Scott Dep. at 121:25-125:10; 128:1-129:10; 132:23-138:4; 141:12-145:5).)  The experts

7    instead restricted their view to a few snapshots, limited in scope and time, never

8    considering the importance or the necessity of a comprehensive review of the entire system

9    and all its moving parts.

10    **4.      The Experts Offered No Opinions about Overcrowding**

11    The experts were not even asked to opine on an issue that the Supreme Court has

12    decreed pivotal to the question of whether California can provide constitutionally adequate

13    mental health care to its inmates: the level of crowding within the prisons and whether and

14    how much it continued to interfere with the delivery of mental health care.  (*See, e.g.*,

15    Dvoskin Dep. at 191:14-192:6 ("I was not asked to render an opinion" on overcrowding);

16    Martin Dep. at 10:12-21 ("I wasn't asked to render opinions on crowding."); Moore Dep.

17    at 32:13-22 ("We didn't look at overcrowding.").)

18    **F.      THE JOINT REPORT FAILS TO MEET THE DISCLOSURE
          REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 26**

19

20    Federal Rule of Civil Procedure 26 requires, in relevant part:  (i) a complete

21    statement of all opinions an expert witness will express and the basis and reasons for them;

22    and (ii) the data or other information considered by the witness in forming them.  Fed. R.

23    Civ. P. 26(a)(2)(B).  Where experts file a "joint" report, there are four major requirements:

24    (**1**) Joint reports must "clearly identif[y] what is the joint work of" the experts and what are

25    their separate opinions, *Perez Librado v. M.S. Carriers*, No. 3:02-CV-2095-D, 2004 U.S.

26    Dist. LEXIS 12203 at *41 (N.D. Tex. June 30, 2004).  (**2**) Joint reports must "contain the

27    'basis and reasons for' each expert's opinions," clearly expressed, *Adams v. United States*,

28    No. 4:CV 03-49-BLW, 2011 U.S. Dist. LEXIS 63775 at *12 (D. Idaho May 29, 2011).  (**3**)

1   Where experts have "divide[d] up the work" to reach shared ultimate opinions, each expert

2   must "fully disclose" his reliance upon the work of his partners in reaching his opinions.

3   *Id.*  **(4)** If an expert's "partner review[s] his work" as part of the process of the expert's

4   formulating his opinions, that review must be disclosed, *Nunex v. BNSF Ry. Co.*, No. 09-

5   4037, 2012 U.S. Dist. LEXIS 97411 at *21 (C.D. Ill. July 13, 2012).  The Joint Report

6   presented does not satisfy these requirements and should be excluded.

7          The Joint Report contains two pages meant to satisfy Rule 26, drafted to lead the

8   reader to believe that all three of the signing experts reached the same opinions, for the

9   same reasons, on the basis of the same data.  (Joint Report at 8-9.)  Under questioning, it

10  became clear that this is not true.

11         The "joint" report actually consists of reports and notes drafted from sections

12  prepared separately by the primary authors, Drs. Dvoskin and Scott, without the presence

13  or real input of Dr. Moore.  Prior to September 2012, the experts had understood that they

14  were preparing, and had begun to prepare, entirely separate reports—until the "Attorney

15  General's office decided all the reports should be together."  (Moore Dep. at 36:10-37:7.)

16  An email from Dr. Dvoskin to his colleagues revealed that as a result of this decision,

17  much of the experts' analysis "became moot," and their "original plan" gave way to

18  counsels' sudden deadline. (Bien Decl. Ex. 122, 12/10/12 Dvoskin email re Report at

19  DEXP 103070.)  Thus, the rushed report and all of its confusion apparently resulted from

20  the fact that the joint report was a late-in-the-game tactical decision by the Attorney

21  General's office, not a decision by the experts as to how best to present their findings.  As

22  a result, even with unlimited access to the prisons over 15 months of secret inspections, the

23  "evidence" presented by Defendants' experts is thin, weak, and often beside the point.

24         Dr. Dvoskin testified that he met face-to-face with Dr. Scott for the writing of the

25  report, but that Dr. Moore was not present.  (Dvoskin Dep. at 31:2-33:3; *see also* Scott

26  Dep. at 194:21-195:11 (testifying that he and Dr. Dvoskin "were in the same place to do

27  our portions of the report" and that areas were left "for Dr. Moore ... to have her opinions

28  represented").)  Dr. Moore in fact *never spoke* with Dr. Scott subsequent to the last site

1   inspection conducted by the team.  (Moore Dep. at 12:2-13.)  Dr. Moore's opinions were

2   included in the report on the basis of her informal, oral presentation at an "exit conference"

3   held at each site inspection, and she was then given "an opportunity" to review the draft

4   prepared by Drs. Dvoskin and Scott.  (Dvoskin Dep. at 32:18-34:19; Moore Dep. at 84:14-

5   85:14 ; *id.* at 130:10-17.)  Neither Dr. Dvoskin's, nor Dr. Scott's, notes revealed that they

6   recorded her comments at those exit conferences and used such contemporaneous notes as

7   the basis for drafting "her" sections of the Joint Report.

8           Despite Dr. Moore's non-participation in the drafting, there are several areas that

9   the other experts identified as her responsibility and focus areas, and about which they had

10  little opinion of their own.  (*See*, *e.g.*, Dvoskin Dep. at 241:19-25 (regarding emergency

11  response to attempted suicides, "Moore did that"); *id.* at 287:11-24 (Dvoskin did not

12  review any LPT rounding logs "because Dr. Moore was looking at the rounds log"); Scott

13  Dep. at 22:24-24:2 ("My understanding of Dr. Moore was that she was as a nurse looking

14  at issues related to nursing medication administration.").)  Some of the areas assigned to

15  Dr. Moore were, apparently inadvertently, not even included in the final report.  For

16  example, Dr. Moore testified during her deposition that she had examined the use of

17  restraints in MHCBs, but that "it was overlooked" and not included in the final report

18  because she "may not have seen that it was missing."  (Moore Dep. at 30:9-31:1.)  This

19  betrays the experts' total lack of an orderly and organized process for ensuring that the

20  experts' conclusions were properly presented to this Court.

21          The joint report also fails to disclose which opinions were those of Dr. Dvoskin and

22  which were those of Dr. Scott, even though their focus areas were different.  (*See*, *e.g.*,

23  Dvoskin Dep. at 291:13-18 (Dvoskin "didn't pay any attention" to cuffing policies within

24  CTCs because "Dr. Scott focused on the CTC"); Scott Dep. at 22:24-24:2; 30:2-23

25  (outlining the separate focus areas of Drs. Scott and Moore); *id.* at 197:6-11 (identifying

26  review of mental health staffing as one of Dr. Dvoskin's focus areas); *id.* at 198:7-199:9

27  (declining to opine on treatment space limitations because "[t]his part was investigated or

28  written by Dr. Dvoskin); *see also* Moore Dep. at 102:22-103:1; 119:7-16; 127:25-128:22;

1  129:9-15; 245:9-16; 246:6-10 (declining to answer questions about, *inter alia*, treatment

2  for CCCMS inmates and suicide prevention because those were areas within Dr. Dvoskin's

3  purview).)  The Joint Report is therefore clearly not of the kind in which experts from

4  different fields collected different data but arrived together at joint conclusions.  Instead, it

5  is very clearly three (or two) individual reports merged together at the last minute, with a

6  veil of confusion thrown over the whole thing to prevent the Court from clearly seeing its

7  weaknesses.  That is, although the experts very clearly divided up their review and

8  analysis, and even though it is thus very clear that various of the opinions in the report are

9  held by only one of the signing experts, the report in no regard makes the required

10  disclosure of whose opinions are whose, based upon what professional expertise or other

11  foundation.  The fact that Plaintiffs have been able to draw inferences about the source of

12  various opinions based on deposition testimony is no substitute for the full and clear

13  disclosures required by Rule 26.  A party that has failed to provide information required by

14  Rule 26(a) "is not allowed to use that information or witness to supply evidence on a

15  motion, at a hearing, or at a trial, unless the failure was substantially justified or is

16  harmless." Fed. R. Civ. P. 37(c)(1).  Defendants' experts' failures to properly identify the

17  separate and distinct opinions of the Joint Report writers merit the exclusion of the Report.

18      Since the report makes no disclosure of which opinions belong to only one expert, it

19  is additionally apparent that it fails to properly disclose the extent to which the experts

20  relied upon one another's work or reviewed one another's work in reaching the report's

21  ultimate conclusions.  The experts did, in fact, supply some limited notes to one another,

22  particularly when one expert had failed to visit a particular prison.  (*See, e.g.*, Scott Dep.

23  168:24-169:7; *id.* at 217:21-218:20.)  The experts neither attempt, nor could possibly,

24  prove to this Court that they were qualified to perform each other's work for one another

25  outside of their own areas of expertise.  Indeed, the joint and obfuscated nature of the

26  report makes it impossible to analyze whether each of the opinions offered therein are

27  presented to this Court by an expert qualified to make such conclusions and on the basis of

28  appropriate information reviewed by the offering expert.  As Dr. Moore testified at her

1   deposition, there are areas of the report on which she would not have felt qualified, either

2   by virtue of her professional expertise or the information that she reviewed, to offer an

3   opinion. (Moore Dep. at 39:3-41:6.)  And even the experts noted that there were areas in

4   which their colleagues were perhaps not the best qualified to offer particular opinions.

5   (*See, e.g.*, Scott Dep. at 220:7-24 (explaining that as Dr. Dvoskin is "not a physician," Dr.

6   Scott would not "necessarily defer to him" in a determination of whether a particular

7   medication was appropriate).)

8           The experts did not even agree with some of the conclusions to which they had

9   signed their names.  For example, Dr. Moore, Defendants' nursing practice expert,

10  expressed a concern during her deposition that nurses at all of the toured institutions except

11  San Quentin "were unfamiliar with the side effects of psychiatric" medications, and that

12  she considered  it "important to be aware" of such side effects in order to ensure the safety

13  of patients.  (Moore Dep. at 180:11-181:12.)  The joint report to which she signed her

14  name, however, opined that CDCR's medication protocols include "appropriate

15  monitoring of the medical conditions of inmates" on psychiatric medications.  (Joint

16  Report at 26.)  Dr. Moore clarified in her depositions that if she had written that section,

17  she  "would have made a recommendation that nursing education emphasize the side

18  effects of the medication and that they have handouts or signs available so these things

19  would be in front of them all the time."  (Moore Dep. at 181:23-182:8.)  Dr. Scott testified

20  in his deposition that Dr. Moore was the sole expert responsible for reviewing issues

21  related to nursing medication management.  (Scott Dep. at 229:17-230:6.)  There thus

22  appears to be no expert willing to assume responsibility for the entirety of the Joint

23  Report's opinion on the appropriateness of CDCR's medication management protocol.

24  Moore also disagreed with the Joint Report's finding that "[t]he response to mental health-

25  related emergencies was timely and appropriate at each institution," (Joint Report at 31),

26  stating that she had found problems with the emergency response in suicides that she

27  reviewed that had occurred in 2010, 2011, and 2012.  (Moore Dep. at 197:22-198:14.)

28

1  **III.    THE CDCR OFFICIAL'S DECLARATIONS FAIL TO MEET THE
       REQUIREMENTS OF FEDERAL RULE OF CIVIL PROCEDURE 602**

2

3       Defendants also seek to support their Motion to terminate with five declarations

4  from senior CDCR officials.  All five of the declarations demonstrate factual inaccuracies

5  and evidentiary flaws.  The four declarants who were deposed were unable to provide a

6  proper foundation for their sworn statements.

7       Federal Rule of Evidence 602, governing non-expert testimony, provides: "A

8  witness may testify to a matter only if evidence is introduced sufficient to support a finding

9  that the witness has personal knowledge of the matter."  The senior CDCR officials who

10  submitted declarations are not qualified expert witnesses, are not permitted to offer

11  opinions to the Court based on hearsay and other inadmissible evidence, and may only

12  submit sworn declarations to this Court as to matters within their personal knowledge.  *See*

13  *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001) (holding that individuals not

14  qualified as expert witnesses may not testify on matters for which they lack personal

15  knowledge or based on "investigation[s] after the fact").  The declarations of Rick

16  Johnson, Diana Toche, Tim Belavich and Laura Ceballos all fail this test.[6]

17       **A.    Declaration of Rick Johnson**

18       Rick Johnson, the retired Chief of the Health Care Placement Oversight Program

19  for CDCR, filed a sworn declaration certifying that "[t]here are a sufficient number of

20  mental health beds and inmates are being timely seen" across the system.  (Johnson Decl. ¶

21  4.)  Defendants rely upon this statement in support of their assertion that the "State has a

22  comprehensive mental health system that timely delivers a continuum of services to

23  inmates across all custody levels ... ."  (Defs. Motion at 17:14-15.)  But when asked at

24  deposition about the foundation and specifics supporting this statement, Mr. Johnson

25  demonstrated that he was unaware of or unfamiliar with certain critical pieces of data –

26  _____

27  [6] These declarations, all filed on January 7, 2013, are located at Docket Nos. 4275-2 ("Ceballos
Decl."); 4275-3 ("Toche Decl."); 4276 ("Johnson Decl."); and 4277 ("Belavich Decl.").

28

1   such as the detailed data provided by the DSH to the *Coleman* Special Master and

2   Plaintiffs' counsel – that paint a very different picture than that set forth in his declaration,

3   and that he may have altered the statements contained in his declaration had he been so

4   aware.  (Johnson Dep. at 145:14-146:23; 147:25-148:21; 192:22-193:19.)  Sworn

5   declarations based on incomplete and fragmentary foundations are hardly the type of

6   reliable evidence upon which Defendants may rely in carrying their burden of proof on this

7   Motion to Terminate.

8         **B.**      **Declaration of Diane Toche**

9       Dr. Toche, then the Acting Statewide Director of the Division of Correctional

10  Health Care Services and now (as of the date of her deposition) the Acting Undersecretary

11  of Administration for the CDCR, filed a declaration on a number of matters, including

12  staffing and hiring, swearing to the fact that "[a]dequate numbers of mental health

13  professionals and administrators" are now employed by the CDCR.  (Toche Decl. ¶¶ 8-10.)

14  Defendants rely upon her statements to support their arguments that the State "recruits,

15  trains, and retains a well-qualified mental health workforce" and that that staff provides

16  "excellent ... mental health care to the *Coleman* class."   (Defs. Motion at 18:24-26; 18:26-

17  19:2).  The basis for Dr. Toche's statements regarding the adequacy of CDCR mental

18  health staffing was apparently an unspecified number of visits to institutions and

19  conversations with the *Coleman* experts, Defendants' experts, and members of her staff –

20  not an adequate foundation for a conclusion that the entire system is sufficiently staffed to

21  meet its needs.  (*See, e.g.*, Toche Dep. at 202:23-205:10.)

22      Dr. Toche also testified in her declaration that "*Coleman* monitoring has

23  increasingly diverted attention and resources away from the central goal of providing and

24  maintaining a constitutional level of mental health care for inmates, and has instead

25  saddled administrators with onerous reporting obligations….The quality and timeliness of

26  the care the State offers to inmates with mental health issues will only further improve

27  when we are no longer obligated to devote resources to these numerous obligations."

28  (Toche Decl. ¶ 9.)  Defendants rely upon her statements to support the argument that the

1    Special Master prevents the State "from providing even more effective mental health care

2    to inmates." (Defs. Motion at 27:4-6.) She was again unable to provide any credible

3    foundation for this opinion when questioned under oath. (*See* Toche Dep. at 35:9-21

4    (when asked how the Special Master's monitoring "diverted attention" from providing

5    care, answering only that the load imposed was "very heavy"); Toche Dep. at 36:18-25

6    (unable to answer specifically as to what the Special Master requests from the institutions

7    or what material is newly produced for him); Toche Dep. at 37:6-38:5 (unable to state how

8    many hours are spent preparing for Special Master monitoring visits, but only that it is "a

9    lot"); Toche Dep. at 38:9-19 (unable to state what is entailed in preparing for monitoring

10   visits).) Dr. Toche's declaration thus also fails the personal knowledge requirement of

11   Rule 602.

12       One thing to which Dr. Toche, a dentist, was able to explain in her deposition was

13   that she relies on Dr. Tim Belavich, a psychologist and then the Acting Statewide Mental

14   Health Deputy Director, for many particulars of her work. (*See*, *e.g.*, Toche Dep. at 176:7-

15   10 (problems arising from use of registry staff "would be more in Dr. Belavich's realm");

16   *id.* at 188:3-8 (if there continue to be staffing problems at CMC, staff there "may be

17   discussing something with Tim or regional" but not to her personal knowledge); *id.* at

18   191:2-20 (unable to offer a personal opinion regarding the program at SCC, "would

19   actually need to talk to Dr. Belavich to see what he has to say").) But there are levels of

20   indirection even between Dr. Belavich and anyone with personal knowledge of operations

21   out in the prisons – "And so for me, as the director of health care, I rely on Dr. Belavich,

22   who's the director of the mental health program... . He has his direct reports that report to

23   him who he relies on." (Toche Dep. at 205:5-10.) The scope of this indirection became

24   apparent during the deposition of Dr. Belavich, who like his supervisor, testified that he

25   would need to converse with members of his staff before opining on precisely the matters

26   to which he swore in his declaration. In other words, neither Toche nor Belavich was able

27   to testify competently under oath about the foundations for their broad statements, relied

28   upon by Defendants throughout their Motion, that mental health care was being timely and

1  appropriately delivered to the *Coleman* class.

2      **C.    Declaration of Tim Belavich**

3      Dr. Belavich's declaration covers a wide range of topics, ranging from the

4  purported adequacy of CDCR's mental health screening processes, (Belavich Decl. ¶ 9), to

5  the adequacy of the State's quality management program, (*id.* ¶ 18), to the thoroughness of

6  the State's suicide-prevention program, (*id.* ¶¶ 23-27).   Unfortunately, when questioned

7  about the particulars of these or various other subject areas, Dr. Belavich's constant refrain

8  during deposition was that he would have to consult his Subject Matter Experts (SMEs)

9  before offering any specific opinions.   (*See, e.g.*, Belavich Dep. at 48:1-49:13 (unable to

10 form an opinion on a suicide-prevention recommendation "without input from my SMEs);

11 57:8-17 (unaware of a recommendation regarding clinical follow-up after OHU discharge

12 and unable to form an opinion "without receiving input from my SMEs); *id*. at 58:2-15

13 (unaware of a recommendation to change a program guide section governing MHCB

14 discharge and unable to form an opinion "without consulting with my SMEs"); *id*. at 72:5-

15 7 (unable to speak to a particular suicide-prevention process "without consulting my

16 SMEs).)   This sort of funneling testimony from one without personal knowledge of the

17 underlying facts it is not permissible from a lay witness pursuant to Rule 602.   Dr.

18 Belavich's declaration, which supports no fewer than 28 separate assertions in Defendants'

19 motion, is itself without support.

20     **D.    Declaration of Laura Ceballos**

21     Defendants rely upon the Declaration of Laura Ceballos, the Chief Psychologist,

22 Quality Management for the MHSDS, in support of their arguments that the State's mental

23 health infrastructure is adequate (Defs. Motion at 19:24-25) and its delivery of services

24 timely (Defs. Motion at 17:14-17).   But Dr. Ceballos's Declaration, like those of her

25 colleagues, is premised upon a flawed evidentiary foundation.   Dr. Ceballos swears as to

26 several particulars of the "median length of time" that CDCR takes to transfer inmates

27 between levels of care as their conditions warrant.   (*See* Ceballos Decl. ¶¶ 4-6.)   There is

28 no basis for her to have selected the median length of time for transfers, rather than the

average, except that such a method dramatically improves the numbers.  This benefit (for Defendants) and distortion (for the Court) was set out in emails between Dr. Ceballos and senior CDCR officials in December.  (*See* Bien Decl. Ex. 116.)  Dr. Belavich responds to a report from Dr. Ceballos with average lengths-of-stay data by saying: "you are better off reporting the median so you can take those outliers into account and they don't have the weight on the total."  (*Id.* at 3.)  The "weight" is clear upon review of Dr. Ceballos's original report, (*id*. at 3-8).  The original report reflects an average length of stay for reception center inmates awaiting transfer to a CCCMS program as 130.1 days, and the median length of stay for such inmates as a rosy 64.3 days.  (*Id.* at 6.)  Dr. Ceballos selects the latter number.  (Ceballos Decl. at 3.)  The original report reflects an average length of stay for inmates at a mainline program awaiting transfer to an EOP program as 50.4 days, but a median length of stay of only 27.4 days.  (*Compare* Bien Decl. Ex. 116 *with* Ceballos Decl. at 3.)  Reporting the median and hiding the average is what permits Defendants to say that they are meeting program guide transfer time lines for these populations.  Dr. Ceballos does not offer any explanation in her declaration for her selection of the significantly lower median lengths of stay.  What Defendants cavalierly refer to as "outliers" that should be eliminated from their data are in fact severely mentally ill *Coleman* class members awaiting transfers to necessary care.  The Defendants' blatant data manipulation to paper over the suffering of these inmates is simply impermissible.

The Court should therefore disregard the statements detailed above, offered by CDCR officials under oath but without any sufficient evidentiary foundation meriting their consideration.

DATED:  March 15, 2013                    Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By:  */s/ Michael W. Bien*
　　　Michael W. Bien

Attorneys for Plaintiffs