1   DONALD SPECTER – 083925                MICHAEL W. BIEN – 096891
    STEVEN FAMA – 099641                   JANE E. KAHN – 112239
2   PRISON LAW OFFICE                      ERNEST GALVAN – 196065
    1917 Fifth Street                      THOMAS NOLAN 169602
3   Berkeley, California  94710-1916       AARON J. FISCHER – 247391
    Telephone:    (510) 280-2621           MARGOT MENDELSON – 268583
4                                          KRISTA STONE-MANISTA – 269083
                                           ROSEN BIEN
5                                          GALVAN & GRUNFELD LLP
                                           315 Montgomery Street, Tenth Floor
6                                          San Francisco, California  94104-1823
                                           Telephone:    (415) 433-6830
7
8   JON MICHAELSON – 083815                CLAUDIA CENTER – 158255
    JEFFREY L. BORNSTEIN – 099358          THE LEGAL AID SOCIETY –
9   LINDA L. USOZ – 133749                 EMPLOYMENT LAW CENTER
    MEGAN CESARE-EASTMAN – 253845          180 Montgomery Street, Suite 600
    K&L GATES LLP                          San Francisco, California  94104-4244
10  4 Embarcadero Center, Suite 1200       Telephone:    (415) 864-8848
    San Francisco, California  94111-5994
11  Telephone:    (415) 882-8200

12  Attorneys for Plaintiffs

13              UNITED STATES DISTRICT COURT

14              EASTERN DISTRICT OF CALIFORNIA

15

16
    RALPH COLEMAN, et al.,               Case No. Civ S 90-0520 LKK-JFM
17
            Plaintiffs,                  **PLAINTIFFS' OPPOSITION TO
18                                       DEFENDANTS' MOTION TO
        v.                               TERMINATE UNDER THE PLRA
19                                       AND TO VACATE UNDER RULE
    EDMUND G. BROWN, Jr., et al.,        60(b)(5)**
20
            Defendants.                  Judge:  Hon. Lawrence K. Karlton
21                                       Date:   March 27, 2013
                                         Time:   10:00 a.m.
22                                       Crtrm.: 4

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................. vii

INTRODUCTION ............................................................................... 1

ARGUMENT ..................................................................................... 4

I.    DEFENDANTS FAILED TO ADDRESS THE EIGHTH AMENDMENT
      DELIBERATE INDIFFERENCE STANDARD. .................................... 4

      A.    Although Defendants Do Not Dispute The Basic Constitutional
            Standards For Mental Health Care, They Have Not Achieved Them............ 7

      B.    Defendants' Compliance With The Remedial Measures In This Case
            Is Relevant To The Court's Evaluation Of Their Deliberate
            Indifference ................................................................................ 8

II.   DEFENDANTS HAVE MET NEITHER THE LEGAL STANDARDS FOR
      RELIEF UNDER THE PLRA NOR FOR RELIEF UNDER RULE 60(b)(5). ....... 10

      A.    Defendants Have The Burden Of Proof To Show That Federal
            Violations Are No Longer Current And Ongoing.......................... 10

      B.    Defendants Cannot Rely On Future Planned Projects And Future
            Mental Health Staffing Plans. ............................................. 12

      C.    "Current and Ongoing" Violations Include Current and Deliberate
            Decisions to Understaff, Under-Resource and Overcrowd Programs in
            Ways that Create a Serious Risk of Harm to Class Members. .................. 13

      D.    Defendants Make No Attempt To Show That Prospective Relief In
            This Case Is Not Necessary, Narrowly Drawn, And The Least
            Intrusive Means To Correct The Violations. .............................. 15

      E.    Defendants Have Not Shown A Significant Change In Factual
            Conditions Or Law To Meet Their Burden Under Rule 60(b)(5). ................. 15

III.  DEFENDANTS' EVIDENCE, PRESENTED LARGELY THROUGH
      THEIR TERMINATION EXPERTS, FALLS FAR SHORT OF THEIR
      BURDEN TO SHOW THAT FEDERAL VIOLATIONS HAVE ENDED............ 16

      A.    Defendants' Flawed Termination Motion Addresses Only The 1995
            Order And Ignores All Subsequent Findings And Orders Including
            Orders Of Three-Judge Court And The Supreme Court. .......................... 16

      B.    Defendants' "Nationally Prominent" Termination Expert Reports Are
            Unreliable And Their Opinions Should Not Be Considered By This
            Court. ........................................................................................ 19

      C.    Defendants' Declaration Evidence Regarding Construction Confirms
            That Adequate Facilities Are Still Years Away. ............................ 19

IV.    PLAINTIFFS' OVERWHELMING EVIDENCE OF ONGOING AND
       PERVASIVE CONSTITUTIONAL VIOLATIONS ............................................ 25

       A.    Plaintiffs' Expert Witnesses ....................................................... 25

       B.    Recent Findings and Orders by the *Coleman* and *Plata* Courts, and
             Reports of the Special Master and the *Plata* Receiver Evince Ongoing
             Constitutional Violations.................................................................. 27

       C.    Current Staff Shortages Throughout CDCR Prisons Make the
             Delivery of Adequate Mental Health Care Impossible ................................ 28

       D.    Defendants' Facilities Suffer from an Ongoing Lack of Minimally
             Adequate Treatment Space................................................................ 32

       E.    Delays in Transfers to Higher Levels of Care and Waitlists....................... 33

             1.    Waitlists for DSH Beds Persist Despite Defendants' Efforts to
                   Redefine Waitlist .......................................................... 35

             2.    Prisoners Requiring Crisis Level Care Are Still Being Placed in
                   Miserable Alternative Cells and Cages .................................. 36

       F.    Severe Clinical Staffing Shortages In DSH Are Making Delivery Of
             Care Impossible, And Staff Are Pressured to Prematurely Discharge
             Still Sick Patients......................................................................... 39

       G.    Defendants' Suicide Prevention and Emergency Response Practices
             Violate the Eighth Amendment by Putting Lives at Serious Risk. ............... 42

             1.    Defendant Officials Have Refused to Implement Life-Saving
                   Suicide Prevention Measures Recommended by Their Own
                   Experts. ..................................................................... 43

             2.    CDCR's Emergency Response Practices Fall Far Short of
                   Constitutional Minima...................................................... 47

       H.    Segregation (Administrative Segregation Units (ASUs) and Security
             Housing Units (SHUs)) ................................................................. 49

             1.    Defendants' Harsh Segregation Units Create an Unacceptable
                   Risk to Prisoners Housed There for Non-Disciplinary Reasons
                   (*i.e.*, Safety Concerns or "Lack of Beds")............................... 51

             2.    Mentally Ill Prisoners Are Languishing in Segregation for
                   Excessive Periods of Time, Leading to Acute Mental Illness
                   and Elevated Risk of Harm, Including Death. ......................... 55

             3.    Defendants Persist in Their Dangerous "Psych-and-Return"
                   Practice of Placing Mentally Ill Prisoners Back in Segregation
                   Immediately after Discharge from MHCB or DSH Inpatient
                   Units, without Regard for the High Risk of Psychological
                   Harm. ....................................................................... 56

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

4.    Defendants Do Not Provide Remotely Adequate Treatment in Appropriate Settings for Mentally Ill Prisoners in Segregation.........57

    a.    Staffing Shortages Make the Delivery of Necessary Mental Health Services in Segregation Impossible. ...............57

    b.    Inadequate Clinical Space to Provide Appropriate, Confidential Treatment in Segregation ..................................58

    c.    Lack of Meaningful, Therapeutic Mental Health Treatment in Segregation ........................................60

5.    Defendants' Failure to Implement the Minimal Standard for Conducting Welfare Checks for All Prisoners Housed in Segregation Is Putting Thousands of Human Beings at Serious Risk of Psychological Damage and Suicide........................................62

6.    Defendants Essentially Ignore the Constitutional Harms Inflicted on Mentally Ill Prisoners in CDCR's Security Housing Units (SHUs)..........................................................64

I.    Severe Medication Management and Medical Records Problems Continue to Interfere With the Delivery of Appropriate Mental Health Care to Class Members.....................................................66

1.    Medication Management Remains Severely Dysfunctional in Critical Areas.....................................................66

    (a)    Clinical Staff Shortages Hamstring Medication Management. ..........................................67

    (b)    Dangerous Lack of Awareness and Monitoring of Side Effects to Psychotropic Medications......................67

    (c)    Deficiencies that Cut Across Nearly All Aspects of Medication Management......................................68

2.    Defendants' Medication Records System Remains Deeply Problematic, Makes Clinicians' Jobs Even Harder, and Jeopardizes Patient Care......................................................70

3.    Medication Management and Records Deficiencies Plague DSH Programs Serving the Very Mentally Ill. ...............72

J.    Defendants Act with Deliberate Indifference to the Mental Health Needs of *Coleman* Class Members on San Quentin's Death Row ...............73

K.    Defendants Have Not Addressed Dangerously Inadequate Reception Center and ASU Screenings .....................................76

L.    Defendants' Custodial Policies, Practices and Procedures Violate Constitutional Standards In Their Excessive and Unnecessary Use of Force, Unfair Disciplinary Procedures, and Overly Harsh, Rigid, and Intrusive Security and Housing Procedures That Exacerbate Mental Illness and Interfere with Mental Health Treatment. ...............78

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO VACATE UNDER RULE 60(b)(5)

1

V.    OVERCROWDING-RELATED DEFICIENCIES REMAIN MAJOR
      BARRIERS TO THE DELIVERY OF CONSTITUTIONAL MENTAL
2     HEALTH CARE........................................................................................ 82

3     CONCLUSION............................................................................................ 90

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1

# TABLE OF AUTHORITIES

2

**Page**

3

## CASES

4

*Balla v. Idaho*,
    595 F. Supp. 1558 (D. Idaho 1984) ........................................................... 7

5

*Benjamin v. Jacobson*,
    172 F.3d 144 (2d Cir. 1999) .................................................................... 12

6

7

*Brown v. Plata*,
    131 S. Ct. 1910 (2011)..................................................................... passim

8

*Cagle v. Hutto*,
    177 F.3d 253 (4th Cir. 1999) .................................................................. 12

9

10

*Cason v. Seckinger*,
    231 F.3d 777 (11th Cir. 2000) ................................................................ 14

11

*Castillo v. Cameron County*,
    238 F.3d 339 (5th Cir. 2001) .................................................................. 14

12

13

*Clark v. California*,
    739 F. Supp. 2d 1168 (N.D. Cal. 2010).................................................... 10

14

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) ....................................... 7, 9, 66, 78

15

16

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ..................................................................... 5, 54, 89

17

*Gilmore v. California*,
    220 F.3d 987 (9th Cir. 2000) .................................................. 10, 11, 14, 15

18

19

*Graves v. Arpaio*,
    623 F.3d 1043 (9th Cir. 2010) ............................................................ 10, 11

20

*Hallett v. Morgan*,
    296 F.3d 732 (9th Cir. 2002) .................................................................. 11

21

22

*Helling v. McKinney*,
    502 U.S. 25 (1993) .............................................................................. 6, 14

23

*Horne v. Flores*,
    557 U.S. 433 (2009) ........................................................................ 8, 10, 16

24

25

*Lewis v. Casey*,
    518 U.S. 343 (1996) ............................................................................ 9, 10

26

*Loyd v. Alabama Dept. of Corr.*,
    176 F.3d 1336 (11th Cir. 1999).............................................................. 12

27

28

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

*Mayweathers v. Newland,*
 258 F.3d 930 (9th Cir. 2001) ............................................................. 11

*Para-Professional Law Clinic at SCI-Graterford v. Beard,*
 334 F.3d 301 (3d Cir. 2003) ............................................................ 13, 14

*Rufo v. Inmates of Suffolk County Jail,*
 502 U.S. 367 (1992) ........................................................................... 15

*Texas Dep't of Community Affairs v. Burdine,*
 450 U.S. 248 (1981) ........................................................................... 12

## STATUTES

Prison Litigation Reform Act, 18 U.S.C. § 3626 ............................... 10, 11, 14, 15

## RULES

Fed. R. Civ. P. 60(b)(5) ........................................................................ 8

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO VACATE UNDER RULE 60(b)(5)

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| ACA | American Correctional Association |
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DMH | Department of Mental Health |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| ISP or Ironwood | Ironwood State Prison |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LVN | Licensed Vocational Nurse |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO VACATE UNDER RULE 60(b)(5)

[755300-4]

| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| RVR | Rules Violation Report |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |
| SM | Special Master in the *Coleman* case |
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | *Tuberculosis* |
| TTA | Triage and Treatment Area |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO VACATE UNDER RULE 60(b)(5)

**INTRODUCTION**

If only it were true.

In their filing on January 7, 2013, and in speeches, press conferences, radio and TV appearances and interviews on the following days, the defendants, Governor Brown, Secretary Beard and other top state officials responsible for the state prison system, proudly announced that California has "transform[ed] its prison mental health care system into one of the best in the nation," (Defendants' Memorandum In Support of Motion to Terminate and Vacate, Docket No. 4275-1 ("Defs. Motion") at 1:8-9), that "California's system is now so good that it not only meets constitutional standards, but often meets and even exceeds mental health care offered in non-correctional, community settings," (Defs. Motion at 3:11-13), and that "[t]here is no justifiable reason for the continued intrusive and costly oversight of California's prison system." (Defs. Motion at 3:27-4:1.)

Nothing that they have asserted can be doubted or challenged because "[a]ll evidence confirms that there are no system-wide deficiencies in the State's mental health care programs, or that the State systematically ignores inmates' serious mental health care needs." (Defs. Motion at 10:1-3.) The rare problems that defendants' "nationally prominent experts" discovered, "in some cases paradoxically resulted from the State's efforts to comply with time-consuming demands and reporting requirements of the special master and plaintiffs' counsel." (Defs. Motion at 10:11-13.) In fact, this almost perfect mental health system will "provide even better care…when it is no longer obligated to devote resources to responding to the numerous obligations imposed by the special master that exceed constitutional requirements." (Defs. Motion at 10:14-16.)

If only it were true.

If Defendants' claims were true, the *Coleman* class, our clients, would have achieved victory. Plaintiffs' counsel, the Special Master and his team of experts, and this Court, would join Defendants in acknowledging this "win-win" outcome. The plaintiff class would be receiving timely and appropriate mental health care, would be housed in settings that contribute to their recovery and rehabilitation and would be supported by

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1    custodial practices that facilitate the delivery of mental health care.  The State would have

2    demonstrated its ability to successfully manage a system that complied with basic

3    constitutional rights and would no longer require judicial supervision.

4        But it is not true.  The truth is that Defendants are still acting with deliberate

5    indifference to the staffing and resources needed to provide minimally humane mental

6    health care to the *Coleman* class.  The effects of Defendants' systemic deliberate

7    indifference are visible in severely understaffed mental health programs throughout the

8    state where devoted and overworked clinicians struggle to provide care in dangerous

9    conditions and without the support they deserve.  They are visible on the faces of *Coleman*

10   patients waiting in segregation units and holding cells for scarce treatment beds to free up.

11   They are visible in a persistently high rate of suicides in California prison, the vast

12   majority of which are avoidable and foreseeable, and in the long list of persons who have

13   died unnecessarily in suicidal mental health crises in the year and half since Defendants

14   ignored and buried the common-sense suicide prevention recommendations of their own

15   nationally-recognized suicide prevention expert.  The facts on the ground demonstrate that

16   life-threatening constitutional violations are current and ongoing.  Defendants' termination

17   motion must be denied.

18       Plaintiffs' response to Defendants' termination motion, which demands that this

19   Court "terminate its jurisdiction and the remaining remedial orders," (Defs. Motion at

20   28:6-7), is multi-faceted and comprehensive.  The stakes for our class members are very

21   high.  Five eminently qualified experts, on short notice, were retained, and have invested

22   an extraordinary amount of time, effort and skill in investigating the current conditions of

23   the California prison system: reviewing medical and correctional records, inspecting 11

24   major CDCR prisons, and reviewing numerous CDCR and Department of State Hospitals

25   ("DSH") documents.  Dr. Pablo Stewart, a forensic psychiatrist, testified in the three-judge

26   court trial in this case, and was cited several times in the Supreme Court's decision in

27   *Brown v. Plata*.  The same is true of Dr. Craig Haney, a psychologist and professor, who

28   also testified in the 1993 *Coleman* trial.  Dr. Edward Kaufman is a psychiatrist with

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1  extensive experience in corrections, who also testified in the 1993 *Coleman* trial.  Jeanne

2  Woodford, the former Acting Secretary of CDCR and Warden of San Quentin Prison,

3  testified at the three-judge court trial, and was also cited several times by the Supreme

4  Court.  Eldon Vail, is the former Secretary of the Washington State Department of

5  Corrections, with 35 years of experience.  These experts have each prepared and filed

6  written testimony which sets forth their opinions, grounded not only in their experience

7  and background but in their current observations, interviews of prisoners and CDCR staff,

8  review of documents, photographs, records and testimony.  The ultimate question is, of

9  course, left to this Court to decide, but the opinions of these five experts are that serious

10 and dangerous deficiencies and shortages in the still overcrowded CDCR persist at all

11 levels, and the barriers to delivery of minimally adequate mental health care remain in

12 place.  Unnecessary and avoidable pain, suffering and death result all too frequently.

13      Plaintiffs also initiated limited and focused discovery through depositions of

14 defendants' termination experts, Secretary Beard, other senior CDCR officials, as well as

15 Lindsay Hayes, a suicide prevention consultant who had been hired by defendants in 2010

16 to help improve its dismal performance, and Dr. John Brim, a psychiatrist presently

17 employed by defendant DSH at the Salinas Valley Psychiatric Program.  Mr. Hayes and

18 Dr. Brim each provide critical and undisputed evidence of current systemic deliberate

19 indifference to the serious medical needs of the *Coleman* class.

20      The factual support for defendants' Termination Motion, it turns out, is extremely

21 thin and weak, as it relies almost exclusively on the seriously flawed opinions of their four

22 experts.  Plaintiffs have filed herewith evidentiary objections to the termination experts'

23 reports, and to the declarations of Dr. Toche, Dr. Belavich, Mr. Johnson and Ms. Ceballos.

24 We respond here to Defendants' creative but unsupported legal argument, which misstates

25 the burden of proof, and manages the extraordinary feat of avoiding citation to the

26 Supreme Court's decision in this very case even once.  The burden of proof is on

27 Defendants to prove the absence of constitutional violations, but Plaintiffs' showing, in

28 any event, provides more than sufficient evidence for this Court to find ongoing, systemic

1   constitutional violations.  For that reason, we also will seek, based on the Court's findings,

2   additional affirmative relief in several critical and life-saving areas that defendants have

3   deliberately and knowingly refused to remedy.

4                                              **ARGUMENT**

5   **I.      DEFENDANTS FAILED TO ADDRESS THE EIGHTH AMENDMENT**
            **DELIBERATE INDIFFERENCE STANDARD.**

6

7          The Eighth Amendment prohibits not only individual acts of cruelty and deliberate

8   indifference to basic human needs, but also systemic acts and omissions that expose

9   prisoners to unreasonable risks of harm from deficient medical and mental health care.

10  The Supreme Court explained the applicable standard in this very case two years ago.

11  *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011).  Prisoners may be deprived of rights that are

12  fundamental to liberty.  *Id.*  Yet they "retain the essence of human dignity inherent in all

13  persons."  *Id.*  The Eighth Amendment prohibition against cruel and unusual punishment

14  extends to "failure to provide sustenance" to persons whose incarceration prevents them

15  from providing for themselves.  *Id.*  Failure to provide for basic sustenance can "produce

16  physical torture or lingering death."  *Id.*  "Just as a prisoner may starve if he is not fed, he

17  or she may suffer or die if not provided adequate medical care.  A prison that deprives

18  prisoners of basic sustenance, including adequate medical care, is incompatible with the

19  concept of human dignity and has no place in civilized society."  *Id.*

20         The record before the Supreme Court, which met the extraordinarily high standards

21  demanded for a population cap, did not focus on acts of cruelty or deliberate indifference

22  by individual clinical or custody staff.  The record that the Supreme Court found to

23  constitute deliberate indifference consisted entirely of systemic violations, in the form of

24  staffing and resource shortages that prevented dedicated staff from attending to basic

25  human needs.  *See Plata,* 131 S. Ct. at 1924 (suicidal inmates held in cages due to shortage

26  of beds); *id.* at 1926 (population exceeding staffing and space capacity); *id.* at 1933

27  (inmates held in segregation while awaiting transfer to scarce treatment beds); *id.* at 1933

28  n. 6 (suicide among persons waiting for transfer); *id.* at 1934 (suicides in unconverted

                                                         4

1 inpatient cells that could not be taken off line for conversion due to high demand); *id.*

2 (impact of lockdowns on mental health treatment and medication delivery).

3      This is not to downplay the subjective component of the Eighth Amendment.

4 Subjective deliberate indifference is required.  *Farmer v. Brennan*, 511 U.S. 825, 844

5 (1994).  On this record, subjective deliberate indifference has always been and remains

6 predominately present in the higher-level management decisions to understaff, under-

7 resource and overcrowd the system.

8      Defendants and their termination consultants have lost sight of the systemic

9 deliberate indifference at issue in this case.  The termination consultants' methodology

10 consisted almost entirely of making one- or two-day, previously announced visits to 13

11 prisons to determine whether the prisoners were receiving some care, or at least enough

12 care for the termination consultants to announce that individual clinical staff were not

13 being deliberately indifferent toward them.  (Dvoskin, Moore, Scott, Clinical Evaluation of

14 California's Prison Mental Health Delivery System, Docket No. 4275-5 ("Defs.' Joint

15 Report" or "Joint Report")) at 8; Declaration of Michael W. Bien In Support of Plaintiffs'

16 Opposition to Defendants' Motion to Terminate Under the PLRA and to Vacate Under

17 Rule 60(b)(5) ("Bien Decl.") Ex. 89 (Scott Dep. at 137:2-10); Ex. 83 (Dvoskin Dep. at

18 224:5-10) (constitutional "if they're trying hard").)  The termination experts made no

19 attempt to account for patients who had not made it to the right level of care.  The

20 termination experts ignored data they received about measurement of care for patients they

21 did not directly observe on their previously announced prison visits.  (Bien Decl. Ex. 89

22 (Scott Dep. at 121:25-125:10; 128:1-129:10; 132:23-138:4; 141:12-145:5).)  Mental health

23 treatment in the twenty prisons they did not tour was largely, if not completely, ignored.

24 (Bien Decl. Ex. 88 (Moore Dep. at 137:23-138:5).)

25      Defendants' top officials, Dr. Tim Belavich, a psychologist, and Dr. Diana Toche, a

26 dentist, testified that they have never personally observed CDCR personnel ignoring an

27 inmate's serious mental health needs.  (Docket No. 4277 at 10:9-11; 4275-3 at 4:3-5.)

28 Governor Brown, just a few days ago, made a similar point: "People who say prison

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1    officials are willfully looking on as inmates commit suicide are so far removed from reality

2    they are not credible.  They are wrongly accusing civil servants who are honest,

3    hardworking employees trying to do a job."  (Bien Decl. Ex. 109, ("Gov. Jerry Brown says

4    federal prison oversight a waste of money," *Sacramento Bee*, March 12, 2013).)  The

5    evidence shows, however, that these same two officials, and others even more senior,

6    including Governor Brown himself, demonstrated deliberate indifference in their decisions

7    to understaff, under-resource and overcrowd the system in a manner that prevents any

8    effective remedy for the long-standing constitutional violations in this case, and that

9    continues to cause needless injury and death to class members.  These high-level, knowing

10   and intentional decisions to lay off thousands of CDCR employees, to freeze and restrict

11   hiring and overtime, to cancel building projects and to ignore and bury life-saving

12   recommendations of numerous experts to fix a broken and dangerous system, have left the

13   exhausted and dedicated CDCR clinical and custody staff with impossible choices in

14   terrible conditions.

15        Defendants' experts' methodology of visiting a few prisons, looking at a few

16   patients, and opining as to whether the patients in front of them are currently receiving

17   care, leaves out a core Eighth Amendment violation found in this case during the

18   overcrowding trial, and affirmed by the Supreme Court.  The Eighth Amendment is not

19   only violated in the moment that a person is injured or killed due to deliberate indifference.

20   It is violated when prisoners are required to live under an unreasonable risk of harm due to

21   inadequate medical and mental health care.  *See Plata*, 131 S. Ct. at 1925 n. 3

22   (Constitution prohibits systemic deficiencies that subject mentally ill prisoners to

23   "substantial risk of serious harm"); *Helling v. McKinney*, 502 U.S. 25, 33-34 (1993)

24   (Eighth Amendment prohibits knowing exposure of inmates to unreasonable risk).  The

25   termination motion evidence ignores the widespread unreasonable risks imposed on class

26   members who have not reached the treatment beds inspected by the termination experts,

27   either because their needs have not been identified due to systemic deficiencies such as

28   short-staffing and poor record keeping, or because their needs still cannot be met due to

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1 lack of beds, and lack of adequate staffing and policies to move the right inmate to the

2 right bed.

### A.    Although Defendants Do Not Dispute The Basic Constitutional Standards For Mental Health Care, They Have Not Achieved Them.

5      Defendants concede that in order to be constitutional, a prison mental health

6 program must provide the six minimal elements of care identified in *Coleman v. Wilson*,

7 912 F. Supp. 1282 (E.D. Cal. 1995), and *Balla v. Idaho*, 595 F. Supp. 1558 (D. Idaho

8 1984). The minimum elements of a constitutional prison mental health system are:

> (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide.

15 *Coleman*, 912 F. Supp. at 1298 n. 10. The evidence developed not only by Plaintiffs'

16 expert inspections, but also by Defendants' own termination experts, shows that

17 Defendants continue to act with deliberate indifference to these basic elements.

18 Deficiencies in screening for mental health needs remain unaddressed. *See* Section IV.K

19 below. The system is still plagued by overuse of segregation in harsh and non-therapeutic

20 conditions as a substitute for life-saving mental health treatment. *See* Section IV.H below

21 Chronic understaffing has gotten worse as Defendants have deliberately chosen to use

22 Realignment to maximize budget savings with no regard for preserving the basic mental

23 health system. *See* Sections IV.C and IV.L below. Defendants' new records system, the

24 eUHR, is currently more of an obstacle to care than the paper system it replaced. *See*

25 Section IV.I below. Overcrowding, understaffing and poor training hampers safe

26 medication administration. *See id.* Defendants have ignored and suppressed their own

27 consultant's report on necessary suicide prevention measures, have resisted and delayed

28 common sense measures such as providing beds for persons on suicide precautions, and,

1    after six years, have not implemented remedies for failures in suicide risk evaluations.  *See*

2    Section IV.F below.  On this last point, the remediation of poor suicide risk evaluations,

3    Defendants have attempted to mislead this Court, submitting sworn declarations that a

4    program was implemented when Defendants' internal documents prove that it had not been

5    implemented at all at some institutions.  *See id.*

6           **B.**      **Defendants' Compliance With The Remedial Measures In This Case Is**

7                  **Relevant To The Court's Evaluation Of Their Deliberate Indifference.**

8          Defendants were and are free to stop these violations by means of their own

9    choosing—compliance with the many remedial orders of this Court—or through

10   alternative appropriate means if they prefer.  *See Horne v. Flores*, 557 U.S. 433 (2009).

11   The course they have chosen, however, is to do neither—to fail to implement the remedial

12   measures, and to fail to develop any alternatives.  The Court is faced with evaluating

13   whether current and ongoing failures in mental health care are the result of systemic

14   deliberate indifference.  Defendants' deliberate decisions to short-staff, delay and under-

15   resource their own remedial plans are relevant to this determination.

16         The best evidence of remedial plan compliance in this case is the Special Master's

17   body of reports.  Because Defendants do not like the reports' particular message, however,

18   they are attacking the messenger.  They contend that the Special Master reports on too

19   many policies and procedures and in too much detail, and that such reporting requirements

20   are no longer equitable and should be terminated under Rule 60(b)(5).  (Defs. Motion at

21   26-27.)  Defendants' objections give the wholly false impression that the Special Master is

22   scoring them against their voluntarily adopted "best practices" unconnected to

23   constitutional violations.  If that warped version of the history of this case were true, then

24   perhaps the Special Master's monitoring could be called excessive or unfair.  But it is not

25   true.

26         The policies and procedures monitored by the Special Master were developed in

27   response to not just one finding of a constitutional violation, but dozens of such findings in

28   Court orders stretching from 1995 through 2012.  This Court allowed Defendants to

[755300-4]

1   develop these policies and procedures themselves as an alternative to even closer forms of

2   judicial supervision that this Court would have been well justified to undertake at many

3   stages of this case, when State correctional authorities repeatedly failed to remedy life-

4   threatening conditions.

5          Each of the policies and procedures is necessary to achieve the minimum

6   components of a constitutional prison mental health system.  These minimum components

7   are not items Defendants undertook to develop on their own, or agreed to in a consent

8   decree.  Rather, these minimum components—and Defendants' failure to provide them—

9   were established through substantial evidence in a contested trial and ordered as part of a

10  contested injunctive remedy in 1995, in numerous additional evidentiary and contested

11  proceedings throughout this litigation, and established again as part of the overcrowding

12  trial in 2008.  *Plata*, 131 S. Ct. at 1933-36; *Coleman*, 912 F. Supp. 1282.  After the Court

13  found these components to be both necessary to and absent from the California prison

14  system, Defendants demanded that the Court set forth a precise set of plans and guidelines

15  for their establishment.  *Coleman*, 912 F. Supp. at 1301.  The Court properly declined to

16  specify "the exact mechanisms" for achieving compliance, but rather exercised due

17  deference to Defendants' penological expertise, "leaving the matter to the creation of

18  protocols, standards, procedures and forms to be developed by defendants in consultation

19  with court appointed medical experts."  *Id.* at 1302.

20         The policies and procedures now being monitored by the Special Master are

21  precisely those Defendants themselves developed through the deferential remedial process

22  set forth by this Court in 1995 and mandated one year later by the United States Supreme

23  Court in *Lewis v. Casey*, 518 U.S. 343, 362-63 (1996).  In areas where Defendants' initial

24  policies and procedures proved inadequate to reduce the serious risk of harm to class

25  members, the Court has, over the years, provided more specific direction, but always gave

26  Defendants additional opportunities to develop their own remedies.  (*See, e.g.*, Docket No.

27  4003, Apr. 25, 2011) (Ninth Circuit affirming court order re expedited SVPP admissions,

28  noting Defendants' repeated failures to provide a remedy, and finding that the "court has

[755300-4]

1   not 'enmeshed [itself] in the minutiae of prison operations' beyond what is necessary to

2   vindicate plaintiffs' federal rights") (citing *Lewis*, 518 U.S. at 362).)

3         Contrary to Defendants' assertions, they are not shackled to their chosen remedial

4   measures, the *Coleman* mental health program guides, as they exist today.  Defendants

5   have amended them numerous times during this litigation, and can amend them as needed,

6   on fourteen days' notice.  (Docket Nos. 1749 at 11, 1968, 3954.)  This is not a case where

7   a federal decree binds state officials to one way of remedying federal violations.  The state

8   officials here are free to remedy violations "by new means that reflect new policy insights

9   and other changed circumstances."  *Horne*, 557 U.S. at 439.  What they are not free to do

10  is to ignore, short-staff, under-resource or otherwise undermine remedial measures that

11  remain necessary to remedy federal violations, and for which they have not come forward

12  with any substitutes.

13  **II.    DEFENDANTS HAVE MET NEITHER THE LEGAL STANDARDS FOR RELIEF UNDER THE PLRA NOR FOR RELIEF UNDER RULE 60(b)(5).**

14

15       **A.    Defendants Have The Burden Of Proof To Show That Federal Violations Are No Longer Current And Ongoing.**

16        Defendants' motion is governed by the termination subsection of the PLRA, which

17  makes prospective relief "terminable" after two years, subject to the limitation set forth in

18  18 U.S.C. § 3626(b)(3):

19      Prospective relief shall not terminate if the court makes written findings

20  based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the

21  prospective relief is narrowly drawn and the least intrusive means to correct the violation.

22

23        Under controlling Ninth Circuit authority, Defendants, as the party moving for

24  termination under 18 U.S.C. § 3626(b), have the burden of proof to demonstrate that

25  federal violations are no longer current and ongoing.  *Graves v. Arpaio*, 623 F.3d 1043,

26  1048 (9th Cir. 2010); *Gilmore v. California*, 220 F.3d 987, 1007 (9th Cir. 2000); *Clark v.*

27  *California*, 739 F. Supp. 2d 1168, 1175 (N.D. Cal. 2010).  Defendants claim that there is

28  some kind of tension within Ninth Circuit cases regarding the burden of proof.  (Defs.

10

1  Motion at 11-12.)  This claim is false.  The two cases from which Defendants divine this

2  "tension" were not termination cases.  *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir.

3  2001), concerned standards for extending preliminary injunctive relief beyond the 90-day

4  limit set by 18 U.S.C. § 3626(A)(2).  *Hallett v. Morgan,* 296 F.3d 732 (9th Cir. 2002),

5  concerned a motion by plaintiffs to extend jurisdiction of a consent decree beyond the

6  decree's express termination date.  In both *Mayweathers* and *Hallett,* plaintiffs were the

7  moving parties for prospective relief.  *Mayweathers*, 258 F.3d at 933; *Hallett*, 296 F.3d at

8  738.  The Ninth Circuit properly placed the burden in those cases on the moving parties to

9  demonstrate that relief was warranted under the PLRA.  *Mayweathers*, 258 F.3d at 936;

10  *Hallett*, 296 F.3d at 743-44.  Similarly here, Defendants have moved for relief under the

11  PLRA, and as such, bear the burden of demonstrating that termination of prospective relief

12  is warranted.

13      Both *Hallett* and *Mayweathers* compared the standard for prospective relief under

14  Section 3626(a)(1)(a) with the standard for terminating prospective relief under Section 18

15  U.S.C. § 3626(b)(2)—both noting that a party seeking prospective relief must show a

16  "current and ongoing" violation.  *Mayweathers*, 258 F.3d at 336; *Hallett*, 296 F.3d at 743.

17  This comparison, however, says nothing about which party bears the burden on a

18  termination motion—an issue not before the court in *Hallett* and *Mayweathers.*  Thus,

19  neither case calls into question the holding in *Gilmore,* which the Ninth Circuit reaffirmed

20  three years ago in *Graves*: defendants bear the burden of proof in a PLRA termination

21  motion.  *Graves,* 623 F.3d at 1048; *Gilmore*, 220 F.3d at 1007.

22      Defendants cite several out-of-circuit cases for the proposition that Plaintiffs have

23  the burden of proof.  (Defs. Motion at 12.)  These out-of-circuit cases do not provide any

24  authority for this Court to disregard the holdings of *Gilmore* and *Graves*, which have not

25  been disturbed by any subsequent Ninth Circuit *en banc* decision.  Defendants' out-of-

26  circuit list is also exaggerated, as it piles on several cases that make no holding at all

27  regarding burden of proof.  Of the five circuit court of appeal cases they cite, three concern

28  only the entitlement to an evidentiary hearing, and have no holding whatsoever regarding

1   burden of proof. *Benjamin v. Jacobson*, 172 F.3d 144, 166 (2d Cir. 1999) (en banc); *Loyd*

2   *v. Alabama Dept. of Corr.*, 176 F.3d 1336, 1342 (11th Cir. 1999); *Cagle v. Hutto*, 177 F.3d

3   253, 258 (4th Cir. 1999). To hold that a party is entitled to present evidence or

4   demonstrate facts at a hearing is not the same thing as to say that party has the ultimate

5   burden of proof. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).

6   The cases holding that plaintiffs are entitled to present evidence at a hearing are

7   compatible with the Ninth Circuit's *Gilmore* holding that Defendants bear the burden of

8   proof. Defendants have the burden to submit proof with their termination motion, which

9   Plaintiffs then have the opportunity to rebut in their submission and/or at an evidentiary

10  hearing.

11          In any event, even if the burden of proof were placed on Plaintiffs in this case,

12  Plaintiffs would have no difficulty meeting that burden based on the overwhelming

13  evidence that prisoners with serious mental illness are still being harmed by systematic and

14  deliberate deficiencies in the prison mental health system.

15          **B.    Defendants Cannot Rely On Future Planned Projects And Future
            Mental Health Staffing Plans.**

16

17          Defendants cite but fail to appreciate the significance of cases holding that the

18  pertinent time frame for a PLRA termination motion is the time at which the motion is

19  decided, not some point in the future. (Defs. Motion at 11.) While paying lip service to

20  the PLRA's "current and ongoing" provision, Defendants paper over the current and

21  ongoing deficiencies in their system by pointing to plans that remain unfulfilled, have

22  already been delayed for years, and for which completion remains in the future.

23  Defendants' termination experts found systemic clinical staffing shortages, but dismissed

24  them because CDCR "was in the process of hiring." (Defs.' Joint Report at 15; Bien Decl.

25  Ex. 83 (Dvoskin Dep. at 236:11-238:13).) Seriously mentally ill prisoners are held in

26  segregation, an environment that the termination experts found "non-therapeutic," but the

27  problem is dismissed because of vaguely referenced but never identified efforts by CDCR

28  to address the problem. (Defs.' Joint Report at 18, 19, 21, 23, 36.) Patients in crisis have

[755300-4]

1   to live in cells with no beds, but "they were expecting them [beds] shortly."  (Bien Decl.

2   Ex. 83 (Dvoskin Dep. at 167:13-19).)  The termination experts found clinicians struggling

3   to use an inadequate records system that blocks access to much of a patient's medical

4   history, but dismiss the problem because of new systems that "were to have been

5   completed" after their inspections.  (Defs.' Joint Report at 27-28.)  Defendants'

6   termination experts frequently identified serious problems on their inspections, and

7   dismissed them with statements like this:  "As of the writing of this report, this situation

8   has been rectified."  (*Id.* at 21.)  On examination, however, the termination experts

9   admitted that they had no direct personal knowledge as to whether the problems had been

10  rectified.  (Bien Decl. Ex. 83 (Dvoskin Dep. at 202:9-203:6; 294:21-297:13); Ex. 88

11  (Moore Dep. at 112:2-12; 142:6-143:10).)  Plaintiffs demonstrate herein, and in the

12  concurrently filed Plaintiffs' Evidentiary Objections to Defendants' Expert Reports and

13  Declarations, that key foundational assumptions relied upon by Defendants' termination

14  experts were false.

15      The termination motion also relies heavily on construction projects that have not

16  been finished and many that have not even begun.  The current state of Defendants' long-

17  delayed construction projects is reviewed below in Section III.C.

18      **C.    "Current and Ongoing" Violations Include Current and Deliberate
             Decisions to Understaff, Under-Resource and Overcrowd Programs in**
19           **Ways that Create a Serious Risk of Harm to Class Members.**

20      Defendants' statement of the PLRA legal standards, if accepted, would improperly

21  remove this Court's equitable power to address Eighth Amendment violations.  Defendants

22  contend that the Court must turn a blind eye toward "likely future violations," citing cases

23  from the Third, Eleventh and Fifth Circuits.  (Defs. Motion at 11.)  No Ninth Circuit case

24  is cited for this proposition.  Even if the out-of-circuit cases were controlling, they do not

25  stand for the proposition that the Court must ignore imminent risks of harm to the class.

26  *Para-Professional Law Clinic at SCI-Graterford v. Beard*, 334 F.3d 301, 306 (3d Cir.

27  2003), involved an injunction requiring maintenance of a legal clinic that a Pennsylvania

28  prison had opened under an access-to-courts consent decree.  The court held that PLRA

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1    termination could not be denied based on a prediction that the clinic would be closed, with

2    no evidence that it would be closed in a way that could violate the access to courts. *Id.*

3    *Para-Professional Law Clinic* turned partly on "the particular constitutional right involved,

4    namely the right of access to courts," a right not violated unless an inmate could show a

5    non-frivolous legal claim had been frustrated. *Id.* at 305 (citing *Lewis*, 518 U.S. at 350).

6    Enforcement of the Eighth Amendment right to mental health care, by contrast, does not

7    require waiting until an inmate is seriously injured or dead—this particular constitutional

8    right is a right to be free from unreasonable risks of harm caused by systemically

9    inadequate care. *Plata*, 131 S. Ct. at 1925 n. 3 (Constitution prohibits systemic

10    deficiencies that subject mentally ill prisoners to "substantial risk of serious harm");

11    *Helling*, 509 U.S. at 33-34 (Eighth Amendment prohibits knowing exposure of inmates to

12    unreasonable risk).

13        Defendants other two out-of-circuit cases provide no additional support for ignoring

14    serious risks of imminent harm to class members. *Cason v. Seckinger*, 231 F.3d 777, 784-

15    785 (11th Cir. 2000), did not discuss any showing of imminent harm, but merely a

16    "potential future violation." *Castillo v. Cameron County*, 238 F.3d 339, 354 (5th Cir.

17    2001), likewise involved a "prediction of future activity," the possible arrest of hundreds

18    of persons still in the community, that might occur if the overcrowding injunction there

19    were lifted, with no showing of the current conditions in the covered facilities. Here, by

20    contrast, Plaintiffs make an extensive showing of the current and ongoing conditions in

21    CDCR's prisons and the substantial risk of harm these conditions create.

22        The only Ninth Circuit case to address the question of risk of harm in PLRA

23    termination motions is *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000). Gilmore held

24    that although Congress appears to have intended "to deprive courts of jurisdiction to

25    continue relief" where "reversion to unlawful past practice is indeed imminent," such a

26    reading of the statute would present "a serious separation of powers claim." *Id.* at 1009

27    n. 27. The Ninth Circuit did not reach the separation of powers issue, remanding to allow

28    the district court to determine whether the termination motion could be resolved without

14

1  addressing it.  *Id.*  In this very case, the Supreme Court has cautioned against reading the

2  PLRA in a manner that would prevent federal courts from remedying violations of

3  constitutional rights, as such a reading "would raise serious constitutional concerns."

4  *Plata,* 131 S. Ct. at 1937.

5      Moreover, the harm presented here does not arise from potential, predicted, or even

6  imminent future actions by Defendants (as was the case in *Para-Professionals, Cason,*

7  *Castillo,* and *Gilmore*), but from their current and ongoing deliberate decisions to

8  understaff, under-resource, and overcrowd the prison mental health system.

9  **D.   Defendants Make No Attempt To Show That Prospective Relief In This**
       **Case Is Not Necessary, Narrowly Drawn, And The Least Intrusive**
10     **Means To Correct The Violations.**

11     The termination motion is premised entirely on an attempt to show that there are no

12  current and ongoing violations.  Defendants make no attempt to address the

13  needs/narrowness/intrusiveness part of Section 3626(b)(3) for any particular prospective

14  relief order.  Plaintiffs have demonstrated that for each current and ongoing violation, the

15  existing orders that have not already been complied with or mooted by changed

16  circumstances, remain necessary, narrowly tailored, and the least intrusive means to

17  correct the violation.  In addition to the evidence submitted with this Opposition, Plaintiffs

18  concurrently submit a Separate Statement addressing the prospective relief issued since the

19  three-judge court trial.

20  **E.   Defendants Have Not Shown A Significant Change In Factual**
       **Conditions Or Law To Meet Their Burden Under Rule 60(b)(5).**
21

22     The Supreme Court set forth the applicable standard in *Rufo v. Inmates of Suffolk*

23  *County Jail*, 502 U.S. 367 (1992).  First, the party seeking modification of an injunction

24  "bears the burden of establishing that a significant change in circumstances warrants

25  revision of the decree."  *Rufo*, 502 U.S. at 383. The party "may meet its initial burden by

26  showing a significant change either in factual conditions or in law."  *Id.* at 384.  If the

27  moving party meets that initial burden, "the district court should determine whether the

28  proposed modification is suitably tailored to the changed circumstance."  *Id.* at 391.  Here,

[755300-4]

1    Defendants do not meet the first part of their burden, and do not even address the second

2    part. *Horne v. Flores* did not change the *Rufo* standard, but reaffirmed it. 557 U.S. at 453-

3    54.

4            An examination for "changed circumstances" requires attention to the choice of

5    time period from which to measure change. Based on Defendants' instructions to their

6    termination experts, and the resulting reports, it is clear that Defendants chose to measure

7    change from the period before the original 1993 trial. (Defs. Motion at 3; Defs.' Joint

8    Report at 14-15.) This may be a good tactical choice by Defendants, as nearly any

9    deployment of staff and resources to the prison mental health system will appear to be an

10   improvement over the pitiful conditions that prevailed before the 1993 trial. Much of the

11   prospective relief that they seek to end, however, has been issued well after the 1993 trial

12   and 1995 permanent injunction, based on much more recent findings of systemic

13   constitutional violations throughout the state prison system. *See Plata*, 131 S. Ct. at 1924-

14   25, 1930-32.

15           Defendants string together federalism quotes from *Horne* to create the impression

16   that any time a state agency moves for relief from a federal injunction, the motion must be

17   granted to avoid undue federal interference with state affairs. (Defs. Motion at 13.)

18   Defendants are looking at only one side of the federalism coin. The other side prohibits

19   federal courts from turning away when a state government violates the federal constitution:

20   "Courts may not allow constitutional violations to continue simply because a remedy

21   would involve intrusion into the realm of prison administration." *Plata*, 131 S. Ct. at

22   1928-29.

23   **III.    DEFENDANTS' EVIDENCE, PRESENTED LARGELY THROUGH THEIR
             TERMINATION EXPERTS, FALLS FAR SHORT OF THEIR BURDEN TO
24           SHOW THAT FEDERAL VIOLATIONS HAVE ENDED.**

25           **A.    Defendants' Flawed Termination Motion Addresses Only The 1995
                    Order And Ignores All Subsequent Findings And Orders Including
26                  Orders Of Three-Judge Court And The Supreme Court.**

27           Defendants, despite their bravado and bluster, have failed to meet their burden of

28   demonstrating that the ongoing constitutional violations in the California prison system,

1  identified most recently by the three-judge court in August 2009, and affirmed by the

2  Supreme Court in May 2011, have been remedied.  In a bizarre strategy, Defendants and

3  their termination experts pretend that the pernicious and pervasive effects of a massively

4  overcrowded prison system on the delivery of medical and mental health care are of no

5  moment and should not be considered by this Court or the experts in forming their

6  opinions.  Defendants did not ask their termination experts to look at overcrowding as a

7  factor, and the termination experts clearly did not consider the three-judge court's findings

8  as relevant to their analysis.  (Bien Decl. Ex. 83 (Dvoskin Dep. at 191:8-192:6); Ex. 88

9  (Moore Dep. at 32:13-33:11); Ex. 89 (Scott Dep. at 24:16-27:18).)[1]

10        Under this creative but defective reasoning, the *only Coleman* order that *is* relevant

11  to understanding the fundamental constitutional violations that Defendants were obligated

12  to remedy was the first, which was issued by this Court in 1995.  *See, e.g.*, Defs. Motion at

13  3:19-21 ("the State meets and exceeds every important benchmark articulated by the Court

14  in 1995"), Defs. Motion at 27:27-28:2 ("The State has remedied all of the deficiencies this

15  Court found in 1995, and brought the prison mental health system into compliance with all

16  applicable federal and constitutional standards").  None of the subsequent remedial orders,

17  including the August 2009 findings and order of the three-judge court, are even referenced

18  and, under this flawed theory, these unpleasant and difficult findings about extreme

19  overcrowding and horrific constitutional violations in the delivery of medical and mental

20  health care can and should be ignored completely.

21        The Supreme Court's decision in this case, *Plata*, affirming each and every finding

22  and order of the three-judge court, *does not even merit a single citation or reference* in

23  Defendants' 28-page Memorandum.  The State only reluctantly concedes, in a single

24  _____

25  [1] One of Defendants' termination experts, Steve Martin, claims to be uniquely qualified to
    investigate and report on issues of prison overcrowding and the question of whether the

26  CDCR can deliver appropriate mental and medical care at current crowding levels.
    Defendants, however, chose *not* to ask Mr. Martin to investigate any crowding issues or to

27  form an opinion on the subject.  (Bien Decl. Ex. 86 (Martin Dep. at 12:6-14:7).)

28

1  footnote, that the three-judge court "ruled that California can only deliver constitutionally

2  adequate medical and mental health care by decreasing its prison population to 137.5% of

3  institutional design capacity" but argues, yet again, "that [the] order was premised on

4  outdated evidence."  (Defs. Motion at 15, n. 7.)  This claim was soundly rejected by the

5  Supreme Court:  "[T]he record and opinion make clear that the decision of the three-judge

6  court was based on current evidence pertaining to ongoing constitutional violations."

7  *Plata*, 131 S. Ct. at 1936.

8        By limiting their analysis to the single original order issued in 1995, and ignoring

9  all unpleasant intervening events in the past 17 years, Defendants, with an ostrich-in-the-

10  sand view of reality, then assert that the "State has complied with the Court's remedial

11  orders and corrected the constitutional deficiencies addressed in the Court's initial

12  judgment."  (Defs. Motion at 6:7-9.)

13        The sorry truth for both Plaintiffs and Defendants is that the three-judge court

14  found, after a full trial on the merits that California prisoners have suffered and died

15  needlessly and unnecessarily due to the deliberate indifference of Defendant public

16  officials who overcrowded California's prisons and failed to provide minimally adequate

17  medical and mental health care and safe and appropriate housing.  By ignoring the issue of

18  ongoing overcrowding in the CDCR and the resulting barriers to the remedial process in

19  *Coleman* and *Plata*, Defendants' termination motion fails to address the fundamental issue

20  that must be decided here:  Have Defendants met their burden of proving that they have

21  remediated the constitutional violations found to exist in 2009 through the population

22  reduction to date and Defendants' substantive efforts to remediate specific deficiencies in

23  their mental health care delivery system?

24        Defendants' wishful theory of the case also ignores all of the other substantive

25  remedial orders issued by this Court concerning, for example: clinical staffing levels,

26  suicide prevention, use of force, disciplinary hearings, construction of necessary

27  specialized mental health beds, administrative segregation, emergency response, access to

28  inpatient care, and the program guides.  In this Court's July 23, 2007 order, 77 of these

1   substantive orders were referenced.  (Docket No. 2320 at 4:13-17 & n. 3 (stating that

2   "there are simply too many orders to list").)  Since then, due to Defendants' inability or

3   unwillingness to remedy the ongoing violations, many more have been required and

4   Defendants' compliance with these orders is anything but complete.

5          The reality is that Defendants are knowingly and currently in violation of numerous

6   fundamental, critical and life-saving orders of this Court.  These violations of fundamental

7   remedial orders of this Court, necessary to establish a minimally adequate level of mental

8   health care, are powerful evidence of Defendants' ongoing deliberate indifference to the

9   serious need for mental health care of the more than 32,000 *Coleman* class members

10  currently identified in the CDCR.

11         **B.      Defendants' "Nationally Prominent" Termination Expert Reports Are
                    Unreliable And Their Opinions Should Not Be Considered By This
12                  Court.**

13         The opinions of defendants' "nationally prominent" termination experts should be

14  given little or no weight in this proceeding.  Plaintiffs have filed separate Evidentiary

15  Objections to Defendants' Experts' Reports, which includes a thorough analysis of the

16  issues and the applicable legal and professional standards.

17         **C.      Defendants' Declaration Evidence Regarding Construction Confirms
                    That Adequate Facilities Are Still Years Away.**
18

19         As noted above, Defendants cannot rely on future predictions of new capacity to

20  meet their burden to show that federal violations have ended.  *See* Section II.B above.

21         With their termination motion, Defendants set forth a laundry list of self-professed

22  accomplishments involving construction and renovation in California prisons.  What the

23  State fails to mention is that many of these projects are years – even *decades* – delayed and

24  have moved toward completion only after repeated court orders and, at times, over

25  Defendants' vociferous objections.  The State cites several projects that CDCR "is

26  finishing," "is building," or for which CDCR "expects to seek establishment."  (Defs.

27  Motion at 7:6, 19, 26.)  The sad reality of CDCR's construction record is that for years

28  Defendants' promises and forecasts have fallen by the wayside.  Projects are routinely "re-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1   scoped," canceled, or delayed indefinitely.  Meanwhile, many urgent projects needed to

2   address the dearth of treatment, office, and bed space for *Coleman* class members remain

3   in pre-planning stages.

4       First and foremost, more than half of the projects cited in the Declaration of

5   Director of the Facility Planning, Construction and Management Division Chris Meyer

6   have not even opened to patients yet.  (Meyer Decl., Docket No. 4278.)  Some do not even

7   have a projected completion date.  Incomplete and hypothetical projects are irrelevant to

8   the Court's inquiry into *current and ongoing* constitutional violations.  Moreover, the

9   history of CDCR construction projects suggests there is reason for skepticism as to when

10  and whether these projects will be completed, properly licensed, staffed and open for

11  patient care.

12      The 50-bed Mental Health Crisis Bed unit at California Men's Colony (CMC) is a

13  case in point.  Defendants' motion states that CDCR "is finishing" the project.  (Defs.

14  Motion at 7:6-7.)  Defendants do not, however, mention that the Court ordered them to

15  submit a plan "for the delivery of a MHCB level of care to inmates in California Men's

16  Colony" *more than ten years ago*, in October 2002.  (Docket No. 1431.)  In October 2006,

17  the court again ordered Defendants to submit a consolidated plan, including the CMC

18  project, "to meet projected populations by June 30, 2011."  (Docket No. 1998.)

19      In June 2012, Mr. Meyer submitted a declaration to the court attesting that the 50-

20  bed MHCB project at CMC was under *construction* and the first inmate-patient admission

21  was scheduled for December 11, 2012.  (Docket No. 4196-5 ¶ 5.)  December 11, 2012 has

22  come and gone.  Acknowledging "the slip on CMC," Mr. Meyer now estimates that inmate

23  admission will start "between July and October 2013."  (Bien Decl. Ex. 87 (Meyer Dep. at

24  113:15-114:14); Docket No. 4278 ¶ 10.)  In the meantime, acutely ill prisoners are

25  suffering from a major shortage of MHCBs.  (Expert Declaration of Pablo Stewart, M.D.

26  ("Stewart Expert Decl.") ¶ 41 (discussing "the use of 'alternative housing' locations for

27  suicide watch because there are no MHCB beds available"); ¶ 101 (discussing impact of

28  "the scarce MHCB beds in the CDCR"), Docket No. 4381.)

20

1    The same is true of Dewitt Nelson Correctional Annex, which Defendants describe

2  as a "soon-to-be renovated" project that will provide more mental health care beds.  Again,

3  Defendants' brief does not cite the Court's order of more than two years ago requiring

4  Defendants to set a schedule that "reflects patient admissions completed to full occupancy

5  by 2013" at Dewitt.  (Docket No. 3761.)  By Defendants' own account, 2013 will pass

6  without a single *Coleman* class member setting foot in Dewitt.  Current projections reflect

7  that the building will be fully occupied on May 31, 2014, but there is cause for concern as

8  to Defendants' ability to meet that deadline.  Mr. Meyer testified about several "issues

9  associated with that project that [he is] concerned about" and stated that he is not "ready"

10  to decide whether the current activation date is "going to be impacted."  (Bien Decl. Ex. 87

11  (Meyer Dep. at 80:13-81:1).)  More broadly, Mr. Meyer testified that "the actual

12  completion date of a project is always a guess" and noted that there are "hundreds, if not

13  thousands, of variables that can impact [a] completion date."  (*Id.* at 37:13-38:12; 114:15-

14  115:9.)

15    Defendants also rely on the future projected completion of the California Health

16  Care Facility in Stockton.  Full activation of that facility is projected for December 31,

17  2013, approximately nine months from now.  (Docket No. 4278 ¶ 5.)  That date depends

18  on nothing going wrong with the extensive remaining construction, fire marshal approval,

19  licensing and the hiring of massive numbers of clinicians, including scarce psychiatrists,

20  any one of which could throw the project off by months or years.

21    Defendants even take credit for projects for which there is not an activation

22  schedule or even a projected completion date.  Among those is the health care facility

23  improvement project at Mule Creek State Prison.  (Docket No. 4278 ¶ 17.)  When

24  questioned, Mr. Meyer admitted the long list of steps to be taken before the MCSP project

25  even breaks ground – including "hire a designer," "hire the various consultants," possibly

26  "start the CEQA [California Environmental Quality Act] process," and "have stakeholder

27  meetings."  (Bien Decl. Ex. 87 (Meyer Dep. at 74:25-75-18).)  Mr. Meyer concluded that

28  "we can't establish exactly how long it's going to take and when we expect it to activate."

1  (*Id.*)  The same is true of the health care facility improvement project at CMC, for which

2  Mr. Meyer testified that he did not know even a "conceptual date of completion."  (*Id.* at

3  78:19-79:6.)

4          Even construction projects nearing completion are vulnerable to cancellation,

5  downsizing, and major delay.  At CCWF, which was the most overcrowded of all the

6  California prisons in February 2013 when Plaintiffs' expert visited, things are moving in

7  the wrong direction for *Coleman* class members.  Despite a recent spike in population due

8  to the closure of Valley State Prison for Women, a long-planned project to create treatment

9  and office space for the EOP general population was "re-scoped" and *reduced* in size.

10  (Docket No. 4289 (Special Master's 25th Round Report) at 43.)  Construction of the new

11  facility was scheduled to begin seven months ago, in August 2012, but the project had not

12  broken ground when Plaintiffs' expert visited.  (Expert Declaration of Edward Kaufman,

13  M.D. ("Kaufman Expert Decl.") ¶ 55, Docket No. 4379.)  Indeed, CDCR's most recent

14  activation schedule indicates that even the working drawings for the site will not be

15  completed until September 2013.  (Bien Decl. Ex. 93 (Defs. Monthly Activation Schedule

16  Report for February ("Activation Report, Feb. 25, 2013") at 34.)  Mr. Meyer confirmed

17  that the project is now "back to square one," and "there is no construction schedule for the

18  re-scoped project."  (Bien Decl. Ex. 87 (Meyer Dep. at 125:10-126:3).)  He described the

19  re-scoping as a "waste of money" and noted that "you just move the starting point again

20  and go through the same process."  (*Id.*)

21          Similarly, due to "re-scoping" at LAC, EOP general population patients will not

22  benefit from a long-planned project to create office and treatment space.  The project was

23  scheduled for completion and full activation by September 12, 2012, but since has been re-

24  scoped and delayed.  Under the new plan, the recently constructed building will be used

25  for EOP administrative segregation, and in order to achieve that mission, additional

26  construction is required.  Patient admissions are now scheduled to begin on March 31,

27  2014, more than a year and a half after they were initially intended to commence.  (Bien

28  Decl. Ex. 93 (Activation Report, Feb. 25, 2013) at 21.)  Mr. Meyer stated that he believes

1   some of the office space is currently in use, but the treatment space is not.  (Bien Decl.

2   Ex. 87 (Meyer Dep. at 68:24-69:16; 70:10-70:19).)  Consequently, the photos of gleaming

3   treatment spaces attached to Mr. Meyer's declaration depict spaces that are *not* available to

4   patients and will remain empty for at least another year.  (Docket No. 4278-13 at 70, 72

5   ("Treatment Hallway" and "Therapy Room"); *see also* Bien Decl. Ex. 93 (Activation

6   Report, Feb. 25, 2013) at 21.)  Yet this is somehow Defendants' evidence that there are no

7   *current* or *ongoing* constitutional violations.

8       At San Quentin, a long-planned project that would have added mental health

9   treatment facilities on death row was canceled abruptly by the Governor in April 2011.

10   (Expert Declaration of Jeanne Woodford ("Woodford Expert Decl.") ¶ 36, Docket No.

11   4380.)  Mr. Meyer testified that the funding, preliminary plans, CEQA approval, design,

12   and working drawings had all been completed for the project at the time it was canceled.

13   (Bien Decl. Ex. 87 (Meyer Dep. at 152:14-154:25).)  Mr. Meyer had no advance notice

14   that the project would be canceled.  (*Id.*)  When asked if all construction projects are

15   subject to sudden cancelation by the Governor, Mr. Meyer stated, "[h]e wants to cancel it,

16   it gets canceled."  (*Id.*)

17       In the meantime, while CDCR construction projects are abruptly canceled,

18   frequently delayed or re-scoped, existing facilities are woefully inadequate to serve the

19   needs of *Coleman* class members.  At LAC, where the project to construct EOP treatment

20   and office space was canceled, EOP patients are "spread out in various ad hoc spaces,"

21   including visiting rooms and classrooms, and "there is not enough space" for groups.

22   (Stewart Expert Decl. ¶ 358.)  At CCWF, where the project for EOP treatment and office

23   space has been downsized and delayed, EOP patients share a unit with non-caseload

24   Reception Center inmates, with a red line of tape down the middle of the unit to separate

25   the populations.  (*See* Kaufman Expert Decl. ¶ 53 & Photo Ex. B.)  The Special Master

26   observed that EOP groups are "conducted on the dayroom floor, which limited

27   confidentiality and was noisy."  (*See* Special Master's 25th Round Report at 412.)

28   CCWF's internal Management Report identified lack of adequate group space for EOPs as

1    an "obstacle[] to providing mental health services and adherence to Program Guide

2    Requirements."  (*See* Bien Decl. Ex. 26 (CCWF 25th Round Management Report), at 3 of

3    17).)

4        The State has conceded, in a Budget Change Proposal submitted to the State of

5    California, that "[e]xisting medication distribution facilities do not allow for safe, efficient

6    and effective distribution of medications and do not allow for compliance with federal and

7    state infection control standards."  (Bien Decl. Ex. 94 (Capital Outlay Budget Change

8    Proposal ("COBCP")) at 1.)  The proposal notes that "inadequate space and the insufficient

9    lighting leads to errors in medication preparation and administration" which, in turn, "can

10   lead to deterioration of a patient's medical condition."  (*Id.* at 2.)  The State's proposal to

11   renovate and build medication distribution facilities is scheduled to conclude in May 2015,

12   but Mr. Meyer testified that "until we do the site assessments and get into the detail, we

13   have no basis" to predict a completion date.  (Bien Decl. Ex. 94 (COBCP) at 7); Ex. 87

14   (Meyer Dep. at 143:1-144:3).)

15       At some institutions, the need for renovation is even more dire.  The Office of the

16   Inspector General concluded in 2008 that "if funding is not dramatically increased, CIM's

17   condition will reach a level of degradation by 2014 that independent facilities management

18   experts throughout the industry would recommend demolishing and replacing the entire

19   institution."  (Bien Decl. Ex. 10 (November 2008 OIG Report) at 2.)  Mr. Meyer agreed

20   that "there is a need for some infrastructure repair and maintenance" at CIM, while stating

21   that "there are institutions that are worse than CIM."  (Bien Decl. Ex. 87 (Meyer Dep. at

22   158:4-23; 159:16-21).)  No renovation projects for CIM were mentioned in Defendants'

23   filing.  At Corcoran, the Chief Psychologist told Plaintiffs' expert that "[t]his prison was

24   built 25 years ago.  We don't have the infrastructure for much medical and mental health

25   care."  (Expert Declaration of Craig Haney ("Haney Expert Decl.") ¶¶ 175, 178, Docket

26   No. 4378.)  At CIM, the Reception Center clinician bluntly stated of the makeshift nature

27   of their clinical space:  "The guy who designed this place should be horsewhipped[.]  [I]t's

28   just not built right."  (*Id.* ¶ 131.)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

IV.  **PLAINTIFFS' OVERWHELMING EVIDENCE OF ONGOING AND PERVASIVE CONSTITUTIONAL VIOLATIONS**

Plaintiffs have provided the Court, in connection with this Opposition Brief, overwhelming evidence of the ongoing constitutional violations in CDCR prisons which continue to be plagued by a high level of overcrowding and shortages of resources.

A.    **Plaintiffs' Expert Witnesses**

Plaintiffs offer the testimony of five eminently qualified retained expert witnesses:

Pablo Stewart, M.D., is a psychiatrist and holds a Clinical Professorship at the Department of Psychiatry at the University of California, San Francisco, School of Medicine.  He has served as Director of Forensic Psychiatric Services for the San Francisco Jail and also served for ten years as a psychiatric expert working for the court-appointed neutral Mediator in the remedial phase of *Gates v. Deukmejian*, a class action concerning, among other issues, mental health care at the California Medical Facility.  Dr. Stewart was an expert witness in the overcrowding trial in this matter in 2008.  Dr. Stewart has extensive clinical, research, and academic experience in forensic mental health including consultations involving prison and jail systems in other jurisdictions.  His expert declaration is filed at Docket No. 4381 (hereinafter "Stewart Expert Decl.").

Edward Kaufman, M.D., is a licensed psychiatrist and former Professor of Psychiatry, who has practiced psychiatry in treatment centers, chemical dependency treatment programs, and correctional settings.  Dr. Kaufman served as the Chief of Psychiatric Services at the Lewisburg Federal Penitentiary and the Director of Psychiatry for Prison Mental Health Services of the City of New York.  He is widely published and has taught and lectured extensively in the areas of prison mental health and the treatment of substance abuse.  Dr. Kaufman previously has been qualified and testified as an expert in prior *Coleman* proceedings.  His expert declaration is filed at Docket No. 4379 (hereinafter "Kaufman Expert Decl.").

Craig Haney, Ph.D., is a Professor of Psychology and former Chair of the

1   Department of Psychology at the University of California at Santa Cruz who has studied

2   and published about institutional environments, including prisons, for 35 years.  Dr. Haney

3   has toured, inspected, and analyzed conditions of confinement at numerous state and

4   federal prisons across the country and around the world.  Dr. Haney has been qualified and

5   testified as an expert in various state and federal courts, and served as a testifying expert in

6   both the *Gates v. Deukmejian* and the *Coleman* trials, and has evaluated and testified about

7   the psychological effects of overcrowded conditions of confinement at the California

8   Men's Colony, San Quentin, and Soledad prisons, as well as in other state prison systems.

9   Dr. Haney testified in the overcrowding trial.  In 2012, Dr. Haney testified before the

10   United States Senate Judiciary Sub-Committee on the psychological effects of isolated

11   confinement.  He is currently a member of a National Academy of Sciences Committee on

12   the Causes and Consequences of High Rates of Incarceration in the United States.  His

13   expert declaration is filed at Docket No. 4378 (hereinafter "Haney Expert Decl.").

14       Jeanne Woodford is the Executive Director of Death Penalty Focus and a Senior

15   Fellow at the Berkeley Center for Criminal Justice.  She was formerly a *Coleman*

16   defendant as Acting Secretary in charge of all California prisons, after a long career at San

17   Quentin during which she served in a range of positions from correctional officer to

18   warden.  Ms. Woodford has also served as the Chief Adult Probation Officer for the San

19   Francisco Adult Probation Department, and has taught, written, and lectured extensively

20   on criminal justice topics.  Ms. Woodford testified in the 2008 overcrowding trial.  Her

21   expert declaration is filed at Docket No. 4380 (hereinafter "Woodford Expert Decl.").

22       Eldon Vail is former Secretary of the Washington State Department of Corrections,

23   having served in the top management of the department for over a decade.  Mr. Vail's

24   corrections career spans 35 years of service in line and supervisory positions.  Mr. Vail

25   served as superintendent of the McNeil Island Corrections Center, where he designed and

26   opened the state's program for mentally ill inmates.  He assumed direct oversight of the

27   entire state prison mental health system when he was elevated to Assistant Director of

28   Prisons.  His expert declaration is filed at Docket No. 4385 (hereinafter "Vail Expert

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1  Decl.").

2      Plaintiffs' experts inspected 11 CDCR prisons in a five-week period from

3  January 28 through February 26, 2013:  Mule Creek State Prison (MCSP), Salinas Valley

4  State Prison (SVSP), California Institute for Men (CIM), California State Prison–Corcoran

5  (COR or Corcoran), California State Prison–Sacramento (SAC), California Correctional

6  Institution (CCI), California State Prison–Los Angeles County (LAC), Central California

7  Women's Facility (CCWF), Kern Valley State Prison (KVSP), San Quentin State Prison

8  (SQ), and R.J. Donovan (RJD).  In addition, Dr. Haney and Mr. Vail recently toured two

9  additional CDCR prisons in connection with their work as expert witnesses on the *Mitchell*

10 case challenging CDCR's racial lockdown policy:  Solano State Prison and High Desert

11 State Prison.

12     **B.    Recent Findings and Orders by the *Coleman* and *Plata* Courts, and**
           **Reports of the Special Master and the *Plata* Receiver Evince Ongoing**
13          **Constitutional Violations**

14     In addition to the evidence set forth herein, Plaintiffs rely on the extensive evidence

15 already set forth in the record of this case and the related *Plata* case, including the reports

16 of the Special Master and Receiver, this Court's findings and orders, the three-judge

17 court's findings and orders, and the Supreme Court's decision in *Plata*.  The Special

18 Master's recently filed 25th Report, Report on CDCR Suicides in 2011, and Report on

19 CDCR Suicides for the First Half of 2012, provide an unequaled comprehensive review of

20 the current operations and serious ongoing deficiencies of CDCR's and DSH's operations.

21 The *Plata* Receiver recently filed his 22nd Tri-Annual Report on the Delivery of Health

22 Care Services to California Prisoners, and a response to *Plata* defendants' objections to

23 that report.  (*Plata* Docket Nos. 2525, 2547.)  Plaintiffs incorporate by reference and

24 herein rely on their Opposition to Defendants' Objections and Motion to Strike the Special

25 Master's 25th Report, and declarations in support (Docket Nos. 4324, 4325)**,** and their

26 Opposition to Defendants' Objections and Motion to Strike the 2011 Suicide Report, and

27 declarations in support, (Docket Nos. 4350, 4350-1.)

28

27

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

**C.    Current Staff Shortages Throughout CDCR Prisons Make the Delivery of Adequate Mental Health Care Impossible**

Defendants have knowingly and intentionally taken steps that put the lives and safety of the *Coleman* class at risk through their decisions to achieve budget savings by sacrificing progress towards a remedy to the ongoing constitutional violations in the delivery of mental health care in the prisons.  The population reduction order provided Defendants with an opportunity to move the remedial process forward by alleviating overcrowding and taking steps to implement the State's own 2009 Staffing Plan.  Instead, Defendants have chosen to balance the budget on the backs of the California prisoners with mental illness.  Defendants have further put dedicated and hard-working clinical staff in an impossible situation.  Mental health care providers must now manage caseloads beyond their (or anyone's) professional abilities and in violation of professional and licensing standards, as they are forced to decide how to ration mental health care in a crisis in which all of their patients need and deserve their help.

Due to the Governor's February 15, 2011 Statewide Hiring Freeze, and his decision to order massive layoffs associated with Realignment, Defendants have failed to address the significant mental health staffing deficiencies that impede the provision of an essential mental health program, including critical suicide prevention measures.  (Docket Nos. 4350-1 Exs. A & C; 4325-1 ¶¶ 6(f), (g) (noting impact of staff shortages in specific suicides).)  Defendants' expert Dvoskin characterized the significant mental health staffing shortages as "unavoidable," because Defendants could not hire mental health clinicians due to the requirements of "state personnel law," noting, "I suppose you could change the law, but that's what the law is."  (Bien Decl. Ex. 83 (Dvoskin Dep. at 236:11-23).)  Although Defendants have sought many waivers of state law from this Court, they did not seek a waiver from the state personnel laws that they now claim have prevented them from hiring the mental health staff necessary to implement their Court-ordered staffing plan. (*See*, *e.g*., Docket Nos. 4120, 3866, 3748.)

Defendants know very well the minimum number of clinical staff required to

[755300-4]

1   deliver constitutionally adequate mental health care.  The current staffing ratios for clinical

2   positions in the CDCR were developed by Defendants themselves after a thorough study

3   and were "deemed necessary to meet the needs of the inmate-patient populations.  *Where*

4   *positions are not filled, the implication is that clinical need is not being met*."  (Special

5   Master's 25th Round Report at 46-47 (emphasis added).)  Defendants' staffing plans were

6   developed during a period of extreme financial crisis and were represented to the

7   Legislature as necessary to meet minimum constitutional standards.  (Docket No. 4325

8   ¶ 16, Ex. K (Mental Health Staffing Ratio Budget Change Proposal 2010-2011).)

9   Defendants' staffing plan and ratios, without objection or appeal, have been incorporated

10  into orders of this Court.  (*See, e.g.*, Docket Nos. 3666, 1774, 1772.)  Defendants have

11  knowingly and intentionally failed to comply with these orders—disregarding their own

12  projections as to staffing needs—by not actively funding these positions and allocating

13  them to prisons that required additional staff.  Nor have they effectively recruited and hired

14  for their vacant clinical positions.  Layoff notices, hiring freezes, complex and delayed

15  "freeze exemption" procedures, Realignment confusion, and delays in mission planning all

16  have resulted in the serious and dangerous staffing shortages that put the lives and health

17  of the *Coleman* class at risk today.  (*See* Bien Decl. Ex. 90 (Toche Dep. at 138:25-139:14;

18  151:3-11).)

19       Defendants, as they must, admit the existence of the extreme staffing shortages, but

20  take no responsibility for the crisis that they have created and managed.  (Toche Decl.,

21  Docket No. 4275-3, ¶¶ 6-8.)  Blame is cast on the *Plata* Receiver, Realignment, the

22  Special Master's monitoring and requirements, the "market for psychiatrists," "nationwide

23  shortages," and even state public employee law.  Defendants, including CDCR Secretary

24  Beard and their experts, go even further, disavowing their own studies of the minimum

25  necessary clinical staffing for mental health care, and this Court's orders, claiming that

26  they provide "too rich" a staffing level and that their clinicians should make do and work

27  harder rather than "complain" about the shortages.  (Bien Decl. Ex. 80 (Beard Dep. at

28  110:19-113:20).)  Dr. Toche cavalierly conceded that Defendants have decided not to fund

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1    what she and Defendants deem "non-critical positions at each institution" for the sole

2    purpose of "providing salary savings."  (Toche Decl., Docket No. 4275-3, ¶ 6.)

3        Mental health staff working on the ground, meanwhile, are forced to bear the

4    significant burdens that result from that choice.  (*See* Haney Expert Decl. ¶¶ 52, 96 (noting

5    that MCSP chief psychologist stated that his "responsibilities were substantial, and that the

6    hiring of a second Chief Psychologist would be very helpful")).  The shortages are now so

7    severe that even when patients are transferred to higher levels of care, they are receiving

8    inadequate and inappropriate psychiatric care that does not meet their needs.  (Stewart

9    Expert Decl. ¶¶ 285-347 (documenting severe problems with delivery of care in 5 EOP

10   ASU programs visited), ¶¶ 431-451 (describing severe problems in DSH inpatient care

11   programs at SVPP), ¶¶ 51-56 (discussing staffing shortages in DSH programs providing

12   inpatient care to CDCR prisoners).)

13       As a result of these staffing shortages and waitlist pressures, Plaintiffs' experts

14   found significant numbers of unstable and seriously ill patients in CDCR prisons during

15   their recent inspections.  (*See, e.g.*, Stewart Expert Decl. ¶¶ 433, 436-445, 448 (class

16   members were suffering from deficient treatment as a result of these staffing shortfalls);

17   Kaufman Expert Decl. ¶ 24 ("The mental health staff at each institution described

18   significant shortages of staff that hindered their capacity to deliver even basic mental

19   health care."), ¶¶ 27, 28, 29 (CCWF unable to offer group treatment to EOP prisoners

20   housed in segregation unit due to staffing shortage), ¶¶ 30, 31 (Prisoner B only seen every

21   other week because case manager told her that her caseload is too big; clinical contact

22   "occurred cell front to manage the large influx of MH patients in ASU while

23   understaffed"), ¶ 32 (Prisoner C seen cell front by her clinician because the prison was

24   "short of staff escorts," and denied mental health treatment "because of custody issues"),

25   ¶ 36 (medium-size cage-like cells filled with eight to ten prisoners left cuffed and waiting

26   for several hours for their health care appointments), ¶ 39 (five CIM prisoners on the

27   mental health caseload placed in ASU due to shortage of appropriate beds and could not

28   get a response to repeated requests to meet with custody counselors due to staff shortage as

confirmed by CDCR doctor), ¶ 42 (Corcoran staff psychiatrist referred to shortage of psychiatrists and its adverse impact),¶ 44 (escort staff shortage noted in Corcoran's internal management report, and confirmed by the 32.7 vacant escort officer positions), ¶ 45 (staff shortages mean patients receive an inadequate amount of treatment and also lower the quality of treatment); Haney Expert Decl. ¶ 52 (staff shortages impact the delivery of mental health treatment at each institution visited), ¶ 95 (Mule Creek mental health staffing "remained a problem"), ¶¶ 100-101 (Chief Psychologist reported that although MCSP has space to provide the treatment to EOPs, they are short the staff to use it), ¶ 136 (CIM faced staffing shortages that reduced treatment, most evident in psychiatry vacancies), ¶ 138 (Defendants' expert Moore found CIM had insufficient staff to provide discharge planning for two-thirds of CCCMS prisoners "due to caseload"), ¶ 188 (Corcoran's allocated mental health staff cut substantially despite the mental health caseload remaining steady), ¶ 189 (77% staff psychiatry vacancy rate at Corcoran, MHCB doctor acknowledged that "we are so short of psychiatrists that they cover as best they can"), ¶ 190 (Corcoran staffing shortages have gotten worse since August 2012), ¶ 195 (staffing has gotten worse, not better at Corcoran, "we are just keeping our heads above water. We just don't have the staff."), ¶¶ 237-239 (CCI staffing shortages significantly impact on delivery of care); Stewart Expert Decl. ¶ 64 (other related staffing problems noted on tours included frequent turnover in key clinical positions, difficulties associated with registry workers), ¶ 72 (staffing vacancies impacted medication management, transfers to higher levels of care, delivery of EOP care), ¶¶ 77-80 (SAC impacted by the current statewide hiring freeze, required to apply for exemption for each position, lapses in medication consents, lack of presence at IDTTs related to shortage of psychiatrists); ¶¶ 83, 88-90 (unable to deliver more than five hours of weekly treatment to its EOP prisoners due to staffing shortages), ¶¶ 104, 109 (staffing shortages at LAC contribute to the ongoing inability to delivery adequate structure therapy hours to EOP prisoners); Woodford Expert Decl. ¶ 43 (insufficient custody staff to provide escort for routine mental health services and emergency treatment).)

1

2

**D.    Defendants' Facilities Suffer from an Ongoing Lack of Minimally Adequate Treatment Space**

3       Section III.C above, addresses Defendants' misplaced reliance on *future* building

4   plans in a motion about current and ongoing conditions.  The current and ongoing

5   deficiencies in treatment spaces at CDCR facilities are not just cosmetic.  Defendants

6   continue to tolerate punitive, non-confidential, and anti-therapeutic settings that discourage

7   mental health patients from participating in treatment.  By forcing patients who access care

8   to jeopardize their safety by talking about sensitive and personal information in front of

9   other prisoners, CDCR erects dangerous barriers to mental health treatment.  Indeed,

10  Defendants' expert Moore testified that the problem with non-confidential treatment

11  settings is that "the inmate will not be as truthful or forthcoming with their issues," which

12  "affect[s] treatment."  (Bien Decl. Ex. 88 (Moore Dep. at 163:20-164:1).)

13      Plaintiffs' experts found inadequate treatment space at nearly every institution they

14  toured.  (*See* Haney Expert Decl. ¶¶ 75-78 (MSCP EOP ASU treatment space is "an

15  environment that is not only congested and inhospitable but not at all conducive to

16  meaningful therapy"; similar observations by the Special Master), ¶ 232 (observing

17  "extremely serious space limitations that compromised the delivery of adequate mental

18  health care" that "were acknowledged by the staff members" at CCI); Kaufman Expert

19  Decl. ¶¶ 48-56 (describing "inadequate," noisy, and non-confidential settings for groups

20  and noting high incidence of cell-front clinical contacts at CCWF), ¶¶ 57-60 (observing

21  adverse impact of inappropriate treatment space on patient participation in therapy), ¶¶ 61-

22  64 (describing treatment spaces with "temporary half-walls" and no "auditory privacy" in a

23  converted gym at Corcoran);  Stewart Expert Decl. ¶ 75 (recounting comments by SVSP's

24  Acting Chief of Mental Health about the shortage of office and treatment space for

25  confidential interviews with class members), ¶¶ 112-114 (observing that EOP Ad Seg

26  patients must meet their clinicians "in non-confidential areas on the crowded, noisy,

27  chaotic dayroom floors in the housing units" at RJD and LAC).)

28      Moreover, Defendants rely on temporary, emergency, unlicensed, and inadequate

[755300-4]

facilities for a major portion of the most critical higher levels of care in the system.  These "bad" and "ugly" beds were ordered to be opened and operated only until minimally adequate and appropriate facilities for inpatient psychiatric care could be constructed.  All of these "bad beds" are consistently filled to capacity in today's overcrowded system.  These inpatient beds are:  CIM MHCB (34 beds), CMC MHCB (40 best), SAC MHCB (20 beds), SVPP ICF (242 beds), CMF ICF and APP (88 acute/MHCB and 140 ICF beds).  (Declaration of Rick Johnson ("Johnson Decl."), Docket No. 4276-2, Ex. 2.)

Widespread deficiencies in the treatment spaces are inseparable from deficiencies in the sufficiency of mental health care.  Medication management is rendered much more difficult – and in some cases, dangerously ineffective – when patients lack confidential settings in which to communicate concerns about side effects and ask questions about their medications.  (Kaufman Expert Decl. ¶ 75.)  Inadequate treatment spaces exacerbate problems with staff retention because they add to clinicians' challenges providing meaningful treatment to their patients.  (Stewart Expert Decl. ¶ 114.)  Even basic suicide prevention measures can be frustrated by chronic inadequacies in treatment settings."  (Kaufman Expert Decl. ¶ 47.)

Finally, the severe problem of inadequate treatment space in segregation units is discussed further detail in Section IV.H.4.b below.

**E.    Delays in Transfers to Higher Levels of Care and Waitlists**

Defendants claim that the State's mental health delivery system provides for "inmates' serious mental health needs through a continuum of services across all custody levels in both inpatient and outpatient programs."  (Toche Decl., Docket No. 4275-3, ¶ 10; Belavich Decl., Docket No. 4277, ¶ 5.)  But this claim is demonstrably false.  Significant and ongoing shortages of MHCB beds, EOP placements, and inpatient psychiatric hospital beds remain.  Clinicians fill these critical beds to capacity.  Additional *Coleman* class members who need these resources are held in cages, punitive administrative segregation units, barren outpatient housing units and other harsh and unsafe locations in lieu of receiving the care they need.

[755300-4]

1   Defendants lack sufficient beds to transfer all the *Coleman* class members requiring

2   EOP or CCCMS placements and use "bad beds" for those who are waiting for transfer.

3   (Stewart Expert Decl. ¶¶ 278, 282; Haney Expert Decl. ¶¶ 44-46.)  Defendants collect data

4   weekly that documents this shortfall, yet have failed to adequately address it.  During the

5   week of February 11, 2013 (the most recent data provided by Defendants), CDCR

6   institutions requested the transfer of 234 EOP prisoners to appropriate EOP programs

7   throughout the system; only 32 prisoners (13.7%) could be transferred.  (Bien Decl. Ex. 2.)

8   During the same week, of the 1435 CCCMS prisoners for whom transfer to an appropriate

9   bed was requested, just 271 (18.9%) could be transferred.  Defendants' weekly EOP data

10  from January 2011 to December 2012 show similar backlogs.  (Bien Decl. Ex. 72.)

11  Despite the clearly documented and long-existing bed shortages (*see* Bien Decl.

12  Ex. 72 (Comparison of EOP Male Beds Requested and Beds Provided Jan. 2011 through

13  Jan. 2013)), Defendants acknowledge that they have not yet made efforts to focus on the

14  needs of the *Coleman* class, nearly two years in to Realignment.  (Bien Decl. Ex. 85

15  (Johnson Dep. at 178:1-179:18)  (Chief of the Health Care Placement Oversight Program

16  (HC-POP) stating, in his February 25, 2013 deposition,  "*so we're just beginning to – even*

17  *though it's been the plan to do this, we're finally at the point where we can now address*

18  *the mental health alignments*." (emphasis added)); *id.* at 204:25-205:19 (first meeting to

19  address the issue had not yet occurred as of February 25); *id.* at 205:20-206:13; *id.* at

20  206:14-207-1.)

21  Defendants' continuing indifference to these bed shortages has caused pain and

22  suffering to *Coleman* class members, many of whom cannot get to an appropriate program

23  to meet their mental health needs.  (Kaufman Expert Decl. ¶ 95 (at every prison toured,

24  prisoners on the mental health caseload housed in ASUs due to shortage of appropriate

25  beds), ¶¶ 97-99 (Prisoner L housed in ASU due to SNY status waiting for transfer more

26  than nine months; increasingly depressed and despairing); Haney Expert. Decl. ¶¶ 44-50,

27  107-114, 141-162, 217-227, (many prisoners suffering and languishing for weeks or

28  months in a "bad bed," such as ASU or OHU waiting for transfer), ¶ 281 (segregated

1  housing used to house prisoners waiting for SNY transfer despite awareness that many

2  ASU suicides involved such prisoners).)

### 1. Waitlists for DSH Beds Persist Despite Defendants' Efforts to Redefine Waitlist

5  Inpatient waitlists still exist. Defendants' have tried to disguise the inpatient

6  waitlist problem has been to redefine how to count the waitlist, using the date of

7  acceptance by DSH instead of the date of referral, contrary to Program Guide provisions

8  (Bien Decl. Ex. 106 (Program Guide Section 12-1-16)), and thus undercounting the

9  number of days that a mentally ill prisoner has been waiting for transfer to psychiatric

10  hospital level care. Although Defendants contended there was no waitlist for DSH care,

11  when Dr. Stewart toured the intermediate inpatient DSH programs at SVPP on January 28,

12  2013, staff kept mentioning the "waiting list," and then correcting themselves and

13  describing it as the "accepted referral list." (Stewart Expert Decl. ¶ 383.) Similarly, Dr.

14  Brim, a treating psychiatrist at SVPP, testified that the Executive Director told the

15  psychiatry staff earlier this year that there were 20 or so patients on the waitlist, making it

16  difficult to restrict admissions. (Bien Decl. Ex. 82 (Brim Depo. at 38:25-39:3).) Rick

17  Johnson, former Chief of HC-POP, testified that there was no prisoner waiting for

18  inpatient care as of December 17, 2012, but he also conceded that he relied on a summary

19  report from DSH and had never seen the actual DSH Bed Utilization Report. This report,

20  which is filed under seal with this Court, lists all patients' referral dates, acceptance dates,

21  and transfer dates, if transferred. (Bien Decl. Ex. 85 (Johnson Dep. at 25:22-26:5; 59:3-

22  14); Confidential Declaration of Jane Kahn in Support of Plaintiffs' Opposition to

23  Defendants' Motion to Terminate ("Kahn Under Seal Decl.") Exs. 43-44.). The data for

24  December 2012 and January 2013 (Bien Decl. Ex. 73) shows that the majority of the

25  patients currently housed in the DSH programs waited longer than transfer timeframes to

26  get to those inpatient programs, and the vast majority of the patients accepted for a DSH

27  bed in December 2012 and January 2013 were on the waitlist longer than the court-ordered

28  transfer timelines. (Bien Decl. Ex. 106 (Program Guide 12-1-16 Transfer Timelines).)

[755300-4]

1   Secretary Beard acknowledged at his deposition on March 5, 2013, that the waitlist

2   for APP acute psychiatric beds was so substantial that DSH and CDCR had met to plan the

3   opening of another temporary emergency wing in CMF's L-wing.  Moreover, this waitlist

4   continues to grow notwithstanding DSH administrative efforts to reduce it by pressuring

5   staff at DSH hospitals to prematurely discharge patients.  (Stewart Expert Decl. ¶ 433-

6   434.)

7       **2.    Prisoners Requiring Crisis Level Care Are Still Being Placed in
            Miserable Alternative Cells and Cages**

8

9   Defendants' policies require that a prisoner in need of suicide observation be

10  referred immediately to an MHCB and placed within 24 hours.  (Bien Decl. Ex. 106.).)

11  This standard, developed by Defendants to meet their constitutional obligations, is

12  constantly flouted, due in large part to the ongoing shortage of MHCBs.  Defendants rely

13  on the use of alternative placements (including holding cages) and unlicensed infirmaries

14  referred to as Outpatient Housing Units ("OHUs") to house prisoners who should be

15  placed in an MHCB.  In December 2012, Dr. Belavich authorized the continued use of

16  OHUs and alternative housing for prisoners who require an MHCB but for whom no bed is

17  available.  (Belavich Decl. ¶ 14, Docket No. 4277.)  His memorandum lists various types

18  of alternative units which can be used, including holding cells with and without toilets, and

19  even small holding cages where a prisoner can only sit on the ground or stand.  (*Id.* Ex. 3

20  at 2-3.)

21  Dr. Belavich testified that, in order to operate the CDCR's mental health delivery

22  system with the resources he was provided, CDCR has to use these small cages.  (Bien

23  Decl. Ex. 81 (Belavich Dep. at 233:4-9).)  Figure 1, below, is the photograph Dr. Belavich

24  was testifying about.  It is a photograph of a holding cage, which was taken at RJD on

25  February 12, 2013:

26

27

28

1

2

3

4

5

6

7

8

9

10



11

**Figure 1 (Bien Decl. Ex. 102.)**

12 This is exactly the sort of holding cage that the Supreme Court found shocking in *Plata*.

13 *See* 131 S. Ct. at 1924 ("Because of a shortage of treatment beds, suicidal inmates may be

14 held for prolonged periods in telephone-booth sized cages without toilets." (attaching

15 photo to Court's decision)).

16      The use of unsafe alternative placements is pervasive.  During the last 32 weeks of

17 2012 (from May 18, 2012, through December 27, 2012), there were a total of 2,429 such

18 alternative placements systemwide.  (Bien Decl. Ex. 51.)  729 of those alternative

19 placements lasted for more than 24 hours, in contravention of the *Coleman* Program Guide

20 standard.  These alternative placements continued in significant numbers through the last

21 week of December 2012, the last week for which data have been made available.  (Stewart

22 Expert Decl. ¶¶ 199-206.)  Many of the alternative placements are physically unsafe for

23 suicidal prisoners; all are harsh and punitive.  (*Id*. ¶¶ 200-202.)

24      Defendants also use unlicensed OHUs to house prisoners who report suicidal

25 ideation but cannot be placed into an MHCB due to the lack of an available bed.  Between

26 May and December 2012, a total of 1,120 prisoners were placed in an OHU; only 354 of

27 those prisoners were ever transferred to an MHCB.  (Bien Decl. Ex. 74.)  Conditions in

28 OHUs are terrible.  Lindsay Hayes, a suicide consultant for CDCR, toured three of

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1  Defendants' OHUs prior to issuing his August 2011 report.  He found conditions in all

2  three concerning.  Regarding the OHU at DVI, he noted:

> I remember [it] distinctly because there was this very foul smell when we
> walked around the unit.  And it was – I was told it was the aftermath of
> pepper spray that was dispensed on the – in the administrative Seg side of it.
> But it had filtered on to the overflow unit … they were very dangerous cells.
> There might have been some minor lighting, but that could have been just the
> light from the outside cell block.  You could not see very clearly into the
> cells.  They were not suicide-resistant … the bunks were very dangerous, and
> there were unsafe ventilation grates.

8  (Bien Decl. Ex. 84 (Hayes Dep. at 82:19-84:18).)

9        When Plaintiffs' expert Craig Haney toured the MCSP OHU on February 7, 2013,

10  he noted that it remained relatively unchanged since his last visit in 2007, with completely

11  barren cells that require a prisoner to sit and sleep on the floor.  (Haney Expert Report

12  ¶ 111 & Photo Ex. M.)  Dr. Haney also toured the CCI OHU on February 22, 2013.

13  Conditions in this OHU are similarly harsh, with men lying on the floor in barren cells and

14  laying placed in cages regardless of their security status.  (Haney Expert Decl. ¶¶ 245-247,

15  274-275 & Photo Exs. DD, EE, KK.)  Mr. Hayes was especially concerned that the harsh

16  conditions in these OHUs would be a deterrent for prisoners to tell someone when they

17  were in psychiatric crisis.  (Bien Decl. Ex. 84 (Hayes Dep. at 65:20-66:17).)

18        Clinicians systemwide have been instructed for many years to contact HC-POP if

19  they need assistance finding an available MHCB for a patient, either because their prison

20  has no MHCB unit or its MHCB unit is full.  (Bien Decl. Ex. 95.)  These requests have

21  been tracked by HC-POP, and were documented on a chart prepared by Plaintiffs for the

22  overcrowding trial in Plaintiffs' Exhibit P-263.  (Bien Decl. Ex. 75 (Copy of Ex. P-263).)

23  At the time of the trial in August 2008, there were 322 prisoners referred to HC-POP by

24  local clinicians for an available MHCB; of these 322 prisoners, 135 were placed in an

25  MHCB by HC-POP.  (*Id.*)  In the most recent report provided by Defendants showing

26  January 2013 data, there were 332 MHCB prisoners referred to HC-POP by local

27  clinicians seeking an available MHCB, of which only 155 were placed.  (Bien Decl.

28  Ex. 66.)  Very little has changed in the past four years for local clinicians seeking to find

1    an available MHCB for their patients who need critical crisis bed care. These clinicians

2    are forced to place their suicidal patients in cages, holding cells, and unlicensed infirmaries

3    due to unavailable MHCBs. This has become the new "normal," one far removed from the

4    constitutional standard.

5        **F.**     **Severe Clinical Staffing Shortages In DSH Are Making Delivery Of Care Impossible, And Staff Are Pressured to Prematurely Discharge Still Sick Patients**

6

7          Defendants' psychiatric inpatient hospital programs are experiencing a dangerous

8    shortage of clinical staff that has undermined the ability of DSH clinicians to provide

9    minimally adequate care to their CDCR patients. DSH hospitals, unable to hire staff due

10   to the Governor's Hiring Freeze and budget cutting and, at the same time, under pressure

11   to reduce their waitlists for the purposes of this termination motion, have been providing

12   inadequate care to patients and discharging them prematurely. These current and ongoing

13   violations are just the latest entries in Defendants' long and sordid history of denying,

14   delaying or otherwise interfering with timely access to inpatient psychiatric hospitalization

15   for members of the *Coleman* class.

16         Defendants, for at least a year and perhaps longer, have allowed SVPP and other

17   state hospital programs serving *Coleman* class members to become dangerously

18   understaffed. DSH also apparently slowed or stopped efforts to replace employees who

19   retired or transferred elsewhere and limited the use of contractors. (Stewart Expert Decl.

20   ¶¶ 51-56.) DSH also chose to pursue "cost savings" by reducing the ratio of clinical

21   staffing in its programs, without informing this Court and with great detriment to patient

22   health and safety. (Bien Decl. Ex. 108.)

23         The result has been extreme levels of understaffing which have transformed the

24   DSH programs from places where CDCR patients receive critically necessary intensive

25   treatment to dangerous locations where clinicians are so overloaded that they can provide

26   only crisis and emergency care. And even crisis care has proven difficult for the limited

27   staff, as shown by an avoidable and horrific suicide at SVPP in late November 2012. (*See*

28   Stewart Expert Decl. ¶¶ 436-444, 448; Kahn Under Seal Decl. Ex. 42 (Prisoner A Suicide

[755300-4]

1  Report) (filed under seal).)  According to Dr. John Brim, an SVPP psychiatrist, who

2  testified on March 1, 2013, patients at SVPP are now receiving approximately one hour a

3  day of treatment, in a program that is designed to provide 20 to 35 hours of scheduled

4  treatment and activities each week.  (Bien Decl. Ex. 82 (Brim Dep. at 91:6-92:18).)  Staff

5  and patient assaults at SVPP have increased significantly as a direct result of understaffing

6  and the inability of the overwhelmed clinical staff to spend enough time with the patients.

7  (Bien Decl. Ex. 82 (Brim Dep. at 77:14-80:14; Bien Decl. Ex. 107).)

8      After their multiple requests to management for help went unanswered, each of the

9  nine psychiatrists at SVPP signed and sent a letter to the Executive Director of SVPP on

10  January 23, 2013, stating that current staffing was not safe or appropriate and that given

11  their large careloads, "patient safety was at stake."  When that went unanswered, SVPP

12  psychiatrists signed and sent second letter on February 12, 2013, stating that the SVPP

13  psychiatrist staff shortage had "devolved" to a "crisis level" and demanding that DSH take

14  steps to hire additional staff and use contractors to protect the health and safety of the

15  patients.  (*See* Bien Decl. Exs. 111 & 112.)  The psychiatrists requested that pending the

16  hiring of additional clinical staff, SVPP be closed to new admissions, so that they could

17  address the needs and ensure the safety of the existing patients.  Dr. Brim testified that the

18  psychiatrists continue to be:

19      … under pressure from administration to move the old people out—the old
        patients out and take in new patients so as to keep our waiting list down.

20      And many of the psychiatrists—well, I would say all—felt that this was
        resulting in shorter stay for patients than historically had been the case.  And

21      they felt that it was getting to the point that people were not staying in all
        cases at least as long as they needed to.  There was pressure from

22      administration to get them out quickly so that new people could be brought
        in.

23

24  (Bien Decl. Ex. 82 (Brim Dep. at 17:25-19:4).)

25      Dr. Brim also testified that there were shortages of other disciplines of clinicians at

26  SVPP, such as social workers, psychologists and rehab therapists, and they too were

27  experiencing shortages and had complained to management.  (*Id.* at 23:7-19, 24:11-25:9,

28  25:13-22).)  He also confirmed reports that to save money, CDCR and DSH had even

1  stopped supplying clean clothes, laundry service, bedding, coats and clothing to the CDCR

2  patients in SVPP. (*Id.* at 61:13-62:7.) Plaintiffs' expert Dr. Stewart found severe

3  problems with DSH treatment related to staff shortages. (Stewart Expert Decl. ¶¶ 51-56,

4  431-451.)

5      A critical piece of Defendants' termination motion is their claim that the SVPP

6  waitlist no longer exists. Johnson Decl. ¶ 3, Docket No. 4276-2. Plaintiffs' counsel,

7  several times in 2012, raised the issue of clinical understaffing of the DSH programs with

8  Defendants. The monthly staffing information provided by Defendants, plus reports from

9  *Coleman* class members, indicated that there was a serious problem. Each time Plaintiffs

10 raised the issue, however, Defendants assured the Special Master and Plaintiffs' counsel

11 that there was no problem, there were errors in their own monthly staffing data, and that

12 the programs were, in fact, fully staffed. Plaintiffs' counsel raised the issue again in

13 December 2012, after the horrific November 2012 suicide, and was again told that there

14 was nothing to worry about and that the program was properly staffed. (*See* Bien Decl.

15 ¶ 105 & Ex. 105.)

16     Plaintiffs' experts discovered many prisoners in MHCB and other CDCR units that

17 had recently returned from DSH programs, but were quite unstable. (*See* Stewart Expert

18 Decl. ¶ 433 (listing seven cases of apparently premature DSH returns to CDCR

19 encountered in various CDCR prisons during recent inspection tours).) CDCR clinicians

20 repeatedly expressed their belief that they were seeing premature discharges from DSH.

21 (Stewart Expert Decl. ¶ 398 (discussing barriers and delays in access to inpatient care),

22 ¶¶ 399-400 (discussing patients labeled as "DSH failures"), ¶¶ 406, 409, 411, 433.) A

23 recent suicide in 2013 of a CDCR prisoner within weeks of his discharge from ASH raises

24 the issue again. (Kahn Under Seal Decl. Ex. 46; *see also* Stewart Expert Decl. ¶¶ 92, 95,

25 97, 231-251.)

26     This Court has ordered that Defendants continue operating all of the temporary,

27 emergency inpatient and MHCB programs unless and until they can demonstrate that they

28 are no longer necessary. (Docket No. 1800.) Yet Defendants have made presentations at

[755300-4]

1  SVPP (and, in all likelihood, at ASH and CMF as well), recruiting for the new Stockton

2  facility and explaining that it will soon replace the temporary emergency units at CMF and

3  SVPP.  The message was clear: half of the staff will be laid off, but there would be

4  openings at Stockton later in 2013.  The result was that numerous DSH staff have retired,

5  transferred or given notice and have not been replaced.  (Bien Decl. Ex. 82 (Brim Dep. at

6  20:13-23:6).)  Defendants are currently violating the Court's order and the order requiring

7  them to maintain their staffing ratios, and have been misleading the Court and the Special

8  Master.

9      This Court has been required to issue numerous orders over many years requiring

10  Defendants to provide prompt access to appropriate levels of inpatient psychiatric

11  hospitalization.  The current  DSH staffing crisis is powerful evidence of ongoing

12  constitutional violations as to a critical part of the mental health delivery system for

13  *Coleman* class members.  It is also evidence of systemic deliberate indifference at the

14  highest levels of CDCR, DSH, and the Governor's Office.

15  **G.    Defendants' Suicide Prevention and Emergency Response Practices**
   **Violate the Eighth Amendment by Putting Lives at Serious Risk.**

16

17      It is undisputed that California prisoners commit suicide at a rate far above the

18  national average prison suicide rate.  The Special Master's expert, a nationally recognized

19  authority on suicide prevention, found that more than 70% of the suicides in 2011 were

20  foreseeable and/or preventable.  (Special Master's Report on CDCR Suicides in Calendar

21  Year 2011 (hereinafter "2011 Suicide Report") at 3, Docket No. 4308, Jan. 25, 2013.)  For

22  the first half of 2012, 73% of the 15 suicides were determined to be either foreseeable or

23  preventable.  (Special Master's Report on Suicides Completed in the CDCR January 1,

24  2012 – June 30, 2012 (hereinafter "First Half 2012 Suicide Report") at 4, Docket No.

25  4376, Mar. 13, 2013.)  Moreover, both CDCR's overall suicide rate and the percentage of

26  CDCR's suicides that are foreseeable and/or preventable have remained high for several

27  years.  (*Id*. at 7.)  During the first six months of 2012, a CDCR inmate died by suicide

28  every 11.4 days on average.  (*Id.* at 2.)

1.    **Defendant Officials Have Refused to Implement Life-Saving Suicide Prevention Measures Recommended by Their Own Experts.**

Defendants claim to "have fully implemented programs to identify, treat, and supervise inmates at risk for suicide" and assert that their experts found "[e]specially impressive" the State's system wide attention to suicide prevention.  (Defs. Motion at 22-23.)  The truth is that they have deliberately and intentionally ignored the recommendations of the Special Master, this Court's orders, and the analysis of their own suicide prevention consultant, Lindsay Hayes.  (*See* First Half 2012 Suicide Report at 22-23 ("The same recommendations have been made repeatedly…  It is absolutely unacceptable that such recommendations have not been implemented and realized by CDCR.").)

Mr. Hayes' consultancy with CDCR on suicide prevention speaks volumes about Defendants' purported "massive and admirable commitment in suicide prevent."  (Defs' Joint Report at 37.)  In 2010, Defendants hired Mr. Hayes to provide "Suicide Expert Consultant Services for CDCR's Suicide Prevention Program."  As articulated by CDCR, "[Mr. Hayes]'s experience (more than 25 years) with correctional suicide prevention programs will allow the CDCR to make immediate, short-term, and long-term changes in its suicide prevention program to begin to decrease the overall rate of suicide over the long-term.  This consultation will allow the CDCR to implement a more effective suicide prevention policy and demonstrate to the *Coleman* court its resolve to deal with an issue that impedes its ability to resolve the litigation."  (Bien Decl. Ex. 113 at 1.)  As CDCR's suicide prevention consultant, Mr. Hayes came to California, toured three prisons, met with CDCR officials, reviewed policies, procedures, and practices, and analyzed suicide reports for 25 of the 35 suicides that occurred in 2010.  Then, as required by the contract, Mr. Hayes provided CDCR with his preliminary recommendations on January 30, 2011, followed by a final report with his recommendations on August 16, 2011.  (*Id*.)  The contract provided for one- and two-year follow ups, and then a consultation in year three, to be followed by an additional final report including recommendations for long-term

[755300-4]

1 changes.  (*Id.* at 3.)

2       Mr. Hayes' August 2011 report set forth the statistics on suicides in California

3 prisons, an analysis of the causes and contributing factors to the high suicide rate, and a

4 number of straightforward recommendations.  After Mr. Hayes submitted his August 16,

5 2011 report to Defendants, however, CDCR "buried" the report and has not requested any

6 additional services from him despite the significant further steps contemplated by the

7 contract.  (*See* Order, Document No. 4341, at 5:3-7, Feb. 14, 2013; Bien Decl. Ex. 28 (e-

8 mail from Robert Canning to Mr. Hayes stating that "[o]bviously when your report landed

9 it was not roundly applauded and in fact was buried."))  Mr. Hayes' August 2011 Report

10 and Recommendations were also hidden from the Special Master and this Court, as well as

11 from Defendants' own experts, by orders that came from the highest levels of state

12 government.  (Bien Decl. Ex. 81 (Belavich Dep. at 28:10-14 (noting that individuals above

13 Dr. Toche made the decision about whether to continue to use Hayes' consulting services

14 after his report was issued)); Ex. 80 (Beard Dep. at 192: 16-23; 194:1-7 (stating that he

15 was provided Hayes report by Ben Rice, Chief Counsel, but told it was an attorney-client

16 privilege and not to talk to the Special Master about it); Ex. 83 (Dvoksin Dep. at 49:24-

17 50:11 (stating that he was not provided the Hayes report until 2013)).

18       Defendants, rather than implement the life-saving recommendations that have been

19 repeatedly put forward by nationally-recognized experts and consultants, resort to

20 unacceptable excuses and explanations for their failures.  They claim that they "have done

21 all they can do," or that these avoidable and unnecessary deaths can be ascribed to causes

22 "beyond our control."  The suicide rate is attributed by these officials, as well as

23 Defendants' termination experts, to "gangs," the ethnicity of CDCR prisoners, and even to

24 Realignment.  (Response to Special Master's Report on 2011 Suicides, by Joel Dvoskin,

25 Docket No. 4326-6, Feb. 11, 2013 at 5; Defs.' Objs. & Mot. to Strike Portions of Special

26 Master's Report on 2011 Suicides at 8:23-9:3, Docket No. 4326 ("So while the overall

27 prison population has decreased, the offenders most prone to committing suicide have

28 remained in prison.").)  If anything, Defendants' strange demographic-based excuses for

[755300-4]

1  their high suicide rate is further evidence of deliberate indifference.  They claim to have

2  knowledge of higher risks in certain groups, but nonetheless have come forward with no

3  plan to address such higher risks.  (*See* First Half 2012 Suicide Report at 15.)

4        At the same time as they have shirked responsibility for suicide prevention

5  measures, Defendants have implemented punitive practices in their MHCBs and the

6  alternative placements (cages and barren cells with no beds) where prisoners linger while

7  waiting for an MHCB, all of which discourage individuals experiencing suicidal ideation

8  from coming forward for assistance.  (Kaufman Expert Decl. ¶ 90; Stewart Expert Decl.

9  ¶¶ 192-262; Bien Decl. Ex. 50 (Hayes 08/16/2011 Report) at 5.)  Plaintiffs' experts have

10  expressed great concern about excessive and unnecessary punitive practices in these

11  settings, commenting that such practices can cause patients to become more suicidal, but

12  "nonetheless to conceal their suicidal ideation in order to avoid feeling dehumanized in the

13  treatment setting."  (Kaufman Expert Decl. ¶ 90.)  Indeed, Defendants' own experts agree

14  with Mr. Hayes' recommendations.  (Bien Decl. Ex. 83 (Dvoskin Dep. at 173:2-174:7);

15  Ex. 88 (Moore Dep. at 116:18-118:5).)  Yet Defendants' harsh and dangerous practices

16  persist.

17        CDCR's resistance to follow important recommendations for suicide prevention is

18  in keeping with its past practice.  CDCR has chronically failed to implement suicide

19  prevention measures recommended by the Special Master's suicide expert, who noted that:

20        The same recommendations have been made repeatedly,
         beginning as early as the 1999 Suicide Report and up to and
21        including the most recently submitted 2011 Suicide Report.  It
         is absolutely unacceptable that such recommendations have not
22        been implemented and realized.  No matter how many times
         these recommendations are reiterated, they continue to go
23        unheeded year after year, while the suicides among CDCR
         inmates continue unabated, and is worsening, as manifested by
24        suicide rates that inch ever higher over the past several years.

25  (First Half 2012 Suicide Report at 22.)  For almost two decades of review, the Special

26  Master has found failures by CDCR clinicians in the area of suicide prevention.  The

27  installation of suicide-resistant beds in MHCBs is a case in point.  Despite advice from

28  their suicide consultant regarding the impact of these punitive measures, Defendants

[755300-4]

1  vigorously resisted the Special Master's recommendation to install suicide-resistant beds in

2  their MHCBs so that suicidal men and women would not be forced to sleep on the floor.

3  Those beds were installed in MHCBs only after this Court ordered Defendants to do so.

4  Order, Docket No. 4044, July 27, 2011.

5      More recently, the Special Master has reported that Defendants have failed to

6  implement other critical life-saving measures in administrative segregation units, including

7  30-minute welfare checks for all segregation prisoners, mental health screening, and basic

8  elements of mental health care such as confidential mental health interviews.  (Special

9  Master's 25th Round Report at 36-38.)  The suicide rate among CDCR's administrative

10  segregation population in 2012 was 157 per 100,000, the same as it was in 2007, and

11  increased from 2011.  (*See* Kahn Decl. ¶ 8 & Ex. I, Docket No. 4325, Feb. 11, 2013.)

12  Although the ASU population is about 5.8 percent of the overall prison population, 26.5

13  percent of the 2011 suicides and 34 percent of the 2012 suicides occurred in ASUs.  (*See*

14  *id.*)

15      The 2011 Suicide Report also found that in 50% of the suicides, suicide risk

16  evaluations were either not done, or were done inadequately.  As a result, interventions

17  that could have saved lives were not implemented.  (2011 Suicide Report at 3.)  The

18  suicide risk evaluation ("SRE") is a checklist utilized by a clinician to assess the level of

19  risk of suicide when a prisoner expresses current suicidal ideation, makes a suicide threat

20  or attempt, when a prisoner is admitted or discharged from higher levels of care, and any

21  time a newly arriving prisoner indicates a current or significant history of suicide risk

22  factors.  Kahn Decl. ¶ 10, Docket No. 4350-1.

23      Defendants' most recent plan to address these failures, the August 2010 Updated

24  Report, includes their Proctor-Mentor Program ("PMP"), which Dr. Belavich, then acting

25  Deputy Director of Mental Health, testified had been developed and implemented at all

26  prisons.  (Kahn 2/11/13 Decl., Docket 4325, Ex. A; Belavich Decl. ¶ 24.)  Defendants have

27  failed to fully implement this program more than two years later.  (Kaufman Expert Decl.

28  ¶ 93.)  Documents produced by Defendants in the last few weeks demonstrate that, in fact,

steps toward implementation of this process were delayed, rushed, and appear to be litigation-focused.  For example, on January 19, 2013, ten days prior to Plaintiffs' expert visit to CSP-Sacramento, Shama Chaiken, the Chief of Mental Health at CSP-Sacramento, along with other Mental Health Chiefs, received an email from the Supervisor of the Proctor-Mentor Program telling them that: "Suicide remains 'the low hanging fruit' for coleman. [sic]  Please MAKE SURE your SRE Mentor Program is up and running."  In response, Dr. Chaiken wrote that the proctor-mentor program had "been on the back burner" and promised to "come up with an implementation plan next week."  (Bien Decl. Ex. 61 (Emails re: Status of Proctor-Mentor SRE Program, January 2013).)  Later, she sent an email to her staff suggesting that the mentoring program was being implemented more for the benefit of litigation than for its substance, noting that "for experienced staff, it takes about an hour," and that "the folks who are mentored … can then become mentors for others the following week."  She then told them that "we need to make some progress by the time the plaintiff attorneys come out the following" week.  (*Id.*; *see also* Haney Expert Decl. ¶¶ 115-117 (MCSP SRE training "kick off" eight days before Plaintiffs' expert tour).)

It is of constitutional significance that Defendants continue to ignore essential suicide prevention steps identified as necessary by their own consultants, to delay implementation, and to deliberately short-staff their system.  These deliberate actions contradict the termination experts' characterization of a "passionate interest in preventing suicide."  (*See* Defs.' Joint Report at 2.)  Rather, the evidence shows that in every area of suicide prevention CDCR is starving the system of resources, putting more lives at risk.

### 2.   CDCR's Emergency Response Practices Fall Far Short of Constitutional Minima

"The constitutional requirement that defendants provide inmates with a system of ready access to adequate medical care" includes an "adequate system for responding to emergencies."  *Coleman*, 912 F. Supp. at 1308 (citations and internal quotation marks omitted).  Defendants make only a passing reference to this important constitutional

47

1    obligation in their motion.  (*See* Defs. Motion at 22-23.)  Unfortunately, and with lethal

2    consequences, Defendants again ignore reality.  Defendants' performance on emergency

3    response is woefully inadequate and has contributed to the high risk of serious harm and

4    death.

5        Defendants' expert Moore testified that she conducted a review of CDCR's

6    emergency response practices, recognizing it as a component of an effective suicide

7    prevention program.  She testified that she found problems with emergency response in

8    suicides she reviewed for the years 2010, 2011, and 2012.  (Bien Decl. Ex. 88 (Moore Dep.

9    Tr. 195:5-198:14).)  Moore reviewed specific cases involving emergency response during

10   her tours.  At CSP-LAC, for example, she reviewed seven (7) cases involving emergency

11   response and found "inadequate emergency response time" in five (5) of those cases.  She

12   testified that this finding was consistent with what she observed at "many" of the CDCR

13   institutions she toured.  (*Id.* (Moore Dep. 198:19-201:21).)  In fact, *Moore disagreed with*

14   *her own report's finding* on "Suicide Prevention" (Defs.' Joint Report at 31, Section B,

15   Subsection 3) that the "response to mental health-related emergencies was timely and

16   appropriate in each institution." (Bien Decl. Ex. 88 (Moore Dep. at 244:14-20).)

17       Other experts who have reviewed the issue agree.  In his review of CDCR suicides

18   in 2010, CDCR suicide prevention consultant Lindsay Hayes found that 28% of 2010

19   suicides involved problems with the emergency response.  (Bien Decl. Ex. 50 (Hayes

20   08/16/2011 Report) at 2.)  Moore agreed with Mr. Hayes' findings.  (Bien Decl. Ex. 88

21   (Moore Dep. at 196:8-197:2).)  Dr. Patterson, the Special Master's expert, found that, in 16

22   of the 34 suicides (47.1%) that occurred in CDCR in 2011, emergency response was not

23   performed in a timely and/or appropriate manner.  (2011 Suicide Report at 3.)  Twenty-

24   seven percent of CDCR prisoner suicides from the first half of 2012 involved the same

25   deficiency in emergency response.  (First Half 2012 Suicide Report at 4.)

26       All the evidence demonstrates that Defendants are nowhere near meeting their

27   constitutional obligations with respect to emergency response; human lives almost

28   certainly have been, and will continue to be, the cost of their failure.

1

2

**H.     Segregation (Administrative Segregation Units (ASUs) and Security Housing Units (SHUs))**

3      Segregation units continue to be extremely high-risk settings for all prisoners, with

4   an astronomical risk of suicide, needless psychological suffering, and pervasive

5   constitutional violations.  (*See* CDCR Suicide Rates: ASU vs. Systemwide Chart, *Coleman*

6   Docket No. 4325, Ex. I (showing that suicide rate in CDCR ASUs since 2007 has been

7   between 129 and 229 per 100,000 – that is, between six (6) and nine (9) times greater than

8   the already high CDCR systemwide suicide rate); 2011 Suicide Report at 10.)  This

9   problem has persisted for years.  (Special Master's Report on Suicides Completed in

10   CDCR in Calendar Year 2004 at 12, Docket No. 1806, May 9, 2006 (finding that, in 2004,

11   69.2% of suicides (18 of 26) occurred in administrative segregation, up from an already

12   high 48.5% in 2003 (17 of 35), and that a majority of the suicides completed in

13   administrative segregation involved inmates who were not on the mental health caseload at

14   the time of their deaths (11 in 2003; 10 in 2004)); Order, Docket No. 1830, June 8, 2006

15   (directing Defendants to develop a plan for "dealing with the escalating percentage of

16   suicides occurring in administrative segregation units" and to "provide adequate resources

17   of mental health and/or custody staff, create sufficient confidential interview space and/or

18   enhance the quality of mental health services provided in administrative segregation units,"

19   as appropriate).)

20      There is no dispute in this case that CDCR's segregation units continue to be an

21   exceedingly high-risk, non-therapeutic environment for every person placed in those units.

22   Defendants' experts, staff, and consultants are all in agreement.  (*See* Defs.' Joint Report at

23   35-36 ("Administrative Segregation Units (including ASU/EOP hubs) remain a high-risk

24   environment, including inmates who were not previously identified as mental health

25   clients, as well as inmates who were assigned to the CCCMS and EOP levels of care.");

26   Bien Decl. Ex. 3 (CDCR Suicides:  Results of Recent Analysis, dated Jan. 25, 2013) at 1

27   (CDCR Suicide Prevention Coordinator's internal memorandum finding that "Segregated

28   settings have traditionally been considered higher risk settings when it comes to

1  suicide.")); Bien Decl. Ex. 50 (Hayes 08/16/2011 Report) at 2 (finding that "there is a

2  disproportionate number of inmate suicides occurring within ASU cells").)  The Special

3  Master and Plaintiffs' experts have reached the same conclusion.  (*See* First Half 2012

4  Suicide Report at 16, Docket No. 4376 (finding the rate of suicide in segregated housing to

5  be "staggering"); Special's Master Report on Defs.' Review of Suicide Prevention

6  Policies, Practices, and Procedures at 9, Docket No. 3918, Sept. 27, 2010 (noting "elevated

7  risk of suicide found in administrative segregation and other secured housing units");

8  Haney Expert Decl. ¶¶ 36-43; Stewart Expert Decl. ¶¶ 178-183, 274-282, 285-347;

9  Kaufman Expert Decl. ¶¶ 95, 125-26.)

10         Defendants now assert, *without* citing to specific evidence or providing any

11  discussion, that "[t]here is no evidence that mentally ill inmates housed in [segregation]

12  settings are being denied appropriate treatment."  (Defs. Motion at 23.)  The evidence

13  establishes the complete falsity of this statement.  Needless suffering and death continue to

14  plague segregation units through the CDCR system: (1) prisoners are being placed in harsh

15  segregation for non-disciplinary reasons, such as safety concerns and "lack of beds"

16  appropriate to meet individual mental health and security needs; (2) mentally ill prisoners

17  are languishing in segregation for excessive periods of time; (3) Defendants continue their

18  dangerous "psych-and-return" practice of placing mentally ill and highly vulnerable

19  prisoners in segregation immediately upon discharge from MHCB or DSH inpatient units,

20  without regard for the high risk of psychological harm; (4) Defendants are failing to

21  provide minimally adequate treatment in appropriate treatment settings for prisoners in

22  segregation; (5) Defendants are failing to implement the minimal standard for conducting

23  welfare checks for all prisoners housed in segregation to address the exceedingly high risk

24  of psychological damage and suicide; and (6) Defendants persist in inflicting constitutional

25  harms on mentally ill prisoners in CDCR's Security Housing Units (SHUs).  Any one of

26  these problems would be deeply problematic.  Together, they constitute a haunting picture

27  of deliberate indifference and constitutional inadequacy.

28

[755300-4]

1.     **Defendants' Harsh Segregation Units Create an Unacceptable Risk to Prisoners Housed There for Non-Disciplinary Reasons (*i.e.*, Safety Concerns or "Lack of Beds").**

There is an enormous and unacceptable risk for the many prisoners housed in segregation for *non-disciplinary* reasons, such as for their own safety or because there is no appropriate bed available in the system that meets their mental health, medical, and security needs.  On this issue, there is no debate.  (Bien Decl. Ex. 3 (CDCR Suicide Prevention Coordinator noting that "[M]any inmates who housed in ASU at the time of their deaths are placed there not for disciplinary reasons, but for safety reasons…. [P]lacement in ASU of already fearful inmates may only serve to make them even more fearful and anxious, which may precipitate a state of panicked desperation, and the urge to die."); Bien Decl. Ex. 22 ("Suicide Prevention in Administrative Segregation Units: What is Missing" article (CMC psychologist's February 2013 article finding that: "Prisoners placed in the administrative segregation unit for their safety face similar stressors related to being isolated.  They also may experience anxiety, fear, and paranoia associated with the initial safety concerns that led to their placement on this unit.")) at 3.)

Defendants' own experts recognized the grave harm that results from placement of prisoners in administrative segregation for non-disciplinary reasons.  For example, Defendants' expert Moore reported observing several EOP prisoners placed in the ASU at CIM solely because there was a lack of appropriate beds in the system.  She found that these men were "very sick … they were hearing voices or … were having auditory hallucinations or that one inmate was seeing signs of his grandmother.  They were sick inmates; they needed to be somewhere else."  (Bien Decl. Ex. 88 (Moore Dep. at 166:4-168:9).)  Defendants' expert Martin testified that there is "no need" to impose segregation conditions on a prisoner who "doesn't otherwise represent a threat to anybody, but somebody is a threat to him" and that "if there are onerous or punitive conditions, a de facto type of punishment when the offender hasn't done anything [there would be] [d]ue process implications, if nothing else.  If not Eighth Amendment ….  If the effect of that is corporally, you know, punitive, then I think there's an issue."  (Bien Decl. Ex. 86 (Martin

1    Dep. at 44:8-47:13).)

2         Defendants' former-suicide prevention consultant Lindsay Hayes likewise agreed.

3    He recalled a 2006 conference with CDCR officials about addressing the risk of suicides in

4    CDCR segregation settings:

5         [T]here were non-disciplinary inmates being housed within the Ad-Seg units.
         And the concern was that they were being managed as if they were
6         disciplinary inmates.

7         In other words, there was very little movement.  In other words, lack of out-
         of-cell time.  Their property was limited.  So they were being treated as if
8         they were disciplinary inmates, but they did not have disciplinary orders.

9         . . . [T]here was a discussion that this could also be one reason why there's a
         disproportionate number of suicides in the Ad-Seg unit, because inmates in
10        these units were very frustrated, and their mental health was deteriorating,
         and their stress level was increasing because they're there for reasons other
11        than discipline, and yet they're being treated it as if they were disciplinary
         inmates and being locked down up to 24 hours a day and not being given
12        yard and normal property.

13        . . . I think it was a general agreement amongst the folks that were at [the
         2006 CDCR] summit conference that this – this could perhaps be one of the
14        reasons why there was this disproportionate number of suicides within the
         Ad-Seg unit.

15

16   (Bien Decl. Ex. 84 (Hayes Dep. at 45:9-46:18).)  Yet Defendants have done little to

17   nothing to remedy these grave and dangerous policies and practices.

18        Defendants' experts made several recommendations in their Joint Report addressing

19   the danger of placing CDCR prisoners in segregation, particularly those housed in

20   segregation solely because they are waiting for a non-segregation EOP bed to open for

21   them.  They recommended that, "whenever an inmate is housed in an Administrative

22   Segregation Unit pending transfer to an Enhanced Outpatient Program, that inmate should,

23   in our opinion, be placed at the front of any waiting list for transfer to the next available

24   and appropriate bed."  (Defs.' Joint Report at 36.)  *Defendants explicitly disagreed and*

25   *refused to implement their own experts' recommendation.*[2]  (Bien Decl. Ex. 92 (Defs.'

26

27   [2] Defendants also refused to consider a "non-disciplinary segregation" unit that is less
28   (footnote continued)

52

[755300-4]

1    Suicide Compendium, dated Jan. 27, 2013) ("Dvoskin Report" section).)

2         Plaintiffs' experts discovered scores of prisoners held in segregation because there

3    was no appropriate bed for them to be placed.  (Because Defendants for some reason do

4    not "count" these prisoners as being in ASU, even though they obviously are, Plaintiffs

5    have no way of knowing the complete magnitude of this practice.)  At CIM Plaintiffs'

6    experts observed a giant housing roster board in one segregation unit, on which the vast

7    majority of prisoners were marked "LOB" – "Lack of Beds."  (Haney Expert Decl. ¶ 143

8    & Photo Ex. S.)  All these men – many with diagnosed mental illness – were held in

9    segregation not for a disciplinary reason, but because CDCR had nowhere else to put

10   them.[3]  (Haney Expert Decl. ¶¶ 143-53; Stewart Expert Decl. ¶¶ 278-282.)  Defendants'

11   expert Dvoskin observed the "LOB" problem during his tours, and testified to his concerns

12   about the practice as follows:  "That's not okay.  Put signs on the door.  Figure it out.  You

13   shouldn't lock me down if I didn't do anything.  It's not fair … It ain't right."  (Bien Decl.

14   Ex. 83 (Dvoskin Dep. at 260:22-262:5).)  This problem is by no means unique to CIM; in

15   fact, the problem of prisoners housed in dangerous segregation due to "lack of beds"

16   pervades the system.  (Haney Expert Decl. ¶¶ 107-110 (MCSP); ¶¶ 217-227 (COR);

_____

18
19   harsh and more conducive to therapeutic objectives for prisoners who are currently being
     placed in administrative segregation for no reason related to discipline or alleged
20   misconduct.  (Bien Decl. Ex. 92 (Defs.' Suicide Compendium, dated Jan. 27, 2013 (second
     page of chart)).)

21   [3] This situation is doubly shocking because prisoners housed in the ASU as "LOB"
22   inmates are, for some reason, *not* provided the thirty-minute welfare checks (for the first
     21 days) or the pre-placement questionnaire that ***all*** prisoners are supposed to receive
23   when they are placed in ASU.  These critical mental health-related practices are, of course,
     designed to protect the safety and well-being of all prisoners who are placed in the harsh
24   segregation environment and to identify those who are at risk of suicide.  Yet, CIM does
     not designate these prisoners as "ASU prisoners" (as if the designation is what matters),
25   and thus does not provide the suicide prevention safeguards that are critical to keeping
26   vulnerable individuals safe from psychological harm and suicide.  (Kaufman Expert Decl.
     ¶ 98; Haney Expert Decl. ¶ 151.)  Such a practice plainly constitutes deliberate
27   indifference to a serious risk of harm, and is frankly unconscionable.

28

[755300-4]

1   ¶¶ 248-257 (CCI); Kaufman Expert Decl. ¶¶ 95-126 (CCWF, CIM, and COR).)

2        Defendants are gambling with the lives of prisoners who they place in segregation

3   solely because no appropriate beds are available, particularly to prisoners with mental

4   illness. (*See, e.g.,* Stewart Expert Decl. ¶¶ 205, 281.) Almost half of suicides that

5   occurred in Administrative Segregation Units between 2007 and 2012 were by prisoners

6   placed in segregation for "safety" concerns, or awaiting transfer to an appropriate bed in

7   the system. (*See* Kahn Under Seal Decl. Ex. 6; Stewart Expert Decl. ¶¶ 278-279; *see also*

8   First Half 2012 Suicide Report at 65-72 (Inmate L suicide in ASU while awaiting transfer

9   to appropriate bed), *id.* at 80-86 (Inmate N suicide after being placed in segregated housing

10  for his own safety).) That dozens of human beings are dying in segregation after being

11  placed there for their own "safety" should set off loud alarm bells that something must be

12  done. (Stewart Expert Decl. ¶¶ 278-279; Kahn Under Seal Decl. Ex. 6.) Yet Defendants

13  have chosen to do nothing. Such inaction constitutes deliberate indifference.

14       CDCR's segregation units have potentially dangerous and devastating effects on

15  anyone who is placed in them, and it is unconscionable to expose prisoners, especially

16  those with mental illness, to such dangers simply because the system cannot place them in

17  an appropriate bed. (*See* Haney Expert Decl. ¶¶ 44-50, 280-83; Stewart Expert Decl.

18  ¶¶ 278-82; Kaufman Expert Decl. ¶¶ 95-118.) Defendants' harsh segregation units have

19  long been the storm center for CDCR suicides, and the situation is not improving. A

20  constitutional system that "provide[s] humane conditions of confinement" and "take[s]

21  reasonable measures to guarantee the safety of the inmates," *Farmer*, 511 U.S. at 832,

22  simply does not do this. Yet Defendants have not taken – and refuse to take – necessary

23  steps (even those recommended by their own experts and consultants) to remedy the

24  exceedingly high rate of suicide among CDCR's segregation population, even as the Court

25  has given them multiple opportunities to develop and implement a plan to do so. (*See,*

26  *e.g.*, Order, Docket No. 3836, Apr. 14, 2010 (directing Defendants to review their suicide

27  prevention policies and practices to address the problem of inmate suicides); Order,

28  Docket No. 2158, Mar. 12, 2007 (directing Defendants to complete a review process to,

1   *inter alia*, "examine more effective ways for reducing the lengths of stay of EOP inmates

2   in administrative segregation"); Order, Docket No. 2139, Feb. 12, 2007 (provisionally

3   approving Defendants plan to address problem of suicides in administrative segregation);

4   Order, Docket No. 1830, June 8, 2006; Order, Docket No. 1559, Jan. 12, 2004.)

5       This practice continues to create an unacceptable risk of harm on the *Coleman* class,

6   and violates the Eighth Amendment.

7           **2.      Mentally Ill Prisoners Are Languishing in Segregation for**
                      **Excessive Periods of Time, Leading to Acute Mental Illness and**
8                     **Elevated Risk of Harm, Including Death.**

9       CDCR houses prisoners with mental illness in segregated housing units for long

10  terms even though lengthy stays in segregation units can be damaging and dangerous for

11  mentally ill prisoners; they are neither safe nor therapeutic places.  (*See* Stewart Expert

12  Decl. ¶¶ 274-347.)  Defendants' own experts agree.  (*See* Bien Decl. Ex. 83 (Dvoskin Dep.

13  at 73:12-15 (agreeing that "long term housing in segregation does cause psychological

14  harm"); Ex. 86 (Martin Dep. at 272:11-273:7); Ex. 88 (Moore Dep. at 166:4-168:9).)

15  Their Joint Report states it clearly:

16          Segregation is not a particularly therapeutic environment to
            house inmates with serious mental disorders, even when EOP
17          level care is provided.  We realize that it is sometimes
            necessary to house inmates with serious mental disorders in an
18          Administrative Segregation Unit in order to ensure the safety
            of the inmate, other inmates, or staff.  *In those cases, housing*
19          *inmates with serious mental disorders should be as brief as*
            *possible and as rare as possible.*
20

21  (Defs.' Joint Report at 23 (emphasis added).)

22      The American Psychiatric Association has found that "[p]rolonged segregation of

23  adult inmates with serious mental illness, with rare exceptions, should be avoided due to

24  the potential for harm to such inmates."  (Bien Decl. Ex. 14.)  Defendants' segregation

25  units continue to be extremely harsh, non-therapeutic places that drive innumerable

26  mentally ill and vulnerable prisoners to mental health crisis and even suicide.  (Haney

27  Expert Decl. ¶¶ 36-50, 69-94 (discussing damaging effects of long stays in segregation

28  among mentally ill at MCSP), ¶¶ 143-53 (same at CIM), ¶¶ 217-227 (same at COR), (same

55

[755300-4]

at CCI) ¶¶ 248-68 (same at CCI); ¶¶ 284-86; Kaufman Expert Decl. ¶¶ 119-126 (discussing harmful effects of long-term placements in administrate segregation), ¶¶ 127-38 (discussing harmful effects of excessive SHU terms in extreme isolation); Stewart Expert Decl. ¶¶ 178-83 (discussing high percentage of CDCR suicides in administrative segregation units), ¶¶ 274-77 (discussing need to limit mentally ill prisoners' stay in toxic segregation environment).)

> ### 3. Defendants Persist in Their Dangerous "Psych-and-Return" Practice of Placing Mentally Ill Prisoners Back in Segregation Immediately after Discharge from MHCB or DSH Inpatient Units, without Regard for the High Risk of Psychological Harm.

Experience has shown, again and again, that returning mentally ill prisoners who have discharged from MHCB crisis-level care or DSH inpatient care directly back to segregation settings is a dangerous proposition. Defendants, however, regularly do so without regard for the high risk of psychological harm, and suicide, that can result. This practice flouts the requirements in the Court-ordered Program Guide (that Defendants developed to remedy constitutional deficiencies) and violates the Eighth Amendment. (*See* Bien Decl. Ex. 16 (Program Guide 12-5-27 & 28); Ex. 17 (Program Guide 12-6-13).)

In January 2013, a *Coleman* class member with serious mental illness died at SVSP after spending nearly one year at ASH for inpatient psychiatric hospitalization. He was placed directly in segregated housing at SVSP despite clinical documentation that his pre-hospitalization segregation stay was responsible for symptoms that led to his ASH admission. Eight (8) days later, this man was dead. (*See* Kahn Under Seal Decl. Ex. 46.)

In a 2011 case, an 18-year old man admitted for MHCB crisis care "overwhelmed by a series of major losses and stresses," was discharged after 15 days. His clinician recommended that he be placed in an EOP program. The discharging psychiatrist called clinical staff at the institution where this young man had been placed in ASU prior to his MHCB admission to alert them of his need for EOP level of care upon his return. He was instead placed back in the ASU (which had no EOP programming). Fifteen (15) days later, this man committed suicide in the ASU. (2011 Suicide Report, Prisoner N; *see also*

56

1    Stewart Expert Decl. ¶ 347 (identifying 4-5 cases where inmate-patients were returned

2    directly from DSH or MHCB to segregation, and finding that "the highly restrictive, anti-

3    therapeutic environments of administrative segregation" "are almost certain to undermine

4    the increased level of functioning and treatment compliance generally achieved through an

5    inpatient placement"); Haney Expert Decl. ¶¶ 119-121 (Prisoner B returned from DSH,

6    placed on suicide observation and then discharged to ASU at MCSP based on odd finding

7    that "[g]iven base rate of 15-20 suicides per 100,000, inmate-patients annually in CDCR,

8    in light of current low risk, per Bayesian analysis, suicide in the foreseeable future

9    secondary to an Axis I disorder not likely"), ¶¶ 165-67 (Prisoner W cycling several times

10   since October 2012 between ASU (safety concerns) and MHCB at CIM); ¶¶ 226 (Prisoner

11   JJ cycling between ASU and MHCB at COR, feeling "suicidal and homicidal all the time,"

12   with clinician reporting that Prisoner JJ has "been here too long" and "debating" whether

13   to send him back to DSH).)

14          **4.      Defendants Do Not Provide Remotely Adequate Treatment in**
            **Appropriate Settings for Mentally Ill Prisoners in Segregation.**

15

16          Deficiencies in the staffing, clinical space, and quality of mental health services for

17   treatment of mentally ill prisoners in segregation are longstanding, well-documented and

18   (unfortunately for the *Coleman* class) still without a remedy despite past court orders.

19   (*See, e.g.*, Special Master's 25th Round Report at 36-38 & 44-48; Order, Docket No. 1830,

20   June 8, 2006.)

21          **a.      Staffing Shortages Make the Delivery of Necessary Mental**
            **Health Services in Segregation Impossible.**

22

23          The inadequacy of clinical and custody staff in segregation units is conspicuous, is

24   in some cases worsening, and has prevented the delivery of adequate mental health care to

25   *Coleman* class members housed in those units. (*See also* Section IV.C above.) For

26   example:

27   •      At CCWF, "[t]he warden said CCWF has been unable to fully accomplish its new
            mission as an EOP administrative segregation 'hub' because of inadequate clinical

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

staff; she also noted that the institution does not have 'the authority to hire' the necessary additional staff to fulfill its mission." There are waitlists for ASU treatment groups, and clinicians must do therapy at cell-front due to escort officer staff shortages. (Kaufman Expert Decl. ¶¶ 28-31.)

• At CIM, the ASU faces treatment challenges due to lack of psychiatrists. (Kaufman Expert Decl. ¶ 37.) The institution reported that CIM's ASU "was significantly impacted by staffing issues created by the AB 109 mission change," with "disrupted continuity and chronic understaffing of the program" resulting. (Bien Decl. Ex. 19, at 8 of 21 (CIM 25th Round Management Report).)

• At COR, the Special Master reported that the "insufficient numbers of access to care officers" has made it difficult for clinicians to see their patients and resulted in a lack of group therapy in segregation units. (Special Master's 25th Round Report at 220-21.) Plaintiffs' experts were informed that the institution has "no mainline or Ad Seg groups for CCCMS inmates because of staff shortages." (Haney Expert Decl. ¶¶ 192-94; Kaufman Expert Decl. ¶¶ 43-44.)

• At CCI, a single clinician is responsible for providing treatment to 46 ASU inmate-patients (each of whom she is supposed to have substantive clinical contact with each week). She is also charged with doing all RVR mental health assessments at the prison. She said that, on average, she does 10-12 one-to-one contacts per day, severely limiting the time and quality of the treatment she can provide. (Haney Expert Decl. ¶ 239.)

• At MCSP, staffing shortages appear to play a role in the inadequate suicide risk evaluations being done, and in the lengthy delay in beginning (much less completing) the SRE training program developed by Defendants in 2010. Suicide risk assessments and suicide prevention efforts in the ASU were extremely problematic. (Haney Expert Decl. ¶¶ 115-21.)

• At LAC, staffing shortages are negatively impacting the delivery of treatment in the EOP ASU. (Stewart Expert Decl. ¶¶ 104, 109, 323.)

• At SAC, staffing shortages are negatively impacting the delivery of treatment in the EOP ASU. (Stewart Expert Decl. ¶¶ 87-88, 313-15.)

Despite the Court's June 8, *2006* order aimed at this issue, staffing shortages still prevent the delivery of minimally adequate, constitutional mental health care to class members in segregation.

### b.    Inadequate Clinical Space to Provide Appropriate, Confidential Treatment in Segregation

Given the inappropriate clinical space necessary to provide privacy and confidentiality, any treatment that is being provided in segregation units is seriously

1  compromised.  (*See* Special Master's 25th Round Report at 37 ("Patient candor is

2  necessary to a successful clinical interaction, but no patient can reasonably be expected to

3  communicate openly unless he or she is afforded a private treatment setting.  All

4  [segregation] hub institutions must look critically at their own space resources and

5  maximize their own capacities to provide a private, confidential environment for patients

6  to communicate openly with clinicians and fellow therapeutic group members."))

7        Clinical space problems persist across the system's segregation units.  (*See* Bien

8  Decl. Ex. 88, Moore Dep. Tr. at 162:11-164:5 (expressing concern about use of non-

9  confidential space for clinical contacts in segregation unit and opining that it affects

10  treatment); Haney Expert Decl. ¶¶ 74-75 & Photo Ex. A (inadequate treatment space in

11  MCSP's EOP ASU with planned treatment space construction still a fenced-off, weed-

12  filled, vacant lot), ¶ 135 & Photo Ex. Q (oppressive treatment space in CIM's ASU and its

13  impact on inmate-patients' participation in treatment), ¶¶ 179-81 & 185-86 (COR's ASU

14  and SHU treatment space in "property/supply storage" room and other inadequate spaces),

15  ¶ 240 & Photo Ex. CC (CCI's ASU and SHU group treatment conducted in a row of cages

16  in old dining hall that is cold and has very loud blower or industrial fan); Kaufman Expert

17  Decl. ¶¶ 56-58 & Photo Ex. C (group treatment space deficiencies in segregation units at

18  CCWF and CIM), ¶¶ 61-64 & Photo Ex. E (at COR, treatment provided in converted space

19  with no auditory privacy and in dirty concrete room with exposed pipes, a broken

20  computer, and very harsh light);  Stewart Expert Decl. ¶¶ 74, 300-301 (EOP ASU

21  treatment space problems at SVSP), ¶ 112 & Appx. B, C, D, E (inadequate office and

22  treatment space in EOP ASU at RJD), ¶ 113 & Appx. F, G (treatment space deficiencies in

23  EOP ASU at LAC).)

24        To the extent Defendants claim to be working to build and/or improve clinical space

25  for mentally ill prisoners in segregation units, *see* Defs. Motion at 6-7, this necessary step

26  towards providing constitutional treatment is many years away.  (*See* Section III.C above.)

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1             **c.**       **Lack of Meaningful, Therapeutic Mental Health Treatment**
2                   **in Segregation**

3      Defendants' provision of meaningful, therapeutic mental health treatment in

4  segregation units also remains shockingly inadequate and unconstitutional.

5      First, Defendants persist in their prolific use of cages for treatment of all prisoners

6  in segregation, regardless of whether they are there for disciplinary reasons, safety

7  concerns, or simply because there is no appropriate bed available for them in CDCR's

8  system.  This essentially universal use of treatment cages in segregation units, even when

9  there is no documented need for them, is counter-therapeutic and inhumane, particularly

10  for mentally ill prisoners.  (Kaufman Expert Decl. ¶ 86.)  Indeed, the harmful effects on

11  mental health and counterproductive effect on treatment are unmistakable.  (Haney Expert

12  Decl. ¶ 83 (Prisoner F, in ASU for safety concerns, stating "I don't like the [treatment]

13  cages.  I feel like a dog, like an animal—so I don't usually go out; if I see my clinician, I

14  see her at my cell front"), ¶ 133 (discussing very high refusal rate for caged treatment at

15  CIM); ¶ 149 (Prisoner Q, in CIM ASU due to "Lack of Bed," stating "who wants to come

16  out for 'therapy' in a cage?  You feel non-human."), ¶ 179 (COR ASU inmate-patient

17  stating "when I am in a cage I feel like an animal"), ¶ 182 & Photo Ex. Z & AA (COR

18  officer first refusing Plaintiffs' expert's request to take photographs from inside of

19  treatment cage during tour, and his supervisor explaining "you know, our officers don't

20  like to get inside those things"); *see also* Haney Expert Decl. Photo Exs. B, E, Q, CC.)

21      Defendants' expert Jacqueline Moore stated that she had worked in no prisons

22  outside of California that used treatment cages (euphemistically called "therapeutic

23  modules") for individual treatment.  The first time she saw them in a California prison, at

24  CSP-SAC, she wrote "cages – terrible hard metal stools.  Hard to be in cage for two

25  hours."  (Bien Decl. Ex. 88 (Moore Dep. at 154:10-156:21).)  Defendants' expert Dvoskin

26  also found that it was "not necessary for all inmates to be in a module" to receive

27  treatment."  He stated that "[i]f somebody's in ad seg for their personal protection, it

28  makes no sense whatsoever to me to require them to be in a module."  (Bien Decl. Ex. 83

[755300-4]

1   (Dvoskin Dep. at 283:15-284:10).)  Yet Defendants do just that.

2        The experts for *both* parties also identified issues with the substance of the

3   treatment provided to *Coleman* class members.  Defendants' experts "observed some

4   groups that appeared to consist primarily of showing the inmate a movie or entertainment

5   video.…  We understand that recreation and entertainment may be an appropriate aspect of

6   group therapy, so long as the majority of group therapy time is devoted to psycho-

7   therapeutic, rehabilitative, skill building, and psychoeducational activities."  (Defs.' Joint

8   Report at 17-18.)  Yet the overuse of "recreation and entertainment" in place of

9   meaningful treatment, and treatment delivered by non-clinical staff, is apparent in many

10  segregation units.  (*See* Kaufman Expert Decl. ¶¶ 150-53; Haney Expert Decl. ¶¶ 76, 79-83

11  & Photo Ex. D (MCSP, with photograph of EOP ASU treatment area with *Titanic* video),

12  140 (inadequate CIM ASU treatment), 202-03, (COR EOP ASU and SHU treatment

13  deficiencies), 207-09 (COR SHU, including Plaintiffs' expert observing treatment group

14  that consisted of showing inmate-patients a commercial film), 240-41 (CCI ASU and SHU

15  treatment deficiencies).)  Such activities may be useful and important to humane treatment

16  in generally harsh isolation settings.  But they do not substitute for meaningful mental

17  health treatment, which remains painfully lacking in segregation units.

18        Defendants' mental health system fails to provide a sufficient amount of structured

19  therapeutic activity in segregation units even in the eyes of Defendants' experts, much less

20  as is required under Program Guide standards.  (Bien Decl. Ex. 88 (Moore Dep. at 237:25-

21  238:24); Bien Decl. Ex. 83 (Dvoskin Dep. at 259:1-20); Special Master's 25th Round

22  Report at 37 ("Another concerning finding at the hubs was that ten of the 11 hubs failed to

23  offer at least ten hours per week of structured therapeutic activity per week [as required by

24  the Program Guide]).)  Only CIW was able to meet that benchmark.  Structured therapeutic

25  activity is a critical part of EOP care in general.  This is particularly true in segregation

26  units, where the group dynamic and interaction with others can help ameliorate the anti-

27  therapeutic effects of isolation on the mentally ill patient."); Stewart Expert Decl. ¶¶ 312-

28  313 (quoting special master); ¶ 315 (CSP-SAC EOP ASU averaging 5.4 hours of treatment

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1   attended per week), ¶ 323 (LAC EOP ASU averaging 6.3 hours attended per week), ¶ 333

2   (RJD EOP ASU providing only one group per weekday).)  At some CDCR institutions,

3   access to structured therapeutic activity is breathtakingly low for hundreds of *Coleman*

4   class members.  (*See, e.g.*, Haney Expert Decl. ¶ 242 (finding that class members at CCI,

5   including hundreds of CCCMS and EOP segregation prisoners, receive on average

6   approximately .034 hours of group therapy per week).)

7          All experts – the Special Master's experts, Plaintiffs' experts and Defendants'

8   experts – that have looked at the setting, quantity, and quality of mental health treatment

9   for class members in segregation and have identified significant deficiencies.  Contrary to

10  Defendants' assertions, there is overwhelming evidence that mentally ill inmates housed in

11  these settings are being denied appropriate treatment.

12             **5.    Defendants' Failure to Implement the Minimal Standard for
                      Conducting Welfare Checks for All Prisoners Housed in
13                    Segregation Is Putting Thousands of Human Beings at Serious
                      Risk of Psychological Damage and Suicide.**

14

15         The American Correctional Association Standard 4-4257 for Welfare Checks

16  requires that all inmates in administrative segregation be personally observed by a

17  correctional officer at least every 30 minutes at an irregular schedule.  (*See* Declaration of

18  Lindsay M. Hayes Support of Pls.' Objs. to Defs.' Plan to Address Suicide Trends in

19  ASUs ¶ 10, Docket No. 2011, Oct. 31, 2006.)  This nationally accepted standard (outside

20  California) is based on the "realization that inmates housed in these locked units are at

21  greater risk of suicide, mental health and medical problems and other security issues.  The

22  majority of state departments of correction throughout the country, as well as the Federal

23  Bureau of Prisons, have implemented and maintained policies regarding thirty minute

24  Welfare Checks in their respective prison systems."  (*Id.*)

25         In October 2006, the issue of implementing "welfare checks" (a "living and

26  breathing" check that involves a cell-front observation by a custodial officer who stands

27  long enough at the cell-door to see some movement of the inmate that indicates that he or

28  she is alive (*i.e.*, leg, head, chest movement) was raised with CDCR by a team of experts.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1  Defendants rejected it; Plaintiffs brought the matter before the Court.  (Pls.' Objs. to Defs.'

2  Plan to Address Suicide Trends in ASU at 12, Docket No. 2006.)  Defendants then issued a

3  memorandum that welfare checks should be provided "to newly placed ASU inmates by

4  Correctional Officers at least every 30 minutes, at staggered intervals, for the first three

5  weeks of ASU placement."  *See* CDCR Memorandum, Docket 2061-4, December 1, 2006.

6  Over the Plaintiffs' objections that just three weeks of checks was insufficient, the Court

7  provisionally approved Defendants' plan.  (Order, Docket No. 2139, Feb. 12, 2007.)

8         More than six (6) years later, CDCR's half-measure on the provision of welfare

9  checks of newly placed ASU inmates *for the first 21 days only* remains out-of-step with

10  the rest of the nation, and has had fatal consequences.  While prisoners are at enormous

11  risk of suicide in the first days and weeks after being placed in segregation, that risk does

12  not abate after 21 days.  (Vail Expert Decl. ¶¶ 124-125) (CDCR outlier among U.S. prison

13  systems); *see also* Bien Decl. Ex. 14 (American Psychiatric Association's Position

14  Statement on Segregation of Prisoners with Mental Illness) (finding "prolonged

15  segregation" creates risk of harm).)  Defendants' recent analysis of segregation unit

16  suicides since 2007 found that more than half of CDCR suicide victims who died in

17  segregation had been in segregation for *more* than 21 days at the time of their death.  (*See*

18  Kahn Decl. Ex. 6 (filed under seal).)  The Special Master's expert found that in five CDCR

19  suicide cases occurring in 2011, "*rigor mortis* had already begun prior to the discovery of

20  the inmate's body.  In three of these five cases, the inmate was housed in administrative

21  segregation at the time of the suicide.  The onset of *rigor mortis* indicates that in these five

22  cases, at least two to four hours had passed since the time of death before the bodies were

23  discovered, underscoring the importance of timely welfare checks and custodial checks."

24  (2011 Suicide Report at 2.)  One of those three inmates found in *rigor mortis* after

25  committing suicide in the ASU died on the *22nd day of his ASU placement* (which was not

26  disciplinary-related, and instead stemmed from concerns about the inmate's safety in his

27

28

[755300-4]

1   previous placement).  (*Id.* at 268 Appx. F (Inmate EE, died December 6, 2011).)[4]

2   Defendants are well aware of these risks to life, and they ignore them.

3          Thirty-minute welfare checks for all prisoners in any administrative segregation unit

4   is an essential standard, and one that is endorsed by experts on all sides in this litigation.

5   (*See* Bien Decl. Ex. 88 (Moore Dep. at 223:14-224:25); Bien Decl. Ex. 84 (Hayes Dep. at

6   41:2-14); Stewart Expert Decl. ¶ 475.)  The logs of these welfare checks reviewed by

7   Plaintiffs' expert Dr. Pablo Stewart on his tours were not properly staggered in virtually

8   every administrative segregation unit where checked.  (Stewart Expert Decl. ¶¶ 241-254.)

9   Lives continue to be lost because Defendants deliberately ignore what is obvious: lives

10  could be saved if Defendants come into line with the national correctional standard on this

11  issue.  (Bien Decl. Ex. 83 (Dvoskin Dep. at 244:5-12, 247:22-248:1).)

12         **6.    Defendants Essentially Ignore the Constitutional Harms Inflicted
                   on Mentally Ill Prisoners in CDCR's Security Housing Units**
13                 **(SHUs).**

14         Defendants' experts had very little to say about the SHUs, having not looked at all

15  at two of the three largest SHUs housing *Coleman* class members (CCI and CIW) in the

16  system.  They found only that inmate-patients "routinely knew" the name of their

17  psychiatrist and primary clinician, their medications, and the "process for arranging an

18  earlier appointment with their psychiatrist if they wanted one."  (Defs.' Joint Report at 23.)

19  The Joint Report is completely silent as to the adequacy of that "process" or of SHU

20  inmate-patients' treatment generally.  Defendants' experts also stated that they found (1)

21  "few, if any, inmates who needed a higher level of care and were not identified"; (2) that

22  _____

23  [4] In reviewing a June 2012 suicide at the Avenal State Prison segregation unit, the Special
    Master's expert found that "welfare checks either did not occur at least every 30 minutes
24  and/or was not done properly" given the apparent onset of *rigor mortis* by the time the
    victim's body was found.  (First Half 2012 Suicide Report at 152 (Inmate N).)  The
25  prisoner had just recently been placed in the ASU (again, not disciplinary-related, but due
    to safety concerns).  This suicide highlights the need not only for a systemwide policy of
26  welfare checks for all prisoners in segregated housing, but also for *actual implementation*
    of welfare check procedures, which was found to be lacking in this case.
27

28

[755300-4]

1    psychiatric technician rounds were conducted on a daily basis, and (3) that "[i]n those

2    situations where the inmate's clinician determined that a private setting is clinically

3    appropriate, the SHU had a private setting available and clinicians were able to meet with

4    inmates privately."  (*Id.* at 24.)

5        Defendants' experts' findings are shallow, misleading, and in error.  First,

6    Plaintiffs' experts identified a very substantial number of mentally ill prisoners in the SHU

7    population suffering from serious and acute mental illness that either was not properly

8    identified or was not adequately treated.  (*See* Haney Expert Decl. ¶¶ 185-86 & 206-214

9    (discussing CSP-Corcoran SHU), ¶¶ 258-68 (discussing CCI SHU); Kaufman Expert Decl.

10   ¶¶ 127-38 (discussing CSP-Corcoran SHU).)

11       Second, Defendants' experts themselves identified "variation in the quality of

12   Licensed Psychiatric Technician rounds" and recommended steps to "improve[e] the

13   qualitative nature of these rounds."  Defs. Joint Report at 24. A policy of conducting daily

14   rounds in segregation is of little worth if the quality of those rounds – essential to

15   identifying acute mental illness and protecting mentally ill prisoner safety – is deficient.

16       Defendants' experts downplay the importance of confidentiality for clinical

17   contacts, endorsing clinical interviews in full hearing of other inmates and custody

18   officers.  (Docket No. 4314-1 at p. 6 (Dvoskin "disagree[s] with the premise that all

19   clinical and/or therapeutic contacts must occur in confidential settings.").)  This is at odds

20   with safe clinical practice.  (*See* Kaufman Expert Decl. ¶ 47; Special Master's 25th Round

21   Report at 37.)  Defendants' experts try to dress up the lack of confidential treatment space

22   in a veneer of clinical discretion—asserting that only certain "situations" call for a private

23   setting.  This issue is not clinical discretion.  Systematic severe space and custody

24   shortages impose non-confidential treatment on the clinicians.  The prevalence of non-

25   confidential treatment is not the result of clinical discretion but of deliberate indifference

26   to the resources needed to exercise such discretion.

27       Defendants' evidence that mentally ill prisoners in SHU are receiving minimally

28   adequate mental health treatment that meets the constitutional requirement falls on its own

1    weight.  In reality, far too many *Coleman* class members in SHU are "isolated, lonely, and

2    struggling with serious psychological conditions," and the "long-term isolation to which

3    these individuals have been exposed is dangerous, harmful, and anti-therapeutic."

4    (Kaufman Expert Decl. ¶ 127; *see also* Haney Expert Decl. ¶ 287.)  The excessive risk of

5    psychological harm and suicide violates the Eighth Amendment.[5]

6    **I.    Severe Medication Management and Medical Records Problems**
         **Continue to Interfere With the Delivery of Appropriate Mental Health**
7        **Care to Class Members.**

8        Defendants' mental health care delivery system continues to be severely

9    compromised by ongoing medication management and medical records problems that

10   endanger the health of class-members and undermine the efficacy of their treatment.

11   **1.    Medication Management Remains Severely Dysfunctional in**
             **Critical Areas.**
12

13       A constitutional mental health care system requires an adequate system to

14   administer and manage necessary medications to those with mental illness.  This Court

15   long ago found serious inadequacies with respect to the supervision of the use of

16   medication, timely provision of prescriptions, prevention of medication hoarding, ensuring

17   continuity of medication, monitoring of inmates on psychotropic medication, and sufficient

18   staffing to provide medication safely and appropriately.  *Coleman*, 912 F. Supp. at 1309.

19       Too many of these medication management problems persist in Defendants'

20   system, creating serious and – in a well-run system, avoidable – risks for *Coleman* class

21   _____

22   [5] There has for many years been an exclusion for prisoners with serious mental illness
     from placement in the SHU at Pelican Bay State Prison and in the standalone ASUs,
23   critical measures for protecting the mentally ill from the high risk of psychological harm
     linked to placement in these units.  (*See* Bien Decl. Ex. 15, Program Guide 12-8-1 through
24   12-8-3 (PBSP SHU exclusion); Bien Decl. Ex. 77 (Program Guide 12-7-11 (stand-alone
     ASU exclusion)).)  The dangerous conditions and persistent lack of adequate staffing,
25   programming, and treatment space in the other SHUs (at Corcoran, CCI, CIW and SAC)
26   demonstrate a need for similar exclusionary criteria for the mentally ill from those equally
     dangerous units.
27

28

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1    members.  Even Defendants' experts found areas of significant concern:

2        **(a)    Clinical Staff Shortages Hamstring Medication**
         **Management.**
3

4        Topping the list is staffing shortages, which have had a profound and negative

5    impact on medication management for *Coleman* class members.  At multiple institutions,

6    Defendants' own experts identified medication management problems, each time

7    connecting them to insufficient clinical staff.  (Defs.' Joint Report at 31 (Corcoran's

8    staffing shortages for psychiatrists made it difficult to complete audits  and to meet

9    required time frames for medication follow-up appointments, CIM's "significant staffing

10   shortages" made it difficult to maintain required follow up appointments, SATF's

11   "significant staffing shortages" limited ability to meet required time frames for psychiatric

12   follow up and led to "sparse documentation").)  Defendants' expert report chooses to

13   downplay the negative effects of such staffing shortages, without any detail or analysis.

14       But Plaintiffs' psychiatric experts *do* engage in a thorough analysis, and find that

15   these "significant staffing shortages" are in fact compromising patient care with respect to

16   medication management.  For example, Dr. Kaufman found that staffing shortages

17   hamstrung psychiatrists' ability to properly manage their patients' medications.  He

18   expressed grave concern that such staffing shortages require delegation of important

19   medication management-related tasks to other staff, who are often not familiar with side

20   effects of psychotropic medications (as discussed below).  The risk to patient safety is

21   enormous: without measures to monitor patients for signs of side effects, a patient's

22   medication regime can be rendered ineffective, physically harmful, or psychologically

23   damaging.  (Kaufman Expert Decl. ¶ 76 (finding that, at Corcoran, there are only 6.5 staff

24   psychiatrists treating 1,441 prisoners on psychotropic medications, requiring delegation of

25   tasks to nurses who Defendants' expert Moore found unfamiliar with side effects

26   information); *see also* Stewart Expert Decl. ¶ 134 (psychiatric technicians distributing

27   medications without asking about side effects).)

28       **(b)    Dangerous Lack of Awareness and Monitoring of Side**

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

**Effects to Psychotropic Medications.**

Awareness of, and inquiry into, potential side effects of psychotropic medications is a critical element of a well-run medication management system. (*See* Stewart Expert Decl. at ¶ 134; Kaufman Expert Decl. ¶¶ 75-76). On this element of mental health care, Defendants again unfortunately continue to miss the mark. Although Defendants' experts noted that Defendants have "medication protocols in place" (Defs.' Joint Report at 26), they are completely silent as to whether or not those nursing protocols are adequate or are appropriately implemented. In fact, Defendants' expert Moore, who was in charge of this component of the expert trio's review, found serious concerns with the basic training and competence of CDCR nursing staff. (Bien Decl. Ex. 88 (Moore Dep. at 180:10-181:12 (finding that the nurses at all but one institution were unfamiliar with the side effects of psychiatric medications, and agreeing that awareness of side effects is important to ensure the safety and well-being of inmate-patients); *id.* at 182:3-8 (noting that if she had written the nursing section of the report "I would have made a recommendation that nursing education emphasize the side effects of the medication and that they have handouts or signs available where they dispense the medications so these things would be in front of them all the time.").) Drs. Stewart and Kaufman observed the same sort of problem, finding that nurses and psychiatric technicians did not ask patients about possible side effects of their psychotropic medications. (Stewart Expert Decl. ¶¶ 134, 141; Kaufman Expert Decl. ¶ 76.)

      **(c)**      **Deficiencies that Cut Across Nearly All Aspects of Medication Management.**

Despite the gloss that Defendants' experts put on medication management issues affecting the mentally ill in California's prisons, Plaintiffs' experts and the Special Master have uncovered *many* current, ongoing, and widespread problems with CDCR institutions' medication distribution and management practices, including:

Failures to complete "appropriate identification, documentation, referral and response to inmate medication non-compliance." (Special Master's 25th Round Report at

[755300-4]

1  68 (19 prisons failing to comply with requirements).  Since "for many chronically mentally

2  ill individuals, periods of medication non-compliance are an aspect of their disease

3  process," serious harms result when the process for addressing such non-compliance is not

4  functioning appropriately.  (*See* Stewart Expert Decl. ¶¶ 123, 142 (discussing problems

5  with responses to medication non-compliance at CSP-Sacramento).)  Dr. Kaufman

6  identified a high frequency of dangerous medication refusal that indicates a "fundamental

7  breakdown of trust and communication between clinicians and patients."  (Kaufman

8  Expert Decl. ¶¶ 74-75.)  Plaintiffs' experts attribute the high rates of medication refusal in

9  part to deficient practices such as non-confidential clinical contacts and express concern

10 that these refusals are receiving an extremely untimely response from clinical staff.  (*See*

11 *id.* at ¶ 74-75, 77; *see also* Stewart Expert Decl. ¶ 153 (RJD responded appropriately to

12 just 30% of medication non-compliance cases in December 2012 and January 2013).

13    Failures to order appropriate laboratory testing for prisoners on psychotropic

14 medications and follow up on results.  (*See* Special Master 25th Round Report at 69-70

15 (problems at half the prisons monitored.)  Monitoring psychiatric medications for side

16 effects is critical:  "many psychotropic medications have very significant side effects

17 including kidney failure, diabetes, heat stroke, increased cholesterol, and suicidality, to

18 name but a few…"  (Kaufman Expert Decl. ¶ 25.)  CDCR's laboratory testing practices are

19 also problematic.  (*See* Stewart Expert Decl. ¶¶ 139, 144, 149, 164.)

20    Failures to conduct Abnormal Involuntary Movement Scale (AIMS) testing as

21 required.  Inadequate AIMS testing, critical for identifying and treating Tardive

22 Dyskinesia, is evident.  (*See* Stewart Expert Decl. ¶¶ 130, 150, 157-163.)

23    Failures in obtaining appropriate informed consents.  (Special Master 25th Round

24 Report at 69.)  Defendants' experts observed serious problems in this area as well.

25    Failures in providing medication renewals.  (Special Master 25th Round Report at

26 68.)  Failures with respect to medication renewals affected care at several prisons with

27 large mental health programs, including CMF, MCSP, CSP-Sacramento and SVSP.

28 Plaintiffs' experts identified cases in which medication renewal processes were highly

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1    problematic.  (*See, e.g.*, Kaufman Expert Decl. ¶ 66; Stewart Expert Decl. ¶ 145.)

2    <u>Inadequate medication distribution facilities</u>.  Defendants concede that "existing

3    medication distribution facilities do not allow for safe, efficient and effective distribution

4    of medications … and can lead to deterioration of a patient's medical condition."  (Bien

5    Decl. Ex. 94 (COBCP) at 1-2.)

6    **2.    Defendants' Medication Records System Remains Deeply**
     **Problematic, Makes Clinicians' Jobs Even Harder, and**
7    **Jeopardizes Patient Care.**

8    Compounding the medication management problems across CDCR's mental health

9    care system are serious medical records problems.  Defendants' experts found that the

10   electronic heath records system currently in use negatively impacts medication

11   management because it is "particularly cumbersome and time demanding in regard to

12   tracking basic labs and progress notes" and because "laboratory and other medication

13   monitoring results [are] not uniformly scanned into the system or [are] scanned into

14   random sections of the eUHR system."  (Defs.' Joint Report at 29.)  Defendants' experts

15   were very critical of the eUHR system in their report.  In deposition, Dr. Dvoskin called

16   the system "difficult to use," "time-consuming" and "a disaster."  (Bien Decl. Ex. 83

17   (Dvoskin Dep. at 210:25-213:8).)

18   Plaintiffs' experts also noted severe problems.  First, because many or most of the

19   CDCR's "electronic" medical records are merely copies of handwritten notes (often

20   scanned with poor quality), they are frequently illegible.  (*See* Kaufman Expert Decl. ¶ 82

21   (in CCWF's MHCB, expert and nurse unable to decipher the psychiatrist's handwriting,

22   even as to the patient's primary diagnosis); *see also* Bien Decl. Ex. 83 (Dvoskin Dep. at

23   211:24-212:14) (describing records as "hard to read" because so many of them are

24   handwritten).)

25   Second, delays in scanning records often require clinical staff to rely on paper

26   records or do without records during the gap between when a patient's records are

27   submitted for scanning and when they appear in the eUHR system.  (*See* Stewart Expert

28   Decl. ¶ 91.)  And even to the extent medical records are timely entered into the electronic

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1  records system, limited or non-existent access to computers in CDCR facilities leaves

2  clinicians without access to basic patient information, including diagnoses and case

3  history.  Dr. Dvoksin acknowledged that this is a near universal problem in the CDCR, and

4  stated that he "quit asking about that early on."  (Bien Decl. Ex. 83 (Dvoskin Dep. at

5  212:15-213:8.)  Of course, Defendants' experts said very little about this issue in their

6  report, and immediately minimized its importance.

7          Yet appropriate access to a patient's record is an extremely serious matter.

8  Clinicians need access to up-to-date, accurate medical records while performing their

9  clinical contacts with patients; this basic aspect of competent care has not been achieved.

10  At MCSP, for example, staff working in the EOP ASU housing units did not know how to

11  access patient records, or even sign onto the electronic database.  (*See* Haney Expert Decl.

12  at ¶ 92.)  A psychiatrist at CSP-Sacramento was so worried that "something could happen"

13  to his patients while he was without access to their records (including when "the computers

14  are down," he explained) that he painstakingly maintained his own printed copy of each

15  patient's record.  (Stewart Expert Decl. ¶ 91; *see also* Bien Decl. Ex. 89 (Scott Dep. at

16  108:23-109:8) (contrasting CDCR's system to "an immediate electronic system where

17  [records] would just appear").)  In the course of his records review, Dr. Kaufman

18  encountered a medical record stating that the patient's "UHR was not available for review"

19  by the clinician.  (Kaufman Expert Decl. ¶ 83; *see also* Haney Expert Decl. ¶ 93 (eight

20  volumes of medical and psychiatric records lost for a class member with traumatic brain

21  injury).)  These problems are not just inconveniences for already stressed and

22  overburdened clinical staff; they are clinically dangerous to patients.

23          Moreover, Plaintiffs' experts observed the medical records themselves to be of very

24  poor quality – "formulaic," "superficial," and "sparse."  (Kaufman Expert Decl. ¶ 79.)

25  Dr. Kaufman found that the medical records "provided very little insight into a given

26  patient's condition" and with few exceptions reflected no real process of mental health

27  treatment.  (*Id.*)  In the records of one very mentally ill patient, Dr. Stewart observed that

28  seven treatment plans, completed over the course of approximately 16 months, were

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1    virtually or substantially identical.  (Stewart Expert Decl. ¶ 361.)

2    　　　Adequate and accessible medical records are central to clinicians' work and to

3    patient care.  As Dr. Kaufman notes, "[t]his reliance is heightened in circumstances like

4    the ones I observed, in which:  (1) clinicians do not see their patients often or meaningfully

5    enough to be familiar with them and their conditions, and (2) high rates of sick leave and

6    turnover frequently require new clinicians to familiarize themselves with patients'

7    conditions."  (Kaufman Expert Decl. ¶ 79.)  The low quality of Defendants system of

8    mental health and medical records reflects a lack of substantial and meaningful treatment

9    for *Coleman* class members.  One hopes that it is improving, but there is certainly a long

10    way to go before constitutional adequacy is achieved.

11    　　　　　**3.    Medication Management and Records Deficiencies Plague DSH**
           **Programs Serving the Very Mentally Ill.**

12

13    　　　There are also serious medication management and medical records issues affecting

14    care in the SVPP programs run by DSH.  Dr. Brim, an SVPP psychiatrist, testified in

15    deposition concerning the alarming state of the DSH inpatient programs at SVPP, and the

16    impact of severe understaffing there on the medication management, quality of care, and

17    staff safety:

18    　　　　　[W]hen the psychiatrists have gotten together in their meetings, there has
           been ongoing discussion of the increasing dangerousness of the situation,
19    　　　　　and a number of different psychiatrists have touched upon the fact that
           [recently staff] injuries appear to be up, relate that to the staff not having the
20    　　　　　time they once had to maintain contact with the patients, monitor how
           they're doing, keep us informed so that we can do what we can with their
21    　　　　　medication to help stabilize them.

22    (Bien Decl. Ex. 82 (Brim Dep. at 79).)  Dr. Brim also indicated that the cell-front contacts

23    required by CDCR custody restrictions for newly arrived patients preclude adequate

24    privacy for clinical contacts, including presumably counseling and questioning when

25    conducting medication distribution.  (*Id.* at 61.)

26    　　　Shockingly, DSH clinicians are not permitted to access and review the CDCR's

27    electronic medical records for their SVPP patients because the CDCR is unwilling to give

28

[755300-4]

1   them passwords for the system.  (*Id.* at 90.)  As Dr. Brim explains, such a practice puts the

2   well-being of prisoners with serious mental illness at serious risk:  "[I]t's dangerous not to

3   have access to the old [CDCR] records because there are potentially relevant things in the

4   old records that are not necessarily included in the referral packet."  (*Id.*)

5       **J.    Defendants Act with Deliberate Indifference to the Mental Health Needs
            of *Coleman* Class Members on San Quentin's Death Row**

6

7       Defendants' experts visited both San Quentin, home to nearly 700 condemned male

8   inmates, and CCWF, home to roughly 20 condemned female inmates.  Approximately 200

9   of the individuals on California's death rows are *Coleman* class members.  Yet

10  Defendants' January 7 filings do not contain the word "condemned," and the only

11  references to "death row" are within their experts' curricula vitae.  Defendants' expert

12  reports do not specifically discuss *anything* about their visit to San Quentin, beyond the

13  fact that it occurred.  When Defendants argue that the entire CDCR system is a smoothly

14  functioning machine that adequately screens, treats, and transfers inmates in need of

15  mental health care, they do so without any consideration of the significant population of

16  mentally ill individuals on death row.

17      The average length of stay on California's death row is 25 years.  (Woodford Expert

18  Decl. ¶ 24.)  Over the course of these long decades, condemned inmates generally

19  experience few changes in custody status and housing, and are almost never transferred

20  between prisons.  (*Id.*)  There is thus little opportunity for them to be screened or observed

21  for signs of mental health deterioration during screenings that CDCR may perform in

22  connection with transfers.  In the absence of such screening opportunities, CDCR has not

23  established any organized practice of routinely re-evaluating condemned inmates to

24  determine their mental health status and needs.  Ms. Woodford testified that to her

25  knowledge the last such comprehensive screening conducted at San Quentin took place in

26  2003 or 2004, during her tenure as Warden there.  (*Id.* ¶ 25.)

27      Nor has San Quentin provided for consistent monitoring of condemned inmates by

28  either custody or mental health staff, such as that prescribed by CDCR policy for inmates

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1  in other segregated units.  (*See id.* ¶¶ 28-29, 33-34 (discussing the importance of CDCR

2  Form 114a custody logs and classification committees as opportunities to assess inmates'

3  mental health needs, neither of which appear to be properly used for condemned inmates).)

4  While mental health staff walk through the tiers periodically, there is no focused effort by

5  custody or clinical staff to conduct regular one-on-one screening.  (*Id.* ¶ 22.)  In the

6  absence of glaring signs of mental health crisis, it is therefore possible for a condemned

7  inmate can go decades without significant contact with mental health staff.  (*Id.* ¶ 62

8  (discussing 2010 suicide of condemned inmate whose files indicated no apparent contact

9  with mental health staff between 1990 and his death).)  The lack of a coherent screening

10 model for long-term condemned inmates results not only in such tragic suicides, but in an

11 overall pattern of systematic under-identification of condemned inmates' serious mental

12 health needs.  (*See id.* ¶ 26; Stewart Expert Decl. ¶ 453 (testifying that the percentage of

13 condemned inmates at the EOP level of care is lower than would be expected given the

14 nature of that population); (*see also* Woodford Expert Decl. ¶¶ 30, 31, 32, 55) (identifying

15 particular individuals whom she would have referred for evaluation for a higher level of

16 care).)

17     Defendants' policies also categorically deny access to higher levels of care to

18 condemned prisoners.  Defendants impose a blanket ban that prevents condemned inmates

19 from being transferred to DSH intermediate care facilities (ICF).  (*See* Woodford Expert

20 Decl. ¶ 44.)  There is no custodial justification for such a ban.  (*Id.* ¶¶ 47-50.)

21     Defendants have long pointed to a vague and amorphous "Specialized Care for the

22 Condemned" program at San Quentin as a remedy for this inexplicable and unsupportable

23 blanket ban.  The program "was implemented on November 8, 2010, and has been in

24 existence ever since, with a census of 8 to 10 inmates at any given time."  (Special

25 Master's 25th Round Report at 177.)  After years of "development," the Specialized Care

26 program still lacks a written Local Operating Procedure governing its operation, a clearly-

27 defined set of governing clinical criteria, or an organized and planned mental health or

28 custodial staffing plan or package.  (*See* Woodford Expert Decl. ¶¶ 45-46.)  While

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1   Defendants continue to delay in producing such necessary elements of any program, the

2   individuals who are either participants or candidates for participation remain gravely ill

3   and desperately in need of a higher level of mental health care.  (*See* Stewart Expert Decl.

4   ¶¶ 457-60; 466-71 (discussing individuals housed in both the CTC and the East Block and

5   concluding that all of the individuals interviewed evidenced severe mental health problems

6   and need for transfer to inpatient care).)  Defendants have, in short, engaged in years of

7   heel-dragging on the development of this program, all while maintaining their unjustified

8   and unjustifiable ban preventing very ill class members from obtaining necessary

9   psychiatric hospital-level care.

10          Finally, although population levels across CDCR have decreased in recent years,

11  the death row population has only grown – and in fact, there remain only a few months

12  before there is simply no more room to house condemned inmates at San Quentin.

13  (Woodford Expert Decl. ¶ 37.)  In 2011, the Governor cancelled a plan to build a new

14  condemned housing facility that might have provided for appropriate housing, medical,

15  and mental health space for this growing population; no replacement for this plan has been

16  set forth.  (*Id.* ¶¶ 36-38.)  These housing units already lack space for mental health

17  treatment.  Filling them to capacity and beyond aggravates the problem.  For example, the

18  same finite number of walk-alone yard cages are used for non-mental health programs,

19  such as basic out-of-cell time, and for mental health programs, such as therapeutic groups–

20  a scheduling and logistical nightmare at best.  (*See id.* ¶¶ 39-41.)  The maximum-capacity

21  operation of death row also limits staff's ability to safely operate the condemned units and

22  to make rational judgments about housing locations, which appears to have contributed at

23  least in part to the suicide of one man who was forced to remain housed in close proximity

24  to others who were tormenting him.  (*See id.* ¶ 64; *see also* First Half 2012 Suicide Report

25  at 55 (concluding that this man's suicide was preventable "if mental health staff and

26  custody staff had collaborated" regarding his situation).)

27          Inadequate staffing, an unsupportable ban on higher levels of care, and

28  overcrowding combine to endanger the welfare of these prisoners constitute a violation of

the Eighth Amendment.  Defendants' attitude is apparent from a telling line in a January 25, 2012 memorandum from Dr. Eric Monthei, the Chief of Mental Health at San Quentin, to Dr. J. Scaramozzino, the Deputy Director for DCHCS.  (Bien Decl. Ex. 78.)  After detailing the obstacles to implementation of the "Specialized Care of the Condemned" program within San Quentin's CTC, Dr. Monthei writes: "If the Death Penalty is repealed in November, the whole issue becomes moot."  (*Id.* at 4.)  A hope that the voters would make the "whole issue" go away is no substitute for adequate planning, programming and resources sufficient to provide necessary treatment given the serious mental health needs of some of California's most mentally ill inmates, and the refusal to provide a remedy constitutes deliberate indifference.

## K.    Defendants Have Not Addressed Dangerously Inadequate Reception Center and ASU Screenings

As Defendants acknowledge, "[b]ecause severely mentally ill inmates often cannot alert staff to their mental health needs, delivery of adequate mental health care to such inmates requires a system for screening and evaluating those who require mental health treatment."  (Defs. Motion at 16:6-8.)  Defendants claim to have implemented a comprehensive mental health system "for screening and evaluating inmates with mental health issues upon admission, readmission and transfer, using standardized mental health screening forms and protocols."  (Belavich Decl. at 3:23-25, Docket No. 4277.)  Defendants' experts also claim, without any analysis, that "CDCR has a well-established and clearly defined system for screening and evaluating inmates for serious mental illness, both at the time of reception and during incarceration."  (Joint Report at 10.)

Defendants, in fact, are fully aware of serious deficiencies in their current screening instrument and procedures that they know put lives at risk.  The problems concern both the reception center ("RC") and administrative segregation ("ASU") screening tools, but have been unaddressed despite their identification in the review of two suicides, one in 2010 and another in 2012.

In the Quality Improvement Plan prepared for the August 22, 2010 suicide that

[755300-4]

1   occurred in the stand-alone ASU at CSP-LAC, the Suicide Prevention and Response

2   Focused Improvement Team ("SPR FIT") discussed the "inadequacy of the 31-item

3   questionnaire to highlight current mental health problems in inmates who are new arrivals

4   to administrative segregation." (Kahn Under Seal Decl. Ex. 45.) In an email entitled

5   "DRAFT of new ASU screener – comments requested," dated October 10, 2012, more

6   than two years after the suicide, Dr. Canning, CDCR's suicide prevention coordinator,

7   wrote that "[t]he 31-item screener has never been validated in the CDCR setting, takes too

8   long to administer, and does not address what we believe are the most important

9   psychological factors effecting an inmate's behavior soon after entry into ASU: distress,

10   isolation, loneliness, fear, and possibly thoughts of suicide." (Bien Decl. Ex. 98.) The

11   agenda from a January 28, 2013 SPR-FIT meeting shows that among the "ongoing items"

12   is "Update on proposal for new ASU screening tool (to replace 31-item questionnaire)."

13   (Bien Decl. Ex. 97.) Defendants have long known that their current screening tool is

14   inadequate, yet they have failed to replace or revise this tool. This failure places prisoners

15   at great risk of death, harm and suffering in the ASUs.

16        On May 16, 2012, a prisoner committed suicide in his general population cell at

17   Pleasant Valley State Prison. (Kahn Decl. filed under seal ¶¶ 8-9, Docket No. 4340, Jan.

18   14, 2013.) During his reception center screening, he responded positively on three

19   questions: (1) that he had a history of past psychiatric hospitalizations; (2) that he had

20   history of taking psychotropic medications; and (3) that he had a suicide attempt history.

21   (*Id.*) Despite these responses, under CDCR's scoring rules on their reception center 31-

22   item questionnaire, these responses did not trigger a referral for further evaluation. (*Id.* at

23   9.) The Suicide Reviewer in this case, the same Dr. Canning, again identified the need to

24   evaluate changes to the scoring rules for this screening questionnaire, noting that "the

25   scoring rules for the questionnaire do not include several significant questions: history of

26   psychiatric (and involuntary) hospitalizations, history of taking psychotropic medications,

27   and *most surprising, a history of having made a suicide attempt*." (*Id.* at 9 (emphasis

28   added).) The problem identified with the scoring rules was directed to the SPR-FIT of the

1  DCHCS to make recommendations for changing the scoring rules.  (*Id.* at 10.)  As of

2  January 28, 2013, eight months after this suicide, and years after the 2010 suicide, this

3  critical reception center screening deficiency remains an "ongoing item."  (Bien Decl.

4  Ex. 97.)

5      Defendants have identified serious and significant problems with their own

6  screening tools, which they admit fail to identify and refer prisoners who have mental

7  health concerns and are at risk.  Despite this knowledge, the deaths of multiple human

8  beings, and the passage of time, Defendants have still not remedied these failings.  This is

9  further evidence of *Coleman* deliberate indifference to the harm that may befall class

10  members.

11  **L.    Defendants' Custodial Policies, Practices and Procedures Violate Constitutional Standards In Their Excessive and Unnecessary Use of**
12  **Force, Unfair Disciplinary Procedures, and Overly Harsh, Rigid, and Intrusive Security and Housing Procedures That Exacerbate Mental**
13  **Illness and Interfere with Mental Health Treatment.**

14      This Court's 1995 decision found "substantial evidence in the record of seriously ill

15  inmates being treated with punitive measures by the custody staff to control the inmates'

16  behavior without regard to the cause of the behavior, the efficacy of such measures, or the

17  impact of those measures on the inmates' mental illness," which the Court attributed in

18  part to inadequate training.  *Coleman*, 912 F. Supp. at 1320.  The Court also found that

19  Defendants' policies and practices that subjected mentally ill inmates to "the use of tasers

20  and 37 mm guns, without regard to whether their behavior was caused by a psychiatric

21  condition and without regard to the impact of such measures on such a condition," violated

22  the Eight Amendment.  *Id.* at 1321-23.

23      These abhorrent practices persist today.  While CDCR custody officers no longer

24  have access to tasers, officers still have a dangerous combination of serious weapons, poor

25  oversight and guidance, and minimal accountability.  (Vail Expert Decl. ¶¶ 37-50, 71-73.)

26  The rules violation process still fails to meaningfully incorporate input from mental health

27  clinicians, resulting in persistently high rates of punitive measures against mentally ill

28  inmates.  (*Id.* ¶ 79.)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1    Plaintiffs' expert, Eldon Vail, found significant deficiencies in many of CDCR's

2  practices regarding the use of force and rules violations, both of which disproportionately

3  affect prisoners with mental illness.  He concluded that:  (1) "CDCR, as a matter of

4  practice and sometimes by policy, engages in unnecessary and excessive use of force with

5  mentally ill inmate patients;" (2) the RVR process is "seriously compromised for mentally

6  ill inmate patients, and does not systematically account for their mental illness when

7  adjudicating prison rule violations;" and (3) CDCR "allows custody staff to dominate and

8  interfere with mental health treatment."  (*Id*. ¶ 34.)  Mr. Vail's conclusions are buttressed

9  by vivid and troubling accounts of unnecessary and excessive force against *Coleman* class

10  members.  Mr. Vail also details CDCR's failure to respond to the critical recommendations

11  of *its own expert.*

12    Mr. Vail found that "CDCR uses physical force on mentally ill inmate patients at a

13  rate that is dramatically higher than on the non-mental health population."  (*Id.* ¶ 35.)

14  Although CDCR requires medical staff to attempt to de-escalate the situation before force

15  is used against a mentally ill patient, Mr. Vail observed that consultations with medical

16  staff during controlled uses of force were "cursory at best, with only a minute or two spent

17  by the practitioner with the inmate, before the intervention is deemed to be ineffective."

18  (*Id.* ¶ 62-63.)  Meanwhile, Mr. Vail noted the "disturbing frequency" with which batons

19  are used in CDCR facilities, and the "lack of clear direction" to officers about the

20  appropriate use of the baton.  (*Id.* ¶¶ 40-41.)  Mr. Vail observed a problematic prevalence

21  of Oleoresin Capsicum (OC) crowd dispensers, OC grenades, and expandable batons –

22  "weaponry [which] is a rarity inside living units in correctional programs around the

23  country."  (*Id.* ¶ 37.)  He found that CDCR officers "overrel[y] on force" and "routinely

24  use more pepper spray than is necessary to control a situation and routinely do not allow

25  for sufficient intervals before dispensing additional rounds."  (*Id.* ¶¶ 38, 44.)

26    Mr. Vail observed a number of incidents in which excessive amounts of pepper

27  spray were used against disoriented mentally ill prisoners who were "not lucid or coherent

28  enough to be able to follow the officer's orders."  (*Id.* ¶¶ 52, 58.)  In one instance, a

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

decompensating inmate-patient at Corcoran refused medications, and the officers sprayed

so much OC at him that they all slipped in the pool of liquid when they subsequently

entered the cell.  (*Id.* ¶ 52.)  In another incident at San Quentin, officers threw two OC

grenades and "four lengthy bursts from a large OC dispenser" within a period of five to six

minutes at a single mentally ill inmate "who presented no imminent threat."  (*Id.* ¶ 58.)

There, too, the "inmate appeared so disoriented that it was clear halfway through the event

that he did not have the capacity to comply with the orders."  (*Id.*)

        In the face of these brutal practices, CDCR failed to respond even to the

recommendations of its own expert, Steve Martin.  Mr. Martin issued a series of

recommendations to CDCR with respect to its use of force and RVR practices.  Like

Mr. Vail, Mr. Martin expressed concern about the lack of guidance for officers about

appropriate use of the expandable baton.  (Bien Decl. Ex. 110 (*Coleman* Audit Best

Practice Recommendations for Use of Force) at DEXP105138.)  Mr. Martin also

"question[ed] the use of crowd control delivery systems into a cell of an unarmed or

unbarricaded inmate" and suggested that OC canisters should be weighed before and after

use to monitor the amount of gas deployed.  (*Id.* at DEXP105139.)  These concerns are

consistent with concerns raised by the Office of the Inspector General in 2011, which

CDCR specifically rejected.  (Bien Decl. Ex. 114 (OIG Report on Use of Force within

CDCR, Nov. 2011) at 13 of 19.)

        Despite these recommendations, it appears that none of the necessary training or

guidelines have been made available to CDCR custody staff.  (Vail Expert Decl. ¶ 46.)

While CDCR issued a memorandum on the subject of OC gas, it mentioned nothing about

the use of crowd-control sized OC dispensers for cell extractions and did not incorporate

Mr. Martin's recommendation that CDCR weigh the amounts of gas deployed by officers

in use of force incidents.  (*Id.* ¶¶ 47-50.)  Mr. Vail also found that CDCR has not taken

steps to implement Mr. Martin's "very important recommendation" that CDCR review and

investigate incidents of force that include "unexplained injuries" or "impact strikes to

lethal target areas."  (*Id.* ¶¶ 73-75; Bien Decl. Ex 110 at DEXP105138.)  To the contrary,

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1  neither Mr. Vail nor Mr. Martin could find "even one example of an officer disciplined for

2  excessive UOF." (Vail Expert Decl. ¶ 72; *see also* Bien Decl. Ex. 86 (Martin Dep. at

3  95:24-06:1 ("I was not able to document a fully realized imposition of a disciplinary

4  sanction for an excessive use of force I looked at.")).) Mr. Vail found that "[t]he absence

5  of a transparent and effective review and employee discipline system is, in and of itself, a

6  message to line staff that they will likely suffer no consequences for the unnecessary and

7  excessive use of force against inmate patients." (Vail Expert Decl. ¶ 72.)

8       Unfortunately, Defendants' record of ignoring essential recommendations of their

9  own experts about egregious practices against mentally ill patients extends to the area of

10  Rule Violation Report (RVR) practices as well. Mr. Vail observed that mental health

11  professionals were consistently frustrated about "not knowing whether or how their input

12  is actually used in the RVR hearing process." (Vail Expert Decl. ¶ 81.) Mr. Vail also

13  noted with concern that "[n]o one, including prison wardens on my tours, kept any

14  aggregate data on how often the mental health clinician's input changed the outcome of or

15  sanction at the hearing." (*Id.*) In his written recommendations, Mr. Martin had called on

16  CDCR to require RVR hearing officers to "affirmatively state whether they modified or

17  mitigated the penalties based on the MH assessment." (Bien Decl. Ex 110 at

18  DEXP105141.) This recommendation has also fallen on deaf ears. (Vail Expert Decl.

19  ¶ 86.)

20       Mr. Vail also found that Mr. Martin's recommendation for greater communication

21  between hearing officers and mental health clinicians about the RVR process had not been

22  realized. (Bien Decl. Ex 110 at DEXP105141; Vail Expert Decl. ¶ 90.) Rather, mental

23  health input into the RVR process continues to be "formulaic and ineffective." (Vail

24  Expert Decl. ¶90) Ultimately, the RVR process for the mentally ill has "several

25  fundamental flaws" and there is simply no evidence that the system for handling

26  disciplinary proceedings for mentally ill prisoners is "actually working." (*Id.* ¶ 79.)

27       The parties' experts largely agree on a range of grave concerns regarding both the

28  use of force and the rules violation process as they relate to *Coleman* class members. For

1  example, Martin acknowledged that there is a disparity in CDCR's use of force against the

2  mentally ill and that they are subject to use of force at a higher rate than the general

3  population.  (Bien Decl. Ex. 86 (Martin Dep. at 62:14-63:7).)  He further agreed that

4  blanket custody procedures and protocols that fail to differentiate between a violent

5  prisoner and one who needs protection from the general population are "not correctionally

6  sound" and are unconstitutional "if there are onerous or punitive conditions, a de facto type

7  of punishment when the offender hasn't done anything.  Due Process implications, if

8  nothing else.  If not Eighth Amendment."  (Bien Decl. Ex. 86 (Martin Dep. at 41:22-

9  47:13); *see also* Vail Expert Decl. ¶ 120.)  Indeed, the excessive force issues that Martin

10  found were so serious and so obvious that he expressed anger that the *Coleman* Special

11  Master and Plaintiffs' counsel had failed to identify and stop the practices themselves.

12  (Bien Decl. Ex. 86 (Martin Dep. at 85:13-88:4).)  Though all experts who have reviewed

13  Defendants' practices agree, Defendants persist in using force and punishment against

14  mentally ill prisoners while neglecting to account for and to address their clinical needs.

15  **V.    OVERCROWDING-RELATED DEFICIENCIES REMAIN MAJOR
       BARRIERS TO THE DELIVERY OF CONSTITUTIONAL MENTAL
16     HEALTH CARE**

17         The *Coleman* class has to date experienced little to no benefit from Realignment.

18  The undisputed evidence shows that the numbers of prisoners with serious mental illness

19  in the prison system—the *Coleman* class—has been reduced by only a small percentage

20  compared to the overall reduction of the prison population.  (Haney Expert Decl. ¶ 54;

21  2011 Suicide Report at 16.)  In addition, many *Coleman* class members are being treated at

22  a lower level of care than is clinically indicated.  (Kaufman Expert Decl. ¶¶ 161-182;

23  Stewart Expert Decl. ¶¶ 275, 305, 346-347, 362-363.)  Ongoing constitutional violations in

24  mental health care persist and resources are stretched thinner than ever.

25         The Defendants, including the Governor, have managed Realignment and

26  California's financial crisis, without regard for, and with deliberate indifference to, the

27  health and safety of the *Coleman* class.  Even as the population reductions of Realignment

28  began to kick in, Defendants prioritized, once again, budget savings over all else,

1   squandering the opportunity to take major steps forward in remedying the ongoing

2   violations. (Bien Decl. Ex. 123 ("Blueprint," Executive Summary) ("A blueprint to save

3   billions of dollars, end federal court oversight and improve the prison system").) The

4   current dangerous levels of clinical and custodial staffing shortages in CDCR and DSH are

5   a direct result of Defendants' intentional and conscious decisions to maximize cost-savings

6   by imposing a hiring freeze on all state public employee positions and managing

7   Realignment mission changes to maximize budget savings. These decisions were made in

8   violation of existing orders of this Court to fully staff CDCR and DSH inpatient

9   psychiatric programs and to maintain clinical vacancy rates under 10% through use of

10   contract registries. (Docket Nos. 4199, 3761, 3613, 1800, 1774, 1772, 1667, 1654, 1383,

11   1198.)

12       Realignment was purportedly designed to address (at least in part) the overcrowded

13   conditions that were the primary cause of the unconstitutional care for the *Coleman* class.

14   (Bien Decl. Ex. 123 ("Blueprint," Executive Summary) at 1.) Yet Defendants have failed

15   in their constitutional obligations and ignored the serious risks of harm that mentally ill

16   prisoners are still made to endure. Even with the population reductions that have occurred,

17   California remains an outlier, and is one of the most overcrowded prison systems in the

18   United States. Some individual prisons are much *more* overcrowded than the overall

19   systemwide figure indicates, and they have scarcely benefitted, if at all, from the overall

20   population reductions that have occurred. (Haney Expert Decl. ¶ 31.) Many individual

21   prisons are operating at extremely crowded levels, far above their abilities to provide

22   appropriate housing and mental health treatment to the *Coleman* class members in those

23   facilities. The female population at CCWF, for example – which has serious deficiencies

24   in its delivery of mental health care (*see, e.g.*, Kaufman Expert Decl. ¶¶ 24-32, 48-56, 66-

25   67) – faces a staggering level of extreme overcrowding (at nearly 180% capacity), while

26   five (5) prisons have populations over 160% capacity (only two of which Plaintiffs'

27   experts were able to visit in the abbreviated discovery period).

28       The three-judge court and the Supreme Court found that overcrowding was the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

1  *primary* cause of the constitutional violations in this case.  *Plata*, 131 S. Ct at 1937.

2  Stunningly, Defendants' motion to terminate does not mention or reference overcrowding

3  once, except to say that the three-judge court's order was "premised on outdated evidence"

4  (Defs. Motion at 15, n.7), an assertion that was squarely rejected.  *Id.* at 1938.  Even more

5  baffling, Defendants specifically directed their experts *not* to look at overcrowding in

6  completing their review of whether California prisons provide constitutional care.  (*See,

7  e.g.*, Bien Decl. Ex. 83 (Dvoskin Dep. at 191:22-192:1 ("I was not asked to render an

8  opinion" on overcrowding)); Ex. 86 (Martin Dep. at 10:12-21 ("I wasn't asked to render

9  opinions on crowding.")); Ex. 88 (Moore Dep. at 32:13-22 ("We didn't look at

10  overcrowding.").)

11        Defendants' willful blindness notwithstanding, the same overcrowding-caused

12  deficiencies identified by the three-judge court and the Supreme Court are still major

13  barriers to the delivery of a minimally adequate level of mental health care to the *Coleman*

14  class.  The current and ongoing constitutional violations do stem from Defendants' many

15  knowing refusals to take sensible and necessary steps to remedy those violations.  But the

16  primary driver of the current and ongoing violations is the overcrowded conditions that

17  still plague the California prison system.

18        The Receiver recently presented evidence of the direct relationship between existing

19  levels of overcrowding and delivery of health care services at today's prisons.  (Receiver's

20  Resp. to Defs.' Objs. to Receiver's 22nd Report at 4-5, *Plata* Docket No. 2547, Feb. 22,

21  2013 (providing data showing that the most crowded prisons have poorest levels of

22  compliance with basic health care standards).)

23        The photographs attached to Secretary Beard's declaration (Docket No. 4281) and

24  Chris Meyer's declaration (Docket No. 4278) purport to demonstrate that the gyms and

25  dayrooms have, by and large, been emptied of bunk beds,[6] and that at least some of the

26

27  _____

28  [6] Whether, in fact, CDCR has truly emptied all of these overcrowded "bad beds" is far
    (footnote continued)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1    numerous promised health care construction and upgrade projects have finally been

2    completed after years and years of cancellations and delays.  But those photographs paint a

3    very incomplete picture, one that omits a whole host of horrors.

4         Plaintiffs have introduced numerous photographs taken during their experts'

5    inspections of CDCR prisons that occurred in January and February of 2013.  They

6    provide shocking and graphic current evidence that most *Coleman* class members, and

7    most CDCR prisoners, have yet to realize any benefits in their housing or health care from

8    Realignment or the Governor's "Blueprint," which is yet another plan to do things that this

9    Court (and Judge Henderson in *Plata*) ordered many years ago.  Conditions across the state

10   are in too many ways unchanged from 2007 and 2008, when photographs of some of the

11   exact same locations shocked the three-judge court, the Supreme Court and the public.

12        The evidence now before the Court demonstrates the ways in which overcrowding

13   remains the primary barrier to Defendants' meeting their constitutional obligations.  The

14   system is filled with "bad beds," cages, non-confidential treatment spaces, crowded and

15   cluttered medical units and offices, dangerous segregation units, unsafe cells, "alternative

16   housing," and unlicensed, converted housing units used for mental health care. There are

17   shortages of yard space in high security units.  (Woodford Expert Decl. ¶ 41.)  There is not

18   enough staff or treatment space to provide adequate and meaningful treatment to prisoners

19   with serious mental health needs.  Clinical staff are spread thin and forced to improvise

20   storage rooms and other converted areas into treatment and office space, while

21   construction projects are trumpeted but remain promises on paper.

22        There is a correctional culture that is still stressed by dangerous levels of

23   overcrowding and that continues to utilize excessive and unacceptable uses of force,

24   predominantly impacting the mentally ill.  (Vail Expert Decl. ¶¶ 35, 104, 107.)  The cycle

25   _____

26   from clear.  Plaintiffs' experts happened upon some extremely overcrowded housing units
     on their inspections that had all of the characteristics of the "bad beds" highlighted in the
27   three-judge court trial.  (*See, e.g.*, Haney Expert Decl. ¶ 161 & Photo Ex. W.)

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

[755300-4]

1   of overcrowding-related violence, tensions, riots and homicides, resulting in harsher and

2   increased security measures, continues unabated in CDCR.  Modified programs and

3   lockdowns, whether caused by violence or by custodial staffing shortages, continue to

4   result in frequent cancellations of programs and activities, including mental health

5   treatment.  (*See* Vail Expert Decl. ¶¶ 104-108; Bien Decl. Ex. 79 (*Mitchell v. Felker*, No.

6   08-CV-01196 JAM EFB (E.D. Cal.), Decl. of Devin M. McDonell in Support of Pls.' Mot.

7   for Class Certification and Mot. for Preliminary Injunction & Exs., Docket No. 160, Mar.

8   5, 2013 (providing data on security-based lockdowns in CDCR for 2010 and 2011).)

9        As Plaintiffs' expert Dr. Stewart describes, the alarming rate of suicide in CDCR's

10   system is closely related to the effects of overcrowding.  (Stewart Expert Decl. ¶¶ 170-

11   177.)  CDCR's still-crowded system is operating in ways that continue to place prisoners

12   at high risk of suicide:

13        First, overcrowded prisons are more frequently locked down and tend to offer far
      less programming to each prison than non-overcrowded ones. . . . [T]hese
14      conditions create heightened risks for suicide prevention in a variety of ways, but
      one important way they create risks is because they impair the functioning and
15      mental health of individuals who are mentally ill and or otherwise susceptible to
      suicidal ideation.  Both the lack of purposeful activity and the social isolation
16      experienced in locked-down, overcrowded prisons are damaging to mental health.
      Second, overcrowded prisons tend to have fewer mental health and custody staff for
17      each prisoner, making surveillance more difficult among the population of at risk
      mentally ill individuals.  Third, in my experience, overcrowded prisons are more
18      violent and stressful for mentally ill prisoners than prisons that are not
      overcrowded.  These factors greatly increase the risks of suicide among susceptible
19      prisoners.

20   (*Id.* ¶¶ 174.)

21        The dysfunction in the system that chronic and severe overcrowding produced, and

22   the norms, expectations, and culture that it has generated, have been entrenched for a very

23   long time.  Backlogs and other crowding-related stresses and deficiencies still predominate

24   across the system.  (Haney Expert Decl. ¶ 32.)  Class members for their "own safety" are

25   made to suffer non-therapeutic and damaging placements in harsh segregation units or

26   under a "Lack of Bed" designation.  (*See, e.g.*, Haney Expert Decl. ¶¶ 44-50, 141-162,

27   217-228, 243-268.)  Inhumane units persist where suicidal men and women are made to

28   sleep on the floor, receive treatment only in cages, and move from one place to another

[755300-4]

1   only in cuffs and restraints, regardless of their actual clinical needs and security status.

2   (*See* Stewart Expert Decl. ¶¶ 199-238; Vail Expert Decl. ¶¶ 104-107.)

3          Thousands of human beings – including those with serious mental illness – have

4   been forced to live *with a cellmate* in cells that are too small to humanely house a *single*

5   person under current national standards.  Defendants are well aware of this shocking fact,

6   but have not remedied it.  Pulitzer/Bogard & Associates (P/B&A) was hired to complete a

7   report on "Prison Capacity Planning" for CDCR.  The final report, dated October 3, 2011,

8   found that, under the American Correctional Association (ACA) standards, California's

9   prisons should house no more than 94,691 prisoners.  (Bien Decl. Ex. 8 (P/B & A

10  California Department of Corrections and Rehabilitation Prison Capacity Planning Final

11  Report) at 4.)  Defendants then adjusted the ACA capacity figure upward, calculating a

12  "Prison Operating Capacity" (POC) that yielded a maximum systemwide POC of 103,470

13  prisoners – almost exactly 130% of design capacity, and approximately 6,000 prisoners

14  less than the three-judge court-ordered cap.  (*Id*; *see also* Pls.' Suppl. Br. in Opp. to Defs.'

15  Mot. to Vacate Population Reduction Order & in Support of Pls.' Mot. for Further Relief,

16  Docket No. 4373, Mar. 11, 2013 (further analysis of P/B&A report in briefing to three-

17  judge court).)

18          P/B&A further identified a serious problem with the way Defendants were housing

19  prisoners in California's still terribly crowded system:

20          The CDCR currently has more than 8,000 cells that are less than 55 square
            feet, including more than 2,800 cells that are less than 40 square feet.  *In*
21          *most cases, these cells hold two inmates, even though they would not be*
            *large enough (per ACA standards) for even one inmate.*  The decision was
22          made early on that while these cells would not be considered eligible for
            double bunking under the new methodology, at the same time they could not
23          just be considered unusable and taken off line.

24  (Bien Decl. Ex. 8 at 10-11 (emphasis added).)

25          The fact that 8,000 CDCR cells do not meet the ACA standard for minimum cell

26  size to house a single prisoner is shocking.  That a substantial number of such undersized

27  cells are filled with *two* prisoners is unconscionable.  (Haney Expert Decl. ¶ 159.)  Yet 15

28  months after CDCR received this report, Plaintiffs' experts observed such cells in use for

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)

double-celling at CIM.  Madrone Hall at CIM was overcrowded with prisoners on the day of the tour.  The cells in that unit are 47.8 gross square feet each.  (Bien Decl. Ex. 8 at 93.) Several inmates, including two EOP inmate-patients, were double-celled in that unit, a shocking sight, and a situation that places mentally ill and vulnerable prisoners at considerable risk of psychological and other harm.  (Haney Expert Decl. ¶¶ 154-59 & Photo Ex. U.)



**Figure 2 CIM Reception Center housing for 2 EOP patients, one of whom slept on floor, taken Feb. 13, 2013.**

The Plaintiffs' experts provide extensive visceral evidence of the impact of overcrowding and space shortages in their declarations.  Two more examples are provided below.



**Figure 3 CIM A-Yard, Angeles Dorm, which houses EOP, CCCMS and general population, taken Feb. 12, 2013.**



**Figure 4 Treatment cages for group therapy in EOP administrative segregation unit, MCSP, taken Feb. 7, 2013.**

To suggest that these are the pictures of a prison system that is not overcrowded, "provide[s] humane conditions of confinement," and "take[s] reasonable measures to guarantee the safety of the inmates," *Farmer*, 511 U.S. at 832, is deeply cynical, and it is entirely incorrect. Defendants have yet to demonstrate the commitment and action

[755300-4]

1  necessary to meet their constitutional obligations.

2                                    **CONCLUSION**

3         Constitutional violations are current and ongoing and present needless risk of injury

4  and death to California state prisoners with serious mental illness.  For the reasons stated

5  herein, Defendants' termination motion should be denied in its entirety.

6

7  DATED:  March 15, 2013              Respectfully submitted,

8                                     ROSEN BIEN GALVAN & GRUNFELD LLP

9

10                                    By:  */s/ Michael W. Bien*
                                          Michael W. Bien
11

12                                    Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[755300-4]

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE UNDER THE PLRA AND TO
VACATE UNDER RULE 60(b)(5)