KAMALA D. HARRIS
Attorney General of the State of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS - 166884
PATRICK McKINNEY - 215228
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5500
Facsimile: (415) 703-5843
Email: Patrick.McKinney@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
WALTER R. SCHNEIDER - 173113
SAMANTHA D. WOLFF - 240280
MEGAN OLIVER THOMPSON - 256654
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone: (415) 777--3200
Facsimile: (415) 541-9366
pmello@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et. al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>Defendants. | CASE NO. 2:90-cv-00520 LKK JFM P<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR LEAVE TO FILE SUPPLEMENTAL BRIEF; DEFENDANTS' SUR-REPLY TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE POPULATION REDUCTION ORDER; DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR FURTHER RELIEF**<br><br><u>**THREE-JUDGE COURT**</u> |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>Defendants. | CASE NO. C01-1351 TEH<br><br><u>**THREE-JUDGE COURT**</u> |

5023820.2

## I.   INTRODUCTION

Plaintiffs have filed four briefs in opposition to Defendants' motion to vacate this Court's population reduction order, all of which were filed after the deadline passed to timely oppose the motion.  (*See* Jan. 29, 2013 Order, ECF Dock. No. 2527, 1:25-26 (noting Plaintiffs failed to timely respond to Defendants' motion); *see also* ECF Dock. Nos. 2528 (Plaintiffs' "response" to Defendants' motion to vacate), 2535 (Plaintiffs' "response" to Defendants' alleged motion to lift the stay on Defendants' motion to vacate), 2551 (Plaintiffs' "reply" to Defendants' motion to vacate), 2562 (Plaintiffs' "supplemental brief" in opposition to Defendants' motion to vacate).)  None should be considered by this Court, and regardless, none are persuasive.  Plaintiffs' instant fourth supplemental brief is no exception.

As an initial matter, the "Prison Capacity Planning Report" (2011 Report) referenced in Plaintiffs' fourth supplemental brief is irrelevant to the Court's consideration of Defendants' motion since Defendants did not even remotely rely on the 2011 Report or its methodology.  Instead, Defendants moved to vacate the population reduction order in light of the dramatic population reduction as a result of public safety realignment, and in recognition of the quality medical care that is being provided at CDCR institutions.  (*See* ECF Dock. No. 2506 (Defs.' Not. of Mot. and Mot. to Vacate or Modify Population Reduction Order).)  Plaintiffs have not presented *any* evidence to rebut these assertions.  (*See* ECF Dock. No. 2528.)  Further, the 2011 Report, which was commissioned to address the flaws inherent in CDCR's current method of measuring capacity, does not indicate that the State's prisons remain overcrowded.  Rather, the 2011 Report proposes a new baseline for measuring capacity, not a ceiling as Plaintiffs incorrectly infer.

Notwithstanding the 2011 Report's irrelevance to this Court's consideration of Defendants' motion, Plaintiffs' fourth supplemental brief also suffers fatal procedural flaws.  While Plaintiffs have now filed four briefs in opposition to Defendants' motion, only one brief was actually ordered by this Court.  (Jan. 29, 2013 Order, ECF Dock. No. 2527.)  Plaintiffs present no viable justification for submitting additional briefing on a

2

DEFS.' OPP'N TO PLS.' SUPPLEMENTAL BRIEF RE DEFS.' MOT. TO VACATE

1  motion that has been fully and finally briefed.  Further, Plaintiffs' initial opposition was not
2  timely filed, and filing an unauthorized supplemental brief does not circumvent the
3  prohibition against this Court's consideration of Plaintiffs' arguments.  *See* E.D. L.R.
4  230(c).  Plaintiffs' supplemental brief, therefore, must not be considered.

5       Finally, the Report in no way supports Plaintiffs' request for thirty-three individual
6  population reduction caps.  Not only have Plaintiffs failed to properly comply with the
7  Prison Litigation Reform Act and ignored Supreme Court precedent, but Plaintiffs have
8  also put forth no evidence in support of their request.  18 U.S.C. § 3626(a)(3)(E)(i)-(ii) &
9  (a)(3)(A); *Brown v. Plata*, 131 S. Ct. 1910, 1941 (2011); *see also* Pls.' Opp'n to Defs.'
10 Mot. to Vacate or Modify, ECF Dock. No. 2528 at 26-28 (devoting just over one page of
11 briefing and submitting no evidence in support of their request for prison-specific
12 population caps).  The 2011 Report, which describes a new professional and evidence-
13 based methodology to determine prison capacity, in no way supports individual prison-
14 specific population caps.  Plaintiffs' afterthought request for individual population caps is
15 procedurally defective and unsupported by *any* evidence, least of all the 2011 Report.

16       For these reasons, Defendants request that this Court reject Plaintiffs' untimely,
17 improper, and unpersuasive supplemental brief (and request that the Court finally and
18 properly grant Defendants' motion to vacate or modify).

19 **II.   ARGUMENT**

20     **A.   Plaintiffs Misinterpret the "Prison Capacity Report," Which Is Irrelevant to Defendants' Motion to Vacate.**
21

22       Plaintiffs assert that the 2011 Report somehow supports their position that "the
23 prisons remain vastly overcrowded" and that "prisons will still be overcrowded beyond
24 their operable capacity even if the State complies with this Court's Population Reduction
25 Order."  (Pls.' Req. for Leave to File Supp. Brief, and Supp. Brief in Opp'n to Defs.' Mot.
26 to Vacate Population Reduction Order and in Supp. Of Pls.' Mot. for Further Relief ("Pls.'
27 Fourth Supp. Brief"), ECF Dock. No. 2562 at 3:1, 5:22-24.)  In making these assertions,
28 however, Plaintiffs misconstrue, misinterpret, and mischaracterize the 2011 Report.

The 2011 Report was commissioned in recognition of the fact that "[t]he design capacity measure . . . has proven to be flawed for a variety of reasons." (Prison Capacity Report at 2.) When CDCR built 23 of its 33 prisons between 1985 and 2005, it based the capacity and design of those institutions on the American Correctional Association's (ACA) recommendations that were current at that time. (*Id.*) The ACA is the recognized national authority on correctional standards and practice. (Decl. Jeffrey Beard Supp. Defs.' Opp'n to Pls.' Fourth Supp. Brief (Decl. Beard), ¶ 6.) The ACA develops standards applicable to correctional facilities and operates a voluntary accreditation program for correctional facilities across the country. (Decl. Kathy Black-Dennis Supp. Defs.' Opp'n to Pls.' Fourth Supp. Brief (Decl. Black-Dennis), ¶ 3.) ACA standards are the national benchmark for the effective operation of correctional facilities throughout the United States. (*Id.* ¶ 4.) These standards address services, programs, and operations that are essential to good correctional management, including administrative and fiscal controls, staff training and development, physical plant, safety and emergency procedures, sanitation, food service, rules and discipline, and health care. (*Id.*) The ACA standards are based on changing practices, current case law, and agency experiences, and reflect a consensus of views of corrections professionals, architects, doctors, and legal experts. (*Id.* ¶ 5.) Adherence to ACA standards is a good indicator than an institution is able to provide a constitutional level of care to inmate-patients. (Decl. Beard, ¶ 6.)

During the 1980s and 1990s, design capacity (and single-celling) was the industry standard accepted and endorsed by the ACA. (Decl. Black-Dennis, ¶ 11; Report at 6.) Since that time, however, the ACA has eliminated the requirement for single-celling from its standards and no longer mandates that a prison system or individual prison stay at or below its stated "design capacity" or "rated capacity" in order to receive accreditation. (Decl. Black-Dennis, ¶ 11; Report at 7.) One reason for this change is that states differ greatly in how they define their "rated capacity" or "design capacity." (Decl. Black-Dennis, ¶ 11.) In fact, the ACA recognizes that double-celling has become an acceptable practice throughout the nation and it is common practice for such prison systems to allow

double-celling as part of their "rated capacity" or "design capacity." (*Id.*)

Design capacity, as it is currently applied by CDCR, is not an accurate measurement of the number of inmates that a system would ideally house, nor is it the maximum number of inmates that can be safely housed. (Decl. Beard, ¶ 8.) Thus, as the 2011 Report notes, "the foundation on which CDCR based its design capacity in the 1980s no longer existed by the 1990s and mid-2000s." (Report at 7.) Despite these facts, CDCR continues to measure its capacity based on outdated and defunct standards. (*Id.*; Decl. Beard, ¶ 11; Trial Tr. at 212:5-19 (Secretary Beard explaining why "it's no longer appropriate for us to talk about design capacity.").)

Recognizing the flaws inherent with its current method of measuring capacity, CDCR sought an alternative approach that was based on established criteria, industry standards, and consistent with approaches used by other large state prison systems and the Federal Bureau of Prisons. (Report at 7-8.) Although CDCR has not implemented the 2011 Report, it has made the decision to move away from the outdated notion of one inmate per cell in defining its capacity. The 2011 Report concludes, as Plaintiffs note, that CDCR's Prison Operating Capacity is 103,470 prisoners. (Report at 43.) Plaintiffs abruptly stop there and conclude that the Prison Operating Capacity must be the absolute maximum number of inmates that can be safely housed. (Pls.' Fourth Supp. Brief at 2:21-23.) But CDCR's Prison Operating Capacity is not remotely its absolute maximum capacity. (Decl. Beard, ¶ 13.) Indeed, the ACA does not require that a prison system or individual prison stay at or below its stated "design capacity" or "rated capacity" in order to receive accreditation. (Decl. Black-Dennis, ¶ 12.) According to the ACA, it is customary for states and the Federal Bureau of Prisons to house above what, under California's current methodology, would be considered "design capacity" by assigning two inmates per cell. (*Id.*) As Plaintiffs point out, Secretary Beard has testified on their behalf that this standard practice "was safe." (Pls.' Fourth Supp. Brief at 4:15-18; *see also* Trial Tr. at 209:9-25, 212:5-21.)

Prison Operating Capacity, like design capacity, is therefore the baseline, not the

5

ceiling, as Plaintiffs suggest. Institutions that house populations above their operational or rated capacity are not per se overcrowded and may nonetheless be accredited by the ACA. (Decl. Black-Dennis, ¶¶ 11, 13; Decl. Beard, ¶ 5.) Indeed, three of CDCR's institutions have already been accredited by the ACA (each with populations in excess of 137.5% of design capacity), with two more undergoing the accreditation process and likely to be accredited.[1] (Decl. Black-Dennis, ¶¶ 16-18.)

While the 2011 Report proposed a new process for evaluating CDCR's inmate capacity, it expressly cautioned that it was "not intended to suggest that it would be indicative of a constitutional standard for defining the capacity of the CDCR's prisons." (Report at 8.) Thus, despite the fact that the Report certainly supports Defendants' position that CDCR's institutions are not overcrowded, Defendants did not rely on the 2011 Report in support of their motion to vacate. Instead, Defendants presented ample evidence that continued enforcement of the population reduction order exceeds this Court's authority because the prison population does not prevent the State from providing constitutionally adequate care. (ECF Dock. No. 2506 at 7.) The 2011 Report is thus irrelevant to this Court's determination that CDCR is *currently* providing adequate care and further population reductions are, therefore, no longer necessary. (*See id.*)

Further, the Report was commissioned before the effects of realignment were ever visible. Realignment, which took effect two days before the 2011 Report was issued, significantly and indelibly altered CDCR's prison population. The 2011 Report's drafters are therefore in the process of evaluating CDCR's prisons in their current state, post-

---

[1] In fact, three of CDCR's institutions, which are "overcrowded" by Plaintiffs' standards, have recently been accredited by the ACA. (Decl. Black-Dennis, ¶ 16.) California State Prison, Sacramento was inspected in April 2012 when its population was 151.7% of design capacity and was subsequently accredited; California State Prison, Solano was inspected in April 2012 when its population was 170.7% of design capacity and was subsequently accredited; Central California Women's Facility was inspected between April and May of 2012 when its population was at 141.5% of design capacity and was subsequently accredited. (*See* ECF Dock. No. 2430-1 (Ex. A to Defs.' April 2012 Status Report in Response to June 30, 2011 Order); *see also* Decl. Black-Dennis, ¶ 16.)

public safety realignment. (Decl. Beard, ¶ 12.) Any operating capacity that is established as a result of this update to the 2011 Report will create a baseline for the number of inmates that may be safely housed and will in no way reflect the maximum capacity of the system. (Decl. Beard, ¶ 13.) This practice is both appropriate and consistent with national standards. (*Id.*)

For these reasons, the 2011 Report should not be considered by this Court in connection with Defendants' motion to vacate.

### B. Plaintiffs' Supplemental Brief Is Procedurally Defective and Must Not Be Considered by this Court.

This is not Plaintiffs' first (or even second or third) attempt at filing supplemental briefing in opposition to Defendants' motion to vacate the population reduction order. After Plaintiffs initially failed to oppose Defendants' motion, this Court ordered Plaintiffs to respond and show good cause for not having done so timely. (Jan. 29, 2013 Order, ECF Dock. No. 2527.) Plaintiffs filed their opposition on February 12, 2013, but (contrary to the Court's explicit instruction) failed to support it with any evidence and instead submitted only two attorney declarations. (ECF Dock. No. 2528.) Plaintiffs also did not show good cause for missing their deadline to oppose Defendants' motion, having stated only that they neglected to note the scheduling order governing motions in this matter. *Kyle v. Campbell Soup Co.*, 28 F.3d 928, 931 (9th Cir. 1994) ("inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable neglect'") (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 392 (1993)). In an apparent attempt to bolster their ineffectual opposition, Plaintiffs filed another response to Defendants' motion to vacate two days later. This filing was styled as a "response" to Defendants' alleged motion to lift the stay on the motion to vacate. (ECF Dock. Nos. 2535.) Again, on February 26, 2013, Plaintiffs filed yet another brief addressing Defendants' motion to vacate. (ECF Dock. No. 2521.)

With no less than three briefs on file opposing Defendants' motion to vacate, Plaintiffs filed the instant supplemental brief. Plaintiffs' supplemental brief, however, must

7
DEFS.' OPP'N TO PLS.' SUPPLEMENTAL BRIEF RE DEFS.' MOT. TO VACATE

be disregarded by this Court.  The local rules do not sanction supplemental filings.  *See* E.D. L.R. 230(a)-(d) (discussion of motion, opposition, and reply only); *see also* N.D. L.R. 7-3(d) (stating that no supplementary material may be filed unless it is an objection to new evidence submitted in a reply brief or to bring to the court's attention a relevant and recent judicial opinion).   Nor did this Court's January 29, 2013 Order request *four* responses from Plaintiffs.  (Jan. 29, 2013 Order, ECF Dock. No. 2527 at 2:14-15 ("this Court directs plaintiffs to file *a response* to the Three-Judge Motion within 14 days") (emphasis added).)

Moreover, Plaintiffs' initial opposition to Defendants' motion was untimely filed. (Jan. 29, 2013 Order, ECF Dock. No. 2527.)  Subsequent supplemental briefs are equally untimely, improper, and not subject to consideration by this Court.  *See* E.D. L.R. 230(c). Plaintiffs' attempts to mitigate their failure to timely oppose Defendants' motion by filing multiple supplemental briefs must not be sanctioned.  Plaintiffs cite no authority permitting their repetitive briefing, and neither the local rules nor this Court's January 29, 2013 Order permit it.  Plaintiffs' instant request to file a fourth supplemental brief must therefore be denied.

### C.  The Report Does Not Support Plaintiffs' Procedurally Defective Request for Thirty-Three Prison-Specific Population Caps.

Almost as an afterthought, Plaintiffs requested in their first opposition to Defendants' motion that this Court issue thirty-three prison-specific population caps. (ECF Dock. No. 2528 at 26-28.)  Plaintiffs provided no evidentiary support for this request.  (*See id.*)  More troubling though, Plaintiffs ignored the exacting requirements of the Prison Litigation Reform Act and the Supreme Court's binding precedent on this exact issue.  18 U.S.C. § 3626(a)(3)(E)(i)-(ii) & (a)(3)(A) (courts must first find that crowding is the primary cause of the violation of a Federal right and that no other relief will remedy that right, and that previous orders for less-intrusive relief have failed); *Brown*, 131 S. Ct. at 1941 ("[t]here is no requirement that every facility comply with the 137.5% limit.").  For those reasons alone, Plaintiffs' flawed request must be denied.

1       Further, the 2011 Report does not support Plaintiffs' request.  As explained above,
2  the 2011 Report sets forth a new, industry-accepted approach to measuring compliance.
3  But, as Plaintiffs correctly note, the 2011 Report "did not consider the available health
4  care space in their analysis of how many prisoners a prison could hold."  (Pls.' Fourth
5  Supp. Brief at 3:10-12.)  (Incidentally, the 2011 Report explains that "none of the states
6  surveyed or the [Federal Bureau of Prisons] have a methodology that directly factors in
7  health care to the overall equation in determining institutional capacity."  (Report at 13.))
8  It is therefore unclear how the 2011 Report, which does not analyze health care,
9  somehow makes it "now apparent that the most crowded prisons have the most severe
10 problems providing healthcare," as Plaintiffs posit.  (Pls.' Fourth Supp. Brief at 5:16-17.)
11 The 2011 Report does not consider health care in its evaluation, and therefore does not
12 support Plaintiffs' argument.

## CONCLUSION

14      Plaintiffs' procedurally defective fourth supplemental brief must be rejected by this
15 Court.  Neither the 2011 Report nor its findings or rationale were even remotely relied
16 upon by Defendants in their motion to vacate, which was amply supported by other
17 evidence.  Further, the 2011 Report does not set a maximum capacity for CDCR
18 institutions, as mischaracterized by Plaintiffs.  Moreover, Defendants' motion to vacate
19 has been fully and finally briefed since at least February 19, 2013, when Defendants filed
20 their reply in support of their motion to vacate. (ECF Dock. No. 2543.)  Plaintiffs cite no
21 authority that would permit their filing, and the local rules and this Court's January 29,
22 2013 Order do not authorize such a filing.  Accordingly, Defendants respectfully request
23 that this Court deny Plaintiffs' request to file their fourth supplemental brief and properly
24 grant Defendants' motion to vacate.
25 / / /
26 / / /
27 / / /
28 / / /

DEFS.' OPP'N TO PLS.' SUPPLEMENTAL BRIEF RE DEFS.' MOT. TO VACATE

| | | |
|---|---|---|
| 1 | DATED: March 18, 2013 | HANSON BRIDGETT LLP |
| 2 | | |
| 3 | | By:   /s/ *Samantha Wolff* |
| 4 | | PAUL B. MELLO<br>SAMANTHA D. WOLFF |
| 5 | | Attorneys for Defendants |
| 6 | DATED: March 18, 2013 | KAMALA D. HARRIS<br>Attorney General of California |
| 7 | | |
| 8 | | |
| 9 | | By:   /s/ *Patrick McKinney*<br>PATRICK McKINNEY |
| 10 | | Deputy Attorney General<br>Attorneys for Defendants |

DEFS.' OPP'N TO PLS.' SUPPLEMENTAL BRIEF RE DEFS.' MOT. TO VACATE