1  KAMALA D. HARRIS
   Attorney General of the State of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE VOROUS - 166884
   PATRICK McKINNEY - 215228
5  Deputy Attorneys General
   455 Golden Gate Avenue, Suite 11000
6  San Francisco, CA  94102-7004
   Telephone:  (415) 703-5500
7  Facsimile:  (415) 703-5843
   Email:  Patrick.McKinney@doj.ca.gov
8
   Attorneys for Defendants
9

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
WALTER R. SCHNEIDER - 173113
SAMANTHA D. WOLFF -  240280
MEGAN OLIVER THOMPSON - 256654
PAUL B. GRUWELL - 252474
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:   (415) 777--3200
Facsimile:   (415) 541-9366
pmello@hansonbridgett.com

10              **UNITED STATES DISTRICT COURT**

11            **EASTERN DISTRICT OF CALIFORNIA**

12        **AND THE NORTHERN DISTRICT OF CALIFORNIA**

13   **UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES**

14      **PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE**

| | |
|---|---|
| 15  RALPH COLEMAN, et. al., | CASE NO. 2:90-cv-00520 LKK JFM P |
| 16         Plaintiffs, | **DECLARATION OF JEFFREY BEARD, Ph.D, IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE** |
| 17      v. | |
| 18  EDMUND G. BROWN, JR., et al., | |
| 19         Defendants. | **THREE-JUDGE COURT** |
| 20 | |
| 21  MARCIANO PLATA, et al., | |
| 22         Plaintiffs, | |
| 23      v. | CASE NO. C01-1351 TEH |
| 24  EDMUND G. BROWN, JR., et al., | |
| 25         Defendants. | **THREE-JUDGE COURT** |

26

27  / / /

28  / / /

5032537.1

I, Jeffrey Beard, Ph.D., declare as follows:

1.    I am the Secretary of the California Department of Corrections and Rehabilitation (CDCR).  I am competent to testify to the matters set forth in this declaration, and if called upon to do so, I would and could so testify.  I submit this declaration in support of Defendants' Opposition to Plaintiffs' Supplemental Brief in Opposition to Defendants' Motion to Vacate.

2.    I was appointed Secretary by Governor Brown on December 19, 2012.  As Secretary, I have responsibility for and oversight of CDCR's overall operations.  The mission of the CDCR is to improve public safety through evidence-based crime prevention and recidivism reduction strategies.

3.    I am a licensed psychologist, and hold a B.S. in Psychology, and an M.Ed and Ph.D. in counseling, all from the Pennsylvania State University.  I am also currently a member of the National Academy of Science committee on the Causes and Consequences of the High Rates of Incarceration in the United States.

4.    I started my career with the Pennsylvania Department of Corrections in 1972 as a psychologist/corrections counselor at the State Correctional Institution at Rockview.  I thereafter moved into supervisory and managerial positions with the Pennsylvania Department of Corrections, eventually becoming Secretary.  I served as Secretary for the Pennsylvania Department of Corrections from December 30, 2000 until August 2010.  As Secretary, I was responsible for all 27 facilities in the state's correctional system, which housed more than 51,000 inmates, had approximately 16,000 employees, and a budget of more than $1.8 billion.

5.    During my tenure as Secretary of the Pennsylvania Department of Corrections, I oversaw American Correctional Association (ACA) accreditation for all facilities.  In so doing, we established an operational capacity or rated capacity for each institution and for the system as a whole.  The rated capacity reflected a baseline for how many inmates the system would house under ideal conditions.  It did not reflect the maximum number of inmates we could safely house and program.  We routinely safely

housed and provided appropriate programming for inmates at up to 150% of that rated capacity.  We did this by double-celling some inmates, by repurposing space, and through new construction.

6.    The ACA is widely recognized as the national authority on correctional standards and practices.  Furthermore, adherence to ACA standards is a good indicator that an institution is currently able to provide a constitutional level of care to inmate-patients.

7.    When I testified on behalf of the Plaintiff-class in this matter in the 2008 evidentiary hearing that resulted in the population cap currently in place, I was asked by this Court whether design capacity was comparable to operational capacity.  I replied, and continue to maintain, that design capacity is different than operational capacity. (Trial Tr. at 212:5-19.)  No further questions were asked of me regarding whether I thought design capacity should be used to establish a maximum population density, however, I did state that it is no longer "appropriate" to discuss population in terms of design capacity.  (*Id.*)

8.    I believed in 2008, as I do now, that design capacity is not an accurate method of establishing the number of inmates that a system would ideally house or the maximum number that it can safely house and program.  Such a definition of capacity is an inappropriate, ineffective, and outdated measurement.  I did not believe then, and do not believe now, that design capacity is the correct measure of operational capacity because accepting design capacity as the standard for population density does not take into consideration the ability of the system to safely and effectively double-cell inmates.

9.    Design capacity assumes single-celling inmates only and does not allow for double-celling.  It also does not account for repurposing space within an institution, the construction of new space, or the make-up of the inmate population.  For example, an institution may not have inmates with medical or mental health issues assigned to it and would transfer any inmate who develops such problems to other designated institutions. Under this circumstance, there would be no need for a specialized care facility at that

1 institution.

2       10.    Inmates with the need for specialized care could be clustered in institutions

3 that have appropriate facilities and staffing.  For instance, in January 2013, California

4 Medical Facility at Vacaville opened a new treatment building for inmates needing an

5 Enhanced Outpatient Program (EOP) level of mental health care.  This $24 million facility

6 has 44,000 square feet of space and is capable of treating up to 650 inmates needing an

7 EOP level of mental health care.  Not only can more inmates needing this level of care be

8 placed in this facility, but it allows the system to cluster such inmates at that institution

9 instead of trying to provide EOP level care at certain other institutions that perhaps have

10 only marginally adequate space.

11       11.    Inmates can be double-celled safely.  CDCR, like most other State

12 correctional systems and the Federal Bureau of Prisons, appropriately double-cells some

13 inmates.  In fact, the ACA recognizes that double-celling can be safely achieved.  Despite

14 these facts, CDCR has continued to measure its capacity based on outdated and defunct

15 standards.

16       12.    Therefore, in my current capacity as Secretary of CDCR, I instructed staff to

17 update the analysis completed by the Pulitzer/Bogard group in 2011, which was

18 commissioned and completed before I became Secretary and before the impacts of

19 public safety realignment were realized.  CDCR must review how population and capacity

20 are measured so that any overcrowding standard, such as that set by this Court, is

21 applied to an accurate base or operational capacity, and not to a defunct standard that is

22 no longer used nationally.  To that end, I have instructed the Pulitzer/Bogard group to

23 revisit its 2011 Report.

24       13.    Importantly, the established operating capacity will not reflect the maximum

25 capacity of the system to house inmates and, instead, it will establish a baseline.  This

26 practice is appropriate, consistent with Pennsylvania's system,  and is also consistent

27 with national practice.

28       14.    As I previously testified, such a practice is not only consistent with national

1  practice but is safe and will allow the system to provide appropriate care for the inmate

2  population.

3

4        I declare under penalty of perjury that the foregoing is true and correct.  Executed

5  in Sacramento, California on March 18, 2013.

6

7    __/s/ Jeffrey Beard, Ph.D. (original signature retained by attorney Samantha Wolff)_
                                Jeffrey Beard, Ph.D.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5032537.1