EXHIBIT C

# American Correctional Association

# ACCREDITATION REPORT



# Commission on Accreditation for Corrections

**California Department of Corrections and Rehabilitation**
**Central California Women's Facility**
**Chowchilla, California**

*The mission of the Commission on Accreditation for Corrections is to upgrade and improve practices and conditions in adult and juvenile correctional facilities and programs through an accreditation process which is founded on a commitment to accountability, professionalism and respect for basic human rights and which recognizes sound and effective correctional practices, while striving towards excellence in the field of corrections.*

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

August 6, 2012

California Department of Corrections and Rehabilitation
Central California Women's Facility
Chowchilla, California

Congratulations!

It is a pleasure to officially inform you that the Central California Women's Facility was accredited by the Commission on Accreditation for Corrections at the American Correctional Association 2012 Congress of Correction on July 23, 2012 in Denver, Colorado.

Your accreditation represents the satisfactory completion of a rigorous self-evaluation, followed by an outside review by a team of independent auditors.

Every profession strives to provide a high quality of service to society.  To know that you, your staff, and other officials are complying with the requirements of the accreditation process is indeed a statement of a high level of commitment to the staff and persons under your care.-

On behalf of the Commission on Accreditation for Corrections, thank you for your commitment to the corrections profession.

Sincerely,

*Lannette Linthicum*

Lannette Linthicum, Chairperson
Commission on Accreditation for Corrections

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

---

For Immediate Release

# Central California Women's Facility Awarded National Accreditation

Lannette Linthicum, Chairperson of the Commission on Accreditation for Corrections (CAC), and Kathy Black-Dennis, Director of Standards and Accreditation, American Correctional Association recently announced the accreditation of the Central California Women's Facility. The award was presented in conjunction with the American Correctional Association 2012 Congress of Correction on July 23, 2012 in Denver, Colorado.

In presenting the award, Lannette Linthicum, Chairperson of the CAC, and Daron Hall, President of the American Correctional Association (ACA), complimented the facility on their professional level of operation and their success in completing the accreditation process. The agency is one of over 1,500 correctional organizations currently involved in accreditation across the nation.

The accreditation program is a professional peer review process based on national standards that have evolved since the founding of the Association in 1870. The standards were developed by national leaders from the field of corrections, law, architecture, health care, and other groups who are interested in sound correctional management.

ACA standards address services, programs, health care and security operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for agencies and facilities throughout the world.

The three-year accreditation award granted to the Central California Women's Facility does not signal the end of their involvement in the accreditation process. During the award period, staff will work to improve any deficiencies identified during the audit and maintain continuous compliance with the standards.

s

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

**www.aca.org/**



**FOUNDED 1870**

EXECUTIVE
COMMITTEE

Daron Hall, TN
President-Elect

Patricia L. Caruso, MI
Vice President

Mary L. Livers, LA
Treasurer

Harold W. Clark, VA
Immediate Past President

Artis R. Hobbs, AR
Board of Governors
Representative

David L. Thomas, FL
Board of Governors
Representative

James A. Gondles, Jr., VA
Executive Director

Congratulations on your accreditation award!  You are now a member of the elite in achieving correctional excellence.  The certificate you have received is but a small symbol of the enormous dedication and commitment demonstrated by each and every member of your staff to the accreditation process, and I urge you to display it prominently as a continual reminder of the level of professionalism achieved.  This is just the beginning of your journey, however, for the true test of excellence is the test of time.  It is critical that your operation be able to sustain this achievement over time and be constant through both prosperity and adversity.

The logo of the Commission on Accreditation for Corrections depicts a sextant.  Those who chose this symbol did so because "the sextant is an instrument used by a navigator to pinpoint the location of his ship in relation to the established points of reference in the universe, with the purpose of charting his future course."  This is the exact purpose of accreditation; objectively reviewing an agency or facility and giving it a goal for which to strive, a destination to reach.  Accreditation is the sextant for our profession; let it be your guide as well.

Thank you for your commitment to the American Correctional Association and the standards and accreditation process.

Kathy Black-Dennis, Director
Standards and Accreditation
American Correctional Association

## Overview of the American Correctional Association

The American Correctional Association is the oldest and most prestigious correctional membership organization in the United States. Founded in 1870, ACA currently represents more than 20,000 correctional practitioners in the United States and Canada. Members include all levels of staff from a wide variety of correctional disciplines and programs as well as professionals in allied fields and representatives from the general public. In addition, the Association represents the interests of 74 affiliated organizations whose goals, while similar to those of ACA, focus on specialized fields and concerns within the realm of corrections.

At its first organizational meeting held in Cincinnati, Ohio, in 1870, the Association elected then-Ohio governor and future U.S. President, Rutherford B. Hayes, as its first president. The *Declaration of Principles* developed at that first meeting became the guidelines for correctional goals in both the United States and Europe.

Since that time, ACA has continued to take a leadership role in corrections and work toward a unified voice in correctional policy. In recent years, one of the Association's major goals has been the development of national correctional policies and resolutions of significant issues in corrections. These policies are considered for ratification at the Association's two annual conferences and ratified policies are then disseminated to the field and other interested groups. ACA has also had a major role in designing and implementing professional standards for correctional practices, as well as methods for measuring compliance with those standards.

The Association conducts research and evaluation activities, provides training and technical assistance, and carries out the regular responsibilities of any professional membership organization, including a full publications program. The Association's two annual conferences, held in varying cities across the nation, attract more than 5,000 delegates and participants each year from the 50 states, U.S. territories, and several foreign countries.

Membership in ACA is open to any individual, agency, or organization interested in the improvement of corrections and the purposes and objectives of the Association. Members include the majority of state, local, provincial, and territorial correctional agencies; individual correctional institutions and local jails, pretrial programs and agencies, schools of criminal justice in colleges and universities, libraries; and various probation, parole, and correctional agencies. Most of ACA's members are employed at the federal, state, and local levels. Members also include more than 200 volunteers affiliated with these agencies as administrators or as members of advisory boards and committees.

## Organizational Purposes of the American Correctional Association

Among the most significant purposes of the Association as outlined in its Constitution, are:

> *To promote the coordination of correctional organizations, agencies, programs, and services to reduce fragmentation and duplication of effort and increase the efficiency of correctional services on a national basis.*

> *To develop and maintain liaisons and a close working relationship in America with national, regional, state, and local associations and agencies in the correctional, criminal justice, civic, and related fields for mutual assistance and the interchange of ideas and information, and to extend and strengthen cooperative working relationships with similar associations and agencies on the international level.*

> *To develop and promote effective standards for the care, custody, training, and treatment of offenders in all age groups and all areas of the correctional field: detention facilities and services, institutions and other facilities for juvenile and adult offenders, probation, parole, community residential centers, and other community-based programs and services.*

> *To conduct studies, surveys, and program evaluations in the correctional field, and provide technical assistance to correctional organizations, departments, institutions, and services.*

> *To publish and distribute journals and other professional materials dealing with all types of correctional activities.*

> *To promote the professional development of correctional staff at all levels.*

In carrying out these purposes, ACA sponsors programs for policy analysis, demonstration, and research. ACA also provides testimony, consultation, publications, conferences, workshops, and other activities designed to stimulate constructive action regarding correctional problems.

### Standard and Accreditation

Perhaps ACA'S greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,500 correctional agencies in the United States.

## Organizational Structure of the American Correctional Association

**Executive Committee**

The Executive Committee is composed of the elected officers of the Association - president, vice president, treasurer, two Board of Governors' members, the immediate past president, the president-elect, and the ACA executive director.  The Executive Committee meets at least quarterly and exercises most of the powers of the Board of Governors during the intervals between meetings of the board.

**Board of Governors**

ACA's bylaws vest control of the Association with an 18-member elected Board of Governors composed of the officers of the Association and five at-large members.  To ensure the interdisciplinary nature of the Association, board members must represent the following areas:

At-Large Citizen (not employed in corrections)
Correctional Administration (Adult)
Correctional Administration (Juvenile)
Institutions (Adult)
Institutions (Juvenile)
Probation (Adult)
Probation (Juvenile)
Parole or Post-Release Supervision (Adult)
Community Programs (Adult)

Community Programs (Juvenile)
Aftercare or Post-Release Supervision (Juvenile)
Detention (Adult)
Detention (Juvenile)
At-Large (Ethnic Minority) (3)
Education
Member At-Large

**Delegate Assembly**

The Delegate Assembly is composed of delegates from the professional affiliates, geographical chapters, membership at-large, Board of Governors, past presidents of ACA, and representatives of each military service.  The Delegate Assembly can establish policy, define Association positions on broad social and professional issues, and determine major programs and legislative priorities.  They meet at least twice annually, at the Winter Conference and Congress of Correction.

**Committees**

The majority of the Association's activities take place through committees.  Each committee chair reports to the Association's Board of Governors at least twice a year.  In this way, the Association collectively benefits from the involvement and contribution of the hundreds of individuals who function on the various committees.  Ad-hoc committees are appointed by the president of the Association.

The current committees and councils are:

Committee on Affirmative Action

Committee on Constitution and Bylaws

Committee on International Relations
Committee on Congress Program Planning
Committee on Legal Issues
Committee on Correctional Awards
Committee on Membership
Committee on Military Affairs
Council of Professional Affiliates
Council of Dual-Membership Chapters and
State and Geographical Affiliates
Nominating Committee

Council on Professional Education
Credentials Committee
Research Council
Eligibility Committee
Resolutions & Policy Development
Comm
Committee on Ethics
Standards Committee
Legislative Affairs Committee

## Affiliates and Chapters

Affiliates and state chapters are major features of the Association's structure. They represent professional, regional, and state groups across the United States and Canada. Affiliates and chapters contribute to the professional development of all members by providing consultation in their respective areas of interest and by participating in seminars and workshops at ACA's annual conferences.

The following affiliates and chapters are currently associated with ACA:

Alabama Council on Crime and Delinquency
Alston Wilkes Society
American Assn for Correctional Psychology
American Correctional Chaplains Association
American Correctional Food Service
Association
American Correctional Health Services Assn
American Institute of Architects
American Jail Association
American Probation and Parole Association
Arizona Probation, Parole, and Corrs Assn
Association for Corrl Research and Info Mgmt
Assn of Paroling Authorities, International
Assn of State Correctional Administrators
Assn of Women Executives in Corrections
International Assn of Correctional Officers
Iowa Corrections Association
Juvenile Justice Trainers Association
Kansas Correctional Association
Kentucky Council on Crime and Delinquency
Louisiana Correctional Association
Maryland Criminal Justice Association
Michigan Corrections Association
Middle Atlantic States Correctional
Association
Minnesota Corrections Association
Missouri Corrections Association

National Association of Adult and Juvenile
State
Corrections Mental Health Directors
National Assn of Blacks in Criminal Justice
National Association of Juvenile Corrl
Agencies
Oregon Criminal Justice Association
Parole and Probation Compact
Administrators Association
Pennsylvania Assn of Probation, Parole, and
Corrections
Prison Fellowship
South Carolina Correctional Association
Tennessee Corrections Association
Association on Programs for Female
Offenders
Central States Correctional Association
Colorado Correctional Association
Connecticut Criminal Justice Association
Correctional Association of Massachusetts
Correctional Accreditation Managers Assn
Correctional Education Association
Correctional Industries Association
Family and Corrections Network
Florida Council on Crime and Delinquency
Illinois Correctional Association
Indiana Correctional Association

International Assn of Corrl Training Personnel
International Community Corrections Assn
National Association of Probation Executives
National Coalition for Mental and Substance
Abuse Health Care in the Justice System
National Correctional Recreation Association
National Council on Crime and Delinquency
Nation Juvenile Detention Association
Nebraska Correctional Association
Nevada Correctional Association
New Jersey Chapter Association
New Mexico Correctional Association
New York Corrections and Youth Svcs Assn

North American Association of Wardens &
Superintendents
North Carolina Correctional Association
Ohio Correctional and Court Svcs
Association
Texas Corrections Association
The Salvation Army
Utah Correctional Association
Virginia Correctional Association
Volunteers of America
Washington Correctional Association
Wisconsin Correctional Association

## Major Activities of the American Correctional Association

**Legislation**

The American Correctional Association is involved with all major issues affecting corrections today. Members and ACA staff maintain close working relationships with committees of the U.S. Congress and all federal agencies and groups whose decisions affect correctional policy. Expert testimony on a wide range of correctional issues is prepared for congressional committee and subcommittee hearings, and recommendations are provided to federal administrative agencies.

To ensure that the concerns and issues of the corrections profession are represented in proposed legislation and public policy, ACA's legislative liaison is addressing legislative and government concerns that will impact the corrections profession. ACA has established partnerships between chapters and affiliates and other national policy making organizations to present a strong collective voice for correctional reform throughout the world.

**Professional Development**

The purpose of the Association's Professional Development Department is to plan, promote, and coordinate professional development through training seminars, workshops, and published materials including curriculums, resource guides, and monographs.

ACA's training plan calls for a variety of professional development activities. Nationally advertised workshops cover topics such as training for trainers, management training, community-based employment programs, and stress management. On-site workshops for state and local departments of corrections are offered in curriculum development, supervision, communications, and report-writing skills.

The *Training for Correctional Staff Trainers* workshops further the skills of correctional professionals qualified to initiate and deliver training. These workshops also enable agencies to comply with national standards for accreditation and ensure that training is job-related and professionally developed and presented.

The department also offers correspondence courses to further professional development. More than 6,000 correctional personnel have completed or are in the process of completing ACA's self-instruction training program for correctional officers. This program, developed under the auspices of the National Institute of Corrections, provides 40 hours of basic training in accordance with ACA standards. A score of at least 80 percent on the comprehensive examination must be attained to achieve certification.

The Association has similar courses available for correctional supervisors, juvenile caseworkers, and food service employees. Additional courses which cover report writing skills, correctional management skills, legal issues for probation and parole officers, and legal issues for correctional officers are also available.

**Publications**

As one of the leading publishers of practical correctional publications, ACA produces books, videos, and lesson plans.  Among the wide ranging subjects available are management, community, security, counseling, law, history, and health.  These excellent resources for career advancement appeal to practitioners and scholars alike.  Directories for every major sector of corrections are also published by ACA.

The following is just a few of the many publications that ACA offers:

> *Corrections Today* is the major corrections magazine in the United States.  Published seven times a year, it focuses on the interests of the professional correctional employee and administrator.   Articles include reports of original research, experiences from the field, discussion of public policy, and the perspectives of prominent practitioners and academicians.

> *On the Line* is published five times a year and contains national and local news of interest to the criminal justice professional.

> *Corrections Compendium Newsletter* publishes cutting-edge information about the corrections environment.  Survey information is compiled from 52 U.S. and 14 Canadian correctional systems.

> *The Juvenile and Adult Directory* has been published since 1939.  A revised edition of the directory is released each January.  This publication is the only up-to-date, comprehensive directory of all U.S. and Canadian juvenile and adult correctional departments, institutions, agencies, and paroling authorities.

> *The National Jail and Adult Detention Directory* was first published in 1978.  It is a source of information concerning jails.  The directory, published every two years, attempts to list all jails in the United States that house offenders or detainees for more than 48 hours.

> *The Probation and Parole Directory*, updated every two years, provides over 500 pages of information regarding federal, state, and county adult and juvenile probation, parole and aftercare systems in the United States.  It includes statistics on caseloads, expenditures, and personnel.

> *The State of Corrections*, formerly *The Proceedings*, includes the events of both the Congress of Correction and the Winter Conference.  Published since 1870, it includes selected speeches and panel presentations concerning the latest thoughts and practices in the criminal justice field.

> *Correctional standards* are the most significant improvement in correctional programming.  As the basis for accreditation, they give administrators a nationally recognized system for upgrading and improving their correctional services.  The Association currently publishes over 20 manuals for every correctional discipline.

To aid in the development of policy with relation to accreditation, *Guidelines for the Development of Policies and Procedures* are available for adult correctional institutions, adult parole authorities/adult probation and parole field services, adult local detention facilities, adult community residential services, juvenile detention facilities, and juvenile training schools.

**Conventions**

ACA hosts two national conventions each year that attract more than 5,000 professionals from all aspects of corrections; the Winter Conference held in January, and the Congress of Correction, held in August.  These events include a variety of workshops, exhibits, and seminars devoted to addressing topics specific to the corrections profession.

**Contracts and Grants**

The American Correctional Association has a history of successful grant and contract management and administration.  ACA has completed contracts and grants of more than $30 million.  These diverse initiatives, which are funded through federal and private sources, add to the technical expertise and knowledge of the organization as well as to the total field of corrections.

**Standards and Accreditation**

Perhaps ACA's greatest influence has been the development of national standards and the accreditation process.  ACA standards address services, programs, and operations essential to effective correctional management.  Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders.  Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,200 correctional agencies in the United States.

## Overview of the Commission on Accreditation for Corrections

The Commission on Accreditation for Corrections (CAC) is a private, nonprofit organization established in 1974 with the dual purpose of developing comprehensive, national standards for corrections and implementing a voluntary program of accreditation to measure compliance with those standards.

The Commission was originally developed as part of the American Correctional Association. In 1979, by joint agreement, the Commission separated from the Association in order to independently administer the accreditation program.   Between 1978 and 1986, the organizations shared the responsibility for developing and approving standards and electing members of the Commission.  On November 7, 1986, the Commission on Accreditation for Corrections officially realigned itself with the American Correctional Association.

The Commission meets at least twice each year.   The responsibility of rendering accreditation decisions rests solely with this board.   The members of the Commission represent the full range of adult and juvenile corrections and the criminal justice system. They are elected from the following categories:

> National Association of Juvenile Correctional Agencies (1 representative)
> Council of Juvenile Correctional Administrators (1 representative)
> Association of State Correctional Administrators (2 representatives)
> National Sheriffs' Association (2 representatives)
> American Jail Association (1 representative)
> North American Association of Wardens and Superintendents (1 representative)
> International Community Corrections Association (1 representative)
> American Probation and Parole Association (1 representative)
> Association of Paroling Authorities International (1 representative)
> National Juvenile Detention Association (1 representative)
> American Bar Association (1 representative)
> American Institute of Architects (1 representative)
> National Association of Counties (1 representative)
> Correctional Health (Physician) (1 representative)
> Juvenile Probation/Aftercare (1 representative)
> Adult Probation/Parole (1 representative)
> At-Large (17 representatives)
> Citizen At-Large (Not in Corrections) (1 representative)

**Association Staff**

Accreditation activities are supported by the staff of the American Correctional Association, Standards and Accreditation Department, under the leadership of the director of the department.  Standards and Accreditation Department staff is responsible for the daily operation of the accreditation program.  Agencies in the process have contact primarily with the accreditation specialist responsible for their state or agency.

**Auditors**

Over 600 corrections professionals in the United States have been selected, trained, and employed on a contract basis by the Association. These individuals perform the field work for the Association which includes providing assistance to agencies working toward accreditation, conducting on-site audits of agencies to assess compliance with standards and confirming that requirements are met, and monitoring to ensure maintenance of the conditions required for accreditation. Teams of auditors, referred to visiting committees or audit teams, are formed to conduct standards compliance audits of agencies seeking accreditation and reaccreditation.

Auditors are recruited nationally through announcements in prominent criminal justice publications and at major correctional meetings. Affirmative action and equal employment opportunity requirements and guidelines are followed in the recruitment of auditors. All auditors employed by the Association have a minimum of three years of responsible management experience, have received a recommendation from an agency administrator, and have demonstrated knowledge in the substantive area(s) in which they are employed to assist the Association. In addition, all auditors must successfully complete the Association's auditor training and be members of the ACA in good standing.

**Standards Development**

Development of the ACA standards began in 1974 with an extensive program of drafting, field testing, revising, and approving standards for application to all areas of corrections. Since then, over 1,200 correctional facilities and programs have adopted the standards for implementation through accreditation, and many others have applied the standards informally themselves.

In the development of standards, the goal was to prescribe the best possible practices that could be achieved in the United States today, while being both realistic and practical. Steps were taken to ensure that the standards would be representative of past standards development efforts, reflect the best judgment of corrections professionals regarding good corrections practice, recognize current case law, and be clear, relevant, and comprehensive. The standards development and approval process has involved participation by a wide range of concerned individuals and organizations. Twenty-three manuals of standards are now used in the accreditation process:

> *Standards for the Administration of Correctional Agencies*
> *Standards for Adult Parole Authorities*
> *Standards for Adult Probation and Parole Field Services*
> *Standards for Adult Correctional Institutions*
> *Standards for Adult Local Detention Facilities*
> *Standards for Small Jail Facilities*
> *Standards for Electronic Monitoring Programs*
> *Standards for Adult Community Residential Services*
> *Standards for Adult Correctional Boot Camps*
> *Standards for Correctional Industries*
> *Standards for Core Jails*

*Standards for Correctional Training Academies*
*Standards for Juvenile Community Residential Facilities*
*Standards for Correctional Facilities*
*Standards for Juvenile Detention Facilities*
*Standards for Juvenile Day Treatment Programs*
*Standards for Juvenile Correctional Boot Camps*
*Standards for Therapeutic Communities*
*Standards for Small Juvenile Detention Facilities*
*Standards for Performance-Based Health Care in Adult Correctional Institutions*
*Certification Standards for Health Care Programs*
*Standards for Adult Correctional Institutions (in Spanish)*

The standards establish clear goals and objectives critical to the provision of constitutional and humane correctional programs and services. The standards include the requirement for practices to promote sound administration and fiscal controls, an adequate physical plant, adherence to legal criteria and provision of basic services. Basic services called for by the standards include the establishment of a functional physical plant, training of staff, adoption of sanitation and safety minimums, and provision of a safe and secure living environment. In offering specific guidelines for facility and program operations, the manuals of standards address due process and discipline, including access to the courts, mail and visitation, searches, and conditions of confinement of special management offenders.

The standards are systematically revised to keep pace with the evolution of different correctional practices, case law, and after careful examination of experiences, applying them over a period of time and circumstances. The ACA Standards Committee, which includes membership from the Commission on Accreditation for Corrections, is responsible for standards development and revision.

The ACA publishes biannual supplement to the standards with updated information and clarifications until new editions of standards manuals are published. Each supplement addresses standards interpretations, deletions, revisions, and additions for all manuals of standards issued by the Standards and Accreditation Department.

Suggestions and proposals for revisions to the standards from the field and interested others are encouraged. The Standards and Accreditation Department has developed a standards proposal form specifically for this purpose. The standards proposal form can be obtained from the Standards Supplement, the ACA website, or Standards and Accreditation Department staff (Appendix A). Proposals should be submitted via the ACA website.

# Accreditation Process Descriptions

For over 120 years, the American Correctional Association has been the only national body involved in the development of standards for the correctional field. ACA standards are supported by ACA's Standards and Accreditation Department and the Commission on Accreditation for Corrections, which is the evaluating and certifying body for accreditation. The department is responsible for the administration of accreditation and ongoing development of correctional standards.

The accreditation process is a voluntary program for all types of correctional agencies. For these agencies, accreditation offers the opportunity to evaluate their operations against national standards, to remedy deficiencies, and to upgrade the quality of programs and services. The recognized benefits of such a process include: improved management; a defense against lawsuits through documentation; demonstration of a "good faith" effort to improve conditions of confinement; increased accountability and enhanced public credibility for administrative and line staff; a safer and more humane environment for personnel and offenders; and the establishment of measurable criteria for upgrading programs, staffing, and physical plant on a continuous basis.

A major component of the accreditation process is the standards compliance audit conducted by a visiting committee. The purpose of the audit is to measure operations against the standards, based on documentation provided by the agency.

## The Visiting Committee Report

The results of the standards compliance audit are contained in the visiting committee report, a document prepared by the visiting committee chairperson. The report is distributed to the agency administrator and members of the visiting committee. This report is also submitted to the Commission on Accreditation for Corrections for consideration at the accreditation hearing.

The following information is usually contained in the visiting committee report:

*Agency and Audit Narrative*

The agency narrative includes a description of program services, a description of physical plant, number of offenders served on the days of the audit, a summary significant incidents and consent decrees, class action lawsuits and/or judgments against the agency/facility, if applicable. The audit narrative, prepared by the visiting committee chairperson, describes audit activities and findings. The narrative examines issues or concerns that may affect the quality of life and services in an agency or facility. Quality of life issues include areas such as staff training, adequacy of medical service, sanitation, use of segregation and detention, reported and/or documented incidences of violence and crowding in institutions, offender activity levels, programming and provision of basic services. The audit narrative also contains comments as a result of staff and offender interviews, and a detailed explanation of all noncompliant and not applicable standards.

*Agency Response*

The agency has three options for standards found in noncompliance: a plan of action; an appeal; or a waiver request.

A **plan of action** is a detailed statement of tasks to be performed in order to achieve compliance with a standard found in noncompliance at the time of the audit. The plan of action designates staff responsibilities and timetables for completion.

An **appeal** is the agency's attempt to change the visiting committee's decision on a standard. The result of a successful appeal is a change in the status of the standard and a recalculation of the compliance tally.

A **waiver** may be requested when noncompliance with a standard does not adversely affect the life, health, or safety of staff and offenders and when quality of life conditions compensate for the lack of implementation of a plan of action. The granting of a waiver by the Commission waives the requirement for submitting a plan of action; however, it does not change the noncompliant finding.

A **discretionary compliance request** is when there are circumstances in which agencies choose not to comply with a particular standard for a variety of reasons.  These reasons include:

- An unwillingness to request funds from a parent agency or funding source.

- A preference to satisfy the standard/expected practice's intent in an alternative fashion.

- An objection from a parent agency, higher level government official or funding source to the nature of the standard/expected practice.

- A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice.

- An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

*Auditor's Response*

This section contains the visiting committee's final reply to all responses received from the agency and includes comments regarding the acceptability of plans of action, appeals, and waivers.

# Accreditation Hearings

The Commission on Accreditation for Corrections is solely responsible for rendering accreditation decisions and considers an agency's application at its next regular meeting following completion of the visiting committee report.  The Commission is divided into panels that are empowered to reach and render accreditation decisions.  These panels hear the individual application for accreditation and include a quorum of at least three Commissioners which includes the panel hearing chairperson.  Agencies are notified in writing of the date, time, and location of the hearings by Standards and Accreditation Department Staff.

The panel hearing is the last step in the process.  With the panel chairperson presiding, panel members discuss issues and raise questions relative to all aspects of agency operations and participation in the process.  The information presented during the hearing and in the visiting committee report is considered by the panel members in rendering accreditation decisions.

The agency is invited to have a representative at the hearing and, in most cases, one or more individuals attend.  When special conditions warrant, the visiting committee chairperson or a member of the visiting committee also may be asked to attend the hearings.  When this occurs, the auditor provides information to help clarify controversial issues and responds to questions and concerns posed by panel members.

Attendance by any other parties (i.e. media representatives, public officials, or personnel from agencies other than the applicant) occurs only with the permission of the applicant agency.  In these cases, the applicant agency representatives and panel members discuss procedures to be followed before commencement of the hearing.

## Conduct of Hearings

The panel schedule provides ample time for review of each individual agency pursuing accreditation.  Hearings are conducted by the panel chairperson in accordance with established procedures.  Panel proceedings require that a formal vote be taken on all final actions, i.e., agency appeals, waiver requests, and the final accreditation decision of the Commission.  All panel proceedings are tape-recorded to assist in preparing minutes of the hearings.  Panel activities generally occur as follows:

- Applicant agency representatives are requested by Standards and Accreditation Department staff to be on-call to allow for scheduling flexibility.

- A designated waiting area is usually provided for this purpose.

- When the panel is ready to review the agency, the Standards and Accreditation Department staff representative notifies agency representative(s).

- The hearing opens with an introduction by the panel chairperson.
- The agency representative is asked to give a brief description of the

program.

- ▪ If a visiting committee member is present at the hearing, the panel chairperson may request that the auditor present an account of the visit, focusing on matters particularly pertinent to the decision or specific panel actions. In some cases, however, the panel may wish to call on the visiting committee member only to request additional information at different points during the hearing.

- ▪ The panel chairperson leads a standard by standard review of non-compliance issues. The agency representative presents information relative to their request for waivers, plans of action, appeals, and discretionary compliance requests. The agency may also present additional materials, including photographs or documentation, for review by the panel.

- ▪ Following the agency presentation, the chairperson has the option of calling the panel into executive session to consider the information provided, determine findings, and make an accreditation decision. Whether or not panel deliberations occur in the presence of agency personnel or in executive session varies from panel to panel, considering the preference of panel members and the sensitivity of issues to be discussed regarding the application.

In final deliberations, the Commission panel:

- ▪ Ensures compliance with all mandatory standards and at least 90 percent of all other standards.

- ▪ Responds with a formal vote to all appeals submitted by the applicant agency.

- ▪ Responds with a formal vote to all request for waivers, discretionary compliance, and plans of action submitted by the applicant agency.

At this time, the panel also:

- ▪ Assures that an acceptable plan of action will be submitted for every non-compliant standard, including those standards for which appeals of non-compliance and waiver requests have been denied by the panel. In judging the acceptability of plans of action, the panel ensures that all of the information requested on the form is provided. Furthermore, the feasibility of plans to achieve compliance is considered, including specific tasks, time frames, and resource availability (staff and funding) for implementing proposed remedies.

- ▪ Addresses to its satisfaction any concerns it has with visiting committee comments about the quality of life in the facility or program, patterns of non-compliance, or any other conditions reviewed by the panel relating to

the life, health, and safety of residents and staff.

For each application, a roll call vote to award accreditation, extend an agency in Candidate or Correspondent Status, or deny accreditation is conducted. The options for final action available to the panel are outlined in the next chapter.

If the panel has deliberated in executive session, agency representatives are invited back into the meeting and informed of the panel's final decision and actions or recommendations on all other issues raised by the applicant. If accreditation has not been granted, the chairperson discusses with agency personnel specific reasons for the decision and the conditions of extension in Candidate or Correspondent Status and procedures for appeal.

**Accreditation Decisions**

Three decisions relative to the accreditation of an agency are available to panels:

- *Three-year accreditation award* based on sufficient compliance with standards, acceptance of adequate plans of action for all non-compliant standards and satisfaction of any other life, health, and safety conditions established by the panel. The balance of the contract must be paid in full in order to receive a certificate of accreditation.

- *Extension of the applicant agency in Candidate Status* (initial accreditation only) for reasons of insufficient standards compliance, inadequate plans of action, or failure to meet other requirements as determined by the panel. The Commission may stipulate additional requirements for accreditation if, in its opinion, conditions exist in the facility or program that adversely affect the life, health, or safety of the offenders or staff. Extension of an applicant in Candidate Status is for period of time specified by the panel and for identified deficiencies if in the panel's judgment, the agency is actively pursuing compliance.

- *Probationary Status* is determined when the panel specifies that compliance levels are marginal, there is a significant decrease in compliance from the previous audit (in the case of reaccreditation), or there are quality of life issues that would indicate continued monitoring. While an award of accreditation is granted, a monitoring visit must be completed and the report presented at the next meeting of the Commission. The cost for a monitoring visit is borne by the agency at a rate of cost plus 25%. The agency does not have to appear before the Commission for the review of the monitoring visit report. If they choose to do so, all related travel expenses are borne by the agency. Specific expectations for removal from probation are outlined.

- *Denial of accreditation* removes the agency from Accredited Status (in the case of reaccreditation) and withdraws the agency from the accreditation program. Situations such as insufficient standards compliance, inadequate plans of action, failure to meet other requirements as determined by the panel or quality of life issues may lead to the denial of accreditation, it is

withdrawn from the process and is not eligible to re-apply (as an applicant) for accreditation status for a minimum of six months from the date of that panel hearing. The Commission will explain the process for appeal.

The agency receives written notification of all decisions relative to accreditation after the hearing.

**Appeal Process**

The accreditation process includes an appeal procedure to ensure the equity, fairness, and reliability of its decisions, particularly those that constitute either denial or withdrawal of Accredited Status. Therefore, an agency may submit an appeal of any denial or withdrawal of accreditation.

The basis for reconsideration is based on grounds that the decision(s) were:

- Arbitrary, capricious, or otherwise in substantial disregard of the criteria and/or procedures promulgated by the Commission.

- Based on incorrect facts or an incorrect interpretation of facts.

- Unsupported by substantial evidence.

- Based on information that is no longer accurate.

The reasonableness of the standards, criteria, and/or procedures for the process may not serve as the basis for reconsideration. The procedures for reconsideration are as follows:

- The agency submits written request for reconsideration to the Director of Standards within 30 days of the adverse decision stating the basis for the request.

- The Executive Committee of the Commission, composed of the officers of the Commission, reviews the request and decides whether or not the agency's request presents sufficient evidence to warrant a reconsideration hearing before the Commission. The agency is notified in writing of the Executive Committee's decision.

- If the decision is made to conduct a hearing, the hearing is scheduled for the next full Commission meeting and the agency is notified of the date.

- The agency, at its option and expense, has the right of representation, including counsel.

- Following the hearing held before the Commission, the decision, reflecting a majority opinion, is made known to the agency immediately.

- Pending completion of the reconsideration process, the agency maintains its

prior status.  Until a final decision has been reached, all public statements concerning the agency's accredited status are withheld.

- Following completion of the reconsideration process, any change in the status of an agency is reflected in the next regularly published list of accredited agencies.

## Accredited Status

The accreditation period is three years, during which time the agency must maintain the level of standards compliance achieved during the audit and work towards compliance of those standards found in non-compliance. Regular contact with Standards and Accreditation Department staff should also be maintained.

**Annual Report**

During the three year accreditation period, the agency submits an annual report to the Standards and Accreditation Department. This statement is due on the anniversary of the accreditation (panel hearing) date and contains the following information:

*Current standards compliance levels* – This includes any changes in standards compliance since accreditation, listing on a standard-by-standard basis any standard with which the agency has fallen out of compliance or achieved compliance.

*Update of plans of action* – A progress report is included with respect to plans of action submitted to the hearing panel, indicating completion of plans resulting in compliance with standards and revised plans reflecting the need for additional time, funds, and/or resources to achieve compliance.

*Significant Events-* A report is made of events and occurrences at the agency during the preceding year that impact on standards compliance, agency operation, or the quality of services provided by the agency. This might include:

- A change in the agency administration and/or major staffing changes mission change or program revisions.

- Mission change or program revisions.

- Changes in the offender population, including number of offenders or general offender profile.

- Physical plant renovations, additions, or closing.

- Any major disturbances, such as extended periods or lock-down, employee work stoppages, etc.

- Any significant incident to include allegations of physical/sexual abuse.

- A death from other than natural causes.

Standards and Accreditation Department staff review the annual report received from the agency and respond to clarity issues or request additional information if necessary.

In addition to submission of the annual report, the agency is responsible for notifying Standards and Accreditation Department staff of any major incident, event, or circumstances

that might affect standards compliance. This notice must be provided to the Standards and Accreditation Department immediately following the event. For example, an agency must notify the Standards and Accreditation Department if it is the subject of a court order, has a major disturbance, escape, physical/sexual abuse (to include allegations), employee work stoppage, death from unnatural causes, or experiences a major fire or other disaster. It it the responsibility of the accredited agency to inform Standards and Accreditation Department staff or provide them with copies of news articles, special reports, or results of investigations that address conditions that affect standards compliance.

Finally, the Standards and Accreditation Department may request that the agency respond to public criticism, notoriety, or patterns of complaint about agency activity that suggests failure to maintain standards compliance. The Standards and Accreditation Department may conduct an on-site monitoring visit to the agency to verify continued compliance.

**Monitoring Visits**

Monitoring visits to agencies in Accredited Status are conducted by an ACA auditor(s) in order to assess continuing compliance with the standards. A monitoring visit may be conducted at anytime during the accreditation period, with advance notice to the agency. The determination of need for a monitoring visit is based on:

- Compliance levels, findings, and recommendations by the Commission on Accreditation for Corrections during the hearing.

- Incidents or events reported by the agency in its annual report.

- Problems indicated by adverse media reports or correspondence received by Standards and Accreditation Department staff, disturbances at the agency, or special investigations.

The length of the visit varies depending on the number of standards or special issues that must be addressed during the visit. The visits are conducted similar to standards compliance audits, but on a reduced scale. Monitoring visits are charged to the agency at a rate of cost plus twenty-five percent.

Activities, as a general rule, involve a review of all mandatory standards, all standards found in non-compliance at the time of accreditation, and any other concerns identified by the Commission. The visit also involves a tour of the agency and interviews with staff and offenders to ensure maintenance of the requirements of accreditation. It concludes with an exit interview during which the auditor informs the agency staff of the findings of the visit.

Following the visit, the auditor prepares a monitoring visit report that addresses findings of the visit. The report includes a list of standards reviewed, explanation of non-compliance findings, results of the tour and interviews with agency staff and offenders, and discussion of any issues believed to be relevant to the agency's accreditation. The report, as with others prepared by auditors, is reviewed and sent to the agency by Standards and Accreditation staff.

When a monitoring visit to the agency reveals deficiencies in maintaining compliance levels that existed at the time of accreditation, or less than 100 percent compliance with mandatory standards, the agency prepares a response providing explanation of the problems indicated in the report. When the agency has failed to maintain compliance with all mandatory standards, the monitoring visit report and the agency response are submitted to the Commission on Accreditation for Corrections for review during a regular hearing. Agency representatives are advised of the date, time, and location of the review, and are invited to attend. At the discretion of the Commission, the agency may be placed in probationary status and a revisit conducted to determine if deficiencies have been corrected.

**Revocation of Accreditation**

If the Commission panel believes that an agency's failure to maintain continuous compliance with certain standards is detrimental to life, health, and safety of residents and staff, the Commission may place an agency on probation. Probationary status last for a specific period of time designated by the Commission at its next regularly schedule meeting. The Commission again reviews the program and considers removing the probationary status or revoking accreditation. When the agency corrects the deficiencies within the probationary status period and the corrections have been verified and accepted, the agency resumes its status as an accredited agency. An agency that does not satisfactorily correct the deficiencies may be withdrawn from accreditation.

Another condition that may result in a rehearing and consideration of revocation is following a significant event in an agency (i.e. major disturbance, death from other than natural causes or allegations of physical/sexual abuse of offenders). Failure to notify the Standards and Accreditation Department in a timely manner may result in suspension of the agency's accreditation. Once ACA is notified of the major event, the Director of Standards and Accreditation may consult with the Executive Committee of the Commission, who may request a monitoring visit. If a visit is warranted, ACA will notify the agency and a date will be established with the concurrence of the facility. The monitoring visit will take place within 14 days of this notification. The monitoring visit report will be sent to the Director of Standards within 7 days of the monitoring visit and then forwarded to the Executive Committee of the Commission. Following review of the report, a determination will be made by the Executive Committee as to whether revocation of accreditation is warranted. Prior to any rehearing, agency representatives will be notified, so that any issues may be addressed and responded to in writing.

Accreditation is revoked for the following reasons:

- Failure on the part of the agency to adhere to the provisions on the contract.

- Failure on the part of the agency to maintain continuous compliance with the standards at levels sufficient for accreditation.

- Intentional misrepresentation of facts, lack of good faith, or lack of deliberate speed or a concerted effort to progress in the accreditation process, including the implementation of plans of action.

- ▪ Failure to notify ACA of significant incidents in the annual report to the Commission.

- ▪ Adverse conditions of confinement that affect the life health, and/or safety of staff and offenders.

- ▪ Failure to comply with the conditions of probation or suspension.

Standards and Accreditation Department staff notify the agency in writing of the specific reasons identified by the Commission for the revocation hearing. Agencies may appeal the decision of the Executive Committee to the full board of the Commission on Accreditation for Corrections. Appeals must be submitted within 30 days. The agency may apply to re-enter the process 180 days after the revocation of accreditation.

**Expiration of Accredited Status**

Accreditation is granted for a three year period. Unless the agency has applied for reaccreditation and completed activities in the process required for reaccreditation, the Commission withdraws the agency from Accreditation Status after this three year period.

For agencies in Accredited Status that are seeking subsequent accreditation, administrative extensions of Accredited Status may be granted under certain conditions. For example, relocation of the facility, staff turnover, and major renovations often warrant an extension. In these cases, a written request to the Director of Standards and Accreditation is required, outlining the reasons for extending the accreditation period. Agencies that fail to successfully complete an audit within the three year period, or do not receive an extension prior to their expiration date, are withdrawn from Accredited Status.





**Visiting Committee Report and Hearing Minutes**

CONFIDENTIALITY

*The American Correctional Association and the Commission on Accreditation for Corrections do not disclose to external parties specific information contained in this Accreditation Report or information discussed in the Accreditation Hearing. The Association encourages all participating agencies to provide information to the media about their accreditation activities, including disclosure of the Self-Evaluation and Accreditation Report.*

**COMMISSION ON ACCREDITATION FOR CORRECTIONS**

**STANDARDS COMPLIANCE INITIAL AUDIT**

California Department of Corrections and Rehabilitation
Central California Women's Facility
Chowchilla, California

April 23-25, 2012

**<u>VISITING COMMITTEE MEMBERS</u>**

Barbara Skeen, Chairperson
Correctional Consultant
235 Kings Grant Road
Lugoff, South Carolina 29078
(803) 438-5383
labaskeen@bellsouth.net

Kelly Ward
Correctional Consultant
8255 Sage Hill Road/P.O. Box 1757
St. Francisville, Louisiana 70775
(225) 635-6230
kllwrd21@gmail.com

Jean Moltz
Correctional Health Care Consultant
JLM Consulting, Inc
P.O. Box 1182
Buena Vista, Colorado 81211
(719) 395-2311
jlmconsult@bresnan.net

## A.    Introduction

The audit of the Central California Women's Facility (CCWF), Chowchilla, California, was conducted on April 23-25, 2012 by the following team:  Barbara Skeen, Chairperson; Kelly Ward, Member; and Jean Moltz, Member.

## B.    Facility Demographics

| | |
|---|---|
| Rated Capacity: | 2,002 |
| Actual Population: | 2,805 |
| Average Daily Population for the last 12 months: | 3,452 |
| Average Length of Stay: | 23 months |
| Security/Custody Level: | Minimum to Maximum |
| Age Range of Offenders: | 18 – 72 years |
| Gender: | Female |
| Full-Time Staff: | 1,007 |

Administrative Support: 101, Program: 12, Security: 437, Other: 457

## C.    Facility Description

The mission of CCWF is:  "Central California Women's Facility plays an important role in CDCR by:  Processing and incarcerating California's female offenders in a secure, safe, disciplined and ethical institutional setting.  By providing staff the resources and training which ensure the highest standards of counseling and specialized programs for California's female offenders for the purpose of successful reintegration into society.  By providing specialized mental health, appropriate medical and dental services commensurate with community standards in a licensed medical environment while encouraging personal responsibility.   Providing an environment open to new and innovative concepts, programs and strategies which encourages personal and social awareness and responsibility by providing community services which encourage public awareness and participation."

CCWF is the largest multi-level correctional facility exclusively housing female offenders in the United States.  CCWF opened in October 1990.  The facility is located approximately six miles southeast of the Central Valley town of Chowchilla. The California Department of Corrections and Rehabilitation (CDCR) designed and built CCWF as a model prison to provide for the safe and secure housing of female offenders in the State of California.  There are 640 acres inside the secure perimeter.

2

The layout of CCWF is in the shape of an octagon. Down the center of the octagon are the four facilities that house and serve the inmate population.

Along the left side of the octagon are program buildings – educational/vocational buildings, the central kitchen, central visiting, central health services and in-patient infirmary, building maintenance, prison industries, and storage buildings. Along the right side of the octagon are the gym, recreation yard, main library and chapel. Some of the buildings located outside the secure perimeter are warehouses, fire station, staff dining room, vehicle maintenance garage, water treatment plant, farm buildings, firing range and classrooms, and waste water treatment plant.

The institution is made up of four facilities Alpha, Bravo, Charlie, and Delta. There are 16 housing units divided between the four facilities. There is a centralized kitchen were food is prepared and two additional kitchens where the food is reheated and served to the inmate population. Facilities A and B share one of these kitchens and each have their own dining room. The same applies to facilities C and D. There is also another kitchen that prepares special medical diets for the in-patient infirmary.

Alpha Facility is the only female Reception Center in California. This facility also houses the Enhanced Outpatient Program (EOP), Administrative Segregation Unit, and Condemned Row. The EOP is housing for offenders with serious mental health needs. They are housed in an area with mental health treatment offices inside the unit with staff that provide ongoing care. There are currently 19 women on death row.

Bravo Facility is a general population facility that houses the Development Disability Program (DDP) and well as Disability Placement Program (DPP) offenders. The DDP is a program stemming from the Clark lawsuit which ensures testing and equal access for developmentally disabled offenders.

Facility Charlie is a general population facility. An Honor Dorm is located in C Facility.

Facility Delta is also a general population facility with an Honor Dorm. This unit also serves to house offenders participating in the substance abuse program.

There are three fences that make up the perimeter of WCCF. The innermost fence is a 12 foot chain-link fence with shaker alarms. The middle fence is a lethal electric fence. The outermost fence is another chain-link fence with rows of razor wire at the top and bottom. The fences are checked on each shift. There are strategically placed cameras at the two breaches to the fence (pedestrian and vehicle sally ports) as well as manned towers at these spots. All staff and visitors must pass through metal detectors and sign in when arriving at the facility. All bags are searched and visitors must provide identification.

**D.     Pre-Audit Meeting**

The team met on April 23, 2012, in Madera, California, to discuss the information provided by the Association staff and the officials from the CCWF.

The chairperson divided standards into the following groups:

Standards #4-4001 - #4-4173 to Barbara Skeen, Chairperson
Standards #4-4174 - #4-4343 to Kelly Ward, Member
Standards #4-4344 - #4-4530 to Jean Moltz, Member

**E.     The Audit Process**

1.     Transportation

The team was escorted to the facility by Daniel Johnson, Correctional Sergeant, CCWF.

2.     Entrance Interview

The audit team proceeded to the office of Deborah K. Johnson, Acting Senior Warden.   The team expressed the appreciation of the Association for the opportunity to be involved with the CCWF in the accreditation process.

Warden Johnson escorted the team to the conference room where the formal entry meeting was held.

The following persons were in attendance:

| | |
|---|---|
| D.K. Johnson | Senior Warden (Acting) |
| Bruce Hubble | Correctional Plant Manager |
| Dave Dougherty | Community Partnership Manager |
| Marcia Contreras | Staff Services Manager |
| Anna Velasquez | Labor Relations Analyst |
| Montaigne White | Correctional Counselor III for Substance Abuse |
| Ovidio Gonzalez | Principle |
| Ryan Anderson | TV Specialist |
| Sarbyet Kaur | Medical |
| Jun Harry | MD |
| Lori Williams | Chief Mental Health |
| Judy Tucker | Chief Nurse |
| Jill Cuadros | Prison Industries Authority |
| Judy Scott | Associate Warden Health Care |
| Ed Parks | Captain |
| Laurie Muzyka | Supervising Correctional Cook |
| Corryn Pierini | Medical |
| Rogelio Davis | Medical |
| Tim Neal | Chief Executive Officer (Medical) |
| Pal Virk | Health Care Officer |
| B.J. Simon | Chief Deputy Warden |

4

| | |
|---|---|
| Travis Wright | Public Information Officer |
| Joe Rouse | Correctional Counselor III Records |
| Frank Sanders | Captain |
| Sonja Bodiford | Associate Warden Central Operations |
| Carole Torres | Captain |
| Joe Rivera | Captain |
| Richard Williams | Captain |
| Mike Allen | Lieutenant |
| Dave Salter | Lieutenant |
| Shalom Zawolkow | Lieutenant |
| Mike Villegas | Lieutenant |
| Bart Fornter | Correctional Counselor II Appeals |
| Brian Landingham | Associate Warden Housing |
| I. Nguyen | Medical |
| Joe Ordaz | Correctional Business Manager |
| Paul Anderson | Associate Warden ADA |

It was explained that the goal of the visiting team was to be as helpful and non-intrusive as possible during the conduct of the audit. The chairperson emphasized the goals of accreditation toward the efficiency and effectiveness of correctional systems throughout the United States. The audit schedule was also discussed at this time.

3.      Facility Tour

The team toured the facility from 8:30A.M. to 3:00P.M. on Monday, and the auditors toured different parts of the facilities as possible over the next two days. The following persons accompanied the team on the tour and responded to the team's questions concerning facility operations:

| | |
|---|---|
| D.K. Johnson | Senior Warden (Acting) |
| Paul Anderson | Associate Warden |
| Dan Johnson | Sergeant |
| Anton Siegl | Correctional Counselor I Scribe |
| Esther Martinez | Correctional Counselor I Scribe |
| Sharyl Valentine | Correctional Counselor I Scribe |
| Arturo Buitron | Correctional Counselor I Scribe |
| Bill Parker | Food Manager |
| Josh Smith | Hazmat Coordinator |
| David Blankenship | Fire Chief |
| Travis Wright | Public Information Officer |
| Perry Poole | Assistant Food Manager |
| Rick Grenert | Sacramento |
| Elizabeth Eck | Sacramento |
| Bob Ayers | Sacramento Departmental ACA Coordinator |

5

4.      Conditions of Confinement/Quality of Life

During the tour, the team evaluated the conditions of confinement at the facility. The following narrative description of the relevant programmatic services and functional areas summarizes the findings regarding the quality of life.

**Security**

The security program is well developed and professionally managed.  The staff is experienced and knowledgeable regarding the wide range of security issues applicable to CCWF.  Basis security procedures are consistently followed in all of the areas visited. Entry screening and documentation for staff and visitors are appropriately stringent. Security equipment is appropriate to the mission of the facility; inventories and inspection records are well documented. The Armory is well stocked and well documented.   Checkout procedures for weapons were observed and were seen to be clear and complete.  Weapons and chemical agent training is well documented; each officer carries a "gold card" documenting their training. The armory and other check-out points have a "do not issue" list. Officers were clear and consistent in their explanation of use of force protocols and other emergency procedures. The Segregation Unit is well run; review processes are consistent with standards. During the follow-up rounds, staff members were very aware of their responsibilities and interacted with the inmates in a professional manner. There were two Standards applicable to the Segregation units that were not found to be compliant (exercise and rounds). There is a weapon post adjoining the Segregation Unit. The use of force protocol was discussed with the staff member assigned to the armed post; the officer was very clear regarding his responsibilities.

There are two manned tower posts and a 24 hour roving security patrol to enhance the perimeter security system. Key control and tool control was consistent throughout. Chemical control was seen to be excellent in most areas however; there were some areas where inventory control was not managed well. The audit team worked with staff to set up an appropriate inventory system in those areas and upon re-inspection found that those areas had revised procedures and set up a workable system.

**Environmental Conditions**

At all facilities within the complex, temperatures were comfortable in the living and program areas. Light and noise levels are acceptable and airflow is well within comfort ranges. The grounds were beautifully maintained with many flowers, rose bushes, and shrubbery that added to the appearance of the facility.

The housing units were clean and dayrooms were pleasant. There were couches and other seating for inmates to watch television. The atmosphere was relaxed and inmates smiled and spoke freely with auditors. The housing units were clean and without clutter. The inmates were clean and appeared well-fed. A number of inmates were observed in wheelchairs.

One inmate in a wheelchair, who had recently fallen and broken a bone in her foot, reported that she had been taken to medical at the time of the injury, got an x-ray the next day and was put on pain medication. She was being referred to an orthopedist. An inmate on death row was interviewed at length and she reported receiving all services as required by ACA standards.

Facility documentation indicates that there are 200 cells of double-cell status. These cells have 20.1 square feet of unencumbered space per inmate. Of the 13 housing units that are multiple-bed housing (up to eight per room), documentation indicates that each inmate would have 20.1 square feet of unencumbered space. One unit of multiple-bed housing has four offenders instead of eight; therefore the square footage per occupant is 28 square feet. The single-occupancy cells in the EOP (mental health) unit have 33 square feet of unencumbered space instead of the 35 square feet required by ACA standards. Segregation cells have a total of 60 to 67 square feet of total space while the standard calls for a minimum of 80 square feet total.

While the facility is over design capacity and lacks adequate square footage in the cells as previously noted, when the rated capacity formula (SCBC FORMULA FOR ADULT CORRECTIONAL INSTITUTIONS, Standard 4-4129) is applied, the facility falls within overall rated capacity guidelines.

The Special Housing Units were very clean and quiet. Cells were maintained in a clean and orderly fashion. Inmates interviewed indicated that they receive all services required by ACA standards. Mental Health Services communicated well with security staff regarding any inmates that might be at risk for self-harming behavior. Cell check logs documented hourly checks on some inmates in segregation instead of the minimum checks at 30 minutes as required by ACA standards. California policy states that inmates have to have recreation 10 hours/week but does not specify five days/week. Inmates may have three hours one day and two hours the next to complete their recreation for the week.

**Sanitation**

Throughout the tour, the facility was found to be clean. All offender rooms were neat and clean without excessive property. All showers and toilets were clean. It was obvious that the facility housekeeping plan was being followed. The grounds were free of litter and debris. Inmates provided the housekeeping services under the supervision of facility staff.

**Fire Safety**

The facility has a well organized fire safety program. All of the fire safety systems, including alarms, sprinklers and detection systems were functional at the time of the audit.
Documentation indicates that there is a robust inspection system that includes documented correction of deficiencies in a timely manner. Staff members were consistently clear regarding evacuation practices and other emergency responses.

CCWF has its own fire station located outside the secure perimeter. The on-site fire station is staffed with trained fire-fighters that include staff and trained inmate firefights. Units respond to two correctional facilities (CCWF and another facility in the same area) as well as to emergencies in the surrounding community. Last year the prison firefighters responded to 1200 calls from the community. The Fire Chief is well experience and has had a wide range of documented training; he has developed an excellent training program for staff and the inmate firefighters that can lead to realistic employment opportunities for the inmates upon release from prison.

**Food Service**

CCWF has a central kitchen where food is cooked and then quick chilled before transport to the two satellite kitchens where the food is reheated and served to the population. There is also a kitchen providing special medical diets in the Skilled Nursing Facility. Food Service has a total of 22 staff and employs 359 offenders. Food service provides a "heart healthy diet" with low fat and low sodium requirements. There are special diets as ordered: 50 religious, 13 kosher, 25 vegetarian and 17 others. A cold box lunch is provided for lunches each day. The auditors observed lunch being served during the audit. Inmates appear to have ample time to consume meals. The kitchens maintained control of knives, utensils, and toxic/caustic supplies. The team observed and sampled food from the kitchen and found it to be tasty and well-presented. The food service and dining areas are well-maintained and clean. The food service areas have adequate food storage facilities. Temperatures in refrigerators and freezers were appropriate and logged accurately. There were no thermometers in dry food storage areas. This was corrected immediately. All foods in coolers or freezers were dated for first in, first out usage. Good thawing practices were observed.

**Health Services**

CCWF is a large facility with four separate"Yards" (Alpha, Bravo, Charlie, Delta,) with approximately 700 offenders in each Yard. Each Yard has its own clinic, dental suite and medication lines. Each Yard has two Panels of providers, which include one physician, one RN, one technical assistant and four LVNs to pass medications on two eight hour shifts. These clinics are open 5:30 a.m. to 9:30 p.m. seven days per week. Each clinic provides chronic care, sick call,

nursing treatments, referrals and medication lines three times per day. Dental emergencies are triaged daily and emergencies seen promptly.

Yard A includes: the Arrival/Discharge area; the Reception Center for women; Segregation with its small medication room and nursing station; Enhanced Outpatient Program (the mental health area) and three Reception housing units. All intake screenings, orientations and physicals are performed in this clinic by nurse practitioners and nursing staff. The condemned women's unit is within the segregation area. A psych technician and LVN make daily rounds and medication delivery.

Yard B includes a licensed Skilled Nursing Facility (SNF), Triage and Treatment Unit (T &T) and four general population housing units. Sick call slips are triaged daily with appropriate appointments given. Building 505 houses developmentally disabled and physically disabled offenders. There are about 176 wheelchairs and 43 walkers in the facility. The SNF and T&T clinic are open seven days a week, 24 hours per day. The T& T provides emergency coverage on the night shift.

The SNF (also known as Paris Lamb Health Center) has 27 in-patient medical beds and 12 mental health crisis beds. The medical area has two negative air flow rooms. The mental health side has several suicide watch rooms. The SNF rooms are used mostly for palliative care for severely disabled offenders, hospice comfort care and offenders receiving chemotherapy. The mental health beds are for observation and severe mental health situations. Due process is followed when involuntary medications are needed for a patient. Telemedicine is used for outside clinics. The total medical/nursing staff is as follows:

11.5 physicians
2.0 nurse practitioners
51.0 registered nurses
56.0 licensed vocational nurses
26.0 certified nursing assistants
1.0 supervising psych tech
8.0 psych techs
5.0 medical record staff

Officers are trained in CPR, first aid and emergency plans to assure the appropriate care is performed. Two AEDs and an emergency bag are located in each clinic area. The facility also has an emergency "ambulance" cart to quickly take medical personnel anywhere on the compound. A local ambulance service provides emergency transfer service.

Provisions are made for the disposal of medical waste by Stericycle, Inc. Sharps, medications and other sensitive tools were randomly counted and found to be accurate in medical and dental areas of all four clinics and the skilled nursing

facility.

The medical record is in process of going from paper to an electronic system. Currently the remaining paper records are stored in a locked room.

The pharmacy is a locked room in the Yard B health services building. The pharmacy has six pharmacists and eight pharmacy techs/runners. The pharmacy staff dispenses about 18,000 prescriptions per month. This includes the dispensing of "keep on person" medications. Over the counter medications are also available in the commissary for self administration. A month's supply of medications is sent with each parolee.

Mental health staff includes a full time psychiatrist, licensed social workers and psychologists. The staff provides cognitive as well as educational groups. The team has an open door policy for offenders and staff. Weekly rounds are provided in segregation. There are about 956 offenders with Axis I diagnoses and the majority take psychotropic medications. As previously described there are special mental health areas in SNF and segregation.

A clinical quality assurance process is used to ensure quality health care through self audit, peer review and onsite inspection. The QA program is very proactive with appropriate corrective actions. Statistical information and infection control discussions are shared with the warden and administrative staff at staff meetings. Peer review was completed appropriately. The occupational exposure number is very small considering it includes any type of body fluids for the whole work force. TB testing and hepatitis B injections are provided to direct care staff initially and annually. Recently the Emneyville Occupational Medical Center has taken over this process. The annual mass TB testing of offenders was taking place during our audit. MRSA infections are aggressively treated and monitored.

**Recreation**

CCWF's recreation program is managed by one coach and four recreation therapists. At the time of the audit, the coach had been on extended sick leave for a while. Wellness programs are scheduled Monday through Friday and include Aerobics/Freestyle Aerobics/Shape Up Express, Curves, Wellates (a combination of Pilates style exercises and exercise tubes), Wellcamp (interval training with a variety of boot camp exercises), Wellfit Circuit (cross training circuit that incorporates abs, exercise tubes, cardio, and toning), Welltone Combo (a combination of cardio and toning with exercise tubes), and Yoga. Inmates can participate in hobby crafts such as knitting, crocheting, and painting. Stationary exercise equipment is located in all Facility housing yards. Board games are available for inmate use within the housing units. Newly release movies are shown over the television sets in the housing units. The large recreation filed was closed during the audit due to lack of staff to supervise the area.

**Religious Programming**

The religious services department provides three chaplains (protestant, catholic and a Jewish rabbi) to administer to the needs of the population. Staffing, equipment, supplies and space for programming are adequate to serve the needs of the population. Some worship programs and various religious study groups are held in the chapel area. For larger groups, the gym is used. Religious materials are provided to offenders housed in close custody/administration segregation for in cell worship activities. The chaplain supervises about 240 volunteers who provide a wide variety of religious activities for the offender population (Girl Scouts Beyond Bars, Kairos, Battered Women's Support Group, Veteran's Support Group, Women of the Bible, Creative Writing, Comfort Care, Beyond Incarceration, Alcoholics Anonymous, Alternatives to Violence, Purpose Driven Life, and many others). Some faith groups represented at the facility are Protestant, Catholic, Jewish, Asatru, Native American, Muslim, Buddhists, Pacific Islanders, and Samhain. Bible studies are provided in death row for inmates housed there. There are also Bible studies in Spanish. In reviewing the activity calendar for Religious Services, there was some type of program every day in which the offenders could participate.

**Offender Work Programs**

All medically eligible offenders assigned to general population have a job assignment. Work programs include Laundry, Food Service, Janitorial, Maintenance, and Prison Industries. The self funded Prison Industry Authority (PIA) operates several programs at CCWF such as Dental laboratory, Fabric Products/Silkscreen (production of offender clothing and flags) and crop cultivation of almonds, alfalfa and oat hay. There is also a joint venture with a private corporation which employs about 45 offenders in an electronics manufacturing program. The offenders are paid a prevailing wage. Appropriate deductions are made for crime victim compensation, prisoner family support and mandatory savings for release.

**Academic and Vocational Education**

The Sierra Vista Adult School is a fully accredited education program. TABE testing is used to assess the needs of the offenders. The Literacy Coordinator maintains a database of test results and provides these to counseling staff for use in classification and assignment functions. Offenders whose total grade placement level is below 9.0 are enrolled in an appropriate academic education program. The classes taught include ABE I, II, and III; English as a Second Language, voluntary education programs; ESEA; and pre- vocation programs. 272 offenders attended these programs in 2011-12. College classes are available through Feather River College for an AA degree. As of March 2012, 59 offenders have graduated with the degree. Vocational education programs are designed to provide the individual with marketable employment skills in a trade area.

The vocational education programs at CCWF are Auto Body and Fender; Cosmetology; Electronics, Office Services and Related Technologies. In addition to the basic technical training, apprenticeship programming is currently offered in the Auto Body and Fender program. As of March 2012, 194 offenders have completed vocational education (for a one-year period). The offenders receive time reduction as an incentive to attend these programs.

**Library Services**

CCWF has an extensive leisure library and law library with daily hours including evening hours. Satellite libraries are located in the housing units. A book cart is taken to segregation housing providing library services in this area. The library has subscriptions to five magazines and three newspapers which are donated to the facility.

**F.     Examination of Records**

Following the facility tour, the team proceeded to the Warden's conference room to review the accreditation files and evaluate compliance levels of the policies and procedures. The accreditation files had no process indicators or secondary documentation. The auditors worked at length with facility staff to obtain necessary documentation for the files. All files were documented prior to the conclusion of the audit.

1.     Litigation

There are five class action lawsuits affecting all CDCR Institutions. None of these are less than three years old. CCWF does not have any cases that originated from their facility within the past three year period.

Armstrong v. Schwarzenegger (Armstrong I)

United States District Court for the Northern District San Francisco Division C-94-02307 CW. Class action brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act on behalf of inmates an parolees with vision, hearing, mobility, kidney, and learning disabilities. After finding that the CDCR was not complying with the ADA and the Rehabilitation act, the Court issued an injunction to improve access to prison programs, services and activities for prisoners with physical disabilities.

The court approved a clustering concept under which CDCR has designated certain prisons and reception centers to house inmates with physical disabilities the severity of which impacts their housing/placement. On January 18, 2007 the court issued an injunction ordering CDECR to take substantial steps to remedy

12

continued violations of the Armstrong Remedial Plan.

This injunction established Office of Court Compliance positions at Institutions to conduct audits and to review and gain compliance with the Armstrong Remedial Plan.

Clark v. State of California

United States District Court for the Northern District San Francisco Division C 96-1486 FMS. This class action complaint was filed on April 22, 1996 alleging that the CDCR denied developmentally disabled inmates (The term "developmental disability" includes mental retardation, cerebral palsy, epilepsy, and autism where the disability originated before age 18 years.) access to programs, services, and activities; that the CDCR failed to protect these individuals from exploitation an abuse by other prisoners; and violated the Constitution, section 504 of the Rehabilitation Act, and the ADA. In 2001, the parties entered into a settlement agreement, followed by the Clark Remedial Plan.

Coleman v. Schwarzenegger

United States District Court Eastern District of California #CIV S 90-0520 LKK-JFM. In 1995 the court found that the department violated the constitutional rights of mentally ill inmates. The court appointed a Special Master and have him wide-ranging duties to monitor CDCR's implementation and compliance with any remedial plan that the court may order. The Special Master and his team of experts are compensated pursuant to various court orders.

IN 1997, the court approved a plan to address constitutional inadequacies in inmate mental health care. Since that time, The Special Master and his experts have monitored compliance with the plan.

Perez v. Hickman

United States District Court Northern District of California # C-05-5241 filed on December 19, 2005. This class action alleges the dental care provided by CDCR is woefully inadequate and violates the constitutional rights of the plaintiff class under the Eighth and Fourteenth Amendments of the United Constitution to be free from cruel and unusual punishment.

Plata v. Schwarzenegger

United States District Court Northern District of California # C 01-1351 THE. This action challenged the constitutionality of the CDCR medical delivery system. In 2002, the parties entered into a stipulation, ultimately approved and ordered by the court that obligated CDCR "to make all reasonable efforts to secure the funding necessary to implement an improved healthcare delivery

13

system that meets the requirement of the Eighth Amendment."

The original order requires that CDCR implement a healthcare system that functions at efficiency levels set forth in fourteen volumes of policies and procedures. On June 29, 2005 the court announced that it was placing CDCR's Health Care Delivery System in receivership.

2.    Significant Incidents/Outcome Measures

The Outcome Measures were gathered annually from March l, 2011 to March 31, 2012. The baseline number of daily population is 3,422. All of the outcome measures were reviewed and seemed reasonable and stable for this complex and type of facility. There were eleven (11) natural deaths in 2011-2012. The deaths were reviewed and determined to be expected deaths from terminal disease processes. Currently the California clinical areas are under receivership.

The Significant Incident Summary was also reviewed carefully with staff. The numbers appear appropriate for the size and mission of the facility.

3.    Departmental Visits

Team members revisited the following departments to review conditions relating to departmental policy and operations:

| | |
|---|---|
| B. Parker | Food Services Manager, Central Kitchen |
| Perry Poole | Assistant Food Manager, Central Kitchen |
| Bruce Hubble | Correctional Plant Manager, Plant Operations |
| Jerry Buus | Maintenance Mechanic |
| Darren Smallridge | Maintenance Mechanic |
| Allan Lott | Fire Captain |
| Doug Torres | Food Administrator, Medical Diet Kitchen |
| Kristine Connelly | Certified Nurse Assistant, Ophthalmology |
| Umberto Perez | Correctional Sergeant, Receiving and Release |
| Judy Scott | Health Care Access Captain, EOP |
| Katherine Hudson | Director of Nursing |
| Margarita Andrade | Lab Assistant, Facility A Medical |
| Judy Tucker | Chief Nurse Executive |
| M. White | Correctional Counselor III, Substance Abuse Program |
| J. Villa | Supervising Correctional Cook, Facility D Dining Hall |
| V. Mudumuri, MD | Physician, Facility D Clinic |
| Steve Lopez | Auto Body Shop |
| Chaplain Crane | Chapel, Religious Services |
| Eduardo Contreras | Recreational Therapist, Gym |
| Mr. Burger | Senior Librarian |
| Lupe Saluado | Painter I, Maintenance |
| Sarbjeet Kaur | Chief Quality Officer, Medical |

14

| D. Fowler | Correctional Officer, Outside Fence Patrol |
|---|---|
| Sergeant Glanzer | Correctional Officer, Control Room |
| Dr. Portales | Dentist, C Facility |

4.      Shifts

      a.      Day Shift

The team was present at the facility during the day shift from 8:00A.M. to 2:00P.M.

The facility was toured during this shift.  In addition to the tour, various departments were visited by audit team members as listed above on subsequent audit days.  The auditors observed recreation taking place in the various yards and in the indoor gyms.  Medication pass in C Facility medical was observed.  Inmates were seen using the leisure library, having recreation in the yard and in the day rooms, and receiving dental care in one of the clinic areas.  The infirmary was revisited and the offender in-patients were found to be clean and appeared to be receiving good care.

      b.      Evening Shift

A number of areas were visited on evening shift – the Fire Department, Vocational Education, and Maintenance areas.   Staff and inmate interviews were conducted during this time.

      c.      Night Shift

The team was present at the facility during the evening shift from 10:00P.M. to 10:30P.M.

The audit team attended the shift change at 10:00P.M.  The officers were neatly dressed and reported to the shift office to obtain radios and equipment.  Pertinent information is relayed to the oncoming shift from staff they are relieving when they report to the assigned work area. Auditors observed medical operations in the Infirmary and Emergency Room. The Segregation Unit was visited during this time and interviews with staff and offenders were conducted.

## G.      Interviews

During the course of the audit, team members met with both staff and offenders to verify observations and/or to clarify questions concerning facility operations.

1.      Offender Interviews

Approximately 75 offenders were interviewed informally during the course of the audit.  The majority of the offenders reported that they felt safe in the facility and were afforded all services required by standards.

2.    Staff Interviews

During the audit, approximately 40 employees were informally interviewed by the auditors.  Each employee reported that the CCWF was a good place to work, that they were well paid, and that they got good support from facility administration

**H.    Exit Discussion**

The exit interview was held at 4:00P.M. in the Training Classroom with the Warden and large number (approximately 50) of facility staff in attendance.

The following were also in attendance:

Kathleen Allison, Deputy Director, Adult Institutions

By teleconference the following persons participated in the closeout:

Kathleen Dickinson, Director, Adult Institutions
Denny Sallade, Deputy Director, Health Care
Lori Austin, Health Care CEO

The chairperson explained the procedures that would follow the audit.  The team discussed the compliance levels of the mandatory and non-mandatory standards and reviewed their individual findings with the group.

The chairperson expressed appreciation for the cooperation of everyone concerned and congratulated the facility team for the progress made and encouraged them to continue to strive toward even further professionalism within the correctional field.

16

COMMISSION ON ACCREDITATION FOR CORRECTIONS

AND THE

AMERICAN CORRECTIONAL ASSOCIATION

| **COMPLIANCE TALLY** |
| :---: |

| Manual Type | Adult Correctional Institutions, fourth edition |
| --- | --- |
| Supplement | 2010 Standards Supplement |
| Facility/Program | Central California Women's Facility<br>Chowchilla, California |
| Audit Dates | April 23-25, 2012 |
| Auditor(s) | Barbara Skeen, Chair; Kelly Ward, Member; Jean Moltz, Member |

| | MANDATORY | NON-MANDATORY |
| --- | :---: | :---: |
| Number of Standards in Manual | 61 | 468 |
| Number Not Applicable | 0 | 31 |
| Number Applicable | 61 | 437 |
| Number Non-Compliance | 0 | 8 |
| Number in Compliance | 61 | 429 |
| Percentage (%) of Compliance | 100% | 98.16% |

- Number of Standards *minus* Number of Not Applicable *equals* Number Applicable

- Number Applicable *minus* Number Non-Compliance *equals* Number Compliance

- Number Compliance *divided by* Number Applicable *equals* Percentage of Compliance

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department of Corrections and Rehabilitation
Central California Women's Facility
Chowchilla, California

April 23-25, 2012

Visiting Committee Findings

Non-Mandatory

Non-Compliant

**Standard # 4-4132 Revised January 2007.**

CELLS/ROOMS USED FOR HOUSING INMATES SHALL PROVIDE AT A MINIMUM, 25 SQUARE FEET OF UNENCUMBERED SPACE PER OCCUPANT. UNENCUMBERED SPACE IS USABLE SPACE THAT IS NOT ENCUMBERED BY FURNISHINGS OR FIXTURES. AT LEAST ONE DIMENSION OF THE UNENCUMBERED SPACE IS NO LESS THAN SEVEN FEET. IN DETERMINING UNENCUMBERED SPACE IN THE CELL OR ROOM, THE TOTAL SQUARE FOOTAGE IS OBTAINED AND THE SQUARE FOOTAGE OF FIXTURES AND THE EQUIPMENT IS SUBTRACTED. ALL FIXTURES AND EQUIPMENT MUST BE IN OPERATIONAL POSITION AND MUST PROVIDE THE FOLLOWING MINIMUMS PER PERSON:

- BED
- PLUMBING FIXTURES (IF INSIDE THE CELL/ROOM)
- DESK
- LOCKER
- CHAIR OR STOOL

FINDINGS:

Facility documentation indicates that 200 cells of double-cell status have 20.1 square feet of unencumbered space. Of the 13 units that are multiple bed (up to eight) occupancy, documentation indicates that each inmate would have 20.1 square feet of unencumbered space per occupant. One unit of multiple bed housing has four occupants in the same space as eight; therefore allows 28 square feet per offender.

AGENCY RESPONSE

Waiver Request

When Central California Women's Facility (CCWF) was constructed it was designed per a bed capacity which was considerably lower than today's population. Since that time, the California Department of Corrections and Rehabilitation (CDCR) has increased in population to 190 percent. Due to the current realignment efforts of the CDCR population, CCWF has a target population of far less than the current percentage which would bring the ratio into compliance.

As it stands today, in order to comply with the minimum 25 square feet of unencumbered space per occupant, modifications would have to be done. Modifications to existing cells impact the following areas:

- Security during construction and during operations
- Architectural layout and current CBC and ADA requirements
- Structural support
- Estimate: Budget
- Construction cost
- Design required – In-house or consultant. Costs associated.
- Long schedule for completion

The above mentioned modifications would result in requesting Major Capital Outlay funding at tremendous cost. A Major Capital Outlay request would have to be approved by the Department of Finance and the Legislature and given the current fiscal climate in California, impossible to justify. Based on the factors in the agency response, CCWF is requesting a waiver for this standard.

AUDITOR'S RESPONSE

The audit team does not support the request for waiver as the facility does not spell out any ongoing or planned efforts to mitigate the effects of overcrowding on their offender population caused by this lack of square footage in the cells. It is recommended that a plan of action be requested.

**Standard # 4-4133 Revised August 2005.**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT SINGLE-OCCUPANCY CELLS/ROOMS, MEASURING A TOTAL OF 80 SQUARE FEET, OF WHICH 35 SQUARE FEET IS UNENCUMBERED SPACE, SHALL BE AVAILABLE, WHEN INDICATED, FOR THE FOLLOWING:

- INMATES WITH SEVERE MEDICAL DISABILITIES
- INMATES SUFFERING FROM SERIOUS MENTAL ILLNESS
- SEXUAL PREDATORS

- ■ INMATES LIKELY TO BE EXPLOITED OR VICTIMIZED BY OTHERS
- ■ INMATES WHO HAVE OTHER SPECIAL NEEDS FOR SINGLE HOUSING
- ■ MAXIMUM CUSTODY INMATES

FINDINGS:

Facility documentation indicates that unencumbered square footage per cell is 33 square feet.

AGENCY RESPONSE

Waiver Request

When CCWF was constructed it was designed per a bed capacity which was considerably lower than today's population. Since that time CDCR has increased in population to 190 percent. Due to the current realignment efforts of the CDCR population, CCWF has a target population of far less than the current percentage which would bring the ratio into compliance.

As it stands today, in order to comply with the minimum 35 square feet of unencumbered space per occupant, modifications would have to be done. Modifications to existing cells impact the following areas:

- Security during construction and during operations
- Architectural layout and current CBC and ADA requirements
- Structural support
- Estimate: Budget
- Construction cost
- Design required – In-house or consultant. Costs associated.
- Long schedule for completion

The above mentioned modifications would result in requesting Major Capital Outlay funding at tremendous cost. A Major Capital Outlay request would have to be approved by the Department of Finance and the Legislature and given the current fiscal climate in California, impossible to justify. Based on the factors in the agency response, CCWF is requesting a waiver for this standard.

AUDITOR'S RESPONSE

The audit team does not support the request for waiver as the facility does not spell out any ongoing or planned efforts to mitigate the effects of overcrowding on their offender population caused by this lack of square footage in the cells. It is recommended that a plan of action be requested.

**Standard #4-4141**

ALL CELLS/ROOMS IN SEGREGATION PROVIDE A MINIMUM OF 80 SQUARE FEET, OF WHICH 35 SQUARE FEET IS UNENCUMBERED SPACE.

FINDINGS:

Segregation cells measure 60 to 67 square feet of total space. Typically 70% of these cells are double-celled.

AGENCY RESPONSE

Waiver Request

When CCWF was constructed it was designed per a bed capacity which was considerably lower than today's population. Since that time CDCR has increased in population to 190 percent. Due to the current realignment efforts of the CDCR population, CCWF has a target population of far less than the current percentage which would bring the ratio into compliance.

As it stands today, in order to comply with the minimum of 80 square feet, of which 35 square feet is unencumbered space, modifications would have to be done. Modifications to existing cells impact the following areas:

- Security during construction and during operations
- Architectural layout and current CBC and ADA requirements
- Structural support
- Estimate: Budget
- Construction cost
- Design required – In-house or consultant. Costs associated.
- Long schedule for completion

The above mentioned modifications would result in requesting Major Capital Outlay funding at tremendous cost. A Major Capital Outlay request would have to be approved by the Department of Finance and the Legislature and given the current fiscal climate in California, impossible to justify. Based on the factors in the agency response, CCWF is requesting a waiver for this standard.

AUDITOR'S RESPONSE

The audit team does not support the request for waiver as the facility does not spell out any ongoing or planned efforts to mitigate the effects of overcrowding on their offender population caused by this lack of square footage in the cells. It is recommended that a plan of action be requested.

**Standard #4-4230**

THERE ARE WRITTEN GUIDELINES FOR RESOLVING MINOR INMATE INFRACTIONS, WHICH INCLUDE A WRITTEN STATEMENT OF THE RULE VIOLATED AND A HEARING AND DECISION WITHIN SEVEN DAYS, EXCLUDING WEEKENDS AND HOLIDAYS, BY A PERSON NOT INVOLVED IN THE RULE VIOLATION; INMATES MAY WAIVE THEIR APPEARANCE AT THE HEARING.

FINDINGS:

California State Policy provides that hearings do not have to be held until 30 days from time of rule violation.

AGENCY RESPONSE

Discretionary Compliance

    ☐ An unwillingness to request funds from a parent agency
    ☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
    ☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
    ☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice
    ☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

Minor infractions are defined as Administrative rules violations and are therefore covered with serious rules violations under Title 15 Section 3320 which is California state law. This law was originally codified in 1977 and addresses a complete and interrelated set of time requirements including when a rules violation report must be reviewed, classified, issued to the inmate and adjudicated.  Subsection (b) of Section 3320 requires, "The charges shall be heard within 30 days from the date the inmate is provided a classified copy of the CDC Form 115 (Rules Violation Report) unless the charges were referred for possible prosecution…"    In order for SAC, CCWF and SOL to comply with ACA Standards 4-4230 and 4-4238 CDCR would have to request a change to a California state law which has withstood judicial and legislative scrutiny for over 34 years.  Additionally, partial justification for CDCR's custody supervisor staffing is based on inmate disciplinary time frames as custody supervisors review, classify, adjudicate, and investigate inmate rules violations.  This process would take a minimum of two years and require additional staff resource which would be impossible to justify.  Therefore, CDCR on behalf of SAC, CCWF, and SOL requests ACA grant Discretionary Compliance with ACA Standards 4-4230 and 4-4238 in lieu of their continued compliance with CCR, Title 15, Section 3320 (copy attached).

AUDITOR'S RESPONSE

The audit team does not support a discretionary compliance for this standard.  Many times the ACA Standards exceed state and local requirements.  As this is one of the first California facilities going through the accreditation process, the auditors believe the facility should at least attempt to "raise the bar" for correctional practices within their state.  The audit team recommends that a plan of action be requested.

**Standard # 4-4238 Revised January 2008.**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES CHARGED WITH RULE VIOLATIONS ARE SCHEDULED FOR A HEARING AS SOON AS PRACTICABLE BUT NO LATER THAN SEVEN DAYS, EXCLUDING WEEKENDS AND HOLIDAYS, AFTER BEING CHARGED WITH A VIOLATION. INMATES ARE NOTIFIED OF THE TIME AND PLACE OF THE HEARING AT LEAST 24 HOURS IN ADVANCE OF THE HEARING.

FINDINGS:

California State Policy does not require a hearing within seven days.  Also, inmates are not notified of the time and place of their hearings.

AGENCY RESPONSE

Discretionary Compliance

    ☐ An unwillingness to request funds from a parent agency
    ☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
    ☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
    ☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice
    ☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

Minor infractions are defined as Administrative rules violations and are therefore covered with serious rules violations under Title 15 Section 3320 which is California state law. This law was originally codified in 1977 and addresses a complete and interrelated set of time requirements including when a rules violation report must be reviewed, classified, issued to the inmate and adjudicated.  Subsection (b) of Section 3320 requires, "The charges shall be heard within 30 days from the date the inmate is provided a classified copy of the CDC Form 115 (Rules Violation Report) unless the charges were referred for possible prosecution…"    In order for SAC, CCWF and SOL to comply with ACA

Standards 4-4230 and 4-4238 CDCR would have to request a change to a California state law which has withstood judicial and legislative scrutiny for over 34 years. Additionally, partial justification for CDCR's custody supervisor staffing is based on inmate disciplinary time frames as custody supervisors review, classify, adjudicate, and investigate inmate rules violations. This process would take a minimum of two years and require additional staff resource which would be impossible to justify. Therefore, CDCR on behalf of SAC, CCWF, and SOL requests ACA grant Discretionary Compliance with ACA Standards 4-4230 and 4-4238 in lieu of their continued compliance with CCR, Title 15, Section 3320 (copy attached).

AUDITOR'S RESPONSE

The audit team does not support a discretionary compliance for this standard. Many times the ACA Standards exceed state and local requirements. As this is one of the first California facilities going through the accreditation process, the auditors believe the facility should at least attempt to "raise the bar" for correctional practices within their state. The audit team recommends that a plan of action be requested.

**Standard #4-4257**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ALL SPECIAL MANAGEMENT INMATES ARE PERSONALLY OBSERVED BY A CORRECTIONAL OFFICER AT LEAST EVERY 30 MINUTES ON AN IRREGULAR SCHEDULE. INMATES WHO ARE VIOLENT OR MENTALLY DISORDERED OR WHO DEMONSTRATE UNUSUAL OR BIZARRE BEHAVIOR RECEIVE MORE FREQUENT OBSERVATION; SUICIDAL INMATES ARE UNDER CONTINUING OBSERVATION.

FINDINGS:

California State Policy stipulates that rounds are made on one-hour (60-minute) intervals. A portion of those housed in segregation require 30-minute checks, but not "all special management inmates are personally observed by a correctional officer at least every 30 minutes.'

AGENCY RESPONSE

Discretionary Compliance

☐ An unwillingness to request funds from a parent agency
☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice

24

X An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

CDCR negotiated with the California Correctional Peace Officers Association and agreed each inmate would be observed every hour as part of unit security checks. In 2006, CDCR in agreement with the federal court (Coleman v. Schwarzenegger) CDCR re-negotiated with CCPOA to perform visual checks every 30 minutes of every inmate for the *first 21 days of confinement* in Administrative Segregation. All other inmates would continue to be checked every hour. This agreement was based on the evidence that inmates were most at risk during their first 21 days of confinement in Administrative Segregation. Increasing 30 minute checks to ALL inmates in Administrative Segregation would require re-negotiation with CCPOA and would have an effect of the Coleman v. Schwarzenegger litigation. Also in agreement with the Coleman court SAC, CCWF, and SOL require suicidal inmates be place under continued observation by staff. Therefore, CDCR on behalf of SAC, CCWF, and SOL requests ACA grant Discretionary Compliance with ACA Standard 4-4257 in lieu of their continued compliance with the Coleman v. Schwarzenegger agreement and the negotiated agreement with CCPOA.

AUDITOR'S RESPONSE

The audit team definitely does not support discretionary compliance for this standard. Longer time periods between cells checks would be detrimental to inmate safety and facility liability. The audit team recommends a plan of action be requested.

**Standard #4-4270**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES IN SEGREGATION RECEIVE A MINIMUM OF ONE HOUR OF EXERCISE PER DAY OUTSIDE THEIR CELLS, FIVE DAYS PER WEEK, UNLESS SECURITY OR SAFETY CONSIDERATIONS DICTATE OTHERWISE.

FINDINGS:

The facility is in compliance with the state policy of 10 hours of recreation a week but policy does not stipulate exercise options five days a week. The 10 hours of recreation may be accomplished in two or three days instead of five days.

AGENCY RESPONSE

Discretionary Compliance

X An unwillingness to request funds from a parent agency
☐ A preference to satisfy the standard/expected practice's intent in an alternative

fashion

☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.

☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice

☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

Exercise in segregated housing is covered under Section 3343(h) of the California Code of Regulations (CCR), Title 15 which is California state law. This law has been in effect and subject to legislative and judicial scrutiny for over 30 years. While Section 3343(h) requires "Inmates in assigned special purpose segregation housing will be permitted a minimum of one hour per day, five day a week, of exercise…" this Section also contains the provision "When special purpose segregated housing units are equipped with their own recreaqtion yard, the yard periods may substitute for other out of cell exercise periods, providing the opportunity for use of the yard is available at least three days per week for a total of not less than 10 hours a week." Complying with the ten hours per week requirement allows SAC, CCWF, and SOL to maximize yard activity areas with limited staff resources while also complying with all other mandatory requirements which must be available to inmates in segregated housing. Therefore, SAC, CCWF, and SOL request that ACA grant Discretionary Compliance with ACA Standard 4-4270 in lieu of compliance with that part of Section 3343(h) (copy attached) which allows for 10 hours per week of out of cell exercise over three days.

AUDITOR'S RESPONSE

The audit team does not support a discretionary compliance for this standard. Many times the ACA Standards exceed state and local requirements. As this is one of the first California facilities going through the accreditation process, the auditors believe the facility should at least attempt to "raise the bar" for correctional practices within their state. The audit team recommends that a plan of action be requested.

**Standard #4-4495 Revised August 2006.**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT, EXCLUDING WEEKENDS AND HOLIDAYS, OR EMERGENCY SITUATIONS, INCOMING AND OUTGOING LETTERS ARE HELD FOR NO MORE THAN 48 HOURS AND PACKAGES (IF ALLOWED) ARE HELD NO MORE THAN 72 HOURS.

FINDINGS:

By state policy, incoming mail is not delivered within 48 hours. Policy allows a week for incoming mail to be delivered to offenders.

AGENCY RESPONSE

Discretionary Compliance

      X  An unwillingness to request funds from a parent agency
      ☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
      ☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
      ☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice
      ☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

The distribution of mail to inmates is covered under Section 3133 of the California Code of Regulations (CCR), Title 15 which is California state law.  This law has been in effect and subject to judicial and legislative scrutiny for over 40 years.  The latest revision was in 2008.  Section 3133, (a), (1) states in part, "All First –Class Mail shall be delivered to the inmate as soon as possible, but no later than seven calendar days from receipt of the mail at the facility mailroom."  In order to comply with Standard 4-4495 SAC, CCWF, and SOL – through CDCR—would have to request a change to California state law which is a two year process.  This request would have to be accompanied by an analysis of required resources.  The required resources to achieve compliance with ACA Standard 4-4495 would be significant and, given the current fiscal climate in California, impossible to justify.  Therefore, on behalf of SAC, CCWF, and SOL CDCR requests ACA grant Discretionary Compliance with ACA Standard 4-4495 in lieu of their continued compliance with CCR, Title 15, Section 3133 (copy attached).

AUDITOR'S RESPONSE

The audit team does not support a discretionary compliance for this standard.  Many times the ACA Standards exceed state and local requirements.  As this is one of the first California facilities going through the accreditation process, the auditors believe the facility should at least attempt to "raise the bar" for correctional practices within their state.  The audit team recommends that a plan of action be requested.

27

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department of Corrections and Rehabilitation
Central California Women's Facility
Chowchilla, California

April 23-25, 2012

<u>Visiting Committee Findings</u>

Non-Mandatory

Non-Applicable


**Standard #4-4123**

THE INSTITUTION CONFORMS WITH APPLICABLE FEDERAL, STATE, AND/OR LOCAL BUILDING CODES.    (RENOVATION, ADDITION, NEW CONSTRUCTION ONLY)

FINDINGS:

CCWF is not new construction.

**Standard #4-4125**

PHYSICAL PLANT DESIGN FACILITATES PERSONAL CONTACT AND INTERACTION BETWEEN STAFF AND INMATES.    (RENOVATION, ADDITION, NEW CONSTRUCTION ONLY)

FINDINGS:

CCWF is not new construction.

**Standard #4-4128**

SINGLE-CELL LIVING UNITS SHALL NOT EXCEED 80 INMATES.    (NEW CONSTRUCTION ONLY)

FINDINGS:

CCWF is not new construction.

**Standard # 4-4147-1 Added August 2006.**

ALL INMATE ROOMS/CELLS PROVIDE INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST THREE SQUARE FEET OF TRANSPARENT GLAZING, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE IN ROOMS/CELLS WITH THREE OR MORE INMATES. (RENOVATION, ADDITION, NEW CONSTRUCTION)

FINDINGS:

CCWF is not new construction.

**Standard # 4-4149 Revised January 2003.**

EACH DAYROOM PROVIDES INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST 12 SQUARE FEET OF TRANSPARENT GLAZING IN THE DAYROOM, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE WHOSE ROOM/CELL IS DEPENDENT ON ACCESS TO NATURAL LIGHT THROUGH THE DAYROOM. (NEW CONSTRUCTION ONLY)

FINDINGS:

CCWF is not new construction.

**Standard # 4-4150-1 Added August 2008. (New Construction Only)**

NOISE LEVELS IN HOUSING AREAS (IN OTHER WORDS, DAYROOMS WITH ADJACENT CELLS OR DORMS) SHALL NOT EXCEED THE FOLLOWING:

- UNOCCUPIED – 45DBA (A SCALE), BUILDING SERVICE SYSTEMS SHALL BE ON AND IN NORMAL OPERATING CONDITION. MID-FREQUENCY AVERAGE REVERBERATION TIME (T 60) MUST BE LESS THAN 1.0 SEC.
- OCCUPIED – 70 DBA (A SCALE) FOR A MINIMUM OF 15 SECONDS OF CONTINUOUS AVERAGE MEASUREMENT IN NORMAL OPERATING CONDITIONS.

ALL MONITORING SHALL BE CONDUCTED IN CLOSE PROXIMITY TO THE CORRECTIONAL OFFICER'S POST. IF A CORRECTIONAL OFFICER'S POST IS NOT IDENTIFIED, THEN MONITORING SHALL BE CONDUCTED AT A LOCATION CONSIDERED BEST TO MONITOR HOUSING NOISE LEVELS. MEASUREMENTS SHALL BE CONDUCTED A MINIMUM OF ONCE PER ACCREDITATION CYCLE BY A QUALIFIED SOURCE.

FINDINGS:

CCWF is not new construction.

**Standard # 4-4151 Revised August 2007.**

CIRCULATION IS AT LEAST 15 CUBIC FEET OF OUTSIDE OR RE-CIRCULATED FILTERED AIR PER MINUTE PER OCCUPANT FOR CELLS/ROOMS, OFFICER STATIONS, AND DINING AREAS, AS DOCUMENTED BY A QUALIFIED TECHNICIAN AND SHOULD BE CHECKED NOT LESS THAN ONCE PER ACCREDITATION CYCLE. (RENOVATION, ADDITION, NEW CONSTRUCTION ONLY)

FINDINGS:

CCWF is not new construction.

**Standard #4-4157**

IN INSTITUTIONS OFFERING ACADEMIC AND VOCATIONAL TRAINING PROGRAMS, CLASSROOMS ARE DESIGNED IN CONSULTATION WITH SCHOOL AUTHORITIES. (RENOVATION, ADDITION, NEW CONSTRUCTION ONLY)

FINDINGS:

CCWF is not new construction.

**Standard #4-4181**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT WHEN BOTH MALES AND FEMALES ARE HOUSED IN THE FACILITY, AT LEAST ONE MALE AND ONE FEMALE STAFF MEMBER ARE ON DUTY AT ALL TIMES.

FINDINGS:

CCWF is an all female institution.

**Standard #4-4208**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICED PROVIDE THE FOLLOWING:

- A MISSION STATEMENT, INCLUDING GOALS AND OBJECTIVES
- EMERGENCY PLANS THAT ARE INTEGRATED INTO THE OVERALL EMERGENCY PLANS OF THE FACILITY

FINDINGS:

CCWF does not have a canine unit.

**Standard #4-4209**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION AND TRAINING REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHOULD BE TRAINED, CERTIFIED, AND RE-CERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR A COMPARABLE INTERNAL TRAINING AND PROFICIENCY TESTING PROGRAM.

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION AND TRAINING REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHOULD BE TRAINED, CERTIFIED, AND RE-CERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR A COMPARABLE INTERNAL TRAINING AND PROFICIENCY TESTING PROGRAM.

FINDINGS:

CCWF does not have a canine unit.

**Standard #4-4210**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE PROVIDE DAILY AND CURRENT RECORDS ON TRAINING, CARE OF DOGS, AND SIGNIFICANT EVENTS.

FINDINGS:

CCWF does not have a canine unit.

**Standard #4-4278**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT MALE AND FEMALE INMATES HOUSED IN THE SAME INSTITUTION HAVE SEPARATE SLEEPING QUARTERS BUT EQUAL ACCESS TO ALL AVAILABLE SERVICES AND PROGRAMS. NEITHER SEX IS DENIED OPPORTUNITIES SOLELY ON THE BASIS OF THEIR SMALLER NUMBER IN THE POPULATION.

FINDINGS:

CCWF is an all female institution.

**Standard #4-4307**

IF YOUTHFUL OFFENDERS ARE HOUSED IN THE FACILITY, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THEY ARE HOUSED IN A SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS EXCEPT WHEN:

- A VIOLENT, PREDATORY YOUTHFUL OFFENDER POSES AN UNDUE RISK OF HARM TO OTHERS WITHIN THE SPECIALIZED UNIT; AND/OR
- A QUALIFIED MEDICAL OR MENTAL-HEALTH SPECIALIST DOCUMENTS THAT THE YOUTHFUL OFFENDER WOULD BENEFIT FROM PLACEMENT OUTSIDE THE UNIT

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE PREPARATION OF A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR HOUSING A YOUTHFUL OFFENDER OUTSIDE THE SPECIALIZED UNIT AND A CASE-MANAGEMENT PLAN SPECIFYING WHAT BEHAVIORS NEED TO BE MODIFIED AND HOW THE YOUTHFUL OFFENDER MAY RETURN TO THE UNIT. THE STATEMENT OF REASONS AND CASE-MANAGEMENT PLAN MUST BE APPROVED BY THE WARDEN OR HIS OR HER DESIGNEE. CASES ARE REVIEWED AT LEAST QUARTERLY BY THE CASE MANAGER, THE WARDEN OR HIS OR HER DESIGNEE, AND THE YOUTHFUL OFFENDER TO DETERMINE WHETHER A YOUTHFUL OFFENDER SHOULD BE RETURNED TO THE SPECIALIZED UNIT.

FINDINGS:

CCWF does not house youthful offenders.

**Standard #4-4308**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE DIRECT SUPERVISION OF YOUTHFUL OFFENDERS HOUSED IN THE SPECIALIZED UNIT TO ENSURE SAFETY AND SECURITY.

FINDINGS:

CCWF does not house youthful offenders.

**Standard #4-4309**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR CLASSIFICATION PLANS FOR YOUTHFUL OFFENDERS THAT DETERMINE LEVEL OF RISK AND PROGRAM NEEDS DEVELOPMENTALLY APPROPRIATE FOR ADOLESCENTS. CLASSIFICATION PLANS SHALL INCLUDE CONSIDERATION OF PHYSICAL, MENTAL, SOCIAL, AND EDUCATIONAL MATURITY OF THE YOUTHFUL OFFENDER.

FINDINGS:

CCWF does not house youthful offenders.

**Standard #4-4310**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ADEQUATE PROGRAM SPACE BE PROVIDED TO MEET THE PHYSICAL, SOCIAL, AND EMOTIONAL NEEDS OF YOUTHFUL OFFENDER AND ALLOWS FOR THEIR PERSONAL INTERACTIONS AND GROUP-ORIENTED ACTIVITIES.

FINDINGS:

CCWF does not house youthful offenders.

**Standard #4-4311**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS HAVE NO MORE THAN INCIDENTAL SIGHT OR SOUND CONTACT WITH ADULT OFFENDERS FROM OUTSIDE THE UNIT IN LIVING, PROGRAM, DINING, OR OTHER COMMON AREAS OF THE FACILITY. ANY OTHER SIGHT OR SOUND CONTACT IS MINIMIZED, BRIEF, AND IN CONFORMANCE WITH APPLICABLE LEGAL REQUIREMENTS.

FINDINGS:

CCWF does not house youthful offenders.

**Standard #4-4312**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT PROGRAM PERSONNEL WHO WORK WITH YOUTHFUL OFFENDERS FROM THE SPECIALIZED UNIT BE TRAINED IN THE DEVELOPMENTAL, SAFETY, AND OTHER SPECIFIC NEEDS OF YOUTHFUL OFFENDERS.  WRITTEN JOB DESCRIPTIONS AND QUALIFICATIONS REQUIRE TRAINING FOR STAFF SPECIFICALLY ASSIGNED TO THE UNIT OR STAFF WHO ARE RESPONSIBLE FOR PROGRAMMING OF YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT BEFORE BEING ASSIGNED TO WORK WITH YOUTHFUL OFFENDERS.  THE TRAINING SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING AREAS:

- ADOLESCENT DEVELOPMENT
- EDUCATIONAL PROGRAMMING
- CULTURAL AWARENESS
- CRISIS PREVENTION AND INTERVENTION
- LEGAL ISSUES
- HOUSING AND PHYSICAL PLANT
- POLICIES AND PROCEDURES
- THE MANAGEMENT OF, AND PROGRAMMING FOR, SEX OFFENDERS
- SUBSTANCE-ABUSE SERVICES
- COGNITIVE-BEHAVIORAL INTERVENTIONS, INCLUDING ANGER MANAGEMENT, SOCIAL-SKILLS TRAINING, PROBLEM SOLVING, AND RESISTING PEER PRESSURE
- SUICIDE PREVENTION
- NUTRITION
- MENTAL-HEALTH ISSUES
- GENDER-SPECIFIC ISSUES
- CASE-MANAGEMENT PLANNING AND IMPLEMENTATION

FINDINGS:

CCWF does not house youthful offenders.

**Standard #4-4353-1 Added January 2003.**

WHERE NURSING INFANTS ARE ALLOWED TO REMAIN WITH THEIR MOTHERS, PROVISIONS ARE MADE FOR A NURSERY, STAFFED BY QUALIFIED PERSONS, WHERE THE INFANTS ARE PLACED WHEN THEY ARE NOT IN THE CARE OF THEIR MOTHERS.

FINDINGS:

CCWF does not house nursing infants.

34

**Standard #4-4364**

ALL IN-TRANSIT OFFENDERS RECEIVE A HEALTH SCREENING BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL ON ENTRY INTO THE AGENCY SYSTEM. FINDINGS ARE RECORDED ON A SCREENING FORM THAT WILL ACCOMPANY THE OFFENDER TO ALL SUBSEQUENT FACILITIES UNTIL THE OFFENDER REACHES HIS OR HER FINAL DESTINATION. HEALTH SCREENS WILL BE REVIEWED AT EACH FACILITY BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL. PROCEDURES WILL BE IN PLACE FOR CONTINUITY OF CARE.

FINDINGS:

CCWF does not house in-transit offenders.

**Standard #4-4377**

OFFENDERS HAVE ACCESS TO A CHEMICAL DEPENDENCY TREATMENT PROGRAM. WHEN A CHEMICAL DEPENDENCY PROGRAM EXISTS, THE CLINICAL MANAGEMENT OF CHEMICALLY DEPENDENT OFFENDERS INCLUDES, AT A MINIMUM, THE FOLLOWING:

- A STANDARDIZED DIAGNOSTIC NEEDS ASSESSMENT ADMINISTERED TO DETERMINE THE EXTENT OF USE, ABUSE, DEPENDENCY, AND/OR CO-DEPENDENCY
- AN INDIVIDUALIZED TREATMENT PLAN DEVELOPED AND IMPLEMENTED BY A MULTI DISCIPLINARY CLINICAL TEAM THAT INCLUDES MEDICAL, MENTAL HEALTH, AND SUBSTANCE ABUSE PROFESSIONALS
- PRE-RELEASE RELAPSE-PREVENTION EDUCATION, INCLUDING RISK MANAGEMENT
- THE OFFENDER SHALL BE INVOLVED IN AFTERCARE DISCHARGE PLANS

FINDINGS:

CCWF does not have a therapeutic community for drug treatment.

**Standard #4-4383 Revised January 2006**

WHEN INSTITUTIONS DO NOT HAVE QUALIFIED HEALTH CARE STAFF, HEALTH-TRAINED PERSONNEL COORDINATE THE HEALTH DELIVERY SERVICES IN THE INSTITUTION UNDER THE JOINT SUPERVISION OF THE RESPONSIBLE HEALTH AUTHORITY AND WARDEN OR SUPERINTENDENT.

FINDINGS:

CCWF has full-time health care staff.

**Standard #4-4391**

IF VOLUNTEERS ARE USED IN THE DELIVERY OF HEALTH CARE, THERE IS A DOCUMENTED SYSTEM FOR SELECTION, TRAINING, STAFF SUPERVISION, FACILITY ORIENTATION, AND DEFINITION OF TASKS, RESPONSIBILITIES AND AUTHORITY THAT IS APPROVED BY THE HEALTH AUTHORITY. VOLUNTEERS MAY ONLY PERFORM DUTIES CONSISTENT WITH THEIR CREDENTIALS AND TRAINING. VOLUNTEERS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS:

CCWF does not use volunteers in the provision of health care.

**Standard #4-4436**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT COMPREHENSIVE COUNSELING AND ASSISTANCE ARE PROVIDED TO PREGNANT INMATES IN KEEPING WITH THEIR EXPRESSED DESIRES IN PLANNING FOR THEIR UNBORN CHILDREN.

FINDINGS:

CCWF does not house pregnant offenders.  Immediately after intake, these inmates are transferred to another facility.

36

|  |  | **Health Care Outcomes** |  |  |
|---|---|---|---|---|
| **Standard** | **Outcome Measure** | **Numerator/Denominator** | **Value** | **Calcu-lated O.M.** |
| **1A** | (1) | Number of offenders diagnosed with a MRSA infection within the past twelve (12) months (3/2011-3/2012) | 81 |  |
|  | divided by | The average daily population | 3422 | 2.36% |
|  | (2) | Number of offenders diagnosed with active tuberculosis in the past twelve (12) months | 1 |  |
|  | divided by | Average daily population. | 3422 | .02% |
|  | (3) | Number of offenders who are new converters on a TB test that indicates newly acquired TB infection in the past twelve (12) months | 24 |  |
|  | divided by | Number of offenders administered tests for TB infection in the past twelve (12) months as part of periodic or clinically-based testing, but not intake screening. | 3724 - (as of 4/2011) | 0.6% |
|  | (4) | Number of offenders who completed treatment for latent tuberculosis infection in the past twelve (12) months | 23 |  |
|  | divided by | Number of offenders treated for latent tuberculosis infection in the past twelve (12) months. | 74 | 31% |
|  | (5) | Number of offenders diagnosed with Hepatitis C viral infection at a given point in time (4/20/12) | 436 |  |
|  | divided by | Total offender population at that time. | 2804 | 15.5% |
|  | (6) | Number of offenders diagnosed with HIV infection at a given point in time(4/20/12) | 38 |  |
|  | divided by | Total offender population at that time. | 2804 | 1.4% |

37

| | (7) | Number of offenders with HIV infection who are being treated with highly active antiretroviral treatment (HAART) at a given point in time (4/20/12) | 36 | |
| | divided by | Total number of offenders diagnosed with HIV infection at that time. | 38 | 95% |
| | (8) | Number of selected offenders with HIV infection at a given point in time who have been on antiretroviral therapy for at least six months with a viral load of less than 50 cps/ml (4/20/12) | 12 | |
| | divided by | Total number of treated offenders with HIV infection that were reviewed. | 38 | 32% |
| | (9) | Number of offenders diagnosed with an Axis I disorder (excluding sole diagnosis of substance abuse) at a given point in time | 956 | |
| | divided by | Total offender population at that time. | 2804 | 34% |
| | (10) | Number of offender admissions to off-site hospitals in the past twelve (12) months | 183 | |
| | divided by | Average daily population. | 2804 | 6.5% |
| | (11) | Number of offenders transported off-site for treatment of emergency health conditions in the past twelve (12) months | 295 | |
| | divided by | Average daily population in the past twelve (12) months. | 3422 | 8.6% |
| | (12) | Number of offender specialty consults completed during the past twelve (12) months | 3618 | |
| | divided by | Number of specialty consults (on-site or off-site) ordered by primary health care practitioners in the past twelve (12) months. | 4341 | 8.3% |
| | (13) | Number of selected hypertensive offenders at a given point in time with a B/P reading > 140 mmHg/ >90 mm Hg (4/24/12) | 3 | |
| | divided by | Total number of offenders with hypertension who were reviewed. (4/24/12) | 175 | 1.7% |

|  | (14) | Number of selected diabetic offenders at a given point in time who are under treatment for at least six months with a hemoglobin A1C level measuring greater than 9 percent | 17 |  |
|  | divided by | Total number of diabetic offenders who were reviewed. | 192 | 8.9% |
|  | (15) | The number of completed dental treatment plans within the past twelve (12) months | 297 |  |
|  | divided by | the average daily population during the reporting period. | 3422 | 8.7% |
| **2A** | (1) | Number of health care *staff* with lapsed licensure or certification during a twelve (12) month period | 0 |  |
|  | divided by | Number of licensed or certified staff during a twelve (12) month period. | 139 | 0 |
|  | (2) | Number of new health care staff during a twelve (12) month period that completed orientation training prior to undertaking their job | 44 |  |
|  | divided by | Number of new health care staff during the twelve (12) month period. | 44 | 100% |
|  | (3) | Number of occupational exposures to blood or other potentially infectious materials in the past twelve (12) months | 15 |  |
|  | divided by | Number of employees. | 977 | 1.4% |
|  | (4) | Number of direct care staff (employees and contractors) with a conversion of a TB test that indicates newly acquired TB infection in the past twelve (12) months | 0 |  |
|  | divided by | Number of direct care staff tested for TB infection in the past twelve (12) months during periodic or clinically indicated evaluations. | 3724 (4/11) | 0 |
| **3A** | (1) | Number of offender grievances related to health care services found in favor of the offender in the past twelve (12) months | 418 partially granted. 233 fully granted. From 4/1/11 to 4/1/12 |  |
|  | divided by | Number of evaluated offender grievances related to health care services in the past twelve (12) months. | 2481 grievances from 4/1/11 to 4/1/12 | 9.3 |

| | | | | |
|---|---|---|---|---|
| | (2) | Number of offender grievances related to safety or sanitation sustained during a twelve (12) month period | 0 | |
| | divided by | Number of evaluated offender grievances related to safety or sanitation during a twelve (12) month period. | 0 | |
| | (3) | Number of adjudicated offender lawsuits related to the delivery of health care found in favor of the offender in the past twelve (12) months | Pending information from Sacramento | |
| | divided by | Number of offender adjudicated lawsuits related to healthcare delivery in the past twelve (12) months | Pending information from Sacramento | |
| **4A** | (1) | Number of problems identified by quality assurance program that were corrected during a twelve (12) month period | 11 | |
| | divided by | Number of problems identified by quality assurance program during a twelve (12) month period. | 14 | 78.57% |
| | (2) | Number of high-risk events or adverse outcomes identified by the quality assurance program during a twelve (12) month period. | 1 | |
| | | | | |
| | (3) | Number of offender suicide attempts in the past twelve (12) months | 4 | |
| | divided by | Average daily population | 3422 | .11% |
| | (4) | Number of offender suicides in the past twelve (12) months | 0 | |
| | divided by | Average daily population | 3422 | 0% |
| | (5) | Number of unexpected natural deaths in the past twelve (12) months | 0 | |
| | divided by | Total number of deaths in the same reporting period. | 11 | 0% |
| | (6) | Number of serious medication errors in the past twelve (12) months | 4 | |

# COMMISSION ON ACCREDITATION FOR CORRECTIONS
## PANEL ACTION REPORT

Denver Convention Center
Denver, Colorado

July 21, 2012

California Department of Corrections and
Rehabilitation
Central California Women's Facility
Chowchilla, California

Agency Representatives:          Deborah Johnson, Warden

Panel Members:                   Marge Webster, Chairperson
                                 James LeBlanc
                                 Cynthia Mausser
                                 Joan Shoemaker

Staff:                           Kenya Golden

## Panel Action

Standard #4-4132               Plan of Action

Standard #4-4133               Plan of Action

Standard # 4-4141              Plan of Action

Standard # 4-4230              Plan of Action

Standard # 4-4238              Plan of Action

Standard # 4-4257              Plan of Action

Standard # 4-4270              Plan of Action

Standard # 4-4495              Plan of Action

## Accreditation Panel Decision

Moved:                         Commissioner Webster

Seconded:                              Commissioner LeBlanc

Three-Year Accreditation:              Yes

| **Accreditation Vote** | **Yes** | **No** |
|---|---|---|
| Commissioner Webster | ✓ | |
| Commissioner LeBlanc | ✓ | |
| Commissioner Mausser | ✓ | |
| Commissioner Shoemaker | ✓ | |

**Final Tally**

| | |
|---|---|
| Mandatory | 100% |
| Non-Mandatory | 98.16% |

## The American Correctional Association

### and the
### Commission on Accreditation for Corrections

*awards*

# ACCREDITATION

to

*California Department of Corrections and Rehabilitation*

*Central California Women's Facility*

*Chowchilla, California*

*2012-2015*

**in recognition of the attainment of excellence in the operation of**

*an Adult Correctional Institution*

**presented this** 23rd **day of** July 2012



_____
ACA PRESIDENT

_____
ACA EXECUTIVE DIRECTOR



AMERICAN CORRECTIONAL ASSOCIATION

_____
COMMISSION CHAIR

_____
DIRECTOR, STANDARDS AND ACCREDITATION

*American Correctional Association*

# ACCREDITATION
# REPORT



*Commission on Accreditation for Corrections*

**California Department of Corrections and Rehabilitation**
**California State Prison- Sacramento**
**Folsom, California**

*The mission of the Commission on Accreditation for Corrections is to upgrade and improve practices and conditions in adult and juvenile correctional facilities and programs through an accreditation process which is founded on a commitment to accountability, professionalism and respect for basic human rights and which recognizes sound and effective correctional practices, while striving towards excellence in the field of corrections.*

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

---

August 6, 2012

California Department of Corrections and Rehabilitation
California State Prison- Sacramento
Folsom, California

Congratulations!

It is a pleasure to officially inform you that the California State Prison- Sacramento was accredited by the Commission on Accreditation for Corrections at the American Correctional Association 2012 Congress of Correction on July 23, 2012 in Denver, Colorado.

Your accreditation represents the satisfactory completion of a rigorous self-evaluation, followed by an outside review by a team of independent auditors.

Every profession strives to provide a high quality of service to society.  To know that you, your staff, and other officials are complying with the requirements of the accreditation process is indeed a statement of a high level of commitment to the staff and persons under your care.-

On behalf of the Commission on Accreditation for Corrections, thank you for your commitment to the corrections profession.

Sincerely,

*Lannette Linthicum*

Lannette Linthicum, Chairperson
Commission on Accreditation for Corrections

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

For Immediate Release

# California State Prison- Sacramento Awarded National Accreditation

Lannette Linthicum, Chairperson of the Commission on Accreditation for Corrections (CAC), and Kathy Black-Dennis, Director of Standards and Accreditation, American Correctional Association recently announced the accreditation of the California State Prison- Sacramento. The award was presented in conjunction with the American Correctional Association 2012 Congress of Correction on July 23, 2012 in Denver, Colorado.

In presenting the award, Lannette Linthicum, Chairperson of the CAC, and Daron Hall, President of the American Correctional Association (ACA), complimented the facility on their professional level of operation and their success in completing the accreditation process.  The agency is one of over 1,500 correctional organizations currently involved in accreditation across the nation.

The accreditation program is a professional peer review process based on national standards that have evolved since the founding of the Association in 1870.  The standards were developed by national leaders from the field of corrections, law, architecture, health care, and other groups who are interested in sound correctional management.

ACA standards address services, programs, health care and security operations essential to effective correctional management.  Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders.  Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for agencies and facilities throughout the world.

The three-year accreditation award granted to the California State Prison- Sacramento does not signal the end of their involvement in the accreditation process.  During the award period, staff will work to improve any deficiencies identified during the audit and maintain continuous compliance with the standards.

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org


**FOUNDED 1870**

**EXECUTIVE COMMITTEE**

**Daron Hall, TN**
President-Elect

**Patricia L. Caruso, MI**
Vice President

**Mary L. Livers, LA**
Treasurer

**Harold W. Clark, VA**
Immediate Past President

**Artis R. Hobbs, AR**
Board of Governors
Representative

**David L. Thomas, FL**
Board of Governors
Representative

**James A. Gondles, Jr., VA**
Executive Director

Congratulations on your accreditation award!  You are now a member of the elite in achieving correctional excellence.  The certificate you have received is but a small symbol of the enormous dedication and commitment demonstrated by each and every member of your staff to the accreditation process, and I urge you to display it prominently as a continual reminder of the level of professionalism achieved.  This is just the beginning of your journey, however, for the true test of excellence is the test of time.  It is critical that your operation be able to sustain this achievement over time and be constant through both prosperity and adversity.

The logo of the Commission on Accreditation for Corrections depicts a sextant. Those who chose this symbol did so because "the sextant is an instrument used by a navigator to pinpoint the location of his ship in relation to the established points of reference in the universe, with the purpose of charting his future course."  This is the exact purpose of accreditation; objectively reviewing an agency or facility and giving it a goal for which to strive, a destination to reach.  Accreditation is the sextant for our profession; let it be your guide as well.

Thank you for your commitment to the American Correctional Association and the standards and accreditation process.


Kathy Black-Dennis, Director
Standards and Accreditation
American Correctional Association

## Overview of the American Correctional Association

The American Correctional Association is the oldest and most prestigious correctional membership organization in the United States. Founded in 1870, ACA currently represents more than 20,000 correctional practitioners in the United States and Canada. Members include all levels of staff from a wide variety of correctional disciplines and programs as well as professionals in allied fields and representatives from the general public. In addition, the Association represents the interests of 74 affiliated organizations whose goals, while similar to those of ACA, focus on specialized fields and concerns within the realm of corrections.

At its first organizational meeting held in Cincinnati, Ohio, in 1870, the Association elected then-Ohio governor and future U.S. President, Rutherford B. Hayes, as its first president. The *Declaration of Principles* developed at that first meeting became the guidelines for correctional goals in both the United States and Europe.

Since that time, ACA has continued to take a leadership role in corrections and work toward a unified voice in correctional policy. In recent years, one of the Association's major goals has been the development of national correctional policies and resolutions of significant issues in corrections. These policies are considered for ratification at the Association's two annual conferences and ratified policies are then disseminated to the field and other interested groups. ACA has also had a major role in designing and implementing professional standards for correctional practices, as well as methods for measuring compliance with those standards.

The Association conducts research and evaluation activities, provides training and technical assistance, and carries out the regular responsibilities of any professional membership organization, including a full publications program. The Association's two annual conferences, held in varying cities across the nation, attract more than 5,000 delegates and participants each year from the 50 states, U.S. territories, and several foreign countries.

Membership in ACA is open to any individual, agency, or organization interested in the improvement of corrections and the purposes and objectives of the Association. Members include the majority of state, local, provincial, and territorial correctional agencies; individual correctional institutions and local jails, pretrial programs and agencies, schools of criminal justice in colleges and universities, libraries; and various probation, parole, and correctional agencies. Most of ACA's members are employed at the federal, state, and local levels. Members also include more than 200 volunteers affiliated with these agencies as administrators or as members of advisory boards and committees.

## Organizational Purposes of the American Correctional Association

Among the most significant purposes of the Association as outlined in its Constitution, are:

*To promote the coordination of correctional organizations, agencies, programs, and services to reduce fragmentation and duplication of effort and increase the efficiency of correctional services on a national basis.*

*To develop and maintain liaisons and a close working relationship in America with national, regional, state, and local associations and agencies in the correctional, criminal justice, civic, and related fields for mutual assistance and the interchange of ideas and information, and to extend and strengthen cooperative working relationships with similar associations and agencies on the international level.*

*To develop and promote effective standards for the care, custody, training, and treatment of offenders in all age groups and all areas of the correctional field: detention facilities and services, institutions and other facilities for juvenile and adult offenders, probation, parole, community residential centers, and other community-based programs and services.*

*To conduct studies, surveys, and program evaluations in the correctional field, and provide technical assistance to correctional organizations, departments, institutions, and services.*

*To publish and distribute journals and other professional materials dealing with all types of correctional activities.*

*To promote the professional development of correctional staff at all levels.*

In carrying out these purposes, ACA sponsors programs for policy analysis, demonstration, and research. ACA also provides testimony, consultation, publications, conferences, workshops, and other activities designed to stimulate constructive action regarding correctional problems.

### Standard and Accreditation

Perhaps ACA'S greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,500 correctional agencies in the United States.

## Organizational Structure of the American Correctional Association

**Executive Committee**

The Executive Committee is composed of the elected officers of the Association - president, vice president, treasurer, two Board of Governors' members, the immediate past president, the president-elect, and the ACA executive director. The Executive Committee meets at least quarterly and exercises most of the powers of the Board of Governors during the intervals between meetings of the board.

**Board of Governors**

ACA's bylaws vest control of the Association with an 18-member elected Board of Governors composed of the officers of the Association and five at-large members. To ensure the interdisciplinary nature of the Association, board members must represent the following areas:

At-Large Citizen (not employed in corrections)
Correctional Administration (Adult)
Correctional Administration (Juvenile)
Institutions (Adult)
Institutions (Juvenile)
Probation (Adult)
Probation (Juvenile)
Parole or Post-Release Supervision (Adult)
Community Programs (Adult)

Community Programs (Juvenile)
Aftercare or Post-Release Supervision (Juvenile)
Detention (Adult)
Detention (Juvenile)
At-Large (Ethnic Minority) (3)
Education
Member At-Large

**Delegate Assembly**

The Delegate Assembly is composed of delegates from the professional affiliates, geographical chapters, membership at-large, Board of Governors, past presidents of ACA, and representatives of each military service. The Delegate Assembly can establish policy, define Association positions on broad social and professional issues, and determine major programs and legislative priorities. They meet at least twice annually, at the Winter Conference and Congress of Correction.

**Committees**

The majority of the Association's activities take place through committees. Each committee chair reports to the Association's Board of Governors at least twice a year. In this way, the Association collectively benefits from the involvement and contribution of the hundreds of individuals who function on the various committees. Ad-hoc committees are appointed by the president of the Association.

The current committees and councils are:

Committee on Affirmative Action                    Committee on Constitution and Bylaws

Committee on International Relations
Committee on Congress Program Planning
Committee on Legal Issues
Committee on Correctional Awards
Committee on Membership
Committee on Military Affairs
Council of Professional Affiliates
Council of Dual-Membership Chapters and
State and Geographical Affiliates
Nominating Committee

Council on Professional Education
Credentials Committee
Research Council
Eligibility Committee
Resolutions & Policy Development
Comm
Committee on Ethics
Standards Committee
Legislative Affairs Committee

**Affiliates and Chapters**

Affiliates and state chapters are major features of the Association's structure. They represent professional, regional, and state groups across the United States and Canada. Affiliates and chapters contribute to the professional development of all members by providing consultation in their respective areas of interest and by participating in seminars and workshops at ACA's annual conferences.

The following affiliates and chapters are currently associated with ACA:

Alabama Council on Crime and Delinquency
Alston Wilkes Society
American Assn for Correctional Psychology
American Correctional Chaplains Association
American Correctional Food Service
Association
American Correctional Health Services Assn
American Institute of Architects
American Jail Association
American Probation and Parole Association
Arizona Probation, Parole, and Corrs Assn
Association for Corrl Research and Info Mgmt
Assn of Paroling Authorities, International
Assn of State Correctional Administrators
Assn of Women Executives in Corrections
International Assn of Correctional Officers
Iowa Corrections Association
Juvenile Justice Trainers Association
Kansas Correctional Association
Kentucky Council on Crime and Delinquency
Louisiana Correctional Association
Maryland Criminal Justice Association
Michigan Corrections Association
Middle Atlantic States Correctional
Association
Minnesota Corrections Association
Missouri Corrections Association

National Association of Adult and Juvenile
State
Corrections Mental Health Directors
National Assn of Blacks in Criminal Justice
National Association of Juvenile Corrl
Agencies
Oregon Criminal Justice Association
Parole and Probation Compact
Administrators Association
Pennsylvania Assn of Probation, Parole, and
Corrections
Prison Fellowship
South Carolina Correctional Association
Tennessee Corrections Association
Association on Programs for Female
Offenders
Central States Correctional Association
Colorado Correctional Association
Connecticut Criminal Justice Association
Correctional Association of Massachusetts
Correctional Accreditation Managers Assn
Correctional Education Association
Correctional Industries Association
Family and Corrections Network
Florida Council on Crime and Delinquency
Illinois Correctional Association
Indiana Correctional Association

International Assn of Corrl Training Personnel
International Community Corrections Assn
National Association of Probation Executives
National Coalition for Mental and Substance
Abuse Health Care in the Justice System
National Correctional Recreation Association
National Council on Crime and Delinquency
Nation Juvenile Detention Association
Nebraska Correctional Association
Nevada Correctional Association
New Jersey Chapter Association
New Mexico Correctional Association
New York Corrections and Youth Svcs Assn

North American Association of Wardens &
Superintendents
North Carolina Correctional Association
Ohio Correctional and Court Svcs
Association
Texas Corrections Association
The Salvation Army
Utah Correctional Association
Virginia Correctional Association
Volunteers of America
Washington Correctional Association
Wisconsin Correctional Association

## Major Activities of the American Correctional Association

**Legislation**

The American Correctional Association is involved with all major issues affecting corrections today. Members and ACA staff maintain close working relationships with committees of the U.S. Congress and all federal agencies and groups whose decisions affect correctional policy. Expert testimony on a wide range of correctional issues is prepared for congressional committee and subcommittee hearings, and recommendations are provided to federal administrative agencies.

To ensure that the concerns and issues of the corrections profession are represented in proposed legislation and public policy, ACA's legislative liaison is addressing legislative and government concerns that will impact the corrections profession. ACA has established partnerships between chapters and affiliates and other national policy making organizations to present a strong collective voice for correctional reform throughout the world.

**Professional Development**

The purpose of the Association's Professional Development Department is to plan, promote, and coordinate professional development through training seminars, workshops, and published materials including curriculums, resource guides, and monographs.

ACA's training plan calls for a variety of professional development activities. Nationally advertised workshops cover topics such as training for trainers, management training, community-based employment programs, and stress management. On-site workshops for state and local departments of corrections are offered in curriculum development, supervision, communications, and report-writing skills.

The *Training for Correctional Staff Trainers* workshops further the skills of correctional professionals qualified to initiate and deliver training. These workshops also enable agencies to comply with national standards for accreditation and ensure that training is job-related and professionally developed and presented.

The department also offers correspondence courses to further professional development. More than 6,000 correctional personnel have completed or are in the process of completing ACA's self-instruction training program for correctional officers. This program, developed under the auspices of the National Institute of Corrections, provides 40 hours of basic training in accordance with ACA standards. A score of at least 80 percent on the comprehensive examination must be attained to achieve certification.

The Association has similar courses available for correctional supervisors, juvenile caseworkers, and food service employees. Additional courses which cover report writing skills, correctional management skills, legal issues for probation and parole officers, and legal issues for correctional officers are also available.

**Publications**

As one of the leading publishers of practical correctional publications, ACA produces books, videos, and lesson plans. Among the wide ranging subjects available are management, community, security, counseling, law, history, and health. These excellent resources for career advancement appeal to practitioners and scholars alike. Directories for every major sector of corrections are also published by ACA.

The following is just a few of the many publications that ACA offers:

*Corrections Today* is the major corrections magazine in the United States. Published seven times a year, it focuses on the interests of the professional correctional employee and administrator. Articles include reports of original research, experiences from the field, discussion of public policy, and the perspectives of prominent practitioners and academicians.

*On the Line* is published five times a year and contains national and local news of interest to the criminal justice professional.

*Corrections Compendium Newsletter* publishes cutting-edge information about the corrections environment. Survey information is compiled from 52 U.S. and 14 Canadian correctional systems.

*The Juvenile and Adult Directory* has been published since 1939. A revised edition of the directory is released each January. This publication is the only up-to-date, comprehensive directory of all U.S. and Canadian juvenile and adult correctional departments, institutions, agencies, and paroling authorities.

*The National Jail and Adult Detention Directory* was first published in 1978. It is a source of information concerning jails. The directory, published every two years, attempts to list all jails in the United States that house offenders or detainees for more than 48 hours.

*The Probation and Parole Directory*, updated every two years, provides over 500 pages of information regarding federal, state, and county adult and juvenile probation, parole and aftercare systems in the United States. It includes statistics on caseloads, expenditures, and personnel.

*The State of Corrections*, formerly *The Proceedings*, includes the events of both the Congress of Correction and the Winter Conference. Published since 1870, it includes selected speeches and panel presentations concerning the latest thoughts and practices in the criminal justice field.

*Correctional standards* are the most significant improvement in correctional programming. As the basis for accreditation, they give administrators a nationally recognized system for upgrading and improving their correctional services. The Association currently publishes over 20 manuals for every correctional discipline.

To aid in the development of policy with relation to accreditation, *Guidelines for the Development of Policies and Procedures* are available for adult correctional institutions, adult parole authorities/adult probation and parole field services, adult local detention facilities, adult community residential services, juvenile detention facilities, and juvenile training schools.

**Conventions**

ACA hosts two national conventions each year that attract more than 5,000 professionals from all aspects of corrections; the Winter Conference held in January, and the Congress of Correction, held in August. These events include a variety of workshops, exhibits, and seminars devoted to addressing topics specific to the corrections profession.

**Contracts and Grants**

The American Correctional Association has a history of successful grant and contract management and administration. ACA has completed contracts and grants of more than $30 million. These diverse initiatives, which are funded through federal and private sources, add to the technical expertise and knowledge of the organization as well as to the total field of corrections.

**Standards and Accreditation**

Perhaps ACA's greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,200 correctional agencies in the United States.

## Overview of the Commission on Accreditation for Corrections

The Commission on Accreditation for Corrections (CAC) is a private, nonprofit organization established in 1974 with the dual purpose of developing comprehensive, national standards for corrections and implementing a voluntary program of accreditation to measure compliance with those standards.

The Commission was originally developed as part of the American Correctional Association. In 1979, by joint agreement, the Commission separated from the Association in order to independently administer the accreditation program. Between 1978 and 1986, the organizations shared the responsibility for developing and approving standards and electing members of the Commission. On November 7, 1986, the Commission on Accreditation for Corrections officially realigned itself with the American Correctional Association.

The Commission meets at least twice each year. The responsibility of rendering accreditation decisions rests solely with this board. The members of the Commission represent the full range of adult and juvenile corrections and the criminal justice system. They are elected from the following categories:

> National Association of Juvenile Correctional Agencies (1 representative)
> Council of Juvenile Correctional Administrators (1 representative)
> Association of State Correctional Administrators (2 representatives)
> National Sheriffs' Association (2 representatives)
> American Jail Association (1 representative)
> North American Association of Wardens and Superintendents (1 representative)
> International Community Corrections Association (1 representative)
> American Probation and Parole Association (1 representative)
> Association of Paroling Authorities International (1 representative)
> National Juvenile Detention Association (1 representative)
> American Bar Association (1 representative)
> American Institute of Architects (1 representative)
> National Association of Counties (1 representative)
> Correctional Health (Physician) (1 representative)
> Juvenile Probation/Aftercare (1 representative)
> Adult Probation/Parole (1 representative)
> At-Large (17 representatives)
> Citizen At-Large (Not in Corrections) (1 representative)

**Association Staff**

Accreditation activities are supported by the staff of the American Correctional Association, Standards and Accreditation Department, under the leadership of the director of the department. Standards and Accreditation Department staff is responsible for the daily operation of the accreditation program. Agencies in the process have contact primarily with the accreditation specialist responsible for their state or agency.

**Auditors**

Over 600 corrections professionals in the United States have been selected, trained, and employed on a contract basis by the Association. These individuals perform the field work for the Association which includes providing assistance to agencies working toward accreditation, conducting on-site audits of agencies to assess compliance with standards and confirming that requirements are met, and monitoring to ensure maintenance of the conditions required for accreditation. Teams of auditors, referred to visiting committees or audit teams, are formed to conduct standards compliance audits of agencies seeking accreditation and reaccreditation.

Auditors are recruited nationally through announcements in prominent criminal justice publications and at major correctional meetings. Affirmative action and equal employment opportunity requirements and guidelines are followed in the recruitment of auditors. All auditors employed by the Association have a minimum of three years of responsible management experience, have received a recommendation from an agency administrator, and have demonstrated knowledge in the substantive area(s) in which they are employed to assist the Association. In addition, all auditors must successfully complete the Association's auditor training and be members of the ACA in good standing.

**Standards Development**

Development of the ACA standards began in 1974 with an extensive program of drafting, field testing, revising, and approving standards for application to all areas of corrections. Since then, over 1,200 correctional facilities and programs have adopted the standards for implementation through accreditation, and many others have applied the standards informally themselves.

In the development of standards, the goal was to prescribe the best possible practices that could be achieved in the United States today, while being both realistic and practical. Steps were taken to ensure that the standards would be representative of past standards development efforts, reflect the best judgment of corrections professionals regarding good corrections practice, recognize current case law, and be clear, relevant, and comprehensive. The standards development and approval process has involved participation by a wide range of concerned individuals and organizations. Twenty-three manuals of standards are now used in the accreditation process:

> *Standards for the Administration of Correctional Agencies*
> *Standards for Adult Parole Authorities*
> *Standards for Adult Probation and Parole Field Services*
> *Standards for Adult Correctional Institutions*
> *Standards for Adult Local Detention Facilities*
> *Standards for Small Jail Facilities*
> *Standards for Electronic Monitoring Programs*
> *Standards for Adult Community Residential Services*
> *Standards for Adult Correctional Boot Camps*
> *Standards for Correctional Industries*
> *Standards for Core Jails*

*Standards for Correctional Training Academies*
*Standards for Juvenile Community Residential Facilities*
*Standards for Correctional Facilities*
*Standards for Juvenile Detention Facilities*
*Standards for Juvenile Day Treatment Programs*
*Standards for Juvenile Correctional Boot Camps*
*Standards for Therapeutic Communities*
*Standards for Small Juvenile Detention Facilities*
*Standards for Performance-Based Health Care in Adult Correctional Institutions*
*Certification Standards for Health Care Programs*
*Standards for Adult Correctional Institutions (in Spanish)*

The standards establish clear goals and objectives critical to the provision of constitutional and humane correctional programs and services. The standards include the requirement for practices to promote sound administration and fiscal controls, an adequate physical plant, adherence to legal criteria and provision of basic services. Basic services called for by the standards include the establishment of a functional physical plant, training of staff, adoption of sanitation and safety minimums, and provision of a safe and secure living environment. In offering specific guidelines for facility and program operations, the manuals of standards address due process and discipline, including access to the courts, mail and visitation, searches, and conditions of confinement of special management offenders.

The standards are systematically revised to keep pace with the evolution of different correctional practices, case law, and after careful examination of experiences, applying them over a period of time and circumstances. The ACA Standards Committee, which includes membership from the Commission on Accreditation for Corrections, is responsible for standards development and revision.

The ACA publishes biannual supplement to the standards with updated information and clarifications until new editions of standards manuals are published. Each supplement addresses standards interpretations, deletions, revisions, and additions for all manuals of standards issued by the Standards and Accreditation Department.

Suggestions and proposals for revisions to the standards from the field and interested others are encouraged. The Standards and Accreditation Department has developed a standards proposal form specifically for this purpose. The standards proposal form can be obtained from the Standards Supplement, the ACA website, or Standards and Accreditation Department staff (Appendix A). Proposals should be submitted via the ACA website.

# Accreditation Process Descriptions

For over 120 years, the American Correctional Association has been the only national body involved in the development of standards for the correctional field. ACA standards are supported by ACA's Standards and Accreditation Department and the Commission on Accreditation for Corrections, which is the evaluating and certifying body for accreditation. The department is responsible for the administration of accreditation and ongoing development of correctional standards.

The accreditation process is a voluntary program for all types of correctional agencies. For these agencies, accreditation offers the opportunity to evaluate their operations against national standards, to remedy deficiencies, and to upgrade the quality of programs and services. The recognized benefits of such a process include: improved management; a defense against lawsuits through documentation; demonstration of a "good faith" effort to improve conditions of confinement; increased accountability and enhanced public credibility for administrative and line staff; a safer and more humane environment for personnel and offenders; and the establishment of measurable criteria for upgrading programs, staffing, and physical plant on a continuous basis.

A major component of the accreditation process is the standards compliance audit conducted by a visiting committee. The purpose of the audit is to measure operations against the standards, based on documentation provided by the agency.

## The Visiting Committee Report

The results of the standards compliance audit are contained in the visiting committee report, a document prepared by the visiting committee chairperson. The report is distributed to the agency administrator and members of the visiting committee. This report is also submitted to the Commission on Accreditation for Corrections for consideration at the accreditation hearing.

The following information is usually contained in the visiting committee report:

*Agency and Audit Narrative*

The agency narrative includes a description of program services, a description of physical plant, number of offenders served on the days of the audit, a summary significant incidents and consent decrees, class action lawsuits and/or judgments against the agency/facility, if applicable. The audit narrative, prepared by the visiting committee chairperson, describes audit activities and findings. The narrative examines issues or concerns that may affect the quality of life and services in an agency or facility. Quality of life issues include areas such as staff training, adequacy of medical service, sanitation, use of segregation and detention, reported and/or documented incidences of violence and crowding in institutions, offender activity levels, programming and provision of basic services. The audit narrative also contains comments as a result of staff and offender interviews, and a detailed explanation of all noncompliant and not applicable standards.

*Agency Response*

The agency has three options for standards found in noncompliance: a plan of action; an appeal; or a waiver request.

A **plan of action** is a detailed statement of tasks to be performed in order to achieve compliance with a standard found in noncompliance at the time of the audit. The plan of action designates staff responsibilities and timetables for completion.

An **appeal** is the agency's attempt to change the visiting committee's decision on a standard. The result of a successful appeal is a change in the status of the standard and a recalculation of the compliance tally.

A **waiver** may be requested when noncompliance with a standard does not adversely affect the life, health, or safety of staff and offenders and when quality of life conditions compensate for the lack of implementation of a plan of action. The granting of a waiver by the Commission waives the requirement for submitting a plan of action; however, it does not change the noncompliant finding.

A **discretionary compliance request** is when there are circumstances in which agencies choose not to comply with a particular standard for a variety of reasons. These reasons include:

- An unwillingness to request funds from a parent agency or funding source.

- A preference to satisfy the standard/expected practice's intent in an alternative fashion.

- An objection from a parent agency, higher level government official or funding source to the nature of the standard/expected practice.

- A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice.

- An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

*Auditor's Response*

This section contains the visiting committee's final reply to all responses received from the agency and includes comments regarding the acceptability of plans of action, appeals, and waivers.

## Accreditation Hearings

The Commission on Accreditation for Corrections is solely responsible for rendering accreditation decisions and considers an agency's application at its next regular meeting following completion of the visiting committee report. The Commission is divided into panels that are empowered to reach and render accreditation decisions. These panels hear the individual application for accreditation and include a quorum of at least three Commissioners which includes the panel hearing chairperson. Agencies are notified in writing of the date, time, and location of the hearings by Standards and Accreditation Department Staff.

The panel hearing is the last step in the process. With the panel chairperson presiding, panel members discuss issues and raise questions relative to all aspects of agency operations and participation in the process. The information presented during the hearing and in the visiting committee report is considered by the panel members in rendering accreditation decisions.

The agency is invited to have a representative at the hearing and, in most cases, one or more individuals attend. When special conditions warrant, the visiting committee chairperson or a member of the visiting committee also may be asked to attend the hearings. When this occurs, the auditor provides information to help clarify controversial issues and responds to questions and concerns posed by panel members.

Attendance by any other parties (i.e. media representatives, public officials, or personnel from agencies other than the applicant) occurs only with the permission of the applicant agency. In these cases, the applicant agency representatives and panel members discuss procedures to be followed before commencement of the hearing.

## Conduct of Hearings

The panel schedule provides ample time for review of each individual agency pursuing accreditation. Hearings are conducted by the panel chairperson in accordance with established procedures. Panel proceedings require that a formal vote be taken on all final actions, i.e., agency appeals, waiver requests, and the final accreditation decision of the Commission. All panel proceedings are tape-recorded to assist in preparing minutes of the hearings. Panel activities generally occur as follows:

- Applicant agency representatives are requested by Standards and Accreditation Department staff to be on-call to allow for scheduling flexibility.

- A designated waiting area is usually provided for this purpose.

- When the panel is ready to review the agency, the Standards and Accreditation Department staff representative notifies agency representative(s).

- The hearing opens with an introduction by the panel chairperson.
- The agency representative is asked to give a brief description of the

program.

- If a visiting committee member is present at the hearing, the panel chairperson may request that the auditor present an account of the visit, focusing on matters particularly pertinent to the decision or specific panel actions. In some cases, however, the panel may wish to call on the visiting committee member only to request additional information at different points during the hearing.

- The panel chairperson leads a standard by standard review of non-compliance issues. The agency representative presents information relative to their request for waivers, plans of action, appeals, and discretionary compliance requests. The agency may also present additional materials, including photographs or documentation, for review by the panel.

- Following the agency presentation, the chairperson has the option of calling the panel into executive session to consider the information provided, determine findings, and make an accreditation decision. Whether or not panel deliberations occur in the presence of agency personnel or in executive session varies from panel to panel, considering the preference of panel members and the sensitivity of issues to be discussed regarding the application.

In final deliberations, the Commission panel:

- Ensures compliance with all mandatory standards and at least 90 percent of all other standards.

- Responds with a formal vote to all appeals submitted by the applicant agency.

- Responds with a formal vote to all request for waivers, discretionary compliance, and plans of action submitted by the applicant agency.

At this time, the panel also:

- Assures that an acceptable plan of action will be submitted for every non-compliant standard, including those standards for which appeals of non-compliance and waiver requests have been denied by the panel. In judging the acceptability of plans of action, the panel ensures that all of the information requested on the form is provided. Furthermore, the feasibility of plans to achieve compliance is considered, including specific tasks, time frames, and resource availability (staff and funding) for implementing proposed remedies.

- Addresses to its satisfaction any concerns it has with visiting committee comments about the quality of life in the facility or program, patterns of non-compliance, or any other conditions reviewed by the panel relating to

the life, health, and safety of residents and staff.

For each application, a roll call vote to award accreditation, extend an agency in Candidate or Correspondent Status, or deny accreditation is conducted. The options for final action available to the panel are outlined in the next chapter.

If the panel has deliberated in executive session, agency representatives are invited back into the meeting and informed of the panel's final decision and actions or recommendations on all other issues raised by the applicant. If accreditation has not been granted, the chairperson discusses with agency personnel specific reasons for the decision and the conditions of extension in Candidate or Correspondent Status and procedures for appeal.

**Accreditation Decisions**

Three decisions relative to the accreditation of an agency are available to panels:

- *Three-year accreditation award* based on sufficient compliance with standards, acceptance of adequate plans of action for all non-compliant standards and satisfaction of any other life, health, and safety conditions established by the panel. The balance of the contract must be paid in full in order to receive a certificate of accreditation.

- *Extension of the applicant agency in Candidate Status* (initial accreditation only) for reasons of insufficient standards compliance, inadequate plans of action, or failure to meet other requirements as determined by the panel. The Commission may stipulate additional requirements for accreditation if, in its opinion, conditions exist in the facility or program that adversely affect the life, health, or safety of the offenders or staff. Extension of an applicant in Candidate Status is for period of time specified by the panel and for identified deficiencies if in the panel's judgment, the agency is actively pursuing compliance.

- *Probationary Status* is determined when the panel specifies that compliance levels are marginal, there is a significant decrease in compliance from the previous audit (in the case of reaccreditation), or there are quality of life issues that would indicate continued monitoring. While an award of accreditation is granted, a monitoring visit must be completed and the report presented at the next meeting of the Commission. The cost for a monitoring visit is borne by the agency at a rate of cost plus 25%. The agency does not have to appear before the Commission for the review of the monitoring visit report. If they choose to do so, all related travel expenses are borne by the agency. Specific expectations for removal from probation are outlined.

- *Denial of accreditation* removes the agency from Accredited Status (in the case of reaccreditation) and withdraws the agency from the accreditation program. Situations such as insufficient standards compliance, inadequate plans of action, failure to meet other requirements as determined by the panel or quality of life issues may lead to the denial of accreditation, it is

withdrawn from the process and is not eligible to re-apply (as an applicant) for accreditation status for a minimum of six months from the date of that panel hearing. The Commission will explain the process for appeal.

The agency receives written notification of all decisions relative to accreditation after the hearing.

**Appeal Process**

The accreditation process includes an appeal procedure to ensure the equity, fairness, and reliability of its decisions, particularly those that constitute either denial or withdrawal of Accredited Status. Therefore, an agency may submit an appeal of any denial or withdrawal of accreditation.

The basis for reconsideration is based on grounds that the decision(s) were:

- Arbitrary, capricious, or otherwise in substantial disregard of the criteria and/or procedures promulgated by the Commission.

- Based on incorrect facts or an incorrect interpretation of facts.

- Unsupported by substantial evidence.

- Based on information that is no longer accurate.

The reasonableness of the standards, criteria, and/or procedures for the process may not serve as the basis for reconsideration. The procedures for reconsideration are as follows:

- The agency submits written request for reconsideration to the Director of Standards within 30 days of the adverse decision stating the basis for the request.

- The Executive Committee of the Commission, composed of the officers of the Commission, reviews the request and decides whether or not the agency's request presents sufficient evidence to warrant a reconsideration hearing before the Commission. The agency is notified in writing of the Executive Committee's decision.

- If the decision is made to conduct a hearing, the hearing is scheduled for the next full Commission meeting and the agency is notified of the date.

- The agency, at its option and expense, has the right of representation, including counsel.

- Following the hearing held before the Commission, the decision, reflecting a majority opinion, is made known to the agency immediately.

- Pending completion of the reconsideration process, the agency maintains its

prior status.  Until a final decision has been reached, all public statements concerning the agency's accredited status are withheld.

▪    Following completion of the reconsideration process, any change in the status of an agency is reflected in the next regularly published list of accredited agencies.

## Accredited Status

The accreditation period is three years, during which time the agency must maintain the level of standards compliance achieved during the audit and work towards compliance of those standards found in non-compliance. Regular contact with Standards and Accreditation Department staff should also be maintained.

**Annual Report**

During the three year accreditation period, the agency submits an annual report to the Standards and Accreditation Department. This statement is due on the anniversary of the accreditation (panel hearing) date and contains the following information:

*Current standards compliance levels* – This includes any changes in standards compliance since accreditation, listing on a standard-by-standard basis any standard with which the agency has fallen out of compliance or achieved compliance.

*Update of plans of action* – A progress report is included with respect to plans of action submitted to the hearing panel, indicating completion of plans resulting in compliance with standards and revised plans reflecting the need for additional time, funds, and/or resources to achieve compliance.

*Significant Events*- A report is made of events and occurrences at the agency during the preceding year that impact on standards compliance, agency operation, or the quality of services provided by the agency. This might include:

- A change in the agency administration and/or major staffing changes mission change or program revisions.

- Mission change or program revisions.

- Changes in the offender population, including number of offenders or general offender profile.

- Physical plant renovations, additions, or closing.

- Any major disturbances, such as extended periods or lock-down, employee work stoppages, etc.

- Any significant incident to include allegations of physical/sexual abuse.

- A death from other than natural causes.

Standards and Accreditation Department staff review the annual report received from the agency and respond to clarity issues or request additional information if necessary.

In addition to submission of the annual report, the agency is responsible for notifying Standards and Accreditation Department staff of any major incident, event, or circumstances

that might affect standards compliance. This notice must be provided to the Standards and Accreditation Department immediately following the event. For example, an agency must notify the Standards and Accreditation Department if it is the subject of a court order, has a major disturbance, escape, physical/sexual abuse (to include allegations), employee work stoppage, death from unnatural causes, or experiences a major fire or other disaster. It it the responsibility of the accredited agency to inform Standards and Accreditation Department staff or provide them with copies of news articles, special reports, or results of investigations that address conditions that affect standards compliance.

Finally, the Standards and Accreditation Department may request that the agency respond to public criticism, notoriety, or patterns of complaint about agency activity that suggests failure to maintain standards compliance. The Standards and Accreditation Department may conduct an on-site monitoring visit to the agency to verify continued compliance.

**Monitoring Visits**

Monitoring visits to agencies in Accredited Status are conducted by an ACA auditor(s) in order to assess continuing compliance with the standards. A monitoring visit may be conducted at anytime during the accreditation period, with advance notice to the agency. The determination of need for a monitoring visit is based on:

- Compliance levels, findings, and recommendations by the Commission on Accreditation for Corrections during the hearing.

- Incidents or events reported by the agency in its annual report.

- Problems indicated by adverse media reports or correspondence received by Standards and Accreditation Department staff, disturbances at the agency, or special investigations.

The length of the visit varies depending on the number of standards or special issues that must be addressed during the visit. The visits are conducted similar to standards compliance audits, but on a reduced scale. Monitoring visits are charged to the agency at a rate of cost plus twenty-five percent.

Activities, as a general rule, involve a review of all mandatory standards, all standards found in non-compliance at the time of accreditation, and any other concerns identified by the Commission. The visit also involves a tour of the agency and interviews with staff and offenders to ensure maintenance of the requirements of accreditation. It concludes with an exit interview during which the auditor informs the agency staff of the findings of the visit.

Following the visit, the auditor prepares a monitoring visit report that addresses findings of the visit. The report includes a list of standards reviewed, explanation of non-compliance findings, results of the tour and interviews with agency staff and offenders, and discussion of any issues believed to be relevant to the agency's accreditation. The report, as with others prepared by auditors, is reviewed and sent to the agency by Standards and Accreditation staff.

When a monitoring visit to the agency reveals deficiencies in maintaining compliance levels that existed at the time of accreditation, or less than 100 percent compliance with mandatory standards, the agency prepares a response providing explanation of the problems indicated in the report. When the agency has failed to maintain compliance with all mandatory standards, the monitoring visit report and the agency response are submitted to the Commission on Accreditation for Corrections for review during a regular hearing. Agency representatives are advised of the date, time, and location of the review, and are invited to attend. At the discretion of the Commission, the agency may be placed in probationary status and a revisit conducted to determine if deficiencies have been corrected.

**Revocation of Accreditation**

If the Commission panel believes that an agency's failure to maintain continuous compliance with certain standards is detrimental to life, health, and safety of residents and staff, the Commission may place an agency on probation. Probationary status last for a specific period of time designated by the Commission at its next regularly schedule meeting. The Commission again reviews the program and considers removing the probationary status or revoking accreditation. When the agency corrects the deficiencies within the probationary status period and the corrections have been verified and accepted, the agency resumes its status as an accredited agency. An agency that does not satisfactorily correct the deficiencies may be withdrawn from accreditation.

Another condition that may result in a rehearing and consideration of revocation is following a significant event in an agency (i.e. major disturbance, death from other than natural causes or allegations of physical/sexual abuse of offenders). Failure to notify the Standards and Accreditation Department in a timely manner may result in suspension of the agency's accreditation. Once ACA is notified of the major event, the Director of Standards and Accreditation may consult with the Executive Committee of the Commission, who may request a monitoring visit. If a visit is warranted, ACA will notify the agency and a date will be established with the concurrence of the facility. The monitoring visit will take place within 14 days of this notification. The monitoring visit report will be sent to the Director of Standards within 7 days of the monitoring visit and then forwarded to the Executive Committee of the Commission. Following review of the report, a determination will be made by the Executive Committee as to whether revocation of accreditation is warranted. Prior to any rehearing, agency representatives will be notified, so that any issues may be addressed and responded to in writing.

Accreditation is revoked for the following reasons:

- Failure on the part of the agency to adhere to the provisions on the contract.

- Failure on the part of the agency to maintain continuous compliance with the standards at levels sufficient for accreditation.

- Intentional misrepresentation of facts, lack of good faith, or lack of deliberate speed or a concerted effort to progress in the accreditation process, including the implementation of plans of action.

- ▪ Failure to notify ACA of significant incidents in the annual report to the Commission.

- ▪ Adverse conditions of confinement that affect the life health, and/or safety of staff and offenders.

- ▪ Failure to comply with the conditions of probation or suspension.

Standards and Accreditation Department staff notify the agency in writing of the specific reasons identified by the Commission for the revocation hearing. Agencies may appeal the decision of the Executive Committee to the full board of the Commission on Accreditation for Corrections. Appeals must be submitted within 30 days. The agency may apply to re-enter the process 180 days after the revocation of accreditation.

**Expiration of Accredited Status**

Accreditation is granted for a three year period. Unless the agency has applied for reaccreditation and completed activities in the process required for reaccreditation, the Commission withdraws the agency from Accreditation Status after this three year period.

For agencies in Accredited Status that are seeking subsequent accreditation, administrative extensions of Accredited Status may be granted under certain conditions. For example, relocation of the facility, staff turnover, and major renovations often warrant an extension. In these cases, a written request to the Director of Standards and Accreditation is required, outlining the reasons for extending the accreditation period. Agencies that fail to successfully complete an audit within the three year period, or do not receive an extension prior to their expiration date, are withdrawn from Accredited Status.

 

**Visiting Committee Report and Hearing Minutes**

CONFIDENTIALITY

*The American Correctional Association and the Commission on Accreditation for Corrections do not disclose to external parties specific information contained in this Accreditation Report or information discussed in the Accreditation Hearing. The Association encourages all participating agencies to provide information to the media about their accreditation activities, including disclosure of the Self-Evaluation and Accreditation Report.*

**COMMISSION ON ACCREDITATION FOR CORRECTIONS**

**STANDARDS COMPLIANCE INITIAL AUDIT**

California Department of Corrections and Rehabilitation
California State Prison, Sacramento
Folsom, California

April 16 – 18, 2012

<u>**VISITING COMMITTEE MEMBERS**</u>

Steve King, Chairperson
Planning/Research/Accreditation Manager
Nebraska Department of Corrections
1261 Fall Creek Road
Lincoln, Nebraska 68510
(402) 429-9600
steve.king@nebraska.gov

Jimmie Atmore
Correctional Consultant
2466 Orsota Circle
Ocoee, Florida 34761
(407) 614-8511
jcatmore@cfl.rr.com

Allan Westmoreland
Retired
Texas Dept. of Criminal Justice
860 Anderson County Road 420
Palestine, Texas 75803
(903) 729-4688
allanrosea@aol.com

## A.    Introduction

The audit of the California State Prison, Sacramento was conducted on April 16-18, 2012, by the following team:  Norman (Steve) King, Chairperson; Jimmie Atmore, Member; and Allan Westmoreland, Member.

## B.    Facility Demographics

Rated Capacity:                                         3,469

(Budgeted Capacity)                                     2,744*

*the Budgeted Capacity can and does vary from month to month.  In only two (Jan. and Feb., 2012) of the previous 12 months was the facility's population above budgeted capacity.  This was no greater than 2 percent.*

Actual Population:                                      2,791

Average Daily Population for the last 12 months:        2,834

Average Length of Stay:                                 Varies

Security/Custody Level:                                 Maximum with a Minimum Security Camp immediately adjacent

Age Range of Offenders:                                 18-80

Gender:                                                 Male

Full-Time Staff:                                        1,779
14 Administrative, 171 Support, 473 Program, 1,039 Security, 82 Other

## C.    Facility Description

Just to the north of Folsom, California situated in rolling hills lush with vegetation and trees is the California State Prison, Sacramento (CSP-SAC).  A common road just off of Natoma Street provides entrance into both California State Prison, Sacramento and to the Folsom State Prison, which lies immediately adjacent to it.  Both facilities lie on approximately 1,200 acres.  The manicured drive among the hills up to the facility reveals wildlife like deer in the trees, and wild turkeys walked along the road and next to the electrified fence of the facility.

California State Prison, Sacramento is a multi-mission institution.  Fundamentally, the institution houses level IV High or maximum inmates serving long sentences or those inmates who have proven to be management problems at other institutions.  In addition,

2

the institution serves as a medical hub for Northern California with a Psychiatric Services Unit (PSU), Enhanced Outpatient (EOP) and EOP Administrative Segregation levels of healthcare. CSP-Sacramento currently has an Outpatient Housing Unit (OHU and a Correctional Treatment Center (CTC) which was licensed in February 2003.

California State Prison is comprised of three compounds within a lethal electric fence. The three compounds are known as: 'A' Facility, 'B' Facility, and 'C' Facility. A Minimum-Support Facility (MSF) is immediately adjacent to 'A' Facility, just outside the 16 foot high concrete wall and lethal electrified fence which serve as the institution's perimeter.

The Minimum Support Facility (MSF) lies just outside the concrete walls and lethal fencing that surround the main compound of CSP, Sacramento. The Minimum Support Facility comprises two dormitories ('D' and 'E') that can house up to 368 Level I inmates. This facility lies immediately adjacent and to the south of 'A' Facility.

'A' Facility is a Level IV, 180 Design yard unit hat primarily houses Level IV Psychiatric Services Population (PSU). The PSU is capable of housing 256 inmates with mental health needs at the Enhanced Outpatient Program (EOP) level of care that are serving a Security Housing Unit (SHU) term. There are four cell blocks (1-4).

Enhanced Outpatient Program (EOP) in general population is housing for inmates with serious mental health needs. They are housed in Blocks 6 and 7 in 'A' Facility. EOP inmates require mental health care and medication and do not function well in the traditional GP (general population) environment.

Enhanced Outpatient Program, Administrative Segregation Unit (EOP/ASU) is capable of housing 74 inmates who are ASU inmates with mental health needs at the EOP level of care. They are housed in Block 9 in 'A' Facility.

General Population Sensitive Needs Yard (GP SNY is capable of housing 87 inmates with safety concerns. They are housed in Block 8. These inmates meet the needs of the facility by working in Education, the dining rooms, yards, law library, medical offices and custody offices.

Licensed Correctional Treatment Center is capable of housing 17 inmate-patients for 24 hour medical and psychiatric care. These are called CTCI.

Correctional Treatment Center (CTC) is capable of housing 12 psychiatric inmate-patients. In Mental Health Crisis Beds (MHCB), this unit provides 24 hour mental health care.

Outpatient Housing Unit (OHU) is capable of housing 20 medical and psychiatric inmate-patients. OHU is located in Block 8 (B section) and provides 24 hour nursing care.

The 'A' Facility Treatment Center provides mental health treatment for EOP, EOP ASU

and PSU inmate-patients.  All inmates in the mental health program are provided at least 1o hours per week in group therapy and/or one-to-one sessions with their case worker.

California dedicated this new Level IV prison on October 1, 1986.  The facility employed the 'clustered triangle' design which permitted a centralized control booth to have a 180 degree view of three units.  Each unit is comprised of 120 cell blocks with a control booth above at the hub.  The three facilities or housing units sit within the electrified fence and all inmates are within 16 foot high concrete walls as well.

California State Prison, Sacramento is sited on ground that has a long history of institutional use.  The remnants of an institutional tower still stand just outside the walls of CSP, Sacramento, and the granite foundation of an 1800's mental health institution, called "The Bug House' is also visible. This former mental health hospital was destroyed in the late 1800's reportedly following an attempted escape of a large number of its mentally-ill patients.

The Stand Alone unit (SA) houses up to 200 security risk Administrative Segregation Unit inmates.  Mental Health Program inmate-patients are not allowed in this unit.

'B' Facility is a Level IV, 180-design that houses maximum security inmates in General Population, Security Housing, Administrative Segregation, Enhanced Outpatient Programs, and mental Health Crisis Beds.  General Population housing in 'B' Facility is capable of housing 472 maximum security General Population inmates.  These inmates are housed in Blocks one, two, five, and six.

Enhanced Outpatient Program General Population (EOP GP) is capable of housing 256 inmates with serious mental health needs.  They are housed in Blocks 7 and 8.  EOP inmates require mental health and medical care and do not function well in general population.

Administrative Segregation Unit (ASU) is capable of housing 128 inmates in the Correctional Clinical Case Management System (CCCMS) who can be housed in ASU with close proximity to mental health care and programs.

Security Housing Unit (SHU) is capable of housing 128 high risk inmates with a current SHU term.  These inmates have committed a crime while incarcerated.

The Mental Health Crisis Bed Unit provides mental health treatment for EOP general population inmates.

The 'B' Facility Treatment Center provides mental health treatment for EOP and EOP ASU.  All inmates in the mental health program are provided at least 10 per week in group therapy and/or one-to-one sessions with their case worker.  The EOP Treatment Center had been under construction just prior to the Audit and had just opened at the beginning of April, 2012.

'C' Facility is a Level IV, 180-Design that houses maximum security General Population inmates. The facility is capable of housing 1,199 inmates. Due to previous prison overcrowding Level I and II inmates are housed in double or triple bunks inside the facility gymnasium. The 'C' gym is capable of housing 175 inmates. 'C' Facility is in the last stages of modification following a major disturbance that occurred on September 7, 2011. This reportedly was gang related.

The California State Prison is comprised of a total of 88 buildings of primarily of poured concrete construction. In total, there are approximately 1,543,077 square feet within CSP, Sacramento.

The facility is immediately adjacent to California's Folsom State Prison whose distinctive dark granite walls and famous entrance are easily visible from parts of the CSP-SAC facility. The town of Folsom, California (72,000 residents) is just a few miles to the south. The acreage that the prisons sit on is home to deer, wild turkeys and other wildlife.

Historically, The California Legislature authorized the construction of Folsom State Prison (FSP) in 1858 to relieve serious overcrowding at San Quentin State Prison. Twenty years later, in 1878, construction finally started for one of the nation's first maximum-security prisons. The location for the prison was an old gold mining site along the American River. There was an abundance of water, and huge granite deposits to sell for revenue. Utilizing inmates to quarry the stone appealed to Prison Directors. They exchanged convict labor at the rate of 50 cents a day for $15, 000 in property. Inmates built the first dam and canal on the American River, (between Folsom City and CSP) which led to the creation of the first hydroelectric power.

**D.    Pre-Audit Meeting**

The team met on April 15, 2012, in Folsom, California, to discuss the information provided by the Association staff and the officials from the California State Prison, Sacramento.

The chairperson divided standards into the following groups:

Standards #4-4001 - 4-4173 to Steve King, Chairperson
Standards #4-4174 - 4-4343 to Jimmie Atmore, Member
Standards #4-4343 - 4-4530 to Allan Westmoreland, Member

**E.    The Audit Process**

1.    Transportation

The team was escorted to the facility by Elijah Caron, ACA Sergeant.

5

2.    Entrance Interview

The audit team proceeded to the office of Tim Virga, Warden, in the facility's Administration Building.  The team expressed the appreciation of the Association for the opportunity to be involved with the California Department of Corrections and Rehabilitation and the California State Prison, Sacramento in the accreditation process.

Warden Tim Virga and ACA Sergeant Elijah Caron escorted the team to the in-service training hall where the formal entry meeting was held with participants from various members of the multidisciplinary institutional team including Mental Health, Custody, Nursing, Medical and Support Staff in attendance.
At 8:08 a.m. this meeting started with everyone in attendance taking a moment for introductions.  Warden Virga played a video for the Audit Team which served as an introduction of the facility and its mission.

The following persons were in attendance:

| | |
|---|---|
| Tim Virga | Warden |
| Dave Baughman | Chief Deputy Warden (A) |
| C. Cannedy | Facility Captain (B) |
| R. Carter | Associate Warden (C) |
| D. DeRoco | Facility Captain (C) |
| D. Higginbotham | Central Services Captain |
| D. Laguana | Facility Captain (A) |
| G. Turner | Health Care Access Captain |
| R. Adams | Correctional Business Manager |
| L. Eldridge | Associate Warden Business Services |
| R. Harrington | Associate Warden Health Care |
| J. Lynch | Associate Warden A Facility |
| V. Mini | Associate Warden B Facility |
| B. Moak | Classification and Parole Representative |
| L. Quinn | Public Information Officer |
| R. Taylor | Correctional Plant Manager |
| E. Daye | Chief Executive Officer |
| L. Deeds | Correct. Health Serv. Admin. & Corr. Support Exec. (A) |
| E. Caron | Sergeant – ACA Coordinator |
| J. Bai | Chief Medical Executive |
| S. Chaiken | Chief of Mental Health |
| P. Chief | Physician and Surgeon |
| J. Clough | Facility Lieutenant (C) |
| B. Quinn-Briggs | Superintendent Corr. Education Program |
| R. O'Brien | PSU Captain (A) |
| Chris Johns | Fire Dept. (FSP), Fire Chief |
| Robert L Ayers, Jr. | Warden (Retired) CDCR |
| Jim Krussow | Fire Chief, CDCR |

6

| Cindy Flores | Corr. Lt., Office of Audits & Court Compliance, CDCR |
| Rick Grenert | Corr. Lt., Office of Audits & Court Compliance, CDCR |
| Robert W. Fox | Associate Warder, California State Prison-Solano |

It was explained that the goal of the visiting team was to be as helpful and non-intrusive as possible during the conduct of the audit. The chairperson emphasized the goals of accreditation toward the efficiency and effectiveness of correctional systems throughout the United States. The audit schedule was also discussed at this time. The team indicated that they would debrief the Warden following the tour, then immediately audit the mandatory standards prior to finishing with the non-mandatory standards. The audit team indicated that they would keep the Warden and designated staff informed at all times of any issues that surfaced.

The Audit Team also indicated that they would work closely with staff from the California Department of Corrections and Rehabilitation's Office of Audits & Compliance and from the next two facilities (California State Prison-Solano and Central California Women's Facility) scheduled to undergo audits. Staff from all three groups was in attendance, and set to accompany the Audit Team on the facility tour and were given permission to observe the audit process.

Because California Department of Corrections and Rehabilitation was re-entering the accreditation process, the Audit Team felt it best to treat this audit not only as an initial audit, but also as a learning laboratory for both the Department and the next two facilities seeking accreditation. This seemed to best exemplify the 'spirit' of the initial audit process.

3.    Facility Tour

The team toured the entire facility from 9:00A.M. to 5:30P.M. The following persons accompanied the team on the tour and responded to the team's questions concerning facility operations:

| Tim Virga | Warden |
| Dave Baughman | Chief Deputy Warden (A) |
| Eli Caron | Sergeant – ACA Coordinator |
| D. Higginbotham | Central Services Captain |
| Robert L Ayers, Jr. | Warden (Retired) CDCR |
| Cindy Flores | Corr. Lt., Office of Audits & Court Compliance, CDCR |
| Rick Grenert | Corr. Lt., Office of Audits & Court Compliance, CDCR |
| Robert W. Fox | Associate Warder, California State Prison-Solano |

4.    Conditions of Confinement/Quality of Life

During the tour, the team evaluated the conditions of confinement at the facility. The following narrative description of the relevant programmatic services and functional areas summarizes the findings regarding the quality of life.

**Security:**

The California State Prison, Sacramento is a Level IV, multi-mission institution housing primarily maximum security inmates serving long sentences or those inmates who have proven to be management problems at other institutions. Because of this, the security at CSP, Sacramento reflects this Level IV designation with a high security electrified (lethal) envelope that completely surrounds the three 'A', 'B', and 'C' facilities within its perimeter. These three units are separated by various fences and security posts to control offender movement. Inside this lethal fence is a 16 foot high solid concrete wall that surrounds all three (A, B and C) interior facilities. The entire facility, its construction, design, and staffing are focused on providing increased security and control at the institution thereby providing maximum containment and control of violence. In 2011, the California State Prison, Sacramento recorded 900 incidents, 450 of which required the use of force. There were two inmate homicides reported last year. The CSP, Sacramento houses inmates:

- with the highest level of security;
- with the highest level of Mental Health needs;
- with the highest level of Reportable Incidents; and,
- with the highest level of the Use of Force.

Outside of the electrified fence and walled facility is a Minimum Support Facility (MSF). This unit houses up to 368 Level I inmates in two dorms ('D' and 'E'). The current population of the MSF is 248. This facility lies immediately south of 'A' Facility. Perimeter security around the MSF consists of a fence with razor ribbon.

Twelve towers are visible around the perimeter of CSP, Sacramento, however only two are in operation currently. Both towers currently operating do so twenty-four hours per day, seven days per week. The facility also has an armed perimeter vehicle post in operation at all times (all three shifts).

Custody staff at CSP, Sacramento are designated qualified 'peace officers' and as such are allowed to take their weapon home with them at night into the community. There was a firing range on property that was used by CSP, Sacramento and Folsom State Prison to continue firearms training.

Control booths in all housing units are 'armed posts' with officers carrying mini-14's strapped across their chests and the gun ports in the housing unit bubbles open. Signage indicates that no warning shot will be fired. Post Orders had been reviewed and staff was very knowledgeable concerning their post responsibilities.

California Department of Corrections and Rehabilitation (CDCR) policy (DOM Chapter 5, Article 16, Section 52020.4, DOM Supplement 52020.5.5, Daily Movement Sheet, and Post Orders) states that a physical count of all inmates shall

be performed a minimum of four times each calendar day, unless otherwise authorized in writing by the Director. All inmate movement and activity ceases when count has been initiated by Central Control with the exception of any emergency medical transport to outside. Individual count totals are conveyed to Central Control. These must correspond with Central Control's Master Count Record which was reconciled with the Bed Vacancy Report and Master Out Count Record. The Audit Team was able to observe count during 1st watch.

Another key component of security, staff training is broken down into three basic categories: Formal Training which is called In Service Training (IST), which the employees are prescheduled to attend. The employees are scheduled away from their assigned post, and provided with training utilizing approved department lesson plans and materials. On the Job Training (OJT) is usually provided by the employee's supervisor and during the employees assigned work hours. All staffs are mandated to receive annual OJT on various classification specific topics. The last category is Out Service Training (OST), which is defined as prescheduled classes, seminars, conferences or any formalized training that is not conducted at the institution. Although these types of trainings are conducted in different settings, each of these categories allow staff to receive training that is necessary and essential to their respective jobs classification and duties. In addition to the 34 hours of mandatory training as outlined by the Office of Training & Professional Development (OTPD), local In Service Training managers, have the ability to develop, modify, & implement 6 hours of training that is specific to their local institutional needs. This training is designed to enhance the employee's ability to effectively enforce rules and regulations that pertain specifically to their Institutions mission. The 34 hour OTPD schedule is added to the local 6 hour training schedule to complete the annual 40 hour IST class schedule for employees to attend. Each Employee is required to fulfill their Annual Training Agreement (ATA) DOM Section 32010.16.1 by completing a minimum of 40 hours of formalized training on a variety of courses that are required by State Law, Departmental Policy, or updates to departmental procedures. All training classes are assigned a course code and input into the Departmental Data Base (Fox Pro) for tracking and record keeping. Every IST office is required to track and maintain all staff training utilizing the FoxPro database. Every Supervisor receives an evaluation of their staff's training attendance for those required courses and hours during accumulated during the rating period. Staff who miss any required class or have insufficient hours will receive a rating of "Improvement Needed," while staff who attend all required classes and have sufficient hours will receive a "Standard" rating. Any staff member who attends all their mandatory courses and has received an additional twenty plus hours of training will receive an IST rating of "Outstanding." The Office of Training and Professional Development (OTPD) then conduct annual audits of all IST Departments to ensure their compliance with standards as established by OTPD and outlined in policy. The ability to track training and insure compliance with standards, ACA or departmental was in place and functioning.

The primary armory is located outside the main entrance to the institution between sally port between towers 'A' and 'B'. Each facility (A, B, and C) is equipped with staging areas within the perimeter where staff is issued equipment

Three major security incidents occurred at California State Prison, Sacramento during the audit. The first happened the evening prior to the audit when an inmate from the Minimum Security Facility (MSF) climbed the fence and escaped.
When the Audit Team was driving through the City of Folsom that morning prior to entering the facility, police and California Department of Corrections and Rehabilitation vehicles could be seen everywhere as part of a coordinated search effort. A flashing red light at the corner of Natoma and the entrance road into Folsom State Prison and California State Prison, Sacramento signaled major problems at the compound. The facility was forced to move the Audit Team into another room as a 'Command Center' had been set up in that room and remained in operation for the next 2.5 days. The inmate was eventually captured on Wednesday within a short distance from where he had last been seen.

The second incident happened on Monday, April 16 in the morning when the Audit Team was touring the Minimum Security Facility when word came of a major disturbance on the yard in 'A' facility. A confrontation between gangs erupted, staff fired shots and eventually a total of 35 inmates were removed to segregation. That same afternoon, the Audit Team was touring when the alarm sounded and staff immediately reacted. Although the alarm eventually turned out to be a false one, the Audit Team had the opportunity to witness staff emergency procedures in action. Staff's reaction was instantaneous. There was no hesitation. Staff exhibited a much disciplined, highly motivated response. It was obvious that they had done this before and knew that others depended on them to respond quickly.

On Tuesday, in 'B' facility, another incident happened in the yard and an inmate was injured. Although the Audit Team did not witness this incident, staff did a good job of managing the ACA Audit and the business of running a Level IV security facility. Their efforts which we observed in the Command Center operation and in the response teams were clearly focused on the safety/security of the public, the inmates and staff.

**Environmental Conditions:**

The environmental conditions at the California State Prison, Sacramento are adequate. Lighting, sound, and air circulation levels are within normal ranges. The facility is well maintained. Temperature throughout the facility (A, B, and C), and the Minimum Security Facility was very comfortable.

**Sanitation:**

Overall, the facility exhibited a high degree of attention to sanitation. There was a housekeeping plan in place and staff did a good job enforcing rules and keeping their units clean. This was visible in all units. Floors were clean, including in the corners and under the equipment. A random check of shower walls in various units in both 'B', and 'C' facility and the Minimum Security Facility produced no evidence of soap buildup typical of walls that are not cleaned regularly. Outside grounds throughout the area were well-manicured, neat, and maintained. There was a minimal amount of clutter.

A single warming oven in the Minimum Security Facility had grease build-up on the inside. When kitchen staffs were notified they indicated that the oven would be cleaned before the end of the day. The size of the institution precluded the Audit Team from visually checking to see that this was done.

**Fire Safety:**

The California State Prison, Sacramento is protected by an automated sprinkler system and heat/smoke detectors throughout all the buildings. The housing units, office and warehouse spaces utilize a Sprinkled Wet Fire Suppression System. Portable fire extinguishers are located throughout CSP and the outside buildings. Ansul-Dry Chemical, Fire Suppression System is used in the 13 pantries throughout the institution. The PBX/Data room utilizes a FM-200 Gas Fire Suppression System. Fire panels and pull stations are available throughout the facility. Exit signs were easily visible and well lit. There were no issues with adequate egress from the institution.

The California State Prison, Sacramento is assisted in fire response by the Folsom State Prison Fire Department, CDCR. Their ability to respond is within a few minutes as the facility is less than a mile away.

The fire safety plan is appropriate for the facility. Required drills are conducted according to the schedule and in a timely fashion. Staffs in the Segregation Housing Units (SHU) are knowledgeable about fire safety and practice simulated drills with their populations.

**Food Service:**

The food service section at CSP, Sacramento is responsible for meal service at not only this institution and the Minimum Security Facility (MSF), but also for the inmate population at Folsom State Prison (FSP). The food service operation at CSP, Sacramento utilizes a 'cook/chill' food service operation throughout its operation. This consists of the cooking and preparation of approximately 7000 meals three times a day. This is done at the main kitchen at CSP, Sacramento in 'C' Facility. Once the meal has been cooked it is immediately placed in a serving tray, covered and placed in a cooler for either one or two days depending on its

11

destination.  When it is time for serving, the meal tray is heated and served on the unit.

Temperature logs are maintained on both heated and chilled food.  There is documentation that the institution's dietary allowances are reviewed annually by a qualified nutritionist or dietician and that menu evaluations are conducted at least quarterly by institution food service supervisory staff.  'Dead Man Trays' were maintained in the kitchens for five full days.  If anyone becomes ill in the facility, CSP, Sacramento will have 5 days' worth of food to be used as possible source material to be examined.

All inmates who work in the food service area have food service handler permits.  Weekly inspections of the food service areas are documented, and there is documentation that the necessary sanitation/safety inspections are being carried out.  CSP, Sacramento provides for the control of vermin and pests and there is a system of waste disposal in place as required.

CSP, Sacramento has a separate special 'medical dietary' kitchen (located in 'A' Facility).  This kitchen is dedicated solely to satisfy the requirements the special therapeutic diet requirements such as required by diabetes, and so forth.  This is unique in the Audit Team's experience.  The kitchen worked directly with medical staff to meet the therapeutic diet needs of the inmate.  Both staff and inmates thought this dietary service to be very effective.

Food service at the Minimum Security Facility consists of somewhere between 6-8 inmate workers who handle the food as it comes over in the hot carts.  They set up a feeding line and immediately begin filing trays as the inmates come through the line

There are a total of 36 food service staff (this include a Correctional Sergeant and a Correctional Corporal) and three vacant positions at CSP, Sacramento.

**Medical Care:**

Healthcare services at the California State Prison, Sacramento are delivered under the directorship of a Medical master appointed by the Federal Courts.  All medical, mental health and dental services are under the authority of the Medical Master.  One of the primary missions of CSP, Sacramento is to provide in depth mental health services to Level IV offenders that were previously housed in other California Department of Corrections and Rehabilitation (CDCR) facilities in either a special housing unit or administrative segregation.  In addition, the facility has a stand-alone (SA) administration segregation area that houses those offenders that cannot be appropriately managed on other CDCR facilities.  None of the offenders housed in the Stand-Alone Administrative Segregation area have any mental health diagnosis.

12

CSP, Sacramento is composed of three units or as they say 'facilities' 'A', 'B', and 'C'.  These are located in the rear of the prison complex, separated from each other by fences and security posts to limit and control inmate movement.

Facility 'A' – houses the Psychiatric Service Unit (PSU) offenders in cellblocks 1 through 4.  There are a total of 256 offenders that are single celled in the PSU.  The PSU's are due to litigation that came out of Pelican Bay Prison in northern California. That was where the first PSU's started, now the model has been refined and exists at CSP, Sacramento also.  The 'A' facility also houses the Enhanced Outpatient Program (EOP) for general population.
These offenders are housed in cell blocks 6 and 7 and the population at the time of the on-site audit was 104.  'A' facility also houses the EOP Administrative Segregation Unit, which has the capability of housing 74 Segregation Unit, which has the capability of housing 74 offenders.  These offenders are housed in cellblock five on 'A' facility.

The 'A' facility also houses General Population Sensitive Needs Yard (GPSNY). This housing area is in cell block 8 and has the capacity of housing 87 offenders with safety concerns.  In other systems, these inmates would be termed 'protective custody'.  'A' facility also houses Correctional Treatment Center I (CTCI) and CTCII.  CTCI has the capability of housing 17 medical or mental health infirmary patients.  The facility does have 24-hour medical and psychiatric care.  CTCI also has two respiratory isolation beds.  CTCII has the capability of housing 12 psychiatric patients.  This facility also has 24 hours of medical and psychiatric care.

'A' facility also houses the Outpatient Housing Unit (OHU).  This housing area is in cellblock eight (B section) and has the capability of housing 20 medical and psychiatric offender patients.  The facility provides 24 hour nursing care.  It should also be noted that the 'A' Facility Treatment Center provides mental health treatment for Enhanced Outpatient Program (EOP), Enhanced Outpatient program Segregation Unit (EOPSU), and Psychiatric Service Unit (PSU) offender patients.  All offenders in the mental health program are provided at least 10 hours per week of group therapy and/or a one on one session with the caseworker.

'B' Facility – houses general population in cellblocks 1, 2, 5 and 6.  There are a total of 472 maximum security offenders assigned to this housing area.  'B' facility also houses the Enhanced Outpatient Program General Population offenders with a housing capacity of 256 offenders with serious mental health needs.  These offenders are housed in blocks 7 and 8 and participate in individual, group and recreational therapy in the Treatment Center.  Construction is currently underway to build an additional Treatment Center and therefore, some of the general population housing areas will be converted in the future to single cell psychiatric services unit bed capacity.

The 'B' facility also houses an administrative segregation unit that is capable of housing 128 offenders in the Correctional Clinical Case Management System. The ASU (Administrative Segregation Unit) is located in closed proximity to mental health care services and programs.

'B' facility also houses the Security Housing Unit (SHU). This facility is capable of housing 128 high-risk offenders with a current special housing unit term. These particular offenders have committed a crime while incarcerated.

'B' facility also houses the Mental Health Crisis Bed Unit. This facility has a capacity of 20 single cells and is a crisis intervention setting for EOP general population offenders.

The 'B' Facility Treatment Center provides mental health treatment of EOP and EOP Administrative Segregation Unit. All offenders in the mental health program are provided at least 10 hours per week in group therapy and/or one on one session with their caseworker.

'C' Facility – is designed as a Level IV (maximum) that houses maximum security general population offenders. This facility is capable of housing 1,199 offenders.

The staffing pattern for SAC will be identified as follows:

A Facility-

| | |
|---|---|
| Supervising Dentist- | 1 |
| Supervising Registered Assistant | 1 |
| Dentist | 1 |
| Registered Dental Assistant | 3 |
| Health Program Manager | 1 |
| Health Program Specialist | 1 |
| Office Tech | 21 |
| Physician and Surgeon | 4 |
| Chief Physician and Surgeon | 2 |
| Physician Assistant | 1 |
| Lab Assistant | 1 |
| Dietician | 1 |
| Building Maintenance Worker | 1 |
| Maintenance Mechanic | 1 |
| Supervisor Correctional Cook | 1 |
| Phlebotomist | 3 |
| Staff Service Analysts | 1 |
| Associate Government Analyst | 2 |
| Chief Executive Officer | 1 |
| CHSA II | 2 |
| Health Program Specialist | 1 |

14

Standards Compliance Coordin.    1
Chief Mental Health              1
Chief Psychiatrist              2
Clinical Social Worker          4
Health Program Specialist       1
Licensed Clinical Social Worker 4
Psychiatrist                   14
Sr. Psychologist                9
Psychologist                   30
Recreation Therapist           11
Social Worker                  11
Supervising Clin. So. Worker    1
Sr. Psychiatric Tech            5
Psychiatric Tech               41
Offices Services Supervisor     1
Chief Executive Nurse           1
Supervising RN                  3
Supervising RN III              1
Supervising RN II               3
RN                             43
LVN                             3
Unit Supervisor                 1
Nurse Instructor                1
Public Health Nurse             1

B Facility-

Dentist                         2
Registered Dental Assistant     4
Physician and Surgeon           2
Asst. Government Prog. Analyst  1
Health Program Specialist       1
Staff Service Analyst           1
Assistant Clerk                 4
Health Record Tech              6
Health Record Tech II           2
Office Tech                     6
Licensed Clinical Social Worker 2
Social Worker                   2
Psychiatrist                    2
Sr. Psychologist                1
Psychologist                   14
Sr. Psychiatric Tech            1
Psychiatric Tech               15
Recreation Therapist            3
Supervising RN II               3

15

| | |
|---|---|
| RN | 11 |
| LVN | 12 |
| Office Tech | 1 |

C Facility-

| | |
|---|---|
| Dentist | 2 |
| Registered Dental Assistant | 4 |
| Physician and Surgeon | 2 |
| Clinical Social Worker | 1 |
| Psychiatrist | 1 |
| Psychologist | 2 |
| Supervising RN | 2 |
| RN | 1 |
| LVN | 10 |

Minimum Facility/Stand Alone Administrative Segregation

| | |
|---|---|
| Registered Dental Assistant | 2 |
| Supervising RN II | 1 |
| RN | 12 |
| LVN | 2 |
| Psychiatric Tech | 1 |
| Office Tech | 1 |

Medical services at SCC are available through 4 Treatment and Triage areas located on Facility A, B, C and the minimum facility.

Medical services at the California State Prison, Sacramento are available through four Treatment and Triage areas located on Facility 'A', 'B', and 'C' and the Minimum Security Facility. These areas are responsible for collecting the offender sick calls and for performing the necessary triage of the offender requests. Offender sick call requests are collected 7 days a week and triaged by licensed personnel. Interviews with offenders indicated that they are generally seen within 24 hours of submitting a sick call request unless it was an emergency. In an emergency situation, the offender is immediately called to the Treatment and Triage area. It was identified during the course of the facility tour that, at least, one security officer had a key to the sick call box located in minimum security housing area. This was immediately brought to the attention of the senior administrative staff and procedures were put in place to remove all security keys to the sick call box. This is to assure patient confidentiality in that only nursing personnel should have keys to the sick call boxes.

CSP, Sacramento has an extensive on call system for medical, mental health and dental emergencies that occur after normal working hours or on holidays. Due to the extensive staff identified above, there is assigned medical and mental health

16

coverage seven days a week at the facility. Various medical, mental health and dental personnel are assigned on call responsibilities. For mental health emergencies this on call system involves psychiatrists, psychologists and nursing personnel. In the event that offenders are to be placed on suicide observation, or placed in restraints, it is required that the on call psychiatrist visit the facility to access the patient's medical and mental health condition. In specific, it was identified that staff psychiatrist rotate on call duty each week beginning on Thursday at 3:00 p.m.

The designated on call psychiatrist carries a blackberry and are responsible for on call responsibilities from 3:00 PM until 8:00 AM the following morning. They are also responsible for 24 hours coverage on weekends and holidays.

California State Prison, Sacramento's Ancillary Services, include:

Laboratory - As identified in the staffing pattern, CSP, Sacramento has 3 phlebotomists. These individuals are responsible for collecting laboratory specimens Monday through Friday from 0700 hours to 1500 hours. Stat laboratories are available for collection 24 hours, seven days a week through the Correctional Treatment Center (CTC).

At the time of the on-site audit, CSP, Sacramento has an existing contract with Quest Diagnostics for the collection and analysis of laboratory specimens. The specimens are placed in a designated location at the front of the facility and collected by courier five days a week. Results of laboratory tests are returned to the facility through a dedicated printer. The results of laboratory tests are reviewed by the ordering clinician and then are scanned into the electronic unit health record. The California system implemented the electronic medical record approximately one year previously.

Radiology – CSP, Sacramento does have an on-site radiology department and dedicated radiology technician. Radiology examinations are provided on site 5 days a week and are transported off site for interpretation. Generally, the results of the radiology examinations are available to the facility within 48 hours. Emergency radiology examinations would be transported to a local emergency room after normal working hours and on weekends/holidays.

Dietary - The California Department of Corrections and Rehabilitation employs approximately 20 Dieticians solely for health services. CSP, Sacramento does have a Master's level Dietician who has been at the facility for approximately 10 years. The Registered Dietician is on site generally Monday and Tuesday of each week. Primarily, the medical dietary department is responsible for providing meals to patients housed in the Correctional Treatment Centers and does follow a master menu provided by the supervising dietician within the CDCR. The staffing within the dietary department consists of one Registered Master's level Dietician, one Dietary Manager and 3 Cooks. The Cooks will rotate coverage for both AM and PM meals. The dietary department is also responsible for providing

diets for offenders throughout CSP, Sacramento that require a renal diet and also responsible for blended diets for patients with broken jaws.

Pharmacy Services - Medications ordered by the providers at CSP, Sacramento are filled through the CDCR Pharmacy. Medications are delivered to the facility by commercial carrier either from the wholesaler, or from the Central CDCR Pharmacy.

Generally, medications are received at the facility five days a week.

Once the medications are received at the facility, they are collected by designated medical/mental health personnel and transported to the appropriate facility. There the packing invoice is compared to the contents to ensure the correct medication and dosage. Then the medications are placed in designated medication carts for the delivery of the prescribed medicines to the patient population.

CSP, Sacramento does allow Keep on Person (KOP) medications and all psychotropic medications that can be crushed prior to administration. The facility also utilizes Direct Observed Therapy (DOT) for certain classes of medications and these offenders are brought to the Treatment and Triage Centers for the completion of the medication administration. In addition, the institution has a total of 385 offenders that have existing court orders for involuntary administration of medications. These offenders are referred to as KEYHEA offenders.

Medications are delivered at CSP, Sacramento seven days a week. Generally, medications are distributed between 6:30 and 7:30, 11:30 to 12:30P.M., 17:30 to 18:30 and 20:00 hours. Generally, due to the populations in A and B Facility, medications are delivered cell side. Correctional officers are available during the distribution of medications and the administration is documented on a medication administration record. Offenders are also able to purchase over the counter (OTC) medications from the commissary.

Medical or mental health emergencies occurring after normal working hours would be triaged either within the facility location or transported to the Treatment and Triage area located within areas A, B and C. In the event that the medical condition required an off-site transport, Folsom Fire Department would be contacted for transportation of the offender. The hospitals identified during the on-site audit would be Mercy Hospital of Folsom or the University of California Davis Medical Center located in Sacramento, California. The facilities do have AEDs located in the Treatment and Triage areas. In specific, there are two in the Correctional Treatment Centers, one in Facility A, B and C Clinics, one at AB Gate, one in the Minimum Security Facility and one in the Stand Alone Administrative Segregation area. In addition, there is one located in the Dental area and two serve as back-ups.

18

CSP, Sacramento does provide infirmary level care through the Correctional Treatment Centers. As identified, CTC I has a capacity for 17 patients with two available respiratory isolation beds. CTC II has a capacity for 12 offender mental health patients. All patients are single celled and there is a lavatory and toilet in each housing area. However, it was discovered during the course of the on-site audit that the facility was found in non-compliance with non-mandatory standard 4-4417. This particular ACA standard requires that offender patients in infirmary areas have the ability to bathe daily. Existing guidelines at the time of the on-site audit only allowed offender patients to bathe three days a week if they were housed in the CTCs.

Due to the primary mission of the institution as an intensive mental health treatment facility, there are various areas available throughout the facility for suicide observation. During the tour of the facility there were at least two patients observed who were on one on one observation with a mental health professional after being placed on suicide observation. In addition, all facilities have the required suicide clothing (Ferguson Smocks) for issuance to offenders if so ordered by the clinician. In addition, offenders housed in the MHCBU (Mental Health Crisis Bed Unit) are placed on either five minute or 15 minute checks by a Certified Nurse Assistant. This process was observed both on the outpatient housing unit and in the mental crisis bed facility. The first choice for offenders being placed on suicide observation would be the outpatient housing unit. When there are no mental health crisis beds or outpatient housing beds available, patients may be placed on suicide observation in A, B and C facilities in what is referred to as ZZ cells, contraband cells or regular housing units. A mental health clinician conducts an individual evaluation of each offender patient on suicide observation at least once per day, seven days a week. CSP, Sacramento no longer uses video cameras as part of suicide observation protocol. This was an issue in a previous court case.

Offenders housed at the institution are also eligible for annual physical examinations. Offenders under age 50 must submit a sick call request identifying the need for an annual physical. Offenders age 50 and above are scheduled for an annual physical examination, which does include screening for cancer.

Offender patients at CSP, Sacramento are eligible for a wide range of chronic clinics. Chronic clinics in existence at the time of the on-site audit included cardiology, respiratory, diabetic, infectious disease, seizure, hypertension and asthma. In addition, offenders with specialty care needs are able to conduct a specialty clinic appointment through telemedicine. There is a designated RN that is responsible for conducting telemed appointments 5 days a week. Generally, the telemed appointment is with the Sacramento Telemedicine Service Center located in the corporate offices of the health services division. Generally, between 5 to10 patients are presented through telemedicine appointments for a specialty consult each week. Interpreters are available if needed for offender patients and there has

been special security personnel designated to provide the required transport of these patients to the telemed area at the institution.

The California State Prison, Sacramento does utilize an individual treatment plan for tracking the care rendered to chronic clinic patients. Based upon the patient's medical condition, the patient may be seen either every 30, 60, 90, or 120 days. In some instances, if the patient's chronic care condition is well controlled, they will be seen every six months.

Offenders at the institution are also provided Optometry services through a contractor. The contract Optometrist is on site once per week and generally, the offender will receive eyeglasses if required in 1 to 8 weeks. The facility also has available Podiatry services on site. These services are also provided by a contractor and are scheduled as needed based upon the offender's podiatry condition.

CSP, Sacramento does have a contract with National Green Gas for the collection and disposal of biohazard waste. Medical waste is collected each day from the medical/dental/mental health areas and stored in a designated location. There are areas designated for the storage of medical waste on Facility A, B and C. The medical waste is then generally removed from the various clinic areas and stored in a locked container outside the perimeter gate behind the Folsom State Prison, which is located adjacent to CSP Sacramento.

During the course of the on-site audit, a random inventory of medication and medical instrument controls was conducted in the Treatment and Triage area located on Facility A and the Treatment and Triage area on Facility C. These areas were found to have excellent accountability methods for all medical/dental instruments and the control of narcotics stored within each area. The contents of the dental flammable cabinet were also inventoried and there was one item found in Triage and Treatment A that was not listed on the inventory. This item was immediately added to the inventory for the flammable cabinet. Due to the size of this facility and the time allowed for this on-site audit, an audit of inventory practices of all areas where medications and sharps are stored was not possible. However, it is felt that the two areas that were audited were representative of the accountability practices for the institution.

**Recreation:**

The Minimum Security Facility (MSF) which houses up to 368 Level I inmates has a large recreational area immediately adjacent to its two Dorms 'D' and 'E'. Also available was an outside basketball area, handball court, and running track. Inside, the inmates have access to television, reading material, and games

Within the walls, at 'A', 'B', and 'C' facilities the Level IV population is more highly controlled. Inmates in the SHU's (Security Housing Units) have access to

20

outdoor, covered recreational pens.  These 'cages' provide outdoor, controlled recreation for individual inmates in a very restricted environment necessary for both inmate and staff safety.  The Audit Team toured the gymnasium in 'B' Facility and found it being used by inmates in that facility.

Segregation yards in the MH units included 'recreational cages or pens'.  These were equipped with 'misters', water misting systems for mentally ill inmates on medications

Due to prison overcrowding previously, the gymnasium in 'C' Facility has been converted to house Level I & II inmates in double or triple bunks.  The gym can hold, when utilized for dormitory space, up to 175 inmates.  This, of course, negates the use of the gymnasium for recreation.

Inmates in the Mental Health units have recreational therapy sessions built in as part of their overall plan. This is done through recreational therapists, for instance at 'B' Facility they work with the inmates in everything from soccer, softball, table games, and talent shows.  The inmates only do this with the recreational therapists present.  This type of therapy is part of their overall treatment plan and very important to the inmate.

**Religious Programming:**

The institution has three full-time chaplains - Muslim, Catholic, and Protestant. Religious worship services are available in the major denominations.  Special religious holiday services are observed. Religious classes and counseling is done by the chaplains. Volunteer groups being led through a Community Partnership Manager has provided significant leadership and guidance in facilitating volunteer led group at the institution.  Approximately 85 group meeting per month are being held at CSP, Sacramento.  These include: various Christian and other groups (5-8 meeting per month); Catholic Outreach men's Group at 'C' Facility (6 meetings per month); Buddhist Services (six meetings per month, and Meditation Groups (3 meetings per month.

**Offender Work Programs:**

Inmates at the Minimum Security Facility (MSF) provide all of the grounds maintenance, landscaping, and detail crews throughout the institution.  Twenty-five inmates from this facility are involved in the Prison Industry Authority (PIA) which is located on the top of the hill overlooking the CSP, Sacramento compound.  The PIA is a Carpentry Pre-Apprenticeship Program where inmates are given the opportunity to develop marketable skills that will enhance their ability to obtain employment once they reach parole.  These inmates will be eligible for construction jobs and will be given a full set of tools upon graduation. Inmates from the MSF are also pressed into work should one of the facilities go on lockdown status

21

The Vocational OSRT Program was reintroduced to CSP, Sacramento in February 2007. It was moved into 'C' Facility Work Center in July 2007. The first graduates were celebrated in February 2008. OSRT's sister program was reopened in April 2008 on the 'B' Facility yard. The Office of Correctional Education authorized CSP, Sacramento to open a third OSRT program on the 'C' Facility yard in September 2008.

**Academic and Vocational Education:**

There are no academic or vocational education courses available for inmates in the Minimum Security Facility other than AA and NA. CSP, Sacramento acknowledge that the entire department was undergoing cuts and layoffs in the area of education programs, at present, it remained unclear what programs and services would be affected. Currently, the following vocational and academic programs remain: office services and related technologies, Adult Basic Education programs, high school GED, EOP designated academics, library services, recreation coach and literacy.

**Social Services:**

Programming at CSP, Sacramento primarily consists of parole planning, anger management, communication skills, wellness self-management, dialectical behavioral therapy, and recreational therapy

**Visitation:**

Visitation is available for all inmates. Visitors are processed through both Saturday and Sunday and holidays from 7:30A.M. to 3:30P.M.

**Library Services:**

Library services are available to the General Population, including access to an institutional law library. For inmates in segregation (SHU), the institution utilized 'library carts on wheels' which could be rolled down the unit allowing the inmate the opportunity to select books from the cart. The stock on the carts was rotated regularly to keep reading matter fresh. When asked about access to both a recreational and law library, inmates interviewed indicated that they had access to fair selection of books, although they always wanted to see more books in the recreational library. They all indicated that access to legal material was not a problem at the institution.

**Laundry:**

Laundry units are available within each facility and the MSF. Inmates had the opportunity to have their laundry done on a scheduled basis in all units. In the Minimum Security Facility the inmates wash in bags.

**F.    Examination of Records**

Following the facility tour, the team proceeded to the Warden's Conference Room to review the accreditation files and evaluate compliance levels of the policies and procedures.  The facility has no notices of non-compliance with local, state, or federal laws or regulations.

1.    Litigation

Over the past year, the facility had several consent decrees, class action lawsuits or adverse judgments.  The major class action litigation is summarized below.

### *ARMSTRONG v. SCHARZENEGGER (ARMSTRONG I)*

Class action brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act on behalf of inmates and parolees with vision, hearing, mobility, kidney, and learning disabilities.  After finding that the CDCR was not complying with the ADA and the Rehabilitation Act, the Court issued an injunction to improve access to prison programs, services and activities for prisoners with physical disabilities.  The court approved a clustering concept, under which CDCR has designated certain prisons and reception centers to house inmates with physical disabilities the severity of which impacts their housing placement.

### *ARMSTRONG v. DAVIS, BOARD OF PAROLE HEARINGS (ARMSTRONG II)*

This class action alleged that the Department of Corrections and the Board of Parole hearings had not accommodated inmate/parolee disabilities as required by the Americans with Disabilities Act.

### *ASHKER v. CDCR, ET.AL.*

This case is based on allegations by plaintiffs that the CDCR's failure to pay interest on their inmate Trust Accounts (ITA) constitutes a "taking" in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution.  The Ninth Circuit ruled that the inmates had a property right to interest earned on the funds deposited into their ITA.

The parties agreed that the CDCR would implement, by December 2007, an inmate Restitution Banking and Canteen System (IRBCS), to ensure that funds held in an inmate's ITA would accrue interest from investments, subject to a deduction for fees to cover the administrative costs of the IRBCS,

### BUDD v. CAMBRA

This is a taxpayer lawsuit against CDCR prohibiting it from providing non-acute inpatient medical and mental health services to inmates in an unlicensed health facility. In 2002, the court ordered CDCR to license Correctional Treatment Centers (CTCs) at 10 prisons to provide non-acute inpatient medical and mental health services to inmates.

CDCR has licensed CTCs at eight of the ten prisons, and continues to work on licensure of the remaining two, California Institution for Women and Ironwood State Prison. There are numerous statutory and regulatory requirements for licensing of a CTC.

### CLARK v. STATE OF CALIFORNIA

This class action complaint alleged that the CDCR denied developmentally disabled inmates (includes mental retardation, cerebral palsy, epilepsy, and autism where the disability originated before age 18 years) access to programs, services, and activities; that the CDCR failed to protect these individuals from exploitation and abuse by other prisoners; and violated the Constitution, section 504 of the Rehabilitation Act, and the ADA. In 2001, the parties entered into a settlement agreement, followed by the Clark Remedial Plan.

### COLEMAN v. SCHWARZENEGGER

In 1995, the court found that the department violated the constitutional rights of mentally ill inmates. The court appointed a Special Master and gave him wide-ranging duties to monitor CDCR's implementation and compliance with any remedial plan that the court may order. The Special Master and his team of experts are compensated pursuant to various court orders.

In 1997, the court approved a plan to address constitutional inadequacies in inmate mental health care. Since that time, the Special Master and his experts have monitored compliance with the plan. They found that the factor most critical to the success of the plan is the ratio of staff to inmate/patients. Other significant issues include: medication management, quality assurance, availability of space for therapy, and transfers to higher levels of care. The plan was memorialized in program guides approved by the court in 1997. These program guides have since been revised and ninety percent of the changes have been agreed upon, with the remaining 10 percent being litigated.

### COOPER v. STATE OF CALIFORNIA, ET.AL.

The plaintiff, seeking injunctive relief and monetary damages, alleged that his religious rights were violated because he was denied a kosher diet. In order to avert a threatened statewide class action, the Legal Affairs Division alerted the

Department to the need to revise regulations and policies pertaining to the provision of kosher meals. At the end of 2003, the Department entered into a settlement agreement to provide kosher diets to kosher-observed Jewish inmates at SOL, where inmate Cooper was housed. The agreement also provided that the Department would make good faith efforts to adopt the kosher diet plan statewide. On July 2005, the statewide implementation of the kosher diet plan commenced. The court retains jurisdiction until three years after the full implementation of the statewide plan.

### FARRELL v. HICKMAN

This is a taxpayer lawsuit claiming a waste of taxpayer funds at the Division of Juvenile Justice (DJJ). Allegations include excessive use of force, failure to protect the wards from physical attack by other wards, substandard housing conditions, inadequate medical and mental health treatment, insufficient due process hearings, faulty grievance procedures, inadequate access to education and treatment programs, disability discrimination, and other unconstitutional conditions of confinement. The parties entered into a Consent Decree in November 2004. Two stipulations have since been filed that make substantive modifications to the Consent Decree. Under the terms of the original consent decree, lack of funding is not an excuse for noncompliance.

### GILMORE v. STATE

This case consists of 26 consolidated lawsuits in which inmates alleged that the California Department of Corrections and Rehabilitation's regulations concerning access to law libraries, legal materials, and assistance in pursuing litigation violated their constitutional rights.

### GARRISON JOHNSON v. GOMEZ

Inmate Garrison Johnson challenged the CDCR's practice of racially segregating double-celled inmates during the 60 days the inmates are housed in Reception Centers. In December 2005, the parties entered into a settlement agreement.

### HECKER v. CDCR, ET.AL.

Class action alleging that disabled inmates are barred from basic educational, vocational, employment and recreational programs that are provided to other, nondisabled inmates.

### JOHNSON v. CDCR

This inmate class action raises Eighth Amendment challenges to the Imposition of grooming standards in light of alleged unsanitary barbering policies. The parties entered into a settlement agreement in October 2005. Under the settlement

25

agreement, the Department agreed to continue strictly enforcing procedures relating to the sterilization and sanitation of barbering tools and instruments; to continue training of all correctional officers in the prevention of blood-borne pathogens during basic training and on an annual basis; to continue specific training on the transmission of blood-borne pathogens and the spread of infectious diseases for all inmate barbers prior to their being assigned as hair cutters. The Department must continue to adhere to barbering standards in the future

### *KEYHEA v. RUSHEN*

In 1986, the court issued a permanent injunction requiring that inmates be provided with due process before being involuntarily medicated with psychiatric medications. The process is an intensive one, which is also monitored through the Coleman class action discussed above. Its requirements were incorporated into Penal Code 2601. Since that time, the numbers of these cases that are initiated have mushroomed to close to 1200 annually. This requires significant resources to comply with the injunction.

At headquarters, the complexity of the process requires time-consuming coordination, from calendaring cases to opening and closing files, from preparing pleadings to constant communication with institution staff. Attorneys review the cases initiated and confer with expert witnesses, before, traveling to the institutions to conduct the cases. Certification Review hearing Officers' bills are covered by the department. All these staff participates in training institutional clinicians and coordinators on the parameters of the injunction.

At the institutions, clinicians evaluate the patients, prepare reports to initiate involuntary medication, consult with departmental attorneys and ensure that records are complete. Other staff arrange for two sets of hearings for each case initiated, including obtaining hearing rooms and expert witnesses, as well as making arrangements for the inmates, judges and inmate counsel to be able to attend the hearings. Correctional officers are often involved as well in security and transportation of the affected inmates.

In addition to CDCR resources, the department contracts with the Office of Administrative Hearings for a Keyhea Coordinator/Calendar Clerk, plus administrative law judges, court reporters or interpreters if needed and inmate counsel for all of the hearings.

### *LH, ET. AT., v SCHWARZENEGGER, ET.AL.*

Plaintiffs are a class of over 4000 juveniles who are involved in proceedings in connection with the granting, extending and/or revoking of their parole. They claim that they are being denied due process under the 14th amendment to the U.S. Constitution, and their right to counsel as guaranteed by the sixth and Fourteenth Amendments to the U. S. Constitution.

26

Plaintiffs also claim they are being denied equal protection of the laws under the Fourteenth Amendment to the United States Constitution in that they are being treated differently than their adult-offender counterparts who are being afforded significant due process protections in revocation proceedings pursuant to a Stipulated Order for Permanent Injunctive Relief in Valdivia v. Schwarzenegger, et al. CIV S-94-0671.

Finally, Plaintiffs claim Defendants are violating the Americans with Disabilities Act and Section 504 of the Rehabilitation Act in that they have failed to develop adequate policies and practices that enable defendants to identify, assess, or reasonably accommodate juvenile parolees with disabilities so that those juveniles can fully participate in revocation and other parole proceedings. They claim that Defendants have also failed to develop policies and practices for providing disabled juvenile parolees with reasonable modifications to access the same programs, activities and services available to other wards.

### *IN RE LUGO ON HABEAS CORPUS*

Rutherford was originally filed on May 26, 2004 as a petition for writ of habeas corpus. The suit alleges that the Board of Parole Hearing (BPH) has violated Plaintiff's due process rights by failing to hold a timely lifer parole hearing for Plaintiff. The court ordered the certification as a class action on November 29, 2004. A complete overhaul of the lifer parole hearing process may be required to reduce/eliminate the lifer backlog.

### *MADRID v. HICKMAN*

In this class action on behalf of all inmates at Pelican Bay State Prison (PBSP), the court found against the department on claims regarding (1) the inappropriateness of housing mentally ill inmates in the Security Housing Unit: (2) the inadequate staff supervision relating to the use of force; (3) the unacceptability of PBSP investigations into allegations of excessive force; and, (4) deficiencies in the delivery of medical and mental health services.

### *PEREZ v. HICKMAN*

Filed on December 19, 2005, this class action alleges the dental care provided by CDCR is woefully inadequate and violates the constitutional rights of the plaintiff class under the Eighth and Fourteenth Amendments of the U.S. Constitution to be free from cruel and unusual punishment.

### *PLATA v. SCHWARZENEGGER*

This class action challenged the constitutionality of the CDCR medical delivery system. In 2002, the parties entered into a stipulation, ultimately approved and ordered by the court that obligated CDCR "to make all reasonable efforts to

secure the funding necessary to implement an improved healthcare delivery that meets the requirements of the Eighth amendment." The original order requires that CDCR implement a healthcare system that functions at efficiency levels set forth in fourteen volumes of policies and procedures.

Although the program has been rolled out at fifteen prisons, no prison has come close to operating at the efficiency levels required by the Plata order. On June 29, 2005, the court announced that it was placing CDCR's Health Care Delivery System into receivership.

### THOMPSON v. ENOMOTO

This class action relates to the conditions of confinement and classification procedures for death row inmates at San Quentin State Prison. A 1980 Consent Decree required the Department to implement various changes in classification procedures and living conditions for death row inmates. That consent decree has been extended to the proposed new condemned unit to be constructed at San Quentin. The extended agreement sets forth a plan to transition from the current condemned unit to the new unit and a modification of the existing *Thompson* consent decree to cover the transition to the new condemned unit. The Department agreed not to seek termination of federal oversight under *Thompson* until at least two years after the new unit is activated.

### TOUSSAINT v. RUSHEN

This class action was filed in approximately 1973 on behalf of inmates committed to administrative segregation in San Quentin State Prison, Folsom State Prison, Deuel Vocational Institution, and the Correctional Training Facility. The complaint alleged that the conditions of confinement in administrative segregation and the procedures for placement and retention in administrative segregation were unconstitutional. The case resulted in the imposition of a permanent injunction, which was modified several times as a result of court decisions in the case. While the court ultimately dismissed the case, the underlying decisions became published cases which remain binding on the Department. Any failure to comply with the terms of the published decision could result in future litigation to compel compliance.

### VALDIVIA v. SCHWARZENEGGER

This class action lawsuit was originally filed in 1994 alleging that CDCR and BPT were violating the due process rights of parolees during the parole revocation process. The case has undergone extensive discovery litigation, and negotiation prior to its recent settlement on March 8, 2004. Settlement of the case requires that CDCR and BPT revise the entire parole revocation process from the time that the parolee commits the violation through completion of the revocation hearing.

28

CDCR and BPT are currently drafting procedures to implement the agreed upon Permanent Injunction. Monitoring of compliance with the Injunction is expected to be extensive. It is expected that the court will award the plaintiffs a very substantial award of attorneys' fees covering ten years of litigation in the near future.

### *WILBER v. WARNER*

In December 2000, a physician sought a writ of mandate to require the California Youth Authority (now Division of Juvenile Justice (DJJ)) to cease offering inpatient treatment in its unlicensed facilities, to obtain licenses for any programs meeting the definition of a correctional treatment center (Health & Safety Code 1250, subd. (j)(l), 1253) and if licensing is not pursued, develop a written plan for servicing inpatient needs through contractual agreements in outside facilities. The parties modified the original court order with two subsequent agreements, revising compliance dates for the licensure of the facilities, adding interim measures for handling inpatient needs, requiring policies for rejection of youth with serious mental health needs, and regular reporting and analysis of data collected on pertinent issues. Currently, DJJ intends to comply with the Health and Safety Codes by licensing a CTC at Herman G. Stark in Ventura and meeting remaining inpatient needs through the use of contractual agreements with the Department of Mental Health (DMH) and other county and private facilities.

2.    Significant Incidents/Outcome Measures

The Audit Team was provided a copy of CDCR's COMPSTAT Statistical Report in place of the Significant Incident Summary. The report contained the necessary elements and time periods which allowed the auditors the opportunity to review in detail data on assaults, uses of force, disturbances, number of times chemical agents were used, escapes, deaths, substantiated grievances, the use of four/five point restraints and the offender medical referrals as a result of injuries sustained. The Audit Team explained the necessity of completing the Significant Incident Summary and having it available for all future audit teams.

Subsequently, CSP, Sacramento staff did submit a completed Significant Incident Summary prior to the submission of the report. That Summary is part of this document. A review of the Significant Incident Summary shows, in general, numbers consistent with the overall mission and level of inmates at this institution. The number incidents of force are high, averaging 35.4 per month. However, this is consistent, fluctuating around that number. Chemical Agents use averages at 20.7 times per month. The number of substantiated grievances resolved in favor of the offender averaged 8.1 per month. The institution had two homicides during the year, and three suicides.

The California State Prison, Sacramento failed to produce Health Care Outcome Measures. The Audit Team spent time explaining what the Health Care Outcome

Measure process, offering assistance, and stressing that both this and the significant incident summary must be included in future audits. The Audit Team stressed the need to start on the Health Care Outcome Measures immediately.

3.    Departmental Visits

Team members revisited the following departments to review conditions relating to departmental policy and operations:

| Department Visited | Person(s) Contacted |
|---|---|
| Minimum Security Facility 'E' Dorm | Dave Higginbotham, Captain |
| MSF – Dining Area | Chris Johns, Fire Chief<br>Bryan Dang, kitchen worker |
| MSF – Academic/Self Help | |
| Canteen & Tool Control | T. York, CO |
| MSF Medical | Victoria Gemmet, RN |
| 'A' Facility | Lt. Konrad |
| In-Patient Medical Unit Correctional Treatment Center I | Captain Higginbotham &<br>Capt. Robert O'Brien |
| PSU 1 Block Housing Unit Control Booth | Officer's Stears & Aguilar |

The Audit Team was able to observe the Control Booth staff at work at CSP, Sacramento. They function in an armed post with mini-14's strapped across their chest and a constant vigil of doors, movement, and monitoring. Staffs were professional, courteous, and answered all questions without hesitation. All while performing their job duties.

| | |
|---|---|
| 'A' Facility 2 & 8 Block Housing Unit (OHU) | A. Konrad, Lt.<br>Officer T. Angelo<br>K. Leahy RN |
| 'A' Facility Dental Office | |
| 'A' Facility PSU Treatment Center | CO Wheeler |
| Enhanced Outpatient & | Capt. Higginbotham |

Administrative Segregation
Unit

The level of Mental Health Care and Treatment available to the Inmate population
is extensive as explained by S. Chaiken, Ph.D. Chief of Mental Health

| | |
|---|---|
| PSU Treatment Center | Captain Turner |
| Group Rooms & | Captain O'Brien |
| Individual Therapy Rooms | |
| | |
| 'A' Facility - CTC II | Lt. Konrad |
| | |
| 'B' Facility | Sgt. Whitted |
| EOP Treatment Center | Officer A. Stinson |
| | Officer M. Jordan |
| | |
| PSU – 3 Block Housing | |
| Unit | Officer Steffens |
| | |
| 'B' Facility – 2 Dining | Officer Dunn |
| | |
| Tour of Construction Site | Warden Virga |
| Future 'B' Facility Treatment | |
| Center (24,000 sq. ft.) | |
| Will add 450 PSU inmates | |
| | |
| 'B' Facility Treatment | |
| Medical, CTC Clinic, | |
| Triage & Dental | B. Bennett, RN |
| Mental Health Crisis | Officer Stinson |
| Bed Unit (MHCBU) | Officer Jordan |
| | |
| 'B' Facility – 3 Block | Sgt. Green |
| SHU | Dicero, Ph.D. |
| | Officer Steffens |
| | |
| 4 Block 'B' Facility | |
| Administrative | |
| Segregation unit (ASU) | Sgt. Phelps |
| | |
| 'C' Facility | 1st Watch Sgt. |
| | |
| Kitchen | |

4.      Shifts

a.      Day Shift

The team was present at the facility during the day shift from 6:00A.M. to 2:00P.M. The Audit Team was present at the institution primarily during this shift.

The tour of California State Prison, Sacramento took place on April 16th from approximately 9:00A.M. to 5:30P.M. and concluded on April 17th. Nevertheless, the majority of the team's time at the institution was spent during this shift.

b.      Evening Shift

The team was present at the facility during the evening shift from 2:00P.M. to 10:00P.M. On each day of the audit, the team worked until the early evening hours. The Audit Team was able to observe shift change at both the 2:00P.M. and 10:00P.M. time slots.

c.      Night Shift

The team was present at the facility during the night shift from 10:00P.M. to 6:00A.M. The Audit Team was present on all three shifts.  On 1st Watch, the team came out to the facility about 9:30P.M. and had the opportunity to observe count, and shift change, as well as talk to staff.

5.      Status of Previously Non-compliant Standards/Plans of Action

As this is an Initial Audit, there are no standards previously found to be non-compliant or related plans of action.

**G.    Interviews**

During the course of the audit, team members met with both staff and offenders to verify observations and/or to clarify questions concerning facility operations.

1.      Offender Interviews

The Audit Team interviewed a total of 26 inmates.  Due to three incidents that occurred while the team was at the institution, the inmate population was on lockdown status for much of the time.  Inmates who were interviewed were primarily those inmates housed at the Minimum Security Facility (MSF) and within the Mental Health unit on 'A' Facility.  In general, inmates at the MSF were glad to be in a minimum custody facility.  Many of them had been at higher custody levels within CDCR.  When asked about their safety, they felt that staff at

32

CSP, Sacramento did a good job in reacting swiftly and with force, if necessary, to insure safety. Many inmates were curious about what was going on and who the audit team was. When explanations were given, the inmates sometimes wanted to know how the institution was doing.

2. Staff Interviews

The Audit Team interviewed a total of 52 CSP, Sacramento staff. Overall, they liked working at the institution. Several staff specifically stated that they we optimistic and hopeful in seeing CDCR take the accreditation step. They saw it as a positive move forward for the Department and for CSP, Sacramento and specifically, for a way out from under litigation. The Audit Team found staff to be professional, dedicated and proud of the work that they were doing in a very difficult situation. Staff saw the opportunity to compare themselves against a minimum set of national standards as the right thing to do.

## H.    Exit Discussion

The exit interview was held at 3:00P.M. in the Warden's Conference Room with the Warden Tim Virga and 32 staff in attendance.

The following persons were also in attendance:

> Terri McDonald        CDCR, Under Secretary

The chairperson explained the procedures that would follow the audit. The team discussed the compliance levels of the mandatory and non-mandatory standards and reviewed their individual findings with the group. The Chairperson acknowledged the historical importance of what California State Prison, Sacramento was attempting to accomplish as CDCR, and CSP, Sacramento embarked on a new era for corrections in the State of California.

The chairperson expressed appreciation for the cooperation of everyone concerned and congratulated the facility team for the progress made and encouraged them to continue to strive toward even further professionalism within the correctional field.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

AND THE

AMERICAN CORRECTIONAL ASSOCIATION

---

**COMPLIANCE TALLY**

---

| | |
|---|---|
| **Manual Type** | Adult Corrections Institutions, 4th Edition |
| **Supplement** | 2010 Standards Supplement |
| **Facility/Program** | California State Prison, Sacramento |
| **Audit Dates** | April 16 – 18, 2012 |
| **Auditor(s)** | Steve King, Chair of the Visiting Committee<br>Jimmie Atmore, Member of the Visiting Committee<br>Allan Westmoreland, member of the Visiting Committee |

| | **MANDATORY** | **NON-MANDATORY** |
|---|---|---|
| Number of Standards in Manual | 61 | 468 |
| Number Not Applicable | 4 | 28 |
| Number Applicable | 57 | 440 |
| Number Non-Compliance | 0 | 6 |
| Number in Compliance | 57 | 434 |
| Percentage (%) of Compliance | 100% | 98.6% |

- Number of Standards *minus* Number of Not Applicable *equals* Number Applicable

- Number Applicable *minus* Number Non-Compliance *equals* Number Compliance

- Number Compliance *divided by* Number Applicable *equals* Percentage of Compliance

34

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department Of Corrections and Rehabilitation
California State Prison, Sacramento
Folsom, California

April 16 – 18, 2012

Visiting Committee Findings

Non-Mandatory Standards

Non-Compliance

**Standard # 4-4134**

EACH INMATE CONFINED TO A CELL/ROOM FOR 10 OR MORE HOURS DAILY
IS PROVIDED A SLEEPING AREA WITH THE FOLLOWING:

- A SLEEPING SURFACE AND MATTRESS AT LEAST 12 INCHES OFF OF
  THE FLOOR
- A WRITING SURFACE AND PROXIMATE AREA TO SIT
- STORAGE FOR PERSONAL ITEMS
- ADEQUATE STORAGE SPACE FOR CLOTHES AND PERSONAL
  BELONGINGS

EACH INMATE CONFINED TO A CELL/ROOM FOR LESS THAN 10 HOURS
DAILY IS PROVIDED A SLEEPING AREA WITH THE FOLLOWING

- A SLEEPING SURFACE AND MATTRESS AT LEAST 12 INCHES OFF THE
  FLOOR
- STORAGE FOR PERSONAL ITEMS
- ADEQUATE STORAGE SPACE FOR CLOTHES AND PERSONAL
  BELONGINGS

FINDINGS:

The California State Prison, Sacramento's Mental Health Crisis Bed Unit (MHCBU) 1
Block had inmates sleeping on mattresses on the floor. A single desk and chair were
shared by both inmates. This standard requires the sleeping surface and mattress to be at
least 12 inches off the floor. Therefore, this standard is in non-compliance.

35

AGENCY RESPONSE

Plan of Action

In accordance with RALPH COLEMAN, et al., v. EDMUND G. BROWN, JR., et al., California State Prison Sacramento (CSP-SAC) will be retrofitted with a total of 44 metal-skirted suicide-resistant beds. 13-in CTC 1, 11 in CTC 2, and 20 in the B Facility temporary Mental Health Crisis Bed Unit (MHCBU). These beds will be located 15 inches from the floor.

The dimensions of the metal-skirted suicide-resistant bed are 36" W x 80" L x 15" H.

Task
a.    Identify the MHCBU that are part of the defendants plan - Completed
b.    Discussion of the types of beds that CDCR intends to install - Completed
c.    The timeline for purchasing and installing the beds in MCHBU – Completed
d.    Installation of the beds in MCHBU - Scheduled

Responsible Agency
a.    California Department of Corrections and Rehabilitation CDCR

Assigned Staff
a.    Dr. Margaret McAloon
b.    Captain Vicky Lundeby

Anticipated Completion Date
a.    Construction scheduled to begin July 6, 2012
b.    Tentative completion date, July 20, 2012

AUDITOR'S RESPONSE

The Plan of Action is acceptable. California State Prison Sacramento (CSP-SAC) indicated during the audit that this would be their response and the audit team felt the response would be appropriate. The response meets the standard's requirements that the 'a sleeping surface and mattress at least 12 inches off of the floor". CSP-SAC beds will be 15 inches from the floor. The number of beds indicated in the Plan of Action is sufficient to meet existing needs.

**Standard # 4-4135**

DAYROOMS WITH SPACE FOR VARIED INMATE ACTIVITIES ARE SITUATED IMMEDIATELY ADJACENT TO THE INMATE SLEEPING AREAS. DAYROOMS PROVIDE A MINIMUM OF 35 SQUARE FEET OF SPACE PER INMATE (EXCLUSIVE OF LAVATORIES, SHOWERS, AND TOILETS) FOR THE MAXIMUM NUMBER OF INMATES WHO USE THE DAYROOM AT ONE TIME,

AND NO DAYROOM ENCOMPASSES LESS THAN 100 SQUARE FEET OF SPACE (EXCLUSIVE OF LAVATORIES, SHOWERS, AND TOILETS).

FINDINGS:

California State Prison, Sacramento does not meet the square footage requirements required under the standard. Dayrooms provide approximately 32 square feet per inmate assuming all inmates (at maximum capacity) were in the dayroom. Therefore, standard is in non-compliance.

AGENCY RESPONSE

Appeal of the Visiting Committee Finding

California State Prison Sacramento (CSP-SAC) is appealing the non-compliant finding for standard 4-4135. Standard 4-4135 requires 35 square feet of dayroom space available per inmate based on maximum capacity. CSP-SAC supplied documentation referring to 32 square feet available per inmate within the minimum support facility.

DISCUSSION: Upon review, incorrect measurements were submitted to the ACA Committee. Our minimum support facility encompasses a dayroom with 3900 square feet of space. At a maximum capacity of 100 inmates, 39 square feet per inmate would be available.

AUDITOR'S RESPONSE

The appeal is acceptable provided the facility submits either drawings (architectural/engineering) or some similar rendering that clearly provides the dimensions of the CSP-SAC dayrooms. This documentation should be available for the Panel Hearing on the appeal to clearly demonstrate compliance. I support the appeal provided the documentation in present.

**Standard # 4-4154**

BOTH OUTDOOR AND COVERED/ENCLOSED EXERCISE AREAS FOR GENERAL POPULATION INMATES ARE PROVIDED IN SUFFICIENT NUMBER TO ENSURE THAT EACH INMATE IS OFFERED AT LEAST ONE HOUR OF ACCESS DAILY. USE OF OUTDOOR AREAS IS PREFERRED, BUT COVERED/ENCLOSED AREAS MUST BE AVAILABLE FOR USE IN INCLEMENT WEATHER. COVERED/ENCLOSED EXERCISE AREAS CAN BE DESIGNED FOR MULTIPLE USES AS LONG AS THE DESIGN AND FURNISHINGS DO NOT INTERFERE WITH SCHEDULED EXERCISE ACTIVITIES. THE MINIMUM SPACE REQUIREMENTS FOR EXERCISE AREAS ARE AS FOLLOWS:

- OUTDOOR EXERCISE AREAS IN FACILITIES WHERE 100 OR MORE INMATES UTILIZE ONE RECREATION AREA - 15 SQUARE FEET PER

INMATE FOR THE MAXIMUM NUMBER OF INMATES EXPECTED TO USE THE SPACE AT ONE TIME, BUT NOT LESS THAN 1,500 SQUARE FEET OF UNENCUMBERED SPACE.

- OUTDOOR EXERCISE AREAS IN FACILITIES WHERE LESS THAN 100 INMATES HAVE UNLIMITED ACCESS TO AN INDIVIDUAL RECREATION AREA - 15 SQUARE FEET PER INMATE FOR THE MAXIMUM NUMBER OF INMATES EXPECTED TO USE THE SPACE AT ONE TIME, BUT NOT LESS THAN 750 SQUARE FEET OF UNENCUMBERED SPACE.
- COVERED/ENCLOSED EXERCISE AREAS IN FACILITIES WHERE 100 OR MORE INMATES UTILIZE ONE RECREATION AREA - 15 SQUARE FEET PER INMATE FOR THE MAXIMUM NUMBER OF INMATES EXPECTED TO USE THE SPACE AT ONE TIME, WITH A MINIMUM CEILING HEIGHT OF 18 FEET, BUT NOT LESS THAN 1,000 SQUARE FEET OF UNENCUMBERED SPACE.
- COVERED/ENCLOSED EXERCISE AREAS IN FACILITIES WHERE LESS THAN 100 INMATES UTILIZE ONE RECREATION AREA - 15 SQUARE FEET PER INMATE FOR THE MAXIMUM NUMBER OF INMATES EXPECTED TO USE THE SPACE AT ONE TIME, WITH A MINIMUM CEILING HEIGHT OF 18 FEET, BUT NOT LESS THAN 500 SQUARE FEET OF UNENCUMBERED SPACE.

FINDINGS:

Inmates are not provided access to yard daily as required. Inmates in General Population have rotated access to the yard and the covered/enclosed recreation areas every other day. This is primarily is primarily due to the violent nature of the population and the need to insure safety for all. Therefore, the standard is in non-compliance.

AGENCY RESPONSE

Waiver Request

California State Prison Sacramento (CSP-SAC) is requesting a waiver for non-mandatory ACA Standard 4-4154 which requires an inmate have access to exercise areas for at least 1 hour every day.

DISCUSSION: Fundamentally, CSP-SAC houses maximum security inmates serving long sentences or those that have proved to be management problems at other institutions. Due to the propensity for violence CSP-SAC limits the number of inmates in an exercise area at any given time. By implementing a rotating yard schedule CSP-SAC ensures a higher level of safety for both staff, and inmates. CSP-SAC currently operates a rotating yard schedule allowing an inmate access to the exercise yard a minimum of 7 hours per week.

In order to be in compliance with ACA Standard 4-154 as it is written, CSP-SAC would have to increase the number of inmates on the exercise yard, increasing the potential for

38

violence against inmates as well as staff. CSP-SAC currently has a budgeted capacity of 972 inmates within C-Facility General Population, covered by 2 exercise yard Officers and 1 exercise Yard Sergeant. The required program structure changes to achieve compliance with ACA Standard 4-4154 would be significant and impossible to justify.

Therefore, CDCR formally requests that ACA grant a Waiver for ACA Standard 4-4154.

AUDITOR'S RESPONSE

The Request for a waiver is acceptable. The California State Prison Sacramento (CSP-SAC) has a very difficult mission to fulfill. The facility houses maximum security inmates serving long sentences and/or those that have proved to be management problems at other institutions. A review of agency data indicated a total of 215 major incidents between January 2012 and April 2012. This helps quantify the situation the staff face at CSP-SAC and lends weight to the request for a waiver which is supported by the audit team.

**Standard # 4-4155**

SEGREGATION UNITS HAVE EITHER OUTDOOR UNCOVERED OR OUTDOOR COVERED EXERCISE AREAS. THE MINIMUM SPACE REQUIREMENTS FOR OUTDOOR EXERCISE AREAS FOR SEGREGATION UNITS ARE AS FOLLOWS:

- GROUP YARD MODULES: 15-SQUARE FEET PER INMATE EXPECTED TO USE THE SPACE AT ONE TIME, BUT NOT LESS THAN 500-SQUARE FEET OF UNENCUMBERED SPACE
- INDIVIDUAL YARD MODULES: 180-SQUARE FEET OF UNENCUMBERED SPACE

IN CASES WHRE COVER IS NOT PROVIDED TO MITIGATE THE INCLEMENT WEATHER, APPROPRIATE WEATHER-RELATED EQUIPMENT AND ATTIRE SHOULD BE MADE AVAILABLE TO THE INMATES WHO DESIRE TO TAKE ADVANTAGE OF THEIR AUTHORIZED EXERCISE TIME.

FINDINGS:

Outdoor exercise areas for segregation inmates do not meet minimum square feet requirements laid out by the standard. CSP, Sacramento's yards are 150 square feet. Therefore, this standard is in non-compliance.

AGENCY RESPONSE

Discretionary Compliance Request

California State Prison Sacramento (CSP-SAC) is requesting a waiver for non-mandatory ACA Standard 4-4155 which requires a minimum of 180 square feet of unencumbered space in an individual yard module.

DISCUSSION: Design and Construction Policy Guidelines states in Section IV Prison Policy, Letter I Housing, Number 19 Administrative Segregation Units (ASU), Sub-letter g, which is on page 37:

"A minimum of one group exercise yard shall be provided for each ASU. The minimum size shall be 75 sq. ft. per Inmate, sized for a maximum of 20 Inmates." Continuing in Sub-letter h, "Any building designated as a permanent ASU or SHU should provide one SMY per every 5 cells. This does not apply to general population housing units converted to temporary overflow ASU housing.

As a result 75 sq. ft. is the standard per Inmate; however we design and build SMY units to house 2 Inmates each thus arriving at 150 sq. ft. SMY yards.

In order to be in compliance with ACA Standard 4-155 CDCR would have to request a change to the Design and Construction Policy Guidelines. This request would have to be accompanied by an analysis of required resources. The required resources to achieve compliance with ACA Standard 4-4155 would be significant and, given the current fiscal climate in California, impossible to justify.

Therefore, CDCR formally requests that ACA grant Discretionary Compliance with ACA Standard 4-4155 in lieu of CDCR's compliance with Design and Constructions Policy Guidelines:

- A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice.
- An unwillingness to request funds from a parent agency or funding source.

AUDITOR'S RESPONSE

The request that ACA grant Discretionary Compliance is acceptable. Given the current challenges facing the California prison system granting Discretionary Compliance is supportable.

**Standard # 4-4238**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES CHARGED WITH RULE VIOLATIONS ARE SCHEDULED FOR A HEARING AS SOON AS PRACTICABLE BUT NO LATER THAN SEVEN DAYS, EXCLUDING WEEKENDS AND HOLIDAYS, AFTER BEING CHARGED WITH A VIOLATION. INMATES ARE NOTIFIED OF THE TIME AND PLACE OF THE HEARING AT LEAST 24 HOUSE IN ADVANCE OF THE HEARING.

FINDING:

Title 15, Section 3320, specifies hearing time lines and stipulates 15 days, therefore the standard is in non-compliance.

AGENCY RESPONSE

Discretionary Compliance

☐ An unwillingness to request funds from a parent agency
☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice
☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

Minor infractions are defined as Administrative rules violations and are therefore covered with serious rules violations under Title 15 Section 3320 which is California state law. This law was originally codified in 1977 and addresses a complete and interrelated set of time requirements including when a rules violation report must be reviewed, classified, issued to the inmate and adjudicated. Subsection (b) of Section 3320 requires, "The charges shall be heard within 30 days from the date the inmate is provided a classified copy of the CDC Form 115 (Rules Violation Report) unless the charges were referred for possible prosecution…" In order for SAC, CCWF and SOL to comply with ACA Standards 4-4230 and 4-4238 CDCR would have to request a change to a California state law which has withstood judicial and legislative scrutiny for over 34 years. Additionally, partial justification for CDCR's custody supervisor staffing is based on inmate disciplinary time frames as custody supervisors review, classify, adjudicate, and investigate inmate rules violations. This process would take a minimum of two years and require additional staff resource which would be impossible to justify. Therefore, CDCR on behalf of SAC, CCWF, and SOL requests ACA grant Discretionary Compliance with ACA Standards 4-4230 and 4-4238 in lieu of their continued compliance with CCR, Title 15, Section 3320 (copy attached).

AUDITOR'S RESPONSE

The request for the granting of Discretionary Compliance is acceptable. California State Prison Sacramento is required by policy in place at a higher level which is contrary to the requirements of the standard. This will be a problem faced by other institutions and this supports the discretionary compliance request.

**Standard # 4-4417**

THERE ARE SUFFICIENT BATHING FACILITIES IN THE MEDICAL HOUSING UNIT AND INFIRMARY AREA TO ALLOW OFFENDERS HOUSED THERE TO BATHE DAILY.
FINDING:

Offenders/Patients at CSP, Sacramento housed in the CTC I and CTC II are only allowed to bathe three times per week.  Therefore, the standard is in non-compliance.

AGENCY RESPONSE

Appeal of the Visiting Committee Finding

California State Prison Sacramento (CSP-SAC) is appealing the non-compliant finding for standard 4-4417. Standard 4-4417 requires sufficient bathing facilities in the medical housing unit and infirmary area to allow offenders housed there to bathe daily.

DISCUSSION:  The ACA auditors noted at CSP-SAC both CTC I and CTC II inmates are bathed 3 times per week. CSP-SAC disagrees with this finding. CTC I and CTC II at CSP-SAC are designated Mental Health Crisis Beds. Inmates housed within these facilities have been diagnosed as inmates in an active crisis situation by licensed medical staff. These inmates are maximum security inmates requiring an increased level of security based on their mental health status.  CSP-SAC operations only require 1 shower every 3 days within CTC 1 and CTC II, however, both CTC I and CTCII contain sufficient bathing facilities allowing daily showers if medical orders were given.

AUDITOR'S RESPONSE

The request for appeal of the non-compliant finding cannot be supported.  The standard requires sufficient bathing facilities in the medical housing unit and infirmary area to allow offenders to bathe there daily.  CSP-SAC operations only require 1 shower every 3 days within CTC I and CTC II.  While the argument for the maximum security inmates and required increased level of security is of particular relevance in the request for waiver in Standard 4-4154, it does not have as great of weight in this appeal.  Therefore, this request cannot be supported.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department Of Corrections and Rehabilitation
California State Prison, Sacramento
Folsom, California

April 16 – 18, 2012

<u>Visiting Committee Findings</u>

Mandatory Standards

Not Applicable

**Standard # 4-4353**

IF FEMALE OFFENDERS ARE HOUSED, ACCESS TO PREGNANCY MANAGEMENT IS SPECIFIC AS IT RELATES TO THE FOLLOWING:

- PREGNANCY TESTING
- ROUTINE PRENATAL CARE
- HIGH-RISK PRENATAL CARE
- MANAGEMENT OF THE CHEMICALLY ADDICTED PREGNANT INMATE
- POSTPARTUM FOLLOW-UP
- UNLESS MANDATED BY STATE LAW, BIRTH CERTIFICATES/REGISTRY DOES NOT LIST A CORRECTIONAL FACILITY AS A PLACE OF BIRTH

FINDING:  +

The California State Prison, Sacramento houses only male offenders.  Therefore, standard is not applicable.

**Standard # 4-4362**

INTAKE MEDICAL SCREENING FOR OFFENDER TRANSFERS, EXCLUDING INTRA-SYSTEM, COMMENCES UPON THE OFFENDER'S ARRIVAL AT THE FACILITY AND IS PERFORMED BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL.  ALL FINDINGS ARE RECORDED ON A SCREENING FORM APPROVED BY THE HEALTH AUTHORITY.  THE SCREENING INCLUDES AT LEAST THE FOLLOWING:

INQUIRY INTO:
- ANY PAST HISTORY OF SERIOUS INFECTIOUS OR COMMUNICABLE ILLNESS, AND ANY TREATMENT OR SYMPTOMS (FOR EXAMPLE, A CHRONIC COUGH, HEMOPTYSIS, LETHARGY, WEAKNESS, WEIGHT LOSS, LOSS OF APPETITE, FEVER, NIGHT SWEATS THAT ARE SUGGESTIVE OF SUCH ILLNESS), AND MEDICATIONS
- CURRENT ILLNESS AND HEALTH PROBLEMS, INCLUDING COMMUNICABLE DISEASES
- DENTAL PROBLEMS
- USE OF ALCOHOL AND OTHER DRUGS, INCLUDING TYPE(S) OF DRUGS USED, MODE OF USE, AMOUNTS USED, FREQUENCY USED, DATE OR TIME OF LAST USE, AND HISTORY OF ANY PROBLEMS THAT MAY HAVE OCCURRED AFTER CEASING USE (FOR EXAMPLE, CONVULSIONS)
- THE POSSIBILITY OF PREGNANCY AND HISTORY OF PROBLEMS (FEMALE ONLY); AND OTHER HEALTH PROBLEMS DESIGNATED BY THE RESPONSIBLE PHYSICIAN

OBSERVATION OF THE FOLLOWING:
- BEHAVIOR, INCLUDING STATE OF CONSIOUSNESS, MENTAL STATUS, APPEARANCE, CONDUCT, TREMOR, AND SWEATING
- PBODY DEFORMITIES, EASE OF MOVEMENT, AND SO FORTH
- CONDITION OF THE SKIN, INCLUDING TRAUMA MARKINGS, BRUISES, LESIONS, JAUNDICE, RASHES, AND INFESTATIONS, RECENT TATOOS, AND NEEDLE MARKS OR OTHER INDICATIONS OF DRUG ABUSE

- MEDICAL DISPOSITION OF THE OFFENDER:
- GENERAL POPULATION
- GENERAL POPULATION WITH PROMPT REFERRAL TO APPROPRIATE HEALTH CARE SERVICE
- REFERRAL TO APPROPTIATE HEALTH CARE SERVICE FOR EMERGENCY TREATMENT

OFFENDERS, WHO ARE UNCONSCIOUS, SEMICONSCIOUS, BLEEDING, OR OTHERWISE OBIOUSLY IN NEED OF IMMEDIATE MEDICAL ATTENTION, ARE REFERRED.  WHEN THEY ARE REFERRED TO AN EMERGENCY DEPARTMENT, THEIR ADMISSION OR RETURN TO THE FACILITY IS PREDICATED ON WRITTEN MEDICAL CLEARANCE.  WHEN SCREENING IS CONDUCTED BY TRAINED CUSTODY STAFF, PROCEDURES WILL REQUIRE A SUBSEQUENT REVIEW OF POSITIVE FINDINGS BY THE LICENSED HEALTH CARE STAFF.  WRITTEN PROCEDURES AND SCREENING PROTOCOLS ARE ESTABLISHED BY THE RESPONSIBLE PHYSICIAN IN COOPERATION WITH THE FACILITY MANAGER.  INMATES CONFINED WITHIN A CORRECTIONAL COMPLEX WITH CONSOLIDATED MEDICAL SERVICES DO NOT REQUIRE HEALTH SCREENING FOR INTRA-SYSTEM TRANSFERS.

FINDINGS:

California State Prison, Sacramento only receives intra-system transfers. Therefore, the standard is not applicable.

**Standard # 4-4365**

A COMPREHENSIVE HEALTH APPRAISAL FOR EACH OFFENDER, EXCLUDING INTRA-SYSTEM TRANSFERS, IS COMPLETED AS DEFINED BELOW, AFTER ARRIVAL AT THE FACILITY. IF THERE IS DOCUMENTED EVIDENCE OF A HEALTH APPRAISAL WITHIN THE PREVIOUS 90 DAYS, A NEW HEALTH APPRAISAL IS NOT REQUIRED, EXCEPT AS DETERMINED BY THE DESIGNATED HEALTH AUTHORITY. HEALTH APPRAISALS INCLUDE THE FOLLOWING:

WITHIN 14 DAYS AFTER ARRIVAL AT THE FACILITY:
- REVIEW OF THE EARLIER RECEIVING SCREEN
- COLLECTION OF ADDITIONAL DATA TO COMPLETE THE MEDICAL, DENTAL, MENTAL HEALTH AND IMMUNIZATION HISTORIES
- 3) LABORATORY OR DIAGNOSTIC TESTS TO DETECT COMMUNICABLE DISEASE, INCLUDING VENEREAL DISEASE AND TUBERCULOSIS
- 4) RECORD OF HEIGHT, WEIGHT, PULSE, BLOOD PRESSURE AND TEMPERATURE
- 5) OTHER TESTS AND EXAMINATIONS, AS APPROPRIATE

WITHIN 14 DAYS AFTER ARRIVAL FOR INMATES WITH IDENTIFIED SIGNIFICANT HEALTH CARE PROBLEMS:
- MEDICAL EXAMINATION, INCLUDING REVIEW OF MENTAL AND DENTAL STATUS (FOR THOSE INMATES WITH SIGNIFICANT HEALTH PROBLEMS DISCOVERED ON EARLIER SCREENING SUCH AS CARDIAC PROBLEMS, DIABETES, COMMUNICABLE DISEASES, AND SO FORTH)
- REVIEW OF THE RESULTS OF THE MEDICAL EXAMINATION, TESTS, AND IDENTIFICATION OF PROBLEMS BY A HEALTH CARE PRACTITIONER OR OTHER QUALIFIED HEALTH CARE PROFESSIONAL, IF SUCH IS AUTHORIZED IN THE MEDICAL PRACTICE ACT
- INITIATION OF THERAPY, WHEN APPROPRIATE
- DEVELOPMENT AND IMPLEMENTATION OF A TREATMENT PLAN, INCLUDING RECOMMENDATIONS CONCERNING HOUSING, JOB ASSIGNMENT, AND PROGRAM PARTICIPATION

WITHIN 30 DAYS AFTER ARRIVAL FOR INMATES WITHOUT SIGNIFICANT HEALTH CARE PROBLEMS:

- MEDICAL EXAMINATION, INCLUDING REVIEW OF MENTAL AND DENTAL STATUS (FOR THOSE INMATES WITHOUT SIGNIFICANT HEALTH CONCERNS IDENTIFIED DURING EARLIER SCREENING- NO IDENTIFIED ACUTE OR CHRONIC DISEASE, NO IDENTIFIED COMMUNICABLE DISEASE AND SO FORTH)
- REVIEW OF THE RESULTS OF THE MEDICAL EXAMINATION, TESTS, AND IDENTIFICATION OF PROBLEMS BY A HEALTH CARE PRACTITIONER OR OTHER QUALIFIED HEALTH CARE PROFESSIONAL, IF SUCH IS AUTHORIZED IN THE MEDICAL PRACTICE ACT
- INITIATION OF THERAPY, WHEN APPROPRIATE
- DEVELOPMENT AND IMPLEMENTATION OF A TREATMENT PLAN, INCLUDING RECOMMENDATIONS CONCERNING HOUSING, JOB ASSIGNMENT AND PROGRAM PARTICIPATION

INTERPRETATION JANUARY 2004.  THE CRITERION FOR TESTING FOR VENEREAL DISEASES AT THE DISCRETION OF THE AGENCIES/FACILITIES HEALTH AUTHORITY.

FINDINGS:

California State Prison, Sacramento only receives intra-system transfers.  Therefore, the standard is not applicable.

**Standard #4-4371 (MANDATORY) Revised January 2006**

ALL INTERSYSTEM OFFENDER TRANSFERS WILL UNDERGO A MENTAL HEALTH APPRAISAL BY A QUALIFIED MENTAL HEALTH PROFESSIONAL WITHIN FOURTEEN DAYS OF ADMISSION TO A FACILITY. IF THERE IS DOCUMENTED EVIDENCE OF A MENTAL HEALTH APPRAISAL WITHIN THE PREVIOUS NINETY DAYS, A NEW MENTAL HEALTH APPRAISAL IS NOT REQUIRED, EXCEPT AS DETERMINED BY THE DESIGNATED MENTAL HEALTH AUTHORITY.  MENTAL HEALTH APPRAISALS INCLUDE, BUT ARE NOT LIMITED TO:

- REVIEW OF AVAILABLE HISTORICAL RECORDS OF INPATIENT AND OUTPATIENT PSYCHIATRIC TREATMENT
- REVIEW OF HISTORY OF TREATMENT WITH PSYCHOTROPIC MEDICATION
- REVIEW OF HISTORY OF PSYCHOTHERAPY, PSYCHO-EDUCATIONAL GROUPS AND CLASSES OR SUPPORT GROUPS
- REVIEW OF HISTORY OF DRUG AND ALCOHOL TREATMENT
- REVIEW OF EDUCATION HISTORY
- REVIEW OF HISTORY OF SEXUAL ABUSE-VICTIMIZATION AND PREDATORY BEHAVIOR
- ASSESSMENT OF CURRENT MENTAL STATUS AND CONDITION

- ▪ ASSESSMENT OF CURRENT SUICIDAL POTENTIAL AND PERSON-SPECIFIC CIRCUMSTANCES THAT INCREASE SUICIDE POTENTIAL
- ▪ ASSESSMENT OF VIOLENCE POTENTIAL AND PERSON-SPECIFIC CIRCUMSTANCES THAT INCREASE VIOLENCE POTENTIAL
- ▪ ASSESSMENT OF DRUG AND ALCOHOL ABUSE AND/OR ADDICTION
- ▪ USE OF ADDITIONAL ASSESSMENT TOOLS, AS INDICATED
- ▪ REFERRAL TO TREATMENT, AS INDICATED
- ▪ DEVELOPMENT AND IMPLEMENTATION OF A TREATMENT PLAN, INCLUDING RECOMMENDATIONS CONCERNING HOUSING, JOB ASSIGNMENT, AND PROGRAM PARTICIPATION

FINDINGS:

California State Prison, Sacramento receives only intra-system transfers. Therefore, the standard is not applicable.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department Of Corrections and Rehabilitation
California State Prison, Sacramento
Folsom, California

April 16 – 18, 2012

<u>Visiting Committee Findings</u>

Non-Mandatory Standards

Not Applicable

**Standard # 4-4128**

SINGLE-CELL LIVING UNITS SHALL NOT EXCEED 80 INMATES (NEW CONSTRUCTION ONLY)

FINDINGS:

This standard applies to new construction only, and therefore, in not applicable.

**Standard # 4-4149**

EACH DAYROOM PROVIDES INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST 12 SQUARE FEET OF TRANSPARENT GLAZING IN THE DAYROOMS, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE WHOSE ROOM/CELL IS DEPENDENT ON ACCESS TO NATURAL LIGHT THROUGH THE DAYROOM. (NEW CONSTRUCTION ONLY)

FINDINGS:

California State Prison, Sacramento is not new construction. Therefore this standard is not applicable.

**Standard # 4-4150-1**

NOISE LEVELS IN HOUSING AREAS (IN OTHER WORDS, DAYROOMS WITH ADJACENT CELLS OR DORMS) SHALL NOT EXCEED THE FOLLOWING:

- UNOCCUPIED – 45DBA (A SCALE), BUILDING SERVICE SYSTMS SHALL BE ON AND IN NORMAL OPERATING CONDITION. MID-FREQUENCY AVERAGE REVERBERATION TIME (T 60) MUST BE LESS THAN 1.0 SEC.

48

- OCCUPIED – 70 DBA (A SCALE) FOR MINIMUM OF 15 SECONDS OF CONTINUOUS AVERAGE MEASUREMENT IN NORMAL OPERATING CONDITIONS

ALL MONITORING SHALL BE CONDUCTED IN CLOSE PROXIMITY TO THE CORRECTIONAL OFFICER'S POST.  IF A CORRECTIONAL OFFICER'S POST IS NOT IDENTIFIED, THEN MONITORING SHALL BE CONDUCTED AT A LOCATION CONSIDERED BEST TO MONITOR HOUSING NOISE LEVELS. MEASUREMENTS SHALL BE CONDUCTED A MINIMUM OF ONCE PER ACCREDITATION CYCLE BY A QUALIFIED SOURCE.

FINDINGS:

California State Prison, Sacramento does not qualify as new construction.  Therefore, this standard is not applicable.

**Standard # 4-4181**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT WHEN BOTH MALES AND FEMALES ARE HOUSED IN THE FACILITY, AT LEAST ONE MALE AND ONE FEMALE STAFF MEMBER ARE ON DUTY AT ALL TIMES.

FINDINGS:

CSP, Sacramento does not house female inmates.  Therefore the standard is not applicable.

**Standard # 4-4190-1**

WRITTEN POLICY, PROCEDURE AND PRACTICE, IN GENERAL, PROHIBIT THE USE OF RESTRAINTS ON FEMALE OFFENDERS DURING ACTIVE LABOR AND THE DELIVERY OF A CHILD.  ANY DEVIATION FROM THE PROHIBITION REQUIRES APPROVAL BY, AND GUIDANCE ON, METHODOLOGY FROM THE MEDICAL AUTHORITY AND IS BASED ON DOCUMENTED SERIOUS SECURITY RISKS.  THE MEDICAL AUTHORITY PROVIDS GUIDANCE ON THE USE OF RESTRAINTS ON PREGNANT OFFENDERS PRIOR TO ACTIVE LABOR AND DELIVERY.

FINDINGS:

CSP, Sacramento does not house female inmates.  Therefore, the standard is not applicable.

**Standard # 4-4208**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICED PROVIDE THE FOLLOWING:

- A MISSION STATEMENT, INCLUDING GOALS AND OBJECTIVES
- EMERGENCY PLANS THAT ARE INTEGRATED INTO THE OVERALL EMERGENCY PLANS OF THE FACILITY

FINDINGS:

This standard is not applicable. The institution does not have a K-9 Unit.

**Standard # 4-4209**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION AND TRAINING REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHOULD BE TRAINED, CERTIFIED, AND RE-CERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR A COMPARABLE INTERNAL TRAINING AND PROFICIENCY TESTING PROGRAM.

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE FOR TRAINING OF HANDLERS/DOG TEAMS AND UPKEEP AND CARE OF THE ANIMALS PROVIDE FOR THE FOLLOWING:

- CRITERIA FOR SELECTION, TRAINING, AND CARE OF ANIMALS
- CRITERIA FOR SELECTION AND TRAINING REQUIREMENTS OF HANDLERS
- AN APPROVED SANITATION PLAN WHICH COVERS INSPECTION, HOUSING, TRANSPORTATION, AND DAILY GROOMING FOR DOGS

EACH HANDLER/DOG TEAM SHOULD BE TRAINED, CERTIFIED, AND RE-CERTIFIED ANNUALLY BY A NATIONALLY RECOGNIZED ACCREDITING BODY OR A COMPARABLE INTERNAL TRAINING AND PROFICIENCY TESTING PROGRAM.

FINDINGS:

CSP, Sacramento does not have a canine unit.  Therefore, the standard is not applicable.

**Standard # 4-4210**

WHERE A CANINE UNIT EXISTS, POLICY, PROCEDURE, AND PRACTICE PROVIDE DAILY AND CURRENT RECORDS ON TRAINING,  CARE OF DOGS, AND SIGNIFICANT EVENTS.

FINDINGS:

CSP, Sacramento does not have a canine unit.  Therefore, the standard is not applicable.

**Standard # 4-4278**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT MALE AND FEMALE INMATES HAOUSED IN THE SAME INSTITUTION HAVE SEPARATE SLEEPING QUARTERS BUT EQUAL ACCESS TO ALL AVAILABLE SERVICES AND PROGRAMS.  NEITHER SEX IS DENIED OPPORTUNITIES SOLELY ON THE BASIS OF THEIR SMALLER NUMBER IN THE POPULATION.

FINDINGS:

CSP, Sacramento houses only male inmates.  Therefore, this standard is not applicable.

**Standard # 4-4285**

WRITTEN POLICIES AND PROCEDURES GOVERN THE ADMISSION OF INMATES NEW TO THE SYSTEM. THESE PROCEDURES INCLUDE AT A MINIMUM THE FOLLOWING:

- DETERMINATION THAT THE INMATE IS LEGALLY COMMITTED TO THE INSTITUTION
- THOROUGH SEARCHING OF THE INDIVIDUAL AND POSSESSIONS
- DISPOSING OF PERSONAL PROPERTY
- SHOWER AND HAIR CARE, IF NECESSARY
- ISSUE OF CLEAN, LAUNDERED CLOTHING AS NEEDED

- PHOTOGRAPHING AND FINGERPRINTING, INCLUDING NOTATION OF IDENTIFYING MARKS OR OTHER UNUSUAL PHYSICAL CHARACTERISTICS
- MEDICAL, DENTAL, AND MENTAL HEALTH SCREENING
- ASSIGNING TO HOUSING UNIT

- RECORDING BASIC PERSONAL DATA AND INFORMATION TO BE USED FOR MAIL AND VISITING LIST
- EXPLAINING MAIL AND VISITING PROCEDURES
- ASSISTING INMATES IN NOTIFYING THEIR NEXT OF KIN AND FAMILIES OF ADMISSION
- ASSIGNING OF REGISTERED NUMBER TO THE INMATE
- GIVING WRITTEN ORIENTATION MATERIALS TO THE INMATE
- DOCUMENTING ANY RECEPTION AND ORIENTATION PROCEDURE COMPLETED AT A CENTRAL RECEPTION FACILITY

FINDINGS:

CSP, Sacramento is not designated as a reception center. Therefore, the standard is not applicable.

**Standard # 4-4286**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THE PREPARATION OF A SUMMARY ADMISSION REPORT FOR ALL NEW ADMISSIONS. THE REPORT INCLUDES AT A MINIMUM THE FOLLOWING INFORMATION:

- LEGAL ASPECTS OF THE CASE
- SUMMARY OF CRIMINAL HISTORY, IF ANY
- SOCIAL HISTORY
- MEDICAL, DENTAL, AND MENTAL HEALTH HISTORY
- OCCUPATIONAL EXPERIENCE AND INTERESTS
- EDUCATIONAL STATUS AND INTERESTS
- VOCATIONAL PROGRAMMING
- RECREATIONAL PREFERENCE AND NEEDS ASSESSMENT
- PSYCHOLOGICAL EVALUATION
- STAFF RECOMMENDATIONS
- PRE-INSTITUTIONAL ASSESSMENT INFORMATION

FINDINGS:

CSP-Sacramento is not a reception center. Therefore, standard is not applicable.

**Standard # 4-4287**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR A RECEPTION PROGRAM FOR NEW INMATES UPON ADMISSION TO THE CORRECTIONAL SYSTEM. EXCEPT IN UNUSUAL CIRCUMSTANCES, INITIAL RECEPTION AND ORIENTATION OF INMATES IS COMPLETED WITHIN 30 CALENDAR DAYS AFTER ADMISSION.

FINDINGS:

CSP, Sacramento is not a designated Reception Center. Therefore, the standard is not applicable.

**Standard # 4-4307**

IF YOUTHFUL OFFENDERS ARE HOUSED IN THE FACILITY, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THEY ARE HOUSED IN A SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS EXCEPT WHEN:

- A VIOLENT, PREDATORY YOUTHFUL OFFENDER POSES AN UNDUE RISK OF HARM TO OTHERS WITHIN THE SPECIALIZED UNIT; AND/OR
- A QUALIFIED MEDICAL OR MENTAL-HEALTH SPECIALIST DOCUMENTS THAT THE YOUTHFUL OFFENDER WOULD BENEFIT FROM PLACEMENT OUTSIDE THE UNIT

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE PREPARATION OF A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR HOUSING A YOUTHFUL OFFENDER OUTSIDE THE SPECIALIZED UNIT AND A CASE-MANAGEMENT PLAN SPECIFYING WHAT BEHAVIORS NEED TO BE MODIFIED AND HOW THE YOUTHFUL OFFENDER MAY RETURN TO THE UNIT. THE STATEMENT OF REASONS AND CASE-MANAGEMENT PLAN MUST BE APPROVED BY THE WARDEN OR HIS OR HER DESIGNEE. CASES ARE REVIEWED AT LEAST QUARTERLY BY THE CASE MANAGER, THE WARDEN OR HIS OR HER DESIGNEE, AND THE YOUTHFUL OFFENDER TO DETERMINE WHETHER A YOUTHFUL OFFENDER SHOULD BE RETURNED TO THE SPECIALIZED UNIT.

FINDINGS:

CSP, Sacramento houses only adults. There are no youthful offenders at the institution; therefore, this standard is not applicable.

**Standard # 4-4308**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE DIRECT SUPERVISION OF YOUTHFUL OFFENDERS HOUSED IN THE SPECIALIZED UNIT TO ENSURE SAFETY AND SECURITY.
FINDINGS:

CSP, Sacramento houses only adults. There are no youthful offenders at the institution; therefore, this standard is not applicable.

**Standard # 4-4309**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR CLASSIFICATION PLANS FOR YOUTHFUL OFFENDERS THAT DETERMINE LEVEL OF RISK AND PROGRAM NEEDS DEVELOPMENTALLY APPROPRIATE FOR ADOLESCENTS. CLASSIFICATION PLANS SHALL INCLUDE CONSIDERATION OF PHYSICAL, MENTAL, SOCIAL, AND EDUCATIONAL MATURITY OF THE YOUTHFUL OFFENDER.

FINDINGS:

CSP, Sacramento houses only adults. There are no youthful offenders at the institution; therefore, this standard is not applicable.

**Standard # 4-4310**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ADEQUATE PROGRAM SPACE BE PROVIDED TO MEET THE PHYSICAL, SOCIAL, AND EMOTIONAL NEEDS OF YOUTHFUL OFFENDER AND ALLOWS FOR THEIR PERSONAL INTERACTIONS AND GROUP-ORIENTED ACTIVITIES.

FINDINGS:

CSP, Sacramento houses only adults. There are no youthful offenders at the institution; therefore, this standard is not applicable.

**Standard # 4-4311**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS HAVE NO MORE THAN INCIDENTAL SIGHT OR SOUND CONTCT WITH ADULT OFFENDERS FROM OUTSIDE THE UNIT IN LIVING, PROGRAM, DINING, OR OTHER COMMON AREAS OF THE FACILITY. ANY OTHER SIGHT OR SOUND CONTACT IS MINIMIZED, BRIEF, AND IN CONFORMANCE WITH APPLICABLE LEGAL REQUIREMENTS.

FINDINGS:

CSP, Sacramento houses only adults. There are no youthful offenders at the institution; therefore, this standard is not applicable.

**Standard # 4-4312**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT PROGRAM PERSONNEL WHO WORK WITH YOUTHFUL OFFENDERS FROM THE SPECIALIZED UNIT BE TRAINED IN THE DEVELOPMENTAL, SAFETY, AND OTHER SPECIFIC NEEDS OF YOUTHFUL OFFENDERS.

WRITTEN JOB DESCRIPTIONS AND QUALIFICATIONS REQUIRE TRAINING FOR STAFF SPECIFICALLY ASSIGNED TO THE UNIT OR STAFF WHO ARE RESPONSIBLE FOR PROGRAMMING OF YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT BEFORE BEING ASSIGNED TO WORK WITH YOUTHFUL OFFENDERS.  THE TRAINING SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING AREAS:

- ADOLESCENT DEVELOPMENT
- EDUCATIONAL PROGRAMMING
- CULTURAL AWARENESS
- CRISIS PREVENTION AND INTERVENTION
- LEGAL ISSUES
- HOUSING AND PHYSICAL PLANT
- POLICIES AND PROCEDURES
- THE MANAGEMENT OF, AND PROGRAMMING FOR, SEX OFFENDERS
- SUBSTANCE-ABUSE SERVICES
- COGNITIVE-BEHAVIORAL INTERVENTIONS, INCLUDING ANGER MANAGEMENT, SOCIAL-SKILLS TRAINING, PROBLEM SOLVING, AND RESISTING PEER PRESSURE
- SUICIDE PREVENTION
- NUTRITION
- MENTAL-HEALTH ISSUES
- GENDER-SPECIFIC ISSUES
- CASE-MANAGEMENT PLANNING AND IMPLEMENTATION

FINDINGS:

CSP, Sacramento houses only adults.  There are no youthful offenders at the institution; therefore, this standard is not applicable.

**Standard # 4-4339**

THE INSTITUTION PROVIDES FOR THE THOROUGH CLEANING AND, WHEN NECESSARY, DISINFECTING OF INMATE PERSONAL CLOTHING BEFORE STORAGE OR BEFORE ALLOWING THE INMATE TO KEEP AND WEAR PERSONAL CLOTHING.

FINDINGS:

Inmate personal clothing is not kept at the facility.  Therefore, this standard is not applicable.

**Standard # 4-4353-1**

WHERE NURSING INFANTS ARE ALLOWED TO REMAIN WITH THEIR MOTHERS, PROVISIONS ARE MADE FOR A NURSERY, STAFFED BY QUALIFIED PERSONS, WHERE THE INFANTS ARE PLACED WHEN THEY ARE NOT IN THE CARE OF THEIR MOTHERS.

FINDINGS:

CSP, Sacramento is an all-male institution.  Therefore, the standard is not applicable.

## Standard # 4-4364

ALL IN-TRANSIT OFFENDERS RECEIVE A HEALTH SCREENING BY HEALTH-TRAINED OR QUALIFIED HEALTH-CARE PERSONNEL ON ENTRY INTO THE AGENCY SYSTEM.  FINDINGS ARE RECORDED ON SCREENING FORM THAT WILL ACCOMPANY THE OFFENDER TO ALL SUBSEQUENT FACILITIES UNTIL THE OFFENDER REACHES HIS OR HER FINAL DESTINATION. HEALTH SCREENS WILL BE REVIEWED AT EACH FACILITY BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL.  PROCEDURES WILL BE IN PLACE FOR CONTINUITY OF CARE.

FINDINGS:

CSP, Sacramento is not a reception center and does not receive in-transit offenders. Therefore, this standard is not applicable.

## Standard # 4-4377

OFFENDERS HAVE ACCESS TO A CHEMICAL DEPENDENCY TREATMENT PROGRAM.  WHEN A CHEMICAL DEPENDENCY PROGRAM EXISTS, THE CLINICAL MANAGEMENT OF CHEMICALLY DEPENDENT OFFENDERS INCLUDES, AT A MINIMUM, THE FOLLOWING:

- A STANDARDIZED DIAGNOSTIC NEEDS ASSESSMENT ADMINISTERED TO DETERMINE THE EXTENT OF USE, ABUSE, DEPENDENCY, AND/OR CO-DEPENDENCY
- AN INDIVIDUALIZED TREATMENT PLAN DEVELOPED AND IMPLEMENTED BY A MULTI DISCIPLINARY CLINICAL TEAM THAT INCLUDES MEDICAL, MENTAL HEALTH, AND SUBSTANCE ABUSE PROFESSIONALS
- PRE-RELEASE RELAPSE-PREVENTION EDUCATION, INCLUDING RISK MANAGEMENT
- THE OFFENDER SHALL BE INVOLVED IN AFTERCARE DISCHARGE PLANS

FINDINGS:

Inmates requiring a chemical dependency treatment program are sent elsewhere in the CDCR. CSP, Sacramento does not have a chemical dependency treatment program. Therefore, the standard is not applicable.

## Standard # 4-4383

WHEN INSTITUTIONS DO NOT HAVE QUALIFIED HEALTH CARE STAFF, HEALTH-TRAINED PERSONNEL COORDINATE THE HEALTH DELIVERY SERVICES IN THE INSTITUTION UNDER THE JOINT SUPERVISION OF THE RESPONSIBLE HEALTH AUTHORITY AND WARDEN OR SUPERINTENDENT.

FINDINGS:

CSP, Sacramento has qualified health care staff. Therefore, this standard is not applicable.

## Standard # 4-4391

IF VOLUNTEERS ARE USED IN THE DELIVERY OF HEALTH CARE, THERE IS A DOCUMENTED SYSTEM FOR SELECTION, TRAINING, STAFF SUPERVISION, FACILITY ORIENTATION, AND DEFINITION OF TASKS, RESPONSIBILITIES AND AUTHORITY THAT IS APPROVED BY THE HEALTH AUTHORITY. VOLUNTEERS MAY ONLY PERFORM DUTIES CONSISTENT WITH THEIR CREDENTIALS AND TRAINING. VOLUNTEERS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS:

CSP, Sacramento does not use volunteers in the delivery of health care. Therefore, this standard is not applicable.

## Standard # 4-4392

ANY STUDENT, INTERNS, OR RESIDENTS DELIVERING HEALTH CARE IN THE FACILITY, AS PART OF A FORMAL TRAINING PROGRAM, WORK UNDER STAFF SUPERVISION, COMMENSURATE WITH THEIR LEVEL OF TRAINING. THERE IS A WRITTEN AGREEMENT BETWEEN FACILITY AND TRAINING OR EDUCATIONAL FACILITY THAT COVERS SCOPE OF WORK, LENGTH OF AGREEMENT, AND ANY LEGAL OR LIABILITY ISSUES.

STUDENTS OR INTERNS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS:

CSP, Sacramento does not utilize student interns or residents for delivering health care services.  Therefore, standard is not applicable.

**Standard # 4-4393**

UNLESS PROHIBITED BY STATE LAW, OFFENDERS (UNDER STAFF SUPERVISION) MAY PERFORM FAMILIAL DUTIES COMMENSURATE WITH THEIR LEVEL OF TRAINING.  THESE DUTIES MAY INCLUDE:

- PEER SUPPORT AND EDUCATION
- HOSPICE ACTIVITIES
- ASSIST IMPAIRED OFFENDERS ON A ONE-ON-ONE BASIS WITH ACTIVITIES OF DAILY LIVING
- SUICIDE COMPANION OR BUDDY IF QUALIFIED AND TRAINED THROUGH A FORMAL PROGRAM THAT IS PART OF SUICIDE PREVENTION PLAN
- HANDLING DENTAL INSTRUMENTS FOR THE PURPOSE OF SANITIZING AND CLEANING, WHEN DIRECTLY SUPERVISED AND IN COMPLIANCE WITH APPLICABLE TOOL CONTROL POLICIES, WHILE IN A DENTAL ASSISTANTS TRAINING PROGRAM CERTIFIED BY THE STATE DEPARTMENT OF EDUCATION OR OTHER COMPARABLE APPROPRIATE AUTHORITY

OFFENDERS ARE NOT TO BE USED FOR THE FOLLOWING DUTIES:

- PERFORMING DIRECT PATIENT CARE SERVICES
- SCHEDULING HEALTH CARE APPOINTMENTS
- DETERMINING ACCESS OF OTHER OFFENDERS TO HEALTH CARE SERVICES
- HANDLING OR HAVING ACCESS TO SURGICAL INSTRUMENTS, SYRINGES, NEEDLES, MEDICATIONS, OR HEALTH RECORDS
- OPERATING DIAGNOSTIC OR THERAPEUTIC EQUIPMENT EXCEPT UNDER DIRECT SUPERVISION (BY SPECIALLY TRAINED STAFF) IN A VOCATIONAL TRAINING PROGRAM

FINDINGS:

CSP, Sacramento does not use inmate workers to perform familial duties.  Therefore, the standard is not applicable.

**Standard # 4-4436**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT COMPREHENSIVE COUNSELING AND ASSISTANCE ARE PROVIDED TO PREGNANT INMATES IN KEEPING WITH THEIR EXPRESSED DESIRES IN PLANNING FOR THEIR UNBORN CHILDREN.

FINDINGS:

CSP, Sacramento is an all-male facility and does not house females. Therefore, the standard is not applicable.

**Standard # 4-4437**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR SUBSTANCE ABUSE PROGRAMS, TO INCLUDE MONITORING AND DRUG TESTING, FOR INMATES WITH DRUG AND ALCOHOL ADDICTION PROBLEMS.

FINDINGS:

CSP, Sacramento is not a designated Substance Abuse Treatment Facility. The institution does not house offenders requiring substance abuse programs. Therefore, the standard is not applicable.

**Significant Incident Summary**

This summary is required to be provided to the chair of your audit team upon their arrival. The information contained on this form will also be summarized in the narrative portion of the visiting committee report and will be incorporated into the final report. It should contain data for the last 12 months; indicate those months in the boxes provided. Please type the data. If you have questions on how to complete the form please contact your regional manager.

**Facility:** CSP Sacramento          **Year:** 2011/2012

| Incidents | | 3/11 | 4/11 | 5/11 | 6/11 | 7/11 | 8/11 | 9/11 | 10/11 | 11/11 | 12/11/ | 1/12 | 2/12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Months | | | | | |
| Assault: Offenders/ Offenders* | Types (sexual* Physical etc.) | 3 phys 2 weap | 7 phys 2 weap | 6 physica 3 weapon | 8 physica | 13 physi 1 weapon | 5 physi 2 sexua | 7 physica 6 weapon | 5 physic 2 weapo (1 weap is inclu with Death # | 5 physic 2 weapo | 6 physica 1 sexual 1 weapon (weapon included death #'s | 6 physica 1 unk liq | 5 physica |
| | With Weapon | 2 | 2 | 3 | 0 | 1 | 0 | 6 | 2 | 2 | 1 | 0 | 0 |
| | Without Weapon | 3 | 7 | 6 | 8 | 13 | 7 | 7 | 5 | 5 | 7 | 7 | 5 |
| Assault: Offender/ Staff | Types (sexual* physical etc.) | 1 spit 8 phys 2 liquid 2 food | 2 spit 10 physica 1 medica 1 urine | 8 physica 2 unk liqu | 8 physica 4 unk liq 1 feces 1 weapon | 1 spit 11 physi 1 unk liqu 1 food tra 1 folders | 2 spit 8 phys 1 liquid 1 urine | 2 spit 9 physic 2 food | 2 spit 8 physic 1 unk liq 2 urine | 2 spit 4 physic 2 unk liq | 2 spit 10 physic 2 unk liq 1 urine 1 sexual | 2 spit 9 physic 2 weapor | 7 physica |
| | With Weapon | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 |
| | Without Weapon | 13 | 14 | 10 | 13 | 15 | 12 | 13 | 13 | 8 | 16 | 11 | 7 |
| Number Forced Moves Used** | # Incident | 27 | 36 | 40 | 38 | 47 | 34 | 39 | 43 | 36 | 30 | 32 | 23 |
| Disturbances* | Riots Hunger Strikes | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 3 | 0 | 0 |
| Number of Ti Chemical Age Used | | 14 | 20 | 26 | 25 | 24 | 16 | 23 | 28 | 19 | 15 | 19 | 19 |
| Number of Ti Special Reaction Te Used | Reaction teams formed to extractio Teams always utilized because usage g complia | 2 | 3 | 6 | 4 | 3 | 5 | 2 | 4 | 3 | 5 | 5 | 0 |
| Four/Five Poi Restraints | Number | 5 | 2 | 2 | 4 | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 1 |
| | Type (Chair, board Etc.) | BED | BED | BED | BED | | | BED | | BED | BED | | BED |
| Offender Med Referrals As a Result Injuries Sustained | | 5 | 2 | 2 | 4 | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 1 |
| Escapes | Attempt | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Actual | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Substantiated Grievances (resolved in fa | Reason (medica food, | 1 Info Record | 1 Legal 1 Mail 1 Fund | 2 ADA 1 Custo Classifica 2 Li | 1 Info/Rec 1 2 Li | 2 Property 1 Info/Rec | 2 Fund 1 Legal 1 Li | 1 Info/Rec 1 Li | 1 Disciplin 2 Legal 2 Li | 4 Proper 2 Legal 1 Condition 2 Li | 1 Funds 2 Li Condition | 3 ADA 1 Li Conditio | 2 Funds 1 Info/Reco |

| of offender) | Religiou etc.) | 1 Mail 1 Prope 3 Fund 2 ADA 1 Li Condit 2 Progr 1 Lega |  | 1 Legal 1 Property 1 Funds | Condition 1 Proper | 1 Custo Classifica 2 Li Condition 1 Mail | Condit 1 ADA | Condition 2 Mail 1 Proper 1 Li Condition | 1 Funds 5 Li Condition | Condition 1 Funds 1 Disciplin | 4 Custo Classifica 2 Property 2 C Info/Reco 1 Mail 1 ADA | 1 Progra 2 Mail 2 Property 1 C Info/Reco 2 Funds | 2 Property 1 Li Condition 2 Mail 1 ADA 1 Custo Classifica |
| | Number | 11 | 3 | 6 | 4 | 7 | 5 | 5 | 9 | 10 | 13 | 13 | 10 |
| **Deaths** | Reason (violent, illness, Suicide, natural) | 1 natur 1 suicid | 1 natur | 1 natural | N/A | N/A | 1 unkn 1 natur | 1 natural 1 suicide | 1 homic 1 unkno 1 accide | 1 suicide 1 natura | 1 homicid | N/A | N/A |
| | Number | 2 | 1 | 1 | 0 | 0 | 2 | 2 | 3 | 2 | 1 | 0 | 0 |
| | | | | | | | | | | | | | |

\*Any physical contact that involves two or more offenders
\*\* Oral, anal or vaginal copulation involving at least two parties
\*\*\* Routine transportation of offenders is not considered "forced"
\*\*\*\* Any incident that involves four or more offenders. Includes gang fights, organized multiple hunger strikes,
   Work stoppages, hostage situations, major fires, or other large scale incidents

**COMMISSION ON ACCREDITATION FOR CORRECTIONS
PANEL ACTION REPORT**

Denver Convention Center
Denver, Colorado

July 21, 2012

California Department of Corrections and
Rehabilitation
California State Prison- Sacramento
Folsom, California

| | |
|---|---|
| Agency Representatives: | Tim Virga, Warden |
| Panel Members: | Marge Webster, Chairperson |
| | James LeBlanc |
| | Cynthia Mausser |
| | Joan Shoemaker |
| Staff: | Kenya Golden |

**<u>Panel Action</u>**

| | |
|---|---|
| Standard #4-4134 | Plan of Action |
| Standard #4-4135 | Plan of Action |
| Standard # 4-4154 | Plan of Action |
| Standard # 4-4155 | Waiver |
| Standard # 4-4238 | Plan of Action |
| Standard # 4-4417 | Plan of Action |

**<u>Accreditation Panel Decision</u>**

| | |
|---|---|
| Moved: | Commissioner Webster |
| Seconded: | Commissioner Mausser |
| Three-Year Accreditation: | Yes |

| **Accreditation Vote** | **Yes** | **No** |
|---|---|---|
| Commissioner Webster | ✓ | |
| Commissioner LeBlanc | ✓ | |
| Commissioner Mausser | ✓ | |
| Commissioner Shoemaker | ✓ | |

**Final Tally**

| Mandatory | 100% |
|---|---|
| Non-Mandatory | 98.6% |

**The American Correctional Association**

*and the*

**Commission on Accreditation for Corrections**

*awards*

# ACCREDITATION

*to*

*California Department of Corrections and Rehabilitation*

*California State Prison, Sacramento*

*Represa, California*

2012-2015

*in recognition of the attainment of excellence in the operation of*

*an Adult Correctional Institution*

*presented this* 23rd *day of* July 2012



ACA PRESIDENT

ACA EXECUTIVE DIRECTOR



COMMISSION ON ACCREDITATION FOR CORRECTIONS

**ACA**
FOUNDED 1870

AMERICAN CORRECTIONAL ASSOCIATION



COMMISSION CHAIR



DIRECTOR, STANDARDS AND ACCREDITATION



*American Correctional Association*

# ACCREDITATION REPORT



*Commission on Accreditation for Corrections*

### California Department of Corrections and Rehabilitation
### California State Prison - Solano
### Vacaville, California

*The mission of the Commission on Accreditation for Corrections is to upgrade and improve practices and conditions in adult and juvenile correctional facilities and programs through an accreditation process which is founded on a commitment to accountability, professionalism and respect for basic human rights and which recognizes sound and effective correctional practices, while striving towards excellence in the field of corrections.*

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

August 6, 2012

California Department of Corrections and Rehabilitation
California State Prison- Solano
Vacaville, California

Congratulations!

It is a pleasure to officially inform you that the California State Prison- Solano was accredited by the Commission on Accreditation for Corrections at the American Correctional Association 2012 Congress of Correction on July 23, 2012 in Denver, Colorado.

Your accreditation represents the satisfactory completion of a rigorous self-evaluation, followed by an outside review by a team of independent auditors.

Every profession strives to provide a high quality of service to society.  To know that you, your staff, and other officials are complying with the requirements of the accreditation process is indeed a statement of a high level of commitment to the staff and persons under your care.-

On behalf of the Commission on Accreditation for Corrections, thank you for your commitment to the corrections profession.

Sincerely,

*Lannette Linthicum*

Lannette Linthicum, Chairperson
Commission on Accreditation for Corrections

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

www.aca.org

---

For Immediate Release

# California State Prison- Solano Awarded National Accreditation

Lannette Linthicum, Chairperson of the Commission on Accreditation for Corrections (CAC), and Kathy Black-Dennis, Director of Standards and Accreditation, American Correctional Association recently announced the accreditation of the California State Prison- Solano.  The award was presented in conjunction with the American Correctional Association 2012 Congress of Correction on July 23, 2012 in Denver, Colorado.

In presenting the award, Lannette Linthicum, Chairperson of the CAC, and Daron Hall, President of the American Correctional Association (ACA), complimented the facility on their professional level of operation and their success in completing the accreditation process.  The agency is one of over 1,500 correctional organizations currently involved in accreditation across the nation.

The accreditation program is a professional peer review process based on national standards that have evolved since the founding of the Association in 1870.  The standards were developed by national leaders from the field of corrections, law, architecture, health care, and other groups who are interested in sound correctional management.

ACA standards address services, programs, health care and security operations essential to effective correctional management.  Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders.  Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for agencies and facilities throughout the world.

The three-year accreditation award granted to the California State Prison- Solano does not signal the end of their involvement in the accreditation process.  During the award period, staff will work to improve any deficiencies identified during the audit and maintain continuous compliance with the standards.

# American Correctional Association

206 NORTH WASHINGTON STREET ALEXANDRIA VA 22314

703.224.0000 FAX 703.224.0079

**www.aca.org**



**FOUNDED 1870**

**EXECUTIVE COMMITTEE**

**Daron Hall, TN**
**President-Elect**

**Patricia L. Caruso, MI**
**Vice President**

**Mary L. Livers, LA**
**Treasurer**

**Harold W. Clark, VA**
**Immediate Past President**

**Artis R. Hobbs, AR**
**Board of Governors**
**Representative**

**David L. Thomas, FL**
**Board of Governors**
**Representative**

**James A. Gondles, Jr., VA**
**Executive Director**

Congratulations on your accreditation award!  You are now a member of the elite in achieving correctional excellence.  The certificate you have received is but a small symbol of the enormous dedication and commitment demonstrated by each and every member of your staff to the accreditation process, and I urge you to display it prominently as a continual reminder of the level of professionalism achieved.  This is just the beginning of your journey, however, for the true test of excellence is the test of time.  It is critical that your operation be able to sustain this achievement over time and be constant through both prosperity and adversity.

The logo of the Commission on Accreditation for Corrections depicts a sextant. Those who chose this symbol did so because "the sextant is an instrument used by a navigator to pinpoint the location of his ship in relation to the established points of reference in the universe, with the purpose of charting his future course."  This is the exact purpose of accreditation; objectively reviewing an agency or facility and giving it a goal for which to strive, a destination to reach.  Accreditation is the sextant for our profession; let it be your guide as well.

Thank you for your commitment to the American Correctional Association and the standards and accreditation process.


Kathy Black-Dennis, Director
Standards and Accreditation
American Correctional Association

## Overview of the American Correctional Association

The American Correctional Association is the oldest and most prestigious correctional membership organization in the United States. Founded in 1870, ACA currently represents more than 20,000 correctional practitioners in the United States and Canada. Members include all levels of staff from a wide variety of correctional disciplines and programs as well as professionals in allied fields and representatives from the general public. In addition, the Association represents the interests of 74 affiliated organizations whose goals, while similar to those of ACA, focus on specialized fields and concerns within the realm of corrections.

At its first organizational meeting held in Cincinnati, Ohio, in 1870, the Association elected then-Ohio governor and future U.S. President, Rutherford B. Hayes, as its first president. The *Declaration of Principles* developed at that first meeting became the guidelines for correctional goals in both the United States and Europe.

Since that time, ACA has continued to take a leadership role in corrections and work toward a unified voice in correctional policy. In recent years, one of the Association's major goals has been the development of national correctional policies and resolutions of significant issues in corrections. These policies are considered for ratification at the Association's two annual conferences and ratified policies are then disseminated to the field and other interested groups. ACA has also had a major role in designing and implementing professional standards for correctional practices, as well as methods for measuring compliance with those standards.

The Association conducts research and evaluation activities, provides training and technical assistance, and carries out the regular responsibilities of any professional membership organization, including a full publications program. The Association's two annual conferences, held in varying cities across the nation, attract more than 5,000 delegates and participants each year from the 50 states, U.S. territories, and several foreign countries.

Membership in ACA is open to any individual, agency, or organization interested in the improvement of corrections and the purposes and objectives of the Association. Members include the majority of state, local, provincial, and territorial correctional agencies; individual correctional institutions and local jails, pretrial programs and agencies, schools of criminal justice in colleges and universities, libraries; and various probation, parole, and correctional agencies. Most of ACA's members are employed at the federal, state, and local levels. Members also include more than 200 volunteers affiliated with these agencies as administrators or as members of advisory boards and committees.

## Organizational Purposes of the American Correctional Association

Among the most significant purposes of the Association as outlined in its Constitution, are:

> *To promote the coordination of correctional organizations, agencies, programs, and services to reduce fragmentation and duplication of effort and increase the efficiency of correctional services on a national basis.*

> *To develop and maintain liaisons and a close working relationship in America with national, regional, state, and local associations and agencies in the correctional, criminal justice, civic, and related fields for mutual assistance and the interchange of ideas and information, and to extend and strengthen cooperative working relationships with similar associations and agencies on the international level.*

> *To develop and promote effective standards for the care, custody, training, and treatment of offenders in all age groups and all areas of the correctional field: detention facilities and services, institutions and other facilities for juvenile and adult offenders, probation, parole, community residential centers, and other community-based programs and services.*

> *To conduct studies, surveys, and program evaluations in the correctional field, and provide technical assistance to correctional organizations, departments, institutions, and services.*

> *To publish and distribute journals and other professional materials dealing with all types of correctional activities.*

> *To promote the professional development of correctional staff at all levels.*

In carrying out these purposes, ACA sponsors programs for policy analysis, demonstration, and research. ACA also provides testimony, consultation, publications, conferences, workshops, and other activities designed to stimulate constructive action regarding correctional problems.

### Standard and Accreditation

Perhaps ACA'S greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,500 correctional agencies in the United States.

# Organizational Structure of the American Correctional Association

**Executive Committee**

The Executive Committee is composed of the elected officers of the Association - president, vice president, treasurer, two Board of Governors' members, the immediate past president, the president-elect, and the ACA executive director. The Executive Committee meets at least quarterly and exercises most of the powers of the Board of Governors during the intervals between meetings of the board.

**Board of Governors**

ACA's bylaws vest control of the Association with an 18-member elected Board of Governors composed of the officers of the Association and five at-large members. To ensure the interdisciplinary nature of the Association, board members must represent the following areas:

| | |
|---|---|
| At-Large Citizen (not employed in corrections) | Community Programs (Juvenile) |
| Correctional Administration (Adult) | Aftercare or Post-Release Supervision (Juvenile) |
| Correctional Administration (Juvenile) | Detention (Adult) |
| Institutions (Adult) | Detention (Juvenile) |
| Institutions (Juvenile) | At-Large (Ethnic Minority) (3) |
| Probation (Adult) | Education |
| Probation (Juvenile) | Member At-Large |
| Parole or Post-Release Supervision (Adult) | |
| Community Programs (Adult) | |

**Delegate Assembly**

The Delegate Assembly is composed of delegates from the professional affiliates, geographical chapters, membership at-large, Board of Governors, past presidents of ACA, and representatives of each military service. The Delegate Assembly can establish policy, define Association positions on broad social and professional issues, and determine major programs and legislative priorities. They meet at least twice annually, at the Winter Conference and Congress of Correction.

**Committees**

The majority of the Association's activities take place through committees. Each committee chair reports to the Association's Board of Governors at least twice a year. In this way, the Association collectively benefits from the involvement and contribution of the hundreds of individuals who function on the various committees. Ad-hoc committees are appointed by the president of the Association.

The current committees and councils are:

| | |
|---|---|
| Committee on Affirmative Action | Committee on Constitution and Bylaws |

Committee on International Relations
Committee on Congress Program Planning
Committee on Legal Issues
Committee on Correctional Awards
Committee on Membership
Committee on Military Affairs
Council of Professional Affiliates
Council of Dual-Membership Chapters and
State and Geographical Affiliates
Nominating Committee

Council on Professional Education
Credentials Committee
Research Council
Eligibility Committee
Resolutions & Policy Development
Comm
Committee on Ethics
Standards Committee
Legislative Affairs Committee

## Affiliates and Chapters

Affiliates and state chapters are major features of the Association's structure. They represent professional, regional, and state groups across the United States and Canada. Affiliates and chapters contribute to the professional development of all members by providing consultation in their respective areas of interest and by participating in seminars and workshops at ACA's annual conferences.

The following affiliates and chapters are currently associated with ACA:

Alabama Council on Crime and Delinquency
Alston Wilkes Society
American Assn for Correctional Psychology
American Correctional Chaplains Association
American Correctional Food Service
Association
American Correctional Health Services Assn
American Institute of Architects
American Jail Association
American Probation and Parole Association
Arizona Probation, Parole, and Corrs Assn
Association for Corrl Research and Info Mgmt
Assn of Paroling Authorities, International
Assn of State Correctional Administrators
Assn of Women Executives in Corrections
International Assn of Correctional Officers
Iowa Corrections Association
Juvenile Justice Trainers Association
Kansas Correctional Association
Kentucky Council on Crime and Delinquency
Louisiana Correctional Association
Maryland Criminal Justice Association
Michigan Corrections Association
Middle Atlantic States Correctional
Association
Minnesota Corrections Association
Missouri Corrections Association

National Association of Adult and Juvenile
State
Corrections Mental Health Directors
National Assn of Blacks in Criminal Justice
National Association of Juvenile Corrl
Agencies
Oregon Criminal Justice Association
Parole and Probation Compact
Administrators Association
Pennsylvania Assn of Probation, Parole, and
Corrections
Prison Fellowship
South Carolina Correctional Association
Tennessee Corrections Association
Association on Programs for Female
Offenders
Central States Correctional Association
Colorado Correctional Association
Connecticut Criminal Justice Association
Correctional Association of Massachusetts
Correctional Accreditation Managers Assn
Correctional Education Association
Correctional Industries Association
Family and Corrections Network
Florida Council on Crime and Delinquency
Illinois Correctional Association
Indiana Correctional Association

International Assn of Corrl Training Personnel
International Community Corrections Assn
National Association of Probation Executives
National Coalition for Mental and Substance
Abuse Health Care in the Justice System
National Correctional Recreation Association
National Council on Crime and Delinquency
Nation Juvenile Detention Association
Nebraska Correctional Association
Nevada Correctional Association
New Jersey Chapter Association
New Mexico Correctional Association
New York Corrections and Youth Svcs Assn

North American Association of Wardens &
Superintendents
North Carolina Correctional Association
Ohio Correctional and Court Svcs
Association
Texas Corrections Association
The Salvation Army
Utah Correctional Association
Virginia Correctional Association
Volunteers of America
Washington Correctional Association
Wisconsin Correctional Association

# Major Activities of the American Correctional Association

**Legislation**

The American Correctional Association is involved with all major issues affecting corrections today. Members and ACA staff maintain close working relationships with committees of the U.S. Congress and all federal agencies and groups whose decisions affect correctional policy. Expert testimony on a wide range of correctional issues is prepared for congressional committee and subcommittee hearings, and recommendations are provided to federal administrative agencies.

To ensure that the concerns and issues of the corrections profession are represented in proposed legislation and public policy, ACA's legislative liaison is addressing legislative and government concerns that will impact the corrections profession. ACA has established partnerships between chapters and affiliates and other national policy making organizations to present a strong collective voice for correctional reform throughout the world.

**Professional Development**

The purpose of the Association's Professional Development Department is to plan, promote, and coordinate professional development through training seminars, workshops, and published materials including curriculums, resource guides, and monographs.

ACA's training plan calls for a variety of professional development activities. Nationally advertised workshops cover topics such as training for trainers, management training, community-based employment programs, and stress management. On-site workshops for state and local departments of corrections are offered in curriculum development, supervision, communications, and report-writing skills.

The *Training for Correctional Staff Trainers* workshops further the skills of correctional professionals qualified to initiate and deliver training. These workshops also enable agencies to comply with national standards for accreditation and ensure that training is job-related and professionally developed and presented.

The department also offers correspondence courses to further professional development. More than 6,000 correctional personnel have completed or are in the process of completing ACA's self-instruction training program for correctional officers. This program, developed under the auspices of the National Institute of Corrections, provides 40 hours of basic training in accordance with ACA standards. A score of at least 80 percent on the comprehensive examination must be attained to achieve certification.

The Association has similar courses available for correctional supervisors, juvenile caseworkers, and food service employees. Additional courses which cover report writing skills, correctional management skills, legal issues for probation and parole officers, and legal issues for correctional officers are also available.

**Publications**

As one of the leading publishers of practical correctional publications, ACA produces books, videos, and lesson plans. Among the wide ranging subjects available are management, community, security, counseling, law, history, and health. These excellent resources for career advancement appeal to practitioners and scholars alike. Directories for every major sector of corrections are also published by ACA.

The following is just a few of the many publications that ACA offers:

*Corrections Today* is the major corrections magazine in the United States. Published seven times a year, it focuses on the interests of the professional correctional employee and administrator. Articles include reports of original research, experiences from the field, discussion of public policy, and the perspectives of prominent practitioners and academicians.

*On the Line* is published five times a year and contains national and local news of interest to the criminal justice professional.

*Corrections Compendium Newsletter* publishes cutting-edge information about the corrections environment. Survey information is compiled from 52 U.S. and 14 Canadian correctional systems.

*The Juvenile and Adult Directory* has been published since 1939. A revised edition of the directory is released each January. This publication is the only up-to-date, comprehensive directory of all U.S. and Canadian juvenile and adult correctional departments, institutions, agencies, and paroling authorities.

*The National Jail and Adult Detention Directory* was first published in 1978. It is a source of information concerning jails. The directory, published every two years, attempts to list all jails in the United States that house offenders or detainees for more than 48 hours.

*The Probation and Parole Directory*, updated every two years, provides over 500 pages of information regarding federal, state, and county adult and juvenile probation, parole and aftercare systems in the United States. It includes statistics on caseloads, expenditures, and personnel.

*The State of Corrections*, formerly *The Proceedings*, includes the events of both the Congress of Correction and the Winter Conference. Published since 1870, it includes selected speeches and panel presentations concerning the latest thoughts and practices in the criminal justice field.

*Correctional standards* are the most significant improvement in correctional programming. As the basis for accreditation, they give administrators a nationally recognized system for upgrading and improving their correctional services. The Association currently publishes over 20 manuals for every correctional discipline.

To aid in the development of policy with relation to accreditation, *Guidelines for the Development of Policies and Procedures* are available for adult correctional institutions, adult parole authorities/adult probation and parole field services, adult local detention facilities, adult community residential services, juvenile detention facilities, and juvenile training schools.

**Conventions**

ACA hosts two national conventions each year that attract more than 5,000 professionals from all aspects of corrections; the Winter Conference held in January, and the Congress of Correction, held in August. These events include a variety of workshops, exhibits, and seminars devoted to addressing topics specific to the corrections profession.

**Contracts and Grants**

The American Correctional Association has a history of successful grant and contract management and administration. ACA has completed contracts and grants of more than $30 million. These diverse initiatives, which are funded through federal and private sources, add to the technical expertise and knowledge of the organization as well as to the total field of corrections.

**Standards and Accreditation**

Perhaps ACA's greatest influence has been the development of national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders. Standards set by ACA reflect practical up-to-date policies and procedures and function as a management tool for over 1,200 correctional agencies in the United States.

## Overview of the Commission on Accreditation for Corrections

The Commission on Accreditation for Corrections (CAC) is a private, nonprofit organization established in 1974 with the dual purpose of developing comprehensive, national standards for corrections and implementing a voluntary program of accreditation to measure compliance with those standards.

The Commission was originally developed as part of the American Correctional Association. In 1979, by joint agreement, the Commission separated from the Association in order to independently administer the accreditation program. Between 1978 and 1986, the organizations shared the responsibility for developing and approving standards and electing members of the Commission. On November 7, 1986, the Commission on Accreditation for Corrections officially realigned itself with the American Correctional Association.

The Commission meets at least twice each year. The responsibility of rendering accreditation decisions rests solely with this board. The members of the Commission represent the full range of adult and juvenile corrections and the criminal justice system. They are elected from the following categories:

> National Association of Juvenile Correctional Agencies (1 representative)
> Council of Juvenile Correctional Administrators (1 representative)
> Association of State Correctional Administrators (2 representatives)
> National Sheriffs' Association (2 representatives)
> American Jail Association (1 representative)
> North American Association of Wardens and Superintendents (1 representative)
> International Community Corrections Association (1 representative)
> American Probation and Parole Association (1 representative)
> Association of Paroling Authorities International (1 representative)
> National Juvenile Detention Association (1 representative)
> American Bar Association (1 representative)
> American Institute of Architects (1 representative)
> National Association of Counties (1 representative)
> Correctional Health (Physician) (1 representative)
> Juvenile Probation/Aftercare (1 representative)
> Adult Probation/Parole (1 representative)
> At-Large (17 representatives)
> Citizen At-Large (Not in Corrections) (1 representative)

**Association Staff**

Accreditation activities are supported by the staff of the American Correctional Association, Standards and Accreditation Department, under the leadership of the director of the department. Standards and Accreditation Department staff is responsible for the daily operation of the accreditation program. Agencies in the process have contact primarily with the accreditation specialist responsible for their state or agency.

**Auditors**

Over 600 corrections professionals in the United States have been selected, trained, and employed on a contract basis by the Association. These individuals perform the field work for the Association which includes providing assistance to agencies working toward accreditation, conducting on-site audits of agencies to assess compliance with standards and confirming that requirements are met, and monitoring to ensure maintenance of the conditions required for accreditation. Teams of auditors, referred to visiting committees or audit teams, are formed to conduct standards compliance audits of agencies seeking accreditation and reaccreditation.

Auditors are recruited nationally through announcements in prominent criminal justice publications and at major correctional meetings. Affirmative action and equal employment opportunity requirements and guidelines are followed in the recruitment of auditors. All auditors employed by the Association have a minimum of three years of responsible management experience, have received a recommendation from an agency administrator, and have demonstrated knowledge in the substantive area(s) in which they are employed to assist the Association. In addition, all auditors must successfully complete the Association's auditor training and be members of the ACA in good standing.

**Standards Development**

Development of the ACA standards began in 1974 with an extensive program of drafting, field testing, revising, and approving standards for application to all areas of corrections. Since then, over 1,200 correctional facilities and programs have adopted the standards for implementation through accreditation, and many others have applied the standards informally themselves.

In the development of standards, the goal was to prescribe the best possible practices that could be achieved in the United States today, while being both realistic and practical. Steps were taken to ensure that the standards would be representative of past standards development efforts, reflect the best judgment of corrections professionals regarding good corrections practice, recognize current case law, and be clear, relevant, and comprehensive. The standards development and approval process has involved participation by a wide range of concerned individuals and organizations. Twenty-three manuals of standards are now used in the accreditation process:

> *Standards for the Administration of Correctional Agencies*
> *Standards for Adult Parole Authorities*
> *Standards for Adult Probation and Parole Field Services*
> *Standards for Adult Correctional Institutions*
> *Standards for Adult Local Detention Facilities*
> *Standards for Small Jail Facilities*
> *Standards for Electronic Monitoring Programs*
> *Standards for Adult Community Residential Services*
> *Standards for Adult Correctional Boot Camps*
> *Standards for Correctional Industries*
> *Standards for Core Jails*

*Standards for Correctional Training Academies*
*Standards for Juvenile Community Residential Facilities*
*Standards for Correctional Facilities*
*Standards for Juvenile Detention Facilities*
*Standards for Juvenile Day Treatment Programs*
*Standards for Juvenile Correctional Boot Camps*
*Standards for Therapeutic Communities*
*Standards for Small Juvenile Detention Facilities*
*Standards for Performance-Based Health Care in Adult Correctional Institutions*
*Certification Standards for Health Care Programs*
*Standards for Adult Correctional Institutions (in Spanish)*

The standards establish clear goals and objectives critical to the provision of constitutional and humane correctional programs and services. The standards include the requirement for practices to promote sound administration and fiscal controls, an adequate physical plant, adherence to legal criteria and provision of basic services. Basic services called for by the standards include the establishment of a functional physical plant, training of staff, adoption of sanitation and safety minimums, and provision of a safe and secure living environment. In offering specific guidelines for facility and program operations, the manuals of standards address due process and discipline, including access to the courts, mail and visitation, searches, and conditions of confinement of special management offenders.

The standards are systematically revised to keep pace with the evolution of different correctional practices, case law, and after careful examination of experiences, applying them over a period of time and circumstances. The ACA Standards Committee, which includes membership from the Commission on Accreditation for Corrections, is responsible for standards development and revision.

The ACA publishes biannual supplement to the standards with updated information and clarifications until new editions of standards manuals are published. Each supplement addresses standards interpretations, deletions, revisions, and additions for all manuals of standards issued by the Standards and Accreditation Department.

Suggestions and proposals for revisions to the standards from the field and interested others are encouraged. The Standards and Accreditation Department has developed a standards proposal form specifically for this purpose. The standards proposal form can be obtained from the Standards Supplement, the ACA website, or Standards and Accreditation Department staff (Appendix A). Proposals should be submitted via the ACA website.

# Accreditation Process Descriptions

For over 120 years, the American Correctional Association has been the only national body involved in the development of standards for the correctional field. ACA standards are supported by ACA's Standards and Accreditation Department and the Commission on Accreditation for Corrections, which is the evaluating and certifying body for accreditation. The department is responsible for the administration of accreditation and ongoing development of correctional standards.

The accreditation process is a voluntary program for all types of correctional agencies. For these agencies, accreditation offers the opportunity to evaluate their operations against national standards, to remedy deficiencies, and to upgrade the quality of programs and services. The recognized benefits of such a process include: improved management; a defense against lawsuits through documentation; demonstration of a "good faith" effort to improve conditions of confinement; increased accountability and enhanced public credibility for administrative and line staff; a safer and more humane environment for personnel and offenders; and the establishment of measurable criteria for upgrading programs, staffing, and physical plant on a continuous basis.

A major component of the accreditation process is the standards compliance audit conducted by a visiting committee. The purpose of the audit is to measure operations against the standards, based on documentation provided by the agency.

## The Visiting Committee Report

The results of the standards compliance audit are contained in the visiting committee report, a document prepared by the visiting committee chairperson. The report is distributed to the agency administrator and members of the visiting committee. This report is also submitted to the Commission on Accreditation for Corrections for consideration at the accreditation hearing.

The following information is usually contained in the visiting committee report:

*Agency and Audit Narrative*

The agency narrative includes a description of program services, a description of physical plant, number of offenders served on the days of the audit, a summary significant incidents and consent decrees, class action lawsuits and/or judgments against the agency/facility, if applicable. The audit narrative, prepared by the visiting committee chairperson, describes audit activities and findings. The narrative examines issues or concerns that may affect the quality of life and services in an agency or facility. Quality of life issues include areas such as staff training, adequacy of medical service, sanitation, use of segregation and detention, reported and/or documented incidences of violence and crowding in institutions, offender activity levels, programming and provision of basic services. The audit narrative also contains comments as a result of staff and offender interviews, and a detailed explanation of all noncompliant and not applicable standards.

*Agency Response*

The agency has three options for standards found in noncompliance: a plan of action; an appeal; or a waiver request.

A **plan of action** is a detailed statement of tasks to be performed in order to achieve compliance with a standard found in noncompliance at the time of the audit. The plan of action designates staff responsibilities and timetables for completion.

An **appeal** is the agency's attempt to change the visiting committee's decision on a standard. The result of a successful appeal is a change in the status of the standard and a recalculation of the compliance tally.

A **waiver** may be requested when noncompliance with a standard does not adversely affect the life, health, or safety of staff and offenders and when quality of life conditions compensate for the lack of implementation of a plan of action. The granting of a waiver by the Commission waives the requirement for submitting a plan of action; however, it does not change the noncompliant finding.

A **discretionary compliance request** is when there are circumstances in which agencies choose not to comply with a particular standard for a variety of reasons.  These reasons include:

- An unwillingness to request funds from a parent agency or funding source.

- A preference to satisfy the standard/expected practice's intent in an alternative fashion.

- An objection from a parent agency, higher level government official or funding source to the nature of the standard/expected practice.

- A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice.

- An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

*Auditor's Response*

This section contains the visiting committee's final reply to all responses received from the agency and includes comments regarding the acceptability of plans of action, appeals, and waivers.

## Accreditation Hearings

The Commission on Accreditation for Corrections is solely responsible for rendering accreditation decisions and considers an agency's application at its next regular meeting following completion of the visiting committee report. The Commission is divided into panels that are empowered to reach and render accreditation decisions. These panels hear the individual application for accreditation and include a quorum of at least three Commissioners which includes the panel hearing chairperson. Agencies are notified in writing of the date, time, and location of the hearings by Standards and Accreditation Department Staff.

The panel hearing is the last step in the process. With the panel chairperson presiding, panel members discuss issues and raise questions relative to all aspects of agency operations and participation in the process. The information presented during the hearing and in the visiting committee report is considered by the panel members in rendering accreditation decisions.

The agency is invited to have a representative at the hearing and, in most cases, one or more individuals attend. When special conditions warrant, the visiting committee chairperson or a member of the visiting committee also may be asked to attend the hearings. When this occurs, the auditor provides information to help clarify controversial issues and responds to questions and concerns posed by panel members.

Attendance by any other parties (i.e. media representatives, public officials, or personnel from agencies other than the applicant) occurs only with the permission of the applicant agency. In these cases, the applicant agency representatives and panel members discuss procedures to be followed before commencement of the hearing.

### Conduct of Hearings

The panel schedule provides ample time for review of each individual agency pursuing accreditation. Hearings are conducted by the panel chairperson in accordance with established procedures. Panel proceedings require that a formal vote be taken on all final actions, i.e., agency appeals, waiver requests, and the final accreditation decision of the Commission. All panel proceedings are tape-recorded to assist in preparing minutes of the hearings. Panel activities generally occur as follows:

- Applicant agency representatives are requested by Standards and Accreditation Department staff to be on-call to allow for scheduling flexibility.

- A designated waiting area is usually provided for this purpose.

- When the panel is ready to review the agency, the Standards and Accreditation Department staff representative notifies agency representative(s).

- The hearing opens with an introduction by the panel chairperson.
- The agency representative is asked to give a brief description of the

program.

▪ If a visiting committee member is present at the hearing, the panel chairperson may request that the auditor present an account of the visit, focusing on matters particularly pertinent to the decision or specific panel actions. In some cases, however, the panel may wish to call on the visiting committee member only to request additional information at different points during the hearing.

▪ The panel chairperson leads a standard by standard review of non-compliance issues. The agency representative presents information relative to their request for waivers, plans of action, appeals, and discretionary compliance requests. The agency may also present additional materials, including photographs or documentation, for review by the panel.

▪ Following the agency presentation, the chairperson has the option of calling the panel into executive session to consider the information provided, determine findings, and make an accreditation decision. Whether or not panel deliberations occur in the presence of agency personnel or in executive session varies from panel to panel, considering the preference of panel members and the sensitivity of issues to be discussed regarding the application.

In final deliberations, the Commission panel:

▪ Ensures compliance with all mandatory standards and at least 90 percent of all other standards.

▪ Responds with a formal vote to all appeals submitted by the applicant agency.

▪ Responds with a formal vote to all request for waivers, discretionary compliance, and plans of action submitted by the applicant agency.

At this time, the panel also:

▪ Assures that an acceptable plan of action will be submitted for every non-compliant standard, including those standards for which appeals of non-compliance and waiver requests have been denied by the panel. In judging the acceptability of plans of action, the panel ensures that all of the information requested on the form is provided. Furthermore, the feasibility of plans to achieve compliance is considered, including specific tasks, time frames, and resource availability (staff and funding) for implementing proposed remedies.

▪ Addresses to its satisfaction any concerns it has with visiting committee comments about the quality of life in the facility or program, patterns of non-compliance, or any other conditions reviewed by the panel relating to

the life, health, and safety of residents and staff.

For each application, a roll call vote to award accreditation, extend an agency in Candidate or Correspondent Status, or deny accreditation is conducted. The options for final action available to the panel are outlined in the next chapter.

If the panel has deliberated in executive session, agency representatives are invited back into the meeting and informed of the panel's final decision and actions or recommendations on all other issues raised by the applicant. If accreditation has not been granted, the chairperson discusses with agency personnel specific reasons for the decision and the conditions of extension in Candidate or Correspondent Status and procedures for appeal.

**Accreditation Decisions**

Three decisions relative to the accreditation of an agency are available to panels:

- *Three-year accreditation award* based on sufficient compliance with standards, acceptance of adequate plans of action for all non-compliant standards and satisfaction of any other life, health, and safety conditions established by the panel. The balance of the contract must be paid in full in order to receive a certificate of accreditation.

- *Extension of the applicant agency in Candidate Status* (initial accreditation only) for reasons of insufficient standards compliance, inadequate plans of action, or failure to meet other requirements as determined by the panel. The Commission may stipulate additional requirements for accreditation if, in its opinion, conditions exist in the facility or program that adversely affect the life, health, or safety of the offenders or staff. Extension of an applicant in Candidate Status is for period of time specified by the panel and for identified deficiencies if in the panel's judgment, the agency is actively pursuing compliance.

- *Probationary Status* is determined when the panel specifies that compliance levels are marginal, there is a significant decrease in compliance from the previous audit (in the case of reaccreditation), or there are quality of life issues that would indicate continued monitoring. While an award of accreditation is granted, a monitoring visit must be completed and the report presented at the next meeting of the Commission. The cost for a monitoring visit is borne by the agency at a rate of cost plus 25%. The agency does not have to appear before the Commission for the review of the monitoring visit report. If they choose to do so, all related travel expenses are borne by the agency. Specific expectations for removal from probation are outlined.

- *Denial of accreditation* removes the agency from Accredited Status (in the case of reaccreditation) and withdraws the agency from the accreditation program. Situations such as insufficient standards compliance, inadequate plans of action, failure to meet other requirements as determined by the panel or quality of life issues may lead to the denial of accreditation, it is

withdrawn from the process and is not eligible to re-apply (as an applicant) for accreditation status for a minimum of six months from the date of that panel hearing.  The Commission will explain the process for appeal.

The agency receives written notification of all decisions relative to accreditation after the hearing.

**Appeal Process**

The accreditation process includes an appeal procedure to ensure the equity, fairness, and reliability of its decisions, particularly those that constitute either denial or withdrawal of Accredited Status.  Therefore, an agency may submit an appeal of any denial or withdrawal of accreditation.

The basis for reconsideration is based on grounds that the decision(s) were:

- Arbitrary, capricious, or otherwise in substantial disregard of the criteria and/or procedures promulgated by the Commission.

- Based on incorrect facts or an incorrect interpretation of facts.

- Unsupported by substantial evidence.

- Based on information that is no longer accurate.

The reasonableness of the standards, criteria, and/or procedures for the process may not serve as the basis for reconsideration.  The procedures for reconsideration are as follows:

- The agency submits written request for reconsideration to the Director of Standards within 30 days of the adverse decision stating the basis for the request.

- The Executive Committee of the Commission, composed of the officers of the Commission, reviews the request and decides whether or not the agency's request presents sufficient evidence to warrant a reconsideration hearing before the Commission.  The agency is notified in writing of the Executive Committee's decision.

- If the decision is made to conduct a hearing, the hearing is scheduled for the next full Commission meeting and the agency is notified of the date.

- The agency, at its option and expense, has the right of representation, including counsel.

- Following the hearing held before the Commission, the decision, reflecting a majority opinion, is made known to the agency immediately.

- Pending completion of the reconsideration process, the agency maintains its

prior status.  Until a final decision has been reached, all public statements concerning the agency's accredited status are withheld.

▪ Following completion of the reconsideration process, any change in the status of an agency is reflected in the next regularly published list of accredited agencies.

# Accredited Status

The accreditation period is three years, during which time the agency must maintain the level of standards compliance achieved during the audit and work towards compliance of those standards found in non-compliance.  Regular contact with Standards and Accreditation Department staff should also be maintained.

**Annual Report**

During the three year accreditation period, the agency submits an annual report to the Standards and Accreditation Department.   This statement is due on the anniversary of the accreditation (panel hearing) date and contains the following information:

*Current standards compliance levels* – This includes any changes in standards compliance since accreditation, listing on a standard-by-standard basis any standard with which the agency has fallen out of compliance or achieved compliance.

*Update of plans of action* – A progress report is included with respect to plans of action submitted to the hearing panel, indicating completion of plans resulting in compliance with standards and revised plans reflecting the need for additional time, funds, and/or resources to achieve compliance.

*Significant Events-* A report is made of events and occurrences at the agency during the preceding year that impact on standards compliance, agency operation, or the quality of services provided by the agency.  This might include:

- A change in the agency administration and/or major staffing changes mission change or program revisions.

- Mission change or program revisions.

- Changes in the offender population, including number of offenders or general offender profile.

- Physical plant renovations, additions, or closing.

- Any major disturbances, such as extended periods or lock-down, employee work stoppages, etc.

- Any significant incident to include allegations of physical/sexual abuse.

- A death from other than natural causes.

Standards and Accreditation Department staff review the annual report received from the agency and respond to clarity issues or request additional information if necessary.

In addition to submission of the annual report, the agency is responsible for notifying Standards and Accreditation Department staff of any major incident, event, or circumstances

that might affect standards compliance. This notice must be provided to the Standards and Accreditation Department immediately following the event. For example, an agency must notify the Standards and Accreditation Department if it is the subject of a court order, has a major disturbance, escape, physical/sexual abuse (to include allegations), employee work stoppage, death from unnatural causes, or experiences a major fire or other disaster. It it the responsibility of the accredited agency to inform Standards and Accreditation Department staff or provide them with copies of news articles, special reports, or results of investigations that address conditions that affect standards compliance.

Finally, the Standards and Accreditation Department may request that the agency respond to public criticism, notoriety, or patterns of complaint about agency activity that suggests failure to maintain standards compliance. The Standards and Accreditation Department may conduct an on-site monitoring visit to the agency to verify continued compliance.

**Monitoring Visits**

Monitoring visits to agencies in Accredited Status are conducted by an ACA auditor(s) in order to assess continuing compliance with the standards. A monitoring visit may be conducted at anytime during the accreditation period, with advance notice to the agency. The determination of need for a monitoring visit is based on:

- Compliance levels, findings, and recommendations by the Commission on Accreditation for Corrections during the hearing.

- Incidents or events reported by the agency in its annual report.

- Problems indicated by adverse media reports or correspondence received by Standards and Accreditation Department staff, disturbances at the agency, or special investigations.

The length of the visit varies depending on the number of standards or special issues that must be addressed during the visit. The visits are conducted similar to standards compliance audits, but on a reduced scale. Monitoring visits are charged to the agency at a rate of cost plus twenty-five percent.

Activities, as a general rule, involve a review of all mandatory standards, all standards found in non-compliance at the time of accreditation, and any other concerns identified by the Commission. The visit also involves a tour of the agency and interviews with staff and offenders to ensure maintenance of the requirements of accreditation. It concludes with an exit interview during which the auditor informs the agency staff of the findings of the visit.

Following the visit, the auditor prepares a monitoring visit report that addresses findings of the visit. The report includes a list of standards reviewed, explanation of non-compliance findings, results of the tour and interviews with agency staff and offenders, and discussion of any issues believed to be relevant to the agency's accreditation. The report, as with others prepared by auditors, is reviewed and sent to the agency by Standards and Accreditation staff.

When a monitoring visit to the agency reveals deficiencies in maintaining compliance levels that existed at the time of accreditation, or less than 100 percent compliance with mandatory standards, the agency prepares a response providing explanation of the problems indicated in the report. When the agency has failed to maintain compliance with all mandatory standards, the monitoring visit report and the agency response are submitted to the Commission on Accreditation for Corrections for review during a regular hearing. Agency representatives are advised of the date, time, and location of the review, and are invited to attend. At the discretion of the Commission, the agency may be placed in probationary status and a revisit conducted to determine if deficiencies have been corrected.

**Revocation of Accreditation**

If the Commission panel believes that an agency's failure to maintain continuous compliance with certain standards is detrimental to life, health, and safety of residents and staff, the Commission may place an agency on probation. Probationary status last for a specific period of time designated by the Commission at its next regularly schedule meeting. The Commission again reviews the program and considers removing the probationary status or revoking accreditation. When the agency corrects the deficiencies within the probationary status period and the corrections have been verified and accepted, the agency resumes its status as an accredited agency. An agency that does not satisfactorily correct the deficiencies may be withdrawn from accreditation.

Another condition that may result in a rehearing and consideration of revocation is following a significant event in an agency (i.e. major disturbance, death from other than natural causes or allegations of physical/sexual abuse of offenders). Failure to notify the Standards and Accreditation Department in a timely manner may result in suspension of the agency's accreditation. Once ACA is notified of the major event, the Director of Standards and Accreditation may consult with the Executive Committee of the Commission, who may request a monitoring visit. If a visit is warranted, ACA will notify the agency and a date will be established with the concurrence of the facility. The monitoring visit will take place within 14 days of this notification. The monitoring visit report will be sent to the Director of Standards within 7 days of the monitoring visit and then forwarded to the Executive Committee of the Commission. Following review of the report, a determination will be made by the Executive Committee as to whether revocation of accreditation is warranted. Prior to any rehearing, agency representatives will be notified, so that any issues may be addressed and responded to in writing.

Accreditation is revoked for the following reasons:

- Failure on the part of the agency to adhere to the provisions on the contract.

- Failure on the part of the agency to maintain continuous compliance with the standards at levels sufficient for accreditation.

- Intentional misrepresentation of facts, lack of good faith, or lack of deliberate speed or a concerted effort to progress in the accreditation process, including the implementation of plans of action.

- ▪ Failure to notify ACA of significant incidents in the annual report to the Commission.

- ▪ Adverse conditions of confinement that affect the life health, and/or safety of staff and offenders.

- ▪ Failure to comply with the conditions of probation or suspension.

Standards and Accreditation Department staff notify the agency in writing of the specific reasons identified by the Commission for the revocation hearing. Agencies may appeal the decision of the Executive Committee to the full board of the Commission on Accreditation for Corrections. Appeals must be submitted within 30 days. The agency may apply to re-enter the process 180 days after the revocation of accreditation.

**Expiration of Accredited Status**

Accreditation is granted for a three year period. Unless the agency has applied for reaccreditation and completed activities in the process required for reaccreditation, the Commission withdraws the agency from Accreditation Status after this three year period.

For agencies in Accredited Status that are seeking subsequent accreditation, administrative extensions of Accredited Status may be granted under certain conditions. For example, relocation of the facility, staff turnover, and major renovations often warrant an extension. In these cases, a written request to the Director of Standards and Accreditation is required, outlining the reasons for extending the accreditation period. Agencies that fail to successfully complete an audit within the three year period, or do not receive an extension prior to their expiration date, are withdrawn from Accredited Status.





**Visiting Committee Report and Hearing Minutes**

CONFIDENTIALITY

*The American Correctional Association and the Commission on Accreditation for Corrections do not disclose to external parties specific information contained in this Accreditation Report or information discussed in the Accreditation Hearing. The Association encourages all participating agencies to provide information to the media about their accreditation activities, including disclosure of the Self-Evaluation and Accreditation Report.*

**COMMISSION ON ACCREDITATION FOR CORRECTIONS**

**STANDARDS COMPLIANCE INITIAL AUDIT**

California Department of Corrections and Rehabilitation
California State Prison- CSP Solano
Vacaville, California

April 30- May 2, 2012

<u>**VISITING COMMITTEE MEMBERS**</u>

Katherine Brown, Chairperson
Correctional Consultant
11039 Hook Lane
Hudson, Florida 34669
(727) 470-4123
kbrown2828@yahoo.com

Jack Falconer
Correctional Consultant
3421 E. Topeka Drive
Phoenix, Arizona 85050
(602) 374-3320
jfalconer1#@cox.net

Barbara Denison
Correctional Consultant
3113 Clubhouse Drive
Edinburg, Texas 78542
(956) 566-2578
denisobj@sbcglobal.net

**A.      Introduction**

The audit of the California State Prison CSP Solano, Vacaville, California was conducted on April 30- May 2, 2012, by the following team:  Katherine Brown, Chairperson; Jack Falconer, Member; and Barb Denison, Member.

**B.      Facility Demographics**

| | |
|---|---|
| Rated Capacity: | 2,610 |
| Actual Population: | 4,600 |
| Average Daily Population for the last 12 months: | 4,895 |
| Average Length of Stay: | Not available at time of audit |
| Security/Custody Level: | Medium |
| Age Range of Offenders: | 18-70 |
| Gender: | Male |
| Full-Time Staff: | 1,308 |

380 Administrative/Support 775 Security, 153 Medical

**C.      Facility Description**

California State Prison-CSP Solano is located in the city of Vacaville, adjacent to the California Medical Facility.  The physical address of the facility is 2100 Peabody Road Vacaville, CA 95696. CSP-CSP Solano opened in August of 1984 as California Medical Facility South and covers 146 acres. When the prison opened it was administered by the warden of the California Medical Facility. In January 1992, the two prisons were separated administratively and a warden was assigned to each prison. That is when this institution officially became known as California State Prison CSP Solano.  CSP Solano was the first institution to open with the new 270 design structure.

CSP Solano is a Level II and III General Population prison consisting of four separate facilities.  Facilities A and B are Level III General Population program units consisting of six 270  design buildings each building houses 200 inmates in 2 man cells.  Facilities C and D are Level II General Population program units.  Level II operations consist of two yards.  Facility C is comprised of six housing units with a total bed capacity of 1380. Three of the buildings are 270 dormitory designs each housing 260 inmates and the other three are E-bed dormitory building designs each housing 200 inmates.  Facility D is also comprised of six housing units with a total bed capacity of 1440.  There are four 270 design buildings and two E bed buildings on Facility D.

2

Each facility has an independent dining room, clothing distribution, canteen, and medical services area.  Shared services include education, library, chapel, dental and visiting which is located in the middle of the yard easily accessible by both facilities.

The primary mission of California State Prison (CSP), CSP Solano is to provide custody, care treatment, and rehabilitative programs for those inmates committed to the Department of Corrections and Rehabilitation by the courts.
CSP-CSP Solano is designed as a medium security institution to provide housing for general population inmates.

**D.      Pre-Audit Meeting**

The team met on April 29, 2012, in Vacaville, California to discuss the information provided by the Association staff and the officials from California State Prison-CSP Solano.

The chairperson divided standards into the following groups:

Standards #4-4001 to 4-4169 to Jack Falconer, Member
Standards #4-4171 to 4 4343 to Katherine Brown, Chairperson
Standards #4-4344 to 4-4521 to Barb Denison Medical

**E.      The Audit Process**

1.      Transportation

The team was escorted to the facility by Elizabeth Eck, Accreditation Sergeant.

2.      Entrance Interview

The audit team proceeded to the conference room with Gary Swarthout, Warden. The team expressed the appreciation of the Association for the opportunity to be involved with California State Prison CSP Solano in the accreditation process. The facility after introductions were made did a brief power point presentation of all areas of the facility and administration.

The following persons were in attendance:

> Gary Swarthout, Warden
> Robert Fox, Associate Warden Business Services
> Lori Austin, CEO Healthcare
> Bea Torres, Correctional Lieutenant; Public Information Officer / Administrative Assistant
> Elizabeth Eck, ACA Sergeant
> Joe McAtte, Fire Chief

3

Malorey Bravo, Executive Assistant
Cindy Flores, Correctional Lieutenant from Office of Audits and Court
Compliance
Rick Grenert, Correctional Lieutenant from Office of Audits and Court
Compliance
Bob Ayers, Project Manager, ACA Accreditation
Jim Krussow, Fire Chief, Office of Correctional Safety
Eric Arnold, CD
Christopher Arnthur, Assistant Warden
Richard Baughman Correctional Counselor III
Malorey Bravo, EA
Shane Brown, Lieutenant
Ronald Cappel Assistant Warden
Santos Cervantes CCH
Brian Coates, CBM
Chad Hickerson, CSE
Dionne Hudnall, FCC
Sharon Lee Sergeant
Tonia Lewis, CCH
Laura Mefford, CHS
Donald Mims, CPM
Robert Mitchell, FCTonya Parker-Mashburn
Barry Perlmutter, CMH
Spencer Peterson FCA
Keith Robinson, CFM
Heather Shirley Acting Assistant Warden
Clifford Strauss, Captain
Timothy Wamble, FCD
Kenya Williams, SCEP
C Ferguson,
Grace Cavaniaya LPN
Learure Brown RN
Christine Gingh Trujilla Pharmacy II
Kathleen Goodenaugh, HPS I
Donald Morgan, SIC
Sallade Denny, Captain
Kandie Smith, AGPA
Amy Padilla, HPN II

It was explained that the goal of the visiting team was to be as helpful and non-intrusive as possible during the conduct of the audit.  The chairperson emphasized the goals of accreditation toward the efficiency and effectiveness of correctional systems throughout the United States.  The audit schedule was also discussed at this time.

The chairperson advised Warden Swarthout, the team would keep him abreast during the entire audit. Also, debriefings would be conducted, with him and any staff he felt relevant, at the end of each day.

The chairperson also advised the facility how important it is to ensure staff are met and spoken to.

The chair further went on to say if over the course of the next two days if there was anyone who they overlooked that the administration knows really wanted to speak with us to let her know and they would make sure they met with them. This is a team effort and everyone needs to know they are a vital part in this process.

3.    Facility Tour

The team toured the entire facility from 8:30A.M. to 4:00P.M. The following persons accompanied the team on the tour and responded to the team's questions concerning facility operations:

> Gary Swarthout, Warden
> Robert Fox, Associate Warden Business Services
> Lori Austin, CEO Healthcare
> Bea Torres, Correctional Lieutenant; Public Information Officer / Administrative Assistant
> Elizabeth Eck, ACA Sergeant
> Joe McAtte, Fire Chief
> Malorey Bravo, Executive Assistant
> Cindy Flores, Correctional Lieutenant from Office of Audits and Court Compliance
> Rick Grenert, Correctional Lieutenant from Office of Audits and Court Compliance
> Bob Ayers, Project Manager, ACA Accreditation
> Jim Krussow, Fire Chief, Office of Correctional Safety

4.    Conditions of Confinement/Quality of Life

During the tour, the team evaluated the conditions of confinement at the facility. The following narrative description of the relevant programmatic services and functional areas summarizes the findings regarding the quality of life.

**Security:**

The perimeter of the facility is surrounded by two twelve foot chain link fences with a single roll of razor wire at the top. There is an inner lethal electric voltage fence that provides perimeter security.

All staff/visitors must enter through a staffed visiting entrance and must sign in and receive a visitor's pass.  All brief cases are thoroughly searched and no laptops or cell phones are permitted in the facility. There are checkpoints throughout the complex where you must present a photo ID to gain access. Visitors must leave a photo ID or keys in order to receive a visitor's pass.

All visitors' passes have whistles attached to provide added security to visitors.

There are closed circuit television cameras throughout the facility and around the compound and perimeter that record all movement and are monitored by the command center/central control.   These recordings are maintained for thirty days.

There is two way communications between the facility's 24-hour command center and the housing units via the telephone, intercom, and institutional radios. There is one armed vehicle patrol present each of the three shifts. All staff except those that works in the yard wears Personal Alarm Devices (PAD) that is tested daily. When one of these alarms are activated it activates a blue light that is strategically placed above all building entrance roof areas that flash  to signal the location of the duress for officers to respond.

CSP Solano has a canine unit comprised of two K-9 teams trained in the detection of illegal narcotics and contraband.  Each team is comprised of one certified K-9 handler and one service dog.  Narcotic detection canines are trained to detect the presence of the odor of marijuana, heroin, cocaine, methamphetamine, and derivate of these drugs.

The institution is equipped with seven emergency generators: there are five 500 KW; one 250 KW and one 100 KW dedicated CSP Solano to the electrified fence. Emergency generators are inspected and operated monthly.  The Corrections Treatment Center and electrified fenced generators are inspected and ran weekly. All emergency generators are load tested annually.

Each housing unit has a tower/control room armed with a Mini 14 Rugar and a 40 mm gas grenade launcher.

All inmates' movement throughout the facility is controlled. The facility supervises the inmates utilizing remote direct supervision.

All housing units are accessed from the main corridors by interlocking metal doors.  The dorms are accessed through a locking metal door.  Throughout the facility are numerous sally port control points

Key control and accountability measures were found to be well within expected parameters.  All keys are signed out using a chit system.  All staff and inmates interviewed voiced they felt safe in the facility.

Tool control procedures and accountability measures were within expected parameters. Tools are classified into two separate categories, Class A and Class B. All tools are shadow board. Spot checking inventories and documentation did not reveal any discrepancies.

The facility has a central armory for the complex. It is equipped with the necessary equipment and munitions to operate the complex in daily operations and during emergencies. There are 20 Rugar Mini 14 20 Smith and Wesson model 38. There are two sets of weapons; B weapons are rotated bi-annually for all armed posts. The sub armory is equipped with six 40 mm multiple round launcher; seventeen Mini 14 Rugar and twelve 40 mm single round launcher.

There are four manned towers and an armed perimeter vehicle.

CSP Solano is going to be a pilot program for Managed Access which is a system to detect unauthorized cell phone, which is to be implemented in June 2012.

The team found the security throughout CSP Solano was well maintained by professional well-trained staff. Security staff demonstrated knowledge of post orders and emergency procedures. Post orders provide clear, concise, and understandable instructions. The central control centers operate the main security doors, observe cameras, issue and maintain keys and security equipment, and monitor all fire and smoke detection alarms, internal radio transmissions, public address system and other mechanical and electrical systems. Officer posts are located in or immediately adjacent to the inmate living areas which allows officers to hear and interact with the inmates and promptly respond to emergency situations.

Logs and shift reports that record all activities where inspected and found to be up to date and accurate. All staff and visitors must sign in on the logs to identify who is in the building. In order to gain access to the control room you show a photo ID. There was proof in the logs as well as observation on the tour to show that supervisors make frequent rounds in the housing units. Inmates knew who the rank and file was and spoke to them openingly on the tour.

A physical count of all inmates is conducted four times a day. The mandated count times at CSP Solano are 0030, 0500, 1700 and 2100, these are positive counts (actual number of inmates that each respective staff member has counted and reported directly to control), 0230 negative count (recording all unoccupied beds in housing unit), 1200 and 1700 counts are Close A inmates (high notoriety, management concerns and/or escape history), minimum support facility, work crew. Close A custody count does not include all inmates at the institution only inmates who fall under Close A custody status. Daily movement sheet list all inmate movement in a 24 hour period.

Inmates are assigned to housing locations based on a level based classification system to ensure the separation of inmates based upon charges, mental and emotional stability, escape history, assaultive behavior, medical needs, age, gender and the need to keep separate. Inmates' classification status is reviewed at appropriate time frames based on the changes in inmate behavior or circumstances.

Special management inmates are housed separate from general population inmates. But have the same opportunities and living conditions as general population inmates. All required checks based on the inmates classification needs were documented. Staff assigned to the segregation unit have all completed their probationary period and are selected on their suitability to work with this type of inmate population. Medical is notified prior to the placement in segregation and provide assessment and review the inmates three times a day.

**Environmental Conditions:**

The temperatures in the facility were within normal comfort ranges. The housing units are not air conditioned and is cooled by fans. Noise levels throughout the facility were acceptable. Inmates are provided with appropriate clothing for cooler temperatures. Water temperatures were well within the appropriate ranges. All fixtures tested were in good working order. All housing areas had good ventilation with no noticeable collections of dust in the vent openings. The housing units had access to natural light through the use of small windows in the cells**.**

Each housing unit had appropriate number of sinks, and toilets easily accessible to the inmates They were found in non compliance with standard 4-4139 due to the shower ratios are 22:1 in Level III housings; 13:1 in Level II dorms and 15:1 in E-beds. There were multiple telephones in the housing units for the detainees to use.

**Sanitation:**

The team found the facility to be fairly clean, neat and orderly throughout. It is an old facility and in need of repairs, however funding sources are limited. They have a maintenance crew that makes the best of the situation. Access to cleaning supplies and hygiene items is appropriate for the custody level of the inmate population. The staff appeared to be highly motivated to maintain the cleanliness of the facility.

Chemicals are controlled and spot checking of inventories revealed no discrepancies. Chemicals for the washers and dishwasher are automatically dispensed and are stored in locked rooms not accessible by inmates.

A Preventative Maintenance plan is in place, which identifies equipment that is checked weekly, monthly, quarterly and semi-annually. This includes ventilation, plumbing, lighting, fire and safety systems.

A written housekeeping plan was developed and assigned sanitation areas of responsibility in accordance with ACA standards. Departments have implemented this plan and established an effective cleaning routine and are maintaining high levels of sanitation. The Safety Officer has sufficient cleaning supply inventory to meet high sanitation standards.

Cryders' Pest Control is contracted to provide pest control services.

Facilities shops, mechanical and storage areas were well organized. Buildings, equipment and mechanical systems were well maintained. Institution grounds were well maintained with no evidence of dumping or improper material disposal.

The facility complies with all applicable laws and regulations of the local and state inspecting bodies of the governing jurisdiction and there was documentation showing past deficiencies had been addressed and repaired and/or cleaned.

**Fire Safety:**

The fire protection system consists of smoke detectors and sprinklers in some buildings. The older buildings are equipped with fire hoses. An annunciation panel is located in the control rooms of each facility to monitor the fire system. The auditors observed fire pull stations, fire exits, egress points, and evacuation routes at appropriate locations. Fire extinguishers are fully charged, appropriately checked and available in all areas of the facility's compounds. Smoking is not permitted inside any of the facilities. Staff and inmates were familiar with fire evacuation procedures and review of paperwork demonstrated fire drills were accomplished at appropriate intervals and required weekly, monthly and annual inspections were accomplished.

Adequate fixed and portable fire suppression systems/equipment is provided in all areas. Power for essential lighting and communication is provided by wall mounted battery powered units. Uninterruptable Power Systems (UPS) and generators maintain lighting, emergency equipment and required computers. Emergency equipment is being tested monthly and quarterly as required by the standards.

Procedures for storage and accountability of flammable liquids are effectively managed throughout the complex. Hazardous materials are properly stored with safety data sheets readily available. Flammable cabinets are maintained in good order with inventory cards reflecting accurate amounts in each storage cabinet. Eye wash stations were present at appropriate locations.

9

The facility has established a routine program of weekly and monthly inspections by qualified departmental staff and Safety personnel.

The facility conforms to applicable federal, state and/or local fire safety codes. The facilities in California are inspected bi-annually by State of California Office of State Fire Marshal; the last fire inspection was conducted on May 6, 2010. The facility Fire Chief conducts an inspection every six months.

The facility has a shared fire department that consists of a fire chief; fire training specialist; four Fire Captain; 13 trained inmate fire fighters; one hazardous materials worker and an inmate dispatcher. The fire department is equipped with one Type 3, 500 GPM, 2008 Fire Engine; Type 3, 250 GPM 2001 Rescue Vehicle; one 1997, 4x4 Command Vehicle and two Type 1, 1000 gallon per minute GPM, 1985 Fire Engines.

First aid kits are located in all Control rooms and various other areas throughout the facility.

**Food Service:**

A full service kitchen operates twelve hours a day and provides two hot meals and one bag lunch per day to the inmate population. The average cost of meals per day is $2.86. Current staffing consists of approximately 53 employees: one Correctional Food Service Manager, one Assistant Correctional Food Manager, one office technician, 3 supervising correctional cools and 20 correctional supervising cooks. There is 265-290 inmate workers work in meal preparation, tray setup and delivery as well as cleaning the kitchen. Over 13,000 meals are served daily. Inmates come to one of the four dining hall. Each facility has two dining halls .Segregated inmates are feed on insulated trays that are delivered to the housing units. Meal times are 6:00A.M., at the breakfast they pick up the bag lunch and 5:00P.M.

The food service department was very organized, efficient and is a vital link in the facilities operation. The dining and kitchen area appear to be spacious and have adequate cooking, food storage and seating areas for the inmate population. There are good internal controls in food safety and sanitation, preparation and presentation of food and resource management. The tour through the food service areas revealed all areas were maintained and sanitation levels were outstanding. The kitchen maintained control of tools, equipment and hazardous material, every inventory was accurate. Inmates were observed wearing proper uniforms, safety shoes, serving gloves, and hairnets.

A registered dietician from DOC reviews the 2769 calorie, 13 week cycle menu quarterly. All meals were well prepared, included proper portions as well as appetizing, appealing, and prepared in a secure environment. Food was prepared

using a cook-serve method. The meals were wholesome and nutritionally adequate.

Both special and religious diets are provided with an average of 400 religious diets and the medical diets are prepared from a kitchen within the medical unit. At the current time there are only approximately four therapeutic diets.

The auditors tasted a sample inmate meal tray, the meal was tasty, and appearance was good and met all nutritional requirements.
Sanitation of the food service areas was well within expected practices including, during and immediately after meal preparation.

The last Health Department inspection was conducted on April 4-6, 2011 by Facility Planning Construction and Management.

**Medical Care:**

The medical department is staffed 24-hours a day, seven day a week with medical staff employed by the California Department of Corrections and Rehabilitation (CDCR).    Administrative, nursing and support staff under the supervision of a Chief Executive Office, who is the designated Health Authority, currently totals 209 with 12 vacancies; a few of those being contracted agency staff.   Healthcare services include medical, dental and mental health services along with a 15-bed inpatient Correctional Treatment Center (CTC).   The CTC building  houses a Treatment and Triage Area (TTA) which includes a pharmacy, specialty services area, lab, x-ray, dental department, peer medical educators office and a small kitchen.   Nursing services are provided 24-hours a day, seven days a week in the TTA and CTC units.   There are four other medical clinic areas located on each yard of the facility that are staffed Monday – Friday from 8:00 a.m. – 4:00 p.m. and a small medical triage area in the segregated unit.   All medical areas are clean, well-organized and with good utilization of the limited space available. Medical providers include a Chief Medical Executive, a Chief Physician and Surgeon, 11 Physicians and one Physician's Assistant.   Physicians share on-call responsibilities on a one-week rotation basis and are accessible at all times for emergencies.

A Healthcare Access team comprised of forty-one Correctional Officers, three Correctional Sergeants and one Correctional Lieutenant provide security support to the healthcare areas.   They ensure inmates have unrestricted access to health care services, provide escorts for inmates scheduled appointments and oversee the distribution of medication at each pill window.

A small kitchen that is located in the TTA is used for the preparation of inpatient CTC meals and outpatient therapeutic diets.   There are currently six therapeutic diets prescribed.   All other inmates receive heart healthy diets.    A full-time

Dietician is on-site Monday-Friday and provides diet counseling and monitoring of therapeutic diets.

A combination of paper and electronic medical records is currently being used to maintain medical, dental and mental health records.   As of July 2011, an Electronic Unit Health Record (eUHR) system was implemented which allows scanned documentation to be accessed electronically.   Medical records of inmates who have been discharged or paroled are archived at the Health Records Center in Sacramento, CA.   There is a $5.00 co-pay fee for patient initiated medical and dental encounters.  There is no co-pay fee for mental health encounters.

Medical staff responds to emergencies with the assistance of security staff that is trained as first responders utilizing one of three motorized emergency vehicles for a response time of four minutes or less.  Patients in need of emergency services are transported to the North Bay Medical Center, Kaiser Medical Center-Vallejo, Sutter-Solano Medical Center, Vaca-Valley Hospital or the Kaiser Medical Center-Vacaville.    Ambulance services for emergent transports are provided by 911 dispatches with the MEDIC Ambulance Service, American Medical Response and the City of Vacaville Fire/Paramedical Response responding in less than 8 minutes.   Non-emergent transports are provided by facility vehicles. There are a total of six AED's that are located in the TTA, CTC and in four emergency response bags that are checked daily.   First aid kits are located in each Sergeant's office and in all transport vehicles and are restocked by the supervisors of those departments.  MSDS sheets are available in the TTA and in many areas throughout the facility.

All inmates are processed into CDCR through one of several Reception Centers and are received into the facility through the Receiving and Release unit where an RN completes the initial healthcare screenings.    Any emergent needs are appropriately referred and health appraisals are completed within 14 days of arrival to the facility.

The CTC has a total of 15 beds which includes nine mental health beds for acute mental health treatment and six medical beds.  The mental health beds include one safety cell and one suicide watch cell, both equipped with cameras.  At the time of the audit, there were five medical patients and two mental health patients in the CTC.   A nurses' station allows staff to be within sight and sound of all patients. Infirmary records are filed separately from the medical chart.   The CTC was clean and bright with ample space.

There are currently 3414 inmates prescribed medications.  A pharmacy on-site receives medications from Amerisource Bergen Drug Company.  Providers order medications via verbal or written order and medications are received one business day after the pharmacy receives the order.   After pharmacy hours, a Docu-Med unit is on-site as a back-up to the pharmacy in the CTC complex.   A few over-the-counter medications are available through the Canteen.   There are four pill window locations, one in each yard, and daily medication administration times are

12

6:30A.M., 12:30P.M., 5:30P.M. and 8:00P.M. with medication distribution documented on the Medical Administration Record (MAR).    Inmates in the segregated unit are delivered their medications on the same administration schedule.    When inmates leave the facility they are given a 30-day supply of their prescribed medications.

There is a destruction program with Guaranteed Returns for the return of expired medications for credit.  The medical auditor observed the afternoon pill window process in one of the yards.  Finger sticks were being performed by diabetic patients and insulin injections were given by a nurse.
There was good security assistance and supervision of the process.    Narcotics were properly secured and narcotic counts were accurate with documentation complete.  All sharps, needle and instrument counts in all areas where these items are stored were accurate with proper documentation of counts being done at the start and end of each shift.

There are approximately 5,000 medical CDCR-7632 for request of medical services received each month.  Locked sick call boxes are located in outside areas in each of the four yards.  Nursing staff picks up the forms from the boxes each morning and all requests are triaged within 24 hours.    An RN line is available in segregated housing Monday – Friday from 8:00A.M. – 4:00P.M. and a provider line is available two to three days per week from 8:00A.M. – 4:00P.M. to address the medical needs of segregated inmates.

Chronic care patients are seen Monday-Friday in all four yards with patients being seen from 30 -180 days depending on the control of their chronic condition. There are currently 2,933 patients being followed in chronic care clinic for various or multiple diagnoses.  There is careful monitoring of these patients with follow-up labs ordered with patient education being provided.  Routine physical examinations are completed per policy.

There are many currently 15 contracted specialty clinic providers providing various services on-site as needed.  Telemedicine is also utilized for some specialty services not provided on-site by contracted Health Net providers. Optometry services are provided by a contracted provider once per week with eyeglasses being made at the facility PIA Optical department and received within one to eight weeks.  Podiatry services are provided one or more days per week by a contracted podiatrist.   Physical therapy services are provided on site by three CDCR Physical Therapists.  The Chief Medical Executive is a surgeon who performs minor surgeries on-site.  Referrals to off-site providers once approved by the Chief Medical Executive are managed through the specialty scheduling office.  Off-site referrals are made to CDCR's Health Net contracted providers. Urgent referrals are seen within 14 days and routine referrals within 90 days.

There is close monitoring of inmates diagnosed with infectious diseases.  An Infection Control Nurse is assisted by a Public Health Nurse with oversight by the

Chief Medical Executive.    The Infection Control Nurse is responsible for maintaining infectious disease statistics, monitoring antibiotics used in CTC, assisting in mass testing and tracking for influenza and TB of staff and inmates. Infection control meetings are held quarterly.

The laboratory department is opened from 7:00A.M. – 4:00P.M. Monday – Friday.  One CDRC Phlebotomist and three contract phlebotomist are assigned to this department supervised by a Clinical Lab Technician.  Nurses perform lab draws after hours, weekends and holidays.  There is a contract with Quest Diagnostics for the processing of lab specimens.  A Quest courier picks up specimens daily Monday –Friday in the front entrance building of the facility and they can be called for STAT lab pick-ups at other times.  Lab results are received on a dedicated printer Monday - Friday and critical values are faxed back to the facility and are posted to on a Quest website.

Routine x-ray services are provided Monday - Friday from 8:00A.M. – 4:00P.M. by a full-time X-ray Technician.  Inmates in need of emergency x-rays after hours and on weekends and holidays are transported to outside emergency rooms. Radiology reports are faxed to the facility in two to three days.   A mobile MRI/CT service is provided on-site one day a week and ultrasounds and echocardiograms are performed one day a week also.  Dosimeter readings are completed monthly by Landauer, Inc.

There is a contract with National Green Gas from Indo, CA for the removal of medical waste. Once removed from the clinics, the medical waste is stored in a locked container in the quad area across from Tower 15 with weekly scheduled pick-ups.

Dental services are provided Monday thru Friday from 6:00A.M. – 9:00P.M. with shifts scheduled from 6:00A.M. – 2:00P.M. and 1:00P.M. – 9:00P.M.    The Dentists rotate on-call responsibilities.  There is a dental clinic in the TTA with four dental chairs and a smaller dental clinic in an annex building with two dental chairs.    Dental services include fillings, extractions, x-rays, cleanings, limited root canals, temporary crowns, oral surgery and full and partial dentures.    Dental staff includes a Health Program Manager, Supervising Dentist, Supervising Dental Assistant, eight Dentists, thirteen Dental Assistants, two Dental Hygienists, a Health Program Specialists, five Office Technicians and five contracted Oral Surgeons.    There are approximately 250 requests for dental services received each month.   Sterilization is monitored weekly by SPS Medical with results received on-line prior to the next weekly testing.  Dosimeter readings are being done monthly by Landauer, Inc.  Random sharps, needle and instrument counts were accurate and logs were complete with signatures of counts being done at the start and end of each shift.   There is good chemical control with MSDS sheets available.  Both dental clinics were neat, clean and orderly with limited space available.

Mental health services are provided Monday - Friday from 6:00A.M. to 6:00P.M. with some occasional services provided during evening hours. A mental health building includes office space and group meeting rooms and there are mental triage rooms in all four yards and in the segregation unit. Psych Techs are on-site in the segregated unit from 5:00A.M. – 9:00P.M. to pass meds and do segregation rounds. There are daily meetings with medical staff and custody staff each morning in the segregated unit.

CDCR mental health staff under the supervision of a Chief of Mental Health Services/Psychologist includes a Chief Psychiatrist, fourteen Psychologists, five Psychiatrists, two Senior Psychologists, a Recreational Therapist, a Health Program Specialist, three Clinical Social Workers, ten Office Technicians and a part-time Office Assistant. Staff also includes two contract Psychiatrists. There are currently twelve groups being offered which include Stress Management, Combat Veterans, Adulterous and Dysfunctional Families, Personal Transformation, Self-Management, Social Skills Training, Mindfulness, Grief and Loss, Start Now-Problem Solving and Recreational Therapy.

During regular mental health hours one clinician is on call for Level II inmates and one for Level III inmates are on call for urgent mental health matters. After hours, emergencies are handled by on-call Psychiatrists with a monthly schedule developed by the Chief Psychiatrist. There are nine mental health beds in the CTC with one of them a suicide observation cell and one a safe cell both having cameras. Inmates who express suicidal ideations are immediately placed in one of these two cells. The average length of stay is five days and an inmate who cannot be stabilized within ten days is considered for transfer to an inpatient Department of Mental Health facility. An interdisciplinary team meeting is held weekly to discuss issues related to inpatient mental health patients.

There are currently 1145 inmates on the outpatient mental health caseload with 770 of them prescribed psychiatric medications. These inmates are seen every 90 days by a Psychiatrist for medication management and all inmates on the mental health caseload are seen minimally once every 90 days by a primary clinician. Initial mental health screenings are completed by an RN in combination with the medical screening process. Any inmates exhibiting mental health concerns are immediately seen for evaluation. According to the Correctional Clinical Case Management System (CCCMS), inmates assigned to this facility are assessed at the reception center to require a basic level of mental health care. A full mental health assessment is completed within 14 days of arrival to the facility. Approximately 90 requests for mental health services are received each month.
Mental health staff provides suicide prevention training to new hires as well as part of the annual training requirement. Mental health staff meetings are held twice a month with 15 minutes of training provided prior to the beginning of the second meeting each month.

New medical employees receive a minimum of 40 hours of new employee orientation through the facility training department. Annual training consists of 70 hours per year in addition to nursing annual competency assessments which totals eight hours and an additional eight hours of refresher training through the facility training department.

The Quality Management Committee meets every other month and sub-committees meet at various intervals on the opposite months. Medical staff meetings are held twice per week and physicians meet twice per week.

An Inmate Peer Education Program (IPEP) provides their peers health information and education to other inmates on topics such as HIV/AIDS, sexually transmitted diseases, tuberculosis and hepatitis just to name a few. They provide new arrival medical orientation in the Receiving and Release area. They publish a newsletter, "Peer Health Advocate", and produce health related videos. Peer educators act as a liaison between medical and the inmate population. IPEP training is provided by a Regional Coordinator and a Peer Education Coordinator at the facility monitors the program.

**Recreation:**

Inmates have access to exercise opportunities and equipment including at least one hour daily of physical exercise outside the cell and outdoors when weather permits. Equipment opportunities includes pull up bars, basketball, volleyball, table tennis, foosball, physical education classes and other related activities. It also serves the inmate population for large musical and invited guest speakers gathering. Indoor leisure time activities in the dayroom include TV's, chess, checkers, board games and reading material.

The segregation units have recreation opportunities outside one hour daily.

**Religious Programming:**

Inmates have the opportunity to participate in practices of their religious faith that are deemed essential by the faith's judicatory, limited only by documentation showing a threat to the safety of persons involved in such activity itself or disruption of order in the facility. There are over 28 different faith based groups and over 1,000 volunteers that provide religious programming.

There are five chaplains who all have the qualifications of clinical pastoral education and endorsement by the appropriate religious certifying body. The chaplains have access to all areas of the facility to minister to inmates and staff. All religious diets are approved by the chaplain and recorded in the computer and a list is forwarded to the kitchen.

When a religious leader of an inmate's faith is not represented through the chaplain's staff or volunteers, the chaplain assist the inmate in contacting a member of that faith.

Religious services are held in the chapel.

**Inmate Work Programs:**

The facility has an inmate work assignment plan that provides for inmate labor in the kitchen, laundry, yard, vocational building, center complex clerks, receiving/release, medical annex, Correction Treatment Center, Education, and visiting. Disabled inmates are allowed to work in office clerk areas. There are a variety of work assignments that afford inmates an opportunity to develop good work habits and attitudes that can be applied to jobs after their release.

**Academic and Vocational Education:**

CSP-Solano focuses on providing a comprehensive work/training program with academic education, vocational training, and industries assignments geared towards providing inmates with work skills and education. Additionally, the institution has a variety of self-help programs including AA, NA, Veterans, VORG (Victim Offender Reconciliation Group), and POP (Prison Outreach Program). Through the Educational and Vocational training, industries assignments, and self-help programs, the institution provides inmates the opportunity to develop the life skills necessary for successful re-integration into society.

Vaca Valley Adult School lies in the foothills of CSP Solano County. It is the adult school at California State Prison. CSP Solano offers vocational and academic programs at five separate sites. There are 1260 assignments available to inmates in either a vocational or academic program.

Vaca Valley Adult School utilizes the Office of Correctional Education competency based instruction curriculum. Fields of study include mathematics, reading/writing, listening/speaking, vocational specialists, life skills, and General Education Development. Academic classes are offered to inmates from literacy through high school.

The school also has eight vocational programs each taught by a credentialed instructor in the field of expertise. The programs are: fiber optics installation, electronics, masonry, office services and related technology, welding, plumbing, carpentry, and residential electrical. Each program has 27 students on an open entry, open exit system. Certificates are available for the students in each of the vocational programs.

**Social Services:**

Inmate Self-Help Programs: A Step Closer, Book Club Discussion Group, Breaking Barriers, Celebrate Recovery, Financial Responsibility, Gang Recovery, Going for the Gold, Great Dads, HIRE, Katargeo, Kingdom Living, Kingdom of Inheritance, Leadership Training, Music Innovators, Passport to Purpose, Pre-Release, Project PRIDE, Purpose Driven Life - 40 Days of Purpose, Self-Esteem by God's Design, Self-Help Book Group, CSP Solano CARES (Compassion, Accountability and Remorse Expressed through community Service), CSP Solano County Child Support Services, Tawheed/Changing Faces, Toastmasters, Transformational Ministries-Prison Fellowship. – Anonymous (AA), Al-anon, Anger Management, Alternatives to Violence Project (AVP), Conflict Management, Denial Management, Domestic Violence, Narcotics Anonymous (NA), Parenting, Substance Abuse Treatment & Counseling, Veteran's Re-Entry Preparation, Youth Diversion Prisoners Outreach Program (POP).

**Visitation:**

A CDCR funded Visitor Center is at the institution operated by a community-based organization under contract to CDCR. The Visitor Center provides visiting assistance to family members and friends including a sheltered place to wait before and after visits, transportation to and from local transit terminals, childcare, clothing appropriate for visits on loan, and information about local resources, visiting rules and regulations

Visitation is conducted Saturday and Sunday from 8:00A.M. to 3:00P.M. for Level III and Saturday and Sunday, from 8:00A.M. to 11:30P.M. for Level II. Contact visiting is by appointment only. No appointment is necessary for those visitors processed from 12:00P.M. - 1:45P.M. Non-contact 8:00A.M. to 1:00P.M. by appointment only.

Sufficient space is provided for inmate visitation.  There is adequate space to permit appropriate screening and searching of both inmates and visitors.  Space is provided for the storage of visitor's coats, handbags, and other personal items not allowed into the visiting area.

**Library Services:**

There are two Libraries one on Level II and one on Level III.  Each one can accommodate 24 inmates at a time per DOC seating policy. They are open five days a week and then book carts go out to the yard on weekends on a schedule to all units.  Law Library services are provided using both hard bound books and West Computer system.

The Leisure Library offers a wide variety of fiction and non-fiction books for inmates to check out. These are available in both English and Spanish. Level III library has over 29,184 books and Level II library has over 27,109 books. Inmates are also provided with VHS movies of over 600 videos the inmates can come down to view. Level III services the Administrative Segregation Unit and Correctional Treatment Center. Administrative Segregation gets physical access for two hours every Sunday in addition to the book cart and requests for legal material they have.

Inmates are provided with copies free of charge.

**Laundry:**

There is a centralized laundry area that is well designed and well equipped to provide adequate clean clothing to the population. Inmates are trained in the safety aspects of laundry procedures and the use of the machines.

The facility is equipped with eight Challenger 1500 lb dryers and a Milnor Tunnel computerized conveyor belt washer, there are two 480 lb. back up washers in the event the conveyor system is out of order.

The laundry unit is managed by a manager; five floor supervisors; two custody officers and 80 inmate workers,

They provide laundry services for various institutions and hospitals and are paid .40 cents per pound for general linen and .46 cents per pound for personal linen.

The chemicals are stored in a secured room or cage area and dispensed automatically. Materials safety data sheets for these chemicals the laundry and are readily accessible if needed. There is sufficient stock of clothing and linen to supply the inmate population. Linens are exchanged weekly. All inmates observed had clean clothing and linens, with all being in good repair.

**F.      Examination of Records**

Following the facility tour, the team proceeded to the Wardens conference room to review the accreditation files and evaluate compliance levels of the policies and procedures. The facility has no notices of non-compliance with local, state, or federal laws or regulations.

1.      Litigation

Over the last three years, the facility has had numerous state consent decrees, class action lawsuits or adverse judgments.

These are state wide lawsuits and not specific to CSP Solano however all state facilities are mandated to follow them.

There are currently 108 cases listed as active/pending which were filed in Federal Court and served on CSP-CSP Solano from 2005 to present.

## ARMSTRONG v. SCHWARZENEGGER (ARMSTRONG I)

Class action brought under the Americans with Disabilities Act (ADA) and the Rehabilitation Act on behalf of inmates and parolees with vision, hearing, mobility, kidney, and learning disabilities, After finding that the CDCR was not complying with the ADA and the Rehabilitation Act, the Court issued an injunction to improve access to prison programs, services and activities for prisoners with physical disabilities.

The court approved a clustering concept, under which CDCR has designated certain prisons and reception centers to house Inmates with physical disabilities the severity of which Impacts their housing/placement.

## ARMSTRONG v. DAVIS, BOARD OF PAROLE HEARINGS (ARMSTRONG II)

This class action alleged that the Department of Corrections and the Board of Parole Hearings had not accommodated Inmate/parolee disabilities as required by the Americans with Disabilities Act.

## ASHKER V. CDCR, ET AL.

This case is based on allegations by plaintiffs that the CDCR's failure to pay Interest on their Inmate Trust Accounts (ITA) constitutes a "taking" in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution. The Ninth Circuit ruled that the inmates had a property right to interest earned on the funds deposited into their ITA.

The parties agreed that the CDCR would implement, by December 2007, an Inmate Restitution Banking and Canteen System (IRBCS), to ensure that funds held in an Inmate's ITA would accrue interest from investments, subject to a deduction for fees to cover the administrative costs of-the IRBCS.

## BUDD v. CAMBRA

This is a taxpayer lawsuit against CDCR prohibiting it from providing non-acute inpatient medical and mental health services to inmates in an unlicensed health facility, in 2002, the court ordered CDCR to license Correctional Treatment Centers (CTCs) at ten prisons to provide non-acute inpatient medical and mental health services to inmates.

CDCR has licensed CTCs at eight of the 10 prisons, and continues to work on licensure of the remaining two, California Institution for Women and Ironwood State Prison. California Institution for Women Is scheduled for licensure in July 2006. Ironwood State Prison does not currently have a date scheduled for licensure, but construction on the CTC should be completed in April 2006. There are numerous statutory and regulatory requirements for licensing of a CTC.

## CLARK v. STATE OF CALIFORNIA

This class action complaint alleged that the CDCR denied developmentally disabled inmates (The term "developmental disability" includes mental retardation, cerebral palsy, epilepsy, and autism Where the disability originated before age 18 years.) access to programs, services, and activities; that the CDCR failed to protect these individuals from exploitation and abuse by other prisoners; and violated the Constitution, section 504 of the Rehabilitation Act, and the ADA. In 2001, the parties entered into a settlement agreement, followed by the *Clark* Remedial Plan.

## COLEMAN v. SCHWARZENEGGER

In 1995, the court found that the department violated the constitutional rights of mentally III inmates. The court appointed a Special Master and gave him wide-ranging duties to monitor CDCR's Implementation and compliance with any remedial plan that the court may order. The Special Master and his team of experts are compensated pursuant to various court orders.

In 1997, the court approved a plan to address constitutional inadequacies in Inmate mental health care. Since that time, the Special Master and his experts have monitored compliance with the plan. They found that the factor most critical to the success of the plan is the ratio of staff to inmate/patients. Other significant issues include: medication management, quality assurance, availability of space for therapy, and transfers to higher levels of care. The plan was memorialized in program guides approved by the court in 1997. These program guides have since been revised and ninety percent of the changes have been agreed upon, with the remaining 10 percent being litigated.

## COOPER v. STATE OF CALIFORNIA, ET AL.

The plaintiff, seeking injunctive relief and monetary damages, alleged that his religious rights were violated because he was denied a kosher diet. In order to avert a threatened statewide class action, the Legal Affairs Division alerted the Department to the need to revise regulations and policies pertaining to the provision of kosher meals. At the end of 2003, the Department entered into a settlement agreement to provide kosher diets to kosher-observant Jewish inmates at CSP SOLANO, where inmate Cooper was housed.

The agreement also provided that the Department would make good faith efforts to adopt the kosher diet plan statewide. On July 2005, the statewide implementation of the kosher diet plan commenced, with implementation in three phases and completion slated for September 2006. The court retains jurisdiction until three years after the full implementation or the statewide plan.

*FARRELL v. HICKMAN*

This is a taxpayer lawsuit claiming a waste of taxpayer funds at the Division of Juvenile Justice (DJJ) (formerly California Youth Authority). Allegations include excessive use of force, failure to protect the wards from physical attack by other wards, substandard housing conditions, inadequate medical and mental health treatment, Insufficient due process hearings, faulty grievance procedures, inadequate access to education and treatment programs, disability discrimination, and other unconstitutional conditions of confinement. The parties entered into a Consent Decree in November 2004. Two stipulations have since been filed that make substantive modifications to the Consent Decree. Under the terms of the original consent decree, lack of funding is not an excuse for noncompliance.

*GILMORE V. STATE*

This case consists of 26 conCSP Solano idated lawsuits in which inmates alleged that the California Department of Corrections and Rehabilitation's regulations concerning access to law libraries, legal materials, and assistance in pursuing litigation violated their constitutional rights.

*GARRISON JOHNSON v. GOMEZ*

Inmate Garrison Johnson challenged the CDCR's practice of racially segregating double-celled inmates during the 60 days the inmates are housed in Reception Centers, In December 2005, the parties entered into a settlement agreement.

*HECKER V. CDCR, ET AL.*

Class action alleging that disabled inmates are barred from basic educational, vocational, employment, and recreational programs that are provided to other, nondisabled inmates.

*JOHNSON v. CDCR*

This Inmate class action raises Eighth Amendment challenges to the Imposition of grooming standards in light of alleged unsanitary barbering policies.

The parties entered into a settlement agreement in October 2005. Under the settlement agreement, the Department agreed to continue strictly enforcing procedures relating to the sterilization and sanitation of barbering tools and instruments; to continue training of all correctional officers In the prevention of blood-borne pathogens during basic training and on an annual basis; to continue specific training on the transmission of blood-borne pathogens and the spread of infectious diseases for all inmate barbers prior to their being assigned as hair cutters. The Department must continue to adhere to barbering standards in the future.

### KEYHEA v. RUSHEN

In 1986, the court issued a permanent injunction requiring that inmates be provided with due process before being involuntarily medicated with psychiatric medications. The process is an intensive one, which is also monitored through the *Coleman* class action discussed above. Its requirements were incorporated into Penal Code §2601. Since that time the numbers of these cases that are initiated have mushroomed to close to 1200 annually. This requires significant resources to comply with the injunction.

At headquarters, the complexity of the process requires time-consuming coordination, from calendaring cases to opening and closing files, from preparing pleadings to constant communication with institution staff. Attorneys review the cases initiated and confer with expert witnesses, before traveling to the Institutions to conduct the cases. Certification Review Hearing Officers' bills are covered by the department. All these staff participated in training institutional clinicians and coordinators on the parameters of the injunction.

At the institutions, clinicians evaluate the patients, prepare reports to initiate involuntary medication, consult with departmental attorneys and ensure that records are complete. Other staff arrange for two sets of hearings for each case Initiated, including obtaining hearing rooms and expert witnesses, as well as making arrangements for the Inmates, judges and Inmate counsel to be able to attend the hearings, Correctional officers are often involved as well in security and transportation of the affected inmates.

In addition to CDCR resources, the department contracts with the Office of Administrative Hearings for a Keyhea Coordinator/Calendar clerk, plus administrative law judges, court reporters or interpreters if needed and inmate counsel for all of the hearings.

## *LH, ET AL., V. SCHWARZENEGGER, ET AL.*

Plaintiffs are a class of over 4000 juveniles who are involved in proceedings In connection with the granting, extending and/or revoking of their parole, They claim that they are being denied due process under the Fourteenth Amendment to the United States Constitution, and their right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

Plaintiffs also claim they are being denied equal protection of the laws under the Fourteenth Amendment to the United States Constitution in that they are being treated differently than their adult-offender counterparts who are being afforded significant due process protections in revocation proceedings pursuant to a Stipulated Order for Permanent Injunctive Relief in Valdivia v. Schwarzenegger, et al. CIV. S-94-0671.

Finally, Plaintiffs claim Defendants are violating the Americans with Disabilities Act and Section 504 of the Rehabilitation Act in that they have failed to develop adequate policies and practices that enable defendants to Identify, assess, or reasonably accommodate juvenile parolees with disabilities so that those juveniles can fully participate in revocation and other parole proceedings. They claim that Defendants have also failed to develop policies and practices for providing disabled juvenile parolees with reasonable modifications to access the same programs, activities and services available to other wards.

## *IN RE LUGO ON HABEAS CORPUS* (*Formerly In re Rutherford on Habeas Corpus*)

*Rutherford* was originally filed on May 26, 2004 as a petition for writ of habeas corpus. The suit alleges that the Board of Parole Hearing (BPH) has violated Plaintiff's due process rights by failing to hold a timely lifer parole hearing for Plaintiff. The court ordered the certification as a class action on November 29, 2004. A complete overhaul of the lifer parole hearing process may be required to reduce/eliminate the lifer backlog.

## *MADRID v. HICKMAN*

In this class action on behalf of all inmates at Pelican Bay State Prison (PBSP), the court found against the department on claims regarding (1) the inappropriateness of housing mentally ill inmates in the Security Housing Unit; (2) the inadequate staff supervision relating to the use of force; (3) the unacceptability of PBSP investigations into allegations of excessive force; and, (4) deficiencies in the delivery of medical and mental health services.

## *PEREZ v. HICKMAN*

Flied on December 19, 2005, this class action alleges the dental care provided by CDCR is woefully inadequate and violates the constitutional rights of the plaintiff class under the Eighth and Fourteenth Amendments of the United Constitution to be free from cruel and unusual punishment.

## *PLATA v. SCHWARZENEGGER*

This class action challenged the constitutionality of the CDCR medical delivery system. In 2002, the parties entered into a stipulation, ultimately approved and ordered by the court that obligated CDCR "to make all reasonable efforts to secure the funding necessary to implement an improved healthcare delivery system that meets the requirements of the Eighth Amendment." The original order requires that CDCR implement a healthcare system that functions at efficiency levels set forth in fourteen volumes of policies and procedures. Although the program has been rolled out at fifteen prisons, no prison has come close to operating at the efficiency levels required by the Plata order. On June 29, 2005, the court announced that it was placing CDCR's Health Care Delivery System into receivership.

## *THOMPSON v. ENOMOTO*

This class action relates to the conditions of confinement and classification procedures for death row inmates at San Quentin State Prison. A 1980 consent decree required the Department to implement various changes in classification procedures and living conditions for death row inmates. That consent decree has been extended to the proposed new condemned unit to be constructed at San Quentin. The extended agreement sets forth a plan to transition from the current condemned unit to the new unit and a modification of the existing *Thompson* consent decree to cover the transition to the new condemned unit. The Department agreed not to seek termination of federal oversight under *Thompson* until at least two years after the new unit is activated.

## *TOUSSAINT V. RUSHEN*

This class action was filed in approximately 1973 on behalf of inmates committed to administrative segregation in San Quentin state Prison, Folsom State Prison, Deuel Vocational Institution, and the Correctional Training Facility. The complaint alleged that the conditions of confinement in administrative segregation and the procedures for placement and retention in administrative segregation were unconstitutional. The case resulted in the imposition of a permanent injunction, which was modified several times as a result of court decisions in the case. While the court ultimately dismissed the case, the underlying decisions became published cases which remain binding on the Department.

Any failure to comply with the terms of the published decision could result in future litigation to compel compliance.

### _VALDIVIA V. SCHWARZENEGGER_

This is class action lawsuit was originally filed in 1994 alleging that CDC and BPT were violating the due process rights of parolees during the parole revocation process. The case has undergone extensive discovery litigation, and negotiation prior to its recent settlement 011 March 8, 2004. Settlement of the case requires that CDC and BPT revise the entire parole revocation process from the time that the parolee commits the violation through completion of the revocation hearing. CDC and BPT are currently drafting procedures to implement the agreed upon Permanent Injunction. Monitoring of compliance with the Injunction is expected to be extensive. It is expected that the court will award the plaintiffs a very substantial award of attorneys' fees covering ten years of litigation in the near future.

### _WILBER v. WARNER_

In December 2000, a physician sought a writ of mandate to require the CYA (now DJJ) to cease offering inpatient treatment in its unlicensed facilities, to obtain licenses for any programs meeting the definition of a correctional treatment center (Health & Safety Code §§ 1250, subd. (j)(l), 1253) and if licensing is not pursued, develop a written plan for servicing inpatient needs through contractual agreements in outside facilities. The parties modified the original court order with two subsequent agreements, revising compliance dates for the licensure of the facilities, adding interim measures for handling inpatient needs, requiring policies for rejection of youth with serious mental health needs, and regular reporting and analysis of data collected on pertinent issues. Currently, DJJ intends to comply with the Health and Safety Codes by licensing a CTC at Heman G. Stark in Ventura and meeting remaining inpatient needs througt1 the use of contractual agreements with the Department of Mental Health (DMH) and other county and private facilities.

2.     Significant Incidents/Outcome Measures

The team reviewed the significant incident summary and found the following: there were 16 offender/offender assaults with a weapon and 43 offender/staff assaults without a weapon; 13 offender/staff without a   weapon; 4 disturbances; chemical agents were deployed 112 times; and there were 6 death 5 naturals and one violent/suicide.

Healthcare Outcomes were reviewed with all data appearing to be appropriate for the size and population of the facility.  There six inmate deaths in 2011 five were determined to be of natural causes and one a suicide by handing which occurred in May 2011.  There have been no deaths to date in 2012.

3.    Departmental Visits

Team members revisited the following departments to review conditions relating to departmental policy and operations:

| Department Visited | Person(s) Contacted |
|---|---|

Third Watch

| | |
|---|---|
| Building B | Officer B. Burns |
| Parolee Hearing | Lt. M. Tillotson |
| Level III yard – | Ron Cappel, Associate Warden |
| | Officer J. Cruzen |
| | Officer Hamishan |
| | Lt. D. McClain |
| Armory | Sgt. R. Slater |
| Plant Operations | Lee |
| | Officer E. Elisara |
| | Officer C. Leath |

Correctional Treatment Center

| | |
|---|---|
| | (CTC) –Lori Austin, CEO |
| | Dr. Lipson |
| | Dr. Tang |
| | Officer A. Alcarez |
| Hobby Craft Program | Mr. Botosan : |
| Chaplain | Boyle (Catholic Chaplain) |
| | Officer D. Brida |
| Correctional Counselor II | C.A. Hughes, |
| Office Technician | Kaur, |
| Correctional Food Manager II | |
| | Keith Robinson, |
| Armory | Officer K. Jones and Sergeant R. Slater |
| Truck Sally Port Officer | D. Miller |
| Education | Kenya Williams, Correctional Principal |
| Carpentry | Mr. Dan Smith |
| Optical, Prison Industry Authority | Mr. Mark Stewart |
| Metal Fabrication, Prison Industry Authority | |
| | Mr. Mark Stewart |

Book Bindery, Prison Industry Authority

| | |
|---|---|
| | Janet Alcantara |
| Plant Operations | Don Mims, Correctional Plant Manager |
| Analyst | Robyn Cole, |
| Level II Entrance | Officer Concepcion |

27

|  | Officer Felix |
| Building 19, Level II – | E Designy Officer Jones III |
| Building 20, Level II – 270 Design | Officer S. Jefferson |
|  |  |
| Laundry, Prison Industry Authority | Mark Stewart |
|  | Candice Higgins |
| Food Services | Keith Robinson, Correctional Food Services |
|  | Manager II |
| Central Key Control | Sgt. D. Davis and Officer A. Sand |
| Medical Nurse | B. Callejo |
| Food Admin. | Joleen Jow |
| Superivsor | Felipe Delosreyes |
| Lab Tech | Eddie Gamboa |
| Health Program Manager | Scott Dawson |
| Dental Assistant | Janet Rhodes |
| Dental Assistant | Christina Medina |
| Dental Assistant | Edith Gonnella |
| RN | Marlou Lajara |
| Pharmacist | Christine Singh Truljillo |
| Pharmacist | William Gephard |
| LPN | Kristi Huwatschek |
| LPN | Gerald Mabubay |
| LPN | Christopher King |
| RN | Irma Kromann |
| RN | Marivick Collins |
| RN | Jose Alves |
| Office Tech | Brian Moore |
| Psychiatrist | Barry Perlmutter |
| Psych Clinic | Elaina Jannell |
| Physical Therapist | Aaron Franklin |
| Phys, Surgeon CF | David Mathis |
| Plant Manager | Donald Mims |
| Associate Warden Business | Robert Fox |
| Business Manager I | Brian Coates |
| Personnel Officer | Miriam Galarza |
| Parole Representative | Richard Baughman |
| In Service Training Manager | Lt. R. Mitchell |
| Mailroom | Officer Annie Rodman |
| Second Watch |  |
|  |  |
| Visiting Entrance | Officer Dutra |
| 2nd Watch | Lt. D. Blackwell |
| Receiving | J. Alves, RN |
|  | Officer.M Williamson |
|  | Officer J. Bowden |
| Quad Officer | Officer Kulman |

|                    |                   |
|--------------------|-------------------|
| Program Building   | Officer Musra     |
| Library Officer    | Officer Munez     |
| Librarian Level III| Helene Kosher     |
| Librarian Level II | Susan Koubong     |
| Programs           | Officer Broyles   |

4.   Shifts

   a.   Day Shift

   The team was present at the facility during the day shift from 0800 to 1400.

   The team observed normal daily operations, programs, recreation, chow, med pass, sick call, vocational programs and law library

   b.   Evening Shift

   The team was present at the facility during the evening shift from 1400 to 2200.

   The team observed normal shift activities, programs, meals.

   c.   Night Shift

   The team was present at the facility during the night shift from 2130 to 2300.

   The team addressed the night shift and explained the importance of accreditation and the important role they play in the process.  The floor was opened up for questions and discussion.  The team answered the questions and concerns of the staff and thanked them for their time and we appreciated their hard work to this process.

5.   Status of Previously Non-compliant Standards/Plans of Action

   This is an initial audit

## G.   Interviews

During the course of the audit, team members met with both staff and offenders to verify observations and/or to clarify questions concerning facility operations.

1.   Offender Interviews

   Approximately 30 inmates were interviewed and all of them said they felt safe in this facility, stated they were able to go out to recreation and that medical was

good at this facility. A few complaints regarding the meals but it was mostly they were not getting large enough portions.

The medical auditor interviewed 34 inmates asking them about their experiences with the medical, dental and mental health departments. All inmates interviewed related positive experiences and satisfaction with the healthcare services they are receiving. Their responses corresponded with the impression given of the excellent quality of medical care that is being provided at this facility. Staff is knowledgeable, cooperative and willing to share information. They expressed job satisfaction and good working relationships with administration and security staff.

2.    Staff Interviews

Approximately 50 staff were interviewed and they stated they liked working at this facility and thought highly of the supervisors. All staff was well versed on fire evacuation procedures. Staff was knowledgeable in their post orders and job duties. All of them reported they had received the required 40 hours of annual training and believed they were receiving adequate training to perform the required duties. They were all aware ACA was going to be conduct at the institution and some of them had been involved in preparing for the review.

## H.    Exit Discussion

The exit interview was held at 3:00P.M. in the Warden Conference Room with Gary Swarthout, Warden and 44 staff in attendance.

The following persons were either on conference call or in attendance:

    Terri McDonald, Undersecretary
    Kathleen Dickenson, Director
    Terri Gonzales, Associate Director
    Coyt Shirley, Executive Assistant to Director
    Dennis Sallade, Deputy Director of Correctional Healthcare Services
    Carl Larson, Senior Advisor
    Danial Cueva, Correctional Administrator
    Robert Ayers, ACA Project Manager
    Rick Grenert, Lieutenant Office of Audits
    Cindy Flores, Lieutenant Office of Audits
    Michael Stainer, Deputy Director Division of Adult Institutions

The chairperson explained the procedures that would follow the audit. The team discussed the compliance levels of the mandatory and non-mandatory standards and reviewed their individual findings with the group.

It is vital to the successful re-accreditation process to have someone devoted to this process. There role is to ensure the institution stays on track and is following all of the ACA standards.

The chair explained the best way to set up accreditation files for the re-accreditation process. The binders the facility is currently using is not adequate for the accreditation process.

The Institution Operations Plans needs to be developed more so that the standards can be paraphrased within these plans. Each standard should be reflected in an Institution Operations Plan. The DOM and Title 15 statewide policies do not completely cover the entire standards and we struggled with that, however after much work we were able to work through this problem. The DOM and Title 15 would become back up support for the OP's.

This was a combination of a technical assistance and an audit and the staff at this facility was tremendous. We worked long hours both Monday and Tuesday trying to get the needed documentation and the staff worked right along with us. Everything we asked them for was provided. While the documentation may not have been in the file it was certainly in practice and they were able to retrieve it within a matter of a few hours. The staff is to be commended for their hard work and dedication to the accreditation process. The audit team felt like we were part of the Solano team.

The chair told the staff that they should consider themselves as obtaining 100% because everything that was within their power to do they did. The standards they lost were either because of a conflict in state law or physical plant standards that they are unable to change.

The chairperson expressed appreciation for the cooperation of everyone concerned and congratulated the facility team for the progress made and encouraged them to continue to strive toward even further professionalism within the correctional field.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

AND THE

AMERICAN CORRECTIONAL ASSOCIATION

| COMPLIANCE TALLY |
|---|

| Manual Type | Adult Correctional Institute 4th Edition |
|---|---|
| Supplement | 2010 Standards Supplement |
| Facility/Program | California State Prison- CSP Solano |
| Audit Dates | April 30 – May 2, 2012 |
| Auditor(s) | Katherine Brown, Chairperson<br>Barb Denison, Member<br>Jack Falconer, Member |

| | **MANDATORY** | **NON-MANDATORY** |
|---|---|---|
| Number of Standards in Manual | 61 | 468 |
| Number Not Applicable | 8 | 36 |
| Number Applicable | 53 | 432 |
| Number Non-Compliance | 0 | 4 |
| Number in Compliance | 53 | 428 |
| Percentage (%) of Compliance | 100% | 99% |

- Number of Standards *minus* Number of Not Applicable *equals* Number Applicable

- Number Applicable *minus* Number Non-Compliance *equals* Number Compliance

- Number Compliance *divided by* Number Applicable *equals* Percentage of Compliance

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department of Corrections and Rehabilitation
California State Prison- CSP Solano
Vacaville, California

Visiting Committee Findings

Non-Mandatory Standards

Non-Compliance

**Standard #4-4139**

INMATES HAVE ACCESS TO OPERABLE SHOWERS WITH
TEMPERATURE-CONTROLLED HOT AND COLD RUNNING WATER, AT A
MINIMUM RATIO OF ONE SHOWER FOR EVERY EIGHT INMATES, UNLESS
NATIONAL OR STATE BUILDING OR HEALTH CODES SPECIFY A DIFFERENT
RATIO.  WATER FOR SHOWERS IS THERMOSTATICALLY CONTROLLED TO
TEMPERATURES RANGING FROM 100 DEGREES FAHRENHEIT TO 120
DEGREES FAHRENHEIT TO ENSURE THE SAFETY OF INMATES AND TO
PROMOTE HYGIENIC PRACTICES.

FINDINGS:

Level III inmates to showers 22:1, Level II dorms 13:1, E-beds 15:1.

AGENCY RESPONSE

Waiver Request

Due to the current fiscal crisis facing the State of California, SOL will not be able to
meet this standard.  SOL was constructed in 1983/84 and was designed with a capacity
which is considerably lower than today's population.  Since the time of construction,
California Department of Corrections and Rehabilitation (CDCR) have increased in
population to 190 percent of design capacity.  However, due to current realignment
efforts being undertaken by CDCR, SOL is anticipated to reach a target population of
137.5 percent of design capacity by June 2013.  Although this population reduction will
not bring SOL into compliance with the ACA standard, these reductions will bring the
ratio closer to accepted standards (17:1 for Level III, 12:1 for Level II Dorms, and 14:1
for E-Bed buildings).  SOL is currently at approximately 160 percent of design capacity.

As it stands today, in order to comply with ACA shower ratios, modifications would
have to be done to the physical plant of each inmate housing unit.  These modifications
to existing rest rooms would impact the current architectural layout of buildings which

33

are built to California Building Code (CBC), Health and Safety Codes, in order meet American Correctional Association (ACA) requirements. Any modifications to gain compliance with this standard could adversely impact the institution's compliance with other standards, by reducing the amount of unencumbered square feet of building space that is available for other uses. The process to facilitate these changes would include contracting design consultants and architects to develop a feasible plan, hiring of structural engineers to ensure all modifications do not deter from the building's structural integrity and would comply with current building code and earthquake requirements before the modifications can be scheduled for construction. The dire fiscal crisis facing California does not even allow for the design phase of this project to be undertaken at this time.

Another factor inhibiting the ability of SOL to undertake this project at this time is the current Joint Powers Agreement between the institution and the City of Vacaville. This agreement addresses many facets of institutional operation including raw water usage and waste water discharge. Due to the institution's increased population, we have had to monitor irrigation, install waterless urinals, and install flush meters on toilets and timers on showers to ensure we remain within the waste water limits imposed by the city. Adding additional shower heads to the institution will inevitably increase water usage and discharge, subsequently causing the institution to be non-compliant, requiring the institution to renegotiate the agreement.

Additionally, any modifications to existing buildings would require the institution to make modifications to the building to comply with all new codes that have come into law since construction. Mechanical modification to ventilation and exhaust equipment as well as electrical for control of shower, lighting, power and alarm systems would need to be modified.

Solano is working with the Facilities Management Division to determine the feasibility of this project; however, as stated above, the current fiscal crisis does not allow us to even undertake the design aspect of this project, and as such, we are unable to provide a final cost estimate or time table for this project. Even if the design element was completed, State of California contracting rules and regulations require a competitive bidding process to obtain a contract for projects and on-going service needs. This would entail sending out Notice of Competitive Bidding. The cost and time of man power to conduct tours of the housing units to view existing layout would have to be done for competitive bidders, parent agency and other outside agencies in order to review what work needs to be completed and in doing so would disrupt everyday inmate movement. Collection and review of bids ensuring that all criteria, codes, rules and regulations were being met (very time consuming) would then have to happen. There would need to be review by the Office of State Fire Marshall for modification and approval. Security Clearances would have to be completed for every person touring and working during this long process, including those working on-site during construction and operations. The additional custody required in order keeping the construction workers safe, insuring tool/inventory control and to keep from having a security breach ensuring public safety during the duration of construction including additional construction costs will be costly.

The above mentioned modifications would also require legislative approval due to the costs involved.   The California Budget Act specifies criteria for approving capital outlays.  The project would qualify as a Major Capital Outlay (over $400,000) by these standards.    A Major Capital Outlay request would have to be approved by the Department of Finance and the Legislature.   Given the current fiscal climate in California, this would be impossible to justify in light of the other needs of the State.

Attachment: See Pages 36-41



| California Department of Corrections and Rehabilitation | Standard :    4-4139 |
|---|---|
| American Correctional Association (ACA) | Inmate Housing |
| | Penal Code Sections: 7000, 7003.5; DOM Sections: 21040.1-21040.14 |

CALIFORNIA STATE PRISON-SOLANO

AMERICAN CORRECTIONAL ASSOCIATION

## STANDARD #4-4139

### Inmate Housing

**Penal Code:**

**7000**.  (a) The Department of Corrections and Rehabilitation shall prepare plans for, and construct facilities and renovations included within, its master plan for which funds have been appropriated by the Legislature.

  (b) "Master plan" means the department's "Facility Requirements Plan," dated April 7, 1980, and any subsequent revisions.

**7003.5.**  (a) The department shall provide the Joint Legislative Budget Committee with quarterly reports on the progress of funded projects consistent with the requirements outlined in the State Administrative Manual. This report shall include new prisons, projects to construct inmate housing and other buildings at, or within, existing prison facilities, prison medical, mental health, and dental facilities, reentry facilities, and infrastructure projects at existing prison facilities.

  (b) On January 10 of each year, the department shall provide a report to the Joint Legislative Budget Committee that includes the status of each project that is part of the master plan, including projects planned, projects in preliminary planning, working, drawing and construction phases, and projects that have been completed.

  (c) This section applies to regular prison facilities; projects to expand existing prison facilities; prison medical, mental health, and dental facilities; reentry facilities; and infrastructure projects at existing prison facilities, whether or not built or

36

operated exclusively by the department.

(3) The department's plans to renovate existing facilities and renovate, improve, or expand infrastructure capacity at existing prison facilities.

(4) The scope of each project identified in the master plan.

(5) The budget for each project identified in the master plan.

(6) The schedule for each project identified in the master plan.

(7) A master schedule for the overall plan to deliver the department's capital outlay program including planned versus actual progress to date.

(8) Staffing plans for each project identified in the master plan, including program, custody, facilities management, administration, and health care.

(9) Total estimated cost of all projects in the master plan by funding source, including planned versus actual expenditures to date.

(10) Projected versus actual population plotted against projected versus actual housing capacity in aggregate and by security level.

**DOM Sections:**
**ARTICLE 3—*UNASSIGNED***
**ARTICLE 4— CAPITOL OUTLAY**
*Revised June 11, 2002*
**21040.1 Policy**
In order to identify capital improvement needs and plan for the funding and accomplishment of this activity, the California Department of Corrections and Rehabilitation (CDCR) annually prepares a five-year plan for these improvements along with a project plan for the budget year (i.e., year one of the five-year plan).

**21040.3 Authorization**
Projects included in the Budget Act, and any other legislation, are authorized for planning, design, and construction in accordance with the effective date of the authorizing legislation.

**21040.4 Responsibility**
The OFM shall maintain the CDCR's five-year plan for major construction projects and direct the planning, design, and construction of all projects authorized by the legislature. Penal Code (PC) Section 7000 authorizes the CDCR to prepare plans for and construct facilities and renovations included within its Five-Year Infrastructure Plan. The CDCR may transfer the responsibility for undertaking any aspect of the plan to the Department of General Services (DGS).

**21040.4.1 Request for Project Undertaking by State Agency**
The OFM may delegate the completion of funded projects subject to the Department Operations Manual, Section 21040.4, to a CDCR facility. All projects to be undertaken by a facility require approval from DGS using a Standard (STD) Form 23, Request for Project Undertaking by State Agency, applicable to

undertake projects from $120,000 to $400,000 excluding those projects authorized for completion by the Inmate Day Labor (IDL) program or those the CDCR undertakes under the authority of PC 7000.

## 21040.5 Definitions

**Major Capital Outlay**
Major capital outlay projects include the following:
• Any real property acquisition including the exercise of a lease purchase option.
• New construction, extension, or betterment in excess of $400,000.
• Fixed and movable equipment necessary for the initial occupancy of a new facility.

**Minor Capital Outlay**
Capital outlay construction projects estimated to cost $400,000 or less.

**Alterations**
Any modification to a State building that changes the use of the building in function, layout, capacity, or quality is an alteration. New construction may be considered an alteration. Typical alterations include the demolition and construction of new walls and additions up to the limits in Section 6.00 of the Budget Act (Section 6).

**Preliminary Plan**
The preliminary plan includes site plan, architectural floor plans, elevations, outline specifications, and cost estimate. For each utility, site development, conversion, and remodeling project, the drawings shall be descriptive to convey accurately the location, scope, cost, and nature of the improvement being proposed.

**Working Drawing**
Working drawings include a complete set of plans, specifications, and final cost estimate that show/describe all phases of a project (architectural, structural, mechanical, electrical, civil engineering, and landscaping systems) to the degree necessary for accurate bidding by contractors and for the use of artisans in constructing the project. All necessary professional fees and administrative service costs shall be included in the final cost estimate.

## 21040.6 Alterations

Alteration projects shall normally be budgeted in the capital outlay budget category as part of the building construction program. Funds from the State operations' budget category may only be used for alterations if they meet the criteria established under Section 6.00. Pursuant to Section 6.00, no support funds may be used for any project for alteration of a State building requiring total expenditures

of $100,000 or more unless the Director of DOF determines that the proposed alteration is critical and it is necessary to proceed using funds appropriated for support purposes. The maximum cost of any project undertaken under Section 6.00 authorization shall not exceed $400,000. Any construction project estimated to be less than $1,000, and includes all of the following, may be undertaken by the facility:
• The alterations do not increase program costs and/or personnel year requirements.
• The alterations do not create life, safety, or environmental problems.

## 21040.7 Development of the Capital Outlay Five-Year Plan for Existing Facilities

As part of the State's construction program, the CDCR shall maintain a five-year plan for major construction projects. The plan shall be prepared in accordance with Government Code (GC) Section 13100 and in compliance with directives from DOF, including the following:
• The CDCR's projected capital outlay needs for five years beyond the period covered by the latest Governor's Budget.
• Capital Outlay Budget Change Proposal's (COBCP) for each project which CDCR wishes to include in the next budget year.
• A listing in priority order of CDC'Rs proposed capital outlay program for the upcoming fiscal year.

## 21040.8 Preparation of Request for Capital Outlay Projects

The COBCP's are the formal requests for capital outlay projects submitted for approval in the five-year plan. They should be prepared in sufficient detail to describe the type of improvements requested. A COBCP shall include the following information regarding the project:
• Purpose of the project.
• Relationship to the Strategic Plan.
• A discussion of alternatives.
• The recommended solution and rationale for choosing it.
• A detailed scope description.
• The basis or source of the cost information.
• Description of any impacts to the support budget.
• Identification of any perceived project risks.
• A proposed project schedule that identifies start and completion of the various funding phases (i.e., preliminary plans, study, etc.).
• A detailed cost breakdown.
• A Management Plan (how will the project be accomplished, swing space, etc.).

## 21040.9 Capital Outlay Timetable

The following schedule has been established to meet the CDCR and DOF time frames. A detailed timetable for the current budget cycle shall be developed

39

annually and provided to the facilities. Facilities shall adhere to this annual timetable so that analysis and processing may occur in an orderly and effective manner within statewide deadlines. Dates on which facilities are required to submit items are the dates for OFM action in order to forward the items to the Secretary, CDCR, and DOF within the statewide deadlines:

Year One:
**March**
The OFM shall issue a "Budget Call Letter" to all facilities requesting the development of budget concept papers for the major and minor capital outlay program and identifying the time frames for the upcoming budget cycle.

**May**
Capital outlay analysts may conduct on-site reviews of all proposed projects in preparation for project priority setting.
A committee that includes representatives of the Division of Adult Institutions, Division of Correctional Health Care Services, Office of Substance Abuse, Joint Venture Program, and OFM makes project priority recommendations. These recommendations are the basis for determining which projects should be fully developed into COBCP's.

Based on the approved priorities and subject to the availability of funding, facilities are given approval to develop COBCP's.

**November**
The OFM recommendations and analysis are submitted to the Office of the Secretary to establish the final priority list for the CDCR's capital outlay program.

**January- February 1**
The existing facilities five-year capital outlay plan is submitted to the CDCR for approval and then to DOF.

Year Two:
**July – August**
Final approved list of projects submitted to DOF.

**September- December**
State Capital Outlay Program Evaluation meetings and review are conducted with DOF. Capital outlay budget hearings are held with the DOF and the CDCR to determine which projects will be included in the Governor's budget for the upcoming fiscal year.

**January**
The Governor's Budget and Budget Bill are submitted to the Legislature.

**April-June**
Legislative hearings on the Budget Bill are held. During this time, the OFM continues to work with DOF and the Legislative Analyst's Office to resolve outstanding issues.

**July**
This is the earliest effective date of the Budget Act. Notification of all major and minor capital outlay projects approved in this process is prepared for transmittal to the institutions and other interested programs.

**21040.10 Project Design**
Project design is the process that converts the concepts outlined in COBCP's into a set of plans and specifications that will allow the project to be constructed. The planning process for major capital outlay projects is divided into two major sections:

• Preliminary plans (or design drawings) include site plans, architectural floor plans, elevations, outline specifications, and cost estimates. This stage in planning is identified in order to review architectural and engineering input to ensure the project still meets facility objectives and is consistent with legislative scope and cost. Preliminary plans shall be reviewed by DOF and approved by the State Public Works Board (SPWB).
• Working drawings (or construction documents) are preliminary plans with full architectural and engineering detail. These plans are developed in sufficient detail to instruct any construction organization how to build the project and identify what materials and equipment must be approved by DOF before any construction can take place.

**21040.11 Project Construction**
Major capital outlay construction can be accomplished in three ways. All public works not specifically exempted are administered by the DGS. Upon approval of working drawings by the DOF, they may authorize DGS to bid the project to private contractors. The lowest responsible bidder may then construct the project. The second method of construction utilizes IDL. The IDL utilizes a combination of State staff, trade union labor, and inmates to accomplish the capital outlay project. The IDL requires the approval of DOF, SPWB, and Prison Industries Board and is subject to the availability of resources. A third method that we now have available is under PC 7000 which allows the CDCR to use new prison construction resources and processes.

AUDITOR'S RESPONSE

The audit team agrees with the request for a waiver.


**Standard # 4-4155 REVISED AUGUST 2004.**

SEGREGATION UNITS HAVE EITHER OUTDOOR UNCOVERED OR OUTDOOR COVERED EXERCISE AREAS. THE MINIMUM SPACE REQUIREMENTS FOR OUTDOOR EXERCISE AREAS FOR SEGREGATION UNITS ARE AS FOLLOWS:

- GROUP YARD MODULES: 15-SQUARE FEET PER INMATE EXPECTED TO USE THE SPACE AT ONE TIME, BUT NOT LESS THAN 500-SQUARE FEET OF UNENCUMBERED SPACE
- INDIVIDUAL YARD MODULES: 180-SQUARE FEET OF UNENCUMBERED SPACE

IN CASES WHERE COVER IS NOT PROVIDED TO MITIGATE THE INCLEMENT WEATHER, APPROPRIATE WEATHER-RELATED EQUIPMENT AND ATTIRE SHOULD BE MADE AVAILABLE TO THE INMATES WHO DESIRE TO TAKE ADVANTAGE OF THEIR AUTHORIZED EXERCISE TIME.

FINDINGS:
Special Management recreation yards are 142.2 sq. ft.

AGENCY RESPONSE

Waiver Request

Due to the current fiscal crisis facing the State of California, SOL will not be able to meet this standard. SOL was constructed in 1983/1984 with a single group exercise yard adjacent to its administrative segregation unit (ASU). Due to increases in violence among inmates of different gang affiliations housed in ASU, the department determined that SMYs would improve inmate safety and increase accessibility to outdoor exercise for inmates housed in ASU. As a result, SOL has constructed 40 SMYs adjacent to the ASU.

As it stands today, in order to comply with the ACA standard of 180 square feet of unencumbered space per SMY, modifications would have to be done to the physical plant of each SMY. These modifications to existing SMY's would impact the current architectural layout of the yard area which was built to California Building Code (CBC) requirements. Any modifications to gain compliance with this standard could adversely impact the institution's compliance with other standards, specifically path of travel requirements and access for persons with limitations as defined by the Americans with Disabilities Act (ADA). The process to facilitate these changes includes, contracting

design consultants and architects to develop a feasible plan in order to expand existing SMYs while maintaining appropriate ingress and egress routes, line-of-sight from security observation posts and ADA access requirements.  The only option to overcome the ADA access issue would be to expand the SMY complex which would encroach upon the open space between the SMY complex and the facility's perimeter security/Electrified Fence, creating a potential security breach.  The dire fiscal crisis facing California does not even allow for the design phase of this project to be undertaken at this time.

Solano is working with the CDCR Facilities Management Division to determine the feasibility of this project in future budget years; the California process dictates we submit our concept for review to CDCR Facilities Management for approval prior to design and cost estimates, as such, we are unable to provide a final cost estimate or time table for this project that we would not be able to start until the 2014-2015 fiscal year.

The process to upgrade our existing SMY's consists of viewing the existing layout with competitive bidders, parent agency and other outside agencies in order to ascertain what work needs to be completed.  In doing so, would severely disrupt inmate movement and the cost and man hours used could prove to be cost prohibitive.  Once bids were submitted, CDCR would then collect and review the bids ensuring that all criteria, codes, rules and regulations were being met (very time consuming).   Additionally, the Office of the State Fire Marshall would need to review the bids and layout to approve any proposed modification.  Security Clearances would have to be completed for every person touring/working during this long process, including every person working on-site during construction and operations.  The additional custody staff required in order to ensure public safety (monitoring any potential security breaches), and construction workers safety (monitoring and providing proper tool inventory/ control) during the duration of construction would also prove to be costly.

The above mentioned modifications would also require legislative approval due to the costs involved.  The California Budget Act specifies the criteria for approving Capital Outlays.  The project would qualify as a Major Capital Outlay (over $400,000) by these standards.   A Major Capital Outlay request would have to be approved by the Department of Finance and Legislature.  Given the current fiscal climate in California, this would be impossible to justify in light of other State needs.

AUDITOR'S RESPONSE

The audit team agrees with the request for a waiver.

**Standard # 4-4238 Revised January 2008.**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES CHARGED WITH RULE VIOLATIONS ARE SCHEDULED FOR A HEARING AS SOON AS PRACTICABLE BUT NO LATER THAN SEVEN DAYS, EXCLUDING WEEKENDS AND HOLIDAYS, AFTER BEING CHARGED WITH A VIOLATION. INMATES ARE NOTIFIED OF THE TIME AND PLACE OF THE HEARING AT LEAST 24 HOURS IN ADVANCE OF THE HEARING.

FINDINGS:

Hearings are held within 30 days after receipt of a classified copy. CSP SOLANO is in compliance with state mandates but state regulations are not compliant with the ACA standard.

AGENCY RESPONSE

Discretionary Compliance

☐ An unwillingness to request funds from a parent agency
☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice
☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

Minor infractions are defined as Administrative rules violations and are therefore covered with serious rules violations under Title 15 Section 3320 which is California state law. This law was originally codified in 1977 and addresses a complete and interrelated set of time requirements including when a rules violation report must be reviewed, classified, issued to the inmate and adjudicated. Subsection (b) of Section 3320 requires, "The charges shall be heard within 30 days from the date the inmate is provided a classified copy of the CDC Form 115 (Rules Violation Report) unless the charges were referred for possible prosecution…" In order for SAC, CCWF and SOL to comply with ACA Standards 4-4230 and 4-4238 CDCR would have to request a change to a California state law which has withstood judicial and legislative scrutiny for over 34 years. Additionally, partial justification for CDCR's custody supervisor staffing is based on inmate disciplinary time frames as custody supervisors review, classify, adjudicate, and investigate inmate rules violations. This process would take a minimum of two years and require additional staff resource which would be impossible to justify. Therefore, CDCR on behalf of SAC, CCWF, and SOL requests ACA grant Discretionary Compliance with ACA Standards 4-4230 and 4-4238 in lieu of their continued compliance with CCR, Title

15, Section 3320 (copy attached).

AUDITOR'S RESPONSE

The audit team agrees with the request for Discretionary Compliance.

## Standard #4-4495 Revised August 2006.

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT, EXCLUDING WEEKENDS AND HOLIDAYS, OR EMERGENCY SITUATIONS, INCOMING AND OUTGOING LETTERS ARE HELD FOR NO MORE THAN 48 HOURS AND PACKAGES (IF ALLOWED) ARE HELD NO MORE THAN 72 HOURS.

FINDINGS:

Title 15 3134 (c ) (4) delivery of all packages, special purchases and all publications shall be completed as soon as possible but not later than (15) calendar days, except during holidays and during lockdowns of affected inmates.

AGENCY RESPONSE

<u>Discretionary Compliance</u>

> X  An unwillingness to request funds from a parent agency
> ☐ A preference to satisfy the standard/expected practice's intent in an alternative fashion
> ☐ An objection from a parent agency, higher-level governmental official or funding source to the nature of the standard/expected practice.
> ☒ A clear policy in place at a higher level that is contrary to the requirements of the standard/expected practice
> ☐ An existing provision in a collective bargaining agreement that makes compliance impossible (without bargaining with the employees' union to effect such a change).

The distribution of mail to inmates is covered under Section 3133 of the California Code of Regulations (CCR), Title 15 which is California state law.  This law has been in effect and subject to judicial and legislative scrutiny for over 40 years.  The latest revision was in 2008.  Section 3133, (a), (1) states in part, "All First –Class Mail shall be delivered to the inmate as soon as possible, but no later than seven calendar days from receipt of the mail at the facility mailroom."  In order to comply with Standard 4-4495 SAC, CCWF, and SOL – through CDCR—would have to request a change to California state law which is a two year process.  This request would have to be accompanied by an analysis of required resources.  The required resources to achieve compliance with ACA Standard 4-4495 would be significant and, given the current fiscal climate in California, impossible

to justify.  Therefore, on behalf of SAC, CCWF, and SOL CDCR requests ACA grant Discretionary Compliance with ACA Standard 4-4495 in lieu of their continued compliance with CCR, Title 15, Section 3133 (copy attached).

AUDITOR'S RESPONSE

The audit team agrees with the request for Discretionary Compliance.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department of Corrections and Rehabilitation
California State Prison- CSP Solano
Vacaville, California
April 30- May 2, 2012

Visiting Committee Findings

Mandatory Standards

Not Applicable

**Standard # 4-4353 Revised January 2003 (MANDATORY).**

IF FEMALE OFFENDERS ARE HOUSED, ACCESS TO PREGNANCY MANAGEMENT IS SPECIFIC AS IT RELATES TO THE FOLLOWING:

- PREGNANCY TESTING
- ROUTINE PRENATAL CARE
- HIGH-RISK PRENATAL CARE
- MANAGEMENT OF THE CHEMICALLY ADDICTED PREGNANT INMATE
- POSTPARTUM FOLLOW-UP
- UNLESS MANDATED BY STATE LAW, BIRTH CERTIFICATES/REGISTRY DOES NOT LIST A CORRECTIONAL FACILITY AS THE PLACE OF BIRTH

FINDINGS:

The facility is an all male facility

**Standard #4-4362 (MANDATORY)**

INTAKE MEDICAL SCREENING FOR OFFENDER TRANSFERS, EXCLUDING INTRASYSTEM, COMMENCES UPON THE OFFENDER'S ARRIVAL AT THE FACILITY AND IS PERFORMED BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL. ALL FINDINGS ARE RECORDED ON A SCREENING FORM APPROVED BY THE HEALTH AUTHORITY. THE SCREENING INCLUDES AT LEAST THE FOLLOWING:

INQUIRY INTO:

- ANY PAST HISTORY OF SERIOUS INFECTIOUS OR COMMUNICABLE ILLNESS, AND ANY TREATMENT OR SYMPTOMS (FOR EXAMPLE, A CHRONIC COUGH, HEMOPTYSIS, LETHARGY, WEAKNESS, WEIGHT LOSS, LOSS OF APPETITE, FEVER, NIGHT SWEATS THAT ARE SUGGESTIVE OF SUCH ILLNESS), AND MEDICATIONS
- CURRENT ILLNESS AND HEALTH PROBLEMS, INCLUDING COMMUNICABLE DISEASES
- DENTAL PROBLEMS
- USE OF ALCOHOL AND OTHER DRUGS, INCLUDING TYPE(S) OF DRUGS USED, MODE OF USE, AMOUNTS USED, FREQUENCY USED, DATE OR TIME OF LAST USE, AND HISTORY OF ANY PROBLEMS THAT MAY HAVE OCCURRED AFTER CEASING USE (FOR EXAMPLE, CONVULSIONS)
- THE POSSIBILITY OF PREGNANCY AND HISTORY OF PROBLEMS (FEMALE ONLY); AND OTHER HEALTH PROBLEMS DESIGNATED BY THE RESPONSIBLE PHYSICIAN

OBSERVATION OF THE FOLLOWING:
- BEHAVIOR, INCLUDING STATE OF CONSCIOUSNESS, MENTAL STATUS, APPEARANCE, CONDUCT, TREMOR, AND SWEATING
- BODY DEFORMITIES, EASE OF MOVEMENT, AND SO FORTH
- CONDITION OF THE SKIN, INCLUDING TRAUMA MARKINGS, BRUISES, LESIONS, JAUNDICE, RASHES, AND INFESTATIONS, RECENT TATTOOS, AND NEEDLE MARKS OR OTHER INDICATIONS OF DRUG ABUSE

MEDICAL DISPOSITION OF THE OFFENDER:
- GENERAL POPULATION
- GENERAL POPULATION WITH PROMPT REFERRAL TO APPROPRIATE HEALTH CARE SERVICE
- REFERRAL TO APPROPRIATE HEALTH CARE SERVICE FOR EMERGENCY TREATMENT

OFFENDERS, WHO ARE UNCONSCIOUS, SEMICONSCIOUS, BLEEDING, OR OTHERWISE OBVIOUSLY IN NEED OF IMMEDIATE MEDICAL ATTENTION, ARE REFERRED. WHEN THEY ARE REFERRED TO AN EMERGENCY DEPARTMENT, THEIR ADMISSION OR RETURN TO THE FACILITY IS PREDICATED ON WRITTEN MEDICAL CLEARANCE. WHEN SCREENING IS CONDUCTED BY TRAINED CUSTODY STAFF, PROCEDURES WILL REQUIRE A SUBSEQUENT REVIEW OF POSITIVE FINDINGS BY THE LICENSED HEALTH CARE STAFF. WRITTEN PROCEDURES AND SCREENING PROTOCOLS ARE ESTABLISHED BY THE RESPONSIBLE PHYSICIAN IN COOPERATION WITH THE FACILITY MANAGER. INMATES CONFINED WITHIN A CORRECTIONAL COMPLEX WITH CONSOLIDATED MEDICAL SERVICES DO NOT REQUIRE HEALTH SCREENING FOR INTRA-SYSTEM TRANSFERS.

FINDINGS:

The facility accepts intra system transfers only

**Standard #4-4365 (MANDATORY) Revised January 2006**

A COMPREHENSIVE HEALTH APPRAISAL FOR EACH OFFENDER, EXCLUDING INTRASYSTEM TRANSFERS, IS COMPLETED AS DEFINED BELOW AFTER ARRIVAL AT THE FACILITY. IF THERE IS DOCUMENTED EVIDENCE OF A HEALTH APPRAISAL WITHIN THE PREVIOUS NINETY DAYS, A NEW HEALTH APPRAISAL IS NOT REQUIRED, EXCEPT AS DETERMINED BY THE DESIGNATED HEALTH AUTHORITY. HEALTH APPRAISAL INCLUDES THE FOLLOWING:

WITHIN FOURTEEN DAYS AFTER ARRIVAL AT THE FACILITY:

- REVIEW OF THE EARLIER RECEIVING SCREEN
- COLLECTION OF ADDITIONAL DATA TO COMPLETE THE MEDICAL, DENTAL, MENTAL HEALTH, AND IMMUNIZATION HISTORIES
- LABORATORY OR DIAGNOSTIC TESTS TO DETECT COMMUNICABLE DISEASE, INCLUDING VENEREAL DISEASE AND TUBERCULOSIS
- RECORD OF HEIGHT, WEIGHT, PULSE, BLOOD PRESSURE, AND TEMPERATURE
- OTHER TESTS AND EXAMINATIONS AS APPROPRIATE

WITHIN FOURTEEN DAYS AFTER ARRIVAL FOR INMATES WITH IDENTIFIED SIGNIFICANT HEALTH CARE PROBLEMS:

- MEDICAL EXAMINATION, INCLUDING REVIEW OF MENTAL AND DENTAL STATUS (FOR THOSE INMATES WITH SIGNIFICANT HEALTH PROBLEMS DISCOVERED ON EARLIER SCREENING SUCH AS CARDIAC PROBLEMS, DIABETES, COMMUNICABLE DISEASES, AND SO FORTH)
- REVIEW OF THE RESULTS OF THE MEDICAL EXAMINATION, TESTS, AND IDENTIFICATION OF PROBLEMS BY A HEALTH CARE PRACTITIONER OR OTHER QUALIFIED HEALTH CARE PROFESSIONAL, IF SUCH IS AUTHORIZED IN THE MEDICAL PRACTICE ACT
- INITIATION OF THERAPY, WHEN APPROPRIATE
- DEVELOPMENT AND IMPLEMENTATION OF TREATMENT PLAN, INCLUDING RECOMMENDATIONS CONCERNING HOUSING, JOB ASSIGNMENT, AND PROGRAM PARTICIPATION

WITHIN 30 DAYS AFTER ARRIVAL FOR INMATES WITHOUT SIGNIFICANT HEALTH CARE PROBLEMS:

- MEDICAL EXAMINATION, INCLUDING REVIEW OF MENTAL AND DENTAL STATUS (FOR THOSE INMATES WITHOUT SIGNIFICANT HEALTH CARE CONCERNS IDENTIFIED DURING EARLIER SCREENING-NO IDENTIFIED ACUTE OR CHRONIC DISEASE, NO IDENTIFIED COMMUNICABLE DISEASES, AND SO FORTH)
- REVIEW OF THE RESULTS OF THE MEDICAL EXAMINATION, TESTS, AND IDENTIFICATION OF PROBLEMS BY A HEALTH CARE PRACTITIONER OR OTHER QUALIFIED HEALTH CARE PROFESSIONAL, IF SUCH IS AUTHORIZED IN THE MEDICAL PRACTICE ACT
- INITIATION OF THERAPY, WHEN APPROPRIATE
- DEVELOPMENT AND IMPLEMENTATION OF A TREATMENT PLAN, INCLUDING RECOMMENDATIONS CONCERNING HOUSING, JOB ASSIGNMENT, AND PROGRAM PARTICIPATION

INTERPRETATION JANUARY 2004. THE CRITERION FOR TESTING FOR VENEREAL DISEASES AT THE DISCRETION OF THE AGENCIES/FACILITIES HEALTH AUTHORITY.

FINDINGS:

The facility accepts intra system transfers only.

Standard #**Standard #4-4371 (MANDATORY) Revised January 2006**

ALL INTERSYSTEM OFFENDER TRANSFERS WILL UNDERGO A MENTAL HEALTH APPRAISAL BY A QUALIFIED MENTAL HEALTH PROFESSIONAL WITHIN FOURTEEN DAYS OF ADMISSION TO A FACILITY. IF THERE IS DOCUMENTED EVIDENCE OF A MENTAL HEALTH APPRAISAL WITHIN THE PREVIOUS NINETY DAYS, A NEW MENTAL HEALTH APPRAISAL IS NOT REQUIRED, EXCEPT AS DETERMINED BY THE DESIGNATED MENTAL HEALTH AUTHORITY. MENTAL HEALTH APPRAISALS INCLUDE, BUT ARE NOT LIMITED TO:

- REVIEW OF AVAILABLE HISTORICAL RECORDS OF INPATIENT AND OUTPATIENT PSYCHIATRIC TREATMENT
- REVIEW OF HISTORY OF TREATMENT WITH PSYCHOTROPIC MEDICATION
- REVIEW OF HISTORY OF PSYCHOTHERAPY, PSYCHO-EDUCATIONAL GROUPS AND CLASSES OR SUPPORT GROUPS
- REVIEW OF HISTORY OF DRUG AND ALCOHOL TREATMENT
- REVIEW OF EDUCATION HISTORY

- REVIEW OF HISTORY OF SEXUAL ABUSE-VICTIMIZATION AND PREDATORY BEHAVIOR
- ASSESSMENT OF CURRENT MENTAL STATUS AND CONDITION
- ASSESSMENT OF CURRENT SUICIDAL POTENTIAL AND PERSON-SPECIFIC CIRCUMSTANCES THAT INCREASE SUICIDE POTENTIAL
- ASSESSMENT OF VIOLENCE POTENTIAL AND PERSON-SPECIFIC CIRCUMSTANCES THAT INCREASE VIOLENCE POTENTIAL
- ASSESSMENT OF DRUG AND ALCOHOL ABUSE AND/OR ADDICTION
- USE OF ADDITIONAL ASSESSMENT TOOLS, AS INDICATED
- REFERRAL TO TREATMENT, AS INDICATED
- DEVELOPMENT AND IMPLEMENTATION OF A TREATMENT PLAN, INCLUDING RECOMMENDATIONS CONCERNING HOUSING, JOB ASSIGNMENT, AND PROGRAM PARTICIPATION

FINDINGS:

The facility accepts intra system transfers only

**Standard #4-4376 (MANDATORY) Revised January 2006**

DETOXIFICATION IS DONE ONLY UNDER MEDICAL SUPERVISION IN ACCORDANCE WITH LOCAL, STATE, AND FEDERAL LAWS. DETOXIFICATION FROM ALCOHOL, OPIATES, HYPNOTICS, OTHER STIMULANTS, AND SEDATIVE HYPNOTIC DRUGS IS CONDUCTED UNDER MEDICAL SUPERVISION WHEN PERFORMED AT THE FACILITY OR IS CONDUCTED IN A HOSPITAL OR COMMUNITY DETOXIFICATION CENTER. SPECIFIC GUIDELINES ARE FOLLOWED FOR THE TREATMENT AND OBSERVATION OF INDIVIDUALS MANIFESTING MILD OR MODERATE SYMPTOMS OF INTOXICATION OR WITHDRAWAL FROM ALCOHOL AND OTHER DRUGS.

FINDINGS:

Detoxification is not done at this facility.  This would be done at the reception center.

COMMISSION ON ACCREDITATION FOR CORRECTIONS

California Department of Corrections and Rehabilitation
California State Prison- CSP Solano
Vacaville, California
April 30- May 2, 2012

Visiting Committee Findings

Non-Mandatory Standards

Not Applicable


**Standard #4-4143**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE ASSIGNMENT OF APPROPRIATELY TRAINED INDIVIDUALS TO ASSIST DISABLED OFFENDERS WHO CANNOT OTHERWISE PERFORM BASIC LIFE FUNCTIONS.

FINDINGS:

CSP SOLANO is not a Disability Placement Program designated facility

**Standard #4-4144**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE EDUCATION, EQUIPMENT AND FACILITIES, AND THE SUPPORT NECESSARY FOR INMATES WITH DISABILITIES TO PERFORM SELF-CARE AND PERSONAL HYGIENE IN A REASONABLY PRIVATE ENVIRONMENT.

FINDINGS:

CSP SOLANO is not a Disability Placement Program designated facility

**Standard # 4-4147-1 Added August 2006.**

ALL INMATE ROOMS/CELLS PROVIDE INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST THREE SQUARE FEET OF TRANSPARENT GLAZING, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE IN ROOMS/CELLS WITH THREE OR MORE INMATES. (RENOVATION, ADDITION, NEW CONSTRUCTION)

FINDINGS:

CSP SOLANO is not new construction

**Standard # 4-4149 Revised January 2003.**

EACH DAYROOM PROVIDES INMATES WITH ACCESS TO NATURAL LIGHT BY MEANS OF AT LEAST 12 SQUARE FEET OF TRANSPARENT GLAZING IN THE DAYROOM, PLUS TWO ADDITIONAL SQUARE FEET OF TRANSPARENT GLAZING PER INMATE WHOSE ROOM/CELL IS DEPENDENT ON ACCESS TO NATURAL LIGHT THROUGH THE DAYROOM. (NEW CONSTRUCTION ONLY)

FINDINGS:

CSP SOLANO is not new construction

**Standard # 4-4150-1 Added August 2008. (New Construction Only)**

NOISE LEVELS IN HOUSING AREAS (IN OTHER WORDS, DAYROOMS WITH ADJACENT CELLS OR DORMS) SHALL NOT EXCEED THE FOLLOWING:

- UNOCCUPIED – 45DBA (A SCALE), BUILDING SERVICE SYSTEMS SHALL BE ON AND IN NORMAL OPERATING CONDITION. MID-FREQUENCY AVERAGE REVERBERATION TIME (T 60) MUST BE LESS THAN 1.0 SEC.
- OCCUPIED – 70 DBA (A SCALE) FOR A MINIMUM OF 15 SECONDS OF CONTINUOUS AVERAGE MEASUREMENT IN NORMAL OPERATING CONDITIONS.

ALL MONITORING SHALL BE CONDUCTED IN CLOSE PROXIMITY TO THE CORRECTIONAL OFFICER'S POST. IF A CORRECTIONAL OFFICER'S POST IS NOT IDENTIFIED, THEN MONITORING SHALL BE CONDUCTED AT A LOCATION CONSIDERED BEST TO MONITOR HOUSING NOISE LEVELS. MEASUREMENTS SHALL BE CONDUCTED A MINIMUM OF ONCE PER ACCREDITATION CYCLE BY A QUALIFIED SOURCE.

FINDINGS:

CSP SOLANO is not new construction

**Standard # 4-4151 Revised August 2007.**

CIRCULATION IS AT LEAST 15 CUBIC FEET OF OUTSIDE OR RE-CIRCULATED FILTERED AIR PER MINUTE PER OCCUPANT FOR CELLS/ROOMS, OFFICER STATIONS, AND DINING AREAS, AS DOCUMENTED BY A QUALIFIED TECHNICIAN AND SHOULD BE CHECKED NOT LESS THAN ONCE PER ACCREDITATION CYCLE. (RENOVATION, ADDITION, NEW CONSTRUCTION ONLY)

FINDINGS:

CSP SOLANO is not new construction

**Standard #4-4181**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT WHEN BOTH MALES AND FEMALES ARE HOUSED IN THE FACILITY, AT LEAST ONE MALE AND ONE FEMALE STAFF MEMBER ARE ON DUTY AT ALL TIMES.

FINDINGS:

CSP SOLANO does not house females

**Standard # 4-4190-1 Added August 2008.**

WRITTEN POLICY, PROCEDURE AND PRACTICE, IN GENERAL, PROHIBIT THE USE OF RESTRAINTS ON FEMALE OFFENDERS DURING ACTIVE LABOR AND THE DELIVERY OF A CHILD. ANY DEVIATION FROM THE PROHIBITION REQUIRES APPROVAL BY, AND GUIDANCE ON, METHODOLOGY FROM THE MEDICAL AUTHORITY AND IS BASED ON DOCUMENTED SERIOUS SECURITY RISKS.  THE MEDICAL AUTHORITY PROVIDES GUIDANCE ON THE USE OF RESTRAINTS ON PREGNANT OFFENDERS PRIOR TO ACTIVE LABOR AND DELIVERY.

FINDINGS:

CSP SOLANO does not house females

**Standard #4-4264**

ALTERNATIVE MEAL SERVICE MAY BE PROVIDED TO AN INMATE IN SEGREGATION WHO USES FOOD OR FOOD SERVICE EQUIPMENT IN A MANNER THAT IS HAZARDOUS TO SELF, STAFF, OR OTHER INMATES. ALTERNATIVE MEAL SERVICE IS ON AN INDIVIDUAL BASIS, IS BASED ON HEALTH OR SAFETY CONSIDERATIONS ONLY, MEETS BASIC NUTRITIONAL REQUIREMENTS, AND OCCURS WITH THE WRITTEN APPROVAL OF THE WARDEN/SUPERINTENDENT AND RESPONSIBLE HEALTH AUTHORITY. THE SUBSTITUTION PERIOD SHALL NOT EXCEED SEVEN DAYS.

FINDINGS:

CSP SOLANO does not utilize an alternate meal service.

**Standard #4-4278**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT MALE AND FEMALE INMATES HOUSED IN THE SAME INSTITUTION HAVE SEPARATE SLEEPING QUARTERS BUT EQUAL ACCESS TO ALL AVAILABLE SERVICES AND PROGRAMS. NEITHER SEX IS DENIED OPPORTUNITIES SOLELY ON THE BASIS OF THEIR SMALLER NUMBER IN THE POPULATION.

FINDINGS:

CSP SOLANO does not house females

**Standard #4-4285**

WRITTEN POLICIES AND PROCEDURES GOVERN THE ADMISSION OF INMATES NEW TO THE SYSTEM. THESE PROCEDURES INCLUDE AT A MINIMUM THE FOLLOWING:

- DETERMINATION THAT THE INMATE IS LEGALLY COMMITTED TO THE INSTITUTION
- THOROUGH SEARCHING OF THE INDIVIDUAL AND POSSESSIONS
- DISPOSING OF PERSONAL PROPERTY
- SHOWER AND HAIR CARE, IF NECESSARY
- ISSUE OF CLEAN, LAUNDERED CLOTHING AS NEEDED
- PHOTOGRAPHING AND FINGERPRINTING, INCLUDING NOTATION OF IDENTIFYING MARKS OR OTHER UNUSUAL PHYSICAL CHARACTERISTICS
- MEDICAL, DENTAL, AND MENTAL HEALTH SCREENING
- ASSIGNING TO HOUSING UNIT
- RECORDING BASIC PERSONAL DATA AND INFORMATION TO BE USED FOR MAIL AND VISITING LIST
- EXPLAINING MAIL AND VISITING PROCEDURES
- ASSISTING INMATES IN NOTIFYING THEIR NEXT OF KIN AND FAMILIES OF ADMISSION
- ASSIGNING OF REGISTERED NUMBER TO THE INMATE
- GIVING WRITTEN ORIENTATION MATERIALS TO THE INMATE
- DOCUMENTING ANY RECEPTION AND ORIENTATION PROCEDURE COMPLETED AT A CENTRAL RECEPTION FACILITY

FINDINGS:

CSP SOLANO is not a Reception Center

**Standard #4-4286**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THE PREPARATION OF A SUMMARY ADMISSION REPORT FOR ALL NEW ADMISSIONS. THE REPORT INCLUDES AT A MINIMUM THE FOLLOWING INFORMATION:

- LEGAL ASPECTS OF THE CASE
- SUMMARY OF CRIMINAL HISTORY, IF ANY
- SOCIAL HISTORY
- MEDICAL, DENTAL, AND MENTAL HEALTH HISTORY
- OCCUPATIONAL EXPERIENCE AND INTERESTS
- EDUCATIONAL STATUS AND INTERESTS
- VOCATIONAL PROGRAMMING
- RECREATIONAL PREFERENCE AND NEEDS ASSESSMENT
- PSYCHOLOGICAL EVALUATION
- STAFF RECOMMENDATIONS
- PRE-INSTITUTIONAL ASSESSMENT INFORMATION

FINDINGS:

CSP SOLANO is not a Reception Center

**Standard # 4-4287 Revised January 2006.**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR A RECEPTION PROGRAM FOR NEW INMATES UPON ADMISSION TO THE CORRECTIONAL SYSTEM. EXCEPT IN UNUSUAL CIRCUMSTANCES, INITIAL RECEPTION AND ORIENTATION OF INMATES IS COMPLETED WITHIN 30 CALENDAR DAYS AFTER ADMISSION.

FINDINGS:

CSP SOLANO is not a Reception Center

**Standard #4-4307**

IF YOUTHFUL OFFENDERS ARE HOUSED IN THE FACILITY, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THEY ARE HOUSED IN A SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS EXCEPT WHEN:

- A VIOLENT, PREDATORY YOUTHFUL OFFENDER POSES AN UNDUE RISK OF HARM TO OTHERS WITHIN THE SPECIALIZED UNIT; AND/OR

- A QUALIFIED MEDICAL OR MENTAL-HEALTH SPECIALIST DOCUMENTS THAT THE YOUTHFUL OFFENDER WOULD BENEFIT FROM PLACEMENT OUTSIDE THE UNIT

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE PREPARATION OF A WRITTEN STATEMENT OF THE SPECIFIC REASONS FOR HOUSING A YOUTHFUL OFFENDER OUTSIDE THE SPECIALIZED UNIT AND A CASE-MANAGEMENT PLAN SPECIFYING WHAT BEHAVIORS NEED TO BE MODIFIED AND HOW THE YOUTHFUL OFFENDER MAY RETURN TO THE UNIT. THE STATEMENT OF REASONS AND CASE-MANAGEMENT PLAN MUST BE APPROVED BY THE WARDEN OR HIS OR HER DESIGNEE. CASES ARE REVIEWED AT LEAST QUARTERLY BY THE CASE MANAGER, THE WARDEN OR HIS OR HER DESIGNEE, AND THE YOUTHFUL OFFENDER TO DETERMINE WHETHER A YOUTHFUL OFFENDER SHOULD BE RETURNED TO THE SPECIALIZED UNIT.

FINDINGS:

CSP SOLANO does not house youthful offenders

**Standard #4-4308**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR THE DIRECT SUPERVISION OF YOUTHFUL OFFENDERS HOUSED IN THE SPECIALIZED UNIT TO ENSURE SAFETY AND SECURITY.

FINDINGS:

CSP SOLANO does not house youthful offenders

**Standard #4-4309**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR CLASSIFICATION PLANS FOR YOUTHFUL OFFENDERS THAT DETERMINE LEVEL OF RISK AND PROGRAM NEEDS DEVELOPMENTALLY APPROPRIATE FOR ADOLESCENTS. CLASSIFICATION PLANS SHALL INCLUDE CONSIDERATION OF PHYSICAL, MENTAL, SOCIAL, AND EDUCATIONAL MATURITY OF THE YOUTHFUL OFFENDER.

FINDINGS:

CSP SOLANO does not house youthful offenders

**Standard #4-4310**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ADEQUATE PROGRAM SPACE BE PROVIDED TO MEET THE PHYSICAL, SOCIAL, AND EMOTIONAL NEEDS OF YOUTHFUL OFFENDER AND ALLOWS FOR THEIR PERSONAL INTERACTIONS AND GROUP-ORIENTED ACTIVITIES.

FINDINGS:

CSP SOLANO does not house youthful offenders

**Standard #4-4311**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT FOR YOUTHFUL OFFENDERS HAVE NO MORE THAN INCIDENTAL SIGHT OR SOUND CONTACT WITH ADULT OFFENDERS FROM OUTSIDE THE UNIT IN LIVING, PROGRAM, DINING, OR OTHER COMMON AREAS OF THE FACILITY.  ANY OTHER SIGHT OR SOUND CONTACT IS MINIMIZED, BRIEF, AND IN CONFORMANCE WITH APPLICABLE LEGAL REQUIREMENTS.

FINDINGS:

CSP SOLANO does not house youthful offenders

**Standard #4-4312**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT PROGRAM PERSONNEL WHO WORK WITH YOUTHFUL OFFENDERS FROM THE SPECIALIZED UNIT BE TRAINED IN THE DEVELOPMENTAL, SAFETY, AND OTHER SPECIFIC NEEDS OF YOUTHFUL OFFENDERS.  WRITTEN JOB DESCRIPTIONS AND QUALIFICATIONS REQUIRE TRAINING FOR STAFF SPECIFICALLY ASSIGNED TO THE UNIT OR STAFF WHO ARE RESPONSIBLE FOR PROGRAMMING OF YOUTHFUL OFFENDERS IN THE SPECIALIZED UNIT BEFORE BEING ASSIGNED TO WORK WITH YOUTHFUL OFFENDERS.  THE TRAINING SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING AREAS:

- ADOLESCENT DEVELOPMENT
- EDUCATIONAL PROGRAMMING
- CULTURAL AWARENESS
- CRISIS PREVENTION AND INTERVENTION
- LEGAL ISSUES
- HOUSING AND PHYSICAL PLANT
- POLICIES AND PROCEDURES
- THE MANAGEMENT OF, AND PROGRAMMING FOR, SEX OFFENDERS
- SUBSTANCE-ABUSE SERVICES

- COGNITIVE-BEHAVIORAL INTERVENTIONS, INCLUDING ANGER MANAGEMENT, SOCIAL-SKILLS TRAINING, PROBLEM SOLVING, AND RESISTING PEER PRESSURE
- SUICIDE PREVENTION
- NUTRITION
- MENTAL-HEALTH ISSUES
- GENDER-SPECIFIC ISSUES
- CASE-MANAGEMENT PLANNING AND IMPLEMENTATION

FINDINGS:

CSP SOLANO does not house youthful offenders

**Standard #4-4339**

THE INSTITUTION PROVIDES FOR THE THOROUGH CLEANING AND, WHEN NECESSARY, DISINFECTING OF INMATE PERSONAL CLOTHING BEFORE STORAGE OR BEFORE ALLOWING THE INMATE TO KEEP AND WEAR PERSONAL CLOTHING.

FINDINGS:

No new inmates are processed at reception center

**Standard #4-4353-1 Added January 2003.**

WHERE NURSING INFANTS ARE ALLOWED TO REMAIN WITH THEIR MOTHERS, PROVISIONS ARE MADE FOR A NURSERY, STAFFED BY QUALIFIED PERSONS, WHERE THE INFANTS ARE PLACED WHEN THEY ARE NOT IN THE CARE OF THEIR MOTHERS.

FINDINGS:

The facility houses male offenders only.

**Standard #4-4364**

ALL IN-TRANSIT OFFENDERS RECEIVE A HEALTH SCREENING BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL ON ENTRY INTO THE AGENCY SYSTEM. FINDINGS ARE RECORDED ON A SCREENING FORM THAT WILL ACCOMPANY THE OFFENDER TO ALL SUBSEQUENT FACILITIES UNTIL THE OFFENDER REACHES HIS OR HER FINAL DESTINATION. HEALTH SCREENS WILL BE REVIEWED AT EACH FACILITY BY HEALTH-TRAINED OR QUALIFIED HEALTH CARE PERSONNEL. PROCEDURES WILL BE IN PLACE FOR CONTINUITY OF CARE.

FINDINGS:

The facility does not accept in transit offenders.

**Standard #4-4377**

OFFENDERS HAVE ACCESS TO A CHEMICAL DEPENDENCY TREATMENT PROGRAM. WHEN A CHEMICAL DEPENDENCY PROGRAM EXISTS, THE CLINICAL MANAGEMENT OF CHEMICALLY DEPENDENT OFFENDERS INCLUDES, AT A MINIMUM, THE FOLLOWING:

- A STANDARDIZED DIAGNOSTIC NEEDS ASSESSMENT ADMINISTERED TO DETERMINE THE EXTENT OF USE, ABUSE, DEPENDENCY, AND/OR CO-DEPENDENCY
- AN INDIVIDUALIZED TREATMENT PLAN DEVELOPED AND IMPLEMENTED BY A MULTI DISCIPLINARY CLINICAL TEAM THAT INCLUDES MEDICAL, MENTAL HEALTH, AND SUBSTANCE ABUSE PROFESSIONALS
- PRE-RELEASE RELAPSE-PREVENTION EDUCATION, INCLUDING RISK MANAGEMENT
- THE OFFENDER SHALL BE INVOLVED IN AFTERCARE DISCHARGE PLANS

FINDINGS:

The facility does not offer a chemical dependency program

**Standard #4-4383 Revised January 2006**

WHEN INSTITUTIONS DO NOT HAVE QUALIFIED HEALTH CARE STAFF, HEALTH-TRAINED PERSONNEL COORDINATE THE HEALTH DELIVERY SERVICES IN THE INSTITUTION UNDER THE JOINT SUPERVISION OF THE RESPONSIBLE HEALTH AUTHORITY AND WARDEN OR SUPERINTENDENT.

FINDINGS:

The facility has full time medical staff

**Standard #4-4391**

IF VOLUNTEERS ARE USED IN THE DELIVERY OF HEALTH CARE, THERE IS A DOCUMENTED SYSTEM FOR SELECTION, TRAINING, STAFF SUPERVISION, FACILITY ORIENTATION, AND DEFINITION OF TASKS, RESPONSIBILITIES AND AUTHORITY THAT IS APPROVED BY THE HEALTH AUTHORITY. VOLUNTEERS MAY ONLY PERFORM DUTIES CONSISTENT WITH THEIR CREDENTIALS AND TRAINING. VOLUNTEERS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS:

Volunteers are not used in the delivery of health care services.

**Standard #4-4392**

ANY STUDENTS, INTERNS, OR RESIDENTS DELIVERING HEALTH CARE IN THE FACILITY, AS PART OF A FORMAL TRAINING PROGRAM, WORK UNDER STAFF SUPERVISION, COMMENSURATE WITH THEIR LEVEL OF TRAINING. THERE IS A WRITTEN AGREEMENT BETWEEN FACILITY AND TRAINING OR EDUCATIONAL FACILITY THAT COVERS SCOPE OF WORK, LENGTH OF AGREEMENT, AND ANY LEGAL OR LIABILITY ISSUES. STUDENTS OR INTERNS AGREE IN WRITING TO ABIDE BY ALL FACILITY POLICIES, INCLUDING THOSE RELATING TO THE SECURITY AND CONFIDENTIALITY OF INFORMATION.

FINDINGS:

Students, interns, and residents are not used in the delivery of healthcare services.

**Standard #4-4436**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT COMPREHENSIVE COUNSELING AND ASSISTANCE ARE PROVIDED TO PREGNANT INMATES IN KEEPING WITH THEIR EXPRESSED DESIRES IN PLANNING FOR THEIR UNBORN CHILDREN.

FINDINGS:

The facility houses male offenders only,

**Standard #4-4438 Revised August 2009.**

WHERE A DRUG TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE ALCOHOL AND DRUG ABUSE TREATMENT PROGRAM HAS A WRITTEN TREATMENT PHILOSOPHY WITHIN THE CONTEXT OF THE TOTAL CORRECTIONS SYSTEM, AS WELL AS GOALS AND MEASURABLE OBJECTIVES.

FINDINGS:

The facility does not offer a substance abuse treatment program

**Standard #4-4439**

WHERE A DRUG TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE FOR AN APPROPRIATE RANGE OF PRIMARY TREATMENT SERVICES FOR ALCOHOL AND OTHER DRUG ABUSING INMATES THAT INCLUDE, AT A MINIMUM, THE FOLLOWING:

- INMATE DIAGNOSIS
- IDENTIFIED PROBLEM AREAS
- INDIVIDUAL TREATMENT OBJECTIVES
- TREATMENT GOALS
- COUNSELING NEEDS
- DRUG EDUCATION PLAN
- RELAPSE PREVENTION AND MANAGEMENT
- CULTURALLY SENSITIVE TREATMENT OBJECTIVES, AS APPROPRIATE
- THE PROVISION OF SELF-HELP GROUPS AS AN ADJUNCT TO TREATMENT
- PRERELEASE AND TRANSITIONAL SERVICE NEEDS
- COORDINATION EFFORTS WITHIN COMMUNITY SUPERVISION AND TREATMENT STAFF DURING THE PRERELEASE PHASE TO ENSURE A CONTINUUM OF SUPERVISION AND TREATMENT

FINDINGS:

The facility does not offer a substance abuse treatment program

**Standard #4-4440**

WHERE A DRUG AND ALCOHOL TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT THE FACILITY USES A COORDINATED STAFF APPROACH TO DELIVER TREATMENT SERVICES. THIS APPROACH TO SERVICE DELIVERY SHALL BE DOCUMENTED IN TREATMENT PLANNING CONFERENCES AND INDIVIDUAL TREATMENT FILES.

FINDINGS:

The facility does not offer a substance abuse treatment program

**Standard #4-4441**

WHERE A DRUG AND ALCOHOL TREATMENT PROGRAM EXISTS, WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE INCENTIVES FOR TARGETED TREATMENT PROGRAMS TO INCREASE AND MAINTAIN THE INMATE'S MOTIVATION FOR TREATMENT.

FINDINGS:

The facility does not offer a substance abuse treatment program

**Standard #4-4443**

TEMPORARY RELEASE PROGRAMS SHOULD INCLUDE BUT NOT BE LIMITED TO THE FOLLOWING:

- WRITTEN OPERATIONAL PROCEDURES
- CAREFUL SCREENING AND SELECTION PROCEDURES
- WRITTEN RULES OF CONDUCT AND SANCTIONS
- A SYSTEM OF SUPERVISION TO MINIMIZE INMATE ABUSE OF PROGRAM PRIVILEGES
- A COMPLETE RECORDKEEPING SYSTEM
- A SYSTEM FOR EVALUATING PROGRAM EFFECTIVENESS
- EFFORTS TO OBTAIN COMMUNITY COOPERATION AND SUPPORT

FINDINGS:

The facility does not have temporary release programs

**Standard #4-4462**

PRIVATE INDUSTRIES ON THE INSTITUTION GROUNDS EMPLOYING INMATES IN POSITIONS NORMALLY FILLED BY PRIVATE CITIZENS PAY INMATES THE PREVAILING WAGE RATE FOR THE POSITION OCCUPIED.

FINDINGS:

The facility does not have private industries on institution  grounds.

**Standard #4-4463**

63

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES EMPLOYED IN THE COMMUNITY BY PUBLIC OR PRIVATE ORGANIZATIONS IN POSITIONS NORMALLY OCCUPIED BY PRIVATE CITIZENS ARE COMPENSATED AT THE PREVAILING WAGE RATE FOR THE POSITION OCCUPIED. INMATES RECEIVING SUCH COMPENSATION REIMBURSE THE JURISDICTION FOR A REASONABLE SHARE OF ITS COST IN MAINTAINING THEM.

FINDINGS:

Inmates of this facility are not employed by public or private organizations.

**Standard #4-4502**

WRITTEN POLICY, PROCEDURE, AND PRACTICE PROVIDE THAT INMATES WITH APPROPRIATE SECURITY CLASSIFICATIONS ARE ALLOWED FURLOUGHS TO THE COMMUNITY TO MAINTAIN COMMUNITY AND FAMILY TIES, SEEK EMPLOYMENT OPPORTUNITIES, AND FOR OTHER PURPOSES CONSISTENT WITH THE PUBLIC INTEREST.

FINDINGS:

CSP SOLANO is a level 2/3 security Level institution and these programs are not available to inmates at this security level.

**Standard #4-4530 Added January 2007.**

WRITTEN POLICY, PROCEDURE, AND PRACTICE REQUIRE THAT ONGOING, BUT NOT LESS THAN SEMI-ANNUALLY, CONSULTATION TAKES PLACE AS DETERMINED BY THE AGENCY OR PARENT AGENCY WITH THE LOCAL JOINT TERRORISM TASK FORCE (JTTF), OR ANOTHER SIMILAR AGENCY, ON ALL TERRORISM MATTERS TO INCLUDE:

- A LIST OF KNOWN TERRORIST INMATES IN LOCAL CUSTODY
- INTELLIGENCE REGARDING INMATES WITH SUSPECTED TERRORIST TIES
- INFORMATION REGARDING SPECIFIC INCIDENTS, EVENTS, OR THREATS AFFECTING THE INSTITUTION OR DETENTION FACILITY THAT HAVE A POSSIBLE TERRORISM CONNECTION

FINDINGS:

This function is completed at headquarters level by the Office of Correctional safety.

**Significant Incident Summary**

This summary is required to be provided to the chair of your audit team upon their arrival. The information contained on this form will also be summarized in the narrative portion of the visiting committee report and will be incorporated into the final report. It should contain data for the last 12 months; indicate those months in the boxes provided. Please type the data. If you have questions on how to complete the form, please contact your regional manager.

**Facility:** California State Prison          **Year:** 2011-2012

| Incidents | | MAR | APR | MAY | JUN | JUL | AUG | SEPT | OCT | NOV | DEC | JAN | FEB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assault: Offenders/ Offenders*** | Indicate types (sexual**, physical, etc.) | PHY | - | - | PHY | PHY | PHY | PHY | PHY | - | - | PHY | [HY |
| | # With Weapon | 1 | 2 | 0 | 0 | 2 | 3 | 2 | 2 | 1 | 0 | 1 | 2 |
| | # Without Weapon | 6 | 5 | 6 | 4 | 5 | 4 | 2 | 2 | 0 | 1 | 3 | 5 |
| **ssault: Offender/ Staff** | Indicate types (sexual**, physical, etc.) | - | PHY | - | - | - | - | - | - | PHY | - | PHY |
| | # With Weapon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Without Weapon | 2 | 3 | 0 | 1 | 2 | 1 | 1 | 0 | 0 | 1 | 0 | 2 |
| **Number of Forced Moves Used*** | (Cell extraction or other forced relocation of offenders) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Disturbances****** | | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 |
| **Number of Times Chemical Agents Used** | | 9 | 10 | 8 | 9 | 14 | 14 | 7 | 17 | 9 | 2 | 7 | 6 |
| **Number of Times Special Reaction Team Used** | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Four/Five Point Restraints** | Number | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Indicate type (chair, bed, board, etc.) | | | | | | | | | | | | |
| **Offender Medical Referrals as a Result of Injuries Sustained** | #'s should reflect incidents on this form, not rec or other source | 3 | 3 | 5 | 2 | 3 | 4 | 3 | 0 | 1 | 0 | 1 | 1 |
| **Escapes** | # Attempted | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | # Actual | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Substantiated Grievances (reCSP Solanoved in favor of offender)** | Reason (medical, food, religious, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Number | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Deaths** | Reason (violent, illness, suicide, etc.) | Natural | - | 2-Natl | - | - | - | Natural | Illness/natu | - | - | - | - |
| | Number | 1 | - | 3 | - | - | - | 1 | 1 | - | - | - | - |



65

**Appendix E**

**Health Care Outcome Measures Worksheet**

**California State Prison - CSP Solanoano (4/1/2011 - 3/31/2012)**

| Standard | Outcome Measure | Health Care Outcomes<br>Numerator/Denominator | Value | Outcome measure |
|---|---|---|---|---|
| 1A | (1) | Number of offenders with a positive tuberculin skin test in the past 12 months | 1256 | |
| | divided by | Annual number of admissions in the past 12 months | 1778 | 70.64% |
| | (2) | Number of offenders diagnosed with active tuberculosis in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.00% |
| | (3) | Number of conversions to a positive tuberculin skin test in the past 12 months | 6 | |
| | divided by | Number of tuberculin skin tests given in the last 12 months | 5549 | 0.11% |
| | (4) | Number of offenders with a positive tuberculin skin test who completed prophylaxis treatment for tuberculosis in the past 12 months | 28 | |
| | divided by | Number of offenders with a positive tuberculin skin test on prophylaxis treatment for tuberculosis in the past 12 months | 28 | 100.00% |
| | (5) | Number of Hepatitis C positive offenders in the past 12 months | 713 | |
| | divided by | Average daily population in the past 12 months | 4895 | 14.57% |
| | (6) | Number of HIV-positive offenders in the past 12 months | 3 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.06% |
| | (7) | Number of HIV-positive offenders who are being treated with highly active antiretroviral treatment in the past 12 months | 3 | |

| | divided by | Number of known HIV-positive offenders in the past 12 months | 3 | 100.00% |
|---|---|---|---|---|
| | (8) | Number of offenders diagnosed with Axis I diagnosis (excluding CSP Solanoe diagnosis of substance abuse) in the past 12 months | 1090 | |
| | divided by | Average daily population in the past 12 months | 4895 | 22.27% |
| | (9) | Number of offender suicide attempts in the past 12 months | 4 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.08% |
| | (10) | Number of offenders suicides in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.00% |
| | (11) | Number of deaths due to homicide in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.00% |
| | (12) | Number of deaths due to injuries in the past 12 months | 0 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.00% |
| | (13) | Number of medically expected deaths in the past 12 months | 1 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.02% |
| | (14) | Number of medically unexpected deaths in the past 12 months | 3 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.06% |
| | (15) | Number of offender admissions to infirmary (where available) in the past 12 months | 324 | |
| | divided by | Average daily population in the past 12 months | 4895 | 6.62% |
| | (16) | Number of offender admissions to off-site hospitals in the past 12 months | 413 | |
| | divided by | Average daily population in the past 12 months | 4895 | 8.44% |
| | (17) | Number of offenders transported off-site (via ambulance or correctional vehicle) for treatment of emergency health conditions in the past 12 months | 121 | |
| | divided by | Average daily population in the past 12 | 4895 | 2.47% |

|  |  | months |  |  |
| --- | --- | --- | --- | --- |
|  | (18) | Number of offender specialty consults completed in the past 12 months | 20423 |  |
|  | divided by | Number of specialty consults (onsite or off-site) ordered by primary health care provider (MD, NP, PA) in the past 12 months | 4406 | 463.53% |
|  | (19) | Number of offender grievances about access to healthcare services found ion favor of the offender in the past 12 months | 221 |  |
|  | divided by | Number of offender grievances about access to healthcare services in the past 12 months | 1594 | 13.86% |
|  | (20) | Number of offender grievances related to quality of health care found in favor of offender during a 12- month period |  |  |
|  | divided by | Number of offender grievances related to quality of health care during a 12-month period | 496 | 0.00% |
|  | (21) | Number of offender grievances related to unfair treatment or rights violation found in favor of the offender during a 12-month period |  |  |
|  | divided by | Number of offender grievances related to unfair treatment or rights violation during a 12-month period | 131 | 0.00% |
|  | (22) | Number of offender grievances related to safety or sanitation found in favor of the offender during a 12-month period |  |  |
|  | divided by | Number of offender grievances related to safety or sanitation during a 12-month period | 4 | 0.00% |
|  | (23) | Number of offender lawsuits about access to healthcare services found in favor of the offender in the past 12 months | 0 |  |
|  | divided by | Number of offender lawsuits about access to healthcare services in the past 12 months | 14 | 0.00% |
|  | (24) | Number of individual sick call encounters in the past 12 months | 33787 |  |
|  | divided by | Average daily population in the past 12 months | 4895 | 690.23% |
|  | (25) | Number of physician visit contacts in the past 12 months | 34167 |  |

| | divided by | Average daily population in the past 12 months | 4895 | 698.00% |
|---|---|---|---|---|
| | (26) | Number of individualized dental treatment plans in the past 12 months | 1702 | |
| | divided by | Average daily population in the past 12 months | 4895 | 34.77% |
| | (27) | Number of hypertensive offenders enrolled in chronic care clinic in the past 12 months | 1366 | |
| | divided by | Average daily population in the past 12 months | 4895 | 27.91% |
| | (28) | Number of diabetic offenders enrolled in chronic care clinic in the past 12 months | 326 | |
| | divided by | Average daily population in the past 12 months | 4895 | 6.66% |
| | (29) | Numberof incidents involving pharmaceuticals as contraband in the past 12 months | 29 | |
| | divided by | Average daily population in the past 12 months | 4895 | 0.59% |
| | (30) | Nubmer of cardiac diets received by offenders with cardiac disease in the past 12 months | 0 | |
| | divided by | Number of cardiac diets prescribed in the past 12 months | 0 | 0.00% |
| | (31) | Number of hypertensive diets received by offenders with hypertension in the past 12 months | 0 | |
| | divided by | Number of hypertensive diets prescribed in the past 12 months | 0 | 0.00% |
| | (32) | Number of diabetic diets received by offenders with diabetes in the past 12 months | 0 | |
| | divided by | Number of diabetic diests prescribed in the past 12 months | 0 | 0.00% |
| | (33) | Number of renal diets received by offender with renal disease in the past 12 months | 9 | |
| | divided by | Number of renal diets prescribed in the past 12 months | 9 | 100.00% |
| | (34) | Number of needle stick injuries in the past 12 months | 5 | |
| | divided by | Number of employees on average in the past 12 months | 287 | 1.74% |
| | | | | |

| | | | | |
|---|---|---|---|---|
| | (35) | Number of pharmacy-dispensing errors in the past 12 months | 43 | |
| | divided by | Number of prescriptions dispensed by the pharmacy in the past 12 months | 267778 | 0.02% |
| | (36) | Number of nursing-medication-administration errors in the past 12 months | 38 | |
| | divided by | Number of medications administered in the past 12 months | 2180412 | 0.00% |
| 2A | (1) | Number of staff with lapsed licensure and or certification during a 12-month period | 0 | |
| | divided by | Number of licensed and or certified staff during a 12-month period | 182 | 0.00% |
| | (2) | Number of new employees during a 12-month period who completed orientation training prior to undertaking job assignments | 42 | |
| | divided by | Number of new employees during a 12-month period | 42 | 100.00% |
| | (3) | Number of employees completing in-service training requirements | 1060 | |
| | divided by | Number of employees eligible | 1256 | 84.39% |
| | (4) | Number of staff turnover per position category (MD, RN, LPN, medical records, and so forth) during a 12-month period | 32 | |
| | divided by | Number of staff positions per category | 287 | 11.15% |
| | (5) | Number of staff terminations for violation of drug-free work policy during a 12-month period | 0 | |
| | divided by | Number of staff terminations during a 12-month period | 3 | 0.00% |
| 3A | (1) | Number of offender lawsuits related to unfair treatment or rights violation found in favor of the offender during a 12-month period | 0 | |
| | divided by | Number of offender lawsuits related to unfair treatment or rights violation during a 12-month period | 13 | 0.00% |
| | (2) | Number of state court malpractice or torte liability cases found in favor of the offender in a 12-month period | 0 | |
| | divided by | Number of state court malpractice or torte liability cases in a 12-month period | 5 | 0.00% |
| 4A | (1) | Number of problems identified by internal review that were corrected during a 12-month period | 6 | |

|  | | | | |
|---|---|---|---|---|
|  | divided by | Number of problems identified by internal review during a 12-month period | 11 | 54.55% |
|  | (2) | Vacancy rate for full-time equivalents for each category within the health care staff, in other words, physician, nursing, midlevelpractitioner, ancillary staff, during a 12-month period | 6.14% |  |
| 5A | (1) | Number of offenders diagnosed with hygiene related conditions (scabies, lice, fungal infections) during a 12-month period | 5 |  |
|  | divided by | Average daily population during a 12-month period | 4895 | 0.10% |
|  | (2) | Number of offender grievances related to hygiene found in favor of the offender during a 12-month period |  |  |
|  | divided by | Number of offender grievances related to hygiene during a 12-month period | 2 | 0.00% |
|  | (3) | Number of offender lawsuits related to hygiene found in favor of the offender during a 12-month period | 0 |  |
|  | divided by | Number of offender lawsuits related to hygiene during a 12-month period | 0 | 0.00% |
| 6A | (1) | Number of fire code violations corrected during a 12-month period | 70 |  |
|  | divided by | Number of fire code violations cited by jurisdictional authority during a 12-month period | 95 | 73.68% |
|  | (2) | Number of offender injuries resulting from fires requiring medical treatment in a 12-month period | 0 |  |
|  | divided by | Average daily population in a 12-month period | 4895 | 0.00% |
|  | (3) | Number of offender injuries (other than fire) requiring medical treatment in a 12-month period | 2565 |  |
|  | divided by | Average daily population in a 12-month period | 4895 | 52.40% |
|  | (4) | Number of staff injuries resulting from fires requiring medical treatment in a 12-month period | 0 |  |
|  | divided by | Average daily population of staff | 270 | 0.00% |
|  | (5) | Number of staff injuries (other than fire) requiring medical treatment in a 12-month period | 76 |  |
|  | divided by | Average daily population of staff | 1216 | 6.25% |

| | | | | |
|---|---|---|---|---|
| | (6) | Number of offender lawsuits related to safety or sanitation found in favor of the offender during a 12-month period | 0 | |
| | divided by | Number of offender lawsuits related to safety or sanitation during a 12-month period | 2 | 0.00% |
| | (7) | Number of assaults: offender/offender, offender/staff during a 12-month period | 72 | |
| | divided by | Average daily population in a 12-month period | 4895 | 1.47% |
| | (8) | Number of lost key incidents during a 12-month period | 0 | |
| | (9) | Number of health code violations corrected during a 12-month period | 11 | |
| | divided by | Number of health code violations during a 12-month period | 14 | 78.57% |
| 7A | None | | | N/A |
| 7B | None | | | N/A |

# COMMISSION ON ACCREDITATION FOR CORRECTIONS
# PANEL ACTION REPORT

Denver Convention Center
Denver, Colorado

July 21, 2012

California Department of Corrections and
Rehabilitation
California State Prison- Sacramento
Folsom, California

Agency Representatives:          Tim Virga, Warden

Panel Members:                   Marge Webster, Chairperson
                                 James LeBlanc
                                 Cynthia Mausser
                                 Joan Shoemaker

Staff:                           Kenya Golden

## **Panel Action**

Standard #4-4134              Plan of Action

Standard #4-4135              Plan of Action

Standard # 4-4154            Plan of Action

Standard # 4-4155            Waiver

Standard # 4-4238            Plan of Action

Standard # 4-4417            Plan of Action

**<u>Accreditation Panel Decision</u>**

| | |
|---|---|
| Moved: | Commissioner Webster |
| Seconded: | Commissioner Mausser |

Three-Year Accreditation:       Yes

**<u>Accreditation Vote</u>**     **<u>Yes</u>**          **<u>No</u>**

| | |
|---|---|
| Commissioner Webster | ✓ |
| Commissioner LeBlanc | ✓ |
| Commissioner Mausser | ✓ |
| Commissioner Shoemaker | ✓ |

**<u>Final Tally</u>**

| | |
|---|---|
| Mandatory | 100% |
| Non-Mandatory | 98.6% |

*The American Correctional Association*
*and the*
*Commission on Accreditation for Corrections*
*awards*

# ACCREDITATION

*to*

*California Department of Corrections and Rehabilitation*

*California State Prison, Solano*

*Vacaville, California*

*2012-2015*

*in recognition of the attainment of excellence in the operation of*

*an Adult Correctional Institution*

*presented this 23rd day of July 2012*



ACA PRESIDENT

ACA EXECUTIVE DIRECTOR



AMERICAN CORRECTIONAL ASSOCIATION

COMMISSION CHAIR

DIRECTOR, STANDARDS AND ACCREDITATION