IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

**RALPH COLEMAN, et al.,**
    **Plaintiffs**

                v.                                        No. CIV S-90-0520 LKK JFM P

**EDMUND G. BROWN, JR., et al.**
    **Defendants**

## CORRECTIONS TO THE SPECIAL MASTER'S
## TWENTY-FIFTH ROUND MONITORING REPORT

On January 18, 2013, the special master filed his Twenty-Fifth Round Monitoring Report. Docket No. 4298. Defendants filed objections and a motion to strike or modify portions of that report, including statements in the Report concerning individual institutions. Objections and Motion to Strike or Modify, filed January 28, 2013, Docket No. 4132. On February 27, 2013, the special master was ordered to review defendants' objections and file a separate notice setting forth any corrections to the statements in the Report concerning individual institutions. Order, Docket No. 4361. The special master submits his response and corrections below.

A.   **CALIFORNIA REHABILITATION CENTER**

**Objection 1:**

On page 59, the special master reports that "CRC did not utilize the QIT process at all, although there were areas in which it could have benefitted from doing so."

Defendants object to any implication or conclusion that CRC's purported failure to use the QIT process during the monitoring period impacted the quality of or access to necessary mental health care systemwide, or that use of a QIT process is constitutionally required. (*See*

1

ECF No. 4275–1 at 7–17.)  The special master provides no evidence supporting such a conclusion and the Court should strike it from the report.

**Special Master's Response:**

CRC could have utilized the QIT process to improve performance in areas in which it was lagging.  These areas included five-day clinical follow-up, which had a compliance rate of 86 percent; custody follow-up, which had a compliance rate of 33 percent; and medication management audits, some of which had previously been conducted but were not conducted during the review period, limiting the audit data that was provided to the monitor.  *See* Twenty-Fifth Round Monitoring Report, p. 360, 361.  Accordingly, the Report will not be modified.

**Objection 2:**

On page 61, the special master reports that "[c]ontent was problematic at CCC, CRC, and SCC, where the agenda was comprised of only statewide suicide prevention video conference."

Defendants object because this statement is inaccurate. CRC provided minutes of the meetings showing that items other than the statewide video conference were included in the SPRFIT agenda in Tab I, 1 of the prison's response to the special master's twenty-fifth round document request. Accordingly, the special master's statements are inaccurate, and the reference to CRC should be removed.

**Special Master's Response:**

The Report is modified as follows: "Content was problematic at CCC and SCC, where the agenda was comprised of only statewide suicide prevention video conference."  Report, p. 61.

2

**Objection 3:**

On page 66, the special master reports "[t]welve institutions . . . reported that they had implemented the medication management audit tool . . ."

This statement must be revised to include CRC because it implemented MAPIP during the monitoring period as reported to the special master in the prison's mental health manage report, pages 8-10 and in Tab C, 17 & 18 of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified with the addition of the following sentence: "The CEO reported to the special master's expert that CRC had partially implemented MAPIP, as some audit items had not yet been utilized." Report, p. 66.

**Objection 4:**

On page 79, the special master reports that "[a]ccess to mainline and SNY EOP programs continued to be slow in many cases. Ten prisons…transferred 203 inmates to EOP programs. Among these transfers, the rate of compliance with the 60 day timeframe was 64 percent."

CRC's documentation of these transfers shows that it transferred its inmates within the 60 day timeframe. (*See* Tab O of the prison's response to the special master's twenty-fifth round document request.) The reference to CRC must be removed.

**Special Master's Response:**

The Report is modified as follows: "Access to mainline and SNY EOP programs continued to be slow in many cases.  Nine prisons – ASP, CCI, CIM, CSP/Solano, CSATF, CTF, Folsom, MCSP, and PVSP – transferred 194 inmates to EOP programs." Among these, the

3

average institutional rate of compliance with the 60-day transfer timeframe was 55 percent." Report, p. 79.

**Objection 5:**

On page 359, the special master reports that "four of the five scheduled [quality management subcommittee] meetings were held during the reporting period."

Defendants object to this statement because it is inaccurate. The CRC mental health quality management subcommittee held five of the six scheduled meetings during the monitoring period. (*See* CRC Mental Health Management Report, p. 7 and Tab B3 of the prison's response to the special master's twenty-fifth round document request.) This statement must be modified to report that CRC's subcommittee met five times.

**Special Master's Response:**

The referenced section of the Report concerns mental health subcommittee meetings. The Report is modified as follows: "Five of the six scheduled meetings were held during the reporting period, and one was cancelled." Report, p. 359.

**Objection 6:**

On page 364, the special master reports that "[r]equired members were present at IDTT meetings, although CRC did not report on attendance by CCIs."

Defendants object to and move to strike this statement because it is inaccurate. CRC reported that CCIs attended IDTT meetings 93% of the time during the reporting period. (*See* Tab B of prison's response to the special master's twenty-fifth round document request.)

4

**Special Master's Response:**

The Report is modified as follows: "Required members were present at IDTT meetings. The overall attendance rate for CCIs was 92 percent, based on information contained in the minutes of mental health subcommittee meetings." Report, p. 364.

B.   **CALIFORNIA CORRECTIONAL INSTITUTION**

**Objection 1:**

On page 339, the special master reports that "CCI reported that 62 percent of inmates received five-day clinical follow-up after discharges from the OHU and MHCB, and after returns from DSH."

Defendants object to and move to strike this statement because it is inaccurate. CCI reported that it provided five-day clinical follow-up after discharge from DSH 100% of the time, from OHU 100% of the time according to internal logs and 62 % of the time according to MHTS.net, and from MHCB 100% of the time. (*See* CCI Mental Health Management Report pp. 8 & 10.)

**Special Master's Response:**

The monitor reported that CCI's management report indicated 100-percent compliance for five-day clinical follow-up after discharged from the MHCB and the OHU and after returns from DSH programs, and 62-percent compliance for five-day follow-up after discharge from the OHU according to MHTS.net data. However, the monitor also reported that the OHU supervisor reported that the 100-percent compliance rates in the management report were wrong, and that the 62-percent compliance rate figure applied to five-day clinical follow-up after MHCB and OHU discharges and after returns from DSH programs. Consequently, the Report will be modified as follows: "CCI's management report stated that the institution was 100-percent

5

complaint with providing five-day clinical follow-up after discharges from the MHCB and the OHU and after returns from DSH programs. However, MHTS.net data indicted a 62-percent compliance rate after OHU discharges, and staff reported a 62-percent compliance rate for five-day follow-up after MHCB and OHU discharges and after returns from DSH programs." Report, p. 339.

**Objection 3:**

On page 347, the special master reports that "[p]rotocols for post-release community supervision were followed in about half of parole planning cases, and the parole outpatient clinic was followed in the other half of cases."

Defendants object to and move to strike this statement because monitoring post-release community supervision of inmates is beyond the scope of the *Coleman* class. Inmates released into the community are no longer *Coleman* class members. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1293 (E.D. Cal. Sep. 13, 1995).

**Special Master's Response:**

The statements will not be redacted from the Report, as they do not concern matters occurring outside of the prison. Rather, they pertain to pre-release planning activities conducted within the prison, which the special master has consistently reported on.

C.      **CENTRAL CALIFORNIA WOMEN'S FACILITY**

**Objection 1:**

On page 410, the special master reports that MHPB inmates are not seen in IDTT prior to admission.

Defendants object to and move to strike this statement because it inaccurately implies that the program requires that an inmate be seen in an IDTT prior to admission. (Program Guide

at p.12-5-12.) No CDCR policies or procedures require that inmates be seen by an Interdisciplinary Treatment Team prior to admission to a crisis bed.

**Special Master's Response:**

The Twenty-Fifth Round Report does not state "that MHPB inmates are not seen in IDTT prior to admission." Rather, the Report states "[r]eferrals to the MHPB were assessed by the IDTT. If they were deemed appropriate for admission, the patient was admitted by the psychiatrist. If the referral was not deemed appropriate, the inmate was returned to her housing unit with five-day clinical follow-up and hourly custody checks." *See* Report, p. 410. Accordingly, the Report will not be modified.

### D. CALIFORNIA MEN'S COLONY

**Objection 1:**

On pages 63 and 67, the special master reports that CMC failed to provide documentation regarding custody follow-up after discharge from crisis care.

Defendants object to and move to strike this statement because it is inaccurate. CMC provided this information to the *Coleman* monitors in its proof of practice binders. (*See* Tab C, sections 2-4 of the prison's response to the special master's twenty-fifth round document request.)

**Special Master's Response:**

The Report is modified as follows: "Twelve institutions – CCC, CMF, CSP/LAC, CSATF, CVSP, DVI, Folsom, HDSP, KVSP, MCSP, PVSP, and SQ – did not provide documentation on custody follow-up after discharge from crisis-level care." Report, p. 63. There is no reference to custody follow-up after discharge from crisis care on page 67 of the Report.

E.	**SAN QUENTIN STATE PRISON**

**Objection 1:**

On page 178, the special master reports that the "[m]ost of these inmates clearly needed inpatient care and were not receiving it or its equivalent." The special master asserts similar opinions on pages 463-475.

Defendants object to and move to strike these statements because they are inaccurate. All inmates in the condemned unit are receiving the proper level of care, and hospitalization within a Department of State Hospital facility is not clinically indicated for any of the condemned inmates receiving specialized care. The most recent report updating San Quentin's specialized care for the condemned program, which was submitted to the special master and plaintiffs' counsel on July 20, 2012, contradicts the special master's conclusions that hospitalization is necessary for inmates A, B, and D in pages 469-74 of the special master's report. Therefore, San Quentin's mental health treatment program meets the serious mental health care needs of its inmates, and the State is not acting with deliberate indifference to their serious mental health needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

**Special Master's Response:**

The statements on pages 178 and within pages 469-474 represent the clinical judgment of the special master's expert and will not be redacted from the Report. Moreover, the legal conclusion as to whether the State is acting with deliberate indifference to the needs of seriously mentally ill inmates is a question for the court, and will not be addressed within a compliance report by the special master.

### F.    CALIPATRIA STATE PRISON

**Objection 1:**

On page 59, the special master failed to include Calipatria among the institutions that regularly reported a quorum at mental health subcommittee meetings.

Calipatria reported in its mental health management report at page five that its mental health subcommittee met regularly and attained a quorum at all meetings. Therefore, this should be included in the statement.

**Special Master's Response:**

Calipatria was not listed among the institutions which regularly reported a quorum because it did not provide proof-of-practice documentation to the monitor. Nevertheless, based on the institution's representation in its management report, the Report is modified as follows: "A quorum was regularly reported at meetings held at 17 institutions – ASP, CCI, Calipatria, Centinela, CMC, CSP/Corcoran, CSP/LAC, CTF, Folsom, HDSP, MCSP, PBSP, PVSP, RJD, SQ, VSPW, and WSP." Report, p. 59.

**Objection 2:**

On page 60, the special master failed to include Calipatria among the institutions that reported a peer review process in place.

Again, Calipatria provided documentation of its peer review process during the monitoring round and should be included in the statement. Calipatria reported this information in its mental health management report at pages 5 and 6 and provided documentation of it in Tab B 6 of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified as follows: "Peer review was in place at 27 institutions – CCI, CCWF, Calipatria, Centinela, CIM, CIW, CMC, CMF, CSP/LAC, CSP/Sacramento, CSP/Solano, CTF, CVSP, DVI, Folsom, HDSP, ISP, KVSP, MCSP, NKSP, PBSP, PVSP, SCC, SQ, SVSP, WSP, and VSPW." Report, p. 60.

### G.  CENTINELA STATE PRISON

**Objection 1:**

On page 62, the special master reports that Centinela was not one of the institutions that achieved 100% compliance with clinical five-day follow-up with inmates discharged from crisis care.

Defendants object to and move to strike this statement because it is inaccurate. Centinela reported that it provided clinical five-day follow-up for all inmates discharged from crisis care. Centinela provided this information at pages ten and eleven of its mental health management report and at Tabs G 6 and H 6 of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

On page ten of its management report for the twenty-fifth round, Centinela states, "A total of five inmates were returned to yard housing after admission for a mental health crisis evaluation. All five who were returned to yard housing/outpatient care (i.e. 100%) received a five-day follow-up after their release from the CTC." However, on page 12 of its management report for the twenty-fifth round, Centinela states, "Five-day clinical contacts were completed as required 96 % of the time." Tabs G 6 and H 6 of Centinela's response to the special master's twenty-fifth round document request are silent with respect to five-day clinical follow-up.

**Objection 2:**

On page 80, the special master failed to include Centinela among the institutions that reported a timely response to 90% or better for routine referrals.

Defendants move to modify this statement to include Centinela among the institutions that reported a timely response to 90% or better for routine referrals because Centinela reported timely responses 99% of the time. Centinela provided this information at page fourteen of its mental health management report and at Tab S 2 of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified as follows: "Twelve institutions – ASP, CIM CMF, CRC, Centinela, DVI, Folsom, PBSP, RJD, SQ, and SCC – reported compliance rates of 90 percent or better for responding to routine referrals within five working days." Report, p. 80.

**H.    KERN VALLEY STATE PRISON**

**Objection 1:**

On page 309, the special master reports that Kern Valley State Prison offered only one therapeutic group to CCCMS inmates.

Defendants object to and move strike this statement because it is inaccurate. Kern Valley offered at least three groups to CCCMS inmates during the monitoring period. Kern Valley State Prison provided this information at Tab M of the prison's response to the special master's twenty fifth round document request. The implication that only offering one group to CCCMS inmates is insufficient also lacks foundation because there is no evidence that the CCCMS population at Kern Valley clinically needed more than one therapeutic group.

**Special Master's Response:**

The Report is modified as follows: "There were three therapeutic groups available to 3CMS inmates." Report, p. 309.

I. **MULE CREEK STATE PRISON**

**Objection 1:**

On page 62, the special master reports that Mule Creek "did not demonstrate completion of monthly [emergency] drills" in administrative segregation.

Defendants object to and move to strike this statement because it is inaccurate. Mule Creek provided the monitors with documents showing the emergency drills were completed. Mule Creek State Prison provided this information in Tab H 12 sub a of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified as follows: "Five institutions – CCI, CRC, CTF, DVI, and NKSP – did not demonstrate completion of monthly drills." Report, p. 62.

**Objection 2:**

On page 62, the special master failed to include Mule Creek among the institutions that demonstrated accessibility to cut-down tools and possession of on-person CPR micro-shields by custody officers.

Defendants object to and move to modify this omission. The special master's own report acknowledges on page 131 that Mule Creek maintained cut-down tools in primary and overflow segregation unit control booths.

**Special Master's Response:**

The Report is modified as follows: "Nineteen institutions – ASP, CCC, CCI, CIM, CIW, CSP/Corcoran, CSP/LAC, CSP/Solano, CSATF, CTF, CCWF, DVI, KVSP, MCSP, NKSP, PVSP, SVSP, VSPW, and WSP – were compliant with accessibility to cut-down tools and possession of on-person CPR micro-shields by custody officers, although at MCSP it took the control booth officer nearly two minutes to locate the cut-down tool." Report, p. 62.

**Objection 3:**

On page 64, the special master omits Mule Creek from the list of institutions that he considered compliant with documented daily psych tech rounds in administrative segregation.

Defendants object to and move to modify this omission. Mule Creek provided the monitors with documents showing daily psych tech rounds in administrative segregation. Mule Creek State Prison provided this information in Tab H 6 sub b of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified as follows: "Twenty-four institutions – ASP, CCC, CCI, CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, CTF, Calipatria, Centinela, Folsom, HDSP, KVSP, MCSP, NKSP, PBSP, RJD, SVSP, SQ, VSPW, and WSP – were compliant with conduct of documented daily psych tech rounds in administrative segregation. Report, p. 64.

**J.    NORTH KERN STATE PRISON**

**Objection 1:**

On page 61, the special master reports that North Kern "failed to provide data regarding an operational ERRC [Emergency Response Review Committee] during the review period."

Defendants object to and move to strike this statement because it is inaccurate. North Kern conducted regular committee meetings, and provided the monitors with documents proving they were held. North Kern provided this information in Tab R of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified as follows: "Eight institutions – CCI, CIM, CMF, CSP/Corcoran, CSP/LAC, DVI, MCSP, and SVSP – did not provide any data regarding an operational ERRC during the review period." Report, p. 61.

**Objection 2:**

On page 311, the special master reports that the "mental health subcommittee did not meet regularly" at North Kern.

Defendants object to and move to strike this statement because it is vague. The North Kern mental health subcommittee met five times during a seven month period from November 2011 to April 2012. North Kern provided this information in Tab B of the prison's response to the special master's twenty-fifth round document request.

**Special Master's Response:**

The Report is modified as follows: "The mental health subcommittee met during four of the six months of the review period." Report, p. 311.

**K.    SUBSTANCE ABUSE AND TREATMENT FACILITY AND STATE PRISON AT CORCORAN, CALIFORNIA**

**Objection 1:**

On page 60, the special master asserts that "CSATF did not have an effective peer review process."

Defendants object to and move to strike this statement because the use of the word

14

"effective" is vague and speculative. The special master provides no evidence supporting his conclusion that the peer review process was not effective or explaining precisely how the peer review process at CSATF was somehow ineffective. Defendants further object to any implication or conclusion that the lack of an "effective peer review process" impacted the quality of or access to necessary mental health care system wide. The special master introduced no evidence in support of such a conclusion.

**Special Master's Response:**

      CSATF's management report stated, "For some time, CSATF has recognized the importance of establishing an **effective** Peer Review process as part of the overall Mental Health Quality management system.  However, staffing limitations have limited the amount of progress that has been made toward that objective.  In January 2012, a renewed development effort was initiated to formulate a Peer Review model for psychologists, social workers, and recreational therapists."  (emphasis added)  Thus, language taken directly from CSATF's management report indicates that CSATF did not yet have an "effective Peer Review process" during the twenty-fifth monitoring period.  Consequently, the Report will not be modified.

      Respectfully Submitted,

      /s/
      Matthew A. Lopes, Jr., Esq.
      Special Master

March 19, 2013