# Exhibit 81



Transcript of the Testimony of:

# Tim Belavich, Ph.D.

Coleman v. Brown

February 22, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

COMPOSED OF THREE JUDGES PURSUANT TO SECTION 2284,

TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,


       Plaintiffs,

-vs-                              No. CIV S 90-0520 LLK-JFMP

EDMUND G. BROWN, JR,  et al.,

       Defendants.

_____/


MARCIANO PLATA, et al.,


       Plaintiffs,

-vs-

                        No. C01-1351 TEH

EDMUND G. BROWN, JR., et al.,

       Defendants.

_____/


DEPOSITION OF TIM BELAVICH, PH.D.

Tim Belavich, Ph.D.                                    February 22, 2013

```
1              UNITED STATES DISTRICT COURTS

2              EASTERN DISTRICT OF CALIFORNIA

3

4

5   RALPH COLEMAN, et al.,

6

7            Plaintiffs,

8   -vs-                           No. CIV S 90-0520 LLK-JFM

9   EDMUND G. BROWN, JR,  et al.,

10            Defendants.
    _____/
11

12              DEPOSITION OF TIM BELAVICH, PH.D.

13

14

15

16

17   DATE:            February 22, 2013

18

19   TIME:            9:01 a.m.

20

21   LOCATION:        315 Montgomery Street, 10th Floor
                      San Francisco, CA

22

23   REPORTED BY:     Joanna Broadwell
                      Certified Shorthand Reporter
24                    License No. 10959

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

```
 1                    A P P E A R A N C E S :

 2

 3

 4

 5

 6      For the Plaintiffs:

 7              ERNEST GALVAN

 8              ATTORNEY AT LAW

 9              Rosen, Bien, Galvan & Grunfeld LLP

10              135 Montgomery Street, 10th Floor
                San Francisco, CA  94104-0390
11              (415)433-6830

12

13      For the Defendants:
                DEBBIE J. VOROUS
14              DEPUTY ATTORNEY GENERAL
                State of California
15              1300 I Street
                Sacramento, CA  95814
16              (916)324-5345

17   Also appearing:  Heather McCray and Margot Mendelson.

18

19                        --o0o--

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   told you either in person or over the telephone about

2   Mr. Hayes' contract?

3       A.   Yes.

4       Q.   Good.  What did she tell you?

5       A.   She -- she did not tell me that we would not

6   be using his contract.  She told me that she could not

7   get any movement on whether we were using his contract.

8       Q.   She could not get any movement from whom?

9       A.   I don't know.

10       Q.   What does that mean to you, not getting any

11   movement?

12       A.   To me it meant that there was -- there were

13   individuals above her who were making the decision as

14   to whether or not we would use the contract.

15       Q.   And did she convey to you why those

16   individuals above her had decided not to use the

17   contract?

18            MS. VOROUS:  Objection.  Misstates his

19   testimony.  He's saying she'd get movement on his

20   contract, not that they wouldn't use his contract.

21            You can answer the question.

22            THE DEPONENT:  I've forgotten the question.

23   I'm sorry.

24            BY MR. GALVAN

25       Q.   Did she tell you why she couldn't get movement

 1        Q.   I'm sorry.  On the fourth bullet point you'll

 2   see that the document starts on Page 12, third

 3   paragraph from the bottom.  So let's turn to Page 12 of

 4   Exhibit 5.  And in Exhibit 4, the document says on

 5   Page 12, 3rd paragraph from the bottom, reads, quote,

 6   "When an inmate patient verbalizes suicidal ideation

 7   without other signs and symptoms of increased risk of

 8   suicide, the mental health clinician is responsible for

 9   evaluation any contributing environmental stressors,

10   and communicating with custody staff and supervisors

11   regarding any potentially solvable custody issues,"

12   period, end quote.

13             "This paragraph is seemingly referring to

14   inmates who are using the threat of suicide to gain

15   cell relocation, i.e., are viewed as manipulative

16   and/or malingering.  My concern is that inmates who

17   present as manipulative and/or malingering can still be

18   suicidal and require placement on suicide observation

19   status.  I would recommend that this paragraph be

20   reviewed again and clarified if necessary."

21             Before today, were you made aware of this

22   recommendation?

23        A.   I don't know that -- if I was.

24        Q.   Is it possible that you -- that today is the

25   first time you became aware of this recommendation?

Tim Belavich, Ph.D.                                         February 22, 2013

1        A.    I don't believe so.

2        Q.    It's your belief that you were made aware of

3    this recommendation earlier than today?

4        A.    Yes, but I can't say with certainty.

5        Q.    Do you recall doing anything in response to

6    being made aware of this recommendation?

7        A.    No.

8        Q.    As you look at this here today, do you have an

9    opinion as to whether this recommendation is correct?

10            MS. VOROUS:   Objection.   Lacks foundation.

11    Argumentative.

12            THE DEPONENT:   I wouldn't form an opinion

13    without input from my SMEs on this.

14            BY MR. GALVAN:

15        Q.    By "SMEs," you mean subject matter experts?

16        A.    I'm sorry, yes.   Capital S, capital M, capital

17    E.   Yes, subject matter expert.

18        Q.    Do you recall ever asking your subject matter

19    experts for their views on this?

20            MS. VOROUS:   Objection.   Asked and answered.

21            THE DEPONENT:   I don't recall asking them, but

22    I don't know if we've had conversations on this.

23            BY MR. GALVAN:

24        Q.    Do you recall your subject matter experts ever

25    offering you their opinions or feedback on this

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    suicidal ideation or threats, right?

2         A.    That's correct.

3         Q.    So his recommendation was treat the OHU

4    discharges the same as the crisis bed discharges if the

5    person was in for suicide risk assessment, right?

6         A.    I can't say that for sure based on the

7    language of the program guide.

8         Q.    Okay.  Were you ever made aware before today

9    of this recommendation regarding clinical follow-up

10   after OHU discharge?

11        A.    I don't know if I was.

12        Q.    Do you have an opinion about this

13   recommendation?

14        A.    Not without receiving input from my SMEs.

15        Q.    Have you ever asked the subject matter experts

16   for that input?

17        A.    I don't know that I have.

18        Q.    Looking at Exhibit 4, Bates-number 70, which

19   is Page 6 of the exhibit, the consultant wrote in the

20   first full bullet point on the page, "On Page 19 under

21   both Discharge or Return and MHCB discharge, I would

22   recommend deleting the word, quote, imminent, end

23   quote, from the paragraphs, as previously detailed

24   about the lack of imminent or immediate danger of

25   self-harm should not be the only criteria for removal

Tim Belavich, Ph.D.                                                February 22, 2013

1    from suicide observation status."

2           And going back to -- looking at Exhibit 5, the

3    program guides chapter, the language he's talking about

4    is in the bottom of Page 19 under MHCB discharge, "A

5    psychiatrist or licensed psychologist in consultation

6    with the IDDT shall write the order to discontinue an

7    inmate patient from suicide precaution or suicide watch

8    when the inmate is no longer in imminent danger of

9    self-harm."

10          Were you ever made aware of this

11   recommendation to change the program guide?

12       A.   I don't recall if I was.

13       Q.   Do you have any opinion about this

14   recommendation as you read it today?

15       A.   Not without consulting with my SMEs.

16       Q.   Have you ever asked your subject matter

17   experts for such a consultation?

18          MS. VOROUS:  Objection.  Argumentative.  Lacks

19   foundation.

20          THE DEPONENT:  I don't think I have.

21          BY MR. GALVAN

22       Q.   Sticking with Exhibit 4, same page,

23   Bates-number 70, the next paragraph refers to the

24   program guide chapter, Exhibit 5, Page 20.  And looking

25   first at the program guide chapter, Page 20, last

Tim Belavich, Ph.D.                                    February 22, 2013

1    of Exhibit 4, at the bottom of the page that, quote,

2    "The conditions within the OHU were quite bad with poor

3    lighting, visibility and sanitation problems.  I had

4    difficulty observing inmates through the cell windows.

5    Many cells contained tile floors with pieces of tile

6    previously removed that could easily be utilized for

7    self-injurious behavior."

8         A.   Again, similar to my previous response, I was

9    made aware of issues like these, but I can't say that

10   there was any particular place connected with it.

11        Q.   And when were you made aware of issues like

12   these?

13        A.   I believe it was the spring of 2012.

14        Q.   Did you ask which prisons had these problems?

15        A.   I don't know if I asked which prisons had the

16   problems, but I also don't know -- I can't recall that

17   someone didn't say at place "X," this is a problem.  I

18   can't recall the conversations.

19        Q.   And these conversations in spring of 2012,

20   this is after you became deputy director?

21        A.   Yes.  Yes.

22        Q.   Did you direct the people who were giving you

23   the information to do anything about it?

24        A.   I believe so.

25        Q.   What did you tell them to do?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    A.    I recall instructing my regionals who I had in

2    place at that time to tour their facilities and to

3    inspect the OHU cells.

4    Q.    And did they report back to you on those

5    tours?

6    A.    I didn't instruct them to report back to me.

7    Q.    Go ahead.

8    A.    Because we had them work with one of my SMEs

9    to work on a directive to the field on cleanliness and

10   maintenance of OHU cells.

11   Q.    And was that a directive issue?

12   A.    Yes.

13   Q.    Going back to Exhibit 4, Bates-number 74, Page

14   10, still on the big -- the paragraph that continues on

15   the top of the page, about DVI, around the middle of

16   the paragraph -- actually, I'm sorry.  It's the

17   first -- the second complete sentence on that page.  He

18   says, "Conditions in the OHU overflow were worse and

19   quite deplorable.  All of the inmates in this unit were

20   on constant one-to-one observation with one certified

21   nursing assistant, CNA, assigned to each inmate at

22   significant expense to the CDCR due to the hazardous

23   conditions in each cell.  The OHU overflow is situated

24   in the same area as the OSU.  Upon my entrance into the

25   unit, there was a foul odor apparently left from the

Tim Belavich, Ph.D.                                    February 22, 2013

1   to see the process.

2        Q.   What process --

3        A.   I'm not sure what this is hanging on the door

4   handle.

5        Q.   What process would make this appropriate?

6        A.   I can't say with certainty without consulting

7   my SMEs and the program guide.

8        Q.   You visited this cell, right?

9        A.   No.

10       Q.   You visited the ZZ cells in Sacramento?

11       A.   Yes.  I saw the ZZ cells.

12       Q.   And when you saw them, were you aware that

13   they were being used for suicide observation?

14            MS. VOROUS:  Objection.  Lacks foundation.

15   Assumes facts not in evidence.

16            THE DEPONENT:  When I saw them, they were not

17   being used for suicide observation.

18            BY MR. GALVAN

19       Q.   When did you see them?

20       A.   I want to say late October of 2012.

21       Q.   And when you say they were not being used for

22   suicide observation, you mean right at that moment when

23   you saw them?

24       A.   Yes.

25       Q.   Is it your testimony that these are not used

Tim Belavich, Ph.D.                                    February 22, 2013

```
 1            MR. GALVAN:  So I'll ask the court reporter
 2     please to read it back.
 3                      (The record was read back by
 4                      the reporter as follows:)
 5                      "Q.  Right.  So that's the question.
 6                      With the information you have now, in
 7                      other words, there's no information
 8                      available.  It's just Dr. Belavich here.
 9                      With all of the information you've
10                      accumulated in your lifetime up until now
11                      and nothing else is coming, okay, do you
12                      have a professional opinion now, this
13                      moment, whether the Mental Health program
14                      at Salinas Valley State Prison is
15                      actually operating adequately with the
16                      level of psychiatric vacancies that it's
17                      had from May 2012 until now?"
18          THE DEPONENT:  I can't say with certainty.  I
19     believe they're getting the job done with the resources
20     they have.
21          BY MR. GALVAN
22     Q.   Okay.  You can't say with certainty -- trying
23     to get a sense of what you can't say with certainty.
24     You can't say with certainty whether you have an
25     opinion, or you can't say with certainty what your
```

Tim Belavich, Ph.D.                                    February 22, 2013

1    opinion is?

2        A.    Yes, I have an opinion, and my opinion is that

3    they are getting the job done with the resources they

4    currently have.

5        Q.    Okay.  So if they are getting the job done

6    with the resources they currently have, why are you

7    making an effort to get more psychiatrists?

8        A.    Because I believe it can be better.

9        Q.    But it's your opinion that it is adequate now

10   with 5.5 psychiatrists?

11       A.    I believe they're getting the job done for now

12   with what they have.

13       Q.    So it's your opinion that this level of

14   staffing is adequate?

15       A.    No.  That's not what I said.

16       Q.    It's your opinion that this level of staffing

17   is adequate to get the job done?

18       A.    No.

19       Q.    Okay.

20       A.    There are times when we are short-staffed

21   where people do more than they usually do, and people

22   have to step up.  And I'm assuming that's what's going

23   on for the psychiatry staff at Salinas Valley.

24       Q.    Okay.  So any requests, then, to add

25   psychiatrists above what they have now would be extra?

1          MS. VOROUS:  Objection.  Misstates his

2    testimony.

3          BY MR. GALVAN

4     Q.   We're in a fiscal crisis.  The State is in a

5    fiscal crisis.  You've testified that with the

6    psychiatrists they have now at Salinas Valley, if

7    everybody steps up, which you assume they're doing,

8    they can get the job done adequately.  So therefore,

9    it's your testimony, isn't it, that any additional

10   hiring there is extra?

11         MS. VOROUS:  Objection.  Misstates his

12   testimony.

13         THE DEPONENT:  Yeah.  I think you've come up

14   with quite a yarn there.

15         BY MR. GALVAN

16    Q.   So you do need additional hiring there at

17   Salinas Valley?

18    A.   Yes.  I'd like to hire more.

19    Q.   I'm not asking if you'd like to.  I know you'd

20   like to.  I'd like to hire more too, but is it

21   necessary to hire more?  It is a necessary expenditure

22   of the State's short funds?

23         MS. VOROUS:  Objection.  Argumentative.  Lacks

24   foundation.  Ambiguous.

25         BY MR. GALVAN

Tim Belavich, Ph.D.                                    February 22, 2013

1        Q.   Do you agree that the State is in a fiscal
2    crisis?
3        A.   Yes.
4        Q.   Given that you agree that the State is in a
5    fiscal crisis, would you recommend hiring psychiatrists
6    if it weren't necessary?
7        A.   If it weren't necessary?
8        Q.   Yes, if it weren't necessary, would you
9    recommend hiring?
10       A.   I don't think that I would have an opinion on
11   that.  I would hire the psychiatrists that I'm
12   allotted.
13       Q.   Even if they weren't necessary, you would hire
14   them?
15       A.   If there was a staffing model that says
16   they're needed, then I would trust the staffing model.
17       Q.   Even if you knew it was just waste?  You would
18   still hire them?
19            MS. VOROUS:  Objection.  Argumentative.
20            THE DEPONENT:  Potentially, yes.  I would
21   follow my direction.
22            BY MR. GALVAN
23       Q.   Sir, are you aware of -- moving from
24   psychiatry to recreational therapists -- first of all,
25   recreational therapists.  Do recreational therapists

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    medication 10 percent of the time is absolutely not.

2    But an issue having to do with, you know, whether, you

3    know, a chrono was appropriately dated or stamped, I

4    don't know that that always has to hit at 90 percent.

5         Q.    You mentioned the documentation that is

6    required for the special master's institutional tours,

7    I think.  Were you referring to the institutional tour

8    documentation?

9         A.    Well, no.  Just all of the documentation,

10   because there is institutional documentation as well as

11   there are monthly reports that we turn over.  But there

12   are also regular requests that we get on other issues

13   that we have quick turnaround and we try to comply

14   with.

15        Q.    But the institutional documentation is one of

16   them, one of the issues?

17        A.    Yes.

18        Q.    And in fact, you attached, I think as Exhibit

19   8 to your declaration, a sample institutional document

20   request.  There's no tabs on these, so it's a little

21   tricky to find Exhibit 8.

22        A.    I got it.

23        Q.    You got it.  Look at that.  So once -- if you

24   got rid of the special master and this reporting

25   requirement, I'm just looking at the things that are

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    audited here, and I just want to get a sense of what

2    you would stop doing.  So for example, would you stop

3    auditing medication management?  Would you stop having

4    the institutions produce documents about medication

5    management?

6         A.    No.  I believe we have a process in place

7    through MAPIT, M-A-P-I-T, all caps, that monitors that.

8         Q.    Okay.  So you would keep doing that?

9         A.    Or something similar to that.

10        Q.    Would you stop auditing DMH referrals?

11        A.    In what way?

12        Q.    Would you stop requiring the institutions to

13   produce reports to headquarters in the regular course

14   of business on their DMH -- I guess it's now DSH --

15   referrals?

16        A.    No.  I believe that's part of our sustainable

17   process that we've instituted and worked with the

18   special master on, and I believe it's quite successful.

19   So I believe that process makes sense.

20        Q.    So in the post Coleman world, you would

21   continue doing that?

22        A.    Yes.

23        Q.    Would you stop auditing Mental Health Crisis

24   Bed referrals?

25        A.    I don't believe so.  I'm not sure.  In what

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

 1    way are you asking that?

 2        Q.   Would you have the institutions produce to

 3    headquarters regular documents regarding the numbers of

 4    persons referred to crisis beds, their length of stay,

 5    their waiting times, those kinds of figures?

 6        A.   I already capture all that in headquarters.

 7        Q.   And you capture that institution by

 8    institution, right?

 9        A.   Yes.

10        Q.   And that's not particularly burdensome for

11    you, is it?

12        A.   It's not "not burdensome."  Sorry for being

13    double negative.

14        Q.   You would do it regardless of the Coleman?

15        A.   I believe it's important, yes.

16        Q.   And would you stop auditing in the post

17    Coleman -- once there was no special master

18    requirement, the use of mental -- I'm sorry.  Mental

19    Health outpatient housing units and other outpatient

20    housing units?

21        A.   No.

22        Q.   Would you stop auditing use of alternative

23    housing?

24        A.   No.

25        Q.   Would you stop auditing the length of stay of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1    EOP patients in administrative segregation?

2         A.    No.

3         Q.    Would you stop auditing the question of

4    whether you have enough intake cells for recent

5    arrivals in segregation?

6              MS. VOROUS:  Objection.  Lacks foundation.

7              THE DEPONENT:  I don't know if I would or not.

8              BY MR. GALVAN

9         Q.    It's one of -- okay.  What would be the

10   considerations?  What -- how would you make that

11   decision?

12        A.    I would need to gather my stakeholders and

13   ask, you know, pros and cons of monitoring, the burden

14   of monitoring this or auditing this, you know, whether

15   it is an issue, whether it's a resolved issue.

16        Q.    Would you stop auditing or monitoring the

17   meetings of the suicide prevention review and -- I

18   can't remember the rest of the acronym -- FIT, the SPR

19   FIT committees at the institutions?

20        A.    I would change the auditing of those.

21        Q.    How would you change it?

22        A.    I don't -- I wouldn't -- I don't know that I

23   would make it so -- such a burden that every member is

24   at every meeting over a time period.  For example, I

25   know that's monitored.  I think that it can be

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1          A.    I would probably monitor that.

2          Q.    Would you monitor -- or would you have the

3     institutions report to headquarters on their ability to

4     provide group therapy as -- to schedule a certain

5     number of hours of group sessions?

6          A.    Yes, but I would do it differently.

7          Q.    Would you have the institutions monitor or

8     report to you on the time it takes to transfer someone

9     to the psychiatric services unit?

10              MS. VOROUS:  Objection.  Lacks foundation.

11              THE DEPONENT:  Yes.

12              BY MR. GALVAN

13         Q.    Would you have the institutions report to

14    you -- report to headquarters on the time it takes to

15    transfer someone to an EOP administrative segregation

16    hub?

17         A.    I'm sorry.  What?

18         Q.    If you didn't have the Coleman special master

19    monitoring, would you still require the institutions to

20    report to headquarters on EOP and ASU hubs, including

21    length of stay, time to transfer in and out?

22              MS. VOROUS:  Objection.  Vague and ambiguous.

23    Lacks foundation.

24              THE DEPONENT:  I think I would have them

25    monitor that.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Tim Belavich, Ph.D.                                    February 22, 2013

1        Q.    Including these cages, correct?

2        A.    If this is what the institution has

3    designated.

4        Q.    So it's your testimony that in order to

5    operate your system with the resources you've been

6    given, you still need to use these cages, correct?

7              MS. VOROUS:    Objection.    Misstates his

8    testimony.    Argumentative.

9              THE DEPONENT:    Yeah.

10             BY MR. GALVAN

11       Q.    I'm going to ask you another question.    Can

12   you walk out of this deposition today, pick up the

13   phone and order someone to stop using these cages or

14   not?

15       A.    I can walk out of here, make a phone call, and

16   those two cages would not be used.    Yes.

17       Q.    And why is it that you don't do that?    Why

18   isn't that the next thing you're going to do when you

19   leave here today?

20             MS. VOROUS:    Objection.    Lack of foundation.

21   Incomplete hypothetical.    Speculative.

22             THE DEPONENT:    I can't say that's not the

23   thing I'm going to do when I walk out of here.

24                     (Off the record from 5:00 p.m.

25                      to 5:12 p.m.)

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1                 CERTIFICATION OF DEPOSITION OFFICER

2

3          I, JOANNA BROADWELL, duly authorized to

4    administer oaths pursuant to Section 2093 (b) of the

5    California Code of Civil Procedure, hereby certify that

6    the witness in the foregoing deposition was by me sworn

7    to testify to the truth, the whole truth, and nothing

8    but the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16          I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22          _____

23          JOANNA BROADWELL

24          CSR 10959

25

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

# Exhibit 82



Transcript of the Testimony of:

# **<u>John Brim, M.D.</u>**

Coleman v. Brown

March 1, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____  )



DEPOSITION OF

JOHN BRIM, M.D.

FRIDAY, MARCH 1, 2013,  9:28 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                        March 1, 2013

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                      Plaintiffs,      )
                                         )CASE NO.:
 6          vs.                          )S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                      Defendants.      )
     _____)
 9

10

11

12

13

14          The Deposition of JOHN BRIM, M.D., taken on

15   behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:28 a.m., Friday, March 1, 2013, at

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

John Brim, M.D.                                    March 1, 2013

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3            BY:  MICHAEL BIEN, ESQ.
                  JANE KAHN, ESQ.
 4                AARON FISCHER, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5           315 MONTGOMERY STREET, 10TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
 6           415.433.6850
             415.433.7104 FAX
 7           MBIEN@RBGG.COM
 8
     FOR DEFENDANTS:
 9
              BY:  JAY C. RUSSELL, ESQ.
10           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
11           455 GOLDEN GATE AVENUE, 11TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94102-7004
12           415.703.5717
             415.703.5843 FAX
13           JAY.RUSSELL@DOJ.CA.GOV
14
              BY:  GEORGE MAYNARD, ESQ.
15                FRANCIE D. CORDOVA, ESQ.
             STATE OF CALIFORNIA
16           DEPARTMENT OF STATE HOSPITALS
             1600 9TH STREET, ROOM 400
17           SACRAMENTO, CALIFORNIA 95814
             916.651.5300
18           916.651.3852 FAX
             GEORGE.MAYNARD@DSH.CA.GOV
19
20   FOR JOHN BRIM, M.D.:
21            BY:  KELCIE M. GOSLING, ESQ.
             MENNEMEIER, GLASSMAN & STROUD, LLP
22           PARK TOWER
             980 9TH STREET, SUITE 1700
23           SACRAMENTO, CALIFORNIA 95814
             916.551.2581
24           916.553.4011 FAX
             GOSLING@MGSLAW.COM
25
```

1          The feeling of the staff was that it was

2    appropriate to inform the union of what was going on

3    since this impacted our working conditions.

4          Q.   Okay.  And who is Katherine Warburton?

5          A.   She is the chief psychiatrist for the

6    Department of State Hospitals.

7          Q.   Okay.  And had you ever interacted with her

8    directly?

9          A.   No.

10          Q.   But you understood she was -- what did you

11    understand her position to be?

12          A.   Well, I understand her position to be in chain

13    of command for the psychiatrists and the highest person

14    in that chain who is a psychiatrist.

15          Q.   Were your -- when you wrote this letter in

16    January of 2013 --

17          MS. GOSLING:  Objection.  Misstates his

18    testimony.  He did not write the letter by himself.  I

19    assume you're saying "you" collectively, meaning the

20    signatories.

21          MR. BIEN:  I agree.

22    BY MR. BIEN:

23          Q.   I was referring to you in the plural.

24          A.   Yes, understand.

25          Q.   Okay.  When your group prepared this letter,

John Brim, M.D.                                                      March 1, 2013

1    was your program relatively full of patients?

2          A.    Yes.

3          Q.    Okay.  And was there still pressure on --

4    there's still new patients arriving?  Are there new

5    admissions arriving?

6          A.    Yes.

7          Q.    I note on the top of the second page, in bold,

8    the letter states:  "But we need to inform you that we

9    will be working in a state of protest regarding our case

10   load and the rate of admissions.  We are also extremely

11   concerned about further attrition of psychiatrists which

12   seems very likely considering the present workload and

13   conditions."

14          Did you discuss -- let me just ask:  Why is

15   there a reference to admissions as being a factor?

16          MR. RUSSELL:  Objection.  Vague and ambiguous.

17          THE WITNESS:  My understanding is that there

18   was a general feeling -- and I -- I felt this way --

19   that we were under pressure from administration to move

20   the old people out -- the old patients out and take in

21   new patients so as to keep our waiting list down.

22          And many of the psychiatrists -- well, I would

23   say all -- felt that this was resulting in shorter stay

24   for the patients than historically had been the case.

25   And they felt that it was getting to the point that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                              March 1, 2013

```
 1   people were not staying in all cases at least as long as
 2   they needed to.  There was pressure from administration
 3   to get them out quickly so that new people could be
 4   brought in.
 5            That does impact the workload, because when a
 6   new person comes in, there's quite a bit of work to do
 7   on the part of the psychiatrist, research assessment, so
 8   on.  So as the number of admissions and discharges go
 9   up, that means more work for the psychiatrist.
10   BY MR. BIEN:
11        Q.   You suggest in the last paragraph that one way
12   to alleviate some of the pressure on the Salinas Valley
13   psychiatric program would be to reduce the flow of new
14   admissions; is that correct?
15        A.   Correct.
16        Q.   And did you have any response from the
17   administration to that suggestion?
18        A.   Not aware of any.
19        Q.   To your knowledge, are there still new
20   admissions arriving at Salinas Valley psychiatric
21   program?
22        A.   Yes.
23        Q.   In the first paragraph on the first page, you
24   refer to "a third psychiatrist scheduled to leave within
25   the past six weeks."
```

John Brim, M.D.                                                    March 1, 2013

 1            You mentioned two that were leaving by

 2    retirement, Drs. Weinstein and Sial?

 3         A.   Yes.

 4         Q.   Who was the third?

 5         A.   Dr. Gaines, Gayle Gaines.

 6         Q.   Okay.  And that's someone who signed this

 7    letter?

 8         A.   Yes.

 9         Q.   Okay.  And what was happening with Dr. Gaines?

10         A.   She had accepted a job with the Department of

11    Corrections and was scheduled to leave us the end of the

12    January.

13         Q.   There's also a reference here to -- on the

14    first page, the third paragraph, to the Stockton

15    program.

16            And that -- I'm looking at the third paragraph

17    down.  It says:  "When administration visited our

18    facility recently to present the Stockton program."

19            Did you have a presentation to the staff at

20    Salinas Valley psychiatric program by Department of

21    State Hospital staff about the new program?

22         A.   Yes, we did.

23         Q.   Approximately when was that?

24         A.   I believe late December, early January.

25         Q.   There's also a reference here to -- I'm

John Brim, M.D.                                        March 1, 2013

1    turning to the last paragraph on the second page.  "We

2    understand that since SVPP is being downsized, then it

3    may be difficult to attract new psychiatrists."

4            Had you understood -- what were you told

5    about -- when were you first told that the Stockton

6    program was opening?  Was it in this presentation in

7    late December, or had you heard about that earlier?

8        A.   No, no.  It had been in the works for a least

9    a couple of years.

10       Q.   When do you first recall being informed that

11   the SVPP program was going to be downsized?

12       A.   I believe I found that out in the early part

13   of 2012.  I was not at SVPP at the time, but I had

14   contact with some people that were there, and they

15   mentioned that they had been informed that it would be

16   downsized --

17       Q.   Okay.

18       A.   -- quite radically.

19       Q.   And there's a reference in this, I believe the

20   same last paragraph, to the -- preparing to close C and

21   D yards.

22            Was that what you were informed?

23       A.   Yes.

24       Q.   So the programs on C and D yards would be

25   closed down, but the two 64-bed units would remain

John Brim, M.D.                                                March 1, 2013

1    operating?

2         A.   That's my understanding.

3         Q.   Okay.  Were you given at any time a schedule

4    for when this closure would take place?

5         A.   Yes.

6         Q.   And when were you told that?

7         A.   We were told at the presentation by the

8    Stockton folks that they would begin taking transfers

9    from our program in later part of July 2013.

10        Q.   And did you understand what the pace of the

11   transition -- what did you understand from that

12   presentation about how the Salinas Valley psychiatric

13   program would be impacted by this transfer of patients?

14        A.   Well, we weren't given a firm schedule for how

15   fast the transfer would take place.  Staff was told that

16   they would all have an opportunity to apply for

17   positions with the Stockton program.

18             Those are the two things that stand out in my

19   mind from that meeting, yeah.

20        Q.   Did you understand that at some point in 2013

21   you were going to have to find another job either at

22   Stockton or somewhere else?

23        A.   Well, I don't think it was quite that clear

24   because there obviously would be 128 patients, I think,

25   left at Salinas Valley psych program, so they would

John Brim, M.D.                                    March 1, 2013

1    require some staff.  And it wasn't clear, you know, who
2    might have an opportunity to stay, who might have to go.
3    That was an assumption that would be probably on a
4    seniority basis, but I wasn't really too involved in
5    that because I'm a contractor.  I come and go, you know,
6    pretty easily.
7        Q.   Okay.  Back on the first page there's a
8    reference to other mental health disciplines such as
9    social work, psychology, and rehab therapy.
10           Were you aware of the staffing levels in these
11   other disciplines at Salinas Valley?
12           MS. GOSLING:  Vague and ambiguous as to time.
13   I'm assuming when they wrote this letter.
14           MR. BIEN:  Yeah, in January 2013.
15           THE WITNESS:  Well, I knew from my own
16   experience on the D yard where I worked that the
17   disciplines were short of staff.  And I understood that
18   to be generally the case in all of the Salinas Valley
19   psych program units.
20   BY MR. BIEN:
21       Q.   Okay.  And did you -- in your personal opinion
22   did you feel that the shortage of other disciplines in
23   psychiatry was greater than it had been in times in the
24   past as of January 2013?
25       A.   It was certainly.

John Brim, M.D.                                                    March 1, 2013

1           MR. RUSSELL:  Objection.  Vague and ambiguous.

2    Lacks foundation.

3           THE WITNESS:  It was certainly greater than

4    two years I had spent in the program from 2009 to 211.

5    BY MR. BIEN:

6       Q.   Did any of the other staff in the other

7    disciplines express to you personally their concern

8    about the level of staffing in the D5/D6 unit where

9    you're working?

10      A.   Yes.

11      Q.   And we're talking about the period since you

12   came back to Salinas Valley?

13      A.   Correct.

14      Q.   And what was said to you and by whom?

15           If you want to tell me just the person's

16   profession, that's fine with me.  I don't care about

17   their name.

18      A.   Okay.  Okay.  I can do that.

19           The social workers in particular were

20   concerned because they were stretched so thin.  It

21   involved having to cover more people than they felt

22   comfortable covering, having to, in some cases, cover

23   more than one case load.

24      Q.   What do you mean by "more than one case load"?

25      A.   One social worker would have to try to cover

John Brim, M.D.                                        March 1, 2013

1    another case load that ordinarily would have its own

2    social worker assigned to it.

3        Q.    Did you discuss with a social worker that

4    spoke with you any strategies to make sure that patient

5    safety was protected in this kind of environment of

6    short staffing?

7        A.    The only strategy that I was aware of that we

8    could pursue was to do the best we could with what we

9    had.

10       Q.    Okay.

11       A.    And, of course, to keep administration

12   informed of the need for more manpower.

13       Q.    Okay.  Are you aware of any other disciplines

14   who, through their unions or groups, expressed concerns

15   about the staffing level at Salinas Valley psychiatric

16   program in December or January?

17       A.    Yes.  I know that nursing was very short.  And

18   I was told by nurses that they were making their concern

19   felt to administration.

20           The MTA staff also was short, and they also

21   were expressing to me concern about the vacancies in

22   their ranks.

23       Q.    Anyone tell you that there was a hiring freeze

24   that was limiting the ability of the institution to fill

25   vacant positions?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

```
 1    out that in his experience it was feasible for the
 2    psychiatrists to rely on information from these other
 3    staff members about the patients rather than actually
 4    seeing the patients in order to make decisions about
 5    their treatment.
 6            It was suggested to him this would not be
 7    proper because it would be like operating on hearsay and
 8    we needed to have time and opportunity to interact with
 9    the patients ourselves in order to make responsible
10    decisions about their treatment.
11        Q.   Did you discuss with him reducing new
12    admissions to the unit to reduce the pressure?
13        A.   Yes.
14        Q.   Okay.  And what did you say to him and he say
15    to you about that?
16        A.   Well, it was pointed out that the more
17    admissions and discharges you have, the higher the
18    workload because a lot of the work is sort of
19    front-loaded and end-loaded on these patients.
20            He, you know, responded we had a
21    responsibility to provide our services promptly to those
22    in need, and we did have a waiting list although it was
23    relatively short at that point in time.
24            That was extent of the discussion on that.
25        Q.   Did he tell you how many people were on the
```

Page 38

John Brim, M.D.                                                    March 1, 2013

1    waiting list at that time?

2         A.    I believe there was a reference to the number

3    20 or so.

4         Q.    Okay.  Did he express to you that he was

5    unable to restrict admissions because of that waiting

6    list?

7         A.    There was discussion -- a statement on his

8    part that the court wanted people to be expeditiously

9    admitted to our facility.

10         Q.    Did he tell you that the governor represented

11    that there was no wait list in filings with the federal

12    court in January of 2013?

13         A.    No.

14              (Plaintiffs' Exhibit 3 was marked for

15               identification.)

16    BY MR. BIEN:

17         Q.    Let me show you what's been marked as

18    Exhibit 3 to your deposition.  This is going to be an

19    exhibit that's under seal because it's a peer review

20    kind of document and it's a suicide report concerning an

21    inmate who died of suicide at Salinas Valley psychiatric

22    program in late November of 2012.

23              He actually died in a hospital on

24    December 4th of 2012?

25         A.    Right.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

 1   issue again because I had raised it many other occasions
 2   and I felt it would be pointless to raise it again.
 3        Q.   In your opinion, was there sufficient staffing
 4   in D5/D6 since November of 2012 to allow psychiatrists
 5   who would insist to have all their contacts in
 6   confidential spaces outside of cells?  Is there
 7   sufficient staffing to provide that for psychiatrists
 8   and their patients?
 9             MR. RUSSELL:  Objection.  Vague and ambiguous.
10   Lacks foundation.  Calls for speculation.
11             THE WITNESS:  No.
12   BY MR. BIEN:
13        Q.   Okay.  Patients have raised with us, Doctor,
14   an issue which we didn't really understand.  We get
15   letters from prisoners all the time, and some of them
16   are -- seem a little bit -- some of them are seriously
17   mentally ill and we're not always sure of reality.
18             But we've heard from our clients that there's
19   insufficient laundry service, soap, clothing being
20   provided to them at the Salinas Valley psychiatric
21   program in the last few months.
22             Have you heard complaints like that?
23        A.   Yes.
24        Q.   Have you investigated them?
25        A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                           March 1, 2013

1       Q.    What can you tell me about them?

2       A.    The DSH staff that I have talked to who had

3    personal knowledge of this confirm that there has been a

4    severe shortage of clean clothes, bedding, coats.  I

5    believe they've made every possible efforts to address

6    this.  They place the blame on CDCR, which has the

7    responsibility for their laundry.

8       Q.    When you say "they," is the staff, the DSH

9    staff that you spoke to about the subject?

10      A.    Yes.

11      Q.    Okay.  We've also heard complaints about food

12   service, the volume of food, amount of food, quality of

13   food.  Have you heard complaints about food service also

14   from patients?

15      A.    Yes.

16      Q.    And have you investigated them?

17      A.    Informally.

18      Q.    And what have you heard?

19      A.    Well, I've inspected the meals and I've been

20   around at feeding time.  I've observed the distribution

21   of the meals, the timing.  I haven't found any substance

22   to the inmates' complaint about the food.  I mean, you

23   know, it's a subjective thing how good it is, but it's

24   provided.  It appears to be hygienic.  And I know it's

25   under supervision of a registered dietician, so I assume

John Brim, M.D.                                          March 1, 2013

1    these were downloaded yesterday from the Department of

2    State Hospital Web site.

3           MS. GOSLING:  Do you want the witness to look

4    through them?

5           MR. BIEN:  Yeah.  Just take a...

6           (Witness reviewing document.)

7    BY MR. BIEN:

8       Q.   Dr. Brim, this isn't a color chart, which is

9    appears on the computer when I looked at it, but are you

10   able to discern the SVPP line on these various charts?

11   Look at the last two charts, staff injuries and patient

12   injuries.

13      A.   Yes, I can discern that.

14      Q.   Okay.  Have you ever had discussions during

15   your work at Salinas Valley psychiatric program about

16   the level of staff and patient injuries?

17          MR. RUSSELL:  Objection.  Vague and ambiguous.

18   Overly broad.

19   BY MR. BIEN:

20      Q.   Since November of 2012?

21      A.   Yes.

22      Q.   And can you tell me about any of those

23   discussions?

24      A.   I have noticed an increase in staff

25   assaults -- assaults by patients on staff -- over the

John Brim, M.D.                                                    March 1, 2013

 1  last few months.  I've asked my colleagues if they were

 2  seeing the same sort of thing and, they agree that it

 3  seems to be increasing.

 4       Q.   Okay.  And just for the record, these charts

 5  cover the period January through September of 2012.

 6            Is it -- has it been your experience that --

 7  is it your perception that staff injuries have been

 8  higher at Salinas Valley than in previous times that

 9  you've worked at Salinas Valley?

10       A.   Yes.

11            MR. RUSSELL:  Objection.  Vague and ambiguous.

12  Lacks foundation.

13            MS. GOSLING:  Join.

14  BY MR. BIEN:

15       Q.   In any discussions with staff, did anyone

16  discuss with you perhaps the level of staff injuries

17  reflects understaffing in the Salinas Valley psychiatric

18  program?

19            MR. RUSSELL:  Objection.  Vague and ambiguous.

20  Overly broad.

21            THE WITNESS:  Yes.

22  BY MR. BIEN:

23       Q.   Okay.  And can you describe that conversation

24  and when that took place?

25       A.   No one conversation stands out in my mind; but

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

1   over the last couple of months when the psychiatrists

2   have gotten together in their meetings, there has been

3   ongoing discussion of the increasing dangerousness of

4   the situation, and a number of different psychiatrists

5   have touched on the fact that the injuries appear to be

6   up, relate that to staff not having the time they once

7   had to maintain contact with the patients, monitor how

8   they're doing, keep us informed so that we can do what

9   we can with their medication to help stabilize them.

10          And we ourselves have all, I think, expressed

11  concern that we're not able to take the time to have the

12  number of face-to-face contacts that we really would

13  like to have to feel comfortable that we are monitoring

14  the patients in the -- a safe and responsible way.

15      Q.   Administration ever inform you that

16  Salinas Valley psychiatric program in 2012 had a higher

17  level of staff and patient injuries than all other state

18  hospital programs?

19      A.   No.  Not to my knowledge.

20      Q.   Did Secretary Allenby discuss with you his

21  concern that -- of the high level of staff and patient

22  injuries that were occurring at Salinas Valley

23  psychiatric program at his meeting this week?

24          MR. RUSSELL:  Objection.  Vague and ambiguous.

25  Assumes facts not in evidence.

John Brim, M.D.                                                    March 1, 2013

1              THE WITNESS:  Not as I recall.

2    BY MR. BIEN:

3        Q.   You assume that the secretary of the

4    Department of State Hospitals is aware of the level of

5    staff injuries and patient injuries in his facilities?

6              MS. GOSLING:  Objection.  Calls for

7    speculation.  Don't assume anything.

8    BY MR. BIEN:

9        Q.   You can answer the question.

10             MS. GOSLING:  Do you know?

11             THE WITNESS:  I would assume that, yes.

12   BY MR. BIEN:

13       Q.   That's part of his job, isn't it?

14       A.   I would assume so.

15             MR. BIEN:  Why don't we take lunch now?

16

17             (Whereupon the luncheon recess was taken
                at 12:09 p.m.)

18

19                       --o0o--

20

21

22

23

24

25

John Brim, M.D.                                          March 1, 2013

1          A.    Well, we have computers that access the system
2     on our units; we simply don't have the log-in and the
3     access password to get at it.
4          Q.    Have you ever asked to get the log-in and
5     access password?
6          A.    Yes.
7          Q.    And who did you ask?
8          A.    Well, we've requested through Dr. Troncoso,
9     when he was senior psychiatrist, acting.  And according
10    to minutes I've seen of the psych meetings before I
11    rejoined the program in November through the previous
12    senior psychiatrist, Dr. Safi, and those individuals
13    have passed on the request to their administrative
14    supervisors.
15         Q.    Okay.  And as of this week, you still did not
16    have permission to use the EUHR?
17         A.    We still don't have access, correct.
18         Q.    How do you feel that would benefit your
19    ability to provide psychiatric care for your patients?
20         A.    Well, I think it's dangerous not to have
21    access to the old records because they're potentially
22    relevant things in the old records that are not
23    necessarily included in the referral packet.  It's just
24    not up to community standards to not have access to
25    relevant recent medical education.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

 1        Q.   Are the same computers available on -- in the
 2   C5/C6 and D5/D6 as are in the T units, to your
 3   knowledge?  In other words, if you got the password,
 4   could you use it in both places?
 5        A.   Yes.
 6        Q.   Okay.  Our expert was informed during his tour
 7   of Salinas Valley psychiatric program in late January of
 8   2013, just a few weeks ago -- a month ago now, that an
 9   hour -- only an hour or so of treatment was being
10   provided for patients due to staff and space
11   restrictions.
12             Is that consistent with your understanding of
13   what was going on in the program as recently as last
14   month?
15             MR. RUSSELL:  Objection.  Vague and ambiguous.
16   Lacks foundation.  Calls for speculation.  Overly broad.
17             THE WITNESS:  I don't have any problem
18   believing that.  I haven't, you know, made a study of
19   that, but that sounds about it right.
20   BY MR. BIEN:
21        Q.   Okay.  People are getting about one group a
22   day?
23        A.   Uh-huh.
24        Q.   Okay.  In your opinion, Doctor, is that less
25   than the optimal treatment that your program is designed

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                         March 1, 2013

 1  for patients at the ICF level of care?

 2          MR. RUSSELL:  Objection.  Vague and ambiguous.

 3  Lacks foundation.  Overly broad.

 4          THE WITNESS:  It's less than they got

 5  historically when I worked there previously.

 6  BY MR. BIEN:

 7      Q.   And do you think the patients could benefit

 8  from a -- more than one hour of group a day at their

 9  level of care?

10          MR. RUSSELL:  Objection.  Vague and ambiguous.

11  Lacks foundation.  Overly broad.

12          THE WITNESS:  Yes.

13  BY MR. BIEN:

14      Q.   And why is that?

15      A.   Well, I think there's ample evidence that

16  within the limits, more treatment produces better

17  outcomes.  And certainly one hour a day is not maxing

18  out the potential for recovery.

19      Q.   Okay.

20          MR. BIEN:  I'd like to mark as the next

21  exhibit in order.  This will be sealed.

22          It's a June 17th, 2011, suicide report for

23  inmate -- and I'll call him G, took place at California

24  State Prison at Sacramento.

25

John Brim, M.D.                                      March 1, 2013

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8              That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20              DATED:  March 4, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 83



Transcript of the Testimony of:

# Joel Dvoskin, Ph.D., ABPP

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____  )



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,              )
                                        )
5                      Plaintiffs,      )
                                        )CASE NO.:
6          vs.                          )S 90-0520 LKK-JFM
                                        )
7   EDMUND G. BROWN, JR., ET AL.,       )
                                        )
8                      Defendants.      )
    _____)

9

10

11

12          The Deposition of JOEL DVOSKIN, PH.D., ABPP,

13   taken on behalf of the Plaintiffs, before Megan F.

14   Alvarez, Certified Shorthand Reporter No. 12470,

15   Registered Professional Reporter, for the State of

16   California, commencing at 9:14 a.m., on Wednesday,

17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,

18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,

19   California.

20

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  MICHAEL BIEN, ESQ.
                  AARON FISCHER, ESQ.
 4                JANE KAHN, ESQ.
            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5          315 MONTGOMERY STREET, 10TH FLOOR
            SAN FRANCISCO, CALIFORNIA 94104
 6          415.433.6850
            415.433.7104 FAX
 7          MBIEN@RBGG.COM

 8
     FOR DEFENDANTS:
 9
              BY:  DEBBIE J. VOROUS, ESQ.
10          OFFICE OF THE ATTORNEY GENERAL
            STATE OF CALIFORNIA
11          1300 I STREET
            SACRAMENTO, CALIFORNIA 95814
12          916.324.5345
            916.324.5205 FAX
13          DEBBIE.VOROUS@DOJ.CA.GOV

14            BY:   HEATHER L. McCRAY, ESQ.
            DEPARTMENT OF CORRECTIONS AND REHABILITATION
15          OFFICE OF LEGAL AFFAIRS
            1515 S STREET, SUITE 314 SOUTH
16          SACRAMENTO, CALIFORNIA 95811
            916.324.4123
17          916.327.5306 FAX

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    was $100,000?

2          A.    That's correct.

3          Q.    I'm sorry.  Going back to the second page of

4    the document, 103092.

5                You understood this was a contract for expert

6    witness services?

7                The first sentence there.

8          A.    That's what the contract says.

9          Q.    Okay.

10         A.    And so I proceeded on the -- you never know if

11   you're actually going to be an expert witness when you

12   start working on these, but that was the contract and

13   that was the way I proceeded.

14         Q.    You understood that you're being retained for

15   litigation purposes?

16         A.    Yes.

17         Q.    Okay.  And the field -- it describes your

18   field as psychology and prison administration?

19         A.    I think that's what they said, yeah.

20         Q.    Do you agree that's your field?

21         A.    Those are some of my fields.

22         Q.    Okay.  And if you go down to the last four

23   pages of this first part, starting with 103098, is that

24   a copy of your CV?

25         A.    At the time, yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                         February 27, 2013

1    expert report itself?

2            I think you mentioned that you -- for part of

3    that time, you were meeting face-to-face with Dr. Scott

4    to work on the report.

5        A.    The vast majority of it.

6        Q.    Was that in Sacramento?

7        A.    Yes.

8        Q.    Okay.

9        A.    In his office.

10       Q.    Was that in December of 2012?

11       A.    I'm pretty sure it was.

12       Q.    Okay.  And do you know -- was that more than

13   one day?

14       A.    Yes.

15       Q.    Can you give me an estimate how many days that

16   was?

17       A.    At least two.  I think maybe three.

18       Q.    Did Dr. Scott have his assistants with him,

19   too, helping?

20       A.    No.

21       Q.    Okay.  Anyone else there with you besides you

22   and Dr. Scott?

23       A.    No.  A couple of times, like, his secretary

24   popped in the room, but not to work on the project with

25   us.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1     Q.    Okay.  And Dr. Moore was not present for this

2   process of writing a report?

3     A.    No.

4     Q.    Okay.  And I understood from -- we took her

5   deposition last week, early this week.  I don't

6   remember.

7           MS. VOROUS:  Last week.

8   BY MR. BIEN:

9     Q.    She had some illness in her family in

10  December; is that right?

11    A.    I don't remember.  She had some logistical

12  issues that made it more difficult to schedule with her.

13  I think her mom may have had some serious medical issue.

14    Q.    So you --

15    A.    And I think she was in car accident.  There

16  were several different things that made it more

17  challenging to get together with her.

18    Q.    Okay.  And how did you and Dr. Scott get input

19  from Dr. Moore into the report?

20    A.    Well, the attorney general -- whenever I'm

21  doing a report like this, I always ask the attorney

22  whether it's a plaintiff or a defense attorney.  What is

23  it that you're -- assuming we were in court, what would

24  you be likely to ask us on direct?  And we kind of build

25  the report around the referral questions.

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

1           So these -- what the AGs wanted was

2    essentially a robust report about our opinions regarding

3    the constitutionality of the mental health care in the

4    prisons we visited.

5           We had always had a exit conference at every

6    prison where we each went around and communicated our

7    findings pretty -- reasonably detailed to the warden and

8    the CEO and the mental health director of the prison.

9    So we knew what Dr. Moore's findings were at each of the

10   prisons, with one exception.  I believe Centinela she

11   was unable to join us, and I did some of that work

12   there.

13          I actually don't know whether she went back

14   there or not.  There was some -- we weren't clear

15   whether she was going to go visit Centinela or not.

16   With that exception, we knew what her findings were at

17   each prison.

18          And so we put those in the report essentially

19   as place holders, and then sent it to her.  Dr. Scott

20   e-mailed it to her and said, you know, "Did we quote you

21   right?  Add anything you want?  Delete anything that you

22   want."

23          And my recollection is that she told Dr. Scott

24   that she liked the report.  And she had some -- made

25   some additions, but I don't -- I actually don't remember

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1   what her specific additions -- I don't think she had

2   many changes to what we had written.  But I think she

3   added some stuff, which is what we intended.

4        Q.   Did she provide written materials to you,

5   notes or findings about individual prisons?

6        A.   To me?  No.

7        Q.   Or to Dr. Scott?

8        A.   I don't believe so.

9        Q.   Okay.  So when it came time to write the

10  report, you and Dr. Scott wrote it.  You used your

11  recollection of her presentations at each of the exits,

12  and then you sent it to her for her review and approval?

13       A.   Yeah.  We were just trying to make it as easy

14  for her as we could, least amount of time-consuming

15  because we believed she was pretty tied up with some --

16  with things that made it -- would have made it difficult

17  for her to join us.  So we -- but we were very

18  encouraging of her to -- if there was something she

19  disagreed with, to change it.

20       Q.   Okay.  This is -- let me -- I'm going to hand

21  you a check for $2,100.  We're entitled to seven hours

22  of deposition today.  I'm sure we'll use it.  And that

23  way you don't have to send me an invoice.  And all I

24  need -- at some point you can sign -- give me your

25  taxpayer ID number.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1   mean to imply in any way that he was not honorable or

2   competent.  He is both of those things.

3       Q.   Do you understand that he had been using the

4   same terms and analysis in all the reports that he's

5   done on this case?

6       A.   Yes.

7       Q.   Okay.  And so one reason that he may be doing

8   it that way is that that is the way it has been

9   consistently done on this case?

10          MS. VOROUS:  Objection.  Speculative.

11          You can answer.

12  BY MR. BIEN:

13      Q.   In other words --

14      A.   The question is:  Is it possible that he did

15  it because it's a bad habit?  Yeah.  I mean, I -- it's

16  not a particularly good reason to do something because

17  that's the way we've always done it, but it's -- I mean,

18  I don't know.  You have to ask him why he used that

19  language.

20          Perhaps he was explicitly asked to use that

21  language.  I don't find the language helpful for the

22  reasons I explained in my report.

23      Q.   Okay.  You're familiar with the work of

24  Lindsay Hayes?

25      A.   Very familiar.

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

 1      Q.    And what's your -- do you have an opinion as
 2   to his reputation in the field?
 3      A.    I have written that Lindsay has saved many
 4   lives.  He's a good man who -- who became impassioned
 5   about jail suicide prevention before anyone cared about
 6   it.
 7           We worked together many, many years ago.  My
 8   staff did the first statewide jail suicide prevention.
 9   So I --
10      Q.    That was in New York?
11      A.    In New York.  We had some dealings with him at
12   that time.  I think he's incredibly knowledgeable.  Very
13   honorable.  Occasionally stubborn, but he's a good guy.
14   I love Lindsay, and I recommend him often.
15      Q.    Okay.
16      A.    I think very highly of him.
17      Q.    Okay.  You were aware during the course of
18   your work that Lindsay was working also with California
19   as a suicide prevention expert?
20      A.    Yes.
21      Q.    Okay.  And were you aware that he had prepared
22   a report for California and provided it to them?
23      A.    Yes.
24      Q.    When did you first become aware of Mr. Hayes'
25   report to California?

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1      A.    I don't remember exactly when.  It was

2   relatively early in the process, but I don't remember

3   when.  I had heard that he had written a report.

4      Q.    Was that report provided to you at any time?

5      A.    Yes.

6      Q.    Okay.  And when was it provided to you?

7      A.    In the last month.

8      Q.    Okay.

9      A.    I don't remember the exact date, but...

10      Q.    So it was in 2013?

11      A.    Yes.

12      Q.    Okay.  And that was -- was it before or after

13   you prepared your report in this case?

14      A.    It was after -- are you talking about the

15   report that Dr. Scott and I collaborated on?

16      Q.    Yes.

17      A.    It was after that.

18      Q.    And was it before or after you prepared your

19   reports -- your report about the 2011 suicides?

20      A.    After.

21      Q.    After that?

22      A.    Yes, sir.

23      Q.    So pretty recent?

24      A.    Yes.

25      Q.    Who provided the report to you?

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

 1   not believe that that study says that there are no

 2   long-term effects of segregation that are negative.  We

 3   were just, in that study, unable to identify them.  And

 4   there are some specific things in Colorado that may have

 5   been responsible for those particular findings.

 6        Q.   Again, rather than go into the details, is it

 7   still correct that at this time you think there's still

 8   not definitive research about whether or not long-term

 9   housing in segregation is dangerous and can cause

10   permanent harm to people?

11        A.   Yes.  I think that's still true.

12        Q.   Okay.  That means -- would you agree it's

13   possible that long-term housing in segregation does

14   cause psychological harm?

15        A.   Yes.

16        Q.   And you're less -- I think I interpreted this

17   correctly --

18        A.   I'm sorry.  Can I just clarify?  I took your

19   question not to mean that it necessarily does, but that

20   it could on -- for an individual.

21        Q.   Right.  That's correct.

22        A.   So the answer is yes.

23        Q.   And you're less -- I understood this article

24   to say that as to the mentally ill, there already has

25   been research and that it is harmful to -- for the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1     meeting.  The clinicians were able to ask for a private

2     meeting if they felt it was appropriate even if the

3     inmate didn't.

4            So I think, in general, that they were trying

5     to bring treatment to people that were in SHU that met

6     their needs.

7            And then -- again, I saw no exception to the

8     belief -- to my belief that if someone became acutely

9     psychotic or suicidal, that they would be removed from

10    their -- I didn't go track down people who weren't there

11    anymore.

12         Q.   Right.

13         A.   But I didn't see people who appeared to me --

14    now, keep in mind, I didn't hit every cell.  These were

15    randomly selected inmates that I talked with and

16    randomly selected cell blocks that I would talk to the

17    officers.

18         Q.   How many residents of the Corcoran SHU who

19    were CCCMS did you speak with?

20         A.   I don't remember.  I documented the ones that

21    were comfortable with my documenting their name.  I

22    always give people the choice if they want to speak and

23    not have their name associated with it.  So I don't

24    recall.  And in SHU, it would have been one by one.

25            And in some places I would talk to groups of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1    inmates and just get kind of general opinions, but that

2    wouldn't have happened in the SHU.

3        Q.    You think it was -- can you give me any

4    estimate of how many people you talked to?

5        A.    I can't remember.  I'm sorry.

6        Q.    10?

7        A.    More than 10.

8        Q.    More than 20?

9        A.    Probably, but I'm not sure.

10       Q.    Okay.  Was it -- you think you did a

11   scientific study of how conditions were affecting the

12   mentally ill in the Corcoran SHU?

13       A.    No, I do not think that.

14       Q.    Okay.  So you didn't really answer in any way

15   the question that was opened in this article about what

16   the long-term effects of housing mentally ill are in a

17   SHU environment?

18       A.    That's correct.

19       Q.    Okay.  And you still believe that it's

20   possible that there are no long-term effects and it's

21   possible that there are long-term effects?

22       A.    What I believe -- let me distinguish between

23   what I believe versus what I think has been

24   scientifically or empirically demonstrated.

25            What I believe is that for some people there

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    about was the one I just mentioned.  And nobody -- I

2    asked, "Has there been any cases in the last few months

3    where you tried to transfer somebody and were told no?"

4    And no one had one.

5         Q.   Okay.

6         A.   So it seemed to be -- I'm not sure about what

7    I'm about to say, but my general impression was it was

8    older information and that it may have been true

9    previously.  But I don't know that.

10         Q.   Okay.  You didn't go and review the last

11    10 rejections from Patton to evaluate them?

12         A.   I did not.

13         Q.   You didn't look to see whether it actually

14    said on the rejection, "This person meets our mental

15    health criteria but is, you know, too dangerous for us

16    to handle"?

17         A.   That's correct.

18         Q.   Okay.

19         A.   I didn't -- I just want to be clear I didn't

20    assess the Department of State Hospitals at all.

21         Q.   Okay.

22         A.   I -- I wasn't asked to do that.  So I don't

23    have any -- really any opinion at all about Patton or

24    any of the other DSH facilities.

25         Q.   I was going to ask you about that, Doctor.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          You understand that inpatient psychiatric care

2     for males in the Department of Correction is provided by

3     the Department of State Hospitals?

4          A.   With the exception of the crisis beds, yes.

5          Q.   Okay.  And you didn't -- as you sit here

6     today, you have no opinion about the quality of care

7     that's being provided inside of the Department of State

8     Hospital facilities?

9          A.   That's correct.

10         Q.   Okay.  And you didn't -- did you inspect any

11    of the Department of State Hospital facilities during

12    this time in California?

13         A.   If I remember correctly, we may have looked

14    briefly or not at the one at Salinas Valley, but I

15    honestly can't remember.  I didn't do any assessment of

16    the -- their treatment, their practices, their staffing,

17    any of that.

18         Q.   Right.

19         A.   And, to my knowledge, none of my colleagues

20    did either.

21         Q.   Okay.  When was the decision made that your --

22    you would not offer an opinion concerning Department of

23    State Hospitals?

24         A.   I was never asked to look at the Department of

25    State Hospitals.

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1    inmates who needed ICF care and doing this other

2    program?

3              MS. VOROUS:  Objection.  Lacks foundation.

4    Vague and ambiguous.

5              THE WITNESS:  The way you asked the

6    question --

7    BY MR. BIEN:

8         Q.    It was a terrible question.  Let me start over

9    again.

10        A.    Okay.

11        Q.    So you have no opinion, as you sit here today,

12   about the adequacy of the care being provided to death

13   row prisoners who may have needed ICF care?

14             MS. VOROUS:  Objection.  Misstates his

15   testimony.

16             THE WITNESS:  I wasn't asked to assess --

17   well, there was some talk about doing a separate

18   assessment of that program.  It was my understanding

19   that was the subject of some litigation or some lawyer

20   stuff.

21             I was then told, "We're not going to do that

22   right now.  We might do it at some time in the future."

23   So I didn't ask about that program for that reason.

24             I did talk -- I'm sure that many of the people

25   I talked to had something to do with that program, but I

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   didn't ask them about that program.

2   BY MR. BIEN:

3        Q.   Okay.

4        A.   That's why the question was a little difficult

5   to answer.

6        Q.   As you sit here today, you don't have an

7   opinion about -- one way or the other about the adequacy

8   of that program which you didn't evaluate?

9             Sort of an obvious question.

10       A.   In theory, the way it was described to me, it

11  could be okay; but I didn't see it, so I can't say that

12  it was okay.

13       Q.   Right.  Would you agree that it would be

14  inappropriate for California to -- assuming that there

15  were some men who needed ICF level of care, to not

16  provide access to it either at San Quentin, an

17  equivalent, or provide access to the ICF program run by

18  DSH?

19       A.   The question is virtually tautological.

20  People should get what they need.  ICF is bit of a

21  conundrum for me.  It's not something that most systems

22  have.

23            In New York, for example, we had a -- we had

24  crisis beds in the prison that are -- we called

25  satellite beds.  Then we had an inpatient hospital.  The

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    average length of stay there was about 45 days.  It
2    varied 30 to 60 days.  And then what you're calling
3    intermediate care, we actually provided in units that we
4    called intermediate care units, which were the model for
5    your EOPs.  So the EOP is kind of an intermediate level
6    of care.  That's the idea of it.
7            So you guys -- California has kind of
8    introduced this thing between acute inpatient and EOP
9    that other places don't have.  So I don't think there's
10   a constitutional duty to do it since no one else does
11   it, but there is a constitutional duty to meet a
12   person's needs.
13           So if I looked at an inmate and said his needs
14   are not being met at an EOP, then he needs something
15   else.  However -- either you bring it to him or him to
16   it, but he needs whatever he needs.
17      Q.   Right.  In other words, the same principle you
18   said before.  I mean, you have to -- the system has a
19   duty to provide the level of care that someone needs,
20   either bring it to them or buy it on the outside or --
21   but you can't say because this person is sentenced to
22   death, he's not going to get the mental health care he
23   needs?
24      A.   Correct.
25      Q.   Okay.  You've written that "Timely access to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   inpatient psychiatric hospitalization is an element of

2   an appropriate mental health program."

3              Is that correct?

4       A.   I don't recall specifically, but I'm sure I

5   did.

6       Q.   Yeah.   And you agree with that statement?

7       A.   I believe it, yes.

8       Q.   Okay.   And did you evaluate whether or not

9   prisoners in California were getting timely access to

10  inpatient psychiatric care?

11      A.   That was a bit of a moving answer, because

12  early on in our visits, the waiting list had previously

13  been even higher than when -- our first visit.

14             By our first visit, the waiting list had begun

15  to drop, but they continued to drop throughout this

16  project to the point where they're, as far as I know,

17  essentially nonexistent now.   And largely that had to do

18  with a couple of things.   One was the creation of

19  additional crisis beds, and the other one was the --

20  the -- there was a drop in the census from the

21  realignment.   But, whatever the reasons, the waiting

22  list appears to be pretty close to nonexistent.

23             And when I looked at the results of -- the

24  special master at CDCR did this project.   I forget what

25  they called it.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   about words "acute" and "intermediate," because every

2   system uses those differently and I didn't assess the

3   actual care.

4           But if somebody's -- you know, there's a bunch

5   of ways --

6   BY MR. BIEN:

7       Q.   I'm just focusing on acute, and I'm focusing

8   on how California uses the definition.  And you

9   evaluated that issue.

10      A.   Yeah.  I would say -- well, the simpler answer

11  is that clinical judgments are presumptively

12  constitutional, but you're supposed to act on them.  So

13  if clinicians all agree that's what the person needs,

14  then that's what should happen.

15      Q.   Okay.

16      A.   I can't give you an exact amount of time, but

17  the sooner the better.

18      Q.   Would you be concerned if -- I know you have

19  disparaged the program guide and its standards, but the

20  program guide has a transfer guideline for APP.

21          Yes?

22      A.   I disparaged the program guide?

23      Q.   You've said that it is overly detailed and

24  gets in the way.

25      A.   No, no, no.  I -- I'm sorry to interrupt.

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1    Please allow me to clarify.

2            Having great policies and procedures, I do not

3    disparage.  Being monitored for every one of your

4    policies and procedures is unheard of.

5        Q.   Okay.

6        A.   That's a very different thing.

7            The program guide is -- I mean, I criticized

8    the State for not having policies and procedures,

9    whatever it was, 12 years ago.

10       Q.   20.

11       A.   Geez.  Getting old so fast.

12       Q.   Me, too.

13       A.   But I just want to be clear.  I'm not opposed

14   to having great policies and procedures.  There are some

15   changes I would recommend in the program guide.  And the

16   inability -- the State's perceived inability to make

17   changes in the program guide is terrible, but I'm not --

18   I don't disparage the program guide.  If I led you to

19   believe that, I apologize.  That's not how I feel.

20       Q.   So the program guide has a transfer guideline.

21       A.   Uh-huh.

22       Q.   And I think the transfer guideline says not

23   more than 10 days for -- from the time of referral to

24   actual admission and, you know, physically moving the

25   patient to -- to an inpatient psychiatric bed.  In fact,

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1   don't think 10 days is an unfair expectation.

2        Q.   So your understanding from the records you

3   received and the information you received from

4   Dr. Toche -- actually, she's not Dr. Toche, is she?

5        A.   Toche.

6             MS. VOROUS:   Toche.

7   BY MR. BIEN:

8        Q.   But she's not a doctor -- yes, she is.  She's

9   a doctor.

10       A.   Sure she is.

11       Q.   Dr. Toche.  Excuse me.

12            -- and from -- I know you asked information

13  from the attorney general's office from time -- was that

14  there was no wait list for acute psychiatric care?

15       A.   No wait list beyond the parameters --

16       Q.   Beyond the 10 days or whatever it is.

17       A.   -- of the program guide.  I should have been

18  more clear.

19       Q.   So that was your understanding?

20       A.   Yes.

21       Q.   Okay.  That's part of the basis of your

22  opinion?

23       A.   Yes.

24       Q.   What about ICF care?

25            I know you've been talking about it, not quite

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          That's even with good documentation.  Where

2     you stand depends on where you sit.

3     BY MR. BIEN:

4          Q.   Do you recall being told that one of the

5     grounds for delaying admission to a DSH facility was

6     that the inmate had swallowed objects due to his

7     illness?

8          In other words, everyone agreed he needed

9     inpatient psychiatric care, but he had ingested some

10    substance or object?

11         A.   Someone told me that, and I believe I had a

12    note about it in my notes.  But I don't remember which

13    facility it was.

14         Q.   Did you investigate whether that was, in fact,

15    a barrier to access to DSH?

16         A.   What I -- yes.  And my recollection of what I

17    was told was that we -- they have to be medically

18    stable.  And that was the receiver.

19         So I didn't really get into it because it was

20    a medical question.  And I don't remember if I passed

21    that along to Dr. Scott or Dr. Moore or not.  But what

22    they told me was it's not true that if you swallow, you

23    can't come; but we got to make sure people are medically

24    stable before they're transferred.

25         And that's a very common principle in health

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1           In terms of the assessment or the monitoring

2    of "Were people underserved?" I think that also came

3    into the -- I'm not sure if you're referring to that as

4    well.  That was probably a good thing to do once because

5    it demonstrated that there were surprisingly few people

6    that were undertreated.

7           And then I really am not offering an opinion

8    about the monitoring of that process, but I -- but I

9    think some of the changes they made in the referral

10   processing probably were helpful.

11       Q.   Okay.  You understand that there had been --

12   that one of the issues that had been found by the court

13   in the past was that CDCR was not referring patients

14   that required a higher level of care to these inpatient

15   psychiatric programs?

16           MS. VOROUS:  Objection.

17           THE WITNESS:  You mean several years ago?

18   BY MR. BIEN:

19       Q.   Yes.

20       A.   Yes, I was told that.

21       Q.   And did you investigate yourself whether or

22   not -- let me start over.

23           As part of your work in California, did you

24   make an investigation as to whether or not there was an

25   unmet need for any kind of mental health care in CDCR?

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        A.    In general, yes.  I looked for undertreated,
2    untreated, and asked about undertreated and untreated
3    people every place I went.
4        Q.    What was your methodology for looking for
5    untreated or undertreated people?
6        A.    Variety of things.  When I visited -- depends
7    on the type of unit.  If it's lockdown units, it's a
8    little more challenging.  Let me start with those.
9              For locked units, I would ask the officers,
10   "Who is the -- if you had to pick the two most psychotic
11   or difficult or quirky or usual inmates" -- I would say
12   any euphemism that you want to use -- "who's your
13   all-star team of, you know, inmates that I, as a
14   psychologist, should be concerned about?"
15             And it's by far the best source of
16   information.  They never hesitate.  They tell me two
17   names, three names; sometimes one; sometimes five, and
18   then I go talk to those people.
19             I also then, typically, if they're -- usually
20   there's a few inmates that seem, on their face, to be
21   credible informants that are relatively reasonable, and
22   I might say to them, "Is there anybody you think I
23   should talk to?"
24             And they might say, "Cell 2," real quietly.
25             And in order to not throw them in, I'll see

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1    somebody else and then eventually wander over to Cell 2.

2              It's a good methodology for identifying who in

3    that group is likely to need more than they're getting.

4              In general population, I do it that way as

5    well as by eyeballing people.  And if somebody appears

6    to be disoriented or confused -- sometimes they turn out

7    to be developmentally disabled or maybe they have a

8    medical illness -- but you ask, say, "I notice you look

9    a little confused.  How are you doing today?"  You start

10   a conversation with them.  And then, depending upon the

11   beginning of the conversation, I might look at their

12   record or might ask about them, or I might have an

13   in-depth conversation with them.

14             Then I do a lot of cell front, walking cell to

15   cell.  "How you doing?"

16             "Fine."

17             And often the person will say something, even

18   in that brief interaction, that leads me to believe that

19   I need to look further into them.

20             Or a cellmate will roll their eyes.  You know,

21   there's a variety of ways that you do it.  But I --

22   usually, the list I come up with is a pretty good

23   list --

24        Q.    Okay.

25        A.    -- of people who appear to need more treatment

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

1    than they're getting.

2         Q.   What about the people who are not in the

3    mental health delivery system?  What work did you do to

4    see whether or not they needed care?

5         A.   I just told you.  That would have been in

6    locked units that were not PSUs or hubs, but in ad seg.

7    And I would walk the yard, if there was a yard.  For

8    like -- for the women's facility, women all over the

9    yard, I just wondered around.  "I'm a psychologist.  Got

10   any friends you think I should talk to?  How do you like

11   the doctors here?  If you have a problem, what do you

12   do?"

13        When I'm walking around the yard, I don't know

14   if they're CCC or not.  A lot will say, "Yeah, I'm CCC."

15        Then I'll ask them, "Do you know who your

16   primary clinician is?

17        "You mean Dr. Smith?  Yeah, she's really nice.

18        "How often do you see Dr. Smith?

19        "Whenever I want to, but she calls me out once

20   every 30 days or every 90 days, depending on the level

21   of care.

22        "Do you have a doctor?

23        "Yeah.  I can't remember his name.  That

24   Indian guy.  He's a short little guy.

25        "What's he like?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1                "He's really nice."  You know, or --

2            And frankly, I was shocked at the consistency

3    with which people knew their doctor and their primary

4    clinician and the generally high opinion that they

5    expressed of them.  It was shocking to me.  Better than

6    I've ever seen in a prison system.

7        Q.   Okay.  Let's go back to people who are -- so

8    this -- you felt that one of the things that you were

9    tasked to do was determine whether there was an unmet

10   need for mental health care in the California system?

11       A.   Yes.

12       Q.   And your opinion is that there is not?

13       A.   Well, I was asked to assess it in the context

14   of did I feel the system was constitutionally adequate

15   or not.  There's always unmet need.  No question about

16   it.

17           The -- if I had unlimited resources, there are

18   many things that you could do that would improve the

19   system and make it better.

20           But using my understanding of constitutional

21   minima as a criterion, then the answer is I think they

22   are meeting the constitutional obligations.

23       Q.   When you were part of the Scarlet Carp team,

24   one of the issues at that point was determining whether

25   or not California had an unmet need for mental health

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1              Steve Martin.

2         Q.   You just turned to look at something?

3         A.   On the next-to-the-last page, I actually --

4    when I go into a big meeting, I have a habit of making a

5    little seating chart so that I can remember -- there was

6    a lot of new faces to me, and I wanted to make sure I

7    remembered who people were.

8              So as the people introduced themselves, I do

9    it in the same -- I've been doing this for many years.

10        Q.   So you're on page 103262?

11        A.   Yes.

12        Q.   Okay.

13        A.   Do you want me to read the names to you?

14        Q.   Sure.

15        A.   Steve Martin.  Jim Scaramozzino,

16   S-C-A-R-M-A-Z-I-N-O, although I think that's a

17   misspelling.  I think there's an A missing there.

18             Judy Burleson, B-U-R-L-E-S-O-N.

19             Debbie Juarez, J-U-A-R-E-Z.

20             Pat McKinney, M-c-K-I-N-N-E-Y.

21             Jackie Moore.

22             Martin -- I think I spelled his name wrong.

23        Q.   Is that Martin Hoshino?

24        A.   Yeah.  I have A-S-H-I-N-O, but I think it's --

25        Q.   That's okay.  I don't need you to read what's

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1   there.  Let's just go over the names.
 2           Was it Debbie Vorous that was there rather
 3   than Juarez?
 4       A.   Oh, yes, it was.
 5           THE WITNESS:  You must not have spoken very
 6   loudly at the time.
 7   BY MR. BIEN:
 8       Q.   I'm just going to go through the names.  Tell
 9   me if I'm right.
10           Rick Subia, he's from Department of
11   Corrections?
12       A.   Yes.
13       Q.   And Katherine Tebrock, lawyer for Department
14   of Corrections?
15       A.   Yes.
16       Q.   Ben Rice, who's CDCR general counsel?
17       A.   Yes.
18       Q.   Cynthia Rodriguez?  It says "counsel at DMH."
19       A.   Yes.
20       Q.   And David Brice, another AG?
21       A.   Yes.
22       Q.   Gabriel Sanchez, another deputy AG?
23       A.   Yes.
24       Q.   And then Rodney Reed from UC Davis?
25       A.   Yes.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   wasn't clear, so I don't know what it refers to.

2        Q.   What about the number at the bottom?  Is that

3   a dollar sign?  Can you read what that says there?

4        A.   "$42 million monitoring."

5        Q.   What was that a reference to?

6        A.   It was -- there was some discussion about the

7   inordinate expense that went with the monitoring as

8   opposed to care -- as opposed to approving care, that

9   the monitoring itself bore an unprecedented expense.

10       Q.   Who informed you of that at the meeting?

11       A.   I would -- I don't remember which person, but

12  it could have been almost anybody in the room except for

13  the four of us and the two fellows.  It was, I think, a

14  widespread belief that monitoring costs were excessive.

15       Q.   Did they explain what they meant by

16  "excessive"?

17       A.   Too much.

18       Q.   Too much.  Too much relative to what?

19       A.   I inferred from the discussion that they

20  thought that the monitoring wasn't focused enough; that

21  it was micromanagerial in nature; that details were

22  being monitored at great expense.

23            There was a comment made that there were four

24  full-time attorneys working for the special master and

25  the -- that no one -- something to the effect of, "I

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   have no idea what they do."

2          There was expressed a belief that there was

3   sort of a gotcha type of monitoring; that they would go

4   and sort of try to find things wrong instead of sticking

5   to the, you know, robust, simple things that the system

6   itself agreed had needed to be fixed.

7          There was an expression of a belief that it

8   wasn't very fair; that the department had done a whole

9   bunch of things to dramatically improve its mental

10  health services and wasn't really being given credit for

11  it.

12         That -- I think it's fair to say there was an

13  acknowledgement that there was a time when some of this

14  may have been necessary or appropriate, but that as the

15  system improved, that the monitoring should have shrunk

16  and the expense of the monitoring should have shrunk and

17  didn't.

18         I think that's a fair summary of the

19  conversation.

20      Q.   During your work from this time forward --

21  it's now been almost 18 months -- have you come to form

22  an opinion about the Coleman monitoring and whether it's

23  excessive or too expensive?

24      A.   Yes.

25      Q.   What is that opinion?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        A.    I think that the -- the manner of monitoring,

2    it could be done very effectively at much less expense,

3    and it could be done -- I have enormous respect for the

4    experts that the special master has hired.  I don't know

5    every single one of them, but I know a fair number of

6    them and they're a great bunch.

7             I think that the manner in which the reports

8    are written where the special master doesn't quote them

9    but he rewrites what they said, and he says "the

10   monitor" to mean all of the individual experts.  I think

11   that's very problematic because it precludes a

12   discussion about, "Well, wait a second, there's a reason

13   why we do this and what if we did it a different way.

14   How would you recommend doing it?"

15            In my report, my response to the suicide

16   report -- and I fear that I hurt Ray's feelings, and it

17   wasn't my intention -- but I pointed out that getting a

18   report on suicide a year after the suicide doesn't help

19   anybody.  And Ray's response said, "That's not my fault,

20   that the State was slow getting me the information."

21            Well, whatever the reason is, it's a really

22   bad way to do business.  In my opinion, those questions

23   or findings should be communicated a couple days -- as

24   soon as they're known, within days.  So -- before the

25   investigation's completed so they can be built into the

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    investigation.

2            I don't understand why anybody would do it

3    this way.  It just makes no sense to me.

4            And I also think that a bunch of details are

5    counted that either don't matter or, in some cases, are

6    actually counterproductive.

7            An example of that is that the IDTTs are so

8    prescripted that they're not -- at least at one facility

9    that told me that the special master specially praised

10   their IDTTs.  We hated them.  They did every single

11   thing right, but there was no meaningful conversation

12   with the inmate, which is the main purpose of it.

13           It was, you know, at some point you just take

14   a step back and you say do we really need to visit 25

15   facilities, because the things that -- that they think

16   are not okay are much more focused than that.  They --

17   you know, they allege that the suicide prevention

18   activities should be improved.  Some of those

19   recommendations I agreed with.

20           Most of that can be -- can be monitored

21   without ever getting on an airplane.  I mean, that

22   information could be electronically communicated to

23   Dr. Patterson.

24       Q.   So you thought that Dr. Patterson withheld

25   information through this process, whether or not

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1      Q.    To your knowledge, at the time you wrote your

2  expert opinion in January of 2013, had this been

3  implemented?

4      A.    I don't know.

5      Q.    Okay.  While you were touring the prisons, one

6  of the things that was happening, I think, during the

7  period when you were out there is the department was

8  installing suicide-resistant beds in the MHCB; is that

9  correct?

10      A.    Yes.

11      Q.    Is that correct, yes?

12      A.    Yes.

13      Q.    And did you see some MHCBs that had the beds

14  and some that had them about to be installed in the next

15  couple of months?

16      A.    Yes.  There were a few places that hadn't

17  installed the beds yet, but they were -- they said they

18  were expecting them shortly.  I don't remember the --

19  where or which ones but...

20      Q.    Okay.  Do you agree that -- with the

21  recommendation that suicide-resistant beds should be

22  installed in MHCBs?

23      A.    Not the ones they installed.  I wouldn't

24  have -- I mean, my understanding is they spent a fortune

25  on beds; that they could have made suicide-resistant

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    CDCR took various measures to be less punitive in its

2    procedures for people on suicide watch or observation?

3                 MS. VOROUS:  Objection.  Lacks foundation.

4                 THE WITNESS:  I don't remember using that

5    exact language, but it's a recommendation I frequently

6    make:  In general, that suicide watch should not be a

7    punitive experience, and whatever reasonable steps you

8    can take to make it feel less punitive to inmates are

9    good to do.

10   BY MR. BIEN:

11        Q.   Didn't you also recommend that if someone's on

12   one-on-one observation on suicide watch, that they

13   needn't take away the person's clothes in every case?

14        A.   Yes, I did.  And I think that.

15        Q.   And did you observe that at least in some

16   locations the practice was to universally take people's

17   clothes and then replace them with suicide smocks?

18        A.   Yes.

19        Q.   Okay.

20        A.   Not just in California.  That's a very common

21   practice nationally.

22        Q.   Okay.

23        A.   In fact, I'd say most -- more common than not.

24   It's relatively rare that people on suicide watch are

25   allowed to have their clothes, but I think they should

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    and Lindsay thinks they should.

2         Q.   Is the fact that something is done other

3    places make it better or worse, in your mind?

4         A.   Not better or worse but it -- it -- depending

5    on the judge, it sometimes has important legal

6    implications.  So when I'm asked what the standard is, I

7    usually ask the court, "Do you want the prescriptive

8    standard, what do I think it should be, or the

9    descriptive standard of what" -- so if you ask what is

10   the standard of care, lawyers will tell you one of two

11   things:  Either what would a reasonably prudent

12   practitioner do under similar circumstances, or what

13   should.  And they can be very different answers, and

14   that's an example of that.

15             So I usually ask the judge which -- "How do

16   you want me to answer the question?"  So, in my opinion,

17   that shouldn't be the standard, but it is.

18        Q.   Okay.  So, in your opinion, you agree with

19   this recommendation that beds should be provided for

20   CDCR prisoners who are on suicide watch in MHCBs?

21        A.   Yes.

22        Q.   Okay.  And did CDCR inform you that they

23   disagreed with that recommendation and objected to it?

24             MS. VOROUS:  Objection.  Lacks foundation.

25   Vague and ambiguous.

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

1   enthusiastically.

2        Q.    Okay.  On the top of the next page, page 5 of

3   Mr. Hayes' report, he makes the recommendation that

4   other characteristics that he observed in units that

5   were doing suicide watch and observation could be

6   perceived as punitive because people were stripped of

7   their clothes, they had no -- they had reduced

8   privileges.  They weren't allowed access to shower,

9   out-of-cell time, telephone calls, and that he thought

10  CDCR should consider whether or not it could make those

11  conditions less punitive.

12            He was using the word "punitive" to mean not

13  like punishment but more like this would be perceived by

14  the prisoner who's receiving this suicide watch as being

15  a negative experience if you look at it from afar.  And

16  that, as I understood, Mr. Hayes was recommending that

17  CDCR look at these practices and see whether they could

18  be less restrictive and -- so that eventually suicide

19  watch would be viewed as less punitive.

20            Do you agree with that recommendation?  It was

21  a long question but --

22        A.    Yes.  I make the same recommendation in other

23  places.  It is a -- what Lindsay's recommending -- not

24  for the first time -- is a sea change, a fundamental

25  change in how suicide watch is done nationally.  And I

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   agree with him.

2           I think that those are the normal conditions

3   of suicide watch, and I think -- Lindsay, myself, and

4   others -- I think Ray and Jeff have probably --

5   Ray Patterson and Jeff Metzner have made the same

6   observation, that that's something that should be looked

7   at and changed.  So I guess I do agree with him.

8       Q.   Did you observe on your tours -- did you tour

9   the OHUs?

10      A.   Yes.

11      Q.   Okay.  And when you toured the prison, you

12  viewed the OHUs along with all the other facilities?

13  OHUs being outpatient housing units.

14      A.   Yes.

15      Q.   And did you observe that in the OHUs they

16  didn't have beds?

17      A.   I can't remember for sure, but I think that's

18  right.

19      Q.   Did you ever see someone on suicide watch or

20  suicide observation in an OHU during your inspection?

21      A.   Yes.

22      Q.   Did you ever see someone on suicide watch or

23  observation in an ad seg unit during your inspection?

24      A.   Not that I can recall.  Suicide watch, not

25  that I -- well, they were -- they had made a change in

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

1    psychiatric technicians that worked for the receiver's
2    office, but they were -- they weren't officers.  Nursing
3    assistant or --
4         Q.   CNA?
5         A.   Correctional nursing assistants.
6         Q.   Right.  Did you ever observe them doing
7    suicide watch?
8         A.   Yes.
9         Q.   Okay.  And did you see them conversing with
10   the inmates and speaking with them?
11        A.   Let's see.  I think I saw both.
12             I know one -- I remember one, I want to say at
13   SAC, where the person, at least while I was there,
14   didn't talk to the inmate.  There was one where -- there
15   were a number of times when the inmate was asleep, so
16   obviously they weren't talking with them.  But the one I
17   was just remembering from SAC, I believe it was -- I
18   think the inmate was up.  I don't know if they were
19   talking before we got there or not.
20        Q.   Do you know that there's an instruction at
21   CDCR that certified nursing assistants are not to speak
22   to prisoners while on suicide watch?
23             MS. VOROUS:  Objection.  Lacks foundation.
24             THE WITNESS:  I did not know that.
25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    BY MR. BIEN:

2         Q.    Would you agree that would be

3    countertherapeutic?

4         A.    Yes.  Just to be clear, you're talking about

5    prohibition against talking to them at all?

6         Q.    Yes.

7         A.    Yes, I would be opposed to that.

8         Q.    When you were at SAC, California State Prison

9    at Sacramento, did you observe the ZZ cells at that

10   facility?

11        A.    Yes.

12        Q.    What did you understand them to be?

13        A.    I assume we're talking about the same cells.

14   It's in the sort of a depot where they hold people while

15   they're waiting for transportation.  And there's several

16   officers in the area, and there's some cells that people

17   were held in -- sort of like a holding unit except they

18   were individual cells as opposed to a group holding tank

19   while they're waiting for their particular bus or

20   transportation.

21             When I was there, all of the inmates in those

22   cells had been there for at least a few hours.  And it

23   was my understanding that they were used for temporarily

24   housing people while they were waiting for the bus or

25   vehicle that's going to take them somewhere to pick them

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1   BY MR. BIEN:
 2       Q.   Okay.  Coming back to your meeting in
 3   Sacramento, Exhibit 6, if you pull that out.  It's your
 4   handwritten notes.
 5            MR. BIEN:  This is Aaron Fischer from my
 6   office.
 7            THE WITNESS:  Hi, Aaron.
 8   BY MR. BIEN:
 9       Q.   On page 2, could you -- there's some
10   discussion four rows down, they measure and report
11   120 items by level of care.
12            Was this some of the discussion that you
13   already talked about about the special master's
14   monitoring?
15       A.   Yeah.  I was just taking notes as they were
16   presenting the status of things.
17       Q.   Okay.  And, again, so they were -- I'll just
18   say complaining about the extent of the monitoring and
19   the detail orientedness of the monitoring; is that a
20   fair summary?
21       A.   Yeah, that's a fair summary.
22       Q.   What does it say at the top of the page?
23       A.   I was afraid you were going to ask me about
24   that.
25            It says:  "Judge Karlton hates State and AG."
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    And I probably wish I hadn't written that note, but I

2    think there was a general belief that any time there was

3    a disagreement between the special master and the State,

4    that the judge would simply agree with the special

5    master.  So that they didn't feel like it was a level

6    playing field, I guess, to put it -- and I wish I hadn't

7    written that.

8         Q.   You wrote it down because it was stated at

9    that meeting?

10        A.   Yeah, I believe so.

11        Q.   Do you know who said that?

12        A.   I do not.

13        Q.   How did you select the number of prisons --

14   the prisons that you toured?

15        A.   We had a meeting -- might have been that same

16   day or shortly thereafter -- where we -- we kind of sat

17   around, and I asked for a list of, like, which kind of

18   programs are at which programs.  And there were people

19   from CDCR there, and I asked them questions about, you

20   know, I say "I"; we all did.

21             All four of us weighed in about -- we wanted a

22   reasonable sample that would cover the types of programs

23   that existed.  We asked specifically for one prison that

24   didn't have much of anything.  I think we picked

25   Centinela for that.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          And then people would give us -- "Here are
2     some prisons that have this level of care."  And we
3     said, "We've got to go see that one."
4          As we began our trip, it became clear to us
5     there were a couple places we should go see, Pelican Bay
6     being an obvious choice because they had one of the two
7     PSUs and we thought that we shouldn't not go to
8     Pelican Bay.
9          And then we wanted to revisit -- our first
10    visits were a little chaotic; we weren't sure what we
11    were doing.  We were still working on our methodology.
12    We went back to CMF, and I think we went back to SAC, if
13    I'm not mistaken.  I know we went back to CMF to make
14    sure that we had asked all the questions we needed to
15    ask.
16         Q.   So why didn't you go to 33 prisons?
17         A.   Expense.
18         Q.   Okay.
19         A.   It would have been a lot more money.
20         Q.   Okay.
21         A.   I shouldn't say that.  That was my assumption.
22         Q.   Okay.
23         A.   I don't think that was said to me, but I
24    didn't even ask the question because I assumed it would
25    be very, very expensive to do that.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1      Q.    Okay.  Did you think that going to 9 of the 33

2  prisons allowed you to make an opinion about the total

3  operations of the California Department of Corrections?

4            MS. VOROUS:  Objection.

5            THE WITNESS:  I think it's 13, isn't it?

6  BY MR. BIEN:

7      Q.    What's 13?

8      A.    All the ones we visited.

9      Q.    Okay.  How many did you go to?

10     A.    I thought we visited 13.

11     Q.    13 prisons.  Okay.  I have it all down.

12     A.    I'm sorry.  I know I wouldn't be able to list

13  all 13 for you.

14     Q.    I do have a list here.  Let's assume you went

15  to 13 prisons.

16     A.    I think it is.

17     Q.    Okay.

18     A.    But I'm willing to stand corrected if that's

19  incorrect.

20     Q.    On what basis do you feel that you can render

21  an opinion about the full California Department of

22  Corrections, which is 33 prisons right now plus 9,000

23  people out of state?

24     A.    I certainly don't -- I don't offer an opinion

25  about the people who are out of state.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1         Q.    Okay.

2         A.    For the rest of the prisons, in addition to

3    going to prisons, we talked to inmates who had been in

4    most of the prisons.  So if there had been any kind of

5    meaningful allegation that something was an outlier in

6    a -- while you're doing that, can I use the restroom

7    real quick?

8         Q.    Sure.

9               (Off the record at 2:32 p.m. and back on

10               the record at 2:36 p.m.)

11   BY MR. BIEN:

12        Q.    I think you were in the middle of an answer so

13   to be fair, I'd like to -- why don't you read back the

14   question and the answer?

15               (Record read as follows:

16               "QUESTION:   On what basis do you feel

17                that you can render an opinion about

18                the full California Department of

19                Corrections, which is 33 prisons right

20                now plus 9,000 people out of state?

21               "ANSWER:  I certainly don't -- I don't

22                offer an opinion about the people who

23                are out of state.

24               "QUESTION:  Okay.

25               "ANSWER:  For the rest of the prisons,

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    court opinion that came out in the summer of 2009?

2         A.   Regarding crowding?

3         Q.   Yes.

4         A.   Not that I recall in that meeting.  And it

5    probably would have been the same answer because that

6    really was the same question as what the Supreme Court

7    addressed as I understand it, so...

8         Q.   Okay.  Your expert report does not include the

9    word "crowding" or "overcrowding," to my understanding;

10   is that correct?

11        A.   I don't remember using that word.

12        Q.   Okay.  Do you have an opinion concerning

13   whether California prisons -- let me back up.

14             Do you disagree with the Supreme Court

15   decision finding that crowding was the primary cause of

16   the ongoing constitutional violations in California

17   prisons?

18             MS. VOROUS:  Objection.  The overcrowding

19   issue is not something Dr. Dvoskin was asked to evaluate

20   or render opinions on in connection with this case.

21             THE WITNESS:  So shall I answer?

22   BY MR. BIEN:

23        Q.   Is that correct?  Dr. Dvoskin, did you

24   understand that you were asked not to render opinions

25   concerning crowding?

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1    A.    No, that's not what she said and that's --

2    Q.    Okay.

3    A.    There's a difference between asking me not to

4  and not asking me to.  I was not asked to render an

5  opinion -- well, in this matter, I was not asked to

6  render an opinion.

7          Can we go off the record for a second?  I have

8  a question.

9          MR. BIEN:  Sure.

10         (Off the record at 2:43 p.m. and back on

11         the record at 2:44 p.m.)

12  BY MR. BIEN:

13   Q.    Do you have something you would like to

14  clarify?

15   A.    The AG office asked me sometime previously if

16  I might be an expert witness on that issue in Plata.

17  And I was not an expert witness for the State in Plata.

18   Q.    You mean the underlying three-judge court

19  trial?

20   A.    Yeah.  The technical answer to your question

21  was, well, I had been asked.  But what I think you meant

22  was in this matter was I asked, and I just didn't want

23  to give you a misleading answer.

24   Q.    So just to be clear so we have it all

25  straight, you're not rendering any opinions in your

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

 1    So, for example, there's prisons that are rated at
 2    single cell, but they're double celled, and they've
 3    taken the right steps in terms of infrastructure where
 4    it might be okay.  So if it's a fair rating -- it's an
 5    accurate rating of what the real capacity the prison is,
 6    then I would say, yes, 180 percent is by definition
 7    overcrowded.
 8    BY MR. BIEN:
 9         Q.   Did CDCR inform you at any time that they had
10    made a decision to overcrowd CCWF with women since the
11    time that you toured the prison?
12              MS. VOROUS:  Objection.  Lacks foundation.
13    Argumentative.
14              THE WITNESS:  No.
15    BY MR. BIEN:
16         Q.   Do you know that CDCR closed down Valley State
17    Prison for Women and moved the women from Valley State
18    across the street to CCWF since the time you toured
19    CCWF?
20         A.   I heard that there was going to be a
21    repurposing of a whole bunch of prisons, and I believe
22    that specifically -- that the -- I don't remember if I
23    knew the details, but that there was going to be some
24    reorganization of where women were housed and some
25    repurposing of facilities.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        Q.   Okay.  Did they ask your opinion about whether

2   it would be okay to go above 180 percent for that

3   facility given you toured it and were prepared to render

4   an opinion about mental health care there?

5             MS. VOROUS:  Objection.  Lacks foundation.

6             THE WITNESS:  No.

7   BY MR. BIEN:

8        Q.   Assuming what I learned on the tour, that

9   staff represented they had received no additional mental

10  health staffing yet now are operating at over

11  180 percent, would you agree that your prior opinion

12  about the adequacy of care at CCWF needs to be

13  reevaluated?

14            MS. VOROUS:  Objection.  Lacks foundation.

15  Vague and ambiguous.

16            THE WITNESS:  I mean, I guess I would say that

17  my opinions are based upon the time I visited the

18  prison.  And I couldn't speak to -- if there's been

19  specific changes in the purpose, utilization of the

20  prison, its census, the nature of its census, then my

21  opinions apply to what it was like at the time I visited

22  it, not now.

23  BY MR. BIEN:

24       Q.   Would you be concerned if -- about the

25  adequacy of CCWF to deliver mental health care if it was

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1    much more willing to use mental health services than

2    men.

3              So we sort of, you know, overstaff women's

4    facilities.  And they were -- you know, their staffing

5    model is higher than it is for a male facility for that

6    reason, appropriately so.  But as far as where they

7    stand right now, I can't say.

8    BY MR. BIEN:

9         Q.   Okay.  So when you asked Dr. Toche about the

10   groups, did she tell you that there had been a

11   significant change in CCWF since the time you toured?

12        A.   Well, they had already told me that there was

13   going to be repurposing, but I didn't ask her about --

14   all I asked her was -- I was going over my notes.  I

15   said, you know, "That went from 100 to 15.  Do you know

16   what" -- and I think at the time, she might have even

17   been with us on the tour.  I can't remember.  But it was

18   said to me this was temporary.

19             So I think I wrote -- I either made a mental

20   note to check back and see where things stood.  I

21   asked -- I don't know if it was a few weeks later.  I

22   don't know if there had been that change or not.

23        Q.   She didn't volunteer the information to you?

24        A.   I don't remember her saying that.

25        Q.   And she didn't -- you have no idea about

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   whether or not 75 groups are being offered at CCWF

2   except for what from Dr. Toche told you?

3        A.   I think that's -- I think it was Dr. Toche.

4   I'm not sure, but...

5        Q.   You didn't go back?

6        A.   I did not go back.

7        Q.   Okay.  Were you informed by the attorney

8   general's office that there was an order in this case

9   requiring that they give notice before their experts do

10  inspections of the prisons?

11       MS. VOROUS:  Objection.  Lacks foundation.

12  Argumentative.

13       THE WITNESS:  If I was, I don't remember it.

14  BY MR. BIEN:

15       Q.   Okay.

16       A.   I was given an awful lot of documents.  If I

17  saw it, I don't recall it.

18       Q.   And did you -- were you ever informed that the

19  order states that the reason to give notice to the other

20  side is that the other side would have a chance to bring

21  an attorney and their own experts along on tours?

22       MS. VOROUS:  Objection.  Lacks foundation.

23  Argumentative.

24       THE WITNESS:  I don't know that.

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1   BY MR. BIEN:

2        Q.   No one told you that?

3        A.   No.

4        Q.   Okay.  Well, no one told you the order -- no

5   one told you that there was an agreement in this case by

6   order and it's reflected in the order that the parties

7   would give each other notice before they did prison

8   inspections?

9             MS. VOROUS:  Objection.  Lacks foundation.

10  Argumentative.

11            THE WITNESS:  I don't know anything about

12  that.

13  BY MR. BIEN:

14       Q.   Okay.  When you did your inspections in

15  Coleman originally, you were accompanied by plaintiffs'

16  counsel, were you not?

17       A.   I actually don't remember.  I know on some of

18  the tours I was accompanied by plaintiffs' experts.

19       Q.   I was going to say that, too.  And plaintiffs'

20  experts were along also on some of your tours?

21       A.   I think Don Specter was on some of the tours.

22  But it was a long time ago; I don't remember very well.

23       Q.   Okay.

24       A.   But I do remember making a tour with

25  Dr. Metzner and also with Dr. Haney, but I don't

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                               February 27, 2013

1    remember if that was for Coleman or Madrid.

2         Q.    One of the methods you used to gather

3    information on your prison inspections was to interview

4    staff; is that correct?

5         A.    Yes.

6         Q.    And you also -- you also interviewed patients?

7         A.    Yes.

8         Q.    Okay.  And who gave you permission to

9    interview patients?

10             MS. VOROUS:  Objection.  Lacks foundation.

11   Argumentative.

12             THE WITNESS:  I guess I just interviewed them.

13   BY MR. BIEN:

14        Q.    Okay.  What did you say to a prisoner when you

15   interviewed them?

16        A.    I said, "Hi.  I'm Dr. Dvoskin.  I'm a

17   consultant to the State, trying to find out about the

18   mental health care in the prison.  If it" -- "Interested

19   in how you're doing.  Do you want to talk to me?"

20             Most of the time they said yes.

21             And then I said, "Well, do you know what level

22   of care you're at?  What services do you get?  Do you

23   know who your primary clinician is?  How often do you

24   see that person?  What do you think about them?"

25             Same sort of questions with the psychiatrist.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        Q.   Did -- you explained that you were working for

2    the attorney general's office?

3             MS. VOROUS:   Objection.   Lacks foundation.

4             THE WITNESS:   I think I usually said the

5    State.

6    BY MR. BIEN:

7        Q.   The State?

8        A.   I may have said the attorney general, but I

9    think I usually said the State.

10       Q.   Did you make a reference to the Coleman case?

11       A.   Almost always the inmates did.   They said --

12   the minute I said I was Dr. Dvoskin, they said, "Are you

13   Coleman?"

14            And I said, "Well, we're not the monitors.

15   We've been hired by the attorney general's office and

16   the department to look at the system and make

17   recommendations, but we don't work for the monitors.

18   That's a different thing."

19            And typically, inmates, when they say

20   "Coleman," they mean the special master and his experts.

21   At least that was my impression.

22       Q.   You understood that one of the things that

23   Coleman monitors do when they investigate the prisons is

24   speak to staff and speak to inmates; is that correct?

25       A.   I'm sure they do, knowing the monitors.

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1       Q.    You've worked with Jeff Metzner, and you know

2    that he goes in and has different methods he uses to

3    evaluate programs; is that right?

4       A.    Yes.

5       Q.    And you've actually done that with him?

6       A.    Yes.

7       Q.    And he will walk in and pick some inmates out

8    and ask similar questions to what you did?

9       A.    I don't know what he does in Coleman.

10      Q.    Right.

11      A.    But typically that's what he does.

12      Q.    Okay.

13      A.    Typically, our methods are pretty similar.

14      Q.    Did you develop a list of people you wanted to

15   interview before walking into a unit, or did you use

16   more the method that you described earlier this morning

17   of kind of walking in and asking guards for help?

18      A.    Both.

19      Q.    Okay.

20      A.    Well, it wasn't just the officers; it was also

21   inmates.  I gave a more complete answer than that.

22            But often, in the initial meeting, I would --

23   we had a long -- usually almost a half-a-day discussion

24   of how things work, what sort of data did he keep,

25   what's your quality improvement process, who runs which

1    committee, who's your SPR-FIT coordinate.  Those kinds

2    of questions.

3            In the course of that, I might ask a lot of

4    different questions.  "What" -- "Was there any recent

5    suicide attempts?  Is there anybody you're having a

6    problem big with?"

7            So occasionally I would have a name that I

8    might scribble on the front page of my note.  That would

9    be somebody I would look for.

10           Or in the course of the day, names would come

11   up through a variety of mechanisms.  I'd be talking to a

12   staff member that might say, "I had a really hard time

13   with inmate Joel."

14           And I'd say, "Where is he?  Could you look him

15   up for me, get his location?"

16           Then I'd find him and see him myself.

17       Q.   Okay.

18       A.   So it was a combination.

19       Q.   You weren't trying to do -- for example, you

20   could have a method where the State gave you a printout

21   of all the inmates that were in the prison on that day,

22   and you randomly selected every 10th or 20th, and then

23   made sure you those.  You didn't use a method like that?

24       A.   No.

25       Q.   Okay.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1       A.    That would have taken more time.  We had two

2   days for each prison, so that wouldn't have been a

3   realistic way to go about it.  It wouldn't have been any

4   better.  In my opinion, we got a really good picture of

5   the system.

6       Q.    When you said "random samples," you meant the

7   method you described?

8       A.    I would randomly pick inmates in the housing

9   unit or people I observed -- like I might walk past a

10  bunch of cells if I saw somebody who I thought I should

11  talk to or if another inmate mentioned their name.  So

12  it was both random and nonrandom.

13      Q.    You did exit interviews after -- at the end of

14  the day or at the end of the second day of each tour?

15      A.    Yes.

16      Q.    And for some of the prisons, did you go for

17  one day?  Or were they all two-day?

18      A.    I think they were all two days except for the

19  second visit to CMF.  And I think -- I can't remember

20  Centinela.

21      Q.    How about Centinela?

22      A.    That might have been one day.

23      Q.    Our records have one day for that.

24      A.    I think Centinela was one day.

25      Q.    Is it correct that on some of the visits you

Joel Dvoskin, Ph.D., ABPP                           February 27, 2013

1    were alone?  You went to Pelican Bay by yourself?

2         A.    No.  I didn't do any of them -- I don't think

3    I did any of them by myself.

4         Q.    Okay.

5         A.    I think Dr. Scott missed one day at Pelican --

6    no.  He couldn't make it to Pelican Bay.  His plane --

7    he literally couldn't get there.

8         Q.    That's what our records show, too.

9         A.    And I think that Dr. Moore also wasn't there.

10   I think it was just me and Steve Martin for Pelican Bay.

11        Q.    Okay.  And you already mentioned that

12   Dr. Moore didn't make it to Centinela, right?

13        A.    Yeah.

14        Q.    Okay.  Were there some prisons that

15   Steve Martin, to your knowledge, didn't go to?

16        A.    I -- no.  I think he made all of them.

17        Q.    Okay.  And you think Dr. Scott went to all the

18   ones except for that -- Pelican Bay?

19        A.    Yeah.  And he did Pelican Bay -- a lot of what

20   he did actually was interviews with the chief

21   psychiatrist and looking at records.  So he did

22   Pelican Bay; he didn't go to Pelican Bay.

23        Q.    He did it by telephone or --

24        A.    Yeah.

25        Q.    Were you given access to the electronic

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   records system for CDCR as part of your work?

2       A.   Technically, yes.  Practically, no.  It is a

3   disaster.

4       Q.   What --

5       A.   I never had any success getting on it.  So

6   when I wanted to see something, I just asked somebody to

7   find it for me.

8            So I was able to look at the EUHR for people,

9   but I always had a guide because I found it very

10  difficult to use.  I would look for a treatment plan in

11  the treatment plan section, and the person would laugh

12  and say, "Well, might be there, but it might be

13  somewhere else."  And so we'd look in the "All Forms"

14  tab and just -- so it was pretty time-consuming.

15           I think I made pretty clear in my record I

16  cannot for the life of me understand why they don't have

17  electronic medical record.  It's inexplicable.

18      Q.   What do you mean?  They call that an

19  electronic medical record.

20      A.   No, they don't.  Nobody calls it that.

21      Q.   What do you --

22      A.   I don't know who said that, but not with a

23  straight face.  It is not an electronic medical record.

24      Q.   Okay.  What -- in your mind, what's the

25  difference between what you called an electronic medical

Joel Dvoskin, Ph.D., ABPP                         February 27, 2013

1   record and the EUHR system that you saw at CDCR?

2        A.   Well, first of all, it's very time-consuming

3   for clerical staff.  They have to scan documents into

4   it.  Documents are often difficult to read because

5   they're handwritten.

6            An electronic medical record is where

7   everything is electronic.  Forms are filled out

8   electronically.  They're instantaneously available.  You

9   don't have to wait for them to be scanned in.  They're

10  organized in a more useable fashion.  The -- where

11  things are filed isn't a matter of chance based on who

12  scanned it but, rather, the form itself is designed to

13  be in a predictable place.

14           This is not an electronic medical record.

15       Q.   Okay.  When I was touring the last couple of

16  weeks, I was also -- been in the prisons.  I had the

17  experience, and I assume from your notes that you had

18  the same experience, where you'd be in some unit and

19  the -- the electronic medical record wasn't available

20  because there was no computer.

21           Did you experience that when you were in CDCR?

22           In other words, to access the electronic

23  medical record, you need to have a computer attached to

24  the system.  That seems obvious, but...

25       A.   I quit asking about that early on.  So what I

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1  would do is if I had questions that I needed to look up,

2  I would go back to office, and that way I could get a

3  guide, somebody who could sit with me for half hour or

4  an hour, whatever it took, and find the things.

5           So I would say, "I saw this guy, and he said

6  he wasn't seen in the last two months.  Can you look him

7  up?  I want to see if there's a progress note."  Things

8  like that.

9      Q.   Okay.  As one of your -- I know you made

10  recommendations to CDCR along the way, both at

11  individual prisons and other places, when you had these

12  meetings with CDCR officials.

13           Did you ever make a recommendation about

14  improving their medical records?

15           MS. VOROUS:  Objection.  Lacks foundation.

16           THE WITNESS:  I probably complained about the

17  lack of an electronic medical record 100 times --

18  BY MR. BIEN:

19      Q.   Okay.

20      A.   -- if I did it once, to anybody who would

21  listen, including you.  I just found it to be, you know,

22  a pain in the neck.  I mean, it's not CDCR, that's --

23  the receiver's in charge of that.

24      Q.   Okay.

25      A.   My very clear impression was that everybody

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    centralized that you either got something or you got
2    nothing, which I thought was -- left people hanging out
3    to dry.
4         Q.   Okay.  Were there a particular set of -- I
5    think you've said in your report that the fact that a
6    particular unit, let's say -- let's use an EOP unit, for
7    example.  That was one of your responsibilities, wasn't
8    it, evaluating EOP units?
9         A.   Uh-huh.
10        Q.   Is it correct that, in your opinion, EOP unit
11   could be delivering a constitutional level of care even
12   if none of the inmates were receiving 10 hours a week of
13   therapeutic treatment and 10 hours of out-of-cell time?
14        A.   Yes.
15        Q.   Okay.  And what standard did you apply to make
16   that evaluation?
17        A.   Let me clarify for you that the 10 and 10
18   language, as Dr. Metzner and I had used it, came in a --
19   out of settings where people are locked down 23 hours a
20   day.  The EOPs are not that.
21             So you could have a -- you know --
22        Q.   Change the question to the hub.  EOP ad seg
23   hub or the PSU.
24        A.   For the hub, I would be more concerned about
25   because that's a lockdown setting.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                        February 27, 2013

1      Q.   Okay.

2      A.   And if they're 9 hours, I would certainly -- I

3    mean, it -- this is -- as I said before, it's a bit of

4    an arbitrary number.

5           So if they're trying hard, the inmates feel

6    cared for, they're -- I could certainly see that it

7    would -- you know, if it's a reasonably therapeutic

8    environment and they're doing okay there, that's

9    constitutional, whether they're doing 10 hours or

10   8 hours.

11     Q.   What standard did you apply in evaluating an

12   EOP ad seg hub or a PSU which are both providing care

13   for the same level of patient in a high-security unit if

14   you were not using the 10-hour standard?

15     A.   Well, I -- the 10-hour standard was in my

16   mind, and I -- I -- it's just not -- it's not the

17   11th Commandment, but it's a meaningful benchmark, and I

18   agree with it.

19          But I looked at -- the standard I looked at

20   was whether or not there appeared to be deliberate

21   indifference to their serious medical needs or not.  And

22   so the 10 hours is one informative piece of data.  I

23   don't mean to diminish it; it's an important one.

24          But I also looked at the fact that inmates

25   overwhelmingly had a positive relationship with their

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    treaters, both the primary clinicians and their

2    psychiatrist, their interactions with the officers, and,

3    you know, how hard people were trying to get care to

4    people was part of the assessment.

5         Q.   How hard who was trying?

6         A.   The clinicians.

7              Were the officers cooperative advocates for

8    treatment or getting in the way of it?

9              There isn't a formula for this.  It is my

10   judgment.  It's a judgment call.

11        Q.   Okay.  Okay.  I notice that there are these

12   protocols or instruments that you guys developed to do

13   your work, but then it appears that -- I'm not sure how

14   they were used.

15             The audit tool.  Can you explain what the

16   audit tool was and how you used it?

17        A.   At the very beginning, the attorney's general

18   suggested to us that we should put together an audit

19   tool.

20             And kind of against my vote, it included a lot

21   of things that -- because they were being monitored by

22   the special master, I wanted to have a simpler, more

23   robust set of questions along the lines that I just

24   articulated to you.

25        Q.   Was there a plan at one point to actually fill

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1    out these audit tools and then calculate -- make up some
2    mathematical calculations based on that that would be
3    part of your opinion?
4         A.    Absolutely not.  There was never an intention
5    to quantify these things but to use them as guided
6    judgment tool.  But I didn't find them helpful.  From
7    the very beginning, I argued that there's no substitute
8    for talking to inmates.  And that that's the most
9    important thing to me, talking to inmates in a program
10   and asking them about it.
11        Q.    In some of the audit tools, I saw there was --
12   early on there was a list saying you should hit
13   10 inmates for this unit and five for this unit.  And
14   then later on in the audit tools, it seems like it said,
15   "Leave that blank.  Do whatever you thought was
16   appropriate."
17        A.    Yeah.  I think people came around to my way of
18   thinking as we visited several prisons, that -- that it
19   was it wasn't particularly helpful to do these, and it
20   was very time-consuming.
21             If I talked to an inmate and I say, "How often
22   do you see your primary clinician?" and the inmate says,
23   "Every week like clockwork," why do I need to go look in
24   the EUHR which takes me 45 minutes to find the last
25   progress note?  It's a waste of time.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          So that's how I did it.

2      Q.    Okay.  I noticed in -- in your report -- and

3  you repeated here today -- that you felt it was a

4  significant factor that inmates you spoke to knew the

5  names of their doctor and medication.  Is that correct?

6      A.    And, even more importantly, that they

7  expressed some positive feeling toward the person or a

8  belief that the person cared about their well-being.

9      Q.    Okay.  Can you -- did you calculate how many

10  of the inmates you spoke to knew their doctors' names

11  versus didn't know them?

12      A.    I wouldn't go by name.  If they said, "Oh, you

13  mean that short Indian guy?  I can't pronounce his

14  name," that was a yes.

15          It was so overwhelmingly positive that I

16  didn't need to count them.  It was well in excess of

17  80 percent of the people I talked to.  It might have

18  been 90 percent.

19      Q.    Did you actually calculate?

20      A.    No.

21      Q.    And did you calculate how many people knew

22  their medication versus how many didn't know it?

23      A.    The name of the medication, I can give you a

24  rough estimate.  I didn't calculate it, but it was over

25  50 percent.  But if you gave them credit for being in

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   the ballpark, like, "He's got me on an antidepressant.

2   I can't remember the name of it," that would be a yes.

3   And then it would be over 80 percent of people.

4        Q.    Okay.  And did you then take -- go to the EUHR

5   and determine whether the information the inmate gave

6   you was correct or incorrect about the name of their

7   doctor or the name of the medication?

8        A.    Yes and no.  I would -- I often -- when I met

9   with treatment teams, I would ask the name of the doctor

10  who's responsible if it was by housing unit.  So I did

11  it enough to verify but not -- I didn't systematically

12  do that.

13       Q.    Is it correct you really didn't do that as a

14  practice?  I mean, I didn't go through all your notes,

15  but I don't see anything where you verified that the

16  inmates' recollection expressed to you of their

17  medication, their doctor, was verified by you or anyone

18  else.  Is that correct?

19       A.    No.  For the most part, I believed the

20  inmates.  If they talked about their doctor warmly, I

21  had no reason to doubt that they felt good about their

22  doctor.  And if they got his name wrong, it wouldn't

23  have changed my mind anyway.

24            The fact that somebody says, "Yeah, he's a

25  good doctor; he listens to me," is much more important

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    to me than whether he knew the doctor's name or not.

2          A lot of the doctors have hard names to

3    pronounce.  Often it was clear they were butchering the

4    name but that they had a good feeling about the

5    clinician or the physician.

6          Q.    On the bottom of page 11, you talk about

7    staffing.  You talk about -- you see that paragraph that

8    has a 1 on it?

9          A.    Yes.  Well, there's two of those.

10         Q.    You're right.  The bottom paragraph on the

11   page.

12         A.    Yes.

13         Q.    And you're talking about -- about the fact

14   that you encountered quite a few prisons on your tour

15   where it was expressed to you that they had staffing

16   shortages, right?

17         A.    Uh-huh.

18         Q.    Is that correct?

19         A.    Yes.  Sorry.

20         Q.    And then you talked about it overall there, in

21   this paragraph that goes over from pages 11 and 12, that

22   there were staffing shortfalls during the time that you

23   were touring the prisons.

24         A.    Yes.

25         Q.    Okay.  And were you aware there was a hiring

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                    February 27, 2013

1    would take responsibility for those decisions, but they

2    also wouldn't say it was voluntary that they made cuts.

3    They might say, "There's not enough money to do all the

4    things that need doing, and I was forced to cut a lot of

5    things that I didn't want to cut."

6            When you use the word "voluntary" -- and

7    that's my answer to you.

8    BY MR. BIEN:

9    Q.    You were told that -- let me back up and try

10   this again.

11           What's your basis to say that the staffing

12   shortages that you saw in the California system, when

13   you inspected it, were unavoidable?

14   A.    Well, what I was referring to there is what I

15   said a minute ago, was that one of the main reasons for

16   staffing shortages where -- they had jobs.  The jobs

17   weren't taken, and they weren't frozen, but they

18   couldn't hire until the bumping process -- that's what I

19   was referring to -- until the bumping process was

20   completed.

21           And that's a state personnel law.  And I

22   suppose you could change that law, but that's what the

23   law is.  And it's not just in California; it's almost

24   everywhere where people have bumping rights as part of

25   the layoff procedure.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1      Q.    So in your opinion, if a staffing shortage at
2  a particular prison results from this public employment
3  law, then it doesn't count in a -- looking at whether or
4  not the care is constitutional?
5              MS. VOROUS:  Objection.  Misstates testimony.
6              THE WITNESS:  I didn't say that.  No, I don't
7  think that.
8  BY MR. BIEN:
9      Q.    Why did you include in your opinion the idea
10 that they're trying hard and it's not evidence of lack
11 of commitment?  Why is that relevant to your opinion?
12     A.    Because there's a subjective component to
13 deliberate indifference and trying matters.  It
14 doesn't -- it's not dispositive.  So if you're trying
15 hard, but you have one psychologist for 75,000 inmates,
16 you could still be deliberately indifferent as a state.
17 But that's not the same thing as saying "trying is
18 irrelevant."  It's not irrelevant.
19     Q.    What was your evidence that people were trying
20 hard to fill their vacant mental health positions?
21     A.    I talked at length with the leadership about
22 the issue of whatever I observed, what appeared to me to
23 be staff shortages, or what were complained of as staff
24 shortages.  I would typically ask Dr. Toche, "What's the
25 status of this?"

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1          And she said, "You know, when the smoke

2     clears, the staffing plan is funded, and they'll have

3     enough staff to do it.  But right now they're right,

4     they don't; and we have to wait."

5          And then she would explain to me what the

6     process was and what the timing was regarding putting

7     the staff on.

8          Q.    What's your understanding about when the smoke

9     will clear?  How long do we have to wait?

10         A.    You know, I don't know the answer to that

11    because I think there are multiple waves of repurposes.

12    So it may be that it affects different prisons at

13    different times.  And I don't know the answer to that.

14              MR. BIEN:  Okay.  Let's take a break.

15              (Off the record at 3:51 p.m. with and

16               back on the record at 4:00 p.m.)

17              MR. BIEN:  I'm going to mark a series of

18    exhibits, several sets of handwritten notes.

19              First is Sacramento 2/29/12 on the front page,

20    the first page of which is DEXP104255.

21              (Plaintiffs' Exhibit 8 was marked for

22               identification.)

23              MR. BIEN:  And the next is three pages of

24    notes, first page of which is DEXP105100.

25

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1              (Plaintiffs' Exhibit 19 was marked for
 2                 identification.)
 3    BY MR. BIEN:
 4         Q.    Let me ask you about 19.
 5               Is that your notes or Ms. Moore's notes?
 6         A.    Mine.
 7         Q.    Those are yours?
 8         A.    Yeah.  I didn't have one of my yellow pads, so
 9    I wrote it on a 8 1/12-by-11.
10               MR. BIEN:  Next is Centinela, 104320 through
11    -34.
12              (Plaintiffs' Exhibit 20 was marked for
13                 identification.)
14               MR. BIEN:  And then I think I'm at the last of
15    this series.  CMF, 2/27/12, 104283 through -319.
16              (Plaintiffs' Exhibit 21 was marked for
17                 identification.)
18    BY MR. BIEN:
19         Q.    One question that I wanted to ask you before
20    we start looking at your notes a little bit is about one
21    of issues that you reviewed was emergency response for
22    attempted suicide.  Is that correct?
23         A.    Mainly, Jackie Moore did that.  I looked at it
24    in -- when I looked at the suicides in responding to
25    Dr. Patterson's reports.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1      Q.    Okay.

2      A.    It gives people a chance to say if they're in

3   medical distress also.

4      Q.    Do you understand that that function is

5   traditionally performed by custody officers?

6      A.    Yes.

7      Q.    And you think that's appropriate?

8      A.    Yeah.

9      Q.    Okay.  And in CDCR, are welfare checks

10  performed in ad seg and SHU?

11     A.    Yeah.  I think they go once every hour in

12  ad seg and SHU to make sure the person's alive and to

13  give an opportunity to ask for something.

14     Q.    Okay.  Are you aware of a --

15     A.    Actually -- I'm sorry.  I didn't give you a

16  complete answer.  For the first 21 days in segregation,

17  I think it's every half hour.

18     Q.    Every half hour?

19     A.    Yeah.

20     Q.    Okay.  And Ms. Moore in her deposition

21  recommended --

22     A.    Dr. Moore.

23     Q.    -- sorry -- Dr. Moore, in her deposition,

24  recommended that CDCR adopt 30-minute welfare checks for

25  all prisoners in ad seg consistent with ACA standard

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    standards.

2            MS. VOROUS:   Objection.   Lacks foundation.

3    BY MR. BIEN:

4        Q.   Do you agree with that?

5        A.   I don't remember what the ACA standard is

6    about that.   But if Jackie said that, there's a very

7    good chance she's right.   She knows the standards pretty

8    well.

9            I'm not sure how much or what it would help.

10   It's not a bad idea.   It just costs -- you know, it's a

11   lot of staff time to do it.   I'm kind of neutral about

12   it.   Certainly not a bad idea.

13       Q.   You understand that in reviewing suicides,

14   which is one of your jobs, you reviewed some of the

15   completed suicides; is that correct?

16       A.   Yes, sir.

17       Q.   You saw cases where it was reported that the

18   inmate had rigor mortis at the time he was found?

19       A.   Yes.

20       Q.   Okay.   And you did some investigation -- I

21   could see from your notes -- as to what rigor mortis was

22   and what the details were; is that right?

23       A.   Yeah.   I did a little checking of -- my

24   recollection was that -- well, let me back up.

25           Rigor mortis is often misconstrued by lay

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   alive and begins emergency medical response?

2        A.   It theoretically could.  I'm aware of that

3   happening.  Very few times in my career that I've seen

4   that happen.  But it could if they got lucky.

5        Q.   You're -- very few times you've seen someone

6   saved to -- attempted suicide and their lives are saved?

7        A.   No.  No.

8        Q.   I didn't understand your testimony.

9        A.   Where an officer happened to see the guy

10  trying to kill himself and intervened quickly.  It

11  happens all the time when other inmates say, "There's a

12  man down," and they yell, and officers respond quickly.

13  I've seen lives saved many times like that.  But it's

14  much more common it would be an inmate than an officer,

15  unless the person was in an easily visible space.

16            Sometimes -- if there's a guy they're worried

17  about, they'll move him to the most visible cell, or

18  maybe there's a cell with a bigger vision panel and then

19  that, the officer might be likely to catch.

20        Q.   Just focus on the 30-minute welfare checks.

21        A.   Okay.

22        Q.   Do you agree that lives can be saved by -- if

23  California expanded 30-minute welfare checks to include

24  all prisoners who are mentally ill in segregation for

25  the time that they're in segregation?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1        A.    Yeah, I would say it could.

2        Q.    Would you also agree that approximately 40 to

3    50 percent of the suicides are people who are not

4    mentally ill?  Is that correct?

5        A.    I believe that's approximately right, yes.

6        Q.    You also agree it would be beneficial and save

7    lives for California --

8        A.    I'm sorry.  By "not mentally ill," I assume

9    you mean not identified mental health service

10   recipients.

11       Q.    That's correct.  That question was vague.

12             Would you also agree that it might save more

13   lives if California did 30-minute welfare checks for

14   everyone in ad seg?

15             MS. VOROUS:  Vague and ambiguous.  Lacks

16   foundation.

17             THE WITNESS:  It might.

18   BY MR. BIEN:

19       Q.    It's possible that somebody would be

20   identified early enough to open the cell and maybe stop

21   his bleeding or provide CPR or other emergency medical

22   services?

23       A.    It's possible.

24       Q.    Okay.  Do you disagree with the ACA standard

25   being 30 minutes as being an appropriate national

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1  There are differences between ethnic groups on suicide.

2  That can actually work in either direction.  These are

3  just hypotheses for exploration.

4      Q.    Segregation.  Do you think California uses

5  segregation more than other systems?

6      A.    It appears to me to be true, but I've never

7  looked at a systematic study of various states.  Some

8  places use different names for statuses.

9          And I told you earlier that it's my opinion

10 that segregation is used nationwide too much.  But

11 that's just my opinion.  It's not -- I haven't really

12 gone and said, "Of the people in segregation, here's how

13 many truly need to be there."

14     Q.    Right.  You recommended to California that

15 they should expedite the movement of people who were in

16 segregation for sensitive needs out of segregation?

17     A.    If that's the only reason they're there,

18 absolutely.  I said put them at the very top of the

19 list.

20     Q.    One of the reasons is you think it's a

21 countertherapeutic place.  It's not a safe place to be

22 if you're mentally ill.

23         MS. VOROUS:  Objection.  Misstates testimony.

24 Lacks foundation.

25         THE WITNESS:  I just think you shouldn't be in

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
1    segregation unless you -- there's no other way to keep
2    the prison or you safe.  But they have sensitive needs
3    yards for that purpose.
4          And I understand there may be a -- you know,
5    if somebody needs a particular level sensitive need
6    yard, there may be a challenge in getting them there,
7    but put them at the top of the list in terms of priority
8    of trying to get them off.  And my understanding is that
9    they've done that.
10   BY MR. BIEN:
11        Q.   And who told you they've done that?
12        A.   I believe it was Mike -- I can't remember his
13   last name.
14        Q.   Okay.
15        A.   I -- I can't remember his last name.
16        Q.   You think California's unusual in terms of its
17   length of stay that the mentally ill spend in
18   segregation and in SHU?
19          MS. VOROUS:  Objection.  Lacks foundation.
20          THE WITNESS:  I don't know.  I've never done a
21   systematic study of various states.  Even if they
22   weren't high, it doesn't mean it's the right number
23   because of what I said a moment ago.  Because it's my
24   general opinion that everybody uses it too much.  But
25   that's just an opinion.  I've never seen a study of
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    that.

2    BY MR. BIEN:

3        Q.   In the last five years, have you done a

4    systematic study of mental health delivery in any other

5    prison system in the United States?

6        A.   Well, Hawaii, I mainly work at the Oahu

7    Correctional Center, which is a jail.  But they have a

8    unified jail prison system.  I've looked at Oahu, which

9    is their big prison on Oahu.

10       Q.   My question is -- I'll go one by one:  Did you

11   do a systematic study of mental health care in the

12   Hawaii prison system in the last five years?

13       A.   I wouldn't say a systematic study, no.

14       Q.   Any other states in the last five years you've

15   done a study of their mental health delivery system to

16   see if it's constitutional?

17       A.   Well, Michigan, I think, is still within the

18   last five years, when I was the monitor there or one of

19   two monitors.

20       Q.   Okay.  And when was that done?

21       A.   I think we finished about three years ago.

22   Maybe four.

23       Q.   Okay.

24       A.   And it was four years before that.

25       Q.   Okay.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                   February 27, 2013

1        Q.    Okay.  Do you remember when you were at CIM

2    that you observed in the ad seg unit a large number of

3    mentally ill inmates who were there because they were

4    designated for sensitive needs?

5        A.    There were 12 of them in CIM in Charlie Unit.

6    And that was a sensitive need unit, and they were --

7    they weren't getting groups.  And I made a pretty strong

8    criticism of that, that -- as I recall, the mental

9    health director said, "Well, the clinicians in that unit

10   are really busy.  They got a lot of CCCs."

11           I said, "Well, you know, these guys are EOP.

12   You've got to give them EOP care."

13           That doesn't mean, by the way, that groups are

14   essential.  Groups are the most cost-effective way of

15   delivering care if you did an equivalent amount of

16   individual, but I didn't think they were doing that.

17       Q.    Okay.

18       A.    So they weren't neglecting the guys, but they

19   weren't giving them the EOP level of care, and they had

20   been deemed to need that.  So I was critical of that.

21           MS. VOROUS:  Can you show him where in the CIM

22   that you're referring to?

23           MR. BIEN:  I wish I could.

24           THE WITNESS:  I actually remember that one.

25

Joel Dvoskin, Ph.D., ABPP                        February 27, 2013

1    BY MR. BIEN:

2         Q.   If you can find the CIM one, you can look and

3    refresh your recollection.

4         A.   CIM is when I was in Charlie yard.

5         Q.   Let me see if I can help you out here.

6              MS. VOROUS:  CIM is Exhibit 13.

7    BY MR. BIEN:

8         Q.   Okay.  Let's see if I can help you out.

9         A.   There's a note on page 10, 104449, the fourth

10   checkmark.  It says:  "Move EOPs out of here.

11   Prioritize."

12             That was related to the same observation, and

13   then...

14        Q.   Okay.  So let's look at that page.  Higher up

15   on that page it says:  "LOB no," with an exclamation

16   mark.

17             What were you referring to there?

18        A.   That stood for -- we just go figured that out

19   yesterday.  Just figured that out.

20        Q.   Also, on the next page, I see a reference to

21   LOB again.

22        A.   Got it.  Okay.  Thank you.

23             What that was was -- so if somebody was in

24   segregation for no other reason than there wasn't a bed

25   for them.  Lack of bed.

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1     Q.   LOB stands for lack of bed?

2     A.   I don't know why I used an acronym.  I hate

3  acronyms.  I think maybe they called it that status.

4          Anyway, on the next page, what it says is -- I

5  said, "Well, wait a second.  If I'm in seg just because

6  I need a place to sleep, why am I confined to my house?

7  Why can't I be treated like a regular old inmate if I

8  haven't done anything?"

9          And they said, "Oh, we do that."  If it's a

10  row of LOBs, they let them all out.

11          If it's interspersed because they didn't have

12  a bed next door to a seg inmate, then they said, "We

13  don't do it for them."

14          I think they were afraid of letting a seg

15  inmate out.

16          I said, "That's not okay.  Put signs on the

17  door.  Figure it out.  You shouldn't lock me down if I

18  didn't do anything.  It's not fair."

19     Q.   You understand when you visited CIM in May of

20  2012 that there was a -- a shortage of the particular

21  kind of beds that were necessary for these men who were

22  in -- called LOB?

23          MS. VOROUS:  Objection.  Lacks foundation.

24  Vague and ambiguous.

25          THE WITNESS:  Yeah.  I don't think they were

Page 261

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   mentally ill.  They were just regular old inmates.  They

2   may have been CCC or not.  It was just a practice when

3   someone had just moved and there was no bed for them --

4   I don't think it was very long.

5            I said, "It ain't right.  If I didn't do

6   anything, open my cell.  Let me out on the yard, and

7   then I'll sleep in the bed.  Who cares where I sleep?"

8   BY MR. BIEN:

9        Q.   Did you call back to -- when you made

10  checkmarks on this, on 449 and the next page, does this

11  reflect issues you raised with the -- in the exit, or

12  did you call back to the institution?  What do the

13  checkmarks mean?

14       A.   Usually I check them off when I -- it might

15  mean that I want to include it in the mention of the

16  exit conference.  It might mean I want to mention it to

17  somebody.  I don't remember specifically what it was at

18  the time.

19       Q.   And you recall encountering people throughout

20  the system that were waiting for -- who were mentally

21  ill, either CCC or EOP, who were waiting for a transfer

22  to a place that was designed to provide housing and

23  treatment for their level of care?

24       A.   You talking about the ones that we were

25  mentioning before, the EOP inmates?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    This had to do with the investigation of -- that staff

2    malfeasance was pulled out of the suicide unit and given

3    to internal affairs, and then that's the last that the

4    suicide folks heard of it.

5           And I thought they needed -- they don't need

6    to know all the details, but they at least need to know,

7    "Yeah, that's being investigated.  There was a problem.

8    It's been dealt with."  It can be vague, but they have

9    to -- there has to be some feedback loop.

10      Q.   On the top of -- I think it's page 4583 --

11      A.   Yeah, I got it.

12      Q.   -- when you write "REC," that means

13   recommendation?

14      A.   Yeah.

15      Q.   Okay.  And that -- can you read that

16   recommendation?

17      A.   "Recommendation:  Not necessary for all

18   inmates to be in module."

19      Q.   And did you recommend -- I've seen this a

20   couple times in your notes, Doctor, that CDCR consider

21   an individualized assessment as to whether or not

22   inmates need to be treated in modules rather than having

23   a blanket rule that applied to groups of inmates, like

24   in particular units or areas.

25      A.   Yes.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1      Q.   And why was that?

2      A.   Let me say there may be groups of inmates

3   where it's legitimate.  For example, somebody's in SHU,

4   I'm not particularly offended by putting everybody in

5   the module.  I don't think that you have to do it that

6   way, but it's reasonable.

7           If somebody's in ad seg for their personal

8   protection, it makes no sense whatsoever to me to

9   require them to be in a module.  So it should be an

10  advised assessment.

11     Q.   And the same in -- you have the same opinion

12  about MHCB and the use of modules in the MHCBs?

13     A.   Yes.

14     Q.   That should be individualized assessment?

15     A.   Yeah.  In fact, Dr. Scott did the modules more

16  than I did, but I would think it would be the minority

17  of cases where it would need a module.

18          If somebody's a danger -- the way I did it, if

19  somebody's a danger -- if somebody's a danger to

20  themselves and to others, then it's fine to put them in

21  a module.  But if they're just a danger to themselves,

22  then I don't get it.  I wouldn't do that unless there's

23  a good reason to do it.

24     Q.   If you turn to the next page, is that your

25  interview with an inmate?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    on a list."

2        A.    Yeah.

3        Q.    Okay.

4        A.    And I checked that with other inmates and

5    staff, and they all said that wasn't true.

6        Q.    The next page, Jackson, on the bottom, says:

7    "LPCs don't go cell to cell."

8        A.    Yes.

9        Q.    Right?

10       A.    That's why I asked.

11       Q.    So that was two different inmates, right?

12       A.    I take that back.

13             Several inmates made that allegation.  I asked

14    several different officers that weren't around each

15    other, and I asked a bunch of inmates, and it was my

16    conclusion that that wasn't true.

17       Q.    Okay.  Did you investigate any logs to confirm

18    whether or not that was happening?

19       A.    No, I didn't, because Dr. Moore was looking at

20    the rounds log.  And once -- if I hadn't gotten so many

21    people telling me it wasn't true, I might have looked.

22    But the inmates themselves told me, and they kind of,

23    you know, implied that the guys who were saying that

24    were complainers, I guess is the best way to put it.

25             I'm tired.  Trying to concentrate.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    Q.   The area you've starred, do you recall what
2    that refers to?
3    A.   That was so bizarre.  I can't really explain
4    it to you.
5         The officers were telling me, "We're required
6    to stay within X number of feet of the CTC because of
7    the licensing regulations.  So we can't move these
8    inmates.  We got to wait for two escorts to come even
9    though we're standing here."  And it was just -- years
10   ago I thought that the licensure of the CTCs was going
11   to be a problem, and that was an example.  So I starred
12   it.
13   Q.   Did you investigate the use of the cuffing
14   policy within CTCs, which inmates that the CDCR policy
15   concerned who has to be cuffed when they come out of
16   their cell and who doesn't?
17   A.   I did not.  Dr. Scott focused on the CTC, so I
18   didn't pay any attention.
19   Q.   Okay.  Can we take a look at the
20   Pelican Bay -- are you okay with time?
21   A.   20 to.
22   Q.   Okay.  Pelican Bay.
23   A.   Which one is that one?  Toward the end, right?
24        MS. VOROUS:  Exhibit 14.
25        THE WITNESS:  Got it.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8               That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                         DATED: March 1, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 84



Transcript of the Testimony of:

# Lindsay M. Hayes

Coleman v. Brown

February 18, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

```
        IN THE UNITED STATES DISTRICT COURT

           EASTERN DISTRICT OF CALIFORNIA

                              No. S 90-0520 LKK-JFM
- - - - - - - - - - - - - - - - - - - - - - - - -

RALPH COLEMAN, et al.,

               Plaintiffs

     vs.

EDMUND G. BROWN, JR., et al.,

               Defendants

- - - - - - - - - - - - - - - - - - - - - - - - -

         DEPOSITION OF LINDSAY M. HAYES

     Monday, February 18, 2013 8:53 a.m.

              Intelligent Office

    265 Franklin Street, Boston, MA 02110
```

```
  Reporter:  Janet M. McHugh, RMR, CRR, CLR

      THORSNES LITIGATION SERVICES, LLC
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                    February 18, 2013

1    APPEARANCES:

2

3    ROSEN BIEN GALVAN & GRUNFELD LLP

4    (By Michael W. Bien, Esquire)

5    315 Montgomery Street, Tenth Floor

6    San Francisco, California 94104-1823

7    415.433.6830

8    Counsel for the Plaintiffs

9

10

11   STATE OF CALIFORNIA DEPARTMENT OF JUSTICE

12   (By Jay C. Russell, Supervising Deputy

13   Attorney General)              (Via Telephone)

14   455 Golden Gate, Suite 11000

15   San Francisco, CA 94102-7004

16   Counsel for the Defendants

17

18

19

20

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    I N D E X

 2   WITNESS              DIRECT          CROSS

 3   LINDSAY M. HAYES

 4   By Mr. Bien          5

 5   By Mr. Russell                       144

 6

 7

 8                  E X H I B I T S

 9   Number           Description              Page

10   Exhibit 1  Notice of Deposition

11              and Subpoena                    5

12   Exhibit 2  Vitae of Lindsay M. Hayes       7

13   Exhibit 3  Contract                        7

14   Exhibit 4  E-mail thread beginning with

15              Tuesday 1/08/13                 8

16   Exhibit 5  Report dated January 30, 2011   9

17   Exhibit 6  Report dated August 16, 2011    9

18   Exhibit 7  Five-page report dated

19              August 16, 2011                 9

20   Exhibit 8  Handwritten notes              10

21   Exhibit 9  Article entitled "Avoiding

22              Obstacles to Prevention"       16

23   Exhibit 10 Guide to Developing and Revising

24              Suicide Prevention Protocols

25              within Jails and Prisons       23
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
1              E X H I B I T S

2    Number           Description              Page

3    Exhibit 11 Document entitled "Guiding

4              Principles to Suicide Prevention

5              in Correctional Facilities"      25

6    Exhibit 12 Article entitled "Review of

7              Completed Suicides in the

8              California Department of

9              Corrections and Rehabilitation,

10             1999 to 2004"                    36

11   Exhibit 13 Photograph                      64

12   Exhibit 14 Photograph                      64

13   Exhibit 15 Three photographs               86

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                February 18, 2013

1    until December of 2010.

2         Q.    What are 30-minute welfare checks?

3         A.    30-minute welfare checks are simply cell

4    checks made by correctional staff in particular areas

5    of an institution, normally required in what is

6    called special housing.  They could be mental health

7    units.  They could be medical units.  They could be

8    administrative and disciplinary Seg units.

9         It's a standard practice in correctional

10   systems around the country, I will say outside of

11   California.  It's been a requirement of the ACA, the

12   American Correctional Association standards for as

13   long as I've read the ACA standards to conduct

14   30-minute checks in special housing units.

15        Q.    And are these -- who conducts these checks

16   under ACA standards?

17        A.    Normally, it's the officers.

18        Q.    Correctional officers?

19        A.    Correct.

20        Q.    And what are they looking for?

21        A.    They're looking for an inmate that's alive,

22   an inmate that's in their cell.  Those are the two

23   main -- main reasons why welfare checks are called.

24   That's why the term is called "welfare."  I think

25   that it's not used as a suicide observation, because

Lindsay M. Hayes                                      February 18, 2013

1      So, you know, whether they were uninformed or

2   not, I am not sure.  I just remember there was a

3   tremendous amount of resistance by the CDCR

4   personnel.

5      I think that there were some -- although most

6   of the CDCR representatives were clinicians, I think

7   there were also correctional officials that were at

8   this meeting, as well.

9      Q.   Okay.  Another issue that you discussed in

10  this 2006 declaration was treating non-disciplinary

11  inmates different from disciplinary inmates in

12  Ad-Seg.  Can you explain what that refers to,

13  Mr. Hayes?  I'm referring to Page 7 and 8 of your

14  declaration, beginning at Paragraph 16.

15     A.   I believe that there was a discussion that,

16  for a variety of reasons that I don't recall, that

17  there were non-disciplinary inmates being housed

18  within the Ad-Seg units.  And the concern was that

19  they were being managed as if they were disciplinary

20  inmates.

21     In other words, there was very little

22  movement.  In other words, lack of out-of-cell time.

23  Their property was limited.  So they were being

24  treated as if they were disciplinary inmates, but

25  they did not have disciplinary orders.

Lindsay M. Hayes                                    February 18, 2013

1        And we were -- there was a discussion that
2    this could also be one reason why there's a
3    disproportionate number of suicides in the Ad-Seg
4    unit, because inmates in these units were very
5    frustrated, and their mental health was
6    deteriorating, and their stress level was increasing
7    because they're there for reasons other than
8    discipline, and yet they're being treated it as if
9    they were disciplinary inmates and being locked down
10   up to 24 hours a day and not being given yard and
11   normal property.
12       And that this -- and I think that there
13   was -- it wasn't an issue that I necessarily brought
14   up.  I think it was a general agreement amongst the
15   folks that were at this summit conference that
16   this -- this could perhaps be one of the reasons why
17   there was this disproportionate number of suicides
18   within the Ad-Seg unit.
19       Q.   Turning forward in time, could you take a
20   look at what's been marked as Exhibit 3, please,
21   which is the contract between National Center of
22   Institutions and Alternatives and CDCR.
23       A.   Yes.
24            (Witness complies.)
25       Q.   Can you explain how you came to be -- to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                    February 18, 2013

1          Exhibit 14.)

2               MR. BIEN:  What numbers are those?

3               COURT REPORTER:  Thirteen and fourteen.

4     BY MR. BIEN:

5          Q.   Mr. Hayes, I can represent to you I was

6     present when these pictures were taken.  And these

7     are pictures taken by CDCR staff, who accompanied

8     plaintiffs' counsel and our experts on a tour on

9     February 7, 2013.

10         Do you -- looking at this picture, does this

11    look like the MOHU cells that you observed at Mule

12    Creek State Prison during your tour?

13         A.   You know, my recollection is not that good

14    from two years ago.  They -- all these OHU cells look

15    pretty much the same to me.  But -- I mean, this is

16    reflective of there not any beds in them.

17         This cell is four concrete walls, a

18    sink-toilet combo, stainless steel commode, and

19    that's about it.

20         Q.   You expressed an opinion in your reports to

21    CDCR that MOHU -- cells such as this that's portrayed

22    in these photos should not be used for various

23    purposes.  Is that correct?

24              MR. RUSSELL:  Objection.  Vague,

25    ambiguous, ambiguous, overly broad, lacks

Lindsay M. Hayes                                    February 18, 2013

1    foundation.

2        A.    I think my specific opinion was in most of

3    the cells that I observed for -- that were

4    designated -- identified to me as being designated to

5    house inmates on suicide observation, and most of

6    these were in the OHU units, because I have probably

7    a separate opinion for the crisis bed cells I saw,

8    but for the OHU cells in all three facilities,

9    including Mule Creek, the furnishings were so stark

10   and non-existent and the lighting and the sanitary

11   conditions were so poor that my opinion was that it

12   was unlikely -- that its stark presence is a

13   deterrent for inmates to come forth who are suicidal

14   and seek out mental health services or confide in

15   staff that they're suicidal because of the -- of the

16   treatment that they would receive once they were put

17   into the cells.

18       That basically, they were clothed in safety

19   smocks and not much else, not allowed to have many

20   possessions, if any, not allowed out of their cells

21   except to shower every other day.

22       So under those conditions, it's -- it's

23   difficult to believe that someone who was suicidal

24   was going to want to come back in there again if they

25   were -- if their suicidal ideation came back.  And,

1    housing.

2         So when I heard that they were being

3    used for a several-day length, then that became

4    concerning enough for me to put this brief

5    section in my report.

6         Q.   Did the ZZ cells that you observed have

7    beds in them?

8         A.   Let me -- I don't think I address that

9    within my report.  Let me see if I did within my

10   notes, if you could just bear with me for a second.

11   I don't see any reference to them in my notes.  I'm

12   sorry.

13        Q.   Okay.  During your observation of CDCR

14   prisons on these tours, did you encounter any CDCR

15   staff that were actually doing suicide watch of an

16   inmate on a one-to-one?

17        A.   Yes.  I observed the certified nursing

18   aides doing almost all of the watches.

19        Q.   And can you describe to me what you

20   observed?  What were they doing?

21        A.    I remember one housing unit very clearly,

22   because -- I believe it was at DVI, there's an OHU

23   overflow unit, which is on the other side of the

24   administrative Seg unit.  It's basically one unit

25   divided in half.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Lindsay M. Hayes                                    February 18, 2013

1        As I recall it, the left side was the
2    administrative Seg unit, and a series of linear
3    cells.  I don't know the length, but quite -- quite a
4    few.  And if you came on to the unit and took a
5    right, you would go through a door on to what is
6    referred to as the OHU overflow unit.
7        And when we walked in, I remember distinctly,
8    because there was this very foul smell when we walked
9    around the unit.  And it was -- I was told it was the
10   aftermath of pepper spray that was dispensed on
11   the -- in the administrative Seg side of it.  But it
12   had filtered on to the overflow unit.  And we walked
13   in, and it was rather surreal.
14       There were -- almost all the inmates -- I
15   think every single inmate that was housed on the
16   overflow unit was on suicide observation status, they
17   were all on a one-on-one status.  And there were --
18   each -- outside of each cell was a certified nursing
19   aide sitting in a chair or standing outside the cell.
20   And they were assigned to that individual inmate.
21   And there was a line of them.
22       If there were 10 or 15 or 20 of these aides,
23   they were all lined up down the linear cell block
24   area.  And all -- most of them had surgical masks on
25   because of the stench of the aftermath of this pepper

Lindsay M. Hayes                                        February 18, 2013

1   spray.  And it was just a surreal-looking visual.

2       Almost all the inmates were either sitting or

3   standing, facing outward, just looking out at us as

4   we're walking through or looking at the CNA or trying

5   to have a conversation with the CNA.

6       I -- when I inquired as to -- I had a number

7   of questions when I saw all this.  But one of them

8   was, why are all these inmates needing one-on-one?

9   And then I realized as I looked into one of these

10  cells that one of the reasons were that they were

11  very dangerous cells.

12      There was no lighting, if any.  There might

13  have been some minor lighting, but that could have

14  been just the light from the outside cell block.  You

15  could not see very clearly into the cells.

16      They were not suicide-resistant.  I believe

17  they did have bunks, but the bunks were very

18  dangerous, and there were unsafe ventilation grates.

19      So it was obvious that these cells were not

20  suicide-resistant, and, therefore, some of the

21  reasons why they were on one-on-one is because the

22  cells were unsafe, not necessarily that these inmates

23  were at the highest risk of suicide requiring

24  one-on-one status, but they were being housed --

25  because it was an overflow unit, they were being

```
 1           C E R T I F I C A T E

 2   COMMONWEALTH OF MASSACHUSETTS

 3   SUFFOLK, SS.

 4        I, Janet M. McHugh, a Registered Merit

 5   Reporter and a Notary Public within and for the

 6   Commonwealth of Massachusetts do hereby certify:

 7        THAT LINDSAY M. HAYES, the witness whose

 8   testimony is hereinbefore set forth, was duly sworn

 9   by me and that such testimony is a true and accurate

10   record of my stenotype notes taken in the foregoing

11   matter, to the best of my knowledge, skill and

12   ability.

13        I further certify that I am not related to any

14   parties to this action by blood or marriage; and

15   that I am in no way interested in the outcome of

16   this matter.

17        IN WITNESS WHEREOF, I have hereunto set my

18   hand this 19th day of February, 2013.

19

20                           _____

21                           JANET M. MCHUGH
                             Notary Public
22

23   My Commission Expires:

24   July 11, 2014

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 85



Transcript of the Testimony of:

# Richard Johnson

Coleman v. Brown

February 25, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

RICHARD JOHNSON

MONDAY, FEBRUARY 25, 2013,  8:58 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Richard Johnson                                    February 25, 2013

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,            )
                                      )
5                     Plaintiffs,     )
                                      )CASE NO.:
6          vs.                        )S 90-0520 LKK-JFM
                                      )
7   EDMUND G. BROWN, JR., ET AL.,     )
                                      )
8                     Defendants.     )
    _____)

9

10

11

12          The Deposition of RICHARD JOHNSON, taken on

13   behalf of the Plaintiffs, before Megan F. Alvarez,

14   Certified Shorthand Reporter No. 12470, Registered

15   Professional Reporter, for the State of California,

16   commencing at 8:58 a.m., Monday, February 25, 2013, at

17   the Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

18   Street, 10th Floor, San Francisco, California.

19

20

21

22

23

24

25

Richard Johnson                                              February 25, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  JANE KAHN, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4            315 MONTGOMERY STREET, 10TH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 5            415.433.6850
              415.433.7104 FAX
 6            JKAHN@RBGG.COM

 7
     FOR DEFENDANTS:
 8
              BY:  JAY C. RUSSELL, ESQ.
 9            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
10            455 GOLDEN GATE AVENUE, 11TH FLOOR
              SAN FRANCISCO, CALIFORNIA 94102-7004
11            415.703.5717
              415.703.5843 FAX
12            JAY.RUSSELL@DOJ.CA.GOV

13            BY:  MICHAEL STONE, ESQ.
              DEPARTMENT OF CORRECTIONS AND REHABILITATION
14            OFFICE OF LEGAL AFFAIRS
              1515 S STREET, SUITE 314 SOUTH
15            SACRAMENTO, CALIFORNIA 95811
              916.323.2929
16            916.327.5306 FAX
              MICHAEL.STONE@CDCR.CA.GOV

17
18   ALSO PRESENT:

19            MARC SHINN-KRANTZ, PARALEGAL

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                          February 25, 2013

```
 1              I N D E X

 2           INDEX OF EXAMINATIONS

 3

 4  Examination by Ms. Kahn  ..........................7

 5

 6                --o0o--

 7

 8        EXHIBITS MARKED FOR IDENTIFICATION

 9  No.              Description              Page

10  Exhibit 1     Notice of deposition  ................7

11  Exhibit 2     Excerpt from Chapter 5 of Mental ....47
                  Health Services Delivery System
12                Program Guide, 2009 Revision

13  Exhibit 3     Memorandum entitled "Use of ........49
                  Alternative Housing" dated
14                5/16/12

15  Exhibit 4     Excerpt from the Mental Health ......59
                  Services Delivery System Program
16                Guide, 2009 Revision

17  Exhibit 5     Alternative Housing Cell ...........69
                  Privatization Memo dated
18                12/12/12

19  Exhibit 6     Summary of cases in alternative .....71
                  housing 5/18/12 - 12/27/12
20
    Exhibit 7     Inmate data on mental health ........77
21                crisis bed referrals and
                  transfers **CONFIDENTIAL**
22
    Exhibit 8     January 4-January 10, 2013 ..........89
23                Statewide Alternative Housing
                  Hours Log, Bates SAC104
24
    Exhibit 9     Letter dated 2/1/13 from Timothy ....93
25                Belavich to Matthew Lopes
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                              February 25, 2013

```
 1    Exhibit 10      Inpatient Psychiatric Aging ........109
                      Report 12/1/12 to 12/31/12
 2                    **CONFIDENTIAL**

 3    Exhibit 11      Summary of Interinstitutional ......112
                      Mental Health Crisis Bed
 4                    Referrals and Transfers, August
                      2008
 5
      Exhibit 12      Use of Outpatient Housing Units ....117
 6                    Directive dated 12/12/12

 7    Exhibit 13      Summary of Cases in Outpatient .....131
                      Housing Units May 1 - December
 8                    31, 2012

 9    Exhibit 14      Letter dated 1/16/13 from Debbie ...142
                      Vorous to Ernest Galvan and
10                    eclosed documents filed under
                      seal regarding the reports from
11                    12/1 through 12/31/12
                      **CONFIDENTIAL**
12
      Exhibit 15      OHU Admission Chart dated ..........153
13                    December 2012 **CONFIDENTIAL**

14    Exhibit 16      Coleman monthly report of ..........164
                      information requested and
15                    response to January 19, 1999,
                      Court order regarding staff
16                    vacancies, dated 1/3/13

17    Exhibit 17      Coleman monthly report of ..........169
                      information requested and
18                    response to January 19, 1999,
                      Court order regarding staff
19                    vacancies, dated 2/1/13

20    Exhibit 18      Weekly EOP population report for ...179
                      the week of 12/10/12
21
      Exhibit 19      Coleman monthly report of ..........187
22                    information requested and
                      response to January 19, 1999,
23                    Court order regarding staff
                      vacancies, dated 8/28/08
24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

```
 1   Exhibit 20      EOP and CCCMS in ad seg/SHU/PSU ....190
                     Placements greater than 90 days,
 2                   Coleman monthly report of
                     information requested and
 3                   response to January 19, 1999,
                     Court order regarding staff
 4                   vacancies, dated 2/1/13,

 5   Exhibit 21      Memo dated 9/7/12 from Timothy .....195
                     Belavich to Anthony Lonigro, et
 6                   al., report on Implementation of
                     Quality Improvement Plans for
 7                   the suicide of an inmate,
                     Pleasant Valley State Prison
 8                   **CONFIDENTIAL**

 9                        E X H I B I T S

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        Q.   And when DSH provides you with the pending
 2   transfer list, what does that list look like?
 3        A.   That lists each of the DSH hospitals or -- I'm
 4   still going to -- even those in the CDCR prisons, can
 5   refer to those as hospitals?
 6        Q.   Please.
 7        A.   Okay.  Then for each of the DSH hospital
 8   settings that house our inmate patients, they have what
 9   they call a BUM report, which is the -- it's the daily
10   utilization management reports.
11             And on those BUM reports, it has their pending
12   transfer list.
13        Q.   And does that show the date that the patient
14   was referred to DSH?
15        A.   I'm not familiar if every -- each of the
16   hospitals does because their BUM reports are different.
17   And for the information that we receive, which is
18   different -- for example, that those are from a -- one
19   of their hospitals versus in a CDCR institution, I know
20   that some of their BUM reports have that information,
21   but I can't confirm that they all do.
22        Q.   Does a BUM report show the date accepted?
23        A.   I don't think that's included in the
24   information that -- that we get for each of the BUM
25   reports, because the BUM report is a very -- it's a much
```

Richard Johnson                                        February 25, 2013

1  more comprehensive document that DSH has than what we

2  get the portion of for our placements.

3        And so -- so I -- I don't know if each of the

4  hospitals give us the information where it has the

5  accepted date for each of their patients.

6    Q.   So how do you know that this is a list of

7  prisoners that are pending transfer?

8    A.   The portion of the document that we work off

9  of is their face sheet, and on the face sheet it has

10 totals.  And so it will have like a column that says the

11 pending or referrals, and then they'll have a separate

12 column for the -- for any wait list, which would be

13 those above the -- beyond the Coleman time frames.  And

14 so it's like a summary information that -- that we

15 receive.

16   Q.   So you're receiving a summary of their

17 referral acceptance and wait list data?

18   A.   Correct.

19   Q.   Okay.  So, in other words, you do not have the

20 underlying data?

21   A.   I'm not sure because I -- for the portion -- I

22 haven't gone to each of the tabs and seen what available

23 is -- you know, which information is available for each

24 of the BUM reports, and so I cannot confirm that.

25   Q.   But what the -- DSH pending list is a --

Page 26

Richard Johnson                                         February 25, 2013

 1    the...

 2    BY MS. KAHN:

 3        Q.   Okay.  Okay.  Paragraph 13 of your

 4    declaration, you write that "As of December 17th, 2012,

 5    there were no inmates waiting for acute or inpatient

 6    care.  There were 13 inmates pending admission to acute

 7    care (accepted by DSH) but none had waited more than

 8    10 days, and there were 45 inmates pending admission to

 9    intermediate care (accepted by DSH), the majority

10    pending two weeks or less."

11            So what is the source of the data reported in

12    paragraph 13?

13        A.   In paragraph 13, it was the -- it was the BUM

14    reports generated by DSH.

15            MS. KAHN:  I think I'm going to mark one more

16    exhibit, now, and then I think we should take a break.

17            So this is Exhibit 4.

18            (Plaintiffs' Exhibit 4 was marked for

19             identification.)

20    BY MS. KAHN:

21        Q.   I just want to direct your attention to first

22    the fourth box -- no -- first, are you familiar with

23    this document?

24        A.   Yes, I am.

25        Q.   Okay.  What is this?

Richard Johnson                                          February 25, 2013

1    those beds?

2    BY MS. KAHN:

3        Q.   Should a -- would -- what about logging

4    prisoners who are placed in holding cells inside of a

5    housing unit who have reported suicidality and are

6    awaiting to be evaluated by a clinician for possible

7    placement in an MHCB?  Should they be logged?

8              MR. RUSSELL:  Objection.  Vague and ambiguous.

9    Calls for speculation.  Lacks foundation.  Incomplete

10   hypothetical.

11             THE WITNESS:  And what I'm aware of is that in

12   the circumstances -- or in the policy and the training

13   directive, that if they're in a holding area because

14   there's not a mental health crisis bed available at the

15   institution, then that's when they should be logged on

16   to the alternative housing log.

17   BY MS. KAHN:

18       Q.   Okay.  Does HCPOP have a list of all

19   alternative placements used at each prison?

20       A.   No.

21       Q.   Why not?

22             MR. RUSSELL:  Objection.  Vague and ambiguous.

23   Lacks foundation.  Calls for speculation.

24             THE WITNESS:  For our placement purposes, it

25   doesn't matter to us, you know, because our oversight is

                                                      Page 67

Richard Johnson                                    February 25, 2013

1    with the placements and with the referral time frames.

2    And so it doesn't matter to us as far as meeting the --

3    being placed within transfer time frames where they're

4    housed in alternative housing.

5    BY MS. KAHN:

6        Q.    Okay.  Are you aware of whether mental health

7    program has a list of all alternative placements?

8            MR. RUSSELL:  Objection.  Vague and ambiguous.

9    Calls for speculation.

10           THE WITNESS:  No, I'm not aware if there's a

11   comprehensive list.

12   BY MS. KAHN:

13       Q.    Okay.  When were you last inside of a prison?

14       A.    Say 2012.  Could be down at CMF.  Was looking

15   at some of their new programs down at CMF.  And that's

16   the last that I remember being in a prison.

17       Q.    Have you ever seen any of the alternative

18   placement locations identified in the memorandum or

19   program guide section?

20       A.    I have been in many correctional treatment

21   centers, so I'm aware of some of their, like, triage

22   areas within the -- within the CTCs.  And I've been to

23   Mule Creek where they have, for example, their MOHU.

24       Q.    Do you have an opinion about whether this is

25   an appropriate location to house a suicidal prisoner?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

 1  accepted and has been waiting since then.  And the
 2  report is dated December 31st, 2012.
 3          Has he been waiting more than 10 days for
 4  placement in the acute program?
 5          MR. RUSSELL:  Objection.  Vague and ambiguous.
 6  Lacks foundation.  Calls for speculation.
 7          THE WITNESS:  And I'm not familiar with their
 8  report, and so I know -- I know how our data is
 9  calculated, but this is the first time that I've seen
10  this report and I would have to know more about it.
11  BY MS. KAHN:
12      Q.   Okay.  Is that your answer?
13      A.   Yes.
14      Q.   Mr. Johnson, I just want to remind you that
15  said as chief of health care placement oversight and the
16  program itself is responsible for tracking capacity and
17  census and wait list data for Department of State
18  Hospitals, correct?
19      A.   Correct.
20      Q.   And you've never seen this detailed data which
21  the Department of State Hospitals provides per court
22  order to the Coleman special master and plaintiffs'
23  counsel and filed with the court?
24      A.   I have not.
25      Q.   This is not provided to HCPOP?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1        A.    I don't remember seeing this report.

2        Q.    And you filed a signed declaration with the

3    court attesting to lack of wait list and stating that

4    certain numbers of people have not been attesting to the

5    waits on waiting -- the numbers of patients waiting to

6    be admitted to these programs without being informed or

7    provided with this data or that knowledge of this data?

8        A.    DSH has told us that their official document

9    on their census and wait list is their BUM reports that

10   come from the hospitals, and that's what we used to

11   compile our data.

12       Q.    Well, if you were aware that this report

13   existed, would you compile a different type of wait list

14   with that -- knowing that?

15            MR. RUSSELL:  Objection.  Vague and ambiguous.

16   Lacks foundation.  Calls for speculation.

17   BY MS. KAHN:

18       Q.    Would you investigate this data differently if

19   you were aware that the department compiled data that

20   showed the date of referral to an inpatient program?

21            MR. RUSSELL:  Objection.  Vague and ambiguous.

22   Lacks foundation.  Calls for speculation.

23            THE WITNESS:  I would look into it.

24   BY MS. KAHN:

25       Q.    Would you have signed a declaration that

Richard Johnson                                    February 25, 2013

```
 1   stated what it stated if you had this data in front of
 2   you and could have reviewed it?
 3              MR. RUSSELL:  Objection.  Vague and ambiguous.
 4   Calls for speculation.
 5              THE WITNESS:  I don't know.  It would depend
 6   on what I was informed what this report is and how it's
 7   collected.
 8   BY MS. KAHN:
 9       Q.   Do you want to read the entire report first?
10              Let me first take you to another page first.
11   Do you want to see the wait list for ICF?  Turn to
12   page 17.
13              Starting at 862, continues to the next page.
14   But the names from 862 through 885 have all been waiting
15   more than 30 days for admission to Salinas Valley
16   psychiatric program from the date of referral.
17              If you turn to page 23.
18              MR. RUSSELL:  There's no question pending.
19              THE WITNESS:  Okay.
20   BY MS. KAHN:
21       Q.   Turn to page 23, 1170 and 1171.  There are two
22   prisoners waiting for admission to Atascadero who were
23   referred more than 30 days ago and accepted.
24              I'll ask my question again.
25              If you had had full information available that
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                          February 25, 2013

1    is filed under seal and provided to plaintiffs, to the

2    Coleman special master, which the attorney general's

3    office was aware of, CDCR legal was aware of, if this

4    information had been provided to you before you signed

5    your declaration under penalty of perjury, would you

6    have changed the statements that were made in your

7    declaration?

8            MR. RUSSELL:  Objection.  Vague and ambiguous.

9    Lacks foundation.  Calls for speculation.

10           THE WITNESS:  And I cannot say that I would

11   change anything because we have these source documents

12   that the data comes from in coming to our data.  But if

13   I'm ever shown anything that differs from -- another

14   source of data that differs from our data, then it is

15   something I will look into or have my staff look into.

16   BY MS. KAHN:

17       Q.   Okay.  And do you feel like this data

18   contradicts what you said in your declaration?

19       A.   Not necessarily.

20       Q.   So you have to look into this data?

21       A.   Yes.

22       Q.   And you plan to look into this data?

23           MR. RUSSELL:  Objection.

24   BY MS. KAHN:

25       Q.   I'd like to refresh your memory of what you

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

1        Q.    Okay.  Have you been involved in any bed

2    planning meetings for CCC prisoners?

3        A.    Yes.

4        Q.    What were those or when were those?

5        A.    Those were -- they've been discussions during

6    the implementation of the workload study.  Then what was

7    the -- the prev-mix process.  You know, the prev-mix was

8    on our same time that the department does the fall and

9    spring projections.  And that's when we used to also

10   look at making the adjustments on the mental health

11   populations and then -- but that was based on the

12   preworkload study model.

13            And then under the -- and so now under the

14   workload study model, we're going to be doing something

15   similar but not identical to the prev-mix and so that's

16   the process I referred to earlier that we're just

17   beginning to, now that AB 109 is -- you know, the

18   conversions of the institutions are getting their

19   completion.  And so we're looking at the -- to see if

20   we're in balance with our CCCMS and EOP like you

21   referred to based on the new alignments of the

22   institutions.  And then to see if we need to make

23   realignments of our mental health staffing due to

24   AB 109.

25       Q.    This is your special assignment that you

Richard Johnson                                                February 25, 2013

1  referred to earlier in the depo?

2      A.   Yes.

3      Q.   So this will also be looking at whether there

4  are adequate number of, for example, SNY yards for CCC

5  prisoners?

6      A.   Yes.  That will be included.

7      Q.   That will be included.

8           And these meetings are ongoing?

9      A.   Yes.  And we're just at a point with the

10  AB 109 conversions getting to the tail end of their

11  conversions that we could really start sitting down and

12  working with -- and also the mental health staff will be

13  involved, you know, in those decisions along with DAI.

14  And so we're just beginning to -- even though it's been

15  the plan to do this for, you know, the planning

16  meetings, but we're finally at the point where things

17  are getting settled with the realignment conversions

18  that we can now address the mental health alignments.

19      Q.   Okay.

20           MS. KAHN:  I want to mark another exhibit.

21           (Plaintiffs' Exhibit 18 was marked for

22            identification.)

23  BY MS. KAHN:

24      Q.   Okay.  Are you familiar with this report?

25      A.   Yes.

Richard Johnson                                        February 25, 2013

1    other issues with the data, too, which I'm not familiar

2    with the details.

3        Q.   Okay.  So this -- this particular section of

4    this report identifies EOPs that are in nonhub

5    institutions for more than 90 days.

6             And, you know, if you could turn to DVI, it's

7    a good example.  It's on R1017.  There are, you know,

8    two prisoners housed there for 281 and 175 days.

9             When you were speaking earlier about being

10   proactive, I guess the question is:  What does HCPOP do

11   with this data which is generated and provided monthly

12   to all sorts of parties to -- to ensure that EOPs who

13   should be transferred within 30 days to a -- well, let

14   me first ask you.  Does DVI have a hub?

15       A.   No.

16       Q.   Okay.  There are two EOPs here who have been

17   housed here, one for more than nine months and one for

18   close to six months.

19       A.   And --

20             MR. RUSSELL:  There's no question.

21   BY MS. KAHN:

22       Q.   Okay.  And so what would -- what is HCPOP's

23   role with regard to this data?

24       A.   Well, on list data is that we believe and the

25   mental health program believes that our other data banks

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                      February 25, 2013

1    are better, more accurate information than who is in

2    the -- mental health who's in ad segs.  And so we use

3    those to cross-check each other.

4            When we have checked this data and there's

5    been errors, like for the, you know, cases being on this

6    list, and so the systems that we cross-reference with

7    are the COMPSTAT and the mental health tracking system

8    and our own -- and to some extent our SOMS, you know,

9    information.

10       Q.   So you ignore this data?

11            MR. RUSSELL:  Objection.  Vague and ambiguous.

12   Lacks foundation.  Misstates testimony.

13            THE WITNESS:  No, I don't ignore it.

14   BY MS. KAHN:

15       Q.   Have you -- is this data reviewed?

16       A.   I'm not sure what our unit does with the

17   information, who sent this to Coleman.  So I would have

18   to verify.  I don't know if this is part of the data --

19   the information that are actually EOP CC3 uses.

20       Q.   But as chief, you're responsible for your

21   unit, correct?  You were in December.

22       A.   I was.

23       Q.   If you want to turn to page R1018 in Folsom.

24   Again, it's CIM.

25       A.   And the question?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

 1           So the idea, just so I understand, is to come
 2    up with a plan that could meet all these needs and
 3    perhaps designate new prisons?
 4        A.   Or new --
 5        Q.   Yards?
 6        A.   Possibly new yards or even expand on some,
 7    like, for example, where we do have some capacity maybe
 8    to increase --
 9        Q.   Or increase --
10        A.   -- increase a program locally.
11        Q.   Okay.
12        A.   Then you could increase locally or you could
13    look at some other institutions, yards that could be
14    expanded or new yards and do a conversion.
15        Q.   But there's no new staffing plan that's being
16    developed with this, is there?
17        A.   No, no.
18        Q.   So it's the staffing plan that was developed
19    and will exist after you've completed this project?
20        A.   Correct.  And the staffing would just follow
21    where the census is.
22        Q.   Okay.  And so this is to address the changes
23    in population as a result of AB 109?
24        A.   That's correct.
25        Q.   Okay.  Is there a timeline for completing

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                    February 25, 2013

 1   this?

 2        A.   Once again, not a deadline, but we'll be --

 3   you know, we recognize the deed and so -- and I, you

 4   know, discussed it with Tim and some others last week

 5   because we're just starting to -- you know, the AB 109

 6   is at a point now where at least I believe that we could

 7   start actually looking at where we might be able to make

 8   the adjustments.

 9             And so we're identifying with the mental

10   health program right now, you know, with -- because we

11   have had meetings with DAI and the stakeholders in this

12   before, but the timing wasn't right because of all the

13   AB 109 conversions.  But just based on correspondence

14   I've had with the stakeholders in DAI and mental health

15   program, we all believe that it is the time to actually

16   start identifying the adjustments that need to be made.

17             And so we're looking at the data now, you

18   know, and setting up the, you know, meetings with who

19   will be the primarily drivers of this.

20        Q.   Who are the stakeholders?

21        A.   Stakeholders would be the mental health

22   program, which would be the population -- or the staff,

23   which is Dr. McAloon still has her hands in it,

24   Sharon McCarver, the regionals, because they know their

25   institutions.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                            February 25, 2013

1      Q.   Right.

2      A.   And it will be briefing, of course, you know,

3  the -- Nathan, Judy, and Tim as we're going along.

4           And then with DAI, they have Dennis Halverson

5  who's there.  He's the new Ross Meier, so their

6  population management chief.

7           And then Becky Alkire is the chief of

8  classification services.

9           And so they're already -- we've already all

10 discussed it and there will be a meeting first at our

11 level just to say like this is the kickoff of actually

12 going forward with this and then we'll bring in other

13 secondary stakeholders as needed.

14     Q.   Are there any preliminary results about where

15 you think -- what you think needs to be done, or it's

16 too early?

17     A.   It will be primarily based on our population

18 management reports, like the EOP report that you showed

19 earlier.

20     Q.   Right.

21     A.   So using our own reports showing where we may

22 have a -- where our greatest demand is.

23     Q.   Okay.

24     A.   And then we'll go off to where our greatest

25 demand is and identify what the need is, you know, based

Richard Johnson                                    February 25, 2013

```
 1   on.  This is outpatient that we'll be doing this for.
 2        Q.   Right.
 3        A.   So it will be CCCMS and EOP.
 4             And then looking for the common ground.  I
 5   mean, we're all committed into finding the solutions to
 6   the need, but we always start off with a wish list that
 7   we all have that works best and then we try and find --
 8   you know, we come to a compromise wherever we need to.
 9   You know, the mental health will have its priority, ones
10   that they would like to expand to.  DAI will have their
11   priority list.  And then we start working together.
12        Q.   Does HCPOP create a report for CCC that's
13   similar to that EOP bed need report?
14        A.   There is a similar report.
15        Q.   Okay.  Just has never been provided?
16        A.   (Witness nods head.)
17        Q.   I appreciate this.
18             I guess the last thing I want to ask you is:
19   Is there anything that you feel at this point you'd like
20   to correct in your declaration?
21             MR. RUSSELL:  Objection.  Vague and ambiguous.
22   Overly broad.
23   BY MS. KAHN:
24        Q.   Well, we can go through each paragraph if
25   you'd like but if you want to take a moment, and I guess
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Richard Johnson                                              February 25, 2013

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4  Reporter, hereby certify that the witness in the

 5  foregoing deposition was by me duly sworn to tell the

 6  truth, the whole truth and nothing but the truth in the

 7  within-entitled cause;

 8              That said deposition was taken down in

 9  shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20              DATED:  March 7, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 86

1        UNITED STATES DISTRICT COURT

2       EASTERN DISTRICT OF CALIFORNIA

3                ---oOo---

4   RALPH COLEMAN, et al.,        )
                                  )
5                                 )
                                  )
        Plaintiffs,               )
6                                 )
             vs.                  )   No. Civ S 90-0520 LKK-JFM
7                                 )
   EDMUND G. BROWN, JR., et al., )    Volume I
8                                 )
                                  )   Page 1 - 300
9        Defendants.              )
   _____)

10

11

12            DEPOSITION OF

13           STEVE J. MARTIN

14      THURSDAY, FEBRUARY 28, 2013

15

16

17   CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19   REPORTED BY:

20   HOLLY THUMAN, CSR No. 6834, RMR, CRR

21   --------------------------------------------------------

22            JAN BROWN & ASSOCIATES

23     WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25          (415) 981-3498 or (800) 522-7096

                                                              1

```
 1                        --o0o--

 2         Deposition of STEVE J. MARTIN, taken by the

 3    Plaintiffs, at K&L GATES LLP, Four Embarcadero Center,

 4    Suite 1200, San Francisco, California 94111, commencing

 5    at 9:27 a.m., on THURSDAY, FEBRUARY 28, 2013, before me,

 6    HOLLY THUMAN, CSR, RMR, CRR.

 7                        --o0o--

 8                       APPEARANCES

 9    FOR THE PLAINTIFFS:

10         K&L GATES LLP
           Four Embarcadero Center, Suite 1200
11         San Francisco, California 94111
           415.249.1059
12         By:  JEFFREY BORNSTEIN, Attorney at Law
                jeff.bornstein@klgates.com
13              MEGAN F. CESARE-EASTMAN, Attorney at Law
                megan.cesare-eastman@klgates.com
14              RANJINI ACHARYA, Attorney at Law

15         ROSEN BIEN GALVAN & GRUNFELD LLP
           315 Montgomery Street, Tenth Floor
16         San Francisco, California 94104-1823
           By:  MICHAEL W. BIEN, Attorney at Law
17              415.433.6830
                (Present when indicated.)

18

19    FOR DEFENDANTS:

20         ATTORNEY GENERAL OF CALIFORNIA
           455 Golden Gate Avenue, Suite 11000
21         San Francisco, California 94102-7004
           By:  PATRICK RICHARD McKINNEY II
22              Deputy Attorney General
                415.703.3035
23              Patrick.McKinney@doj.ca.gov

24    ALSO PRESENT:  ELDON VAIL

25
```

4

1    discussed was the -- he wanted -- my particular role, he

2    wanted my best assessment of where the system was

3    relative to constitutional minimum.  I don't recall

4    whether we discussed at all what was motivating that

5    inquiry.  I certainly did not have the impression or do

6    not recall him saying, we are going to attempt to -- how

7    did you phrase it -- get out from under Coleman?

8         Q.  Uh-huh.

9         A.  No.

10        Q.  Were you surprised, then, when you read about

11   them filing a motion which is pending now?

12            MR. McKINNEY:  Objection.  Calls for

13   speculation, vague and ambiguous.

14            THE WITNESS:  No.  No, I was not surprised.

15            MR. BORNSTEIN:  Q.  Okay.  Why not?

16        A.  Well, Counsel, I've been in the business quite

17   some time in a variety of capacities, law-trained, legal

18   capacities in cases that were of this magnitude and

19   understand strategies in this arena.

20            And it doesn't take a rocket scientist to

21   figure out that if somebody is telling the State that

22   they're doing this or doing that, that they might use

23   that to then set a course of action.

24        Q.  In the course of your work, were you told that

25   there had been some sort of an agreement that there was

8

1    supposed to be notice to the plaintiffs about when you

2    as experts went into the prisons?

3       A.  Oh, no.  That type of thing was never -- I

4    looked at it and understood that I was being retained --

5    or the discussions of retention were just as a

6    consultant that had utterly, mind you, nothing to do

7    with plaintiffs or courts or anything else.  It's --

8    having been in that position myself as Agency counsel

9    and Special Assistant Attorney General myself, we

10   routinely retained consultants on matters that -- for a

11   variety of reasons.

12      Q.  Did you in your work -- would you agree that

13   the State's prison system is still overcrowded?

14          MR. McKINNEY:  Objection.  Vague and ambiguous,

15   vague as to time.

16          THE WITNESS:  That was not my charge, to make

17   that assessment.  But being acutely aware of the

18   Coleman/Plata case and knowing many of the actors and

19   experts, and trying to stay acquainted with the law, I

20   was certainly -- and having been through probably near a

21   thousand institutions for 40 years, as I was going

22   through the facilities, I was certainly attuned to signs

23   that I typically associate with overcrowdedness in a

24   constitutional sense.

25          MR. BORNSTEIN:  Q.  And what were those signs

9

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    that were you attuned to?

2          MR. McKINNEY:  Objection.  Vague as to time.

3          THE WITNESS:  Well, that the infrastructures

4    were compromised, the inmate movement is impeded by

5    shear numbers, that spatial densities are extremely

6    limited.  Staffing flow, staffing deficiencies.  There's

7    a whole myriad of signs an experienced person would look

8    for.

9          MR. BORNSTEIN:  Q.  And you weren't asked to

10   look for those things?

11         **A.  I was not.**

12         Q.  But in the course of your work, did you form an

13   opinion about whether the State's systems are -- prison

14   system is still overcrowded?

15         MR. McKINNEY:  Objection.  Vague and ambiguous.

16         THE WITNESS:  When you say an opinion, are you

17   asking for Steve Martin's observations of having gone

18   through some number of facilities relative to their

19   general operation?  I mean, I don't -- I want to be real

20   careful with what you're asking here.

21         I wasn't asked to render opinions on crowding.

22         MR. BORNSTEIN:  Q.  Right.  And now I'm asking

23   you, based on your training and experience and the

24   myriad of things that you've just told me about, whether

25   you have an opinion.

10

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    should be met by the State of California?

2         A.   I have no opinion on that, because I haven't

3    done the examination that I would need to do to render

4    such an ultimate opinion.  I did not see -- well, I'll

5    just stand on what I've testified thus far.

6         Q.   And in order to render such an opinion, what

7    would you have to do?

8         A.   I would probably want to look at certainly

9    staffing complements.  I would want to look at access to

10   programming by the inmate populations.  The whole array

11   of -- when I say programming, I'm talking about stem to

12   stern, everything from out-of-cell rec time to service

13   delivery, mental health, medical, vocational, the whole

14   array.

15        I would look at spatial densities, and I would

16   want to calculate very -- with as much precision as I

17   could the in-cell time of the typical -- of the majority

18   of the inmate populations, the time they literally are

19   locked up at some point in the evening and what time

20   they're able to come out in the morning.

21        I would want a full-scale, absolute inventory

22   of all housing units by space, by cell space, dorm

23   space, immediate adjacent common space.

24        Q.   And --

25        A.   I would --

12

1    Q.  Go ahead, sorry.

2    A.  You'll get used to me pausing.  I apologize for

3    that.

4    Q.  Please, don't.

5    A.  But I would also look at the common indices

6    that correctional managers look at, such as

7    inmate-on-inmate violence, staff-on-inmate violence,

8    disciplinary rates, seg rates, the full data that's

9    available that tells you on a 24/7 basis how a facility

10   is operating.

11        I of course would want to look at probably

12   individual facility budget -- budgets and requests to

13   determine with what the particular physical plant, how

14   it's operating in terms of dishwashers and laundry

15   machines and all that type of thing, to try to establish

16   whether those things are being -- they are getting --

17   those things are being accelerated.  I would do a

18   full-scale look at maintenance schedules, the ability --

19   you know, one quick way is to see how many down cells

20   you had at a given point in time on a day.

21        Probably a lot of these things a lot of the

22   experts in this case didn't do, to my understanding, to

23   reach these magical reduction numbers that are somewhat

24   arbitrary at best, in my view, absent doing this type of

25   thing.

13

1    **But that's how -- I mean, I do a very -- as I**

2    **did a lot of my work, you dig it out of the dirt, and**

3    **what you do, you can render a pretty reliable opinion of**

4    **whether something is -- you know, whether the inmate**

5    **population has outstripped the physical plant and**

6    **outstripped the ability of the managers to operate it**

7    **safely.**

8    Q.  I mean no disrespect, but are you actually

9    qualified to do that kind of work and render that kind

10   of opinion?

11   MR. McKINNEY:  Well, objection.  He's not being

12   offered for that purpose.  It's been asked and answered.

13   MR. BORNSTEIN:  Q.  Go ahead.

14   **A.  Yes, having come from a system in which all**

15   **those things were at issue in the largest scale case in**

16   **the history of American corrections other than the**

17   **Coleman/Plata case, the Ruiz case.  That's what we did,**

18   **all those things.  And I worked hand-in-hand with**

19   **professionals and experts that did just that.**

20   Q.  And that's because there was a cap -- there

21   still is a cap in Texas, isn't there?

22   **A.  It depends on how you look at it, but yeah.**

23   Q.  Soft cap?

24   **A.  Yeah.**

25   Q.  As opposed to a hard cap?

14

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

 1    And that's how this originated.

 2        Q.  So did the State prepare this audit tool for

 3    you, or did you prepare it?

 4        A.  No, we -- on this particular issue, when we got

 5    to it, Patrick and I don't recall who all was present

 6    or whatever, but the -- I said -- probably was very

 7    quick to say, this is what I am going to look at, given

 8    what you want me to do.  And they probably said, what is

 9    it that you're going to look at?  And I said, 1, 2, 3,

10    4, 5, 6.

11        Q.  There's actually 9.

12        A.  Well, whatever.  You ought to share the entire

13    document with me, Counsel.

14        Q.  I mean to, and I apologize for not having it.

15    But I'm going to go get it for you.

16            MS. CESARE-EASTMAN:  It's on its way down.

17            THE WITNESS:  Is that like the check is in the

18    mail?

19            MR. BORNSTEIN:  Q.  No, we'll get it for you.

20    If you want to take a break until we get it --

21        A.  No, I know what's on there.  I did it.

22        Q.  How did you decide what -- let me ask it this

23    way:  Why didn't you go to all of the prisons in

24    California?

25        A.  Time, expense.

                                                          30

1    Q.  Okay.  So -- well, there certainly was enough

2    time, because you had -- you started in September of

3    2011, and this is February of 2013, I guess the last day

4    of February of 2013.  So you had time.  If -- is that --

5    you -- there certainly was enough time to do it.

6         MR. McKINNEY:  Objection.  Asked and answered.

7         THE WITNESS:  Counsel, are you intimately

8    familiar with my calendar and commitments?

9         MR. BORNSTEIN:  Q.  Ah.  So it was your

10   schedule?

11   **A.  Yeah.  I carry 20-plus cases at any given time,**

12   **monitoring four or five systems.  Don't be so cavalier**

13   **with my time.**

14   Q.  Was it -- how did you decide on the ones you

15   went to?

16   **A.  Good question.  With four experts, I think at**

17   **least two of -- well, three of us, three of us had**

18   **varying levels of working familiarity with the CDCR over**

19   **a variety of years and circumstances.  We had our own**

20   **ideas on institutions that we needed to visit and to set**

21   **a number where it could confidently be said that what**

22   **we've seen is representative, generally representative**

23   **of how the system is operating, save the possibility of**

24   **a rogue facility that's out there that we just didn't**

25   **get on our list and is inconsistent with observations we**

31

1    might render on others.

2          But generally, we wanted to get 10 to 12 to 13

3    facilities that we believed, as professionals, once we

4    went through them, would give us a fairly illustrative

5    representative idea of how the system was operating,

6    with respect to my particular issues, at least.

7          Q.  So from that sample size, you were then -- you

8    would then have a sense, I guess, of what you thought

9    was going on in all the prisons?

10         A.  It's better than a sense, because if you're --

11   in my areas -- I'm just going to speak to my areas.  But

12   if you've confirmed and established that a set of regs,

13   policies, procedures, are in place, and they're State

14   regs, and they're vigorously monitored both externally

15   and internally, and there's all these mechanisms and all

16   these reviews being done, you know, like OIG and the --

17   you know, whatever -- that if those are in place at 10

18   to 13 institutions, there is a very strong likelihood

19   they're in place at the remaining ones, save, you know,

20   the possible anomaly, the possible, you know, rogue

21   facility that just simply is -- whatever, is not abiding

22   by regs, which those tend to be -- in a system that has

23   this kind of scrutiny, you can't hide those too long.

24   So I doubt there's -- I'd be surprised if there's a

25   rogue facility out there that's abandoned the

32

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

 1      Q.  No, I hear you.

 2          The State's lawyers were with you when you did

 3   it, though.  Right?

 4      **A.  When I interviewed inmates?**

 5      Q.  Yes.

 6      **A.  Not necessarily -- you mean standing beside me?**

 7      Q.  Well, they were in the facility --

 8      **A.  Oh, yes.**

 9      Q.  -- with you while you did it.

10          MR. McKINNEY:  That's a different question.

11          MR. BORNSTEIN:  Q.  Right?

12          MR. McKINNEY:  Compound.  Objection.  That's a

13   totally separate question you just asked.

14          THE WITNESS:  They were --

15          MR. BORNSTEIN:  Q.  Let me start over.

16          When you went on your tours, you were

17   accompanied by State Attorney Generals and CDCR lawyers.

18   Correct?

19      **A.  Not always CDCR lawyers.  I think almost all**

20   **instances, out of the AG's office.**

21      Q.  Was it Pat who was with you?

22      **A.  More often that not, but sometimes Deborah.**

23      Q.  Okay.

24      **A.  And there was a third.  I can't recall his**

25   **name.**

                                                          37

1    Q.  And they were with you in the units when you

2    went into the units.

3            MR. McKINNEY:  Objection.  Calls for

4    speculation.

5            THE WITNESS:  No.  Again, I operate

6    differently.  I don't like a lot of you folks around me.

7    It interferes with what I do, it compromises what I do,

8    and if there's any way I can avoid any of you, I

9    pointedly do.

10           And that -- I'm neutral on that.  That's

11   plaintiffs, defendants, anybody.

12           MR. BORNSTEIN:  Q.  So who took you around?

13   **A.  I had typically asked for a lieutenant, I asked**

14   **for a coordinator, I asked for a CDCR employee**

15   **intimately familiar with that facility.**

16   Q.  When you did your interviews with inmates,

17   where did those interviews take place?

18   **A.  Variety of settings.  I would do cell-front**

19   **interviews, I would call some out for particular-purpose**

20   **interviews, in a dedicated interview space.  Yard**

21   **interviews, common space, day-room interviews.  Quite a**

22   **variety of inmate interviews.**

23   Q.  Did the -- did you tell the inmates that you

24   were working on the Coleman matter?

25   **A.  Certainly those inmates that I specifically**

38

1    whether you have enough staff or whether you're able to

2    do this and so forth, but I did not catalog those.

3              MR. BORNSTEIN:  Q.  But did you get feedback

4    that, well, we're in a -- we are doing the best we can,

5    but we need more people?

6              MR. McKINNEY:  Objection.

7              THE WITNESS:  Counsel, I have never spoken with

8    a correctional administrator that they don't tell you

9    that.

10             MR. BORNSTEIN:  Q.  Okay.  I'm just trying to

11   make sure we're talking about --

12        **A.   Ever.   Ever.**

13        Q.   That's what they said to you.  Didn't they?

14             MR. McKINNEY:  Objection.  Vague and ambiguous.

15             THE WITNESS:  I didn't catalog -- I know -- I

16   remember one lieutenant that I was -- particularly took

17   to for whatever reason, because I was impressed with

18   him, said, Mr. Martin, you know that we can always use

19   more staff.  Does it compromise what we're doing?  You

20   know, make -- it makes it difficult, but no, we get our

21   business done.  Which is a typical refrain.

22             MR. BORNSTEIN:  Q.  It becomes important where

23   you've got mental health people in ADSEG or other

24   restrictive environments, and they need escort staff or

25   other people to get them out of their cells so they can

                                                        41

1    go to programming, doesn't it?

2         MR. McKINNEY:  Objection.  Lack of foundation,

3    vague and ambiguous, vague as to time.

4         THE WITNESS:  You must have staff to move

5    prisoners from Point A to Point B to deliver or bring --

6    deliver that inmate to the service or bring the service

7    to the inmate, yes.

8         MR. BORNSTEIN:  Q.  And in -- particularly in

9    those ADSEG units, you need two staff to move inmates.

10   Right?

11        MR. McKINNEY:  Objection.  Lack of foundation,

12   lack of personal knowledge, assumes facts not in

13   evidence, vague and ambiguous.

14        THE WITNESS:  Yeah, I -- I don't know that you

15   need.  Do they typically require, I -- yes, they do.

16        MR. BORNSTEIN:  Q.  Okay.  Now, whether they

17   actually should require is a different question.

18   **A.  Yes.**

19        Q.  But that's their requirement?

20   **A.  Yes.**

21        Q.  And they make the inmates cuff up, and then

22   they have two staff move them from place to place.

23   Correct?

24        MR. McKINNEY:  Objection.  Vague and ambiguous,

25   vague as to time, lack of foundation.

42

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1     THE WITNESS:  There are certainly categories of

2     inmates that when they come out of their cells, they're

3     placed in restraints.

4     MR. BORNSTEIN:  Q.  Well, I'm talking about in

5     the ADSEG units.

6     **A.  Yes, that's what I mean.**

7     Q.  And in the ADSEG units, if you're there because

8     you're an aggressor or you're there because -- for

9     protection or special needs, you're treated the same.

10    Is that right?

11    MR. McKINNEY:  Objection.  Compound -- pardon

12    me, Counsel.  Objection.  Compound, vague and ambiguous.

13    Lack of foundation.

14    THE WITNESS:  I did not survey that, but I had

15    discussions with fellow team members about that issue as

16    to my view, in observation of the systems.

17    MR. BORNSTEIN:  Q.  But your observation was

18    that they were treated the same.

19    MR. McKINNEY:  Objection.  Lack of foundation,

20    vague and ambiguous.

21    MR. BORNSTEIN:  Let me rephrase the question.

22    Q.  Your observation was that there was one set of

23    rules for people in a particular unit.

24    **A.  Counsel, I didn't directly observe that.  I'm**

25    **basing my -- what I'm telling you on what was**

43

1    **represented to me by a fellow team member.**

2        Q.  And what was that?

3        **A.  That they were.**

4        Q.  And who was that who told you that?

5        **A.  Joel Dvoskin.**

6        Q.  And what did he say?

7        **A.  Basically that.**

8        Q.  And from your experience, wouldn't it be more

9    appropriate to make decisions based on the individual

10   inmate you're dealing with?

11       MR. McKINNEY:  Objection.  Vague and ambiguous,

12   argumentative.

13       THE WITNESS:  Well, I embraced the proposition

14   that -- well, I don't favor blanket rules applying to

15   segregated populations.  That is to say, if they're in

16   that population because they're recently, seriously,

17   frequently violent, that's one set of protocols.  If

18   they're separated because they need protection from the

19   general population, that's a separate set of protocols.

20       Very different protocols.  Oftentimes, that's

21   not made.  It's -- the overarching ADSEG dictates the

22   protocols.

23       MR. BORNSTEIN:  Q.  And there should be

24   separate protocols for the two populations you're

25   talking about.  Right?

44

1          MR. McKINNEY:  Objection.  Vague and ambiguous.

2          THE WITNESS:  What I think I just said.

3          MR. BORNSTEIN:  Q.  I just want to make sure,

4    because I've now got prison noise behind me.

5          And the problem is, when you mix those two

6    populations together in a unit -- which is what CDCR

7    does; isn't that right?

8          MR. McKINNEY:  Objection.  Assumes facts not in

9    evidence, argumentative, vague and ambiguous.

10          THE WITNESS:  What's the question?

11          MR. BORNSTEIN:  Q.  Isn't that what CDCR does,

12    they mix those populations together, at least according

13    to what the other experts told you that you're working

14    with?

15      **A.  That came up at a particular facility in a**

16    **conversation during the day, and I don't even know**

17    **whether I'm recalling it, you know, with accurate**

18    **detail.  So I don't know if there's a -- I certainly**

19    **can't render an observation or opinion on what CDCR is**

20    **doing as a general practice with respect to that issue.**

21      Q.  Assuming they are doing what I just said, is

22    that of concern based on your expertise?

23          MR. McKINNEY:  Objection.  Vague and ambiguous.

24    It's an incomplete hypothetical, argumentative.

25          THE WITNESS:  It would be.

45

1      MR. BORNSTEIN:  Q.  Why?

2      **A.  Well, because other than -- a PC inmate that**

3      **doesn't otherwise represent a threat to anybody, but**

4      **somebody is a threat to him, once you physically**

5      **separate him in a housing unit, then he ought to be**

6      **managed just like any other general population inmate.**

7      **There's no need to keep him locked up, if he's with like**

8      **offenders.**

9      Q.  Is it a sign of overcrowding if you are forced

10     to have your -- your inmate population in one unit in a

11     segregated unit because that's the only way you can

12     protect them?

13         MR. McKINNEY:  Objection.  Vague and ambiguous.

14         THE WITNESS:  Well, the critical operative word

15     there is, if you are forced to do it, that would be a

16     sign.  But I know any number of operations that have no

17     space issues that do it.  So again, you've got to dig

18     deeper.

19         MR. BORNSTEIN:  Q.  So it's both.  It -- it's

20     not right to do it.

21     **A.  It's not in my view correctionally sound and**

22     **appropriate to treat --**

23     Q.  Is it unconstitutional, in your opinion?

24     **A.  I believe it could be, if there are onerous or**

25     **punitive conditions, a de facto type of punishment when**

46

1    **the offender hasn't done anything.  Due process**

2    **implications, if nothing else.  If not Eighth Amendment.**

3        Q.  Like being confined in your cell for 23 hours a

4    day, for instance?

5            MR. McKINNEY:  Objection.  Vague and ambiguous,

6    argumentative.

7            THE WITNESS:  Yeah, because you're gay?

8            MR. BORNSTEIN:  Q.  Or because you have special

9    needs --

10       **A.  Or because you have special needs or whatever.**

11   **It could be a whole array of things, yeah.**

12           **If the effect of that is corporally, you know,**

13   **punitive, then I think there's an issue.**

14       Q.  In your views of the various facilities, you

15   went to some that had SHUs.  Right?

16       **A.  Yes.**

17       Q.  Did you notice that in -- if you got an inmate

18   in a SHU who comes out and then goes into ADSEG because

19   there's no space available in the SNY yard, isn't that

20   just more punishment for that inmate?

21           MR. McKINNEY:  Objection.  Lack of foundation,

22   lack -- hold on, Steve.  Lack of personal knowledge,

23   compound, vague and ambiguous, argumentative.

24           THE WITNESS:  Again, not just per se, no.

25           MR. BORNSTEIN:  Q.  Why not --

47

1  that.  That was bad question, so let me withdraw that.

2      Q.  The total mental health caseload in the prison

3  population is approximately 30 percent, more or less.

4          MR. McKINNEY:  Objection.  Vague as to time.

5  It's not a question, either.  There's no question

6  pending currently.

7          THE WITNESS:  It's in the ballpark.  I mean,

8  data tells us that, so I don't -- but yeah, it's not

9  outlandish, what you just said.

10         MR. BORNSTEIN:  Q.  No, no, but it's in that

11  neighborhood, in that range.  Is that right?

12     **A.  It's my understanding, somewhere in that**

13  **neighborhood.**

14     Q.  Did you do any sort of -- I don't care,

15  counting, if no other word, the number of use-of-force

16  incidents against mental health inmates/patients versus

17  the number of use-of-force incidents against non-mental

18  health inmates?  Did you do that?

19     **A.  I didn't do that counting.  I saw data that's**

20  **routinely reported in the Special Master's office and**

21  **the CDCR's own data as to that.**

22     Q.  I think CDCR said at the end of 2012, there was

23  about 26 percent of the population were mental health.

24     **A.  Well, whatever it says, yeah.  I mean, I don't**

25  **know.  I don't recall all those figures.**

                                                        62

1    Q.  But the CDCR tracks the number of use-of-force

2  incidents against the mental health population, don't

3  they?

4    **A.  Absolutely.**

5    Q.  And it's significantly higher than 26 percent.

6         MR. McKINNEY:  Objection.  Argumentative.

7         THE WITNESS:  It's my understanding that's so.

8         MR. BORNSTEIN:  Q.  Okay.  And in fact, I'll

9  just give you an example from your files.  Next in

10  order, please.

11         (Deposition Exhibit 3 was marked for

12         identification.)

13         MR. BORNSTEIN:  Q.  This is from -- I guess is

14  that your writing at the top, "RJD Pat"?

15    **A.  Yes.**

16    Q.  "3-7-12"?

17    **A.  It is.**

18    Q.  So that's Mr. --

19    **A.  Yes.**

20    Q.  -- McKinney?

21    **A.  Yes.**

22    Q.  Who's here?

23    **A.  Yes.**

24    Q.  And he gave you this.  Right?

25    **A.  In an email, yes.**

                                                         63

1    especially in a pattern and practice.

2         What I would do is, say, that's a problem here.

3    That's an issue here --

4         MR. BORNSTEIN:  Q.  Okay.  Well, in fact --

5    A.   -- that will come back to bite you type of --

6    Q.   That's how you do it?

7    A.   Well, at the time, on an individual case, yeah,

8    until I have an understanding of whether it's a pattern

9    and practice.

10        Q.   It is true --

11   A.   What would you have me do?  Go around arresting

12   these people or something, accusing them, or --

13        Q.   Well, I don't know.  You tell me.  What do you

14   think should be done if somebody's using excessive

15   force?

16   A.   Well, they'd be enjoined to stop it in a class

17   action.  Don't talk to me about that.  I've reformed

18   more facilities in this country on that than you'll ever

19   even think about.

20        Q.   So you agree with --

21   A.   Don't even question that.

22        Q.   I'm not.  I'm asking you --

23   A.   I've put myself in harm's way physically,

24   politically, and every other way to stop this kind of

25   thing.

85

1      Q.  Because it's very hard to do, isn't it?

2      **A.  It's difficult to do.  But more than that, it**

3  **hurts people.  It's inhumane, it's immoral.**

4      Q.  What's inhumane?

5      **A.  To hurt somebody when it's not necessary.**

6      Q.  Right.  I agree with you.

7          But my question to you, though, is, this

8  particular policy that you helped to create -- or

9  inspire, let me put it that way -- I mean, this should

10 have been done long before they hired you, shouldn't it?

11         MR. McKINNEY:  Objection.  Vague and ambiguous,

12 it's argumentative.

13         THE WITNESS:  Well, I would answer this by

14 saying, where have all your experts been and the Special

15 Master's experts been and the Court been while this has

16 been going on in plain view?

17         MR. BORNSTEIN:  Q.  So they should have --

18     **A.  I mean, you want to always focus on the agency.**

19 **This has not been secret, what I've identified here.**

20 **This has been out there for everybody to see.  But**

21 **people count beans.  The Special Master just counts**

22 **events.  They haven't looked at actual applications.**

23 **Your people haven't.  I mean, there's got to be some**

24 **equity in these things here.  This is unfair.**

25     Q.  It's unfair for outsiders to run the

86

1    institution?

2        A.   No.  No.  It's unfair to hold them to a high

3    standard that y'all don't seem to have to meet.

4        Q.   Whose prison is it?

5        A.   It's the public's.

6        Q.   But who runs it?

7        A.   The public trustees.  The agency officials.

8        Q.   Well, those are CDCR people.

9        A.   Yes.  No, I'm not trying to diminish their

10   responsibility.  They -- it is their responsibility.

11       Q.   Okay.  They're the ones --

12       A.   I'm just wondering, you know, where's everybody

13   else been in this thing?

14       Q.   Well, I don't know.  But I know -- I'm trying

15   to find out where you're at and where they're at, and

16   that's what I'm trying to figure out.

17       A.   And I'm trying to answer that.

18       Q.   And I appreciate that.  But my question to you

19   is, it seems like what you've suggested here and what

20   they have adopted is something that should have been

21   adopted a long time ago.

22            MR. McKINNEY:  Objection.  Calls for --

23            MR. BORNSTEIN:  Q.  Would you agree with that?

24            MR. McKINNEY:  Objection.  Calls for

25   speculation, it's argumentative.

87

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1          THE WITNESS:  Well, I -- it should have been

2     adopted when they had enough information to know that,

3     through their reviews, their investigations, and their

4     oversight, that there is a potential problem here.

5          MR. BORNSTEIN:  Q.  All right.  And you

6     would -- does it surprise you -- well, let me ask it

7     this way.  Hypothetically, have you heard -- no, let me

8     do it this way:

9          In your tours, when you interviewed command

10    staff at whatever prison you were at, did they tell you

11    that they prefer using spray as opposed to other means

12    to extract prisoners from cells?

13         A.  Yes.  I think that's generally true.

14         Q.  And that's because of what they call officer

15    safety?

16         A.  And inmate safety, likewise.

17         Q.  And in general, there's nothing wrong with that

18    as far as you're concerned, so long as they do it in a

19    sensitive way and not an excessive way.

20         A.  Well, I would couch it more in terms of a

21    tactical, sound manner.

22         Q.  Okay.

23         A.  That accomplishes the objective of the force,

24    which is to neutralize aggression.  I look at it very

25    coldly, very objectively.

                                                        88

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1  of what that incident is, they use MK-9, but I've not

2  ever seen that being carried on a person on line level.

3      Q.  And you're comparing it to what kinds of other

4  systems?  I mean, is California --

5      A.  I've been in so many.  I've probably been in

6  confinement operations in 40 of the 50 states.

7      Q.  So nobody else does it like this.

8      A.  Not that I recall.  I've never seen an MK-9

9  being standard issue on a line level.

10     Q.  What about in the last 5 years?

11     A.  No.

12     Q.  How many different kinds of institutions have

13  you been to in the last 5 years?

14     A.  I'd have to study that, but I typically during

15  a 12-month period find my way in between, you know, 5

16  and 10 facilities a year, so I -- you know, I could very

17  well have been in 30 to 50 facilities in the past 5

18  years, easily.

19     Q.  And you said you -- I think during the past

20  year you've been working on 20 different cases or

21  something?  Sorry, I didn't --

22     A.  It went down wrong.  I've got 20 different

23  client -- cases, yeah, if you will.

24     Q.  And are some of them -- I mean, are the -- can

25  you discuss which ones they are?

133

1    A.  Well, four or five of them are -- I'm a federal

2    court monitor in New York City jails, federal court

3    monitor in the state juvenile system in Ohio, federal

4    court monitor in state prison in Mississippi.  Those are

5    my monitoring.

6        I'm also working as an appointed expert in a

7    Taser class action case in the State of Ohio in Franklin

8    County, which is Columbus.

9        I've got a large class action use-of-force

10   litigation in LA County jail, I've got another LA County

11   jail use-of-force involving five plaintiffs damage case.

12   I've got cases in Louisiana.

13       Some I'm just not -- not coming to mind.

14   Q.   The LA County cases --

15   A.   Denver, an in-custody death case, use of force,

16   in Denver Jail.  Strip-search case in LA County Jail.

17       That gives you a good -- crowding conditions

18   case in Birmingham, Alabama, Jefferson County.

19   Q.   That's a good sample.

20       Speaking of strip-searching, is it in your

21   experience in the prison setting, something in a Level 4

22   facility, like an ADSEG or a Level 4 yard, would

23   there -- would it be common to strip-search an inmate

24   every time they come in or out of their cell?

25       MR. McKINNEY:  Objection.  Ambiguous, compound,

134

1   practice, you want to look -- obviously, in my view, you

2   should separate.  Because quite frankly, in

3   pattern-and-practice cases, I find unnecessary force to

4   typically be the problem that has to be addressed, you

5   know, through training, investigation, supervision, and

6   so forth.

7        Q.  Okay.  Let's turn to the first page of your --

8   well, with the -- 105138.  And the -- there are four

9   recommendations that you made regarding use of force.

10  Right?

11       A.  Yes.

12       Q.  Why didn't you include these in your report?

13       A.  Well, they're best practice, and counsel --

14  which I think appropriately -- can make that call.  I

15  mean, it's not my call; it's their call.  Wanted that

16  report limited to constitutional issues.  It's as simple

17  as that.

18       Q.  What -- well, let's talk about that.

19            So you told counsel that you found these things

20  and you thought they were important, they should be

21  changed.

22            MR. McKINNEY:  Objection.

23            MR. BORNSTEIN:  Q.  Right?

24            MR. McKINNEY:  Objection.  Vague and ambiguous.

25            THE WITNESS:  Yes, I think that's basically

                                                        147

1   correct.

2           MR. BORNSTEIN:  Q.  And counsel said to you,

3   well, are they constitutional, or is it best practices?

4           MR. McKINNEY:  Objection.  Vague and ambiguous,

5   argumentative.

6           THE WITNESS:  I probably categorized them as

7   such.

8           MR. BORNSTEIN:  Q.  At what point would it be

9   constitutional as opposed to a best practice?  Help me

10  to understand that.

11      A.  Well, this -- I mean, let me take number 2.

12          You know, where I say there's virtually no

13  guidance regarding use of the expandable baton.

14      Q.  Yep.

15      A.  If I'm finding frequent instances where it's

16  used unnecessarily or excessively, then that lack of

17  guidance is very close at hand to being

18  unconstitutional.  I mean, you've got to establish a

19  nexus, but I mean, I don't think it would take a great

20  leap of imagination to suggest they use it whenever they

21  want to.

22          Well, how are they able to do that?  Because

23  there's nothing that tells them they can't.

24      Q.  Well, you found numerous instances in which it

25  was used to intervene in inmate-on-inmate assaults, and

148

1    **impose -- the classification people administratively**

2    **need to say, do we need to put him in a higher security**

3    **setting by reclassifying him close.**

4        Q.  Did you review any of those classification

5    decisions as it related to mental health inmates who

6    were assessed with some, you know, recommendation by a

7    mental health person that, gee, you need to take this

8    into consideration, or yes, I think their mental illness

9    played a role in this, and you, you know, should

10   mitigate it?

11       Did you look at any of the classification

12   decisions that follow those RVR proceedings?

13       **A.  You know, as they were referred for the ICC?**

14       Q.  Uh-huh.

15       **A.  No, I did not.**

16       Q.  Is there a mental health component in the ICC

17   process?

18       **A.  I hope so.**

19       Q.  Well, do you know?

20       **A.  No.**

21       Q.  We know that there is in the RVR process,

22   because there's a whole written policy and procedure

23   about it.  Right?

24       **A.  Yes.**

25       Q.  Have you seen any written policy and procedure

186

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    about the classification process and -- as it results

2    from an RVR referral or finding?

3        A.  I have not.  I just did not look in that, you

4    know --

5        Q.  Is that a hole in the system?

6        MR. McKINNEY:  Objection.  Argumentative, calls

7    for speculation.

8        THE WITNESS:  It's a hole in my review that I

9    didn't look at it.

10       MR. BORNSTEIN:  Q.  Well, were you asked to

11   look at it?

12       A.  No.

13       Q.  Were you told that, well, this is only part of

14   this thing, part of the sanctions that might be imposed?

15       A.  No, no, because -- Jeffrey, that's not a

16   sanction, and that's why I didn't look at it.

17       Q.  Why is it not a sanction?

18       A.  It's an administrative decision.  A

19   classification decision is an administrative decision

20   based entirely on objective variables.  It's not a

21   sanction.  It's not a penal decision.  It's an

22   administrative decision.

23       Q.  Well, it can be penal.

24       A.  It in effect can be, certainly.

25       Q.  If you take someone --

187

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1      **A.   Right.**

2      Q.   Okay.  So there's all sorts of reasons why

3   somebody might need an assistant.  Right?

4      **A.   Yes.**

5      Q.   And did you find a process in place to provide

6   them with assistance?

7      **A.   There is, but I did not go into that.**

8      Q.   Is it a formal process, or does it vary from

9   institution?

10     **A.   I think it's a -- I mean, there's formal regs.**

11  **I mean, there's regs that set that out, state regs.**

12     Q.   Isn't it at the discretion of the hearing

13  officer?

14          MR. McKINNEY:  Objection.

15          MR. BORNSTEIN:  Q.  Whether somebody gets a

16  Staff Assistant or not?

17          MR. McKINNEY:  Objection.  Calls for

18  speculation.  The witness has testified he didn't

19  examine this issue.

20          MR. BORNSTEIN:  Q.  Okay.  If you --

21     **A.   I don't know.  I just did not look at that.**

22     Q.   Okay.  Is that something that, though, ought to

23  be considered as part of a review of a disciplinary

24  process, what procedures are in place to help inmates

25  who need it?

240

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    Did you do that?

2    A.   No.

3    Q.   What do you think of this?

4    A.   I -- not much.

5    Q.   Why?

6    A.   Well, it's -- it wasn't any revelation to me.

7    I mean, there's programs like that around the country.

8    Q.   You agree with this, though, don't you?

9    A.   Oh, yeah, yeah, I agree with the substance of

10   it, yeah.

11   Q.   In other words, there should be a way for

12   inmates to gain additional privileges in segregation.

13   Right?

14   A.   Yeah, I endorse it as a correctionally sound

15   approach, certainly.

16   Q.   Does CCR?

17   A.   I did not look at the operation of the programs

18   to the extent Joel did.  I know Joel and I bounced

19   around -- I know we had discussions about it, that he, I

20   think, believed there were some things that --

21   additional things could be done.

22   Q.   And you agree, too, don't you?

23   A.   As --

24   MR. McKINNEY:  Objection.  Asked and answered.

25   THE WITNESS:  As a corrections professional,

272

1   yeah, I always supported programs that reduced the

2   length of stay in high-security environments, because

3   they're expensive, they're oppressive, or can be, and

4   they can become counterproductive if people are in there

5   too long.

6        So yeah, I endorse any program that can shorten

7   that.

8        MR. BORNSTEIN:  Q.  Okay.  So we've talked a

9   lot today about your basic opinions, which are, as far

10  as you're concerned, there's no constitutional violation

11  in the way in which the use-of-force is being

12  administered in the California prisons.  Is that right?

13       **A.  This is -- in a pattern and practice --**

14       Q.  In pattern and practice.

15       **A.  -- practice of excessive or unnecessary force,**

16  **I did not see that.  Did not find it.**

17       Q.  You found individual instances of use of force

18  that could be considered unnecessary or

19  unconstitutional.  Is that correct?

20       **A.  Correct.**

21       Q.  And you also found a review process for -- or

22  at least you agree that there is a review process that

23  needs to be improved.

24       MR. McKINNEY:  Objection.  That misstates the

25  opinion.

273

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

# CERTIFICATE OF REPORTER

1

2    I, HOLLY THUMAN, a Certified Shorthand Reporter,

3 hereby certify that the witness in the foregoing

4 deposition was by me duly sworn to tell the truth, the

5 whole truth, and nothing but the truth in the

6 within-entitled cause; that said deposition was taken

7 down in shorthand by me, a disinterested person, at the

8 time and place therein state, and that the testimony of

9 said witness was thereafter reduced to typewriting, by

10 computer, under my direction and supervision;

11    That before completion of the deposition review of

12 the transcript [] was [X] was not requested.  If

13 requested, any changes made by the deponent (and

14 provided to the reporter) during the period allowed are

15 appended hereto.

16    I further certify that I am not of counsel or

17 attorney for either or any of the parties to the said

18 deposition, nor in any way interested in the event of

19 this cause, and that I am not related to any of the

20 parties thereto.

21

22 DATED: March 4, 2013

23

24    _____
       HOLLY THUMAN, CSR

25

300

# Exhibit 87



Transcript of the Testimony of:

# Christopher Richard Meyer

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, et al.,                No. S 90-0520 LKK JFM

          Plaintiffs,

     vs.

EDMUND G. BROWN, JR., et al.,

          Defendants.
                              /




DEPOSITION OF CHRISTOPHER RICHARD MEYER




          DATE:        February 27, 2013

          TIME:        9:08 a.m.

          LOCATION:    ROSEN BIEN GALVAN & GRUNFELD
                       315 Montgomery Street
                       Tenth Floor
                       San Francisco, California

          REPORTED BY: Mary E. Garland
                       Certified Shorthand Reporter
                       License Number 4721

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1               A P P E A R A N C E S

 2

 3    For the Plaintiffs:

 4         MARGOT KNIGHT MENDELSON, ESQ.
           JANE E. KAHN, ESQ.
 5         ROSEN BIEN GALVAN & GRUNFELD
           315 Montgomery Street
 6         Tenth Floor
           San Francisco, California 94104-1823
 7         (415) 433-6830

 8

 9    For the Defendants:

10         JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
           STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
11         OFFICE OF THE ATTORNEY GENERAL
           455 Golden Gate Avenue
12         11th Floor
           San Francisco, California 94102-7004
13         (415) 703-5717

14

           MICHAEL A. STONE, ATTORNEY III
15         CALIFORNIA DEPARTMENT OF CORRECTIONS AND
           REHABILITATION, LEGAL AFFAIRS
16         1515 S Street
           Sacramento, California 95811
17         (916) 324-1421

18

19

20

21

22

23

24

25
```

1    with what I observed in the way of subcontractor

2    coordination.

3        Q.  At that stage, did you believe there would be

4    delays due to the performance of the contractor?

5            MR. RUSSELL:  Objection.  Vague and ambiguous.

6            THE WITNESS:  I believe I asked my team to

7    evaluate whether or not there would be delays of the

8    project.  I did not specifically say due to contractor

9    poor performance.

10   BY MS. MENDELSON:

11       Q.  And did your team do that?

12       A.  They did.

13       Q.  And so when did you become aware that there

14   were delays in the project?

15       A.  It doesn't work that way.

16       Q.  Okay.  Tell me how it works.

17       A.  If you're trying to estimate a year out when a

18   project's going to be done, it's a very, very difficult

19   thing to do.

20       Q.  I would imagine.

21       A.  We have -- we have good analytical tools,

22   critical path schedules, and other ways that we try to

23   determine if a project is going to complete when the

24   estimated date is.  Typically what happens is that I'll

25   become concerned by what I see.

1          And in this case, it was enhanced by watching

2     the same contractor do the CIW project, looking at what

3     their level of completion was -- because these projects

4     are very, very similar -- at about the same point in

5     time, and then looking at what happened between that

6     point and the end of the project.

7          When I was convinced that I thought the

8     probability of the project being finished as currently

9     scheduled was very, very low, I then reported that to the

10    courts.  But the actual completion date of a project is

11    always a guess; and the further out you are, the harder

12    it is to guess on when it's going to be done.

13         Q.  Sure.  Okay.

14         Is it your role to predict how long the project

15    will take, or do you work with others on that?

16         A.  I have the final say on what gets reported as

17    to when a project will be completed.  And I spend time

18    with my staff.  If there's any inkling on their part

19    that a project may slip, I will usually work with them

20    to validate -- if there's ways that we can recover -- to

21    initiate the recovery, or if I don't believe it's

22    recoverable, to report to the courts.  But those are my

23    calls.

24         Q.  Sure.  What does "validate" mean in this

25    context?

Christopher Richard Meyer                                    February 27, 2013

1          A.  I think it gets released tomorrow.

2          Q.  And what will that entail, that new schedule?

3          A.  Oh, I'm sorry.  The activation schedule.

4              I don't believe -- or I don't know if they have

5      an actual completion date in the current activation

6      schedule.  My sense -- we've had discussions on schedule

7      over the last few weeks.  And we're probably looking

8      right now, in what I know, early 2014, we'll have the

9      conversion done.

10             But until they come back to me with a target

11     date -- so they may or may not have an actual date in

12     the filing, this month's filing.

13         Q.  Okay.

14         A.  If not, I would guess they will see it next

15     month.

16         Q.  Also, by "released tomorrow," you mean a new

17     activation schedule --

18         A.  Correct.

19         Q.  -- will be released --

20         A.  Yes.

21         Q.  -- tomorrow?

22         A.  Right.

23         Q.  Understood.  Thank you.

24             Do you know if the building is in use at all

25     right now?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                February 27, 2013

1      A.  I understand that they are using some of the

2  office spaces.  It was -- so the conversion that needed

3  to be done was to harden the treatment space, but that

4  the office space was good to go.  And the institution is

5  actually -- has some staff using the office portion of

6  that building; but it's just hearsay.

7      Q.  What does it mean to harden treatment space?

8      A.  Ah.  That some of the walls -- in this room,

9  you have regular sheetrock walls?  For higher-security

10  inmates, we put in a harder wall surface, so they're not

11  damaged so easily.  And things -- you know, basically,

12  appropriate security and facilities measures for higher-

13  security inmates.

14      Q.  And so that means there are no inmates using

15  that facility right now?

16      A.  I -- I would assume not.

17      Q.  So when attorneys from our office toured LAC on

18  January 31st, they said they weren't allowed into

19  certain parts of the building because the prison had not

20  yet taken legal possession.

21          Is that a concept that means anything to you?

22          MR. RUSSELL:  Objection.  Vague and ambiguous.

23  Lacks foundation.  Calls for speculation.

24          THE WITNESS:  I have -- do not know what the

25  legal position -- possession means.  However, during

1    construction, control of the site belongs to the

2    contractor, not the owner.

3          And we tell the institution staffs that until

4    activation is complete and there's a handing of the baton

5    to the institution, they do not have control of the

6    facilities.  And that's done primarily for safety

7    reasons, of institution staff stepping into a

8    construction zone.

9    BY MS. MENDELSON:

10         Q.  So attached to Exhibit 13, attached to your

11   termination declaration, there's some photos of LAC.

12         A.  Okay.

13         Q.  You can turn to them, if you'd like.

14          I'm just wondering if you know whether those

15   spaces are in use?

16         A.  For LAC, again, I understand through hearsay

17   that they are using the office space, because that does

18   not need to be converted.  They are not using the

19   treatment space, because that does need to be converted.

20         Q.  And the photos that you took -- I'll pull them

21   up; I think you have them there -- are they of office

22   space or treatment space?

23         MR. RUSSELL:  Objection.  Misstates testimony.

24   BY MS. MENDELSON:

25         Q.  Exhibit 13 is page 69.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1          THE WITNESS:  I believe the activation group
 2   participates in it, but so do all sorts of other folks.
 3   BY MS. MENDELSON:
 4      Q.  And to the best of your knowledge, will the
 5   EOP-ASU facility being built not service the EOP-GP
 6   inmates that it was originally intended to service?
 7      A.  That's a program question.  That's -- I have no
 8   idea.
 9      Q.  Okay.  Thank you.
10          I'm looking at paragraphs 17 and 18 of your
11   termination declaration.  Paragraph 17 discusses a
12   health care facility improvement project at Mule Creek
13   State Prison.  It says that on December 14th, 2012, the
14   PWB established that project.
15          Are you familiar with that project?
16      A.  From a global-scope position, yes.
17      Q.  And it says it includes a sub-project to design
18   and construct new AD SEG primary care and AD SEG EOP
19   mental health clinic for inmates housed in Facility C.
20          Do you know if there's an activation schedule
21   for that project yet?
22      A.  I doubt it.  It's -- we just got approval to
23   get started on it.  Activation schedules usually come a
24   little bit further in -- along in the design process.
25      Q.  So if was just established by the PWB, what

Christopher Richard Meyer                          February 27, 2013

1    would the next steps typically be?

2        A.  Hire a designer.  Hire the various consultants

3    to evaluate whether or not they need to file an

4    environmental document on it.  And if we do, then to

5    start the CEQA process.

6            And then to have stakeholder meetings, to bring

7    in all of the stakeholders associated with it to scope

8    in detail exactly what the project needs are.

9        Q.  So is it fair to say there's not a projected

10   date for finishing construction yet?

11       A.  There may be a -- as was shown earlier in the

12   activation schedules, there may be -- and I believe

13   there is -- a conceptual schedule of how projects, all

14   of our projects, will lay out over the next three or

15   four years.  But, again, until we sit down and actually

16   design the building, we can't establish exactly how long

17   it's going to take and when we expect it to activate.

18   It's the difference between conceptual and detailed.

19       Q.  If it's been through the PWB, remind me, does

20   that mean that it's gotten funding?

21       A.  I don't know if these projects had to go to

22   PMIB; but as far as we're concerned, it's funded.  We're

23   out hiring designers and get going on it; so to me, that

24   means that we have funding.

25       Q.  Are you certain that the project will be

Christopher Richard Meyer                                    February 27, 2013

1    all the components of it.

2        Q.  Sure.  So these improvement programs tend to be

3    not specific to just one component, but, rather, involve

4    various; is that correct?

5        A.  Correct.  It's both mental health and health,

6    dental, ADA.  So, yes, it involves many aspects of the

7    total health care delivery.

8        Q.  And like MCSP, is that now at the stage where

9    designers are designing the buildings?

10       A.  We're -- I believe we've hired those designers,

11   and we're starting with preliminary stakeholder

12   meetings.

13       Q.  What's a preliminary stakeholder meeting?

14       A.  We bring in all the stakeholders and we say,

15   "Okay, we got some money, we have a mission, and let's

16   figure it out."

17       Q.  Do you attend those meetings?

18       A.  No, I do not attend those meetings.

19       Q.  But there's not yet a projected date for

20   completion?

21       A.  Oh, it's -- again, I would guess that there is

22   a conceptual date for the overall design and

23   construction period that -- from funding that that

24   project's going to take; but until we have a detailed

25   design, we will not have a detailed schedule.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                          February 27, 2013

1      Q.  Do you know when the conceptual date of

2  completion is?

3      A.  It typically takes about a year to design a

4  project, but that can vary, depending on the complexity

5  and -- basically, on complexity of the project.

6          But the answer to your question is no.

7      Q.  And do you know what the projections for the

8  completion of the construction are?

9      A.  No, not off the top of my head.

10     Q.  Your termination declaration also mentions the

11 Dewitt.  Nelson Correctional Annex Project.  It says it

12 will add 1,133 beds, of which 953 will be health care

13 beds.  Let me pull out the activation schedule for that

14 one.  This will be No. 11.

15         (Plaintiff's Exhibit No. 11

16          marked for identification.)

17 BY MS. MENDELSON:

18     Q.  I see that you're listed on the top as the

19 "Responsible Person"?

20     A.  Yes.

21     Q.  What does the "Responsible Person" mean?

22     A.  It's the name that they put on the top of the

23 activation schedule.

24     Q.  That's the only meaning it has to you?

25     A.  It's -- that is, honestly, the only real

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1    meaning that has to me.  Our Facilities group is

 2    responsible for producing the report; it's done under my

 3    general supervision.

 4        Q.  So the "Responsible Person" doesn't refer to

 5    the project, perhaps it just refers to the schedule; is

 6    that what you're saying?

 7        A.  When we present the activation schedule at the

 8    court coordination meetings, if my name is on it, I

 9    present --

10        Q.  Okay.

11        A.  -- if Deborah's name is on it, she presents.

12        Q.  Fair enough.

13            It says in your declaration that the Dewitt

14    project is scheduled to open with the first inmate

15    admission on February 17th, 2014, and to be fully

16    occupied by May 31st, 2014.

17        A.  Correct.

18        Q.  Is that still true, to the best of your

19    knowledge?

20        A.  It's -- projecting out a year is always tricky;

21    but, yes.  There are issues associated with that project

22    that I'm concerned about, but nothing that has risen to

23    the level that I'm yet ready to -- or may never --

24    decide that it's going to be impacted.

25            But right now, those are the dates that we're

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                     February 27, 2013

1    planning and constructing to.

2          Q.  What kinds of issues have come up?

3          A.  We decided to put a single perimeter fence

4    around both CHCF and Dewitt Nelson, which makes the

5    endgame, the last month or so of the project, more

6    problematic, more difficult.

7               The contractors now will be going through a

8    secured institution to try and complete the punch list

9    work in Dewitt Nelson, rather than a freestanding

10   institution from CHCF.

11              So we have a group of people trying to figure

12   out when we can do the cutover to have the least impact

13   on construction -- it's a big impact.  If you go from

14   free access to now everybody has to go through a sally

15   port, it can impact it.  However, we have a bunch of

16   very smart people trying to figure out ways not to

17   impact it.

18         Q.  So the fence is already up, or is it planned to

19   go up?

20         A.  It's planned to go up for Dewitt Nelson.  We're

21   just completing the electric fence on CHCF, but we have

22   not yet started the electric fence on CHCF -- or on

23   Dewitt Nelson.  And then we will also have to breach the

24   fence at CHCF when we connect the two up for a single

25   perimeter.  So it's a tricky engineering and

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                          February 27, 2013

1   accelerations, there's a cost associated?

2        A.  Yes.

3        Q.  You pay to accelerate --

4        A.  You do.

5        Q.  -- is that correct?

6        A.  Yes.

7        Q.  You do.

8        A.  And if you don't manage it very intelligently,

9   you will spend the money and not get any schedule

10  improvement; and in some cases, you will actually get

11  the project slowing down.

12       Q.  Am I correct that you've presented at policy

13  meetings before, Coleman policy meetings?

14       A.  Yes.

15       Q.  What kind of things have you had to explain at

16  those meetings?

17       A.  Oh, probably the most extensive explanation was

18  the slip on CMC --

19       Q.  Okay.

20       A.  -- when made an independent evaluation, based

21  on a lot of study that I did, that the contractor's

22  projections of when he was going to be done were

23  unrealistic, and that I was not going to give the courts

24  unrealistic projections of when I thought things were

25  going to be done.

Christopher Richard Meyer                                    February 27, 2013

1          One of the issues that happened at CIW was, I

2     believe in the last six months of that project, the

3     project slipped a month every month.  Contractor would

4     give you his critical path schedule update, say he was

5     going to be done in two months; and then a month later,

6     he would give his update and say it's going to be done in

7     two months.  And there was no way that I wanted to go

8     through that again with CMC.

9          So I went out with staff, did a completely

10    independent analysis after visiting the project, and came

11    back to the court and said, "I know you're going to beat

12    me up, but I honestly don't think that this thing is

13    going to be done until July or -- June or July, or

14    something like that, of 2013."

15         Q.  So when you were at the policy meeting, was

16    your role to explain the sources of the delays?

17         A.  It was to explain the analysis that went into

18    my decision to forecast -- again, it's still a forecast

19    -- that there would be a delay in the project that was

20    significant.  And to do it as early as possible, as soon

21    as I truly believed that that was going to be the

22    reality.

23         Q.  And by "forecast," you mean -- what do you mean

24    by "forecast"?

25         A.  An analysis of when something in the future is

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                    February 27, 2013

 1    going to be done, when there's still hundreds, if not

 2    thousands, of variables that can impact that completion

 3    date.

 4          And, you know, there is often disagreement

 5    between experts and professionals when you're that --

 6    there's just -- there's too many unquantifiable

 7    variables in it.  But there -- I had enough concern with

 8    what I saw on the project, that I did not believe that

 9    the contractor's term schedule was realistic.

10          Q.  So then you sort of had a policy meeting,

11    trying to explain the exigencies of contracting to

12    people who don't know contracting?

13          A.  It actually went better than I thought it

14    would.  But, yes, I did the best I could to explain the

15    reasoning behind my forecast.

16          Q.  Who attends policy meetings?  I haven't been to

17    one myself.

18          A.  Everybody in the world.  It's a large group.

19    There's probably at least 25 or 30 people in the room.

20    And I don't know most of them.  But, yeah, it's -- I go

21    do my little construction thing, and then they're --

22          Q.  What kinds of questions do they have?

23          (Reporter requesting clarification.)

24          THE WITNESS:  -- and then they're off to their

25    policy decisions, so ...

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                    February 27, 2013

 1   changed, if I understand correctly, before they got to

 2   you, anyway.  So it didn't matter that much to your

 3   work; is that correct?

 4            MR. RUSSELL:  Objection.  Vague and ambiguous.

 5            THE WITNESS:  So, again, I pick it up when it's

 6   funded and then I run with it.  And although I am aware

 7   of discussions going on, I don't pay a lot of attention

 8   to it, because I can't influence it.

 9   BY MS. MENDELSON:

10       Q.  But then there are also cases where the plan

11   changes partway through, like the LAC rescope or the

12   CCWF rescope; is that correct?

13       A.  Not halfway through.  In the case of --

14       Q.  Okay.

15       A.  -- LAC, it was after it was done; and at CCWF,

16   it was before it started.

17       Q.  Is that challenging?

18            MR. RUSSELL:  Objection.  Vague and ambiguous.

19            THE WITNESS:  No more so than any other aspect

20   of construction.  It's, you know, a -- converting a

21   completed project is not nearly the level of effort as

22   it is building a new project.

23            And since -- you know, in the case of CCWF, I

24   think we had -- design was already going, so now we're

25   back to square one on design.  So it's a waste of money.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                      February 27, 2013

1    But from the process of design and construction, you

2    just move the starting point again and go through the

3    same process.

4    BY MS. MENDELSON:

5        Q.  But doesn't it suggest that no project will,

6    certainly, open until the minute it opens?

7            MR. RUSSELL:  Objection.  Vague and ambiguous.

8            THE WITNESS:  I would not -- I would not hire

9    or have working for me anybody that maintained the

10   position is "it happens when it happens."  It happens

11   when we manage it to happen, with a realistic intention

12   to the variables and risks associated with it.

13           So I do believe that management makes a

14   difference, and I believe it makes a big difference.

15   The key is to focus on the best management you can do to

16   deliver as quickly as possible.  That does not mean that

17   there won't be things that come up that mess up your

18   plan.

19   BY MS. MENDELSON:

20       Q.  Because you could have managed LAC perfectly,

21   but the end of the day, it didn't get to be the thing

22   that it was intended to be?

23       A.  I thought we did manage LAC perfectly.

24       Q.  Okay.  But at the end of the day, did it end up

25   being the thing you thought it would be?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                          February 27, 2013

```
 1              On page 7, there's a project schedule, item
 2    number 8.  It states here that the construction will be
 3    complete on May 2015, in May 2015.  It says that
 4    preliminary plans will start September 2012.
 5              Do these constitute the preliminary plans?
 6         A.  No.
 7         Q.  Do you know if the preliminary plans have
 8    started?
 9         A.  The project was approved, and we're -- we hired
10    the designers.  I don't know where -- I don't know where
11    they're at in the preliminary design at this point in
12    time, but they're working on it.
13         Q.  Do you think that it's realistic, May 5th,
14    2015, as a deadline for all 22 facilities?
15              MR. RUSSELL:  Objection.  Vague and ambiguous.
16    Lacks foundation.
17              THE WITNESS:  As I said previously, until we do
18    the site assessments and get into the detail, we have no
19    basis.
20    BY MS. MENDELSON:
21         Q.  Okay.  No basis for?
22         A.  Realistic, could it be done earlier?  I don't
23    know yet.  Is it going to take longer than that?  I
24    don't know yet.  We need to go do the individual site
25    assessments and put the design team on it.  It does not
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                            February 27, 2013

1   seem to me at all unreasonable that it could --

2        Q.   Okay.

3        A.   -- be done by this point in time.

4        Q.   Okay.  Thank you.

5             So the plan, as you understand it, has been

6   through the PWB?

7        A.   For med distribution, is funded.

8        Q.   Not just as to specific sites, but the full

9   roster?

10            MR. RUSSELL:  Objection.  Vague and ambiguous.

11  Lacks foundation.

12            THE WITNESS:  I would have to go look at

13  exactly what is approved.  But the fact that we started

14  on it, and it was a single program, is a pretty good

15  indication that --

16  BY MS. MENDELSON:

17       Q.   Okay.  Thanks a lot.

18       A.   -- we're going forward with everything.

19       Q.   Okay.  Great.

20            Let's turn back to your declaration for a

21  moment, your termination declaration, which would be

22  Exhibit 1.  I want to ask you a couple questions about

23  SAC; California State Prison, Sacramento, which we refer

24  to as "SAC."  Is that how you refer to it?

25       A.   Yeah, CSP SAC --

Christopher Richard Meyer                                    February 27, 2013

```
 1   of what they call the MHCBU, Mental Health Crisis Bed
 2   Unit, which is an unlicensed 20-bed space.
 3           Are you familiar with it?
 4       A.  I am not.
 5       Q.  Were you aware it existed?
 6           MR. RUSSELL:  Objection.  Vague and ambiguous.
 7           THE WITNESS:  I don't recall.
 8   BY MS. MENDELSON:
 9       Q.  Are you aware of any plans to close that unit?
10           MR. RUSSELL:  Objection.  Vague and ambiguous.
11   Lacks foundation.  Assumes facts not in evidence.
12           THE WITNESS:  I'm not aware of it, no.
13   BY MS. MENDELSON:
14       Q.  So I want to ask you a little bit -- no
15   exhibits here, just some questions -- about the
16   Condemned Inmate Complex at San Quentin that was
17   cancelled by Governor Brown in April 2011.
18           Are you familiar with the project?
19       A.  Yes.
20       Q.  Had you worked on the project?
21       A.  No.
22       Q.  Do you know if it had mental health capacity?
23       A.  I don't know.
24       Q.  Who would know that, in your department?
25       A.  The project director that managed the design
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                    February 27, 2013

1    phase of that would know that.

2         Q.  So it had been through the design phase, to

3    your knowledge?

4         A.  The design was complete.

5         Q.  So if we were looking at an activation

6    schedule, where would we be on the activation schedule

7    before it was cancelled?

8              MR. RUSSELL:  Objection.  Vague and ambiguous.

9    Lacks foundation.

10             THE WITNESS:  At the bid stage.

11   BY MS. MENDELSON:

12        Q.  At the bid stage.  So there had not been --

13   well, before I say that, let me look at an activation

14   report.

15             So before the bid stage is the funding request,

16   the legislative approval, the board approval, the loan

17   request; is this all correct?

18        A.  Yes.

19        Q.  Also the preliminary plans?

20        A.  Yes.

21        Q.  CEQA?

22        A.  Yes.

23        Q.  The Joint Legislative Budget Committee

24   approval?

25        A.  Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                    February 27, 2013

1          Q.  And working drawings?

2          A.  Yes.

3          Q.  So to your knowledge, all those stages have

4     been completed?

5          A.  Yes.

6               MR. RUSSELL:  Objection.  Lacks foundation.

7     Calls for speculation.

8     BY MS. MENDELSON:

9          Q.  Did you know it was going to be cancelled

10    before it was cancelled?

11         A.  No.

12         Q.  You heard just at the same time as everyone

13    else?

14         A.  Yes.

15              MR. RUSSELL:  Objection.  Vague and ambiguous.

16    Lacks foundation.

17    BY MS. MENDELSON:

18         Q.  To your knowledge, are all projects subject to

19    cancellation by the governor, all construction projects

20    on CDCR sites?

21              MR. RUSSELL:  Objection.  Vague and ambiguous.

22    Lacks foundation.  Overly broad.

23              THE WITNESS:  I'm not an attorney, I don't know

24    what authority he has, but he's the boss.  He wants to

25    cancel it, it gets cancelled.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                          February 27, 2013

1          THE WITNESS:  I would have to be aware of the
2     specific instance where it did.  And I'm not aware of a
3     specific instance where it did.
4     BY MS. MENDELSON:
5          Q.  Do you have concerns about the condition of
6     CIM?
7               MR. RUSSELL:  Objection.  Vague and ambiguous.
8               THE WITNESS:  I do.
9     BY MS. MENDELSON:
10         Q.  What are your concerns?
11         A.  Some of the special repairs at that project are
12    not at the state that I'd like to see.  So some of the
13    rep. replacements, some of the electrical distribution.
14    Not any worse than some of our other institutions, but
15    there is a need for some infrastructure repair and
16    maintenance at that institution.
17         Q.  Do you know of any on the books?
18              MR. RUSSELL:  Objection.
19              THE WITNESS:  I would have to go --
20              MR. RUSSELL:  Objection.  Vague and ambiguous.
21    Lacks foundation.
22              THE WITNESS:  Not without looking at the
23    reports.
24    BY MS. MENDELSON:
25         Q.  Would those kinds of repairs you described be

Christopher Richard Meyer                          February 27, 2013

```
 1    major works?
 2              MR. RUSSELL:  Objection.  Vague and ambiguous.
 3    Lacks foundation.  Calls for speculation.
 4              THE WITNESS:  What do you mean by "major"?
 5    BY MS. MENDELSON:
 6         Q.  Well, earlier you said that you don't know of
 7    any major projects going on, scheduled construction or
 8    renovation projects, at CIM.  I'm wondering if --
 9         A.  So I'm referring to major capital outlay.
10         Q.  Mm-hm.
11         A.  I believe most -- major capital outlay is
12    defined by the dollar investment in the particular
13    project.  I'm not aware of any single repair items out
14    there that would be major capital outlay.  It'd probably
15    be a minor outlay or Section 6s.
16         Q.  Do you think CIM is in worse condition than
17    other prisons?
18              MR. RUSSELL:  Objection.  Vague and ambiguous.
19    Lacks foundation.  Calls for speculation.
20              THE WITNESS:  I think there are institutions
21    that are worse than CIM.
22    BY MS. MENDELSON:
23         Q.  Which ones?
24         A.  CRC.
25         Q.  CRC.  Any others?  You said "institutions."
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1       A.   Where did I get them, in the first place?

2       Q.   Mm-hm.

3       A.   Off the project list.

4       Q.   Off the project list?

5       A.   Mm-hm.

6       Q.   What project list?

7       A.   List of projects.

8       Q.   You keep a running list of projects?

9            MR. RUSSELL:  Objection.  Vague and ambiguous.

10           THE WITNESS:  Yes.

11  BY MS. MENDELSON:

12      Q.   You do?  Okay.

13           Is that the written list that you keep?

14      A.   No.  I mean, it's a piece of paper that I make

15  notes on; and I change it, and throw it out, and redo it

16  occasionally.

17      Q.   So you got these facts and figures from a piece

18  of paper that you change and throw away?

19      A.   Ah.  The draft of the declaration was prepared

20  by counsel.

21      Q.   Okay.

22      A.   I then had it vetted for facts, and figures,

23  and correctness.  I then reviewed it and edited it.

24      Q.   And Mr. Borg, you said, vetted it?

25      A.   Mr. Borg vetted it, in combination with

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                    February 27, 2013

1    representatives from Department of Finance.

2         Q.  When you edited it, were you editing the

3    figures and facts at that stage?

4         A.  I did not edit the figures and the facts.

5         Q.  Okay.  So those came from first counsel, then

6    Mr. Borg?

7         A.  That's correct.

8         Q.  And does that include the dates of activation,

9    projected and past?

10        A.  It did.

11        Q.  Do you know what forms or documents they used

12   to get -- to vet those?

13        A.  I do not.

14        Q.  To get to --

15             MR. RUSSELL:  Who is -- I'm sorry.

16   BY MS. MENDELSON:

17        Q.  To vet them?

18             MR. RUSSELL:  Objection.  Vague and ambiguous.

19   Who is "they"?

20             MS. MENDELSON:  Mr. Borg and the Department of

21   Finance.  I'm sure you know that we made a request for

22   production related to any documents relied upon in the

23   declaration.

24             MR. RUSSELL:  And you've gotten them.

25   BY MS. MENDELSON:

Christopher Richard Meyer                                    February 27, 2013

1      Q.  And so to go through:  Counsel would be
2  responsible for the first draft.  Beyond that, it was
3  not vetted by -- it was vetted by Dr. Borg and
4  Department of Finance --
5      A.  Dean Borg.
6      Q.  Excuse me.
7          -- Dean Borg and the Department of Finance --
8      A.  Yes.
9      Q.  -- and you're not sure according to which
10  document?
11      A.  Right.  I don't know what documents they use to
12  -- to vet it.  I would imagine it was PWB submission --
13  submittals.
14      Q.  Then when it came back to you, what did you
15  check it against?
16      A.  Statements that I was not comfortable with,
17  was, basically, what I checked it against.
18      Q.  What would make you uncomfortable with a
19  statement?
20          MR. RUSSELL:  Objection.  To the extent that
21  you can answer that without discussing attorney-client
22  privileged communications, you can answer.
23          THE WITNESS:  One statement referred to the
24  CHCF as a state-of-the-art facility.  I have no basis,
25  professional basis, to determine whether or not it was a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    state-of-the-art facility, because that's a programmatic

2    call, not a construction call.  So I struck it from the

3    declaration.

4    BY MS. MENDELSON:

5        Q.  Okay.  Anything else?

6            MR. RUSSELL:  Objection.  Vague and ambiguous.

7    Lacks foundation.  Overly broad.

8            To the extent you can answer without discussing

9    attorney-client communications, you're free to answer.

10           THE WITNESS:  I'm not aware of any other

11   statements that I struck without talking to counsel

12   first.

13   BY MS. MENDELSON:

14       Q.  Okay.  So you said that you checked it against

15   statements you're uncomfortable with.  Did you check it

16   against any particular documents?

17       A.  No, I did not.

18       Q.  So you trusted that Dean Borg would get the

19   facts right?

20       A.  I did.

21       Q.  Would you say that you have personal knowledge

22   of all the facts, including prices, square feet, dates?

23       A.  "Personal knowledge."  These are facts of

24   record; we have records that have those facts.  Whether

25   or not I -- well, I have seen them, them all.  So, yes.

Christopher Richard Meyer                          February 27, 2013

 1   I would say the answer to that is yes.
 2        Q.  You've seen all the records that --
 3        A.  I have seen the square footages and I've seen
 4   the prices.
 5        Q.  When did you see those?
 6            MR. RUSSELL:  Objection.  Overly broad.
 7            THE WITNESS:  Over the last four years.
 8   BY MS. MENDELSON:
 9        Q.  In what kinds of documents?
10            MR. RUSSELL:  Objection.  Overly broad.
11            THE WITNESS:  Monthly reports.  Project
12   documents that go across my desk.
13   BY MS. MENDELSON:
14        Q.  What kind of project documents would they be?
15            MR. RUSSELL:  Objection.  Vague and ambiguous.
16   Overly broad.
17            THE WITNESS:  Occasionally there'll be a
18   submittal that goes over to Department of Finance that
19   will cross my desk, or a request from plaintiffs that
20   will cross my desk, related to basic information about
21   projects.  Also, some of this information is available
22   on the public websites, for square footage and cost.
23   BY MS. MENDELSON:
24        Q.  So I just want to clarify that the basis for
25   the facts in your declaration, that it was first created

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                                February 27, 2013

```
 1   by counsel, then Dean Borg vetted the facts and figures,
 2   and --
 3        A.  With the assistance of Department of Finance.
 4        Q.  With the assistance of the Department of
 5   Finance.
 6        A.  Right.
 7        Q.  You didn't go through the facts and figures
 8   specifically to make sure they were correct?
 9            MR. RUSSELL:  Objection.  Vague and ambiguous.
10   Misstates testimony.  Argument --
11   BY MS. MENDELSON:
12        Q.  Excuse me.  Did you go through --
13            THE REPORTER:  Excuse me.  One at a time.
14            MR. RUSSELL:  Please, don't interrupt me.
15            Objection.  Vague and ambiguous.  Overly broad.
16   Misstates testimony.  Argumentative.
17            THE WITNESS:  I rely on Dean to vet it, as I do
18   with many documents.  And if something catches my eye
19   when it hits my desk, I'll inquire about it.
20            There was nothing to lead me to believe that
21   anything that staff had prepared in the declaration --
22   or vetted in the declaration was anything but true and
23   accurate.
24   BY MS. MENDELSON:
25        Q.  So the documents that were relied on for this
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Christopher Richard Meyer                          February 27, 2013

 1  were not ones that you individually relied on?

 2          MR. RUSSELL:  Objection.  Vague and ambiguous.

 3  Misstates testimony.  Argumentative.

 4          If you understand the question, you can try to

 5  answer.

 6          THE WITNESS:  I don't know what particular

 7  documents they used to vet the draft.

 8  BY MS. MENDELSON:

 9      Q.  But in terms of the documents that you keep

10  personally, you said that there is a monthly report that

11  has the status of all projects, in various phases;

12  correct?

13      A.  That's correct.

14      Q.  And it's generated by all the people who work

15  on those projects?

16      A.  That's correct.

17      Q.  Okay.  And it's called monthly report?

18      A.  That's correct.

19      Q.  And that would include infill projects?

20      A.  It includes infill projects, that's correct.

21      Q.  Would it include renovations?

22      A.  It includes --

23          MR. RUSSELL:  Objection.  Vague and ambiguous.

24          THE WITNESS:  It would include any renovation

25  projects that are being run through our shop.

1              CERTIFICATION OF DEPOSITION OFFICER

2

3        I, MARY E. GARLAND, duly authorized to administer

4   oaths pursuant to Section 2093(b) of the California Code

5   of Civil Procedure, do hereby certify that the witness

6   in the foregoing deposition was duly sworn by me to

7   testify to the truth, the whole truth and nothing but

8   the truth in the within-entitled cause; that said

9   deposition was taken at the time and place therein

10  stated; that the testimony of said witness was

11  thereafter transcribed by means of computer-aided

12  transcription under my direction; that the foregoing is

13  a full, complete and true record of said testimony.  And

14  that the witness was given an opportunity to read and

15  correct said deposition and to subscribe to the same.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, nor in any way

19  interested in the outcome of the cause named in said

20  caption.

21       Executed March 7, 2013, at San Francisco,

22  California.

23

24

25              MARY E. GARLAND, CSR 4721

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 88



Transcript of the Testimony of:

# Jacqueline Moore, R.N., Ph.D.

Coleman v. Brown

February 21, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                  Plaintiffs,         )
                                      )CASE NO.:
        vs.                           )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                  Defendants.         )
_____  )



DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                      )
 5                   Plaintiffs,      )
                                      )CASE NO.:
 6         vs.                        )S 90-0520 LKK-JFM
                                      )
 7   EDMUND G. BROWN, JR., ET AL.,    )
                                      )
 8                   Defendants.      )
     _____)
 9

10

11

12

13

14          The Deposition of JACQUELINE MOORE, RN, PH.D.,

15   taken on behalf of the Plaintiffs, before Megan F.

16   Alvarez, Certified Shorthand Reporter No. 12470,

17   Registered Professional Reporter, for the State of

18   California, commencing at 8:50 a.m., Thursday,

19   February 21, 2013, at the Rosen, Bien, Galvan &

20   Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21   Francisco, California.

22

23

24

25
```

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  AARON J. FISCHER, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, 10TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              AFISCHER@RBGG.COM

 7

      FOR DEFENDANTS:
 8
                BY:  DEBBIE J. VOROUS, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              1300 I STREET
                SACRAMENTO, CALIFORNIA 95814
11              916.324.5345
                916.324.5205 FAX
12              DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jacqueline Moore, R.N., Ph.D.                                February 21, 2013

```
 1        A.   No.

 2        Q.   When was the last time you spoke with

 3   Dr. Dvoskin or Dr. Scott?

 4        A.   I spoke with Dr. Dvoskin prior to finalization

 5   of the report.

 6             I never spoke to Dr. Scott; I communicated

 7   with him by e-mail.

 8        Q.   What do you mean you never spoke with

 9   Dr. Scott?

10        A.   I didn't speak -- when we were working on the

11   report, I didn't -- the last time.  The last time I

12   spoke with Dr. Scott would have been during the last

13   site survey that we did.

14             MR. FISCHER:  Okay.  Mark as Exhibit 2.

15             (Plaintiffs' Exhibit 2 was marked for

16              identification.)

17   BY MR. FISCHER:

18        Q.   Do you recognize this document?

19        A.   Yes.

20        Q.   Can you tell me what it is?

21        A.   It's expert witness work that I've done in my

22   consulting practice.

23        Q.   Does it also include your CV?

24        A.   Yes, it does.

25        Q.   Okay.  And the publication section of your CV,
```

Jacqueline Moore, R.N., Ph.D.                              February 21, 2013

1      Q.   On the middle of the page about halfway down,
2  it says "Overmonitoring."  And can you just read what
3  you have in that note?  The 11th line.
4      A.   "Overmonitoring in number of prisons looked
5  at."
6      Q.   What does that refer to?  Do you remember?
7      A.   There was a lot of monitoring going on in the
8  prisons, that they were going back several times looking
9  at things, that they felt -- whoever related this felt
10  that there was an overmonitoring on the part.
11      Q.   And this was someone from CDCR or the AG's
12  office?
13      A.   It was someone.  I don't know who.
14      Q.   Okay.  And they said they felt that there was
15  overmonitoring being done?
16      A.   Being done, yes.
17      Q.   Further down, you mention cost drivers, the
18  fourth line from the bottom.  It says "Cost Drivers."
19  Can you read the rest of that?
20      A.   "Attorneys and their own law firms and the
21  monitors."
22      Q.   Do you remember what this refers to?
23      A.   To the cost of the Coleman monitors and the
24  attorneys that are the -- that handle the reports.
25      Q.   What did they tell you about this

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   specifically?

2       A.   That they bill a lot of money.

3       Q.   On the next page, 101026.

4            On this page at the top says "Presiding Judge

5   Karlton."

6            Do you recall what they told you about

7   presiding Judge Karlton at this meeting?

8       A.   I think that's the judge on the case.

9       Q.   What else did they tell you about him?

10      A.   Well, anything else I would have written down

11  if I thought that it was important.  I mean, they didn't

12  really tell me much.  This was the presiding judge.

13      Q.   And the fifth line says:  "Karlton does not

14  like state AG office."

15      A.   Yeah.  Someone said that, so I wrote it down.

16      Q.   Did they say anything else about that?

17      A.   No.  If they said something else, I would have

18  written it.  I'm a Catholic school schoolgirl; I write

19  down everything.

20      Q.   And the line below, can you read what the line

21  below says?

22      A.   "Rules of evidence not applied uniformly."

23      Q.   Do you recall what that is?

24      A.   It meant that sometimes the monitors would

25  pick certain things up at one institution and not bring

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    the same things together at another institution.

2        Q.   Here were they talking about the monitors or

3    were they talking about the court?

4        A.   I think -- I think it was the court.  It was

5    the court.

6        Q.   And so what did they -- what was being related

7    as far as the court here?

8        A.   That it was an uphill battle for the attorney

9    general.

10       Q.   Two lines below what you just read, what does

11   that say?

12       A.   "Takes plaintiff's finding as truth."

13       Q.   And the next line?

14       A.   Words the plaintiff would use, like

15   "languishing" or "dying," you know, they were

16   descriptive terms that would be in a plaintiff's report.

17       Q.   This is again talking about Judge Karlton?

18       A.   Judge Karlton.

19       Q.   What was being related here?

20       A.   Other than what I have written here -- and

21   this was many, many, many months ago, and it was just an

22   overview meeting -- quite frankly, I never referred to

23   these notes again.

24       Q.   Do you remember this meeting?

25       A.   I remember being there.  I remember all of the

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

1    improvement and suicide prevention.

2         Q.   What are these five bullet points?  What do

3    they represent?

4         A.   These were the areas that we reviewed.

5         Q.   Are these the five areas that you reviewed

6    based on your discussions with the other consultants and

7    with counsel?

8         A.   Yes.

9         Q.   Are there any other areas that you considered

10   including but did not?

11        A.   The only other area that I see that I looked

12   at that did not get into the report was an area on

13   restraints.

14        Q.   Do you know why it wasn't included?

15        A.   I think it was overlooked, that there was --

16   there were no issues with the restraint process.

17        Q.   You said it was overlooked?

18        A.   I may not have gotten it to them.  I may not

19   have seen that it was missing when I read the report.

20        Q.   Okay.  Had you decided that restraints were an

21   important issue for -- to be included in the report?

22        A.   I think we looked at it under rule violation

23   and reports.  And I did that section.

24        Q.   But that section is not in the report?

25        A.   No, but I take responsibility for not putting

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    it there.

2        Q.   Were you asked to look at any treatment or

3    office space issues in completing your report?

4        A.   We all did.  We all made site visits.

5        Q.   Were you asked by CDCR counsel or the AG's

6    office to look at treatment or office space issues

7    related to mental health care?

8            MS. VOROUS:  Vague and ambiguous as to what

9    you mean by looking at treatment and office space

10   issues.

11           THE WITNESS:  I don't know what you mean.  I

12   mean, how big the things were, whether you could have

13   confidential meetings.  I'm not sure what you mean.

14   BY MR. FISCHER:

15       Q.   Were you asked to -- had you determined to

16   look at that issue at all at the prisons prior to doing

17   your site visit?  For example, confidentiality, what you

18   just said.

19       A.   No one asked us to look at anything prior to

20   doing our site visits.  We found our own findings while

21   we did our site visits.

22       Q.   Okay.  You said you started your site visits

23   in November 2011; is that correct?

24           MS. VOROUS:  Objection.

25           THE WITNESS:  We had our first meeting in

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1   November -- the first site visit may have been in
 2   February.
 3   BY MR. FISCHER:
 4       Q.   This is not including the initial visit to
 5   Sac; is that correct?
 6       A.   Exactly.
 7       Q.   Okay.  Before I move ahead, in your report, is
 8   there any discussion of the overcrowding trial?
 9       A.   Not that I'm aware of.
10       Q.   You're aware that Supreme Court made their
11   decision in the overcrowding case in the summer of 2011?
12       A.   Yes.
13       Q.   Was there a decision not to include any
14   discussion of overcrowding in this report?
15           MS. VOROUS:  Objection.  The questions with
16   respect to overcrowding are beyond the scope of the
17   issue -- beyond the scope of the issues raised in the
18   motion to terminate and beyond the scope of what was
19   requested in terms of the expert consultancy in this
20   case.
21           Go ahead and answer if you can.
22           THE WITNESS:  We didn't look at overcrowding.
23   BY MR. FISCHER:
24       Q.   Did you think that overcrowding wasn't
25   relevant to the issues that you were asked to look at?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1           MS. VOROUS:  Objection.  Again, beyond the
2   scope of the issues to terminate in Coleman and the
3   scope of the consultancy of Dr. Moore in this case.
4           Go ahead and answer if you can.
5           THE WITNESS:  We had specific issues that we
6   were looking at, and those issues consumed four of us
7   for the time we were on site.  We didn't have time to
8   become involved in every issue that CDCR has.
9   BY MR. FISCHER:
10      Q.    Including overcrowding?
11      A.    Including overcrowding.
12      Q.    Okay.  On your tours, did you find that
13   crowding was impacting care at any of the institutions?
14          MS. VOROUS:  Objection.  Beyond the scope of
15   the issues that are in dispute with respect to the
16   motion to terminate.  Beyond the scope of Dr. Moore's
17   motion to consult in this case and expert report.
18          I'm sorry.  I'm speaking too low.  Beyond the
19   scope of the issues that are in dispute and beyond the
20   scope of Dr. Moore's expert opinion in this case.
21          THE WITNESS:  Do you want me to answer?
22   BY MR. FISCHER:
23      Q.    Yes, please.
24      A.    The areas that I went to -- and I did not go
25   to every housing area in the jail -- I did not find that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   BY MR. FISCHER:

2       Q.   This is an e-mail dated July 20th, 2012, from

3   Patrick McKinney with Dr. Moore, your name, in the "To"

4   line along with Dr. Dvoskin, Dr. Scott, and Mr. Martin.

5            Do you recall receiving this e-mail?

6       A.   Yes.

7       Q.   Mr. McKinney is one of the counsel that you

8   worked with on this consultancy; is that correct?

9       A.   Correct.

10      Q.   In the second paragraph under "Preparation of

11  Reports," Mr. McKinney writes in the third line:  "We

12  understand that you'll prepare separate reports."

13           Did you prepare separate reports?

14      A.   I prepared a draft report, but then we didn't

15  use it.  I had some errors in it.  But I started, and

16  you'll even find I was getting ready to do that because

17  my notes from R.J. Donovan were typed, which they hadn't

18  been.  So I started --

19      Q.   How many -- I'm sorry.?

20      A.   -- and then we decided that we weren't going

21  to do it this way.

22      Q.   When did that decision not to do it this way

23  occur?

24      A.   Sometime around September.

25      Q.   September 2012?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1          A.    Right.

2          Q.    What was the reason for that decision?

3          A.    They wanted all the reports together.

4          Q.    Who wanted all the reports together?

5          A.    The attorney general's office decided all the

6     reports should be together.  And Steve Martin felt that

7     his should be separate because it was so different.

8          Q.    Did you feel that yours should be separate?

9          A.    No.  I thought there was overlap on all of our

10    reports.

11         Q.    How many institutions had you drafted reports

12    for at that point?

13         A.    Eight.

14         Q.    Is any of the content for those reports not

15    included in the final joint report?

16         A.    There were, as in any draft report, at least

17    when I first do a report, I put everything in it,

18    whether it's relevant or not.  And then -- then I take

19    it out.  You know, this doesn't really belong, this

20    doesn't really mean anything, this isn't true.

21              But the content on these reports, in the final

22    report, I had a lot of it done.  So yes, they had it.

23              I mean, I gave it -- we talked about it.  We

24    met.  We discussed things.

25         Q.    Who is "we"?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1          So we looked at the same topic but from

 2   different angles.

 3      Q.   Are you qualified to give an expert opinion of

 4   the areas that you just mentioned Dr. Scott having

 5   reviewed?

 6      A.   No, I wouldn't have given an expert on the

 7   areas Dr. Scott reviewed.  The areas I reviewed were

 8   under the purview of nursing.

 9      Q.   And the areas that Dr. Scott reviewed are

10   under the purview of what?

11      A.   A physician or a psychiatrist.

12      Q.   Are there any other areas of the report for

13   which you feel that you were not qualified to give

14   individual expert opinion?

15      A.   I didn't work with the suicidality of the

16   inmates.  I reviewed the emergency response of the

17   suicide patients and other patients there.  And

18   certainly looked at the timeliness.  As far as suicide

19   prevention and adequacy of care, I relied on

20   Joel Dvoskin.

21      Q.   So the -- certain areas regarding suicidality

22   you feel you're not qualified to give individual expert

23   opinion on?

24      A.   I felt that -- yes, I don't think feel that

25   I'm a suicidal expert.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      Q.   Any other areas of the report for which you
2  felt that you would not be individually qualified?
3      A.   There were areas where they looked at
4  consistency of diagnosis.  I don't diagnose.
5      Q.   Which sections of the report related to
6  consistency of diagnosis?
7      A.   I couldn't tell you what page it's on.  I know
8  it was a quality assurance indicator, and, you know, I
9  looked at it as a quality assurance indicator.  But I
10  know that -- I mean, I don't have this report listed out
11  as to what page each item is on.  I'd have to find it
12  for you.
13          But I know that Joel Dvoskin and Dr. Scott
14  looked at that issue.  And I may have pointed it out
15  from a quality assurance meeting and brought it to them,
16  and then they would have looked at medical records.
17      Q.   My question is, is which sections of the
18  report --
19      A.   Did I do?
20      Q.   Which sections of the report contain issues
21  related to consistency of diagnosis?
22          MS. VOROUS:  Asked and answered.
23          THE WITNESS:  I don't know.  I'd have to read
24  the whole report and find it for you.  I just can't tell
25  you just right now.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    BY MR. FISCHER:

2         Q.   Would it be in several sections?

3              MS. VOROUS:  Same objection.  Asked and

4    answered.

5              THE WITNESS:  I don't know.  I don't even know

6    if it's in there.

7    BY MR. FISCHER:

8         Q.   Okay.  You said earlier that you were asked to

9    offer opinion as to whether the system was

10   constitutional; is that correct?

11        A.   Yes.

12        Q.   What are -- what is the measure of whether a

13   system is constitutional, in your opinion?

14        A.   Whether the inmates have access to care,

15   whether they have benefit of a physician judgment,

16   whether they receive the care that's ordered, and

17   whether or not there are no deliberate omissions in care

18   that would create harm to a patient.

19        Q.   Anything else?

20        A.   No.  That's what I would use.

21        Q.   Go through those.

22             First you said "access to care."  What do you

23   mean by "access to care"?

24        A.   The right of the inmate to access care when

25   they feel that they need it.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          A.    Of course.
2                MR. FISCHER:  Exhibit 6.
3                (Plaintiffs' Exhibit 6 was marked for
4                 identification.)
5    BY MR. FISCHER:
6          Q.    Exhibit 6 is another e-mail from Patrick
7    McKinney.  It appears to be a chart.  In one column,
8    date; the other column, institution.
9                Do you recognize the chart?
10         A.    Yes.
11         Q.    Or what it -- and what is the information
12   contained on that chart?
13         A.    That's the site visit that we went to.
14         Q.    Did you attend all of these site visits?
15         A.    I didn't always attend them when the group
16   went, as it said.  I went to California Women's on
17   June 26th and Corcoran on June 27th and 28toh.
18         Q.    And both of those were separate from Dr. Scott
19   and Dvoskin?
20         A.    Yes.
21               And I didn't go to the visit in Centinela.
22         Q.    Why didn't you go to Centinela?
23         A.    I had problems with my plane.
24               MS. VOROUS:  The plane had problems.
25               THE WITNESS:  The plane had problems, and I

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    didn't get in until very, very late that night, and the

2    group had already left.  And so I would have gotten up

3    early the next morning to go, but I would have had to

4    get up at 4:00 and they finally said to me don't bother.

5    BY MR. FISCHER:

6        Q.    Did you make an effort to return to Centinela

7    at a later date?

8        A.    No.  They told me that it was a very small

9    desert facility, and that they had done my part while

10   they were there.

11              And I didn't go to Pelican Bay either.

12       Q.    Why didn't you go to pelican bay?

13       A.    I was in an accident.

14       Q.    Did you attempt to return to Pelican Bay at a

15   later date?

16       A.    No.  I talked to Patrick about it.

17              MS. VOROUS:  Objection.

18              THE WITNESS:  No.

19   BY MR. FISCHER:

20       Q.    Is there a reason that you didn't go to

21   Pelican Bay at a later date?

22       A.    There weren't sufficient crisis beds or ad seg

23   beds.  It was a very small mental health area.

24       Q.    Defendants' counsel told you that?

25       A.    I actually saw a grid.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    Q.   The other institutions listed on here, you did

2    attend on the dates identified?

3    A.   Yes.

4    Q.   Okay.  In your report on the tours, it says

5    that you and the other experts interviewed patients; is

6    that correct?

7    A.   Yes.

8    Q.   Can you just explain the process for

9    interviewing patients on the tour?

10   A.   My process was generally to interview inmates

11   that were housed in administrative segregation, although

12   at one point I interviewed inmates at Corcoran that were

13   housed in protective custody, protective housing because

14   it was right next to the ad seg units.

15   Q.   Is this the SHU, segregated housing unit?

16   A.   I think so.  It could be.

17   Q.   How many -- in the course of your consulting,

18   how many individuals patients would you say that you

19   interviewed inside CDCR?

20   A.   On each visit I tried to interview five

21   patients.

22   Q.   That's a total of about 50 patients?

23   A.   Yes.

24   Q.   And to -- say you're in an administrative

25   segregation unit.  How would you identify which patients

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    to interview?

2        A.    I asked the LPT to indicate which patients

3    were EOP patients and were receiving meds.  Or sometimes

4    the psychiatrist, if there was a psychiatrist on the

5    unit.

6        Q.    And then what was the process?

7        A.    I would get a vest, I would go up to where the

8    patient was, and introduce myself.

9        Q.    Okay.  At cell front?

10       A.    At cell front.

11             I would tell them who I was and why I was

12    there.

13       Q.    What did you say?

14       A.    "My name is Jackie Moore.  I'm a registered

15    nurse.  I'm working with the attorney general's office.

16    We're going to evaluate the quality of mental and health

17    care at this facility.  I'm going to ask you about a few

18    questions about your care.  Do you care to talk to me?

19    Will you answer my questions?"

20       Q.    Did you mention the Coleman case?

21       A.    No.

22       Q.    Is it --

23       A.    I don't believe so.  I don't know for sure.

24       Q.    What if -- did any inmates patients refuse to

25    speak to you?

Jacqueline Moore, R.N., Ph.D.                              February 21, 2013

```
 1        A.   Rarely.  If one did, then I would just find
 2   another.  Rarely.
 3        Q.   Do you recall any patients having questions
 4   about who you were?
 5        A.   No, because I told them.  They wanted to --
 6   sometimes, regardless of what I told them, they wanted
 7   to know if I was going to come to work there the next
 8   day.  Was I going to come back, you know, those kind of
 9   questions.  I mean, even though I told them, I'm not
10   sure they always comprehended.  You know, "Are you going
11   to be a new here?  You ought to come here."  I mean,
12   they would get to the part where I'm a registered nurse.
13   "Oh, yeah, we need nurses."
14        Q.   Is that what they said, "We need nurses"?
15        A.   That's what they would say to me.  "Oh, yeah,
16   we need new nurses."
17        Q.   Did you ask them what they meant by that?
18        A.   No.  I just laughed.  I would say, "No, that's
19   not why I'm here."
20             There was always someone in attendance with me
21   when I did the interview.  They stepped back; they
22   didn't stand right next to me.  I stood at the side of
23   the door so I could hear.
24        Q.   Uh-huh.  Who -- who would be with you?
25        A.   It could be the LPT.  It could be the nursing
```

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1    supervisor if that's who was giving me the tour of the

2    grounds.

3         Q.   Was there ever a custody officer there with

4    you?

5         A.   Never.  Never.

6         Q.   Was there ever someone from the attorney

7    general's office with you?

8         A.   No, never.

9         Q.   Ever anyone from CDCR counsel?

10        A.   No, but one time the secretary watched me and

11   I didn't know it.

12        Q.   The secretary watched you?

13        A.   The secretary.

14        Q.   The Secretary Beard?

15        A.   No.

16        Q.   This is the previous secretary,

17   Secretary Cate?

18        A.   Yeah, but he wasn't standing right there.  He

19   was in the general area.

20        Q.   Where was that?

21        A.   Salinas.

22        Q.   Did he join you on the tour at Salinas?

23        A.   No.  He just -- he was standing in the middle

24   of this area, and I was interviewing an inmate.

25        Q.   When did you find out it was Secretary Cate?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    back.  I mean, we always had to have an officer so that

2    we could have access to the inmate, but they were never

3    right there with us; they always were back.

4         Q.   Was it your understanding they were able to

5    hear the discussions?

6         A.   No, they couldn't hear the discussion.

7              I could barely hear the discussions.

8         Q.   Do you recall how -- Dr. Dvoskin would

9    introduce himself during these interviews?

10        A.   No, I don't.  It was early on.  And I don't

11   know how he introduced himself.

12             I'm sure I introduced myself the way that I

13   said I do because that's what I've done for 35 years.

14        Q.   Sure.

15        A.   That's what I do.

16             I know he introduced himself.  I don't know

17   what else he said.

18        Q.   At the end of the interviews, did any of the

19   patients ask how you were going to use the information

20   that you received?

21        A.   I told them, and sometimes I didn't even take

22   their names down because I didn't want to get into

23   individual people in trouble.

24             I told them that it was just an informal

25   survey.  I was just interested in their opinion about

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1  how the care was going.  I asked them how long they had

2  been on the unit, how often somebody came by and talked

3  to them about their welfare, what the welfare checks

4  consisted of, how often they saw their primary

5  clinician, how often they saw their psychiatrist, how

6  often did they get to IDTT meetings.

7          Did they go to group therapy.  If they didn't

8  go, why didn't they go.

9          Were they on any medications.  Did they have

10 side effects of the medications.  Did they know what the

11 side effects were.

12         Did they know how to call mental health for an

13 emergency.  And did they know how to call -- how did

14 they get medical care, because I wanted to make sure the

15 mental health patients got medical care, too.

16     Q.   Sure.

17     A.   And then at the end, I would ask them to rate

18 them.  Sometimes they would give me a number.  Sometimes

19 they would say the care is great.  Sometimes they would

20 split the scores.

21     Q.   Did some patients say the care was not great?

22     A.   They never said that about mental health.

23 They did say that about medical.

24     Q.   Interesting.

25         Did you tell them you'd be writing a report at

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                           February 21, 2013

1    the end of your tour?

2        A.   I told them that we were here in the

3    institution and that we were going to various housing

4    units and interviewing various inmates at random, and

5    that -- you know, they were just happened to be picked

6    and would it be all right.  I mean, I always asked for

7    permission before I just assumed that they were going to

8    talk to me.

9        Q.   Sure.

10       A.   And I didn't put down any particular inmate in

11   my report.

12       Q.   Okay.  But they didn't know you were there to

13   write a report at the end of your tour?

14       A.   They knew we were doing an evaluation of that

15   facility, so...

16       Q.   A few more questions and then we can take a

17   break.

18       A.   I mean, these inmates were so used to being

19   talked to.

20       Q.   They were used to being talked to?

21       A.   Yeah.  I mean, when I would walk through the

22   yard, they would sometimes say, "Oh, she's with

23   Coleman."

24       Q.   Who would say that?

25       A.   The inmates.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      I mean, if they saw a suit, that was their

2   assumption.

3      Q.   Did any inmates ever mistake you for being

4   with the special master team for Coleman?

5      A.   I never asked them what they thought.

6      Q.   Okay.  You said that you asked them a number

7   of questions about their clinician and their

8   medications.  And in the report, I noticed that you said

9   that their knowing their clinicians or their medications

10  was unusual.

11         Do you recall that?

12     A.   I didn't think it was unusual.  I thought it

13  was great.

14     Q.   Thought it was great.

15         Did you think that it indicated that they were

16  receiving an appropriate level of care?

17     A.   Yes, because they knew who the people were.

18  They knew who they had access to.

19     Q.   Are you aware of any studies that show that

20  whether the patient knows their psychiatrist or their

21  primary clinician is a -- an appropriate measure for

22  quality of care?

23     A.   I'm not aware of quality assurance studies as

24  such.

25     Q.   Are you aware of any quality assurance studies

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   or any studies that validate that whether a patient

2   knows what medication they're on is a measure of quality

3   of care?

4       A.   I'm not aware of any studies, but my personal

5   opinion is is that that's a good thing.

6       Q.   Are you aware of any studies as to whether

7   they expressed positive or neutral feelings or mixed

8   scores as an appropriate measure of the quality of care?

9       A.   I think that that's a study that's done in

10  hospitals all the time.  They ask inmates about

11  satisfaction.

12      Q.   Okay.  Do you think if that a patient knows

13  his clinician's name or the medications that he's

14  receiving, that is he receiving an appropriate level of

15  mental health care?

16      A.   Yes.

17          MR. FISCHER:  Okay.  Let's take a five-minute

18  break.

19          (Off the record at 10:10 a.m. and back

20           on the record at 10:18 a.m.)

21  BY MR. FISCHER:

22      Q.   Dr. Moore, you mentioned that you thought

23  whether the patient knew the name of their clinician or

24  the medications they were receiving is an indication of

25  quality of care, correct?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1        A.    Yes.

2        Q.    And you asked those questions during your

3    interviews; is that right?

4        A.    Yes.

5        Q.    Did you follow up to confirm that what the

6    patients told you was correct?

7        A.    No, I did not.

8        Q.    Is there -- in other systems that you

9    reviewed, do you use the same method of determining

10   quality of care?

11       A.    No.  It depends on what I'm looking at.  I

12   might ask different questions.

13       Q.    What were you looking at here that led you to

14   use this line of questioning?

15       A.    I was looking to see that patients that were

16   in administrative seg were seen by their preliminary

17   clinicians once a week, seen by their psychiatrist every

18   30 days, that they went to IDTT meetings, that they were

19   offered group therapy, that they were receiving their

20   meds.  That was the first question I asked, "Are you

21   taking any medications?"

22       Q.    Did you review records of each of the people

23   you interviewed to confirm what they were telling you

24   was correct?

25       A.    If I had an inmate that complained to me about

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1         Q.   Who is Nate Mills?

2         A.   He was an IT person.

3         Q.   With which office?

4         A.   I don't know.

5         Q.   With defense counsel?

6              MS. VOROUS:  Objection.  Asked and answered.

7    BY MR. FISCHER:

8         Q.   Was Nate Mills an IT person for defendants'

9    counsel?

10        A.   He was sometimes on our tours.  He helped us

11   with IT issues.

12        Q.   But you don't know what office he was from?

13        A.   No.

14        Q.   And what was the outcome of those discussions

15   as to whether to enter this -- the data into the audit

16   tool?

17        A.   At first we were going to put all the data

18   into the audit tools.  And the attorney general asked us

19   to fill out the audit tools.

20             But then we didn't do that.  And we decided

21   that we didn't want to be that specific in our report,

22   that we wanted to be more global.  So we didn't have to

23   go through and do each and every.

24        Q.   Was any data entered into a computer system

25   from the audit tool?

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1        A.    Not by me.

2        Q.    Are you aware if it was entered by any of the

3   other consultants?

4        A.    I don't know.

5        Q.    Why did you think that you wanted to be more

6   global and less specific?

7        A.    You'd have to ask the attorney general.

8        Q.    So that was the attorney general's decision?

9        A.    That we were going to have a broader report

10  rather than specific.

11       Q.    How much time did you spend making this audit

12  tool, you individually?

13       A.    I don't know.  I don't know how many days we

14  worked on it, because we had meetings in Sacramento and

15  then we had phone calls.  And I really don't know.  I'd

16  have to look at my invoices, and I might be able to tell

17  you.  But I couldn't tell you off the top of my head.

18       Q.    Would you say you spent more than 20 hours?

19       A.    I don't know.

20       Q.    Did you find the audit tool to be useful on

21  your tours?

22       A.    I used all of the questions.  I used this to

23  make sure that I asked every question.  Before I left an

24  area, I would say, "Wait a minute.  Let me look at my

25  audit tool and make sure I asked everything here."  And

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   in that report?

2        A.   No.

3        Q.   Next one, quality management audit tool on

4   page 18.

5        A.   Yes.

6        Q.   This was an area you looked at?

7        A.   Yes.

8        Q.   Same thing with medication management?

9        A.   Yes.

10        Q.   And emergency response?

11        A.   Yes.

12        Q.   I want to turn back to Exhibit 4.  This is the

13   joint report.

14            Are there specific parts of this report that

15   you authored?

16        A.   Yes.  I contributed to it, yes.

17        Q.   Are there any sections in which you were the

18   primary author?

19        A.   No.

20        Q.   Who was the primary author?

21        A.   I don't know.  It could have been Dr. Scott or

22   Dr. Dvoskin.

23        Q.   You were not the primary author on any of the

24   sections?

25        A.   No.  I had input.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                     February 21, 2013

1      Q.   When revisions were made to the report, how
2    was that handled by the -- by the group?
3      A.   They sent an e-mail out with the draft of the
4    report.  They asked if we would review it and -- and
5    respond.
6      Q.   Were defendants' counsel included on those
7    e-mails?
8      A.   I believe I sent you the e-mails that I
9    received.  I can't recall without seeing them who was
10   included.
11     Q.   Were there times when it was just the experts
12   sharing information?
13     A.   I'm sorry.  Without seeing the e-mails, I
14   don't recall.
15     Q.   Okay.  Dr. Moore, take some time going through
16   some of the findings in your report.
17     A.   Okay.
18     Q.   Let's start on page 11 of the report.
19     A.   I'm going to use my copy, if you don't mind.
20   Unfortunately, I dropped it this morning on my way up.
21     Q.   Okay.  Let me know when you're ready.
22          MS. VOROUS:  I prefer that you use the
23   exhibit.  If you need to look at something, we can look
24   at it.  But use the exhibit.
25          THE WITNESS:  Okay.  It's going to take me

1        Q.   In your opinion?

2        A.   "Unavoidable" means it's unforeseen.  You

3   can't predict it.  Maybe there are insufficient staff in

4   the area.

5        Q.   Can unavoidable staff shortages affect mental

6   health care for prisoners?

7        A.   Yes.

8        Q.   In that same paragraph it says that -- the

9   temporary -- it says:  "Staffing shortages were

10  temporary unavoidable" -- "temporary and unavoidable."

11            Have you followed up on the staffing shortages

12  that you identified on your tours?

13       A.   Yes, I did.

14       Q.   Were they all temporary?

15       A.   Many of them were, yes.  They've hired other

16  people.  And they are instituting a program with

17  San Quentin for telemedicine.

18       Q.   Are you aware of any institutions where there

19  are still staff shortages?

20       A.   No, I have not done a staffing study of

21  California staffing.  I don't know that.

22       Q.   So you looked staffing at the time of your

23  tours?

24       A.   At the time of our tours.

25       Q.   Did you look at staffing of any of the

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    facilities that you didn't tour?

2          A.   No.

3          Q.   How did you determine which institutions you

4    were going to tour?

5          A.   It was a collective decision made by the

6    group, primarily by Steve Martin.

7               I think we all had input, but Steve Martin

8    made the final decision.

9          Q.   Were there any institutions that you thought

10   were essential to visit?

11         A.   Most of the big ones that had crisis units.

12         Q.   Did defendants' counsel offer any input?

13              MS. VOROUS:  Objection to the extent that

14   calls for communications between Dr. Moore and your

15   attorney.  You're not to answer that question.

16   BY MR. FISCHER:

17         Q.   On page 12 at the top, it says:  "In our

18   opinion, the CDCR mental health staffing plan will

19   provide adequate resources to meet the mental health

20   needs of inmates."

21              MS. VOROUS:  So page 10 of the report or

22   page 10 of the --

23              MR. FISCHER:  I'm going to go off the report

24   numbers rather than the docket.

25              MS. VOROUS:  What page did you say?

 1        A.    Yes.

 2        Q.    And what about -- you said also affects the

 3    IDTT process.  What did you mean by that?

 4        A.    That may not have been true at Salinas.  That

 5    was true at another facility.

 6        Q.    That staffing shortages would affect IDTT

 7    meeting --

 8        A.    Yes.

 9        Q.    And how did it affect the IDTT meeting?

10        A.    The psychiatrist wasn't always present.

11        Q.    And you think the psychiatrist is an important

12    member of the interdisciplinary treatment team for

13    patients?

14        A.    Yes.

15        Q.    Were are they an important member?

16        A.    Because they make adjustments to the

17    medication.

18        Q.    And in the same paragraph, there appears to be

19    a suggested solution with the introduction of

20    telepsychiatry to support the efforts of the on-site

21    psychiatrists.

22              Was that a recommendation of the -- you and

23    the other consultants?

24        A.    I'm sure it was.

25        Q.    Did you make that recommendation?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1       A.   No, but I would have.

2       Q.   What is the benefit of telepsychiatry in a

3  place like Salinas Valley?

4       A.   It's a difficult place for -- to recruit

5  psychiatrists.  Psychiatrists routinely don't want to

6  live there.  The inmates don't want to be transferred to

7  another facility.  They don't like to leave their cell

8  mate or cell block, whatever.  Telepsychiatry works

9  very, very well in almost every prison system that I

10  know of in the United States.

11       Q.   When you say "works very well," what do you

12  mean?

13       A.   They use telepsychiatry for -- to do

14  psychiatry at remote facilities.

15       Q.   So to provide psychiatric --

16       A.   To provide psychiatric services.

17       Q.   Are you aware that telepsychiatry still hasn't

18  been instituted at Salinas Valley State Prison?

19            MS. VOROUS:  Objection.  Lacks foundation.

20            THE WITNESS:  I don't know.

21  BY MR. FISCHER:

22       Q.   Did you find out whether telepsychiatry has

23  been implemented there?

24       A.   No.  I was not asked to.

25       Q.   Okay.  Would that have been important

1    you discuss this with staff at the institution?

2         A.   Yes.

3         Q.   What did they tell you?

4         A.   They said that there were staffing shortages.

5    They were working on system to put in place where they

6    were tracking medication renewals.  In their QI meeting,

7    they were getting better.

8         Q.   Did you follow up after the tour at CMC to

9    find out whether a new psychiatrist had been hired?

10        A.   A new psychiatrist has been hired.

11        Q.   How many -- what -- how many psychiatrist

12   vacancies were at CMC?  Do you remember?

13        A.   I would have to look at my notes.

14        Q.   Was it more than one?

15        A.   I don't know.

16        Q.   Okay.  Number 8 on the same page, at the

17   Substance Abuse Treatment Facility, SATF.

18             It says:  "Mental health staff reported

19   dramatic mental health staffing shortages."

20             Did you observe this during your SATF tour?

21        A.   There was staffing shortages.  I'm not sure I

22   would use the word "dramatic."  I did observe IDTT

23   meetings where there was not a psychiatrist in

24   attendance.

25             That did not mean that the psychiatrist did

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1   not adjust the patient's medication.  He just was not

 2   present at the IDTT meetings.  It was another step that

 3   they went to.

 4        Q.   In your opinion, would it have been better for

 5   the psychiatrist to be present with the other treatment

 6   team members to discuss medication?

 7        A.   It would have been better, but the care was

 8   still rendered.

 9        Q.   Okay.  You went to SATF in November?

10        A.   In November.

11        Q.   Are you aware of what efforts have been taken

12   to address the staffing shortages at SATF?

13        A.   No, I'm not.

14        Q.   Are you aware of whether any additional hiring

15   has been done?

16        A.   No, I'm not.

17        Q.   Okay.  Move forward to page 16, if that's

18   okay.

19             On page 16 near the bottom of the page it says

20   that the Central California Women's Facility, CCWF,

21   "We" -- the experts -- "were informed that only 15

22   groups were being offered to CCCMS female inmates

23   whereas nearly a hundred groups had previously been

24   provided."

25             Did you observe this on the tour?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      Q.   The specific number of hours you said you
2   don't know?
3      A.   Yes.
4      Q.   But to have access to some groups would be
5   appropriate -- would be necessary for CCCMS inmates?
6      A.   Yes.
7      Q.   And does this opinion apply in the CCCMS
8   general population?
9      A.   Yes.
10      Q.   And would it apply to CCCMS inmates in
11   segregation?
12      A.   CCCMS inmates in segregation, I don't believe
13   have groups at this point.  I'm not sure.
14      Q.   Do you think it's important for them to have
15   access to groups?
16      A.   Yes.  If they'll come out, yes.
17      Q.   Do you have concerns that in certain ASUs in
18   California prisons, there is no access to groups for
19   CCCMS prisoners?
20           MS. VOROUS:  Objection.  Overly broad.  Vague
21   and ambiguous.  Lacks foundation.
22           THE WITNESS:  I didn't evaluate the CCCMS
23   inmates, so it's very difficult for me to answer these
24   questions because Dr. Dvoskin did this.  And so I'm not
25   as familiar with this ground, and I feel uncomfortable

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1  giving you answers.

 2  BY MR. FISCHER:

 3      Q.   You don't have any opinion as to whether

 4  CCCMS --

 5      A.   No, I don't.

 6      Q.   -- inmates in ad seg require groups?

 7      A.   No.

 8           MS. VOROUS:  Let him finish his question.

 9           THE WITNESS:  No, I have no opinion.

10  BY MR. FISCHER:

11      Q.   Okay.  Did you observe any other staffing

12  problems on the tours that you went on that we have not

13  already discussed?

14           MS. VOROUS:  Objection.  Vague and ambiguous

15  as to what -- "staffing problems."

16           Answer if you can.

17           THE WITNESS:  I don't recall any others.

18  BY MR. FISCHER:

19      Q.   Is it possible that there is another

20  institution that had staffing problems?

21           MS. VOROUS:  Objection.  Vague and ambiguous.

22  Lacks foundation.

23           THE WITNESS:  I don't recall without my

24  reports.

25           MR. FISCHER:  This is Exhibit 10.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                              February 21, 2013

```
 1   BY MR. FISCHER:
 2        Q.   Was part of your role with this consultancy to
 3   provide recommendation as to ways to improve care?
 4        A.   We did -- at each exit conference, we provided
 5   recommendations.
 6        Q.   At each institution there was an exit
 7   conference at which you provided recommendations?
 8        A.   Yes.
 9        Q.   Did you follow up after that exit conference
10   at any point to determine whether those recommendations
11   had been implemented?
12        A.   No.
13        Q.   Go back to page 102411, eighth line.
14             In your typewritten notes, you write:  "If
15   urgent problem, seen day of arrival.  If not, maybe seen
16   second or third day."
17             This is under the "Reception Center" heading.
18   What does this note mean?
19        A.   These are new intakes that were coming in.
20   They have 72 hours to complete the intake.
21             If the patient had an urgent problem, they
22   were seen that day.  If not, they may be seen the second
23   or third day.
24        Q.   Where did you get this information?
25        A.   Observed and reviewed 10 intake records.
```

Jacqueline Moore, R.N., Ph.D.                                February 21, 2013

1   BY MR. FISCHER:

2       Q.   In your opinion, do you think an individual

3   assessment should be done for ad seg inmates placed in

4   ad seg for their own safety as to whether they should be

5   cuffed for MHCB, IDTT meetings?

6       A.   Yes.

7       Q.   Would the same apply for inmates coming from

8   ad seg who have been placed in ad seg pending transfer

9   to a general population or SNY yard?

10           MS. VOROUS:  Objection.  Lacks foundation.

11  Compound question.

12           THE WITNESS:  These are really getting into

13  questions you should be asking Joel Dvoskin.

14  BY MR. FISCHER:

15      Q.   Do you have an opinion on this?

16      A.   No.

17      Q.   Okay.  Were there any other institutions that

18  you visited for which you visited MHCBs at which they

19  had this positive practice of assessing an individual

20  where the individual needed to be cuffed for the IDTT

21  meeting?

22      A.   No.  That was the only one that I saw.

23      Q.   Okay.  And you observed IDTT meetings in the

24  other crisis units that you --

25      A.   As often as I could.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    places CDCR in the upper echelon of state prison mental

2    health systems."

3           What -- what was your methodology for reaching

4    that conclusion?

5      A.   For myself -- and I can only speak for

6    myself -- it was the work that I have done in Indiana,

7    North Carolina, Kentucky, New Mexico, Utah, Maine, and

8    Delaware.

9      Q.   And in all these institutions, you've looked

10   at the state prison mental health system?

11     A.   As part of the component of the review that I

12   was doing.  I looked at the entire state.  I wasn't just

13   hired to look at mental health.

14     Q.   So you listed seven states?

15     A.   I listed seven states.  I could probably list

16   more.

17           Puerto Rico.

18     Q.   Did you look at any current data from those

19   states to do a contemporary comparison between the state

20   mental health systems?

21     A.   I have data from those systems.  I have data

22   from North Carolina, New Mexico, Puerto Rico.

23     Q.   Did you use that data?

24     A.   And I have Indiana data that's current.

25           Did I use that data?  No.  I wasn't asked to

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    do that.

2         Q.   At the bottom of page 14, there's some

3    discussion about the special master monitors.

4              It states that the special master monitoring

5    results, quote, in scrutiny not of constitutional

6    standards but of the department's own policies and

7    procedures.

8              Are you aware that the program guide is a

9    court-ordered remedy in the Coleman case?

10             MS. VOROUS:  Objection.  Lacks foundation.

11             THE WITNESS:  If you're telling me that, yes,

12   I am aware of that.

13   BY MR. FISCHER:

14        Q.   Do you have an opinion as to what the special

15   master should be doing instead of looking at the program

16   guide standards?

17        A.   I think the program guide standards or the

18   interpretation of the timelines might be too exacting;

19   that if someone is one day late, then they are in

20   noncompliance, where in the free world or in other

21   prison systems, they're not held to such rigid

22   requirements.

23        Q.   Do you have specific problems with the program

24   guide guidelines?

25        A.   In some of them, yes, I do.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1    the special master had asked for the same information?

2         A.   Or similar.

3         Q.   And was that information that you needed in

4    order to make your -- to form your opinions?

5         A.   I don't know what the special master asked

6    for.  I never looked at their binders.

7         Q.   Did the data that you and the other

8    consultants asked for, was that information that you

9    used in order to form your opinions in the case?

10        A.   It was information from the audit tools.

11        Q.   And that was information that you used in

12   order to reach your conclusions as to whether the care

13   is constitutional?

14        A.   Yes.

15        Q.   So my question is:  Is some of that same data

16   also data that the special master requests in their

17   monitoring?

18             MS. VOROUS:  Objection.  Asked and answered.

19             THE WITNESS:  I don't know what he asks for.

20   BY MR. FISCHER:

21        Q.   Okay.  You -- I understood that you just said

22   that some of the data they had already collected for the

23   special masters?

24        A.   That's what the staff said.

25        Q.   On the same page, it says:  "Second, any

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    positive innovation that the department wishes to employ

2    to improve its services to inmates with mental illness

3    becomes a criterion against which their compliance is

4    measured."

5             Further down:  "This serves as a disincentive

6    to system improvements."

7             Were you told any examples of positive

8    innovations that were not implemented because of the

9    special master's involvement?

10    A.    Please redirect that question to Dr. Dvoskin.

11    Q.    Why am I redirecting that question to

12    Dr. Dvoskin?

13    A.    Because he would be the author of that.

14    Q.    He wrote that.  Okay.

15          Do you have a different opinion?

16    A.    No.  I just didn't write that.

17    Q.    Do you agree with this opinion?

18    A.    Yes.

19    Q.    Do you have any examples of any positive

20    innovations that weren't implemented because of special

21    master's involvement?

22    A.    No, I don't.

23    Q.    Okay.  Pages 15 and 16 under the section on

24    the correctional clinical case management system

25    patients, CCCMS -- CCCMS.

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1      A.   These would not have been sections that I
2   wrote.
3      Q.   Did you interact with the CCCMS inmates?
4      A.   Not specifically, no.
5      Q.   Did you interact with CCCMS inmates in
6   administrative segregation?
7      A.   If they were there and I got them by accident.
8   Usually I wanted the EOP inmates.
9      Q.   You weren't interested in the CCCMS inmates?
10          MS. VOROUS:  Objection.  Misstates her
11   testimony.
12          THE WITNESS:  I was interested but, I was more
13   interested in the EOP patients.
14          Dr. Dvoskin had that responsibility.  You're
15   asking me about sections that I didn't review.
16   BY MR. FISCHER:
17      Q.   Okay.  I'm just trying to get a sense of which
18   sections those are.
19      A.   Do you want me to tell you the ones I
20   reviewed?
21      Q.   It will be easier as we go.  I don't want to
22   waste more time.
23          But this section on CCCMS you did not review,
24   you have no opinion --
25      A.   No.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        Q.   -- on these issues?
 2             And that's from page 15 to 16?
 3        A.   Correct.
 4        Q.   On page 16 is the EOP discussion.
 5             Did you have any involvement on this?
 6        A.   Yes.
 7        Q.   You did.  Okay.
 8             Did you write portions of this section, the
 9   EOP section?
10        A.   I didn't write any of it.  Verbally told them.
11   And they wrote notes from their conversations with me
12   and dialogues of exit conferences.
13        Q.   Verbally told who?
14        A.   Dr. Dvoskin and Dr. Scott.
15        Q.   Okay.  So you didn't write this section or
16   anything --
17        A.   I didn't write anything on this report.
18        Q.   The report was finalized on January 4th.  In
19   the weeks prior to the finalization of the report, were
20   there any sections of the report that you felt
21   uncomfortable with?
22        A.   No.
23        Q.   There were none?
24        A.   No.
25        Q.   You agreed with -- with everything that
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    BY MR. FISCHER:

2        Q.   Doctor, this is an e-mail dated August 21st,

3    2012, from Patrick McKinney and your name is on the "To"

4    list.

5             Do you recognize this e-mail?

6        A.   Yes.

7        Q.   It provides an agenda for the August 21st

8    meeting at 1515 S Street.

9        A.   Yes.

10       Q.   Did you attend a meeting on August 21st in

11   Sacramento?

12       A.   Yes.

13       Q.   And on the agenda, the first item, 10:00 to

14   11:00 a.m., it says:  "Discussions concerning overall

15   systemic constitutional findings of the mental health

16   care system based on the 10 site visits.  Includes

17   representatives of the governor's office, CDCR,

18   Department of Finance, and Department of State

19   Hospitals."

20            Do you recall this meeting?

21       A.   Yes.

22       Q.   At this meeting, was -- were systemic

23   constitutional findings discussed?

24       A.   We discussed our findings.

25       Q.   At that point, there had been 10 site visits;

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    is that correct?

2         A.    Correct.

3         Q.    When was the decision made to go to three more

4    institutions?

5         A.    We only went to two more, but it was following

6    this meeting.  But I don't know exactly what date.

7         Q.    What was your understanding of why you went to

8    three more -- two or three more?

9         A.    I don't recall.

10              I do know there was a discussion.  I just

11    don't recall the reason.

12        Q.    Were you part of that discussion?

13        A.    Yes.

14        Q.    Did you indicate that you wanted to visit more

15    institutions?

16        A.    No, I didn't.

17        Q.    At that point, had you reached your conclusion

18    as to systemic constitutional findings?

19        A.    On the 10 sites or eight sites -- nine, I

20    guess, sites that I visited, yes.

21        Q.    What about as to the CDCR system as a whole?

22        A.    I felt that was constitutionally adequate.

23        Q.    What was your basis for finding the mental

24    health care at the institutions that you hadn't toured

25    constitutionally adequate?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      A.    We did a sample of the institutions.  It was

2   never our intent to visit every single institution.

3      Q.    Did you ever ask to see any data from the

4   other institutions?

5      A.    No.

6      Q.    Prior to the final visits at CMC and SATF, you

7   had already made your conclusion that CDCR had not acted

8   with systemic deliberate indifference?

9      A.    I did, yes.

10      Q.    Did anybody go to Pelican Bay --

11      A.    Yes.

12      Q.    -- from the consultants team?

13      A.    Yes.

14      Q.    Who went?

15      A.    Joel Dvoskin.

16      Q.    Only Joel Dvoskin?

17      A.    Yes.

18      Q.    Was it your understanding that Dr. Dvoskin,

19   Dr. Scott had reached the same conclusion as to

20   constitutional care as of the August 21st meeting?

21      A.    Yes.

22      Q.    Did anyone ever question as to the necessity

23   of going to these other institutions?

24      A.    I'm not aware.  I don't recall.

25      Q.    Do you recall whose idea it was to go to the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

```
 1      Q.   Was it more than half the institutions you
 2  visited?
 3      A.   Sorry.  Without going through my notes, I
 4  don't have it.
 5           But I know in my notes I've addressed it.
 6      Q.   In the same paragraph you write, the report
 7  writes:  "We also observed some groups that appear to
 8  consist primarily of showing the inmate a movie or
 9  entertainment video."
10           And then below that, it says:  "We understand
11  that recreation and entertainment may be an appropriate
12  aspect of group therapy so long as the majority of the
13  group therapy time is devoted to psychotherapeutic
14  rehabilitative skill building and psychoeducational
15  activities."
16           Do you agree with this finding?
17      A.   Yes.
18      Q.   Did you observe some groups that -- during
19  which only movies were shown?
20      A.   Yes.
21      Q.   What is the certain about -- that you have
22  about showing movies for treatment groups?
23      A.   It wasn't very therapeutic.  They didn't
24  really discuss the movie or its impact or how it would
25  alter what they were thinking or anything else.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      Q.   Do you recall any of the movies that they were

2   showing?

3      A.   No, I don't.

4      Q.   Okay.  And about how many institutions did you

5   observe this?

6      A.   One or two at the most.

7      Q.   Did you follow up as to whether any changes

8   had been made in light of this recommendation at those

9   institutions?

10     A.   No.

11     Q.   With respect to your recommendation to

12  increase the quantity of groups, how did you make that

13  determination at a particular institution whether more

14  groups should be offered?

15     A.   There were some CQI studies that I looked at

16  that would only show 70 percent of the inmates going to

17  IDTT.

18          And sometimes when I talked to the inmates

19  about why they don't go, they said that the groups were

20  boring.

21     Q.   How does that relate to your recollection to

22  increase the quantity of groups that are offered?

23     A.   Well, sometimes if they didn't have enough

24  LPTs -- at Salinas is a good example -- where we

25  talked -- where they didn't have LPTs and they had lost

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1    frequently.  The first time I saw it, I thought it was

2    good idea.

3          Q.   First time you saw it where?

4          A.   In Connecticut.

5          Q.   Why did you think it was a good idea?

6          A.   Because they could bring inmates out from

7    various classifications and have group therapy with them

8    and the inmates would feel safe, whereas they might not

9    be able to get this grouping of inmates together.

10         Q.   Is it your opinion that the therapeutic

11   modules can be overused, used in situations where

12   they're not required?

13              MS. VOROUS:  Objection.  Vague and ambiguous.

14   Lacks foundation.

15              THE WITNESS:  I don't know that.  I don't know

16   that they -- I'm trying to think if I saw group therapy

17   where they didn't use therapeutic modules.

18   BY MR. FISCHER:

19         Q.   In the California prisons?

20         A.   In the California prisons.

21         Q.   What about in the other states?  Philadelphia,

22   Connecticut, Indiana, North Carolina, Kentucky,

23   New Mexico, Utah, Maine, Delaware, Puerto Rico?

24         A.   Puerto Rico didn't use modules.  There was not

25   an emphasis on group therapy as there has been here in

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

```
 1    the state of California in many of the other states that
 2    I've gone to.
 3         Q.   What about individual treatment?
 4         A.    Individual treatment, yes.
 5         Q.   And did any of these other states use
 6    therapeutic modules for individual treatment?
 7         A.    No.
 8         Q.   And that's all the states that you --
 9    including Connecticut?
10         A.    I'm sorry.  I didn't hear you.
11         Q.   All the states other than California that
12    you've worked in the adult prisons have not used
13    therapeutic modules for individual treatment?
14         A.    Not that I can remember.
15         Q.   Okay.  First time you saw the therapeutic
16    module -- therapeutic modules here in California, what
17    was your -- what was your response?
18              MS. VOROUS:  Objection.  Vague and ambiguous.
19              If you can, answer that question.
20              THE WITNESS:  I refer to them as a cage.
21    BY MR. FISCHER:
22         Q.   Did you have any other opinions or thoughts
23    about their use?
24         A.    On one of my reports, I made some notations of
25    it.  It was a very early report.
```

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

```
 1              (Plaintiffs' Exhibit 12 was marked for

 2               identification.)

 3              MR. FISCHER:  Exhibit 12.

 4    BY MR. FISCHER:

 5         Q.   Exhibit 12 are handwritten notes.  At the top

 6    it says "SAC Folsom."

 7              Does this refer to your CSP Sacramento tour on

 8    February 29 and March 1st?

 9         A.   Yes.

10         Q.   And I'll direct you to DEXP103015.

11              At the bottom, it says -- last four lines:

12    "Sometimes group's not dynamic.  Cages - terrible hard

13    metal stools.  Hard to be in cage for two hours."

14              Were those your impressions?

15         A.   I knew you were going to find this.

16              Yes.  I knew you were going to find this.

17    This was one of my early, early visits before I

18    understood the therapeutic modules.

19         Q.   This was one of your initial impressions of

20    the modules?

21         A.   Yes.  It may have been the first time.

22         Q.   The first time?

23         A.   That I had seen this -- these therapeutic

24    modules in California.

25         Q.   And so can you tell me a little more about
```

Page 156

 1    during your tours?
 2            MS. VOROUS:  Let me clarify.  During her
 3    tours -- not Mule Creek.
 4    BY MR. FISCHER:
 5        Q.   I recognize that the experts did not go to
 6    Mule Creek.  But were there other similar treatments
 7    settings that you observed at other institutions?
 8        A.   Not that I'm aware of.
 9        Q.   Not that you're aware of?
10        A.   Not that I recall.
11        Q.   In this photograph, there are three modules
12    filled with inmates with two clinicians conducting
13    one-to-one treatments.
14            Did you observe individual treatment being
15    conducted in this manner on any of your tours?
16        A.   Not that I recall.  Sorry.
17        Q.   Do you have any concerns about conducting
18    one-to-one treatment in such a setting?
19            MS. VOROUS:  Objection.  Lacks foundation.
20    Argumentative.
21            Go ahead.
22            THE WITNESS:  My concern would be the
23    confidentiality of the interview.
24    BY MR. FISCHER:
25        Q.   Because they're so close?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      A.   Because they're so close.

2           And especially the -- inmate at the end has

3   nothing better to do than to listen.

4      Q.   Inmate on the left side is just listening?

5      A.   Right.

6      Q.   Would a more appropriate treatment space be an

7   individual office for these individual contacts?

8           MS. VOROUS:  Objection.  Lacks foundation.

9   Speculative.  Argumentative.

10          THE WITNESS:  Do you want an answer?

11  BY MR. FISCHER:

12     Q.   Uh-huh.

13     A.   If it was available.

14     Q.   You're aware from some of your tours that

15  individual treatment space is not available at some of

16  the institutions at this time?

17     A.   Yes.

18     Q.   Let me go back for one more minute to

19  Exhibit 13.

20          In your experience what is the impact that --

21  or the effect of having one-to-one contacts in a

22  nonconfidential setting similar to what you see here?

23          MS. VOROUS:  Objection.  Lacks foundation as

24  far as her experience in having this kind of experience.

25          THE WITNESS:  The inmate will not be as

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   truthful or forthcoming with their issues.

2   BY MR. FISCHER:

3       Q.   And that would negatively affect the

4   treatment?

5       A.   That would affect the treatment.

6       Q.   Okay.  Move to page 19 of the report.

7            Subsection B versus the one EOP section,

8   states:  "At California Institution for Men, CIM.  There

9   were some inmates waiting for EOP special needs yards

10  beds reportedly housed in administrative segregation

11  unit for their own protection; not because they posed a

12  danger to others."

13           Did you observe this during your tour of CIM?

14      A.   I didn't look at special needs yards, so I

15  wouldn't be aware of this.

16      Q.   Did you observe any administrative segregation

17  units?

18      A.   Yes.

19      Q.   In any of the ad seg units, were inmates

20  waiting for EOP special need yard beds housed?

21      A.   I would have to look at my notes.  I don't

22  recall.

23           MR. FISCHER:  Exhibit 14.

24           (Plaintiffs' Exhibit 14 was marked for

25            identification.)

Jacqueline Moore, R.N., Ph.D.                                February 21, 2013

1      A.   Okay.

2      Q.   Are you aware?

3      A.   Yes.  Yes.

4      Q.   Okay.  Did you visit the administrative

5   segregation unit at CIM?  I think you said you did.

6      A.   Um.

7      Q.   Direct you to top of the 10266, top two

8   issues:  "EOP not transfer fast enough.  That's not

9   getting 10 hours RX" --

10     A.   Treatment.

11     Q.   "RX" is treatment?

12     A.   Treatment.

13     Q.   "Now nine in seg."

14          Were you documenting that there were nine EOPs

15   awaiting transfer in this segregation unit?

16     A.   Yes.

17     Q.   And they were not there for disciplinary

18   reasons; is that your understanding?

19     A.   Yes.

20     Q.   They were there because they were awaiting for

21   a bed to open?

22     A.   Yes.

23     Q.   Okay.  On the page just before that, 102620,

24   near the bottom you write:  "Lack of beds."

25          Is this related to same issue?

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

```
 1        A.   Lack of beds in general population.
 2        Q.   So there were lack of beds for EOP and there
 3   were lack of beds for -- related to the general
 4   population?
 5        A.   Yes.
 6        Q.   Were there more inmates than appropriate beds?
 7        A.   Yes.
 8        Q.   It's your understanding?
 9             Were there more EOPs than appropriate beds in
10   the system?
11             MS. VOROUS:   Objection.
12   BY MR. FISCHER:
13        Q.   Trying to understand what your --
14        A.   More EOPs -- they couldn't transfer EOPs to
15   other institutions.
16        Q.   For lack of available beds?
17        A.   Lack of available beds.
18        Q.   Okay.  Do you recall, did you interview any of
19   the EOPs in segregation awaiting transfer when you were
20   at CIM?
21        A.   This -- these may have been the inmates on
22   page 102626.
23        Q.   Uh-huh.
24             Based on your interviews with these inmates,
25   were you able to reach an opinion as to whether they
```

1    were receiving appropriate level of care treatment?

2         A.   They were sick inmates.  They were very sick

3    inmates.  And --

4         Q.   Do you remember anyone specifically?

5         A.   No.  Just by what I'm -- I wrote down about

6    the fact that -- that they were hearing voices or that

7    they were having auditory hallucinations or that one

8    inmate was seeing signs of his grandmother.  They were

9    sick inmates; they needed to be somewhere else.

10        Q.   In your opinion, was the administrative

11   segregation unit an appropriate area for these inmates?

12             MS. VOROUS:  Objection.  Assumes that these

13   inmates were ad seg.

14             THE WITNESS:  If these inmates were in ad seg.

15   BY MR. FISCHER:

16        Q.   Based on your memory, you interviewed inmates

17   in ad seg?

18        A.   I thought these were the inmates in ad seg.

19   I'm not sure.  I'd have to look at the numbers to be

20   sure.

21        Q.   On the page after which you were reading where

22   it again says "Seg" at the top.  This is 102627.

23             About halfway down, it says "LOB" -- "Make a

24   note LOB."  Does that stand for lack of bed?

25             MS. VOROUS:  Are you asking her whether --

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1             MR. FISCHER:  Yeah.

2             THE WITNESS:  I don't know what LOB stands for

3    anymore.

4    BY MR. FISCHER:

5        Q.   You don't recall or you didn't ask?

6        A.   I don't remember anymore.  I don't know what

7    my abbreviation was.

8        Q.   Were you made aware that there were some EOP

9    reception center inmates in the administrative

10   segregation unit?

11       A.   Yes.

12       Q.   Based on lack of beds?

13       A.   Yes.

14       Q.   If you go back to the first page, the cover

15   page of Exhibit 14, 102619, I just want to understand.

16   You wrote -- about halfway down it says:  "EOP 39 (15)

17   in MHCB"?

18       A.   Mental health crisis beds.

19       Q.   Does that note that 15 of EOPs -- 15 of the 39

20   EOPS at the institution were in the mental health crisis

21   beds?

22       A.   Yes.

23       Q.   Did you consider that to be a high number of

24   EOPs, high percentage of EOPs requiring mental health

25   crisis care?

Jacqueline Moore, R.N., Ph.D.                              February 21, 2013

1   components I looked at.

2        Q.   One of the audit tool components for your --

3        A.   For my criteria, yes.  And so the nurse

4   brought me to this meeting.

5        Q.   And so do I understand that your finding was

6   that there were more CCCMS prisoners than there were

7   staff to be able to do discharge planning, including

8   patrol medications with them?

9            MS. VOROUS:  Objection.  Misstates testimony.

10           THE WITNESS:  No, no, no.

11  BY MR. FISCHER:

12       Q.   Go ahead.

13       A.   No, no, no.  The parole meds were done

14  differently than the discharge planning.

15           My premise was that there weren't enough

16  discharge planners to fill out the social security

17  applications, make sure people had housing, other

18  therapies.

19       Q.   Various aspects of discharge planning were not

20  done for the CCCMS population?

21       A.   Correct.

22       Q.   Okay.  Thank you for clarifying.  Maybe I can

23  get my question correct this time.

24           Your finding was that there were more CCCMS

25  prisoners at CIM than there were staff available to do

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1   discharge planning at the institution?

2          MS. VOROUS:  Objection.  Misstates her

3   testimony.

4          THE WITNESS:  Yes.

5   BY MR. FISCHER:

6      Q.   Okay.  And one last thing on CIM I wanted ask

7   you about in your notes on the final page, 102633.

8          Most of the way down next to No. 5, it says:

9   "Nurse UNFAM, SE, psy meds."

10         What does that note refer to?

11     A.   Nurses were unfamiliar with the side effects

12  of psychiatric meds.

13     Q.   I imagine that's on your radar because you're

14  a nurse?

15     A.   I asked them.

16     Q.   Why did you ask this question?

17     A.   I asked all the institutions.  That was one of

18  the criteria on my audit tool.

19     Q.   And here -- SE is side effects?

20     A.   Side effects.

21     Q.   And is this particular CIM of concern to you

22  in your analysis?

23     A.   Yes.

24     Q.   Why is that?

25     A.   Because it's a common practice that nurses

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    know the side effects of the medication that they're

2    giving because very often you are the one that might

3    observe lithium toxicity in an inmate.

4        Q.   So it's important to be aware of the side

5    effects of the psych medications in order to ensure the

6    safety and well-being of those patients?

7        A.   Yes, sir.

8        Q.   Did you observe this problem at any other

9    institutions?  Do you remember?

10       A.   Yes.

11       Q.   Do you remember which institutions?

12       A.   All of them except San Quentin.

13       Q.   San Quentin?

14       A.   Knew the side effects.

15       Q.   They were good?

16       A.   They were good.

17       Q.   Did you raise this with -- at the exit

18   interviews?

19       A.   Each and every time.

20       Q.   Did this make it into your report?

21           Direct you to page 26 of your report,

22   Exhibit 4.

23           Tell me if I'm looking at the right -- bottom,

24   "Nursing Medication Management."  Just a short section.

25           Is that an issue you think could have been put

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    in the report if you were writing it?

2          A.    I think I would have phrased it differently.

3          Q.    What would you have phrased differently?

4          A.    I would have made a recommendation that

5    nursing education emphasize the side effects of the

6    medication and that they have handouts or signs

7    available where they dispense the medications so these

8    things would be in front of them all the time.

9          Q.    All right.  Back on page 19 very briefly.  It

10   says:  "At Corcoran, inmates reported from the EOP

11   special needs yard that yard time was canceled for

12   various reasons on a relatively frequent basis."

13          You didn't visit the EOP special needs yard?

14          A.    No, I did not.

15          Q.    Were you aware of this issue at the

16   institution?

17          A.    No, I was not.

18          Q.    From a mental health perspective, is it

19   concerning to you, given your expertise, for EOPs to be

20   denied yard time?

21          A.    Yes.

22          Q.    And why is that?

23          A.    Inmates need to go outside, exercise,

24   socialize.

25          Q.    And the lack of that opportunity can adversely

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1   Exhibit 15.
 2            (Plaintiffs' Exhibit 15 was marked for
 3             identification.)
 4   BY MR. FISCHER:
 5        Q.   This is from Lindsay Hayes, project director,
 6   National Center on Institutions and Alternatives, dated
 7   August 16th, 2011.  And it's re "CDCR Suicide Prevention
 8   Consultation."
 9            I assume you have not seen this document
10   before?
11        A.   No, sir.
12        Q.   And this is dated before you began your
13   consultancy?
14        A.   Yes.
15        Q.   Very shortly before; is that correct?
16        A.   Correct.
17        Q.   Is this a report that would have been -- you
18   would have considered in reaching your opinions had you
19   been given it earlier?
20            MS. VOROUS:  Objection.  She hasn't --
21            THE WITNESS:  I don't know.
22            MS. VOROUS:  -- hasn't read the report.
23            THE WITNESS:  I don't know.  I haven't
24   reviewed it.
25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   BY MR. FISCHER:

2       Q.   Okay.  Based on your short review, does it

3   look like something you would have considered?

4       A.   I would have considered every document that I

5   got.

6       Q.   Including this one?

7       A.   Including this one.

8       Q.   On page 2, at the top, there's a finding of

9   problems of emergency response to suicide, 7 of 25

10  suicides.

11          Would Lindsay Hayes' finding as to emergency

12  response been important to your consideration on that

13  topic in the course of your review?

14          MS. VOROUS:  Objection.  Speculative.  Lacks

15  foundation.

16          THE WITNESS:  It doesn't talk about emergency

17  response.

18  BY MR. FISCHER:

19      Q.   At the very top of page 2.

20      A.   "Following a review of these 25 cases, I

21  informally made the following calculations."

22          Oh, the emergency response incident.  Yes, I

23  agree with Lindsay Hayes with the emergency response

24  incident.

25      Q.   What do you agree?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1        A.    That there were cases where the response was

2    not timely.

3        Q.    What days cases did you review?  From what

4    time period?  Do you remember?

5        A.    They're all in my report, every one of them

6    that I reviewed and from what time period from the time

7    that I first started doing these audits until the very

8    last one.

9              But these are in 2010.

10       Q.    Did you review more recent suicides?

11       A.    I reviewed -- if the case involved a suicide,

12   if the emergency response involved a suicide, I reviewed

13   it.

14             When I first started doing these audits, I

15   wasn't sure what I was supposed to do with these

16   emergency responses, so I would review medical emergency

17   responses as well.

18             As time went on, I became less interested in a

19   cardiac response or an asthma response, and I became

20   more familiar with the documents and I only went to look

21   for the mental health responses.

22       Q.    I see.  And you said you found problems with

23   emergency response as to the suicides -- as to the

24   suicides that you reviewed?

25       A.    Yes.  There were a few, yes.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1          Q.   And were there some as to the medical as well?

2          A.   Yes.

3          Q.   And do you know what -- do you remember what

4     time period you reviewed?

5          A.   Between 2011 and 2012.

6          Q.   And as you just noticed -- mentioned,

7     Lindsay Hayes' report covers 2010 suicide?

8          A.   Yes.

9          Q.   And you found problems with emergency response

10    in 2010?

11         A.   Yes.

12         Q.   And you found problems with emergency response

13    in 2011 and 2012?

14         A.   Yes.

15              MR. FISCHER:  Exhibit 16.

16              (Plaintiffs' Exhibit 16 was marked for

17               identification.)

18    BY MR. FISCHER:

19         Q.   Exhibit 16, at the top it says "LAC CSP."

20              Are these your notes from the Lancaster tour

21    that you did?

22         A.   LAC Lancaster, no.

23         Q.   Los Angeles County?

24         A.   Los Angeles County.

25         Q.   Is that correct?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1      A.   CSP, yes.  Los Angeles.

 2      Q.   Okay.  I'm just going to -- what was the date

 3  of this tour?  I'm sorry.

 4      A.   May 3rd and 4th.

 5      Q.   Page 102630.  At the top, it says "Emergency

 6  Response"?

 7      A.   Yes.

 8      Q.   And do I understand correctly that below you

 9  reviewed specific cases involves emergency response?

10      A.   Yes.

11      Q.   I just want to go through those quickly.

12           The first one, about a third of the way down,

13  you write:  "No account for delay of time from custody

14  to nurse"?

15      A.   Yes.

16      Q.   Was that an example of a delayed response, if

17  I understand that correctly?

18      A.   Yes.

19      Q.   And on the next page, you review a particular

20  inmate's case and at the conclusion of that, on 102604,

21  about a third of the way down, you write:  "Inadequate

22  response time"?

23      A.   Yes.

24      Q.   That was your finding?

25      A.   Yes.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      Q.   Next one, conclusion of the bottom of 102604,
2   you write:  "Response time adequate"?
3      A.   Yes.
4      Q.   On the next page you have another inmate
5   review.  And almost at the bottom -- am I reading
6   correctly?  It says:  "Response time adequate"?
7      A.   Yes.
8      Q.   Next page, another inmate review.  And you
9   write -- is that -- am I understanding correctly? --
10   "Adequate time"?
11      A.   Adequate time for the paramedics to arrive,
12   but I was critical that they didn't call 911 from the
13   yard or have 911 called.
14      Q.   So there was some delay you identified there?
15      A.   Some delay.  But once the paramedics were
16   called, they arrived.
17      Q.   They arrived quickly?
18      A.   They arrived quickly.
19      Q.   Two more on the final page.
20           First one halfway down says:  "Response time
21   inadequate.  Training staff involved complete first
22   responder"?
23      A.   Right.
24      Q.   What does that refer to?  If you recall.
25      A.   The nursing staff assigned to the suicide

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    watch activated a personal alarm where she should have

2    gone in and been the responder.  She could have done

3    both.

4         Q.    And that was a case of suicide in custody,

5    correct?

6         A.    I don't know if the patient committed suicide

7    or not.

8         Q.    It was an attempted suicide?

9         A.    It was attempted suicide.

10        Q.    And your finding was response time inadequate?

11        A.    Yes.

12        Q.    And then at the bottom, the final inmate, your

13   finding is:  "Responsive time inadequate"?

14        A.    Yes.

15        Q.    So of the seven cases that you reviewed from

16   your response at CSP LAC, five of the seven you found

17   inadequate emergency response time?

18        A.    Yes.

19        Q.    Is this consistent with what you saw at any

20   other institutions?

21        A.    Many of them.

22        Q.    Any specifically?  If you remember.

23        A.    Corcoran, if that's the gang -- very difficult

24   institution.

25        Q.    There were difficult --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      Q.    Are you aware of any guidelines as to wellness
2  checks in segregation environments?
3      A.    Done by the LPT or by whom?
4      Q.    Anything about NCCHC or ACA guidelines as to
5  wellness checks in segregation.
6      A.    Done -- performed by -- who do you want them
7  to be performed by.
8      Q.    Are you aware of who the guidelines say --
9  what the guidelines say about that?
10     A.    The only guidelines that I'm aware of relating
11 to checks in segregation for suicide watches, and
12 those -- your inmates are not in segregation if they're
13 on suicide watch.
14     Q.    Are you aware of any national guidelines as to
15 welfare checks for all prisoners in segregation?
16     A.    They vary from 30 minutes to an hour to
17 15 minutes, depending upon -- depending upon the acuity
18 that the inmate is displaying.
19     Q.    Based on your expertise and experience, do you
20 have any opinion as to the appropriate practice as to
21 welfare checks in segregation?
22     A.    It's recommended that they be staggered, that
23 they not be done exactly at 30 minutes, only every half
24 hour.
25     Q.    Did you observe at some institutions problems

Jacqueline Moore, R.N., Ph.D.                                February 21, 2013

1   with staggered welfare checks?

2          A.   I never checked.

3          Q.   You didn't look at that issue?

4          A.   I didn't look at it.

5          Q.   Are you aware of guidelines that welfare

6   checks should be done regularly for all inmates during

7   the entire period that they're in segregation?

8          A.   Yes.  Yes.

9          Q.   You're aware of that guideline?

10         A.   Yes.

11         Q.   Are you aware that CDCR has welfare checks

12  only for first 21 days?

13         A.   No, I'm not.

14         Q.   Do you have any opinion as to the

15  appropriateness of that policy?

16         A.   Based on just what you've told me?

17         Q.   Sure.

18         A.   I think it should be continued indefinitely,

19  that you should have welfare checks.

20         Q.   Welfare checks?

21         A.   Every day.

22         Q.   For all inmates in segregation?

23         A.   Yes.

24         Q.   For the entire time they're in segregation?

25         A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1          A.    Yes.
 2          Q.    You can see that it goes from DEXP102775 to
 3    102784.  Is that right?
 4          A.    Yes.
 5          Q.    And that -- I'm sorry -- one -- yeah.  And
 6    then shortly after that is 102801 on Exhibit 21.
 7                Are you able to -- I know that they're fairly
 8    blank.  Are you able to confirm whether this is the CCWF
 9    audit tool or not?
10          A.    Yes.  It has the CCWF medication -- medication
11    is stapled to the back at the end.
12          Q.    So this is the CCWF audit tool, Exhibit 21?
13          A.    Yes.
14          Q.    Okay.  Can I have you turn to DEXP102813?
15          A.    Yes.
16          Q.    On there, under "Administrative Segregation
17    Unit," did you write:  "No groups at ad seg"?
18          A.    Yes.
19          Q.    Does that remind you whether there are groups
20    in ad seg?
21          A.    Yes.
22          Q.    And there are not groups in administrative
23    segregation at CCWF?
24          A.    Yes.
25          Q.    Is this a barrier to appropriate treatment for

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    EOPs in the ad seg unit at CCWF, in your opinion?

2            MS. VOROUS:  Objection.  Misstates the content

3    of the document we're looking at.

4            The section that you're referring to, this

5    page 10283 -- 813 relates to general ad seg.  It does

6    not relate to the EOP ad seg hub.

7    BY MR. FISCHER:

8        Q.   Do you recall whether there was treatment at

9    any of the segregation units at CCWF?

10       A.   The unit that I went to, the ad seg unit that

11   I went to, also held the condemned women in it.  So I

12   don't know if it was the EOP ad seg or the general

13   ad seg.

14       Q.   On the next page of the exhibit, 102814, it

15   says under "EOP ASU Hub," it says:  "Meeting number of

16   hours of structured therapeutic activities offered per

17   week?"  You write "No."

18       A.   "None."

19       Q.   "None"?

20       A.   That's what written, "none."

21       Q.   Do you agree that the lack of structured

22   therapeutic activities in this unit was a barrier to

23   treatment to EOP women?

24       A.   Yes.

25       Q.   And CCCMS women at CCWF?

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1          A.   No.

2          Q.   Did anybody look at emergency response for

3    those 10 suicides, to your knowledge?

4          A.   In 2010?

5          Q.   The 2010 and 2011 suicides at CMC.

6          A.   I looked at 2011.

7               Let's take a look at -- the report -- the

8    emergency response report that's there because I looked

9    at some suicides.  Let's look at my reports.

10              MS. VOROUS:  Let him ask questions.

11   BY MR. FISCHER:

12         Q.   So you may have is your answer?

13         A.   He's do very well without me.

14         Q.   On page 31 under "Suicide Prevention," near

15   the bottom, Section B, Subsection 3, there's a finding

16   that the response to mental health-related emergencies

17   was timely and appropriate in each institution.

18              We discussed earlier -- is this a finding that

19   you disagree with?

20         A.   I disagree with it.

21         Q.   Did either Dr. Dvoskin or Dr. Scott look at

22   this issue, to your knowledge?

23         A.   Dr. Dvoskin did.

24         Q.   Dr. Dvoskin looked at it.

25              Did you ever discuss this issue with

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    Dr. Dvoskin?

2        A.    If I had individual cases that I was concerned

3    with, yes, I brought them to his attention at the

4    facilities.

5        Q.    But in drafting the, report there was no

6    further discussion?

7        A.    No.

8        Q.    Go to page 33.

9            Subsection 4, this is on recommendations as to

10    suicide reports.  There's a recommendation:  "We

11    strongly recommend avoiding use of the term

12    'preventable' without a very specific and timely

13    explanation of the manner in which the suicide could

14    have been prevented."

15            Is this an issue that you looked at?

16        A.    No.  That was Joel Dvoskin.

17        Q.    Starting at the bottom of page 32, Section 1

18    through Section 15 on page 37.  Is this Dr. Dvoskin's

19    section to write?

20        A.    Yes.

21        Q.    Did you have -- are any of the opinions in

22    here something that you looked at, paragraphs 1 through

23    15?

24        A.    I read them.

25        Q.    Are any of these issues issues that you

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    specifically looked at in the course of your review?

2        A.   I looked at the suicide response and the

3    timeliness of it.

4        Q.   And nothing else?

5        A.   Nothing else.

6        Q.   Okay.  Do you agree with this recommendation

7    that the use of "preventable" should be avoided in

8    reviewing completed suicides?

9        A.   I don't take suicide cases.  I wouldn't know

10   how to answer that.

11       Q.   Okay.

12       A.   In my private practice, in my consulting

13   practice.

14       Q.   Are you aware of whether attempted suicides

15   are tracked by CDCR?

16       A.   I had some statistical forms from some of the

17   sites.  I couldn't tell you what's been tracked at this

18   point.

19       Q.   Do you know whether attempted suicides are

20   tracked in individual's EUHRs?

21       A.   Yes.

22       Q.   Do you know?

23       A.   There would be a progress note.

24       Q.   Do you know whether they're tracked for

25   non-mental health case load prisoners?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1      Q.   What was your impression of the mental health
 2   care being provided in the condemned unit?
 3      A.   It was excellent.
 4      Q.   It was excellent?
 5      A.   It was excellent.
 6      Q.   Were you aware of the -- the blanket ban of
 7   condemned prisoners requiring intermediate care
 8   inpatient hospitalization?
 9      A.   No.
10      Q.   No?
11      A.   No.
12      Q.   Were you aware of the specialized program for
13   prisoners in the condemned unit requiring ICF inpatient
14   level of care?
15      A.   No.
16      Q.   Did you interview or review any records for
17   any inmates who had been identified as requiring ICF
18   inpatient level of care?
19           MS. VOROUS:  Objection.  Lacks foundation.
20           THE WITNESS:  Not that I was aware of.
21   BY MR. FISCHER:
22      Q.   Were you told anything about inpatient
23   access -- inpatient hospitalization access for the
24   condemned in San Quentin?
25      A.   No.  I interviewed the psychiatrist.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1      Q.   Do you remember the psychiatrist's name?

2      A.   He was on the unit.  He was housed on the

3   unit.  He was a young psychiatrist.

4      Q.   Okay.  Was it Dr. Monthei?

5      A.   I don't know his name.

6           He didn't bring up those issues.

7      Q.   And you didn't know to ask?

8      A.   I didn't know to ask.

9      Q.   Do you have any opinion on any blanket ban to

10  an inpatient level of care for the condemned at

11  San Quentin?

12          MS. VOROUS:  Objection.  Lacks foundation.

13          THE WITNESS:  I would need to have more

14  information on what that policy meant.

15  BY MR. FISCHER:

16     Q.   And you haven't been provided information

17  other than what I just told you?

18     A.   Yes.

19          MR. FISCHER:  Okay.  23.

20          (Plaintiffs' Exhibit 23 was marked for

21           identification)

22  BY MR. FISCHER:

23     Q.   At the top it says "Salinas State Prison."  I

24  assume this refers to your handwritten notes for

25  Salinas Valley State Prison; is that correct?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1        A.   Yes.

2        Q.   Okay.  When you were at Salinas Valley State

3   Prison, did you visit any of the DMH or DSH patients at

4   the facility?

5        A.   Yes.  There was one DMH facility that was on

6   the ground, but I was there very briefly only to find

7   out about the Clozaril inmates because that's where they

8   gave the Clozaril.

9        Q.   To inmates?

10       A.   For Salinas Valley.

11       Q.   For the Salinas Valley non-DMH inmates?

12       A.   Correct.

13       Q.   So did you look at any treatment issues in

14   DMH --

15       A.   No.

16       Q.   -- at SVPP?

17       A.   No.  I asked about the Clozaril patients.

18   They briefly showed me one of the wings just so if I

19   wanted to see it, and then I was out of there very

20   quickly.

21       Q.   Do you know whether Dr. Dvoskin or Dr. Scott

22   looked at the DMH treatment programs at SVSP?

23       A.   No, they didn't.

24       Q.   When you were at California Medical Facility,

25   CMF, did you or any of the other experts look at the DMH

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    inpatient treatment units at CMF?

2         A.    We saw the new unit.

3         Q.    Which new unit?  Do you recall?

4         A.    The new unit that they were building.

5         Q.    Is that the L3 ICF unit?

6         A.    Right.

7         Q.    Had it been activated when you were there?

8         A.    No.

9         Q.    Did you go to any of the operational DMH units

10   while you were there?

11        A.    No.

12        Q.    Neither did Dr. Dvoskin or Dr. Scott?

13        A.    As to my knowledge.

14        Q.    Okay.  Were you provided any information about

15   those treatment units at either SVPP or at VPP --

16   Vacaville Psychiatric Program at CMF?  I'm sorry.

17        A.    No.  We were told that that was not part of

18   our -- our mission was to look at the Department of

19   Mental Health.

20        Q.    Who told you that?

21        A.    In the beginning when we were discussing the

22   program, we were only looking at referrals.  We weren't

23   looking at the level of care provided by the Department

24   of Mental Health.

25        Q.    You were looking at referrals to --

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1         A.   No.
 2         Q.   Psychologist Craig Haney?
 3         A.   No.
 4         Q.   Psychiatrist Ed Kaufman?
 5         A.   I've seen the name.  I don't know if I know
 6    him.
 7         Q.   Okay.  What about Jeanne Woodford?
 8         A.   No.
 9         Q.   Former warden of San Quentin?
10         A.   No.
11         Q.   What about Eldon Vail?
12         A.   No.
13         Q.   Have you ever worked with Lindsay Hayes?
14         A.   Yes.
15         Q.   When was the last time that you worked with
16    Lindsay Hayes?
17         A.   It would have been in 2006 or '7.
18         Q.   What was the context of your work together?
19         A.   A county jail in Colorado had three suicides
20    in the course of a year.  And it was the client of a
21    company that I worked for, and I recommended that they
22    call Lindsay Hayes in to do an evaluation.
23         Q.   Evaluation of the suicide --
24         A.   And the process that was occurring at the
25    jail.
```

Jacqueline Moore, R.N., Ph.D.                      February 21, 2013

1        Q.   You must have respected his expertise?

2        A.   Yes.

3        Q.   Did he provide some recommendations in that

4    case?

5        A.   Yes, and they were excellent.

6        Q.   Do you know if they were implemented?

7        A.   Yes, they were.

8        Q.   Do you know the status of the suicide

9    prevention program there at that facility now?

10       A.   I don't know because I left the company.  But

11   there was an article in the Denver Post that talked

12   about the positive response and, of course, the county

13   took all the credit for bringing Lindsay in.

14       Q.   Didn't mention you?

15       A.   No.

16       Q.   What was the name of the facility?

17       A.   Jefferson County -- Jefferson County Jail or

18   something along that line, a detention center.

19            MR. FISCHER:  Okay.  Let's take a short break.

20            (Off the record at 4:07 p.m. and back on

21             the record at 4:13 p.m.)

22   BY MR. FISCHER:

23       Q.   Dr. Moore, you said earlier that you've now

24   read the 25th report of the special master --

25       A.   Yes.

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

```
 1                 CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8               That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13               I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                         DATED: February 25, 2013

21

22                         _____

23                         MEGAN F. ALVAREZ

24                         RPR, CSR 12470

25
```

```
1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4     Reporter, hereby certify that the witness in the

5     foregoing deposition was by me duly sworn to tell the

6     truth, the whole truth and nothing but the truth in the

7     within-entitled cause;

8          That said deposition was taken down in

9     shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                         DATED: February 25, 2013

21

22

23                         MEGAN F. ALVAREZ

24                         RPR, CSR 12470

25
```

# Exhibit 89



Transcript of the Testimony of:

# Charles Scott, M.D.

Coleman v. Brown

March 8, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         ) S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA







REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Charles Scott, M.D.                                      March 8, 2013

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3

4    RALPH COLEMAN, ET AL.,              )
                                         )
5                        Plaintiffs,     )
                                         )CASE NO.:
6          vs.                           ) S 90-0520 LKK-JFM
                                         )
7    EDMUND G. BROWN, JR., ET AL.,       )
                                         )
8                        Defendants.     )
     _____)

9

10

11

12

13

14          The Deposition of CHARLES SCOTT, M.D., taken

15   on behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:06 a.m., Friday, March 8, 2013, at the

19   UC Davis Immigration Law Clinic, Building TB-34, Davis,

20   California.

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  ERNEST J. GALVAN, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, TENTH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              EGALVAN@RBGG.COM

 7
      FOR DEFENDANTS:
 8
                BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
11              415.703.3035
                415.703.5843 FAX
12              PATRICK.MCKINNEY@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Charles Scott, M.D.                                      March 8, 2013

1    the psychiatric medication piece, I was also asked to

2    look at that.  For example, there were some IDTTs I

3    attended on an EOP and in some CCCMS settings to look at

4    the medication management and settings not isolated to

5    the mental health crisis beds.

6            To the degree that parole medications were

7    being provided to inmates upon release from the prison

8    and to the degree that there were quality assurance

9    monitoring relevant to psychiatry medication management,

10   I reviewed those as well.

11           And looked at the psychiatry meetings that

12   they had as part of their organization.  Also reviewed

13   if there were policies relevant to medication

14   management, such as Clozaril medication management

15   policy.  Had they developed a medication management

16   policy relevant to heat risk medications.  And were

17   issues related to the medication monitoring both at a

18   local and at a statewide level in place.

19           Q.  Anything else that was on your plate?

20           A.  Those were the primary issues.  There may have

21   been some isolated site-specific areas where I was

22   present or sitting in, but those were the primary areas

23   of my focus.

24           Q.  Do you recall what Dr. Dvoskin was tasked

25   with?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1       A.    In general.

2       Q.    What were those things?

3       A.    Looking at the quality of mental health care

4   provided outside of the medication administration in the

5   different levels of care.  Doing a suicide review or

6   review of the suicide risk assessment management and

7   policies and procedures.

8             I've already talked about his involvement in

9   different levels of care and the provision of care at

10  those different levels.

11            He also met with and was -- the SPR-FIT

12  coordinators.  And to the degree that quality assurance

13  or improvement projects overlapped with the provision of

14  nonpsychiatric care, he may have reviewed that aspect as

15  well.

16            And, in general, access to care through the

17  different levels of care he was involved in assessing.

18      Q.    And what about Dr. Moore?

19      A.    My understanding of Dr. Moore was that she was

20  as a nurse looking at issues related to nursing

21  medication administration.  And that could include

22  medication refusals or sign-offs on medicines.

23            In some instances, checking with pharmacy

24  about parole medications and how that process was

25  administered.  Emergency response.  And also she may

Charles Scott, M.D.                                              March 8, 2013

1    have had some involvement in the screening aspect as

2    well.

3         Q.    And was Dr. Martin -- Mr. Martin present at

4    your meeting as well?

5         A.    Yes.

6         Q.    Would it be fair to say he was tasked with use

7    of force and rules violations?

8         A.    Yes.

9         Q.    Were you asked to look at all at the inpatient

10   level of care at the Department of State Hospitals?

11        A.    No.

12        Q.    Do you recall if anyone was asked to look at

13   that?

14        A.    If they were, I wasn't present when that was

15   requested.

16        Q.    Were you asked to look at the impact of

17   overcrowding on the delivery of care?

18        A.    I was asked to look at, with the current both

19   staffing levels and prison population, was appropriate

20   care psychiatric care provided to inmates and was there

21   evidence that the California Department of Corrections

22   was deliberately indifferent to the inmates based on the

23   population at the time that I did the evaluation.

24        Q.    You had published at least one article about

25   the overcrowding decision in this case, right?

Charles Scott, M.D.                                          March 8, 2013

1      A.    Yes.

2      Q.    Fair to say you had read the three-judge court

3  opinion and the Supreme Court opinion?

4      A.    A while back, yes.

5      Q.    Had you already formed an opinion as to

6  whether those overcrowding findings -- the one in the

7  three-judge court opinion and the Supreme Court

8  opinion -- were incorrect or correct?

9           MR. McKINNEY:  Objection.  Vague and

10  ambiguous.

11          THE WITNESS:  No.  The article summarized

12  information that was provided to the court.

13  BY MR. GALVAN:

14     Q.    So coming into this engagement, you didn't

15  have an opinion one way or the other as to whether the

16  system was overcrowded?

17     A.    I knew what the percentage numbers were as far

18  as the number of prisoners per designated housing.  So I

19  knew that by that number designation, it was over the

20  100 percent capacity mark.

21     Q.    And do you recall reviewing the findings

22  regarding the evidence in the trial about the

23  relationship between the capacity, the cell capacity

24  mark that you described, and the medical and mental

25  health care infrastructure?

Charles Scott, M.D.                                    March 8, 2013

1      A.    From the court decision?

2      Q.    Yes.

3      A.    I remember what the court said, yes.

4      Q.    Do you recall the court saying that although

5  the system had been built with a certain single-cell

6  capacity and then could accommodate much higher capacity

7  at double cells, it hadn't been built with a medical or

8  mental health care infrastructure for that higher

9  capacity?

10      A.    I recall that that was one of the comments the

11  court made.

12      Q.    Did you form an opinion as to whether that was

13  a reasonable way to measure overcrowding in a medical

14  and mental health care case?

15           MR. McKINNEY:  Objection.  Vague and

16  ambiguous.

17           THE WITNESS:  I wasn't asked to render an

18  opinion on the court's reasonableness of how they

19  defined "overcrowding."

20  BY MR. GALVAN:

21      Q.    But as you were doing your own scholarly work

22  before this engagement, did you form your own opinion

23  about that?

24      A.    Did I form my own opinion about the judge's

25  definition of "overcrowding"?  Is that the question?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          March 8, 2013

1      Q.   Yes.  Did you form your own opinion as you
2  were reviewing the case for your scholarly work about
3  whether it was reasonable for the judges to take into
4  consideration the medical and mental health care
5  infrastructure in their findings as to whether the
6  system was too crowded to deliver adequate mental health
7  care?
8            MR. McKINNEY:  Objection.  Vague and
9  ambiguous.
10           THE WITNESS:  What I did not glean from the
11  court's decision was how they considered different
12  facilities and the prevalence of mental illness per
13  facility.  For example, you might have one facility with
14  very few individuals with a mental illness, but they may
15  be over capacity.
16           So it was impossible to know how they consider
17  that, if at all, in the ruling.  And I don't have any of
18  the other documents that they may have reviewed.
19  BY MR. GALVAN:
20     Q.   Your medical school has a relationship with
21  Sacramento County Jail involving the delivery of mental
22  health care; is that right?
23     A.   Yes.
24     Q.   Are you involved with that?
25     A.   I have been in the past, but I'm not currently

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

```
1        A.   Yes.
2        Q.   And what -- at that point, just at that first
3   meeting, what methodology -- did you settle on a
4   methodology?  Or were things left to be determined?
5        A.   You're talking about the first meeting or in
6   general?
7        Q.   Just the first meeting for now.
8        A.   At the first meeting, the best of my
9   recollection, the detail of precise methodology wasn't
10  finalized there.
11       Q.   Did you have a general framework settled?
12       A.   A general framework, yes.
13       Q.   Can you describe that?
14       A.   General framework would be that we would tour
15  institutions that were representative of the CDCR at
16  large, meaning with different locations, different
17  programs.  And Mr. Martin would be reviewing primarily
18  the use of force.  Dr. Moore would be looking primarily
19  at issues related to nursing administration and
20  medication.  Dr. Dvoskin would be looking overall at
21  those institutions about the provision of mental health
22  care.  And I'd be focusing primarily on the psychiatric
23  medication management piece.
24       Q.   At that point, did your methodology include
25  any quantitative element; that is, would you be
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                            March 8, 2013

1    collecting data and tabulating it in some way?

2        A.   I don't recall if on the very first meeting

3    there was an organized data collection procedure

4    finalized on the first meeting.

5        Q.   Okay.  Did you ever work up an organized data

6    collection procedure?

7        A.   Yes.

8        Q.   When did that happen?

9        A.   Over several months following that first

10   meeting, a tool to help look at different components

11   important to care, or potentially important to care, was

12   developed.  And my input was primarily into the

13   medication piece.  And to the degree that that also

14   related to the mental health crisis bed, I had input

15   into that as well.

16       Q.   And was the plan to tabulate data from that

17   collection and include it in your report?

18            MR. McKINNEY:  Objection.  Vague and

19   ambiguous.

20            THE WITNESS:  No, the plan wasn't to per se

21   include all the data collection pieces in the final

22   report.

23   BY MR. GALVAN:

24       Q.   What were you going to do with the data

25   collection pieces?

Charles Scott, M.D.                                        March 8, 2013

1      A.    Have them available for review should we have

2   an opinion that people would want to know the basis for

3   the opinion.

4      Q.    And did you actually do that?  Do you have

5   them available for review?

6      A.    I turned them over, I believe, yes.

7      Q.    When you say "turned them over" -- ask a

8   different question.

9            When you talk about having something for

10  review, do you mean something in which you -- you broke

11  out or rolled up the results of your tabulation in terms

12  of percentages or scores in some way?

13     A.    I provide the entire data set so someone could

14  verify it for themselves rather than rely on my own

15  summary.

16     Q.    Did you ever make your own summary?

17     A.    I have a general impression from having

18  reviewed the data.  So having been at the institutions

19  and collected the data, it's easy to learn it as you do

20  it.

21     Q.    Do you have a document with a summary of the

22  data?

23     A.    No, just what's in my head.

24     Q.    Is it possible -- or do you know whether

25  Dr. Bobb has a document with a summary of the data?

Charles Scott, M.D.                                          March 8, 2013

1    ambiguous.

2                THE WITNESS:  Not based on the IDT [sic] and

3    the information shared during that IDT.  The answer is

4    no.

5    BY MR. GALVAN:

6        Q.    Were you told at some point that there was no

7    waiting list to go to APP?

8                MR. McKINNEY:  Objection.  Vague and

9    ambiguous.

10               THE WITNESS:  My understanding is that the

11   waiting list has been substantially decreased and

12   there's not a wait list for DSH acute care now.

13   BY MR. GALVAN:

14       Q.    When you say "now," what time period do you

15   mean?

16       A.    I would have to look at the grids over time to

17   see -- there's not a waiting list now.

18       Q.    Now, March 8th, 2013?

19       A.    Yes.

20       Q.    You testified earlier you haven't done any

21   work since you finished the report.

22               Did you want to clarify that?

23       A.    No.

24       Q.    Okay.  So you've consulted the DSH list --

25   waiting list for today, March 8th, 2013?

Charles Scott, M.D.                                        March 8, 2013

1    monitoring them for changes in weight or glucose.  But

2    to put your hands around an inmate and measure their

3    waist circumference and that being a requirement in a

4    correctional environment had some unique challenges as

5    far as who did it, when you do it, how you do it.

6              And so I knew that was part of the MAPIP audit

7    tool, and it was something the psychiatrists were aware

8    of at the different institutions as being a mandated

9    monitor and, at the same time, they were monitoring the

10   risk in other ways.

11        Q.   Was the MAPIP -- did CDCR psychiatrists, to

12   your knowledge, have input into what was included and

13   not included in MAPIP?

14        A.   I only know that they had MAPIP training.  And

15   I understand from my individual discussions with a

16   psychiatrist that after the MAPIP tool was created, they

17   did voice their opinions to the chief psychiatrist.

18        Q.   Okay.  Next page, very first word is

19   "Chaiken."  Is that Dr. Shama Chaiken?

20        A.   Yes.

21        Q.   And the note is:  "Chaiken does 0 IT audits"?

22        A.   No.  It's "QIT audits."

23        Q.   Okay.  Going down about two-thirds of the way

24   down, there's a note that starts:  "Lab goes to

25   where" -- and I can't read the rest of it.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1      A.    "Lab goes to where it was ordered."

2            And so, for example, if you're on the

3      equivalent of a CTC and you order the lab, there's a

4      possibility that some of the labs may go back to the

5      CTC.  And the person, if they're no longer on that site,

6      the piece of paper has to be scanned in.  So that's how

7      it's different than an immediate electronic system where

8      it would just appear.

9      Q.    Was that a problem?

10           MR. McKINNEY:  Objection.  Vague and

11     ambiguous.

12           THE WITNESS:  Not necessarily.  I mean, if you

13     know what the lab is, if you're informed of the lab and

14     you have that knowledge, then it's not a problem.  But

15     it would be easier if it's scanned in automatically.  Or

16     part of it -- not even scanned, part of the electronic

17     system.

18     BY MR. GALVAN:

19     Q.    On the next page, 895, you have some notes

20     here at the bottom about a suicide case?

21     A.    Yes.

22     Q.    I'm not sure if this is all part of the same

23     note:  "400 Keyheas not staffed for here, 2602."

24           What's the significance of that note?

25     A.    Two separate notes.

Charles Scott, M.D.                                           March 8, 2013

```
 1          MARCH 8, 2013   AFTERNOON SESSION    1:09 P.M.
 2                          --o0o--
 3     BY MR. GALVAN:
 4          Q.   Doctor, there was -- we've talked earlier
 5     about the material that the attorney general would
 6     prepare for you in advance of your tours.
 7               MR. McKINNEY:  Just to clarify, we sent it.
 8     BY MR. GALVAN:
 9          Q.   Right.  The material that the attorney general
10     would send to you in advance of your tours.
11               MR. GALVAN:  I'd like to mark an Exhibit 9.
12               (Plaintiffs' Exhibit 9 was marked for
13                identification.)
14     BY MR. GALVAN:
15          Q.   Could you take a look, Doctor, at Exhibit 9?
16     This is an e-mail.  It says from Patrick McKinney to
17     Dvoskin, Martin, Moore, Scott, copying a couple of
18     people, including David Spagnolo.
19               He works for you?
20          A.   He works for the university.
21          Q.   What's his -- what was his role on this
22     project?
23          A.   He's an administrative assistant.
24          Q.   Skipping down to bottom of the e-mail.
25               Mr. McKinney wrote:  "In addition to these
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1    documents, I have gathered a number of documents that

2    include current data from the 33 institutions and will

3    send them to you on a DVD."

4              Do you remember getting that DVD?

5        A.    No.  I remember that Mr. Spagnolo would print

6    out and hand me all hard copies of all documents

7    versus -- so if he got DVD, I never got it.  I instruct

8    him, so that I know the volume and the bulk of records,

9    to just print them all out and put them in a box for me.

10   So he may have gotten a DVD, but I know that I had hard

11   copies.

12       Q.    Did he even give you -- did he give you hard

13   copies also of spreadsheets that wouldn't print beyond,

14   you know, on one page, big long spreadsheets?

15       A.    Yes.

16       Q.    How did you work with those?

17       A.    You can position them.

18       Q.    Okay.  So you would never have seen, then, the

19   disc that came?

20       A.    That's correct.

21       Q.    This is the disc I got from the attorney

22   general with folders, as you can see here.  This CD is

23   Exhibit 4 in our transcript.

24              They divided it up for me by institution, so

25   had we started, for example, with CMF.  And as you can

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1    see, there are a number of spreadsheets here.

2         I'm just going to look inside one of them and

3    maybe -- it may be that some of this looks familiar from

4    the hard copies you looked at.

5         So this one has -- it called CCCMS.3.ad seg in

6    addition to its Bates number, which is DEXP13765 to 67.

7         As you look across at these columns, Doctor,

8    does this look like something that David might have

9    printed out for you?

10        A.    Vaguely.  Many of the documents -- for

11   example, review of ad seg care was not my area that I

12   was working on.  My -- so my focus on was documents

13   related to medication management.

14        Q.    Also MHCB?

15        A.    And MHCB.

16        Q.    So if we look at one of the MHCB ones, for

17   example, there's one that's called MHCB.8, Bates

18   No. 23286 to 785.

19        First group, A through F, does this look like

20   something David might have printed out for you?

21        A.    Yes.

22        Q.    I'll just -- I'm going to go to the right and

23   look at some of the other columns.

24        Are you familiar with this term in Column F

25   7447MH?

Charles Scott, M.D.                                          March 8, 2013

1     A.    Not offhand, but I may have at the time.  I'm
2  not recalling what 7447 stands for.
3     Q.    Is that possibly the suicide risk evaluation,
4  7447?  I'll represent that it's the CDCR form for
5  suicide risk evaluation.
6     A.    Okay.
7     Q.    Does that sound possible?
8     A.    I don't know the number anymore.
9     Q.    When he printed these -- do you have any
10 understanding as to where this data came from?  Stop
11 moving it around.
12    A.    On a broad level, data entered through
13 MHTS.net is my general understanding.
14    Q.    What's your understanding of what MHTS.net is?
15    A.    It's a data tracking system for specific
16 monitors, and there's data entry relevant to those for
17 the individuals.
18    Q.    So, for example, this one with the 7447
19 suicide risk evaluation, would you review these, the
20 printouts, in advance of your tours for this purpose?
21    A.    I would see them.  What -- what I felt was
22 more productive and useful was to actually look on-site
23 at the mental health crisis bed, at the charts in front
24 of me, because it gave me more information than this
25 kind of grid did.  Then if I had questions about a

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

 1   particular case, I could look further, whereas this

 2   wasn't as easy to use.

 3       Q.   Did you ask anyone, like Drs. Reid or Bobb, to

 4   look at these for any anomalies or red flags?

 5       A.   No.

 6       Q.   As we look at this one, MHCB 88, so it has one

 7   row for -- each row seems to be an event and you had

 8   multiple rows for an inmate.  And then it seems like we

 9   have something like five -- 5,800 rows, so it's a lot.

10       A.   Uh-huh.

11       Q.   And then you said the event seems to be the

12   completion of the suicide risk evaluation.  Does that

13   seem right?

14            MR. McKINNEY:  Objection based on counsel's

15   representation.

16   BY MR. GALVAN:

17       Q.   Based on my representation that 7447 --

18       A.   If 7447 stands for that.

19       Q.   And did you form any understanding as to what

20   this Column G with the zero percent, 100 percent means

21   in MHTS.net?

22       A.   Yes.

23       Q.   What does it mean?

24       A.   Did they have a compliance within a program

25   guide specified period of time.

Charles Scott, M.D.                                              March 8, 2013

1          Q.   Still sticking with Exhibit 4 and the folder

2    for Vacaville, which was the first place you went, I'm

3    going to go to the one called DMH, has Bates No. 18735

4    to 738.  This also seems to be arranged in rows with one

5    row per -- sometimes an inmate has multiple rows,

6    generally it's inmate and row and events.

7               Do you remember seeing a printout of this that

8    David might have made for you?

9          A.   I believe those were the packets, yes.

10         Q.   Did you form an understanding as to

11   significance of this table?

12         A.   Yes.

13         Q.   What is its significance?

14         A.   What I think it's trying to communicate is how

15   many days a person may have been on an wait list to DMH.

16         Q.   And the wait days would be Column F?

17         A.   Those are the days some office technician

18   entered, yes.

19         Q.   Just looking here at the first screen, the

20   first entry for this Mr. Ackley, Row 2, 95 days waiting

21   for -- DMH intermediate psychiatric referral?

22              MR. McKINNEY:  Objection.  Calls for

23   speculation.

24   BY MR. GALVAN:

25         Q.   Is that what's entered on the chart?

Charles Scott, M.D.                                    March 8, 2013

1        A.    That's what's entered on the spreadsheet.

2        Q.    If we go down two more rows, we have 99 days;

3   is that right?

4        A.    That's what's entered on the spreadsheet.

5        Q.    Go down three more rows, 98 days?

6        A.    Correct.

7        Q.    But it's your testimony that you didn't ask

8   Drs. Bobb or Reid to examine this data for issues of red

9   flags?

10       A.    That's correct.

11       Q.    Second DMH is -- it's called DMH.1-2, Bates

12   No. 18731 to 734.

13             Do you remember seeing a chart like this

14   printed out?

15       A.    I believe that was in the stack of records,

16   yes.

17       Q.    Fair to say the difference between this one

18   and the one we just looked at, DMH, is that this is

19   acute care versus intermediate care?

20             MR. McKINNEY:  Objection.  Calls for

21   speculation.

22             THE WITNESS:  The Excel sheet I'm reading says

23   "DMH acute psychiatric referral" under the D column

24   event.

25

Charles Scott, M.D.                                      March 8, 2013

```
 1   speculation.
 2            THE WITNESS:  That's the number listed on that
 3   Excel sheet.
 4   BY MR. GALVAN:
 5        Q.   And then we've got Mr. Gutierrez, 30 days?
 6            MR. McKINNEY:  Objection.  Calls for
 7   speculation.
 8   BY MR. GALVAN:
 9        Q.   Right?
10        A.   That's the number on the Excel sheet.
11        Q.   We've got Mr. Pauley, 77 days?
12            MR. McKINNEY:  Objection.  Calls for
13   speculation.
14   BY MR. GALVAN:
15        Q.   Right.
16        A.   That's what it says, yes.
17        Q.   We've got Mr. Hill, 78 days, right?
18            MR. McKINNEY:  Objection.  Calls for
19   speculation.
20            THE WITNESS:  That's what it says on that
21   slide projection.
22   BY MR. GALVAN:
23        Q.   After you got this spreadsheet in advance of
24   your CMF tour, did you direct Drs. Bobb, Reid or anybody
25   to check whether these wait times were due to concurrent
```

Charles Scott, M.D.                                      March 8, 2013

1    medical care?

2        A.    No.   My focus of my part of the review was on

3    on-site medication management by the psychiatrist, not

4    as the expert reviewing the length of stay and wait

5    period for the acute care.

6        Q.    We were talking about CSP SAC, which was the

7    second location you went to.

8             Would it be correct that you reviewed

9    printouts made from spreadsheets for CSP SAC as well?

10       A.    Yes.

11       Q.    And if there were in here DMH grids that

12   showed long waiting times, your testimony would be the

13   same:  You didn't direct anyone to check into those

14   situations?

15       A.    Yes.  Because I testified earlier, my role was

16   to look at the psychiatric medication management, not at

17   DMH bed wait days.

18       Q.    And your role was also to look at MHCBs,

19   right?

20       A.    The care provided on the MHCB to the

21   individuals.

22       Q.    So if we go into the SAC folder here, we look

23   at MHCB.8, which is Bates No. 42285.

24             You see this spreadsheet looks similar to what

25   we looked at before for the 7477s for Vacaville that we

Charles Scott, M.D.                                    March 8, 2013

1   looked at?

2       A.   Yes.

3       Q.   This looks like something that would have been

4   printed out for SAC?

5       A.   It's similar, yes.

6       Q.   And it has -- Column H, it has the Text

7   Box 10, the scoring of whether the -- whether the event

8   was documented or not?

9            MR. McKINNEY:  Objection.  Vague and

10  ambiguous.  Misstates prior testimony.

11           THE WITNESS:  It only has a compliance

12  percentage, as I understand it, if it was documented

13  within a compliance period in accordance with the

14  program guide.

15  BY MR. GALVAN:

16      Q.   Do you know what the compliance period is?

17      A.   I don't want to misstate off my memory.  So,

18  offhand, I'd pull the program guide.

19      Q.   Is it important to have a deadline to do a

20  suicide risk evaluation?

21      A.   As a general concept, yes.

22      Q.   Why?

23      A.   Depending on the case and depending on the

24  reason for referral to evaluate the person for risk of

25  suicide.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                              March 8, 2013

1      Q.   If I go slowly down through Column H, you see

2   the first few are you've got group of 100 percent and

3   group of zeros?

4      A.   Yes.

5      Q.   Roughly the same size.

6           Then if I scroll slowly down, you see it's

7   true I'm scrolling for quite a while before I get to

8   another hundred?

9      A.   Many of them are the same patient.  So, for

10  example, they could be on a one-to-one, and they can be

11  refusing to answer the suicide risk evaluation but

12  they're being watched.  So the clinician will miss each

13  deadline because the person is refusing to speak, but

14  they maintain them on a suicide watch.

15          Therefore, they -- the compliance will report

16  as zero, but that doesn't reflect deliberate

17  indifference by the clinician.  So if the person will

18  not answer your question and you can't complete the SRE

19  but they're still on a watch or there's some other

20  reason, then you could have a zero but it doesn't mean

21  that they were deliberately indifferent.

22     Q.   If you look at Row 76 through Row 91 on

23  Bates 42285, you've got William Warren?

24     A.   Right.

25     Q.   He's got -- let's see.  Column F is the -- due

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    date, it's a date related to the event.  I don't know

2    what date it is.  But it seems to be that he gets a new

3    row every week, right?  9/11, 9/18, 9/25, 10/2, 10/9 all

4    the way up to Christmas, 12/25/2011?

5        A.    Right.

6        Q.    And every one of those is a zero, right?

7        A.    Yes.

8        Q.    So you're testifying it's possible that he

9    just kept refusing to participate, right?

10       A.    That's one possibility.

11       Q.    From September 11th to December 25th?

12       A.    He could have had a medical issue or reason.

13   It could have been done and not scanned in.

14             If they had during those two-month period of

15   time a deficit in office technician and then it wasn't

16   entered into the statewide database.

17             Various reasons why that could happen.

18       Q.    But you didn't -- when you went to SAC, or at

19   any time, you didn't check to see whether any of those

20   circumstances explained all these zeros in Mr. Warren's

21   part of the spreadsheet, right?

22       A.    I checked for people who were actually on the

23   mental health crisis bed to see if their suicide risk

24   evaluations were done appropriately.  I did not

25   investigate if there were administrative reasons through

1    office technicians that things were not scanned in.

2         Q.    So you checked the people who were there the

3    day you were there?

4         A.    Yes.

5         Q.    In general, these crisis bed units have

6    capacities of something like 20, 30 beds?

7         A.    In general.

8         Q.    You checked some sample from 20 or 30 people,

9    right?

10        A.    It depended on the site.  Yes.

11        Q.    But you had been given about -- at least on

12   this spreadsheet -- 828 admissions at least -- or 821

13   events?  Some people have many events.

14             MR. McKINNEY:  Objection.  Vague and

15   ambiguous.

16   BY MR. GALVAN:

17        Q.    Over a long period of time, right?

18             MR. McKINNEY:  Vague and ambiguous.  Compound.

19             THE WITNESS:  There was some information.

20   However, because there were various reasons why that

21   information may or may not accurately reflect the care

22   being given, I thought it was more important to review

23   the actual care delivered versus an Excel sheet that may

24   or may not be accurate.

25

Charles Scott, M.D.                                      March 8, 2013

```
 1   BY MR. GALVAN:
 2        Q.    Actual care delivered on the day you were
 3   there?
 4        A.    The days I was there, yes.
 5        Q.    On a day set out in a schedule in
 6   October 2011, right?
 7             MR. McKINNEY:  Objection.  Calls for
 8   speculation.
 9             THE WITNESS:  I don't know that the facility
10   knew we were coming.
11   BY MR. GALVAN:
12        Q.    They knew you were coming at least a month in
13   advance, right?
14             MR. McKINNEY:  Objection.  Calls for
15   speculation.
16             THE WITNESS:  I honestly don't know.
17   BY MR. GALVAN:
18        Q.    You and Mr. McKinney met and set the schedule,
19   right?
20        A.    No.
21        Q.    And you, Mr. McKinney, Dr. Moore, and
22   Dr. Dvoskin met and set the schedule, right?
23        A.    In general, we agreed upon dates where we
24   could be -- all be available.
25        Q.    And the schedule was set more than a week
```

Charles Scott, M.D.                                              March 8, 2013

```
 1    the witness.
 2              MR. McKINNEY:  Mr. Galvan --
 3              MR. GALVAN:  These objections are coaching the
 4    doctor into how to answer, and I really think it should
 5    stop.
 6              MR. McKINNEY:  I cannot disagree with you in
 7    more stronger terms.  The court has precluded the
 8    parties from presenting live testimony at the hearing on
 9    this matter.  This is my one and only chance to make a
10    record, and I will do so.
11    BY MR. GALVAN:
12         Q.   Focusing narrowly on the quality of MHCB care,
13    leaving aside medication, your evaluation of the
14    constitutionality of MHCB care, your method for doing
15    that evaluation was to examine information about a
16    sample of the patients present and being cared for in
17    the MHCBs on the day of your tour?
18              MR. McKINNEY:  Can you read that back, please?
19              MR. GALVAN:  Correct.
20              (Record read as follows:
21              "QUESTION:   Focusing narrowly on the
22               quality of MHCB care, leaving aside
23               medication, your evaluation of the
24               constitutionality of MHCB care, your
25               method for doing that evaluation was to
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1              examine information about a sample of

2              the patients present and being cared

3              for in the MHCBs on the day of your

4              tour?")

5         MR. McKINNEY:  Objection.  Vague and

6    ambiguous.  Compound.

7         THE WITNESS:  Sorry.  That was part of the

8    evaluation.

9    BY MR. GALVAN:

10        Q.  What was the rest of the evaluation?

11        A.  Interviewing actual inmates, sitting in on

12   IDTTs, interviewing staff, interviewing custodial

13   officers and for nursing staff, reviewing the actual

14   record at the time.

15        Q.  Breaking that down, the first thing you said

16   was interviewing inmates.

17        What inmates are you talking about?

18        A.  Inmates who were housed on the mental health

19   crisis bed.

20        Q.  On the day you were there?

21        A.  Yes.

22        Q.  Second part, IDTTs, which IDTTs are you

23   talking about?

24        A.  IDTTs that were occurring on the mental health

25   crisis beds.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1    Q.    For patients that were being cared for on the

2    day you were there?

3    A.    Some of the patients, they had pre-IDTT

4    meetings, so there would be informational sharing in

5    addition to the actual IDTT.  But it was related to

6    inmates who were on the crisis bed unit at the time.

7    Q.    Third one was records.  Records of patients

8    that were in the crisis bed unit on the day you were

9    there?

10   A.    Yes.

11   Q.    Any other records?

12   A.    EUHR records relevant to the patient prior to

13   their admission.  That would be an EUHR.

14   Q.    Which patients?

15   A.    The MHCB patients.

16   Q.    Who were being cared for on the day you were

17   there?

18   A.    Yes.

19   Q.    Any other records?

20   A.    Some components of MHTS.net.

21   Q.    For the patients being cared for on the day

22   you were there?

23   A.    Yes.

24   Q.    Fair to say, Doctor, based on all that you

25   just testified to under oath, that your review of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1   patient care was limited to the patients who were

2   present on the MHCB being cared for on the day you were

3   there?

4        A.   No.  And the reason is that many of the

5   medication reviews that I did of the over 130 had prior

6   MHCB admissions.  There's a special tab on EUHR.  So

7   those could be months or years before.  So, of those,

8   you can also look at MHCB admissions unrelated to the

9   day I was there.

10       Q.   So the second part, then, is the people you

11  were reviewing anyway for medication review, medication

12  monitoring.  If they had prior MHCB admissions, you

13  include them as the basis for your opinion on MHCBs?

14       A.   I would look at the care provided on the MHCB

15  and include that in my analysis, yes.

16       Q.   And for SAC, how many -- how many persons

17  would you estimate fell into that latter set that you

18  just described?

19       A.   Two or three.

20       Q.   Two or three.  Okay.

21            But you had this data that Mr. Spagnolo

22  printed out for you regarding care for the several

23  months prior to your tour during the period when the

24  institution had no notice that you were coming.  But you

25  did not direct Dr. Bobb, Dr. Reid, or anybody else to

Charles Scott, M.D.                                    March 8, 2013

1    review this data for any issues?

2            MR. McKINNEY:  Objection.  Compound.  Vague

3    and ambiguous.

4            THE WITNESS:  That was not my directive to

5    them, no.

6    BY MR. GALVAN:

7        Q.    Let's go back to Exhibit 8.  We're still in

8    SAC, CSP SAC.

9            On Bates No. 903, you have a note here.  Let's

10   see.  After -- about the sixth line down:  "Primary

11   clinician not present."

12           I think these notes are regarding an IDTT, it

13   says on the page before, right?

14       A.    In part.  They also did have on that day a

15   classification hearing they had to do, so one of these

16   may reflect -- I believe the warden was present for this

17   classification hearings, maybe a classification hearing.

18       Q.    So this note may not be about an IDTT?

19       A.    That particular one, because the warden is

20   present.

21       Q.    Okay.  Does it change your recollection if you

22   go back to the prior page and see under the line --

23   under the second line, it says "Initial IDTT"?  Is it

24   possible -- I don't know if we're still looking at the

25   same event or not.

Charles Scott, M.D.                                    March 8, 2013

1    provide because there can be a time period to turn them

2    over.  So that's something they're aware of and they're

3    caution about.

4          The next note is this individual told me that

5    they may get anywhere between two to three hundred

6    requests from the population or referral to them a

7    month, and the majority are routine.  So they felt that

8    they could see, and they did see, about five to six

9    referrals a day.

10   Q.   So a referral -- a referral in this context is

11   a request for services from an individual?

12   A.   It could be a request for services from an

13   individual.

14   Q.   And the transfers, are they mistaken because

15   people on the mental health case load aren't supposed to

16   go to Centinela?  Is that what "mistaken" means?

17   A.   I don't know their definition of "mistaken."

18   Q.   Keep 11 handy.  You might refer to it as we're

19   looking at the audit tool.

20        MR. GALVAN:  Mark Exhibit 12, please.

21        (Plaintiffs' Exhibit 12 was marked for

22         identification.)

23   BY MR. GALVAN:

24   Q.   So in your Centinela folder that they produced

25   was this version of a few pages from the audit tool

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                      March 8, 2013

 1  where the entries are typed.

 2       A.   Yes.

 3       Q.   Was this your work filling this out?

 4       A.   Yes.

 5       Q.   Okay.  And was Dr. Moore absent, so you were

 6  doing the quality management part, too?

 7       A.   Correct.

 8       Q.   Okay.  Toward the bottom of the quality

 9  management part, you had typed:  "Psychiatrist can't

10  attend QA meetings"?

11       A.   Yes.

12       Q.   Is that a concern for you?

13            MR. McKINNEY:  Objection.  Vague and

14  ambiguous.

15            THE WITNESS:  No in this case because of her

16  review of the minutes, ongoing communication, input, and

17  being proactive vocal regarding the quality of the care,

18  it was not a concern to me.

19  BY MR. GALVAN:

20       Q.   And you also filled out the medication

21  management tool on page 29, which is Bates 986 of

22  Exhibit 12, one of your question in this part of the

23  tools is:  What the maximum length of bridge orders?

24            What is a bridge order?

25       A.   A bridge order is a description of a

Charles Scott, M.D.                                    March 8, 2013

1    know if any happened in these particular cases, but it

2    can happen on some.

3            The two fields to go through are general

4    comments and diagnosis.  Those would typically put more

5    information specific to general comments and diagnosis

6    because the Bento box is bigger.

7            MR. GALVAN:  I'd like to mark Exhibit 14.

8            (Plaintiffs' Exhibit 14 was marked for

9             identification.)

10   BY MR. GALVAN:

11       Q.   Exhibit 14 we took from the court file.  It's

12   the joint report that the State filed for you and

13   Dr. Dvoskin and Dr. Moore and...

14           So could you discuss the -- the process for

15   writing this report?  I'll ask you a few specific

16   questions about it.

17           I think you've already testified that the

18   process did not include you drafting a separate report

19   and then somehow putting them together, right?

20       A.   Yes.  Yes.

21       Q.   What was the process for drafting this?

22       A.   The process for drafting the report was

23   discussing our findings at each of the sites and then

24   summarizing those findings in a combined report.

25       Q.   And when did you actually start doing that?

Charles Scott, M.D.                                    March 8, 2013

1        A.    I don't know the exact date.  May have been in

2    November, that time frame, of 2012.

3        Q.    And did all three of you get together in one

4    place to do this?

5        A.    No.

6        Q.    How did it work?

7        A.    Joel Dvoskin and I were in the same place to

8    do our portions of the report.  And then having created

9    sort of the general format, the areas left for Dr. Moore

10   were for her to have her opinions represented.  And so

11   she was included in that process.

12       Q.    If you turn to page 7 of the joint report.

13            The first paragraph says at the end that "We

14   also reviewed data from studies conducted by CDCR and

15   the special master's team."

16            Do you remember specifically what data you

17   reviewed?

18       A.    I was aware -- I won't be able to cite you the

19   exact report, but there was a report that looked at

20   trying to identify underserved or unidentified inmates

21   in the CDCR system.  I don't know if the number was in

22   40s or the 70s, but it was a low number from that report

23   of individuals who were felt to require a higher level

24   of care or mental health treatment that had not been

25   identified.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          March 8, 2013

1    Q.    On the next page, staffing discussion, last

2    sentence in the paragraph that continues at the top of

3    the page -- this is page 12 of Exhibit 14:  "Finally, in

4    our opinion, the CDCR mental health staffing plan will

5    provide adequate resources."

6         Did you review their CDCR mental health

7    staffing plan?

8    A.    That wasn't my role, no.

9    Q.    This is not a Dr. Scott part; that's a

10   Dr. Dvoskin part?

11   A.    Best I understand, yes.

12   Q.    So you don't have an opinion one way or the

13   other whether their staffing plan is good, bad,

14   inadequate, adequate?

15   A.    That's not exactly what I said.  As far as

16   psychiatric care, that even in those institutions that

17   identify there were -- the staffing of psychiatrists was

18   not at full level, they were still deliberately

19   indifferent to the mental health needs of inmates, and

20   they were providing constitutionally appropriate care.

21   Q.    But to the extent that this part of the report

22   expresses an opinion about a plan, a mental health

23   staffing plan, you didn't do any review of that plan to

24   determine whether that plan was adequate to meet

25   constitutional standards, right?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1      A.    That's correct.

2      Q.    Did you didn't do any review to determine

3  whether that plan was necessary to meet constitutional

4  standards?

5      A.    Correct.  I looked at the care currently

6  provided and did it meet constitutional standards.

7      Q.    Also on page 12 there's a discussion here

8  under numbered paragraph 4 regarding Los Angeles

9  County -- California State Prison Los Angeles County

10  regarding, quote -- I'm just going to quote it:

11      "Significant limitations on office and

12  interview space for the mental health staff,

13  particularly psychiatrists.  While these limitations

14  were not intentional or due to a lack of effort" -- I

15  just want to focus on those words, "intentional or due

16  to lack of effort."

17      How do you know whether the limitations were

18  intentional or not?

19      A.    This part was investigated or written by

20  Dr. Dvoskin.  I was aware that there were -- the office

21  space for psychiatrist was limited.  And then he did the

22  follow-up on that, and I did my medication reviews.

23      Q.    As far as you know, the limitations on the

24  office space for psychiatrists might have been

25  intentional?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

 1              MR. McKINNEY:  Objection.  Calls for
 2      speculation.
 3              THE WITNESS:  I have no evidence that they
 4      were intentional.
 5      BY MR. GALVAN:
 6          Q.   But you don't know one way or the other
 7      whether they were intentional or not?
 8          A.   I didn't investigate that, so I have evidence
 9      that they were one way or the other.
10          Q.   Were you informed that CDCR was building --
11      had a building project at LAC to eliminate this problem?
12          A.   Yes.
13              And the psychiatrist was aware of that as well
14      and felt that that would address their space problems.
15          Q.   And have you done anything to learn the
16      current status of that building project?
17          A.   No.
18          Q.   Would it change your opinion if you learned
19      the building project was not complete?
20          A.   Wouldn't change my opinion on the
21      constitutionality of the medication management and care.
22          Q.   On the same page, numbered Item 5, concerning
23      Salinas Valley State Prison.  First bullet point
24      discusses concerns expressed by the mental health
25      director regarding staffing and space shortages.

Charles Scott, M.D.                                    March 8, 2013

```
 1  BY MR. GALVAN:
 2      Q.   On the next page, page 13, there's a numbered
 3  paragraph 6 regarding Pelican Bay.
 4           You didn't actually go to Pelican Bay, right?
 5      A.   That's correct.
 6      Q.   Anything here about staffing shortages would
 7  be Dr. Dvoskin's work?
 8      A.   Correct.
 9      Q.   And the next paragraph about California Men's
10  Colony says:  "Mental staff reported mental health
11  staffing shortages that adversely impacted their ability
12  to provide care to inmates."
13           Do you agree with that statement?
14      A.   That statement is, as I understand it, was in
15  part by the work Dr. Dvoskin did.  So I would let him
16  speak to that.  I didn't do that part of the
17  investigation.
18      Q.   And then the last paragraph on the page
19  discusses staff shortages at substance abuse treatment
20  facility.
21           Are you -- are you the author of this part?
22      A.   I was aware there were staffing shortages for
23  psychiatry.  And I did -- I did put this in the report,
24  yes.
25      Q.   When you say "this," you mean the part about
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                      March 8, 2013

 1  psychiatrist.  So this was the chart review part of it.

 2      Q.   So when you spoke to an inmate, you didn't

 3  enter those results in the Bento box?

 4      A.   No.

 5      Q.   On page 14 of the report, Exhibit 14, there

 6  are discussion about comparison with other systems.

 7  There's a heading, "Comparison With Other Systems."

 8           What was your methodology for comparing CDCR

 9  to other systems?

10      A.   This is primarily the work of Dr. Dvoskin.

11  However, I have worked as a treating clinician in both

12  jails, Hunt Correctional Facility in Louisiana, maximum

13  security facilities for inmates, and in the -- as a

14  military officer working with detained soldiers, and

15  also in a jail in Ohio.  So, for me, it was comparing

16  the experience of actually working in state correctional

17  systems and comparing those systems to the CDCR.

18      Q.   So let's break -- I want to break it down to

19  just talk about state correctional systems because that

20  what it says in the report here.

21      A.   Okay.

22      Q.   "Numerous state correction systems."

23           So you listed a few things, but I might have

24  missed it.  I'm not sure which of those were state

25  correctional systems.

Charles Scott, M.D.                                    March 8, 2013

1          So can you tell me which state correctional

2     systems have you worked in?

3          A.   Louisiana.

4          Q.   Okay.  So one state, Louisiana.

5               So the basis for your opinion that -- let me

6     look at the exact words.  The basis for your opinions

7     involving comparisons between CDCR and numerous state

8     correctional systems is a comparison been CDCR and

9     Louisiana?

10              MR. McKINNEY:  Objection.  Mischaracterizes

11    the report.  Mischaracterizes prior testimony.

12              THE WITNESS:  Only in part.

13    BY MR. GALVAN:

14         Q.   What other state correctional systems are you

15    comparing California to?

16         A.   Because I am asked to review care on

17    individual cases in state prisons in other states, I

18    have an opportunity to review both their policies and

19    procedures, the assessment process, and medication

20    management in different states.  So those would include

21    Florida, Illinois, Ohio, Alabama.  I believe Arizona.

22              And I also believe New Mexico.  I just

23    remembered a New Mexico case.

24         Q.   And all of those cases -- the Florida,

25    Illinois, Ohio, Alabama, Arizona, and New Mexico

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1    cases -- those were individual liability cases?

2         A.    Combined.   They were individual liability,

3    also constitutionality of care provided under

4    Section 1983.   And then some involved ADA, American With

5    Disabilities Act, allegations for violations.   But in

6    addition to deviation from the standard of care, I

7    believe they all involved constitutional of care as

8    well.

9         Q.    What was at issue in those cases was whether

10   there was liability for injury to an individual,

11   correct?

12        A.    Not an -- not alone, no.   That's not correct.

13        Q.    Let me ask the question differently.

14             Were any of these cases, cases for injunctive

15   relief?

16        A.    I would have to go back and review to see if

17   that was part of the complaint.

18        Q.    Were any of these cases, cases for money

19   damages?

20        A.    There may have been.   I'd have to look at the

21   actual complaint.

22        Q.    Did all of these cases involved the facts and

23   circumstances surrounding either the death of or injury

24   to an individual?

25        A.    In part but not solely.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                        March 8, 2013

1        A.    I did sit in on several EOP IDTTs and felt

2    that IDTTs were appropriate, engaged, and involved.  And

3    so that part of this opinion, I personally witnessed.

4        Q.    Does what you just said have anything to do

5    with transferring EOP inmates out of segregation?

6        A.    Well, you asked me to comment on "i."  And so

7    part of my opinion is relevant to "i."

8        Q.    Okay.  Focusing on the statement here that

9    there are efforts to expedite the transfer of EOP

10   inmates out of segregation, you have no basis for that

11   statement?

12       A.    No.

13       Q.    To the extent that there are statements in the

14   report about placing EOP inmates in segregation for

15   their own protection, that would be Dr. Dvoskin's work?

16   It Wouldn't be part of your study?

17       A.    That was his focus, not mine, that's correct.

18       Q.    So you wouldn't have any opinions about that?

19       A.    That wasn't the focus of my role as the expert

20   in this case.

21       Q.    When we get to chapter here, the section on

22   page 19 on the mental health crisis bed unit, would it

23   be fair to say that this section is your section?

24       A.    In part, but not in totality.

25       Q.    It starts by saying:  "At every prison visited

1   with an MHCB or CTC, a member of our team assessed the

2   program by doing several things."

3           Is that true for Pelican Bay where you didn't

4   go?

5       A.   Yes.

6       Q.   But you weren't there to interview randomly

7   selected inmates, correct?

8       A.   That's correct.

9       Q.   Did Dr. Dvoskin do that for you?

10      A.   It was my understanding he did.

11      Q.   And he went to IDTT meetings and deducted

12  interviews?

13      A.   I don't have his notes in front of me.  I

14  can't speak to that.

15      Q.   But you did -- I saw in your notes -- review

16  medical records from Pelican Bay?

17      A.   Yes.

18      Q.   Did Dr. Dvoskin report to you about his

19  observation regarding the care at Pelican Bay?

20      A.   Yes.

21      Q.   Do you remember what he reported to you?

22      A.   He felt that there was confusion about the

23  technical term for a suicide watch versus suicide

24  precaution and that, in his experience having visited

25  there, that he did not find a suicide risk evaluation

Charles Scott, M.D.                                      March 8, 2013

1    So I don't know his knowledge of the medical database.

2         Q.   So when you see a phenomenon in the world like

3    someone being prescribed Haldol without a diagnosis, and

4    Axis 1 diagnosis, would the rule of parsimony apply in

5    terms of what the explanation is?

6         A.   I don't understand your question.

7         Q.   If you're given a choice between two

8    explanations for a phenomenon, one that requires a

9    certain multiplication of entities like hypothesizing

10   that the clinician has read some literature that says

11   that you have -- you could use this off-label use for

12   Axis 2, or you have a possible explanation that's more

13   parsimonious that requires fewer entities, i.e., that

14   they're simply short-staffed and can't get the job done,

15   why would you choose the less parsimonious explanation?

16        MR. McKINNEY:   Objection.   Compound.   Vague

17   and ambiguous.

18        THE WITNESS:   I like the word "parsimony,"

19   though.

20        First of all, Dr. -- with all due respect to

21   Dr. Dvoskin, he's not a physician and he -- his

22   understanding of the appropriateness for prescribing in

23   an acute setting Haldol would -- may not be -- I

24   wouldn't necessarily defer to him in that decision.

25        If you look at standard of care in emergency

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1  a lower level of observation is, in general, a good

2  guideline.

3         I think that follow-up after discharge from a

4  mental health crisis bed to a lower level of care is

5  also a general good guideline.

6         So those would be the overall guidelines.  I

7  also, though, understand that, for example, at RJD, they

8  will go out, a team -- Dr. Laura Leard-Hansson and a

9  psychologist -- and do the evaluations in advance even

10  of getting to the mental health crisis bed and can do

11  the suicide risk assessment.  Whether or not that's

12  entered into MHTS.net following the technical admission

13  would be an example of a very early SRE that may not get

14  coded for.

15  BY MR. GALVAN:

16     Q.   Going ahead to page 26 in the report.

17         There's a Roman III at the top, "Medication

18  Management," which is decided into two sections.

19  There's A, nursing medication management, and, B,

20  psychiatry medication management.

21         Is it correct to say that nursing medication

22  management would be Dr. Moore's section?

23     A.   On those prisons where she attended, I

24  believe, on one of my CMF visits, I also spoke on --

25  with the nursing staff and we reviewed my notes in --

Charles Scott, M.D.                                    March 8, 2013

1    relevant to that.

2         Q.   Did you do any review for Item No. 3,

3    potential hoarding of medication?

4         A.   No.

5         Q.   So this would all be on Dr. Moore's work?

6         A.   Correct.

7         Q.   And looking at B, this would be your section,

8    correct?

9         A.   Primarily, yes.

10        Q.   And your Conclusion No. 2 regarding

11   consistency with diagnosis would be based on -- the

12   basis for that would be your chart reviews that are in

13   your notes, your chart reviews that in the Bento box,

14   and your MAPIP reviews?

15             MR. McKINNEY:   Objection.   Mischaracterizes

16   prior testimony.

17             THE WITNESS:   In part with the MAPIP reviews

18   but also with interviews of inmates and in observing

19   IDTTs, the discussion of what their diagnosis and the

20   medication treatment.

21   BY MR. GALVAN:

22        Q.   And have you been -- with regard to No. 3,

23   you've discussed the difficulty of using the EUHR to

24   find lab results.

25             Have you received any follow-up information

Charles Scott, M.D.                                    March 8, 2013

1    care?  Would that be an element you would look at?

2              MR. McKINNEY:  Objection.  Vague and

3    ambiguous.

4              THE WITNESS:  I would look to see is there a

5    mechanism in place to review decisions that may not be

6    agreed upon because clinicians have different skills and

7    different understanding of level of care.  So a

8    psychiatric technician, who may be called a clinician or

9    may be clinician, recommending to DSH may be different

10   than another provider.  Likewise, they may not have an

11   understanding of DSH level of care or not.  So the

12   question would be:  Is there a system in place to help

13   resolve those differences?

14             Because it's fairly common both in community

15   care, private hospital care, and in correctional care

16   that people can have different opinions about the level

17   of care.  And so does the system have a mechanism to

18   review those kind of case?

19   BY MR. GALVAN:

20        Q.   What would your opinion be in a situation

21   where there was a system with such a mechanism and all

22   the levels of review agreed that the person should go to

23   inpatient care, but then the department in charge of the

24   inpatient care, the Department of State Hospitals,

25   simply pointed to the MOU and said, "It doesn't matter

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    that your clinician and our clinician wants to admit

2    this patient.  The MOU says we don't have to and we're

3    not going to"?

4            Would that impact your opinion?

5            MR. McKINNEY:  Objection.  Calls for

6    speculation.  Incomplete hypothetical.

7            THE WITNESS:  I would have to see the

8    memorandum of understanding, the particulars of the

9    case.  But if it's out of a large system, was this

10   something that was endemic to the system or was it

11   isolated cases.  So that could also make a difference.

12   BY MR. GALVAN:

13       Q.   What would your opinion be if it was endemic

14   to the system?

15       A.   If every single case or the majority of cases

16   referred to Department of State Hospitals refused to go

17   or refused to be accepted.

18       Q.   That would be your definition of "endemic,"

19   the majority?

20       A.   Not necessarily.  But I did not find, in

21   speaking with clinicians directly at the 12 facilities I

22   visited that there is any consistency, any endemic

23   concern by people recommending the transfer that DSH was

24   blocking those transfers.

25       Q.   What if they're consistently blocking the

Charles Scott, M.D.                                    March 8, 2013

1    transfers in a certain type of case?  Keeping in mind

2    that, as you've said, every case is different, there's a

3    wide spectrum of symptoms and conditions.

4            If you have a circumstance where even though

5    it's not the majority of cases but every time it's a

6    certain type of case -- in other words, actively

7    psychotic, in need of inpatient care but violent,

8    history of violence -- that in those cases, despite

9    clinician unanimity as to the appropriateness of the

10   referral, DSH simply points to their memorandum and

11   says, "Don't have to take them.  They're violent"?

12           MR. McKINNEY:  Objection.  Vague and

13   ambiguous.

14   BY MR. GALVAN:

15       Q.  So we're not talking about the endemic --

16   something that's endemic to a big system with 30,000

17   patients.  We're talking about a little slice of the

18   system and a consistent practice in that slice.

19           In that hypothetical, would your opinion be

20   that there's a problem in terms of the institutional

21   level of care?

22           MR. McKINNEY:  Same objection.  Vague and

23   ambiguous.  Incomplete hypothetical.  Calls for

24   speculation.

25           THE WITNESS:  No.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1   BY MR. GALVAN:

2       Q.   So it's your opinion that even though there's

3   clinical unanimity with regard to a group of referrals,

4   that in a situation where the agency that's the

5   gatekeeper to the state hospitals refuses to provide

6   that level of care, pointing to something in its MOU,

7   that the system can still be constitutional?

8           MR. McKINNEY:  Objection.  Asked and answered.

9           THE WITNESS:  Two or three points.

10          First, you have to look at the memorandum of

11  understanding.

12          Secondly, does the receiving Department of

13  State Hospital have the adequate monitoring of security

14  to safely provide care to that patient.

15  BY MR. GALVAN:

16      Q.   Assume that it doesn't.  Assume it doesn't, it

17  doesn't have adequate safety and security.  Someone's

18  made a conscious decision not to provide it.  Okay?

19  Make that assumption.  So those patients just don't go;

20  they just don't get that care.

21          Is it deliberately indifferent not to provide

22  them that care or not?

23          MR. McKINNEY:  Objection.  Vague and

24  ambiguous.  Incomplete hypothetical.  Asked and

25  answered.

Charles Scott, M.D.                                    March 8, 2013

1          THE WITNESS:  If you were providing the best

2    care available in the system, I do not believe you're

3    being deliberately indifferent.

4    BY MR. GALVAN:

5          Q.   So in your opinion in assessing

6    constitutionality, if you're providing the best care

7    available in your system, then your actions are

8    constitutional?

9          A.   No.  Not -- not in and of itself.  In a

10   particular case where you have a few high-risk patients

11   who are both extremely violent and in an unstructured

12   setting of a hospital could kill other patients or staff

13   but they are psychotic, and you have a correctional

14   setting where security can be provided and mental health

15   care in a mental health crisis bed can be provided, that

16   those subset of cases, trying to figure out the best

17   place and the safest place for both staff and the

18   patient and those who treat them and having

19   disagreements in those isolated cases about that, does

20   mean you're unconstitutional.

21         Q.   So in those cases it's okay for custody to

22   overrule the clinicians?  Remember, in my hypothetical,

23   all the clinicians agree this patient needs to be in the

24   inpatient level; crisis bed is not enough.

25              But because someone's made a conscious

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                            March 8, 2013

1    decision not to have sufficient custody protections in
2    the hospital, they won't take them.  All the clinicians
3    agree, but they're overruled.
4            That's okay constitutionally?
5            MR. McKINNEY:  Objection.  One, it's a
6    different question.  Vague and ambiguous.  Incomplete
7    hypothetical.
8            THE WITNESS:  The important aspect would be
9    are they getting care in the setting they're in that
10   meets their serious medical needs or are they not
11   receiving the care.
12   BY MR. GALVAN:
13       Q.   Does not my hypothetical imply that they're
14   not receiving the care that all clinicians say that they
15   need?
16       A.   Not necessarily.  Because the mental health
17   crisis bed has a recommendation for a 10-day limit.  And
18   if you're not resolved by then, then you -- one of the
19   triggers for transfer to DSH is that your symptoms
20   haven't been addressed or resolved in that 10-day period
21   of time.
22           However, you can still provide the appropriate
23   medications, the observations, suicide watch if
24   necessary, and you're not being deliberately indifferent
25   to that individual if the system interlapping between

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                            March 8, 2013

1    the two have decided that safety plus treatment of
2    mental illness is best handled in a correctional
3    environment.
4         Q.   Did you find any evidence that clinicians are
5    referring to inpatient care because -- only because
6    they've hit a 10-day limit in the crisis bed?
7              MR. McKINNEY:  Objection.  Vague and
8    ambiguous.
9              THE WITNESS:  Not only because they hit a
10   10-day limit, no.
11             MR. GALVAN:  Mark Exhibit 16, please.
12             MR. McKINNEY:  Can we take a quick break at
13   some point?
14             (Plaintiffs' Exhibit 16 was marked for
15              identification.)
16   BY MR. GALVAN:
17        Q.   Doctor, you won't have seen this before.  I
18   you will represent to you that it is a document that my
19   office receives from CDCR on a monthly basis.  It lists
20   the names and status of persons referred to this state
21   hospital system for inpatient care.
22             Now if you turn to -- if you turn to page 18,
23   page 18 has the gray bar and then it starts at Row 882
24   and down to 899.  And then you see in the -- there's a
25   column called "Date of Admission" toward the middle of

Charles Scott, M.D.                                    March 8, 2013

1      Q.   Do you remember what your recommendations

2   were?

3      A.   Yes.

4      Q.   What were they?

5      A.   I remember that if the electronic record

6   system could be streamlined, that might -- or

7   information more easily accessed, that might help do

8   some of the audits.

9           I recommended that the MAPIP audits -- or

10  commented is better than the word "recommended" -- that

11  the MAPIP audits were monitoring psychiatric medication

12  in a very detailed manner, and that the amount of

13  medication monitoring that was currently being conducted

14  did not represent deliberate indifference for

15  psychiatric treatment.

16     Q.   Any other recommendations?

17     A.   No.  Those are the ones I recall.

18     Q.   Was there a point in the project where you

19  were sharing responsibility for reviewing suicide

20  prevention with Dr. Dvoskin?

21     A.   To the extent that I was looking at the mental

22  health crisis bed and suicide watches, but I wasn't

23  working on the suicide prevention piece.

24     Q.   Did you learn at some point that the CDCR had

25  commissioned a report from Lindsay Hayes on suicide

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1    prevention?

2         A.   No, I don't -- I don't recall that.

3         Q.   Okay.  Even after your work was done, did you

4    learn about that?

5         A.   From Lindsay Hayes?

6         Q.   Yes.

7         A.   No, I'm not aware of -- I don't recall it.

8         Q.   Okay.  So you've never seen his report or

9    heard that there was a report?

10        A.   I read Dr. Dvoskin's report.  And if he

11   referenced it in that, then I would have had a reference

12   from reading his reports.

13        Q.   If I told you that he -- one of his

14   recommendations was that CDCR take steps to do two

15   things in conjunction with regard to the crisis beds,

16   one, lower the threshold for putting people on suicide

17   precautions, both watch and the other level, and in

18   order to deal with the increase, then, in people that

19   you need to watch, use the nonlicensed outpatient

20   housing units more for suicide precautions?

21        A.   Last bit again.

22        Q.   Use the nonlicensed outpatient housing more

23   and also -- I'll back up before I ask the question and

24   give you more background representation.

25             The way the system operates now, the guideline

```
 1              CERTIFICATE OF REPORTER

 2

 3        I, MEGAN F. ALVAREZ, a Certified Shorthand

 4  Reporter, hereby certify that the witness in the

 5  foregoing deposition was by me duly sworn to tell the

 6  truth, the whole truth and nothing but the truth in the

 7  within-entitled cause;

 8            That said deposition was taken down in

 9  shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13            I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                    DATED:  March 11, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25
```

# Exhibit 90



Transcript of the Testimony of:

# Diana Toche

Coleman v. Brown

February 22, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,               )
                                     )
                    Plaintiffs,      )
                                     )CASE NO.:
          vs.                        ) S 90-0520 LKK-JFM
                                     )
EDMUND G. BROWN, JR., ET AL.,        )
                                     )
                    Defendants.      )
_____)



DEPOSITION OF

DIANA TOCHE

FRIDAY, FEBRUARY 22, 2013,  9:00 A.M.

SAN FRANCISCO, CALIFORNIA






REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Diana Toche                                                February 22, 2013

```
 1                  UNITED STATES DISTRICT COURT

 2                EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                    Plaintiffs,      )
                                       )CASE NO.:
 6         vs.                         ) S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                    Defendants.      )
     _____)

 9

10

11

12

13

14          The Deposition of DIANA TOCHE, taken on behalf

15   of the Plaintiffs, before Megan F. Alvarez, Certified

16   Shorthand Reporter No. 12470, Registered Professional

17   Reporter, for the State of California, commencing at

18   9:00 a.m., Friday, February 22, 2013, at the offices of

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  KRISTA STONE-MANISTA, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4            315 MONTGOMERY STREET, TENTH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 5            415.433.6850
              415.433.7104 FAX
 6            KSTONE-MANISTA@RBGG.COM

 7
     FOR DEFENDANTS:
 8
              BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
10            455 GOLDEN GATE AVE., SUITE 11000
              SAN FRANCISCO, CALIFORNIA  94102-7004
11            415.703.3035
              415.703.5843 FAX
12            PATRICK.MCKINNEY@DOJ.CA.GOV

13            BY:  KATHERINE K. TEBROCK, ESQ.
              DEPARTMENT OF CORRECTIONS AND REHABILITATION
14            OFFICE OF LEGAL AFFAIRS
              1515 S STREET, SUITE 314 SOUTH
15            SACRAMENTO, CALIFORNIA 95811
              916.323.2929
16            916.327.5306 FAX
              KATHERINE.TEBROCK@CDCR.CA.GOV

17
     ALSO PRESENT:
18
              MARC SHINN-KRANTZ, PARALEGAL
19

20

21

22

23

24

25
```

Diana Toche                                                    February 22, 2013

```
 1                     I N D E X
 2               INDEX OF EXAMINATIONS
 3
 4    Examination by Ms. Stone-Manista  ..................7
 5
 6                    --o0o--
 7
 8          EXHIBITS MARKED FOR IDENTIFICATION
 9    No.              Description                 Page
10    Exhibit 1    Organizational chart dated .........11
                   February 2013, California
11                 Department of Corrections and
                   Rehabilitation
12
      Exhibit 2    Letter dated 4/17/12 from Brigid ....17
13                 Hanson to Cliff Tillman, Bates
                   DEXT103779 through 103787
14
      Exhibit 3    Declaration of Diana Toche  ........20
15
      Exhibit 4    Mental Health Services Audit .......52
16                 Tool, Bates DEXP104219 through
                   104254
17
      Exhibit 5    Report titled "Clinical .............60
18                 Evaluation of California's
                   Prison Mental Services Delivery
19                 System"
20    Exhibit 6    Color photograph  ..................83
21    Exhibit 7    Color photograph  ..................87
22    Exhibit 8    Color photograph  ..................89
23    Exhibit 9    Pilot Program for Alternative ......94
                   Treatment Option Modules
24
      Exhibit 10   E-mail string, topmost dated .......113
25                 1/8/13, RE: Suicide prevention
```

Diana Toche                                            February 22, 2013

```
 1   Exhibit 11     Letter dated 7/18/12 from .........123
                    Benjamin Rice to Jane Kahn
 2
     Exhibit 12     Plaintiff Ralph Coleman's Third ....143
 3                  Request for Production of
                    Documents to Defendants Brown,
 4                  et al.

 5   Exhibit 13     Memo dated 7/31/12, Mental ........148
                    Health Program Position
 6                  Authority

 7   Exhibit 14     Executive Summary, Mental Health ...168
                    Program Hiring Progress and
 8                  Vacancy Reports, November 2012
                    Reporting Period
 9
     Exhibit 15     Executive Summary, Mental Health ...177
10                  Program Hiring Progress and
                    Vacancy Reports, December 2011
11                  Reporting Period

12   Exhibit 16     Correctional Health Care ...........189
                    Services Mental Health
13                  Institution Vacancies, Summary
                    by Institution by Classification
14                  as of December 2012

15   Exhibit 17     Notice of deposition  .............232

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              WITNESS INSTRUCTED NOT TO ANSWER

 2                                         Page   Line
                                           No.    No.
 3   Q.   When you had those conference calls ....55     5

 4        or meetings where they told you

 5        what they had found, how did they

 6        do that?

 7

 8   Q.   Will you tell me now what ............233     10

 9        recommendations Ms. Moore made in

10        those earlier meetings?

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Diana Toche                                                    February 22, 2013

```
 1        Q.    What about Dr. Canning?  Do you remember
 2   anything specifically that you discussed regarding the
 3   report?
 4        A.    No.
 5        Q.    And Ms. Eargle or Dr. Eargle?
 6        A.    Dr. Eargle.
 7        Q.    Did do you remember anything you discussed?
 8        A.    No.
 9        Q.    Okay.  While we're on the subject of this
10   special master and his reports, turn to paragraph 9 of
11   your declaration.  You write there, on line 22, of this
12   page:  "The continued Coleman monitoring has
13   increasingly diverted attention and resources away from
14   the central goal of providing and maintaining the
15   constitutional level of mental health care."
16             What do you mean when you say "diverted
17   attention"?
18        A.    What I mean is that the load that's created by
19   the monitoring rounds and doing the monitoring and
20   providing the reports and the like is very -- is very
21   heavy.
22        Q.    Okay.
23        A.    That's a large lift for the institutions and
24   for the headquarters.  And so -- and in so that we have
25   to do that, it diverts attention from providing direct
```

Page 35

Diana Toche                                                    February 22, 2013

```
 1   patient care.
 2        Q.   So one example of that that you provide here
 3   is that there are, quote, onerous reporting obligations.
 4        A.   Whose quoted onerous?  Me?
 5        Q.   On line 34.
 6        A.   Okay.
 7        Q.   And also line 27.
 8        A.   Okay.
 9        Q.   What do you mean by "onerous reporting
10   obligations"?
11        A.   That it's -- you know, they ask for a lot of
12   information that is a heavy lift and a lot of extra
13   stuff --
14        Q.   What specifically --
15        A.   -- to gather.
16        Q.   I'm sorry?
17        A.   It's a lot of stuff to gather.
18        Q.   What specifically do they ask for?
19        A.   There's a whole request for -- for the
20   monitoring part.
21        Q.   And why --
22        A.   So I don't know specifically.
23        Q.   Do you know what in that request is new for
24   the special master?  What is --
25        A.   I don't know.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                        February 22, 2013

1        Q.    Okay.   If the special master weren't there,

2   you weren't requesting these things, do you know what

3   information the institutions would cease -- would stop

4   producing?

5        A.    I don't know.

6        Q.    Okay.   In the same paragraph, also line 25,

7   you write:  "The clinical staff expended considerable

8   resources preparing for prison visits."

9             Do you know how much time is spent preparing

10  for those visits?

11       A.    Specifically?

12       Q.    What's your understanding?

13       A.    I understand it's a tremendous amount of time.

14       Q.    What do you mean by "tremendous"?

15       A.    A lot.

16       Q.    Can you give me a ballpark?

17       A.    No.

18       Q.    Does "a lot" to you mean 10 hours?

19       A.    No.

20       Q.    Do you believe that it's more than 10 hours?

21       A.    Yes.

22       Q.    Do you believe that it's more than 20 hours?

23            MR. MCKINNEY:  I'm going to object to that

24  question as vague and ambiguous.  I'm not sure if we're

25  talking about one institution or systemwide.  I just

Diana Toche                                        February 22, 2013

```
 1    want to be clear on that.
 2              You can answer.
 3              THE WITNESS:  I don't know the hours.  So you
 4    can keep naming hours, and I'll keep saying "I don't
 5    know."  To be honest, I don't know the hours.
 6    BY MS. STONE-MANISTA:
 7         Q.   But you know that it's a lot?
 8         A.   Yeah.
 9         Q.   Do you know what exactly is entailed in
10    preparing for those visits?  What does the institution
11    actually do?
12         A.   No.
13         Q.   Do you know what information the special
14    master requests that isn't prepared in the ordinary
15    course of business for those visits?
16         A.   No.
17         Q.   Do you know what information he requests that
18    can't be pulled out of existing databases?
19         A.   No.
20         Q.   Have you attended any of the special master's
21    monitoring tours?
22         A.   I believe so.
23         Q.   Do you recall what tour you might have
24    attended?
25         A.   Mule Creek.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                              February 22, 2013

```
 1        Q.   Did you, at any time after this e-mail, reach
 2   out to Mr. Hayes about his report?
 3        A.   No.
 4        Q.   So that e-mail was written on August 21st --
 5        A.   Uh-huh.
 6        Q.   -- and you were cc'd.  And the next e-mail
 7   thread from September 4th was Mr. Hayes' response to
 8   Dr. Belavich, again cc'ing you.
 9        A.   Uh-huh.
10        Q.   And then the next e-mail in the thread is from
11   January 8th, 2013, also from Mr. Hayes to Dr. Belavich
12   cc'ing you.
13             Do you recall receiving this e-mail in
14   January?
15        A.   Yes, I do.
16        Q.   When you received this e-mail, did you discuss
17   it with Dr. Belavich?
18        A.   I -- you know, I don't specifically remember
19   if I discussed it with him, but I'm sure that we
20   discussed it.  I mean, I -- but I don't remember
21   positively, but I'm sure we did.
22        Q.   Okay.  Between August 21st, at which time --
23   Dr. Belavich wrote:  "Please give us a few days to make
24   further contacts within CDCR so that we can contact you
25   and formulate ideas about potential consulting
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                            February 22, 2013

1    opportunities for you with CDCR."

2              Between August 21st and January 8th of this

3    year, did you and Dr. Belavich -- did you reach out to

4    anyone within CDCR about further work from Mr. Hayes?

5        A.   I believe I discussed this with counsel, legal

6    counsel.

7        Q.   Do you recall with whom you discussed it

8    specifically?

9        A.   I think I talked about it with Debbie Vorous.

10       Q.   Beyond speaking with Ms. Vorous --

11       A.   But I'm not positive.  It could have been

12   Tom Gilevich as well since he was on the string.  So I'm

13   not sure.

14       Q.   So beyond speaking with counsel, from the

15   attorney general --

16       A.   Right.

17       Q.   -- did you reach out to anyone else within the

18   department about potential consulting opportunities for

19   Mr. Hayes?

20       A.   I don't remember.

21       Q.   Okay.  To your knowledge, did Dr. Belavich --

22       A.   I don't know.

23       Q.   -- reach out to anyone?

24            You don't know?

25       A.   I don't know.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1    broadly, but I may get some of the finer points not

 2    exactly right.

 3           And so I will say that we've always, in the

 4    mental health program, been focused on hiring what we

 5    call the big three:  The psychiatrist, the clinical

 6    social workers and psychologists.

 7        Q.   Right.

 8        A.   And when we were rolling out all the positions

 9    that were approved for the mental health staffing, along

10    with what was going to be happening with the realignment

11    and the shift of the inmate patients, that there --

12    begins with the voluntary transfer process.

13           So if there's a -- and they noticed based on

14    whatever.  I can't remember the specifics.  And so --

15    and so people can voluntarily transfer anywhere in the

16    state.  Statewide.

17        Q.   Okay.

18        A.   Once those people land, then options happen.

19    And then people are either given the right -- either

20    you're high enough on the seniority list and you

21    maintain your position, or there may be some bumping, or

22    you may go into a vacancy or something like that, but

23    that only happens within the county.

24        Q.   Okay.

25        A.   So if there are, let's say, five office

Diana Toche                                          February 22, 2013

1    technicians in one county and there's only four spaces

2    for people to be at, then one person may eventually be

3    laid off.

4           Q.   Okay.

5           A.   Okay.  So during this time of the shuffling of

6    people, there might be small windows to fill, but you

7    have to -- you can't say you can voluntarily transfer to

8    these vacancies and then, in the meantime, been filling

9    those vacancies.

10          So when you asked "Is there a freeze?" -- I

11   mean, it's dependent on the point in time that you're

12   talking about and the classification and the county, and

13   that sort of thing.  Okay?  So it's a little bit more

14   complicated than yes or no.

15          Q.   I'm aware it's very complicated.

16          A.   I hope I explained that well.  But, you know,

17   we're not really ever supposed to talk about it, because

18   there's so many nuances with different bargaining units.

19   So I'm hoping that, broadly, I explained it well enough.

20          Q.   You mentioned that there might, in some cases,

21   be layoffs.

22          Are you aware of any layoffs that have

23   happened yet in 2013, just in the last two months?

24          A.   I believe we're close to something happening.

25          Q.   So to your knowledge, there may be layoffs

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                              February 22, 2013

```
 1        A.   Why you tell me what you think it is, and then
 2   I'll correct you.
 3        Q.   I've been trying and trying to figure out --
 4   so when I actually read those words "freeze exemption
 5   request process," that implies to me that there is a
 6   freeze from which an exemption must be requested.
 7             Is that -- am I wrong in that understanding?
 8        A.   Well, there's a process, and I think that
 9   might be the name; and there may or may not be a freeze
10   depending on where we are in the layoff process and the
11   clarification.
12        Q.   So where we are in space and time.
13        A.   Yeah.  And so what I'm saying is that if we
14   had to come up with a new name for the form and a new
15   form for all the different points in time, it would be
16   very confusing for the field.  So you stick the same
17   name and the same form.
18        Q.   Regardless of --
19        A.   Regardless of.
20        Q.   Okay.  That's interesting.  This is something
21   I've been trying to understand as well as everybody
22   else.
23             Are there particular -- we talked about it
24   kind of depends on where you are --
25        A.   Right.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                            February 22, 2013

1  rough idea, across the system, of how many mental health

2  positions are currently filled by the registry?

3       A.   Personally, breakdown, I don't know.

4       Q.   Okay.  Do you -- are you aware of any

5  downsides to using people off the registry?

6       A.   Currently, right now, no.

7       Q.   Does use of the registry ever cause problems

8  in -- I imagine you have to train people.  Is that ever

9  a problem for an institution?

10      A.   That would be more in Dr. Belavich's realm.

11      Q.   As far as the actual use of registry?

12      A.   Management and use, yes.

13      Q.   Okay.  In the data we were looking at a little

14  bit ago, it mentions adjustments for new hires.

15           Can you explain that to me?

16      A.   It's my understanding the SCO is -- there's a

17  certain cutoff date for data, and then maybe people will

18  be hired after that and they wouldn't be captured in the

19  SCO data.

20      Q.   Okay.  That's interesting.

21           Okay.  So that sort of -- you mentioned

22  earlier there's kind of a pipe line.

23      A.   Kind of like a flux.

24      Q.   Okay.  I see that.  That makes sense.

25           And adjustments for long-term sick leave, I'm

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                    February 22, 2013

1  have they raised up something to my level to say

2  something's wrong?

3       Q.   Has a problem come to your attention?

4       A.   They have not raised something up to my level.

5       Q.   Okay.

6       A.   They may be discussing something with Tim or

7  regional.  I don't know.  But nothing has been raised up

8  to my level.

9       Q.   You haven't had further discussions with

10  Dr. Belavich about CMC specifically about staffing

11  shortages?

12       A.   About staffing at CMC?  I think that we always

13  have discussions about CMC, because we're also -- have

14  the new 50 beds being developed there.  So there's

15  discussions about staffing.

16       Q.   I see.

17       A.   So there's additional factors.

18       Q.   Okay.  What about department of state

19  hospital's facilities?  Do you get data about vacancies

20  at DSH facilities?

21       A.   Staffing vacancies, no.

22       Q.   You never review data about those facilities?

23       A.   No.

24       Q.   So you couldn't speak to, for instance,

25  staffing at SVPP or --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                          February 22, 2013

1        A.    43.75.

2        Q.    We talked a little bit earlier about

3   30 percent and the system could be adequate at

4   30 percent.

5             Do you think that SCC is running an adequate

6   program at 43.75 percent vacancies?

7             MR. MCKINNEY:  Objection.  Compound.  Calls

8   for speculation.  Argumentative.

9             THE WITNESS:  I would need -- I would actually

10  need to talk to Dr. Belavich to see what he has to say

11  about the care being provided here per the vacancy rate,

12  who's working here.

13  BY MS. STONE-MANISTA:

14       Q.    So you don't -- as we sit here today, you

15  don't have a personal opinion?

16       A.    Without all the facts -- because I -- I -- Tim

17  and I have discussed SCC, and so there's -- I know that

18  there's certain things about it.  And so I just -- you

19  know, I would prefer to talk to Tim before I answer that

20  question.

21       Q.    What have you and Dr. Belavich discussed about

22  SCC?

23       A.    About the personnel there and the -- and the

24  mental health caseloads and the like.  So I just would

25  be comfortable in discussing that with him more.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                           February 22, 2013

```
 1            MR. MCKINNEY:  Objection.  Vague and
 2    ambiguous.  Calls for speculation.  Calls for legal
 3    conclusion.
 4            THE WITNESS:  So I recently visited Pelican
 5    Bay -- well, not recently -- last year -- so it's been a
 6    new year -- and spoke with the CEO and the chief of
 7    mental health, and they showed me the -- their -- the
 8    program of how they're following it and how they're
 9    delivering care and how they're assessing themselves.
10    And Dr. Dvoskin was there as well.  And it was, you
11    know, of my opinion and of Dr. Dvoskin's opinion, while
12    we were there, that the care being delivered there was
13    adequate.
14    BY MS. STONE-MANISTA:
15        Q.   Was Dr. Dvoskin the only expert to come on
16    that tour?  Do you recall?
17        A.   Steve Martin was there as well.
18        Q.   So with respect to Pelican Bay, because you'd
19    recently visited or you visited last fall with
20    Dr. Dvoskin and Steve Martin, you're comfortable saying
21    that care there is adequate?
22        A.   Yes, because I went there myself.
23        Q.   So we've been talking through things.  It
24    sounds like there's a lot more information you would
25    like to have in front of you and a lot of conversations
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                                    February 22, 2013

 1    with Dr. Belavich.

 2              Is there anyone else on whom you rely in

 3    making these kinds of assessments about care at

 4    particular institutions other than Dr. Belavich?

 5         A.   Well, as I alluded to, is that we have -- we

 6    have the structure in the system and the processes.  And

 7    so for me, as the director of health care, I rely on

 8    Dr. Belavich, who's the director of the mental health

 9    program.  All right?  He has his direct reports that

10    report to him who he relies on.

11         Q.   I understand.

12         A.   And so in meetings I rely -- if we're in a

13    meeting about a specific subject matter, there may be a

14    SME that will also inform Dr. Belavich and myself for

15    further education or knowledge base, but it's not like

16    I'm going to go and contact someone at an institution, a

17    chief of mental health at an institution and circumvent

18    all these other people.  Because they --

19         Q.   Is that something you've ever done, contacted

20    a chief of mental health at an institution?

21         A.   Personally, I have -- I have, but then you

22    have to circle around and keep everybody in the loop.

23              So even before I was the director of health

24    care over dental health and mental, I was just the

25    director over the dental program.  Same structure.  You

Diana Toche                                      February 22, 2013

1   have the -- you -- we had the regional structure and the

2   regional structure reported to my associate director in

3   that circumstance.  So relatively similar structure.

4          It's not like I went down and talked to

5   supervising dentists every day.  Okay?  I did do it, and

6   then people got mad because then they're out of the

7   loop.  Everybody needs to know what's going on, what's

8   important.

9          So if it's important enough to me to want to

10  reach down, then obviously I think that someone like Tim

11  would want to know, the regional would want to know.

12     Q.   Okay.  So when you wrote in your declaration,

13  quote, adequate numbers of mental health professionals

14  and administrators proactively diagnosis and treat

15  inmates' serious mental health needs, what was the basis

16  for that statement?

17     A.   For that statement.

18          So the basis for that statement is that

19  throughout 2012 I visited a number of institutions with

20  the Coleman experts, see the sustainable process.  I

21  visited numerous expert -- numerous institutions with

22  the DAG experts:  Dr. Dvoskin and Dr. Scott, Jackie

23  Moore.  And also receiving reports from the regionals as

24  they report out on the sustainable process and the care

25  being delivered.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                           February 22, 2013

```
 1            And so, you know, personal observation,
 2    reports, the wait list is at zero.  You know, the care
 3    that I observed personally out at these institutions,
 4    from the staff.  I mean, they care.  You got people
 5    staying there as long as it takes.  They're -- this is a
 6    dedicated staff dedicated to providing care.
 7            So if we're there doing some sort of tour,
 8    they're there staying late or coming in early so that
 9    they can see the inmate patients.
10       Q.   So your visits to the institutions?
11       A.   My visits to institution, conversations with
12    the Coleman experts.
13       Q.   Okay.
14       A.   Conversations with the deputy attorney general
15    experts.  Conversations with the staff at the
16    institutions.
17       Q.   So just a second ago, before I forget, when
18    you said DAG experts, you meant deputy attorney general?
19       A.   Yes.
20       Q.   Okay.  We have acronyms for everything.
21            MR. MCKINNEY:  One acronym you didn't know.
22    BY MS. STONE-MANISTA:
23       Q.   Okay.
24       A.   I'm trying to distinguish between the experts.
25    It's hard, though.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8          That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                    DATED:  March 5, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25
```