KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF ROBERT FISCHER, Ph.D., IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Robert Fischer, Ph.D., declare as follows:

1. I am the Acting Chief Psychologist at California State Prison, Corcoran (Corcoran). I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

1

2. I have reviewed the pertinent portions of the declarations by plaintiff's experts Craig Haney and Edward Kaufman and respond to those declarations below. If called as a witness in this matter, I could and would testify to the matters set forth herein.

3. I have worked for the California Department of Corrections and Rehabilitations (CDCR) since 2003, initially as a contract psychologist. I was hired as a senior psychologist in 2007 and in June 2012 became the Acting Chief Psychologist. Prior to working at CDCR I received my licensed in New York in 1975 as a psychologist. I worked as a management psychologist doing psychological assessment work, training, and management.

<u>Corcoran's Mental Health Staff Meets the Needs of its Inmate Patients</u>

4. Corcoran provides constitutionally adequate mental health care to its patients. Corcoran is responsible for providing health care for over 1300 mentally ill inmates housed in various levels of care at the institutions. Although Corcoran has vacancies for certain mental health disciplines, Corcoran remains staffed to adequately deal with the needs of the mentally ill population housed within the institution. When gaps arise in treatment, Corcoran staff works the additional hours necessary to make sure all treatment needs are met.

5. Corcoran continually makes an effort to recruit and fill all vacancies. Corcoran routinely files requests for freeze exemptions for all mental health disciplines. Additionally, has recently interviewed and hired for two of three open senior psychologist positions. We have recently interviewed five social workers for openings. We canvas the registry for clinicians and regularly utilize registry workers to augment Corcoran's clinical staff. We also authorize overtime for some therapists to ensure that Corcoran functions at an adequate level.

6. In paragraph 190 of Mr. Haney's declaration, he states that 8-10 psychologists are currently on extended sick leave. This is incorrect. There are currently 8-10 *clinicians in general*, such as psychologists and clinical social workers, on extended sick leave. In that same paragraph, Mr. Haney notes that I indicated that psychologist caseloads went from 100 cases to 160 cases. However, this statistic applies only to inmates in the Correctional Clinical Case Management

System (CCCMS) mainline level of care, not to Corcoran as a whole. Nevertheless, clinicians on that yard are able to provide the necessary mental health care to the patients on their caseload.

### Mental Health Treatment Space Rebuttal Points

7. Corcoran provides mental health treatment space for all levels of care in various locations around the institution. Group space and individual treatment space are located in or near the building where a mental health patient is housed.

8. Mr. Haney and Mr. Kaufman contend that gymnasiums are being used to treat mentally ill inmates. (See Haney at paragraph 174, Kaufman at paragraph 47.) While it is true that the gymnasium is set up for treatment that does not mean inadequate treatment is being provided. The gymnasium is dedicated entirely to mental health treatment space for the EOP Administrative Segregation Unit Program. Inside the building are offices for mental health staff, confidential cubicles for one on one interviews between inmate and patient, and confidential enclosed group treatment rooms within the gymnasium. Records are easily accessed from within the building. The building is quiet and clean and is not used for any non-mental health treatment purpose.

9. In addition to the treatment space offered in the gymnasium for EOP Administrative Segregation Unit Program, the EOP Mainline building currently has six dedicated private treatment rooms for treating the EOP patients on that part of the yard. Additionally, a new EOP treatment building, to be used primarily for Administrative Segregation Unit inmates, is under construction and is scheduled to open on May 1, 2013. By June 2013 treatment will be taking place within the building. This will help free up space in the existing gymnasium to offer recreational activities for the inmates on that yard.

10. Plaintiff's experts also complain about a lack of confidentiality for treatment space. (See Kaufman at paragraph 47 and Haney at paragraph 201.) They complain that interactions with inmates occur at cell-front 46% of the time in the Administrative Segregation Unit's Enhanced Outpatient Program. However, inmates are offered an opportunity leave their cell for a more confidential one on one interview. In my experience, inmate often decline opportunities for

3

Decl. Robert Fischer, Ph.D. Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

confidential meetings. When that occurs, Corcoran mental health staff is required to go to the inmate's cell to visit them there and encourage them to come out for a confidential visit. If the inmate declines, clinicians meet with the inmate at his cell-front for their session. Inmates receive appropriate interaction with a case manager psychologist or social worker to meet their basic mental health needs.

### ATOM Chair

11. The Alternative Treatment Option Module (ATOM) chair pilot program began in early 2012. The ATOM Chair provides an alternative to the Therapeutic Treatment Modules (TTM) normally used in group settings for higher level offenders. The suggestion to find alternatives to the TTM were was encouraged by the *Coleman* plaintiffs and a chair used in New York similar to the ATOM chair was suggested. During the pilot program, data is collected routinely from inmates, correctional staff, and clinicians. Although the program is still ongoing, data indicates that two thirds of inmates prefer the TTM to the ATOM Chair. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-A for ATOM chair survey result roundup from October 2012.]

12. The declarations of Mr. Haney and Mr. Kaufman provide conflicting information about the preference of ATOM chairs at Corcoran. Mr. Haney, in paragraph 179 of his declaration, states that inmates prefer to use the ATOM chair based on his discussions with inmates at Corcoran during his tour. Mr. Haney described his interaction with Prisoner Z, at paragraph 179, who claims to prefer ATOM chairs over TTMs because he says TTMs make him feel like "an animal."

13. However, Mr. Kaufman, in his declaration at paragraph 62, states that patients described the chairs as "painful and restrictive." Mr. Kaufman describes Prisoner I in paragraph 62 who states he prefers to avoid groups that have ATOM chairs. Prisoner I, between his arrival at Corcoran on January 30, 2013 and today, has only attended one group offered to him. He is offered recreational therapy, relaxation training, and coping skills. He has also stopped attending

4

his one-on-ones with his case manager for some time due to his belief he was being lied to. This is consistent with his Borderline Personality Disorder and had nothing to do with ATOM chairs.

14. Plaintiff's expert's brief survey tells only a part of the story. Early surveys indicate that most inmates prefer to use the TTMs due to the ability to move around during group sessions. Additionally, inmates prefer the TTMs due to the safety and security provided against possible assault from other inmates in the group setting. Correctional Officers prefer the TTMs for safety and security reasons as well. Early data has indicated that groups with TTMs tend to last longer than groups with ATOM chairs as the inmates are more willing remain in the session.

<u>Group Therapy</u>

15. Group therapy is offered to inmates with mental illness at Corcoran. The amount of groups offered per week depends on the inmate's level of care and personal need. Inmates receive an adequate amount of group treatment to meet their basic mental health needs.

16. Although the 10 hour guideline is not always met for all inmates, patients receive a level of care required to treat their mental illnesses. Corcoran has made great strides in expanding its offering of group hours. For instance, in the Enhanced Outpatient Program (EOP) mainline, groups are being offered around 14-16 hours per week. In the last week, EOP mainline and EOP Hub offered 14 hours of group therapy sessions for inmates. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-B for group EOP group schedule for week of March 4, 2013.]

17. Mr. Haney, in paragraph 202 of his declaration, indicates that the substance of the groups offered at Corcoran are lacking. Mr. Kaufman also discusses groups in his declaration at paragraph 150. Mr. Haney and Mr. Kaufman observed a group where inmates were watching a movie. The group observed by Mr. Haney was being run by a recreational therapist and does not represent the sum total of the groups offered at Corcoran. Corcoran offers groups on anger management, pain management, medication education, current events, and positive thinking. Additionally, movies offer positive therapeutic value to inmates when they are followed by discussion, as they are at Corcoran, about themes, emotional reactions, and the quality of the decisions made by the characters in the film. The groups offered at Corcoran are currently

undergoing a review to create a more structured and organized group offering to ensure consistency in therapeutic offerings to inmates.

18. Prisoner EE, a Segregated Housing Unit (SHU) inmate cited in Mr. Haney's declaration at paragraph 212, indicates that he has not received groups for five to six years. Currently, groups are being offered to all SHU inmates at least once per month on a weekly rotation among the four SHU housing units.

19. Mr. Haney, in paragraph 185 of his declaration, also alleges that the SHU treatment area is a dirty concrete room that used to be a property or supply room. The room that Mr. Haney describes is a large supply room that has been converted to a treatment room which now houses TTMs for group space. The room is clean and is used regularly to provide treatment. Although the old sign may still be on the door, the room is now used solely for mental health treatment.

eUHR Access

20. Over the past two years, CDCR has modernized its record keeping by creating an electronic unit health record (eUHR). This advancement allows staff to access any inmate's mental health record from any computer terminal.

21. Mr. Kaufman complains in his declaration, at paragraph 82, that he found the eUHR illegible for the records he reviewed. This vague generalization is simply not true. While some eUHR records are scans of handwritten notes, other portions are typed progress notes done by primary clinicians and psychiatrists. Staff offers little complaints about the ability to read eUHR documents. The system allows clinicians to competently access information and treat patients a higher standard of care.

22. In paragraph 83 of Mr. Kaufman's declaration, he complains that clinicians bring their own keyboards to access computer terminals in treatment rooms to view the eUHR. Such a complaint is meaningless in light of the fact that clinicians at Corcoran do access the medical records prior to meeting with a patient and complete notes based on their clinical contact. This is not a common practice at Corcoran and is likely a onetime occurrence at an individual computer

6

Decl. Robert Fischer, Ph.D. Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

terminal.  Some clinicians are provided with laptops by CDCR's IT department to bring with them when they go to meet with their patients in housing units or remote treatment spaces.

<u>Mental Health Crisis Beds</u>

23. Mr. Kaufman complains, in paragraph 84 of his declaration, that the Mental Health Crisis Beds (MHCB) are harsh places due to "stark walls, heavy doors" and the placement of holding cells on the unit.  Almost all units in a prison have temporary holding cells.  Likewise, all prison cells have heavy doors and walls.  MHCB cells are generally roomier and brighter than regular housing cells.  Each cell has its own bed installed.

24. Mr. Kaufman also claims that inmates sleep on the floor of crisis bed cells in paragraph 84 of his declaration.  Curiously, he cites exhibits showing photos of empty crisis bed cells at California Institute for Men with beds and rolled up bedding.  When inmates sleep on the floor of their cell it is their choice.  They are provided with a bed and blankets nonetheless.  Corcoran has beds installed in all its MHCB cells.

25. Likewise, Mr. Kaufman alleges in paragraph 84 of his declaration, that inmates often only wore suicide resistant smocks.  While it is true that suicidal inmates will often be issued suicide smocks upon admission to prevent them from killing themselves with their own clothes, inmate clothing will be reviewed at treatment team meetings held inside the MHCB.  When an inmate stabilizes and is cleared for discharge the inmate will be offered his normal issue clothing back.

26. Mr. Kaufman, in paragraph 92 of his declaration, also alleges that psychiatrists in MHCBs receive no training on suicide risk evaluations.  This is simply not true.  All psychiatrists receive training on evaluating suicide risks of patients.  This training is offered regularly and is mandatory.  Training was most recently offered on March 18 and 19, 2013.  Prior to that, training was offered in April 2012.

27. Mr. Kaufman, in paragraph 93 of his declaration, states that the proctor mentoring program has not been rolled out in the MHCB yet.  At the time of his visit, the mentoring program had been rolled out in the EOP programs and it is being rolled out in the MHCB soon.

7

Rebuttal to Allegations of Isolation in the ASU and SHU

28. Many of the inmates housed in the Administrative Segregation Unit (ASU) have mental illness. Some of those inmates are there due to lack of bed space outside of the unit where, if available, they would be sent to. For all inmates housed within the ASU, the mental health staff continues to provide consistent mental health care for those inmates with mental illnesses. Despite their more restrictive setting, inmates in an ASU receive treatment that meets their basic mental health needs.

29. In paragraph 127 of Mr. Kaufman's declaration, he describes unnamed SHU patients claiming they receive no groups. However, at the current time, CCCMS patients in the SHU are offered at least one group per month in the building for recreational therapy.

30. Mr. Haney cites to Prisoner DD in paragraphs 210 and 211 of his declaration. Prisoner DD claims he has no activities for programming and rarely sees his case manager. However according to records, Prisoner DD has had 104 contacts with a mental health provider since July 2012, including contacts with psychiatrist, recreation therapists, and a primary case manager. He has refused two contacts since then, including a March 11, 2013 appointment his psychiatrist. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-C for Prisoner DD's appointment history.] Prisoner DD is receiving a treatment plan that meets his basic mental health needs.

31. Mr. Kaufman, in paragraph 137 of his declaration, describes a phenomenon of patients "cycl[ing] in and out of the SHU." This occurs when a CCCMS inmate decompensates and is placed in an EOP program outside of the SHU. This occurrence is rare. Inmates in the SHU have different levels of coping. Some cope well with long SHU terms. Others need more treatment at some times. When a CCCMS patient decompensates he is made EOP to get the care that he requires. "Cycling" helps prevents decompensation of patients in the SHU by offering them the appropriate level of care they need in times of need.

Rebuttal to Individual Inmate Allegations

8

Decl. Robert Fischer, Ph.D. Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

32. Prisoner AA, referenced in paragraph 202 of Mr. Haney's declaration, is an ASU inmate who claims to have seen his case manager only once since his transfer to Corcoran. However since arriving at COR on or about February 5, 2013, he had 23 mental health clinical contacts between that date and March 14, 2013, including five with his case manager, and an initial treatment team meeting. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-D for Prisoner AA's appointment history.] Prisoner AA is receiving a treatment plan that meets his basic mental health needs.

33. Prisoner II, referenced in paragraph 225 of Mr. Haney's declaration, complains that he has seen his case manager only twice in a month. However, records indicate that Prisoner II has had 62 clinical contacts with mental health staff between January 30, 2013, and March 13, 2013, more than one per day. 15 of those contacts were with his case manager. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-E for Prisoner II's appointment history.] Prisoner II is receiving a treatment plan that meets his basic mental health needs.

34. Prisoner JJ, referenced in paragraph 226 of Mr. Haney's declaration, claims staff do not care about him and he was told by his doctor to attack someone. He also claims to have no access to psychiatrists. Since January 1, 2013, he has had 116 contacts with mental health clinical staff including 12 appointments with his psychiatrist. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-F for Prisoner JJ's appointment history.] Prisoner JJ is a heavy utilizer of mental health services and has been placed on involuntary medications for being a danger to self and others. Staff is currently pursuing an involuntary medication order. The petition was filed in January 2013 and the hearing is currently scheduled for May 8, 2013, as a result of a continuance motion on behalf of Prisoner JJ. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-G for Prisoner JJ's Administrative Law Judge order setting matter for hearing on May 8, 2013.] Prisoner JJ is receiving a treatment plan that meets his basic mental health needs.

35. Prisoner R, referenced in Mr. Kaufman's declaration at paragraph 72, claims it is easy to cheek medication and that he has done so in order to hoard medication to kill himself by overdose. Prisoner R, however, has been on involuntary psychiatric medications since July 2011

9

Decl. Robert Fischer, Ph.D. Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

due to the behavior he described. He overdosed in an attempt to kill himself and has been maintained on a court order ever since. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-H for Prisoner R's involuntary medication (*Keyhea*) initial petition from July 2011.] Prisoner R is receiving a treatment plan that meets his basic mental health needs.

36. Prisoner GG, referenced in Mr. Haney's declaration at paragraph 222, claims that he has recently arrived at Corcoran and has received little assistance by staff and that he does not have any medications. In fact, since arriving at Corcoran on or about January 3, 2013, Prisoner GG has had 35 mental health clinical contacts between that date and March 7, 2013. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-I for Prisoner GG's appointment history.] These include ten contacts with a psychiatrist. On March 7, 2013, he actively refused to participate in one-on-one treatment with his case manager. On February 15, 2013, he told his case manager that he does not take any psychiatric medications and declared that he is not suffering from any mental health symptoms and that he "feel[s] fine." [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-J for Prisoner GG's mental health progress notes.] Prisoner GG does not qualify for involuntary medication as he is not a danger to self, a danger to others, or gravely disabled. Prisoner GG is receiving a treatment plan that meets his basic mental health needs.

37. Despite the challenges of providing mental health treatment inside a prison, in the majority of cases Corcoran provides timely and adequate care. Corcoran can always improve, and we are continuing to work on improvements, but ideal conditions are not required, rather *constitutionally adequate* conditions are. Corcoran certainly provides that. Inmates receive the basic mental health care needed regardless of the issues mentioned in plaintiffs' experts' declarations.

/////
////
///
//
/

10

Decl. Robert Fischer, Ph.D. Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Corcoran, California on March 21, 2013.

*Robert Fischer, Ph.D.* (signature)

Robert Fischer, Ph.D.
Acting Chief Psychologist,
California State Prison, Corcoran
*(original signature retained by attorney)*

CF1997CS0003
20668591.docx

11

Decl. Robert Fischer, Ph.D. Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)