KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>　　　　　　　　　　　Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF WARDEN CONNIE GIPSON IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Connie Gipson, declare as follows:

1. I am the Acting Warden of California State Prison, Corcoran. I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

1

2. I have reviewed the pertinent portions of the declarations by plaintiff's experts Craig Haney and Edward Kaufman and respond to those declarations below. If called as a witness in this matter, I could and would testify to the matters set forth herein.

3. Corcoran is a multi-mission institution serving level I, level III, and level IV inmates. Corcoran also contains an Administrative Segregation Unit and a Segregated Housing Unit. Corcoran houses approximately 1300 inmates who are members of the Mental Health Services Delivery System.

Treatment Space

4. Corcoran provides a wide range of treatment space options for mental health staff. Treatment space includes one-on-one meeting spaces for clinicians, and group treatment spaces for psychotherapy and recreational therapy. Treatment space is offered in or near the housing units where the inmates reside.

5. In paragraphs 55 of Mr. Haney's declaration, he alleges that additional treatment space was planned for the "distant future." In fact, EOP treatment and office space is currently under construction at Corcoran.

6. Mr. Haney claims to have viewed EOP office and treatment space under construction on February 19, 2013. However, in paragraph 178 or Mr. Haney's declaration he opines, without basis, that the building's June 2013 activation date "seems unrealistic after having seen the site itself and the status of construction." Mr. Haney's observations are inaccurate. The new office and treatment space building is due to be completed by May 1, 2013. It is anticipated that staff will move in and begin treatment by June 2013. The construction remains on schedule.

7. In paragraph 174 of Mr. Haney's declaration, he complains that some treatment space is located in empty gymnasiums. Mr. Haney failed to note that group therapy sessions are held in walled off areas of the gymnasium to provide confidentiality. Additionally, individual sessions with inmates are held in confidential cubicles on the gym floor. The gymnasium is used solely for mental health treatment.

2
Decl. Acting Warden Connie Gipson Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

#### Corcoran's Inmate Population and Health Care Access Officers

8. Despite Corcoran's growing mental health population, Corcoran has always been able to provide adequate staff to ensure the needs of the mentally ill population. Corcoran has always delivered constitutionally adequate care to its population. Corcoran's correctional officers provide consistent and timely service to the mental health staff and their patients which allows the mental health clinicians to facilitate their program.

9. In paragraph 191 of Mr. Haney's declaration, Mr. Haney alleges that Corcoran is short approximately 32 escort officers. It is alleged that this shortage prevents inmates from seeing their clinicians. This simply is not true. The Health Care Captain was asked during the tour of Corcoran how many escort officers were on duty. He replied 133. Although Corcoran is allocated 180.6 positions for escort officers, that does not mean that all 180.6 are on duty simultaneously. All escort positions at Corcoran are full. [See attached Health Care Access Post Assignment Sheet in Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-K.] There are not 32 escort officer vacancies. Corcoran has no problem escorting inmates to see their clinicians in a timely manner.

10. Mr. Haney, in paragraph 191 of his declaration, describes difficulty with obtaining ducated appointments. Effective March 1, 2013, a new ducating process has been implemented which allows daily ducat reconciliation between health care access and health care provider staff. This allows staff to accurately capture the reason for any missed appointments.

#### ATOM Chairs and Therapeutic Treatment Modules

11. Corcoran is utilizing the Alternative Treatment Option Module (ATOM) chairs in a two year pilot program to develop alternatives to the Therapeutic Treatment Modules (TTM). Every six months the program is evaluated. Inmates, clinicians, and correctional staff have been surveyed about the use of ATOM chairs as a possible TTM alternative. The ATOM chair pilot program began at the request of the plaintiffs to come up with an alternative to the TTMs. Plaintiffs suggested a chair used in New York, that is similar to the ATOM chair.

12. The declarations of Mr. Haney and Mr. Kaufman provide conflicting information about the use of ATOM chairs at Corcoran. Mr. Haney, in paragraph 179 of his declaration, states that inmates prefer to use the ATOM chair based on his discussions with inmates at Corcoran during his tour. Mr. Haney described his interaction with Prisoner Z, at paragraph 179, who prefers ATOM chairs over TTMs because he says TTMs make him feel like "an animal."

13. However, Mr. Kaufman, in his declaration at paragraph 62, states that patients described the chairs as "painful and restrictive." Mr. Kaufman describes Prisoner I in paragraph 62 who states he prefers to avoid groups that have ATOM chairs.

14. Plaintiff's expert's brief survey tells only a part of the story. The ATOM chair pilot program is ongoing. Early surveys indicate that most inmates prefer to use the TTMs by a two-to-one ratio due to the ability to move around during group sessions. Additionally, inmates prefer the TTMs for to the safety and security provided against possible assault from other inmates in the group setting. Correctional Officers prefer the TTMs for safety and security reasons as well. Early data has indicated that groups with TTMs tend to last longer than groups with ATOM chairs as the inmates are more willing remain in the session. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-L for ATOM Chair survey report October 2012.]

15. Prisoner Z also stated that officers discourage him to attend groups because it is "extra work for them to place" inmates in restraints. Prisoner Z is mistaken. Officers at Corcoran do not encourage nor discourage inmate participation in group therapy session. While there are additional steps in securing an inmate into an ATOM Chair, officers are aware of this and have undertaken a good faith effort to participate in the pilot program.

16. Mr. Haney, in his declaration at paragraph 181, indicates that an officer refused to photograph a TTM from inside. In fact, the officer at first took the request from Mr. Haney as a joke and ultimately did take a photograph of the inside of the TTM. The supervising officer has denied making the statement alleged by Mr. Haney that "officers don't like to get inside those things."

4

Decl. Acting Warden Connie Gipson Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

### Administrative Segregation Use for Mentally Ill Inmates

17. Inmates are housed in Administrative Segregation for several issues, including threats to the security and safety of the institution and for their own safekeeping when threatened or targeted by other inmates.

18. Corcoran takes very seriously inmates housed in the Administrative Segregation Unit (ASU) who also have mental illnesses. These housing areas are adequately staffed by both correctional officers and mental health clinicians.

19. Although some inmates are housed in ASU for non-disciplinary reasons or are housed while waiting for an opening in another unit, all ASU inmates receive the same level of mental health care. Inmates housed in ASU are required to abide by the rules for ASU inmates including unclothed body searches when leaving their cells to go to yard or medical appointments. However, ASU inmates also receive up to ten hours of yard time per week.

20. Prisoner GG, referenced in Mr. Haney's declaration at paragraph 222, is an inmate who was housed in ASU for non-disciplinary reasons. In fact, Prisoner GG was placed in the ASU because he complained of safety concerns to staff. He has since resolved these concerns and his release back to a regular housing unit is pending.

21. Prisoner HH, referenced in Mr. Haney's declaration at paragraphs 223 and 224, is an inmate in the ASU. He claims he is in ASU while waiting for space to open up in another institution. In fact, Prisoner HH is in the ASU for indecent exposure which occurred in October 2012. Prior to receiving the rules violation, Prisoner HH was waiting for a transfer, however, now he is being referred to the institutional classification committee to determine if he will be sent to the SHU.

22. Prisoner J, referenced in Mr. Kaufman's declaration at paragraph 112, is in the ASU. He claims he has been waiting for a year to go to Kern Valley State Prison (KVSP) but has not transferred. Prisoner J arrived at Corcoran in October 2011 while serving a SHU term for possession of a weapon. He was transferred to the ASU in December 2011 and referred to KVSP.

5

However his request to go to KVSP was denied as he has enemies on both of KVSP's yards. Before a transfer to another institution could be arranged, Prisoner J became a suspect in an in-cell sexual assault. That case was closed in January 2013 and Prisoner J is pending a referral to a level IV facility.

### Segregated Housing Unit (SHU)

23. Inmates receive SHU terms when they have committed a rules violation within the institution that indicates that the inmate is unsafe to house with other inmates. In essence, the SHU provides a secure housing unit for some of CDCR's most dangerous offenders. Like all aspects of the CDCR population, the SHU population includes those who are mentally ill.

24. Both Mr. Haney, in paragraph 185, and Mr. Kaufman, in paragraph 63, allege that group therapy is held in a storage or supply room, which they describe as dirty with harsh lighting and exposed pipes on the ceiling. The treatment room is a large converted supply room. However, it is well lit, not dirty, and is set up for treatment space with several TTMs in a semi-circle. [See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 4-M for photo showing treatment space.] This therapy room is confidential as it is cut off from the rest of the SHU.

25. Mr. Haney, in paragraph 191 of his declaration, alleges that the SHU at Corcoran lacks group therapy due to lack of programming space and lack of access to care officers. As discussed above, escort officers are fully staffed at Corcoran. Following the Special Master's 25th Round Tour Report from August 2012, which Mr. Haney quotes in paragraph 191 of his declaration, group therapy rooms were reevaluated in the SHU. Each SHU building has an identified group therapy room.

26. Mr. Haney, in paragraph 192 of his declaration, blames medical and dental services for pulling escort officers of mental health cases. However, escort teams at Corcoran are assigned to various disciplines – medical, dental, mental health – and each discipline assigns its own officers to the SHU. Appointment ducats from one discipline do not affect the ability of other disciplines from escorting inmates to their appointments. Likewise, correctional officers are provided in accordance to the published mental health appointment schedule. Mr. Haney is

incorrect when he states in paragraph 205 of his declaration that an "escort shortage" has "made it impossible for clinicians to have" contact with their patients as frequently as indicated. Health care access officers follow the schedules set out by mental health staff. There are no issues providing escorts based on those schedules.

27. Mr. Haney, in paragraphs 210 and 211 of his declaration, alleges that Prisoner DD, a mentally ill inmate on involuntary psychiatric medication for being a danger to others, is held in the SHU due to an ongoing dispute about his medical condition. Prisoner DD claims that he has spent much of the last 23 years in a SHU setting. Although Prisoner DD has disputes regarding his disability classification, that is not the reason he has spent most of the last 23 years in a SHU. In fact, Prisoner DD is serving a long SHU term for various offenses. From 1992 to as recently as September 2010, Prisoner DD has regularly received Rules Violation Reports. Prisoner DD is in the SHU for longstanding and regular disciplinary reasons, not medical care disputes.

28. Mr. Haney alleges in paragraph 207 that Prisoner CC is discouraged from exiting his SHU cell to see his clinician. Correctional Officers do not discourage or encourage inmates to attend their groups. They facilitate appointments if an inmate wants to attend.

Mental Health Crisis Bed

29. Mr. Haney also cites the Special Master's report from August 2012 in paragraph 227 of his declaration and states that there is a policy of keeping inmates in the Mental Health Crisis Bed handcuffed when meeting with their treatment team. However, inmates are no longer handcuffed while in the TTM during a treatment team meeting unless clinical and correctional staff agrees on a need to do so. That policy has been in place since at least August 2012.

30. Despite the challenges of providing mental health treatment inside a prison, in the majority of cases Corcoran provides timely and adequate care. Corcoran can always improve, and we are continuing to work on improvements, but ideal conditions are not required, rather *constitutionally adequate* conditions are. Corcoran certainly provides that. Inmates receive the basic mental health care needed regardless of the issues mentioned in plaintiffs' experts' declarations.

7

Decl. Acting Warden Connie Gipson Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Corcoran, California on March 20, 2013.

*[signature]*

Connie Gipson
Acting Warden, California State Prison, Corcoran
*(original signature retained by attorney)*

CF1997CS0003
20668591.docx