KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **REPLY DECLARATION OF DIANA TOCHE IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

I, DIANA TOCHE, declare as follows:

1. I am the Acting Undersecretary of Administration and Offender Services for the California Department of Corrections and Rehabilitation (CDCR). Previously, I served as the Acting Director of the Division of Health Care Services (DHCS) for CDCR. I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I submit this declaration in support of the State's Reply Memorandum in support of its

1

1. motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. As Director of DHCS, I had responsibility for and oversight of the Department's mental health care and dental programs. In that capacity, I became familiar with the prison mental health care delivery system at the statewide level, and also became familiar with the Court's intervention and supervision of this system through the special master. In addition, I work with the receiver appointed in *Plata v. Brown* to ensure integration of medical and mental health care, including the recruitment and hiring of mental health care staff.

**CDCR's Statewide Mental Health Program Maintains Appropriate Levels of Mental Health Clinicians and Staff to Deliver Care that Meets or Exceeds Inmates' Mental Health Care Needs.**

3. Currently, the mental health program has 1586.73 positions filled. 1044.50 of these filled positions are staffed by clinical social workers, psychologists, psychiatrists and recreational therapists that are directly responsible for delivering mental health care to a mentally ill inmate population of 32,361 inmates at a ratio of one clinician per 28 inmates. In addition, the mental health program employs the equivalent of 106.46 mental health clinicians through registry.

**The 2009 Mental Health Staffing Allocation Plan Was Designed to Ensure Adequate Mental Health Care Delivery Even If Every Position is Not Filled.**

4. As Acting Director of DHCS, I gained a fundamental understanding of how CDCR's mental health program staffing allocation plans were developed and are now implemented to provide appropriate mental health staffing components to each institution.

5. In 2009, CDCR developed a comprehensive staffing allocation plan for each mental health program and administrative function that was approved by the State Legislature in the Fiscal Year 2011/2012 budget. The 2009 staffing allocation plan was filed with the Court as Document 3693.

6. The 2009 staffing plan was an ambitious proposal that was designed to ensure that CDCR's Statewide Mental Health Program was equipped with a robust and flexible mental health staffing model that facilitated quality care. The 2009 staffing plan, and the clinician-to-patient ratios it employs to allocate positions, are not based on assumptions that all positions allocated

2

Decl. D. Toche Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

under the plan must be filled to deliver basic mental health care. Rather, the staff-to-patient ratios were designed to: (a) provide sufficient staff that was capable of providing care that exceeds the standard of mental health care in the correctional community to all programming levels and custody settings; (b) meet Program Guide and other reporting requirements imposed under the *Coleman* special mastership; and (3) account for tasks not specifically documented in the Program Guide but necessarily part of the workday, including indirect time, administration, training, quality assurance, peer review, and other professional activities, court mandated requirements, and forensic reporting. Further, the mental health staffing ratios were designed to provide more than enough staff to anticipate situations when relief was necessary for vacations or sick leave, and to meet the constantly fluctuating and unpredictable demands that seriously mentally ill prisoners place on a health care system. In fact, upon filing the staffing plan with the Court, Defendants expressly recognized that the staffing allocations and services expressed in the plan were not required under the Constitution. (ECF No. 3693 at 3 n.1.)

7. The CDCR Mental Health Program staffs institutions by applying clinician-to-patient ratios designed in the 2009 staffing plan to population projections that forecast the number of inmates who will require programming by their levels of care and custody (for example, General Population Enhanced Outpatient Care). Next, headquarters staff calculate how the inmate population for each level of care or programming provided is distributed among the institutions to ensure that each institution is allocated an array of mental health staff that is consistent with the population it serves. Minor manual adjustments are then made to appropriately manage resources.

8. In their opposition to Defendants' motion to terminate, Plaintiffs portray the existence of statewide mental health staffing vacancies as conclusive evidence that the State employs insufficient mental health care staff to meet the mental health care needs of *Coleman* class members. These assertions are misleading and fundamentally inaccurate. The staffing plan was designed to ensure that the Mental Health Program had sufficiently robust staffing resources so that institutions could always meet the basic mental health care needs of *Coleman* class members even if all funded positions are not filled.

3

Decl. D. Toche Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

**The State Has Fully Funded CDCR's Mental Health Positions with Few Exceptions for Fiscal Year 2012/2013 and Recruitment to Fill All Clinical Positions Continues Apace.**

9.  The Fiscal Year 2012/ 2013 system-wide mental health position authority, which is based on the 2009 plan, totals 2268.26. This represents a net increase of 187.06 mental health clinical positions from fiscal year 2009/10.

10. The funding allocations for Fiscal Year 2012/2013 fund nearly 100% of the 2268.26 positions. Funding for approximately two non-critical positions at each institution was not allocated with the intention of providing salary savings make up for a costing error that caused a 7 million dollar shortfall or deficit. These non-critical positions included: (1) a second Chief Psychologist, except at Pelican Bay State Prison; (2) the Correctional Health Services Administrator II; and (3) one Clinical Psychologist at the five prisons without designated mental health programs. The Correctional Health Services Administrator and Chief Psychologist positions, which are not clinical positions, were not "cut for cost savings" as Plaintiffs claim, but merely held for the fiscal year 2012-2013 to realize salary savings necessary to cover an accounting shortfall. These salary savings preserved hiring authority and funding for more critically needed clinical mental health professionals.

11. Since July 2011, the receiver appointed in *Plata v. Brown* has been primarily responsible for the recruitment and hiring for mental health positions, but uses the positions allocated from the 2009 staffing allocation plan for hiring mental health clinicians. My staff and I have worked—and continue to work—in conjunction with the receiver to ensure that mental health staffing needs are met. In addition, the receiver's regional human resources staff works with CDCR's mental health division to coordinate interview dates and locations, and mental health staff conducts interviews.

12. Since implementing the new staffing model CDCR's mental health program has focused on recruiting and hiring three classifications of mental health professionals: Psychologist-Clinical; Staff Psychiatrist; and Clinical Social Workers.

13. Although challenges remain to fill every single position in the 2009 staffing allocation plan, the State and the receiver are continuing their efforts to add to the State's already

4

Decl. D. Toche Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

robust and well-qualified mental health workforce. The mental health program is working aggressively to fill all allocated positions with well-qualified and competent staff.

14. On July 31, 2012, I issued a memorandum to the Chief Executive Officers and Chiefs of Mental Health of each institution directing them to fill as many vacant positions as possible.

15. On February 26, 2013, Acting Deputy Director of the Mental Health Program Tim Belavich issued a similar memorandum to the Chief Executive Officers and Chiefs of Mental Health of each institution directing them to fill as many vacant allocated positions as possible.

16. Recently, sixty psychiatrists have committed to join the Mental Health Program, thirty of which will provide telemedicine appointments for inmates housed in more remote prisons.

17. Further, the Mental Health Program continues to use registry appointments to supplement staffing where necessary.

**Defendants' Efforts to Reorganize Prisons and Institute a Long Range Bed Plan Are a Testament to the State's Commitment to Providing Care that Meets Inmates' Mental Health Care Needs.**

18. In 2011, the prison population and institution missions were significantly reorganized due to realignment under AB 109 and Defendants' implementation of a new long term mental health bed plan. Realignment and the long range bed plan were designed to reduce the inmate population and maximize the efficient allocation of State resources to best serve the long term mental health and medical needs of California inmates.

19. In their opposition to Defendants' motion to terminate, Plaintiffs claim that the State ordered "massive layoffs" in connection with the realignment process. This too is a false and frivolous accusation.

20. Under realignment and the long range bed plan, the programming missions at multiple institutions changed. These changes necessitated a shift in the way mental health care providers were allocated among institutions. Accordingly, the Mental Health Program had to redistribute mental health professionals among the institutions to meet the mental health care needs of changing populations. Under a bargaining unit agreement negotiated with Unions, a voluntary transfer process was implemented that gave mental health staff the option to transfer to

5

Decl. D. Toche Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1 another institution if the program they served was being modified under realignment or the long
2 range mental health bed plan.

3     21. The voluntary transfer process that has accompanied realignment and implementation
4 of the long term bed plan has been necessary to redistribute mental health staff to serve the needs
5 of a shifting mental health population. The State did not simply order layoffs as Plaintiffs
6 contend. Nor was there any decision to cut costs at the expense of inmate mental health care as
7 evidenced by the net increase of fully funded clinical positions in fiscal year 2012/13. (*See infra*,
8 ¶ 9.) Since the mental health care budget for 2012/13 was already fully funded State funds were
9 committed to hiring staff allocated under the budgeting authority. Thus, even if there were salary
10 savings realized from a layoff, those funds were not absorbed back into the State's general fund at
11 the expense of inmate health care.

12     22. The voluntary transfer process complicated hiring because eligible State mental
13 health professionals from other divisions, including the Division of Juvenile Justice and Division
14 of Adult Parole Operations, were experiencing layoffs, and were able to use their seniority to
15 have first pick at institutions that had open positions or to force the transfer or layoff of a less-
16 senior employee. But ultimately, the Statewide Mental Health Program gained well-trained
17 clinicians from correctional settings through these voluntary transfers. Plaintiffs' suggestion that
18 the State could have avoided barriers to recruitment or hiring by requesting state law waivers
19 mischaracterizes the options available to the state. The voluntary transfer process is governed by
20 negotiated collective bargaining agreements forged between employees and the State.
21 Unilaterally breaching the terms of the bargaining agreement employees of bargained for rights
22 was never an unacceptable option because it could have exposed the State to legal liability, and
23 disrupted the bargaining relationship between CDCR and its employees.

24     23. This voluntary transfer process was also fully explained to the Plaintiffs and special
25 master during a meeting with the *Plata* Receiver in September 2012. No one at that meeting
26 objected to this necessary process.

27     24. Plaintiffs also assert that the Governor's hiring freeze impeded the provision of
28 mental health care. This is not true. In February 2011, Governor Brown issued a statewide hiring

6

Decl. D. Toche Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1 freeze. But the Governor's 2011 hiring freeze did not impact the budgeting authority for CDCR's mental health program. All mental health positions allocated for fiscal year 2011-2012 were fully funded.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in _____, California on March __, 2013.

>                             */s/ Diana Toche*
>                             DIANA TOCHE
>                             *(original signature retained by attorney)*

CF1997CS0003
20668591.docx

7

Decl. D. Toche Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)