KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-3035
  Fax:  (415) 703-5843
  E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF ERIC MONTHEI, Psy.D., CHIEF OF MENTAL HEALTH AT SAN QUENTIN STATE PRISON, IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Eric Monthei, declare as follows:

1. I am Eric Monthei, Psy.D., Chief of Mental Health at San Quentin State Prison. I am responsible for the oversight of the mental health service delivery system at that institution. I oversee all of the mental health staff at San Quentin. I submit this declaration in support of the

1

State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. I have read the declarations of Pablo Stewart, M.D., and Jeanne Woodford, plaintiffs' experts, both dated March 14, 2013. In the scope of my job duties, I am familiar with the subjects Dr. Stewart and Ms. Woodford raise in their declaration. If called as a witness in this matter, I could and would testify to the matters herein.

## Individual Inmate Assessments

3. Regarding Dr. Stewart's referenced Prisoner A, Dr. Stewart opines that this prisoner "had an arguably fairly serious suicide attempt...[where he was] initially housed and then was sent to the MHCB unit at San Quentin. While he was in San Quentin, his primary clinician at CSP-Sacramento contacted the treating physician at San Quentin because he was concerned that Prisoner A had not been referred to the DSH Acute Program at CMF." (Expert Declaration of Pablo Stewart, M.D., page 162, paragraph 437.) However, records indicate that Prisoner A had been properly treated while in the MHCB at San Quentin. Prisoner A was stabilized in the MHCB from July 20, 2012 until August 1, 2012. Prisoner A proved stable upon return to CSP-Sacramento, where he received the appropriate treatment. Prisoner A was referred from CSP-Sacramento to the Intermediate Care Facility, not the Acute Psychiatric Program. Records indicate that this inmate received adequate care while at San Quentin and that his treatment team acted appropriately given the circumstances of his case. (See exhibit Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-A, All records related to Prisoner A from SQSP including: inpatient records, CSP-SAC records, DSH referral, DSH discharge summary.)

4. Regarding Dr. Stewart's referenced Prisoner E, Dr. Stewart opines that this prisoner was "prematurely discharged" from the Administrative Segregation Unit. (Expert Declaration of Pablo Stewart, M.D., page 65, paragraph 166.) In addition, Dr. Stewart also believes that, although this prisoner has a history of manipulation does not preclude that person from being

2

suicidal or possibly assaulting staff members. (Expert Declaration of Pablo Stewart, M.D., page 66, paragraph 168.) Dr. Stewart fails to acknowledge that this inmate was discharged from DSH, not San Quentin, so this point is moot. In regards to Dr. Stewart's opinion about not receiving a specific medication due to possible secondary gains, medications are prescribed by psychiatrists at San Quentin State Prison when clinically indicated. Although Aripiprazole (Abilify) is a non-formulary medication, this designation does not represent a barrier to prescription. In fact, as of March 11, 2013, of all inmate-patients who are prescribed second-generation antipsychotics, 13.3% were prescribed this particular medication. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-B, Patient Health Information Portal-PHIP.) Furthermore, a thorough chart review of Prisoner E revealed that this inmate had been admitted to the CTC on four (4) separate occasions. In addition, he was evaluated during a single hospitalization at DSH in February 2013. The frequency of his clinical contacts included at least five separate evaluating psychiatrists at two separate facilities. Many of these evaluations were conducted in an in-patient setting, which provides around-the-clock evaluation and monitoring. None of these psychiatrists whom evaluated Prisoner E felt that Artane was clinically necessary, despite the inmate's belief otherwise. The fact that Prisoner E was admitted to the CTC on four (4) separate occasions shows that the mental health treatment team at San Quentin does, in fact, take every suicide threat seriously. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-C, Mental Health Crisis Bed Discharge Summaries for Prisoner E.)

5. Regarding Dr. Stewart's referenced Prisoner GG, Dr. Stewart opines that this prisoner should be transferred to Department of State Hospitals (DSH) as he was continuously refusing treatment and is severely mentally ill. (Expert Declaration of Pablo Stewart, M.D., page 128, paragraph 344.) In fact, the inmate-patient is not deemed to be an acute risk of self-harm, a threat to others, or gravely disabled. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1; See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-E, Mental Health Treatment Plan, February 25, 2013.) He has refused most orders to come out of his cell for ICC  Interdisciplinary

3

Decl. Eric Monthei, Chief of Mental Health at SQSP    Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

Classification Committee, yard time, and both medical and mental health treatment appointments. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1.) Prisoner GG was extracted to the Mental Health Crisis Bed (MHCB) where he presented with delusions, but no hallucinations, depression, or manic symptoms. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1.) Prisoner GG's treatment team has determined to monitor him closely, with the intent to make treatment appealing to him. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1.) Records indicate that clinical contacts have frequently caused Prisoner GG aggravation. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1.) If there is a change in that Prisoner GG becomes a danger to himself or others, a transfer to the MHCB will be considered. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1; See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-F March 13, 2013 at 0855.) It is my opinion that extracting Prisoner GG from his cell at this time would run the risk of further alienating him from mental health treatment. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-D, Interdisciplinary Treatment Team-Level of Care Decision, February 13, 2013, page 1.) Prisoner GG, at this point in time, does not meet the qualifications necessary to be placed under emergency involuntary psychotropic medication. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-F, Interdisciplinary Treatment Team-Level of Care Decision, March 13, 2013 at 0855.)

6. Regarding Dr. Stewart's referenced Prisoner HH, Dr. Stewart finds that this inmate's diagnosis is inappropriate as it is "generic." (Expert Declaration of Pablo Stewart, M.D., page 128, paragraph 346.) In Dr. Stewart's opinion, a diagnosis of "NOS" or "not otherwise specified," is "generally inappropriate for someone who has been continuously receiving mental health treatment for a long period of time, such as Prisoner HH." (Expert Declaration of Pablo Stewart,

4

Decl. Eric Monthei, Chief of Mental Health at SQSP    Supp. Defs.' Reply in Support of
                                                     Termination Motion
                                                     (2:90-cv-00520 LKK JFM PC)

M.D., page 128, paragraph 346.) This understanding or application of "NOS" categories is incorrect as it applies to the DSM-IV TR and this inmate in particular. For instance, the DSM-IV TR indicates that there are four (4) situations in which this diagnosis might be appropriate. One of those situations is where there is "diagnostic uncertainty about etiology" of a disorder. (DSM-IV TR.) There is no indication in the DSM-IV TR that a diagnosis including "NOS" is somehow constrained by time or duration of one's illness. Prisoner HH has, in fact, met the criteria according to the DSM-IV TR for a diagnosis that includes an "NOS" qualifier, as it is understood in the context of multiple etiologies that have led to his current condition. Examination of Prisoner HH's records indicate that he has met, at one time or another, the criteria for: schizoaffective disorder, bipolar type; amphetamine or amphetamine-like type substance induced psychotic disorder with hallucinations; schizophrenia, paranoid type; and psychotic disorder due to traumatic brain injury (psychotic disorder due to a general medical condition). In addition, Prisoner HH has previously met the diagnostic criteria for post-traumatic stress disorder, chronic with various types of substance abuse and possible adolescent and adult ADHD-spectrum disorders. Prisoner HHH's working diagnosis is schizoaffective disorder, bipolar type, in remission. His alcohol dependence is in institutional remission and Prisoner HHH has borderline personality disorder. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-W, Prisoner HH records.) Prisoner HH's history of severe abuse and neglect, educational and developmental delay, and the multiple underlying factors listed above are the cause for Prisoner HH's current, and appropriate, diagnosis of psychotic disorder NOS.

7. In regards to Dr. Stewart's referenced Prisoner CCC, Dr. Stewart opines that this prisoner "meets DSH referral criteria 1 and 2," and "requires inpatient level of care at the intermediate level for an extended period of time." (Expert Pablo Stewart Declaration, page 168, paragraph 458.) I reviewed Prisoner CCC's files and IDTT determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Even if Prisoner CCC did meet the criteria to be transferred to DSH-ICF, the Penal Code does not allow for a condemned inmate to be transferred to DSH-ICF level of care. (Penal Code 3600 (b)(4).)

5

Prisoner CCC is in the Specialized Care for the Condemned and has been since its inception. Furthermore, as part of his Specialized Care regimen, Prisoner CCC is offered the following mental health treatment interventions: individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts, recreational therapy, therapeutic yards, and monthly interdisciplinary treatment team meetings. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-T, Interdisciplinary Treatment Team-Level of Care Decision for Prisoner CCC.)   Given that Prisoner CCC is in the Specialized Care for the Condemned, he is not only receiving adequate mental health care, but more than the minimum required care.

8.   In regards to Dr. Stewart's referenced Prisoner DDD, Dr. Stewart finds that Prisoner DDD should be placed in an inpatient level of care unit. However, records indicate that Prisoner DDD has not exhibited an indication for an emergent and involuntary psychiatric hospitalization. He has demonstrated improvements in his grooming and level of service participation while in the Specialized Care for Condemned Program. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-G, Summary of Reports and Recommendations, page 6.) I reviewed Prisoner DDD's files and IDTT determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Even if Prisoner DDD did meet the criteria to be transferred to DSH-ICF, the Penal Code does not allow for a condemned inmate to be transferred to DSH-ICF level of care. (Penal Code 3600 (b)(4).) Thus, it seems that admission to an inpatient level of care would be inappropriate at this time.

9.   In regards to Dr. Stewart's referenced Prisoner EEE, Dr. Stewart opines that this prisoner is not currently taking any psychiatric medications despite the fact that he has a psychiatric diagnosis and has been housed in the CTC. (Expert Pablo Stewart's Declaration, page 169, paragraph 460.) However, records indicate that Prisoner EEE is currently prescribed Haloperidol Decanoate for his mental illness. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-H, Summary of Reports and Recommendations, page 1.) Furthermore, despite the fact that Dr. Stewart believes an inpatient level of care is appropriate for Prisoner EEE, Prisoner EEE is not an acute danger to himself or others, nor is he gravely disabled. (See Decl. Monthei Supp.

6

Decl. Eric Monthei, Chief of Mental Health at SQSP     Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

Reply Mot. Terminate, Ex. 9-H, Summary of Reports and Recommendations, page 6.) CTC admission is not clinically indicated at this time and could, in fact, hinder the rapport and progress that has been established with his treatment team. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-H, Summary of Reports and Recommendations, page 6.)

10. In regards to Dr. Stewart's referenced Prisoner FFF, Dr. Stewart opines that Prisoner FFF is a high suicide risk and needs a higher level of care than Prisoner FFF is currently receiving. (Expert Pablo Stewart Declaration, page 172, paragraph 468.) However, Prisoner FFF has seen improvement within the last several months. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-I, Specialized Care for the Condemned Report, March 16, 2013; See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-J, Treatment Summary.) Part of the improvement seen by this patient is that Prisoner FFF has developed a support network that includes mental health staff, an inmate peer group, and community support in the form of letters and visits. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-I, Specialized Care for the Condemned Report, March 16, 2013; See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-J, Treatment Summary.) Prisoner FFF's mood has been euthymic and there have been no recent CTC admissions, Department of Mental Health (also known as DSH) referrals, or acts of self-harm. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-I, Specialized Care for the Condemned Report, March 16, 2013; See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-J, Treatment Summary.) Furthermore, I reviewed Prisoner FFF's files and IDTT determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Even if Prisoner FFF did meet the criteria to be transferred to DSH-ICF, the Penal Code does not allow for a condemned inmate to be transferred to DSH-ICF level of care. (Penal Code 3600 (b)(4).) Therefore, I am of the opinion that Prisoner FFF is currently receiving adequate mental health care.

11. In regards to Dr. Stewart's referenced Prisoner GGG, Dr. Stewart opines that this prisoner should be placed in a nursing home level of care, but does not state why that is warranted. (Expert Pablo Stewart's Declaration, page 172, paragraph 469.) In addition, Dr. Stewart has also noted that Prisoner GGG is currently not taking any prescribed psychotropic medication for his

7

mental illness. (Expert Pablo Stewart's Declaration, page 172, paragraph 469.) I reviewed Prisoner GGG's files and IDTT determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Even if Prisoner GGG did meet the criteria to be transferred to DSH-ICF, the Penal Code does not allow for a condemned inmate to be transferred to DSH-ICF level of care. (Penal Code 3600 (b)(4).) Currently, Prisoner GGG is in the Specialized Care for the Condemned and has been since its inception. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-K, Summary of Reports and Recommendations, page 4.) Furthermore, as part of his Specialized Care regimen, Prisoner GGG is offered the following mental health treatment interventions: individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts, recreational therapy, therapeutic yards, and monthly interdisciplinary treatment team meetings. Prisoner GGG is currently not prescribed any antipsychotic medication for his mental illness. Prisoner GGG, although mentally ill, does not meet the criteria for inpatient care or for involuntary medication under Penal Code 2602, and thus cannot be involuntarily medicated. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-L, Specialized Care for the Condemned Report, March 16, 2013.) Given that Prisoner GGG is in the Specialized Care for the Condemned, he is not only receiving adequate mental health care, but more than the minimum required care.

12. In regards to Dr. Stewart's referenced Prisoner HHH, Dr. Stewart believes that this prisoner requires an inpatient level of care and that he should not remain in a regular housing unit given his mental illness. (Expert Pablo Stewart's Declaration, page 172, paragraph 470.) However, Prisoner HHH is currently housed and cared for in the Specialized Care for the Condemned Program and has been a part of this program since its inception. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-M, Summary of Reports and Recommendations, page 4.) Participation in this program has included the following mental health treatment interventions for Prisoner HHH: individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts, recreational therapy, therapeutic yards, and monthly interdisciplinary treatment team meetings. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-M, Summary of Reports and

8

Decl. Eric Monthei, Chief of Mental Health at SQSP      Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

Recommendations, page 4.) Thus, the allegation that Prisoner HHH will "eventually" be placed in a Specialized Care Program is patently false, as is evidenced by the medical records available.

13. Similarly, in regards to Dr. Stewart's referenced Prisoner III, records indicate that this prisoner is currently a part of the Specialized Care for the Condemned Program and has been since its inception. I reviewed Prisoner III's files and IDTT determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Even if Prisoner III did meet the criteria to be transferred to DSH-ICF, the Penal Code does not allow for a condemned inmate to be transferred to DSH-ICF level of care. (Penal Code 3600 (b)(4).) As part of his Specialized Care, he has been offered the same or similar mental health treatment interventions: individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts, recreational therapy, therapeutic yard, and monthly interdisciplinary treatment team meetings. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-N, Summary of Reports and Recommendations, page 4.) Since the development of the Specialized Care Program, Prisoner III has demonstrated a "progressive improvement in his functioning, grooming, and mental health service participation. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-N, Summary of Reports and Recommendations, page 5.)

### Staffing

14. Dr. Stewart alleges that the functional vacancy rate at San Quentin being "much higher" than the May 23-24, 2012 expert visit. (Expert Pablo Stewart Declaration, page 30, paragraph 63.) However, at this time, vacancy rates are significantly lower than in May 2012. At this time San Quentin is staffed adequately to serve the mental health needs of the prisoners housed here. At this time, statewide candidate pool is pending along with additional Statewide recruitment efforts. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-O, Coleman Staffing Report XXIV, XXV.) In addition, there have not been any qualified candidates who have responded to the interviews scheduled during the months of December and January. Management

9

Decl. Eric Monthei, Chief of Mental Health at SQSP    Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

is continually assessing performance and attempting to maintain adherence to Program Guide requirements and professional standards of care. Despite all of this, inmates at San Quentin are still receiving above minimum required care at this time.

### Extended Outpatient Program (EOP) Services

15. Dr. Stewart has a general belief that inmates who return from State hospitals are decompensating on EOP Administrative Segregation Unit. (Expert Pablo Stewart Declaration, page 129, paragraph 347.) All inmates needing a higher level of care are appropriately referred to a higher level of care. All DSH returns are evaluated in the Triage Treatment Area (TTA) and either returned to housing or admitted to the Mental Health Crisis Bed (MHCB). (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-P, DMH and CTC Return Protocol.) All inmates, whether returning from DSH or MHCB, are monitored in the housing units with the 5-day follow-up protocol. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-Q, Primary Clinician Five Day Follow-Up Suicide Protocol.) This includes inmates that are in the Specialized Care Program for the Condemned who are returning from the DSH Acute Program.

16. Ms. Woodford states that "North Segregation inmates are not provided with regular monitoring of their mental health status by either custody of mental health staff." (Woodford Decl., ¶ 22.) This is untrue. Of several required treatment activities is daily Psychiatric Technician contacts for all condemned EOP patients, as well as Grade B CCCMS patients, wherever they may be housed.

### Treatment Space

17. Dr. Stewart claims to have witnessed "ad hoc office and treatment spaces" at San Quentin in the "East block unit for the condemned." (Expert Pablo Stewart Declaration, page 110, paragraph 296.) I can attest that mental health has access to four offices on the East Block. These offices are actual rooms, approximately 8' x 12' and have doors. Two of those four rooms are assigned to mental health while the other two rooms are used as needed. There is a

10

Decl. Eric Monthei, Chief of Mental Health at SQSP   Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

therapeutic module in each of these offices, which provide a confidential setting for inmates, when necessary. These areas are only used when inmates request services and do not want to walk across the yard to the Central Healthcare Services Building (CHSB), where treatment is usually given. The "ad hoc spaces" are offered as a convenience to the inmates on this block and allow for a private setting for the impromptu sessions.

18. Dr. Stewart, too, claims that there is no confidential space for inmates to be interviewed and that he himself had to interview inmates in an open doorway with staff nearby. (Expert Pablo Stewart Declaration, page 127, paragraph 342.) When Dr. Stewart was visiting San Quentin, he was offered confidential space off of the "Carson Unit." Dr. Stewart declined and therefore we used a Sergeant's office to conduct this portion of the tour. The door was closed and no CDCR staff was in the room while he spoke with the inmate. Again, I can attest that individual appointments are typically held off of the "Carson Unit." Patients who want to stay on the unit, but are requesting services, may do so. The inmate is informed that if a treatment session is requested, or if he would like to speak in a confidential setting, he should go to the CHSB, where appointments and treatment are normally given. The "Carson Unit" is not a designated treatment area, but services will be provided there if the inmate requests it or when clinically indicated.

19. Dr. Stewart further claims that there are generally poor living conditions and lack of confidentiality on the unit. (Expert Pablo Stewart Declaration, page 127, paragraph 343.) However, the amount of space and confidentiality currently given to inmates is not only adequate, but above constitutionally required levels. In addition, it should be noted that San Quentin's Central Health Services Building (CHSB) has five (5) new individual rooms specifically designed for individual confidential interviews with Administrative Segregation Unit (ASU) inmates and

11

Decl. Eric Monthei, Chief of Mental Health at SQSP        Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

other inmate-patients. I can attest that these spaces are clean, quiet, and comfortable and can be readily accessed by clinicians using access-to-care team custody escorts.

## Medication Management

20. Dr. Stewart references the Special Master's monitoring report from last summer, which showed that when clinically indicated tests were ordered 92% of the time, lab tests were reviewed and clinical action documented only 88% of the time. (Expert Pablo Stewart Declaration, page 64, paragraph 164.) However, the establishment and implementation of a dedicated psychiatric nursing presence in San Quentin's outpatient psychiatric clinic has ensured robust compliance with multiple parameters of medication monitoring, inclusive of those outlined in the Medication Administration Performance Improvement Program (MAPIP) guidelines. For instance, in the summer of 2012, San Quentin State Prison added a full-time registered nurse to the outpatient psychiatry clinic. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-O, Coleman Staffing Report XXIV, XXV.) This clinic was immediately identified and utilized as a central hub to coordinate an inmate's mental health needs. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-O, Coleman Staffing Report XXIV, XXV.) This psychiatric nursing clinic has been unofficially dubbed "PsychOne Clinic," a name coined to reflect its mission: collaboration with multiple disciplines to ensure comprehensive oversight of a patient's mental healthcare. Specific responsibilities of staff on the PsychOne Clinic team are attached. Staff also closely monitor medication management as is seen in attachment titled "Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-R, PsychOne Clinic Routine Policies." A most recent audit of medication noncompliance, for instance, demonstrated that, during the month of February 2013, 88% of noncompliant patients had seen a psychiatrist within seven (7) days. A total of 93% were seen within eight (8) days. This represents a substantial improvement from the numbers reported in the summer of 2012 and demonstrates San Quentin's ability to meet the needs of mental health

12

Decl. Eric Monthei, Chief of Mental Health at SQSP    Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

patients. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-R, PsychOne Clinic Routine Policies.)

### Care for the Condemned Population

21. Dr. Stewart alleges that inmates in the San Quentin hospital are being treated on site instead of being transferred to the Department of State Hospitals (DSH) for proper care. (Expert Pablo Stewart Declaration, page 170, paragraph 464.) In addition, Dr. Stewart also alleges that the condemned unit patients do not receive inpatient care. (Expert Pablo Stewart Declaration, page 173, paragraph 471.) Not only is this a misrepresentation of fact, but this statement is completely untrue. Inmates that must be transferred to a higher level of care, such as is provided by DSH, are transferred as needed. Condemned inmates who have met indicators for a referral to an intermediate care facility operated by the DSH are excluded from transfer to Salinas Valley State Prison and California Medical Facility under Penal Code 3600 (b)(4). However, condemned inmates may be transferred to DSH Acute Psychiatric Program at CMF. The staff at San Quentin have been operating at an adequate level of care by providing those condemned mental health services such as, Acute Psychiatric Program, Mental Health Crisis Bed, Specialized Care for the Condemned, EOP, and Correctional Clinical Case Management Services, as needed.

22. Dr. Stewart alleges that condemned patients that are part of the Specialized Care Program for the Condemned are housed in the Correctional Treatment Center (CTC). (Expert Pablo Stewart Declaration, page 168, paragraph 457.) This is a false statement. Condemned patients are not housed in the CTC on a permanent or semi-permanent basis, either for medical reasons or as participants in the Specialized Care Program. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-S, Census Report for Condemned Inmate Housing.)

13

23. Ms. Woodford claims that condemned inmates are not routinely evaluated for mental health treatment, and that these inmates have little opportunity to be screened or observed. (Woodford Decl., ¶ 24.) This is inaccurate, however, as multiple measures are in place to ensure routine, emergent, or urgent care. Staff in the condemned units regularly interact with inmates housed on their tiers and notify mental health staff when an inmate is observed to be acting in a bizarre or erratic manner. East Block, which houses the overwhelming majority of condemned inmates, has six mental health professionals dedicated to the unit in addition to licensed psychiatric technicians who conduct ongoing rounds. Unit custody staff and these mental health professionals work collaboratively, and as issues arise, custody staff notifies mental health staff both verbally and in writing. This process is formalized through the CDCR form "mental health referral chrono," or form 128-MH5. This process has proven to be successful and of great benefit to East Block.

24. Ms. Woodford also claims that she spoke with four condemned inmates whom she would have referred to a higher level of care. (Woodford Decl., ¶¶ 30, 31, 32, 55.) Ms. Woodford observed that these four inmate were currently receiving mental health treatment. (*Id.*) Certainly, these four inmates would be referred to a mental health crisis bed or acute psychiatric program if their clinicians believed such care to be necessary.

25. Ms. Woodford states on page 8, lines 14-17 that some condemned inmates are housed in the Correctional Treatment Center (CTC) on a permanent or semi-permanent basis. This is incorrect. Condemned inmate-patients are not housed in the CTC on a permanent or semi-permanent basis, either for medical reasons or as participants in the "Specialized Care for the Condemned" mental health program. (See Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-S, Census Report for Condemned Inmate Housing.)

26. Ms. Woodford states in Paragraph 38 of her declaration that condemned inmates

routinely fail to attend their classification hearings, and that this "eliminates an important source of information regarding an inmate's mental health status . . ." However, while inmates may refuse to attend their classification hearings, MHSDS staff routinely attend classification hearings for condemned inmates, regardless of *Coleman* class member status, so that they may address mental health concerns when indicated.

27. Ms. Woodford evaluates San Quentin's Specialized Care Program beginning on page 19 of her declaration. Ms. Woodford states that she "saw no evidence that such staffing has yet been designated or trained," and that she inquired whether there was adequate staffing "and was told in vague terms that there was 'enough,' but was not offered any specifics." (Woodford Decl. at 20:7-10.) There is in fact approved MHSDS staffing for the Specialized Care for the Condemned Program, which includes 1.5 Senior Clinical Social Workers, 1 Senior Psychiatrist Supervisor, 2 Psychologists, 3 Recreational Therapists, and 1 Psychiatrist.

28. Ms. Woodford further claims, with respect to the Specialized Care for the Condemned Program, that if an assessment were conducted of the inmates currently receiving specialized care, it would reveal that "many if not all would be deemed both in need of a transfer to ICF care and suitable for such a transfer from a custodial perspective." This statement indicates a misapprehension of San Quentin's program, which provides the equivalent of an ICF-level of care. In fact, it is my opinion that the MHSDS at San Quentin has been providing the condemned inmate-patient population with at least if not more than a constitutionally adequate level of care. It is my understanding that condemned inmate-patients who may have met indicators for referral to an Intermediate Care Facility (ICF) operated by the Department of State Hospitals are excluded from transfer to Salinas Valley State Prison and California Medical Facility under California Penal Code section 3600(b)(4). Nonetheless, I believe that the Specialized Care for the Condemned Program at San Quentin provides a viable alternative to

15

these condemned inmate-patients. The specialized treatment planning for the condemned inmate-patients at San Quentin is based on a model of assertive community treatment and utilizes a biological, behavioral and psychosocial model. San Quentin evaluates an inmate-patient's clinical needs and addresses behaviors in conjunction with their medical, cognitive/learning, adaptive behavior, and social abilities and needs. The specialized treatment planning is tailored to promote an inmate-patient's self-management of daily living skills and mental health needs at a sustainable individual optimal level of functioning. It focuses on monitoring symptoms, providing assistance with and training in daily living skills and medication management and provides structured opportunities for recreation and socialization. The treatment goal of the Specialized Care Program is to maintain each inmate-patient at his highest level of functioning. Positive reinforcement is utilized to promote and affirm an inmate-patient's effort and progressive improvement in functioning.

29. San Quentin's Specialized Care Program utilizes a multidisciplinary treatment team of mental health clinicians that work in the condemned inmate-patients seven days per week. This multidisciplinary team currently provides continuous care with daily inmate-patient contacts occurring up to several times per day, as clinically indicated. Additionally, the treatment providers offer a wide-range of treatments that are centered on the inmate-patient's individual mental health needs, including psychiatrist-prescribed medication management, psychologist delivered therapy, psychiatric technician daily rounds, and recreational therapist delivered activities. Moreover, internal medicine nurses and an internist are in the housing unit(s) for close coordination of medical care.

30. In contrast, it is my understanding that the Department of State Hospitals operates their condemned treatment protocols in a more restrictive manner and with potentially less interaction. The average length of stay for our condemned inmate-patients at San Quentin is

16

Decl. Eric Monthei, Chief of Mental Health at SQSP        Supp. Defs.' Reply in Support of
                                                          Termination Motion
                                                          (2:90-cv-00520 LKK JFM PC)

approximately 25 years. Given this duration, condemned inmate-patients have established a unique association to their home, housing, neighbors, institution and treatment providers. In my opinion, our staff operate with superior knowledge, experience and training associated with the condemned population and we operate with an understanding that they will remain with us for several years and perhaps decades.

### Collaboration Between Mental Health and Custody

31. Moreover, on one recent occasion, the Warden at San Quentin, Kevin Chappell, received a letter from an attorney representing nine men on death row to thank him and the institution for "providing extra support in the area of counseling, psychological support, and other mental/emotional health resources to condemned individuals." The letter also states that on the night of the election in November 2012, "the administration had a psychologist available all night walking the tiers in case anyone wanted to talk or thought to harm himself." The letter closes by stating "[p]lease consider this letter my expression of thanks to you and other San Quentin staff for taking these kind and compassionate measures . . ." A true and correct copy of the letter is attached as Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-X.

32. Additionally, on February 28, 2013, I received the results of an audit conducted by the CDCR Division of Mental Health which was designed to audit San Quentin's compliance with *Coleman* mandates for daily Administrative Segregation and Condemned Row patient clinical rounding. The results of the audit indicated "[f]ull compliance" for the reporting month. Attached as Exhibit Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-Y, is a true and correct copy of the results of this audit.

33. Ms. Woodford stated that it is her understanding that "North Segregation inmates are not provided with regular monitoring of their mental health status by either custody or mental health staff." (Woodford Decl., ¶ 22.) As an initial matter, North Segregation accounts for just

17

approximately one-tenth of the total number of condemned cells. Further, mental health staff do in fact conduct rounds in the North Segregation housing unit and custody staff is trained in suicide prevention and wellness checks. Also, the inmate population in North Segregation is static, and the custody staff for that population is very tenured and consistent, and they know and understand this population very well. Staff in this housing unit have a rapport with these inmates that allows for consistent daily interaction and observation. Custody staff routinely refer inmates in North Segregation for mental health treatment when they exhibit bizarre or erratic behavior.

34. Ms. Woodford states on page 9, lines 11-13 that mental health staff must work closely with custody "to develop and operate an effective, coherent program that proactively addresses these unique custodial challenges." This statement implies that custody and mental health do not currently work closely together, which is untrue. Custody and mental health staff attend weekly subcommittee meetings that specifically address any issues to effective communication or barriers to achieving common goals. Detailed weekly minutes are kept of these meetings and distributed to attendees for approval each week. Ongoing or unresolved issues are kept on the agenda each week until resolution is reached. Regular attendees include, but are not limited to, myself, Associate Wardens, Senior Psychologists, Quality Management Team staff, the Use of Force Coordinator, and custody staff responsible for RVRs. Attached as Exhibit Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-Z, is a true and correct copy of minutes from a weekly subcommittee meeting held on February 20, 2013. In addition, there is a monthly SPR-FIT training attended by custody and mental health to address suicide prevention strategies and any specific concerns related to suicide at San Quentin. Attached as Exhibit Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-AA, is a true and correct copy of the SPR-FIT monthly trainings held from January 1, 2013 through March 19, 2013. There is also a bi-monthly Difficult Patient Management/High Risk Case Conference that includes mental health staff and

18

custody staff involved with the particular inmate presented at the conference. In addition, training on the Inmate Disciplinary Process – RVR Mental Health Assessment was held at San Quentin on February 13, 2012, with a second training planned for this year. The revised Mental Health and Custody Collaboration training is scheduled to begin at San Quentin on March 18, 2013 and 8-hour classes are scheduled Monday through Friday until May 24, 2013 in order to train approximately 1500 custody staff, mental health, and nursing staff at San Quentin. In order to facilitate these classes, an additional six mental health staff and nine custody staff were trained by Headquarters on March 5 and 6, 2013. Attached as Exhibit Decl. Monthei Supp. Reply Mot. Terminate, Ex. 9-BB, is a true and correct copy of the Mental Health and Custody Collaboration Training Dates schedule and sign-up sheet.

35. Ms. Woodford describes one particular inmate in Paragraph 30 of her declaration and states that "[i]t is my opinion that this inmate should have been transferred for mental health evaluation immediately following the forcible cell extraction, and that his activities as reflected in the 114a logs from the Adjustment Center indicate that he remains in urgent need of a referral for mental health evaluation." However, Ms. Woodford is mistaken that this inmate has not received mental health treatment. To the contrary, mental health services were provided on an ongoing basis prior, during, and after this inmate's refusal of a medical quarantine movement order.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in San Quentin, California on March 21, 2013.

/s/ Eric Monthei
Eric Monthei, Psy.D. Chief of Mental Health
San Quentin State Prison
*(original signature retained by attorney)*

19
Decl. Eric Monthei, Chief of Mental Health at SQSP     Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)