KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>           Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>           Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>REPLY DECLARATION OF DR. WILLIAM WALSH IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5) |

I, Dr. William Walsh, declare as follows:

1. I am the current Chief of Mental Health (CMH) at California Correctional Institute (CCI) in Tehachapi, California. I have been a licensed psychologist since 1982. I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate

1

1  under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under
2  Federal Rule of Civil Procedure 60(b)(5).
3      2.  Between 1982 and 1985, I was in the United States Air Force (USAF), employed
4  primarily as a Clinical Psychologist until my honorable discharge with the rank of Major. I
5  served an additional 12 years in the USAF reserves. In 1985, I entered private practice and, in
6  1992, I retired and returned to school to study medicine. I became the senior managing partner of
7  a rather sizable multidisciplinary mental health care practice (CPP) that managed both inpatient
8  and outpatient clinics throughout California. In 1996, I completed medical school and returned to
9  California to begin working as a staff psychologist with the California Department of Corrections
10 and Rehabilitation (CDCR) at California State Prison-Los Angeles County (CSP-LAC). I have
11 been continuously employed by the CDCR since then with no break in service. By early 1997, I
12 was promoted to Senior Supervising Psychologist and tasked with opening and managing an
13 Enhanced Outpatient Program (EOP) in a 270-degree, level IV yard for a couple of years. I
14 stepped down to staff psychologist after my limited term assignment expired and once again
15 worked as a staff psychologist assigned primarily to Administrative Segregation. I worked the
16 yard as well. In 2000, I again promoted to supervisor and was placed in charge of the Mental
17 Health Crisis Bed (MHCB) Correctional Treatment Facility (CTC) licensing effort at CSP-LAC,
18 in which we successfully obtained licensure. In addition to managing the MHCB, I managed the
19 Administrative Segregation Mental Health Program. Around 2001, I became the acting Chief
20 Psychologist at CSP-LAC for approximately two years. Around 2003, I accepted a permanent
21 Chief Psychologist position at CCI, which was also designated as CMH and I have maintained
22 these jobs ever since. I also worked as the Health Care Manager at CCI for over two years
23 between 2008 and 2011. During that time, I was simultaneously the CMH. Since 2012, I have
24 been the CMH exclusively at CCI.
25     3.  Dr. Craig Haney states in paragraph 229 on page 102 of his Declaration filed March
26 14, 2013, that I told him "many of [the EOP patients at CCI] were GP or CCCMS patients who
27 had decompensated while at CCI and mental health staff found that they now needed EOP level
28 of care." This is a mischaracterization of my statements to Dr. Haney. I explained during the

2

1  tour that, when the situation arises that a CCCMS/GP inmate decompensates, that inmate is
2  immediately referred to the appropriate higher level of care, generally EOP, and the inmate is
3  immediately referred for appropriate transfer. All EOP inmates were identified and attended to.
4  Additionally the specific EOP inmates to which Dr. Haney was referring had had only recently
5  been increased to EOP level of care.

6      4. Dr. Craig Haney states in paragraph 230 on page 102 of his Declaration filed March
7  14, 2013, that "[a] member of the Special Master's team told [me I] could not use the modified
8  treatment cages because they were too narrow. Otherwise, there have not been any intrusive
9  interventions [I] could think of that prevented [me] from doing anything [I] wanted to." This is
10 another mischaracterization of my statements. As I explained to the Plaintiffs' representatives,
11 the Coleman monitors had made things extremely difficult regarding this issue. Specifically,
12 when the very expensive therapeutic modules did not fit through the door, the modules had to be
13 cut in half to get through the door and then be re-assembled and installed. However, despite that
14 at the visit before the same monitors had approved of the space where the modules were then
15 placed, on their next visit, the monitors claimed that they did not like the placement of the
16 modules.

17     5. Dr. Craig Haney states in paragraph 231 on page 103 of his Declaration filed March
18 14, 2013, that the group of CDCR staff accompanying him on the tour "ha[d] the effect of
19 substantially slowing down our tour activities, as each of us had to show identification and sign
20 in/out at various checkpoints each time we moved from one unit to the next. Given these delays
21 and long distances between facilities inside the prison, I did not have the opportunity to visit
22 Facilities C, D, and E which housed over 600 prisoners on the mental health caseload." In fact,
23 most security checkpoints did not take longer than two to five minutes and, at one point, the
24 Facility Captain checked identifications to expedite the tour's passing through a security
25 checkpoint. The Plaintiffs' attorneys also requested a break at one point, which lasted about 30
26 minutes. Moreover, the Plaintiffs' representatives did not request to attend Yards C, D and E,
27 although activities on other yards were mentioned to them. I also note that there was an inefficient
28 use of time when the Plaintiffs' representatives transferred from Yard B to Yard A, then back to

3

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1  Yard B, and finally to Yard A again. Furthermore, the Plaintiffs' representatives interviewed
2  some inmates more than once, leaving the yard and returning back to it to do so.

3      6. Dr. Craig Haney states in paragraph 232 on page 103 of his Declaration filed March
4  14, 2013, that the Deputy Warden told him "there was no treatment space on the units because
5  'treatment' was not something that CCI was originally designed to do. Now that it has been made
6  a central part of CCI's mission, he said, there is little that can be done to overcome the physical
7  limitations that were initially built into the design of the facility." Despite the original design of
8  the institution, inmates continue to seen regularly and timely in private settings.

9      7. Dr. Craig Haney states in paragraph 233 on page 103 of his Declaration filed March
10 14, 2013, that "[t]he 'repurposing' of a number of units made it difficult to tell whether the space
11 limitations with which the prison was plagued in the past have gotten appreciably worse. No one
12 suggested they had gotten dramatically better." I first note that this statement is contradicted in
13 paragraph 235 on page 104, where his report states, "On the other hand, CCI has successfully
14 managed the 'conversion' of a non-contact visiting area for clinical use in the Ad. Seg. area of the
15 prison. Specifically, the lack of appropriate space for one-on-one clinical contacts in the Ad. Seg.
16 unit at CCI led the prison to take rooms that once were used for non-contact attorney visits and
17 converted them into treatment space." This non-contact visiting area is still used for non-contact
18 confidential attorney visits. This conversion also took place in the Security Housing Unit (SHU)
19 as well, so these non-contact visiting areas are available in Administrative Segregation Units
20 (ASUs) and SHU for treatment space. Additionally, as I specifically told the plaintiffs'
21 representatives during the tour, that space had dramatically improved since the 2008 visit. I also
22 pointed out to the plaintiffs' representatives that treatment space had been gained on Yards A, B,
23 C, D, and E. It was not the case in 2008, nor is it now, that Mental Health is ignored when it
24 comes to looking at treatment space.

25     8. Dr. Craig Haney states in paragraph 234 on page 104 of his Declaration filed March
26 14, 2013, that "[t]he mental health cells in the OHU are barren and bleak, and the inmate-patients
27 inside them were lying down on the floor when we walked through in the late morning, huddled
28 on thin mattresses, with their blankets pulled up over their heads." Then, in paragraph 244 on

4

1  page 109, Dr. Haney further stated, "I observed and spoke with inmate patients who found
2  themselves placed in inhumane or dangerous settings at CCI-including in the OHU (where
3  prisoners are made to sleep on the floor)...." In paragraph 247 on page 110, he further called the
4  OHU placements "barren OHU cells, where inmate-patients I spoke with were held for several
5  days following their mental health crisis admission." He makes similar statements in paragraph
6  59 on pages 27-28. This is not accurate. First, inmates in the Outpatient Housing Units (OHUs)
7  are provided suicide-resistant mattresses. Additionally, most inmates in the OHU are placed for
8  danger to self and are under suicide watch or precaution. As a precaution and in efforts to prevent
9  self-injurious behaviors inmate patients in the OHU are allowed very limited items. Some of these
10 items include paper clothing or a safety smock, a safety mattress and a safety blanket. When an
11 inmate expresses suicidal thoughts, or demonstrates concerning behavior to his clinician, the
12 inmate will be placed in a holding cell and immediately assessed by a supervising clinician as
13 well as staff from the OHU. If the inmate requires further care, the inmate will be admitted to
14 the OHU on a temporary basis as OHU staff immediately begins the referral process to either a
15 Mental Health Crisis Bed (MHCB) or to Department of Mental Health, whichever is most
16 appropriate.

17    9. Dr. Craig Haney also states in paragraph 247 on page 110 of his Declaration filed
18 March 14, 2013, that "Lindsay Hayes, in his August 16, 2011 report for CDCR, was 'quite
19 concerned about the current conditions observed in the OHUs' at certain institutions, including
20 the unsanitary conditions and lack of beds or other humane amenities." The OHU at CCI is
21 cleaned regularly and, as noted above, inmates in the OHU do sleep on suicide-resistant
22 mattresses.

23    10. Dr. Craig Haney also states in paragraph 274 on page 122 of his Declaration filed
24 March 14, 2013, that "The OHU is used to provide crisis level care, although it is not equipped or
25 licensed the way an MHCB is." As noted above, the OHU is only used to provide temporary
26 crisis level of care while facilitating transfer to a licensed crisis facility.

27
28

5.
Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

11. Dr. Craig Haney states in paragraph 237 on page 105 of his Declaration filed March 14, 2013, that I told him CCI "currently had a vacancy in the Chief Psychiatrist position." This is incorrect. The correct designation that was vacant was our Senior Supervising Psychiatrist.

12. Dr. Craig Haney states in paragraph 240 on pages 106-107 of his Declaration filed March 14, 2013, that he attended an inmate group that "was being held in a large open hallway outside the dining hall. But there was a very loud blower or industrial fan that was on in the background; it was so loud that it was very difficult to hear. In addition, the hallway was very cold (which was especially problematic because none of the inmate-patients was wearing a jacket or coat)." The blower that Dr. Haney mentions is a fan that is activated when the door to the building is opened. The plaintiffs' representatives insisted that this door be kept open and hence this blower noise, which is not usually heard as the building door is routinely shut when group is being conducted, was directly due to this request that the door stay open. Additionally, with respect to the noise level, I stood approximately 20 to 30 feet from the modules and was able to hear the proceedings when the plaintiff's attorneys had walked into the group. Notably, as I had interrupted by walking in, I excused myself to the inmates in the group and the inmates appeared to clearly hear and understand me, despite the noise in the background. The reason that the group was held in the Dining hall was because it is winter. During the warmer months the group is held outside. With regard to the temperature, all inmates are issued a jacket and can elect to wear it or not. Like the inmates, neither I nor the Recreation Therapist was wearing a jacket and neither of us was cold.

13. Dr. Craig Haney further states in paragraph 240 on pages 106-107 of his Declaration filed March 14, 2013, that all nine treatment modules "were arranged in a long straight line, so that participants really could not function as a 'group' at all. It would have been impossible for any one prisoner to see (or hear) another prisoner who was more than two cages away, and the prisoners acknowledged this to me when I spoke to them." As I explained to the Plaintiffs' representatives during the tour, no more than three to four of these linear arranged treatment modules are used at a time. Groups generally do not have more than 5 to 6 members. If more

6

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1   treatment modules are needed, then two or three modules behind the Recreational Therapist are
2   used as these modules face the other modules directly.
3         14. In further discussion of the inmate group, Dr. Craig Haney states in paragraph 241 on
4   pages 107 of his Declaration filed March 14, 2013, that the inmates in the group stated "there
5   were rarely more than three (3) prisoners who attended group—'most guys refuse'." This is
6   inaccurate as a review of that therapist's groups from July 2012 through February 22, 2013,
7   denotes only a 32% patient refusal rate. Additionally, group sizes tend to be at a maximum of 5
8   to 6 members per group for greater therapeutic effect.
9         15. Dr. Craig Haney further states in paragraph 241 on page 107 of his Declaration filed
10   March 14, 2013, that three of the inmates in the group he observed said that "they saw their
11   clinicians no more than once a month, and sometimes even more infrequently than that." Under
12   the Coleman program guide requirements, inmates at the Correctional Clinical Case Management
13   System (CCCMS) level of care, who are serving Security Housing Unit (SHU) terms, receive
14   contact every 30 days with their primary clinicians. In addition, these inmates are seen for
15   psychiatry appointments as needed, Interdisciplinary Treatment Team (IDTT), IDTT preparation,
16   and pre-parole counseling as appropriate. These inmates also receive weekly rounds by Licensed
17   Psychiatric Technicians (LPTs).
18         16. Dr. Craig Haney further states in paragraph 242 on page 108 of his Declaration filed
19   March 14, 2013, that, "[e]ven assuming 6 patients attend every group in a given month
20   (something that prisoners told us rarely if ever occurred) that adds up to just 144 treatment hours
21   available to mentally ill prisoners a month (6x24 treatment hours)." Dr. Haney further stated,
22   "The schedule also reveals that there are no group treatment sessions provided for the 68 CCCMS
23   and one EOP prisoner housed in Facilities D and E. My interviews with many inmate-patients
24   in distress at CCI, who reported having little or no group treatment available to them, confirmed
25   as much." As per *Coleman*-approved program guidelines group therapy treatment is not required
26   for inmates at the CCCMS level of care. We are therefore providing services above and beyond
27   treatment requirements by providing some groups. Additionally, part of treatment hours includes
28   groups, Primary Clinician contacts, IDTT, IDTT preparation, Psychiatry contacts as needed if

7

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

appropriate, Pre-parole counseling, and weekly LPT rounds in the SHU, which Dr. Haney did not include in his above calculation. I also note that, when an inmate's level of care is increased to EOP level, the inmate is immediately referred for transfer to a Psychiatric Services Unit (PSU) where SHU inmates can receive EOP level of treatment.

17. Dr. Craig Haney states in paragraph 247 on pages 110 of his Declaration filed March 14, 2013, that "CCI's 25th Round Management Report, prepared for the Special Master, raised an additional concern. It stated that only "64% [of OHU patients admitted for suicidality] were administered a SRE [Suicide Risk Evaluation] at the time of placement, 0% received an SRE upon release from OHU, and 62% received a five day follow-up upon their release." CCI stated that a "contributing factor" to this low performance in the areas of suicide prevention was "loss of mh staff assigned to the OHU which has not been replaced." This is inaccurate. SREs were not accounted for appropriately in MHTS.net. Upon review of data from August 2012 through February 2013, 91% of the inmates received an SRE at admission to the OHU and 96% received an SRE at discharge from the OHU. Additionally, the actual percentage of inmates receiving a five-day follow up after discharge from the OHU and MHCB was 100% for the time period reviewed of August 2012 through January 2013.

18. Dr. Craig Haney states in paragraph 248 on page 111 of his Declaration filed March 14, 2013, that "Ad Seg prisoners at CCI fell into two general categories—those prisoners who had been sent directly to Ad Seg from GP yards, and those who were coming "back down" from SHU, after the completion of their SHU term .... [M]any of them were mentally ill inmate-patients who were suffering under very severe Ad Seg conditions simply because there was no appropriate bed elsewhere in the system in which to place them." Inmates continue to receive treatment while awaiting transfer. They are constantly monitored and treated and if any decompensation is observed then the inmate is immediately referred to a higher level of care.

19. Dr. Craig Haney states in paragraph 253 on page 114 of his Declaration filed March 14, 2013, that "backlogs for one mental health bed (EOP) cause further backlogs elsewhere (EOP ASU). And meanwhile, a mentally ill inmate-patient gets worse in a bad bed in which he should

8

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1 | never have been placed to begin with." Inmates continue to receive therapeutic care while in the
2 | SHU in additional to weekly LPT rounds, per *Coleman*-approved program guide requirements.
3 |     20. Dr. Craig Haney states in paragraph 257 on page 115 of his Declaration filed March
4 | 14, 2013, that the segregation units are "places where [inmates'] treatment needs cannot be and
5 | are not adequately addressed." Additionally, in paragraph 258 on page 115, he further adds that
6 | "the SHUs at CCI are also very harsh and subject inmate-patients to conditions of confinement
7 | that may further damage their already fragile mental health conditions." Dr. Haney goes on to
8 | state that Coleman class members in these units are "suffering" and that their "mental conditions
9 | are being adversely affected by their time in SHU and the lack of programming and treatment
10 | they receive there." Treatment continues to be provided at CCI within *Coleman*-approved
11 | program guide requirements and oftentimes above and beyond the requirements. For example,
12 | groups are provided to non-EOP inmates, which is above program guide requirements. Inmates
13 | are seen as per these requirements in Primary Clinician contacts, Psychiatry contacts as needed,
14 | IDTT, IDTT preparation, and pre-parole counseling. Additionally, inmates are seen during LPT
15 | rounds daily in ASU and weekly in the SHU.
16 |     21. Dr. Craig Haney states in paragraph 269 on pages 119-120 of his Declaration filed
17 | March 14, 2013, "Implicit in my lengthy discussion of the institutional histories of the many
18 | inmate-patients who are being subjected to these harsh, severely deprived and potentially
19 | damaging conditions of confinement - most often merely because they are waiting to be
20 | transferred elsewhere - is the concern that many of them will decompensate and require an even
21 | higher and more difficult to obtain level of care, or act out in response to the harshness of their
22 | environment and lack of treatment, precipitating an even longer stay in punitive segregation.
23 | There were numerous examples of this destructive process in operation at CCI, beyond the ones I
24 | have already recounted." Much of Dr. Haney's statement is unsubstantiated inference. All
25 | mental health inmates receive treatment at minimum within *Coleman*-approved program
26 | guidelines, and often in excess of requirements. A higher level of care is not more difficult to
27 | obtain as inmates meeting requirements for a higher level of care are referred for a higher level of
28 | care immediately.

9

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

22. Dr. Craig Haney states in paragraph 245 on page 109 of his Declaration filed March 14, 2013, that Inmate KK told him he had "been mistreated in the past at this OHU, and that he was housed here again temporarily, having been transported from SVSP to attend Court. 'They put me in the OHU because they don't have an EOP bed for me'." This inmate has been treated appropriately and consistently within program guidelines during past visits to the OHU. Inmate KK was placed in the OHU to provide increased level of care given EOP placement and recent DSH placement and discharge. Increased level of care includes primary clinician contacts five days per week and daily contacts by the LPT. In the same paragraph, Dr. Haney also noted Inmate KK to state that his OHU placement included "being placed in restraints for all escorts, being forced to sleep on the floor in his cell and so on." All inmates placed at CCI for Out to Court (OTC) are placed in ASU and require placement in restraints for all escorts, so Inmate KK was treated in accordance with policy and procedure for all OTC inmates. Inmate KK was provided a safety mattress and was not required to sleep on the ground.

23. Dr. Craig Haney states in paragraph 249 on pages 111-112 of his Declaration filed March 14, 2013, "While I was in the Ad Seg unit, I spoke with Prisoner LL, who told me he had been waiting in Ad Seg for 90 days, having completed his SHU term. However, because of the amount of time that he was in Ad Seg waiting to transfer and the harsh conditions under which he waited, he was afraid that he on his way back into SHU. . . . He said that he was endorsed for Kern Valley but that the endorsement had been withdrawn . . . and may now face another SHU term. . . . He said he did not know of any groups being held on the unit or accessible to prisoners like him. He sees his clinician, Dr. Jensen, for a few minutes each week … He also was afraid of the stress building up and getting to him, precipitating another incident that would give him a third strike." According to the inmate's electronic Unit Health Record (eUHR), Inmate LL expressed his strong desire to return to the SHU on several different occasions. His clinician states, "IPs main focus in treatment has been discussing different ways to manipulate himself back into the SHU." (See Decl. Vorous Supp. Reply Mot. Terminate, Ex. 1-A.) Regarding his endorsement to Kern Valley, this endorsement was rescinded when Inmate LL received a new rules violation for Possession of a Deadly Weapon, of which he was found guilty. He was only in

10

1  ASU only 30 days before he committed this SHU-able offense. With regard to availability of
2  groups, per *Coleman*-approved program guidelines, group therapy is not required for CCCMS
3  SHU or ASU inmates. However, CCI has gone above and beyond what is required and offers
4  group for some inmates in ASU and SHU. Regarding his claim of seeing his clinician for only a
5  few minutes each week, a review of our mental health tracking system, MHTS.net, indicates that
6  his weekly sessions with his primary clinician averaged 29 minutes.
7      24. Dr. Craig Haney states in paragraph 250 on pages 112 of his Declaration filed March
8  14, 2013, that Inmate MM told him his "clinical contact [with his primary clinician] often lasts
9  only a couple of minutes. . . ." A review of MHTS.net indicates that his weekly sessions with his
10 primary clinician averaged 26 minutes.
11     25. Dr. Craig Haney states in paragraph 259 on pages 115 of his Declaration filed March
12 14, 2013, that "Prisoner PP is an EOP SHU inmate (although EOPs are not supposed to be in the
13 SHU)." According to the MHTS, Inmate PP had only recently been made EOP on February 7,
14 2013, while housed in the SHU. Subsequent to the increase in his level of care, he was referred
15 for transfer to an EOP program and transferred within 30 days on March 6, 2013. This transfer
16 occurred well within the 60 days allowed by the *Coleman*-approved program guide. Dr. Haney
17 further noted Inmate PP's assertions that "his weekly clinical contact with his case manager …
18 can last for as little as 5 or 10 minutes." A review of MHTS.net indicates that his weekly sessions
19 with his primary clinician averaged 35 minutes.
20     26. Dr. Craig Haney states in paragraph 264 on pages 117 of his Declaration filed March
21 14, 2013, that Prisoner RR told him "he was getting hardly any therapeutic contact or support in
22 the SHU," had "not seen a case manager since he entered the SHU" and stated that "there are no
23 groups either." A review of his record indicated that Inmate RR was moved to the SHU on
24 January 31, 2013. He has received numerous contacts with clinical staff since that time. (See
25 Decl. Vorous Supp. Reply Mot. Terminate, Ex. 1-B.) Additionally, Inmate RR has a history of
26 refusing offered private therapeutic contact. According to the MHTS.net, he has refused 6 out of
27 the 12 private contacts offered since the beginning of January, electing instead, to be seen cell-
28 front where the opportunity for therapeutic exchange is more limited. Dr. Haney also noted that

11

1  Inmate RR claimed "he had not had an IDTT meeting yet." According to the MHTS, Inmate RR
2  was present for his IDTT in the SHU on February 15, 2013. (See id.) Dr. Haney also noted
3  Inmate RR's statement that "psych techs do not check on the prisoners in the SHU 'they way they
4  should.'" LPTs make rounds to tend to each SHU inmate once a week, as per the *Coleman*-
5  approved Mental Health Program Guide. Among other things, the LPTs offer the inmates activity
6  handouts and an opportunity to request a referral to see their Primary Clinician.
7     27. Dr. Craig Haney states in paragraph 265 on pages 118 of his Declaration filed March
8  14, 2013, that Prisoner SS told him he was "hardly being seen by clinical staff." Inmate SS
9  arrived in the SHU on February 2, 2013. Subsequent to his arrival, he met with the Psychiatrist
10 for a private contact on February 5, 2013. He then met privately with his Primary Clinician on
11 February 7, 2013. The following week, Inmate SS participated in his initial IDTT where his
12 treatment plan was discussed. Then, the following week, he was seen yet again by the
13 Psychiatrist in a private setting to discuss medication issues and options. (See Decl. Vorous
14 Supp. Reply Mot. Terminate, Ex. 1-C.)
15    28. Dr. Craig Haney states in paragraph 268 on pages 119 of his Declaration filed March
16 14, 2013, that records showed "on Dec. 24, Prisoner UU submitted a HC Services Request
17 stating: 'I would like to talk to mental health. I've been down 3-years with 4 1/2 to go. I find
18 myself thinking different. I'm getting more and more institutionalized. My way of thinking and
19 my anger issues to be addressed ASAP. Thank you.' However, as of February 7, 2013, more than
20 two months later, there was no indication in his records that he had been seen or actually placed
21 on CCCMS status." On December 24, 2012, neither a medical nor mental health request form
22 CDC 7362 Request for Healthcare Services, nor CDCR 128-MH5 Mental Health Referral chrono,
23 are documented in the MHTS, nor found in the inmate-patient's eUHR. For that date, only a
24 CDC 7243 Health Care Services Physician's Request for Services was submitted for referral to
25 specialist, by Inmate UU's treating physician. Inmate UU only submitted requests for medical
26 intervention on December 4, 2012 and December 20, 2012. Dr. Haney further quotes the inmate
27 as stating "I've been on CCCMS before. I ask for groups. I need to be around people- they just
28 want to give you a pill. It doesn't work, plus it interferes with my medical problems." Dr. Haney

12

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

added that Inmate UU said the last time he was CCCMS, he objected to receiving medications and was removed from the caseload. He is worried that despite now being placed back at the CCCMS LOC, he will not be helped 'because they have no groups,' in SHU." According to a review of his records, Inmate UU was removed from the Mental Health Services Delivery System (MHSDS), CCCMS level of care, on April 14, 2011 due to lack of participation in his mental health treatment as well as for not meeting criteria for an Axis I diagnosis. Notably, on Inmate UU's SHU yard, there are currently three groups running and offered to MHSDS inmate-patients. With his recent placement back into the MHSDS, CCCMS LOC, he qualifies for participation in these groups.

29. Dr. Craig Haney states in paragraph 270 on pages 120 of his Declaration filed March 14, 2013, that Inmate VV "has been awaiting to transfer to SNY EOP bed since February 11[, 2013]. As of March 4, he was still waiting at CCI . . . ." Inmate VV was transferred to CSP-LAC EOP on March 6, 2013, which was within the 60-day program guideline, per the *Coleman*-approved program guide. Dr. Haney further noted Inmate VV's claim that he "lost weight- 30-40 pounds- from exercising in [his] cell, because that's the only thing to do." Inmate VV's reported 30-40 lb weight loss is inconsistent with a review of his records in his eUHR. Per the eUHR, he weighed 164 pounds on May 10, 2012, 175 pounds on February 7, 2013, and 165 pounds on March 6, 2013, which demonstrates fairly consistent weight maintenance.

30. Dr. Craig Haney quoted Inmate WW in paragraph 272 on pages 121 of his Declaration filed March 14, 2013, as stating "I sleep on the floor like an animal... I've been in Ad Seg a year trying to get a transfer." Inmate WW was placed in management cell on February 11, 2013 with paperwork, full set of clothing and linens, and mattress. Dr. Haney also noted Inmate WW as stating that "he just could not take it- 'I lost it', banged on the door, now I got a 115 and might get a SHU term' From his perspective, this has happened because he was held in Ad Seg for so long, beyond what he could tolerate or endure. He called his current situation the "bottom of the barrel" and a very hard place to be." A review of this record indicates that his primary clinician reports him to be coping well while drawing and relaxing in cell.

1  I declare under penalty of perjury under the laws of the State of California and the United States
2  of America that the foregoing is true and correct. Executed in Tehachapi, California on March
3  21, 2013.

Dr. William Walsh

*(original signature retained by attorney)*

14

Decl. of Dr. William Walsh in Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)