KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                              Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF ELLEN BACHMAN IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Ellen Bachman, declare as follows:

1. I am the Executive Director for the Vacaville Psychiatric Program (VPP) and have worked in this position since late January, 2012. I have dedicated my career to management of treatment of mentally ill patients, having worked in supervisory and management positions with the California Department of State Hospitals (DSH) for approximately 25 years. Prior to taking

1

on supervision and management duties, I was a Music Therapist for 5 years, providing music therapy groups and recreational activities to state hospital forensic patients. I have personal knowledge of the facts stated in this declaration, except where indicated otherwise. I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. As the Executive Director of VPP, I oversee all VPP clinical programs and administrative services and I work collaboratively with the California Medical Facility Warden and CEO of Health Care to ensure that we provide quality patient care in a safe and secure environment. I am aware of our staffing and treatment modalities and am committed to maintaining and enhancing the comprehensive, innovative mental health treatment programs we operate at VPP.

**VPP works actively to quickly process and admit inmate-patients in need of placement in our acute program**

3. Care at our acute program involves a dynamic and constant flow of patient referrals, evaluations for placement, admissions, and discharges. For example, the total flow of patients for our acute program over the last four weeks was as follows.

- the week of February 18, 2013, we had 16 admissions, 20 discharges and 13 new referrals;
- the week of February 25, 2013, we had 14 admissions, 11 discharges, and 17 new referrals;
- the week of March 4, 2013, we had 18 admissions, 19 discharges and 19 new referrals; and
- the week of March 11, 2013 we had 13 admissions, 24 discharges and 22 new referrals.
- This week to date (March 18 and 19, 2013) we had 14 admissions, 7 discharges and no new referrals. Today, March 20, 2013, we have 7 beds on hold for pending admissions and 5 scheduled discharges with one additional patient on the discharge list pending placement.

2

4. Additionally when patients are referred to VPP they must be evaluated for placement, which involves review, evaluation and determination of appropriate placement within our facility based on clinical and other factors.

5. Because of the constant flow of patients, a static examination of the total number of patients who have been referred, but not yet admitted, on two separate days is incomplete and misleading. Simply put, the patients who have been referred and are being evaluated on a given date are not the exact same patients who have been referred and are being evaluated two weeks later, because many, if not all, patients will have been admitted and new patients will have been referred for evaluation.

6. While we make every effort to expeditiously evaluate and place referred patients, the Court has acknowledged that 10 days is a reasonable period for a referred patient to be evaluated and placed in our program. If a patient has waited beyond those 10 days, they are considered to be on the waiting list.

7. We closely monitor the rates of referrals, admissions, and discharges to determine our ability to expeditiously place referred patients. When we observe an increase in the numbers of referred, but not yet placed patients, we take all reasonable steps to address the situation. For example, on March 6, 2013, after closely monitoring the referral and placement rates since early January, we determined that it was necessary to open an additional unit, L-2, to increase our capacity and ensure that patients are admitted in a timely manner. Our first patient will be accepted on March 20, 2013 and we will be admitting patients on a continuing basis.

8. Because Unit L-2 was not designed as an acute unit, individuals on the acute referral list will not be admitted directly to L-2. Instead, patients will be transferred within VPP units on a medically appropriate basis to open up acute beds. This process is described as follows. First, patients on existing VPP ICF units have been clinically evaluated and identified as appropriate for transfer to L-2. This will open up ICF beds for patients in the Acute Psychiatric Program (APP) who are ready for transition to the ICF level of care. As these acute patients transfer to ICF beds, individuals on the referral list will be brought into APP. These transfers are in addition to the regular discharge of patients who are ready for return to the EOP level of care at

3

Decl. Bachman Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

their sending institution. It is anticipated that incorporating these additional ICF beds on L-2 into our overall capacity will facilitate a rapid reduction of the referral list.

9. In order to expedite this process, we have worked closely with the California Department of Public Health (CDPH) Licensing and Certification Branch on a request for program flexibility. CDPH has approved this request, which will allow us to transfer patients between Acute and ICF units without closing the medical record and re-opening a new record, in essence avoiding a full discharge and admission process. This significantly reduces the amount of paperwork to be completed by our clinicians without negatively impacting patient care. Expediting quality treatment is a priority at our facility and we were successful in negotiating this adjustment in documentation requirements with CDPH in order to facilitate continuity of care as patients transition from one level of care to another within VPP.

10. The current list of 14 patients who are pending placement includes 8 individuals who were referred more than 10 days ago. Those patients have been pending placement for a longer period because our triage process, which prioritizes suicidal and self-injurious patients for admission, has required that other patients with urgent needs be admitted ahead of these less acute patients.

11. The triage process requires that inmates' clinical needs dictate placement, rather than the date of referral. The triage process is absolutely necessary to ensure patient care, although this priority means that those patients with less acuity must sometimes wait somewhat longer for placement.

12. Under the triage process, individuals referred as a result of a suicide attempt, or self-injurious behavior, are the highest priority for admission. Individuals who are expressing suicidal ideation are the second priority for admission. Individuals who are referred due to psychiatric or behavioral reasons but are not displaying suicidal or self-injurious behavior or ideation are the third priority for admission. Those individuals who are in Mental Health Crisis Beds (MHCB) are also granted placement priority over individuals in Enhanced Outpatient Program (EOP) housing units. The rationale is that individuals in an MHCB have a higher acuity level, and if individuals in EOP require immediate services, they will be referred to the MHCB

4

level of care.

13. Moreover, all patients pending placement still receive psychiatric treatment, and the majority of patients currently pending acute placement are being treated at Department of Corrections and Rehabilitation MHCB facilities. Of the individuals currently pending acute placement, only two are in EOP units.

**DSH discharges are based on patients' clinical needs**

14. Discharge planning and determination of discharge readiness is a process that begins at admission to ensure that patient discharges are based on appropriate clinical rationale. A patient's primary treatment needs are identified in the admission assessment process and are outlined in the initial and master treatment team conferences. The interdisciplinary treatment team develops the patient's treatment plan which includes treatment goals and discharge criteria. Throughout the course of treatment, the treatment plan, including discharge criteria, is reevaluated and revised as clinically appropriate.

15. When the treatment team determines a patient is ready for discharge the treating psychiatrist prepares a recommended continuing care plan/discharge summary. The discharge summary includes a thorough history of the patient's treatment at DSH, including the diagnoses on referral and admission, course of treatment pursued and progress made, status at the time of discharge, and an explanation of the clinical determination that discharge is appropriate. Clinicians are not pressured to prematurely discharge patients from DSH.

**VPP is adequately staffed**

16. VPP is not experiencing a shortage of clinical staff. For example, we currently have twenty-two psychiatrists on staff, including five contract psychiatrists. An additional contract psychiatrist is going through the credentialing process and is expected to join our staff within the next month. In order to maintain our staffing and address any anticipated or unanticipated departures, we actively recruit for clinical classifications including psychiatrists, psychologists, social workers, rehabilitation therapists, registered nurses, and psychiatric technicians. We are also conducting interviews at this time to fill vacancies. Some of these vacancies are related to activating L-2 and others are a result of normal attrition.

5

Decl. Bachman Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

17. A review of our total vacancy rates is misleading because it includes positions associated with units that have not been activated. As a result, the total vacancy rates appear higher than the actual number of staff needed to meet licensing minimums and staff our units at the acute and ICF levels of care. Vacancy rates also show a high number of psychiatric technician vacancies. VPP added the psychiatric technician classification to our staffing mix with the L-wing expansion, including unit L-2 which is being activated at this time, and unit L-1 which has not been activated. We have not needed to fill many of these psychiatric technician positions thus far because we have appropriate levels of staffing coverage with the existing number of medical technical assistants. With the L-2 activation we anticipate hiring additional psychiatric technicians.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Vacaville, California on March 22, 2013.

Ellen Bachman
*(original signature retained by attorney)*

CF1997CS0003
20668591.docx

6

Decl. Bachman Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)