KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN JR., et al., <br><br> Defendants. | 2:90-cv-00520 LKK JFM PC <br><br> **REPLY DECLARATION OF LORI WILLAMS IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Lori Williams, declare as follows:

1. I am the Chief Psychologist at Central California Women's Facility (CCWF) in Chowchilla, California. I am licensed as a psychologist in California and my curriculum vitae is attached to this Declaration. (Vorous Supp. Reply Mot. Terminate, Ex. 2-C.) I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate

1

under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5). My declaration is in response to the Expert Declaration by Edward Kaufman, M.D. Dr. Kaufman toured the Central California Women's Facility (CCWF) on February 8, 2013. His Expert Declaration was filed on March 14, 2013.

2. I have worked for the California Department of Corrections and Rehabilitation since 1996. I started as a Staff Psychologist at the Reception Center at Valley State Prison for Women (VSP). In August 2001, I was promoted to Senior Psychologist, Supervisor at VSP. In December 2004, I was appointed acting Chief Psychologist/Chief of Mental Health at Valley State Prison for Women. This became a permanent position May 2007. As of April 1, 2013, I became the Chief of Mental Health at CCWF, but also continue to work at VSP as the Chief Mental Health Executive.

**A. Alleged Major Staffing Shortages**

3. Dr. Kaufman asserted, at paragraph 24 of his declaration, that clinical staffing shortages hinders our capacity to deliver even basic mental health care. This is incorrect. While CCWF has faced significant staffing challenges due partly to an increase in population caused by the conversion of Valley State Prison for Women (VSPW) to a men's institution, our staff makes a concerted effort to provide inmates with appropriate care. Additionally, since Dr. Kaufman's visit on February 8, 2013, out staffing has increased. One psychologist and one social worker were borrowed from VSP and continue to provide services at CCWF, although they do not yet occupy official positions. Currently, 7.5 out of 9.5 psychiatry positions have been filled and a .75 psychiatry contractor was brought on board.

4. At paragraph 29, Dr. Kaufman characterized the lack of group therapy for EOP inmates in administrative segregation as due to staff shortages and opined that the lack of group therapy is a serious deficiency in mental health care. Dr. Kaufman does not understand the mission of the CCWF administrative segregation unit. CCWF temporarily houses administrative segregation EOP inmates about 30 days while they individually await transfer to California Institute for Women. And it is well known in the mental health community that group therapy is not therapeutic for mental health patients when the group is constantly changing, because there is

2

not time to build rapport and a sense of safety and trust among the group members. In fact, Dr. Kaufman cites this very principle in paragraph 54 of his declaration. EOP inmates in administrative segregation receive staff contacts throughout the day through medication rounds, library offerings, yard time, and cell front contacts. Treatment modules are available for confidential individual interviews when additional care is needed. Our staffing is adequate to assure that every inmate in our ASU EOP receives the appropriate level of care required by their individual needs. If a clinician determines an inmate needs a higher level of care, the inmate is transferred.

5. In paragraph 30 of his declaration, Dr. Kaufman asserts that Prisoner A, an EOP inmate in administrative segregation at CCWF, is in need of additional treatment and quoted her claims that she had not received clinical contacts out of cell since she had transferred to CCWF. I reviewed of the medical records of Prisoner A and disagree with the Dr. Kaufman's assessment and the claims made regarding Patient A's clinical contacts. Patient A was transferred to CCWF on January 15, 2013. Her initial clinician contact was on January 23, 2013. She was seen by her primary clinician on January 28, 2013, out of cell, to complete her mental health paperwork for the interdisciplinary treatment team (IDTT). Prisoner A was seen in IDTT on January 29, 2013. Her EOP level of care was left unchanged due to her mental health symptoms. She was offered out of cell contacts on February 4, 2013 and February 11, 2013. On both dates, Prisoner A refused to be seen out of cell.

6. Dr. Kaufman, at paragraphs 32 and 48, also criticize the treatment and staffing at CCWF on the basis of select portions of medical records for only two inmates that reflect each received **a single** cell-front due to staffing issues. CCWF tracks data on all clinical appointments, including whether the appointment was conducted cell front in the Mental Health Tracking System. I requested a staff member to export the data on clinical contacts for the period September 1, 2012 through February 28, 2013, which is the only timeframe available through this process, into an Excel spreadsheet. I have reviewed and agree with the data. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 2-D.) The data reveals that of the 2,299 clinical encounter between September 1, 2012 and February 28, 2012, less than 12 % of all encounters occurred at

3

the cell-front. (*Id.*) Moreover, only **fourteen** cell-front contacts, or less than 1% of the total clinical contacts, were because of the unavailability of staff escort.

7. Dr. Kaufman's repeated criticisms throughout his Declaration about the lack of confidential contacts are misplaced. The great majority of contacts—82.86 %— of all encounters occurred in a confidential setting. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 2-D.)

### B. Alleged Inadequate, Inappropriate and Anti-Therapeutic Treatment Space

8. In paragraph 53 of his Declaration, Dr. Kaufman mischaracterizes the housing of EOP inmates. He states EOP patients are housed in a unit with non-mental health caseload reception center patients. This is incorrect. EOP inmates are housed only with reception center inmates who are clinical case management (CCCMS) patients. In order to maintain separation between the two populations a bank of cells are left empty, and red tape is used to create a dividing line in the unit so that the inmates do not intermingle when they are out of their cells. Dr. Kaufman asserts that this results in diminished freedom of movement and greater confinement for both populations. But the use of the dividing line allows for significant amounts of out of cell time in the unit. In addition, I have found that inmates respect the dividing line and do not try to interact with inmates of the other population. Also, these populations are not confined to the unit. The EOP inmates have yard time and attend group therapy with no interference by the CCCMS inmates. To my knowledge no EOP inmate has voiced concern about the CCCMS inmates being housed in the same unit.

9. At paragraph 54, Dr. Kaufman opines that group therapy conducted in non-confidential settings is not effective. Group therapy meetings for EOP inmates are held in the unit dayroom, but are also sometimes held in the institution chapel or gym, either of which provides more confidentiality. To my knowledge no member of EOP group therapy held in the dayroom has voiced a concern that CCCMS inmates may hear them. And in my experience, EOP group therapy sessions held in the unit result in the same level of participation as when groups are held in the more confidential settings of the chapel or in the gym. During group therapy held in the dayroom custody officers do maintain their security rounds, escort inmates, and monitor office encounters, but they are not posted near the group to purposely hear the conversations.

4

Decl. Williams Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

### C. Alleged Excessively Punitive Practices in Mental Health Crisis Beds

10. At paragraph 85 of his declaration, Dr. Kaufman stated he observed widespread cuffing of inmates at CCWF within the MHCB unit. While I do not know how many inmates Dr. Kaufman observed, patient inmates in the MHCB are typically not cuffed unless they are administrative segregations status or at risk of hurting themselves or others. During a Sustainability Tour conducted Feb 22-28, 2013, by the Regional Mental Health director and Coleman monitors, it was noted and staff received praise that inmates were not cuffed during the IDTT process. Staff was also praised for their appropriate interactions with patients.

11. Dr. Kaufman also asserts that CCWF's MHCB is punitive based solely on Prisoner D's recollections and impressions of her treatment by staff following an attempted suicide in June 2011. Patient D described being stripped, searched, and placed into an MHCB with only a non-tear blanket and a non-tear smock. I reviewed Prisoner D's MHCB admission records and disagree that the actions described by Prisoner D were punitive. They are actions based on clinical decisions of the admitting psychiatrist to prevent further self harm and were consistent with the *Coleman* approved Program Guide. Prisoner D had lacerated her neck and was assessed to have moderate acute and chronic risk for further suicidal behavior on admission to the MHCB. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 2- E.) It is the policy of the facility to search inmates prior to admission to the MHCB in order to avoid contraband and weapons from entering the MHCB unit. Furthermore, due to the significant risk prisoner D had for suicidal behavior, the admitting physician also recommended a "careful custody search for contraband/blades." (*Id.*) It is also a clinical decision of the admitting psychiatrist whether to place an inmate in a safety gown with a safety blanket. For those inmates at risk of harming themselves safety gowns and blankets are utilized to protect them from harming themselves. Inmates at low risk for hurting themselves are offered items such as muumuus, underwear and sandals in the cell. In addition,

5

Decl. Williams Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

the medical records made at the time of Prisoner D's inpatient stay in the MHCB unit, state in the Mental Health Program Discharge Summary, under Clinical Treatment Course and Response to Treatment, that "she was cooperative and compliant with medication and milieu therapy. She participated in recreational therapy, and was an avid reader of books and magazines while in her cell, eating with good appetite and sleeping through the night." (*Id.*)

### D. Alleged Misuse of Administrative Segregation for Non-Disciplinary Reasons

12. At paragraph 110 of Dr. Kaufman's declaration, he mentioned he encountered and heard accounts of mental health inmates inappropriately housed in administrative segregation. Inmates are housed in administrative segregation when their presence in the general population presents a safety and security concern. Inmates who report safety concerns can also be placed in administrative segregation for their own safety. Dr. Kaufman cites to Prisoner A as an example of inmate who was placed in administrative segregation. Dr. Kaufman also quotes Prisoner A as being housed with SHU inmates and condemned inmates. But CCWF does not house SHU inmates. Further, condemned status inmates are housed within a separate, secured environment within the administrative segregation unit.

13. Dr. Kaufman states, at paragraphs 118 and 163, that I said the EOP beds are scarce at CCWF. Dr. Kaufman is mistaken. I did not say or imply that EOP beds are scarce at CCWF. CCWF currently is currently budgeted for more EOP beds than we have EOP patients. The same was true when Dr. Kaufman toured CCWF. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 2-F.) CCWF is budgeted for 54 EOP inmates and if that capacity is reached, additional EOP inmates may be transferred to CIW.

### E. Alleged Inadequate Quality and Quantity of Mental Health Treatment

14. At paragraph 143, Dr. Kaufman alleges the rapid growth of the mental health population without a corresponding increase in mental health staff has led to a higher incidence of

6

Decl. Williams Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

modified programs and non-confidential clinical contacts. His statements are inaccurate. As discussed previously, more than 80% of all contacts for the past six month were confidential. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 2-D.) Further, the mental health staff has worked diligently to assure all mental health patients receive appropriate levels of care based on their individual needs.

15. Dr. Kaufman's criticism in paragraph 171, that frequent lockdowns and modified programs interfere with mental health treatment, is misplaced. For instance, Dr. Kaufman states Prisoner D's medical record describes an extended lockdown and multiple lockdowns on her unit. But, Prisoner D is a condemned inmate and does not experience extended lockdowns or modified programs.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Fresno, California on March 21, 2013.

/S/ L. Williams
L. Williams
**(original signature retained by attorney)**

7

Decl. Williams Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)