KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF G. HOFFMAN, Ph.D. IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, G. Hoffman, Ph.D. declare as follows:

1.   I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

///

1

**BACKGROUND**

2.    I have been the Chief Psychologist/Chief of Mental Health at Pleasant Valley State Prison since May 2009, and was Acting Chief between November 2008 and April 2009.

3.    I began my career with the California Department of Corrections and Rehabilitation as a Staff Psychologist in 1997, and was later promoted to Senior Psychologist, Supervisor. Throughout my career, I have seen thousands of mental-health patients under CDCR custody.  I am also very familiar with CDCR policies and practices concerning mental-health care and treatment, including suicide prevention and intervention.

4.    Exhibit 1 to this declaration is a true and correct copy of my curriculum vitae, which details my extensive experience, qualifications, and credentials in mental-health care and treatment.

5.    In preparation for this declaration, I reviewed the relevant prison and healthcare records belonging to Pleasant Valley, as well as the special master's reports concerning suicides at Pleasant Valley in 2011-2012.  As Chief, I am familiar with the creation and maintenance of those documents, which were made by custody and healthcare officials in the ordinary course of business at or near the time of the act, condition, or event recorded.  The records were also made by officials with knowledge of the matters addressed or according to information provided by officials with knowledge of those matters.

**INTRODUCTION TO MENTAL-HEALTH CARE AT PLEASANT VALLEY**

6.    The prison records show that Pleasant Valley offers a high level of mental-health services to the largest CCCMS program in CDCR.  We have an active, engaged, and productive clinical and administrative-support staff.  We enjoy outstanding collaboration with staff in other institutional healthcare departments and custody.  We have an evolving quality-management structure that uses this collaboration to solve process problems in real time.  Much is accomplished which lowers the likelihood of suicide.

2

Decl. Gary Hoffman, Ph.D. Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1

2   **Pleasant Valley Has Increased Its Overall Mental-Health Staffing Capacity**

3       7.   Pleasant Valley has increased its overall mental-health staffing capacity from 49.5

4   positions in 2012 to 67 positions in 2013 to treat the inmate population.  While recruitment is a

5   problem at Pleasant Valley because of its location, the prison continues to adhere to a new

6   staffing model that mixes clinical and support positions, as determined by CDCR Healthcare

7   Services Division, to provide and document provision of treatment services to a projected number

8   of Mental Health Services Delivery System-included patients at an institution.

9       8.   As Chief of Mental Health, I have worked very hard to recruit and retain mental-

10  health professionals, technicians, and workers to Pleasant Valley.

11

12  **Any Staff Member Can Refer Inmates to the Mental-Health Department on an Urgent or Emergency Basis**

13      9.   At Pleasant Valley, any staff member can refer an inmate to the mental-health

14  department on an urgent or emergency basis if he or she believes that the inmate poses a danger

15  to himself or others or appears to be deteriorating.  Urgent requests require clinical evaluation

16  within twenty-four hours and emergency requests require immediate attention.

17      10.  For the past fourteen months, the mental-health department has seen about thirteen

18  inmates a month on these bases.

19  **Admission to the Mental Health Crisis Bed Unit**

20      11.  During that same fourteen-month period, mental-health staff admitted 122 inmates (or

21  8.71 inmates per month) into the Mental Health Crisis Bed unit (the crisis bed unit), where

22  inmates receive intensive mental-health treatment.

23      12.  In the crisis bed unit, inmate-patients are placed on either suicide watch or suicide

24  precautions.  They are seen by physicians, clinicians, psychiatrists, and nursing for appropriate

25  care and treatment.

26  **Discharge From the Mental Health Crisis Bed Unit**

27      13.  All patients are taken to the Interdisciplinary Treatment Team for case review and

28  determination of discharge level of care.  While discharge plans vary with each patient, all

3

inmate-patients receive daily contacts from mental-health clinicians for five consecutive days and quarterly follow-ups from them for a year.

14.  Since 1998, when the crisis bed unit first opened, no inmate-patient who has committed suicide on Pleasant Valley grounds after receiving care and treatment here.  Our inpatient crisis bed program is successful because of the coordinated efforts between the mental health, medical, nursing, and custody staff to provide the best care possible.

**Level of Care Changes**

15.  For the past three months (December 2012-February 2013), our records basically show that inmates in the Correctional Clinical Case Management System (CCCMS) are appropriately placed at their current level of care and that consideration of treatment need is given by outpatient clinicians in an interdisciplinary-team setting.  Clinicians take an active look at providing appropriate treatment to meet the needs of the inmate-patient.  In other words, consideration of level of care occurs apart from crisis bed placement.  During this period, a monthly average of 15.67 non-MHSDS inmates were raised to CCCMS level of care, 13.33 were returned to non-MHSDS status, and 5 were referred to a higher level of care (either the Enhanced Outpatient Program or Department of State Hospitals).

**A System of Interdisciplinary Redundant Checks and Reviews**

16.  We treat a large inmate population with mental-health issues at Pleasant Valley because, as explained below, we have a system of interdisciplinary redundant checks and reviews—i.e., custody, healthcare, and managerial staff actively seek out inmates with health-care issues and refer them for evaluation and treatment.  For example, the clinical and psychiatric-technician teams had 11,053 face-to-face contacts with inmates with mental-health concerns or issues in January 2013.  The number of inmates in the mental-health delivery system near that time was about 1,857 inmates with various levels of care.

**Suicide Prevention and Response-Focused Improvement Team**

17.  The Suicide Prevention and Response-Focused Improvement Team (also known as SPR-FIT or "Superfit") is an interdisciplinary team chaired by a senior psychologist.  The team

4

comprises the Chief of Mental Health, the Nursing Educator, a senior psychologist, a crisis bed psychologist, a staff psychiatrist, a senior supervising nurse, a psychiatric technician, a facility captain, and a segregation-unit sergeant.

18.   The team meets monthly to review logs and other records to ensure that staff conducted the required (1) follow-ups for five straight days after the inmates' discharge from the crisis bed unit, (2) hourly welfare checks for the first 24 hours after discharge, and (3) thirty-minute welfare checks for twenty-one consecutive days for all new placements in Administrative Segregation.

19.   The team also reviews all suicides and attempted suicides and scrutinizes each emergency response to ensure that emergency responders from both the custody and healthcare sides performed their duties properly and in accordance with prison protocol.  The team looks for any defect, delay, or gap in each emergency response and discusses ways to improve the response, including training.  In addition to the above, the team conducts ongoing training to healthcare and custody staff on suicide prevention and response.  For example, training is given at the monthly SPR-FIT meeting, by video conference, to all new employees, at annual training, and on the job.  Thus, staff is constantly trained and reminded on suicide prevention and response techniques.

**Additional Reviewing Committees That Address Suicide Prevention and Response**

20.   The prison's Local Governing Body is a committee that has overall responsibility for and ultimate authority over all healthcare services and matters.  This interdisciplinary healthcare body comprises multiple managerial members and meets monthly to discuss healthcare issues, including suicide.

21.   The prison's Quality Management Committee meets monthly to monitor, assess, and improve the quality of inmate healthcare.  The committee comprises high-ranking healthcare and custody officials with authority to address and resolve problems with the prison's suicide prevention and response plans.

5

**Mental Health Quality Management Subcommittee**

22.  The prison's Mental Health Quality Management Subcommittee oversees mental health services.  This subcommittee meets monthly to address mental-health issues at the prison, including any suicide and attempted suicide.

**Peer Reviews**

23.  The prison's primary clinicians conduct peer reviews monthly.  During a peer review, clinicians select five medical files from that day's clinical visits by other clinicians.  The peer-review findings are forwarded to a peer staff psychologist who serves as a clearinghouse for information to the larger clinical staff.  Some gains have been made in addressing documentation issues such as noting date/time, use of updated forms, and documentation of effective communication.  The peer-review process is evolving.  A statewide work group created to standardize the peer-review process is reviewing proposals to standardize the process.  Our goal is to build a culture of collaboration and working as a team.

24.  The prison's psychiatrists also conduct peer reviews monthly.  In January 2012, the psychiatrists began using Medication Administration Process Improvement Program (MAPIP) as the peer-review tool.  Using this process, electronic medical records are randomly selected for review from a database of inmates taking psychiatric medications provided by the pharmacy.  MAPIP is conducted quarterly.  Psychiatrists are provided feedback at the time of the audit.

**Quality Improvement Teams**

25.  Mental Health Quality Improvement Teams (QITs) are chartered as needed to seek, implement, and monitor solutions for process improvements in delivery of mental-health services.

**RESPONSE TO SPECIAL MASTER'S CRITICISMS CONCERNING PLEASANT VALLEY'S PURPORTED FAILURES TO PREVENT SUICIDES**

**Inmate A's Suicide on January 1, 2011**

26.  The department found that inmate A's suicide was likely unforeseeable because the inmate did not express any suicidal ideations to staff.  The special master disagreed with this

6

finding, claiming that inmate A's suicide may have been preventable had there been a collaboration between medical and mental health staff given the inmate's chronic pain complaints, anger and volatile behavior toward staff, isolation from other inmates, and, "except for showers and some medical appointments, failure to come out of his cell for approximately four and one-half years while at PVSP."

27.   Contrary to the special master's claim, there is no evidence that inmate A was "a cave dweller" (a term given to inmates who hide out in their cells).  In fact, his suicide note indicated that he socialized with a select group of inmates.  Prison records also show that he occupied his time exercising, reading, and filing legal paperwork such as healthcare grievances.  The inmate's behavior was never bizarre, uncharacteristic, or unusual to the point where healthcare or custody staff needed to refer him to mental health.

28.   The special master faulted Pleasant Valley's medical and mental health staff for failing to work together to address the inmate's complaints of chronic pain.  But there was an interdisciplinary pain-management committee in place at that time to help the inmate with his issue.  It is unclear from the healthcare records whether the pain-management committee knew about inmate A's complaints.  This committee meets weekly and sees about six patients every week.

29.   The special master also stated that the suicide may have been "preventable" had there been an appropriate and thorough suicide risk evaluation.  Of particular concern to the special master was the lack of a suicide risk evaluation completed during the last referral received by mental health "due to custody staff reporting his statements that he would kill himself when paroled."  But the inmate did not indicate to staff that he had thought about injuring himself.  He did have a history of poor impulse control as evinced by a January 7, 2009 incident where he expressed anger at custody and medical staff regarding his pain treatment.  When staff interviewed him, he denied thoughts of harming himself or others.

30.   While the criteria for completing a suicide risk evaluation have changed over the years, Pleasant Valley's Chief of Mental Health did follow up with staff regarding the importance

7

of completing thorough Suicide Risk Evaluations, and provide training on how and when to complete the document.  This training has continued on a routine basis in the form of peer reviews and through the Suicide Risk Evaluation Mentor Program at Pleasant Valley.

31.  Another area of concern was inmate A's ability to purchase a large amount of pain medication, which he ultimately used to commit suicide.  Pleasant Valley reviewed the case during a Suicide Prevention and Response-Focused Improvement Team meeting, and a Quality Improvement Team was convened at Pleasant Valley to identify and correct concerns related to the use of opiates, medication dispensing procedures, and staff compliance with policies and procedures.  Input from a consultant from the Division of Correctional Health Care Services was also incorporated into the actions taken by the Quality Improvement Team.

32.  Finally, the special master noted that inmate A had three crisis bed stays between 2002 and 2006 (11/7/2002-11/18/2002;  01/17/2005-01/18/2005; 04/12/2006-04/17/2006).  He was discharged, per medical documentation, with a GAF of 29 on the 2005 stay (note: the special master erred in reporting the low GAF was on his 2006 crisis bed stay); however, a higher level of care referral was not made for a more comprehensive and coordinated treatment.  For the past several years, CDCR has implemented the 7388B–IDTT (Interdisciplinary Treatment Team) Level of Care Decision form, which is completed during each IDTT and addresses areas of concerns that may warrant a need for a higher Level of Care.  Moreover, Pleasant Valley has a Department of State Hospitals Coordinator who is tasked with monitoring completion and the quality of IDTTs and 7388Bs, as well as facilitating referrals to the Department of Mental Health/Enhanced Outpatient Program to encourage clinician compliance and consultation.

**Inmate K's Suicide on April 1, 2011**

33.    The special master stated that inmate K's suicide "was very highly likely preventable, however, had he been appropriately placed in MHSDS, referred for a higher level of care while at NKSP, and had appropriate information been acted upon at R&R at PVSP when he informed the RN that he was taking medication."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

34.  The initial issue began at North Kern State Prison following the inmate's discharge from MHTH (alternative housing due to lack of crisis bed availability) on psychotropic medication, but no MH3 chrono stating his level of care had been changed to a higher level of care was entered into MHTS.net or scanned into the electronic medical record system.  Upon his arrival at Pleasant Valley, due to the lack of classification of CCCMS, mental-health staff was not aware of the inmate-patient's mental-health needs.  Although the inmate-patient was evaluated by the intake nurse at Pleasant Valley and reported taking medication, no further information regarding the type of medication was gathered.  And although the intake nurse apparently referred the inmate to the mental-health department, the department did not receive the referral.  Regardless of fault, the prison implemented new procedures to ensure that referrals are forwarded to the mental-health department by fax and institutional mail the same day.

35.  The healthcare records also indicate that inmate K was non-compliant with the treatment plan (mainly, missing psychotropic medications) at both North Kern State Prison and Pleasant Valley.  The inmate never sought follow-up care with the mental-health department, despite receiving verbal and written instructions from the intake nurse on how to obtain mental-health care at Pleasant Valley.

36.  A Quality Improvement Plan inquired into the problems related to the initial screening when an inmate-patient arrives at Pleasant Valley.  Corrective training was provided to the intake nurse.  Moreover, Nursing Supervisors have become more of a presence throughout the arrival process as seen in their ongoing reviews of staff conducting the arrival screenings.  In addition, an Office Technician was assigned to support the intake screening nurse, which has allowed the nurse to increase focus on clinical duties and follow-up on problematic cases.  Finally, the Chief Executive Officer directed a revision of Operating Procedure 109, "Health Care Transfer Process" to include the automatic referral of any inmate-patient received at Pleasant Valley who is prescribed psychotropic medication without a CCCMS level of care.  The intake staff received a reference list of psychotropic medications to assist in the identification process.

9

Decl. Gary Hoffman, Ph.D. Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

37. We have seen evidence of these changes being utilized successfully in inmate-patients who arrive on psychotropic medications that are prescribed for medical reason (i.e. Amitriptyline); therefore they are not classified as CCCMS in some cases. Intake nursing has successfully identified the psychotropic medication and forwarded an immediate referral to mental health as directed in OP 109, Section C, 14h.

38. Additionally, the Quality Improvement Plan inquired into the problem of repeated documentation of medication noncompliance by nursing staff not being received by mental health staff. OP 19 "Noncompliance Psychiatric Medication Procedure" was reviewed and deemed to operationalize an appropriate referral and follow-up procedure. Nursing Supervisors provided training to line staff and continue to oversee the documentation of noncompliance and the delivery of appropriate documentation. Mental health staff was also provided with training on the scheduling of noncompliant inmate-patients and appropriate clinical follow-up. Finally, MAPIP medication audit contains monthly medication noncompliance data that are reviewed quarterly by the Medication Management Quality Improvement Team and by Nursing and Mental Health Supervisors to remain in 95 percent compliance.

39. The special master suggested that while the QIPs appeared appropriate, "responses by NKSP and PVSP appeared to be inadequate as to staff's actual supervisory role and audits to demonstrate improvement in actual compliance." As previously mentioned, Pleasant Valley has augmented and reinforced our screening process at intake with additional staffing and supervisory presence which has shown to be successful. The inmate-patient did not have a suicide risk evaluation performed at Pleasant Valley because he did not indicate that he had suicidal intent or plans to any staff. In fact, he denied any mental-health problems to the examining physician on 03/28/2011. As an ongoing process of peer review, clinicians participate in Suicide Risk Evaluation training and feedback sessions.

**Inmate X's Suicide on October 9, 2011**

40. Disagreeing with the departmental finding that inmate X's suicide did not appear to have been foreseeable, the special master listed three areas of concern that were consistent with

10

the CDCR's Suicide Report.  First, the special master claimed that there was a departure from the Program Guide when the inmate was removed from CCCMS in 2009 as his symptoms had not been in remission for the six months previously.

41.  The medical records, however, do not support the finding that was displaying clinically significant symptoms.  He had done well off of psychotropic medication for twelve months prior to his removal.  In the interim he was noted to have said "it's been a year since I had depression" and "I have bad days but they pass."  On the day of the removal IDTT Inmate requested to removed from CCCMS and stated "I'm doing great."  Mild symptoms were noted at times during the year but none of which appeared to impair daily functioning to any significant degree.  Two and one-half years elapsed from his last mental-health MH contact until the suicide. At no time did Inmate request services by MH or was a staff referral received.  Page 12-3-13 of the Program Guide states "Inmate-patients may be clinically discharged from CCCMS if they have been in continuous remission and are functioning adequately in the mainline without treatment (including medication) for six months. Inmates shall be seen for 90-day clinical contacts throughout the six month period."

42.  Regardless whether the standard for CCCMS discharge was met in this case, an audit was conducted by Pleasant Valley's SPR-FIT Chair of inmate-patients removed from MHSDS within the prior 30-day period.  Of the 9 inmates removed, all required documentation was completed and all cases were consistent with removal criteria of 6 months of symptom remission, which is over 95%.  In line with good clinical practice, Pleasant Valley mental health staff routinely participates in an active peer review process, as well as consultation with colleagues and supervisors regarding MHSDS participation (i.e., additions, removals, LOC changes).

43.  The special master expressed concern that CPR was not initiated by custody upon identification of the inmate.  The special master argued that the three-minute delay from discovery of the body to initiation of CPR was unnecessary.  However, the discovery was at 0530 hrs and only one correctional officer was posted in the building at that time.  In order to secure the cell and maintain control of the inmate X's cellmate, staff had to wait for the arrival of other

11

custody to open the door and enter the cell.  Supporting staff were busy with getting inmates ready for out to medical and out to court transportation.  It took as long as 3 minutes to gather appropriate staff response.  Medical personnel arrived at the same time as the additional correctional officer and CPR was immediately initiated once the cellie was handcuffed and escorted from the cell.

44.  Documentation was provided showing drills for emergency medical response, as well as ongoing training was provided to all custody staff with a specific focus on the policy requirement that first responders are responsible for initiating CPR.  Custody staff also participated in annual suicide prevention training through the Institutional Training Unit (IST).

**Inmate G's Suicide on May 15, 2012**

45.  According to the special master, the CDCR found inmate G's suicide did "not appear to have been foreseeable as he did not indicate that he had suicidal intent or plans to any staff, and reported no history of suicidal behavior."  Disagreeing, the special master argued that the inmate's may have been "preventable" given that there was no mental health follow-up Interdisciplinary Treatment Team as planned on two occasions (January and April 2012).

46.  But the special master failed to note that during an examination on 1/12/2012, a primary clinician noted that inmate G was "anxiety," a diagnosis which is not listed in the Program Guide (12-1-5) as an "Axis I serious mental disorder."  Nonetheless, the primary clinician recommended review by the Interdisciplinary Treatment Team to address treatment on an as-needed basis.  The clinician did not note any suicidal or homicidal ideations.  In fact, the clinician observed that his daily functioning was "fair" as he was exhibiting symptom control at that time.  In addition, inmate G was to follow-up with the primary clinician "as needed" as a result of the non-acute and non-emergent evaluation by the primary clinician.  It was this instruction by the primary clinician, along with ongoing symptoms, that led to the inmate to request further treatment on 4/21/2012.

47.  A primary clinician evaluated inmate G on 4/30/2012.  The inmate reported ongoing anxiety while denying depression, anhedonia, and suicidal or homicidal ideations.  The clinician

12

referred him to the Interdisciplinary Treatment team within thirty days.  Inmate G's suicide occurred 15 days later on 05/15/2012.  The special master listed "the lack of follow-up to two plans made by mental health clinicians to refer the inmate to IDTT within 30 days of the encounter;" However, only one recommendation (1/12/2012) met this criterion.

48.   On the day of the inmate's death, he was evaluated by mental health on an emergency basis within one hour after staff referred him to the mental-health department following a cell fight.  At that time, inmate G denied any past or current thoughts of suicidal or homicidal ideations.  He was uncooperative with the interview, as seen in his unwillingness to discuss any further mental health issues, and requested to return his cell block.  The intervention noted was discussion of coping skills to deal with current situation stressors, and the treatment plan at that time was to follow up with the primary clinician assigned to his building (previously seen on 2 occasions and pending IDTT).

49.   Three committees—EMRRC, SPR-FIT, and QIT—reviewed staff's response to inmate G's suicide, and from these committee meetings, referral documentation for any clinical contact was revisited and staff was educated on the mandatory use of MH 5 – Referral Chrono for tracking purposes and to increase compliance.  Staff was provided education and supervision by supervisory staff on the necessity of electronic healthcare review before any patient contact.  Finally, due to staffing and scheduling Interdisciplinary Treatment Team challenges, primary clinicians were instructed to list any inmates who needed an IDTT, but could not be scheduled and review those cases with supervisors monthly.

**Inmate H's Suicide on May 16, 2012**

50.   According to the special master, the CDCR commented that inmate H's suicide did "not appear to have been foreseeable in that he was not reporting suicidal ideation or intent in the days to weeks prior to his suicide to any health care staff."  Disagreeing with this comment, the special master called the death preventable because the inmate should have been referred after the initial health screening and 31-item mental health screening during his intake at San Quentin State Prison's reception center.

13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51.  The special master noted two concerns, the first of which was the lack of a referral to mental health after the reception center's initial health screening and questionnaire.  At that time, inmate H reported a history of mental-health treatment, including suicide attempt, involuntary inpatient treatment and treatment with psychiatric medication for depression in 2001.  Second, the inmate's controlling offense of a sex crime was alleged to be another trigger for mental-health referral.  The special master claimed that the clinician should have ignored the scoring algorithm and made a referral to mental health anyway.  However, a clinician does not conduct these initial screenings.  Rather, a nurse, licensed vocational nurse, or licensed psychiatric technician conducts them.  In addition, no current mental health symptoms, including suicidal and homicidal ideations, were being reported.  The situation was repeated upon arrival at Pleasant Valley.  The work at the reception center was reviewed and the inmate denied any problems since 2001.  He presented himself appropriately with no indicators of acute or chronic symptoms.  The inmate was presumably counseled on how to contact mental health should he experience adjustment problems (standard operating procedure).  The inmate did not request mental-health services at any point prior to his suicide.

52.  The second concern surrounded the lack of emergency response in the case as no first aid or CPR was attempted once the body was discovered.  The special master incorrectly cited this as out of compliance with the Program Guide, because the Program Guide does not address these nursing procedures.  It is appropriate for a nurse or any other first responder to determine that CPR is not indicated at the time of discovery.  In any event, this issue was addressed by EMRRC on 06/12/2012, raising the lack of life saving measures, noncompliance with ERV protocols, and training issues; "the need for Health Care Documentation training OP 128 assessment, ERV protocols, Vol 4, Ch12-A IMSP&P will be provided to staff involved due to lack of documentation, assessments, and failure to follow protocols."  The training was provided and documented on an IST sheet for Proof of Practice – EMRRC (08/14/2012).

////

14

1  I declare under penalty of perjury under the laws of the State of California and the United

2  States of America that the foregoing is true and correct. Executed in Coalinga, California on

3  March 21, 2013.

4

5  G. Hoffman, Ph.D.
   Chief of Mental Health
6  Pleasant Valley State Prison
   *(original signature retained by attorney)*
7
   CF1997CS0003
8  20668591.docx

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. Gary Hoffman, Ph.D. Supp. Defs' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

Exhibit 1

# VITA
# Gary L. Hoffman, Ph.D.

## SPECIALTY AREAS
Diagnosis, evaluation, and psychotherapeutic treatment of affective disorders, psychotic disorders, and personality disorders in adults.  Psychological training and consultation.  Mental health program administration.

## ACADEMIC HISTORY

| | | |
|---|---|---|
| **1991-96** | **PhD** | **California School of Professional Psychology, Fresno**<br>Clinical Psychology Ph.D. with Neuropsychology Proficiency<br>Full A.P.A. accreditation.<br>Internship (APA Approved):  Psychology Service, Federal Correctional Institution, Morgantown, WV |
| 1986-87 | | Rice University, Houston, TX<br>Experimental Psychology, University Fellowship |
| **1983-86** | **MA** | **California State University, Fresno**<br>Psychology |
| **1979-83** | **BA** | **California State University, Fresno**<br>Psychology |
| 1978 | | Walla Walla University, College Place, WA<br>General education courses. |
| 1977-79 | | Kings River Community College, Reedley, CA<br>General education courses. |

## HOSPITAL AFFILIATIONS
**11/09-Present  Medical Staff, Central Valley General Hospital, 1025 North Douty St., Hanford, CA 93230.  559-583-2100**

**8/99-Present   Medical Staff, Correctional Treatment Center, Pleasant Valley State Prison, PO Box 8500, Coalinga, CA 93210.  559-935-4900x5477**

## PROFESSIONAL HISTORY
**5/09-Present  Chief Psychologist and Chief of Mental Health Department, Pleasant Valley State Prison, PO Box 8500, Coalinga, CA 93210.  559-935-4900x5413(Office), 559-935-7026 (Fax)**
Provide oversight to program consisting of outpatient services to 1950 mainline inmate-patients, 150 administrative segregation inmate-patients, and a 6 bed crisis unit.  Coordinate quality management and audits of program progress.  Oversee personnel budget ($7.1m 2010-11, $6.4 m 2011-12, $7.9m 2012-13) and recruitment, selection, evaluation, training of 63.5 budgeted staff including psychiatrists, psychologists, social workers, licensed psychiatric technicians, and

2

administrative support staff.  Develop and implement policy and procedures to ensure quality care.
Supervisor:  Charles E. Young, Chief Executive Officer, Health Care Services

**11/09-Present  Psychologist and Clinical Director, Behavioral Health Services, Adventist Health Community Care, 1025 Douty St., Hanford, CA 93230.  559-589-2310**
Provide clinical oversight to Behavioral Health program which offers services using social workers, psychologists, psychiatrists, and support staff at 7 clinic locations.  Also provide Individual (adults, children) psychotherapy 20 hours per week utilizing a cognitive-behavioral model providing brief psychotherapy to a diverse population.   Medical staff privileges at Adventist Medical Center and Central Valley General Hospital in Hanford.
Supervisor:  Derrick Gruen, Ph.D., Vice President, Community Care Programs

**2/09-5/09       Senior Psychologist, Supervisor, Pleasant Valley State Prison, Coalinga, CA.**
Acting Chief Psychologist and Chief of Mental Health beginning 11/08 (as a contract employee, rejoined State service 2/09 as Sr. Psychologist Supervisor, promoted to Chief Psychologist and Chief of Mental Health 5/09).
Supervisor:  Felix Igbinosa,M.D., Chief Medical Officer & Health Care Manager (A)

**12/04-1/09     Contract Psychologist, American Correctional Solutions, 1588 N. Batavia St. Suite 1, Orange, CA  92867.  714-538-0200**
Acting Chief Psychologist and Director of Mental Health 11/08 – 2/09 and acting Senior Psychologist Supervisor 12/04 – 11/08.  Provided oversight to staff working in CCCMS, Administrative Segregation, Mental Health Crisis Bed, Sensitive Needs, and general population settings.  Assist with Quality Management activities, staff development, and coordination of administrative personnel.
Supervisor:  Michael Murphy, Ph.D.,Chief Psychologist

**12/03–12/05   Assistant Professor of Psychology, University of Arkansas at Fort Smith, P O 3649, Fort Smith AR  72913-3649.  479-788-7000**
Courses taught:  General Psychology, Research Methods, Social Psychology, Personality, Applied Psychology, Industrial Psychology, Cognitive Psychology, Field Experience, and Senior Seminar.  Faculty advisor for Psychology Majors; Member of Student Learning Committee.  Initiated and directed instructional re-design of General Psychology course based on the Center for Academic Transformation's "Roadmap to Redesign" project.
Supervisor: Karen Stauffacher, Ed.D, Dean, College of Arts & Sciences

**8/99-12/03     Senior Psychologist, Supervisor, Pleasant Valley State Prison, Coalinga, CA.**
Responsibilities:  Supervision of psychiatrists, psychologists, social workers, psychiatric technicians, contract clinicians assigned to our Mental Health Crisis Bed unit and Correctional Clinical Case Management outpatient program.   Assist with personnel recruitment, selection, orientation and evaluation.  Development of Coleman Corrective Action plan and assistance with program implementation

**VITA:  Gary L. Hoffman, Ph.D.**

**3**

and evaluation.   Member of Mental Health Quality Assurance Committee and Chair of Suicide Prevention Committee.  Participant in other medical and prison administrative committees.  Medical Chief of Staff 7/99-06/01, Secretary of Medical Staff 7/03 - present. Acting Chief Psychologist 2/15/00 - 8/30/00.
Supervisor:  William Alvarez, Ph.D., Chief Psychologist

**2/97- 7/99    Staff Psychologist, Pleasant Valley State Prison, Coalinga, CA.**
Responsibilities: Outpatient treatment including case management, psychological testing, BPT and MDO assessments and crisis intervention.  Staff training. Elected Secretary of the Medical Staff, 3/99.
Supervisor:  Joseph Muga, Ph.D., Chief Psychologist

**1/97-12/03    Consultant, Private Practice, Fresno CA.**
Job function analysis & assessment of the work environment. Consultant for team building and training; neutralizing workplace stress.  Pre-employment skills testing.  Personality, intellectual and neuropsychological testing. Individual psychotherapy.

**8/88-12/03    Adjunct Psychology Instructor, College of the Sequoias, 915 S. Mooney Blvd, Visalia CA  93277.  559-730-3700**
Courses taught:  Introduction to Psychology and Abnormal Psychology
Supervisor:  Ron McGriff, Ed.D., Chairperson – Social Science Dept.

**9/95-8/96    Clinical Psychology Intern, Federal Correctional Institution, PO Box 1000, Morgantown, WV  26507.  304-296-4416**
Responsibilities:  Outpatient individual & group psychotherapy, psychological & neuropsychological assessment, substance abuse treatment, psychological consultation, graduate student supervision.
Supervisors:  Jeffrey A. Hammond, Ph.D. & Martin Boone, Ph.D.

**5/93-8/95    Mental Health Technician, Cedar Vista Psychiatric Services,  7171 N Cedar Ave.,  Fresno, CA  93720. 559-449-8000**
Responsibilities:  Provided supportive care milieu management to patients in adolescent unit and adult open, closed, and chemical dependency units.
Supervisor:  Gloria Martin, RN, Director of Nursing

**9/93-5/94    Psychologist Trainee, Cedar Vista Psychiatric Services, Fresno, CA**
Responsibilities:  Inpatient group therapy with adolescent and adult clients on closed, open, and chemical dependency units.  Psychosocial assessments. Personality and intellectual assessment.  Neuropsychological screenings.
Supervisors:  Michael Petrovich, Ph.D.,  &  Sherri Gibson, Ph.D.

**8/88-4/94    Adjunct Counselor & Psychology Instructor, Fresno City College, 1101 E. University Ave., Fresno, CA  93741.  559-442-4600**
Responsibilities:  Social Sciences Division: Taught Human Sexuality and Career Development.  Student Services: academic, personal, and career counseling. Training Institute: FrontLine Leadership Training, coordinated Independent Living Skills (Foster Teen) Program, counseling for Pacific Bell Education Program. Grant proposal preparation.  Pre-employment assessment testing, assessment of

**VITA:  Gary L. Hoffman, Ph.D.**

**4**

           workplace literacy needs.
           Supervisors:  Gerald Stokle, M.A. (Social Science), Deborah Ikeda (Student
           Services), & Brian Calhoun, Ph.D. (Training Institute)

**2/92-11/92**     **Psychologist Trainee, California Men's Colony, PO Box 8101, San Luis
           Obispo, CA  93409-8101.  805-547-7900**
           Responsibilities: Outpatient individual therapy to inmates.  Co-facilitated
           "childhood victims of sexual abuse" process group for sex offenders.  Facilitated
           anger control group and stress management group.  Psychological assessments.
           Supervisors:  Gary Elem,  Ph.D., Jay Adams, Ph.D., & Steven Moberg, Ph.D.

**8/89-5/93**     **Adjunct Psychology Instructor, West Hills Community College, 9900 Cody
           St. Coalinga, CA  93210.  559-934-2155**
           Courses taught:  Abnormal Psychology, Personal and Social Adjustment,
           Introduction to Psychology.
           Supervisor:  Stan Warkentin, M.A.

**10/87-8/88**     **Behavior Modification Counselor, Physician's Medical Clinic, Bakersfield,
           CA**
           Responsibilities:  Individual counseling and facilitation of didactic groups for
           patients participating in medically-based weight loss program.

**6/87-8/87**     **Adjunct Psychology Instructor, California State University, 5241 N. Maple
           Ave., Fresno, CA  93740-0001.  559-278-4240**
           Courses taught:  Introductory Statistics and Experimental Methods
           Supervisor:  Alex Gonzalez, Ph.D.

**9/86-6/87**     **Research Assistant, Rice University, PO Box 1892, Houston, TX  77251-
           1892.  713-348-0000**
           Responsibilities:  Testing human subjects investigating memory.  Data analysis.
           Supervisor:  Michael Watkins, Ph.D.

**1/84-5/86**     **Teaching Assistant, California State University, Fresno**
           Responsibilities:  Introduction to Psychology, Research Methods, and
           Introductory Statistics.
           Supervisor:  Barbara Basden, Ph.D.

**2/82-12/83**     **Volunteer crisis line operator, Help In Emotional Trouble, Fresno, CA**

## COURSES TAUGHT

| | | |
|---|---|---|
| General Psychology | Psychology of Personality | Personal and Social |
| Personal & Social Adjustment | Applied Psychology | Development |
| Research Methods | Industrial Psychology | Field Experience in |
| Introduction to Statistics | Cognitive Psychology | Psychology |
| Abnormal Psychology | Human Sexuality | Psychology Senior Seminar |
| Social Psychology | Career Development | |

**VITA:  Gary L. Hoffman, Ph.D.**

**5**

## LICENSE & CREDENTIALS

| | |
|---|---|
| 2/99 | Psychologist Licensure:  Lic. # PSY 16213 |
| 7/88 | California Community College Psychology Instructor, valid for life. |
| 12/88 | California Community College Counselor, valid for life. |

## RESEARCH

11/96      Dissertation:  Applicability of alternative forms of the Trail Making Test to the discrimination of brain damage.  California School of Professional Psychology, Fresno.  Chairperson: Daniel E. Stanczak, Ph.D.

5/94      Research Proposal:  Neuropsychological effects of coccidioides immitis infection.  Assisted with grant proposal for CSPP-Fresno.

1/92-5/94      Neuropsychology Research Practicum, Schuyler & Associates, Fresno, CA Duties:  Assisted study of quantitative electroencephalogram (QEEG) variables of ADHD children 6-14 years of age.  Examined relationships between neuropsychological tests and QEEG in patients with history of mild head injury. Supervisors:   Bradley Schuyler, Ph.D., & Fred Ulam, Ph.D.

5/86      Thesis:  Complex Rule Learning:  The effects of instructional set and interfering tasks.  California State University, Fresno

## PAPERS & PRESENTATIONS

4/05      The Practice of Psychology in the Correctional Environment.  Presentation to the Psychology Club, UAFS.

2/05      Detection of Malingering in a Clinical Setting.  Presentation to the clinical staff at the Booneville (AR) Human Development Center.

1/05      Mind of the Young Adult Learner.  UAFS College of Arts and Sciences faculty in-service presentation.

1/94      Current trends in adolescent inpatient care:  Analysis of 71 adolescent inpatient admissions to Cedar Vista Hospital.  Presentation to professional staff, Cedar Vista Psychiatric Services.

## AWARDS & SCHOLARSHIPS

| | |
|---|---|
| 2001 | Pleasant Valley State Prison, Employee of the Month, January |
| 1986-87 | University Fellowship, Rice University; Houston, TX. |
| 1982-83 | Deans List of Honor Students, California State University, Fresno. |

## PROFESSIONAL AFFILIATIONS

National Commission on Correctional Health Care

## COMMUNITY ACTIVITIES

**VITA:  Gary L. Hoffman, Ph.D.**

**6**

1/04-1/06      Old Fort Homeless Coalition, Fort Smith AR

**VITA:  Gary L. Hoffman, Ph.D.**