KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN JR., et al., <br><br> Defendants. | 2:90-cv-00520 LKK JFM PC <br><br> REPLY DECLARATION OF CHRISTOPHER CORNELL IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5) |

I, Christopher Cornell, declare as follows:

1. I am the Chief of Mental Health (A) for California State Prison at Los Angeles County (LAC). I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

///

1

2. I received my Doctor of Psychology: Clinical Psychology degree in May 1999. I have worked for CDCR since April 2008. From April 2008 until October 2008, I worked as a Staff Psychologist. From October 2008 until December 2012, I worked as Senior Psychologist-Supervisor. I have worked as the acting Chief of Mental Health at California State Prison-Los Angeles County since December 2012. In my current position, I am responsible for the oversight of the Mental Health Program at LAC.

3. In paragraphs 228-235 of his Declaration, Dr. Stewart states that LAC has punitive measures for suicide watch procedures that require an inmate-patient to wait undressed in a holding cell for hours. (Stewart Decl. ¶ 228-235) The reality of providing effective care in a correctional setting demands that staff eliminate any possible manner in which a suicidal patient could do harm to himself. This requires that the patient be placed in an environment free of any and all materials that could be used, fashioned, manipulated or exploited to do harm himself, until such time that staff determine that the risk has passed. Staff at LAC makes every effort possible to get a suicidal inmate into the MHCB as quickly as possible. The safety and security of the patient, staff and facility necessitates that protocols and procedures for safety are adhered to. For these reasons, CSP-LAC's use of the holding cells for inmates who are deemed suicidal is necessary and proper, and is not punitive.

4. Also, in paragraph 228 of his Declaration, Dr. Stewart states "CSP-Los Angeles County also employs alternative placements for suicidal inmates. For suicidal individuals who are already in an administrative segregation unit, the first placement in alternative housing will be into cells 121-126 in the EOP Administrative Segregation Unit." (Stewart Decl. ¶ 228) Dr. Stewart also states "[f]or suicidal inmates who are not yet in administrative segregation, cells 101 through 105 in the D-1 EOP unit are used essentially." (Stewart Decl. ¶ 229) The two statements above are incorrect. Suicidal patients awaiting admission to a MHCB who are not under ASU status are first placed in wet cells that have toilet facilities in the CTC. If these cells are full they are placed in wet cells in the yard medical clinic. Only if both cells identified above are filled are inmates placed in the D1 housing unit. These are the areas when an inmate is held while staff works with Headquarters to locate available MHCB at other institutions. When a

2

1  patient deemed suicidal is placed in alternative housing during routine business hours, staff
2  immediately begins finding available MHCB at other institutions. When a suicidal patient placed
3  into alternative housing after hours, staff begins finding an available MHCB during routine
4  business hours. Suicidal inmates in ASU status are placed into alternative housing on A4 in cell
5  119 until a MHCB can be located. Similar to patients who are not on ASU status, staff begins
6  finding an MHCB placement immediately at the start of routine business hours.

7      5.  In paragraph 231 of Dr. Stewart's Declaration, he states "[s]taff members at CSP-Los
8  Angeles County told me that when an individual is suicidal, the standard procedure at the
9  institution in a regular housing unit is to place them into a safe holding cell. Often this is a so
10 called "therapeutic module" (an upright cage for sitting or standing only, depending on the
11 specific module) in the program office on the yard." (Stewart Decl. ¶ 231)  The spaces
12 identified by Dr. Stewart in this statement are where a patient is placed right after they express
13 suicidal ideation, while they await the completion of a Suicide Risk Evaluation and a final
14 decision about their treatment needs is made. This is not where an inmate-patient is housed or
15 placed after an assessment has been completed. It should also be noted that CSP-Los Angeles
16 County makes every effort to begin the assessment process within one hour of the patient being
17 referred for an Emergency Mental Health Assessment so that the inmate-patient does not remain
18 in a holding cell any longer than is necessary during routine business hours, and so that he can be
19 provided with the most appropriate care possible as soon as possible.

20     6.  In paragraph 61, Dr. Stewart points to the 34.47% vacancy rate for mental health
21 positions at LAC. (Stewart Decl. ¶ 61)  Offers to 4 LPTs have been made. In addition,
22 interviews on March 20, 2013, were conducted to fill recreational therapist positions; interviews
23 are scheduled on March 25th and 26th to fill eight positions for social workers; interviews were
24 held on March 15th to fill the vacant Chief Psychologist position. And candidates from the
25 registry have been selected to fill the five vacant psychologist positions. The vacancy rate has not
26 posed a significant barrier to the provision of appropriate and effective mental health care
27 services to date or on an ongoing basis, but with the addition of more staff, LAC's mental health
28 care goals will be more readily achieved.

3

7. In paragraph 58 of his Declaration, Dr. Stewart notes that no group therapy is available for EOP-SNY individuals because of "inadequate staff and space available." (Stewart Decl. ¶ 58)   During the inspection tour at LAC, Dr. Stewart was provided with a group schedule that shows that EOP-SNY patients are being scheduled for 8 hours of group treatment each week.

8. In paragraph 61 of his Declaration, Dr. Stewart noted that Defendants' experts visited LAC on May 3-4, 2012. (Stewart Decl. ¶ 61)   At that time, the functional vacancy rate was 12.11. much lower than it is now.  The current vacancy rate at LAC is higher now because several positions were established that did not exist previously, including OT staff, social workers, and Senior Psychologist-Specialists.

9. In paragraphs 104-105 of his Declaration, Dr. Stewart stated that he observed serious staffing-related problems during his inspection tour on January 31, 2013 and February 1, 2013. (Stewart Decl. ¶ 104-105)   Many of the supervisor/management positions cited as being "vacant" were filled with staff performing the duties in an "Acting" capacity.  In addition, registry staff has been used to fill vacant staff positions. Contrary to Dr. Stewart's opinion, the staff vacancies did not create an impediment to the effective provision of clinical care and compliance report data is available to show that Program Guide requirements in most areas were met.  The deficiencies observed in the provision of ten plus hours of group treatment to ML EOP patients at LAC was a temporary state of affairs.  MH Program initially agreed to give up space in the Education Department which was being used for group treatment. MH is utilizing space in the Education Department again and is again scheduling all ML EOP inmates into more than ten hours of group treatment per week.  Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 5-A is a chart of treatment hours for March 4-March 10 2013.

10. In paragraph 108, Dr. Stewart mentions that LAC has an acting DSH referral coordinator, a Senior Psychologist- Supervisor, who has been in the position since July 2012. (Stewart Decl. ¶ 108)   Dr. Stewart's opinion that frequent turnover in the DSH coordinator position is dangerous, is based on an assumption that the duties were not being performed at LAC. But no evidence shows that this was the case at LAC.

4

Decl. Cornell Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1        11. Dr. Stewart opines that chronic staff vacancies contribute to the inability of LAC to
2  deliver sufficient hours of therapeutic activities, and that the prisoners' refusals to participate in
3  therapeutic activities indicates that the activities are offered are of little value. (Stewart Decl. ¶
4  109-110)  Dr. Stewart's opinion is not correct because there are a myriad of reasons why an
5  inmate-patient may refuse to attend a group, and to assume that their refusals are solely based on
6  a notion that the group is perceived to have no value therapeutically is a huge assumption. In
7  addition, the wait and talk groups at LAC allow for every patient the opportunity to meet
8  confidentially on a 1:1 basis with their primary clinician. The fact that LAC has devised a way to
9  address two treatment requirements simultaneously is a testament to our innovative and creative
10 approach to making treatment mandates a reality in the correctional setting.  Although magazines
11 are frequently made available to patients in these groups, opportunities for socialization and other
12 recreation/leisure activities like card and board games are also provided.  The Program Guide
13 requires patients be afforded a minimum of ten hours of structured therapeutic activities and not
14 all ten hours have to be heavily focused on direct and intense clinical intervention.  Attached as
15 Decl. Vorous Supp. Reply Mot. Terminate, Ex. 5-B are group schedules identifying groups
16 offered at LAC on a weekly basis.

17       12. In paragraph 114 of his Declaration states "[t]here is essentially no confidential
18 treatment space available in either EOP Administrative Segregation program." (Stewart Decl. ¶
19 114)   This statement is simply incorrect.  There are two echo chambers available at CSP-LAC
20 in the ASU EOP program where every ASU EOP patient is offered the opportunity to meet
21 weekly in a completely private (sight and sound) and confidential setting.  When these spaces
22 were pointed out to Dr. Stewart, they did not seem interested in viewing or photographing those
23 areas.

24       13. Dr. Stewart states "[t]he patients I spoke with in the EOP Administrative
25 Segregation Unit at CSP-Los Angeles County included a number of extremely mentally ill
26 individuals, including prisoner Z. Although interviewed in the EOP ASU unit, Prisoner Z was
27 actually downgraded to CCCMS level of care in October of 2012. He felt that his EOP level of
28 care was arbitrarily reduced in retaliation for his filing of administrative appeals. He indicated

5

Decl. Cornell Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

that he believed he had a major mental health issues that were not being adequately dealt with by staff members in his unit." (Stewart Decl. ¶ 324) I have personally met with Prisoner Z on at least two separate occasions following his movement from EOP to CCCMS after his placement in ASU for assault on a staff member. In at least one of these meetings the patient acknowledged to me that he did not have a serious mental illness but liked getting out of his cell frequently and wanted to remain in the EOP program in order to do so. Prisoner Z's level of care change was based on his absence of symptoms of a severe mental illness, his ability to work and program effectively at the EOP level of care over a protracted period of time. His assault on the staff member was deemed due more in part to Axis II pathology than to anything overt on Axis I. The notion that this inmate was acutely manic on the day he was interviewed by Dr. Stewart is also questionable, because this inmate has a tendency to speak in an increasingly animated fashion once he gets started and has an audience who will listen.

14. Dr. Stewart reports he observed a group where patients were given a movie to watch while others were reading magazines, and that these activities were not structured or therapeutic. (Stewart Decl. ¶ 365) Current events and other leisure type groups are offered as a part of the overall structured and therapeutic activities offered to EOP inmates at CSP-Los Angeles County. It is recognized that patients need opportunities to engage in these types of activities as a way of helping them manage their time incarcerated and to alleviate the monotony of in cell time. Dr. Stewart declined an invitation to walk one door down in the Education Building to observe a recreational therapy group that had several patients all actively engaged in a collaborative art project with a group facilitator.

15. In his Declaration in paragraphs 409-410 & 416, Dr. Stewart expresses his concerns about patients waiting to be transferred to DSH, the large number of high acuity patients waiting for transfer to DSH, the transfer timelines to DSH and the excessively long stays in MHCB beyond transfer timelines. (Stewart Decl. ¶ 409-410, 416). Staff does everything to expedite the transfer of these patients to DSH. These patients are appropriately maintained in our MHCB or EOP until they leave in order to ensure that they receive the highest level of care available until their transfers occur. Presently, of the eleven patients that were or are pending transfer at the

6

Decl. Cornell Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

1  time of Dr. Stewart's inspection tour, eight of these patients have been transferred to DSH, while
2  three patients remain at LAC. One of the three patients is housed in MHCB; one is in ASU EOP;
3  and the third is housed in Mainline Sensitive Needs Yard EOP.
4  ///
5      I declare under penalty of perjury under the laws of the State of California and the United
6  States of America that the foregoing is true and correct. Executed in Lancaster, California on
7  March 21, 2013.

CHRISTOPHER CORNELL
*(original signature retained by attorney)*