1   KAMALA D. HARRIS
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   JAY C. RUSSELL
    Supervising Deputy Attorney General
4   DEBBIE VOROUS, State Bar No. 166884
    PATRICK R. MCKINNEY, State Bar No. 215228
5   WILLIAM DOWNER, State Bar No. 257644
    Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone: (415) 703-3035
     Fax: (415) 703-5843
8    E-mail: Patrick.McKinney@doj.ca.gov

9   *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14

15   **RALPH COLEMAN, et al.,**                     2:90-cv-00520 LKK JFM PC

16                              Plaintiffs,    **REPLY DECLARATION OF DIANE
                                               O'LAUGHLIN IN SUPPORT OF**
17        **v.**                               **DEFENDANTS' MOTION TO
                                               TERMINATE UNDER THE**
18   **EDMUND G. BROWN JR., et al.,**          **PRISON LITIGATION REFORM ACT
                                               [18 U.S.C. § 3626(b)] AND TO VACATE**
19                              Defendants.    **THE COURT'S JUDGMENT AND
                                               ORDERS UNDER FEDERAL RULE OF**
20                                             **CIVIL PROCEDURE 60(b)(5)**

21

22

23

24        I, Diane O'Laughlin, declare as follows:

25        1.   I am Diane O'Laughlin. I submit this declaration in support of the State's Reply

     Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to
26
     Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).
27

28
                                                1

2.   I am the Supervising Registered Nurse who has acted as Chair of the Emergency
Medical Response Review Committee (EMRRC) at Folsom State Prison ("FSP") since June,
2008.  The EMRRC rigorously reviews all patients who leave the prison via "Code 3" ambulance
(lights and sirens), and all patients who die while in FSP.  I have been on this committee for four
years, and I strongly believe in the interdisciplinary teamwork, accountability, and staff
improvement that occurs as a result of the committee's hard work.

3.   The EMRRC members include personnel from various positions within the prison, so
multiple perspectives can be utilized in the process of reviewing each case.  The following
EMRRC members are typically present at committee meetings:

        a.   The Chief Medical Executive is present to look at the data from the medical
           doctor's perspective.

        b.   The Warden and Correctional Captain are at the table to review the data
           from the custody officer's point of view.

        c.   The Chief Psychologist considers the mental health aspects of the cases
           presented, and the Chief Nurse Executive analyzes the details of the nursing
           care provided in each case presented.

        d.   The Nurse Instructor is there both to present the most recent Emergency
           Drill report, and also to design future training based on any deficiencies
           uncovered during the review process.

        e.   The Chief Executive Officer offers an over-arching facility-wide perspective,
           as well as having authority to immediately implement changes or
           investigation if indicated by the case review.

        f.   An Office Technician is present at every meeting to take notes, and prepare
           the minutes from the meeting.

        g.   Other team members such as the Supervising Dentist or the Fire Chief, may
           be asked to join the committee if the type of case presented would benefit
           from their areas of expertise.

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    4.   My role as the Chair of the EMRRC is to review multiple aspects about the patient and the emergency, and then present the cases to the committee.   The Chair of the EMRRC reviews all the documentation from the emergency response. The analysis of the emergency response includes putting together a timeline as well as a narrative regarding the custody first responder's actions, the healthcare first responder's interventions, the nursing response, each aspect of the care provided, the physician's response, the ambulance response, as well as the time, health status, and manner the inmate left our facility. Our patient's vital signs and response to each intervention is reviewed and assessed throughout the emergency response process. Every time interval from the time the patient's issue is first discovered until he leaves our facility is recorded and assessed for lapses and delays.

    5.   The EMRRC Chair also reviews the past medical history of the patients. This includes looking at their most recent visit with their primary care provider, their mental health visits, their medication and their compliance with taking that medication. Their chronic diseases, their disabilities, and their mental health status are also included in the Chair's report. Additionally, hospital records are reviewed, in order to further assess the appropriateness of the pre-hospital care provided in our prison. All of this data is printed out, and held ready for review in the EMRRC meeting, should any member wish to study that data during the case presentation.

    6.   The EMRRC meets each month to review all "Code 3" and death in custody cases; each case is presented within 30 days of the event. During the meeting, the EMRRC Chair's narrative and timeline of the event is presented to the committee members. Each member considers the data from his/her unique perspective, and if there are questions or concerns about timelines or care, these are discussed as a team.

    7.   When training needs or deficiencies are discovered during the EMRRC's review of a patient or emergency, a corrective action plan is designed. Examples of corrective action plans may include training, skills labs, changes in process, investigation, request for further study, or whatever else is needed to protect the health and safety of our patients in future events. Even if the outcome for our patient is good, when deficiencies are found during the review process, a

3

1    corrective action plan will be designed and implemented by the committee. When an exemplary

2    job was done by the emergency response team, this is reinforced with positive feedback to the

3    staff.

4        8.    My EMRRC and I take our emergency response very seriously at FSP. The level of

5    self-monitoring, analysis and implementation of training and process improvement strategies is

6    intense during the EMRRC meetings. Each department is held to a very high standard by the

7    other departments. Some examples of this type of inter-departmental accountability that I have

8    seen include the following:

9            a.  The Chief Physician Executive asking the Warden about an extended time

10               for an ambulance entering and leaving the prison.

11           b.  The Chief Nurse Executive asking the CEO for funding for emergency

12               transport vehicles for emergencies that happen far away from our emergency

13               response areas.

14           c.  Recently there was a stabbing victim at FSP, and though the outcome for the

15               patient was good, the committee saw several areas for improvement in our

16               response, so our next emergency drill was the exact same stabbing scenario.

17       9.    The EMRRC regularly calls for Emergency drills and skills labs for our staff to

18   refine the response, so they will be more effective for the next patient. All our emergency drills

19   are done in tandem with the custody officers, run on every shift, and done quarterly at a

20   minimum. We have had drills regarding hanging victims, so that staff would be well trained and

21   current on what they needed to do to give an attempted suicide victim the best chance for survival.

22       10. Based on my experience, during actual emergency events and during drills, our first

23   responders have shown themselves to be engaged and serious about saving lives. They run to

24   respond, carrying large emergency bags and defibrillators. So intent on emergency care are they

25   that we recently had to have a drill on not doing CPR if the patient is already cold and stiff; staff

26   truly wants to try to save our patients, if there is any hope at all. A report is made of each of our

27

28

4

1  emergency drills, and is reported back to the EMMRC quarterly to inform the committee on the

2  completion and outcome of that training directed by the committee.

3      11. Contrary to allegations in the pending lawsuit, the EMMRC at FSP is not indifferent

4  to the mentally ill and to suicide. The EMMRC members and I take every response and every

5  death very seriously. We are not without mistakes, but we intensely endeavor to improve our

6  skills with every review. We hold ourselves to a very high level of accountability in doing the

7  right thing for our patients.

8      I declare under penalty of perjury under the laws of the State of California and the United

9  States of America that the foregoing is true and correct. Executed in Folsom, California on

10  March 21, 2013.

11

12                              DIANE O'LAUGHLIN
                                *(original signature retained by attorney)*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          5