1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  WILLIAM DOWNER, State Bar No. 257644
   Deputy Attorneys General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-3035
    Fax:  (415) 703-5843
8   E-mail:  Patrick.McKinney@doj.ca.gov

9  *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14 | | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **REPLY DECLARATION OF ROBERT C. McMAHON, PH.D., IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

23

         I, Robert C. McMahon, Ph.D., declare as follows:

         1.    I am Robert C. McMahon, Ph.D.  I submit this declaration in support of the State's

Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act

and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

                                    1

2.    I have worked for the California Department of Corrections since August 2007.  I am currently employed at Folsom State Prison (FSP) as a staff psychologist, and since January 2012, I have also acted as the Suicide Prevention/Risk (SPR-FIT) Coordinator.

3.    The FSP has a SPR-FIT Committee, which meets the first Tuesday of every month at the conclusion of the Mental Health Quality Management Committee, which begins at 10:00 am. The meeting is well-attended and taken seriously by all members.  Except for occasional absences by the supervising nurses and psychiatric technicians, Committee members attend regularly and are actively engaged in improving operations to prevent inmate deaths by suicide.  At Committee meetings, senior representatives from mental health, nursing, and custody have the opportunity for meaningful face-to-face discussion and constructive problem solving in real time.

4.    Throughout this past year, SPR-FIT Committee members have brought valuable perspectives and information that has been helpful to understand and prevent further tragic outcomes for Inmate/Patients (IP's) in crisis and those considering suicide.

5.    As the SPR-FIT Coordinator, my job is to review individual cases of IP's who have been identified by staff as requiring crisis intervention during the previous month.  Prior to each SPR-FIT Committee meeting, I audit the many forms generated by mental health clinicians, nursing staff, and custody to ensure that each IP who was in a state of crisis or had a mental health emergency is dealt with according to the procedures outlined in the Program Guide.  I also gather information throughout each week by attending daily Clinical Staff Meetings (where urgent/emergent cases are identified by staff referrals and assigned to clinicians) and weekly Clinical Supervision Meetings (held every Monday, where mental health clinicians discuss IP's that they are concerned about and solicit advice and consultation from their fellow clinicians).

6.    Additionally, information about IP's who are identified by medical staff as being high-risk for suicide or possibly having undiagnosed mental health problems are brought to my attention by the psychiatrists who attend weekly Physicians Meetings (held on Mondays) with the medical doctors and Dr. Sahota, Chief Medical Executive at FSP, and Psychiatry Meetings (held on Fridays) with Dr. Paizis, Senior Psychiatrist at FSP.  From these multiple sources, I create an

2

agenda for each SPR-FIT meeting and share changes in procedures, programming, or policy that may affect how IP's in crisis are treated and how their crises are to be resolved.

7.     During each SPR-FIT meeting, the Committee reviews each and every emergency case that has required a referral for a Mental Health Crisis Bed (MHCB) level of care during the previous month. Precipitating events, risk factors, audit compliance, and a status update is provided for each individual case. At this time, I give direct feedback to senior representatives from custody or nursing if forms are missing or the paperwork suggests that there were any lapses in procedure.

8.     From month to month, the Committee follows up on problems that have been identified until there is resolution. As each case is reviewed, it bears mentioning that highly sensitive and/or confidential information is often discussed in the context of the meeting (e.g., IP had safety concerns, specific family issues, etc.) that would not be included in the SPR-FIT meeting minutes to protect the IP's privacy and safety within the institution. It also bears mentioning that positive feedback is given to custody and nursing supervisors if local operating procedures have been followed and the potentially suicidal IP has been dealt with safely and without loss of life.

9.     In the unfortunate instance that there has been a recently completed suicide, the Committee independently reviews local operating procedures to determine whether changes or updates may be warranted. The Committee also tracks whether recommendations spelled out in the corrective action plans of the Suicide Review and reports back to Dr. Cho, Chief of Mental Health, and Headquarters about the progress toward those goals.

10.   At the conclusion of each meeting, the Committee identifies IP's who may not have required MHCB or crisis intervention, but who may be at risk for suicide or other dangerous behavior so that staff can intervene before the IP escalates or deteriorates further as the case may be. The following are two such examples which I recently oversaw as the SPR-FIT Coordinator:

a.   On or about January 10, 2013, it was brought to the attention of the SPR-FIT Committee that a particular inmate who was waiting for news about a

3

pending capital murder case.  He was not participating in the Correctional

Clinical Case Management System ("CCCMS") level of care but staff had

referred him to mental health several times due to the fact that he had made

indirect statements about possibly ending his life if the outcome of his court

case was negative.  Interviews with clinicians revealed that his suicidal

thoughts were conditional and intermittent.  He was placed in CCCMS level

of care (despite the IP's initial objections) to follow his case.  During the

SPR-FIT meeting, I and the Committee discussed plans as to whether the

procedures for transfer out to court were sufficient for his safety.  There was

concern that clinicians in the County Jail needed to be alerted that his suicide

risk was serious if he received "bad news."  In his case, the Committee

determined that since he did not take psychiatric medication, he may be

overlooked.  The Committee's plan required alerting Medical Records staff

that a printout of the Mental Health Services Delivery System ("MHSDS")

Summary would need to be transferred with him to County Jail in order to

alert them that he was a risk of suicide (clinicians outside of CDCR do not

have direct access to IP's mental health records for confidentiality reasons).

b.  On or about December 15, 2012, medical staff identified an IP with

advanced hepatitis who was refusing to take his interferon treatment and

appeared depressed and agitated.  The IP was referred for an evaluation by a

mental health clinician.  After spending over an hour with the IP, the

clinician was able to gain a better understanding of his change in attitude and

behavior.  The clinician was also able to redirect the IP and identify positive

goals and reasons worth living.  With the intervention, the IP was able to see

the value in safeguarding his life by complying with medical treatment.

Additionally, he was also able to see that rather than being treated like "a

4

guinea pig" with medication, medical staff were actually concerned for his long-term welfare.

11. At present, all of the mental health clinicians at FSB have been mentored under the Suicide Risk Evaluation Mentorship Program. A total of seven psychologists (one who has since transferred to another institution), three psychiatrists, and two social workers received mentoring from either Dr. Meg Cho, Dr. Cheryl Paizis, or myself. All 12 clinicians passed their mentorship evaluation; most in fact received very high scores demonstrating highly developed clinical skills, sensitivity, and competence. It is true that there was initial resistance to the idea of the mentorship program. Over the course of several meetings with clinical staff, however, the initial fears and concerns of the clinicians (who perceived this program within a negative framework of a scapegoating culture) transformed to a clearer understanding that participation in the mentorship program was consistent with our mission to provide the best mental health care available to CDCR IP's.

12. Having mentored five of the original 12 clinicians, I can say that I was impressed with the professionalism and clinical abilities that I witnessed. I felt that I got to know the work of my colleagues on a much deeper level and learned much from them in the ways that they conducted their suicide risk evaluations. I believe that the implementation of this mentoring program has also had the positive effect of deepening trust and teamwork among our staff.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Folsom State Prison, Represa, California on March 22, 2013.

ROBERT C. McMAHON
*(original signature retained by attorney)*

5

Reply Decl. of Robert C. McMahon In Supp. of Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)