1   KAMALA D. HARRIS
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   JAY C. RUSSELL
    Supervising Deputy Attorney General
4   DEBBIE VOROUS, State Bar No. 166884
5   PATRICK R. MCKINNEY, State Bar No. 215228
    WILLIAM DOWNER, State Bar No. 257644
6   Deputy Attorneys General
7    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
8    Telephone:  (415) 703-3035
     Fax:  (415) 703-5843
9    E-mail:  Patrick.McKinney@doj.ca.gov

10  *Attorneys for Defendants*

11              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF CALIFORNIA
12                    SACRAMENTO DIVISION

13

14
    RALPH COLEMAN, et al.,                    2:90-cv-00520 LKK JFM PC
15
                          Plaintiffs,         **REPLY DECLARATION OF TIM**
16                                            **BELAVICH IN SUPPORT OF**
                                              **DEFENDANTS' MOTION TO**
17            v.                              **TERMINATE UNDER THE**
                                              **PRISON LITIGATION REFORM ACT**
18  EDMUND G. BROWN JR., et al.,              **[18 U.S.C. § 3626(b)] AND TO VACATE**
                                              **THE COURT'S JUDGMENT AND**
19                        Defendants.         **ORDERS UNDER FEDERAL RULE OF**
                                              **CIVIL PROCEDURE 60(b)(5)**
20

21

22        I, Tim Belavich, declare as follows:

23        1.  I am the Acting Statewide Mental Health Deputy Director for California

24  Department of Corrections and Rehabilitation (CDCR or Department).  I submit this declaration

25  in support of the State's Reply Memorandum in support of its motion to terminate under the

26  Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule

27

28
                                              1

1    of Civil Procedure 60(b)(5).

2        2.    I was appointed as CDCR's Acting Director, Division of Health Care Services in

3    February 2013. Some of my duties as Director include responsibility for and supervision of the

4    Department's mental health program and clinical support division as well as the field operations,

5    which include mental health program support, psychology support, psychiatry support, health

6    care placement oversight, inpatient care, regional support, and compliance with *Coleman*

7

8    mandates. I am familiar with current processes in place at headquarters to address quality

9    management and improvement and suicide prevention. In addition, I am familiar with the

10   extensive policies and procedures that govern the prison mental health care delivery system at the

11   institutional level and have visited and evaluated the majority of prisons with mental health care

12   programs.

13

14       3.    I continue to serve as the Acting Statewide Mental Health Program Deputy

15   Director, the position to which I was appointed on March 12, 2012. Prior to that appointment, I

16   served as Chief Executive Officer (CEO) at California State Prison, Los Angeles County. In that

17   capacity, I was responsible for the entire health care delivery system at the prison, which included

18   medical, pharmacy, nursing, mental health, and dental services. Prior to my appointment as the

19   CEO, I served in the capacities of Staff, Senior and Chief Psychologist and as the Health Care

20   Manager at California State Prison, Los Angeles County.

21

22       4.    I hold degrees in Clinical Psychology and Health Care Administration, and am a

23   certified as a Correctional Health Professional by the National Commission on Correctional

24   Healthcare.

25       5.    Based on my education, my experience providing mental health services in

26   correctional settings, and my knowledge of the State's mental health delivery system, I provide

27   the following update regarding CDCR's statewide accomplishments over the past several years.

28

2

**Statewide Mental Health Program Accomplishments**

6.      Since 2009, CDCR has taken aggressive steps to improve the delivery of mental health care to inmates.  A summary of our statewide mental health program accomplishments are attached as Exhibit A.  Because the list is long, I only specifically describe some of the significant achievements here below.

7.      In 2011, CDCR in conjunction with the Special Master and his experts developed what we refer to at CDCR as the "sustainable process," which relates to the system of identifying an individual inmate's need for an increased level of care and the transfer policy to a higher level of care at Department of State Hospitals (DSH).  The sustainable process is a complex process that requires clear lines of communication between CDCR and DSH.  We built in significant internal oversight by Mental Health Regional Administrators to ensure that timeliness of the process and appropriate care for the inmates' needs is sustainable over time.  Further description of the impact of the oversight is more fully described below.  The implementation of the sustainable process has significantly reduced an inmate's wait time for transfer to higher level of care and has resolved the waitlist for DSH beds.

8.      Also in 2011, CDCR significantly improved its suicide prevention processes in the institutions.  As an example, videos were produced for rotation on the inmate channel that are directed toward inmates and address suicide prevention using a public health, primary prevention model.  We also instituted "evening programs" which include extended clinical staff working hours to ensure more direct and timely crisis intervention services are available to inmates.  This has allowed a quicker response when an inmate evaluation is required to determine whether the inmate requires a crisis bed admission or other intervention.   Additionally, suicide risk assessment training was completed at all institutions.   Suicide prevention and quality improvement is an ongoing effort as well, so while CDCR recognized great strides in 2011, we

3

1   continue to evaluate and amend policies to improve care and prevent future suicides where

2   possible.

3        9.      Beginning in 2011, CDCR started an effort to standardize mental health forms and

4   operational policies to ensure consistent care across the system.  This has included the

5   development of a mental health forms committee workgroup to review and vet changes to forms

6   as well as a standardized peer review audit tool.

7

8        10.     In 2012, CDCR implemented a system to track and monitor alternative and

9   outpatient housing usage.  Directives for use of outpatient housing units and alternative housing

10  were also implemented.

11       11.     Also in 2012, CDCR secured funding and position authority for the approved 2009

12  staffing plan consistent with the Blueprint for California.  This assures establishment of and

13  funding for staff to provide mental health care for the inmates.  Additionally, senior psychologist

14  specialist positions at each institution were authorized to implement quality management.  This

15  provides local oversight and auditing to ensure compliance with policies.

16

17       12.     In 2012, the psychiatric inpatient program was opened at California Institute for

18  Women (CIW) and CDCR has received accreditation from the Joint Commission for the 45-bed

19  program.  This program is unique because it was the first to be staffed, managed, and operated by

20  CDCR mental health staff rather than DSH staff.  The opening of CIW is a significant milestone

21  in demonstrating CDCR can reassume the responsibility for the entire continuum of mental health

22  care for CDCR inmates.

23

24       13.     In collaboration with the Special Master and his experts, CDCR has bolstered the

25  already established quality assurance and improvement program, which ensures timely provision

26  of mental health care with more robust auditing and oversight from headquarters.  As example,

27  CDCR has finalized a quality improvement audit tool, has developed and completed a statewide

28

4

1    training for trainers on suicide risk assessment, and has developed a new suicide prevention

2    workgroup at headquarters.   Attached as Exhibit B is a flowchart describing the process by which

3    headquarters and the executive staff at the institutions have oversight of processes to ensure

4    compliance with policies and procedures through robust auditing and reporting.   This flow chart

5    shows pictorially the systems and processes in place to ensure inmates with serious mental health

6    needs receive appropriate treatment; to identify how improvement needs are identified; and how

7    they develop remedies and track for compliance.

8

9    Continuum of Care and the 'Sustainable Process'

10        14.    Significant work has been done to ensure a robust system is in place to appropriately

11    and timely transfer inmates to a higher level of care when the need arises.   The sustainable

12    process evaluations conducted jointly between the Special Master and CDCR in late 2011 show

13    that the current system is working as intended.   Indeed this court recognized the significant

14    progress and success in transferring inmates to higher levels of care at the July 13, 2012 hearing

15    on the matter.

16

17        15.    Since its implementation, CDCR has continued to closely monitor the process and we

18    have seen continued improvements in placing inmates in the proper level of care setting over time.

19    The audit results from 2012 and 2013 are captured here in Exhibit C in a document titled, "Audit

20    results for 2012 and 2013."   These audits reveal the increase in the percentage of referral

21    packages with sufficient and appropriate documentation and reflect the improved quality of work

22    over time at each institution.   They also evidence that CDCR staff have the skills to recognize an

23    inmate's need for the transfer to a higher level of care, in fact are identifying the additional needs,

24    and are properly documenting those needs to demonstrate the inmate meets the criteria for

25    transfer, all of which ensures the inmate will transfer to the level of care needed.

26

27    **Suicide Prevention Efforts**

28

16.    While I am aware of the criticism levied on CDCR by the plaintiffs' counsel and by the Special Master and his team of experts for failure to prevent suicides, the criticisms do not acknowledge the full breadth of the work done by CDCR to prevent suicides. CDCR takes the issue of inmates' suicides and suicide prevention seriously. CDCR is committed to continuously improving its suicide prevention policies. There is a great deal of evidence which shows successful interventions before an attempted suicide occurs. In order to get a full picture of the work done to prevent suicides, the court and experts should take into account the number of inmates referred to DSH for care and to the number of inmates sent to a mental health crisis bed (MHCB) for care. Data reflects that CDCR made 937 DSH referrals for ICF beds in 2011, 1016 in 2012, and 79 for the first two months of 2013. See Exhibit D. Similar data also shows that CDCR made 654 DSH referrals or acute level care in 2011, 698 in 2012, and 69 in the first two months of 2013. See Exhibit E. Moreover, additional information shows that 2030 requests for inter-institutional MHCB placements were made in 2011 and 3594 in 2012. This is not reflective of the thousands of annual intra-institutional MHCB placements. Data reveals in 2011 there were 10,946 referrals to intra-institutional MHCB, 2012 yielded 11000 similar referrals and there have been 1714 such referrals through March 21, 2013. See Exhibit F.

**Response to Criticisms of Dr. Ray Patterson**

17.    I am aware that the Coleman expert regarding suicides, Dr. Ray Patterson's report reflects a belief that CDCR has refused to consider recommendations made by him or other experts regarding suicide prevention. This is false. CDCR headquarters staff carefully reviews and considers each recommendation from each expert on this issue. Since 2006, CDCR has received numerous recommendations from experts, both our own and those of the Special Master's. CDCR has considered each recommendation made and where sensible, it has implemented those recommendations. Indeed, CDCR has either completely implemented or is in

6

1    the process of implementing the majority of the recommendations made.

2    **Response to Criticisms of  Dr. Lindsay Hayes**

3        18.    In 2010, CDCR retained Lindsay Hayes as a consultant to help CDCR review and

4    further improve its suicide prevention policies.  From late 2010 and into 2011, Mr. Hayes visited

5    three institutions, reviewed CDCR's policies and training materials regarding suicide prevention,

6    and consulted with headquarters staff.  Mr. Hayes's report, issued in 2011, included several

7    recommendations and observations. His entire report was not "buried."  Instead, headquarters

8    staff  continue to analyze the report and review his recommendations.

9        19.    We have agreed with many of his recommendations or observations, we have

10    disagreed with some or parts of his recommendations and some of his recommendations are no

11    longer applicable to the current situation at CDCR.  The following paragraphs provide a summary

12    of his recommendations and an explanation as to what the department has done in response to

13    those recommendations or the reasons why we disagreed or found them no longer applicable.

14        20.    Mr. Hayes recommended the use of suicide-resistant beds in MHCBs.  In 2012,

15    CDCR furnished all MHCB units that are identified as permanent and all the unlicensed MHCB

16    units at California State Prison, Sacramento and California Institution for Men with 250 suicide-

17    resistant beds and 18 restraint beds, for a total of 268 beds.

18        21.    Mr. Hayes also recommended expanding the use of the Mental Health Tracking

19    System (MHTS) to include data collection on *all* inmates who have attempted suicide, engaged in

20    self-injurious behavior, or otherwise been placed on suicide observation, rather than having data

21    available only for those inmates who are participants in the Mental Health Services Delivery

22    System (MHSDS).  MHTS presently tracks any inmate that has had a suicide risk evaluation,

23    regardless of whether the inmate is participating in MHSDS.  Further, in MHTS there is currently

24    an alert in MHTS which identifies an inmate who is a "High Acute Suicide Risk."  This

7

1    automatically pops up as an alert when Acute Risk is marked as "high" from an 7447 Suicide

2    Risk Evaluation and entered in MHTS.

3        22.    Mr. Hayes also recommended a number of changes to the MHSDS Program

4    Guide, 2009 Revision (Program Guide) that he believed would enhance suicide prevention efforts

5    or provide greater clarity for staff.  CDCR had met with plaintiffs and the Special Master's

6    experts with respect to similar revisions to the Program Guide long before the report from Mr.

7
8    Hayes had been received.  However, many of his recommendations have been addressed not

9    through a revision to the Program Guide, as he suggested, but rather as refinements or

10   redistributions of already existing policies or procedures.  As an example, Mr. Hayes'

11   recommendation that inmates discharged from an Outpatient Housing Unit (OHU) receive five-

12
13   day follow-ups if they were placed in the OHU for suicidal ideation had already been addressed

14   in a memorandum requiring the same for inmates who were admitted to OHU's for mental health

15   reasons. See Exhibit G.

16       23.    Mr. Hayes' provided recommendations regarding various training curricula

17   utilized by CDCR. He recommended adding new sections to existing training offered at the cadet

18   academy, health care new employee orientation and annual in-service training.  The Mental

19   Health Program is currently working with CDCR to revise the cadet academy lesson plan to

20   include several of the issues Mr. Hayes noted.  A revision of the lesson plan was delivered to

21   students at the academy on March 19, 2013 and will be further refined.  Of course, we will

22
23   include the current, updated research in annual training and the health care new employee

24   orientations.  With respect to disseminating the current research about suicides in CDCR and the

25   recommendations generated as part of the suicide case reviews system wide, we agree that the

26   information should be disseminated to institutional staff  but do not agree that formal training is

27   the appropriate mechanism to accomplish this goal.  Rather, we believe the information can be

28

8

1    effectively communicated with a quarterly Suicide Prevention Bulletin which can be distributed

2    via the CDCR intranet and individual's work email accounts.  We also plan to discuss these issues

3    at the monthly Suicide Prevention Videoconference and the quarterly statewide Suicide

4    Prevention and Response Focused Improvement Team coordinator teleconference.  The

5    recommendations that will be implemented will also be shared with the relevant custody staff at

6    the daily morning collaboration meetings and the regular weekly facility training and of course,

7    integrated in the annual training.

8

9         24.    Mr. Hayes recommended utilizing OHUs for placement of inmates that require

10   suicide precautions.  This recommendation will not be implemented for a number of reasons.

11   First, this recommendation was based, at least in part, on the significant wait time for placement

12   in MHCBs that Mr. Hayes observed in 2010.  This problem has since been rectified, obviating the

13   need for other beds in which to place inmates who require placement on suicidal watch or

14   precautions.  Second, plaintiff's and Special Master's experts are strongly opposed to the use of

15   OHUs for inmates who have expressed suicidal ideation.  Third, placement of individuals judged

16   to be in immediate danger of self-harm in a licensed bed is consistent with community standards.

17   Our solution meets community standards and provides the safest housing for the inmate with

18   suicidal ideation.

19

20        25.    Mr. Hayes noted that the threshold for placement of inmates on suicide observation

21   and precautions is set too high.   He argued that inmates who are rated as "moderate" acute risk

22   should be placed on suicide watch.  He noted that there were several suicides of inmates who had

23   been recently discharged from MHCB's in 2010.  The Mental Health Program does not believe

24   this recommendation to be useful.  First, we examined the clinician's ratings of acute and chronic

25   risk on the last Suicide Risk Evaluation form completed prior to date of death for 2012 suicides.

26   For the 20 inmates who received a Suicide Risk Evaluation per Mental Health Program

27

28

9

guidelines, only two inmates had acute risk levels rated as moderate or high. Both of those cases had a subsequent inpatient admission and one of those inmates was in an inpatient DSH setting at the time of death. Second, in my opinion, using risk level as determined by the Suicide Risk Evaluation as the sole determinant of need for suicide watch or observation is inappropriate. Estimation of risk is not based on any particular "cut-off score" nor is there any scoring system. Risk is a clinical judgment. One cannot assume equivalence between different clinicians' ratings of risk. Finally, placement on suicide watch or precautions is not a treatment. CDCR does not suggest that inmates who have moderate risk levels should go untreated. For individuals with "moderate" acute risk but who are not in immediate danger of self-harm, enhanced treatment plans (safety plans) designed to mitigate that level of risk should be developed. The clinical strategies that form the basis of these plans help the inmate develop skills and resources to cope with risky situations and serve to reduce future suicide risk. Inmates who have chronic risk factors for suicide should be carefully monitored for the emergence of acute risk factors.

26.    As part of our ongoing efforts to evaluate and enhance our mental health services and suicide prevention efforts, in 2012, the Attorney General's office hired four nationally recognized experts to conduct a series of site inspections of CDCR's institutions to provide observations and opinions of CDCR's MHSDS. Three of the experts; Joel Dvoskin, Charles Scott and Jacqueline Moore, issued a report signed January 4, 2013, that was filed with this Court on January 7th, 2013. As part of that report, they found our current suicide prevention policies and practices met the standard of care. However, they did make several recommendations on how to further improve our suicide prevention policies. Although this report is fairly recent, we have evaluated these recommendations and have begun to implement some of them. Below is a summary of these recommendations and the actions CDCR has taken with respect to each recommendation.

10

27.     Dr. Dvoskin and his colleagues recommended integration of custody, mental health, and medical staff in the suicide case review process. This has been largely accomplished. A representative of the Divisions of Adult Institutions now accompanies mental health throughout the process of the on-site data gathering during a suicide case review. Custody is involved and interviewed at institutions. In addition, suicide case reviewers develop recommendations with custody prior to the teleconference presentation of case. Mental health staff now attends Death Review Committee (DRC). For cases in which medical issues are present, mental health works with DRC prior to suicide case completion. Medical staff are invited to the suicide case review teleconference and given special notice when a case involves medical issues. Custody, nursing and medical staff at the institution is also invited to the case review teleconference.

28.     Dr. Dvoskin and his colleagues further recommended that serious issues should be addressed immediately, while the reviewer(s) are still at the institution for the initial data-gathering, and should not wait for the headquarters' suicide case review teleconference. CDCR has implemented this recommendation as well by training all case reviewers to immediately address with the institution any issues identified during the review. We additionally issue periodic reminders to reviewers to stress the importance of this process.

29.     In another recommendation, Dr. Dvoskin and his colleagues suggested that all recommendations arising as part of the suicide case review process be categorized according to an examination of the causality and seriousness of the concern noted, as well as whether the recommendation concerns actions taken prior to or after the inmate's death. This has been performed for all 2011 and 2012 suicides and is an ongoing process for 2013 suicides.

30.     Since previous suicide case reports sometimes differentiated between formal and informal recommendations, Dr. Dvoskin and his colleagues recommended that headquarters staff follow up on informal recommendations contained in the suicide case review reports by utilizing

11

a process similar to that for formal recommendations.  In response, we have eliminated informal recommendations from the reports.  If an issue arises as a concern, it will either be fully resolved prior to report completion or will become a formal recommendation.

31.    Dr. Dvoskin and his colleagues also recommended coordination with the DSH if a recently discharged inmate commits suicide.  This process has been implemented and close collaboration occurred during the review of a recent inmate suicide.

32.    Dr. Dvoskin notes that, in one case, medical records could not be found.  Health care implemented the electronic unit health record in July 2011 and records from that date forward can easily be found once scanned.  In cases in which past paper records are deemed relevant and cannot be found, suicide case reviewers have been instructed to notify headquarters, and headquarters staff will in turn pursue the issue until resolution.

33.    Dr. Dvoskin and his colleagues noted multiple suggestions for further improvement related to Administrative Segregation Units (ASU).  Dr. Dvoskin made a number of recommendations, most of which are under consideration and are being discussed by either the MHSDS in Segregation Workgroup or the Suicide Prevention Workgroup.

34.    Another recommendation from Dr. Dvoskin and his colleagues was that Special Master reports on suicide should be immediately available.  This is not under CDCR control.

35.    Dr. Dvoskin and colleagues recommended that requests for additional information and attention to recommendations should issue directly from the Secretary's office.  This is not necessary in most cases.  Routine requests are handled at the institutional level.  However, if difficulties obtaining required or requested information are encountered, this situation would be elevated through the chain of command, up to and including the Secretary's office.

36.    Dr. Dvoskin and his colleagues recommended that the medical DRC be folded into the suicide case review process.  This cannot be fully accomplished as the timelines for

12

1    completion differ for these two processes. However, as noted above, a mental health clinician

2    now attends Death Review Committee and other clinical staff from this committee are invited to

3    the suicide case reviews which promotes communication and collaboration between these two

4    functions. When issues related to medical care or emergency response are noted, these are

5    broached with Death Review Committee and discussions are held with relevant California

6    Correctional Health Care Services (CCHCS) staff prior to report completion.

7

8        37.    Another recommendation from Dr. Dvoskin and his colleague was that completed

9    suicide case review reports be routed to the Federal Receiver for signature. Due to the tight

10   timelines for completing the reports, they are routed for signature through mental health and the

11   Division of Adult Institutions. The Receiver's staff is present during the suicide case review

12   teleconference and communication continues throughout the process whenever indicated by the

13   facts of the case. A final copy of each report is forwarded to the CCHCS.

14

15       38.    Dr. Dvoskin noted that limited information is available when issues in suicide case

16   reviews relate to such issues as employee discipline, security group issues, or institutional

17   security. To the extent possible, and without compromising confidential personnel information or

18   jeopardizing legitimate safety concerns, the Mental Health Program requests such information

19   and elevates denials for information if needed. The Mental Health Program is informed if an

20   investigation is opened, receives the investigation number, and is notified upon closure. If a

21   suicide case review could not be adequately completed due to staff reluctance to speak to the

22   reviewer(s), we would contact supervisorial, managerial, and executive staff with the request.

23

24       39.    Dr. Dvoskin and his colleagues additionally recommended a change in our use of

25   the term Quality Improvement Plan (QIP). Currently, CDCR refers to each individual

26   recommendation in a suicide case report as a QIP. The experts suggested that the term QIP

27   should refer only to the entire plan for a given institution, which may then have separate

28

13

1    recommendations labeled as such.  After consideration of this suggestion, the Mental Health

2    Program retained its practice of referring to each recommendation as a separate QIP, given the

3    institutions' staff are accustomed to this term and understand its application.

4        40.    The CDCR uses its suicide case review process to improve suicide prevention

5    efforts in California prisons.  We identify problems or concerns in the provision of treatment or

6    care to inmates in CDCR, and enhance understanding of the suicide risk factors for inmates

7    incarcerated in CDCR.  We consider every suicide to be a tragic event and, thus, seriously

8    scrutinize each incident to identify errors or systemic issues.  If errors or other issues are

9    identified, corrective actions are implemented at the individual, institutional, or statewide level to

10   prevent similar errors or outcomes in the future.

11       41.    The suicide case review encompasses several components, including a description

12   and analysis of the emergency response, autopsy results if available, relevant background

13   information, mental health and medical history, description of institutional functioning,

14   description of significant pre-suicidal events, discussion/conclusions, and recommendations to

15   rectify any errors.  These recommendations result in concrete actions to reduce suicides in CDCR

16   institutions as the institution is required to provide compliance with the quality improvement plan

17   as a step in the case review process.

18       42.    In addition to the recommendations that we received from our own experts, CDCR

19   has also received numerous recommendations from Dr. Ray Patterson, a court-appointed suicide

20   expert in the *Coleman* case.  For example, in his reports on suicides that occurred in 2011, Dr.

21   Patterson recommended the establishment of a suicide prevention and management workgroup to

22   timely review suicide prevention measures, suicide deaths, and deaths deemed to be of

23   undetermined cause, with participation by CDCR clinical, custodial, and administrative staff as

24   well as DSH staff and the Special Master's experts.  As noted above, CDCR already had a

14

1   Suicide Case Review process reviewed in a timely fashion by the headquarters Suicide Case

2   Review committee, which is comprised of mental health, custody, and nursing staff at

3   headquarters, as well as institution custody and mental health staff.  Institution nursing staff and

4   medical staff participate as needed.  DSH staff participates if the suicide occurred in DSH or was

5   a recent DSH discharge.  In addition, headquarters has ongoing Suicide Prevention and Response

6   Focused Improvement Team (SPRFIT) meetings independent of the suicide case review process.

7   Finally, headquarters has established a new Suicide Prevention Workgroup that meets in addition

8   to SPRFIT.  Thus, CDCR had fully implemented Dr. Patterson's recommendation prior to its

9   receipt.

10       43.       Dr. Patterson also recommended full implementation of the Suicide Risk

11  Evaluation Mentor Program to improve levels of clinical competency in the administration of the

12  Suicide Risk Evaluation and ongoing assessment of clinician training, performance and

13  supervision regarding suicide risk evaluations and management.  Prior to this recommendation,

14  CDCR was implementing this policy as well.  Attached as Exhibit H are a copy of the policy and

15  the procedure issued to the field in January 2013 titled, "Policy 12.04.201 Suicide Risk

16  Evaluation Mentoring Program" and 12.04.201P "Suicide Risk Evaluation Procedure."  Training

17  of mentors has been and will continue to be regularly offered in the future.  A memorandum dated

18  February 5, 2013, titled "Implementation of the Suicide Risk Evaluation Mentor Program" issued

19  to the field is attached here as Exhibit I.

20       44.       Past recommendations of Dr. Patterson's have included additional training of

21  mental health staff on the implementation of existing Program Guide requirements and related

22  departmental policies on mental health.  In that regard, I am aware that multiple trainings have

23  been delivered to staff, including, but not limited to, program guide training, Suicide Risk

24  Assessment training, suicide risk evaluation mentor program training, training regarding

15

1  confidentiality, and training regarding involuntary medication for psychiatrists. Of course,

2  training is a process that is an ongoing process. Attached as Exhibit J is a memorandum dated

3  February 15, 2013 titled, "Suicide Risk Evaluation Training," outlining additional mandatory

4  training for suicide risk evaluation which was recently completed.

5

6      45.    Another past recommendation from Dr. Patterson pertains to training regarding

7  emergency response to suicides. Again, CDCR has fully implemented this recommendation.

8  Training that reinforces current requirements in the Department's Operations Manual are

9  conducted regularly through block training and through periodic drills. Kathleen Allison, Deputy

10 Director of the Division of Adult Institutions, describes this process more fully in her declaration.

11     46.    More recently, in recognition of the challenges associated with the return of

12 inmates from DSH to ASU and the risk for self harm which may arise in that circumstance,

13 CDCR has issued a new "Psych and Return" policy. This policy is a dual signature memorandum

14 by the Director of Adult Institutions and myself, which reflects CDCR's intent to move inmates

15 to their proper level of care and to expedite processing rather than having inmates returned to

16 administrative segregation directly from DSH. Kathleen Allison, Deputy Director of the Division

17 of Adult Institutions, describes this memorandum more fully in her declaration. A copy of the

18 memorandum is attached as Exhibit K.

19

20     47.    CDCR has also undertaken further efforts to clarify with the staff the expectations

21 regarding ASU welfare checks. There has been confusion in the field regarding implementation

22 of the checks. A draft memorandum titled, "Revised Administrative Segregation Unit Welfare

23 Check Procedure and Implementation of Security Inspections in Specialized Housing," has been

24 signed and is ready to be implemented, which provides clarification that at least three checks per

25 hours must occur at staggered, unpredictable intervals not to exceed 30 minutes, rather than

26 simply providing the checks every 30 minutes. This memorandum further instructs the staff that

27

28

16

welfare checks in administrative segregation should continue beyond 21 days when clinically appropriate. This memorandum has been signed by both me and the Director of Adult Institutions. It has not yet been released to the field pending union notification. However, we are hopeful that this can be accomplished expeditiously so that it may be disseminated to the field. A copy of the draft memorandum is attached as Exhibit L.

**EOP Population Breakdown**

48.    Finally, to address concerns raised about the potential under-identification of EOP inmates in the condemned population, 3.6% of all condemned inmates are classified as "EOP," compared to 3.09% of all CDCR inmates. Additionally, the percentage of EOP-condemned inmates far exceeds the percentage of EOP inmates in administrative segregation and in the Psychiatric Services Unit statewide combined and multiplied by a factor of five. [noting that 0.4% of all administrative segregation inmates and 0.29% of all Psychiatric Services Unit inmates receive EOP-level care.]

See Exhibit M.


I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Sacramento, California on March 22nd, 2013.

TIM BELAVICH

*(original signature retained by attorney)*

Decl. of Tim Belavich in Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)