# EXHIBIT A

## STATEWIDE MENTAL HEALTH PROGRAM ACCOMPLISHMENTS 2009-2013

| 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| • Developed Local Operating Procedure for Duty to Warn | • Upgraded Mental Health Tracking System (MHTS.Net) | • Developed and implemented Sustainable Process | • System implemented to track and monitor alternative and outpatient housing usage | • Finalized Quality Improvement Audit Tool |
| • Activated 50 bed MHCB facility at CMF | • Completed ASU Intake Cell Retrofit Project | • Collaborated with DSH to reduce waitlist for ICF and Acute beds | • Reorganized HQ structure to better support the field | • Filed motion to terminate *Coleman* lawsuit |
| • Revised MHSDS Program Guide | • Completed T4T (Training for Trainer) for Program Guide | • Implemented DSH Sharepoint site | • Established Field Operations Unit with revamped Regional Structure | • Developed and completed T4T for Suicide Risk Assessment statewide |
| • Provided training on MHSDS Program guide revisions | • Revised and improved Suicide tracking system | • Developed new Psychological Testing policy | • Secured full PY Authority for 2009 approved Staffing Plan | • Directive disseminated to finish Suicide Risk Evaluation Mentor Program by June 30, 2013 |
| • Procedures developed and clarified for discharge from MHCB and DSH | • Standardized Data Entry procedures for MHTS.Net | • Established Proctor/Mentor Program at numerous institutions | • Successfully moved inmates out of VSPW after conversion to all male facility | • Activated CMF EOP treatment and office space |
| • Guidelines for Informed Consent developed | • Completed 15 short term construction projects | • Completed RVR T4T at all 33 institutions | • Psychiatric Inpatient Program (PIP) opened at CIW | • Received Joint Commission Accreditation for CIW PIP |
| • Suicide Prevention training plan developed | • Developed policy for 5 day Follow-Ups for all inmates discharged from "crisis care" | • Suicide Prevention video released to all 33 institutions | • Reduced wait times for higher level of care transfers | • MHTS.Net incorporated in "shared calendar" system of SOMS |
| • Qualified for Federal Loan Repayment | • Implemented Alternative Housing Logs at all 33 institutions | • Implemented "evening programs" at institutions to provide enhanced crisis intervention services | • Developed Medication Administration Process Improvement Project (MAPIP) | • New Suicide Prevention Workgroup developed at HQ |
| • Mental Health Bed Plan approved and filed | • Developed IDTT timeframe policy for inmates discharged from security housing | • Developed standardized procedure for policy and procedure development | • Developed MDO report writing guidelines | |
| • Mental Health Staffing Plan approved and filed | • Developed procedures for ASU Intake Cells | • Developed Mental Health Forms Committee Workgroup, in collaboration with field staff, to vet MHSDS form changes through | • Collaborated with Special Master and Team to develop Quality Improvement initiative | |
| • Initiated Mental Health Assessment Referral Project (MHARP) | • Revised Major Depressive Disorder Disease Medication Management Guideline | • Standardized Peer Review audit tool | • Completed Mental Health and Custody Collaboration Training for ALL staff at two institutions | |
| • Provided Quality Management training | • Established and implemented EOP with Co-occurring Disorders Program at SATF | • Initiated Clozapine treatment within 4 institutions | • Developed documentation guidelines for Peer Review Audit Tool | |
| • Developed Mental Health Best Practices Designees Group, in collaboration with field staff, to vet Policy Changes through | • Clarified transfer timelines for MHSDS | • Developed MDO operational policy | • Implemented directive for use of alternative housing | |
| • Updated procedures for transfer of inmate's following discharge from MHCB and DSH | • Revised process for MHSDS inmate designated as Non-Revocable Parole | • Developed Post Release Community Supervision process | • Policy implemented for 5 day Follow-Ups for all inmates discharged from Acute or ICF care | |
| • Established access for mental health clinicians to the Parole Outpatient Clinic database | • Standardized "Essential Functions" developed for Clinical Psychologist and Staff Psychiatrist classifications | • Developed standardized audit tools | • Implemented directive for use of outpatient housing units (OHU's) | |
| • Established Mental Health Peer Review Subcommittee | • Suicide Prevention posters disseminated to all 33 institutions | • Policy for Transgender inmates developed | • Implemented directive for Removal of Health Care Appliances | |
| | • Suicide Prevention cards disseminated to all 33 institutions | • Developed and administered Suicide Risk Assessment training to all 33 institutions | • Established Senior Psychologist position, specifically for Quality Management, at each institution | |
| | • Developed audit tool for Suicide Case Review Process | • Implemented MHTS/UHR agreement audit | | |
| | • Established permanent Suicide Case Reviewers at HQ | | | |
| | • Established Risk Management Workgroup | | | |
| | • Revised Suicide Risk Evaluation Form (7447) | | | |

# EXHIBIT B



# EXHIBIT C

| | ASP | CAL | CCWF | CIW | CMC | CMF | COR | CTF | KVSP | HDSP | LAC | MCSP | NKSP | PBSP | PVSP | RJD | SAC | SATF | SCC | SOL | SVSP | SQ | VSPW | WSP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quarter 1-12 | 0 | | | | 68% | 29% | 74% | ### | 43% | 50% | 43% | | 67% | | 50% | 72% | 39% | | 50% | | 29% | | | 42% |
| Quarter 2-12 | 67% | | | | 63% | | 73% | 0 | 73% | 0 | 61% | | 100% | | 100% | 74% | 63% | | 0 | 0 | 30% | | | 73% |
| Quarter 3-12 | | | 91% | 54% | | 51% | | | | | | | | | | | | | | | | 30% | 0 | |
| Quarter 4-12 | | | | | 78% | | | | | | 77% | | | 78% | | | 60% | 90% | | 100% | 87% | | | |
| Quarter 1-13 | | | 80% | 72% | | 61% | 81% | | 63% | | | 73% | | | | 81% | | | | | | 82% | | |
| Quarter 2-13 | | | | | | | | | | | | | | | | | | | | | | | | |
| Quarter 3-13 | | | | | | | | | | | | | | | | | | | | | | | | |
| Quarter 4-13 | | | | | | | | | | | | | | | | | | | | | | | | |

Yellow:     Indicates institutions which were not visited during the applicable quarter.

Percentages:     The percentages represent the number of reviewed 7388B's which were deemed of good clinical quality.

"0"     Indicates institutions visited which had zero 7388B's to review.

# EXHIBIT D

 **DMH ICF Referrals Received by Year/Month/Institution** 
*for : 2011*

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASP | 2 | 0 | 2 | 0 | 3 | 1 | 0 | 2 | 1 | 2 | 1 | 2 | 16 |
| CCI | 0 | 0 | 3 | 1 | 0 | 3 | 1 | 1 | 3 | 1 | 2 | 1 | 16 |
| CIM | 9 | 11 | 17 | 5 | 6 | 8 | 13 | 24 | 10 | 7 | 6 | 5 | 121 |
| CMC | 9 | 10 | 10 | 11 | 14 | 23 | 10 | 11 | 16 | 27 | 18 | 6 | 165 |
| CMF | 9 | 9 | 9 | 8 | 3 | 6 | 8 | 13 | 12 | 7 | 9 | 9 | 102 |
| COR | 0 | 2 | 1 | 0 | 2 | 1 | 2 | 0 | 0 | 1 | 2 | 2 | 13 |
| CRC | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| CTF | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| DVI | 2 | 4 | 2 | 3 | 4 | 5 | 0 | 2 | 2 | 2 | 5 | 1 | 32 |
| HDSP | 0 | 1 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 1 | 0 | 0 | 6 |
| KVSP | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 2 | 3 | 1 | 0 | 7 |
| LAC | 2 | 3 | 2 | 2 | 3 | 1 | 3 | 4 | 4 | 9 | 7 | 6 | 46 |
| MCSP | 0 | 4 | 4 | 2 | 0 | 2 | 0 | 1 | 2 | 3 | 1 | 1 | 20 |
| NKSP | 1 | 0 | 5 | 0 | 1 | 2 | 1 | 1 | 2 | 4 | 2 | 1 | 20 |
| PBSP | 6 | 6 | 3 | 4 | 1 | 2 | 3 | 3 | 0 | 4 | 3 | 5 | 40 |
| RJD | 1 | 2 | 16 | 7 | 8 | 7 | 11 | 10 | 9 | 16 | 4 | 7 | 98 |
| SAC | 0 | 7 | 0 | 3 | 5 | 3 | 11 | 9 | 5 | 4 | 3 | 7 | 57 |
| SATF | 0 | 4 | 0 | 1 | 4 | 2 | 0 | 1 | 2 | 3 | 3 | 7 | 27 |
| SOL | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 2 | 0 | 1 | 0 | 7 |
| SQ | 4 | 3 | 6 | 5 | 4 | 4 | 8 | 4 | 2 | 2 | 3 | 6 | 51 |
| SVSP | 2 | 4 | 1 | 2 | 3 | 1 | 0 | 2 | 6 | 3 | 0 | 4 | 28 |
| WSP | 7 | 6 | 4 | 6 | 5 | 5 | 7 | 9 | 2 | 6 | 2 | 3 | 62 |
| Total | 57 | 78 | 86 | 61 | 66 | 78 | 80 | 98 | 82 | 105 | 73 | 73 | 937 |

 **DMH ICF Referrals Received by Year/Month/Institution** 
*for : 2012*

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCI | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 6 |
| CCWF | 1 | 1 | 0 | 2 | 2 | 1 | 1 | 4 | 4 | 0 | 1 | 0 | 17 |
| CIM | 3 | 4 | 4 | 3 | 3 | 4 | 2 | 2 | 2 | 4 | 1 | 5 | 37 |
| CIW | 0 | 0 | 3 | 1 | 1 | 0 | 12 | 3 | 4 | 3 | 1 | 1 | 29 |
| CMC | 9 | 12 | 21 | 15 | 12 | 18 | 17 | 20 | 19 | 10 | 18 | 7 | 178 |
| CMF | 6 | 13 | 15 | 15 | 16 | 12 | 20 | 18 | 12 | 15 | 11 | 22 | 175 |
| COR | 2 | 0 | 4 | 1 | 1 | 1 | 2 | 2 | 3 | 12 | 3 | 1 | 32 |
| DVI | 0 | 4 | 2 | 1 | 1 | 3 | 1 | 2 | 2 | 0 | 0 | 1 | 17 |
| HDSP | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| KVSP | 0 | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 1 | 0 | 2 | 0 | 7 |
| LAC | 3 | 15 | 6 | 11 | 6 | 7 | 3 | 6 | 7 | 9 | 5 | 5 | 83 |
| MCSP | 1 | 5 | 1 | 2 | 1 | 1 | 1 | 1 | 2 | 1 | 1 | 1 | 18 |
| NKSP | 2 | 3 | 3 | 2 | 1 | 2 | 1 | 1 | 2 | 1 | 2 | 1 | 21 |
| PBSP | 3 | 3 | 1 | 1 | 3 | 2 | 2 | 1 | 2 | 2 | 2 | 3 | 25 |
| PVSP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| RJD | 11 | 6 | 9 | 5 | 9 | 7 | 8 | 18 | 27 | 25 | 11 | 8 | 144 |
| SAC | 5 | 8 | 13 | 5 | 8 | 6 | 9 | 8 | 5 | 7 | 14 | 11 | 99 |
| SATF | 0 | 1 | 2 | 0 | 4 | 6 | 0 | 0 | 5 | 4 | 0 | 3 | 25 |
| SOL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| SQ | 2 | 5 | 3 | 2 | 4 | 3 | 3 | 2 | 1 | 0 | 0 | 3 | 28 |
| SVSP | 2 | 1 | 1 | 2 | 6 | 5 | 1 | 4 | 7 | 3 | 4 | 2 | 38 |
| VSPW | 0 | 0 | 0 | 0 | 2 | 2 | 1 | 0 | 1 | 0 | 0 | 0 | 6 |
| WSP | 1 | 2 | 0 | 5 | 2 | 2 | 1 | 1 | 1 | 1 | 1 | 4 | 21 |
| Total | 54 | 84 | 92 | 75 | 85 | 84 | 87 | 93 | 106 | 100 | 77 | 79 | 1016 |

 **DMH ICF Referrals Received by Year/Month/Institution** 

| | Jan | Feb |
|---|---|---|
| CCI | 0 | 1 |
| CCWF | 2 | 2 |
| CIM | 2 | 3 |
| CIW | 1 | 1 |
| CMC | 20 | 15 |
| CMF | 12 | 13 |
| COR | 1 | 2 |
| DVI | 1 | 0 |
| KVSP | 0 | 1 |
| LAC | 12 | 5 |
| MCSP | 4 | 1 |
| NKSP | 3 | 2 |
| PBSP | 1 | 1 |
| RJD | 1 | 13 |
| SAC | 11 | 15 |
| SATF | 3 | 2 |
| SQ | 0 | 0 |
| SVSP | 1 | 0 |
| WSP | 2 | 2 |
| Total | 77 | 79 |

# EXHIBIT E



## DMH APP Referrals Received by Year/Month/Institution
### for: 2011



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCI | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| CIM | 2 | 1 | 3 | 1 | 1 | 2 | 3 | 2 | 0 | 0 | 1 | 1 | 17 |
| CMC | 1 | 5 | 7 | 6 | 9 | 4 | 4 | 5 | 2 | 8 | 8 | 3 | 62 |
| CMF | 5 | 15 | 10 | 12 | 5 | 16 | 9 | 7 | 9 | 9 | 10 | 9 | 116 |
| COR | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 |
| DVI | 2 | 1 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 6 |
| HDSP | 0 | 1 | 0 | 1 | 4 | 1 | 0 | 1 | 2 | 0 | 1 | 0 | 11 |
| KVSP | 0 | 2 | 4 | 1 | 2 | 3 | 4 | 2 | 1 | 0 | 5 | 1 | 25 |
| LAC | 3 | 7 | 4 | 3 | 9 | 3 | 6 | 4 | 3 | 4 | 0 | 2 | 48 |
| MCSP | 0 | 3 | 3 | 1 | 0 | 1 | 3 | 3 | 1 | 1 | 1 | 0 | 17 |
| NKSP | 0 | 2 | 3 | 0 | 4 | 3 | 1 | 5 | 10 | 4 | 3 | 7 | 42 |
| PBSP | 2 | 3 | 2 | 0 | 2 | 3 | 1 | 2 | 2 | 1 | 2 | 2 | 22 |
| PVSP | 0 | 2 | 1 | 2 | 1 | 0 | 1 | 2 | 0 | 3 | 0 | 0 | 12 |
| RJD | 1 | 1 | 4 | 6 | 5 | 2 | 3 | 3 | 2 | 2 | 4 | 4 | 37 |
| SAC | 4 | 4 | 10 | 5 | 4 | 7 | 5 | 4 | 7 | 10 | 3 | 8 | 71 |
| SATF | 2 | 5 | 1 | 2 | 1 | 4 | 2 | 6 | 4 | 2 | 2 | 3 | 34 |
| SOL | 0 | 0 | 2 | 0 | 0 | 1 | 1 | 1 | 2 | 0 | 0 | 2 | 9 |
| SQ | 5 | 2 | 5 | 6 | 6 | 7 | 6 | 5 | 6 | 1 | 2 | 2 | 53 |
| SVSP | 1 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 1 | 7 |
| WSP | 3 | 9 | 3 | 7 | 6 | 7 | 3 | 7 | 6 | 6 | 2 | 2 | 61 |
| Total | 31 | 64 | 62 | 54 | 61 | 65 | 56 | 59 | 57 | 53 | 45 | 47 | 654 |



## DMH APP Referrals Received by Year/Month/Institution
### for: 2012



| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCWF | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| CIM | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 4 | 0 | 1 | 2 | 0 | 10 |
| CIW | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| CMC | 6 | 4 | 7 | 5 | 6 | 9 | 9 | 6 | 4 | 9 | 5 | 14 | 84 |
| CMF | 12 | 9 | 8 | 8 | 13 | 5 | 12 | 10 | 5 | 6 | 5 | 4 | 97 |
| COR | 0 | 3 | 1 | 0 | 1 | 1 | 2 | 1 | 1 | 4 | 2 | 0 | 16 |
| DVI | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| HDSP | 1 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 5 |
| KVSP | 0 | 1 | 4 | 5 | 0 | 1 | 3 | 3 | 0 | 2 | 4 | 1 | 24 |
| LAC | 5 | 8 | 5 | 3 | 5 | 4 | 3 | 1 | 3 | 1 | 4 | 4 | 46 |
| MCSP | 3 | 3 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 2 | 1 | 13 |
| NKSP | 7 | 4 | 6 | 5 | 2 | 7 | 7 | 8 | 4 | 7 | 7 | 10 | 74 |
| PBSP | 0 | 0 | 0 | 1 | 1 | 1 | 3 | 0 | 3 | 1 | 1 | 5 | 16 |
| PVSP | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 1 | 8 |
| RJD | 4 | 4 | 1 | 2 | 3 | 4 | 2 | 6 | 2 | 1 | 5 | 4 | 38 |
| SAC | 9 | 4 | 8 | 9 | 10 | 2 | 13 | 3 | 5 | 8 | 3 | 7 | 81 |
| SATF | 4 | 4 | 5 | 1 | 2 | 3 | 1 | 0 | 2 | 3 | 0 | 2 | 27 |
| SOL | 2 | 0 | 0 | 1 | 4 | 3 | 3 | 3 | 1 | 2 | 1 | 2 | 22 |
| SQ | 6 | 5 | 10 | 3 | 11 | 8 | 1 | 12 | 11 | 5 | 6 | 7 | 85 |
| SVSP | 2 | 0 | 3 | 0 | 2 | 0 | 1 | 1 | 0 | 0 | 1 | 0 | 10 |
| WSP | 3 | 3 | 4 | 2 | 4 | 4 | 7 | 2 | 3 | 2 | 3 | 2 | 39 |
| Total | 66 | 54 | 64 | 46 | 66 | 55 | 68 | 61 | 45 | 56 | 53 | 64 | 698 |

## DMH APP Referrals Received by Year/Month/Institution
### for: 2013



| | Jan | Feb |
|---|---|---|
| CCI | 0 | 1 |
| CIW | 2 | 0 |
| CMC | 12 | 14 |
| CMF | 5 | 7 |
| COR | 0 | 3 |
| KVSP | 1 | 1 |
| LAC | 4 | 5 |
| MCSP | 1 | 2 |
| NKSP | 6 | 10 |
| PBSP | 2 | 3 |
| PVSP | 2 | 1 |
| RJD | 2 | 5 |
| SAC | 6 | 6 |
| SATF | 5 | 2 |
| SOL | 4 | 4 |
| SQ | 8 | 4 |
| WSP | 7 | 1 |
| Total | 67 | 69 |

# EXHIBIT F

**Intra-Institution Mental Health Crisis Bed (MHCB) Referrals**
**2011-Current**

| | |
|---|---|
| 2011 MHCB Referrals | 10946 |
| 2012 MHCB Referrals | 11000 |
| 2013 MHCB Referrals (January 1 – March 21, 2013) | 1714 |
| | |
| Total Referrals | 23660 |

# EXHIBIT G

State of California                                      California Department of Corrections and Rehabilitation

# Memorandum

Date    :    **JUL 2 8 2010**

To      :    Chiefs of Mental Health

Subject :    **MH-D-001 QUALITY STANDARD: FIVE DAY FOLLOW-UPS FOR INMATE-PATIENT DISCHARGES AND TRANSFERS**

The attached MH-D-001 Quality Standard - Five Day Follow-Ups for Inmate-Patient Discharges and Transfers, establishes Statewide Mental Health Program, Division of Correctional Health Care Services, guidance for NEW requirements.

**Quality Standard**
All inmate-patients who were admitted to a Mental Health Crisis Bed or were placed in a Mental Health Outpatient Housing Unit or Outpatient Housing Unit setting to ameliorate acute symptoms of a serious mental health crisis <u>shall</u> receive a 5-day clinical follow-up treatment plan by a mental health clinician following their discharge.

**Rationale**
The Mental Health Tracking System (MHTS.net) requires parameters for all mental health inmate-patient movement and appointments. Because there are some areas in the Mental Health Services Delivery System Program Guide, 2009 Revision, in which certain rules or parameters are not specific, new standards to accommodate the new MHTS.net requirements are necessary.

To ensure MHTS.net parameters are satisfied without creating excessive workload for the institution staff, Best Practices Designees were queried regarding their current practices *and* their opinion regarding how the attached new MH-D-001 Quality Standard would affect workload. A majority of these Best Practices Designees agreed this new Quality Standard is an optimal solution that accommodates the new parameters required by MHTS.net, staff workload, and inmate-patient care.

**Action Required**
Local institutions shall institute Local (Standard) Operating Procedures to reflect this Quality Standard no later than **August 23, 2010.**

Chiefs of Mental Health
MH-D-001 Quality Standard: Five Day Follow-Ups for Inmate-Patient Discharges and
  Transfers
Page 2

**Questions**

If you have questions or need any additional information regarding this memorandum or the
attached Quality Standard, you may contact Lorraine Donnelly, Staff Services Analyst,
Policy Development, at (916) 445-5185.

*Laura Ceballos, Ph.D.*

LAURA CEBALLOS, PH.D.
Chief Psychologist, Quality Management
Statewide Mental Health Program

cc:    M. Jackson Kahle, Ph.D.
       James Scaramozzino, Ph.D.
       Health Care Managers
       Associate Directors – Mental Health
       Regional Chiefs of Mental Health
       Regional Administrators

**MH-D-001**    Quality Standard: Five Day Follow-Ups for Inmate-Patient Discharges and Transfers

---

**Quality Standard**    All inmate-patients who were admitted to a MHCB or were placed in a MOHU or OHU setting to ameliorate acute symptoms of a serious mental health crisis <u>shall</u> receive a 5-day clinical follow-up treatment plan by a mental health clinician following their discharge.

---

**Rationale**    In the new MHTS.Net all MHSDS inmate-patient activity is tracked. In order to decrease variability and capture accurate data, the need to standardize five-day follow-up requirements following discharge from a MHCB or OHU has arisen.

---

**Definition**    A **five-day clinical follow-up treatment plan (5-day follow-up)** is defined as an individualized treatment plan that includes daily clinical contact by a mental health clinician with an inmate-patient, in their housing unit, for five consecutive days following the inmate-patient's discharge.

---

**Weekends and holidays**    The 5-day follow-up contacts on weekends and holidays shall be conducted consistent with MHSDS Program Guide, 2009 Revision, requirements.

**Note:**    The inmate-patient's primary clinician is responsible for ensuring the contacts occur.

---

**Custody Welfare Checks**    This Quality Standard is independent of, and does not affect current Custody Welfare Check requirements.

---

**Action required**    The following action is required for your institution to be in compliance with the new Quality Standard.

| If your institution... | Then... |
|---|---|
| has a LOP for inmate-patients discharging from a MHCB or an OHU | amend what you currently have in place to meet the new QS via an addendum until the next LOP revision date. |
| does not have a LOP for inmate-patients discharging from a MHCB or an OHU | create a LOP to meet the new QS requirements. |

---

| Example: Compliance | Inmate Smith was admitted to an MHCB for grave disability. He was then discharged from a MHCB on Tuesday. Documentation was provided in the UHR that a 5-day clinical follow-up treatment plan was initiated and that, as per clinical notes, the 5-day follow-up clinical contacts were conducted consecutively for 5 days following the inmate-patient's discharge. |
|---|---|

| Example: Non-compliance | Inmate Smith was transferred to an OHU for psychological observation. He was then transferred from the OHU back to his housing. No documentation found to verify/support that a 5-day clinical follow-up treatment plan was initiated or that the inmate-patient received daily clinical contacts for five consecutive days upon return to his or her housing.<br><br>This is not in compliance because according to the above QS, all inmate-patients discharging from an OHU or MHCB **SHALL** receive the 5-day clinical follow-up treatment plan that includes 5-day clinical follow-up contacts for 5 consecutive days after the inmate-patient discharges. |
|---|---|

| Questions | If you have any questions or need any additional information related to this Quality Standard, you may contact Lorraine Donnelly, Staff Services Analyst, Policy Development, Statewide Mental Health Program, at (916) 445-5185 or via e-mail at Lorraine.Donnelly@cdcr.ca.gov. |
|---|---|

The below table lists all acronyms included in the above QS.

| Acronym Key | |
|---|---|
| **Acronym** | **Complete spelling** |
| IDTT | Interdisciplinary Treatment Team |
| LOP | Local Operating Procedures |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| MHTS.net | Mental Health Tracking System.net |
| MOHU | Mental Health Outpatient Housing Unit |
| OHU | Outpatient Housing Unit |
| QS | Quality Standard |

# EXHIBIT H

SRE Mentor Program Policy

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 04:<br>PESONNEL AND TRAINING | Revision Date(s): | 1/17/2013 |
| POLICY 12.04.201<br>SUICIDE RISK EVALUATION MENTORNG PROGRAM | Attachments: | Yes ☒ No ☐ |

**Policy**

Each institution shall institute the standardized CDCR mental health Mentor Program for suicide risk evaluations.

The program shall include the use of the "Suicide Risk Evaluation Quality of Care" standardized tool that:

- Provides mentors with specific areas of focus for providing guidance; and
- Allows the tracking of progress and measurement of improvement

**Definitions**

*Suicide Risk Evaluation (SRE) Mentoring Program:* A program, established by this policy, which includes mentoring for mental health clinicians on appropriate techniques for suicide risk evaluation

*Mental health clinician:* Practitioners including psychologists, psychiatrists, and clinical social workers. Clinicians may be probationary, permanent, contract employees, or others designated and trained to complete suicide risk evaluations on CDCR patient-inmates.

*CDCR 7447 Suicide Risk Evaluation:* The form used to guide the focused clinical evaluation performed by a mental health professional when a patient-inmate is identified (by thought, speech, or behavior) to be at elevated risk of suicide or self-harm.

*Mentor:* The mental health clinician designated to provide mentoring to assigned mental health clinicians as part of the SRE Mentoring Program. This clinician will also provide training to the mentee, as needed. The Mentor may be either line staff or a supervisory-level clinician.

*Mentee:* Mental health clinician participating in the SRE Mentoring Program for enhancement of clinical skills.

*Suicide Risk Evaluation Mentoring Program Director.* Designated HQ psychologist with oversight for training, consultation, data collection, and interpretation for the Mentor Program.

**Purpose**

- To assist clinicians in adapting to the unique, challenging circumstances of the correctional setting.

SRE Mentor Program Policy

- Improve and maintain the quality of suicide risk evaluations.

- Ensure that clinicians possess the knowledge and skill to adequately evaluate inmate-patients who may be at an elevated risk of suicide.

- Support newly hired mental health clinicians by having experienced clinicians provide relevant training.

- Preserve standards of clinical practice by providing a process to systematically evaluate CDCR mental health clinicians' knowledge and ability to complete an adequate suicide risk evaluation.

- Contribute to the creation of a cooperative and collegial mental health care team.

**Applicability**

This policy applies to all CDCR mental health clinicians who perform suicide risk evaluations.

**Compliance Indicators**

- Every institution has initiated the mentor program according to statewide and local operating procedures within 60 days of receipt of this policy.

- All persons who have completed or are participating in the SRE Mentor Program are tracked according to LOP.

- The SRE Quality of Care tool (attached) is used to evaluate clinical competence.

- Within six months of the implementation of this policy, and every six months thereafter, the aggregated SRE Quality of Care results, which are tracked in the HQ-based "Quality of Care Data Collection Tool," are reviewed by the SRE Mentoring Program Director.

- Confidentiality - All persons participating in the mentor program adhere to provisions regarding confidentiality in accordance with applicable state law governing confidentiality of provider-level documents. Compliance is measured by the following:

  - All provider-level documents related to the mentor, including but not limited to SRE Quality of Care reviews are maintained as confidential and are not available to unauthorized persons.

  - Documentation of mentee progress provided solely to the mentees may be shared with the mentees' regular clinical supervisors or other management staff.

**References**

1. Defendants' August 25, 2010 Updated Report on Activities Taken Following the Court's April 14, 2010 Order.

2. Department of Correctional Health Care Services. Mental Health Services Delivery System Program Guide (2009 revision), Chapter 10: Suicide Prevention and Response.

SRE Mentor Program Policy

This acronym key defines all acronyms utilized in the above quality standard.

| Acronym Key | |
|---|---|
| Acronym | Definition |
| CDCR | California Department of Corrections Rehabilitation |
| HQ | Headquarters |
| LOP | Local Operating Procedures |
| SRE | Suicide Risk Evaluation |

Procedure SRE Mentor Program

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 4:**<br>PERSONNEL AND TRAINING | Revision Date(s): | 01/17/2013 |
| **PROCEDURE 12.04.201P**<br>SUICIDE RISK EVALUATION PROCEDURE | Attachments: | Yes ☒ No ☐ |

| | |
|---|---|
| **Introduction** | The Suicide Risk Evaluation (SRE) Mentoring Program pairs clinical mentors with mental health providers in order to promote adherence to the highest standards of suicide risk assessment. The program, which can be incorporated into Peer Review, is intended to provide collegial feedback, training, and support for all staff members who perform suicide risk evaluations. |
| **Roles and responsibilities** | The following defines the responsibilities of the mentor and mentee involved in the SRE Mentoring Program. |

### MENTOR

1. There is no formal requirement for the number of mentees a mentor can oversee, but it is recommended that a mentor have no more than three mentees under his/her guidance at any given time.

2. The mentor will observe the mentee conduct one or more suicide risk evaluations.

3. Use of the statewide approved SRE Quality of Care Tool (attached) will guide the mentor in assessing the mentee's skill in: 1) interviewing; 2) gathering relevant information; 3) formulating risk factors; 4) developing a treatment plan; and, 5) documenting findings.

4. When indicated, training will be provided to the mentee by the mentor. The training may include, but is not limited to, the following:

   - Effective techniques for conducting interviews and establishing rapport with inmate-patients.
   - Brief, focused interventions for inmate-patients in crisis.
   - Development of individualized treatment plans.
   - Appropriate treatment focused interventions for all inmate-patients, including those suspected of malingering, threatening suicide for secondary gain, or manipulating staff.
   - Directed readings.

Procedure SRE Mentor Program

5.  Under the direction of the Chief of Mental Health, conduct routine chart reviews of all mental health clinicians' SREs to assess the overall quality of suicide risk assessment and crisis intervention at the institution.

6.  The mentor may use the information gathered during routine chart reviews to:

    - Identify opportunities for improvement in overall clinical practice
    - Design and facilitate staff development exercises to improve practice
    - Identify best practices
    - Identify clinical staff who may have the skills and abilities to serve as a mentor to other staff

7.  The mentor will provide written feedback to the mentee about their SRE performance and crisis intervention skills, any methods for improvement, and progress made in performing SREs. This can be completed via providing a copy of the completed SRE Quality of Care tool or other written document created as part of local operating procedures.

8.  If administrative intervention is required related to the mentee's participation in the program, the mentor reports the concerns to the mentees' supervisor. Status reports to the supervisor are not required unless administrative concerns are identified.

## MENTEE

1.  Mentees will include all mental health clinicians whose job duties include the administration of the SRE.  The following listing suggests a prioritization strategy:

    - Current mental health clinicians employed in the MHCB or Mainline EOP programs.
    - Mental health clinicians referred to the SRE Mentoring Program by their supervisors, either for cause or for routine staff development purposes.
    - Mental health clinicians referred to the SRE Mentoring Program by the Professional Practice Executive Committee or the Mental Health Peer Review Subcommittee.
    - Newly hired, or unlicensed mental health clinicians, including psychologists, psychiatrists, and clinical social workers.
    - Self-referred employees.
    - All mental health clinicians employed in other (non EOP and MHCB) programs.

2.  A score of at least 80% on the SRE Quality of Care tool must be achieved before the mentoring program is completed.

**Process**          The SRE Mentoring Program is designed to allow flexibility for mentors to address the mentee's specific needs, but must include at least the following stages and

Procedure SRE Mentor Program

activities.

| STAGE | DESCRIPTION |
|-------|-------------|
| 1 | Institutional Chiefs of Mental Health shall designate at least one mental health clinician as the primary mentor. The primary mentor will have the responsibility of: maintaining up to date records of staff participating in the mentoring process and ensuring that Quality of Care Tool results are filed in a confidential location.<br><br>Staff designated to serve as mentors shall have strong clinical skills and leadership abilities and may be either senior clinicians or line staff.<br><br>More than one clinician may serve as a mentor depending on institutional staffing levels and clinical need. |
| 2 | The mentee may observe the mentor perform one or more SREs. This is not a requirement and may be conducted if the mentee elects to do so. |
| 3 | The mentee may perform a self-audit of a SRE that he/she has performed using the *Suicide Risk Evaluation Quality of Care Review Tool*. This is not a requirement and may be conducted if the mentee elects to do so. |
| 4 | The mentor will observe the mentee performing **one or more** SREs and offer guidance, techniques, and strategies that may improve SRE quality. |
| 5 | The mentee and mentor will work collaboratively in assessing the mentee's SRE performance and any identified areas for improvement. |
| 6 | The timeframe for completion of these activities is contingent upon the mentor's assessment that the mentee can competently and independently perform a suicide risk evaluation. |
| 7 | If the above activities cannot be successfully completed within three months, continued mentoring must be approved by the mentee's supervisor. |
| 8 | The SRE Mentoring Program operates on a cyclical basis. Each clinician will be mentored once every two years. When a clinician transfers from one institution to another, the SRE mentor at the new institution shall contact the Chief of Mental Health at the previous institution, who will facilitate getting the clinician's last mentoring date to the mentor. |

Procedure SRE Mentor Program

| 9 | • When the SRE Quality of Care tool is used for peer review, the primary mentor will ensure that completed SRE Quality of Care tools are filed in a confidential location accessible only to the primary mentor. Records shall be kept for at least two years, or until the mentee completes a second cycle of mentoring, at which point the previous completed SRE Quality of Care Tool can be destroyed. |
| | • If the SRE Quality of Care tool is not used as part of the formal peer review program, the completed tool may be destroyed after the mentee completes the mentoring cycle. |

**Program evaluation, tracking, and reports**

The LOP for the SRE Mentoring Program shall include a method to track participation in and completion of each cycle of the SRE Mentoring Program. Tracking shall include, at a minimum, the name and position of each clinician mentored.

**Confidentiality**

In accordance with applicable state law governing confidentiality of provider-level documents, it is essential that all provider-level documents related to the SRE Mentoring Program, including but not limited to Quality of Care Reviews and mentoring feedback, be maintained as confidential and not be available to unauthorized persons.

This acronym key defines all acronyms utilized in the above quality standard.

| Acronym Key | |
|---|---|
| Acronym | Definition |
| SRE | Suicide Risk Evaluation |
| LOP | Local Operating Procedures |

# EXHIBIT I

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES


## MEMORANDUM

| | |
|---|---|
| **Date:** | 2-5-2013 |
| **To:** | Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | Timothy G. Belavich, Ph.D., MSHCA, CCHP, Deputy Director (A),<br>Statewide Mental Health Program, Division of Health Care Services |
| **Subject:** | IMPLEMENTATION OF THE SUICIDE RISK EVALUATION MENTOR PROGRAM |

The purpose of this memorandum is to notify institutions of the following requirement to have all clinicians complete the *Suicide Risk Evaluation (SRE) Mentor Program*.

The program involves mentoring *all* Mental Health clinical staff in the administration of a SRE. Mentoring will be provided, individually, by a trained SRE mentor. The length of time required to complete the SRE Mentor Program varies.

To fully implement the SRE Mentor Program, each institution must complete two things:
- Clinicians who are regularly assigned to work in the Enhanced Outpatient Programs and Mental Health Crisis Bed units must complete the SRE Mentor Program by **April 30, 2013**.
- All other mental health clinicians must complete the SRE Mentor Program by **June 30, 2013**.

Each institution currently has SRE mentors who have been trained by Statewide Mental Health Program headquarters staff. If your institution requires additional trained SRE mentors to complete this program, please send an email to the Suicide Prevention Unit mailbox at CDCR_MHProgramSuicidePreventionandResponse@CDCR. Headquarters will then schedule additional SRE mentor training, as needed. Please note that clinicians must be mentored by a *trained SRE mentor*. The SRE Mentor Program Policy and Procedures are attached.

If you have any questions or require additional information, please contact the Suicide Prevention and Response Unit at CDCR_MHProgramSuicidePreventionandResponse@CDCR, or Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, Division of Health Care Services (DHCS), at (916) 691-0279 or via email at amy.eargle@cdcr.ca.gov.

Attachments

# MEMORANDUM

cc: Diana L. Toche, D.D.S., Director (A), Division of Health Care Services
Judy Burleson, Associate Director, Program and Clinical Support,
    Statewide Mental Health Program, DHCS
Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
    Statewide Mental Health Program, DHCS
Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
    Statewide Mental Health Program, DHCS
Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
    Statewide Mental Health Program, DHCS
Margaret McAloon, Ph.D., Southern Mental Health Regional Administrator (A),
    Statewide Mental Health Program, DHCS
Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, DHCS

# EXHIBIT J

 

## CALIFORNIA CORRECTIONAL
# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| **Date:** | February 15, 2013 |
| **To:** | Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | Timothy G. Belavich, Ph.D., MSHCA, CCHP, Deputy Director (A),<br>Statewide Mental Health Program, Division of Health Care Services |
| **Subject:** | SUICIDE RISK EVALUATION TRAINING |

The purpose of this memorandum is to notify institutions of the upcoming **mandatory** Suicide Risk Evaluation (SRE) training. This training is designed to assist clinical staff in administering and documenting comprehensive suicide risk evaluations. The content of this training is complementary to the SRE Mentoring Program; however, it is independent of and adjunct to the mentoring program.

Training will be accomplished by using Training for Trainers (T4T). Headquarters' staff will be conducting this training in the regional offices **during the weeks of February 25, 2013 and March 4, 2013.** Institutions must send two clinicians, who shall be the Suicide Prevention and Response Coordinators and/or trained SRE mentors, to attend this two-day training event.

**The training schedule is as follows:**

| Date | Training Site | Institutions |
|---|---|---|
| Tues – Wed<br>2/26 - 2/27 | Elk Grove<br>8680 Long Leaf Drive,<br>Building D, 3rd Floor, Suite# 736 | SQ, SAC, FOL, CMF, SOL, PBSP,<br>MCSP, SCC, CHCF, DVI, HDSP/CCC |
| Thurs – Fri<br>2/28 - 3/1 | Fresno<br>2550 Mariposa Mall, VCR Room | ASP, PVSP, VSP, CCWF,<br>SVSP, CTF, CMC |
| Tues – Wed<br>3/5 - 3/6 | Bakersfield<br>5509 Young Street, Conference Room | CCI, WSP, NKSP, KVSP,<br>COR, SATF |
| Thurs – Fri<br>3/7 - 3/8 | Rancho Cucamonga<br>10608 N. Trademark Parkway,<br>Small Conference Room | CEN, CIW, CIM, CRC,<br>ISP/CVSP, LAC, CAL, RJD |

Local training will be delivered by the clinicians, who have completed the T4T, to all clinical staff at each institution by March 26, 2013. Clinicians hired after the completion of these training sessions must complete their SRE training within 180 days of hire. The training for institutional staff consists of two 3½-hour training sessions. Continuing education credits will be offered for psychiatry, psychology, and social work. Completion of training shall be documented on an In-Service Training sign-in sheet and emailed to Byron Russell, HPSI, Policy Support, Statewide Mental Health Program, Division of Health Care Services (DHCS), at Byron.Russell@cdcr.ca.gov.

---

HEALTH CARE SERVICES

P.O. Box 4038
Sacramento, CA 95812-4038

# MEMORANDUM

**By February 20, 2013**, each Chief of Mental Health should submit the names of the two clinicians who will attend the T4T workshop via email to Byron Russell, HPSI, Policy Support, Statewide Mental Health Program, DHCS, at Byron.Russell@cdcr.ca.gov. Training dates and other information will be distributed to these individuals. Institutions are responsible to cover the travel and other related expenses for their staff to attend the workshop.

If you have any questions or require additional information, please contact Robert Canning, Ph.D., Senior Psychologist, Specialist, Statewide Mental Health Program, DHCS, at (916) 691-0276 or via email at Robert.Canning@cdcr.ca.gov.

cc: Diana L. Toche, DDS, Director (A), Division of Health Care Services
   Judy Burleson, Associate Director, Program and Clinical Support,
      Statewide Mental Health Program, DHCS
   Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
      Statewide Mental Health Program, DHCS
   Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
      Statewide Mental Health Program, DHCS
   Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
      Statewide Mental Health Program, DHCS
   Margaret McAloon, Ph.D., Southern Mental Health Regional Administrator (A),
      Statewide Mental Health Program, DHCS
   Amy Eargle, Ph.D., Chief, Clinical Support,
      Statewide Mental Health Program, DHCS
   Robert Canning, Ph.D., Senior Psychologist, Specialist,
      Statewide Mental Health Program, DHCS
   Byron Russell, HPSI, Policy Support,
      Statewide Mental Health Program, DHCS

# EXHIBIT K

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date   :   March 21, 2013

To     :   See Distribution List

Subject:   **CASE-WORK EXPECTATIONS, CLASSIFICATION TIME FRAMES, AND PSYCHIATRIC AND RETURN POLICY FOR DEPARTMENT OF STATE HOSPITAL ACUTE AND INTERMEDIATE CARE FACILITY INMATE-PATIENTS**

The purpose of this memorandum is to provide clarification and direction regarding California Department of Corrections and Rehabilitation (CDCR) procedures and casework expectations for inmate-patients admitted and/or discharged from a Department of State Hospital (DSH) program, in accordance with Penal Code Sections 2684 and 2685. This memorandum supersedes the previous Psychiatric and Return memorandum, dated November 17, 2004. Policies outlined herein are to be implemented in conjunction with existing departmental policies outlined in the following memoranda (attached):

1.  Procedures for Transfer of Inmate-Patients after Discharge from Mental Health Crisis Bed and Department of Mental Health Treatment dated September 8, 2009.
2.  Pilot Program for Intermediate Care Facilities at Atascadero State Hospital, California Medical Facility, and Salinas Valley State Prison, dated July 16, 2009.
3.  Notification of the Continuation of the Department of Mental Health Intermediate Care Facility Pilot Program Policy, Modified Custody Criteria, and Procedures, dated October 24, 2011.
4.  CDCR and DSH Acute and Intermediate Care Facility (ICF) Memorandum of Understanding (MOU), dated August 11, 2006, and August 18, 2010.
5.  Mental Health Crisis Bed/Department of Mental Health Transports dated March 30, 2012.
6.  Primary and Alternate Hub Designations for Placement of Inmates who require Administration Segregation Placement and Mental Health Services, dated June 17, 2008.

It is the expectation of CDCR that inmate-patients referred to DSH are housed, based on evaluation of current case factors and updated casework, in the least restrictive housing environments within DSH and upon return to CDCR. It is also expected pending case work will be completed in a timely manner throughout the referral, admission, and discharge processes, consistent with current CDCR policies.

**Initial Referral for DSH Placement**

At the time of the initial referral from the Institutional CDCR/DSH Coordinator, the Classification and Parole Representative (C&PR) or designee shall ensure the Health

See Distribution List
Page 2
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return
Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate
Patients)

Care Placement Oversight Program (HCPOP) Placement Screening Sheet (PSS) is
completed. The C&PR shall ensure that an inmate-patient's CDCR Form 812, *Notice
of Critical Case Information, Safety of Persons (Non-Confidential Enemies),* and
CDCR Form 812-C, *Notice of Critical Information Confidential Enemies,* are updated
during completion of the PSS. If during the update process enemies are identified at
the receiving institution, the sending institution's C&PR/designee shall fax a copy of
CDCR Form 812/812-C to the receiving institution, and confirm receipt by telephone
or email, prior to the inmate-patient's arrival.

The C&PR/designee at the DSH liaison institution shall notify the DSH Clinical
Assessment Team (CAT) of all identified documented enemy concerns at the DSH
facility. Inmate-patients will not be precluded from DSH housing treatment programs
due to the presence of documented enemy concerns; however, inmate-patients will
not be housed within the same DSH housing units with the identified enemies.

Upon clinical acceptance of an inmate-patient to DSH, the sending CDCR/DSH
Coordinator shall notify the C&PR and provide a copy of the DSH acceptance
chrono, CDCR Form 7480, *Mental Health Due Process Chrono* (Vitek), and the
CDCR Form 128-MH3, *Mental Health Placement Chrono,* reflecting the
inmate-patient's change in Level of Care (LOC). The C&PR/designee shall ensure
the documents are placed in the central file prior to transfer and coordinate transfer
arrangements. (Refer to CDCR Memorandum dated March 30, 2012, titled "Mental
Health Crisis Bed/ Department of Mental Health Transports").

The sending C&PR/designee shall complete a CDCR Form 128-B, *Information
Chrono,* on all cases prior to transfer, noting any pending or incomplete casework
requiring follow up by sending institution staff, such as pending CDCR Form 115,
*Rules Violation Report,* Reception Center (RC) processing documents, pending
investigations, etc. A copy of CDCR Form 128-B shall be placed in the
inmate-patient's central file and a copy shall be forwarded to the sending institution
facility staff responsible for providing the required missing documentation, requesting
the documentation and/or assistance in facilitating the required casework to be
completed. Prior to transfer the C&PR/designee shall follow up on all requested
documentation to ensure placement into the central file. The C&PR/designee will
track requested documentation not received prior to transfer for continued follow up
and forwarding to the receiving institution.

Upon completion of the CDCR Form 128-MH3, the sending institution's CDCR/DSH
Coordinator shall ensure the Strategic Offender Management System (SOMS) is
updated to reflect the appropriate DSH LOC prior to transfer.

See Distribution List
Page 3
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

A pending CDCR Form 115 will not preclude an inmate-patient from being transferred into an appropriate DSH program within the established timelines; however, the sending institution shall be responsible for processing any pending CDCR Form 115, including providing all required documentation to facilitate the adjudication at the receiving institution. The sending institution shall forward the CDCR Form 115, CDCR Form 115-MH, *Mental Health Assessment Request*, Investigative Employee report, documentation of exceptional circumstance, etc., no later than five working days after an inmate-patient has transferred to DSH.

If the processing casework has not been completed for DSH referrals from an RC or Mental Health Crisis Bed Facility (MHCBF), the C&PR/Correctional Counselor III (CC-III) at the RC or MHCBF institution shall coordinate with the appropriate referring mental health staff who shall in turn coordinate with the appropriate medical staff to make every effort to provide the C&PR/designee with all required clinical and medical documentation needed in order to expedite completion of the RC processing.

Completed RC processing includes, but is not limited to:

- CDCR Form 128C-1, *Reception Center Medical Clearance/Restriction Information chrono*
- CDCR Form 128-MH1, *Mental Health Screening chrono*
- CDCR Form 128C, *Medical-Psych-Dental (TB chrono)*
- CDCR Form 128C-2, *Recommendation for Adaptive Support*
  CDCR Form 128C3, *Medical Classification Chrono*
- CDCR Form 1845, *Disability Placement Program Verification Form* (if necessary)
- Completed Institutional Staff Recommendation Summary (for New Commitments)
- CDCR Form 839, *Classification Score Sheet (for New Commitments)*
- CDCR Form 841, *Readmission Score Sheet (for Parole Violators Return to Custody with New Term)*
- CDCR Form 816, *Reception Center Readmission Summary (for Parole Violators Return to Custody with New Term)*

Unfinished RC processing shall not impede transfer of inmate-patients to DSH. RC processing casework completed thus far shall be placed in the inmate-patient's central file prior to transfer to the DSH facility.

**Initial Acceptance into DSH Acute/Intermediate Care Facility**

Upon confirmation of an inmate-patient's arrival to the CDCR/DSH liaison facility, the receiving institution shall be responsible to facilitate a teletype request from the

See Distribution List
Page 4
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return
Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate
Patients)


Classification Services Unit (CSU). The receiving institution's Case Records shall
ensure the appropriate intake screening is completed no later than the next business
day after arrival. The C&PR/designee shall ensure all necessary documents,
specifically the DSH acceptance chrono, CDCR Form 7480 and
CDCR Form 128-MH3, are present and the case prepared for the Classification Staff
Representative (CSR) endorsement review.

The C&PR/designee shall complete a preliminary central file screening of each
expedited psychiatric and return transfer upon arrival and evaluate if imminent Mental
Disorder Offender, Sexual Violent Predator, Board of Prison Hearing, notifications, or
release date issues exist. If imminent time constraints are present, the
C&PR/designee shall make the appropriate notifications to needed staff in order to
expedite the required processing.

It is the expectation that inmate-patients admitted into DSH programs receive an
initial classification review within 14 days of arrival or 10 days of arrival if
Administrative Segregation Unit (ASU) issues existed prior to arrival. The initial Unit
Classification Committee (UCC) or Institutional Classification Committee (ICC) shall
perform a thorough case file review to include a review of the CDCR Form 128-B,
completed by the sending institution, prior to transfer which shall indicate any
pending or incomplete casework requiring follow up by institutional staff. The
receiving UCC/ICC shall review and complete any pending casework which may
assist in the evaluation process of an inmate-patient and potential placement into a
less restrictive treatment program.

If it is discovered during the initial review that follow up documentation is necessary,
the assigned CC-II shall be responsible for ensuring appropriate follow up is
completed with the sending institution's C&PR/designee in order to obtain the
information. If the requested documentation from the sending institution is not
obtained within seven business days from the initial request, the CC-II shall notify
their C&PR/designee and Unit Captain of the delay, via email.

The C&PR/designee or Unit Captain will be responsible for contacting the sending
institution's C&PR/designee or Unit Captain, identified on the CDCR Form 128-B. If
the requested documents are not received within three business days from the
second contact, the Warden/designee shall be responsible for making contact with
the sending institution's Warden/designee.

Continual casework is expected while inmate-patients are housed in the DSH
program, to include completion of the disciplinary process for all issued CDCR
Form 115s and any other resolvable casework issues, such as case-by-case reviews

See Distribution List
Page 5
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

for VIO, R suffix reviews, archive reviews, etc. It is imperative the disciplinary and classification processes are conducted in compliance with CDCR policies. The CC-II's shall ensure all casework requiring ICC review is addressed and CSR referrals appropriately concentrate on the inmate-patient's placement in the least restrictive housing available upon discharge.

**DSH Out to Court Appearances**

Upon receipt of a court order to remove an inmate-patient housed in a DSH program, the Holds/Warrants/Detainers or Out to Court (OTC) desk Case Records Technician shall notify the C&PR/designee of the court ordered request. The C&PR/designee shall ensure appropriate notification and processing is made with the DSH CAT. The DSH CAT shall contact the treating Psychiatrist to discuss whether the inmate-patient is stable enough to attend the requested hearing.

If it is the determination of the treating Psychiatrist that clinical conditions exist which would hamper the inmate-patient's court appearance, the Psychiatrist shall indicate the clinical recommendation on a CDCR Form 128-B and provide the chrono to DSH CAT, who will forward to the C&PR/designee. The C&PR/designee shall ensure the CDCR Form 128-B is provided to the requesting court no later than three business days after receiving the requested court order for a scheduled appearance. The overall determination for a mandated court appearance or postponement resulting in rescheduling shall be the decision of the requesting Judge/Court.

DSH inmate-patients required to attend a court ordered hearing by means of CDCR transportation will be provided special transport and not be transported via CDCR bus. Inmate-patients requiring transport to an alternate CDCR institution to facilitate county pick up shall only proceed upon clinical coordination between the DSH CAT and HCPOP. The CDCR DSH Coordinator and HCPOP shall ensure an appropriate inpatient bed placement is available at the lay-over institution, in order to accommodate the inmate-patient's mental health LOC needs prior to release to the county.

Inmate-patients housed in an ICF DSH program who have a custody reduction from Maximum (MAX) custody to Close A or Close B custody as a result of an ICC action, for the sole purpose of programming within DSH, shall revert back to MAX custody prior to OTC release. The C&PR/designee shall ensure the OTC flimsy central file reflects the appropriate prior MAX custody and ASU housing concerns if still applicable outside of DSH placement. The C&PR/designee shall indicate the inmate-patient's MAX custody on the CDCR Notice of Detainer, as well as any housing, gang, or mental health concerns if retention at a county facility is required.

See Distribution List
Page 6
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

Receiving institutions temporarily housing DSH LOC inmate-patients in a MHCB while attending OTC proceeding shall notify the C&PR/designee at the DSH liaison institution immediately upon completion of court proceedings in order to expedite readmission to DSH. The C&PR/designee at the DSH liaison institution shall contact the DSH CAT to ensure bed availability upon return and the inmate-patient was not discharged from DSH while on out to court status. Upon completion of the court proceedings and confirmation of DSH bed availability the inmates-patient shall be transferred expeditiously.

## Discharge from the DSH

Upon notification of an inmate-patient's discharge from a DSH program, it is the expectation that the C&PR/Bed Utilization Management team shall make every effort to expeditiously return the discharged inmate-patient to an appropriate CDCR institutional bed in order to create space for other inmate-patients requiring DSH treatment. Every effort shall be made to ensure transfers occur no later than three working days in accordance with the CDCR/DSH ICF Memorandum of Understanding (MOU). Once the C&PR's office has determined the appropriate CDCR institution for the inmate-patient to return to, it is imperative the C&PR/designee notifies the DSH CAT or DSH Forensic Office. The DSH CAT shall notify the C&PR/designee two weeks prior to the pending physical discharge of Security Housing Unit (SHU) inmate-patients. The two week requirement is to allow CDCR staff sufficient time to determine if the inmate-patient's case factors remain appropriate prior to return to the sending institution or if additional ICC review is required to address and resolve safety concerns or disciplinary issues in order to avoid ASU/SHU placement upon discharge.

Once the C&PR/designee is notified in advance of the release of SHU inmate-patients, the respective assigned CC-II shall complete a file review to determine if an ICC hearing is warranted or if return to the sending SHU institution is appropriate.

Additionally, every effort shall be made by the DSH CDCR Captain/designee to coordinate with the DSH CAT to identify Sensitive Need Yard (SNY), Psychiatric Services Unit (PSU), and MAX custody inmate-patients two weeks prior to discharge. Timely notification and coordination of identified inmate-patients will allow the CC-II sufficient time to facilitate a potentially needed ICC review and ensure appropriate placement based on current case factors for inmate-patients whom no longer require ASU/SHU/PSU placement upon return to CDCR.

See Distribution List
Page 7
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

The DSH CAT shall facilitate all inmate-patient discharges back to CDCR. The assigned DSH CC-I shall coordinate on a daily basis with the CAT who will provide the CDCR Form 128-MH-3 Discharge Chrono to the assigned CC-I.

The CC-I shall ensure inmate-patient's CDCR Form 812/812-C is updated prior to discharge from DSH. The CC-I shall complete a central file review daily on all discharged DSH inmate-patients. The discharge review shall be documented on a CDCR Form 128-B to identify the originating institution, current case factors, and pending casework to determine an appropriate placement. The inmate-patient cases will be presented to the C&PR/designee to determine if the inmate-patient can return to the originating/sending institution, ASU hub, or if alternate re-direction placement is needed. If return to the originating institution is not appropriate, inmate-patients may be released to the DSH CDCR respective institution's General Population (GP), only if there are no safety/security issues, and case factors are appropriate for placement. All cases shall be referred to HCPOP for placement redirection noted on a CDCR Form 128-B, and approved by the Warden/designee prior to placement. The CC-I shall ensure the case is subsequently presented for CSR endorsement.

Again, it is the expectation of CDCR that DSH discharged inmate-patients are housed in the least restrictive housing environments in accordance with existing case factors and are provided the most effective continuity of care upon return to CDCR. Fiscal prudence shall be utilized in coordinating transportation arrangements.

Upon discharge from DSH, inmate-patients endorsed and transferred as "Psych and Return" shall be returned to their originating institution including RCs. If an inmate-patient's LOC is Enhanced Outpatient Program (EOP) at the time of discharge and requires pending RC casework, then the inmate-patient shall be transferred back to the originating RC to complete the RC processing. The RC shall expedite the transfer to occur within the clinically indicated 30-day timeline as required in the Mental Health Services Delivery System (MHSDS) Program Guidelines.

If the MHSDS LOC is Correctional Clinical Care Management System (CCCMS) at time of discharge, the transfer shall be expedited and occur within the 60-day timeline as required in the MHSDS Program Guidelines.

RC inmate-patients discharged from DSH with completed RC processing and no outstanding casework aside from a CSR endorsement, shall be evaluated by the C&PR/designee at the DSH institution upon discharge and referred to HCPOP for redirection placement to an appropriate designated institution. Under no

See Distribution List
Page 8
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

circumstances are inmate-patients to be returned to institutions not designated to provide for their MHSDS Level of Care (LOC).

If, after the C&PR/designee review, it is determined the inmate-patient cannot return to the sending/originating institution based on the inmate-patient's MHSDS LOC, other case factors precluding placement, and ASU hub placement is not warranted, all DSH discharges will be processed consistent with the MHCB discharge process outlined in the September 8, 2009, memorandum, *Procedures for Transfer of Inmate-Patients after Discharge from Mental Health Crisis Bed and Department of Mental Health Treatment.*

The C&PR/designee will contact the HCPOP for placement assistance. The C&PR/designee shall provide an updated HCPOP PSS which shall document all relevant case factors (i.e., inmate-patient's LOC, any other pertinent medical concerns, classification score, custody designation, safety concerns, etc.), updated CDCR Form 812/812C, and UCC/ICC CDCR Form 128-G, *Classification Chrono,* noting placement recommendations, if the inmate-patient had SHU placement concerns, SNY concerns, and/or MAX custody issues recently addressed.

HCPOP will review the inmate-patient's case factors and LOC to determine appropriate bed availability in alternate mental health designated institutions and will provide the designated DSH liaison institution, receiving institution, and the CSU with a placement recommendation on a CDCR Form 128-B, *General Chrono.*

The C&PR/designee at the DSH liaison institution will then present the case with the HCPOP CDCR Form 128-B recommendation chrono to an onsite CSR for an emergency transfer endorsement.   If an onsite CSR is not available, the C&PR/designee will contact the receiving institution's C&PR to coordinate transfer.

The C&PR/designee at the designated receiving institution will then accept admission of the inmate-patient and contact the CSU Officer of the Day for an emergency teletype endorsement.  The C&PR/designee shall provide a copy of the PSS and HCPOP CDCR Form 128-B recommendation chrono to CSU.   The receiving institution to which the inmate-patient will be discharged is responsible for coordination of the special transportation, once clinical clearance is received from the CDCR DSH Coordinator.

Additionally, contact will be made with the Statewide Transportation Unit (TU) to provide transport assistance and mitigate institutional associated overtime. The TU will provide assistance to facilitate special transports to and from DSH facilities.  If TU

See Distribution List
Page 9
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

cannot facilitate transport within the established time frame, then the receiving institution shall be responsible to facilitate the special transport.

It is expected that clinical contact is made by the DSH CAT to the CDCR DSH Discharge Coordinator at the receiving institution prior to transfer to ensure continuity of care. The CDCR/DSH Coordinator at the receiving institution shall immediately notify their C&PR once clinical to clinical contact has been made to expedite the return transfer of discharged inmate-patients.

Inmate-patients included in the Disability Placement Program, or the Developmental Disability Placement, or have Medical LOC change, or are placed on Clozaril may have impacted discharge placement which may require specialized housing upon discharge and shall be referred to HCPOP and CSU for case conference review to facilitate appropriate placement.

**Administrative Segregation Cases**

Inmate-patients discharged from DSH treatment with a SHU term, or have case factors that require ASU placement, including inmate-patients whose originating institution was a RC, shall be transferred to the originating/sending institution's primary ASU hub.

Inmate-patients transferred to an EOP ASU hub shall only be placed in ASU if the inmate-patient presents an immediate threat to the safety of self or others, endangers institution security, and/or jeopardizes the integrity of an investigation of alleged serious misconduct or criminal activity. If an inmate-patient is pending adjudication of a CDCR Form 115 that could result in imposition of a SHU term, the institution that generated the CDCR Form 115 shall retain responsibility for the completion of the disciplinary process. Institution staff shall make every effort to resolve the basis for the inmate-patient's ASU placement prior to transfer to the ASU hub.

Based upon bed availability, it may be necessary to transfer ASU EOP or CCCMS cases to a hub other than the designated primary ASU hub facility. If the respective ASU hub is unable to house discharged inmates due to lack of bed availability, contact shall be made with HCPOP for alternate ASU hub placement recommendation and a CDCR Form 128-B redirection placement chrono.

Every effort shall be made to transfer inmate-patients requiring ASU hub placement expeditiously, but no later than three working days of discharge. Inmate-patients may be released to the DSH respective institution's GP, if there are no safety and/or security issues, and case factors are appropriate for placement. If an inmate-patient

See Distribution List
Page 10
(Case Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate Patients)

is placed in the DSH institution's ASU based on incomplete casework, the case will be expedited for presentation to the CSR for endorsement and transfer to an appropriate institution. The Warden shall take appropriate administrative steps to ensure ASU placement after DSH discharge does not occur due to incomplete casework while housed in DSH.

If you have any questions, please contact Dennis Halverson, Chief (A), Population Management Unit, Division of Adult Institutions, at (916) 324-7812, or Becky Alkire, Chief, CSU, Division of Adult Institutions, at (916) 322-2544 or Robert Calderon, Chief, HCPOP, Division of Health Care Services, at (916) 691-3496.


KATHLEEN L. DICKINSON          TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Director                       Director (A)
Division of Adult Institution  Division of Health Care Services

Attachments


Distribution List:

Associate Directors, Division of Adult Institutions
Regional Administrators, Health Care Services Division
Wardens
Chief Executive Officers
Chief Medical Executives
Chiefs of Mental Health
Health Care Managers
Classification and Parole Representatives
Correctional Counselors III, Reception Centers

cc: M. D. Stainer, Deputy Director, Facility Operations
    Kathleen Allison, Deputy Director, Special Project Liaison
    Vimal Singh, Deputy Director (A), Facility Support
    Dennis Halverson, Chief (A), Population Management Unit
    Becky Alkire, Chief, Classification Services Unit
    Shelly Neeley, Chief (A), HCPOP

# EXHIBIT M

State of California

# Memorandum

Department of Corrections and Rehabilitation

COPY REC'D
COPY TO CDW    *I 5F*
1 COPY TO AW - BS    *I 54*
1 COPY TO AW - CS
1 COPY TO AW - H & P
1 COPY TO AW - RC
1 COPY TO *all Captains*
1 COPY TO _____

Date : October 31, 2006

To : Associate Directors-Division of Adult Institutions    *Warden*
Wardens

Subject : **30-MINUTE WELFARE CHECKS OF INMATES PLACED IN ADMINISTRATIVE SEGREGATION UNITS**

The California Department of Corrections and Rehabilitation (CDCR) is continuing its efforts to reduce inmate suicides within CDCR. During recent discussion, the recommendation to commence with more frequent welfare checks of inmates during the first three weeks of placement in Administrative Segregation Units (ASU) was approved.

Currently, custody staff assigned to ASU on First and Third Watch are required to perform hourly security checks to ensure inmates are accounted for and secured within their assigned housing units.

In keeping with the October 2, 2006 memorandum titled, "Expectations Regarding Administrative Segregation and Suicide Prevention", all inmates shall have the "INTAKE" identifying marker on the outside of the cell door for the first three weeks of ASU placement.

Additionally, CDCR will immediately begin 30 minute "Welfare Checks" of inmates during the first three weeks of ASU placement. Welfare checks are the "personal observation" of newly placed ASU inmates by Correctional Officers at least every 30 minutes, at irregular intervals, for the first three weeks of ASU placement. These Welfare Checks shall be recorded on the attached "ASU 30-Minute Welfare Check Tracking Sheet".

When possible and practical, ASU new arrival inmates should be housed in cells in close proximity of each other and near high traffic areas or control booths that allow for better observation by staff. The "clustering" of newly placed ASU inmates will better allow for existing resources to complete the Welfare Check function.

If you have any questions, please contact Joseph Moss, Correctional Captain at (916) 323-3578.

Original signed by:

JOHN DOVEY
Director
Division of Adult Institutions

cc: Joseph Moss

# ASU 30 MINUTE WELFARE CHECK TRACKING SHEET

DATE:_____    PRISON:_____    CELL NUMBER:_____

INMATE:_____ CDCR #:_____ INMATE:_____ CDCR #:_____

| TIME | TIME CHECKED | PRINTED STAFF NAME | STAFF SIGNATURE |
|------|-------------|--------------------|-----------------|
| 0030 | | | |
| 0100 | | | |
| 0130 | | | |
| 0200 | | | |
| 0230 | | | |
| 0300 | | | |
| 0330 | | | |
| 0400 | | | |
| 0430 | | | |
| 0500 | | | |
| 0530 | | | |
| 0600 | | | |
| 0630 | | | |
| 0700 | | | |
| 0730 | | | |
| 0800 | | | |
| 0830 | | | |
| 0900 | | | |
| 0930 | | | |
| 1000 | | | |
| 1030 | | | |
| 1100 | | | |
| 1130 | | | |
| 1200 | | | |
| 1230 | | | |
| 1300 | | | |
| 1330 | | | |
| 1400 | | | |
| 1430 | | | |
| 1500 | | | |
| 1530 | | | |
| 1600 | | | |
| 1630 | | | |
| 1700 | | | |
| 1730 | | | |
| 1800 | | | |
| 1830 | | | |
| 1900 | | | |
| 1930 | | | |
| 2000 | | | |
| 2030 | | | |
| 2100 | | | |
| 2130 | | | |
| 2200 | | | |
| 2230 | | | |
| 2300 | | | |
| 2330 | | | |
| 0000 | | | |

DEVELOPED OCTOBER 31, 2008

## Gaines, Thomas

| | |
|---|---|
| **From:** | Vazquez, P |
| **Sent:** | Wednesday, November 01, 2006 7:29 AM |
| **To:** | Gaines, Thomas |
| **Subject:** | FW: 30-Minute Welfare Checks in ASU |

**Attachments:**   ASU 30 minute checks memo.doc; ASU 30 MINUTE CHECK Tracking Sheet.xls

| | |
|---|---|
| **From:** | Tronti, Randy |
| **Sent:** | Tuesday, October 31, 2006 4:51 PM |
| **To:** | Institutions Wardens; Chrones, Lea Ann; Dickinson, Kathleen; Giurbino, George; Kane, Anthony; Schwartz, Teresa; Still, Wendy |
| **Cc:** | Dovey, John; Kernan, Scott; Cappel, Ronald; Runnels, David; Quackenbush, Timothy; Gaddi, Kathy; Moss, Joseph; Dobson-Davis, Velda; Facciola, Sue; Lemon, Max; O'Ran, Sterling; Prudhomme, Pamela; Smith, Calvin; Baker, Karen; Jacquez, Juan; Marquez, Marilyn; Mendonca, Cheriyann; Santiago, Debra; Chatt, Rachel; Fong, Jenson; Groves, Kay; Koshell, Linda; Smith, Christiane |
| **Subject:** | 30-Minute Welfare Checks in ASU |

Good Evening Bosses - please see the attached documents per this mornings conference call. Also, please be advised that there may be changes required to the attached form and possibly to the manner in which the 30-Minute Welfare Checks are completed. Captain Moss will be working on providing a training document for assigned ASU staff to ensure that they are properly trained to use the form. As you are aware, this issue is of such great urgency that Mr. Dovey felt compelled to initiate this change immediately, with the understanding that there may need to be changes made as we move through the process. Mr. Dovey and Mr. Kernan thank you for your understanding and assistance in implementing these procedures at your institutions with such short notice. Thank you,

  

ASU 30 minute     ASU 30 MINUTE
checks memo.doc  ..CHECK Tracking S...

Randy Tronti
California Department of Corrections and Rehabilitation
Division of Adult Institutions
(916) 323-1029

1

# EXHIBIT L

# MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)
## MANAGEMENT INFORMATION SUMMARY (MIS) REPORT

### 3/11/2013

| Level of Care | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|
| | Capacity | Census | Wait List | Capacity | Census | Wait List |
| Correctional Clinical Case Management System (CCCMS) | 24,720 | 25,640 | | 1,398 | 2,018 | |
| Enhanced Outpatient Program (EOP)[1] | 3,443 | 3,720 | | 129 | 108 | |
| General Population (GP) | 3443 | 3,512 | | 129 | 65 | |
| *Sensitive Needs Yard (SNY)* | *1170* | *1,164* | | | | |
| Reception Center (RC) EOP | 0 | 208 | | 0 | 43 | |
| Administrative Segregation Unit (ASU) EOP[1,2] | 566 | 494 | 0 | 20 | 6 | 0 |
| Psychiatric Services Unit (PSU)[1,2] | 384 | 345 | 1 | 20 | 15 | 0 |
| Mental Health Crisis Bed (MHCB)[2] | 335 | 269 | 0 | 22 | 12 | 0 |
| Psychiatric Inpatient Programs: Intermediate Care Facility (ICF)[2] | 891 | 769 | 3 | | | |
| Low Custody | 390 | 283 | 0 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 193 | 0 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 36 | 0 | | | |
| *California Medical Facility (CMF)* | 84 | 54 | 0 | | | |
| High Custody | 501 | 486 | 3 | | | |
| *CMF* | 131 | 130 | 0 | | | |
| *Salinas Valley Psychiatric Program (SVPP)* | 370 | 356 | 1 | | | |
| *Penal Code 1370s (Incomp. to stand trial)* | | | 2 | | | |
| Acute Psychiatric Program (APP)[2] | 218 | 210 | 15 | | | |
| CMF | 218 | 210 | 15 | | | |
| ICF/APP[2] | | | | 75 | 38 | 0 |
| California Institution for Women (CIW) | | | | 45 | 36 | 0 |
| Patton State Hospital (PSH) | | | | 30 | 2 | 0 |
| Penal Code 2974s (Parolees) | 10 | 14 | 0 | | | |
| Metro State Hospital (MSH) | 5 | 2 | 0 | | | |
| Napa State Hospital (NSH) | 5 | 12 | 0 | | | |
| TOTALS (excluding Parolees) | 30,557 | 31,447 | 19 | 1,664 | 2,197 | 0 |

| 7301 Cases[5] Census = 34 Pending = 4 | | Total Capacity | Total Census[3] | Total Wait List[3] | Census Percentages | |
|---|---|---|---|---|---|---|
| | | | | | % MHSDS | % CDCR[4] |
| | CCCMS | 26,118 | 27,658 | | 82.21% | 22.33% |
| | EOP | 3,572 | 3,828 | | 11.38% | 3.09% |
| | ASU-EOP | 586 | 500 | 0 | 1.49% | 0.40% |
| | PSU | 404 | 360 | 1 | 1.07% | 0.29% |
| | MHCB | 357 | 281 | 0 | 0.84% | 0.23% |
| | PSYCHIATRIC INPATIENT | 1,184 | 1,017 | 18 | 3.02% | 0.82% |
| | GRAND TOTAL | 32,221 | 33,644 | 19 | 100.00% | 27.17% |

1 EOP, ASU-EOP, & PSU may not reflect actual program vacancies because beds can be held vacant for inmate-patients temporarily housed in MHCB and OHU.

2 Consistent with the Mental Health Program Guide transfer timelines, the ASU-EOP Wait List includes cases in non-hubs waiting > 30 days, PSU Wait List includes cases with an original CSR endorsement date > 60 days, MHCB Wait List includes referrals > 24 hours, DSH ICF Wait List includes referrals > 30 days, and DSH APP Wait List includes referrals > 10 days.

3 Census sources: Datamart for CCCMS, EOP, PSU; Field Reporting for MHCB; and DSH Reports for all ICF, APP, and Parolee programs.

4 CDCR pop as of 3/6/13 (OISB). Based on Total In-State Institution Population.

5 Welfare & Institutions Code 7301 cases are a subset of the total MHSDS Population.

DHCS, Health Care Placement Oversight Program