1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  WILLIAM DOWNER, State Bar No. 257644
   Deputy Attorneys General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-3035
    Fax: (415) 703-5843
8   E-mail: Patrick.McKinney@doj.ca.gov

9  *Attorneys for Defendants*

10           IN THE UNITED STATES DISTRICT COURT

11        FOR THE EASTERN DISTRICT OF CALIFORNIA

12                  SACRAMENTO DIVISION

13

14
15  **RALPH COLEMAN, et al.,**              2:90-cv-00520 LKK JFM PC

16                          Plaintiffs,   **REPLY DECLARATION OF SHAMA
                                          CHAIKEN IN SUPPORT OF
17           v.                           DEFENDANTS' MOTION TO
                                          TERMINATE UNDER THE
18  **EDMUND G. BROWN JR., et al.,**       PRISON LITIGATION REFORM ACT
                                          [18 U.S.C. § 3626(b)] AND TO VACATE
19                          Defendants.   THE COURT'S JUDGMENT AND
                                          ORDERS UNDER FEDERAL RULE OF
20                                        CIVIL PROCEDURE 60(b)(5)

21

22

23       I, Shama Chaiken, declare as follows:

24       1.   I submit this declaration in support of the State's Reply Memorandum in support of

25  its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's

26  Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

27

28
                                      1

2.    I have been employed as Chief Psychologist at California State Prison, Sacramento (SAC) since July 2009. Prior to that time, I was employed as Chief Psychologist in the California Department of Corrections and Rehabilitation Division of Correctional Health Care Services from May 2005 to July 2009. I have been employed by CDCR as a Senior Psychologist, Supervisor from March 2000 to May 2005 and prior to that time as a Psychologist, Clinical, Correctional Facility from March 1995 to March 2000.

3.    In my capacity as Chief Psychologist at California State Prison, Sacramento (SAC), I have reviewed the declaration filed by Dr. Pablo Stewart dated March 14, 2013, with regards to mental health services provided to specific inmates, and respond as follows with narrative, along with supporting documentation where appropriate.

Staffing Shortages Rebuttal Points

4.    On page 36 of Dr. Stewart's Declaration, he stated that managers at SAC expressed concern about the ongoing shortage of psychiatrists at the prison. During the January 29, 2013 visit from plaintiff attorneys and Dr. Stewart, managers at SAC were asked about the rate of Interdisciplinary Treatment Team (IDTT) attendance by psychiatrists. Plaintiff attorneys indicated that there was a report indicating that psychiatrists attended 7 percent of IDTTs. I responded that this was not a correct statistic, but did not have specific data to counter the statement on hand. In fact, for the period October 1, 2012 through December 31, 2012, psychiatrists attended 1632 of 2150 IDTTs, or 75.9 percent. See chart documenting IDTT attendance attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-A.

Involuntary Medication Rebuttal Points

5.    On page 37 of his Declaration, Dr. Stewart states that SAC staff reported that they are trying to do involuntary medication order renewals without using staff psychiatrists (using senior psychiatrists instead). As noted above, he indicated that psychiatrists attend only 7 percent of the IDTT meetings at the institution because the psychiatrists are prioritizing more urgent care. This statement is incorrect. The treating psychiatrist completes the Penal Code section 2602 renewal documentation and attends the hearing nearly 100 percent of the time. I am not aware of any time

2

that a Senior Psychiatrist or Chief Psychiatrist has attended a Penal Code section 2602 hearing instead of a treating psychiatrist. Please see response regarding IDTT meeting attendance above.

E-UHR Rebuttal Points

6.    On page 40 of his Declaration, Dr. Stewart expresses a concern about a clinician's access to up to date, accurate medical records while performing their clinical contacts with patients. Dr. Jackson has access to a laptop that can be used anywhere in the prison with wireless access. He therefore has access to accurate medical records while performing clinical contacts with patients.

Medication Management Rebuttal Points

7.    On page 59 of his Declaration, Dr. Stewart states that I reported during the inspection tour that the number of medication non-compliance cases had improved recently to 76 percent of the time. Inmates who are involuntarily medicated per Penal Code 2602 receive immediate follow up when they refuse medication. If a backup medication by injection is ordered, it is given involuntarily. If a backup medication by injection is not ordered, the psychiatrist on call is contacted to decide if a backup is appropriate at that time. The audit noted by Dr. Stewart measures whether follow up documentation of individual contact by the psychiatrist with the inmate-patient met all documentation quality criteria and was conducted within timeframes required by the medication management policy and procedure.

Suicide Watch Rebuttal Points

8.    On page 85 of his Declaration, Dr. Stewart points to a photograph attached as Appendix T, which is of a sign on the door of one of the two ZZ alternative holding cells. Suicide watches are routinely conducted in these cells, and the sign is a suicide watch instruction sign. The sign says, among other things, "*do not converse with the inmate.*" Inmate-patients in alternative housing receive daily contact from a trained mental health clinician. Some inmate-patients seek placement into alternative housing for access to inappropriate/sexualized conversations with female staff, thereby reinforcing superficial self injuries and reports of suicidal

3

1  crises. Before observers were trained to limit conversation with the inmate-patient, the observers,

2  without extensive training in mental health treatment and the specific inmate-patient treatment

3  plan, inadvertently undermined the treatment plans for inmate-patients and reinforced dangerous,

4  destructive, and disruptive behavior.

5      Mentoring Program Rebuttal Points

6      9.    On page 93 of his Declaration, Dr. Stewart notes that I sent an e-mail to my staff

7  suggesting the mentoring program was being implemented more for the benefit of litigation than

8  for its substance, noting that "for experienced staff it takes about an hour," and that "the folks

9  who are mentored can then become mentors for others the following week." Dr. Stewart also

10  expresses concern that my alleged cavalier attitude about the SRE training/mentoring program is

11  particularly alarming given that two suicide reviews since 2011 concerning suicides at CSP-

12  Sacramento have identified serious problems with the suicide risk assessments.

13

14      10.   At no time did I suggest that the mentoring program was being implemented more for

15  the benefit of litigation than for its substance.  Dr. Stewart quotes an email from me to Dr.

16  Wheeler, Chief Psychologist, written on January 19, 2013, which is attached as Decl. Vorous

17  Supp. Reply Mot. Terminate Ex. 8-B.  I have communicated in all staff meetings at SAC that the

18  SRE mentoring program is one of the most valuable training systems we have implemented, as it

19  provides individualized feedback to clinicians about their ability to conduct a risk assessment.

20  Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-C, is an email dated January 21,

21  2013 to SAC Staff re SRE monitoring. In this email, I point out to staff that the CDCR Mental

22  Health Program has implemented a system statewide to ensure that all mental health providers

23  receive mentoring, in order to ensure that they are able to complete a thorough suicide risk

24  evaluation according to recommended guidelines.  I state that implementation of this system at

25  SAC has been slow, and since it has improved the quality of suicide risk evaluations at other

26

27

28

4

1  institutions, we have been asked to expedite the process. Dr. Stewart's opinion that I have a

2  "cavalier attitude" about the SRE mentoring program is inaccurate and unfounded. I am

3  dedicated to providing high quality clinical care, and fully support this continuous quality

4  improvement effort to ensure that clinicians have critical clinical skills for handling suicide risk

5  assessments.

6

7          MHCB Rebuttal Points

8          11.    On pages 140 and 141 of his Declaration, Dr. Stewart indicates that all three MHCB

9  units were completely full on the day of my tour, with two additional cases identified by the

10  Crisis Triage Team as requiring placement into an MHCB bed waiting in standing cages in their

11  housing units for placements. He states that the Crisis Triage Team was hoping an MHCB bed

12  would open up to permit the admission of one of these cases. This statement is incorrect. The

13  Crisis Triage Team actually told Dr. Stewart that there were beds available in the MHCB for both

14  inmate-patients and they were waiting for the inmate-patients to be escorted to the MHCB. One

15

16  of the inmate-patients (Prisoner J) was resistant to admission and needed to be convinced to be

17  escorted, which took some time (he was admitted to the MHCB within four hours of placement

18  into the holding cell).

19          12. Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-D

20  are relevant pages of Prisoner J's eUHR.

21

22          EOP Structured Therapy Rebuttal Points

23          13. In numerous locations throughout his Declaration, Dr. Stewart noted structured

24  activities for EOP inmates on the mainline, Administrative Segregation Unit (ASU) and in PSU

25  were lower than 10 hours per week offered, with attendance levels significantly lower. Since Dr.

26  Stewart's visit, SAC has made several changes to protocols to ensure that more hours of

27

28

                                                5

1  structured activities are offered and that cancellations due to staff absence are kept to a minimum.

2  For all programs, as of March 18, 2013, groups cannot be cancelled until the Chief of Mental

3  Health has determined that all options for coverage have been exhausted, and has contacted the

4
   Chief Executive Officer to ensure that all nursing options have been exhausted.   For ASU EOP,
5
   inmate-patients are scheduled for 12 hours of group per week.  For unexpected absences,
6
7  clinicians work in a buddy system to cover core groups run by other clinicians.  For mainline

8  EOP, scheduled activities have been increased from 13 hours to 15 hours per week (10 hours of

9  groups plus 5 hours of structured yard).  Exceptions to this are inmate-patients on a modified

10 program and new admissions during orientation.   The mainline EOP supervisors have developed

11 a backup plan for coverage of groups facilitated by primary clinicians to cover primary clinician
12
   group facilitator absences. A supervisor is monitoring scheduling of inmates at their initial IDTT
13
14 to ensure immediate inmate scheduling/attendance at groups/yard.  For PSU, the PSU yard

15 schedule was changed to allow the maximum number of inmate-patients to attend both structured

16 yard and their Treatment Center groups. With the addition of another yard each week for each

17 block, and the changing of the yard times, inmate-patients will now have more options for yard

18 time without having to choose between their yard time and a structured group.  As of March 25,
19
   2013, most inmates are now being scheduled for six two-hour groups per week instead of five,
20
21 and also given the option of a structured recreational therapy yard one time per week (for a

22 potential total of seven two-hour groups per week), giving them potentially two bonus hours of

23 group time, for a total of 14 possible group hours. PSU supervisors have developed a cancellation

24 coverage plan with the psychiatric technician group supervisor.

25        /

26        /

27        /

28

6

<u>Individual Inmate Matters Rebuttal Points</u>

On pages 94-95 of his Declaration, Dr. Stewart states that the clinician who responded to the Chief Deputy Warden's request to see Prisoner T in the administrative segregation overflow unit at SAC on July 23, 2012, failed in her clinical duties by failing to conduct a mental status exam, failing to review the inmate's electronic health record, failing to consider whether the inmate required a higher level of care, and failing to consider conducting a suicide risk assessment solely because the inmate was "not cooperative." The clinical psychologist's action on July 23, 2012, was within the standard of care expected of a clinical psychologist and within the requirements of the Mental Health Services Delivery System (MHSDS) Program Guide..The clinical psychologist was asked to check on Prisoner T because he had been in a cell fight and was, according to custody staff, "acting weird."  The clinician went to his cell front and attempted to speak to him, but he refused to interact with her. Nevertheless, she documented that he was "pacing in his cell" and collected collateral information from custody staff in the unit, who indicated that the Prisoner T appeared to be "extremely angry."  She was aware that he had been in a cell fight and documented that custody staff also reported that he "refused to communicate with the investigating officer." The psychologist considered it her responsibility to provide an opportunity for Prisoner T to participate in mental health treatment, but felt there was no need for a suicide risk evaluation, as it is not uncommon for inmates to engage in cell fights and other violent behavior where an extraction is required, as was the case here. Inmates sometimes refuse to interact with staff when they are angry and have a right to refuse to participate in mental health treatment. The psychologist was aware that because Prisoner T was treated at the Clinical Correctional Case Management System (CCCMS) level of care, and on Administrative Segregation Unit (ASU) status, that he would be seen weekly for follow-up, and that PSU inmates

7

1   have regular contact with staff.  Without clear evidence that Prisoner T was at immediate risk to

2   himself or others, admission to a MHCB was not considered.

3

4       14. In the 12 hours between the psychologist contact and Prisoner T's death, staff who

5   conducted count, delivered dinner, picked up dinner trays, and conducted showers did not

6   indicate that he was engaging in any concerning behavior.

7       15. The psychologist did not review the health record for Prisoner T, as it was not

8   common practice to do so for a "welfare check."  The psychologist has since reviewed the health

9   record and stated to me that that nothing contained in it would have led her to a different

10  conclusion has she reviewed it on July 23, 2013, as all progress notes leading up to the incident

11

12  describe the inmate-patient as euthymic, low risk for self harm, and indicate that he had no

13  evidence of psychosis. However, as a result of the suicide of Prisoner T, this scenario has been

14  used for informal training of mental health staff at SAC during staff meetings, and clinicians have

15

16  been advised to review the health record for any inmate-patient referred by staff for a mental

17  health contact.

18      16. The psychologist, based on years of experience providing mental health care in a

19  corrections setting, did not come to the conclusion that a suicide risk evaluation (SRE) was

20  indicated, and per Mental Health Services Delivery System (MHSDS) Program Guide

21  requirements, there was no SRE required. While an assumption that Prisoner T's emotional state

22  was a contributing factor to his death is understandable, there is some indication reflected in the

23

24  suicide review that the death may have been due to auto-erotic asphyxiation rather than intent to

25  commit suicide based on his emotional state.

26      17. Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-E

27  are relevant pages of Prisoner T's eUHR.

28

8

1       18.  On page 132 of his Declaration, Dr. Stewart states that Prisoner II waited for transfer

2    to an ICF level of care for more than a month, should have been housed at a higher level of care

3    than SAC's Enhanced Outpatient Program (EOP) while awaiting ICF level of care, and that he

4    may have been overmedicated.   Prisoner II was housed in a MHCB until January 2, 2013, when

5    he was discharged.  His discharge summary from MHCB on January 2, 2013, indicated that his

6    psychotic symptoms had stabilized and recommended that he be returned to a MHCB if his

7    symptoms worsen in the outpatient unit, but did not indicate that the ICF referral should be

8    rescinded.  The clinical treatment team in the outpatient program did not find that his symptoms

9    warranted return to a MHCB during the time between his discharge and Dr. Stewart's visit with

10   Prisoner I on January 29, 2013.  Prisoner II transferred to the Department of State Hospitals ICF

11   on January 31, 2013, but was seen by a psychiatrist on January 30, 2013.  The psychiatrist's

12   assessment found "neither subjective nor objective evidence to suggest he is in any way a danger

13   to self/others, incapable of meeting his basic needs, is toxic or in acute distress." *Id.*  Had any of

14   those been found, he would have been appropriately transferred to an MHCB.  It is in the best

15   interest of inmate-patients for them to be treated in the least restrictive setting in which their

16   clinical needs can be met.  Based on the review of the psychiatrist on January 30, 2013, Prisoner

17   II was housed at a level of care adequate to provide for his clinical needs and did not require a

18   higher level of care while awaiting transfer to ICF.

19       19.  In addition to reviewing Prisoner II's mental status, the psychiatrist also reviewed his

20   medications during the January 30, 2013, encounter.  The plan to treat medication side effects

21   included "Resume Geodon as a titration to target dose Geodon 60 mg po bid." As Prisoner II was

22   formerly on 90 mg, that was a reduction in medication dosage, although that was based on the

23   psychiatrist's clinical evaluation and unrelated to Dr. Stewart's visit.

9

20. Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-F are relevant pages of Prisoner II's eUHR.

21. On page 164 of his Declaration, Dr. Stewart states that the suicide of Prisoner S may very well have been preventable had he had an accurate Suicide Risk Evaluation while still housed at Salinas Valley Psychiatric Program and had he not been transferred to a lower level of care at SAC and that his chronic risk factors and his imminent deportation did not appear to have been factored in as additional risk factors affecting his acute level of risk by SAC clinicians. Dr. Stewart is incorrect with respect to the actions taken by SAC, as clinicians both knew of and addressed his chronic risk factors and his pending deportation appropriately in assessing his level of risk.

22. During the course of the CDCR Suicide Review, it was determined that all protocols were followed in the treatment provided to Prisoner S by CDCR staff. Prior to the inmate's discharge, SAC received email notification of Prisoner S's discharge and both the director of the inpatient unit and Prisoner S's primary clinician were notified. Prisoner S was evaluated upon his return to SAC and a Suicide Risk Evaluation was completed within 24 hours, a five-day follow-up was scheduled, and Prisoner S was seen for daily clinical contact during this period. Given the daily clinical contact he received at SAC as well as staff's awareness of his suicide history, even clinician-to-clinician contact prior to SVPP discharge was unlikely to have prevented this suicide. Further, on March 23, 2011, the psychiatrist spoke to this inmate-patient and specifically asked him about his parole plans. He was future oriented, stating that he was "okay" going back to Mexico and that his mother was there. Thus, Prisoner S's imminent deportation did not appear to be an issue that would have contributed to a different treatment plan for this inmate.

23. Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-G is the Suicide Report regarding Prisoner S.

10

24. On pages 117-118 of his Declaration, Dr. Stewart states Prisoner X told him that he is only scheduled for three groups per week and that he never goes to yard. Dr. Stewart further stated that this is an example of staff being aware that EOPs do not receive the full complement of care required by the Program Guide and not working closely with them to encourage greater group and programming. Dr. Stewart's conclusions that SAC staff did not do that are in error for the following reasons. Prisoner X reportedly claimed to have "a modified program" in PSU. The Mental Health Tracking System (MHTS) shows that this was never the case and instead indicates that he was offered a full treatment program and also actively worked to obtain and retain Step 4, the top privilege group in the Behavioral Incentive Program (BIP) used in the Psychiatric Services Unit. Data in MHTS.net indicates that he was offered a full treatment program. However, in August of 2012, Prisoner X suffered a significant loss when his dear friend unexpectedly died. As a result, he suffered significant grief issues which impacted his functioning. On August 28, 2012, Prisoner X was referred by his group leader to the primary clinician after he was noted to leave the group upset. Prisoner X's primary clinician repeatedly consulted with the PSU program director about Prisoner X's treatment needs. As a result Prisoner X was provided with more individual clinical contact than prior, as well as in-cell activities and "homework." Prisoner X's treatment plan meets his basic mental health needs despite the grief issues with which he dealt and his impacted functioning level.

25. Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-H are relevant pages of MHTS.net and eUHR documentation regarding Prisoner X.

26. On page 86-87 of his Declaration, Dr. Stewart stated that Prisoner I had been in a holding cage for more than three hours when he saw him on January 29, 2013, that Prisoner I was not yet placed in alternate housing, that all MHCB were full and that he would be held while waiting for a bed to open and that no one was paying him any attention. However, at the time

11

1   that Prisoner I was interviewed by Dr. Stewart, staff members working in the Crisis Triage Team

2   reported to Dr. Stewart in my presence that there was a MHCB bed open, and Prisoner I was

3   pending escort to the open bed. I personally observed a custody officer providing constant direct

4   clinical observation when Dr. Stewart arrived to interview Prisoner I. When an inmate at SAC is

5   identified as possibly needing crisis intervention, a clinician responds as quickly as possible to

6   evaluate that inmate.    In this case, the evaluation led to a plan for MHCB admission which was

7   completed by 1 p.m., within the required 4 hour timeframe, as Prisoner was placed in the holding

8   area after 9 a.m.

9   27.  Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-I are

10  relevant pages of Prisoner I's eUHR.

11  28.  On page 150 of his Declaration, Dr. Stewart stated that Prisoner TT is an example of

12  the very sick individuals cycling in and out of DSH who fill up scarce CDCR inpatient beds

13  rather than being in DSH facilities and thus has spent more than two months in the SAC's MHCB

14  unit at the wrong level of care, experienced additional self-injury, and taken up needed bed space

15  for other SAC prisoners in need of crisis care. Prisoner TT currently remains in a MHCB, but a

16  SAC psychologist is conducting psychological testing to verify his diagnosis, and will re-refer to

17  DSH if clinically indicated after this is completed.

18  29.  On pages 122, 144-145, and 153-154 of his Declaration, Dr. Stewart refers to

19  Prisoner UU as being returned early from DSH directly to a PSU or ASU EOP and possibly on

20  the wrong medications and was housed in the PSU when Dr. Stewart spoke with him on January

21  29, 2013. Prisoner UU was not in the PSU when Dr. Stewart spoke with him as Dr. Stewart's

22  declaration stats, but was housed in SAC's MHCB.

23  30.  Attached to this Declaration as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-Jare

24  relevant pages of Prisoner K's eUHR.

12

31. On page 33-37 of his Declaration, Dr. Stewart opines about the suicide death of Prisoner B at SAC. Prisoner B was treated at Salinas Valley Psychiatric Program (SVPP) Intermediate Care Facility from May 25, 2010 to March 1, 2011. His treatment team referred him back to DSH ICF on August 31, 2011. The SAC DSH coordinator was notified of an available bed at SVPP on November 3, 2011. An update of medical documentation was required prior to posting of the Acceptance and Transfer Chrono. An updated CDCR Form 7371 was requested from nursing staff via email with a due date of November 8, 2011. No 7371 was completed by the time of inmate's death on November 26, 2011. SAC chartered a Quality Improvement Team to address this issue. The DSH Coordinator or backup now sends daily information regarding DSH documentation that is needed, and if any document is not completed by the due date, the issue is elevated to the Healthcare Chief Executive.

32. Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-K is the Suicide Report regarding Prisoner B.

33. On page 87 and page 145 of his Declaration, Dr. Stewart discussed Prisoner J and his issues concerning referral to DSH. Prisoner J is current being treating at DSH-ICF at SVPP. He transferred from SAC to SVPP on February 7, 2013. He arrived at SAC from LAC on January 4, 2013. A review of progress notes since the date of his arrival in Psychiatric Services Unit indicates no evidence that clinical staff knew that he was keeping feces in his cell. On January 22, 2013, a progress note from his primary clinician indicates that the inmate had cleaned out his cell, and had been cautioned about keeping food in his cell. The progress note dated January 29, 2013 from the MHCB unit indicates "inmate has been storing feces for the last several weeks per staff." This report is not supported by other evidence.

34. Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-L are relevant pages of eUHR documentation regarding Prisoner J.

13

35. On page 149 of his Declaration, Dr. Stewart opines that the situation involving Prisoner SS is an example of problems with continuity of care and with/or adequate clinical resources at SAC. In the case of Prisoner SS, the psychiatrist may have disagreed with the Schizoaffective Disorder diagnosis based on his clinical assessment. The January 18, 2013 progress note indicates that Prisoner SS's "psych testing did not reveal any psychosis." And that "they suggested malingering and psychopathy." The psychiatrist takes into consideration new information, which is integral to continuity of care.

36. Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-M are relevant pages of eUHR documentation regarding Prisoner SS.

37. On page 80 of his Declaration, Dr. Stewart discusses Prisoner K who alleged punitive suicide watch procedures used in ASU EOP housing unit A-5. Prisoner K was placed in the EOP Administrative Segregation about 5 months prior to speaking to Dr. Stewart following his release from MH Crisis bed. When he was admitted to the Crisis Bed unit, Prisoner K's level of care had been CCCMS. He was accused of Battery on a Peace Officer on during his inpatient admission. Prisoner K was referred to DSH-ICF at his December 27, 2012, IDTT. He was accepted for treatment by DSH-ICF on January 9, 2013, so he had been waiting 20 days when interviewed by Dr. Stewart. Prisoner K had three MH Crisis Bed admissions between August 24, 2012, and November 19, 2012. A mental health clinician conducts a suicide evaluation to determine if the inmate requires a mental health crisis bed or whether he is sufficiently stable and that it is appropriate for him to return to his regular housing cell. In the course of this evaluation, the evaluator would ask the inmate-patient if he feels safe to return to his cell if, in the opinion of the evaluator, there are no overt indications of suicidal or self-harm intent. and/or the evaluator is attempting to make a distinction (in this inmate-patient's case) between feeling more depressed versus feeling significantly more depressed to the point where he is considering committing

14

suicide as a means of escaping these feelings. There are holding cells both in the breezeway (an outside location) and several in the hallway (an inside location) near the CTC. The holding cells in the MHCBU area are all inside the housing unit.

38.    The ZZ holding cells referenced in Photographic Appendix R and S are located in each of SAC's three facility yards. Each is inside the building. These cells are used as temporary housing when an inmate-patient has been assessed and it has been determined that he requires inpatient admission but there are no vacancies in any of CSP-Sac's inpatient units. Inmate-patients are issued a quilted smock, a quilted blanket, and a sleeping pad. Prisoner K was not approved for DSH admission until January 9, 2013. This inmate was recommended for DSH on December 27, 2012 and referred to DSH on January 4, 2013. He had been waiting for admission for less than three weeks when he was interviewed by Dr. Stewart. Contrary to the inmate's statement, during the month of January 2013, Prisoner K had been scheduled for 11 hours of group per week and had attended an average of 5.94 hours per week in addition to almost two hours of individual therapy with his primary clinician and psychiatrist.

39.    Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-N are relevant pages of MHTS.net and eUHR documentation regarding Prisoner K.

40.    On page 148 of his Declaration, Dr. Stewart discusses his interview of Prisoner RR who he categorized as another case of "DSH failure." Prisoner RR returned to SAC on January 7, 2013 from SVPP. Upon his return, he was placed into the MHCB due to extremely low functioning. After a C-CAT meeting, this inmate was referred to DSH. He was accepted on January 17, 2013. While housed in the MHCB, he was monitored while showering daily and his cell was cleaned daily. While in MHCB, Prisoner RR was re-evaluated regarding his adaptive functioning. His 128 C-2 chrono has been updated to include his new development disability

15

1   (DD) status as DD3.  His treatment plan also includes regular visits with the recreational therapist

2   to engage him in social interactions.   Prisoner RR was transferred to DSH on March 20, 2013.

3        41.  Attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 8-O are relevant pages of

4   MHTS.net and eUHR documentation regarding Prisoner RR.

5

6        I declare under penalty of perjury under the laws of the State of California and the United

7   States of America that the foregoing is true and correct. Executed in *Represa* , California on

8   March 21, 2013.

9

10

11                          SHAMA CHAIKEN

12                          *(original signature retained by attorney)*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    16
─────────────────────────────────────────────