KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>         v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                                    Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF KATHLEEN ALLISON IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Kathleen Allison, declare as follows:

1. I am the Deputy Director of the Division of Adult Institutions (DAI), Facilities Support, for the California Department of Corrections and Rehabilitation (CDCR).  I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate

1

under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. I began working for CDCR in 1987 as a Medical Technical Assistant and promoted to a Senior Medical Technical Assistant in 1993. I became a community resources manager in 1996, where I managed various inmate programs including religion, Arts in Corrections, Inmate/Family Services, and substance abuse programs such as Alcoholics Anonymous. I served one year as the Litigation Coordinator at Avenal State Prison. In 2002, I became a correctional health services administrator at the California Substance Abuse and Treatment Facility, with responsibility for health care budgets, contract management, personnel, and disciplinary matters. I also acted as health care manager at that institution, overseeing delivery of health care to inmates. In 2004, I became an Associate Warden, overseeing the custody staff and operations on Level II General Population yards, a Sensitive Needs Yard, and Administrative Segregation units; managing various litigation compliance efforts; and overseeing areas including Case Records and Religious Services. In 2007, I became Chief Deputy Warden, at which time my duties expanded to include oversight of all staff in the institution, with primary coordination of all clinical services and custodial functions of the institution. In 2009, I was appointed Warden and became responsible for the safety and security of all the inmates, staff, and visitors to the institution. Among my duties was coordination with staff in the handling of the care, discipline, custody, and employment of inmates. In November 2011, I was named Associate Director for the Division of Adult Institutions. My duties included providing managerial direction to wardens who reported to me, implementing the Alternative Custody Program, and managerial direction of various community-based programs providing services to offenders and their children. I promoted to Deputy Director in approximately April 2012.

3. Some of my current duties as Deputy Director for the DAI include oversight of the following: inmate case records administration; inmate classification unit; budgeting; statewide inmate transportation unit; prison bed management; fiscal planning and development; staffing standardization; institutional audits; and policy and procedure standardization. The Policy and

2

Decl. Kathleen Allison Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

Procedure Standardization Unit is primarily responsible for CDCR headquarters review of Coleman compliance for DAI.

### Suicide Prevention Efforts at CDCR

4.     In providing oversight of Coleman compliance, I have reviewed and am familiar with both of Dr. Ray Patterson's most recent reports regarding suicides that occurred in CDCR in 2011 and 2012. The reports criticize CDCR for its suicide prevention efforts by looking primarily at the number of successful suicides. This type of review is two-dimensional, however, and does not provide full context for the work done by CDCR to prevent suicides. CDCR is able to successfully prevent suicides throughout the state through timely and professional clinical intervention but also through good communication and observation by custodial staff. Attached as Exhibit A is a report reflecting that CDCR successfully prevented 347 attempted suicides between January 1, 2012, and December 31, 2012.

5.     CDCR's suicide prevention measures involves myriad policies and procedures, described in part below, that involve dedicated correctional and mental health staff diligently working to prevent loss of life. Correctional officers complete regular welfare checks of inmates in the Administrative Segregation Unit (ASU). Efforts are made to reduce the length of stay for all inmates in an ASU to prevent incidents of mental illness caused decompensation. Additionally, officers are regularly provided with mandatory training on emergency response to prevent loss of life.

### Efforts to ensure welfare checks are completed and implemented

6.     CDCR has taken steps to ensure that ASU welfare checks are timely completed and tracked by correctional staff. In the past, this has been a labor-intensive effort requiring written logs by staff. Welfare checks are monitored at the institution level on a daily basis by the sergeant, who then reviews and signs off on each log at the end of each shift to indicate that the welfare checks have been done correctly and completely.

7.     CDCR has now sought a bid to acquire electronic monitoring devices and/or a system consisting of an electronic recording device to digitally record the Correctional Officers

3

Decl. Kathleen Allison Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

check time at all pre-assigned individual cell locations. This welfare check tracking system will electronically and automatically store each welfare check as the Correctional Officer conducts an inmate welfare check. Upon completion of the Correctional Officer's shift, the data, including the timing and results of the welfare checks, will be electronically transferred to a software system located on the department's network. Such a system will allow better tracking by CDCR headquarters.

8.   In the interim, while the contract is being sought, CDCR has taken steps to ensure that welfare checks are completed as originally intended by the 2006 directives to the field. In order to clarify any confusion in the field, CDCR has authored a joint signature memorandum from the Director of Adult Institutions and the Director of Health Care Services titled "Revised Administrative Segregation Unit Welfare Check Procedure and Implementation of Security Inspections in Specialized Housing." A copy of the memorandum is attached as Exhibit B. This memorandum instructs staff that the welfare checks on inmates are to be completed in a staggered and unpredictable way. Notably, it further instructs staff that three welfare checks per hour should be completed at staggered intervals not to exceed 30 minutes. Moreover, the memorandum directs staff that welfare checks for inmates in administrative segregation may continue beyond 21 days when deemed clinically appropriate. The memo has not yet been released to the field pending union notification. However, we are hopeful that this can be accomplished expeditiously so that it may be disseminated to the field.

9.   In order to facilitate better monitoring of inmates in the ASU, CDCR has also issued a memorandum to the field as of March 20, 2013, titled "Administrative Segregation Unit Requirements Regarding Clustering and Entertainment Appliances." This memorandum is attached as Exhibit C. The purpose of this memorandum is two-fold; first, to ensure that new arrivals in administrative segregation are clustered in areas close to staff to allow for better observation by staff; and, second, to remind institutions that CDCR authorized inmates in administrative segregation to possess one entertainment appliance. I believe that this memorandum will allow for improved monitoring of inmates coming into the administrative

4

segregation units and that such monitoring will help ensure their safety during this important transition time into the new unit.

10.     In addition to the above, my team is reviewing all possible options for entertainment devices in ASU cells, such as windup or battery operated entertainment appliances. It is our goal to authorize entertainment appliances for all inmates in the ASU.

<u>Efforts to Reduce the Length of Stay in Administrative Segregation</u>

11.     CDCR has formed an ASU Stakeholder Workgroup that meets monthly and discusses policies and proposals for improving the ASU system.  This group consists of headquarters representatives from numerous stakeholders regarding ASU policies and procedures, including DAI, the Division of Health Care Services, Population Management and Health Care Population Oversight, Legal Affairs, Classification Services, and other subject matter experts.  I am one of the co-facilitators of this group.  The original charter of the workgroup was to reduce suicide rates and develop strategies for CDCR to better manage populations for ASU Enhanced Outpatient Program (EOP).  Our focus has been on reducing the length of stay in ASU.

12.     Among our accomplishments, the ASU Stakeholder Workgroup clarified the requirement to conduct staggered welfare checks to assure ASU inmate safety.  We also identified the need to improve utilization of the COMPSTAT ASU tracking log for managerial review.  A sub-workgroup was created to address this.  The subgroup did comparative analyses of SOMS to COMPSTAT for ASU housing and sent noted discrepancies to the institution via Associate Directors for correction.

13.     The workgroup's early focus was to end the waitlist for ASU inmates pending EOP ASU Hub placement.  At the inception of the workgroup, this waitlist was at 185 inmates. As a result of increased monitoring of these cases, coupled with numerous training sessions provided to the institutions, between December 2011 and April 2012 the list decreased from 185 inmates to zero inmates on the EOP ASU Hub waitlist.  At the present time, no inmates pending EOP ASU Hub placement have been waiting beyond program guide timelines.

5

Decl. Kathleen Allison Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

14. As part of the workgroup's additional efforts to reduce the length of stay for inmates in the ASU, we conduct a biweekly report on ASU inmates with the longest lengths of stay. This report identifies all inmates who have remained in ASU for greater than 90 days. From this report, we run several drills requesting institutions to explain continued placements of these individuals. The COMPSTAT drills evolved to focus on timeliness of ASU processes that affect the length of stay. By focusing on the timeliness of ASU casework utilizing the existing due processing auditors, there is an assurance that cases are not remaining in ASU without legitimate penological interest.

15. As an additional accomplishment of this workgroup, on March 21, 2013, CDCR issued a memorandum regarding casework expectations, classification time frames, and the Psychiatric and Return policy for Department of State Hospital Acute and Intermediate care Facility Inmate-Patients. A copy of that policy is attached here as Exhibit D. The intent of this memorandum is to incorporate various existing departmental policy memorandums, provide clarification on expectations, and reiterate critical issues existing in the CDCR and Department of State Hospital (DSH) Memorandums of Understanding associated with enhancing access to care and treatment.

16. Through the recent distribution of the policy memorandum, CDCR has reiterated its expectations associated with ensuring that highest priority is given to casework completion of inmates while housed in DSH facilities and the expeditious movement and placement of inmate-patients requiring enhanced level of Acute or Intermediate care placement in a DSH facility. The policy further clarifies that it is the expectation of CDCR that inmate-patients referred to DSH are housed, based on evaluation of current case factors and updated casework, in the least restrictive housing environments within DSH and upon return to CDCR. Additionally, emphasis has been reiterated for Institutional Classification Committees to promptly evaluate and address issues within departmental policy regarding Rules Violation Reports (RVR) and Administrative Segregation concerns that play a key role in making discretionary decisions regarding the placement and programming of inmate-patients. It is the expectation of the department to

6

Decl. Kathleen Allison Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

continue its commitment in ensuring that inmate-patients are effectively provided access to programs in a safe and conducive environment within DSH to provide treatment.

Emergency Response

17. Training reinforcing current requirements for emergency response procedures in the Department's Operations Manual are conducted regularly through block training and through periodic drills. Emergency drills are conducted quarterly. Additionally, ASU holds monthly emergency drills. Correctional officers are further provided with bi-annual CPR training, and those officers in specialty units, including ASU, receive additional CPR training. (See Exhibit E.)

18. Training drill logs are sent to the Associate Director at headquarters. Feedback is provided from the Associate Director to the institution when needed. Drill logs are also reviewed in the Standardized Procedures Unit. The Standardized Procedures Unit retains these logs. We also have specialized emergency response procedures for segregated area that requires a specified number of staff present to open and enter the cell.

19. CDCR previously issued a policy memo requiring first responders, including custody staff, to perform life saving measures and this has been fully implemented. This has now been implemented in the most recent version of the Program Guide, pages 12-10-21 and 12-10-22, mandating custody officers to provide life support if trained to do so.

Use of Force (UOF)

20. In his declaration filed on March 14, 2013, Eldon Vail opines that CDCR's "UOF review and employee discipline system is badly broken and ineffective," apparently based on his mistaken belief that CDCR has not initiated any investigations or disciplinary measures regarding any UOF incidents. In fact, excessive and unnecessary force is responded to through our disciplinary matrix. The corrective action process includes both training, informal corrective action, and formal corrective action. We have data demonstrating that discipline was taken a number of times throughout the state in both 2011 and 2012. (See Exhibit F.) CDCR does not

7

Decl. Kathleen Allison Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

tolerate excessive or unnecessary force against inmates. Vail's statements that excessive use of force is routine mischaracterizes the way the disciplinary system works.

21. Each CDCR Institution has a dedicated Use of Force Coordinator. Each UOF Coordinator does an analytical review and critique of each UOF incident to determine if the action prior to, during, and after the use of force was appropriate. Additionally, every institution has at least one staff member who oversees RVRs. Each Associate Warden who oversees housing units will have a staff member that maintains the RVR registry.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Sacramento, California on March 21, 2013.

*K. Allison*
Kathleen Allison
Deputy Director of the Division of Adult Institutions

**(original signature retained by attorney)**

8

Decl. Kathleen Allison Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)