KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN JR., et al., <br><br> Defendants. | 2:90-cv-00520 LKK JFM PC <br><br> **REPLY DECLARATION OF CHARLES L. SCOTT IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Charles L. Scott, declare as follows:

1. I am a Clinical Professor of Psychiatry at the University of California, Davis. I am licensed to practice medicine in California and am board-certified by the American Board of Psychiatry and Neurology. I have served as the Forensic Psychiatry Fellowship Training Director at the University of California, Davis since October of 1998 and as the Chief, Division of Psychiatry and the Law at University of California, Davis since 2002. I have experience as a clinical psychiatrist in correctional settings and have been selected to provide national training on issues related to correctional mental health care for the American Academy of Psychiatry and

1

Law's Annual Forensic Review Course. I have served as an expert witness in litigation on standards of care in correctional settings in Alabama, Arizona, California, Florida, New Mexico, and Illinois. I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. An expert opinion about appropriate psychiatric care requires a review of the actual psychiatric care provided. In particular, in addition to interviewing patients, the consulting expert is responsible for selecting a representative sample of mental health records and actually reviewing the records before rendering an opinion on the standard of care and/or whether providers and/or the system is deliberately indifferent to the mental health needs of inmate patients. And although the term "deliberate indifference" has arisen from caselaw, it is a very basic concept in forensic psychiatry and one that is required for individuals who are trained in forensic psychiatry and who do evaluations of correctional care to understand.

3. Important components to consider when evaluating whether or not a system and/or individual providers are deliberately indifferent include the following:

- Does the system provide access to psychiatric assessment and treatment?
- Does the psychiatric evaluation review important components of a person's history and current mental status examination to make an appropriate diagnosis?
- Does the psychiatric diagnosis match the information gathered in regard to the individual?
- Are the medication or medications prescribed appropriate for the diagnosis rendered?
- Are the medications monitored once prescribed, to include appropriate laboratory monitoring?

4. In addressing the above questions, I personally toured 12 CDCR institutions, personally reviewed over 135 actual mental health records, reviewed 65 Mental Health Crisis Bed admissions with associated Suicide Risk Evaluations (SREs), and personally observed 57 separate Interdisciplinary Treatment Team meetings. Based on this methodology, the evidence indicates that CDCR is not deliberately indifferent in regard to the psychiatric care provided to inmates in their care. The evidence indicates that there is a clearly established system to provide psychiatric

2

Decl. Scott Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

care, that such care is routinely accessed as appropriate, that psychiatric evaluations are conducted appropriately, that the medications prescribed are appropriate to the diagnoses, and the there are multiple monitoring systems in place to safely monitor prescribed medications.

5. My review of the psychiatric care provided to CDCR inmates involved a detailed review of over 135 actual medical records, through both the Electronic Unified Health Record (EUHR) and on site records on the mental health crisis beds. Because the EUHR system includes important assessment, treatment, and monitoring information in different sections of this electronic format, an expert must review the available information relevant to the provision of psychiatric care. Importantly, important documentation in regard to psychiatric care is often noted in more than one location in the EUHR. Therefore, failing to review actual documentation substantially increases the risk of faulty and erroneous conclusions about psychiatric treatment and monitoring. In other words, if an expert fails to review an independent selection of actual treatment records, their opinion on the quality of psychiatric care is without substance.

6. I have reviewed the declarations submitted by Plaintiffs' experts Dr. Edward Kaufman and Dr. Pablo Stewart in support of Plaintiffs' Opposition to Defendants' Motion to Terminate. I have also reviewed the transcript of Dr. Kaufman's deposition on March 16, 2013, and briefly reviewed the transcript of Dr. Stewart's deposition on March 19, 2013. Based on my review, it is my opinion that the conclusions proffered by Drs. Kaufman and Stewart are not supported by a valid evidentiary basis, are not based on any discernable methodology, and do not speak to any relevant or widely accepted standard of care.

**Dr. Kaufman did not examine the State's provision of mental health care under a relevant standard of care.**

7. Dr. Kaufman testified that he did not understand constitutional requirements and he could not articulate a rational understanding of the concept of "deliberate indifference." (Deposition of Dr. Edward Kaufman at 12:6-12; 29:24-30:2.) As I described above, the term "deliberate indifference" is a very basic concept in forensic psychiatry and one that is required for individuals who are trained in forensic psychiatry and who do evaluations of correctional care to understand.

3

8. Moreover, it is evident that Dr. Kaufman is judging CDCR's provision of mental health care against an undefined, vague and, in some cases, unrealistic "best practices" standard. For example, Dr. Kaufman appears to believe that patients should have to wait no longer than five minutes to see a clinician, as is his private practice standard. (Kaufman Depo. at 64:1-3.) This incredibly high standard is not a constitutional requirement or consistent with even a community standard of care. Further, Dr. Kaufman opines that the standard of care in the community requires a psychiatrist to conduct an initial psychiatric evaluation for at least 45 minutes. (Kaufman Dep. at 78:22.) Although this is an ideal or best practice goal, there are many community clinics and private practices that do not require 45 minute psychiatric evaluations for the initial appointment. Moreover, Dr. Kaufman was unaware of the length of time a state psychiatrist spent with an inmate during their initial evaluation.

**Dr. Kaufman lacks a defined methodology of review and relies primarily on unverified anecdotal evidence, incomplete information, and unjustified assumptions.**

9. Dr. Kaufman's broad opinions about CDCR's systemic provision of care are not supported by a through sample. Dr. Kaufman testifies that the basis for his opinions regarding the quality and quantity of psychiatric care provided by CDCR was approximately 20 interviews with inmates, a review of selected portions of their medical charts, and *possibly* the review of five to ten additional charts. (Kaufman Dep. at 31:14-17; 33:1-22, 145:7-12.) He further notes that he did not review the records of all of the inmates he interviewed. Of the records he did actually review, he noted, "I reviewed medical charts to the extent that the pages were provided to me." (Kaufman Dep. at 32:4-5.) Dr. Kaufman explains that this analysis of psychiatric care was based primarily on selected pages from the medical records forwarded to him by the plaintiff's attorneys. (Kaufman Dep. at 32:1-16; 36:22-37:1.) Because Dr. Kaufmann did not review the actual records, he is unable to accurately opine as whether information that was or was not located in the actual EUHR. Therefore, he is in no position to provide opinions on quality of treatment, medication assessment, or medication monitoring based on actual facts.

10. Further, Dr. Kaufman's assessment of the treatment provided to the inmates are based primarily on unverified comments obtained during his interviews and unjustified assumption

4

about the quality of clinical contacts.  For example Dr. Kaufman testifies that in evaluating the care provided to "Prisoner C," he evaluated the "extent of the therapeutic value" of cell front mental health contacts in rendering his opinion. (Kaufman Dep. at 58:22-25; 60:12-14.)  But Dr. Kaufman acknowledges in his deposition that he never actually observed cell front contacts by mental health clinicians in CDCR institutions. (Kaufman Dep. at 82:9-83)  Therefore, Dr. Kaufman is in no position to evaluate the therapeutic value of cell front contact for Prisoner C or any other inmate.  He acknowledged that he had not reviewed her actual chart to determine how many mental health contacts she had received, where she had received such care, and the circumstances of why she was in Administrative Segregation. (Kaufman Dep. at 60:2-5.)

11. Similarly, Dr Kaufman attacks the provision and quality of daily rounds by licensed psychiatric techs (LPT) based on comments by "Prisoner A," an EOP patient at CCWF. (Decl. Kaufman ¶ 50.)  But there is no indication that Dr. Kaufman observed any LPT rounds, has knowledge of the purpose or scope of such rounds, or attempted to verify Prisoner A's comments in any way.  Further, Dr. Kaufman acknowledged that inmates have the opportunity to request clinician meeting from an LPT. (Kaufman Dep. at 99:22-25.)

12. Dr. Kaufmann also frequently second guesses clinical treatment decisions, on basis of his 20 minute interviews.  Moreover, even where Dr. Kaufman asserts he has reviewed charts, absent an appropriate review of the full records as opposed to a selected sample of medical record pages provided to him after the fact, he has no basis to offer a valid opinion on appropriate levels of clinical treatment.

13. For example, Dr. Kaufman notes that Patient A said "she hears voices that give commands to lash out." (Decl. Kaufman ¶ 30.)  He then records that this same inmate told him she has not had group therapy and he criticizes CDCR for not providing group therapy to her despite her desire for group therapy. (*Id.*)  Dr. Kaufman's substituted judgment for what he believes is appropriate care is based on his brief cell side discussion rather than on an actual review of this inmate's care.  Moreover, even on the on the basis of the limited information Dr. Kaufman relies on, a treatment team would be clearly justified to not place a person who is

5

1  experiencing command hallucinations to lash out and harm others in a group setting with other
2  people.
3      14. Likewise, Dr. Kaufman asserts that Prisoner B, a CCCMS level of care inmate,
4  should be seen weekly because he believes this represents "best practice" and her level of care
5  required this frequency. (Kaufman Dep. at 57:22-25.) Again because Dr. Kaufman did not fully
6  review the patient's medical records, he rendered this opinion without knowing how many mental
7  health contacts this patient actually had or other important relevant information related to her care.
8      15. Dr. Kaufman also relies on unverified anecdotal comments he appears to have
9  obtained in passing. For example, in his declaration, Dr. Kaufman asserts that during his visit to
10 CIM, he encountered 10 inmates in a holding cell in the reception center who reported they had
11 been waiting for medical appointments for "hours." (Kaufman Decl. ¶ 36.) But in his deposition,
12 he admits that he only spoke briefly to a few of these inmates, and that he had no actual
13 knowledge how many were waiting for mental health appointments, or most importantly, how
14 long they had actually been waiting. (Kaufman Dep. at 62:5-63:21.)
15     16. When asked to provide supportive evidence for his statements that inmates had
16 decompensated as a result of their medication management or lack thereof, Dr. Kaufman was
17 repeatedly unable to cite the medication, the dose of the medication, how many doses of the
18 medication were missed (if any), and the reasons why the medications may have been withheld
19 for medical reasons. His opinions were repeatedly unsupported by any specific evidence other
20 than his general impressions and personal beliefs.
21     17. It is also clear that Dr. Kaufman failed to assess CDCR's process and monitoring
22 systems. When Dr. Kaufman was asked his understanding of the Medication Administration
23 Process Improvement Plan (MAPIP) tool, he answered, that he had only a "vague idea" of this
24 tool and its associated monitors. (Kaufman Decl. 105:15-22.) MAPIP is a highly detailed
25 medication monitoring tool that has been implemented in every CDCR prison to monitor an
26 inmate's medications. The very fact that such as tool is in place indicates that CDCR is not
27 deliberately indifferent to the medication monitoring of CDCR inmates. Because Dr. Kaufman
28 had only a minimal understanding of the MAPIP tool, how audits were conducted, the monitors

6

on the audit, he cannot accurately evaluate or render an opinion in regard to medication monitoring.

18.  Dr. Kaufman also failed to evaluate any general population inmates who are classified at the CCCMS level care, although CCCMS inmates constitute approximately 82% of the entire mental health population. (Kaufman Dep. at 108:10-12.)

19.  In summary, Dr. Kaufman's opinions are based on brief cursory reviews of limited information that in the majority of the cases was preselected for him.  In contrast, I randomly selected records, independent of counsel, and reviewed the entirety of the records to render an opinion.  I personally received training in the EUHR system and MHTS.net so that I could reliably verify the care provided, rather than imagine or guess what care may or may not have been rendered, which is the methodology utilized by Dr. Kaufman.

**Dr. Stewart also relies on primarily on unverified anecdotal evidence, incomplete information, and unjustified assumptions.**

20.  Dr. Stewart's sweeping opinions about CDCR's systemic provision of care are also not supported by a through sample.  Dr. Stewart took no notes of his tours, yet was somehow able to generate a one-hundred and sixty-seven page declaration. (Stewart Dep. at 12:11-19.)  Dr. Stewart spent only one day at four of the prisons he visited, and a day and a half at the other prison. (Stewart Dep. at 9:9-13; 22:24 – 23:1; 30:1-9;  31:20-24; 33:13-14.)  He spent about an hour in most of the mental health units at the institutions, and in some, he simply did "a walk through." (Stewart Dep. at 24:12 – 25:14; 26:12-25; 27:14-20; 29:11-22.)  Dr. Stewart submitted with his declaration a long list of documents he reviewed in rendering his opinion, yet he admits that he simply "skimmed them." (Stewart Dep. at 41:1-5.)  Dr. Stewart testifies that the basis for his opinions regarding the quality and quantity of psychiatric care provided by CDCR was based in part on his interviews with 61 inmates and about 40 other people in groups. (Stewart Dep. at 89:2; 95:17-24; 95:17-23.)  His opinion was based on the review of the medical records of only the patients he interviewed.  He did not conduct any random records reviews. (Stewart Dep. at 37:11-16.)

7

Decl. Scott Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

21. Dr. Stewart cannot give an example of any good mental health programs in a prison in the country, aside from possibly a jail or small system. (Stewart Dep. at 238:10-11, 16.) Also, he acknowledged that he has no idea how to fix CDCR's problems. (Stewart Dep. at 239:5-6.)

22. Although Dr. Stewart opined that CDCR must improve the quantity and quality of mental health treatment provided to inmates, Dr. Stewart did not sit in on any IDTT hearings at any prison he visited. (Stewart Dep. at 39:17-19.) And although Dr. Stewart complained about the lack of participation by the treating psychiatrist at IDTTs, he was not even aware that the inmate meets with his psychiatrist prior to the IDTT meeting to discuss his care. (105:21-24.) Similarly, while Dr. Stewart contends that inmates with a high level of clinical acuity were not receiving adequate mental health care, he "didn't encounter anybody that [he] felt needed to have an immediate clinical intervention." (Stewart Dep. at 224:22-24.) And, although he felt many inmates needed a higher level of care, Dr. Stewart did not give CDCR's mental health staff his opinions. (Stewart Dep. at 224:1-6.)

23. Dr. Stewart opines that because problems with the mental health delivery system still exist, CDCR hasn't addressed them. (Stewart Dep. at 55:12-17.) CDCR's failure to meet the program guide requirements means they know of serious medical harm to inmates but they choose not to do anything about it. (Stewart Dep. at 47:5-25.) But, on the contrary, the program guide itself demonstrates CDCR's willingness to address concerns regarding mental health inmates.

**Staffing**

24. Although Dr. Stewart contends that inadequate staffing contributes to inadequate mental health care, Dr. Stewart admits that CDCR is addressing the issue of staffing, and that CDCR may be doing things he's not aware of. (Stewart Dep. at 57:10-12.) Also, Dr. Stewart opines that vacancy rates are equivalent to an equivalent reduction in care provided, but he admits that it is pure speculation that a given vacancy rate equates to an equivalent reduction in care that's delivered. (Stewart Dep. at 58:15-19.) In fact, Dr. Stewart hasn't personally evaluated CDCR's staffing pattern to determine if it is constitutionally adequate –rather, he simply relies on the Program Guide Requirements as a minimum. (Stewart Dep. at 98:5.) And Dr. Stewart was

8

Decl. Scott Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

not aware that telepsychiatry started at SVSP as of January 31, 2013. (Steward Dep. at 101:11-15.)

**Treatment Space**

25. Dr. Stewart, who believes that every clinical contact should be confidential, opined that the lack of confidential treatment space renders the delivery of mental health care inadequate, and cites specifically to the use of treatment modules as not providing for confidential contacts. But he never determined whether the treatment modules were in fact confidential. (Stewart Dep. at 77:8-11; 103:9-11.)

**Punitive Suicide Watch Conditions**

26. Although Dr. Stewart opines that punitive suicide watch conditions contribute to the high suicide rate in CDCR, Stewart cannot point to any specific inmate who was subjected to punitive suicide watch procedures that caused him to commit suicide. (Stewart Dep. at 91:2-7.) And notwithstanding his opinion that temporary placement of inmates in holding cells while waiting transfer to a MHCB is punitive, he never observed an inmate who was subjected to any such punitive conditions. (171:25 – 172:2.) Dr. Stewart complained about the punitive suicide watch procedures at CSP-SAC and the delays of placing an inmate in a MHCB. Dr. Stewart used Prisoner I as an example of someone who should not be waiting for a MHCB due to his acuity, yet he never evaluated Prisoner I. His opinion is rendered without a clinical basis, and he is simply second-guessing Prisoner I's treatment providers. (Stewart Dep. at 201:19-22, 25.)

27. Similarly, while Dr. Stewart opines that the use of alternative housing for suicide watch contributes to the high suicide rate, he has no evidence that any inmate didn't get 1:1 observation in alternate housing. (Stewart Dep. at 188:16-19.) And while Dr. Stewart was troubled because staff didn't find commonalities after their review of the suicides at SVSP, he reviewed two of these suicides and did not find commonalities either. (Stewart Dep. at 192:14-16.) Additionally, while Dr. Stewart claims a link between harsh suicide watch conditions and the suicide of Prisoner N in 2010, Stewart admitted he had no evidence that use of a holding cell was a factor in the inmate's suicide 6 days after he was removed from a holding cell. (203:22-25, 204:2-05.) Dr. Stewart never observed any welfare checks. (208:18-22.)

9

**Medication Management**

28. With respect to medication management, Dr. Stewart opines that pervasive and dangerous problems exist. Yes he failed to monitor for informed consent nor did he review lab tests. He simply relied on the findings of the Special Master's 25th report. (Stewart Dep. at 143:12-13, 19-21; 148:24 - 149:5.) Dr. Stewart claims medication distribution is a problem, but only actually observed medication distribution in one prison, one time. (Stewart Dep. at 145:17-19.)

**Suicide Prevention**

29. Dr. Stewart opines that CDCR must increase and improve its suicide prevention efforts. But when asked whether he had any direct evidence that what he referred to as harsh punitive suicide watch or the use of alternative placements for suicide watch rather than MHCBs greatly increased the risk of suicide, he could provide nothing but his "belief" that it was "yet another factor." (Stewart Dep. at 181:17-19.) In fact, Dr. Stewart admits the suicide risk assessment is adequate. (Stewart Dep. at 204:20-21, 205:3.) Dr. Stewart also admits he hasn't reviewed all CDCR's suicide prevention policies nor could he say they were inadequate. (Stewart Dep. at 211:4-6.)

30. Although Dr. Stewart attacked CDCR's "failure" to adopt the recommendation of Lindsay Hayes with respect to suicide prevention, Dr. Stewart couldn't state what the recommendations of the report were; nor could he say what CDCR implemented or failed to implement. Dr. Stewart could not even articulate what Hayes recommended as less restricted suicide watch conditions. (Stewart Dep. at 178:14-25, 179:20-22, 180:3, 7-9.) And he actually observed only one inmate waiting for a suicide evaluation. (187:20-23.)

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true. Executed in Washington, D.C., March 21, 2013.

                           /s/
                    Charles L. Scott
          *(authorization to file obtained by Defendants' counsel)*

CF1997CS0003
20668591.docx

10

Decl. Scott Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)