KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF JAMES TELANDER IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, James Telander, Psy.D., declare as follows:

1. I am employed by the Department of Corrections and Rehabilitation as the Chief of Mental Health and Chief Psychologist at Mule Creek State Prison (MCSP) and I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate

1

under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. In my capacity as Chief of Mental Health and Chief Psychologist at MCSP, I have reviewed the declaration filed by Dr. Craig Haney dated March 11, 2013, with regards to mental health services provided to specific inmates, and respond as follows with narrative, along with supporting documentation where appropriate.

3. Terms I may use in this declaration include Mental Health Crisis Bed ('MHCB'), Intermediate Care Facility (ICF), Mental Health Outpatient Housing Unit ('MHOHU'), Correctional Clinical Case Management System level of care ('CCCMS'), Enhanced Outpatient level of care ('EOP'), Correctional Treatment Center ('CTC'), Administrative Segregation Unit ('AdSeg' or 'ASU'), Interdisciplinary Treatment Team ('IDTT'), Psychiatric Services Unit ('PSU'), Special Needs Yard ('SNY'), Rules Violation Report ('RVR'), and Suicide Risk Evaluation ('SRE').

4. Dr. Haney quoted me as stating, "if you reduce crowding, you reduce stress on the mental health population." (Haney Decl. ¶ 67.) But even though the mental health population at MCSP has not been reduced, the mental health population has been positively impacted through housing and yard activities. This is because the reduction in MCSP's general prison population has reduced the need to house CCCMS inmates in EOP mental health housing units, and has reduced the number of individuals engaging yard activities at the same time. All of these circumstances, which Dr. Haney fails to mention in his declaration, have improved mental health conditions at MCSP.

5. Dr. Haney alleges that the primary driver for the placement of mentally ill prisoners in AdSeg and other "inappropriate" beds is the issue of overcrowding. (Haney Decl. ¶ 70.) He is incorrect for the following reasons. Placements into AdSeg are made primarily based upon inappropriate behavior that threatens innocent inmates, and safety-related concerns (for example, to protect an inmate from other inmates). Although at times AdSeg may be used to house

2

mentally ill inmates awaiting transfer to appropriate treatment and mental health facilities, placement into the AdSeg is most often related to behavior and the safety of the individual.

6. Dr. Haney alleges that a large percentage of the 90 mental health patients on AdSeg were there awaiting transfer, and goes on to state that seven in EOP were awaiting transfer for more than 90 days. (Haney Decl. ¶¶ 72-73.) Dr. Haney does not state that, of the seven awaiting transfer, only three were awaiting transfer to a lesser degree of security, while four were awaiting transfer to the higher security of the Psychiatric Services Unit (PSU). Dr. Haney appears to infer that the majority of the 90 mental health patients in AdSeg are there because they are unable to transfer to proper mental health treatment, which in turn will cause further decompensation of their mental health condition. However, he fails to mention that placement was due to behavior impacting the safety and security of the individual and four of the individuals were awaiting transfer to a PSU, which is specifically designed to address mental health issues. (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-V.)

7. Dr. Haney asserts that no progress has been made on the acquisition of treatment space for the AdSeg unit in the past five and a half years. (Haney Decl. ¶ 74.) However, this is incorrect in that that the funding has been approved and initial design and planning process has been completed. This project is planned for C-Yard to provide Mental Health Services for AdSeg in Building C-12 and C-13 and will be constructed between buildings C-12 and C-13. While the building project has not actually broken ground, the process of having the treatment space building is well underway, with a reported designated project manager. The project was approved in December 2012, interim funding was approved in January 2013, architectural and engineering fees have been negotiated, and (according to Gary Lewis, Project Director III) the contracts are being executed. Schematic design is scheduled to begin in April 2013. (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-W for a rendering of the facility.)

8. Dr. Haney correctly identifies challenges for confidential treatment space in the AdSeg area. (Haney Decl. ¶¶ 75, 77.) However, it is important to note that care has been taken to arrange space and treatment areas in ways which affords the greatest degree of privacy given

3

the constraints we have until our new facility is built. The group areas face away from the unit cells and are partitioned for increased privacy. Dr. Haney also notes the use of television and videos, and concludes that the arrangement of treatment space is congested and inhospitable, and leads to an environment not conducive to meaningful therapy or interpersonal interaction. (<u>Id.</u> ¶ 75.) Although congestion in the AdSeg unit does pose challenges, meaningful therapy and interpersonal relationship is more dependent upon an individual's effort and desire for these things to occur, and not solely the treatment environment.

9. Dr. Haney states the no noticeable change has been made since his tour in 2007. (Haney Decl. ¶¶ 77.) One significant change since 2007 is the addition of ADA-compliant treatment modules.

10. Dr. Haney concludes that there was a "lack of meaningful treatment, a lack of groups, groups scheduled but did not meet or ones which resorted to showing movies and little else…" as well as harsh treatment, a lack of out-of-cell time, and meaningful programming. (Haney Decl. ¶¶ 79-83.) Although various individual behaviors must be managed, patients are given time out-of-cell, and opportunity to participate in weekly mental health programming. The value of this programming, while impacted by the challenges of confidential treatment space, is also dependent upon an individual's effort into the activity. The following is a list of the weekly treatment groups provided on the ASU: Social Skills, Stress Management, Health Issues Relaxation, Stage II Recovery, Communication Skills, Group Therapy, Music Appreciation, Fairy tales and Fables, Parole Planning, Anger Management, Creative Experience, Relaxation and Visualization, Suicide Prevention. Various groups may involve movies. (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-X, Y, and Z.) Regardless of the quantity and quality of group sessions, however, meaningful treatment is dependent upon the individual's effort to engage with the material.

11. Dr. Haney discusses the AdSeg management cells and anecdotal cases of different patients. (Haney Decl. ¶¶ 85-90.) Although the use of these cells with mental health patients

4

Decl. James Telander Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

presents special challenges, their use is necessary to help isolate disruptive individuals as well as provide a quiet environment for individuals who are reacting to the noise of the ASU.

12. Dr. Haney states that when he "asked staff on the unit floor" to see medical recoreds, "no one seemed to know how to do that." (Haney Decl. ¶ 92.) I was present on the tour at this time, mental health staff were actively using computer laptops on the unit to access and update inmates' medical and mental health records. The majority of "staff on the unit floor" do not regularly access these records. In addition, while some clinician may choose to hand write notes, and complete paperwork in their office, laptop computers are available and are regularly used.

13. Dr. Haney states that his record review "confirmed that Prisoner H's eight volumes of medical records had been lost, and insinuates that Dr. Ortigo knew little about Prisoner H's mental health condition. (Haney Decl. ¶ 93.) In any event, his is conclusion is flawed. CDCR ships paper records to an archival repository and scans everything into eUHR, so eight volumes of the UHR would not be expected to be at Mule Creek. Based on my information and belief, this prisoner's mental health records are scanned onto eUHR as part of our daily business practice of scanning all paper and keeping the full UHR jacket(s) in a warehouse.

14. Dr. Haney discusses staffing shortages and the implementation of the "standardized staffing model in July of 2012, stating staffing is still a problem. (Haney Decl. ¶ 95.) But Dr. Haney does not describe the gains made in filling the vacancies before and after July 2012. Since July 2012, Mule Creek has hired three full time psychologists, two social workers with a third starting April 2, 2013, which has helped to alleviate staff turnover. We have just completed interviewing psychologist interviews and will be filling nine psychologist vacancies.

15. Dr. Haney discusses the impact of staffing on weekly treatment hours for EOP patients. (Haney Decl. ¶¶ 97, 100-01, and 103.) I am increasing these hours in ways I had not yet identified at the time of the visit. Weekly treatment hours are impacted by staffing shortages. But the detrimental effects of staffing shortages are offset by identifying other ways of providing treatment, accurately recording other types of scheduled treatment, and fully documenting the

5

treatment that is occurring. Specifically, I am filling groups to capacity (13) and looking to provide additional nursing groups.

16. Dr. Haney opines that continued staffing shortages have resulted in problems with mental health supervisor attendance at quality management meetings, tracking custody wellness checks, and pre-placement screenings. (Haney Decl. ¶ 98.) However, even though there continue to be staffing shortages and turnover, these issues have been addressed.

17. Dr. Haney discusses a conversation with a CCCMS doctor-related to group treatment in the CCCMS program as well as the issue of groups on the SNY yard. (Haney Decl. ¶ 102.) The mix of EOP, CCCMS, and mainline individuals on all facilities at MCSP helps to aid mental health patients mainstream and mix with normal populations. In addition, although the doctor noted that the CCCMS program does not conduct "specialty" groups, the groups sessions that are convened focus on mental health issues. Processes are in place to minimize waiting lists. In CCCMS, where there is a waiting list, inmates are given a workbook to fill out and do group preparation. Those inmates who do the work are given first priority. In EOP, there are no waiting lists.Wating lists are "reset" each quarter so they do not age indefinitely. For inmates with an interest participating in groups, new groups are created. In addition, there are groups held on each of the yards, to address specialty areas for inmates not in mental health programs. This is relevant because these are inmate-run groups (AA, NA) so these are called yard-groups and are still recovery programs.

18. Dr. Haney discusses treatment satisfaction of patients within the EOP program. (Haney Decl. ¶¶ 103-05.) All EOP supervisors and clinicians are asked to review the groups offered on a quarterly basis. EOP care is intended for very disturbed individuals. Although patients are occasionally not satisfied with their care and the groups they attend, supervisory efforts to address quality patient care occurs on an ongoing basis. (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-Z for weekly groups offered in EOP programs.) When working with disturbed individuals, treatment can be difficult and requires effort on the part of the patient as well as the provider, and it can be very difficult for those with significant pathology to extend the

6

effort to address their problems. Treatment satisfaction should not be uniformly expected with an inmate patient population.

19. Dr. Haney asserts that "[t]here was some confusion about the purpose of MHOHU confinement." (Haney Decl. ¶ 112.) The use of the MHOHU is according to policy. Since the addition of suicide safe beds in the CTC in the last year, the MHOHU has been used significantly less than in past years. Although MHOHU can still be used as alternative housing for a suicidal inmate, policy mandates MHOHU only be used when crisis beds are full. It is also used as a space for evaluation, to give us additional time to evaluate an inmate who needs clinical focus but doesn't need one-on-one attention. When this practice is employed, notices for suicide watch are posted. The MHOHU is most frequently used, not for those in need of a higher level of care or for those who are suicidal, but for those who need additional evaluation time, and to enhance the safety of those inmates who don't need a MHCB or a higher level of care. So, instead of sending these individuals to back to their daily living unit, or having them occupy a high-cost bed, they are placed in the MHOHU for additional evaluation or observation.

20. Dr. Haney states that, according to what he was told, treatment in the CTC consists of meeting with the patient in IDTT. (Haney Decl. ¶ 114.) However, treatment for patients in MHCB also consists of evaluations, individual assessments and treatment, recreation therapy, and other forms of treatment outside of the IDTT.

21. Dr. Haney asserts that the suicide mentor program had been proposed in August 2010, and implies that because of its lack of implementation and staffing shortages, patients with suicidal ideations are being ignored. (Haney Decl. ¶¶ 116-18.) I became aware of the suicide mentor program at Mule Creek with the corrective action plan as a result of the noted suicide in 2012. This program had apparently been discussed with a previous administration, but not initiated. All suicidal behavior is taken seriously by all staff at MCSP. Training is delivered yearly to all staff. When a suicidal individual is discovered, staff is trained to stay with the individual and make an emergency referral to mental health and the TTA.

7

Decl. James Telander Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

22. Dr. Haney discusses how the SRE is used in the assessment and referral of individuals to higher and lower levels of care. (Haney Decl. ¶¶ 119-21.) He draws the conclusion from the notes of one clinician that inadequate suicide risk assessment is occurring. (Id.) But clinicians have varying degrees of expertise on which they draw to make the best assessment of risk to safely refer patients to higher and lower levels of care. CDCR Mental Health Crisis Bed clinicians adhere to the suicide prevention policy and procedures. They start with the SRE and then bring in whatever other professional training and experience they have.

23. Despite the challenges of providing mental health treatment inside a prison, in the majority of cases, MCSP provides timely and adequate care. MCSP can always improve, and we are continuing to work on improvements, but ideal conditions are not required; rather MCSP is required to provide for the basic mental health needs of its inmates. And MCSP is meeting that requirement.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Ione, California on March 22, 2013.

JAMES TELANDER, PSY.D.
*(original signature retained by attorney)*

8

Decl. James Telander Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)