1   KAMALA D. HARRIS
    Attorney General of California
2   JONATHAN L. WOLFF, State Bar No. 193479
    Senior Assistant Attorney General
3   JAY C. RUSSELL, State Bar No. 122626
    Supervising Deputy Attorney General
4   DEBBIE VOROUS, State Bar No. 166884
    PATRICK R. MCKINNEY, State Bar No. 215228
5   WILLIAM DOWNER, State Bar No. 257644
    Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-3035
     Fax:  (415) 703-5843
8    E-mail:  Patrick.McKinney@doj.ca.gov

9   *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14  | | |
    |---|---|
    | **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
    | | |
    | Plaintiffs, | **REPLY DECLARATION OF JEREMY COLLEY IN SUPPORT OF DEFENDANTS'MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |
    | v. | |
    | **EDMUND G. BROWN JR., et al.,** | |
    | Defendants. | |

23          I, Jeremy Colley, M.D., declare as follows:

24          1.   I am employed by the Department of Corrections and Rehabilitation as the Chief

25  Psychiatrist at Mule Creek State Prison (MCSP),and submit this declaration in support of the

26  State's reply to Plaintiffs' opposition to the Motion to Terminate under the Prison Litigation

27  Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil

28
                                    1

Procedure 60(b)(5). I am board-certified in Psychiatry and board-certified in Forensic Psychiatry. I also have served and currently serve as a lecturer for the Program in Psychiatry and the Law at the University of California, Davis, School of Medicine, since July 1, 2009. I was the Associate Director for New York University School of Medicine, Bellevue Hospital Center, Division of Forensic Psychiatry, From January 1, 2009, to May 4, 2009. Prior to that I was an Assistant Clinical Professor, Department of Psychiatry, at the New York University School of Medicine from July 1, 2007, to May 4, 2009. I worked with inmates at Rikers Island in the Assisted Outpatient Program as an Attending Psychiatrist from July 1, 2007, to May 4, 2009. I began my employment with the Department of Corrections and Rehabilitation on June 17, 2009, as a Staff Psychiatrist at CSP-Sacramento.

2.    In my capacity as Chief Psychiatrist at MCSP, I have reviewed the declaration filed by Dr. Craig Haney dated March 11, 2013, regarding mental health services provided to specific inmates.

3.    Terms I will use in this declaration include Mental Health Crisis Bed (MHCB), Intermediate Care Facility (ICF), Department of State Hospitals (DSH), Mental Health Outpatient Housing Unit (MHOHU), Correctional Clinical Case Management System level of care (CCCMS), Enhanced Outpatient level of care (EOP), Correctional Treatment Center (CTC), Administrative Segregation Unit (AdSeg or ASU), Interdisciplinary Treatment Team (IDTT), Department of Justice (DOJ), Psychiatric Services Unit (PSU), Rules Violation Report (RVR), Special Needs Yard (SNY), and Suicide Risk Evaluation (SRE).

4.    Dr. Haney alleges that Prisoner A's mental health deteriorated over several months while waiting to be transferred to an appropriate EOP level of care within CDCR. (Haney Decl. ¶¶ 86-87.) Dr. Haney further states that the inmate was placed in a management cell within the AdSeg unit and remained there without proper clinical interventions until mid-January 2013, when an IDTT note indicated he was floridly psychotic. (Id.) Dr. Haney is not fully aware of all the events and circumstances that have occurred with regards to Prisoner A. First, Prisoner A was properly in AdSeg because he received a Rules Violation Report for threatening staff in October

2

2012.  He was referred to the Triage and Treatment Area at Mule Creek on October 15, 2012, for being hostile and aggressive. On October 24, 2012, Mule Creek served Prisoner A notification that he was being taken in front of an administrative law judge because he would not consent to take psychiatric medications for Axis I bipolar disorder. These facts are documented in Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-A, page 2, which is a petition for involuntary medication that was filed on October 24, 2012.  Because Prisoner A was intermittently compliant with some medications, this petition was filed on a non-emergent basis within the meaning of section 2602, subdivision (c), of the California Penal Code, alleging he was a danger to others and gravely disabled.  At a hearing on November 6, 2012, the administrative law judge denied the petition.  Prisoner A continued to refuse psychiatric medication, as shown in Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-A at page 21, where he received treatment referrals for medication referrals. Nonetheless he was followed regularly by clinicians assigned to monitor him in AdSeg as shown in Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-A the attachment, except when he was too disruptive to accept a visit or refused to come to the therapeutic module to see the clinician.  (<u>See</u> Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-A, pp. 19-21.) Prisoner A never went to a DSH facility because he refused to get on the van.  Ultimately he did arrive at CSP-Corcoran, and that institution again started Penal Code section 2602 proceedings on March 14, 2013, with a hearing scheduled for April 3, 2013. (See Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-BB.)

5.    Dr. Haney alleges that Prisoner B told him that he had been placed in AdSeg at Mule Creek for his own safety after having been attacked by other inmates; that psychiatric technicians rarely checked on him; and that Prisoner B's records show that he was discharged from DSH to the MHOHU for one day, and then to AdSeg.  These assertions are incorrect for the following reasons.  (Haney Decl. ¶¶ 80, 109.) Prisoner B is serving a life sentence for child molestation. Although lacking an Axis I diagnosis, he threatened suicide immediately upon getting off the van transporting him from DHS.  (<u>See</u> Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-B, Interdisciplinary Progress Note 7230, October 19, 2012.)  There was no injury, no effort to

3

conceal, no plan.  (Id.)  Prisoner B did not articulate any depressed mood, anhedonia, excessive guilt, worthlessness, or reasons he felt he deserved to die.  He did not complain of panic or anxiety.  (Id.)  He had a further and greater preoccupation and interest in advocating for concerns about his safety upon arrival at MCSP.  Dr. Haney stated that Prisoner B had his medication of 20 years "taken away" from him.  (Haney Decl. ¶ 109.) But, as documented in my progress note from October 19, 2012, when I met and spoke with Prisoner B, he exhibited no signs or symptoms of an Axis I mental illness.  (See Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-C.)  Since discontinuing involuntary medication, Prisoner B has remained in AdSeg for safety concerns.  He has not required MHCB or MHOHU placement since October 19, 2012.  He was seen four days after he was released from the MHOHU on October 19, 2012, in a confidential setting with his psychiatrist, not two months later in an IDTT.  His treatment plan meets basic mental health needs, despite issues.  Addressing paragraph 80 of Dr. Haney's declaration regarding the frequency of visits to prisoners in AdSeg, page 6 of Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-C indicates that clinicians visited Prisoner B on December 17, 18, 19, 21, 22, and 23.  Again, he is in AdSeg based on his committing offense and concerns for his safety—the same concerns he himself expressed the day he stepped off the van from DSH.  When Prisoner B learned that he would be transferred to an institution in Southern California, the sent a letter to the Warden thanking him for housing him in ASU and keeping him safe.  (See Vorous Decl. Supp. Reply Mot.Terminate, Ex. 6-D.)

6.    Dr. Haney alleges that Prisoner D had complained that clinician Simpson had been absent for three weeks and that no groups had been offered.  (Haney Decl. ¶ 82.)  Further, Prisoner D complained that he did not want to attend the groups because the movies were recreational, not educational, and he'd seen them all.  The facts reported by Dr. Haney are explained as follows.  On page two of the attached Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-E, there is a list of Prisoner D's clinical contacts and programming with names of all clinicians. That page contains 63 entries and does in fact show that on seven occasions, a provider was unavailable, including the provider for the stress management class for the three-week period

1  directly prior to Dr. Haney's visit.  The same log shows that Prisoner D had a status of "refused-
2  no show" 13 times on the same list.  (<u>Id.</u>)  This prisoner was in AdSeg because he was out to court
3  from North Kern State Prison and at Mule Creek on a temporary basis for superior court
4  proceedings in Amador County.  Prisoner D's treatment plan and housing assignment meet his
5  mental health needs.
6          7.    Dr. Haney alleges that Prisoner D also complained that he was not getting 10 hours
7  per week of therapeutic activity; that in the prior week he had not been out of his cell for more
8  than four hours; and that when he did attend groups, he was required to watch regular movies, not
9  educational movies.  (Haney Decl. ¶ 82.)  The facts reported by Dr. Haney are explained as
10  follows.   Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-F**,** attached**,** shows the groups
11  offered to Prisoner D. Looking at a typical week (January 14, 2013) as found on pages two
12  through four of this exhibit, I located five groups, 120 minutes each, offered and attended by
13  Prisoner D (ASU Stress Management on January 14, ASU Epict I 02 on January 15, ASU
14  Relaxation on January 16, ASU Creative Exp on January 17, and ASU Epict 05 on January 18).
15  For other weeks, the log indicates that providers that may have been ill or absent, the prisoner
16  refused to exit his cell, and the institution canceled groups once due to heavy fog that threatened
17  institutional security.  Most of the time, however, Prisoner D completed his group assignments.
18  His treatment plan and housing assignment meets his mental health needs.
19          8.    Dr. Haney alleges a lack of access to meaningful treatment and activity in the C-13
20  overflow AdSeg unit.  (Haney Decl. ¶¶ 83-84.)  Dr. Haney is incorrect for the following reasons.
21  According to Prisoner E's and Prisoner F's programming log, these prisoners are at the
22  Correctional Clinical Case Management System (CCCMS) level of care.  (Vorous Decl. Supp.
23  Reply Mot. Terminate, Ex. 6-G.)  CCCMS is CDCR's lowest level of mental health care, and
24  designed to allow inmates to meet their own needs to the extent they are able to do so.  Prisoner E
25  was seen in two groups on January 4, 2013, but not scheduled to be seen again until January 25,
26  2013, in accordance with MHSDS program guidelines.  (Id.)  Prisoner E's treatment plan and
27  housing assignment meet his basic mental health needs.
28

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9.    Dr. Haney alleges that Prisoner G from C-12 was visibly distraught from being in AdSeg, and that his needs were being ignored by staff.  (Haney Decl. ¶¶ 88-90.)  Dr. Haney cites a January 2, 2013, mental health note in which the prisoner states that he is "still feeling depressed but does not want to go to the OHU because it is too cold." (Id. ¶ 88.)  Dr. Haney is incorrect for the following reasons.  At the outset, my initial contact with Prisoner G informed me that he has had varying psychiatric diagnoses in the past; according to his UHR, he carries a developmental disability (DD2) and hearing impaired (DNH) designations; he has an extensive history of drug use including paint, glue and amphetamines; and he often resorts to aggression towards himself or others as a primitive coping mechanism, consistent with his 7388 diagnosis of Borderline Personality Disorder. (CDCR 7230, December 28, 2012.)  This is relevant here because Dr. Haney's makes note of Prisoner G's placement in the MHOHU at MCSP.  (Haney Decl. ¶ 89.)  Dr. Haney's narrative regarding the MHOHU placement from January 24, 2013, to January 28, 2013, is inaccurate, as shown by the progress notes for Prisoner G, the SRE 7447 from clinician Dr. Fang on January 23, 2013, CDCR Form 7230 from Dr. Cordosi on January 23, 2013 and the RVR evaluation by Dr. Scott on February 6, 2013, that set forth the Prisoner G's behavior and the circumstances of his placement in MHOHU at the time.  (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-H.)  In summary, on January 13, 2013, Prisoner G was kicking on his door in ASU for several hours, demanding immediate transfer to the Psychiatric Services Unit or to Department of State Hospitals, where he wanted to stay until he paroled.  He was offered movement to a confidential setting for further clinical intervention and refused.  Both custody and staff members spoke with him cell side at length in an attempt to help him cope, but he persisted to kick his door, threatening to continue, and to kill himself, if his demands were not met. (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-H, pages 7, 9.) He then attempted to tear a sheet, and was ordered by ASU staff to stop, or face possible cell extraction. (Id.) He persisted, despite continued offers for removal from his cell to a therapeutic setting, and at that point OC pepper spray was used. OC was not used in the MHOHU on January 28, 2013, as Dr. Haney reports.  Prisoner G was given a mattress and blanket in MHOHU and allowed to stay over

6

the weekend at his request for a "break" from C-12, though he showed no signs of an active episode of an Axis I disorder while in MHOHU.  In summary with regards to Prisoner G, given his diagnosis of Borderline Personality Disorder, he needs limits in the form of a consistent treatment frame, rather than treatment solely with medication or the Department of State Hospitals for no reason other than a change in environment.  Accordingly, his clinical records reflect that there was no benefit to either continued involuntary medication (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-I), a trip to MHCB, or his desired trip to a DHS facility, all of which would have made his symptoms worse by catering to his secondary gain syndrome.  His pathology is better managed by longer term day hospitalization—such as EOP.  Notably, he has not been referred to the MHOHU or MHCB since January 28, 2013.  He was released to A-Facility at Mule Creek on March 1, 2013, but had to be returned to AdSeg on March 10, 2013, citing enemy concerns.  His DD2 status was revised to NDD on December 19, 2012.

10.  Dr. Haney alleges that unnamed staff on the unit floor were unable to show him how to access mental health records, and did not know where the computers were.  And once a laptop was located, the staff member did not know how to log on.  (Id. ¶ 92.)  As to mental status, Dr. Haney notes that Prisoner H was found by an IDTT to have shown deterioration in function along with "grave disability," yet was placed in an AdSeg "management cell" where he remained for 256 days.  (Id. ¶¶ 94.)  Dr. Haney is incorrect for the following reasons.  Dr. Haney's declaration is not clear about the "floor staff" he was conversing with concerning operation of the laptop computers.  Paper volumes of medical files have been moved off site to central storage.  Medical records are now scanned and accessed via eUHR.  All AdSeg clinical staff who document in the eUHR are trained and routinely use the laptops to access medical records in AdSeg.  Custody staff would not be trained in their use.  Prisoner H's level of care was changed back to EOP by IDTT on December 26, 2012. (Vorous Decl. Supp. Reply Mot. to Terminate, Ex. 6-J, page 1.)  A Penal Code section 2602 order was sought and granted on January 15, 2013, requiring him to take psychiatric medications. Prisoner H's current treatment plan calls for his referral to DSH ICF if he does not respond to medication sufficiently.

11.  Dr. Haney alleges that Prisoner I complained that it was not uncommon for groups to be canceled, or to be asked to watch a film and then be told "think about it."  (Haney Decl. ¶ 103.) I disagree with this allegation.  Prisoner I, along with Prisoners J and K, were in Building 6 on B Yard (EOP-Level III).  Prisoner I's programming log shows a roughly eighty-percent entry rate of "refused-no show" for his scheduled group, entitled "Anger Mgmt 01."  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-K, L, and M.)  Prisoner I appears to pick and choose which groups he attends, as the log shows he commendably completed his work/school groups but chose not to attend many others that he was offered.  (Id.)  Prisoner I's treatment plan and housing assignment meets basic mental health needs.

12.  Dr. Haney alleges that Prisoner J self-reports having bipolar disorder and told Dr. Haney that he has been housed in AdSeg for four months, that he is on a waiting list for a Level II EOP SNY bed, and that he likes to go to groups but that they are frequently cancelled.  (Haney Decl. ¶ 104.)  Prisoner J's remark that "groups often get canceled" is not accurate in view of his programming log, which indicates that he had 123 completed appointments; six were not conducted due to inclement weather at the institution, which prevented inmate movement; he elected not to show up for 36 group sessions; and the scheduled provider(s) were unavailable 27 times between July 2012 and February 2013.  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-L, pp. 31-34.)  Prisoner J's treatment plan and housing assignment meet his basic mental health needs.

13.  Dr. Haney alleges that Prisoner K, an EOP inmate, seemed anxious and unstable, and complained about lack of treatment; Dr. Haney reviewed mental health record and identified a history of suicidal gestures; and Dr. Haney noted that the prisoner had been referred to ICF level of care on January 10, 2013, but was still at Mule Creek as of March 1, 2013.  (Haney Decl. ¶ 105.)  I disagree with Dr. Haney for the following reasons.  Prisoner K was subject to a Penal Code section 2602 involuntary medication order at the time he was interviewed by Dr. Haney, and scheduled for a renewal hearing on February 26, 2013.  He could not be transferred on his ICF referral until his court hearing was conducted at the prison where his treating psychiatrist was

8

available.  Prisoner K was treated at Wasco State Prison in August 2011 for lacerating his wrists and has had emotional and behavioral disturbances since age three.  However, when he was asked on January 16, 2013, if he had a serious mental illness, he replied, "no, I lied about it to get medication because I was depressed about having to do a lot of time. When I was in Ventura County, I didn't take any medications."  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-N, CDCR Form 7368, p. 5.) Prisoner K was transferred to a DHS facility on March 2, 2013, after his Penal Code section 2602 hearing.  He had previously been to a DHS facility from March 13, 2012, to May 24, 2012, and had been discharged without ICF referral because of his lack of participation in the program.  Prisoner K's engagement with the EOP program at MCSP has been marginal at best.  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-K, L, and M.)  Prisoner K's treatment plan and housing assignment meet his basic mental health needs.

14.  Dr. Haney alleges that Prisoner L appeared both frail and psychotic, and that the prisoner self-reported that he had been moved back and forth between the CCCMS and EOP levels of care multiple times.  (Haney Decl. ¶ 110.)  I disagree with Dr. Haney's description of Prisoner L.  Prisoner L is six feet tall and his current weight is 176 pounds.  This results in a body mass index of 23, which is in the normal and healthy range.  Prisoner L has been offered psychiatric medications but has not consented to take them.  Currently he is not engaging in behavior that falls within the legal definition of making him a danger to himself, others, or indicating that he is gravely disabled.  (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-O.) He does have an Axis I diagnosis and he is being followed clinically.  He transferred to DHS for more intensive treatment on February 28, 2013.  Prisoner L's treatment plan and housing assignment at MCSP met his basic mental health needs.

15.  Regarding Prisoner M, who committed suicide on June 7, 2012, at Mule Creek, Dr. Haney states that, although a Quality Improvement Plan for Suicide Risk Evaluations was signed off on September 7, 2012, (Haney Decl. ¶ 116.), MCSP did not begin any Suicide Risk Evaluator Mentor Program until January 30, 2013.  (Id. ¶ 117.)  He also expressed discomfort at language seen on some progress notes which referenced a base rate of 15-20 suicides per 100,000 and use

9

of Bayesian analysis to help assist with suicide risk.  (Id. ¶ 119.)  I will respond to Dr. Haney's concerns in this area as follows.  The SRE Mentoring Program is underway; all staff will be trained on the SRE 7447 by the end of March 2013, with all MHCB and EOP staff being mentored by the end of April 2013, and all staff being mentored by the end of June 2013.

o    Regarding the use of base rates and Bayes' Theorem for suicide risk evaluation, Dr. Haney's analysis reveals his lack of understanding and experience with expert caliber risk assessment techniques in forensic psychiatry.  Dr. Haney questions whether the clinician who uses this method has any training in suicide risk assessment.  I am the clinician who uses this method, and I am certified by the American Board of Psychiatry and Neurology in both Adult and Forensic Psychiatry, and have over ten years of clinical experience evaluating suicide risk not only in CDCR, but also in the  Comprehensive Psychiatric Emergency Program at Bellevue Hospital in New York City and as the former Section Chief of  the Forensic Psychiatry Service for the New York City Police Department and New York City Department of Corrections, located at Bellevue Hospital and New York University Medical Center.  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-P.)

o    Base rates, Bayesian analysis, Receiver-Operator Characteristics (ROC) of risk assessments instruments and Number Needed to Treat/Detain analyses are expert tools used in clinical decision making regarding management of violence and suicide risk related to mental illness, as described in the American Psychiatric Association's *Textbook of Forensic Psychiatry*, Chapter 22, "Understanding Prediction Assessments."  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-Q.)

o    Explaining these methods in detail is beyond the scope of this rebuttal, but please see attached lecture slides prepared and delivered by the clinician whose competence Dr. Haney questions, as a faculty member at NYU and a lecturer in the UC Davis program in Psychiatry and the Law.  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-R.)

o    In very brief summary, the base rate for suicide represents a "pre-test probability," which is then adjusted based on consideration of myriad chronic and acute risk factors as part of the

10

suicide risk evaluation—the test, in this situation - to yield a "post-test probability," that is, the inmate-patient's suicide risk as determined at the time of, and as a result of, the evaluation.  As this process makes clear, the use of this type of Bayesian analysis is only one of many elements of the expert suicide risk assessment, though Dr. Haney focuses on only a single sentence of documentation, and portrays it as replacing the SRE 7447 and subverting CDCR suicide reduction policy.  This method is used in conjunction with the SRE 7447 and the American Psychiatric Association's 2003 guidelines on the assessment and management of suicidal behaviors, which are also documented in the notes to which Dr. Haney draws attention, but fails to mention.

    o    The base rate that the clinician quotes—15-20 suicides per 100,000 inmates in CDCR—is based on a ten year average from 2000 to 2010 published by the United States Department of Justice (DOJ), entitled "Mortality in Local Jails and State Prisons," released in December 2012. (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-S.)  Reports of base rates vary depending on the method of calculation (hence the range), but the clinician remains confused regarding Dr. Haney's insistence that the CDCR suicide rate is dangerously above the national average.  Based on the DOJ report, CDCR's rate of 20 suicides per 100,000 inmates per year ranks 19 out of the 50 states, and is within one standard deviation (9)of the average of 16 ( thus range 16 +/-9, or 7 to 25), square in the middle of the pack.  (See Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-T.)

    o    Dr. Haney completely misconstrues the clinical utility of using base rates and Bayes' Theorem, when he suggests that this argument leads to the conclusion that "[t]aken on its face, it appears to be a categorical justification for *never* initiating higher levels of MHCB/DMH care in response to an inmate's expression of suicidality."  This is ridiculous, both abstractly and in regards to Prisoners B and G, both of whom have received the highest levels of care in CDCR, including MHCB and DSH.  Moreover, the clinician using this method as part of a comprehensive suicide risk evaluation has admitted hundreds of patients to MHCB and DSH using this method.

    o    Suicide risk evaluation occurs in the contexts of particular clinical decisions.  In the cases of Prisoners B and G, on whom Dr. Haney focuses, these decisions concerned their admission and discharge from MHCB and MHOHU.  Suicide risk evaluation in this context focuses on the

11

acute, malleable risk factors for suicide, comparing how a less restrictive (for example, EOP) versus a more restrictive clinical setting (MHCB) affects these risk factors; and balancing the relative risk reduction with the relative restrictions of each.  Dr. Haney and the Special Master take a blunt, elementary approach, in which all problems are solved by hospitalization, as if admission to a hospital is a benign panacea, with no downsides.  This approach is simpleminded and misguided.  The comprehensive suicide risk evaluation using evidence-based, mathematically rigorous tools to augment and enhance—not replace—the utility of clinical assessment.  The SRE 7447 is neither "flawed" nor "dangerous," as Dr. Haney states, but represents expert-caliber risk assessment in forensic psychiatry.

Mule Creek responds to inmates' expressions of suicidality not only seriously but professionally, using sophisticated methods of analysis and intervention.

16.  Dr. Haney expresses concerns about Prisoner N that are similar to those he expressed about Prisoner M—that some staff do not take prisoner expressions of suicidality seriously. (Haney Decl. ¶ 118.)  His example here is taken from Building 7 in B Facility, which houses Level III EOP SNY prisoners.  There, Dr. Haney interviewed Prisoner N, who stated that he had repeatedly told staff  that he "thinks about killing himself all the time." (Id.)  The prisoner self-reports that he does not feel comfortable in most places in the prison except in his cell.  He also reports being depressed, suicidal, and thinking about ways to kill himself. (Id.)  Dr. Haney suggests that staff is ignoring Prisoner N's overt suicidality.  I disagree with Dr. Haney for the following reasons.  SRE 7447s have been completed annually for Prisoner N, consistent with program guide requirements, the most recent of which was completed August 28, 2012, which indicated moderate chronic suicide risk and low acute suicide risk.  Prisoner N is serving a life term and reports chronic depression.  (Vorous Decl. Supp. Reply Mot. Terminate, Ex. 6-U.)  A progress note dated November 15, 2012, suggests that Prisoner N elected to discontinue medication he was taking for depression as an "immature act of rebellion" due to a narcissistic personality. (Id., p. 4.)  He has been screened for DSH ICF via the 7388-B at his IDTT meetings and has not met criteria.  He has not injured himself.  Nor has he required MHCB nor MHOHU placement since his arrival at MCSP in October 2010, and has been retained in the EOP program

because of his ongoing struggles with depression and suicidal thoughts.  This level of care allows close monitoring just short of an inpatient admission.

17.  Despite the challenges of providing mental health treatment inside a prison, in the majority of cases MCSP provides timely and adequate care.  MCSP can always improve, and we are continuing to work on improvements.  But ideal conditions are not required; rather constitutionally *minimally adequate* conditions are.  Mule Creek certainly provides those.  Ours receive the basic mental health care needed, regardless of the issues mentioned in plaintiffs' experts' declarations.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.  Executed in Ione, California on March __, 2013.

_____
JEREMY COLLEY M.D.
*(original signature retained by attorney)*

13

1    because of his ongoing struggles with depression and suicidal thoughts. This level of care allows

2    close monitoring just short of an inpatient admission.

3         17. Despite the challenges of providing mental health treatment inside a prison, in the

4    majority of cases MCSP provides timely and adequate care. MCSP can always improve, and we

5    are continuing to work on improvements. But ideal conditions are not required; rather

6    constitutionally *minimally adequate* conditions are. Mule Creek certainly provides those. Ours

7    receive the basic mental health care needed, regardless of the issues mentioned in plaintiffs'

8    experts' declarations.

9         I declare under penalty of perjury under the laws of the State of California and the United

10   States of America that the foregoing is true and correct. Executed in Ione, California on March

11   21, 2013.

12

13                                        JEREMY COLLEY M.D.
                                          *(original signature retained by attorney)*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          13