KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                           Plaintiffs,<br><br>       v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                           Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**REPLY DECLARATION OF STEVE J. MARTIN IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Steve J. Martin, declare as follows:

1. I am a corrections consultant, with over forty years of experience in the field of corrections as an officer, administrator, court expert, and court monitor. I have been qualified as an expert in the field of corrections and testified as such on more than forty occasions. I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate

1

under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

2. On January 4, 2013 I submitted an expert report on behalf of the defendants in above referenced matter. In my report I examined use of force in California prisons with respect to inmates with mental illness and I concluded that that the California Department of Corrections and Rehabilitation (CDCR) has in place heightened system wide safeguards to ensure that inmates with mental illness are not subjected to unnecessary and excessive use of force. Moreover, in the typical application of staff use of force in the CDCR, tactics are employed in a good faith effort to control, neutralize, or immobilize inmates who are actively engaged in threats of harm to each other, staff, or the good order of the facility. I also examined whether the rule violation hearing process reasonably accommodates inmates' mental conditions and concluded that CDCR has in place a well-defined, valid, and predictable process to reasonably accommodate inmates whose mental status requires/merits consideration when adjudicating rule violation offenses.

3. I have reviewed the declaration submitted by Plaintiffs' expert Eldon Vail in support of Plaintiffs' Opposition to Defendants' Motion to Terminate. I have also reviewed many of the documents and materials that were produced by the State and provided to Mr. Vail, including hundreds of institutional executive review committee packets, including use of force reports and hundreds of rule violation reports, including mental health assessments.

4. My review of these materials has strengthened and affirmed the conclusions I set forth in my expert report. Further, based on my review of Mr. Vail's declaration and the documents submitted for his review, it is my opinion that the conclusions proffered by Mr. Vail are not supported by a thorough evidentiary record and display a lack of reasoned and substantive analysis.

**CDCR does not systemically use excessive and unnecessary force on mentally ill inmates**

5. Throughout his declaration, Mr. Vail appears to conflate isolated, sporadic instances of excessive use of force with a systemic pattern or practice. As Mr. Vail acknowledges, I have reviewed more department documents and materials, and inspected more institutions than he did.

2

Case 2:90-cv-00520-KJM-SCR   Document 4483   Filed 03/22/13   Page 3 of 8

Further I have reviewed a significant portion of the use of force materials produced by the State which were provided to Mr. Vail. These materials include hundreds of use of force reports and review packets from San Quentin State Prison, Kern Valley State Prison, California State Prison Corcoran, and California State Prison Los Angeles. I received these materials on Wednesday, March 13, and reviewed over 175 of these reports. Throughout my review, I have found isolated instances which could possibly be considered excessive use of force, but have found no systemic pattern or practice of excessive and unnecessary use of force against mentally ill inmates

6. Mr. Vail declares that CDCR uses excessive force that disproportionately affects mentally ill inmates. The only basis for this statement is a rudimentary comparison of the percentage of use of force incidents involving mentally ill inmates against the percentage mentally ill inmates comprising CDCR's population.

7. This analysis fails to take into account a number of real world considerations that affect the number of use of force incidents on mentally ill inmates. For instance, officers are often required to intervene in instances of self harm by mentally ill inmates. Use of force in these incidents is necessary to prevent the loss of life or serious bodily injury. Additionally, in my experience a small number of mentally ill inmates who pose significant custody challenges can drive up the number of use of force instances. And as Mr. Vail acknowledges on page 33 of his declaration, mentally ill inmates often have a difficult time coping with prison environments which can generate behaviors that can, and often do, escalate to a level in which staff use of force is necessary to neutralize violent or threatening behaviors.

8. Further, this issue is not unique to CDCR. Throughout my experience in correctional settings, I have consistently observed an unfortunate, but unavoidable, overrepresentation of mentally ill inmates in use of force incidents. Based on my thorough review of use of force documents, videos, and materials, there is no evidence to support Mr. Vail's inference that the overrepresentation of mentally ill inmates in use of force incidents is caused by a systemic deliberate indifference to the needs of mentally ill inmates, or that it is somehow different from other prison systems in the United States.

3

9. Mr. Vail also critiques CDCR's use of force policy as allowing officers broad discretion by not requiring sequential use of force options, or a "continuum of force." Mr. Vail's critique reflects a professional preference, which I disfavor. I have found that continuums of force prescribe overly mechanical and rigid responses, which can cause hesitancy and confusion for correctional officers and lead to harm to staff and inmates. I do not consider a mechanical or sequential process for use of force to be best practices, and do not find them necessary or helpful in limiting excessive or unnecessary use of force.

10. Mr. Vail also critiques the amount of weaponry carried and available to CDCR officers. This critique represents also professional preference and is not *ipso facto*, evidence of a constitutional violation. I have recommended that CDCR put into place a number of policies and procedures to better ensure that the weapons such as batons and OC spray are consistently deployed in an appropriate and sound tactical manner.

    a.    Use of the Expandable Baton

11. Mr. Vail criticizes the frequent use of the expandable baton for non-defensive purposes, but fails to provide a thorough context for its use. Mr. Vail acknowledges that expandable batons are used to prevent and stop inmate-on-inmate attacks, but claims these attacks "could be controlled by other means." But Mr. Vail does not identify these other means. Furthermore, based on my review, the expandable baton is typically used to break up inmate fights only after the inmates have refused to comply with verbal commands to stop and the application of OC spray has proven ineffective. While I continue to recommend that CDCR include additional guidance on the use of the expandable baton, it is my considered opinion that the good faith use of an expandable baton in a tactically appropriate manner to stop an inmate-on-inmate attack does not constitute excessive and unnecessary force.

    b.    Use of OC Spray

12. Mr. Vail's conclusion that the use of OC spray by CDCR staff results in systemically excessive use of force is bereft of any solid evidentiary basis. For instance, Mr. Vail concludes from written reports that excessive amounts of OC spray are used. But Mr. Vail does not provide any basis for this conclusion, nor does he describe how he can tell from these written reports that

4

the amount of the OC spray is excessive. I have reviewed in excess of 500 use of force reports, hundreds of which include written reports describing applications of OC spray and in most instances it is impossible to conclusively determine what amount of OC spray was used or that it was an excessive amount..

13. CDCR staff certainly exercise a tactical preference for OC spray as opposed to impact weapons or hands on contacts, but this does not equate to a Constitutional violation. Mr. Vail also conflates isolated, sporadic instances of excessive use of OC spray with a systemic pattern or practice. While I continue to recommend that CDCR provide further guidance and oversight for the use of OC spray to better ensure its use in a sound tactical manner, there is no evidence to support a conclusion that CDCR's use of OC spray is systemically excessive and unnecessary.

    c. Documentation of consultation with medical staff before controlled use of force incidents

14. Mr. Vail asserts that he "encountered use of force packets which failed to document that a clinical intervention occurred" in violation of CDCR policy. (Vail Decl. ¶62.) But Mr. Vail does not identify these use of force packets, or how many he believes lacked such documentation. Moreover, simple lack of documentation is not substantive evidence that these consultations are not occurring. In my review of use of force packets, I found evidence that custody staff consult with clinicians and more importantly, provided extended time intervals to "wait out" the inmate and, thus, avoid the use of force. Mr. Vail also critiques use of force videos for not documenting consultation and waiting out period, but as I have explained above, there is no basis to support a conclusion that as matter of pattern or practice, staff do not consult with clinicians and provide adequate waiting period before using force.

15. Mr. Vail also describes a use of force video from Corcoran where a custody officer overrides a medical recommendation that OC spray should not be used. (Vail Decl. ¶64.) I have reviewed this incident, and while I too question the decision to override the medical recommendation and use of force, this was only one of three incidents in the almost 500 incidents that I reviewed where I determined that a medical recommendation was questionably overruled. Moreover, Mr. Vail claims to have found "numerous" other examples where medical

5

recommendations were overruled, but does not state whether there was evidence that supported the custody officer's decision to overrule. (Id. at ¶65). And even counting incidents where the overruling of medical recommendations **could possibly** have been questionable, I would not and cannot say those instances were numerous.

16. I strongly dispute Mr. Vail's use of phrase the "practice of immediate inflection of pain and punishment" to describe CDCR polices and behavior by line staff. (Vail Decl. ¶69.) In my review of hundreds of use of force records from 15 CDCR institutions, and my visits to 11 CDCR institutions including Corcoran and San Quentin, I did not find an instance where force was applied in malicious or sadistic manner to punish an inmate.

**CDCR adequately accommodates inmates' mental illness while adjudicating rule violations**

17. Mr. Vail asserts that it is "impossible to assess whether the [mental health assessment] procedure is actually working." (Vail Decl. ¶88.) Mr. Vail is incorrect. Through my review I was able to gain a systemic understanding of typical sanctions imposed for rule violations and was able to conclude that sanctions are appropriately modified in order to accommodate mentally ill inmates. For example, on the basis of a mental health assessment, hearing officers would often apply a different sanction than would be typical for a particular rule violation or apply a lesser sanction.

18. While I recommend that CDCR require hearing officers to affirmatively state whether they modified or mitigated the penalties based on the mental health assessment as a matter of best practices, my review allowed me conclude without hesitation that CDCR's hearing officers consistently accommodate inmates' mental illness and take seriously their responsibilities as adjudicators.

19. Mr. Vail also egregiously mischaracterizes my evaluation of CDCR's use of staff assistants in rule violation hearings, and I dispute Mr. Vail's assertion that "staff assistants are "essentially meaningless." (Vail Decl. ¶93) Under CDCR's regulations staff assistants are not advocates, but serve as fact finders for mentally ill inmates and play a valuable role in assisting inmates. Moreover, in the deposition transcript cited by Mr. Vail I was responding to a

6

hypothetical question concerning my professional recommendations for best practices in rule violation hearings. I did not then and do not now conclude that staff advocates for mentally ill inmates is a constitutional mandate.

20. Plaintiffs' and Mr. Vail also confuse and conflate the rule violations process with the classification process. In most correctional settings, including California, there is a clear distinction between penal decisions for inmate behavior, and preventative decisions to prevent future acts of harm or violence. Classification decisions are not punitive measures, but are objective administrative decisions to ensure the security and safety of the institution.

**Mr. Vail's purported "bare minimums" are at best professional preferences and in some instances overly restrictive policies that could lead to harm for both staff and inmates**

21. Mr. Vail's purported "bare minimums that CDCR should adopt" are at most professional preferences. (Vail Decl. ¶145.) There is not a single "requirement" in the 21 criteria that Mr. Vail identifies as bare minima that to my knowledge are constitutionally required, and in some cases are simply irresponsible policies that demonstrate a lack of real world understanding of correctional systems. For instance, Mr. Vail's recommendation for an absolute prohibition on the use of "crowd-control OC dispensers during cell extractions" would unnecessarily restrict officer tactical options and create a risk of harm to staff and inmates. The use of larger delivery systems of OC is tactically sound and advised in certain situations, for example, where inmates have barricaded themselves in a cell or are armed.

**My Discussions with the Coleman Monitors About the Site Visits**

22. There is no question that the Coleman special master's monitors were aware of the work I was doing for the State beginning in early 2012. In February 2012, I was testifying at trial with Jeffrey Metzner, one of the Coleman Special Master's monitors, in South Carolina in the case of *P.R. & K.W. v. the South Carolina Department of Corrections*. During the trip, we had dinner, and I mentioned to him that I had been retained as a consultant by the CDCR to evaluate use of force issues. I discussed with him that I was part of a consultant team that included Joel Dvoskin and Charles Scott. I told him that we would be going through a lot of prisons, and I

7

believe it was understood that we would be talking to inmates during those site visits, as is the case in any prison tour.

23. I also spoke with Dr. Raymond Patterson in Denver, Colorado, in April 2012, when we were working together on a trial. During the course of our conversation, we discussed the *Coleman* matter and the fact that our team was conducting prison site visits to evaluate the mental health system. I believe it was understood that we would be talking to inmates during those site visits, as is the case in any prison tour

**My Discussions with Plaintiffs' Counsel**

24. I also spoke with Don Specter, one of the Plaintiffs' attorneys, some time in the late summer or early fall of 2012. We discussed that I had visited California prisons for my work on the *Coleman* matter, and that I would continue to do so. Mr. Specter expressed no surprise or concern about my visits during the course of the conversation. I believe it was understood that we would be talking to inmates during those site visits, as is the case in any prison tour.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Austin, Texas on March 22, 2013.

_____
Steve J. Martin
*(original signature retained by attorney)*

CF1997CS0003
20668591.docx

8

Decl. Martin Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)