1   KAMALA D. HARRIS
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   JAY C. RUSSELL
    Supervising Deputy Attorney General
4   DEBBIE VOROUS, State Bar No. 166884
    PATRICK R. MCKINNEY, State Bar No. 215228
5   WILLIAM DOWNER, State Bar No. 257644
    Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-3035
     Fax:  (415) 703-5843
8    E-mail:  Patrick.McKinney@doj.ca.gov

9   *Attorneys for Defendants*

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE EASTERN DISTRICT OF CALIFORNIA

12                    SACRAMENTO DIVISION

13

14

15
    **RALPH COLEMAN, et al.,**                    2:90-cv-00520 LKK JFM PC
16
                                Plaintiffs,
17
         v.                                       **REPLY MEMORANDUM OF POINTS
18                                                AND AUTHORITIES IN SUPPORT OF
                                                  MOTION TO TERMINATE UNDER THE
19  **EDMUND G. BROWN, JR., et al.,**             PRISON LITIGATION REFORM ACT
                                                  [18 U.S.C. § 3626(b)] AND TO VACATE
20                              Defendants.        THE COURT'S JUDGMENT AND
                                                  ORDERS UNDER FEDERAL RULE OF
21                                                CIVIL PROCEDURE 60(b)(5)**

22                                                Date:        March 27, 2013
                                                  Time:        1:30 p.m.
23                                                Dept:        4
                                                  Judge:       The Honorable Lawrence K.
24                                                             Karlton

25                                                Action Filed:  1990

26

27

28

1

**TABLE OF CONTENTS**

2

Page

3

I.    Introduction. ....................................................................................... 1

II.   The termination motion proved that the state meets inmates' serious mental
      health needs. ....................................................................................... 3

      A.   California has implemented a comprehensive prison mental health
           care system that exceeds all constitutional requirements. ...................... 3

      B.   Additional significant accomplishments of the state's mental health
           program in 2012 & 2013. .......................................................... 6

III.  Plaintiffs misstate the burden: the PLRA places the burden on the party
      seeking to perpetuate court intrusion into state prison management. ................ 7

IV.   Plaintiffs' novel theory of systemic deliberate indifference fails. ................ 9

      A.   Plaintiffs misinterpret and misapply the deliberate-indifference
           standard. ....................................................................... 11

      B.   Compliance with the program guide is not the constitutional
           standard. ....................................................................... 12

      C.   Changed factual circumstances require the court to vacate the
           injunction. ..................................................................... 13

V.    All credible evidence proves that the state meets inmates' serious mental
      health needs. ..................................................................... 14

      A.   Plaintiffs' expert's opinions should be disregarded. ............................ 14

      B.   Plaintiffs present no evidence showing constitutional inadequacies
           in screening and identifying inmates who need mental health care. .......... 16

      C.   The state provides an appropriate continuum of services to inmates
           with serious mental illness. ..................................................... 17

           1.   The State's Inmates Are Not Languishing. .............................. 18

           2.   The State Provides Appropriate, Safe Care to Inmates in
                Mental Health Crisis. ..................................................... 18

           3.   Plaintiffs' Allegations of "Persistent Waitlists" for DSH
                Treatment Are Not Supported by Evidence. ............................. 19

           4.   San Quentin's Condemned Inmates Receive Adequate and
                Appropriate Mental Health Care. ....................................... 21

      D.   California provides appropriate care to its inmates with mental
           health care needs. ............................................................. 26

           1.   The State's Prison Mental Health Care System Is Meeting
                the Mental Health Care Needs of Mentally Ill Inmates. .............. 26

           2.   Plaintiffs' Offered No Evidence or Argument Regarding the
                State's Quality Management Program. ................................... 29

      E.   The state provides adequate treatment space and treatment across
           all custody levels. ............................................................. 29

           1.   Plaintiffs' Claims About Lack of Confidential Treatment
                Space Are False. ........................................................... 30

i

**TABLE OF CONTENTS**
(continued)

Page

2. The State's Use of Unlicensed Facilities to Provide Inpatient Care Is Appropriate. ....................................................................... 31

3. Experts on Both Sides Agree that the Use of Therapeutic Treatment Modules Is Appropriate. .............................................. 31

F. Plaintiffs failed to rebut the evidence showing that the state has an appropriate medication management system in place.............................. 32

1. Plaintiffs' "Concern" About Whether Nurses Are Knowledgeable About Side Effects Does Not Raise a Question of Systemic Deliberate Indifference. ............................ 34

2. None of Plaintiffs' Remaining "Problems" Are of Constitutional Concern or Require Continued Federal Court Oversight of Medication Management.......................................... 34

   a. Plaintiffs Fail to Raise a Constitutional Question With Respect to the Special Master's Measure of "Medication Noncompliance.".......................................... 35

   b. Plaintiffs Did Not Prove that the State's Laboratory Testing Orders Violate the Constitution. ......................... 36

   c. Plaintiffs' Claims About Abnormal Involuntary Movement Scale (AIMS) Testing Do Not Present a Constitutional Issue.............................................................. 37

   d. Plaintiffs' Unsupported Claims About Lack of Informed Consent Must Be Rejected. ............................... 37

   e. Plaintiffs' Unsupported Claims About Lack of Medication Renewals Must Be Rejected. ......................... 37

   f. The State's Efforts to Improve Its Medical Facilities Are Not Evidence of a Constitutional Deficiency............. 38

3. Plaintiffs' Failed to Rebut the Evidence that the State Maintains Accurate, Complete, and Confidential Mental Health Records. .............................................................................. 38

G. California's suicide-prevention program meets the constitutional standard. ................................................................................................... 40

   a. Defendants' Suicide Prevention Measures Far Exceed The Basic Requirements of the Constitution........ 41

      (1) Suicide Prevention and Response. ........................ 42

      (2) Suicide Reporting Procedures. ............................. 46

   b. California Successfully Prevents Hundreds of Suicide Attempts And Intervenes To Provide Crisis Care To Thousands Of Inmates Each Year...................... 47

   c. Suicide Rate Is Not the Litmus Test to Assess the Constitutionality of California's Mental Health Program. ........................................................................ 49

ii

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

d.   The Suicide-Rate Comparisons in the Special
Master's Reports Are Misleading, and Overlook

4

Other Causal Factors. ....................................................... 50

5

3.   The Special Master's 2011 and 2012 Suicide Reports Are
Not Evidence Of Systemic Deliberate Indifference To A

6

Risk of Suicide. ........................................................................ 51

7

a.   The Special Master's 2011 and 2012 Suicide
Reports Concede That The Vast Majority Of
Suicides Were Not Foreseeable And Therefore

8

Defendants Cannot Have Been Deliberately
Indifferent To A Risk Of Suicide ..................................... 52

9

b.   The Special Master's 2011 and 2012 Suicide
Reports Do Not Demonstrate Deliberate

10

Indifference. ........................................................................ 53

11

(1)   Failure to Refer Inmates to Higher Levels of
Care ................................................................. 53

12

(2)   Completion of Suicide Risk Evaluations .............. 56

13

(3)   Purported Emergency Response Errors ................ 58

(4)   Problems with 30-Minute Welfare Checks ........... 59

14

(5)   In Instances Where the Department Finds a
Problem with its Suicide Prevent Process, it

15

Diligently Implements Corrective Action. ............ 60

16

a.   Defendants have not ignored the Special Master's
Recommendations. ............................................................. 62

17

c.   Plaintiffs' Remaining Arguments Also Do Not

18

Establish an Ongoing Constitutional Violation ................. 64

19

H.   Plaintiffs failed to demonstrate that the care provided to inmates
housed in segregation violates the eighth amendment. ............................. 64

20

1.   The State Appropriately Treats Inmates Housed in
Administrative Segregation for Non-Disciplinary Reasons. ......... 67

21

2.   The Eighth Amendment Does Not Recognize a Particular

22

Length of Stay in Segregated Units. .............................................. 72

23

3.   The Eighth Amendment Does Not Require a Particular
Housing Placement Following Discharge from a Crisis Bed
or Department of State Hospitals Facility. ..................................... 74

24

4.   The State's 30-Minute Welfare Check Policy For All

25

Inmates in Administrative Segregation Exceeds
Constitutional Requirements. ......................................................... 75

26

5.   The State Provides Constitutional Care in the Its Security
Housing Units. ................................................................................ 77

27

28

iii

1

# TABLE OF CONTENTS
(continued)

2

**Page**

3
4

I.     Plaintiffs failed to demonstrate any pattern or practice of unnecessary or excessive use of force against the coleman class, or any violation of a federal right in the disciplinary process. ..................... 79

5

     1.     Plaintiffs Failed to Demonstrate a Constitutional Violation Regarding Use of Force. ................................................. 79

6

     2.     The State Appropriately Considers and Accommodates Mental Health in the Disciplinary Process.................................. 81

7
8

VI.     Plaintiffs failed to demonstrate any systemic violation of a federal right regarding the care provided by the department of state hospitals....................... 82

9

A.     There are no "severe clinical staffing shortages" affecting the quality of care provided to dsh patients. ................................... 82

10

B.     DSH has appropriate medical records and medication management........ 84

VII.     Plaintiffs failed to establish that the state is not providing adequate mental health care at the current population density......................................... 84

11
12

VIII.     The state has implemented a durable and sustainable remedy and further federal court oversight is contrary to law............................................................ 88

13

IX.     Conclusion. ....................................................................................................... 89

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

Reply Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1

**TABLE OF AUTHORITIES**

2

<u>Page</u>

3

4

5

**CASES**

6

*Balla v. Idaho State Bd. of Corrs.*
   595 F. Supp. 1558 (D. Idaho 1984)................................................................. 40, 41

7

*Belcher v. Oliver*
   898 F.2d 32 (4th Cir. 1990) ....................................................................................... 42

8

9

*Benjamin v. Jacobson*
   172 F.3d 144 (2d Cir. 1999)........................................................................................ 9

10

*Boncher v. Brown County*
   272 F.3d 484 (7th Cir. 2001) (Posner, J.) ......................................................... 49, 51

11

12

*Brown v. Plata*
   131 S. Ct. 1910 (2011) ...................................................................................... passim

13

*Cagle v. Hutto*
   177 F.3d 253 (4th Cir. 1999)....................................................................................... 9

14

15

*City of Canton v. Harris*
   489 U.S. 378 (1989)........................................................................................... 12, 89

16

*Clouthier v. County of Contra Costa*
   591 F.3d 1232 (9th Cir. 2010)................................................................................... 41

17

18

*Colburn v. Upper Darby Township*
   946 F.2d 1017 (3rd Cir. 1991) .................................................................................. 52

19

20

*Coleman v. Wilson*
   912 F. Supp. 1282 (E.D. Cal. 1995)................................................................. passim

21

*Cook v. Sheriff of Monroe Cty, Florida*
   402 F.3d 1092 (11th Cir. 2005)................................................................................. 52

22

23

*Edwards v. Gilbert*
   867 F.2d 1271 (11th Cir. 1989).................................................................................. 42

24

25

*Estelle v. Gamble*
   429 U.S. 97 (1976)..................................................................................................... 54

26

*Farmer v. Brennan*
   511 U.S. 825 (1994).................................................................................... 11, 53, 55

27

28

v

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Frake v. City of* Chicago
4     210 F.3d 779 (7th Cir. 2000)............................................................. 61

5     *Gilmore v. California*
      220 F.3d 987 (9th Cir. 2000)......................................................... 8, 9, 88

6

7     *Graves v. Arpaio*
      623 F.3d 1043 (2010)....................................................................... 8, 9

8     *Gray v. City of Detroit*
9     399 F.3d 612 (6th Cir. 2005)............................................................. 40

10    *Hallett v. Morgan*
      296 F.3d 732 (9th Cir. 2002)......................................................... 8, 58

11

12    *Hallett v. Morgan*
      296 F.3d 743-45 (9th Cir. 2002) ...................................................... 8, 9

13    *Horne v. Flores*
14    557 U.S. 433 (2009)................................................................. 13, 14, 88

15    *In Re Long Term Administrative Segregation of Inmates Designated As Five Percenters*
      174 F.3d 464 (4th Cir. 1999)............................................................. 66

16    *Jackson v. McIntosh*
17    90 F.3d 330 (9th Cir. 1996).......................................................... 54, 55

18    *Lewis v. Casey*
      518 U.S. 343 (1996)........................................................................ 30

19

20    *Liebe v. Norton*
      157 F.3d 574 (8th Cir. 1998)........................................................ 53, 58

21    *Loyd v. Ala. Dep't of Corr.*
22    176 F.3d 1336 (11th Cir. 1999).......................................................... 9

23    *Madrid v. Gomez*
      889 F. Supp. 1146 (N.D. Cal. 1995) .............................................. 15, 66

24

25    *Madrid v. Schwarzenegger*
      No. C 90-3094 TEH (N.D. Cal.) ........................................................ 88

26    *Manarite v. City of Springfield*
      957 F.2d 953 (1st Cir. 1992)............................................................. 42

27

28

vi

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Mayweathers v. Newland*
    258 F.3d 930 (9th Cir. 2001)............................................................................. 8, 9

4

*Molton v. Cleveland*
    839 F.2d 240 ................................................................................................. 42

5

6

*Orr v. Larkins*
    610 F.3d 1032 (8th Cir. 2010)......................................................................... 66

7

*Perez v. Brown*
    No. C 05-05241 JSW (N.D. Cal.) ................................................................... 88

8

9

*Perez v. Oakland County*
    380 F. Supp. 2d 830 (E.D. Mich. 2005)..................................................... 41, 49

10

*Pierce v. County of Orange*
    526 F.3d 1190 (9th Cir. 2008)........................................................................... 8

11

12

*Popham v. City of Talladega*
    908 F.2d 1561 (11th Cir. 1990)...................................................................... 52

13

*Redman v. County of San Diego*
    942 F.2d 1435 (9th Cir. 1991)........................................................................ 11

14

*Rellergert v. Cape Girardeau Cty, Missouri*
    924 F.2d 794 (9th Cir. 1991)................................................................ 17, 41, 49

15

16

*Rufo v. Inmates of the Suffolk Cty. Jail*
    502 U.S. 367 (1992)....................................................................................... 14

17

*Sanchez v. Vild*
    891 F.2d 240 (9th Cir. 1989).................................................................... 54, 55

18

19

*Shapley v. Nv. Bd. of State Prison Comm'rs*
    766 F.2d 404 (9th Cir. 1985)......................................................................... 58

20

*Simmons v. Navajo County, Ariz.*
    609 F.3d 1011 (9th Cir. 2010)........................................................................ 41

21

22

*Strickler v. McCord*
    306 F. Supp. 2d 818 (N.D. Ind. 2004) ........................................................... 40

23

24

*Taylor v. Mich. Dept. of Corr.*
    69 F.3d 76 (6th Cir. 1995)............................................................................. 30

25

26

27

28

1
2

# TABLE OF AUTHORITIES
**(continued)**

**Page**

3
4
*Tittle v. Jefferson Cty. Comm'n*
  10 F.3d 1535 (11th Cir. 1994)............................................................. 41

5
*Torraco v. Maloney*
  923 F.2d 231 (1st Cir. 1991)................................................................ 52

6
7
*Turner v. Safley*
  482 U.S. 78 (1987)................................................................................ 62

8
*Whitley v. Albers*
  475 U.S. 312 (1986).............................................................................. 62

9
10
*Whitt v. Stephens Cty*
  529 F.3d 278 (5th Cir. 2008)................................................... 53, 58, 59

11
STATUTES

12
18 U.S.C. § 3626(b) ................................................................................ 8, 9

13
18 U.S.C. § 3626 (b)(1)............................................................................... 7

14
18 U.S.C. § 3626(b)(3)........................................................................... 7, 10

15
16
Cal. Pen. Code § 3600(b)(4) ...................................................................... 24

17
CONSTITUTIONAL PROVISIONS

18
Eighth Amendment ........................................................................... passim

19
United States Constitution .......................................................................... 7

20
COURT RULES

21
Federal Rule of Civil Procedure 60(b)(5) ...................................... 9, 13, 14

22
23
24
25
26
27
28

1    I.    **INTRODUCTION.**

2          In the more than seventeen years of federal monitoring, California has invested tremendous

3    amounts of money, resources, and effort to transform its prison mental health care system into

4    one of the best in the country.  In just the last few years alone, the State has invested more than a

5    billion dollars to build further mental health care facilities and other prison capacity to provide

6    timely and effective care to the State's inmates.  Moreover, the State has implemented a myriad

7    of systems to evaluate the mental health care needs of inmates, and provide them with whatever

8    level of care they require.  The State employs over 1,700 psychiatrists, psychologists, therapists,

9    social workers, licensed psych techs, and nurses, all of whom work in close coordination with

10   custody staff, to provide effective treatment to mentally ill inmates.  The reality is that

11   California's inmates receive as good or better mental health care than inmates in any other state.

12         Yet Plaintiffs ignore the comprehensive system the State has put in place, and speciously

13   proclaim that the State is deliberately indifferent to the mental health needs of its inmates.  They

14   ignore the fact that the State screens and evaluates inmates for serious mental illness; provides

15   appropriate diagnoses, administration, and supervision of inmate-patients on psychiatric

16   medication; and maintains accurate mental health treatment records.  They fail to acknowledge

17   that the State has fully implemented programs to identify, treat, and supervise inmates at risk for

18   suicide.  Or that the State has implemented a durable quality-management system, including

19   continuous and critical self-evaluation to identify issues and further improve the system.  It

20   simply defies any common sense that a state that dedicates as much money and resources to treat

21   mentally ill inmates as California does, could at the same time be indifferent to their needs.  Yet

22   that is exactly Plaintiffs' argument.

23         And the notion that the thousands of prison officials, doctors, therapists, nurses, and other

24   care providers are deliberately indifferent to the needs of the mentally ill inmates they care for

25   every day is not only utter nonsense, but offensive.  Instead of vilifying these hardworking and

26   dedicated professionals, they should be praised for the difficult and important work they perform.

27         Plaintiffs make generalizations about the system as a whole based on little more than

28   hyperbolic misrepresentations, anecdotes from inmates, and a few isolated cases from among the

1

1    more than 32,000 inmate-patients receiving appropriate care.  These types of arguments do not

2    withstand scrutiny, and provide no basis to perpetuate this case any longer.[1]

3         The special master's reviews are just as unfair because rather than assess the State against

4    the constitutional standard of deliberate indifference, he scrutinizes whether the State has

5    achieved full compliance with every aspect of a comprehensive set of prison policies detailing

6    every aspect of the mental health care system.  He criticizes prison officials for less-than-perfect

7    form-completion skills, meeting attendance, and other matters that have no impact on the quality

8    care inmates receive.  Even worse, he exaggerates these minor imperfections into matters of

9    monumental significance.  Then he denounces the State for not implementing every last one of

10   his recommendations.  But—just like Plaintiffs—he ignores the multitude of recommendations

11   and improvements the State has, in fact, implemented.  And he seems unaware that some of his

12   so-called recommendations are simply that he be allowed to continue monitoring.

13        Plaintiffs' voluminous opposition puts forth a slanted theory of deliberate indifference that

14   seeks to hold California to a standard higher than any known to the Constitution or American

15   corrections.  But perfection, of course, is not the legal standard.  Rather, for this case to persist,

16   Plaintiffs must prove systemic deliberate indifference to the treatment needs of inmates with

17   serious mental illness—*that* is the legal standard.  But the State's robust, multi-faceted prison

18   mental health system is the very antithesis of deliberate indifference.  In light of the tremendous

19   _____

20        [1] This evidence is presented in the 32 declarations submitted by the Custody and Mental
     Health staff from each of the 10 institutions Plaintiffs visited: (1) ***California Correctional***
21   ***Institution*** – Warden Kim Holland, Chief of Mental Health William Walsh, Dr. Morgan Jensen,
     and Captain Sanders; (2) ***California Correctional Women's Facility*** – Warden Johnson, Chief
22   Psychologist Lori Williams, Jonathan Harry (Psychiatrist), and Katherine Hudson (Director of
     Nursing); (3) ***California Institution for Men*** – Warden Brenda M. Cash & Chief of Mental
     Health Victor Jordan; (4) ***Corcoran*** – Warden Connie Gipson and Dr. Robert Fischer (Acting
23   Chief Psychologist); (5) ***Los Angeles County*** – Warden John Soto and Chief of Mental Health
     Christopher Cornell; (6) ***Mule Creek State Prison*** – Chief Deputy Warden Joe Lizarraga, Chief
24   of Mental Health James Telander, and Chief Psychiatrist Jeremy Colley; (7) ***RJ Donovan*** –
     Warden Daniel Paramo and Chief Psychologist Heather Greenwald; (8) ***Sacramento*** – Warden
25   Tim Virga and Chief Psychologist Shama Chaiken; (9) ***San Quentin*** – Warden Kevin Chapell
     and Chief of Mental Health Eric Monthei; and (10) ***Salinas Valley State Prison*** – Warden
26   Randolf Grounds, Dr. Schneider (Chief of Mental Health), H. Gabeler (Director Nursing –
     Emergency Response), Dr. Howe (DSH Coordinator), Dr. Card (Senior Psychologist Supervisor –
27   SPR FIT), Dr. Douglass Beatty, Captain M. Atchley (Administrative Segregation Unit), C. Shytle
     (LPT Supervisor), and E. Force (Regional Administrator).

28

2

1    improvements that have been made, and the comprehensive system that is now in place,

2    continued micromanagement by the special master over every aspect of the State's prison mental

3    health policies violates federal law and principles of federalism.  After more than 17 years of

4    federal court monitoring, it is now time for this case to end.

5    **II.    THE TERMINATION MOTION PROVED THAT THE STATE MEETS INMATES' SERIOUS
         MENTAL HEALTH NEEDS.**

6

7         **A.    California Has Implemented a Comprehensive Prison Mental Health Care
              System that Exceeds All Constitutional Requirements.**

8         In the termination motion, the State set forth both the necessary facts and opinion evidence

9    establishing that California's correctional mental health care system exceeds constitutional

10   requirements regarding the six basic components identified by the *Coleman* Court.  (*See*

11   Termination Mot.)  The motion also established that the State and its officials are in no way

12   deliberately indifferent to inmates' serious mental health needs.  Through the Declarations of

13   Diana Toche, Tim Belavich, Laura Ceballos, Chris Meyer, and Rick Johnson, and the reports of

14   experts in psychiatry, clinical psychology, nursing, and custody/use of force,[2] the State's evidence

15   demonstrated that all necessary elements have been satisfied:

16        (1) *Appropriate Screening & Evaluation*.  The State has successfully implemented a

17   comprehensive system with standardized forms for screening and evaluating inmates with mental

18   health issues upon admission, readmission, or transfer.  (Motion at 16-17; Belavich Decl., ¶¶ 5, 9-

19   11 & 17 & Ex. 1; Ceballos Decl. ¶ 5; Clinical Exp. Rept. at 1, 8, 10-25 & 39.)  The State has also

20   implemented clinical care tools—the Internet-based Mental Health Tracking System (MHTS.net)

21   and Patient Registries—that allow meaningful tracking of screening and evaluation.  Plaintiffs

22   make no argument that the State's system for evaluating and placing inmates into the CCCMS

23

24        [2] The State's declarations and reports submitted with the termination motion will be
     referred to throughout this reply as follows: (1) Declaration of Diana Toche, ECF No. 4275-3

25   ("Toche Decl."); (2) Declaration of Tim Belavich, ECF No. 4277 ("Belavich Decl."); (3)
     Declaration of Laura Ceballos, ECF No. 4275-2 ("Ceballos Decl."); (4) Declaration of Chris

26   Meyer, ECF No. 4278 ("Meyer Decl."); (5) Declaration of Rick Johnson, ECF No. 4276
     ("Johnson Decl."); (6) *Clinical Evaluation of California's Prison Mental Health Services*

27   *Delivery System* by Dvoskin, Moore, and Scott, ECF No. 4275-5 ("Clinical Exp. Rpt."); and (7)
     Report of Defendants' Expert Steve J. Martin, ECF No. 4279 ("Martin Exp. Rpt.").

28
                                        3

1    and EOP programs[3] is in any way inadequate.  Since Plaintiffs have conceded this issue, all

2    monitoring of this issue should immediately cease.  Plaintiffs' "concern" about the State's effort

3    to improve its screening tools is addressed in Section V.B.

4        (2) *Access to Care*.  The State timely and appropriately delivers inpatient and outpatient

5    care to its inmate-patients.  (Motion at 17-18; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 5-16 & Exs. 2

6    & 3; Johnson Decl. ¶¶ 5-13 & Exs. 2 & 3; Ceballos Decl. ¶¶ 4-6; Clinical Exp. Rpt. 1-2, 8, 11-25,

7    & 39; Martin Exp. Rpt. at 10 & 13-15.)  The State systematically oversees access to care using a

8    number of tools, including MHTS.net, Patient Registries, the Patient Health Information Portal,

9    the Strategic Offender Management System, and the Health Care Scheduling and Tracking

10   System.

11       (3) *Adequate Mental Health Staffing & Quality Management Programs*.  The dedicated and

12   hard-working mental health professionals employed by the State deliver quality health care to the

13   *Coleman* class.  (Motion at 18-19; Toche Decl. ¶¶ 6-10; Belavich Decl. ¶¶ 18-20 & Ex. 4;

14   Clinical Exp. Rpt. 1-2 & 30.)[4]  The State also has a comprehensive extensive quality-management

15   program, both at headquarters and in each institution.  (Motion at 19.)  As discussed in the

16   attached declarations, at each institution Plaintiffs visited and questioned the adequacy of staffing,

17   the staff has confirmed that they have the staff and program space necessary to provide adequate

18   care.

19       (4) *Accurate, Complete, and Confidential Mental Health Records*.[5]  Electronic Unit Health

20   Records are used in every prison, and mental health staff have been trained to use and maintain

21       [3] The State comprehensively provides inmates with mental health care services at three
22   levels of care: (1) the Correctional Clinical Case Management System ("CCCMS") (outpatient
     clinic services for stable inmates functioning in the general population); (2) the Enhanced
23   Outpatient Program ("EOP") (separate housing units and structured activities for inmates who
     experiences adjustment difficulties in a general population setting); and (3) Mental Health Crisis
24   Bed placement ("MHCB") (24-hour services for conditions that require short-term inpatient care
     to ameliorate mental health symptoms).

25       [4] As discussed in the Motion, the *Plata* receiver is responsible for recruiting and hiring
     CDCR's mental health professionals.  (Motion at 18; ECF No. 2247.)

26       [5] The *Plata* receiver is also responsible for medical records in the state prisons (ECF No.
27   2247 at 7), and made the decision to implement an electronic Unit Health Record rather than a
     true electronic medical record.  In April 2012, the receiver issued a Request for Proposal for an
28   Electronic Medical Record Project.  (*See* http://www.cphcs.ca.gov/docs/projects/EMR_RFP12-
     (continued…)

4

1    the electronic records.  (Motion at 19-20; Belavich Decl. ¶ 21; Receiver's 19th Rep., *Plata* ECF

2    No. 4145-1 at 20; Special Master's 24th Monitoring Rep., ECF No. 4205, at 17; Clinical Exp. Rpt.

3    at 28.)  Department of State Hospitals (DSH) clinicians also have access to the Electronic Unit

4    Health Record as appropriate, including training by the receiver's office.  (Decl. Kathy Gaither

5    Supp. Reply ¶¶ 11 & 12.)  Any DSH clinician who requests access will receive a user name and

6    password and can access inmate-patient records like any CDCR clinician.  (*Id.*)

7         (5) *Appropriate Prescription, Administration, and Monitoring of Psychiatric Medication*.

8    The Motion established that the State's prison medication management program now meets the

9    standard of care for correctional mental health care systems, and "many facilities surpass the

10   community standard of care in their medication management approach."  (Clinical Exp. Rpt. at 27;

11   *see also id.* at 26-29; Toche Decl. ¶ 10; Belavich Decl. ¶ 22 & Ex. 6.)  The State monitors

12   medication management through the Medication Administration Process Improvement Plan

13   (MAPIP), an innovative auditing tool that "exceeds the standard of care requirements generally

14   found in the community."  (Clinical Exp. Rept. at 1 & 28; Decl. Charles Scott Supp. Reply ¶ 4.)

15   The MAPIP tool was developed in collaboration between CDCR, the receiver, and the special

16   master and his experts.

17        (6) *Appropriate Program to Identify, Treat, and Supervise Inmates at Risk for Suicide*.  The

18   State has implemented a robust suicide prevention program, including a detailed suicide risk

19   evaluation protocol and process; training; suicide prevention committees that meet regularly at

20   each institution; and a process to thoroughly investigate and timely report on completed suicides

21   and serious suicide attempts.  (Motion at 21-23; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 23-30;

22   Special Master's 24th Round Monitoring Rep., ECF No. 4205 at 40; Clinical Exp. Rpt. at 2, 15,

23   & 31-32.)

24        (7) *Heightened Safeguards to Ensure that Inmates with Mental Illness Are Not Subjected to*

25   *Unnecessary and Excessive Use of Force, and to Reasonably Accommodate Mental Health Status*

26   _____

27   (…continued)
     009-ITS-20120420.pdf.)

28

1   *in the Disciplinary Process.*  There is no pattern or practice of unnecessary or excessive force in

2   CDCR against inmates with serious mental illness.  (Motion at 23-24; Belavich Decl. ¶ 32;

3   Martin Exp. Rpt. 11 & 13.)  Moreover, nearly every institution has a dedicated Use of Force

4   Coordinator, and a dedicated Rule Violation Report Coordinator to monitor the institutions'

5   practices, and take corrective action if necessary.  (Decl. K. Allison Supp. Reply ¶ 21.)

6       **B.    Additional Significant Accomplishments of the State's Mental Health Program
            in 2012 & 2013.**

7

8   In addition to establishing a mental health treatment system that this Court should recognize

9   as a model, the State has accomplished a large number of innovations that demonstrate the

10  commitment and quality of the statewide program.  In 2013, the State has already:

11  • Finalized a quality-improvement audit tool with the special master;

12  • Developed and completed a statewide training for trainers on suicide risk assessment;

13  • Activated new treatment and office space for Enhanced Outpatient Program inmates at
      the California Medical Facility;

14  • Received accreditation from the Joint Commission for the 45-bed Psychiatric Inpatient
      Program at the California Institution for Women;

15

16  • Created a shared calendar system that integrates MHTS.net and the Strategic Offender
      Management System; and

17  • Developed a new suicide prevention workgroup at headquarters.

18  (Belavich Reply Decl., ¶¶ 6-16 & Ex. A.)

19  In 2012, the accomplishments of the Statewide Mental Health Program include:

20  • Secured full authority to implement the 2009 staffing plan;

21  • Began admitting patients to the Psychiatric Inpatient Program at the California
      Institution for Women (Decl. Chris Meyer ¶ 12 & Exs. 11 & 12);

22

23  • Constructed a $33.7 million 64-bed Intermediate Care Facility at the California Medical
      Facility, which opened in February 2012 (*id.* at ¶ 7 & Ex. 6);

24  • Successfully implemented the "sustainable process," which reduced significantly the
      wait times to transfer patients to intermediate psychiatric care.  The State also

25    reorganized its structure at headquarters, including adding Regional Managers to ensure
      the durability of the sustainable process;

26

27  • Developed the Medication Administration Process Improvement Plan (MAPIP), an
      innovative medication management monitoring tool;

28

6

- Completed collaboration training between custody and mental health staff to further improve access to care;

- Implemented directives regarding the use of alternative housing and outpatient housing units, and implemented a system to track and monitor alternative and outpatient housing usage; and

- Implemented updated policy mandating daily follow-up care for the first five days for all inmates discharged from Department of State Hospitals acute or intermediate care facilities.

(Belavich Reply Decl. ¶¶ 6-16 & Ex. A.)  Additional accomplishments of the statewide mental health program over the last five years are discussed in detail in the Declaration of Dr. Belavich.

    In light of the clear and convincing evidence that the State is providing timely and appropriate mental health care to its prison inmates, including the innovative accomplishments discussed above, any argument that the system falls below the minimal standards required by the United States Constitution is patently meritless.  The State addresses those arguments made by the Plaintiffs in this matter, the majority of which reflect Plaintiffs' disagreement that society has chosen to permit criminal offenders with serious mental illness in prison.  None of them reflect deliberate indifference by the State or, indeed, any violation of a federal right against inmates with serious mental illness.

### III.    PLAINTIFFS MISSTATE THE BURDEN: THE PLRA PLACES THE BURDEN ON THE PARTY SEEKING TO PERPETUATE COURT INTRUSION INTO STATE PRISON MANAGEMENT.

    After more than 17 years of costly and intrusive monitoring and micromanagement under the Court's structural reform injunction, Plaintiffs have the burden of showing that Defendants' statewide prison mental health system is so deficient that it violates their Eighth Amendment right to be free from cruel and unusual punishment.  The PLRA's plain language requires the party seeking termination merely to establish the requisite passage of time.  18 U.S.C. § 3626 (b)(1).  Then, the burden of proof shifts to the plaintiffs to demonstrate that prospective relief "remains necessary to correct a current and ongoing violation of the Federal right" and that the prospective relief is "narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3) (emphasis added).

    Ninth Circuit caselaw, at least in part, reiterates that the PLRA places the burden on

7

1    plaintiffs to demonstrate that they are entitled to prospective relief—regardless of whether they

2    are initially seeking prospective relief or seek to continue it after a termination motion is filed.

3    *Hallett v. Morgan*, 296 F.3d 743-45 (9th Cir. 2002) (affirming denial of motion to extend relief

4    under consent decree absent proof of current and ongoing violation of a federal right);

5    *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001) (requiring the party seeking

6    prospective relief to prove current and ongoing constitutional violations). *But see Pierce v.*

7    *County of Orange*, 526 F.3d 1190, 1206 n.16 (9th Cir. 2008) (acknowledging tension with two

8    cases that place the burden on defendants to demonstrate no ongoing violation: *Gilmore v.*

9    *California*, 220 F.3d 987 (9th Cir. 2000) and *Graves v. Arpaio,* 623 F.3d 1043, 1048 (2010)).

10        Plaintiffs incorrectly contend that Defendants cannot rely on the Ninth Circuit's decisions

11   in *Hallett* or *Mayweathers* because those cases decided the plaintiffs' motions for relief rather

12   than termination motions.  (Opp'n 11.)  Such a distinction is immaterial.  Both the standard and

13   the burden under the PLRA are the same whether a party seeks to obtain prospective relief or

14   extend existing prospective relief.  *Hallett*, 296 F.3d at 743-744 ("The quoted standard for

15   termination does not differ materially from the standard to be applied in deciding whether relief is

16   proper.  To prevail on their motion to extend jurisdiction, *Plaintiffs* must establish that the

17   prospective relief 'extends no further than necessary to correct the violation of' their Eighth

18   Amendment rights) (emphasis added).  The burden is on the party seeking to impose or extend

19   relief irrespective of whether it is affirmatively sought in a motion for prospective relief or its

20   extension advocated in a motion to terminate.  *Mayweathers*, 258 F.3d at 936 (stating that the

21   imposition of the burden of proof on the party seeking a preliminary injunction under the PLRA

22   "conforms with how the PLRA governs the termination of final prospective relief.) (citing to 18

23   U.S.C. § 3626(b).

24        *Hallett* and *Mayweathers* are in line with other circuits' decisions that the burden is on

25   plaintiffs to establish a current and ongoing violation, regardless of whether they ask for initial

26   prospective relief or its continuation.  (*See* Termination Mot. at 11:22-13:4 [citing nine out-of-

27   circuit cases demonstrating that the majority of courts that have addressed this issue assign the

28   burden of proof to the party opposing termination].)  Plaintiffs wrongly complain that Defendants

8

1    unfairly cite three circuit decisions to support their argument that the burden is on Plaintiffs:

2    *Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999); *Loyd v. Ala. Dep't of Corr.*, 176 F.3d 1336

3    (11th Cir. 1999); and *Cagle v. Hutto*, 177 F.3d 253, 258 (4th Cir. 1999).  Each of these decisions

4    provided the plaintiffs an opportunity to present evidence because of the implied recognition that

5    the relief would terminate unless evidence was presented.  It stands to reason that if a party will

6    not retain the relief they seek without providing evidence, that party has the burden of proof.  This

7    is consistent with the PLRA's plain language, which makes a case terminable two years after

8    relief is imposed unless the Court makes findings of a current and ongoing violation of a

9    constitutional right.  18 U.S.C. § 3626(b).

10   Plaintiffs contend that the holdings in *Gilmore* and *Graves* should control (Opp'n 11), but

11   both of those decisions lack the clear reasoning that is expressed in *Hallett*, *Mayweathers*, and the

12   other circuits.  For instance, *Gilmore* held that, like the modification provisions of Federal Rule of

13   Civil Procedure 60(b)(5), "nothing in the termination provisions [of the PLRA] can be said to

14   shift the burden of proof."  220 F.3d at 1007.  But Gilmore cited no authority to support the

15   conclusion that the PLRA's drafters intended the termination provisions to be subject to the same

16   assignment of burden as Rule 60(b)(5).  *Id.*  Indeed, the legislative history of the PLRA suggests

17   the opposite.  See H.R. Rep. No. 104-21, at 25 (1995) ("in order to continue to receive relief

18   beyond a two-year period, the need for continued remedies to alleviate actual violations of federal

19   rights must be proven") (emphasis added).

20   This Court should follow the well-reasoned decisions in *Hallett*, *Mayweathers*, and the

21   other circuits. By placing the burden on plaintiffs to demonstrate a current, ongoing violation that

22   could justify continued intrusion into state functions, those decisions properly account for the

23   PLRA's plain language and its purpose.

**IV.   PLAINTIFFS' NOVEL THEORY OF SYSTEMIC DELIBERATE INDIFFERENCE FAILS.**

25   As discussed above and in the termination motion, California provides care to inmates with

26   serious mental illness that meets or exceeds the minimum requirements of the Eighth

27   Amendment.  The facts demonstrate that the State has not only remedied the objective systemic

28

9

1   deficiencies identified by this Court, but is taking proactive actions to continually improve prison

2   mental health care.

3        Faced with the evidence, Plaintiffs advance spurious and nonsensical arguments that the

4   State and its experts "have lost sight of the systemic deliberate indifference in this case." (Opp'n

5   at 5.)[6]  For example, on pages 16-19 of the Opposition, Plaintiffs argue that the State should have

6   requested its experts to opine on population density, and should have examined the evidence

7   relied upon by the Three-Judge Court, which is outdated by at least five years.  The reports

8   submitted by the State's experts make clear that they were asked to provide their observations and

9   opinions about the *current* adequacy of California's prison mental health care system.  (*See*

10  Clinical Exp. Rpt. at 1; S. Martin Exp. Rpt. at 1; *see also* 18 U.S.C. § 3626(b)(3) [prospective

11  relief shall terminate unless the court "makes written findings based on the record that

12  prospective relief remains necessary to correct a current and ongoing violation of the Federal

13  right"].)  By definition, if mental health care is systemically adequate, the population density

14  cannot be the primary cause of constitutionally inadequate mental health care since that condition

15  does not exist.

16        The State's experts thoroughly evaluated California's prison mental health care system,

17  including multiple site visits to CDCR institutions, meetings with mental health leadership and

18  institutional mental health and custody staff, reviews of medical records and clinical tools

19  (including the electronic Unit Health Record, the Mental Health Tracking System, and the

20  MAPIP medication monitoring tool), and reviews of quality improvement meeting minutes and

21  documents.  (Clinical Exp. Rpt. at 8-9.)  In addition, before realignment, the special master and

22  his team went to 14 prisons and did not find inmates languishing.  Contrary to Plaintiffs'

23  contention that the State's experts should have gone to each prison, the experts selected a

24  representative sample, which is "a common practice in social science." (McKinney Reply Decl.

25  Ex. 1 [Dvoskin Depo.] 184:13-188:14; *see also id.* Exs. 2 [Martin Depo.] 31:14-33:9, 3 [Scott

26  _____

        [6] Plaintiffs' unsupported and unsubstantiated attacks on the experts' methodology are

27  addressed in further detail throughout this reply and in the accompanying response to the Court's
    Order to Show Cause and Plaintiffs' Objections to Evidence.

28

                                        10

1   Depo.] 30:13-23, & 4 [Moore Depo.] 138:1-3.)[7]  And despite Plaintiffs' protestations that the

2   experts ignored risks to inmates whose needs were not identified because of staffing and resource

3   concerns, the experts thoroughly examined whether inmates' mental health needs where

4   identified both through site visits and reviews of data from CDCR and the Special Master.

5   (Clinical Exp. Rpt. at 11.)  Moreover, on the basis of their review, the experts concluded that

6   CDCR's mental health delivery system "diligently and successfully identifies inmates with

7   serious mental disorders upon reception into the CDCR and during inmates' subsequent

8   incarceration," and "refers inmates identified with serious mental disorders for appropriate

9   psychiatric and mental health care."  (Clinical Exp. Rpt. at 8, 11.)

10          **A.    Plaintiffs Misinterpret and Misapply the Deliberate-Indifference Standard.**

11          As discussed on page 14 of the termination motion, the Eighth Amendment requires both

12   an objective analysis of the alleged deprivation of care and subjective analysis of defendants'

13   state of mind.  *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).  To establish the subjective

14   component, Plaintiffs must establish that state officials are acting with a "sufficiently culpable

15   state of mind" to be held responsible for constitutional violations.  *Id.* at 834, 837-39.  That

16   standard requires state officials to be *criminally* reckless, requiring actual knowledge or willful

17   blindness of impending harm to inmates that could have easily been prevented.  *Id.*; *see also*

18   *Redman v. County of San Diego*, 942 F.2d 1435, 1449 (9th Cir. 1991) (deliberate indifference is

19   "conduct [that is] so reckless as to be tantamount to a desire to inflict harm.")

20          Because there is no evidence that any state official is acting with the requisite culpable

21   state of mind, Plaintiffs cite to the findings before the Supreme Court in *Plata* as evidence of

22   what is required to prove systemic deliberate indifference.[8]  (Opp'n 4-5.)  *Plata* did not alter the

---

23          [7] The experts in the three-judge court proceeding similarly looked at only a representative
24   number of prisons to make their systemic determinations. (*See*, *e.g.*, Oct. 30, 2007 Order at 2
     [stating that the dispute at issue relates to Plaintiffs' experts' site inspections at 10 institutions];
25   ECF No. 1527 [Decl. Ronald Shansky] p. 8 [stating that his visits to 5 institutions formed the
     basis of his opinion]; ECF No. 1528 [Decl. Doyle Wayne Scott], p. 10, fn. 1 [stating that he
26   toured 4 institutions]; ECF No. 1531 [Decl. Craig Haney], p. 26 [stating that he toured 8
     prisons].)

27          [8] Plaintiffs also attempt to criticize the State for not citing the Supreme Court's decision in
28   *Brown v. Plata* in the present motion to terminate.  But Plaintiffs ignore the fact that the State
                                                                                    (continued...)

                                               11

1    legal standard for deliberate indifference, and Plaintiffs cannot satisfy either the objective or the

2    subjective standard.  The objective evidence in this case conclusively demonstrates that the State

3    is meeting or exceeding the minimal requirements of a constitutional prison mental health system.

4    *See supra* Section II.  Plaintiffs present no evidence—nor could they, given the monumental

5    efforts devoted by the Defendants to delivery of care—to prove the subjective component.

6    Instead, Plaintiffs argue that the State should allocate more resources to staffing and treatment

7    space, and should release more inmates.  Plaintiffs' experts are against housing any mentally ill

8    inmates in prison.  (*See, e.g.,* Kaufman Decl. ¶ 7 & Appx. A; McKinney Decl. Exs. 5 [Kaufman

9    Depo.] 36:25-37:7 & 208, 6 [Stewart Depo.] 238:10-11, 16.)  This case is not an invitation for

10   Plaintiffs to radically reconfigure the state prison system in their image.  As discussed in Sections

11   V.D and V.E, these arguments do not even demonstrate systemic inadequacies to satisfy the

12   objective standard.  Indeed, it is ironic that Plaintiffs attempt to warp the State's critical self-

13   analysis and responsiveness to issues into evidence of deliberate indifference.  *See e.g.,* Sections

14   V.A (screening) & V.G (suicide prevention).  Plaintiffs' second-guessing of the State's programs

15   is not evidence of deliberate indifference, but seeks precisely the type of micromanagement of

16   State prisons that the Supreme Court has instructed federal courts to avoid.  *See City of Canton v.*

17   *Harris*, 489 U.S. 378, 392 (1989) (second-guessing local officials "is an exercise we believe the

18   federal courts are ill-suited to undertake, as well as one that would implicate serious questions of

19   federalism.").

20       **B.**     **Compliance With the Program Guide Is Not the Constitutional Standard.**

21       In asking the Court to focus on the State's compliance with the revised Program Guide,

22   Plaintiffs confuse and conflate the mandates of the Constitution with the avenues to meet those

23   mandates.  *See Coleman v. Wilson*, 912 F. Supp. 1282, 1301 (E.D. Cal. 1995) ("[t]he Constitution

24   does not . . . prescribe the precise mechanisms for satisfying its mandate to provide access to

25   adequate mental health care.").

26   _____

27   (…continued)
     concurrently filed a motion to vacate the population cap upheld in *Brown v. Plata*.  (ECF Nos.
     4280-4282.)

28

1    Throughout the opposition, Plaintiffs cite the special master's twenty-fifth round report for

2    examples of alleged deficiencies.  The special master's report in no way establishes that the State

3    is deliberately indifferent to inmates' serious mental health needs.  As discussed on page 26 of the

4    termination motion, rather than simply being required to satisfy the requirements of the

5    Constitution, the State is required to achieve 90% compliance with all prison mental health

6    procedures and program guides and court orders (and 100% compliance with policies and

7    procedures and court orders related to suicide prevention).  Indeed, the special master's report

8    confirms that he no longer (if ever) assesses whether the State's prison mental health care system

9    satisfies constitutional standards.  (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF No.

10   4205, at 18-19; *see also* Feb. 28, 2013 Order, ECF No. 4361.)

11   The Constitution requires only that the State's prison system not be deliberately indifferent

12   to the serious mental health needs of inmates.  As the motion and the credible evidence show,

13   California's prison system exceeds that standard.  Yet the special master's report fails to convey

14   this crucial information because he has not attempted to assess the system against this standard.

15   (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF No. 4205, at 18-19.)  Plaintiffs repeatedly

16   reference the State's compliance with the Program Guide by reference to the prisons'

17   management reports, which were prepared for the special master in advance of his twenty-fifth

18   round site visits.  Although the special master relies on these reports, they do not assess whether

19   the State's prison mental health care system satisfies constitutional standards.  *See Horne v.*

20   *Flores*, 557 U.S. 433, 450 (2009) (citation omitted) ("[F]ederal court decrees exceed appropriate

21   limits if they are aimed at eliminating a condition that does not violate federal law . . . .")

22   **C.    Changed Factual Circumstances Require the Court to Vacate the Injunction.**

23   It is undisputed that Federal Rule of Civil Procedure 60(b)(5) is the proper vehicle for

24   terminating federal court oversight in institutional reform cases when there are no longer

25   violations of federal law that the order was intended to address.  *Brown v. Plata*, 131 S. Ct. 1910

26   (2011); *Horne*, 557 U.S. 433.  The Court's power to modify injunctive relief is "long-established,

27   broad, and flexible."  *Plata*, 131 S. Ct. at 1946.  With that power comes "the continuing duty and

28   responsibility to assess the efficacy and consequences of its order."  *Id.* at 1947.  An injunction

13

1    must be vacated whenever "changes in the underlying problem . . . and new policy insights . . .

2    render[] continued enforcement . . . 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447-

3    48 & 453 (quoting *Rufo v. Inmates of the Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992)).

4           Defendants have demonstrated that continued enforcement of injunctive relief under Rule

5    60(b)(5) is unnecessary and therefore detrimental to the public interest by showing that the State's

6    prison mental health care system meets the basic mental health care needs of California inmates.

7    Plaintiffs submitted no admissible evidence establishing that any systemic federal rights violation

8    persists.  Because the evidence shows that the State can comply with its constitutional obligations

9    without a structural reform injunction or intrusive monitoring, the motion to vacate must be

10   granted.

11   **V.    ALL CREDIBLE EVIDENCE PROVES THAT THE STATE MEETS INMATES' SERIOUS
            MENTAL HEALTH NEEDS.**
12
            **A.    Plaintiffs' Expert's Opinions Should Be Disregarded.**
13
            Many of the statements in the declarations submitted by Plaintiffs' experts are false,
14
     misleading, and speculative.  Whether this is willful or simply reflects the lack of a thorough
15
     investigation, it seriously undermines the credibility of the opinions.  The complete story is told in
16
     the dozens of reply declarations submitted by the dedicated and hard-working staff at the ten
17
     institutions Plaintiffs visited.  (*See* Footnote 1.)  Additional reasons why the Court should
18
     disregard the opinions of Plaintiffs' experts are discussed in detail in the accompanying
19
     Evidentiary Objections to Plaintiffs' Expert Reports.  The State asks that the Court refuse to
20
     consider these declarations or give them the minimal weight they deserve.
21
            Discovery revealed that Plaintiffs' clinical experts lack credibility.  For example, one of
22
     Plaintiffs' psychiatrists, Dr. Kaufman, has not worked in a correctional setting for 40 years,
23
     reviewed only the portions of the records Plaintiffs selected and provided to him, and testified
24
     that he believed that no mentally ill inmate should be in prison.  (*See* Kaufman Decl. ¶ 7 & Appx.
25
     A; McKinney Decl. Ex. 5 [Kaufman Depo.] 36:25-37:7 & 208.)  Moreover, when asked about his
26
     opinions, Dr. Kaufman had to refer to the table of contents of his declaration.  (*Id.* at 6:24-7:25.)
27
     Plaintiffs' other psychiatrist, Dr. Pablo Stewart, also had trouble recalling the opinions in his
28

                                                       14

1    declaration.  This is perhaps understandable since, although Dr. Stewart submitted a 160-page

2    declaration to this Court, he did not produce a single page of notes.  (*Id.* at Ex. 6 [Stewart Depo.]

3    12:11-19.)  Dr. Stewart testified that he has never seen a prison mental health system in the entire

4    United States that met his standard.  (*Id.* at 238:10-11, 16.)  Additional rebuttal points are

5    included in the Reply Declarations of Drs. Scott and Moore.  There is no reason to believe that

6    Plaintiffs' other clinical expert, Craig Haney, would have offered any different extreme testimony,

7    but Plaintiffs did not allow the State an opportunity to depose him before the filing date of this

8    reply.[9]

9         Plaintiffs' correctional experts, Eldon Vail and Jeanne Woodford, must also be disqualified.

10   Mr. Vail, Plaintiffs' use-of-force expert, had not even reviewed the State's use-of-force policy

11   and was unaware of the outcome in *Madrid v. Gomez*, which resulted in the statewide use of force

12   policy.  (*Id.* at Ex. 7 [Vail Depo.] at 271:1-19.)[10]  Further, rather than undertaking an independent

13   and objective assessment of the mental health care CDCR provides to its inmates, Mr. Vail

14   simply concluded that California's prison system was "very troubled."  In fact, he offered to

15   testify against the State before having been provided even a single item of evidence.  (*Id.* at

16   20:21-22:10.)  Additional rebuttal points are included in the Reply Declaration of Mr. Martin.

17        Ms. Woodford, who opined as to the adequacy of mental health care provided to San

18   Quentin's condemned inmates, admitted that she is "not a mental health professional." (Woodford

19   Decl. ¶ 2, ECF No. 4380; McKinney Decl. Ex. 8 [Woodford Depo.] at 15:12, 121:10.)  Ms.

20   Woodford has never been trained to conduct mental health assessments or screenings, has no

21   formal mental health education, and holds no advanced degrees.  (Woodford Depo. at 111:6-8

22   [admitting no training in mental health care assessments or screenings]; Woodford Decl. ¶¶ 2,

23   4.)  Yet, despite her background, Ms. Woodford freely opines on subjects outside the scope of her

24   expertise.  (*See*, *e.g.*, Woodford Decl. ¶ 23 ("newly-condemned inmates often experience extreme

25   mental health distress and suicidal ideation"), ¶ 30 (stating that an inmate whose 114a log she

26   _____

       [9] *See* accompanying Motion to Exclude Testimony of Craig Haney.

27        [10] The State's expert, Steve J. Martin, was the *Plaintiffs' expert* in Madrid.  (Martin Exp.
     Rpt. at 2.)

28

                                          15

1    reviewed "remains in urgent need of a referral for mental health evaluation,"), ¶ 31 ("[m]any, if

2    not all of the individuals to whom I spoke appeared to me to be in need of higher levels of mental

3    health care than they were receiving").)  It is not surprising that Ms. Woodford's declaration is

4    replete with opinions outside the scope of her knowledge and expertise since she did not actually

5    write it.  (Woodford Depo. at 86:23-24 ("And the first draft was not prepared by me, no.").)  It is

6    also quite telling that, while Ms. Woodford states in her declaration, for instance, that there is a

7    problem with under-assessment of condemned inmates' mental health needs and that many

8    inmates were in need of a higher level of care, she acknowledged during her deposition that no

9    inmates had indicated to her during her tour that they had sought out care but did not receive

10   it.  (Woodford Decl. ¶¶ 26, 31; Woodford Depo. at 103:12-15.)  Similarly, while Ms. Woodford's

11   declaration indicates that "new arrivals on death row should be closely monitored for signs of

12   mental health deterioration or crisis," she stated at her deposition that she is personally not aware

13   of any new arrivals on death row who suffered a mental health deterioration or crisis in the last

14   two years.  (Woodford Decl. ¶ 23; Woodford Depo. at 108:10-13, 109:2-5.)

15           **B.    Plaintiffs Present No Evidence Showing Constitutional Inadequacies In
                     Screening and Identifying Inmates Who Need Mental Health Care.**
16

17           The termination motion and supporting evidence demonstrated that the State has

18   successfully implemented systems to screen and evaluate inmates, both at intake and during their

19   incarceration.  (Termination Mot. at 16-17.)  With one exception, Plaintiffs presented no

20   argument or evidence on this issue.  The one issue Plaintiffs argue is not an example of deliberate

21   indifference; rather, it demonstrates how the State's inability to alter forms without Plaintiffs'

22   approval impedes the opportunity to improve care.

23           In their opposition, Plaintiffs argue that because CDCR's suicide-prevention coordinator,

24   Dr. Robert Canning, has noted that reception-center and administrative-segregation suicide-risk-

25   assessment tools may be improved, Defendants' "failing to replace or revise" these tools equates

26   to deliberate indifference.  (Opp'n at 77-78.)  Plaintiffs specifically reference a suicide occurring

27   in May 2012 following which Dr. Canning, as the suicide reviewer, noted that the administrative

28

                                                16

1   segregation screening questionnaire could be improved to investigate any history of prior suicide

2   attempts.  (*Id.*)

3       Here, as with virtually every other argument in the Opposition, Plaintiffs conflate any

4   comment in which Defendants identify areas in which to further improve their system with

5   deliberate indifference.  But just the opposite is true.  The suicide screening device that Plaintiffs

6   reference was formulated in conjunction with input from Plaintiffs' counsel, the Special Master,

7   and this Court.  In other instances, Plaintiffs (falsely) allege that Defendants have failed to heed

8   the advice of expert consultants, including Lindsay Hayes, but nowhere within Mr. Hayes'

9   August 2011 recommendations does he suggest that Defendants must amend their administrative

10  segregation screening process.  (*See* Bien Decl. Ex. 50.)  Indeed, *there are no instances of any*

11  *expert recommending potential revisions to the screening tool*.  The only evidence that anyone

12  has suggested of changes to screening process are those suggestions made by Defendants' own

13  suicide prevention coordinator, Dr. Canning.

14      The flaw in Plaintiffs' logic is repeated throughout their opposition.  Rather than

15  recognizing the State's efforts to continually improve their operations, Plaintiffs instead use every

16  instance of self-review and self-improvement to argue that Defendants' present processes and

17  procedures are "failures" that exhibit deliberate indifference.  Exactly the opposite is true.  *See*

18  *Rellergert v. Cape Girardeau Cty, Missouri*, 924 F.2d 794, 797 (9th Cir. 1991) (taking deliberate

19  steps to prevent suicide cannot "have been both deliberately cautious about [inmate's] risk as a

20  suicide and deliberately indifferent about it.  Indifference is apathy or unconcern.  The policy

21  demonstrates the opposite").  California's efforts to be self-critical and constantly seek to improve

22  processes is manifest evidence that state officials are not deliberately to prisoner's needs.

**C.   The State Provides an Appropriate Continuum of Services to Inmates With
      Serious Mental Illness.**

25      The termination motion established that the State's comprehensive mental health system

26  provides "reasonably speedy access" to a continuum of services to inmates across all custody

27  levels in both inpatient and outpatient settings.  (*See* Motion at 17-18.)  As this Court recognized,

28

17

1    by July 2012, the State had successfully guaranteed timely access to inpatient mental health care

2    for all class members needing hospitalization.  (*Id.*; *see also* Order, ECF No. 4214.)

3             **1.      The State's Inmates Are Not Languishing.**

4             Plaintiffs argue that the State does not have enough mental health treatment capacity, but

5    their argument confuses placements by custody with mental health treatment received by inmate-

6    patients while they await transfer.  (Opp'n at 34:1-10.)  Plaintiffs discuss transfers for Enhanced

7    Outpatient Program (EOP) and Correctional Clinical Case Management System (CCCMS)

8    inmates, but fail to explain that these inmates, many of whom are being transferred to a Special

9    Needs Yard, are currently receiving treatment in their EOP or CCCMS housing units.[11]

10   Plaintiffs' argument is not evidence of mental health treatment that is below a constitutional level.

11   Receiving EOP treatment while awaiting transfer to another EOP bed is not deliberate

12   indifference.

13            For example, one of Plaintiffs' experts remarked that Prisoner L was receiving CCCMS

14   treatment while awaiting a housing transfer.  (Kaufman Decl. ¶¶ 97-99.)  This treatment, along

15   with seeing a mental health provider every 30 days, as Dr. Kaufman notes, does not violate either

16   the Program Guide or the Constitution.  This anecdotal evidence does not support Plaintiffs'

17   argument, and is not even evidence of inadequate treatment.

18            **2.      The State Provides Appropriate, Safe Care to Inmates in Mental Health
                        Crisis.**
19
         The Program Guide permits CDCR to house patients in a number of locations pending
20
     transfer to a crisis bed unit according to a specific order of preference.  (*See* Program Guide 12-5-
21
     5.)  Plaintiffs make a number of arguments with respect to these placements that are false or
22
     misleading.  First, Plaintiffs argue that the State is using small holding cells (which may be used
23
     for up to four hours) for long periods.  (Opp'n at 36.)  Plaintiffs' expert never observed such
24

25            [11] On page 34 of the Opposition, Plaintiffs take the testimony of Rick Johnson, the Chief
     of CDCR's Health Care Placement Oversight Program, out of context.  Mr. Johnson testified that,
26   following realignment, the State is now able to move CCCMS and EOP inmates into Special
     Needs Yards.  (McKinney Decl., Ex. 9 [Johnson Depo.] at 178:1-179:18.)  Plaintiffs insinuate
27   that inmates awaiting Special Needs Yard placement do not receive their appropriate level of care
     while awaiting transfer, but they present no evidence to prove this point, nor could they.

28

                                                    18

1    conditions.  (McKinney Decl. Ex. 6 [Stewart Depo.] 171:25-172:2.)  Dr. Belavich testified that

2    these small holding cells are not used as Plaintiffs' suggest.  (McKinney Decl., Ex. 10 [Belavich

3    Depo.] at 228:20-25; *see also* Dec. 12, 2012 Memorandum, ECF No. 4277-3 at 3 ["Inmates shall

4    be transferred out of these cells as soon as possible and never to exceed four hours"].)  Plaintiffs

5    cite no evidence to the contrary.[12]

6         Second, Plaintiffs present the statistics regarding Outpatient Housing Unit (OHU)

7    admissions pending crisis bed transfer in a misleading fashion.  OHUs are the preferred location

8    for housing inmates awaiting transfer to a crisis bed unit.  (ECF 4277-3 at 2.)  The Program Guide

9    allows the State to house inmate-patients referred to a crisis bed for up to 72 hours.  (*Id*. at 3.)

10        Third, Plaintiffs complain that some inmate-patients are placed in an OHU but are not "ever

11   transferred to an MHCB."  (Opp'n at 37:25-27).  This argument ignores the obvious: inmate-

12   patients are evaluated in the OHU, and the evaluation results in a determination that the inmate-

13   patient does not need a crisis bed placement.  This does not reflect the lack of a crisis bed, but

14   instead reflects appropriate evaluation and treatment so that the inmate-patient can return to his

15   home.

16             **3.    Plaintiffs' Allegations of "Persistent Waitlists" for DSH Treatment
                       Are Not Supported by Evidence.**
17

18        In their opposition, Plaintiffs assert that "the majority of the patients currently housed in the

19   DSH programs waited longer than transfer timelines to get to those inpatient programs, and the

20   vast majority of the patients accepted for a DSH bed in December 2012 and January 2013 were

21   on the waitlist longer than the court-ordered transfer timelines."  (Opp'n at 35; Decl. Bien Ex.

22   73.)  To support this assertion, Plaintiffs rely on a chart created by their lawyers, which was

23   ostensibly drafted using data obtained from DSH's Bed Utilization Reports.  (*See* Decl. A. Haney

24   ¶ 2.)  But Plaintiffs' chart is unreasonable, and even misrepresents the amount of time the

25   Program Guide permits the State to process and place patients in a DSH facility.  The evidence

26   ────────────
          [12] The testimony of Dr. Belavich on which Plaintiffs rely was in response to a hypothetical
27   question posed by counsel and concerned the maximum length of time an inmate-patient could be
     kept in such a cell.  (McKinney Decl., Ex. 10 [Belavich Depo.] at 229:1-2 ["Q: Yes. Up to four
     hours. And assume he's going to spend the whole four hours."])
28
                                               19

1  shows that there are virtually no patients waiting to be placed into DSH programs.  (Belavich

2  Reply Decl. ¶¶ 14-15.)

3         Plaintiffs argue that an inmate-patient is on the "waitlist" from the moment the referral is

4  accepted by DSH, even if the referral was made literally minutes before the document detailing

5  the admission was printed.  Plaintiffs' argument ignores the Court's recognition that ten days is

6  an acceptable timeframe in which to process and place patients accepted by DSH into acute care.

7  (*See Coleman* Program Guide 12-6-5.)  Moreover, the list of patients admitted to acute care is

8  dynamic: DSH daily admits and discharges patients to address their treatment needs, with priority

9  given to suicidal patients.  (Decl. E. Bachman Supp. Reply (Decl. Bachman) ¶¶ 3-4 & 11-12.)

10 Although, as of the date on which Defendants filed their motion, there were no patients waiting

11 for acute care, there have been some—generally between five and ten patients—who have been

12 required to wait more than ten days after DSH acceptance before being transferred.  (Decl. K.

13 Gaither Supp. Reply (Decl. Gaither) ¶ 14.)  Presently, there are eight patients on the acute list

14 who have been waiting for admission longer than ten days following referral by CDCR.  (*Id.*)[13]

15 Six of them remain housed in Mental Health Crisis Beds, two are housed in Enhanced Outpatient

16 Settings, and all receive ongoing psychiatric care.  (Bachman Reply Decl. ¶ 13.)

17        When the demand for hospital beds increases, the State takes action to address that

18 increased demand.  Recognizing an increase in referral rate, DSH opened another unit at the

19 Vacaville Psychiatric Program to ensure that patients referred to DSH care can be expeditiously

20 processed and placed into a DSH bed without being forced to wait any longer than the

21 recommended processing time between DSH acceptance and transfer.  (*Id.* at ¶ 7.)  The State's

22 recognition of an issue and the decisive action to address it is the opposite of deliberate

23 indifference.

24        Despite Plaintiffs' unsupported assertions, there is no "growing" waitlist.  Their argument

25 is based on speculation by Dr. John Brim, a part-time psychiatrist at DSH's Salinas Valley

26 ───────────────
   [13] The Court has similarly recognized that transfers to intermediate care can take up to 30
27 days to complete after DSH accepts the patient.  (*See Coleman* Program Guide 12-6-11.)  In the
   interim, the patient is receiving timely and appropriate psychiatric care.  (Bachman Reply Decl. ¶
28 13.)

                                          20

Psychiatric Program who co-authored a letter but never spoke to the DSH Executive Director to whom it was addressed.  The flow of patients in and out of DSH is dynamic, and the list of inmates who have been referred but not yet processed changes almost daily.  (*Id.* at ¶¶ 3-5.)  Further, patients referred to DSH facilities are admitted on the severity of their medical need, not just on their referral date, which unfortunately leads to some less acute inmates having wait longer for bed.  (*Id.* at ¶¶ 10-12.)  In contrast admitting patients by Plaintiff's "first come-first serve" approach would almost certainly ensure that no patient waits longer than ten days, but only at cost of significant harm to high risk patients.  (*Id.*)  And there has been no effort by DSH administration to "pressure" clinicians to prematurely discharge patients.  (*Id.* at ¶¶ 14-15.)  All decisions about discharges are solely on the basis of clinical judgments of patients' treatment results and mental status.  (*Id.*)

Far from being deliberately indifferent to the needs of inmate-patients who require acute psychiatric care, Defendants have and will continue to take affirmative steps to meet their mental health needs.

### 4. San Quentin's Condemned Inmates Receive Adequate and Appropriate Mental Health Care.

Plaintiffs claim that Defendants are deliberately indifferent to the mental health care needs of San Quentin's condemned inmate population.  In support, Plaintiffs rely largely on a purported expert, Jeanne Woodford, who has no advanced degrees or formal mental health training, and who admits that she is "not a mental health professional."  (Woodford Decl. ¶ 2, ECF No. 4380; McKinney Decl. Ex. 8 [Woodford Depo.] at 15:12, 121:10.)  Plaintiffs' unsubstantiated, unsupported, and inaccurate allegations of inadequate care must be disregarded by this Court.

First, Plaintiffs claim that CDCR does not have an organized practice for routinely screening and re-evaluating condemned inmates' mental health status and needs.  (Pls.' Opp'n 73.)  Plaintiffs claim that such a comprehensive screening of all condemned inmates is necessary because condemned inmates have "little opportunity . . . to be screened or observed."  (*Id.*)  Plaintiffs rely on Ms. Woodford's limited observations during a one-day tour at San Quentin in support.  (Woodford Decl. ¶ 15, ECF No. 4380.)  But Ms. Woodford is mistaken that condemned

21

1   inmates are not routinely evaluated for mental health treatment, and that these inmates have little

2   opportunity to be screened or observed.  To the contrary, multiple measures are in place to ensure

3   routine, emergent, or urgent care.  (Monthei Decl. Supp. Reply ¶ 19.)  Staff in the condemned

4   units regularly interact with inmates housed on their tiers and notify mental health staff when an

5   inmate is observed to be acting in a bizarre or erratic manner.  (*Id.*)  Further, East Block, which

6   houses the majority of condemned inmates, has six mental health professionals dedicated to the

7   unit in addition to licensed psychiatric technicians who conduct daily rounds.  (*Id.*)  Unit custody

8   staff and these mental health professionals work collaboratively, and as issues arise, custody staff

9   notifies mental health staff both verbally and in writing.  (*Id.*)  This process is formalized through

10  the CDCR form "mental health referral chrono," or form 128-MH5.  (*Id.*)  This process has

11  proven to be successful and of great benefit to East Block.  (*Id.*)  Indeed, as Plaintiffs note, over

12  26% of all condemned inmates are receiving either a CCCMS or EOP-level of care.  (*See* Decl.

13  Woodford, ¶ 26 [noting that 181 of 691 condemned inmates receive EOP or CCCMS care].)  It is

14  telling that Ms. Woodford was apparently unaware of this practice, since she makes no mention

15  of the mental health referral process.

16       Further, as the Special Master reported in his 25th Round Report, a psychiatric technician

17  in the East Block was "familiar with the inmates on the unit, and the inmates appeared to have a

18  good rapport with the pysch tech."  (Special Master's 25th Round Report 180, ECF No. 4298.)

19  And, as the Special Master observed, "rounds were conducted daily for EOP and Grade B 3CMS

20  inmates housed on the unit."  (*Id.*)

21       Second, Plaintiffs claim that San Quentin does not provide for consistent monitoring of

22  condemned inmates and that there is "no focused effort by custody or clinical staff to conduct

23  regular one-on-one screening."  (Opp'n 73-74.)  Plaintiffs claim that, as a result, there is a

24  purported "pattern of systematic under-identification of condemned inmates' serious mental

25  health needs."  (*Id.* at 74.)  The only evidence that Plaintiffs submit in support is reference to Dr.

26  Pablo Stewart's declaration, which states that the percentage of condemned EOP inmates is lower

27  than he would expect, and Ms. Woodford's declaration, identifying four inmates whom she would

28  refer for evaluation for a higher level of care.  (Opp'n at 74.)  This purported evidence is entirely

22

1    unpersuasive.

2           Dr. Stewart fails to provide the basis for this opinion and does not indicate his background

3    working with or evaluating condemned populations. He has published numerous articles, none on

4    the topic of condemned inmates.  (*See* Stewart Decl. at ¶ 18.)  He fails to indicate what, in his

5    opinion, would be a more adequate or appropriate number of EOP-level inmates in a condemned

6    population.  (*See id.* ¶ 453.)  Dr. Stewart also fails to note that the percentage of EOP-condemned

7    inmates is actually *greater* than the percentage of EOP inmates system-wide.  Notably, 3.6% of

8    all condemned inmates are classified as "EOP," compared to 3.09% of all CDCR inmates.

9    (Belavich Reply Decl. ¶ 48.)  Additionally, the percentage of EOP-condemned inmates far

10   exceeds the percentage of EOP inmates in administrative segregation and in the Psychiatric

11   Services Unit statewide combined and multiplied by a factor of five.  (*See id.* [noting that 0.4% of

12   all administrative segregation inmates and 0.29% of all Psychiatric Services Unit inmates receive

13   EOP-level care].)  In this context, it is unclear why Plaintiffs believe the percentage of EOP

14   condemned inmates falls short.

15          Ms. Woodford's testimony on this topic is similarly unavailing.  Ms. Woodford claims

16   that, after having spoken briefly with four condemned inmates *who are currently receiving*

17   *mental health treatment*, she would have referred those inmates to a higher level of care.  (Opp'n

18   at 74; Woodford Decl. ¶¶ 30, 31, 32, 55.)  Yet, even Ms. Woodford admits that she is in no way

19   qualified to make this assessment.  (*See* McKinney Decl. Ex. 8 [Woodford Depo] at 15:12,

20   121:10 [stating she is "not a mental health professional"].)  These four inmates, who are

21   indisputably receiving mental health treatment, would certainly be referred to a mental health

22   crisis bed or acute psychiatric program if their clinicians believed such care to be necessary.

23   (Decl. Monthei ¶ 20.)  Ms. Woodford's lay opinion should not outweigh the professional

24   determination of licensed clinicians.

25          Moreover, Plaintiffs' statement that "there is no focused effort by custody or clinical staff

26   to conduct regular one-on-one screening" is misleading and wrong.  (Opp'n at 74:4-5.)  Ms.

27   Woodford's statements to this effect were limited to North Segregation, and not, as Plaintiffs

28   imply, the entire condemned population.  (Decl. Woodford, ¶ 22 [stating "[i]t is also my

                                                    23

1  understanding that North Segregation inmates are not provided with regular monitoring of their

2  mental health status by either custody or mental health staff"].)  This is a significant omission

3  since North Segregation accounts for nearly one-tenth of the total number of condemned cells.

4  (Decl. Monthei ¶ 21.)  Additionally, mental health staff do in fact conduct rounds in the North

5  Segregation housing unit and custody staff is trained in suicide prevention and wellness checks.

6  (*Id.*)  Further, the inmate population in North Segregation is static, and the custody staff for that

7  population is very tenured and consistent, and they know and understand this population very

8  well.  (*Id.*)  Staff in this housing unit have a rapport with these inmates that allows for consistent

9  daily interaction and observation.  (*Id.*)  Custody staff appropriately refer inmates in North

10 Segregation for mental health treatment when they exhibit bizarre or erratic behavior.  (*Id.*)  There

11 is simply no evidence to indicate otherwise.

12     Third, Plaintiffs allege that Defendants have imposed an "inexplicable and unsupportable"

13 ban on the transfer of condemned inmates to DSH intermediate care facilities.  (Opp'n at 74.)

14 Conveniently, Plaintiffs fail to note that the basis for Defendants' "inexplicable" ban lies in the

15 Penal Code, which provides that only emergent inmates whose "needs are so critical as to

16 endanger the inmate or others" may be transferred to other facilities for treatment.  Cal. Pen. Code

17 § 3600(b)(4).  This does not apply to intermediate-level inmates, whose needs do not rise to this

18 level.  *See id.*  Ms. Woodford's opinion that "there is no custodial justification" for a ban on the

19 transfer of condemned inmates who do not meet the Penal Code's requirements is, therefore,

20 irrelevant since the law prohibits the transfer of these inmates.  (*See* Decl. Woodford, ¶ 47.)

21     Regardless, CDCR has established a program at San Quentin—the "Specialized Care for

22 the Condemned" program—that is specifically designed to address the needs of this intermediate-

23 level condemned population.  Plaintiffs are acutely aware of the "Specialized Care" program.

24 (*See* Opp'n at 74.)  And although Plaintiffs claim that the program is "vague and amorphous" and

25 lacking a written Local Operating Procedure, Plaintiffs fail to note that they were  present and

26 participated in the meeting where a Local Operating Procedure was drafted in December 2012

27 and also conducted a "focused revisit at the institution to further examine the condemned care

28 program" with the Special Master's team at that time.  (Special Master's 25th Report, ECF No.

24

1    4298, at 179.)

2          Further, the status of the Local Operating Procedure (which is in the process of being

3    finalized) is irrelevant to the success of the program.  During the December 2012 visit, the special

4    master's expert observed an IDTT meeting between treatment staff and an inmate-patient, noting

5    that "[t]reatment staff all knew the inmate very well and offered thoughtful and meaningful

6    contributions to the meeting," that "the meeting was conducted appropriately," and that the

7    treatment staff collaborated with custody staff "and incorporated all staff information into their

8    formulation of the inmate's treatment status."  (*Id.* at 181-82.)  This particular inmate-patient

9    stated that "mental health staff adequately addressed her gender identity disorder and its resulting

10   challenges."  (*Id.* at 181.)  The special master's expert and Plaintiffs' counsel also observed a

11   musical recreational therapy group, which included two inmates from the specialized treatment

12   program, and determined that "the group appeared to be beneficial."  (*Id.* at 182-83.)  The special

13   master's expert also interviewed several inmates receiving specialized treatment, who related that

14   they saw their treatment providers "more frequently and had access to them on the unit," and

15   "were generally positive about the program."  (*Id.* at 183.)  During this tour, the special master's

16   expert also interviewed inmates participating in recreational therapy, who reported that "the

17   contacts with the recreational therapist were beneficial."  (*Id.*)

18          Plaintiffs' claims that purported "inadequate staffing, an unsupportable ban on higher levels

19   of care, and overcrowding" constitute deliberate indifference are therefore unsubstantiated and

20   indicate a misunderstanding of the deliberate indifference standard.  As discussed above,

21   Plaintiffs' alleged evidence submitted in support of their allegations relating to the delivery of

22   mental health care for the condemned population amount to nothing more than unsupported

23   conclusions by a person—Ms. Woodford— who admits that she is "not a mental health

24   professional."  (Woodford Dep Tr. at 15:12, 121:10.)  Her testimony must not be considered by

25   this Court because she is unqualified to opine on the subjects of her declaration.  Further,

26   evidence submitted by Defendants in support of their motion to terminate indicate that the State

27   maintains a mental health care system that is one of the best in the nation.  (*See* Termination Mot.

28   at 7, 9, 15 & 34.)  The State's devotion of significant resources, which has yielded positive

                                                      25

1  results, indicates very clearly that Defendants are not acting with a wanton disregard for inmates'

2  mental health care needs.  (*See id.*)

3      **D.  California Provides Appropriate Care to its Inmates With Mental Health Care Needs.**

4

5      **1.  The State's Prison Mental Health Care System Is Meeting the Mental Health Care Needs of Mentally Ill Inmates.**

6          The State's prison mental health care system has sufficient staff to meet the basic mental

7  health needs of California inmates.  *See Hallet*, 296 F.3d 748.  The evidence shows that the

8  State's treatment of inmates with serious mental disorders "meets and often exceeds the standard

9  of care for prisons in the United States . . . ."  (Clinical Exp. Rpt. 1; *see also* Reply Declarations

10  of Cho, Chaiken, Johnson, Paizis, Schneider, Gipson, and Howe.)  There is no evidence that

11  Plaintiffs' allegations of staffing shortages have lead to constitutional violations.  Even beyond

12  this constitutional threshold, Defendants have added and funded additional positions consistent

13  with the 2009 plan to provide even better care.

14          Plaintiffs contend that current staffing "shortages" and other past challenges associated with

15  the reorganization of institutional mental health program missions have contributed to

16  deficiencies in care system wide.  Plaintiffs' reliance on vacancies is misleading because those

17  vacancies are caused by the increased positions the State has authorized.  (Toche Reply Decl. ¶

18  8.)  Plaintiffs contend that mental health staffing vacancies—the deficit between budgeted mental

19  health positions and filled positions—supports a conclusion that the State is providing inadequate

20  care to inmates.  But all evidence shows that the State is and has been providing care that meets

21  the mental health care needs of *Coleman* class members statewide under current levels of mental

22  health staffing.  (*See* Termination Mot. & Supporting Evidence; Williams Reply Decl. ¶¶ 3-7;

23  Cash Reply Decl. ¶¶ 3-5, Jordan Reply Decl. ¶¶ 2-5; Holland Reply Decl. ¶¶ 4-5; Chaiken Reply

24  Decl. ¶ 4; Johnson Reply Decl. ¶¶ 3-5; Monthei Reply Decl.; Fischer Reply Decl. ¶¶ 4-6.)

25  Moreover, there is no correlation, as Plaintiffs contend, between the number of mental health staff

26  positions allocated and the number of positions needed to meet the basic mental health care needs

27  of inmates system wide.  (*See* Toche Reply Decl.)  Accordingly, Plaintiffs' reliance on staffing

28

26

1  vacancies throughout the opposition is flawed and immaterial to the only salient issue in this case:

2  whether the State is providing adequate care to inmates.

3       Instead of providing evidence that the State's mental health system is fundamentally unable

4  to meet the most basic needs of *Coleman* class members, Plaintiffs have assembled an incoherent

5  string of innuendo, unqualified opinions derived from questionable analysis and assessment

6  methodologies, and logical fallacies that are unhinged from any constitutional standard of prison

7  mental health care delivery.  Ultimately, Plaintiffs' arguments fail to establish current and

8  ongoing systemic violations of Coleman class members' Eighth Amendment right to basic mental

9  health care.  The following are examples of the flawed analysis employed by Plaintiffs' experts:

- Plaintiffs' experts rely almost entirely on the same false premise that staffing vacancies conclusively establish that the mental health program is not meeting inmates' basic clinical needs.  (Opp'n at pp. 28-32; Haney Decl. ¶¶ 52, 95-96, 136,189-90; Kaufman Decl. ¶¶ 34-35, 41, 44; Stewart Decl. ¶¶ 57-65, 67-69, 77-78.)  They not only ignore the timely and effective care that is actually being provided, but they cite no evidence showing that the staffing allocations for mental health care positions are tied to the minimum number of staff necessary to provide basic mental health care.[14]

- Plaintiffs' experts made sweeping claims that staff vacancies or "shortages" adversely impacted care based on unsworn hearsay statements from staff or inmates.  (Haney Decl. ¶¶ 51-54, 95-106, 136-138, 188-195, 237-239; Kaufman Decl. ¶¶ 24-46; Stewart Decl. ¶¶ 57-73, 77-90, 104-111, 115-118.)  But they offer no concrete evidence of a causal link between staffing levels and systemic deprivations of basic mental health care.

- Plaintiffs' routinely conclude that staff statements expressing a desire for additional staff, frustration with workloads, or confronting challenges to delivering care within existing staffing levels indicate that inmates' needs are not being met.  (Opp'n at pp 30-31.)  But these conclusions are misleading, because none of the statements shows that mental health clinical staff were unable to deliver care that meets the basic mental health care needs of their patients.  Rather, these statements merely acknowledge challenges and obstacles that have accompanied staff movements and a hiring freeze.  (*See* institution declaration cited above.)  Contrary to Plaintiffs' conclusions, these statements are a testament to the abilities of staff to maintain adequate care under challenging but temporary circumstances.

---

[14] None of Plaintiffs' experts has any documented experience designing or developing a staffing model for a prison, much less for an entire prison system.  Nor do any of them have experience assessing the numbers and array of clinical positions that are necessary to provide mental health care that meets the basic needs of patients in a prison setting.  Their inexperience is manifest in their blind reliance on the special master's flawed interpretation of staffing vacancies as conclusive evidence of unmet need.  Accordingly, none of Plaintiffs' experts is qualified to give an opinion as to whether staffing vacancies are conclusive proof that Defendants' mental health care system is understaffed.

27

1       Moreover, Plaintiffs' accusation that the State has acted with calculated deliberate

2 indifference by understaffing and under-resourcing the mental health program is demonstrably

3 false.  First, the hiring freeze was not targeted at CDCR, but across all agencies statewide.  And

4 the actual impact of the hiring freeze was minimal since CDCR's mental health program was

5 permitted to fully hire all allocated mental health positions during fiscal years 2011-12 and 2012-

6 13.  (Toche Decl. ¶¶ 9 & 24.)  Second, the Health Care Administrator and Senior Psychologist

7 positions, which are not clinical positions, were not "cut for cost savings" as Plaintiffs casually

8 claim.  Those positions were allocated, but ordered not to be filled during fiscal year 2012-2013,

9 resulting in salary savings so that more essential clinical positions could be filled.  (*Id.* at ¶ 10.)

10 Third, the layoffs that accompanied public safety realignment and the historic reduction of the

11 prison population were necessary to redistribute mental health staff in a manner consistent with

12 the mental health mission changes that occurred at multiple institutions.  (*Id.* at ¶¶ 18-23.)  The

13 layoff process impacted certain institutions that closed their Reception Centers and thus reduced

14 the need for staff necessary to complete screening, but these institutions have adjusted to their

15 new missions of providing routine mental health care with the staffing component consistent with

16 the institutional mental health care mission.  (*Id.*)  Plaintiffs' baseless claim that the hiring freeze,

17 or other staffing decisions were implemented to save money at the expense of inmate mental

18 health care recklessly ignores the facts.

19       Instead, here is what the evidence proves.  Defendants have:

20
- Allocated $384,734,000 in fiscal year 2011-2012 to provide mental health care to *Coleman* class members, increased from $341,358,000 budgeted in fiscal year 2009-10.  (2011 annual CDCR Report.)

22
- Employed 1,586 clinical psychologists, psychiatrists, licensed clinical social workers, and therapists (including registry) to serve an outpatient population of 32,361 at a ratio of one employee per 28 inmates.  (Toche Decl. ¶ 3.)

24
- Directed institutional mental health care administrators and supervisors to fill all allocated clinical line staff positions in July 2012 and again in February 2013.  (*Id.* ¶¶ 14 & 15.)

26
- Conducted clinical staff recruitment efforts to recruit and retain psychiatrists for the statewide mental health program.  (*Id.* at ¶ 16.)

28

28

1

2

- Obtained commitments from 60 psychiatrists to provide services statewide through telemedicine so that mental health programs located in more remote locations have the staffing capacity and expertise to meet the mental health care needs. (*Id.*.)

3

4

- Employed registry staff to provide relief to full-time staff when necessary. (*Id.* at ¶ 17.)

5      It is irrefutable that that the State has made a commitment to allocating the resources

6  necessary to exceed the basic mental health care needs of California inmates. Plaintiffs' thin

7  evidence, misleading interpretations of staffing vacancies, and unqualified expert opinions fail to

8  contradict the clear commitment the State has made to ensure that the California prisons are

9  equipped with sufficient numbers of well-trained, well-compensated, and dedicated mental health

10  care professionals.

11          **2.    Plaintiffs' Offered No Evidence or Argument Regarding the State's Quality Management Program.**

12      Plaintiffs failed to rebut the State's evidence demonstrating its robust quality assurance

13  program. (Motion at 19; Clinical Exp. Rpt. at 1-2 & 30.) The State's experts reported that they

14  "have never seen a system that is more comprehensive and extensive regarding quality

15  improvement within a correctional environment." (Clinical Exp. Rpt. at 30.) Dr. Dvoskin

16  similarly reported that he is "aware of no correctional mental health system in the United States

17  that matches the amount of effort or the quality of CDCR's quality improvement system, which

18  includes a well-attended QI Committee at every single prison." (Dvoskin Comments Regarding

19  25th Round Report of the Special Master, ECF No. 4314-1, at 1.) Plaintiffs provided no response,

20  and the Court should cease all oversight with respect to this issue, including vacating its August

21  30, 2012 order. (ECF No. 4232.)

22          **E.    The State Provides Adequate Treatment Space and Treatment Across All Custody Levels.**

23

24      Plaintiffs contend that California prisons' lack of minimally adequate treatment space has

25  created barriers to mental health treatment. Among the barriers Plaintiffs cite in their opposition

26  brief are (1) congested, noisy, and inhospitable treatment environments in administrative

27  segregation units at Mule Creek; (2) high incidence of clinical cell-front clinical contacts at

28  CCWF; (3) treatment spaces that offer limited or no confidentiality; and the (4) lack of office

29

1    space for clinical staff.  (Opp'n at 32, 58-59.)  Plaintiffs' allegation concerning CCWF is untrue:

2    between September 1, 2012 and February 28, 2013, less than 12% of all encounters occurred at

3    the cell-front.  (Williams Reply Decl. ¶¶ 6 & 7; Vorous Reply Decl. Ex. 2-D.)  Moreover,

4    Plaintiffs cite to no authority that requires prisons to provide therapeutic or even confidential

5    treatment spaces for prison inmates to receive outpatient mental health treatment.  This is because

6    the Eighth Amendment does not mandate that prisons be pleasant or even therapeutic

7    environments.  *See, e.g., Lewis v. Casey*, 518 U.S. 343, 391 (1996) (noting that prisons "are

8    inherently dangerous institutions"); *and Taylor v. Mich. Dept. of Corr.*, 69 F.3d 76, 84 (6th Cir.

9    1995) (holding that "[p]risons are dangerous places because they house dangerous people in

10   congested conditions"); *see also Plata*, 131 S. Ct at 1964 (Alito, J. dissenting) ("this court has

11   never suggested that the failure to provide consultation rooms in prisons amounts to cruel and

12   unusual punishment").  Thus, Plaintiffs' conclusory assertions that these prison environments are

13   non-ideal spaces to have treatment establish no objectively intolerable risk of harm constituting

14   an Eighth Amendment violation.

15           **1.    Plaintiffs' Claims About Lack of Confidential Treatment Space Are False.**

16           Plaintiffs' experts' flawed observations and inaccurate descriptions of how treatment is

17   delivered were likely warped by their limited scope of assessment.  For example, Dr. Kaufman's

18   claim that CCWF had high incidence of cell front clinical contacts is misleading given that 83%

19   of clinical encounters occurred in a confidential setting from September 2012 through February

20   2013.  (Williams Reply Decl. [CCWF] ¶¶ 6 & 7; Vorous Reply Decl. Ex. 2-D.)   Confidential

21   treatments spaces existed at the time of his visit, and more has been added since.  (*Id.*)

22           In addition, there is no evidence that inmates are deprived of access to confidential

23   treatment if they request it.  To the contrary, every prison is equipped with confidential space that

24   can be used whenever requested.  (*Id.* see attached chart.)

25           **2.    The State's Use of Unlicensed Facilities to Provide Inpatient Care Is
               Appropriate.**

26

27           Plaintiffs also criticize the State for using *court*-ordered unlicensed facilities for crisis care

28   and inpatient hospitalization programs.  In so doing, Plaintiffs' experts generally opine that these

                                                    30

1    are "bad" or "ugly" beds—neither of which is true—as if using epithets relieve Plaintiffs from

2    their obligation to demonstrate how inmates who receive necessary treatment in these beds are

3    allegedly harmed.  (Opp'n at 33.)  Plaintiffs cite to no systemic lapses of treatment in these "bad

4    beds."  Nor do they describe how they are inadequate with any specificity.  This discussion again

5    demonstrates just how divorced Plaintiffs' analysis is from what is required under the

6    Constitution.

7                    **3.     Experts on Both Sides Agree that the Use of Therapeutic Treatment
                             Modules Is Appropriate.**
8
           Plaintiffs criticize the use of therapeutic treatment modules to facilitate treatment for
9
     inmates housed in segregation or security housing units.  (Opp'n at 60.)  Plaintiffs rely on their
10
     experts' observations of a handful of inmates that express distaste for the treatment modules,
11
     before reaching the categorical conclusion that the therapeutic modules actually discourage
12
     inmate participation in treatment.  Plaintiffs provide no evidence that the sentiment expressed by
13
     a few inmates is shared universally.  Indeed, at deposition, their own expert testified that both the
14
     inmate-patients and the clinicians prefer the treatment modules.  (McKinney Decl. Ex. 5
15
     [Kaufman Depo.] 109:16-23; *see also* Fischer Reply Decl. ¶¶ 11-14 [at Corcoran, inmates and
16
     clinicians prefer therapeutic modules to ATOM chair because inmates and clinicians feel safer
17
     and inmates are able to stand in the modules]; Gipson Reply Decl. [Corcoran] ¶¶ 11-16.)[15]
18
           Plaintiffs' theory that the mental health program's use of the treatment module discourages
19
     inmate participation in treatment activities, and for that reason is systemically denying treatment
20
     to inmates housed in segregation, is unsupported by their own expert.
21
22                **F.     Plaintiffs Failed to Rebut the Evidence Showing that the State Has an
                          Appropriate Medication Management System in Place.**
23         The termination motion, supporting evidence, and discovery demonstrate that the State's

24   medication management program meets or exceeds the standard of care.  (Motion at 21; Clinical

25   Report at 26-29).  The State's psychiatric expert, Dr. Charles Scott, testified that he evaluated

26   _____
           [15] Indeed, data from the ATOM chair piloting program indicates  that inmates refuse
27   group therapy more frequently when ATOM chairs are used in lieu of therapeutic treatment
     modules.  And non-ATOMS group times tend to be longer in length due to inmate-patients and
     clinician preference.
28
                                              31

1   "the provision of psychiatric care and the monitoring of the psychiatric care, and what were the

2   mechanisms in place to assist with that methodology and evaluation process." (McKinney Decl.

3   Ex. 3 [Scott Depo.] 21:4-8; *see also* Scott Reply Decl. ¶¶ 2-5.) He testified about his detailed

4   methodology for reviewing issues related to medication, including the review of 130-140 patients

5   with an oversampling of inmates at the EOP and crisis bed levels of care, and inmates with a

6   higher risk of suicide. (*Id.* at 35-38.) He reviewed the State's comprehensive systems for

7   monitoring medication—including the e-UHR, patient charts, MHTS.net, and LabQuest 360—

8   and maintained a database of his review. (*Id.* at 50-51; Scott Reply Decl. ¶ 5.) Dr. Scott's review

9   included a very detailed review of the items CDCR psychiatrists monitor. (*Id.* at 182.) Dr. Scott

10  also relied on the State's own audit tool, known as MAPIP, an extensive monitoring tool that

11  includes measures that are beyond "the reasonable care in the community that a reasonable and

12  prudent psychiatrist in a similar or like circumstance would do. So tort standard of care." (*Id.* at

13  49:25-50:3.) Based on this thorough review, Dr. Scott concluded that CDCR (1) appropriately

14  prescribes and administers psychotropic medications to its inmate-patients, (2) appropriately

15  supervises and evaluates patients on psychotropic medication, and (3) is not deliberately

16  indifferent to the psychiatric needs of its inmate-patients. (Clinical Exp. Rpt. 27-30; Reply Decl.

17  of C. Scott ¶ 4.)

18          Plaintiffs made no effort to rebut Dr. Scott's opinions, and the clear and convincing

19  evidence that CDCR's system for psychiatric medication management and lab studies is

20  undisputed. (*See* Stewart Decl., ¶¶ 119-168 & Kaufman Decl., ¶¶ 65-83.) While both of

21  Plaintiffs' experts spoke about "problems" or "concerns," neither of them raise a question of

22  systemic inadequacy or deliberate indifference. One of Plaintiffs' experts could not articulate the

23  deliberate indifference standard despite twice testifying before this Court on mental health issues,

24  including in the original *Coleman* trial. (Kaufman Depo., 13:25-14:12; *see also* Scott Reply Decl.

25  ¶ 2 [deliberate indifference "is a very basic concept in forensic psychiatry and one that is required

26  for individuals who are trained in forensic psychiatry and who do evaluations of correctional care

27  to understand"].) When asked at deposition about what standard he was applying, Dr. Kaufman

28

32

1   asked for a break.  (*Id.* at 44:14-45:24.)  By his own admission, Dr. Kaufman's opinions have no

2   relevance to the issues this Court is asked to decide.[16]

3         The entire basis for the opinions of Plaintiffs' other psychiatrist, Dr. Stewart, is the State's

4   system for managing and monitoring compliance with the Program Guide.  His declaration

5   consists almost entirely of statements about the State's compliance with the Program Guide.  (*See,*

6   *e.g.,* Stewart Decl., ¶¶ 122-23, 124-25, 126-27, & 128-29; McKinney Decl. Ex. 6 [Stewart Depo.]

7   61:14-16].)  He did not randomly review any medical records, did not sit in on any

8   Interdisciplinary Treatment Team meetings at the prisons he visited, and only "skimmed" the

9   documents attached to his declaration.  (*Id.* at 37:11-16, 39:7-19 & 41:1-5; *see also* Scott Reply

10  Decl. ¶ 5 ["failing to review actual documentation substantially increases the risk of faulty and

11  erroneous conclusions about psychiatric treatment and monitoring".)  What is absent is any

12  evidence of harm—or indeed, any impact—to a single *Coleman* class member, let alone a

13  systemic violation of a federal right impacting the entire *Coleman* class.  The very presence of

14  these systems, coupled with the fact that the State is using these systems to continually monitor

15  and self-improve, should be enough for the Court to end its oversight of this matter.

16        Plaintiffs presented no evidence to rebut the clear and convincing evidence presented by

17  the State that it meets its inmates' psychiatric needs, and the Court should immediately terminate

18  all future monitoring of this issue.  The concerns raised by Plaintiffs are isolated and do not raise

19  a systemic concern.  Each of them is dismissed below.

20  ///

21       **1.**     **Plaintiffs' "Concern" About Whether Nurses Are Knowledgeable About**

22              **Side Effects Does Not Raise a Question of Systemic Deliberate Indifference.**

23        Plaintiffs' primary complaint about medication management is that nurses lack knowledge

24  about potential side effects of psychotropic medication.  (Opp'n at 67-68.)[17]  Plaintiffs vaguely

25        [16] Even if the Court were to consider Dr. Kaufman and Dr. Stewart's opinions regarding
medication management, they both admitted that they did not consider medication issues for

26  CCCMS inmates in General Population, or approximately 80% of the *Coleman* class.  (McKinney
Decl. Exs. 5 [Kaufman Depo.] 108:10-12 & 204:7-20 & 6 [Stewart Depo.] 11:25-14; *see also*

27  Scott Reply Decl. ¶ 18.)
      [17] The *Plata* receiver is responsible for nursing staff.

28

1   state a "concern," but their experts fail to cite a single instance where this purported lack of

2   knowledge had any impact on a *Coleman* class member.  (*Id.*; Kaufman Decl. ¶¶ 75-76; Stewart

3   Decl., ¶¶ 134-135.)[18]  To the contrary, Plaintiffs' expert testified that the "follow-up about side

4   effects of medication was comprehensive."  (McKinney Decl. Ex. 5 [Kaufman Depo.] 148:12-16.)

5        Plaintiffs base this opinion not on their own investigation, but on the recommendation of

6   the State's nursing expert, Dr. Moore.  (*Id.* at 143:2-14 ["I'm mainly citing the State's expert, Dr.

7   Moore."].)  Dr. Moore did not testify that this was an issue of deliberate indifference, but simply

8   recommended that CDCR provide further education to its nurses.  (Moore Depo., 182:3-8

9   [recommendation that "nursing education emphasize the side effects of the medication . . . ."];

10  Moore Reply Decl., ¶ 4.)

11        **2.    None of Plaintiffs' Remaining "Problems" Are of Constitutional Concern
              or Require Continued Federal Court Oversight of Medication**
12            **Management.**

13        Plaintiffs cite the special master's twenty-fifth round report for examples of "medication

14  management problems."  (Opp'n at 68-70.)  The special master's report in no way establishes that

15  the State's medication monitoring system is deliberately indifferent to the serious mental health

16  needs of class members.  Indeed, the special master's monitoring report confirms that he does not

17  assess whether any aspect of the State's prison mental health care system satisfies constitutional

18  standards.  (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF 4205, at 18-19.)

19        The Constitution requires only that the State's prison system not be deliberately

20  indifferent to the serious mental health needs of its inmates.  California's medication monitoring

21  system far exceeds that standard.  (*See* Clinical Exp. Rpt. at 26-29; Scott Reply Decl. at ¶ 4.)

22  Plaintiffs' reference to excerpts from two prisons' management reports, which were prepared for

23  the special master in advance of his twenty-fifth round site visits and on which his report rely, fail

24  because they do not assess whether the State's prison mental health care system satisfies

25  constitutional standards.  (*See* Opp'n at 68:21-70:1.)  Since Plaintiffs do not (and cannot) allege

26  _____

27        [18] Dr. Stewart, a psychiatrist, oddly opines that "standard nursing practice is to ask about
     clinical efficacy and any possible side effects" every time they distribute medication.  (*Id.* at ¶
     134.)  This is not the standard of care in any setting.  (Moore Reply Decl., ¶ 5.)

28

                                             34

1  that any of these issues represent deliberate indifference or a violation of a federal right with

2  respect to the *Coleman* class, there is no reason for the *Coleman* Court to continue its oversight of

3  medication management.

> **a.   Plaintiffs Fail to Raise a Constitutional Question With Respect to the Special Master's Measure of "Medication Noncompliance."**

5       Plaintiffs' first example of an alleged deficiency is the special master's vague statement

6  that nineteen institutions "indicated noncompliance with appropriate identification,

7  documentation, referral, and response to inmate medication noncompliance." (25th Report at 68.)

8  The report does not include "any citation or authority that identifies the standard that CDCR is

9  allegedly failing to meet." (Dvoskin Comments Regarding 25th Round Report of the Special

10  Master, ECF 4314-1, at 1.) Moreover, at least four separate measures—identification,

11  documentation, referral, and response—are included within this single statement, and one of those

12  measures appears to be whether appointments occur "within four working days of referral." (25th

13  report at 107 [finding that Pelican Bay State Prison had a 96 percent compliance rate with this

14  measure].) Neither the special master nor Plaintiffs offer any evidence to support a conclusion

15  that a 96 percent compliance rate is a failure, or that a failure to comply with timelines or any

16  other measure included in this provision impacted quality of care or the federal rights of the

17  *Coleman* class. Stating that 19 institutions failed to meet any one of at least four Program Guide

18  requirements 100% of the time does not establish systemic deliberate indifference. And neither

19  does Dr. Stewart's reference to a single institution that was unable to show that a physician's

20  order or progress note made it into the patient's chart within 7 days. (Stewart Decl., ¶ 153; *see*

21  *also* Scott Reply Decl. ¶ 28.) While Dr. Stewart might think this is "alarming," Dr. Stewart did

22  not identify how this isolated instance caused systemic harm.

23       The opinion of Plaintiffs' expert Dr. Kaufman that high rates of medication refusal

24  indicate a "fundamental breakdown of trust and communication between clinicians and patients"

25  is bizarre. (Kaufman Decl., ¶¶ 74-75.) Plaintiffs presented no evidence that there is a high rate of

26  medication refusal in CDCR, or that CDCR's systemic response to medication refusals have

27  violated the federal rights of any member of the *Coleman* class. Dr. Kaufman testified that

28

35

1   patients have a right to refuse medication, and that his patients sometimes refuse their medication.

2   (McKinney Decl. Ex. 5 [Kaufman Depo.] 140:10-141:22.)  Although Dr. Kaufman claimed his

3   patients' refusal rate is around 10%, he has no experience in a correctional setting.

> **b.  Plaintiffs Did Not Prove that the State's Laboratory Testing Orders Violate the Constitution.**

4
5       The State's experts reported "that laboratory results were appropriately monitored and

6   addressed." (Clinical Report at 27.)  Dr. Scott further testified that the State's MAPIP internal

7   audit tool is beyond the standard of care.  (McKinney Decl. Ex. 3 [Scott Depo.] 48-50.)  He also

8   testified about the numerous ways CDCR doctors obtain and check lab results.  (*Id.* at 54:24-

9   55:10.)  Plaintiffs' experts, on the other hand, did not personally review any lab work.  (*Id.* at Ex.

10  6 [Stewart Depo.] 148:24-149:5; *see also* Scott Reply Decl. ¶ 28.)  Nevertheless, Plaintiffs

11  reference the special master's report where he discusses Program Guide compliance on issues

12  related to laboratory testing.  (25th Report at 70 & 86; Stewart Decl., ¶ 144 [acknowledging that

13  "for those taking Clozapine, it was 96-percent compliant"].)  Dr. Kaufman offers nothing that

14  would establish deliberate indifference, just a general truism about the side effects of

15  psychotropic medication.  (Kaufman Decl. ¶ 25.)  And once again, Dr. Stewart bases his opinions

16  on the special master's report and management reports prepared for three prisons documenting

17  compliance with the Program Guide, one of which stated that "laboratory tests were ordered 92

18  percent of the time and lab tests were reviewed and clinical documented 88 percent of the time."

19  (Stewart Decl., ¶¶ 139, 149 & 164 [quoting Ex. 45 to Bien Dec. (SQ Management Report) at 5].)

20  While Plaintiffs appear to want a system that manages 100 percent compliance with the Program

21  Guide, this is not what the Constitution requires.  Plaintiffs' evidence is evidence of a working

22  system, not one that needs further federal court oversight.  *See Coleman*, 912 F. Supp. at 1323

23  (ordering the State to monitor inmates (if necessary, by blood testing) to determine if they were

24  miscuing psychotropic medication).

25

> **c.  Plaintiffs' Claims About Abnormal Involuntary Movement Scale (AIMS) Testing Do Not Present a Constitutional Issue.**

26
27      Plaintiffs' next complaint is that CDCR's AIMS testing is "inadequate," but they

28  acknowledge that CDCR has a system for conducting AIMS testing.  (Stewart Decl., ¶ 161.)

36

1   Although Dr. Stewart visited SVSP, CSP-Sacramento, CSP-Los Angeles County, RJ Donovan,

2   and San Quentin, Dr. Stewart identifies only two inmates (Prisoners C & D at RJD) who he

3   claims should have had more recent AIMS testing.  (Stewart Decl., ¶¶ 157, 161 & 163.)  That he

4   mentions only two isolated examples out of the 76 *Coleman* class members he reviewed belies

5   Plaintiffs' contention that this is a serious—let alone constitutional—medication management

6   "problem."

7              **d.      Plaintiffs' Unsupported Claims About Lack of Informed Consent**

8                        **Must Be Rejected.**

9         Plaintiffs argue without any supporting evidence that lack of appropriate informed

10  consents is a "serious problem."  (Opp'n at 69.)  The evidence shows that California's inmate-

11  patients are receiving their medication, and while most inmates do have an appropriately

12  documented informed consent form in their medical record, informed consent is not a

13  requirement in prison, even for accreditation by the National Commission on Correctional Health

14  Care.  (McKinney Decl. Ex. 3 [Scott Depo.] 86:16-22; *see also id.* at 84:20-21, 157:10-12,

15  237:13-16 [examples of testimony documenting informed consent].)

16             **e.      Plaintiffs' Unsupported Claims About Lack of Medication**

                         **Renewals Must Be Rejected.**

17        Similarly, Plaintiffs point to no evidence showing that members of the *Coleman* class are

18  systematically being denied medication.  Plaintiffs misleadingly cite to page 68 of the special

19  master's report, which states that nearly every prison was compliant with medication orders.

20  Plaintiffs also rely on a non sequitur by Dr. Stewart that a single institution—CSP-Sacramento—

21  uses "Senior Psychiatrists rather than staff psychiatrists to renew medications."  (Stewart Decl., ¶

22  145.)  Plaintiffs also cite to two anecdotes by Dr. Kaufman: (1) a nurse told him that a psychiatrist

23  at some time in the past prescribed six medications to a patient without personally seeing the

24  patient.  (Kaufman Decl., ¶ 66.)  But Dr. Kaufman did not follow up with the patient, did not

25  know what four of the medications were, and did not even verify that the anecdote was true.

26  (McKinney Decl. Ex. 5 [Kaufman Depo.] 110:4-111:15.)  Dr. Kaufman also discusses a single

27  inmate at CCWF who was "worried" that her medication might lapse, but there is no evidence

28

37

1   from Dr. Kaufman that the medication actually lapsed.  (Kaufman, Decl. ¶ 66.)  There is no

2   systemic issue here.

3              f.      The State's Efforts to Improve Its Medical Facilities Are Not
                       Evidence of a Constitutional Deficiency.
4

5          Plaintiffs point to a budget document to try to argue that there is a systemic constitutional

6   deficiency with respect to medication management.  (Opp'n at 70.)  The evidence before the

7   Court is that the State systemically meets the medication needs of its inmate-patients.  Rather than

8   evidence of deficiencies, the documents Plaintiffs rely on show that the State is continuing to

9   improve its system, and the Court should not countenance Plaintiffs' use of the State's efforts at

10  continued self-improvement against them.  It is inappropriate for Plaintiffs to use documents

11  intended to gain funding or otherwise improve the system as evidence of inadequacy.

12         3.      Plaintiffs' Failed to Rebut the Evidence that the State Maintains
                   Accurate, Complete, and Confidential Mental Health Records.

13         The State's termination motion established that the *Plata* receiver implemented an

14  electronic Unit Health Record project to create an electronically accessible medical record for

15  every inmate, which is being used in every prison.  (Motion at 19-20.)  Mental health staff have

16  been trained to use and maintain the electronic Unit Health Records.  (*Id.*)  The motion further

17  established that the records are current, accurate, and available to all appropriate staff.  (*Id.*; *see*

18  Belavich Decl. ¶ 21; Clinical Exp. Rpt. at 28.)

19         Plaintiffs cite no evidence to the contrary.  Plaintiffs' argument that records are not being

20  scanned in a timely manner is particularly feeble.  Plaintiffs' expert acknowledges that records are

21  scanned within 24 hours, which is consistent with Defendants' evidence.  (Stewart Decl. ¶ 91.)

22  Yet Plaintiffs rely on a single clinician's practice of maintaining a paper copy of relevant records

23  to argue that there are "delays in scanning records."  (*See also* Jordan Reply Decl. ¶¶ 36-37;

24  Harry Reply Decl. ¶ 6; Chaiken Reply Decl. ¶ 6; Fischer Reply Decl. ¶¶ 20-22.)  Plaintiffs' own

25  evidence shows this is false.

26         Plaintiffs next argue that the electronic record is "cumbersome" by parroting the finding

27  of Defendants' experts, and citing a few isolated examples of illegible handwriting by clinicians

28  found in the electronic record (Kaufman, Decl. ¶ 82; *but see* Fischer Reply Decl. [Corcoran] ¶ 21

38

1   ["This vague generalization is simply not true . . . The system allows clinicians to competently

2   access information and treat patients . . . ."].)[19]  Despite this challenge created by the *Plata*

3   receiver, however, the State's clinicians and Defendants' experts are able to adequately access

4   individual inmate-patient records.  (*See* Clinical Exp. Rpt. at 28; *see also, e.g.,* Scott Depo. at 36-

5   37, 52-57, 90:21-91:20, 105:13-20, 143:11-144:9, 230:22-231:14, 237:5-13; Scott Reply Decl. ¶

6   5.)  Even Plaintiffs' expert agreed that he was able to gain a great deal of information, including

7   whether a diagnosis was made, whether medication was appropriately prescribed, and whether the

8   doctor was monitoring the medication-from the records provided to him.  (Kaufman Depo., 32:1-

9   33:18 & 37:10-14.)[20]  In light of this testimony, Plaintiffs' claims about the quality of the medical

10  records, which were based on the opinion of Dr. Kaufman (who has not worked in a correctional

11  setting in 40 years and reviewed only 20 records), should be rejected.  (*Id.* at 31:14-25.)

12      Plaintiffs' complaints about the electronic Unit Health Record are not a constitutional issue

13  and certainly are not evidence of deliberate indifference.  To the extent that the Court believes

14  Plaintiffs' complaints have constitutional merit, the issue should be addressed by the *Plata* court

15  and its receiver, who remains responsible for "implementation of the long term [information

16  technology] program to include the medical, dental and mental health programs.  (ECF No. 2247

17  at 7.)

18

19      **G.    California's Suicide-Prevention Program Meets the Constitutional Standard.**

20      California's system of suicide prevention far exceeds the basic constitutional requirements

21  and saves thousands of lives each year.  The special master's suicide reports on which plaintiffs

22      [19] Plaintiffs also misleadingly cite a single example where Plaintiffs' expert says he
    unsuccessfully asked "staff on the unit floor to see the medical/mental health records . . . ."
23  (Haney Decl. ¶ 92.)  Mr. Haney does not identify the staff in question, and Plaintiffs refused to
    make Mr. Haney available for deposition in time to address his vague declaration, so it is
24  impossible for the State to even assess this claim.  Moreover, although Plaintiffs fail to mention
    this, Mr. Haney concedes that he was subsequently able to review the records in question.  (*Id.* at
25  ¶ 94).

26      [20] Plaintiffs' expert further conceded that he only reviewed the "record that was provided
    to [him]" by Plaintiffs' counsel (Kaufman Depo., 36:25-37:7), so his opinions are based on
27  incomplete and indeed cherry-picked information, which should be viewed by this Court with
    suspicion.

28
                                            39

1  rely in fact show that only a handful of suicides in 2011 and 2012 were actually foreseeable or

2  preventable—far too few to establish systemic deliberate indifference.  Of the remaining cases

3  discussed in the reports, many of the special master's findings amount to an impermissible

4  exercise in second-guessing and conjecture.  Finally, the claim that Defendants have ignored

5  recommendations by the special master or other experts is nonsensical and demonstrably false.

6  For the following reasons, Defendants' suicide prevention measures must be found constitutional.

7       Through the din and diatribe of Plaintiffs' opposition, they have lost sight of a central

8  truth.  "Suicide is a difficult event to predict and prevent and often occurs without warning.  Both

9  the common law and the recently developed constitutional law applying to those in custody have

10  taken this uncertainty into account in developing rules of liability based on foreseeability."  *Gray*

11  *v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).   Because suicide rests on a complex array

12  of factors and motives, inmates determined to commit suicide are very difficult to stop.  *Strickler*

13  *v. McCord*, 306 F. Supp. 2d 818, 829 (N.D. Ind. 2004).

14       In light of these challenges, the Constitution requires only that prison officials take

15  reasonable steps to alleviate the serious risk of harm.  Prison officials must put in place

16  reasonable measures to prevent inmate suicide as a necessary component of any correctional

17  mental health system.  *Balla v. Idaho State Bd. of Corrs.*, 595 F. Supp. 1558, 1577 (D. Idaho

18  1984).  But the Constitution does not require that particular measures be enacted—the Eighth

19  Amendment does not enshrine specific preventive measures to prevent inmate suicide.  Nor does

20  the Constitution require that "every possible measure be taken to prevent [inmates'] suicidal

21  efforts."  *Gray*, 399 F.3d at 619.  "As all agree, prisoners do not have a generalized right to be

22  correctly screened for suicidal tendencies, or to be absolutely protected against committing

23  suicide."  *Perez v. Oakland County*, 380 F. Supp. 2d 830, 840 (E.D. Mich. 2005).

24       A corollary to this legal principle of reasonable response to a known risk is that deliberate

25  indifference cannot be assessed simply by looking at the results—in other words, that an inmate

26  committed suicide does not by itself establish that his Constitutional rights were violated.  "It is

27  deceivingly inviting to take the suicide, *ipso facto*, as conclusive proof of deliberate indifference.

28  However, where suicidal tendencies are discovered and preventive measures taken, the question

40

1    is only whether the measures taken were so inadequate as to be deliberately indifferent to the

2    risk." *Rellegert by Rellegert v. Cape Girardeau County, Mo.*, 924 F.2d 794, 796 (8th Cir. 1991).

3    Thus, the fact that inmates commit suicide despite a prison's efforts to prevent them does not

4    establish a constitutional violation.  Further, that someone might, in hindsight, question the

5    preventive measures undertaken does not suffice under the governing law, especially since "once

6    a suicide has been accomplished in spite of preventive measures, it is all too easy to point out the

7    flaws of failure." *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1020 (9th Cir. 2010) (citation

8    omitted).

9              **1.   Defendants Have Instituted a Robust Suicide Prevention Program, Which
                     Belies Plaintiffs' Claims of Systemic Deliberate Indifference.**

10

11             **a.   Defendants' Suicide Prevention Measures Far Exceed The
                     Basic Requirements of the Constitution.**

12           Plaintiffs cannot establish that Defendants are deliberately indifferent to a substantial risk

13   of inmate suicide.  Prisons are required to establish no more than a "basic program for the

14   identification, treatment, and supervision of inmates with suicidal tendencies." *Balla v. Idaho*

15   *State Bd. of Corrs.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984).  *See Clouthier v. County of Contra*

16   *Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (rejecting deliberate indifference claim where county

17   jail "had reasonable and well-established written policies" for handling detainee's mental health

18   needs, and the county "invested considerable resources in developing its policies and training its

19   employees" on these issues); *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1537 (11th Cir. 1994)

20   (upholding county's suicide prevention policies which included basic screening questionnaire and

21   policy of suicide watch for inmates with suicidal tendencies).

22

23           Where officials have "promulgated commonplace suicide-prevention policies," courts

24   ordinarily have rejected deliberate indifference claims, "even if officers did not always follow the

25   department's policy and even if other, better policies might have diminished suicide risk."

26   *Manarite v. City of Springfield*, 957 F.2d 953, 957 (1st Cir. 1992).  *See, e.g.*, *Edwards v. Gilbert*,

27

28

                                              41

867 F.2d 1271, 1276 (11th Cir. 1989) (no liability for suicide although a better, more up-to-date screening procedure might have identified victim as a risk requiring special procedures); *Belcher v. Oliver*, 898 F.2d 32, 34-36 (4th Cir. 1990) (no liability for suicide despite court's acknowledgment that better screening procedures might have identified inmate as a special suicide risk); *Molton v. Cleveland*, 839 F.2d 240, 246-47 (no liability despite city's failure to give officers much suicide-prevention training).

California far exceeds this constitutional minimum. The State's suicide prevention program is multi-faceted, and consists of a program that identifies, treats, and supervises inmates at risk for suicide. (ECF No. 4277 ¶¶ 23–24.) Mental health clinicians, correctional officers, and facility management personnel collaborate and coordinate in responding to and preventing inmate suicides. (*Id.*; *see also* Hill Reply Decl. ¶¶ 6-8; Jansen Reply Decl.; Johnson Reply Decl. ¶¶ 6-7; Monthei Reply Decl.) All inmates are observed for suicide risk, and inmates enrolled in the mental health program are regularly monitored for risk of suicide as clinically appropriate. (*Id.*)

**(1)   Suicide Prevention and Response.**

Suicide prevention and response improvement teams exist both at headquarters and at each prison. (ECF No. 4277 ¶ 29.) These teams train prison staff on suicide prevention, response, reporting, and suicide review. (*Id.*) For example, in 2011, suicide prevention videos were released to all 33 prisons so that the videos could be used to provide a consistent message during training. (Belavich Decl. ¶ 8.) In addition, each prison's suicide prevention committee is required to amend and implement local operating procedures when necessary. (ECF No. 4277 ¶ 29.) Declarations submitted by clinical staff at Folsom State Prison, Pleasant Valley Prison, and Salinas Valley State Prison show just three examples of prisons with active and functioning prevention committees. (Hoffman Reply Decl. ¶¶ 16-25; McMahon Reply Decl. ¶¶ 3-8; Card Reply Decl. ¶¶ 2-6.)

42

Another function of the suicide program is the identification and treatment of inmates at risk for suicide.  (ECF No. 4277 at ¶¶ 10–29.)  The State has standardized mental health forms to document the mental health care being provided to all inmates, which include forms used to record screening for suicide risk.  (ECF No. 4277 at ¶ 10, Ex. 1.)  Mental health staff conduct a face-to-face suicide risk evaluation to identify inmates at risk for suicide in multiple circumstances, arranging from a newly arrived inmate who exhibits a current or significant risk to evaluating inmates upon their return from inpatient treatment programs.  (ECF No. 4277 at ¶ 24.)

In 2010, CDCR developed a mentoring program to improve clinical competency in the administration of suicide risk evaluations.  (ECF No. 4313 ¶ 14.)  The mentoring program in 2010 was designed to mentor new or unlicensed staff, with an initial intent to "grandfather" in veteran staff.  (*Id.*)  Thereafter, CDCR provided ongoing training to selected monitors at all institutions and, by January 2013, every institution had an identified primary mentor.  (*Id.*)  After developing the program, CDCR changed the focus to complete suicide risk evaluation mentoring for all staff who administer suicide-risk evaluations with inmates needing Enhanced Outpatient Program and Mental Health Crisis Bed placement.  (*Id.*)

Because of the expanded nature of the mentoring program and CDCR's commitment to maintain an ongoing focus on quality clinician work, CDCR directed that all staff conducting suicide risk evaluations in the Enhanced Outpatient Program and Mental Health Crisis Bed programs complete the mentor program by April 30, 2013.  (Belavich Decl. ¶ 43, Exs. H & I.)  In addition, CDCR has recently provided additional training on completing a suicide risk evaluation.  (*Id.* ¶ 44, Ex. J.)  Moreover, CDCR has developed a new suicide prevention workgroup at headquarters to further address inmate suicides.  (*Id.* ¶ 13 & 42, Ex. B**.**)  CDCR mental health staff are also actively involved in monitoring inmates at a high risk of suicide.  (ECF No. 4313 ¶ 16.)  Mental health staff continually monitor high-risk inmates through multiple processes,

43

including designated referral coordinators, monthly meetings, and data tracking.  (*Id.*)  Mental health clinicians from Salinas Valley, Folsom, and Pleasant Valley State prisons describe how these myriad processes work locally.  (Hoffman Reply Decl. ¶¶ 29-30; Cho Reply Decl. ¶ 2, 11 & 14-15; Paizis Reply Decl. ¶¶ 2-9; Schneider Reply Decl. ¶¶ 18-19 & 22-25; McMahon Reply Decl. ¶¶ 3-10; Howe Reply Decl. ¶¶ 1-8.)

Multiple proactive measures exist in Administrative Segregation Units to prevent suicide, including double-celling inmates when safe, and providing electrical appliances when feasible.  (ECF No. 4277 ¶ 26; Allison Decl. ¶ 9–10, Ex. C.)  In addition, CDCR has retrofitted and designated "in take" cells for inmates new to segregation, requires mental health staff to conduct daily clinical rounds, custody and clinical staff to conduct daily morning "check in" meetings, and custody to conduct 30-minute welfare checks of every inmate during their first three weeks in segregation.  (ECF No. 4277 ¶ 26; Allison Decl. ¶¶ 5–8; Hill Decl. ¶ 4; Center Reply Decl.)

Welfare checks are monitored at the institution level on a daily basis by the sergeant in a labor-intensive effort requiring written logs by staff, which a sergeant then verifies. (Hill Reply Decl. ¶ 4; Schneider Reply Decl. ¶ 21; Atchley Reply Decl. ¶¶ 7 & 8.)  CDCR has now sought a bid to acquire electronic monitoring devices and or a system consisting of an electronic recording device to digitally record the Correctional Officers check time at all pre-assigned individual cell locations.  (Allison Decl. ¶ 7.)  This system will allow better tracking by CDCR headquarters.  (*Id.*)  In the interim, while the contract is being sought, CDCR has authored a memorandum that reminds staff to complete the welfare checks at a staggered and unpredictable way.  (*Id.* ¶ 8, Ex. B.)  Moreover, the memorandum directs staff that welfare checks for inmates in administrative segregation continue beyond 21 days when deemed clinically appropriate.  (*Id.*)

A state-wide emergency medical response system policy, which includes policies and procedures on medical response, treatment, and transportation, also exits. (ECF No. 4326–1 ¶ 6,

44

Ex. 1.)  Under this policy, staff receives mandatory training in emergency response, and all

institutions maintain emergency response tools.  (*Id.*; Allison Decl. ¶ 17.)  CDCR has also issued

and implemented procedures for segregated areas that require a specified number of staff present

to open and enter a cell and for first responders to perform life saving measures.  (Allison Decl.

¶¶ 18–19.)  Locally, institutions have committees designated to analyze emergency medical

responses, which review the emergency medical response reports at regular monthly meetings,

and quarterly drills occur at each institution.  (ECF No. 4326–1 ¶ 7; Allison Reply Decl. ¶ 17, Ex.

D; Keith Reply Decl. ¶¶ 4-6; O'Laughlin Reply Decl. ¶¶ 2-10; Hoffman Reply Decl. ¶ 19;

McMahon Reply Decl. ¶¶ 7-9; Gabeler Reply Decl. ¶¶ 2-10.)  Drill logs are sent to headquarters

for review and feedback.  (Allison Decl. ¶ 18.)  And, when suicides occur that implicate

emergency response procedures, the prisons and headquarters appropriately respond.  (*See* ECF

No. 4326–1 ¶¶ 10–11; Gabeler Reply Decl. ¶ 7; Hoffman Reply Decl. ¶ 19; McMahon Reply

Decl. ¶ 9.)

CDCR is also continuing in its efforts to reduce the length of stay in administrative

segregation.  (Allison Decl. ¶ 11.)  It has formed an "ASU Stakeholder Workgroup" that meets

monthly to discuss policies and proposals for improving the ASU system, such as improved

tracking of welfare checks and lengths of stay.  (*Id.* ¶ 12.)  By continuing to monitor and review

inmates with the longest lengths of stay, CDCR was able to reduce the wait list for enhanced

outpatient program inmates pending transfer to an administrative segregation program to zero by

April 2012.  (*Id.* ¶ 13.)  Moreover, through this process, there is an assurance that inmates are not

remaining in segregation units without legitimate penological interest.  (*Id.* ¶ 14.)

In addition, CDCR has instituted additional program elements beyond its standard

program.  For instance, in 2011, CDCR instituted "evening programs" requiring extended staff

hours in order to have more direct and timely crisis intervention services.  (Belavich Decl. ¶ 8.)

45

Beginning in 2011, CDCR drafted and successfully implemented a standardized self-monitoring process to ensure that inmates are timely identified, referred, and transferred to acute and intermediate levels of care. (*Id.* ¶ 7 & 14–15; ECF No. 4277 at ¶ 9.) To assist in this process, CDCR has coordinators at each institution to manage and audit the referral process and a team of mental health professionals assigned to review the process on an ongoing basis. (*Id.*) In fact, by July 2012, the State had successfully guaranteed timely access to inpatient mental health care to all class members needing hospitalization. (*See* Order, ECF No. 4214 (noting the "remarkable accomplishments" in addressing the problems in access to inpatient mental health care); 24th Monitoring Rep., ECF No. 4205 at 9.)

In 2012, CDCR implemented a system to track and monitor alternative and outpatient housing use, and issued memorandums to govern their use pending admission to a Mental Health Crisis Bed. (Belavich Decl. ¶ 10; ECF No. 4277 ¶ 14.) In 2013, CDCR finalized a quality improvement audit tool. (Belavich Decl. ¶ 13.)

### (2)     Suicide Reporting Procedures.

There is a robust suicide review process in CDCR, both at the institution level and at headquarters. (Belavich Decl. ¶¶ 40–41; ECF No. 4277 at ¶ 29.) This process ensures that when a suicide occurs, there is immediate notification of the suicide and appointment of a clinician to investigate and prepare a suicide report. (Belavich Decl. ¶¶ 40–41; *Id.* ¶ 30.) That report covers the possible distal and proximal causes of the suicide, the victim's mental health status before death, mental health care provided to the victim, and emergency response measures undertaken. (*Id.*) The report also makes recommendations, as appropriate, to correct any actions taken by custody or clinical staff. (*Id.*) Additionally, if cardiopulmonary resuscitation (CPR) is not undertaken in response to a suicide event, a report detailing the reasons why is sent to both the warden and headquarters staff for review. (ECF No. 4277 ¶ 28.)

46

1    Clearly, the State has succeeded in implementing a thorough, standardized suicide

2    prevention program. The State devotes "extraordinary resources to clinical and operational

3    investigations into completed suicides, as well as prospective efforts to prevent such acts in the

4    future." (ECF No. 4271-5 at 2.)  Nationally-renowned experts have found the State's

5    "systemwide attention to suicide prevention "especially impressive," and noted that "CDCR does

6    as diligent a job of investigating suicides as any system of prisons or jails in the country."

7    (Clinical Exp. Rpt. at 2; *see also* ECF No. 4314-1 at 2-3.)  Moreover, the fact that "the CDCR

8    suicide review team has been consistently competent and self-critical in their reviews of the

9    [2011] suicides, . . . is powerful evidence that CDCR is not deliberately indifferent to the

10   prevention of suicides among its inmates."  (ECF No. 4326–6 at 4.)  In light of this evidence,

11   Plaintiffs cannot show that California is deliberately indifferent to the suicide risk posed to its

12   prisoners.

13              **b.      California Successfully Prevents Hundreds of Suicide Attempts
                         And Intervenes To Provide Crisis Care To Thousands Of**
14                       **Inmates Each Year**

15   In addition to all the programs and measures implemented and carried out by dedicated

16   state officials in their efforts to prevent suicides, what is wholly ignored by Plaintiffs are the

17   thousands of lives saved each year by these measures.

18   The State prevents hundreds of suicides each year and it intervenes to help thousands of

19   suicidal patients.  This occurs by CDCR's ability to prevent suicides through timely and

20   professional clinical intervention and good communication and observation by custodial staff.

21   (Allison Decl. ¶ 4.)  Between January 1, 2012, and December 31, 2012, CDCR successfully

22   prevented 347 attempted suicides, meaning actual attempts that were thwarted by prison officials.

23   (*Id.*, Ex. A.)

24   Beyond the immediate suicide attempts that were averted, California successfully treats

25   thousands of inmates in need of crisis care each year—the overwhelming majority of which never

26   commit suicide.  In 2011, 10,946 referrals were made to another institution for admission into a

27   Mental Health Crisis Bed.  In 2012, the number of inmates referred to a crisis bed from another

28

47

1   institution rose to 11,000.  (Belavich Decl. at ¶ 16, Ex. F.)   These numbers do not reflect the

2   thousands more who receive crisis care treatment within their own institutions. (*Id.*)

3          Inmate-patients are also being sent to higher levels of care as needed.  In 2011, there were

4   654 referrals of inmate-patients to acute psychiatric care facilities run by DSH.  (Belavich Decl. at

5   ¶ 16, Ex. E.)  In 2012, the number of referrals to acute state hospital facilities increased to 698.

6   (*Id.*)  For inmates with chronic mental health conditions, 937 inmates were referred to DSH

7   intermediate care facilities in 2011, and 1,016 referred in 2012.  (*Id.*, Ex. D.)

8          These numbers reflect thousands of successful interventions and prevention of suicide by

9   California officials each year.  California's suicide prevention program is comprehensive and

10  responsive.  Given the thousands of inmates that are treated and saved each year, Defendants'

11  system of treatment for inmates in crisis refutes any allegation of deliberately indifference to the

12  issue of inmate suicides.

13          **2.  The Constitution Does Not Require that California Prevent All Suicides, or
14          Maintain a Particular Suicide Rate, and Thus Plaintiffs' and the Special
                Master's Reliance on Such Comparisons Are Inapposite for this Constitutional
15          Analysis.**

16          Unable to meet the stringent deliberate indifference standard discussed above, Plaintiffs

17  rely on vague metrics to try to meet their burden.  Thus, they claim generally that California's

18  suicide rate has "remained high" for several years, and, relying on a national report, that the

19  suicide rate is above the national average.  (Opp'n at 42.)  Although the State is committed to

20  continuing to work to reduce the suicide rate, the Constitution does not require that a prison

21  system have a particular suicide rate, any more than the Constitution requires that prison officials

22  prevent all suicides.  In short, the deliberate indifference standard is not results-oriented, but

23  instead looks at the reasonableness of prison officials' actions.

24          **c.  Suicide Rate Is Not the Litmus Test to Assess the
                Constitutionality of California's Mental Health Program.**
25

26          As noted above, the deliberate-indifference standard does not prescribe particular results,

27  but instead hinges on whether prison officials responded reasonably to known risks of serious

28

48

1   harm.  Where prison officials discover that an inmate has suicidal tendencies and take preventive

2   measures, "the question is only whether the measures taken were so inadequate as to be

3   deliberately indifferent to the risk." *Rellegert*, 924 F.2d at 796.  That inmates ultimately commit

4   suicide (and, by logical extension, the rates at which such suicides take place) does not *ipso facto*

5   show that Defendants were deliberately indifferent.  *Id.*  "In fact, tying the suicide to proof of

6   deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions."

7   *Id.*; *see also Perez*, 380 F. Supp. 2d at 840 (noting that prisoners do not have a general right "to

8   be absolutely protected against committing suicide").  And statistics do not displace the deliberate

9   indifference test.  *Boncher v. Brown* County, 272 F.3d 484, 487 (7th Cir. 2001) (Posner, J.)  ("It

10  would not be sound to condemn a jail administrator if the rate of suicide in his population was

11  within one or two standard deviations of the rate elsewhere").  Thus, as a legal matter, Plaintiffs'

12  and the special master's reliance on putative differences between California's suicide rates and

13  those of other states is simply inapposite because it overlooks the relevant legal requirement of

14  deliberate indifference to a known risk of harm.

15       Moreover, even if the U.S. Department of Justice Report's report entitled "Mortality in

16  Local Jails and State Prisons, 2000-2010—Statistical Tables" (DOJ Mortality Report) is used for

17  comparison purposes, *California's suicide rate is not an outlier*.  According to this report,

18  California's prison suicide rate is in the middle of other state prison systems.  (ECF No. 4314 at

19  11:10-11.)  Based on prison mortality statistics from 2001 through 2010, California's average

20  prison suicide rate of 20 for this time period is lower than or equal to that of 20 other states.  (*Id.*

21  at 11:12-13.)  If ranking higher than the national average were the constitutional litmus test

22  (which it clearly is not), then California is in the company of the majority of states.  Twenty-five

23  other states have prison suicide rates higher than the national average of 16.  (*Id.* at 11:15-16.)

24  California's suicide rate over the last decade is less than half that of the national suicide rate in

25  jails, 41 per 100,000.  (*Id.*)  Taken at face value, the special master's emphasis on suicide rate

26  comparisons suggests that 25 other states and the vast majority of jails across the country are

27  violating the Constitution.  This cannot be squared with the case law.

28

49

Reply Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1

### d.   The Suicide-Rate Comparisons in the Special Master's Reports Are Misleading, and Overlook Other Causal Factors.

2

3        Suicide-rate comparisons between California and other states is misleading.  Plaintiffs and

4   the Special Master place undue reliance on comparisons between California's reported suicide

5   rate and those noted in the DOJ Mortality Report.

6        But, as the Mortality Report itself notes, "Mortality rates between states are not directly

7   comparable because rates are not adjusted for differences in age, sex, race, geographic location,

8   and any other characteristics."  (*Id.* at 3.)  Moreover, as the State has pointed out, there are

9   numerous demographic factors that impact these rates, and render comparisons between

10  California's suicide rate and those reported in the DOJ Mortality Report questionable at best.

11  First, suicide rates vary substantially based on commitment offense.  For example, murderers and

12  other violent offenders have a far higher likelihood of committing suicide than someone with a

13  shorter sentence.  Offenders facing long prison sentences are also more likely to commit

14  suicide—an important factor given that California has the largest population of inmates serving

15  life sentences of any correctional system in the country.  As discussed in previous filings, prison

16  population demographics, including race, culture, age, commitment offense, morbidity rate, and

17  other factors such as the prevalence of prison gangs, are all relevant to suicide risks, and must be

18  evaluated in such a comparison.  (ECF No. 4314 at 7:26-8:9; Dvoskin Response to 2011 Suicide

19  Report at 5.)  In short, comparing only California's prison suicide rate with that of other states

20  ignores the complexities of prison population demographics across states and yields a simplistic

21  and misleading comparison that is meaningless under the case law.

22        Further, the Special Master's comparison fails to take into account criminal justice

23  realignment's impact on California's 2012 prison suicide rate.  (ECF No. 4314 at 8.)  Violent

24  offenders—the majority of offenders remaining in prison after realignment—commit suicide at

25  nearly three times the rate of nonviolent offenders.  (*Suicide and Homicide in State Prisons and

26  Local Jails*, U.S. Dep't of Justice, Bureau of Justice Statistics, August 2005, p. 7, *available at*

27  www.bjs.gov/content/pub/pdf/shsplj.pdf (last visited March 11, 2013).)  Thus, while California's

28

1    overall prison population has gone down, the offenders most prone to suicide have remained in

2    prison.

3          Moreover, as the Seventh Circuit has noted, suicide rate by itself is not a meaningful

4    standard in the context of deliberate indifference claims against jailers or prison officials.

5    *Boncher v. Brown County*, 272 F.3d 484, 486 (7th Cir. 2001) (Posner, J.).  "It is not the number

6    of suicides that is a meaningful index of suicide risk and therefore of governmental responsibility

7    [citations]; and it is not even the rate by itself, but rather the rate relative to the 'background'

8    suicide rate in the relevant free population (the population of the area from which the jail draws

9    its inmates) and to the rate in other jails."  *Id.* at 486-87.  According to the Centers for Disease

10   Control and Prevention, adult males in the country commit suicide at a rate of 25.94 per 100,000.

11   *Available at* http://www.cdc.gov/nchs/fastats/suicide.htm (last visited March 21, 2013).  The

12   American Foundation for Suicide Prevention states that a person commits suicide every 13.7

13   minutes in the country.  Facts and Figures, American Foundation for Suicide Prevention,

14   available at http://www.afsp.org/index.cfm?fuseaction=home.viewPage&page_id=04EA1254-

15   BD31-1FA3-C549D77E6CA6AA37 (last visited March 21, 2013).

16         The Special Master's 2011 and 2012 Suicide Reports gloss over these important statistical

17   distinctions, and invite the Court to overlook the controlling legal standard.  The Court should

18   decline this invitation, and properly focus on the relevant legal standard.

19                    **3.    The Special Master's 2011 and 2012 Suicide Reports Are Not Evidence
                             Of Systemic Deliberate Indifference To A Risk of Suicide.**
20

21         Plaintiffs rely almost exclusively on the special master's suicide reports to support their

22   claim of constitutional infirmity.  But the special master's 2011 and 2012 suicide reports are

23   deeply flawed.  These suicide reports scour the record for errors, invariably finding some past

24   wrong with the benefit of 20-20 hindsight.  Those errors—as is shown in detail below—

25   frequently occurred months or years before the suicide itself or were clearly not the actual and

26   proximate cause of death.  Many of the purported "mistakes" identified in the reports are no more

27   than differences in clinical judgment about an inmate's treatment needs at the time.  In many

28   instances, the special master's conclusion that a suicide could have been prevented had "X"

51

1    occurred rests on sheer speculation.  In those far fewer instances where the special master raises

2    legitimate concerns, the evidence consistently shows that prison officials promptly and effectively

3    responded to the identified shortcomings.  In short, the special master's 2011 and 2012 suicide

4    reports, which purport to show systemic deliberate indifference, instead largely amount to an

5    impermissible exercise in second-guessing and conjecture.

6                    **a.    The Special Master's 2011 and 2012 Suicide Reports Concede That**
                    **The Vast Majority Of Suicides Were Not Foreseeable And Therefore**
7                    **Defendants Cannot Have Been Deliberately Indifferent To A Risk Of**
                    **Suicide**
8

9         It is bedrock law that deliberate indifference to a known risk of suicide requires a "strong

10   likelihood, rather than mere possibility, that self-infliction of harm will occur."  *Torraco v.*

11   *Maloney*, 923 F.2d 231, 236 (1st Cir. 1991).  *See Cook v. Sheriff of Monroe Cty, Florida*, 402 F.3d

12   1092, 1116 (11th Cir. 2005) ("Foreseeability … in a prison suicide case, [requires] knowledge of

13   'a strong likelihood'" that a suicide will occur); *Popham v. City of Talladega*, 908 F.2d 1561,

14   1563 (11th Cir. 1990) ("[T]he mere opportunity for suicide, without more, is clearly insufficient to

15   impose liability on those charged with the care of prisoners."); *Colburn v. Upper Darby*

16   *Township*, 946 F.2d 1017, 1024 (3rd Cir. 1991) (same) .

17        Plaintiffs conveniently ignore that the special master himself found that only 4 of the 34

18   completed suicides in 2011 were "foreseeable" or "highly likely foreseeable."   (ECF No. 4308 at

19   122, 160, 184, & 236).  *See* Dfts Objections and Motion To Strike Or Modify Portions Of Special

20   Master's Report of 2011, at 10-11, incorporated herein in its entirety.[21]  The remaining 30

21   suicides in 2011 were deemed by the special master to be "not foreseeable," "probably not

22   foreseeable," or simple "possibly foreseeable."  (ECF No. 4308.).  Similarly, of the 15 reported

23   suicides in the first half of 2012, the special master found that 13 were not foreseeable.  (Special

24   Master 2012 Suicide Report, ECF No. 4376.)  These findings by the special master foreclose

25   Plaintiffs' assertion that Defendants are responsible for having failed to prevent these suicides.

26   _____
         [21] Although the Court overruled Defendants objections and request to strike portions of
27   the special master's report, it did so recognizing that Defendants could raise their arguments again
     in consideration of evidence of Defendants' suicide prevention measures.  (ECF No. 4361.)

28

                                                    52

1   Prison officials cannot be held liable under the Constitution for risks that they did not know

2   about, much less for risks that they could not have known about.  *Farmer*, 511 U.S. at 838.

3        Plaintiffs also fail to mention that the special master identified 10 suicides in 2011 (of 34)

4   and 4 suicides in 2012 (of 15), *in which the inmate had been adequately treated or the suicide*

5   *could not have been foreseen or prevented by any prison official*.  In fact, the special master

6   found that only 6 completed suicides in 2011 were actually "preventable" or "highly likely"

7   preventable.[22]  Taken together, these findings confirm that the special master's suicide reports—

8   which only identify an isolated handful of suicides that were foreseeable or preventable—cannot

9   hold up as evidence of system-wide deliberate indifference to the risk of suicide.

10           **b.      The Special Master's 2011 and 2012 Suicide Reports Do Not**
             **Demonstrate Deliberate Indifference.**
11

12       The special master's suicide reports criticize the State's responses to suicides in three

13   major areas: 1) referrals to higher levels of care; 2) completions of suicide risk evaluations; 3)

14   emergency responses; and 4) 30-minute welfare check.  These criticisms are unfounded, and

15   ignore the constitutional standard because they disregard the causation requirement, and because

16   they engage in hindsight second-guessing and speculation.

17           **(1)     Failure to Refer Inmates to Higher Levels of Care**

18       That the special master's suicide reports take issue with mental health staff's responses in

19   some instances does not suffice under the deliberate indifference standard.  The Eighth

20   Amendment is not violated when someone simply disagrees with the course of treatment that

21   prison officials thought was appropriate under the circumstances; a difference of medical opinion

22   about appropriate treatment does not establish a Constitutional violation.  *Estelle v. Gamble*, 429

23

24       [22] The special master's claim that Defendants are responsible for "preventable" suicides
     even where the suicide was not foreseeable is spurious. A state official's legal obligation only
25   arises in response to a known, obvious risk of danger. *Farmer*, 511 U.S. at 838. Numerous
     courts have rejected deliberate indifference claims where the risk of suicide was not apparent,
26   even where an emergency response was botched. *See, e.g., Liebe v. Norton*, 157 F.3d 574, 576
     (8th Cir. 1998) (finding no evidence of deliberate indifference even when CPR was delayed by 15
27   minutes); *Whitt v. Stephens Cty*, 529 F.3d 278 (5th Cir. 2008) (rejecting suicide deliberate
     indifference claim despite officer's failure to check inmate's pulse or to administer CPR).
28

53

1   U.S. 97, 107 (1976). "Where a defendant has based his actions on a medical judgment that either

2   of two alternative courses of treatment would be medically acceptable under the circumstances,

3   plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson v. McIntosh*, 90

4   F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

5          In several cases, the special master's reports second-guess clinicians who met with the

6   inmate personally, and purport to provide a better diagnosis and treatment recommendation.  In

7   his 2011 Suicide Report, the special master took issue with 7 cases where he found problematic

8   mental health staff's response, and opined that the inmates should have been referred to a higher

9   level of care – inmates B, CC, I, Y, N, O, and FF.[23]  The 2012 Suicide Report had 2 such cases,

10  inmates E and M.  A closer analysis reveals that most of these conclusions are after-the-fact

11  second-guessing of the professionals who made these clinical decisions.  At other times, these

12  conclusions have no causal link to the inmate's ultimate death.  As such, they do not establish

13  deliberate indifference under the governing legal standard.

14         For example, the 2011 Report surmises that Inmate A's death may have been preventable if

15  there had been more cooperation between medical and mental health, and if he had been referred

16  to a higher level of care.  (ECF No. 4308 at 58.)  The special master's conclusion that such

17  collaboration would have prevented the suicide is a quintessential example of hindsight

18  rationalization, which the law rejects under the Eighth Amendment.  *Jackson v. McIntosh*, 90

19  F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  Further, the

20  report's perfunctory conclusion that the inmate should have been referred to a higher level of care

21  overlooks the fact that the inmate received suicide risk evaluations from different clinicians at

22  least four different times, was referred to a crisis bed at least once, and had regular mental health

23  contacts.  (ECF No. 4308 at 52-54.)  His last Suicide Risk Evaluation did not indicate any suicidal

24  or homicidal ideation, and the inmate was informed that he could obtain further mental health

25

26  _____

27         [23] The details concerning the State's position with respect to each of these cases are
    discussed in the objections to the special master's 2011 Suicide Report (ECF No. 4326) and are
    incorporated herein by reference.

28

1   treatment if he needed it.  (*Id.* at 54.)  When staff interviewed him, he denied thoughts of harming

2   himself or others.  (Hoffman Reply Decl. ¶ 29.).

3         Similarly, the 2011 Report concludes that Inmate B's suicide "may very well have been

4   preventable had he been referred to a higher level of care."  (ECF No. 4308 at 66.)   Mental health

5   staff assessed this inmate's case for transfer to the Department of State Hospitals, but ultimately

6   decided that his family's social support was more important than the potential value of a different

7   clinical environment.  (*Id.* at 62-63.)  As with the previous case, the Special Master's conclusion

8   that a referral to a higher level of care "may have" prevented this suicide is speculative, and thus

9   irrelevant under the caselaw. The operative question is whether "the course of treatment the

10  doctors chose was medically unacceptable under the circumstances," and whether "they chose

11  this course in conscious disregard of an excessive risk to plaintiff's health."  *Jackson*, 90 F.3d at

12  332 (citing *Farmer*, 511 U.S. at 836-37).  These same defects infect the special master's

13  conclusions about the deaths of inmates E, F, H, I, N, O, P, and S, among others.  (*See* Defs.'

14  Objs. To Special Master Rep., ECF No. 4326.)

15        Inmate H provides another case in point.  Although this inmate committed suicide in May

16  2012, he apparently had a reported suicide attempt and concomitant hospitalization eleven years

17  earlier.  (ECF No. 4376 at 40-41.)  When he entered CDCR custody around December, 2011, a

18  clinician assessed this inmate.  (*Id.* at 41.)  If the inmate is taking psychotropic medication or

19  received mental health services during previous incarceration, or if the clinician otherwise deems

20  it appropriate, the inmate is referred for further mental health evaluation.  (*Id.*)  In this inmate's

21  case, a clinician determined that none of these warranted referral to mental health treatment.  (*Id.*)

22  But the special master disagrees, surmising that the inmate's history of a suicide attempt and

23  hospitalization *eleven years prior* "should have been enough for the clinician to utilize the other

24  criteria for referral based on the inmate's history alone."  (*Id.* at 44.)

25        The Special Master's post hoc disagreement with the clinical choices made simply does not

26  meet the stringent constitutional standard of systemic deliberate indifference.

27                **(2)   Completion of Suicide Risk Evaluations**

28

1    The special master reported that in 2011, "[I]n 50 percent [or 17] of the suicide cases in

2    2011, inmate suicide risk evaluations were either not done, or found levels of 'low' or 'no

3    appreciable' risk of suicide, without adequate consideration of risk factors, past history, and/or

4    review of medical records."  (ECF No. 4308 at 3.)  In 2012, the special master reported that

5    failure to conduct adequate suicide risk assessments appeared in six of the 15 reviewed cases.

6    (ECF No. 4376 at 4.)  (C, F, J, M, N, & O.)

7    As noted above, the special master often simply disagrees with a clinician's reasonable

8    treatment of the inmate.  Inmate F in the 2012 Report received at least two suicide risk

9    assessments.  The initial screening found that the inmate was depressed and had considered

10   suicide, and staff referred him for further evaluation.  (ECF No. 4376 at 26-27.)  The inmate was

11   later transferred to a Mental Health Crisis Bed.  (*Id.*)  After further assessment, the clinical team

12   discharged the inmate from the crisis bed, finding that he had "moderate chronic and low acute

13   risk for suicide," but providing for a five-day follow-up at the CCCMS level of care.  (*Id.*)  As

14   required, the inmate received the five-day follow up, which assessed his suicide risk as "moderate

15   chronic and low acute."  (*Id.*)  Despite the fact that numerous clinicians met in person with this

16   inmate and assessed his suicide risk as low, the special master disagreed.  (*Id.*)  Without pointing

17   to any evidence, the Report divines that the MHCB treatment team "may have minimized the

18   inmate's threats of self-injury."  (*Id.* at 30.)  But, as noted above, such hindsight second-guessing

19   does not establish that this inmate's treatment violated his constitutional rights.

20   Inmate E in the 2011 Report is another example of the special master's improper second-

21   guessing of prison clinical staff.  This inmate received three different evaluations, five days apart,

22   from more than one mental health professional.  (ECF No. 4376 at 85-86.)  All three evaluations

23   assessed the inmate's suicidality, and properly identified the inmate's objective risk factors.  (*Id.*)

24   The first clinician recommended the inmate's inclusion in the Mental Health Services Delivery

25   System, but determined that the inmate's case did not warrant placement in a Mental Health

26   Crisis Bed.  (*Id.* at 85.)  A second clinician met with the inmate the next day, noted the inmate's

27   suicide attempts, and confirmed his inclusion in the mental health system.  (*Id.*)  A third clinician

28   met with the inmate three days later, assessed his suicidality, and conferred with both the clinician

56

1    on duty and the inmate's primary physician to assess the inmate's suicidality. (*Id.* at 87.) The

2    inmate was subsequently seen by an IDTT, and met with his primary clinician at least four times

3    before he committed suicide. (*Id.*) Despite this methodical mental health treatment, the Special

4    Master concluded that the inmate's death was "preventable had he received adequate evaluations

5    and referral to an MHCB based on his clinical assessments dated 4/5/12, 4/6/12, and 4/9/12." (*Id.*

6    at 91.) This conclusion fails to take into account the fact that different clinicians saw the inmate

7    numerous times, none of whom determined that crisis bed placement was appropriate. (*Id.*)

8    Moreover, this conclusion does not explain how such placement would have prevented the

9    inmate's ultimate suicide. (*Id.*) As such, the conclusion that this suicide was preventable

10   amounts to mere speculation, and second-guessing. (*See* McKinney Decl. Ex. 12 [Dvoskin

11   Response to 2012 Suicide Report].)

12          Further, the 2011 and 2012 Suicide Reports do not establish deliberate indifference because

13   they do not address the requisite causation element under the Eighth Amendment.  For example,

14   in the case of inmate A's suicide in 2011, the special master faults Defendants for not completing

15   a suicide risk evaluation *two years* before the suicide.  He concludes that the inmate's death

16   "may have been preventable" as a result without any evidence supporting such an attenuated

17   connection.  Moreover, the special master glosses over the fact that inmate consistently denied

18   thoughts of harming himself or others in his various contacts with mental health

19   clinicians. (Hoffman Reply Decl., ¶ 29.)

20          Similarly, the 2012 Report determined that inmate G's suicide was "preventable" had the

21   inmate been referred to an IDTT for evaluation of his mental health status and possible inclusion

22   in the mental health system.  However, this inmate received a mental health screening at the

23   Reception Center, and he did not have any mental health problems or a history of mental health

24   treatment. (ECF No. 4376 at 33.)  He received two clinical contacts in January and April 2012,

25   in which he denied any suicidal ideations both times and reported only feelings of anxiety.

26   (Hoffman Reply Decl. ¶¶ 45-49.)  On the *morning* of his suicide, he was seen by a mental health

27   social worker for a disciplinary issue, who documented no reason to make an emergency change

28   on the inmate's status and no reason to believe he might be suicidal.  The special master's report

57

1    faults the fact that the interdisciplinary assessment did not take place, and speculates that such an

2    assessment "might have led to mental health staff becoming aware of [the inmate's] downward

3    course and the potential for suicide." (*Id.* at 39.)  But there is nothing to support this naked

4    assertion, particularly given the fact that mental health staff saw the inmate on multiple occasions,

5    none of which disclosed suicidal ideation. (*See* Hoffman Reply Decl. ¶¶ 45-49.)  There is simply

6    no evidence to show that the absence of an IDTT assessment was the actual and proximate cause

7    of inmate G's death.

8                                    **(3)    Purported Emergency Response Errors**

9            The special master's reports also take the Department to task for its emergency response

10   times.  Although delay in providing treatment can sometimes establish deliberate indifference,

11   such delays must cause "significant harm," and defendants must have been aware that such harm

12   would befall an inmate.  *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002); *Shapley v. Nv. Bd.*

13   *of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  *See e.g.*, *Liebe*, 157 F.3d 574 at 576

14   (rejecting deliberate indifference claim even when CPR was delayed by 15 minutes); *Whitt*, 529

15   F.3d at 281 (rejecting deliberate indifference claim despite officer's failure to check inmate's

16   pulse and made no effort to administer CPR).  The special master offers no evidence that any

17   delay in providing an emergency response in these cases was causally related to inmate deaths.

18          For example, the 2011 report concludes that the death of inmate D "may very well have

19   been preventable," criticizing a delay in providing CPR.  (ECF No. 4308 at 79.)  The first

20   responders apparently delayed giving CPR for five to eight minutes.  (*Id.*)  But the inmate

21   ultimately responded to CPR, which means that the delay was not causally related to his death.

22   (*Id.*)  Similarly, the Special Master deemed Inmate W's suicide preventable, in part criticizing a

23   three-minute delay in giving the inmate CPR.  (ECF No. 4308 at 228.)  But, as the report notes,

24   this inmate's body was in rigor mortis when CPR was started, and "it is unlikely that the inmate

25   would have been resuscitated" if CPR had been timely given.  (*Id.*)

26          The case of Inmate I in the 2012 report likewise erroneously lays blame on the emergency

27   response.  (ECF No. 4376 at 48.)  The special master concludes that staff delayed in cutting the

28   ligature from the inmate's neck, and this five-minute delay allegedly rendered the inmate's death

                                                     58

1   "preventable." (ECF No. 4376 at 48.) But, as the report notes, when staff discovered the

2   inmate's body, they also found multiple bloodstained items, including towels and sheets. (*Id.* at

3   47.) The inmate had also devised a funnel to drain his blood, and the bucket connected to the

4   funnel "contained approximately 1 gallon of blood." (*Id.*) Thus, it is unclear how a minimal

5   delay in cutting the ligature could have prevented the death of an individual who had lost at least

6   one gallon of blood.

7          Similar examples of error by the special master may be found with respect to inmate A in

8   2011. Although the special master found a "three-minute delay" in the administration of CPR by

9   custody, a thorough investigation of the incident confirms that custody staff responded

10  appropriately. Any brief delay in emergency response was the result of the responding officer

11  taking necessary safety measures before opening the cell door, by waiting for another officer

12  before opening the cell door. (Buckley Reply Decl. ¶¶ 6-12.) In any event, Defendants are not

13  aware of any legal authority holding that a three minute delay amounts to deliberate indifference.

14                    **(4)    Problems with 30-Minute Welfare Checks**

15         The special master's reports also blame the Department for alleged errors in conducting 30-

16  minute welfare checks, which in turn purportedly made some suicides preventable. A closer

17  analysis reveals that the special master's findings in several cases are factually incorrect or rife

18  with speculation.

19         In the case of Inmate X in the 2011 report, the special master concludes that "[t]his

20  inmate's suicide may have been preventable had custody checks been conducted" because the

21  body was noted to be in rigor mortis at the time of discovery. The special master's conclusion is

22  flawed—this inmate resided in general population housing and therefore was never subject to 30-

23  minute welfare checks by custody staff. Custody leaders at the institution confirm that all

24  custody checks were administered in a timely and appropriate manner.

25         The following tables summarize in part how the special master's 2011 and 2012 Suicide

26  Reports overlook the constitutional standard, and, concomitantly, demonstrate why the Court

27  should disregard the reports as evidence of systemic deliberate indifference. In addition,

28

59

Defendants reincorporate their specific case arguments to their objections to the special master's 2011 suicide report.  (ECF No. 4326.)

### Special Master's 2011 Suicide Report

| Type of Error | Inmate Designation |
|---|---|
| Causation error | A, E, O, P, W, X |
| Clinical difference of opinion | B, E, N, P, R, DD, FF |
| Speculation/post hoc second guessing | A, F, H, N, P, R, Q, S, AA, CC, DD, FF |

### Special Master's 2012 Suicide Report

| Type of Error | Inmate Designation |
|---|---|
| Causation error | G, I, J |
| Clinical difference of opinion | C, E, H, I, O |
| Speculation/post hoc second guessing | J, N |

> **(5)     In Instances Where the Department Finds a Problem with its Suicide Prevent Process, it Diligently Implements Corrective Action.**

Strip away the special master's erroneous conclusions that most of these suicides were preventable, and the Department's suicide rate significantly decreases.  And, in the instances where the suicide review process identified valid concerns, the evidence shows that the institutions responded immediately to remedy these issues.

For example, in the 2011 report Inmate A committed suicide by ingesting 465 Tramadol tablets, and the Special Master noted a "serious failure in monitoring" pain medications.  Pleasant Valley has in place a Pain Management Program to address this concern, and to prevent similar problems from recurring.  (Reply Decl. F. Igbinosa Supp. Defs.' Mot to Terminate ¶¶ 2-10.)  The 2011 report also noted problems with Inmate K's suicide, and concluded that the inmate should

60

1   have been included in the mental health program because of the medications he was taking at the

2   sending institution.  (ECF No. 4308 at 127-128.)  In response to these concerns, the institution put

3   in place numerous improvements to its intake process, to better screen new arrivals for any

4   mental health issues, and to administer medications to them.  (Reply Decl. T. Felton Supp. Defs.'

5   Mot. Terminate ¶¶ 8-12.)  In response to these concerns, the institution put in place numerous

6   improvements to its intake process, to better screen new arrivals for any mental health issues, and

7   to administer medications to them.  (Reply Decl. T. Felton Supp. Defs.' Mot. Terminate ¶¶ 8-12;

8

9   Hoffman Decl. ¶¶ 36-39.)

10          In response to concerns raised about inmate H's suicide in 2012, the institution increased

11   the frequency of emergency response drills from quarterly to monthly, created an emergency

12   response drill based on the factual scenario in inmate H's case to prevent a similar breakdown by

13   the nursing staff, and instituted additional nursing staff training.  (Keith Decl. ¶¶ 8-10.)

14

15          **4.    Defendants Have Not Ignored Recommendations By the Special Master or Their Former Consultant Lindsay Hayes**

16          Plaintiffs' remaining arguments gain no traction.  Plaintiffs contend that Defendants have

17   not implemented "life-saving suicide prevention measures" that their own experts recommend.

18   (Opp'n at 43.)  In this regard, they try to attach constitutional significance to an errant comment

19   that the report by Mr. Hayes had been "buried."  But CDCR did no such thing, and the

20

21   Constitution does not require that prison officials adopt particular recommendations—instead, the

22   analysis is whether a prison system is deliberately indifferent to serious medical needs.  *See, e.g.,*

23   *Frake v. City of* Chicago, 210 F.3d 779, 782 (7th Cir. 2000) ("The existence or possibility of

24   other better policies which might have been used does not necessarily mean that the defendant

25   was being deliberately indifferent.").  And it is undisputed that California has made great strides

26   and continues to put significant effort to prevent suicide in its prisons.  (*See* infra.)  Plaintiffs can

27   point to no caselaw holding that Defendants have to adopt an expert's proposed measures to meet

28

61

the constitutional standard, particularly given the substantial measures that Defendants have in

fact adopted, and the deference that state prison officials are due under the Prison Litigation

Reform Act. *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) ("Running a prison is an inordinately

difficult undertaking that requires expertise, planning, and the commitment of resources, all of

which are peculiarly within the province of the legislative and executive branches of

government."); *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

### a. Defendants have not ignored the Special Master's Recommendations.

In the special master's recent report on suicides occurring in the first six months of 2012,

the special master's expert cites to three recommendations that he asserts, CDCR, "*year after

year, … fails to implement.*" (ECF No. 4376 at 8–10.)  This is simply not true.

The first stated recommendation is:  "Continuation of monitoring and assessment of

conduct of five-day clinical follow-up, custody staff adherence to policies and procedures

regarding conduct of custody welfare checks and others, and supervision of inmates, including

those who are single-celled and have histories of increased risk of suicide."  (ECF No. 4376 at 8.)

But as discussed above, all of these items are ongoing.  (Belavich Decl. ¶ 6, 42, 44 & 47**;** Allison

Decl. ¶¶ 4–14.)

The second recommendation is:  "Continuation of referrals to higher levels of care,

particularly referrals to MHCBs and to DSH programs, as per indicators within the 7388B referral

process." (ECF No. 4376 at 9.)  This comment is confusing—the sustainable process evaluation

conducted jointly between the Special Master and CDCR in late 2011 showed that the system in

place is working as intended.  (Belavich Decl. ¶¶ 14–15.)  In addition, as the special master is

well aware, CDCR has continued to monitor and see improvements in the process.  (*Id.,* Ex. C.)

Finally, as noted, referrals to DSH programs have increased since 2011.  (*Id.* 16.)

And the last recommendation is:  "Continuation of monitoring emergency response

procedures, particularly in higher-custody housing such as administrative segregation, secured

housing units, and psychiatric services units, establishment of a state-wide criteria to improve

62

1    emergency cell entry and extraction procedures."  Again, these actions are occurring as well.

2    (Allison Decl. ¶¶ 4–14; Belavich Decl. ¶ 45.)

3                **b.    Defendants' Did Not "Bury" the Hayes Report, But Instead
                    Implemented Most of its Recommendations.**

4
5         In 2010, as part of its continuing efforts to improve responses to inmate suicide risk and

6    assessment, the State hired Lindsay Hayes, a correctional suicide expert.  (Reply Decl. R.

7    Canning Supp. Defs.' Mot. Terminate ¶ 3.)  On August 16, 2011, after touring a few institutions

8    and reviewing certain aspects of CDCR's suicide prevention program, he prepared a report, which

9    provided a number of recommendations to address potential issues in the State's suicide

10   responses.  (Belavich Decl. ¶ 18.)  CDCR staff continues to analyze and review his

11   recommendations.  (*Id.*)  In some instances, the Report duplicated CDCR's efforts. For instance,

12   Hayes suggested changes to the Program Guide.  (*Id.* ¶ 22.)  CDCR had met with the Special

13   Masters' experts to review and revise the Program Guide, before receiving Hayes's report.  (*Id.*)

14   In addition, some of his recommendations duplicated what had already been in place such as the

15   recommendations that inmates discharged from Outpatient Housing Units receive five-day

16   follows up.  (*Id.,* Ex. G.)   In other cases, CDCR agreed with his recommendations or

17   observations and had either previously adopted them or is in the process of adopting them.  (*Id.* ¶

18   23 [revisions to training curricula].)  Still others, CDCR is continuing to consider.  (*Id.* ¶ 21

19   [expansion of Mental Health Tracking System to include data collection on all inmates with

20   suicide attempts].  And in some instances, CDCR disagrees with the recommendations.  (*Id.* ¶ 23

21   [formal training not required to disseminate research about suicides]; ¶ 24 [use of Outpatient

22   Housing Units for suicide precaution and watch now obviated]; ¶ 25 [current threshold for suicide

23   observation takes into account clinical acuity].)

24        Plaintiffs' assertion that Defendants "buried" the Hayes Report simply lacks merit.  And as

25   Dr. Canning, who made the comment in an e-mail that the report was "buried," has since

26   explained that it was "an unfortunate off-hand remark" he made when he lacked relevant

27   information.  (Canning Decl. ¶ 4.) [24]

28   _____
         [24] Even though not addressed in detail in this reply, Defendants further note in the

                                                 (continued…)

1
2

**c.    Plaintiffs' Remaining Arguments Also Do Not Establish an Ongoing Constitutional Violation.**

3

Plaintiffs further quibble with Defendants' specific measures for suicide prevention, and

4

purport to engraft more requirements into the prison system's suicide prevention efforts.  (Opp'n

5

at 46.)  For example, Plaintiffs criticize Defendants for not implementing 30-minute welfare

6

checks in segregation, mental health screening, and confidential mental health interviews.  (Opp'n

7

at 46.)  Plaintiffs point to nary an authority establishing that these measures are required by the

8

Constitution.  (*Id.*)

9

Additionally, the record reflects that Defendants are implementing most of these

10

measures, despite the fact that they are not constitutionally required to do so. (Allison Decl. ¶¶ 4–

11

19; Belavich Decl., *passim*.)

12

**H.    Plaintiffs Failed to Demonstrate that the Care Provided to Inmates Housed in Segregation Violates the Eighth Amendment.**

13

The State has presented compelling evidence that it has developed and implemented

14

procedures for placing and retaining inmates with mental health needs in administrative

15

segregation or security housing units.  (Motion at 23:19-22; ECF No. 4279 at 10 & 13–16, &

16

4277 at ¶ 31 & Ex. 7.)[25]  It has also presented compelling evidence that when housed in these

17

units, inmates' mental health needs are being appropriately met.  (ECF No. 4275–5; *see also, e.g.,*

18

Gipson Reply Decl. [Corcoran] ¶¶ 17-28.)  Moreover, because Plaintiffs have failed to meet their

19

burden to show otherwise, this Court should reject Plaintiffs' argument that the conditions of

20

CDCR's segregated confinement exacerbate symptoms of mental illness and create an

21

_____

22

(…continued)
declaration of Dr. Belavich their review and analysis of the recommendations made by their

23

experts.  (Belavich Decl. ¶¶ 26–39.)

24

[25] Inmates at the EOP and CCCMS levels of care may be housed in administrative
segregation units.  (Program Guide ch. 7.)  Inmates at the CCCMS level of care who are assessed
a term of confinement in a segregated housing unit can be housed in a Security Housing Unit.

25

(*Id.* ch. 8.)  Five prisons—California Correctional Institution, California State Prison, Corcoran,
Pelican Bay State Prison, California State Prison, Sacramento, and Central California Women's

26

Facility, have Security Housing Units.  (*Id.*)  Inmates at the EOP level of case who are assessed a
term of confinement in a segregated housing unit can be housed in a Psychiatric Services Unit.

27

(*Id.* ch. 9.)  Three prisons—California State Prison, Sacramento, Pelican Bay State Prison, and
California Institution for Women, have Psychiatric Services Units.  (*Id.*)

28

64

1    unacceptable risk of injury to inmates with mental health needs.

2          The State does not dispute that the administrative segregation and security housing units

3    remain a high-risk environment for suicide.  That is why the State continues to address suicides in

4    segregated housing units, including recent efforts to reduce unit size, prioritize transfers, and

5    provide electrical appliances.  (ECF No. 4275–5 at 36; *see also* discussion at Section V.G *infra*.)

6    Plaintiffs, however, exaggerate the significance of the suicide rate in these units and inaccurately

7    state that "[t]his problem has persisted for years."  (Opp'n at 49:8–9.)  In fact, the State's efforts

8    are effective and suicides occurring in administrative segregation units as a percentage of the

9    overall suicide rate have significantly declined since 2004 when the special master found that

10   69.2% of suicides occurred in administrative segregation.  (*See* ECF No. 4313–6 ¶¶ 17–18 & Ex.

11   6-7.)  By comparison, the suicides in administrative segregation units in 2012 totaled 11 or 34%.

12   (ECF No. 4277 ¶ 27.)  Moreover, suicides have decreased in security housing units.  (ECF No.

13   4313–6 ¶ 19.)

14         Plaintiffs urge this Court to find the State is acting with deliberate indifference to the

15   needs of mentally ill inmates in segregated housing because they: (1) house the inmates in

16   administrative segregation units for non-disciplinary reasons; (2) place the inmates in

17   administrative segregation for extended lengths of time; (3) return the inmates from inpatient

18   housing units back to segregated housing; (4) do not conduct 30 minute welfare checks for all

19   inmates in administrative segregation; and (5) allegedly ignore the constitutional harms inflicted

20   on the inmates in security housing units.  (Opp'n at 49-66.)

21         Plaintiffs largely premise their argument on the opinions of three of their experts—

22   Stewart, Kaufman, and Haney—that the conditions of CDCR's segregation units exacerbate

23   symptoms of mental illness and create mental illness where none previously exist.  (ECF No.

24   4408 at 50:8–9.)  However, a recent empirical study of the psychological effects of administration

25   segregation on inmates found that the inmates did not deteriorate psychiatrically, most offenders

26   showed no change, and in fact, many individuals showed improvement, some of whom were

27   those with a diagnosed mental illness.  (McKinney Decl., Ex. 11 [O'Keefe, Maureen L, "One

28   Year Longitudinal Study of the Psychological Effects of Administrative Segregation," October

65

1   31, 2010, (O'Keefe Study)].)  Moreover, "a lot of people in segregation don't want to step down.

2   The notion that everybody hates segregation is incorrect.  Some people feel safer there."  (*Id.* at

3   Ex. 1 [Dvoskin Depo.] 13:4–7.)

4          Plaintiffs also ignore that several courts have concluded that mentally ill inmates may be

5   segregated from the general population if they receive adequate mental health programming and

6   treatment.  *See Madrid v. Gomez,* 889 F. Supp. 1146, 1267 (N.D. Cal. 1995) (defendants are not

7   precluded from segregating mentally ill inmates if conditions are not equivalent to the Pelican

8   Bay State Prison Security Housing Unit); *Orr v. Larkins,* 610 F.3d 1032, 1035 (8th Cir. 2010)

9   (dismissing Eighth Amendment claim by mentally ill inmate kept in administrative segregation

10  for nine months were inmate received treatment and anti-psychotic medication); *In Re Long Term*

11  *Administrative Segregation of Inmates Designated As Five Percenters,* 174 F.3d 464, 472 (4th

12  Cir. 1999) (no Eighth Amendment violation where administrative segregation procedures

13  provided for periodic visits by medical personnel of inmates displaying mental health problems).

14  And as Defendants have already established, when inmates are housed in these units—whether in

15  administrative segregation or secured housing units—their mental health needs are being

16  appropriately met.  (Clinical Exp. Rpt. *passim*.)

17         Plaintiffs' string citations to a litany of paragraphs describing individual cases in the

18  Haney, Stewart, and Kaufman declarations does nothing to change fact, and fails to prove that

19  inmates in administrative segregation units are not receiving mental health programming and

20  treatment on a systemwide basis.  (*See* ECF No. 4408 at 53:2–54:18.)  Ironically, Plaintiffs and

21  their experts appear instead to believe that even though it may be safer to place a mentally ill

22  inmate into segregated housing for their protection or the protection of other inmates or prison

23  staff, mentally ill inmates should never be placed into segregated housing.  (McKinney Decl. Ex.

24  5 [Kaufman Depo.] 208:18-21 ["I think it's to be avoided whenever possible."].)  By this logic,

25  Plaintiffs—not Defendants—create an unacceptable risk that mentally ill inmates will be harmed

26  or will harm others.  On the other hand, the sensitivity shown by CDCR's clinical professionals to

27  the needs of mentally ill inmates placed into segregation—whether for safety reasons or

28  otherwise—evidences a concern for their wellbeing.  (*See* ECF No. 4382 ¶¶ 279–80.)  Similarly,

1    Plaintiffs and their experts advocate for the Court to ignore the discretion granted to penal officers

2    in determining the most appropriate placements, taking into account safety concerns, in receiving

3    inmates who have discharged from inpatient care programs back into the prison environment.

4    This the Court cannot do.

5              1.      **The State Appropriately Treats Inmates Housed in Administrative**
              **Segregation for Non-Disciplinary Reasons.**
6

7         Defendants' use of administrative segregation does *not,* as Plaintiffs advocate, create an

8    unreasonable risk of injury to the serious mental health needs of inmates to which the State

9    intentionally has done nothing to address.  (Opp'n at 51:3-8.)  The State recognizes the risk to

10   inmates placed in segregated units and has, as already discussed, implemented extensive

11   measures designed to help prevent inmate suicides in segregated housing units since 2006.  *See*

12   Section V.G.  (*Cf. id.* at 52:2–17, asserting that Defendants have done nothing since a 2006

13   Conference with CDCR officials and Lindsay Hayes.)  In addition, CDCR's Suicide Prevention

14   Coordinator's January 25, 2013 report that Plaintiffs reference, "CDCR Suicides:  Results of

15   Recent Analysis," shows sensitivity for the risks associated with placement into segregated

16   housing, not deliberate indifference.  (*See* Bien Decl., ECF No. 4399–1, at 9–22.)  Likewise, in

17   the 2013 article referenced by Plaintiffs written by a psychologist at the California Men's Colony,

18   Lindsay Hayes highlights California as one state that has taken "efforts to help prisoners cope

19   with the boredom and isolation that can lead to sensatory deprivation."  (*Id.* at 336.)

20        Even so, Plaintiffs assert four things in support of their argument that Defendants' use of

21   segregation housing creates an unacceptable risk of injury to the serious mental health needs of

22   inmates housed in those units, none of which warrant merit.  Plaintiffs first rely on Defendants'

23   experts' deposition testimony.  But this reliance is misleading and cherry picked because Moore's

24   testimony lacks foundation, Martin's testimony is based on a broad hypothetical, and Dvoskin's

25   testimony is that the State is meetings its constitutional obligation.  In connection with Dr.

26   Moore's expert opinion, what Plaintiffs fail to include in their opposition is that Moore's

27   testimony concerning the administrative segregation unit at California Institution for Men is

28   speculative and lacks foundation given that she also testified that "she may have" interviewed

                                                    67

1  men in administrative segregation at that prison and, in fact, all she could remember was that she

2  was told there were some "EOP reception center inmates in the administrative unit" waiting for

3  beds.  (Opp'n at 51:16–22; Bien Decl. Ex. 8 (Moore Dep. at 167 & 169, referring to DEXP

4  102626.)  Likewise, Mr. Martin's testimony, which is based on a broad hypothetical relating to

5  the potential operations of the prison as whole, has no bearing on whether placing mentally ill

6  inmates in segregated housing units for their safety or otherwise, are denied adequate mental

7  health care.  (Bien Decl. Exs. 44–47.)  Moreover, Dr. Dvoskin reinforced his opinion that the

8  State is meeting its constitutional obligations.  (McKinney Decl. [Dvoskin Depo.] 144:20–22.)

9          Second, Plaintiffs attempt to assert that Defendants failed to implement several

10  recommendations made by their experts, yet reference only *one*—that inmates housed in an

11  administrative segregation unit pending transfer to an Enhanced Outpatient Unit be placed at the

12  front of any waiting list for transfer.  (Opp'n 52:21–22.)  Plaintiffs mislead the Court by

13  representing that "*Defendants explicitly disagreed and refused to implement their own experts'*

14  *recommendation.*"  (*Id.* at 52:24–25.)[26]  This is not true as reflected in the declaration of Dr.

15  Belavich describing the State's response to the experts' recommendations.  (Belavich ¶¶ 26–39.)

16  And Plaintiffs point to no legal authority stating that the Constitution mandates prison officials to

17  implement each and every recommendation made by their consultants or experts.  And, not

18  surprisingly, Plaintiffs fail to point the Court to CDCR's current "Health Care Transportation

19  Scheduling Priorities," which follow the Program Guide and "have been presented to the

20  *Coleman* Special Master and have been presented under deposition to the Three Judge Panel on

21  Prison Overcrowding."  (McKinney Decl. ¶  Ex. 11.)  This pre-existing schedule creates a seven-

22  tier priority transfer list, and acknowledges the competing urgent needs to transfer cases endorsed

23  to leave the desert or California Correctional Center, and cases returned from Department of State

24  Hospitals programs and Mental Health Crisis Bed units before transferring Enhanced Outpatient

25

26          [26] Plaintiffs cite to a document that Defendants inadvertently produced to them through
    discovery and that contains privileged attorney-client communications, which Plaintiffs were
27  obligated to return under the Rule of Professional Conduct.  (Bien Decl. Ex. 92 (Defs.' Suicide
    Compendium, dated January 27, 2013.)  *See* Defendants' Objections to Evidence.

28
                                                68

1    Program inmates from administration segregation units and reception centers.  (*Id.*)[27]

2           Third, Plaintiffs claim that their experts "discovered scores of prisoners" being held in

3    segregation "because there was no appropriate beds for them to be placed."  (Opp'n at 53:2–3.)

4    This is false.

5           Even assuming that Plaintiffs found isolated instances of inmates held on segregation

6    because of temporary bed limitations, these examples fail to prove that inmates in administrative

7    segregation units are not receiving mental health programming and treatment on a system-wide

8    basis.  Although Defendants believe that the State has already established that its provides

9    constitutionally adequate care to inmates housed in administrative segregation, the evidence filed

10   with this reply brief from clinicians at the prisons Stewart, Haney, and Kaufman visited,

11   conclusively establish that the inmates received adequate mental health programming and

12   treatment.

13          Plaintiffs' experts primarily focus on the administrative unit at California Institution for

14   Men.  (Opp'n at 53:2–14.)  But CIM is a reception center and does not have a major mental health

15   care program for inmates clinically determined to need an Enhanced Outpatient Program level of

16   care.  (Jordan Reply Decl. [CIM] ¶¶ 20-29.)  For that reason, CIM places inmates into the

17   segregation unit either for disciplinary or safety reasons pending return to the Reception Center

18   for processing or transfer to a different prison.  (*Id.*)  In this situation, inmates housed in the

19   administrative segregation unit on a temporary basis are treated as if they were in regular or

20   reception center housing, returning to the segregation unit for the evening.  (*Id.* at ¶ 24.)

21   Plaintiffs focus on where custody houses the inmate, but forget the State's clinicians are treating

22   them consistent with their level of care.

23          Even though Defendants' expert Dr. Dvoskin recommended that CDCR transfer as

24   quickly as possible those inmates needing an EOP Program level of care who were housed in the

25   administrative segregation unit at California Institution for Men for safety reasons, he nonetheless

26   _____

           [27] Plaintiffs note that Defendants are not developing a systemwide non-disciplinary
27   segregation unit.  (ECF No. 4408 at 52:25 n.2.)  The decision whether to develop such a system is
     outside the scope of Defendants' motion to terminate based on the provision of constitutionally
     adequate mental health care and should not be considered by this Court.

28
                                                      69

1    concluded that despite these limitations, "[i]nmates who are awaiting transfer to an EOP level of

2    care in an Administrative Segregation Unit were seen regularly while awaiting transfer despite the

3    obvious physical plant limitations of providing services within an administrative segregation

4    environment."  (Clinical Exp. Rpt. 23.)  In fact, as of March 13, 2013, there were a total of only

5    three inmates in the administrative segregation unit at California Institution for Men from the

6    Reception Center who were identified as needing an Enhanced Outpatient Program level of care.

7    (CIM Decl.  .)  All three of these men were in the unit for battery.  (*Id.*)

8            In all eight cases identified by Plaintiffs' experts Haney and Kaufman from California

9    Institution for Men, the inmates were appropriately placed and receiving adequate mental health

10   care.  (*See* Jordan Reply Decl. ¶¶ 40 [Haney Prisoner P] (CCCMS inmate placed in segregation

11   for battery on an inmate and seen weekly by clinician), 41 [Haney Prisoner Q] (inmate was seen

12   regularly for mental health treatment, left the administrative segregation unit on March 1, 2013,

13   and is no longer housed at CIM), 42 [Haney Prisoner R] (inmates was timely screened and

14   evaluated, and is seen as appropriate), 53 [Kaufman Prisoner P] (inmate receives timely clinical

15   care and additional services beyond Program Guide requirements), 51 [Kaufman Prisoner N]

16   (inmate is timely seen by his mental health clinician and reports he is "doing fine"), 52 [Kaufman

17   Prisoner O] (inmates continues to be seen within policy timeframes and is stable), & 54

18   [Kaufman Prisoner Q] ("continues to be seen according to program guidelines.")

19           Although Haney also states in his declaration that he identified "some" EOP prisoners

20   housed in an administrative segregation unit at Mule Creek State Prison waiting for transfer to

21   another Enhanced Outpatient Program Special Needs Yard, he only identifies one inmate—

22   Prisoner B—but does not mention that this inmate's medical chart establishes that he was

23   receiving, and continues to receive, appropriate mental health care pending transfer.  (Haney

24   Decl. ¶ 108; Colley Reply Decl. [MCSP] ¶ 5.)

25           Haney identifies four prisoners from California State Prison, Corcoran.  (Haney Decl. ¶¶

26   112–113, 221-227.)  But yet again, Haney fails to refute that these inmates are all receiving

27   appropriate mental health care.  (*See* Fischer Reply Decl. [COR] ¶¶ 36 [Haney Prisoner GG]

28   (inmates has had 35 mental health clinical contacts between January 3 and March 7, 2013, but is

                                                    70

1  unwilling to take medication), 33 [Haney Prisoner II] (inmate has received 62 clinical contacts

2  with mental health staff between January 13 and March 13, 2013, more than one per day), 34

3  [Haney Prisoner JJ] (inmate has had 116 mental health contacts since January 1, 2013, including

4  12 psychiatry appointments).

5          Haney identified two inmates from California Correctional Institution—Prisoners LL and

6  MM—who allegedly were in administrative segregation waiting for a Special Needs Yard bed,

7  but he does not identify them as *Coleman* class members.  (Haney Decl. ¶¶ 249–250; *see* Walsh

8  Reply Decl. ¶¶ 23-24.)  A third inmate, Prisoner NN, was recently deemed to need an Enhanced

9  Outpatient Program level of care.  (Haney Decl. ¶¶ 251–253.)  Prisoner NN is waiting for

10  transfer, however, due to his unique circumstances—not due to overcrowding as Dr. Haney's

11  asserts—and has not yet been transferred.  (*See* Holland Reply Decl. [CCI] ¶ 8.)  A fourth

12  inmate—Prisoner OO is a class member at the Correctional Clinical Case Management System

13  level of care, but there is no indication that this inmate is in segregation for non-disciplinary

14  reasons or that he is not receiving appropriate  mental health care.  (Haney Decl. ¶ 254; Holland

15  Reply Decl. ¶ 9.)

16          Finally, Plaintiffs claim that placing inmates in administrative segregation for safety

17  reasons increases their risk of suicide.  (Opp'n 4408 at 2–13.)  Stewart points out that since 2007,

18  27 out of the 64 inmates who committed suicide in administrative segregation were reported as

19  being in the unit for safety reasons.  (Stewart Decl. ¶ 279.)  But there is no evidence that

20  placement in administrative segregation was the driving force behind their suicides, and certainly

21  no evidence that inmates housed in administrative segregation are not receiving constitutionally

22  adequate care.   Plaintiffs' two examples exemplify why it is specious to assume that these

23  inmates chose to take their own lives due to their segregated confinement.  Inmate L in the 2012

24  Suicide Report at 65-72 received a rules violation for battery on an inmate and was placed in the

25  segregation unit on April 4, 2012.  (2012 Special Master Suicide Report, ECF No. 4376, at 68.)

26  On June 7, 2012, the inmate met with the Institutional Classification Committee and was "told

27  that he would be transferred to another institution because of enemy concerns once he was

28  released from the ASU; the inmate was unhappy and upset about the news regarding his transfer."

71

1    (*Id.* at 70.)  The inmate took his life later that day.  (*Id.* at 71 (noting "suicide, however, appears

2    to have been an impulsive act directly relating to his receiving what was for him 'bad news' that

3    he would be transferred to another facility".)  Inmate N from the 2011 Suicide Report was

4    "transferred from the general population yard at ASP to administrative segregation for safety

5    reasons at his request on 6/27/12 after being interviewed by the yard lieutenant."  (*Id.* at 80.)

6    Early the next morning, staff found him unresponsive in his cell.  (*Id.*)  Thus, it clear his suicide

7    was unrelated to having spent only some hours in segregated housing.

8                    **2.      The Eighth Amendment Does Not Recognize a Particular Length of Stay in
                              Segregated Units.**

9

10             Plaintiffs argue that CDCR's segregation units that house mentally ill inmates for

11   excessive periods of time "drive mentally ill and vulnerable prisoners to mental health crisis and

12   even suicide."  (Opp'n 55:9–26.)  But Plaintiffs cite no legal authority for the proposition that the

13   Constitution places a cap on the length of time a mentally ill inmate who is receiving adequate

14   treatment can remain in administrative segregation.  On the contrary, the cases are clear that

15   mentally ill inmates may be segregated from the general population for safety reasons if they

16   receive adequate mental health programming and treatment.  *See Madrid*, 889 F. Supp. at 1267;

17   *Orr*, 610 F.3d at 1035;  *In Re Long Term Administrative Segregation of Inmates Designated As*

18   *Five Percenters*, 174 F.3d at 472.  And, as noted *supra* 68, empirical research does not support

19   the suggestion that offenders necessarily deteriorate in segregated environments. Nevertheless,

20   Defendants take segregation seriously and have implemented multiple measures to address length

21   of stay in segregated units.  (Allison Decl. ¶¶ 11-16.)

22             The individual cases cited by Plaintiffs' experts do not compel a contrary result.  Dr.

23   Stewart identifies Prisoner K from California State Prison, Sacramento.  (Stewart Decl. ¶ 317.)

24   Prisoner K was in administrative segregation for five months for assault on staff.  (*Id.*)  Prisoner

25   K, however, was referred by his Interdisciplinary Treatment Team to the Department of State

26   Hospitals for intermediate level of care treatment on December 27, 2012.  (Chaiken Reply Decl.

27   [SAC] ¶ 30; Vorous Reply Decl. Ex. 8-J.)  He was accepted for treatment by the Department of

28   State Hospitals on January 9, 2013, so he had been waiting twenty days for a transfer when

                                                     72

1  interviewed by Dr. Stewart.  (*Id.*)

2          At Richard J. Donovan, Stewart states that he asked staff members in the Enhanced

3  Outpatient Program Administrative Segregation Unit to help him identify mentally ill individuals

4  "who did not come out of their cells very often."  (Stewart Decl. ¶ 334.)  The inmate identified—

5  Prisoner D—also happened to be among the longest residing inmates on the unit.  (*Id.*)  Stewart,

6  however, incorrectly attributes his stay to his acuity.  According to mental health staff at Richard

7  J. Donovan, this inmate was appropriately tracked, monitored, and transferred to the Department

8  of State Hospitals on February 13, 2013.  (Greenwald Reply Decl. [RJD] ¶ 11 & Vorous Decl.

9  Ex. 7-H.)  As to Prisoner EE, Stewart simply disagrees with the clinical judgment rendered by

10 prison staff for this inmate.  (Stewart Decl. ¶ 334; Greenwald Reply Decl. ¶ 6 & Vorous Decl. 7-

11 C.)

12         Stewart also visited San Quentin State Prison.  Here, he identified three inmates—

13 Prisoners GG, E, and HH—as allegedly needing higher levels of care.  For Prisoner E, he

14 provides no discussion of his reasoning.  (Stewart Decl. ¶ 347; *see* Monthei Reply Decl. [San

15 Quentin] ¶ 4.)  For Prisoner GG, Stewart's suggestion to forcibly extract the inmate to a mental

16 health crisis bed was clinically inappropriate for this inmate. (Stewart Decl. ¶¶ 343-44; *see*

17 Monthei Reply Decl. ¶ 5.)   And for Prisoner HH, Stewart's statements concerning the diagnosis

18 are incorrect both in the case of this inmate and generally.  (Stewart Decl. ¶ 346; Monthei Reply

19 Decl. ¶ 6.)

20         Like with Stewart's examples, the few inmates identified by Haney and Kaufman at Mule

21 Creek State Prison, California Institution for Men, California State Prison, Corcoran, and

22 California Correctional Institution do not establish systemwide deliberate indifference to mental

23 health care.  (*See* Colley Reply Decl. [MCSP] ¶¶ 4 & 9; Telander Reply Decl. [MCSP] ¶ 13

24 (responding to Haney Decl. ¶¶ 86-94 [Prisoners A, G, H]); Jordan Reply Decl. ¶¶ 39-42 & 57

25 (responding to Haney Decl. ¶¶ 145-46 [Prisoner O], 148 [Prisoner P], 149 [Prisoner Q], 150-51

26 [Prisoner R] & Kaufman Decl. ¶¶ 121-22 [Prisoner S]); Fischer Reply Decl. [COR] ¶¶ 33-34 &

27 36 (responding to Haney Decl. ¶¶ 222 [Prisoner GG], 223-24 [Prisoner HH], & 226 [Prisoner JJ];

28 and  Walsh Reply Decl. [CCI] ¶¶ 23-24 & Holland Reply Decl. ¶¶ 8-9 (responding to Haney

73

1    Decl. ¶¶ 249 [Prisoner LL], 250 [Prisoner MM], and 251-53 [Prisoner NN].)

2         Plaintiffs distort the deposition testimony of Defendants' experts.  (Opp'n at 55:12–15.)

3    Dr. Dvoskin testified that he agreed it "was *possible* that long-term housing in segregation does

4    cause psychological harm"—while clarifying that he took the "question not to mean that it

5    necessarily does, but that it could on – for an individual."  (*Id.*)  (*See* Bien Decl. Ex. 83,

6    McKinney Decl. Ex. 1 [Dvoskin Depo.] at 73:12–24.)  Similarly, Mr. Martin testified that a high-

7    security environment *can* be oppressive or counter-productive if inmates are in there too long.

8    (*See* Bien Decl. Ex. 86, McKinney Decl. Ex. 2 [Martin Depo.] at 272:11–273:7.)  As already

9    noted, Defendants take segregation very seriously and will respond promptly when an individual

10   inmate's mental health condition deteriorates as a result of segregation.  But that is a far cry from

11   Plaintiffs' legally baseless claim that mentally ill inmates cannot be housed in segregation.

12        3.    **The Eighth Amendment Does Not Require a Particular Housing Placement**
              **Following Discharge from a Crisis Bed or Department of State Hospitals**
13            **Facility.**

14        Plaintiffs challenge as a dangerous and unconstitutional practice Defendants' policy that

15   allows the return of inmates from a Mental Health Crisis Bed or Department of State Hospital

16   inpatient care program back to segregated housing to, among other things, allow CDCR to

17   complete the inmate's reception center processing in their previous housing location.  (Opp'n at

18   56:10–16.)

19        But again, Plaintiffs fail to point to any legal authority that returning inmates from

20   inpatient care to segregated units violates the Constitution.  Instead, Plaintiffs offer the misleading

21   example of an inmate who died at Salinas Valley State Prison in January 2013.  (*Id.* at 56:17–21.)

22   The discharge summary that Plaintiffs produced under seal contains the inmate's report to the

23   Department of State Hospitals that he became depressed when placed in administrative

24   segregation, but nowhere does the report state—as plaintiffs claim—that his "pre-hospitalization

25   segregation stay was responsible for symptoms that led to his ASH admission."  (*See* Kahn Under

26   Seal Decl. Ex. 46; Warburton Reply Decl.)

27        As for the inmate who died in 2011, he entered CDCR in March 2011 and was transferred

28   to the administrative segregation unit after a riot.  (2011 Suicide Report, ECF No. 4308 at 142–

                                            74

151.)  Upon discharge from the mental health crisis bed unit to complete his reception center

processing, he was temporarily sent to the Outpatient Housing Unit and reevaluated, and then

changed by his clinicians to a Correctional Clinical Case Management System status and housed

in administrative segregation.  Plaintiffs seek to claim that his administrative segregation housing

resulted in his suicide, but what they fail to note is that this inmate received numerous suicide risk

evaluations and clinical contacts in the weeks prior to his death.  (ECF No. 4326–6 at 15–6.)

There is simply no evidence that his administrative segregation placement bore any relationship

to his suicide.

Nor have Plaintiffs cited to any individual case that establishes systemwide deliberate

indifference on the part of CDCR by virtue of its psych and return policy.  Stewart cites as

examples Prisoner E and "possibly" Prisoner HH at San Quentin State Prison, Prisoners SS and

UU who he met at the Mental Health Crisis Bed unit at California State Prison, Sacramento, and

Prisoner ZZ in the Mental Health Crisis Bed unit at Richard J. Donovan.  (ECF No. 4381 at ¶¶

437 & 402.)  But as with Stewart's other individual examples, these cases offer no evidence to

show that these inmates were not receiving adequate mental health care upon return to their

segregated housing unit.  (*See* Monthei Reply Decl. ¶¶ 4 & 6 [Prisoners HH and E both returned

to housing where they were monitored as clinically indicated and exceeding Program Guide

standards]; Chaiken Decl. 29 & 35-36 [discussing Prisoner UU, who was in a mental health crisis

bed and thereafter transferred to the SVSP ICF program, and Prisoner SS].)  Similarly, Prisoners

B, W, and JJ identified by Haney in his declaration were receiving constitutionally adequate

mental health care.  (*See* Colley Reply Decl. ¶ 5 [Prisoner B], Jordan Reply Decl. ¶ 47 [Prisoner

W] & Fischer Reply Decl. ¶ 34 [Prisoner JJ].)

### 4. The State's 30-Minute Welfare Check Policy For All Inmates in Administrative Segregation Exceeds Constitutional Requirements.

The State currently conducts hourly custody checks for all inmates in administrative

segregation, and 30-minute welfare checks for all inmates during the first 21 days they are housed

in administrative segregation.  (ECF No. 2139.)  Plaintiffs do not contest that the State

consistently completes these checks.  Rather, they criticize the State for not extending the 30-

75

1    minute checks beyond 21 days, and because a tiny sample of the checks "were not properly

2    staggered," meaning they were done at regular 30-minute intervals.  They cite no legal authority

3    that would require either of these measures as a matter of constitutional law.  And they make no

4    attempt to causally link their criticisms to any complete suicides or harm to a *Coleman* class

5    member.[28]

6           The only reliable evidence in the record demonstrates that 30-minute welfare checks have

7    some utility, but its ability to save lives cannot be overstated:

8                 **Q. The point is that for suicide prevention, one of the tools you**
                  **can use in ad seg is identifying people in the act of attempting**
9                 **suicide and hopefully interrupting them.**

10                A. That's very unlikely with one-hour or 30-minute checks, to be
                  honest with you. It's – people say to do it, but it's probably not
11                going to stop very many suicides. It's just a matter of luck. You
                  know, it's a two-minute process [to complete a suicide], if you can
12                even tell by looking at the person that -- if they're hanging, you can
                  tell. And then you – it's a -- the luck of the draw of whether you
13                happen to catch them at the moment.

14   (McKinney Decl. Ex. 1 [Dvoskin Depo.] 245:16-246:23.)

15          Nevertheless, because organizations such as the American Correction Association consider

16   30-minute welfare checks to be a best practice, Secretary Beard directed two policy changes: First,

17   CDCR will conduct three welfare checks per hour at staggered intervals not to exceed 30 minutes.

18   (Allison Reply Decl. ¶ 8; T. Belavich Reply Decl. ¶ 47.)  Second, clinical staff may continue

19   welfare checks beyond 21 days on specific inmates in administrative segregation when deemed

20   necessary.  (*Id.*)  Secretary Beard announced this policy on March 20, 2013, and it will become

21   effective on May 1, 2013.  (*Id.*)  The memorandum announcing this change will be released to the

22   field once the union is notified.  (*Id.*)

23          Moreover, on March 19, 2013, the *Plata* receiver issued a Request for Quotation for an

24   automated "Inmate Welfare Check System"; the request is available at

25   http://www.cphcs.ca.gov/project_rfp.aspx.  Plaintiffs' issues with the current quality of the logs

26   are therefore being addressed.

27   _____
            [28] The specifics regarding the suicide cases relied upon by Plaintiffs are discussed in
     further detail on page 61.

28

                                        76

1    Compliance with this ACA standard is not mandatory; the ACA has accredited three

2    California institutions so far while expressly acknowledging the existing procedure for welfare

3    checks.  (*See* ECF No 4417-3 at 35 [page 7 of ACA Accreditation Report for CCWF, which

4    accredited CCWF despite finding that "Cell check logs documented hourly checks on some inmates

5    in segregation instead of the minimum checks at 30 minutes as required by ACA standards"];

6    McKinney Decl. Ex. 13 [Beard Depo.] 243:19-22].)  Thus, although Plaintiffs correctly note that

7    experts on both sides state CDCR could expand welfare checks, and CDCR agrees, it is a best

8    practice recommendation that is beyond this Court's power to order.

9           **5.      The State Provides Constitutional Care in the Its Security Housing Units.**

10       Plaintiffs' arguments regarding the Security Housing Units are replete with errors.  As an

11   initial matter, Plaintiffs' attempt to discredit Defendants' experts' testimony here is disingenuous

12   given that Plaintiffs' own experts' failed to visit several prisons with some of the largest mainline

13   and administrative units serving the Enhanced Outpatient Program populations, including the

14   largest program at California Men's Colony—and yet they freely opined on care systemwide.

15   Regardless, Defendants' experts reviewed three of the five prisons with Security Housing Units,

16   including the 450 capacity unit at California State Prison, Corcoran for inmates at the

17   Correctional Clinical Case Management System level of care.  Based on this review, the State's

18   experts concluded that the "CDCR Mental Health Delivery System appropriately meets the

19   mental health needs of CCCMS inmates assigned to a SHU."  (Clinical Exp. Rpt. at 25–26.)

20        Plaintiffs' experts' opinions regarding the inmates interviewed in the two Security

21   Housing Units at California State Prison, Corcoran and California Correctional Institution, do not

22   evidence that the care provided to inmates in those units is below a constitutional level.  At best,

23   their opinions simply reinforce Plaintiffs' long-standing belief that all mentally ill inmates be

24   excluded from segregated housing units, *even* if they receive care consistent with the *Coleman*

25   Program Guide requirements.  Moreover, their primary complaint is an alleged insufficient

26   number of groups for inmates at the Correctional Clinical Case Management System level of care.

27   But even the testimony that Plaintiffs cite to in their declarations does not rise to a constitutional

28

77

1    threshold.   On the other hand, Defendants provide evidence that groups for inmates at this level

2    of care is not a constitutional issue.  (McKinney Decl. Ex. 1 [Dvoskin Depo.] at 276:6 to 277:16

3    (testifying that groups for  CCCMS is not a constitutional issue).

4        The first inmate, at Corcoran (inmate CC in Haney's declaration), complains about a

5    change in his case managers, his environment, and dissatisfaction with groups, but his treatment,

6    which includes seeing a medical provider every month and other weekly contacts, does not

7    violate either the Program Guide or the Constitution.  (Haney Decl. ¶¶ 207–08.)  This is similar

8    with inmate EE.  (*Id.* at ¶¶ 212–13.)  Inmate DD allegedly reported to Haney dissatisfaction with

9    his overall treatment, but mental health clinicians at Corcoran who reviewed his records report

10   that he is receiving mental health care at the Correctional Clinical Case Management System

11   level of care.  (*Id.* ¶ 210–211; Fischer Reply Decl. [COR] ¶ 30.)

12       Likewise, at California Correctional Institution, inmates PP and QQ both reported

13   receiving enhanced weekly clinical care beyond a Correctional Clinical Case Management

14   System level of care pending transfer to a Psychiatric Services Unit.  (Haney Decl. ¶¶ 259–63.)

15   Inmates RR and SS were new arrivals to the SHU and there is no evidence that they not receiving

16   treatment consistent with a Correctional Clinical Case Management System level of care. (*Id.* ¶

17   264.)  Inmate TT's care also included seeing a medical provider every month and other weekly

18   contacts.  (*Id.* ¶ 267.)  Finally, Haney's report of inmate UU neglects to reference any evidence

19   that he was not receiving mental health care.  (*See* Walsh Reply Decl. ¶¶ 25-28.)

20       Although Kaufman identified one inmate that he believed required additional mental

21   health care—Inmate F—Kaufman agreed that he was not basing his opinion on any constitutional

22   requirements.  (McKinney Decl. Ex. 5 [Kaufman Depo.] at 13:25-14:12.)   And, since Plaintiffs

23   have provided no legal authority to support their view that "all" clinical conducts must to be

24   confidential, Kaufman's opinion on this point is wholly meaningless.  (*See* Opp'n at 65: 20, citing

25   Kaufman Decl. at ¶ 47.)

26       Defendants' experts noted variability in the rounds in the Security Housing Unit, but did

27   not state they found the rounds "deficient."  (Clinical Exp. Rpt. at 24.)  On the contrary,

28   Defendants' experts found that the rounds, which were conducted on a daily basis, "exceed the

78

1  standard of care." (*Id.*)

2  **I.   Plaintiffs Failed to Demonstrate Any Pattern or Practice of Unnecessary or
         Excessive Use of Force Against the *Coleman* Class, or Any Violation of a
3        Federal Right in the Disciplinary Process.**

4         **1.   Plaintiffs Failed to Demonstrate a Constitutional Violation Regarding Use
                 of Force.**

5         Plaintiffs and their expert, Eldon Vail, present no meaningful evidence of systemic

6  Constitutional violations against mentally ill inmates with respect to custodial practices, use of

7  force, and disciplinary measures.  Instead they focus on a few isolated, sporadic instances to

8  second-guess what the State's expert determined to be appropriate systemic correctional

9  practices.  Moreover, the conclusions set forth by Mr. Vail are rife with inaccuracies and are the

10 result of unjustifiable assumptions that he reached by reviewing the same evidence that

11 Defendants' use-of-force expert, Steve Martin, reviewed to find that Defendants' mental health

12 system was constitutionally adequate.  (McKinney Decl. Ex. 7 [Vail Depo.] 176:20-177:6.)

13        For instance, Mr. Vail concluded that excessive use of force is "pretty routine" and "used

14 with some frequency" in California based on rudimentary statistics showing that use of force

15 incidents are higher among mentally inmates.  (Vail Decl. ¶ 35; McKinney Decl. Ex. 7 [Vail

16 Depo.] 174:2-175:11.)  But Mr. Vail engaged in no analysis to draw sound conclusions from this

17 data.  As noted by the State's expert, Steve Martin, who has decades of experience evaluating this

18 issue with multiple correctional systems across the United States, it is an unfortunate, but often

19 simply unavoidable, fact that use of force incidents nationwide are statistically higher among

20 inmates with serious mental illness.  (Martin Reply Decl., ¶¶ 6-7.)  This occurs for a variety of

21 reasons, including the need for officers to intervene in instances of self harm to protect inmates,

22 violent or threatening behaviors by mentally ill inmates which lead to necessary staff use of force,

23 and the problem of a few particularly unstable inmates being repeatedly involved in use of force

24 instances.  (*Id.*)  Mr. Vail provides no evidence or analysis that demonstrates the statistical

25 difference he identifies is the result of a pattern or practice that victimizes the mentally ill or that

26 use of force incidents are in fact excessive or unnecessary.  Mr. Vail also admits that instances

27 where officers physically prevent mentally ill inmates from harming themselves are included in

28

79

1   the State's use of force totals, and that small numbers of unstable inmates can drive up the total.

2   (McKinney Decl. Ex. 7 [Vail Depo.] 67:7-11 & 68:3-11.)  Mr. Martin's more thorough and

3   extensive review conclusively found no pattern or practice of excessive or unnecessary use of

4   force against mentally ill inmates.  (Martin Exp. Rpt. at 12-13; Martin Reply Decl. ¶ 5.)

5          Contrary to Mr. Vail's belief, CDCR does not tolerate excessive or unnecessary use of force

6   against inmates.  (Allison Reply Decl. ¶ 20.)  CDCR's corrective action process includes training,

7   informal corrective action, and informal corrective action.  (*See id.* at Ex. E.)

8          Plaintiffs' criticism of the use of expandable batons and Oleoresin Capsicum (OC) spray is

9   similarly bereft of context and riddled with half-truths and incomplete analysis.  Indeed, Plaintiffs

10  and Mr. Vail appear to believe that the mere provision of batons and OC spray to officers is

11  evidence of a constitutional violation.  (Vail Decl. ¶¶ 37-41.)  Mr. Vail notes that the expandable

12  baton is often used to gain inmate compliance, but leaves out the fact that in the vast majority of

13  cases the expandable baton is used to stop ongoing inmate-on-inmate assaults, and even then only

14  *after* the inmates have refused to obey verbal commands, and *after* the use of OC spray has

15  proven ineffective.  (Martin Reply Decl. ¶ 11; McKinney Decl. Ex. 2 [Martin Depo.] 129:2-14.)

16  And Plaintiffs' criticism of the use of OC spray relies on drawing unsupported inferences about

17  systemwide use from only two videotaped incidents.  (Vail Decl. ¶¶ 52 &58-60.)  While the State

18  obviously does not defend any particular instance where excessive or unnecessary use of OC

19  spray may have occurred, the isolated and sporadic instances set forth by Plaintiffs are not

20  evidence of a pattern or practice of excessive or unnecessary force.  To cover this flaw, Mr. Vail

21  makes the broad and unsupported statement that "from the written reports the amounts are

22  excessive."  (*Id.* ¶ 60.)  But Mr. Vail does not explain his methodology or basis for determining

23  from written reports the amounts of OC spray used, nor does he describe the number of reports

24  where he was able to determine that excessive amounts of spray were used.

25

26

27

28

1

2

**2.    The State Appropriately Considers and Accommodates Mental Health in the Disciplinary Process.**

Plaintiffs' cursorily critique CDCR's disciplinary process but fail to provide any evidence that inmates' mental health conditions are not being considered and accommodated in disciplinary hearings.  Mr. Martin conducted an exhaustive review of the State's rule violation process (RVR), including discussions with hearing officers and mental health staff, an exhaustive review of RVR documents, and a full understanding of the typical sanctions for rule violations.  And on the basis of this review Mr. Martin concluded that California's hearing officers fully and adequately take into account inmates' mental health conditions when adjudicating rule violations, including appropriately mitigating sanctions.  (Martin Rpt. at 15; Martin Reply Decl. ¶ 2 & 17; McKinney Decl. Ex. 2 [Martin Depo.] 195:18-197:5.)  Unable to rebut this evidence, Plaintiffs levy a number of legally and factually inconsequential critiques, including complaining that the State does not track these mitigations to their satisfaction and that language used in the hearing officers' written reports are "formulaic."  But the Constitution only requires that inmates' mental health conditions be taken into account during disciplinary hearings.  And Plaintiffs have failed entirely to demonstrate that the State's disciplinary process is lacking in this regard.

Plaintiffs also completely mischaracterize and confuse best practice recommendations with constitutional requirements.  The intrusive list of requirements that Mr. Vail purports be minimum requirements, are at most, professional preferences and "in some cases are simply irresponsible."  (Martin Reply Decl. at ¶ 21.)  Plaintiffs' confusion over best practices as opposed to constitutional requirements is evident in their characterization of Mr. Martin's expert report and conclusions.  Mr. Martin concluded, without qualification, (1) that the State has in place a system to minimize and control unnecessary and excessive use of force on inmates and (2) that the State has in place a valid process to accommodate inmates' mental illnesses when adjudicating rule violation offenses.  (Martin Exp. Rpt. at 10; Martin Reply Decl. ¶ 2.)  Mr. Martin's recommendations regarding guidelines for use of batons/OC spray and revisions to the RVR Process were exactly what he stated—recommendations—that, while not constitutionally required, would improve the State's already extensive safeguards.  Similarly, Mr. Martin as a

81

1    respected corrections expert, also made recommendations to better improve CDCR's tracking of

2    RVR processes and reporting and review of use-of-force incidents that were not caveats to his

3    opinions.  Plaintiffs further try to mischaracterize the conclusions set forth by Mr. Martin by

4    citing sections of deposition testimony that rely on incomplete and inaccurate hypotheticals and

5    mischaracterizing the content of Mr. Martin's deposition testimony.  (Decl. Martin ¶19.)  But the

6    simple truth is that there is no of evidence any ongoing and current systemic violation of mentally

7    ill inmates' Constitutional rights with respect to custodial practices, use of force, and disciplinary

8    practices.  (Martin Rpt. at 10; Martin Reply Decl. ¶ 2, refer back to Section H on ASU and SHU.)

9    **VI.    PLAINTIFFS FAILED TO DEMONSTRATE ANY SYSTEMIC VIOLATION OF A FEDERAL RIGHT**
     **       REGARDING THE CARE PROVIDED BY THE DEPARTMENT OF STATE HOSPITALS.**
10

11        The Department of State Hospitals (DSH) provides inpatient acute and psychiatric care to

12   the State's inmates.  The Court has never found that care within DSH violated the Eighth

13   Amendment.  Plaintiffs make a number of allegations involving the DSH, but fail to prove any

14   violation of a federal right.

15        **A.    There Are No "Severe Clinical Staffing Shortages" Affecting the Quality of**
     **         Care Provided to DSH Patients.**

16        Relying primarily on Dr. John Brim's testimony—a contract physician retained through a

17   registry to work part-time at the Salinas Valley Psychiatric Program (SVPP)—Plaintiffs allege

18   that "dangerous shortages" of clinical staff are undermining DSH's ability to provide adequate

19   care to patients.  (Pls.' Opp'n at 39-40.)  Plaintiffs allege that these purported shortages have

20   arisen because Defendants have stopped hiring staff and contractors for "costs savings," going so

21   far as to deny inmates clothes, laundry, bedding, and coats to "save money."  (*Id.* at 40-41.)  If

22   true, these allegations would be shocking.  But, as with virtually all of Plaintiffs' allegations, they

23   are not true.

24        There is presently no "dangerous shortage of clinical staff" within DSH, or at SVPP

25   specifically.  Several of Plaintiffs' assertions reflect Dr. Brim's allegations and the notice that

26   medical staff (including Dr. Brim) sent SVPP's executive director via correspondence dated

27

28

                                                82

1   January 23, 2013 and February 12, 2013.  (*See* Bien Decl. Exs. 111 & 112.)  But Plaintiff's have

2   absolutely no evidence that any patient care suffered as the result of normal staff turnover.  The

3   treatment team at SVPP consists of psychiatrists, psychologists, therapists, nurses, and

4   technicians who work together to provide a comprehensive variety of mental health service,

5   including one-on-one counseling, group therapy, and rehabilitative programming.  (DaSilva

6   Reply Decl. ¶¶ 3-7.)  There has been no deficit whatsoever in SVPP other professional groups,

7   and these services have been provided to SVPP's patients at a frequency and level that meets or

8   exceeds clinical standards.  (*Id.* at ¶ 9.) Moreover DSH was making concerted efforts to recruit

9   and hire psychiatrists at SVPP in response to normal staff turnover, well before Dr. Brim's

10  correspondence.  (Gaither Reply Decl. ¶¶ 3-4; DaSilva Reply Decl. ¶¶ 9-10.)  Further, in response

11  to those letters, which described potential problems that would arise if anticipated physician

12  moves actually occurred, Defendants took immediate action to remedy the situation.[29]  (Gaither

13  Reply Decl. ¶¶ 5-6; DaSilva Reply Decl. ¶¶ 10-12.)   And because of Defendant's ongoing

14  committing to recruiting and hiring each psychiatrist who departed was replaced with a new hire

15  or transfer within a matter of weeks, if not days.  (Gaither Reply Decl. ¶ 5; DaSilva Reply Decl.

16  ¶¶ 10-12.)   At SVPP, there are presently 12.75 filled psychiatrist positions to attend to the needs

17  of approximately 352 patients, which is an increase from the 10 psychiatrists on staff before the

18  December departures.  (*Id.*)  Physicians now working at SVPP provide for a patient to staff ratio

19  that is well within the staffing ratios ordered by this Court.

20        Defendants have been anything but deliberately indifferent to patient needs at SVPP, or at

21  the programs in Vacaville and Atascadero (at which, in the case of the later two facilities,

22  Plaintiffs properly make no allegations of staffing concerns), and have mitigated the departures of

---

[29] Indeed, the anticipated physician moves that so concerned the remaining staff to cause them to write the letters in question did not completely occur.  (Decl. Gaither ¶ 5.)

psychiatric staff.  Nor is there, as Plaintiffs allege, a "hiring freeze" or any current directive to "shut down" programs.  (*Id.* at ¶ 3.)  In short, DSH has appropriately responded to staffing challenges, and it has and continues to provide appropriate and timely treatment to all patients needing acute and intermediate psychiatric care.

**B.   DSH Has Appropriate Medical Records and Medication Management.**

Plaintiffs also rely exclusively on the deposition testimony of Dr. Brim to assert that there are serious issues with medication management and access to medical records at SVPP.  But Dr. Brim's testimony about access to medical records was false.  (Decl. Gaither ¶ 11.)  Any SVPP clinician who needs access to the eUHR is provided with electronic access code and training on the eUHR.  (*Id.*)  Further, clinicians can access to any health records not included in the eUHR, but submitting a request to CDCR's medical records department.  (*Id.*)  And Plaintiff's tenuous accusations of poor medication management are not supported by any evidence.  SVPP employs a interdisciplinary treatment team approach which provides a variety of overlapping layers of treatment and monitoring of patients by psychiatrists, psychologists, nurses, therapists, and mental health technicians.  (Decl. DaSilva ¶¶ 3-5.)  SVPP has over fifty registered nurses who attend to patients' care, including assisting with appropriate medication monitoring.  (*Id.* ¶ 5.)

**VII.   PLAINTIFFS FAILED TO ESTABLISH THAT THE STATE IS NOT PROVIDING ADEQUATE MENTAL HEALTH CARE AT THE CURRENT POPULATION DENSITY.**

The evidence overwhelmingly shows that the State has achieved and maintains a superior mental health care system that more than meets the requirements of the Constitution.  As the State established in its motion to vacate the population reduction order,[30] which was filed the same day

---

[30]   Having failed to timely respond to the State's motion to vacate the population reduction order, Plaintiffs cannot backdoor arguments to that motion in their opposition here. (Jan. 29, 2013 Order, *Plata*, ECF No. 2527.)  Indeed, the entire argument regarding overcrowding is irrelevant to the State's motion to terminate, and thus should not be considered, because this motion turns on the State's ability to provide constitutionally adequate mental health care, *not* the question of whether overcrowding is currently a primary barrier to the delivery of constitutional medical and mental health care.  The latter question is before the three-judge court and is the subject of the State's motion to vacate the population reduction order filed the same day as the instant motion.

84

1    as the instant motion, the current prison population does not pose a barrier to the State providing

2    constitutionally adequate mental health care.  (Defs.' Mot. to Vacate, ECF No. 4280.)  The prison

3    population has been drastically reduced since 2006 when Plaintiffs moved to convene the three-

4    judge court, and the population continues to decrease as a direct result of public safety

5    realignment.  Further, mental health programs – the very programs applicable to this class - are

6    not overcrowded and are sufficiently staffed to provide constitutional care.  Simply put, the

7    system is not overcrowded.[31]

8         The reduction in prison population is due in large part to public safety realignment.  The

9    population has dropped by nearly 25,000 inmates since the legislation went into effect in October

10   2011, by more than 31,000 inmates since the three-judge court issued its population reduction

11   order in January 2010, and by more than 42,000 since the three-judge court was convened.

12   (Defs.' Mot. to Vacate, ECF No. 4280 at 8; March 15, 2013 Status Report, ECF No. 4406.)

13   Notwithstanding Plaintiffs' claims to the contrary, any relationship between implementation of

14   public safety realignment and the State's budget crisis is completely irrelevant to this analysis.

15   What is key is the legislation's unparalleled impact on the prison population levels and,

16   consequentially, the delivery of constitutional mental health care.

17        California is not an "outlier" in terms of overcrowding, as Plaintiffs suggest.  Rather, all

18   evidence points to the contrary.  The *Coleman* Special Master does not complain of overcrowding

19   as a barrier to constitutional mental health care.  (Special Master's 24th Report, ECF No. 4205.)

20   According to Robert Barton, the independent Inspector General, and Jeffrey Beard, the newly

21   appointed Secretary of CDCR, former Director of the Pennsylvania Department of Corrections,

22   and psychologist who testified on Plaintiffs' behalf at trial, the current prison population does not

23

24        [31] Plaintiffs inserted a few photos from California Institution for Men to misleadingly
     suggest that the State's prisons remain overcrowded.  Photo U is a double bed cell which houses
25   reception center inmates for short periods of time.  Inmates who are CCCMS or EOP are
     transferred to an appropriate placement once they are endorsed, and receive the required
26   treatment and yard time while at the reception center.  Figure 3 is the Angeles Dorm, which was
     recently remodeled, and housed CCCMS and up to five EOP inmate-patients pending transfer to
27   an EOP program.  All inmate-patients in Angeles Dorm, which is clean, open and roomy dorm,
     receive the required treatment and programming.  Figure 4 depicts inmates receiving group
     therapy in therapeutic treatment modules.  (*See* Jordan Reply Decl. [CIM] ¶¶ 6-11.)

28

1   prohibit the State from providing adequate medical or mental health care.  (Defs.' Mot. to Vacate,

2   ECF No. 4280 at 12-14.)  Despite Plaintiffs' claims that the State's experts did not address

3   "overcrowding" *per se*, the State's experts also opined that constitutional care was being provided

4   at the current population and, thus, that the current population is not a barrier to the delivery of

5   constitutional mental health care.  (McKinney Decl. Exs. 3 [Scott Depo.] 24:16-24 ["I was asked

6   to look at, with the current both staffing levels and prison population, was appropriate care

7   psychiatric care provided to inmates and was there evidence that the California Department of

8   Corrections was deliberately indifferent to the inmates based on the population at the time I did

9   the evaluation"]); 1 [Dvoskin Depo.] 193:5-7 ("If I felt that crowding was precluding the

10  provision of adequate mental health care, then I would have written it, and there was no

11  preclusion of me doing that"); & 2 [Moore Depo.] 41:8-18; *see also* Moore Reply Decl ¶ 6.)

12  Plaintiffs' oversimplified reliance on semantics should be disregarded.

13          Moreover, Plaintiffs' repeated reliance on "design capacity" in asserting that individual

14  prisons are overcrowded is inapt given the concept is outdated and defunct.  Although CDCR

15  built the majority of its prisons to "design capacity" standards, including single-celling, that was

16  based on the American Correctional Association's (ACA) recommendations that were current at

17  that time.  (Defs.' Opp. to Supp. Resp. to Mot. to Vacate, ECF No. 4415 at 4.)  Since that time,

18  however, the ACA has eliminated the requirement for single-celling from its standards and no

19  longer mandates that a prison system or individual prison stay at or below its stated "design

20  capacity" or "rated capacity" in order to receive accreditation.  (*Id.*)  In fact, the ACA recognizes

21  that double-celling has become an acceptable practice throughout the nation and it is common

22  practice for such prison systems to allow double-celling as part of their "rated" or "design"

23  capacity.  (*Id.* at 4-5.)  Further, given that ACA standards are the national benchmark for

24  operation of correctional facilities, they are a good indicator that an institution is able to provide a

25  constitutional level of care to inmate-patients.  (*Id.* at 4.)  Indeed, three of CDCR's institutions,

26  which are "overcrowded" by Plaintiffs' standards, have already been accredited by the ACA

27  (each with populations in excess of 137.5% of design capacity), with two more undergoing the

28  accreditation process and likely to be accredited.  (*Id.* at 6.)   These accreditations are all the more

86

1   significant when considering that CDCR was unable to achieve accreditation for some institutions

2   in the mid-1980s.  (McKinney Decl. Ex. 8 [Woodford Depo.] 112:4-17.)  Given the ACA's

3   movement away from the one-inmate-per-cell concept as the measure for acceptable occupancy,

4   Plaintiffs' continued reference to supposed overcrowding at individual prisons based on this

5   measure must be disregarded.  Moreover, Plaintiffs' refrain ignores the Supreme Court's binding

6   precedent that every facility need not comply with the 137.5% limit.  *Brown v. Plata*, 131 S. Ct.

7   1910, 1941 (2011).

8           Contrary to Plaintiffs' assertion, the Receiver's recent submission does not show a direct

9   relationship between population levels and the delivery of constitutional care.  (*Plata*, ECF No.

10   2547.)  Instead of providing any analysis of the population levels, the Receiver's submission

11   averages the population density percentages at various prisons based on his grouping of the

12   prisons into the "top third" and "bottom two-thirds" based on their overall performance.  (*Id.* at 4-

13   5.)  Averaging the percentages this way obscures the data so that it would be impossible to show a

14   "direct relationship" between population levels and the delivery of constitutional care.  Indeed, on

15   closer examination, it is evident that some of prisons receiving the highest ratings from the

16   Receiver are also have the highest population densities, *i.e.*, CCI at 165.4% and CVSP at 160.6%,

17   and that one of the lowest population prisons also achieved the lowest scores from the Receiver,

18   *i.e.*, CMF at 101.3%.  (*Plata* ECF No. 2547, Exs. 1 and 2.)  Moreover, with respect to three

19   prisons—SAC SAC, SOL, and CCWF—the Receiver's findings directly conflict with the ACA's

20   certification that these prisons meet national accreditation standards, for which health care is a

21   significant focus.  This is further evidence that California is being held to standards of near

22   perfection that are well above recognized national standards.  (Decl. of Kathy Black-Dennis in

23   Support of Defs.' Opp. to Supp. Resp. to Mot. to Vacate, ECF No. 4417 at 4-5.)

24           Defendants object to Plaintiffs' naked assertion that 8,000 cells do not comply with the

25   ACA standard for minimum cell size.  There is no evidence that all or any of the 8,000 cells will

26   not meet ACA standards.  Even if the cells do not meet technical ACA standards, however, the

27   ACA has a process whereby an agency can achieve accreditation notwithstanding non-

28   compliance with particular ACA standards. (Declaration of Kathy Black-Dennis, Ex. A at 41.)  In

87

1    such cases, an agency may apply for a waiver of the requirements when it can show mitigation of

2    the negative impact of non-compliance.  (*Id.*)  The waiver request must satisfy several

3    requirements in order to be granted by the ACA.  (*Id.*)  Moreover, Plaintiffs have taken out of

4    context the statement of Pulitzer/Bogard & Associates regarding these cells.  As P/B&A later

5    states in its report, "the reality is that it is not practical to simply take [these cells] off line and

6    remove them entirely from including in CDCR's systemwide capacity."  (Bien Decl., Ex. 8 at 25,

7    ECF No. 4399.)  Rather, P/B&A acknowledges a methodology that would permit the cells to be

8    used for one inmate "even though they fall below the ACA standard."  (*Id.*)

9         In addition, Plaintiffs inappropriately rely on the prison operating capacity set forth in a

10   recent report commissioned by the State and prepared by Pulitzer/Bogard & Associates.  The

11   report is irrelevant, however, because, if anything, the prison operating capacity sets the baseline,

12   not the ceiling, and, in any event, the State has not implemented the report.

13   **VIII. THE STATE HAS IMPLEMENTED A DURABLE AND SUSTAINABLE REMEDY AND FURTHER**
     **FEDERAL COURT OVERSIGHT IS CONTRARY TO LAW.**

14

15        Under *Horne v. Flores*, the critical inquiry is whether continued enforcement of injunctive

16   relief is supported by ongoing federal law violations.  "If a durable remedy has been implemented,

17   continued enforcement of the order is not only unnecessary but improper."  *Horne*, 557 U.S. 450.

18   The mental health care system developed, implemented, and improved over the last 17 years,

19   which now systemically provides quality mental health care to California's inmates is the

20   definition of a durable remedy.  While Plaintiffs and the special master appear to demand

21   perfection, and the State shares that goal, the Constitution does not recognize this as the measure

22   for continuing federal court oversight.  As the Supreme Court held, "when the objects of the

23   decree have been attained . . . responsibility for discharging the state's obligations [must be]

24   returned promptly to the State and its officials."  *Horne*, 557 U.S. at 452; *Frew*, 540 U.S. at 442.[32]

25   _____

26        [32] Other courts have recognized that it is appropriate to dismiss class action cases related
     to prison conditions when constitutional minima are met.  *See, e.g., Perez v. Brown*, No. C 05-
     05241 JSW (N.D. Cal.) (prison dental care); *Madrid v. Schwarzenegger*, No. C 90-3094 TEH

27   (N.D. Cal.) (prison use-of-force policies); *Lancaster v. Tilton* (San Quentin prison conditions);
     and *Gilmore v. California* (prison law library).

28

1   California's Mental Health Services Delivery System is comprehensive and durable, and its

2   implementation and continuous self-monitoring goes well beyond the minimum requirements of

3   constitutional care.

4   Continued intrusive federal oversight would be an unlawful and unnecessary waste of

5   taxpayer resources that would be better spent treating the State's inmates with serious mental

6   illness.  Continued enforcement of injunctive relief in *Coleman* also interferes with the State's

7   democratic processes, and further micromanagement of every aspect of prison mental health care

8   raises federalism concerns. Plaintiffs failed to raise a single systemic federal law violation, and

9   the Court can no longer inject itself in the State's fiscal and policy decisions, at least with respect

10  to prison mental health care.  A federal court is not well-equipped to run a suicide-prevention

11  program, monitor psychiatric medication, or evaluate any other aspect of a prison mental health

12  care system.  Indeed, the Court should play no role in continuing to second-guess the State's

13  policy decisions regarding prison mental health care.  *See Harris*, 489 U.S. at 392.  Because the

14  State has established a mental health care system that easily passes constitutional muster, the

15  Court must discontinue prospective enforcement of its injunctive orders and end federal court

16  supervision over the State's legislative, fiscal, and policy decisions under basic principles of

17  federalism.

18  **IX.   CONCLUSION.**

19  Plaintiffs presented no credible evidence that the State is any way continuing to

20  systemically violate the federal rights of inmates with a serious mental illness.  Although

21  Plaintiffs make a flailing, disorganized effort to argue that this is not the case, their claims and

22  expert declarations do not withstand scrutiny.  All admissible evidence, including the numerous

23  responses from the institutions telling the true story about Plaintiffs' site visits that demonstrate a

24  well-functioning system, proves that the State is providing timely and appropriate mental health

25  care to its prison inmates.  The time has come to let go of the burdensome, expensive federal

26  court monitoring and oversight that has persisted for more than seventeen years and return control

27  of mental health care to the State.

28

1    Dated:  March 22, 2013                            Respectfully Submitted,

2                                            KAMALA D. HARRIS
                                            Attorney General of California

3                                            JAY C. RUSSELL
                                            Supervising Deputy Attorney General

4

5

6                                            /s/ Patrick R. McKinney
                                            PATRICK R. MCKINNEY

7                                            Deputy Attorney General
                                          *Attorneys for Defendants*

8

9    CF1997CS0003
    20681037.docx

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28