**Exhibit 1**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,            )
                                  )
                Plaintiffs,       )
                                  )CASE NO.:
        vs.                       )S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                Defendants.       )
                                  )

DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013, 9:14 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY: MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1  not believe that that study says that there are no
2  long-term effects of segregation that are negative. We
3  were just, in that study, unable to identify them. And
4  there are some specific things in Colorado that may have
5  been responsible for those particular findings.
6      Q. Again, rather than go into the details, is it
7  still correct that at this time you think there's still
8  not definitive research about whether or not long-term
9  housing in segregation is dangerous and can cause
10 permanent harm to people?
11     A. Yes. I think that's still true.
12     Q. Okay. That means -- would you agree it's
13 possible that long-term housing in segregation does
14 cause psychological harm?
15     A. Yes.
16     Q. And you're less -- I think I interpreted this
17 correctly --
18     A. I'm sorry. Can I just clarify? I took your
19 question not to mean that it necessarily does, but that
20 it could on -- for an individual.
21     Q. Right. That's correct.
22     A. So the answer is yes.
23     Q. And you're less -- I understood this article
24 to say that as to the mentally ill, there already has
25 been research and that it is harmful to -- for the

```
 1            "He's really nice."  You know, or --
 2            And frankly, I was shocked at the consistency
 3   with which people knew their doctor and their primary
 4   clinician and the generally high opinion that they
 5   expressed of them.  It was shocking to me.  Better than
 6   I've ever seen in a prison system.
 7       Q.   Okay.  Let's go back to people who are -- so
 8   this -- you felt that one of the things that you were
 9   tasked to do was determine whether there was an unmet
10   need for mental health care in the California system?
11       A.   Yes.
12       Q.   And your opinion is that there is not?
13       A.   Well, I was asked to assess it in the context
14   of did I feel the system was constitutionally adequate
15   or not.  There's always unmet need.  No question about
16   it.
17            The -- if I had unlimited resources, there are
18   many things that you could do that would improve the
19   system and make it better.
20            But using my understanding of constitutional
21   minima as a criterion, then the answer is I think they
22   are meeting the constitutional obligations.
23       Q.   When you were part of the Scarlet Carp team,
24   one of the issues at that point was determining whether
25   or not California had an unmet need for mental health
```

```
 1   And I probably wish I hadn't written that note, but I
 2   think there was a general belief that any time there was
 3   a disagreement between the special master and the State,
 4   that the judge would simply agree with the special
 5   master.  So that they didn't feel like it was a level
 6   playing field, I guess, to put it -- and I wish I hadn't
 7   written that.
 8        Q.   You wrote it down because it was stated at
 9   that meeting?
10        A.   Yeah, I believe so.
11        Q.   Do you know who said that?
12        A.   I do not.
13        Q.   How did you select the number of prisons --
14   the prisons that you toured?
15        A.   We had a meeting -- might have been that same
16   day or shortly thereafter -- where we -- we kind of sat
17   around, and I asked for a list of, like, which kind of
18   programs are at which programs.  And there were people
19   from CDCR there, and I asked them questions about, you
20   know, I say "I"; we all did.
21             All four of us weighed in about -- we wanted a
22   reasonable sample that would cover the types of programs
23   that existed.  We asked specifically for one prison that
24   didn't have much of anything.  I think we picked
25   Centinela for that.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1         And then people would give us -- "Here are
2    some prisons that have this level of care." And we
3    said, "We've got to go see that one."
4         As we began our trip, it became clear to us
5    there were a couple places we should go see, Pelican Bay
6    being an obvious choice because they had one of the two
7    PSUs and we thought that we shouldn't not go to
8    Pelican Bay.
9         And then we wanted to revisit -- our first
10   visits were a little chaotic; we weren't sure what we
11   were doing. We were still working on our methodology.
12   We went back to CMF, and I think we went back to SAC, if
13   I'm not mistaken. I know we went back to CMF to make
14   sure that we had asked all the questions we needed to
15   ask.
16   Q.   So why didn't you go to 33 prisons?
17   A.   Expense.
18   Q.   Okay.
19   A.   It would have been a lot more money.
20   Q.   Okay.
21   A.   I shouldn't say that. That was my assumption.
22   Q.   Okay.
23   A.   I don't think that was said to me, but I
24   didn't even ask the question because I assumed it would
25   be very, very expensive to do that.

```
 1      Q.   Okay.  Did you think that going to 9 of the 33
 2   prisons allowed you to make an opinion about the total
 3   operations of the California Department of Corrections?
 4           MS. VOROUS:  Objection.
 5           THE WITNESS:  I think it's 13, isn't it?
 6   BY MR. BIEN:
 7      Q.   What's 13?
 8      A.   All the ones we visited.
 9      Q.   Okay.  How many did you go to?
10      A.   I thought we visited 13.
11      Q.   13 prisons.  Okay.  I have it all down.
12      A.   I'm sorry.  I know I wouldn't be able to list
13   all 13 for you.
14      Q.   I do have a list here.  Let's assume you went
15   to 13 prisons.
16      A.   I think it is.
17      Q.   Okay.
18      A.   But I'm willing to stand corrected if that's
19   incorrect.
20      Q.   On what basis do you feel that you can render
21   an opinion about the full California Department of
22   Corrections, which is 33 prisons right now plus 9,000
23   people out of state?
24      A.   I certainly don't -- I don't offer an opinion
25   about the people who are out of state.
```

1   Q.   Okay.

2   A.   For the rest of the prisons, in addition to
3   going to prisons, we talked to inmates who had been in
4   most of the prisons.  So if there had been any kind of
5   meaningful allegation that something was an outlier in
6   a -- while you're doing that, can I use the restroom
7   real quick?

8   Q.   Sure.

9        (Off the record at 2:32 p.m. and back on
10       the record at 2:36 p.m.)

11  BY MR. BIEN:

12  Q.   I think you were in the middle of an answer so
13  to be fair, I'd like to -- why don't you read back the
14  question and the answer?

15       (Record read as follows:

16       "QUESTION:  On what basis do you feel
17       that you can render an opinion about
18       the full California Department of
19       Corrections, which is 33 prisons right
20       now plus 9,000 people out of state?
21       "ANSWER:  I certainly don't -- I don't
22       offer an opinion about the people who
23       are out of state.
24       "QUESTION:  Okay.
25       "ANSWER:  For the rest of the prisons,

```
 1              in addition to going to prisons, we
 2              talked to inmates who had been in most
 3              of the prisons. So if there had been
 4              any kind of meaningful allegation that
 5              something was an outlier in a" --)
 6         THE WITNESS: In a different prison that
 7  wasn't on our list, we could have asked to add a prison
 8  to the list. We made sure that we hit every level of
 9  care, reception centers, SNY yards.
10         So it's a sampling. It's a common practice in
11  social science. Is it possible that something could
12  happen in a prison that we didn't go to that would be
13  different? Yes. But I think it's a pretty good sample
14  of their system.
15  BY MR. BIEN:
16      Q.  Did you ask to expand the number of prisons
17  you went to?
18      A.  Yes.
19      Q.  Okay. When did you do that?
20      A.  I don't remember when or I don't even remember
21  who brought it up, but I said and others said, "Gosh, I
22  feel uncomfortable not visiting Pelican Bay."
23         And the AGs quickly said, "Then we'll add
24  Pelican Bay."
25         Well, not adding, but I said -- I feel like we
```

1   expert report or in this matter concerning crowding?
2        A.   I was not precluded from rendering an opinion
3   about crowding if I -- I was asked to render an opinion
4   about the constitutionality of the mental health care.
5   If I felt that crowding was precluding the provision of
6   adequate mental health care, then I would have written
7   it, and there was no preclusion of me doing that.  No
8   one ever asked me not to address crowding.
9             But I wasn't asked to specifically assess the
10  capacity of the prisons and whether or not they were
11  crowded.
12       Q.   Okay.  I think understand that.
13       A.   You want me to try again?
14       Q.   No.  No.  I should ask you questions, and we
15  can follow up from there.
16            Did you review the three-judge court's opinion
17  in connection with forming your opinion today?
18       A.   If I did, it was so long ago it had nothing to
19  do with my opinion today.
20       Q.   Okay.
21       A.   I mean, I knew the general findings that the
22  three-judge panel had made.
23       Q.   Okay.  I just asked a little about how you
24  picked the 13 prisons, and I think I understand that.
25            Can you explain the methodology you used in

```
 1  people who mistake lividity for rigor mortis.  If you're
 2  hanging especially, your muscles become hard from the
 3  pooling of blood.  But rigor mortis is joints, not
 4  muscle.
 5          So often when you see rigor mortis set in,
 6  what they're really describing is lividity.  The reason
 7  that matters is lividity can be much earlier than
 8  rigor mortis.
 9      Q.  Okay.
10      A.  However, in at least one of the cases -- I
11  think several of them -- there was other evidence that
12  would indicate that Dr. Patterson's conclusions was
13  right, whether it was rigor mortis or not, that it had
14  been -- that people hadn't been doing the checks.
15          So I did say that, yeah.
16      Q.  The point is that for suicide prevention, one
17  of the tools you can use in ad seg is identifying people
18  in the act of attempting suicide and hopefully
19  interrupting them.
20      A.  That's very unlikely with one-hour or
21  30-minute checks, to be honest with you.  It's -- people
22  say to do it, but it's probably not going to stop very
23  many suicides.  It's just a matter of luck.  You know,
24  it's a two-minute process, if you can even tell by
25  looking at the person that -- if they're hanging, you
```

1  can tell. And then you -- it's a -- the luck of the
2  draw of whether you happen to catch them at the moment.
3          So it's not a suicide watch, and it's --
4  it's-- people say to do it because it seems like a more
5  diligent thing to do. I'm not really sure how many
6  suicides it would ever prevent.
7          I think Lindsay thinks more highly of that
8  than I do, to be honest with you. It's not a big
9  difference of opinion, but doesn't mean you shouldn't do
10 it.
11         The main purpose of the checks or main value
12 of the checks for suicide prevention, in my opinion, it
13 gives a guy an opportunity to tell somebody, "I'm not
14 doing good" or "I need to see the psych."
15         Maybe they wouldn't yell it out, but if an
16 officer stops by and sees a guy crying and he says, "You
17 okay?"
18         "No, man, I can't take this anymore" or
19 "Forget my appointment tomorrow. I'm not going to need
20 it." Then that saves lives.
21         It also probably helps with rapport if the
22 officers swing by and say hi to people. Helps with
23 custody staff also.
24    Q.   Can it also save lives because the officer
25 comes upon an act of suicide and the person is still

```
 1  last entry, can you read that?
 2       A.   "Lots of CCCMS groups canceled.  Not const"
 3  meaning not a constitutional issue.
 4       Q.   Why did you write "not constitutional" next to
 5  it?
 6       A.   Because the -- the groups for CCCMS aren't
 7  typically viewed as a constitutional mandate unless
 8  somebody for a particular reason needs a group.
 9            So I guess I will say I didn't think it's a
10  constitutional issue; but I think, as a matter of public
11  policy, it's good to do groups with people in CCC.  In
12  fact, it's good to do groups with inmates, period.
13       Q.   I never saw in the constitution any reference
14  to whether groups are necessary for CCCs.
15            MS. VOROUS:  Objection.  Argumentative.
16            Ask a question.
17  BY MR. BIEN:
18       Q.   I don't understand where the standard comes
19  from.  Where do you get the standard that groups are not
20  required for CCCMS inmates as a matter of law
21  constitutional law?
22       A.   Generally speaking, I'm unaware of anyplace
23  that has required for people that are stable on
24  medication to get more than that.  If they're doing
25  fine, then it's not -- it's my opinion.  It's not a
```

1  constitutional issue. I'm not quoting case law. That's
2  my opinion.
3          Whereas for people that are not stable in EOP,
4  that it is a constitutional issue that they get
5  something more than medication presumptively. I guess
6  it's possible somebody might not need it, but we presume
7  that they do.
8      Q. Would you agree that if -- if there are no
9  groups provided for CCCs, you don't see any
10 constitutional issue if there's a particular prison that
11 decided to cancel all groups?
12     A. I think -- yeah, that wouldn't be necessarily
13 a constitutional problem. But if somebody had an
14 unmet -- a serious unmet mental health need, that might
15 be a constitutional issue, but it wouldn't have to be
16 groups that met it.
17     Q. Let's assume for a moment that there's a
18 prison in California and, for whatever reason, not
19 individually based, but for a staffing reason or a
20 lockdown, all CCC groups are canceled for six months,
21 let's say. Wouldn't that be a serious problem in the
22 delivery of mental health care?
23         MS. VOROUS: Objection. Vague and ambiguous.
24         THE WITNESS: Not necessarily. If -- if a --
25 if the inmates were stable, then their mental health

1         CERTIFICATE OF REPORTER

2

3         I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8         That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13        I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                           DATED: March 1, 2013

21

22                           _____

23                           MEGAN F. ALVAREZ

24                           RPR, CSR 12470

25