**Exhibit 2**

```
             UNITED STATES DISTRICT COURT

            EASTERN DISTRICT OF CALIFORNIA

                      ---oOo---

RALPH COLEMAN, et al.,        )
                              )
                              )
            Plaintiffs,       )
                              )
              vs.             )  No. Civ S 90-0520 LKK-JFM
                              )
EDMUND G. BROWN, JR., et al., )  Volume I
                              )
                              )  Page 1 - 300
            Defendants.       )
                              )
_____)
```

DEPOSITION OF

STEVE J. MARTIN

THURSDAY, FEBRUARY 28, 2013

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

REPORTED BY:

HOLLY THUMAN, CSR No. 6834, RMR, CRR

---

JAN BROWN & ASSOCIATES

WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

701 Battery Street, 3rd Floor, San Francisco, CA 94111

(415) 981-3498 or (800) 522-7096

1

1  Q. Okay. So -- well, there certainly was enough
2  time, because you had -- you started in September of
3  2011, and this is February of 2013, I guess the last day
4  of February of 2013. So you had time. If -- is that --
5  you -- there certainly was enough time to do it.
6  　　　MR. McKINNEY: Objection. Asked and answered.
7  　　　THE WITNESS: Counsel, are you intimately
8  familiar with my calendar and commitments?
9  　　　MR. BORNSTEIN: Q. Ah. So it was your
10 schedule?
11 　　A. Yeah. I carry 20-plus cases at any given time,
12 monitoring four or five systems. Don't be so cavalier
13 with my time.
14 　　Q. Was it -- how did you decide on the ones you
15 went to?
16 　　A. Good question. With four experts, I think at
17 least two of -- well, three of us, three of us had
18 varying levels of working familiarity with the CDCR over
19 a variety of years and circumstances. We had our own
20 ideas on institutions that we needed to visit and to set
21 a number where it could confidently be said that what
22 we've seen is representative, generally representative
23 of how the system is operating, save the possibility of
24 a rogue facility that's out there that we just didn't
25 get on our list and is inconsistent with observations we

31

1  might render on others.
2       But generally, we wanted to get 10 to 12 to 13
3  facilities that we believed, as professionals, once we
4  went through them, would give us a fairly illustrative
5  representative idea of how the system was operating,
6  with respect to my particular issues, at least.
7       Q.  So from that sample size, you were then -- you
8  would then have a sense, I guess, of what you thought
9  was going on in all the prisons?
10      A.  It's better than a sense, because if you're --
11 in my areas -- I'm just going to speak to my areas.  But
12 if you've confirmed and established that a set of regs,
13 policies, procedures, are in place, and they're State
14 regs, and they're vigorously monitored both externally
15 and internally, and there's all these mechanisms and all
16 these reviews being done, you know, like OIG and the --
17 you know, whatever -- that if those are in place at 10
18 to 13 institutions, there is a very strong likelihood
19 they're in place at the remaining ones, save, you know,
20 the possible anomaly, the possible, you know, rogue
21 facility that just simply is -- whatever, is not abiding
22 by regs, which those tend to be -- in a system that has
23 this kind of scrutiny, you can't hide those too long.
24 So I doubt there's -- I'd be surprised if there's a
25 rogue facility out there that's abandoned the

32

1   use-of-force regs, or the structure that's in place at
2   the other 13 units.
3           In other words, like Use of Force Coordinator,
4   every single facility had one, every single one of them
5   were reasonably competent.  It was a position that
6   required a fairly good level of competence.  I -- I
7   can't imagine that there's -- very many facilities
8   have -- either don't have them or they're incompetent
9   people.  Well, I could imagine, but I don't think it's
10  there.
11      Q.  What about RVR Coordinators?  Were they in
12  every facility too?
13      A.  I don't believe they were.
14      Q.  Was that a problem?
15      A.  I would have to say it was somewhat of a
16  problem, yes.
17      Q.  Why?
18      A.  Well, because the RVR Mental Health Assessment
19  system is a coordinating effort between clinical
20  healthcare personnel and security management personnel.
21  It's -- it requires that.  I mean, it's structured that
22  way.  And they have sometimes differing views of how to
23  manage a particular inmate based on mental health
24  factors and so forth, and that takes the left hand
25  knowing what the right hand is doing, and that the

33

1  baton as a defensive tactical weapon.
2       That's not to say in certain situations that
3  they could not be used in a way to interrupt a serious
4  assault, like they use them here, where they typically
5  use them in a fight intervention or fight breakup more
6  as, you know, as a distraction, pain compliance type of,
7  quit doing that.
8       And if that is the only available viable means,
9  other than getting down, you know, hands-on, that's one
10 thing.
11      I mean, it's -- you know, very well could be an
12 appropriate use if that's the only available means to
13 interrupt that what could be, you know, pretty serious
14 threat.
15  Q.  Well, when an alarm goes off, pulling your
16 baton and coming running to see what's going on, is that
17 an appropriate use of the baton?
18      MR. McKINNEY:  Objection.  Calls for
19 speculation.
20      THE WITNESS:  Well, I don't know when you say
21 appropriate.  I -- I view all non-lethal tactical
22 weaponry as something that should be limited, narrow,
23 specific, that -- in its application and use.  In other
24 words, you can pretty well predict the types of events,
25 you know, in a confinement setting.  I mean, they're

129

1  not able to kind of drill down and see what's really
2  going on, then you can't effectively implement or
3  monitor the implementation of a program.  Right?
4          MR. McKINNEY:  Objection.  Improper
5  characterization of prior testimony, vague and
6  ambiguous.
7          THE WITNESS:  I think you can.  It's just it
8  makes it more difficult and it puts a greater emphasis
9  on the hard work of drilling down, which, if you don't
10 have the staff and the resources or you don't have
11 external monitors or you don't have some reason to track
12 it, it sometimes -- form overtakes substance, you know.
13 You're filling them out, you're -- it's one of the
14 reasons I'm hesitant about audit instruments.  They
15 don't really allow you to drill down.
16         MR. BORNSTEIN:  Q.  How many hours did you
17 spend reviewing these 440 packets?
18     A.  Quite a -- I mean, quite a number of hours,
19 because, I mean, I'd take a stack and sit there for
20 hours at a time doing it.
21     Q.  10 hours?
22     A.  For the total, more than that.
23     Q.  A hundred hours?
24     A.  I don't know.  I would -- I'd say two to
25 three -- I'd say somewhere between probably 50 and 75

195

```
 1   hours.
 2        Q.   In those -- in those -- in that review that you
 3   did, even when you found a hearing officer saying he was
 4   taking into consideration mental health, could you
 5   figure out from the form how or what he did?
 6             MR. McKINNEY:  Objection.  Vague and ambiguous,
 7   calls for speculation.
 8             THE WITNESS:  I could once I became really
 9   familiar with the -- you know, the dispositional options
10   and what was typically given for this level of offense
11   and so forth.
12             MR. BORNSTEIN:  Q.  How did you become familiar
13   with that?
14        A.   Primarily, interacting with the disciplinary
15   hearing officers.
16        Q.   So through your interviews with them?
17        A.   Yeah.  I had them explain to me how to do that.
18   I couldn't have done it without that.
19        Q.   Okay.  And they would tell you, well, normally
20   they would get 30 days loss of privileges, but here,
21   they got 15 days?
22        A.   Exactly.
23             MR. McKINNEY:  Objection.  Vague and ambiguous.
24             MR. BORNSTEIN:  Q.  Is that right?
25        A.   Yes.
```

196

1   Q.   Okay.  But that is how that was done?

2   A.   It's how -- I didn't know any other way to do
3   it, and I thought it was important to do.  It -- I'm
4   going to render opinions that they substantively take
5   into account the Mental Health Assessments.

6   Q.   In the process, even though there is mental
7   health -- there's a mental health component, the
8   disciplinary process is a custody-run operation.  Right?

9        MR. McKINNEY:  Objection.  It's vague and
10  ambiguous, a mischaracterization of the program.

11       THE WITNESS:  It's a function of what typically
12  would be referred to as security personnel.

13       MR. BORNSTEIN:  Q.  Okay.  So that's custody.
14  Right?

15  A.   Yes.

16  Q.   Okay.  And what you found through your own
17  investigation was there's not a lot of communication
18  between the two of them.  Is that right?

19  A.   No, what I found was that there could be more
20  effective communication, and thereby improve the quality
21  of the process.

22  Q.   Did you ask in your tours or on your tours
23  whether clinical staff are advised of the outcomes of
24  the RVR process and how and whether their
25  recommendations are considered?

197

```
 1              Did you do that?
 2       A.   No.
 3       Q.   What do you think of this?
 4       A.   I -- not much.
 5       Q.   Why?
 6       A.   Well, it's -- it wasn't any revelation to me.
 7  I mean, there's programs like that around the country.
 8       Q.   You agree with this, though, don't you?
 9       A.   Oh, yeah, yeah, I agree with the substance of
10  it, yeah.
11       Q.   In other words, there should be a way for
12  inmates to gain additional privileges in segregation.
13  Right?
14       A.   Yeah, I endorse it as a correctionally sound
15  approach, certainly.
16       Q.   Does CCR?
17       A.   I did not look at the operation of the programs
18  to the extent Joel did.  I know Joel and I bounced
19  around -- I know we had discussions about it, that he, I
20  think, believed there were some things that --
21  additional things could be done.
22       Q.   And you agree, too, don't you?
23       A.   As --
24            MR. McKINNEY:  Objection.  Asked and answered.
25            THE WITNESS:  As a corrections professional,
```

272

1  yeah, I always supported programs that reduced the
2  length of stay in high-security environments, because
3  they're expensive, they're oppressive, or can be, and
4  they can become counterproductive if people are in there
5  too long.
6       So yeah, I endorse any program that can shorten
7  that.
8       MR. BORNSTEIN:  Q.  Okay.  So we've talked a
9  lot today about your basic opinions, which are, as far
10 as you're concerned, there's no constitutional violation
11 in the way in which the use-of-force is being
12 administered in the California prisons.  Is that right?
13      A.  **This is -- in a pattern and practice --**
14      Q.  In pattern and practice.
15      A.  **-- practice of excessive or unnecessary force,**
16 **I did not see that.  Did not find it.**
17      Q.  You found individual instances of use of force
18 that could be considered unnecessary or
19 unconstitutional.  Is that correct?
20      A.  **Correct.**
21      Q.  And you also found a review process for -- or
22 at least you agree that there is a review process that
23 needs to be improved.
24      MR. McKINNEY:  Objection.  That misstates the
25 opinion.

273

CERTIFICATE OF REPORTER

I, HOLLY THUMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein state, and that the testimony of said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

That before completion of the deposition review of the transcript [] was [X] was not requested. If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: March 4, 2013

_____
HOLLY THUMAN, CSR