**Exhibit 3**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          )CASE NO.:
          vs.                             ) S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____    )



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1      Q.    Did you discuss a methodology for the work?

2      A.    Yes.

3      Q.    What methodology did you use?

4      A.    That as a psychiatrist, I would be looking at

5    the provision of psychiatric care and the monitoring of

6    the psychiatric care, and what were the mechanisms in

7    place to assist with that methodology and evaluation

8    process.

9      Q.    If you -- how would you break down the

10   elements of psychiatric care that you were asked to look

11   at?

12     A.    I was asked to look at were the inmates

13   referred for psychiatric evaluation, did they receive

14   that.  Were the diagnoses appropriate to the symptoms

15   reported.  Were the -- did the treatments match the

16   diagnoses.  Were the medications monitored in a

17   reasonable way.

18            Another aspect of my review, we're looking at

19   the mental health crisis beds and the evaluations done

20   relevant to the mental health crisis bed and the

21   management of inmates in the mental health crisis bed

22   units.

23     Q.    Are those all the topics that you were asked

24   to look at?

25     A.    To the degree that there were overlaps with

Charles Scott, M.D.                                                    March 8, 2013

1  have had some involvement in the screening aspect as

2  well.

3      Q.    And was Dr. Martin -- Mr. Martin present at

4  your meeting as well?

5      A.    Yes.

6      Q.    Would it be fair to say he was tasked with use

7  of force and rules violations?

8      A.    Yes.

9      Q.    Were you asked to look at all at the inpatient

10 level of care at the Department of State Hospitals?

11     A.    No.

12     Q.    Do you recall if anyone was asked to look at

13 that?

14     A.    If they were, I wasn't present when that was

15 requested.

16     Q.    Were you asked to look at the impact of

17 overcrowding on the delivery of care?

18     A.    I was asked to look at, with the current both

19 staffing levels and prison population, was appropriate

20 care psychiatric care provided to inmates and was there

21 evidence that the California Department of Corrections

22 was deliberately indifferent to the inmates based on the

23 population at the time that I did the evaluation.

24     Q.    You had published at least one article about

25 the overcrowding decision in this case, right?

1        A.    Yes.

2        Q.    And what -- at that point, just at that first

3  meeting, what methodology -- did you settle on a

4  methodology?  Or were things left to be determined?

5        A.    You're talking about the first meeting or in

6  general?

7        Q.    Just the first meeting for now.

8        A.    At the first meeting, the best of my

9  recollection, the detail of precise methodology wasn't

10 finalized there.

11       Q.    Did you have a general framework settled?

12       A.    A general framework, yes.

13       Q.    Can you describe that?

14       A.    General framework would be that we would tour

15 institutions that were representative of the CDCR at

16 large, meaning with different locations, different

17 programs.  And Mr. Martin would be reviewing primarily

18 the use of force.  Dr. Moore would be looking primarily

19 at issues related to nursing administration and

20 medication.  Dr. Dvoskin would be looking overall at

21 those institutions about the provision of mental health

22 care.  And I'd be focusing primarily on the psychiatric

23 medication management piece.

24       Q.    At that point, did your methodology include

25 any quantitative element; that is, would you be

1      A.    I asked for the prison to turn over to me all

2   inmates on the medications that -- so that I could do a

3   random selection and not have requested in advance any

4   inmates' charts in advance.

5      Q.    Can you explain that last part of your answer?

6   I didn't quite understand that.  So you could not have

7   requested any inmates' charts in advance.  What does

8   that mean?

9      A.    It means that if you're trying to do an

10  independent audit, that you want to ensure that if you

11  say, "Please pull these 10 charts," and that's a week or

12  month before you arrive, that you try to eliminate any

13  concern that people could have really tried to make the

14  charts -- what we call chart up in advance of the

15  evaluation.

16            So this way, if I only on-site had them turn

17  over all the inmates on the medicine and then I accessed

18  EUHR, then, with a large number of inmates on medicines,

19  I felt a random sampling was a more accurate reflection

20  of the care delivered.

21      Q.    Did you also include in your database people

22  whose IDTTs you sat in on?

23      A.    Yes.

24      Q.    Did you include the people that Dr. Dvoskin

25  may have picked out on the yard to talk to?

Charles Scott, M.D.                                                March 8, 2013

```
 1              MR. McKINNEY:  Objection.  Vague and
 2      ambiguous.
 3              THE WITNESS:  There may be some overlap.  But
 4      he also may have talked to individuals that either
 5      weren't on medicines or that weren't part of my random
 6      sampling.
 7      BY MR. GALVAN:
 8         Q.   Did you consult any experts in statistics on
 9      your sample size?
10         A.   No.
11         Q.   Did you take any steps to determine whether
12      your sample size was representative?
13         A.   Yes.
14         Q.   What did you do?
15         A.   I tried to have a variety of medications
16      selected so that when I had the list of the medication
17      that the inmates were on, I would try to have different
18      categories of medicine.  Number one.
19              Number two, I purposely oversampled people
20      that may be on medications with a higher risk of side
21      effects, such as atypical antipsychotics or other
22      medication that would require monitoring versus other
23      medicines with lesser risk because those could have
24      potentially more serious side effects.
25              And I had, by design, looked at medical
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1  if indeed there was no mention of DMH or DSH transfers

2  back into the facility.

3  BY MR. GALVAN:

4      Q.    We'll go back to it once we have that in front

5  of us.

6            Turning to page 20, Bates 455, at this point

7  begins a medication section; is that right?

8      A.    Yes.

9      Q.    If you go through the next few pages, you have

10 a lab studies page here, two pages, then you have a

11 Depakote page, a lithium page, a carbamazepine page,

12 Lamictal, clozapine, antidepressants.

13           What was your plan for using these?

14     A.    The plan was that these criteria were close to

15 the criteria and many were exactly the same as a tool

16 already developed called the MAPIP tool, which is

17 Medication Administration Process Improvement Project.

18           And the -- in discussing developing this,

19 there were many things we understood on the MAPIP tool

20 were above standard of care, would not be required to

21 meet in many circumstances.  And so, in some essence, it

22 may be above and beyond what the requirements for

23 medication monitoring are.

24           However, because I understood that a MAPIP

25 tool and data collection was in process at different

1    sites, it would provide at least a similar format for

2    reviewing the sites -- their understanding of the MAPIP

3    tool as well -- and would give me familiarity with the

4    tool, the requested data collection points, which would

5    be useful in speaking with a psychiatrist on-site.

6         Q.   So these -- the screens that you have here for

7    each of the -- for lab and for each of the meds -- see

8    if I understand what you just said correctly -- these

9    screens were already present in the MAPIP tool?

10        A.   Many were.

11        Q.   Many are?

12        A.   Yes.

13        Q.   But MAPIP also included other screens that you

14   didn't think were necessary for this project?

15        A.   I would have to compare the MAPIP tool to

16   verify that.  I think it's very close to the MAPIP tool.

17        Q.   When you say the MAPIP has things that are

18   above the standard of care, do you -- when you say

19   "standard of care," you mean the standard of -- for

20   constitutional deliberate indifference, that standard of

21   care?

22        A.   No.

23        Q.   What standard of care are you referring to

24   there?

25        A.   I'm talking about the reasonable care in the

Charles Scott, M.D.                                                    March 8, 2013

1    community that a reasonable and prudent psychiatrist in

2    a similar or like circumstance would do.  So tort

3    standard of care.

4        Q.   If most of these screens were in MAPIP

5    already, why couldn't you have done your audit just by

6    pulling the data from MAPIP?

7        A.   Some institutions had not implemented MAPIP.

8    So I knew that if it hadn't been rolled out yet, then I

9    wouldn't have any comparison if they hadn't had the

10   training yet on it.

11           Secondly, if I relied only on the MAPIP tool

12   that was submitted, I wouldn't have my own understanding

13   of how the tool was utilized, why numbers in the MAPIP

14   reports may not accurately reflect the care given.

15           So I wanted both the MAPIP tool where it had

16   been done, but I also wanted my own understanding of the

17   data collection process in addition.

18       Q.   And was your data collection process for these

19   screens to find the information in the EUHR?

20           MR. McKINNEY:  Objection.  Lacks foundation.

21           THE WITNESS:  Not just through EUHR.

22   BY MR. GALVAN:

23       Q.   How else?

24       A.   In patient charts, for example.  When a

25   person's on mental health crisis bed, there's

Charles Scott, M.D.                                                March 8, 2013

1   information there.  It is eventually scanned into EUHR

2   upon discharge.

3            But you could look at the paper record

4   on-site.

5            MHTS.net also has information about

6   medications prescribed and/or the diagnoses entered into

7   MHTS.net.  And in some sites, some programs use

8   Lab Quest 360, which may be another mechanism to locate

9   labs.

10       Q.   At some point in the project did the audit

11  tool get a lot shorter?

12           MR. McKINNEY:  Objection.  Vague and

13  ambiguous.

14           THE WITNESS:  I can speak for my part.  On the

15  physical data entry on these forms, you couldn't really

16  record precisely the blood glucose on the date, the

17  number of a blood glucose in a way that could be

18  effectively entered into this particular grid.

19           So it got shorter because I moved more to have

20  it into a computer grid that would allow me to do that

21  and have it in the consolidated way.

22           Also, people sometimes were on more than one

23  medication.  So the practical implementation, it was

24  more organized, I thought, to do it on a computer grid.

25           So I think that's why my part became shorter.

1    Just for this paper exercise.

2    BY MR. GALVAN:

3         Q.    When you say "do it a computer grid," do you

4    mean that you brought a computer to the institution and

5    typed into it?

6         A.    Yes.

7         Q.    And did you save those files?

8         A.    Yes.

9         Q.    What -- did you type into Excel?

10        A.    No.

11        Q.    What did you type into?

12        A.    A program called Bento.

13        Q.    Okay.  So you had with you a sort of portable

14   version of Bento that you could type into?

15        A.    I think it's the regular version.

16        Q.    Regular.  Okay.

17              Here on page 20 in the psych lab, the lab

18   study page, it's 455, it says at the top:  "Review files

19   for 20 IPs taking atypical antipsychotics"?

20        A.    Yes.

21        Q.    Did you review 20 files for any prisons?

22        A.    Some prisons, I did 20 files.  They weren't

23   all for atypical antipsychotics.

24              What became clear after doing this first draft

25   was that -- two things.  One is there were other MAPIP

1    audits available to look at medication administration at

2    large typically, particularly as we progressed.

3            And going through the EUHR, it was important

4    to verify the data in the EUHR rather than do a cursory

5    screen of it.  And so doing more thorough chart reviews

6    per patient versus a superficial screen with 20, I made

7    the decision to do that at some sites.

8        Q.    Why did you have to verify the data in the

9    EUHR?

10       A.    Because I didn't want to guess that it was or

11   wasn't there.

12       Q.    When you say "verify the data in the EUHR," it

13   implies to me that there's something wrong with the data

14   there, you don't trust it.  What do you mean?

15       A.    No.  If, for example, you want to see if a

16   person had a blood glucose drawn, then you have to look

17   to see if a blood glucose was and what that blood

18   glucose was.  Without looking, you don't know what the

19   blood glucose was.

20       Q.    So there you are, you're at a terminal looking

21   at the EUHR, and you go to the lab tab, lab path tab.

22   Once you find a lab for blood glucose, what is there to

23   verify?  Don't you have it already?

24       A.    But that's the process.  You go and you --

25   once you have it, then you enter it into the data.

1       Q.    Okay. So then why not just do 20 of those?

2  What's cursory about that? You said there's something

3  cursory about it?

4       A.    Oh, because there's more than one monitor per

5  med. So the glucose might be one of the monitors.

6       Q.    So why not do them all for the 20?

7       A.    Because when you go through EUHR, it can take

8  an hour, hour and a half, two hours per chart to do an

9  accurate review. So the electronic medical system that

10  they've developed is not as quick to access the data as

11  you're suggesting.

12       Q.    Based on your study, if you're a psychiatrist

13  in the system and you've ordered a lab like a blood

14  glucose, how do you get that lab back?

15            Do you have to get it -- you as the doctor, do

16  you have to get it from the EUHR or does someone bring

17  you the paper lab result to sign off on?

18            MR. McKINNEY: Objection. Calls for

19  speculation.

20            Sorry to talk over you.

21            THE WITNESS: To the degree that I know, it

22  can happen in more than one way.

23  BY MR. GALVAN:

24       Q.    Okay. What are those ways?

25       A.    You can have the actual lab sent to you. If

 1    the lab is concerned when they run the analysis that

 2    it's abnormal, then they can call the physician

 3    directly.  You could look in EUHR for the lab.  And

 4    there's another program at some prisons used called

 5    Lab Quest 360 where they can look up the labs that way.

 6           You can -- some physicians would call the lab

 7    directly if they were interested in a particular lab for

 8    a particular reason.

 9           So there are four or five different

10    mechanisms.

11       Q.   If you as the psychiatrist in operating this

12    prison system received a new patient from another

13    prison, would you consider it part of your job to review

14    previous labs that were done if the person was on

15    atypical antipsychotic?

16           MR. McKINNEY:  Objection.  Compound.  Calls

17    for speculation.  Vague and ambiguous.

18           THE WITNESS:  It depends on what information

19    they received in the discharge summary, the dose of the

20    medication, the length of time they may have been on,

21    prior monitoring that may be available depending on

22    where they're coming from, and the clinical symptoms

23    presented.

24    BY MR. GALVAN:

25       Q.   So assuming that the person is coming just

 1    from another EOP yard.  There's no discharge summary; he

 2    was not an inpatient.  Just coming from one prison to

 3    your prison, and you're now in charge of that person's

 4    medication management.

 5              Would you have to go to EUHR to get the labs,

 6    the prior labs?

 7              MR. McKINNEY:  Objection.  Calls for

 8    speculation.

 9              THE WITNESS:  Not necessarily limited to EUHR.

10    BY MR. GALVAN:

11         Q.   If you had to use EUHR, would you -- would it

12    be practical to take a whole hour to go through to find

13    the labs?  You said it takes about an hour or two?

14         A.   No.  What I said was it took about an hour,

15    hour and a half to do all of these data points.  But

16    there are many other data points than just the labs, so

17    it could be much quicker if you just wanted one lab.

18              But this also included a great deal of other

19    information independent of the labs.

20         Q.   Okay.  And by that you mean -- do you mean

21    these other pages, like page 22, for example, if someone

22    is on Depakote?

23              MR. McKINNEY:  Objection.  Misstates

24    testimony.

25              THE WITNESS:  That would be one example of

Charles Scott, M.D.                                                          March 8, 2013

```
 1   information in addition to labs.
 2              MR. GALVAN:  Shall we take a five-minute
 3   break?
 4              (Off the record at 10:25 a.m. and back
 5              on the record at 10:39 a.m.)
 6   BY MR. GALVAN:
 7        Q.   Your report, your final joint report, was
 8   filed with the court on or about January 7th.  And I
 9   believe it was completed around January 4th; is that
10   right?  Early January 2013.
11              I don't need the exact date, but you finished
12   with the report around the beginning of the year?
13        A.   Around the beginning of the year, yes.
14        Q.   Since you finished the report, have you done
15   any more work other than preparing for this deposition?
16        A.   I prepared for the deposition.  I believe I
17   reviewed reports written by Dr. Dvoskin about the
18   suicide in response to one of the special master's
19   reports.  I organized my files and had them delivered to
20   be turned over.
21              I think that's the substance of any additional
22   work.
23        Q.   Do you plan to do any additional work?
24        A.   If I'm asked to do so, I may.
25        Q.   But there's nothing set now?  No more prison
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1   that was less of an issue.  And upon the revisit there a

2   second time, it was no longer an issue.

3       Q.   What's your understanding of the purpose of

4   the 10-day limit for -- 10-day limit on length of stay

5   in the mental health crisis bed?

6       A.   To make sure that clinicians are reviewing

7   appropriate criteria for transfer to Department of State

8   Hospital level of care.

9       Q.   Do you consider that a valid purpose?

10      A.   I think it's a general guideline, and it's

11  always -- there's nothing wrong with trying to set a

12  guideline to help the inmate be at the right level of

13  care.

14      Q.   On Bates No. 716 --

15      A.   Yes.

16      Q.   -- you have a note:  "MHCB review"?

17      A.   Yes.

18      Q.   "Ten random charts reviewed"?

19      A.   Yes.

20      Q.   "All charts had informed consent for meds."

21      A.   On the chart.

22      Q.   On the chart?

23      A.   Yes.

24      Q.   "All charts met criteria for suicide risk

25  monitoring."

1    This would be in addition to my 10 charts. There may
2    have been overlap.
3           Q.    Do they have their notes on chart review?
4           A.    These are theirs.  I included -- any notes
5    they made, I forwarded.
6           Q.    What does it mean on the -- you have two
7    columns here.  Looks like "yes" -- like in the first
8    entry:  "Yes, involuntarily meds."
9                 And then "Yes, MH care."
10                What's the second column for?
11          A.    There's an informed consent sheet about mental
12   health care.  That was one of the parts of the chart.
13          Q.    Is informed consent an element of a
14   constitutionally adequate level of care?
15          A.    It can be, but not necessarily.
16          Q.    Why did you decide to include it?
17          A.    In part, it was part of the MAPIP tool and so
18   I knew that was being monitored.  And it is listed as an
19   important component by the NHC -- National Commission of
20   Correctional Health Care Guidelines, but not an
21   essential component.  But informed consent is part of
22   evaluating medication monitoring.
23          Q.    On Bates No. 720, few pages forward.
24                What does this page contain?  What were you
25   doing on this page?

1    speculation.  Vague and ambiguous.

2            THE WITNESS:  I don't know.

3    BY MR. GALVAN:

4        Q.  Down at the bottom, Point 17 says:  "Given the

5    inefficiencies of reviewing the EUHR, there is a strong

6    concern that the MAPIP project in mental health will

7    require a minimum of 30 minutes per EUHR that is

8    reviewed for data.  Our experience is that it is closer

9    to 60 minutes."

10           This was a concern that you shared regarding

11   the MAPIP project?

12           MR. McKINNEY:  Objection.  Vague and

13   ambiguous.

14           THE WITNESS:  I think it's reflected in my

15   report, yes.

16   BY MR. GALVAN:

17       Q.  And have you received any information

18   regarding how this concern is being addressed?

19       A.  Yes.

20       Q.  What information have you received?

21       A.  One, because the MAPIP started, there was a

22   start time from when information got scanned into EUHR.

23   And so, therefore, information that was collected, such

24   as informed consents or labs, if it was before the

25   scan-in date, it may not be in EUHR, even if you

1    could -- even if it was done and you could document that

2    in the paper record.

3              As time has progressed, more information now

4    is available in EUHR because if a person gets started on

5    a medicine after the scan-in date, then it's easier to

6    access.

7              So this facility I reviewed in 2012, February

8    time frame, and so the EUHR scan-in process had only --

9    had not -- some of the data couldn't be accessed because

10   it hadn't been scanned in yet.

11             So one sort of common sense thing you learn is

12   that as time passes, when -- more information now for

13   the inmates are scanned in because when they come into

14   the system, the EUHR is up and running already.

15        Q.   Wouldn't that aggravate the problem he's

16   talking about?  If there's more information to read in

17   the EUHR, it's going to take longer to do it.

18        A.   Not necessarily.  Because if, for example, you

19   find something versus you're searching for something

20   that's not there, that can be the difference.

21        Q.   So still in -- on the Vacaville tour, I'd like

22   to show you the disc that we marked as Exhibit 4, at

23   least show you the content of it.

24             I know you will not have seen it in this form

25   before, but it was produced to us with some folders

1       A.    No.

2       Q.    Right under there, you made a note:  "Use name

3   stamp.  Signature hard to read."

4             What does that refer to?

5       A.    Psychiatrist has said that one of the

6   standards that they do is to make sure they all use name

7   stamps because doctors' signatures and handwriting can

8   be sometimes hard to read.

9       Q.    Is that in the records that get scanned into

10   the EUHRs?

11       A.    I can't answer that question.  But on this

12   CTC, they used name stamps.

13       Q.    Did you form an opinion at some point about

14   whether the EUHR is what you really think of as an

15   electronic medical record or whether it's something

16   else?

17       A.    It is a form of an electronic medical record

18   because you access it electronically, but it is

19   different than other electronic medical records that

20   I've seen.

21       Q.    So in a true electronic medical record, you

22   wouldn't care about name stamps or signatures because

23   the information, including the identity of the

24   clinician, would be there digitally in the field, right?

25       A.    Some, but not all.

1      Q.   For patients that were being cared for on the

2   day you were there?

3      A.   Some of the patients, they had pre-IDTT

4   meetings, so there would be informational sharing in

5   addition to the actual IDTT.  But it was related to

6   inmates who were on the crisis bed unit at the time.

7      Q.   Third one was records.  Records of patients

8   that were in the crisis bed unit on the day you were

9   there?

10     A.   Yes.

11     Q.   Any other records?

12     A.   EUHR records relevant to the patient prior to

13   their admission.  That would be an EUHR.

14     Q.   Which patients?

15     A.   The MHCB patients.

16     Q.   Who were being cared for on the day you were

17   there?

18     A.   Yes.

19     Q.   Any other records?

20     A.   Some components of MHTS.net.

21     Q.   For the patients being cared for on the day

22   you were there?

23     A.   Yes.

24     Q.   Fair to say, Doctor, based on all that you

25   just testified to under oath, that your review of

1    patient care was limited to the patients who were

2    present on the MHCB being cared for on the day you were

3    there?

4        A.    No.  And the reason is that many of the

5    medication reviews that I did of the over 130 had prior

6    MHCB admissions.  There's a special tab on EUHR.  So

7    those could be months or years before.  So, of those,

8    you can also look at MHCB admissions unrelated to the

9    day I was there.

10       Q.    So the second part, then, is the people you

11   were reviewing anyway for medication review, medication

12   monitoring.  If they had prior MHCB admissions, you

13   include them as the basis for your opinion on MHCBs?

14       A.    I would look at the care provided on the MHCB

15   and include that in my analysis, yes.

16       Q.    And for SAC, how many -- how many persons

17   would you estimate fell into that latter set that you

18   just described?

19       A.    Two or three.

20       Q.    Two or three.  Okay.

21             But you had this data that Mr. Spagnolo

22   printed out for you regarding care for the several

23   months prior to your tour during the period when the

24   institution had no notice that you were coming.  But you

25   did not direct Dr. Bobb, Dr. Reid, or anybody else to

1    because you can have a decrease in the white blood cell

2    count.

3                The were also monitoring his weight, which is

4    metabolic monitor.  They did not do a waist

5    circumference.

6                I couldn't find a blood pressure on him, but

7    it could have been I just ran out of the time in the

8    EUHR.  And I couldn't find the fasting glucose and

9    metabolic panel.

10               He had informed consent both for Clozaril and

11   that it was a heat medication.  They had done AIMS

12   monitoring.

13               So they were monitoring the most important

14   risks, which was white blood cell count and his weight,

15   which is the monitor for metabolic syndrome.

16       Q.    If you could only find weight but not fasting

17   glucose and not metabolic panel and they didn't do waist

18   circumference -- so if I understand your testimony

19   correctly, there's a constellation of things you can do

20   for metabolic syndrome:  Weight, fasting glucose,

21   metabolic panel, waist circumference.  And you only

22   found one of the four.  Is one of the four enough?

23       A.    This was one of those cases that they had not

24   yet scanned in all the records from July 2011 when the

25   scanning started.  So he had been on clozapine, as I

Charles Scott, M.D.                                           March 8, 2013

1              We have date created field, CDCR number field,
2    IP initials.
3              Blood pressure, weight, BMI, height, EKG if
4    indicated, et cetera.  CMC.
5              Diagnoses.  Medications 1, Meds 2, Meds 3,
6    Meds 4, meds appropriate.
7              Lab results.  CBC with dif.  Pregnancy test.
8    Informed consent.  Informed consent/HM.  Thyroid
9    function.  Lithium.  Renal function.  General comments.
10   Waist circumference.  Glucose, lipid, metabolic panel.
11   EPS, AIMS.
12             Level of care.  Reviewer, review date, RPR,
13   RBC.
14             Then I'll just go through -- there's meds.  I
15   won't read them all.  Couple of column of meds.
16             Date of birth, age.  ANC, folate.
17             There are a group of MHCB Screens 1, 2, 3, 4,
18   5.  And then there's Meds 5, Meds 6.
19             Reviewed EUHR.  Reviewed paper.  Attended
20   IDTT.  Interviewed IP.
21             Meds 7, lithium and then there's more meds.  I
22   won't read them all.
23             Crisis bed admission history.
24             So that's all that -- the columns.  Does that
25   look like -- at least in terms of the fields, does that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1  relevant to that.

2      Q.   Did you do any review for Item No. 3,

3  potential hoarding of medication?

4      A.   No.

5      Q.   So this would all be on Dr. Moore's work?

6      A.   Correct.

7      Q.   And looking at B, this would be your section,

8  correct?

9      A.   Primarily, yes.

10     Q.   And your Conclusion No. 2 regarding

11  consistency with diagnosis would be based on -- the

12  basis for that would be your chart reviews that are in

13  your notes, your chart reviews that in the Bento box,

14  and your MAPIP reviews?

15          MR. McKINNEY:  Objection.  Mischaracterizes

16  prior testimony.

17          THE WITNESS:  In part with the MAPIP reviews

18  but also with interviews of inmates and in observing

19  IDTTs, the discussion of what their diagnosis and the

20  medication treatment.

21  BY MR. GALVAN:

22     Q.   And have you been -- with regard to No. 3,

23  you've discussed the difficulty of using the EUHR to

24  find lab results.

25          Have you received any follow-up information

 1   about this difficulty being addressed?

 2       A.    In part.

 3       Q.    And regarding Opinion No. 4, informed consent

 4   forms generally being present, you made an observation

 5   again about the EUHR system.

 6             Have you received any follow-up about that?

 7       A.    Yes.  As I mentioned earlier, because some of

 8   the medications monitored required informed consent only

 9   annually, the earlier prisons visited, if the informed

10   consent had been done prior to July 1, 2011, that

11   wouldn't have been scanned in EUHR.  But now that time

12   has passed and it's an annual requirement, they would be

13   scanned.  So that aspect of this scanning would have

14   been solved.

15       Q.    On page 28 regarding MAPIP, there's a

16   paragraph regarding MAPIP.

17             At the end it says:  "At the time of this

18   report, all institutions were to have completed the

19   MAPIP training."

20             I don't remember my English grammar, what

21   tense that is, "were to have completed."

22       A.    It's Southern.

23       Q.    Where did you get that information that they

24   were to have completed the MAPIP training?

25       A.    I spoke with Dr. Higgins, Karen Higgins, and

 1       Q.   No EKG found, correct?

 2       A.   Correct.

 3       Q.   His diagnosis is schizoaffective disorder

 4   according to their computer system, and you recorded in

 5   Meds 1 his dosage and time, correct?

 6       A.   Correct.

 7       Q.   You found this appropriate for his diagnosis?

 8       A.   Yes.

 9       Q.   That's what Column E says?

10       A.   Yes.

11       Q.   You had found white blood count in Column Q?

12       A.   Yes.

13       Q.   You found informed consent in 2006 but consent

14   renewed and documented on May -- May 2012.  So you found

15   he had informed consent?

16       A.   Yes.

17       Q.   You found they had done thyroid.

18            You found they had done kidney function in

19   Column W.

20            You found they had measured his waist in Y.

21            You found glucose in Z.

22            In Column AA, you didn't find -- found no

23   lipids.

24            Column AB, you found metabolic panel.

25            In Column AC, you found no AIMS.  Was that a

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8          That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                    DATED:   March 11, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com