**Exhibit 5**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,            )
                                  )
        Plaintiffs,               )
                                  )
    vs.                           )   Case No. Civ S 90-0520 LKK-JFM P
                                  )
EDMUND G. BROWN, JR., et al.,     )
                                  )
                                  )
        Defendants.               )
_____)
MARCIANO PLATA, et al.,           )
                                  )
                                  )
        Plaintiffs,               )
                                  )
    vs.                           )   Case No. C01-1351 TEH
                                  )
EDMUND G. BROWN, JR., et al.,     )
                                  )
                                  )
        Defendants.               )
_____)

   DEPOSITION OF EDWARD KAUFMAN, M.D., taken on behalf of the defendants, at 32392 South Coast Highway, Suite 250, Laguna Beach, California, commencing at 10:00 a.m., Saturday, March 16, 2013, before Audrey L. Ricks, Certified Shorthand Reporter, No. 12098, CCR, RPR, CLR.

```
 1   "constitutional" was used.
 2        Q    So none of your evaluation was done with
 3   an eye to determine whether or not it was
 4   deliberately indifferent to the inmates' subjective
 5   or serious medical needs?
 6        A    Again, that's a legal term that I didn't
 7   use in my assessment of the condition.
 8        Q    Okay.  So what did you base your
 9   assessments against?
10        A    I based it on an issue -- first of all,
11   certain community standards, certain standards of
12   care in other correctional facilities that I have
13   visited.
14             I based it on damage to the mental health
15   of inmates and inmate patients, and on the adequacy
16   of the therapy to treat the needs of mentally ill
17   and seriously mentally ill inmates.
18        Q    So when you were rendering the opinions
19   that you issued in your report, you were looking at
20   community standards, what you had seen -- observed
21   at other correctional facilities, and then
22   individual care of each patient that you evaluated?
23        A    As to whether or not the treatment was
24   inadequate or damaging to their mental health.
25        Q    Okay.  Are you aware that the
```

1  constitutional standard of care or what is required
2  for mental health providers in terms of what is
3  constitutionally adequate is whether or not they are
4  deliberately indifferent to an inmate's mental
5  health needs, that is, know of and disregard a
6  substantial medical need?  Do you know about that
7  standard?
8       A    I've heard of it.
9       Q    But you did not apply that standard when
10 looking at the health care that was provided?
11      A    I'd have to say that I didn't utilize
12 those terms when I looked at the health care.
13      Q    Okay.  So let's go back to your opinions:
14           And other than what is listed here on the
15 table of contents of your declaration, are there any
16 other opinions that you have in this case?
17      A    Well, of course each of the items in the
18 table of contents is described in detail within the
19 report.
20      Q    Yes.  And I will ask you some questions
21 about that.
22      A    Okay.
23      Q    But are there any other areas in which you
24 were asked to render an opinion in the case?
25      A    Not that I can recall.

```
 1       Q    Okay.  Did you -- speaking about the
 2  medical charts, did you review medical charts in
 3  detail and look at the care that was provided?
 4       A    I reviewed medical charts to the extent
 5  that the pages were provided to me.
 6       Q    Okay.  Did you ever sit down and look at
 7  an inmate's medical record?
 8       A    I did.
 9       Q    Okay.  And did you look through that chart
10  to evaluate the care that was provided by the
11  clinicians?
12       A    I did.
13            But most of my evaluations of medical
14  records were done in a much more leisurely fashion
15  when those records were sent to me by the state
16  through my -- I believe through my attorneys to me.
17       Q    Okay.  And I'm not concerned about were
18  you at the prison looking at the medical records or
19  were you looking at them your office, but did you
20  look at medical records to evaluate what the level
21  of care was that was being provided by the mental
22  health staff?
23       A    Yes.
24       Q    Okay.  And how many medical charts did you
25  look at to determine the care provided?
```

```
 1        A    Approximately 20.
 2        Q    And did you look to determine whether or
 3   not a diagnosis was made?
 4        A    Yes.
 5        Q    Whether medication was -- was prescribed?
 6        A    Yes.
 7        Q    Whether the medication was appropriately
 8   prescribed?
 9        A    To some extent, yes.
10        Q    And did you look to determine whether or
11   not the doctor was monitoring the medications?
12        A    Yes.
13        Q    Was there anything else that you looked at
14   in those charts to determine whether or not the care
15   was, in your opinion, within community standards?
16        A    Well, I was looking at the charts to see
17   if some of the comments made by inmates about their
18   care was validated by the chart or not.
19        Q    Okay.  So after your conversations with
20   the inmates, you then looked at their charts to
21   confirm what they had told you?
22        A    Correct.
23        Q    Okay.  With respect to the charts that you
24   did review and the inmates that you interviewed --
25   well, I guess I will ask separately because the
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

1  were those inmates selected?
2      A    When we went to each unit, my recollection
3  is that we would ask for inmates who had prolonged
4  stays.
5           I think there were a few inmates that
6  Ms. Mendelson had advance knowledge that they have
7  extended stays in SHU or AD-SEG.
8      Q    Okay.  Any other way that they were
9  selected?
10     A    Not that I recall.
11     Q    Okay.
12     A    By the way, I just recalled another mental
13 health expert whose name I've heard, and that's
14 Pablo Stewart --
15     Q    Thank you.
16     A    -- who is the other psychiatrist involved.
17     Q    Okay.  Thank you.
18     A    Whom I have never met.
19     Q    So for the 20 inmates that you
20 interviewed, did you review all of their medical
21 records?
22     A    Yes -- actually, let me correct that
23 statement.  I -- I read each of their medical
24 records.  I didn't read all of their -- each of
25 their records because I only read the record that

1  was provided to me.
2     Q   Do you know what was provided to you?
3     A   It's in an individual case, and it would
4  be the record going back maybe a year or two, maybe
5  some history dating back further. But it didn't
6  seem to be a voluminous, total record, but rather a
7  record of the last year or so in general.
8     Q   Okay. And were there any specific parts
9  to those records that you looked at?
10    A   I focused mainly on the psychiatric
11 evaluations, on the treatment team meetings and
12 treatment team recommendations, on the psychiatric
13 evaluations, the psychotherapy notes, and the
14 compliance with medications.
15    Q   Was there anything that wasn't provided to
16 you that you wish you would have had to look at?
17    A   Not to my knowledge.
18    Q   So looking at your opinion on page --
19 starting at page 7 of your declaration regarding
20 staffing shortages, I'd like to ask you some -- some
21 questions about that. Okay?
22    A   Yes.
23    Q   So with respect to your opinion on
24 staffing shortages, what are the basis for those
25 opinions?

1  settings in a correctional institution?
2      A    I believe there are -- there are standards
3  of care, such as the state's expert Dr. Dvoskin has
4  suggested, stating that there should be 10 to 15
5  hours of treatment a week of inmates in
6  administrative segregation.
7      Q    So you agree with Dr. Dvoskin on that?
8      A    In that issue, yes.
9      Q    Okay.  So are you aware of any other
10 research or literature that supports whether or not
11 group therapy is required in an administrative
12 segregation setting in a correctional institution?
13     A    Simply, no.
14     Q    In paragraph 28 on page 9, you commented
15 that the EOP administrative segregation hub at CCWF
16 was unable to accomplish its mission.
17          Does the failing to meet the mission of
18 that building for mental health unit equate with
19 constitutionally inadequate care?
20          MS. MENDELSON:  Objection.  I think the
21 witness has made it clear that's not a term he uses.
22 We can keep going through this if you want, but if
23 he needs to state it every time --
24 BY MS. ANDERSON:
25     Q    Yes.  Well, one of the issues in the

```
 1   case -- the primary issue in the case is whether or
 2   not the defendants -- yes, defendants -- are
 3   deliberately indifferent to the medical needs of the
 4   inmates.  So I will continue to ask you your opinion
 5   about deliberate indifference or the constitutional
 6   minimum.
 7              If you are evaluating something and saying
 8   that it simply falls below the standard of care,
 9   please let me know that.  I would like to know, in
10   your opinion, when something simply doesn't meet the
11   standard of care in the community or in -- in a
12   correctional setting, versus when something violates
13   the Constitution.
14              So that's -- that's why I am going to
15   continue to ask these questions.
16        A     Since that seems to be such an important
17   distinction, and since it relates to what I consider
18   legal aspects of the case, I'd like to consult with
19   my counsel about that now.
20        Q     Okay.
21              MS. MENDELSON:  Okay.  If you want to take
22   a little break.  Is this actually a good time?  It's
23   been an hour.  I was going to suggest --
24              THE WITNESS:  Let's take a break.
25              MS. MENDELSON:  Great.  So I'm stopping
```

```
 1   adequate care, would it not?
 2        A    If those standards were used and put into
 3   practice on a regular basis, yes.
 4             The other drug besides Seroquel that
 5   causes metabolic syndrome is olanzapine, by the way.
 6   And that's probably even more important than
 7   Seroquel too.  And it's pretty widely prescribed and
 8   another drug you have to really monitor for
 9   metabolic syndrome.
10        Q    Doctor, did you interview any CCCMS
11   patients in the general population?
12        A    I don't recall that I did.
13        Q    Do you remember how many charts you
14   reviewed of patients that were CCCMS as opposed to
15   EOP?
16        A    I'd really have to go through each of them
17   and -- and count them.  So I don't remember
18   specifically.
19        Q    If a doctor is supposed to see a patient
20   in 30 days and sees him on day 31, does that
21   necessarily indicate deliberate indifference?
22        A    You know, there's some circumstances here
23   where I think patients need to be seen sooner than
24   every 30 days.  And I think that it's grossly
25   negligent care to not see some patients sooner than
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   30 days.
 2              But you know, I think that it's -- in my
 3   opinion, it's individualized.  You use a guideline
 4   like 30 days to be sure a patient is seen.
 5              Clinically, does it matter if it's 29, 30,
 6   or 31?  Probably not.  What matters is if somebody
 7   needs to be seen in seven days, they're seen in
 8   seven days.
 9       Q    Okay.  So assuming -- strike that.
10            Do you know what the Adam chair -- what an
11   Adam chair is?
12       A    I've seen them.
13       Q    Okay.  And did you know that the Adam
14   chairs were required by the Coleman special master?
15       A    I did not know.
16       Q    And did you know inmates prefer the
17   treatment modules as opposed to the Adam chair?
18       A    The majority of inmates that I spoke to
19   prefer the treatment modules to the Adam chair.
20       Q    Did you know that staff also preferred the
21   treatment modules as opposed to the Adam chair?
22       A    The majority of staff that I spoke to
23   preferred the treatment modules.
24       Q    Looking at your opinion regarding poor
25   medication management at CCWF, do you remember what
```

1  your opinion was with respect to medication
2  management at CCWF?
3       A    Would you tell me the page, please.
4       Q    I'm looking at page 21, paragraph 65 --
5  actually, paragraph 66.
6       A    Okay.  If I can start off by reading this
7  brief paragraph, "At CCWF, I received a number of
8  troubling reports about medication management.  The
9  nurse in the RC" -- that's reception center --
10 "cited an instance in which a psychiatrist had
11 prescribed six medications including two
12 antipsychotic medications, Seroquel and olanzapine,
13 without personally seeing or evaluating the patient
14 for up to 14 days."
15      Q    Doctor, you said the nurse cited an
16 instance.  What -- who specifically was that
17 patient?  Was it Prisoner D?
18      A    I don't think so.  I think that was
19 another one.
20      Q    Did you follow up, then, to find out what
21 was happening with that patient?
22      A    No, I did not.  But I have serious
23 concerns because those are two antipsychotics which
24 are -- are very serious medications, and the use of
25 the two of them with -- both of which have side

1   effects of potentially increasing blood sugar,
2   cholesterol, body mass, and causing diabetes or
3   metabolic syndrome, is -- it's a pretty serious
4   combination.  And I think that any patient on the
5   combination of those two medications who comes into
6   a new institution should be seen immediately.
7           But that combination is a red flag for a
8   very difficult patient as well as a high potential
9   for side effects.
10      Q   Well, despite those concerns, you did not
11  follow up; right?
12      A   I didn't follow up.  Correct.
13      Q   Okay.  Did you verify whether what the
14  nurse told you was true?
15      A   No.
16      Q   So it's possible the patient was stable
17  and didn't need to be seen before these 14 days?
18      A   Now, I don't know why the nurse would have
19  cited that if there were no problems.  But I mean,
20  you know, it may have been in response to a question
21  about what -- when patients are seen and what kind
22  of medications they're on.
23          And I mean, I don't know for sure, but --
24  but any -- any medical professional would have a
25  concern about those two medications and the person

```
 1              Is there anything else that you know they
 2   did?  Not -- not what you should do or what anybody
 3   else might do --
 4        A    No.
 5        Q    -- what CDCR is doing.
 6        A    No.
 7        Q    Okay.  You also touched on the subject of
 8   medication refusals; correct?
 9        A    Correct.
10        Q    Would you agree patients have a right to
11   refuse their medications?
12        A    Yes.
13        Q    Okay.  Do you know what the refusal rate
14   is in CDCR?
15        A    I don't know the exact number.
16        Q    Do you have a guess?
17        A    No.  The only thing I know, and I -- I
18   think I reported, is that I thought it was -- that
19   it was rampant, and that in many of the charts that
20   I reviewed, I saw documented refusal.
21        Q    What would a percentage be for rampant?
22        A    I would say 25 to 30 percent.
23        Q    Okay.  What's the percentage of patients
24   in the community who don't follow their medication
25   regimen?  Do you know?
```

```
 1        A    The best example I can give is at the
 2   treatment center where I'm the medical director,
 3   where I'm notified every time one of my patients or
 4   any patient in the facility refuses their
 5   medications.  And I would say that it's probably
 6   about 10 percent.
 7             But every time somebody misses, I respond
 8   immediately as to how to deal with it.
 9        Q    Would you be surprised to hear that
10   studies show that 50 percent of the community is
11   noncompliant with their medications or they fail to
12   take a full -- their complete -- their full regimen
13   of prescribed meds?
14        A    I think that all depends on the treatment
15   relationship with the prescribing physician.
16             So I think -- I don't know the study
17   you're citing.  I don't know -- I don't know if it's
18   medications by family practitioners or
19   psychiatrists, so if it's -- or what type of
20   medications you're talking about.
21             So I really have to see the specific study
22   that says 50 percent.
23        Q    Doctor, one of the -- the observations in
24   your report is that the refusal to take the
25   prescribed medications represents that -- that rate
```

1    A    Yes.

2    Q    In your -- in your declaration you talked
3  about nurses not -- nurses are unfamiliar with the
4  side effects of psychotropic medications.

5         How many nurses did you talk to to find
6  out whether or not they were familiar with the side
7  effects?

8    A    I'm mainly citing the State's expert,
9  Jacqueline Moore here.

10   Q    Okay.  So did you conduct any individual
11 inquiries yourself?  Did you talk to any of the
12 nurses yourself?

13   A    I did not quiz any of the nurses on the
14 side effects.

15   Q    Okay.  In Paragraph 77 you mention that
16 you have serious concerns, I quote, about the system
17 for following up on medication refusals; right?

18   A    Yes.

19   Q    Is that your opinion?

20   A    Yes.

21   Q    So is it your opinion that if a patient
22 misses one dose, a psychiatrist has to be called in
23 to examine the patient?

24   A    No.  But the psychiatrist should be
25 notified.

```
 1  took place.
 2       Q    You're referring to the monitoring systems
 3  in place as a part of the program guide, the Coleman
 4  lawsuit?
 5       A    No, no.  I'm -- I'm referring to the
 6  medication follow-up -- you gave me the acronym for
 7  it earlier -- the follow-up for all the side effects
 8  of medications.
 9            MS. MENDELSON:  Let me find my statistic
10  form.
11  BY MS. ANDERSON:
12       Q    Oh, the MAPIP?
13       A    Yeah, the MAPIP.  And I don't recall
14  specifically whether he discussed the AIMS or not.
15  But my best recollection was that his follow-up
16  about side effects of medications was comprehensive.
17       Q    Okay.
18       A    So if it was as comprehensive as it
19  seemed, I would have been -- I would be surprised if
20  he didn't include the AIMS, although I don't really
21  recall whether we discussed it or not.
22       Q    Okay.  On -- in Paragraph 80, you are
23  referring to patients who aren't seeing their
24  clinicians -- they're not having an interaction that
25  is, quote, meaningful enough.
```