# Exhibit 8

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

RALPH COLEMAN, et al., )
)
       Plaintiffs, )
) Case No.
vs. ) 2:90-cv-00520 LKK JFM PC
)
EDMUND G. BROWN JR., et al., )
)
       Defendants. )
)

## DEPOSITION OF JEANNE WOODFORD

March 19, 2013

CHERREE P. PETERSON, CSR No. 11108

355609



40 YEARS  BARKLEY Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco   (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose        (760) 322-2240 Palm Springs   (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City   (347) 821-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains    (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
         +33 1 70 72 65 26 Paris      +971 4 8137744 Dubai       +852 3693 1522 Hong Kong

1    Q.    And that program, the COMPSTAT program, is
2    that a program that comes out of central office or
3    Sacramento?
4    A.    I'm not sure I understand what you mean by
5    that.
6    Q.    See, there's one of the first of my many bad
7    questions. Do they report the information in the
8    COMPSTAT reports to Sacramento?
9    A.    Well, it is my understanding that that's what
10   prisons do, that they're asked to provide responses to a
11   set of metrics and those are sent to Sacramento, yes.
12   Q.    Okay. Do you know how long those reports have
13   been in use?
14   A.    Well, I started that program in I believe
15   2005. And it has evolved since then. So their current
16   reporting mechanism, I really don't know.
17   Q.    Okay. You also mentioned that you looked at
18   bed numbers for mental health beds or words to that
19   effect. What specifically did you look at?
20   A.    I looked at -- I had read where they were
21   going to close down the San Quentin ad seg hub and so I
22   tried to find the document to show when they might be
23   closing down that hub.
24   Q.    Were you able to find that document?
25   A.    I didn't -- I did find -- I didn't find the

JEANNE WOODFORD

BARKLEY
Court Reporters

1  specific one I was looking at, but I did find some other
2  documents where they talked about mental health beds,
3  yes.
4      Q.   I'm sorry, I missed that last part.
5      A.   I did find some documents where they talked
6  about their mental health beds.
7      Q.   And is that all levels of care?
8      A.   Yes, I believe it was.
9      Q.   And again, in preparation for your deposition
10 you met with an attorney, correct?
11     A.   I met with two attorneys.
12     Q.   Okay.  Who?
13     A.   Well, I met with Krista who is here today, Ms.
14 Stone.  And I met with Michael Bien.
15     Q.   And when did you meet -- did you meet with
16 them together?
17     A.   I met with Krista for a lengthy period of time
18 and then Michael Bien only came in for a few minutes
19 when we were talking.  So my meeting with Michael Bien
20 was very short, probably less than five minutes.  And I
21 might describe that more as him saying hello, but we
22 were discussing the case.
23     Q.   And when was that meeting?
24     A.   Yesterday.
25     Q.   Approximately from what time to what time did

1  you stepped back into the undersecretary role were you
2  in that position before you retired?
3    A.   Again, it's been a along time, but a couple of
4  months.
5    Q.   Okay.  Were you ever a direct provider of
6  medical or -- to mental health care to inmates during
7  your time at CDCR?
8    A.   Can you define "direct provider"?
9    Q.   Were you ever a physician, psychologist,
10 nurse?  Have you ever held those titles or those
11 trainings?
12   A.   No, I'm not a mental health professional.
13   Q.   Did you ever administer medications to inmates
14 while working at CDCR?
15   A.   Sadly, yes.
16   Q.   Okay.  When you were a correctional officer?
17   A.   Yes, that's correct.
18   Q.   Did you ever -- and that was prior to 1999?
19   A.   Oh, yes.  Quite a bit prior to 1999.
20   Q.   Okay.  And did you when you administered those
21 medications explain the medications and potential side
22 effects to folks when you provided those medications?
23   A.   No, I did not.
24   Q.   You're not a pharmacist, correct?
25   A.   That is correct.

1  documents?

2   A.   I don't remember if Ms. Stone left the room,
3  but she described for me what was -- what the documents
4  were.  But I believe that I looked at the documents on
5  my own.  Ms. Stone may have still been in the room
6  looking at other things.

7   Q.   Did you ask Ms. Stone or Mr. Bien when he was
8  in the conference room or office any questions about any
9  of the documents?

10   A.   I'm sure that I did.  I mean, none come to
11  mind, but I'm sure that I did ask questions about
12  different documents.

13   Q.   But as you sit here today, you can't recall
14  any of those questions?

15   A.   No.  I'm sorry.  I can't.

16   Q.   Okay.  How many more sit-down meetings after
17  that initial three- to four-hour meeting did you have
18  with Ms. Stone or Mr. Bien or their office?

19   A.   Maybe two or three.

20   Q.   Did you prepare the first draft of your
21  declaration in this case?  Or was it provided to you?

22   A.   So I -- we discussed what should be included
23  in the draft.  And the first draft was not prepared by
24  me, no.  But it was in discussion with me.

25   Q.   And then on what date do you recall your

JEANNE WOODFORD

BARKLEY
Court Reporters

1  rounding where the mental health staff walk the tiers,
2  they could ask help that way, they could put in an
3  inmate appeal to get treatment, they can and do write to
4  their attorneys for assistance with getting treatment.
5  So there's a variety of ways.
6      Q.    When you were touring San Quentin on February
7  26, 2013, did any inmates indicate to you that they were
8  -- that they had asked for and sought out care and did
9  not receive it?
10     A.    No.   I don't recall any inmate said that, nor
11 do I recall asking inmates that question.
12     Q.    Just so I'm clear, no inmate indicated to you
13 that they had sought out care and hadn't received it,
14 correct?
15     A.    That's correct.
16     Q.    In paragraph 22 of your declaration you state
17 that north segregation inmates "...do not receive the
18 regular casual custodial contact that non-segregation
19 inmates receive, because the unit is designed to
20 maintain physical barriers between inmates and staff."
21 Do you see that?
22     A.    Yes.
23     Q.    Does this mean that you believe that
24 nonsegregation inmates receive adequate care or adequate
25 monitoring?

103

1  Q.   And you were able to engage in that activity
2  while the warden at San Quentin, correct?
3  A.   Yes.  To some degree.
4  Q.   In paragraph 23 on page 7 of your declaration,
5  you state that "It is also my opinion that new arrivals
6  on death row should be closely monitored for signs of
7  mental health deterioration or crisis."  Do you see
8  that?
9  A.   Yes, I do.
10  Q.   Are you aware of any new arrival on death row
11  who suffered a mental health deterioration or crisis in
12  the last two years?
13  A.   I personally am not aware of that.  And while
14  they had newly-arriving death row inmates, we were
15  prohibited from talking to them.
16  Q.   Who prohibited you from talking to them?
17  A.   The staff at San Quentin, along with the legal
18  staff that was there, had the opinion that we could not
19  talk to anybody that wasn't a member of the class.  And,
20  in fact, with the newly-arriving death row inmates they
21  had some difficulty in telling us who they were.  There
22  was a lot of discussion about whether they had or had
23  not been evaluated.  And, you know, unfortunately we
24  didn't have access to them to find out how long they had
25  been there, have you been evaluated, how are you doing,

1   which I think would have been very helpful.

2   Q.   But to your knowledge you're not aware of any
3   new arrival on death row in the last two years who
4   suffered mental health deterioration or crisis, correct?

5   A.   I personally am not aware, that's correct.

6   Q.   In paragraph 24 of your declaration at page 7
7   you state that inmates at San Quentin "...are not
8   regularly re-evaluated for their mental health needs."
9   Do you see that?

10   A.   Yes, I do see that.

11   Q.   What's the basis for your opinion?

12   A.   I ask questions of the mental health staff
13   that were on the tour with us and I also looked at --
14   reviewed the central files of some of the inmates.

15   Q.   Okay. So I think we now get to the -- I use
16   the word program. But the work that you did at San
17   Quentin. In paragraph 25 on page 8, you state that to
18   the best of my knowledge 2003 or 2004 "...was the last
19   such complete mental health reassessment of every
20   condemned inmate." Do you see that?

21   A.   Yes.

22   Q.   What's the basis of your knowledge for that
23   beyond what you've already told me?

24   A.   By asking questions of the mental health staff
25   if they had a reassessment program for death row

1  percentage of EOP inmates indicates to me a serious
2  problem with under-assessment of condemned" mental
3  health needs -- "inmates' mental health needs." Do you
4  see that?
5      A.    Yes, uh-huh.
6      Q.    Okay. Have you ever been trained to do mental
7  health care assessments or screenings?
8      A.    No, I have not.
9      Q.    Okay. Did you identify any -- strike that.
10     Did you read any document in your preparation
11 for this deposition or for the preparation of your
12 declaration which indicated that there was an under
13 assessment of condemned inmates' mental health care
14 needs at San Quentin?
15     A.    No, I did not.
16     Q.    In paragraph 29 of your declaration on page 9
17 you use the term "adequate yard time." Do you see that?
18     A.    Yes.
19     Q.    What do you mean by adequate yard time in your
20 declaration?
21     A.    Well, there are specific standards as were
22 laid out in Title 15 for what is considered appropriate
23 or adequate yard time. And the 114A logs, I know at San
24 Quentin they utilize a method of taking inmates to yard
25 -- well, they're supposed to take -- they utilize the

1  method of taking inmates to the yard three days a week.
2  That's the method they use for ad seg inmates.
3      But in fact, what we learned in Carson section
4  was one of the correctional officers said the inmates
5  get about eight hours a week, which means they're not
6  really going to yard three days a week. And in
7  reviewing the 114As, it was really clear that they're
8  not being offered yard time or meeting that level of
9  yard time at all. I mean, there's other ways to meet
10 the level of yard time. You can take inmates to yard an
11 hour a day five days a week, but that's not the method
12 that San Quentin utilizes.
13  Q.   So what is the Title 15 requirement with
14 respect to yard time?
15  A.   It requires -- it requires that inmates be out
16 of their cell for up to ten hours a week or they give
17 several choices. One other method is to take them to
18 yard five days in a row for an hour at a time, I
19 believe. But the whole point is that it designates a
20 certain amount of time that inmates should be out of
21 their cell and offered yard.
22  Q.   And then you described a San Quentin policy
23 with respect to ad seg of three days per week. And I'm
24 not trying to misstate your testimony, so correct me if
25 I'm wrong. So you mentioned the San Quentin policy or

JEANNE WOODFORD

BARKLEY
Court Reporters

1    A.    Thirty-one.  I'm sorry.  Yes.

2    Q.    Okay.  And you base that upon no mental health
3 care training, correct?

4    A.    Well, as I stated previously, I've had some
5 training on mental health care, but I base it on my
6 experience working with inmates.

7    Q.    Okay.  But you're not -- you've already
8 admitted that you're not professionally qualified to
9 make mental health care assessments, correct?

10   A.    I am not a mental health professional, if that
11 is the question.  But I certainly have years of
12 experience with working with this population and have on
13 many, many occasions appropriately referred someone to
14 mental health staff who upon their review of that inmate
15 agreed that the inmate was not receiving treatment at
16 the appropriate level of care and needed additional
17 care.

18   Q.    How many inmates did you speak to when you say
19 "Many, if not all, of the individuals" I spoke to
20 appeared to be in need of higher levels of care?

21   A.    On the day of this tour I only spoke to really
22 a handful of inmates.  We were limited by time.  But it
23 was very telling that of the few that I -- we spoke to
24 that identified primarily by either their refusal to go
25 to yard or to shower, that after talking to them they

121

JEANNE WOODFORD

BARKLEY
Court Reporters

```
1                    DEPOSITION OFFICER'S CERTIFICATE
2

3    STATE OF CALIFORNIA    }
                            }   ss.
4    COUNTY OF CONTRA COSTA }

5

6            I,  Cherree P. Peterson  , hereby certify:

7            I am a duly qualified Certified Shorthand

8    Reporter in the State of California, holder of

9    Certificate Number CSR  11108  issued by the Court

10   Reporters Board of California and which is in full force

11   and effect.  (Fed. R. Civ. P. 28(a)).

12           I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a), 30(f)(1)).

17           I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22           I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                            / / /
```

146

BARKLEY
Court Reporters

1  of the testimony given by the witness. (Fed. R. Civ. P.
2  30(f)(1)).
3          Before completion of the deposition, review of
4  the transcript [ ] was [XX] was not requested. If
5  requested, any changes made by the deponent (and
6  provided to the reporter) during the period allowed, are
7  appended hereto. (Fed. R. Civ. P. 30(e)).

9  Dated: March 20, 2013 ,

11          *[signature]*

BARKLEY Court Reporters