progression of offenders out of CSP and offenders who their work privilege, the same 54 offenders are not usually working for more than a couple of months.

The restrictions inherent in AS diminish staff's ability to impose traditional sanctions for institutional rule violations. Offenders in GP who are found guilty of a rule violation can receive a maximum of 60 days in punitive segregation or up to 180 days in loss of privileges (e.g., TV, canteen, visiting). Offenders in AS are required to follow the same institutional rules as GP offenders; however, because AS offenders are already in segregation for an indeterminate amount of time, they cannot receive additional segregation time as punishment. They can still lose privileges and be regressed through the QOL system. Sanctions are tailored to the seriousness of the infraction.

Offenders who engage in minor rule violations may initially receive a warning that is documented in a chronological record report. If the behavior continues, the offender may lose a privilege for a short amount of time (e.g., three days) without losing a QOL level. For example, this may happen if an offender covers the security light in his cell to make it darker for sleeping. This may also happen if an offender is caught "rat lining" or "fishing," which are forms of communication or exchange of items between offenders locked in their cells.

When an offender in AS violates a serious institutional rule, the officer initiates documentation on which he may recommend that the offender be regressed to a lower QOL level. This recommendation is approved or denied by a housing lieutenant. In general, if the lieutenant approves the offender's level regression, he is dropped one level. This process is kept separate from the disciplinary process, which may or may not result in a guilty finding, in order to have an immediate response to an offender's negative behavior. The disciplinary process can be lengthy because of due process requirements, but he may also receive a loss of privileges sanction through the disciplinary process.

Regardless of the offender's level, if he engages in behavior that dangerously disrupts the operation of the facility, he will be placed on special controls in the intake unit where he can be carefully monitored. This often happens during what is referred to as a use of force incident, which is any time an officer uses any level of force against an offender. A use of force incident generally occurs when an offender assaults a staff member or refuses to comply with a lawful order (e.g., refuses to be restrained for escort). An officer's response can include the use of simple pressure point tactics, the use of agents such as oleoresin capsicum (OC), or a forced cell extraction of the offender. During both fiscal years 2008 and 2009, CSP had an average of seven use of force incidents per month. Upon an offender's return to his cell, he will automatically begin at QOL level one again. Though the offender will not be required to retake any of the cognitive classes that he has already completed, he will be terminated from any classes in which he is currently enrolled and will be required to begin his process through the QOL levels again. Additional sanctions may be imposed through the disciplinary process.

Offenders who have difficulty progressing through the QOL level system may require special consideration. Offenders in segregation can accumulate a high number of sanctions through behaviors such as breaking the sprinkler head in their cells or overflowing the toilet in their cells, causing flooding on the tier. It is difficult to manage and change the behavior of offenders who have so many sanctions that there is no tangible incentive to improve their behavior. When this is the case, case managers and housing staff enact a behavior management plan. In a behavior management plan, case managers and correctional staff will use one privi-

lege (e.g., TV) that is highly valuable to the offender as an incentive. If the offender can behave well for a short period of time (generally 7 to 10 days), he may receive a television despite his loss of privilege status.

When an offender has been at level three for at least 90 days with good behavior and has successfully completed the requirements of the program, he is interviewed for progression out of CSP. A classification committee must approve the decision to reclassify him to close custody, and then he is moved to the Centennial Correctional Facility when a bed becomes available, where he continues to work toward completing his reintegration programming. It is less common that an offender transitions out of CSP any other way; however, offenders do sometimes parole from CSP or release when they reach the end of their sentence while in AS. Additionally, an offender may be released from AS based on a warden's review. An offender may receive a warden's review if he has been in CSP for more than two years but has been unable to progress out of CSP. If it is felt that the offender no longer needs to be in CSP, he may be released back to GP without transitioning through Centennial Correctional Facility.

*Progressive Reintegration Opportunity (PRO) Unit.* At the Centennial Correctional Facility, there is a continued focus on behavior modification and cognitive programs to transition disruptive offenders to less secure environments. Most offenders complete QOL levels four through six in the PRO unit. Upon transfer from CSP, offenders are reclassified from AS to close custody, the next highest custody level. Upon arrival, little is different for the newly classified close custody offenders; however, as offenders work their way through the PRO unit levels, they work toward contact visits with friends and family and are eventually allowed recreation time in the gym with other inmates. Ultimately, offenders who are successful in completing all six QOL levels are released back to GP.

*Offenders with Mental Illness (OMI) Management Program.* During the course of the research project, the OMI management program was opened at Centennial Correctional Facility. In addition to the PRO unit, the OMI program was designed to be a transitional program from CSP specifically for prisoners with a mental illness. Offenders are selected for the OMI program by a multi-disciplinary committee and must be approved for reclassification as a close custody inmate. In order to be considered for transfer to the program, offenders must have been in AS for a minimum of six months, enrolled in a cognitive program, have a mental health disorder, and be actively working with a mental health clinician.

Upon transfer to the OMI program, inmates are automatically placed in the intermediate program level. The OMI program has three levels: high, intermediate, and low. High is the most restrictive level with low the least. Depending on the individual's behavior, he can be moved to high or low levels. The program focuses on treatment and socialization. Offenders in this program work their way toward earning more privileges than are available in AS, contact visits with friends and family, and recreation in the gym with other inmates, much like PRO unit offenders do; however, the OMI program has the added benefit of group therapy. Initially, offenders are afforded the opportunity to participate in group therapy by being tethered to a special table. As offenders progress through the program, they are eventually allowed in groups of eight untethered inmates. The goal is to transition offenders to GP or the community although placements in the program may be long term.

*San Carlos Correctional Facility (SCCF)*

SCCF is a 255-bed special needs prison designed to stabilize and treat offenders with the most acute psychiatric symptoms or with developmental disabilities who are at risk for self injury as a result of their illness

and who have shown a substantial impairment in their ability to function at another correctional facility. SCCF houses inmates at all five custody levels. SCCF is unique in that offenders of all custody levels live and interact with one another on their living unit, with the exception of AS offenders who are housed in a separate unit.

All offenders who arrive at SCCF are processed through the intake/assessment unit. New arrivals are interviewed by both the mental health clinician assigned to the unit and a psychiatrist. New offenders are not permitted interaction with other inmates for the first 72 hours. If after 72 hours, clinicians and correctional staff feel the offender can reasonably interact with other offenders, he will be allowed in the day hall with as many as five other inmates. Offenders on the intake unit are permitted out of their cell in the day hall for at least one hour a day, five days per week. During this time, they have open access to the phones and showers.

Offenders typically progress through the programming levels as their mental health status improves. Offenders are continually monitored by a psychiatrist with an appointment every 30 days for the most severe offenders or every 60 days for those who are progressing well. One-on-one sessions occur with a mental health clinician as needed and are not scheduled on a regular basis; however, there is a clinician assigned to each unit, with each unit housing fewer than 30 inmates.

As an offender continues to progress through the facility, he will work his way towards open access to the day hall, phones, and shower. As he progresses through the facility he will then be allowed out with seven inmates and then fifteen, eventually earning all day open access. Those who have progressed to the lowest levels are also permitted one hour of recreation five days per week in the yard or gym plus three hours per week at the library. Additionally, they are able to participate in group therapy sessions, which happen once or twice a week depending on the topic. Group therapy subjects include anger management, understanding one's mental illness, and other related topics. Once mental health, psychiatric, and correctional staff determine that the offender has improved enough to function in GP, he is then transferred to a facility at his custody level.

PURPOSE OF PRESENT STUDY

The broad purpose of the project was to evaluate the psychological effects of long-term segregation on offenders, particularly those with mental illness. This study examined conditions as they existed in the Colorado prison system with respect to AS, using CSP as the AS study facility. Only males were included because females represent 2% of Colorado's AS population. We did not assign inmates to segregation, but studied those conditions as they naturally occurred. The following were the primary goals and hypotheses of the grant.

*Goal 1: To determine which, if any, psychological domains are affected, and in which direction, by the different prison environments.* A multitude of psychological dimensions were examined, drawing from those most often cited in the literature. The broad constructs of interest were depression/hopelessness, anxiety, psychosis, withdrawal and alienation, hostility and anger control, somatization, hypersensitivity, and cognitive impairment. We hypothesized that offenders in segregation would develop an array of psychological symptoms consistent with the SHU syndrome, with elevations across the eight constructs.

*Goal 2: To assess whether offenders with mental illness decompensate differentially from those without mental illness.* We were particularly interested in whether long-term segregation had a differential impact based on the presence of mental illness in offenders. We sought answers to the following questions: Does AS exacerbate symptoms in offenders with mental illness? Does AS create symptoms of mental illness in those who did not exhibit any at placement? It was hypothesized that offenders with and without mental illness would deteriorate over time, but the rate at which it occurred would be more rapid and more extreme for the mentally ill.

*Goal 3: To compare the impact of long-term segregation against the general prison setting and a psychiatric care prison.* In this study, the psychological and behavioral symptoms of offenders in AS were compared to similar offenders who were sent to SCCF or returned to the general prison population pursuant an AS hearing. This study used a repeated measures design over the course of a year to explore whether psychological distress was attributable to the various prison environments. It was hypothesized that inmates in segregation would experience greater psychological deterioration over time than the comparison groups.

This study also included an examination of individual characteristics such as mental health status, personality, and trauma history to determine if certain factors could predict patterns of change. The prediction analyses were exploratory in nature and we did not formulate a hypothesis about the variables that might predict differential rates of psychological decompensation.

# METHOD

## GROUP ASSIGNMENT

Study participants included male inmates placed in AS and comparison inmates in the GP. Placement into AS or GP conditions occurred as a function of routine CDOC operations, pending the outcome of their AS hearing, without involvement of the researchers. Inmates were identified as study candidates at the point the offenders were notified that they would have an AS hearing. Oftentimes, it was unknown whether a particular inmate would be placed in AS or returned to GP at the time of his study consent; approximately 10% of hearings do not result in AS placement. For the purposes of this study, all study participants classified to AS were waitlisted for and placed in CSP (as opposed to Sterling Correctional Facility). Inmates who returned to GP following an AS hearing were assumed to be as similar as possible to AS inmates and, therefore, comprised the comparison groups. Comparison participants also included inmates targeted for a diversionary program that identified inmates at high risk of AS placement due to their disruptive behavior. This program discontinued shortly after the study commenced, hence few participants were identified through this method.

Inmates in both of these settings (CSP, GP) were divided into two groups – offenders with mental illness (MI) and with no mental illness (NMI). There are fewer inmates with mental illness than without, but because both subgroups were of equal interest to this study, separate groups enabled over-selection of inmates with mental illness. All offenders are rated on a psychological needs level by trained clinicians upon intake into CDOC and periodically during their incarceration as warranted. The psychological needs level has a 5-point rating, where higher values indicate the need for more intensive services, and a qualifier code that indicates whether the offender has a serious and persistent mental disorder. Most inmates rated 3 through 5 have an Axis I diagnosis, although certain Axis II diagnoses may infrequently warrant this rating (e.g., borderline, schizotypal). Disorders that typically qualify as serious and pervasive include mood disorders including major depression, other depressive disorders, dysthymic, and bipolar disorders; psychotic disorders including schizophrenic, paranoid, delusional, and schizophreniform disorders; dissociative identity disorder; and posttraumatic stress disorder. In this study, inmates assessed with a psychological needs level of 3 through 5 were defined as MI and levels 1 or 2 were defined as NMI.

A third comparison group was included. This group included inmates with severe mental health problems placed in SCCF. Of the inmates placed in SCCF, only those with patterns of prison misbehavior, as measured by disciplinary violations, were included in the study. However, inmates placed into AS at SCCF were excluded because of the small number and because many had transferred from AS at CSP or Sterling Correctional Facility, where the effects of the earlier placement would be unknown. The purpose of the SCCF comparison group was to study inmates with serious mental illness and behavioral problems who were managed in a psychiatric prison setting.

Figure 1 illustrates the number of offenders who were eligible for the study and details the selection of offenders within each of the five study groups. Given that the purpose of this project was to study long-term segregation, inmates projected to release from prison before administration of the final testing session were excluded. Inmates were also excluded if they could not read English or if their reading level was not high enough (roughly eighth grade) to complete the battery of tests. SCCF inmates were excluded if they did not have significant disciplinary violations in their history. Infrequently, offenders were excluded for other reasons such as being an interstate compact offender, being the suspect in a high-profile murder investigation (as reason for AS placement), or a visual impairment prohibiting them from reading. Finally, inmates were sampled as a matter of convenience. Because this project funded only one field researcher, participants were selected based on their proximity by either timing or location to others who could be included in this study.

Figure 1. Eligibility and Selection of Study Participants



| | At Risk of Ad Seg Placement | | | | |
|---|---|---|---|---|---|
| | 884 Ad Seg hearing or diversion placement | | | | |
| **CDOC Decision** | 664 Decision to Ad Seg | | 220 Return to GP or Diversion Placement | | 203 Placed in SCCF |
| **Mental Illness Designation** | 232 MI | 432 NMI | 73 MI | 147 NMI | 203 MI |
| **Excluded from Participating** | 84 Sentence Length / 17 Location / 7 Other | 79 Sentence Length / 125 Location / 15 Other | 22 Sentence Length / 10 Location / 1 Other | 51 Sentence Length / 16 Location / 10 Other | 78 Sentence Length / 28 Violation History / 9 Other |
| **# Eligible** | 144 | 219 | 40 | 70 | 88 |
| **Not Selected** | 75 | 104 | 7 | 16 | 17 |
| **Approached Inmate to Participate in Study** | 69 | 75 | 33 | 54 | 71 |

PARTICIPANTS

Figure 2 details the flow of participants through the study, including an account of how many offenders completed the testing at each interval. A total of 302 male inmates were approached to participate in the study. Thirty refused to participate. Two more offenders were considered a passive refusal and were removed for inappropriate sexual behavior towards the researcher during the first testing session. An additional 23 offenders later withdrew their consent, although the data collected to the point of their withdrawal was used. In addition to refusals and withdrawals, 10 inmates released prior to the end of the study due to discretionary releases by the Parole Board and one GP participant died of a drug overdose.

Five testing sessions were initially established at 3-month intervals, beginning with the date of consent and initial administration. Therefore, tests were scheduled at 3 months, 6 months, 9 months and 12 months after the baseline assessment. However, this schedule was problematic for the CSP groups. When the study began, there was a 3-month average wait for inmates to be transferred to CSP due to a shortage of AS beds. While on the waitlist, AS inmates were held in a punitive segregation bed at their originating facility. It was determined that the primary goal was to study inmates in a single long-term segregation facility (CSP) to limit confounding variables and that therefore the baseline measure should be collected upon placement into CSP. However, it was also recognized that significant changes could occur while inmates were held in segregation at their originating facility. Therefore, a "pre-baseline" measure was collected as close to the AS hearing as possible, which meant that the CSP groups completed six test intervals rather than five. The time between the pre-baseline and baseline measure varied according to how long the inmate was on the waitlist. The median time between pre and baseline tests was 99 days, although eight offenders were moved into CSP so quickly that they did not have a pre-baseline measure. In the analyses, tests were aligned across groups according to the test number, such that the CSP groups had an additional test at the end rather than at the beginning.

Participants' ages ranged from 17 to 59 at the time of consent, with a mean age of 31.8 ($SD$ = 9.1). The racial/ethnic breakdown of participants was 40% white, 36% Hispanic, 19% African American, 4% Native American, and 1% Asian. Of the inmates with mental illness who were included in this study, 56% were identified with a serious and pervasive disorder. Other participant characteristics are described in greater detail in the results section, including comparisons of study samples to eligible pools and comparisons of refusers to participants.

MATERIALS

Assessment tools were selected to comprehensively cover the variety of psychological constructs associated with AS (e.g., Arrigo & Bullock, 2008; Grassian, 1983; Haney, 2003). The primary constructs assessed in this study were as follows: (1) anxiety, (2) cognitive impairment, (3) depression/hopelessness, (4) hostility/anger control, (5) hypersensitivity, (6) psychosis, (7) somatization, and (8) withdrawal/alienation. Additionally, malingering, self-harm, trauma, and personality disorders were assessed.

Research materials were selected to meet the following criteria: (1) use of assessments with demonstrated reliability and validity, (2) use of multiple sources for providing information (e.g., self-report, clinician ratings, files), (3) use of multiple assessments of each construct of interest, (4) ability to use within the prison setting, and (5) ease of administration, including no specialized equipment, no physical contact, short length of time, and appropriate reading level.

Figure 2. Flow of Participants through Study

After selection of the self-report assessments was complete, there remained several areas of interest (e.g., panic disorder, hypersensitivity to external stimuli, physical hygiene) for which there was no established measure that met our criteria. In conjunction with the study advisory board, the research team developed a 39-item instrument to assess these areas. This instrument, called the Prison Symptom Inventory (PSI), is shown in Appendix A.

In addition to self-report assessments, ratings of psychological functioning were obtained from clinical staff and ratings of behavior in the housing unit were obtained from correctional staff. Official record data were also gathered from electronic and paper files. This section summarizes information for self-report assessments, staff ratings, and behavioral data. Complete descriptions of the individual measures and their known psychometric properties from past research and for the current study are provided in Appendix B. Additional analyses of the psychometric properties of the PSI are presented in Appendix C.

Data were collected directly from participants on 12 self-report assessments (ten paper-and-pencil tests, two administered by the researcher) to assess 12 different constructs. Table 1 provides a list of the assessment tools for each construct. Most assessments were collected at each testing period, although personality disorders, self-harm, and trauma history were not collected at all time periods. It was determined that personality and trauma history were relatively stable constructs that needed to be assessed only once to limit the testing burden on study participants. Also, due to the burden on already limited mental health resources, the BPRS was only administered at the first, third, and fifth testing intervals.

Table 1. Assessments and Constructs

| | Anxiety | Cognitive Impairment | Depression – Hopelessness | Hostility – Anger Control | Hypersensitivity | Psychosis | Somatization | Withdrawal – Alienation | Malingering | Personality Disorder | Self-Harm | Trauma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Beck Hopelessness Scale (BHS)* | | | I | | | | | | | | | |
| *Brief Psychiatric Rating Scale (BPRS)* | | | | | | | | | | | | |
| Activity | | | | | | | | | | | | |
| Anxious-Depressed | C | | C | | | | | | | | | |
| Hostility/Suspiciousness | | | | C | | | | | | | | |
| Thought Disorder | | | | | | C | | | | | | |
| Withdrawal | | | | | | | | C | | | | |
| *Brief Symptom Inventory (BSI)* | | | | | | | | | | | | |
| Anxiety | I | | | | | | | | | | | |
| Depression | | | I | | | | | | | | | |
| Hostility | | | | I | | | | | | | | |
| Interpersonal Sensitivity | | | | | I | | | | | | | |
| Obsessive-Compulsive | I | | | | | | | | | | | |
| Paranoid Ideation | | | | | | I | | | | | | |
| Phobic Anxiety | I | | | | | | | | | | | |
| Psychoticism | | | | | | I | | | | | | |
| Somatization | | | | | | | I | | | | | |
| *Coolidge Correctional Inventory (CCI)* | | | | | | | | | | I | | |
| *Deliberate Self-Harm Inventory (DSHI)* | | | | | | | | | | | I | |
| *Personality Assessment Screener (PAS)* | | | | | | | | | | | | |
| Acting Out | | | | I | | | | | | | | |
| Alienation | | | | | | | | I | | | | |

| | Anxiety | Cognitive Impairment | Depression – Hopelessness | Hostility – Anger Control | Hypersensitivity | Psychosis | Somatization | Withdrawal – Alienation | Malingering | Personality Disorder | Self-Harm | Trauma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anger Control | | | | I | | | | | | | | |
| Health Problems | | | | | | | I | | | | | |
| Hostile Control | | | | I | | | | | | | | |
| Negative Affect | I | | I | | | | | | | | | |
| Psychotic Features | | | | | | I | | | | | | |
| Social Withdrawal | | | | | | | | I | | | | |
| Suicidal Thinking | | | I | | | | | | | | | |
| *Prison Behavior Rating Scale (PBRS)* | | | | | | | | | | | | |
| Anti-Authority | | | | O | | | | | | | | |
| Anxious-Depressed | O | | O | | | | | | | | | |
| Dull-Confused | | O | | | | | | | | | | |
| *Prison Symptom Inventory (PSI)* | | | | | | | | | | | | |
| Panic Disorder | I | | | | | | | | | | | |
| Hypersensitivity/External Stimuli | | | | | I | | | | | | | |
| Physical Symptoms | | | | | | | I | | | | | |
| *Profile of Mood States (POMS)* | | | | | | | | | | | | |
| Anger-Hostility | | | | I | | | | | | | | |
| Depression-Dejection | | | I | | | | | | | | | |
| Fatigue-Inertia | | | | | | | I | | | | | |
| Tension-Anxiety | I | | | | | | | | | | | |
| *St Louis Univ Memory Scale (SLUMS)* | | R | | | | | | | | | | |
| *State-Trait Anxiety Inventory (STAI)* | | | | | | | | | | | | |
| State Anxiety | I | | | | | | | | | | | |
| Trait Anxiety | I | | | | | | | | | | | |
| *Structured Inventory of Malingered Symptomatology (SIMS)* | | | | | | | | | I | | | |
| *Trail Making Test (TMT)* | | R | | | | | | | | | | |
| *Trauma Symptom Inventory (TSI)* | | | | | | | | | | | | I |

Note. C = Clinician rating; I = Inmate self-report; O = Officer rating; R = Researcher administered. Shaded tests not administered at every testing interval.

*Self-Report Assessments*

A composite score was developed for seven of the eight primary constructs by standardizing scores from the scales on the self-report assessments. Standardized scores were used so that comparisons between constructs could be made more easily and to create a single measure for constructs assessed by multiple self-report assessments. Scores were standardized by centering on the mean of the entire sample at the first assessment and dividing by the standard deviation. A composite score was computed by standardizing each assessment and averaging the standardized scores across the individual assessments as the composite score. Reliabilities for these composites are presented in the discussion of each construct.

*Anxiety Construct.* Anxiety was measured by eight self-report variables assessed at each time period. The self-report measures used to create the anxiety composite score were the State and Trait subscales from the State-Trait Anxiety Inventory (STAI; Spielberger, Gorsuch, & Lushene, 1970); the Obsessive-Compulsive, Anxiety, and Phobic Anxiety subscales from the Brief Symptom Inventory (BSI; Derogatis, 1993); the Negative

METHOD

Affect subscale from the Personality Assessment Screener (PAS; Morey, 1997); the Tension-Anxiety subscale from the Profile of Mood States (POMS; McNair, Lorr, & Droppleman, 1992); and the Panic Disorder subscale from the PSI. The following PSI items were included on the Panic Disorder subscale: 2, 6, 10, 13, 16, 17, 20, 25, and 30.

Internal consistency reliabilities were computed for each assessment period for the entire sample. The mean Cronbach's alpha across individual anxiety measures and time periods was .87 (range = .60 to .95). The Cronbach's alphas for the composite ranged between .89 and .91 for the six time periods. Reliabilities were similar across testing intervals, and they were similar to internal consistency estimates from normative samples. Test-retest correlations between sequential time periods ranged between .49 and .86 ($M$ = .76) indicating reasonable stability over 3 month assessment periods. The validity coefficients between self-assessments of the anxiety construct indicated evidence for convergent validity, with correlations between measures ranging from .36 to .85 ($M$ = .65) across all time periods.

*Cognitive Impairment Construct.* Cognitive impairment was assessed by two individually administered tests. The Saint Louis University Memory Scale (SLUMS; Tariq, Tumosa, Chibnall, Perry, & Morely, 2006) was used to assess orientation, memory, attention, and executive function. The SLUMS is an 11-item scale and yields a single total score ranging from 0 to 30, where higher scores indicate stronger cognitive abilities. The Trail Making Test (TMT; Reitan, 1958) was used to assess attention. The time required to complete the A (connect sequential numbers) and B (connect alternating numbers and letters) tasks were collected, and the ratio of times (B/A) was used as the attention measure in subsequent analyses.

The SLUMS demonstrated low internal consistency with a mean Cronbach's alpha of .52 across groups and time periods (range = .48 to .60). We could not find comparative information on this newly developed measure. Because this is a multidimensional measure of cognitive function, internal consistency may not be the correct assessment of quality. The correlations between sequential time periods ranged from .38 to .84 ($M$ = .67), indicating good test-retest reliability. The Trails B/A ratio and SLUMS total score were negatively correlated (range = -.17 to -.31), as would be expected because the tests are scaled in opposite directions; however, these correlations are fairly small, indicating that these two measures are assessing different cognitive functions. Because of the weak correlations between the SLUMS and TMT, each of these assessments was used individually to assess cognitive impairment rather than combining them to yield a composite score.

*Depression-Hopelessness Construct.* The depression-hopelessness construct was assessed using five self-report measures. The scales used to create this construct were the Beck Hopelessness Scale (BHS; Beck & Steer, 1993), the BSI Depression subscale (Derogatis, 1993), the PAS Negative Affect and Suicidal Thinking subscales (Morey, 1997), and the POMS Depression-Dejection subscale (McNair et al., 1992).

Internal consistency reliabilities were computed for each assessment period for the entire sample. The mean Cronbach's alpha across depression measures and time periods was .87 (range = .60 to .96). The Cronbach's alpha for the composite ranged between .71 and .77 ($M$ = .75) for the six time periods. Internal consistency estimates for the subscales were similar to reliabilities from normative data. The test-retest correlations for the depression-hopelessness composite were strong ($M$ = .76, range = .57 to .90) indicating good stability over time. The validity coefficients between self-assessments of the depression-hopelessness construct indicated good convergent validity with estimates ranging from .35 to .89 ($M$ = .60) across all measures and time periods.

METHOD

*Hostility-Anger Control Construct.* The hostility-anger control composite was assessed using five self-report measures: the BSI Hostility subscale (Derogatis, 1993); the Anger Control, Hostile Control, and Acting Out subscales on the PAS (Morey, 1997); and the POMS Anger-Hostility subscale (McNair et al., 1992).

Internal consistency reliabilities were computed for each scale at each assessment period for the entire sample and a mean Cronbach's alpha of .62 (range = .27 to .94) was obtained. The Cronbach's alphas for the composite ranged between .54 and .61 ($M = .57$) for the six time periods. Although these reliabilities were lower than expected, the smaller internal consistency estimates were for the scales with a small number of items (i.e., PAS subscales with two items) and these reliability estimates are similar to other literature. The correlations between sequential time periods ranged between .56 and .84 ($M = .75$) and suggest that the hostility composite is stable over 3 month periods. The validity coefficients between self-assessments of the hostility-anger control construct were quite variable with validity coefficients ranging between .11 and .84 ($M = .42$) across all measures and time periods; it was the PAS Acting Out and Hostile Control subscales that tended to have lower correlations for this composite. These lower correlations along with the lower composite internal consistency estimates suggest a potential multidimensional construct. Because the composite was stable and the different aspects of hostility-anger control were relevant to this study, all subscales were kept together for the composite measure. Analyses were conducted without the PAS subscales and the overall study results did not change substantially (results available from the authors upon request), thus all measures were included as part of the composite.

*Hypersensitivity Construct.* The hypersensitivity construct was measured by two self-report measures—the Hypersensitivity to External Stimulus subscale of the PSI and the Interpersonal Sensitivity subscale of the BSI (Derogatis, 1993). Items 1, 7, 31, 34, and 37 were included on the PSI Hypersensitivity to External Stimulus subscale. This composite is assessing two different aspects of hypersensitivity—environmental and interpersonal.

Internal consistency reliabilities computed for each scale at each assessment period for the entire sample indicated highly variable internal consistency estimates (.22 to .86) with a mean estimate of .56. However, examination of each scale showed that the BSI had strong internal consistency estimates (.71 to .86) whereas the PSI has low estimates (.22 to .39). The PSI was created by the researchers and its purpose was to capture variables not measured by existing measures, thus it may not be a homogeneous construct. Although internal consistency estimates of the composite were low (.47 to .61 with $M = .53$), the composite showed good test-retest reliability (.21 to .80 with a mean of .63) and the correlations between these two subscales provided evidence of convergent validity (range = .31 to .44); thus these scales were analyzed in the rest of the study as a composite variable. Analyses using each measure separately are available from the researchers upon request.

*Psychosis Construct.* The psychosis construct was assessed by three self-report measures. These included the Paranoid Ideation and Psychoticism subscales of the BSI (Derogatis, 1993) and the Psychotic Features subscale of the PAS (Morey, 1997).

Internal consistency estimates for the subscales ranged between .62 and .83 ($M = .77$) and estimates for the composite ranged between .73 and .80 ($M = .78$) indicating adequate internal consistency estimates for this composite and its components. Internal consistency estimates for the subscales were similar to those found with normative samples. Test-retest correlations between sequential time periods indicated strong stability over time (range .52 to .87 with a mean correlation of .71). The validity coefficients between self-

assessments of the psychosis construct provided evidence of convergent validity, ranging between .35 and .79 ($M$ = .63) across all measures and time periods.

*Somatization Construct.* The somatization construct was measured by four self-report assessments, including the Somatization subscale of the BSI (Derogatis, 1993), the Health Problems subscale of the PAS (Morey, 1997), the POMS Fatigue-Inertia subscale (McNair et al., 1992), and the Physical Symptoms subscale of the PSI. Items 5, 8, 11, 15, 19, 24, 27, and 28 were included on the PSI Physical Symptoms subscale.

The mean Cronbach's alpha across somatization measures and time periods was .79 (range = .56 to .94) and for the composite the mean alpha was .77 (range = .73 to .79). Test-retest reliability estimates were strong with correlations ranging between .58 and .86 ($M$ = .76). The correlations between the self-assessments of the somatization construct indicated good convergent validity with coefficients ranging between .38 and .67 ($M$ = .54) across all measures and time periods.

*Withdrawal-Alienation Construct.* The withdrawal-alienation construct was assessed using two PAS subscales—Alienation and Social Withdrawal. Internal consistency reliabilities were computed for each assessment period for the entire sample and the median Cronbach's alpha across withdrawal-alienation measures and time periods was .75 (range = .69 to .83). The Cronbach's alphas for the composite ranged between .62 and .71 ($M$ = .67) for the six time periods. Correlations between sequential time periods (range = .49 to .87; $M$ = .68) indicated stability. Reliabilities were similar across testing intervals and were similar to reliabilities found in the normative samples. The correlations between the subscales used in the withdrawal-alienation construct indicated good convergent validity with coefficients ranging between .45 and .55 ($M$ = .51) across time periods.

*Malingering.* The Structured Inventory of Malingered Symptomatology (SIMS; Widows & Smith, 2005) was used to assess malingering on mental health disorders. Scores on five subscales (Psychosis, Neurologic Impairment, Amnestic Disorders, Low Intelligence, and Affective Disorders) were obtained at each testing period. The SIMS was used in this study as one of the tools to determine if a participant's responses may be truthful.

The subscales of the SIMS tended to be positively correlated (range = .19 to .63; $M$ = .51) with each other. The median Cronbach's alpha across malingering subscales and time periods was .76 (range = .50 to .93). Lower correlations and reliability estimates tended to be with the Affective Disorder and Low Intelligence subscales.

The SIMS manual provides cut-off scores to suggest malingering on each of the subscales as well as a total score. The cut-offs were scores greater than 1 for the Psychosis subscale and scores greater than 2 for the Neurological Impairments, Amnestic Disorders, Low Intelligence, and Affective Disorders subscales. The total SIMS scale cut-off included scores greater than 14.

*Personality Disorders.* The Coolidge Correctional Inventory (CCI; Coolidge, 2004) was utilized to identify personality disorders among individuals. For this study, the CCI was used to assess 14 personality disorders identified in the current and past American Psychiatric Association's (1980, 2000) Diagnostic and Statistical Manuals (DSM): Antisocial, Avoidant, Borderline, Dependent, Depressive, Histrionic, Narcissistic, Obsessive-Compulsive, Paranoid, Passive-Aggressive, Sadistic, Schizoid, and Schizotypal. The CCI also has other subscales to assess, among others, DSM Axis I variables, neuropsychological functioning, and response validity.

For this study we also used the CCI measures of Axis I and personality disorders (Axis II). These variables have been hypothesized as potential predictors of the impact of segregation on psychological distress. Because personality disorders are considered relatively stable constructs, this measure was given only at the baseline assessment period. Therefore, they were not included in the change over time measures. The median Cronbach's alpha across CCI subscales was. 75. The Cronbach's alphas ranged between .46 and .88 for different subscales.

*Self-Harm Construct.* The Deliberate Self-Harm Inventory (DSHI; Gratz, 2001) was used to assess the deliberate self-harm history at the initial assessment. The data obtained from the DSHI was coded to provide a quantitative severity rating based on the frequency of the self harming behavior and whether or not the behavior resulted in hospitalization. This variable was considered to be a potential predictor of outcomes. The baseline assessment was used to assess lifetime history of self-harm and each harming behavior was coded as *having occurred in lifetime* or *not occurring*. Scores were summed across the 17 items for a total score. This measure is meant to be given as an interview rather than a paper-and-pencil test; we modified to fit the testing situation. We had hoped to use this assessment as a repeated measure; however, misunderstanding of instructions did not allow for integrity of the data and only the lifetime assessment of self-harm was used as a potential predictor of outcomes. The internal consistency estimate for the total score was .84 indicating that it is reasonable to sum the 17 indicators into a total score.

*Trauma.* The Trauma Symptom Inventory (TSI; Briere, 1995) was used to assess the ongoing impact of traumatic history. This measure was selected as a potential predictor of outcomes. This was administered once at the second assessment period. Participants use a 4-point rating scale for frequency of occurrence (0 – *never* to 3 – *often*) of 100 events (e.g., flashbacks, wanting to cry, feeling jumpy) experienced within the last 6 months. Scores are obtained on 3 validity scales and 10 clinical subscales. For this study, the total score was used. The Cronbach's alpha for the total score was .97.

*Staff Ratings*

Two measures were completed by prison staff to assess the constructs of interest. The Brief Psychiatric Rating Scale (BPRS; Ventura, Lukoff, Nuechterlein, Liberman, Green, & Shaner, 1993) was completed by clinical staff and the Prison Behavior Rating Scale (PBRS; Cooke, 1998) was completed by correctional officers and case managers.

*Clinician Ratings.* The BPRS (Overall & Gorman, 1962) is a 24-item scale most commonly used to assess patients with psychiatric disorders. It is designed to assess rapidly changing symptoms (Lukoff, Nuechterlein, & Ventura, 1986; Ventura et al., 1993). It measures positive symptoms, general psychopathology, and affective symptoms. Some items can be rated after observation of the patient; others require clinical interview to obtain the patient's self report information. Each of the 24 symptom constructs are rated on a 7-point scale of severity ranging from 1 (*not present*) to 7 (*extremely severe*).

Research has indicated that there are five factors: Thought Disorder, Withdrawal, Anxious-Depressed, Hostility-Suspiciousness, and Activity (Burger, Calsyn, Morse, Klinkenberg, & Trusty, 1997; Hedlund & Vieweg, 1980). The BPRS subscales and total scores demonstrated low internal consistency with alpha estimates ranging between .40 and .66 ($M = .55$); these estimates are lower than those found with normative samples. The correlations between sequential time periods ranged from .23 to .58 ($M = .40$), indicating moderate stability over a 6 month period. The BPRS subscales had low correlations with self-report measures of the same

underlying construct, with validity correlations ranging between .03 and .49 among the corresponding measures and the average validity coefficients of the BPRS with all self-report assessments at .28. The Anxious-Depressed subscale had the strongest correlations with the self-report measures and Withdrawal had the lowest. In general, the BPRS scales had low scores, indicating a possible floor effect (see means in results section) and impacting variability as well as relationships between measures.

*Correctional Staff Ratings.* The PBRS was designed to assess psychological features common to prison life (Cooke, 1998). The instrument was developed for a British prison population. Therefore, some words that are not common in the U.S. were changed to be culturally appropriate (see Appendix A). Correctional staff rated 36 behaviors using a 4 point rating scale (0 – *never/rarely*; 1 – *sometimes*, 2 – *often*, 3 – *most of the time*) at each of the six time periods. There are three scales: Anti-Authority, Anxious-Depressed, and Dull-Confused. All items were summed to provide a total score. Internal consistencies were good for the PBRS scales with a mean Cronbach's alpha across groups and times of .93 (range = .90 to .95) for the Anti-Authority scale, .91 (range .90 to .95) for the Anxious-Depressed scale, and .83 (range = .78 to .87) for the Dull-Confused scale. Total score internal consistency estimates ranged from .94 to .95. Test–retest reliabilities were highly variable with correlations ranging between .08 and .50. Correlations between testing periods were lowest from first to second assessments and tended to increase over time, which might be a function of familiarity. Correlations with self-report measures tended to be highly variable and mostly small (-.06 to .46), as they were with clinician ratings (.08 to .16).

*Official Records Data*

Data from official records were collected primarily from the Department of Corrections Information System (DCIS), which is an administrative database of offender data. Offender characteristics to include demographic history, criminal history and offense data, institutional behavior, and needs levels were electronically downloaded. Inmates are routinely processed through the diagnostic unit upon intake into prison, and data are gathered through various sources including arrest and pre-sentence investigation records, diagnostic interview, and pencil-and-paper tests.

Two standardized tests administered to all inmates at the diagnostic unit were included in this study to describe the population. These were the Level of Service Inventory – Revised (LSI-R; Andrews & Bonta, 1995, 2003) and the Tests of Adult Basic Education (TABE; CTB/McGraw-Hill, 1994). The LSI-R is a semi-structured interview tool that assesses criminal risk, with information verified through official records. The LSI-R total score ranges from 0 to 54 and is used to assign the level of supervision for community-based offenders and to determine allocation of services (Motiuk, Motiuk, & Bonta, 1992). The LSI-R showed moderately strong predictive validity ($r$ = .31) for 1-year recidivism rates with Colorado parolees (O'Keefe, Klebe, & Hromas, 1998). The TABE is designed to measure adult proficiency in reading, mathematics, language, and spelling. It gives the information needed to place learners in the appropriate lessons for their particular skill deficiencies. Final scoring of the tests can yield grade equivalent scores. The correlation between the TABE total battery score and the GED average score was .63 (CTB/McGraw-Hill, 2004).

Resulting from the diagnostic assessment process are ratings across different needs levels, including academic, vocational, sex offender, substance abuse, medical, psychological, intellectual disabilities, assaultiveness, and self-destruction. Each level is rated on a 5-point scale, where scores of 3 through 5 indicate problem areas. Similar to the other scales, a psychological rating of 3 or greater indicates the need for mental health services. Levels may be reevaluated during an offender's incarceration.

Institutional behavior, such as disciplinary violations and involvement in gangs, are recorded electronically over the course of an offender's incarceration. Disciplinary violations are grouped into three categories according to their seriousness. Because patterns were similar when analyzing either violation type or total violations, only totals are reported. There are three levels of gang involvement: member, associate, and suspect. Levels are ascertained by field intelligence officers who rate offenders' involvement across 11 items (e.g., self admission, moniker, gang tattoos, identification by law enforcement). Each item carries a weight ranging from 5 to 20 points, and summative scores determine the degree of gang membership or involvement. To clearly delineate offenders actively involved in gangs, only those scored as gang member were considered to have gang involvement in the following analyses.

Certain data elements were collected only for study participants during the course of their participation in the study. The following were collected and coded for the period of time between each testing interval for each participant: the amount of time spent in various settings (e.g., segregation, GP, hospital), phone records, and mental health crisis data. Additionally, activity logs from paper files for the CSP participants were collected and coded.

Phone records were received electronically from the Colorado Inmate Phone System (CIPS). From these records, researchers coded the number of phone calls attempted, the number of calls completed, and the time spent on the phone across all calls.

Mental health staff is required to make a written report in DCIS following any unscheduled mental health visit or crisis. All reports completed for participants during their participation in the study were reviewed and coded by researchers on a 3-point self-harm scale (1 – *ideation*, 2 – *self-harm behavior*, 3 – *attempted suicide*) and whether or not there was a report of a psychotic symptom during the crisis.

Pod activity records are kept by CSP correctional staff and are updated on a daily basis to provide information on an offender's time outside of his cell for shower, exercise, and porter duties. These forms also track the number of times each offender refused or was not offered these activities. Data were coded to reflect a refusal or an activity not offered on a specific day as well as the actual amount of time the offender spent participating in the activity. When the records were unclear or no information was recorded on a specific day, it was coded as unknown. Researchers coded the pod activity sheets for each offender between each testing interval and summed for the number of refusals, days an activity was not offered, unknowns, and average time spent for shower and exercise activities.

PROCEDURES

Study enrollment began July 2007 and ended March 2009, with final testing of all participants completed in March 2010. The project operated under the approval of the institutional review board at the University of Colorado at Colorado Springs (UCCS).

The research team was notified of AS hearings by the case management supervisor at each facility and of SCCF placements by the clinician who scheduled the facility transfers. Notification typically occurred before the hearings or SCCF placement to give the field researcher maximal lead time. Researchers reviewed electronic records to screen inmates for study eligibility.

Per the UCCS institutional review board, a stipulation was added to provide greater protection to inmates with mental illness. Before consenting them, researchers were required to contact mental health staff, who

in turn were asked to assess whether the offender would be able to understand the consent form and to weigh the study risks against the benefits. Other than the SCCF group, there were rarely issues. However, it was not uncommon for the SCCF clinician to wait several days or even occasionally weeks for a new arrival to stabilize prior to giving researchers approval to consent participants; these inmates were then included in the study. Two inmates were excluded from the study because clinicians did not believe they had the capacity to fully understand the consent process; both were SCCF inmates.

The field researcher was a female university employee who completed the full CDOC training academy and had a CDOC badge that permitted her unescorted access to the facilities. In advance of each visit, the field researcher contacted prison security to arrange visits with specific inmates. All inmates were escorted by security staff to the visiting room, which contained a noncontact booth for inmates in AS or punitive segregation conditions. The field researcher met individually with each inmate to review the consent form, which included the general purpose of the study, voluntary nature of participation, risks and benefits, and remuneration. Inmates were advised that the purpose of the study was to learn about their adjustment to prison and offenders in prisons across the state were being included in this study. Inmates who agreed to participate were given $10 for each testing interval. Although this amount may at first seem high for AS inmates who do not have an opportunity to earn income, it was important that AS inmates were compensated at the same rate as GP inmates since the activities were exactly the same. Additionally, all deposits into inmate bank accounts were subject to a 30% restitution recovery fee and deposits to inmates with negative balances (common among AS inmates) were subject to a 50% reduction of the deposited amount. Therefore, actual payments ranged from $2 to $7.

Inmates were screened for their native language and reading abilities. Although this was done when determining study eligibility, the field researcher further assessed them at the time of consent. The testing battery was not available in alternative languages and it was determined that using interpreters could negatively impact the validity of the tests. However, the field researcher attempted to include inmates with borderline English or reading skills by helping them to understand difficult words. Eighteen inmates across the five study groups were specifically excluded from the study for lacking adequate language or reading abilities.

At the time of consent, the initial test battery was administered. The field researcher instructed participants to read the directions for each test. Instructions were highlighted by researchers when there was an indication on the test to respond with respect to a certain timeframe (e.g., in the past week). The field researcher administered the timed TMT and the SLUMS tests, and she assisted if they had questions, most frequently with the definition of a word. The researcher collected the test packet immediately following its completion, so it was not ever handled by security staff. At the same time, she visually scanned the packet before the inmate was returned to his cell to ensure that he had not inadvertently skipped a test or section of items.

Prior to leaving the facility, the researcher conducted a further review of inmates' responses for indications of intent to harm self or others. There were no items that assessed intent to harm others, but numerous items were identified as potential indicators of suicide ideation. Participants were notified at the time of consent that confidentiality would be broken if they responded affirmatively to any of these items. When participants endorsed a suicidal item, the field researcher notified mental health staff and the principal investigator immediately. Mental health staff then followed up with each case following notification to assess the seriousness or intent to self-harm. There were no participant suicides during the course of the study.

The field researcher distributed the PBRS to housing staff at each testing interval and collected the completed forms upon return visits to the facility. Mental health clinicians were generally notified that a BPRS was needed a couple weeks prior to the researcher testing to give them time to complete the assessment.

In the CSP groups, 18 out of 127 participants were consented and tested prior to their AS hearing. On average, CSP participants completed their initial test 7 days ($SD = 7.3$) after their AS hearing. Thirteen participants in the GP groups were selected from the diversion program (for being at risk of AS placement) and seven were tested prior to an AS hearing. On average, however, GP participants were tested 16 days ($SD = 18.9$) after their hearing or placement into the diversion program. At the time of consent and the initial testing, 43% of inmates had been confined in segregation (40% in AS groups and 3% in GP groups) for an average of 18.2 days ($SD = 18.1$). SCCF participants were tested within 13 days of placement on average ($SD = 8.9$).

Participants' data were kept in two separate databases. The eligibility database tracked the eligible pool of offenders, such as identifying information, current location, date of AS hearing or SCCF placement, expected release date, psychiatric status and clinician approval, selection into study or reason for exclusion, and date of consent or refusal. A testing schedule for study participants was incorporated into the database, which also had reporting capabilities in order to manage the project. A separate database tracked participants' responses to the standardized tests; no identifying information was included in this database other than a secure researcher-assigned identification number. Both databases were stored on a secured server with access restricted to the project researchers.

# RESULTS

DATA ANALYSIS PLAN

We first present results that speak to the quality of the research design, addressing issues concerning sampling and group representativeness; comparing those who participated fully, partially, or refused to participate; evaluating the fidelity to confinement conditions; and examining the validity of self-report responses. Following these analyses, we present results addressing the hypotheses of interest. This study had three goals and related hypotheses:

- To determine which, if any, psychological domains are affected, and in which direction, by the different prison environments; it was hypothesized that offenders in segregation would develop an array of psychological symptoms consistent with the SHU syndrome, characterized by elevations across the eight constructs.

- To assess whether offenders with mental illness decompensate differentially from those without mental illness in AS by testing the hypothesis that both groups will get worse over time but that the rate of deterioration would be greater for the mentally ill.

- To compare the impact of AS against other prison conditions by testing the hypothesis that inmates in segregation experience greater psychological deterioration over time compared to inmates in other confinement conditions.

To test the first hypothesis, one sample t-tests are completed to see if study groups are significantly different from normative data on the study measures at each time period.

To test the second hypothesis, analysis of variance statistical techniques are used to assess if the AS groups have differential change over time. Comparisons are made on mean change over time for each construct for the mentally ill and non-mentally ill groups in AS confinement conditions.

To test the third hypothesis, analysis of variance statistical methods are used to assess mean change over time and groups for each construct of interest. In particular, it is of interest to determine whether there is a significant interaction between time and group to indicate that there is differential change over time depending on condition of confinement. An analysis is completed for those with different mental illness status. That is, the mentally ill group in AS is compared to the mentally ill groups in the general prison and in the psychiatric prison, whereas the non-mentally ill in AS are compared to the non-mentally ill in the general prison population.

Mean difference statistical results for all three analyses are supplemented with effect size measures assessing proportion of variance accounted for by the time and group variables. Significant main effects will be further investigated using pairwise comparisons to explore group differences and comparisons between means at consecutive time periods to explore time effects. If there is a statistically significant interaction, simple main effects exploring change over time for each group will be completed. All statistical tests are completed at the .05 significance level.

In addition to the analysis of variance methods to explore mean change over time, regression analysis is used to predict change over time using individual variables as potential predictors. Change over time is assessed by computing an individual slope estimate for each person on each construct of interest. Predictors

include demographic variables, criminal history variables, personality variables, and confinement conditions. Within each section we describe the data analytical tools used to complete the analyses.

SAMPLING

*Group Representativeness*

Because random assignment procedures were not engaged, comparisons of offender characteristics across variables routinely collected in DCIS were conducted between eligible inmates and study participants to determine the study sample's representativeness (see Table 2). Some data are dynamic and, therefore, these data represent those that were current for each offender at the point of his eligibility for the study. The institutional behavior measures of disciplinary violations and prior AS placement were collected over their entire incarceration up to study eligibility.

Table 2. Representativeness of CSP Study Groups to Eligible Pool

| | CSP MI | | | CSP NMI | | |
|---|---|---|---|---|---|---|
| | Sample | Eligible Pool | *p* | Sample | Eligible Pool | *p* |
| **Demographics** | (*n* = 64) | (*n* = 232) | | (*n* = 63) | (*n* = 432) | |
| Mean age (*SD*) | 31.2 (9.7) | 32.1 (9.2) | n.s. | 30.0 (9.9) | 30.4 (8.5) | n.s. |
| Ethnicity/Race | | | n.s. | | | n.s. |
| White | 41% | 45% | | 19% | 27% | |
| Hispanic | 33% | 32% | | 54% | 55% | |
| African American | 19% | 17% | | 22% | 16% | |
| Other | 8% | 6% | | 5% | 2% | |
| High school achievement | | | n.s. | | | n.s. |
| HS diploma | 12% | 12% | | 10% | 13% | |
| HS equivalency | 51% | 45% | | 54% | 58% | |
| Neither | 37% | 43% | | 36% | 30% | |
| Test of Adult Basic Education | | | | | | |
| Mean reading score (*SD*) | 8.7 (3.6) | 8.0 (3.6) | n.s. | 7.8 (3.3) | 8.6 (3.6) | n.s. |
| Mean math score (*SD*) | 6.7 (2.5) | 6.3 (2.8) | n.s. | 6.7 (2.5) | 7.2 (3.0) | n.s. |
| Mean language score (*SD*) | 7.7 (4.0) | 7.1 (4.1) | n.s. | 7.2 (3.8) | 7.6 (3.9) | n.s. |
| Mean total score (*SD*) | 7.7 (3.5) | 7.1 (3.5) | n.s. | 7.4 (3.4) | 7.8 (3.5) | n.s. |
| **Sentence and Criminal History** | | | | | | |
| Mean prior incarcerations (*SD*) | .5 (0.9) | .5 (0.9) | n.s. | .4 (0.8) | .4 (0.7) | n.s. |
| Mean felony class 1 − 6 (*SD*) | 3.4 (1.1) | 3.7 (1.1) | .02 | 3.2 (1.1) | 3.5 (1.1) | n.s. |
| Mean LSI-R (*SD*) | 35.3 (7.4) | 34.8 (6.9) | n.s. | 33.1 (5.8) | 33.0 (6.6) | n.s. |
| % Sentenced for violent crime | 67% | 54% | .03 | 70% | 59% | n.s. |
| **Institutional Behavior** | | | | | | |
| Mean # disc. violations (*SD*) | 22.0 (27.5) | 20.7 (20.1) | n.s. | 13.2 (10.8) | 13.9 (14.1) | n.s. |
| % Prior AS placement | 38% | 38% | n.s. | 32% | 29% | n.s. |
| % Gang member | 30% | 33% | n.s. | 43% | 45% | n.s. |
| Need Levels (% scored 3-5) | | | | | | |
| % Academic | 42% | 45% | n.s. | 41% | 37% | n.s. |
| % Vocational | 83% | 82% | n.s. | 87% | 83% | n.s. |
| % Medical | 23% | 17% | n.s. | 10% | 9% | n.s. |
| % Substance abuse | 83% | 80% | n.s. | 71% | 81% | n.s. |
| % Sex offender | 44% | 33% | n.s. | 30% | 22% | n.s. |
| % Intellectual disability | 11% | 10% | n.s. | 3% | 3% | n.s. |
| % Anger | 69% | 61% | n.s. | 70% | 64% | n.s. |
| % Self-destruction | 34% | 25% | n.s. | 10% | 9% | n.s. |

RESULTS

Nonparametric chi-square and *t* test analyses were conducted for both sets of group comparisons. There were no differences between the CSP NMI study sample and eligible pool. The only difference for the CSP MI group was that study participants had a more serious felony offense, as measured by felony class (class 1 is most serious and class 6 is least) and percent with a violent crime, than individuals in the eligible pool.

*Refusals*

The field researcher asked inmates who refused to participate or who withdrew their consent for their reasons. Half of them gave no reason for doing so. Of those who listed their reasons, 10 inmates stated general disinterest, 6 were skeptical of the research, 4 feared retaliation from their gang or other inmates for participating, 3 listed monetary reasons, and 3 expected imminent release due to an appeal. Chi-square analyses and *t*-tests were conducted between study participants and inmates who refused to participate in the study or withdrew their consent to determine if significant differences existed (see Table 3). The only measured difference between the two groups was that participants had higher LSI-R scores, which indicates higher recidivism risk.

Table 3. Comparison of Refusals to Study Participants

| | Refusals | Participants | *p* |
|---|---|---|---|
| **Demographics** | (*n* = 55) | (*n* = 247) | |
| Mean age (*SD*) | 33.2 (10.5) | 31.7 (8.9) | n.s. |
| Ethnicity/Race | | | n.s. |
| White | 44% | 40% | |
| Hispanic | 33% | 37% | |
| African American | 20% | 18% | |
| Other | 4% | 5% | |
| High school achievement | | | n.s. |
| HS diploma | 23% | 13% | |
| HS equivalency | 42% | 56% | |
| Neither | 36% | 32% | |
| Test of Adult Basic Education | | | |
| Mean reading score (*SD*) | 8.2 (3.6) | 8.5 (3.5) | n.s. |
| Mean math score (*SD*) | 7.1 (3.1) | 6.6 (2.8) | n.s. |
| Mean language score (*SD*) | 7.9 (4.0) | 7.3 (3.9) | n.s. |
| Mean total score (*SD*) | 7.8 (3.4) | 7.5 (3.5) | n.s. |
| **Sentence and Criminal History** | | | |
| Mean prior incarcerations (*SD*) | .3 (0.6) | .5 (0.8) | n.s. |
| Mean felony class 1 – 6 (*SD*) | 3.2 (1.1) | 3.4 (1.1) | n.s. |
| Mean LSI-R (*SD*) | 31.4 (7.4) | 34.3 (7.3) | .02 |
| % Sentenced for violent crime | 70% | 60% | n.s. |
| **Institutional Behavior** | | | |
| # Disciplinary violations | 16.9 (24.0) | 15.8 (16.8) | n.s. |
| % Prior AS placement | 26% | 23% | n.s. |
| % Gang member | 22% | 28% | n.s. |
| **Need Levels (% scored 3-5)** | | | |
| % Academic | 42% | 39% | n.s. |
| % Vocational | 87% | 83% | n.s. |
| % Medical | 13% | 19% | n.s. |
| % Substance abuse | 70% | 79% | n.s. |
| % Sex offender | 35% | 31% | n.s. |
| % Intellectual disability | 15% | 9% | n.s. |
| % Anger | 72% | 60% | n.s. |
| % Self-destruction | 24% | 23% | n.s. |

*Complete and Incomplete Testers*

There were 222 participants who completed all testing sessions of the study; thus only 18% of participants did not have all self-report assessments for every time period. There were a number of reasons why participants did not complete all testing periods: some withdrew their consent, others were paroled before the end of the study, and some were not available for a specific testing interval (e.g., out to court for extended trial). There was not a significant differential incompletion rate across the five study groups, $\chi^2(4, N = 270) = 3.71$, $p = .45$, with incompletion rates of 25% for CSP MI, 16% for CSP NMI, 18% for GP NMI, 15% for GP MI, and 18% for SCCF. Comparisons were made between those who did and did not complete all assessments on demographic, background variables, and the dependent variables. To compute a score on the dependent variables, the mean across scores for available time periods was computed for the self-report composites and cognitive variables. Table 4 provides information on these comparisons. Participants who did not complete the entire study had significantly higher self-destruction needs, higher mean hostility composite scores, and lower cognitive function as demonstrated by significantly lower scores on both measures of cognitive performance (SLUMS, Trails B/A).

Table 4. Comparison of Incomplete to Complete Testers

| | Incomplete | Complete | p |
|---|---|---|---|
| **Demographics** | (n =48) | (n =222) | |
| Mean age (*SD*) | 31.4  (8.7) | 34.1 (10.6) | n.s. |
| Ethnicity/Race | | | n.s. |
|   White | 49% | 39% | |
|   Hispanic | 34% | 36% | |
|   African American | 13% | 20% | |
|   Other | 4% | 5% | |
| High school achievement | | | n.s. |
|   HS diploma | 12% | 19% | |
|   HS equivalency | 57% | 44% | |
|   Neither | 31% | 37% | |
| Test of Adult Basic Education | | | |
|   Mean reading score (*SD*) | 8.6  (3.5) | 7.7  (3.7) | n.s. |
|   Mean math score (*SD*) | 6.6  (2.8) | 7.1  (3.3) | n.s. |
|   Mean language score (*SD*) | 7.4  (3.9) | 7.5  (4.1) | n.s. |
|   Mean total score (*SD*) | 7.6  (3.5) | 7.4  (3.6) | n.s. |
| **Sentence and Criminal History** | | | |
| Mean prior incarcerations (*SD*) | 0.5  (0.8) | 0.4  (0.8) | n.s. |
| Mean felony class 1 – 6 (*SD*) | 3.5  (1.1) | 3.2  (1.2) | n.s. |
| Mean LSI-R (*SD*) | 34.0  (7.5) | 33.3  (7.5) | n.s. |
| % Sentenced for violent crime | 65% | 61% | n.s. |
| **Institutional Behavior** | | | |
| # Disciplinary violations | 15.1 (15.4) | 22.5 (28.8) | n.s. |
| % Prior AS placement | 22% | 27% | n.s. |
| % Gang member | 27% | 29% | n.s. |
| **Need Levels (% scored 3-5)** | | | |
| % Academic | 37% | 43% | n.s. |
| % Vocational | 84% | 85% | n.s. |
| % Medical | 18% | 15% | n.s. |
| % Substance abuse | 78% | 72% | n.s. |
| % Sex offender | 32% | 30% | n.s. |
| % Intellectual disability | 9% | 13% | n.s. |
| % Anger | 60% | 64% | n.s. |
| % Self-destruction | 21% | 36% | .04 |

| Composites and Cognitive Measures | Incomplete | Complete | p |
|---|---|---|---|
| Mean Anxiety (SD) | −.18   (.72) | −.08   (.80) | n.s. |
| Mean Depression-Hopelessness (SD) | −.16   (.73) | −.01   (.76) | n.s. |
| Mean Hostility-Anger Control (SD) | −.16   (.57) | .02   (.65) | .05 |
| Mean Hypersensitivity (SD) | −.13   (.68) | −.12   (.77) | n.s. |
| Mean Psychosis (SD) | −.18   (.75) | −.06   (.73) | n.s. |
| Mean Somatization (SD) | −.15   (.69) | .06   (.82) | n.s. |
| Mean Withdrawal-Alienation (SD) | −.22   (.63) | −.03   (.70) | n.s. |
| Mean SLUMS (SD) | 23.18 (3.36) | 22.02 (3.76) | .03 |
| Mean Trails (SD) | 2.82 (0.75) | 3.18 (1.12) | .01 |

The amount of complete data was higher on self-report assessments (85%) than clinician ratings (76%) and correctional staff ratings (57%). There were significant differences in groups' completion rates for clinician ratings with the MI groups having more complete data (CSP MI 70%, GP MI 76%, SCCF 75%) than the NMI groups (CSP NMI 56%, GP NMI 58%). There were also significant differences between completion rates for the correctional staff ratings with the GP groups having less complete data (GP NMI 47%, GP MI 49%) than the other three groups (CSP MI 64%, CSP NMI 75%, SCCF 61%).

*Group Fidelity to Conditions of Confinement*

Participants remained in their assigned group regardless of later placements throughout the prison system. Table 5 summarizes the locations of study participants by group and by testing interval (each interval is the period of time between two assessment periods).

One of the challenges of applied research is the researchers' lack of control over the independent variable, which in this case is the condition of confinement. Therefore, all offenders in AS were not confined in segregation for their entire period of participation in the study. Over the course of the study, 15 offenders in the CSP MI group were placed in the specialized OMI program; most completed at least three tests prior to the transfer. Some of the inmates placed in CSP were taken to county jail for a court appearance. Conversely, inmates in the GP groups may have at some time during their study participation been placed in punitive segregation or even AS. There were five GP MI and four GP NMI participants who were placed in AS during the course of their segregation; the remainder of GP inmates who had time in segregation were in punitive segregation. Seven of the nine GP inmates were reclassified to AS primarily between the third and fourth assessment periods, one was reclassified after only two tests, and one was reclassified two days prior to his final test.

Due to the contamination across groups, a separate set of analyses were conducted using only the "pure" cases, which included those who only experienced a single condition of confinement during their entire study participation. There were 26 pure cases in the CSP MI group, 39 in the CSP NMI group, 13 in the GP MI, and 11 in the GP NMI. The *p* values and partial eta-squares for the self-report composites were compared for these pure cases and the original study groups. The SCCF group was not included because those participants were expected to transfer from SCCF once stabilization occurred. A result would be considered different if both the *p* value changed significance and the effect size was not of the same magnitude. Because of the smaller sample size in the pure group analysis, it might be possible for an effect of the same magnitude to no longer be statistically significant, thus we did not count this as a different result. The same pattern of results was found for both samples (total vs. pure) except on the hypersensitivity composite. For

this variable, there was a significant time effect for the entire sample ($p = .001$, $\eta^2 = .026$) demonstrating higher scores at the first assessment compared to all other periods but no significant time effect for the pure sample ($p = .56$, $\eta^2 = .009$). As it does not appear that changing locations was a major explanation for the results, subsequent analyses included all offenders who participated in the study. (Complete statistical results are available upon request from the authors.)

Table 5. Number of Days by Location for each Group at each Testing Interval

| Group | Location | Interval 1 | | Interval 2 | | Interval 3 | | Interval 4 | | Interval 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | n | M (days) | n | M (days) | n | M (days) | n | M (days) | n | M (days) |
| CSP MI (n = 64) | CSP | 62 | 19.8 | 60 | 78.3 | 57 | 91.2 | 50 | 88.2 | 44 | 83.0 |
| | Other seg | 56 | 88.9 | 2 | 4.5 | 2 | 9.5 | 0 | -- | 2 | 10.5 |
| | SCCF | 1 | 89.0 | 0 | -- | 0 | -- | 1 | 69.0 | 1 | 71.0 |
| | GP | 4 | 43.8 | 3 | 31.0 | 7 | 63.0 | 8 | 74.6 | 15 | 75.7 |
| | Other[a] | 6 | 32.0 | 5 | 12.4 | 9 | 8.9 | 5 | 20.2 | 5 | 14.2 |
| CSP NMI (n = 63) | CSP | 59 | 14.2 | 57 | 82.7 | 56 | 92.2 | 56 | 92.7 | 54 | 91.4 |
| | Other seg | 57 | 90.3 | 2 | 3.5 | 2 | 43.0 | 0 | -- | 0 | -- |
| | SCCF | 0 | -- | 0 | -- | 0 | -- | 0 | -- | 0 | -- |
| | GP | 4 | 5.0 | 0 | -- | 0 | -- | 0 | -- | 3 | 62.3 |
| | Other[a] | 5 | 39.0 | 5 | 8.4 | 2 | 15.5 | 4 | 1.8 | 1 | 1.0 |
| GP MI (n = 33) | CSP | 0 | -- | 0 | -- | 4 | 24.3 | 4 | 80.5 | | -- |
| | Other seg | 9 | 12.4 | 7 | 23.0 | 9 | 34.2 | 6 | 30.7 | | -- |
| | SCCF | 0 | -- | 0 | -- | 0 | -- | 0 | -- | | -- |
| | GP | 32 | 87.2 | 32 | 89.9 | 27 | 84.8 | 25 | 88.8 | | -- |
| | Other[a] | 0 | -- | 3 | 1.0 | 1 | 1.0 | 1 | 11.0 | | -- |
| GP NMI (n = 43) | CSP | 0 | -- | 0 | -- | 0 | -- | 0 | -- | | -- |
| | Other seg | 10 | 39.8 | 9 | 13.3 | 5 | 39.6 | 15 | 37.9 | | -- |
| | SCCF | 0 | -- | 0 | -- | 0 | -- | 1 | 46.0 | | -- |
| | GP | 41 | 79.2 | 41 | 89.1 | 39 | 85.3 | 35 | 83.7 | | -- |
| | Other[a] | 2 | 23.5 | 4 | 11.5 | 2 | 12.5 | 2 | 2.5 | | -- |
| SCCF (n = 67) | CSP | 0 | -- | 0 | -- | 0 | -- | 1 | 53.0 | | -- |
| | Other seg | 1 | 37.0 | 4 | 7.5 | 4 | 10.3 | 8 | 24.0 | | -- |
| | SCCF | 64 | 77.3 | 54 | 79.1 | 40 | 92.4 | 34 | 80.6 | | -- |
| | GP | 7 | 26.6 | 21 | 66.2 | 24 | 77.3 | 29 | 75.6 | | -- |
| | Other[a] | 5 | 12.0 | 6 | 32.5 | 3 | 39.7 | 6 | 9.7 | | -- |

Note. Individuals may have multiple locations within a study period, so the n's within a group and interval can be larger than the group sample size.
[a] Other included out to court (county jail), in custody of US Marshall, hospital or external medical, community placement, and time in transport.

## VALIDITY OF RESPONSES

Most of the assessments used in this study were self-report measures, which always carry the risk of not being completed accurately by the participant. Because of this risk, several measures were collected to assess the validity of individual responses.

During data collection and data entry, responses were scanned for abnormal pattern of responses (e.g., the same response selected for all items). Each person's pattern of response was coded as potentially questionable or not. If the pattern was noticed during data collection, then the participant was questioned about his response pattern and asked to redo the test if he admitted to not being truthful. If the participant said he was being honest and the researcher still did not believe him, she marked the test as questionable. Overall, 12% of participants had a questionable response pattern on any measure at any time period (see Table 6);

however, there were no differences between the number of questionable response patterns across groups, $\chi^2(4, N = 270) = 3.87$, $p = .42$.

Table 6. Percentage of Participants with Questionable Response Patterns

|        | CSP MI | CSP NMI | GP MI | GP NMI | SCCF | All |
|--------|--------|---------|-------|--------|------|-----|
| Time 1 | 5%     | 0%      | 6%    | 0%     | 2%   | 2%  |
| Time 2 | 6%     | 7%      | 0%    | 0%     | 3%   | 4%  |
| Time 3 | 3%     | 5%      | 3%    | 5%     | 0%   | 3%  |
| Time 4 | 5%     | 5%      | 0%    | 3%     | 0%   | 3%  |
| Time 5 | 4%     | 7%      | 0%    | 10%    | 2%   | 5%  |
| Time 6 | 8%     | 7%      | NA    | NA     | NA   | 8%  |

Potential malingering was assessed using the SIMS, a 75-item screening measure for detecting feigned symptoms of psychopathology and cognitive functioning in clinical and forensic settings. A total score and scores on five subscales (i.e., Psychosis, Neurological Impairment, Amnestic Disorders, Low Intelligence, Affective Disorders) were obtained. The SIMS assesses whether respondents endorse atypical, improbable, inconsistent, or illogical symptoms. Scores above the cutoff suggest malingering but may also suggest genuine psychopathology. Eighty-five percent of participants had at least one elevated score across the different subscales of the SIMS (see Table 7). The percentage of participants with elevated scores was significantly different across groups, $\chi^2(4, N = 270) = 56.82$, $p < .001$, with the MI groups (CSP MI 92%, SCCF 96%, GP MI 97%) demonstrating more elevated scores than the NMI groups and with the CSP NMI group (86%) showing more elevations than the GP NMI group (49%). We also considered using a rule of removing participants if they were elevated on multiple scales; however, multiple elevations within a time period were still high among the mentally ill groups (47% to 62%). Because elevated scores may actually reflect psychopathology, we did not eliminate anyone from the study based on this measure. The SIMS was administered to detect potential malingering and was not intended as an outcome measure, thus there are no further analyses with this measure (Appendix B provides summary statistics for the sample).

We further examined response patterns within the main constructs of interest. Because multiple measures were used for each construct, we computed variability across standardized measures of the same construct in order to see if a person was responding in an inconsistent fashion (see Table 8). For example, inconsistent responses within the depression construct might entail a high score on the BHS but a low score on the BSI Depression scale, where one might expect the pattern of scores to be similar. If the variability score for a participant was greater than two standard deviations from the mean on any composite, responses were examined. Approximately 17% of participants had a value greater than this cutoff. Different rates of inconsistent responses were found across the groups, $\chi^2(4, N = 270) = 10.09$, $p = .04$, with the lowest incidence of inconsistency for GP MI (9%), CSP NMI (10%), and GP NMI (12%) groups, and higher incidences for CSP MI (20%) and SCCF (27%) groups.

To explore if results were influenced by participants with inconsistent or questionable responses, three sets of analyses comparing group differences on composite variables were completed using (1) all participants, (2) those who did not have a questionable response, and (3) those who did not have inconsistent responses. Removal of persons with questionable or inconsistent responses did not change the overall effects and results, so all participants are used in the analyses for this report (full statistical results are available from the authors upon request).