**Exhibit 12**

# *Coleman v. Brown*

Case No. 90-cv-00520 LKK JFM P (Eastern District of California)

Response to Dr. Raymond F. Patterson's "Report on Suicides Completed in the California Department of Corrections and Rehabilitation in January 1, 2012 – June 30, 2012"

By

## Joel A. Dvoskin, Ph.D., A.B.P.P.

## **Introduction**

As was the case in my last response to Dr. Patterson's report, I found much with which to agree in this latest report. For example, I agree with the recommendation to reduce or remove any punitive aspects of suicide watch. I also agree with the observation that welfare checks must include some observation that the inmate is alive, such as observation of the subtle movement associated with respiration. Absent such observation of signs of life, the reason for these checks would be unclear to me. On the other hand, inmates often complain about officers' use of flashlights at night to detect signs of life, complaining that the light wakes them up for no good reason.

In general, Dr. Patterson's report mirrors the suicide reviews conducted at the facility and headquarters levels, at least as it relates to recommendations for improvement in suicide prevention. My main disagreement with Dr. Patterson's report is the implied presumption that failures to follow policy and procedure are evidence of a lack of commitment to suicide prevention. In my experience, there are almost always lessons to be learned and room for improvement when a suicide is retrospectively analyzed, and such analysis is a useful means of continuous quality improvement. However, the existence of such room for improvement does not imply a lack of commitment or effort to improve the systems' ability to prevent suicides.

It is also important to understand the speculative nature of findings of preventability when it comes to prison suicide. In a number of cases below, I agreed with recommendations that the inmate should likely have been treated differently (e.g., by admission to the EOP level of care.) Had such a change been implemented, it is possible but not certain that the inmate might have learned distress tolerance or other skills that might have prevented them from taking their own lives.

Dr. Patterson's overall findings, which are quite critical of CDCR, appeared to be based largely on the suicide rate itself, which admittedly remains higher than the reported national average. His case-specific reports have provided examples where policy was not adequately followed, for example regarding five-day follow-ups and custody adherence to welfare checks. However, I do not agree with Dr. Patterson's conclusions that these specific failures to adhere to the requirements of the Program Guide represent systemic failures or an inattention to these issues. To the contrary, as the Special Master is well aware, each of these practices is carefully monitored by CDCR and reported to the Special Master on a regular basis.

My most important recommendation regarding suicide prevention is to improve the quality of suicide risk assessments, a point on which Dr. Patterson and I obviously agree. The ongoing training and mentoring program promises to demonstrate improvement in this regard, but at the time of our facility visits, there remained room for improvement.

For example, on page 9 of his report, Dr. Patterson criticizes CDCR for its failure to refer patients to higher levels of care. However, it is my understanding that the Special Master's own review, through the "sustainable process," revealed very few cases of inmates who appeared to need a higher level of care within CDCR. Further, in our own reviews of randomly selected treatment team meetings, we found that teams were diligent about discussing possible referral to DSH when certain criteria (e.g., multiple admissions to crisis beds) were met.

Dr. Patterson also criticizes CDCR for its failure to implement appropriate emergency responses to suicides. Again, I agree with his criticisms of several specific cases, however, CDCR and the federal Receiver have created Emergency Medical Response Review Committees, which are tasked with continuous quality improvement of these processes. In other words, I agree with Dr. Patterson that there is room for continued improvement; I do not agree with him that this represents a failure of CDCR and the Receiver to attend to these important issues.

Dr. Patterson criticized Dr. Belavich for citing the reduction of suicides in segregation, stating that Dr. Belavich "implied that the problem of suicides in administrative segregation has been solved." I do not understand Dr. Patterson's inference. I am well aware that Dr. Belavich continues to believe that the number of suicides in segregation is of great concern, and he is working hard to reduce their frequency even further. To suggest that acknowledging improvement means that the "problem is solved" is an unfair inference.

In a number of case reviews Dr. Patterson's report criticizes CDCR for a lack of continuity of care, because an inmate saw multiple primary clinicians or psychiatrists. While I agree that such continuity is desirable, this is predictable problem in correctional systems, where recruitment and retention of staff are often problematic.

In Dr. Patterson's final paragraph, he suggests that further reports of this kind would be a "waste of time and effort." I agree. As I have suggested previously, Dr. Patterson and his colleagues' vast experience would be much more useful to CDCR and the Receiver in "real time." Dr. Patterson's frustration with the continuing high rate of suicides is understandable, and is shared by the leadership of CDCR, which has worked diligently to implement his recommendations, despite the fact that tragic exceptions have occurred.

## Case Specific Reviews

There were 15 suicides within CDC are facilities from January 2012 to June 30, 2012. There were two suicides each at San Quentin (SQ), Pleasant Valley (PVSP), RJ Donovan (RJD), and Folsom (FSP), and one suicide each at Centinela, and CCI, Wasco, Duell VI, Mule Creek, Salinas Valley, and Avenal.

2

## A. Died January 1, 2012 at Centinela SP (Hanging)

Dr. Scheidegger's summary of the suicide review follows:

> "36 year-old Hispanic first term inmate had served 14 ½ years of 19 years to life sentence for the murder of a rival gang member's father. Prior to incarceration he held unskilled jobs and primarily depended upon his gang for financial support through selling illegal drugs. He had no involvement with MHSDS and no significant medical issues. He had no RVRs since 2006. On the day of his death he and his cellmate went to yard at 0830, but he left yard returning to his cell earlier then usual. When his cellmate returned, he found inmate Ramirez hanging in their cell. One recommendation was generated.
>
> **Recommendation 1:** Documentation of the emergency medical response, as noted above, contained multiple inconsistencies in recording of the time various actions were taken."

I agree with Dr. Bramble's conclusion that this inmate gave no indication of any intention to commit suicide. He had no significant medical or mental health history, and had made no suicidal threats of any kind.

Dr. Bramble noted problems regarding documentation of timelines regarding emergency medical response by custody and medical staff. As I have noted previously, in the midst of a suicidal emergency, it is often difficult for staff to document the exact time that events have taken place. With that being said, one possible suggestion for CDCR is to task someone who is not directly involved in the response (e.g., a control room officer) with documenting timelines more accurately. This would allow for more accurate and instructive review of the timeliness of emergency responses. Otherwise, there does not appear to be any significant error on CDCR that led to this inmate's suicide.

Dr. Bramble's review contains a great deal of speculation especially about personality dynamics. The facts simply suggest that this inmate was violent and disobedient as a young inmate and that these behaviors abated as the years of his incarceration passed. This is a very common pattern among inmates and does not, in my opinion, suggest depression or in any way suggest suicidality.

I also disagree with Dr. Bramble's inference that this inmate's failure to attend his classification committee meetings was indicative of isolation, withdrawal, psychological pain, or an unwillingness to reach out for help. The most common reasons inmates decline to attend ICC meetings is that they do not believe it will matter, because the outcome is clear based on objective factors.

The timeline in Dr. Bramble's report notes that the emergency transport vehicle was present, but that "the rear doors of the vehicle were jammed and could not be

3

opened." If the timelines are accurate, this appears to have resulted in a 3-minute delay in transporting the inmate to the prison hospital. I note, however, that CPR continued the entire time, suggesting that this delay likely had no effect on the inmate's death. However, I believe that Dr. Bramble should have included a recommendation regarding regulator maintenance of emergency vehicles.

## B. Died May 18, 2012 at CCI (Hanging)

Dr. Eargle's summary of the suicide review follows:

> "This 31-year-old Caucasian inmate was sentenced to 59+ years for two counts of attempted murder with a firearm in April 2004. He abused methamphetamine, and was using (methamphetamine) the day of his crime. Due to serious behavior problems in prison, including attempted murder of a cellmate, he was housed in SHU for several years with an MERD (release date from SHU) of July 15, 2012. He was a validated associate of the Aryan Brotherhood. He was not in the MHSDS. He was found hanging in the SHU cell. A letter he left for his mother indicated he was struggling with depressive thoughts and regrets, and made a clear choice to end his life. Three recommendations were developed from this review.
>
> **Recommendation 1:** Chest compression not initiated until I/M arrived at Facility B medical clinic. Also, cervical stabilization was not used during cut down.
>
> **Recommendation 2:** No Medical Staff was available to handle the emergency. Staff had to come from Facilities (i.e., yards) A & C, get in cars, park, and enter building. Left Facilities A & C short staffed.
>
> **Recommendation 3:** Less than mandated yard time offered to SHU inmate."

The most troubling aspect of the suicide review is that a review of the SHU logs suggested that this inmate was allegedly offered yard only 14 times in 8 months. If this allegation is true, it would represent a very serious violation of Title 15 requirements. (It is my understanding, with some exceptions, that Title 15 would require SHU inmates to be offered one hour of yard per day, five days per week.) However, I frankly doubt its accuracy, for several reasons. Most importantly, many inmates in SHU are often litigious, and if such an extreme violation of Title 15 was occurring over many months, it would have very likely resulted in grievances or litigation. Nevertheless, it is a very serious allegation that should have been further investigated by the suicide reviewer and the facility. If corroborated, it should have resulted in immediate corrective action.

Even if the allegations about yard time are true, it is unclear whether this issue had any direct or indirect relationship to this inmate's suicide, which appeared to be the result of shame or regret regarding his crime and incarceration, coupled with

depression for which he did not request treatment. I note that he had four mental health contacts, none of which were requested by the inmate. On one occasion, he was mandatorily evaluated by mental health due to his participation in a hunger strike. On three occasions, he was mandatorily evaluated by mental health due to a refusal to attend medical appointments. Importantly, the last such referral resulted in an assessment that was completed five days before his suicide.

The reviewer also noted that chest compressions were not initiated until the inmate arrived at Facility B medical clinic. In addition, there was no medical staff present in Facility B to respond to the emergency. As a result, medical staff came from Facilities A & C, which resulted in a reported delay of nine minutes, assuming that reported times are accurate. This issue should be referred to the Office of the Federal Receiver to determine appropriate expectations for medical response times and whether health care staffing was adequate to meet them.

It is also not clear to me why chest compressions were initiated by medical staff 9 minutes after the inmate was discovered hanging, as opposed to being initiated by correctional officers who are trained in CPR. (Again, this assumes reported times are accurate.) However, the condition of the inmate's body -- "described as cold and dusky" -- suggests that these delays did not contribute to the inmate's death. Nevertheless, this reinforces my previous recommendation to review and drill emergency response procedures, including medical, mental health, and custody.

### C. Died March 20, 2012 at Salinas Valley SP (Hanging)

Dr. Scheidegger's summary of the suicide review:

> "This 34-year-old multi-term Caucasian inmate has served seven years of his current commitment when he was found hanging in his ASU cell. He was a gang dropout and had participated in the MHSDS since 2002, usually in CCCMS. He had a history of serious (suicide) attempts in and out of custody. On March 14, the inmate became suicidal and his cellmate reported this to custody. The inmate was evaluated at the CTC and placed on five-day follow-up from March 15-19. Precipitating events related to loss of support from his wife and son. He left a suicide note. One recommendation for quality improvement was made.
>
> **Recommendation 1:** Lack of follow up on five-day follow-up procedures (which noted increasing agitation, sadness, and tearfulness), which increased mental health interventions."

This inmate had accumulated more then 25 RVRs during his four-year prison term, most recently for battery on an inmate. This offense apparently occurred in a sensitive needs yard (SNY) on February 22, 2012, and was reportedly likely to result in a SHU term. Six days before his death, the inmate reportedly attempted suicide by hanging himself with a bed sheet. The inmate was quoted as blaming his cellmate for interfering with his attempt to kill himself. Unfortunately, the suicide

case review is not clear regarding the specific events of this reported suicide attempt. Nevertheless, an officer reportedly "became aware" that the inmate was suicidal, and appropriately referred him to mental health. The inmate's primary clinician evaluated the inmate and quoted him as saying, "I was gone, I don't know why [cellie] saved me. He didn't have the right to save me. I'm just done. I was gone. He stole that from me." Appropriately, the primary clinician referred the inmate for admission to a mental health crisis bed.

At the mental health crisis unit, a psychologist and psychiatrist, who were apparently unaware of the statements that had been made to the primary clinician several hours before, evaluated the inmate. They did not admit this inmate to a crisis bed. Although I believe it is likely, I cannot say for certain whether the additional information would have changed the decision regarding a crisis bed admission; however, it is absolutely clear that they should have had this information in order to complete their suicide risk evaluation.

Five-day follow-ups were completed by an LPT and two psychologists, including the inmate's primary clinician. During these visits, the inmate was noted to have increased sadness, crying, and anxiety. The inmate reportedly stated that he "was exercising, reading, writing letters, and using mental health services." It is not clear what mental health services the inmate was referring to. In my opinion, these observations should have resulted, at the very least, in an assessment for possible re-admission to a crisis bed, including a suicide risk evaluation.

I also note that this inmate was being treated for Bipolar Disorder, including an extended-release antipsychotic medication (Invega). In my opinion, considering the combination of this inmate's diagnosis, his recent apparent suicidal crisis, and his current expressions of psychological distress, he should have also been considered for re-classification to EOP status.

In my opinion, this inmate was not properly evaluated for admission to a crisis bed on at least two occasions. In the first instance, the evaluators apparently did not have all of the information that should have been available, and in the second instance, no referral was made. If such an evaluation had taken place, I believe it was likely that the inmate would have been admitted to a crisis bed, which would have prevented him from killing himself at that time. He also should have been referred to an EOP level of care once the suicidal crisis had resolved itself, which would likely have improved his psychiatric condition.

### D. Died April 25, 2012 at San Quentin SP (Hanging)

Dr. Scheidegger's summary of the suicide review follows:

"This 39-year-old Haitian first-term (and first offense) inmate had served eight years of a 16-year sentence for murdering his ex-girlfriend. He seemed to have adjusted to his incarceration, and spent his time furthering his education. He

functioned well in the general population, had only one RVR for defending himself in a cell fight, and was not in the MHSDS. Additionally, he had very good support, many visitors, and over $500 in his trust account. He gave no indication of his planned suicide, which he accomplished by hanging from the top bunk while his cellmate was at work. No formal recommendation emerged; although it was suggested that scheduling morning and afternoon rounds at random times be considered."

This case resulted in no recommendations or negative findings by the reviewer, and I agree. The inmate gave no warning of any kind to staff, although he did make ambiguous statements to other inmates that might have raised a question had they been reported to staff. Most importantly, the inmate spoke to his public defender two weeks before his death, and the inmate was described as "upbeat and optimistic...." The attorney was reportedly "shocked" to learn of the inmate's suicide. There were also no issues regarding the emergency response, which was reportedly good.

The evaluator raised one issue of concern, which was the reported presence of *rigor mortis* in the inmate's body when he was found, and that his body temperature was reportedly 97.5. (Although I am not a physician, I question the accuracy of these two apparently conflicting reports.) The reviewer hypothesized that additional "rounds" "could serve as a barrier in the future for inmates who are considering suicide." I disagree. The purpose of counts is to ensure that no inmates have escaped or are out of place; standing counts serve the added purpose of assessing the basic welfare of each inmate. I am aware of no duty to perform any sort of suicide watch on general population inmates who have given no reason to believe that they are suicidal or in need of mental health attention. Finally, requiring additional rounds would create an additional burden and expense for the CDCR, with little likelihood that a staff member would happen upon an inmate in the act of attempting suicide.

## E. Died May 12, 2012 at Wasco SP RC (Hanging)

Dr. Scheidegger's summary of the suicide review follows:

"This multi-term 27-year old Caucasian inmate had returned to prison just three months before he was found hanging in his ASU cell. On April 5, 2012, he cut his wrists and committed battery on an officer escorting him for treatment. He was placed into ASU and got into a fight with his cellmate. On April 11, 2012, he was entered into MHSDS (CCCMS) for the first time. There were conflicting reports from custody staff, LPTs, and Psychologists on IPs (i.e., the inmate's) functioning based on direct observation and IP's self-report. At times he presented with significant mental health impairments, including command auditory hallucinations. At other times, he presented as higher functioning and reported no mental health symptoms. He also inquired of his ASU (primary clinician) about using mental illness as a defense and requested assistance in forming such a defense. Despite his CCCMS level of care placement, he was seen frequently by

7

mental health clinicians in the weeks preceding his death. Four recommendations were generated by this review:

Recommendation 1: Utilize appropriate follow-up questions during clinical interview process and thoroughly document this and other interventions utilized.

Recommendation 2: Review the process for receiving, completing, and tracking mental health referrals from custody staff.

Recommendation 3: Be sure necessary clinical documentation (ASU pre-placement chrono) is completed and filed appropriately (a policy and procedural recommendation, not a clinical issue).

Recommendation 4: Use security caulking in ASU cells around light fixtures to reduce attachment sites and/or replace all ASU light fixtures if/when funds become available.

In this case, the inmate cut his wrists on April 5, 2012. He also assaulted the officer that was escorting him for medical treatment. There was an emergency referral to mental health. He was evaluated and an SRE completed. The clinician found the inmate's suicide risk to be moderate, both chronic and acute. She also recommended that he be evaluated for placement in the MH service delivery system. The inmate was then evaluated by a different clinician, to whom he reported that he was hearing voices telling him to do "sexual acts on his cellmate." He denied suicidality, but stated that he had to get away from his cellmate. He described his mood as anxious and paranoid. The psychiatrist concluded that the inmate had self-reported auditory hallucinations and some paranoia but was not suicidal. The psychiatrist prescribed Risperidone and Vistaril. The psychiatrist noted that the inmate was awaiting transfer to the ASU, apparently because of his assault on the officer.

The inmate was noted to have asked his primary clinician about using his mental illness as a defense, that he asked about the insanity defense, and requested assistance in forming a defense. This raised an understandable question about the legitimacy of the inmate's claimed psychotic symptoms.

The inmate also reported several previous suicide attempts, and that he received treatment for depression in the county jail. He "appeared compelled to act out sexually or urinate on someone," and reported auditory hallucinations. He also reported voices telling him to kill himself by hanging and to urinate on prisoners and officers, and to do sexual things to get more time. He reported banging his head "recently" out of frustration.

By this time, in my opinion, this inmate should have been immediately evaluated for possible placement at the EOP level of care. If he was not determined to need this

8

level of care (e.g., if he had been determined to be malingering) then the record should include an explanation of the results of the evaluation.

However, during the period that he was being treated at the CCCMS level of care, the inmate was apparently being seen on a weekly basis by various clinicians. Further, there were conflicting reports from LPT's, custody staff, and clinical staff that raise questions about the legitimacy of this inmate's reported symptoms.

Obviously, in retrospect, the inmate's death suggests that his psychological distress was legitimate. However, it is less clear that that would have been my conclusion at the time that these decisions were being made. Nevertheless, this inmate's clinical status should have been clarified in a more timely way, with clear documentation to explain the logic of clinical decisions. Finally, I note that this inmate was being treated with antipsychotic medications, which suggests that it least one psychiatrist believed his symptoms to be legitimate. If this is the case, considering the severity of the self-reported symptoms, it strongly argues for a quick resolution of his clinical status.

### F. Died May 12, 2012 at Deuel Voc. Inst. (Hanging)

"This 24-year-old Caucasian first-term inmate spent just three weeks in prison before hanging himself. On December 2009 he was arrested for multiple counts of child molestation, and after a 28-month investigation and trial, received three consecutive sentences totaling 49 years to life. The inmate tearfully begged the judge for a death penalty, saying he could not live in prison. Upon arrival he was housed in OHU and the CMF MHCB. Following discharge he was housed in ASU for (his own) safety with a cellmate, receiving five-day follow-up and all required checks. On Thursday, May 10, 2012 he was moved to Special Program Unit (a Reception Center program for inmates with possible enemy concerns), but no cellmate was available. He hung himself Saturday morning during breakfast. Two recommendations emerged.

Recommendation 1: Improve documentation as discrepant reporting times in the Incident Report (0830) and unit logbook (0842) were noted.

Recommendation 2: Develop a contingency plan to ensure the five-day post MHCB discharge follow-up is completed by a Primary Clinician."

This inmate was appropriately transferred to an OHU and a mental health crisis bed, where he informed clinical staff that he had asked the judge for a death sentence. Despite the absence of a suicidal plan, the inmate's consistent statements that he did not want to live in the prison were appropriately treated as potentially suicidal. An SRE was completed on April 28, 2012, and noted minimization of his crime, outrage at his sentence, and "his strong feeling that it would be better to die than face fifty years of torture." At that time, he was retained in the crisis bed. Two days later, on April 30, 2012, the inmate was reported to be nonpsychotic, fully oriented, verbal,

and seemingly insightful. According to the clinician, "While evident that he was still grieving his loss of freedom, it appeared that the inmate would be able to make a successful adjustment to prison."

After discharge from the MHCB, the inmate was evaluated at an OHU at Deuel VI, where he was again given a suicide risk assessment. He told staff, "I feel better, it helped to go to a crisis; I don't feel like hurting myself." He was assigned to CCCMS level of care and sent to administrative segregation housing (for his own protection) with a five-day follow-up order in place.

On May 8, 2012, four days before his death, the inmate had a confidential interview with his primary clinician and a psychiatrist and attended his treatment team meeting. At that time, he stated he was doing better on Zoloft and denied any suicidal ideation.

The suicide reviewer noted two issues of concern. The first involved discrepant reports of time, a subject that has been previously discussed in my prior reports. Time estimates regarding emergencies are often inaccurate, and it does not appear that the reported times in this case are accurate. The second recommendation was that the last of the five-day follow-ups was not completed by the primary clinician. However, the inmate was seen by his primary clinician four days before his death; thus, this departure from the program guide did not appear to make any contribution to his death.

This inmate appears in retrospect to have posed a chronically high risk of suicide that was appropriately responded to by mental health staff. The judgment calls that they reportedly made appear to me to have been reasonable, based on what was known at the time they made them.
I do not exactly understand Dr. Patterson's report's recommendations regarding discharge criteria from a crisis bed as it refers to this case. This inmate was assessed as having a moderately high level of chronic risk. It was difficult to understand if Dr. Patterson's report was suggesting that inmates with chronically moderate risk should be kept on suicide watch, and for how long. It appears that the mental health staff took the inmate's risk seriously, and discharged him when he no longer appeared to present an acute risk of suicide. On the other hand, one might question the decision to release him back to CCCMS status (as opposed to EOP status) in light of his moderate chronic risk, and to ensure that treatment plans of such inmates include suicide preventive interventions.

## G. Died May 15, 2012 at Pleasant Valley SP (Hanging)

Dr. Eargle's summary of the suicide review follows:

"This 38-year-old Hispanic inmate had served 13 years of the 34 years to life sentence for second-degree murder of two victims in a hit and run vehicle accident. In 2003 he renounced affiliation with the Northern Structure prison

10

gang and had resided on an SNY since that time. Although he was never in MHSDS, he had self-referred for feelings of anxiety in both January and April, 2012. On the morning of his death he was involved in a fight with his cellmate, following which he was referred for a mental health contact. There is some suspicion that the inmate had been using drugs. Cellmate reported change in behavior in week preceding death. That afternoon another inmate returning to the housing unit found the inmate hanged in the cell. Two recommendations resulted from this review.

Recommendation 1: Lack of clinical follow-up. On two occasions, I/M was to be referred to IDTT but this did not occur.

Recommendation 2: Inadequate review of clinical documents: clinician did not review first contact at time of second contact, resulting in inconsistent dx (i.e., Generalized Anxiety Disorder v. no diagnosis.) Clinical contact on day of death did not have file.

This inmate referred himself for mental health treatment for apparently situational anxiety on two occasions, in January and April of 2012. In both instances, he was seen by a psychologist, and was supposed to be referred to an IDTT for consideration of entry into the MHSDS. For unknown reasons, neither IDTT referral and meeting took place. One possible reason was the inmate's reluctance to take psychotropic medication, but this is unclear, and would have been inappropriate.

Nevertheless, the inmate was seen by a MH social worker on May 15, 2012, the day of his death, pursuant to a fight with his cellmate. Apparently unbeknownst to staff, his cellmate had observed some significant changes in the inmate's behavior during the week preceding his death, including reports of seeing non-existent mice, faces, and people in his cell. The sudden change in behavior raises a question regarding the possible use of illicit drugs, and there was a rumor (conveyed to the reviewer) that the inmate was taking drugs and had a "drug debt" of $27.

The social worker who evaluated this inmate on the day of his death had no reason to make an emergency change in the inmate's status, and there was no reason to believe that he might be suicidal. However, the failure to refer him for recommended consideration of entry into the MHSDS was a serious error. Whether it would have prevented his eventual suicide is not known.

### H. Died May 16, 2012 at Pleasant Valley SP (Exsanguination)

Dr. Eargle's summary of the suicide review follows:

"This 40-year-old Mexican national entered prison for the first time on December 1, 2011, with a sentence of 22 years for two counts of sexually molesting his girlfriend's daughter. Subsequent to this, he was accused of molesting his twin sons. He programmed quietly in prison and was not in

11

MHSDS. A suicide note and letters stated the accusations of his sons were untrue, and he just could not carry on. He was found lying on his upper bunk in a pool of blood in what was initially thought to be a homicide, until the Sheriff's investigator found a suicide note and determined that the laceration of his jugular vein was self-inflicted. One recommendation was generated from this review.

Recommendation 1: update scoring procedures for 31-item screen."

This inmate was housed at the San Quentin Reception Center for six months. He reported that he had been involuntarily hospitalized in 2001. He reportedly requested placement in a sensitive needs yard. However, for unknown reasons, he appears to have been placed in general population at Pleasant Valley. It is important to note that there is no reason to believe that this inmate's suicide had anything to do with the fact that he was not in a sensitive needs yard. Letters and a suicide note clearly indicated that his suicide was predominantly a response to accusations that he had molested his sons.

Due to the nature of his death by exsanguination, there was initially some suspicion that this death was a homicide, but discovery of the suicide note and letters preceding his death led to a convincing conclusion that this inmate died by suicide.

The emergency response appears to have been timely and competent. The condition of the body made is virtually immediately clear that the inmate had been dead for some time.

Dr. Patterson's report points out that the nurse's decision to forego CPR with an inmate in apparent rigor mortis conflicts with the Program Guide. However, it appears to comport with the Inmate Medical Services Policies and Procedures Manual of the federal Receiver. These policies appear to conflict on this point, and should be reconciled.

Dr. Patterson's report also noted that the inmate was not referred o mental health after his initial screening, apparently because of the scoring algorithm. However, Dr. Patterson's report stresses the importance of reminding clinicians that any inmate can be referred based on clinical judgment, their score notwithstanding. I agree. It is my understanding that a memo to this effect was sent out some time ago.

## I. Died May 21, 2012 at Folsom State Prison (Hanging)

Dr. Scheidegger's summary of suicide review follows:

"This 49-year old Caucasian inmate had completed 23 years of 32-years to life sentence for two counts of second-degree murder. He was a "programming" general population inmate who was never involved with MHSDS. He had several non-life threatening medical issues, most notably long-standing shoulder pain.

On Friday, May 18, 2012, he re-injured the shoulder at work and was seen at the health clinic. The following Monday morning, the inmate was found hanging in his cell. He left a suicide note in which he claimed the primary care physician had told him the only way he would be free of pain would be to kill himself (unsubstantiated). The motive for the suicide and the note was not apparent. No recommendations were generated."

This inmate had served 23 of 32 years in prison, and was described as an "influential skinhead, " and had been accused of inciting a race riot in 2008. He did not, however, receive disciplinary action. However, despite his reported gang activities, he was also described as a "programming inmate."

Despite being in "basically good health," this inmate had apparently severe pain in his shoulder and lower back. He was also positive for Hepatitis C, Valley Fever, and an enlarged prostate. In a suicide note, he alleged that the primary care physician had told him that the only way he would be free of pain would be to kill himself. However, when interviewed, the physician stated that he informed the inmate "that he would most likely have some shoulder discomfort/pain for the rest of his life, but never implied or stated that the only way to stop the pain was to kill himself." Because this was a private conversation, there is no way for me to confirm or belie this accusation. Otherwise, there does not appear to be any failure on the part of mental health or custody staff that contributed to this inmate's suicide.

Dr. Patterson's report points out that there was a 5-minute delay in cutting the ligature from the inmate's neck. It is unclear whether the ligature was loosened prior to the time that it was cut from the inmate's neck. Certainly, if it is true that the ligature remained taut for 5 minutes, it would have constituted a serious error, and one that would have likely contributed to the inmate's death. If, on the other hand, the ligature was loosened but not entirely removed, then it would not likely have contributed to the inmate's death.

## J. Died May 27, 2012 at San Quentin (Hanging)

Dr. Scheidegger's summary of suicide review follows:

"After 13 years of incarceration following convictions for multiple violent sexual crimes against children and the murder of a child, the 68-year-old Caucasian inmate was found hanging in his solitary condemned row cell. He had been followed at the CCCMS level of care. His medical issues were well treated and monitored. No specific precipitating event was discovered, and there were no recommendations generated by this review."

This inmate was on condemned row at the CCCMS level of care, apparently because he was experiencing psychological distress during his capital trial, which perhaps continued due to his ongoing status as a condemned inmate. There were no known precipitating events, and there is no evidence or suggestion that the inmate

13

communicated his suicidal intentions to anyone or that he failed to receive timely service for any known mental health need.

Due to recent television publicity, the inmate was reportedly being harassed by other inmates. Staff were aware of this harassment by the inmate's peers.

Interestingly this inmate was seen on May 25, 2012 and described as upbeat, friendly, polite, with a euthymic mood. During this visit, he was also given a suicide risk evaluation, which was apparently routinely required for certain condemned inmates. The inmate also informed the clinician that a problematic correctional officer was no longer on the unit, which he regarded as a good thing.

Dr. Patterson's report raises the possibility that a thorough cell search might have revealed, through examination of the content of the inmate's letters that he had "given up." However, it is not my understanding that staff in any correctional institution routinely read through inmate's private and personal correspondence, absent some legitimate reason to do so.

### K. Died May 30, 2012 at Folsom State Prison (Hanging)

Dr. Scheidegger's summary of suicide review follows:

> "This 35-year-old Caucasian inmate was found hanging at 2127 hours in his solely occupied ASU cell. The inmate had an extensive and violent criminal history. He entered CDCR in 2005 with as 11-year term for assault with a deadly weapon, was sentenced to an additional 8-year term for battery on an inmate in 2009, and trial was pending for a recent charge of attempted murder on an inmate, which would become his third strike. He received services at the CCCMS level of care on and off for several years, for depression and anxiety. On May 15, 2012, he was informed he would be temporarily transferred from CSP-SAC to FSP due to ASU overcrowding. This inmate did not want to go to FSP, became suicidal, and was briefly placed on MHCB on suicide precautions. He was released the following day with a 5-day follow-up, and immediately transferred to FSP. At FSP, his pain medications were delivered inconsistently and his methadone was discontinued on the day of his death. Two recommendations emerged.
>
> Recommendation 1: The IP's bridging order for opiate medications was allowed to expire without interviewing the inmate and was discontinued.
>
> Recommendation 2: Stagger the times welfare checks are completed so that they occur at random times and are therefore unpredictable for inmates."

The emergency response to this suicide was reportedly quite fast.

14

The inmate had been assigned to ASU for attempted murder of an inmate, and had a long history of treatment for pain in his back and legs, for which he revived methadone. The inmate was scheduled to transfer from ASU at SAC to ASU at FSP, and reported that he was suicidal in order to avoid an unwanted transfer. He was briefly housed at alternative housing on May 15, 2012, referred for transfer to the mental health crisis bed unit, and evaluated for suicide risk. The assessor rated his chronic risk as moderate and his acute risk as low. The inmate acknowledged that he had claimed suicidality to avoid an unwanted transfer. Nevertheless, five-day follow-up was initiated and the inmate was successfully transferred to Folsom.

At approximately the same time, issues arose regarding medical treatment of the inmate's reported pain. His prescription for methadone was reportedly discontinued, renewed, and again discontinued, apparently because he was hoarding and/or diverting the medication to other inmates.

On June 1, 2012 a family nurse practitioner wrote an addendum to his progress note from the day before. (Note -- the inmate died on May 30, 2012.) The note stated, "Due to the patient's past and current history of hoarding, drug diversion and documented EKG change, I decided to DC methadone at this time. Continue to follow up patiently clinically. Alternatives were offered but patent decided to terminate visit." Thus, it appears that the patient's immediate motivation for suicide may have been a response to the discontinuation of his methadone. I do not, however, mean to suggest that the discontinuation of methadone was inappropriate.

I do not believe that this case presents any failure of the part of CDCR mental health or custody staff. I do agree with the observation that improved communication between medical and mental health staff might have been beneficial in this case, since the inmate's Methadone was to be discontinued; however, this is much more clear in retrospect than it would have been at the time.

## L. Died June 7, 2012 at (Hanging)

Dr. Eargle's summary of suicide review follows:

"This 38-year-old African American inmate had served multiple prison terms and parole revocations for drug-related charges. He last entered CDCR in June 2009 and could have been released in September 2013. He was followed at the CCCMS level of care, and had been in EOP during a previous incarceration. He had previous MHCB and APP (DSH Acute Program) admits. There were two prior suicide "attempts" during which he attempted hanging in public places, in front of others. He was in ASU for battery on another inmate. He was seen in ICC on June 7, 2012, and informed he would be transferred to another institution due to enemy concerns, which upset him. He was found hanging in his solitary ASU cell at 16:01 hours that afternoon by an officer passing out dinner trays. This inmate had a history of using suicide attempts to change his circumstances, and the

15

timing of this suicide suggested that possibility. Possibly hoped to be discovered. One recommendation emerged.

Recommendation 1: Inadequate quality of SRE's – Draft LOP for SRE Mentor Program, Implement mentor program."

There is some significant question about the likelihood that this suicide was an intentional act as opposed to an inappropriate way of expressing distress that went badly. Nevertheless, the inmate provided no reason to assume that he posed a suicide risk at the time of his death. He was seen on May 17, 2012, less than three weeks before he died. At that time, he was cheerful, and considered to be "a good candidate for CCCMS removable as he (was) very stable with few current symptoms." He was not removed from CCCMS because he was still taking prescribed psychotropic medication. He exhibited futuristic thinking by discussing his upcoming parole. He was also seen on May 29, 2012 by a psychiatrist, who described his mood as good.

My only suggestion regarding this case is not a criticism of CDCR mental health staff, but may present an opportunity for improvement. Currently, facilities maintain a list of "high risk" inmates. It appears that membership on this list is sometimes determined in a somewhat formulaic manner. This inmate, despite the fact that he was doing very well, had a history of expressing distress through suicidal gestures. He also had recently received some unwanted news, that he would be transferred to a different facility. My suggestion is that inmates with a history of multiple suicidal attempts or gestures are appropriate for inclusion on such a list. By periodically "checking in" with such inmates, it would provide staff with an opportunity to become aware of increased psychological distress much sooner than the inmate might report it on his or her own.

The reviewer also noted that the SRE's completed at Mule Creek were "inadequate in that they did not reflect the inmate's documented mental health history and seemed to be based on self-report." Note, however, that these SRE's preceded his death by more than a year, and I am unaware that there was any reason to conduct additional SRE's prior to his death. Previously, I have remarked on the need to improve on the quality of SRE's, and I reiterate my support for the training project that CDCR is implementing towards that end.

### M. Died June 11, 2012 at Richard J. Donovan (Hanging)

Dr. Scheidegger's summary of suicide review follows:

"This 26-year-old Hispanic inmate had served eight years of a 40-life sentence for the gang-related murder of a 23-year old woman when he was age 17. In June 2010 the inmate started experiencing mental health problems relating to concerns about his status with the Mexican Mafia. He was admitted to MHCB, after which he was placed into CCCMS. Following multiple subsequent MHCB

admissions for suicidal ideation, he moved to EOP in April 2012. His mental illness also manifested in multiple somatic complaints. Medication compliance was poor. He was found hanging from the underside of the upper bunk, with his cellmate present on top of the upper bunk. Four recommendations emerged.

Recommendation 1: PC's should complete documentation training and PMP for SRE training.

Recommendation 2: Psychiatrists should follow a best-practice model for the prescription of psychotropic medications.

Recommendation 3: PC's should complete documentation training and provide a more in-depth review of clinical symptoms and functioning."

This case includes numerous failures to provide adequate care to this inmate, who was obviously seriously mentally ill long before his condition was adequately recognized and responded to by mental health staff. Most importantly, he was maintained at the CCCMS level of care, which is designed to serve inmates who are stable. This inmate was not stable at least as early at 2010, yet he was only switched to an EOP level of care in April 2012.

There was no discussion by the suicide reviewer of the apparent 19-minute interval between the discovery of this inmate's hanging and the arrival of the Emergency Transportation Vehicle.

This inmate's medical complaints should have resulted in early referral to mental health for evaluation and treatment, and were very likely evidence of his emerging psychosis.

In my opinion, this inmate's consistent refusal to take his medication every day should have caused explicit consideration of and possible transfer to a higher level of care, which did not occur until he was moved to EOP status in April of 2012. This change might have eventually resulted in an improved willingness to take medication, as the frequency of clinical contact can enhance a therapeutic alliance. If EOP level of care did not result in improved willingness to take medication, then it would have been appropriate to consider the DSH treatment program at either an acute or intermediate level of care. Specifically, in my experience some inmates are more likely to willingly take medication in a more therapeutic environment.

Regarding his potential for suicide, I believe that the mental health staff were trying very hard to help this man stay alive, as evidenced by his numerous transfers to crisis beds. He did not provide any notice, threat, or other evidence of his immediate suicidal intentions; however, it is not possible to know if treatment at a higher level of care might have caused him to take medication and perhaps be more hopeful about his future. Evidence to support this idea is provided by the fact that he tended to improve whenever he was transferred to a crisis bed.

17

Otherwise, I agree with the self-critical evaluation and corrective actions recommended by the RJ Donovan review, reinforced by the findings and recommendations of the headquarters suicide reviewer, especially regarding failure to timely move this inmate to EOP status, the failure to consider transferring him to a higher level of care (i.e., DSH), the one-month gap in visits by the inmate's primary clinician, and the failure to conduct suicide risk evaluations more frequently in a person with so many chronic risk factors who was obviously unstable.

### N. Died June 28, 2012 at ASP (Strangulation)

Dr. Scheidegger's summary of suicide review follows:

"This 36-year old Native-American second-term inmate had served five years of an eight-year sentence for arson of an inhabited structure. He had a severe alcohol addiction. He was previously suicidal in jail, and when first arriving in CDCR. Thereafter he was followed for depression in CCCMS, and was a relatively low profile inmate housed in a level ll dormitory. The day before his death, he asked to get off the yard because he was afraid of being targeted due to a bad drug deal. He was housed in ASU that afternoon with no compatible cellmate available. He was found lying unresponsive on his bunk early the following morning. Staff could not see that he had strangled himself until they entered the cell. Two recommendations were generated by the review.

Recommendation 1: Poor documentation by PC on IP's SRE, indicating the possibility of poor clinical practice by clinician.

Recommendation 2: Train staff regarding the LOPs for intake cell management."

I agree with Dr. Patterson's report that a 5-minute delay between discovery and opening the door to this inmate's cell was problematic. What is less clear to me is the reason for the delay, which was not explained in the review. If staff waited for backup before opening the segregation cell door, this practice is consistent with practices in most systems I have observed. On the other hand, if staff were required to wait for a sergeant to open the door, this would be inappropriate and inconsistent with my understanding of CDCR policy.

Dr. Patterson's report sites the presence of *rigor mortis* as evidence that welfare checks were not completed in an appropriate manner. While it appears that staff checked the inmate's cell every 30 minutes, it is equally clear that they did not check for signs of life. I agree with Dr. Patterson's report that welfare checks should include observation of signs of life, typically meaning the movement that is associated with respiration. XXX

18

This inmate reportedly gave away his beadwork a week before he died, which suggests the likelihood that he was planning to end his life, although this was not reported to staff.

Last suicide attempt was 2007

Because the intake cells were full at the time of his admission to ASU, this inmate was not housed in one of the designated "intake cells." Instead, he was housed in a more remote cell. When CDCR is forced to place newly admitted inmates placed in non-intake cells, I recommend consideration of temporary practices to enhance suicide prevention, such as more frequent welfare checks.

I agree that insufficient documentation of the SRE, especially in regard to previous history of suicide, is problematic. Considering that the psychologist in question had a previous history of similar problems, I agree with the recommendation that a review of professional practice (with appropriate supervision) was warranted.

## O. Died June 29, 2012 at RJD (Hanging)

Dr. Scheidegger's summary of suicide review follows:

"This 46-year-old Caucasian inmate had a long criminal history related to his methamphetamine dependence. His fifth CDCR term began October 28, 2003, and his EPRD was March 26, 2013. He was notably anxious about paroling. He was followed in the EOP throughout his incarceration, and participated actively in treatment. On the morning of June 23, 2012, he was involved in a fight with another inmate, received an RVR, and placed into ASU. He was found hanging that late evening. His heart was restarted, but he suffered fatal anoxia to the brain. He was pronounced dead at the UC San Diego Medical Center on June 29, 2012. Five recommendations emerged.

Recommendation 1: Corrective action in the form of staff training and updating LOPs to improve the documentation and competition of 30 minute welfare checks.

Recommendation 2: Conduct interactive training with mental health staff focusing on mental health treatment concerns such as goals, interventions, and adequate documentation.

Recommendation 3: PMP for SRE enhancement to foster development for PCs in the identification of risk and risk management.

Recommendation 4: Update training for custody staff regarding RVR/mental health referral requirements.

19

Recommendation 5: Provide training regarding policies and clinical documentation as outlined in memorandum."

Although he died on June 29, 2012, this inmate essentially committed suicide on his first day in ASU, despite the fact that he was scheduled to be release from prison in a relatively short period of time. While this RVR might have extended his time somewhat, he would still likely have been paroled within less than a year.

As was the case in the above-referenced suicide, this inmate was not housed in an intake cell, despite the fact that it was his first day in ASU. (See above recommendations.)

On the day before the act that resulted in his death, this inmate was seen by his primary clinician, to whom he "denied auditory hallucinations and appeared future-oriented, talking about living with his mother in Kansas and that his father had offered some financial support after his release." Upon admission to ASU, he was cleared by MH, and talked to the psychiatric technician during his medication pass, and "did not seem agitated or depressed." Thus, there was no reason for the clinician to suspect suicidality at that time. Indeed, it appears that the immediate stimulus of his RVR changed his intentions toward either self-injurious behavior or suicide.

I also agree with Dr. Patterson's report regarding the absence of any SRE's since 2010, despite frequent auditory hallucinations that were sometimes suicidal.

However, a review of this inmate's institutional record reveals a consistent pattern of non-suicidal self-injurious behavior (i.e., cutting) whenever he received an RVR. The specific circumstances under which he hung himself (e.g., hanging himself at the front of the cell where he would be easily seen, and a ligature that was not tied or tightly wrapped) suggest the possibility that this suicide was a "cry for help" gone wrong. I am also concerned that this inmate's pattern of self-injurious behavior was not addressed in his treatment plan, where it should have resulted in some effort to teach him distress tolerance or affect regulation skills. Whether or not such treatment would have prevented his eventual suicide is unknown.

As an EOP inmate, the Program Guide would have required his primary clinician to see him within 5 days. However, his treatment plan or a safety plan should have included a recommendation regarding the fact that he cut himself every time received an RVR.

I also note that this inmate reportedly experienced physical pain due to peripheral neuropathy, and was positive for Hepatitis C. It is unclear if these conditions contributed to the inmate's suicide.

20

Finally, the suicide reviewer noted that rounds are conducted so quickly that they apparently preclude ensuring that inmates are breathing at each 30-minute check. (See above recommendation in previous case review.)

Dated: March 22, 2013

_/s/ Joel A. Dvoskin_
Joel A. Dvoskin, Ph.D. A.B.P.P.