# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                  Plaintiffs,         )
                                      ) CASE NO.:
         vs.                          ) S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                  Defendants.         )
_____       )



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1    a -- you know, it's a big system.  And so in the exit
2    conferences, every once in a while he would ask a
3    question.  Or if we were discussing, as we were going
4    through the prisons, an issue, he asked good questions.
5         Occasionally he brought to my attention issues
6    of concern that I missed, which I appreciated.
7         Like an example would be, "You might want to
8    talk to this guy over here."  Because one of the things
9    that I do when I tour the prisons is look for people who
10   appear to be undertreated, overmedicated.  I'm sort of
11   eyeballing folks.  And it's impossible to -- you know,
12   you're not assessing each individual.
13        So it was very helpful.  On occasion he said,
14   "I think you might want to talk to this guy."  And that
15   was quite helpful.
16        Q.   "This guy" being a -- you remember it being a
17   prisoner?
18        A.   Yeah.
19        Q.   And was Dr. Beard also present for any of your
20   communications with CDCR staff?
21             You said he was at the exit conferences.
22        A.   Yeah.  I think he was at all or most of the
23   exit conferences.
24             And we had a lot of informal conversations
25   with CDCR staff.  He was often present for some of

1       Q.   Okay.

2       A.   I mean, I -- I take that back.  I have -- I

3   have consulted with the Department of State Hospitals

4   around other issues.  Not related to the Department of

5   Corrections, CDCR.

6       Q.   I was focusing on this particular case.

7            So you came out here and you had a meeting.

8   And was there a discussion about whether or not

9   Department of State Hospitals would be part of the scope

10  of your opinion?

11      A.   No.  I think that -- I don't remember a

12  specific conversation about it, but it was always clear

13  to me from the beginning that we were being asked to

14  review the mental health care in 10, and then later,

15  13 prisons.

16      Q.   Okay.  In planning -- when you planned your

17  tours, did you -- you discussed whether or not you

18  should include Department of State Hospital facilities

19  in those tours?

20      A.   I may have asked that simple question and been

21  told no.

22      Q.   Okay.

23      A.   But it was clear to me that we were only being

24  asked to look at CDCR.

25      Q.   Okay.  And you actually went to two prisons

1        In terms of the assessment or the monitoring

2   of "Were people underserved?" I think that also came

3   into the -- I'm not sure if you're referring to that as

4   well.  That was probably a good thing to do once because

5   it demonstrated that there were surprisingly few people

6   that were undertreated.

7        And then I really am not offering an opinion

8   about the monitoring of that process, but I -- but I

9   think some of the changes they made in the referral

10  processing probably were helpful.

11       Q.  Okay.  You understand that there had been --

12  that one of the issues that had been found by the court

13  in the past was that CDCR was not referring patients

14  that required a higher level of care to these inpatient

15  psychiatric programs?

16       MS. VOROUS:  Objection.

17       THE WITNESS:  You mean several years ago?

18  BY MR. BIEN:

19       Q.  Yes.

20       A.  Yes, I was told that.

21       Q.  And did you investigate yourself whether or

22  not -- let me start over.

23       As part of your work in California, did you

24  make an investigation as to whether or not there was an

25  unmet need for any kind of mental health care in CDCR?

1          A.    In general, yes.  I looked for undertreated,

2    untreated, and asked about undertreated and untreated

3    people every place I went.

4          Q.    What was your methodology for looking for

5    untreated or undertreated people?

6          A.    Variety of things.  When I visited -- depends

7    on the type of unit.  If it's lockdown units, it's a

8    little more challenging.  Let me start with those.

9          For locked units, I would ask the officers,

10   "Who is the -- if you had to pick the two most psychotic

11   or difficult or quirky or usual inmates" -- I would say

12   any euphemism that you want to use -- "who's your

13   all-star team of, you know, inmates that I, as a

14   psychologist, should be concerned about?"

15          And it's by far the best source of

16   information.  They never hesitate.  They tell me two

17   names, three names; sometimes one; sometimes five, and

18   then I go talk to those people.

19          I also then, typically, if they're -- usually

20   there's a few inmates that seem, on their face, to be

21   credible informants that are relatively reasonable, and

22   I might say to them, "Is there anybody you think I

23   should talk to?"

24          And they might say, "Cell 2," real quietly.

25          And in order to not throw them in, I'll see

1    somebody else and then eventually wander over to Cell 2.

2              It's a good methodology for identifying who in

3    that group is likely to need more than they're getting.

4              In general population, I do it that way as

5    well as by eyeballing people.  And if somebody appears

6    to be disoriented or confused -- sometimes they turn out

7    to be developmentally disabled or maybe they have a

8    medical illness -- but you ask, say, "I notice you look

9    a little confused.  How are you doing today?"  You start

10   a conversation with them.  And then, depending upon the

11   beginning of the conversation, I might look at their

12   record or might ask about them, or I might have an

13   in-depth conversation with them.

14             Then I do a lot of cell front, walking cell to

15   cell.  "How you doing?"

16             "Fine."

17             And often the person will say something, even

18   in that brief interaction, that leads me to believe that

19   I need to look further into them.

20             Or a cellmate will roll their eyes.  You know,

21   there's a variety of ways that you do it.  But I --

22   usually, the list I come up with is a pretty good

23   list --

24        Q.   Okay.

25        A.   -- of people who appear to need more treatment

1    than they're getting.

2         Q.   What about the people who are not in the

3    mental health delivery system?  What work did you do to

4    see whether or not they needed care?

5         A.   I just told you.  That would have been in

6    locked units that were not PSUs or hubs, but in ad seg.

7    And I would walk the yard, if there was a yard.  For

8    like -- for the women's facility, women all over the

9    yard, I just wondered around.  "I'm a psychologist.  Got

10   any friends you think I should talk to?  How do you like

11   the doctors here?  If you have a problem, what do you

12   do?"

13        When I'm walking around the yard, I don't know

14   if they're CCC or not.  A lot will say, "Yeah, I'm CCC."

15        Then I'll ask them, "Do you know who your

16   primary clinician is?

17        "You mean Dr. Smith?  Yeah, she's really nice.

18        "How often do you see Dr. Smith?

19        "Whenever I want to, but she calls me out once

20   every 30 days or every 90 days, depending on the level

21   of care.

22        "Do you have a doctor?

23        "Yeah.  I can't remember his name.  That

24   Indian guy.  He's a short little guy.

25        "What's he like?

1              "He's really nice."  You know, or --

2              And frankly, I was shocked at the consistency

3    with which people knew their doctor and their primary

4    clinician and the generally high opinion that they

5    expressed of them.  It was shocking to me.  Better than

6    I've ever seen in a prison system.

7         Q.   Okay.  Let's go back to people who are -- so

8    this -- you felt that one of the things that you were

9    tasked to do was determine whether there was an unmet

10   need for mental health care in the California system?

11        A.   Yes.

12        Q.   And your opinion is that there is not?

13        A.   Well, I was asked to assess it in the context

14   of did I feel the system was constitutionally adequate

15   or not.  There's always unmet need.  No question about

16   it.

17             The -- if I had unlimited resources, there are

18   many things that you could do that would improve the

19   system and make it better.

20             But using my understanding of constitutional

21   minima as a criterion, then the answer is I think they

22   are meeting the constitutional obligations.

23        Q.   When you were part of the Scarlet Carp team,

24   one of the issues at that point was determining whether

25   or not California had an unmet need for mental health

1    And I probably wish I hadn't written that note, but I
2    think there was a general belief that any time there was
3    a disagreement between the special master and the State,
4    that the judge would simply agree with the special
5    master.  So that they didn't feel like it was a level
6    playing field, I guess, to put it -- and I wish I hadn't
7    written that.
8         Q.   You wrote it down because it was stated at
9    that meeting?
10        A.   Yeah, I believe so.
11        Q.   Do you know who said that?
12        A.   I do not.
13        Q.   How did you select the number of prisons --
14    the prisons that you toured?
15        A.   We had a meeting -- might have been that same
16    day or shortly thereafter -- where we -- we kind of sat
17    around, and I asked for a list of, like, which kind of
18    programs are at which programs.  And there were people
19    from CDCR there, and I asked them questions about, you
20    know, I say "I"; we all did.
21             All four of us weighed in about -- we wanted a
22    reasonable sample that would cover the types of programs
23    that existed.  We asked specifically for one prison that
24    didn't have much of anything.  I think we picked
25    Centinela for that.

 1          And then people would give us -- "Here are
 2  some prisons that have this level of care."  And we
 3  said, "We've got to go see that one."
 4          As we began our trip, it became clear to us
 5  there were a couple places we should go see, Pelican Bay
 6  being an obvious choice because they had one of the two
 7  PSUs and we thought that we shouldn't not go to
 8  Pelican Bay.
 9          And then we wanted to revisit -- our first
10  visits were a little chaotic; we weren't sure what we
11  were doing.  We were still working on our methodology.
12  We went back to CMF, and I think we went back to SAC, if
13  I'm not mistaken.  I know we went back to CMF to make
14  sure that we had asked all the questions we needed to
15  ask.
16      Q.   So why didn't you go to 33 prisons?
17      A.   Expense.
18      Q.   Okay.
19      A.   It would have been a lot more money.
20      Q.   Okay.
21      A.   I shouldn't say that.  That was my assumption.
22      Q.   Okay.
23      A.   I don't think that was said to me, but I
24  didn't even ask the question because I assumed it would
25  be very, very expensive to do that.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        Q.   Okay.  Did you think that going to 9 of the 33

2   prisons allowed you to make an opinion about the total

3   operations of the California Department of Corrections?

4             MS. VOROUS:  Objection.

5             THE WITNESS:  I think it's 13, isn't it?

6   BY MR. BIEN:

7        Q.   What's 13?

8        A.   All the ones we visited.

9        Q.   Okay.  How many did you go to?

10       A.   I thought we visited 13.

11       Q.   13 prisons.  Okay.  I have it all down.

12       A.   I'm sorry.  I know I wouldn't be able to list

13   all 13 for you.

14       Q.   I do have a list here.  Let's assume you went

15   to 13 prisons.

16       A.   I think it is.

17       Q.   Okay.

18       A.   But I'm willing to stand corrected if that's

19   incorrect.

20       Q.   On what basis do you feel that you can render

21   an opinion about the full California Department of

22   Corrections, which is 33 prisons right now plus 9,000

23   people out of state?

24       A.   I certainly don't -- I don't offer an opinion

25   about the people who are out of state.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1        Q.    Okay.

2        A.    For the rest of the prisons, in addition to

3    going to prisons, we talked to inmates who had been in

4    most of the prisons.  So if there had been any kind of

5    meaningful allegation that something was an outlier in

6    a -- while you're doing that, can I use the restroom

7    real quick?

8        Q.    Sure.

9              (Off the record at 2:32 p.m. and back on

10             the record at 2:36 p.m.)

11   BY MR. BIEN:

12       Q.    I think you were in the middle of an answer so

13   to be fair, I'd like to -- why don't you read back the

14   question and the answer?

15             (Record read as follows:

16             "QUESTION:   On what basis do you feel

17              that you can render an opinion about

18              the full California Department of

19              Corrections, which is 33 prisons right

20              now plus 9,000 people out of state?

21             "ANSWER:  I certainly don't -- I don't

22              offer an opinion about the people who

23              are out of state.

24             "QUESTION:  Okay.

25             "ANSWER:  For the rest of the prisons,

1              in addition to going to prisons, we

2              talked to inmates who had been in most

3              of the prisons.  So if there had been

4              any kind of meaningful allegation that

5              something was an outlier in a" --)

6         THE WITNESS:  In a different prison that

7    wasn't on our list, we could have asked to add a prison

8    to the list.  We made sure that we hit every level of

9    care, reception centers, SNY yards.

10         So it's a sampling.  It's a common practice in

11   social science.  Is it possible that something could

12   happen in a prison that we didn't go to that would be

13   different?  Yes.  But I think it's a pretty good sample

14   of their system.

15   BY MR. BIEN:

16        Q.   Did you ask to expand the number of prisons

17   you went to?

18        A.   Yes.

19        Q.   Okay.  When did you do that?

20        A.   I don't remember when or I don't even remember

21   who brought it up, but I said and others said, "Gosh, I

22   feel uncomfortable not visiting Pelican Bay."

23         And the AGs quickly said, "Then we'll add

24   Pelican Bay."

25         Well, not adding, but I said -- I feel like we

```
 1    need to go back to CMF because there was some questions
 2    we didn't ask that I wish I had asked.
 3              And I think CMC might have been added.  And
 4    that had to do with -- well, one is its history as sort
 5    of a main cog of the -- I can't remember if it was added
 6    or it was on the original list, but I think it was
 7    added.  But also because they had a suicide problem for
 8    2010/2011, and I wanted to talk with them in person
 9    about that.
10         Q.   Okay.  Is there anything else that you --
11    well, I think that's fine.  I understand.
12              I wanted to ask you about this original
13    meeting.  This took place, I think we determined, in
14    October of 2011?
15         A.   I believe so, yeah.
16         Q.   Okay.  Was there a discussion of the
17    Supreme Court decision that had occurred in May of 2011?
18         A.   Are you talking about the Plata decision?
19         Q.   Yes.
20         A.   I'm sure there was, but I don't specifically
21    recall.  But I knew about it.
22         Q.   I don't see anything in your notes about it.
23         A.   Yeah, I just don't recall whether it was --
24    like what specifically was said.  And I know I was aware
25    of it.  And, in fact, you had called me prior to the
```

1    expert report or in this matter concerning crowding?

2         A.   I was not precluded from rendering an opinion

3    about crowding if I -- I was asked to render an opinion

4    about the constitutionality of the mental health care.

5    If I felt that crowding was precluding the provision of

6    adequate mental health care, then I would have written

7    it, and there was no preclusion of me doing that.  No

8    one ever asked me not to address crowding.

9         But I wasn't asked to specifically assess the

10   capacity of the prisons and whether or not they were

11   crowded.

12        Q.   Okay.  I think understand that.

13        A.   You want me to try again?

14        Q.   No.  No.  I should ask you questions, and we

15   can follow up from there.

16        Did you review the three-judge court's opinion

17   in connection with forming your opinion today?

18        A.   If I did, it was so long ago it had nothing to

19   do with my opinion today.

20        Q.   Okay.

21        A.   I mean, I knew the general findings that the

22   three-judge panel had made.

23        Q.   Okay.  I just asked a little about how you

24   picked the 13 prisons, and I think I understand that.

25        Can you explain the methodology you used in

Page 193

```
 1    whether or not 75 groups are being offered at CCWF
 2    except for what from Dr. Toche told you?
 3        A.   I think that's -- I think it was Dr. Toche.
 4    I'm not sure, but...
 5        Q.   You didn't go back?
 6        A.   I did not go back.
 7        Q.   Okay.  Were you informed by the attorney
 8    general's office that there was an order in this case
 9    requiring that they give notice before their experts do
10    inspections of the prisons?
11             MS. VOROUS:  Objection.  Lacks foundation.
12    Argumentative.
13             THE WITNESS:  If I was, I don't remember it.
14    BY MR. BIEN:
15        Q.   Okay.
16        A.   I was given an awful lot of documents.  If I
17    saw it, I don't recall it.
18        Q.   And did you -- were you ever informed that the
19    order states that the reason to give notice to the other
20    side is that the other side would have a chance to bring
21    an attorney and their own experts along on tours?
22             MS. VOROUS:  Objection.  Lacks foundation.
23    Argumentative.
24             THE WITNESS:  I don't know that.
25
```

1    BY MR. BIEN:

2         Q.   No one told you that?

3         A.   No.

4         Q.   Okay.  Well, no one told you the order -- no

5    one told you that there was an agreement in this case by

6    order and it's reflected in the order that the parties

7    would give each other notice before they did prison

8    inspections?

9              MS. VOROUS:  Objection.  Lacks foundation.

10   Argumentative.

11             THE WITNESS:  I don't know anything about

12   that.

13   BY MR. BIEN:

14        Q.   Okay.  When you did your inspections in

15   Coleman originally, you were accompanied by plaintiffs'

16   counsel, were you not?

17        A.   I actually don't remember.  I know on some of

18   the tours I was accompanied by plaintiffs' experts.

19        Q.   I was going to say that, too.  And plaintiffs'

20   experts were along also on some of your tours?

21        A.   I think Don Specter was on some of the tours.

22   But it was a long time ago; I don't remember very well.

23        Q.   Okay.

24        A.   But I do remember making a tour with

25   Dr. Metzner and also with Dr. Haney, but I don't

 1   remember if that was for Coleman or Madrid.

 2        Q.   One of the methods you used to gather

 3   information on your prison inspections was to interview

 4   staff; is that correct?

 5        A.   Yes.

 6        Q.   And you also -- you also interviewed patients?

 7        A.   Yes.

 8        Q.   Okay.  And who gave you permission to

 9   interview patients?

10             MS. VOROUS:  Objection.  Lacks foundation.

11   Argumentative.

12             THE WITNESS:  I guess I just interviewed them.

13   BY MR. BIEN:

14        Q.   Okay.  What did you say to a prisoner when you

15   interviewed them?

16        A.   I said, "Hi.  I'm Dr. Dvoskin.  I'm a

17   consultant to the State, trying to find out about the

18   mental health care in the prison.  If it" -- "Interested

19   in how you're doing.  Do you want to talk to me?"

20             Most of the time they said yes.

21             And then I said, "Well, do you know what level

22   of care you're at?  What services do you get?  Do you

23   know who your primary clinician is?  How often do you

24   see that person?  What do you think about them?"

25             Same sort of questions with the psychiatrist.

1          Q.   Did -- you explained that you were working for
2     the attorney general's office?
3               MS. VOROUS:   Objection.   Lacks foundation.
4               THE WITNESS:   I think I usually said the
5     State.
6     BY MR. BIEN:
7          Q.   The State?
8          A.   I may have said the attorney general, but I
9     think I usually said the State.
10         Q.   Did you make a reference to the Coleman case?
11         A.   Almost always the inmates did.   They said --
12    the minute I said I was Dr. Dvoskin, they said, "Are you
13    Coleman?"
14              And I said, "Well, we're not the monitors.
15    We've been hired by the attorney general's office and
16    the department to look at the system and make
17    recommendations, but we don't work for the monitors.
18    That's a different thing."
19              And typically, inmates, when they say
20    "Coleman," they mean the special master and his experts.
21    At least that was my impression.
22         Q.   You understood that one of the things that
23    Coleman monitors do when they investigate the prisons is
24    speak to staff and speak to inmates; is that correct?
25         A.   I'm sure they do, knowing the monitors.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          Q.    You've worked with Jeff Metzner, and you know

2      that he goes in and has different methods he uses to

3      evaluate programs; is that right?

4          A.    Yes.

5          Q.    And you've actually done that with him?

6          A.    Yes.

7          Q.    And he will walk in and pick some inmates out

8      and ask similar questions to what you did?

9          A.    I don't know what he does in Coleman.

10         Q.    Right.

11         A.    But typically that's what he does.

12         Q.    Okay.

13         A.    Typically, our methods are pretty similar.

14         Q.    Did you develop a list of people you wanted to

15     interview before walking into a unit, or did you use

16     more the method that you described earlier this morning

17     of kind of walking in and asking guards for help?

18         A.    Both.

19         Q.    Okay.

20         A.    Well, it wasn't just the officers; it was also

21     inmates.  I gave a more complete answer than that.

22               But often, in the initial meeting, I would --

23     we had a long -- usually almost a half-a-day discussion

24     of how things work, what sort of data did he keep,

25     what's your quality improvement process, who runs which

1    committee, who's your SPR-FIT coordinate.  Those kinds

2    of questions.

3            In the course of that, I might ask a lot of

4    different questions.  "What" -- "Was there any recent

5    suicide attempts?  Is there anybody you're having a

6    problem big with?"

7            So occasionally I would have a name that I

8    might scribble on the front page of my note.  That would

9    be somebody I would look for.

10           Or in the course of the day, names would come

11   up through a variety of mechanisms.  I'd be talking to a

12   staff member that might say, "I had a really hard time

13   with inmate Joel."

14           And I'd say, "Where is he?  Could you look him

15   up for me, get his location?"

16           Then I'd find him and see him myself.

17      Q.   Okay.

18      A.   So it was a combination.

19      Q.   You weren't trying to do -- for example, you

20   could have a method where the State gave you a printout

21   of all the inmates that were in the prison on that day,

22   and you randomly selected every 10th or 20th, and then

23   made sure you those.  You didn't use a method like that?

24      A.   No.

25      Q.   Okay.

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1       A.    That would have taken more time.  We had two
2   days for each prison, so that wouldn't have been a
3   realistic way to go about it.  It wouldn't have been any
4   better.  In my opinion, we got a really good picture of
5   the system.
6       Q.    When you said "random samples," you meant the
7   method you described?
8       A.    I would randomly pick inmates in the housing
9   unit or people I observed -- like I might walk past a
10  bunch of cells if I saw somebody who I thought I should
11  talk to or if another inmate mentioned their name.  So
12  it was both random and nonrandom.
13      Q.    You did exit interviews after -- at the end of
14  the day or at the end of the second day of each tour?
15      A.    Yes.
16      Q.    And for some of the prisons, did you go for
17  one day?  Or were they all two-day?
18      A.    I think they were all two days except for the
19  second visit to CMF.  And I think -- I can't remember
20  Centinela.
21      Q.    How about Centinela?
22      A.    That might have been one day.
23      Q.    Our records have one day for that.
24      A.    I think Centinela was one day.
25      Q.    Is it correct that on some of the visits you

1    were alone?  You went to Pelican Bay by yourself?

2         A.   No.  I didn't do any of them -- I don't think

3    I did any of them by myself.

4         Q.   Okay.

5         A.   I think Dr. Scott missed one day at Pelican --

6    no.  He couldn't make it to Pelican Bay.  His plane --

7    he literally couldn't get there.

8         Q.   That's what our records show, too.

9         A.   And I think that Dr. Moore also wasn't there.

10   I think it was just me and Steve Martin for Pelican Bay.

11        Q.   Okay.  And you already mentioned that

12   Dr. Moore didn't make it to Centinela, right?

13        A.   Yeah.

14        Q.   Okay.  Were there some prisons that

15   Steve Martin, to your knowledge, didn't go to?

16        A.   I -- no.  I think he made all of them.

17        Q.   Okay.  And you think Dr. Scott went to all the

18   ones except for that -- Pelican Bay?

19        A.   Yeah.  And he did Pelican Bay -- a lot of what

20   he did actually was interviews with the chief

21   psychiatrist and looking at records.  So he did

22   Pelican Bay; he didn't go to Pelican Bay.

23        Q.   He did it by telephone or --

24        A.   Yeah.

25        Q.   Were you given access to the electronic

1   treaters, both the primary clinicians and their

2   psychiatrist, their interactions with the officers, and,

3   you know, how hard people were trying to get care to

4   people was part of the assessment.

5        Q.   How hard who was trying?

6        A.   The clinicians.

7             Were the officers cooperative advocates for

8   treatment or getting in the way of it?

9             There isn't a formula for this.  It is my

10  judgment.  It's a judgment call.

11       Q.   Okay.  Okay.  I notice that there are these

12  protocols or instruments that you guys developed to do

13  your work, but then it appears that -- I'm not sure how

14  they were used.

15            The audit tool.  Can you explain what the

16  audit tool was and how you used it?

17       A.   At the very beginning, the attorney's general

18  suggested to us that we should put together an audit

19  tool.

20            And kind of against my vote, it included a lot

21  of things that -- because they were being monitored by

22  the special master, I wanted to have a simpler, more

23  robust set of questions along the lines that I just

24  articulated to you.

25       Q.   Was there a plan at one point to actually fill

1    out these audit tools and then calculate -- make up some

2    mathematical calculations based on that that would be

3    part of your opinion?

4        A.    Absolutely not.    There was never an intention

5    to quantify these things but to use them as guided

6    judgment tool.    But I didn't find them helpful.    From

7    the very beginning, I argued that there's no substitute

8    for talking to inmates.    And that that's the most

9    important thing to me, talking to inmates in a program

10   and asking them about it.

11       Q.    In some of the audit tools, I saw there was --

12   early on there was a list saying you should hit

13   10 inmates for this unit and five for this unit.    And

14   then later on in the audit tools, it seems like it said,

15   "Leave that blank.  Do whatever you thought was

16   appropriate."

17       A.    Yeah.    I think people came around to my way of

18   thinking as we visited several prisons, that -- that it

19   was it wasn't particularly helpful to do these, and it

20   was very time-consuming.

21            If I talked to an inmate and I say, "How often

22   do you see your primary clinician?" and the inmate says,

23   "Every week like clockwork," why do I need to go look in

24   the EUHR which takes me 45 minutes to find the last

25   progress note?  It's a waste of time.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1           So that's how I did it.

2       Q.   Okay.  I noticed in -- in your report -- and

3   you repeated here today -- that you felt it was a

4   significant factor that inmates you spoke to knew the

5   names of their doctor and medication.  Is that correct?

6       A.   And, even more importantly, that they

7   expressed some positive feeling toward the person or a

8   belief that the person cared about their well-being.

9       Q.   Okay.  Can you -- did you calculate how many

10  of the inmates you spoke to knew their doctors' names

11  versus didn't know them?

12      A.   I wouldn't go by name.  If they said, "Oh, you

13  mean that short Indian guy?  I can't pronounce his

14  name," that was a yes.

15           It was so overwhelmingly positive that I

16  didn't need to count them.  It was well in excess of

17  80 percent of the people I talked to.  It might have

18  been 90 percent.

19      Q.   Did you actually calculate?

20      A.   No.

21      Q.   And did you calculate how many people knew

22  their medication versus how many didn't know it?

23      A.   The name of the medication, I can give you a

24  rough estimate.  I didn't calculate it, but it was over

25  50 percent.  But if you gave them credit for being in

1    the ballpark, like, "He's got me on an antidepressant.

2    I can't remember the name of it," that would be a yes.

3    And then it would be over 80 percent of people.

4        Q.   Okay.  And did you then take -- go to the EUHR

5    and determine whether the information the inmate gave

6    you was correct or incorrect about the name of their

7    doctor or the name of the medication?

8        A.   Yes and no.  I would -- I often -- when I met

9    with treatment teams, I would ask the name of the doctor

10   who's responsible if it was by housing unit.  So I did

11   it enough to verify but not -- I didn't systematically

12   do that.

13       Q.   Is it correct you really didn't do that as a

14   practice?  I mean, I didn't go through all your notes,

15   but I don't see anything where you verified that the

16   inmates' recollection expressed to you of their

17   medication, their doctor, was verified by you or anyone

18   else.  Is that correct?

19       A.   No.  For the most part, I believed the

20   inmates.  If they talked about their doctor warmly, I

21   had no reason to doubt that they felt good about their

22   doctor.  And if they got his name wrong, it wouldn't

23   have changed my mind anyway.

24            The fact that somebody says, "Yeah, he's a

25   good doctor; he listens to me," is much more important

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1                    CERTIFICATE OF REPORTER

2

3            I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8            That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13           I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                                DATED: March 1, 2013

21

22                     _____

23                     MEGAN F. ALVAREZ

24                     RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# EXHIBIT 2

1             UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4   RALPH COLEMAN, et al.,      )

5                        )

            Plaintiffs,    )

6                        )

              vs.        )   No. Civ S 90-0520 LKK-JFM

7                        )

   EDMUND G. BROWN, JR., et al., )  Volume I

8                        )

                        )   Page 1 - 300

9          Defendants.    )

                        )

10

11

12               DEPOSITION OF

13             STEVE J. MARTIN

14          THURSDAY, FEBRUARY 28, 2013

15

16

17      CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19   REPORTED BY:

20   HOLLY THUMAN, CSR No. 6834, RMR, CRR

21   -----------------------------------------------------------

22           JAN BROWN & ASSOCIATES

23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25         (415) 981-3498 or (800) 522-7096

                                                      1

1    how it works, as far as being under oath and

2    understanding the questions and all of that.  Right?

3        A.  I do.

4        Q.  Do you want me to go through those usual

5    admonitions, or can we have an agreement that you're

6    familiar with them?

7        A.  It's your deposition.

8        Q.  Okay.  I'm fine if you're fine.  I just want to

9    make sure that we're communicating.

10       A.  You bet.  No, I don't feel the need for you to

11   do that.

12       Q.  All right.  You began working with the State in

13   September of 2011 in this case?

14       A.  I think that's correct.

15       Q.  And initially, what were you asked to do?

16       A.  My initial contact was with Mr. McKinney on the

17   phone, and we discussed the Coleman case.  And there

18   were issues in that case of staff use of force in the

19   disciplinary -- inmate disciplinary process, and I

20   believe they were contemplating or had maybe already

21   decided that they wanted to create a team of experts,

22   independent experts, to come in and look at issues of

23   the case to consult with them on the system's compliance

24   with -- I believe we talked in terms of, you know,

25   constitutional standards, as opposed to the myriad

6

1    requirements that had emerged over the years in that

2    case, of which, keeping in mind, I knew very little

3    about.

4              So it was a very general discussion.  We have

5    this complex system of requirements, Coleman

6    requirements.  And I don't know whether the program

7    guide was mentioned in that initial phone call or not.

8    But anyway, I had the impression that there was quite a

9    complex set of requirements for compliance in the

10   matter, but they were more interested in, are we

11   operating in a correctionally sound constitutional

12   manner.

13   Q.  So in the initial phase of this, at least, they

14   told you, you know, hey, we're spending $42 million on

15   this Special Master or things like that?

16             MR. McKINNEY:  Objection.  Vague and ambiguous.

17             THE WITNESS:  You know, I know there were some

18   phone calls that Pat and I had, or Mr. McKinney and I

19   had early on where that was discussed.  I don't know

20   whether it was initial -- I wasn't aware of even who the

21   Special Master was in the Coleman case.

22             MR. BORNSTEIN:  Q.  They told you that they

23   wanted to get experts together, including you, so they

24   could get out from under the Court's jurisdiction?

25   A.  No, that was not discussed at all.  What was

                                                          7

1    discussed was the -- he wanted -- my particular role, he

2    wanted my best assessment of where the system was

3    relative to constitutional minimum.  I don't recall

4    whether we discussed at all what was motivating that

5    inquiry.  I certainly did not have the impression or do

6    not recall him saying, we are going to attempt to -- how

7    did you phrase it -- get out from under Coleman?

8         Q.  Uh-huh.

9         A.  No.

10        Q.  Were you surprised, then, when you read about

11   them filing a motion which is pending now?

12             MR. McKINNEY:  Objection.  Calls for

13   speculation, vague and ambiguous.

14             THE WITNESS:  No.  No, I was not surprised.

15             MR. BORNSTEIN:  Q.  Okay.  Why not?

16        A.  Well, Counsel, I've been in the business quite

17   some time in a variety of capacities, law-trained, legal

18   capacities in cases that were of this magnitude and

19   understand strategies in this arena.

20             And it doesn't take a rocket scientist to

21   figure out that if somebody is telling the State that

22   they're doing this or doing that, that they might use

23   that to then set a course of action.

24        Q.  In the course of your work, were you told that

25   there had been some sort of an agreement that there was

8

1    supposed to be notice to the plaintiffs about when you

2    as experts went into the prisons?

3         A.   Oh, no.   That type of thing was never -- I

4    looked at it and understood that I was being retained --

5    or the discussions of retention were just as a

6    consultant that had utterly, mind you, nothing to do

7    with plaintiffs or courts or anything else.   It's --

8    having been in that position myself as Agency counsel

9    and Special Assistant Attorney General myself, we

10   routinely retained consultants on matters that -- for a

11   variety of reasons.

12        Q.   Did you in your work -- would you agree that

13   the State's prison system is still overcrowded?

14             MR. McKINNEY:   Objection.   Vague and ambiguous,

15   vague as to time.

16             THE WITNESS:   That was not my charge, to make

17   that assessment.   But being acutely aware of the

18   Coleman/Plata case and knowing many of the actors and

19   experts, and trying to stay acquainted with the law, I

20   was certainly -- and having been through probably near a

21   thousand institutions for 40 years, as I was going

22   through the facilities, I was certainly attuned to signs

23   that I typically associate with overcrowdedness in a

24   constitutional sense.

25             MR. BORNSTEIN:   Q.   And what were those signs

                                                              9

1    might render on others.

2         But generally, we wanted to get 10 to 12 to 13

3    facilities that we believed, as professionals, once we

4    went through them, would give us a fairly illustrative

5    representative idea of how the system was operating,

6    with respect to my particular issues, at least.

7         Q.   So from that sample size, you were then -- you

8    would then have a sense, I guess, of what you thought

9    was going on in all the prisons?

10        A.   It's better than a sense, because if you're --

11   in my areas -- I'm just going to speak to my areas.  But

12   if you've confirmed and established that a set of regs,

13   policies, procedures, are in place, and they're State

14   regs, and they're vigorously monitored both externally

15   and internally, and there's all these mechanisms and all

16   these reviews being done, you know, like OIG and the --

17   you know, whatever -- that if those are in place at 10

18   to 13 institutions, there is a very strong likelihood

19   they're in place at the remaining ones, save, you know,

20   the possible anomaly, the possible, you know, rogue

21   facility that just simply is -- whatever, is not abiding

22   by regs, which those tend to be -- in a system that has

23   this kind of scrutiny, you can't hide those too long.

24   So I doubt there's -- I'd be surprised if there's a

25   rogue facility out there that's abandoned the

                                                              32

1    Counsel.  It came to our office, but Mr. Martin's file

2    was produced.  Period.

3            MR. BORNSTEIN:  Q.  The -- let me start my

4    question over.

5            In the materials from your files that I had a

6    chance to review, there seemed to be a number of

7    instances where there was findings by the Senior Hearing

8    Officer -- that's SHO.  Right?

9        **A.  Uh-huh.**

10       Q.  Senior Hearing Officer.  And sometimes it would

11   include mitigation of punishment, sometimes it wouldn't.

12   Right?

13       **A.  Correct.**

14       Q.  Even in those instances where there was some

15   mitigation that was included, depending on what the

16   offense was, there were many times referrals to ICC for

17   classification -- for classification decisions.

18       **A.  Correct.**

19       Q.  What does that mean?

20       **A.  Well, that some offense behaviors, if not --**

21   **automatically suggest a reclassification decision need**

22   **to be made.  In other words, if you're medium custody**

23   **and you beat the hell out of somebody, somebody needs to**

24   **look and see whether you need to be close custody, in**

25   **addition to the sanction.  You know, whether they**

185

1    impose -- the classification people administratively

2    need to say, do we need to put him in a higher security

3    setting by reclassifying him close.

4        Q.   Did you review any of those classification

5    decisions as it related to mental health inmates who

6    were assessed with some, you know, recommendation by a

7    mental health person that, gee, you need to take this

8    into consideration, or yes, I think their mental illness

9    played a role in this, and you, you know, should

10   mitigate it?

11            Did you look at any of the classification

12   decisions that follow those RVR proceedings?

13       A.   You know, as they were referred for the ICC?

14       Q.   Uh-huh.

15       A.   No, I did not.

16       Q.   Is there a mental health component in the ICC

17   process?

18       A.   I hope so.

19       Q.   Well, do you know?

20       A.   No.

21       Q.   We know that there is in the RVR process,

22   because there's a whole written policy and procedure

23   about it.  Right?

24       A.   Yes.

25       Q.   Have you seen any written policy and procedure

                                                        186

1    about the classification process and -- as it results

2    from an RVR referral or finding?

3         A.   I have not.  I just did not look in that, you

4    know --

5         Q.   Is that a hole in the system?

6              MR. McKINNEY:  Objection.  Argumentative, calls

7    for speculation.

8              THE WITNESS:  It's a hole in my review that I

9    didn't look at it.

10             MR. BORNSTEIN:  Q.  Well, were you asked to

11   look at it?

12        A.   No.

13        Q.   Were you told that, well, this is only part of

14   this thing, part of the sanctions that might be imposed?

15        A.   No, no, because -- Jeffrey, that's not a

16   sanction, and that's why I didn't look at it.

17        Q.   Why is it not a sanction?

18        A.   It's an administrative decision.  A

19   classification decision is an administrative decision

20   based entirely on objective variables.  It's not a

21   sanction.  It's not a penal decision.  It's an

22   administrative decision.

23        Q.   Well, it can be penal.

24        A.   It in effect can be, certainly.

25        Q.   If you take someone --

                                                        187

1              CERTIFICATE OF REPORTER

2         I, HOLLY THUMAN, a Certified Shorthand Reporter,

3    hereby certify that the witness in the foregoing

4    deposition was by me duly sworn to tell the truth, the

5    whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken

7    down in shorthand by me, a disinterested person, at the

8    time and place therein state, and that the testimony of

9    said witness was thereafter reduced to typewriting, by

10   computer, under my direction and supervision;

11        That before completion of the deposition review of

12   the transcript [] was [X] was not requested.  If

13   requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21

22   DATED: March 4, 2013

23

24                              _____
                                     HOLLY THUMAN, CSR
25

                                                           300

# EXHIBIT 3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                  Plaintiffs,       )
                                    )CASE NO.:
        vs.                         ) S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                  Defendants.       )
_____     )



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA






REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC


Page 1

```
 1    Debbie Vorous.  And then other administrative officials
 2    from CDCR, but I don't remember their names.
 3         Q.   Is it possible that Dr. Belavich was there?
 4         A.   It's possible, but I don't recall.
 5         Q.   How long was that meeting?
 6         A.   My best recollection was two or three hours
 7    all totaled.
 8         Q.   What did you discuss?
 9         A.   An overview of the prison system in
10    California.  A discussion of the electronic medical
11    record system that they now have.  A review and overview
12    of a program called MHTS.net.  Policies and procedures
13    that had -- that had been developed over time.  And --
14    and also that there was a general program guide for the
15    provision of care to mental health clients.
16         Q.   Did you discuss the litigation?
17         A.   The litigation was clearly discussed in the
18    sense that we were asked to do an objective and
19    independent review of the care provided and was the
20    California system deliberately indifferent to the
21    serious medical needs of the inmates, medical and/or
22    mental.
23         Q.   Did you discuss the judge and the special
24    master?
25         A.   Not to my recollection.
```

1      Q.    Did you discuss a methodology for the work?

2      A.    Yes.

3      Q.    What methodology did you use?

4      A.    That as a psychiatrist, I would be looking at

5   the provision of psychiatric care and the monitoring of

6   the psychiatric care, and what were the mechanisms in

7   place to assist with that methodology and evaluation

8   process.

9      Q.    If you -- how would you break down the

10  elements of psychiatric care that you were asked to look

11  at?

12     A.    I was asked to look at were the inmates

13  referred for psychiatric evaluation, did they receive

14  that.  Were the diagnoses appropriate to the symptoms

15  reported.  Were the -- did the treatments match the

16  diagnoses.  Were the medications monitored in a

17  reasonable way.

18          Another aspect of my review, we're looking at

19  the mental health crisis beds and the evaluations done

20  relevant to the mental health crisis bed and the

21  management of inmates in the mental health crisis bed

22  units.

23     Q.    Are those all the topics that you were asked

24  to look at?

25     A.    To the degree that there were overlaps with

Page 21

1    the psychiatric medication piece, I was also asked to
2    look at that.  For example, there were some IDTTs I
3    attended on an EOP and in some CCCMS settings to look at
4    the medication management and settings not isolated to
5    the mental health crisis beds.

6         To the degree that parole medications were
7    being provided to inmates upon release from the prison
8    and to the degree that there were quality assurance
9    monitoring relevant to psychiatry medication management,
10   I reviewed those as well.

11        And looked at the psychiatry meetings that
12   they had as part of their organization.  Also reviewed
13   if there were policies relevant to medication
14   management, such as Clozaril medication management
15   policy.  Had they developed a medication management
16   policy relevant to heat risk medications.  And were
17   issues related to the medication monitoring both at a
18   local and at a statewide level in place.

19        Q.   Anything else that was on your plate?
20        A.   Those were the primary issues.  There may have
21   been some isolated site-specific areas where I was
22   present or sitting in, but those were the primary areas
23   of my focus.

24        Q.   Do you recall what Dr. Dvoskin was tasked
25   with?

1          A.    In general.

2          Q.    What were those things?

3          A.    Looking at the quality of mental health care

4    provided outside of the medication administration in the

5    different levels of care.  Doing a suicide review or

6    review of the suicide risk assessment management and

7    policies and procedures.

8               I've already talked about his involvement in

9    different levels of care and the provision of care at

10   those different levels.

11              He also met with and was -- the SPR-FIT

12   coordinators.  And to the degree that quality assurance

13   or improvement projects overlapped with the provision of

14   nonpsychiatric care, he may have reviewed that aspect as

15   well.

16              And, in general, access to care through the

17   different levels of care he was involved in assessing.

18         Q.    And what about Dr. Moore?

19         A.    My understanding of Dr. Moore was that she was

20   as a nurse looking at issues related to nursing

21   medication administration.  And that could include

22   medication refusals or sign-offs on medicines.

23              In some instances, checking with pharmacy

24   about parole medications and how that process was

25   administered.  Emergency response.  And also she may

1    have had some involvement in the screening aspect as

2    well.

3         Q.    And was Dr. Martin -- Mr. Martin present at

4    your meeting as well?

5         A.    Yes.

6         Q.    Would it be fair to say he was tasked with use

7    of force and rules violations?

8         A.    Yes.

9         Q.    Were you asked to look at all at the inpatient

10   level of care at the Department of State Hospitals?

11        A.    No.

12        Q.    Do you recall if anyone was asked to look at

13   that?

14        A.    If they were, I wasn't present when that was

15   requested.

16        Q.    Were you asked to look at the impact of

17   overcrowding on the delivery of care?

18        A.    I was asked to look at, with the current both

19   staffing levels and prison population, was appropriate

20   care psychiatric care provided to inmates and was there

21   evidence that the California Department of Corrections

22   was deliberately indifferent to the inmates based on the

23   population at the time that I did the evaluation.

24        Q.    You had published at least one article about

25   the overcrowding decision in this case, right?

1          Q.    Had you ever -- so you've never delivered

2     services to state prisoners as a psychiatrist?

3          A.    In California or in all states?

4          Q.    In California.

5          A.    Not in California.

6          Q.    You never consulted with California Department

7     of Corrections and Rehabilitation?

8          A.    No, that's not exactly correct.

9          Q.    What kind of -- did you consult with them?

10         A.    Yes.

11         Q.    What did you do?

12         A.    I was asked to do some trainings and education

13    for California Medical Facility in Vacaville on -- by

14    their chief psychiatrist at the time on issues related

15    to malpractice and deliberate indifference.

16         Q.    When was that?

17         A.    My best estimate, I would -- 2000 or 2001,

18    somewhere around there.

19         Q.    Going back to your initial meeting on this

20    engagement, you've testified about the division of labor

21    among the four experts?

22         A.    In general terms, yes.

23         Q.    In general terms.

24               Did you also discuss a methodology for

25    performing the work, what kind of study you would do?

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

```
 1        A.    Yes.
 2        Q.    And what -- at that point, just at that first
 3   meeting, what methodology -- did you settle on a
 4   methodology?  Or were things left to be determined?
 5        A.    You're talking about the first meeting or in
 6   general?
 7        Q.    Just the first meeting for now.
 8        A.    At the first meeting, the best of my
 9   recollection, the detail of precise methodology wasn't
10   finalized there.
11        Q.    Did you have a general framework settled?
12        A.    A general framework, yes.
13        Q.    Can you describe that?
14        A.    General framework would be that we would tour
15   institutions that were representative of the CDCR at
16   large, meaning with different locations, different
17   programs.  And Mr. Martin would be reviewing primarily
18   the use of force.  Dr. Moore would be looking primarily
19   at issues related to nursing administration and
20   medication.  Dr. Dvoskin would be looking overall at
21   those institutions about the provision of mental health
22   care.  And I'd be focusing primarily on the psychiatric
23   medication management piece.
24        Q.    At that point, did your methodology include
25   any quantitative element; that is, would you be
```

THORSNES LITIGATION SERVICES, LLC | 877.771.3312 | www.thorsnes.com

1   collecting data and tabulating it in some way?

2       A.   I don't recall if on the very first meeting

3   there was an organized data collection procedure

4   finalized on the first meeting.

5       Q.   Okay.  Did you ever work up an organized data

6   collection procedure?

7       A.   Yes.

8       Q.   When did that happen?

9       A.   Over several months following that first

10  meeting, a tool to help look at different components

11  important to care, or potentially important to care, was

12  developed.  And my input was primarily into the

13  medication piece.  And to the degree that that also

14  related to the mental health crisis bed, I had input

15  into that as well.

16      Q.   And was the plan to tabulate data from that

17  collection and include it in your report?

18           MR. McKINNEY:  Objection.  Vague and

19  ambiguous.

20           THE WITNESS:  No, the plan wasn't to per se

21  include all the data collection pieces in the final

22  report.

23  BY MR. GALVAN:

24      Q.   What were you going to do with the data

25  collection pieces?

 1        A.    Have them available for review should we have
 2   an opinion that people would want to know the basis for
 3   the opinion.
 4        Q.    And did you actually do that?  Do you have
 5   them available for review?
 6        A.    I turned them over, I believe, yes.
 7        Q.    When you say "turned them over" -- ask a
 8   different question.
 9              When you talk about having something for
10   review, do you mean something in which you -- you broke
11   out or rolled up the results of your tabulation in terms
12   of percentages or scores in some way?
13        A.    I provide the entire data set so someone could
14   verify it for themselves rather than rely on my own
15   summary.
16        Q.    Did you ever make your own summary?
17        A.    I have a general impression from having
18   reviewed the data.  So having been at the institutions
19   and collected the data, it's easy to learn it as you do
20   it.
21        Q.    Do you have a document with a summary of the
22   data?
23        A.    No, just what's in my head.
24        Q.    Is it possible -- or do you know whether
25   Dr. Bobb has a document with a summary of the data?

1          MR. McKINNEY:  Objection.  Calls for

2     speculation.

3          THE WITNESS:  I think that would be highly

4     unlikely considering that they entered the data into the

5     general database and they were only at a couple of the

6     site visits.

7     BY MR. GALVAN:

8          Q.  Okay.  So you answered "they," so that would

9     apply to Dr. Reid, too?

10          A.  Yes.

11          Q.  This process you describe of collecting data

12     and summarizing it, was this just for your part of the

13     study, yours and Dr. Bobb's and Dr. Reid's, or did it

14     also apply to Dr. Dvoskin and Dr. Moore?

15          A.  There were two parts to that question.

16          Q.  Yes.

17          A.  So the first part was the issue about

18     collecting and summarizing.  And I think that I've

19     already reported that I turned over the database in its

20     entirety without summarizing in that database.  So I

21     don't want to acknowledging that question contradict

22     what I testified to earlier.

23          The next part was did Dr. Dvoskin and

24     Dr. Moore -- repeat your question on that part.

25          Q.  Did they also have their own databases that

1    they ran, as far as you know?

2              MR. McKINNEY:  Objection.  Calls for

3    speculation.

4              THE WITNESS:  I don't know precisely their

5    database collection method, and I haven't reviewed

6    theirs.

7    BY MR. GALVAN:

8         Q.   Did you give them access to your database?

9         A.   If they had a question relevant to psychiatric

10   medication, yes.

11        Q.   How would they do that?  Would they actually

12   sit at a computer and query the database in some way?

13        A.   No.

14        Q.   What would they do?

15        A.   They would say, "Can you see if this inmate

16   that I talked is on this medication, and is it correct

17   what he told me?"

18              And then I could look at the information and

19   give them that feedback.

20        Q.   Did that actually occur?

21        A.   Yes.

22        Q.   Did you have amongst you a settled population

23   of inmates you were looking at such that if they asked

24   you, like as you just testified, if they asked you,

25   "Could you look at this inmate?" that inmate would be in

1    the universe of people you had in your database?

2         A.    If we're on-site, and because I had access to

3    EUHR, then I could access and then enter that

4    information into the database.  And then because we were

5    at the sites on the same day, could express what I

6    found.

7         Q.    How many inmates were in your database?

8         A.    Between 137 to 150 depending how you code the

9    charts.  Maybe slightly higher.

10              Because there's a information related to some

11   of the mental health crisis beds that may not have been

12   on medication, so they wouldn't be in the medication

13   database if they're not on medication, but their charts

14   may have been reviewed issues related to suicide risk

15   assessment or informed consent.  So that's why I say

16   there's a range.

17        Q.    So a person could get an entry in the

18   database, but he may not have all the fields filled?

19        A.    Correct.

20        Q.    So there may be medication fields for some

21   people crisis bed fields for others, et cetera?

22        A.    Correct.  But there were around 135 to 137

23   that were on medications.

24        Q.    How did you select this 135 -- how did you

25   select this, roughly, 137 to 150 people?

Charles Scott, M.D.                                                              March 8, 2013

1       A.   I asked for the prison to turn over to me all
2   inmates on the medications that -- so that I could do a
3   random selection and not have requested in advance any
4   inmates' charts in advance.

5       Q.   Can you explain that last part of your answer?
6   I didn't quite understand that.  So you could not have
7   requested any inmates' charts in advance.  What does
8   that mean?

9       A.   It means that if you're trying to do an
10  independent audit, that you want to ensure that if you
11  say, "Please pull these 10 charts," and that's a week or
12  month before you arrive, that you try to eliminate any
13  concern that people could have really tried to make the
14  charts -- what we call chart up in advance of the
15  evaluation.

16          So this way, if I only on-site had them turn
17  over all the inmates on the medicine and then I accessed
18  EUHR, then, with a large number of inmates on medicines,
19  I felt a random sampling was a more accurate reflection
20  of the care delivered.

21      Q.   Did you also include in your database people
22  whose IDTTs you sat in on?

23      A.   Yes.

24      Q.   Did you include the people that Dr. Dvoskin
25  may have picked out on the yard to talk to?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

 1            MR. McKINNEY:  Objection.  Vague and

 2    ambiguous.

 3            THE WITNESS:  There may be some overlap.  But

 4    he also may have talked to individuals that either

 5    weren't on medicines or that weren't part of my random

 6    sampling.

 7    BY MR. GALVAN:

 8        Q.    Did you consult any experts in statistics on

 9    your sample size?

10        A.    No.

11        Q.    Did you take any steps to determine whether

12    your sample size was representative?

13        A.    Yes.

14        Q.    What did you do?

15        A.    I tried to have a variety of medications

16    selected so that when I had the list of the medication

17    that the inmates were on, I would try to have different

18    categories of medicine.  Number one.

19            Number two, I purposely oversampled people

20    that may be on medications with a higher risk of side

21    effects, such as atypical antipsychotics or other

22    medication that would require monitoring versus other

23    medicines with lesser risk because those could have

24    potentially more serious side effects.

25            And I had, by design, looked at medical

1    records more representative of the EOP and/or mental

2    health crisis bed level of care because those, by the

3    program guide definitions, would require more intense

4    services.

5            MR. GALVAN:  I'll ask the court reporter to

6    mark Exhibit 2.

7                (Plaintiffs' Exhibit 2 was marked for

8                 identification.)

9            MR. GALVAN:  And I'd like to mark, please, an

10   Exhibit 3.

11               (Plaintiffs' Exhibit 3 was marked for

12                identification.)

13   BY MR. GALVAN:

14      Q.   What I've marked as Exhibits 2 and 3 are

15   different versions of a document that says "Mental

16   Health Services Audit Tool."

17           Start with No. 2.  Is this a version of the --

18   of the -- I don't remember what you called it in your

19   testimony, but since it says "audit tool," we can call

20   it audit tool -- that you and the other consultants

21   developed?

22      A.   Yes.

23      Q.   And did anyone from CDCR help you develop

24   this?

25           MR. McKINNEY:  Objection.  Vague and

1    ambiguous.

2              THE WITNESS:  To the extent the clerical

3    support to create the boxes and the formatting, the

4    content was developed by the expert team.

5    BY MR. GALVAN:

6         Q.   Did counsel help you develop the content?

7              MR. McKINNEY:  Objection.  Vague and

8    ambiguous.

9              THE WITNESS:  Not per se, no.  I don't recall

10   counsel helping me develop the content.

11   BY MR. GALVAN:

12        Q.   So turning to page 9, Bates No. 102444,

13   there's a section here "MHCB Standard of Care Audit

14   Tool," and has the names Joel and Charles next to it?

15        A.   Right.

16        Q.   At the top, there's a table, says "General

17   Program Data," and then it has six rows.

18        A.   Right.

19        Q.   Are these -- did -- what are these six rows?

20   Are these criteria that you developed?

21             MR. McKINNEY:  Objection.  Vague and

22   ambiguous.

23             THE WITNESS:  No.

24   BY MR. GALVAN:

25        Q.   What are they?

1        A.   They are general pieces of information that we

2   understood could be available for the data systems at

3   CDCR and might give us a understanding of the program.

4        Q.   Okay.  So down here, further down where there

5   are things that prefixed with Screen 1, Screen 2,

6   Screen 3, are these criteria that you developed?

7        A.   Yes.

8        Q.   How did you choose these five?

9        A.   In looking at the constitutionality of a

10  system, we felt it was important about what kind of

11  indicators indicated deliberate indifference, and these

12  were five screens we felt were relevant to assessing

13  deliberate indifference.

14        Q.   Was there a point when you considered

15  including a screen for waiting time to actually arrive

16  at the crisis bed?

17             MR. McKINNEY:  Objection.  Vague and

18  ambiguous.

19             THE WITNESS:  Because this screen was looking

20  for those who were on mental health crisis bed on -- at

21  the facility, that screen wouldn't have been relevant

22  for the people we were looking at at the time on the

23  mental health crisis bed.  It doesn't mean that -- I'm

24  not saying it's not a relevant topic at large, but this

25  was for evaluating people on the mental health crisis

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   BY MR. GALVAN:
 2       Q.   After SAC, they gave you a month off and you
 3   went to Centinela; is that correct?
 4       A.   I was on probation, that's correct.
 5       Q.   Were you involved in the discussion of
 6   choosing Centinela as a prison to include?
 7       A.   To the extent that it was representative of
 8   another type of prison compared to Folsom and -- I'm
 9   sorry -- CSP SAC and CMF, I did ask to see a variety of
10   types of prisons in the system, and so this was an
11   example of one that had -- more out in the desert
12   community and had less percentage of psychiatric
13   patients as well.
14       Q.   Looking at page Bates No. 960 in this
15   Exhibit 11, you have a note:  "Psychiatrist out today."
16       A.   That was correct.  The psychiatrist was not
17   there on that date.
18       Q.   Were you -- when you say "the psychiatrist,"
19   how many do they have?
20       A.   I think they have a half-time psychiatrist.
21       Q.   Do you consider that adequate staffing?
22       A.   For this facility, yes.
23       Q.   Why?
24       A.   One, they had very few inmates on psychotropic
25   medications.
```

CERTIFICATE OF REPORTER

1

2

3        I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8        That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13        I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                    DATED:   March 11, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# EXHIBIT 4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
            vs.                       )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
                                      )
_____


DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1   BY MR. FISCHER:
 2        Q.   Would it be in several sections?
 3             MS. VOROUS:  Same objection.  Asked and
 4   answered.
 5             THE WITNESS:  I don't know.  I don't even know
 6   if it's in there.
 7   BY MR. FISCHER:
 8        Q.   Okay.  You said earlier that you were asked to
 9   offer opinion as to whether the system was
10   constitutional; is that correct?
11        A.   Yes.
12        Q.   What are -- what is the measure of whether a
13   system is constitutional, in your opinion?
14        A.   Whether the inmates have access to care,
15   whether they have benefit of a physician judgment,
16   whether they receive the care that's ordered, and
17   whether or not there are no deliberate omissions in care
18   that would create harm to a patient.
19        Q.   Anything else?
20        A.   No.  That's what I would use.
21        Q.   Go through those.
22             First you said "access to care."  What do you
23   mean by "access to care"?
24        A.   The right of the inmate to access care when
25   they feel that they need it.
```

```
 1          Q.    The other institutions listed on here, you did
 2    attend on the dates identified?
 3          A.    Yes.
 4          Q.    Okay.   In your report on the tours, it says
 5    that you and the other experts interviewed patients; is
 6    that correct?
 7          A.    Yes.
 8          Q.    Can you just explain the process for
 9    interviewing patients on the tour?
10          A.    My process was generally to interview inmates
11    that were housed in administrative segregation, although
12    at one point I interviewed inmates at Corcoran that were
13    housed in protective custody, protective housing because
14    it was right next to the ad seg units.
15          Q.    Is this the SHU, segregated housing unit?
16          A.    I think so.   It could be.
17          Q.    How many -- in the course of your consulting,
18    how many individuals patients would you say that you
19    interviewed inside CDCR?
20          A.    On each visit I tried to interview five
21    patients.
22          Q.    That's a total of about 50 patients?
23          A.    Yes.
24          Q.    And to -- say you're in an administrative
25    segregation unit.   How would you identify which patients
```

1    to interview?

2         A.    I asked the LPT to indicate which patients

3    were EOP patients and were receiving meds.  Or sometimes

4    the psychiatrist, if there was a psychiatrist on the

5    unit.

6         Q.    And then what was the process?

7         A.    I would get a vest, I would go up to where the

8    patient was, and introduce myself.

9         Q.    Okay.  At cell front?

10        A.    At cell front.

11              I would tell them who I was and why I was

12   there.

13        Q.    What did you say?

14        A.    "My name is Jackie Moore.  I'm a registered

15   nurse.  I'm working with the attorney general's office.

16   We're going to evaluate the quality of mental and health

17   care at this facility.  I'm going to ask you about a few

18   questions about your care.  Do you care to talk to me?

19   Will you answer my questions?"

20        Q.    Did you mention the Coleman case?

21        A.    No.

22        Q.    Is it --

23        A.    I don't believe so.  I don't know for sure.

24        Q.    What if -- did any inmates patients refuse to

25   speak to you?

1      A.   Rarely.  If one did, then I would just find

2  another.  Rarely.

3      Q.   Do you recall any patients having questions

4  about who you were?

5      A.   No, because I told them.  They wanted to --

6  sometimes, regardless of what I told them, they wanted

7  to know if I was going to come to work there the next

8  day.  Was I going to come back, you know, those kind of

9  questions.  I mean, even though I told them, I'm not

10  sure they always comprehended.  You know, "Are you going

11  to be a new here?  You ought to come here."  I mean,

12  they would get to the part where I'm a registered nurse.

13  "Oh, yeah, we need nurses."

14      Q.   Is that what they said, "We need nurses"?

15      A.   That's what they would say to me.  "Oh, yeah,

16  we need new nurses."

17      Q.   Did you ask them what they meant by that?

18      A.   No.  I just laughed.  I would say, "No, that's

19  not why I'm here."

20           There was always someone in attendance with me

21  when I did the interview.  They stepped back; they

22  didn't stand right next to me.  I stood at the side of

23  the door so I could hear.

24      Q.   Uh-huh.  Who -- who would be with you?

25      A.   It could be the LPT.  It could be the nursing

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    supervisor if that's who was giving me the tour of the

 2    grounds.

 3        Q.   Was there ever a custody officer there with

 4    you?

 5        A.   Never.  Never.

 6        Q.   Was there ever someone from the attorney

 7    general's office with you?

 8        A.   No, never.

 9        Q.   Ever anyone from CDCR counsel?

10        A.   No, but one time the secretary watched me and

11    I didn't know it.

12        Q.   The secretary watched you?

13        A.   The secretary.

14        Q.   The Secretary Beard?

15        A.   No.

16        Q.   This is the previous secretary,

17    Secretary Cate?

18        A.   Yeah, but he wasn't standing right there.  He

19    was in the general area.

20        Q.   Where was that?

21        A.   Salinas.

22        Q.   Did he join you on the tour at Salinas?

23        A.   No.  He just -- he was standing in the middle

24    of this area, and I was interviewing an inmate.

25        Q.   When did you find out it was Secretary Cate?
```

1        A.    When he asked me questions about how we were

2    doing and what I saw and what my findings were, and he

3    said it with such authority and rapid-fire sureness,

4    that I thought I should find out who he was before I

5    answered the questions.  So I said, "Excuse me, sir.  I

6    don't know who you are."

7             And the warden says, "This is the secretary,"

8    and I still didn't know.  Still stupid.  I said, "Your

9    secretary?"

10            And he said, "No, the secretary for the

11   department."  And then I just wanted to die.

12       Q.    So he just happened to be there on the same

13   day?

14       A.    He just happened to be there same day.  Just

15   happened to be in that area at the same time I was

16   there.  I mean, there was nothing planned.  I don't even

17   think he knew what I was doing when I was over there,

18   because I took an inmate from a corner cell and he was

19   standing in the center of them.

20       Q.    So he was just sort of observing you doing the

21   interview?

22       A.    Well, I don't know if he was observing me.  He

23   was just in that unit.

24       Q.    Who else would join you on the tours?

25       A.    That's it.  Either the LPT or -- oh, who would

Jacqueline Moore, R.N., Ph.D.                                February 21, 2013

1    join me?

2         Q.    Yeah.

3         A.    One time, Patrick went on a tour with me.  One

4    time, Diana.

5         Q.    Patrick is AG counsel Patrick McKinney?

6         A.    AG counsel.

7         Q.    And Diana is Diana Toche?

8         A.    Yes.  One time.  Most of the other times I was

9    by myself.

10        Q.    Would Dr. Dvoskin and Dr. Scott be --

11        A.    They sometimes went with -- Patrick would go

12   with Dr. Dvoskin or Dr. Scott.  Or sometimes he would go

13   with Charles.  I mean, it just, you know, it rotated

14   around.

15        Q.    Did you ever do your interviews with

16   Dr. Dvoskin?

17        A.    Once, yes.

18        Q.    Where was that?

19        A.    That was one of the first or second facilities

20   that I went to.  We did our interviews together just so

21   that we would have some interrater reliability.

22        Q.    And do you remember if at those interviews,

23   was anyone else with you during the interviews?

24        A.    It was just the two of us.  There was a guard

25   that was back, not up to the cell like we were, but

Page 56

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

1    back.  I mean, we always had to have an officer so that

2    we could have access to the inmate, but they were never

3    right there with us; they always were back.

4         Q.   Was it your understanding they were able to

5    hear the discussions?

6         A.   No, they couldn't hear the discussion.

7              I could barely hear the discussions.

8         Q.   Do you recall how -- Dr. Dvoskin would

9    introduce himself during these interviews?

10        A.   No, I don't.  It was early on.  And I don't

11   know how he introduced himself.

12             I'm sure I introduced myself the way that I

13   said I do because that's what I've done for 35 years.

14        Q.   Sure.

15        A.   That's what I do.

16             I know he introduced himself.  I don't know

17   what else he said.

18        Q.   At the end of the interviews, did any of the

19   patients ask how you were going to use the information

20   that you received?

21        A.   I told them, and sometimes I didn't even take

22   their names down because I didn't want to get into

23   individual people in trouble.

24             I told them that it was just an informal

25   survey.  I was just interested in their opinion about

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    how the care was going.  I asked them how long they had
 2    been on the unit, how often somebody came by and talked
 3    to them about their welfare, what the welfare checks
 4    consisted of, how often they saw their primary
 5    clinician, how often they saw their psychiatrist, how
 6    often did they get to IDTT meetings.
 7              Did they go to group therapy.  If they didn't
 8    go, why didn't they go.
 9              Were they on any medications.  Did they have
10    side effects of the medications.  Did they know what the
11    side effects were.
12              Did they know how to call mental health for an
13    emergency.  And did they know how to call -- how did
14    they get medical care, because I wanted to make sure the
15    mental health patients got medical care, too.
16         Q.   Sure.
17         A.   And then at the end, I would ask them to rate
18    them.  Sometimes they would give me a number.  Sometimes
19    they would say the care is great.  Sometimes they would
20    split the scores.
21         Q.   Did some patients say the care was not great?
22         A.   They never said that about mental health.
23    They did say that about medical.
24         Q.   Interesting.
25              Did you tell them you'd be writing a report at
```

```
 1    the end of your tour?
 2         A.    I told them that we were here in the
 3    institution and that we were going to various housing
 4    units and interviewing various inmates at random, and
 5    that -- you know, they were just happened to be picked
 6    and would it be all right.  I mean, I always asked for
 7    permission before I just assumed that they were going to
 8    talk to me.
 9         Q.    Sure.
10         A.    And I didn't put down any particular inmate in
11    my report.
12         Q.    Okay.  But they didn't know you were there to
13    write a report at the end of your tour?
14         A.    They knew we were doing an evaluation of that
15    facility, so...
16         Q.    A few more questions and then we can take a
17    break.
18         A.    I mean, these inmates were so used to being
19    talked to.
20         Q.    They were used to being talked to?
21         A.    Yeah.  I mean, when I would walk through the
22    yard, they would sometimes say, "Oh, she's with
23    Coleman."
24         Q.    Who would say that?
25         A.    The inmates.
```

1                    I mean, if they saw a suit, that was their

2        assumption.

3             Q.    Did any inmates ever mistake you for being

4        with the special master team for Coleman?

5             A.    I never asked them what they thought.

6             Q.    Okay.  You said that you asked them a number

7        of questions about their clinician and their

8        medications.  And in the report, I noticed that you said

9        that their knowing their clinicians or their medications

10       was unusual.

11                   Do you recall that?

12            A.    I didn't think it was unusual.  I thought it

13       was great.

14            Q.    Thought it was great.

15                   Did you think that it indicated that they were

16       receiving an appropriate level of care?

17            A.    Yes, because they knew who the people were.

18       They knew who they had access to.

19            Q.    Are you aware of any studies that show that

20       whether the patient knows their psychiatrist or their

21       primary clinician is a -- an appropriate measure for

22       quality of care?

23            A.    I'm not aware of quality assurance studies as

24       such.

25            Q.    Are you aware of any quality assurance studies

1   or any studies that validate that whether a patient

2   knows what medication they're on is a measure of quality

3   of care?

4          A.   I'm not aware of any studies, but my personal

5   opinion is is that that's a good thing.

6          Q.   Are you aware of any studies as to whether

7   they expressed positive or neutral feelings or mixed

8   scores as an appropriate measure of the quality of care?

9          A.   I think that that's a study that's done in

10  hospitals all the time.  They ask inmates about

11  satisfaction.

12         Q.   Okay.  Do you think if that a patient knows

13  his clinician's name or the medications that he's

14  receiving, that is he receiving an appropriate level of

15  mental health care?

16         A.   Yes.

17              MR. FISCHER:  Okay.  Let's take a five-minute

18  break.

19              (Off the record at 10:10 a.m. and back

20               on the record at 10:18 a.m.)

21  BY MR. FISCHER:

22         Q.   Dr. Moore, you mentioned that you thought

23  whether the patient knew the name of their clinician or

24  the medications they were receiving is an indication of

25  quality of care, correct?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1        A.   Yes.
 2        Q.   And you asked those questions during your
 3   interviews; is that right?
 4        A.   Yes.
 5        Q.   Did you follow up to confirm that what the
 6   patients told you was correct?
 7        A.   No, I did not.
 8        Q.   Is there -- in other systems that you
 9   reviewed, do you use the same method of determining
10   quality of care?
11        A.   No.  It depends on what I'm looking at.  I
12   might ask different questions.
13        Q.   What were you looking at here that led you to
14   use this line of questioning?
15        A.   I was looking to see that patients that were
16   in administrative seg were seen by their preliminary
17   clinicians once a week, seen by their psychiatrist every
18   30 days, that they went to IDTT meetings, that they were
19   offered group therapy, that they were receiving their
20   meds.  That was the first question I asked, "Are you
21   taking any medications?"
22        Q.   Did you review records of each of the people
23   you interviewed to confirm what they were telling you
24   was correct?
25        A.   If I had an inmate that complained to me about
```

Page 62

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                    CERTIFICATE OF REPORTER

 2

 3            I, MEGAN F. ALVAREZ, a Certified Shorthand

 4      Reporter, hereby certify that the witness in the

 5      foregoing deposition was by me duly sworn to tell the

 6      truth, the whole truth and nothing but the truth in the

 7      within-entitled cause;

 8            That said deposition was taken down in

 9      shorthand by me, a disinterested person, at the time and

10      place therein stated, and that the testimony of the said

11      witness was thereafter reduced to typewriting, by

12      computer, under my direction and supervision;

13            I further certify that I am not of counsel or

14      attorney for either or any of the parties to the said

15      deposition, nor in any way interested in the events of

16      this cause, and that I am not related to any of the

17      parties hereto.

18

19

20                              DATED: February 25, 2013

21

22                         _____

23                         MEGAN F. ALVAREZ

24                         RPR, CSR 12470

25
```

# EXHIBIT 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,           )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )   Case No. Civ S 90-0520 LKK-JFM P
                                 )
EDMUND G. BROWN, JR., et al.,    )
                                 )
                                 )
          Defendants.            )
_____)
MARCIANO PLATA, et al.,          )
                                 )
                                 )
          Plaintiffs,            )
                                 )
     vs.                         )   Case No. C01-1351 TEH
                                 )
EDMUND G. BROWN, JR., et al.,    )
                                 )
                                 )
          Defendants.            )
_____)

DEPOSITION OF EDWARD KAUFMAN, M.D., taken

on behalf of the defendants, at 32392 South Coast

Highway, Suite 250, Laguna Beach, California,

commencing at 10:00 a.m., Saturday, March 16, 2013,

before Audrey L. Ricks, Certified Shorthand

Reporter, No. 12098, CCR, RPR, CLR.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    said that your opinion was that there were
 2    significant shortages in mental health staff in all
 3    three institutions you visited.
 4              Is that -- is it your opinion that what --
 5    the staffing levels are unconstitutional?
 6         A    "Constitutional" is not a psychiatric
 7    term.  I'm sorry.  I found that -- that's a legal
 8    term.  I find that hard to address that definition.
 9         Q    Then what is your understanding of
10    "deliberate indifference"?
11         A    I think that's a legal term too.  I'm not
12    medically able to respond to what that term means.
13         Q    Were you not asked to render an opinion as
14    to whether or not the mental health care system
15    within the Department of Corrections and
16    Rehabilitation met the constitutional minimum?
17         A    I don't recall that I was asked to use the
18    word "constitutional."
19         Q    Were you asked to compare it to community
20    standards?
21         A    Yes.
22         Q    But no one ever asked you to look to
23    determine whether or not the care that was rendered
24    met constitutional standards?
25         A    I don't recall that the word
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    didn't make it into your declaration?
 2         A    I spoke to some very briefly that are not
 3    included in the declaration.
 4              MS. MENDELSON:   I'd like to state for the
 5    record that Inmate M was in the report, that was in
 6    error.
 7              MS. ANDERSON:   Yes.   Thank you.   Inmate M
 8    is on page 45 and 46.
 9    BY MS. ANDERSON:
10         Q    So just to be clear, you did speak to
11    other inmates in there but their comments are not in
12    the report?
13         A    Correct.
14         Q    Did you make any notes about those
15    interviews with them?
16         A    Not that I recall.
17         Q    And how many were there?
18         A    I don't really recall.
19         Q    Okay.   The ones that you spoke to who did
20    not end up in your declaration, did they have
21    positive things to say about the system?
22         A    I don't recall that any of them had
23    anything positive to say.
24         Q    Doctor, what is your definition of
25    "deliberate indifference"?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1          A      Again, that's a legal term.  I don't

2     really have a definition of that.

3          Q      Okay.  On page 5 of your declaration you

4     indicate that you conducted private one-on-one

5     interviews with individual prisoners who were

6     selected with the assistance of plaintiffs' counsel

7     and institution staff.

8                 Can you tell me how many interviews you

9     had.

10         A      I believe they're listed as A through T.

11    I can count them if you'd like.

12         Q      Well, Doctor, you said that you

13    interviewed other individuals who didn't make it

14    into the report --

15         A      Oh.

16         Q      -- so I'm trying to figure out how many in

17    total you interviewed.

18         A      I really have to approximate and go

19    through my rough notes to see.  But in addition to

20    the 20 or so that are in my report, I had brief

21    contacts with maybe 5 or 6 others.

22         Q      Okay.  And how do you define "brief

23    contacts"?

24         A      Really, just maybe a cell phone contact or

25    in a dormitory -- a brief nonclinical discussion.

1          I, Audrey L. Ricks, CSR 12098, do hereby

2    declare:

3

4          That, prior to being examined, the witness

5    named in the foregoing deposition was by me duly
     sworn pursuant to Section 30(f)(1) of the Federal
6    Rules of Civil Procedure and the deposition is a
     true record of the testimony given by the witness.

7

           That said deposition was taken down by me in
8    shorthand at the time and place therein named and
     thereafter reduced to text under my direction.

9

           That the witness was requested to review the
10   transcript and make any changes to the transcript as
     a result of that review pursuant to Section 30(e) of
11   the Federal Rules of Civil Procedure.

12         No changes have been provided by the witness
     during the period allowed.

13

           The changes made by the witness are appended
14   to the transcript.

15         No request was made that the transcript be
     reviewed pursuant to Section 30(e) of the
16   Federal Rules of Civil Procedure.

17         I further declare that I have no interest in
     the event of the action.

18

           I declare under penalty of perjury under the
19   laws of the United States of America that the
     foregoing is true and correct.

20

           WITNESS my hand this 17th day of

21

     March, 2013.

22

23   _____

     Audrey L. Ricks, CSR 12098
24

25

# EXHIBIT 6

# EXHIBIT 7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          )CASE NO.:
          vs.                             ) S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____   )



DEPOSITION OF

ELDON VAIL

TUESDAY, MARCH 19, 2013,  9:10 A.M.

SAN FRANCISCO, CALIFORNIA



REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    that that's being done on a systemic basis, correct?

2        A.    It's very clear that Mr. Martin and I reached

3    different conclusions based on the material that we

4    reviewed.  We reviewed some of the same material, some

5    different material.  I didn't have access to what he

6    looked on when he was on-site at institutions, and he

7    didn't have access to what was made available to me that

8    happened since he toured facilities.

9        Q.    And you -- incidentally, when you were doing

10   your tours, you had -- I think you described you had

11   access to and spoke with inmates; is that correct?

12       A.    Yes.

13       Q.    And you were able to do that on essentially a

14   confidential basis without any of defendants' -- you

15   know, defendants' staff or staff counsel present?

16       A.    We moved to that.  We had to back people off

17   when we were trying to talk to folks in a -- you know,

18   in a day room environment or a cell front.

19            But we moved to, as we got farther into the

20   tours, simply calling them out and insisting that we

21   have a confidential office so that we could remove that

22   issue.

23       Q.    Okay.  And that was provided to you on these

24   tours when you asked for it?

25       A.    It was.

1                    CERTIFICATE OF REPORTER

2

3           I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8           That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                    DATED:    March 21, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

# EXHIBIT 8

# EXHIBIT 9

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          ) CASE NO.:
         vs.                              ) S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
                                          )


DEPOSITION OF

RICHARD JOHNSON

MONDAY, FEBRUARY 25, 2013,  8:58 A.M.

SAN FRANCISCO, CALIFORNIA


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1    admission to acute care, accepted by DSH, but none have
 2    waited more than 10 days, and there were 14 inmates
 3    pending admission to intermediate care accepted by DSH,
 4    the majority pending two weeks or less.
 5              I think you've already testified that the
 6    source of this data were the BUM reports from DSH.  Is
 7    that correct?
 8         A.   That's correct.
 9         Q.   Okay.  Did you look at anything else besides
10    that as the basis of that testimony in your declaration?
11         A.   Yeah, for the DSH placements it was the BUM
12    reports.
13         Q.   Okay.  You've already looked at -- testified
14    about the transfer timelines on the DMH beds?
15         A.   Correct.
16         Q.   That was in Exhibit 4?
17         A.   Correct.
18              MS. KAHN:  I'm going to mark another exhibit
19    that will be confidential.
20              (Plaintiffs' Exhibit 14 was marked for
21               identification.)
22    BY MS. KAHN:
23         Q.   It has prisoner names in it.
24              I'd like you to turn to page 5 first.
25              Well, first actually you should just probably
```

Richard Johnson                                          February 25, 2013

1    turn to the front page and actually open it up.  Open to

2    the -- to page to the fourth page where it says:

3    "January 10th, Monthly Bed Utilization Report for the

4    Department of State Hospitals."

5            Have you received this report ever or reviewed

6    this report?

7        A.   No.

8        Q.   So then if you can turn to page 5.

9            I'm sorry.  It's page 5 on the report with all

10   the names.  You have to get really in deep.

11       A.   Gotcha.

12       Q.   Look at it sideways.

13           On the bottom box there, I want to just kind

14   of take you through this.  So is it -- in the bottom

15   box, see the number 255?

16       A.   Yes.

17       Q.   Okay.  So that -- and that patient, the

18   referral institution there is CIM.

19           The date of referral is 11/28/12.  They're

20   referred to APP, VPP/APP.

21           The date it's received is 12/19/12.

22           Patient accepted and has been on the wait

23   list.

24           And you can follow down with -- these are all

25   accepted patients at APP, and it has the date of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    referral is on the left-hand side of "APP" there.  This
 2    continues on the next page.
 3           And if you want to do the math, you can do the
 4    math while we're sitting here, but I will -- these are
 5    patients on the wait list for the month of December, the
 6    time frame of your declaration.
 7           And I understand that you're not provided with
 8    this information, Mr. Johnson.  You're provided with
 9    some -- some other information from DSH.  This is
10    information that's provided to the court, to plaintiffs'
11    counsel.  But...
12           I will ask you -- I can start with the first
13    one and I'll ask you if the first prisoner on the list
14    if from the date of referral he's been waiting more than
15    10 days for admission to APP.
16           MR. RUSSELL:  Objection.  Vague and ambiguous.
17    Lacks foundation.  Calls for speculation.
18    BY MS. KAHN:
19       Q.   Based on the report you're reviewing.
20            Let me ask it again.
21            You're reviewing a report prepared by DSH for
22    the -- that's filed with the court and provided to the
23    Coleman special master and plaintiffs' counsel.
24            In reviewing this report, patient located,
25    Item No. 255, was referred to acute on 11/28/12, was
```

1  accepted and has been waiting since then. And the

2  report is dated December 31st, 2012.

3          Has he been waiting more than 10 days for

4  placement in the acute program?

5          MR. RUSSELL: Objection. Vague and ambiguous.

6  Lacks foundation. Calls for speculation.

7          THE WITNESS: And I'm not familiar with their

8  report, and so I know -- I know how our data is

9  calculated, but this is the first time that I've seen

10 this report and I would have to know more about it.

11 BY MS. KAHN:

12     Q.   Okay. Is that your answer?

13     A.   Yes.

14     Q.   Mr. Johnson, I just want to remind you that

15 said as chief of health care placement oversight and the

16 program itself is responsible for tracking capacity and

17 census and wait list data for Department of State

18 Hospitals, correct?

19     A.   Correct.

20     Q.   And you've never seen this detailed data which

21 the Department of State Hospitals provides per court

22 order to the Coleman special master and plaintiffs'

23 counsel and filed with the court?

24     A.   I have not.

25     Q.   This is not provided to HCPOP?

1          A.    I don't remember seeing this report.

2          Q.    And you filed a signed declaration with the

3    court attesting to lack of wait list and stating that

4    certain numbers of people have not been attesting to the

5    waits on waiting -- the numbers of patients waiting to

6    be admitted to these programs without being informed or

7    provided with this data or that knowledge of this data?

8          A.    DSH has told us that their official document

9    on their census and wait list is their BUM reports that

10   come from the hospitals, and that's what we used to

11   compile our data.

12         Q.    Well, if you were aware that this report

13   existed, would you compile a different type of wait list

14   with that -- knowing that?

15              MR. RUSSELL:  Objection.  Vague and ambiguous.

16   Lacks foundation.  Calls for speculation.

17   BY MS. KAHN:

18         Q.    Would you investigate this data differently if

19   you were aware that the department compiled data that

20   showed the date of referral to an inpatient program?

21              MR. RUSSELL:  Objection.  Vague and ambiguous.

22   Lacks foundation.  Calls for speculation.

23              THE WITNESS:  I would look into it.

24   BY MS. KAHN:

25         Q.    Would you have signed a declaration that

1    stated what it stated if you had this data in front of

2    you and could have reviewed it?

3              MR. RUSSELL:  Objection.  Vague and ambiguous.

4    Calls for speculation.

5              THE WITNESS:  I don't know.  It would depend

6    on what I was informed what this report is and how it's

7    collected.

8    BY MS. KAHN:

9         Q.   Do you want to read the entire report first?

10             Let me first take you to another page first.

11   Do you want to see the wait list for ICF?  Turn to

12   page 17.

13             Starting at 862, continues to the next page.

14   But the names from 862 through 885 have all been waiting

15   more than 30 days for admission to Salinas Valley

16   psychiatric program from the date of referral.

17             If you turn to page 23.

18             MR. RUSSELL:  There's no question pending.

19             THE WITNESS:  Okay.

20   BY MS. KAHN:

21        Q.   Turn to page 23, 1170 and 1171.  There are two

22   prisoners waiting for admission to Atascadero who were

23   referred more than 30 days ago and accepted.

24             I'll ask my question again.

25             If you had had full information available that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   is filed under seal and provided to plaintiffs, to the
 2   Coleman special master, which the attorney general's
 3   office was aware of, CDCR legal was aware of, if this
 4   information had been provided to you before you signed
 5   your declaration under penalty of perjury, would you
 6   have changed the statements that were made in your
 7   declaration?
 8               MR. RUSSELL:  Objection.  Vague and ambiguous.
 9   Lacks foundation.  Calls for speculation.
10               THE WITNESS:  And I cannot say that I would
11   change anything because we have these source documents
12   that the data comes from in coming to our data.  But if
13   I'm ever shown anything that differs from -- another
14   source of data that differs from our data, then it is
15   something I will look into or have my staff look into.
16   BY MS. KAHN:
17      Q.   Okay.  And do you feel like this data
18   contradicts what you said in your declaration?
19      A.   Not necessarily.
20      Q.   So you have to look into this data?
21      A.   Yes.
22      Q.   And you plan to look into this data?
23               MR. RUSSELL:  Objection.
24   BY MS. KAHN:
25      Q.   I'd like to refresh your memory of what you
```

```
 1  being proactive, you know, and making sure that the
 2  cases get out before they're at that 30 days benchmark.
 3             MS. KAHN:  I'd like to mark another document,
 4  20.
 5             (Plaintiffs' Exhibit 20 was marked for
 6             identification.)
 7  BY MS. KAHN:
 8     Q.   I'd like to ask you about this report.  I
 9  think this report is prepared by health care placement
10  oversight program, correct?
11     A.   It comes from our databases, is what my
12  understanding is.
13     Q.   Okay.  I'd like to ask you first about the
14  note on the bottom of left which says:  "Validity of
15  this report has not been established in over 10 years.
16  Aging clock resets when an inmate patient is moved from
17  one cell to another within same treatment custody
18  setting."
19             Do you know what that refers to?
20     A.   Part of it.  I know that this report comes
21  from an outdated access database that we've had problems
22  with the maintenance of it.  And then also we're
23  migrating it into a -- what's called a sequel database.
24             And so the way that it was originally set
25  up -- which I'm not an IT person -- has raised the --
```

1    the validity of the data as kind of been in question

2    because of the way it was originally programmed, you

3    know, which was before I was in HCPOP, you know, so

4    1994, whatever it was.

5            And so there are other tracking systems such

6    as the mental health tracking system and the COMPSTAT

7    that we have a much more higher rate of confidence in

8    for the -- for the placements in ad seg, mental health

9    placements in ad seg over.  But I guess this has been a

10   document that's been part of the Coleman reporting, you

11   know, which is why it's still included in the Coleman

12   reports.

13       Q.   I mean, does this refer to the fact that if a

14   prisoner in ad seg goes out for court or to an MHCB and

15   returns to the unit --

16       A.   Even internally --

17       Q.   -- the clock restarts?

18       A.   Even internally if there's a bed move --

19       Q.   If there's a bed move.

20       A.   -- within ad seg, which happens quite

21   frequently.

22       Q.   Right.

23            So this report would underreport length of

24   stay often, correct?

25       A.   It could underreport, but I think there was

1    other issues with the data, too, which I'm not familiar
2    with the details.

3         Q.   Okay.  So this -- this particular section of
4    this report identifies EOPs that are in nonhub
5    institutions for more than 90 days.

6              And, you know, if you could turn to DVI, it's
7    a good example.  It's on R1017.  There are, you know,
8    two prisoners housed there for 281 and 175 days.

9              When you were speaking earlier about being
10   proactive, I guess the question is:  What does HCPOP do
11   with this data which is generated and provided monthly
12   to all sorts of parties to -- to ensure that EOPs who
13   should be transferred within 30 days to a -- well, let
14   me first ask you.  Does DVI have a hub?

15        A.   No.

16        Q.   Okay.  There are two EOPs here who have been
17   housed here, one for more than nine months and one for
18   close to six months.

19        A.   And --

20             MR. RUSSELL:  There's no question.

21   BY MS. KAHN:

22        Q.   Okay.  And so what would -- what is HCPOP's
23   role with regard to this data?

24        A.   Well, on list data is that we believe and the
25   mental health program believes that our other data banks

Case 2:90-cv-00520-KJM-SCR   Document 4498-1   Filed 03/25/13   Page 102 of 103
Richard Johnson                                           February 25, 2013

1    are better, more accurate information than who is in

2    the -- mental health who's in ad segs.  And so we use

3    those to cross-check each other.

4              When we have checked this data and there's

5    been errors, like for the, you know, cases being on this

6    list, and so the systems that we cross-reference with

7    are the COMPSTAT and the mental health tracking system

8    and our own -- and to some extent our SOMS, you know,

9    information.

10        Q.   So you ignore this data?

11             MR. RUSSELL:  Objection.  Vague and ambiguous.

12   Lacks foundation.  Misstates testimony.

13             THE WITNESS:  No, I don't ignore it.

14   BY MS. KAHN:

15        Q.   Have you -- is this data reviewed?

16        A.   I'm not sure what our unit does with the

17   information, who sent this to Coleman.  So I would have

18   to verify.  I don't know if this is part of the data --

19   the information that are actually EOP CC3 uses.

20        Q.   But as chief, you're responsible for your

21   unit, correct?  You were in December.

22        A.   I was.

23        Q.   If you want to turn to page R1018 in Folsom.

24   Again, it's CIM.

25        A.   And the question?

Page 193

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1                    CERTIFICATE OF REPORTER

2

3           I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20             DATED:   March 7, 2013

21

22             _____

23             MEGAN F. ALVAREZ

24             RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com