KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-3035
 Fax:  (415) 703-5843
 E-mail:  Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS** |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |
| | Date:         March 27, 2013 |
| | Time:         1:30 p.m. |
| | Dept:         4 |
| | Judge:        The Honorable Lawrence K. Karlton |
| | Action Filed:  1990 |

# TABLE OF CONTENTS

Page

Introduction ............................................................................................................... 1

Defendants' Response to the Order to Show Cause ................................................. 3

    I.      The experts' inspections were not secret, and their minimal reliance on limited interaction with inmate-patients has not prejudiced Plaintiffs ................... 3

    II.     Inspections by Defendants' experts were otherwise lawful under Rule 26. .......... 5

    III.    Inspections by Defendants' experts did not violate the law of this case............... 7

    IV.    Plaintiffs violated their own rationale justifying joint expert tours. ...................... 8

    V.     Defendants' suggested timing for expert inspections in the Three-Judge Court was appropriate and made in good faith. ...................................................... 8

    VI.    The experts did not mislead inmates.................................................................... 9

Response to Plaintiffs' Objections ........................................................................... 10

    I.      Plaintiffs' so-called "evidentiary objections" inappropriately attempt to argue against the weight of the evidence that termination is proper..................... 10

    II.     The expert reports are based on solid facts and methodology, and the court should consider their persuasiveness despite Plaintiffs' objections..................... 11

           A.    The termination experts provide opinions about ultimate facts in the case, not legal conclusions. ...................................................................... 11

           B.    The experts' inspections were not secret, and their partial reliance on interviews with inmate-patients has not prejudiced Plaintiffs' ability to respond to the termination motion. ............................................. 12

           C.    Plaintiffs have failed to offer any evidence to show that the State's expert reports lacked proper and reliable foundation................................ 12

                 1.    The experts' opinions were based on a thorough and exhaustive review of California's mental health care for inmates. ....................................................................................... 12

                 2.    The experts did not accept factual assertions of defense counsel without verification and were not denied vital information by counsel.................................................................. 14

                       a.    Suicide Prevention ........................................................... 14

                       b.    Disciplinary Procedures .................................................... 15

                       c.    Explanations Regarding Care............................................ 16

                       d.    Bed Assignment in Segregation ........................................ 16

            D.    The methodology on which Defendants' experts base their opinion is reliable. ....................................................................................... 18

                   1.    Defendants' experts' opinion was formed after a comprehensive and exhaustive audit of CDCR's Mental Health Services Delivery System................................................ 18

                   2.    Plaintiffs' selective challenge to the experts' methodology is unavailing. .................................................................................. 20

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

        3.     The experts appropriately focused on the prevailing standard of mental health care within a correctional setting. ...................... 22

4

    E.    The experts' opinions are supported by substantial and reliable evidence.................................................................................................. 24

5

6

        1.     The experts visited an appropriate sampling of prisons, and they are eminently qualified to render opinions in this case......... 25

7

        2.     The experts did not visit DSH Facilities because DSH services are not at issue in this case. .............................................. 27

8

        3.     The experts did review care for condemned inmates.................... 28

9

        4.     The experts addressed whether proper care is being provided at the current population level...................................... 28

10

    F.    Defendants' expert report meets the requirements of Federal Rule of Civil Procedure 26. ................................................................................ 28

11

   III.   The CDCR officials' declarations meet the requirements of Federal Rule of Civil Procedure 602........................................................................................ 32

12

    A.    Rick Johnson's testimony is admissible................................................. 32

13

    B.    Dr. Diana Toche's testimony is admissible............................................ 33

14

    C.    Dr. Tim Belavich's testimony is admissible. ......................................... 34

15

    D.    Dr. Laura Ceballos's testimony is admissible......................................... 35

Conclusion ................................................................................................................... 36

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

Defs.' Resp. OSC & Pls.' Evid. Objections re: Defs.' Expert Reports & Decls.
(2:90-cv-00520 LKK JFM PC)

1

# TABLE OF AUTHORITIES

2

<u>Page</u>

3

CASES

4

*Agfa-Gevaert, A.G. v. A.B. Dick Co.*
    879 F.2d 1518 (7th Cir. 1989)................................................................. 33, 34

*Casey v. Lewis*
    834 F.Supp. 1477 (D. Ariz. 1993)............................................................. 24

*Coleman v. Wilson*
    912 F. Supp. 1282 (E.D. Cal. 1995).................................................... passim

*Continental Ins. Co. v. Superior Court*
    32 Cal. App. 4th 94 (Cal. App. 2d Dist. 1995) ........................................ 5

*Daubert v. Merrell Dow Pham., Inc.*
    509 U.S. 579 (1993) .............................................................. 11, 18, 21

*Faison v. Thornton*
    863 F. Supp. 1204 (D. Nev. 1993) ............................................................ 5

*First Marblehead Corp. v. House*
    541 F.3d 36 (1st Cir. 2008) ..................................................................... 26

*Heflin v. Stewart County*
    958 F.2d 709 (6th Cir. 1992).............................................................. 11, 12

*Hemmings v. Tidyman's Inc.*
    285 F.3d 1174 (9th Cir. 2002)....................................................... 10, 12, 32

*Hereford v. Warren*
    536 F.3d 523 (6th Cir. 2008)..................................................................... 5

*Kumho Tire Co., Ltd. v. Carmichael*
    526 U.S. 137 (1999) ......................................................................... 18, 21

*Librado v. M.S. Carriers*
    No. 3:02-CV-2095-D, 2004 U.S. Dist. LEXIS 12203 (N.D. Tex. June 30, 2004) ..... 30, 31, 32

*Lloyd v. Conseco Fin. Corp.*
    No. CV 00-10452 MMM (RNB), 2001 WL 36097624 (C.D. Cal. Oct. 19, 2001).......... 10, 32

*Lyman v. St. Jude Med. S.C., Inc.*
    580 F. Supp. 2d 719 (E.D. Wis. 2008) ................................................... 15

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*
  385 F.3d 72 (1st Cir. 2004) ...................................................................... 10, 11, 18

*Mitchell v. Cate*
  Case No. 2:08-CV-01196 JAM EFB (E.D. Cal.) ................................................... 6

*Navel Orange Admin. Comm. v. Exeter Orange Co.*
  722 F.2d 449 (9th Cir. 1983) ............................................................................. 33

*Nunex v. BNSF Ry. Co.*
  No. 09-4037, 2012 U.S. Dist. LEXIS 97411 (C.D. Ill. July 13, 2012) .................. 31

*Paine v Johnson*
  No. 06 C3173, 2010 U.S. Dist. LEXIS 16978 (N.D. Ill. 2010) ............................. 12

*Rhodes v. Chapman*
  452 U.S. 337 (1981) ......................................................................................... 24

*Robinson v. Watts Detective Agency, Inc.*
  685 F.2d 729 (1st Cir. 1982) ........................................................................ 33, 34

*Tex. A&M Research Found. v. Magna Transp., Inc.*
  338 F.3d 394 (5th Cir. 2003) ............................................................................. 29

*Transcontinental Gas Pipe Line Corporation, et al. v. Federal Energy Regulatory Commission*
  998 F.2d 1313 (5th Cir. 1993) ............................................................................. 5

*United States v. Franklin*
  177 F. Supp. 2d 459 (E.D. Va. 2001) ................................................................... 5

**CONSTITUTIONAL PROVISIONS**

Eighth Amendment ................................................................................... 11, 12

Sixth Amendment ........................................................................................... 5

**COURT RULES**

California Rule of Professional Conduct
  Rule 2-100 ....................................................................................................... 4

1

### TABLE OF AUTHORITIES
**(continued)**

2

**Page**

3

Federal Rules of Civil Procedure
    Rule 26 ....................................................................................................... passim

4

    Rule 26(a) ............................................................................................................. 31

5

    Rule 26(a)(2)(B) .......................................................................................... 29, 30
    Rule 26(b)(4) ......................................................................................................... 6

6

    Rule 30(b)(6) ....................................................................................................... 34
    Rule 34 .................................................................................................................. 9

7

    Rule 37 ................................................................................................................ 31
    Rule 37(c)(1) ....................................................................................................... 31

8

9

Federal Rules of Evidence
    Rule 602 ................................................................................ 32, 33, 34,35,

10

    Rule 704(a) .......................................................................................................... 11
    Rule 706 ........................................................................................................ 24, 25

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

The Court should not strike the experts' testimony.  Plaintiffs' allegation that the experts' site visits were conducted in "secret" is simply false.  Undersecretary Hoshino notified the Special Master (*i.e.*, the Court) that the State had retained consultants and would be touring prisons—before the site visits even started.  If Plaintiffs did not know soon thereafter because of the Special Master's regular contact with the parties, they certainly knew several months before the motion was filed, when one of the State's experts mentioned it to Don Specter, one of Plaintiffs' lead counsel.  Thus, the site visits occurred with the knowledge of the Special Master and Plaintiffs.

Moreover, the State has an absolute right to examine its own departments, including corrections, to assess whether they are providing effective services.  That is all the State was doing here, and Plaintiffs wrongly assert that the State cannot assess its own prison system without Plaintiffs' counsel being present.  The five-year-old order from the Three-Judge Court proceeding does not control this case.  That order is from a separate court proceeding, concerning preparation for a trial that has already concluded.  The Three-Judge Court has never ordered that its procedural orders apply here, and indeed, this Court issues its own procedural orders.  As a matter of law, and common sense, there was no reason for the State to think that the 2007 pre-trial order from a separate proceeding governed the remedial phase here.

Nor were Plaintiffs prejudiced by the experts' limited communications with inmate-patients while they assessed the mental health care system.  The experts' innocuous, brief interactions did not slant their opinions against Plaintiffs.  Their interactions were attempts to identify any inmates who were not getting the care they needed, and any instances that the experts would have found simply would have hampered the State's ability to move to terminate.  Tossing their reports simply because they spoke with some inmate-patients in an attempt to find inmates who *were not* receiving appropriate care would be contrary to law, given the absence of any prejudice.

Plaintiffs' ability to conduct comprehensive discovery further demonstrates the lack of any prejudice.  Plaintiffs' experts received the experts' notes before the depositions, and

1

1   Plaintiffs' counsel deposed each of the experts.  Plaintiffs also had their own opportunities to

2   speak with inmates apart from any of the State's representatives and to test the impressions that

3   the defense experts gathered during the brief interactions.  Plaintiffs have pointed to no instance

4   in which their counsel's absence allowed the State to derive any misinformation, damaging

5   admission, or unfair benefit.

6       Further, Plaintiffs' efforts to malign the motives of the experts and counsel are unfounded.

7   The harmless interactions with inmate-patients were not borne from any improper intent.  Rather,

8   they arose in the context of an institutional class action at the remedial phase, where standards

9   regarding such communications are relaxed.  And they occurred against a backdrop in which the

10  Special Master, his team, and Plaintiffs' counsel commonly communicate with parties without

11  their counsel present.

12      The experts' goal from the outset was to candidly appraise whether the mental health care

13  system was performing properly.  If there were areas of improvement, they informed the State so

14  that the State could resolve them.  If there were ways that the system was performing properly,

15  which it largely was, they reported that as well—so that the State could see what was working

16  well to decide whether to bring a termination motion, which it did.  And for the experts to ensure

17  that they had a complete picture, they interacted briefly with some patients who were being

18  evaluated (to ensure that these inmates were receiving proper treatment).  Had they not done so,

19  Plaintiffs certainly would have complained that the experts' evaluation was incomplete.

20      In sum, there is no legal or common sense basis to exclude the State's expert reports. The

21  State made no secret of the fact that it had engaged experts to inspect its mental health care

22  system; its intentions—to credibly assess its own system—were noble; and Plaintiffs have

23  suffered no prejudice. There is no reason the Court should deny itself the opportunity to examine

24  the important information the report conveys about the actual care being provided within the

25  State's prisons.

26      Finally, the remaining portions of Plaintiffs' purported evidentiary objections are

27  primarily attempts to reargue the weight of the evidence—rather than raise issues of admissibility.

28  Thus, the objections can largely be ignored for evidentiary purposes.  Even so, they fail to

2

1   discredit the experts' exhaustive review of the mental health care system.  They also fail to call

2   into question the experts' well-founded and highly qualified conclusions that there is no evidence

3   of systemic deliberate indifference in the mental health care system.

4           In sum, the Court should consider all of the evidence supporting the motion to terminate.

5   It conclusively demonstrates the absence of any ongoing systemic deliberate indifference in the

6   mental health care system.  And it shows that now is time to return the system to the State.

7                    **DEFENDANTS' RESPONSE TO THE ORDER TO SHOW CAUSE**

8   **I.    THE EXPERTS' INSPECTIONS WERE NOT SECRET, AND THEIR MINIMAL RELIANCE
        ON LIMITED INTERACTION WITH INMATE-PATIENTS HAS NOT PREJUDICED
9       PLAINTIFFS.**

10          To fully assess the mental health system's performance, the experts thoroughly inspected

11  the delivery of care at prisons.  As part of those inspections, the experts had minimal interactions

12  with some of the inmate-patients receiving care in the system—to ensure that they were not

13  lacking appropriate care.  (Decl. McKinney Supp. Mot. Terminate (Decl. McKinney) Ex. 1

14  [Dvoskin Dep.] at 43:8-12; 140:21-141:3.)  These communications did not circumvent legal or

15  ethical obligations.  Rather, they arose in the context of an institutional class action in its remedial

16  stage, where standards regarding such communication are relaxed.  This is particularly true in this

17  case where there is pervasive communication by the Special Master, his team, and Plaintiffs'

18  counsel.  Given the absence of any improper intent here, an understanding of the context of the

19  case in which the communication arose, and the lack of prejudice to Plaintiffs' ability to fully

20  respond to the experts' evaluation, the Court should consider the expert testimony.

21          The experts' tour of California's prisons, and even their interviews with inmate-patients,

22  were not secret.  Indeed, by early Fall 2012, defense expert Steve Martin informed one of

23  Plaintiffs' lead counsel, Don Specter, that the prison inspections were going on—with the

24  apparent understanding that the experts were talking to inmates during the inspections—and Mr.

25  Specter expressed no surprise or concern.  (Decl. Steve J. Martin Supp. Reply ¶ 24, ECF No.

26  4483.)  Even before any of the tours began, Defendants notified the Court's Special Master that

27  they had retained expert consultants to evaluate the prisons' mental health care system.  (Hoshino

28  Decl. ¶ 3. )  Similarly, the State's use of force expert, Steve J. Martin, disclosed to one of the

3

1    Special Master's monitors, Jeffrey Metzner, that he had been retained by the Attorney General's

2    Office and would be touring prisons before the site visits began.  (Decl. Steve J. Martin Supp.

3    Reply ¶ 22, ECF No. 4483.)  Notably, no dispute arose at that time over the foreseeable contact

4    with inmates.  This is likely because contact by Plaintiffs' counsel and the Special Master

5    pervades the remedial proceedings here.  For instance, Plaintiffs' counsel have commonly

6    discussed the substance of this case with Defendants' key decisionmakers without notifying

7    Defendants' counsel or receiving their approval.  (Decl. Hoshino ¶ 2; Decl. Cate ¶ 2.)  During

8    prison tours, they also speak to mental health staff without defense counsel present despite

9    defense counsel's attempt to limit such contact.  (Decl. Vorous ¶ 4).  Likewise, the Special Master

10   and his team also have contact with mental health staff (*id.* at ¶ 2) and, according to Defendants'

11   understanding, also contacts with inmates during their site visits.

12        While such contact is prevalent in the remedial phase of this case, that is not to say that

13   there is necessarily anything prejudicial from it, particularly in a "long-continuing litigation

14   which has approximated the type involving institutional reform."  *Armando Perez & others v.*

15   *Boston Housing Authority*, 379 Mass. 703, 741–42 (1980).  Courts and law reviews have noted

16   that "[t]he specter of ex parte discussions or influence would not seem to be of as much concern

17   at the remedial stage as when liability is at issue."  *Id.* at 742 (quoting Coffin, The Frontier of

18   Remedies:  A Call for Exploration, 67 Calif. L. Rev. 983, 996 (1979)).  Certainly this case, where

19   the Court determined liability in 1995 and has worked on institutional reform since, qualifies as

20   one in which ex-parte communication is not unexpected.  Given the apparent status quo of such

21   communication by Plaintiffs' counsel and the Special Master with seemingly no harm, it is no

22   surprise that no one was alerted  at the time by the expert consultants' interaction with inmates.

23        Moreover, the experts' limited communications could have only hurt the State's

24   termination motion, and could not have prejudiced Plaintiffs.  The experts have testified that they

25   found no systemic deliberate indifference based on their comprehensive review of the system, but

26   they wanted to ensure that there weren't inmate-patients who were somehow falling through the

27   cracks.  (Decl. McKinney Ex. 1 [Dvoskin Dep.] at 43:8-12; 140:21-141:3.)  Had they found such

28   inmates through their interviews, these findings would have only hindered or delayed the State's

4

Defs.' Resp. OSC & Pls.' Evid. Objections re: Defs.' Expert Reports & Decls.
(2:90-cv-00520 LKK JFM PC)

1    ability to move to terminate.  But the State sought an honest assessment of its system, including

2    identification of any faults so that they could be corrected, which explains why the experts sought

3    out inmates who might have needed more appropriate care.  (*Id.*)

4         Given the lack of improper intent here, plus the lack of prejudice to Plaintiffs, the Court

5    should not disregard the expert reports as Plaintiffs seek.  Striking the reports would only

6    necessitate redundant expert tours, raise costs, and waste court resources.[1]  Both parties have now

7    had their experts tour and privately interview the inmates whose concerns are at issue here.

8    Plaintiffs have not alleged that their counsel's absence resulted in Defendants deriving any

9    misinformation, damaging admission, or unfair benefit.  *See Continental Ins. Co. v. Superior*

10   *Court*, 32 Cal. App. 4th 94, 111 (Cal. App. 2d Dist. 1995) (questioning whether a suppression

11   order is warranted without showing that a violation of Rule 2-100 led to unfair advantage or

12   disclosure of confidential attorney-client-privileged communications).  Thus, Plaintiffs have not

13   demonstrated prejudice, and there is not a basis for striking the reports.

14

15

16

17

18

19   **II.   INSPECTIONS BY DEFENDANTS' EXPERTS WERE OTHERWISE LAWFUL UNDER**
     **RULE 26.**
20

21        Further, contrary to Plaintiffs' argument, Rule 26 did not require Defendants to notify

22   Plaintiffs of mere prison inspections by Defendants' consultants and experts.  The law in fact

23   insulates Defendants from providing such notice.  In 2010, Federal Rule of Civil Procedure

24   26(b)(4) was specifically amended to provide work-product protection against discovery

25        [1] Courts apply a harmless-error analysis to ex-parte contact in the Sixth Amendment
     context, when such contact occurs in non-critical stages of a criminal conviction.  *See Hereford v.*
26   *Warren*, 536 F.3d 523, 525 (6th Cir. 2008).  The Fifth Circuit also applied harmless error to
     alleged ex-parte contact in the administrative-law context.  *Transcontinental Gas Pipe Line*
27   *Corporation, et al. v. Federal Energy Regulatory Commission*, 998 F.2d 1313, 1324 (5th Cir.
     1993).
28

                                                    5

1   regarding draft expert disclosures and communications between expert witnesses and counsel.

2   Fed. R. Civ. P. 26 Advisory Committee's Note, "2010 Amendments." This change was designed

3   to prevent rising costs stemming from attorneys taking such extreme measures as hiring "two sets

4   of experts—one for the purposes of consultation and another to testify at trial—because

5   disclosure of their collaborative interactions with expert consultants would reveal their most

6   sensitive and confidential case analyses." *Id.* Even before the 2010 amendment to Rule 26,

7   Plaintiffs and the Three-Judge Court could not identify any caselaw requiring that Plaintiffs be

8   noticed by Defendants of their experts' inspections. (*Plata* Docket No. 906 at 4.)

9        Thus, in September 2011, Defendants hired expert consultants to evaluate prison conditions

10  regarding mental healthcare. (Decl. McKinney Supp. Resp. OSC ¶ 2.) Defendants openly

11  notified the Special Master of this. (Hoshino Decl. ¶ 3.) While Defendants' counsel was present

12  at the prisons while the experts were inspecting and interacting with inmates, counsel did not

13  participate in any of the interactions with inmates, nor overhear any of the conversations. During

14  the course of their inspections, the expert consultants developed an opinion that California's

15  inmates received a good standard of mental healthcare. (Decl. McKinney Supp. Resp. OSC ¶ 3.)

16  Defendants thus grew confident that the time was right to terminate federal oversight over their

17  prisons' mental health care. (*Id.* at OSC ¶ 5.) Consistent with the new protections under Rule

18  26, Defendants conserved taxpayer money by retaining their consultants as experts to testify in

19  favor of termination in this case. (*Id.*) Defendants thus moved to terminate on January 7, 2013.

20  They were not obliged to notify Plaintiffs' counsel or invite them along on redundant expert tours

21  that would have doubled the costs of the inspections. Indeed, on October 17, 2012, Judge

22  Edmund F. Brennan had relied on Rule 26 in denying the plaintiffs in a putative prisoner class

23  action the very same thing Plaintiffs here argue they were entitled to: an invitation to join

24  Defendants' prison tours with their expert consultants. *Mitchell v. Cate*, Case No. 2:08-CV-

25  01196 JAM EFB (E.D. Cal.), Oct. 17, 2012 Order re: Discovery Dispute.[2] In short, Rule 26

26

27        [2] A contrary district-court decision on February 21, 2013 in *Plata* post-dated Defendants' actions at issue here and was not based strictly on an evaluation of Rule 26. (*Plata* Docket No. 2546.)

28

permitted Defendants to lawfully hire consultants to tour their prisons without the presence of Plaintiffs' counsel to glean privileged work-product and attorney-client information.

### III. INSPECTIONS BY DEFENDANTS' EXPERTS DID NOT VIOLATE THE LAW OF THIS CASE.

The law of this case did not counter the mandate of Rule 26.  Plaintiffs partly quote an order from the Three-Judge Court requiring Defendants, in the context of that proceeding, to provide Plaintiffs and the California Correctional Peace Officers' Association (who are interveners in that proceeding) with reasonable notice of any site inspections by Defendants' experts.  (Pls.' Obj. 3.)  As a preliminary matter, that order from October 2007 is antiquated in the context of Rule 26 because it preceded the 2010 amendment on which Defendants rely.

In addition, the order is inapplicable outside the Three-Judge Court proceeding, as indicated by Plaintiffs' telling substitution of "the CCPOA" with ellipses where that party's name twice arose in the borrowed passage.  (*Cf.* Docket No. 2495 at 4 with Pls.' Objs. 3.)  Plaintiffs do not state that Defendants should also have notified the California Correctional Peace Officers' Association about their expert consultants' inspections—which would be silly, although the logic of Plaintiffs' argument would necessitate this.

The Court here has not explicitly adopted such Three-Judge Court orders for use in *Coleman*.  Rather, those orders were specifically tailored to that proceeding's circumstances, as evidenced by the 2007 Order's reference to intervenors there.  And while this Court has referenced the 2007 Order within the context of *Coleman*, it did so merely to reference the reasoning of the order to resolve a discovery dispute here.  (*See* ECF No. 4050 at 5 n.2 (cited by Pls.' Objs. 3 n.1); *see also* Apr. 25, 2008 Order, ECF No. 2779 ¶ 4 ["All discovery is to be completed no later than ninety (90) days from April 30, 2008"].)

In addition, that there may have been joint prison tours early on in this case does not establish that this is a legal requirement, decades later and after amendment to Rule 26.  (*See* Pls.' Objs. 3 (citing *Coleman v. Wilson*, 912 F. Supp. 1282, 1303 n.22 (E.D. Cal. 1995) (noting merely that Plaintiffs contended in 1995 "that, at least for purposes of prison tours, plaintiffs' experts and defendants' experts used the same methods and worked in teams")).)  Although the Court may

7

1   recall such joint tours from years ago and believe it "common sense" that joint tours would thus

2   remain the status quo today (Order and Order to Show Cause at 2, Mar. 18, 2013), no counsel

3   from 1995 remain for Defendants, and such institutional knowledge is bygone.  Defendants

4   instead rested more immediately on the 2010 amendment to Rule 26.

5   **IV.   PLAINTIFFS VIOLATED THEIR OWN RATIONALE JUSTIFYING JOINT EXPERT TOURS.**

6         Plaintiffs have argued that having all of the parties' counsel along for expert inspections

7   would "establish a common factual baseline" and "promote efficiency and fairness," but they lack

8   the courage of their argument's conviction.  (Pls.' Objs. 3; *Plata* Docket No. 906 at 4.)  Their

9   counsel and experts, in conducting prison tours with Defendants' counsel to gather evidence in

10  response to the termination motion, systematically ushered away Defendants' counsel so that

11  Plaintiffs' experts could speak privately with inmates.  (*See, e.g.,* Decl. McKinney Ex. 7 [Dep.

12  Vail] 181:9-25.)  Plaintiffs cannot reasonably claim that the State arguably violated a court order

13  after Plaintiffs themselves then deliberately set out to do so.

14        Against this backdrop, it would be more simple, fair, and prudent to conserve State and

15  federal resources by accepting the parties' expert reports rather than dismissing them altogether to

16  simply be re-drafted after redundant inspections.

17  **V.   DEFENDANTS' SUGGESTED TIMING FOR EXPERT INSPECTIONS IN THE THREE-
     JUDGE COURT WAS APPROPRIATE AND MADE IN GOOD FAITH.**

18  

19        Plaintiffs imply that Defendants objected in bad faith to the timing of expert tours in the

20  Three-Judge Court on August 17, 2012 because their own expert consultants in this case had

21  already begun touring prisons.  (Pls.' Objs. 9–10 (incorrectly citing Defendants' objections as

22  being filed on August 20, 2012).)  Plaintiffs' attempt to equate the Three-Judge Court with

23  *Coleman*'s independent proceedings is disingenuous and misses the point.

24        The Three-Judge Court was considering whether to modify the prison-population cap from

25  137.5% capacity to 145% capacity.  (Defs.' Response to Aug. 3, 2012 Order at 9–10, Aug. 17,

26  2012.)  Defendants in the Three-Judge Court argued that expert tours should be postponed until

27  March 2012, when the 145% capacity mark was actually expected to be reached, so that experts

28  would not have to speculate on conditions at 145% capacity, but truly observe them.  (*Id.*)  For

8

1   purposes of the Three-Judge Court's prospective modification of the prison-population cap—a

2   critical development with potentially vast consequences to the safety and security of citizens

3   throughout California—experts indeed ought not speculate but truly observe the prison population

4   at the imminently foreseen capacity.

5          The fact that Defendants in *Coleman* had at that point hired expert consultants to gauge

6   whether inmates were then already receiving sufficient mental health care is a show of

7   responsible prison governance rather than bad faith—it is a showing of the sort of ready and

8   independent responsibility that this Court and the court in *Plata* have been hopeful to see.  (*See*

9   Plata order instituting Receiver.)

10  **VI.    THE EXPERTS DID NOT MISLEAD INMATES.**

11         Plaintiffs also fail in their attempt to impugn the ethics of Defendants' expert consultants

12  for allegedly misrepresenting themselves to the inmates when the record shows the opposite to be

13  true.  (Pls.' Objs. 3–6.)  As held by this Court and the Three-Judge Court through the very orders

14  that Plaintiffs cite in support of their evidentiary objections, Defendants' expert consultants

15  reasonably interviewed available inmates while inspecting prison conditions—just as Plaintiffs'

16  experts were permitted to speak with inmates and staff alike during tours in accordance with

17  Federal Rule of Civil Procedure 34.  (*Coleman* Docket No. 4050 at 5; *Plata* Docket No. 906 at 3

18  (also finding "questions by [Plaintiffs'] experts directed to prison employees and to class

19  members" a proper part of an inspection).)  The difference here is that Federal Rule of Civil

20  Procedure 34 is gratuitous because the Defendants were simply inspecting their own prisons

21  through their expert consultants.

22         Defendants' expert consultants did not misrepresent their mission to the inmates.  Plaintiffs

23  incorrectly presume that the expert consultants' "true purpose" during the tours was to support

24  Defendants' motion to terminate rather than to develop an "opinion about how the care was

25  going."  (Pls.' Objs. 5.)  Rather, Defendants had hired their expert consultants at the time of the

26  tours merely to independently evaluate inmates' mental health care.  (Decl. McKinney Ex. 3

27  [Scott Dep.] 20; Ex. 2 [Martin Dep.] 6:15-9:11; Ex. 1 [Dvoskin Dep.] 203:7-210; Ex. 4 [Moore

28  Dep.] 51:8-59:8.)  Defendants had not yet determined to move to terminate *Coleman*, because that

9

1    decision was borne out of the expert consultants' positive reviews of the prison conditions they

2    encountered during their tours.  (Decl. McKinney Supp. Resp. OSC ¶ 4.)  Dr. Dvoskin thus

3    straightforwardly told the inmates whom he encountered on tours that he was "trying to find out

4    about the mental health care in the prison" and was "interested in how you're doing."  (Pls.' Objs.

5    5.)  And Dr. Moore's introduction was likewise candid:  "My name is Jackie Moore.  I'm a

6    registered nurse.  I'm working with the Attorney General's Office.  We're going to evaluate the

7    quality of mental and health care at this facility.  I'm going to ask you about a few questions

8    about your care.  Do you care to talk to me?  Will you answer my questions?"  (Decl. McKinney

9    Ex. 4 [Moore Dep.] 52:11-19.)  In short, Defendants' expert consultants did not misrepresent

10   themselves as Plaintiffs have alleged but been unable to show.

11                   **RESPONSE TO PLAINTIFFS' OBJECTIONS**

12   I.    **PLAINTIFFS' SO-CALLED "EVIDENTIARY OBJECTIONS" INAPPROPRIATELY**
             **ATTEMPT TO ARGUE AGAINST THE WEIGHT OF THE EVIDENCE THAT**
13           **TERMINATION IS PROPER.**

14           Plaintiffs largely mistake their attempts to discredit the weight of the evidence as

15   evidentiary objections, which they are not.  Mere challenges to the weight of evidence do not

16   raise issues of admissibility.  For instance, Plaintiffs' attacks against the soundness or

17   methodology of the expert's opinions go to their weight, not their admissibility.  *Hemmings v.*

18   *Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("Objections to the inadequacy of a study

19   are more appropriately considered an objection to the weight of the evidence rather than its

20   admissibility."); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 81 (1st Cir.

21   2004); *Lloyd v. Conseco Fin. Corp.*, No. CV 00-10452 MMM (RNB), 2001 WL 36097624, at *8

22   (C.D. Cal. Oct. 19, 2001) ("Generally, disputes regarding the validity of statistical evidence . . .

23   affect its weight rather than its admissibility.").  Moreover, because the expert opinions here will

24   be considered by a judge, not a jury, "the usual concerns of the [*Daubert*] rule—keeping

25   unreliable expert testimony from the jury—are not present." *Microfinancial, Inc.*, 385 F.3d at 81

26   (citing *Daubert v. Merrell Dow Pham., Inc*., 509 U.S. 579, 589 (1993)). In short, the Court should

27   largely disregard Plaintiffs' purported evidentiary objections as misguided attempts to add to their

28   already-voluminous briefing about the merits of the evidence.

                                        10

II.   THE EXPERT REPORTS ARE BASED ON SOLID FACTS AND METHODOLOGY, AND THE COURT SHOULD CONSIDER THEIR PERSUASIVENESS DESPITE PLAINTIFFS' OBJECTIONS.

A.   The Termination Experts Provide Opinions About Ultimate Facts in the Case, Not Legal Conclusions.

The experts' testimony that there is no systemic deliberate indifference in the mental health system is permissible testimony about an ultimate factual issue, not a legal opinion. The term "deliberate indifference"—from the perspective of a forensic psychiatrist—is common parlance with factual meaning within a specialized discipline. (Decl. Charles L. Scott Supp. Reply, ECF No. 4479 ¶ 7 ["the term 'deliberate indifference' is a very basic concept in forensic psychiatry"].) Plaintiffs' misperception about the nature of the experts' testimony in this regard is understandable, since their mental health expert's lack of experience renders him completely unfamiliar with the well-recognized concept in his proffered area of expertise. (Decl. McKinney, ECF No. 4491-5 [Kaufman Dep.] at 12:6-12 & 29:24-30:2.) Regardless, given Plaintiffs' misperception about the nature of the experts' testimony concerning "deliberate indifference," their objection is not well taken.

Federal Rule of Evidence 704(a) permits testimony in the form of an opinion that embraces an ultimate issue to be decided by the trier of fact. For example, in *Heflin v. Stewart County*, 958 F.2d 709, 715 (6th Cir. 1992), an expert witness in an Eighth Amendment case properly testified that, in his opinion, the prison officials were not "deliberately indifferent" to the medical needs of a pretrial detainee. The court concluded that the district court did not commit "reversible error" by admitting the evidence because the witness "used 'deliberate indifference' in the way an ordinary layman would to describe such conduct—to state his opinion on the ultimate fact, not to state a legal conclusion." *Id.* Plaintiffs' citation to an unpublished district court case that made the same mistake about the nature of testimony in this context only demonstrates that Plaintiffs are not alone in misunderstanding that "deliberate indifference" can have meaning outside the strictly legal Eighth Amendment context. (Pls.' Evid. Objs. 2 (citing *Paine v Johnson*, No. 06 C3173, 2010 U.S. Dist. LEXIS 16978 at *10-11 (N.D. Ill. 2010)).

11

1    As in *Heflin*, the experts' testimony about a lack of systemic deliberate indifference is an

2    opinion on the ultimate fact in the case. "Deliberate indifference" is a very basic concept in

3    forensic psychiatry; individuals who are properly trained in that field and who evaluate

4    correctional care readily understand the phrase. (Scott Reply Decl. ¶ 7.) And because the

5    experts' opinions on this issue are factual rather than legal, the Court may properly consider them.

6    **B.    The Experts' Inspections Were Not Secret, and Their Partial Reliance on
            Interviews with Inmate-Patients Has Not Prejudiced Plaintiffs' Ability to
7           Respond to the Termination Motion.**

8    As discussed in the preceding response to the Court's order to show cause, there is no basis

9    on which to strike any of the experts' opinions.

10   **C.    Plaintiffs Have Failed to Offer Any Evidence to Show that the State's
            Expert Reports Lacked Proper and Reliable Foundation.**

11   **1.    The Experts' Opinions Were Based on a Thorough and
12           Exhaustive Review of California's Mental Health Care for Inmates.**

13   Plaintiffs contend that the State's expert reports were premised on an improper foundation.

14   Specifically, Plaintiffs argue that in reaching their opinions, the State's experts primarily relied on

15   the opinions of their counsel regarding "the fairness of this Court, the validity of court orders, and

16   the alleged 'excesses' of the court-ordered monitoring processes" and that the experts did not

17   verify their opinions with any reliable sources of information. (Pls.' Objs. 14.) Initially, this type

18   of argument does not form the basis for an evidentiary objection, but at most, goes to the weight

19   of the evidence. *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) ("Objections

20   to the inadequacy of a study are more appropriately considered an objection to the weight of the

21   evidence rather than its admissibility.").

22   Regardless, the joint report demonstrates that the State's experts undertook a thorough and

23   exhaustive review of California's provision of mental health care to mentally ill inmates,

24   including multiple site visits to CDCR institutions, meetings with mental health leadership and

25   institutional mental health and custody staff, reviews of medical records and the Mental Health

26   Tracking System, and reviews of quality-improvement meeting minutes and documents. (Clinical

27   Evaluation of California's Prison Mental Health Services Delivery System by Dvoskin, Moore,

28   and Scott 8-9, ECF No. 4275-5 ("Clinical Exp. Rpt."); *see also* Scott Reply Decl. ¶¶ 2-5.) In

12

1   addition, the State produced to Plaintiffs more than 100,000 pages of documents to Plaintiffs'

2   prior that reflect all of the documents the State's experts could have considered prior to the site

3   visits. (*See* Docket No. 4257-2 [Feb. 26, 2013 McKinney Decl.] ¶ 4.)

4          In addition, Mr. Martin's report describes in detail the various sources of information he

5   used to formulate his opinions.  Before the site visits, Mr. Martin received and reviewed the

6   following: (1) MHSDS Program Guide; (2) Monitoring Reports of the Special Master; (3)

7   population data on the CDCR mental health population; (4) materials on departmental-use-of-

8   force regulations and training materials related to the RVR Mental Health Assessment Process; (5)

9   facility management reports prepared by institutional staff as part of the Special Master's

10  monitoring inspections; (6) CDCR reports reflecting compliance with the Program Guide; (7)

11  use-of-force incident logs for each institution; (8) total RVRs issued to CCCMS and EOP inmates

12  at each institution visited; and (9) summary data on inmates referred for mental health

13  assessments.  (Martin Rpt 7-9; *see also* Martin Reply Decl. ¶¶ 2-4.)

14         Moreover, according to Mr. Martin, he reviewed various documents during his site visits to

15  evaluate the institutions' mental health care services, which included the following: (1) 220 use-

16  of-force incident packets; (2) LOPs and training materials related to staff use of force; (3) OIS

17  Use of Force Reports covering use-of-force incidents; (4) use-of-force system-wide CDCR data;

18  (5) approximately 540 RVR packets; (6) CDCR and local memoranda related to RVR MH

19  Process; (6) RVR reporting data; (7) Monitor Reports related to RVR MH Process; and (8) over

20  300 use-of-force incident packets.  (*Id.* at 8-9.)  Mr. Martin also states in his report that he

21  interviewed various CDCR staff, including Use of Force Coordinators and RVR hearing officers,

22  and attended numerous meetings in the process of evaluating the institutions.  (*Id.*)

23         Furthermore, the experts testified at their depositions that they visited thirteen different

24  institutions covering various types of mental health care programs offered by CDCR across the

25  state.   (Decl. McKinney Ex. 1 [Dvoskin Dep.] 184-85, 188; Ex. 2 [Martin Dep.] 32.)  Dr.

26  Dvoskin further testified that the experts visited certain institutions multiple times to ensure that

27  they were using the right methodology to accurately evaluate the mental health care provided at

28  each institution.  (Decl. McKinney Ex. 1 [Dvoskin Dep.] 185.)  Accordingly, Plaintiffs 'argument

                                            13

1  that the State's experts' opinions lack proper foundation fails in light of the various sources of

2  information and data used by the experts in evaluating the State's mental health care system.

3       Similarly, there is no evidence to support Plaintiffs' allegations that the State's experts'

4  opinions were biased.  To the contrary, the reports demonstrate that the experts conducted an

5  objective evaluation of the CDCR's mental health care system.  The report thoroughly discusses

6  various issues found in each institution, as well as the experts' recommendations about how to

7  address those issues, which demonstrate a lack of any bias.  (*See generally* Clinical Exp. Rpt.)

8       Plaintiffs further contend that even where the experts have identified issues, they have

9  downplayed those issues and tried to falsely blame the Special Master for those problems.

10  Plaintiffs' contentions are meritless because as discussed above, the report specifically identifies

11  issues that resulted from CDCR policies and even proposes detailed solutions that ran contrary to

12  the way CDCR had been operating under its own policies.

13       **2.      The Experts Did Not Accept Factual Assertions of Defense Counsel
          Without Verification and Were Not Denied Vital Information by
14          Counsel.**

15       Contrary to the Plaintiffs' argument, the experts did not blindly rely on summaries of data

16  provided by counsel or fail to independently verify such data before relying on it for their

17  opinions.  The termination experts independently evaluated ample information regarding CDCR's

18  suicide prevention program and the conditions at both CCWF and CIM to support their

19  conclusion that the Department is providing appropriate care at those prisons and making every

20  effort to stop inmate suicides.  The facts establish that the experts' inspections and other activities

21  in the case enabled them to independently verify the reliability of the relevant data in those areas.

22  *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008).

23       **a.      Suicide Prevention**

24       The State has implemented a robust suicide-prevention program, including a detailed

25  suicide-risk-evaluation protocol and process; training; suicide-prevention committees that meet

26  regularly at each institution; and a process to thoroughly investigate and timely report on

27  completed suicide and serious suicide attempts.  (*See* Reply, Section G).  As part of that program,

28  the State adopted most of the recommendations that the Department's suicide-prevention

14

1  consultant, Lindsay Hayes, set forth in his report regarding the State's responses to inmate suicide

2  risk and assessment.  (*Id.*)

3      Nevertheless, Plaintiffs assert that the termination experts' "glowing conclusions" about the

4  Department's suicide-prevention programs cannot be relied on because they were not provided

5  with the August 2011 report by Hayes.  According to Plaintiffs, that report documented "serious

6  deficiencies in CDCR's suicide prevention program, and [made] numerous recommendations to

7  address the problems."  (Pls.' Objs. 10.)

8      This Court should reject Plaintiffs' claim that the termination experts' conclusions about

9  suicide prevention are suspect because they were not provided with the Hayes report.  The

10  termination experts conducted their own review of the Department's suicide prevention programs

11  roughly one year after Hayes issued his report.  Their January 2013 reports are based on current

12  information that they gathered during the preceding several months, as was appropriate for a

13  proceeding where the issue is whether there is current and ongoing systemic deliberate

14  indifference.  There was no need to consult the Hayes report, which is based on older data.

15              **b.    Disciplinary Procedures**

16      Plaintiffs question the accuracy of Mr. Martin's conclusions regarding CDCR's disciplinary

17  process because he was not provided information about the Department's classification process

18  after an RVR finding.  But the Department's disciplinary process and the classification process

19  involve separate policy concerns.  As Mr. Martin stated in his deposition, unlike a disciplinary

20  decision, "a classification decision is an administrative decision based entirely on objective

21  variables.  It's not a sanction.  It's not a penal decision."  (Decl. McKinney Supp. Resp. OSC

22  [Martin Dep.]  187:18-22.)  In short, Martin did not need information regarding the Department's

23  classification process in order to render an opinion regarding the Department's disciplinary

24  process.

25      Plaintiffs' assertion that Martin was only "vaguely aware" of the state regulations regarding

26  the staff assistant process for disciplinary hearings is also incorrect.  (Pls.' Objs. 11.)  In his reply

27  declaration in support of Defendants' motion to terminate, Martin notes that "[u]nder CDCR's

28

                                    15

1   regulations staff assistants are not advocates, but serve as fact finders for mentally ill inmates and

2   play a valuable role in assisting inmates."  (Decl. Martin ¶ 19.)

3                       c.      **Explanations Regarding Care**

4        Without any adequate basis, Plaintiffs attempt to impugn the experts' credibility with

5   conclusory argument that the experts "papered over" purported problems by stating without

6   justification that they had been resolved.  (Pls.' Objs. 11.)  Plaintiffs attempt to justify such a

7   broad statement by citing to the experts' statement that although the number of programs for

8   inmates at CCWF had temporarily decreased from 100 to 15, they had rebounded to 75.  (*Id.*)

9   Plaintiffs point to no solid evidence to dispute the experts' citation of the current number of

10  programs.  They merely argue that it was "probably false" and "definitely incomplete and

11  misleading" without any adequate justification.  (*Id.*)  Their only attempt to support their bold

12  contention is by citing their own expert's conclusory characterization of the prison's conditions.

13  (*Id.* (citing Decl. Kaufman).)  In fact, all that the citation to Plaintiffs' expert shows is that he has

14  a confused understanding of the distinction between custody levels and levels of mental health

15  care.  Specifically, he complained about mixing EOP prisoners with death row, administrative

16  segregation, and reception center prisoners.  (*Id.*)  Apparently, he believes that an inmate-patient

17  receiving enhanced outpatient care can never be a condemned inmate, one who is in

18  administrative segregation, or one who is housed in a reception center.  Anyone with a degree of

19  familiarity with this case would understand otherwise.

20                      d.      **Bed Assignment in Segregation**

21       Plaintiffs assert that the termination experts "glossed over" a purported "serious shortage"

22  of EOP beds at various security levels and custody requirements.  Plaintiffs' experts primarily

23  focus on the administrative unit at California Institution for Men.  (Pls.' Objs. 12-13.)  California

24  Institution for Men, however, is a reception center and does not have a major mental health care

25  program for inmates clinically determined to need an Enhanced Outpatient Program level of care.

26  (Jordan Reply Decl. [CIM] ¶¶ 20-29.)  For that reason, it is common to place inmates into the

27  segregation unit either for disciplinary or safety reasons pending return to the Reception Center

28  for processing or transfer to a different prison.  (*Id.*)  In this situation, inmates housed in the

16

1    administrative segregation unit on a temporary basis are treated as if they were in regular or

2    reception center housing, returning to the segregation unit for the evening.  (*Id.* ¶ 24)  In short,

3    Plaintiffs confuse mental health treatment with a custody designation.

4         Although Defendants' expert Dr. Dvoskin recommended that inmates who need an EOP

5    level of care be transferred from the administrative segregation at the California Institution for

6    Men, he nonetheless concluded that "[i]nmates who are awaiting transfer to an EOP level of care

7    in an Administrative Segregation Unit were seen regularly while awaiting transfer."  (ECF No.

8    4275–5 at 23.)  Moreover, as of March 13, 2013, there were a total of only three inmates in the

9    administrative segregation unit at California Institution for Men from the Reception Center who

10   were identified as needing an Enhanced Outpatient Program level of care.  (Amended Decl.

11   Victor Jordan Supp. Reply ¶ 22.)  All three of these men were in the unit for battery.  (*Id.*)

12        Regardless, in all eight cases identified by Plaintiffs' experts Haney and Kaufman from the

13   California Institution for Men, the inmates were appropriately placed and were receiving adequate

14   mental health care.  (*See id.* ¶¶ 40 [Haney Prisoner P] (CCCMS inmate placed in segregation for

15   battery on an inmate and seen weekly by clinician), 41 [Haney Prisoner Q] (inmate was seen

16   regularly for mental health treatment, left the administrative segregation unit on March 1, 2013,

17   and is no longer housed at CIM), 42 [Haney Prisoner R] (inmates was timely screened and

18   evaluated, and is seen as appropriate), 53 [Kaufman Prisoner P] (inmate receives timely clinical

19   care and additional services beyond Program Guide requirements), 51 [Kaufman Prisoner N]

20   (inmate is timely seen by his mental health clinician and reports he is "doing fine"), 52 [Kaufman

21   Prisoner O] (inmates continues to be seen within policy timeframes and is stable), & 54

22   [Kaufman Prisoner Q] ("continues to be seen according to program guidelines").)

23

24

25

26

27        **D.    The Methodology on Which Defendants' Experts Base Their Opinion Is
                Reliable.**

28
                                            17

1

2

**1.   Defendants' Experts' Opinion Was Formed After a Comprehensive and Exhaustive Audit of CDCR's Mental Health Services Delivery System.**

3   The Federal Rules of Evidence generally impose a basic "gatekeeper" function on the trial

4   judge to ensure "any and all scientific testimony admitted is not only relevant, but reliable."

5   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  This obligation applies to all

6   expert testimony, not just testimony which could be classified as "scientific."  *Kumho Tire Co.,*

7   *Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  When the trier of fact is the judge rather than a

8   jury, however, "the usual concerns of the [*Daubert*] rule—keeping unreliable expert testimony

9   from the jury—are not present."  *Microfinancial, Inc.*, 385 F.3d at 81 (citing *Daubert v. Merrell*

10   *Dow Pham., Inc*., 509 U.S. 579, 589 (1993)).  Regardless, to the extent that *Daubert* applies here,

11   district courts may consider the following factors: (1) whether the scientific theory or technique

12   can be tested; (2) whether it has been subjected to peer review and publication; (3) whether there

13   is a known or potential rate of error and the existence and maintenance of standards controlling

14   the technique's operation; and (4) whether the theory or technique has been generally accepted in

15   the relevant scientific community.  *Dauber*t, 509 U.S. at 593-94.  This list of factors is neither

16   necessarily exclusive, nor fully applicable in every case.  *Kumho Tire*, 526 U.S. at 149-53.

17   Indeed, a trial court may consider other factors relevant to an expert's reliability such as his

18   "personal knowledge or experience."  *Id*. at 150.

19   Plaintiffs argue that Defendants' experts' reports should be disregarded because they failed

20   to apply "any scientifically legitimate methodology" in forming their opinions.  (Pls.' Evid. Objs.

21   Defs.'  Exp. Reports & Decls. (Pls.' Objs.) 13.)  Plaintiffs' argument is based on the fact that the

22   expert opinions are not exclusively based on an audit tool, and includes the experts' subjective

23   impressions following interviews with mentally ill inmates.  (*Id*. 13-16)  But even a quick review

24   of the experts' reports, and their deposition testimony, belies Plaintiffs' argument and shows that

25   the experts' opinions are reliable.

26   Contrary to Plaintiffs' assertions, the experts' opinions regarding the adequacy of mental

27   health care was not based on a disorganized, unclear methodology, but rather a comprehensive,

28   exhaustive review of various aspects of CDCR's Mental Health Care Service Delivery System.

18

1    Indeed, before forming their opinions, Defendants' experts: (1) visited a sampling (thirteen) of

2    CDCR's thirty-three institutions where they interviewed mental health, medical, and custody staff

3    about mental health care; (2) reviewed institutional information related to mental health care,

4    including documentation of services delivered, suicide prevention efforts, and quality

5    improvement efforts; (3) reviewed minutes from quality management and suicide prevention

6    committee meetings and had discussions with relevant coordinators and committee members; and

7    (4) reviewed various inmates' mental health records, both in electronic and paper format, and data

8    from CDCR's Mental Health Tracking System.  (Clinical Exp. Rpt. 15.)

9        As Dr. Dvoskin explained during his deposition, the sampling of prisons toured was not

10   done on an ad hoc basis.  Rather, each prison was carefully selected by the experts to ensure that

11   every level of treatment (e.g., Correctional Clinical Case Management System, Enhanced

12   Outpatient Program, etc.) and different custodial environments that could have an effect on an

13   inmate's mental health (e.g., reception centers, sensitive needs yards, and psychiatric services

14   units) were properly evaluated.  (Decl. McKinney Ex. 1 [Dvoskin Dep.] 184:13-188:9.)  The

15   experts even added some additional prisons to the list to ensure that their evaluation was

16   sufficiently comprehensive.  (*Id.* 188:16-189:9.)  As Dr. Dvoskin explains, such a sampling is "a

17   common practice in social science."  (*Id.* 188:10-11.)

18       Before entering the prisons, the State's experts developed an auditing tool designed to help

19   them focus on different components of CDCR's mental health care system, such as medication

20   management or the placement of an inmate in a mental health crisis bed.  (Decl. McKinney Ex. 3

21   [Scott Dep.] 30:24-31:15.)  This tool was not intended to be a matrix by which the State's experts

22   would input the data captured by the tool into their final report in rote fashion, but was intended

23   to assist Defendants' experts in forming their opinion and to serve as an objective basis for

24   Defendants' experts' conclusion.  (*See id.* 31:16-32:23.)  The auditing tool was divided into five

25   categories that the experts felt were relevant to assessing whether CDCR was acting with

26   deliberate indifference to inmates' mental health needs.  (*Id.* 38:14-40:13.)

27       Once they arrived at each prison, each expert was tasked with reviewing a different aspect

28   of mental health care.  Dr. Dvoskin was assigned to review the overall provision of mental health

19

1  care within the institution, which included reviewing CDCR's policies and procedures governing

2  suicide risk management, assessing the provision of and access to mental health care for inmates

3  needing different levels of care (e.g., intermediate, acute, etc.), and reviewing quality assurance or

4  improvement projects.  (*Id.* 22:24-23:17, 29:19-30:23.)  Dr. Moore was tasked with looking at

5  issues related to nursing administration and the provision of medication, including medication

6  refusals, the disbursement of medication to parolees, emergency responses, and mental health

7  screening.  (*Id.* 23:18-24:2, 29:19-30:23.)  Dr. Scott focused on psychiatric medication

8  management, which included reviewing whether inmates were properly referred to psychiatric

9  care and received it, whether the diagnosis corresponded with the symptoms presented, whether

10  the treatment matched the diagnosis, and whether psychiatric medications were reasonably

11  monitored. (*Id.* 21:1-22:23, 29:19-30:23.)

12      The experts' review was quite extensive.  For example, in determining whether inmates

13  with mental health needs were going untreated or undertreated, Dr. Dvoskin would speak to

14  particular inmates about their mental health care and cross-reference the information relayed with

15  the inmates' mental health records.  (Decl. McKinney Ex. 1 [Dvoskin Dep.] 141:4-144:6; Ex. 3

16  [Scott Dep.] 33:25-34:21.)  In determining whether psychiatric medication was properly managed,

17  Dr. Scott would randomly review the Unit Health Records of inmates whom he was told were on

18  different categories of psychiatric medications, oversampled inmates on medications with high

19  risks of side-effects, and looked more intensely at records of inmates receiving higher levels of

20  care.  (Decl. McKinney Ex. 3 [Scott Dep.] 35:24-38:4.)

21          **2.      Plaintiffs' Selective Challenge to the Experts' Methodology is
                     Unavailing.**

22

23      Plaintiffs' effort to challenge the experts' methodology ignores the experts' comprehensive

24  efforts to form their opinions and instead takes a few discrete issues out of context.  First,

25  Plaintiffs fault Defendants' experts for creating an auditing tool that they supposedly abandoned

26  in favor of a more global approach.  (Pls.' Objs. 13-14.)  Plaintiffs contend that the experts'

27  opinions should been formed by an "objective, detailed instrument" and on "concrete, data-driven

28  specifics" rather than subjective analysis.  (*Id.* 14.)  But Plaintiffs offer no evidence showing that

20

1   the use of an auditing tool is the *only* accepted method within the psychiatric community of

2   measuring the constitutionality of mental health care in a correctional setting.  *See id.; see also*

3   *Daubert,* 509 U.S. at 594.  Indeed, *Kumho Tire* belies such a position holding that the reliability

4   of an expert's opinion may be measured in a variety of ways, including an expert's "personal

5   knowledge or experience." *Kumho Tire*, 526 U.S. at 150.  Moreover, as Dr. Dvoskin explained,

6   strictly following the audit tool had downsides because it focused on some issues being monitored

7   by the Special Master, rather issues pertinent to constitutional compliance, and was time-

8   consuming because it required the experts to gather data in an inefficient way.  (Decl. McKinney

9   Ex. 1 [Dvoskin Dep.] 225:15-227:1.)

10      Plaintiffs also try to fault the experts for considering the fact that inmate-patients knew their

11  clinician's name and the medications they were prescribed to help come to a conclusion that care

12  in various treatment settings was proper.  (Pls.' Objs. 14-15.)  But, as Dr. Moore explained, such

13  data is relevant because it shows that the inmate-patients were having regular and timely

14  interactions with mental health professionals, were receiving their prescribed medications, and

15  were generally aware of whom they could access to treat their mental illnesses.  (*See* McKinney

16  Dep. Ex. 4 [Moore Dep.] 60:6-18, 61:22-62:21.)  Moreover, such information was only one of a

17  variety of reasons Defendants' experts found CDCR's provision of mental health care to be

18  proper.  (*See* Clinical Exp. Rpt. 15-20, 22-25.)  And, contrary to Plaintiffs' contention,

19  Defendants' experts did periodically cross reference the information the inmates provided by

20  reviewing their Unit Health Records or speaking with their treating physicians.  (*See* Decl.

21  McKinney Ex. 1 [Dvoskin Dep.] 227:21-228:12; Ex. 3 [Scott Dep.] 33:23-35:6.)

22      Finally, Plaintiffs contend that the experts' finding that that few, if any, inmates were in

23  need of a higher level of care is flawed because the experts based this opinion solely on

24  interviews with inmates that custody staff designated as the most the "quirky" in their unit.  (Pls.'

25  Obj. 15-16.)  But Plaintiffs mischaracterize the evidence.  (*See* Reply and supporting declarations

26  from clinical staff.)  In determining whether mentally ill inmates were going untreated or

27  undertreated, the experts spoke not only with inmates that custody staff identified, but also those

28  whom the experts perceived to be disoriented or confused, were identified by other inmates as

21

1   having mental health issues, or were identified by clinicians as problematic. (Decl. McKinney Ex.

2   1 [Dvoskin Dep.] 141:4-144:6, 207:14-209:12.)  They also reviewed inmates' Unit Health

3   Records and had conversations with the inmates' clinicians.  (*Id.*)  Again, Plaintiffs fail to show

4   how this robust methodology is unreliable.  (*See* Pls.' Objs. 15-16.)

5       In sum, Plaintiffs' challenge to the experts' methodology is unavailing.  Plaintiffs fail to

6   provide the Court with the full picture and do not offer evidence showing why the reasoning or

7   methodology underlying Defendants' experts' opinion is scientifically invalid or unreliable.  For

8   these reasons, Plaintiffs' objections should be overruled and the Court should consider

9   Defendants' experts' opinions when deciding Defendants' termination motion.

10              **3.    The Experts Appropriately Focused on the Prevailing Standard of**
                     **Mental Health Care Within a Correctional Setting.**
11

12      Plaintiffs argue that the State's experts' reports should be disregarded because they do not

13   define a constitutional standard of care and thus do not assist the Court in understanding the

14   evidence or determining a material issue of fact.  (Pls.' Objs. 16-18.)  In support, Plaintiffs' cite

15   deposition testimony where Plaintiffs' counsel unsuccessfully attempted to have Defendants'

16   experts define a constitutional standard of care regarding treatment for particular mental health or

17   correctional issues.  (*Id.*)  But as previously discussed, the experts' task was not to opine about

18   constitutional standards.  Rather, they were to determine whether the mental health care system

19   delivers care that fits professional standards.  (*See supra*, Response to OSC, Argument I.)  And a

20   comprehensive review of the experts' reports shows that they provided the Court more than

21   sufficient information for the Court to determine that the constitutional requirements for

22   providing a system of mental health care are being met.

23      Moreover, contrary to Plaintiffs' assertions, Defendants' experts did not "bless" every

24   prison's level of mental health care as "constitutional," without defining the term.  (*See* Pls.' Objs.

25   16.)  Rather, they compared CDCR's mental health care delivery system with that of other state

26   prisons and jails regarding discrete mental health issues.  For example, in their joint report, the

27   mental health experts, noting their extensive experience observing and monitoring other state

28   correctional systems opined that "the clinical care itself places CDCR in the upper echelon of

                                          22

1    state prison systems." (Clinical Eval. Cal. Prison Mental Health Services Delivery System (Jt.

2    Report) 15.) Concerning the Enhanced Outpatient Program, the experts opined that "CDCR

3    meets the standard of care for prison mental health services in regard to the provision of group

4    therapy." (*Id*. 17.) Concerning the internal review process, the experts opined that they had

5    "never . . . seen a system that is more comprehensive and extensive regarding quality

6    improvement within a correctional setting." (*Id*. 30.) And concerning suicide prevention, the

7    experts opined that "CDCR does as diligent a job investigating suicides as any system of prisons

8    of jails in the country." (*Id*. 32.)

9         Similarly, Defendants' expert on use of force and the disciplinary process, Steve Martin,

10   based his opinion not on some undefined constitutional standard, as Plaintiffs allege, but on the

11   prevailing correctional practices. For example, Mr. Martin opined that CDCR's use-of-force

12   practices, based on his extensive experience with confinement operations across the United States,

13   is "aligned with constantly evolving sound correctional practices" and is "among the very best of

14   any such systems with which I am familiar." (Martin Report 13.) Mr. Martin further opined that

15   CDCR's process for adjudicating Rules Violation Reports of mentally ill inmates "compares very

16   favorably with any similar process with which I am familiar in other confinement systems." (*Id*.

17   15-16.)

18        Clearly, these reports show that Defendants' experts are basing their opinions on

19   contemporary correctional practices within the United States, and not on a subjective, fluid

20   definition of constitutional compliance.

21        Plaintiffs also espouse concerns that during depositions, two other experts—Dr. Joel

22   Dvoskin and Steve Martin—did not answer to Plaintiffs' satisfaction their counsel's persistent

23   questions about constitutional standards. (Pls.' Objs. 16-17.) But this is an attempt by Plaintiffs

24   to manufacture an issue out of nothing, given that the experts were not retained to render legal

25   opinions about constitutional standards.

26        Basically, Plaintiffs are unhappy with their counsel's unsuccessful efforts to pigeonhole

27   Defendants' experts into a concrete definition of constitutionality regarding the various facets of

28   correctional mental health care. But Plaintiffs' dissatisfaction with their litigation efforts does not

                                                    23

1   mean that the experts' testimony violates the Federal Rules of Evidence.  To the contrary, while

2   experts' opinions may be helpful to the Court in determining constitutional standard, they are not

3   dispositive.  *See Rhodes v. Chapman*, 452 U.S. 337, 348 n.13 (1981) (opinions of experts about

4   desirable prison conditions may be relevant and helpful, but they do not establish the

5   constitutional minima.); *Casey v. Lewis*, 834 F.Supp. 1477, 1544 (D. Ariz. 1993) ("Courts may

6   consider expert opinions to determine the constitutional requirements.  However, such opinions

7   do not ordinarily establish constitutional minimums.")  Thus, the fact that Defendants' experts did

8   not define the constitutional standard does not mean their reports are infirm.  By comparing

9   CDCR's mental health delivery system, use-of-force practices, and disciplinary procedures, with

10  that of other state prison or jail systems, Defendants' experts did just what Rule 706 required of

11  them; providing specialized knowledge that will assist the Court in determining whether CDCR's

12  provision of mental health services satisfies constitutional mandates.  *See* Fed. R. Evid. 706.

13  Because the experts' testimony satisfies Rule 706, the Court should consider it when deciding

14  whether to terminate this class-action.

15      **E.    The Experts' Opinions Are Supported by Substantial and Reliable**
16      **Evidence.**

17      Plaintiffs incorrectly contend that the experts' opinions are unreliable because the experts

18  only visited thirteen institutions and no Department of State Hospital (DSH) facilities, and

19  because they supposedly did not explain how the sites they visited were representative of the

20  state's correctional system.  (Pls.' Objs. 25.)  The also argue, without any merit, that the experts

21  lacked expertise to make what they unfairly characterize as "sweeping judgments and systematic

22  conclusions on the basis of their fragmentary and piecemeal reviews."  (*Id.* at 26.)  As discussed

23  below, the experts visited a proper sample of prisons that allowed them to see various aspects of

24  the mental health care delivery system.  And the experts were eminently qualified to render their

25  detailed and thoughtful opinions.

26          **1.    The Experts Visited an Appropriate Sampling of Prisons, and They**
            **Are Eminently Qualified to Render Opinions in this Case.**
27

28

The State's experts testified at their depositions about the methods that they used to ensure that the institutions visited accurately represent the state's correctional system. Specifically, Dr. Dvoskin testified that all experts discussed with CDCR staff the various mental health programs offered by different institutions in the state and complied a comprehensive list of institutions that covered all different levels of care and programs, including reception centers and SNY yards, offered by CDCR. (Decl. McKinney Ex. 1 [Dvoskin Dep.] 184-85, 188.) Dr. Dvoskin also testified that the experts visited certain institutions multiple times to ensure that they were using the right methodology to accurately evaluate the mental health care provided at each institution. (*Id.* at 185.) Dr. Dvoskin further testified that the methodology used to select a sample list of institutions was consistent with common research practices used in the social science field. (*Id.* at 188.)

In addition, Mr. Martin testified at his deposition that each expert provided input about the specific institutions that she or he believed were representative of the state's system regarding specific issues within the individual's areas of expertise. (Decl. McKinney Ex. 2 [Martin Dep.] 32.) Mr. Martin also testified that he believed, based on his expertise and experience, that because statewide rules and regulations governing mental health care services were implemented and vicariously enforced in thirteen institutions, there is reliable evidence that those rules and regulations are also in place in other institutions. (*Id.*) Moreover, Dr. Scott testified at his deposition that he requested to see a variety of types of institutions to ensure that the sites visited were representative of the state's correctional system. (Decl. McKinney Ex. 3[Scott Decl.] 165.) For example, Dr. Scott testified that he asked to visit Centinela State Prison to evaluate institutions in desert communities housing lower percentage of patients with psychiatric needs. (*Id.*)

The facts of the matter are that the State's experts undertook a thorough and exhaustive review of California's provision of mental health care to mentally ill inmates, including multiple site visits to CDCR institutions, meetings with mental health leadership and institutional mental health and custody staff, reviews of medical records and the Mental Health Tracking System, and reviews of quality improvement meeting minutes and documents. (Clinical Exp. Rpt 8-9.)

25

1    Plaintiffs have failed to offer any evidence beyond their conclusory allegations to show that the

2    experts' opinions are not reliable.

3         In addition, contrary to Plaintiffs' allegations, the experts' extensive credentials and

4    experience qualify them for accurately assessing the state's correctional mental health care

5    system.  In actuality, the experts are imminently qualified and easily surpass Rule 702's minimal

6    requirement that they have adequate knowledge, skill, training, experience, or education in the

7    field in question to provide testimony that would assist the trier of fact.  *See First Marblehead*

8    *Corp. v. House*, 541 F.3d 36, 41 (1st Cir. 2008) (noting that experts need not be "blue-ribbon

9    practitioners' with optimal qualifications").)

10        Dr. Dvoskin is a licensed clinical psychologist and an expert in forensic psychology.

11   (Clinical Exp. Rpt 1, 3-5; Ex. A to Clinical Ex. Rpt.)  He testified as an expert witness in the

12   original *Coleman v. Wilson* trial.  (*Id.*)  He has served as monitor of federal court settlement

13   agreements over the Michigan Department of Corrections, as well as various psychiatric hospitals

14   across the country.  (*Id.*)  He currently serves with Dr. Jeffrey Metzner, one of the special

15   master's experts, as a member of the expert team for the Civil Rights Division of the U.S.

16   Department of Justice that is currently investigating the Los Angeles County Jail.  (*Id.*)  He has

17   also served as Acting Commissioner of Mental Health for the State of New York, as well as

18   Director of Forensic Services and Associate Commissioner for Forensic Services for the New

19   York State Office of Mental Health.  (*Id.*)  In addition, Dr. Dvoskin has written extensively on the

20   subject of correctional and forensic mental health and the relation between mental health and

21   criminal justice and has played a major role in development of the American Psychological

22   Association's Guidelines for Psychiatrist Services in Jails and Prisons.  (*Id.*)

23        In addition, the report describes Dr. Scott's extensive experience and expertise in the field

24   of psychiatry.  (Clinical Exp. Rpt 5-7; Ex. A to Clinical Ex. Rpt.)  Dr. Scott works as a clinical

25   professor of psychiatry at University of California Davis and provides training on forensic

26   psychiatry on issues involving constitutional standards of care in correctional facilities.  (*Id.*)

27   Furthermore, Dr. Scott has gained direct clinical experience working as a psychiatrist in various

28   correctional settings, including county jails.  (*Id.*)  He has also written extensively on issues

26

1  relating to correctional mental health care and has contributed to the American Psychiatric

2  Association's Handbook of Correctional Mental Health Care.  (*Id.*)  Moreover, Dr. Scott has

3  served as an expert witness in numerous federal and state cases.  (*Id.*)  Additionally, according to

4  the State's report, Dr. Moore has a doctorate degree in nursing, specializing in health policy and

5  program evaluation, as well as over thirty years of experience in operating and evaluating

6  correctional systems.  (Clinical Exp. Rpt 7-8; Ex. B to Clinical Exp. Rpt.)  She has also published

7  extensively on various correctional topics and has served as expert witness in several cases.  (*Id.*)

8              **2.    The Experts Did Not Visit DSH Facilities Because DSH Services Are
                       Not at Issue in this Case.**

9

10         Furthermore, Plaintiffs argue that the State's expert report was unreliable because the

    expert witnesses did not visit DSH inmates.  Plaintiffs' argument lacks merit because the Court

11  has never found that the care provided to *Coleman* class members in DSH to be inadequate.

12  Rather, the Court only added the Director of the Department of Mental Health as a defendant in

13  2006 as a means to remove any "delay and difficulty" that was impeding "DSH's attempts to

14  remedy the shortage of inpatient beds." (ECF No. 1855 at 2:4–6.) And by July 2012, the State had

15  successfully guaranteed timely access to appropriate mental-health care.  (ECF No. 4196.)

16

17              **3.    The Experts Did Review Care for Condemned Inmates.**

18         In addition, Plaintiffs contend that the State's report was unreliable because the expert

    witnesses did not evaluate the mental health care services provided to condemned inmates.  (Pls.'

19  Objs. 37-38.)  Plaintiffs have failed, however, to offer any evidence to support their allegations.

20  In fact, Plaintiffs admit that the experts visited San Quentin and the Central California Women's

21  Facility, which house the State's condemned inmates.  (*Id.*)  To support their argument, Plaintiffs

22  solely rely on Dr. Dvoskin's testimony that the experts did not specifically study whether

23  condemned inmates requiring Intermediate Care Facilities (ICF) level of care were placed in

24  alternative programs meeting their needs.  (*Id.* at 27-28.)  But the mere fact that the experts did

25  not separately assess this specific issue cannot be interpreted to mean that they did not evaluate

26  the mental health care services provided to condemned inmates generally.

27

28              **4.    The Experts Addressed Whether Proper Care Is Being Provided at
                       the Current Population Level.**

27

1   Furthermore, despite Plaintiffs' claims that the State's experts did not address

2   "overcrowding" per se, the State's experts opined that proper care was being provided at the

3   current population and, thus, that the current population is not contributing to systemic deliberate

4   indifference.  (Decl. McKinney Ex. 3 [Scott Dep.] 24:16-24 ("I was asked to look at, with the

5   current both staffing levels and prison population, was appropriate care psychiatric care provided

6   to inmates and was there evidence that the California Department of Corrections was deliberately

7   indifferent to the inmates based on the population at the time I did the evaluation"); Ex. 1

8   [Dvoskin Dep.] 193:5-7 ("If I felt that crowding was precluding the provision of adequate mental

9   health care, then I would have written it, and there was no preclusion of me doing that"); Ex. 5

10  [Moore Dep.] 41:8-11.)  Plaintiffs' oversimplified reliance on semantics should be disregarded.

11      **F.    Defendants' Expert Report Meets the Requirements of Federal Rule of
              Civil Procedure 26.**

12      Contrary to Plaintiffs' contentions, the joint expert report filed by Defendants includes the

13  information required by Federal Rule of Civil Procedure 26.  And even if there were some

14  variance, exclusion of testimony should only occur when there is resulting prejudice that is more

15  than negligible.  *Tex. A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir.

16  2003).  Here, Plaintiffs fail to make any such showing of prejudice.

17      Rule 26 requires that an expert witness report include the following: "(i) a complete

18  statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts

19  or data considered by the witness in forming them; (iii) any exhibits that will be used to

20  summarize or support them; (iv) the witness's qualifications, including a list of all publications

21  authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years,

22  the witness testified as an expert at trial or by deposition; and (vi) a statement of the

23  compensation to be paid for the study and testimony in the case."  Fed. R. Civ. P. 26(a)(2)(B).

24  Defendants' expert witness report meets all these requirements.

25      Defendants' report lists the four main opinions reached by the expert witnesses, as well as

26  the specific facts and data used by the experts.  (Ex. 1 to Vorous Decl. (Joint Report), ECF No.

27  4725-5, Ex. 1 at 10-11.)  Specifically, the experts' main opinions are separately listed in the

28

28

1   report as follows: (1) inmates with serious mental disorders are diligently and successfully

2   identified upon retention in the CDCR and their subsequent incarceration; (2) CDCR's Mental

3   Health Services Delivery System provides inmates with serious mental disorders appropriate

4   psychiatric and mental health care; (3) CDCR responds to inmates' mental health crises in a

5   timely manner; and (4) CDCR does not act with systematic deliberate indifference in response to

6   inmates' serious mental care needs.  (*Id.* at 10.)  In addition, the report lists the following seven

7   sources used by the experts to formulate their opinions: (1) experts' personal experience and

8   expertise in the field; (2) site visits at thirteen CDCR institutions; (3) institutional information,

9   including mental health census, documentation of services delivered, suicide prevention and

10  quality-improvement efforts, and reports of incidents; (4) documents provided by the Attorney

11  General's Office; (5) meetings with mental health, medical, and custody staff at CDCR; (6)

12  minutes from Quality Management and Suicide Prevention and Response Focused Improvement

13  Team meetings; and (7) inmates' mental health records.  (*Id.* at 10-11.)

14          Moreover, the report includes thorough information concerning each expert's qualifications.

15  (Report, Ex. 1 to Vorous Decl. 3-7, Attachs. A-C.)  The report provides a list of each expert's

16  publications during the previous ten years, as well as the cases in which each witness has testified

17  as an expert during the previous four years.  (*Id.*)  Further, the report provides the amount of

18  compensation each witness has received for his or her work in this case.  (*Id.*, Attach. D.)

19  Accordingly, Defendants' report includes all the information required by Rule 26.

20          Plaintiffs argue, however, that the report is inconsistent with the federal rules because it

21  fails to: (1) "clearly identify what is the joint work of the experts and what are their separate

22  opinions;" (2) include the "basis and reasons for each expert's opinions;" (3) "fully disclose" each

23  expert's "reliance upon the work of his partners in reaching his opinions;" and (4) disclose

24  whether an expert had his work reviewed by his partner in the process of the expert's formulating

25  his opinions.  (Pls.' Objs. 28-29.)  As an initial manner, Plaintiffs have failed to provide any

26  authoritative precedent to show that the federal rules required Defendants to comply with such

27  requirements, which go beyond the scope of Rule 26(a)(2)(B).  Notably, Plaintiffs have not

28  included a single decision that is controlling precedent here.  In addition, none of the decisions

                                                    29

1   cited by Plaintiffs require that a joint report meet all the requirements listed by Plaintiffs.  Instead,

2   Plaintiffs have gathered a number of unpublished cases from assorted district courts and have

3   drawn upon the isolated requirements discussed in each decision to compile a long list of

4   requirements that they now seek to impose on Defendants.  (*See id.*)

5        Moreover, even assuming arguendo that Plaintiffs can rely on those decisions to support

6   their arguments, they still fail to show that Defendants' expert report was inconsistent with Rule

7   26.  Plaintiffs cite to *Librado v. M.S. Carriers*, No. 3:02-CV-2095-D, 2004 U.S. Dist. LEXIS

8   12203 at *41 (N.D. Tex. June 30, 2004), to support their contention that each expert here should

9   have identified those portions of the report that were joint work and those portions that were the

10  individual expert's separate opinion.  (*See* Pls.' Objs. 28.)  However, the primary issue in *Librado*

11  was the fact that the joint witness report was not signed by the expert witness who provided most

12  of the opinions contained in the report and did not properly identify that individual as an author.

13  *See Librado*, 2004 U.S. Dist. LEXIS at *39-43.  Here, Defendants' joint report is signed by all

14  three experts who prepared it.  (*See* Report 41.)  Moreover, contrary to Plaintiffs' allegations,

15  Defendants' report here identifies the particular sections that were not joint work of all three

16  experts.  Specifically, the report clearly states that the Medication Management section was

17  prepared by the psychiatrist and nurse expert.  (*See* Report 28-31.)  In addition, Defendants

18  separately produced a Mental Health Services Audit Tool on March 1, 2013 which contains

19  detailed break-downs of each subject analyzed in the report, as well as the names of individual

20  experts responsible for researching and analyzing various subjects.  (DEXP 109869.)

21       Similarly, the other decision cited by Plaintiffs is distinguishable from this case.  Plaintiffs

22  rely on *Nunex v. BNSF Ry. Co.*, No. 09-4037, 2012 U.S. Dist. LEXIS 97411 at *21 (C.D. Ill. July

23  13, 2012), to support their argument that if "an expert's partner reviews his work as part of the

24  process of the expert's formulating his opinion, that review must be disclosed."  (Pls.' Objs. 29.)

25  Contrary to Plaintiffs' contentions, the court in *Nunex* did not require that the report itself identify

26  the portions that have been prepared by one expert and reviewed by another.  *See id.*  The court

27  only held that when asked, an expert witness must disclose in his deposition whether he has relied

28  on his partner's review of his report in formulating his opinions.  *See id.*  In addition, in reaching

30

1    its opinion, the court in *Nunex* specifically considered its findings that the expert witnesses'

2    opinions were not supported by any objective or scientific evidence.  *See id.* at **21-30.  Here,

3    however, Defendants' expert report is supported by extensive and reliable evidence.  In addition,

4    Plaintiffs admit that all three expert witnesses who authored the joint report testified at their

5    depositions regarding the parts that each individual expert was responsible for and the parts where

6    each individual relied on other experts' work.  (Pls.' Objs. 29-32.)  Accordingly, Plaintiffs have

7    failed to show that Defendants' expert witness report does not meet the requirements of Rule 26.

8            Moreover, even assuming arguendo that the report violates Rule 26, the alleged errors are

9    harmless under Rule 37 because Plaintiffs deposed all three expert witnesses and had an

10   opportunity to inquire about the specific work of each witness.  *See* Fed. R. Civ. P. 37(c)(1) ("If a

11   party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party

12   is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or

13   at a trial, unless the failure was substantially justified or is harmless").  In fact, in *Librado*, the

14   court denied plaintiffs' motion to strike defendants' expert report even though the report did not

15   contain the signature of the main witness and did not properly identify that person based on the

16   fact that plaintiffs could depose the experts with regard to their opinions.  *See Librado*, 2004 U.S.

17   Dist. LEXIS 12203 at *42.  Here, Plaintiffs admit that they deposed all three experts authoring the

18   report and inquired about each individual's work.  (Pls.' Objs. 29-33.)  In addition, Plaintiffs

19   cannot show any harm in light of the Mental Health Services Audit Tool produced by Defendants,

20   specifying the individual experts responsible for preparing each section of the report.  (See DEXP

21   109864.)

22   **III.   THE CDCR OFFICIALS' DECLARATIONS MEET THE REQUIREMENTS**
     **OF FEDERAL RULE EVIDENCE 602.**
23

           **A.    Rick Johnson's Testimony Is Admissible.**
24

25           Plaintiffs incorrectly challenge the testimony of Rick Johnson, CDCR's former Chief of the

     Health Care Placement Oversight Program, arguing it is improper under Federal Rule of Evidence
26

     602 because it is not based on his personal knowledge.  (Pls.' Objs. 26-27.)  Specifically,
27

28   Plaintiffs challenge the portion of Mr. Johnson's declaration certifying that CDCR has a sufficient

                                                    31

1   number of mental health beds and that inmates are being timely seen.  (*Id*. 26.)  Plaintiffs contend

2   that Mr. Johnson's testimony is inadmissible because at his deposition, he was unaware of or

3   unfamiliar with purported "critical pieces of data."  That piece of data was a report prepared by

4   the Department of State Hospitals and shared exclusively with the Court, Special Master, and

5   Plaintiffs' counsel, about the timing for placing mentally ill inmates in the Acute Placement

6   Program and a list, which was generated from an outdated and unused CDCR database.  (*See*

7   Decl. McKinney Ex. 9 [Johnson Dep.] 142:18-148:21, 190:8-193:19.)

8          But the fact that Mr. Johnson did not know of outlying data when he signed his declaration

9   does not show that he lacks personal knowledge about the matters he testified to.  At best, this

10  evidence goes to Mr. Johnson's credibility, not its admissibility.  *Cf. Hemmings v. Tidyman's Inc.*,

11  285 F.3d 1174, 1188 (9th Cir. 2002) ("Objections to the inadequacy of a study are more

12  appropriately considered an objection to the weight of the evidence rather than its admissibility.");

13  *Lloyd v. Conseco Fin. Corp.*, No. CV 00-10452 MMM (RNB), 2001 WL 36097624, at *8 (C.D.

14  Cal. Oct. 19, 2001) (Generally, disputes regarding the validity of statistical evidence . . . affect its

15  weight rather than its admissibility.").  Because Mr. Johnson's testimony does not violate Rule

16  602's personal knowledge requirement, Plaintiffs' evidentiary challenge must be denied.

17

18         **B.     Dr. Diana Toche's Testimony Is Admissible.**

19         Plaintiffs object to the declaration of Dr. Diana Toche on the ground that her testimony

20  lacked foundation.  Specifically, Plaintiffs contend that Dr. Toche's statements were not based on

21  her personal knowledge because she relied on information obtained from various sources, while

22  serving as the Acting Statewide Director of the Division of Correctional Health Services.

23  Plaintiffs' contention lacks merit.  The mere fact that Dr. Toche obtained information from

24  conversations with experts, subordinates within her department, and other staff, does not

25  transform her testimony into inadmissible hearsay.  *Navel Orange Admin. Comm. v. Exeter*

26  *Orange Co.*, 722 F.2d 449, 454 (9th Cir. 1983) ("The head of an administrative agency need not

27  have first-hand knowledge of all the facts that inform an agency's understanding in order to

28  testify.").

32

1    Knowledge acquired through others may still be personal knowledge within the meaning of

2    Rule 602.  *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989).  As

3    common-sense would dictate, talking with others, including experts, is "a common and reliable

4    way of obtaining knowledge."  *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 739 (1st

5    Cir. 1982).  This act does not convert such knowledge into inadmissible hearsay, which is the

6    mere repetition of a statement made by someone else without the voucher of the actual witness.

7    *Id.*; *Agfa-Gevaert, A.G.*, 879 F.2d at 1523.

8    For example, in *Agfa-Gevaert*, the plaintiff raised hearsay objections to testimony from the

9    business executives regarding the quality of a product because their statements were based on

10   information told to them by engineers and customers.  *Agfa-Gevaert, A.G.*, 879 F.2d at 1523.  The

11   Seventh Circuit rejected the plaintiff's objection, noting that "business executives do not make

12   assessments of a product's quality and marketability by inspecting the product at first hand."  *Id.*

13   The court explained that "personal knowledge [that is] merely based, as most knowledge is based,

14   on information obtained from other people" is not hearsay.  *Id.*  Accordingly, the executives'

15   assessments, like all perceptions, were inferential and "as long as they are the sorts of inference

16   that businessmen customarily draw they count as personal knowledge."  *Id.*

17   Notably, Plaintiffs cite no authority to support their contention that knowledge acquired

18   through others runs afoul of Rule 602's personal-knowledge requirement.  Indeed, by Plaintiffs'

19   reasoning, no organizational deponent under Federal Rule of Civil Procedure 30(b)(6) could ever

20   seemingly produce admissible testimony.  The logic of their contention is simply untenable.

21   Here, Dr. Toche's declaration offered assessments based on information provided to her as

22   the Acting Statewide Director of the Division of Correctional Health Services.  Her assessments

23   are inferential and based on information acquired from a wide range of sources.  Moreover, in her

24   declaration, Dr. Toche expressly states that her conclusions are rooted in her education,

25   experience, and knowledge of the state's mental health care system.  (Decl. Toche ¶ 10.)  Taken

26   together with the information Dr. Toche acquired through consultations with others, the

27   declaration reflects her perceptions regarding the adequacy of mental health staffing, the

28

33

1   consequences of the monitoring, and the overall effectiveness of the mental health system.  These

2   perceptions count as personal knowledge and are admissible under Rule 602.

3   **C.   Dr. Tim Belavich's Testimony Is Admissible.**

4   Plaintiffs also object to the declaration of Dr. Tim Belavich, incorrectly arguing that his

5   testimony is not based on personal knowledge.  This is the same argument Plaintiffs raise against

6   Dr. Toche's declaration, and it suffers from the same flaws.  Plaintiffs contend that Dr. Belavich's

7   testimony lacks foundation because when questioned "about the particulars" of various matters

8   during his deposition, Dr. Belavich indicated that his opinions rely on input from Subject Matter

9   Experts.  (Pls.' Objs. 29.)  While Plaintiffs refer to this process as "funneling testimony," courts

10  and the rules of evidence recognize this as simply "a common and reliable way of obtaining

11  knowledge."  *See Robinson*, 685 F.2d at 739; *Agfa-Gevaert, A.G.*, 879 F.2d at 1523.  Dr.

12  Belavich's declaration provides testimony that is inferential and based on his knowledge as

13  provided by others, which constitutes personal knowledge under Rule 602.  *See Agfa-Gevaert,*

14  *A.G.*, 879 F.2d at 1523.

15  As examples of Dr. Belavich's supposed lack of foundation, Plaintiffs point to instances in

16  his deposition testimony where Dr. Belavich was unable to provide an opinion regarding

17  recommendations he was "unaware of" without first getting input from his experts.  (Pls.' Objs.

18  29:11-14.)  All that this demonstrates is that Dr. Belavich had not acquired the requisite

19  knowledge to opine on a recommendation he was unfamiliar with.  Plaintiffs fail to explain how

20  any of the cited deposition testimony undermines the foundation of Dr. Belavich's declaration.

21  Plaintiffs' objection to Dr. Belavich's declaration is meritless.  As with their other

22  objections, Plaintiffs argue about the weight of the evidence, not its admissibility.  Knowledge

23  obtained from experts is still personal knowledge under Rule 602, and Dr. Belavich's declaration

24  is properly admissible.

25  **D.   Dr. Laura Ceballos's Testimony Is Admissible.**

26  Plaintiffs challenge Dr. Ceballos's findings regarding the length of time that it takes for

27  inmates to transfer from mainline to EOP programs, arguing that she should have used the

28  average instead of median length of transfer time.  To support their argument, Plaintiffs rely on an

34

1    email sent from Dr. Belavich to Dr. Ceballos, advising her to use the median length of time to

2    ensure that her findings accurately represent the State's mental health care system.  (Pls.' Objs.

3    37.)   Dr. Belavich's recommendation merely demonstrates the State's thorough efforts in

4    ensuring that the experts' findings accurately represent the statewide health care system.  In his

5    email, Dr. Belavich stated: "you are better off reporting the median so you can take those outliers

6    into account and they don't have the weight on the total."  (Bien Decl. Ex. 116.)  Plaintiffs rely on

7    this statement to argue that the State manipulated the data.  To the contrary, using the median

8    instead of average length of time was a common-sense methodology to ensure that Dr. Ceballos's

9    findings draw an accurate picture as to how long it generally takes for inmates across the state

10   requiring EOP level of care to transfer to an EOP program.  *See* Michael J. Saks, David L.

11   Faigman, David H. Kaye & Joseph Sanders, Annotated Reference Manual on Scientific Evidence

12   (2d ed.), 2004 WL 48151, 25 (explaining that median measurements are more reliable than mean

13   measurements because "a few unusually large or small observations may have too much influence

14   on the mean [while] [t]he median is resistant to such outliers").  The "outliers" mentioned in the

15   email refer to inmates with exceptionally complicated case factors, which delay their transfer to

16   EOP programs.  For example, in rare cases, an inmate may not only require EOP level of care, but

17   may also need to be single-celled, be placed in the Sensitive Needs Yard, and may also have

18   enemy concerns on the Sensitive Needs Yard that need to be addressed.  Finding appropriate

19   housing for such inmates would take significantly more time than it would normally take to house

20   inmates only requiring EOP level of care.  As explained in Dr. Belavich's email, relying on

21   average wait times can present a misleading number because averages can be skewed by a few,

22   limited outliers that are not representative of the experience of vast majority of inmates system-

23   wide.  The use of median wait times reflects the system-wide wait time more accurately, because

24   it is not skewed by unique cases, either good or bad.

25

26

27

28

1

**CONCLUSION**

2        The Court should consider all of Defendants' evidence, which demonstrates that there is

3  no ongoing systemic violation, and that this case should be terminated.  The experts' testimony is

4  properly based on thorough and exhaustive reviews of the evidence in this case, and resulted in

5  well-founded and highly qualified opinions that there is no systemic deliberate indifference.  The

6  opinions' partial reliance on limited communication with inmate-patients did not create any unfair

7  prejudice.  And there is no legitimate challenge to the officials' testimony, which had a proper

8  foundation.  For each of these reasons, the Court should overrule Plaintiffs' objections.

9

10  Dated:  March 25, 2013                          Respectfully Submitted,

11

12                                                 KAMALA D. HARRIS
                                                   Attorney General of California
                                                   JAY C. RUSSELL
13                                                 Supervising Deputy Attorney General

14

15                                                 /s/ Patrick R. McKinney

16                                                 PATRICK R. MCKINNEY
                                                   Deputy Attorney General
17                                                 *Attorneys for Defendants*

18  CF1997CS0003
    20681193.docx
19

20

21

22

23

24

25

26

27

28

36