KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                              Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**AMENDED REPLY DECLARATION OF VICTOR JORDAN PH.D. IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE UNDER THE PRISON LITIGATION REFORM ACT [18 U.S.C. § 3626(b)] AND TO VACATE THE COURT'S JUDGMENT AND ORDERS UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)(5)** |

I, Victor Jordan, Ph.D., declare as follows:

1. I am the Chief of Mental Health at California Institution for Men (CIM), a prison under the control of the California Department of Corrections and Rehabilitation (CDCR). I have been the Chief of Mental Health at CIM since July 2011. Previously, I was the Acting Chief of Mental Health and Chief Psychologist at CIM from July 2010 to July 2011. Before that, I held the position of Senior Psychologist, Supervisor from May 1997 to July 2010. I have a doctorate

1

degree in psychology and have been practicing as a psychologist for 21 years and have been at CDCR for the entire length of my practice. I am responsible for the management of the entire Mental Health Department at CIM, including supervision of another manager, CIM's Chief Psychiatrist; all Mental Health Programs; approximately one hundred professional and ancillary employees; and a seventeen million dollar annual budget. My duties include, but are not limited to: managing labor issues, continuous quality improvement, coordination with all CDCR divisions, coordination with the California Correctional Health Care Services Administration, and compliance with federal and state laws and regulations. I submit this declaration in support of the State's Reply Memorandum in support of its motion to terminate under the Prison Litigation Reform Act and to Vacate the Court's Judgment and Orders under Federal Rule of Civil Procedure 60(b)(5).

## REBUTTALS TO GENERAL ALLEGATIONS IN PLAINTIFFS' EXPERTS' DECLARATIONS

### A. Staffing Shortages

2. In paragraphs 52 and 136 of Dr. Haney's declaration, he states that CIM has a shortage of psychiatrists and other mental health staff that allegedly prevent important services from being provided to mentally ill inmate-patients. Dr. Haney does not explain exactly what services are missing; however, CIM has the necessary staff required to provide timely and quality care. According to a recent audit, CIM has 82 percent of its clinical positions filled. See the February 2013 CIM Dashboard attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-A. According to this attachment, which reports December 2013 audit results, CIM scored 99 percent compliance for clinical intervals, which are periodic therapeutic encounters with primary clinicians. These appointments are with psychologists, social workers, psychiatrists and include regular Interdisciplinary Treatment Team (IDTT) encounters. In addition, overall CIM scored 83 percent for timely level of care change requests, which consists of referrals to a higher or lower level of care. CIM has also scored 79 percent for timely mental health referrals. Urgent referrals to mental health have scored 100 percent timeliness for February 2013. For the last three months,

2

Decl. Victor Jordan Ph.D Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

all primary clinician encounters, including 90-day follow-ups, routine appointments, initial appointments and initial 30-day appointments were at or above 96 percent. According to the February 2013 Program Report, an internal report of the last three months worth of audits for use by CIM mental health management, CIM's compliance levels clearly indicate that we are able to provide adequate care. See the CIM February 2013 Program Report attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-B.

3. Similarly, Dr. Kaufman in his declaration at paragraphs 33 through 39 states that CIM has staffing shortages. CIM does have vacancies, but the Chief Psychiatrist position was in fact filled when Dr. Kaufman toured CIM. Regardless of vacancies, CIM is and has been providing timely adequate treatment. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-B) Treatment received meets basic mental health needs despite staffing shortages. Although CIM's population decrease has been less than other institutions, the acuity of the remaining population has reduced ---there are significantly fewer EOP patients since realignment. Before realignment, CIM's Mental Health Crisis Bed (MHCB) was operating at full capacity with 36 patients; the average census for February 2013 was approximately 17 patients as shown by the MHCB Statistics spreadsheet attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-C.

4. Dr. Kaufman claims in paragraph 36 of his declaration that patients often miss meals while waiting for mental health appointments. There is no evidence that patients are missing meals and staff members are not aware of this as being an issue. CIM's Warden regularly attends the Men's Action Committee meetings, which is an inmate-run group that represents inmates to prison management in addressing inmate concerns. The Warden has not informed me of any complaints received from them on this matter. Certainly, mental health staff members have not heard this concern from their patients.

5. Dr. Haney noted that CDCR does not provide assistance with housing, filling out social security applications or arranging treatment for two-thirds of paroling Correctional Clinical Case Management Services (CCCMS) inmate-patients. (Haney decl. para. 138) CIM staff members do not do this type of work. This service is completed by headquarters' staff members

in the Transitional Case Management Program. CIM has a social worker dedicated to facilitate post-release housing and any type of community support available upon parole, based on referral by the primary clinician.

### B. Lack of Appropriate Treatment Space

6. Dr. Haney claims that the space at CIM makes for impossible provision of appropriate care in paragraph 55 of his declaration. I disagree. It is true that CIM asked for additional treatment space and that the current space in the Administrative Segregation Unit (Ad Seg) is not ideal. There has been construction that added treatment and office space at CIM reception. But the treatment space limitations at CIM Ad Seg do not interfere in our ability to provide regularly scheduled treatment or to provide the basic mental health care needed.

7. Plaintiffs in their responsive brief cite to Figure 4, a photo of the 6 therapeutic treatment modules in Ad Seg. This photo shows Ad Seg inmate-patients receiving group therapy. Ad Seg inmates need to be placed in therapeutic treatment modules for the safety of other inmates and staff. Also, inmates waiting to see a clinician may wait in a therapeutic module while they are waiting to see their clinician when group therapy is not occurring. This photo does not appear to show either overcrowding or inhumane conditions.

8. Certainly, CIM is providing timely care as stated above in paragraph 2. On average, CIM providers have approximately 202 daily patient encounters and 1012 weekly patient encounters. In addition, there are approximately 9 groups per day and 56 groups per week on average. Patients are being seen timely and adequately even though CIM would prefer additional treatment space. According to the Program Report, CIM has consistently scored a 99 percent on timely primary clinician appointments. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-B.) Timely psychiatry appointments were consistently at or above 88 percent on this same audit. Lastly, CIM scored a 98 or 99 percent timely for IDTT encounters for the last three months.

9. Dr. Kaufman also claims that the space in Ad Seg for group treatment is inadequate due to a lack of privacy. (Kaufman decl. para. 57) Group treatment is done at time when custody and staff members are not "milling about." Staff members that are not part of group therapy are

not present during group therapy sessions. In addition, the IDTT does not meet when personnel crowd the room or group therapy is occurring. IDTT does not meet at the same time that other people are in the room. Dr. Kaufman also notes that Ad Seg treatment space is not ideal. Again, the treatment space at CIM is adequate to provide the basic mental health care needed. The basic mental health needs of Ad Seg patients are being met, despite the matters Drs. Kaufman and Haney discuss in their declarations.

10. Dr. Haney at paragraph 131 of his declaration states that there is no group program for CCCMS reception center inmate-patients. This is because the court-approved and court-ordered Mental Health Program Guide, a collection of policies and procedures for CDCR's mental health program, does not require group therapy for inmate-patients in reception center. These patients are only in reception for a limited amount of time before transfer to a mainline mental health program wherein they can receive group therapy. They receive the basic mental health care needed.

11. In paragraph 131 of Dr. Haney's declaration, he states that a provider indicated that reception center inmate-patients do not have as much yard or out of cell time "as they should." However, this comment was not explained or clarified and appears to be a general comment that inmate-patients should have more time out of cell. CIM provides the appropriate and required out of cell therapy to the majority of patients. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-B.) Reception center staff members ensure that the required yard time is provided.

**C. Refusal Rate**

12. Drs. Haney and Kaufman state in their declarations that a high refusal rate among inmate-patients to attend the Interdisciplinary Treatment Team (IDTT) meetings indicates difficulties by inmate-patients in forming therapeutic relationships with staff. (Haney decl. para. 133 and Kaufman decl. para. 147-148) An "ASU Treatment Compliance" Quality Improvement Team was chartered on March 18, 2013 to address these refusals. In addition to the added pressures of the inmate culture of Ad Seg, there is no documented proof that attending IDTT is directly related to the formation of the "therapeutic alliance" with treatment staff. In fact, the

primary clinician often reviews the same treatment goals with the patient prior to the IDTT. It may be that inmate-patients simply do not feel that they need to repeat this process in a group setting. CIM continues to work on improving and encouraging attendance by inmate-patients.

13. Nine inmate-patients refused to attend IDTT on the day that Drs. Haney and Kaufman toured CIM. (Haney decl. para. 134 and Kaufman decl. para. 147) Approximately 40 percent of the inmates in Ad Seg are Hispanic and they have informed treatment staff that they will not come out for IDTT due to directives given by Hispanic gang leaders. Hispanic patients have also directly informed clinical staff that they will not come out for IDTT as it is "a sign of weakness for their race." Of the 60 remaining, a majority attend IDTT.

**D. Lack of Meaningful Treatment**

14. In paragraph 139 of Dr. Haney's declaration and paragraph 140 of Dr. Kaufman's declaration, they state that a CIM provider, Dr. Lindsay, informed them that CIM is unable to provide the appropriate amount of weekly treatment for reception center inmates. This is incorrect. Dr. Lindsay reported erroneous information and offered his opinion without basis. Reception center patients receive what the program guide requires. Reception center staff members ensure that the required yard time and services are provided.

15. According to Dr. Haney, from November 2012 to January 2013; only 35 percent of EOP patients were receiving the required 5 hours of treatment per week. (Haney decl. para. 139) Dr. Haney indicates that this was due to "space constraints, escort issues, inmate movement challenges, and yard and treatment scheduling conflicts." This is not correct. We investigated this matter and CIM was providing disproportionate services to the EOP inmates, such that, some inmate-patients received much more than the required 5 hours of weekly treatment per week, while some received less. Once this issue was targeted, offered services rose tremendously, approaching compliance. CIM is currently on target to meet performance goals for the month of March (the first week of March 2013 achieved 100 percent of scheduled and offered services).

16. Dr. Haney states that there is a lack of adequate treatment time due to the environment of Ad Seg. (Haney decl. para. 140, 148). According to him, the "harsh and

6

inhospitable environment" causes refusals and this leads to a lack of adequate treatment time. Group therapy is offered in Ad Seg and the patient has a right to refuse treatment. Treatment refusal by Ad Seg patients is more likely due to the directives of gang leaders as discussed above. Ad Seg inmate-patients receive very appropriate treatment planning and intervention by mental health staff, despite minimal Ad Seg programming. An "ASU Treatment Compliance" Quality Improvement Team (QIT) was chartered on March 18, 2013 to improve attendance.

17. According to Dr. Kaufman, therapy provided by CIM is inadequate and poor quality. (Kaufman decl. para. 146) He claims that appointments with case managers last only 15 minutes. (Kaufman decl. para. 146) This is untrue. Psychiatry appointments may last about 15 minutes as this is sufficient time in most instances to establish whether medications are working for that individual patient. However, case managers are either psychologists or social workers. Social workers run two-hour psychotherapy groups as well as individual psychotherapy sessions that last more than 15 minutes in all programs offered. Psychology appointments last on average 45 minutes to an hour. All inmates have a treatment plan developed between the primary clinician and the patient. The primary clinician thereafter treats the patient according to the plan they had previously agreed upon. In addition, patients receive the full spectrum of services required by the mental health program guide---psychotherapy, medication management, recreational therapy, and crisis management---based upon the needs of the patient. Moreover, throughout CIM, many inmate-patients receive additional services beyond the requirements of the program guide because of the dedication of their clinicians.

18. Dr. Kaufman also alleges that patients distrust their providers making it less likely they will attend therapy. (Kaufman decl. para. 146) This is untrue. CIM clinicians believe they have established good therapeutic rapport with their patients. This is proved by the many patient requests for both additional appointments and services. There are virtually no refusals in most programs aside from Ad Seg.

19. According to Dr. Kaufman, CIM fails to provide meaningful group therapy, but apparently only provides groups run by recreational therapists or psychiatric technicians in which

7

Decl. Victor Jordan Ph.D Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

patients only read, watch movies or listen to music. (Kaufman decl. para. 150-153) The groups Dr. Kaufman mentions are in fact recreational therapy groups, not psychotherapy groups. It appears that he confused the two different groups. In Ad Seg, psycho-educational groups are run by psychiatric technicians and these groups provide education with coping skills, medication compliance and anger management. Psychotherapy groups are only run by psychiatrists, psychologists and social workers, depending on the program. Psychiatric technicians and recreational therapists run recreational therapy groups.

### E. Lack of Appropriate Beds

20. In paragraph 141 of Dr. Haney's declaration, he states that CIM has difficulty in "achieving level of care referrals within required timeframes." According to a December 2012 audit, CIM scored 83 percent on timely level of care change requests. It appears that CIM is in fact able to provide timely level of care referrals. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-A.)

21. Allegedly, CIM lacks EOP beds, causing reception center EOP patients to wait on average 91 days for transfer. (Haney decl. para. 142 and Kaufman para. 162) Most of the patients they refer to are waiting for an open Special Needs Yard EOP bed. But while patients wait for an open Special Needs Yard EOP bed, they receive adequate care and mental health services according to the program guide requirements.

22. Dr. Kaufman at paragraph 118 of his declaration claims that the lack of EOP and beds is inappropriate, leading to use of Ad Seg as alternative placement. Despite the length that patients wait for open EOP beds, they continue to be seen regularly and daily by mental health staff. As of March 13, 2013, there were a total of only three inmates in the Ad Seg unit at CIM from the reception center who were identified as needing an Enhanced Outpatient Program level of care. All three of these men were in the unit for battery. These patients receive adequate care regardless of where they are housed.

23. Dr. Kaufman at paragraph 162 of his declaration, claims that he is concerned that CIM clinicians will be less likely to refer patients to EOP level of care due to chronic shortage of

EOP beds and that this practice is dangerous for the patient. CIM clinicians refer patients to an appropriate level of care and not based on "bed availability." There is no practice at CIM of referring based on bed availability. There is no evidence that CIM or any clinician fails to refer patients to EOP level of care because of alleged bed shortages. Clinicians at CIM provide appropriate care, including when using clinical judgment in evaluating when a patient should be referred to a higher or lower level of care.

24. Dr. Haney are concerned over patients labeled as "lack of bed" or "LOB" and states that these inmate does not receive the 30 minute welfare checks or the 31-item pre-placement that Ad Seg inmates are required to receive under the program guide. (Haney decl. para. 143) However, these inmate-patients are only housed in Ad Seg until a regular reception center bed becomes available. LOBs are not Ad Seg inmates and do not receive the 30 minute welfare checks or the 31-item pre-placement questionnaire. These inmate-patients are housed in that location, but are not treated in that manner. They have access to all other privileges as other non Ad Seg inmates. They are allowed to go to clinics, yard, and other programs unescorted. Accordingly, they do not receive welfare checks as Ad Seg inmates do. These patients are receiving normal privileges so the risk of self-harm and decompensation is low on average among this patient group. There are minimal if any referrals for crisis intervention among LOB patients.

25. Specifically, Dr. Kaufman claims in paragraph 96 of his declaration that LOB inmates are desperate and decompensating. He alleges that they are restricted to their cell most of the time except when they go out to yard once a week and have few groups. This is incorrect as LOB patients have normal privileges. These patients are being seen regularly and are not decompensating. This is proved by the small amount of institution-wide referrals to MHCBs and the very short length of stay. The average number of patients in MHCB is 17 out of a total of 36 beds.

26. In paragraphs 147 of Dr. Haney's declaration and 123 of Dr. Kaufman's declaration, they indicate that Ad Seg isolation may cause decompensation and patients may end up in MHCB. They quote the Senior Psychologist as saying, "we recognize that isolation is not good for people

9

Decl. Victor Jordan Ph.D Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

who have psychiatric problems and vulnerabilities." It appears they took her comment out of context since she never stated that CIM Ad Seg inmate-patients were isolated or were not receiving yard time. Rather, she made a general statement regarding the potential harm of isolation. Ad Seg inmate-patients receive very appropriate treatment planning and intervention by mental health staff, despite minimal Ad Seg programming. These patients receive the required yard time. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-B.)

27. Very sick Ad Seg inmates need to be housed somewhere else, but are in Ad Seg allegedly because there is nowhere else to put them. (Haney dec. para. 152) Very sick mentally ill inmates are referred and admitted to MHCB and are not housed in Ad Seg. CIM's local policy prohibits retaining severely mentally ill inmates in Ad Seg. CIM has many vacancies in MHCB and there are sufficient beds for any patients who decompensate.

28. Dr. Haney in paragraphs 154 through 159 of his declaration appears to mischaracterize what is in the photo he refers to in Photo Exhibit U. Plaintiffs' Photo Exhibit U shows a double bed cell in reception center Madrone Hall. Some of the cells have a stationary bed and one of the beds folds down from the wall to make it a double cell. Inmates housed here are in reception center for a brief duration and may be CCCMS or EOP. They will be transferred to a mental health program once they are endorsed. They receive the required yard time and programming.

29. Plaintiffs in their responsive brief cite to Figure 3, a photo of Angeles Dorm, to suggest that CIM is overcrowded and this shows inhumane conditions of confinement. Dr. Haney in paragraph 161 refers to this same picture as Photo Exhibit W and quotes 2008 and 2010 Office of the Inspector General Special Reports that describe CIM's dorms as having structural problems. These dorms, including Angeles Dorm, are the newly remolded dorms as a result of the 2009 riot. Primarily CCCMS, and up to five EOP patients pending transfer to an EOP program may be housed here. They receive the required programming, yard time, and mental health care. It is a clean, open, and roomy dorm. This is not a gym; it was intentionally built to be an open dorm room.

### F. Punitive Suicide Prevention Measures

30. At paragraph 163 of Dr. Haney's declaration he claims that CIM's suicide prevention measures are punitive and discourage self reports of suicidal ideations. However it is critical to ensure that a suicidal patient be removed from any potential tools that would assist in self harm. Inmate-patients are stripped and moved to a therapeutic module in order to remove any potentially harmful items that could be used as a tool. It is also critical that suicidal patients be seen by a clinician while still being removed from any potential tools. Inmate-patients wait in a safe environment until they can be properly assessed by a clinician. When a clinician refers the suicidal patient to a MHCB, that patient continues to have a risk of self harm so that removal to a safe location while waiting for a MHCB to open is important.

31. Dr. Kaufman states in his declaration at paragraph 84 that patients sleep on the floor wearing suicide smocks while housed in MHCB as an allegedly punitive suicide prevention measure. As stated in the paragraph directly above, it is critical to remove a patient from potential tools that could be used to self harm while a patient is experiencing suicidal ideations, so it is appropriate to provide only suicide smocks to suicidal patients. All MHCB Inmates have suicide resistant beds bolted to the floor, so there is no need to sleep on the floor. Patients have the option to sleep on the floor if they wish, but this was not observed by me or other staff who accompanied Dr. Kaufman on his tour of CIM.

32. Dr. Kaufman claims that clinical staff members wear protective shields over their faces in all interactions with maximum custodial risk inmates. (Kaufman decl. para. 85) This is not correct. Staff members are required to wear protective masks on the maximum custody unit when walking on the tiers, but not in treatment areas or while providing treatment.

33. According to Dr. Kaufman, requiring MHCB inmate-patients to remain in therapeutic treatment modules during treatment is "counter-therapeutic and inhumane." (Kaufman decl. para. 86) MHCB patients who are required to use the modules are those patients that pose a risk of harm either to self or others. The unpredictability necessitates the use of treatment modules. This is necessary regardless of history of violence in order to protect patients from each other as well

11

Decl. Victor Jordan Ph.D Supp. Defs.'Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

as staff. Patients also need to be protected from self-harm. Inmates not admitted to MHCB for dangerousness, either danger to self or others are not required nor use treatment modules. So, gravely disabled patients are not required to be placed inside the modules.

**G. Medication Management**

34. Dr. Kaufman claims that medications are managed poorly at CIM in paragraphs 68 through 71. CIM's February 2013 medication management nursing audit scores indicate that medications are being managed adequately. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-D.) During Round 25, the Special Master's expert monitors indicated that CIM is utilizing the medication management audit tool appropriately, validating CIM's results of this audit tool.

35. Dr. Kaufman states that a provider told him that CIM inmates overdose on prescribed medications; however, from the quote given, "everything—meth, heroin, ecstasy lately," this appears to have been taken out of context and that the provider was really indicating a problem with illegal drugs. Moreover, most medications are nurse-administered at CIM and nurses are responsible for directly observing and documenting whether the patient has taken their medications. Any attempts to hoard or hide medications are documented and reported immediately by the nurse. Over the past year, CIM had approximately three overdose cases and none of them were mental health patients.

**H. Medical Records**

36. Dr. Kaufman claims in paragraph 82 of his declaration that the electronic records are barely legible and the scanning is of poor quality. This is untrue. The scanning is fine and documents come out perfectly clear after scanning, just like any other scanner. Providers write legibly and many notes are typed. This is shown by the numerous medical records attached as exhibits to this declaration.

37. Dr. Kaufman also claims that many treatment spaces do not have computers in order to access the electronic chart. (Kaufman decl. para. 83) All areas and all clinician offices, with the exception of the group therapy areas and two IDTT rooms, have computers that can access the electronic chart.

12

Decl. Victor Jordan Ph.D Supp. Defs.' Reply in Support of Termination Motion
(2:90-cv-00520 LKK JFM PC)

# INDIVIDUAL INMATE-PATIENT CONCERNS

## A. Inmate-Patients Discussed in the Haney Declaration

38. For the sake of consistency, I refer to the name Dr. Haney used for each inmate-patient discussed in his declaration.

39. Prisoner O came from a mainline facility to CIM reception center. His 30-day follow-up appointment was done on time. Prisoner O reports that he does not want to be seen by Mental Health staff and that he is "great." However, he is being seen for his regularly scheduled appointments. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-E, medical records.)

40. Prisoner P was admitted to the EOP level of care on February 26, 2013. The patient has been seen weekly and has been described consistently as stable by both his primary clinician and by psychiatric technicians. He came to his initial appointment, but more recent appointments have been conducted cell front due to his refusal to leave his cell. He was recently seen on March 18, 2013. He was seen according to Program guidelines while housed at CIM. He transferred to California State Prison Los Angeles County on March 19, 2013. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-F, medical records.)

41. Prisoner Q's diagnosis is Bipolar Disorder; most recent episode depressed. The patient was seen regularly by his primary clinician while he was housed in administrative segregation. Progress notes reflect that the patient was stabilized on medication; his mental status exam was consistently stable and his mood described as euthymic. The patient consistently denied suicidal ideations. Records indicated he left Ad Seg March 1, 2013. Prisoner Q is no longer housed at CIM, but did receive the required mental health services while at CIM. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-G, medical records.)

42. Prisoner R was screened and evaluated timely and received a 30-day follow-up on time. He continues to be seen according to Program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-H, medical records.)

43. Prisoner S was screened and evaluated on time when he arrived at CIM and was admitted to the EOP level of care. All his primary clinician visits and IDTT's occurred on time.

Prisoner S states he is "doing very well." He has been seen according to the mental health program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-I, medical records.)

44. Prisoner T was screened and evaluated on time. His current level of care is EOP and has been at CIM for over 6 months. In that time, has only missed two primary clinician contacts. All his IDTT's have been done timely. He self-reports that he is doing fine. He is being seen according to program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-J, medical records.)

45. Prisoner U has been at EOP level of care since September 13, 2012. He has been seen by his primary clinician on a weekly basis since then to address his depression and psychosis. He was last seen by his primary clinician on March 18, 2013. He is regularly seen by his psychiatrist and was last seen by his psychiatrist on March 18, 2013. He attends weekly recreational therapy groups and last attended on March 1, 2013. He is also seen every day for welfare check. He continues to have bouts of depression. He stated that he is very frustrated being here and that he has lost interest in socializing with the other inmates. Early on, he was trying to have a positive attitude and stay involved in positive social interactions. He is doing a life sentence and now feels he will probably not see his family for a long time since they live in northern California. Feelings of hopelessness are becoming prevalent in the clinical picture. He continues to complain about hearing voices and seeing things. He is compliant with his treatment plan and medications. He continues to be offered supportive therapy as often as needed to help him cope. He is being seen according to Program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-K, medical records.)

46. Prisoner V was referred to the MHCB from California Correctional Institution after an incident of self-injury by swallowing a paper clip. An acute referral to the Department of State Hospitals had already been made and the patient was awaiting transfer when the incident occurred. Prisoner V was admitted to MHCB on February 8, 2013. Patient was prescribed Risperdal to target mood stability and reports of auditory hallucinations. Patient was discharged from the MHCB on February 22, 2013. During his stay in the MHCB, he was seen daily by his

treatment team. Upon discharge, the patient was reported to have no suicidal ideation, was irritable, but displayed stable mood. Patient continues to be seen according to program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-L, medical records.)

47. Prisoner W was screened and evaluated on time. Prisoner W always sees his primary clinician timely. He is also always seen timely by IDTT. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-M, medical records.)

48. Prisoner X was admitted to MHCB on January 13, 2013 after returning from Atascadero State hospital. His diagnosis is Paranoid Schizophrenia. He was described as stable upon admission and quickly discharged to reception, but immediately returned to MHCB after reporting suicidal ideation. The treatment team assessed that this patient had extreme anxiety regarding housing in prison. He was treated daily while in the MHCB and then referred back to the Department of State Hospitals as the team assessed that this would be the most appropriate placement for his functioning level. Prisoner X has been adjudged to lack capacity to refuse psychotropic medications and providers have an order authorizing them to involuntarily administer these medications. He was transferred back to Atascadero State Hospital on March 13, 2013. He was seen according to Program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-N, medical records.)

49. Prisoner Y is at the CCCMS level of care. His chart indicates that he has been seen weekly throughout for the following months: November 2012, December 2012, January 2013, February 2013 and March 2013. His current diagnoses are Psychotic disorder NOS and Opioid dependence. Sessions are typically conducted cell front by his preference. The patient is consistently described to be stabilized on psychotropic medication and has been symptom-free for 6 months with good medication compliance. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-O, medical records.)

### B. Inmate-Patients Discussed in the Kaufman Declaration

50. Prisoner K arrived at CIM on December 3, 2012 and was housed in reception center at CIM EOP level of care. He was screened on time and was evaluated on time. He was seen for

IDTT encounters on time and was always seen by his primary clinician on time. Dr. Kaufman in paragraph 68 of his declaration states that Prisoner K refused his medications and that he failed to receive his prescribed dose of Risperdal in the mornings. However, the medical reconciliation in the Maxor pharmacy program indicates that Prisoner K was never prescribed Risperdal. He transferred to California State Prison Los Angeles County on February 19, 2012. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-P, medication history and medical records.)

51. Prisoner N has been seen timely by his primary clinician and IDTT. Two months later gets released to RC, there he is seen for his 30 day follow-up on time. His recent 30-day follow up appointment was on time. Prisoner N's last self-report to his clinician is that he is "doing fine." He was seen according to the Mental Health Program guidelines. He has been transferred to a mainline facility in the last few days. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-Q, medical records.)

52. Prisoner O was housed recently in MHCB and was discharged to reception center on January 15, 2013. He was seen timely for psychiatric visits. He continues to be seen for regularly scheduled Mental Health visits primarily focusing on medication issues. He continues to be seen within policy timeframes and is stable on each visit. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-R , medical records.)

53. Prisoner P was screened and evaluated and had a timely 30-day follow-up. He receives timely clinical care. He also receives additional services beyond Program guide requirements. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-S, medical records.)

54. Prisoner Q recently transferred from C yard and was seen for his 30-day follow-up on time. He continues to be seen according to program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-T, medical records.)

55. Prisoner M has been at the EOP level of care since October 2, 2012. He has been seein on a weekly basis to address his depression and anxiety. He has been admitted to MHCB twice since he has been designated EOP. He also has a congenital heart condition when causes him anxiety and concern. At times, he will come to his primary clinician's office and spend the

entire hour discussing his anxiety, depression, and medical conditions. At other times, he will only come up to the chain-link fence that divides the waiting area from the yard, stating that he has nothing to talk about because nothing has changed. He is extremely frustrated, irritable, and angry about being here in the dorm-setting. He has been writing letters to Sacramento about that and has gotten favorable responses; however, he is still housed in the dorm, so he is starting to feel helpless. He recently was sent to an outside facility for an echocardiogram and was told he needs his heart valve repaired. This is causing him even more anxiety and stress. He stated that the stress and anxiety are causing his blood pressure to become elevated. He does not take psychotropic medications as he does not want to take anything that will cause him additional health problems. His anxiety and depression have increased noticeably over the past few weeks. His primary clinician continues to offer him supportive therapy as often as needed to help him cope with his difficulties. He continues to be seen according to program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-U, medical records.)

56. Prisoner L was placed in Ad Seg from February 11, 2013 to March 17, 2013. From a review of mental health records, it does not appear that he was placed for disciplinary reasons. During his brief stay, he was evaluated by his primary clinician on February 19, 2013. His primary clinician indicates in the progress note that although the patient had previously reported various mental health symptoms, he was stable and symptom-free at the time of evaluation. This inmate continues to be seen according to program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-V, medical records.)

57. Prisoner S is an Ad Seg patient. He arrived to Ad Seg on December 14, 2012. His most recent treatment plan is dated January 8, 2013. This patient has a diagnosis of Depressive Disorder NOS. He is a lifer and has a history of one suicide attempt in 2003. He is most recently prescribed a trial of Zoloft and prior to that was taking Remeron. This patient is attends weekly groups on the unit and is seen weekly by his assigned clinician. Although his primary clinician makes routine efforts to have the patient come to her office for therapy, he appears to consistently choose to be seen cell front. His most recent clinician contact was on March 8, 2013. He was

seen by his assigned social worker and was described as stable and denying suicidal ideation. This patient is documented to be mostly focused on housing issues as he is fearful of getting a cellmate. He has been seen according to policy guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-W, medical records.)

58. Prisoner T has been diagnosed with schizoaffective disorder and amphetamine dependence. He was admitted to the MHCB on February 19, 2013 for grave disability. He is being seen daily by his treatment team. Patient was able to stabilize on medication and transition back to the yard. He was discharged from MHCB on February 25, 2013 was referred to the Department of State Hospitals and is pending transfer there. He is being seen according to program guidelines. (Decl. Vorous Supp. Reply Mot. Terminate, Ex. 3-X, medical records.)

**CONCLUSION**

59. CIM is committed to patient care and provides the required mental health services needed as well as additional services. CIM obtained approval by the American Psychological Association to provide Continuing Education to psychologists and this is provided on a monthly basis from January through October every year. Also, CIM obtained approval to provide California Board of Behavioral Sciences Continuing Education to clinical social workers.

60. I am personally committed to providing these additional services beyond the program guide. I have obtained resources for CIM clinicians from organizations such as Immanuel House, 211, Phoenix House, and the Weingart Center. Another meeting is already scheduled for April 16, 2013 for the CIM clinicians with the Social Security Administration and Weingart Center. We are seeking a representative from Aids Project Los Angeles. Ella's House, an agency servicing Los Angeles County mentally ill, regularly coordinates services with CIM. We have set up meetings between CIM patients and this organization. We have a psychologist from the Veteran's Administration conduct a large weekly group for Veterans. Proudly, we established a Peer Program with the National Alliance for the Mentally Ill. The President of the Chino Valley Chapter conducts meetings each month. We also have six students from local universities that provide psychological services.

61. Despite the challenges of providing mental health treatment inside a prison, in the majority of cases, CIM provides timely and adequate care. CIM can always improve, and we are continuing to work on improvements, but ideal conditions are not required, rather *minimally adequate* conditions are. CIM certainly provides that. Inmate-patients receive the basic mental health care needed regardless of the challenges.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge. Executed in Chino, California on March 25, 2013.

_____
Victor Jordan, Ph.D.
*(original signature retained by attorney)*