1   DONALD SPECTER – 083925
    STEVEN FAMA – 099641
2   PRISON LAW OFFICE
    1917 Fifth Street
3   Berkeley, California  94710-1916
    Telephone:    (510) 280-2621
4

5

6

7

8   JON MICHAELSON – 083815
    JEFFREY L. BORNSTEIN – 099358
9   LINDA L. USOZ – 133749
    MEGAN CESARE-EASTMAN – 253845
10  K&L GATES LLP
    4 Embarcadero Center, Suite 1200
11  San Francisco, California  94111-5994
    Telephone:    (415) 882-8200

12  Attorneys for Plaintiffs

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

13

14              UNITED STATES DISTRICT COURT

15              EASTERN DISTRICT OF CALIFORNIA

16

17  RALPH COLEMAN, et al.,

18              Plaintiffs,

19       v.

20  EDMUND G. BROWN, Jr., et al.,

21              Defendants.

22

23

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' EVIDENTIARY
OBJECTIONS TO DEFENDANTS'
REPLY DECLARANTS AND MOTION
TO STRIKE, AND RESPONSE TO
DEFENDANTS' OBJECTIONS**

Judge:   Hon. Lawrence K. Karlton
Date:    March 27, 2013
Time:    1:30 p.m.
Crtrm.:  4

24

25

26

27

28

[767816-1]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................ v

INTRODUCTION ................................................................................. 1

I.    THIS COURT SHOULD STRIKE NEW EVIDENCE AND ARGUMENTS
      IMPROPERLY OFFERED BY DEFENDANTS IN THEIR REPLY ................... 1

II.   the court should decline to consider defendants' improper and irrelevant
      introduction of evidence in their reply that concerns future plans or
      conditions or otherwise violates the rules of evidence ................................. 3

      A.    Evidence about Alleged Future Plans or Conditions Should Be
            Excluded as Irrelevant ........................................................... 3

      B.    Evidence that Violates Other Basic Rules of Evidence Should Be
            Excluded ................................................................................. 5

III.  EVIDENTIARY OBJECTIONS TO EVIDENCE ................................... 10

      A.    Declaration of Tim Belavich, Docket No. 4472 ("Belavich Decl.") ............. 10

      B.    Declaration of Jacqueline Moore, Docket No. 4484 ("Moore Decl.") ......... 16

      C.    Declaration of Diana Toche, Docket No. 4431 ("Toche Decl.") ................. 18

      D.    Reply Declaration of Steve J. Martin, Docket No. 4483 ("Martin
            Decl.") ...................................................................................... 22

      E.    Declaration of Connie Gipson, Docket No. 4430 ("Gipson Decl.") ............. 24

      F.    Declaration of Robert Fischer, Docket No. 4429 ("Fischer Decl.") ............. 29

      G.    Declaration of Brenda Cash, Docket No. 4459 ("Cash Decl.") ................... 35

      H.    Declaration of Victor Jordan, Docket No. 4458 ("Jordan Decl.") ............... 40

      I.    Declaration of Katherine Hudson, Docket No. 4448 ("Hudson Decl.") ....... 51

      J.    Declaration of Jonathan Harry, Docket No. 4447 ("Harry Decl.") .............. 51

      K.    Declaration of Lori Williams, Docket No. 4446 ("Williams Decl.") ........... 52

      L.    Declaration of Jeremy Colley, Docket No. 4482 ("Colley Decl.") .............. 56

      M.    Declaration of Kim Holland, Docket No. 4438 ("Holland Decl.") .............. 57

      N.    Declaration of Joe Lizarraga, Docket No. 4481 ("Lizarraga Decl.") ........... 59

      O.    Declaration of James Telander, Docket No. 4480 ("Telander Decl.") ......... 59

      P.    Declaration of Randolf Grounds, Docket No. 4477 ("Grounds Decl.") ....... 62

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

Q.  Declaration of M. Schneider, Docket No. 4471 ("Schneider Decl.") ........... 63

R.  Declaration of Douglas Beatty, Docket No. 4470 ("Beatty Decl.") ............. 65

S.  Declaration of M. Atchley, Docket No. 4466 ("Atchley Decl.") ................. 65

T.  Declaration of Tim Virga, Docket No. 4467 ("Virga Decl.") ...................... 65

U.  Declaration of Shama Chaiken, Docket No. 4476 ("Chaiken Decl.") .......... 66

V.  Declaration of John Soto, Docket No. 4451 ("Soto Decl.") ........................ 72

W.  Declaration of Christopher Cornell, Docket No. 4453 ("Cornell Decl.") .................................................................................................... 72

X.  Declaration of Heather Greenwald, Docket No. 4434 ("Greenwald Decl.") .................................................................................................... 74

Y.  Declaration of Daniel Paramo, Docket No. 4432 ("Paramo Decl.") ............ 77

Z.  Declaration of Kevin Chappell, Docket No. 4437 ("Chappell Decl.") ......... 79

AA.  Declaration of Ellen Bachman, Docket No. 4443 ("Bachman Decl.") ......... 79

BB.  Declaration of Charles DaSilva, Docket No. 4442 ("DaSilva Decl.") .......... 84

CC.  Declaration of Kathryn Radtkey-Gaither, Docket No. 4441 ("Radtkey-Gaither Decl.") ............................................................................ 87

DD.  Declaration of Katherine Warburton, Docket No. 4444 ("Warburton Decl.") .................................................................................................... 92

EE.  Declaration of T. Felton, Docket No. 4456 ("Felton Decl.") ...................... 93

FF.  Declaration of J. Keith, Docket No. 4455 ("Keith Decl.") .......................... 94

GG.  Declaration of F. Igbinosa, Docket No. 4454 ("Igbinosa Decl.") ................ 96

HH.  Declaration of C. Shytle, Docket No. 4475 ("Shytle Decl.") ...................... 97

II.  Declaration of J. Card, Docket No. 4465 ("Card Decl.") ............................ 98

JJ.  Declaration of E. Force, Docket No. 4469 ("Force Decl.") ........................ 99

KK.  Declaration of Rick Hill, Docket No. 4461 ("Hill Decl.") ........................... 99

LL.  Declaration of Meg Cho, Docket No. 4463 ("Cho Decl.") ........................ 101

MM.  Declaration of Diane O'Laughlin, Docket No. 4462 ("O'Laughlin Decl.") .................................................................................................. 103

NN.  Declaration of K. Center, Docket No. 4457 ("Center Decl.") ................... 105

OO.  Declaration of Robert McMahon, Docket No. 4464 ("McMahon Decl.") .................................................................................................. 107

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

PP.     Declaration of Cheryl Paizis, Docket No. 4460 ("Paizis Decl.")............... 107

QQ.     Declaration of J. Buckley, Docket No. 4450 ("Buckley Decl.") ............... 108

RR.     Declaration of G. Hoffman, Docket No. 4452 ("Hoffman Decl.")............. 108

SS.     Declaration of Kathleen Allison, Docket No. 4478 ("Allison Decl.")........ 110

TT.     Declaration of Patrick R. McKinney, Docket No. 4491 ("McKinney Decl.") ........................................................................................... 116

UU.     Declaration of Eric Monthei, 436 ("Monthei Decl.") ................................ 116

IV.     RESPONSE TO DEFENDANTS' EVIDENTIARY OBJECTIONS AND BASELESS ATTACKS ON PLAINTIFFS' EXPERTS ...................................... 122

A.      Defendants' Evidentiary Objections .......................................... 123

B.      Defendants' Attacks on Plaintiffs' Other Experts Are Baseless, Improper, and Ignore the Facts.................................................... 131

CONCLUSION.................................................................................................. 141

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Brown v. Plata*,
   131 S. Ct. 1910 (2011) .................................................................................. 3

*Coleman v. Wilson*,
   912 F. Supp. 1282 (E.D. Cal. 1995) ....................................................... 131

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ................................................................................. 126

*Gilmore v. California*,
   220 F.3d 987 (9th Cir. 2000) ...................................................................... 4

*Graves v. Arpaio*,
   623 F.3d 1043 (9th Cir. 2010) .................................................................... 2

*L.H. v. Schwarzenegger*,
   2008 U.S. Dist. LEXIS 9632 (E.D. Cal. Jan. 29, 2008) ............................ 3

*Lancaster v. Tilton*,
   No. C 79-01630, 2007 U.S. Dist. LEXIS 95523 (N.D. Cal. Dec. 21, 2007) ......... 3, 4

*Ontiveros v. Zamora*,
   No. S-08-567 2013 U.S. Dist. LEXIS 11925 (E.D. Cal. Jan. 29, 2013) ................... 3

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) .................................................................... 2

## <u>STATUTES</u>

18 U.S.C. § 3626 ................................................................................................... 4

[767816-1]

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

# TABLE OF ABBREVIATIONS

| ACA | American Correctional Association |
|---|---|
| APP | Acute Psychiatric Program |
| ASH or Atascadero | Atascadero State Hospital |
| ASP or Avenal | Avenal State Prison |
| ASU | Administrative Segregation Unit |
| BCP | Budget Change Proposal |
| CAL or Calipatria | Calipatria State Prison |
| CCC | California Correctional Center |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCPOA | California Correctional Peace Officers Association |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CDPH | California Department of Public Health |
| CEN or Centinela | Centinela State Prison |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CMO | Chief Medical Officer |
| COR or Corcoran | California State Prison/Corcoran |
| CPR | Cardiopulmonary Resuscitation |
| CRC | California Rehabilitation Center |
| CSH or Coalinga | Coalinga State Hospital |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| CVSP or Chuckwalla | Chuckwalla Valley State Prison |
| DAI | Division of Adult Institutions |
| DMH | Department of Mental Health |
| DOM | Department Operations Manual |
| DSH | Department of State Hospitals |
| DOT | Direct Observation Therapy |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| eUHR | electronic Unit Health Records |
| FOL or Folsom | Folsom State Prison |
| HDSP or High Desert | High Desert State Prison |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

| ISP or Ironwood | Ironwood State Prison |
|---|---|
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Los Angeles County |
| LPT | Licensed Psychiatric Technician |
| LVN | Licensed Vocational Nurse |
| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| NKSP or North Kern | North Kern State Prison |
| OC | oleoresin capsicum |
| OHU | Outpatient Housing Unit |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PCP | Primary Care Provider |
| PLRA | Prison Litigation Reform Act |
| PSH or Patton | Patton State Hospital |
| PSU | Psychiatric Services Unit |
| PVSP | Pleasant Valley State Prison |
| R&R | Reception and Receiving |
| RC | Reception Center |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RN | Registered Nurse |
| RVR | Rules Violation Report |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SCC or Sierra | Sierra Conservation Center |
| SHU | Segregated Housing Unit |
| SM | Special Master in the *Coleman* case |
| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TB | Tuberculosis |
| TTA | Triage and Treatment Area |
| TTM | Therapeutic Treatment Module |
| UHR | Unit Health Records |
| VSPW or Valley State | Valley State Prison for Women |
| VPP | Vacaville Psychiatric Program |
| WSP or Wasco | Wasco State Prison |
| ZZ Cell | Makeshift Temporary Cells Outside of Clinic Areas |

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Defendants are seeking to use their Reply briefing to introduce evidence that they should have included with their Motion to Terminate, and that Plaintiffs should have had an opportunity to test through discovery. Defendants' termination motion was a bare-bones project, supported only by sweepingly broad claims of constitutional compliance in declarations of high-level officials, and in cursory expert reports lacking any reference to specific evidence. Now, after the close of discovery, Defendants offer over 50 declarations, full of untested and unsupported factual claims. As detailed in the specific objections below, nearly all of these claims are inadmissible statements without personal knowledge. Almost all of the few statements grounded in person knowledge are admissions of ongoing failures to provide minimally adequate mental health care.

Plaintiffs request that the Court (1) strike new evidence improperly filed on Reply by Defendants; and (2) exclude statements that are inadmissible under the Federal Rules of Evidence; and (3) disregard unsupported and baseless attacks on the opinions of Plaintiffs' expert witnesses. *See* Parts I-III, *infra*.

In Part IV, Plaintiffs provide their response to Defendants' Evidentiary Objections (Docket No. 4486) and to the improper and scurrilous attacks on Plaintiffs' experts that pervade Defendants' Reply brief and Reply Declarations.

**I.     THIS COURT SHOULD STRIKE NEW EVIDENCE AND ARGUMENTS IMPROPERLY OFFERED BY DEFENDANTS IN THEIR REPLY**

Defendants filed an astonishing 55 witness declarations in support of their Reply, many of which improperly offer new evidence or assertions to buttress Defendants' claim that California is currently providing constitutionally adequate mental health care in its prisons. Forty-nine of these declarants had not previously submitted evidence in connection with Defendants' Motion to Terminate, and Plaintiffs did not have the

1    opportunity to depose them in the discovery phase of the termination proceeding.[1]  A

2    moving party is not permitted to offer new evidence or arguments in its reply.  *Graves v.*

3    *Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("[A]rguments raised for the first time in a

4    reply brief are waived."); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (court

5    should not consider new evidence submitted in reply without affording non-moving party

6    opportunity to respond); *Clark v. State of California*, 739 F. Supp. 2d 1168, 1223 n.14

7    (N.D. Cal. 2010) ("Defendants have submitted new evidence … [B]ecause Defendants

8    have failed to explain why this evidence was not developed in a timely manner, and

9    because consideration of this evidence at this stage would deprive Plaintiffs of the

10   opportunity to cross-examine the relevant witness, this Court declines to consider it.").

11        The exclusion of new evidence in a reply brief applies to "new" evidence that could

12   have been presented at the time of the original Motion.  It also applies to new actions

13   Defendants allege they have taken since filing their Motion that they contend have

14   suddenly remedied longstanding constitutional violations.  For example, Defendants cite

15   memoranda dated March 20, 2013 and March 21, 2013 in support of their claim that they

16   are undertaking appropriate suicide precautions, of which one has "not yet been released to

17   the field."  Defs. Reply at 44:15-27 & 76:15-22; Allison Decl. ¶ 8 & Belavich Decl. ¶ 47

18   (3/20/13 memorandum regarding welfare checks, not yet released to field); Defs. Reply at

19   44:7-14, 62:13-18, 62:26-63:2 & 64:9-11; Allison Decl. ¶ 9 (3/20/13 memorandum

20   regarding administrative segregation conditions); Defs. Reply at 64:9-11 & 72:10-21;

21   Allison Decl. ¶¶ 15-16 & Belavich Decl. ¶ 46 (3/21/13 memorandum regarding policies for

22   acute and intermediate care patients).  If Defendants present evidence in the form of

23   assertions about after-occurring actions or fixes they have allegedly taken in the three

24   weeks since the close of discovery, Plaintiffs must have a corollary opportunity to test that

---

25

26   [1] Only six of Defendants' declarants submitted declarations or reports in support of the
     original motion to terminate:  Diana Toche, Tim Belavich, Jacqueline Moore, Steve
27   Martin, Charles Scott, and Debbie Vorous.

28

2

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  evidence.  This would lead to a never-ending cycle of discovery, which the strict time

2  limits of the PLRA do not allow.  *See Lancaster v. Tilton*, No. C 79-01630, 2007 U.S. Dist.

3  LEXIS 95523 at *18 (N.D. Cal. Dec. 21, 2007) (rejecting plaintiffs' proposal for additional

4  discovery in termination proceedings because it would "result in an endless process of

5  updating and supplementing the record without any means to the end").  As the U.S.

6  Supreme Court found in *Brown v. Plata*, "[o]rderly trial management may require

7  discovery deadlines" that set a timeframe for evidence that may be presented to the court.

8  131 S. Ct. 1910, 1935 (2011); *see also Clark*, 739 F. Supp. 2d at 1228 (finding that "[t]he

9  orderly presentation of evidence requires that parties prepare in advance of the hearing to

10  present all relevant evidence" and plaintiff would be prejudiced by accepting defendants'

11  new evidence where plaintiffs did not have the opportunity to depose or cross examine the

12  individuals who presented the evidence).

13          If the Court finds it necessary to consider this new evidence in order to adjudicate

14  the termination motion, the Court must afford Plaintiffs an opportunity to file a sur-reply.

15  *See, e.g.*, *Ontiveros v. Zamora*, No. S-08-567 2013 U.S. Dist. LEXIS 11925 at *2 (E.D.

16  Cal. Jan. 29, 2013); *L.H. v. Schwarzenegger*, 2008 U.S. Dist. LEXIS 9632 at *14 n.3 (E.D.

17  Cal. Jan. 29, 2008).  However, because of the time limits imposed by the PLRA for ruling

18  on a termination motion, and because, as explained in more detail in the next section, the

19  relevant evidence for a termination motion is evidence about conditions existing as of the

20  time Defendants filed the Motion, the better course in this case would be for the Court to

21  exclude Defendants' new evidence as improper, pursuant to clearly established Ninth

22  Circuit law.  The evidentiary objections identified below include new evidence and

23  arguments presented by Defendants in their Reply that the Court should strike.

24  **II.    THE COURT SHOULD DECLINE TO CONSIDER DEFENDANTS'
        IMPROPER AND IRRELEVANT INTRODUCTION OF EVIDENCE IN
25      THEIR REPLY THAT CONCERNS FUTURE PLANS OR CONDITIONS
        OR OTHERWISE VIOLATES THE RULES OF EVIDENCE**

26

27          **A.    EVIDENCE ABOUT ALLEGED FUTURE PLANS OR CONDITIONS SHOULD BE
                EXCLUDED AS IRRELEVANT**

28  As Plaintiffs noted in their Opposition to Defendants' Motion to Terminate Under

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

1   the PLRA and to Vacate Under Rule 60(b)(5) (Docket No. 4408 at 12) (hereinafter "Pls.

2   Opp'n" or "Pls' Opp. Br."), relevant evidence for a motion to terminate is evidence that

3   exists as of the time of the termination motion.  *Gilmore v. California*, 220 F.3d 987, 1010

4   (9th Cir. 2000) (record relevant to evaluating current and ongoing conditions is "record

5   reflecting conditions as of the time termination is sought"); *Lancaster*, 2007 U.S. Dist.

6   LEXIS 95523 at *15-16 & *21 (relevant record for Court's inquiry into "current"

7   conditions is record reflecting conditions "as of the moment the termination motion was

8   made").  Evidence about Defendants' purported future plans or events is not proper or

9   relevant to a termination motion because the legal standard asks whether "prospective

10  relief remains necessary to correct a *current and ongoing* violation of the Federal right."

11  18 U.S.C. § 3626(b)(3) (emphasis added).

12       For example, in addition to the future plans for new beds and record systems relied

13  upon by Defendants in their original Motion to Terminate, Defendants claim in their reply

14  that they have remedied their inadequate suicide prevention practices.  Defendants cite to a

15  mentor program for suicide risk evaluation that will allegedly be completed by April 30,

16  2013 (Defs. Reply at 43:18-22), an outstanding request for bids for an electronic welfare

17  check tracking system, and a not-yet-released memorandum providing for "interim

18  measures" until this tracking system is contracted, funded, designed, and implemented.

19  (Defs. Reply at 44:15-26.)  One of the declarants Defendants rely upon for evidence that

20  they currently provide adequate care to inmate-patients remarkably asserts, "[a]s of

21  March 25, 2013, most inmates are now being scheduled for [more groups]," although this

22  declaration is dated March 21, 2013.  (Reply Declaration of Shama Chaiken, Docket No.

23  4476 ("Chaiken Decl."), ¶ 13:18:23; *see* Defs. Reply at 26:7-10.)  Another declarant

24  claims that inmate-patients delayed on a waitlist for acute psychiatric hospitalization are

25  being placed in a timely manner based on the supposed availability of a new unit at CMF

26  that had not accepted a single patient as of the time she wrote the declaration.  (Reply

27  Declaration of Ellen Bachman, Docket No. 4443 ("Bachman Decl."), ¶¶ 7-9 (future

28  reductions in waitlist based on patient placements discussed in future tense).)

[767816-1]

4

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    Assertions that current violations will no longer be ongoing at some point in the

2    future because of actions allegedly planned but not yet taken by Defendants do not satisfy

3    Defendants' burden to demonstrate that federal violations are not current and ongoing.  *See*

4    *Clark*, 739 F. Supp. 2d at 1212 (In PLRA termination case, Court found that "[s]ince the

5    instrument is not finished…the Court cannot find that it will do what it is intended to do").

6    As detailed below, Plaintiffs have identified at least twenty assertions in Defendants' eve-

7    of-hearing declarations about conditions that will purportedly result from future, planned,

8    or hoped-for actions.

9    **B.    EVIDENCE THAT VIOLATES OTHER BASIC RULES OF EVIDENCE SHOULD**
      **BE EXCLUDED**

10

11    The Court should also decline to consider Defendants' Reply declarations insofar as

12    they are riddled with unsupported claims, speculative assertions, inadmissible hearsay, and

13    gross mischaracterizations.  As set forth below, nearly every declarant offers opinions for

14    which no foundation or personal knowledge is provided.  The non-attorney declarants –

15    including an assortment of prison wardens, institutional staff members, and others –

16    repeatedly assert without evidence or citation that the mental health care provided at

17    CDCR institutions is "constitutional."  Doctors offer opinions as to the adequacy of mental

18    health care provided to patients they never claim to have met and whose medical records

19    they do not claim to have reviewed.  Declarants opine widely about changes they *intend* to

20    make, buildings they *hope* will open, and memoranda they *want* to issue.  The end result is

21    a collection of unreliable declarations of little to no value to the Court.

22    Plaintiffs' objections (though lengthy) are clear and uncomplicated.  First,

23    Defendants' Reply declarations time and again violate the dictates of Federal Rule of

24    Evidence 602, which permits a lay witness to testify "*only if* evidence is introduced

25    sufficient to support a finding that the witness has personal knowledge of the matter"

26    (emphasis added).  Defendants' declarations demonstrate no regard for this Rule, as

27    individuals assert sweeping conclusions about quality of care, staffing levels, and suicide

28    prevention measures offered without a scintilla of foundation in personal knowledge.  No

5

[767816-1]

1  fewer than 41 of the declarations include assertions that are inadmissible on account of

2  being unsupported by personal knowledge.

3      One clear example of the utter lack of foundation underpinning the declarants'

4  assertions is evidenced by the Reply Declaration of Charles DaSilva (Docket No. 4442).

5  Mr. DaSilva, the Executive Director of the Salinas Valley Psychiatric Program (SVPP),

6  claims that "SVPP provides a robust and multifaceted treatment program" which "seeks to

7  address the totality of patients' mental health needs." (*Id.* at 2.) Mr. DaSilva asserts that

8  "there is presently no shortage of clinical staff at SVPP," and that any recent "staff

9  reductions were quickly remedied by DSH's ongoing focus on recruitment and hiring."

10 (*Id.* at 3, 5.) In support of that assertion, he cites vague predictions that a psychiatrist who

11 left SVPP may return in the future and claims to have identified doctors "willing to work"

12 at SVPP. (*Id.* at 4.) Despite opining broadly on staffing, hiring, and credentialing, Mr.

13 DaSilva cites no data of any kind and provides no evidentiary support for his sunny

14 assessments.

15     Meanwhile, on the same day that Defendants filed their Reply and supporting

16 declarations, Dr. Joel Badeaux, a psychiatrist at SVPP, was so "grave[ly] concern[ed]"

17 about the safety conditions" at that institution that he sent a letter to Attorney General Eric

18 Holder (copied to Governor Brown) to request an investigation of conditions at SVPP. (A.

19 Fischer Decl. Ex. 8 (Letter of Joel Badeaux, M.D.), at 1.) Chief among his concerns was a

20 "critical level of understaffing" leading to "perilous conditions." (*Id.*) Dr. Badeaux stated

21 that at the same time as SVPP "has reported to the media that there is no anticipated

22 staffing crisis," "all nine psychiatrists working at this program just two months ago have

23 either quit, gone on extended leave, or will be transferring to new positions by the end of

24 April." (*Id.*) Dr. Badeaux requested "urgent assistance [to] prevent further needless injury

25 and death." (*Id.* at 5.) The concerns of Dr. Badeaux, on subjects addressed only in the

26 most flimsy manner by Mr. DaSilva, put a fine point on the unreliability of these

27 declarations. If Mr. DaSilva had felt compelled to cite evidence or establish a foundation

28 for his conclusions, he might have found it more challenging to write such a one-sided,

6

1   self-serving account of the circumstances at SVPP.

2        The declarants also repeatedly proffer expert testimony despite not being qualified

3   as experts in any manner.  These statements contravene the requirements of Fed. R. Evid.

4   701, which provides that non-expert "testimony in the form of an opinion is limited to one

5   that is:  (a) rationally based on the witness's perception, (b) helpful to … determining a

6   fact in issue, and (c) not based on scientific, technical, or other specialized

7   knowledge."  Declarants offer opinions about complex issues relating, for example, to the

8   adequacy of staffing levels for mental health care, the appropriateness of holding cells for

9   suicidal inmates, and the relative necessity of confidential space for clinical contacts.  Such

10  statements are also in direct violation of Fed. R. Evid. 702, which sets forth the specific

11  requirements as to who may provide expert testimony.  At least 24 of the declarations

12  involve conclusions and assessments that are properly the province of expert witnesses, not

13  lay declarants.

14       Similarly, Plaintiffs object to the declarants' repeated assertions of broad legal

15  conclusions, which are appropriately reserved for the Court, not mental health care

16  providers, correctional officials, and assorted others.  These statements, including multiple

17  statements that the mental health care being provided to *Coleman* class members is

18  "constitutional," constitute improper opinions on conclusions of law rather than facts and

19  evidence to be considered in the Court's determination of constitutionality.  *See Hangarter*

20  *v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) ("No witness

21  – expert or non-expert – should opine on the ultimate legal conclusion, which is province

22  of the court.").  No fewer than ten of the declarations contain bare assertions of legal

23  conclusions.

24       Many declarants base their declarations on mere hearsay, such as assertions about

25  purported statements made by patients, correctional officers, and doctors.  The declarants

26  offer these statements made by third parties for the truth of the matter asserted, and no

27  hearsay exceptions apply.  *See* Fed. R. Evid. 801, 802.  No fewer than eight declarations

28  rely on hearsay statements that render them inadmissible.

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    Moreover, many declarations make assertions that are inadmissible on account of

2  their total irrelevance.  As noted above, such statements include speculations about future

3  actions, projects, and reforms that have no bearing on the Court's inquiry into current and

4  ongoing conditions.  Other declarations include statements that are irrelevant because they

5  simply do not respond to any matter at issue in the case.  Such irrelevant statements are

6  present in at least 31 of the declarations.

7    As noted above, Plaintiffs also object to the declarants' introduction of new

8  evidence after the close of discovery.  These include sweeping assertions of major reforms

9  and changes about which Plaintiffs are unable to depose or cross-examine the declarants.

10  In some cases, the new evidence has been *generated* by Defendants since the close of

11  discovery.

12    A case in point is the Reply Declaration of Charles Scott (Docket No. 4478) ("Scott

13  Decl."), which Dr. Scott uses as an opportunity to improperly cure the major deficiencies

14  in his expert report.  A party "that without substantial justification fails to disclose

15  information required by Rule 26(a) shall not, unless such failure is harmless, be permitted

16  to use as evidence at a trial any information not so disclosed."  Fed. R. Civ. P.

17  37(c)(1).  Dr. Scott, who signed his name to a joint expert report containing no

18  methodological disclosures as required by Rule 26, now attempts to present a description

19  of his methodology for the first time on Reply.  (Scott Decl. ¶¶ 2-5.)  The numbers he

20  provides regarding records reviewed and meetings observed still do not clearly set forth a

21  scientific method by which Defendants' experts applied their expertise to the facts of this

22  case.  To the extent that Dr. Scott's purported "methodology" was not previously

23  disclosed, it should be excluded pursuant to Rule 37(c)(1).  And to the extent that it is no

24  methodology at all, it is irrelevant.

25    In Dr. Scott's case, none of the information provided in Paragraphs 3-5 of his

26  Reply Declaration (regarding specific numbers of cases, files, and events forming the basis

27  for his opinions) was disclosed in any way with the Joint Report.  (*See* Report of Dvoskin,

28  Moore, & Scott, Docket. No. 4275-5.)  Plaintiffs remain prejudiced by this non-disclosure

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   of the specific bases for Dr. Scott's opinions, even after attempting diligent discovery into

2   the foundations of his opinion.  Dr. Scott was unable in his deposition to state the precise

3   number of cases he reviewed, which cases may or may not have made it into his partial

4   database of case reviews, nor any method of tabulating the results of his case reviews other

5   than stating that the results were "in my head."  (Scott Dep. at 31:5-32:23; *see also id.* at

6   159:20-160:9, 185:19-187:6.)  The partial information Plaintiffs eventually received about

7   the cases that Dr. Scott reviewed came too late to allow Plaintiffs' experts an opportunity

8   to review the same patients' cases, as discovery was closed by the time Plaintiffs could

9   extract this partial information from Dr. Scott.  (*See* Docket Nos. 4363, 4357, 4316.) [2]

10         In addition to lacking substantive reliability, some of the declarations fail the

11  elementary standards of admissibility.  For example, four of Defendants' declarations, filed

12  on March 22, 2013, lack a complete jurat including the required date, and therefore must

13  be stricken.  An undated Declaration is not admissible.  *See* 28 U.S.C. § 1746 (unsworn

14  declarations must be "subscribed, as true under penalty of perjury, and dated"); *Rosales v.*

15  *El Rancho Farms*, No. 09-cv-00707, 2011 U.S. Dist. LEXIS 142772 at *21-22 (E.D. Cal.

16  Dec. 12, 2011) (granting request to strike undated declarations).  The declarations of Diana

17  Toche (Docket No. 4431), Daniel Paramo (Docket No. 4432),  H. Gabeler (Docket No.

18  4473), and J. Card (Docket No. 4465) should be stricken as a preliminary matter,

19  irrespective of their major substantive deficiencies.[3]

20  ———————————

21  [2] By contrast, Plaintiffs' expert reports are completely transparent as to the patients
    interviewed, files reviewed, and the conclusions drawn.  And, Defendants did not have to
22  wait for Plaintiffs' expert reports, because Defendants had contemporaneous notice of
    everything Plaintiffs' experts did—including each location and patient case
23  reviewed.  Defendants were able to access this information because Plaintiffs, unlike
24  Defendants, complied with this Court's orders regarding notice of expert tours.

25  [3] As to the Defendants' expert reports – both those filed in conjunction with Defendants'
26  Motion to Terminate and the "response" to Dr. Patterson's suicide report  submitted on
    Reply by Dr. Dvoskin (Docket No. 4491-12) – these reports have *never* been sworn by the
    experts.  Defendants' attorneys attach the reports to their own declarations, but *counsel* are
27  "not competent to testify about the matters therein."  *Harris v. Extendicare Homes*, 829 F.
    Supp. 2d 1023, 1027 (W.D. Wash. 2011).  "[C]ourts in this circuit have routinely held that
28  (footnote continued)

[767816-1]

1    No fewer than eight declarations violate Federal Rule of Evidence 1002, the "Best

2    Evidence" Rule, which provides that "[a]n original writing … is required in order to prove

3    its content unless these rules or a federal statute provides otherwise."  The declarants

4    repeatedly offer testimony as to the contents of written writings without introducing such

5    records into evidence.  As these documents, which include CDCR treatment records, are

6    clearly within Defendants' possession and control, there is no excuse for introducing their

7    contents through testimony rather than the documents themselves.

8    Defendants' lengthy Reply Declarations, filed days before the hearing, represent

9    nothing more than a desperate attempt to shore up their case, but ultimately contain flimsy,

10    unreliable, improper evidence that the Court should strike.

11    **III.    EVIDENTIARY OBJECTIONS TO EVIDENCE**

12    **A.    DECLARATION OF TIM BELAVICH, DOCKET NO. 4472 ("BELAVICH
       DECL.")**

13

14    **1.    Overall Objection to Belavich Decl. and attached Exhibits**

15    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.

16    Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

17    occurred at prisons or in CDCR Headquarters for the first time on reply, well after the

18    discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

19    completed and who cannot conduct additional tours or depositions to test the new

20    evidence.  The Belavich Declaration addresses Suicide Prevention efforts at CDCR,

21    Welfare Check policies, ASU "Psych and Return" policies, and other developments dated

22    within days of their filing of their Reply, and attaches several exhibits that have never been

23    provided to Plaintiffs before the Reply.  These policies did not exist at the time of

24    _____

25    unsworn expert reports are inadmissible."  *Id.* (collecting cases).  That is because an
       unsworn expert report is hearsay, upon which courts may not rely.  *See Hunt v. City of*

26    *Portland*, No. 11-35600, 2012 U.S. App. LEXIS 22506, 2012 WL 5351227 at *2 (9th Cir.
       2012) ("With respect to the expert's written report, we conclude that the report is hearsay

27    to which no hearsay exception applies"); *see also Pack v. Damon Corp.*, 434 F.3d 810, 815
       (6th Cir. 2006) ("the [expert] Report is unsworn and thus is hearsay").

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

1    Defendants' filing of the Motion to Terminate, and it is thus improper that they rely on

2    them in support of their position.

3            **2.      Belavich Decl., ¶ 6 & Exhibit A**

4            "Statewide Mental Health Program Accomplishments 2009-2013"

5    **Objection 1**

6            **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Belavich does

7    not provide any context for the chart contained in Exhibit A, including how it was prepared

8    or whether he verified (or even reviewed) the accuracy of the data it contains.  He

9    explicitly states that he is not providing a description as to what many of these

10   "accomplishments" entail, or how they constitute evidence that Defendants' mental health

11   care system provides constitutionally-required care.[4]

12           **3.      Belavich Decl., ¶ 15 & Exhibit C**

13           "Audit Results for 2012 and 2013" re: Sustainable Process

14   **Objection 1**

15           **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Belavich does

16   not provide any context for the chart contained as Exhibit C, including how it was prepared

17   or whether he verified (or even reviewed) the accuracy of the data it contains.  He provides

18   no explanation as to how the chart—which purports to document the sufficiency of

19   documentation in referral packages (though it is unclear what that means)—supports his

20

21   _____

22   [4] In this hard-to-decipher chart, Defendants take credit for plans that have never been fully
     implemented, including the "Mental Health Bed Plan approved and filed" and the "Mental
23   Health Staffing Plan approved and filed" in 2009.  Defendants' chart also states that they
     "Established Proctor/Mentor Program at numerous institutions" in 2011.  As Exhibits I & J
24   to the Belavich Declaration make clear, the systemwide memorandum about the
     implementation of this program did not get disseminated until February <u>2013</u> at the
25   earliest.  Finally, and disturbingly, according to Defendants' chart, "Statewide Mental
     Health Program Accomplishment" for 2013 is that Defendants "Filed motion to terminate
26   *Coleman* lawsuit," an accomplishment that is hardly evidence of whether Defendants'
     system is providing constitutionally required care.
27

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  statement that the data "evidence that CDCR staff have the skills to recognize and inmate's

2  need for the transfer to a higher level of care, in fact are identifying the additional needs,

3  and are properly documenting those needs to demonstrate the inmate meets the criteria for

4  transfer."  In fact, the data show that performance has declined at some institutions

5  (CCWF, KVSP, SAC), and that only four institutions are producing sufficient and

6  appropriate documentation more than 82% of the time, with many institutions'

7  performance much lower than that.

8              **4.       Belavich Decl., ¶ 16 & Exhibits D, E, & F**

9         "There is a great deal of evidence which shows successful interventions before an

10 attempted suicide occurs.  In order to get a full picture of the work done to prevent

11 suicides, the court and experts should take into account the number of inmates referred to

12 DSH for care and to the number of inmates sent to a mental health crisis bed (MHCB) for

13 care. Data reflects that CDCR made 937 DSH referrals for ICF beds in 2011, 1016 in

14 2012, and 79 for the first two months of 2013. See Exhibit D. Similar data also shows that

15 CDCR made 654 DSH referrals or acute level care in 2011, 698 in 2012, and 69 in the first

16 two months of 2013. See Exhibit E. Moreover, additional information shows that 2030

17 requests for inter-institutional MHCB placements were made in 2011 and 3594 in 2012.

18 This is not reflective of the thousands of annual intra-institutional MHCB placements.

19 Data reveals in 2011 there were 10,946 referrals to intra-institutional MHCB, 2012 yielded

20 11000 similar referrals and there have been 1714 such referrals through March 21,2013.

21 See Exhibit F."

22 **Objection 1**

23        **Best Evidence Rule [Fed. R. Evid. 1002]:**  Dr. Belavich does not state the source

24 of this summary data or how it was generated.  He provides no data at all in support of his

25 statement that "additional information shows that 2030 requests for inter-institutional

26 MHCB placements were made in 2011 and 3594 in 2012."

27

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 2**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Belavich does not provide any foundation for his statements and the data therein. He also ignores in his purported "full picture" that "referrals" to higher levels of care mean nothing to the hundreds (if not thousands) of inmate-patients who never get placed following a higher-level-of-care referral or do so only after significant delays. (*See, e.g.*, Pls.' Opp. Br. at 38:18-39:4 (less than half of MHCB referrals to HCPOP result in actual MHCB placement, including more than 175 inmate-patients referred for MHCB placement in January 2013 alone that were never placed in an MHCB).)

        **5.**     **Belavich Decl., ¶ 19**

    "[Defendants] have agreed with many of [Lindsay Hayes'] recommendations or observations."

**Objection 1**

    **Lack of Foundation [Fed. R. Evid. 602]:** Dr. Belavich presents no foundation for this assertion. In fact, Paragraphs 20-25 confirm that this statement is false. Paragraph 20 states that "Mr. Hayes recommended the use of suicide-resistant beds in MHCBs" and that Defendants have implemented this recommendation. This is true, but Defendants certainly did not "agree" with this recommendation to improve suicide prevention in CDCR. To the contrary, Defendants vigorously opposed the recommendation, which was only implemented pursuant to court order. (*See* Docket No. 4404.) Paragraph 21 states that "Mr. Hayes also recommended expanding the use of the Mental Health Tracking System (MHTS) to include data collection on all inmates who have attempted suicide, engaged in self-injurious behavior, or otherwise been placed on suicide observation rather than having data available only for those inmates who are participants in the Mental Health Services Delivery System (MHSDS)." Dr. Belavich goes on to explain that while Defendants do some tracking of non-MHSDS prisoners, they have not implemented Mr. Hayes' recommendation.

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    In Paragraphs 22-25, Dr. Belavich attempts to explain away additional

2    recommendations and justify why none of them have been implemented.  (Belavich Decl.

3    ¶ 22 (Hayes recommended approximately twelve suicide prevention-related revisions to

4    the Program Guide, Defendants completed none of those revisions but did issue a

5    memorandum on one of twelve issues); *id.* ¶ 23 (several Hayes recommendations

6    regarding suicide prevention training rejected or not yet implemented, save one training

7    first delivered *March 19, 2013*, more than two and a half years after Hayes'

8    recommendation was made, and only three days before Reply brief was filed); *id.* ¶ 24

9    (declining to implement recommendations related to OHUs); *id.* ¶ 25 (rejecting

10    recommendation regarding threshold for placement on suicide observation and precautions

11    because it was not "useful").  What is clear is that Defendants did not agree to implement

12    any of the Hayes recommendations that Dr. Belavich describes, save the one that was

13    implemented only after heavily contested litigation and a court order.

### 6.    Belavich Decl., ¶ 46, 16:11-19 & Exhibit K

15    "More recently, in recognition of the challenges associated with the return of

16    inmates from DSH to ASU and the risk for self harm which may arise in that circumstance,

17    CDCR has issued a new 'Psych and Return' policy. This policy is a dual signature

18    memorandum by the Director of Adult Institutions and myself, which reflects CDCR's

19    intent to move inmates to their proper level of care and to expedite processing rather than

20    having inmates returned to administrative segregation directly from DSH. Kathleen

21    Allison, Deputy Director of the Division of Adult Institutions, describes this memorandum

22    more fully in her declaration. A copy of the memorandum is attached as Exhibit K."

**Objection 1**

23    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

24    **Evid. 401]**  Exhibit K, a joint memo signed by the Director of DAI and the Director of

25    Health Care Services, dated March 21, 2013, is new evidence provided to Plaintiffs for the

26    first time on Reply.  This new policy memo about time frames for classification, and psych

27    and return policies for CDCR prisoners treated in DSH facilities lacks relevance to the

28

[767816-1]

14

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  present inquiry into current and ongoing – not future and speculative – conditions.  The

2  memorandum has never been shared with Plaintiffs, and it is deficient given its failure to

3  effectively address the problem, as outlined in Plaintiffs' Opposition brief.  (Docket No.

4  4422 at 56-57.)

5  ### 7.    Belavich Decl., ¶ 47, 16:20-17:5 & Exhibit L

6  "CDCR has also undertaken further efforts to clarify with the staff the expectations

7  regarding ASU welfare checks. There has been confusion in the field regarding

8  implementation of the checks. A draft memorandum titled, 'Revised Administrative

9  Segregation Unit Welfare Check Procedure and Implementation of Security Inspections in

10  Specialized Housing,' has been signed and is ready to be implemented, which provides

11  clarification that at least three checks per hours must occur at staggered, unpredictable

12  intervals not to exceed 30 minutes, rather than simply providing the checks every 30

13  minutes. This memorandum further instructs the staff that welfare checks in administrative

14  segregation should continue beyond 21 days when clinically appropriate. This

15  memorandum has been signed by both me and the Director of Adult Institutions. It has not

16  yet been released to the field pending union notification. However, we are hopeful that this

17  can be accomplished expeditiously so that it may be disseminated to the field. A copy of

   the draft memorandum is attached as Exhibit L."

18  **Objection 1**

19  **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

20  **Evid. 401]:** Contrary to Dr. Belavich's Reply Declaration, Exhibit L is not a joint

21  memorandum signed by the Director of DAI and the Director of Health Care Services,

22  dated March 20, 2013.  Exhibit L is an October 31, 2006 memorandum signed by a former

23  director of DAI, regarding 30 minute welfare checks.  Plaintiffs assume that Dr. Belavich

24  meant to reference Exhibit B to the Declaration of Kathleen Allison (Docket No. 4478),

25  which is a memorandum dated March 20, 2013 regarding planned future changes to the

26  manner in which Defendants conduct welfare checks.  Plaintiffs' objections to that exhibit

27  are discussed *infra*.  Dr. Belavich's "hopefulness" that this referenced plan to implement a

28

[767816-1]

15

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   new 30 minute welfare check program "may be disseminated to the field" lacks relevance

2   to the present inquiry into current and ongoing – not future and speculative – conditions.

3          **8.      Belavich Decl., ¶ 48 & Exhibit M**

4         "[T]o address concerns raised about the potential under-identification of EOP

5   inmates in the condemned population, 3.6% of all condemned inmates are classified as

6   'EOP,' compared to 3.09% of all CDCR inmates. Additionally, the percentage of EOP-

7   condemned inmates far exceeds the percentage of EOP inmates in administrative

8   segregation and in the Psychiatric Services Unit statewide combined and multiplied by a

9   factor of five. [noting that 0.4% of all administrative segregation inmates and 0.29% of all

10  Psychiatric Services Unit inmates receive EOP-level care.]"

11  **Objection 1**

12        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**:  In what may be

13  one of the most disturbing declarant statements of all, Dr. Belavich, the *Acting Statewide*

14  *Mental Health Deputy Director*, demonstrates a shocking lack of knowledge about the

15  mental health programs in his system.  His sworn statement that "0.4% of all

16  administrative segregation inmates and 0.29% of all Psychiatric Services Unit inmates

17  receive EOP-level care" is dead wrong.  In fact, Defendants' data show that approximately

18  8.47% of ASU prisoners and nearly 100% of PSU prisoners are at the EOP level of care.

19  (*See* A. Fischer Decl. Ex. 9.)  The PSU is *designed* for EOPs (*see* Chapter 9 of the

20  *Coleman* Program Guide), so the fact that Dr. Belavich testifies that just ".29% of PSU

21  inmates receive EOP level of care" is troubling to say the least.

22

23       **B.   DECLARATION OF JACQUELINE MOORE, DOCKET NO. 4484 ("MOORE**

          **DECL.")**

24

25        **1.      Moore Decl., ¶ 4, 2:16-20**

26       "Plaintiffs and their expert, Dr. Kaufman, correctly note that I recommended that

27  nurses distributing medication to mental health inmate-patients in California's prisons

28  receive training about the potential side effects of psychotropic medication. I made this

[767816-1]

16

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    recommendation not because I found the nursing care inadequate, but because training

2    would improve the already good nursing care provided in California's prisons."

3    <u>Objection 1</u>

4        **New Evidence Presented for First Time on Reply:** Defendants are not permitted

5    to present new evidence, such as this attempt by Dr. Moore to rebut her own testimony

6    given under oath during the period of fact discovery in this matter.  At her deposition, Dr.

7    Moore stated that she "would have phrased [her *own* expert report] differently" on the

8    issue of Nursing Medication Management, such that she would have made a

9    "recommendation that nursing education emphasize the side effects of the medication and

10   that they have handouts or signs available where they dispense the medications..."  She

11   testified that, outside of CDCR, it was a "common practice that nurses know the side

12   effects of the medication that they're giving because very often you [*i.e.*, a nurse] are the

13   one that might observe lithium toxicity in an inmate" and agreed that "it's important to be

14   aware of the side effects of the psych medications in order to ensure the safety and well-

15   being of those patients."  Moore found this to be a problem at "all of [the institutions she

16   evaluated] except San Quentin."  (Moore Dep. at 180:6-182:8.)  Defendants' attempt to

17   inject further testimony not subject to cross-examination at this late date and after Moore

18   had the opportunity to explain herself fully in her written report and during her deposition,

19   should not be permitted.

20              **2.      Moore Decl., ¶ 6, 2:25-3:2**

21        "In their Opposition, I read that Plaintiffs claim that our expert group was asked not

22   to opine on population density. While this is literally true, if I saw that crowding was

23   precluding the State's ability to provide adequate mental health care, I would have

24   expressed that opinion. I did not observe this to be the case during my evaluation of

25   CDCR's mental health system."

26   **Objection 1**

27        **New Evidence Presented for First Time on Reply**: Once again, Defendants

28   should not be permitted to introduce new evidence at this late date in an effort to rebut

1    their own expert's prior sworn testimony given during the Court-ordered discovery period.

2    Moore quite specifically testified that she and the other Defendants' experts "had specific

3    issues that we were looking at, and those issues consumed four of us for the time we were

4    on site.  *We didn't have time to become involved in every issue that CDCR has* …

5    [i]ncluding overcrowding."  (Moore Dep. at 32:13-33:11.)  Defendants' attempt to inject

6    further testimony not subject to cross-examination at this last date and after Moore had the

7    opportunity to explain herself fully in her written report and during her deposition, should

8    not be permitted.

9        **C.**    **DECLARATION OF DIANA TOCHE, DOCKET NO. 4431 ("TOCHE DECL.")**

10            **1.**    **Toche Decl., ¶ 3, 2:11-15**

11        "Currently, the mental health program has 1586.73 positions filled. 1044.50 of these

12    filled positions are staffed by clinical social workers, psychologists, psychiatrists and

13    recreational therapists that are directly responsible for delivering mental health care to a

14    mentally ill inmate population of 32,361 inmates at a ratio of one clinician per 28 inmates.

15    In addition, the mental health program employs the equivalent of 106.46 mental health

16    clinicians through registry."

17    **Objection 1**

18        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Toche

19    provides no evidentiary basis for any of the numbers cited in this paragraph.

20            **2.**    **Toche Decl., ¶ 6, 2:25-3:13 and ¶ 8, 3:24-27**

21        Paragraph 6 sets forth an argument about the nature of the 2009 staffing plan and

22    the purposes for which that plan was "designed."  These assertions are presented for the

23    first time in this Declaration on Reply. Paragraph 8 similarly sets forth an argument about

24    the adequacy of the staffing plan, and asserts that the plan "was designed to ensure that the

25    Mental Health Program had sufficiently robust staffing resources so that institutions could

26    always meet the basic mental health care needs of *Coleman* class members even if all

27    funded positions are not filled."

28

[767816-1]

18

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

     **New Evidence Presented for First Time on Reply:** Defendants are not permitted to present new evidence, such as this detailed discussion of the staffing plan, for the first time on reply and well after the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, who cannot conduct additional depositions to test the new evidence.

**Objection 2**

     **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  When asked at deposition about the 2009 staffing plan, Dr. Toche testified as follows:

Q.     Are you familiar with the development of that staffing plan?

A.     I know that they had a group work on it.  That's how I'm familiar with it.

Q.     Is that what you know?

A.     Yes.

Q.     Is that everything that you know about the development of that?

A.     Yes.  Pretty much.

(Toche Dep. at 140:20-141:3.)

     Dr. Toche was the Deputy Director for Dental Services for CDCR during the development of the staffing plan.  Dr. Toche cannot now plausibly declare, as she does in paragraphs 6 and 8, to a detailed understanding of the purposes for which the staffing plan was designed, when she expressly disclaimed any specific knowledge about its development during her deposition.

### 3.    Toche Decl., ¶ 7, 3:14-20

     "The CDCR Mental Health Program staffs institutions by applying clinician-to-patient ratios designed in the 2009 staffing plan to population projections that forecast the number of inmates who will require programming by their levels of care and custody (for example, General Population Enhanced Outpatient Care). Next, headquarters staff calculate how the inmate population for each level of care or programming provided is distributed among the institutions to ensure that each institution is allocated an array of mental health staff that is consistent with the population it serves. Minor manual

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

1  adjustments are then made to appropriately manage resources."

2  **Objection 1**

3      **New Evidence Presented for First Time on Reply.**  Defendants are not permitted

4  to present new evidence, such as this detailed discussion of the staffing allocation system,

5  for the first time on reply and well after the discovery cut-off.  To allow such evidence

6  would prejudice Plaintiffs, who cannot conduct additional depositions to test the new

7  evidence.

8              **4.       Toche Decl., ¶ 15, 5:5-7**

9      "On February 26, 2013, Acting Deputy Director of the Mental Health Program Tim

10  Belavich issued a similar memorandum to the Chief Executive Officers and Chiefs of

11  Mental Health of each institution directing them to fill as many vacant allocated positions

12  as possible."

13  **Objection 1**

14      **New Evidence Presented for First Time on Reply:**  Defendants are not permitted

15  to present new evidence, such as testimony regarding this purported memorandum, for the

16  first time on reply and well after the discovery cut-off.  To allow such evidence would

17  prejudice Plaintiffs, who cannot conduct additional depositions to test the new evidence.

18  The referenced memorandum was issued four days following Dr. Belavich's deposition.

19  **Objection 2**

20      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]/Best Evidence**

21  **Rule [Fed. R. Evid. 1002]:**  This purported memorandum is not attached as an exhibit to

22  Dr. Toche's declaration and not otherwise referenced as existing within the record before

23  the Court.  Dr. Toche's assertions as to its content therefore lack foundation.

24              **5.       Toche Decl., ¶ 16, 5:8-10**

25      "Recently, sixty psychiatrists have committed to join the Mental Health Program,

26  thirty of which will provide telemedicine appointments for inmates housed in more remote

27  prisons."

28

**Objection 1**

 **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  No evidence is submitted or referred to in support of the assertion that sixty psychiatrists have "committed" to join the Mental Health Program, a vague and ambiguous term at best.

**Objection 2**

 **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]**:  To the extent that Dr. Toche's statement purports to present to the Court any commitments made either orally or in writing by these psychiatrists, it is inadmissible hearsay as to the truth of those psychiatrists' statements "committing" to their employment.

**Objection 3**

 **Lack of Relevance [Fed. R. Evid. 401]:**  Statements about psychiatrists "committing" to work at some unspecified time in the future lack relevance to the present inquiry into current and ongoing – not future and speculative – conditions.

   **6. Toche Decl., ¶ 20, 5:27-28 and ¶ 22, 6:19-20**

 Paragraph 20 states: "Under a bargaining unit agreement negotiated with Unions, a voluntary transfer process was implemented …"  Similarly, Paragraph 22 refers to "negotiated collective bargaining agreements forged between employees and the State."

**Objection 1**

 **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]/ Best Evidence Rule [Fed. R. Evid. 1002]:**  No copy of these alleged bargaining unit agreements are offered into evidence.  Dr. Toche offers no explanation supporting her personal knowledge of these agreements, or their contents.

   **7. Toche Decl., ¶ 24, 6:27-7:3**

 "Plaintiffs also assert that the Governor's hiring freeze impeded the provision of mental health care. This is not true. In February 2011, Governor Brown issued a statewide hiring freeze. But the Governor's 2011 hiring freeze did not impact the budgeting authority for CDCR's mental health program. All mental health positions allocated for fiscal year 2011-2012 were fully funded."

21

[767816-1]

1    **Objection 1**

2        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Toche

3    attaches no evidence in support of her statement, and does not explain the basis for her

4    personal knowledge of the Governor's 2011 hiring freeze or its impact on mental health

5    staffing.

6        Dr. Toche's statement also contradicts her under-oath deposition testimony made on

7    February 22, 2013, during which she explained at length that a "freeze exemption process"

8    applied to the filling of mental health positions.  (Toche Dep. at 150:9-22.)

9        **D.    REPLY DECLARATION OF STEVE J. MARTIN, DOCKET NO. 4483 ("MARTIN
        DECL.")**

10            **1.    Martin Decl., ¶ 8, 3:23-27**

11        "Based on my thorough review of the use of force documents, videos, and

12    materials, there is no evidence to support Mr. Vail's inference that the overrepresentation

13    of mentally ill inmates in use of force incidents is caused by a systemic deliberate

14    indifference to the needs of mentally ill inmates…"

15    **Objection 1**

16        **Improper Opinion Testimony as to a Legal Conclusion**:  Mr. Martin is providing

17    an opinion on whether there is "systemic deliberate indifference" to the needs of mentally

18    ill inmates in the CDCR.  Whether or not such indifference presently exists in the CDCR,

19    and whether it rises to the level of "deliberate indifference" is a legal conclusion for the

20    Court. It is improper for Mr. Martin to opine on this issue.

21            **2.    Martin Decl., ¶ 10, 4:10-12**

22        "I have recommended that CDCR put into place a number of policies and

23    procedures to better ensure that the weapons such as batons and OC spray are consistently

24    deployed in an appropriate and sound tactical manner."

25    **Objection 1**

26        **Lack of Relevance [Fed. R. Evid. 401]:**  Mr. Martin is providing an opinion on the

27    basis of facts that do not address the current conditions existing in the CDCR.  Mr.

28

[767816-1]

22

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  Martin's recommendations are intended to address potential future CDCR behavior and do

2  not reflect presently existing facts.  Such evidence is therefore clearly irrelevant and should

3  not be admitted.

4        **3.      Martin Decl., ¶ 13, 5:5-6**

5        "CDCR staff certainly exercise a tactical preference for OC spray…but this does

6  not equate to a constitutional violation."

7  **Objection 1**

8        **Improper Opinion Testimony as to a Legal Conclusion**:  Mr. Martin is providing

9  an opinion on whether the evidence before the Court is sufficient to warrant a finding of a

10  constitutional violation.  Whether or not there is a violation of Plaintiffs' rights under the

11  Constitution is a legal conclusion for the Court.  It is improper for Mr. Martin to opine on

12  this issue.

13        **4.      Martin Decl., ¶ 21, 7:11-12**

14        "There is not a single 'requirement' in the 21 criteria that Mr. Vail identifies as bare

15  minima that to my knowledge are [sic] constitutionally required…"

16  **Objection 1**

17        **Improper Opinion Testimony as to a Legal Conclusion**:  Mr. Martin is providing

18  an opinion on whether the "bare minima" identified by Plaintiffs' expert, Mr. Eldon Vail,

19  are "constitutionally required."  This is a legal conclusion that is ultimately for this Court

20  to decide.  It is improper for Mr. Martin to opine on this issue.

21        **5.      Martin Decl., ¶ 10, 4:9-10**

22        "This critique [of the amount of weaponry issued to CDCR officers] represents also

23  professional preference and is not *ipso facto*, evidence of a constitutional violation."

24  **Objection 1**

25        **Improper Opinion Testimony as to a Legal Conclusion**:  Mr. Martin is providing

26  an opinion on whether the evidence before the Court regarding the issuance of weaponry to

27  CDCR officers is sufficient to warrant a finding of a constitutional violation.  Whether or

28  not there is a violation of Plaintiffs' rights under the Constitution is a legal conclusion for

[767816-1]

23

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    the Court.  It is improper for Mr. Martin to opine on this issue.

2        **E.**     **DECLARATION OF CONNIE GIPSON, DOCKET NO. 4430 ("GIPSON DECL.")**

3        **1.**     **Gipson Decl., ¶ 8, 3:3-7**

4        "Despite Corcoran's growing mental health population, Corcoran has always been

5    able to provide adequate staff to ensure the needs of the mentally ill population. Corcoran

6    has always delivered constitutionally adequate care to its population.  Corcoran's

7    correctional officers provide consistent and timely service to the mental health staff and

8    their patients which allows the mental health clinicians to facilitate their program."

9    **Objection 1**

10       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

11   Ms. Gipson has provided no evidence of her qualifications, knowledge, or expertise that

12   would support the conclusion that "Corcoran has always delivered constitutionally

13   adequate care to its population."

14   **Objection 2**

15       **Improper Opinion Testimony as to Ultimate Legal Conclusion:** Ms. Gipson

16   inappropriately opines as to the legal conclusion that "Corcoran has always delivered

17   constitutionally adequate care to its population."

18   **Objection 3**

19       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Gipson

20   provides no foundation for these broad assertions.  Her conclusions are unsupported by

21   facts, evidence, or even observations and are therefore without value.

22       **2.**     **Gipson Decl., ¶ 9, 3:15-16**

23       "Corcoran has no problem escorting inmates to see their clinicians in a timely

24   manner."

25   **Objection 1**

26       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Gipson

27   provides no foundation for the broad and vague assertion that Corcoran has "no problem"

28   with staff escorts for clinical contacts.  This is particularly problematic given that the

[767816-1]

24

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   unsupported assertion directly contradicts the Special Master's findings and Corcoran's

2   own internal Management Report.  (*See* Docket No. 4298, Special Master's 25th Round

3   Report at 220-21; Docket No. 4399, Bien Decl. Ex. 20, at 4 of 16 (COR 25th Round

4   Management Report).)

5               **3.      Gipson Decl., ¶ 15, 4:18-21**

6       "Officers at Corcoran do not encourage nor discourage inmate participation in

7   group therapy session.  While there are additional steps in securing an inmate into an

8   ATOM Chair, officers are aware of this and have undertaken a good faith effort to

9   participate in the pilot program."

10  **Objection 1**

11      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Gipson

12  provides no foundation for the statement that officers do not encourage nor discourage

13  group participation.  She does not state how she knows that officers "are aware" of extra

14  steps involved with use of the ATOM chair or that they are undertaking a "good faith

15  effort."  She does not claim to have investigated the issue or to have any personal

16  knowledge of whether officers do or do not discourage group participation.

17              **4.      Gipson Decl., ¶ 16, 4:22-26**

18      "Mr. Haney, in his declaration at paragraph 181, indicates that an officer refused to

19  photograph a TTM from inside. In fact, the officer at first took the request from Mr. Haney

20  as a joke and ultimately did take a photograph of the inside of the TTM. The supervising

21  officer has denied making the statement alleged by Mr. Haney that 'officers don't like to

22  get inside those things.'"

23  **Objection 1**

24      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**:  Ms. Gipson

25  provides no foundation as to whether the officer took Dr. Haney's request "as a joke."  She

26  does not state whether she was even present for this exchange or how she knows the

27  officer "took [it] as a joke."

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    **Objection 2**

2        **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]**:  The supervising officer's

3    purported statement that that he/she denied making the statement that "officers don't like

4    to get inside those things" is a hearsay statement not made under oath offered for the truth

5    of the matter asserted, and is not subject to any hearsay exception.

6                **5.    Gipson Decl., ¶ 20, 5:14-17**

7        "Prisoner GG, referenced in Mr. Haney's declaration at paragraph 222, is an inmate

8    who was housed in ASU for non-disciplinary reasons. In fact, Prisoner GG was placed in

9    the ASU because he complained of safety concerns to staff. He has since resolved these

10   concerns and his release back to a regular housing unit is pending."

11   **Objection 1**

12       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: To the extent this

13   statement does not constitute an admission that mentally ill prisoners are housed in ASUs

14   for non-disciplinary reasons (including personal safety concerns) and that there are delays

15   in transferring mentally ill prisoners from ASU to regular housing units, Ms. Gipson

16   provides no foundation for the statement "[h]e has since resolved these concerns and his

17   release back to a regular housing unit is pending."  No medical records, central files, or

18   other sources are cited.

19               **6.    Gipson Decl., ¶ 22, 5:24-6:4**

20       "Prisoner J, referenced in Mr. Kaufman's declaration at paragraph 112, is in the

21   ASU.  He claims he has been waiting for a year to go to Kern Valley State Prison (KVSP)

22   but has not been transferred. Prisoner J arrived at Corcoran in October 2011 while serving

23   a SHU term for possession of a weapon.  He was transferred to the ASU in December 2011

24   and referred to KVSP.  However, his request to go to KVSP was denied as he has enemies

25   on both of KVSP's yards.  Before a transfer to another institution could be arranged,

26   Prisoner J became a suspect in an in-cell sexual assault.  That case was closed in January

27   2013 and Prisoner J is pending a referral to a level IV facility."

28

[767816-1]

26

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  **Objection 1**

2      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**:  Again, to the

3  extent this statement does not constitute an admission that there are delays in transferring

4  mentally ill prisoners from ASU to regular housing units, Ms. Gipson provides no

5  foundation for the statement "That case was closed in January 2013 and Prisoner J is

6  pending a referral to a level IV facility."  No medical records or central files are cited to

7  support this assertion.

8  **Objection 2**

9      **Lack of Relevance [Fed. R. Evid. 401]**:  In addition to lacking foundation, the

10  statement that Prisoner J "is pending a referral" to an appropriate facility lacks relevance to

11  the present inquiry into current and ongoing – not future and speculative – conditions.

12              **7.    Gipson Decl., ¶ 26, 7:2-4**

13      "Health care access officers follow the schedules set out by mental health staff.

14  There are no issues providing escorts based on those schedules."

15  **Objection 1**

16      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**:  Ms. Gipson

17  provides no foundation, support, or evidence for the blanket statement that "there are no

18  issues providing escorts."  Again, this assertion is directly undermined not only by

19  Plaintiffs' experts' observations, but also the Special Master and Corcoran's own internal

20  Management Report.  (*See* Docket No. 4298, Special Master's 25th Round Report at 220-

21  21; Docket No. 4399, Bien Decl. Ex. 20, at 4 of 16 (COR 25th Round Management

22  Report).)

23              **8.    Gipson Decl., ¶ 27, 7:5-12**

24      "Mr. Haney, in paragraphs 210 and 211 of his declaration, alleges that Prisoner DD,

25  a mentally ill inmate on involuntary psychiatric medication for being a danger to others, is

26  held in the SHU due to an ongoing dispute about his medical condition.  … Although

27  Prisoner DD has had disputes regarding his disability classification, that is not the reason

28  he has spent most of the last 23 years in a SHU.  In fact, Prisoner DD is serving a long

[767816-1]

1  SHU terms for various offenses.  From 1992 to as recently as September 2010, Prisoner

2  DD has regularly received Rules Violations Reports.  Prisoner DD is in the SHU for

3  longstanding and regular disciplinary reasons, not medical care disputes."

4  **Objection 1**

5       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**:  To the extent this

6  is not an admission that mentally ill individuals may spend "most of the last 23 years in a

7  SHU," Ms. Gipson provides no foundation for the statements that Prisoner DD is "serving

8  a long SHU term for various offenses" or "Prisoner DD is in the SHU for longstanding and

9  regular disciplinary reasons, not medical care disputes."  Ms. Gipson cites no RVRs,

10  records, personal observations, or other evidence in support of these statements.

11               **9.        Gipson Decl., ¶ 30, 7:22-27**

12       "[I]n the majority of cases Corcoran provides timely and adequate care.  Corcoran

13  can always improve, and we are continuing to work on improvements, but ideal conditions

14  are not required, rather *constitutionally adequate* conditions are. Corcoran certainly

15  provides that."

16  **Objection 1**

17       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

18  Ms. Gipson has provided no evidence of her  qualifications, knowledge, or expertise that

19  would support the statement that Corcoran provides "constitutionally adequate conditions."

20  This is particularly problematic because Ms. Gipson claims no expertise in mental health

21  care or law.

22  **Objection 2**

23       **Improper Opinion Testimony as to Ultimate Legal Conclusion:**  Ms. Gipson

24  inappropriately opines as to the legal conclusion that "Corcoran certainly provides"

25  constitutionally adequate conditions.

26  **Objection 3**

27       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Gipson

28  provides no foundation for the statement that Corcoran "provides timely and adequate

[767816-1]

care" in the majority of cases.  This is a unsupported conclusory statement.

## F.   DECLARATION OF ROBERT FISCHER, DOCKET NO. 4429 ("FISCHER DECL.")

### 1.   Fischer Decl., ¶ 4, 2:10

"Corcoran provides constitutionally adequate mental health care to its patients."

**Objection 1**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Dr. Fischer has provided no evidence of his qualifications, knowledge, or expertise that would support this sweeping and vague statement.

**Objection 2**

**Improper Opinion Testimony as to Ultimate Legal Conclusion:**  Dr. Fischer inappropriately opines as to the legal conclusion that "Corcoran provides constitutionally mental health care to its patients."

**Objection 3**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer provides no foundation for the statement that Corcoran provides constitutionally adequate mental health care.

### 2.   Fischer Decl., ¶ 4, 2:12-15

"Although Corcoran has vacancies for certain mental health disciplines, Corcoran remains adequately staffed to deal with the needs of the population housed within the institution.  When gaps arise in treatment Corcoran staff works the additional hours necessary to make sure all treatment needs are met."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer provides no foundation, data, evidence, or support for the statement that "Corcoran remains adequately staffed to deal with the needs of the population housed within the institution."  No records are cited to support the assertion that Corcoran is adequately staffed or that staff members work extra hours.

[767816-1]

1    **3.    Fischer Decl., ¶ 6, 3:1-2**

2    "Nevertheless, the clinicians on that [CCCMS] yard are able to provide the

3    necessary mental health care to the patients on their caseload."

4    **Objection 1**

5    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer

6    provides no foundation for this broad assertion.  He also provides no explanation as to

7    what he means by "necessary mental health care" or how that standard is being met.

8    **4.    Fischer Decl., ¶ 9, 3:18-22**

9    "Additionally, a new EOP treatment building, to be used primarily for

10    Administrative Segregation Unit inmates, is under construction and is scheduled to open

11    on May 1, 2013. By June 2013 treatment will be taking place within the building. This will

12    help free up space in the existing gymnasium to offer recreational activities for the inmates

13    on that yard."

14    **Objection 1**

15    **Lack of Relevance [Fed. R. Evid. 401]:**  Dr. Fischer's characterizations of

16    purportedly ongoing construction projects and their possible impact lack relevance to the

17    present inquiry into current and ongoing – not future and speculative – conditions.

18    **5.    Fischer Decl., ¶ 10, 4:4-5**

19    "Inmates receive appropriate interaction with a case manager psychologist or social

20    worker to meet their basic health care needs."

21    **Objection 1**

22    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer

23    provides no foundation for this broad assertion.  The conclusory statement is supported by

24    no evidence, data, or standards.

25    **6.    Fischer Decl., ¶ 13, 4:26-5:2**

26    "[Prisoner I] has also stopped attending his one-on-ones with his case manager for

27    some time due to his belief he was being lied to.  This is consistent with his Borderline

28    Personality Disorder and had nothing to do with ATOM chairs."

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Again, Dr. Fischer provides no foundation as to how he draws his conclusion about Prisoner I's beliefs or the motivations for his conduct.  Dr. Fischer does not claim to be Prisoner I's treating clinician, to have met or assessed him, or even to have reviewed his medical records.

**7.**     **Fischer Decl., ¶ 15, 5:11-12**

      "The amount of groups offered per week depends on the inmate's level of care and personal need.  Inmates receive an adequate amount of group treatment to meet their basic mental health care needs."

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer provides no foundation for the broad conclusion that "[i]nmates receive an adequate amount of group treatment."

**8.**     **Fischer Decl., ¶ 16, 5:13-14**

      "Although the 10 hour guideline is not always met for all inmates, patients receive a level of care required to treat their mental illnesses."

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Beyond Dr. Fischer's admission that Corcoran fails to meet Program Guide standards, Dr. Fischer provides no foundation for the vague conclusion that despite violating the Program Guide, Corcoran continues to provide patients "a level of care required totreat their mental illnesses."

**9.**     **Fischer Decl., ¶ 17, 5:28-6:2**

      "The groups offered at Corcoran are currently undergoing a review to create a more structured and organized group offering to ensure consistency in therapeutic offerings to inmates."

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer provides no foundation for the claim that Corcoran is reviewing its group offerings.  He cites no plans, no meetings, and no participants in the purported review process.

**Objection 2**

    **Lack of Relevance [Fed. R. Evid. 401]:**  The statement that Corcoran is "currently undergoing a review" of its group offerings lacks relevance to the present inquiry into current and ongoing – not future and speculative – conditions.

           **10.     Fischer Decl., ¶ 21, 6:16-20**

    "Mr. Kaufman complains in his declaration, at paragraph 82, that he found eUHR illegible for the records he reviewed.  This vague generalization is simply not true.… Staff offers little complaints about the ability to read eUHR documents."

**Objection 1**

    **Mischaracterizes Testimony:**  Dr. Kaufman did not make a vague generalization, but rather a specific claim, for which he offered personal knowledge, that many of the records *he reviewed* were totally or nearly illegible. Dr. Fischer's statement is particularly questionable given that the States' own expert testified that the records were difficult to read.  (Dvoskin Dep. at 211:24-212:14.)

           **11.     Fischer Decl., ¶ 21, 6:20-21**

    "The [eUHR] system allows clinicians to competently access information and treat patients a higher level of care."

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer provides no foundation for the broad statement the eUHR allows clinicians to "treat patients a higher level of care."  He does not explain how the system allows clinicians to treat patients at higher levels of care, what it means to treat patients at higher levels of care, or on what basis he knows that the system allows clinicians to treat patients at higher levels of care.

32

1

### 12.    Fischer Decl., ¶ 26, 7:20-22

2    "Mr. Kaufman, in paragraph 92 of his declaration, also alleges that psychiatrists in

3    MHCBs receive no training on suicide risk evaluations.  This is simply not true. All

4    psychiatrists receive training on evaluating suicide risks of patients."

5    **Objection 1**

6        **Mischaracterizes Testimony:**  Dr. Kaufman's declaration does not "allege[] the

7    psychiatrists in MHCBs receive no training on suicide risk evaluations."  Rather, it states

8    that a psychiatrist in the MHCB told Dr. Kaufman that he neither receives nor provides

9    training in suicide risk evaluation.  (Decl. of Edward Kaufman, M.D., Docket No. 4379

10   ("Kaufman Expert Decl."), ¶ 92.)

11   **Objection 2**

12       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer

13   provides no foundation for his generalizations about suicide training at Corcoran.  He also

14   provides no explanation for the psychiatrist's claim that he has received no training.

15

### 13.    Fischer Decl., ¶ 27, 7:26-27

16   "At the time of [Dr. Kaufman's] visit, the mentoring program had been rolled out in

17   the EOP programs and it is being rolled out in the MHCB soon."

18   **Objection 1**

19       **Lack of Relevance [Fed. R. Evid. 401]:**  The statement that the proctoring

20   program "is being rolled out in the MHCB soon" lacks relevance to the present inquiry

21   into current and ongoing – not future and speculative – conditions.

22

### 14.    Fischer Decl., ¶ 28, 8:2-7

23   "Many of the inmates housed in the Administrative Segregation Unit (ASU) have

24   mental illness.  Some of those inmates are there due to lack of bed space outside of the unit

25   where, if available, they would be sent to.  For all inmates housed within the ASU, the

26   mental health staff continues to provide consistent mental health care for those inmates

27   with mental illnesses.  Despite their more restrictive setting, inmates in an ASU receive

28   treatment that meets their basic mental health needs."

[767816-1]

33

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** To the extent that this statement is not an admission that mentally ill inmates are held in administrative segregation "due to lack of bed space outside of the unit," it is entirely lacking in foundation as to the statement that "mental health staff continues to provide consistent health care" and "inmates in an ASU receive treatment that meets their basic mental health care needs." No evidence, data, case information, or observations are cited.

15. **Fischer Decl., ¶ 31, 8:19-25**

"Mr. Kaufman, in paragraph 137 of his declaration, describes a phenomenon of patients 'cycl[ing] in and out of the SHU.' This occurs when a CCCMS inmate decompensates and is placed in an EOP program outside of the SHU. This occurrence is rare…. When a CCCMS patient decompensates he is made EOP to get the care that he requires. 'Cycling' helps prevents decompensation of patients in the SHU by offering them the appropriate level of care they need in times of need."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Beyond this serious admission that patients known to decompensate in the SHU are knowingly returned there, the statements lack foundation as to whether and to what degree the "occurrence is rare," whether and how often CCCMS patients are "made EOP" to get more care after decompensating in the SHU, and whether and how cycling them in and out of the SHU "helps prevent decompensation."

16. **Fischer Decl., ¶ 37, 10:17-20**

"[I]n the majority of cases Corcoran provides timely and adequate care. Corcoran can always improve, and we are continuing to work on improvements, but ideal conditions are not required, rather *constitutionally adequate* conditions are. Corcoran certainly provides that."

**Objection 1**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

[767816-1]

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  Dr. Fischer has provided no evidence of his qualifications, knowledge, or expertise that

2  would support the statement that Corcoran provides "constitutionally adequate conditions."

3  **Objection 2**

4        **Improper Opinion Testimony as to Ultimate Legal Conclusion:**  Dr. Fischer

5  inappropriately opines as to the legal conclusion that "Corcoran certainly provides"

6  "constitutionally adequate" conditions.

7  **Objection 3**

8        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Fischer

9  provides no foundation for the statement that Corcoran "provides timely and adequate

10  care" in the majority of cases.  Moreover, there is no foundation for the conclusion that

11  mental health care at Corcoran is constitutionally adequate.  Rather, it is a conclusion

12  without evidence, data, support, or explanation.

13        **G.**     **D**ECLARATION OF **B**RENDA **C**ASH, **D**OCKET **N**O. 4459 ("**C**ASH **D**ECL.")

14            **1.**     **Cash Decl., ¶ 3, 2:5-6**

15        "CIM is currently providing a constitutionally required level of treatment for mental

16  health inmate patients."

17  **Objection 1**

18        **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

19  Ms. Cash has provided no evidence of her qualifications, knowledge, or expertise that

20  would support the statement that CIM provides "a constitutionally required level of

21  treatment."  Ms. Cash does not claim to have medical or legal expertise.

22  **Objection 2**

23        **Improper Opinion Testimony as to Ultimate Legal Conclusion:**  Ms. Cash

24  inappropriately opines as to the legal conclusion that CIM provides "a constitutionally

25  required level of treatment."

26  **Objection 3**

27        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Cash

28  provides no foundation for the statement that "CIM provides "a constitutionally required

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

level of treatment."

## 2.   Cash Decl., ¶ 6, 2:23-24

"The ASU has been significantly affected by Public Safety Realignment, as has CIM as a whole, but ASU still provides the required level of care to mental health inmate patients."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Cash provides no foundation for the statement the ASU "still provides the required level of care to mental health patients."  No data or evidence support Ms. Cash's conclusion about care in the ASU.

**Objection 2**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**  To the extent that Ms. Cash is opining about the "required level of care" for mentally ill inmates, she is inappropriately offering opinions without being qualified as an expert.

## 3.   Cash Decl., ¶ 7, 3:6-8

"While the use of illicit narcotics such as heroin or ecstasy by inmates is a pervasive problem in correctional facilities throughout the country, it has no bearing on CIM's ability to provide adequate mental health care to inmates."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  There is no foundation for Ms. Cash's characterization of "pervasive" problems in correctional facilities "throughout the country" or her conclusion that illicit narcotics have "no bearing" on CIM's mental health care.

## 4.   Cash Decl., ¶ 8, 3:10-12

"While gangs are a pervasive problem in correctional facilities throughout the country, that has no bearing on CIM's ability to provide adequate mental health care to inmates."

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** There is no foundation for Ms. Cash's characterization of "pervasive" problems in correctional facilities "throughout the country" or her conclusion that gangs have "no bearing" on CIM's mental health care. This statement also contradicts Dr. Jordan's statement that CIM's inability to provide care for a large portion of the ASU population is due to directives from gang members. (Reply Declaration of Victor Jordan, Docket No. 4458, ¶ 13.)

             **5.    Cash Decl., ¶ 9, 3:15-17**

      "CIM issues suicide resistant smocks and removes beds from holding cells to prevent inmates from using their clothing or surroundings to commit suicide. ClM does not issue suicide resistant smocks or remove beds for punitive reasons."

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** There is no foundation for Ms. Cash's assertions about CIM's practices with respect to suicide smocks and intake cells. Moreover, there is no foundation for her speculation about the reasons why suicide smocks are provided and beds are removed from holding cells.

             **6.    Cash Decl., ¶ 11, 3:25-27**

      "While new intake inmates are sometimes placed in ASU due to lack of bed space, this virtually never lasts beyond a week and frequently the inmates leave ASU within one to two days."

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** To the extent that the statement is not an admission about the use of administrative segregation as response to bed shortages, there is no foundation, no data, and no evidence to support Ms. Cash's statements about the amount of time individuals are held in ASUs.

             **7.    Cash Decl., ¶ 12, 4:2-5**

      "An inmate is appropriately placed in Administrative Segregation whenever the

[767816-1]

1  inmate's presence in general population presents a threat to other inmates or himself,

2  endangers institution security, or jeopardizes the integrity of a criminal or serious

3  misconduct investigation. There is no requirement that ASU be used only for disciplinary

4  reasons."

5  **Objection 1**

6      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  To the extent that

7  the statement is not an admission about the use of administrative segregation for non-

8  disciplinary reasons, Ms. Cash's statement is lacking in foundation for the assertion of

9  when the use of administrative segregation is "appropriate[]" and what requirements exist

10  or apply.

11          **8.     Cash Decl., ¶ 13, 4:6-8**

12      "Dr. Kaufman says that 'LOB' inmates in ASU go to yard only once a week. Mr.

13  Haney also notes this on page 68 of his declaration. This is misleading. All ASU inmates

14  are allowed at least ten hours a week of yard time, and sometimes more is allotted."

15  **Objection 1**

16      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  There is no

17  foundation whatsoever for Ms. Cash's broad statements that *all* ASU inmates are allowed

18  *at least* ten hours a week of yard time "and sometimes more is allotted." Ms. Cash does not

19  claim to monitor yard time for ASU inmates or to have reviewed any data or evidence to

20  support her assertion.

21          **9.     Cash Decl., ¶ 13, 4:9-11**

22      "Furthermore, while new intake inmates are sometimes placed in ASU due to lack

23  of bed space, this virtually never lasts beyond a week, as bed space is constantly becoming

24  available, and frequently the inmates leave ASU within one to two days."

25  **Objection 1**

26      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  To the extent that

27  the statement is not an admission about the use of administrative segregation for bed

28  shortages, there is no foundation, no data, and no evidence to support Ms. Cash's

38

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  statements about the amount of time individuals are held in ASUs or that bed space is

2  "constantly becoming available."

3  **10.    Cash Decl., ¶ 14, 4:12-19**

4  "On page 75, Mr. Haney states that an inmate and a psych tech both described a

5  process for inmates expressing suicidal ideations wherein the inmate is stripped down to

6  his underwear, placed in a cage, and forced to wait for several hours until a custody officer

7  could escort the inmate to a mental health crisis bed.  This is not an accurate description of

8  the process.  Upon reporting suicidal ideations, staff documents the report and refers the

9  matter to the Chief of Mental Health, who then requests that the inmate be seen by a

10  mental health clinician.  There is no requirement that individual modules be used upon a

11  report of suicidal ideation.  There is also no requirement that inmates strip to their

12  underwear prior to being referred to a clinician."

13  **Objection 1**

14  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  There is no

15  foundation whatsoever for Ms. Cash's characterizations of the process that takes place

16  after an inmate reports suicidal ideation.  Ms. Cash does not claim to be a mental health

17  professional or to participate in any part of the suicide monitoring or treatment process.

18  Her claim that the psych tech and the inmate were both wrong in their description of the

19  process is unsupported by facts or evidence.

20  **11.    Cash Decl., ¶ 16, 4:26-5:3**

21  "On page 56, Dr. Kaufman claims that CIM custody officers create a deliberately

22  antagonistic relationship with the inmates by intentionally ignoring pleas for assistance,

23  including refusing to let inmates leave a cell containing an overflowing toilet. … [A]n

24  overflowing toilet creates safety concerns for staff as well as inmates due to water spillage

25  on a housing tier, so staff would not ignore it."

26  **Objection 1**

27  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  There is no

28  foundation for Ms. Cash's statements as to what staff "would" or would not do.  She does

[767816-1]

1  not claim to have asked staff or to have investigated the incident in any manner.  Rather,

2  she offers pure speculation as to what she believes staff would do.

3      **12. Cash Decl., ¶ 15, 5:4-9**

4    "On page 56, Dr. Kaufman states that several inmates have claimed that they have

5  been treated more harshly as a result of a recent failed escape attempt. It is true that two

6  inmates attempted to escape in January. These two inmates were not mental health

7  patients. After  interviewing the inmates after the unsuccessful escape attempt, our staff

8  improved existing search procedures and security protocols to amend noted deficiencies.

9  There has been no punitive action or restriction of yard time taken against other inmates

10  due to this escape attempt."

11  **Objection 1**

12    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Cash offers

13  no foundation for the statement that "[t]here has been no punitive action or restriction of

14  yard taken against other inmates due to this escape attempt."  Ms. Cash does not purport to

15  be aware of every punitive action taken at CIM or to record the hours of yard offered to

16  every inmate.  This statement is unsupported.

17    **H. DECLARATION OF VICTOR JORDAN, DOCKET NO. 4458 ("JORDAN DECL.")**

18

19      **1. Jordan Decl., ¶ 4, 3:17-23**

20    "Dr. Kaufman claims in paragraph 36 of his declaration that patients often miss

21  meals while waiting for mental health appointments. There is no evidence that patients are

22  missing meals and staff members are not aware of this as being an issue.…  Certainly,

23  mental health staff members have not heard this concern from their patients."

24  **Objection 1**

25    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  The assertion that

26  "mental health staff members have not heard this concern from their patients" is without

27  foundation or support.  Dr. Jordan does not claim to have asked any of the mental health

28  staff members – much less *all* of them – and he does not claim to know everything that

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  patients have told mental health staff members.  Indeed, it is hard to imagine how Dr.

2  Jordan could be "certain" about what other people did *not* hear.

3              **2.      Jordan Decl., ¶ 6, 4:9-10**

4        "[T]he treatment space limitations at CIM Ad Seg do not interfere in our ability to

5  provide regularly scheduled treatment or to provide the basic mental health care needed."

6  **Objection 1**

7        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

8  provides no evidence, data, or foundation to support this conclusory assertion.

9              **3.      Jordan Decl., ¶ 7, 4:13-14**

10        "Ad Seg inmates need to be placed in therapeutic treatment modules for the safety

11  of other inmates and staff."

12  **Objection 1**

13        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

14  provides no foundation for this blanket assertion.

15  **Objection 2**

16        **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**  To the

17  extent that Dr. Jordan is opining broadly on the need for treatment modules for

18  administrative segregation patients, he is inappropriately offering opinions without being

19  qualified as an expert.

20              **4.      Jordan Decl., ¶ 9, 4:26-5:3**

21        "Group treatment is done at time when custody and staff members are not 'milling

22  about.'  Staff members that are not part of group therapy are not present during group

23  therapy sessions.  In addition, the IDTT does not meet when personnel crowd the room or

24  group therapy is occurring.  IDTT does not meet at the same time that other people are in

25  the room."

26  **Objection 1**

27        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

28  provides no basis for his assertion that staff members who are not part of group therapy

1   "are not present during group therapy sessions."  Dr. Jordan does not claim to attend all (or

2   any) group therapy sessions or to have a log of individuals present in the room during

3   those sessions.  Likewise, he provides no foundation for the claim that IDTT "does not

4   meet at the same time that other people are in the room."  This is particularly questionable

5   in light of Dr. Kaufman's direct, firsthand observation to the contrary.  (Kaufman Expert

6   Decl. ¶ 51.)

7                    **5.       Jordan Decl., ¶ 9, 5:3-6**

8           "Again, the treatment space at CIM is adequate to provide the basic mental health

9   care needed. The basic mental health needs of Ad Seg patients are being met, despite the

10  matters Drs. Kaufman and Haney discuss in their declarations."

11  **Objection 1**

12          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  This is a

13  sweeping, conclusory statement with no foundation or evidence provided to support it.

14                   **6.       Jordan Decl., ¶ 10, 5:12-13**

15  "[Reception Center patients] receive the basic mental health care needed."

16  **Objection 1**

17          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Again, this is a

18  conclusory statement with no foundation or evidence provided.  Such statements with no

19  foundation or evidentiary support lack any indicia of reliability.

20                   **7.       Jordan Decl., ¶ 12, 5:21-27**

21          "Drs. Haney and Kaufman state in their declarations that a high refusal rate among

22  inmate-patients to attend the Interdisciplinary Treatment Team (IDTT) meetings indicates

23  difficulties by inmate-patients in forming therapeutic relationships with staff.…  In

24  addition to the added pressures of the inmate culture of Ad Seg, there is no documented

25  proof that attending IDTT is directly related to the formation of the 'therapeutic alliance'

26  with treatment staff."

27  **Objection 1**

28          **Mischaracterizes Testimony:** Neither Dr. Kaufman nor Dr. Haney asserted that

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  the high refusal rate for IDTT sessions "indicates difficulties by inmate-patients in forming

2  therapeutic relationships with staff" as Dr. Jordan states. Rather, both Dr. Kaufman and

3  Dr. Haney noted that the *State's experts* had concluded that the high rate of refusals

4  reflected "difficulties with forming therapeutic alliances with the treatment staff."  (Report

5  of Dvoskin, Moore, & Scott, Docket. No. 4275-5, at 23.) Thus, Dr. Jordan's dispute is with

6  the *State's experts*, not Drs. Haney and Kaufman, as he alleges.

7            **8.        Jordan Decl., ¶ 13, 6:5-9**

8            "Approximately 40 percent of the inmates in Ad Seg are Hispanic and they have

9  informed treatment staff that they will not come out for IDTT due to directives given by

10  Hispanic gang leaders.  Hispanic patients have also informed clinical staff that they will

11  not come out for IDTT as it is 'a sign of weakness for their race.'"

12  **Objection 1**

13            **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:**  Dr. Jordan states that "they"

14  (presumably referring to "approximately 40% of the inmates in Ad Seg") "have informed

15  treatment staff" that they do not participate in IDTT due to gang associations.  Dr. Jordan

16  does not identify the treatment staff who allegedly conveyed this information to him.  He

17  does not identify when or what information was conveyed to him. The quote that attending

18  IDTT is "a sign of weakness for their race" is not attributed to anyone. The identity of the

19  patient(s) and treatment staff member(s) are undisclosed. This is clearly inadmissible as

20  hearsay not made under oath offered for the truth of the matter asserted.

21  **Objection 2**

22            **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

23  provides no foundation for any aspect of this statement.  This purported explanation for

24  deficiencies in care is based on mere hearsay with no personal knowledge or foundation

25  underlying it.

26            **9.        Jordan Decl., ¶ 14, 6:14-16**

27            "Reception center patients receive what the program guide requires. Reception

28  center staff members ensure that the required yard time and services are provided."

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    **Objection 1**

2        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  No foundation,

3    evidence, data, or other support is offered for this vague, conclusory statement.

4                    **10.    Jordan Decl., ¶ 16, 7:2-5**

5        "Treatment refusal by Ad Seg patients is more likely due to the directives of gang

6    leaders as discussed above. Ad Seg inmate-patients receive very appropriate treatment

7    planning and intervention by mental health staff, despite minimal Ad Seg programming."

8    **Objection 1**

9        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  To the extent this

10   is not an admission that there is "minimal Ad Seg programming," it is a vague and

11   unsupported statement with no information about what "very appropriate treatment" is or

12   how and in what form it is provided to patients in Ad Seg.  There is also no support for the

13   generalization that treatment refusal is due to gang directives.

14                   **11.    Jordan Decl., ¶ 17, 7:13-16**

15       "Psychology appointments last on average 45 minutes to an hour.  All inmates have

16   a treatment plan developed between the primary clinician and the patient.  The primary

17   clinician thereafter treats the patient according to the plan they had previously agreed

18   upon."

19   **Objection 1**

20       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

21   provides no foundation as to how he knows the average length of psychology

22   appointments at CIM.  Such data would presumably be tracked and recorded, but

23   Dr. Jordan does not bother to cite evidence or even state that he reviewed evidence in

24   reaching his conclusion. He also provides no support for the broad assertion that primary

25   clinicians follow the treatment plans they create.

26                   **12.    Jordan Decl., ¶ 18, 7:22-25**

27       "CIM clinicians believe they have established good therapeutic rapport with their

28   patients. This is proved by the many patient requests for both additional appointments and

[767816-1]

1  services. There are virtually no refusals in most programs aside from Ad Seg."

2  **Objection 1**

3      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan does

4  not explain how he knows what CIM clinicians "believe."  Moreover, he cites no evidence

5  whatsoever to support the assertion that there are "virtually no refusals in most programs

6  aside from Ad Seg."  Such data would presumably be tracked and recorded, but Dr. Jordan

7  does not bother to cite evidence or even state that he reviewed evidence in reaching his

8  conclusion.

9              **13.    Jordan Decl., ¶ 20, 8:9-10**

10      "In paragraph 141 of Dr. Haney's declaration, he states that CIM has difficulty in

11  'achieving level of care referrals within required timeframes.'"

12  **Objection 1**

13      **Mischaracterizes Testimony:**  Dr. Haney did not state that CIM has difficulty

14  achieving levels of care referrals within required timeframes.  Rather, he stated that he was

15  informed of "*another recent QIT initiative at CIM* that focused on achieving level of care

16  referrals within required timeframes." (Decl. of Craig Haney, Ph.D., Docket 4378.)

17  Dr. Jordan's statements do not deny that CIM itself created a plan to address referral times.

18              **14.    Jordan Decl., ¶ 20, 8:16-18**

19      "Most of the patients [Drs. Haney and Kaufman] refer to are waiting for an open

20  Special Needs Yard EOP bed.  But while patients wait for an open Special Needs Yard

21  EOP bed, they receive adequate care and mental health services according to the program

22  guide requirements."

23  **Objection 1**

24      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  To the extent that

25  this is not an admission that EOP patients are not being placed in appropriate timeframes,

26  Dr. Jordan provides no evidence, data, or foundation to support the conclusory assertion

27  that all patients awaiting EOP beds are receiving "adequate care."

28

45

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1      **15.    Jordan Decl., ¶ 22, 8:20-22**

2          "Despite the length that patients wait for open EOP beds, they continue to be seen

3    regularly and daily by mental health staff. These patients receive adequate care regardless

4    of where they are housed."

5    **Objection 1**

6          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Again, Dr. Jordan

7    provides no evidence, data, or foundation to support the broad, conclusory assertion that all

8    patients housed anywhere at CIM awaiting EOP beds are receiving "adequate care."

9    Moreover, Dr. Jordan cites no evidence to demonstrate regular, daily contacts by mental

10   health, to say nothing of the quality of those contacts.

11     **16.    Jordan Decl., ¶ 23, 9:1-3**

12         "Clinicians at CIM provide appropriate care, including when using clinical

13   judgment in evaluating when a patient should be referred to a higher or lower level of

14   care."

15   **Objection 1**

16         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

17   provides no evidence, data, or foundation to support this conclusory assertion. It is not

18   clear if this conclusion is based on direct observation, review of medical records, vague

19   personal impressions, or nothing at all.

20     **17.    Jordan Decl., ¶ 24, 9:12-14**

21         "These ['LOB'] patients are receiving normal privileges so the risk of self-harm and

22   decompensation is low on average among this patient group. There are minimal if any

23   referrals for crisis intervention among LOB patients."

24   **Objection 1**

25         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Again, this

26   conclusion is offered without evidence or foundation.  This statement is particularly

27   specious because it is contrary to evidence cited in medical records reviewed by

28   Dr. Kaufman and which Dr. Jordan purports to have reviewed as well. (*See, e.g.*, Decl. of

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  Edward Kaufman, M.D., Docket 4379, ¶¶ 99, 104 (describing MHCB admissions for LOB

2  Prisoners L and N); Jordan Decl. ¶¶ 51, 56 (discussing the same patients with no reference

3  to the fact that their medical records showed multiple MHCB admissions).)

4              **18.    Jordan Decl., ¶ 25, 9:18-20**

5         "These ['LOB'] patients are being seen regularly and are not decompensating. This

6  is proved by the small amount of institutionwide referrals to MHCBs and the very short

7  length of stay."

8  **Objection 1**

9         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Again, this

10  statement is based on no evidence that LOB patients are "being seen regularly" or "are not

11  decompensating."  It also mischaracterizes the evidence about MHCB referrals, as stated

12  above.

13             **19.    Jordan Decl., ¶ 28, 10:12-15**

14        "Inmates housed here [in Madrone Hall] are in reception center for a brief duration

15  and may be CCCMS or EOP. They will be transferred to a mental health program once

16  they are endorsed. They receive the required yard time and programming."

17  **Objection 1**

18        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan

19  provides no evidence as to how long individuals are held in the reception center, instead

20  characterizing it as "a brief duration."  Likewise, he concludes without evidence or

21  foundation that "[t]hey receive the required yard time and programming." It is unclear

22  from what – if any – information Dr. Jordan draws these conclusions.

23             **20.    Jordan Decl., ¶ 32, 11:16-19**

24        "Dr. Kaufman claims that clinical staff members wear protective shields over their

25  faces in all interactions with maximum custodial risk inmates. This is not correct. Staff

26  members are required to wear protective masks on the maximum custody unit when

27  walking on the tiers, but not in treatment areas or while providing treatment."

28

[767816-1]

47

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

   **Mischaracterizes Testimony**: Dr. Jordan states that Dr. Kaufman's testimony is wrong because clinical staff members are not required to wear protective masks in treatment areas or while providing treatment.  However, Dr. Kaufman did not claim that clinical staff members are *required* to wear masks in the "max units" of the MHCB but rather that he was told they *do* wear plastic shields over their faces.  (Kaufman Expert Decl. ¶ 85.)  Dr. Jordan does not state to the contrary.

   21.   **Jordan Decl., ¶¶ 40, 41, 42, 43, 44, 45, 46, 48, 51, 52, 53, 54, 55, 56, 57, 58**

   In each of these paragraphs Dr. Jordan states that the patient in question was seen in accordance with Program Guidelines or requirements.

**Objection 1**

   **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan provides no support for the broad assertion that each patient "was seen according to Program guidelines."  The attached records do not support the breadth of the conclusion Dr. Jordan asserts and Dr. Jordan provides no additional foundation for his conclusions. Dr. Jordan does not claim to have assessed the patients or undertaken a thorough review of their medical records.

   22.   **Jordan Decl., ¶ 47, 15:3-5**

   "Prisoner W always sees his primary clinician timely. He is also always seen timely by IDTT."

**Objection 1**

   **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  There is absolutely no support for the assertion that Prisoner W *always* sees his IDTT and primary clinician timely. The same objection applies to paragraph 50 in which Dr. Jordan makes the unsubstantiated statement that Prisoner K "was always seen by his primary clinician on time."

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1        **23.    Jordan Decl., ¶ 50, 15:27-16:3**

2        "Dr. Kaufman in paragraph 68 of his declaration states that Prisoner K refused his

3   medications and that he failed to receive his prescribed dose of Risperdal in the mornings.

4   However, the medical reconciliation in the Maxor pharmacy program indicates that

5   Prisoner K was never prescribed Risperdal."

6   **Objection 1**

7        **Mischaracterizes Testimony:**  In fact, Dr. Kaufman never stated that Prisoner K

8   refused medications. Moreover, Dr. Jordan fails to acknowledge that the Dr. Kaufman's

9   statement that Prisoner K failed to *receive* his prescribed Rispderal was based on *CDCR's*

10  *own medical records.*  The statement that Prisoner K "is currently taking Vistaril and

11  Risperdal" can be found in Prisoner K's eUHR in the Chronological Interdisciplinary

12  Progress Notes dated December 10, 2012.  (Confidential Declaration of Ernest Galvan,

13  3/26/13, Docket No. 4512 ("Galvan Confidential Decl."), Ex. 1.)  Moreover, in Prisoner

14  K's Chronological Interdisciplinary Progress Notes dated December 17, 2012, his clinician

15  noted that "he has not been getting the increased dose of Rispderal in the mornings."

16  (Galvan Confidential Decl. Ex. 2.)  Dr. Jordan's testimony may thus have identified some

17  limitations of "the medical reconciliation in the Maxor pharmacy program" which

18  apparently reported that Prisoner K was not prescribed Risperdal.

19       **24.    Jordan Decl., ¶ 56, 17:13-15**

20       "Prisoner L was placed in Ad Seg from February 11, 2013 to March 17, 2013.

21  From a review of mental health records, it does not appear that he was placed for

22  disciplinary reasons.  During his brief stay, he was evaluated by his primary clinician on

23  February 19, 2013."

24  **Objection**

25       **Mischaracterizes Testimony**:  Dr. Jordan disputes Dr. Kaufman's account that

26  Prisoner L had been housed in an ASU as a "LOB" for lack of an appropriate bed for an

27  extended period of time. (Kaufman Expert Decl. ¶ 97.)  According to Dr. Jordan, Prisoner

28  L *was* placed in administrative segregation  at CIM for non-disciplinary reasons, but it was

49

[767816-1]

1    only a "brief stay," from February 11, 2013 to March 17, 2013.  Dr. Jordan's statement is

2    contrary to the evidence in CDCR's own records.  An "Interdisciplinary Progress Note –

3    Group Treatment Note" *dated August 19, 2012* identified Prisoner L as being housed in the

4    same administrative housing unit at which Dr. Kaufman met him and also identified

5    Prisoner K as an "LOB." This evidence – available upon review of Prisoner L's eUHR – is

6    directly contrary to Dr. Jordan's statements about Prisoner L's "brief stay" in the ASU and

7    further undermines the reliability of Dr. Jordan's declaration.  (Galvan Confidential Decl.

8    Ex. 3.)

9           **25.    Jordan Decl., ¶ 55, 16:23-17:11**

10          "Prisoner M has been at the EOP level of care since October 2, 2012.… [Prisoner

11   M] has been writing letters to Sacramento about that and has gotten favorable responses;

12   however, he is still housed in the dorm, so he is starting to feel helpless.…  He continues to

13   be seen according to program guidelines."

14   **Objection**

15          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan cites

16   no evidence or foundation for his conclusion that Prisoner M continues to be seen

17   "according to program guidelines." Indeed, if Prisoner M remains in the Angeles General

18   Population dorm as Dr. Jordan states despite having been designated as EOP on *October 2,*

19   *2012*, his care is certainly not in compliance with the Program Guide, which states that

20   CCCMS patients referred to an EOP level of care shall be transferred to an appropriate

21   setting within 60 days, or 30 days if clinically indicated.  As of March 20, 2013, when Dr.

22   Jordan declared that Prisoner M was still in the general population awaiting transfer,

23   Prisoner M had been waiting *169 days* (more than five months) for transfer to an

24   appropriate treatment setting.

25          **26.    Jordan Decl., ¶ 61, 18:1-5**

26          "[I]n the majority of cases, CIM provides timely and adequate care.  CIM can

27   always improve, and we are continuing to work on improvements, but ideal conditions are

28   not required, rather *minimally adequate* conditions are.  CIM certainly provides that."

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Jordan provides no foundation for the statement that CIM "provides timely and adequate care" in the majority of cases.  Moreover, he provides no foundation in personal knowledge for the assertion that CIM "certainly provides" "minimally adequate conditions."

**I.**    **DECLARATION OF KATHERINE HUDSON, DOCKET NO. 4448 ("HUDSON DECL.")**

    **1.**    **Hudson Decl., ¶ 4, 2:24-3:1**

    "There are multiple safeguards for the replacement medications because the RC nurses discuss the continuation orders with a pharmacist, medical doctor, and the psychiatrist.  When urgent issues are discovered by the RC nurse, an immediate referral is initiated and the inmate will have an immediate assessment by psychiatry staff."

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Hudson provides no evidence, data, or other foundation to support her broad statement as to the immediacy of referral and assessment by psychiatry staff.

**J.**    **DECLARATION OF JONATHAN HARRY, DOCKET NO. 4447 ("HARRY DECL.")**

    **1.**    **Harry Decl., ¶ 5, 2:25-27**

    "Dr. Kaufman also did not explain, or did not know, that RC nurses are trained to identify severe mental illness and significant/life threatening side effects.  When these issues are discovered by the RC nurse, that inmate will receive an immediate assessment by a psychiatrist."

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Harry provides no evidence, data, or other foundation to support his broad statement about the "immedia[cy]" of referral and assessment by psychiatry staff.  Dr. Harry's statement also lacks foundation as to the degree of training of RC nurses. Dr. Harry provides no data as to how often or how quickly such referrals are made, to say nothing of how psychiatrists are

available for "immediate" assessments despite documented shortages.

### K.    DECLARATION OF LORI WILLIAMS, DOCKET NO. 4446 ("WILLIAMS DECL.")

#### 1.    Williams Decl., ¶ 4, 3:5-8

"Our staffing is adequate to assure that every inmate in our ASU EOP receives the appropriate level of care required by their individual needs.  If a clinician determines an inmate needs higher level of care, the inmate is transferred."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  This statement is conclusory, broad, and vague, and it lacks any data or evidence to support it.

#### 2.    Williams Decl., ¶ 6, 3:20-22

"Dr. Kaufman, at paragraphs 32 and 48, also criticize [sic] the treatment and staffing at CCWF on the basis of select portions of medical records for only two inmates that reflect each received **a single** cell-front due to staffing issues."

**Objection 1**

**Mischaracterizes Evidence:** Dr. Williams states that the records of inmates interviewed by Dr. Kaufman show that each received a "single cell-front" due to staffing issues.  Even a cursory review of these inmates' medical records by Dr. Williams would have demonstrated to the contrary. In the case of Prisoner B, for example:

- An "Interdisciplinary Progress Note" dated December 3, 2012 stated that "*MH contact occurred cell front to manage the large influx of MH patients in ASU while understaffed.*"  (Galvan Confidential Decl. Ex. 4.)

- A Mental Health Treatment Plan dated February 5, 2013 stated that "there were a high number of cell front contact over the last quarter" and noted that Prisoner B's treatment process was "impacted" by "modified programs *due to a significant increase of MH patients in ASU.*"  (*Id.*, Ex. 5.)

- An "Interdisciplinary Progress Note" dated July 26, 2012 stated that Prisoner B was seen at "cell front *because of the lack of escorting officers.*"  (*Id.*, Ex.

6.)

• Another Interdisciplinary Progress Note, dated December 31, 2012, stated that Prisoner B's "MH contact occurred at cell front *to accommodate all assigned MH patients*." (*Id.*, Ex. 7.)

• Yet another Interdisciplinary Progress Note in Prisoner B's file, dated January 28, 2013, stated that "MH contact occurred at cell front because of the lack of available confidential space." (*Id.*, Ex. 8.)

• An Interdisciplinary Progress Note for Prisoner B, dated November 14, 2012 stated that "MH contact occurred cell front due to modified program." (*Id.*, Ex. 9.)

• In addition to those six instances, notes on September 5, 2012 reflect that Prisoner B was seen cell-front, with no indication that it was due to her refusal to leave the cell. (*Id.*, Ex. 10.)

• Notes dated June 28, 2012 and December 17, 2012 both indicate that Prisoner B was seen in a "non-confidential location." (*Id.*, Ex. 11 & Ex. 12.)

In total, that is *nine* instances of cell-front contacts for one prisoner. Several of these cell-front contacts were explicitly attributed – *by CCWF clinicians* – to CCWF's inability to keep up with the needs of its population. Thus, Dr. Williams grossly mischaracterizes the evidence supporting Dr. Kaufman's claims, and her statements suggest that she failed to review the patients' basic treatment records before opining.

### 3.    Williams Decl., ¶ 7, 4:3-4

"Dr. Kaufman's repeated criticisms throughout his Declaration about the lack of confidential contacts are misplaced."

**Objection 1**

**Mischaracterizes Evidence:** As noted above, CDCR's own medical records reflect a high rate of cell-front contacts, in addition to the corroborating accounts Dr. Kaufman received from inmates and staff members.

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1         **4.      Williams Decl., ¶ 12, 6:13-17**

2         "Dr. Kaufman also quotes Prisoner A as being housed with SHU inmates and

3 condemned inmates. But CCWF does not house SHU inmates. Further, condemned status

4 inmates are housed within a separate, secured environment within the administrative

5 segregation unit."

6 **Objection 1**

7         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Williams

8 offers no foundation for her statement that CCWF does not house SHU inmates.  Indeed,

9 had she attempted to support her statement with data, she may have found that CCWF's

10 own Management report describes the presence of SHU inmates, noting that "[t]he lack of

11 ASU treatment modules for MHPB P/Is on ASU or SHU status is problematic. Given the

12 custody status of these inmates, the provision of clinical services in a confidential setting is

13 minimal."  (Declaration of Michael Bien in Opp. to Mot. to Terminate, Mar. 15, 2013,

14 Docket No. 4399,  Ex. 26, at 3 of 17 (CCWF 25th Round Management Report)); *see also*

15 Kaufman Expert Decl., ¶ 110.  Dr. Williams' statement that condemned status inmates are

16 housed within a separate, secured environment also lacks foundation and, once again, is

17 belied by the facts.  Prisoner D's Interdisciplinary Progress Note on September 14, 2012

18 states that despite being a condemned row inmate, she is "being housed outside of the Row

19 (second floor)."  This is consistent with Dr. Kaufman's observations and investigations.

20 (Galvan Confidential Decl. Ex. 13.)

21         **5.      Williams Decl., ¶ 12, 6:26-7:1**

22         "At paragraph 143, Dr. Kaufman alleges the rapid growth of the mental health

23 population without a corresponding increase in mental health staff has led to a higher

24 incidence of modified programs and non-confidential clinical contacts. His statements are

25 inaccurate."

26 **Objection 1**

27         **Mischaracterizes Evidence**:  Dr. Kaufman did not "allege" that rapid growth of the

28 mental health population without a corresponding increase in mental health staff has led to

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  a higher incidence of modified programs and non-confidential clinical contacts.  He

2  observed that phenomenon through conversations with staff members and inmates, as

3  documented in his declaration.  Moreover, it was CDCR's own medical records that made

4  this point most clearly, stating that a patient's treatment process was "impacted" by

5  "modified programs *due to a significant increase of MH patients in ASU*."  (Galvan

6  Confidential Decl. Ex. 5.)  The same record attributed this to "the increased number of

7  mental health patients occur[ing] from the closure of VSPW."  *Id.*  The point was also

8  made by CDCR clinicians in a note indicating that "*MH contact occurred cell front to*

9  *manage the large influx of MH patients in ASU while understaffed*."  (Galvan Confidential

10  Decl. Ex. 4.)  To the extent that Dr. Williams disputes these assertions, she is contradicting

11  the written statements of her own clinical staff members.

### 6.  Williams Decl., ¶ 15, 7:6-11

13  "Dr. Kaufman's criticism in paragraph 171, that frequent lockdowns and modified

14  programs interfere with mental health treatment, is misplaced. For instance, Dr. Kaufman

15  states Prisoner D's medical record describes an extended lockdown and multiple

16  lockdowns on her unit. But, Prisoner D is a condemned inmate and does not experience

17  extended lockdowns or modified programs."

18  **Objection 1**

19  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Again, Dr.

20  Williams makes assertions with no reference to evidence and which are demonstrably

21  false.  Dr. Williams states that Prisoner D is "a condemned inmate and does not experience

22  extended lockdowns or modified programs."  A review of Prisoner D's medical records

23  demonstrates to the contrary.  An Interdisciplinary Progress Note dated June 13, 2012

24  states that Prisoner D "was seen for a routine MH contact *due to the extended lock down of*

25  *the Row*."  (Galvan Confidential Decl. Ex. 13.)  These repeated, fundamental errors reveal

26  a total lack of foundation and demonstrate the inherent unreliability of Dr. Williams'

27  declaration.

28

[767816-1]

55
PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**L.  DECLARATION OF JEREMY COLLEY, DOCKET NO. 4482 ("COLLEY DECL.")**

**1.  Colley Decl., ¶ 6, 5:4-5; ¶ 7, 5:18; 8, ¶ 5:26-27; ¶ 11, 8:8-9; ¶ 12, 8:18-19; ¶ 13, 9:10-11; ¶ 14, 9:21-22**

In each of the above listed paragraphs, Dr. Colley states that the prisoner's treatment plan and housing assignment meets his mental health needs.

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Colley provides no foundation for this finding. He does not claim to have treated any of the prisoners about whom he opines or to have conducted a review of their treatment plans or mental health records. He provides no factual basis or foundation for this statement at all.

**2.  Colley Decl., ¶ 17, 13:3-8**

"Despite the challenges of providing mental health treatment inside a prison, in the majority of cases MCSP provides timely and adequate care. MCSP can always improve, and we are continuing to work on improvements. But ideal conditions are not required; rather constitutionally *minimally adequate* conditions are. Mule Creek certainly provides those. Ours receive the basic mental health care needed, regardless of the issues mentioned in plaintiffs' experts' declarations."

**Objection 1**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Dr. Colley has provided no evidence of his qualifications, knowledge, or expertise that would support the conclusion that "Mule Creek certainly provides" "constitutionally minimally adequate conditions."

**Objection 2**

**Improper Opinion Testimony as to Ultimate Legal Conclusion:** Dr. Colley inappropriately opines as to the legal conclusion that "Mule Creek certainly provides" "constitutionally minimally adequate conditions."

**Objection 3**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Colley

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

provides no foundation for these broad assertions.  His conclusions are unsupported by facts, evidence, or even observations and are therefore without value**.**

### M.  DECLARATION OF KIM HOLLAND, DOCKET NO. 4438 ("HOLLAND DECL.")

#### 1.  Holland Decl., ¶ 5, 2:27-3:2

"There are additional expansions and modifications being considered through the Health Care Facilities Improvement Program. These modifications will increase clinical, MH treatment space, pharmacy, lab etc."

**Objection 1**

**Lack of Relevance [Fed. R. Evid. 401]**: The statement as to additional expansions and modifications currently "being considered" lacks relevance to the present inquiry into current and ongoing – not future and speculative – conditions.

#### 2.  Holland Decl., ¶ 7, 3:17-19

"Inmates, whether in Outpatient Housing Unit, Administrative Segregation Unit or Segregated Housing Unit, still receive, at minimum, treatment as per Coleman approved program guidelines."

**Objection 1**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]**: Ms. Holland has provided no evidence of her qualifications, knowledge, or expertise that would support her finding that all inmate-patients are receiving appropriate treatment pursuant to Program Guide requirements.

**Objection 2**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Ms. Holland provides no foundation for the broad and vague assertion that all inmates at CCI "receive, at minimum, treatment as per Coleman approved program guidelines."  She provides no foundation for her knowledge of the treatment that *all* CCI inmate-patients receive, nor for her knowledge of "Coleman approved program guidelines."

[767816-1]

57
PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

### 3.     Holland Decl., ¶ 8, 3:22-4:1

2      "Inmate NN received the referenced RVR while he was in the hospital for medical

3   reasons, following Outpatient Housing Unit placement [that] was also for medical reasons,

4   not psychological.  NN was elevated to Enhanced Outpatient Program LOC on February

5   fourth, 2013 and has been receiving treatment within Coleman approved program

6   guidelines that require Inmate-patients awaiting Enhanced Outpatient Program transfer to

7   be seen on a weekly basis by the PC.  In addition, he was added to the group therapy

8   waitlist and provided group therapy as available."

9   **Objection 1**

10      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: To the extent that

11   this statement is not an admission that there is waitlist for group therapy for EOPs at CCI,

12   this statement is inadmissible because Ms. Holland provides no foundation for her

13   statements as to the treatment being provided to Inmate NN.

14

### 4.     Holland Decl., ¶ 9, 4:9-13

15      "Therapeutic programming at California Correctional Institution Administrative

16   Segregation Unit is in accordance and goes beyond the Coleman approved program

17   requirements for Administrative Segregation Unit, including daily contact with licensed

18   psychiatric technicians, weekly or more if clinically indicated contacts with the primary

19   clinician and group therapy as available."

20   **Objection 1**

21      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Ms. Holland

22   provides no foundation for the grand and vague assertion that treatment in the CCI ASUs

23   "is in accordance and goes beyond the Coleman approved program requirements for

24   Administrative Segregation Unit." She provides no foundation for her knowledge of the

25   treatment that *all* CCI inmate-patients receive, nor for her knowledge of "Coleman

26   approved program requirements."

27

### 5.     Holland Decl., ¶ 11, 4:19-20

28      "Treatment is provided in the Segregated Housing Unit as per *Coleman*-approved

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    program guide requirements."

2    **Objection 1**

3        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Holland

4    again provides no foundation for her knowledge of the treatment that *all* CCI inmate-

5    patients in the SHU receive, nor for her knowledge of "Coleman approved program guide

6    requirements."

7        N.    **DECLARATION OF JOE LIZARRAGA, DOCKET NO. 4481 ("LIZARRAGA**
         **DECL.")**

8        1.    **Lizarraga Decl., ¶ 5, 2:23-26**

9    "Mule Creek can always improve, and we are continuing to work on improvements,

10   but ideal conditions are not required; rather, MCSP is required to meet the basic mental

11   health needs of its inmates. And MCSP is meeting those needs."

12   **Objection 1**

13       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Mr. Lizarraga, the

14   Chief Deputy Warden at MCSP, provides no foundation for his broad and vague statement

15   that MCSP is meeting the basic mental health needs of *all* MCSP inmate-patients.

16   **Objection 2**

17       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]**: Mr.

18   Lizarraga has provided no evidence of his qualifications, knowledge, or expertise that

19   would support his finding that all inmate-patients are receiving appropriate treatment and

20   conditions to meet their basic mental health needs.

21       O.    **DECLARATION OF JAMES TELANDER, DOCKET NO. 4480 ("TELANDER**
         **DECL.")**

22

23       1.    **Telander Decl., ¶ 7, 3:17-24**

24   "This [EOP AdSeg treatment space] project is planned for C-Yard to provide

25   Mental Health Services for AdSeg in Building C-12 and C-13 and will be constructed

26   between buildings C-12 and C-13. While the building project has not actually broken

27   ground, the process of having the treatment space building is well underway, with a

28   reported designated project manager. The project was approved in December 2012, interim

59

[767816-1]

1  funding was approved in January 2013, architectural and engineering fees have been

2  negotiated, and (according to Gary Lewis, Project Director III) the contracts are being

3  executed. Schematic design is scheduled to begin in April 2013."

4  **Objection 1**

5       **Lack of Relevance [Fed. R. Evid. 401]:** Dr. Telander's statement about planned

6  EOP AdSeg treatment space addresses hoped-for future conditions, and thus lacks

7  relevance to the present inquiry into current and ongoing – not future and speculative –

8  conditions.

9       **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** To the extent that Dr.

10  Telander's statement is based on a representation from Gary Lewis, it constitutes

11  inadmissible hearsay offered for the truth of the matter asserted.

12           **2.     Telander Decl., ¶ 14, 5:19-21**

13       "Since July 2012, Mule Creek has hired three full time psychologists, two social

14  workers with a third starting April 2, 2013, which has helped to alleviate staff turnover.

15  We have just completed interviewing psychologist interviews and will be filling nine

16  psychologist vacancies."

17  **Objection 1**

18       **Lack of Relevance [Fed. R. Evid. 401]:** To the extent Dr. Telander's statement

19  addresses future hiring and/or arrival of mental health staff, it lacks relevance to the

20  present inquiry into current and ongoing – not future and speculative – conditions.

21           **3.     Telander Decl., ¶ 15, 5:22-6:2**

22       "Dr. Haney discusses the impact of staffing on weekly treatment hours for EOP

23  patients. (Haney Decl. ¶¶ 97, 100-01, and 103.) I am increasing these hours in ways I had

24  not yet identified at the time of the visit. Weekly treatment hours are impacted by staffing

25  shortages. But the detrimental effects of staffing shortages are offset by identifying other

26  ways of providing treatment, accurately recording other types of scheduled treatment, and

27  fully documenting the treatment that is occurring. Specifically, I am filling groups to

28  capacity (13) and looking to provide additional nursing groups."

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

1   **Objection 1**

2        **Lack of Relevance [Fed. R. Evid. 401]**:  Dr. Telander's statement provides no

3   indication of the time period in which EOP treatment hours are being increased – including

4   when his plan to "identify[] other ways of providing treatment" or "look[] to provide

5   additional nursing groups" will come to fruition to actually "offset" the "detrimental

6   effects of staffing shortages" which Dr. Telander identifies.  All that is clear is that these

7   plans to provide more appropriate EOP treatment hours had not been identified or

8   implemented at the time of Plaintiffs' expert's tour, which occurred one month after

9   Defendants filed their motion to terminate.  What Dr. Telander "look[s] to" do or

10  accomplish simply is not relevant.  To the extent Dr. Telander's statement addresses

11  conditions that hopefully will exist in the future, it lacks relevance to the present inquiry

12  into current and ongoing – not future and speculative – conditions.

13                    **4.        Telander Decl., ¶ 16, 6:3-6**

14        "Dr. Haney opines that continued staffing shortages have resulted in problems with

15  mental health supervisor attendance at quality management meetings, tracking custody

16  wellness checks, and pre-placement screenings. (Haney Decl. ¶ 98.) However, even though

17  there continue to be staffing shortages and turnover, these issues have been addressed."

18  **Objection 1**

19        **Lack of Foundation [Fed. R. Evid. 602]**: Dr. Telander concedes that Mule Creek

20  has experienced these staffing-related problems, and that "there continue to be staffing

21  shortages and turnover," and he provides no absolutely no evidence or factual basis for his

22  conclusory statement that "these issues have been addressed."

23                    **5.        Telander Decl., ¶ 23, 8:8-12**

24        "[I]n the majority of cases MCSP provides timely and adequate care.  MCSP can

25  always improve, and we are continuing to work on improvements, but ideal conditions are

26  not required, rather MCSP is required to provide for the basic mental health needs of its

27  inmates.  And MCSP is meeting that requirement."

28

[767816-1]

61

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Dr. Telander provides no foundation for his broad and vague statement that MCSP is meeting the basic mental health needs of *all* MCSP inmate-patients.

**P.    DECLARATION OF RANDOLF GROUNDS, DOCKET NO. 4477 ("GROUNDS DECL.")**

**1.    Grounds Decl, ¶ 4, 3:4-6**

"As Warden, I would never tolerate any of my staff humiliating or demeaning any inmates. If I were to receive information substantiating that any of my staff had acted in this manner, I would take immediate steps to address this issue."

**Objection 1**

**Lack of Relevance [Fed. R. Evid. 401]**: These speculative and conclusory statements concerning what the Warden would do if he "were to receive information substantiating" allegations of improper staff lack relevance to the issue of whether staff mistreat prisoners when not in the presence of the Acting Warden. These statements and policies do not address *existing* staff misconduct that takes place when managers are not present. Accordingly, these statements lack relevance to the present inquiry into current and ongoing – not future and speculative – conditions.

**2.    Grounds Decl., ¶ 4, 3:17-24**

"[A]t SVSP, we have clear policies in place that prohibit staff retaliation against any inmates for any reason. … Cell searches are not completed as retaliation or to discourage an inmate from speaking with any persons …. As Warden, I would never tolerate any of my staff retaliating against any inmates…. If I were to receive information substantiating that any of my staff had acted in this manner, I would take immediate steps to address this issue …."

**Objection 1**

**Lack of Relevance [Fed. R. Evid. 401]**: Again, these speculative and conclusory statements concerning what the Warden would do if he "were to receive information

[767816-1]

substantiating" allegations of improper staff lack relevance to the issue of whether staff retaliate against prisoners.  These statements lack relevance to the present inquiry into current and ongoing – not future and speculative – conditions.

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**:  Acting Warden Grounds has no personal knowledge concerning whether cell searches are completed in retaliation. He does not provide any foundation for his claims about allegedly "clear policies" or what those policies involve.

### 3.    Grounds Decl., ¶ 6, 3:26-4:2

"At SVSP, we also have an inmate appeals system in place through which inmates can bring to our attention any issues that they feel should be addressed.  I hold my staff to high expectations regarding the review and processing of every inmate complaint.  The inmates are aware of this process and utilize it to address any issues that they might have."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: The Warden does not have any personal knowledge of prisoners' awareness of the appeals system or of how willing prisoners are to use that system to address problems they are experiencing.  He provides no foundation at all for these speculative statements.

### Q.    DECLARATION OF M. SCHNEIDER, DOCKET NO. 4471 ("SCHNEIDER DECL.")

#### 1.    Schneider Decl., ¶¶ 7-10

These paragraphs purport to contain reviews of data "generated from the Mental Health Tracking System."  *See* ¶ 7, 3:2-4; ¶ 8, 3:15-17; ¶ 9, 4:5-7; ¶ 10, 4:18-20;

**Objection 1**

**Best Evidence Rule [Fed. R. Evid. 1002]**:  Acting Mental Health Chief Schneider's summaries of data from the Mental Health Tracking System are not summaries of voluminous data, and Dr. Schneider is not a designated expert in this case. The reports themselves should have been attached to her Declaration rather than her unsupported assertions about what those reports say.

[767816-1]

63

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

## 2.    Schneider Decl, ¶ 13, 5:13-16

2    "Dr. Stewart's March 14, 2013 declaration at paragraph 70 notes that tele-

3    psychiatry was scheduled to begin shortly after his visit.  Telepsychiatry services are now

4    being offered on our Level IV SNY Yard (Alpha).  Dr. Gaines officially started on January

5    31, 2013 and is currently seeing 40 inmates per week (8 per day)."

6    **Objection 1**

7        **New Evidence Presented for First Time on Reply.**  Defendants are not permitted

8    to present new evidence concerning events subsequent to the expert tours for the first time

9    on reply, well after the discovery cut-off.  To allow such evidence would prejudice

10   Plaintiffs, whose tours are completed and who cannot conduct additional tours or

11   depositions to test the new evidence.

12

## 3.    Schneider Decl, ¶¶ 19-27

13       These paragraphs describe various training measures and quality improvement team

14   efforts undertaken at SVSP, purportedly to respond to the nine suicides that have occurred

15   at SVSP between December 2011 and January 2013.

16   **Objection 1**

17       **New Evidence Presented for First Time on Reply.**  Defendants are not permitted

18   to present new evidence concerning events subsequent to the expert tours for the first time

19   on reply, well after the discovery cut-off.  To allow such evidence would prejudice

20   Plaintiffs, whose tours are completed and who cannot conduct additional tours or

21   depositions to test the new evidence.

22   **Objection 2**

23       **Lack of Relevance [Fed. R. Evid. 401]:**  In addition to lacking foundation, the

24   statements regarding "planned training at SVSP" (¶ 20, 7:19) and "ongoing training" (¶ 21,

25   7:22, ¶ 22; 7:27) lack relevance to the present inquiry into current and ongoing – not future

26   and speculative – conditions.

27

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**R.    DECLARATION OF DOUGLAS BEATTY, DOCKET NO. 4470 ("BEATTY DECL.")**

**1.    Beatty Decl., ¶ 3, 2:18-19**

"Inmates are never 'stripped naked' pending evaluation" for suicidality.

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Mr. Beatty's testimony that inmates are "never stripped naked" in this manner is overbroad and conclusory and speculative.  Mr. Beatty has no personal knowledge and cites no evidence as to whether or not prisoners are ever stripped naked outside of his presence.

**S.    DECLARATION OF M. ATCHLEY, DOCKET NO. 4466 ("ATCHLEY DECL.")**

**1.    Atchley Decl., ¶ 5, 2:17-18**

"Inmates that express any suicidal ideations are immediately referred for mental health evaluation."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Captain Atchley's testimony that inmates are "immediately referred" when they express suicidal ideation lacks foundation, and is overbroad and conclusory and speculative.  Captain Atchley has no personal knowledge as to whether or not custody officers respond appropriately or "immediately" when prisoners tell them they are suicidal and cites no evidence to support his assertion.

**T.    DECLARATION OF TIM VIRGA, DOCKET NO. 4467 ("VIRGA DECL.")**

**1.    Virga Decl., ¶ 3, 2:3-8**

"Dr. Pablo Stewart, M.D., states that CSP-Sacramento is the 'largest user of punitive suicide watch placements' in CDCR.  CSP-Sacramento does not employ punitive conditions of suicide watch. CSP-Sacramento has a policy of keeping inmate-patients no longer than 4 hours in a holding cell.  A log is kept recording the time of entry and release from the holding cell. The facility captain is contacted if an inmate-patient is kept in a holding cell for more than 4 hours."

[767816-1]

65

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Acting Warden Virga provides no foundation for his vague assertion that CSP-Sacramento does not employ punitive suicide watch conditions. He does not provide any indication that he has personally observed conditions during such watches. He cites no data from the holding cell tracking logs which he references and he provides no evidence of CSP-Sacramento's policies or practices.

**Objection 2**

    **Lack of Relevance [Fed. R. Evid. 401]:** In addition to lacking foundation, these statements of policy are not relevant to or probative of the relevant issues identified by the declaration in Dr. Stewart's testimony – whether or not these policies are punitive, whether or not the policies designed to limit the duration of such placements are being followed, and whether CSP-Sacramento uses such placements more than other prisons.

    **U.**    <u>**Declaration of Shama Chaiken, Docket No. 4476 ("Chaiken Decl.")**</u>

        **1.**    **Chaiken Decl., ¶ 6, 3:4-8**

    "On page 40 of his declaration, Dr. Stewart expresses concern about a clinician's access to up to date, accurate medical records while performing their clinical contacts with patients. Dr. Jackson has access to a laptop that can be used anywhere in the prison with wireless access. He therefore has access to accurate medical records while performing clinical contacts with patients."

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Chaiken does not provide any foundation of personal knowledge for the assertion that Dr. Jackson has access to a laptop that can be used anywhere within the prison. She does not recount any conversations with Dr. Jackson about this subject and does not cite any evidence that the wireless system works "anywhere in the prison." Moreover, she does not explain why Dr. Jackson apparently did not know or did not tell Dr. Stewart about this on the day of the

[767816-1]

66

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    tour, or why he was keeping his own personal copies of key medical records when

2    interviewed on the tour.  (*See* Expert Declaration of Pablo Stewart, M.D. (Docket No.

3    4381) ("Stewart Expert Decl.") ¶ 91.)

4                    **2.    Chaiken Decl., ¶ 8, 3:25-4:5**

5            "Some inmate-patients seek placement into alternative housing for access to

6    inappropriate/sexualized conversations with female staff, thereby reinforcing superficial

7    self injuries and reports of suicidal crises.  Before observers were trained to limit

8    conversation with the inmate-patient, the observers, without extensive training in mental

9    health treatment and the specific inmate-patient treatment plan, inadvertently undermined

10   the treatment plans for inmate-patients and reinforced dangerous, destructive, and

11   disruptive behavior."

12   **Objection 1**

13          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Except to the

14   extent that this paragraph contains admissions that individuals who conduct suicide watch

15   at CSP-Sacramento are not adequately familiar with the treatment plan for the individuals

16   being watched and have not been adequately trained "in mental health treatment," this

17   paragraph should be stricken because it includes no foundation establishing the basis for

18   Dr. Chaiken's knowledge about the alleged cases of individuals seeking placement on

19   suicide watch as an excuse/opportunity to talk to female staff members.

20   **Objection 2**

21          **Best Evidence Rule [Fed. R. Evid. 1002]:**  Presumably, if such cases of

22   individuals seeking suicide watch as a chance to speak with female staff members exist,

23   there are treatment records for these individuals confirming these findings.  Such records

24   would constitute the best evidence that such incidents took place and that the treatment

25   plans for these individuals were undermined as a result.

26                   **3.    Chaiken Decl., ¶ 13, 5:23-6:24**

27          In part, this paragraph states that "[i]n numerous locations throughout his

28   Declaration, Dr. Stewart noted structured activities for EOP inmates on the mainline,

1    Administrative Segregation Unit (ASU) and in PSU were lower than 10 hours per week

2    offered, with attendance levels significantly lower.  Since Dr. Stewart's visit, SAC has

3    made several changes to protocols to ensure that more hours of structured activities are

4    offered and that cancellations due to staff absence are kept to a minimum."  The rest of the

5    paragraph describes these various changes that have taken place since Dr. Stewart visited

6    the prison.

7    **Objection 1**

8         **New Evidence Submitted For First Time With Reply**:  Except to the extent it

9    admits to the problems documented in Dr. Stewart's report with inadequate amounts of

10   structured therapeutic activity being provided to EOP class members in various programs

11   at CSP- Sacramento, this paragraph is objectionable because it concerns recent and future

12   changes in policy allegedly made subsequent to the tour of CSP-Sacramento by Dr.

13   Stewart and the discovery cut-off.

14   **Objection 2**

15        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Dr. Chaiken lists a

16   host of purported changes to treatment protocols, but provides no evidence of any of these

17   changes.  She does not cite documentation reflecting these "several changes," but rather

18   asserts them with no basis in fact or evidence.

19              **4.    Chaiken Decl., ¶ 13, 7:3-12**

20        "On pages 94-95 of his Declaration, Dr. Stewart states that the clinician who

21   responded to the Chief Deputy Warden's request to see Prisoner T in the administrative

22   segregation overflow unit at SAC on July 23, 2012 failed in her clinical duties by failing to

23   conduct a mental status exam, failing to review the inmate's electronic health record,

24   failing to consider whether the inmate required a higher level of care, and failing to

25   consider conducting a suicide risk assessment solely because the inmate was 'not

26   cooperative.'  The clinician psychologist's action on July 23, 2012 was within the standard

27   of care expected of a clinical psychologist and within the requirements of the Mental

28   Health Services Delivery System (MHSDS) Program Guide."

1 **Objection 1**

2      **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Dr.

3 Chaiken has not been designated as an expert and has provided no evidence of her

4 expertise and personal knowledge of the specifics of the suicide of Prisoner T to support

5 her conclusion that the psychologist discussed in this paragraph was within the standard of

6 care in her treatment of Prisoner T.

7 **Objection 2**

8      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Chaiken does

9 not explain how she became familiar with the specifics of the suicide of Prisoner T and

10 does not identify what documents, interviews, or investigations might form the basis for

11 her views with respect to the suicide of Prisoner T.  Her declaration also misrepresents the

12 opinion of Dr. Stewart above, to the extent that it does not disclose that Dr. Stewart's

13 opinion after reviewing the case of Prisoner T was partially based on and in agreement

14 with the CDCR's own internal suicide review of the case as to two of the four areas in

15 which he was critical of the manner in which the case was handled.  (*See* Stewart Report, ¶

16 269, at 94:26-95:12.)

17           **5.    Chaiken Decl., ¶ 15, 8:7-9**

18      "The psychologist did not review the health record of Prisoner T, as it was not

19 common practice to do so for a 'welfare check.'"

20 **Objection 1**

21      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602] and/or**

22 **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:**  Dr. Chaiken does not provide any

23 foundation or personal knowledge for her statement about the reasons why the

24 psychologist in question failed to review the health record of Prisoner T, who took his own

25 life soon thereafter.  If the psychologist in question told Dr. Chaiken that this was the

26 reason, then this material is objectionable as hearsay asserted for the truth of the matter

27 asserted that is not subject to any hearsay exceptions.  If Dr. Chaiken is merely making a

28 general statement concerning common practices in her prison at the time of the suicide last

[767816-1]

69

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

summer, then the statement is an important admission concerning the limited, superficial

nature of "welfare checks" by clinical staff members at the time at CSP-Sacramento, and

concerning the severe potential consequences of those inadequate checks.

**6.      Chaiken Decl., ¶ 18, 9:18-21**

"Based on the review of the psychiatrist on January 30, 2013, Prisoner II was

housed at a level of care adequate to provide for his clinical needs and did not require a

higher level of care while awaiting transfer to ICF."

**Objection 1**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

Dr. Chaiken has not been designated as an expert in this case, and therefore it is improper

for her to provide an expert opinion as to the adequacy of care provided to a prisoner

discussed in Dr. Stewart's expert statement.

**Objection 2**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Chaiken does

not claim to have any personal knowledge or familiarity with Prisoner II.  She does not

provide any foundation as to how she reached her conclusions or upon what data she bases

her assertions.

**7.      Chaiken Decl., ¶ 28, 12:12-19**

"On page 150 of his Declaration, Dr. Stewart stated that Prisoner TT is an example

of the very sick individuals cycling in and out of DSH who fill up scarce CDCR inpatient

beds rather than being in DSH facilities and thus has spent more than two months in the

SAC's MHCB unit at the wrong level of care, experienced additional self-injury, and taken

up needed bed space for other SAC prisoners in need of crisis care.  Prisoner TT currently

remains in a MHCB, but a SAC psychologist is conducting psychological testing to verify

his diagnosis, and will re-refer to DSH if clinically indicated after this is completed."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]; Lack of**

**Relevance [Fed. R. Evid. 401]:** To the extent that this paragraph states that Prisoner TT

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   has spent nearly two *additional* months since Dr. Stewart's evaluation in a crisis bed

2   waiting for a higher level of care after DSH rejected him for treatment, it contains a very

3   troubling admission.  The portion of the statement indicating that a SAC psychologist will

4   re-refer him to DSH if clinically indicated is a speculative statement about future events

5   for which Dr. Chaiken does not and cannot have personal knowledge, because it has not

6   happened yet.  Moreover, such predictions and speculations lack relevance to the present

7   inquiry into current and ongoing – not future – conditions.

8                **8.**    **Chaiken Decl., ¶ 29, 12:20-25**

9        "On pages 122, 144-145, and 153-154 of his Declaration, Dr. Stewart refers to

10  prisoner UU as being returned early from DSH directly to a PSU or ASU EOP and

11  possibly on the wrong medications and was housed in the PSU when Dr. Stewart spoke

12  with him on January 29, 2013.  Prisoner UU was not in the PSU when Dr. Stewart spoke

13  with him as Dr. Stewart's declaration stats [sic], but was housed in SAC's MHCB."

14  **Objection 1**

15       **Mischaracterizes Testimony:**  The first time Prisoner UU is mentioned in Dr.

16  Stewart's declaration at paragraph 347 on page 122, he states that the examples he

17  witnessed of individuals returned directly from DSH to "an EOP Administrative

18  Segregation Unit or PSU unit" included "*Prisoner SS and Prisoner UU, both of whom I*

19  *met in the MHCB unit at CSP-Sacramento, but who had both been returned directly from*

20  *DSH into the PSU, and had both quickly decompensated in the PSU.*"   Dr. Chaiken's

21  statement is accurate to the extent that Dr. Stewart appears to have mistakenly stated in

22  paragraph 408 on page 145 of his declaration that he interviewed Prisoner UU in the PSU

23  unit, rather than the MHCB. However, the mistake is clear from Dr. Stewart's initial

24  introduction and explanation of the case on page 122.  In that more complete description,

25  quoted above, Dr. Stewart makes clear the interview took place in the MHCB and that

26  Prisoner UU was improperly returned directly from the inpatient DSH program to the

27  locked down PSU program, which resulted in rapid decompensation and loss of the

28  benefits achieved in the DSH inpatient program.

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

V.    **DECLARATION OF JOHN SOTO, DOCKET NO. 4451 ("SOTO DECL.")**

1.    **Soto Decl., ¶ 5, 3:5-10**

"As noted above, it is standard operating procedure to remove the inmate from his cell … and perform and unclothed body search to ensure that he has no injuries that require immediate attention and that he does not have anything that he can hurt himself with.  The inmate's clothing is then exchanged for a paper jump suit to decrease the likelihood of providing the inmate cloth that could be used by the inmate to injure him."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**   This paragraph provides no foundation for Mr. Soto's claim as to the standard operating procedure when inmates in the ASU express suicidal ideation.  It also provides no information as to whether that procedure is followed.

W.    **DECLARATION OF CHRISTOPHER CORNELL, DOCKET NO. 4453 ("CORNELL DECL.")**

1.    **Cornell Decl., ¶ 3, 2:7-17**

"In paragraphs 228-235 of his Declaration, Dr. Stewart states that LAC has punitive measures for suicide watch procedures that require an inmate-patient to wait undressed in a holding cell for hours.  (Stewart Expert Decl. ¶ 228-235)  The reality of providing effective care in a correctional setting requires that staff eliminate any possible manner in which a suicidal patient could do harm to himself.  This requires that the patient be placed in an environment free of any and all materials that could be used, fashioned, manipulated or exploited to do harm to himself, until such time that staff determine that the risk has passed.  Staff at LAC makes every effort possible to get a suicidal inmate into the MHCB as quickly as possible.  The safety and security of the patient, staff and facility necessitates that protocols and procedures for safety are adhered to.  For these reasons, CSP-LAC's use of holding cells for inmates who are deemed suicidal is necessary and proper, and is not punitive."

[767816-1]

72

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]: Except to the extent that this paragraph acknowledges and admits that the practice of stripping suicidal prisoners at CSP-Lancaster naked and placing them into a holding cell for hours before moving them to an alternative placement or to the MHCB is accurately described in Dr. Stewart's Declaration, this paragraph should be stricken because it includes lay opinions about a subject matter that is properly the subject of expert opinions. Dr. Cornell has not been designated as an expert in this case – neither for clinical care issues nor for correctional safety and security issues – and therefore it is improper for him to provide an expert opinion either as to the necessity of the procedures followed for safety and security of the institution, or as to their necessity for clinical safety.

**Objection 2**

Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]: Dr. Cornell provides no foundation for his vague statement about staff "mak[ing] every effort possible." Likewise, he provides no evidence for his sweeping claims about "the reality of providing effective care in a correctional setting" or what is "necessary and proper." These conclusions are offered without a shred of evidence to support them.

### 2. Cornell Decl., ¶ 9, 4:16-18 and Vorous Decl. Ex. 5-A

"The deficiencies observed in the provision of ten plus hours of group treatment to ML EOP patients at LAC was a temporary state of affairs. MH program initially agreed to give up space in the Education Department which was being used for group treatment. MH is utilizing space in the Education Department again and is again scheduling all ML EOP inmates into more than ten hours of group treatment per week. Attached as Decl. Vorous Supp. Rely Mot. Terminate, Ex. 5-A is a chart of treatment hours for March 4-March 10, 2013."

**Objection 1**

Improper Presentation of New Evidence with Reply and Past Discovery Cut Off: The paragraph and the cited Exhibit to the Vorous Declaration include new evidence

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  concerning an improvement in mainline EOP treatment hours during a single week, March

2  4-10, 2013, a week that was after the discovery cut-off.  This new evidence is improper

3  because it was submitted for the first time with the reply brief and concerns events which

4  took place after the cut-off for discovery.

5  **3.      Cornell Decl., ¶ 15, 6:28-7:3**

6  "Presently, of the eleven patients that were or are pending transfer at the time of

7  Dr. Stewart's inspection tour, eight of these patients have been transferred to DSH, while

8  three patients remain at LAC.  One of the three patients is housed in MHCB; one is in

9  ASU EOP; and the third is housed in Mainline Sensitive Need Yard EOP."

10  **New Evidence Submitted For First Time with Reply; Lack of Relevance [Fed.**

11  **R. Evid. 401]:**  The statements cited above are admissible to the extent that they contain a

12  significant admission that three of the 11 individuals Dr. Stewart noted were awaiting

13  transfer to DSH inpatient care facilities in the MHCB unit at LAC during his tour there on

14  January 31, 2013 and February 1, 2013 are *still waiting for transfer to inpatient care more*

15  *than six weeks later*.  However, the information that eight of the individuals have

16  transferred to DSH since the tour is objectionable as it does not rebut Dr. Stewart's

17  testimony and contains new evidence submitted for the first time on reply concerning

18  events since the expert tour that may also have taken place after the discovery cut off.

19  Allowing this information to come in at this time would prejudice Plaintiffs, who would be

20  unable to confirm or challenge this information with additional discovery. The fact that

21  these individuals transferred (after long waiting times) is also irrelevant to the issue raised

22  by Dr. Stewart – namely, the heavy use of CDCR MHCBs by individuals waiting for

23  inpatient treatment in DSH programs.

24  **Objection 2**

25  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Cornell cites

26  no central files, medical records, or other documents for his assertion that eight of the

27  individuals Dr. Stewart identified have been transferred.

28  **X.      DECLARATION OF HEATHER GREENWALD, DOCKET NO. 4434**

1    ("**GREENWALD DECL.**")

2           **1.        Greenwald Decl., ¶ 3, 2:7-16**

3           "Dr. Pablo Stewart states on pages 21 and 23 of his declaration filed March 16,

4    2013, that RJD vacancy rate of established positions as of January 2013 was 20.65%.  In

5    February 2013, additional hiring took place.  As of March 2013, the vacancy rate is 15%

6    for established positions including non-clinical positions.  On page 40, paragraph 111 of

7    Dr. Stewart's Declaration, he states that as of January 2013, RJD had a 50% vacancy rate

8    for office technicians, a 28.6% functional vacancy rate for psychiatrists, and a 20%

9    vacancy rate for social workers.  As of March, 2013, nine additional office technicians

10   have been hired, with only two positions currently vacant.  Four psychiatry positions have

11   been filled and contract coverage has been obtained … with the exception of a .5 social

12   worker position.  6 Recreational Therapists have also been hired."

13   **Objection 1**

14          **Best Evidence Rule [Fed. R. Evid. 1002]:**  To the extent that the information

15   concerning current staffing levels at RJD in this paragraph is based on some report or

16   document, then that document itself should be provided rather than Dr. Greenwald's

17   unverified and unsupported assertions about that report.  The absence of data documenting

18   these claims is particularly problematic because Plaintiffs have no opportunity to cross-

19   examine or depose Dr. Greenwald as to her assertions.

20   **Objection 2**

21          **Improper Presentation of New Evidence with Reply and Past Discovery Cut**

22   **Off:**  This paragraph is objectionable and must be stricken because it contains information

23   gathered after the discovery cut-off and presented for the first time on reply.

24          **2.        Greenwald Decl., ¶ 3, 2:17**

25          "We are providing inmates with a constitutional level of care with our current

26   staff."

27   **Objection 1**

28          **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

75

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    Dr. Greenwald has provided no evidence of her qualifications, knowledge, or expertise that

2    would support the conclusion that "we are providing inmates with a constitutional level of

3    care with our current staff."

4    **Objection 2**

5         **Improper Opinion Testimony as to Ultimate Legal Conclusion:**  Dr. Greenwald

6    inappropriately opines as to the legal conclusion that "we are providing inmates with a

7    constitutional level of care."

8    **Objection 3**

9         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Greenwald

10   provides no foundation for this sweeping assertion.  Her conclusions are unsupported by

11   facts, evidence, or even personal observations and are therefore without value.

12              **3.    Greenwald Decl., ¶ 4, 2:23-25 and Vorous Decl. Ex. 7-A**

13        "Subsequent to Dr. Stewart's inspection tour, the current quarter's MAPIP audit

14   demonstrated improvement in a variety of areas including labs, DOT and Medication

15   Administration Record (MAR) documentation.  Attached as Decl. Vorous Supp. Reply

16   Mot. Terminate, Ex. 7-A is the current quarter's MAPIP audit."

17   **Objection 1**

18        **Improper Presentation of New Evidence with Reply and Past Discovery Cut**

19   **Off:**  Except to the extent they contain admissions of ongoing problems, this paragraph

20   and the exhibit to the Vorous Declaration containing MAPIP data for the current quarter

21   are objectionable and must be stricken because they contains information gathered after the

22   discovery cut-off and presented for the first time on reply.  Exhibit 7-A includes significant

23   admissions regarding ongoing medication problems, including the finding that only 50% of

24   patients meeting medication non-compliance criteria were referred to a psychiatrist within

25   the required timeframe.

26              **4.    Greenwald Decl., ¶ 11 and Vorous Decl. Ex. 7-H and 7-I**

27   **Objection 1**

28        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Each of these

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  exhibits is preceded by an unsigned clinical summary of the prisoner's medical records.

2  These are improper and unreliable documents which Dr. Greenwald cannot appropriately

3  rely upon.

4       **5.    Greenwald Decl., ¶ 13, 6:1-6 and Vorous Decl. Ex. 7-J**

5       "RJD EOP offers an average of 14.5 treatment hours on SNY EOP, 12.11 in ML

6  EOP, and 11.83 in ASU EOP.  RJD closely monitors the hours offered to each inmate, the

7  average hours offered to EOP inmates of each program, and the percentage of all EOPs

8  offered 10 hours weekly.  Additionally, in ASU, we are expanding group offering times to

9  include ICC time on Thursday, during which currently no groups are held.  Treatment hour

10  Reports are attached as Decl. Vorous Supp. Reply Mot. Terminate, Ex. 7-J."

11  **Objection 1**

12       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Except to the

13  extent the treatment hour data in the exhibit to the Vorous Declaration actually contains

14  admissions supporting Dr. Stewart's findings regarding the low number of treatment hours

15  actually provided to EOP prisoners at RJD (*see* ¶¶ 327, 367), this paragraph and the exhibit

16  to the Vorous Declaration containing treatment hour reports for the period since Dr.

17  Stewart's tour are objectionable and must be stricken because they contain information

18  gathered after the discovery cut-off and presented for the first time on reply.  To allow

19  them into evidence at this stage of the proceedings would prejudice Plaintiffs who cannot

20  test the data through additional discovery and depositions.

21       **Lack of Relevance [Fed. R. Evid. 401]:** Dr. Greenwald states that "we *are*

22  *expanding* group offering times" to include times "during which *currently* no groups are

23  held."  The relevant inquiry is into *current* conditions.  Planned changes to those

24  conditions lack relevance and should not be considered.

25       **Y.    DECLARATION OF DANIEL PARAMO, DOCKET NO. 4432 ("PARAMO DECL.")**

26

27       **1.    Paramo Decl., ¶ 4 and Exhibit 7-N to Vorous Decl.**

28       "In Dr. Stewart's Declaration on page 87, he refers to the CDCR Suicide Report

77

1  dated June 23, 2012 of inmate patient P, stating that there were 'very serious problems'

2  with welfare checks on B Yard, housing unit 6.  RJD custody audits the welfare check

3  documentation monthly and reports that information to the Mental Health Quality

4  Management.  Attached as Attached [sic] as Decl. Vorous Supp. Reply Mot. Terminate,

5  Ex. 7-N is a copy of the Mental Health ASU Custody Wellness Checks for Buildings B

6  yard 6 and B yard 7 at RJD for the months of July 2012-December 2012.  These audits

7  select a random set of 29-31 welfare check sheets for a given month.  For building 6, the

8  audits showed that checks were done every 30 minutes 87% to 94% of the time depending

9  upon the month.  For Building 7, the audits showed that checks were being done 90% to

10  95% of the time depending on the month."

11  **Objection 1**

12      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  This paragraph

13  and the exhibit to the Vorous Declaration containing audit data are objectionable and must

14  be stricken because they contain information gathered after the discovery cut-off and

15  presented for the first time on reply.

16                    **2.    Paramo Decl., ¶ 6, 2:28-3:2**

17      "Placing an inmate-patient in ASU when they have a safety concern is consistent

18  with state policy. Custody staff and Mental Health work together to monitor an inmate-

19  patient's functioning in ASU."

20  **Objection 1**

21      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Mr. Paramo

22  provides absolutely no support or foundation for these assertions.  He does not cite *which*

23  state policy he is referring to or what that policy requires.  He also provides no evidence,

24  examples, or observations in support of the claim that "[c]ustody and Mental Health work

25  together to monitor" patients in the ASU.

26

27

28

1

**Z.    DECLARATION OF KEVIN CHAPPELL, DOCKET NO. 4437 ("CHAPPELL DECL.")**

2

**1.    Chappell Decl., ¶ 7, 4:12-14**

3

4

"However, the amount of space and confidentiality currently given to inmates is not

5

only adequate, but above constitutionally required levels."

**Objection 1**

6

7

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**  Mr.

8

Chappell has not been designated an expert in this case and has provided no evidence of

9

his qualifications, knowledge, or expertise that would support the conclusion that "the

10

amount of space and confidentiality currently given to inmates is not only adequate, but

above constitutionally required levels."

11

12

**2.    Chappell Decl., ¶ 4, 2:20-25**

13

"[I]nmates in the [Specialized Care for the Condemned Program] initially will be

14

seen at the Institutional Classification Committee usually within 10 days of arrival to the

15

program.  This addresses any safety and security concerns, yard designation, and the

16

opportunity to participate in the group setting therapy…"

17

Objection 1

18

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Mr. Chappell

19

offers no foundation or data to support his multiple vague and sweeping statements.  He

20

cites no evidence about how long it takes for inmates to be seen at the ICC, instead

21

generalizing that it is "usually" within 10 days. Moreover, he concludes without any

22

evidence that the ICC addresses *any* safety and security concerns, as well as various other

issues.  This claim is buttressed by no evidence or explanation.

23

**AA.    DECLARATION OF ELLEN BACHMAN, DOCKET NO. 4443 ("BACHMAN DECL.")**

24

25

**1.    Overall Bachman Decl.**

26

**Objection 1**

27

**Lack of Relevance [Fed. R. Evid. 401]; Improper and Untimely Reply**

28

**Evidence:**  Ms. Bachman, Executive Director of the Vacaville Psychiatric Program

79

1  ("VPP") for DSH, presents new evidence concerning DSH's VPP program – a topic that

2  was not addressed by defendants' in their initial moving papers or by their experts, who

3  were asked not to inspect the VPP by defense counsel.  Plaintiffs' experts did not inspect

4  the VPP either.  In addition, Ms. Bachman's Declaration provides irrelevant information

5  concerning conditions after the close of discovery, in March 2013.  To allow such evidence

6  would prejudice Plaintiffs, whose tours are completed and who cannot conduct additional

7  tours or depositions to test the new evidence.

8  **2.    Bachman Decl., ¶ 3, 2:15-28 and ¶ 10, 4:12-16**

9  Data concerning weekly admissions, discharges and referrals and wait list from

10  February 18, 2013 through March 20, 2013.

11  **Objection 1**

12  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Bachman

13  lacks personal knowledge as to the facts asserted.  She provides no foundation and cites no

14  source for the data in these paragraphs.

15  **3.    Bachman Decl., ¶ 6, 3:11-12**

16  "[T]he Court has acknowledged that 10 days is a reasonable period for a referred

17  patient to be evaluated and placed in our program."

18  **Objection 1**

19  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  While

20  Defendants' transfer time lines for acute care are included within the Program Guides,

21  Ms. Bachman lacks foundation or personal knowledge for her contention that the Court has

22  found 10 days "reasonable."

23  **4.    Bachman Decl., ¶ 8, 3:21-4:2**

24  Description of future intended operations of the VPP and specifically the L-2 Unit,

25  including where patients "will be" transferred and that beds "will open up" (¶ 8:22, 25).

26  **Objection 1**

27  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Bachman

28  lacks personal knowledge of the matters asserted and provides no basis for her

80

[767816-1]

1  speculations about future operations of the VPP.

2  **Objection 2**

3      **Lack of Relevance [Fed. R. Evid. 401]**: In addition to lacking foundation, these

4  statements lack relevance to the present inquiry into current and ongoing – not future and

5  speculative – conditions.

6              **5.    Bachman Decl., ¶ 9, 4:3-7**

7      "In order to expedite this process, we have worked closely with the California

8  Department of Public Health (CDPH) Licensing and Certification Branch on a request for

9  program flexibility.  CDPH has approved this request, which will allow us to transfer

10  patients between Acute and ICF units without closing the medical record and re-opening a

11  new record, in essence avoiding a full discharge and admission process."

12  **Objection 1**

13      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Bachman

14  lacks foundation, does not establish personal knowledge, and provides no documentation

15  in support of the contention that a licensing waiver was, in fact, granted.

16  **Objection 2**

17      **Best Evidence Rule [Fed. R. Evid. 1002]:**  If CDPH approved a request for

18  program flexibility, documentation of that approval would presumably have been

19  generated and should be provided.

20  **Objection 3**

21      **Lack of Relevance [Fed. R. Evid. 401]**:  In addition to lacking foundation,

22  statements about plans that will purportedly allow for faster transfers at some undefined

23  point in the future lack relevance to the present inquiry into current and ongoing – not

24  future and speculative – conditions.

25              **6.    Bachman Decl. ¶¶ 10-12, 4:12-5:1**

26      Description of "triage process" operation, including statements as to what is

27  "absolutely necessary to ensure patient care" (¶ 11, 4:18).

28

**Objection 1**

      **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**
Ms. Bachman has not been designated as an expert and is not qualified to offer an opinion concerning the quality of patient care or the merits of the VPP program including her opinion that the "triage process is absolutely necessary to ensure patient care."

**Objection 2**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Bachman provides no foundation for her opinions or personal knowledge of the triage process.  She also provides no evidence that the process in fact operates in the manner she describes.

      **7.    Bachman Decl., ¶ 13, 5:2-5**

    "Moreover, all patients pending placement still receive psychiatric treatment, and the majority of patients currently pending acute placement are being treated at Department of Corrections and Rehabilitation MHCB facilities.  Of the individuals currently pending acute placement, only two are in EOP units."

**Objection 1**

      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Bachman has no personal knowledge and establishes no foundation for her statements concerning whether or not prisoners in CDCR on the APP waitlist are receiving psychiatric care or where they are located.

      **8.    Bachman Decl., ¶¶ 14-15, 5:7-19**

    Description of the DSH discharge process and statement that "[c]linicians are not pressured to prematurely discharge patients from DSH" (¶ 15, 5:19).

**Objection 1**

      **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**
Ms. Bachman has not been designated as an expert and is not qualified to offer an opinion concerning either the quality of patient care or the merits of the VPP program including that "discharges are based on appropriate clinical rationale" (¶ 14, 5:8) and are "clinically appropriate" (¶ 14, 5:13).

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    **Objection 2**

2        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Bachman

3    provides no foundation for her opinions or personal knowledge of the operation of the

4    discharge process or that it, in fact, operates in the manner that she describes.  She has no

5    personal knowledge or foundation to support her speculation that "[c]linicians are not

6    pressured to prematurely discharge patients from DSH."  (¶ 15, 5:19.)

7                    **9.        Bachman Decl., ¶¶ 16-17, 5:16-17**

8        "VPP is not experiencing a shortage of clinical staff" (5:21).  Discussion of staffing

9    data and vacancy rates.

10   **Objection 1**

11       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Ms.

12   Bachman has not been designated as an expert and is not qualified to offer an opinion

13   concerning the quality of patient care or the merits of the VPP program including whether

14   it is "experiencing a shortage of clinical staff" (¶ 16, 5:21) or that VPP has "the actual

15   number of staff needed to meet licensing minimums" (¶ 17, 6:3) or that "we have

16   appropriate levels of staffing coverage with the existing number of medical technical

17   assistants" (¶ 17, 6:8-9).

18   **Objection 2**

19       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Bachman

20   does not provide any foundation for her opinions or personal knowledge of the actual

21   staffing levels, the actual number of clinicians hired, her knowledge of licensing standards,

22   the manner in which DSH publishes vacancy rates, or the recruiting and retention process

23   for clinicians at VPP.  She has no personal knowledge or foundation to support her

24   speculations that "an additional contract psychiatrist…is expected to join our staff within

25   the next month" (¶ 16, 5:22-24) and that "we anticipate hiring additional psychiatric

26   technicians" (¶ 16, 6:9-10).

27   **Objection 3**

28       **Lack of Relevance [Fed. R. Evid. 401]:** In addition to lacking foundation,

1  statements about plans for future hiring lack relevance to the present inquiry into current

2  and ongoing – not future and speculative – conditions.

3  **BB.  DECLARATION OF CHARLES DASILVA, DOCKET NO. 4442 ("DASILVA DECL.")**

4  **1.    Overall DaSilva Declaration**

5  **Objection 1**

6  **Lack of Relevance [Fed. R. Evid. 401]; Improper and Untimely Reply**

7  **Evidence:**  Mr. DaSilva, Executive Director of the Salinas Valley Psychiatric Program

8  ("SVPP") for DSH, presents new evidence concerning DSH's SVPP program – a topic that

9  was not addressed by defendants' in their initial moving papers, or by their experts, who

10  were asked not to inspect the SVPP by defense counsel.  In addition, Mr. DaSilva's

11  declaration provides irrelevant information concerning conditions after the close of

12  discovery, in March 2013.  To allow such evidence would prejudice Plaintiffs, whose tours

13  are completed and who cannot conduct additional tours or depositions to test the new

14  evidence.

15  **2.    DaSilva Decl., ¶¶ 2-8, 2:5-3:14**

16  Description of SVPP program and staffing:

17  •    "SVPP provides a robust and multifaceted treatment program." (¶ 2, 2:5-6).

18  •    "The IDTT…seeks to address the totality of patients' mental health needs."
    (¶ 3, 2:11-12).

19  •    "The mental health services provided by the IDTT go beyond basic
    psychiatric assessments and medication management…." (¶ 4, 2:14-15).

20  •    "Fifteen clinical social workers and thirteen psychologists diligently meet
    with patients…Upwards of two-hundred medical technical assistants and
    over fifty registered nurses provide direct and immediate daily care of the
    patients and consistently work with the patients on nursing and care needs…
    Eighteen rehabilitation therapists provide programming…" (¶ 5, 2:20-24).

•    "Group therapies are provided at upwards of ten hours per week per

[767816-1]

1   patient….yard and dayroom time, which is provided at a minimum of four

2   hours per day per patient" (¶ 6, 2:25-28).

3   •   "The IDTT approach has led to numerous positive results for our

4   patients…This is just one example, out of many, that demonstrates the

5   totality of care provided by all staff members at SVPP" (¶ 8, 3:8-14).

6   **Objection 1**

7   **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**  Mr.

8   DaSilva has not been designated as an expert and is not qualified to offer an opinion

9   concerning the quality of patient care or the merits of the SVPP program including whether

10  it provides a "robust and multifaceted treatment program…." (¶ 2, 2:5-6) or "seeks to

11  address the totality of patients' mental health needs" (¶ 3, 2:11-12), or "go[es] beyond

12  basic psychiatric assessments and medication management…" (¶ 4, 2:14-15).  He is not

13  qualified to opine that the approach used has "led to numerous positive results" and

14  "demonstrates the totality of care provided by all staff members at SVPP" (¶ 8, 3:8-14).

15  **Objection 2**

16  **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Mr. DaSilva does

17  not provide any foundation for his opinions or establish his personal knowledge of the

18  actual staffing levels, the actual number of clinicians hired, the hours of group treatment

19  and yard provided, the success or failure of the treatment program.  He also fails to explain

20  what time period or documentation he is relying on or testifying about.

21  **3.    DaSilva Decl., ¶¶ 9-15, 3:15-5:5**

22  Description of psychiatric staffing and clinical staffing levels and quality of care,

23  including the following claims:

24  •   "Despite recent fluctuations in the psychiatric staffing level at SVPP, the

25  IDTT approach allowed SVPP to maintain the quality of mental health care"

26  (¶ 9, 3:16).

27  •   "Comprehensive mental health treatment and services were consistently

28  provided…and there have been no staffing shortages in other disciplines…."

[767816-1]

85

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1          (¶ 9, 3:16-18).

2     •    "[T]here is presently no shortage of clinical staff at SVPP." (¶ 14, 4:27-28).

3   **Objection 1**

4          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Mr. DaSilva has

5   no personal knowledge and provides no foundation for his opinions and testimony

6   concerning the actual staffing levels, the actual number of clinicians hired, his statements

7   concerning DSH "leadership," his knowledge of licensing and credentialing standards (¶

8   11, 4:7-9), or DSH's recruiting tactics (¶ 13, 4:14-26). Nor does he provide a foundation

9   or establish personal knowledge for the speculative assertion that there are "eight doctors

10  willing to work additional appointments at SVPP" and that they "have already begun the

11  process for credentialing" and "will work on modified schedules…" (¶ 13, 4:22-25).

12  **Objection 2**

13         **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Mr.

14  DaSilva has not been designated as an expert and is not qualified to offer an opinion

15  concerning the quality of patient care or the merits of the SVPP program including whether

16  it has experienced or is experiencing a shortage of clinical staff or psychiatrists.

17  **Objection 3**

18         **Lack of Relevance [Fed. R. Evid. 401]:** To the extent that Mr. DaSilva opines on

19  the *intent* of a psychiatrist to "return to SVPP in May 2013" (¶ 11, 4:3-4) and various plans

20  to increase staffing at an undetermined point in the future, his testimony lacks relevance to

21  current and ongoing conditions.

22              **4.    DaSilva Decl., ¶ 15, 5:1-5**

23         "I have no doubt that the interdisciplinary team approach will continue to succeed at

24  SVPP and I will continue to work diligently to ensure that quality team members for all

25  disciplines are recruited and retained at SVPP. While fluctuations in staffing are often

26  unavoidable, we have always worked to maintain adequate staffing levels and provide a

27  high level of quality patient care."

28

[767816-1]

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   **Objection 1**

2       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Mr. DaSilva has

3   no personal knowledge and provides no foundation for this speculative testimony about

4   future events.

5   **Objection 2**

6       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702:** Mr.

7   DaSilva has not been designated as an expert and is not qualified to offer an opinion

8   concerning the quality of patient care or the merits of the SVPP program including whether

9   it has experienced or is experiencing a shortage of clinical staff or psychiatrists or will in

10  the future be able to maintain staffing levels or provide quality care.

11      CC.   <u>DECLARATION OF KATHRYN RADTKEY-GAITHER, DOCKET NO. 4441</u>
            <u>("RADTKEY-GAITHER DECL.")</u>

12

13          **1.     Overall Radtkey-Gaither Decl.**

    **Objection 1**
14

15          **Lack of Relevance [Fed. R. Evid. 401]; Improper and Untimely Reply**

    **Evidence:** Ms. Radtkey-Gaither, Chief Deputy Director of the Department of State
16
    Hospitals ("DSH"), presents new evidence concerning DSH's SVPP and VPP programs –
17
    topics that was not addressed by defendants' in their initial moving papers or by their
18
    experts, who were asked not to inspect the SVPP or VPP by defense counsel.   In addition,
19
    Ms. Radtkey-Gaither's Declaration includes irrelevant information concerning conditions
20
    after the close of discovery, in March 2013.  To allow such evidence would prejudice
21
    Plaintiffs, whose tours are completed and who cannot conduct additional tours or
22
    depositions to test the new evidence.
23
            **2.     Radtkey-Gaither Decl., ¶ 3, 2:11-13**
24
            "DSH has been aggressively recruiting psychiatrists for the SVPP and VPP
25
    facilities to maintain our high level of patient care and has been actively addressing any
26
    and all staffing issues that arise."
27

28

1 **Objection 1**

2   **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Radtkey-

3 Gaither provides no foundation for and cites no evidence for her assertion that DSH is

4 "aggressively recruiting psychiatrists" or for the sweeping claim that DSH is "actively

5 addressing *any and all* staffing issues that arise." No evidentiary basis is provided for

6 these conclusory assertions.

7   **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Ms.

8 Radtkey-Gaither has not been designated as an expert and is not qualified to offer an

9 opinion concerning the quality of patient care in the VPP and SVPP programs.

10     **3.  Radtkey-Gaither Decl., ¶ 4, 3:4-11**

11   "In June of 2012, the DSH medical director personally called all psychiatrists on the

12 civil service priority list to encourage their transfer to SVPP.… Furthermore, eight doctors

13 are willing to work additional appointments at SVPP … These psychiatrists are in the

14 process of credentialing with CDCR and SVPP."

15 **Objection 1**

16   **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Radtkey-

17 Gaither provides no foundation and cites no basis in personal knowledge to support these

18 statements. She does not state how she knows who the DSH medical director called or

19 what the eight doctors "are willing" to do. She cites no evidence of any process of

20 credentialing.

21 **Objection 2**

22   **Lack of Relevance [Fed. R. Evid. 401]:** In addition to lacking any indicia of

23 reliability, Ms. Radtkey-Gaither's statements about individuals who are "willing to work"

24 at some point in the future and credentials that are purportedly "in the process" of being

25 issued simply lack relevance to the present inquiry into current and ongoing conditions.

26     **4.  Radtkey-Gaither Decl., ¶¶ 5-7, 3:20-5:6**

27   Discussion of SVPP psychiatrist staffing shortage, staffing ratios, quality of care,

28 and "appropriate staffing levels."

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 1**

　　**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Radtkey-Gaither provides no basis for any knowledge of the SVPP or VPP programs, standards, or staffing levels.  She does not even state that she has ever visited SVPP or VPP. She has established no foundation or personal knowledge of appropriate staffing levels, licensing requirements, quality of patient care, or actual hiring decisions.  She also provides no foundation for her characterizations of "normal" or "appropriate staffing" or "staffing levels that minimized negative impacts, if any at all, on patient care." (¶ 5, 3:24-25)

**Objection 2**

　　**Lack of Relevance [Fed. R. Evid. 401]:** To the extent that these unsupported statements relate to speculation about the future – such as statements that "the Chief Psychiatrist *will  be* carrying a patient case load" or that SVPP "*will be* in full compliance with a medically appropriate staffing ration" "for the foreseeable future" (¶ 5, 5:2-6) – simply lack relevance to the present inquiry into current conditions.

## 5.　　Radtkey-Gaither Decl., ¶ 8, 5:12-18

　　"Priority for admissions is given to highest risk patients, such as those that have attempted suicide or have expressed suicidal ideation…. Further, these eight patients have exceeded the ten day processing period partly because of medical decisions to immediately admit other high risk patients who were referred more recently.  And regardless of processing status, all patients awaiting admission continue to receive ongoing psychiatric care at CDCR facilities."

**Objection 1**

　　**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Ms. Radtkey-Gaither has no personal knowledge and establishes no foundation for her statements concerning whether or not prisoners in CDCR on the APP waitlist are receiving ongoing psychiatric care or where they are located.  She also lacks personal knowledge and provides no foundation for her testimony concerning the number of patients on the wait list, how long they have been there, or how the wait list has been managed.

1

**6.      Radtkey-Gaither Decl., ¶ 10, 5:27-6:1**

2      "DSH will reduce the current number of inmate-patients housed at SVPP by

3   transferring eligible inmate-patients to Correctional Health Care Facility (CHCF) in

4   Stockton when the facility begins accepting inmate-patients …"

5   **Objection 1**

6      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Radtkey-

7   Gaither has no personal knowledge and establishes no foundation for her speculative

8   statements about what DSH will do in the future.

9   **Objection 2**

10      **Lack of Relevance [Fed. R. Evid. 401]:** Speculative statements about events Ms.

11  Radtkey-Gaither expects to happen in the future not only lack reliability, but also lack

12  relevance to the present inquiry into current and ongoing conditions.

13

**7.      Radtkey-Gaither Decl., ¶ 11, 6:12-16**

14      DSH's Chief Information Officer ("CIO") "informed me that Dr. Brim never

15  activated his [eUHR] account.  If any clinician believes that he or she is unable to access

16  these electronic records, it is most likely the clinician forgot the training, or the assigned

17  user name and password.… If reported to the appropriate Information Technology support

18  staff, the issue is promptly resolved."

19  **Objection 1**

20      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** These statements

21  lack any foundation whatsoever.  They include speculation as to possible reasons for other

22  people's actions and mere conjecture about what happens if reports are made to the

23  Information Technology support staff.

24  **Objection 2**

25      **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** Ms. Radtkey-Gaither's

26  statements about what the CIO informed her about Dr. Brim's eUHR account are hearsay

27  offered for the truth of the matter asserted.

28

1      **8.      Radtkey-Gaither Decl., ¶¶ 11-12, 6:17-20**

2      "Records scanned into the eUHR consist of the current volume of the paper-based

3    Unit Health Record. This does not include all historical records of past treatment. But the

4    prior volumes of the Unit health Record are available upon request through the CDCR

5    medical records department."

6    **Objection 1**

7      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Radtkey-

8    Gaither has no personal knowledge and establishes no foundation for characterizations of

9    what the eUHR contains.  Moreover, she does not state how she knows that prior volumes

10   of the UHR are "available upon request" or if those volumes are actually provided when

11   requested by a clinician.

12     **9.      Radtkey-Gaither Decl., ¶¶ 13-14, 6:22-7:5**

13     "DSH has not restricted patient allocations for clothing or laundry. Plaintiffs have

14   alleged 'severe shortages' of clean clothes, bedding, and coats for patients-that supply

15   shortages are further evidence of impending 'shutdowns.' These allegations are false.…

16   Clothing theft by inmates working in these facilities has been an ongoing issue both in

17   DSH and CDCR institutions. DSH and CDCR continue to work to resolve these issues.…

18   VPP and CMF health care and custody managers and Standards Compliance Coordinators

19   recently completed an extensive performance improvement process addressing the clothing

20   and linen shortages. As a result of this effort, systems changes were implemented and the

21   VPP units are receiving appropriate levels of clothing and linens."

22   **Objection 1.**

23     **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Radtkey-

24   Gaither has no personal knowledge and establishes no foundation for her testimony

25   concerning the shortage of clean clothing, bedding, coats at SVPP and VPP for patients.

26   She also establishes no foundation and cites no evidence for her assertion regarding a

27   "performance improvement process" or "system changes" that allegedly have been

28   implemented as a result.

1

2

## DD. DECLARATION OF KATHERINE WARBURTON, DOCKET NO. 4444 ("WARBURTON DECL.")

3

### 1. Overall Warburton Decl.

4

**Objection 1**

5

**Lack of Relevance [Fed. R. Evid. 401]; Improper and Untimely Reply**

6

**Evidence:** Dr. Warburton, Acting Medical Director and Deputy Director of the

7

Department of State Hospitals ("DSH"), presents new evidence concerning DSH's ASH

8

Program – a topic that was not addressed by Defendants' in their initial moving papers, or

9

by their experts, who were asked not to inspect the DSH programs by defense counsel.   In

10

addition, Dr. Warburton's Declaration purports to be an additional expert declaration on

11

behalf of Defendants by a witness who was not so designated and whose deposition cannot

12

be taken.  To allow such evidence would prejudice Plaintiffs, who cannot conduct

13

additional tours or depositions to test the new evidence and the opinions of this new expert.

**Objection 2**

14

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]; Lack of**

15

**Personal Knowledge/Foundation [Fed. R. Evid. 602]; Inadmissible Hearsay [Fed. R.**

16

**Evid. 801(c), 802]:**  Dr. Warburton has not been designated as an expert and is not

17

qualified to offer an opinion concerning the quality of patient care or the circumstances of

18

a recently discharged ASH patient who subsequently committed suicide upon return to

19

CDCR.  She has not established her qualifications in evaluating the circumstances of a

20

suicide.  Moreover, she has not established any personal knowledge or foundation for her

21

evaluation of the care at ASH and whether the discharge of this patient was premature.

22

She makes no mention of any basis for knowledge or familiarity with the ASH programs,

23

standards, staffing, and the pressure that ASH psychiatrists have been under to discharge

24

CDCR patients. She does not even claim to have reviewed the patient's medical records

25

and relies upon an undescribed "brief" conversation with Dr. Thomas Cahill, whose

26

statements to her would be hearsay improperly presented for the truth of the matter

27

asserted.

28

[767816-1]

92

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    **EE.    DECLARATION OF T. FELTON, DOCKET NO. 4456 ("FELTON DECL.")**

2    **1.    Overall Objection to Felton Decl.**

3    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

4    **Evid. 401]** Defendants are not permitted to present new evidence concerning events that

5    occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

6    the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

7    completed and who cannot conduct additional tours or depositions to test the new

8    evidence.  The Felton Declaration concerns conditions at Pleasant Valley State Prison, a

9    prison which Plaintiffs and their experts did not tour.

10    **2.    Felton Decl., ¶ 9, 3:17-21**

11    "To ensure continuity of care, inmates arrive at Pleasant Valley with their original

12    medication-administrative records and direct-observation therapy medications.  For

13    instance, new arrivals now arrive at Pleasant Valley with their healthcare transfer forms

14    (CDC 7371), which provide thorough summaries of their healthcare histories."

15    **Objection 1**

16    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** SRN Felton

17    provides no foundation for the broad and unqualified statement that inmates arriving at

18    Pleasant Valley have their original medication-administrative records, their direct-

19    observation mediations, and their healthcare transfer forms in their possession. Felton

20    provides no records which would support the assertion that *all* inmates arriving at PVSP

21    have these records, forms, and medications with them.

22    **Objection 2**

23    **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**  SRN

24    Felton has not been designated as an expert in this case, and therefore it is not proper for

25    Felton to provide an expert opinion that the screening process at Pleasant Valley State

26    Prison "ensures continuity of care."

27    **3.    Felton Decl., ¶ 12, 4:6-12**

28    "Additionally, the nursing staff audits the medication-administration process

monthly to ensure that inmates transferred to Pleasant Valley with their medications, that staff reordered their medications within eight hours of arrival, and that inmates received their medications within twenty-four hours. We are currently operating at 100% or near 100% compliance with this self-implemented procedure. If the nursing staff uncovers any defect in the process, the supervisors will address the issue with staff, propose remedies to help prevent reoccurrence, and provide further training on the issue."

**Objection 1**

Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]: SRN Felton provides no evidentiary support for the statements that PVSP is currently operating at 100% or near 100% compliance with their self-implemented procedure for medication administration. No data is cited and no documentation is provided to support these figures. Moreover, Felton offers no support for his assertion about what steps nursing staff takes if they "uncover[] any defect in the process" and how (or if) supervisors "address the issue with staff."

**Objection 2**

Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]. SRN Felton has not been designated as an expert in this case, and it is improper to provide an expert opinion as to the nature and adequacy of the medication administration process at PVSP.

FF.    DECLARATION OF J. KEITH, DOCKET NO. 4455 ("KEITH DECL.")

1.    Overall Objection to Keith Decl.

New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R. Evid. 401]: Defendants are not permitted to present new evidence concerning events that occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after the discovery cut-off. To allow such evidence would prejudice Plaintiffs, whose tours are completed and who cannot conduct additional tours or depositions to test the new evidence. The Keith Declaration concerns conditions at Pleasant Valley State Prison, a prison which was not toured by Plaintiffs and their experts.

1      ## 2.      Keith Decl., ¶ 6, 2:22-25

2      "Since the formation of the Emergency Medical Response Review Committee, I

3      have seen significant improvements in the staff's ability to respond to medical

4      emergencies.  These improvements have saved lives and reduced injuries to inmate-

5      patients."

6      **Objection 1**

7      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** RN Keith

8      provides no evidentiary support for the broad, conclusory statement that the formation of

9      the EMRRC has improved staff's ability to respond to medical emergencies and "saved

10     lives" and "reduced injuries" to inmates.  This is a sweeping conclusion offered wholly

11     without support.

12     **Objection 2**

13     **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702].** RN

14     Keith has not been designated as an expert in this case, and it is improper to provide an

15     expert opinion as to the adequacy and impact of the Emergency Response Review

16     Committee at PVSP on the loss of life or reduction of injuries to inmate-patients.

17     ## 3.      Keith Decl., ¶ 11, 3:18-20

18     "The nursing department has taken significant remedial steps to prevent a repeat of

19     the mistakes made in inmate H's case.  We are hard on ourselves because we want to do

20     the best job possible in every emergency.  Above all, we care about our inmate-patients."

21     **Objection 1**

22     **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Keith provides no

23     evidence to support the claim that "significant remedial steps" have been taken.  Keith

24     offers no foundation for the knowledge about whether other people are "hard on

25     [them]selves" or "care about inmate-patients" "above all."  These is mere speculation and

26     generalization with no basis in evidence or personal knowledge.

27     **Objection 2**

28     **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** To the extent that RN Keith

1   describes communications between the nursing about the suicide of inmate H, emergency

2   response concerns, and their concerns for inmate-patients, the statement constitutes

3   inadmissible hearsay that does not fall within any exception to the hearsay rule.

4   **GG.  DECLARATION OF F. IGBINOSA, DOCKET NO. 4454 ("IGBINOSA DECL.")**

5   **1.   Overall Objection to the Igbinosa Decl.**

6   **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.

7   Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

8   occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

9   the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

10  completed and who cannot conduct additional tours or depositions to test the new

11  evidence.   The Igbinosa Declaration concerns condition at Pleasant Valley State Prison,

12  which was not one of the prisons toured by Plaintiffs and their experts.

13  **2.   Igbinosa Decl., ¶ 5, 2:13-18**

14       "Pleasant Valley has a pain-management program that (1) standardizes the

15  treatment of chronic pain, (2) ensures that inmates are receiving appropriate treatment for

16  chronic pain, and (3) discourages the misuse, abuse, and trafficking of pain medications.

17  The prison monitors the administration of pain medications carefully because inmates have

18  misused pain medications to commit, among other things, suicide."

19  **Objection 1**

20       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** These broad

21  assertions about the purported effects of the pain-management program wholly lack

22  support in evidence or personal knowledge.  Igbinosa offers sweeping conclusions about

23  the effect of the program without citing a shred of data to support the claims.

24  **Objection 2**

25       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** CME

26  Igbinosa has not been designated as an expert in this case, and it is improper to provide an

27  expert opinion as to effects of the pain-management program at PVSP.

28

[767816-1]

96

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1      **3.      Igbinosa Decl., ¶ 6, 2:19-28**

2          "The pain management program improves quality of care and promotes patient

3      safety by: (a) reducing the wide variation in pain-medication prescriptions for chronic

4      pain; (b) minimizing the risk of drug abuse and trafficking – misuses that often lead to

5      morbidity, hospitalization, and death; (c) improving compliance with prescribing and

6      documentation requirements; and (d) reducing the workload on pharmacy, nursing, and

7      medical staff resource-intensive dispensing and administering requirements."

8      **Objection 1**

9          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  CME Igbinosa

10     does not provide sufficient evidence that he/she has personal knowledge that PVSP's pain-

11     management program has improved quality of care and promoted patient safety through

12     the means listed. Moreover, if the program has an observable impact, Igbinosa should cite

13     evidence or data supporting these broad claims.

14     **HH.   DECLARATION OF C. SHYTLE, DOCKET NO. 4475 ("SHYTLE DECL.")**

15     **1.      Shytle Decl., ¶ 2, 1:27-2:2**

16         "At Salinas Valley, a licensed psychiatric technician (PT) performs a daily health

17     and welfare check (ASU rounds) on every inmate/patient (I/P) that is currently housed in

18     an Administrative Segregation Unit (ASU).  This check is completed one time per day, 365

19     days per year."

20     **Objection 1**

21         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** SRN Shytle

22     testifies to the provision of daily psych tech rounding at SVSP one time per day, 365 days

23     per year without providing sufficient evidence or any basis in personal knowledge.  The

24     testimony is extremely broad and unqualified, and also vague as to timeframe.

25     **2.      Shytle Decl., ¶¶ 3-10, 2:4-3:15**

26         The cited paragraphs describe the psych tech rounding and documenting process,

27     including the statement that "[a]t all times communication between the I/P, custody staff,

28     clinical staff, and the PT is constant and continual." (¶ 7, 2:26-27).

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1 **Objection 1**

2       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** SRN Shytle

3 testifies in paragraphs 3 through 10 to the procedures that are supposed to be followed in

4 all of the ASUs by the psychiatric technicians, but fails to provide any evidence of his or

5 her personal knowledge of what occurs in all of the ASUs and whether the psychiatric

6 technicians are in fact complying with the procedures in SVSP's ASUs.  Broad statements

7 about "constant and continual" communication "at all times" are asserted without support

8 or qualification.

9     **II.**     **DECLARATION OF J. CARD, DOCKET NO. 4465 ("CARD DECL.")**

10     **1.**     **Card Decl., ¶ 2, 2:5-6**

11     "The meeting [SPR-FIT] includes knowledgeable attendees who can make

12 important decisions and implement strategies.  Discussions at this level are invaluable and

13 essential to suicide prevention."

14 **Objection 1**

15       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Card provides

16 no evidence to support the claims about which "knowledgeable attendees" are present

17 meetings and whether these meetings are "invaluable" or "essential."

18 **Objection 2**

19       **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Dr.

20 Card has not been designated as an expert in this case, and it is improper for Dr. Card to

21 offer an opinion about whether the SVSP SPR-FIT meetings are an invaluable and

22 essential element of suicide prevention.

23     **2.**     **Card Decl., ¶ 6, 3:1-4**

24     "The SPR-FIT minutes are brought to the Mental Health Sub-Committee meeting

25 on a quarterly schedule.  At that time, the minutes are reviewed and discussed with the

26 sub-committee members.  Problem areas are discussed and problem solving occurs.  Sub-

27 committee meeting minutes are then forward up the chain."

28

1  **Objection 1**

2        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Card provides

3  no evidentiary support for the vague and broad statements regarding the review of the

4  SPR-FIT minutes, the nature of any discussions regarding problem areas and what, if any,

5  "problem-solving occurs." Furthermore, Dr. Card's vague statement concerning the

6  forwarding of the Sub-Committee meeting minutes "up the chain" is unsupported by

7  evidence or personal knowledge.

8        **JJ.    DECLARATION OF E. FORCE, DOCKET NO. 4469 ("FORCE DECL.")**

9             **1.    Overall Objection to Force Decl.**

10       **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

11  **Evid. 401]:** Defendants are not permitted to present evidence in a new area for the first

12  time on reply, well after the discovery cut-off. To allow such evidence would prejudice

13  Plaintiffs, who cannot conduct depositions to test the new evidence.

14       **KK.    DECLARATION OF RICK HILL, DOCKET NO. 4461 ("HILL DECL.")**

15  **1.    Overall Objection to Hill Decl.**

16       **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

17  **Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

18  occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

19  the discovery cut-off. To allow such evidence would prejudice Plaintiffs, whose tours are

20  completed and who cannot conduct additional tours or depositions to test the new

21  evidence. The Hill Declaration concerns conditions at Folsom State Prison, a prison that

22  Plaintiffs and their experts did not tour.

23       **2.    Hill Decl., ¶ 4, 2:16-23**

24       "I am aware that, in our ASU at FSP, officers conduct welfare checks of all inmates

25  during the first 21 days of their admission to this unit. Our officers conduct these checks

26  24 hours per day at staggered intervals no greater than 30 minutes apart and then document

27  the times on our ASU welfare check logs. The Sergeant on each watch reviews the logs

28  once per watch, or three times daily, to ensure both that checks are correctly completed

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   and appropriately documented.  If the Sergeants were to find evidence of incorrectly

2   completed or improperly documented welfare checks during a review, they would provide

3   immediate on-the-job training to the officer responsible so that our ASU unit can best

4   maintain the accuracy and effectiveness of the ASU welfare checks."

5   **Objection 1**

6          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Mr. Hill provides

7   no evidentiary support for the broad statements contained in this paragraph, including that

8   all inmates in the FSP ASU are provided with staggered 30 minute welfare checks during

9   the first 21 days of their admission, and that all of the Sergeants on each watch review the

10  30 minute welfare check logs.  Moreover, Mr. Hill's testimony as to what Sergeants

11  "would" do if they "were to" identify problems with welfare checks is pure speculation.

12  Mr. Hill provides no evidence that Sergeants have ever actually identified problems or

13  addressed them.

14          **3.      Hill Decl., ¶ 8, 3:17-2**

15         Discussing ASU "daily coordination meetings . . . between ASU Sergeant and

16  ASU-designated psychologists" and concluding that "[i]ncreasing communication can

17  often uncover additional information about the inmate that assists the clinical staff in

18  developing their treatment strategies."

19  **Objection 1**

20          **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Mr. Hill provides

21  no evidentiary support or personal knowledge to support his claims about what happens at

22  meetings between ASU Sergeants and psychologists. He does not state even that he has

23  attended one of these meetings about which he offers broad characterizations.  Moreover,

24  Mr. Hill is a prison warden and does not explain any basis upon which he concludes that

25  "increasing communication can often … assist[] the clinical staff in developing their

26  treatment strategies."

27

28

[767816-1]

100
PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

LL.  **DECLARATION OF MEG CHO, DOCKET NO. 4463 ("CHO DECL.")**

1.  **Overall Objection to Cho Decl.**

**New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R. Evid. 401]:** Defendants are not permitted to present new evidence concerning events that occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are completed and who cannot conduct additional tours or depositions to test the new evidence.  The Cho Declaration concerns conditions at Folsom State Prison, a prison that Plaintiffs and their experts did not tour.

2.  **Cho Decl., ¶ 7, 2:21-27**

"Approximately five months ago, in response to a recent inmate suicide case in which the inmate was discontinued from his pain medications by his treating physician, CEO Mr. Jonathan Copley recommended that the psychiatrists attend the weekly Medical Provider Meeting.  Therefore, I assigned all psychiatrists to attend the weekly Medical Provider meetings.  These meetings are attended by the Chief Medical Executive, all the Physicians and Surgeons, all the Nurse Practitioners, all the Staff Psychiatrists, and the Senior Psychiatrists.  In these meetings, they discuss difficult inmate cases that have both medical and psychiatric issues."

**Objection 1**

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Cho provides no evidentiary support for her unqualified statements regarding the attendance of doctors, psychiatrists, and nurse practitioners at weekly Medical Provider meetings.  She cites no attendance logs or meeting agendas to support her assertions as to attendance and topics of discussions at these meetings.

**Objection 2**

**Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** To the extent that Dr. Cho describes a statement made by CEO Mr. Jonathan Copley recommending that psychiatrists attend the weekly Medical Provider meeting, it constitutes inadmissible hearsay that does

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  not fall within any exception to the hearsay rule.

2        **4.**     **Cho Decl., ¶ 9, 3:8-9**

3       "These meetings [ASU IDTTs] are attended by the ASU MH Supervisor, the ASU

4  Primary Clinicians, the ASU Psychiatrists, the LPTs and the Correctional Counselor

5  (CCI)."

6  **Objection 1**

7       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Cho provides

8  no evidentiary support that she has personal knowledge regarding the  types of staff who

9  are attending the ASU IDTTs.

10       **5.**     **Cho Decl., ¶ 13, 3:25-4:5**

11      "In addition, beginning approximately eight years ago, FSP Mental Health Program

12 has held between eight and thirteen therapy groups per week. Although we are not required

13 to hold this many weekly therapy groups, we have this many weekly therapy groups

14 because I am interested in providing mental health treatment to the inmates and because

15 we have the clinical staff to provide this many therapy groups. These therapy groups are

16 facilitated by the staff psychologists and the staff social workers. All staff psychologists

17 and all staff social workers (including ASU clinicians) are assigned to facilitate these

18 Mainline therapy groups. We do not have ASU therapy groups because there is no group

19 space."

20 **Objection 1**

21      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** To the extent that

22 this statement is not an admission that FSP is prevented from offering therapy to its ASU

23 patients on account of space limitations, the testimony lacks foundation and personal

24 knowledge.  Dr. Cho does not cite or attach any evidence of the number of groups offered

25 or by whom they are led.

26       **6.**     **Cho Decl., ¶¶ 15-19**

27      Paragraphs 15 through 19 contain assertions by Dr. Cho regarding the number of

28 walk-in referrals per work day, CDCR 602 Medical Appeals per month, and mental health

---

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

caseloads and staffing allocations over various periods of time.  None of the underlying

data is provided.

**Objection 1**

     **Best Evidence Rule [Fed. R. Evid. 1002]**: Dr. Cho's summaries of walk-in

referrals, CDCR 602 Medical Appeals per month, and staffing and caseload population

figures are offered in support of conclusions about care, and Dr. Cho is not a designated

expert in this case.  The underlying data that she relies upon should have been attached to

her Declaration.

**Objection 2**

     **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Dr. Cho

has not been designated as an expert in this case and it is improper for her to offer her

opinion about the satisfaction of prisoners with mental health care at Folsom ("This

indicates that the inmates are satisfied with Mental Health Care at FSP, ¶ 16:21-22) or

about the appropriateness of staffing levels at FSP ("we are currently overstaffed", ¶

19:13).

    **MM.**   **DECLARATION OF DIANE O'LAUGHLIN, DOCKET NO. 4462
("O'LAUGHLIN DECL.")**

      **1.**     **Overall Objection to O'Laughlin Decl.**

    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.
Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

completed and who cannot conduct additional tours or depositions to test the new

evidence.  The O'Laughlin Declaration concerns conditions at Folsom State Prison, a

prison that Plaintiffs and their experts did not tour.

      **2.**     **O'Laughlin Decl., ¶ 8, 4:4-7**

    "My EMRCC and I take our emergency response very seriously at FSP.  The level

of self-monitoring, analysis and implementation of training and process improvement

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  strategies is intense during the EMRCC meetings.  Each department is held to a very high

2  standard by the other departments."

3  **Objection 1**

4       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. O'Laughlin

5  provides no evidentiary support for these broad statements.  She does not state how she

6  knows whether other people take emergency response "very seriously."  She provides no

7  basis for the claim that self-monitoring and analysis "is intense."

8  **Objection 2**

9       **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** To the extent that Ms.

10  O'Laughlin is relying on statements by members of the EMRCC during meetings or

11  statements from other departments, it constitutes inadmissible hearsay that does not fall

12  within any exception to the hearsay rule.

13       **3.    O'Laughlin Decl., ¶ 11, 5: 3-7**

14       "Contrary to allegations in the pending lawsuit, the EMMRC at FSP is not

15  indifferent to the mentally ill and to suicide.  The EMMRC members and I take every

16  response and every death very seriously.  We are not without mistakes, but we intensely

17  endeavor to improve our skills with every review.  We hold ourselves to a very high level

18  of accountability in doing the right thing for our patients."

19  **Objection 1**

20       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Again, Ms.

21  O'Laughlin provides no evidentiary support for these broad statements.  She does not state

22  how she knows whether other people take "every response and every death" "very

23  seriously."  She provides no basis for the claim that others hold themselves "to a very high

24  level of accountability."

25  **Objection 2**

26       **Improper Opinion Testimony as to Ultimate Legal Conclusion:** Ms. O'Laughlin

27  inappropriately opines as to the EEMRC's lack of deliberate indifference to the mentally

28  ill and suicide.

104

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    **NN.    DECLARATION OF K. CENTER, DOCKET NO. 4457 ("CENTER DECL.")**

2         **1.    Overall Objection to Center Decl.**

3         **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

4    **Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

5    occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

6    the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

7    completed and who cannot conduct additional tours or depositions to test the new

8    evidence. The Center Declaration concerns conditions at Pleasant Valley State Prison, a

9    prison that Plaintiffs and their experts did not tour.

10         **2.    Center Decl., ¶ 3. 2:7-9**

11         "Each correctional sergeant from the second and third watches meets with the

12    mental-health staff daily to discuss matters relating to the psychiatric needs of inmates in

13    Administrative Segregation Unit 2."

14    **Objection 1**

15         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**  K. Center, who is

16    a second-watch sergeant, provides no evidentiary support for his statements concerning the

17    activities conducted by each correctional sergeant who works during second and third

18    watches in the ASU 2 at PVSP.  This is mere speculation.

19         **3.    Center Decl., ¶ 6: 21-28**

20         "A floor officer conducts a welfare check on inmates who are in the Welfare Check

21    Program every thirty minutes for twenty-one consecutive days for inmates housed in

22    administrative segregation.  Unless there is an emergency or something unusual, a welfare

23    check takes precedent over any other matter.  We average about 54 welfare checks a day,

24    which comes out to about 1,620 welfare checks a month.  For the past nine months,

25    according to our records, we conducted about 14,580 checks, and of those, only ten were

26    untimely.  Percentage-wise, the on-time rate is nearly perfect."

27    **Objection 1**

28         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** K. Center, who is

1  a second-watch sergeant, provides no evidentiary support for his statement concerning the

2  activities conducted by correctional staff during watches when he is not working in ASU.

3  Moreover, no data is attached to support any of his assertions.

4        **4.**     **Center Decl., ¶ 9, 3:22-23**

5      "Based on my training and experience, inmates know that officers are vulnerable

6  during a medical emergency because they are distracted by the emergency at hand.

7  Accordingly, inmates have staged medical emergencies with the intent to kill or assault

8  officers."

9  **Objection 1**

10      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  It is unclear *how*

11  Sgt. Center's training and experience support his conclusion about staged emergencies.

12  Moreover, no evidence is cited about *any* incident of staged emergency.

13  **Objection 2**

14      **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** To the extent, Sgt. Center

15  relies on statements by inmates to draw his conclusion, it is inadmissible as hearsay

16  offered for the truth of the matter asserted.

17        **5.**     **Center Decl., ¶ 10, 3:24-25**

18      "During second and third watches, emergency responders respond very quickly,

19  usually under a minute, because of the high availability of staff members in the building."

20  **Objection 1**

21      **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  K. Center, who is

22  a second-watch sergeant, provides no evidentiary support for his statements about third

23  watch when he is not working.  With regard to his statement regarding second watch

24  emergency responders, Sgt. Center provides no evidentiary basis for the statement that

25  second responders usually respond in under a minute.  He also cites no evidence to support

26  his assertion that there is a "high availability" of staff members in the building, either

27  during his own shifts or on other shifts, during which he is not present.

28

**PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS**

1

### 6. Center Decl., ¶ 11

This paragraph consists of a personal example told by Sgt. Center involving a prisoner housed in ASU.

**Objection 1**

**Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** These statements include a series of hearsay statements by the prisoner, which are offered for the truth of the matter, and for the purpose of illustrating how ASU staff are responsive and caring. These statements by the prisoner constitute

hearsay that does not fall within any exception to the hearsay rule.

### OO. DECLARATION OF ROBERT MCMAHON, DOCKET NO. 4464 ("MCMAHON DECL.")

#### 1. Overall Objection to McMahon Decl.

**New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R. Evid. 401]:** Defendants are not permitted to present new evidence concerning events that occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after the discovery cut-off. To allow such evidence would prejudice Plaintiffs, whose tours are completed and who cannot conduct additional tours or depositions to test the new evidence. The McMahon Declaration concerns conditions at Folsom State Prison, a prison that Plaintiffs and their experts did not tour.

### PP. DECLARATION OF CHERYL PAIZIS, DOCKET NO. 4460 ("PAIZIS DECL.")

#### 1. Overall Objection to Paizis Decl.

**New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R. Evid. 401]:** Defendants are not permitted to present new evidence concerning events that occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after the discovery cut-off. To allow such evidence would prejudice Plaintiffs, whose tours are completed and who cannot conduct additional tours or depositions to test the new evidence. The Paizis Declaration concerns conditions at Folsom State Prison, a prison that Plaintiffs and their experts did not tour.

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    **QQ.    DECLARATION OF J. BUCKLEY, DOCKET NO. 4450 ("BUCKLEY DECL.")**

2    **1.    Overall Objection to Buckley Decl.**

3    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

4    **Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

5    occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

6    the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

7    completed and who cannot conduct additional tours or depositions to test the new

8    evidence. The Buckley Declaration concerns conditions at Pleasant Valley State Prison, a

9    prison which Plaintiffs and their experts did not tour.

10    **2.    Buckley Decl., ¶¶ 6-13 (responding to Special Master's review of PVSP suicides)**

11    **Objection 1**

12    **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

13    Associate Warden Buckley has not been designated as an expert in this case for review of

14    emergency response in suicide cases and has provided no evidence of qualifications,

15    knowledge or expertise that would support conclusions made in the declaration that

16    emergency response in each suicide was timely and custody checks were adequate.

17    **Objection 2**

18    **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]:** Paragraph 8 includes testimony

19    regarding why two officers must be present to open a cell door in a general population

20    housing unit; it includes comments from an inmate who reportedly confessed a plan to kill

21    a responding officer.  *Id.* at 3:13-14.  The statement by the inmate is offered for the truth of

22    the matter asserted, and as hearsay is inadmissible.

23    **RR.    DECLARATION OF G. HOFFMAN, DOCKET NO. 4452 ("HOFFMAN DECL.")**

24    **1.    Overall Objection to Hoffman Decl.**

25    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

26    **Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

27    occurred at prisons not visited by Plaintiffs' experts for the first time on reply, well after

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

[767816-1]

1  the discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

2  completed and who cannot conduct additional tours or depositions to test the new

3  evidence. The Hoffman Declaration concerns conditions at Pleasant Valley State Prison, a

4  prison which Plaintiffs and their experts did not tour.

5              **2.      Hoffman Decl., ¶ 6, 2:20-26**

6              "The prison records show that Pleasant Valley offers a high level of mental health

7  services to the largest CCCMS program in CDCR.  We have an active, engaged, and

8  productive clinical and administrative-support staff.  We enjoy outstanding collaboration

9  with staff in other institutional healthcare departments and custody.  We have an evolving

10 quality-management structure that uses this collaboration to solve process problems in real

11 time.  Much is accomplished which lowers the likelihood of suicide."

12 **Objection 1**

13             **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Dr.

14 Hoffman has not been designated as an expert in this case and provides no evidence of his

15 qualifications, knowledge or expertise that would support his conclusions that PVSP offers

16 a high level of mental health care, that there is outstanding collaboration among staff, and

17 that these accomplishments lowers the likelihood of suicide.

18             **3.      Hoffman Decl., ¶ 14, 4:3-6**

19             "Since 1998, when the crisis bed unit first opened, no inmate-patient who has

20 committed suicide on Pleasant Valley grounds after receiving care and treatment here [sic].

21 Our inpatient crisis bed program is successful because of the coordinated efforts between

22 the mental health, medical, nursing, and custody staff to provide the best care possible.

23 **Objection 1**

24             **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Hoffman

25 provides no evidentiary foundation for his statement that since 1998 none of the PVSP

26 suicides involved a prisoner who had received treatment in the MHCB.  Nor does he

27 provide any foundation for the statement that this shows the success of PVSP's MHCB

28 program and that this success is the result of coordinated efforts by mental health, medical,

1  nursing and custody staff.  The data supporting his statement that none of the PVSP

2  suicides since 1998 involved a prisoner who had been admitted to the MHCB should have

3  been attached to his Declaration.

4      **4.    Hoffman Decl. Response to Special Master's Criticisms
        Concerning Pleasant Valley's Purported Failures to Prevent
5        Suicides, ¶¶ 26-52**

6      Dr. Hoffman discusses the suicides of Inmate A on January 1, 2011; Inmate K on

7  April 1, 2011; Inmate X on October 9, 2011; Inmate G on May 15, 2012; and Inmate H on

8  May 16, 2012.

9  **Objection 1**

10     **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:**

11  Dr. Hoffman has not been designated as a suicide expert in this case and provides no

12  evidence of his qualifications, knowledge or expertise that would support his conclusions

13  about the five suicides that were reviewed by the Special Master in the reports filed with

14  the Court, and with which Dr. Hoffman disagrees throughout his declaration.

15  **Objection 2**

16     **Lack of Relevance [Fed. R. Evid. 401]:**  Dr. Hoffman repeatedly includes in his

17  critique of the Special Master statements about changes that have been made since the

18  2011 suicides, a fact which is irrelevant to the suicides that occurred in prior years.

19  **SS.    DECLARATION OF KATHLEEN ALLISON, DOCKET NO. 4478 ("ALLISON
        DECL.")**

20

21     **1.    Overall Objection to Allison Decl. and attached Exhibits A-F**

     **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.
22
     Evid. 401]:** Defendants are not permitted to present new evidence concerning events that

23  occurred at prisons or in CDCR Headquarters for the first time on reply, well after the

24  discovery cut-off.  To allow such evidence would prejudice Plaintiffs, whose tours are

25  completed and who cannot conduct additional tours or depositions to test the new

26  evidence.  In addition to making new claims – often based on evidence generated in the

27  day or two before Defendants' reply brief was filed – the Allison Declaration attaches six

28  exhibits, which were not provided to Plaintiffs before the date of the reply.

[767816-1]

## 2. Allison Decl., ¶ 4, 3:8-12

"CDCR is able to successfully prevent suicides throughout the state through timely and professional clinical intervention but also through good communication and observation by custodial staff.  Attached as Exhibit A is a report reflecting that CDCR successfully prevented 347 attempted suicides between January 1, 2012 , and December 31, 2012."

**Objection 1**

**New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R. Evid. 401]:** This evidence, which is purportedly a list of prisoners who attempted suicide in 2012, is new evidence presented to Plaintiffs for the first time on reply and should be excluded.

**Objection 2**

**Inadmissible Hearsay [Fed. R. Evid. 801(c),802]:** Exhibit A, which is described as a "report reflecting that CDCR successfully prevented 347 attempted suicides between January 1, 2012, and December 31, 2012," has no identifying information on it and is no way authenticated.

## 3. Allison Decl., ¶ 7, 3:27-4:1

"CDCR has now sought a bid to acquire electronic monitoring devices and/or a system consisting of an electronic recording device to digitally record the Correctional Officers check times at all pre-assigned individual cell locations."

**Objection 1**

**Lack of Relevance [Fed. R. Evid. 401]:** The statement that CDCR has "sought a bid to acquire" electronic monitoring devices and/or a system for 30-Minute welfare checks lacks relevance to the present inquiry into current and ongoing – not future and speculative – conditions. There is no indication when or if such devices will actually be installed and in effect.

**Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Allison has provided no evidence supporting the claim that CDCR has "sought a bid to acquire" electronic monitoring devices.  She neither attaches nor cites documentation regarding the purported bid.

[767816-1]

111

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

## 4.     Allison Decl., ¶ 8, 4:7-18, & Exhibit B

2      "In the interim, while the contract is being sought, CDCR has taken steps to ensure

3   that welfare checks are completed as originally intended by the 2006 directives to the field.

4   In order to clarify any confusion in the field, CDCR has authored a joint signature

5   memorandum from the Director of Adult Institutions and the Director of Health Care

6   Services titled 'Revised Alternative Segregation Unit Welfare Check Procedure and

7   Implementation of Security Inspections in Specialized Housing.' A copy of the

8   memorandum is attached as Exhibit B. This memorandum instructs staff that the welfare

9   checks on inmates are to be completed in a staggered and unpredictable way. Notably, it

10   further instructs staff that three welfare checks per hour should be completed at staggered

11   intervals not to exceed 30 minutes. Moreover, the memorandum directs staff that welfare

12   checks for inmates in administrative segregation may continue beyond 21 days when

13   deemed clinically appropriate. The memo has not yet been released to the field pending

    union notification."

14   **Objection 1**

15      **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

16   **Evid. 401]:** Exhibit B, the joint memo signed by the Director of DAI and the Director of

17   Health Care Services, dated March 20, 2013, is new evidence provided to Plaintiffs for the

18   first time on Reply. The memorandum does not address the constitutional violations and

19   harms related to this problem, as detailed in Plaintiffs' opposition brief (Docket No. 4422

20   at 62-64), and indicates a continuation of Defendants' failure to meet well established and

21   accepted national minimum standards.

22   **Objection 2**

23      **Lack of Relevance [Fed. R. Evid. 401]:** Ms. Allison clearly states that the

24   memorandum – generated two days before Defendants' reply brief was due – has "not

25   been released to the field." A plan to release a memo "pending union notification" at

26   some point in the future is not relevant to the present inquiry into current and ongoing –

    not future and speculative – conditions.

27

28

112

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

**5.    Allison Decl., ¶ 9, 4:20-23, & Exhibit C**

2

"In order to facilitate better monitoring of inmates in the ASU, CDCR has also

3

issued a memorandum to the field as of March 20, 2013, titled "Administrative

4

Segregation Unit Requirements Regarding Clustering and Entertainment Appliances."

5

This memorandum is attached as Exhibit C."

6

**Objection 1**

7

**New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

8

**Evid. 401]:** Exhibit C, the March 20, 2013 memo signed by Kathleen Dickinson, is new

9

evidence provided to Plaintiffs for the first time on Reply.

**Objection 2**

10

**Lack of Relevance [Fed. R. Evid. 401]:**  This memorandum directing institutions

11

to implement clustering of mental health prisoners in intake cells in ASUs and permit them

12

to have entertainment devices is another plan for *future implementation* (captured in a

13

memorandum signed two days before the reply).  As such, Exhibit C and testimony about

14

the exhibit lacks relevance to the present inquiry into current and ongoing – not future and

15

speculative – conditions.

16

**6.    Allison Decl., ¶ 10, 5:3-4**

17

"In addition to the above, my team is reviewing all possible options for

18

entertainment devices in ASU cells, such as windup or battery operated entertainment

19

appliances.  It is our goal to authorize entertainment devices for all inmates in the ASU."

20

**Objection 1**

21

**Lack of Relevance [Fed. R. Evid. 401]:** Again, this statement about future goals

22

for ASU prisoners lacks relevance to the present inquiry into current and ongoing – not

23

future and speculative – conditions.

24

**7.    Allison Decl., ¶ 13, 5:23-26**

25

"As a result of increased monitoring of these cases, coupled with numerous training

26

sessions provided to the institutions, between December 2011 and April 2012 the list

27

decreased from 185 inmates to zero inmates on the EOP ASU Hub waitlist.  At the present

28

time, no inmates pending EOP ASU Hub placement have been waiting beyond program

1  guide timelines."

2  **Objection 1**

3       **Lack of Foundation [Fed. R. Evid. 602]; Best Evidence Rule [Fed. R. Evid.**

4  **1002]:** Ms. Allison provides no foundation for the statement that at the present time there

5  are no prisoners pending transfer to the EOP ASU Hubs longer than Program Guide

6  transfer timelines.  To the extent Ms. Allison is relying on data, the data itself (rather than

7  her assertions of its existence) constitutes the best evidence and should have been attached

8  to her declaration as an Exhibit.

       **8.      Allison Decl., ¶ 15, 6:9-12, & Exhibit D**

9       "As an additional accomplishment of this workgroup, on March 21, 2013, CDCR

10  issued a memorandum regarding casework expectations, classification time frames, and the

11  Psychiatric and Return policy for Department of State Hospitals Acute and Intermediate

12  Facility Inmate-Patients.  A copy of that policy is attached here as Exhibit D."

13  **Objection 1**

14       **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed. R.**

15  **Evid. 401]:** Exhibit D, a joint memo signed by the Director of DAI and the Director of

16  Health Care Services, dated March 21, 2013, is new evidence provided to Plaintiffs for the

17  first time on Reply.  This new policy memo about time frames for classification, and psych

18  and return policies for CDCR prisoners treated in DSH facilities lacks relevance to the

19  present inquiry into current and ongoing – not future and speculative – conditions.  The

20  declaration does not clarify what "issued" means with regard to Exhibit D, which is dated

21  March 21, 2013, the day before Defendants' Reply was filed.

       **9.      Allison Decl., ¶ 17, & Exhibit E**

22  **Objection 1**

23

24       **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed., R.**

25  **Evid. 401]:** Paragraph 17 of the Allison Declaration discusses officer training, including

26  CPR training.  Exhibit E is referenced, with no explanation about the exhibit, where it

27  came from, who provided the data, and how it was created.  Exhibit E is new evidence

28  provided to Plaintiffs for the first time on reply.

[767816-1]

114

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

**Objection 2**

    **Inadmissible Hearsay [Fed. R. Evid. 801(c), 802]**  Exhibit E, which is not described in the declaration, has a CDCR heading on it, but it is unclear whether this document was created during the ordinary course of business or created for the reply declaration.  As such, and since it has not been properly authenticated, Exhibit E should be excluded as hearsay.

          **10.**    **Allison Decl., ¶ 19, 7:15-18**

    "CDCR previously issued a policy memo requiring first responders, including custody staff, to perform life saving measures and this has been fully implemented."

**Objection 1**

    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Ms. Allison provides no foundation for this bold assertion that CDCR's first responder policy has been fully implemented.

          **11.**    **Allison Decl., ¶ 20, 7:25-26, & Exhibit F**

    "We have data demonstrating that discipline was taken a number of times throughout the state in both 2011 and 2012. (See Exhibit F.)"

**Objection 1**

    **New Evidence Presented for First Time on Reply; Lack of Relevance [Fed., R. Evid. 401]:** Paragraph 20 of the Allison Declaration discusses use of force and employee discipline, with a reference to Exhibit F.  Exhibit F is new evidence provided to Plaintiffs for the first time on reply.

**Objection 2**

    **Inadmissible Hearsay [Fed. R. Evid. 801(c),802]/Best Evidence  Rule [Fed. R. Evid. 1002]** The Allison Declaration places a reference to Exhibit F in the text with no explanation as to how and when it was created, what data was used, and what the various categories on the chart reference.  The underlying data, used to create this chart, should have been attached to her declaration.  Exhibit F has not been properly authenticated and should be excluded as inadmissible hearsay.

TT.   **DECLARATION OF PATRICK R. MCKINNEY, DOCKET NO. 4491 ("MCKINNEY DECL.")**

1.   **Exhibit 12, Dvoskin, "Response to Dr. Patterson's Report on Suicides Completed in the CDCR in January 1, 2012-June 30, 2012"**

**Objection 1**

**New Evidence Presented for First Time on Reply:** Defendants are not permitted to present new evidence to Plaintiffs for the first time on reply, well after the discovery cut-off. To allow such evidence would prejudice Plaintiffs, whose tours are completed and who cannot conduct additional tours or depositions to test the new evidence.

UU.   **DECLARATION OF ERIC MONTHEI, 436 ("MONTHEI DECL.")**

1.   **Monthei Decl., ¶ 4, 2:24-3:4**

"Regarding Dr. Stewart's referenced Prisoner E, Dr. Stewart opines that this prisoner was 'prematurely discharged' from the Administrative Segregation Unit. . . . Dr. Stewart fails to acknowledge that this inmate was discharged from DSH, not San Quentin, so this point is moot." (citations omitted)

**Objection 1**

**Misstates Testimony:** Dr. Stewart's testimony in paragraph 166 (which is on page 58 of his declaration, not page 65) clearly states that "Prisoner E reported that he was only allowed to stay in the acute DSH program at California Medical Facility for eight days before being returned to San Quentin." Dr. Stewart did not allege that prisoner E was discharged from the ASU – he alleged what Dr. Monthei confirms, that he was discharged from DSH.

2.   **Monthei Decl., ¶ 4, 3:4-6**

"In regards to Dr. Stewart's opinion about not receiving a specific medication due to possible secondary gains, medications are prescribed by psychiatrists at San Quentin when clinically indicated."

**Objection 1**

**Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Mr.

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  Monthei has provided no evidence of his qualifications, knowledge, or expertise that
2  would support this overbroad, conclusory statement.

3  **Objection 2**

4     **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**   Mr. Monthei
5  does not establish and almost certainly does not have the requisite personal knowledge to
6  support this broad, sweeping, conclusory statement.

7     **3.    Monthei Decl., ¶ 7, 5:25-27; ¶ 8, 6:15-16 ; ¶ 9, 7:1-3; ¶ 10, 7:19-
8          21; ¶ 11, 8:16-17; ¶ 13, 9:5-7.**

9     Paragraphs 7-13 of Dr. Monthei's Declaration summarize treatment records for
10  various prisoners whom Dr. Stewart evaluated during his tour of San Quentin State Prison.
11  Many or most of the records that Dr. Monthei summarizes in these paragraphs actually
12  provide support for Dr. Stewarts' findings in his Declaration.  However, these paragraphs
13  also include a number of sweeping, conclusory statements, apparently based on a record
14  review alone, as to the appropriateness of care being provided to these individuals.

15  **Objection 1**

16     **Lack of Personal Knowledge/Foundation [Fed R. Evid. 702] and Best Evidence
17  Rule [Fed R. Evid. 1002]:** Dr. Monthei does not purport to be the treating clinician for
18  any of the patients about whom he opines.  His sweeping assertions are not supported by
19  the evidence in the record or by any adequate foundation. .

20     **4.    Monthei Decl., ¶ 10 at 7:8-9, 7:12-13, and 7:16-17;  ¶ 11 at 8:14-
21          15**

22     In the cited locations, Dr. Monthei refers to Exhibits 9-I, 9-J, and 9-L, "Specialized
23  Care for the Condemned Reports" for three inmates prepared on March 16, 2013.

24  **Objection 1**

25     **New Evidence Presented for First Time on Reply**.  Defendants are not permitted
26  to present new evidence created subsequent to the discovery cut-off for the first time on
27  Reply.  To allow such evidence would prejudice Plaintiffs, whose tours are completed and
28  who cannot conduct additional tours or depositions to test the new evidence.

[767816-1]

117

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1

### 5.   Monthei Decl., ¶ 14, 9:22-24 and 10:2-3

2     "At this time San Quentin is staffed adequately to serve the mental health needs of

3 the prisoners housed there."

4     "Despite all this, inmates at San Quentin are still receiving above minimum

5 required care at this time."

6 **Objection 1**

7     **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]**: Dr.

8 Monthei has not been designated as an expert in this case.  These overbroad, conclusory

9 statements regarding staffing levels at San Quentin and the adequacy of the treatment

10 provided must be stricken as improper lay testimony concerning an expert issue.

11

### 6.   Monthei Decl., ¶ 16, 10:15-20

12     "Ms. Woodford states that 'North Segregation inmates are not provided with regular

13 monitoring of their mental health status by either custody [or] mental health staff.'

14 (Woodford Decl., ¶ 22.) This is untrue. Of several required treatment activities is daily

15 Psychiatric Technician contacts for condemned EOP patients, as well as Grade B CCCMS

16 patients, wherever they may be housed."

17 **Objection 1**

18     **Lack of Relevance [Fed. R. Evid. 401]**: As also stated in ¶ 22 of Ms. Woodford's

19 declaration, "there are no MHSDS inmates housed in North Segregation."  (Expert

20 Declaration of Jeanne Woodford, Docket No. 4380 ("Woodford Expert Decl.").)

21 Therefore, Dr. Monthei's assertion about psychiatric technician contacts for EOP and

22 CCCMS patients is irrelevant to the truth of Ms. Woodford's observation that North

23 Segregation inmates do not receive regular mental health monitoring.

24

### 7.   Monthei Decl., ¶ 19, 11:23-24

25     "However, the amount of space and confidentiality currently given to inmates is not

26 only adequate, but above constitutionally required levels."

27 **Objection 1**

28     **Improper "Expert" Testimony of Non-Expert [Fed. R. Evid. 701, 702]:** Mr.

1  Monthei has not been designated an expert in this case and has provided no evidence of his

2  qualifications, knowledge, or expertise that would support the conclusion that "the amount

3  of space and confidentiality currently given to inmates is not only adequate, but above

4  constitutionally required levels."

5  **Objection 2**

6    **Improper Opinion Testimony as to a Legal Conclusion:** Mr. Monthei

7  inappropriately opines as to the legal conclusion that space and confidentiality provided to

8  prisoners at San Quentin is "above constitutionally required levels."

9    **8.    Monthei Decl., ¶ 22, 13:24-26 and ¶ 25, 14:23-25**

10    Dr. Monthei asserts in both cited paragraphs that "[c]ondemned inmate-patients are

11  not housed in the CTC on a permanent or semi-permanent basis, either for medical reasons

12  or as participants in the 'Specialized Care for the Condemned'" program." He cites to an

13  Exhibit, 9-S, titled "Census Report for Condemned Inmate Housing."

14  **Objection 1**

15    **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** The cited exhibit,

16  which purports to be a complete "Census Report for Condemned Inmate Housing," is in

17  actuality merely a list of condemned inmates admitted to the MHCB from 3/14/2012 to

18  3/15/2013. It in no way constitutes a housing census report and it provides no foundation

19  for Dr. Monthei's assertions.

20    **9.    Monthei Decl., ¶ 23, 14:1-5**

21    "Ms. Woodford claims that condemned inmates are not routinely evaluated for

22  mental health treatment, and that these inmates have little opportunity to be screened or

23  observed. (Woodford Decl., ¶ 24.) This is inaccurate, however, as multiple measures are in

24  place to ensure routine, emergent, or urgent care." Dr. Monthei goes on to describe the

25  process by which custody staff may refer inmates for mental health evaluation.

26  **Objection 1**

27    **Lack of Relevance [Fed. R. Evid. 401]:** It is readily apparent from the context of

28  the cited paragraph in Ms. Woodford's declaration that she is referring to the absence of a

[767816-1]

119

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  regular evaluation process for all condemned inmates, not just those whom custody staff

2  refers for mental health evaluation.  Dr. Monthei's assertion that the process in place for

3  such ad-hoc, custody-driven evaluations "has proven to be successful" is irrelevant and

4  also unsupported.

5            **10.    Monthei Decl., ¶ 26, 15:2-15:6**

6         Ms. Woodford observes that condemned inmates routinely fail to attend their

7  classification hearings.  (Woodford Expert Decl., ¶ 33.)  Dr. Monthei replies: "[W]hile

8  inmates may refuse to attend their classification hearings, MHSDS staff routinely attend

9  classification hearings for condemned inmates, regardless of *Coleman* class member status,

10  so that they may address mental health concerns when indicated."

11  **Objection 1**

12         **Lack of Relevance [Fed. R. Evid. 401]**:  Dr. Monthei does not contradict Ms.

13  Woodford's statement that condemned inmates do not attend their classification hearings

14  or her evidentiary basis for that statement.  It is irrelevant, by way of a reply to her

15  declaration, to state that staff members attend classification hearings.

16  **Objection 2**

17         **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: There is no cited

18  or provided evidence supporting Dr. Monthei's assertion that "MHSDS staff routinely

19  attend classification hearings for condemned inmates."

20            **11.    Monthei Decl., ¶ 27, 15:7-14**

21         "Ms. Woodford evaluates San Quentin's Specialized Care Program beginning on

22  page 19 of her declaration. Ms. Woodford states that she 'saw no evidence that such

23  staffing has yet been designated or trained,' and that she inquired whether there was

24  adequate staffing 'and was told in vague terms that there was 'enough,' but was not offered

25  any specifics.' (Woodford Decl. at 20:7-10.)  There is in fact approved MHSDS staffing

26  for the Specialized Care for the Condemned Program, which includes 1.5 Senior Clinical

27  Social Workers, 1 Senior Psychiatrist Supervisor, 2 Psychologists, 3 Recreational

28  Therapists, and 1 Psychiatrist."

[767816-1]

120

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   **Objection 1**

2        **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Dr. Monthei

3   provides no evidentiary support for the staffing numbers that he outlines in this paragraph.

4   His assertions therefore lack foundation.

5                    **12.     Monthei Decl., ¶ 28, 15:15-21**

6        "Ms. Woodford further claims, with respect to the Specialized Care for the

7   Condemned Program, that if an assessment were conducted of the inmates currently

8   receiving specialized care, it would reveal that 'many if not all would be deemed both in

9   need of a transfer to ICF care and suitable for such a transfer from a custodial perspective.'

10  This statement indicates a misapprehension of San Quentin's program, which provides the

11  equivalent of an ICF-level of care."

12  **Objection 1**

13       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]**: Dr. Monthei's

14  assertion that San Quentin "provides the equivalent of an ICF-level of care" is without any

15  foundation in the record. Moreover, Dr. Monthei has provided no evidence of his

16  qualifications to assess whether care is equivalent to ICF-level of care.

17                   **13.     Monthei Decl., ¶ 30, 16:25-28**

18       "[I]t is my understanding that the Department of State Hospitals operates their

19  condemned treatment protocols in a more restrictive manner and with potentially less

20  interaction."

21  **Objection 1**

22       **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:**  Dr. Monthei

23  provides no basis whatsoever for his knowledge of DSH's protocols or operation.  His

24  statements are pure, unsupported speculation.

25                   **14.     Monthei Decl., ¶ 35, 19:12-19**

26       "Ms. Woodford describes one particular inmate in Paragraph 30 of her declaration

27  and states that '[i]t is my opinion that this inmate should have been transferred for mental

28  health evaluation immediately following the forcible cell extraction, and that his activities

121
PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

as reflected in the 114a logs from the Adjustment Center indicate that he remains in urgent need of a referral for mental health evaluation.' However, Ms. Woodford is mistaken that this inmate has not received mental health treatment. To the contrary, mental health services were provided on an ongoing basis prior, during, and after this inmate's refusal of a medical quarantine movement order."

**Objection 1**

> **Lack of Personal Knowledge/Foundation [Fed. R. Evid. 602]:** Dr. Monthei provides no basis or evidentiary foundation for his assertion that mental health services were provided to this inmate at any time. He cites no medical records and never claims to be the patient's treating physician or to have any personal knowledge that the patient received mental health services.

## IV.    RESPONSE TO DEFENDANTS' EVIDENTIARY OBJECTIONS AND BASELESS ATTACKS ON PLAINTIFFS' EXPERTS

Defendants have filed a cursory four-page "evidentiary objections" document (Docket No. 4486) seeking to exclude the testimony of Plaintiffs' experts Jeanne Woodford and Eldon Vail, and asking the Court to strike various statements in Plaintiffs' opposition that Defendants find "objectionable." As detailed below in Part IV.A, their arguments have no merit and are often demonstrably false.

Defendants do not seek to exclude the expert reports of Plaintiffs' experts Dr. Edward Kaufman, Dr. Pablo Stewart, and Dr. Craig Haney as part of their "evidentiary objections." They instead levy a series of improper and even scurrilous attacks against these highly qualified experts in Defendants' Reply brief and their supporting declarations. Defendants repeatedly misstate these experts' findings, distort their opinions, and present misleading and even non-existent sound bites of testimony in a feeble attempt to undermine Plaintiffs' experts' testimony about the state of mental health care delivery within California's prisons. Plaintiffs address the most egregious of these distortions below in Part IV.B.

A.    **DEFENDANTS' EVIDENTIARY OBJECTIONS**

    1.    **Defendants' Objection to Plaintiffs' Correctional Expert Jeanne Woodford's Expert Opinions on the Ground that She is "Not a Mental Health Professional" Is Absurd and Should Be Rejected**

Defendants inappropriately seek to exclude Ms. Woodford's entire declaration on the grounds that she is not "qualified as [a] mental health expert." (Defs. Evidentiary Objections at 1.) This is an absurd request; Defendants do not explain how their own expert, Mr. Martin, who (like Ms. Woodford) has a corrections background and makes no attempt to define himself as a "mental health expert" should not be excluded for the same reason. In fact, Ms. Woodford has already been qualified as an expert in the *Coleman* case (her expert opinion was cited multiple times by the three-judge court and the United States Supreme Court). Ms. Woodford is uniquely qualified to offer expert opinions regarding custody operations, staffing, and overcrowding at San Quentin, as she does throughout her declaration. Ms. Woodford does not opine on the matters at issue as a mental health expert in the paragraphs Defendants cite, nor anywhere else.[5] In Paragraph 23, Ms. Woodford writes that *in her experience* "newly-condemned inmates often experience extreme mental health distress and suicidal ideation." Woodford Expert Decl. ¶ 23. Defendants omit the mention of Ms. Woodford's experience, consisting in part of twenty-six years' service at San Quentin including work as the Associate Warden, Chief Deputy Warden, and Warden of the prison. Ms. Woodford is certainly qualified to draw upon her long personal knowledge of the mental health distress experienced by new arrivals to death row, and need not be a mental health expert to do so.[6] In Paragraph 30, Ms. Woodford reviews the

---

[5] Defendants reiterate these same baseless complaints, nearly verbatim, at pages 15-16, 21 and 25 of their Reply brief. Defs. Reply at 15:17-16:5; 21:18-21; 25:20-24.

[6] Defendants' argument that Ms. Woodford's opinion that "new arrivals on death row should be closely monitored for signs of mental health deterioration or crisis" contradicts her statement at deposition that she is not personally aware of any individuals who have recently suffered such deterioration or crisis fails for the same reason. Reply at 16:10-14. Ms. Woodford is certainly able to opine, based on her many years' experience at San (footnote continued)

[767816-1]

1   114a custody logs of a particular inmate, and concludes that "*his activities as reflected in*

2   *the 114a logs from the Adjustment Center indicate that* he remains in urgent need of a

3   referral for mental health evaluation" (emphasis added).  Defendants misleadingly omit the

4   italicized phrase, which provides the basis for Ms. Woodford's statement.  They provide

5   no argument that she, as a qualified correctional expert, cannot use these important custody

6   documents as a measure of whether an inmate requires a referral for mental health

7   evaluation.  As Defendants tout elsewhere in their reply filings, *see* Declaration of Eric

8   Monthei ¶ 23 (Docket No. 4436), custody referrals to mental health are expected.[7]  In

9   Paragraph 31, Ms. Woodford writes that "[m]any, if not all, of the individuals to whom

10  [she] spoke appeared to [her] to be in need of higher levels of mental health care than they

11  were receiving."  Defendants again misapprehend the basis and nature of Ms. Woodford's

12  opinion, which is entirely appropriate given her long experience of direct interaction with

13  condemned inmates and work with clinical and correctional staff as Warden of San

14  Quentin for many years.  Defendants also misleadingly omit the last sentence of Paragraph

15  31, in which Ms. Woodford states that she would have referred the inmate at issue in that

16  paragraph for a mental health evaluation had she "encountered her while working at San

17  Quentin."  Ms. Woodford need not be a "mental health professional" to offer such an

18  opinion.

19         The attacks on Ms. Woodford's testimony in the Declaration of Eric Monthei, Chief

20  of Mental Health at San Quentin State Prison should similarly be disregarded.  Dr.

21  Monthei offers a variety of irrelevant statements purporting to contradict narrow portions

22  ———————————————

23  Quentin, as to her understanding of the needs of new arrivals on death row.

24  [7] Ms. Woodford's clear understanding of the role of custody in referring individuals for

25  mental health evaluation is apparent throughout her declaration.  *See, e.g.*, Woodford

     Expert Decl. at 9:10-12; 10:9-10; 11:3-4; 11:16-18; 20:14-15 (all referring to individuals

26  whom she would have referred for a mental health evaluation).  Defendants' cavalier

27  statement that she was "apparently unaware of this practice" is false.  Reply Br. at 22:14-

     15.

28

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1   of Ms. Woodford's declaration.  As just one example, Dr. Monthei writes that Ms.

2   Woodford's observation that "North Segregation inmates are not provided with regular

3   monitoring of their mental health status by either custody or mental health staff"

4   (Woodford Decl., ¶ 22, 6:18-22) is "untrue[,]" because among "several required treatment

5   activities is daily Psychiatric Technician contacts for condemned EOP patients, as well as

6   Grade B CCCMS patients, wherever they may be housed."  Monthei Decl., ¶ 16, 10:17-

7   20.  Dr. Monthei's assertion is unsupported and irrelevant: there are no EOP and CCCMS

8   prisoners housed in North Segregation.  (Woodford Expert Decl., ¶ 22, 6:11-12.)  Dr.

9   Monthei seems to be oblivious to Defendants' basic duty to properly screen prisoners and

10  identify those with mental illness (including mental illness that develops during a

11  prisoner's incarceration).

12      There are critically serious facts established by Ms. Woodford's expert declaration,

13  which Defendants simply do not and cannot dispute.  Defendants provide no response to

14  Ms. Woodford's expert findings that there is no custodial justification for CDCR's blanket

15  ban on transferring condemned inmates to ICF care (Woodford Expert Decl., ¶ 47, 17:7-

16  18), nor to her discussion of the Governor's cancellation of a project to build a new facility

17  for death row and resultant continued lack of sufficient housing and yard capacity to meet

18  the needs of the condemned population (Woodford Expert Decl., ¶¶ 36-42).  Instead,

19  Defendants try to keep these facts out of the record by seeking to strike her entire

20  declaration without legal or factual support.

21          **2.    Defendants' Objection to Plaintiffs' Correctional Expert Eldon**
            **Vail on the Ground that He Was "Unaware of the Outcome of**
22          ***Madrid v. Gomez*" Is Without Merit**

23      Eldon Vail is a former corrections administrator with over thirty-five years'

24  experience working in and administering adult institutions.  Most recently, he has served

25  as Deputy Secretary and then Secretary of the Washington Department of Corrections, and

26  has extensive experience in dealing with the mentally ill population in prisons and issues

27  concerning their custody, housing, and treatment.  (*See generally* Expert Decl. of Eldon

28  Vail (Docket No. 4385 ("Vail Expert Decl.") ¶¶ 2-6.)

1    Defendants argue that Mr. Vail's opinions should be excluded on the basis that he

2  did not review the "State's use-of-force policy and was unaware of the outcome in *Madrid*

3  *v. Gomez*."  (Evidentiary Objections at 2:20-23.)  Defendants offer no authority in support

4  of these abstract arguments, nor do they explain why the documents that Mr. Vail did

5  consider are inadequate to support his conclusions.

6    Mr. Vail has offered expert testimony on his review of use of force policy and

7  practice with respect to mentally ill inmates within the CDCR.  He has also offered expert

8  opinion on the policy and practice of the CDCR in connection with the internal discipline

9  process ("RVR process") with respect to mentally ill inmates within the CDCR.  Finally,

10  Mr. Vail has opined on the role and influence of custody staff in the care and treatment of

11  the mentally ill within the CDCR.  (Vail Expert Decl. ¶ 10.)  Defendants have not objected

12  to Mr. Vail's credentials as an expert witness, his findings concerning the RVR process as

13  it relates to the mentally ill population in California prisons, or his opinions regarding the

14  interference of custody staff with the care and treatment of class members.  Thus, Plaintiffs

15  limit this response to Defendants' baseless attack on Mr. Vail's opinions concerning

16  CDCR's use of force policy.

17    Defendants' motion is merely a disagreement with Mr. Vail's expert findings.  Such

18  disagreement, however, is not grounds for exclusion.  *Daubert v. Merrell Dow Pharms.,*

19  *Inc.*, 509 U.S. 579, 595 (1993) (holding that a court is limited to evaluating the principles

20  and methodology underlying an expert's proposed testimony, "not on the conclusions that

21  they generate").  First, Defendants claim that Mr. Vail's opinions are invalid because he

22  failed to review the "CDCR statewide use of force policy," but they fail to identify what to

23  what specific documents they are referring, and what exactly Mr. Vail purportedly did not

24  review.  The framework governing use of force in CDCR is comprised of a number of

25  separate publications, including the Title 15 regulations set out in the California Code of

26  Regulations, and the provisions contained in the CDCR's own Department Operations

27  Manual ("DOM").  Specifically, Chapter 5, Article 2 of the DOM is titled "Use of Force,"

28  and sections 51020.1 *et seq.* therein set out the CDCR guidelines concerning use of force

[767816-1]

1   in California institutions.  Mr. Vail's expert report makes clear that he reviewed the

2   relevant DOM provisions.  (*See* Vail Expert Decl. Ex. 2.)  Mr. Vail also testified about his

3   review and analysis of the DOM and Title 15 regulations in connection with his review of

4   CDCR use of force policy and practice.  (Vail Dep. at 113:14-25.)  There is simply no

5   support for Defendants' ill-defined assertion that Mr. Vail did not review the "CDCR

6   statewide use of force policy."  He did.

7        Defendants' second assertion that Mr. Vail's lack of "awareness" of the "outcome

8   in *Madrid v. Gomez* is even more far-fetched.  In resolving the *Madrid* litigation, the State

9   filed a "Notice of Adoption and Implementation of California Code of Regulations,

10  Statewide Use of Force Policy," on August 30, 2010 ("Notice").  In this Notice, the State

11  provides:

12        The California Office of Administrative Law approved the statewide use-of-
          force regulations on August 19, 2010. The California Department of
13        Corrections and Rehabilitation (CDCR) subsequently approved related
          changes to the Departmental Operations Manual. Attached as Exhibit A are
14        true and correct copies of memoranda noticing the adoption of the statewide
          use-of-force policy and the training that implements CDCR's policy. Now
15        that these changes are codified in regulation and in the Department
          Operations Manual, Defendants will meet and confer with Plaintiffs' counsel
16        in an attempt to end this case without further Court proceedings.

17  (A. Fischer Decl. Ex. 7 at 1-2).

18        The "*Madrid* decision" does not involve use of force policies beyond what is

19  provided in the California Code of Regulations and the DOM.  *Madrid* does not, in and of

20  itself, contain any significant information about the use of force policies and practices in

21  California.  By its own reckoning, the CDCR implemented the policies developed in

22  *Madrid* through its August 2010 amendments to the DOM.  (*See id.*)  The CDCR's DOM

23  and the relevant provisions of Title 15 regulations set out California's use of force policy.

24  As noted above, Mr. Vail reviewed all of these documents when preparing his opinions in

25  this case.

26        In addition, the mischaracterizations of Mr. Vail's testimony in the Reply

27  Declaration of Steve J. Martin ("Martin Decl.") (Docket No. 4483) warrant a response.

28  The most serious misrepresentations are described below.

1   Mr. Martin alleges that, "Mr. Vail does not provide any basis for this conclusion
2   [that excessive amounts of OC spray are used], nor does he describe how he can tell from
3   these written reports that the amount of the OC spray is excessive and in most instances it
4   is impossible to conclusively determine what amount of OC spray was used or that it was
5   an excessive amount." (Martin Decl. ¶ 12, 4:25-5:4.)  However, Mr. Vail testified that he
6   performed measurements by counting the number of seconds that OC spray was deployed
7   in UOF videos. (*See* Vail Dep. at 81:5-17 ("Well, as Mr. Martin points out, it's not
8   measured in the State of California, so there's no way to tell exactly how much.  You look
9   at the size of the canister that's being used to deploy it, and you can count the seconds that
10  the trigger is pulled.  And you can count the seconds between the time the next trigger is
11  pulled and you can add up how many times.  And you count the grenades that are thrown
12  in. And those were pretty darn frequent.  Not just in the videos but in the use of force
13  reports."); *id.* at 87:20-88:4.)  Mr. Martin does not address Mr. Vail's thoughtful
14  explanation of his methodology at all.

15      Mr. Martin also states, "I strongly dispute Mr. Vail's use of the phrase the 'practice
16  of immediate inflection [sic] of pain and punishment' to describe CDCR policies and
17  behavior by line staff…I did not find an instance where force was applied in a malicious or
18  sadistic manner to punish an inmate." (Martin Decl. ¶ 16, 6:5-9.)  This too is a
19  mischaracterization of Mr. Vail's testimony.  Mr. Vail's critique did not equate the
20  immediate use of force to an application in a "malicious or sadistic manner." (*See* Vail
21  Expert Decl. ¶ 69.)  Any use of force will almost certainly involve elements of pain and
22  punishment.  Mr. Vail's critique was that the use of force appears to be considered an
23  immediate option by CDCR, and not one that utilized once verbal de-escalation and other
24  non-use of force options are exhausted. (*See* Vail Dep. at 114:9-116:14.)

25      Finally, Mr. Martin alleges that the perceived deficiencies he identifies in
26  Mr. Vail's testimony stem from "a lack of real world understanding of correctional
27  systems." (Martin Decl. ¶ 21, 7:13-14.)  This is a baseless and scurrilous attack on
28  Mr. Vail's credibility.  Mr. Vail, in his declaration and during his deposition, testified

128

1  extensively on his knowledge, skill and training in relation to correctional systems.

2  Mr. Martin does not explain how he squares his attack on Mr. Vail with Mr. Vail's many

3  years of service for the Washington Department of Corrections, including as Deputy

4  Secretary and then Secretary of the state's prison system.

5         **3.    Defendants' Arguments that Portions of Plaintiffs' Opposition and Evidence Lack Evidentiary Support Are Frivolous, Factually**

6              **Incorrect, and Should Be Rejected**

7        On pages 3 and 4 of their Evidentiary Objections, Defendants assert that certain

8  "assertions in Plaintiffs' opposition are unsupported by any evidence and should be

9  stricken or disregarded by the Court." This is untrue with respect to each and every

10  assertion they challenge. Their objections are baseless and should be rejected.

11        Defendants argue that Plaintiffs "cite no evidence" that "California remains an

12  outlier, and is one of the most overcrowded prison systems in the United States." This is

13  wrong. (*See, e.g.*, Expert Declaration of Craig Haney, Docket No. 4378 ("Haney Expert

14  Decl.") ¶¶ 22, 23, 31, & n.18 (citing Bureau of Justice Statistics report showing the

15  California has one of the most overcrowded prison systems in the country).) Defendants

16  also claim that Plaintiffs "cite no evidence" that "[s]ome individual prisons … have

17  scarcely benefitted, if at all, from the overall population reductions that have occurred."

18  The full quote in Plaintiffs' brief states: "Some individual prisons are much *more*

19  overcrowded than the overall systemwide figure indicates, and they have scarcely

20  benefitted, if at all, from the overall population reductions that have occurred." Pls.' Opp.

21  Br. at 83. And it cites directly to evidence (Haney Expert Decl. ¶ 31). The statement is

22  fully supported by evidence submitted by Plaintiffs. *See, e.g.*, Kaufman Expert Decl.

23  ¶¶ 24-32, 48-56, 66-67 (noting extreme overcrowding at CCWF (at nearly 180% capacity)

24  that has gotten significantly worse and resulted in mental health care deficiencies directly

25  related to such crowding). Such evidence that some prisons remain dangerously

26  overcrowded is presented throughout Plaintiffs' opposition filings.

27        Defendants also challenge certain portions in Plaintiffs' opposition brief regarding

28  death row, in which Plaintiffs present evidence that there is no regular mental health

1   screening process for long-term death row inmates.  (Defs. Evidentiary Objections at 3:10-

2   18.)  Tellingly, Defendants offer no evidence to rebut Plaintiffs' expert's finding by

3   pointing to an actual regular screening process.[8]  They also make no actual "evidentiary

4   objection."  In the next paragraph, Defendants argue (without citation to a rule of

5   evidence) that it is "improper for Plaintiffs to extrapolate one circumstance they rely on to

6   the entire condemned population."  (*Id.* at 3:22-23.)  Plaintiffs argue, however, that the

7   tragic case of an inmate who committed suicide after 20 years with no mental health

8   contact demonstrates that it is possible for a condemned inmate to go decades without such

9   contact.  (Pls.' Opp. Br. at 74:5-7.)  Defendants do not, and cannot, challenge the factual

10   truth of that statement.

11       Defendants then seek to strike certain statements made by Dr. Pablo Stewart in his

12   Declaration on the grounds that they purportedly "lack evidentiary support."  (Defs.

13   Evidentiary Objections at 3:25-4:3.)  If a specific citation for each statement is the proper

14   standard for an expert report – which it obviously is not – then Defendants' bare-bones,

15   conclusory expert reports should be stricken in their entireties for this reason alone.

16       Defendants also make a superficial and patently false attack on Dr. Stewart's

17   general statements about the negative effects of overcrowded prisons on suicide prevention

18   and the mental health of prisoners, calling his opinions "musings."  These opinions are

19   well within the scope of Dr. Stewart's expertise and they are fully supported with

20   extensive evidence in Dr. Stewart's current declaration, as well as in his two declarations

21   in the overcrowding proceedings.  Defendants also ignore the fact that Dr. Stewart's expert

22   _____

23   [8] While Defendants offer much irrelevant argument in their Reply Brief as to the existence
    of informal, ad hoc processes by which condemned inmates are purportedly monitored,
24   they nowhere claim that there is any kind of systematic, formal process by which every
    condemned inmate is regularly re-evaluated for mental health concerns.  (*See* Reply Br. at
25   22:1-11; 23:25-24:11.)  Ms. Woodford's opinions go to the need for such a process, and
    Defendants offer no reply thereto.
26

27

28

[767816-1]

1  opinions regarding the effects of overcrowding were appropriately and extensively relied

2  upon by the three-judge court and the United States Supreme Court.

3        Finally, Defendants argue that "Plaintiff's [sic] opposition also engages in

4  speculation that violates Federal Rule of Evidence 602."  The relevance of this rule,

5  regarding witness testimony, to an opposition legal brief is not apparent.  In any event,

6  Defendants offer no reply to the facts underlying Plaintiffs' discussion of this suicide: that

7  a condemned inmate, housed on the near-capacity East Block, committed suicide after a

8  long period of harassment by a neighboring inmate, and that neither the deceased inmate

9  nor his harasser were moved to a different housing location despite custody's awareness of

10  the situation.  (*See* First Half 2012 Suicide Report at 55 (App. H), 375.)

11        The evidence submitted by Plaintiffs is thorough, well-supported, and warrants full

12  consideration by the Court.  Defendants' evidentiary objections should be denied.

13   **B.    DEFENDANTS' ATTACKS ON PLAINTIFFS' OTHER EXPERTS ARE
             BASELESS, IMPROPER, AND IGNORE THE FACTS**

14        **1.    Edward Kaufman, M.D.**

15

16        Dr. Edward Kaufman is an accomplished, experienced, and qualified doctor with an

17  active psychiatry practice and substantial background in working in correctional settings.

18  To draw his conclusions about the state of mental health care in CDCR facilities,

19  Dr. Kaufman toured three prisons, spoke with correctional officers and mental health

20  clinicians, conducted psychiatric interviews with inmates on the mental health caseload in

21  a variety of housing settings and levels of care, thoroughly reviewed medical records, and

22  reviewed extensive documents about CDCR's current mental health care delivery system.

23  Dr. Kaufman has already been qualified as an expert in this litigation.  *Coleman v. Wilson*,

24  912 F. Supp. 1282 (E.D. Cal. 1995) (relying on Dr. Kaufman's expert findings at least

25  seven times).  These qualifications were set forth clearly in Dr. Kaufman's report, and he

26  testified cogently as to his methods and qualifications.

27        Dr. Scott hurls a number of unfounded accusations at Dr. Kaufman.  Dr. Scott's

28  primary accusation is that Dr. Kaufman had not reviewed the records of the patients with

1  whom he met.  To the contrary, Dr. Kaufman expressly testified that he read medical

2  records for *each* of the inmates he interviewed.  (Kaufman Dep. at 36:19-37:1.)  Generally,

3  he reviewed records going back one to two years (*id.*, 37:2-7), a significant undertaking in

4  the brief discovery period.  Included in the records reviewed by Dr. Kaufman were

5  psychiatric evaluations, treatment team meetings and treatment team recommendations,

6  psychotherapy notes, and records relating to medication administration and compliance.

7  (Kaufman Dep. at 37:8-14.)

8      Dr. Scott states over and over again, without basis, that Dr. Kaufman's records were

9  pre-selected. To the contrary, Dr. Kaufman received and reviewed all of the records

10  Plaintiffs' counsel could reasonably obtain for each individual he met.  It is notable that

11  Defendants refused to produce requested mental health records in paper form and rejected

12  Plaintiffs' and Plaintiffs' experts' request for access to CDCR's electronic Unit Health

13  Records (eUHR) system to review class member records (access which was apparently

14  provided to Defendants' psychiatric expert Scott).  (Scott Decl. ¶ 19, 7:7-9 479.)  Plaintiffs

15  were required to spend several days printing out thousands of pages of medical records at

16  San Quentin prison.  Those printed records were provided in full to Plaintiffs' experts

17  without omission or modification.  Indeed, Plaintiffs have provided to Defendants the full

18  126 pages of Dr. Kaufman's notes, many of which extensively document the content of

19  patients' medical records, including dates of IDTT meetings, contents of Treatment Plans,

20  details about MHCB admissions, and clinicians' notes.

21      Dr. Scott mischaracterizes Dr. Kaufman's testimony and in some instances appears

22  to have skipped pages of Dr. Kaufman's testimony entirely.  For example, he states that

23  Dr. Kaufman failed to "observe[] any LPT rounds" or "attempt[] to verify Prisoner A's

24  comments in any way."  (Scott Decl. ¶ 11.)  In point of fact, Dr. Kaufman expressly stated

25  that he had checked the charts of the inmates he met to find out if "the comments made by

26  inmates about their care was validated by the chart or not."  (Kaufman Dep. at 33:13-18.)

27  Dr. Kaufman also testified that he observed a psych tech doing rounds, and spoke with an

28  inmate about the nature and substance of the rounds.  (*Id.*, 82:13-22, 98:10-18.)

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    Dr. Scott criticizes Dr. Kaufman for not employing the legal terms "constitutional"

2  and "deliberately indifferent."  Indeed, Dr. Scott seems to share Defendants' view that

3  doctors, nurses, and even prison wardens can meaningfully assess constitutionality.  In

4  contrast, Dr. Kaufman explained that while he declines to apply legal terms, he used

5  careful and considered medical standards when evaluating CDCR's mental health care

6  system.  In addition to considering "standards of care in other correctional facilities,"

7  Dr. Kaufman evaluated CDCR's "ability to provide humane treatment that avoids inmate

8  suffering and psychological decompensation." (*Id.*, 13:8-13, 73:10-15.)  Dr. Kaufman

9  testified that he evaluated whether CDCR's policies and practices "would prevent unusual

10  suffering and decompensation." (*Id.*, 127:9-21.)

11    Defendants' criticisms of Dr. Kaufman play fast and loose with the facts, and are

12  rife with mischaracterizations, misrepresentations, and irrelevancies.  At one point, they

13  fault Dr. Kaufman for not having worked in a correctional setting for 40 years, and later

14  state that "he has no experience in a correctional setting."  (Reply Brief, p. 14, 36.)  His

15  declaration clearly states that, among other experience in correctional mental health care,

16  he served as the Chief of Psychiatric Services at Lewisburg Federal Penitentiary and the

17  Director of Psychiatry for Prison Mental Health Services of the City of New York.

18  (Kaufman Expert Decl., ¶¶ 5, 7.)  Defendants also distort Dr. Kaufman's statements about

19  the appropriate use of prisons for mentally ill patients, stating that he is "against housing

20  *any* mentally ill inmates in prisons." (*But see* Kaufman Dep. at 209:2-9 (Dr. Kaufman

21  testifying that "there are some mentally ill people who have to be in prisons").)

22    Defendants also deploy Dr. Kaufman's testimony selectively – inventing omissions

23  and limitations.  For example, Defendants state that "Dr. Kaufman discusses *a single*

24  *inmate* at CCWF who was 'worried' her medication might lapse."  (Defs. Reply at 37.)

25  They fail to mention Dr. Kaufman's report of an instance in which a patient described

26  returning multiple times to the medication line window for her Lithium Carbonate and

27  being turned away, or the three instances in which he found medical records that document

28  CDCR's failure to distribute psychotropic medications consistently and safely.  (Kaufman

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    Expert Decl. ¶¶ 67, 68, 69, 70.)

2        Ultimately, Defendants' attacks on Dr. Kaufman are frivolous, misleading and

3    frankly a waste of the Court's time.

4                    **2.    Pablo Stewart, M.D.**

5        Dr. Stewart is an extremely experienced correctional psychiatrist with decades of

6    experience monitoring the delivery of mental health care in correctional settings.  (*See*

7    *generally* Stewart Expert Decl. ¶¶ 1-24.)  Dr. Stewart has worked as an expert for Federal

8    Courts monitoring the provision of mental health care at the California Medical Facility, he

9    has investigated a number of different state juvenile correctional departments for the

10   Department of Justice, he has been employed as a defense expert on prison mental health

11   care for the State of New Mexico, and he ran the mental health programs for the

12   San Francisco City and County jail for a number of years.  (*Id.*)  Dr. Stewart's careful and

13   comprehensive approach to developing his expert opinion in this matter involved long

14   hours, hard work, six long days spent touring five CDCR prisoners, interviews with more

15   than one hundred prisoners and numerous staff members at the five prisons visited, the

16   review of thousands of pages of medical records, and the review of thousands of pages of

17   other reports, reviews and documents.  (*See* Stewart Dep. at 8:1-9:8, 12:9-13:10, 15:4-

18   16:20, 17:13-18:7.)

19       Defendants have responded with at least 14 declarations purporting to challenge

20   various aspects of his report.  As Plaintiffs' numerous specific evidentiary objections set

21   forth herein demonstrate, many portions of these rebuttal declarations misrepresent and

22   distort Dr. Stewart's testimony, and numerous other portions offer broad, conclusory

23   opinions unsupported by any evidence.  At the same time, much of the limited factual

24   information that is actually provided by these rebuttal declarants supports Dr. Stewart's

25   findings and conclusions, and these declarations contain a number of significant

26   admissions confirming Dr. Stewart's findings.  For example, a number of prisoners told

27   Dr. Stewart that standard practice at CSP-Los Angeles County is to strip suicidal prisoners

28   naked and place them into a holding cage until they are evaluated on their housing unit by

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    mental health staff.  In his rebuttal declaration, the Chief of Mental Health at CSP-Los

2    Angeles County, Christopher Cornell, admits that this is the standard practice at the

3    institution.  (Cornell Decl. ¶ 3, Docket No. 453.)

4        Some of the most egregious distortions of Dr. Stewart's expert opinions are

5    contained in the Reply Declaration of Defendants' expert Dr. Scott.  One need only read

6    Dr. Scott's out-of-context citations to Dr. Stewart's deposition to understand the degree of

7    distortion.  For example, Dr. Scott asserts, "Dr. Stewart took no notes of his tours, yet was

8    somehow able to generate a one-hundred and sixty-seven page declaration."  (Scott Reply

9    Decl. ¶ 20, 7:16-18, citing to Stewart Dep. at 12:11-19.)  But in fact, as the next section of

10    Dr. Stewart's deposition explained in detail, Dr. Stewart's process was to spend many

11    hours immediately after the tour dictating the beginnings of his report to the attorney with

12    whom he was working.  (*See* Stewart Dep. at 13:1-14:24.)  For example, after the first day

13    of touring at SVSP, he dictated his findings for approximately five hours while driving in

14    the car to the next prison.  (*Id.*)  Later, after the attorney made copies of thousands of pages

15    of medical records and Dr. Stewart reviewed them, he would revise these initial findings in

16    light of the full medical record review.  (Stewart Dep. at 15:23-16:20.)

17        In another distortion, Dr. Scott alleges that Dr. Stewart did not encounter anybody

18    that [he] felt needed to have an immediate clinical intervention."  (Scott Reply Decl. ¶ 22,

19    8:10-11, citing Stewart Dep. at 224:22-24.)  The context for this statement makes clear that

20    Dr. Stewart was explaining that he never met a prisoner who was imminently suicidal that

21    he felt the need to warn staff members about.  (Stewart Dep. at 223:19-224:24.)

22    Dr. Stewart has explained that he encountered numerous prisoners who needed higher

23    levels of care or different care than they were receiving.  (Stewart Dep. at 221:19-222:4.)

24    In another deceptive smear, Dr. Scott notes "Dr. Stewart was not aware that tele-psychiatry

25    started at SVSP as of January 31, 2013."  (Scott Reply Decl. ¶ 24, 8:28-9:2.)  Actually,

26    January 31, 2013 was three days after Dr. Stewart visited the prison, so he could not have

27    any personal awareness of this fact, but his response to the question indicated he was told

28    this was planned:  "I was informed that that was the plan.  I'm not aware that it has

[767816-1]

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    actually happened." (Stewart Dep. at 101:11-15.)

2        Defendants also criticize Dr. Stewart's assertion that there are fewer EOP prisoners

3    on death row than he would expect given his extensive experience with this population as

4    an expert in death penalty cases.  This opinion is also well within the scope of

5    Dr. Stewart's expertise and fully supported by his declaration, especially given the severity

6    of the mental illness he observed among the prisoners he interviewed on that unit.  (*See*

7    *generally* Stewart Expert Decl. ¶¶ 453, 457-471.)

8        The fact that Defendants resort to these sorts of distortion in an attempt to

9    undermine Dr. Stewart's expert opinions demonstrates that they are unable to develop

10   more substantive bases on which to criticize Dr. Stewart's comprehensive, detailed, and

11   well-reasoned findings of pervasive clinical shortfalls in the CDCR that are doing great

12   harm to *Coleman* class members.

13       **3.    Craig Haney, Ph.D.**

14       Dr. Haney has spent nearly 40 years studying the psychological effects of

15   conditions in prison settings.  His work has included conducting interviews with

16   correctional officials, officers, and prisoners to assess the nature and consequences of

17   living and working in correctional settings.  He has studied and statistically analyzed data

18   to examine the effects of overcrowding, punitive segregation, and other conditions of

19   confinement.  (*See generally* Haney Expert Decl. ¶¶ 1-13.)  Dr. Haney examined

20   overcrowding and its effects and offered expert testimony in the three-judge court

21   proceedings.  His expert opinions in the three-judge court proceedings, based largely on

22   the same analysis and methods that he used in the current proceedings, were relied upon

23   extensively by the three-judge court and the United States Supreme Court.  Dr. Haney's

24   approach to developing his expert opinion in this matter was based on extremely careful

25   documentation of his observations, interviews, and review of records and materials.  (*Id.* ¶¶

26   14-21.)

27       Dr. Haney found serious deficiencies and in some cases dangerous conditions in

28   Defendants' system that resulted in mentally ill patients being placed in inappropriate beds

1    and unnecessarily punitive settings, and their not receiving necessary and appropriate

2    treatment. Dr. Haney explicitly opines that his findings of serious deficiencies and

3    dangerous conditions are not a negative commentary on the professionalism or dedication

4    of the overwhelming majority of the mental health and correctional staff members, and he

5    has recognized that they face virtually insurmountable barriers—*i.e.*, systemic failures in

6    the CDCR—to delivering appropriate and effective mental health services. (*Id.* ¶ 61.)

7          Dr. Haney's findings as to systemwide failures appear to be of significant concern

8    to Defendants: they filed a motion to exclude his testimony on March 14 (Docket No.

9    4382), and just four days after that motion was denied (Docket No. 4412), they moved to

10   exclude his testimony again *on the exact same grounds as the first motion* (Docket No.

11   4492). See Order, 3/25/13, Docket No. 4506 (denying second motion and finding it

12   "frivolous"). Defendants have also responded with no less than 13 declarations that appear

13   aimed at attacking various aspects of Dr. Haney's report.

14         As with Plaintiffs' other experts, many portions of these rebuttal declarations

15   misrepresent and distort Dr. Haney's testimony, and offer broad, conclusory opinions

16   unsupported by any evidence or personal knowledge, as detailed in Plaintiffs' specific

17   evidentiary objections set forth above. At the same time, much of the limited factual

18   information that is actually provided by these rebuttal declarants serves to confirm Dr.

19   Haney's findings and conclusions.

20         The declarants' jumbled assertions do nothing to undercut any of Dr. Haney's

21   expert opinions, including that: 1) the CDCR remains severely overcrowded by any

22   measure; 2) the size of the mentally ill population remains largely unchanged across the

23   system; 3) severe staffing shortages persist and still prevent existing staff from providing

24   appropriate care; 4) there remains a widespread pattern in which mentally ill prisoners are

25   not receiving the quantity or quality of out-of-cell time, treatment, and programming that

26   they require; and 5) current conditions in the CDCR are marked with a disturbingly high

27   number of mentally ill prisoners suffering while placed in inappropriate settings—due to

28   "lack of beds" and other unacceptable reasons—that very frequently include extremely and

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  unduly harsh conditions of segregated confinement.  To provide just a sampling of the

2  most egregious distortions and irrelevancies in Defendants' declarations:

3         Declarants "correct" Dr. Haney's findings with assertions that, while quibbling with

4  details, in fact confirm the conclusions Dr. Haney reaches.  (*See, e.g.*, Walsh Decl. ¶ 29,

5  13:14-18 (Docket No. 4439) ("correcting" Dr. Haney's report that Inmate VV told him that

6  he had lost 30-40 pounds by stating that he had actually lost 10 pounds between February 7

7  and March 6 while in segregation, an alarming fact in itself); Colley Decl. ¶ 9, 6:17-27

8  (Docket No. 4482) (Haney was "incorrect" that Prisoner G, a seriously mentally ill and

9  developmentally delayed prisoner, was pepper-sprayed for making a suicidal gesture in the

10  MHOHU, noting record that he was actually pepper-sprayed for making a suicidal gesture

11  in the Administrative Segregation Unit); Colley Decl. ¶ 7, 5:6-13 (purporting to rebut

12  Haney's finding that Prisoner D reported that during the first week of February he had

13  been out of his ASU cell for no more than four hours by asserting that Prisoner D had

14  attended five groups in mid-January).)  In another perplexing example, both Dr. Fischer,

15  the Acting Chief Psychologist at Corcoran, and Acting Warden Connie Gipson complain

16  that Drs. Haney and Kaufman provide "conflicting information" about inmate-patients'

17  "preferences" as to being placed in a cage vs. an Alternative Treatment Option Module

18  (ATOM) chair for treatment.  (Fischer Decl. ¶¶ 11-13 (Docket No. 4429); Gipson Decl. ¶¶

19  12-13.)  They emphasized that Dr. Kaufman noted that patients he interviewed described

20  the ATOM chair as "painful and restrictive," while Dr. Haney noted that a patient he

21  interviewed had difficulty being treated in a cage because it made him feel like "an

22  animal."  The declarants appear unable to recognize the obvious: *neither* space is

23  hospitable or conducive to therapeutic treatment, and both can impede the delivery of

24  mental health care.

25         Defendants' "rebuttal" declarations also repeatedly mischaracterize Dr. Haney's

26  findings such that Defendants' evidence has very little to do with the finding they attempt

27  to rebut.  (*See, e.g.*, Fischer Decl. ¶ 19, 36:7-11 (attacking Haney's discussion of a

28  Corcoran storage area that had been refashioned into a makeshift treatment space for SHU

138

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    inmate-patients, stating that Haney called it a "dirty concrete room," which he never did);

2    *id.* ¶ 34, 9:14-16 (attacking Haney's claim that Prisoner JJ had "no access to psychiatrists,"

3    an issue never mentioned in Haney's report on Prisoner JJ); *id.* ¶ 30, 8:11-15 (attacking

4    Haney's report that Prisoner DD claims to rarely see his case manager by totaling up all

5    purported contacts with mental health providers since July 2012—without foundation or

6    citation—and providing no information as to how many of those contacts were actually

7    with his case manager); Colley Decl. ¶ 11, 8:6-8 (purporting to rebut Haney's report that

8    Prisoner I complained that groups often do not occur or are not meaningful by stating that

9    Prisoner I "appears to pick and choose which groups he attends").)

10        Defendants' declarants also provide strange "corrections" to what they remember

11    telling Dr. Haney about staffing, treatment, and other issues at the prisons during the

12    expert tours.  As an initial matter, Dr. Haney took 224 pages of contemporaneous notes

13    during his four prison tours, all of which were produced to Defendants.  None of the

14    interviewees appeared to take any notes of their conversations with Dr. Haney, and their

15    "corrections," written 4-6 weeks after the dates of those conversations, should be treated

16    with great suspicion.  In any event, these "corrections" are largely frivolous and beside the

17    point.  (*See, e.g.*, Jenson Decl. ¶ 3, 2:9-12 (Docket No. 4440) ("Dr. Craig Haney states …

18    that I 'praised the cooperation that [I] said the escort officers now showed.'  This is a

19    mischaracterization of my statement to the [P]laintiffs' representatives.  I, in no way,

20    indicated that the officers 'now show' cooperation.  I stated that the officers are

21    cooperative."); Walsh Decl. ¶ 4, 3:6-11 ("Dr. Craig Haney states … that '[a] member of

22    the Special Master's team told [me I] could not use the modified treatment cages because

23    they were too narrow.  Otherwise, there have not been any intrusive interventions [I] could

24    think of that prevented [me] from doing anything [I] wanted to.'  This is another

25    mischaracterization of my statements. As I explained to the Plaintiffs' representatives,

26    *Coleman* monitors had made things extremely difficult regarding this issue …."); Colley

27    Decl. ¶ 9, 6:17-27 (stating that a seriously mentally ill and developmentally delayed

28    prisoner was pepper-sprayed for making a suicidal gesture in the ASU, *not* the MHOHU).)

[767816-1]

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1    On the issues that do matter, the declarants repeatedly agree with Dr. Haney's

2    expert findings, and often highlight the serious deficiencies he has identified.  (*See, e.g.*,

3    Holland Decl. ¶ 6, 3:3-6 (Docket No. 4438) (Dr. Haney "stated that as a result of

4    overcrowding due to transfer backlogs, there was no appropriate place to put inmates

5    awaiting transfer.  *The issue of inmates waiting for transfer to an appropriate bed at Kern*

6    *Valley State Prison is a statewide one and not just specific to California Correctional*

7    *Institution*." (emphasis added)); *id.* ¶ 7, 3:16-17 & Walsh Decl. ¶¶ 8-10 (confirming that

8    the policy is for suicidal prisoners at CCI to be made to sleep on thin mattresses on the

9    floor); Holland Decl. ¶ 10, 4:16-17 (confirming that "[all ASU] inmates are required to be

10   strip searched for safety and security precautions as is the standard for all Administrative

11   Segregation Units," which an inmate reported to Dr. Haney discouraged him from leaving

12   his cell); Telander Decl. ¶ 5, 2:24-3:2 (confirming that ASU houses prisoners for reasons

13   that include behavior as well as safety concerns and "awaiting transfer to appropriate

14   treatment and mental health facilities"); *id.* ¶¶ 8, 3:25-26 & 10, 4:15-17 ("Dr. Haney

15   correctly identifies challenges for confidential treatment space in the AdSeg area" at

16   MCSP and that the "value of [mental health] programming" is "impacted by the challenges

17   of confidential treatment space"); Jordan Decl. ¶ 21, 8:14-19 ("Allegedly, CIM lacks EOP

18   beds, causing reception center EOP patients to wait on average 91 days for transfer. . . .

19   Most of the patients they refer to are waiting for an open Special Needs Yard EOP bed.");

20   Fischer Decl. ¶ 10, 3:23-4:6 (not disputing that 46% of Corcoran EOP ASU primary

21   clinical contacts occur at cell-front, but blaming inmate-patients for this problem without

22   addressing strip searches and use of restraints to which they are subjected for out-of-cell

23   contacts).)

24   In the end, Defendants' declarants' apparent attacks on Dr. Haney's findings,

25   though strongly worded, are not attacks on his expert conclusions at all. They instead range

26   from straw man fallacies to frivolous and misleading corrections to actual statements of

27   agreement.  These attacks should be taken for what they are—a desperate attempt to

28   distract from the fact that Defendants' system is currently not providing adequate mental

[767816-1]

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS

1  health care to class members.

2  **CONCLUSION**

3       For the reasons stated above, Plaintiffs request that Defendants' Reply evidence be

4  excluded in its entirety or, in the alternative, that the Court strike all declarant evidence of

5  claimed future (but currently non-existent) conditions or otherwise violates rules of

6  evidence.  The Court should further reject Defendants' wrong-headed evidentiary

7  objections and disregard the improper and scurrilous attacks on Plaintiffs' experts.

8  DATED:  March 26, 2013       Respectfully submitted,

9            ROSEN BIEN GALVAN & GRUNFELD LLP

10

11            By:  */s/ Aaron J. Fischer*

12                Aaron J. Fischer

13            Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[767816-1]

141

PLAINTIFFS' EVIDENTIARY OBJECTIONS TO DEFENDANTS' REPLY DECLARANTS AND MOTION TO
STRIKE, AND RESPONSE TO DEFENDANTS' OBJECTIONS