Exhibit 1



Transcript of the Testimony of:

# Joel Dvoskin, Ph.D., ABPP

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                    Plaintiffs,     )
                                    )CASE NO.:
          vs.                       )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                    Defendants.     )
_____ )



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,            )
                                      )
5                    Plaintiffs,      )
                                      )CASE NO.:
6         vs.                         )S 90-0520 LKK-JFM
                                      )
7   EDMUND G. BROWN, JR., ET AL.,     )
                                      )
8                    Defendants.      )
    _____)

9

10

11

12          The Deposition of JOEL DVOSKIN, PH.D., ABPP,

13   taken on behalf of the Plaintiffs, before Megan F.

14   Alvarez, Certified Shorthand Reporter No. 12470,

15   Registered Professional Reporter, for the State of

16   California, commencing at 9:14 a.m., on Wednesday,

17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,

18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,

19   California.

20

21

22

23

24

25

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3             BY:  MICHAEL BIEN, ESQ.
                   AARON FISCHER, ESQ.
 4                 JANE KAHN, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5           315 MONTGOMERY STREET, 10TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
 6           415.433.6850
             415.433.7104 FAX
 7           MBIEN@RBGG.COM

 8
     FOR DEFENDANTS:
 9
               BY:  DEBBIE J. VOROUS, ESQ.
10           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
11           1300 I STREET
             SACRAMENTO, CALIFORNIA 95814
12           916.324.5345
             916.324.5205 FAX
13           DEBBIE.VOROUS@DOJ.CA.GOV

14             BY:  HEATHER L. McCRAY, ESQ.
             DEPARTMENT OF CORRECTIONS AND REHABILITATION
15           OFFICE OF LEGAL AFFAIRS
             1515 S STREET, SUITE 314 SOUTH
16           SACRAMENTO, CALIFORNIA 95811
             916.324.4123
17           916.327.5306 FAX

18

19

20

21

22

23

24

25
```

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

1  records system for CDCR as part of your work?

2        A.   Technically, yes.  Practically, no.  It is a

3  disaster.

4        Q.   What --

5        A.   I never had any success getting on it.  So

6  when I wanted to see something, I just asked somebody to

7  find it for me.

8             So I was able to look at the EUHR for people,

9  but I always had a guide because I found it very

10 difficult to use.  I would look for a treatment plan in

11 the treatment plan section, and the person would laugh

12 and say, "Well, might be there, but it might be

13 somewhere else."  And so we'd look in the "All Forms"

14 tab and just -- so it was pretty time-consuming.

15            I think I made pretty clear in my record I

16 cannot for the life of me understand why they don't have

17 electronic medical record.  It's inexplicable.

18       Q.   What do you mean?  They call that an

19 electronic medical record.

20       A.   No, they don't.  Nobody calls it that.

21       Q.   What do you --

22       A.   I don't know who said that, but not with a

23 straight face.  It is not an electronic medical record.

24       Q.   Okay.  What -- in your mind, what's the

25 difference between what you called an electronic medical

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                    February 27, 2013

1    record and the EUHR system that you saw at CDCR?

2         A.    Well, first of all, it's very time-consuming

3    for clerical staff.  They have to scan documents into

4    it.  Documents are often difficult to read because

5    they're handwritten.

6         An electronic medical record is where

7    everything is electronic.  Forms are filled out

8    electronically.  They're instantaneously available.  You

9    don't have to wait for them to be scanned in.  They're

10   organized in a more useable fashion.  The -- where

11   things are filed isn't a matter of chance based on who

12   scanned it but, rather, the form itself is designed to

13   be in a predictable place.

14        This is not an electronic medical record.

15        Q.    Okay.  When I was touring the last couple of

16   weeks, I was also -- been in the prisons.  I had the

17   experience, and I assume from your notes that you had

18   the same experience, where you'd be in some unit and

19   the -- the electronic medical record wasn't available

20   because there was no computer.

21        Did you experience that when you were in CDCR?

22        In other words, to access the electronic

23   medical record, you need to have a computer attached to

24   the system.  That seems obvious, but...

25        A.    I quit asking about that early on.  So what I

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1                  CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                            DATED: March 1, 2013

21

22                       _____

23                            MEGAN F. ALVAREZ

24                            RPR, CSR 12470

25
```

Exhibit 2



Transcript of the Testimony of:

# Edward Kaufman

Coleman v. Brown

March 16, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

Edward Kaufman                                    March 16, 2013

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


```
RALPH COLEMAN, et al.,        )
                             )
          Plaintiffs,        )
                             )
     vs.                     )  Case No. Civ S 90-0520 LKK-JFM P
                             )
EDMUND G. BROWN, JR., et al., )
                             )
                             )
          Defendants.        )
_____)
MARCIANO PLATA, et al.,       )
                             )
                             )
          Plaintiffs,        )
                             )
     vs.                     )  Case No. C01-1351 TEH
                             )
EDMUND G. BROWN, JR., et al., )
                             )
                             )
          Defendants.        )
_____)
```


DEPOSITION OF EDWARD KAUFMAN, M.D., taken

on behalf of the defendants, at 32392 South Coast

Highway, Suite 250, Laguna Beach, California,

commencing at 10:00 a.m., Saturday, March 16, 2013,

before Audrey L. Ricks, Certified Shorthand

Reporter, No. 12098, CCR, RPR, CLR.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                                    March 16, 2013

```
 1    APPEARANCES:

 2    For Plaintiffs:

 3              ROSEN BIEN GALVAN & GRUNFELD LLP
                BY: Margot Knight Mendelson, Esq.
 4              315 Montgomery Street, 10th Floor
                San Francisco, California 94104
 5              415-433-6830
                mmendelson@rbgg.com

 6

 7    For Defendants:

 8              OFFICE OF THE ATTORNEY GENERAL
                BY: Monica Anderson, Esq.
 9              1300 I Street
                Sacramento, California 95814
10              916-324-5345
                monica.anderson@doj.ca.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                    March 16, 2013

1    "constitutional" was used.

2        Q    So none of your evaluation was done with

3    an eye to determine whether or not it was

4    deliberately indifferent to the inmates' subjective

5    or serious medical needs?

6        A    Again, that's a legal term that I didn't

7    use in my assessment of the condition.

8        Q    Okay.  So what did you base your

9    assessments against?

10       A    I based it on an issue -- first of all,

11   certain community standards, certain standards of

12   care in other correctional facilities that I have

13   visited.

14            I based it on damage to the mental health

15   of inmates and inmate patients, and on the adequacy

16   of the therapy to treat the needs of mentally ill

17   and seriously mentally ill inmates.

18       Q    So when you were rendering the opinions

19   that you issued in your report, you were looking at

20   community standards, what you had seen -- observed

21   at other correctional facilities, and then

22   individual care of each patient that you evaluated?

23       A    As to whether or not the treatment was

24   inadequate or damaging to their mental health.

25       Q    Okay.  Are you aware that the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                              March 16, 2013

1        A     Approximately 20.

2        Q     And did you look to determine whether or

3   not a diagnosis was made?

4        A     Yes.

5        Q     Whether medication was -- was prescribed?

6        A     Yes.

7        Q     Whether the medication was appropriately

8   prescribed?

9        A     To some extent, yes.

10       Q     And did you look to determine whether or

11  not the doctor was monitoring the medications?

12       A     Yes.

13       Q     Was there anything else that you looked at

14  in those charts to determine whether or not the care

15  was, in your opinion, within community standards?

16       A     Well, I was looking at the charts to see

17  if some of the comments made by inmates about their

18  care was validated by the chart or not.

19       Q     Okay.  So after your conversations with

20  the inmates, you then looked at their charts to

21  confirm what they had told you?

22       A     Correct.

23       Q     Okay.  With respect to the charts that you

24  did review and the inmates that you interviewed --

25  well, I guess I will ask separately because the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                    March 16, 2013

1    were those inmates selected?

2        A    When we went to each unit, my recollection

3    is that we would ask for inmates who had prolonged

4    stays.

5            I think there were a few inmates that

6    Ms. Mendelson had advance knowledge that they have

7    extended stays in SHU or AD-SEG.

8        Q    Okay.  Any other way that they were

9    selected?

10       A    Not that I recall.

11       Q    Okay.

12       A    By the way, I just recalled another mental

13   health expert whose name I've heard, and that's

14   Pablo Stewart --

15       Q    Thank you.

16       A    -- who is the other psychiatrist involved.

17       Q    Okay.  Thank you.

18       A    Whom I have never met.

19       Q    So for the 20 inmates that you

20   interviewed, did you review all of their medical

21   records?

22       A    Yes -- actually, let me correct that

23   statement.  I -- I read each of their medical

24   records.  I didn't read all of their -- each of

25   their records because I only read the record that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                              March 16, 2013

1    was provided to me.

2         Q    Do you know what was provided to you?

3         A    It's in an individual case, and it would

4    be the record going back maybe a year or two, maybe

5    some history dating back further.  But it didn't

6    seem to be a voluminous, total record, but rather a

7    record of the last year or so in general.

8         Q    Okay.  And were there any specific parts

9    to those records that you looked at?

10        A    I focused mainly on the psychiatric

11   evaluations, on the treatment team meetings and

12   treatment team recommendations, on the psychiatric

13   evaluations, the psychotherapy notes, and the

14   compliance with medications.

15        Q    Was there anything that wasn't provided to

16   you that you wish you would have had to look at?

17        A    Not to my knowledge.

18        Q    So looking at your opinion on page --

19   starting at page 7 of your declaration regarding

20   staffing shortages, I'd like to ask you some -- some

21   questions about that.  Okay?

22        A    Yes.

23        Q    So with respect to your opinion on

24   staffing shortages, what are the basis for those

25   opinions?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                    March 16, 2013

```
 1   were visiting.
 2        A    Do you have the page?
 3        Q    No.  I'm asking you if you know what the
 4   current --
 5        A    No.  I don't know what they are currently,
 6   no.
 7        Q    Okay.  What about at CCWF?  Do you know
 8   what the current staffing ratios are?
 9        A    Not as of today, no.
10        Q    What is your opinion on what the
11   Constitution requires in terms of staffing?
12        A    Again, you're using the term
13   "constitution."  I would use the term "the ability
14   to provide humane treatment that avoids inmate
15   suffering and psychological decompensation."
16             And basically, in terms of the numbers,
17   what I'm pointing out is decreases in the system,
18   unfilled positions within the system, and extended
19   sick leave of almost a third of psychologists within
20   the system of one facility.
21        Q    Well -- and your position is that it
22   adversely impacts their mental health care?
23        A    Yes.
24        Q    Okay.  But can you give me any examples of
25   an impacted health care?
```

Edward Kaufman                                    March 16, 2013

1   your list here that that happened to?  You talked

2   about Prisoner B.  But anybody else?

3       A    Prisoner C was seen at cell front by her

4   clinician because there was a shortage of staff

5   escorts.

6       Q    But how does that show that the amount of

7   treatment was reduced simply because she was seen at

8   the cell front?

9       A    Because in general, the visits at the cell

10  front, as I said before, do not provide sufficient

11  therapeutic contact.  Again, it's my impression they

12  tend to be briefer --

13      Q    Did you observe a cell-front visit?

14      A    The only cell-front visit I recall

15  observing was a psychiatric technician walking by a

16  row of cells.

17      Q    So when -- when you say that they're

18  inadequate, you're basing that on what?

19      A    Basing that on what usually happens when

20  someone is seen cell front as opposed to seeing them

21  in a confidential setting where the therapist can

22  sit comfortably and have eye contact.

23      Q    And how do you know what usually happens

24  if you haven't observed one?

25      A    I only know what is -- is my custom and my

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                    March 16, 2013

1    understand, but on page 9 it specifically says that

2    she's a CCCMS.

3    BY MS. ANDERSON:

4        Q    So paragraph 49, you referenced Prisoner B

5    as having a high number of cell-front contacts

6    because of a lack of available confidential space.

7             Did you verify this with her health

8    record, her medical record?

9        A    Yes.  The quote is from her medical file.

10       Q    Okay.  And did you see any other

11   patients -- were you able to confirm in their

12   medical record that contacts had occurred simply

13   because of lack of available confidential space?

14       A    Well, it says Prisoner A -- it said most

15   of her interactions with clinicians consist of

16   someone walking by her cell, presumably a psyche

17   tech, and calling out, "Everything okay?"  That's

18   obviously not a confidential interaction.

19       Q    Well, it might not be confidential, but it

20   doesn't relate to whether or not there was a lack of

21   available space, or are you now saying that Prisoner

22   A was talking to the psyche tech at the cell front

23   because of lack of available space?

24       A    No, I'm not saying that.  I'm referring

25   again to paragraph 48, that several patients at CCWF

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                    March 16, 2013

 1   about mental health needs being met are more general

 2   rather than specific.  To try to say that any one

 3   issue results in somebody decompensating is -- is

 4   difficult to do.

 5           But what I'm saying is that the totality

 6   of the lack of therapy and the overall conditions,

 7   including the overcrowding, are what contribute to

 8   her decompensation.

 9       Q    And so is it your position that because of

10   these circumstances, the medical -- mental health

11   care providers should have known that she needed --

12   they needed something different?

13       A    Yes.

14       Q    Okay.  So let me take you --

15       A    Yeah.  Let me -- we could go through every

16   one of the 20 cases that I have, and I could

17   elaborate on whether I think they fulfill a

18   deliberate indifference or not, or my substitution

19   for deliberate indifference, which is knowing that

20   other more comprehensive and humane treatments would

21   prevent unusual suffering and decompensation.

22       Q    Okay.  I'm going to direct your attention

23   to 20 -- or page 22, in terms of Prisoner T.

24           We're -- we're still on the issue of

25   medication management or medication interference.

Edward Kaufman                                              March 16, 2013

```
 1        A    No.
 2        Q    So is that consistent with your
 3   position -- with my statement, that they shouldn't
 4   be in a prison?
 5        A    I think there are some mental -- there are
 6   some mentally ill people that have to be in prisons.
 7   But I think it's -- if we had adequate psychiatric
 8   facilities, the percentage of mentally ill that are
 9   in prison would be enormously reduced.
10        Q    Doctor, I'm going to ask you some
11   questions now about your qualifications as an
12   expert.  Okay?
13             Do you have any prior experience before
14   this case as working -- as working as an expert?
15        A    Yes.
16        Q    And could you please tell me every
17   situation in which you've been retained as an
18   expert?
19        A    Well, besides all the ones in prisons that
20   I mentioned, and I don't know if I mentioned
21   Pennsylvania or not, but that was another one where
22   I was retained as an expert.
23             In addition to prison work --
24        Q    Let me just ask about prison work to save
25   some time.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                          March 16, 2013

```
 1        I, Audrey L. Ricks, CSR 12098, do hereby
 2   declare:

 3

 4        That, prior to being examined, the witness
 5   named in the foregoing deposition was by me duly
     sworn pursuant to Section 30(f)(1) of the Federal
 6   Rules of Civil Procedure and the deposition is a
     true record of the testimony given by the witness.
 7
          That said deposition was taken down by me in
 8   shorthand at the time and place therein named and
     thereafter reduced to text under my direction.
 9
          That the witness was requested to review the
10   transcript and make any changes to the transcript as
     a result of that review pursuant to Section 30(e) of
11   the Federal Rules of Civil Procedure.

12        No changes have been provided by the witness
     during the period allowed.
13
          The changes made by the witness are appended
14   to the transcript.

15        No request was made that the transcript be
     reviewed pursuant to Section 30(e) of the
16   Federal Rules of Civil Procedure.

17        I further declare that I have no interest in
     the event of the action.
18
          I declare under penalty of perjury under the
19   laws of the United States of America that the
     foregoing is true and correct.
20
          WITNESS my hand this 17th day of
21
     March, 2013.
22

23   _____
     Audrey L. Ricks, CSR 12098
24

25
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

Exhibit 3



Transcript of the Testimony of:

# Jacqueline Moore, R.N., Ph.D.

Coleman v. Brown

February 21, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                    Plaintiffs,     )
                                    )CASE NO.:
        vs.                         )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                    Defendants.     )
_____)



DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,             )
                                       )
5                    Plaintiffs,       )
                                       )CASE NO.:
6          vs.                         )S 90-0520 LKK-JFM
                                       )
7   EDMUND G. BROWN, JR., ET AL.,      )
                                       )
8                    Defendants.       )
    _____)

9

10

11

12

13

14          The Deposition of JACQUELINE MOORE, RN, PH.D.,

15   taken on behalf of the Plaintiffs, before Megan F.

16   Alvarez, Certified Shorthand Reporter No. 12470,

17   Registered Professional Reporter, for the State of

18   California, commencing at 8:50 a.m., Thursday,

19   February 21, 2013, at the Rosen, Bien, Galvan &

20   Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21   Francisco, California.

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3              BY:  AARON J. FISCHER, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, 10TH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              AFISCHER@RBGG.COM

 7

     FOR DEFENDANTS:
 8

                BY:  DEBBIE J. VOROUS, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              1300 I STREET
                SACRAMENTO, CALIFORNIA 95814
11              916.324.5345
                916.324.5205 FAX
12              DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1  November -- the first site visit may have been in
 2  February.
 3  BY MR. FISCHER:
 4      Q.    This is not including the initial visit to
 5  Sac; is that correct?
 6      A.    Exactly.
 7      Q.    Okay.  Before I move ahead, in your report, is
 8  there any discussion of the overcrowding trial?
 9      A.    Not that I'm aware of.
10      Q.    You're aware that Supreme Court made their
11  decision in the overcrowding case in the summer of 2011?
12      A.    Yes.
13      Q.    Was there a decision not to include any
14  discussion of overcrowding in this report?
15          MS. VOROUS:  Objection.  The questions with
16  respect to overcrowding are beyond the scope of the
17  issue -- beyond the scope of the issues raised in the
18  motion to terminate and beyond the scope of what was
19  requested in terms of the expert consultancy in this
20  case.
21          Go ahead and answer if you can.
22          THE WITNESS:  We didn't look at overcrowding.
23  BY MR. FISCHER:
24      Q.    Did you think that overcrowding wasn't
25  relevant to the issues that you were asked to look at?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

 1           MS. VOROUS:  Objection.  Again, beyond the
 2   scope of the issues to terminate in Coleman and the
 3   scope of the consultancy of Dr. Moore in this case.
 4           Go ahead and answer if you can.
 5           THE WITNESS:  We had specific issues that we
 6   were looking at, and those issues consumed four of us
 7   for the time we were on site.  We didn't have time to
 8   become involved in every issue that CDCR has.
 9   BY MR. FISCHER:
10       Q.   Including overcrowding?
11       A.   Including overcrowding.
12       Q.   Okay.  On your tours, did you find that
13   crowding was impacting care at any of the institutions?
14           MS. VOROUS:  Objection.  Beyond the scope of
15   the issues that are in dispute with respect to the
16   motion to terminate.  Beyond the scope of Dr. Moore's
17   motion to consult in this case and expert report.
18           I'm sorry.  I'm speaking too low.  Beyond the
19   scope of the issues that are in dispute and beyond the
20   scope of Dr. Moore's expert opinion in this case.
21           THE WITNESS:  Do you want me to answer?
22   BY MR. FISCHER:
23       Q.   Yes, please.
24       A.   The areas that I went to -- and I did not go
25   to every housing area in the jail -- I did not find that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                February 21, 2013

1    discharge planning at the institution?

2                MS. VOROUS:  Objection.  Misstates her

3    testimony.

4                THE WITNESS:  Yes.

5    BY MR. FISCHER:

6        Q.    Okay.  And one last thing on CIM I wanted ask

7    you about in your notes on the final page, 102633.

8                Most of the way down next to No. 5, it says:

9    "Nurse UNFAM, SE, psy meds."

10               What does that note refer to?

11       A.    Nurses were unfamiliar with the side effects

12    of psychiatric meds.

13       Q.    I imagine that's on your radar because you're

14    a nurse?

15       A.    I asked them.

16       Q.    Why did you ask this question?

17       A.    I asked all the institutions.  That was one of

18    the criteria on my audit tool.

19       Q.    And here -- SE is side effects?

20       A.    Side effects.

21       Q.    And is this particular CIM of concern to you

22    in your analysis?

23       A.    Yes.

24       Q.    Why is that?

25       A.    Because it's a common practice that nurses

1  know the side effects of the medication that they're

2  giving because very often you are the one that might

3  observe lithium toxicity in an inmate.

4      Q.   So it's important to be aware of the side

5  effects of the psych medications in order to ensure the

6  safety and well-being of those patients?

7      A.   Yes, sir.

8      Q.   Did you observe this problem at any other

9  institutions?  Do you remember?

10     A.   Yes.

11     Q.   Do you remember which institutions?

12     A.   All of them except San Quentin.

13     Q.   San Quentin?

14     A.   Knew the side effects.

15     Q.   They were good?

16     A.   They were good.

17     Q.   Did you raise this with -- at the exit

18  interviews?

19     A.   Each and every time.

20     Q.   Did this make it into your report?

21          Direct you to page 26 of your report,

22  Exhibit 4.

23          Tell me if I'm looking at the right -- bottom,

24  "Nursing Medication Management."  Just a short section.

25          Is that an issue you think could have been put

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    in the report if you were writing it?

2         A.    I think I would have phrased it differently.

3         Q.    What would you have phrased differently?

4         A.    I would have made a recommendation that

5    nursing education emphasize the side effects of the

6    medication and that they have handouts or signs

7    available where they dispense the medications so these

8    things would be in front of them all the time.

9         Q.    All right.  Back on page 19 very briefly.  It

10   says:  "At Corcoran, inmates reported from the EOP

11   special needs yard that yard time was canceled for

12   various reasons on a relatively frequent basis."

13              You didn't visit the EOP special needs yard?

14        A.    No, I did not.

15        Q.    Were you aware of this issue at the

16   institution?

17        A.    No, I was not.

18        Q.    From a mental health perspective, is it

19   concerning to you, given your expertise, for EOPs to be

20   denied yard time?

21        A.    Yes.

22        Q.    And why is that?

23        A.    Inmates need to go outside, exercise,

24   socialize.

25        Q.    And the lack of that opportunity can adversely

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1                  CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                          DATED: February 25, 2013

21

22                          _____

23                          MEGAN F. ALVAREZ

24                          RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                          February 21, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8          That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                   DATED: February 25, 2013

21

22

23                   MEGAN F. ALVAREZ

24                   RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit 4



Transcript of the Testimony of:

# <u>Pablo Stewart, M.D.</u>

Coleman v. Brown

March 19, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,          )
                                )
        Plaintiffs,             )
vs.                             )    No. Civ S 90-0520 LKK-JFM P
                                )
EDMUND G. BROWN, JR.,           )
et al.,                         )
                                )
        Defendants.             )
_____  )
MARCIANO PLATA, et al.,         )
                                )
        Plaintiffs,             )
                                )
vs.                             )    No. C01-1351 THE
                                )
EDMUND G. BROWN, JR.,           )
et al.,                         )
                                )
        Defendants.             )
_____  )


DEPOSITION OF

PABLO STEWART, M.D.

TUESDAY, MARCH 19, 2013, 9:00 A.M.

SAN FRANCISCO, CALIFORNIA


REPORTED BY:  BRENDA L. MARSHALL, RPR, CSR NO. 6939

THORSNES LITIGATION SERVICES, LLC

Pablo Stewart, M.D.                                    March 19, 2013

1              UNITED STATES DISTRICT COURTS

2              EASTERN DISTRICT OF CALIFORNIA

3           AND NORTHERN DISTRICT OF CALIFORNIA

4     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6

7    RALPH COLEMAN, et al.,      )
                                 )
8         Plaintiffs,            )
     vs.                         )    No. Civ S 90-0520 LKK-JFM P
9                                )
     EDMUND G. BROWN, JR.,       )
10   et al.,                     )
                                 )
11        Defendants.            )
     _____ )
12   MARCIANO PLATA, et al.,     )
                                 )
13        Plaintiffs,            )
                                 )
14   vs.                         )    No. C01-1351 THE
                                 )
15   EDMUND G. BROWN, JR.,       )
     et al.,                     )
16                               )
          Defendants.            )
17   _____ )

18

19           The Deposition of PABLO STEWART, M.D., taken

20   on behalf of the Defendants, before Brenda L. Marshall,

21   Certified Shorthand Reporter No. 6939, Registered

22   Professional Reporter, for the State of California,

23   commencing at 9:00 a.m., at the U.S. Department of

24   Justice, Office of the Attorney General, 455 Golden Gate

25   Avenue, San Francisco, California.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Pablo Stewart, M.D.                                              March 19, 2013

```
 1    APPEARANCES OF COUNSEL:

 2

 3    FOR PLAINTIFFS:

 4            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              BY:  THOMAS NOLAN, ESQ.
 5            315 Montgomery Street, Tenth Floor
              San Francisco, California   94104
 6            (415) 433-6830
              tnolan@rbgg.com
 7

 8

      FOR DEFENDANTS:
 9
              STATE OF CALIFORNIA
10            DEPARTMENT OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
11            BY:  MONICA N. ANDERSON, ESQ.
              1300 I Street
12            Sacramento, California   95814
              (916) 324-3867
13            monica.anderson@doj.ca.gov

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1      Q.   So you have based the opinions in your report,

2  which I'm going to ask you about in detail, on your visits

3  to five institutions; correct?

4      A.   Well, on my visits to five institutions, as well

5  as reviewing materials that have been provided, like

6  management reports, special master's reports -- what's

7  that one that gives you the statistics on amount of

8  vacancies -- monthly statistical report.  I forget all the

9  names, there's a lot of reports, and I don't know if I can

10  give you all the names right now, but it's those

11  additional documents, besides my tours.

12      Q.   Did you look at that information with an eye

13  toward the institutions that you visited?

14      A.   I looked at those materials both with an eye

15  toward the institutions that I visited and to get a sense

16  if -- to confirm whether or not the findings that I saw,

17  the opinions that I arrived at, and the things that I

18  found, basically, in the tour were present systemwide.

19      Q.   And so your -- the information -- aside from

20  what you personally observed at the five institutions, the

21  information that you are relying on regarding systemwide

22  comes from management reports and the special master

23  reports, as well as this other statistical information?

24      A.   Yes.  And other documents that I list there.

25      Q.   And those documents, are those the ones that are

Pablo Stewart, M.D.                                    March 19, 2013

1  attached to your declaration as well?

2       A.   Yes.

3       Q.   Okay.  Please list for me the five institutions

4  that you visited.

5       A.   I visited Salinas Valley State Prison;

6  California State Prison Sacramento; I call it Lancaster,

7  but it's the Los Angeles County State Prison, something

8  like that, R.J. Donovan, and San Quentin.

9       Q.   Okay.  And so let's start with the first one,

10 Salinas Valley.  How much time did you spend at Salinas

11 Valley?

12      A.   I spent a long day there.

13      Q.   Okay.  One day?

14      A.   Yes.

15      Q.   And define "a long day" for me.  How many hours?

16      A.   I got there early and left late.  We had a

17 meeting with staff that I believe began at 8:00, 8:15, in

18 that range, and we went until 6:00.  Something in that

19 range.

20      Q.   Okay.  And how many facilities did you visit

21 at -- was I asking about Salinas Valley first?

22      A.   Salinas Valley, yes.

23      Q.   And how many facilities did you go to at Salinas

24 Valley?

25      A.   What do you mean, "facilities"?

Pablo Stewart, M.D.                                          March 19, 2013

1   GP?  Did you go to any general population yards and talk

2   to CCCMS inmates?

3        A.   I don't believe I did.  I know I spoke with

4   CCCMS in the ad seg unit.

5        Q.   Okay.  Counsel just raised a good point.  You

6   didn't provide any notes with your report --

7        A.   Correct.

8        Q.   -- right?

9             Did you take any notes during the visit?

10       A.   I did not.

11       Q.   Okay.  Do you have a photographic memory?

12       A.   Even though it may not seem that way today, I

13  have a pretty good memory in the -- in the -- in sort of

14  the short and intermediate term.  So -- so, yes, to answer

15  your question.

16       Q.   Okay.  You have -- you didn't take any notes,

17  but then you were able to generate a 167-page declaration

18  based on specific information regarding the visits --

19       A.   Correct.

20       Q.   -- correct?

21            So you didn't write anything down?

22       A.   I did not.

23       Q.   And how is it that you recall all the specific

24  details to prepare the declaration without taking any

25  notes?

Pablo Stewart, M.D.                                      March 19, 2013

1        A.   Well, my way of working, and I've worked with

2    Mr. Nolan in the past, so we have a -- our sort of style

3    that has worked, to be able to produce a document like

4    this is that immediately after the visit, we would review

5    exactly what we did and go -- and review, like, okay, what

6    did we do at the EOP ad seg, for example, what did we do

7    at the EOP GP unit, and who did we see there, and let's

8    review what the findings were, what my opinions were at

9    that time, and he would then start -- I dictated to him

10   the beginnings of the report.

11       Q.   Okay.  So did you do that in the car, or were

12   you in another office, or where did you do that?

13       A.   Well, because of the fact that, you know, the

14   Salinas Valley visit was on a Monday, and then we were at

15   CSP SAC on Tuesday so we did that in the car, immediately

16   afterwards.

17       Q.   Okay.  And did he write down what you were

18   telling him?

19       A.   Yes.

20       Q.   Okay.  So that happened at Salinas Valley;

21   right?

22       A.   Yes.

23       Q.   Okay.  And so, then, after -- did that happen at

24   every institution that you visited?

25       A.   That was how we worked.  Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Pablo Stewart, M.D.                                    March 19, 2013

1    Q.   That was how you worked.  Okay.  How much time

2  did you spend talking about your findings at Salinas

3  Valley State Prison, dictating to Mr. Nolan what -- what

4  you had seen?

5    A.   Well, when we left Salinas Valley, what -- I

6  remember we did some work right in the parking lot.  I

7  wanted to get some ideas down while they were still fresh.

8  And then we drove, and we stopped for something to eat,

9  and we worked during our food stop.

10       And then we continued to drive.  I was driving,

11  and Mr. Nolan had his laptop, and so I was dictating while

12  we were driving.

13       So the drive from Salinas Valley all the way to

14  New Folsom, however far that area of Sacramento is, so at

15  least those hours, plus time in the parking lot, plus time

16  at our dinner stop.

17    Q.   So would you say two hours?  Three hours?

18    A.   I'd say more like -- boy.

19       MR. NOLAN:  Do you know the drive?  The drive is

20  probably about five hours.  Four or five hours.

21       THE WITNESS:  Yeah.  I was going to say, you

22  know, five hours minimum.  Because we didn't get to the

23  hotel that night until almost midnight.  Something around

24  in that range.  So the whole time, we were working.

25  BY MS. ANDERSON:

Pablo Stewart, M.D.                                        March 19, 2013

1      Q.    So for five hours, you were dictating to
2  Mr. Nolan what to put in the report?
3      A.    Yes.
4      Q.    Okay.  So just so I'm clear about the process,
5  so you went to the prison, you dictated to him all your
6  findings and the specifics about each inmate that you had
7  met with, and then he typed that into the report?
8      A.    Yes.
9      Q.    Okay.  And what about information that's in the
10 report you reviewed after the fact?  Because there's
11 information regarding inmates that you reviewed later;
12 right?
13     A.    Yes.
14     Q.    So how did you deal with that?  Did you take any
15 notes about that?
16     A.    No.  I did not take any notes.  Are you
17 referring to reviewing medical records?
18     Q.    Yes.  And other things.  I mean, in your
19 declaration, you reference medical records and other --
20 other documents that influenced your decision.  So what
21 did -- how did you deal with those?  How did you insert
22 that information into the report?
23     A.    Well, when I reviewed it, you know -- again,
24 Mr. Nolan and I worked on this together, and so he had
25 gone to San Quentin, I believe, where they had the setup

Pablo Stewart, M.D.                                        March 19, 2013

1    to copy out medical records.  So the people that we had

2    seen, he had gotten their medical -- their pertinent

3    portions of their medical records.  And --

4         Q.   Who decided what the pertinent portions were?

5    Did you tell him what you wanted to look at?

6         A.   Yes.  I told him that I needed to have treatment

7    plans that went back several iterations.

8         Q.   Was there a period of time that you were looking

9    at a -- I mean, I'm not sure what "several iterations"

10   means.  That could be a week, a month.  How long -- how

11   far back did you look at records?

12        A.   It was a range.  It was around a year to maybe a

13   year and a half.  Sometimes two years.  And, also, besides

14   just treatment planning, medication records, doctors'

15   orders, progress notes, and any other events that may have

16   happened to a particular inmate, such as MHCB admissions,

17   DSH referral packets, and, in some of the cases, there

18   were records from DSH, due to a recent DSH admission.

19             So those were all part of what I instructed

20   Mr. Nolan to get.

21        Q.   Okay.  So did you actually physically look at

22   any records, or you relied solely on what was provided by

23   Mr. Nolan?

24        A.   Oh, I --

25        Q.   Did you pick up an inmate's medical file and

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   look at it?
 2           MR. NOLAN:  Just so the record is clear, the
 3   inmates in the CDCR don't have physical medical files.
 4   They have an electronic file.
 5           MS. ANDERSON:  I think that's in dispute.  I
 6   think that's one of the issues that I'd like to explore
 7   with Dr. Stewart.
 8           MR. NOLAN:  Okay.  Go ahead.
 9   BY MS. ANDERSON:
10       Q.   So --
11       A.   Well, to answer your question, did I ever
12   physically pick up a medical record during the tours?
13       Q.   Or later.  I mean, not just during the tour, but
14   did you actually look at the medical record of an
15   individual who you were talking to?  Or evaluating?
16       A.   Yes.
17       Q.   And who -- which inmates were those?
18       A.   Well, during the course of my tours, you know, I
19   was accompanied by a whole group of individuals -- mental
20   health people, chief psychiatrists, or acting chiefs, all
21   these different people -- and, oftentimes, I would ask
22   them -- I decided which people I wanted to interview, and
23   then I said, "Could you please get me what their current
24   diagnostic assessment is and what their current
25   medications and treatment plan include."
```

Pablo Stewart, M.D.                                     March 19, 2013

1         And they would go to a -- you know, a kiosk, or

2    however they do it, they print it out and bring it back to

3    me so I'd have it there.

4         During the course of my interviews with inmates,

5    or shortly thereafter, I certainly consulted with the

6    staff about diagnostic assessments that they had of

7    inmates.

8         Q.   And were they printing -- you said they were

9    printing it out.  Were they printing it out from the EUHR,

10   the electronic health record?

11        A.   Yes.  Yes.

12        Q.   How did you decide which inmates that you wanted

13   to interview at the institutions that you visited?

14        A.   Well, it depended.  I think we should be more

15   specific about which institutions.

16        Q.   So you had a different process at different

17   ones?  I'm just trying to find out --

18        A.   No.  I understand.  It wasn't -- it was the same

19   process overall, but it depended on where, like I said, we

20   went, to the ad seg EOP versus going to a mainline EOP.

21        Q.   Okay.  And I know that in your report you

22   indicated that, in some circumstances, you looked at the

23   length -- the inmates who had been there the longest or

24   had the most acuity, things like that.

25        A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    complaints by CDCR staff that people were sent back from

2    DSH prematurely --

3        Q.    Did you verify that yourself or --

4        A.    Yes.  And then I went to -- I interviewed these

5    people, I evaluated them --

6        Q.    The inmates?

7        A.    -- the inmates, and found that, you know, they

8    had recently, within weeks or maybe a month, at the most,

9    had been in a DSH program.  And that -- and then, soon

10   after their return to the sending facility, they were

11   deemed to need to go back again because they really hadn't

12   gotten any clinical benefit of being there.

13           There was that.  There was the complaints of the

14   staff, one area that sort of alerted me to this problem.

15   Then, evaluating these guys that had recently been

16   returned really highlighted how sick they still were, in

17   spite of recent stays in DSH.

18       Q.    Can you tell me about the evaluations that you

19   did on these inmates that had recently been returned from

20   DSH?  Did you --

21       A.    Okay.  Let me finish that other part about how I

22   knew that these people were sent back.

23           In the most -- I don't want to say "elaborate,"

24   but the most detailed conversation I had about this issue

25   was one of the treating psychiatrists in the unlicensed

Pablo Stewart, M.D.                                          March 19, 2013

1   MHCB at CSP SAC.  He was a registry doctor who actually

2   was going to have to stop working a week or so after I saw

3   him because he had already expended his hours, but he -- I

4   introduced myself to him, and he asked me if I wouldn't

5   mind consulting with him, as a colleague, around this

6   particular issue, around this particular inmate.

7            And so in this particular case, we had the

8   medical record.  He had it right there.  It was actually

9   a -- I don't remember if it was a paper record or

10  electronic record in the unlicensed MHCB.  But we looked

11  at the medical record, we confirmed that this person had

12  recently been sent back from a DSH program and was

13  exceedingly psychotic and met referral criteria for DSH,

14  and he was on two long-term, long-acting, injectable

15  antibiotic psychotic medications.

16           So I was having a collegial consultation with

17  this psychiatrist about how clinically -- because he was

18  lost, what to do with this guy, quite frankly.  He wasn't

19  sure.  So we were, you know, just consulting.  You know, I

20  said, "Well, maybe you want to try this med" or "do this

21  sort of maneuver," trying to stabilize this guy while he

22  was waiting to go back to DSH.

23       Q.   Is that the psychiatrist that you're referring

24  to in your report about the premature discharges?

25       A.   If there's --

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Pablo Stewart, M.D.                                    March 19, 2013

1           MR. NOLAN:  Is there a particular place in his

2    report that you would like to refer him to?  He talked to

3    many psychiatrists, I believe.

4           THE WITNESS:  Yeah.

5    BY MS. ANDERSON:

6      Q.   Well, you refer to staff, but you're not

7    mentioning a specific position.

8      A.   No.  I believe, in the report, it was at the

9    MHCB, unlicensed unit at CSP SAC, and the doctor was a

10   registry person.

11     Q.   Okay.  So other than this -- this specific

12   consultation that you had with this clinician, did you --

13   what process did you use to evaluate any other inmates

14   that you thought had been prematurely discharged?

15     A.   Well, again, I didn't -- I hadn't arrived at

16   that opinion yet.  I hadn't arrived at the -- I said,

17   "Well, show me the people that were prematurely

18   discharged, and then let me see them."

19           I -- I asked for who are the people -- I've

20   forgotten -- the conversations with staff is usually the

21   MHCB director and the psychiatrist.  They would alert me

22   to the fact that we had -- we sort of went through the

23   MHCB and said, "What about this guy?  What's going on with

24   this guy?"  And they alerted me that there were several

25   people that had recently been discharged from DSH that

Page 81

Pablo Stewart, M.D.                                    March 19, 2013

1   they needed to -- that they were holding there because

2   they were rereferring them back.

3        Q.   And did you review the discharge summary from

4   DSH to see --

5        A.   And in certain places, I reviewed the discharge

6   summary, I looked at other -- their current medical

7   record, I consulted with both the psychologist and the

8   psychiatrist involved in the case, and I did a personal

9   interview.

10       Q.   So how many of these did you do?

11       A.   Of the recent returns and --

12       Q.   Yes.

13       A.   I don't know an exact number.  I know that at

14   R.J. Donovan, in the MHCB, there was, like, 11 patients,

15   and I believe it was -- five or six of them were in this

16   category.

17       Q.   What about at the other institutions?

18       A.   And at CSP SAC, there was a significant number.

19   I forget the number.  It was more than 10 that were in

20   this category.  So it was -- I didn't look at all of them.

21   Okay?

22       Q.   But you did at Donovan and SAC?

23       A.   No.  I didn't look at everyone who was waiting

24   to return back to DSH.  I didn't look at every -- I didn't

25   personally evaluate every inmate.

Pablo Stewart, M.D.                                    March 19, 2013

1    didn't have -- there was no evidence that it was

2    occurring, during my tours, at least.

3         Q.   Okay.  Doctor, is recreational therapy

4    constitutionally required?

5         A.   If there's a serious medical need that's been

6    identified that can only be addressed by recreational

7    therapy and then they don't do it, then that would not be

8    constitutional.

9         Q.   And would that be a case-by-case basis?

10        A.   Yes.

11        Q.   Doctor, are you aware that telepsychiatry

12   started at Salinas Valley State Prison January 31st of

13   2013?

14        A.   I was informed that that was the plan.  I'm not

15   aware that it has actually happened.

16        Q.   In paragraph 72 of your report, you mention that

17   staffing problems at Salinas Valley played a significant

18   role in the problems of the delivery of mental health care

19   that you observed.

20        A.   Yes.

21        Q.   Can you identify a specific inmate for me who

22   didn't get mental health care?

23        A.   Well, all of the EOP members weren't getting

24   proper mental health care.

25        Q.   Because of staffing problems?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1      Q.   Well, in your opinion, should -- based on your

2  evaluation and your discussions with the staff, do you

3  think he should have been forcibly medicated?  You

4  mentioned he doesn't meet the criteria for Keyhea, but did

5  you think, in your opinion, he should have been forcibly

6  medicated?

7           MR. NOLAN:  That misstates what he says.  Right

8  here, it says not that that's the doctor's opinion, but

9  possibly this is because of the belief that he does not

10  meet the criteria.

11           MS. ANDERSON:  Thank you.

12      Q.   So staff didn't think he --- well, so what do

13  you think?

14      A.   Well, again, based on the severity of his

15  symptoms and the fact that he had -- there were notes that

16  he was -- had been obstructing staff and for assault from

17  the last few months, it certainly seemed to me that he

18  should at least be considered for involuntary medication.

19      Q.   And you also mentioned that Prisoner W needs

20  inpatient level of care before he hurt someone else.

21           Did you give your opinion to the chief

22  psychiatrist?  Did you tell anybody, not just the chief

23  psychiatrist, but -- that you thought he should be put in

24  inpatient level of care?

25      A.   He was one of a relatively large group of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Pablo Stewart, M.D.                                    March 19, 2013

1    individuals that I felt needed to access higher levels of

2    care, and in certain cases, I did relay my opinions to

3    staff; in some cases, I didn't.  And I don't -- I don't

4    know if I did in this case.

5         Q.   Why not?

6         A.   Well --

7         Q.   I mean why some, not others?

8         A.    In some, the staff were available and willing to

9    talk.  Okay?  In other cases, and I don't know if it's the

10   case in this particular example, but I was blocked off

11   from accessing staff.  Other staff were involved in sort

12   of shunning people away.  When I would try to talk to

13   them, they would take them away.  And I had -- I didn't

14   have, in all cases, ready access to the staff to have an

15   open and unobstructed collegial conversation.

16        Q.   Where were they shunning them away from you?

17        A.   I'm sorry?

18        Q.   Where were they shunning them away?

19        A.   Oh, that happened in -- it certainly happened in

20   R.J. Donovan, where I wanted to speak with the

21   psychiatrist on a particular case.  And when I approached

22   the psychiatrist, the -- the -- I don't know if it was --

23   if she was acting or the actual chief of mental health,

24   but a woman sort of literally got between me and this

25   doctor and said, "I'm just talking to -- I'm talking to

1    one of my staff.  You have to wait.  You can't talk to him

2    now."  And then she took him off to the side and gave him

3    a parting line is what it looked like.

4              So that certainly went on.

5         Q.   So did that happen anywhere else besides

6    Donovan?

7         A.   It -- it occurred at -- to a lesser extent at

8    Lancaster.  It -- it didn't occur at Salinas Valley

9    because the psychiatrist was nowhere to be found.  So I

10   didn't have access to the psychiatrist at all.

11             At CSP SAC --

12        Q.   Well, can I --

13             MR. NOLAN:  Let him --

14             THE WITNESS:  -- I had fairly good access to the

15   psychiatrist, and I described that one collegial

16   discussion I had about unlicensed MHCB unit with that --

17   with the registry doctor.

18   BY MS. ANDERSON:

19        Q.   So you said that there were -- or were there

20   mental health staff from the prison that accompanied you

21   on the tours?

22        A.   Yes.

23        Q.   Okay.  So even if you couldn't have spoken to a

24   psychiatrist, was -- could you have mentioned something to

25   the person on the tour with you?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Pablo Stewart, M.D.                                    March 19, 2013

1      A.    Theoretically, and in -- I'll tell you why I

2    didn't speak to the staff, say, about my opinions where

3    this guy needs to be in a hospital because that's my

4    opinion, and I think it was a very well-founded opinion,

5    based on review of the medical records, etc., but it was

6    an opinion.

7            Now, if I felt someone were suicidal, on the

8    other hand, then I would -- was acutely suicidal, then I

9    would absolutely let people know, but I did not encounter

10   that in any of my tours with someone I evaluated.  I

11   always asked about suicidality, and I never met someone

12   who said, "Yes, I'm going to kill myself now" or "I'm

13   thinking about it really seriously."  Nothing like that.

14           In fact, there was a lot of times where I would

15   counsel the members, people that were -- had reported to

16   me that they feel suicidal a lot of the time, but they

17   didn't feel suicidal at the moment, I'd ask them, "So what

18   would you do if you're feeling suicidal?"

19           And they said, "I don't know."

20           I said, "Well, you should talk to your staff.

21   Talk to staff."

22           So I would do that, but I didn't encounter

23   anybody that I felt I needed to have an immediate clinical

24   intervention on.

25           MS. ANDERSON:  Okay.  Are we now at an hour?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              CERTIFICATION OF DEPOSITION OFFICER

 2

 3         I, BRENDA L. MARSHALL, CSR, duly authorized to

 4    administer oaths pursuant to Section 2093(b) of the

 5    California Code of Civil Procedure, hereby certify that

 6    the witness in the foregoing deposition was by me sworn to

 7    testify to the truth, the whole truth and nothing but the

 8    truth in the within-entitled cause; that said deposition

 9    was taken at the time and place therein stated; that the

10    testimony of said witness was thereafter transcribed by

11    means of computer-aided transcription; that the foregoing

12    is a full, complete and true record of said testimony; and

13    that the witness was given an opportunity to read and

14    correct said deposition and to subscribe the same.

15         I further certify that I am not of counsel or

16    attorney for either or any of the parties in the foregoing

17    deposition and caption named, or in any way interested in

18    the outcome of this cause named in said caption.

19

20

21

22         _____

23         BRENDA L. MARSHALL

24         CSR No. 6939

25
```

Exhibit 5



Transcript of the Testimony of:

# Diana Toche

Coleman v. Brown

February 22, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                 Plaintiffs,      )
                                  )CASE NO.:
        vs.                       ) S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                 Defendants.      )
_____)



DEPOSITION OF

DIANA TOCHE

FRIDAY, FEBRUARY 22, 2013,  9:00 A.M.

SAN FRANCISCO, CALIFORNIA






REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                    February 22, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4  RALPH COLEMAN, ET AL.,            )
                                     )
 5                   Plaintiffs,     )
                                     )CASE NO.:
 6        vs.                        ) S 90-0520 LKK-JFM
                                     )
 7  EDMUND G. BROWN, JR., ET AL.,    )
                                     )
 8                   Defendants.     )
    _____)
 9

10

11

12

13

14          The Deposition of DIANA TOCHE, taken on behalf

15  of the Plaintiffs, before Megan F. Alvarez, Certified

16  Shorthand Reporter No. 12470, Registered Professional

17  Reporter, for the State of California, commencing at

18  9:00 a.m., Friday, February 22, 2013, at the offices of

19  Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20  Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                          February 22, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3           BY:  KRISTA STONE-MANISTA, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4           315 MONTGOMERY STREET, TENTH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
 5           415.433.6850
             415.433.7104 FAX
 6           KSTONE-MANISTA@RBGG.COM

 7
     FOR DEFENDANTS:
 8
             BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
10           455 GOLDEN GATE AVE., SUITE 11000
             SAN FRANCISCO, CALIFORNIA  94102-7004
11           415.703.3035
             415.703.5843 FAX
12           PATRICK.MCKINNEY@DOJ.CA.GOV

13           BY:  KATHERINE K. TEBROCK, ESQ.
             DEPARTMENT OF CORRECTIONS AND REHABILITATION
14           OFFICE OF LEGAL AFFAIRS
             1515 S STREET, SUITE 314 SOUTH
15           SACRAMENTO, CALIFORNIA 95811
             916.323.2929
16           916.327.5306 FAX
             KATHERINE.TEBROCK@CDCR.CA.GOV

17

18   ALSO PRESENT:

19           MARC SHINN-KRANTZ, PARALEGAL

20

21

22

23

24

25
```

Page 3

Diana Toche                                          February 22, 2013

 1  coming?

 2      A.   Right.

 3      Q.   Is that fair to say?

 4      A.   Yes.

 5      Q.   Were there layoffs in 2012 of mental health

 6  staff, to your knowledge?

 7      A.   You know what?  I can't remember specifically.

 8      Q.   To your personal knowledge, you're not sure?

 9      A.   Yeah.  I mean, there's spreadsheets of people

10  and -- I mean, it's -- so...

11      Q.   Okay.

12      A.   If I had a spreadsheet, I could tell you.

13      Q.   Let's talk about some specifics.  I know it's

14  hard to talk generalities.

15           So looking back at your declaration, in

16  paragraph 6, you start off by saying that the state

17  developed a comprehensive staffing allocation plan in

18  2009 for each mental health program and administrative

19  function.

20           Are you familiar with the development of that

21  staffing plan?

22      A.   I know that they had a group work on it.

23  That's how I'm familiar with it.

24      Q.   Is that what you know?

25      A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                          February 22, 2013

1      Q.   Is that everything that you know about the
2  development of that?
3      A.   Yes.  Pretty much.
4      Q.   You write that, under that staffing plan, it
5  was approved by the legislature in fiscal year 2011 to
6  2012.  So the fiscal year 2012 to 2013 systemwide mental
7  health position authority, which is based on the 2009
8  plan, totals 2,268.26.
9           What does that mean, "authority"?
10     A.   That you have -- you can establish the
11 positions.
12     Q.   All right.  Who says you can establish the
13 positions or what says?
14     A.   You're given authority.
15     Q.   By?
16     A.   By the legislature and department of finance
17 to establish the positions.
18     Q.   What does it mean to establish a position?
19     A.   So you have funding behind the position and
20 you can establish the position.
21     Q.   And what does that look like on the ground?
22 How is the position established?
23     A.   I believe with a 607.
24     Q.   Okay.  What about when you write "funding
25 allocations for fiscal year 2012 to '13 represent nearly

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                    February 22, 2013

```
 1    We're -- you know...
 2        Q.   Okay.  So was there anything in particular
 3    going on in July that led to this, or was this -- was
 4    there anything in particular in July?
 5        A.   Like an impetus?
 6        Q.   Any particular impetus?
 7        A.   I don't recall if there was a particular
 8    impetus specific to July.  I don't recall.
 9        Q.   You write in this memo -- and we touched on
10    just a little bit early -- on the first page, your first
11    bullet point there:  "Current receiver's freeze
12    exemption request process will continue to exist for
13    filling of all MHP vacant positions."
14        A.   Uh-huh.
15        Q.   Can you explain to me what the freeze
16    exemption request process is?
17        A.   So in July they -- they fill out a freeze
18    exemption to hire for specific positions.
19        Q.   Why is that necessary?
20        A.   It's necessary for the review due to the whole
21    layoff process to ensure that we're staying in line with
22    that process.
23        Q.   So the receiver has a process to request
24    exemption essentially from hiring freezes.
25             Is that my understanding?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Diana Toche                                           February 22, 2013

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8          That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                    DATED:  March 5, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit 6



Transcript of the Testimony of:

# Eldon Vail

Coleman v. Brown

March 19, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,               )
                                     )
                    Plaintiffs,      )
                                     )CASE NO.:
          vs.                        ) S 90-0520 LKK-JFM
                                     )
EDMUND G. BROWN, JR., ET AL.,        )
                                     )
                    Defendants.      )
_____)



DEPOSITION OF

ELDON VAIL

TUESDAY, MARCH 19, 2013,  9:10 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Eldon Vail                                                March 19, 2013

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                    Plaintiffs,      )
                                       )CASE NO.:
 6         vs.                         ) S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                    Defendants.      )
     _____)
 9

10

11

12

13

14          The Deposition of ELDON VAIL, taken on behalf

15   of the Defendants, before Megan F. Alvarez, Certified

16   Shorthand Reporter No. 12470, Registered Professional

17   Reporter, for the State of California, commencing at

18   9:10 a.m., Tuesday, March 19, 2013, at the Attorney

19   General's Office, 455 Golden Gate Avenue, 11th Floor,

20   San Francisco, California.

21

22

23

24

25
```

Eldon Vail                                                    March 19, 2013

 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  MEGAN F. CESARE-EASTMAN, ESQ.
                     JON MICHAELSON, ESQ.
 4                   RANJINI ACHARYA
              K&L GATES LLP
 5            FOUR EMBARCADERO CENTER, SUITE 1200
              SAN FRANCISCO, CALIFORNIA 94111
 6            415.882.8086
              415.882.8220 FAX
 7            MEGAN.CESARE-EASTMAN@KLGATES.COM

 8

      FOR DEFENDANTS:
 9
                BY:  JAY C. RUSSELL, ESQ.
10            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
11            455 GOLDEN GATE AVE., SUITE 11000
              SAN FRANCISCO, CALIFORNIA  94102-7004
12            415.703.3035
              415.703.5843 FAX
13            JAY.RUSSELL@DOJ.CA.GOV

14

15

16

17

18

19

20

21

22

23

24

25

Eldon Vail                                                    March 19, 2013

```
 1   BY MR. RUSSELL:
 2        Q.   And when you say "too much gas," you're basing
 3   that upon what you viewed in the videos, correct?
 4        A.   Correct.
 5        Q.   You didn't see any reports about the measured
 6   amount of spray that was used in any of those videos,
 7   did you?
 8        A.   Well, as Mr. Martin points out, it's not
 9   measured in the State of California, so there's no way
10   to tell exactly how much.  You look at the size of the
11   canister that's being used to deploy it, and you can
12   count the seconds that the trigger is pulled.  And you
13   can count the seconds between the time the next trigger
14   is pulled and you can add up how many times.  And you
15   count the grenades that are thrown in.  And those were
16   pretty darn frequent.  Not just in the videos but in the
17   use of force reports.
18        Q.   But as you say, the fact is that there is no
19   way to tell how much spray is actually being deployed in
20   these videos; is that correct?
21        A.   And that's a flaw.
22        Q.   But that is correct, right?  There's no way to
23   tell?
24        A.   There is no measurement of the spray in
25   California.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eldon Vail                                          March 19, 2013

1    of force videos; is that correct?

2         A.   That the final total.

3         Q.   Excuse me.  Paragraph 30.

4              MS. CESARE-EASTMAN:  I believe he reviewed

5    every video provided by CDCR.

6              THE WITNESS:  18 is the number that was

7    provided by CDCR.

8    BY MR. RUSSELL:

9         Q.   How many of those did you see similar

10   instances of too much paper spray used?

11        A.   I didn't count them.

12        Q.   At paragraph 59 you state you that "This

13   pattern" -- and I presume that that's the pattern of too

14   much spray used with too short of an interval between

15   applications -- "is also reflected in a majority of the

16   use of force reports."

17             Again, do the use of force reports talk about

18   the amount of spray used?

19        A.   Frequently.

20        Q.   And how is it -- is that expressed in terms of

21   volume or of -- how is that expressed in those reports

22   of how much pepper spray is used?

23        A.   It's usually, from what I was judging, there

24   is frequency of disbursement -- if that's the right

25   word -- where there was multiple times where they would

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eldon Vail                                                March 19, 2013

1    spray into the cell, where they would also list the kind

2    of equipment that they would use to spray into the cell,

3    when they would throw in a grenade in and how many

4    grenades they would throw in.

5           And oftentimes it was in combination of

6    multiple sprays from dispensers, sometimes different

7    dispensers, including what's called the BRD, which is, I

8    think, a battering ram device but attached to it is a

9    fire extinguisher sized canister, and then also the

10   different grenades that were dropped in.

11        Q.   But, again, there's no actual measurement of

12   the amount of chemical agent that's used in those

13   instances that reflected in the use of force report,

14   correct?

15        A.   There's no actual measurement, that's correct.

16        Q.   And when you say that -- that the pattern is

17   reflected in the majority of the use of force reports,

18   what do you mean by "the majority"?

19           MS. CESARE-EASTMAN:  You're referring to

20   paragraph 59?

21           MR. RUSSELL:  Yes.  I'm sorry.  I should have

22   stated that.  I apologize.

23   BY MR. RUSSELL:

24        Q.   As stated in paragraph 59.

25        A.   Simple meaning of the word.

Eldon Vail                                                    March 19, 2013

1          It's kind of a hard question for me to answer

2    outside of the context of what I've written here, but I

3    think much of this section about use of force would

4    inform a different a appropriate to the policy.

5          Q.   But you don't reference specific parts of the

6    policy within this declaration, do you?

7          A.   In terms of footnote, I don't believe I do.

8    In paragraph 68, where you say "as required by CDCR's

9    own policy in other situations," I reference it.

10         Well, no, maybe I do.  If you look at the next

11   page, 69, I think that's a direct reference.  I think

12   there might be one earlier in this portion of the

13   declaration.

14         Q.   Well, I guess I should ask:  When you --

15   paragraph 69 talks about CDCR's DOM.  And do you

16   understand that to be the department operating manual?

17         A.   Yes.

18         Q.   Are you aware that there's a separate use of

19   force policy apart from the department operating manual?

20         A.   Maybe.  Can you say more?

21         Q.   Well, I'm just asking if you're aware if there

22   is a statewide use of force policy that is separate and

23   apart from the department operating manual?

24         A.   There's a CCR regulations that I also read.

25   Is that the same thing?

Eldon Vail                                                    March 19, 2013

1        Q.   I don't believe so, no.

2        A.   Okay.  So maybe I'm not -- I don't know.  I

3    don't know the answer to your question.

4        Q.   Okay.  As you sit here today, do you recall

5    being provided a document that's entitled "CDCR

6    Statewide Use of Force Policy"?

7        A.   I may have.  But right this minute, no, I

8    don't recall it.

9        Q.   And then turning to paragraph 69 where you do

10   reference the department operating manual, specifically

11   Section 51020.11.2.

12            And you state that that policy provides for

13   immediate infliction of pain and punishment, or at least

14   it's sanctioned and authorized by that policy.

15            Do you know which policy that is specifically

16   within the department operating manual?

17       A.   I believe it's the use of force DOM.

18       Q.   It's the use of form DOM that relates to

19   inmate handling or taking control of a food port?

20       A.   That's what this specific reference is, I

21   believe.

22       Q.   Okay.

23       A.   It's also might be -- you know, without having

24   a chance to look at it, it might be about food trays as

25   well.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eldon Vail                                                    March 19, 2013

1        Q.   And your understanding is -- I think we've

2   talked about this before -- is that the department

3   operating manual allows for the discretion of the use of

4   immediate force if an inmate either fails to return a

5   food tray or takes control of a food port, correct?

6        A.   Yes.  It changes the policy language for this

7   specific behavior.

8             There is some good policy language about not

9   using force when it's not needed.  But this is like an

10  exception.

11            Where it says but in this case, you don't have

12  to make a determination about whether there's an

13  imminent threat of risk or serious harm; you can just go

14  ahead and do it.  And my position is that that's

15  unnecessary.

16            If that stays as your base expectation,

17  officers could still choose to use immediate force in

18  the situation if there's something extra going on other

19  than the irritation of having a food port open and not

20  returning your food tray.  They can still act.  But to

21  give them free reign, to give them permission to make a

22  decision when it should instead be a controlled use of

23  force situation, I think is an error in the policy and

24  contributive to a climate of violence between staff and

25  inmates.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eldon Vail                                                    March 19, 2013

1      Q.    So are you equating the discretion to engage
2  in immediate force in those instances with a practice of
3  the immediate infliction of pain and punishment?
4      A.    That's what it is.
5      Q.    The use of immediate force is the immediate
6  infliction of pain and punishment?
7      A.    No.   In this situation, when it oftentimes
8  could be a controlled use of force and might result in a
9  deescalation and no need to use force, giving the
10 officers the authority because the inmate has done
11 something irritating like keep their food port open and
12 not return their food tray, to have them immediately be
13 allowed to inflict pain and punishment without any other
14 intervening review is inappropriate.
15     Q.    And does the provision of punishment -- I
16 mean, are you taking that department directly from
17 department operating manual?
18     A.    No.   That's my characterization.
19     Q.    Did you see any incidents either in reviewing
20 use of force policy -- excuse me -- use of force reports
21 packets or use of force videos where immediate force was
22 used for the -- for the express purpose of inflicting
23 punishment?
24     A.    Well, I couldn't have seen it on video if it's
25 immediate.

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

```
1                    CERTIFICATE OF REPORTER

2

3              I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20             DATED:  March 21, 2013

21

22             _____

23             MEGAN F. ALVAREZ

24             RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit 7

1   EDMUND G. BROWN JR.
    Attorney General of California
2   JONATHAN L. WOLFF
    Senior Assistant Attorney General
3   MICHAEL W. JORGENSON
    Supervising Deputy Attorney General
4   EMILY L. BRINKMAN
    Deputy Attorney General
5   State Bar No. 219400
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA 94102-7004
     Telephone: (415) 703-5742
7    Fax: (415) 703-5843
     E-mail: Emily.Brinkman@doj.ca.gov
8   *Attorneys for Defendants Cate and Lewis*

9                   IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

12

13

14   **ALEJANDRO MADRID, et al.,**          C 90-3094 TEH

15                           Plaintiff,     **NOTICE OF ADOPTION AND
                                            IMPLEMENTATION OF CALIFORNIA**
16              **v.**                      **CODE OF REGULATIONS,
                                            STATEWIDE USE OF FORCE POLICY**
17   **MATTHEW CATE, et al.,**

18                           Defendants.

19

20

21        TO THE COURT AND PLAINTIFFS' COUNSEL:

22        The Court's May 14, 2008 Order (Court Docket No. 2143) required Defendants to advise

23   the Court within ten days of adoption and implementation of changes to the California Code of

24   Regulations related to use-of-force. The California Office of Administrative Law approved the

25   statewide use-of-force regulations on August 19, 2010. The California Department of

26   Corrections and Rehabilitation (CDCR) subsequently approved related changes to the

27   Departmental Operations Manual.

28

                                         1

1    Attached as Exhibit A are true and correct copies of memoranda noticing the adoption of

2    the statewide use-of-force policy and the training that implements CDCR's policy.  Now that

3    these changes are codified in regulation and in the Department Operations Manual, Defendants

4    will meet and confer with Plaintiffs' counsel in an attempt to end this case without further Court

5    proceedings.

6

7    Dated:  August 30, 2010                          Respectfully submitted,

8                                                     EDMUND G. BROWN JR.
                                                      Attorney General of California
9                                                     JONATHAN L. WOLFF
                                                      Senior Assistant Attorney General
10                                                    MICHAEL W. JORGENSON
                                                      Supervising Deputy Attorney General
11

12

13                                                    EMILY L. BRINKMAN
                                                      Deputy Attorney General
14                                                    *Attorneys for Defendants Cate and Lewis*

15   CF1997CS0002
     20334327.doc
16

17

18

19

20

21

22

23

24

25

26

27

28

2

Not. re: Adoption Statewide Use-of-Force Regulations  (C 90-3094 TEH)

# EXHIBIT A



| | Department of Corrections and Rehabilitation | Transmittal Letter Number: |
|---|---|---|
| | **NOTICE OF CHANGE**<br>**TO DEPARTMENT OPERATIONS MANUAL** | **10-18** |
| | | **Revision Date:** |
| | **Chapter 5, Article 2**<br>**Use Of Force** | **August 20, 2010** |

The purpose of this document is to provide the Department Operations Manual (DOM) holders with information regarding the incorporation of Chapter 5, Article 2, Use Of Force.

This article is being adopted to assist CDCR in implementing remedial measures required by the federal court in *Madrid v. Cate* (U.S.D.C. N.D. Cal. C90-3094 TEH). In 1993 the *Madrid* court held that correctional staff at Pelican Bay State Prison routinely used unnecessary and excessive force against inmates, that uses of force were either not reported at all or were reported inaccurately and that the prison did not have an adequate system for investigating the uses of excessive force. In response the institution developed and the court approved a Use of Force Remedial Plan.

Regulations (Title 15) which provide the necessary authority for changes to the Use Of Force policy in the California Code of Regulations were developed, revised, and adopted on August 19, 2010.

Please inform all persons concerned of the contents of this notice, which shall be maintained and the information contained in this document utilized until it is incorporated into the next updated DOM.

Please direct any inquiries to Timothy M. Lockwood, Chief, Regulation and Policy Management Branch, at (916) 255-5500.

*Original signed by:*


SCOTT KERNAN
Undersecretary/Operations
California Department of Corrections and Rehabilitation

Department of Corrections and Rehabilitation

# Memorandum

Date   :   June 8, 2010

To·   :   Associate Directors, Division of Adult Institutions
Wardens

Subject:   **UPDATED USE OF FORCE POLICY TRAINING SCHEDULED FOR JUNE 29, 2010**

The California Department of Corrections and Rehabilitation (CDCR) has revised the current Use of Force (UOF) Annual Training course to correspond with revisions made to the Title 15 language and the new Department Operations Manual (DOM), Chapter 5, Article 2, "Use of Force." Both the DOM and the Title 15 (currently under review by the Office of Administrative Law) are anticipated to be adopted between July 2010, and September 2010.

An eight-hour course of training has been scheduled for institutional UOF Coordinators and In Service Training (IST) Managers at the Correctional Training Center (CTC) in Galt on June 29, 2010. The class will be held in the Sierra Auditorium from 8 a.m. to 5 p.m. The institutional UOF Coordinators have been selected to attend for the benefit of receiving comprehensive training prior to implementation of the policy changes. IST Training Managers have been designated for attendance as they will be responsible for providing initial training to institutional managers, supervisors and UOF instructors. Participants are to bring a flash drive and a copy of the draft DOM section that was provided by email to all Wardens on May 12, 2010, to the training. Attendees will receive an electronic copy of the new lesson plan and power point presentation at the training to take back to their institution.

No overtime is authorized for those attending training. Therefore, travel to and from the training shall occur on June 28 and June 30. Staff shall utilize the most fiscally responsible means for travel, i.e., State vehicles. Lodging accommodations (double occupancy) will be provided on site at the CTC - Galt. Please keep in mind that If CTC housing is available, participants will not be reimbursed for off grounds lodging. Meals will also be provided at the Academy for the usual nominal cost.

Please provide the names, contact information and lodging needs for your institution's two attendees by email to Deavonne Long, Correctional Counselor II Specialist, at Dee.Long@cdcr.ca.gov by noon on June 18, 2010. If there are any special needs or accommodations required, please indicate this as well.

The Travel Exemption for the training and a CTC Visitor Information Packet is attached.

· CDC 1017 (3/89)

Associate Directors, Division of Adult Institutions
Wardens
Page 2

The UOF training plan will roll out in four phases. Phase One is the immediate On the Job Training described in the Director's memorandum dated June 8, 2010, and titled "Use Of Force Policy On the Job Training Requirement". Phase Two is the training at CTC Galt described on page one of this memorandum. Phase Three will accomplish the IST training of all managers, supervisors, and UOF instructors. Phase Four is to provide the IST training to the balance of all staff at the institutions.

- Phase Three: Immediately following Phase Two, IST Managers will be responsible to provide IST training (using the revised lesson plan and power point) to all managers, supervisors and designated UOF instructors at their institution by August 1, 2010. A proof of practice certification memorandum must also be submitted to the institution's Associate Director by August 2, 2010. Overtime is authorized for first watch staff. Efforts should be made, however, to have instructors train on first watch rather than keeping staff into second watch.

- Phase Four: Immediately following completion of the third phase, the updated IST UOF Training shall be provided to all staff in accordance with each employee's scheduled annual training. Therefore, it is anticipated IST training will take 12 months to complete. Training in the fourth phase can be conducted by any manager, supervisor or qualified UOF instructor who received training in the third phase. The IST Manager is to ensure instructors do not deviate from the lesson plan.

  After completion of the first quarter's training (November 1, 2010), each institution must report to their Associate Director the number of staff who have completed the course. This reporting process shall continue each quarter thereafter (February 1, May 1 and August 1, 2011). At the conclusion of the 12 months of training (August 1, 2010), each institution shall also provide their Associate Director with a proof of practice certification memorandum noting all staff has completed the updated IST course.

- Institutions shall ensure all post orders are current in reflecting the updated policy information no later than October 1, 2010. In addition, copies of the new policy shall be made readily available to staff.

- The department is currently developing a UOF policy pocket reference guide specific to the needs of peace officer staff. Upon completion of development and procurement, all CDCR peace officers shall be provided with a copy of the new pocket guide outlining the revised UOF Policy. Headquarters staff will be providing these pocket guides to the field (e.g., institutions, CTC) this Fall or as soon as purchasing has been completed.

Associate Directors, Division of Adult Institutions
Wardens
Page 3

If you have any questions regarding this matter, please contact Brian Bevan, Associate Warden, High Desert State Prison, at Brian.Bevan@cdcr.ca.gov or Deavonne Long, Correctional Counselor II Specialist, High Security and Transitional Housing, at Dee.Long@cdcr.ca.gov.

GEORGE J. GIURBINO
Director
Division of Adult Institutions

Attachments

cc: Brian Bevan
    Deavonne Long

Department of Corrections and Rehabilitation

# Memorandum

Date : June 8, 2010

To : Associate Directors, Division of Adult Institutions
Wardens

Subject: USE OF FORCE POLICY ON-THE-JOB TRAINING REQUIREMENT

The California Department of Corrections and Rehabilitation (CDCR) has revised the current Use of Force Annual Training course to correspond with revisions made to the California Code of Regulations Title 15 language and the new Department Operations Manual (DOM), Chapter 5, Article 2, "Use of Force." Both the DOM and the Title 15 (currently under review by the Office of Administrative Law) are anticipated to be adopted between July 2010, and September 2010.

Since it is anticipated that it will take up to 12 months for all staff to complete formal In-Service Training (IST), the attached On-the-Job Training (OJT) document will serve as an interim measure to ensure all custody staff are familiar with the specific changes to the Department's Use of Force policy prior to completion of the IST training.

Document all training with a CDCR Form 844, "OJT/IST Sign-in Sheet," using "B2670, Use of Force DOM Policy – OJT" for the class code/subject title. Upon completion of this assignment, please provide a proof of practice certification memorandum to your Associate Director by August 2, 2010.

If you have any questions regarding this matter, please contact Brian Bevan, Associate Warden, High Desert State Prison, at Brian.Bevan@cdcr.ca.gov or Deavonne Long, Correctional Counselor II, High Security and Transitional Housing, at Dee.Long@cdcr.ca.gov.

GEORGE J. GIURBINO
Director
Division of Adult Institutions

Attachment

cc: Brian Bevan
Deavonne Long

CDC 1617 (3/89)

## USE OF FORCE ON THE JOB TRAINING
## OJT CODE: B2670

The changes in the California Department of Corrections and Rehabilitation (CDCR) Use of Force Policy include a new Department Operations Manual (DOM) section and updated California Code of Regulations Title 15 section.  Both these documents include previous information contained in various departmental memorandums and forms.  Listed below is an overview of the new information not previously addressed in any other statewide documentation.  More comprehensive information will be provided to designated staff and via In-Service Training.

### NEW  LANGUAGE

**New Definitions of Types of Force:**   Non-conventional Force (Found in DOM Section 51020.4)

Non-conventional Force is force that utilizes techniques or instruments that are not specifically authorized in policy, procedures, or training.   Depending on the circumstances, non-conventional force can be necessary and reasonable; it can also be unnecessary or excessive.

### Safety Triangle/Soft Restraints (Found in DOM Section 51020.6)

Safety Triangle:  This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on duty staff.  The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit or if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern (such as an irate inmate who has threatened violence or an inmate upon whom force has just been used).  The safety triangle is not intended to control the inmate outside the cell, nor is it intended to pull an inmate to the cell front in order to remove the handcuffs.  The correctional officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the inmate from pulling his hands inside the cell while the door is being closed.

Soft Restraints:  Soft restraints consist of towels or sheets used to temporarily secure an inmate's ankles and/or arms together.  After the application of soft restraints, mechanical restraints are removed, and staff are to exit the cell before the inmate has time to release himself from the soft restraints.  Soft restraints are used on inmates who try to resist the entering of their cell and were developed in an effort to avoid using physical force on inmates.  The Incident Supervisor may authorize the use of soft restraints.   If force is used, it must be appropriately documented.

### New Technique for Immediate Use of Force Involving Food/Hand Cuff Ports:
Immediate Use of Force in Cells (Found in DOM Section 51020.11)

When immediate force is necessary for inmates confined in their cells, oleoresin capsicum (OC) is the preferred option for carrying out the immediate use of force.  A verbal warning shall be given before force is used unless the circumstances require immediate force that precludes a verbal warning.

1

**Food Ports (Found in DOM Section 51020.11.2)**

During routine duties, if correctional officers encounter an inmate who refuses to allow officers to close and lock the food port:

- The officer shall verbally order the inmate to relinquish control of the food port and allow custody staff to secure it. The officer shall issue a warning that chemical agents will be used if he/she does not comply.

- If the inmate refuses to relinquish control of the food port after the warning, the officer is authorized to administer chemical agents against the inmate to secure the food port. Alternatively, the officer may choose to contact a supervisor and await further guidance in formulating a response.

- If the inmate relinquishes control of the food port, it will be secured and designated staff will notify their supervisor and follow in-cell decontamination procedures.

- In the event the use of chemical agents does not accomplish the goal of regaining control of the food port, the officer shall back away from the cell and contact and advise the custody supervisor of the incident. Controlled force will be initiated while custody staff continue to monitor the inmate. Health care staff shall monitor the inmate at least every 15 minutes.

**New Technique for Inmate Food Tray Retention and Confiscation of Potential Contraband: Food Trays (Found in DOM Section 51020.12.5)**

- Accountability for food trays is an operational concern for the safety and security of institutions. It is important custody staff who issue food trays to inmates in cells account for all trays after the meal is concluded.

- If an inmate attempts to break a food tray, the immediate use of chemical agents is authorized to stop the threat of the inmate obtaining dangerous contraband.

- If the inmate refuses to return a food tray, the supervisor and the First or Second Level Managers shall be notified. Custody staff shall document the inmate's refusal to return the food tray on a CDC-115, Rules Violation Report.

- The inmate will be advised that he will not receive another meal until the first scheduled mealtime after the tray is returned. Additionally, the inmate – and all other inmates in the pod/section – will be placed on escort/restraint status to prevent passing of contraband items. Inmates may exit their cells to acquire various services. If the cell is vacated, staff will use that opportunity to retrieve the food tray.

- Notice shall be provided to staff members working subsequent shifts to ensure their awareness of the circumstances. Institution/facility staff shall implement security measures to deter and prevent the movement of the retained food tray from one cell to another.

2

- If the inmate retains control of the food tray for a period of 24 hours, the Manager shall determine if controlled force will be used to retrieve the tray. This does not preclude the Manager from making a determination, based on safety and security concerns, to retrieve the tray using force prior to the 24-hour time frame.

- If the goal of the controlled use of force is only to retrieve the tray, all staff shall be informed of this in advance. If the inmate has retreated to the back of the cell and the tray can be safely retrieved without the application of force, then custody staff shall retrieve the tray and exit the cell.

**Revision to Previous Expectations Regarding Video Recording of Inmates Injured in Use of Force Occurrences:** Video Records Made After Immediate Uses of Force that Cause Injury and Allegations of Unnecessary or Excessive Force (Found in DOM Section 51020.17.3)

A video recording of an inmate shall be made under the following circumstances:

- The inmate has sustained a serious bodily injury or great bodily injury that could have been caused by a staff use of force.

- The inmate has made an allegation of an unnecessary or excessive use of force.

Any visible or alleged injuries shall be video recorded. The video recording shall be conducted by persons not involved in the incident. The video recording should be made within 48 hours of discovery of the injury or allegation. The video recording shall also include a request of the inmate to be interviewed regarding the circumstances of the incident. If the inmate refuses to be video recorded, such refusal shall be recorded.

**With the Exception of Training, All Firearm Discharges Require a Public Safety Statement:** Response Supervisor-Additional Reporting Requirements for Deadly Force (Found in DOM Sections 51020.17.1 and 51020.17.5)

The supervisor shall ask the employee who used deadly force to provide a public safety statement immediately after the incident. This is the employee's oral statement. This statement helps determine the general circumstances of the incident, assess the need for resources, set the perimeter, locate injured persons, and determine the nature of the evidence to be sought. It shall provide basic information such as the number of persons involved in the incident, the number not yet in custody, and number and direction of shots fired. The statement shall not include, and the employee should not be asked to provide, a step-by-step narrative of the incident or a motive for his/her actions. It should be noted all instances of deadly force require the employee to give a public safety statement, including warning shots.

**Time Constraints for Submission and Review of Reports:**
Response Supervisor-Additional Reporting Requirements for Deadly Force (Found in DOM Sections 51020.17.1 and 51020.17.5)

Written reports regarding staff using force shall be documented on a CDCR Form 837-C. Reports must be prepared by the employee participants or witnesses, and reviewed by the

3

Incident Supervisor prior to the employee being relieved from duty. Staff shall not collaborate with each other in the preparation of reports.

## New Supervisory Reporting Responsibility Time Parameters:
Incident Commander-Reporting Requirements (Found in DOM Section 51020.17.7)

It is the responsibility of the Incident Commander to notify the Office of Internal Affairs (OIA) and the Bureau of Independent Review (BIR) as soon as possible, but no later than one hour from the time the incident is discovered, of any use of deadly force and every death, great bodily injury or serious bodily injury that could have been caused by a staff use of force. Depending on the specific Memorandum of Understanding and the nature of the incident, a call to the county sheriff or police department may also occur.

## New Use of Force Reporting Responsibilities and Use of Force Review Monitoring and Tracking: Allegations of Excessive or Unnecessary Force-Incident Commander and Appeals Coordinator Reporting Requirements (Found in DOM Sections 51020.18.2)

When informed of allegations of the use of unnecessary or excessive force, the Incident Commander and/or the Appeals Coordinator shall make an initial assessment of the information received and notify the appropriate First or Second Level Manager as soon as practical. The Incident Commander and/or the Appeals Coordinator shall determine whether the seriousness of the allegations and/or extent of the reported injuries warrant immediate notification of the First or Second Level Manager.

Additionally, the Incident Commander and/or the Appeals Coordinator shall:

- Ensure health care staff has evaluated the inmate and a medical report has been completed.
- Review written reports of witnesses and obtain statements from inmate witnesses, if any.
- Ensure that the inmate's injuries are video recorded and the inmate is interviewed within 48 hours in accordance with the requirements set forth in DOM Section 51020.17.3. This shall be done as soon as possible upon receiving verbal notification of the allegation.
- When an allegation is received, whether verbally or through the appeals process, the Appeals Coordinator or Incident Commander shall contact Investigative Services Unit or the Watch Commander and determine if the related incident report exists. The respective Appeals Coordinator or Incident Commander shall note the existence of the incident report by log number in their submittal prior to forwarding the allegation for administrative review.
- If the inmate has suffered serious injury or great bodily injury, the Incident Commander shall notify the OIA and the BIR as soon as possible, but no later than one hour from the time the incident is discovered. In instances where the allegation was submitted through the inmate appeal process and there is no corresponding incident report, the Appeals Coordinator shall, in consultation with the hiring authority, notify the OIA and BIR.
- If, at any point in the review, the Incident Commander and/or the Appeals Coordinator discovers information that leads him/her to reasonably believe or suspect an employee has committed any serious misconduct, the Incident Commander and/or Appeals Coordinator shall immediately forward all information to the Institution Head via the chain of command, recommending an internal affairs investigation, if appropriate.

4

- Prepare a Report of Findings, CDCR Form 3014, and/or Appeal Inquiry. The report shall contain the allegations made, an explanation of the incident, the written or verbal statements of the witnesses, the health care information, and a conclusion and recommendation.
- Submit the Report of Findings and/or Appeal Inquiry and evidence through the chain of command to the Institution Head. The evidence shall include copies of the medical reports, and any other documentation that is deemed significant to further document the incident/allegation. If the Incident Commander learns the verbal allegation is part of a reported incident, the incident package shall be included with the Report of Findings. Correspondingly, if the Appeals Coordinator learns the written allegation is part of a reported incident, the incident package shall be included with the appeal for administrative review.

## Revised Time Constraints for Initial Institutional Executive Review Committee (IERC)/Use of Force Review:
### Use of Force Coordinator Responsibility (Found in DOM Section 51020.19.4)

The Use of Force Coordinator shall normally schedule all logged use of force cases for review within 30 days of their logged occurrence. Any use of force incident or allegation review that is over 31 days old and has not received an initial review, shall be scheduled for review at the next scheduled IERC meeting. Unless there are outstanding issues or a corresponding investigation, this review will be both an initial/final review. This means most institutions will need to hold institutional reviews at least on a monthly basis.

## Revised Institutional Use of Force Data Collection and Maintenance Expectations:
### Use of Force Data (Found in DOM Section 51020.21)

Designated staff shall maintain a database containing use of force information. The Daily Incident Reporting System (DIRS) fulfills this new requirement.

The database should be capable of producing statistical reports to monitor trends and patterns of force used, whether the report is received in the form of an incident report, a verbal allegation of excessive or unnecessary force, or an allegation contained in inmate appeal. At a minimum the database should address the following categories:

- Date of incident.
- Specific area of institution.
- Staff involved.
- Controlled or immediate use of force.
- Reason for use of force.
- Use of impact munitions.
- Identified inmate disabilities and steps that were taken to reasonably accommodate the inmate during and after the use of force.
- Allegations of unnecessary or excessive use of force.
- Serious injury, great bodily injury or death.

5

**New Use of Force Records Retention Expectations and External Review Oversight:**
**External Review of the Use of Force - The Use of Force Coordinator Responsibility**
**(Found in DOM Section 51020.22)**

For the purpose of an external review, the Use of Force Coordinator shall identify and retain use of force cases closed by the IERC during the review period. External reviews of closed use of force cases shall be conducted at least every 24 months.

**Establishment of Use of Force Joint Use Committee:**
**Revisions - Use of Force Joint Use Committee (JUC) (Found in DOM Section 51020.23)**

The Use of Force JUC is a committee of designated field staff and stakeholders tasked with reviewing and evaluating recommended revisions to the CDCR's Use of Force Policy and Procedures. The JUC shall meet quarterly as necessary, but not less than annually, to review recommended revisions.

**NEW FORMS**

CDCR Form 3034          IERC Allegation review

**LANGUAGE AND TERMINOLOGY CHANGES**

| OLD POLICY | NEW POLICY |
|---|---|
| Emergency use of force | Immediate use of force |
| Calculated use of force | Controlled use of force |
| Serious Injury | Serious Bodily Injury |

**THE FOLLOWING DEFINITIONS AND PROCEDURAL GUIDELINES FOUND IN THE NEW USE OF FORCE POLICY HAVE THEIR ORIGINS IN CURRENT POLICY/TRAINING DOCUMENTS:**

Response Supervisor definition and role.
Incident Commander definition and role.
Institutional Executive Review Committee definition and role/process.
Department Executive Review Committee definition and role/process.
Deadly Force Investigation Team definition and role.
Holding Cell definition.
No Choke Holds, unless deadly force authorized.
Leather restraint use/application.
In-Cell Assault procedures.
Cell extraction procedures.
Video recording procedures.
Controlled Use of Force involving serious mentally ill, procedure.
Cell extraction procedures.
Involuntary medication.
American Disability Act inmate restraints and searching.

6

Involuntary admission to medical facility.
Processing video records.
Use of less lethal weapons during Controlled Use of Force.
Maintaining visual contact with inmate after using chemical agents.
Chemical Agent Restrictions.
Chemical Agent Decontamination.
In-Cell Decontamination from chemical agents.
Application of Spit masks, positional asphyxia prevention.
Employee is granted 72 hours of Administrative Time Off after using deadly force resulting in
death or Great Bodily Injury.
Reports are to be completed before being relieved of duty.
Public Safety Statement reporting requirement.
Health care staff Use of Force reporting requirements.
Incident commander, first/second level manager reporting requirements.
Reporting Allegations of Unnecessary/Excessive Force process.

Five factors for force evaluation:

- The threat perceived by the responsible individual applying the force.
- The need for the application of force.
- The relationship between that need and the amount of force used.
- The extent of the injury suffered.
- Any efforts made to temper the severity of a forceful response.

Review of the Use Of Force:

- Incident Commander
- First and Second level Manager
- Institution
- Department

Use of Force Coordinator Responsibilities:

Investigating Deadly Force (Deadly Force Investigative Team and Deadly Force Review Board)
roles and responsibilities.

Forms:

| | |
|---|---|
| 3013 | Interview guidelines |
| 3014 | Report of findings |
| 3010 | Incident commander's review |
| 3011 | First level manager review |
| 3012 | Second level manager review |
| 3037 | Controlled Use of Force manager report |
| 3035 | IERC Review and after action recommendation |
| 3036 | IERC Critique and Qualitative evaluation |
| 837 (all) | |

Attachment:  CDCR 3034 - IERC Allegation review

7

Exhibit 8

**From:**           Joel Badeaux <joel.badeaux@gmail.com>
**Sent:**           Sunday, March 24, 2013 8:40 AM
**To:**             Michael W. Bien
**Subject:**        Request from SVPP colleague of Dr. Brim for USDOJ investigation of SVPP and state mental health care
**Attachments:**    AG letter J Badeaux MD 3-22-13.pdf; SVPP 1st letter.pdf; SVPP 2nd letter.pdf; Brim deposition.pdf; Bien letter.pdf

Hi, Mr. Bien. As a colleague of Dr. Brim at SVPP, I am very worried about what will happen there and therefore felt compelled to write this letter to US Attorney General Holder. The other 4 attachments included are referenced in the letter and are part of the Coleman case. Although AG Holder will likely not see it, I am hoping that someone who can help the situation at SVPP and bring about mental health care reform in California will.

Sincerely,

Joel Badeaux, MD

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Friday, March 22nd, 2013

**Name**    The Honorable Eric H. Holder, Jr.
Attorney General, U.S. Department of Justice
**Address**  950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Dear Sir,

As a psychiatrist working for the state of California, I am writing you to express grave concern about safety conditions within the California mental health system. Most urgently, I would request that you investigate conditions at the Salinas Valley Psychiatric Program, which is part of the Salinas Valley State Prison.

The Salinas Valley Psychiatric Program is an inpatient level correctional treatment program administered by the California Department of State Hospitals. The program currently treats about 357 patients, admitted from all California state prisons. These patients are referred based on a high level of psychiatric need, requiring an inpatient level of care, and most are at significant risk of danger to themselves or others. In November 2012 the program had its first completed suicide.

In January and February of 2013 all psychiatrists working at this program including myself wrote letters to our Executive Director regarding a critical level of understaffing, which we believe had resulted in perilous conditions as far as safety (see enclosed letters). Since then, timely action was not taken, conditions have worsened, and ***now all nine psychiatrists working at this program just two months ago have either quit, gone on extended leave, or will be transferring to new positions by the end of April***. Five psychiatrists including myself will be leaving by the end of next week. For me, the lack of staff and resulting workload was simply not sustainable.

The administration has been unable to hire replacement psychiatrists and yet continues to admit new patients to the program. The administration has reported to the media that there is no anticipated staffing crisis at our program and has been focused on denying that there is a problem, apparently in an effort to win a major court case against the state (Coleman v. Brown) and end federal oversight of the prison system. One of my colleagues, Dr. John Brim, was deposed as a part of this case (see enclosures).

The Salinas Valley Psychiatric Program has come in millions of dollars under budget, primarily as the result of understaffing at all levels, but there has also been a lack of

basic provisions including clothes, soap, and blankets for the inmates. The oral medication diphenhydramine (Benadryl), which is the 'gold standard' of antihistamine treatment, and which is essential in psychiatry for the prevention and control of severe side effects from some antipsychotics, is not included on the California Department of Corrections and Rehabilitation medication formulary.

A Department of State Hospital staff survey of employees at the Salinas Valley Psychiatric Program conducted in September of 2012 found that 75% of staff either disagreed or strongly disagreed with the statement that the Department of State Hospitals has a desire to serve its staff well, and 86% of staff either disagreed or strongly disagreed with the statement that workplace morale was positive. 72% of staff either disagreed or strongly disagreed that there was a commitment to improving safety at its facilities, and 45% either disagreed or strongly disagreed that Department of State Hospital staff were effective in meeting the needs of their patients. From the results of this survey, you can see why employees, including psychiatrists, might want to leave the program.

As you are certainly aware, the state of California has a long history of inadequate mental health care delivery and has been under federal and Department of Justice supervision in the past. Unfortunately, when not under supervision, the state has shown a consistent pattern of drastically cutting spending on mental health. For example, when released from Department of Justice monitoring less than two years ago, more than a dozen psychiatrist contractors at Atascadero State Hospital were promptly laid off. California mental health care law (Title 22) is written such that there is no minimum psychiatrist-to-patient ratio, because clinical social workers and psychologists are considered to be equivalent to psychiatrists, even though they are not able to prescribe medication.

You should also be aware that mental health treatment outside of the prison system is inadequate to the point of jeopardizing the health and safety of the mentally ill, mental health workers, and the general public. As has been well-documented in the media, the California state hospital system has been plagued with violence. While I was working at Napa State Hospital, I was personally horrified when a psychiatrist friend who I trained with was badly assaulted by a patient and left state service.

According to media reports, the problem of violence in the California state hospitals actually got worse during past Department of Justice oversight. These reports have also documented actions resulting from the so-called 'Enhancement Plan' that could be considered nepotism or corruption. As far as psychiatric practice, I can tell you that recommendations from the Department of Justice court monitor deviated significantly from community standards in psychiatry, standing in contrast to the guidelines of the American Psychiatric Association. The policy changes that resulted from the Enhancement Plan included discouraging the use of an adjunctive antipsychotic medication for those with treatment resistant psychosis (sometimes erroneously labeled 'polypharmacy'), and discouraging the use benzodiazepines,

which are used effectively in psychiatric practice around the world to calm potentially violent, agitated, and psychotic patients.

Another concerning practice at California state hospitals and prisons is the use of the medication clozapine for purposes of restoration to competency, and the reluctance of forensic competency evaluators to declare a person unrestorable to competency without first having a trial of clozapine.

Clozapine is by far the highest risk medication in all of psychiatry. It has five black box warnings and was almost taken off the market due to the alarming number of deaths resulting from its use, which is monitored by a national registry due to its high-risk nature.

Atascadero State Hospital has had multiple patient deaths resulting from clozapine use, and while I was at Napa the majority of emergency medical sendouts resulted from adverse reactions to clozapine. While clozapine can be an effective and well-tolerated medication for some voluntary patients, I would submit to you that involuntary use of clozapine for purposes of restoration competency to stand criminal trial is inappropriate, especially considering the wide variety of safe and effective antipsychotic alternatives available on the market today.

As far as safety to general public, I think there is strong evidence that the current state mental health system allows for an unacceptable level of violence in the community that results from untreated or inadequately treated mental illness. As an example, while working at Napa State Hospital I treated a patient who was transferred to another Department of State Hospitals facility, and then later reportedly released into the community. After months wandering homeless, without adequate medication or support, he reportedly killed an innocent person.

By contrast, I can tell you that in the state of Arizona, where I trained and worked previously, all patients deemed to have serious mental illness and qualifying for Medicaid are provided with free medication, housing, transportation to appointments, and case management services including frequent home visits, assistance in applying for benefits, and close monitoring. ***Not providing adequate support, shelter, and medication for those with serious mental illness is inhumane and very dangerous to our society.***

Without adequate treatment or support in the community, it is not surprising that a large number of the mentally ill in California end up in the criminal justice system. Compounding this problem, the state of California has antiquated civil commitment laws (Lanterman-Petris-Short Act in effect since 1972, Mentally Disordered Offender law since 1986). By contrast, civil commitments in Arizona are easier to obtain and last for up to one year of outpatient treatment, and only rarely require the appointment of a conservator or guardian. Arizona law contains the Persistent or

Acute Disability standard, as well as the Danger to Self, Danger to Others, and Grave Disability standards.

Far too often in California a mentally ill individual gets treatment only after committing a violent or nonviolent offense. Apparently under the pretense of individual rights, California state law makes it difficult to get adequate involuntary mental health commitments for those who need help but are unwilling or unable to seek it voluntarily. But rather than preserving the individual's freedom, the effect of this is that the mentally ill are prosecuted by criminal law, rather than given treatment by civil commitment.

As an example from my own experience, I treated an individual at Napa State Hospital who had been criminally prosecuted for making seventy non-emergency phone calls to county 911 operators, with my job being to treat and potentially restore him to competency in order to stand trial. This patient's actions were clearly the result of his mental illness, so this would be an example of the 'criminalization of mental illness' which has resulted in exploding jail and prison population in California and across the United States. An individual like this could spend years hospitalized involuntarily, with no defined release date, at incredible expense to the Californian taxpayer. In Arizona, he would likely have been hospitalized involuntarily for only a few weeks and then committed for up to one year of outpatient treatment as Persistent or Acutely Disabled by Mental Disorder. Criminal charges would not have been pursued.

The current state government approach to mental health care seems to be that cheaper is better. Actually, if civil commitment laws were modernized in California and Assertive Community Treatment (ACT) were properly implemented, cheaper really would be better. The 'criminalization of mental illness' is of one reason why the United States has 5% of the world's population but has 25% of the world's incarcerated prisoners. Psychiatric hospitalization is estimated to cost about $500 per day, not including legal costs. Incarceration in California has been estimated to cost $50,000 per year for each inmate, but the cost for mentally ill inmates is much higher than that.

With a civil commitment a mental health patient might have a relatively short involuntary hospitalization and then get court ordered to have outpatient treatment for one year. With proper outpatient follow-up, this provides a lot of safety and does not cost a lot of tax dollars. Most of the mentally ill are not violent when they are taking their medication. I know if I were mentally ill, I would rather be locked up briefly against my will as opposed to locked up for many years against my will with a felony on my record, likely never able to get a job or have a chance to function in society again. *Frankly, not providing mental health treatment to those with mental illness before they might commit serious criminal acts, and instead prioritizing criminal prosecution after the fact is a violation of the civil and*

**_human rights of the mentally ill and also victimizes the citizens of California._**

Considering the 3rd strike laws, this type of inappropriate prosecution threatens to financially ruin the state of California. On my current caseload I have multiple individuals with serious mental illness serving 25-year sentences for nonviolent 3rd strikes. With the type of inappropriate, disproportionate, and inhumane sentencing that exists in the state of California, is it any wonder why hope runs short and suicide rates are alarmingly high in the California prison system?

Since state government seems unable or unwilling to provide a mental health system that can adequately provide for the health and welfare of the mentally ill, mental health care workers, and the citizenry of California, I am writing in hopes that the U.S. Department of Justice can provide urgent assistance and prevent further needless injury and death. Feel free to contact me at the e-mail address below if you have any questions, since I will no longer be a state employee after next week.

Sincerely,

Joel Badeaux, MD, MPH

Staff Psychiatrist
Department of State Hospitals – Salinas Valley Psychiatric Program

joel.badeaux@gmail.com

cc:    Governor Jerry Brown, State of California
       Senator Diane Feinstein, State of California
       Senator Barbara Boxer, State of California
       Amnesty International
       Mental Health America of California

Enclosures (4)

Revised 3/23/13

STATE OF CALIFORNIA — DEPARTMENT OF STATE HOSPITALS                    EDMUND G. BROWN JR., GOVERNOR

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA  93960



Wednesday, January 23, 2013

**Name**     Charles DaSilva,
            Executive Director, Salinas Valley Psychiatric Program
**Address**  31625 Highway 101,
            Soledad, CA 93960

Executive Director DaSilva,

As staff psychiatrists, we are writing you collectively to express our serious concern about the level of staffing at SVPP. At the end of January, we will have lost our 3rd psychiatrist in the past (6) weeks.

This will leave us only (7) full-time psychiatrists, including a senior, plus 1 part-time psychiatrist, covering (6) Units that average about 60 beds each. Other disciplines such as social work, psychology, and rehab therapy have 15 to 16 staff covering the same number of patients. The SVPP census issued today shows that there are 351 patients in the program. Across the (6) Units we have also been averaging about (2) to (3) admissions and discharges per Unit per week.

The DSH standard for Stockton and elsewhere is a (15) patient caseload for a team that does admissions, with about (2) admissions per week. When administration visited our facility recently to present the Stockton program, we were told that a 15 patient caseload would also be the standard at SVPP as well as Stockton. At present we have been averaging a caseload of about (40) with (2) admissions per week, and all psychiatrists are taking admissions. Some psychiatrists are already covering (60) patients daily, (4) times the accepted standard. We find a caseload of (40) to be unsafe, and a caseload of (60) is even more perilous.

As psychiatrists, we are united in our belief that the level of staffing currently present is not safe or appropriate for an ICF level of patient care. We believe that it potentially creates an unsafe situation for both staff and patients. When patient safety is at stake, we cannot in good conscience continue to take on a higher and higher caseload without making you aware of our concerns. In November, 2012 SVPP had its first completed suicide. Current staffing levels will create an unacceptable level of risk as far as patient safety.

We will continue to do our best for every patient, under every

circumstance. **But we need to inform you that we will be working in a state of protest regarding our caseload and the rate of admissions.** We are also extremely concerned about further attrition of psychiatrists, which seems very likely considering the present workload and conditions.

We understand that since SVPP is being downsized that it may be difficult to attract new psychiatrists. However, in the past, staff from other facilities have been brought in on a temporary basis. This would be a tremendous help. We also believe the situation could be made significantly better through a reduction in admissions as we scale back and prepare to close C and D yards.

Thank you for listening to our concerns.

Sincerely,

Joel Badeaux, MD

John Brim, MD

Gayle Gaines, MD

Minhas Kapadia, MD

Muhammad Saleem, MD

Mary Stoller, MD

Ariel Troncoso, MD

Lei Wei, DO

Indu Aramandla, MD

Position  Staff and Senior Psychiatrists
Division  DSH SVPP

cc:    Katherine Warburton, DO, Chief Psychiatrist, DSH
       Nereyda Rivera, UAPD

STATE OF CALIFORNIA – DEPARTMENT OF STATE HOSPITALS                                    EDMUND G. BROWN JR., GOVERNOR

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Tuesday, February 12, 2013

---

**Name**      Charles DaSilva,
              Executive Director, Salinas Valley Psychiatric Program
**Address**   31625 Highway 101,
              Soledad, CA 93960

Dear Executive Director DaSilva,

This letter will confirm our verbal communication to you during the psychiatry
meeting today.  We alerted you to the severe psychiatry staffing shortage in our
letter of three weeks ago.  Now, as you know, our psychiatry staffing shortage has
devolved from serious to crisis level.  With three more psychiatrists leaving in the
near future we must take urgent action.  After extensive discussion and
consideration, the psychiatry staff at SVPP have unanimously determined that we
cannot safely manage more than 40 patients per psychiatrist.  We will not abandon
additional patients beyond this limit, but can provide only emergency psychiatry
services for such additional patients.

Thank you.

Sincerely,


Joel Badeaux, MD                           Ariel Troncoso, MD

John Brim, MD                         Lei Wei, DO

Minhas Kapadia, MD                   Indu Aramandla, MD

Muhammad Saleem, MD               Mary Stoller, MD


cc:    Katherine Warburton, DO, Chief Psychiatrist, DSH
       Nereyda Rivera, UAPD

Case 2:90-cv-00520-LKK-JFM  Document 4354-1  Filed 02/25/13  Page 1 of 10

1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  ALISON HARDY – 135966
   SARA NORMAN – 189536
3  REBEKAH EVENSON – 207825
   PRISON LAW OFFICE
4  1917 Fifth Street
   Berkeley, California  94710-1916
5  Telephone:  (510) 280-2621

6  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
7  LINDA L. USOZ – 133749
   MEGAN CESARE-EASTMAN – 253845
   K&L GATES LLP
8  4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
   Telephone:  (415) 882-8200

9

   MICHAEL W. BIEN – 096891
   JANE E. KAHN – 112239
   ERNEST GALVAN – 196065
   LISA ELLS – 243657
   ROSEN BIEN GALVAN &
   GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
   San Francisco, California  94104-1823
   Telephone:  (415) 433-6830

   CLAUDIA CENTER – 158255
   THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
   600 Harrison Street, Suite 120
   San Francisco, California  94107-1389
   Telephone:  (415) 864-8848

10 Attorneys for Plaintiffs

11

12              UNITED STATES DISTRICT COURTS
13              EASTERN DISTRICT OF CALIFORNIA
                AND NORTHERN DISTRICT OF CALIFORNIA
14  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
15    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

16  RALPH COLEMAN, et al.,                    Case No. Civ S 90-0520 LKK-JFM P

17          Plaintiffs,                       **THREE JUDGE COURT**

18      v.                                    **DECLARATION OF MICHAEL W.
                                              BIEN IN SUPPORT OF PLAINTIFFS'**
19  EDMUND G BROWN, JR., et al.,              **MOTION FOR LEAVE OF COURT
                                              TO TAKE THE DEPOSITION OF**
20          Defendants.                       **DR. JOHN BRIM**

21                                            Judge:  Hon. Magistrate Judge Moulds

22
    MARCIANO PLATA, et al.,                   Case No. C01-1351 TEH
23
            Plaintiffs,                       **THREE JUDGE COURT**
24
        v.
25
    EDMUND G. BROWN, JR., et al.,
26
            Defendants.
27

28

    DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE OF COURT TO
                    TAKE THE DEPOSITION OF DR. JOHN BRIM

1 │ DONALD SPECTER – 083925              MICHAEL W. BIEN – 096891
    │ STEVEN FAMA – 099641                JANE E. KAHN – 112239
2 │ PRISON LAW OFFICE                    ERNEST GALVAN – 196065
    │ 1917 Fifth Street                   LISA ELLS – 243657
3 │ Berkeley, California 94710-1916      AARON J. FISCHER – 247391
    │ Telephone:  (510) 280-2621          MARGOT MENDELSON – 268583
4 │                                      KRISTA STONE-MANISTA – 269083
    │                                      ROSEN BIEN
5 │                                      GALVAN & GRUNFELD LLP
    │                                      315 Montgomery Street, Tenth Floor
6 │                                      San Francisco, California 94104-1823
    │                                      Telephone:  (415) 433-6830
7 │
    │ JON MICHAELSON – 083815             CLAUDIA CENTER – 158255
8 │ JEFFREY L. BORNSTEIN – 099358        THE LEGAL AID SOCIETY –
    │ LINDA L. USOZ – 133749              EMPLOYMENT LAW CENTER
9 │ MEGAN CESARE-EASTMAN – 253845        180 Montgomery Street, Suite 600
    │ K&L GATES LLP                       San Francisco, California 94104-4244
10│ 4 Embarcadero Center, Suite 1200     Telephone:  (415) 864-8848
    │ San Francisco, California 94111-5994
11│ Telephone:  (415) 882-8200

12│ Attorneys for Plaintiffs

13│                    UNITED STATES DISTRICT COURT

14│                    EASTERN DISTRICT OF CALIFORNIA

15│

16│ RALPH COLEMAN, et al.,               Case No. Civ S 90-0520 LKK-JFM

17│              Plaintiffs,              **DECLARATION OF MICHAEL W.**
                                          **BIEN IN SUPPORT OF PLAINTIFFS'**
18│        v.                             **MOTION FOR LEAVE OF COURT**
                                          **TO TAKE THE DEPOSITION OF DR.**
19│ EDMUND G. BROWN, Jr., et al.,         **JOHN BRIM**

20│              Defendants.             Judge:  Hon. Magistrate Judge Moulds

21│

22│

23│

24│

25│

26│

27│

28│

─────────────────────────────────────────────────────────
DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE OF COURT TO
TAKE THE DEPOSITION OF DR. JOHN BRIM

1    I, Michael W. Bien, declare:

2    1.    I am a an attorney admitted to practice in California, a member of the Bar of

3    this Court and the managing partner of the law firm, Rosen Bien Galvan & Grunfeld LLP,

4    counsel of record for the Plaintiff Class. I have personal knowledge of the matters set

5    forth herein, and if called as a witness I could competently so testify. I make this

6    declaration in support of Plaintiffs' motion for leave of court to take the deposition of

7    Dr. John Brim.

8    2.    Defendants contend that they are providing "timely access to inpatient

9    mental health care for all class members needing hospitalization." Docket 4275-1 at

10   p. 17:20-22. Dr. John Brim is a psychiatrist employed by the Department of State

11   Hospitals ("DSH") at the Salinas Valley Psychiatric Program ("SVPP") inside the walls of

12   Salinas Valley State Prison. The SVPP is an inpatient psychiatric hospital that provides

13   mental health services exclusively to *Coleman* class members. Plaintiffs' counsel and

14   Plaintiffs' psychiatric expert inspected Salinas Valley State Prison and the SVPP on

15   January 28, 2013. Based on that inspection and on additional information that we have

16   received, it is my opinion that the deposition of Dr. Brim is necessary for Plaintiffs to

17   respond to Defendants' termination motion.

18   3.    Specifically, after the expert tour, my office received two letters signed by

19   Dr. Brim and multiple other SVPP psychiatrists describing extreme clinical staffing

20   shortages that are creating unsafe conditions and preventing these psychiatrists from

21   providing Plaintiff class members minimally adequate inpatient care. A true and correct

22   copy of the first letter, which is dated January 23, 2013, signed by Dr. Brim and eight other

23   SVPP psychiatrists, and addressed to Charles Silva, the SVPP Executive Director, is

24   attached hereto as **Exhibit A**. This letter was received by my office on February 4, 2013.

25   A true and correct copy of the second letter, which is dated February 12, 2013, signed by

26   Dr. Brim and seven other SVPP psychiatrists, and also addressed to Mr. Silva, is attached

27   hereto as **Exhibit B**. This second letter was received by my office on February 15, 2013.

28   Additionally, my office received additional confidential information from a non-party

1

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE OF COURT TO
TAKE THE DEPOSITION OF DR. JOHN BRIM

1   source on February 20, 2013 that lead to my decision to depose Dr. Brim.

2        4.      On February 22, 2013, my office hand served counsel for Defendants with a

3   notice setting Dr. Brim's deposition on March 1, 2013, the final day of discovery.

4        I declare under penalty of perjury under the laws of the United States that the

5   foregoing is true and correct and that this declaration is executed in San Francisco,

6   California on February 25, 2013.

7

8                                    /s/ Michael W. Bien
                                     Michael W. Bien
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MICHAEL W. BIEN IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE OF
TAKE THE DEPOSITION OF DR. JOHN BRIM



**ROSEN BIEN**
**GALVAN & GRUNFELD LLP**

315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Michael W. Bien
Email: mbien@rbgg.com

March 4, 2013

VIA E-MAIL

Debbie J. Vorous
Deputy Attorney General
California Department of Justice
P.O. Box 944255
Sacramento, CA 94244-2550
Debbie.Vorous@doj.ca.gov

Jay C. Russell
Deputy Attorney General
California Department of Justice
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102-7004
Jay.Russell@doj.ca.gov

Benjamin Rice
General Counsel
CDCR Office of Legal Affairs
P.O. Box 942883
Sacramento CA 94283-0001
benjamin.rice@cdcr.ca.gov

      Re:    *Coleman v. Brown*; Dangerous Staff Shortages in
            Department of State Hospitals (DSH) Programs
            Our File No. 0489-03

Dear Ms. Vorous, Mr. Russell and Mr. Rice:

      We are writing to demand immediate action by the Governor and Director Allenby of DSH to address the critical shortage of clinical staff, especially psychiatrists, at the DSH-operated state hospital programs located at Salinas Valley State Prison and California Medical Facility. These programs are operating at maximum capacity and each have waiting lists of additional patients referred for psychiatric hospitalization by CDCR clinical staff, "accepted" for care by DSH, but lingering in CDCR prisons due to the shortage of inpatient psychiatric beds. Thirty human beings are now waiting for acute emergency psychiatric care. There is also, of course, a wait list for ICF hospitalization, despite defendants' representations that no such wait list exists.

      Under pressure to reduce spending in accord with the Governor's hiring freeze and Department of Finance instructions, DSH and CDCR have intentionally or negligently

[750804-3]

Debbie J. Vorous
Jay C. Russell
Benjamin Rice
March 4, 2013
Page 2

started the process of shutting down major parts of the CMF and SVPP inpatient psychiatric programs by cutting staffing allocations, failing to use registry to fill vacancies, restricting overtime and even restricting allocations for patient clothing, soap and laundry. The result has already been the needless loss of one life in the inpatient psychiatric hospital at SVPP due to suicide in late November 2012.

The psychiatrists at SVPP have repeatedly complained to their superiors concerning the critical shortages of staffing and resources, both before and after the unnecessary and avoidable suicide at their facility in late November. They urged their superiors to restrict new admissions to the program as they felt that they were barely able to provide minimal care to the existing patients. They were told that they were under pressure to "reduce the wait list" and could not restrict new admissions, despite the danger to patients and staff. In addition to the suicide, SVPP in 2012 experienced a dramatic increase in injuries to patients and injuries to staff, directly attributable to Defendants' decisions to reduce spending on the program. The ICF program is required to provide between 20 and 35 hours of scheduled treatment and activities per patient per week. According to Dr. Brim, SVPP is now only providing one hour a day.

Freed from the USDOJ CRIPA Decree, DSH promptly reduced its staffing ratios for its ICF programs. Plaintiffs' counsel repeatedly raised the staffing shortages at SVPP and CMF VPP with Defendants and their attorneys in 2012. Defendants repeatedly assured plaintiffs' counsel and the *Coleman* Special Master that the programs were fully staffed and that the monthly staffing data, that showed large numbers of vacancies and limited or no use of registries was "inaccurate." In December 2012, plaintiffs' counsel again raised the issue and we were again assured in a face to face meeting, with the Special Master present, that SVPP was fully staffed and operating safely and appropriately. Dr. Brim's testimony, and the letters signed and written by each and every psychiatrist working in SVPP in January and February of 2013, demonstrate that the statements made by DSH officials, to say the least, misrepresented the true crisis that existed in November and December at SVPP and, apparently, has worsened since December.

DSH officials made a presentation in December at SVPP (and probably also at CMF), to recruit clinicians to move to the new facility under construction at Stockton. At the same time, they informed staff that more than half of the DSH programs at SVPP and CMF would be closing down. The result, as intended, was that numerous DSH staff have left their jobs or given notice. It is also apparent that DSH was making little or no effort to recruit new clinicians to work at CMF and SVPP despite the extreme and dangerous level of vacancies, nor was DSH making effective use of registries at SVPP. As a result,

Debbie J. Vorous
Jay C. Russell
Benjamin Rice
March 4, 2013
Page 3

only "emergency" psychiatry is taking place, and ICF level of care is not being delivered to the patients.

We have received reports of similar extreme clinical vacancies, especially in psychiatry, at the CMF VPP programs. These inpatient psychiatric programs were and remain at full capacity, yet Defendants' actions have directly put the patients and staff at grave risk.

Defendants are under court orders to continue to operate all of the inpatient programs at CMF and SVPP unless and until the court finds that they are no longer necessary. The court order also applies to the "temporary and emergency" MHCB's at CIM, CMC and SAC. Operating inpatient psychiatric hospitalization programs without the necessary clinical staff is a violation of the court's orders. Additional lives are at stake.

We demand that Defendants provide, by Friday, March 8, a full and complete list, under penalty of perjury, of all clinical and custody positions authorized for SVPP and CMF VPP, the names of each person that is currently filling that position, and whether they are full time, part-time or registry (and whether they have given notice to DSH that they are retiring, taking leave, or moving to another position within the next 30 days). We also demand CDCR's and DSH's immediate plan to address the dangerous and growing wait lists. Prompt transfers of patients to the numerous open beds at Coalinga State Hospital , Patton State Hospital and Atascadero State Hospital should be undertaken. CDCR could also transfer patients to the new inpatient psychiatric facility at CIW that has an empty wing. The Deputy Special Master suggests that an additional L-Wing floor at CMF be converted to acute inpatient care. Something must be done now.

///

///

///

///

///

///

[750804-3]

Debbie J. Vorous
Jay C. Russell
Benjamin Rice
March 4, 2013
Page 4

    If and when Defendants complete construction, obtain licensing approval and hire and train clinical and custody staff, they can begin to transfer patients to Stockton. This has not and will not occur for many more months. We will not permit Defendants to endanger the lives of *Coleman* class members in order to balance the State's budget in the interim.

                Sincerely,

                ROSEN BIEN
                GALVAN & GRUNFELD LLP

                */s/ Michael W. Bien*

          By:  Michael W. Bien

MWB:cg
cc:    Special Master Lopes
        Donald Specter
        Diana Toche
        Tim Belavich

Exhibit 9

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**

P.O. Box 942883
Sacramento, CA94283-0001



March 1, 2013

Matthew A. Lopes, Jr. Esquire                    via: Debbie J. Vorous, Esquire
Office of the Special Master                           Deputy Attorney General
Pannone Lopes & Devereaux LLC                    Department of Justice
317 Iron Horse Point Way, Suite 301               1300 "I" Street, Suite 125
Providence, RI  02908                                  P. O. Box 944255
                                                        Sacramento, CA  94244-2550

**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF
VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of January, 2013 data (or as otherwise
noted).  The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and
    Vacancy History**.**
2.  MHSDS Hiring Activity Report**.**
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary
    and Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly
    Report for all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center
    (RC) Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient
    Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of State Hospitals (DSH) (including
    admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of State Hospitals (DSH) Monthly Report of CDCR Patients in DSH
    Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.  **(No Longer Available)**

Matthew A. Lopes, Jr. Esquire
Page 2

16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison, San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Deputy Director (A)
Statewide Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc:  Diana Toche, DDS, Director (A), Division of Correctional Health Care Services (DCHCS)
     Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
     Linda Holden, Esq., *Coleman* Deputy Special Master
     Jeffrey L. Metzner, M.D., *Coleman* Expert
     Kerry C. Hughes, M.D., *Coleman* Expert
     Raymond F. Patterson, M.D, *Coleman* Expert
     Paul Nicoll, MPA, *Coleman* Monitor
     Mary Perrien, Ph.D., *Coleman* Expert
     Kathryn A. Burns, M.D., MPH, *Coleman* Expert
     Henry A. Dlugacz, Esq., *Coleman* Expert
     Kerry F. Walsh, Esq., *Coleman* Monitor
     Patricia Williams, Esq., *Coleman* Monitor
     Haunani Henry, *Coleman* Monitor
     Debbie Vorous, Esq., Office of the Attorney General
     Heather McCray Esq., Office of Legal Affairs, CDCR
     Michael Stone, Esq., Office of Legal Affairs, CDCR
     Michael Bien, Esq., Rosen, Bien and Galvan

Matthew A. Lopes, Jr. Esquire
Page 3

Donald Specter, Esq., Prison Law Office
Judy Burleson, Associate Director, Statewide Mental Health Program, DCHCS
Nathan Stanley, Chief, Operational Program Oversight, Statewide Mental Health Program DCHCS
Teresa Owens, Associate Governmental Program Analyst, Operational Program Oversight, DCHCS

# Mental Health Adseg/SHU/PSU

**January 18, 2013**

| | | MH POPULATION IN AD SEG | | | AD SEG CAPACITY | MH PERCENT OF AD SEG* | | |
|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| ASP | II | 1 | 40 | **41** | 175 | 0.57% | 22.86% | **23.43%** |
| CAL | I,IV | | 6 | **6** | 300 | 0.00% | 2.00% | **2.00%** |
| CCC | I,II,III | | 1 | **1** | 175 | 0.00% | 0.57% | **0.57%** |
| CCI | I,II,III,IV | | 107 | **107** | 327 | 0.00% | 32.72% | **32.72%** |
| CCWF | | 3 | 49 | **52** | 61 | 4.92% | 80.33% | **85.25%** |
| CEN | III | | 8 | **8** | 350 | 0.00% | 2.29% | **2.29%** |
| CIM | I | 2 | 90 | **92** | 356 | 0.56% | 25.28% | **25.84%** |
| CIW | | 3 | 34 | **37** | 56 | 5.36% | 60.71% | **66.07%** |
| CMC | I,II,III | 62 | 31 | **93** | 226 | 27.43% | 13.72% | **41.15%** |
| CMF | I,II,III | 44 | 19 | **63** | 164 | 26.83% | 11.59% | **38.41%** |
| COR | I,III,IV | 70 | 125 | **195** | 460 | 15.22% | 27.17% | **42.39%** |
| CTF | I,II | 2 | 27 | **29** | 228 | 0.88% | 11.84% | **12.72%** |
| DVI | I,II | 2 | 45 | **47** | 303 | 0.66% | 14.85% | **15.51%** |
| FOL | III | 1 | 13 | **14** | 138 | 0.72% | 9.42% | **10.14%** |
| HDSP | I,III,IV | 3 | 35 | **38** | 343 | 0.87% | 10.20% | **11.08%** |
| ISP | I,III | | 2 | **2** | 175 | 0.00% | 1.14% | **1.14%** |
| KVSP | I,IV | 3 | 70 | **73** | 396 | 0.76% | 17.68% | **18.43%** |
| LAC | I,III,IV | 64 | 150 | **214** | 450 | 14.22% | 33.33% | **47.56%** |
| MCSP | I,II,III,IV | 36 | 52 | **88** | 175 | 20.57% | 29.71% | **50.29%** |
| NKSP | I,III | 6 | 39 | **45** | 175 | 3.43% | 22.29% | **25.71%** |
| PBSP | I,IV | 4 | 90 | **94** | 246 | 1.63% | 36.59% | **38.21%** |
| PVSP | I,III | | 152 | **152** | 350 | 0.00% | 43.43% | **43.43%** |
| RJD | I,III | 56 | 105 | **161** | 350 | 16.00% | 30.00% | **46.00%** |
| SAC | I,IV | 39 | 74 | **113** | 406 | 9.61% | 18.23% | **27.83%** |
| SATF | II,III,IV | 1 | 104 | **105** | 325 | 0.31% | 32.00% | **32.31%** |
| SCC | I,II,III | | 15 | **15** | 175 | 0.00% | 8.57% | **8.57%** |
| SOL | II,III | 4 | 79 | **83** | 350 | 1.14% | 22.57% | **23.71%** |
| SQ | I,II | 10 | 69 | **79** | 379 | 2.64% | 18.21% | **20.84%** |
| SVSP | I,IV | 48 | 160 | **208** | 439 | 10.93% | 36.45% | **47.38%** |
| WSP | I,III | 2 | 39 | **41** | 175 | 1.14% | 22.29% | **23.43%** |
| **Totals** | | **466** | **1830** | **2296** | **5504** | **8.47%** | **33.25%** | **41.72%** |

Mental Health and HIV numbers are as accurate as the information

     provided by the respective identifier systems.       *R2-1*

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

Health Care Placement Oversight Program

1/18/2013

| | | MH POPULATION IN PSU | | | PSU CAPACITY | MH PERCENT OF PSU | | |
|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| PBSP | I,IV | 118 | 1 | **119** | 128 | 92.19% | 0.78% | **92.97%** |
| SAC | | 238 | 5 | **243** | 256 | 123.96% | 2.60% | **126.56%** |

| | | MH POPULATION IN SHU | | | SHU CAPACITY | MH PERCENT OF SHU | | |
|---|---|---|---|---|---|---|---|---|
| | | EOP | CCCMS | TOTAL | | EOP | CCCMS | TOTAL |
| COR | I,III,IV | 1 | 415 | **416** | 1400 | 0.07% | 29.64% | 29.71% |
| VSPW | | 0 | 0 | **0** | 44 | 0.00% | 0.00% | **0.00%** |
| CCI | | 1 | 193 | **194** | 274 | 0.36% | 70.44% | **70.80%** |

| | EOP | CCCMS | TOTAL | CAPACITY | EOP | CCCMS | TOTAL |
|---|---|---|---|---|---|---|---|
| **Total** | **2** | **608** | **610** | **1718** | **0.12%** | **35.39%** | **35.51%** |

Mental Health and HIV numbers are as accurate as the information

provided by the respective identifier systems.                   *R2-2*

*Ad Seg Capacities do not include "overflow." Therefore, MH Percent of Ad Seg may be artificially inflated.

COR Ad-Seg EOP housing is located in the SHU.

Exhibit 10



Transcript of the Testimony of:

# Charles Scott, M.D.

Coleman v. Brown

March 8, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                 Plaintiffs,      )
                                  )CASE NO.:
         vs.                      ) S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                 Defendants.      )
_____   )



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Charles Scott, M.D.                                          March 8, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,              )
                                         )
 5                      Plaintiffs,      )
                                         )CASE NO.:
 6        vs.                            ) S 90-0520 LKK-JFM
                                         )
 7   EDMUND G. BROWN, JR., ET AL.,       )
                                         )
 8                      Defendants.      )
     _____)
 9

10

11

12

13

14              The Deposition of CHARLES SCOTT, M.D., taken

15   on behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:06 a.m., Friday, March 8, 2013, at the

19   UC Davis Immigration Law Clinic, Building TB-34, Davis,

20   California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                              March 8, 2013

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  ERNEST J. GALVAN, ESQ.
                ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4              315 MONTGOMERY STREET, TENTH FLOOR
                SAN FRANCISCO, CALIFORNIA 94104
 5              415.433.6850
                415.433.7104 FAX
 6              EGALVAN@RBGG.COM

 7
      FOR DEFENDANTS:
 8
                BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9              OFFICE OF THE ATTORNEY GENERAL
                STATE OF CALIFORNIA
10              455 GOLDEN GATE AVE., SUITE 11000
                SAN FRANCISCO, CALIFORNIA  94102-7004
11              415.703.3035
                415.703.5843 FAX
12              PATRICK.MCKINNEY@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    collecting data and tabulating it in some way?

2        A.   I don't recall if on the very first meeting

3    there was an organized data collection procedure

4    finalized on the first meeting.

5        Q.   Okay.  Did you ever work up an organized data

6    collection procedure?

7        A.   Yes.

8        Q.   When did that happen?

9        A.   Over several months following that first

10   meeting, a tool to help look at different components

11   important to care, or potentially important to care, was

12   developed.  And my input was primarily into the

13   medication piece.  And to the degree that that also

14   related to the mental health crisis bed, I had input

15   into that as well.

16       Q.   And was the plan to tabulate data from that

17   collection and include it in your report?

18            MR. McKINNEY:  Objection.  Vague and

19   ambiguous.

20            THE WITNESS:  No, the plan wasn't to per se

21   include all the data collection pieces in the final

22   report.

23   BY MR. GALVAN:

24       Q.   What were you going to do with the data

25   collection pieces?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1      A.   Have them available for review should we have

2   an opinion that people would want to know the basis for

3   the opinion.

4      Q.   And did you actually do that?  Do you have

5   them available for review?

6      A.   I turned them over, I believe, yes.

7      Q.   When you say "turned them over" -- ask a

8   different question.

9           When you talk about having something for

10  review, do you mean something in which you -- you broke

11  out or rolled up the results of your tabulation in terms

12  of percentages or scores in some way?

13     A.   I provide the entire data set so someone could

14  verify it for themselves rather than rely on my own

15  summary.

16     Q.   Did you ever make your own summary?

17     A.   I have a general impression from having

18  reviewed the data.  So having been at the institutions

19  and collected the data, it's easy to learn it as you do

20  it.

21     Q.   Do you have a document with a summary of the

22  data?

23     A.   No, just what's in my head.

24     Q.   Is it possible -- or do you know whether

25  Dr. Bobb has a document with a summary of the data?

Charles Scott, M.D.                                    March 8, 2013

1   Dr. Paizis did with one of the other psychiatrists, that

2   they could look at labs that aren't in EUHR.  They took

3   me to the CTC, they took me to the office room and

4   verified that although it wasn't in EUHR, they could

5   check it through 360.

6          So that work with them on this patient

7   combined with what I found with EUHR, I felt clozapine

8   was being monitored appropriately.

9          Q.    You testified that they could check it on 360.

10  Did they actually look up Mr. Jimenez --

11         A.    Yes.

12         Q.    -- and check the fasting glucose and the

13  metabolic panel on 360?

14         A.    We walked over to a Quest 360 computer because

15  one was not near me.  Dr. Paizis then opened it up and

16  showed me.

17         Q.    Why didn't you include it in your notes?

18         A.    Because we -- I left my pad and I walked over

19  there with them, and I didn't write it when I went back.

20         Q.    If I looked in your database, would it be in

21  your database?

22         A.    The database didn't start until Chowchilla, so

23  you would not see it in the database.

24         Q.    Oh, the database starts in Chowchilla?

25         A.    Well, the database starts with the first site

Charles Scott, M.D.                                          March 8, 2013

1    visit.  But the computer collects data it's stored

2    there.  These are original database for the initial site

3    visits.

4         Q.   So we shouldn't expect to see anything in the

5    database until -- so not for Vacaville, not for SAC, not

6    for Centinela, not for RJD, but for Chowchilla and

7    thereafter?

8         A.   You may see some for Centinela because I think

9    they were around the same time.

10        Q.   Is it true to say that there weren't very many

11   patients on clozapine that you were able to review,

12   right?

13        A.   I think at the Folsom site, that's correct.

14        Q.   I mean, altogether through the project there's

15   only a handful, right?

16        A.   I would have to go back and count them.

17        Q.   Certainly fewer than 10?

18        A.   I don't know that.  I'd have to count them.

19        Q.   On the next page of these notes, at 919,

20   there's a note here about a Mr. Bonila?

21        A.   Yes.

22        Q.   You have at the top of the page:  "Suicide

23   precaution."

24             Do you remember where you saw him?

25        A.   My recollection was it was on their CTC.

1   some of those are blanks.

2      Q.   Occasionally you have created a blank record

3   here?

4      A.   Yes.  When it asks you how to enter new data,

5   sometimes that happens.

6      Q.   That seems to be just a few blank lines.

7      A.   Yeah, at the beginning.

8      Q.   I was going to go to the bottom and see how

9   many records we have and get your general sense of

10  whether you think we're in ballpark of having your whole

11  database.

12          Looks like we have 132 -- 132 rows.

13     A.   Correct.

14     Q.   Although some are blank.

15     A.   Yes.

16     Q.   I don't think there are very many blanks,

17  though.

18     A.   Six or seven.

19     Q.   So does this -- would you be -- can you

20  testify that this is your whole database?

21     A.   No.

22     Q.   Okay.  Can you testify that this seems to be

23  a -- what would you need -- what more would you need to

24  be able to testify this was your whole database?

25     A.   First of all, the first, I believe, two or

Charles Scott, M.D.                                    March 8, 2013

1   three institutions, I tried to enter the data on the

2   audit tool.  And we've gone over those institutions, the

3   number of cases.  And so I would say my database

4   involves the data entered into Bento, which is the

5   equivalent of what would have been on an audit tool,

6   plus the actual audit tool and handwritten notes.

7           So there are obviously more records, because

8   we've gone over them, than the 125, if we extract the

9   six or so here.  So that's how I came up earlier with

10  the number.

11          For medication reviews, at least 135.  Some of

12  these individuals -- and you'll even see it on this

13  database.  If I pulled their chart, a random system

14  sample, and it said they'd been on Prozac, for example,

15  when I went to open the record, that may have been

16  discontinued at the time I did the review so they were

17  no longer on meds.  So I may:  "On no meds, no medicine

18  review."

19          So that's why, although there are more records

20  than I testified to about the medical record review,

21  it's because not all of the records necessarily were on

22  the medicine.  But the majority were.

23      Q.  So limiting it to just what's -- just trying

24  to nail down what is the Bento database versus database

25  of conceptual database, can you testify that what we're

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1    looking at now, you're -- this Excel export, is your

2    Bento database?

3        A.   I could testify that this is the Bento

4    database, but the other database that we've gone over is

5    not a conceptual one.  It's an actual data collection

6    but hasn't been entered into Bento.

7        Q.   So this Exhibit 111 -- I mean Exhibit 13,

8    Bates 111579 to 641, is the Bento database?

9        A.   Correct.

10        Q.   Exported to Excel?

11        A.   Yes.

12        Q.   I'll show you one other thing to increase your

13    confidence in that being true.  I think it has data --

14    oh, last modified by me.  I've been playing with it in

15    front of me.  You've seen what I did it.  I changed the

16    way the cells display.

17        A.   Saved to backup.

18        Q.   Don't worry.  I'm doing it off the CD, so I

19    can't really save changes to this CD.

20            When you first open it from the CD, it says

21    "Last modified by Charles Scott," but I can't show you

22    that because of what we did to make it more readable.

23            It is your testimony that we have a true and

24    correct representation of your Bento database in the

25    Excel spreadsheet that you exported from us?

Charles Scott, M.D.                                    March 8, 2013

```
1                  CERTIFICATE OF REPORTER

2

3         I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8              That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13             I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                  DATED:  March 11, 2013

21

22                   _____

23                   MEGAN F. ALVAREZ

24                   RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com