DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | DECLARATION OF MICHAEL W. BIEN IN REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE RE: DEFENDANTS' EXPERT REPORTS AND DECLARATIONS |
| v. | |
| EDMUND G. BROWN, Jr., et al., | |
| Defendants. | Judge: Lawrence K. Karlton |

I, Michael W. Bien, declare as follows:

1. I am an attorney at law, a member of the Bar of this Court and a partner of the law firm, Rosen Bien Galvan & Grunfeld LLP, counsel of record for the plaintiff class in this litigation. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would so testify competently. I submit this declaration in reply to Defendants' Response to Order to Show Cause and Plaintiffs' Evidentiary Objections

1   Regarding Defendants' Expert Reports and Declarations.

2       2.    I am lead counsel for the plaintiff class in this litigation. I have never given

3   permission to defense counsel or their experts, agents or consultants, to communicate with,

4   or interview my clients, prisoners with serious mental illness housed in CDCR prisons and

5   DSH hospitals, outside of my presence. I have never received written or oral notice from

6   opposing counsel, the Attorney General's Office, or from in-house counsel, Benjamin

7   Rice, or from Martin Hoshino or Matt Cate, that they had retained experts and were

8   conducting inspections of the prisons to be used for the *Coleman* litigation.

9       3.    I was never informed by the Special Master that a representative of

10  defendants or the Attorney General or anyone else had informed him that they were

11  conducting inspections of CDCR prisons that included interviews and communications

12  with my clients or that retained experts were conducting inspections of the prisons for use

13  in the *Coleman* litigation.

14      4.    I was never informed by my co-counsel, Donald Specter, that he had been

15  informed by Steve Martin that he was part of a team actively conducting inspections of

16  CDCR prisons for purposes of litigation on behalf of the Attorney General's Office that

17  included interviews of and communications with our clients. At the time Mr. Martin

18  recalls talking to Mr. Specter, "some time in the late summer or early fall of 2012,"

19  defendants had already conducted 10 secret prison inspections. Mr. Martin does not state

20  that he informed Mr. Specter that he was conducting formal prison inspections that

21  included interviews with mentally ill prisoners or that Mr. Specter gave his consent to the

22  secret tours. Mr. Specter, in *Plata*, litigated this very issue and obtained an order

23  prohibiting defendants from conducting secret tours with their retained experts without

24  notice to plaintiffs' counsel and the opportunity to observe the inspection and be present

25  for any communications with their prisoner clients. 2/21/13 Order, *Plata* Docket 2546.

26      5.    Mr. Specter and I have been co-counsel on various cases against the State

27  concerning prison and parole conditions, for more than 25 years including but not limited

28  to *Gates, Coleman, Armstrong, and Valdivia*, and most recently, the three-judge court

1  proceedings in the coordination of *Coleman* and *Plata*. In each of these cases, plaintiffs'

2  counsel has always insisted on being present for any inspections of CDCR facilities by

3  defendants' retained experts, and where possible, have arranged for plaintiffs' experts to

4  participate in the inspection. In each of these cases the Attorney General's Office has

5  represented the State defendants.

6        6.      I have had conversations with Martin Hoshino, Mathew Cate, and other

7  senior CDCR and State of California officials, including representatives of the Governor,

8  from time to time during the course of this litigation without notice to the Attorney

9  General's Office. Some of the conversations included Donald Specter and I have also

10  been informed by Mr. Specter that he has also had conversations with Secretary Cate,

11  Secretary Beard and other senior CDCR and State of California officials. In virtually

12  every case, Benjamin Rice, CDCR General Counsel, or another attorney representing the

13  State or CDCR was present, had been informed or gave permission. Secretary Beard, at

14  his deposition in this case on March 5, 2013 in the presence of Paul Mello of Hanson

15  Bridgett and Benjamin Rice, invited me to call him at his office at any time to set up a

16  meeting. At times, including during discussions with Mr. Hoshino, Secretary Cate and

17  Benjamin Rice in 2012, the CDCR and State officials I have communicated with,

18  including Mr. Rice, have specifically requested that we exclude the Attorney General's

19  Office from our meeting or conversations.

20        7.      The Special Master and his Team are authorized by the Order of Reference

21  of this Court, and have plaintiffs' counsel permission, to communicate with and interview

22  my clients.

23        8.      Attached hereto as **Exhibit 1**, is a true and correct copy of excerpts from the

24  transcript of the deposition of Joel Dvoskin taken February 27, 2013 in San Francisco,

25  California and lodged with this Court on March 15, 2013.

26        9.      Attached hereto as **Exhibit 2** is a true and correct copy of Dr. Dvoskin's

27  contract with the AG's Office which was authenticated as Exhibit 2 to his deposition and

28  which states that Dr. Dvoskin's retention was for purposes of assisting the Department of

[769535-2]

1    Justice "in its defense of the case referenced herein" [Coleman v. Brown], at DEXP

2    103092 ¶ 1, and was authenticated at pages 16-17 of the transcript of his deposition.

3        10.    Attached hereto as **Exhibit 3**, is a true and correct copy of excerpts from the

4    transcript of the deposition of Charles Scott taken March 8, 2013 in Davis, California and

5    lodged with this Court on March 15, 2013.

6        11.    Attached hereto as **Exhibit 4**, is a true and correct copy of excerpts from the

7    transcript of the deposition of Jacqueline Moore taken February 21, 2013 in San Francisco,

8    California and lodged with this Court on March 15, 2013.

9        12.    Attached hereto as **Exhibit 5** is a true and correct copy of an e-mail sent by

10   Patrick McKinney to Joel Dvoskin, Jackie Moore, Charles Scott, and Steve Martin, cc'ing

11   William Downer, Jay Russell, and Debbie Vorous, on July 20, 2012, and which was

12   produced by Defendants as DEXP 000021-22.

13       13.    Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the

14   transcript of the deposition of Steve Martin taken February 28, 2013 in San Francisco,

15   California and lodged with this Court on March 15, 2013.

16       14.    Attached hereto as **Exhibit 7** is a true and correct copy of an e-mail sent by

17   Patrick McKinney to Joel Dvoskin, Jackie Moore, Charles Scott, and Steve Martin, cc'ing

18   David Spagnolo and Debbie Vorous, on February 24, 2012, and which was produced by

19   Defendants as DEXP 000014.

20       15.    My ability to defend defendants' termination motion has been seriously

21   compromised by defendants' decision to conduct secret inspections of the prisons and to

22   interview my clients without my permission and outside my presence.  As reflected in the

23   cross-examination of Dr. Packer  and Dr. Thomas in the three-judge court and Drs. Koson

24   and Dvoskin in the 1993 *Coleman* trial, where plaintiff counsel is given notice of a defense

25   expert prison inspection and the opportunity to accompany him or her on the inspection, an

26   effective cross-examination or deposition can be undertaken.  When plaintiffs' counsel is

27   present to see and hear the same information that is provided to the defense expert, to note

28   the time spent in different locations and with different prison officials, to record the names

of prisoners and employees interviewed and to copy or make note of the documents and records that the expert witness was provided access to, we have a fair opportunity to understand the foundation of the expert's opinion. We can separate facts that were "fed" to the expert by defendants and their representatives from facts that they gleaned on their own from observations and interviews. We can speak privately to our clients, explain the purpose of the inspection and ask them if they are willing to speak with defense experts or prefer not to for whatever reason. While I usually encourage my clients to speak with defense experts, I have advised clients who have pending criminal cases or serious disciplinary charges not to participate.

16.     Defendants' expert reports did not include a list of the names of prisoners and state employees that they spoke with, when and where they spoke with them, or identification of which medical records and documents they reviewed, when they reviewed them and where they are located. The Joint Report did not identify the role of each expert, who attended each tour, or break down the specific tasks and assignments of the three joint experts. Defendants' document production and notes did not cure the confusion. No matter how much time and energy I could spend in a deposition with one of these experts, I will never know what was really said to them by who on a certain day at a certain prison, what the conditions were like that day at the prison, whether there were incidents on the Unit—a riot, an attempted suicide or other emergency--how many hours they spent in each unit and what parts they skipped altogether. Even if I look at a later version of the medical record, I will never know what the record looked like the day they examined it. The missed inspection can never be recreated and the missed opportunity as plaintiffs' counsel cannot be cured.

17.     Ms. Vorous's declaration at Paragraph 4 (Dkt. No. 4496) gives the incorrect impression that she was the sole defense attorney present at the California State Prison, Sacramento tour (which took place on January 29, 2013, not January 28, 2013 as she reports), and that it was normal for Plaintiffs to send four attorneys. First, Ms. Vorous was one of three defense attorneys on the tour. She was accompanied by attorneys Katherine

1  Tebrock and Heather McCray.  At all times, CDCR had enough attorneys present to

2  monitor any discussions with staff that took place.  In addition to three attorneys for the

3  state, we were accompanied by several high-ranking state officials, including Nathan

4  Stanley, CDCR Deputy Director Mike Staynor, Warden Virga, and the head of CSP-

5  Sacramento's mental health program, Dr. Shama Chaiken, as well as others.  It was highly

6  unusual for Plaintiffs to have four attorneys on a tour.  The Sacramento tour took place at

7  the beginning of a highly compressed discovery period, during which five experts would

8  tour prisons up and down the state.  It was necessary and appropriate for Plaintiffs to use

9  this early tour close to the Bay Area to orient two newer attorneys to the tour process.

10  Subsequent tours generally included only one or two attorneys for Plaintiffs.  Defendants,

11  however, consistently sent a large entourage of attorneys and state officials.  There was

12  only one expert, Dr. Stewart, on this tour and the group stayed together, in the same

13  locations, at all times.  At no time did I, nor did I observe or hear any other attorney for the

14  plaintiffs, make any effort to speak with a state employee outside the presence of defense

15  counsel.

16         I declare under penalty of perjury under the laws of the United States and the State

17  of California that the foregoing is true and correct, and that this declaration is executed at

18  San Francisco, California this 26th day of March, 2013.

19

20  _____

21  Michael W. Bien

22

23

24

25

26

27

28