Exhibit 1



Transcript of the Testimony of:

# Joel Dvoskin, Ph.D., ABPP

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,            )
                                  )
                Plaintiffs,       )
                                  )CASE NO.:
        vs.                       )S 90-0520 LKK-JFM
                                  )
EDMUND G. BROWN, JR., ET AL.,     )
                                  )
                Defendants.       )
_____)



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1                  UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,              )
                                        )
5                      Plaintiffs,      )
                                        )CASE NO.:
6          vs.                          )S 90-0520 LKK-JFM
                                        )
7   EDMUND G. BROWN, JR., ET AL.,       )
                                        )
8                      Defendants.      )
    _____)

9

10

11

12            The Deposition of JOEL DVOSKIN, PH.D., ABPP,

13   taken on behalf of the Plaintiffs, before Megan F.

14   Alvarez, Certified Shorthand Reporter No. 12470,

15   Registered Professional Reporter, for the State of

16   California, commencing at 9:14 a.m., on Wednesday,

17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,

18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,

19   California.

20

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFFS:

 3              BY:  MICHAEL BIEN, ESQ.
                     AARON FISCHER, ESQ.
 4                   JANE KAHN, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5            315 MONTGOMERY STREET, 10TH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 6            415.433.6850
              415.433.7104 FAX
 7            MBIEN@RBGG.COM

 8
      FOR DEFENDANTS:
 9
                BY:  DEBBIE J. VOROUS, ESQ.
10            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
11            1300 I STREET
              SACRAMENTO, CALIFORNIA 95814
12            916.324.5345
              916.324.5205 FAX
13            DEBBIE.VOROUS@DOJ.CA.GOV

14              BY:  HEATHER L. McCRAY, ESQ.
              DEPARTMENT OF CORRECTIONS AND REHABILITATION
15            OFFICE OF LEGAL AFFAIRS
              1515 S STREET, SUITE 314 SOUTH
16            SACRAMENTO, CALIFORNIA 95811
              916.324.4123
17            916.327.5306 FAX

18

19

20

21

22

23

24

25
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   was $100,000?

2          A.   That's correct.

3          Q.   I'm sorry.  Going back to the second page of

4   the document, 103092.

5              You understood this was a contract for expert

6   witness services?

7              The first sentence there.

8          A.   That's what the contract says.

9          Q.   Okay.

10         A.   And so I proceeded on the -- you never know if

11  you're actually going to be an expert witness when you

12  start working on these, but that was the contract and

13  that was the way I proceeded.

14         Q.   You understood that you're being retained for

15  litigation purposes?

16         A.   Yes.

17         Q.   Okay.  And the field -- it describes your

18  field as psychology and prison administration?

19         A.   I think that's what they said, yeah.

20         Q.   Do you agree that's your field?

21         A.   Those are some of my fields.

22         Q.   Okay.  And if you go down to the last four

23  pages of this first part, starting with 103098, is that

24  a copy of your CV?

25         A.   At the time, yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1        A.   Same answer I gave before.  It seems
2    reasonable to me.
3        Q.   Okay.  Okay.
4        A.   And it would -- the appropriateness of the
5    individual case would depend on the individual case.
6        Q.   Of course.
7        A.   Is that all for this one?
8        Q.   Yes, I was going to ask you...
9             MR. BIEN:  Mark next exhibit in order, No. 6,
10   some handwritten notes produced by defendants
11   represented to be from Dr. Dvoskin.  They bear
12   production numbers DEXP103258 through -263.
13             (Plaintiffs' Exhibit 6 was marked for
14              identification.)
15             THE WITNESS:  Okay.
16   BY MR. BIEN:
17       Q.   Dr. Dvoskin, are these your notes?
18       A.   Yes.
19       Q.   Okay.  And do you recall attending a meeting
20   in Sacramento, approximately October of 2011, as one of
21   your first events in your work on this case?
22       A.   Yeah.  I think it was my first event, other
23   than some -- the telephone calls I previously discussed.
24       Q.   Okay.  And who was present at the meeting?
25       A.   Well, I happen to know that.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1            Steve Martin.
 2      Q.    You just turned to look at something?
 3      A.    On the next-to-the-last page, I actually --
 4   when I go into a big meeting, I have a habit of making a
 5   little seating chart so that I can remember -- there was
 6   a lot of new faces to me, and I wanted to make sure I
 7   remembered who people were.
 8            So as the people introduced themselves, I do
 9   it in the same -- I've been doing this for many years.
10      Q.    So you're on page 103262?
11      A.    Yes.
12      Q.    Okay.
13      A.    Do you want me to read the names to you?
14      Q.    Sure.
15      A.    Steve Martin.  Jim Scaramozzino,
16   S-C-A-R-M-A-Z-I-N-O, although I think that's a
17   misspelling.  I think there's an A missing there.
18            Judy Burleson, B-U-R-L-E-S-O-N.
19            Debbie Juarez, J-U-A-R-E-Z.
20            Pat McKinney, M-c-K-I-N-N-E-Y.
21            Jackie Moore.
22            Martin -- I think I spelled his name wrong.
23      Q.    Is that Martin Hoshino?
24      A.    Yeah.  I have A-S-H-I-N-O, but I think it's --
25      Q.    That's okay.  I don't need you to read what's
```

```
 1    there.  Let's just go over the names.
 2            Was it Debbie Vorous that was there rather
 3    than Juarez?
 4        A.   Oh, yes, it was.
 5            THE WITNESS:  You must not have spoken very
 6    loudly at the time.
 7    BY MR. BIEN:
 8        Q.   I'm just going to go through the names.  Tell
 9    me if I'm right.
10            Rick Subia, he's from Department of
11    Corrections?
12        A.   Yes.
13        Q.   And Katherine Tebrock, lawyer for Department
14    of Corrections?
15        A.   Yes.
16        Q.   Ben Rice, who's CDCR general counsel?
17        A.   Yes.
18        Q.   Cynthia Rodriguez?  It says "counsel at DMH."
19        A.   Yes.
20        Q.   And David Brice, another AG?
21        A.   Yes.
22        Q.   Gabriel Sanchez, another deputy AG?
23        A.   Yes.
24        Q.   And then Rodney Reed from UC Davis?
25        A.   Yes.
```

Joel Dvoskin, Ph.D., ABPP                                February 27, 2013

1       Q.   And David Bobb from UC Davis?

2       A.   Yes.

3       Q.   And then you?

4       A.   Yes.

5       Q.   And Dr. Scott?

6       A.   Yes.

7            MS. VOROUS:  If I could interject, it's

8    actually Gabriel Sanchez.  I think -- just in terms of

9    the spelling.

10           THE WITNESS:  The names are on here.

11   BY MR. BIEN:

12      Q.   So in addition to the four experts that have

13   been retained, there were Mr. Subia and Mr. Hoshino from

14   CDCR administrators; is that right?  You understood

15   that?

16      A.   Yes.

17      Q.   Okay.  And then Judy Burleson and

18   Jim Scaramozzino were there from CDCR mental health?

19      A.   Yes.

20      Q.   And everyone else was a lawyer for the

21   defendants, either in-house or AGs?

22      A.   No.  The two fellows, David Bob and

23   Rodney Reed, were psychiatric fellows that worked with

24   Dr. Scott.

25      Q.   Right.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1              So coming back to the first page of this

2    meeting, what did you understand the purpose of the

3    meeting to be?

4         A.   To set some context for what we were being

5    asked to do, to explain some of the litigation history

6    and the current status of the litigation and the

7    question that we were being asked.

8         Q.   Okay.  And I'm looking on the first page where

9    it says -- I think I'm reading your handwriting right --

10   "six areas"?

11        A.   Six areas.

12        Q.   Right.  Are these the six areas that you were

13   asked to investigate or --

14        A.   No.  These were six -- well, kind of.  But

15   these were six areas that the plaintiffs had alleged,

16   and I believe that the judge had found problems in six

17   general areas that were the topics of interest of the

18   Coleman litigation and monitoring and remedial work.

19        Q.   Do you know what the reference sort of towards

20   the bottom "agreement to work over 90-day period"

21   referred to?

22        A.   I do not.

23        Q.   Okay.  What about "wait list 142"?

24        A.   I assume that referred to the wait list for

25   something.  Maybe for inpatient care.  But my note

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   wasn't clear, so I don't know what it refers to.

2       Q.    What about the number at the bottom?  Is that

3   a dollar sign?  Can you read what that says there?

4       A.    "$42 million monitoring."

5       Q.    What was that a reference to?

6       A.    It was -- there was some discussion about the

7   inordinate expense that went with the monitoring as

8   opposed to care -- as opposed to approving care, that

9   the monitoring itself bore an unprecedented expense.

10      Q.    Who informed you of that at the meeting?

11      A.    I would -- I don't remember which person, but

12  it could have been almost anybody in the room except for

13  the four of us and the two fellows.  It was, I think, a

14  widespread belief that monitoring costs were excessive.

15      Q.    Did they explain what they meant by

16  "excessive"?

17      A.    Too much.

18      Q.    Too much.  Too much relative to what?

19      A.    I inferred from the discussion that they

20  thought that the monitoring wasn't focused enough; that

21  it was micromanagerial in nature; that details were

22  being monitored at great expense.

23            There was a comment made that there were four

24  full-time attorneys working for the special master and

25  the -- that no one -- something to the effect of, "I

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

```
 1   BY MR. BIEN:
 2       Q.   Okay.  Coming back to your meeting in
 3   Sacramento, Exhibit 6, if you pull that out.  It's your
 4   handwritten notes.
 5             MR. BIEN:  This is Aaron Fischer from my
 6   office.
 7             THE WITNESS:  Hi, Aaron.
 8   BY MR. BIEN:
 9       Q.   On page 2, could you -- there's some
10   discussion four rows down, they measure and report
11   120 items by level of care.
12             Was this some of the discussion that you
13   already talked about about the special master's
14   monitoring?
15       A.   Yeah.  I was just taking notes as they were
16   presenting the status of things.
17       Q.   Okay.  And, again, so they were -- I'll just
18   say complaining about the extent of the monitoring and
19   the detail orientedness of the monitoring; is that a
20   fair summary?
21       A.   Yeah, that's a fair summary.
22       Q.   What does it say at the top of the page?
23       A.   I was afraid you were going to ask me about
24   that.
25             It says:  "Judge Karlton hates State and AG."
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1   And I probably wish I hadn't written that note, but I

2   think there was a general belief that any time there was

3   a disagreement between the special master and the State,

4   that the judge would simply agree with the special

5   master.  So that they didn't feel like it was a level

6   playing field, I guess, to put it -- and I wish I hadn't

7   written that.

8        Q.   You wrote it down because it was stated at

9   that meeting?

10       A.   Yeah, I believe so.

11       Q.   Do you know who said that?

12       A.   I do not.

13       Q.   How did you select the number of prisons --

14   the prisons that you toured?

15       A.   We had a meeting -- might have been that same

16   day or shortly thereafter -- where we -- we kind of sat

17   around, and I asked for a list of, like, which kind of

18   programs are at which programs.  And there were people

19   from CDCR there, and I asked them questions about, you

20   know, I say "I"; we all did.

21            All four of us weighed in about -- we wanted a

22   reasonable sample that would cover the types of programs

23   that existed.  We asked specifically for one prison that

24   didn't have much of anything.  I think we picked

25   Centinela for that.

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13              I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                        DATED: March 1, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit 2

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213 (Rev 06/03)

| | |
|---|---|
| AGREEMENT NUMBER | 11-6459 |
| REGISTRATION NUMBER | eP 1182434 |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
**DEPARTMENT OF JUSTICE**

CONTRACTOR'S NAME
**JOEL A. DVOSKIN, Ph.D., A.B.P.P.**

2. The term of this Agreement is:    **9/1/11**    through    **6/30/12**

3. The maximum amount of this Agreement is:    **$ 100,000.00**
   One Hundred Thousand Dollars and No Cents

4. The parties agree to comply with the terms and conditions of the following exhibits which are by this reference made a part of the Agreement.

| | |
|---|---|
| Exhibit A – Scope of Work | 1  page |
| Exhibit B – Budget Detail and Payment Provisions | 2  pages |
| Exhibit C* – General Terms and Conditions | GTC 610 |
| Check mark one item below as Exhibit D: | |
| ☒  Exhibit - D Special Terms and Conditions (Attached hereto as part of this agreement) | 3  pages |
| ☐  Exhibit - D* Special Terms and Conditions | |
| Exhibit E – Contractor's Resume | 4  pages |

DOJ Docket No.: **48170 286 CF1997CS0003**    DAG: **Patrick McKinney**
Case Name: **Coleman v. Brown**

*Items shown with an Asterisk (\*), are hereby incorporated by reference and made part of this agreement as if attached hereto. These documents can be viewed at www.ols.dgs.ca.gov/Standard+Language/default.htm*

**IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.**

| CONTRACTOR | California Department of General Services Use Only |
|---|---|
| CONTRACTOR'S NAME (If other than an individual, state whether a corporation, partnership, etc.) **JOEL A. DVOSKIN, Ph.D., A.B.P.P.** | |
| BY (Authorized Signature)      DATE SIGNED (Do not type) 9/19/11 | |
| PRINTED NAME AND TITLE OF PERSON SIGNING **JOEL A. DVOSKIN, Ph.D., A.B.P.P.** | **APPROVED** |
| ADDRESS **668 E. Wecki Place** **Tucson, AZ 85704-6076**      Telephone: **(520) 577-3051** | OCT 2 6 2011 |
| STATE OF CALIFORNIA | DEPT OF GENERAL SERVICES |
| AGENCY NAME **DEPARTMENT OF JUSTICE** | |
| BY (Authorized Signature)      DATE SIGNED (Do not type) OCT 18 2011 | ☐ Exempt per: |
| PRINTED NAME AND TITLE OF PERSON SIGNING **STEPHEN F. NAPOLILLO, Manager, Contracts Unit** | |
| ADDRESS **1300 I Street, 8th Floor** **Sacramento, CA  95814** | |

Joel Dvoskin
February 27, 2013
**Exhibit No. 2**
Megan F. Alvarez
RPR, CSR No. 12470

DEXP 103091

**EXHIBIT A**
**(Standard Agreement)**

<u>**SCOPE OF WORK**</u>

1. Contractor agrees to provide to the Department of Justice (DOJ) expert witness services as described here:

   Contractor, **JOEL A. DVOSKIN, Ph.D., A.B.P.P.,** an expert in the field of **psychology and prison administration,** will provide consultation, advice and services to, and on behalf of, the Department of Justice in its defense of the case referenced herein. Services to include, but may not be limited to: reviewing and analyzing records, preparing a report of the findings, and providing testimony via deposition and/or trial, if necessary.

   Case Name: **Coleman v. Brown**
   Docket No.: **48170 286 CF1997CS0003**

2. The project representatives during the term of this agreement will be:

| State Agency: **DEPARTMENT OF JUSTICE** | Contractor: **JOEL A. DVOSKIN, Ph.D., A.B.P.P.** |
|---|---|
| Name: **Patrick McKinney, DAG** | Name: **JOEL A. DVOSKIN, Ph.D., A.B.P.P.** |
| Address: **455 Golden Gate Avenue, Ste. 11000** | Address: **668 E. Weckl Place** |
| City/State/Zip: **San Francisco, CA 94102-7004** | City/State/Zip: **Tucson, AZ 85704-6076** |
| Phone: **(415) 703-3035** | Phone: **(520) 577-3051** |
| Fax:     **(415) 703-5843** | Fax:     **(520) 577-7453** |

DEXP 103092

**EXHIBIT B**
**(Standard Agreement)**
**BUDGET DETAIL AND PAYMENT PROVISIONS**

**Payment**  For full and satisfactory performance of the services provided pursuant to this Agreement, the Department of Justice shall pay the Contractor the following rates:

**$300/hr** for records review, consultations and other non-testimony services; **$300/hr** for travel, deposition and trial testimony; plus reasonable out-of-pocket expenses as incurred.

The total amount which may be paid under this Agreement shall not exceed **$100,000.00** with the actual amount being dependent upon the extent of the Contractor's services required by the Department of Justice.

Travel and per diem expenses necessarily incurred in performance of the services rendered shall be reimbursed in accordance with the current State of California, Department of Personnel Administration Regulations applicable to State of California employees.  No travel outside the State of California shall be reimbursed unless prior written authorization is obtained from the Department of Justice.

The Contractor understands that no Federal or State income tax shall be withheld from the payments under this Agreement.  However, the State of California is required to report all payments to the Internal Revenue Service and Franchise Tax Board for tax purposes.

**Invoicing**  The Contractor shall submit monthly invoices, in arrears, stating the Agreement Number, dates of service, description of service(s) provided on those dates, charges for those services, any expense(s) incurred, and a total amount payable for each invoice.  For all expenses incurred, each invoice must include necessary supporting documents and/or substantiation of travel and per diem costs, except mileage.  The invoice shall be submitted to:

OFFICE OF THE ATTORNEY GENERAL
Attn: **Patrick McKinney**, DAG
455 Golden Gate Avenue, Ste. 11000
San Francisco, CA  94102-7004

**Budget Contingency Clause**  It is mutually agreed that if the Budget Act of the current year and/or any subsequent years covered under this Agreement does not appropriate sufficient funds for the program, this Agreement shall be of no further force and effect.  In this event, the State shall have no liability to pay any funds whatsoever to Contractor or to furnish any other considerations under this Agreement and Contractor shall not be obligated to perform any provisions of this Agreement.

If funding for any fiscal year is reduced or deleted by the Budget Act for purposes of this program, the State shall have the option to either cancel this Agreement with no liability occurring to the State, or offer an agreement amendment to Contractor to reflect the reduced amount.

**Prompt Payment Clause**  Payment will be made in accordance with the provisions of the California Prompt Payment Act, Government Code section 927, et seq.

**Federally Funded Contracts**  All contracts, except for state construction projects, that are funded in whole or in part by the federal government must contain a 30-day cancellation clause and the following provisions:

It is mutually understood between the parties that this contract may have been written for the mutual benefit of both parties before ascertaining the availability of congressional appropriation of funds, to avoid program and fiscal delays that would occur if the contract were executed after the determination was made.

DEXP 103093

**EXHIBIT B**
**(Standard Agreement)**
**BUDGET DETAIL AND PAYMENT PROVISIONS**

This contract is valid and enforceable only if sufficient funds are made available to the state by the United State Government for the grant fiscal year(s) _n/a_ for the purposes of this program.  In addition, this contract is subject to any additional restrictions, limitations or conditions enacted by the Congress or to any statute enacted by the Congress may affect the provisions, terms, or funding of this contract in any manner.

The parties mutually agree that if the Congress does not appropriate sufficient funds for the program, this contract shall be amended to reflect any reduction in funds.

The department has the option to invalidate the contract under the 30-day cancellation clause or to amend the contract to reflect any reduction in funds.

DEXP 103094

JOEL A. DVOSKIN, Ph.D., A.B.P.P.
Agreement Number
Page 1 of 3

## EXHIBIT D
### (Standard Agreement)
### SPECIAL TERMS AND CONDITIONS

**Control and Direction**  The Department of Justice shall at all times maintain control and direction over the scope of work being performed under this Agreement.  The Department of Justice reserves the right to change the tasks as defined within the general scope of the work to be performed by the Contractor.  These changes shall be accomplished by written amendment to this Agreement.

**Termination**  The Department of Justice reserves the right to terminate this Agreement when such termination is in the best interest of the Department.  Such termination is subject to 30 days written notice to the Contractor.

Any such termination shall be effected by delivery to the Contractor of a notice of termination specifying whether termination is for default of the Contractor or for the convenience of the Department of Justice, the extent to which performance of services under this Agreement is terminated, and the date upon which such termination becomes effective.  After receipt of a notice of termination and except as otherwise directed by the Department of Justice, the Contractor shall:

- o  Stop work under this Agreement on the date and to the extent specified in the notice of termination;

- o  Transfer title to the Department of Justice (to the extent that title has not already been transferred) and deliver in the manner, at the times, and to the extent directed by the Department of Justice the work in process, completed work and other material produced as a part of, or acquired in respect of the performance, the work terminated.

Contractor may submit a written request to terminate this Agreement only if the State should substantially fail to perform its responsibilities as provided herein.

**Confidentiality of Data**  All financial, statistical, personal, technical, and other data and information relating to the Department of Justice's operations which are designated confidential by the Department of Justice and made available to the Contractor in order to carry out this Agreement, or which becomes available to the Contractor in carrying out this Agreement, shall be protected by the Contractor from unauthorized use and disclosure.  If the methods and procedures employed by the Contractor for the protection of the Contractor's data and information are deemed by the Department of Justice to be adequate for the protection of the Department of Justice's confidential information, such methods and procedures may be used, with the written consent of the Department of Justice, to carry out the intent of this paragraph.  The Contractor shall not be required under the provisions of this paragraph to keep confidential any data or information which is or becomes publicly available, is already rightfully in the Contractor's possession, is independently developed by the Contractor outside the scope of this Agreement, or is rightfully obtained from third parties.

**Copyrights and Rights in Data**  The Department of Justice reserves the right to use, to authorize others to use, duplicate and disclose, in whole or in part, in any manner for any purpose whatsoever, the activities supported by this Agreement that produce original computer programs, writings, sound recordings, pictorial reproductions, drawings, or other graphical representation and works of any similar nature (the term computer programs includes executable computer programs and supporting data in any form).  The Department of Justice reserves its right to any original materials produced pursuant to this Agreement.

**Publications**  Before publishing any materials produced by activities supported by this Agreement, the Contractor shall notify the Department of Justice ninety (90) days in advance of any such intended publication and shall submit twenty (20) copies of the materials to be published.  Within sixty (60) days after any such materials have been received by the Department of Justice, the Department of Justice shall submit to the Contractor its comments with respect to the materials intended to be published.  The Contractor shall determine, within ten (10) days after receipt of any such comments, whether or not to revise the materials to incorporate the comments of the Department of Justice and shall advise the Department of Justice of its determination within fifteen (15) days after such comments have been received by the Contractor.  If the Contractor determines not to incorporate any of the comments of the Department of Justice into the text of the materials, it may publish the materials provided that the initial preface of introduction to these materials as published contain the following:

- o  A disclaimer statement reading as follows:  "The opinions, findings, and conclusions in this publication are those of the author and not necessarily those of the Department of Justice.  The Department of Justice reserves a royalty-free, nonexclusive, and irrevocable license to reproduce, publish, and use and to authorize others to use these materials."

- o  The comments of the Department of Justice are full, unabridged, and unedited.

DEXP 103095

JOEL A. DVOSKIN, Ph.D., A.B.P.P.
Agreement Number
Page 2 of 3

**EXHIBIT D**
**(Standard Agreement)**
**SPECIAL TERMS AND CONDITIONS**

If the Contractor wishes to incorporate some or any of the comments of the Department of Justice in the text of the materials, it shall revise the materials to be published and resubmit them to the Department of Justice which shall prepare comments on the resubmitted data within thirty (30) days after receipt thereof. Within ten (10) days after receipt of these comments, the Contractor shall determine whether or not to accept or adopt any of the comments on the revised materials as resubmitted to the Department of Justice and shall advise the Department of Justice of this determination within fifteen (15) days after receipt of the comments of the Department of Justice. Thereafter, the materials may be published or revised in accordance with the procedures set forth above for the publication of materials on which the Department of Justice has submitted the comments to the Contractor.

If the Department of Justice has not submitted its comments on any materials submitted to it within ninety (90) days after the Department of Justice has received any such materials, the Contractor may proceed to publish the materials in the form in which they have been submitted to the Department of Justice but shall include the credit statement and the disclaimer statement set forth above, but without any further comments.

<u>Patents</u>  If any discovery or invention arises or is developed in the course of or as a result of work performed under this Agreement, the Contractor shall refer the discovery or invention to the Department of Justice. The Contractor hereby agrees that determinations of rights to inventions or discoveries made under this Agreement shall be made by the Department of Justice, or its duly authorized representative, who shall have the sole and exclusive powers to determine the disposition of all rights in such inventions or discoveries, including title to and license rights under any patent application or patent which may issue thereon. The determination of the Department of Justice, or its duly authorized representative, shall be accepted as final. The Contractor agrees and otherwise recognizes that the Department of Justice shall acquire at least an irrevocable, nonexclusive, and royalty-free license to practice and have practiced throughout the world for governmental purposes and invention made in the course of or under this Agreement.

<u>Assignment or Subcontracting</u>  It is the policy of the Department of Justice to withhold consent from proposed assignments, subcontractors, or novations when such transfer of responsibility would operate to decrease the Department of Justice's likelihood of receiving performance on this Agreement. No performance of this Agreement or any portion thereof may be assigned or subcontracted by the Contractor without the express written consent of the Department of Justice and any attempt by the Contractor to assign or subcontract any performance of this Agreement without the express written consent of the Department of Justice shall be void and shall constitute a breach of this Agreement.

Whenever the Contractor is authorized to subcontract or assign, all the terms of this Agreement shall be included in such subcontract or assignment.

<u>Covenant Against Contingent Fees</u>  The Contractor warrants that no person or selling agency has been employed or retained to solicit or secure this Agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Contractor for the purpose of securing business. For breach or violation of this warranty, the Department of Justice shall have the right to terminate this Agreement in accordance with the termination clause and, in its sole discretion, to deduct from this Agreement's price or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

<u>Disputes</u>  Except as otherwise provided in the Agreement, any dispute concerning a question of fact arising under this Agreement which is not disposed of by agreement shall be decided by the Department of Justice who shall reduce its decision in writing and mail or otherwise furnish a copy thereof to the Contractor. The Contractor has fifteen (15) calendar days after receipt of such decision to submit a written protest to the Department of Justice specifying in detail in what particulars the Contractor disagrees with the Department's decision. Failure to submit such protest within the period specified shall constitute a waiver of any and all rights to adjustment of the Department's decision and the Department of Justice's decision shall be final and conclusive. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of this Agreement.

<u>Consultant Services</u>  **(Applies Only to Consultant Services Contracts)**  The Contractor is advised that the provisions of Public Contract Code sections 10335 through 10381 pertaining to the duties, obligations, and rights of a consultant service Contractor are applicable to this Agreement. Within sixty (60) days after completion of this Agreement, the Contract Manager shall complete a written evaluation of Contractor's performance under this Agreement. If Contractor did not satisfactorily perform the work, a copy of the evaluation will be sent to the State Department of General Services, Office of Legal Services, and to Contractor within fifteen (15) working days of the completion of the evaluation (PCC 10369). This evaluation shall not be a public record.

DEXP 103096

**EXHIBIT D**
**(Standard Agreement)**
**SPECIAL TERMS AND CONDITIONS**

**Outside Legal Counsel** **(Applies Only to Outside Legal Counsel Contracts)** The Contractor shall agree to adhere to legal costs, billing guidelines, litigation plans, and case phasing of activities designated by the Department of Justice. The Contractor shall also submit and adhere to legal budgets as designated by the Department and shall maintain legal malpractice insurance in an amount not less than $1,000,000.00. The Contractor shall also submit to legal bill audits and law firm audits if requested by the Department. The audits may be conducted by employees or designees of the Department of Justice or by legal cost control providers retained by the Department for that purpose. A contractor may be required to submit to a legal cost and utilization review, as determined by the Department.

**Conflict with Existing Law** The Contractor and the Department of Justice agree that if any provision of this Agreement is found to be illegal or unenforceable, such term or provision shall be deemed stricken and the remainder of this Agreement shall remain in full force and effect. Either party having knowledge of such terms or provision shall promptly inform the other of the presumed nonapplicability of such provision. Should the offending provision go to the heart of this Agreement, this Agreement shall be terminated in a manner commensurate with the interest of both parties, to the maximum extent reasonable.

**PREVAILING WAGE** **(Applies Only to Moving, Courier, Security, Video services)**

No Contractor or subcontractor performing hereunder shall pay any employee actually engaged in the moving and handling of goods being relocated under such contract less than the prevailing wage rate, as prescribed by California Government Code Section 14920.

It is hereby mutually agreed that the Contractor shall forfeit to the Department a penalty of twenty-five dollars for each calendar day, or portion hereof, for each worker paid by him, or subcontractor under him, less than the prevailing wage so stipulated; and in addition, the Contractor further agrees to pay to each worker the difference between the actual amount paid for each calendar day, or portion thereof, and the stipulated prevailing wage rate for the same. Upon the request of the Department of Industrial Relations, these penalties shall be withheld from progress payment due.

**Employee Benefits** **(Applies ONLY to Janitorial and Security Guard services)** The Contractor shall comply with Government Code (GC) section 19134, which requires contractors to provide employee benefits that are valued at least 85% of the state employer cost of benefits provided to state employees for performing similar duties. Employee benefits include health, dental and vision. the benefit rate is published by the Department of Personnel Administration (DPA) February 1st of each year and is effective until January 31st of the following year. Contractor may either provide benefits as described above or cash-in-lieu payments for each hour of service employees perform on the covered state contract (excluding overtime). Failure to comply with the provisions of GC § 19134 will be deemed a material breach of this contract, which may result in contract termination at the state's sole discretion. Contractor may access rates and information at www.dpa.ca.gov.

THIS AGREEMENT IS OF NO FORCE AND EFFECT UNTIL SIGNED BY BOTH PARTIES AND APPROVED BY THE DEPARTMENT OF GENERAL SERVICES, IF REQUIRED. CONTRACTOR MAY NOT COMMENCE PERFORMANCE UNTIL SUCH APPROVAL HAS BEEN OBTAINED AND ANY COMMENCEMENT OF PERFORMANCE PRIOR TO AGREEMENT APPROVAL SHALL BE DONE AT THE CONTRACTOR'S OWN RISK.

DEXP 103097

## *Curriculum Vitae*
## Joel A. Dvoskin, Ph.D., A.B.P.P.

668 E. Weckl Place
Tucson, Arizona  85704-6076
Phone:  520-577-3051
Fax:  520-577-7453
E-mail: JoeltheD@aol.com

### EDUCATION:

Undergraduate:     University of North Carolina at Chapel Hill; B.A. 1973;
                                   Majors:  English and Psychology;
                         Awards: Order of the Old Well Honorary Society
                                       Order of the Grail Honorary Society

                   Stockholm University, Stockholm, Sweden; Diploma, 1972;
                                   Major:  Social Science.

Graduate:          University of Arizona, Tucson, Arizona;
                                   M.A. in Clinical Psychology, 1978; Ph.D. in Clinical Psychology, 1981;

                   Dissertation:  Battered Women:  An Epidemiological Study of Spousal Violence.

Professional:      University of Arizona College of Law, Tucson, Arizona; Doctoral Minor

### HONORS:

Diplomate in Forensic Psychology, American Board of Professional Psychology
Fellow, American Psychological Association
Fellow, American Psychology-Law Society
Peggy Richardson Award, National Coalition for the Mentally Ill in the Criminal Justice System
*Amicus* Award, American Academy of Psychiatry and the Law
Affiliate Member, International Criminal Investigative Analysis Fellowship
Distinguished Visiting Professor of Psychiatry, University of California, Davis School of Medicine and
         Napa State Hospital, April 14, 2005
President, Division 18 of the American Psychological Association, Psychologists in Public Service
         (2000-2001)
President, American Psychology – Law Society, Division 41 of the American Psychological
         Association (Presidential year 2006-2007).
American Psychological Association, Division 18 Special Achievement Award
Arizona Psychological Association, Distinguished Contribution to the Science of Psychology Award,
         2010
Distinguished Visiting Professor of Psychiatry, University of California, Davis School of Medicine and
         Napa State Hospital, March 30, 2011

DEXP 103098

**CURRICULUM VITAE - JOEL A. DVOSKIN, PH.D.**
**PAGE 2**

### ACADEMIC POSITIONS:

1996 - 2001
  Asst. Professor (Adjunct) - University of Arizona College of Law

1996 - current
  Asst. Professor (Clinical) - University of Arizona College of Medicine, Dept. of Psychiatry

1986 – 1995 (currently inactive)
  Assistant Clinical Professor - New York University Medical School, Dept. of Psychiatry

2000 – 2005 (currently inactive)
  Assistant Clinical Professor - Louisiana State University Medical Center

### LICENSES:

Arizona Board of Psychologist Examiners, License #0931
New Mexico State Board of Psychologist Examiners, License #0904
Certificate of Professional Qualifications in Psychology (CPQ), CPQ #2,439
Interjurisdictional Practice Certificate, ASPPB, #2439

### PROFESSIONAL EXPERIENCE:

September 1995 - Current
  Full-time private practice of forensic psychology, providing expert testimony on civil and criminal matters, and consultation in the provision of mental health and criminal justice services, and workplace and community violence prevention programs.
  **Duties:** Provide expert testimony, consultation, training, and public speaking services to federal, state, and local governmental agencies, corporations and attorneys, including the following areas:
  - Police misconduct
  - Conditions of confinement and hospitalization
  - Architectural design of psychiatric and secure psychiatric buildings
  - Workplace violence prevention and crisis response
    - Working with labor organizations
    - Safely managing corporate layoffs
  - Psychological autopsy – (Psychological investigation of equivocal death or suicide)
  - Suicide prevention
  - Mental health services in correctional and criminal justice settings
  - Mental health services to juvenile correctional facilities
  - Stalking
  - Assessing and preventing the risk of violent behavior
  - Administration of public mental health and criminal justice services

September 1995 – Current
  Associate, Threat Assessment Group, Inc., Newport Beach, California.
  **Duties:** Provide consultation and training in workplace violence prevention and crisis management to governmental and corporate organizations.

DEXP 103099

**CURRICULUM VITAE - JOEL A. DVOSKIN, PH.D.**
**PAGE 3**

September 1995 - Current
  Associate, Park Dietz & Associates, Inc., Newport Beach, California.
  **Duties:** Forensic psychological services and expert testimony

March 1995 - August 1995
  Acting Commissioner, New York State Office of Mental Health.
  **Duties:** Under the direct supervision of the Governor, served as C.E.O. of the largest
  agency of its kind in the United States, with an annual budget of more than $2.4 billion.
  The agency employed over 24,000 people and directly operated 29 institutions, including
  adult inpatient and outpatient psychiatric facilities, children's psychiatric hospitals,
  forensic hospitals and research institutes. The Office of Mental Health also licensed,
  regulated, financed, and oversaw more than 2,000 locally operated inpatient, emergency,
  outpatient, and residential programs in collaboration with 57 counties and New York
  City.

November 1984 - March 1995
  Director, Bureau of Forensic Services (1984-1988) and Associate Commissioner for
  Forensic Services (1988-1995), New York State Office of Mental Health.
  **Duties:** Line authority for inpatient services at three large forensic hospitals and two
  regional forensic units, including services to civil, forensic and correctional patients; line
  authority for all mental health services in New York State prisons (serving more than
  60,000 inmates); responsibility for innovative community forensic programs including
  suicide prevention in local jails, police mental health training, and mental health
  alternatives to incarceration.

December 1984 - July 1985
  Acting Executive Director, Kirby Forensic Psychiatric Center.
  **Duties:** Founding C.E.O. for new maximum security forensic psychiatric hospital
  in New York City.

July 1984 - November 1984
  Acting Director, Office of Mental Health, Virginia Department of Mental Health and
  Mental Retardation (held concurrently with permanent position as Director of
  Forensic Services).
  **Duties:** Supervision of budget and certification of all community mental health programs
  statewide; statewide policy development in all program areas related to mental health;
  Executive Secretary to Virginia Mental Health Advisory Council.

July 1983 - November 1984
  Director of Forensic Services, Virginia Department of Mental Health and
  Mental Retardation.
  **Duties:** Design and coordination of statewide delivery system of institutional and
  community treatment and evaluation of forensic patients; management of the contract for
  the University of Virginia Institute of Law, Psychiatry and Public Policy; departmental
  liaison to Virginia Dept. of Corrections and other criminal justice agencies; develop
  statewide plan for delivery of mental health services to D.O.C. inmates; statewide Task
  Force on Mental Health Services in Local Jails.

August 1982 - July 1983
  Psychologist, Arizona Correctional Training Center, Tucson, Arizona.
  **Duties:** Supervision of psychology department; direct clinical treatment and evaluation
  services.

DEXP 103100

CURRICULUM VITAE - JOEL A. DVOSKIN, PH.D.
PAGE 4

April 1982 - July 1982
> Acting Inmate Management Administrator, Arizona State Prison Complex, Florence, Arizona.
> **Duties:** Direct supervision of inmate records office; inmate classification and movement; correctional program (counseling) services; psychology department; hiring of all new correctional officers. (NOTE: During this period, I also maintained all duties of my permanent position as Psychologist (below).

October 1981 - July 1982
> Psychologist, Arizona State Prison Complex, Florence, Arizona.
> **Duties:** Supervision of Psychology Department for complex consisting of five prisons; direct clinical treatment and evaluation services.

November 1980 - October 1981
> Psychology Associate, Arizona State Prison Complex, Florence, Arizona.
> **Duties:** Direct clinical treatment and evaluation services.

August 1980 - November 1980
> Psychological consultant to the Massachusetts Department of Correction.
> **Duties:** Consultation to Director of Health Services; direct clinical treatment and evaluation services at Walpole and Norfolk State Prisons.

January 1980 - November 1980
> Psychologist (non-licensed) - Tri-Cities Community Mental Health Center, Malden, Massachusetts. Pre-screened civil commitments for community mental health center.

August 1979 - August 1980
> Pre-Doctoral Intern in Clinical Psychology, McLean Hospital, Belmont, Massachusetts; and Fellow in Clinical and Forensic Psychology, Harvard Medical School, Cambridge, Massachusetts, and Bridgewater (Massachusetts) State Hospital

1978-1979      Psychology Extern, Pima County (Arizona) Superior Court Clinic

1977-1978      Psychology Extern, Palo Verde Hospital, Tucson, Arizona

1976-1977      Psychology Extern, Arizona Youth Center (now Catalina Mountain School), Tucson, Arizona

1975-1976      National Institute of Mental Health Trainee

1973-1975      United States Peace Corps Volunteer, Senegal, West Africa

1970-1995      Coach, Dean Smith's Carolina Basketball School, Chapel Hill, N.C.
               (1-3 weeks each summer)

**DEXP 103101**

*KAMALA D. HARRIS*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I Street
P. O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 327-1930
Fax: (916) 324-0680
E-Mail Address: Mary.Banzon@doj.ca.gov

August 13, 2012

JOEL A. DVOSKIN, PH.D.
668 E. Weckl Place
Tucson, AZ 85704-6076

RE:    Consultant Contract in the Matter of:  *Coleman v. Brown*
       Agreement Number:  11-6459, Amendment Number 1

Dear Dr. Dvoskin:

Enclosed for your records is a fully executed Standard Agreement Amendment (STD 213A) of Contract No. 11-6459, Amendment No. 1 for the provision of consulting services by you in the above captioned case. You are now authorized to continue providing the agreed upon services.

The total amount of the Agreement shall not exceed $100,000.00. The Department of Justice cannot pay for work completed which exceeds the total amount of the Agreement. **If you anticipate the work will exceed the total remaining balance of $3,295.53, please contact the Deputy Attorney General immediately.** Upon Department of Justice approval, the Agreement may be amended by mutual consent of both parties to cover any additional services and expenses.

**Please promptly submit detailed monthly invoices for services provided pursuant to the guidelines located under the "Invoicing" paragraph in Exhibit B of the original Standard Agreement to the Deputy Attorney General.** If you have any questions regarding this contract, please feel free to contact me or Deputy Attorney General, Patrick McKinney at (415) 703-3035.

Sincerely,

MARY BANZON
Staff Services Analyst

For    KAMALA D. HARRIS
       Attorney General

Enclosures

cc: Patrick McKinney, DAG (*via email w/ attachments*)

DEXP 103545

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213A (Rev 06/03)

☐ CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED          Pages

| AGREEMENT NUMBER | AMENDMENT NUMBER |
|---|---|
| **11-6459** | **1** |
| REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

   STATE AGENCY'S NAME

   **DEPARTMENT OF JUSTICE**

   CONTRACTOR'S NAME

   **JOEL A. DVOSKIN, PH.D., A.B.P.P.**

2. The term of this          **9/1/11**          through          **6/30/13**
   Agreement is:

3. The maximum amount          **$ 100,000.00**
   of this Agreement is:          One Hundred Thousand Dollars and No Cents

4. The parties mutually agree to this amendment as follows. All actions noted below are by this reference made a part of the Agreement and incorporated herein:

   This Amendment is effective as of **6/29/12**.

   - Change the termination date of the Agreement from **6/30/12** to **6/30/13**.

   All other terms and conditions shall remain the same.

   Case Name: **Coleman v. Brown**
   Docket No.: **48170 286 CF1997CS0003**
   DAG: **Patrick McKinney**

**All other terms and conditions shall remain the same.**

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.

| CONTRACTOR | California Department of General Services Use Only |
|---|---|

CONTRACTOR'S NAME *(if other than an individual, state whether a corporation, partnership, etc.)*
**JOEL A. DVOSKIN, PH.D., A.B.P.P.**

BY *(Authorized Signature)*          DATE SIGNED *(Do not type)*
✍          **7/27/12**

PRINTED NAME AND TITLE OF PERSON SIGNING
**JOEL A. DVOSKIN, PH.D., A.B.P.P.**

ADDRESS
**668 E. Weckl Place**
**Tucson, AZ 85704-6076**          Telephone: **(520) 577-3051**

"Exempt From DGS Approval Per
DGS Exemption Letter No. 52"

| STATE OF CALIFORNIA | |
|---|---|

AGENCY NAME
**DEPARTMENT OF JUSTICE**

BY *(Authorized Signature)*          DATE SIGNED *(Do not type)*
✍          **8/8/12**

PRINTED NAME AND TITLE OF PERSON SIGNING
**STEPHEN F. NAPOLILLO, Manager, Contracts Unit**

ADDRESS
1300 I Street, Suite 820
Sacramento, CA 95814

☐ Exempt per:

**DEXP 103546**

**Joel A. Dvoskin, Ph.D., ABPP**
668 E. Weckl Place
Tucson, Arizona 85704-6076
Phone:  520-577-3051
E-mail: joelthed@aol.com

# INVOICE

To:      California Office of the Attorney General
Attn:    Patrick McKinney, DAG
From:  Joel A. Dvoskin, Ph.D.  SS# 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
Date:   May 15, 2012
Re:      *Coleman v. Brown*

Professional Fees at $300 per hour

| Date | Description | Hours | Amount |
|---|---|---|---|
| Feb. 15, 2012 | Read case materials | 5.5 hours | $1,650 |
| Feb. 16, 2012 | Travel to Sacramento | | |
| | and review case materials | 8.0 hours | $2,400 |
| Feb. 17, 2012 | Meeting in Sacramento | 8.0 hours | $2,400 |
| Feb. 17, 2012 | Return travel | 5.8 hours | $1,740 |
| Feb. 24, 2012 | Read case materials | 4.4 hours | $1,320 |
| Feb. 26, 2012 | Travel to Sacramento | | |
| | and review case materials | 8.0 hours | $2,400 |
| Feb. 27, 2012 | Consultation and meetings - CMF | 8.0 hours | $2,400 |
| Feb. 28, 2012 | Consultation and meetings - CMF | 8.0 hours | $2,400 |
| Feb. 29, 2012 | Consultation and meetings – CSP-Sac | 8.0 hours | $2,400 |
| March 1, 2012 | Consultation and meetings – CSP-Sac | 8.0 hours | $2,400 |
| March 1, 2012 | Return Travel | 5.6 hours | $1,680 |
| March 22, 2012 | Read case materials | 4.6 hours | $1,380 |
| March 26, 2012 | Travel to Sacramento | | |
| | and review case materials | 10.0 hours | $3,000 |
| March 27, 2012 | Consultation and meetings - Centinela | 8.0 hours | $2,400 |
| March 27, 2012 | Travel to San Diego | 2.0 hours | $600 |
| March 28, 2012 | Consultation and meetings – RJ Donovan | 8.0 hours | $2,400 |
| March 29, 2012 | Consultation and meetings – RJ Donovan | 8.0 hours | $2,400 |
| March 29, 2012 | Return travel | 4.0 hours | $1,200 |
| April 15, 2012 | Read case materials | 6.6 hours | $1,980 |
| April 16, 2012 | Travel to Fresno | | |
| | and review case materials | 6.0 hours | $1,800 |
| April 17, 2012 | Consultation and meetings – Corcoran | 8.0 hours | $2,400 |
| April 18, 2012 | Consultation and meetings – Corcoran | 8.0 hours | $2,400 |
| April 19, 2012 | Consultation and meetings – CWF | 8.0 hours | $2,400 |
| April 20, 2012 | Consultation and meetings – CWF | 8.0 hours | $2,400 |
| April 20, 2012 | Return travel | 5.8 hours | $1,740 |
| April 29-30, 2012 | Travel to Ontario and review case files | 7.3 hours | $2,190 |
| May 1, 2012 | Consultation and meetings – CIM | 8.0 hours | $2,400 |
| May 2, 2012 | Consultation and meetings – CIM | 8.0 hours | $2,400 |
| May 2, 2012 | Travel to Lancaster | 2.2 hours | $660 |
| May 3, 2012 | Consultation and meetings – CSP-LAC | 8.0 hours | $2,400 |
| May 4, 2012 | Consultation and meetings – CSP-LAC | 8.0 hours | $2,400 |
| Various | Telephone consultations | N/C | N/C |

Total professional fees = 213.8 hours = $64,140

Expenses

| Date | Description | Amount |
|---|---|---|
| Feb. 16-17, 2012 | Airfare Tucson to Sacramento | $748.30 |
| Feb. 16-17, 2012 | Residence Inn – 1 night room and tax | $179.70 |
| Feb. 16-17, 2012 | Taxi to and from airport | $99.00 |
| Feb. 16-17, 2012 | Airport Parking in Tucson | $10.50 |
| Feb. 16-17, 2012 | Meals | $13.66 |
| Feb. 26 – March 1, 2012 | Airfare Tucson-Sacramento round trip | $501.20 |
| Feb. 26 – March 1, 2012 | Meals | $190.19 |
| Feb. 26 – March 1, 2012 | Priceline / Alamo Car Rental | $186.76 |
| Feb. 26 – March 1, 2012 | Gasoline | $53.26 |
| Feb. 26-28, 2012 | Marriott Courtyard Vacaville (2 nights room/tax) | $188.16 |
| Feb. 26 – March 1, 2012 | Airport Parking in Tucson | $26.25 |
| Feb. 28-March 1, 21012 | Marriott Courtyard Sacramento Folsom (2 nights) | $180.80 |
| March 26-29, 2012 | Round trip airfare Tucson – San Diego | $593.20 |
| March 26-29, 2012 | Enterprise Can Rental | $123.88 |
| March 26-27, 2012 | Fairfield Inn – El Centro – 1 night | $147.50 |
| March 26-29, 2012 | Airport Parking | $21.00 |
| March 27-29, 2012 | Marriott Courtyard San Diego Mission Valley (2) | $331.36 |
| March 26-29, 2012 | Meals | $129.60 |
| April 16-20, 2012 | Round trip air travel Tucson – Fresno | $385.20 |
| April 16-20, 2012 | Airport parking in Tucson | $26.25 |
| April 16-20, 2012 | Springhill Suites Madera CA – 2 nights room and tax | $183.26 |
| April 16-20, 2012 | Visalia Marriott  – 2 nights room and tax | $198.60 |
| April 16-20, 2012 | Alamo Gasoline | $60.84 |
| April 16-20, 2012 | Priceline Alamo | $218.65 |
| April 16-20, 2012 | Meals | $199.31 |
| April 29-May 4, 2012 | Airfare round trip Tucson – Burbank | $439.20 |
| April 29-May 4, 2012 | Airport Parking Tucson | $31.50 |
| April 29-May 4, 2012 | Enterprise Car Rental | $237.43 |
| April 29-May 2, 2012 | Fairfield Inn Ontario – 2 nights room and tax | $176.56 |
| May 2-4, 2012 | Embassy Suites Palmdale – 2 nights room and tax | $246.00 |
| April 30-May 4, 2012 | Meals | $227.91 |

Total expenses = $6,354.87

# Total amount due = $70,494.87

Joel A. Dvoskin, Ph.D., ABPP

APPROVED FOR PAYMENT:

Case: Coleman v. Brown

Docket: 16009286 CF1997 C50003

By: P. McKinney

Date: 5-30-12

STATE OF CALIFORNIA
**STANDARD AGREEMENT**
STD 213A (Rev 06/03)

☐ CHECK HERE IF ADDITIONAL PAGES ARE ATTACHED          Pages

| AGREEMENT NUMBER | AMENDMENT NUMBER |
|---|---|
| 11-6459 | 1 |
| REGISTRATION NUMBER | |

1. This Agreement is entered into between the State Agency and the Contractor named below:

STATE AGENCY'S NAME
DEPARTMENT OF JUSTICE

CONTRACTOR'S NAME
JOEL A. DVOSKIN, PH.D., A.B.P.P.

2. The term of this          9/1/11          through          6/30/13
   Agreement is:

3. The maximum amount     $ 100,000.00
   of this Agreement is:     One Hundred Thousand Dollars and No Cents

4. The parties mutually agree to this amendment as follows. All actions noted below are by this reference made a part of the Agreement and incorporated herein:
   This Amendment is effective as of **6/29/12**.

   −   Change the termination date of the Agreement from **6/30/12** to **6/30/13**.

   All other terms and conditions shall remain the same.

   Case Name: Coleman v. Brown
   Docket No.: 48170 286 CF1997CS0003
   DAG: Patrick McKinney

**All other terms and conditions shall remain the same.**

**IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto.**

| CONTRACTOR | California Department of General Services Use Only |
|---|---|

CONTRACTOR'S NAME (if other than an individual, state whether a corporation, partnership, etc.)
JOEL A. DVOSKIN, PH.D., A.B.P.P.

BY (Authorized Signature)          DATE SIGNED (Do not type)
                                   7/27/12

PRINTED NAME AND TITLE OF PERSON SIGNING
JOEL A. DVOSKIN, PH.D., A.B.P.P.

ADDRESS
668 E. Weckl Place
Tucson, AZ 85704-6076          Telephone: (520) 577-3051

"Exempt From DGS Approval Per DGS Exemption Letter No.52"

**STATE OF CALIFORNIA**

AGENCY NAME
DEPARTMENT OF JUSTICE

BY (Authorized Signature)          DATE SIGNED (Do not type)
                                   8/8/12

PRINTED NAME AND TITLE OF PERSON SIGNING
STEPHEN F. NAPOLILLO, Manager, Contracts Unit

☐ Exempt per:

ADDRESS
1300 I Street, Suite 820
Sacramento, CA 95814

DEXP 105116

APPROVED FOR PAYMENT:

Case: COLEMAN V. BROWN

Docket: 4817O286CF 1997C50003

By: ~R.H~

Date: 1-4-12

CONTRACT NO. 11-6459

**Joel A. Dvoskin, Ph.D., ABPP**
668 E. Weckl Place
Tucson, Arizona 85704-6076
Phone: 520-577-3051
E-mail: joelthed@aol.com

# INVOICE

To:     California Office of the Attorney General
Attn:   Patrick McKinney, DAG
From:   Joel A. Dvoskin, Ph.D.  SS# 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
Date:   October 19, 2011
Re:     *Coleman v. Brown*

Professional Fees at $300 per hour

| Date | Description | Hours | Amount |
|---|---|---|---|
| October 9, 2011 | Travel to Sacramento and review case materials | 8.0 hours | $2,400 |
| October 10, 2011 | Consultation meetings | 8.0 hours | $2,400 |
| October 10, 2011 | Travel | 4.0 hours | $1,200 |
| October 11, 2011 | Read case materials | 4.6 hours | $1,380 |
| October 12, 2011 | Read case materials | 3.9 hours | $1,170 |
| November 11, 2011 | Read case materials | 7.7 hours | $2,310 |
| November 13, 2011 | Travel to Sacramento and review case materials | 8.0 hours | $2,400 |
| November 14, 2011 | Consultation and meetings | 8.0 hours | $2,400 |
| November 15, 2011 | Consultation and meetings | 8.0 hours | $2,400 |
| November 16, 2011 | Consultation and meetings | 8.0 hours | $2,400 |
| November 16, 2011 | Return travel | 6.0 hours | $1,800 |
| December 12, 2011 | Read and conference call | 3.0 hours | $900 |
| December 22, 2011 | Read and conference call | 3.0 hours | $900 |
| Various | Telephone consultations | N/C | N/C |

Total professional fees = 80.2 hours = $24,060

Expenses

| Date | Description | Amount |
|---|---|---|
| October 9-10, 2011 | Airfare Tucson to Sacramento | $268.10 |
| October 9-10, 2011 | Airfare Sacramento to Los Angeles | $158.70 |
| October 9-10, 2011 | Hyatt – 1 night room and tax | $134.93 |
| October 9-10, 2011 | Taxi to and from airport | $100.00 |
| October 9-10, 2011 | Airport Parking in Tucson | $8.00 |
| October 13-16, 2011 | Meals | $46.38 |
| November 13-16, 2011 | Airfare Tucson-Sacramento round trip | $722.80 |
| November 13-16, 2011 | Meals | $170.90 |
| November 13-16, 2011 | Hyatt Hotel – 3 nights room and tax | $404.79 |
| November 13-16, 2011 | Taxis | $114.00 |
| November 19-22, 2011 | Airport Parking in Tucson | $21.00 |

Total expenses = $2,149.60

## Total amount due = $26,209.60

Joel A. Dvoskin, Ph.D., ABPP

DEXP 105117

**Joel A. Dvoskin, Ph.D., ABPP**
Diplomate in Forensic Psychology
668 East Weckl Place
Tucson, Arizona 85704-6076
Phone:  520-577-3051
Fax:  520-577-7453
E-mail:  joelthed@aol.com

June 30, 2012

Patrick McKinney, Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Re:  *Invoice for Consultation Services*

Dear Mr. McKinney:

Please find below a statement of my expert fees and expenses from May 16, 2012 to June 30, 2012

Thank you in advance for your attention to this matter.

Sincerely,

Joel A. Dvoskin, Ph.D., ABPP

**Joel A. Dvoskin, Ph.D., ABPP**
668 E. Weckl Place
Tucson, Arizona 85704-6076

# INVOICE

To:    California Office of the Attorney General
Attn:  Patrick McKinney, DAG
From:  Joel A. Dvoskin, Ph.D.  SS# 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
Date:  June 30, 2012
Re:    *Coleman v. Brown*

Professional Fees at $300 per hour

| | | | |
|---|---|---|---|
| May. 19, 2012 | Read case materials | 4.0 hours | $1,200 |
| May 20, 2012 | Travel to Salinas Valley | | |
| | and read case materials | 8.3 hours | $2,490 |
| May 21, 2012 | Consultation and meetings - SV | 8.0 hours | $2,400 |
| May 22, 2012 | Consultation and meetings - SV | 8.0 hours | $2,400 |
| May 23, 2012 | Consultation and meetings - SQ | 8.0 hours | $2,400 |
| May 24, 2012 | Consultation and meetings - SQ | 8.0 hours | $2,400 |
| May 25, 2012 | Return travel | 4.4 hours | $1,320 |
| June 19, 2012 | Conference call | 1.0 hour | $300 |
| Various | Telephone consultations | N/C | N/C |

Total professional fees = 49.7 hours = $14,910

Expenses

| | | |
|---|---|---|
| May 20-25, 2012 | US Airways round trip Tucson – San Francisco | $514.20 |
| May 20-23, 2012 | Holiday Inn Express Salinas– 2 nights room/tax | $187.80 |
| May 22-24, 2012 | Embassy Suites San Rafael – 2 nights room/tax | $188.50 |
| May 24-25, 2012 | Renaissance Hotel – SF – 1 night room/tax | $179.12 |
| May 24-25, 2012 | Hotel parking and tax | $52.44 |
| May 20-25, 2012 | Enterprise Rental Car | $173.69 |
| May 20-25, 2012 | Tolls | $11.00 |
| May 20-25, 2012 | Airport Parking in Tucson | $31.50 |
| May 20-25, 2012 | Meals | $304.30 |

Total expenses = $1,642.55

## Total amount due = $16,552.55

Joel A. Dvoskin, Ph.D., ABPP

DEXP 109521

**Joel A. Dvoskin, Ph.D., ABPP**
Diplomate in Forensic Psychology
668 East Weckl Place
Tucson, Arizona 85704-6076
Phone: 520-577-3051
Fax: 520-577-7453
E-mail: joelthed@aol.com

September 30, 2012

Patrick McKinney, Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Re: *Invoice for Consultation Services*

Dear Mr. McKinney:

Please find below a statement of my expert fees and expenses from July 1, 2012 to
September 30, 2012.

Thank you in advance for your attention to this matter.

Sincerely,

Joel A. Dvoskin, Ph.D., ABPP

DEXP 109522

# INVOICE

To:    California Office of the Attorney General
Attn:  Patrick McKinney, DAG
From:  Joel A. Dvoskin, Ph.D.  SS# 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
Date:  September 30, 2012
Re:    *Coleman v. Brown*

Professional Fees at $300 per hour

| | | | |
|---|---|---|---|
| July 1, 2012 | Travel to Sacramento | 5.4 hours | $1,620 |
| July 2, 2012 | Meetings re: suicide prevention | 8.0 hours | $2,400 |
| July 3, 2012 | Meetings re: suicide prevention | 8.0 hours | $2,400 |
| July 4, 1012 | Return travel | 5.2 hours | $1,560 |
| August 20, 2012 | Travel to Sacramento | 5.2 hours | $1,560 |
| August 21, 2012 | Meeting with Asst. Attorneys Gen, | 8.0 hours | $2,400 |
| August 21, 2012 | Return travel | 5.0 hours | $1,500 |
| September 10, 2012 | Review materials and write reports | 6.0 hours | $1,800 |
| September 11, 2012 | Meeting and report writing | 8.0 hours | $2,400 |
| September 12, 2012 | Consultation and meetings – CMF | 8.0 hours | $2,400 |
| September 13, 2012 | Return travel | 4.0 hours | $1,200 |
| Various | Telephone consultations | N/C | N/C |

Total professional fees = 70.8 hours = $21,240

Expenses

| | | |
|---|---|---|
| July 1-4, 2012 | US airways round trip Tucson-Sacramento | $358.20 |
| July 1-4, 2012 | Marriott Residence Inn (3 nights room/tax/parking) | $496.35 |
| July 1-4, 2012 | Meals | $56.00 |
| July 1-4, 2012 | Airport Parking in Tucson | $23.00 |
| July 1-4, 2012 | Enterprise Car Rental | $113.88 |
| August 20-21, 2012 | US Airways round trip Tucson-Sacramento | $727.20 |
| August 20-21, 2012 | Residence Inn Sacramento (1 night room & tax) | $148.45 |
| August 20-21, 2012 | Meals | $57.33 |
| August 20-21, 2012 | Taxis | $78.00 |
| August 20-21, 2012 | Airport parking in Tucson | $11.50 |
| Sept. 9-13, 2012 | Airfare round trip Tucson-San Francisco | N/C |
| Sept. 9-13, 2012 | Marriott Courtyard–Sacramento (3 nights room/tax) | $379.96 |
| Sept. 9-13, 2012 | Meals | $119.77 |
| Sept. 9-13, 2012 | Tolls | $9.00 |
| Sept. 9-13, 2012 | Gasoline | $61.79 |

Total expenses =  $2,640.43

## Total amount due = $23,880.43

Joel A. Dvoskin, Ph.D., ABPP

Exhibit 3



Transcript of the Testimony of:

# Charles Scott, M.D.

Coleman v. Brown

March 8, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                Plaintiffs,         )
                                    )CASE NO.:
        vs.                         ) S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                Defendants.         )
_____)



DEPOSITION OF

CHARLES SCOTT, M.D.

FRIDAY, MARCH 8, 2013,  9:06 A.M.

DAVIS, CALIFORNIA







REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1               UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3

4   RALPH COLEMAN, ET AL.,              )
                                        )
5                   Plaintiffs,         )
                                        )CASE NO.:
6        vs.                            ) S 90-0520 LKK-JFM
                                        )
7   EDMUND G. BROWN, JR., ET AL.,       )
                                        )
8                   Defendants.         )
    _____)

9

10

11

12

13

14          The Deposition of CHARLES SCOTT, M.D., taken

15  on behalf of the Plaintiffs, before Megan F. Alvarez,

16  Certified Shorthand Reporter No. 12470, Registered

17  Professional Reporter, for the State of California,

18  commencing at 9:06 a.m., Friday, March 8, 2013, at the

19  UC Davis Immigration Law Clinic, Building TB-34, Davis,

20  California.

21

22

23

24

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          March 8, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  ERNEST J. GALVAN, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4            315 MONTGOMERY STREET, TENTH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 5            415.433.6850
              415.433.7104 FAX
 6            EGALVAN@RBGG.COM

 7

     FOR DEFENDANTS:
 8
              BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
10            455 GOLDEN GATE AVE., SUITE 11000
              SAN FRANCISCO, CALIFORNIA  94102-7004
11            415.703.3035
              415.703.5843 FAX
12            PATRICK.MCKINNEY@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Charles Scott, M.D.                                    March 8, 2013

```
 1   Debbie Vorous.  And then other administrative officials
 2   from CDCR, but I don't remember their names.
 3        Q.   Is it possible that Dr. Belavich was there?
 4        A.   It's possible, but I don't recall.
 5        Q.   How long was that meeting?
 6        A.   My best recollection was two or three hours
 7   all totaled.
 8        Q.   What did you discuss?
 9        A.   An overview of the prison system in
10   California.  A discussion of the electronic medical
11   record system that they now have.  A review and overview
12   of a program called MHTS.net.  Policies and procedures
13   that had -- that had been developed over time.  And --
14   and also that there was a general program guide for the
15   provision of care to mental health clients.
16        Q.   Did you discuss the litigation?
17        A.   The litigation was clearly discussed in the
18   sense that we were asked to do an objective and
19   independent review of the care provided and was the
20   California system deliberately indifferent to the
21   serious medical needs of the inmates, medical and/or
22   mental.
23        Q.   Did you discuss the judge and the special
24   master?
25        A.   Not to my recollection.
```

Charles Scott, M.D.                                      March 8, 2013

1    collecting data and tabulating it in some way?

2         A.   I don't recall if on the very first meeting

3    there was an organized data collection procedure

4    finalized on the first meeting.

5         Q.   Okay.  Did you ever work up an organized data

6    collection procedure?

7         A.   Yes.

8         Q.   When did that happen?

9         A.   Over several months following that first

10   meeting, a tool to help look at different components

11   important to care, or potentially important to care, was

12   developed.  And my input was primarily into the

13   medication piece.  And to the degree that that also

14   related to the mental health crisis bed, I had input

15   into that as well.

16        Q.   And was the plan to tabulate data from that

17   collection and include it in your report?

18             MR. McKINNEY:  Objection.  Vague and

19   ambiguous.

20             THE WITNESS:  No, the plan wasn't to per se

21   include all the data collection pieces in the final

22   report.

23   BY MR. GALVAN:

24        Q.   What were you going to do with the data

25   collection pieces?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                          March 8, 2013

 1        A.    Have them available for review should we have

 2   an opinion that people would want to know the basis for

 3   the opinion.

 4        Q.    And did you actually do that?  Do you have

 5   them available for review?

 6        A.    I turned them over, I believe, yes.

 7        Q.    When you say "turned them over" -- ask a

 8   different question.

 9              When you talk about having something for

10   review, do you mean something in which you -- you broke

11   out or rolled up the results of your tabulation in terms

12   of percentages or scores in some way?

13        A.    I provide the entire data set so someone could

14   verify it for themselves rather than rely on my own

15   summary.

16        Q.    Did you ever make your own summary?

17        A.    I have a general impression from having

18   reviewed the data.  So having been at the institutions

19   and collected the data, it's easy to learn it as you do

20   it.

21        Q.    Do you have a document with a summary of the

22   data?

23        A.    No, just what's in my head.

24        Q.    Is it possible -- or do you know whether

25   Dr. Bobb has a document with a summary of the data?

Charles Scott, M.D.                                    March 8, 2013

1   speculation.  Vague and ambiguous.

2          THE WITNESS:  I don't know.

3   BY MR. GALVAN:

4      Q.   Down at the bottom, Point 17 says:  "Given the

5   inefficiencies of reviewing the EUHR, there is a strong

6   concern that the MAPIP project in mental health will

7   require a minimum of 30 minutes per EUHR that is

8   reviewed for data.  Our experience is that it is closer

9   to 60 minutes."

10          This was a concern that you shared regarding

11  the MAPIP project?

12          MR. McKINNEY:  Objection.  Vague and

13  ambiguous.

14          THE WITNESS:  I think it's reflected in my

15  report, yes.

16  BY MR. GALVAN:

17     Q.   And have you received any information

18  regarding how this concern is being addressed?

19     A.   Yes.

20     Q.   What information have you received?

21     A.   One, because the MAPIP started, there was a

22  start time from when information got scanned into EUHR.

23  And so, therefore, information that was collected, such

24  as informed consents or labs, if it was before the

25  scan-in date, it may not be in EUHR, even if you

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                    March 8, 2013

1   could -- even if it was done and you could document that
2   in the paper record.
3          As time has progressed, more information now
4   is available in EUHR because if a person gets started on
5   a medicine after the scan-in date, then it's easier to
6   access.
7          So this facility I reviewed in 2012, February
8   time frame, and so the EUHR scan-in process had only --
9   had not -- some of the data couldn't be accessed because
10  it hadn't been scanned in yet.
11         So one sort of common sense thing you learn is
12  that as time passes, when -- more information now for
13  the inmates are scanned in because when they come into
14  the system, the EUHR is up and running already.
15     Q.   Wouldn't that aggravate the problem he's
16  talking about?  If there's more information to read in
17  the EUHR, it's going to take longer to do it.
18     A.   Not necessarily.  Because if, for example, you
19  find something versus you're searching for something
20  that's not there, that can be the difference.
21     Q.   So still in -- on the Vacaville tour, I'd like
22  to show you the disc that we marked as Exhibit 4, at
23  least show you the content of it.
24         I know you will not have seen it in this form
25  before, but it was produced to us with some folders

Charles Scott, M.D.                                    March 8, 2013

1    because you can have a decrease in the white blood cell

2    count.

3                The were also monitoring his weight, which is

4    metabolic monitor.  They did not do a waist

5    circumference.

6                I couldn't find a blood pressure on him, but

7    it could have been I just ran out of the time in the

8    EUHR.  And I couldn't find the fasting glucose and

9    metabolic panel.

10                He had informed consent both for Clozaril and

11   that it was a heat medication.  They had done AIMS

12   monitoring.

13                So they were monitoring the most important

14   risks, which was white blood cell count and his weight,

15   which is the monitor for metabolic syndrome.

16        Q.   If you could only find weight but not fasting

17   glucose and not metabolic panel and they didn't do waist

18   circumference -- so if I understand your testimony

19   correctly, there's a constellation of things you can do

20   for metabolic syndrome:  Weight, fasting glucose,

21   metabolic panel, waist circumference.  And you only

22   found one of the four.  Is one of the four enough?

23        A.   This was one of those cases that they had not

24   yet scanned in all the records from July 2011 when the

25   scanning started.  So he had been on clozapine, as I

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Charles Scott, M.D.                                      March 8, 2013

1   understand it, a while for schizophrenia.

2              So the way that EUHR was set up, you couldn't

3   go back past that six or seven months.

4              So everything else was in the protocol.  The

5   weights were monitored.  He had his white blood cell

6   count monitored within that six month frame.  He had an

7   AIMS done on 10/13/2011 that I found.  So I felt that

8   was adequate based on the available information and his

9   safety.

10      Q.   You're there on February 29th, 2012?

11      A.   Right.

12      Q.   And you testified that the absence of the

13  glucose and the metabolic panel could have been because

14  they hadn't scanned material from July 2011 and

15  previously.  So July 2011 is eight months before

16  February 2012.

17             Do you not have to do these things for

18  clozapine more than every eight months?

19      A.   It's recommended more than eight months.  But

20  the other thing that's important about CSP SAC, there

21  were monitoring -- and you can see it in my notes early

22  on -- the labs through Quest 360 versus EUHR.

23             So this is towards the end of my review.  I'm

24  not near the Quest 360 computer.  So they -- I did ask

25  them to take me to a Quest 360 computer document, and

```
 1              CERTIFICATE OF REPORTER

 2

 3          I, MEGAN F. ALVAREZ, a Certified Shorthand

 4     Reporter, hereby certify that the witness in the

 5     foregoing deposition was by me duly sworn to tell the

 6     truth, the whole truth and nothing but the truth in the

 7     within-entitled cause;

 8              That said deposition was taken down in

 9     shorthand by me, a disinterested person, at the time and

10     place therein stated, and that the testimony of the said

11     witness was thereafter reduced to typewriting, by

12     computer, under my direction and supervision;

13          I further certify that I am not of counsel or

14     attorney for either or any of the parties to the said

15     deposition, nor in any way interested in the events of

16     this cause, and that I am not related to any of the

17     parties hereto.

18

19

20              DATED:  March 11, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

Exhibit 4



Transcript of the Testimony of:

# Jacqueline Moore, R.N., Ph.D.

Coleman v. Brown

February 21, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312  |  F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF CALIFORNIA

 3

 4  RALPH COLEMAN, ET AL.,            )
                                     )
 5                  Plaintiffs,      )
                                     )CASE NO.:
 6         vs.                       )S 90-0520 LKK-JFM
                                     )
 7  EDMUND G. BROWN, JR., ET AL.,    )
                                     )
 8                  Defendants.      )
    _____)

 9

10

11

12

13

14          The Deposition of JACQUELINE MOORE, RN, PH.D.,

15  taken on behalf of the Plaintiffs, before Megan F.

16  Alvarez, Certified Shorthand Reporter No. 12470,

17  Registered Professional Reporter, for the State of

18  California, commencing at 8:50 a.m., Thursday,

19  February 21, 2013, at the Rosen, Bien, Galvan &

20  Grunfeld, LLP, 315 Montgomery Street, 10th Floor, San

21  Francisco, California.

22

23

24

25
```

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3            BY:  AARON J. FISCHER, ESQ.
              ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4            315 MONTGOMERY STREET, 10TH FLOOR
              SAN FRANCISCO, CALIFORNIA 94104
 5            415.433.6850
              415.433.7104 FAX
 6            AFISCHER@RBGG.COM

 7
     FOR DEFENDANTS:
 8
              BY:  DEBBIE J. VOROUS, ESQ.
 9            OFFICE OF THE ATTORNEY GENERAL
              STATE OF CALIFORNIA
10            1300 I STREET
              SACRAMENTO, CALIFORNIA 95814
11            916.324.5345
              916.324.5205 FAX
12            DEBBIE.VOROUS@DOJ.CA.GOV

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC   |   877.771.3312   |   www.thorsnes.com

1    new.  People weren't -- it wasn't just you presented it.

2    It was people presenting joint in a conversation.  It

3    wasn't one person did a presentation, then someone else

4    did.

5         Q.   Was there a leader to the meeting?

6         A.   If there is, I don't recall who it was.

7         Q.   On Exhibit 3, your notes from that meeting, on

8    the third page, 102025 --

9         A.   Yes.

10        Q.   Can you just give me an overview of what the

11   content of your notes on this page?

12        A.   They were talking about the trial and that the

13   case had six elements that had been identified by the

14   courts.  And they said that the case had expanded beyond

15   that, that there was a cost component to the monitoring

16   of the -- the monitoring.

17        Q.   At this point, had you read any -- any

18   documents to -- that CDCR provided you?

19        A.   I have a huge bin.  I read everything that

20   they gave me.  Whether I read it before or after this, I

21   couldn't tell you.  I know I did read the trial.  I did

22   read the monitoring reports.  But at what time, I don't

23   know.

24        Q.   So this was your instruction to the case?

25        A.   This was my introduction to the case.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      Q.   On the middle of the page about halfway down,
2   it says "Overmonitoring."  And can you just read what
3   you have in that note?  The 11th line.
4      A.   "Overmonitoring in number of prisons looked
5   at."
6      Q.   What does that refer to?  Do you remember?
7      A.   There was a lot of monitoring going on in the
8   prisons, that they were going back several times looking
9   at things, that they felt -- whoever related this felt
10  that there was an overmonitoring on the part.
11     Q.   And this was someone from CDCR or the AG's
12  office?
13     A.   It was someone.  I don't know who.
14     Q.   Okay.  And they said they felt that there was
15  overmonitoring being done?
16     A.   Being done, yes.
17     Q.   Further down, you mention cost drivers, the
18  fourth line from the bottom.  It says "Cost Drivers."
19  Can you read the rest of that?
20     A.   "Attorneys and their own law firms and the
21  monitors."
22     Q.   Do you remember what this refers to?
23     A.   To the cost of the Coleman monitors and the
24  attorneys that are the -- that handle the reports.
25     Q.   What did they tell you about this

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

 1   specifically?

 2        A.   That they bill a lot of money.

 3        Q.   On the next page, 101026.

 4             On this page at the top says "Presiding Judge

 5   Karlton."

 6             Do you recall what they told you about

 7   presiding Judge Karlton at this meeting?

 8        A.   I think that's the judge on the case.

 9        Q.   What else did they tell you about him?

10        A.   Well, anything else I would have written down

11   if I thought that it was important.  I mean, they didn't

12   really tell me much.  This was the presiding judge.

13        Q.   And the fifth line says:  "Karlton does not

14   like state AG office."

15        A.   Yeah.  Someone said that, so I wrote it down.

16        Q.   Did they say anything else about that?

17        A.   No.  If they said something else, I would have

18   written it.  I'm a Catholic school schoolgirl; I write

19   down everything.

20        Q.   And the line below, can you read what the line

21   below says?

22        A.   "Rules of evidence not applied uniformly."

23        Q.   Do you recall what that is?

24        A.   It meant that sometimes the monitors would

25   pick certain things up at one institution and not bring

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1   the same things together at another institution.

2       Q.   Here were they talking about the monitors or

3   were they talking about the court?

4       A.   I think -- I think it was the court.  It was

5   the court.

6       Q.   And so what did they -- what was being related

7   as far as the court here?

8       A.   That it was an uphill battle for the attorney

9   general.

10      Q.   Two lines below what you just read, what does

11  that say?

12      A.   "Takes plaintiff's finding as truth."

13      Q.   And the next line?

14      A.   Words the plaintiff would use, like

15  "languishing" or "dying," you know, they were

16  descriptive terms that would be in a plaintiff's report.

17      Q.   This is again talking about Judge Karlton?

18      A.   Judge Karlton.

19      Q.   What was being related here?

20      A.   Other than what I have written here -- and

21  this was many, many, many months ago, and it was just an

22  overview meeting -- quite frankly, I never referred to

23  these notes again.

24      Q.   Do you remember this meeting?

25      A.   I remember being there.  I remember all of the

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

1     the end of your tour?

2          A.   I told them that we were here in the

3     institution and that we were going to various housing

4     units and interviewing various inmates at random, and

5     that -- you know, they were just happened to be picked

6     and would it be all right.  I mean, I always asked for

7     permission before I just assumed that they were going to

8     talk to me.

9          Q.   Sure.

10         A.   And I didn't put down any particular inmate in

11    my report.

12         Q.   Okay.  But they didn't know you were there to

13    write a report at the end of your tour?

14         A.   They knew we were doing an evaluation of that

15    facility, so...

16         Q.   A few more questions and then we can take a

17    break.

18         A.   I mean, these inmates were so used to being

19    talked to.

20         Q.   They were used to being talked to?

21         A.   Yeah.  I mean, when I would walk through the

22    yard, they would sometimes say, "Oh, she's with

23    Coleman."

24         Q.   Who would say that?

25         A.   The inmates.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1          I mean, if they saw a suit, that was their
2     assumption.
3          Q.   Did any inmates ever mistake you for being
4     with the special master team for Coleman?
5          A.   I never asked them what they thought.
6          Q.   Okay.  You said that you asked them a number
7     of questions about their clinician and their
8     medications.  And in the report, I noticed that you said
9     that their knowing their clinicians or their medications
10    was unusual.
11          Do you recall that?
12          A.   I didn't think it was unusual.  I thought it
13    was great.
14          Q.   Thought it was great.
15          Did you think that it indicated that they were
16    receiving an appropriate level of care?
17          A.   Yes, because they knew who the people were.
18    They knew who they had access to.
19          Q.   Are you aware of any studies that show that
20    whether the patient knows their psychiatrist or their
21    primary clinician is a -- an appropriate measure for
22    quality of care?
23          A.   I'm not aware of quality assurance studies as
24    such.
25          Q.   Are you aware of any quality assurance studies

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                                    February 21, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8             That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13            I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                       DATED: February 25, 2013

21

22                       _____

23                       MEGAN F. ALVAREZ

24                       RPR, CSR 12470

25

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1                    CERTIFICATE OF REPORTER

2

3          I, MEGAN F. ALVAREZ, a Certified Shorthand

4    Reporter, hereby certify that the witness in the

5    foregoing deposition was by me duly sworn to tell the

6    truth, the whole truth and nothing but the truth in the

7    within-entitled cause;

8          That said deposition was taken down in

9    shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                      DATED: February 25, 2013

21

22                      *Megan F. Alvarez*

23                      MEGAN F. ALVAREZ

24                      RPR, CSR 12470

25

Exhibit 5

**From:**     Patrick McKinney
**To:**       Dvoskin, Joel;  Moore, Jackie;  Scott, Charles;  Steve Martin <sjmart@sb...
**CC:**       Downer, William;  McKinney, Patrick;  Russell, Jay;  Vorous, Debbie
**Date:**     7/20/2012 3:51 PM
**Subject:**  Coleman - Reports and Meeting in Sacramento

All:

We wanted to follow up with you about the decisions made during our conference call last month, and to schedule a meeting with the clients in Sacramento to discuss the tours and your recommendations for the system.

Preparation of Reports

This message will confirm our discussion that you will proceed to write reports addressing whether there are systemic constitutional violations in the delivery of mental health care services in the California prison system, i.e., whether there is deliberate indifference to serious mental health needs.  We understand that you will prepare separate reports, but will coordinate to make sure the issues are appropriately addressed.  We anticipate that the reports will be organized by issue; discussion and examples from the institutions should inform discussion of the issues, but we do not anticipate that the reports will be organized by institution.  Consistent with our discussions and the audit tool, the major systemic issues are the following:

- Screening/Evaluation of Mental Health Issues
- Access to Care
- Medication Administration/Management
- Medical Records
- Suicide Prevention
- Quality Management / Quality Assurance
- Use of Force / Consideration of Mental Health in the RVR Process

We understand that some of you have work to complete, for example, Steve is finishing his review of the use of force/RVR documents for CIM and Joel is following up on the suicide reports and related issues.  We are also finishing up the quantitative portions of the audit tools, and will be sending you audit tools that are tailored to each institution.  While we would like to have the audit tools completed, as always the audit tool was designed to identify the issues and organize your analysis for purposes of writing the reports.  Accordingly, we do not expect that the audit tools will be used as an attachment to your final reports.

Please let us know if any of you have additional work that needs to be completed.  Otherwise, please prepare your reports in draft.

Meeting with the Clients in Sacramento

Let us know your availability for a one-day meeting with the clients in August to further debrief about the site visits and to share your recommendations to CDCR for improving the system.

Thank you for all of your work to date, and please let me know if you have any questions or would like to discuss.

Patrick
Patrick R. McKinney II

DEXP 000021

Case 2:90-cv-00520-KJM-SCR Document 4522-1 Filed 03/26/13 Page 66 of 75

Deputy Attorney General
Direct: (415) 703-3035

DEXP 000022

Exhibit 6

1              UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF CALIFORNIA

3                 ---oOo---

4  RALPH COLEMAN, et al.,     )

                       )

5                    )

          Plaintiffs,     )

6                    )

             vs.        )  No. Civ S 90-0520 LKK-JFM

7                    )

  EDMUND G. BROWN, JR., et al., )  Volume I

8                    )

                    )  Page 1 - 300

9         Defendants.     )

  _____)

10

11

12                DEPOSITION OF

13              STEVE J. MARTIN

14         THURSDAY, FEBRUARY 28, 2013

15

16

17     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19  REPORTED BY:

20  HOLLY THUMAN, CSR No. 6834, RMR, CRR

21  ---------------------------------------------------------

22          JAN BROWN & ASSOCIATES

23     WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24  701 Battery Street, 3rd Floor, San Francisco, CA 94111

25       (415) 981-3498 or (800) 522-7096

                                          1

```
 1                        --oOo--

 2         Deposition of STEVE J. MARTIN, taken by the

 3    Plaintiffs, at K&L GATES LLP, Four Embarcadero Center,

 4    Suite 1200, San Francisco, California 94111, commencing

 5    at 9:27 a.m., on THURSDAY, FEBRUARY 28, 2013, before me,

 6    HOLLY THUMAN, CSR, RMR, CRR.

 7                        --oOo--

 8                       APPEARANCES

 9    FOR THE PLAINTIFFS:

10         K&L GATES LLP
           Four Embarcadero Center, Suite 1200
11         San Francisco, California 94111
           415.249.1059
12         By:  JEFFREY BORNSTEIN, Attorney at Law
                jeff.bornstein@klgates.com
13              MEGAN F. CESARE-EASTMAN, Attorney at Law
                megan.cesare-eastman@klgates.com
14              RANJINI ACHARYA, Attorney at Law

15         ROSEN BIEN GALVAN & GRUNFELD LLP
           315 Montgomery Street, Tenth Floor
16         San Francisco, California 94104-1823
           By:  MICHAEL W. BIEN, Attorney at Law
17              415.433.6830
                (Present when indicated.)

18

19    FOR DEFENDANTS:

20         ATTORNEY GENERAL OF CALIFORNIA
           455 Golden Gate Avenue, Suite 11000
21         San Francisco, California 94102-7004
           By:  PATRICK RICHARD McKINNEY II
22              Deputy Attorney General
                415.703.3035
23              Patrick.McKinney@doj.ca.gov

24    ALSO PRESENT:  ELDON VAIL

25
```

4

1   agenda, I'll give you an opportunity to tell me, maybe I

2   should ask this or I failed to ask that or some other

3   observation you want to make, and that's typically the

4   approach I would take.

5       Q.  Did you use the word "Coleman" at all in how

6   you introduced yourself to the inmates?

7       A.  Gosh.  I know I at times said that I've been

8   retained to look at how, you know, inmates with mental

9   health designations or inmates with mental impairments

10  are managed in this system.

11          Now, whether -- you know, whether -- and I said

12  related to the Coleman lawsuit -- I don't remember.  It

13  certainly wasn't something that was on my mind that I

14  had to say to announce, I'm associated with the Coleman

15  litigation.

16      Q.  But it was something you probably said?

17          MR. McKINNEY:  Objection.  Asked and answered.

18  You know what, Counsel?  I'm not going to allow this

19  to -- you know, if you want -- you know, if you're

20  suggesting that the State can't examine its own system,

21  you can make that argument in court.  This is -- has

22  nothing to do with anything in this case.  I mean, it's

23  a silly agenda, frankly.  I'm not going to restrict you

24  from asking these questions, but it's inappropriate, to

25  say the least.

72

1    MR. BORNSTEIN:  Q.  Go ahead.  Did you say

2  that, do you think?

3    I wasn't there, so I'm just trying to get your

4  best memory.

5    A.  **I know.**

6    MR. McKINNEY:  Asked and answered.

7    THE WITNESS:  I -- all I can say, Counsel, is,

8  I didn't have a set script.  I don't recall having been

9  told, you know, when you introduce yourself to an

10  inmate, say such-and-such.  So I -- you know.

11    MR. BORNSTEIN:  Q.  Were some of the people

12  that you interviewed people that the State has pending

13  charges against because of their actions while they've

14  been in custody?

15    A.  **You mean criminal charges?**

16    Q.  Yeah.

17    A.  **I have no idea.**

18    Q.  Did that come up at all?

19    A.  **No.  Immaterial to me.**

20    Q.  Well, you do know that some of the use-of-force

21  incidents get referred for criminal prosecution, don't

22  you?

23    A.  **Sure.  Yes, it's routine.**

24    Q.  And in fact, there could have been some of

25  those people that you interviewed that were referred,

73

1   could there not?

2       **A.  I guess you're right.  Probably could, yeah.**

3   **I -- because I didn't look at that, I'm not aware**

4   **whether they were or not.  I can't answer it.  But yeah,**

5   **possibility exists.**

6       Q.  Okay.  I'm assuming that had you realized, you

7   wouldn't have talked to them?

8       **A.  I sure would have.**

9       Q.  You would have anyway?

10      **A.  I sure would have.**

11      Q.  Okay.  Why?

12      **A.  I wanted some answers to some questions.**

13      Q.  Did you share your notes of your interactions

14  with the State?

15      **A.  In a particular case, to the extent that it was**

16  **relevant to my determination of what occurred in that**

17  **incident, that this is -- he probably was struck or, you**

18  **know, there's some evidence of such-and-such.**

19      Q.  Well, let's talk about some of your -- some of

20  the things that you did in terms of your

21  recommendations.  And I want to start with this next in

22  order.

23          (Deposition Exhibit 4 was marked for

24          identification.)

25          MR. BORNSTEIN:  Q.  So Exhibit 4 is a -- it's

74

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1         CERTIFICATE OF REPORTER

2         I, HOLLY THUMAN, a Certified Shorthand Reporter,

3    hereby certify that the witness in the foregoing

4    deposition was by me duly sworn to tell the truth, the

5    whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken

7    down in shorthand by me, a disinterested person, at the

8    time and place therein state, and that the testimony of

9    said witness was thereafter reduced to typewriting, by

10   computer, under my direction and supervision;

11        That before completion of the deposition review of

12   the transcript [] was [X] was not requested.  If

13   requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21

22   DATED: March 4, 2013

23

24                          _____
                                  HOLLY THUMAN, CSR
25

                                                          300

Exhibit 7

**From:**     Patrick McKinney
**To:**       Dvoskin, Joel;  Moore, Jackie;  Scott, Charles;  Steve Martin <sjmart@sb...
**CC:**       Spagnolo, David;  Vorous, Debbie
**Date:**     2/24/2012 1:33 PM
**Subject:**  Site Visits this Week

All, I just wanted to give you a head's up that we will be joined on next week's site visits by Jeffrey Beard, a consultant who has been retained directly by CDCR and is advising the department on issues related to *Coleman* and other cases.

Some of you may know Jeff, but for those who do not, Jeff was with the Pennsylvania Department of Corrections for approximately 30 years in a number of positions, including most recently Secretary of the Department.  He retired within the last couple of years and is now doing consulting work, including with CDCR.

We expect that Jeff will be observing the programs and the tours, but will not be taking a hands-on approach.  Accordingly, we do not expect that this should change anything you are doing to evaluate the program and use the audit tool.

Please give me a call if you have any questions or concerns.  I will see you on Monday.

Patrick

Patrick R. McKinney II
Deputy Attorney General
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-5500
Direct: (415) 703-3035

DEXP 000014