DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS**<br><br>Judge: Hon. Lawrence K. Karlton<br>Date: March 27, 2013<br>Time: 1:30 p.m.<br>Crtrm.: 4 |

[770364-2]

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT.......................................................................................................................... 2

I.     DEFENDANTS ADMIT THAT THEIR COUNSEL DIRECTED AND WERE PRESENT FOR *EX PARTE* INTERVIEWS WITH REPRESENTED PARTIES ................................................................................................................. 2

        A.     TERMINATION WAS THE PURPOSE OF THE EXPERT CONSULTATION FROM THE BEGINNING AND THE EXPERTS DID NOT LEVEL WITH EITHER THE COURT OR WITH THE REPRESENTED PRISONERS THEY INTERVIEWED .............................. 3

        B.     FRCP RULE 26 DOES NOT EXCUSE USE OF EXPERT WITNESSES TO CIRCUMVENT THE REPRESENTED PARTY RULE ........................................................................................................... 5

        C.     DEFENDANTS CANNOT ARROGATE TO THEMSELVES THE RIGHT TO VIOLATE THIS COURT'S PRIOR DISCOVERY ORDERS ........................................................................................................ 5

        D.     THERE IS NO COMPARISON BETWEEN THE SECRET INTERVIEWS OF PLAINTIFF CLASS MEMBERS, AND PLAINTIFFS' COUNSEL'S CONTACTS WITH HIGH OFFICIALS OF STATE GOVERNMENT ....................................................................... 6

II.    PLAINTIFFS AND THE COURT HAVE BEEN PREJUDICED BY THE SECRET INSPECTIONS AND THE *EX PARTE* COMMUNICATIONS BECAUSE THEY UNDERMINE THE FAIRNESS AND INTEGRITY OF THE PROCEEDINGS ...................................................................................................... 8

III.   THE COURT SHOULD EXCLUDE DEFENDANTS' EXPERT REPORTS AS A SANCTION FOR THEIR IMPROPER CONDUCT ..................................... 11

IV.   DEFENDANTS' RESPONSE FAILS TO REHABILITATE THEIR EXPERTS' LACK OF RELIABLE METHODOLOGY ........................................ 12

        A.     DEFENDANTS' EXPERTS USE "DELIBERATE INDIFFERENCE" TO STATE LEGAL CONCLUSIONS, NOT OPINIONS ABOUT ULTIMATE FACTS................................................... 12

        B.     DEFENDANTS' RESPONSIVE BRIEF CONFIRMS THAT DEFENDANTS' TERMINATION EXPERTS HAVE NO CONSISTENT DEFINITION OF "DELIBERATE INDIFFERENCE" ...... 13

CONCLUSION..................................................................................................................... 14

[770364-2]

i

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

# TABLE OF AUTHORITIES

**Page**

### CASES

*Cont'l Ins. Co. v. Superior Court*,
    32 Cal. App. 4th 94 (App. Ct. 1995) ........................................................................... 8

*Doyle v. Ill. Central Rr. Co.*,
    2009 U.S. Dist. LEXIS 8917 (9th Cir. 2009) .............................................................. 8

*Fink v. Gomez*,
    239 F.3d 989 (9th Cir. 2001) ............................................................................. 11, 12

*Gomez v. Vernon*,
    255 F.3d 1118 (9th Cir. 2001) ........................................................................... 11, 12

*Heflin v. Stewart County*,
    958 F.2d 709 (6th Cir. 1992) ..................................................................................... 13

*Lewis v. Telephone Emps. Credit Union*,
    87 F.3d 1537 (9th Cir. 1996) .................................................................................... 11

*Mitchell v. Cate,*
    No. 2:08-CV-1196 JAM-EFB (E.D. Cal. Oct. 17, 2012) ........................................... 5

*Perez v. Boston Hous. Auth.*,
    379 Mass. 703 (1980) ............................................................................................ 3, 7

*Truitt v. Superior Court,*
    59 Cal. App. 4th 1183 (App. Ct. 1997) ..................................................................... 2

*United States v. Lopez*,
    4 F.3d 1455 (9th Cir. 1993) ..................................................................................... 11

### STATUTES

28 U.S.C. § 1927 ................................................................................................................ 12

### RULES

Cal. Rules of Prof. Conduct, Rule 2-100 ............................................................................. 7

Cal. Rules of Prof. Conduct, Rule 2-100(A) ....................................................................... 2

Cal. Rules of Prof. Conduct, Rule 2-100(C)(1) ................................................................... 7

Fed. R. Civ. P. 11(b) ............................................................................................................ 6

[770364-2]

ii
PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS'
EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

1 | Fed. R. Civ. P. 26..................................................................................................................5

# INTRODUCTION

The Court should strike the Defendants' termination experts' testimony. Defendants have failed to discharge the Order to Show Cause ("OSC"). Defendants do not even try to excuse or justify their violation of the Court's orders regarding prison inspections. They arrogated to themselves the authority to decide that the Court's orders do not apply when they find them inconvenient or too expensive. (Defs. Response to OSC, 3/25/13, Docket No. 4499 ("Response") at 6:17-19.) The clear ethical obligation of counsel to refrain from *ex parte* communication with represented parties on disputed subjects is also waved off as not applicable whenever California officials find themselves inconvenienced by it. In an attempt to justify their gross abuse of their unfettered access to class members because of the nature of a custodial setting, Defendants invent a completely unsupported rule that ethical "standards regarding such communications are relaxed" during the remedial phase of an institutional class action. (Response at 2, 3 & 4.) In direct violation of this Court's Order to Show Cause, Defendants failed to answer this Court's direct question regarding the presence of defense counsel in prisoner interviews. (OSC, Docket No. 4414 at 3.) Defense counsel signed two self-serving declarations, both of which are silent on their presence during the defense experts' interviews with prisoners. (Docket Nos. 4498, 4496.) Instead of addressing the Court's question, Defendants include one artfully-phrased sentence in their filing that sidesteps the question, but admits that counsel were present, and thus were fully complicit, in the *ex parte* interviews by their consultants. (Response at 6:11-13.)

Defendants' response to the evidentiary objections does not remedy the defects in their expert reports and in the non-expert declarations of Rick Johnson, Tim Belavich, Diana Toche and Laura Ceballos. Plaintiffs do not here repeat the evidentiary objections but incorporate by reference the corrected objections filed at Docket No. 4423. In Section IV of this Reply, Plaintiffs address the attempt to rehabilitate Dr. Scott by through a new declaration purporting to cure the termination experts' use of the legal conclusion "deliberate difference."

[770364-2]

1

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS'
EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

# ARGUMENT

## I. DEFENDANTS ADMIT THAT THEIR COUNSEL DIRECTED AND WERE PRESENT FOR *EX PARTE* INTERVIEWS WITH REPRESENTED PARTIES

In argument but not in their declarations, defense counsel admits that they "were present while the experts were inspecting and interacting with inmates." (Response at 6:11.) Defendants then assert that counsel "did not participate in any of the interactions with inmates, nor overhear any of the conversations," as if orchestrating *ex parte* contacts through intermediaries somehow cured the violation. The ethical rules could not be clearer: An attorney may not communicate with the represented party regarding the subject matter of litigation, either directly or through intermediaries. *See* Cal. Rules of Prof. Conduct, Rule 2-100(A) ("a member shall not communicate directly or indirectly about the subject of the representation"); *Truitt v. Superior Court,* 59 Cal. App. 4th 1183, 1187-88 (App. Ct. 1997).

Defendants' artful phrasing of their answer, admitting that counsel were present, but claiming that counsel did not themselves participate in the interviews with represented parties, sidesteps this Court's direct question: "Defendants shall also address whether any defense counsel were present during any of the defense experts' interviews with prisoners." (Order to Show Cause at 3.) Although they tried to sidestep it, the Defendants have answered the Court's question in the most damning possible way—they were present for, directed and condoned indirect communication with represented parties on the subject matter of the litigation. (*See* Declaration of Michael W. Bien in Reply to Defendants' Response to Order to Show Cause re: Defendants' Expert Reports and Declarations, Dkt No. 4522 (hereinafter "Bien Decl.") Ex. 4 (Deposition Testimony of Jacqueline Moore) ("Moore Dep.") at 55:24-56:14; Bien Decl. Ex. 6 (Deposition Testimony of Steve Martin) ("Martin Dep.") at 37:15-22 (both testifying to the presence of Deputy Attorneys General at the institutions during the experts' tours); Bien Decl. Ex. 7 (email from Deputy Attorney General McKinney informing experts that "*we* will be joined on next week's site visits by Jeffrey Beard" (emphasis added) and that he would "see [the experts] on Monday").)

[770364-2]

2

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

Defendants' unsupported and novel assertion that ethical standards regarding communications of opposing counsel with represented parties are "relaxed" in the context of institutional class actions is unavailing.  (Response at 2, 4 & 7.)  In fact, the single case Defendants cite in their *post hoc* attempt to justify defense counsel's actions is a 1980 Massachusetts Supreme Court case discussing the propriety of a Judge's *ex parte* contact with his Special Master and the parties, and noting that, "[i]n the absence of an understanding with the parties about such encounters," even the Judge's *ex parte* communications constituted "misbehavior" that "should not have taken place."  *Perez v. Boston Hous. Auth.*, 379 Mass. 703, 741-42 (1980).  Furthermore, Defendants' attempt to link the applicability of Rule 2-100 to the particular phase of litigation is squarely preempted by the comments to the Rule, which explicitly state, "As used in paragraph (A), 'the subject of the representation,' 'matter,' and 'party' are not limited to a litigation context."

### A. TERMINATION WAS THE PURPOSE OF THE EXPERT CONSULTATION FROM THE BEGINNING AND THE EXPERTS DID NOT LEVEL WITH EITHER THE COURT OR WITH THE REPRESENTED PRISONERS THEY INTERVIEWED

Defendants' Response claims that the termination experts were retained for some sort of neutral evaluation of the mental health system, rather than specifically for litigation purposes.  Under oath, however, the experts told the truth:  From day one, their job was to support the Defendants' litigation purposes.  (Bien Dec. Ex. 1 (Deposition Testimony of Joel Dvoskin) ("Dvoskin Dep.") at 18:14-16, 150:17-155:14, Ex. 2 (Dvoskin contract, Scope of Work ¶ 1); Ex. 3 (Deposition Testimony of Charles Scott) ("Scott Dep.") at 20:16-22 ("This litigation was clearly discussed").)

From start to finish, the expert's work was a litigation project, directed toward the showing necessary for a PLRA termination showing.  At their first meeting in October 2011, defense counsel "briefed" the experts on defense counsel's view of the problem— not that prisoner patients were lacking access to mental health care—but instead that the *Coleman* judge did not like the State or the Attorney General, and that the Special Master

[770364-2]

3
PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

monitored too many things and spent too much money.  (Bien Decl. Ex.1 (Dvoskin Dep. at 150:17-155:14; 183:17-184:10); Ex. 4 (Moore Dep. at 19:7-22:18).)  By July 2012, the first ten prison tours (then all of the tours that they had planned) had been complete for two months already, and the Attorney General summoned the termination experts to Sacramento to present their findings—and to present them specifically in the terms required by the PLRA for a termination motion.  (Bien Decl. Ex. 5 [DEXP 000021-22] (Email from Patrick McKinney to Termination Experts, etc. ("[Y]ou will proceed to write reports addressing whether there are systemic constitutional violations in the delivery of mental health care . . . .").)

A full month after the Deputy Attorney General's email summoning the experts to present their termination findings after ten prison tours, the same Defendants told this Court that Plaintiffs' request for expert inspections of the prisons was "premature" and should be denied until at least March 2013.  (Docket No. 4226; Docket No. 4423 at 2-3.)  No amount of pretzel logic about how the "premature" inspections concerned mental health care at a certain population level, versus just mental health care *per se*, can change the simple fact that the Defendants misled the Court about expert inspections being "premature."  (Response at 8-9.)

In addition to misleading this Court, Defendants' experts also misled the class members whom they interviewed outside the presence of counsel.  While Defendants try to obfuscate the point in a cloud of irrelevant deposition excerpts, (Response at 9-10), they do not and cannot deny that their experts made no effort to disabuse the prisoner interviewees of the common misconception that the experts were "Coleman," that is were with the *Coleman* Special Master's monitoring team:

> Q. They were used to being talked to?
> A. Yeah.  I mean, when I would walk through the yard, they would sometimes say, "Oh, she's with Coleman."
> Q. Who would say that?
> A. The inmates.  I mean, if they saw a suit, that was their assumption.
> Q. Did any inmates ever mistake you for being with the special master team for Coleman?
> A. I never asked them what they thought.

[770364-2]

4

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

(Bien Decl. Ex. 4 (Moore Dep. at 57:18-60:5); *see also* Ex. 6 (Martin Dep. at 72:5-73:10).)

### B. FRCP RULE 26 DOES NOT EXCUSE USE OF EXPERT WITNESSES TO CIRCUMVENT THE REPRESENTED PARTY RULE

Defendants ask this Court to rewrite Rule 26 of the Federal Rules of Civil Procedure into some sort of federal abrogation of the rule against indirect communication with represented parties. The only authority they offer for this remarkable proposition is an unpublished magistrate judge order. That order, Docket No. 131 in *Mitchell v. Cate,* No. 2:08-CV-1196 JAM-EFB (E.D. Cal. Oct. 17, 2012), says absolutely nothing about experts interviewing represented parties outside the presence of counsel. The Supreme Court and Congress, in enacting the 2010 changes to Rule 26 of the Federal Rules of Civil Procedure, did not abrogate *sub silentio* the attorney ethics rules of the 50 states governing represented party communications.

### C. DEFENDANTS CANNOT ARROGATE TO THEMSELVES THE RIGHT TO VIOLATE THIS COURT'S PRIOR DISCOVERY ORDERS

Defendants have decided for themselves that this Court's prior orders regarding expert tours no longer apply to them. (Response at 7, Docket No. 4050.) The only excuse they offer is that violating the order and the rules of ethics "conserved taxpayer money." (Response at 6:17-18.) They never explain exactly how the secret inspections "conserved taxpayer money." If, in fact, the law allowed Defendants to prevail in a termination motion by relying on secret inspections in which only their side gets to see the places, processes, persons and records scrutinized, then certainly that form of "justice" would be cheap. This Court's discovery orders, however, are grounded in the common sense principle that this kind of shortcut never turns out to be cheap. The past two-and-a-half months of round-the-clock discovery and litigation confirms that this Court's discovery orders were correct. Properly conducted, noticed inspections could have allowed a far more expeditious and economical determination of the termination motion.

If Defendants believed that the October 2007 discovery order was "antiquated" or

[770364-2]

5

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

no longer applied, the proper thing to do would have been to seek clarification or reconsideration of the order. What is not proper is to wait until *after* the secret tours are complete, and the harm to the parties cannot be undone. Defendants acknowledge, as they must, that the parties were addressing the subject of renewed expert tours in briefing in August 2012, regarding Defendants' contentions that the population cap should be raised on the grounds that Defendants believed that they could provide constitutional care at a higher population. (Response at 8-9.) That would have been the time for Defendants to come forward with questions regarding the applicability of the Court's prior orders requiring notice of expert tours. Instead, as noted above, they told the Court to deny Plaintiffs' request for expert inspections and discovery on the grounds that any such investigation would be "premature" until March 2013.

Defendants' additional "defense" that the Office of the Attorney General and CDCR in-house counsel should be excused from their misconduct because "no counsel from [the time of trial in] 1995 remain for Defendants" (Response at 8), a statement unsupported by any evidence,[1] only further demonstrates that these public officials have lost touch with their professional responsibilities as officers of the Court. *See* Fed. R. Civ. P. 11(b).

### D. THERE IS NO COMPARISON BETWEEN THE SECRET INTERVIEWS OF PLAINTIFF CLASS MEMBERS, AND PLAINTIFFS' COUNSEL'S CONTACTS WITH HIGH OFFICIALS OF STATE GOVERNMENT

Defying credulity, Defendants find a parallel between these two situations:

Situation 1: A prisoner with serious mental illness is approached on the prison yard or in the infirmary by a phalanx of prison officials, state attorneys, and their experts and questioned about the state of his or her mental health care, with no ability to consult with

---

[1] Although this "defense" has no legal significance, it is also blatantly unsupported by the facts: Bruce Slavin, one of the lead counsel for the State defendants at trial, remains employed by the AG's Office. http://members.calbar.ca.gov/fal/Member/Detail/115192.

[770364-2]

6
PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

counsel, and no assurance regarding how the officials responsible for his daily well-being will respond to what he says.  <u>Situation 2</u>:  The California Secretary of Corrections, an attorney with decades of experience, appointed by the Governor of California and confirmed by the Senate, and his Undersecretary, a non-attorney, albeit also with years of experience at high levels of government, take a call or meeting with an attorney representing inmates in an ongoing class action, with full knowledge of in-house counsel and the Attorney General's office, and full opportunity to consult with counsel in preparation for or response to the meeting.  (Cate Decl. ¶ 2, Docket. No. 4497; Hoshino Decl. ¶ 2, Docket. No. 4495; Bien Decl. ¶ 6.)

The ethical rules governing attorney conduct, however, specifically distinguish between unlawful communication with a represented party, and communication with a government official.  Rule 2-100 of the California Rules of Professional Conduct expressly allows counsel to communicate with "a public officer," Rule 2-100(C)(1), such as the Secretary and Undersecretary of Corrections.  Moreover, even though the letter of the Rule would allow for unfettered communication with the Secretary and Undersecretary, Plaintiffs' counsel has been scrupulously careful to make sure that such communications are undertaken with the knowledge and consent of CDCR counsel.  (Bien Decl. ¶ 6.)

Without any applicable authority, Defendants propose a novel theory of "relaxation" of the rules of ethics in the remedial stage of institutional litigation cases to allow defense counsel to orchestrate *ex parte* contacts with represented prisoner class members.  The case they cite, however, *Perez v. Boston Housing Authority,* 379 Mass. at 741-42, concerns *ex parte* communications by the presiding judge with his own special master, and with party representatives in the special master's presence.  It says nothing to condone *ex parte* contacts between counsel with an adverse counsel's clients.  Defendants cannot seriously contend that interviews of prisoner class members by adverse counsel and their experts are comparable to either interviews by a judge or court-appointed monitor on the one hand, or conversations between public officials at the highest level and Plaintiffs' counsel, on the other.  Rather, Defense counsel took advantage of their unique access to

[770364-2]
7
PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS'
EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

plaintiff class members in the custodial prison setting, as well as the familiarity of many class members with the *Coleman* Special Master's monitoring team, to conduct improper interviews with Plaintiff counsel's clients. In fact, Defendants' abuse of their control over class members and secrecy motive is further evidenced by Defendants' failure to include a list of the names of prisoners they interviewed in their expert reports, preventing Plaintiffs' counsel from following up with clients. (*See* Bien Decl. ¶ 15.)

## II. PLAINTIFFS AND THE COURT HAVE BEEN PREJUDICED BY THE SECRET INSPECTIONS AND THE *EX PARTE* COMMUNICATIONS BECAUSE THEY UNDERMINE THE FAIRNESS AND INTEGRITY OF THE PROCEEDINGS

Defendants contend that the standard the Court should apply in deciding whether or not to exclude their expert reports as a sanction for Defense counsel's violation of the ethical rules and Court orders is whether or not "Defendants derive[ed] any misinformation, damaging admission, or unfair benefit" from Defense counsel's actions. (Response at 5:8-10.) Defendants cite only inconclusive dicta in a footnote of a California court of appeal's decision for this standard, but, regardless, leave out a very important part of the appellate court's observation: the same sentence Defendants quote in part continues by asking in the alternative whether the violation "impacted the fairness of the trial or the integrity of the judicial system." *Cont'l Ins. Co. v. Superior Court*, 32 Cal. App. 4th 94, 111 n.5 (App. Ct. 1995); *see also Doyle v. Ill. Central Rr. Co.*, 2009 U.S. Dist. LEXIS 8917 at *20 (9th Cir. 2009) (factors to consider regarding sanctions include whether wrongdoing prejudiced party or hindered administration of justice). While Plaintiffs were clearly prejudiced by Defendants' actions and Defendants derived obvious benefits, as explained below, Defendants' ethical violations also undermined the fairness and integrity of the proceedings before this Court and the Court's ability to evaluate the evidence presented. One purpose of the adversarial process, including discovery and ethical rules, is to allow the each side to test each other's evidence so that the Court (or factfinder) can gain as objective a view as possible of the facts. Defendants' covert inspections and interviews inhibit Plaintiffs' counsel from fully exploring and testing their evidence, and

[770364-2]

8

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

1  this prejudices not only Plaintiffs, but this Court.

2  Defendants' covert actions compromised Plaintiffs' ability to fully test the validity
3  of defense experts' methods and conclusions. (Bien Decl. ¶¶ 15-16.) Mr. Bien's
4  declaration describes the manner in which Defendants' stealth tours and nonspecific joint
5  expert report obstructed Plaintiffs' counsel from developing a full record. (*Id.*) For
6  example, some of the defense experts' conclusions purport to be based on prisoner medical
7  records that they reviewed. In addition to Defendants' failure to disclose which individual
8  records their experts reviewed, even were they now identified, the medical records as they
9  existed when Defendants' experts reviewed them, between February 2012 and November
10 2012, will never exist again in the state in which the experts reviewed them. Nor will the
11 conditions at each prison visited by Defendants' experts, which were not simultaneously
12 viewed by Plaintiffs' counsel or experts.

13 By contrast, when Plaintiffs' experts toured the prisons, they were followed
14 everywhere by a group of defense attorneys and officials who were able to see everything
15 they saw. Even in the instances where Plaintiffs' counsel and their experts availed
16 themselves of the right to interview clients confidentially, defense counsel and their clients
17 were close enough at hand to learn the name and the CDCR number of the prisoner
18 interviewed. (Bien Decl. ¶ 17; Galvan Decl. Dkt. No. 4365-1 ¶¶ 3-4.) Moreover, even if
19 defense counsel neglected to keep track of who Plaintiffs' experts interviewed, Plaintiffs
20 provided a complete summary of the cases reviewed with Plaintiffs' experts' reports, in
21 contrast to Defendants' opaque expert report. Defense counsel, their clients, and their
22 experts thereby had every opportunity to review the records of those prisoners, and
23 interview those prisoners' clinicians, and the 55 witness declarations they filed with their
24 Reply shows that they, in fact, extensively exercised their ability to do so. For example,
25 one of Defendants' declarants went so far as to contest Mr. Haney's description of the odor
26 of a cell he observed during an inspection. (Reply Decl. Sanders, Docket No. 4433, ¶ 3.)
27 Defendants' covert tours robbed Plaintiffs' counsel and their experts of similar opportunity
28 to contest evidence, and to present a picture to the Court of the actual circumstances of

[770364-2]

9

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS'
EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

1   Defendants' inspections, including, for example, the actual locations visited, events that
2   were witnessed (and reported or omitted in the experts' reports), time that was spent in
3   each facility by experts, and manner in which questions were asked of staff and prisoners.
4   Defendants contend that because Plaintiffs had the opportunity to depose the experts,
5   Plaintiffs were not prejudiced by the *ex parte* communications with represented parties, or
6   by the violation of this Court's discovery orders.  This contention is false.  Plaintiffs were
7   prejudiced both in terms of prejudice to individual class members, and in terms of
8   counsel's ability defend against Defendants' termination motion.  For example, the *ex*
9   *parte* interviews deprive represented prisoners of the ability to consult with counsel
10  regarding possible jeopardy to pending criminal proceedings or appeals when they make
11  unprivileged statements to the agents of the Attorney General's office.  (Bien Decl. ¶ 15.)
12  Defendants' termination consultant on discipline and use of force testified that he would
13  not have hesitated to elicit uncounseled statements from inmates facing criminal charges.
14  (Bien Decl. Ex. 6 (Martin Dep. at 73:11-74:18).)  In terms of counsel's ability to defend
15  against the termination motion, Plaintiffs' counsel cannot possibly recreate full knowledge
16  of defense experts' year of prison inspections throughout the state through a deposition in a
17  conference room.  As detailed in Plaintiffs' Evidentiary Objections, defense experts failed
18  to even describe their methodology in their joint report, and were not able to do much
19  better in their depositions.
20          Contrary to Defendants' Response at page 8, Plaintiffs' expert tours did not violate
21  the principle that discovery should proceed with a common factual baseline.  First,
22  Defendants submit a misleading declaration that implies that defense counsel were
23  outnumbered on Plaintiffs' tours, and falsely accuses Plaintiffs' counsel of conducting *ex*
24  *parte* interviews with staff. (Vorous Decl., Docket No. 4496 ¶ 4.)  Both the implication
25  and the accusation are untrue.  (Bien Decl. ¶ 17.)  Second, Plaintiffs' experts were always
26  accompanied by multiple defense counsel and officials who observed everything Plaintiffs'
27  experts observed, including which inmates they interviewed, and took copies of every
28  document that Plaintiffs' experts asked for.  (*Id.*; Galvan Decl., Docket No. 4365-1 ¶¶ 3-4.)

[770364-2]

10

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS'
EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

Defendants had complete and contemporaneous access to the factual baseline of Plaintiffs' experts' tours.

### III. THE COURT SHOULD EXCLUDE DEFENDANTS' EXPERT REPORTS AS A SANCTION FOR THEIR IMPROPER CONDUCT

The Court has inherent power to exclude Defendants' expert evidence as a sanction for this misconduct. *Fink v. Gomez*, 239 F.3d 989, 991-92 (9th Cir. 2001) (court's inherent power is both broader and narrower than other means of imposing sanctions and extends to a full range of litigation abuses when litigant engages in bad faith or willful disobedience of court order); *Lewis v. Telephone Emps. Credit Union*, 87 F.3d 1537, 1558-59 (9th Cir. 1996) (recognizing "as part of a district court's inherent powers the broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial" including "the power to exclude testimony of witnesses whose use at trial would unfairly prejudice an opposing party") (internal quotations omitted). In *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001), the Ninth Circuit sanctioned counsel from the Idaho Attorney General's office, who "improperly acquired and used privileged and confidential litigation materials belonging to inmate litigants." *Id.* at 1122. The Court found that "Department counsel's actions in this case do not pass even the most lenient ethical 'smell test.' They knowingly disregarded advice from the bar counsel and bypassed questions of ethics in an effort to gain advantage in [the] litigation." *Id.* at 1134. Similarly, in the instant case, Defense counsel ignored decades of discovery precedent in this very case, explicit court orders about joint expert tours, violated one of the most basic rules of professional conduct (*see, e.g.*, *United States v. Lopez*, 4 F.3d 1455, 1458-59 (9th Cir. 1993)), and deliberately misrepresented their actions to Plaintiffs' counsel and the three-judge court. Defendants' weak attempt in their Response to parse their representations and behavior before the three-judge court and this Court meet the very definition of sanctionable action established by the Ninth Circuit: "[W]e hold that an attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical

[770364-2]

11

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

advantage in another case, are sanctionable under a court's inherent power." *Fink*, 239 F.3d at 994.

Exclusion of the expert reports derived from Defendants' misconduct is appropriate here, where Defendants have the option of bringing a new PLRA termination motion next year, premised upon evidence gathered in accordance with the Rules of Professional Conduct, the Federal Rules of Civil Procedure, and court orders, but Plaintiffs and the Court have no mechanism to fully ameliorate prejudice to the current proceeding caused by Defense counsel's unethical conduct.

Additionally, the Court may also sanction Defendants for costs, expenses and attorney's fees, pursuant to 28 U.S.C. § 1927, which authorizes sanctions against an attorney who "multiplies the proceedings in any case unreasonably and vexatiously." *Gomez*, 255 F.3d at 1134-35; *see also Fink*, 239 F.3d at 991.  Although Defendants illogically attempt to allocate responsibility to Plaintiffs for the additional expenditure of money and resources resulting from their bad actions, in reality, Defendants' covert operation has already resulted and likely will result in unnecessary litigation and discovery proceedings, and the waste of public funds.  Plaintiffs were forced to conduct separate expert tours at the last minute (which at least doubled the State's cost because Defendants sent counsel and client representatives on those tours), and Defendants, Plaintiffs, and the Court are now spending time and resources litigating the issue of Defendants' improper conduct.  As in *Gomez*, the conduct of the State lawyers in callously disregarding the rights of prisoner class members in this case "exemplifies antagonism toward prisoner litigation at the cost of constitutional rights and legal ethics."  255 F.3d at 1122.

### IV. DEFENDANTS' RESPONSE FAILS TO REHABILITATE THEIR EXPERTS' LACK OF RELIABLE METHODOLOGY

#### A. DEFENDANTS' EXPERTS USE "DELIBERATE INDIFFERENCE" TO STATE LEGAL CONCLUSIONS, NOT OPINIONS ABOUT ULTIMATE FACTS

Contrary to Defendants' Response at 11, their termination experts do not use the term "deliberate indifference" as a non-legal code for a factual conclusion.  Instead, they

[770364-2]

12

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

retreat to this legal conclusion whenever they encounter facts that are inconvenient for Defendants' litigation objectives. In the goal-oriented "science" of the termination experts there are no inadequacies in care, staffing or resources that can justify denying the termination motion, because all such inadequacies, no matter how severe, fall under the termination experts' vague and undefined threshold of "deliberate indifference." Instead of systemically analyzing the data that they collected, the termination experts simply made an overall review of the general shape of the data "in my head," (Bien Ex. 3 (Scott Dep. at 31:5-32:23), and it always confirms the built-in bias—no deliberate indifference.

Defendants' new declaration from Dr. Scott does not cure this obscurantist use of the term "deliberate indifference," but just makes it worse. Dr. Scott declares that the words "deliberate indifference" comprise not just a legal term, but also a specialized term of art in forensic psychiatry. (Scott Reply Decl., Docket No. 4479, ¶ 2.) He provides no definition of what this term of art means, via references to the psychiatric literature or any other means. It is just a scientific term that means something to him. Defendants attempt to compare Dr. Scott's use of the term to its use in a Sixth Circuit case, *Heflin v. Stewart County*, 958 F.2d 709 (6th Cir. 1992). In *Heflin*, the court permitted expert use of the term deliberate indifference "in the way an ordinary layman would to described such conduct," not, as Dr. Scott would have it, as an obscuring scientific term of art encompassing standards he never explains, and which conveniently maps precisely onto the legal conclusion that is the exclusive province of this Court.

**B. DEFENDANTS' RESPONSIVE BRIEF CONFIRMS THAT DEFENDANTS' TERMINATION EXPERTS HAVE NO CONSISTENT DEFINITION OF "DELIBERATE INDIFFERENCE"**

Defendants' Response is incoherent in defense of the termination experts' biased and supported conclusions. "Deliberate indifference" has as many meanings as necessary to achieve the litigation objection. On page 11 of the Response, the measure is, briefly, Dr. Scott's "very basic concept in forensic psychiatry,"—so basic apparently that he need never define it. By page 22 of the Response, what is "basic" 11 pages before is now a sliding scale, based on comparisons with other state correctional systems. Under this

[770364-2]

13

PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS

definition, as long as California is in the middle or upper tier of state systems, based on standards of comparison that are never revealed, but are made only against the handful of states that the termination experts know anything about, then the system is constitutional. This free-floating usage of the term "deliberate indifference" further confirms that it has no scientific meaning for these experts, and that their use of it is not helpful to the Court, but, rather, is a blatant attempt to cloth mere sloganeering in a pseudo-scientific disguise.

## CONCLUSION

For the foregoing reasons, as well as the reasons stated in the Plaintiffs' corrected evidentiary objections (Docket No. 4423), the Defendants' termination expert reports should be excluded. The specific sections of the non-expert declarations of Rick Johnson, Tim Belavich, Diana Toche and Laura Ceballos identified in Plaintiffs' evidentiary objections should be excluded for the reasons stated therein.

The Court should find that Defendants have failed to discharge the March 18, 2013 Order to Show Cause, in that they have failed to show cause why their expert reports should not be stricken, and based on that finding the Court should strike the Joint Report of Drs. Dvoskin, Moore and Scott (Docket No. 4275-5), and the separate report of Mr. Martin (Docket No. 4279). In addition, Defendants' response contains disturbing admissions that defense counsel orchestrated improper *ex parte* contacts with represented parties outside of the presence of counsel. In light of these admissions, the Court should issue a further Order to Show Cause directing Defendants to identify all counsel involved and why such counsel should not be sanctioned for their improper conduct.

DATED: March 26, 2013

Respectfully submitted,
ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Michael W. Bien*
Michael W. Bien

Attorneys for Plaintiffs

[770364-2]

14
PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND PLAINTIFFS' EVIDENTIARY OBJECTIONS REGARDING DEFENDANTS' EXPERT REPORTS AND DECLARATIONS