1  KAMALA D. HARRIS
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  WILLIAM DOWNER, State Bar No. 257644
   Deputy Attorneys General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-3035
    Fax:  (415) 703-5843
8   E-mail:  Patrick.McKinney@doj.ca.gov

9  *Attorneys for Defendants*

10           IN THE UNITED STATES DISTRICT COURT

11         FOR THE EASTERN DISTRICT OF CALIFORNIA

12                  SACRAMENTO DIVISION

13

14

15
   **RALPH COLEMAN, et al.,**                    2:90-cv-00520 LKK JFM PC
16
                              Plaintiffs,
17
          v.                                     **CORRECTED REPLY MEMORANDUM**
18                                               **OF POINTS AND AUTHORITIES IN**
                                                 **SUPPORT OF**
19  **EDMUND G. BROWN, JR., et al.,**            **MOTION TO TERMINATE UNDER THE**
                                                 **PRISON LITIGATION REFORM ACT**
20                            Defendants.        **[18 U.S.C. § 3626(b)] AND TO VACATE**
                                                 **THE COURT'S JUDGMENT AND**
21                                               **ORDERS UNDER FEDERAL RULE OF**
                                                 **CIVIL PROCEDURE 60(b)(5)**
22

23                                               Date:      March 27, 2013
                                                 Time:      1:30 p.m.
24                                               Dept:      4
                                                 Judge:     The Honorable Lawrence K.
25                                                          Karlton

26                                               Action Filed:  1990

27

28

# TABLE OF CONTENTS

**Page**

I.    Introduction. ...................................................................................................... 1

II.   The termination motion proved that the state meets inmates' serious mental
      health needs. ..................................................................................................... 3

      A.    California has implemented a comprehensive prison mental health
            care system that exceeds all constitutional requirements.......................... 3

      B.    Additional significant accomplishments of the state's mental health
            program in 2012 & 2013. ........................................................................... 6

III.  Plaintiffs misstate the burden: the PLRA places the burden on the party
      seeking to perpetuate court intrusion into state prison management. ................... 7

IV.   Plaintiffs' novel theory of systemic deliberate indifference fails. ........................ 9

      A.    Plaintiffs misinterpret and misapply the deliberate-indifference
            standard. ................................................................................................. 11

      B.    Compliance with the program guide is not the constitutional
            standard. ................................................................................................. 12

      C.    Changed factual circumstances require the court to vacate the
            injunction. .............................................................................................. 13

V.    All credible evidence proves that the state meets inmates' serious mental
      health needs. ................................................................................................... 14

      A.    Plaintiffs' expert's opinions should be disregarded. ............................... 14

      B.    Plaintiffs present no evidence showing constitutional inadequacies
            in screening and identifying inmates who need mental health care.......... 16

      C.    The state provides an appropriate continuum of services to inmates
            with serious mental illness. ..................................................................... 17

            1.    The State's Inmates Are Not Languishing. .................................... 18

            2.    The State Provides Appropriate, Safe Care to Inmates in
                  Mental Health Crisis. .................................................................... 18

            3.    Plaintiffs' Allegations of "Persistent Waitlists" for DSH
                  Treatment Are Not Supported by Evidence. ................................... 19

            4.    San Quentin's Condemned Inmates Receive Adequate and
                  Appropriate Mental Health Care. ................................................... 21

      D.    California provides appropriate care to its inmates with mental
            health care needs. .................................................................................... 26

            1.    The State's Prison Mental Health Care System Is Meeting
                  the Mental Health Care Needs of Mentally Ill Inmates. ............... 26

            2.    Plaintiffs' Offered No Evidence or Argument Regarding the
                  State's Quality Management Program. ........................................... 29

      E.    The state provides adequate treatment space and treatment across
            all custody levels. ................................................................................... 29

            1.    Plaintiffs' Claims About Lack of Confidential Treatment
                  Space Are False. ........................................................................... 30

i

**TABLE OF CONTENTS**
(continued)

Page

2. The State's Use of Unlicensed Facilities to Provide Inpatient Care Is Appropriate. ....................................................... 31

3. Experts on Both Sides Agree that the Use of Therapeutic Treatment Modules Is Appropriate. ............................................. 31

F. Plaintiffs failed to rebut the evidence showing that the state has an appropriate medication management system in place............................. 32

1. Plaintiffs' "Concern" About Whether Nurses Are Knowledgeable About Side Effects Does Not Raise a Question of Systemic Deliberate Indifference. ........................... 34

2. None of Plaintiffs' Remaining "Problems" Are of Constitutional Concern or Require Continued Federal Court Oversight of Medication Management........................................... 34

   a. Plaintiffs Fail to Raise a Constitutional Question With Respect to the Special Master's Measure of "Medication Noncompliance.".......................................... 35

   b. Plaintiffs Did Not Prove that the State's Laboratory Testing Orders Violate the Constitution. ........................ 36

   c. Plaintiffs' Claims About Abnormal Involuntary Movement Scale (AIMS) Testing Do Not Present a Constitutional Issue............................................................ 37

   d. Plaintiffs' Unsupported Claims About Lack of Informed Consent Must Be Rejected. .............................. 37

   e. Plaintiffs' Unsupported Claims About Lack of Medication Renewals Must Be Rejected. ......................... 37

   f. The State's Efforts to Improve Its Medical Facilities Are Not Evidence of a Constitutional Deficiency............. 38

3. Plaintiffs' Failed to Rebut the Evidence that the State Maintains Accurate, Complete, and Confidential Mental Health Records. ............................................................................. 38

G. California's suicide-prevention program meets the constitutional standard. ......................................................................................... 40

   a. Defendants' Suicide Prevention Measures Far Exceed The Basic Requirements of the Constitution........ 41

      (1) Suicide Prevention and Response. ....................... 42

      (2) Suicide Reporting Procedures. ............................ 46

   b. California Successfully Prevents Hundreds of Suicide Attempts And Intervenes To Provide Crisis Care To Thousands Of Inmates Each Year...................... 47

   c. Suicide Rate Is Not the Litmus Test to Assess the Constitutionality of California's Mental Health Program. ........................................................................ 49

ii

# TABLE OF CONTENTS
(continued)

Page

d.   The Suicide-Rate Comparisons in the Special Master's Reports Are Misleading, and Overlook Other Causal Factors. ........................................ 50

3.   The Special Master's 2011 and 2012 Suicide Reports Are Not Evidence Of Systemic Deliberate Indifference To A Risk of Suicide. ......................................... 51

a.   The Special Master's 2011 and 2012 Suicide Reports Concede That The Vast Majority Of Suicides Were Not Foreseeable And Therefore Defendants Cannot Have Been Deliberately Indifferent To A Risk Of Suicide ....................... 52

b.   The Special Master's 2011 and 2012 Suicide Reports Do Not Demonstrate Deliberate Indifference. ........................................ 53

(1)   Failure to Refer Inmates to Higher Levels of Care ............................................. 53

(2)   Completion of Suicide Risk Evaluations .............. 56

(3)   Purported Emergency Response Errors ................ 58

(4)   Problems with 30-Minute Welfare Checks .......... 59

(5)   In Instances Where the Department Finds a Problem with its Suicide Prevent Process, it Diligently Implements Corrective Action. ........... 60

a.   Defendants have not ignored the Special Master's Recommendations. ......................................... 62

c.   Plaintiffs' Remaining Arguments Also Do Not Establish an Ongoing Constitutional Violation. ............... 64

H.   Plaintiffs failed to demonstrate that the care provided to inmates housed in segregation violates the eighth amendment. ......................... 64

1.   The State Appropriately Treats Inmates Housed in Administrative Segregation for Non-Disciplinary Reasons. ......... 67

2.   The Eighth Amendment Does Not Recognize a Particular Length of Stay in Segregated Units. .............................. 72

3.   The Eighth Amendment Does Not Require a Particular Housing Placement Following Discharge from a Crisis Bed or Department of State Hospitals Facility. .................................. 74

4.   The State's 30-Minute Welfare Check Policy For All Inmates in Administrative Segregation Exceeds Constitutional Requirements. ........................................ 75

5.   The State Provides Constitutional Care in the Its Security Housing Units. ........................................ 77

iii

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

I.    Plaintiffs failed to demonstrate any pattern or practice of unnecessary or excessive use of force against the coleman class, or any violation of a federal right in the disciplinary process. ...................... 79

4

5

1.    Plaintiffs Failed to Demonstrate a Constitutional Violation Regarding Use of Force. ............................................... 79

6

2.    The State Appropriately Considers and Accommodates Mental Health in the Disciplinary Process. ................................. 81

7

VI.    Plaintiffs failed to demonstrate any systemic violation of a federal right regarding the care provided by the department of state hospitals. ...................... 82

8

A.    There are no "severe clinical staffing shortages" affecting the quality of care provided to dsh patients. ..................................... 82

9

B.    DSH has appropriate medical records and medication management. ........ 84

10

VII.    Plaintiffs failed to establish that the state is not providing adequate mental health care at the current population density ....................................... 84

11

VIII.    The state has implemented a durable and sustainable remedy and further federal court oversight is contrary to law ............................................... 88

12

IX.    Conclusion. .................................................................................... 89

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Balla v. Idaho State Bd. of Corrs.*
5        595 F. Supp. 1558 (D. Idaho 1984)..................................................................40, 41

6
*Belcher v. Oliver*
7        898 F.2d 32 (4th Cir. 1990)...........................................................................42

8
*Benjamin v. Jacobson*
        172 F.3d 144 (2d Cir. 1999)...........................................................................9
9

*Boncher v. Brown County*
10        272 F.3d 484 (7th Cir. 2001) (Posner, J.) ......................................................49, 51

11
*Brown v. Plata*
12        131 S. Ct. 1910 (2011) ..............................................................................passim

13
*Cagle v. Hutto*
        177 F.3d 253 (4th Cir. 1999).........................................................................9
14

*City of Canton v. Harris*
15        489 U.S. 378 (1989)................................................................................12, 89

16
*Clouthier v. County of Contra Costa*
17        591 F.3d 1232 (9th Cir. 2010) ......................................................................41

18
*Colburn v. Upper Darby Township*
        946 F.2d 1017 (3rd Cir. 1991).......................................................................52
19

*Coleman v. Wilson*
20        912 F. Supp. 1282 (E.D. Cal. 1995)..............................................................passim

21
*Cook v. Sheriff of Monroe Cty, Florida*
22        402 F.3d 1092 (11th Cir. 2005)......................................................................52

23
*Edwards v. Gilbert*
        867 F.2d 1271 (11th Cir. 1989)......................................................................42
24

*Estelle v. Gamble*
25        429 U.S. 97 (1976)...................................................................................54

26
*Farmer v. Brennan*
27        511 U.S. 825 (1994) ...........................................................................11, 53, 55

28

v

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Frake v. City of* Chicago
    210 F.3d 779 (7th Cir. 2000).............................................................. 61

4

*Gilmore v. California*
    220 F.3d 987 (9th Cir. 2000)........................................................ 8, 9, 88

5

6

*Graves v. Arpaio*
    623 F.3d 1043 (2010)...................................................................... 8, 9

7

*Gray v. City of Detroit*
    399 F.3d 612 (6th Cir. 2005)............................................................. 40

8

9

*Hallett v. Morgan*
    296 F.3d 732 (9th Cir. 2002)........................................................... 8, 58

10

*Hallett v. Morgan*
    296 F.3d 743-45 (9th Cir. 2002) ....................................................... 8, 9

11

12

*Horne v. Flores*
    557 U.S. 433 (2009)................................................................ 13, 14, 88

13

14

*In Re Long Term Administrative Segregation of Inmates Designated As Five Percenters*
    174 F.3d 464 (4th Cir. 1999)............................................................. 66

15

16

*Jackson v. McIntosh*
    90 F.3d 330 (9th Cir. 1996)........................................................... 54, 55

17

18

*Lewis v. Casey*
    518 U.S. 343 (1996).......................................................................... 30

19

*Liebe v. Norton*
    157 F.3d 574 (8th Cir. 1998)........................................................ 53, 58

20

21

*Loyd v. Ala. Dep't of Corr.*
    176 F.3d 1336 (11th Cir. 1999)............................................................. 9

22

23

*Madrid v. Gomez*
    889 F. Supp. 1146 (N.D. Cal. 1995) ................................................ 15, 66

24

*Madrid v. Schwarzenegger*
    No. C 90-3094 TEH (N.D. Cal.) ......................................................... 88

25

26

*Manarite v. City of Springfield*
    957 F.2d 953 (1st Cir. 1992)............................................................ 42

27

28

### TABLE OF AUTHORITIES
#### (continued)

**Page**

*Mayweathers v. Newland*
258 F.3d 930 (9th Cir. 2001)........................................................................ 8, 9

*Molton v. Cleveland*
839 F.2d 240 ........................................................................................... 42

*Orr v. Larkins*
610 F.3d 1032 (8th Cir. 2010)....................................................................... 66

*Perez v. Brown*
No. C 05-05241 JSW (N.D. Cal.) ................................................................... 88

*Perez v. Oakland County*
380 F. Supp. 2d 830 (E.D. Mich. 2005).................................................... 41, 49

*Pierce v. County of Orange*
526 F.3d 1190 (9th Cir. 2008)........................................................................ 8

*Popham v. City of Talladega*
908 F.2d 1561 (11th Cir. 1990)..................................................................... 52

*Redman v. County of San Diego*
942 F.2d 1435 (9th Cir. 1991)...................................................................... 11

*Rellergert v. Cape Girardeau Cty, Missouri*
924 F.2d 794 (9th Cir. 1991)............................................................. 17, 41, 49

*Rufo v. Inmates of the Suffolk Cty. Jail*
502 U.S. 367 (1992)................................................................................... 14

*Sanchez v. Vild*
891 F.2d 240 (9th Cir. 1989).................................................................. 54, 55

*Shapley v. Nv. Bd. of State Prison Comm'rs*
766 F.2d 404 (9th Cir. 1985)....................................................................... 58

*Simmons v. Navajo County, Ariz.*
609 F.3d 1011 (9th Cir. 2010)...................................................................... 41

*Strickler v. McCord*
306 F. Supp. 2d 818 (N.D. Ind. 2004) ........................................................... 40

*Taylor v. Mich. Dept. of Corr.*
69 F.3d 76 (6th Cir. 1995)........................................................................... 30

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3

*Tittle v. Jefferson Cty. Comm'n*
    10 F.3d 1535 (11th Cir. 1994) ............................................................. 41

4

5

*Torraco v. Maloney*
    923 F.2d 231 (1st Cir. 1991) ................................................................ 52

6

*Turner v. Safley*
    482 U.S. 78 (1987) ............................................................................... 62

7

8

*Whitley v. Albers*
    475 U.S. 312 (1986) ............................................................................. 62

9

10

*Whitt v. Stephens Cty*
    529 F.3d 278 (5th Cir. 2008) ................................................. 53, 58, 59

11

STATUTES

12

18 U.S.C. § 3626(b) .......................................................................... 8, 9

13

18 U.S.C. § 3626 (b)(1) ......................................................................... 7

14

18 U.S.C. § 3626(b)(3) ...................................................................... 7, 10

15

Cal. Pen. Code § 3600(b)(4) ................................................................. 24

16

CONSTITUTIONAL PROVISIONS

17

Eighth Amendment ...................................................................... passim

18

United States Constitution ..................................................................... 7

19

COURT RULES

20

Federal Rule of Civil Procedure 60(b)(5) ..................................... 9, 13, 14

21

22

23

24

25

26

27

28

Type Footer Info Here 2 («Matter Primary Court Case #»)

## I.   INTRODUCTION.

In the more than seventeen years of federal monitoring, California has invested tremendous amounts of money, resources, and effort to transform its prison mental health care system into one of the best in the country.  In just the last few years alone, the State has invested more than a billion dollars to build further mental health care facilities and other prison capacity to provide timely and effective care to the State's inmates.  Moreover, the State has implemented a myriad of systems to evaluate the mental health care needs of inmates, and provide them with whatever level of care they require.  The State employs over 1,700 psychiatrists, psychologists, therapists, social workers, licensed psych techs, and nurses, all of whom work in close coordination with custody staff, to provide effective treatment to mentally ill inmates.  The reality is that California's inmates receive as good or better mental health care than inmates in any other state.

Yet Plaintiffs ignore the comprehensive system the State has put in place, and speciously proclaim that the State is deliberately indifferent to the mental health needs of its inmates.  They ignore the fact that the State screens and evaluates inmates for serious mental illness; provides appropriate diagnoses, administration, and supervision of inmate-patients on psychiatric medication; and maintains accurate mental health treatment records.  They fail to acknowledge that the State has fully implemented programs to identify, treat, and supervise inmates at risk for suicide.  Or that the State has implemented a durable quality-management system, including continuous and critical self-evaluation to identify issues and further improve the system.  It simply defies any common sense that a state that dedicates as much money and resources to treat mentally ill inmates as California does, could at the same time be indifferent to their needs.  Yet that is exactly Plaintiffs' argument.

And the notion that the thousands of prison officials, doctors, therapists, nurses, and other care providers are deliberately indifferent to the needs of the mentally ill inmates they care for every day is not only utter nonsense, but offensive.  Instead of vilifying these hardworking and dedicated professionals, they should be praised for the difficult and important work they perform.

Plaintiffs make generalizations about the system as a whole based on little more than hyperbolic misrepresentations, anecdotes from inmates, and a few isolated cases from among the

1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

more than 32,000 inmate-patients receiving appropriate care.  These types of arguments do not withstand scrutiny, and provide no basis to perpetuate this case any longer.[1]

The special master's reviews are just as unfair because rather than assess the State against the constitutional standard of deliberate indifference, he scrutinizes whether the State has achieved full compliance with every aspect of a comprehensive set of prison policies detailing every aspect of the mental health care system.  He criticizes prison officials for less-than-perfect form-completion skills, meeting attendance, and other matters that have no impact on the quality care inmates receive.  Even worse, he exaggerates these minor imperfections into matters of monumental significance.  Then he denounces the State for not implementing every last one of his recommendations.  But—just like Plaintiffs—he ignores the multitude of recommendations and improvements the State has, in fact, implemented.  And he seems unaware that some of his so-called recommendations are simply that he be allowed to continue monitoring.

Plaintiffs' voluminous opposition puts forth a slanted theory of deliberate indifference that seeks to hold California to a standard higher than any known to the Constitution or American corrections.  But perfection, of course, is not the legal standard.  Rather, for this case to persist, Plaintiffs must prove systemic deliberate indifference to the treatment needs of inmates with serious mental illness—*that* is the legal standard.  But the State's robust, multi-faceted prison mental health system is the very antithesis of deliberate indifference.  In light of the tremendous

---

[1] This evidence is presented in the 32 declarations submitted by the Custody and Mental Health staff from each of the 10 institutions Plaintiffs visited: (1) ***California Correctional Institution*** – Warden Kim Holland, Chief of Mental Health William Walsh, Dr. Morgan Jensen, and Captain Sanders; (2) ***California Correctional Women's Facility*** – Warden Johnson, Chief Psychologist Lori Williams, Jonathan Harry (Psychiatrist), and Katherine Hudson (Director of Nursing); (3) ***California Institution for Men*** – Warden Brenda M. Cash & Chief of Mental Health Victor Jordan; (4) ***Corcoran*** – Warden Connie Gipson and Dr. Robert Fischer (Acting Chief Psychologist); (5) ***Los Angeles County*** – Warden John Soto and Chief of Mental Health Christopher Cornell; (6) ***Mule Creek State Prison*** – Chief Deputy Warden Joe Lizarraga, Chief of Mental Health James Telander, and Chief Psychiatrist Jeremy Colley; (7) ***RJ Donovan*** – Warden Daniel Paramo and Chief Psychologist Heather Greenwald; (8) ***Sacramento*** – Warden Tim Virga and Chief Psychologist Shama Chaiken; (9) ***San Quentin*** – Warden Kevin Chapell and Chief of Mental Health Eric Monthei; and (10) ***Salinas Valley State Prison*** – Warden Randolf Grounds, Dr. Schneider (Chief of Mental Health), H. Gabeler (Director Nursing – Emergency Response), Dr. Howe (DSH Coordinator), Dr. Card (Senior Psychologist Supervisor – SPR FIT), Dr. Douglass Beatty, Captain M. Atchley (Administrative Segregation Unit), C. Shytle (LPT Supervisor), and E. Force (Regional Administrator).

2

Reply Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

improvements that have been made, and the comprehensive system that is now in place, continued micromanagement by the special master over every aspect of the State's prison mental health policies violates federal law and principles of federalism.  After more than 17 years of federal court monitoring, it is now time for this case to end.

## II.    THE TERMINATION MOTION PROVED THAT THE STATE MEETS INMATES' SERIOUS MENTAL HEALTH NEEDS.

### A.    California Has Implemented a Comprehensive Prison Mental Health Care System that Exceeds All Constitutional Requirements.

In the termination motion, the State set forth both the necessary facts and opinion evidence establishing that California's correctional mental health care system exceeds constitutional requirements regarding the six basic components identified by the *Coleman* Court.  (*See* Defs.' Mot. to Terminate, ECF No. 4275, et seq., [Motion].)  The motion also established that the State and its officials are in no way deliberately indifferent to inmates' serious mental health needs.  Through the Declarations of Diana Toche, Tim Belavich, Laura Ceballos, Chris Meyer, and Rick Johnson, and the reports of experts in psychiatry, clinical psychology, nursing, and custody/use of force,[2] the State's evidence demonstrated that all necessary elements have been satisfied:

(1) *Appropriate Screening & Evaluation*.  The State has successfully implemented a comprehensive system with standardized forms for screening and evaluating inmates with mental health issues upon admission, readmission, or transfer.  (Motion at 16-17; Belavich Decl., ¶¶ 5, 9-11 & 17 & Ex. 1; Ceballos Decl. ¶ 5; Clinical Exp. Rept. at 1, 8, 10-25 & 39.)  The State has also implemented clinical care tools—the Internet-based Mental Health Tracking System (MHTS.net) and Patient Registries—that allow meaningful tracking of screening and evaluation.  Plaintiffs make no argument that the State's system for evaluating and placing inmates into the CCCMS

---

[2] The State's declarations and reports submitted with the termination motion will be referred to throughout this reply as follows: (1) Declaration of Diana Toche, ECF No. 4275-3 ("Toche Decl."); (2) Declaration of Tim Belavich, ECF No. 4277 ("Belavich Decl."); (3) Declaration of Laura Ceballos, ECF No. 4275-2 ("Ceballos Decl."); (4) Declaration of Chris Meyer, ECF No. 4278 ("Meyer Decl."); (5) Declaration of Rick Johnson, ECF No. 4276 ("Johnson Decl."); (6) *Clinical Evaluation of California's Prison Mental Health Services Delivery System* by Dvoskin, Moore, and Scott, ECF No. 4275-5 ("Clinical Exp. Rpt."); and (7) Report of Defendants' Expert Steve J. Martin, ECF No. 4279 ("Martin Exp. Rpt.").

3

1  and EOP programs[3] is in any way inadequate.  Since Plaintiffs have conceded this issue, all

2  monitoring of this issue should immediately cease.  Plaintiffs' "concern" about the State's effort

3  to improve its screening tools is addressed in Section V.B.

4      (2) *Access to Care*.  The State timely and appropriately delivers inpatient and outpatient

5  care to its inmate-patients.  (Motion at 17-18; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 5-16 & Exs. 2

6  & 3; Johnson Decl. ¶¶ 5-13 & Exs. 2 & 3; Ceballos Decl. ¶¶ 4-6; Clinical Exp. Rpt. 1-2, 8, 11-25,

7  & 39; Martin Exp. Rpt. at 10 & 13-15.)  The State systematically oversees access to care using a

8  number of tools, including MHTS.net, Patient Registries, the Patient Health Information Portal,

9  the Strategic Offender Management System, and the Health Care Scheduling and Tracking

10  System.

11      (3) *Adequate Mental Health Staffing & Quality Management Programs*.  The dedicated and

12  hard-working mental health professionals employed by the State deliver quality health care to the

13  *Coleman* class.  (Motion at 18-19; Toche Decl. ¶¶ 6-10; Belavich Decl. ¶¶ 18-20 & Ex. 4;

14  Clinical Exp. Rpt. 1-2 & 30.)[4]  The State also has a comprehensive extensive quality-management

15  program, both at headquarters and in each institution.  (Motion at 19.)  As discussed in the

16  attached declarations, at each institution Plaintiffs visited and questioned the adequacy of staffing,

17  the staff has confirmed that they have the staff and program space necessary to provide adequate

18  care.

19      (4) *Accurate, Complete, and Confidential Mental Health Records*.[5]  Electronic Unit Health

20  Records are used in every prison, and mental health staff have been trained to use and maintain

21

22      [3] The State comprehensively provides inmates with mental health care services at three
levels of care: (1) the Correctional Clinical Case Management System ("CCCMS") (outpatient
clinic services for stable inmates functioning in the general population); (2) the Enhanced
Outpatient Program ("EOP") (separate housing units and structured activities for inmates who
experiences adjustment difficulties in a general population setting); and (3) Mental Health Crisis
Bed placement ("MHCB") (24-hour services for conditions that require short-term inpatient care
to ameliorate mental health symptoms).

25      [4] As discussed in the Motion, the *Plata* receiver is responsible for recruiting and hiring
CDCR's mental health professionals.  (Motion at 18; ECF No. 2247.)

27      [5] The *Plata* receiver is also responsible for medical records in the state prisons (ECF No.
2247 at 7), and made the decision to implement an electronic Unit Health Record rather than a
true electronic medical record.  In April 2012, the receiver issued a Request for Proposal for an
(continued…)

the electronic records.  (Motion at 19-20; Belavich Decl. ¶ 21; Receiver's 19th Rep., *Plata* ECF No. 4145-1 at 20; Special Master's 24th Monitoring Rep., ECF No. 4205, at 17; Clinical Exp. Rpt. at 28.)  Department of State Hospitals (DSH) clinicians also have access to the Electronic Unit Health Record as appropriate, including training by the receiver's office.  (Decl. Kathy Gaither Supp. Reply ¶¶ 11 & 12.)  Any DSH clinician who requests access will receive a user name and password and can access inmate-patient records like any CDCR clinician.  (*Id.*)

(5) *Appropriate Prescription, Administration, and Monitoring of Psychiatric Medication*. The Motion established that the State's prison medication management program now meets the standard of care for correctional mental health care systems, and "many facilities surpass the community standard of care in their medication management approach."  (Clinical Exp. Rpt. at 27; *see also id.* at 26-29; Toche Decl. ¶ 10; Belavich Decl. ¶ 22 & Ex. 6.)  The State monitors medication management through the Medication Administration Process Improvement Plan (MAPIP), an innovative auditing tool that "exceeds the standard of care requirements generally found in the community."  (Clinical Exp. Rept. at 1 & 28; Decl. Charles Scott Supp. Reply ¶ 4.) The MAPIP tool was developed in collaboration between CDCR, the receiver, and the special master and his experts.

(6) *Appropriate Program to Identify, Treat, and Supervise Inmates at Risk for Suicide*.  The State has implemented a robust suicide prevention program, including a detailed suicide risk evaluation protocol and process; training; suicide prevention committees that meet regularly at each institution; and a process to thoroughly investigate and timely report on completed suicides and serious suicide attempts.  (Motion at 21-23; Toche Decl. ¶ 10; Belavich Decl. ¶¶ 23-30; Special Master's 24th Round Monitoring Rep., ECF No. 4205 at 40; Clinical Exp. Rpt. at 2, 15, & 31-32.)

---

(…continued)
Electronic Medical Record Project.  (*See* http://www.cphcs.ca.gov/docs/projects/EMR_RFP12-009-ITS-20120420.pdf.)

5

(7) *Heightened Safeguards to Ensure that Inmates with Mental Illness Are Not Subjected to Unnecessary and Excessive Use of Force, and to Reasonably Accommodate Mental Health Status in the Disciplinary Process.*  There is no pattern or practice of unnecessary or excessive force in CDCR against inmates with serious mental illness.  (Motion at 23-24; Belavich Decl. ¶ 32; Martin Exp. Rpt. 11 & 13.)  Moreover, nearly every institution has a dedicated Use of Force Coordinator, and a dedicated Rule Violation Report Coordinator to monitor the institutions' practices, and take corrective action if necessary.  (Decl. K. Allison Supp. Reply ¶ 21.)

**B.    Additional Significant Accomplishments of the State's Mental Health Program in 2012 & 2013.**

In addition to establishing a mental health treatment system that this Court should recognize as a model, the State has accomplished a large number of innovations that demonstrate the commitment and quality of the statewide program.  In 2013, the State has already:

- Finalized a quality-improvement audit tool with the special master;

- Developed and completed a statewide training for trainers on suicide risk assessment;

- Activated new treatment and office space for Enhanced Outpatient Program inmates at the California Medical Facility;

- Received accreditation from the Joint Commission for the 45-bed Psychiatric Inpatient Program at the California Institution for Women;

- Created a shared calendar system that integrates MHTS.net and the Strategic Offender Management System; and

- Developed a new suicide prevention workgroup at headquarters.

(Belavich Reply Decl., ¶¶ 6-16 & Ex. A.)

In 2012, the accomplishments of the Statewide Mental Health Program include:

- Secured full authority to implement the 2009 staffing plan;

- Began admitting patients to the Psychiatric Inpatient Program at the California Institution for Women (Meyer Decl. Supp. Defs.' Mot. Terminate, ECF No. 4278, ¶ 12 & Exs. 11 & 12);

- Constructed a $33.7 million 64-bed Intermediate Care Facility at the California Medical Facility, which opened in February 2012 (*id.* at ¶ 7 & Ex. 6);

- Successfully implemented the "sustainable process," which reduced significantly the wait times to transfer patients to intermediate psychiatric care.  The State also

6

reorganized its structure at headquarters, including adding Regional Managers to ensure the durability of the sustainable process;

• Developed the Medication Administration Process Improvement Plan (MAPIP), an innovative medication management monitoring tool;

• Completed collaboration training between custody and mental health staff to further improve access to care;

• Implemented directives regarding the use of alternative housing and outpatient housing units, and implemented a system to track and monitor alternative and outpatient housing usage; and

• Implemented updated policy mandating daily follow-up care for the first five days for all inmates discharged from Department of State Hospitals acute or intermediate care facilities.

(Belavich Reply Decl. ¶¶ 6-16 & Ex. A.)  Additional accomplishments of the statewide mental health program over the last five years are discussed in detail in the Declaration of Dr. Belavich.

In light of the clear and convincing evidence that the State is providing timely and appropriate mental health care to its prison inmates, including the innovative accomplishments discussed above, any argument that the system falls below the minimal standards required by the United States Constitution is patently meritless.  The State addresses those arguments made by the Plaintiffs in this matter, the majority of which reflect Plaintiffs' disagreement that society has chosen to permit criminal offenders with serious mental illness in prison.  None of them reflect deliberate indifference by the State or, indeed, any violation of a federal right against inmates with serious mental illness.

**III.   PLAINTIFFS MISSTATE THE BURDEN: THE PLRA PLACES THE BURDEN ON THE PARTY SEEKING TO PERPETUATE COURT INTRUSION INTO STATE PRISON MANAGEMENT.**

After more than 17 years of costly and intrusive monitoring and micromanagement under the Court's structural reform injunction, Plaintiffs have the burden of showing that Defendants' statewide prison mental health system is so deficient that it violates their Eighth Amendment right to be free from cruel and unusual punishment.  The PLRA's plain language requires the party seeking termination merely to establish the requisite passage of time.  18 U.S.C. § 3626 (b)(1).  Then, the burden of proof shifts to the plaintiffs to demonstrate that prospective relief "remains necessary to correct a current and ongoing violation of the Federal right" and that the prospective

7

relief is "narrowly drawn and the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3) (emphasis added).

Ninth Circuit caselaw, at least in part, reiterates that the PLRA places the burden on plaintiffs to demonstrate that they are entitled to prospective relief—regardless of whether they are initially seeking prospective relief or seek to continue it after a termination motion is filed. *Hallett v. Morgan*, 296 F.3d 743-45 (9th Cir. 2002) (affirming denial of motion to extend relief under consent decree absent proof of current and ongoing violation of a federal right); *Mayweathers v. Newland*, 258 F.3d 930, 936 (9th Cir. 2001) (requiring the party seeking prospective relief to prove current and ongoing constitutional violations).  *But see Pierce v. County of Orange*, 526 F.3d 1190, 1206 n.16 (9th Cir. 2008) (acknowledging tension with two cases that place the burden on defendants to demonstrate no ongoing violation: *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000) and *Graves v. Arpaio,* 623 F.3d 1043, 1048 (2010)).

Plaintiffs incorrectly contend that Defendants cannot rely on the Ninth Circuit's decisions in *Hallett* or *Mayweathers* because those cases decided the plaintiffs' motions for relief rather than termination motions.  (Opp'n 11.)  Such a distinction is immaterial.  Both the standard and the burden under the PLRA are the same whether a party seeks to obtain prospective relief or extend existing prospective relief.  *Hallett*, 296 F.3d at 743-744 ("The quoted standard for termination does not differ materially from the standard to be applied in deciding whether relief is proper.  To prevail on their motion to extend jurisdiction, *Plaintiffs* must establish that the prospective relief 'extends no further than necessary to correct the violation of' their Eighth Amendment rights.") (emphasis added).  The burden is on the party seeking to impose or extend relief irrespective of whether it is affirmatively sought in a motion for prospective relief or its extension advocated in a motion to terminate.  *Mayweathers*, 258 F.3d at 936 (stating that the imposition of the burden of proof on the party seeking a preliminary injunction under the PLRA "conforms with how the PLRA governs the termination of final prospective relief.") (citing to 18 U.S.C. § 3626(b).

*Hallett* and *Mayweathers* are in line with other circuits' decisions that the burden is on

8

plaintiffs to establish a current and ongoing violation, regardless of whether they ask for initial prospective relief or its continuation.  (*See* Termination Mot. at 11:22-13:4 [citing nine out-of-circuit cases demonstrating that the majority of courts that have addressed this issue assign the burden of proof to the party opposing termination].)  Plaintiffs wrongly complain that Defendants unfairly cite three circuit decisions to support their argument that the burden is on Plaintiffs: *Benjamin v. Jacobson*, 172 F.3d 144 (2d Cir. 1999); *Loyd v. Ala. Dep't of Corr.*, 176 F.3d 1336 (11th Cir. 1999); and *Cagle v. Hutto*, 177 F.3d 253, 258 (4th Cir. 1999).  Each of these decisions provided the plaintiffs an opportunity to present evidence because of the implied recognition that the relief would terminate unless evidence was presented.  It stands to reason that if a party will not retain the relief they seek without providing evidence, that party has the burden of proof.  This is consistent with the PLRA's plain language, which makes a case terminable two years after relief is imposed unless the Court makes findings of a current and ongoing violation of a constitutional right.  18 U.S.C. § 3626(b).

Plaintiffs contend that the holdings in *Gilmore* and *Graves* should control (Opp'n 11), but both of those decisions lack the clear reasoning that is expressed in *Hallett*, *Mayweathers*, and the other circuits.  For instance, *Gilmore* held that, like the modification provisions of Federal Rule of Civil Procedure 60(b)(5), "nothing in the termination provisions [of the PLRA] can be said to shift the burden of proof."  220 F.3d at 1007.  But Gilmore cited no authority to support the conclusion that the PLRA's drafters intended the termination provisions to be subject to the same assignment of burden as Rule 60(b)(5).  *Id.*  Indeed, the legislative history of the PLRA suggests the opposite.  See H.R. Rep. No. 104-21, at 25 (1995) ("in order to continue to receive relief beyond a two-year period, the need for continued remedies to alleviate actual violations of federal rights must be proven") (emphasis added).

This Court should follow the well-reasoned decisions in *Hallett*, *Mayweathers*, and the other circuits. By placing the burden on plaintiffs to demonstrate a current, ongoing violation that could justify continued intrusion into state functions, those decisions properly account for the PLRA's plain language and its purpose.

9

**IV.    PLAINTIFFS' NOVEL THEORY OF SYSTEMIC DELIBERATE INDIFFERENCE FAILS.**

As discussed above and in the termination motion, California provides care to inmates with serious mental illness that meets or exceeds the minimum requirements of the Eighth Amendment.  The facts demonstrate that the State has not only remedied the objective systemic deficiencies identified by this Court, but is taking proactive actions to continually improve prison mental health care.

Faced with the evidence, Plaintiffs advance spurious and nonsensical arguments that the State and its experts "have lost sight of the systemic deliberate indifference in this case." (Opp'n at 5.)[6]  For example, on pages 16-19 of the Opposition, Plaintiffs argue that the State should have requested its experts to opine on population density, and should have examined the evidence relied upon by the Three-Judge Court, which is outdated by at least five years.  The reports submitted by the State's experts make clear that they were asked to provide their observations and opinions about the *current* adequacy of California's prison mental health care system.  (*See* Clinical Exp. Rpt. at 1; S. Martin Exp. Rpt. at 1; *see also* 18 U.S.C. § 3626(b)(3) [prospective relief shall terminate unless the court "makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right"].)  By definition, if mental health care is systemically adequate, the population density cannot be the primary cause of constitutionally inadequate mental health care since that condition does not exist.

The State's experts thoroughly evaluated California's prison mental health care system, including multiple site visits to CDCR institutions, meetings with mental health leadership and institutional mental health and custody staff, reviews of medical records and clinical tools (including the electronic Unit Health Record, the Mental Health Tracking System, and the MAPIP medication monitoring tool), and reviews of quality improvement meeting minutes and documents.  (Clinical Exp. Rpt. at 8-9.)  In addition, before realignment, the special master and

---

[6] Plaintiffs' unsupported and unsubstantiated attacks on the experts' methodology are addressed in further detail throughout this reply and in the accompanying response to the Court's Order to Show Cause and Plaintiffs' Objections to Evidence.

10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

his team went to 14 prisons and did not find inmates languishing.  Contrary to Plaintiffs'

contention that the State's experts should have gone to each prison, the experts selected a

representative sample, which is "a common practice in social science."  (McKinney Reply Decl.

Ex. 1 [Dvoskin Depo.] 184:13-188:14; *see also id.* Ex. 2 [Martin Depo.] 31:14-33:9, 3 [Scott

Depo.] 30:13-23, 35:5-37:25 & Ex. 4 [Moore Depo.] 138.1-2.)[7]  And despite Plaintiffs'

protestations that the experts ignored risks to inmates whose needs were not identified because of

staffing and resource concerns, the experts thoroughly examined whether inmates' mental health

needs where identified both through site visits and reviews of data from CDCR and the Special

Master.  (Clinical Exp. Rpt. at 11.)  Moreover, on the basis of their review, the experts concluded

that CDCR's mental health delivery system "diligently and successfully identifies inmates with

serious mental disorders upon reception into the CDCR and during inmates' subsequent

incarceration," and "refers inmates identified with serious mental disorders for appropriate

psychiatric and mental health care."  (Clinical Exp. Rpt. at 8, 11.)

   **A.     Plaintiffs Misinterpret and Misapply the Deliberate-Indifference Standard.**

        As discussed on page 14 of the termination motion, the Eighth Amendment requires both

an objective analysis of the alleged deprivation of care and subjective analysis of defendants'

state of mind.  *Farmer v. Brennan*, 511 U.S. 825, 846 (1994).  To establish the subjective

component, Plaintiffs must establish that state officials are acting with a "sufficiently culpable

state of mind" to be held responsible for constitutional violations.  *Id.* at 834, 837-39.  That

standard requires state officials to be *criminally* reckless, requiring actual knowledge or willful

blindness of impending harm to inmates that could have easily been prevented.  *Id.*; *see also*

*Redman v. County of San Diego*, 942 F.2d 1435, 1449 (9th Cir. 1991) (deliberate indifference is

---

[7] The experts in the three-judge court proceeding similarly looked at only a representative number of prisons to make their systemic determinations. (*See, e.g.*, Oct. 30, 2007 Order at 2 [stating that the dispute at issue relates to Plaintiffs' experts' site inspections at 10 institutions]; ECF No. 1527 [Decl. Ronald Shansky] p. 8 [stating that his visits to 5 institutions formed the basis of his opinion]; ECF No. 1528 [Decl. Doyle Wayne Scott], p. 10, fn. 1 [stating that he toured 4 institutions]; ECF No. 1531 [Decl. Craig Haney], p. 26 [stating that he toured 8 prisons].)

"conduct [that is] so reckless as to be tantamount to a desire to inflict harm.")

Because there is no evidence that any state official is acting with the requisite culpable state of mind, Plaintiffs cite to the findings before the Supreme Court in *Plata* as evidence of what is required to prove systemic deliberate indifference.[8]  (Opp'n 4-5.)  *Plata* did not alter the legal standard for deliberate indifference, and Plaintiffs cannot satisfy either the objective or the subjective standard.  The objective evidence in this case conclusively demonstrates that the State is meeting or exceeding the minimal requirements of a constitutional prison mental health system.  *See supra* Section II.  Plaintiffs present no evidence—nor could they, given the monumental efforts devoted by the Defendants to delivery of care—to prove the subjective component.  Instead, Plaintiffs argue that the State should allocate more resources to staffing and treatment space, and should release more inmates.  Plaintiffs' experts are against housing any mentally ill inmates in prison.  (*See, e.g.,* Kaufman Decl. ¶ 7 & Appx. A; McKinney Decl. Exs. 5 [Kaufman Depo.] 36:25-37:7 & 208, & Ex. 6 [Stewart Depo.] 238:10-20.)  This case is not an invitation for Plaintiffs to radically reconfigure the state prison system in their image.  As discussed in Sections V.D and V.E, these arguments do not even demonstrate systemic inadequacies to satisfy the objective standard.  Indeed, it is ironic that Plaintiffs attempt to warp the State's critical self-analysis and responsiveness to issues into evidence of deliberate indifference.  *See e.g.,* Sections V.A (screening) & V.G (suicide prevention).  Plaintiffs' second-guessing of the State's programs is not evidence of deliberate indifference, but seeks precisely the type of micromanagement of State prisons that the Supreme Court has instructed federal courts to avoid.  *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (second-guessing local officials "is an exercise we believe the federal courts are ill-suited to undertake, as well as one that would implicate serious questions of federalism.").

**B.    Compliance With the Program Guide Is Not the Constitutional Standard.**

---

[8] Plaintiffs also attempt to criticize the State for not citing the Supreme Court's decision in *Brown v. Plata* in the present motion to terminate.  But Plaintiffs ignore the fact that the State concurrently filed a motion to vacate the population cap upheld in *Brown v. Plata*.  (ECF Nos. 4280-4282.)

12

Reply Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In asking the Court to focus on the State's compliance with the revised Program Guide, Plaintiffs confuse and conflate the mandates of the Constitution with the avenues to meet those mandates. *See Coleman v. Wilson*, 912 F. Supp. 1282, 1301 (E.D. Cal. 1995) ("[t]he Constitution does not . . . prescribe the precise mechanisms for satisfying its mandate to provide access to adequate mental health care.").

Throughout the opposition, Plaintiffs cite the special master's twenty-fifth round report for examples of alleged deficiencies. The special master's report in no way establishes that the State is deliberately indifferent to inmates' serious mental health needs. As discussed on page 26 of the termination motion, rather than simply being required to satisfy the requirements of the Constitution, the State is required to achieve 90% compliance with all prison mental health procedures and program guides and court orders (and 100% compliance with policies and procedures and court orders related to suicide prevention). Indeed, the special master's report confirms that he no longer (if ever) assesses whether the State's prison mental health care system satisfies constitutional standards. (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF No. 4205, at 18-19; *see also* Feb. 28, 2013 Order, ECF No. 4361.)

The Constitution requires only that the State's prison system not be deliberately indifferent to the serious mental health needs of inmates. As the motion and the credible evidence show, California's prison system exceeds that standard. Yet the special master's report fails to convey this crucial information because he has not attempted to assess the system against this standard. (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF No. 4205, at 18-19.) Plaintiffs repeatedly reference the State's compliance with the Program Guide by reference to the prisons' management reports, which were prepared for the special master in advance of his twenty-fifth round site visits. Although the special master relies on these reports, they do not assess whether the State's prison mental health care system satisfies constitutional standards. *See Horne v. Flores*, 557 U.S. 433, 450 (2009) (citation omitted) ("[F]ederal court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate federal law . . . .")

**C.    Changed Factual Circumstances Require the Court to Vacate the Injunction.**

13

It is undisputed that Federal Rule of Civil Procedure 60(b)(5) is the proper vehicle for terminating federal court oversight in institutional reform cases when there are no longer violations of federal law that the order was intended to address. *Brown v. Plata*, 131 S. Ct. 1910 (2011); *Horne*, 557 U.S. 433. The Court's power to modify injunctive relief is "long-established, broad, and flexible." *Plata*, 131 S. Ct. at 1946. With that power comes "the continuing duty and responsibility to assess the efficacy and consequences of its order." *Id.* at 1947. An injunction must be vacated whenever "changes in the underlying problem . . . and new policy insights . . . render[] continued enforcement . . . 'detrimental to the public interest." *Horne*, 557 U.S. at 447-48 & 453 (quoting *Rufo v. Inmates of the Suffolk Cty. Jail*, 502 U.S. 367, 384 (1992).)

Defendants have demonstrated that continued enforcement of injunctive relief under Rule 60(b)(5) is unnecessary and therefore detrimental to the public interest by showing that the State's prison mental health care system meets the basic mental health care needs of California inmates. Plaintiffs submitted no admissible evidence establishing that any systemic federal rights violation persists. Because the evidence shows that the State can comply with its constitutional obligations without a structural reform injunction or intrusive monitoring, the motion to vacate must be granted.

## V. ALL CREDIBLE EVIDENCE PROVES THAT THE STATE MEETS INMATES' SERIOUS MENTAL HEALTH NEEDS.

### A. Plaintiffs' Expert's Opinions Should Be Disregarded.

Many of the statements in the declarations submitted by Plaintiffs' experts are false, misleading, and speculative. Whether this is willful or simply reflects the lack of a thorough investigation, it seriously undermines the credibility of the opinions. The complete story is told in the dozens of reply declarations submitted by the dedicated and hard-working staff at the ten institutions Plaintiffs visited. (*See* Footnote 1.) Additional reasons why the Court should disregard the opinions of Plaintiffs' experts are discussed in detail in the accompanying Evidentiary Objections to Plaintiffs' Expert Reports. The State asks that the Court refuse to consider these declarations or give them the minimal weight they deserve.

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Discovery revealed that Plaintiffs' clinical experts lack credibility.  For example, one of

Plaintiffs' psychiatrists, Dr. Kaufman, has not worked in a correctional setting for 40 years,

reviewed only the portions of the records Plaintiffs selected and provided to him, and testified

that he believed that no mentally ill inmate should be in prison.  (*See* Kaufman Decl. ¶ 7 & Appx.

A; McKinney Decl. Ex. 5 [Kaufman Depo.] 36:25-37:7 & 208:14-209:9.)  Moreover, when asked

about his opinions, Dr. Kaufman had to refer to the table of contents of his declaration.  (*Id.* at

6:24-7:25.)  Plaintiffs' other psychiatrist, Dr. Pablo Stewart, also had trouble recalling the

opinions in his declaration.  This is perhaps understandable since, although Dr. Stewart submitted

a 160-page declaration to this Court, he did not produce a single page of notes.  (*Id.* at Ex. 6

[Stewart Depo.] 12:5-22.)  Dr. Stewart testified that he has never seen a prison mental health

system in the entire United States that met his standard.  (*Id.* at 238:10-20.)  Additional rebuttal

points are included in the Reply Declarations of Drs. Scott and Moore.  There is no reason to

believe that Plaintiffs' other clinical expert, Craig Haney, would have offered any different

extreme testimony, but Plaintiffs did not allow the State an opportunity to depose him before the

filing date of this reply.[9]

Plaintiffs' correctional experts, Eldon Vail and Jeanne Woodford, must also be disqualified.

Mr. Vail, Plaintiffs' use-of-force expert, had not even reviewed the State's use-of-force policy

and was unaware of the outcome in *Madrid v. Gomez*, which resulted in the statewide use of force

policy.  (*Id.* at Ex. 7 [Vail Depo.] at 29:8-30:1.)[10]  Further, rather than undertaking an independent

and objective assessment of the mental health care CDCR provides to its inmates, Mr. Vail

simply concluded that California's prison system was "very troubled."  In fact, he offered to

testify against the State before having been provided even a single item of evidence.  (*Id.* at

17:11-18:25, 20.)  Additional rebuttal points are included in the Reply Declaration of Mr. Martin.

---

[9] *See* accompanying Motion to Exclude Testimony of Craig Haney.

[10] The State's expert, Steve J. Martin, was the *Plaintiffs' expert* in Madrid.  (Martin Exp. Rpt. at 2.)

15

Ms. Woodford, who opined as to the adequacy of mental health care provided to San Quentin's condemned inmates, admitted that she is "not a mental health professional." (Woodford Decl. ¶ 2, ECF No. 4380; McKinney Decl. Ex. 8 [Woodford Depo.] at 15:12, 121:10.)  Ms. Woodford has never been trained to conduct mental health assessments or screenings, has no formal mental health education, and holds no advanced degrees.  (Woodford Depo. at 111:6-8 [admitting no training in mental health care assessments or screenings]; Woodford Decl. ¶¶ 2, 4.)  Yet, despite her background, Ms. Woodford freely opines on subjects outside the scope of her expertise.  (*See, e.g.*, Woodford Decl. ¶ 23 ("newly-condemned inmates often experience extreme mental health distress and suicidal ideation"), ¶ 30 (stating that an inmate whose 114a log she reviewed "remains in urgent need of a referral for mental health evaluation,"), ¶ 31 ("[m]any, if not all of the individuals to whom I spoke appeared to me to be in need of higher levels of mental health care than they were receiving").)  It is not surprising that Ms. Woodford's declaration is replete with opinions outside the scope of her knowledge and expertise since she did not actually write it.  (Woodford Depo. at 86:23-24 ("And the first draft was not prepared by me, no.").)  It is also quite telling that, while Ms. Woodford states in her declaration, for instance, that there is a problem with under-assessment of condemned inmates' mental health needs and that many inmates were in need of a higher level of care, she acknowledged during her deposition that no inmates had indicated to her during her tour that they had sought out care but did not receive it.  (Woodford Decl. ¶¶ 26, 31; Woodford Depo. at 103:12-15.)  Similarly, while Ms. Woodford's declaration indicates that "new arrivals on death row should be closely monitored for signs of mental health deterioration or crisis," she stated at her deposition that she is personally not aware of any new arrivals on death row who suffered a mental health deterioration or crisis in the last two years.  (Woodford Decl. ¶ 23; Woodford Depo. at 108:10-13, 109:2-5.)

> **B.    Plaintiffs Present No Evidence Showing Constitutional Inadequacies In Screening and Identifying Inmates Who Need Mental Health Care.**

The termination motion and supporting evidence demonstrated that the State has successfully implemented systems to screen and evaluate inmates, both at intake and during their

16

1    incarceration.  (Termination Mot. at 16-17.)  With one exception, Plaintiffs presented no

2    argument or evidence on this issue.  The one issue Plaintiffs argue is not an example of deliberate

3    indifference; rather, it demonstrates how the State's inability to alter forms without Plaintiffs'

4    approval impedes the opportunity to improve care.

5         In their opposition, Plaintiffs argue that because CDCR's suicide-prevention coordinator,

6    Dr. Robert Canning, has noted that reception-center and administrative-segregation suicide-risk-

7    assessment tools may be improved, Defendants' "failing to replace or revise" these tools equates

8    to deliberate indifference.  (Opp'n at 77-78.)  Plaintiffs specifically reference a suicide occurring

9    in May 2012 following which Dr. Canning, as the suicide reviewer, noted that the administrative

10   segregation screening questionnaire could be improved to investigate any history of prior suicide

11   attempts.  (*Id.*)

12        Here, as with virtually every other argument in the Opposition, Plaintiffs conflate any

13   comment in which Defendants identify areas in which to further improve their system with

14   deliberate indifference.  But just the opposite is true.  The suicide screening device that Plaintiffs

15   reference was formulated in conjunction with input from Plaintiffs' counsel, the Special Master,

16   and this Court.  In other instances, Plaintiffs (falsely) allege that Defendants have failed to heed

17   the advice of expert consultants, including Lindsay Hayes, but nowhere within Mr. Hayes'

18   August 2011 recommendations does he suggest that Defendants must amend their administrative

19   segregation screening process.  (*See* Bien Decl. Ex. 50.)  Indeed, *there are no instances of any*

20   *expert recommending potential revisions to the screening tool*.  The only evidence that anyone

21   has suggested of changes to screening process are those suggestions made by Defendants' own

22   suicide prevention coordinator, Dr. Canning.

23        The flaw in Plaintiffs' logic is repeated throughout their opposition.  Rather than

24   recognizing the State's efforts to continually improve their operations, Plaintiffs instead use every

25   instance of self-review and self-improvement to argue that Defendants' present processes and

26   procedures are "failures" that exhibit deliberate indifference.  Exactly the opposite is true.  *See*

27   *Rellergert v. Cape Girardeau Cty, Missouri*, 924 F.2d 794, 797 (8th Cir. 1991) (taking deliberate

28

                                                    17

steps to prevent suicide cannot "have been both deliberately cautious about [inmate's] risk as a suicide and deliberately indifferent about it.  Indifference is apathy or unconcern.  The policy demonstrates the opposite").  California's efforts to be self-critical and constantly seek to improve processes is manifest evidence that state officials are not deliberately to prisoner's needs.

### C.   The State Provides an Appropriate Continuum of Services to Inmates With Serious Mental Illness.

The termination motion established that the State's comprehensive mental health system provides "reasonably speedy access" to a continuum of services to inmates across all custody levels in both inpatient and outpatient settings.  (*See* Motion at 17-18.)  As this Court recognized, by July 2012, the State had successfully guaranteed timely access to inpatient mental health care for all class members needing hospitalization.  (*Id.*; *see also* Order, ECF No. 4214.)

### 1.   The State's Inmates Are Not Languishing.

Plaintiffs argue that the State does not have enough mental health treatment capacity, but their argument confuses placements by custody with mental health treatment received by inmate-patients while they await transfer.  (Opp'n at 34:1-10.)  Plaintiffs discuss transfers for Enhanced Outpatient Program (EOP) and Correctional Clinical Case Management System (CCCMS) inmates, but fail to explain that these inmates, many of whom are being transferred to a Special Needs Yard, are currently receiving treatment in their EOP or CCCMS housing units.[11] Plaintiffs' argument is not evidence of mental health treatment that is below a constitutional level. Receiving EOP treatment while awaiting transfer to another EOP bed is not deliberate indifference.

For example, one of Plaintiffs' experts remarked that Prisoner L was receiving CCCMS treatment while awaiting a housing transfer.  (Kaufman Decl. ¶¶ 97-99.)  This treatment, along

---

[11] On page 34 of the Opposition, Plaintiffs take the testimony of Rick Johnson, the Chief of CDCR's Health Care Placement Oversight Program, out of context.  Mr. Johnson testified that, following realignment, the State is now able to move CCCMS and EOP inmates into Special Needs Yards.  (McKinney Decl., Ex. 9 [Johnson Depo.] at 178:1-179:18.)  Plaintiffs insinuate that inmates awaiting Special Needs Yard placement do not receive their appropriate level of care while awaiting transfer, but they present no evidence to prove this point, nor could they.

18

1    with seeing a mental health provider every 30 days, as Dr. Kaufman notes, does not violate either

2    the Program Guide or the Constitution.  This anecdotal evidence does not support Plaintiffs'

3    argument, and is not even evidence of inadequate treatment.

4         **2.     The State Provides Appropriate, Safe Care to Inmates in Mental Health**

5              **Crisis.**

6         The Program Guide permits CDCR to house patients in a number of locations pending

7    transfer to a crisis bed unit according to a specific order of preference.  (*See* Program Guide 12-5-

8    5.)  Plaintiffs make a number of arguments with respect to these placements that are false or

9    misleading.  First, Plaintiffs argue that the State is using small holding cells (which may be used

10   for up to four hours) for long periods.  (Opp'n at 36.)  Plaintiffs' expert never observed such

11   conditions.  (McKinney Decl. Ex. 6 [Stewart Depo.] 171:25-172:2.)  Dr. Belavich testified that

12   these small holding cells are not used as Plaintiffs' suggest.  (McKinney Decl., Ex. 10 [Belavich

13   Depo.] at 228:20-25; *see also* Dec. 12, 2012 Memorandum, ECF No. 4277-3 at 3 ["Inmates shall

14   be transferred out of these cells as soon as possible and never to exceed four hours"].)  Plaintiffs

15   cite no evidence to the contrary.[12]

16        Second, Plaintiffs present the statistics regarding Outpatient Housing Unit (OHU)

17   admissions pending crisis bed transfer in a misleading fashion.  OHUs are the preferred location

18   for housing inmates awaiting transfer to a crisis bed unit.  (ECF 4277-3 at 2.)  The Program Guide

19   allows the State to house inmate-patients referred to a crisis bed for up to 72 hours.  (*Id*. at 3.)

20        Third, Plaintiffs complain that some inmate-patients are placed in an OHU but are not "ever

21   transferred to an MHCB."  (Opp'n at 37:25-27).  This argument ignores the obvious: inmate-

22   patients are evaluated in the OHU, and the evaluation results in a determination that the inmate-

23   patient does not need a crisis bed placement.  This does not reflect the lack of a crisis bed, but

24   instead reflects appropriate evaluation and treatment so that the inmate-patient can return to his

25   home.

26        [12] The testimony of Dr. Belavich on which Plaintiffs rely was in response to a hypothetical
     question posed by counsel and concerned the maximum length of time an inmate-patient could be
27   kept in such a cell.  (McKinney Decl., Ex. 10 [Belavich Depo.] at 229:1-2 ["Q: Yes. Up to four
     hours. And assume he's going to spend the whole four hours."])

28                                              19

### 3.   Plaintiffs' Allegations of "Persistent Waitlists" for DSH Treatment Are Not Supported by Evidence.

In their opposition, Plaintiffs assert that "the majority of the patients currently housed in the DSH programs waited longer than transfer timelines to get to those inpatient programs, and the vast majority of the patients accepted for a DSH bed in December 2012 and January 2013 were on the waitlist longer than the court-ordered transfer timelines." (Opp'n at 35; Decl. Bien Ex. 73.) To support this assertion, Plaintiffs rely on a chart created by their lawyers, which was ostensibly drafted using data obtained from DSH's Bed Utilization Reports. (*See* Decl. A. Haney ¶ 2.) But Plaintiffs' chart is unreasonable, and even misrepresents the amount of time the Program Guide permits the State to process and place patients in a DSH facility. The evidence shows that there are virtually no patients waiting to be placed into DSH programs. (Gaither Reply Decl. ¶¶ 8-9.)

Plaintiffs argue that an inmate-patient is on the "waitlist" from the moment the referral is accepted by DSH, even if the referral was made literally minutes before the document detailing the admission was printed. Plaintiffs' argument ignores the Court's recognition that ten days is an acceptable timeframe in which to process and place patients accepted by DSH into acute care. (*See Coleman* Program Guide 12-6-5.) Moreover, the list of patients admitted to acute care is dynamic: DSH daily admits and discharges patients to address their treatment needs, with priority given to suicidal patients. (Decl. E. Bachman Supp. Reply (Decl. Bachman) ¶¶ 3-4 & 11-12.) Although, as of the date on which Defendants filed their motion, there were no patients waiting for acute care, there have been some—generally between five and ten patients—who have been required to wait more than ten days after DSH acceptance before being transferred. (Gaither Reply Decl. ¶ 8.) Presently, there are eight patients on the acute list who have been waiting for admission longer than ten days following referral by CDCR. (*Id.*)[13] Six of them remain housed

---

[13] The Court has similarly recognized that transfers to intermediate care can take up to 30 days to complete after DSH accepts the patient. (*See Coleman* Program Guide 12-6-11.) In the interim, the patient is receiving timely and appropriate psychiatric care. (Bachman Reply Decl. ¶ 13.)

in Mental Health Crisis Beds, two are housed in Enhanced Outpatient Settings, and all receive ongoing psychiatric care.  ( Gaither Reply Decl. ¶ 8; Bachman Reply Decl. ¶¶ 10-13.)

When the demand for hospital beds increases, the State takes action to address that increased demand.  Recognizing an increase in referral rate, DSH opened another unit at the Vacaville Psychiatric Program to ensure that patients referred to DSH care can be expeditiously processed and placed into a DSH bed without being forced to wait any longer than the recommended processing time between DSH acceptance and transfer.  (Bachman Reply Decl. ¶ 7.)  The State's recognition of an issue and the decisive action to address it is the opposite of deliberate indifference.

Despite Plaintiffs' unsupported assertions, there is no "growing" waitlist.  Their argument is based on speculation by Dr. John Brim, a part-time psychiatrist at DSH's Salinas Valley Psychiatric Program who co-authored a letter but never spoke to the DSH Executive Director to whom it was addressed.  The flow of patients in and out of DSH is dynamic, and the list of inmates who have been referred but not yet processed changes almost daily.  (*Id.* at ¶¶ 3-5.) Further, patients referred to DSH facilities are admitted on the severity of their medical need, not just on their referral date, which unfortunately leads to some less acute inmates having wait longer for bed.  (*Id.* at ¶¶ 10-12.)  In contrast admitting patients by Plaintiff's "first come-first serve" approach would almost certainly ensure that no patient waits longer than ten days, but only at cost of significant harm to high risk patients.  (*Id.*)  And there has been no effort by DSH administration to "pressure" clinicians to prematurely discharge patients.  (*Id.* at ¶¶ 14-15.)  All decisions about discharges are solely on the basis of clinical judgments of patients' treatment results and mental status.  (*Id.*)

Far from being deliberately indifferent to the needs of inmate-patients who require acute psychiatric care, Defendants have and will continue to take affirmative steps to meet their mental health needs.

**4.    San Quentin's Condemned Inmates Receive Adequate and Appropriate Mental Health Care.**

21

Plaintiffs claim that Defendants are deliberately indifferent to the mental health care needs of San Quentin's condemned inmate population.  In support, Plaintiffs rely largely on a purported expert, Jeanne Woodford, who has no advanced degrees or formal mental health training, and who admits that she is "not a mental health professional."  (Woodford Decl. ¶ 2, ECF No. 4380; McKinney Decl. Ex. 8 [Woodford Depo.] at 15:12, 121:10.)  Plaintiffs' unsubstantiated, unsupported, and inaccurate allegations of inadequate care must be disregarded by this Court.

First, Plaintiffs claim that CDCR does not have an organized practice for routinely screening and re-evaluating condemned inmates' mental health status and needs.  (Pls.' Opp'n 73.)  Plaintiffs claim that such a comprehensive screening of all condemned inmates is necessary because condemned inmates have "little opportunity . . . to be screened or observed."  (*Id.*)  Plaintiffs rely on Ms. Woodford's limited observations during a one-day tour at San Quentin in support.  (Woodford Decl. ¶ 15, ECF No. 4380.)  But Ms. Woodford is mistaken that condemned inmates are not routinely evaluated for mental health treatment, and that these inmates have little opportunity to be screened or observed.  To the contrary, multiple measures are in place to ensure routine, emergent, or urgent care.  (Monthei Decl. Supp. Reply ¶ 23.)  Staff in the condemned units regularly interact with inmates housed on their tiers and notify mental health staff when an inmate is observed to be acting in a bizarre or erratic manner.  (*Id.*)  Further, East Block, which houses the majority of condemned inmates, has six mental health professionals dedicated to the unit in addition to licensed psychiatric technicians who conduct daily rounds.  (*Id.*)  Unit custody staff and these mental health professionals work collaboratively, and as issues arise, custody staff notifies mental health staff both verbally and in writing.  (*Id.*)  This process is formalized through the CDCR form "mental health referral chrono," or form 128-MH5.  (*Id.*)  This process has proven to be successful and of great benefit to East Block.  (*Id.*)  Indeed, as Plaintiffs note, over 26% of all condemned inmates are receiving either a CCCMS or EOP-level of care.  (*See* Decl. Woodford, ¶ 26 [noting that 181 of 691 condemned inmates receive EOP or CCCMS care].)  It is telling that Ms. Woodford was apparently unaware of this practice, since she makes no mention of the mental health referral process.

22

Further, as the Special Master reported in his 25th Round Report, a psychiatric technician in the East Block was "familiar with the inmates on the unit, and the inmates appeared to have a good rapport with the pysch tech." (Special Master's 25th Round Report 180, ECF No. 4298.) And, as the Special Master observed, "rounds were conducted daily for EOP and Grade B 3CMS inmates housed on the unit." (*Id.*)

Second, Plaintiffs claim that San Quentin does not provide for consistent monitoring of condemned inmates and that there is "no focused effort by custody or clinical staff to conduct regular one-on-one screening." (Opp'n 73-74.) Plaintiffs claim that, as a result, there is a purported "pattern of systematic under-identification of condemned inmates' serious mental health needs." (*Id.* at 74.) The only evidence that Plaintiffs submit in support is reference to Dr. Pablo Stewart's declaration, which states that the percentage of condemned EOP inmates is lower than he would expect, and Ms. Woodford's declaration, identifying four inmates whom she would refer for evaluation for a higher level of care. (Opp'n at 74.) This purported evidence is entirely unpersuasive.

Dr. Stewart fails to provide the basis for this opinion and does not indicate his background working with or evaluating condemned populations. He has published numerous articles, none on the topic of condemned inmates. (*See* Stewart Decl. at ¶ 18.) He fails to indicate what, in his opinion, would be a more adequate or appropriate number of EOP-level inmates in a condemned population. (*See id.* ¶ 453.) Dr. Stewart also fails to note that the percentage of EOP-condemned inmates is actually *greater* than the percentage of EOP inmates system-wide. Notably, 3.6% of all condemned inmates are classified as "EOP," compared to 3.09% of all CDCR inmates. (Belavich Reply Decl. ¶ 48.) Additionally, the percentage of EOP-condemned inmates far exceeds the percentage of EOP inmates in administrative segregation and in the Psychiatric Services Unit statewide combined and multiplied by a factor of five. (*See id.* [noting that 0.4% of all administrative segregation inmates and 0.29% of all Psychiatric Services Unit inmates receive EOP-level care].) In this context, it is unclear why Plaintiffs believe the percentage of EOP condemned inmates falls short.

23

Ms. Woodford's testimony on this topic is similarly unavailing.  Ms. Woodford claims that, after having spoken briefly with four condemned inmates *who are currently receiving mental health treatment*, she would have referred those inmates to a higher level of care.  (Opp'n at 74; Woodford Decl. ¶¶ 30, 31, 32, 55.)  Yet, even Ms. Woodford admits that she is in no way qualified to make this assessment.  (*See* McKinney Decl. Ex. 8 [Woodford Depo] at 15:12, 121:10 [stating she is "not a mental health professional"].)  These four inmates, who are indisputably receiving mental health treatment, would certainly be referred to a mental health crisis bed or acute psychiatric program if their clinicians believed such care to be necessary.  (Decl. Monthei ¶ 24.)  Ms. Woodford's lay opinion should not outweigh the professional determination of licensed clinicians.

Moreover, Plaintiffs' statement that "there is no focused effort by custody or clinical staff to conduct regular one-on-one screening" is misleading and wrong.  (Opp'n at 74:4-5.)  Ms. Woodford's statements to this effect were limited to North Segregation, and not, as Plaintiffs imply, the entire condemned population.  (Decl. Woodford, ¶ 22 [stating "[i]t is also my understanding that North Segregation inmates are not provided with regular monitoring of their mental health status by either custody or mental health staff"].)  This is a significant omission since North Segregation accounts for nearly one-tenth of the total number of condemned cells.  (Monthei Reply Decl. ¶ 33.)  Additionally, mental health staff do in fact conduct rounds in the North Segregation housing unit and custody staff is trained in suicide prevention and wellness checks.  (*Id.*)  Further, the inmate population in North Segregation is static, and the custody staff for that population is very tenured and consistent, and they know and understand this population very well.  (*Id.*)  Staff in this housing unit have a rapport with these inmates that allows for consistent daily interaction and observation.  (*Id.*)  Custody staff appropriately refer inmates in North Segregation for mental health treatment when they exhibit bizarre or erratic behavior.  (*Id.*)  There is simply no evidence to indicate otherwise.

Third, Plaintiffs allege that Defendants have imposed an "inexplicable and unsupportable" ban on the transfer of condemned inmates to DSH intermediate care facilities.  (Opp'n at 74.)

24

Conveniently, Plaintiffs fail to note that the basis for Defendants' "inexplicable" ban lies in the Penal Code, which provides that only emergent inmates whose "needs are so critical as to endanger the inmate or others" may be transferred to other facilities for treatment.  Cal. Pen. Code § 3600(b)(4).  This does not apply to intermediate-level inmates, whose needs do not rise to this level.  *See id.*  Ms. Woodford's opinion that "there is no custodial justification" for a ban on the transfer of condemned inmates who do not meet the Penal Code's requirements is, therefore, irrelevant since the law prohibits the transfer of these inmates.  (*See* Decl. Woodford, ¶ 47.)

Regardless, CDCR has established a program at San Quentin—the "Specialized Care for the Condemned" program—that is specifically designed to address the needs of this intermediate-level condemned population.  Plaintiffs are acutely aware of the "Specialized Care" program.  (*See* Opp'n at 74.)  And although Plaintiffs claim that the program is "vague and amorphous" and lacking a written Local Operating Procedure, Plaintiffs fail to note that they were  present and participated in the meeting where a Local Operating Procedure was drafted in December 2012 and also conducted a "focused revisit at the institution to further examine the condemned care program" with the Special Master's team at that time.  (Special Master's 25th Report, ECF No. 4298, at 179.)

Further, the status of the Local Operating Procedure (which is in the process of being finalized) is irrelevant to the success of the program.  During the December 2012 visit, the special master's expert observed an IDTT meeting between treatment staff and an inmate-patient, noting that "[t]reatment staff all knew the inmate very well and offered thoughtful and meaningful contributions to the meeting," that "the meeting was conducted appropriately," and that the treatment staff collaborated with custody staff "and incorporated all staff information into their formulation of the inmate's treatment status."  (*Id.* at 181-82.)  This particular inmate-patient stated that "mental health staff adequately addressed her gender identity disorder and its resulting challenges."  (*Id.* at 181.)  The special master's expert and Plaintiffs' counsel also observed a musical recreational therapy group, which included two inmates from the specialized treatment program, and determined that "the group appeared to be beneficial."  (*Id.* at 182-83.)  The special

25

master's expert also interviewed several inmates receiving specialized treatment, who related that they saw their treatment providers "more frequently and had access to them on the unit," and "were generally positive about the program." (*Id.* at 183.)  During this tour, the special master's expert also interviewed inmates participating in recreational therapy, who reported that "the contacts with the recreational therapist were beneficial." (*Id.*)

Plaintiffs' claims that purported "inadequate staffing, an unsupportable ban on higher levels of care, and overcrowding" constitute deliberate indifference are therefore unsubstantiated and indicate a misunderstanding of the deliberate indifference standard.  As discussed above, Plaintiffs' alleged evidence submitted in support of their allegations relating to the delivery of mental health care for the condemned population amount to nothing more than unsupported conclusions by a person—Ms. Woodford— who admits that she is "not a mental health professional." (Woodford Dep Tr. at 15:12, 121:10.)  Her testimony must not be considered by this Court because she is unqualified to opine on the subjects of her declaration.  Further, evidence submitted by Defendants in support of their motion to terminate indicate that the State maintains a mental health care system that is one of the best in the nation.  (*See* Termination Mot. at 7, 9, 15 & 34.)  The State's devotion of significant resources, which has yielded positive results, indicates very clearly that Defendants are not acting with a wanton disregard for inmates' mental health care needs.  (*See id.*)

### D.  California Provides Appropriate Care to its Inmates With Mental Health Care Needs.

#### 1.  The State's Prison Mental Health Care System Is Meeting the Mental Health Care Needs of Mentally Ill Inmates.

The State's prison mental health care system has sufficient staff to meet the basic mental health needs of California inmates.  *See Hallet*, 296 F.3d 748.  The evidence shows that the State's treatment of inmates with serious mental disorders "meets and often exceeds the standard of care for prisons in the United States . . . ."  (Clinical Exp. Rpt. 1; *see also* Reply Declarations of Cho, Chaiken, Johnson, Paizis, Schneider, Gipson, and Howe.)  There is no evidence that Plaintiffs' allegations of staffing shortages have led to constitutional violations.  Even beyond this

26

constitutional threshold, Defendants have added and funded additional positions consistent with the 2009 plan to provide even better care.

Plaintiffs contend that current staffing "shortages" and other past challenges associated with the reorganization of institutional mental health program missions have contributed to deficiencies in care system wide. Plaintiffs' reliance on vacancies is misleading because those vacancies are caused by the increased positions the State has authorized. (Toche Reply Decl. ¶¶ 8-9.) Plaintiffs contend that mental health staffing vacancies—the deficit between budgeted mental health positions and filled positions—supports a conclusion that the State is providing inadequate care to inmates. But all evidence shows that the State is and has been providing care that meets the mental health care needs of *Coleman* class members statewide under current levels of mental health staffing. (*See* Termination Mot. & Supporting Evidence; Williams Reply Decl. ¶¶ 3-7; Cash Reply Decl. ¶¶ 3-5, Jordan Reply Decl. ¶¶ 2-5; Holland Reply Decl. ¶¶ 4-5; Chaiken Reply Decl. ¶ 4; Johnson Reply Decl. ¶¶ 3-5; Monthei Reply Decl. ¶ 14; Fischer Reply Decl. ¶¶ 4-6.) Moreover, there is no correlation, as Plaintiffs contend, between the number of mental health staff positions allocated and the number of positions needed to meet the basic mental health care needs of inmates system wide. (*See* Toche Reply Decl. ¶¶ 3-9.) Accordingly, Plaintiffs' reliance on staffing vacancies throughout the opposition is flawed and immaterial to the only salient issue in this case: whether the State is providing adequate care to inmates.

Instead of providing evidence that the State's mental health system is fundamentally unable to meet the most basic needs of *Coleman* class members, Plaintiffs have assembled an incoherent string of innuendo, unqualified opinions derived from questionable analysis and assessment methodologies, and logical fallacies that are unhinged from any constitutional standard of prison mental health care delivery. Ultimately, Plaintiffs' arguments fail to establish current and ongoing systemic violations of Coleman class members' Eighth Amendment right to basic mental health care. The following are examples of the flawed analysis employed by Plaintiffs' experts:

- Plaintiffs' experts rely almost entirely on the same false premise that staffing vacancies conclusively establish that the mental health program is not meeting inmates' basic clinical needs. (Opp'n at pp. 28-32; Haney Decl. ¶¶ 52, 95-96, 136,189-90; Kaufman

27

Decl. ¶¶  34-35, 41, 44; Stewart Decl. ¶¶ 57-65, 67-69, 77-78.)  They not only ignore the timely and effective care that is actually being provided, but they cite no evidence showing that the staffing allocations for mental health care positions are tied to the minimum number of staff necessary to provide basic mental health care.[14]

- Plaintiffs' experts made sweeping claims that staff vacancies or "shortages" adversely impacted care based on unsworn hearsay statements from staff or inmates.  (Haney Decl. ¶¶ 51-54, 95-106, 136-138, 188-195, 237-239; Kaufman Decl. ¶¶ 24-46; Stewart Decl. ¶¶ 57-73, 77-90, 104-111, 115-118.)  But they offer no concrete evidence of a causal link between staffing levels and systemic deprivations of basic mental health care.

- Plaintiffs' routinely conclude that staff statements expressing a desire for additional staff, frustration with workloads, or confronting challenges to delivering care within existing staffing levels indicate that inmates' needs are not being met.  (Opp'n at pp 30-31.)  But these conclusions are misleading, because none of the statements shows that mental health clinical staff were unable to deliver care that meets the basic mental health care needs of their patients.  Rather, these statements merely acknowledge challenges and obstacles that have accompanied staff movements and a hiring freeze.  (*See* Defs.' Reply Brief, *infra*, p. 26:22-24; *see also* Toche Reply Decl. ¶¶ 18-24.)  Contrary to Plaintiffs' conclusions, these statements are a testament to the abilities of staff to maintain adequate care under challenging but temporary circumstances.

Moreover, Plaintiffs' accusation that the State has acted with calculated deliberate indifference by understaffing and under-resourcing the mental health program is demonstrably false.  First, the hiring freeze was not targeted at CDCR, but across all agencies statewide.  And the actual impact of the hiring freeze was minimal since CDCR's mental health program was permitted to fully hire all allocated mental health positions during fiscal years 2011-12 and 2012-13.  (Toche Decl. ¶¶ 9 & 24.)  Second, the Health Care Administrator and Senior Psychologist positions, which are not clinical positions, were not "cut for cost savings" as Plaintiffs casually claim.  Those positions were allocated, but ordered not to be filled during fiscal year 2012-2013, resulting in salary savings so that more essential clinical positions could be filled.  (*Id.* at ¶ 10.)  Third, the layoffs that accompanied public safety realignment and the historic reduction of the

---

[14] None of Plaintiffs' experts has any documented experience designing or developing a staffing model for a prison, much less for an entire prison system.  Nor do any of them have experience assessing the numbers and array of clinical positions that are necessary to provide mental health care that meets the basic needs of patients in a prison setting.  Their inexperience is manifest in their blind reliance on the special master's flawed interpretation of staffing vacancies as conclusive evidence of unmet need.  Accordingly, none of Plaintiffs' experts is qualified to give an opinion as to whether staffing vacancies are conclusive proof that Defendants' mental health care system is understaffed.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

prison population were necessary to redistribute mental health staff in a manner consistent with the mental health mission changes that occurred at multiple institutions. (*Id.* at ¶¶ 18-23.) The layoff process impacted certain institutions that closed their Reception Centers and thus reduced the need for staff necessary to complete screening, but these institutions have adjusted to their new missions of providing routine mental health care with the staffing component consistent with the institutional mental health care mission. (*Id.*) Plaintiffs' baseless claim that the hiring freeze, or other staffing decisions were implemented to save money at the expense of inmate mental health care recklessly ignores the facts.

Instead, here is what the evidence proves. Defendants have:

- Allocated $384,734,000 in fiscal year 2011-2012 to provide mental health care to *Coleman* class members, increased from $341,358,000 budgeted in fiscal year 2009-10. (2011 Annual CDCR Report *available at* http://www.cdcr.ca.gov/News/docs/2011_Annual_Report_FINAL.pdf.)

- Employed 1,586 clinical psychologists, psychiatrists, licensed clinical social workers, and therapists (including registry) to serve an outpatient population of 32,361 at a ratio of one employee per 28 inmates. (Toche Decl. ¶ 3.)

- Directed institutional mental health care administrators and supervisors to fill all allocated clinical line staff positions in July 2012 and again in February 2013. (*Id.* ¶¶ 14 & 15.)

- Conducted clinical staff recruitment efforts to recruit and retain psychiatrists for the statewide mental health program. (*Id.* at ¶¶ 11-16.)

- Obtained commitments from 60 psychiatrists to provide services statewide through telemedicine so that mental health programs located in more remote locations have the staffing capacity and expertise to meet the mental health care needs. (*Id.*)

- Employed registry staff to provide relief to full-time staff when necessary. (*Id.* at ¶ 17.)

It is irrefutable that that the State has made a commitment to allocating the resources necessary to exceed the basic mental health care needs of California inmates. Plaintiffs' thin evidence, misleading interpretations of staffing vacancies, and unqualified expert opinions fail to contradict the clear commitment the State has made to ensure that the California prisons are equipped with sufficient numbers of well-trained, well-compensated, and dedicated mental health care professionals.

29

**2.     Plaintiffs' Offered No Evidence or Argument Regarding the State's Quality Management Program.**

Plaintiffs failed to rebut the State's evidence demonstrating its robust quality assurance program.  (Motion at 19; Clinical Exp. Rpt. at 1-2 & 30.)  The State's experts reported that they "have never seen a system that is more comprehensive and extensive regarding quality improvement within a correctional environment."  (Clinical Exp. Rpt. at 30.)  Dr. Dvoskin similarly reported that he is "aware of no correctional mental health system in the United States that matches the amount of effort or the quality of CDCR's quality improvement system, which includes a well-attended QI Committee at every single prison."  (Dvoskin Comments Regarding 25th Round Report of the Special Master, ECF No. 4314-1, at 1.)  Plaintiffs provided no response, and the Court should cease all oversight with respect to this issue, including vacating its August 30, 2012 order.  (ECF No. 4232.)

**E.     The State Provides Adequate Treatment Space and Treatment Across All Custody Levels.**

Plaintiffs contend that California prisons' lack of minimally adequate treatment space has created barriers to mental health treatment.  Among the barriers Plaintiffs cite in their opposition brief are (1) congested, noisy, and inhospitable treatment environments in administrative segregation units at Mule Creek; (2) high incidence of clinical cell-front clinical contacts at CCWF; (3) treatment spaces that offer limited or no confidentiality; and the (4) lack of office space for clinical staff.  (Opp'n at 32, 58-59.)  Plaintiffs' allegation concerning CCWF is untrue: between September 1, 2012 and February 28, 2013, less than 12% of all encounters occurred at the cell-front.  (Williams Reply Decl. ¶¶ 6 & 7; Vorous Reply Decl. Ex. 2-D.)  Moreover, Plaintiffs cite to no authority that requires prisons to provide therapeutic or even confidential treatment spaces for prison inmates to receive outpatient mental health treatment.  This is because the Eighth Amendment does not mandate that prisons be pleasant or even therapeutic environments.  *See, e.g., Lewis v. Casey*, 518 U.S. 343, 391 (1996) (noting that prisons "are inherently dangerous institutions"); *and Taylor v. Mich. Dept. of Corr.*, 69 F.3d 76, 84 (6th Cir. 1995) (holding that "[p]risons are dangerous places because they house dangerous people in congested conditions"); *see also Plata*, 131 S. Ct at 1964 (Alito, J. dissenting) ("this court has

30

never suggested that the failure to provide consultation rooms in prisons amounts to cruel and unusual punishment"). Thus, Plaintiffs' conclusory assertions that these prison environments are non-ideal spaces to have treatment establish no objectively intolerable risk of harm constituting an Eighth Amendment violation.

      **1.     Plaintiffs' Claims About Lack of Confidential Treatment Space Are False.**

Plaintiffs' experts' flawed observations and inaccurate descriptions of how treatment is delivered were likely warped by their limited scope of assessment. For example, Dr. Kaufman's claim that CCWF had high incidence of cell front clinical contacts is misleading given that 83% of clinical encounters occurred in a confidential setting from September 2012 through February 2013. (Williams Reply Decl. [CCWF] ¶¶ 6 & 7; Vorous Reply Decl. Ex. 2-D.) Confidential treatments spaces existed at the time of his visit, and more has been added since. (*Id.*)

In addition, there is no evidence that inmates are deprived of access to confidential treatment if they request it. To the contrary, every prison is equipped with confidential space that can be used whenever requested. (*Id.* see attached chart.)

      **2.     The State's Use of Unlicensed Facilities to Provide Inpatient Care Is Appropriate.**

Plaintiffs also criticize the State for using *court*-ordered unlicensed facilities for crisis care and inpatient hospitalization programs. In so doing, Plaintiffs' experts generally opine that these are "bad" or "ugly" beds—neither of which is true—as if using epithets relieve Plaintiffs from their obligation to demonstrate how inmates who receive necessary treatment in these beds are allegedly harmed. (Opp'n at 33.) Plaintiffs cite to no systemic lapses of treatment in these "bad beds." Nor do they describe how they are inadequate with any specificity. This discussion again demonstrates just how divorced Plaintiffs' analysis is from what is required under the Constitution.

      **3.     Experts on Both Sides Agree that the Use of Therapeutic Treatment Modules Is Appropriate.**

Plaintiffs criticize the use of therapeutic treatment modules to facilitate treatment for inmates housed in segregation or security housing units. (Opp'n at 60.) Plaintiffs rely on their

31

experts' observations of a handful of inmates that express distaste for the treatment modules, before reaching the categorical conclusion that the therapeutic modules actually discourage inmate participation in treatment.  Plaintiffs provide no evidence that the sentiment expressed by a few inmates is shared universally.  Indeed, at deposition, their own expert testified that both the inmate-patients and the clinicians prefer the treatment modules.  (McKinney Decl. Ex. 5 [Kaufman Depo.] 109:16-23; *see also* Fischer Reply Decl. ¶¶ 11-14 [at Corcoran, inmates and clinicians prefer therapeutic modules to ATOM chair because inmates and clinicians feel safer and inmates are able to stand in the modules]; Gipson Reply Decl. [Corcoran] ¶¶ 11-16.)[15]

Plaintiffs' theory that the mental health program's use of the treatment module discourages inmate participation in treatment activities, and for that reason is systemically denying treatment to inmates housed in segregation, is unsupported by their own expert.

### F.   Plaintiffs Failed to Rebut the Evidence Showing that the State Has an Appropriate Medication Management System in Place.

The termination motion, supporting evidence, and discovery demonstrate that the State's medication management program meets or exceeds the standard of care.  (Motion at 21; Clinical Report at 26-29).  The State's psychiatric expert, Dr. Charles Scott, testified that he evaluated "the provision of psychiatric care and the monitoring of the psychiatric care, and what were the mechanisms in place to assist with that methodology and evaluation process."  (McKinney Decl. Ex. 3 [Scott Depo.] 21:4-8; *see also* Scott Reply Decl. ¶¶ 2-5.)  He testified about his detailed methodology for reviewing issues related to medication, including the review of 130-140 patients with an oversampling of inmates at the EOP and crisis bed levels of care, and inmates with a higher risk of suicide.  (*Id.* at 35-38.)  He reviewed the State's comprehensive systems for monitoring medication—including the e-UHR, patient charts, MHTS.net, and LabQuest 360— and maintained a database of his review.  (*Id.* at 50-51; Scott Reply Decl. ¶ 5.)  Dr. Scott's review included a very detailed review of the items CDCR psychiatrists monitor.  (*Id.* at 182.)  Dr. Scott

---

[15] Indeed, data from the ATOM chair piloting program indicates  that inmates refuse group therapy more frequently when ATOM chairs are used in lieu of therapeutic treatment modules.  And non-ATOMS group times tend to be longer in length due to inmate-patients and clinician preference.

also relied on the State's own audit tool, known as MAPIP, an extensive monitoring tool that includes measures that are beyond "the reasonable care in the community that a reasonable and prudent psychiatrist in a similar or like circumstance would do.  So tort standard of care."  (*Id.* at 49:25-50:3.)  Based on this thorough review, Dr. Scott concluded that CDCR (1) appropriately prescribes and administers psychotropic medications to its inmate-patients, (2) appropriately supervises and evaluates patients on psychotropic medication, and (3) is not deliberately indifferent to the psychiatric needs of its inmate-patients. (Clinical Exp. Rpt. 27-30; Reply Decl. of C. Scott ¶ 4.)

Plaintiffs made no effort to rebut Dr. Scott's opinions, and the clear and convincing evidence that CDCR's system for psychiatric medication management and lab studies is undisputed.  (*See* Stewart Decl., ¶¶ 119-168 & Kaufman Decl., ¶¶ 65-83.)  While both of Plaintiffs' experts spoke about "problems" or "concerns," neither of them raise a question of systemic inadequacy or deliberate indifference.  One of Plaintiffs' experts could not articulate the deliberate indifference standard despite twice testifying before this Court on mental health issues, including in the original *Coleman* trial. (Kaufman Depo., 13:25-14:12; *see also* Scott Reply Decl. ¶ 2 [deliberate indifference "is a very basic concept in forensic psychiatry and one that is required for individuals who are trained in forensic psychiatry and who do evaluations of correctional care to understand"].)  When asked at deposition about what standard he was applying, Dr. Kaufman asked for a break.  (*Id.* at 44:14-45:24.)  By his own admission, Dr. Kaufman's opinions have no relevance to the issues this Court is asked to decide.[16]

The entire basis for the opinions of Plaintiffs' other psychiatrist, Dr. Stewart, is the State's system for managing and monitoring compliance with the Program Guide.  His declaration consists almost entirely of statements about the State's compliance with the Program Guide.  (*See, e.g.,* Stewart Decl., ¶¶ 122-23, 124-25, 126-27, & 128-29; McKinney Decl. Ex. 6 [Stewart Depo.]

---

[16] Even if the Court were to consider Dr. Kaufman and Dr. Stewart's opinions regarding medication management, they both admitted that they did not consider medication issues for CCCMS inmates in General Population, or approximately 80% of the *Coleman* class.  (McKinney Decl. Ex. 5 [Kaufman Depo.] 108:10-12 & 204:7-20 & Ex. 6 [Stewart Depo.] 11:25-14; *see also* Scott Reply Decl. ¶ 18.)

1    61:14-16].)  He did not randomly review any medical records, did not sit in on any

2    Interdisciplinary Treatment Team meetings at the prisons he visited, and only "skimmed" the

3    documents attached to his declaration.  (*Id.* at 37:11-16, 39:7-19 & 41:1-5; *see also* Scott Reply

4    Decl. ¶ 5 ["failing to review actual documentation substantially increases the risk of faulty and

5    erroneous conclusions about psychiatric treatment and monitoring".)  What is absent is any

6    evidence of harm—or indeed, any impact—to a single *Coleman* class member, let alone a

7    systemic violation of a federal right impacting the entire *Coleman* class.  The very presence of

8    these systems, coupled with the fact that the State is using these systems to continually monitor

9    and self-improve, should be enough for the Court to end its oversight of this matter.

10           Plaintiffs presented no evidence to rebut the clear and convincing evidence presented by

11   the State that it meets its inmates' psychiatric needs, and the Court should immediately terminate

12   all future monitoring of this issue.  The concerns raised by Plaintiffs are isolated and do not raise

13   a systemic concern.  Each of them is dismissed below.

14   ///

15
                  **1.      Plaintiffs' "Concern" About Whether Nurses Are Knowledgeable About
16                           Side Effects Does Not Raise a Question of Systemic Deliberate Indifference.**

17           Plaintiffs' primary complaint about medication management is that nurses lack knowledge

18   about potential side effects of psychotropic medication.  (Opp'n at 67-68.)[17]  Plaintiffs vaguely

19   state a "concern," but their experts fail to cite a single instance where this purported lack of

20   knowledge had any impact on a *Coleman* class member.  (*Id.*; Kaufman Decl. ¶¶ 75-76; Stewart

21   Decl., ¶¶ 134-135.)[18]  To the contrary, Plaintiffs' expert testified that the "follow-up about side

22   effects of medication was comprehensive."  (McKinney Decl. Ex. 5 [Kaufman Depo.] 148:12-16.)

23           Plaintiffs base this opinion not on their own investigation, but on the recommendation of

24   the State's nursing expert, Dr. Moore.  (*Id.* at 143:2-14 ["I'm mainly citing the State's expert,

25

26           [17] The *Plata* receiver is responsible for nursing staff.

27           [18] Dr. Stewart, a psychiatrist, oddly opines that "standard nursing practice is to ask about
     clinical efficacy and any possible side effects" every time they distribute medication.  (*Id.* at ¶
28   134.)  This is not the standard of care in any setting.  (Moore Reply Decl., ¶ 5.)

                                                    34

Jacqueline Moore."].)  Dr. Moore did not testify that this was an issue of deliberate indifference, but simply recommended that CDCR provide further education to its nurses.  (McKinney Decl. Ex. 4 [Moore Depo.] at 182:3-8 [recommendation that "nursing education emphasize the side effects of the medication . . . ."]; Moore Reply Decl., ¶ 4.)

### 2. None of Plaintiffs' Remaining "Problems" Are of Constitutional Concern or Require Continued Federal Court Oversight of Medication Management.

Plaintiffs cite the special master's twenty-fifth round report for examples of "medication management problems."  (Opp'n at 68-70.)  The special master's report in no way establishes that the State's medication monitoring system is deliberately indifferent to the serious mental health needs of class members.  Indeed, the special master's monitoring report confirms that he does not assess whether any aspect of the State's prison mental health care system satisfies constitutional standards.  (*See, e.g.,* Special Master's 24th Monitoring Rep., ECF 4205, at 18-19.)

The Constitution requires only that the State's prison system not be deliberately indifferent to the serious mental health needs of its inmates.  California's medication monitoring system far exceeds that standard.  (*See* Clinical Exp. Rpt. at 26-29; Scott Reply Decl. at ¶ 4.) Plaintiffs' reference to excerpts from two prisons' management reports, which were prepared for the special master in advance of his twenty-fifth round site visits and on which his report rely, fail because they do not assess whether the State's prison mental health care system satisfies constitutional standards.  (*See* Opp'n at 68:21-70:1.)  Since Plaintiffs do not (and cannot) allege that any of these issues represent deliberate indifference or a violation of a federal right with respect to the *Coleman* class, there is no reason for the *Coleman* Court to continue its oversight of medication management.

### a. Plaintiffs Fail to Raise a Constitutional Question With Respect to the Special Master's Measure of "Medication Noncompliance."

Plaintiffs' first example of an alleged deficiency is the special master's vague statement that nineteen institutions "indicated noncompliance with appropriate identification, documentation, referral, and response to inmate medication noncompliance."  (25th Report at 68.) The report does not include "any citation or authority that identifies the standard that CDCR is

35

allegedly failing to meet."  (Dvoskin Comments Regarding 25th Round Report of the Special

Master, ECF 4314-1, at 1.)  Moreover, at least four separate measures—identification,

documentation, referral, and response—are included within this single statement, and one of those

measures appears to be whether appointments occur "within four working days of referral."  (25th

report at 107 [finding that Pelican Bay State Prison had a 96 percent compliance rate with this

measure].)  Neither the special master nor Plaintiffs offer any evidence to support a conclusion

that a 96 percent compliance rate is a failure, or that a failure to comply with timelines or any

other measure included in this provision impacted quality of care or the federal rights of the

*Coleman* class.  Stating that 19 institutions failed to meet any one of at least four Program Guide

requirements 100% of the time does not establish systemic deliberate indifference.  And neither

does Dr. Stewart's reference to a single institution that was unable to show that a physician's

order or progress note made it into the patient's chart within 7 days.  (Stewart Decl., ¶ 153; *see*

*also* Scott Reply Decl. ¶ 28.)  While Dr. Stewart might think this is "alarming," Dr. Stewart did

not identify how this isolated instance caused systemic harm.

The opinion of Plaintiffs' expert Dr. Kaufman that high rates of medication refusal

indicate a "fundamental breakdown of trust and communication between clinicians and patients"

is bizarre.  (Kaufman Decl., ¶¶ 74-75.)  Plaintiffs presented no evidence that there is a high rate of

medication refusal in CDCR, or that CDCR's systemic response to medication refusals have

violated the federal rights of any member of the *Coleman* class.  Dr. Kaufman testified that

patients have a right to refuse medication, and that his patients sometimes refuse their medication.

(McKinney Decl. Ex. 5 [Kaufman Depo.] 140:10-141:22.)  Although Dr. Kaufman claimed his

patients' refusal rate is around 10%, he has no experience in a correctional setting.

### b.   Plaintiffs Did Not Prove that the State's Laboratory Testing Orders Violate the Constitution.

The State's experts reported "that laboratory results were appropriately monitored and

addressed."  (Clinical Report at 27.)  Dr. Scott further testified that the State's MAPIP internal

audit tool is beyond the standard of care.  (McKinney Decl. Ex. 3 [Scott Depo.] 48-50.)  He also

testified about the numerous ways CDCR doctors obtain and check lab results.  (*Id.* at 54:24-

36

55:10.)  Plaintiffs' experts, on the other hand, did not personally review any lab work.  (*Id.* at Ex. 6 [Stewart Depo.] 148:24-149:5; *see also* Scott Reply Decl. ¶ 28.) Nevertheless, Plaintiffs reference the special master's report where he discusses Program Guide compliance on issues related to laboratory testing.  (25th Report at 70 & 86; Stewart Decl., ¶ 144 [acknowledging that "for those taking Clozapine, it was 96-percent compliant"].)  Dr. Kaufman offers nothing that would establish deliberate indifference, just a general truism about the side effects of psychotropic medication.  (Kaufman Decl. ¶ 25.)  And once again, Dr. Stewart bases his opinions on the special master's report and management reports prepared for three prisons documenting compliance with the Program Guide, one of which stated that "laboratory tests were ordered 92 percent of the time and lab tests were reviewed and clinical documented 88 percent of the time." (Stewart Decl., ¶¶ 139, 149 & 164 [quoting Ex. 45 to Bien Dec. (SQ Management Report) at 5].) While Plaintiffs appear to want a system that manages 100 percent compliance with the Program Guide, this is not what the Constitution requires.  Plaintiffs' evidence is evidence of a working system, not one that needs further federal court oversight.  *See Coleman*, 912 F. Supp. at 1323 (ordering the State to monitor inmates (if necessary, by blood testing) to determine if they were miscuing psychotropic medication).

> **c.   Plaintiffs' Claims About Abnormal Involuntary Movement Scale (AIMS) Testing Do Not Present a Constitutional Issue.**

Plaintiffs' next complaint is that CDCR's AIMS testing is "inadequate," but they acknowledge that CDCR has a system for conducting AIMS testing.  (Stewart Decl., ¶ 161.) Although Dr. Stewart visited SVSP, CSP-Sacramento, CSP-Los Angeles County, RJ Donovan, and San Quentin, Dr. Stewart identifies only two inmates (Prisoners C & D at RJD) who he claims should have had more recent AIMS testing.  (Stewart Decl., ¶¶ 157, 161 & 163.)  That he mentions only two isolated examples out of the 76 *Coleman* class members he reviewed belies Plaintiffs' contention that this is a serious—let alone constitutional—medication management "problem."

> **d.   Plaintiffs' Unsupported Claims About Lack of Informed Consent Must Be Rejected.**

37

1
2
3
4
5
6
7

Plaintiffs argue without any supporting evidence that lack of appropriate informed consents is a "serious problem." (Opp'n at 69.) The evidence shows that California's inmate-patients are receiving their medication, and while most inmates do have an appropriately documented informed consent form in their medical record, informed consent is not a requirement in prison, even for accreditation by the National Commission on Correctional Health Care. (McKinney Decl. Ex. 3 [Scott Depo.] 86:11-22; *see also id.* at 84:20-21, 157:10-12, 237:13-16 [examples of testimony documenting informed consent].)

8
9

### e. Plaintiffs' Unsupported Claims About Lack of Medication Renewals Must Be Rejected.

10
11
12
13
14
15
16
17
18
19
20
21
22

Similarly, Plaintiffs point to no evidence showing that members of the *Coleman* class are systematically being denied medication. Plaintiffs misleadingly cite to page 68 of the special master's report, which states that nearly every prison was compliant with medication orders. Plaintiffs also rely on a non sequitur by Dr. Stewart that a single institution—CSP-Sacramento— uses "Senior Psychiatrists rather than staff psychiatrists to renew medications." (Stewart Decl., ¶ 145.) Plaintiffs also cite to two anecdotes by Dr. Kaufman: (1) a nurse told him that a psychiatrist at some time in the past prescribed six medications to a patient without personally seeing the patient. (Kaufman Decl., ¶ 66.) But Dr. Kaufman did not follow up with the patient, did not know what four of the medications were, and did not even verify that the anecdote was true. (McKinney Decl. Ex. 5 [Kaufman Depo.] 110:4-111:15.) Dr. Kaufman also discusses a single inmate at CCWF who was "worried" that her medication might lapse, but there is no evidence from Dr. Kaufman that the medication actually lapsed. (Kaufman, Decl. ¶ 66.) There is no systemic issue here.

23
24

### f. The State's Efforts to Improve Its Medical Facilities Are Not Evidence of a Constitutional Deficiency.

25
26
27

Plaintiffs point to a budget document to try to argue that there is a systemic constitutional deficiency with respect to medication management. (Opp'n at 70.) The evidence before the Court is that the State systemically meets the medication needs of its inmate-patients. Rather than evidence of deficiencies, the documents Plaintiffs rely on show that the State is continuing to

28

38

improve its system, and the Court should not countenance Plaintiffs' use of the State's efforts at continued self-improvement against them.  It is inappropriate for Plaintiffs to use documents intended to gain funding or otherwise improve the system as evidence of inadequacy.

### 3. Plaintiffs' Failed to Rebut the Evidence that the State Maintains Accurate, Complete, and Confidential Mental Health Records.

The State's termination motion established that the *Plata* receiver implemented an electronic Unit Health Record project to create an electronically accessible medical record for every inmate, which is being used in every prison.  (Motion at 19-20.)  Mental health staff have been trained to use and maintain the electronic Unit Health Records.  (*Id.*)  The motion further established that the records are current, accurate, and available to all appropriate staff.  (*Id.*; *see* Belavich Decl. ¶ 21; Clinical Exp. Rpt. at 28.)

Plaintiffs cite no evidence to the contrary.  Plaintiffs' argument that records are not being scanned in a timely manner is particularly feeble.  Plaintiffs' expert acknowledges that records are scanned within 24 hours, which is consistent with Defendants' evidence.  (Stewart Decl. ¶ 91.) Yet Plaintiffs rely on a single clinician's practice of maintaining a paper copy of relevant records to argue that there are "delays in scanning records."  (*See also* Jordan Reply Decl. ¶¶ 36-37; Harry Reply Decl. ¶ 6; Chaiken Reply Decl. ¶ 6; Fischer Reply Decl. ¶¶ 20-22.)  Plaintiffs' own evidence shows this is false.

Plaintiffs next argue that the electronic record is "cumbersome" by parroting the finding of Defendants' experts, and citing a few isolated examples of illegible handwriting by clinicians found in the electronic record (Kaufman, Decl. ¶ 82; *but see* Fischer Reply Decl. [Corcoran] ¶ 21 ["This vague generalization is simply not true . . . The system allows clinicians to competently access information and treat patients . . . ."].)[19]  Despite this challenge created by the *Plata*

---

[19] Plaintiffs also misleadingly cite a single example where Plaintiffs' expert says he unsuccessfully asked "staff on the unit floor to see the medical/mental health records . . . ." (Haney Decl. ¶ 92.)  Mr. Haney does not identify the staff in question, and Plaintiffs refused to make Mr. Haney available for deposition in time to address his vague declaration, so it is impossible for the State to even assess this claim.  Moreover, although Plaintiffs fail to mention this, Mr. Haney concedes that he was subsequently able to review the records in question.  (*Id.* at ¶ 94).

39

1   receiver, however, the State's clinicians and Defendants' experts are able to adequately access

2   individual inmate-patient records.  (*See* Clinical Exp. Rpt. at 28; *see also, e.g.,* Scott Depo. at 36-

3   37, 52-57, 90:21-91:20, 105:13-20, 143:11-144:9, 230:22-231:14, 237:5-13; Scott Reply Decl. ¶

4   5.)  Even Plaintiffs' expert agreed that he was able to gain a great deal of information, including

5   whether a diagnosis was made, whether medication was appropriately prescribed, and whether the

6   doctor was monitoring the medication-from the records provided to him.  (Kaufman Depo., 32:1-

7   33:18 & 37:10-14.)[20]  In light of this testimony, Plaintiffs' claims about the quality of the medical

8   records, which were based on the opinion of Dr. Kaufman (who has not worked in a correctional

9   setting in 40 years and reviewed only 20 records), should be rejected.  (*Id.* at 31:14-25.)

10   Plaintiffs' complaints about the electronic Unit Health Record are not a constitutional issue

11   and certainly are not evidence of deliberate indifference.  To the extent that the Court believes

12   Plaintiffs' complaints have constitutional merit, the issue should be addressed by the *Plata* court

13   and its receiver, who remains responsible for "implementation of the long term [information

14   technology] program to include the medical, dental and mental health programs.  (ECF No. 2247

15   at 7.)

16

17   **G.   California's Suicide-Prevention Program Meets the Constitutional Standard.**

18   California's system of suicide prevention far exceeds the basic constitutional requirements

19   and saves thousands of lives each year.  The special master's suicide reports on which plaintiffs

20   rely in fact show that only a handful of suicides in 2011 and 2012 were actually foreseeable or

21   preventable—far too few to establish systemic deliberate indifference.  Of the remaining cases

22   discussed in the reports, many of the special master's findings amount to an impermissible

23   exercise in second-guessing and conjecture.  Finally, the claim that Defendants have ignored

24   recommendations by the special master or other experts is nonsensical and demonstrably false.

25

26   [20] Plaintiffs' expert further conceded that he only reviewed the "record that was provided
    to [him]" by Plaintiffs' counsel (Kaufman Depo., 36:25-37:7), so his opinions are based on
27   incomplete and indeed cherry-picked information, which should be viewed by this Court with
    suspicion.

28

40

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For the following reasons, Defendants' suicide prevention measures must be found constitutional.

Through the din and diatribe of Plaintiffs' opposition, they have lost sight of a central truth. "Suicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and the recently developed constitutional law applying to those in custody have taken this uncertainty into account in developing rules of liability based on foreseeability." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). Because suicide rests on a complex array of factors and motives, inmates determined to commit suicide are very difficult to stop. *Strickler v. McCord*, 306 F. Supp. 2d 818, 829 (N.D. Ind. 2004).

In light of these challenges, the Constitution requires only that prison officials take reasonable steps to alleviate the serious risk of harm. Prison officials must put in place reasonable measures to prevent inmate suicide as a necessary component of any correctional mental health system. *Balla v. Idaho State Bd. of Corrs.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984). But the Constitution does not require that particular measures be enacted—the Eighth Amendment does not enshrine specific preventive measures to prevent inmate suicide. Nor does the Constitution require that "every possible measure be taken to prevent [inmates'] suicidal efforts." *Gray*, 399 F.3d at 619. "As all agree, prisoners do not have a generalized right to be correctly screened for suicidal tendencies, or to be absolutely protected against committing suicide." *Perez v. Oakland County*, 380 F. Supp. 2d 830, 840 (E.D. Mich. 2005).

A corollary to this legal principle of reasonable response to a known risk is that deliberate indifference cannot be assessed simply by looking at the results—in other words, that an inmate committed suicide does not by itself establish that his Constitutional rights were violated. "It is deceivingly inviting to take the suicide, *ipso facto*, as conclusive proof of deliberate indifference. However, where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk." *Rellegert by Rellegert v. Cape Girardeau County, Mo.*, 924 F.2d 794, 796 (8th Cir. 1991). Thus, the fact that inmates commit suicide despite a prison's efforts to prevent them does not establish a constitutional violation. Further, that someone might, in hindsight, question the

41

preventive measures undertaken does not suffice under the governing law, especially since "once

a suicide has been accomplished in spite of preventive measures, it is all too easy to point out the

flaws of failure." *Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1020 (9th Cir. 2010) (citation

omitted).

      **1.   Defendants Have Instituted a Robust Suicide Prevention Program, Which**
          **Belies Plaintiffs' Claims of Systemic Deliberate Indifference.**

         **a.   Defendants' Suicide Prevention Measures Far Exceed The**
              **Basic Requirements of the Constitution.**

Plaintiffs cannot establish that Defendants are deliberately indifferent to a substantial risk

of inmate suicide.  Prisons are required to establish no more than a "basic program for the

identification, treatment, and supervision of inmates with suicidal tendencies." *Balla v. Idaho*

*State Bd. of Corrs.*, 595 F. Supp. 1558, 1577 (D. Idaho 1984).  *See Clouthier v. County of Contra*

*Costa*, 591 F.3d 1232, 1252 (9th Cir. 2010) (rejecting deliberate indifference claim where county

jail "had reasonable and well-established written policies" for handling detainee's mental health

needs, and the county "invested considerable resources in developing its policies and training its

employees" on these issues); *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1537 (11th Cir. 1994)

(upholding county's suicide prevention policies which included basic screening questionnaire and

policy of suicide watch for inmates with suicidal tendencies).

Where officials have "promulgated commonplace suicide-prevention policies," courts

ordinarily have rejected deliberate indifference claims, "even if officers did not always follow the

department's policy and even if other, better policies might have diminished suicide risk."

*Manarite v. City of Springfield*, 957 F.2d 953, 957 (1st Cir. 1992).  *See, e.g.*, *Edwards v. Gilbert*,

867 F.2d 1271, 1276 (11th Cir. 1989) (no liability for suicide although a better, more up-to-date

screening procedure might have identified victim as a risk requiring special procedures); *Belcher*

*v. Oliver*, 898 F.2d 32, 34-36 (4th Cir. 1990) (no liability for suicide despite court's

42

acknowledgment that better screening procedures might have identified inmate as a special

suicide risk); *Molton v. Cleveland*, 839 F.2d 240, 246-47 (no liability despite city's failure to give

officers much suicide-prevention training).

California far exceeds this constitutional minimum. The State's suicide prevention

program is multi-faceted, and consists of a program that identifies, treats, and supervises inmates

at risk for suicide. (ECF No. 4277 ¶¶ 23–24.)  Mental health clinicians, correctional officers, and

facility management personnel collaborate and coordinate in responding to and preventing inmate

suicides.  (*Id.*; *see also* Hill Reply Decl. ¶¶ 6-8; Monthei Reply Decl. ¶¶ 31-35)  All inmates are

observed for suicide risk, and inmates enrolled in the mental health program are regularly

monitored for risk of suicide as clinically appropriate. (*Id.*)

### (1)    Suicide Prevention and Response.

Suicide prevention and response improvement teams exist both at headquarters and at

each prison. (ECF No. 4277 ¶ 29.)  These teams train prison staff on suicide prevention, response,

reporting, and suicide review.  (*Id.*)  For example, in 2011, suicide prevention videos were

released to all 33 prisons so that the videos could be used to provide a consistent message during

training.  (Belavich Reply Decl. ¶ 8.)  In addition, each prison's suicide prevention committee is

required to amend and implement local operating procedures when necessary.  (ECF No. 4277 ¶

29.)  Declarations submitted by clinical staff at Folsom State Prison, Pleasant Valley Prison, and

Salinas Valley State Prison show just three examples of prisons with active and functioning

prevention committees. (Hoffman Reply Decl. ¶¶ 17-21; McMahon Reply Decl. ¶¶ 3-12; Card

Reply Decl. ¶¶ 2-6.)

Another function of the suicide program is the identification and treatment of inmates at

risk for suicide.  (ECF No. 4277 at ¶¶ 10–29.)  The State has standardized mental health forms to

document the mental health care being provided to all inmates, which include forms used to

43

record screening for suicide risk.  (ECF No. 4277 at ¶ 10, Ex. 1.)  Mental health staff conduct a face-to-face suicide risk evaluation to identify inmates at risk for suicide in multiple circumstances, arranging from a newly arrived inmate who exhibits a current or significant risk to evaluating inmates upon their return from inpatient treatment programs.  (ECF No. 4277 at ¶ 24.)

In 2010, CDCR developed a mentoring program to improve clinical competency in the administration of suicide risk evaluations.  (ECF No. 4313 ¶ 14.)  The mentoring program in 2010 was designed to mentor new or unlicensed staff, with an initial intent to "grandfather" in veteran staff.  (*Id.*)  Thereafter, CDCR provided ongoing training to selected monitors at all institutions and, by January 2013, every institution had an identified primary mentor.  (*Id.*)  After developing the program, CDCR changed the focus to complete suicide risk evaluation mentoring for all staff who administer suicide-risk evaluations with inmates needing Enhanced Outpatient Program and Mental Health Crisis Bed placement.  (*Id.*)

Because of the expanded nature of the mentoring program and CDCR's commitment to maintain an ongoing focus on quality clinician work, CDCR directed that all staff conducting suicide risk evaluations in the Enhanced Outpatient Program and Mental Health Crisis Bed programs complete the mentor program by April 30, 2013.  (Belavich Reply Decl. ¶ 43, Exs. H & I.)  In addition, CDCR has recently provided additional training on completing a suicide risk evaluation.  (*Id.*¶ 44, Ex. J.)  Moreover, CDCR has developed a new suicide prevention workgroup at headquarters to further address inmate suicides.  (*Id.* ¶ 13 & 42, Ex. **B.**)  CDCR mental health staff are also actively involved in monitoring inmates at a high risk of suicide.  (ECF No. 4313 ¶ 16.)  Mental health staff continually monitor high-risk inmates through multiple processes, including designated referral coordinators, monthly meetings, and data tracking.   (*Id.*)  Mental health clinicians from Salinas Valley, Folsom, and Pleasant Valley State prisons describe how these myriad processes work locally.  (Hoffman Reply Decl. ¶¶ 9-22 & 30; Cho Reply Decl.

44

¶ 2, 11 & 14-15; Paizis Reply Decl. ¶¶ 2-9; Schneider Reply Decl. ¶¶ 18-19 & 22-25; McMahon Reply Decl. ¶¶ 3-10; Howe Reply Decl. ¶¶ 1-8.)

Multiple proactive measures exist in Administrative Segregation Units to prevent suicide, including double-celling inmates when safe, and providing electrical appliances when feasible. (ECF No. 4277 ¶ 26; Allison Decl. ¶ 9–10, Ex. C.)  In addition, CDCR has retrofitted and designated "in take" cells for inmates new to segregation, requires mental health staff to conduct daily clinical rounds, custody and clinical staff to conduct daily morning "check in" meetings, and custody to conduct 30-minute welfare checks of every inmate during their first three weeks in segregation.  (ECF No. 4277 ¶ 26; Allison Decl. ¶¶ 5–8; Hill Decl. ¶ 4; Center Decl.¶¶ 1-8 & 11.)

Welfare checks are monitored at the institution level on a daily basis by the sergeant in a labor-intensive effort requiring written logs by staff, which a sergeant then verifies. (Hill Reply Decl. ¶ 4; Schneider Reply Decl. ¶ 21; Atchley Reply Decl. ¶¶ 7 & 8.)  CDCR has now sought a bid to acquire electronic monitoring devices and or a system consisting of an electronic recording device to digitally record the Correctional Officers check time at all pre-assigned individual cell locations.  (Allison Decl. ¶ 7.)  This system will allow better tracking by CDCR headquarters. (Id.)  In the interim, while the contract is being sought, CDCR has authored a memorandum that reminds staff to complete the welfare checks at a staggered and unpredictable way.  (Id. ¶ 8, Ex. B.)  Moreover, the memorandum directs staff that welfare checks for inmates in administrative segregation continue beyond 21 days when deemed clinically appropriate.  (Id.)

A state-wide emergency medical response system policy, which includes policies and procedures on medical response, treatment, and transportation, also exits. (ECF No. 4326–1 ¶ 6, Ex. 1.)  Under this policy, staff receives mandatory training in emergency response, and all institutions maintain emergency response tools.  (Id.; Allison Decl. ¶ 17.)  CDCR has also issued and implemented procedures for segregated areas that require a specified number of staff present

45

to open and enter a cell and for first responders to perform life saving measures.  (Allison Decl.

¶¶ 18–19.)  Locally, institutions have committees designated to analyze emergency medical

responses, which review the emergency medical response reports at regular monthly meetings,

and quarterly drills occur at each institution.  (ECF No. 4326–1 ¶ 7; Allison Reply Decl. ¶ 17, Ex.

E; Keith Reply Decl. ¶¶ 4-6; O'Laughlin Reply Decl. ¶¶ 2-10; Hoffman Reply Decl. ¶ 19;

McMahon Reply Decl. ¶¶ 7-9; Gabeler Reply Decl. ¶¶ 2-10.)  Drill logs are sent to headquarters

for review and feedback.  (Allison Decl. ¶ 18.)  And, when suicides occur that implicate

emergency response procedures, the prisons and headquarters appropriately respond.  (*See* ECF

No. 4326–1 ¶ 11; Gabeler Reply Decl. ¶ 5 and 7; Hoffman Reply Decl. ¶ 19; McMahon Reply

Decl. ¶ 9.)

　　　　CDCR is also continuing in its efforts to reduce the length of stay in administrative

segregation.  (Allison Decl. ¶ 11.)  It has formed an "ASU Stakeholder Workgroup" that meets

monthly to discuss policies and proposals for improving the ASU system, such as improved

tracking of welfare checks and lengths of stay.  (*Id.* ¶ 11-12.)  By continuing to monitor and

review inmates with the longest lengths of stay, CDCR was able to reduce the wait list for

enhanced outpatient program inmates pending transfer to an administrative segregation program

to zero by April 2012.  (*Id.* ¶ 13.)  Moreover, through this process, there is an assurance that

inmates are not remaining in segregation units without legitimate penological interest.  (*Id.* ¶ 14.)

　　　　In addition, CDCR has instituted additional program elements beyond its standard

program.  For instance, in 2011, CDCR instituted "evening programs" requiring extended staff

hours in order to have more direct and timely crisis intervention services.  (Belavich Decl. ¶ 8.)

Beginning in 2011, CDCR drafted and successfully implemented a standardized self-monitoring

process to ensure that inmates are timely identified, referred, and transferred to acute and

intermediate levels of care. (*Id.* ¶ 7 & 14–15; ECF No. 4277 at ¶ 9.)  To assist in this process,

46

CDCR has coordinators at each institution to manage and audit the referral process and a team of mental health professionals assigned to review the process on an ongoing basis.  (*Id.*)  In fact, by July 2012, the State had successfully guaranteed timely access to inpatient mental health care to all class members needing hospitalization.  (*See* Order, ECF No. 4214 (noting the "remarkable accomplishments" in addressing the problems in access to inpatient mental health care); 24th Monitoring Rep., ECF No. 4205 at 9.)

In 2012, CDCR implemented a system to track and monitor alternative and outpatient housing use, and issued memorandums to govern their use pending admission to a Mental Health Crisis Bed.  (Belavich Decl. ¶ 10; ECF No. 4277 ¶ 14.)  In 2013, CDCR finalized a quality improvement audit tool.  (Belavich Decl. ¶ 13.)

### (2)    Suicide Reporting Procedures.

There is a robust suicide review process in CDCR, both at the institution level and at headquarters.  (Belavich Decl. ¶¶ 40–41; ECF No. 4277 at ¶ 29.)  This process ensures that when a suicide occurs, there is immediate notification of the suicide and appointment of a clinician to investigate and prepare a suicide report.  (Belavich Decl. ¶¶ 40–41;  ECF No. 4277 at ¶ 30.)  That report covers the possible distal and proximal causes of the suicide, the victim's mental health status before death, mental health care provided to the victim, and emergency response measures undertaken.  (*Id.*)  The report also makes recommendations, as appropriate, to correct any actions taken by custody or clinical staff.  (*Id.*)  Additionally, if cardiopulmonary resuscitation (CPR) is not undertaken in response to a suicide event, a report detailing the reasons why is sent to both the warden and headquarters staff for review.  (ECF No. 4277 ¶ 28.)

Clearly, the State has succeeded in implementing a thorough, standardized suicide prevention program. The State devotes "extraordinary resources to clinical and operational investigations into completed suicides, as well as prospective efforts to prevent such acts in the future."  (ECF No. 4271-5 at 2.)  Nationally-renowned experts have found the State's "systemwide attention to suicide prevention "especially impressive," and noted that "CDCR does

47

as diligent a job of investigating suicides as any system of prisons or jails in the country."

(Clinical Exp. Rpt. at 2; *see also* ECF No. 4314-1 at 2-3.)  Moreover, the fact that "the CDCR

suicide review team has been consistently competent and self-critical in their reviews of the

[2011] suicides, . . . is powerful evidence that CDCR is not deliberately indifferent to the

prevention of suicides among its inmates."  (ECF No. 4326–6 at 4.)  In light of this evidence,

Plaintiffs cannot show that California is deliberately indifferent to the suicide risk posed to its

prisoners.

   **b.**  **California Successfully Prevents Hundreds of Suicide Attempts**
      **And Intervenes To Provide Crisis Care To Thousands Of**
      **Inmates Each Year**

   In addition to all the programs and measures implemented and carried out by dedicated

state officials in their efforts to prevent suicides, what is wholly ignored by Plaintiffs are the

thousands of lives saved each year by these measures.

   The State prevents hundreds of suicides each year and it intervenes to help thousands of

suicidal patients.  This occurs by CDCR's ability to prevent suicides through timely and

professional clinical intervention and good communication and observation by custodial staff.

(Allison Decl. ¶ 4.)  Between January 1, 2012, and December 31, 2012, CDCR successfully

prevented 347 attempted suicides, meaning actual attempts that were thwarted by prison officials.

(*Id.*, Ex. A.)

   Beyond the immediate suicide attempts that were averted, California successfully treats

thousands of inmates in need of crisis care each year—the overwhelming majority of which never

commit suicide.  In 2011, 10,946 referrals were made to another institution for admission into a

Mental Health Crisis Bed.  In 2012, the number of inmates referred to a crisis bed from another

institution rose to 11,000.  (Belavich Reply Decl. at ¶ 16, Ex. F.)   These numbers do not reflect

the thousands more who receive crisis care treatment within their own institutions. (*Id.*)

   Inmate-patients are also being sent to higher levels of care as needed.  In 2011, there were

654 referrals of inmate-patients to acute psychiatric care facilities run by DSH.  (Belavich Reply

Decl. at ¶ 16, Ex. E.)  In 2012, the number of referrals to acute state hospital facilities increased to

48

698.  (*Id.*)  For inmates with chronic mental health conditions, 937 inmates were referred to DSH

intermediate care facilities in 2011, and 1,016 referred in 2012.  (*Id.*, Ex. D.)

These numbers reflect thousands of successful interventions and prevention of suicide by

California officials each year.  California's suicide prevention program is comprehensive and

responsive.  Given the thousands of inmates that are treated and saved each year, Defendants'

system of treatment for inmates in crisis refutes any allegation of deliberately indifference to the

issue of inmate suicides.

**2.  The Constitution Does Not Require that California Prevent All Suicides, or Maintain a Particular Suicide Rate, and Thus Plaintiffs' and the Special Master's Reliance on Such Comparisons Are Inapposite for this Constitutional Analysis.**

Unable to meet the stringent deliberate indifference standard discussed above, Plaintiffs

rely on vague metrics to try to meet their burden.  Thus, they claim generally that California's

suicide rate has "remained high" for several years, and, relying on a national report, that the

suicide rate is above the national average.  (Opp'n at 42.)  Although the State is committed to

continuing to work to reduce the suicide rate, the Constitution does not require that a prison

system have a particular suicide rate, any more than the Constitution requires that prison officials

prevent all suicides.  In short, the deliberate indifference standard is not results-oriented, but

instead looks at the reasonableness of prison officials' actions.

**c.  Suicide Rate Is Not the Litmus Test to Assess the Constitutionality of California's Mental Health Program.**

As noted above, the deliberate-indifference standard does not prescribe particular results,

but instead hinges on whether prison officials responded reasonably to known risks of serious

harm.  Where prison officials discover that an inmate has suicidal tendencies and take preventive

measures, "the question is only whether the measures taken were so inadequate as to be

deliberately indifferent to the risk."  *Rellegert*, 924 F.2d at 796.  That inmates ultimately commit

suicide (and, by logical extension, the rates at which such suicides take place) does not *ipso facto*

show that Defendants were deliberately indifferent.  *Id.*  "In fact, tying the suicide to proof of

49

1

2

deliberate indifference is tantamount to requiring jailers to provide suicide-proof institutions."

*Id.*; *see also Perez*, 380 F. Supp. 2d at 840 (noting that prisoners do not have a general right "to

3

be absolutely protected against committing suicide").  And statistics do not displace the deliberate

4

indifference test.  *Boncher v. Brown* County, 272 F.3d 484, 487 (7th Cir. 2001) (Posner, J.)  ("It

5

would not be sound to condemn a jail administrator if the rate of suicide in his population was

6

within one or two standard deviations of the rate elsewhere").  Thus, as a legal matter, Plaintiffs'

7

and the special master's reliance on putative differences between California's suicide rates and

8

those of other states is simply inapposite because it overlooks the relevant legal requirement of

9

deliberate indifference to a known risk of harm.

10

Moreover, even if the U.S. Department of Justice Report's report entitled "Mortality in

11

Local Jails and State Prisons, 2000-2010—Statistical Tables" (DOJ Mortality Report) is used for

12

comparison purposes, *California's suicide rate is not an outlier.*  According to this report,

13

California's prison suicide rate is in the middle of other state prison systems.  (ECF No. 4347 at

14

8:10-11.)  Based on prison mortality statistics from 2001 through 2010, California's average

15

prison suicide rate of 20 for this time period is lower than or equal to that of 20 other states.  (*Id.*

16

at 8:12-13.)  If ranking higher than the national average were the constitutional litmus test (which

17

it clearly is not), then California is in the company of the majority of states.  Twenty-five other

18

states have prison suicide rates higher than the national average of 16.  (*Id.* at 8:15-16.)

19

California's suicide rate over the last decade is less than half that of the national suicide rate in

20

jails, 41 per 100,000.  (*Id.*)  Taken at face value, the special master's emphasis on suicide rate

21

comparisons suggests that 25 other states and the vast majority of jails across the country are

22

violating the Constitution.  This cannot be squared with the case law.

23

24

**d.    The Suicide-Rate Comparisons in the Special Master's Reports
Are Misleading, and Overlook Other Causal Factors.**

25

Suicide-rate comparisons between California and other states is misleading.  Plaintiffs and

26

the Special Master place undue reliance on comparisons between California's reported suicide

27

rate and those noted in the DOJ Mortality Report.

28

50

But, as the Mortality Report itself notes, "Mortality rates between states are not directly comparable because rates are not adjusted for differences in age, sex, race, geographic location, and any other characteristics." (*Id.* at 3.)  Moreover, as the State has pointed out, there are numerous demographic factors that impact these rates, and render comparisons between California's suicide rate and those reported in the DOJ Mortality Report questionable at best. First, suicide rates vary substantially based on commitment offense.  For example, murderers and other violent offenders have a far higher likelihood of committing suicide than someone with a shorter sentence.  Offenders facing long prison sentences are also more likely to commit suicide—an important factor given that California has the largest population of inmates serving life sentences of any correctional system in the country.  As discussed in previous filings, prison population demographics, including race, culture, age, commitment offense, morbidity rate, and other factors such as the prevalence of prison gangs, are all relevant to suicide risks, and must be evaluated in such a comparison.  (ECF No. 4347 at 7:26-8:9; Dvoskin Response to 2011 Suicide Report at 5.)  In short, comparing only California's prison suicide rate with that of other states ignores the complexities of prison population demographics across states and yields a simplistic and misleading comparison that is meaningless under the case law.

Further, the Special Master's comparison fails to take into account criminal justice realignment's impact on California's 2012 prison suicide rate.  (ECF No. 4347 at 9.)  Violent offenders—the majority of offenders remaining in prison after realignment—commit suicide at nearly three times the rate of nonviolent offenders.  (*Suicide and Homicide in State Prisons and Local Jails*, U.S. Dep't of Justice, Bureau of Justice Statistics, August 2005, p. 7, *available at* www.bjs.gov/content/pub/pdf/shsplj.pdf (last visited March 11, 2013).)  Thus, while California's overall prison population has gone down, the offenders most prone to suicide have remained in prison.

Moreover, as the Seventh Circuit has noted, suicide rate by itself is not a meaningful standard in the context of deliberate indifference claims against jailers or prison officials. *Boncher v. Brown County*, 272 F.3d 484, 486 (7th Cir. 2001) (Posner, J.).  "It is not the number

51

of suicides that is a meaningful index of suicide risk and therefore of governmental responsibility

[citations]; and it is not even the rate by itself, but rather the rate relative to the 'background'

suicide rate in the relevant free population (the population of the area from which the jail draws

its inmates) and to the rate in other jails." *Id.* at 486-87.  According to the Centers for Disease

Control and Prevention, adult males in the country commit suicide at a rate of 25.94 per 100,000.

*Available at* http://www.cdc.gov/nchs/fastats/suicide.htm (last visited March 21, 2013).  The

American Foundation for Suicide Prevention states that a person commits suicide every 13.7

minutes in the country.  Facts and Figures, American Foundation for Suicide Prevention,

available at http://www.afsp.org/index.cfm?fuseaction=home.viewPage&page_id=04EA1254-

BD31-1FA3-C549D77E6CA6AA37 (last visited March 21, 2013).

The Special Master's 2011 and 2012 Suicide Reports gloss over these important statistical

distinctions, and invite the Court to overlook the controlling legal standard.  The Court should

decline this invitation, and properly focus on the relevant legal standard.

### 3.   The Special Master's 2011 and 2012 Suicide Reports Are Not Evidence Of Systemic Deliberate Indifference To A Risk of Suicide.

Plaintiffs rely almost exclusively on the special master's suicide reports to support their

claim of constitutional infirmity.  But the special master's 2011 and 2012 suicide reports are

deeply flawed.  These suicide reports scour the record for errors, invariably finding some past

wrong with the benefit of 20-20 hindsight.  Those errors—as is shown in detail below—

frequently occurred months or years before the suicide itself or were clearly not the actual and

proximate cause of death.  Many of the purported "mistakes" identified in the reports are no more

than differences in clinical judgment about an inmate's treatment needs at the time.  In many

instances, the special master's conclusion that a suicide could have been prevented had "X"

occurred rests on sheer speculation.  In those far fewer instances where the special master raises

legitimate concerns, the evidence consistently shows that prison officials promptly and effectively

responded to the identified shortcomings.  In short, the special master's 2011 and 2012 suicide

1
2
reports, which purport to show systemic deliberate indifference, instead largely amount to an

impermissible exercise in second-guessing and conjecture.

3
4

          **a.**    **The Special Master's 2011 and 2012 Suicide Reports Concede That The Vast Majority Of Suicides Were Not Foreseeable And Therefore Defendants Cannot Have Been Deliberately Indifferent To A Risk Of Suicide**

5
6
7
      It is bedrock law that deliberate indifference to a known risk of suicide requires a "strong

likelihood, rather than mere possibility, that self-infliction of harm will occur." *Torraco v.*

8
9
*Maloney*, 923 F.2d 231, 236 (1st Cir. 1991). *See Cook v. Sheriff of Monroe Cty, Florida*, 402 F.3d

1092, 1116 (11th Cir. 2005) ("Foreseeability … in a prison suicide case, [requires] knowledge of

10
11
'a strong likelihood'" that a suicide will occur); *Popham v. City of Talladega*, 908 F.2d 1561,

1563 (11th Cir. 1990) ("[T]he mere opportunity for suicide, without more, is clearly insufficient to

12
13
impose liability on those charged with the care of prisoners."); *Colburn v. Upper Darby*

*Township*, 946 F.2d 1017, 1024 (3rd Cir. 1991) (same) .

14
15
      Plaintiffs conveniently ignore that the special master himself found that only 4 of the 34

completed suicides in 2011 were "foreseeable" or "highly likely foreseeable."   (ECF No. 4308 at

16
17
122, 160, 184, & 236). *See* Dfts Objections and Motion To Strike Or Modify Portions Of Special

Master's Report of 2011, at 10-11, incorporated herein in its entirety.[21]  The remaining 30

18
19
suicides in 2011 were deemed by the special master to be "not foreseeable," "probably not

foreseeable," or simple "possibly foreseeable." (ECF No. 4308.).  Similarly, of the 15 reported

20
21
suicides in the first half of 2012, the special master found that 13 were not foreseeable.  (Special

Master 2012 Suicide Report, ECF No. 4376.)  These findings by the special master foreclose

22
23
Plaintiffs' assertion that Defendants are responsible for having failed to prevent these suicides.

Prison officials cannot be held liable under the Constitution for risks that they did not know

24
25
about, much less for risks that they could not have known about. *Farmer*, 511 U.S. at 838.

26
27
---

[21] Although the Court overruled Defendants objections and request to strike portions of the special master's report, it did so recognizing that Defendants could raise their arguments again in consideration of evidence of Defendants' suicide prevention measures.  (ECF No. 4361.)

28

Plaintiffs also fail to mention that the special master identified 10 suicides in 2011 (of 34) and 4 suicides in 2012 (of 15), *in which the inmate had been adequately treated or the suicide could not have been foreseen or prevented by any prison official.*  In fact, the special master found that only 6 completed suicides in 2011 were actually "preventable" or "highly likely" preventable.[22]  Taken together, these findings confirm that the special master's suicide reports— which only identify an isolated handful of suicides that were foreseeable or preventable—cannot hold up as evidence of system-wide deliberate indifference to the risk of suicide.

### b.    The Special Master's 2011 and 2012 Suicide Reports Do Not Demonstrate Deliberate Indifference.

The special master's suicide reports criticize the State's responses to suicides in three major areas: 1) referrals to higher levels of care; 2) completions of suicide risk evaluations; 3) emergency responses; and 4) 30-minute welfare check.  These criticisms are unfounded, and ignore the constitutional standard because they disregard the causation requirement, and because they engage in hindsight second-guessing and speculation.

### (1)    Failure to Refer Inmates to Higher Levels of Care

That the special master's suicide reports take issue with mental health staff's responses in some instances does not suffice under the deliberate indifference standard.  The Eighth Amendment is not violated when someone simply disagrees with the course of treatment that prison officials thought was appropriate under the circumstances; a difference of medical opinion about appropriate treatment does not establish a Constitutional violation.  *Estelle v. Gamble*, 429 U.S. 97, 107 (1976).  "Where a defendant has based his actions on a medical judgment that either of two alternative courses of treatment would be medically acceptable under the circumstances,

---

[22] The special master's claim that Defendants are responsible for "preventable" suicides even where the suicide was not foreseeable is spurious. A state official's legal obligation only arises in response to a known, obvious risk of danger. *Farmer*, 511 U.S. at 838.  Numerous courts have rejected deliberate indifference claims where the risk of suicide was not apparent, even where an emergency response was botched. *See, e.g., Liebe v. Norton*, 157 F.3d 574, 576 (8th Cir. 1998) (finding no evidence of deliberate indifference even when CPR was delayed by 15 minutes); *Whitt v. Stephens Cty*, 529 F.3d 278 (5th Cir. 2008) (rejecting suicide deliberate indifference claim despite officer's failure to check inmate's pulse or to administer CPR).

54

plaintiff has failed to show deliberate indifference, as a matter of law." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

In several cases, the special master's reports second-guess clinicians who met with the inmate personally, and purport to provide a better diagnosis and treatment recommendation.  In his 2011 Suicide Report, the special master took issue with 7 cases where he found problematic mental health staff's response, and opined that the inmates should have been referred to a higher level of care – inmates B, CC, I, Y, N, O, and FF.[23]  The 2012 Suicide Report had 2 such cases, inmates E and M.  A closer analysis reveals that most of these conclusions are after-the-fact second-guessing of the professionals who made these clinical decisions.  At other times, these conclusions have no causal link to the inmate's ultimate death.  As such, they do not establish deliberate indifference under the governing legal standard.

For example, the 2011 Report surmises that Inmate A's death may have been preventable if there had been more cooperation between medical and mental health, and if he had been referred to a higher level of care.  (ECF No. 4308 at 58.)  The special master's conclusion that such collaboration would have prevented the suicide is a quintessential example of hindsight rationalization, which the law rejects under the Eighth Amendment.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  Further, the report's perfunctory conclusion that the inmate should have been referred to a higher level of care overlooks the fact that the inmate received suicide risk evaluations from different clinicians at least four different times, was referred to a crisis bed at least once, and had regular mental health contacts.  (ECF No. 4308 at 52-54.)  His last Suicide Risk Evaluation did not indicate any suicidal or homicidal ideation, and the inmate was informed that he could obtain further mental health treatment if he needed it.  (*Id.* at 54.)  When staff interviewed him, he denied thoughts of harming himself or others.  (Hoffman Reply Decl. ¶ 29.).

---

[23] The details concerning the State's position with respect to each of these cases are discussed in the objections to the special master's 2011 Suicide Report (ECF No. 4326) and are incorporated herein by reference.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Similarly, the 2011 Report concludes that Inmate B's suicide "may very well have been preventable had he been referred to a higher level of care." (ECF No. 4308 at 66.)   Mental health staff assessed this inmate's case for transfer to the Department of State Hospitals, but ultimately decided that his family's social support was more important than the potential value of a different clinical environment. (*Id.* at 62-64.) As with the previous case, the Special Master's conclusion that a referral to a higher level of care "may have" prevented this suicide is speculative, and thus irrelevant under the caselaw. The operative question is whether "the course of treatment the doctors chose was medically unacceptable under the circumstances," and whether "they chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson*, 90 F.3d at 332 (citing *Farmer*, 511 U.S. at 836-37).  These same defects infect the special master's conclusions about the deaths of inmates E, F, H, I, N, O, P, and S, among others. (*See* Defs.' Objs. To Special Master Rep., ECF No. 4326.)

Inmate H provides another case in point.  Although this inmate committed suicide in May 2012, he apparently had a reported suicide attempt and concomitant hospitalization eleven years earlier. (ECF No. 4376, Appx. H, at 40-41.)  When he entered CDCR custody around December, 2011, a clinician assessed this inmate. (*Id.* at 41.)  If the inmate is taking psychotropic medication or received mental health services during previous incarceration, or if the clinician otherwise deems it appropriate, the inmate is referred for further mental health evaluation. (*Id.*)  In this inmate's case, a clinician determined that none of these warranted referral to mental health treatment. (*Id.*)  But the special master disagrees, surmising that the inmate's history of a suicide attempt and hospitalization *eleven years prior* "should have been enough for the clinician to utilize the other criteria for referral based on the inmate's history alone." (*Id.* at 44.)

The Special Master's post hoc disagreement with the clinical choices made simply does not meet the stringent constitutional standard of systemic deliberate indifference.

### (2)    Completion of Suicide Risk Evaluations

The special master reported that in 2011, "[I]n 50 percent [or 17] of the suicide cases in 2011, inmate suicide risk evaluations were either not done, or found levels of 'low' or 'no

56

1  appreciable' risk of suicide, without adequate consideration of risk factors, past history, and/or

2  review of medical records."  (ECF No. 4308 at 3.)  In 2012, the special master reported that

3  failure to conduct adequate suicide risk assessments appeared in six of the 15 reviewed cases.

4  (ECF No. 4376 at 4.)  (C, F, J, M, N, & O.)

5  As noted above, the special master often simply disagrees with a clinician's reasonable

6  treatment of the inmate.  Inmate F in the 2012 Report received at least two suicide risk

7  assessments.  The initial screening found that the inmate was depressed and had considered

8  suicide, and staff referred him for further evaluation.  (ECF No. 4376 at 26-27.)  The inmate was

9  later transferred to a Mental Health Crisis Bed.  (*Id.*)  After further assessment, the clinical team

10  discharged the inmate from the crisis bed, finding that he had "moderate chronic and low acute

11  risk for suicide," but providing for a five-day follow-up at the CCCMS level of care.  (*Id.*)  As

12  required, the inmate received the five-day follow up, which assessed his suicide risk as "moderate

13  chronic and low acute."  (*Id.*)  Despite the fact that numerous clinicians met in person with this

14  inmate and assessed his suicide risk as low, the special master disagreed.  (*Id.*)  Without pointing

15  to any evidence, the Report divines that the MHCB treatment team "may have minimized the

16  inmate's threats of self-injury."  (*Id.* at 30.)  But, as noted above, such hindsight second-guessing

17  does not establish that this inmate's treatment violated his constitutional rights.

18  Inmate E in the 2012 Report is another example of the special master's improper second-

19  guessing of prison clinical staff.  This inmate received three different evaluations, five days apart,

20  from more than one mental health professional.  (ECF No. 4376, Appx. H, at 85-86.)  All three

21  evaluations assessed the inmate's suicidality, and properly identified the inmate's objective risk

22  factors.  (*Id.*)  The first clinician recommended the inmate's inclusion in the Mental Health

23  Services Delivery System, but determined that the inmate's case did not warrant placement in a

24  Mental Health Crisis Bed.  (*Id.* at 85.)  A second clinician met with the inmate the next day, noted

25  the inmate's suicide attempts, and confirmed his inclusion in the mental health system.  (*Id.*)  A

26  third clinician met with the inmate three days later, assessed his suicidality, and conferred with

27  both the clinician on duty and the inmate's primary physician to assess the inmate's suicidality.

28

57

1   (*Id.* at 87.)  The inmate was subsequently seen by an IDTT, and met with his primary clinician at

2   least four times before he committed suicide.  (*Id.*)  Despite this methodical mental health

3   treatment, the Special Master concluded that the inmate's death was "preventable had he received

4   adequate evaluations and referral to an MHCB based on his clinical assessments dated 4/5/12,

5   4/6/12, and 4/9/12."  (*Id.* at 91.)  This conclusion fails to take into account the fact that different

6   clinicians saw the inmate numerous times, none of whom determined that crisis bed placement

7   was appropriate.  (*Id.*)  Moreover, this conclusion does not explain how such placement would

8   have prevented the inmate's ultimate suicide.  (*Id.*)  As such, the conclusion that this suicide was

9   preventable amounts to mere speculation, and second-guessing.  (*See* McKinney Decl. Ex. 12

10  [Dvoskin Response to 2012 Suicide Report].)

11          Further, the 2011 and 2012 Suicide Reports do not establish deliberate indifference because

12  they do not address the requisite causation element under the Eighth Amendment.   For example,

13  in the case of inmate A's suicide in 2011, the special master faults Defendants for not completing

14  a suicide risk evaluation *two years* before the suicide.   He concludes that the inmate's death

15  "may have been preventable" as a result without any evidence supporting such an attenuated

16  connection.  Moreover, the special master glosses over the fact that inmate consistently denied

17  thoughts of harming himself or others in his various contacts with mental health

18  clinicians.  (Hoffman Reply Decl., ¶ 29.)

19          Similarly, the 2012 Report determined that inmate G's suicide was "preventable" had the

20  inmate been referred to an IDTT for evaluation of his mental health status and possible inclusion

21  in the mental health system.  However, this inmate received a mental health screening at the

22  Reception Center, and he did not have any mental health problems or a history of mental health

23  treatment.  (ECF No. 4376, Appx. H at 33.)   He received two clinical contacts in January and

24  April 2012, in which he denied any suicidal ideations both times and reported only feelings of

25  anxiety.  (Hoffman Reply Decl. ¶¶ 45-49.)  On the *morning* of his suicide, he was seen by a

26  mental health social worker for a disciplinary issue, who documented no reason to make an

27  emergency change on the inmate's status and no reason to believe he might be suicidal.  The

28

58

Reply Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5)
(2:90-cv-00520 LKK JFM PC)

special master's report faults the fact that the interdisciplinary assessment did not take place, and speculates that such an assessment "might have led to mental health staff becoming aware of [the inmate's] downward course and the potential for suicide." (ECF No. 4376, Appx. H at 39.)    But there is nothing to support this naked assertion, particularly given the fact that mental health staff saw the inmate on multiple occasions, none of which disclosed suicidal ideation. (*See* Hoffman Reply Decl. ¶¶ 45-49.) There is simply no evidence to show that the absence of an IDTT assessment was the actual and proximate cause of inmate G's death.

### (3)    Purported Emergency Response Errors

The special master's reports also take the Department to task for its emergency response times. Although delay in providing treatment can sometimes establish deliberate indifference, such delays must cause "significant harm," and defendants must have been aware that such harm would befall an inmate. *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002); *Shapley v. Nv. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). *See e.g.*, *Liebe*, 157 F.3d 574 at 576 (rejecting deliberate indifference claim even when CPR was delayed by 15 minutes); *Whitt*, 529 F.3d at 281 (rejecting deliberate indifference claim despite officer's failure to check inmate's pulse and made no effort to administer CPR). The special master offers no evidence that any delay in providing an emergency response in these cases was causally related to inmate deaths.

For example, the 2011 report concludes that the death of inmate D "may very well have been preventable," criticizing a delay in providing CPR. (ECF No. 4308 at 79.) The first responders apparently delayed giving CPR for five to eight minutes. (*Id.*) But the inmate ultimately responded to CPR, which means that the delay was not causally related to his death. (*Id.*) Similarly, the Special Master deemed Inmate W's suicide preventable, in part criticizing a three-minute delay in giving the inmate CPR. (ECF No. 4308 at 228.) But, as the report notes, this inmate's body was in rigor mortis when CPR was started, and "it is unlikely that the inmate would have been resuscitated" if CPR had been timely given. (*Id.*)

The case of Inmate I in the 2012 report likewise erroneously lays blame on the emergency response. (ECF No. 4376, Appx. H at 48.) The special master concludes that staff delayed in

59

cutting the ligature from the inmate's neck, and this five-minute delay allegedly rendered the inmate's death "preventable." (*Id.*)  But, as the report notes, when staff discovered the inmate's body, they also found multiple bloodstained items, including towels and sheets. (*Id.* at 47.)  The inmate had also devised a funnel to drain his blood, and the bucket connected to the funnel "contained approximately 1 gallon of blood." (*Id.*)  Thus, it is unclear how a minimal delay in cutting the ligature could have prevented the death of an individual who had lost at least one gallon of blood.

Similar examples of error by the special master may be found with respect to inmate X in 2011.  Although the special master found a "three-minute delay" in the administration of CPR by custody, a thorough investigation of the incident confirms that custody staff responded appropriately.  Any brief delay in emergency response was the result of the responding officer taking necessary safety measures before opening the cell door, by waiting for another officer before opening the cell door. (Buckley Reply Decl. ¶¶ 6-12.)  In any event, Defendants are not aware of any legal authority holding that a three minute delay amounts to deliberate indifference.

### (4)    Problems with 30-Minute Welfare Checks

The special master's reports also blame the Department for alleged errors in conducting 30-minute welfare checks, which in turn purportedly made some suicides preventable.  A closer analysis reveals that the special master's findings in several cases are factually incorrect or rife with speculation.

In the case of Inmate X in the 2011 report, the special master concludes that "[t]his inmate's suicide may have been preventable had custody checks been conducted" because the body was noted to be in rigor mortis at the time of discovery.  The special master's conclusion is flawed—this inmate resided in general population housing and therefore was never subject to 30-minute welfare checks by custody staff.  Custody leaders at the institution confirm that all custody checks were administered in a timely and appropriate manner.

The following tables summarize in part how the special master's 2011 and 2012 Suicide Reports overlook the constitutional standard, and, concomitantly, demonstrate why the Court

60

should disregard the reports as evidence of systemic deliberate indifference.  In addition,

Defendants reincorporate their specific case arguments to their objections to the special master's

2011 suicide report.  (ECF No. 4326.)

### Special Master's 2011 Suicide Report

| Type of Error | Inmate Designation |
| --- | --- |
| Causation error | A, E, O, P, W, X |
| Clinical difference of opinion | B, E, N, P, R, DD, FF |
| Speculation/post hoc second guessing | A, F, H, N, P, R, Q, S, AA, CC, DD, FF |

### Special Master's 2012 Suicide Report

| Type of Error | Inmate Designation |
| --- | --- |
| Causation error | G, I, J |
| Clinical difference of opinion | C, E, H, I, O |
| Speculation/post hoc second guessing | J, N |

**(5)    In Instances Where the Department Finds a Problem with its Suicide Prevent Process, it Diligently Implements Corrective Action.**

Strip away the special master's erroneous conclusions that most of these suicides were

preventable, and the Department's suicide rate of foreseeable or preventable suicides significantly

decreases.  And, in the instances where the suicide review process identified valid concerns, the

evidence shows that the institutions responded immediately to remedy these issues.

For example, in the 2011 report Inmate A committed suicide by ingesting 465 Tramadol

tablets, and the Special Master noted a "serious failure in monitoring" pain medications.  Pleasant

Valley has in place a Pain Management Program to address this concern, and to prevent similar

problems from recurring.  (Reply Decl. F. Igbinosa Supp. Defs.' Mot to Terminate ¶¶ 2-10.)  The

61

2011 report also noted problems with Inmate K's suicide, and concluded that the inmate should have been included in the mental health program because of the medications he was taking at the sending institution. (ECF No. 4308 at 127-128.) In response to these concerns, the institution put in place numerous improvements to its intake process, to better screen new arrivals for any mental health issues, and to administer medications to them. (Reply Decl. T. Felton Supp. Defs.' Mot. Terminate ¶¶ 8-12.) In response to these concerns, the institution put in place numerous improvements to its intake process, to better screen new arrivals for any mental health issues, and to administer medications to them. (Reply Decl. T. Felton Supp. Defs.' Mot. Terminate ¶¶ 8-12; Hoffman Decl. ¶¶ 36-39.)

In response to concerns raised about inmate H's suicide in 2012, the institution increased the frequency of emergency response drills from quarterly to monthly, created an emergency response drill based on the factual scenario in inmate H's case to prevent a similar breakdown by the nursing staff, and instituted additional nursing staff training. (Keith Decl. ¶¶ 8-10.)

### 4. Defendants Have Not Ignored Recommendations By the Special Master or Their Former Consultant Lindsay Hayes

Plaintiffs' remaining arguments gain no traction. Plaintiffs contend that Defendants have not implemented "life-saving suicide prevention measures" that their own experts recommend. (Opp'n at 43.) In this regard, they try to attach constitutional significance to an errant comment that the report by Mr. Hayes had been "buried." But CDCR did no such thing, and the Constitution does not require that prison officials adopt particular recommendations—instead, the analysis is whether a prison system is deliberately indifferent to serious medical needs. *See, e.g., Frake v. City of* Chicago, 210 F.3d 779, 782 (7th Cir. 2000) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent."). And it is undisputed that California has made great strides and continues to put significant effort to prevent suicide in its prisons. (*See* infra.) Plaintiffs can

62

point to no caselaw holding that Defendants have to adopt an expert's proposed measures to meet the constitutional standard, particularly given the substantial measures that Defendants have in fact adopted, and the deference that state prison officials are due under the Prison Litigation Reform Act. *Turner v. Safley*, 482 U.S. 78, 84-85 (1987) ("Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."); *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).

### a.  Defendants have not ignored the Special Master's Recommendations.

In the special master's recent report on suicides occurring in the first six months of 2012, the special master's expert cites to three recommendations that he asserts, CDCR, "*year after year, ... fails to implement.*" (ECF No. 4376 at 8–10.)  This is simply not true.

The first stated recommendation is:  "Continuation of monitoring and assessment of conduct of five-day clinical follow-up, custody staff adherence to policies and procedures regarding conduct of custody welfare checks and others, and supervision of inmates, including those who are single-celled and have histories of increased risk of suicide."  (ECF No. 4376 at 8.)  But as discussed above, all of these items are ongoing.  (Belavich Decl. ¶ 6, 42, 44 & 47**;** Allison Decl. ¶¶ 4–14.)

The second recommendation is:  "Continuation of referrals to higher levels of care, particularly referrals to MHCBs and to DSH programs, as per indicators within the 7388B referral process."  (ECF No. 4376 at 9.)  This comment is confusing—the sustainable process evaluation conducted jointly between the Special Master and CDCR in late 2011 showed that the system in place is working as intended.  (Belavich Decl. ¶¶ 14–15.)  In addition, as the special master is well aware, CDCR has continued to monitor and see improvements in the process.  (*Id.,* Ex. C.)  Finally, as noted, referrals to DSH programs have increased since 2011.  (*Id.* at ¶ 16.)

And the last recommendation is:  "Continuation of monitoring emergency response procedures, particularly in higher-custody housing such as administrative segregation, secured

63

housing units, and psychiatric services units, establishment of a state-wide criteria to improve emergency cell entry and extraction procedures."  Again, these actions are occurring as well. (Allison Decl. ¶¶ 4–14; Belavich Decl. ¶ 45.)

### b. Defendants' Did Not "Bury" the Hayes Report, But Instead Implemented Most of its Recommendations.

In 2010, as part of its continuing efforts to improve responses to inmate suicide risk and assessment, the State hired Lindsay Hayes, a correctional suicide expert.  (Reply Decl. R. Canning Supp. Defs.' Mot. Terminate ¶ 3.)  On August 16, 2011, after touring a few institutions and reviewing certain aspects of CDCR's suicide prevention program, he prepared a report, which provided a number of recommendations to address potential issues in the State's suicide responses.  (Belavich Decl. ¶ 18.)  CDCR staff continues to analyze and review his recommendations.  (*Id.*)  In some instances, the Report duplicated CDCR's efforts. For instance, Hayes suggested changes to the Program Guide.  (*Id.* ¶ 22.)  CDCR had met with the Special Masters' experts to review and revise the Program Guide, before receiving Hayes's report.  (*Id.*)  In addition, some of his recommendations duplicated what had already been in place such as the recommendations that inmates discharged from Outpatient Housing Units receive five-day follows up.  (*Id.,* Ex. G.)   In other cases, CDCR agreed with his recommendations or observations and had either previously adopted them or is in the process of adopting them.  (*Id.* ¶ 23 [revisions to training curricula].)  Still others, CDCR is continuing to consider.  (*Id.* ¶ 21 [expansion of Mental Health Tracking System to include data collection on all inmates with suicide attempts].  And in some instances, CDCR disagrees with the recommendations.  (*Id.* ¶ 23 [formal training not required to disseminate research about suicides]; ¶ 24 [use of Outpatient Housing Units for suicide precaution and watch now obviated]; ¶ 25 [current threshold for suicide observation takes into account clinical acuity].)

Plaintiffs' assertion that Defendants "buried" the Hayes Report simply lacks merit.  And as Dr. Canning, who made the comment in an e-mail that the report was "buried," has since

64

explained that it was "an unfortunate off-hand remark" he made when he lacked relevant information.  (Canning Decl. ¶ 4.) [24]

> **c.   Plaintiffs' Remaining Arguments Also Do Not Establish an Ongoing Constitutional Violation.**

Plaintiffs further quibble with Defendants' specific measures for suicide prevention, and purport to engraft more requirements into the prison system's suicide prevention efforts.  (Opp'n at 46.)  For example, Plaintiffs criticize Defendants for not implementing 30-minute welfare checks in segregation, mental health screening, and confidential mental health interviews.  (Opp'n at 46.)  Plaintiffs point to nary an authority establishing that these measures are required by the Constitution.  (*Id.*)

Additionally, the record reflects that Defendants are implementing most of these measures, despite the fact that they are not constitutionally required to do so. (Allison Decl. ¶¶ 4–19; Belavich Decl., *passim.*)

> **H.   Plaintiffs Failed to Demonstrate that the Care Provided to Inmates Housed in Segregation Violates the Eighth Amendment.**

The State has presented compelling evidence that it has developed and implemented procedures for placing and retaining inmates with mental health needs in administrative segregation or security housing units.  (Motion at 23:19-22; ECF No. 4279 at 10 & 13–16, & 4277 at ¶ 31 & Ex. 7.) [25]  It has also presented compelling evidence that when housed in these units, inmates' mental health needs are being appropriately met.  (ECF No. 4275–5; *see also, e.g.,* Gipson Reply Decl. [Corcoran] ¶¶ 17-28.)  Moreover, because Plaintiffs have failed to meet their

---

[24] Even though not addressed in detail in this reply, Defendants further note in the declaration of Dr. Belavich their review and analysis of the recommendations made by their experts.  (Belavich Decl. ¶¶ 26–39.)

[25] Inmates at the EOP and CCCMS levels of care may be housed in administrative segregation units.  (Program Guide ch. 7.)  Inmates at the CCCMS level of care who are assessed a term of confinement in a segregated housing unit can be housed in a Security Housing Unit. (*Id.* ch. 8.)  Five prisons—California Correctional Institution, California State Prison, Corcoran, Pelican Bay State Prison, California State Prison, Sacramento, and Central California Women's Facility, have Security Housing Units.  (*Id.*)  Inmates at the EOP level of case who are assessed a term of confinement in a segregated housing unit can be housed in a Psychiatric Services Unit. (*Id.* ch. 9.)  Three prisons—California State Prison, Sacramento, Pelican Bay State Prison, and California Institution for Women, have Psychiatric Services Units.  (*Id.*)

burden to show otherwise, this Court should reject Plaintiffs' argument that the conditions of CDCR's segregated confinement exacerbate symptoms of mental illness and create an unacceptable risk of injury to inmates with mental health needs.

The State does not dispute that the administrative segregation and security housing units remain a high-risk environment for suicide.  That is why the State continues to address suicides in segregated housing units, including recent efforts to reduce unit size, prioritize transfers, and provide electrical appliances.  (ECF No. 4275–5 at 36; *see also* discussion at Section V.G *infra*.)  Plaintiffs, however, exaggerate the significance of the suicide rate in these units and inaccurately state that "[t]his problem has persisted for years."  (Opp'n at 49:8–9.)  In fact, the State's efforts are effective and suicides occurring in administrative segregation units as a percentage of the overall suicide rate have significantly declined since 2004 when the special master found that 69.2% of suicides occurred in administrative segregation.  (*See* ECF No. 4313–6 ¶¶ 17–18 & Ex. 6-7.)  By comparison, the suicides in administrative segregation units in 2012 totaled 11 or 34%.  (ECF No. 4277 ¶ 27.)  Moreover, suicides have decreased in security housing units.  (ECF No. 4313–6 ¶ 19.)

Plaintiffs urge this Court to find the State is acting with deliberate indifference to the needs of mentally ill inmates in segregated housing because they: (1) house the inmates in administrative segregation units for non-disciplinary reasons; (2) place the inmates in administrative segregation for extended lengths of time; (3) return the inmates from inpatient housing units back to segregated housing; (4) do not conduct 30 minute welfare checks for all inmates in administrative segregation; and (5) allegedly ignore the constitutional harms inflicted on the inmates in security housing units.  (Opp'n at 49-66.)

Plaintiffs largely premise their argument on the opinions of three of their experts— Stewart, Kaufman, and Haney—that the conditions of CDCR's segregation units exacerbate symptoms of mental illness and create mental illness where none previously exist.  (*Id.* at 50:8– 9.)  However, a recent empirical study of the psychological effects of administration segregation on inmates found that the inmates did not deteriorate psychiatrically, most offenders showed no

66

change, and in fact, many individuals showed improvement, some of whom were those with a diagnosed mental illness.  (McKinney Decl., Ex. 11 [O'Keefe, Maureen L, "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation," October 31, 2010, (O'Keefe Study)].)  Moreover, "a lot of people in segregation don't want to step down. The notion that everybody hates segregation is incorrect.  Some people feel safer there."  (*Id.* at Ex. 1 [Dvoskin Depo.] 13:4–7.)

Plaintiffs also ignore that several courts have concluded that mentally ill inmates may be segregated from the general population if they receive adequate mental health programming and treatment.  *See Madrid v. Gomez,* 889 F. Supp. 1146, 1267 (N.D. Cal. 1995) (defendants are not precluded from segregating mentally ill inmates if conditions are not equivalent to the Pelican Bay State Prison Security Housing Unit); *Orr v. Larkins,* 610 F.3d 1032, 1035 (8th Cir. 2010) (dismissing Eighth Amendment claim by mentally ill inmate kept in administrative segregation for nine months were inmate received treatment and anti-psychotic medication); *In Re Long Term Administrative Segregation of Inmates Designated As Five Percenters,* 174 F.3d 464, 472 (4th Cir. 1999) (no Eighth Amendment violation where administrative segregation procedures provided for periodic visits by medical personnel of inmates displaying mental health problems). And as Defendants have already established, when inmates are housed in these units—whether in administrative segregation or secured housing units—their mental health needs are being appropriately met.  (Clinical Exp. Rpt. *passim*.)

Plaintiffs' string citations to a litany of paragraphs describing individual cases in the Haney, Stewart, and Kaufman declarations does nothing to change fact, and fails to prove that inmates in administrative segregation units are not receiving mental health programming and treatment on a systemwide basis.  (*See* Opp'n at 53:2–54:18.)  Ironically, Plaintiffs and their experts appear instead to believe that even though it may be safer to place a mentally ill inmate into segregated housing for their protection or the protection of other inmates or prison staff, mentally ill inmates should never be placed into segregated housing.  (McKinney Decl. Ex. 5 [Kaufman Depo.] 208:18-21 ["I think it's to be avoided whenever possible."].)  By this logic,

67

Plaintiffs—not Defendants—create an unacceptable risk that mentally ill inmates will be harmed or will harm others.  On the other hand, the sensitivity shown by CDCR's clinical professionals to the needs of mentally ill inmates placed into segregation—whether for safety reasons or otherwise—evidences a concern for their wellbeing.  (*See* ECF No. 4382 ¶¶ 279–80.)  Similarly, Plaintiffs and their experts advocate for the Court to ignore the discretion granted to penal officers in determining the most appropriate placements, taking into account safety concerns, in receiving inmates who have discharged from inpatient care programs back into the prison environment. This the Court cannot do.

### 1.    The State Appropriately Treats Inmates Housed in Administrative Segregation for Non-Disciplinary Reasons.

Defendants' use of administrative segregation does *not*, as Plaintiffs advocate, create an unreasonable risk of injury to the serious mental health needs of inmates to which the State intentionally has done nothing to address.  (Opp'n at 51:3-8.)  The State recognizes the risk to inmates placed in segregated units and has, as already discussed, implemented extensive measures designed to help prevent inmate suicides in segregated housing units since 2006.  *See* Section V.G.  (*Cf. id.* at 52:2–17, asserting that Defendants have done nothing since a 2006 Conference with CDCR officials and Lindsay Hayes.)  In addition, CDCR's Suicide Prevention Coordinator's January 25, 2013 report that Plaintiffs reference, "CDCR Suicides:  Results of Recent Analysis," shows sensitivity for the risks associated with placement into segregated housing, not deliberate indifference.  (*See* Bien Decl., ECF No. 4399–1, at 9–22.)  Likewise, in the 2013 article referenced by Plaintiffs written by a psychologist at the California Men's Colony, Lindsay Hayes highlights California as one state that has taken "efforts to help prisoners cope with the boredom and isolation that can lead to sensatory deprivation."  (*Id.* at 336.)

Even so, Plaintiffs assert four things in support of their argument that Defendants' use of segregation housing creates an unacceptable risk of injury to the serious mental health needs of inmates housed in those units, none of which warrant merit.  Plaintiffs first rely on Defendants' experts' deposition testimony.  But this reliance is misleading and cherry picked because Moore's

68

testimony lacks foundation, Martin's testimony is based on a broad hypothetical, and Dvoskin's testimony is that the State is meetings its constitutional obligation.  In connection with Dr. Moore's expert opinion, what Plaintiffs fail to include in their opposition is that Moore's testimony concerning the administrative segregation unit at California Institution for Men is speculative and lacks foundation given that she also testified that "she may have" interviewed men in administrative segregation at that prison and, in fact, all she could remember was that she was told there were some "EOP reception center inmates in the administrative unit" waiting for beds.  (Opp'n at 51:16–22; Bien Decl. Ex. 8 (Moore Dep. at 167 & 169, referring to DEXP 102626.)  Likewise, Mr. Martin's testimony, which is based on a broad hypothetical relating to the potential operations of the prison as whole, has no bearing on whether placing mentally ill inmates in segregated housing units for their safety or otherwise, are denied adequate mental health care.  (Bien Decl. Exs. 44–47.)  Moreover, Dr. Dvoskin reinforced his opinion that the State is meeting its constitutional obligations.  (McKinney Decl. [Dvoskin Depo.] 144:20–22.)

Second, Plaintiffs attempt to assert that Defendants failed to implement several recommendations made by their experts, yet reference only *one*—that inmates housed in an administrative segregation unit pending transfer to an Enhanced Outpatient Unit be placed at the front of any waiting list for transfer.  (Opp'n 52:21–22.)  Plaintiffs mislead the Court by representing that "*Defendants explicitly disagreed and refused to implement their own experts' recommendation.*"  (*Id.* at 52:24–25.)[26]  This is not true as reflected in the declaration of Dr. Belavich describing the State's response to the experts' recommendations.  (Belavich Decl. ¶¶ 26–39.)  And Plaintiffs point to no legal authority stating that the Constitution mandates prison officials to implement each and every recommendation made by their consultants or experts.  And, not surprisingly, Plaintiffs fail to point the Court to CDCR's current "Health Care Transportation Scheduling Priorities," which follow the Program Guide and "have been presented

---

[26] Plaintiffs cite to a document that Defendants inadvertently produced to them through discovery and that contains privileged attorney-client communications, which Plaintiffs were obligated to return under the Rule of Professional Conduct.  (Bien Decl. Ex. 92 (Defs.' Suicide Compendium, dated January 27, 2013.)  *See* Defendants' Objections to Evidence.

to the *Coleman* Special Master and have been presented under deposition to the Three Judge Panel on Prison Overcrowding." (McKinney Decl. ¶  Ex. 11.)  This pre-existing schedule creates a seven-tier priority transfer list, and acknowledges the competing urgent needs to transfer cases endorsed to leave the desert or California Correctional Center, and cases returned from Department of State Hospitals programs and Mental Health Crisis Bed units before transferring Enhanced Outpatient Program inmates from administration segregation units and reception centers.  (*Id.*)[27]

Third, Plaintiffs claim that their experts "discovered scores of prisoners" being held in segregation "because there was no appropriate beds for them to be placed."  (Opp'n at 53:2–3.)  This is false.

Even assuming that Plaintiffs found isolated instances of inmates held on segregation because of temporary bed limitations, these examples fail to prove that inmates in administrative segregation units are not receiving mental health programming and treatment on a system-wide basis.  Although Defendants believe that the State has already established that its provides constitutionally adequate care to inmates housed in administrative segregation, the evidence filed with this reply brief from clinicians at the prisons Stewart, Haney, and Kaufman visited, conclusively establish that the inmates received adequate mental health programming and treatment.

Plaintiffs' experts primarily focus on the administrative unit at California Institution for Men.  (Opp'n at 53:2–14.)  But CIM is a reception center and does not have a major mental health care program for inmates clinically determined to need an Enhanced Outpatient Program level of care.  (Jordan Reply Decl. [CIM] ¶¶ 20-29.)  For that reason, CIM places inmates into the segregation unit either for disciplinary or safety reasons pending return to the Reception Center for processing or transfer to a different prison.  (*Id.*)  In this situation, inmates housed in the

---

[27] Plaintiffs note that Defendants are not developing a systemwide non-disciplinary segregation unit.  (ECF No. 4408 at 52:25 n.2.)  The decision whether to develop such a system is outside the scope of Defendants' motion to terminate based on the provision of constitutionally adequate mental health care and should not be considered by this Court.

70

1    administrative segregation unit on a temporary basis are treated as if they were in regular or

2    reception center housing, returning to the segregation unit for the evening.  (*Id.* at ¶ 24.)

3    Plaintiffs focus on where custody houses the inmate, but forget the State's clinicians are treating

4    them consistent with their level of care.

5        Even though Defendants' expert Dr. Dvoskin recommended that CDCR transfer as

6    quickly as possible those inmates needing an EOP Program level of care who were housed in the

7    administrative segregation unit at California Institution for Men for safety reasons, he nonetheless

8    concluded that despite these limitations, "[i]nmates who are awaiting transfer to an EOP level of

9    care in an Administrative Segregation Unit were seen regularly while awaiting transfer despite the

10   obvious physical plant limitations of providing services within an administrative segregation

11   environment."  (Clinical Exp. Rpt. 23.)  In fact, as of March 13, 2013, there were a total of only

12   three inmates in the administrative segregation unit at California Institution for Men from the

13   Reception Center who were identified as needing an Enhanced Outpatient Program level of care.

14   (Jordan Reply Decl. ¶ 22 .)  All three of these men were in the unit for battery.  (*Id.*)

15       In all eight cases identified by Plaintiffs' experts Haney and Kaufman from California

16   Institution for Men, the inmates were appropriately placed and receiving adequate mental health

17   care.  (*See* Jordan Reply Decl. ¶¶ 40 [Haney Prisoner P] (CCCMS inmate placed in segregation

18   for battery on an inmate and seen weekly by clinician), 41 [Haney Prisoner Q] (inmate was seen

19   regularly for mental health treatment, left the administrative segregation unit on March 1, 2013,

20   and is no longer housed at CIM), 42 [Haney Prisoner R] (inmates was timely screened and

21   evaluated, and is seen as appropriate), 53 [Kaufman Prisoner P] (inmate receives timely clinical

22   care and additional services beyond Program Guide requirements), 51 [Kaufman Prisoner N]

23   (inmate is timely seen by his mental health clinician and reports he is "doing fine"), 52 [Kaufman

24   Prisoner O] (inmates continues to be seen within policy timeframes and is stable), & 54

25   [Kaufman Prisoner Q] ("continues to be seen according to program guidelines.")

26       Although Haney also states in his declaration that he identified "some" EOP prisoners

27   housed in an administrative segregation unit at Mule Creek State Prison waiting for transfer to

28

71

another Enhanced Outpatient Program Special Needs Yard, he only identifies one inmate—
Prisoner B—but does not mention that this inmate's medical chart establishes that he was
receiving, and continues to receive, appropriate mental health care. (Haney
Decl. ¶ 108; Colley Reply Decl. [MCSP] ¶ 5.)

Haney identifies four prisoners from California State Prison, Corcoran. (Haney Decl. ¶¶
112–113, 221-227.) But yet again, Haney fails to refute that these inmates are all receiving
appropriate mental health care. (*See* Fischer Reply Decl. [COR] ¶¶ 36 [Haney Prisoner GG]
(inmates has had 35 mental health clinical contacts between January 3 and March 7, 2013, but is
unwilling to take medication), 33 [Haney Prisoner II] (inmate has received 62 clinical contacts
with mental health staff between January 13 and March 13, 2013, more than one per day), 34
[Haney Prisoner JJ] (inmate has had 116 mental health contacts since January 1, 2013, including
12 psychiatry appointments).

Haney identified two inmates from California Correctional Institution—Prisoners LL and
MM—who allegedly were in administrative segregation waiting for a Special Needs Yard bed,
but he does not identify them as *Coleman* class members. (Haney Decl. ¶¶ 249–250; *see* Walsh
Reply Decl. ¶¶ 23-24.) A third inmate, Prisoner NN, was recently deemed to need an Enhanced
Outpatient Program level of care. (Haney Decl. ¶¶ 251–253.) Prisoner NN is waiting for
transfer, however, due to his unique circumstances—not due to overcrowding as Dr. Haney's
asserts—and has not yet been transferred. (*See* Holland Reply Decl. [CCI] ¶ 8.) A fourth
inmate—Prisoner OO is a class member at the Correctional Clinical Case Management System
level of care, but there is no indication that this inmate is in segregation for non-disciplinary
reasons or that he is not receiving appropriate mental health care. (Haney Decl. ¶ 254; Holland
Reply Decl. ¶ 9.)

Finally, Plaintiffs claim that placing inmates in administrative segregation for safety
reasons increases their risk of suicide. (Opp'n at 2–13.) Stewart points out that since 2007, 27
out of the 64 inmates who committed suicide in administrative segregation were reported as being
in the unit for safety reasons. (Stewart Decl. ¶ 279.) But there is no evidence that placement in

72

administrative segregation was the driving force behind their suicides, and certainly no evidence that inmates housed in administrative segregation are not receiving constitutionally adequate care. Plaintiffs' two examples exemplify why it is specious to assume that these inmates chose to take their own lives due to their segregated confinement.  Inmate L in the 2012 Suicide Report received a rules violation for battery on an inmate and was placed in the segregation unit on April 4, 2012.  (2012 Special Master Suicide Report, ECF No. 4376, Appx. H, at 68.)  On June 7, 2012, the inmate met with the Institutional Classification Committee and was "told that he would be transferred to another institution because of enemy concerns once he was released from the ASU; the inmate was unhappy and upset about the news regarding his transfer." (*Id.* at 70.)  The inmate took his life later that day.  (*Id.* at 71 (noting "suicide, however, appears to have been an impulsive act directly relating to his receiving what was for him 'bad news' that he would be transferred to another facility".)  Inmate N from the 2012 Suicide Report was "transferred from the general population yard at ASP to administrative segregation for safety reasons at his request on 6/27/12 after being interviewed by the yard lieutenant." (*Id.* at 80.)  Early the next morning, staff found him unresponsive in his cell.  (*Id.*)  Thus, it clear his suicide was unrelated to having spent only some hours in segregated housing.

## 2. The Eighth Amendment Does Not Recognize a Particular Length of Stay in Segregated Units.

Plaintiffs argue that CDCR's segregation units that house mentally ill inmates for excessive periods of time "drive mentally ill and vulnerable prisoners to mental health crisis and even suicide." (Opp'n 55:9–26.)  But Plaintiffs cite no legal authority for the proposition that the Constitution places a cap on the length of time a mentally ill inmate who is receiving adequate treatment can remain in administrative segregation.  On the contrary, the cases are clear that mentally ill inmates may be segregated from the general population for safety reasons if they receive adequate mental health programming and treatment.  *See Madrid*, 889 F. Supp. at 1267; *Orr*, 610 F.3d at 1035;  *In Re Long Term Administrative Segregation of Inmates Designated As Five Percenters*, 174 F.3d at 472.  And, as noted *supra* 68, empirical research does not support the suggestion that offenders necessarily deteriorate in segregated environments. Nevertheless,

73

Defendants take segregation seriously and have implemented multiple measures to address length of stay in segregated units.  (Allison Decl. ¶¶ 11-16.)

The individual cases cited by Plaintiffs' experts do not compel a contrary result.  Dr. Stewart identifies Prisoner K from California State Prison, Sacramento.  (Stewart Decl. ¶ 317.) Prisoner K was in administrative segregation for five months for assault on staff.  (*Id.*)  Prisoner K, however, was referred by his Interdisciplinary Treatment Team to the Department of State Hospitals for intermediate level of care treatment on December 27, 2012.  (Chaiken Reply Decl. [SAC] ¶ 30; Vorous Reply Decl. Ex. 8-J.)  He was accepted for treatment by the Department of State Hospitals on January 9, 2013, so he had been waiting twenty days for a transfer when interviewed by Dr. Stewart.  (*Id.*)

At Richard J. Donovan, Stewart states that he asked staff members in the Enhanced Outpatient Program Administrative Segregation Unit to help him identify mentally ill individuals "who did not come out of their cells very often."  (Stewart Decl. ¶ 334.)  The inmate identified— Prisoner DD—also happened to be among the longest residing inmates on the unit.  (*Id.*)  Stewart, however, incorrectly attributes his stay to his acuity.  According to mental health staff at Richard J. Donovan, this inmate was appropriately tracked, monitored, and transferred to the Department of State Hospitals on February 13, 2013.  (Greenwald Reply Decl. [RJD] ¶ 11 & Vorous Decl. Ex. 7-B.)  As to Prisoner EE, Stewart simply disagrees with the clinical judgment rendered by prison staff for this inmate.  (Stewart Decl. ¶ 334; Greenwald Reply Decl. ¶ 6 & Vorous Decl. 7-C.)

Stewart also visited San Quentin State Prison.  Here, he identified three inmates— Prisoners GG, E, and HH—as allegedly needing higher levels of care.  For Prisoner E, he provides no discussion of his reasoning.  (Stewart Decl. ¶ 347; *see* Monthei Reply Decl. [San Quentin] ¶ 4.)  For Prisoner GG, Stewart's suggestion to forcibly extract the inmate to a mental health crisis bed was clinically inappropriate for this inmate. (Stewart Decl. ¶¶ 343-44; *see* Monthei Reply Decl. ¶ 5.)   And for Prisoner HH, Stewart's statements concerning the diagnosis are incorrect both in the case of this inmate and generally.  (Stewart Decl. ¶ 346; Monthei Reply

74

Decl. ¶ 6.)

Like with Stewart's examples, the few inmates identified by Haney and Kaufman at Mule
Creek State Prison, California Institution for Men, California State Prison, Corcoran, and
California Correctional Institution do not establish systemwide deliberate indifference to mental
health care. (*See* Colley Reply Decl. [MCSP] ¶¶ 4 & 9; Telander Reply Decl. [MCSP] ¶ 13
(responding to Haney Decl. ¶¶ 86-94 [Prisoners A, G, H]); Jordan Reply Decl. ¶¶ 39-42 & 57
(responding to Haney Decl. ¶¶ 145-46 [Prisoner O], 148 [Prisoner P], 149 [Prisoner Q], 150-51
[Prisoner R] & Kaufman Decl. ¶¶ 121-22 [Prisoner S]); Fischer Reply Decl. [COR] ¶¶ 33-34 &
36 (responding to Haney Decl. ¶¶ 222 [Prisoner GG], 223-24 [Prisoner II], & 226 [Prisoner JJ];
and  Walsh Reply Decl. [CCI] ¶¶ 23-24 & Holland Reply Decl. ¶ 8 (responding to Haney Decl. ¶¶
249 [Prisoner LL], 250 [Prisoner MM], and 251-53 [Prisoner NN].)

Plaintiffs distort the deposition testimony of Defendants' experts.  (Opp'n at 55:12–15.)
Dr. Dvoskin testified that he agreed it "was *possible* that long-term housing in segregation does
cause psychological harm"—while clarifying that he took the "question not to mean that it
necessarily does, but that it could on – for an individual." (*Id.*)  (*See* Bien Decl. Ex. 83,
McKinney Decl. Ex. 1 [Dvoskin Depo.] at 73:12–24.)  Similarly, Mr. Martin testified that a high-
security environment *can* be oppressive or counter-productive if inmates are in there too long.
(*See* Bien Decl. Ex. 86, McKinney Decl. Ex. 2 [Martin Depo.] at 272:11–273:7.)  As already
noted, Defendants take segregation very seriously and will respond promptly when an individual
inmate's mental health condition deteriorates as a result of segregation.  But that is a far cry from
Plaintiffs' legally baseless claim that mentally ill inmates cannot be housed in segregation.

### 3.    The Eighth Amendment Does Not Require a Particular Housing Placement Following Discharge from a Crisis Bed or Department of State Hospitals Facility.

Plaintiffs challenge as a dangerous and unconstitutional practice Defendants' policy that
allows the return of inmates from a Mental Health Crisis Bed or Department of State Hospital
inpatient care program back to segregated housing to, among other things, allow CDCR to
complete the inmate's reception center processing in their previous housing location.  (Opp'n at

75

56:10–16.)

But again, Plaintiffs fail to point to any legal authority that returning inmates from inpatient care to segregated units violates the Constitution. Instead, Plaintiffs offer the misleading example of an inmate who died at Salinas Valley State Prison in January 2013. (*Id.* at 56:17–21.) The discharge summary that Plaintiffs produced under seal contains the inmate's report to the Department of State Hospitals that he became depressed when placed in administrative segregation, but nowhere does the report state—as plaintiffs claim—that his "pre-hospitalization segregation stay was responsible for symptoms that led to his ASH admission." (*See* Kahn Under Seal Decl. Ex. 46; Warburton Reply Decl.)

As for the inmate who died in 2011, he entered CDCR in March 2011 and was transferred to the administrative segregation unit after a riot. (2011 Suicide Report, ECF No. 4308 at 142–151.) Upon discharge from the mental health crisis bed unit to complete his reception center processing, he was temporarily sent to the Outpatient Housing Unit and reevaluated, and then changed by his clinicians to a Correctional Clinical Case Management System status and housed in administrative segregation. Plaintiffs seek to claim that his administrative segregation housing resulted in his suicide, but what they fail to note is that this inmate received numerous suicide risk evaluations and clinical contacts in the weeks prior to his death. (*Id.* at 146-47.) There is simply no evidence that his administrative segregation placement bore any relationship to his suicide.

Nor have Plaintiffs cited to any individual case that establishes systemwide deliberate indifference on the part of CDCR by virtue of its psych and return policy. Stewart cites as examples Prisoner E and "possibly" Prisoner HH at San Quentin State Prison, Prisoners SS and UU who he met at the Mental Health Crisis Bed unit at California State Prison, Sacramento, and Prisoner ZZ in the Mental Health Crisis Bed unit at Richard J. Donovan. (ECF No. 4381 at ¶¶ 347 & 402.) But as with Stewart's other individual examples, these cases offer no evidence to show that these inmates were not receiving adequate mental health care upon return to their segregated housing unit. (*See* Monthei Reply Decl. ¶¶ 4 & 6 [Prisoners HH and E both returned to housing where they were monitored as clinically indicated and exceeding Program Guide

76

standards]; Chaiken Decl. 29 & 35-36 [discussing Prisoner UU, who was in a mental health crisis bed and thereafter transferred to the SVSP ICF program, and Prisoner SS].)  Similarly, Prisoners B, W, and JJ identified by Haney in his declaration were receiving constitutionally adequate mental health care.  (*See* Colley Reply Decl. ¶ 5 [Prisoner B], Jordan Reply Decl. ¶ 47 [Prisoner W] & Fischer Reply Decl. ¶ 34 [Prisoner JJ].)

       **4.**    **The State's 30-Minute Welfare Check Policy For All Inmates in Administrative Segregation Exceeds Constitutional Requirements.**

The State currently conducts hourly custody checks for all inmates in administrative segregation, and 30-minute welfare checks for all inmates during the first 21 days they are housed in administrative segregation.  (ECF No. 2139.)  Plaintiffs do not contest that the State consistently completes these checks.  Rather, they criticize the State for not extending the 30-minute checks beyond 21 days, and because a tiny sample of the checks "were not properly staggered," meaning they were done at regular 30-minute intervals.  They cite no legal authority that would require either of these measures as a matter of constitutional law.  And they make no attempt to causally link their criticisms to any complete suicides or harm to a *Coleman* class member.[28]

The only reliable evidence in the record demonstrates that 30-minute welfare checks have some utility, but its ability to save lives cannot be overstated:

> **Q. The point is that for suicide prevention, one of the tools you can use in ad seg is identifying people in the act of attempting suicide and hopefully interrupting them.**
>
> A. That's very unlikely with one-hour or 30-minute checks, to be honest with you. It's – people say to do it, but it's probably not going to stop very many suicides. It's just a matter of luck. You know, it's a two-minute process [to complete a suicide], if you can even tell by looking at the person that -- if they're hanging, you can tell. And then you – it's a -- the luck of the draw of whether you happen to catch them at the moment.

(McKinney Decl. Ex. 1 [Dvoskin Depo.] 245:16-246:23.)

---

[28] The specifics regarding the suicide cases relied upon by Plaintiffs are discussed in further detail on page 61.

77

Reply Supp. Defs.' Mot. to Terminate Under the PLRA and Fed. R. Civ. Pro. 60(b)(5) (2:90-cv-00520 LKK JFM PC)

Nevertheless, because organizations such as the American Correction Association consider 30-minute welfare checks to be a best practice, Secretary Beard directed two policy changes: First, CDCR will conduct three welfare checks per hour at staggered intervals not to exceed 30 minutes. (Allison Reply Decl. ¶ 8; T. Belavich Reply Decl. ¶ 47.)  Second, clinical staff may continue welfare checks beyond 21 days on specific inmates in administrative segregation when deemed necessary.  (*Id.*)  Secretary Beard announced this policy on March 20, 2013, and it will become effective on May 1, 2013.  (*Id.*)  The memorandum announcing this change will be released to the field once the union is notified.  (*Id.*)

Moreover, on March 19, 2013, the *Plata* receiver issued a Request for Quotation for an automated "Inmate Welfare Check System"; the request is available at http://www.cphcs.ca.gov/project_rfp.aspx.  Plaintiffs' issues with the current quality of the logs are therefore being addressed.

Compliance with this ACA standard is not mandatory; the ACA has accredited three California institutions so far while expressly acknowledging the existing procedure for welfare checks.  (*See* ECF No 4417-3 at 35 [page 7 of ACA Accreditation Report for CCWF, which accredited CCWF despite finding that "Cell check logs documented hourly checks on some inmates in segregation instead of the minimum checks at 30 minutes as required by ACA standards"]; McKinney Decl. Ex. 13 [Beard Depo.] 243:19-22].)  Thus, although Plaintiffs correctly note that experts on both sides state CDCR could expand welfare checks, and CDCR agrees, it is a best practice recommendation that is beyond this Court's power to order.

### 5.      The State Provides Constitutional Care in the Its Security Housing Units.

Plaintiffs' arguments regarding the Security Housing Units are replete with errors.  As an initial matter, Plaintiffs' attempt to discredit Defendants' experts' testimony here is disingenuous given that Plaintiffs' own experts' failed to visit several prisons with some of the largest mainline and administrative units serving the Enhanced Outpatient Program populations, including the largest program at California Men's Colony—and yet they freely opined on care systemwide. Regardless, Defendants' experts reviewed three of the five prisons with Security Housing Units,

78

including the 450 capacity unit at California State Prison, Corcoran for inmates at the Correctional Clinical Case Management System level of care.  Based on this review, the State's experts concluded that the "CDCR Mental Health Delivery System appropriately meets the mental health needs of CCCMS inmates assigned to a SHU."  (Clinical Exp. Rpt. at 25–26.)

Plaintiffs' experts' opinions regarding the inmates interviewed in the two Security Housing Units at California State Prison, Corcoran and California Correctional Institution, do not evidence that the care provided to inmates in those units is below a constitutional level.  At best, their opinions simply reinforce Plaintiffs' long-standing belief that all mentally ill inmates be excluded from segregated housing units, *even* if they receive care consistent with the *Coleman* Program Guide requirements.  Moreover, their primary complaint is an alleged insufficient number of groups for inmates at the Correctional Clinical Case Management System level of care.  But even the testimony that Plaintiffs cite to in their declarations does not rise to a constitutional threshold.   On the other hand, Defendants provide evidence that groups for inmates at this level of care is not a constitutional issue.  (McKinney Decl. Ex. 1 [Dvoskin Depo.] at 276:6 to 277:16 (testifying that groups for  CCCMS is not a constitutional issue).

The first inmate, at Corcoran (inmate CC in Haney's declaration), complains about a change in his case managers, his environment, and dissatisfaction with groups, but his treatment, which includes seeing a medical provider every month and other weekly contacts, does not violate either the Program Guide or the Constitution.  (Haney Decl. ¶¶ 207–08.)  This is similar with inmate EE.  (*Id.* at ¶¶ 212–13.)  Inmate DD allegedly reported to Haney dissatisfaction with his overall treatment, but mental health clinicians at Corcoran who reviewed his records report that he is receiving mental health care at the Correctional Clinical Case Management System level of care.  (*Id.* ¶ 210–211; Fischer Reply Decl. [COR] ¶ 30.)

Likewise, at California Correctional Institution, inmates PP and QQ both reported receiving enhanced weekly clinical care beyond a Correctional Clinical Case Management System level of care pending transfer to a Psychiatric Services Unit.  (Haney Decl. ¶¶ 259–63.)  Inmates RR and SS were new arrivals to the SHU and there is no evidence that they not receiving

79

treatment consistent with a Correctional Clinical Case Management System level of care. (*Id.* ¶ 264.)  Inmate TT's care also included seeing a medical provider every month and other weekly contacts.  (*Id.* ¶ 267.)  Finally, Haney's report of inmate UU neglects to reference any evidence that he was not receiving mental health care.  (*See* Walsh Reply Decl. ¶¶ 25-28.)

Although Kaufman identified one inmate that he believed required additional mental health care—Inmate F—Kaufman agreed that he was not basing his opinion on any constitutional requirements.  (McKinney Decl. Ex. 5 [Kaufman Depo.] at 13:25-14:12.)   And, since Plaintiffs have provided no legal authority to support their view that "all" clinical conducts must to be confidential, Kaufman's opinion on this point is wholly meaningless.  (*See* Opp'n at 65: 20, citing Kaufman Decl. at ¶ 47.)

Defendants' experts noted variability in the rounds in the Security Housing Unit, but did not state they found the rounds "deficient."  (Clinical Exp. Rpt. at 24.)  On the contrary, Defendants' experts found that the rounds, which were conducted on a daily basis, "exceed the standard of care."  (*Id.*)

**I.     Plaintiffs Failed to Demonstrate Any Pattern or Practice of Unnecessary or Excessive Use of Force Against the *Coleman* Class, or Any Violation of a Federal Right in the Disciplinary Process.**

      **1.     Plaintiffs Failed to Demonstrate a Constitutional Violation Regarding Use of Force.**

Plaintiffs and their expert, Eldon Vail, present no meaningful evidence of systemic Constitutional violations against mentally ill inmates with respect to custodial practices, use of force, and disciplinary measures.  Instead they focus on a few isolated, sporadic instances to second-guess what the State's expert determined to be appropriate systemic correctional practices.  Moreover, the conclusions set forth by Mr. Vail are rife with inaccuracies and are the result of unjustifiable assumptions that he reached by reviewing the same evidence that Defendants' use-of-force expert, Steve Martin, reviewed to find that Defendants' mental health system was constitutionally adequate.  (McKinney Decl. Ex. 7 [Vail Depo.] 176:20-177:6.)

For instance, Mr. Vail concluded that excessive use of force is "pretty routine" and "used with some frequency" in California based on rudimentary statistics showing that use of force

80

incidents are higher among mentally inmates.  (Vail Decl. ¶ 35; McKinney Decl. Ex. 7 [Vail Depo.] 174:2-175:11.)  But Mr. Vail engaged in no analysis to draw sound conclusions from this data.  As noted by the State's expert, Steve Martin, who has decades of experience evaluating this issue with multiple correctional systems across the United States, it is an unfortunate, but often simply unavoidable, fact that use of force incidents nationwide are statistically higher among inmates with serious mental illness.  (Martin Reply Decl., ¶¶ 6-7.)  This occurs for a variety of reasons, including the need for officers to intervene in instances of self harm to protect inmates, violent or threatening behaviors by mentally ill inmates which lead to necessary staff use of force, and the problem of a few particularly unstable inmates being repeatedly involved in use of force instances.  (*Id.*)  Mr. Vail provides no evidence or analysis that demonstrates the statistical difference he identifies is the result of a pattern or practice that victimizes the mentally ill or that use of force incidents are in fact excessive or unnecessary.  Mr. Vail also admits that instances where officers physically prevent mentally ill inmates from harming themselves are included in the State's use of force totals, and that small numbers of unstable inmates can drive up the total.  (McKinney Decl. Ex. 7 [Vail Depo.] 67:7-11 & 68:3-11.)  Mr. Martin's more thorough and extensive review conclusively found no pattern or practice of excessive or unnecessary use of force against mentally ill inmates.  (Martin Exp. Rpt. at 12-13; Martin Reply Decl. ¶ 5.)

Contrary to Mr. Vail's belief, CDCR does not tolerate excessive or unnecessary use of force against inmates.  (Allison Reply Decl. ¶ 20.)  CDCR's corrective action process includes training, informal corrective action, and informal corrective action.  (*See id.* at Ex. F.)

Plaintiffs' criticism of the use of expandable batons and Oleoresin Capsicum (OC) spray is similarly bereft of context and riddled with half-truths and incomplete analysis.  Indeed, Plaintiffs and Mr. Vail appear to believe that the mere provision of batons and OC spray to officers is evidence of a constitutional violation.  (Vail Decl. ¶¶ 37-41.)  Mr. Vail notes that the expandable baton is often used to gain inmate compliance, but leaves out the fact that in the vast majority of cases the expandable baton is used to stop ongoing inmate-on-inmate assaults, and even then only *after* the inmates have refused to obey verbal commands, and *after* the use of OC spray has

proven ineffective.  (Martin Reply Decl. ¶ 11; McKinney Decl. Ex. 2 [Martin Depo.] 129:2-14.)
And Plaintiffs' criticism of the use of OC spray relies on drawing unsupported inferences about
systemwide use from only two videotaped incidents.  (Vail Decl. ¶¶ 52 &58-60.)  While the State
obviously does not defend any particular instance where excessive or unnecessary use of OC
spray may have occurred, the isolated and sporadic instances set forth by Plaintiffs are not
evidence of a pattern or practice of excessive or unnecessary force.  To cover this flaw, Mr. Vail
makes the broad and unsupported statement that "from the written reports the amounts are
excessive." (*Id.* ¶ 60.)  But Mr. Vail does not explain his methodology or basis for determining
from written reports the amounts of OC spray used, nor does he describe the number of reports
where he was able to determine that excessive amounts of spray were used.

### 2.    The State Appropriately Considers and Accommodates Mental Health in the Disciplinary Process.

Plaintiffs' cursorily critique CDCR's disciplinary process but fail to provide any evidence
that inmates' mental health conditions are not being considered and accommodated in
disciplinary hearings.  Mr. Martin conducted an exhaustive review of the State's rule violation
process (RVR), including discussions with hearing officers and mental health staff, an exhaustive
review of RVR documents, and a full understanding of the typical sanctions for rule violations.
And on the basis of this review Mr. Martin concluded that California's hearing officers fully and
adequately take into account inmates' mental health conditions when adjudicating rule violations,
including appropriately mitigating sanctions.  (Martin Rpt. at 15; Martin Reply Decl. ¶ 2 & 17;
McKinney Decl. Ex. 2 [Martin Depo.] 195:18-197:5.)  Unable to rebut this evidence, Plaintiffs
levy a number of legally and factually inconsequential critiques, including complaining that the
State does not track these mitigations to their satisfaction and that language used in the hearing
officers' written reports are "formulaic."  But the Constitution only requires that inmates' mental

health conditions be taken into account during disciplinary hearings.  And Plaintiffs have failed entirely to demonstrate that the State's disciplinary process is lacking in this regard.

Plaintiffs also completely mischaracterize and confuse best practice recommendations with constitutional requirements.  The intrusive list of requirements that Mr. Vail purports to be minimum requirements, are at most, professional preferences and "in some cases are simply irresponsible." (Martin Reply Decl. at ¶ 21.)  Plaintiffs' confusion over best practices as opposed to constitutional requirements is evident in their characterization of Mr. Martin's expert report and conclusions.  Mr. Martin concluded, without qualification, (1) that the State has in place a system to minimize and control unnecessary and excessive use of force on inmates and (2) that the State has in place a valid process to accommodate inmates' mental illnesses when adjudicating rule violation offenses.  (Martin Exp. Rpt. at 10; Martin Reply Decl. ¶ 2.)  Mr. Martin's recommendations regarding guidelines for use of batons/OC spray and revisions to the RVR Process were exactly what he stated—recommendations—that, while not constitutionally required, would improve the State's already extensive safeguards.  Similarly, Mr. Martin as a respected corrections expert, also made recommendations to better improve CDCR's tracking of RVR processes and reporting and review of use-of-force incidents that were not caveats to his opinions.  Plaintiffs further try to mischaracterize the conclusions set forth by Mr. Martin by citing sections of deposition testimony that rely on incomplete and inaccurate hypotheticals and mischaracterizing the content of Mr. Martin's deposition testimony.  (Decl. Martin ¶19.)  But the simple truth is that there is no of evidence any ongoing and current systemic violation of mentally ill inmates' Constitutional rights with respect to custodial practices, use of force, and disciplinary practices.  (Martin Rpt. at 10; Martin Reply Decl. ¶ 2.)

## VI.   PLAINTIFFS FAILED TO DEMONSTRATE ANY SYSTEMIC VIOLATION OF A FEDERAL RIGHT REGARDING THE CARE PROVIDED BY THE DEPARTMENT OF STATE HOSPITALS.

The Department of State Hospitals (DSH) provides inpatient acute and psychiatric care to the State's inmates.  The Court has never found that care within DSH violated the Eighth Amendment.  Plaintiffs make a number of allegations involving the DSH, but fail to prove any violation of a federal right.

83

**A.      There Are No "Severe Clinical Staffing Shortages" Affecting the Quality of Care Provided to DSH Patients.**

Relying primarily on Dr. John Brim's testimony—a contract physician retained through a registry to work part-time at the Salinas Valley Psychiatric Program (SVPP)—Plaintiffs allege that "dangerous shortages" of clinical staff are undermining DSH's ability to provide adequate care to patients.  (Opp'n at 39-40.)  Plaintiffs allege that these purported shortages have arisen because Defendants have stopped hiring staff and contractors for "costs savings," going so far as to deny inmates clothes, laundry, bedding, and coats to "save money."  (*Id.* at 40-41.)  If true, these allegations would be shocking.  But, as with virtually all of Plaintiffs' allegations, they are not true.

There is presently no "dangerous shortage of clinical staff" within DSH, or at SVPP specifically.  Several of Plaintiffs' assertions reflect Dr. Brim's allegations and the notice that medical staff (including Dr. Brim) sent SVPP's executive director via correspondence dated January 23, 2013 and February 12, 2013.  (*See* Bien Decl. Exs. 111 & 112.)  But Plaintiff's have absolutely no evidence that any patient care suffered as the result of normal staff turnover.  The treatment team at SVPP consists of psychiatrists, psychologists, therapists, nurses, and technicians who work together to provide a comprehensive variety of mental health service, including one-on-one counseling, group therapy, and rehabilitative programming.  (DaSilva Reply Decl. ¶¶ 3-7.)  There has been no deficit whatsoever in SVPP other professional groups, and these services have been provided to SVPP's patients at a frequency and level that meets or exceeds clinical standards.  (*Id.* at ¶ 9.) Moreover DSH was making concerted efforts to recruit and hire psychiatrists at SVPP in response to normal staff turnover, well before Dr. Brim's correspondence.  (Gaither Reply Decl. ¶¶ 3-4; DaSilva Reply Decl. ¶¶ 9-10.)  Further, in response to those letters, which described potential problems that would arise if anticipated physician

84

moves actually occurred, Defendants took immediate action to remedy the situation.[29]  (Gaither

Reply Decl. ¶¶ 5-6; DaSilva Reply Decl. ¶¶ 10-12.)   And because of Defendant's ongoing

committing to recruiting and hiring each psychiatrist who departed was replaced with a new hire

or transfer within a matter of weeks, if not days.  (Gaither Reply Decl. ¶ 5; DaSilva Reply Decl.

¶¶ 10-12.)   At SVPP, there are presently 12.75 filled psychiatrist positions to attend to the needs

of approximately 352 patients, which is an increase from the 10 psychiatrists on staff before the

December departures.  (*Id.*)  Physicians now working at SVPP provide for a patient to staff ratio

that is well within the staffing ratios ordered by this Court.

Defendants have been anything but deliberately indifferent to patient needs at SVPP, or at

the programs in Vacaville and Atascadero (at which, in the case of the later two facilities,

Plaintiffs properly make no allegations of staffing concerns), and have mitigated the departures of

psychiatric staff.  Nor is there, as Plaintiffs allege, a "hiring freeze" or any current directive to

"shut down" programs.  (*Id.* at ¶ 3.)  In short, DSH has appropriately responded to staffing

challenges, and it has and continues to provide appropriate and timely treatment to all patients

needing acute and intermediate psychiatric care.

## B.   DSH Has Appropriate Medical Records and Medication Management.

Plaintiffs also rely exclusively on the deposition testimony of Dr. Brim to assert that there

are serious issues with medication management and access to medical records at SVPP.  But Dr.

Brim's testimony about access to medical records was false.  (Decl. Gaither ¶ 11.)  Any SVPP

clinician who needs access to the eUHR is provided with electronic access code and training on

the eUHR.  (*Id.*)  Further, clinicians can access to any health records not included in the eUHR,

but submitting a request to CDCR's medical records department.  (*Id.*)  And Plaintiff's tenuous

accusations of poor medication management are not supported by any evidence.  SVPP employs a

---

[29] Indeed, the anticipated physician moves that so concerned the remaining staff to cause
them to write the letters in question did not completely occur.  (Decl. Gaither ¶ 5.)

interdisciplinary treatment team approach which provides a variety of overlapping layers of treatment and monitoring of patients by psychiatrists, psychologists, nurses, therapists, and mental health technicians.  (Decl. DaSilva ¶¶ 3-5.)  SVPP has over fifty registered nurses who attend to patients' care, including assisting with appropriate medication monitoring.  (*Id.* ¶ 5.)

## VII. PLAINTIFFS FAILED TO ESTABLISH THAT THE STATE IS NOT PROVIDING ADEQUATE MENTAL HEALTH CARE AT THE CURRENT POPULATION DENSITY.

The evidence overwhelmingly shows that the State has achieved and maintains a superior mental health care system that more than meets the requirements of the Constitution.  As the State established in its motion to vacate the population reduction order,[30] which was filed the same day as the instant motion, the current prison population does not pose a barrier to the State providing constitutionally adequate mental health care.  (Defs.' Mot. to Vacate, ECF No. 4280.)  The prison population has been drastically reduced since 2006 when Plaintiffs moved to convene the three-judge court, and the population continues to decrease as a direct result of public safety realignment.  Further, mental health programs – the very programs applicable to this class - are not overcrowded and are sufficiently staffed to provide constitutional care.  Simply put, the system is not overcrowded.[31]

---

[30]  Having failed to timely respond to the State's motion to vacate the population reduction order, Plaintiffs cannot backdoor arguments to that motion in their opposition here.  (Jan. 29, 2013 Order, *Plata*, ECF No. 2527.)   Indeed, the entire argument regarding overcrowding is irrelevant to the State's motion to terminate, and thus should not be considered, because this motion turns on the State's ability to provide constitutionally adequate mental health care, *not* the question of whether overcrowding is currently a primary barrier to the delivery of constitutional medical and mental health care.  The latter question is before the three-judge court and is the subject of the State's motion to vacate the population reduction order filed the same day as the instant motion.

[31]  Plaintiffs inserted a few photos from California Institution for Men to misleadingly suggest that the State's prisons remain overcrowded.  Photo U is a double bed cell which houses reception center inmates for short periods of time.  Inmates who are CCCMS or EOP are transferred to an appropriate placement once they are endorsed, and receive the required treatment and yard time while at the reception center.  Figure 3 is the Angeles Dorm, which was recently remodeled, and housed CCCMS and up to five EOP inmate-patients pending transfer to an EOP program.  All inmate-patients in Angeles Dorm, which is clean, open and roomy dorm, receive the required treatment and programming.  Figure 4 depicts inmates receiving group therapy in therapeutic treatment modules.  (*See* Jordan Reply Decl. [CIM] ¶¶ 6-11.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   The reduction in prison population is due in large part to public safety realignment.  The population has dropped by nearly 25,000 inmates since the legislation went into effect in October 2011, by more than 31,000 inmates since the three-judge court issued its population reduction order in January 2010, and by more than 42,000 since the three-judge court was convened. (Defs.' Mot. to Vacate, ECF No. 4280 at 8; March 15, 2013 Status Report, ECF No. 4406.) Notwithstanding Plaintiffs' claims to the contrary, any relationship between implementation of public safety realignment and the State's budget crisis is completely irrelevant to this analysis. What is key is the legislation's unparalleled impact on the prison population levels and, consequentially, the delivery of constitutional mental health care.

   California is not an "outlier" in terms of overcrowding, as Plaintiffs suggest.  Rather, all evidence points to the contrary.  The *Coleman* Special Master does not complain of overcrowding as a barrier to constitutional mental health care.  (Special Master's 24th Report, ECF No. 4205.) According to Robert Barton, the independent Inspector General, and Jeffrey Beard, the newly appointed Secretary of CDCR, former Director of the Pennsylvania Department of Corrections, and psychologist who testified on Plaintiffs' behalf at trial, the current prison population does not prohibit the State from providing adequate medical or mental health care.  (Defs.' Mot. to Vacate, ECF No. 4280 at 12-14.)  Despite Plaintiffs' claims that the State's experts did not address "overcrowding" *per se*, the State's experts also opined that constitutional care was being provided at the current population and, thus, that the current population is not a barrier to the delivery of constitutional mental health care.  (McKinney Decl. Exs. 3 [Scott Depo.] 24:16-24 ["I was asked to look at, with the current both staffing levels and prison population, was appropriate care psychiatric care provided to inmates and was there evidence that the California Department of Corrections was deliberately indifferent to the inmates based on the population at the time I did the evaluation"]); 1 [Dvoskin Depo.] 193:5-7 ("If I felt that crowding was precluding the provision of adequate mental health care, then I would have written it, and there was no preclusion of me doing that"); & 2 [Moore Depo.] 41:8-18; *see also* Moore Reply Decl ¶ 6.) Plaintiffs' oversimplified reliance on semantics should be disregarded.

87

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Moreover, Plaintiffs' repeated reliance on "design capacity" in asserting that individual prisons are overcrowded is inapt given the concept is outdated and defunct.  Although CDCR built the majority of its prisons to "design capacity" standards, including single-celling, that was based on the American Correctional Association's (ACA) recommendations that were current at that time.  (Defs.' Opp. to Supp. Resp. to Mot. to Vacate, ECF No. 4415 at 4.)  Since that time, however, the ACA has eliminated the requirement for single-celling from its standards and no longer mandates that a prison system or individual prison stay at or below its stated "design capacity" or "rated capacity" in order to receive accreditation.  (*Id.*)  In fact, the ACA recognizes that double-celling has become an acceptable practice throughout the nation and it is common practice for such prison systems to allow double-celling as part of their "rated" or "design" capacity.  (*Id.* at 4-5.)  Further, given that ACA standards are the national benchmark for operation of correctional facilities, they are a good indicator that an institution is able to provide a constitutional level of care to inmate-patients.  (*Id.* at 4.)  Indeed, three of CDCR's institutions, which are "overcrowded" by Plaintiffs' standards, have already been accredited by the ACA (each with populations in excess of 137.5% of design capacity), with two more undergoing the accreditation process and likely to be accredited.  (*Id.* at 6.)   These accreditations are all the more significant when considering that CDCR was unable to achieve accreditation for some institutions in the mid-1980s.  (McKinney Decl. Ex. 8 [Woodford Depo.] 112:4-17.)  Given the ACA's movement away from the one-inmate-per-cell concept as the measure for acceptable occupancy, Plaintiffs' continued reference to supposed overcrowding at individual prisons based on this measure must be disregarded.  Moreover, Plaintiffs' refrain ignores the Supreme Court's binding precedent that every facility need not comply with the 137.5% limit.  *Brown v. Plata*, 131 S. Ct. 1910, 1941 (2011).

Contrary to Plaintiffs' assertion, the Receiver's recent submission does not show a direct relationship between population levels and the delivery of constitutional care.  (*Plata*, ECF No. 2547.)  Instead of providing any analysis of the population levels, the Receiver's submission averages the population density percentages at various prisons based on his grouping of the

88

prisons into the "top third" and "bottom two-thirds" based on their overall performance.  (*Id.* at 4-5.)  Averaging the percentages this way obscures the data so that it would be impossible to show a "direct relationship" between population levels and the delivery of constitutional care.  Indeed, on closer examination, it is evident that some of prisons receiving the highest ratings from the Receiver are also have the highest population densities, *i.e.*, CCI at 165.4% and CVSP at 160.6%, and that one of the lowest population prisons also achieved the lowest scores from the Receiver, *i.e.*, CMF at 101.3%.  (*Plata* ECF No. 2547, Exs. 1 and 2.)  Moreover, with respect to three prisons—SAC SAC, SOL, and CCWF—the Receiver's findings directly conflict with the ACA's certification that these prisons meet national accreditation standards, for which health care is a significant focus.  This is further evidence that California is being held to standards of near perfection that are well above recognized national standards.  (Decl. of Kathy Black-Dennis in Support of Defs.' Opp. to Supp. Resp. to Mot. to Vacate, ECF No. 4417 at 4-5.)

Defendants object to Plaintiffs' naked assertion that 8,000 cells do not comply with the ACA standard for minimum cell size.  There is no evidence that all or any of the 8,000 cells will not meet ACA standards.  Even if the cells do not meet technical ACA standards, however, the ACA has a process whereby an agency can achieve accreditation notwithstanding non-compliance with particular ACA standards. (Declaration of Kathy Black-Dennis, Ex. A at 41.)  In such cases, an agency may apply for a waiver of the requirements when it can show mitigation of the negative impact of non-compliance.  (*Id.*)  The waiver request must satisfy several requirements in order to be granted by the ACA.  (*Id.*)  Moreover, Plaintiffs have taken out of context the statement of Pulitzer/Bogard & Associates regarding these cells.  As P/B&A later states in its report, "the reality is that it is not practical to simply take [these cells] off line and remove them entirely from including in CDCR's systemwide capacity."  (Bien Decl., Ex. 8 at 25, ECF No. 4399.)  Rather, P/B&A acknowledges a methodology that would permit the cells to be used for one inmate "even though they fall below the ACA standard."  (*Id.*)

In addition, Plaintiffs inappropriately rely on the prison operating capacity set forth in a recent report commissioned by the State and prepared by Pulitzer/Bogard & Associates.  The

89

report is irrelevant, however, because, if anything, the prison operating capacity sets the baseline, not the ceiling, and, in any event, the State has not implemented the report.

### VIII. THE STATE HAS IMPLEMENTED A DURABLE AND SUSTAINABLE REMEDY AND FURTHER FEDERAL COURT OVERSIGHT IS CONTRARY TO LAW.

Under *Horne v. Flores*, the critical inquiry is whether continued enforcement of injunctive relief is supported by ongoing federal law violations. "If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary but improper." *Horne*, 557 U.S. 450. The mental health care system developed, implemented, and improved over the last 17 years, which now systemically provides quality mental health care to California's inmates is the definition of a durable remedy. While Plaintiffs and the special master appear to demand perfection, and the State shares that goal, the Constitution does not recognize this as the measure for continuing federal court oversight. As the Supreme Court held, "when the objects of the decree have been attained . . . responsibility for discharging the state's obligations [must be] returned promptly to the State and its officials." *Horne*, 557 U.S. at 452; *Frew*, 540 U.S. at 442.[32]

California's Mental Health Services Delivery System is comprehensive and durable, and its implementation and continuous self-monitoring goes well beyond the minimum requirements of constitutional care.

Continued intrusive federal oversight would be an unlawful and unnecessary waste of taxpayer resources that would be better spent treating the State's inmates with serious mental illness. Continued enforcement of injunctive relief in *Coleman* also interferes with the State's democratic processes, and further micromanagement of every aspect of prison mental health care raises federalism concerns. Plaintiffs failed to raise a single systemic federal law violation, and the Court can no longer inject itself in the State's fiscal and policy decisions, at least with respect to prison mental health care. A federal court is not well-equipped to run a suicide-prevention

---

[32] Other courts have recognized that it is appropriate to dismiss class action cases related to prison conditions when constitutional minima are met. *See, e.g., Perez v. Brown*, No. C 05-05241 JSW (N.D. Cal.) (prison dental care), *Madrid v. Schwarzenegger*, No. C 90-3094 TEH (N.D. Cal.) (prison use-of-force policies); *Lancaster v. Tilton* (San Quentin prison conditions); and *Gilmore v. California* (prison law library).

program, monitor psychiatric medication, or evaluate any other aspect of a prison mental health care system.  Indeed, the Court should play no role in continuing to second-guess the State's policy decisions regarding prison mental health care.  *See Harris*, 489 U.S. at 392.  Because the State has established a mental health care system that easily passes constitutional muster, the Court must discontinue prospective enforcement of its injunctive orders and end federal court supervision over the State's legislative, fiscal, and policy decisions under basic principles of federalism.

## IX.   CONCLUSION.

Plaintiffs presented no credible evidence that the State is any way continuing to systemically violate the federal rights of inmates with a serious mental illness.  Although Plaintiffs make a flailing, disorganized effort to argue that this is not the case, their claims and expert declarations do not withstand scrutiny.  All admissible evidence, including the numerous responses from the institutions telling the true story about Plaintiffs' site visits that demonstrate a well-functioning system, proves that the State is providing timely and appropriate mental health care to its prison inmates.  The time has come to let go of the burdensome, expensive federal court monitoring and oversight that has persisted for more than seventeen years and return control of mental health care to the State.

Dated:  March 28, 2013                          Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
JAY C. RUSSELL
Supervising Deputy Attorney General


/s/ Patrick R. McKinney
PATRICK R. MCKINNEY
Deputy Attorney General
*Attorneys for Defendants*

CF1997CS0003
20681037.docx

91