**Exhibit 4**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, ET AL.,             )
                                   )
                 Plaintiffs,       )
                                   ) CASE NO.:
           vs.                     ) S 90-0520 LKK-JFM
                                   )
EDMUND G. BROWN, JR., ET AL.,      )
                                   )
                 Defendants.       )
_____)

DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013, 8:50 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Page 1

```
 1  BY MR. FISCHER:
 2      Q.   Would it be in several sections?
 3           MS. VOROUS:  Same objection.  Asked and
 4  answered.
 5           THE WITNESS:  I don't know.  I don't even know
 6  if it's in there.
 7  BY MR. FISCHER:
 8      Q.   Okay.  You said earlier that you were asked to
 9  offer opinion as to whether the system was
10  constitutional; is that correct?
11      A.   Yes.
12      Q.   What are -- what is the measure of whether a
13  system is constitutional, in your opinion?
14      A.   Whether the inmates have access to care,
15  whether they have benefit of a physician judgment,
16  whether they receive the care that's ordered, and
17  whether or not there are no deliberate omissions in care
18  that would create harm to a patient.
19      Q.   Anything else?
20      A.   No.  That's what I would use.
21      Q.   Go through those.
22           First you said "access to care."  What do you
23  mean by "access to care"?
24      A.   The right of the inmate to access care when
25  they feel that they need it.
```

1   A.   We did a sample of the institutions. It was
2   never our intent to visit every single institution.
3   Q.   Did you ever ask to see any data from the
4   other institutions?
5   A.   No.
6   Q.   Prior to the final visits at CMC and SATF, you
7   had already made your conclusion that CDCR had not acted
8   with systemic deliberate indifference?
9   A.   I did, yes.
10  Q.   Did anybody go to Pelican Bay --
11  A.   Yes.
12  Q.   -- from the consultants team?
13  A.   Yes.
14  Q.   Who went?
15  A.   Joel Dvoskin.
16  Q.   Only Joel Dvoskin?
17  A.   Yes.
18  Q.   Was it your understanding that Dr. Dvoskin,
19  Dr. Scott had reached the same conclusion as to
20  constitutional care as of the August 21st meeting?
21  A.   Yes.
22  Q.   Did anyone ever question as to the necessity
23  of going to these other institutions?
24  A.   I'm not aware. I don't recall.
25  Q.   Do you recall whose idea it was to go to the

1    A.   Okay.

2    Q.   Are you aware?

3    A.   Yes.  Yes.

4    Q.   Okay.  Did you visit the administrative

5  segregation unit at CIM?  I think you said you did.

6    A.   Um.

7    Q.   Direct you to top of the 10266, top two

8  issues:  "EOP not transfer fast enough.  That's not

9  getting 10 hours RX" --

10   A.   Treatment.

11   Q.   "RX" is treatment?

12   A.   Treatment.

13   Q.   "Now nine in seg."

14        Were you documenting that there were nine EOPs

15  awaiting transfer in this segregation unit?

16   A.   Yes.

17   Q.   And they were not there for disciplinary

18  reasons; is that your understanding?

19   A.   Yes.

20   Q.   They were there because they were awaiting for

21  a bed to open?

22   A.   Yes.

23   Q.   Okay.  On the page just before that, 102620,

24  near the bottom you write:  "Lack of beds."

25        Is this related to same issue?

```
 1        A.    Lack of beds in general population.
 2        Q.    So there were lack of beds for EOP and there
 3   were lack of beds for -- related to the general
 4   population?
 5        A.    Yes.
 6        Q.    Were there more inmates than appropriate beds?
 7        A.    Yes.
 8        Q.    It's your understanding?
 9              Were there more EOPs than appropriate beds in
10   the system?
11              MS. VOROUS:  Objection.
12   BY MR. FISCHER:
13        Q.    Trying to understand what your --
14        A.    More EOPs -- they couldn't transfer EOPs to
15   other institutions.
16        Q.    For lack of available beds?
17        A.    Lack of available beds.
18        Q.    Okay.  Do you recall, did you interview any of
19   the EOPs in segregation awaiting transfer when you were
20   at CIM?
21        A.    This -- these may have been the inmates on
22   page 102626.
23        Q.    Uh-huh.
24              Based on your interviews with these inmates,
25   were you able to reach an opinion as to whether they
```

```
 1  were receiving appropriate level of care treatment?
 2       A.   They were sick inmates.  They were very sick
 3  inmates.  And --
 4       Q.   Do you remember anyone specifically?
 5       A.   No.  Just by what I'm -- I wrote down about
 6  the fact that -- that they were hearing voices or that
 7  they were having auditory hallucinations or that one
 8  inmate was seeing signs of his grandmother.  They were
 9  sick inmates; they needed to be somewhere else.
10       Q.   In your opinion, was the administrative
11  segregation unit an appropriate area for these inmates?
12            MS. VOROUS:  Objection.  Assumes that these
13  inmates were ad seg.
14            THE WITNESS:  If these inmates were in ad seg.
15  BY MR. FISCHER:
16       Q.   Based on your memory, you interviewed inmates
17  in ad seg?
18       A.   I thought these were the inmates in ad seg.
19  I'm not sure.  I'd have to look at the numbers to be
20  sure.
21       Q.   On the page after which you were reading where
22  it again says "Seg" at the top.  This is 102627.
23            About halfway down, it says "LOB" -- "Make a
24  note LOB."  Does that stand for lack of bed?
25            MS. VOROUS:  Are you asking her whether --
```

```
 1   in the report if you were writing it?
 2        A.   I think I would have phrased it differently.
 3        Q.   What would you have phrased differently?
 4        A.   I would have made a recommendation that
 5   nursing education emphasize the side effects of the
 6   medication and that they have handouts or signs
 7   available where they dispense the medications so these
 8   things would be in front of them all the time.
 9        Q.   All right.  Back on page 19 very briefly.  It
10   says:  "At Corcoran, inmates reported from the EOP
11   special needs yard that yard time was canceled for
12   various reasons on a relatively frequent basis."
13             You didn't visit the EOP special needs yard?
14        A.   No, I did not.
15        Q.   Were you aware of this issue at the
16   institution?
17        A.   No, I was not.
18        Q.   From a mental health perspective, is it
19   concerning to you, given your expertise, for EOPs to be
20   denied yard time?
21        A.   Yes.
22        Q.   And why is that?
23        A.   Inmates need to go outside, exercise,
24   socialize.
25        Q.   And the lack of that opportunity can adversely
```