# Exhibit 5

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


| | |
|---|---|
| RALPH COLEMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. Civ S 90-0520 LKK-JFM P |
| ) | |
| EDMUND G. BROWN, JR., et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____) | |
| MARCIANO PLATA, et al., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. C01-1351 TEH |
| ) | |
| EDMUND G. BROWN, JR., et al., ) | |
| ) | |
| ) | |
| Defendants. ) | |
| _____) | |


DEPOSITION OF EDWARD KAUFMAN, M.D., taken

on behalf of the defendants, at 32392 South Coast

Highway, Suite 250, Laguna Beach, California,

commencing at 10:00 a.m., Saturday, March 16, 2013,

before Audrey L. Ricks, Certified Shorthand

Reporter, No. 12098, CCR, RPR, CLR.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                      March 16, 2013

```
 1   we can go back and touch on that.
 2           However, if you change your testimony
 3   after the deposition is concluded, I will be able to
 4   substantively comment on that change at trial.
 5           Do you understand that?
 6   A    Yes.
 7   Q    Okay.  Is there any reason based upon a
 8   medical reason, emotional reason, or some other
 9   reason why you can't participate in the deposition
10   today?
11   A    No.
12   Q    Is there -- are you under the influence of
13   anything which would impair your memory?
14   A    No.
15   Q    Anything which would impair your ability
16   to tell the truth today?
17   A    No.
18   Q    We discussed breaks a little bit before we
19   got on the record, but please let me know if you
20   need to take a break.  And I will also be checking
21   with the court reporter to see if she needs one as
22   well.
23   A    Thank you.
24   Q    I'd like to start with the opinions that
25   you've reached in this matter.
```

Edward Kaufman                                                    March 16, 2013

1          Can you please list for me separately each

2    opinion that you have reached in this case?

3      A    Okay.  I would like to refer to my

4    declaration for that.

5      Q    Okay.  Do you have a copy of it?

6          MS. MENDELSON:  Did you bring a copy?

7          MS. ANDERSON:  I do have a copy if you

8    need it.

9          THE WITNESS:  Yes, let me have your copy.

10         MS. ANDERSON:  Okay.  One second.

11         Counsel, I did not bring two copies; I

12   just brought one, so if you can --

13         MS. MENDELSON:  I have my own.

14         MS. ANDERSON:  Okay.  Let the record

15   reflect Dr. Kaufman has been provided with a copy of

16   his declaration.

17   BY MS. ANDERSON:

18     Q    So, Doctor, before going into any

19   explanations of your opinions, I would just like you

20   to state them for me first.

21     A    Of course, this is 57 pages of my opinion,

22   so I'd like to just state them from the summary.

23     Q    And by "the summary," are you referring to

24   page 6 of your declaration?

25     A    Yes.

1  "constitutional" was used.

2      Q    So none of your evaluation was done with

3  an eye to determine whether or not it was

4  deliberately indifferent to the inmates' subjective

5  or serious medical needs?

6      A    Again, that's a legal term that I didn't

7  use in my assessment of the condition.

8      Q    Okay.  So what did you base your

9  assessments against?

10     A    I based it on an issue -- first of all,

11 certain community standards, certain standards of

12 care in other correctional facilities that I have

13 visited.

14          I based it on damage to the mental health

15 of inmates and inmate patients, and on the adequacy

16 of the therapy to treat the needs of mentally ill

17 and seriously mentally ill inmates.

18     Q    So when you were rendering the opinions

19 that you issued in your report, you were looking at

20 community standards, what you had seen -- observed

21 at other correctional facilities, and then

22 individual care of each patient that you evaluated?

23     A    As to whether or not the treatment was

24 inadequate or damaging to their mental health.

25     Q    Okay.  Are you aware that the

Edward Kaufman                                              March 16, 2013

1    constitutional standard of care or what is required
2    for mental health providers in terms of what is
3    constitutionally adequate is whether or not they are
4    deliberately indifferent to an inmate's mental
5    health needs, that is, know of and disregard a
6    substantial medical need?  Do you know about that
7    standard?
8         A    I've heard of it.
9         Q    But you did not apply that standard when
10   looking at the health care that was provided?
11        A    I'd have to say that I didn't utilize
12   those terms when I looked at the health care.
13        Q    Okay.  So let's go back to your opinions.
14             And other than what is listed here on the
15   table of contents of your declaration, are there any
16   other opinions that you have in this case?
17        A    Well, of course each of the items in the
18   table of contents is described in detail within the
19   report.
20        Q    Yes.  And I will ask you some questions
21   about that.
22        A    Okay.
23        Q    But are there any other areas in which you
24   were asked to render an opinion in the case?
25        A    Not that I can recall.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                              March 16, 2013

1       Q    Okay.  Did you -- speaking about the
2  medical charts, did you review medical charts in
3  detail and look at the care that was provided?
4       A    I reviewed medical charts to the extent
5  that the pages were provided to me.
6       Q    Okay.  Did you ever sit down and look at
7  an inmate's medical record?
8       A    I did.
9       Q    Okay.  And did you look through that chart
10 to evaluate the care that was provided by the
11 clinicians?
12      A    I did.
13           But most of my evaluations of medical
14 records were done in a much more leisurely fashion
15 when those records were sent to me by the state
16 through my -- I believe through my attorneys to me.
17      Q    Okay.  And I'm not concerned about were
18 you at the prison looking at the medical records or
19 were you looking at them your office, but did you
20 look at medical records to evaluate what the level
21 of care was that was being provided by the mental
22 health staff?
23      A    Yes.
24      Q    Okay.  And how many medical charts did you
25 look at to determine the care provided?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                          March 16, 2013

1        A    Approximately 20.

2        Q    And did you look to determine whether or

3   not a diagnosis was made?

4        A    Yes.

5        Q    Whether medication was -- was prescribed?

6        A    Yes.

7        Q    Whether the medication was appropriately

8   prescribed?

9        A    To some extent, yes.

10       Q    And did you look to determine whether or

11  not the doctor was monitoring the medications?

12       A    Yes.

13       Q    Was there anything else that you looked at

14  in those charts to determine whether or not the care

15  was, in your opinion, within community standards?

16       A    Well, I was looking at the charts to see

17  if some of the comments made by inmates about their

18  care was validated by the chart or not.

19       Q    Okay.  So after your conversations with

20  the inmates, you then looked at their charts to

21  confirm what they had told you?

22       A    Correct.

23       Q    Okay.  With respect to the charts that you

24  did review and the inmates that you interviewed --

25  well, I guess I will ask separately because the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                                    March 16, 2013

1    were those inmates selected?

2         A    When we went to each unit, my recollection

3    is that we would ask for inmates who had prolonged

4    stays.

5              I think there were a few inmates that

6    Ms. Mendelson had advance knowledge that they have

7    extended stays in SHU or AD-SEG.

8         Q    Okay.   Any other way that they were

9    selected?

10        A    Not that I recall.

11        Q    Okay.

12        A    By the way, I just recalled another mental

13   health expert whose name I've heard, and that's

14   Pablo Stewart --

15        Q    Thank you.

16        A    -- who is the other psychiatrist involved.

17        Q    Okay.   Thank you.

18        A    Whom I have never met.

19        Q    So for the 20 inmates that you

20   interviewed, did you review all of their medical

21   records?

22        A    Yes -- actually, let me correct that

23   statement.   I -- I read each of their medical

24   records.   I didn't read all of their -- each of

25   their records because I only read the record that

Edward Kaufman                                                    March 16, 2013

1    was provided to me.

2         Q    Do you know what was provided to you?

3         A    It's in an individual case, and it would

4    be the record going back maybe a year or two, maybe

5    some history dating back further.  But it didn't

6    seem to be a voluminous, total record, but rather a

7    record of the last year or so in general.

8         Q    Okay.  And were there any specific parts

9    to those records that you looked at?

10        A    I focused mainly on the psychiatric

11   evaluations, on the treatment team meetings and

12   treatment team recommendations, on the psychiatric

13   evaluations, the psychotherapy notes, and the

14   compliance with medications.

15        Q    Was there anything that wasn't provided to

16   you that you wish you would have had to look at?

17        A    Not to my knowledge.

18        Q    So looking at your opinion on page --

19   starting at page 7 of your declaration regarding

20   staffing shortages, I'd like to ask you some -- some

21   questions about that.  Okay?

22        A    Yes.

23        Q    So with respect to your opinion on

24   staffing shortages, what are the basis for those

25   opinions?

```
 1    settings in a correctional institution?
 2        A    I believe there are -- there are standards
 3    of care, such as the state's expert Dr. Dvoskin has
 4    suggested, stating that there should be 10 to 15
 5    hours of treatment a week of inmates in
 6    administrative segregation.
 7        Q    So you agree with Dr. Dvoskin on that?
 8        A    In that issue, yes.
 9        Q    Okay.  So are you aware of any other
10    research or literature that supports whether or not
11    group therapy is required in an administrative
12    segregation setting in a correctional institution?
13        A    Simply, no.
14        Q    In paragraph 28 on page 9, you commented
15    that the EOP administrative segregation hub at CCWF
16    was unable to accomplish its mission.
17             Does the failing to meet the mission of
18    that building for mental health unit equate with
19    constitutionally inadequate care?
20             MS. MENDELSON:  Objection.  I think the
21    witness has made it clear that's not a term he uses.
22    We can keep going through this if you want, but if
23    he needs to state it every time --
24    BY MS. ANDERSON:
25        Q    Yes.  Well, one of the issues in the
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                              March 16, 2013

```
 1   case -- the primary issue in the case is whether or
 2   not the defendants -- yes, defendants -- are
 3   deliberately indifferent to the medical needs of the
 4   inmates.  So I will continue to ask you your opinion
 5   about deliberate indifference or the constitutional
 6   minimum.
 7           If you are evaluating something and saying
 8   that it simply falls below the standard of care,
 9   please let me know that.  I would like to know, in
10   your opinion, when something simply doesn't meet the
11   standard of care in the community or in -- in a
12   correctional setting, versus when something violates
13   the Constitution.
14           So that's -- that's why I am going to
15   continue to ask these questions.
16      A    Since that seems to be such an important
17   distinction, and since it relates to what I consider
18   legal aspects of the case, I'd like to consult with
19   my counsel about that now.
20      Q    Okay.
21           MS. MENDELSON:  Okay.  If you want to take
22   a little break.  Is this actually a good time?  It's
23   been an hour.  I was going to suggest --
24           THE WITNESS:  Let's take a break.
25           MS. MENDELSON:  Great.  So I'm stopping
```

1  adequate care, would it not?

2      A   If those standards were used and put into

3  practice on a regular basis, yes.

4          The other drug besides Seroquel that

5  causes metabolic syndrome is olanzapine, by the way.

6  And that's probably even more important than

7  Seroquel too.  And it's pretty widely prescribed and

8  another drug you have to really monitor for

9  metabolic syndrome.

10     Q   Doctor, did you interview any CCCMS

11 patients in the general population?

12     A   I don't recall that I did.

13     Q   Do you remember how many charts you

14 reviewed of patients that were CCCMS as opposed to

15 EOP?

16     A   I'd really have to go through each of them

17 and -- and count them.  So I don't remember

18 specifically.

19     Q   If a doctor is supposed to see a patient

20 in 30 days and sees him on day 31, does that

21 necessarily indicate deliberate indifference?

22     A   You know, there's some circumstances here

23 where I think patients need to be seen sooner than

24 every 30 days.  And I think that it's grossly

25 negligent care to not see some patients sooner than

```
 1    30 days.
 2              But you know, I think that it's -- in my
 3    opinion, it's individualized.  You use a guideline
 4    like 30 days to be sure a patient is seen.
 5              Clinically, does it matter if it's 29, 30,
 6    or 31?  Probably not.  What matters is if somebody
 7    needs to be seen in seven days, they're seen in
 8    seven days.
 9         Q    Okay.  So assuming -- strike that.
10              Do you know what the Adam chair -- what an
11    Adam chair is?
12         A    I've seen them.
13         Q    Okay.  And did you know that the Adam
14    chairs were required by the Coleman special master?
15         A    I did not know.
16         Q    And did you know inmates prefer the
17    treatment modules as opposed to the Adam chair?
18         A    The majority of inmates that I spoke to
19    prefer the treatment modules to the Adam chair.
20         Q    Did you know that staff also preferred the
21    treatment modules as opposed to the Adam chair?
22         A    The majority of staff that I spoke to
23    preferred the treatment modules.
24         Q    Looking at your opinion regarding poor
25    medication management at CCWF, do you remember what
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    your opinion was with respect to medication

2    management at CCWF?

3        A    Would you tell me the page, please.

4        Q    I'm looking at page 21, paragraph 65 --

5    actually, paragraph 66.

6        A    Okay.  If I can start off by reading this

7    brief paragraph, "At CCWF, I received a number of

8    troubling reports about medication management.  The

9    nurse in the RC" -- that's reception center --

10   "cited an instance in which a psychiatrist had

11   prescribed six medications including two

12   antipsychotic medications, Seroquel and olanzapine,

13   without personally seeing or evaluating the patient

14   for up to 14 days."

15       Q    Doctor, you said the nurse cited an

16   instance.  What -- who specifically was that

17   patient?  Was it Prisoner D?

18       A    I don't think so.  I think that was

19   another one.

20       Q    Did you follow up, then, to find out what

21   was happening with that patient?

22       A    No, I did not.  But I have serious

23   concerns because those are two antipsychotics which

24   are -- are very serious medications, and the use of

25   the two of them with -- both of which have side

1    effects of potentially increasing blood sugar,

2    cholesterol, body mass, and causing diabetes or

3    metabolic syndrome, is -- it's a pretty serious

4    combination.  And I think that any patient on the

5    combination of those two medications who comes into

6    a new institution should be seen immediately.

7            But that combination is a red flag for a

8    very difficult patient as well as a high potential

9    for side effects.

10       Q    Well, despite those concerns, you did not

11    follow up; right?

12       A    I didn't follow up.  Correct.

13       Q    Okay.  Did you verify whether what the

14    nurse told you was true?

15       A    No.

16       Q    So it's possible the patient was stable

17    and didn't need to be seen before these 14 days?

18       A    Now, I don't know why the nurse would have

19    cited that if there were no problems.  But I mean,

20    you know, it may have been in response to a question

21    about what -- when patients are seen and what kind

22    of medications they're on.

23            And I mean, I don't know for sure, but --

24    but any -- any medical professional would have a

25    concern about those two medications and the person

```
 1              Is there anything else that you know they
 2    did?  Not -- not what you should do or what anybody
 3    else might do --
 4        A    No.
 5        Q    -- what CDCR is doing.
 6        A    No.
 7        Q    Okay.  You also touched on the subject of
 8    medication refusals; correct?
 9        A    Correct.
10        Q    Would you agree patients have a right to
11    refuse their medications?
12        A    Yes.
13        Q    Okay.  Do you know what the refusal rate
14    is in CDCR?
15        A    I don't know the exact number.
16        Q    Do you have a guess?
17        A    No.  The only thing I know, and I -- I
18    think I reported, is that I thought it was -- that
19    it was rampant, and that in many of the charts that
20    I reviewed, I saw documented refusal.
21        Q    What would a percentage be for rampant?
22        A    I would say 25 to 30 percent.
23        Q    Okay.  What's the percentage of patients
24    in the community who don't follow their medication
25    regimen?  Do you know?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1        A      The best example I can give is at the

2   treatment center where I'm the medical director,

3   where I'm notified every time one of my patients or

4   any patient in the facility refuses their

5   medications.  And I would say that it's probably

6   about 10 percent.

7              But every time somebody misses, I respond

8   immediately as to how to deal with it.

9        Q      Would you be surprised to hear that

10  studies show that 50 percent of the community is

11  noncompliant with their medications or they fail to

12  take a full -- their complete -- their full regimen

13  of prescribed meds?

14       A      I think that all depends on the treatment

15  relationship with the prescribing physician.

16             So I think -- I don't know the study

17  you're citing.  I don't know -- I don't know if it's

18  medications by family practitioners or

19  psychiatrists, so if it's -- or what type of

20  medications you're talking about.

21             So I really have to see the specific study

22  that says 50 percent.

23       Q      Doctor, one of the -- the observations in

24  your report is that the refusal to take the

25  prescribed medications represents that -- that rate

1       A    Yes.

2       Q    In your -- in your declaration you talked

3   about nurses not -- nurses are unfamiliar with the

4   side effects of psychotropic medications.

5            How many nurses did you talk to to find

6   out whether or not they were familiar with the side

7   effects?

8       A    I'm mainly citing the State's expert,

9   Jacqueline Moore here.

10      Q    Okay.  So did you conduct any individual

11  inquiries yourself?  Did you talk to any of the

12  nurses yourself?

13      A    I did not quiz any of the nurses on the

14  side effects.

15      Q    Okay.  In Paragraph 77 you mention that

16  you have serious concerns, I quote, about the system

17  for following up on medication refusals; right?

18      A    Yes.

19      Q    Is that your opinion?

20      A    Yes.

21      Q    So is it your opinion that if a patient

22  misses one dose, a psychiatrist has to be called in

23  to examine the patient?

24      A    No.  But the psychiatrist should be

25  notified.

1    took place.

2         Q    You're referring to the monitoring systems

3    in place as a part of the program guide, the Coleman

4    lawsuit?

5         A    No, no.  I'm -- I'm referring to the

6    medication follow-up -- you gave me the acronym for

7    it earlier -- the follow-up for all the side effects

8    of medications.

9              MS. MENDELSON:  Let me find my statistic

10   form.

11   BY MS. ANDERSON:

12        Q    Oh, the MAPIP?

13        A    Yeah, the MAPIP.  And I don't recall

14   specifically whether he discussed the AIMS or not.

15   But my best recollection was that his follow-up

16   about side effects of medications was comprehensive.

17        Q    Okay.

18        A    So if it was as comprehensive as it

19   seemed, I would have been -- I would be surprised if

20   he didn't include the AIMS, although I don't really

21   recall whether we discussed it or not.

22        Q    Okay.  On -- in Paragraph 80, you are

23   referring to patients who aren't seeing their

24   clinicians -- they're not having an interaction that

25   is, quote, meaningful enough.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                          March 16, 2013

 1   prevents crisis as well as attempts to deal with a
 2   crisis after they've occurred.
 3          You need to build coping skills.  You need
 4   to evaluate their gradually emerging symptoms of
 5   depression for psychosis before they escalate into
 6   crisis.
 7      Q    Did you talk to CCCMS patients in the
 8   general population?
 9      A    No.  You asked that before.
10      Q    So you don't know whether CCCMS patients
11   in the general population are receiving mental
12   health services?
13      A    No, I -- I don't -- I don't know.
14      Q    So your statement that CDCR is providing a
15   mental health delivery system that only deals with
16   individuals currently experiencing total
17   psychological crisis, that has nothing to do with
18   CCCMS patients in the general population?
19      A    That's correct.  I'm referring to CCCMS
20   patients that I observed directly.
21      Q    Okay.  Did you ever personally observe
22   custodial interference with mental health treatment?
23          MS. MENDELSON:  You're at Section 53 --
24   page 53, Custodial?
25          MS. ANDERSON:  I'm just asking if he's

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                          March 16, 2013

```
 1            And that he, in fact, refused treatment,
 2   but that this was his right to refuse; is that
 3   right?
 4        A    Yes.
 5        Q    And Inmate W is not in your report either,
 6   is he?
 7        A    No.
 8        Q    Okay.  Did you read Dr. Stewart's
 9   declaration filed in this case?
10        A    No.
11        Q    Have you spoken to Dr. Stewart about any
12   opinions he has regarding CDCR's care in this case?
13        A    No.
14        Q    Before you began your work on this case,
15   you were of the opinion that mentally ill people
16   shouldn't be in prison at all; isn't that right?
17        A    I not -- I wouldn't say at all.
18        Q    What is your opinion with respect to
19   mentally ill people being placed in prison?
20        A    I think it's to be avoided wherever
21   possible.  If they need a secure setting, it should
22   be in a -- it would best be in a mental health
23   facility.
24        Q    Well, a mental health facility is not a
25   prison, is it?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Edward Kaufman                                    March 16, 2013

```
 1        A     No.
 2        Q     So is that consistent with your
 3   position -- with my statement, that they shouldn't
 4   be in a prison?
 5        A     I think there are some mental -- there are
 6   some mentally ill people that have to be in prisons.
 7   But I think it's -- if we had adequate psychiatric
 8   facilities, the percentage of mentally ill that are
 9   in prison would be enormously reduced.
10        Q     Doctor, I'm going to ask you some
11   questions now about your qualifications as an
12   expert.  Okay?
13              Do you have any prior experience before
14   this case as working -- as working as an expert?
15        A     Yes.
16        Q     And could you please tell me every
17   situation in which you've been retained as an
18   expert?
19        A     Well, besides all the ones in prisons that
20   I mentioned, and I don't know if I mentioned
21   Pennsylvania or not, but that was another one where
22   I was retained as an expert.
23              In addition to prison work --
24        Q     Let me just ask about prison work to save
25   some time.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com