**Exhibit 6**

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | |
| Plaintiffs, | |
| vs. | No. Civ S 90-0520 LKK-JFM P |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |
| MARCIANO PLATA, et al., | |
| Plaintiffs, | |
| vs. | No. C01-1351 THE |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

DEPOSITION OF

PABLO STEWART, M.D.

TUESDAY, MARCH 19, 2013, 9:00 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY: BRENDA L. MARSHALL, RPR, CSR NO. 6939

THORSNES LITIGATION SERVICES, LLC

```
 1        Q.   And was that the EOP program in the SNY?
 2        A.   Yes.
 3        Q.   Okay.
 4             MR. NOLAN:  Again, just to be clear, I was
 5   there, I believe it's a -- I don't know if it's a formal
 6   SNY program.  It's an SNY yard, and there were several EOP
 7   individuals there who Dr. Stewart spoke with.
 8             MS. ANDERSON:  Okay.
 9        Q.   Do you remember anything else, any other
10   programs at Salinas Valley that you went to?
11        A.   Boy, I think that generally covered the places
12   that I visited.
13             MR. NOLAN:  Can I -- can I again, just to be
14   clear -- sorry, I know you don't want me to testify, but
15   it's not really a memory test for Dr. Stewart.  The one
16   other program I believe he went to was the CCC ad seg unit
17   or --
18             THE WITNESS:  Oh, yes.
19             MR. NOLAN:  -- facility there.
20   BY MS. ANDERSON:
21        Q.   Do you remember going to the CCCMS?
22        A.   I remember going to an ad seg unit that was not
23   an EOP and was not the free-standing.  Yes.  That was an
24   additional -- that was a CCCMS ad seg.
25        Q.   Did you talk to any CCCMS inmates just in the
```

1   GP?  Did you go to any general population yards and talk
2   to CCCMS inmates?
3        A.   I don't believe I did.  I know I spoke with
4   CCCMS in the ad seg unit.
5        Q.   Okay.  Counsel just raised a good point.  You
6   didn't provide any notes with your report --
7        A.   Correct.
8        Q.   -- right?
9             Did you take any notes during the visit?
10       A.   I did not.
11       Q.   Okay.  Do you have a photographic memory?
12       A.   Even though it may not seem that way today, I
13  have a pretty good memory in the -- in the -- in sort of
14  the short and intermediate term.  So -- so, yes, to answer
15  your question.
16       Q.   Okay.  You have -- you didn't take any notes,
17  but then you were able to generate a 167-page declaration
18  based on specific information regarding the visits --
19       A.   Correct.
20       Q.   -- correct?
21            So you didn't write anything down?
22       A.   I did not.
23       Q.   And how is it that you recall all the specific
24  details to prepare the declaration without taking any
25  notes?

1    there, picking some -- I mean, was there any other way
2    that you would pick someone to look at records -- I'm just
3    trying to get a sense of did you look -- did you simply
4    look at the records from the people that you had spoken
5    to, or did you do some random review?
6              MR. NOLAN:  Objection.  Vague and ambiguous.
7    BY MS. ANDERSON:
8         Q.   Do you understand the question, Doctor?
9         A.   Somewhat.  As I testified, my memory today is
10   that when we went to this kiosk for the medical records,
11   we particularly looked at records for those individuals
12   that I had seen that day because I had several questions
13   about many of them.
14             I don't believe we did a random review of just,
15   you know, sort of roll the dice and see what we come up
16   with.  I don't believe we did anything like that.
17        Q.   And did you look at any physical -- any of the
18   UHRs on any of the people that you spoke with, as opposed
19   to the electronic records?
20        A.   Not as -- not at San Quentin.
21             I wanted to clarify something, because you asked
22   me this earlier, and I don't believe I properly answered
23   it.  My memory of looking at paper charts, the old-style
24   medical records, was in the Salinas Valley DSH units that
25   were housed in the prison block, the cell blocks there.

1        A.   The one conversation that I know of that's
2   documented in my report is a conversation with this
3   gentleman who was the head of the MHCB.
4        Q.   What about the psychologist that was in there
5   while you were looking at the records?
6        A.   Yes.  That's the same person.
7        Q.   Same person.  Okay.
8        A.   Right.  And the -- what is documented is the
9   conversations that we had about this one particular
10  inmate.
11       Q.   Okay.  And that's in your report?
12       A.   That's in the report.
13       Q.   Okay.  We'll get to that, then.
14            After you looked at the electronic records at
15  San Quentin, did you do anything else?
16       A.   I think that was the end of our day.
17       Q.   Okay.  And then did you sit in on an IDT on any
18  of these institutional visits?
19       A.   I did not.
20       Q.   Okay.  And did you permanently do the records
21  review, or did somebody else review them and summarize
22  information for you?
23       A.   Where are you referring to and with whom?
24       Q.   When you -- that's -- that's a good question.
25  Let me clarify.

1        Q.   And you looked at them all?
2        A.   I -- what I will testify to is I certainly had
3   the binders, and I opened them, and I certainly looked
4   at -- skimmed them.  I couldn't tell you that I studied
5   each page in detail.
6        Q.   Okay.  In -- in this list, you have the
7   electronic unified health record of -- for example, the
8   very first line says, (Reading) Salinas Valley State
9   Prison Prisoners, Printed at San Quentin.  So I assume
10  these -- this is what you were referring to when you said
11  you sat at the kiosk?
12       A.   No.  See, Mr. Nolan had -- after our -- that's a
13  good point about the different -- the non-San Quentin
14  inmates that were listed in the medical records.  Those
15  would be people I'd seen already.  Salinas Valley, L.A. or
16  someplace like that.  And Mr. Nolan had made an
17  arrangement with the department to access medical records.
18            So he went there, and after I told him what --
19  generally, the materials that I wanted, he printed those
20  out and then brought those back to an office, where I
21  reviewed them.
22       Q.   And do you know if those were printed out from
23  the electronic record or if they were -- if copies were
24  made from the actual medical records of the inmates?
25       A.   My understanding is that there's one record, and

```
 1         Q.   Okay.  On -- also, in your report, you talk
 2   about the 10 hours per week for EOP-level-of-care
 3   inmates --
 4         A.   Correct.
 5         Q.   -- is that right?
 6              And is -- do you know where that 10 hours came
 7   from?
 8         A.   If my memory serves me correct, it came out of
 9   the Scarlett Carp report from the late '90s and the
10   early -- the late '80s -- excuse me -- and the early '90s.
11   And I believe one of the defendants' experts is currently
12   involved in a case.  A Dr. Dvoskin was involved in that
13   report back then.
14         Q.   And is 10 hours a constitutional requirement?
15         A.   Ten hours was a clinical requirement that was
16   determined by the department and agreed to by everybody.
17         Q.   Okay.  But does the constitution require 10
18   hours?  Is nine and a half enough, under the constitution?
19         A.   Again, going back to the deliberate indifference
20   standard that we've talked about, if it was determined
21   that 10 hours was -- was the minimum, is what the program
22   guide calls for, hours of treatment to address, in this
23   case, EOP-level inmates to prevent them from suffering
24   harm and the department is not meeting those goals,
25   then -- and they know about it, then I think that is a
```

1  no bathroom facilities, they're just stand-up phone
2  booth-size cages, and I think that's -- that is not good
3  for anybody.
4       Q.   So -- but doesn't the department have an
5  obligation to keep them safe?
6       A.   Exactly.  And if there were a sufficient number
7  of MHCB beds, then they could move them directly to an
8  MHCB, but there's not.
9       Q.   But you recognize that this is a temporary
10 placement; right?  You said four hours.
11      A.   Well, it is temporary, but, see, you can really
12 talk more about this because in -- in talking to custody
13 staff and confirmed by talking to inmates who have been in
14 these places, they -- they tell me -- the inmates tell me,
15 which was confirmed by custody staff, that they put them
16 in these holding cells, and then they come up to them
17 later and say, "You want to go back to your cell yet?"
18           And then the inmates will tell me, they'll say,
19 you know, after a while, sitting there, cold, not being
20 able to go to the bathroom and being shackled and having
21 to stand up, that going back to the cell is a more
22 preferable option than just standing there, waiting to be
23 admitted to an MHCB.
24      Q.   Okay.  So the inmates are reporting to you that
25 staff are saying these things.  Did you observe any of

```
 1   that yourself?
 2        A.   I didn't observe it.  But staff had told me,
 3   various staff at various institutions had told me, that,
 4   you know, they do that when they come back and check with
 5   them.
 6        Q.   They do what?  What specifically did they tell
 7   you they did?
 8        A.   They will go through the procedure, like I said,
 9   stripping them down, shackling them, putting them in a
10   holding cage where they can't sit, go to the bathroom, and
11   they'll come back after a while and say, "Are you willing
12   to go back to your cell?  Do you want to go back to your
13   cell now," which, then, somehow they became less suicidal
14   by these horrible conditions they were subjected to, and
15   then they move them back to their cells in some cases.
16             Whereas some of the inmates said you had to
17   really -- you really had to persist and really stick to it
18   because it was much easier just to say, "Okay.  I want to
19   go back to my cell."
20        Q.   It sounds like you're -- you're characterizing
21   the staff checking in with them as punitive.
22        A.   Yeah.
23        Q.   Is that what you're --
24        A.   Absolutely.
25        Q.   You have an opinion that you outlined in your
```

Page 172

```
 1            So I don't know if I would necessarily look to
 2   any correctional agencies to inform me about that because
 3   the illnesses themselves present the same -- the same
 4   problems with med compliance, with suicidality, with
 5   abhorrent behavior, with assaultiveness, all these sorts
 6   of things.
 7            So I can't give you a person -- a group that I
 8   would refer to, saying, "Oh, I rely on these people for
 9   information."
10       Q.   What, in your opinion, is the best mental health
11   program in a prison in the U.S.?
12       A.   I'm not aware of there being a best program.  It
13   would be the least bad.  And in my experience of contacts
14   around the country, I'm not aware of one that is much
15   better than the other.
16       Q.   So no good ones?
17       A.   Not that I'm aware of.  There may be.  There may
18   be individual jails or there may be small prison systems
19   that are good, but I know in the prison systems that I'm
20   familiar with, they struggle with similar issues.
21       Q.   I'm just trying to get a sense of what you would
22   want California to look like.
23            MR. NOLAN:  Objection.  Vague and ambiguous.
24   Very broad.
25   BY MS. ANDERSON:
```

```
 1                CERTIFICATION OF DEPOSITION OFFICER
 2
 3        I, BRENDA L. MARSHALL, CSR, duly authorized to
 4   administer oaths pursuant to Section 2093(b) of the
 5   California Code of Civil Procedure, hereby certify that
 6   the witness in the foregoing deposition was by me sworn to
 7   testify to the truth, the whole truth and nothing but the
 8   truth in the within-entitled cause; that said deposition
 9   was taken at the time and place therein stated; that the
10   testimony of said witness was thereafter transcribed by
11   means of computer-aided transcription; that the foregoing
12   is a full, complete and true record of said testimony; and
13   that the witness was given an opportunity to read and
14   correct said deposition and to subscribe the same.
15        I further certify that I am not of counsel or
16   attorney for either or any of the parties in the foregoing
17   deposition and caption named, or in any way interested in
18   the outcome of this cause named in said caption.
19
20
21
22                       _____
23                       BRENDA L. MARSHALL
24                       CSR No. 6939
25
```