**Exhibit 7**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          ) CASE NO.:
            vs.                           ) S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____ )


DEPOSITION OF

ELDON VAIL

TUESDAY, MARCH 19, 2013,  9:10 A.M.

SAN FRANCISCO, CALIFORNIA


REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Eldon Vail                                                    March 19, 2013

1   with Director Cate?

2       A.   Well, he ultimately offered me the job and

3   very kindly gave me two months to think about it, which

4   was a long time, but that had to do with some of what

5   was going on with me professionally.

6            And at the end of that period of time, I

7   called him and told him I decided to not take the

8   position.

9       Q.   What is it that led you to decide to not take

10  the position?

11      A.   Well, California Department of -- CDCR,

12  Departments of Corrections and Rehabilitation, is a very

13  troubled system, and it has struggled to try to figure

14  out how to right itself.  And if that's ever going to

15  happen, it's going to take political will.

16           And my sense was -- my judgment was is that

17  the focus was on getting out from under the lawsuits as

18  opposed to trying to figure out how to create conditions

19  that wouldn't lead to lawsuits.  And I didn't believe

20  that there was a political will to do that.

21           So while it was an attractive offer in terms

22  of the money they were willing to pay, I decided that I

23  didn't want to go and work in a system where there

24  wasn't the political backing to do what needed to be

25  done.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Eldon Vail                                                    March 19, 2013

```
 1        Q.   Let me understand.
 2             So your contacts with California to this time
 3   had been the brief meeting that you talked about in 1997
 4   during the conference in Monterey, contacts with
 5   Secretary Cate during the ASCA meetings, and then this
 6   several-day trip in the spring of 2011; is that correct?
 7        A.   The first part of your question was -- I lost
 8   it.  I'm sorry.
 9        Q.   Okay.  What you've recounted for me is that
10   you first remember discussing Coleman with California
11   officials in 1997 --
12        A.   Yes.
13        Q.   -- at the Monterey conference?
14        A.   Yes.
15        Q.   You would intermittently meet with Matt Cate
16   during ASCA meetings, the national directors meetings;
17   is that correct?
18        A.   Yes.
19        Q.   And then you had this several-day meeting with
20   Secretary Cate in spring of 2011, correct?
21        A.   Correct.
22        Q.   Is it from those contacts with California that
23   you came to the conclusion that it's a very troubled
24   system?
25        A.   In part.
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1              Also, Bernie Warner -- and I don't remember
 2    his exact title, but he was the head of the juvenile
 3    division that was part of the California Department of
 4    Corrections.  Bernie's been a friend for 30 years.
 5    After he worked in California system for five years,
 6    then I hired him as my director of prisons in
 7    Washington.  So through the personal relationship with
 8    Bernie, we would talk about his experience here.
 9              And I guess the other thing that I would add
10    is that the entire country watches California because it
11    is so out of step with what happens in other
12    jurisdictions.
13              And at those national meetings, we'd have
14    those kinds of conversations with others, some of
15    whom -- who have been here and served in a capacity as
16    expert witnesses, as well as personal mentors and
17    colleagues that -- that I've worked with over the years
18    have been in California in different capacities.
19    Chase Riveland has been involved in the Valdivia case.
20              Nancy Campbell has been involved in cases that
21    I can't remember down here.
22              Joe Lehman, previous secretary in Washington,
23    was one of the experts, I think, that reported to the
24    court in about 2008, to the three-judge panel.
25              So, I mean, there's a conversation that occurs
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    amongst folks in my profession who have either worked

2    here or who read about it and witness it and talk about

3    it at the national level.

4        Q.   Is there anyone else that you can, as you

5    recall -- that you can recall, as you sit here today,

6    with whom you had conversations that informed your

7    opinion that CDCR is a very troubled system?

8        A.   Not that I can think of at this moment, no.

9        Q.   During any of these meetings did you -- well,

10   apart from these meetings, have you ever meet

11   Steve Martin?

12       A.   Only at his deposition.

13       Q.   Are you familiar with Mr. Martin and his work?

14       A.   A little.

15       Q.   What is your familiarity with or knowledge of

16   Mr. Martin's work?

17       A.   Well, most of it comes through my experience

18   in this case.  I had heard about him once or twice

19   before.  But that he's been involved in different cases

20   at different times in his career.

21       Q.   Do you have any information or opinions

22   regarding Mr. Martin's professional reputation?

23       A.   I don't have an extensive knowledge of his

24   professional reputation.  A lot of what I've heard has

25   been pretty positive.

Eldon Vail                                                    March 19, 2013

1      Q.   Going back to your conversation with Mr. Bien

2   on January 30th, 2013, and the areas on which he asked

3   you to focus during that conversation, did you ask for

4   any information?

5      A.   I told him that I'm not deeply steeped in

6   Coleman and that I would have to get some information in

7   order to get up to speed, so yes.

8      Q.   What did you ask for?

9      A.   I don't think I asked for anything specific at

10  that point.  I was riding in a car at the time.  It was

11  a little bit awkward and difficult to have a good

12  conversation.

13     Q.   Did he say that he would provide you anything

14  that day?

15     A.   He may have said, "We'll get you some stuff."

16  Nothing specific that I recall.

17     Q.   During that call, did you agree to consult

18  with Mr. Bien?

19     A.   My memory is that I said that I would be

20  interested.  And I think the next conversation was a

21  teleconference with Mr. Bien and attorneys from

22  K&L Gates.

23     Q.   Do you recall who the attorneys were with

24  K&L Gates?

25     A.   Jeff Bornstein.

Eldon Vail                                                    March 19, 2013

1          Megan here.  And there was others, but I don't
2     remember.
3          Q.   And that was a telephone conference?
4          A.   Yes.
5          Q.   When did that take place?
6          A.   I don't remember the exact date.  Shortly
7     after.  So I do know by February 4th I had received some
8     written material and I was beginning to read about the
9     case.
10         Q.   And what -- what was discussed during this
11    telephone call, the second telephone call attended by
12    K&L Gates attorneys?
13         A.   It was a little -- with all due respect to the
14    attorneys that work with us on this case -- difficult to
15    follow.  People were in different locations, and, you
16    know, again, I was on cell phone and audio quality
17    wasn't great.
18              I think in part they were vetting me and
19    trying to get a sense of who I was and what my
20    experience was and how I would want to approach the
21    case.
22              At the same time, they were imparting some
23    information but it was pretty sketchy, and I -- I didn't
24    reach much in the way of a conclusion from that
25    conversation other than I think at the end of it, it was

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1            I think I might have also said I needed to see

2    their use of force and inmate discipline policies.  That

3    would be typical.

4        Q.   The three-judge panel report, which report is

5    it that you meant?

6        A.   That the panel wrote itself, that came from

7    the judges.

8        Q.   Okay.  As part of your familiarity with the

9    California system prior to this time, did you ever have

10   any conversations with anyone from California concerning

11   a lawsuit called Madrid?

12       A.   I'm aware of the Madrid lawsuit a little, but

13   I don't recall any specific conversations with

14   California officials.

15       Q.   Are you aware of any of the outcomes from that

16   litigation?

17       A.   I'm trying to remember.  I believe -- yeah, I

18   would -- you asked me not to guess.

19       Q.   Okay.

20       A.   So if there are outcomes and you tell me what

21   they were, I might say, "Yeah, I might remember that,"

22   but anything else at this point would be a guess.

23       Q.   Are you aware that one of the outcomes of the

24   Madrid litigation was the creation and implementation of

25   a statewide use of force policy?

1      A.   No.

2      Q.   I'd like to go back and explore a little bit

3   of your background with the Washington State Department

4   of Corrections.

5           When did you begin working with Washington?

6      A.   I started in the juvenile system in 1974,

7   which was actually a different agency at the time.  I'm

8   still a different agency.

9           So I guess that answers your question.

10     Q.   What was your role when you started?

11     A.   I was a line counselor/officer.  It was a bit

12  of a different organizational structure than you find in

13  some facilities.  But we worked the floor in the living

14  unit with court-committed juveniles, but we were all,

15  you know, college graduates and we had a small case load

16  that we worked pretty intensely with.  So it was a bit

17  of a hybrid job.

18     Q.   What is your college degree in?

19     A.   I went to the Evergreen State College in --

20  and it had opened the -- couple years before I graduated

21  from there.  And it doesn't have majors.

22          So it's a bachelor's of arts degrees, and --

23  I'm sorry -- bachelor's of art degree and probably best

24  characterized as general studies.

25     Q.   Prior to beginning with the Washington State

1    counterproductive to good mental health.  So you have to

2    find ways to ameliorate that natural impact on custody

3    on folks who need treatment.

4    BY MR. RUSSELL:

5        Q.    But it's true, is it not, that the natural

6    impact of custody in a correctional setting is not -- is

7    not therapeutic therapeutically advantageous to somebody

8    who has a mental health disorder?

9        A.    I would say it a little bit differently; that

10   corrections isn't organized to provide treatment for the

11   mentally ill.  You have to work at that.  But it's not

12   naturally organized to do that.  You have to work hard

13   to see what you can do to counterbalance that natural

14   tendency.

15       Q.    Isn't it true that generally within the

16   United States, that the -- that the rate of the use of

17   force on inmates with mentally -- with mental health

18   problems is proportionally higher than those who have

19   not been so diagnosed in the general population?

20       A.    In my experience, that's largely a function of

21   treatment; that when folks receive treatment, then

22   that's not true.

23       Q.    Well, is it true that in systems generally

24   within the United States, that persons with mental

25   health disorders are generally overrepresented in use of

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    force incidents?

2        A.    You asked me not to guess.  I understand that

3    there is a truth to what you're saying.  But, again, I

4    think that that's a function of how much treatment

5    people are receiving and when they receive treatment.

6    It's just like in a general population, is there's

7    people who are mentally ill, they'll commit more

8    violence than folks who aren't.  And the same can be

9    true in prison if they receive proper treatment.  That's

10   been my experience.

11       Q.    Use of force incidents arise when an inmate is

12   either perceived or suspected or about to engage in

13   self-harm, correct?

14       A.    I don't necessarily agree with that.  Someone

15   who's threatening to kill themselves, the best response

16   is -- first response is not always pepper spray.

17   Finding a way to talk, finding a way to establish some

18   connection with whatever reality they offer you can be

19   very effective intervention.  Doesn't necessarily have

20   to resort in use of force.  Sometimes it does, I agree,

21   but it's pretty rare in my experience.

22       Q.    So, in your experience, it was a rare occasion

23   that an officer would actually see somebody engaging in

24   self-harm and there would have to be some kind of

25   physical intervention?

```
 1        A.    The cultures are built differently, and people
 2   respond in the context of the culture that they live in.
 3   Oftentimes that's attention-seeking behavior.  So if
 4   there's other ways for which people could get that
 5   attention, they're less likely to pick up a razor blade
 6   and say, "I'm going to kill myself."
 7             I mean, it's a long-winded answer to your
 8   question, but it happens.  I've seen it happen.  I know
 9   that it happens.  It just seems to happen with a lot of
10   frequency here.
11        Q.    Well, use of force, at least within a
12   California, is defined apart from just the use of pepper
13   spray, correct?
14        A.    It is.
15        Q.    So, for example, if an officer enters into a
16   cell and physically prohibits somebody from cutting
17   themselves, that would be reported in a use of force
18   incident, correct?
19        A.    It should be.
20             MS. CESARE-EASTMAN:  I think your initial
21   question in this line of questioning was a little
22   unclear.  Were you asking him whether force is only used
23   to prevent incidents of self-harm?
24             MR. RUSSELL:  No.
25             MS. CESARE-EASTMAN:  Okay.  Then I'm sorry I
```

1    misunderstood you.

2    BY MR. RUSSELL:

3        Q.    And in some of those incidents, I mean, is it

4    your experience that that intervention can sometimes be

5    violent, deemed to be violent; isn't that correct?

6        A.    Let me make sure I understand.  That the

7    intervention of using hands-on physical force can be

8    perceived as being violent?

9        Q.    Correct.

10       A.    Can be.

11       Q.    And that a -- is it your experience that a

12   small number of mentally ill offenders can generate a

13   high number of use of force incidents in a correctional

14   setting?

15       A.    Yes, it is.

16       Q.    And that when those occur, that increases the

17   rate of reported use of force incidents, correct?

18       A.    Well, it depends on who you report it.  You

19   can sort that out.

20            And I -- that is work that I've done, to sort

21   out, you know, when you've got frequent flyers in the

22   use of force arena.  You know, if you track that

23   information, that tells you something different than if

24   you track it for a greater number of people who maybe

25   only have one or two in their incarceration career.

Eldon Vail                                                    March 19, 2013

1              It's kind of a hard question for me to answer

2    outside of the context of what I've written here, but I

3    think much of this section about use of force would

4    inform a different a appropriate to the policy.

5         Q.   But you don't reference specific parts of the

6    policy within this declaration, do you?

7         A.   In terms of footnote, I don't believe I do.

8    In paragraph 68, where you say "as required by CDCR's

9    own policy in other situations," I reference it.

10             Well, no, maybe I do.  If you look at the next

11   page, 69, I think that's a direct reference.  I think

12   there might be one earlier in this portion of the

13   declaration.

14        Q.   Well, I guess I should ask:  When you --

15   paragraph 69 talks about CDCR's DOM.  And do you

16   understand that to be the department operating manual?

17        A.   Yes.

18        Q.   Are you aware that there's a separate use of

19   force policy apart from the department operating manual?

20        A.   Maybe.  Can you say more?

21        Q.   Well, I'm just asking if you're aware if there

22   is a statewide use of force policy that is separate and

23   apart from the department operating manual?

24        A.   There's a CCR regulations that I also read.

25   Is that the same thing?

1        Q.    I don't believe so, no.

2        A.    Okay.   So maybe I'm not -- I don't know.   I

3   don't know the answer to your question.

4        Q.    Okay.   As you sit here today, do you recall

5   being provided a document that's entitled "CDCR

6   Statewide Use of Force Policy"?

7        A.    I may have.   But right this minute, no, I

8   don't recall it.

9        Q.    And then turning to paragraph 69 where you do

10   reference the department operating manual, specifically

11   Section 51020.11.2.

12           And you state that that policy provides for

13   immediate infliction of pain and punishment, or at least

14   it's sanctioned and authorized by that policy.

15           Do you know which policy that is specifically

16   within the department operating manual?

17       A.    I believe it's the use of force DOM.

18       Q.    It's the use of form DOM that relates to

19   inmate handling or taking control of a food port?

20       A.    That's what this specific reference is, I

21   believe.

22       Q.    Okay.

23       A.    It's also might be -- you know, without having

24   a chance to look at it, it might be about food trays as

25   well.

Eldon Vail                                                    March 19, 2013

1    investigations that were referred for outside review, I

2    never saw the results of those.  But what I did see come

3    back in a few occasions was the case was closed, the

4    staff member was exonerated.  I didn't see any exception

5    to that.  I don't want to make too big a conclusion out

6    of it, but that's what I saw.  People were exonerated

7    and not disciplined.

8         Q.    Those are investigations that went to the

9    office of the inspector general?

10        A.    I don't really know.  I know they were

11   referred outside the institution and then there was a

12   gap in the documentation.  And what came back is that

13   they were exonerated, no further action required.

14        Q.    I wanted to turn back to what we marked

15   Exhibit 2.

16        A.    I have it as 2.

17        Q.    Okay.  And my understanding from what you had

18   earlier said is that these are your notes from

19   reviewing -- at least until we get toward the back

20   starting on page 4519.  But the first part of these

21   notes, from 4489 to 4518, are your notes of reviewing

22   use of force packets and use of force incident reports

23   and some rules violation reports; is that correct?

24        A.    For the most part.  There may be a couple

25   other things in here, but it's from reviewing

 1    Mr. Martin's file material.

 2        Q.    Okay.    So these are the same file materials

 3    that Mr. Martin reviewed; is that correct?

 4        A.    Yes.

 5        Q.    Did you review -- did you actually review the

 6    packets themselves, or did you review the notes that

 7    Mr. Martin had attached to those packets?

 8        A.    Well, I reviewed what was in there, and both

 9    were in there.    Sometimes it was handwritten notes.

10    Sometimes it was complete packet.    Sometimes it was a

11    page or two of the packet, I assume.    But they were in a

12    very inconsistent format.

13        Q.    Is there anything within your review of these

14    packets and RVR reports where you can recall expressly

15    disagreeing with any notes taken by Mr. Martin?

16        A.    Yeah, I -- there's quite a few circumstances.

17    I mean, I agreed with some of what he said.    But when I

18    talk about the threshold for controlled versus

19    immediate, I don't think that he addressed that.

20            Well, I remember one time he addressed that.

21    I don't think he looked at that as consistently as I

22    did.

23            I also don't think he spent much time

24    questioning whether or not the description of the

25    incident as it was given even needed to be a use of

```
1         A.    I do agree with that.

2         Q.    Do you have an opinion one way or the other if

3    the provisions that are in paragraph 146 of your

4    declaration are required by the constitution?

5         A.    I don't have an opinion as to that.

6              MS. CESARE-EASTMAN:  Could we go off the

7    record for a second?

8              MR. RUSSELL:  Yeah.

9              (Off the record at 3:29 p.m. and back on

10              the record at 3:42 p.m.)

11   BY MR. RUSSELL:

12        Q.    Mr. Vail, we were going through your

13   conclusions here and I'm almost finished.

14             Are each of these bullet points you've

15   included in paragraph 146, are those -- are these

16   elements that were incorporated within the Washington

17   correctional system?

18        A.    No.  Not all of them.  Many of them weren't

19   necessary because the practices weren't the same.

20        Q.    When you say, "The practices weren't the

21   same," what do you mean by that?

22        A.    Well, for example, the first one, officers

23   don't have authority to use pepper spray in a situation

24   that -- where immediate force really isn't required.

25             They would secure the scene, isolate and
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1    contain, get some supervision and, if necessary, go to

2    controlled use of force.  So...

3        Q.   When you say in your declaration, corporate

4    punishment -- and I think again we're referring to the

5    department operating manual that we've discussed

6    earlier, regarding the immediate use of force in

7    instances when a food tray has been retained or the food

8    port in the door has been taken over.  I mean, the

9    department operating manual doesn't provide for corporal

10   punishment, does it?

11       A.   It doesn't use that phrase.  I would say

12   that's the rule of being able to use pepper spray in a

13   situation where it very likely is not called for.

14       Q.   Well, CDCR does provide for a system, does it

15   not, that -- in which if it's determined following a use

16   of force incident report that force was either excessive

17   or unnecessary, that that would result in action against

18   the officer; isn't that correct?

19       A.   They have a system.  I'm not convinced that

20   it's an effective system from the pieces of it that I've

21   been able to view.

22       Q.   So, in other words, what I gather you're

23   saying is that the system is in place but it may not --

24   but it's not operating as effectively as you would like

25   it to be -- like to see?

1     A.   I don't think that the system they have is

2   effective to ferret out what actually occurred in an

3   incident.

4     Q.   And, again, going to bullet points in

5   paragraph 146, you would provide -- this is another one

6   of the more extensive parts of your declaration.  You

7   would provide for a system in which expandable batons

8   are only used for the safety of the officer or when

9   there's a risk of death or serious bodily harm; is that

10  correct?  Looking at the first full bullet point on

11  page 48.

12    A.   Yes, that's what I've recommended, that first

13  bullet point.

14    Q.   So you would not provide for the use of an

15  expandable baton in instances where officers are trying

16  to break up yard fights, for example?

17    A.   Again, and I think I said this a couple times

18  and I want to say it again.  How or if CDCR ever embarks

19  on fundamental change, the implementation plan and how

20  they do that requires a lot of attention.

21       So with that caveat, yes, I -- I agree with

22  your statement.

23       I guess it's kind of contained in the

24  statement.  I do say they should provide extensive

25  training to implement this policy change.

Eldon Vail                                                                March 19, 2013

```
 1              Then I would add that I don't think you could
 2    do these in isolation.  I mean, in sequencing is
 3    important as well.
 4              If California rethought how they're going to
 5    run their facilities and provide incentives for those
 6    inmates who are going to respond to incentives -- which,
 7    in my judgment is the vast majority of inmates -- they
 8    need to be going down roads like that at the same time
 9    they disarm their staff a little bit so that inmates'
10    belief in the fairness and legitimacy of the authority
11    exercised by the department occurs hand in hand with the
12    other changes to the use of force policies.
13        Q.   And on what grounds do you believe that
14    providing incentives would lead to a -- to the change
15    that you're talking about among the inmate population?
16        A.   A massive body of research that exists
17    nationally, whether you want to look at the work coming
18    out of PU or the Washington State Institute for Public
19    Policy or the Washington State Department of
20    Corrections, and other jurisdictions have similar
21    internal studies where we demonstrate not only improved
22    recidivism rates but improved inmate behavior when
23    inmates are involved in certain kinds of positive
24    programs.
25              One of those is connected to family.  But drug
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com