IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE LAWRENCE K. KARLTON, JUDGE

---oOo---

RALPH COLEMAN, et al.,

        Plaintiffs,

vs.                            No. Civ. S-90-0520

EDMUND G. BROWN, Jr.,
et al.,

        Defendants.

_____/

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

DEFENDANTS' MOTION TO TERMINATE

WEDNESDAY, MARCH 27, 2013

---oOo---

Reported by:   KATHY L. SWINHART, CSR #10150

```
1                            APPEARANCES

2

     For the Plaintiffs:
3
              ROSEN, BIEN, GALVAN & GRUNFELD
4             315 Montgomery Street, Tenth Floor
              San Francisco, California  94104-1823
5             BY:     MICHAEL W. BIEN
              and     JANE E. KAHN
6             and     THOMAS NOLAN

7                          and

8             DONALD SPECTER
              PRISON LAW OFFICE
9             1917 Fifth Street
              Berkeley, California  94710-1916
10

11   For the Defendants:

12            STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
              OFFICE OF THE ATTORNEY GENERAL
13            1300 I Street, Suite 125
              Post Office Box 944255
14            Sacramento, California  94244-2550
              BY:     PATRICK R. MC KINNEY
15            and     DEBBIE J. VOROUS
              and     WILLIAM H. DOWNER
16

17

18

19

20

21

22

23

24

25
```

1        SACRAMENTO, CALIFORNIA

2        WEDNESDAY, MARCH 27, 2013, 1:30 P.M.

3                    ---o0o---

4        THE CLERK:  Calling civil case 90-520, Coleman, et

5  al., versus Brown, et al., on for defendants' motion to

6  terminate, Your Honor.

7        THE COURT:  Counsel, approach the podium and state

8  your appearance for the record.  If you are arguing, remain at

9  the podium.

10        MR. BIEN:  Good morning, Your Honor.  Michael Bien on

11  behalf of the Coleman plaintiff class.

12        MR. MC KINNEY:  Good afternoon, Your Honor.  Patrick

13  McKinney on behalf of defendants.

14        THE COURT:  Well, I'll say this for the record, not

15  that I think it will convince you at all, I do my very best to

16  decide cases on the law, not on my feelings about the parties

17  or the lawyers.  Having said that, let's turn to the very

18  difficult issues that are before the Court.  I guess I start

19  with the ethical problem.

20        Counsel, I've read your papers.  Even if I were to

21  believe your rationale that at the time we didn't know whether

22  we were going to go forward with a motion to terminate, and so

23  somehow or other that made a difference, why does it make a

24  difference?

25        Ascertaining whether or not you wanted to go forward

2

1   with a motion to terminate turns on what you understand the

2   situation relative to remediation is, all of which is this

3   very lawsuit.  How could it possibly make a difference?

4        MR. MC KINNEY:  Thank you, Your Honor.

5        First of all, I have no reason to disbelieve you will

6   not decide this case on the merits, and I certainly believe

7   that to be true.  We don't have a history, and I hope that

8   doesn't impact this.

9        To respond to your question, under Rule 26, the

10  parties are allowed to go out and conduct investigations of

11  their systems.  That's exactly what we retained consultants to

12  do here.  The fact that they turned that into -- we got their

13  opinions.  At the time they were retained, we did not know

14  what their opinions were going to be.

15       But they conducted a systemic evaluation which

16  included review of policy, review of --

17       THE COURT:  I know, I know what you say they did.  I'm

18  going to ask you again, because I'm afraid that somehow or

19  other I failed to convey the problem.  Which is you are

20  talking to their clients about this case without either

21  telling them, getting their permission or anything else that

22  the rules of ethics require.

23       MR. MC KINNEY:  Your Honor, on that issue, we disagree

24  that this was done in secret.  We notified the special master,

25  first of all, before the tours began.

1          The way this case has worked over the last 17 years --
2     this is a case where judgment was entered back in 1995, and
3     we've been in a remedial phase.  The Court has certainly
4     relaxed the contact rules.  The special master frequently has
5     contact with staff of CDCR without us being present.
6          THE COURT:  The special master is the Court.  It's got
7     nothing to do -- oh, this is -- I'm sorry.  I don't want to
8     raise my voice.
9          Assume that I disagree with you, assume that I think
10    that there is a profound ethical violation.  The plaintiffs
11    want me to strike the experts' affidavits -- well, I suppose I
12    better go back and ask the next question.
13         Let's assume everything you've said is true.  At that
14    point, you said, gee whiz, we ought to make a motion to
15    terminate, but we can't use these experts' opinions because
16    they were -- if we did, we'd be in violation of the rules of
17    ethics.  We've got to go get new experts.
18         Is that wrong?
19         MR. MC KINNEY:  Yes, Your Honor.
20         Rule 26 specifically says that you no longer have to
21    do that, that you're allowed to use the same experts that you
22    used --
23         THE COURT:  That's even after you violated the rules
24    of ethics?
25         MR. MC KINNEY:  Your Honor, I disagree that we

4

1    violated the rules.  Again, we -- the special master was

2    notified.  The plaintiffs were notified several months in

3    advance of the filing of the motion.

4         THE COURT:  Were you notified about the fact that the

5    experts were going out and asking -- talking to your clients?

6         MR. BIEN:  No, Your Honor.  I swore to that yesterday.

7         MR. MC KINNEY:  But, Your Honor, Mr. Bien was

8    extremely coy in his declaration.  He doesn't mention what Don

9    Specter did, but Don Specter is the first attorney on the

10   caption up here on the top left.  Don Specter was notified

11   several months before we filed our motion.

12        And the plaintiffs --

13        THE COURT:  Notified of what?

14        MR. MC KINNEY:  Notified that we were conducting site

15   visits and that -- which would necessarily include speaking

16   with inmates.

17        And, Your Honor, to be clear, we were looking at this

18   systemically, so the conversations with the inmates were --

19   were not the main issue.  They were a side point that was used

20   to confirm from the general.

21        There's not a single inmate mentioned in the --

22        THE COURT:  Among other things that aren't mentioned,

23   I agree with you about that.

24        Let me ask you, Mr. Bien.  I think this is a serious

25   matter, a very serious matter.  On the other hand, this is a

1    very important lawsuit, important to the plaintiffs but

2    equally important to the defendants.

3         Yes, I can strike the affidavits.  Then there will be

4    no support for the motion.  The motion can be denied on that

5    basis.  Isn't that an extraordinary, an extraordinary remedy?

6         I acknowledge this is an extraordinary violation.  I

7    mean, how many cases have we found that have anything to do

8    with it because lawyers know better.

9         But, I mean --

10        MR. BIEN:  Let me --

11        THE COURT:  Go ahead.

12        MR. BIEN:  -- try to address -- it's a very difficult

13   problem.

14        Let me assure the Court that I was never notified, and

15   Mr. Specter was never notified, that these tours had taken

16   place.  There were already ten tours completed at the time

17   that they claimed to have had a conversation with Mr. Specter.

18   And it wasn't their attorneys, it was Steve Martin, one of

19   their experts in a casual conversation.  There is no way that

20   Donald Specter gave permission retroactively to tours being

21   conducted or contact with our clients.

22        There is another issue besides just the ethical

23   violation of contact with our clients, and that is the

24   prejudice to plaintiffs and our ability to understand what

25   these experts did, to know who they spoke to, which units they

1    were shown, which units they were not shown, what records they

2    saw.  This is -- this is a mystery to us.

3          I spent a whole day looking at Dr. Dvoskin's records

4    and speaking with him, and I still do not know what he said to

5    who, on what date, who he spoke to, where these -- where the

6    information comes from.

7          And I think if you look at the contrast to their

8    response to our expert reports, where they accompanied us

9    every minute, a swarm of people accompanied us on every minute

10   of these tours, and then they had people file declarations.

11   When you said it was gray, it was actually black over here.

12   And this person didn't say that, he said something slightly

13   different.  We didn't get that chance.

14         And, as Your Honor knows, when we get that chance to

15   accompany an opposing expert on a prison inspection, which is

16   our right and our duty to represent our clients, we're able to

17   inform the Court about what really happened, what that person

18   really saw, so you have a factual background that's

19   undisputed.

20         Here we have a mess.  I don't know what they saw.

21   They haven't shared what they saw.

22         THE COURT:  Mr. Bien, I understand your problem.  I'm

23   going to ask you again.  Let me give you the world's worst

24   case.  Okay?

25         I determine, A, there's been an ethical violation of a

1    profound nature, which, B, seriously affects the ability of

2    the plaintiffs to participate in this motion and, C, that the

3    only remedy that is appropriate under those circumstances is

4    striking the experts' affidavits.  And upon doing that,

5    obviously there's no support for the defendants' motion.  The

6    motion is denied.

7          It goes up to the Ninth Circuit.  For reasons that

8    escape me entirely, escape me entirely, that court finds

9    either there wasn't an ethical violation because somehow or

10   other Rule 26 or their reading of Rule 26 overcomes their

11   ethical duties, as difficult as it is for me to believe that

12   anybody believes that it could happen; or there was no ethical

13   violation or it was an oversight; or, in any event, this is

14   too important a case to decide that on this basis, we reverse.

15   It comes back down.  We've exceeded the time period permitted

16   by the PLRA, and the Court enters a termination order because

17   I have no choice, because I do the law.

18          MR. BIEN:  There are several alternatives to that

19   worst case.  First of all, we are introducing evidence here

20   today not only in response to defeat their motion, we have

21   established that there are ongoing constitutional violations.

22          THE COURT:  Absolutely.

23          MR. BIEN:  And --

24          THE COURT:  And we'll never get to those ongoing

25   constitutional violations if I strike the affidavits and,

1    therefore, there is no basis for the motion, and the motion is

2    denied on that basis.

3         MR. BIEN:  We think you could reach both.  There's no

4    reason that you're presented with evidence that you -- that

5    the issue is really before you.  Plus, this is not the only

6    evidence that they have in support of their motion.  They have

7    other --

8         THE COURT:  None of that evidence goes to the

9    question -- is substantial enough to go to -- to approve the

10   termination.

11        All right.  The Court has considered -- and, you know,

12   I mean, there is so much work in this case, I hope the Ninth

13   Circuit just takes a look at the volume of papers that have

14   been filed.  Because that brings me to the second question,

15   which we're going to have to deal with in just a moment.  We

16   may never get to the substance.

17        The Court has considered that probably the appropriate

18   thing to do is to have alternative holdings.  The problem is

19   that in some ways that undermines the Court's conclusion that

20   there is a serious ethical violation.  But, I don't know,

21   maybe that's the appropriate thing to do.

22        MR. BIEN:  Your Honor, if I may.

23        THE COURT:  Yes.

24        MR. BIEN:  If the Court goes that route, the ethical

25   violations which were committed not only by opposing counsel

1    and higher-ups in the administration, but also by the experts

2    themselves, reflect on the credibility --

3              THE COURT:  Oh, I agree with that.

4              MR. BIEN:  -- of the experts.

5              THE COURT:  You don't have to tell me that.  Please.

6              MR. MC KINNEY:  Your Honor, if I --

7              THE COURT:  Well, actually you ought to have an

8    opportunity to respond to that.

9              It is the Court's tentative conclusion that all of

10   these ethical violations, even if they don't justify striking

11   the experts' affidavits -- and I understand you don't believe

12   that there's an ethical violation, and you're entitled to

13   that.  You have to say that on behalf of your clients for

14   sure.

15             But assume for a moment, I know it's difficult, but

16   assume for a moment that the Court finds that there is a

17   serious ethical violation, but that the totality of

18   circumstances are such that it's unwilling to strike the

19   affidavits.

20             I don't know how to ask this to let you answer it

21   without being bound by your duties to your client.  I don't

22   think there's any way for me to ask, but I'll ask it, and you

23   can just say no, you know, if that's your position.

24             Assuming that the Court finds there's an ethical

25   violation and that it affected the plaintiffs' ability to

1    respond to this motion, but that other circumstances have

2    determined that the Court not strike the affidavits.

3    Nonetheless, it would appear to the Court that the weight to

4    be given those affidavits has been seriously undermined.

5              If you can respond to that, I'd like you to do so.

6              MR. MC KINNEY:  Your Honor, that would be incredibly

7    unfair.

8              I think, first of all, addressing the ethical

9    violation, Mr. Bien in his declaration submitted to the Court

10   admitted that he engages in ex parte contacts himself with the

11   higher-ups of the organization, of CDCR.  As I mentioned, the

12   special master engages in ex parte contacts with inmates and,

13   umm, staff of CDCR.  That's simply the way this case has

14   worked over the last 17 years.  So, at a minimum, we had a

15   good faith understanding that it would not be an issue,

16   particularly in light of the fact that we disclosed this to

17   the Court.

18             Second of all, with respect to the prejudice issue,

19   the report was extremely fair and balanced.  You got -- the

20   experts were looking for issues.  To the extent they spoke

21   with an inmate, it would have gone to the benefit of that

22   inmate, not to the detriment.  He would have received better

23   care.

24             They can't point to a single admission or --

25             THE COURT:  Of course not.  They don't even know who

1  you talked to.

2          MR. MC KINNEY:  That's untrue, Your Honor.

3          THE COURT:  Stop.

4          MR. MC KINNEY:  They were -- we produced hundreds of

5  thousands of pages of documents.  They got all of the experts'

6  notebooks.  They deposed each of those experts.  This was

7  simply -- everything was done the way an expert would have

8  done this looking at a systemic issue.

9          And I think they -- they are overemphasizing the

10  importance of these interviews.  It was only a small portion

11  of what was done in the site visits.  It certainly wouldn't

12  justify striking the entire report, even if the Court found

13  that some of these incidental contacts with inmates did happen

14  to violate an ethical rule, which, again, we dispute in this

15  remedial phase of the case.

16          THE COURT:  All right.  Let me talk to the next issue,

17  which is also not to the substance yet.  We may never get --

18  well, hopefully we will.

19          The PLRA creates a dilemma for the Court.  If I don't

20  find and issue an order setting forth my findings as to why

21  termination is inappropriate by a given date, then termination

22  follows.

23          In the instant matter, the affidavits of the

24  plaintiff -- I mean, the affidavits of the plaintiff, the

25  affidavits of the defendant, the arguments of the parties all

12

1    turn on a variety of -- all turn on evidence -- I don't mean

2    turn, but all involve evidence in which credibility is at

3    issue.  I say X happened, you say it didn't happen.

4          The way one solves a credibility issue ordinarily is

5    to hold a hearing and listen to the people and make a decision

6    based upon what they say, how they say it, and the other

7    characteristics of the making of credibility determinations.

8    I'm precluded from doing that.  We don't have the time.

9          It is -- is it arguable is the correct way to say it,

10   is it arguable that by virtue of this circumstance, the PLRA

11   goes beyond what Congress clearly has the power to do because

12   it in effect is precluding the Court from doing those things

13   which the law ordinarily requires the Court to do in deciding

14   credibility issues?

15         And, if so, how does the separation of powers issue

16   bear upon what the Court is supposed to do?

17         Let's start with -- I suppose I start with the

18   plaintiff, give you a chance to catch your breath.

19         MR. BIEN:  Your Honor, these issues that you've raised

20   are extremely serious and put the Court and plaintiffs'

21   counsel in a very difficult bind.

22         THE COURT:  Well, it puts the defendants' counsel in a

23   very difficult bind also.  He says if I could just have a

24   hearing -- I don't want to put words in your mouth.

25   Conceivably he says if I just have a hearing, you'll see that

13

```
1    my people are telling the truth, and those plaintiffs' experts
2    are to be disregarded at least insofar as these particular
3    credibility issues are concerned.
4         So it's not just you're at a disadvantage, and the
5    Court clearly is at a disadvantage, arguably so are the
6    defendants.  Go ahead.
7         MR. BIEN:  The -- the constitutionality of this
8    provision has been raised, but not in a case of this
9    magnitude.
10        THE COURT:  And not under these particular
11   circumstances.
12        MR. BIEN:  And not --
13        THE COURT:  Which frankly are quite extraordinary, but
14   go ahead.
15        MR. BIEN:  I think that -- that the message that the
16   courts that have reviewed this provision, this rather
17   Draconian provision have stated they hear from Congress is you
18   must move as rapidly as possible, you cannot stall the
19   proceedings, we really mean it.  But the question is, how far
20   does that go?
21        When we have looked at the record here before you, we
22   feel that -- that there are undisputed matters that you can
23   reach that allow you to find constitutional violations on the
24   record here.  But it is -- and no one has requested as of this
25   point an evidentiary hearing.
```

14

```
 1              THE COURT:  I'm about to raise that question with
 2     everybody after we get through my question about does this
 3     create a serious issue of separation of the powers?
 4              I mean, it's very rare, let's all be candid, it's very
 5     rare that Congress acts in a way that the Supreme Court has
 6     said that's too far, you're now invading the powers of the
 7     Court in a way which denies the Court its separate third
 8     branch rights.  I mean, I can only -- I can't think of a case
 9     off the top of my head, but here we are.
10              Plaintiffs and defendants -- and I don't blame
11     defendants, I say both of you.  It's not a blame question.
12     It's what people do because they think they've got to do so.
13              The effect of the cross affidavits, the effect of the
14     arguments is that there are credibility issues.  Now it may
15     be -- you're right, it may be that the Court -- well, see,
16     that assumes that you win.
17              Let's assume that those issues that you think we're
18     going to win on anyhow, so forget about it, Judge, turn out to
19     be more difficult than you think they are.  And the Court then
20     thinks, gee, I've got to -- I've got to reach these other
21     issues, and I can't reach them because I don't have the time
22     under the PLRA.
23              MR. BIEN:  I think that if the Court comes to that
24     judgment, and it's obviously the Court's province, can you as
25     the trier of fact make this decision based on what's been
```

1    presented?  Then -- then we would suggest that you follow the

2    course that Judge Breyer followed, which is actually to allow

3    the stay at least as to certain orders to take effect.  Your

4    special master retains power during this period, plaintiffs'

5    counsel would retain our rights, and we would see whether or

6    not the State, in the face of an ongoing trial, will in fact

7    comply with the Court's prior directives or undermine them.

8             They would be in a pretty difficult position --

9             THE COURT:  We're all in a difficult position.  I've

10   got to tell you, you think that you're sitting in the catbird

11   seat.  You ought not to.  I think these are very difficult

12   issues.

13            Counsel, I want you to assume for a moment -- and

14   these are all assumptions.  You know, I certainly have some

15   tentative views on things, and I'd be disingenuous if I denied

16   it.  But I want you to assume for a moment that the Court is

17   uncertain about whether or not the plaintiff prevails on those

18   issues that he -- that I think you both would agree don't

19   involve credibility judgments, so I've got to reach these

20   other issues which do involve people saying, yes, you did, no,

21   I didn't, et cetera, et cetera.  You know, did you read these

22   reports that you signed?  And do you agree with them?  Which

23   apparently the plaintiffs say there's deposition testimony

24   that says that, if you have that hearing, you'll see that

25   that's true.  Whereas obviously you're going to say, no, that

1    the depositions didn't quite inquire into the heart of the

2    matter, and there is no conflict, et cetera.

3              Assume that that's where we are.  What do I do?

4              MR. MC KINNEY:  Your Honor, first of all, Congress's

5    intent under the PLRA was to end judicial oversight at the

6    soonest point possible.  So I think those provisions are

7    constitutional, and there's no reason why the stay should not

8    go into effect even if you were to order an evidentiary

9    hearing to go forward.

10             For one, it allows the system to go forward on its

11   own.  And I can tell you the dedicated people here -- we have

12   Secretary Beard here today; we have Undersecretary Toche; we

13   have Dr. Belavich, the director of health care services --

14   they will carry this forward whether there's a stay or not.

15             We believe that these termination proceedings have

16   shown that there is no systemic constitutional violation.  And

17   it's more than just the opinion evidence, Your Honor.  With

18   the motion, we submitted several declarations from Dr. Toche,

19   Dr. Belavich, Dr. Ceballos, Chris Meyer, Rick Johnson.  On

20   reply I think the plaintiffs were left with no evidence.

21             To show how the system is working, people are so

22   excited out there in the system that they wanted to come

23   forward and explain the truth, and that's why we submitted 50

24   declarations with our reply rebutting paragraph by paragraph,

25   line by line, each sentence in those expert declarations.  So

1    the plaintiffs are left with no evidence here, Your Honor.

2              THE COURT:  Oh, my.  All right.  I can see that

3    neither the plaintiff nor the defendant understands the

4    position that the Court's put in.

5              MR. MC KINNEY:  I apologize, Your Honor, if --

6              THE COURT:  It's not your fault.

7              Well, all right.  The difference between this case and

8    those cases which have found, as an abstract matter, that the

9    PLRA is constitutional -- frankly that's what I would have

10   done if I were sitting on the Court of Appeals and I was

11   presented with an abstract question.  It's no longer an

12   abstract question.  There is a real world here in which it may

13   well be that the Court believes that it has a duty to have an

14   evidentiary hearing because 50 affidavits were filed and, of

15   course, the plaintiff has no opportunity to even reply to

16   them, but they all suggest credibility questions which are

17   ordinarily resolved by hearing.

18             MR. BIEN:  May I, Your Honor?

19             THE COURT:  Yes.  Sure.  Go ahead.  I'm sorry, I

20   didn't mean to sound that way.  Excuse me.

21             MR. BIEN:  First, we suggest that the Court, as is

22   intended by the PLRA termination, set a date, that's the date

23   to determine factual issues.  Much of the materials that were

24   included in the reply declarations were about events that took

25   place after plaintiffs inspected, after defendants filed their

1    motion, and certainly after March 1st, which was the close of

2    discovery.

3           We think that the Ninth Circuit law establishes that

4    the relevant date for a termination motion for determining

5    facts is the date the defendants filed their motion, January

6    7th.  But even if the Court said, you know, you can raise

7    factual issues about what our experts saw on our tours,

8    certainly you can't -- you should not be considering evidence

9    of things that haven't happened yet in the future, they don't

10   deal with current conditions, and certainly things that

11   happened after the close of discovery, March 1st.

12          The PLRA with its termination motion allows repeated

13   termination motions by these defendants.  You must set a time

14   schedule, you must close it and see have they met their burden

15   of proof at the time they filed their motion to establish that

16   all of the constitutional violations have been remediated.  If

17   they have not, the motion should be denied.  And if you make

18   findings of ongoing constitutional violations, then we have

19   relief pending.

20          If they want to make the motion again next year,

21   they're allowed to do that.  It would be -- that's their

22   right.  I mean, this court and plaintiffs' counsel are going

23   to have to address the fact that they can repeatedly file the

24   same motion even if they lose.

25          But you must set a time frame, and that's part of what

1   Congress contemplated, that there be a fixed period.  And to

2   some extent that might add -- provide one way of dealing with

3   the reply declarations.

4          We have demonstrated the reply declarations are mostly

5   inadmissible anyway, not just -- not just because they're

6   late, but because there's a lack of personal knowledge and

7   foundation.

8          But --

9          THE COURT:  See how easy it is?  All of your stuff is

10  no good.  According to you, none of his stuff is any good.

11  Why is the Court even bothering?

12         MR. MC KINNEY:  I think we disagree on the burden,

13  too, Your Honor.

14         THE COURT:  Oh, I've got a lot to say about that, but

15  I don't need you to talk to me about that.

16         I will say this, only an en banc decision or decision

17  of the Supreme Court can overrule a finding and determination

18  by a panel of the Ninth Circuit.  I don't want argument about

19  that.  I don't need it.  The things that we're talking about I

20  need to talk to you about.  That seems to me to be imminently

21  straightforward.

22         All right.

23         MR. BIEN:  May I make one more pitch?

24         THE COURT:  Sure.  Why not.

25         MR. BIEN:  The --

1          THE COURT:  Go ahead.

2          MR. BIEN:  I suggested earlier that it would be okay

3    to allow a stay to enter as to some orders.  I would like to

4    retract that position.

5          The discovery that we have done in this case and what

6    we have seen and our experts have seen and the attitudes of

7    public officials that we have seen in their filings and in

8    their public statements leads us to have grave concern about

9    the sincerity of this administration in complying with this

10   court's orders.  We think there's been deception as to

11   materials that were provided to the special master and the

12   Court and very serious problems in terms of the remedial

13   process that we've been engaged in in good faith.

14         THE COURT:  What --

15         MR. BIEN:  Under that circumstance, I would suggest

16   that if the Court feels that the Pl -- that this kind of

17   proceeding puts the Court in this position where this

18   provision of the PLRA is unconstitutional, then the Court

19   should so find.

20         This is a unique case.  This is a case that is unlike

21   any other case that's been presented under the PLRA.  The

22   Supreme Court just ruled on it in 2011.  And we would be --

23         THE COURT:  No, no, you don't understand.  That was --

24   the five members who ruled in favor of the plaintiffs, it's

25   because they didn't like the defendants, and they didn't care

1    for their lawyers.  I mean, I don't understand why you don't

2    understand that.

3         MR. MC KINNEY:  If we're going to argue the merits,

4    I'm happy to do so.  The State has invested substantial

5    amounts of money --

6         THE COURT:  Everything that the State has done is by

7    virtue of the fact that this court has ordered it done, where

8    the special master has supervised it.

9         Part of the sadness of all of this is the enormous

10   progress that has been made, enormous progress -- plaintiff

11   may disagree, I don't care -- enormous progress that has been

12   made.  You weren't around 17 years ago and the shocking

13   circumstances that were found then.

14        And here we are, you've made enormous progress, much

15   of it by virtue of the Court's order, much of it by virtue of

16   the special master's intervention, and some of it, maybe a

17   significant part of it by virtue of the change of personnel

18   and people who are concerned with doing what the Constitution

19   requires them to do.

20        There are things in these pleadings which cause me to

21   wonder whether that's so, but, on the other hand, I look at

22   what's being done, and there are remarkable things.

23   Considering where we were, they are astonishing.

24        But --

25        MR. MC KINNEY:  Well, Your Honor, I agree with those

1    comments, that it was a team effort over many, many years.

2    But there comes a point where there's no longer a systemic

3    issue, where there are systems in place, where they're

4    screening and evaluating inmates, where they're providing a

5    continuum of care both inpatient and outpatient, where they've

6    got an appropriate system for administering and monitoring

7    medication, which the plaintiffs did not even contest.

8         Their psychiatrists did not even look at the triple

9    CMS general population.  That's 80 percent of the class they

10   did not even look at with respect to medication management.

11        The staffing is adequate.  There's lots of testimony

12   from each of the institutions that they have the staff.

13   There's a record systems.  While it's not perfect, it was

14   created by the receiver, it works, it's up to date.

15        There is -- there are extensive programs to deal with

16   the serious suicide issue, Your Honor, which the department is

17   taking extremely seriously.

18        THE COURT:  Let me address a question I think where

19   actually it's a legal question.  How surprising, there are

20   some legal questions.

21        The defendants take the position -- which at least on

22   the surface is not unreasonable -- that the question continues

23   to be whether or not the State is deliberately indifferent to

24   the mental health needs of its prisoners.  And on that basis,

25   however we find deliberate indifference -- and, you know,

1    that's going to be yet another issue that we could spend all

2    day talking about.  And, of course, in a sense they're right,

3    but in another sense it's bizarre.

4         You can't be deliberately indifferent any more.  I've

5    got a special master on your shoulder every day.  I don't mean

6    every day, that's not true, but some of his experts are there

7    every day.

8         So deliberate indifference is established by virtue of

9    the initial order.  We are now in remediation.  What

10   remediation is designed to do is twofold.  We can't change

11   people's internal beliefs.  You know, those are sacrosanct.

12   We can change their objective behavior from which we can

13   infer, as if circumstantial evidence is somehow or other no

14   longer of significance.  All you gotta do is get up and say,

15   see, I really care now.  Oh, that ends that question.

16   Obviously that's not true.

17        We can examine what people do and ask whether or not

18   in that sense there is deliberate indifference.  On the other

19   hand, if you see that the system, while far from perfect and

20   not remediated as initially contemplated by the program guide,

21   is nonetheless such a substantial improvement over what

22   existed when the Court found deliberate indifference

23   initially, that the Court should be thinking about whether or

24   not the defendants have now reached a place where, even if it

25   isn't perfect, it suffices to meet the constitutional

1   standard.

2          That's I think ultimately your problem, Mr. Bien.

3          MR. BIEN:  Your Honor, deliberate indifference in a

4   systemic case can be demonstrated by knowing what needs to be

5   done, being in charge of a system and knowing what needs to be

6   done -- because you've studied it yourself.  You've hired

7   consultants.  You've told the Court this is my plan to remedy

8   the constitutional violations, this is what I'll do.  You tell

9   the Legislature this is the minimum we need to do to comply

10  with the Constitution.  This is what they did with their

11  construction plan, this is what they did with their staffing

12  plan.  And then failing, knowingly failing and consciously

13  failing to implement that plan, that remedy, those

14  recommendations.

15         Deliberate indifference, we are -- we have made an

16  effort to demonstrate ongoing deliberate indifference by the

17  very officials who are responsible.

18         The decisions -- the decisions that they're making to

19  overcrowd various prisons, to choose not to fund projects or

20  delay them when they know that those projects are necessary to

21  save lives, to provide care, that is evidence of deliberate

22  indifference.

23         THE COURT:  I want to --

24         MR. BIEN:  I didn't answer your legal question.

25         THE COURT:  No.  I'll get back to you, I promise.

1          The question is somewhat different.  Clearly the

2    Constitution doesn't require perfection.  Indeed, even

3    occasionally judges make mistakes.  Not often, but it happens.

4          If perfection is not the standard -- and, yes,

5    defendants have to admit, we adopted the program guide because

6    we thought if we did all of those things, clearly we would

7    have solved the constitutional question.

8          But the question then becomes, if perfection is not

9    the test, the standard, and if something less than perfect

10   conditions will suffice for the Constitution -- maybe it

11   shouldn't suffice for the State, but that's for them to

12   decide -- then at what level can the Court, must the Court

13   say, oh, yes, it's not perfect -- and I don't mean this -- I

14   know how it sounds, but I'm going to say it anyhow -- but it's

15   good enough for government work.  Because the Constitution --

16   what's good enough for the Constitution is the definition of

17   what the government must do.

18          MR. BIEN:  I don't think --

19          THE COURT:  You see what I'm trying to get at?

20          MR. BIEN:  I do understand, Your Honor.

21          I think that there's a different question posed when

22   you were -- if it's okay to refer to the LH case that was

23   before this court a few days ago -- when defendants and

24   plaintiffs and the special master are working cooperatively

25   towards a solution, and the question is how much is enough?

1    The issue before this court is are there ongoing

2    constitutional violations?  They have walked away from this

3    process of moving forward in a remedial plan, and they've

4    called a different -- they've sort of, you know, gone for the

5    home run ball.  There are no constitutional violations in the

6    system.

7            That is a different question, and perfection is never

8    the issue when we're looking for constitutional violations.

9    We are not seeking it.  The special master has never sought

10   that.  What we have seen in the system are serious problems.

11   And if we didn't see serious problems, the Court would be

12   required, and I know would, dismiss -- and it still may.  We

13   haven't proven anything.  We are still here before you.  I

14   don't know if we have demonstrated enough.

15           But you're sort of required to re-prove your case

16   under this provision of the PLRA.  Whether that's fair or not,

17   I can't say, but that's what we're faced with.

18           THE COURT:  Counsel?

19           MR. MC KINNEY:  Yeah, Your Honor.

20           Prospective relief cannot continue under the PLRA or

21   under Rule 60(b)(5) for that matter unless there is a current

22   and ongoing violation of a federal right.

23           What Mr. Bien is arguing for is in fact a perfect

24   system.  The things that they describe as problems or concerns

25   are not of constitutional scope, they're not systemic.  They

1   rely on instances that involve one, perhaps two individuals.

2   And, of course, the State has never argued that the system is

3   going to be perfect, nor that it needs to be.

4          I think what he's done by relying on the program guide

5   is confusing the means with the end.  The program guide is the

6   remedial plan designed to get the State up to a constitutional

7   level of care, and that was the reason we brought in

8   independent experts who have worked in other states, to come

9   and look at our system and compare it and tell us how are we

10  doing, good, bad or indifferent?  Let us know.  And that's

11  what they did.

12         And when they came back and told us that your system

13  is among the top tiers or is more than adequate, that's when

14  we came to the Court for relief because federal oversight

15  should not continue unless there is a violation of federal

16  law.  And the plaintiffs have pointed to nothing systemic in

17  their papers.

18         THE COURT:  Well, okay.  You're entitled to that view

19  as well, but I'll put the question the most graphic way that I

20  can.

21         What if the State, if it did X, Y and Z, could prevent

22  two people from committing suicide.  Would it be your argument

23  that those two people must die because we don't seek

24  perfection and there's no constitutional requirement for X, Y

25  and Z?

1      MR. MC KINNEY:  Your Honor, I think it would depend on

2  the circumstances of those two individual cases.

3      When you're talking about the systemic level, what the

4  State is required to do for suicide prevention is have a basic

5  system in place.

6      THE COURT:  I'm going to say it again.

7      MR. MC KINNEY:  That's all the law requires.

8      THE COURT:  No, sir.  You're not answering my

9  question.

10     Does the Constitution countenance death because the

11  State doesn't have to do -- because there's no specific

12  requirement that the State do X, Y and Z?  Yes, no, or I don't

13  know?

14     MR. MC KINNEY:  On the facts you've described, no,

15  Your Honor.  It would depend on those two individual cases.

16  If there was deliberate indifference in an individual case,

17  another attorney in my office would handle that.  We handle

18  those individual cases every day, but it's not -- it doesn't

19  address the systemic issue whatsoever.

20     THE COURT:  So your answer is the Constitution will

21  tolerate preventable suicides as long as we have a system in

22  place which on the whole addresses suicide risk?  Is that your

23  position?

24     MR. MC KINNEY:  No, Your Honor.

25     To clarify that, if there was deliberate indifference

1    in that individual case, then the Constitution would

2    absolutely not allow that.  And --

3         THE COURT:  We're talking about -- no, we're talking

4    about in the context of remedial relief.  We're talking about

5    your motion to terminate.  And I thought I'd asked you a

6    couple of times, and I haven't been successful in

7    communicating my concern.  And you've given me the answer that

8    you think is best, and that's fine.

9         MR. MC KINNEY:  Well, Your Honor, if the question is

10   are zero suicides permitted in prison on a systemic level,

11   then that can't be.

12        THE COURT:  Of course not.  Of course not.  You know,

13   you can't prevent people who are determined to kill

14   themselves -- I'm not sure that's -- I assume, along with your

15   experts, that -- and your experts, as far as that goes -- that

16   it would be impossible to prevent all suicides.  That seems

17   likely to be the case.  That's not the question that I've

18   asked you.

19        I've asked you, you've got a system in place.  The

20   system does not include X, Y and Z.  Your own consultant

21   suggested X, Y and Z are good things to do to prevent

22   suicides.  The special master has said X, Y and Z or maybe

23   just X and Y are good things to prevent suicides.  And your

24   answer is those two people will die because we don't require

25   perfection.

1    MR. MC KINNEY:  On the systemic issue alone, that's

2    correct.  And to address those suicide recommendations,

3    certainly those recommendations have been adopted by the

4    State, Your Honor --

5    THE COURT:  I know.  I know.

6    MR. MC KINNEY:  -- including collaboration between

7    custody and mental health.

8    Dr. Belavich discusses that in his reply brief, in his

9    reply declaration.

10   THE COURT:  No.

11   MR. MC KINNEY:  But you're definitely right on the --

12   THE COURT:  All right.  All right.  I understand your

13   position.

14   It's perfectly clear -- ah, nothing is perfectly

15   clear.  It's as clear as this hearing is going to require that

16   you can't prevent all suicides.  What standard applies to a

17   determination as to whether or not there's a continuing

18   constitutional violation?

19   MR. BIEN:  This is the same standard, Your Honor,

20   applied at trial in this case.  Defendants sought to have

21   certain defendants removed as parties because we didn't show

22   that they were individually deliberately indifferent.  And the

23   standard in this court's published opinion applies equally to

24   the defendants here today.

25   Did the defendants who were in charge of the system,

1    from the Governor to Secretary Beard to Dr. Toche and Dr.

2    Belavich and others, did they know of things that could be

3    done to prevent harm, suffering and death and fail to take

4    reasonable steps to implement those solutions?

5         We think we've established that each of them have done

6    that, they each violated the Constitution.  Suicide prevention

7    is just one of many examples.  That is a constitutional

8    violation.

9         And they're not -- they don't have to accept every

10   recommendation.  We're not saying that, that's not what the

11   law is.  But they cannot hide from a recommendation.  They

12   have to have a real, appropriate basis to reject such a

13   recommendation, and we have not seen that.

14        THE COURT:  And is it your view if we come to a motion

15   to terminate, they've got to be prepared and they've got to

16   provide the Court with the explanation about why those

17   recommendations were not taken, were not implemented rather

18   than just saying, well, we took X, Y and we didn't take Z

19   because, after all, we're the State, and we can make judgments

20   of that kind?

21        You think that in order for --

22        MR. BIEN:  That failure, Your Honor, is evidence of

23   deliberate indifference.

24        THE COURT:  All right.  I understand your position.

25        MR. MC KINNEY:  Your Honor, I think Mr. Bien stated

1   half of the standard.  He's left out the subjective piece of

2   the standard.  And --

3         THE COURT:  I'm going to say again, sir, I don't know

4   how anybody proves the subjective standard other than by

5   saying these are the things that are happening in the real

6   world which give rise to a right of the trier of fact to make

7   a judgment based upon circumstantial evidence as to whether or

8   not the requisite subjective standard exists.

9         I'm going to stop for a minute because I'm going to

10  take a break.  I find these are very difficult questions.  I

11  really admire the lawyers who know all of the answers, but I

12  don't, and every once in a while I've got to take a deep

13  breath.

14        I think I see Mr. Specter in the courtroom; do I not?

15  Mr. Specter come forward.

16        I know you just look forward to doing this.  Madam

17  Clerk, swear Mr. Specter.

18        MR. SPECTER:  From here or --

19        THE COURT:  Right there.

20        THE CLERK:  Okay.  Please raise your right hand.

21        (Oath administered to Mr. Specter.)

22        MR. SPECTER:  I do.

23        THE CLERK:  Thank you.  Please state and spell your

24  name for the record.

25        MR. SPECTER:  Donald Specter, S-P-E-C-T-E-R.

1          THE COURT:  Sir, you've heard the defendants say that

2     you were fully informed about their proceeding, that you knew

3     from the very beginning that they were going to talk to your

4     clients, and that you impliedly consented to it or, in any

5     event, at some point you said, oh, that's terrific.

6          Would you set forth your understanding -- not your

7     understanding, the facts as they relate to that.

8          THE WITNESS:  Certainly.

9          I don't remember exactly the specific date in which I

10    had a conversation with Steven Martin, who I've known for over

11    20 years.  We -- most of the conversation was a personal

12    conversation about our family and our professional life.  And

13    in the middle or at some point of that conversation Mr. Martin

14    informed me that he had been hired by the defendants to

15    undertake some kind of evaluation.  I don't recall him

16    mentioning the Coleman case.  And most importantly, Your

17    Honor, I never explicitly or implicitly gave him permission to

18    speak to my clients.

19         THE COURT:  You don't remember the date, but relative

20    to how long you now know that the experts had been out there,

21    would you characterize it as early in the process, in the

22    middle of the process, late in the process?

23         If you can.  If you can't --

24         THE WITNESS:  I can't answer that.  I have no reason

25    to disbelieve Mr. Martin's suggestion of when the conversation

1   occurred.  I do believe he says it was in June of some year,

2   and that's generally consistent with my recommendation -- I

3   mean, my recollection.

4          THE COURT:  All right.

5          Sir, I don't know whether you want to cross Mr.

6   Specter on his testimony.

7          MR. MC KINNEY:  No, Your Honor.

8          THE COURT:  Thank you, sir.  You may retire.  We're

9   going to take a 15-minute recess.

10          (Recess taken.)

11          THE COURT:  Counsel, please come forward.

12          Among the other things that I did, I talked to my law

13   clerks.  I think I've exhausted those things which the Court

14   finds most troubling.  That's not to say that there aren't a

15   lot of other things.  But I think I want to give you folks the

16   opportunity to tell me what you think either wasn't

17   sufficiently articulated in the briefs or you think needs

18   further articulation.

19          And this is the defendants' motion.  I know you think

20   you don't bear the burden of proof, but I'll let you -- I'll

21   pretend that you do, and so you can tell me -- you can both

22   open and close.

23          MR. MC KINNEY:  All right, Your Honor.  I think I'll

24   probably say something about the burden shortly here.

25          These termination proceedings have demonstrated that

 1   judicial oversight of prison mental health care is no longer

 2   necessary or appropriate.  Under the law, both the PLRA and

 3   Rule 60(b), plaintiffs have the burden of showing that as a

 4   system prison mental health care is so deficient that it

 5   violates inmates' Eighth Amendment rights.

 6           Plaintiffs have not come forward with any evidence

 7   showing a systemic issue here.  The State has invested

 8   tremendous resources towards prison mental health care.  They

 9   spend nearly 400 million dollars annually.

10           Most recently, CMF over in Vacaville opened a new

11   treatment and office space.  That followed on to a 64-bed

12   intermediate care facility that was opened and a 50-bed crisis

13   unit that was opened.  The State has also constructed a 64-bed

14   intermediate care facility at Salinas Valley and a 45-bed

15   inpatient psychiatric unit at the California Institution for

16   Women.

17           Those are just some of the more recent construction

18   projects have been completed.  So to the extent that counsel

19   was talking about the State, you know, not going forward with

20   construction, what we've seen is year to year the system just

21   getting better and better.

22           And we certainly don't agree that, while the special

23   master and the Court have certainly been involved and played a

24   key role, we don't agree that that is the driver.  At this

25   point, it is CDCR improving its system, continually looking

1    for issues, looking to self improve and, when they identify an

2    issue, correcting that issue.

3         There were a couple of issues that arose during the --

4    during the termination proceedings.  One, plaintiffs raised an

5    issue with respect to 30-minute welfare checks for inmates in

6    administrative segregation.  While we don't agree that's a

7    constitutional issue, in fact, it's not even a mandatory

8    provision by the American Correctional Association, Secretary

9    Beard and the department looked to change that.  So just last

10   week, they issued memos that we would go to three checks an

11   hour and would also go to an automated check system that would

12   fully document when those checks were taking place.

13        So that is one piece of evidence showing just how

14   committed the State is toward helping prevent suicides within

15   the system.

16        One of the other big issues that came up in the media

17   were wait lists at the Department of State Hospitals.  Again,

18   as soon as the department found out about that, they sprung

19   into action, opened a new wing, the L-2 at Vacaville, and

20   began admitting patients last week.  As of yesterday, there

21   are a total of three patients waiting for intermediate care

22   statewide longer than 10 days.  There are zero patients

23   waiting for intermediate care longer than 30 days statewide.

24   So those wait lists, again when we were here back in July,

25   those wait lists no longer exist and have been eliminated.

1          As I mentioned earlier, the State has created basic

2    systems in all of the six elements identified by the Court

3    back when it issued the Coleman opinion in '95.  And that's

4    what the Constitution requires, is that there be a basic

5    mental health system in place.

6          The State has gone far beyond a basic system.  They've

7    implemented the program guide, which -- I'm not sure if

8    counsel said this or not, but the State does follow the

9    program guide.  There's no -- there's no question about that.

10   I think that's beyond dispute here.

11         What they may not do is comply 95 percent or some

12   percentage for every single issue.  But the State has adopted

13   the program guide as its policy and procedure and follows that

14   policy.  So based on the evidence before the Court, the basic

15   system is in place.

16         Now, in the opposition and throughout these

17   proceedings plaintiffs have failed to contest a number of

18   issues.  One, screening and evaluation.  They have presented

19   no evidence whatsoever on screening and evaluation in CDCR.

20   The only evidence they have presented were some comments by

21   one of the commissions about the administrative segregation

22   tool that's being used.  And really all that reflects is that

23   the State is continuing to think about and improve that tool.

24         Generally access to care for the general population

25   for the in-house patient program and the triple CMS program,

38

1    they didn't present any evidence on that.  That's a huge

2    portion of the class that no evidence was presented on.

3         The plaintiffs have focused on exceptions, the things

4    that the State hasn't been doing, and we'll get to some of

5    those in a minute or maybe I'll let Mr. Bien talk about those

6    exceptions, because they certainly haven't talked about the

7    basic systems that are in place.

8         Quality management, we presented this in the motion.

9    Plaintiffs didn't address it whatsoever.  So the quality

10   management system, which I think has been acknowledged as

11   robust by both the special master's reports and our own

12   experts' reports has not been addressed, so that should be

13   removed from the case immediately.

14        Last, and I referred to this earlier, is medication

15   management.  Neither of the plaintiffs' psychiatrists, Dr.

16   Kaufman or Dr. Stewart, looked at the triple CMS general

17   population at all for medication management issues.  That's 80

18   percent of the class that the plaintiffs have presented no

19   evidence on whatsoever, and that should be taken out of the

20   case completely.

21        Rather than look at the State's evidence, the

22   plaintiffs also just focused on a number of -- well, they make

23   a number of arguments actually that aren't supported by facts.

24   And as we discussed earlier, this isn't about a perfect

25   system.  The system is well beyond adequate.  It's

1    functioning.  It's constantly evaluating itself.  It's self

2    critical.  When it is self critical, the plaintiffs jump on

3    the opportunity to criticize the system for that, and that's

4    inappropriate.  That's a pretty good example of why federal

5    oversight and having plaintiffs involved directly in some of

6    these things is not appropriate.

7           What they have focused on are problems, the

8    exceptions, the issues that -- or concerns or problems that I

9    think Mr. Bien -- those are the terms he uses.  And for each

10   of those, they point to an example or maybe two examples where

11   they spoke to an inmate, didn't corroborate that statement,

12   but spoke to an inmate.  Or maybe one staff person said this,

13   and they generalize it to the whole system from that.

14          Now in reply we came back and explained why a lot of

15   those things were not true.

16          For example, the plaintiffs complained about group

17   treatment.  Dr. Stewart was down at Los Angeles County prison

18   and claimed that all the inmates do there is watch movies in

19   groups.  But what actually happened was Dr. Cornell, the chief

20   of mental health at LAC, offered to take Dr. Stewart down to

21   the next room where a group was working on a collaborative art

22   project.  Dr. Stewart refused and instead just issued the

23   opinion that all the inmates do are watch movies in their

24   groups.

25          Another example that I think is pretty important is

40

1   plaintiffs have really been pressing lack of confidentiality

2   for treatment settings.  While we disagree that's a

3   constitutional issue, in fact no court has held that --

4          THE COURT:  Yet.  Yet.

5          MR. MC KINNEY:  Fair enough.  But the law as of today

6   is not that a constitutional setting is not required for

7   treatment.  And --

8          THE COURT:  A conventional setting is not required for

9   treatment.  You said a constitutional.

10          MR. MC KINNEY:  Pardon me.  I meant confidential.

11   Thank you, Your Honor.

12          So down at the State of California women's facility,

13   Dr. Kaufman claimed that -- based on a discussion with one

14   inmate, that inmates are never seen in confidentiality,

15   confidentially.  So we submitted evidence both from Lori

16   Williams, the chief psychologist at CCWF, and a documentary

17   showing both that CCWF provides a confidential setting more

18   than 85 percent of the time, but also that every -- every

19   institution within the state has a confidential setting

20   available if requested and if clinically appropriate, that's

21   provided.

22          There are a number of isolated cases.  We could keep

23   going on this, but I don't think it's necessary.  Our reply

24   evidence, our reply brief goes through a lot of that evidence.

25          I wanted to focus on a couple of issues.  One is

1    suicide prevention because we discussed that earlier.

2            What the law requires, what the Coleman court required

3    in its opinion, what was required by ballot is that a basic

4    system be in place.  At the time the Court issued its order,

5    it did not find that the suicide prevention system was

6    constitutionally inadequate.

7            And it's transformed as of today.  Each institution

8    and at headquarters, they have committees called the suicide

9    prevention response focused improvement team that meet.  They

10   address suicide prevention issues.  They look through the

11   completed suicides and serious attempts and seek to improve.

12   So that's ongoing throughout the system.

13           They have standardized forms for screening risk of

14   suicide.  To make sure that those forms are being

15   appropriately implemented, a proctor mentoring program to

16   train clinicians on the appropriate use of those forms was

17   conducted by the State.

18           CDCR just recently developed a new suicide prevention

19   work group to further address suicide issues.  CDCR staff also

20   monitored inmates at risk, at high risk for suicide.  We in

21   seven of the declarations, the declarations by Hoffman, Cho,

22   Paizis, Schneider, McMahon and Howe, discuss that high risk

23   monitoring program.

24           CDCR has also done a number of things to address

25   suicides in administrative segregation.  First of all, between

1    2004 and last year, the rate of suicide in administrative

2    segregation has been cut in half so that it's now far less of

3    an issue than it was even back in 2004.

4         CDCR has also retrofitted intake cells to make them

5    more suicide resistant.  Suicide beds have been installed

6    in -- throughout the state.  Again, I discussed the welfare

7    check issue earlier, but that's another effort to improve

8    suicide prevention efforts.

9         There has also been extensive emergency response

10   planning and training.  And you can see that through the

11   declarations we submitted from custody staff, the wardens and

12   captains and sergeants that submitted declarations talking

13   about the emergency drills that they go through.

14        Finally, there's a thorough process for investigating

15   suicides, completed suicides, and suggesting corrective

16   action.  So there's a system in place that is comprehensive

17   from the screening to evaluating completed suicides.  The

18   State has taken this issue extremely seriously, continues to

19   take it very seriously.  And I submit to the Court that

20   judicial oversight is not necessary for the State to continue

21   moving those efforts forward.

22        The State and its top leaders, including Secretary

23   Beard, who is sitting here, Dr. Toche, the Undersecretary and

24   Dr. Belavich, the director of the health care system, are all

25   committed to this issue.

```
 1            Finally just briefly, Your Honor, because there was

 2    some discussion on this, there's been suggestions by the

 3    plaintiffs that the State doesn't follow recommendations by

 4    experts it has retained.  That's simply false.  The reply

 5    declaration submitted by Dr. Belavich -- and this is

 6    appropriate for reply because it wasn't raised as an issue

 7    until the plaintiffs brought it up and deposed Lindsay Hayes

 8    and raised other issues.  But, with respect to Lindsay Hayes,

 9    who did a report on suicide issues, the State has implemented

10    several of his recommendations.

11            THE COURT:  Let -- I think I know your position.  You

12    don't have to repeat it.  But you've I think demonstrated in

13    your final argument one of the problems that the Court is

14    faced with.

15            We've got all of these reply affidavits.  Ordinarily

16    the plaintiff would say I want to take the depositions of

17    those people or, at minimum, Your Honor, I want an evidentiary

18    hearing where I can question them.  It can't be done.

19            What is the effect of that?  How is the Court to deal

20    with that?

21            MR. MC KINNEY:  Your Honor, under the PLRA, plaintiffs

22    had the opportunity to request an evidentiary hearing.  They

23    did not.

24            THE COURT:  Sir, stop.  I mean --

25            MR. MC KINNEY:  Well --
```

1        THE COURT:  -- this is the real world.  There's no

2   time.

3        You know, even assuming, which is very difficult for

4   the Court to do, that you really were just trying to figure

5   out whether or not you ought to have a termination hearing way

6   back when you started, these folks had, what, five weeks, four

7   weeks -- I don't remember, whatever it is.  And, you know,

8   there's just so much that can be done.

9        I'm asking you as a practical real world problem -- if

10  you can address it, maybe you can't.  But as a practical real

11  world problem where the circumstances are such that in this

12  case the plaintiffs -- and I think almost inevitably under the

13  PLRA they're the plaintiffs -- are precluded from searching

14  examination of affidavits that have been filed, and the Court

15  thinks that it would be a useful and appropriate thing to have

16  those folks on the stand, to have them testify, to have the

17  plaintiffs cross-examine them for the Court to be able to make

18  judgments about whether or not they're just doing their duty

19  as employees of the State or whether they really believe what

20  they're saying and it's really true, I can't do any of those

21  things.

22       MR. MC KINNEY:  Well, Your Honor, the practical

23  solution here is to let the stay go into effect.

24       THE COURT:  You know what that means, if we had to

25  start all over again?  I understand that you think the special

1    master -- or maybe not you personally -- there are members of

2    the defendants' certainly legal team who have the

3    misapprehension that the special master is a party in this

4    lawsuit.  But -- and they behave accordingly and criticize

5    accordingly.  But -- and it would be useful if somebody would

6    go to them and say, you know what, you really ought to keep

7    quiet because it's inappropriate.

8         But if I were to allow termination to take place and

9    then later determine that termination was inappropriate, God

10   knows how long it would take the special master to pull a team

11   together again and start all over again.

12        You know, as it is right now -- and it's a serious

13   problem in the Court's view -- things are sort of at a

14   standstill.  The working relationship that the special master

15   has developed with members of the operational team, where as

16   best I can tell -- and I don't speak for the special master on

17   this, but this is my own judgment -- as best I can tell,

18   there's been a successful operation.  People have been able to

19   exchange in ways that are meaningful.  All of that has now

20   come to a stop.

21        If I were to terminate and then later have a hearing

22   and say, oh, that termination was inappropriate, assuming that

23   I could do that -- I'm not even sure I could, but assuming

24   that I could do that -- you think it cost money now, I hate to

25   tell you the time, the effort, the slippage that would have

1    occurred.  That's not a realistic alternative.

2              MR. MC KINNEY:  Your Honor, if I may just address that

3    final point.

4              THE COURT:  Yes.

5              MR. MC KINNEY:  I disagree strongly that there will be

6    slippage.  This administration is committed to the mental

7    health care program and will continue to improve the mental

8    health care program.  We've seen that in the last couple of

9    months since the special master has in fact pulled back as a

10   result of the termination proceedings.

11             If you look at Dr. Belavich's declaration and Exhibit

12   A to that declaration --

13             THE COURT:  That's exactly the kind of thing that

14   there is a real question about whether I can look at for all

15   of the reasons that the plaintiff has argued.  And more

16   particularly because I have no way of judging how much

17   credibility I should give to that affidavit.  I understand

18   your position.

19             And by the way, I don't know what the answer, if any,

20   is to that.  That's a different question.

21             Yes, Mr. Bien.

22             MR. BIEN:  Your Honor, the Supreme Court in Miller v.

23   French left open a question which is central to the dilemma

24   the Court finds itself in and plaintiffs' position here today,

25   whether or not, given plaintiffs' rights under the due process

1  clause, that this kind of appeal or a proceeding with these

2  kinds of time limits violates the due process clause and

3  violates our rights.

4         THE COURT:  Even if it doesn't as a general matter,

5  the question is whether in these particular circumstances

6  that's the case.

7         MR. BIEN:  Right, and that's an open question.  And

8  this is the case and the issues you're raising, especially

9  given the conduct in the litigation of the State, where they

10  raise on the last day -- you know, we get 50 or something

11  declarations, it raises this issue front and center.

12         I'd like to suggest to the Court that you can stay the

13  stay under Miller and say that under these unique

14  circumstances, the very circumstances that the Supreme Court

15  left open, that you need not allow a stay to move forward.

16  You can allow appropriate time for discovery, for evidentiary

17  hearings so that this very important case that affects 33,000

18  Coleman class members and, as the State's made clear, affects

19  hundreds of millions of dollars of their expenditures, that

20  this decision be made on the appropriate full record in accord

21  with the due process clause.

22         This is the most important matter that affects -- the

23  Governor thinks it's very important.  We think it's very

24  important.  It should be decided on an appropriate record, and

25  that cannot be done based on this kind of record on this kind

1    of schedule.

2        We're talking about several weeks from now that this

3    court would have to make those determinations.  You can issue

4    an order to stay the stay and make findings that the stay

5    under these circumstances is simply unconstitutional.  We can

6    set this matter for an appropriate resolution.

7        I do think that we can demonstrate that there are

8    matters that are not in dispute, that based on the findings

9    and the record that the special master has already introduced,

10   both in his suicide reports and in his regular reports, based

11   on the evidence that is undisputed in this record, admissions

12   by defendants and their witnesses, which are extensive, that

13   there are certain issues that this court can feel comfortable

14   need not have an evidentiary hearing.  Others should be set

15   for hearing.

16       THE COURT:  Let me interrupt.

17       Aside from the suicide prevention program, what else

18   do you believe -- I take it -- it's my understanding that you

19   take the position that the uncontroverted evidence is that

20   there is continuing violation as far as that's concerned, so I

21   don't need an evidentiary hearing.  Am I correct?

22       MR. BIEN:  That's correct, Your Honor.

23       THE COURT:  Is there anything else in your view that

24   is of such a character?

25       MR. BIEN:  There are people dying -- the second person

1    died this weekend at Salinas Valley psychiatric program.  That

2    program is dangerously understaffed.

3         THE COURT:  Understaffed.

4         MR. BIEN:  And there are --

5         THE COURT:  Let's talk about the understaffing for a

6    moment because I think it is a problem, which I don't

7    understand what the State says and what you say, and it's my

8    fault.

9         MR. MC KINNEY:  Your Honor, may I address that

10   suicide -- I'm sorry, the --

11        THE COURT:  No.

12        MR. MC KINNEY:  Okay.  I'll address it when I have --

13        THE COURT:  Exactly.

14        MR. MC KINNEY:  Thank you.

15        THE COURT:  As I understand it, but I may be wrong,

16   there is a hiring freeze in place which results, according to

17   the plaintiff, in the psychiatric services being understaffed.

18        Is that your position?

19        MR. BIEN:  The hiring freeze is one of many reasons.

20   For whatever reason, they don't have enough doctors, and

21   they're losing more.

22        THE COURT:  I understand --

23        MR. BIEN:  I don't know exactly all of the reasons,

24   but --

25        THE COURT:  One of the things that we do in an

1    evidentiary hearing is find out.

2            MR. BIEN:  Right.

3            THE COURT:  So you don't -- as I understand it now,

4    and I didn't understand it before, you don't assert that that

5    set of circumstances is sufficiently undisputed as to fact so

6    that I can resolve it without an evidentiary hearing trying to

7    find out why, whether and how?

8            MR. BIEN:  Well, no, I just meant I couldn't explain

9    all of the reasons.

10           I think that what's undisputed is that defendants,

11   Department of State Hospitals and anyone else involved are not

12   taking appropriate measures to hire and retain sufficient

13   mental health and custody staff to run those programs.  And

14   the evidence of that is now two doctors who have come forward

15   at risk of their careers and made statements about the dangers

16   there to their own patients.  We've taken the deposition of

17   one of the doctors.

18           Whether -- you know, whether at this point there seems

19   to be -- I don't know what is holding them back from providing

20   this care, whether it's the freeze, whether it's other

21   efforts.  But I can tell you that our understanding is that

22   there are insufficient clinical staff for the patients that

23   are there right now, and that's the dangerous situation that

24   we want to bring to the Court's attention.

25           THE COURT:  Is there anything else, anything else that

1    in your view is sufficiently undisputed so that the Court

2    could resolve it without a hearing on the reasons and the

3    credibility of witnesses?

4           MR. BIEN:  I think there are a series of issues where

5    there is no material dispute.  There are policies and

6    practices as to how people are handled in ad seg and SHU

7    units, requiring every single person to be treated only in a

8    module, to be strip-searched upon leaving their housing to go

9    outside to exercise.  There are undisputed issues -- you know,

10   defendants in their reply declarations affirm their belief in

11   these policies.

12          There are policies about keeping the mentally ill in

13   ad seg and SHU for unlimited periods of time, and I think it's

14   undisputed the danger that results from that.

15          I think there are a number of things where defendants

16   are standing by their policies proudly, and they raise an

17   issue of law that can be determined without an evidentiary

18   hearing.

19          There are also policies that even their own experts

20   said, well, you can't do that, you have to treat people

21   individually.  You can't say everyone in this category should

22   be treated the same way.

23          I'm sure that I could come up with a list of

24   additional issues that we think -- if we use such a -- like a

25   Rule 56 process and said let's set forth on this record, what

1    are the material issues in dispute as to each issue, what have

2    the parties put in so far, we could then decide whether or not

3    there really is evidence necessitating a trial.

4         THE COURT:  Okay.  Unfortunately we don't even have

5    the time to do that.  All right.  I understand your position.

6         You may close, sir.

7         MR. MC KINNEY:  Thank you, Your Honor.  If I may

8    address, first of all, the issues that Mr. Bien raised.

9         The death at Salinas Valley, first of all, that was a

10   mischaracterization.  There is no evidence whatsoever that

11   that was a suicide.

12        And I don't think this matter could be undisputed in

13   any way, shape or form.  We've put forth the evidence that

14   there is a basic program in place.  If they're willing to

15   stipulate that that program is in place, then I think it may

16   be a simple legal matter.  But I think they're going to rely

17   improperly on the rate, which is not a -- not a measure that

18   the law recognizes for suicide prevention programs.

19        With respect to staffing, I'll address that in two

20   ways.  Within CDCR, you referenced a hiring freeze, Your

21   Honor, and the hiring freeze had no impact on CDCR.  CDCR was

22   permitted to hire all allocated mental health positions during

23   both fiscal year 2011-2012 and 2012-2013.  That evidence is in

24   paragraphs 9 and 24 of Dr. Toche's declaration.

25        With respect to DSH, there was an issue with staffing.

1    A number of psychiatrists did in fact leave.  The psychiatrist

2    they deposed did not have correct information.  He's a

3    part-time psychiatrist.  That was revealed at the

4    deposition.

5          The current facts are that the Department of State

6    Hospitals has 13 psychiatrists, 13 psychologists and 15 social

7    workers to serve 352 patients within that program.  And within

8    the program, they offer an array of services, very broad

9    treatment, more than 10 hours per week of group therapy, many

10   other types of therapy, individual therapy.

11         There was a period beginning in December where

12   psychiatrists did leave.  There were 10 beginning in December

13   of 2012, but through staff psychiatrists leaving and staff

14   being hired on, the program is now back up to 13

15   psychiatrists.  So it's more than adequate staffing.

16         Could they have more?  I'm certain of that.  But it's

17   more than adequate to get the job done within the Department

18   of State Hospitals.

19         And I also would remind plaintiffs and the Court that

20   there has never been a finding with respect to care in the

21   Department of State Hospitals.  This was a new issue raised by

22   the plaintiffs in their opposition.  They could bring their

23   own motion on that if they think they've got the evidence, but

24   it's -- the care provided within DSH, while more than

25   adequate, is not currently within the scope of the remedial

1    order in Coleman.

2         Finally I think Mr. Bien identified a philosophical

3    difference between -- with respect to housing inmates in

4    administrative segregation or security housing units in

5    California.  The law is clear that inmates may be housed in

6    segregated units so long as they're provided proper treatment.

7    All of the evidence submitted to the Court shows that the

8    inmates that they identified during their tours were receiving

9    adequate treatment within those segregated housing units.

10        So while there may be an issue that they disagree

11   fundamentally or philosophically, it's not a legal issue for

12   the Court to decide.  The care being provided in segregation

13   is at a constitutional level based on the evidence submitted

14   to this court.

15        THE COURT:  Thank you, gentlemen.  I'm not going to

16   make a speech.  Thank you, gentlemen.  The matter will stand

17   submitted.

18        MR. MC KINNEY:  Thank you, Your Honor.

19        THE COURT:  Let me change that.

20        In the event in the next couple of days that the

21   defendants decide that it would be in their interest to have

22   an evidentiary hearing, they can waive the time limits of the

23   PLRA, and we'll have an evidentiary -- we'll get together and

24   set up a schedule and have an evidentiary hearing.

25        I'm not saying you should do so.  I'm saying you can

1    go home and think about it and say maybe that is really in

2    everybody's best interest.  It certainly would be in the

3    Court's, but so what.

4              MR. MC KINNEY:  Thank you, Your Honor.

5              THE COURT:  Stand in recess.

6                   (Proceedings were concluded at 3:07 p.m.)

7                         ---o0o---

1           I certify that the foregoing is a correct transcript

2    from the record of proceedings in the above-entitled matter.

3

4

                              /s/ Kathy L. Swinhart
5                              KATHY L. SWINHART, CSR #10150

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25