UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

      Plaintiffs,          NO. CIV. S-90-520 LKK/JFM (PC)

    v.

EDMUND G. BROWN, JR., et al.,       O R D E R

      Defendants.

_____/

    Plaintiffs are a class of prisoners with serious mental disorders confined in the California Department of Corrections and Rehabilitation ("CDCR"). In 1995, this court found defendants in violation of their Eighth Amendment obligation to provide class members with access to adequate mental health care. Coleman v. Wilson, 912 F. Supp. 1282 (E.D. Cal. 1995). To remedy the gross systemic failures in the delivery of mental health care, the court appointed a Special Master to work with defendants to develop a plan to remedy the violations and, thereafter, to monitor defendants' implementation of that remedial plan. See Order of Reference, filed December 11, 1995 (Dkt. No. 640). That remedial

1 process has been ongoing for over seventeen years.

2      This matter is before the court on defendants' motion pursuant

3 to 18 U.S.C. § 3626(b) and Fed. R. Civ. P. 60(b)(5) to "terminate

4 all relief in this action, vacate the Court's judgment and orders

5 and dismiss the case." Notice of Motion and Motion to Terminate

6 Under the Prison Litigation Reform Act [18 U.S.C. § 3626(b)] and

7 Vacate the Court's Judgement and Orders Under Federal Rule of Civil

8 Procedure 60(b)(5), filed January 7, 2013 ("Notice of Motion") (ECF

9 No. 4275) at 1.[1]  The court heard oral argument on the motion on

10 March 27, 2013.

11 I.  Motion to Terminate Under 18 U.S.C. § 3626(b)

12      Pursuant to 18 U.S.C. § 3626(b), defendants seek termination

13 of all prospective relief and dismissal of this action. Defendants

14 contend that they have remedied the six core constitutional

15

_____

16      [1]  In 2009, a three-judge court found that overcrowding in
California's prison system was the primary cause of the state's
17 failure to remedy ongoing constitutional violations in the
delivery of mental health care to prison inmates. That order was
18 affirmed by the United States Supreme Court in 2011.  See Brown v.
Plata, 563 U.S. ___, 131 S. Ct. 1910 (2011).  Pursuant to that
19 order, the state is currently under an order to reduce the state
prison population to 137.5% of capacity by the end of this year.
20 As this court has previously noted, it cannot entertain a motion
to terminate the relief ordered by the three-judge court or to
21 vacate the population reduction order.  See Order, filed January
29, 2013 (ECF No. 4316) at 3-4. Defendants have, concurrently with
22 the motion at bar, filed a motion in the three-judge court to
vacate or modify the population reduction order. Notice of Motion
23 and Motion to Vacate or Modify Population Reduction order, filed
January 7, 2013 (ECF No. 4280). Indeed, since the state has not
24 reached the required population cap, that would appear to dispose
of the instant motion.  Nonetheless, both plaintiffs and defendants
25 insist that this court can resolve this motion without  reference
to the three-judge court's order.  Given the posture of the
26 parties, the court will proceed to consider the motion.

1  deficiencies identified in the court's 1995 order, that they

2  provide timely access to mental health care, and that they are not

3  deliberately indifferent to the serious needs of class members for

4  mental health care.

5      A.  General Legal Standards

6      Section 3626(b) of Title 18 of the United States Code, enacted

7  as part of the Prison Litigation Reform Act of 1995 ("PLRA"),

8  provides in relevant part that "prospective relief" ordered in "any

9  civil action with respect to prison conditions" is "terminable upon

10 the motion of any party – 2 years after the date the court granted

11 or approved the prospective relief."  18 U.S.C. § 3626(b)(1)(I).

12 However, "[p]rospective relief shall not terminate if the court

13 makes written findings based on the record that prospective relief

14 remains necessary to correct a current and ongoing violation of the

15 Federal right, extends no further than necessary to correct the

16 violation of the Federal right, and that the prospective relief is

17 narrowly drawn and the least intrusive means to correct the

18 violation."  18 U.S.C. § 3626(b)(3).

19     As the moving party, defendants have the burden of

20 demonstrating "that there are no ongoing constitutional violations,

21 that the relief ordered exceeds what is necessary to correct an

22 ongoing constitutional violation, or both."  Graves v. Arpaio, 623

23 F.3d 1043, 1048 (9th Cir. 2010) (citing Gilmore v. California, 220

24 F.3d 987, 1007-08 (9th Cir. 2000)).  Plaintiffs do not, as

25 defendants contend, have the burden of proving either of those two

26 elements of defendants' termination motion.  "[N]othing in the

termination provisions [of 18 U.S.C. § 3626(b)] can be said to shift the burden of proof from the party seeking to terminate the prospective relief." Gilmore, 220 F.3d at 1007.  Defendants argue that the court is somehow free to disregard the specific holdings in Gilmore and Graves that defendants bear the burden of proof on this motion, holdings that are, after all, consistent with the ordinary rule that the party seeking an order bears the burden of proof.[2]  It is not.

---

[2]  Defendants cite to Hallett v. Morgan, 296 F.3d 732 (9th Cir. 2002) and Mayweathers v. Newland, 258 F.3d 930 (9th Cir. 2001) for the proposition that plaintiffs have the burden of proving that "a current and ongoing federal right violation supports continuing prospective relief" under 18 U.S.C. § 3626(b).  Memorandum of Points and Authorities in Support of Motion to Terminate, filed January 7, 2013 ("Termination Motion") (ECF No. 4275-1) at 17.  In both Hallett and Mayweathers, the plaintiffs were the moving parties on the motions at issue.  In Hallett, the court noted that the "'general standard for granting prospective relief differs little from the standard set forth in § 3626(b)(2) for terminating prospective relief, or from the standard set forth in § 3626(b)(3) for preserving relief to correct a current and ongoing violation.'" Id. at 743-44 (quoting Gilmore, 220 F.3d at 1006), but it did not hold that plaintiffs had the burden of proof on a concurrent motion to terminate filed by defendants in that action; instead, the court held that the motion to terminate was mooted by the denial of plaintiffs' motion to extend jurisdiction.  Id. at 739.  In relevant part the question in Mayweathers was whether certain provisions of 18 U.S.C. § 3626 precluded entry of a second preliminary injunction after expiration of a first such injunction. 258 F.3d at 936.  In holding that those provisions did not, the court of appeals, in dicta, noted that the provision of the statute that provides for expiration of a preliminary injunction after ninety days "simply imposes a burden on plaintiffs to continue to prove that preliminary relief is warranted" and that "[t]he imposition of this burden conforms with how the PLRA governs termination of final prospective relief." Id. (thereinafter quoting 18 U.S.C. § 3626(b)(3)). However much tension this dicta might create,  it goes without saying that this court is not free to overrule the specific holdings of Gilmore and Graves. If indeed Gilmore and Graves are not to be the law in this circuit, it is for en banc court of this circuit or the Supreme Court to so hold, and not another panel of the Ninth Circuit, much less a district court.

1    The record on which this motion is decided must reflect
2    "'conditions as of the time termination is sought.'" <u>Gilmore</u>, 220
3    F.3d at 1010 (quoting <u>Benjamin v. Jacobson</u>, 172 F.3d 144, 166 (2nd
4    Cir. 1999)).  "Because the PLRA directs a district court to look
5    to *current conditions*, and because the existing record at the time
6    the motion for termination is filed will often be inadequate for
7    purposes of this determination, the party opposing termination must
8    be given the opportunity to submit additional evidence in an effort
9    to show current and ongoing constitutional violations." <u>Hadix v.</u>
10   <u>Johnson</u>, 228 F.3d 662, 671-72 (6th Cir. 2000) (emphasis in text)
11   (and cases cited therein) (emphasis in original).

12       Defendants' motion, filed January 7, 2013, is supported by two
13   declarations of staff with the CDCR Division of Correctional Health
14   Care Services and declarations from the former Chief of the Health
15   Care Placement Oversight Program, the Acting Statewide Mental
16   Health Deputy Director for CDCR, and the Director of the Facility
17   Planning, Construction and Management Division for the CDCR, as
18   well as two expert reports, one of which is a joint report by three
19   experts and one of which is a solo report.  With the exception of
20   evidence of planned and ongoing construction, the evidentiary
21   material tendered by defendants with their motion covers the period
22   through the end of 2012.

23       On January 18, 2013, pursuant to court order, the Special
24   Master filed his Twenty-Fifth Round Monitoring Report ("Twenty-
25   Fifth Round Report") (ECF No. 4298).  It was circulated to the
26   parties on December 28, 2012. It is the Special Master's twenty-

fifth report to the court on defendants' compliance with the

remedial plan in this action, currently referred to as the Revised

Program Guide.   It covers the period from May 1, 2012 through

September 11, 2012, and is based on visits by the Special Master

and his monitoring team to twenty-three prison institutions and

document reviews for the remaining institutions.   Twenty-Fifth

Round Monitoring Report (ECF No. 4298) at 10.[3]

        In opposition to defendants' termination motion, plaintiffs

filed five expert declarations totaling over 400 pages and

accompanied by numerous exhibits, as well as three declarations of

counsel with over one hundred additional exhibits.   Plaintiffs have

also tendered numerous depositions of defendants' declarants,

experts, and other witnesses.   In reply to plaintiffs' opposition,

defendants have filed fifty-four declarations and a declaration of

counsel to which are attached numerous additional exhibits.

---

        [3] Defendants interposed a number of objections to the Twenty-
Fifth Round Monitoring Report and moved to strike or modify several
of its provisions.   By order filed February 28, 2013, the court
overruled defendants' objections as to all but specific
institutional objections raised by defendants.   Order filed
February 28, 2013 (ECF No. 4361). With respect to the latter, the
court directed the Special Master to "review those objections in
section I(C) [of defendants' objections] that contain specific
citation to material provided to him and file any corrections to
the Twenty-Fifth Round Monitoring Report as may be required by
those specific objections." Id. at 11.   The Special Master filed
a Notice of Corrections on March 19, 2013 (ECF No. 4420).   That
notice contains the Special Master's response to each of the
objections in section I(C) of defendants' objections.   The court
reserved for further consideration in connection with the motion
at bar the questions of whether defendants' suicide prevention
efforts are consistent with the requirements of the Eighth
Amendment and the weight to be given any particular finding or
conclusion of the Special Master as it might relate to issues
raised in defendants' termination motion.   Id. at 8, 11.

1    The PLRA requires that the court "promptly rule on any motion

2    to modify or terminate prospective relief," 18 U.S.C. § 3626(b)(1),

3    and an automatic stay goes into effect not later than ninety days

4    after the motion is filed unless the court timely rules on the

5    motion.   See 18 U.S.C. § 3626(b)(2).   As discussed above,

6    defendants have the burden of proof on the motion at bar, and the

7    motion is resolved with reference to prison conditions at the time

8    the motion is filed.   As part of meeting their burden, defendants

9    must first meet their burden of producing evidence that they are

10   in constitutional compliance and that all prospective relief should

11   be terminated.

12        The reply declarations filed by defendants are apparently

13   intended to raise factual and credibility disputes with plaintiffs'

14   evidence.   The task of resolving these disputes, especially those

15   involving    credibility    determinations,    would    normally    be

16   accomplished through an evidentiary hearing.   However, as in any

17   motion, the court need not address disputes and credibility issues

18   that are not material and can have no effect on the outcome of the

19   motion.[4]   Moreover, in accordance with the allocation of the

20   burdens of production and proof, unless defendants meet their

21   initial burden of production, their motion must be denied.   There

22   would, in that case, be no reason to consider the evidence produced

23   ──────────────

24        [4] Some of the disputes defendants raise here, for example, are
     marginal to the core issues at bar.  See, e.g., Reply Declaration
25   of Bradford M. Sanders, Jr., filed March 22, 2013 (ECF No. 4433)
     (averring that he was present on the tour with plaintiffs' expert,
26   Dr. Craig Haney, and that the cells Mr. Sanders observed "were
     clean and no odor was present").

1   by plaintiffs, except to the degree necessary to protect their due

2   process rights, and no need to consider brand new evidence produced

3   by defendants in reply.   In the absence of the required initial

4   showing by defendants, the subsequent disputes are rendered

5   immaterial.

6        In accordance with the above, except where due process

7   requires otherwise, see Hadix, supra, the court has focused on the

8   evidence tendered by defendants with their motion and the Special

9   Master's most recent monitoring report.[5]   As discussed infra, this

10  evidence is analyzed with reference to key issues identified in the

11  court's August 30, 2012 order to determine whether there are

12  ongoing constitutional violations in the delivery of mental health

13  care to seriously mentally ill prisoners in California.[6]

14  _____

15       [5]   In an objection to plaintiffs' post-hearing brief filed
    April 2, 2013, defendants continue to argue that the Special
16  Master's monitoring report does not identify constitutional
    deficiencies and "in no way establishes that the State is
    deliberately indifferent to inmates' serious mental health needs."
17  Defendants' Objections and Response to Pls. Post-Hearing Brief,
    filed April 2, 2013 ("Objs. To Post-Hearing Brief") (ECF No. 4536)
18  at 13.   This court has considered and rejected defendants' argument
    that the Special Master is not monitoring with reference to a
19  constitutional standard.   See February 28, 2013 Order (ECF No.
    4361) at 3-6.
20
         [6]   Plaintiffs raise at least two issues in their opposition
21  to defendants' motion that do not fit squarely into areas examined
    by the court on this motion, including clinical staffing shortages
22  at the Department of State Hospital ("DSH") programs for CDCR
    inmates, particularly the Salinas Valley Psychiatric Program
23  ("SVPP"); and adequacy of mental health care provided to
    California's condemned inmates.   In addition, plaintiffs challenge
24  the adequacy of medication management, medical record keeping, and
    problems  with screening in CDCR's reception centers and
25  administrative segregation unit.   The constraints imposed by the
    automatic stay provisions of the PLRA preclude this court from
26  undertaking in this order an exhaustive resolution of whether there

1        B.  <u>Defendants' Expert Reports</u>

2        Before turning to the merits of defendants' motion, the court

3  must address serious concerns raised in connection with two expert

4  reports filed by defendants with their motion. Plaintiffs filed

5  objections to these expert reports alleging, among other things,

6  that the experts conducted "secret" inspections of prisons, and

7  that they "conducted unprofessional and unethical interviews with

8  represented class members outside the presence and without the

9  consent of plaintiffs' counsel." Plaintiffs' corrected objections

10 to termination motion, filed March 15, 2013 ("Objs. to Termination

11 Motion") (ECF No. 4423 at 9-13).  Plaintiffs assert that the <u>ex</u>

12 <u>parte</u> contact with their clients violated defense counsels' ethical

13 obligations under Cal. R. Prof. Conduct 2-100 (the "no-contact"

14 rule).

15       Of course, since the attorneys for defendants are members of

16 the California Bar, they are bound by the California rules of

17 ethical behavior.  Their conduct is not only of concern to the

18 California Bar, however, as this court has "adopted [those rules]

19 as standards of professional conduct in this court."  Local Rules

20 of the United States District Court Eastern District of California,

21 180(e).  Since it is accordingly of concern to this court, the

22 court reviews the matter, below.

23 ─────────────────────────

24 are ongoing constitutional violations in these or other areas of
   mental health care delivery.  For purposes of this motion and the
   relief sought by defendants, it is sufficient that ongoing
25 constitutional  violations in other areas remain, and that
   compliance with outstanding orders for prospective relief is
26 required.

9

1              **1.   The expert reports.**

2      The first expert report, signed by Drs. Joel A. Dvoskin,

3  Jacqueline M. Moore and Charles L. Scott, makes clear that the

4  experts planned and conducted <u>ex parte</u> interviews with inmates at

5  all thirteen CDCR institutions they visited.   Clinical Evaluation

6  of California's Prison Mental Health Services Delivery System by

7  Dyoskin, <u>et al.</u>, filed January 7, 2013 ("Clinical Exp. Rpt.") (ECF

8  No. 4275-5) at 18 ("At every facility we visited, we interviewed

9  randomly selected CCCMS inmates").   Those interviews were among the

10 critical pieces of information that formed the "basis" for the

11 experts' report.   <u>Id.</u> at 10 ("Basis and Reasons for Opinions: ...

12 Site visits (including confidential and private conversations with

13 inmates and staff)").   It is clear that the author of the second

14 expert report, Steve J. Martin, Esq., also spoke with inmates.   <u>See</u>

15 Excerpts of February 28, 2013 Deposition of Steve J. Martin, filed

16 March 26, 2013 ("Excerpts of Feb. 28, 2013 Martin Depo.") (ECF No.

17 4522-1) at 70-72.

18             **2.   The scope of the <u>ex parte</u> interviews.**

19     The   inmate   interviews   were   not,   despite   defendants'

20 descriptions of them, simply occasional, unintended by-products of

21 the inspections.   Rather, at every facility the defense experts

22 visited, they without fail sought out class members – inmates with

23 serious mental disorders – for their interviews.   <u>See</u> Clinical Exp.

24 Rpt. (ECF No. 4275-5) at 21 ("At every prison visited with a Mental

25 Health Crisis Bed (MHCB) unit or Correctional Treatment Center

26 serving inmates experiencing mental health crises, a member of our

1  team assessed the program by interviewing randomly selected

2  inmates").[7]

3      **3.   The reasons for the <u>ex parte</u> interviews.**

4      Notwithstanding defendants' descriptions of these interviews,

5  they were not in the nature of pastoral visits to sick patients,

6  in which the experts simply were visiting the inmates because they

7  were "'interested in how you're doing,'" or to "ensure that they

8  were not lacking appropriate care."[8] <u>See</u> Resp. to OSC (ECF No.

9  4499) at 9 and 16. Nor were the visits conducted to enable

10 defendants to find problems in the system "so that the State could

11 resolve them."[9] <u>See</u> <u>id.</u> at 8.

12     To the contrary, the experts were retained expressly for

13 litigation purposes in this case. <u>See</u> Exhibit 1 to Declaration of

14 Michael Bien (Excerpts of February 27, 2013 Deposition of Joel

15 Dvoskin, Ph.D) filed March 26, 2013 ("Excerpts of Feb. 27, 2013

16 Dvoskin Depo.") (ECF No. 4522-1) at 6 (Dvoskin confirms that he was

17 "retained for litigation purposes"), 18 (Ex. 2 to Dvoskin

18

19     [7] Moreover, the expert report gives the impression that a large number of inmates were interviewed, since it often refers to "the vast majority of individual inmates we interviewed." <u>See, e.g.,</u> Clinical Exp. Rep. (ECF No. 4275-5) at 16, 18, 19, 22, 24, 25, 26 and 29. If a majority of the whole is "vast," the whole itself must be large also (unless the experts were simply exaggerating).

20

21

22

23     [8] Defendants describe these contacts as "harmless interactions" and "minimal." Defendants' Response to Order to Show Cause (Resp. To OSC"), filed March 25, 2013 (ECF No. 4499) at 8.

24

25     [9] In more candid moments, defendants come close to admitting that the experts were hired for this termination motion. <u>See</u> Resp. to OSC (ECF No. 4499) at 8 (defendants hired the experts to help them "decide whether to bring a termination motion").

26

1  Deposition) (Dvoskin retained for the "defense of the case

2  referenced herein"). As defendants themselves put it, the experts

3  inspected the prison and interviewed the inmates "to fairly and

4  accurately determine whether the State's mental health care system

5  remedied the constitutional deficiencies the Court identified in

6  1995." Termination Motion (ECF No. 4275-1) at 15.

7              **4.  How the interviews were used.**

8      Defendants used the information they gleaned from the inmates

9  against the inmates, in support of their motion to terminate and

10  to vacate the injunction.[10]  For example:

> At every facility we visited, we interviewed randomly
> selected CCCMS inmates. The vast majority of CCCMS
> inmates interviewed knew the name of their Primary
> Clinician, how to contact him or her, the name of their
> psychiatrist, the name of their medication, the purpose
> of the prescribed medication, and the process for
> arranging an earlier appointment with their psychiatrist
> or primary clinician if they wanted one. In our
> experience, this is a very unusual finding, and one that
> speaks to the extensive efforts that have been made to
> have inmates seen on a timely and predictable basis by
> their psychiatrist and clinician.

18  Clinical Exp. Rpt. (ECF No. 4275-5) at 18, 23 ("We conducted

19  randomly selected interviews of CCCMS inmates housed in

20  Administrative Segregation Units (ASU). All CCCMS inmates we

21  identified in ASU were provided appropriate services and

22  periodically assessed to evaluate if they needed a higher level of

---

24       [10] However, the Court notes that the experts did include some
prisoner comments that tended to undermine defendants' motion.
25  See, e.g., Clinical Exp. Rpt. (ECF No. 4275-5) at 12 ("Inmates
reported that there were instances where they were forced to choose
26  between their yard time and mental health treatment groups").

1    care"); see also id. at 14 ("inmates expressed concerns" about

2    participating in mental health treatment), 19 ("Inmates

3    consistently reported that their Primary Clinician met with them

4    according to the Program Guide parameters"), 31 ("interviews with

5    inmates did not confirm" a medication availability problem

6    complained about by a mental health staff member).[11]

7         The court concludes that these experts were hired for a

8    litigation purpose – to file this termination motion. The ex parte

9    interviews of represented inmates were then used against those

10   inmates, directly, in this motion. The court does not mean to

11   imply that defendants would have filed the motion even if they had

12   interpreted the expert reports as precluding such a motion.

13   However, there is no dispute, from the record before the court,

14   that they were hired in anticipation of filing this motion, and

15   that their resulting reports were submitted for this motion.

16              **5.  Consent to the interviews.**

17        Defendants insinuate that plaintiffs consented to these

18   interviews. Resp. to OSC (ECF No. 4499) at 9. In support,

19   _____

20        [11] The "vast majority" of the inmates who were interviewed by
     defense experts had the same things to report, all of which would
21   be used against them in this motion:

22        The vast majority of [CCCMS / SHU [CCCMS] / MHCB / EOP-
          ASU / PSU] inmates interviewed knew the name of their
23        Primary Clinician and how to contact him or her if they
          wished to do so. [The vast majority of EOP / MHCB /
24        EOP-ASU] Inmates also reported that they could request
          to see their Primary Clinician in addition to the
25        minimum required visit frequency.

26   See ECF No. 4275-5 at 16, 17, 20, 22, 23 and 24.

1    defendants cite a single conversation that Steve Martin, one of the

2    defense experts, had with plaintiffs' counsel Donald Specter: "I

3    believe it was understood that we would be talking to inmates

4    during the site visits, as is the case in any prison tour." <u>See</u>

5    Reply Declaration of Steve J. Martin, Filed March 22, 2013 ("Reply

6    Decl. Martin") (ECF No. 4483) ¶ 24.[12]  This statement establishes

7    nothing.  The no-contact rule, Cal. R. Prof. Conduct 2-100, does

8    not concern itself with what defense counsel's expert now claims

9    to "believe" about what was going on in the mind of plaintiffs'

10   counsel.  It requires that defense counsel get the consent of

11   plaintiffs' counsel before conducting these types of interviews.

12        In any event, plaintiffs' counsel testified in open court to

13   the conversation at issue.  Mr. Specter testified that the

14   conversation was principally a casual conversation between him and

15   Dr. Martin.  Reporter's Transcript of Proceedings held on March 27,

16   2013 ("RT") (ECF No. 4538) at pp. 32-34.  While the expert

17   mentioned that he would participate in a site inspection, Specter

18   testified, there was no mention of whether plaintiffs' attorneys

19   would be present, or whether he or any other expert would interview

20   inmates.[13]  <u>Id.</u>  This is not even a slender reed upon which to base

21   an assertion that plaintiffs' counsel consented to <u>ex parte</u>

22

23        [12] Martin's reference to "any prison tour," leaves defendants
     quite a bit of wiggle room, since it leaves open the possibility
     that he is referring to prison tours where there is no on-going
24   litigation, or prison tours where he is accompanied by the lawyers
     representing the inmates he is going to interview.  In short, it
25   does not explain why he thought he could read counsel's mind.

26        [13] Defendants' counsel declined to cross-examine Mr. Specter.

1   contacts with their clients.  It is simply culled from thin air.

2   Thus, even if notice were enough, the evidence shows conclusively

3   that such notice was never given.

4       However, even if the expert had fully disclosed his plans to

5   plaintiffs' counsel, that would not have cured the ethical problem

6   that defense counsel face.  Nothing in Rule 2-100 permits counsel

7   (or his expert) to simply inform opposing counsel that he will be

8   talking with a represented party in violation of the Rule.

9   Moreover, the only notice that was even alleged is not enough,

10  since at best it was notice that defense experts would inspect the

11  prisons, not that they would also interview the plaintiff class

12  with no counsel present.[14]

13                  **6.  Applicability of the no-contact rule.**

14      Defendants next assert that the no-contact rule does not

15  apply, or is "relaxed," in the remedial phase of litigation. Resp.

16  to OSC (ECF No. 4499) at 8 and 10.  However, they cite no relevant

17  authority for this proposition.  Further, they make no mention of

18  the California authority plaintiffs cite, which states that contact

19  by a person retained by counsel for an adverse party is prohibited

20  by Rule 2-100:

21          There is no question that communication by the
            investigator for FFOR&K (indirect communication) with
22          Slowe (a covered employee of a corporate party) violated
            rule 2-100, <u>if</u> FFOR&K knew AT&SF was represented by a
23          lawyer in the Truitt matter at the time of the
            communication.

24

25      [14] Defendants assert that they notified someone on the Special
    Master's team that the defense experts would be touring the prison
26  system.  Assuming this to be true, it has no legal relevance.

                                      15

Truitt v. Superior Court, 59 Cal. App. 4th 1183, 1187-88 (2d Dist. 1997) (emphasis in text).

Defendants do cite a 1980 opinion from the Supreme Judicial Court of Massachusetts, and a 1979 law review article in support. Id. at 10.  The Massachusetts decision has nothing to do with the issue at hand.  It addressed an ex parte communication made by a judge.  See Perez v. Boston Hous. Auth., 379 Mass. 703, 741-42 (1980) (addressing ex parte communications with defendant).  The court did not condone the judge's conduct in talking with the defendant housing authority, but noted that it came in the context of the remedial phase of the case "where the judge tends to be more active in such proceedings and to use less formal procedures." Id. at 741-42 ("We do not condone such communications, but the nature of the case suggests some palliation of the misbehavior").[15]  The court made no reference to California's no-contact rule, Massachusetts' equivalent rule, nor to any "model" no-contact rule. The court made no reference to any counsel's ex parte contact with represented opposing parties.  That is because the Massachusetts case has absolutely nothing to do with the no-contact rule, which is the only rule at issue here.

Even if there were authority in support of defendant's

---

[15]  The law review article defendants cite has even less to do with this case, as it addresses the possibility that for the remedial phase of a case, a court might call in "an outside expert judge with similar experience elsewhere who, without vote, might sit in on hearings and consult."  Frank M. Coffin, Frontier of Remedies: A Call for Exploration, 67 Cal. L. Rev. 983, 996 (1979).

1    argument, and such contacts could be permitted while all sides were

2    working cooperatively to make a consent decree work – and

3    defendants have cited no such authority – that is not the situation

4    here.  The results of these <u>ex parte</u> interviews are being presented

5    in an adversarial litigation context, against the interest of the

6    interviewees, in an attempt to terminate and vacate the injunction

7    plaintiffs had obtained through protracted litigation against

8    defendants.

9              **7.   Plaintiffs' contacts with CDCR personnel.**

10        For their remaining responses, defendants assert that

11   plaintiffs engaged in the same conduct.[16]   Specifically, they

12   assert that "Plaintiffs' counsel have commonly discussed the

13   substance of this case with Defendants' key decisionmakers without

14   notifying Defendants' counsel or receiving their approval." Resp.

15   to OSC (ECF No. 4499) at 10.

16        Even if this were a valid defense to defendants' conduct – and

17   it is not – the declarations cited do not even support the charge.

18   In support of this assertion, defendants cite the Reply Declaration

19   of Martin Hoshino, filed March 25, 2013 ("Reply Decl. Hoshino")

20   (ECF No. 4495), the Reply Declaration of Matthew Cate, filed March

21   25, 2013 ("Reply Decl. Cate") (ECF No. 4497), and the Reply

22   Declaration of Debbie Vorous, filed March 25, 2013 (Reply Decl.

23   Vorous") (ECF No. 4496).

24   _____

25        [16] Defendants appear to argue that they figured it was okay
     for them to violate Rule 2-100 because, they say, plaintiffs did
26   it too.  As far as the court is aware, this is not a valid defense
     for grown-ups.

1                    **a.   Hoshino and Cate Declarations.**

2        The Hoshino declaration does not state or imply that any

3   conversation Hoshino had with plaintiffs' counsel was done without

4   notice to, or the consent of, defendants' counsel. Reply Hoshino

5   Decl. (ECF No. 4495).  It does not even address the issue of notice

6   or consent.   Moreover, defendants' assertion that these contacts

7   "commonly" occurred, or were "pervasive," is flatly belied by the

8   Hoshino declaration.  Hoshino makes clear that he spoke alone with

9   plaintiffs' counsel "two or three" times.[17]  <u>Id.</u> ¶ 2.  These "two

10  or three" times, further, included times Hoshino spoke to

11  plaintiffs' counsel about "<u>Hecker</u>."[18]  Thus, it is not clear from

12  the declaration that Hoshino <u>ever</u> spoke alone to plaintiffs'

13  counsel about <u>this</u> case.

14       The Cate declaration states that he spoke with plaintiffs'

15  counsel without the presence or "specific" approval of defense

16  counsel.   Reply Decl. Cate (ECF No. 4497) ¶ 2.   There is no

17  explanation for what "specific" approval refers to, or whether it

18  is distinguished from any "general" or "blanket" approvals that

19  may, or may not, have been given.  Cate goes on to state that "to

20  my knowledge," the plaintiffs (who are mentally ill inmates) never

21

22       [17] Meanwhile, Hoshino spoke with plaintiffs' counsel seven or
    eight times with CDCR counsel present. Reply Decl. Hoshino (ECF No.
23  4495  ¶  2.)   The remainder of Hoshino's discussion of these
    conversations fails to distinguish between times when CDCR counsel
24  was present and those when he was not.

25       [18] This is apparently a reference to <u>Hecker v. California
    Dept. of Corr. and Rehab.</u>, 2007 WL 836806 (E.D. Cal. Mar. 15, 2007)
26  (Karlton, J.).

1  sought the consent of defense counsel for the conversation. Id.
2  Cate does not, however, set forth why this information would ever
3  be within his knowledge.  Accordingly, the fact that he does not
4  know about whether or not consent was given is irrelevant.

5      In contrast, plaintiffs' counsel has presented a declaration
6  stating, of his own personal knowledge, that of his conversations
7  with CDCR officials, including Hoshino and Cate, "[i]n virtually
8  every case, Benjamin Rice, CDCR General Counsel, or another
9  attorney representing the State or CDCR was present, had been
10 informed or gave permission."  Declaration of Michael Bien, filed
11 March 26, 2013 ("Becl. Bien") (ECF No. 4522) ¶ 6.

12                    **b.   The Vorous Declaration.**

13      The declaration of Debbie Vorous, a Deputy Attorney General
14 for the State, is troubling.  Vorous asserts that during a site
15 inspection of a prison by plaintiffs' expert and plaintiffs'
16 counsel, she "observed" plaintiffs' counsel "talking to prison
17 staff without counsel present."  Reply Decl. Vorous (ECF No. 4496)
18 ¶ 4.  Vorous never addresses the obvious questions raised by this
19 assertion.  For example, how could she have been present at the
20 inspection and "observed" this conduct, without being "present" for
21 purposes of Rule 2-100?  Also, if she "observed" this conduct, why
22 did she not make her objection known at the time, when it could
23 have been stopped?

24      Most troubling about this declaration is the insinuation that
25 plaintiffs' counsel spoke with CDCR staff apart from the time
26 Vorous was making her observations.  Here, Vorous states that

1 counsel engaged prison staff "without my ability to participate,"

2 and "without my presence." Id. Vorous does not indicate whether her

3 participation or presence was even relevant, since she does not

4 indicate whether other defense lawyers were present who did

5 participate or were present.  In fact, plaintiffs' counsel states

6 in his declaration that Vorous was not alone on that inspection.

7 Rather, she was accompanied by two other defense lawyers, Katherine

8 Tebrock and Heather McCray. Decl. Bien ¶ 17.  Vorous does not state

9 that any conversation with plaintiffs' counsel took place outside

10 of the presence or consent of any of the other two CDCR lawyers who

11 were present.  If the other CDCR lawyers were present, then the

12 declaration gives a decidedly false impression.[19]

13     Defendants also seem to complain that plaintiffs' counsel

14 spoke with the inmates, their own clients, with defense counsel not

15 present.  Resp. to OSC (ECF No. 4499) at 14.  It hardly needs

16 explaining that plaintiffs' counsel and agents are entitled to

17 speak privately with their own clients without violating either

18 Rule 2-100, or any prior order of this court or for that matter,

19 the three-judge court.

20              **8.   Disposition of defendants' expert reports.**

21     In sum, it appears clear that defendants' conduct violated

22 Cal. R. Prof. Conduct 2-100, in having its experts conduct these

23 ex parte interviews with represented class members, especially

24 _____

25     [19] In addition, Vorous does not explain how these matters came
   her knowledge such that she can now testify about them, since she
26 says that she did not observe them.

1   since those interviews were used against the plaintiffs in support

2   of defendants' Termination Motion.

3       The reports are problematic for an additional reason.

4       During the time period when defendants' experts were carrying

5   out the prison inspections and inmate interviews that went into

6   their reports, defendants were opposing efforts by plaintiffs, in

7   the three-judge court, to conduct their own discovery.  See

8   Defendants' Response and Motion To Strike Plaintiffs' "Application

9   for Limited Discovery and Order To Show Cause re Contempt" filed

10  September 5, 2012 ("Response to App. for Limited Discovery")(ECF

11  No. 4234).  Plaintiffs' discovery request was for information

12  relating to defendants' efforts to reduce prison overcrowding, the

13  principal cause of the constitutional violations.  The court denied

14  the discovery request.  Order of three-judge court filed September

15  7, 2012 (ECF No. 4235).  This raises issues of fairness to

16  plaintiffs, who were denied discovery they could have used for

17  their own expert reports, while defendants were conducting ex parte

18  communications for their expert reports.

19      Given all the above, it is clear that plaintiffs were

20  prejudiced.  Defendants' assertion that this conduct was

21  "harmless" is plainly belied by the expert reports themselves,

22  which directly use these tainted interviews against the

23  interviewees in this termination motion.  However, the defense

24  experts made no attempt to hide the fact of interviews – after they

25  had occurred.  Thus the court can theoretically attempt to discount

26  those portions of the report that appear to be based upon, or

21

1   influenced by, those statements.[20]   This is problematic, however,

2   as the court cannot really know what portions of the report are

3   dependent upon the tainted inmate interviews.   Moreover, Dr.

4   Martin's report makes no reference to his interviews with inmates,

5   leaving the court completely unable to identify which portions of

6   his report are tainted.

7       The court thus believes that it is entirely proper to strike

8   these expert reports and not consider them in connection with this

9   motion.   Under normal circumstances, defendants could then correct

10  this problem by retaining untainted experts to re-inspect the

11  prisons, and give their report.   However, the PLRA places such a

12  strict time limit on the court's decision-making that this approach

13  is not possible.   As a consequence of striking these reports, the

14  court must deny the motion, since defendants' remaining evidence

15  is plainly insufficient to meet their burden to show that they have

16  cured the constitutional violations.

17      In sum, the court finds that defendants violated their

18  professional duty and the plaintiffs were prejudiced thereby.

19  Accordingly, the court strikes the experts' reports, and finds

20  therefore that there is insufficient evidence to support

21  defendants' motion, and thus, denies it.

22  _____

23      [20] In the absence of unfair advantage, it may be that the
    possible ethics violations here are best left to be dealt with by

24  the California Bar.   See Continental Ins. Co. v. Superior Court,
    32 Cal. App. 4th 94, 111 n.5 (1995).

25  In addition, the Clerk is directed to deliver a copy of this order

26  to the State Attorney General, to ensure that she is made aware of
    the conduct.

1    Nonetheless, the court recognizes that, given the paucity of

2    authority, a reviewing court might find the sanction inappropriate.

3    Accordingly, the court will consider whether, even considering the

4    affidavits, the defendants have made their case.[21]  Having done so,

5    the court concludes as an additional ground to deny the motion,

6    that defendants have not borne their burden of proof.

7        C.  Standards for Eighth Amendment Violation

8        The Eighth Amendment violation in this action is defendants'

9    "severe and unlawful mistreatment" of prisoners with "serious

10   mental disorders," through "grossly inadequate provision of . . .

11   mental health care."  Brown v. Plata,  131 S. Ct. at 1922 & 1923.

12   As  the  United  States  Supreme  Court  noted,  the  serious  and

13   persistent constitutional violation in this action is based on

14   "systemwide deficiencies in the provision of . . . mental health

15   care that, taken as a whole, subject ... mentally ill prisoners in

16   California to 'substantial risk of serious harm' and cause the

17   delivery  of  care  in  the  prisons  to  fall  below  the  evolving

18   standards of decency that mark the progress of a maturing society."

19   Id. at 1925 n.3 (quoting Farmer v. Brennan, 511 U.S. 825, 834

20   (1994)).   "For years the . . . mental health care provided by

21   California's prisons has fallen short of minimum constitutional

22   requirements and has failed to meet prisoners' basic health needs.

23   Needless suffering and death have been the well-documented result."

24   Id. at 1923.

25   _____

26   [21] In any event, under the circumstances, the weight to be given those affidavits is significantly diminished.

1          As recently as August 30, 2012, this court identified several

2    "critically important" goals which are necessary to remedy the

3    Eighth Amendment violation in this action.  These include:

4          •    Re-evaluation and updating of CDCR
                suicide prevention policies and
5               practices;

6          •    Ensuring that seriously mentally ill
                inmates are properly identified,
7               referred, and transferred to receive
                necessary higher levels of mental health
8               care, including inpatient care only
                available from DMH[22];
9
           •    Addressing ongoing issues related to
10              placement of EOP (Enhanced Outpatient)
                inmates in administrative segregation,
11              particularly those housed in such units
                for over 90 days;
12
           •    Completion of the construction of mental
13              health treatment space and beds for
                inmates at varying levels of care;
14
           •    Full implementation of defendants' new
15              mental health staffing plan; and

16         •    Refinement and implementation of MHTS.net
                to its fullest extent and benefit.[23]
17

18
     See Order, filed August 30, 2012 (ECF No. 4232) at 5 n.3.  These
19
     goals, identified by the Special Master two years ago in his
20
     Twenty-Second Round Monitoring Report, have been the most recent
21
     focus of the extended remedial phase of this litigation.
22
           The specific goals track ongoing violations identified by this
23
     _____

24         [22]  Department of Mental Health, now known as Department of
     State Hospitals.
25
           [23]  MHTS.net is defendants' internet-based mental health
26   tracking system.  Twenty-Fifth Round Report (ECF No. 4298) at 11.

                                    24

1   court in its July 23, 2007 order recommending that a three-judge

2   court be convened to consider a prisoner release order. See Order,

3   filed July 23, 2007 (ECF No. 2320) at 6 (ongoing violations include

4   delays in access to mental health crisis beds, acute inpatient

5   care, and intermediate inpatient care; inadequate capture,

6   collection, and analysis of data necessary to long-range planning

7   for adequate delivery of mental health care; unacceptably high

8   staffing vacancies; insufficient program space; and insufficient

9   beds for mentally ill inmates). The specific goals also directly

10  connect to evidence of conditions through August 2008 presented to

11  the three-judge court, which showed serious ongoing constitutional

12  violations in the delivery of mental health care to CDCR inmates,

13  including severe shortages in treatment space, beds, and staffing;

14  inadequate medication management; inadequate medical recordkeeping;

15  and an unacceptably high number of inmate suicides. See Order of

16  three-judge court, filed August 4, 2009 (ECF No. 3641) at 60-87.

17       Finally, several of the goals set forth in the court's August

18  30, 2012 order (ECF. No. 4232) are tied to constitutional

19  deficiencies described by the United States Supreme Court in its

20  2011 Opinion affirming the three-judge court's population reduction

21  order, which include:

22              •   A shortage of treatment beds, causing suicidal
                    inmates to be "held for prolonged periods in
23                  telephone-booth sized cages without toilets",
                    other inmates to be "held for months in
24                  administrative segregation, where they endure
                    harsh and isolated conditions and receive only
25                  limited mental health services," and inmates
                    to commit suicide while awaiting treatment.
26                  131 S. Ct. at 1924, 1933.

- "Wait times for mental health care rang[ing] as high as 12 months." <u>Id</u>. at 1924.

- A suicide rate that in 2006 "was nearly 80% higher than the national average for prison populations;" and "72.1% of suicides involved 'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable.'" <u>Id</u>. at 1924-25 (internal citation omitted). <u>See also id.</u> at 1925 n.2.

- An "absence of timely access to appropriate levels of care at every point in the system." <u>Id</u>. at 1931 (quoting 2009 Special Master report).

- Unacceptably high staffing vacancy rates when measured against the state's staffing formula, with expert testimony showing that the staffing need had been significantly underestimated. <u>Id</u>. at 1932 & n.5. Mental health staff "managing far larger caseloads than is appropriate or effective" and a prison psychiatrist reporting that they are "doing about 50% of what we should be doing to be effective." <u>Id</u>. at 1932.

- Insufficient space in which to perform "critical tasks and responsibilities" and staff operating out of "makeshift facilities." <u>Id</u>. at 1933.

D. <u>Analysis</u>

Defendants' motion is premised on their contention that they now have a mental health care delivery system that includes each of the "six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system,"

////

////

////

_Coleman_, 912 F. Supp. at 1298,[24] and that those components have

been adequately implemented.[25]   Defendants' motion, which proceeds

from the erroneous assumption that plaintiffs bear the burden of

proof on a motion to terminate under 18 U.S.C. § 3626(b), is itself

woefully inadequate.[26]

---

[24] "The six components are:  (1) a systematic program for
screening and evaluating inmates to identify those in need of
mental health care; (2) a treatment program that involves more than
segregation and close supervision of mentally ill inmates; (3)
employment of a sufficient number of trained mental health
professionals; (4) maintenance of accurate, complete and
confidential mental health treatment records; (5) administration
of psychotropic medication only with appropriate supervision and
periodic evaluation; and (6) a basic program to identify, treat,
and supervise inmates at risk for suicide."   _Id_. at 1298 n.10
(citing _Balla v. Idaho State Board of Corrections_, 595 F. Supp.
1558, 1577 (D. Idaho 1984)).

[25] In their motion, defendants contend that in its 1995
decision this court "did not find that the State's mental health
care delivery system was inadequate, but rather that it did not
provide 'reasonably speedy' access to care."   Termination Motion
(ECF No. 4275-1) at 10 (citing _Coleman_, 912 F. Supp. at 1308).
This cramped reading of the foundational order in this case is
without merit. _See_, _e.g._, _Coleman_, 912 F. Supp. at 1318 ("Whatever
variances exist between the various studies that have been made,
they consistently find a woefully inadequate system of mental
health care with all its tragic consequences.")

[26] In the analysis that follows, the court frequently relies
on the Special Master's reports.   This is both sensible and
appropriate.   Unlike the parties, who have viewpoints colored by
their status, the Special Master is responsible only to the court,
a responsibility that he has discharged with both care and great
propriety.   The defendants' initial attempt to deprecate his
reports, based upon monetary interests, and subsequently withdrawn
_see_ ECF Nos. 4414 and 4353, is both plainly false and unworthy of
consideration.   Indeed, Dr. Patterson, the Special Master's suicide
expert, is leaving his position because of his frustration arising
from the defendants' repeated failure to implement his
recommendations. _See_ Report on Suicides completed in the California
Department of Corrections and Rehabilitation January 1, 2012 - June
30, 2012, filed March 13, 2013 ("First Half 2012 Suicide Report")
(ECF No. 4376) at 23.

1    The motion also disregards most of the relevant context in
2    which it arises.   As a general proposition, proof of an Eighth
3    Amendment violation in the delivery of health care to inmates has
4    two  components:    an  objective  component  that  identifies
5    deficiencies  in  the  provision  of  inmate  health  care,  and  a
6    subjective component that requires a finding that defendants are
7    "deliberately indifferent" to those deficiencies.   See Estelle v.
8    Gamble, 429 U.S. 97, 106 (1976); see also Wilson v. Seiler, 501
9    U.S. 298-99 (1991).   Here, the objective component turns generally
10   on whether there are ongoing deficiencies in the delivery of mental
11   health care to class members that subject them to "substantial risk
12   of  serious  harm,"  see  Brown v. Plata,  supra.    The subjective
13   component is discussed infra.

14       As this court observed in its 1995 decision, the standards for
15   compliance with the Eighth Amendment must and indeed "can only be
16   developed contextually."   Coleman, 912 F. Supp. at 1301.   At the
17   time of trial in this matter, among other "woeful inadequacies,"
18   defendants did not "have a systematic program for screening and
19   evaluating inmates for mental illness."   Id. at 1305.   Evidence at
20   trial in 1994 showed that in 1987, the state prison system had
21   identified 2,966 inmates with psychiatric classifications, while
22   studies estimated that there were over 4,000 inmates suffering from
23   serious mental disorders who had not been detected.    Id. at 1306
24   n.29.   By July 1997, a year and a half into the remedial phase of
25   this action, the state prison system had identified 14,293 inmates
26   with serious mental disorders.   As of November 2, 2012, there were

1  32,106 inmates in CDCR's mental health services delivery system.
2  See February 28, 2013 Order (ECF No. 4361) at 6 n.6.

3      In order to prevail on this motion, defendants must prove that
4  there are no ongoing constitutional violations in the delivery of
5  mental health care to the plaintiff class.[27]  This contention must
6  be analyzed with reference to its particular context: delivery of
7  mental health care to over 32,000 mentally ill inmates housed
8  throughout the thirty-three prisons in the California Department
9  of Corrections and Rehabilitation.[28]

10      As the history of this "complex and intractable constitutional
11 violation" shows, the prospective relief required for the delivery
12 of constitutionally adequate mental health care to over 32,000
13 mentally ill prison inmates is not "susceptible of simple or
14 straightforward solutions."  Brown v. Plata, 131 S. Ct. at 1936.
15 See also Armstrong v. Schwarzenegger, 622 F.3d 1058, 1070 (9th Cir.
16 2010)("Prospective relief for institutions as complex as prisons
17 is a necessarily aggregate endeavor, composed of multiple elements
18 that work together to redress violations of the law.")

19
20  [27]  Had defendants moved for termination of specific orders,
    they might have been required to show, in the alternative, that
21  "the relief ordered exceeds what is necessary to correct an ongoing
    constitutional violation."  Graves, 623 F.3d at 1048.  As
22  plaintiffs observed at the hearing, however, with this motion
    defendants have "gone for the home run ball."  RT (ECF No. 4538)
23  at 26:4-5.

24  [28]  Only twenty-eight of California's prisons have a
    "designated mental health mission."  Declaration of Rick Johnson,
25  filed January 7, 2013 ("Decl. Johnson") (ECF No. 4276) at ¶ 5.
    Inmates at the other five prisons are not without mental health
    issues; they are, however, transferred to one of the other twenty-
26  eight prisons.  Id.

1    The first remedial order in this action directed defendants

2  to work with the Special Master and his staff to develop and

3  implement plans to remedy the Eighth Amendment violation.  See

4  Coleman, 912 F. Supp. at 1323-24.[29]  Over a decade of effort led to

5  development of the currently operative remedial plan, known as the

6  Revised Program Guide.  The Revised Program Guide "represents

7  defendants' considered assessment, made in consultation with the

8  Special Master and his experts, and approved by this court, of what

9  is required to remedy the Eighth Amendment violations identified

10  in this action and to meet their constitutional obligation to

11  deliver adequate mental health care to seriously mentally ill

12  inmates."  February 28, 2013 Order (ECF No. 4361) at 3.[30]  Over

13  seven years ago, this court ordered defendants to immediately

14  ────────────

15  [29]  "The remedial phase of this litigation has been guided by
the court's core view that the obligation to comply with the
16  Constitution rests with the defendants and that it is defendants
who must choose and implement the mechanisms for meeting that
obligation."  Order, filed August 15, 2011 (ECF No. 4069) at 5.
17  See also Coleman, 912 F. Supp. at 1301 ("The Constitution does not
. . . prescribe the precise mechanisms for satisfying its mandate
18  to provide access to adequate mental health care. . . . [I]n cases
challenging conditions of prison confinement, courts must strike
19  a careful balance between identification of constitutional
deficiencies and deference to the exercise of the wide discretion
20  enjoyed by prison administrators in the discharge of their
duties.")
21

22  [30]  In most of the papers filed recently in this action,
defendants have argued that the Special Master is not monitoring
23  to a constitutional standard when he monitors their compliance with
the Revised Program Guide.  However, at the hearing, defense
24  counsel acknowledge that "[t]he program guide is the remedial plan
designed to get the State up to a constitutional level of
25  care . . . ."  RT (ECF No. 4538) at 27:5-7.  Thus, the degree to
which defendants are complying with the Revised Program Guide is
26  an appropriate way to assess whether defendants are meeting their
constitutional obligations.

1  implement all undisputed provisions of the Revised Program Guide.[31]

2  Id. at 5-6.

3      Over the past seventeen years this court has issued over one

4  hundred other substantive orders to defendants in an ongoing effort

5  to bring the CDCR's mental health care delivery system into

6  compliance with Eighth Amendment standards.[32]  Those orders have

7  been focused on core issues including but not limited to staffing,

8  bed planning, suicide prevention, and access to inpatient care.

9  Monitoring of defendants' remedial efforts has been ongoing as

10 well, and the Special Master has filed periodic monitoring reports

11 which both report on defendants' progress and the tasks that

12 remain.[33]  See, e.g., Twenty-Second Round Monitoring Report, filed

13 _____

14  [31]  Ninety-five percent of the provisions of the Revised
    Program Guide were undisputed by the parties when submitted to the
15  court in 2006.  See Special Master's Report and Recommendations on
    Defendants' Revised Program Guide, filed February 3, 2006 (ECF No.
16  1749) at 4.

17  [32]  As of July 2007, prior to the convening of the three-judge
    court, this court had issued over seventy-seven such orders.  See
18  July 23, 2007 Order (ECF No. 2320) at 4 & n.3.  Since that time,
    this court has issued at least thirty-five additional orders
19  directed at adequate design and implementation of necessary
    remedial measures.
20
    [33]  The Special Master has also observed, correctly, that
21  "[t]he ultimate goal of Coleman monitoring is to eventually render
    itself obsolete as more and more institutions obtain adequate
22  compliance levels and are prepared to assume self-monitoring
    responsibilities. . . .  The hope is that as more and more
23  institutional mental health programs progress toward adequately
    higher levels of functioning, they too will be shifted to a self-
24  monitoring and reporting status.  If their progress proves to be
    stable and maintainable, the special master's oversight will no
25  longer be needed, and monitoring and review of institutional
    performance will eventually be turned back over to CDCR."  Twenty-
26  Fourth Round Report (ECF No. 4205) at 62.

1  March 9, 2011 (ECF No. 3990) at 461-62; Twenty-Third Round
2  Monitoring Report, filed December 1, 2011 (ECF No. 4124) at 74-77;
3  Twenty-Fourth Round Monitoring Report, filed July 2, 2012 (ECF No.
4  4205) at 59-66; Twenty-Fifth Round Monitoring Report, (ECF No.
5  4298) at 16-51.   As this court recently reminded defendants,
6  "[b]ecause the Revised Program Guide is grounded in the
7  requirements of the Eighth Amendment as they have been developed
8  in the context of this action, . . ., the Special Master's Report
9  to the court on defendants' compliance with the provisions of the
10 Revised Program Guide is also grounded in the requirements of the
11 Eighth Amendment . . . ."   February 28, 2013 order (ECF No. 4361)
12 at 3.

13     This motion comes before the court focused on a basic
14 structure identified by the court almost two decades ago.
15 Defendants have, through the Revised Program Guide, designed an
16 adequate system for the delivery of mental health care to prison
17 inmates.   Their motion fails to address in any meaningful way the
18 more recent specific findings concerning ongoing constitutional
19 violations that have continued to plague adequate implementation
20 of that system.   This failure notwithstanding, the court must
21 determine whether defendants have met their burden of proving that
22 those ongoing violations no longer exist.

23     1.  Suicide Prevention

24     In 2011, the United States Supreme Court cited California's
25 inmate suicide rate and the percentage of those suicides that
26 involved "'some measure of inadequate assessment, treatment, or

intervention, and were therefore most probably foreseeable and/or preventable'" as evidence that "[p]risoners in California with serious mental illness do not receive minimal, adequate care." Brown v. Plata, 131 S. Ct. at 1924-25. The Court cited the following specific facts: California's 2006 inmate suicide rate was "nearly 80% higher than the national average for prison populations" and that pattern appeared to have continued in 2007; 72.1 percent of the inmate suicides in 2006 involved "'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable'", and that percentage rose to 82% in 2007; the Special Master's report that those "'numbers clearly indicate no improvement in this area during the past several years, and possibly signal a trend of ongoing deterioration,'"; and the Special Master's report that "'the data for 2010 so far is not showing improvement in suicide prevention.'" Brown v. Plata, 131 S. Ct. at 1924-25 & 1925 n.2.

Despite the fact that current evidence shows that inmate suicides are occurring at virtually the same rate[34] and with

---

[34] California's inmate suicide rate reached an all-time high of 26.2 inmates per 100,000 in 2005, and was not significantly better in 2006, at 25.1 per 100,000. Report on Suicides Completed in the California Department of Corrections and Rehabilitation in Calendar Year 2011, filed January 25, 2013 ("2011 Suicide Report") (ECF No. 4308) at 7. In 2009, the suicide rate dipped to 15.7 per 100,000, near the national average of 15.2 per 100,00. Id. at 7-8. Since then, however, it has climbed back up to 23.72 per 100,000 inmates in 2012. Id. at 8. The suicide rate is going in the wrong direction.
    The percentage of suicides that involved "'some measure of inadequate assessment, treatment, or intervention, and were therefore most probably foreseeable and/or preventable'" has been at or above 72.1 percent since 2006. See discussion infra.

1    virtually the same degree of inadequacies in assessment, treatment

2    and intervention, defendants now seek termination of all relief in

3    this action.   The facts show, however, that the rate of inmate

4    suicide is not declining, and more than seventy percent of inmate

5    suicides in California involve significant inadequacies about which

6    defendants have known for years.   These facts demonstrate an

7    ongoing violation of the Eighth Amendment rights of members of the

8    plaintiff class.

9         With respect to suicide prevention, defendants' motion is

10   premised on two basic contentions.   First, they contend that "[t]he

11   Eighth Amendment does not mandate that prisons eliminate all

12   suicide risks."   Termination Motion (ECF No. 4275) at 27 (citations

13   omitted).[35]   Second, they assert that they have "fully implemented

14   _____

15        [35]   In their reply brief, defendants contend that they
     "successfully prevented 347 attempted suicides" in 2012.   They

16   support this assertion with a citation to paragraph 4 of the Reply
     Declaration of Kathleen Allison, Deputy Director of the Division

17   of Adult Institutions (DAI), Facilities Support, for CDCR and
     Exhibit A to said declaration.   See Reply Declaration of Kathleen

18   Allison filed March 22, 2013 (ECF No. 4478) ¶ 4, Ex. A.   In part,
     Ms. Allison avers that "CDCR is able to successfully prevent

19   suicides throughout the state through timely and professional
     clinical intervention but also through good communication and

20   observation by custodial staff.   Attached as Exhibit A is a report
     reflecting that CDCR successfully prevented 347 attempted suicides

21   between January 1, 2012, and December 31, 2012." Id. Plaintiffs
     object to this evidence as new evidence presented for the first

22   time in a reply brief, and to Exhibit A as inadmissible hearsay on
     the grounds that it has no identifying information and is not

23   authenticated in any way.   Plaintiffs' objections to this evidence
     are well-taken. [... Plaintiffs' objections to this evidence are

24   well-taken.]

25   The time and place for defendants to submit this declaration, along
     with properly authenticated exhibits, was in their moving papers,

26   not in their Reply.   Defendants' error creates no hardship for them
     however, as the PLRA appears to permit them to file successive

                                    34

1   and staffed a thorough, standardized program for the

2   identification, treatment, and supervision of inmates at risk for

3   suicide." <u>Id.</u> at 28 (case citations omitted).  Defendants' first

4   argument misses the mark, and they have not proved the second.

5       To state the obvious, "'suicide is a serious harm.'"  <u>Estate</u>

6   <u>of Miller, ex rel. Bertram v. Tobiasz</u>, 680 F.3d 984, 989 (7th Cir.

7   2012) (internal citation omitted).  The suicide rate, and the

8   number of inmate suicides, provide notice to defendants that

9   inmates in their custody have been, and continue to be, suffering

10  the serious harm of suicide.  Defendants seek to avoid

11  responsibility for the problem of inmate suicide in California's

12  prisons by making a number of arguments concerning particular

13  statistical methodologies.[36]  This analysis misses the point

14  _____

15  motions to terminate at appropriate times in the future.  <u>See</u> 18
    U.S.C. § 3626(b)(1)(A)(ii).  If defendants do so, they will be able
16  to file their papers next time with an awareness of their burden
    of production and proof.  Defendants will also have the benefit of
17  this court's order, which identifies for them at least some of the
    work that remains to be done to bring the prison's mental health
18  system into constitutional compliance.

19      [36] The court is persuaded that suicide rate is the proper
    method for assessment of suicide trends.  As Dr. Patterson suggests
20  in his most recent report, "even assuming that the raw number of
    suicides was a meaningful metric for evaluating" CDCR's suicide
21  prevention, Report on Suicides Completed in the California
    Department of Corrections and Rehabilitation January 1, 2012 - June
22  30, 2012, filed March 13, 2013 (First Half 2012 Suicide Report)
    (ECF No. 4376) at 13, those numbers do not help defendants.  From
23  1999 through 2012, 437 inmates have committed suicide in
    California's prisons.  <u>Id</u>.  Three hundred twenty-six of those
24  suicides were committed in the decade from 2001 to 2010.  <u>Id</u>. at
    13.  California's total number of inmate suicides for that period
25  was substantially higher than any other prison system in the United
    States, including the federal prison system. <u>Id</u>. Texas had the next
26  highest number of inmate suicides from 2001-2010, with 248. <u>Id</u>.

1  relative to termination of this action.  Where, as here, defendants

2  know that they house prison inmates at risk for suicide, they are

3  required to take all reasonable steps to prevent the harm of

4  suicide.

5      For the past several years, and continuing, over seventy

6  percent of inmate suicides in California have involved  "'at least

7  some degree of inadequacy in assessment, treatment, or

8  intervention," also described as "significant indications of

9  inadequate treatment."  See, e.g., 2011 Suicide Report (ECF No.

10  4308) at 3, 28; Report on Suicides Completed in the California

11  Department of Corrections and Rehabilitation in calendar years 2008

12  and 2009, filed May 15, 2011 (ECF No. 4009) at 9 (82 percent rate

13  in 2007 suicides; 78.4 percent rate in 2008 suicides); Report on

14  Suicides Completed in the California Department of Corrections and

15  Rehabilitation in calendar year 2010, filed November 9, 2011 (ECF

16  No. 4110) at 9-10 (84 percent rate in 2009 suicides; 74 percent

17  rate in 2010).  In 2011, 25 of 34 completed suicides, or 73.5% of

18  the suicides involved significant indications of inadequate

19  treatment and "were, therefore, most probably foreseeable or

20  preventable." 2011 Suicide Report (ECF No. 4308) at 3, 10.[37]  On

21  ─────────────

22  [37]    Defendants take issue with the findings of the Special
   Master's suicide expert, Dr. Raymond Patterson, concerning
23  foreseeability or preventability, contending that many of the 25
   suicides should not be categorized as "foreseeable and/or
24  preventable." Defendants' Objections to 2011 Suicide Report, filed
   Marc h28, 2013 ("Objs. to 2011 Suicide Report") (ECF No. 4526) at
25  12-31. A review of Dr. Patterson's report, however, indicates that
   defendants, in their characterization of Dr. Patterson's analysis,
26  failed to acknowledge or address a number of probative facts
   underlying Dr. Patterson's conclusions.

1

---

2    As an example, defendants objected to Dr. Patterson's
assessment of Inmate H, finding that "[Inmate H's] statement to his
3  psychiatrist that he would be going home to Mexico and that his
mother was there may very well have been an indication of his
4  intent to go home to Mexico after his death given that his mother
was already dead,'" as "retroactive speculation" without a "factual
5  basis for th[e] assertion."  Objs. To 2011 Suicide Report (ECF No.
4526) at 17.  However, defendants failed to note Dr. Patterson's
6  overt reliance on the fact that a suicide risk evaluation ("SRE")
performed at Salinas Valley Psychiatric Program ("SVPP"), before
7  his release to a lower level of care, failed to recognize Inmate
H's "serious suicide attempt in 2010" and his "imminent
8  deportation."  See 2011 Suicide Report (ECF No. 4308) at 107.
    Even CDCR's suicide reviewer acknowledged the inadequacies in
9  the SRE performed at SVPP prior to Inmate H's discharge, because
it was "not completed with the aid of an interpreter, nor was there
10  more than a cursory record review."  Id. at 106.
    As to Inmate P, defendants contended that Dr. Patterson's
11  finding that Inmate P's suicide was "very likely preventable" lacks
a   foundation   because   "[d]espite   a   challenging   clinical
12  presentation, staff continued to provide this inmate with mental
health care--immediately prior to his death, his treatment team
13  considered a Keyhea petition, but determined he did not meet the
grave disability requirement."  Objs. to 2011 Suicide Report (ECF
14  No. 4526)at 19-20.  Defendants further argued that "given the
staff's efforts to treat this inmate, [it] should not be considered
15  an error in clinical care."  Id. at 20.  Defendants, however,
omitted reference to: (1) the inmate's "clear deterioration in
16  mental health functioning," which Dr. Patterson found required that
Inmate P be "referred to a higher level of care for more
17  comprehensive and adequate examination"; (2) the inmate's placement
in SHU, "despite the requirement that inmates with serious mental
18  illness be placed in a PSU," and with only "minimal consideration
that he should have had an evaluation to determine his ability to
19  remain mentally healthy in a SHU"; and (3) the fact that, because
a "recently hired psychiatrist inappropriately completed a Removal
20  Chrono after his first meeting with the inmate because the inmate
[had] refused medications and treatment," the inmate was "errantly
21  removed from the MHSDS on 2/10/11 and was not seen again until
5/5/11," even though his condition "had clearly deteriorated and
22  continued to do so."  2011 Suicide Report (ECF No. 4308) at 168,
170-71.
23    The CDCR suicide reviewer in Inmate P's case similarly noted
that "it was concerning that the response and decision making of
24  the IDTT with respect to the primary clinician's concerns as to the
inmate's increasing symptoms and possible need for a level of care
25  change, especially in the context of no established therapeutic
relationship and extreme diagnostic uncertainty, was 'concerning',"
26  given that "ample clinical justification was present for a level

1   March 13, 2013, the Special Master filed Dr. Patterson's Report on

2   Suicides Completed in the First Half of 2012.   Dr. Patterson

3   reports that for the first half of 2012, the rate climbed to 86.6

4   percent, or 13 of the 15 suicides.  First Half 2012 Suicide Report,

5   filed March 13, 2013 (ECF No. 4376) at 3.  Defendants have objected

6   to that report; their objections to that report are still pending.

7        These "significant indications" continue to fall into an

8   ongoing pattern of repeating inadequacies.   In the 2011 Suicide

9   Report, Dr. Patterson's findings as to each of the suicides in

10  question repeatedly include the following (or some combination of

11  the following) systemic inadequacies: (1) failures to refer inmates

12  ─────────────────────────

13  of care change at IDTT reviews on 6/9/11 and 6/16/11," including
    "the inmate's deteriorating condition and that his functioning was

14  'most definitely no longer stable'."  Id. at 166-67.   The CDCR
    reviewer further found that no SREs "were completed during the

15  inmate's second term of incarceration," despite the inmate's
    documented history of a suicide attempt in 2006, and that "another

16  SRE should have been completed at some time during the obvious
    decline in his functioning beginning at the end of May 2011."  Id.

17  at 167.   The reviewer also noted that two areas of concern
    "ultimately under the control of custody" were "the inmate's single

18  cell status without adequate documentation," given that single cell
    housing is a risk factor for suicide, and the lack of "out-of-cell

19  time for the inmate to have had regular breaks from SHU
    confinement," even though "regular breaks from the confinement of

20  a SHU cell is an important stress reducer."  Id. at 167-68.
         As a final example, defendants objected to Dr. Patterson's

21  assessment that Inmate R's suicide was "very likely . . .
    preventable", and argued that Dr. Patterson's finding that the

22  inmate "was discharged from APP to an EOP level of care in a
    psychiatrically fragile state," lacks a foundation because

23  "[i]mprovement had been noted." (ECF No. 4308) Objs. To 2011
    Suicide Report (ECF No. 4526) at 20-21. Defendants, however, failed

24  to address either Dr. Patterson's finding that "the level of
    improvement d[id] not appear to have justified his return to an EOP

25  level of care" or the fact that "the inmate was discovered in rigor
    mortis, which raised appropriate questions from the warden

26  regarding monitoring by custody staff."  2011 Suicide Report (ECF
    No. 4308) at 192.

1  to higher levels of care when clinically appropriate; (2) failures

2  to conduct indicated mental health evaluations and/or assessments;

3  (3) failure to conduct adequate or timely mental health status

4  examinations; (4) failure to carry out basic clinical procedures,

5  such as consultations between mental health and medical providers,

6  conducting UHR/eUHR reviews following discharges from DSH, or

7  obtaining necessary clinical records from the UHR/eUHR; (5)

8  inadequate completion of SRE's; or (6) inadequate emergency

9  responses.  2011 Suicide Report at 9.

10      As to the suicides that occurred in segregated housing units,

11  Dr. Patterson repeatedly found systemic failures as to (1)

12  documentation and completion of 30-minute welfare checks; (2)

13  completion of the 31-item screen for newly-arriving inmates in

14  administrative segregation; (3) emergency response protocols; and

15  (4) clinical follow-up for inmates discharged from crisis care.

16  Id. at 10.

17      In the First Half of 2012 Suicide Report (ECF No. 4376), Dr.

18  Patterson surveys the suicide prevention measures that he has

19  repeated over the past fifteen years and which defendants have

20  failed to implement.  First Half 2012Suicide Report (ECF No. 4376)

21  at 8-10.  These recommendations fall into three areas:

22      • Ongoing failure in compliance with
         specific existing requirements, including
23        five-day clinical follow-ups; custody
         staff adherence to policies and
24        procedures regarding conduct of custody
         welfare checks and others; and proper
25        supervision of inmates who have histories
         of increased suicide risk.

26

1        •      Close clinical monitoring of suicidal
                inmates; proper and timely referral of
2               decompensating inmates to higher levels
                of care, particularly mental health
3               crisis beds and inpatient care;
                appropriate clinical management of
4               suicidal inmates pending referral to
                higher levels of care, including proper
5               assessment of suicidal risk factors,
                particularly upon placement in
6               administrative segregation.

7        •      Improvement in necessary emergency
                response procedures.
8

9    Id. These recommendations have been repeated periodically since

10   1999. See id. These and other repeatedly identified inadequacies,

11   including "the need for adequate consideration of information

12   available in the medical records of Coleman class members" were

13   also described in this court's April 14, 2010 order. Order, filed

14   April 14, 2010 (ECF No. 3836) at 4-6.

15          Defendants' clinical experts also report on inmate suicides.[38]

16   _____

17        [38]  Much of this part of defendants' clinical expert report is
     not particularly useful to the issues at bar. Whether or not the
18   Department has or lacks "a passionate commitment to the prevention
     and elimination of suicides," Clinical Exp. Rpt. (ECF No. 4275-5)
19   at 32, for example, is not relevant to whether defendants have
     taken all reasonable steps to remedy the identified pattern of
20   deficiencies in suicide prevention. In addition, the suggestion
     that the Special Master's suicide reports should be provided more
21   timely to defendants, see Id. at 36-37, is completely misguided.
     The report of Dr. Patterson, the Special Master's expert, is based
22   entirely on CDCR's own information and data about inmate suicides.
     As noted above, Dr. Patterson has reported a pattern of
23   inadequacies for years. This pattern has been known to defendants
     and can and should have provided a useful framework for defendants
24   to apply in their own internal reviews of inmate suicides, as well
     as their assessment of required measures going forward. It is,
25   after all, defendants who are responsible for timely investigating
     and reviewing inmate suicides and for implementing procedures to
26   address recurring issues that, if corrected, might have prevented
     suicides in the past and may prevent them in the future.

1   They report that they "are aware that CDCR has experienced a rate

2   of suicide that is higher than the reported national average for

3   state prisons for the last several years" and they report on

4   "statistical overrepresentation" of inmate suicides that occur in

5   the "non-therapeutic" environment of administrative segregation.

6   Clinical Evaluation of California Prison Mental Health Services

7   Delivery System by Dvoskin, et al., filed January 7, 2013

8   ("Clinical Exp. Rpt.") (ECF No. 4275-5) at 20, 23, 34. They also

9   note the critical importance of appropriate consideration and

10  accurate documentation of suicide risk factors on the suicide risk

11  evaluation instrument now available.  Id. at 4, 39 (quality of

12  suicide risk evaluations "remains an area of concern.")  These

13  findings are congruent with relevant findings by Dr. Patterson.[39]

14  _____

15      [39]   In addition, plaintiffs have presented evidence that in
    2010 defendants hired a nationally recognized expert on suicide
16  prevention, Lindsay Hayes.  The contract between CDCR and Mr. Hayes
    recognizes that "[i]n the last ten years the CDCR has experienced
17  an increase in the rate of suicide," that "[f]or most years in the
    last decade the suicide rate in CDCR has exceeded the national rate
18  of suicide among state prisoners," and that "[r]ecently the CDCR
    has stumbled in the timeliness of its suicide reviews and the
19  adequacy of the responses to these reviews by institutions and the
    CDCR as a whole."  Exhibit 113 to Declaration of Michael Bien,
20  filed March 15, 2013 (ECF No. 4404) at 2.  The contract further
    provided that Mr. Hayes was hired as a consultant for the express
21  purpose of addressing numerous deficiencies in CDCR's suicide
    prevention efforts, including "subpar and inadequate" assessments
22  that in turn lead "to poor follow-up trajectories that may
    contribute to an eventual suicide"; developing assurance that
23  institutional policies and practices reflect department standards
    and are "consistent across institutions"; and remedying CDCR's
24  inability to "adequately track, monitor, and prevent suicide
    attempts [which] ha[d] eroded until at the current time [of Hayes'
25  contract] the CDCR has no active database of suicide attempts and
    no plan to systematically collect data on attempts as a way to
26  better understand who may and who may not attempt and ultimately
    complete a suicidal act. . . ."  Id.  In short, CDCR contracted

41

with Lindsay Hayes so that his "experience (more than 25 years) with correctional suicide prevention programs will allow the CDCR to make immediate, short-term, and long-term changes in its suicide prevention program to begin to decrease the overall rate of suicide over the long term. . . [and] to implement a more effective suicide prevention policy . . . ." Id.

In August 2011, the first year of the three year contract, Mr. Hayes delivered a report to defendants with his findings and recommendations. See Order, filed February 14, 2013 (ECF No. 4341) at 5 (citing Declaration of Lindsay Hayes, filed February 12, 2013 ("Decl. Hayes") (ECF No. 4328) ¶ 5). The "report was written with the explicit intent to provide CDCR with a strategy to reduce inmate suicides within the prison system." Decl. Hayes ¶ 5. Despite explicit contractual provisions for additional services, Mr. Hayes was not contacted by CDCR again except to redact his report in order for certain parts to be provided to the Special Master and plaintiffs' counsel. See February 14, 2013 Order (ECF No. 4341) at 5.

In what he now describes as an "unfortunate off-hand remark," in June 2012, Robert Canning, PhD, CDCR's Suicide Prevention and Response Coordinator, told Mr. Hayes in an email that when his "report landed it was not roundly applauded and in fact was buried." Reply Declaration of Robert Canning, Ph.D.), filed March 22, 2013 (ECF No. 4474) at ¶ 4. He now avers that he asked additional questions in the same email because he "wanted to know whether the department could have done anything else to help Mr. Hayes produce a more useful product for the department." Id. at ¶ 5. Dr. Canning also avers that CDCR has "analyzed" all of the recommendations in Mr. Hayes' report and "has acted on several of them, including installing hundreds of suicide resistant beds in the Mental Health Crisis Bed Units." Id. at ¶ 6; see also Reply Declaration of Tim Belavich, filed March 22, 2013 (ECF No. 4472) at ¶¶ 5, 20 (same). No explanation, however, is provided as to why the other recommendations were not adopted.

In fact, the Special Master recommended that defendants develop a plan for installation of suicide resistant beds in mental health crisis bed units in a report and recommendations on defendants' review of their suicide prevention policies filed September 27, 2010. See Order, filed September 27, 2010 (ECF No. 3918). Of five recommendations contained in that report, defendants objected only to the recommendation to furnish suicide resistant beds in mental health crisis bed units. See Order, filed November 18, 2010 (ECF No. 3954) at 3. Defendants' objections were overruled on July 21, 2011 (ECF No. 4044) and defendants were ordered to file with the court and submit to the Special Master a plan to furnish suicide resistant beds. Order, filed July 21, 2011 (ECF No. 4044) at 8. While this court is refraining from making credibility assessments in connection this alternative disposition of defendants' motion, defendants' representation concerning the

1    In summary, for over a decade a disproportionately high number

2  of inmates have committed suicide in California's prison system.

3  Review of those suicides shows a pattern of identifiable and

4  describable inadequacies in suicide prevention in the CDCR.

5  Defendants have a constitutional obligation to take and adequately

6  implement all reasonable steps to remedy those inadequacies. The

7  evidence shows they have not yet done so.  In addition, while

8  defendants represent that they have fully implemented their suicide

9  prevention program, they have not.[40]  An ongoing constitutional

10 violation therefore remains.

11          2.  <u>Administrative Segregation</u>

12    Another "critical goal" centers on treatment of mentally ill

13 inmates in administrative segregation, particularly those whose

14 stays in these units exceed ninety days and those who are placed

15 _____

16 implementation of this recommendation by Mr. Hayes would appear to
   ignore some relevant history with respect to the provision of

17 suicide resistant beds in their mental health crisis bed units.

18    [40]  For example, in opposition to defendants' motion,
   plaintiffs present evidence that on January 19, 2013, Shama

19 Chaiken, the Chief of Mental Health at California State Prison-
   Sacramento (SAC) and other prison mental health chiefs received an
   email from the CDCR Supervisor of the Suicide Risk Evaluation

20 Mentor Program, Kathleen O'Meara.  It reads:  "Suicide remains 'the
   low hanging fruit for coleman. Please MAKE SURE your SRE Mentor

21 Program is up and running."  Exhibit 61 to Declaration of Michael
   Bien, filed Marc h15, 2013 ("Ex. 61 to Decl. Bien") (ECF No. 4402)

22 at 3.  Dr. Chaiken replied on the same day:  "OK – This has been
   on the back burner at SAC, but we'll come up with an implementation

23 plan next week."  <u>Id.</u>  Ms. O'Meara requested that the plan be
   forwarded "upon completion," to which Shama Chaiken replied that

24 she and the person taking over the program at SAC "want to go
   through the mentoring so we understand what is required, and then

25 Catherine will likely take some supervisors through the process so
   we will have a team of mentors."  <u>Id.</u>  Ms. O'Meara's response was:

26 "Call me . . . .  I'm floored by what you're telling me."  <u>Id.</u>

1  in administrative segregation for non-disciplinary reasons.  These

2  inmates face substantial risk of serious harm, including

3  exacerbation of mental illness and potential increase in suicide

4  risk.  See Twenty-Fifth Round (ECF No. 4298) at 36.  The evidence

5  before the court shows that a disproportionate number of inmate

6  suicides occur in administrative segregation units.  Remedial

7  efforts over the past six years have focused on reducing the length

8  of time EOP inmates remain in administrative segregation and

9  providing appropriate clinical care for EOP inmates housed in such

10  units.  See id. at 34-35.

11      In their motion, defendants contend that they have "developed

12  and implemented procedures for placing and retaining inmates with

13  mental health needs in any administrative segregation or security

14  housing unit."  Termination Motion (ECF No. 4275-1) at 29.

15  Defendants contend that while mentally ill inmates are in these

16  units their mental health needs are "being appropriately met" and

17  that there is no evidence to the contrary.  Id.  This contention

18  is not supported by defendants' own experts.

19      Defendants' experts describe the "environment of

20  administrative segregation" as "generally non-therapeutic."

21  Clinical Exp. Rpt. (ECF No. 4275-5) at 20.  They recommend that

22  housing inmates with serious mental disorders be "as brief as

23  possible and as rare as possible."  Id. at 25.[41]  Defendants'

24

25      [41]  They also "applaud CDCR's efforts to expedite the transfer
   of EOP inmates out of administrative segregation" but they don't
26  describe what those efforts are.  Id. at 20.

1   experts noted the "statistical overrepresentation of completed

2   suicides" in administrative segregation units when compared to

3   other housing units, accordingly, recommend that "placement of

4   inmates who require an EOP level of care be housed in

5   Administrative Segregation Units only when absolutely necessary for

6   the safety of staff or other inmates, and only for as long as it

7   absolutely necessary." Id. at 23. They also reported finding, at

8   two prisons, "some inmates waiting for EOP Special Needs Yard beds

9   and reportedly housed in an Administrative Segregation Unit for

10  their own protection; not because they posed a danger to others."

11  Id. at 21.[42]  They recommended that such inmates be "placed in the

12  front of any waiting list."  Id.

13      In the Twenty-Fifth Round Report, the Special Master reported

14  an ongoing need for improvement in treatment provided to inmates

15  needing an Enhanced Outpatient (EOP) level of care who are placed

16  into administrative segregation units.  See Twenty-Fifth Round

17  Report (ECF No. 4298) at 34-38.  The Special Master reports an

18  "elevated proportion of inmates in administrative segregation who

19  are mentally ill" and describes a series of issues to be addressed,

20  including

21              reduction of risks of decompensation and/or
            suicide, alternatives to use of administrative
22          segregation placements for non-disciplinary
            reasons, access to treatment/mitigation of
23          harshness of conditions in the administrative

24  ────────────────

25      [42]  Defendants' experts describe a single case at California
    Medical Facility (CMF) as having "no systemic implications" but
26  they reiterate their recommendation that such inmates be "moved to
    the top of the transfer list."  Id. at 24.

1                   segregation units, suicide prevention, and
2                   reduction of lengths of stay in administrative
                    segregation.

3    Id. at 38.  The Special Master's findings identify remaining issues

4    that are also identified by defendants' experts.  These issues,

5    until remedied, mean that seriously mentally ill inmates placed in

6    administrative segregation units continued to face a substantial

7    risk of harm.

8                3.  <u>Transfer to Higher Levels of Care</u>

9        Evidence of ongoing constitutional violations in this action

10   has included evidence of "an 'absence of timely access to

11   appropriate levels of care at every point in the system.'"  <u>Brown</u>

12   <u>v. Plata</u>, 131 S. Ct. at 1931 (quoting report filed by Special

13   Master in July 2009).  Delays in access to inpatient care have been

14   shown by evidence in this action dating back to 1993, and serious

15   delays have existed until as recently as last year.  <u>See</u> Order,

16   filed July 22, 2011 (ECF No. 4045), *passim* (discussing history of

17   delays in access to inpatient care and ordering specific relief);

18   Order, filed July 13, 2012 (ECF No. 4214) at 1 (commending "the

19   parties and the Special Master for the remarkable accomplishments

20   to date in addressing the problems in access to inpatient mental

21   health care.")[43]  Defendants assert they have remedied this

22   _____

23        [43] Significant events in the long history of efforts to remedy
     ongoing delays in timely access to care, particularly inpatient
     care, are described by the Special Master in his Twenty-Fifth Round
24   Report.  <u>See</u> Twenty-Fifth Round Report (ECF No. 4298) at 25-31.
     Among other things, that history shows the interrelationship
25   between bed shortages and failures to identify and treat inmates
     in need of higher levels of care.  An insufficient number of beds
26   has led to long wait lists for inpatient care; the two assessments

1   violation. Termination Motion (ECF No. 4275-1) at 17-18.

2      In assessing defendants' constitutional compliance, the

3   relevant requirement is defendants' constitutional obligation to

4   provide "a system of <u>ready</u> access to <u>adequate</u> [mental health]

5   care." <u>Hoptowit v. Ray</u>, 682 F.2d 1237, 1253 (9th Cir. 1982)

6   (emphasis added), abrogated in part on other grounds by <u>Sandin v.</u>

7   <u>Connor</u>, 515 U.S. 472, 481-84 (1995).  Defendants' mental health

8   care delivery system provides four levels of mental health care and

9   is designed to provide inmates at all custody levels both inpatient

10   and outpatient mental health care.  <u>See</u> Decl. Johnson (ECF No.

11   4276) ¶¶ 4-12; Declaration of Tim Belavich, filed January 7, 2013

12   ("Decl. Belavich") (ECF No. 4277)  ¶¶ 6-8.  Defendants' remedial

13   plan, the Revised Program Guide, contains "the time frames which

14   CDCR must meet for the transfer of MHSDS inpatient-patients between

15   _____

16   described by the Special Master, the Unidentified Needs Assessment
     (UNA) completed in March 2005 and the 2009 Mental Health Assessment
     and Referral Project (MHARP) each, respectively, revealed hundreds

17   of inmates in need of higher levels of care who had not been
     identified or referred for such care. <u>See</u> Special Master's Report

18   on Defendants' Plan Re: Intermediate Care Facility and Acute
     Inpatient Wait Lists, filed June 13, 2011 (ECF No. 4020) (in March

19   2005 defendants reported to the Special Master that 400 inmates had
     been identified "who otherwise would not have been referred to

20   higher levels of care"); Ex. B to Declaration of Jane E. Kahn in
     Support of Plaintiffs' Status Conference Statement Regarding

21   Defendants' Initial Report on the Mental Health Assessment and
     Referral Project (MHARP) and the ICF Pilot Program, filed March 24,

22   2010 (ECF No. 3825-1) at 7 (As result of MHARP 987 inmates "were
     either recommended for referral by the . . . assessment teams or

23   directly referred by the institutions.")  The wait list for
     inpatient care in early 2010 was 574 male inmates waiting for

24   intermediate inpatient care and 64 male inmates waiting for acute
     care.  Twenty-Fifth Round Report (ECF No. 4298) at 33.  The history

25   set forth by the Special Master also shows how relatively recent
     defendants' gains in access to inpatient care are. <u>See id</u>. at 25-

26   33.

47

levels of care, whether within the same institution or to another

institution", set out in a chart.   Revised Program Guide, 2009

Revision,[44] at 12-1-14, 12-1-16.   The time frames in the Revised

Program Guide represent defendants' considered assessment of what

is sufficiently "ready access" to each level of care.

a.   Inpatient Beds

Citing to this court's July 13, 2012 order (ECF No. 4214),

defendants contend that "[b]y July 2012, the State had successfully

guaranteed timely access to inpatient mental health care for all

class members needing hospitalization."   Termination Motion at 17.

Defendants also present evidence that "[a]s of December 17, 2012,

there were no inmates waiting for acute or inpatient care" past the

timelines set in the Revised Program Guide.   Johnson Decl. at ¶ 13.

Thirteen inmates were waiting for acute inpatient care but none had

been waiting more than ten days.   Id.   There were forty-five

inmates waiting for admission to intermediate hospital care, "the

majority pending two weeks or less."   Id.

In the Twenty-Fifth Round Monitoring Report, the Special

Master reported in relevant part that by the end of June 2012,

"defendants had substantially implemented the objectives" of a

sustainable self-monitoring process developed over the preceding

year.   Twenty-Fifth Round Monitoring Report at 31.   The objectives

of that self-monitoring process are "to timely identify, refer, and

transfer inmate-patients needing DSH inpatient care and to

[44] www.cdcr.ca.gov/dchcs/docs/mental%20health%20program
%guide.pdf.

48

1   internally monitor and improve the process." Id.  The July 12,

2   2012 completion of a project at California Medical Facility (CMF)

3   permitted placement of high-custody inmates waiting for inpatient

4   care in hospital beds, "a milestone in the process of eliminating

5   the intermediate care wait list." Id.  The Special Master reports

6   that "[f]rom an overall perspective, identification, referral and

7   transfer of inmates in need of inpatient care have improved greatly

8   in the past two years." Id. at 32-33.  He confirmed that there

9   were thirty-six inmates accepted to inpatient care who had been

10  waiting less than thirty days, one whose admission had been delayed

11  because of a scheduled hearing, and three waiting assessment to

12  determine whether they were competent to stand trial who had been

13  waiting more than thirty days. Id. at 33. As he reports, this is

14  a "vast improvement over the wait lists in early 2010, when there

15  were 574 male inmates awaiting transfer to intermediate inpatient

16  care, and 64 male inmates awaiting transfer to acute care." Id.

17      The gains in timely and adequate access to inpatient care are

18  new.[45]  And they are not complete.  Access to hospital care begins

19  _____

20      [45]  They are also challenged, at least in part, by plaintiffs,
    who present evidence that defendants have "tried to disguise the
21  inpatient waitlist" by starting an inmate's wait time on the date
    the inmate is accepted for hospital care by DSH, rather than the
22  date the inmate is referred for such care.  Corrected Plaintiffs'
    Opposition to defendants' Motion to Terminate Under the PLRA and
23  to Vacate under Rule 60(b)(5) (ECF No. 4422) at 44.  Plaintiffs
    also challenge Mr. Johnson's averment that there was no wait list
24  for inpatient care, pointing to his deposition testimony that he
    had relied on a summary from DSH and had not reviewed the actual
25  bed utilization report. Id.  Plaintiffs contend review of that
    report "shows that the majority of the patients currently housed
26  in the DSH programs waited longer than transfer time frames to get
    to those inpatient programs" and that inmates waiting in December

1   at the institutional level with a process for referral to inpatient

2   care. As the Special Master explains, timely and complete

3   referrals at the institutional level are "an important aspect of

4   the entire process of moving seriously mentally ill patients to

5   inpatient care." Id. The Special Master reports that "a number

6   of institutions' levels of performance continued to lag on the

7   basic elements" of the process for referring inmates to inpatient

8   care. Id. at 33. For example, one-third of the men's prisons do

9   not adequately track referrals to higher levels of care, and over

10   two-thirds of prisons do not timely complete the necessary referral

11   packets. Id. In addition, "[o]nce inmates were accepted at DSH

12   programs, transfers to both acute level care and intermediate

13   inpatient care continued to be slow at a number of institutions."

14   Id. See also Twenty-Fifth Round Monitoring Report at 72-75

15   (discussing referral and transfer issues at institutional level).

16      The substantial improvement in access to inpatient care cannot

17   be gainsaid. Defendants have made significant progress in

18   remedying one of the most tragic failures in the delivery of mental

19   health care – the unconscionable delays in access to inpatient care

20   and the sequlae therefrom, including periodic substantial decline

21   in clinical referrals to necessary hospital care. As noted above,

22   however, the gains are new and work remains. The gains that have

23   been made, however significant, do not entitle defendants to

24

25   2012 and January 2013 had been waiting longer than the relevant
    time frames. Id. (citing, inter alia, Ex. 73 to Bien Decl.) (ECF
26   No. 4402) at 228-229.

1    termination of all relief in this action.

2                b.   Mental Health Crisis Beds

3          Mental health crisis beds (MHCBs) are for inmates who are

4    suffering "[M]arked Impairment and Dysfunction in most areas . . .

5    requiring 24-hour nursing care" and/or dangerous to others as a

6    result of a serious mental illness or to themselves for any reason.

7    Revised Program Guide, 2009 Revision, 12-1-8.  They are also used

8    for "short-term inpatient care for seriously mentally disordered

9    inmate-patients awaiting transfer to a hospital program or being

10   stabilized on medication prior to transfer to a less restrictive

11   level of care."  Id.  They are short-term care units, with inmates

12   discharged within ten days unless administrative approval is given

13   for a longer stay.  Id.

14         In support of their motion, defendants present evidence that

15   there were no inmates waiting for placement in a mental health

16   crisis bed as of December 17, 2012.  Decl. Johnson (ECF No. 4276)

17   at ¶ 9.  This statement, however true, obscures the relevant issue

18   with respect to access to mental health crisis care.  While it may

19   be technically true that the inmates are not waiting for a crisis

20   bed, that is only because they are being housed in facilities

21   totally inappropriate for a person in need of a mental health

22   crisis bed.

23         Defendants do not presently have a sufficient number of mental

24   health crisis beds (MHCBs) to meet the need for such beds.  Twenty-

25   Fifth Round Report (ECF No. 4298) at 21.  For an extended period

26   of time, inmates in need of mental health crisis care have been

placed in a variety of alternative holding areas when MHCBs are
unavailable. During the twenty-fifth round monitoring period, only
eight prisons with mental health crisis beds had sufficient beds
to meet the need. Id. at 76.  Ten other prisons had insufficient
beds and had to use "alternative holding areas" to monitor inmates
in need of mental health crisis bed care.  Id.  During the
monitoring period, 722 inmates at California State Prison-
Sacramento (CSP/Sac) in need of crisis bed care were placed in
"medical OHU beds, ZZ cells, and contraband cells" when crisis beds
were unavailable.  Id.  Two hundred-sixty nine of these inmates
were eventually transferred to MHCBs.  Id.  Eight other prisons
also placed numerous inmates in need of crisis care in these
"alternative holding areas."  Id.  Lengths of stay ranged from four
hours to four to five days.  Id.  Folsom Prison used "eight
alternative holding cells in administrative segregation" to monitor
inmates in need of mental health crisis beds "via continuous
watch."  Id. at 77.

On June 15, 2012, the court ordered defendants to continue to
work with the Special Master to incorporate the number of inmates
placed in alternative housing areas into their future planning for
necessary MHCBs and to meet any increased need for such beds
identified by this process.  Order, filed June 15, 2012 (ECF No.
4199) at 2. In the Twenty-Fifth Round Report, the Special Master
reports that it appears defendants have now planned for sufficient
MHCBs.  Twenty-Fifth Round Report (ECF No. 4298) at 21.  "Work on
the provision of those beds is continuing."  Id.

1    Until the necessary number of mental health crisis beds are

2  complete and operational, mentally ill inmates in need of this care

3  are held in conditions that defendants have now agreed should not

4  be used to house inmates in need of crisis care.  This aspect of

5  the Eighth Amendment violation is ongoing.

6                    4.  <u>Treatment Space/Beds</u>

7    Shortages in treatment space and access to beds at each level

8  of mental health care have plagued the entire remedial phase of

9  this action.  Defendants identify several ongoing construction

10  projects in their termination motion, some of which are at very

11  preliminary stages, yet they seek termination of this action before

12  critically important construction is complete.  <u>See</u> Termination

13  Motion (ECF No. 4275-1) at 12-13.  Those projects are underway

14  pursuant to a bed plan that took at least four attempts and

15  numerous court orders to complete so that defendants had <u>a</u> <u>plan</u> for

16  sufficient beds and  treatment space at each level of the mental

17  health care delivery system.  Creation of that plan for a

18  constitutionally adequate number of beds has taken years.  The

19  construction required by the bed plan is ongoing.  Until all

20  necessary projects are complete, the state's prison system is

21  operating with a constitutionally inadequate amount of treatment

22  space and a constitutionally inadequate number of beds necessary

23  for adequate care.  That is an ongoing constitutional violation

24  that must be remedied.

25  ////

26  ////

### 5. Staffing

Inadequate staffing has plagued the delivery of mental health care in CDCR prisons for decades, and chronic understaffing and high vacancy rates in mental health staff positions are evidence of an ongoing Eighth Amendment violation. See Brown v. Plata, 131 S. Ct. at 1926, 1932-33 & n.5. In their motion, defendants acknowledge that the Constitution "requires the employment of 'trained mental health professionals . . . in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" Termination Motion (ECF No. 4275-1) at 24 (quoting Ruiz v. Estelle, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980)). Defendants acknowledge ongoing mental health staffing vacancies, but contend that these vacancies do not "significantly impair the level of care being provided to inmates, and that 'the clinical care itself places CDCR in the upper echelon of state prison mental health systems.'" Termination Motion (ECF No. 4275-1) at 25 (quoting Clinical Exp. Rpt. (ECF No. 4275-5) at 1, 14; and citing Twenty-Fourth Round Report (ECF No. 4205) at 41).

In 2009, pursuant to this court's June 18, 2009 Order (ECF No. 3613), defendants developed a staffing allocation plan (ECF No. 3693) (2009 Staffing Plan). Defendants' 2009 Staffing Plan sets forth how defendants' mental health delivery system is to be staffed. See Declaration of Diana Toche, filed January 7, 2013 ("Decl. Toche") (ECF No. 4275-3) ¶ 6. The 2009 Staffing Plan is driven by ratios of clinical and support staff to inmate population

1  at each level of the mental health delivery system.   See 2009

2  Staffing Plan (ECF No. 3693), passim. Defendants' experts opine

3  that the 2009 Staffing Plan "will provide adequate resources to

4  meet the mental health needs of inmates in a reasonable manner and

5  within the standard of care." Clinical Exp. Rpt. (ECF No. 4275-5)

6  at 14.   That opinion comports with defendants' representation to

7  the California Legislature that full implementation of that plan

8  was necessary.

9      Prior to development of defendants' 2009 Staffing Plan, expert

10 testimony showed that the state had underestimated its mental

11 health staffing needs.  See Brown v. Plata, 131 S.Ct. at 1932 n.5.

12 After submitting the 2009 Staffing Plan to this court, defendants,

13 at the end of 2009, submitted a budget change proposal to the

14 California Legislature to "fully implement" the staffing model

15 described in the 2009 Staffing Plan. Exhibit K to Declaration of

16 Jane E. Kahn in Support of Plaintiffs' Response to Defendants'

17 Motion to Strike or Modify Portions of the Twenty-Fifth Round

18 Monitoring Report of the Special Master, filed February 11, 2013

19 (Ex. K to Decl. Kahn) (ECF No. 4325) at 93.   The budget change

20 proposal described the critical flaws in defendants' prior staffing

21 model, and represented that the 2009 Staffing Plan "identifies

22 appropriate    staffing    levels    to    meet    constitutional

23 standards . . . ." Id. at 95.[46]

24 _____

25   [46] It also asserts that the plan would allow defendants to
   "provide the quantity and quality of Resources needed to achieve
26 compliance with policies and procedures contained in the . . .
   Revised Program Guide" and was "consistent with models for program

1        With their motion, defendants present evidence that for Fiscal

2   Year 2012/2013, the ratios in the 2009 Staffing Plan require

3   2268.26 staff positions.  Decl. Toche (ECF No. 4275-3) ¶ 6.[47]

4   Defendants admit that as of the end of November 2012, there were

5   653.86 mental health staffing vacancies.  Id. at ¶ 8.  This

6   represents a total vacancy rate of approximately 29 percent.  The

7   cited declaration does not provide specific vacancy rates by staff

8   classification or mental health delivery service level.  Thus,

9   there is no way to tell from defendants' motion what the vacancy

10  rate is for mental health providers.

11       The Special Master, on the other hand, provided the parties

12  and the court with a detailed report of staffing vacancies in his

13  his Twenty-Fifth Round Report. That report covers much of the same

14  time period, May 1 2012 through September 11, 2012, as defendants'

15  declaration. (ECF No. 4298) at 10.  The Special Master reports a

16  vacancy rate among staff psychiatrists of 42 percent, with use of

17  contract psychiatrists reducing that rate to 26 percent.  Id at 45.

18  The vacancy rate among staff psychologists and social workers was

19  reported at  21 and 24 percent, respectively.  Id. at 45-46.

20  _____

21  staffing in similarly situated models in other states." Ex. K to
    Decl. Kahn at 98.
22

23       [47]   Funding for FY 2012/2013 covers "nearly 100%" of those
    positions.  Decl. Toche at ¶ 6.  To provide salary savings, the
    state is not funding "approximately two non-critical positions at
24  each institution . . . includ[ing]:  (1) a second Chief
    Psychologist, except at Pelican Bay State Prison; (2) the
25  Correctional Health Services Administrator II; and (3) one Clinical
    Psychologist at the five prisons without designated mental health
26  programs."  Id.

1  Contractors reduced those vacancy rates to 17 and 20 percent,
2  respectively.  Id.

3      The 29% staffing vacancy rate at the end of November 2012
4  attested to by defendants is higher than that reported by the
5  Special Master in his Twenty-Fifth Round Report.  The Special
6  Master reported an overall vacancy rate of 21.2 percent, lowered
7  only marginally to 18.3 percent through use of contractors.
8  Twenty-Fifth Round Report (ECF No. 4298) at 44.  Significantly, the
9  Special Master reported that "[t]his was a reversal of the trend
10 of consistently declining vacancy rates across preceding monitoring
11 periods.  It signaled a significant departure from the overall
12 mental health vacancy rate of 14 percent and the overall functional
13 vacancy rate of 7.7 percent that was reported for the twenty-third
14 monitoring period", from October 2010 to April 2011, "the most
15 recent review period in which all institutions were audited."  Id.
16 at 44.

17     Altogether, the vacancy rates in these three clinical
18 categories significantly exceed the 10 percent maximum vacancy rate
19 in those positions required by this court's June 12, 2002 Order
20 (ECF No. 1383).  See Twenty-Fifth Round Report (ECF No. 4298) at
21 44.  The Special Master concluded,

22          Clinical staff are the conduit for the
            delivery of care to patients.  Without
23          necessary staff, the chain of care is broken
            and patients are not treated.  This sort of
24          breakdown manifests itself in, among other
            things, inadequate attendance by required
25          clinical staff at IDTT meetings, delays in
            clinical contacts, and untimely completion of
26          referrals for inmates who require higher

levels of care, all of which undermine
progress that has been made with the delivery
of care.

Id. at 47.[44]   The Special Master's expert on suicide prevention,

---

[44] The Special Master reported on vacancies in the following
staffing classifications.  All of the staffing classifications are
required by the Revised Program Guide and provided for in
defendants' 2009 Staffing Plan.

- Chief Psychiatrists:    33 percent vacancy rate in 18
  allocated positions; no contract coverage for any vacant
  position.    Six institutions "operated without chief
  psychiatrists," including CSP/LAC, which was without a chief
  psychiatrist for the fourth consecutive monitoring period.

- Senior Psychiatrists:    50 percent vacancy rate; nine
  institutions filled all positions; one institution had one of
  three positions filled; nine institutions had 100 percent
  vacancy rates; no vacancies covered by contractors.

- Staff Psychiatrists:    42 percent vacancy rate; use of
  contractors reduced functional vacancy rate to 26 percent;
  including contract coverage, six institutions had vacancy
  rates of 10% or less; seventeen institutions had vacancy
  rates from 11 percent to 50 percent; seven institutions had
  vacancy rates from 54 percent to 83 percent, and four
  institutions "did not fill any of their line psychiatry
  allocations with full-time psychiatrists."

- Chief Psychologists:    7 percent vacancy rate; 26 of 28
  positions filled; no contract coverage for remaining two
  positions.

- Senior Psychologists:    39 percent vacancy rate; no
  contractors used to cover vacancies; seven institutions were
  filled or nearly filled; fifteen institutions had vacancy
  rates from 20 to 50 percent; six institutions had vacancy
  rates from 60 percent to 75 percent; and four institutions,
  each with one position, had not filled the position.

- Staff Psychologists:    21 percent vacancy rate; use of
  contractors reduced functional vacancy rate to 17 percent.
  Fifteen institutions had all their positions or a vacancy
  rate under 10 percent either through filled positions or use
  of contractors;  eleven institutions had vacancy rates from
  13 percent to 30 percent; and six institutions had vacancy
  rates from 31 percent to 65 percent.

1    Dr. Patterson, also reported that the lack of adequate mental

2    health staff "continues to exacerbate" the inadequacies in

3    assessment, treatment and interventions that were present in 73.5%

4    of the inmate suicides committed in CDCR prisons in 2011. 2011

5    Suicide Report (ECF No. 4308) at 16. CDCR suicide reviews have

6    also identified the impact of staffing shortages in their reviews

7    of several inmate suicides in 2011 and 2012. See Decl. Kahn (ECF

8    No. 4325) ¶¶ 6f, g, h, 9c.[45]

9           Despite this, defendants assert, in conclusory fashion, that

10   _____

11   •   Social Workers: 24 percent vacancy rate; use of contractors
         made functional vacancy rate 20 percent; five institutions
12       filled all their positions; two had functional vacancy rates
         below ten percent; ten institutions had vacancy rates from 11
13       to 29 percent; nine institutions had vacancy rates from 30
         percent to 59 percent; and two institutions had vacancy rates
14       of 67 percent and 69 percent, respectively.

15   •   Psych techs:  6.5 percent vacancy rate; functional vacancy
         rate of five percent.
16
     •   Recreational therapists: 26 percent vacancy rate; negligible
17       use of contractors; six institutions filled all positions;
         three institutions had vacancy rates under 10 percent; ten
18       institutions had vacancy rates between 13 and 50 percent;
         three institutions had vacancy rates of 57 percent, 71
19       percent, and 75 percent, respectively, and three institutions
         did not fill their recreational therapist positions.
20
     •   Office techs:  33 percent vacancy rate; use of contractors
21       reduced functional vacancy rate to 32 percent.  Five
         institutions had full coverate; twenty-one institutions had
22       vacancy rates from 14 to 50 percent; four institutions had
         vacancy rates ranging from 56 to 67 percent; and two
23       institutions, each with a .5 position, had no office tech.

24   Twenty-Fifth Round Report (ECF No. 4248) at 52-56.

25       [45]  The staffing shortages referred to in two of these reviews
     appear to be shortages of custody staff (¶ 6g) and medical staff
26   (¶ 9c).

                                  59

1   notwithstanding these vacancies, "[a]dequate numbers of mental

2   health professionals and administrators" are providing class member

3   inmates with "access to high-quality mental health care."   Decl.

4   Toche at ¶ 10.[46]   This conclusory assertion is belied by

5   substantial evidence in the record, including the fact that as of

6   the end of November 2012 defendants had a vacancy rate approaching

---

[46]   In addition, in their objections to the Special Master's Twenty-Fifth Round Report reserved for consideration on this motion, defendants challenge the requirement that clinical vacancy rates not exceed ten percent; object to "the special master's conclusion that mental health clinical staff positions were established because CDCR mental health deemed they were clinically necessary to meet the needs of the inmate population", contending instead that the staffing allocation plan "'represents a comprehensive, optimal staffing model with regard to CDCR's mental health program needs'" that is subject to reexamination and revision; and contend that no particular staffing rate is mandated by the Constitution.   Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, filed February 19, 2013 (ECF No. 4347) at 23.

Defendants' current objections to the Special Master's findings concerning staffing shortages bear a striking resemblance to their objections to the Magistrate Judge's 1994 findings concerning constitutionally inadequate staffing levels.   Here, defendants contend: (1) they do have mental health staff; (2) the Constitution does not specify the specific number of staff required; and (3) their staffing allocation plan is designed to provide optimal staffing.   Then, they contended: (1) they did have mental health staff; (2) the magistrate judge failed to specify a constitutional minimum number of staff; and (3) a staffing plan in a consultants' report offered at trial exceeded constitutional minima.   See Coleman, 912 F. Supp. at 1306.

Moreover, the evidence tendered by defendants to support their current specific objections consists of "comments" by one of their experts, Dr. Joel Dvoskin.   Dvoskin Comments Regarding Twenty-Fifth Round Report, filed February 19, 2013 (ECF No. 4347-1).   Dr. Dvoskin reports that he was asked by defendants' counsel to "offer [his] initial impression of the 25th Round Monitoring Report of the Special Master."   Id. at 3.   Dr. Dvoskin's "impression" of the Special Master's Report is of no utility to the matters at bar. Indeed, his only relevant comment is that he was leaving the assessment of the quality of psychiatric services being provided to another defense expert, Dr. Scott.   Id. at 7.

30% in staffing levels that defendants themselves have represented are "appropriate" to "meet constitutional standards," (ECF No. 4325), which exceeds the vacancy reported by the Special Master from data gathered through September 11, 2012, and by findings of defendants' own experts.

To meet the requirements of the Eighth Amendment, defendants are required to "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" Coleman v. Wilson, 912 F. Supp. at 1306 (quoting Baila, 595 F. Supp. at 1577). The Clinical Experts' Report tendered by defendants with their termination motion (ECF No. 4275-5), does not show that defendants have "sufficient numbers" of mental health staff in place. Even if it were proper for defendants to back away from the 2009 Staffing Plan, they have not met their burden of proving that they can meet their constitutional obligations with the existing levels of staffing vacancies.[47]  To the contrary, defendants' experts themselves describe worrisome staffing vacancies and significant negative impacts of those vacancies on the delivery of mental health care.  Clinical Exp. Rpt. (ECF No. 4275-5) at 13-15.

For example, defendants' experts report that at Salinas Valley

---

[47] As discussed above, evidence cited by the United States Supreme Court showed that a previous staffing plan was inadequate Defendants represented to the state legislature that the 2009 Staffing Plan would meet their constitutional obligations.  As described in the text, defendants have failed to show how they can meet their constitutional obligations by retreating from the current plan.

State Prison, "[t]he mental health director expressed concerns regarding staffing and space shortages" and the defense experts "were especially concerned with the number of psychiatrists on staff there." <u>Id.</u> at 14.    Concerns regarding mental health staffing shortages were also reported to the defense experts at Pelican Bay State Prison; at California Men's Colony, where staff reported that the shortages "adversely impacted their ability to provide care to inmates"; and at the Substance Abuse Treatment Facility (SATF), where "mental health staff reported dramatic mental health staffing shortages." <u>Id.</u> at 15.  Defendants experts found the staffing shortages at SATF "particularly apparent for recreational therapy and psychiatry" and that "[d]ue to significant psychiatric staffing shortages, psychiatrists were not present for many Interdisciplinary Treatment Team meetings, with the exception of the Mental Health Crisis Bed Unit" even though they are "essential members of the treatment team and should be present." <u>Id.</u>  These findings mirror the conclusion of the Special Master in his Twenty-Fifth Round Monitoring Report.

In short, defendants have not met their initial burden of showing that seriously mentally ill inmates in the CDCR no longer face substantial risk of serious harm due to significant shortages in mental health staffing.  Chronic understaffing continues to hamper the delivery of constitutionally adequate medical care and is a central part of the ongoing constitutional violation in this action.

////

1                    6.  <u>Deliberate Indifference</u>

2          Relying on the opinion of their experts, defendants contend

3    that they are no longer acting with deliberate indifference to the

4    serious mental health needs of the plaintiff class.  <u>See</u>, <u>e.g.</u>,

5    Termination Motion (ECF No. 4275-1) at 11. (citing Clinical Ex.

6    Rpt. at 2, 8).   The court is not persuaded that defendants have

7    focused on the proper analysis of this factor in this context.

8          In order to obtain injunctive relief for an Eighth Amendment

9    violation, plaintiffs must present evidence sufficient to give rise

10   to an inference that defendants are "knowingly and unreasonably

11   disregarding an objectively intolerable risk of harm" and that

12   defendants will continue to disregard the risk into the future.

13   <u>Farmer v. Brennan</u>, 511 U.S. at 846.   To avoid entry of an

14   injunction, defendants may prove either that they were unaware of

15   the risk of harm or that they have responded reasonably to it.  <u>Id.</u>

16         Defendants were found to be deliberately indifferent at the

17   initial phase of these proceedings.   Since then, they have been

18   under a series of court orders to develop and implement plans to

19   remedy the serious inadequacies in the delivery of mental health

20   care to prison inmates.   The court also appointed a Special Master

21   whose very purpose, among other things, has been to insure that

22   defendants do not remain deliberately indifferent to their duty to

23   remedy the constitutional violation in this action.   Where, as

24   here, defendants were found to be deliberately indifferent in the

25   initial phase of these proceedings, they must  either comply with

26   the court-ordered relief to remedy the identified violation or

establish that the identified violation has been remedied in another way. They can no longer act in a manner that is deliberately indifferent to the objective violation without risking contempt.

At most, the relevant subjective inquiry turns on the policies defendants have adopted to remedy the harm and the manner and extent to which those policies have been implemented and are being administered. See Helling v. McKinney, 509 U.S. 25, 36 (1993); see also Hadix v. Johnson, 367 F.3d 513, 516 (6th Cir. 2004) (where court is concerned with "future conduct to correct prison conditions," finding of objectively unconstitutional conditions also satisfies subjective prong because the same information that leads to court's conclusion is also available to prison officials).[48] As discussed above, defendants have either failed to adequately implement and administer necessary components of their suicide prevention program and other critical parts of their remedial plan, the Revised Program Guide, or they have not yet completed tasks essential to full implementation of those component parts of their mental health delivery system. Systemic failures persist in the form of inadequate suicide prevention measures,

---

[48]   To the extent that defendants contend certain specific steps are not constitutionally required, the argument misses the mark. "A court may order 'relief that the Constitution would not of its own force initially require if such relief is necessary to remedy a constitutional violation'." Sharp v. Weston, 233 F.3d 1166, 1173 (9th Cir. 2000) (quoting Toussaint v. McCarthy, 801 F.2d 1080, 1087 (9th Cir. 1986)). In addition, defendants have the burden of demonstrating that relief ordered by this court exceeds what is necessary to remedy ongoing constitutional violations. Graves, 623 F.3d at 1051. Defendants have not met this burden.

1   excessive administrative segregation of the mentally ill, lack of

2   timely access to adequate care, insufficient treatment space and

3   access to beds, and unmet staffing needs. Per Hadix, supra, these

4   objectively unconstitutional conditions evidence the subjective

5   component of deliberate indifference.

6       Further, based on defendants' conduct to date, the court

7   cannot rely on their averments of good faith as a basis for

8   granting termination. There is overwhelming evidence in the record

9   that much of defendants' progress to date is due to the pressure

10  of this and other litigation.  While defendants take credit for

11  building the Correctional Health Care Facility (CHCF), which will

12  substantially remedy the ongoing shortages in necessary beds, that

13  project came into existence because of the Receiver in Plata.

14  Defendants' current mental health bed plan, current mental health

15  staff plan, and sustainable process for referring inmates to

16  necessary inpatient care were the result of numerous court orders

17  and years of effort by the Special Master, defendants, and

18  plaintiffs' counsel.

19      In light of the foregoing, I am satisfied that outstanding

20  orders for prospective relief remain necessary to correct current

21  and ongoing violations in the delivery of adequate mental health

22  care to plaintiff class members and extend no further than

23  necessary to correct those violations.  I am also satisfied that

24  these orders are narrowly drawn and the least intrusive means to

25  correct the ongoing violations.  The court emphasizes again that

26  the court and the Special Master have been guided throughout the

remedial phase of this action by the view that it is the court's obligation to identify constitutional deficiencies and defendants' obligation to remedy them.  See Coleman, 912 F. Supp. at 1301.  The Special Master has been required numerous times to make specific recommendations for further action by defendants to remedy ongoing constitutional violations, and the court has been required numerous times to issue specific orders to defendants to develop and/or implement plans to remedy ongoing constitutional violations. Defendants have had full and fair opportunities to object to each of the Special Master's recommendations, and to litigate fully the propriety of orders issued by the court.  They must comply with outstanding court orders and complete remediation of ongoing Eighth Amendment violations in the delivery of mental health care to seriously mentally ill inmates in the state's prison system.

> 7.  Prospective Relief Remains Necessary

Defendants bear the burden of showing that outstanding orders for prospective relief "exceed[] what is necessary to correct an ongoing constitutional violation."  Graves, 623 F.3d at 1048. Defendants seek termination of all outstanding prospective relief. They have not identified or addressed particular orders for prospective relief which they contend should be set aside.

With their opposition, plaintiffs filed a separate statement of orders issued by this court over the past four years.  (ECF No. 4409.)  Plaintiffs have identified each outstanding order, as well as those that have expired by their own terms.  Id.  Plaintiffs have also included one or more reasons why outstanding orders

1   remain necessary and otherwise meet the PLRA standards for

2   prospective relief.   <u>Id.</u>

3       The court is satisfied that its outstanding orders for

4   prospective relief remain necessary to correct current and ongoing

5   violations in the delivery of adequate mental health care to

6   plaintiff class members and extend no further than necessary to

7   correct those violations.   The court is also satisfied that these

8   are narrowly drawn and the least intrusive means to correct the

9   ongoing violations.

10       For the foregoing reasons, this court finds that ongoing

11   constitutional violations remain in this action and the prospective

12   relief ordered by this court remains necessary to remedy those

13   violations.   Defendants' motion to terminate under the Prison

14   Litigation Reform Act, 18 U.S.C.§ 3626(b) will be denied.

15   II.   <u>Rule 60(b)(5)</u>

16       Defendants also move to vacate the judgment of this court and

17   orders for prospective relief pursuant to Fed. R. Civ. P. 60(b)(5)

18   on the ground that they are delivering constitutionally adequate

19   mental health care to the plaintiff class.   In relevant part, Rule

20   60(b)(5) provides for relief from a final judgment or other order

21   on the grounds that "the judgment has been satisfied, released, or

22   discharged; . . . or applying it prospectively is no longer

23   equitable." Fed. R. Civ. P. 60(b)(5).   Defendants contend that

24   the court must "vacate its judgment and orders for prospective

25   relief" because they are delivering constitutionally adequate

26   mental health care.   Termination Motion (ECF No. 4275-1) at 31.

1    The court construes this as a request for finding that the judgment

2    has been satisfied and prospective relief is no longer equitable.

3        For the reasons set forth supra, defendants have not met the

4    "more exacting" standard of 18 U.S.C. § 3626(b) for termination of

5    relief in this action. See Gilmore, 220 F.3d at 1007. A fortiori,

6    they are not entitled to relief under Rule 60(b)(5) at this time.

7        In accordance with the above, IT IS HEREBY ORDERED that

8    defendants' January 7, 2013 motion to terminate this action (ECF

9    No. 4275) is DENIED.

10       IT IS SO ORDERED.

11       DATED: April 5, 2013.

12

13

14

15                         LAWRENCE K. KARLTON
                           SENIOR JUDGE
16                         UNITED STATES DISTRICT COURT

17

18

19

20

21

22

23

24

25

26