1
2
3
4          IN THE UNITED STATES DISTRICT COURTS
5        FOR THE EASTERN DISTRICT OF CALIFORNIA
6        AND THE NORTHERN DISTRICT OF CALIFORNIA
7    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
8      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
9

10   RALPH COLEMAN, et al.,

11              Plaintiffs,                NO. 2:90-cv-0520 LKK JFM P

12        v.                              **THREE-JUDGE COURT**

13   EDMUND G. BROWN JR., et al.,

14              Defendants.

15  ────────────────────────────

16   MARCIANO PLATA, et al.,               NO. C01-1351 TEH

17              Plaintiffs,                **THREE-JUDGE COURT**

18        v.                              OPINION AND ORDER
                                          DENYING DEFENDANTS'
19   EDMUND G. BROWN JR., et al.,          MOTION TO VACATE OR
                                          MODIFY POPULATION
20              Defendants.                REDUCTION ORDER

21  ────────────────────────────

22        On January 7, 2013, defendants filed a Motion to Vacate or Modify Population

23   Reduction Order.  Defs.' Mot. to Vacate or Modify Population Reduction Order (ECF No.

24   2506/4280) ("Three-Judge Motion").[1]  Defendants contend that a significant and

25

26        [1] All filings in this Three-Judge Court are included in the individual docket sheets of
     both *Plata v. Brown*, No. C01-1351 TEH (N.D. Cal.), and *Coleman v. Brown*, No. 90-cv-
27   520-LKK (E.D. Cal.).  In this Opinion, when we cite to such filings, we include the docket
     number in *Plata* first, then *Coleman*.  When we cite to filings in the individual cases, we
28   include the docket number and specify whether the filing is from *Plata* or *Coleman*.

unanticipated change in facts renders inequitable our June 30, 2011 Population Reduction Order (amended as of January 29, 2013) ("Order").  They request a complete vacatur of our Order under Federal Rule of Civil Procedure 60(b)(5).  On January 29, 2013, this Court stayed consideration of the Three-Judge Motion.  This Court now lifts that stay and DENIES defendants' Three-Judge Motion.  On February 12, 2013, plaintiffs filed a cross-motion requesting this Court to order defendants to develop institution-specific population caps.  Pls.' Opp'n to Three-Judge Mot. and Cross-Mot. for Additional Relief (ECF No. 2528/4331) ("Pls.' Opp'n" and/or "Cross-Mot.").  This Court DENIES plaintiffs' Cross-Motion.  Defendants must immediately take all steps necessary to comply with this Court's June 30, 2011 Order, as amended by its January 29, 2013 Order, requiring defendants to reduce overall prison population to 137.5% design capacity by December 31, 2013.  We issue a separate order to that effect concurrently herewith.[2]

## I.      PROCEDURAL HISTORY

Given the lengthy history of this case, a brief (or not-so-brief) synopsis is in order.  Defendants seek vacatur of a population reduction order that this Court issued in order to provide remedial relief for Eighth Amendment violations found in two independent legal proceedings.  Aug. 4, 2009 Op. & Order at 54 (ECF No. 2197/3641).  The first, *Coleman v. Brown*, began in 1990 and concerns California's failure to provide constitutionally adequate mental health care to its mentally ill prison population.  The second, *Plata v. Brown*, began in 2001 and concerns the state's failure to provide constitutionally adequate medical health care to its prison population.  In both cases, the district courts found constitutional violations and ordered injunctive relief.  As time passed, however, it became clear that no relief could be effective in either case absent a reduction in the prison population.[3]

_____

[2] Other pending matters are addressed in Part II of this Opinion & Order.  Any matter not specifically mentioned is denied without prejudice.

[3] For those interested in the extensive (and unsuccessful) remedial efforts in both the *Plata* and *Coleman* cases, see our August 4, 2009 Opinion & Order at 10-36 (ECF No. 2197/3641), which provides a detailed summary of those proceedings.

Congress restricted the ability of federal courts to enter a population reduction order in the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (codified in relevant parts at 18 U.S.C. § 3626); Aug. 4, 2009 Op. & Order at 50-51 (ECF No. 2197/3641) (explaining why a population reduction order is a "prisoner release order," as defined by the PLRA, 18 U.S.C. § 3626(g)(4)). Such relief can be provided only by a specially convened three-judge court after it has made specific findings. 18 U.S.C. § 3626(a).

In 2006, the plaintiffs in *Coleman* and *Plata* independently filed motions to convene a three-judge court to enter a population reduction order. Both courts granted plaintiffs' motions and recommended that the cases be assigned to the same three-judge court "[f]or purposes of judicial economy and avoiding the risk of inconsistent judgments." July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *6; July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *8; *see also Brown v. Plata*, 131 S. Ct. 1910, 1922 (2011) ("Because the two cases are interrelated, their limited consolidation for this purpose has a certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement."). The Chief Judge of the United States Court of Appeals for the Ninth Circuit agreed and, on July 26, 2007, convened the instant three-judge district court pursuant to 28 U.S.C. § 2284.[4]

### A.   This Court's August 2009 Opinion & Order

In August 2009, after a fourteen-day trial, this Court issued an Opinion & Order designed to remedy the ongoing constitutional violations with respect to both medical and mental health care in the California prison system. The order directed defendants, including the Governor, then Arnold Schwarzenegger, and the Secretary of the California Department of Rehabilitation and Corrections ("CDCR"), then Matthew Cate, to reduce the institutional prison population to 137.5% design capacity within two years. This Court made extensive findings, as set forth in our 184-page opinion. We repeat here only those findings that are necessary or relevant to the determination of the motions pending before us.

---

[4] In accordance with the circuit's procedure for the assignment of circuit court judges, Judge Stephen Reinhardt was drawn as the third member of this Court.

First, based on the testimony of seven expert witnesses (including Jeffrey Beard[5]), the defendants' own admissions, and the extensive data on prison crowding in the record, this Court found that "crowding is the primary cause of the violation of a Federal right."  18 U.S.C. § 3626(a)(3)(E)(i).[6]  Indeed, we devoted approximately 25% of our Opinion – 46 out of 184 pages – to demonstrating how "crowding creates numerous barriers to the provision of medical and mental health care that result in the constitutional violations. . . ."  Aug. 4, 2009 Op. & Order at 57 (ECF No. 2197/3641); *see id.* at 55-101.  Two barriers were particularly important.  First, a lack of treatment space "prevent[ed] inmates from receiving the care they require."  *Id.* at 57.  Second, "[c]rowding also render[ed] the state incapable of maintaining an adequate staff."  *Id.*  In short, because California had too many prisoners, it lacked the staff and space to provide constitutionally adequate medical health care and mental health care.

Second, after finding that "no other relief will remedy the violation of the Federal right," 18 U.S.C. § 3626(a)(3)(E)(ii), Aug. 4, 2009 Op. & Order at 101-19 (ECF No. 2197/3641), this Court faced the challenging question of designing an order that was "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and [was] the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).  In this context, this meant determining the population level at which defendants could begin to provide constitutionally adequate medical and mental health care.  It was a predictive judgment that, as we acknowledged, was "not an exact science."  Aug. 4, 2009 Op. & Order at 124 (ECF No. 2197/3641) (quoting plaintiffs' expert, Dr. Craig Haney).  Accordingly, this Court considered the testimony of various

---

[5] Jeffrey Beard, who was then the Secretary of the Pennsylvania Department of Corrections and testified on behalf of plaintiffs, has been recently appointed as the new CDCR Secretary.  He has since revised his position on the crowding issue, a point we discuss *infra*.

[6] As stated in our prior Opinion & Order, "the words crowding and overcrowding have the same meaning, and we use them interchangeably."  Aug. 4, 2009 Op. & Order at 56 (ECF No. 2197/3641).

4

experts.  Many of these experts believed that a prison population at 100% design capacity[7] was required.  Plaintiffs' experts, however, sought a population cap at 130% design capacity, believing that constitutional care could be provided at that population level.  Defendants, meanwhile, suggested that if ordered, a population cap at 145% design capacity was the most acceptable, citing a single analysis by the Corrections Independent Review Panel in 2004.  The Panel's analysis, however, suffered from a "potentially fatal flaw," *id.* at 128, in that it failed to account for the ability to provide medical and mental health care.  As this was the critical question, this Court found that "the Panel's 145% estimate clearly exceeds the maximum level at which the state could provide constitutionally adequate medical and mental health care in its prisons." *Id.* at 129.  Evaluating the expert evidence in light of the caution demanded by the PLRA, this Court decided to impose a population cap of 137.5% design capacity. *Id.* at 130.

Third, this Court gave "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).  In fact, we devoted 10 days out of the 14-day trial to the issue of public safety; we also devoted approximately 25% of our Opinion – 49 out of 184 pages – to it.  We concluded that the evidence clearly established that "the state *could* comply with our population reduction order without a significant adverse impact upon public safety or the criminal justice system's operation."  Aug. 4, 2009 Op. & Order at 133 (ECF No. 2197/3641).  Specifically, we identified a variety of measures to reduce prison population: (1) early release through the expansion of good time credits; (2) diversion of technical parole violators; (3) diversion of low-risk offenders with short sentences; (4) expansion of evidence-based rehabilitative programming in prisons or communities; and (5) sentencing reform and other potential population reduction measures. *Id.* at 137-57.  After evaluating the testimony and evidence – including the fact that many of the identified measures had been successfully implemented in

---

[7] "Design capacity" is based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for housing.  Aug. 4, 2009 Op. & Order at 39-42 (ECF No. 2197/3641) (explaining various measures of prison capacity).

other jurisdictions without any meaningful harm – we found that all of these measures could be implemented without adversely affecting public safety or the operation of the criminal justice system. *Id.* at 157-81. Indeed, given the criminogenic nature of overcrowded prisons, *id.* at 133-37, substantial evidence supported the conclusion "that a less crowded prison system would in fact benefit public safety and the proper operation of the criminal justice system." *Id.* at 178. Finally, but perhaps most important, expert testimony – specifically the report of the Expert Panel on Adult Offender Recidivism Reduction Programming – supported the conclusion that these measures could, if implemented in combination, sufficiently reduce prison population to within the range necessary to comply with a 137.5% population cap. *Id.* at 177-81. This Court did not, however, order defendants to adopt any one of these measures. This Court role's was merely to determine that defendants *could* comply with the population reduction order. The question of *how* to do so was properly left to defendants.[8]

Defendants timely appealed to the Supreme Court.

## B.   The Supreme Court's June 2011 Opinion

In June 2011, the Supreme Court affirmed this Court's order in full. Again, we repeat here only those portions of the Supreme Court opinion that are relevant to the motions pending before us. First, with respect to the question of whether overcrowding was the primary cause of ongoing constitutional violations, the Supreme Court noted with approval the extensive evidence presented in our Opinion & Order – specifically, the high rates of vacancy for medical professions, the lack of physical space, and the testimony from experts who testified that crowding was the primary cause of the failure to provide constitutionally adequate medical and mental health care. *Plata*, 131 S. Ct. at 1932-34. In light of this

---

[8] On January 12, 2010, this Court issued an order accepting defendants' two-year plan for achieving a prison population of 137.5% design capacity without ordering implementation of any specific population reduction measures. Rather, this Court ordered defendants to reduce prison population to 167%, 155%, 147%, and 137.5% at six-month benchmarks. Jan. 12, 2010 Order to Reduce Prison Population at 4 (ECF No. 2287/3767). This Court stayed the effective date of that order while the appeal was pending before the Supreme Court. *Id.* at 6.

1   evidence, the Supreme Court deferred to this Court's factual determination that

2   overcrowding was the primary cause of ongoing constitutional violations.  *Id.* at 1932 ("With

3   respect to the three-judge court's factual findings, this Court's review is necessarily

4   deferential.  It is not this Court's place to 'duplicate the role' of the trial court.  The ultimate

5   issue of primary cause presents a mixed question of law and fact; but there, too, 'the mix

6   weighs heavily on the fact side.'  Because the 'district court is better positioned . . . to decide

7   the issue,' our review of the three-judge court's primary cause determination is deferential."

8   (internal citations omitted)).

9          Second, with respect to this Court's determination that a prison population of 137.5%

10  design capacity was necessary in order to begin to solve the ongoing constitutional

11  violations, the Supreme Court was even more solicitous.  The Supreme Court began its

12  discussion by stating:

13          Establishing the population at which the State could begin to
            provide constitutionally adequate medical and mental health care,
14          and the appropriate time frame within which to achieve the
            necessary reduction, requires a degree of judgment.  The inquiry
15          involves uncertain predictions regarding the effects of population
            reductions, as well as difficult determinations regarding the
16          capacity of prison officials to provide adequate care at various
            population levels.  Courts have substantial flexibility when
17          making these judgments.  "Once invoked, 'the scope of a district
            court's equitable powers . . . is broad, for breadth and flexibility
18          are inherent in equitable remedies.'"  *Hutto* [*v. Finney*, 437 U.S.
            678, 687, n.9 (1978)] (quoting *Milliken v. Bradley*, 433 U.S. 267,
19          281, 97 S. Ct. 2749, 53 L. Ed. 2d 745 (1977), in turn quoting
            *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91
20          S. Ct. 1267, 28 L. Ed. 2d 554 (1971)).

21  *Id.* at 1944.  The Supreme Court described the evidence before us, much of which supported

22  "an even more drastic remedy," *id.* at 1945, i.e., a population cap lower than 137.5% design

23  capacity.  Because our Court had closely considered all the evidence, the Supreme Court

24  affirmed our determination that 137.5% was the correct figure, stating that "[t]here are also

25  no scientific tools available to determine the precise population reduction necessary to

26  remedy a constitutional violation of this sort.  The three-judge court made the most precise

27  determination it could in light of the record before it."  *Id.*

28

Third, the Supreme Court recognized that this Court had extensively considered the question of public safety. *Id.* at 1941 ("The court devoted nearly 10 days of trial to the issue of public safety, and it gave the question extensive attention in its opinion."). It expressly noted the evidence cited in our Opinion & Order that other jurisdictions had reduced prison population without adversely affecting public safety. *Id.* at 1942-43. It also listed the measures identified in our Opinion & Order as "various available methods of reducing overcrowding [that] would have little or no impact on public safety." *Id.* at 1943. Specifically, the Supreme Court stated that "[e]xpansion of good-time credits would allow the State to give early release to only those prisoners who pose the least risk of reoffending." *Id.* Again, the Supreme Court deferred to our Court's factual determination, especially as our finding was informed by many experts who "testified on the basis of empirical evidence and extensive experience in the field of prison administration." *Id.* at 1942.

Throughout its opinion, the Supreme Court expressly and repeatedly noted the flexibility of our order, which did not "limit[] the State's authority to run its prisons." *Id.* at 1941. By adopting a population percentage (not a strict number of prisoners to release), our order permits defendants to "choose whether to increase the prisons' capacity through construction or reduce the population." *Id.* at 1941; *see also id.* at 1937-38 (explaining that defendants can also comply through "new construction" and "out-of-state transfers"). Additionally, by identifying various measures by which defendants could reduce the prison population, our order "took account of public safety concerns by giving the State substantial flexibility to select among these and other means of reducing overcrowding." *Id.* at 1943. Furthermore, our order, by not selecting particular classes of prisoners to be released, "g[ave] the State substantial flexibility to determine who should be released." *Id.* at 1940. Finally, because our order is systemwide, "it affords the State flexibility to accommodate differences between institutions." *Id.* at 1940-41. The Supreme Court stated – even more directly than our Court did – that if defendants fail to take advantage of the flexibility that our order permits, they will be required to release some prisoners:

1

2
> The order leaves the choice of means to reduce overcrowding to
> the discretion of state officials.  But absent compliance through
> new construction, out-of-state transfers, or other means – or
> modification of the order upon a further showing by the State –
> the State will be required to release some number of prisoners
> before their full sentences have been served.

3

4

5   *Id.* at 1923.  In such an instance, this Court is empowered to order defendants to develop a

6   plan for the release of prisoners who pose the lowest risk for public safety:

7
> The three-judge court, in its discretion, may also consider
> whether it is appropriate to order the State to begin without delay
> to develop a system to identify prisoners who are unlikely to
> reoffend or who might otherwise be candidates for early release.
> Even with an extension of time to construct new facilities and
> implement other reforms, it may become necessary to release
> prisoners to comply with the court's order.  To do so safely, the
> State should devise systems to select those prisoners least likely
> to jeopardize public safety.  An extension of time may provide
> the State a greater opportunity to refine and elaborate those
> systems.

8

9

10

11

12

13   *Id.* at 1947.  In short, our order – and the Supreme Court's affirmance of our order – left the

14   question of *how* to comply in the discretion of defendants, but not the question of *whether* to

15   comply.

16          In the final section of its opinion, the Supreme Court discussed the possibility of

17   defendants seeking modification of our order.  The Supreme Court was specifically

18   addressing defendants' challenge to the portion of this Court's order requiring them to

19   achieve a prison population of 137.5% design capacity *within two years*.  *Id.* at 1945.  The

20   Supreme Court affirmed this aspect of our order principally because defendants had not

21   requested – either at trial or on appeal – an extension of the two-year timeline.  *Id.* at 1945

22   ("At trial and closing argument before the three-judge court, the State did not argue that

23   reductions should occur over a longer period of time."); *id.* at 1946 ("Notably, the State has

24   not asked this Court to extend the 2-year deadline at this time.").  The Supreme Court also

25   noted that, because our order was stayed pending appeal, defendants effectively will have

26   had four years in which to comply.  *Id.* at 1946 ("The 2-year deadline, however, will not

27   begin to run until this Court issues its judgment.  When that happens, the State will have

28   already had over two years to begin complying with the order of the three-judge court.").

Immediately after affirming this Court's two-year timeline, the Supreme Court discussed the possibility of modification:

> The three-judge court, however, retains the authority, and the responsibility, to make further amendments to the existing order or any modified decree it may enter as warranted by the exercise of its sound discretion. "The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *New York State Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (C.A.2 1983) (Friendly, J.). A court that invokes equity's power to remedy a constitutional violation by an injunction mandating systemic changes to an institution has the continuing duty and responsibility to assess the efficacy and consequences of its order. *Id.*, at 969-971. Experience may teach the necessity for modification or amendment of an earlier decree. To that end, the three-judge court must remain open to a showing or demonstration by either party that the injunction should be altered to ensure that the rights and interests of the parties are given all due and necessary protection.

*Id.* at 1946. If defendants believe that a change has occurred "regarding the time in which a reduction in the prison population can be achieved consistent with public safety," "[a]n extension of time may allow the State to consider changing political, economic, and other circumstances and to take advantage of opportunities for more effective remedies that arise as the Special Master, the Receiver, the prison system, and the three-judge court itself evaluate the progress being made to correct unconstitutional conditions." *Id.*; *see also id.* at 1947 ("An extension of time may provide the State a greater opportunity to refine and elaborate those [systems to select those prisoners least likely to jeopardize public safety]."). Public safety was not the only rationale mentioned by the Supreme Court as a basis for modification. The Supreme Court also stated:

> If significant progress is made toward remedying the underlying constitutional violations, that progress may demonstrate that further population reductions are not necessary or are less urgent than previously believed. *Were the State to make this showing, the three-judge court in the exercise of its discretion could consider whether it is appropriate to extend or modify this timeline.*

*Id.* at 1947 (emphasis added). The Supreme Court concluded by reminding this Court that, if defendants request modification, we "should give any such requests serious consideration." *Id.*

1    **C.    <u>Three-Judge Court Proceedings since June 2011</u>**

2    Having been affirmed, our Court issued an order setting the following schedule by

3    which defendants must reduce the prison population to 137.5% design capacity within two

4    years:

5    Defendants must reduce the population of California's
     thirty-three adult prisons as follows:

6    

7    a.    To no more than 167% of design capacity by
           December 27, 2011.

8    b.    To no more than 155% of design capacity by June 27,
           2012.

9    

10   c.    To no more than 147% of design capacity by
           December 27, 2012.

11   d.    To no more than 137.5% of design capacity by June 27,
           2013.

12   

13   June 30, 2011 Order Requiring Interim Reports at 1-2 (ECF No. 2374/4032).  Defendants

14   were also ordered to file detailed reports at the end of each of the six-month intervals,

15   advising this Court whether they were able to achieve the required population reduction and,

16   if not, why this was the case and what measures they have taken or propose to take to remedy

17   the failure.  *Id.* at 2.  Defendants were also ordered to file monthly reports with "a discussion

18   on whether defendants expect to meet the next six-month benchmark and, if not, what further

19   actions are contemplated and the specific persons responsible for executing those actions."

20   *Id.* at 3.

21   Defendants informed this Court that they would accomplish the population reduction

22   primarily through Assembly Bill 109, often referred to as "Realignment."  Defs.' Resp. to

23   Jan. 12, 2010 Court Order (ECF No. 2365/4016).[9]  Realignment would shift responsibility

24   for criminals who commit "non-serious, non-violent, and non-registerable sex crimes" from

25   the state prison system to county jails.  This would apply both to incarceration and parole

26   <u>supervision and revocation,</u> and to current and future inmates convicted of such crimes.

27   _____

     [9] California had also enacted Senate Bill 18, which made various reforms to its good-
     time credits, parole policy, community rehabilitation programs, and sentences.  Defs.' Resp.
28   to Jan. 12, 2010 Court Order at 4-5 (ECF No. 2365/4016).

Defs.' Resp. to June 30, 2011 Court Order (ECF No. 2387/4043).  Realignment came into effect in October 2011, and its immediate effects were highly productive, as thousands of inmates either serving prison terms or parole revocation terms for "non-serious, non-violent, and non-registerable sex crimes" were shifted to county jails.  Defendants were thus able to comply with the first benchmark, albeit shortly after the deadline.  Defs.' Jan. 6, 2012 Status Report (ECF No. 2411/4141).  It also appeared that Defendants would easily meet the second benchmark and would likely meet the third benchmark.  *Id.*

It soon became equally apparent, however, that Realignment was not sufficient on its own to achieve the 137.5% benchmark by June 2013 or to meet the ultimate population cap at any time thereafter, in the absence of additional actions by defendants.  In February 2012, plaintiffs filed a motion requesting this Court to order defendants to demonstrate how they intended to meet the 137.5% figure by June 2013.  Pls.' Mot. for an Order Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction by June 2013 (ECF No. 2420/4152).  Plaintiffs argued that, based on CDCR's own population projections (as of Fall 2011), defendants would not achieve a prison population of 137.5% by June 2013.  *Id.* at 2-3.  Defendants responded that, because the Fall 2011 projections predated the implementation of Realignment, they were not reliable.  Defs.' Opp'n to Pls.' Mot. for Increased Reporting in Excess of the Court's June 30, 2011 Order at 2-3 (ECF No. 2423/4162).  They stated that the forthcoming Spring 2012 population projections would give a more accurate indication of whether defendants would meet the 137.5% figure by June 2013.  *Id.* at 4.  This Court accepted defendants' representations and denied plaintiffs' motion without prejudice to the filing of a new motion after CDCR published the Spring 2012 population projections.  Mar. 22, 2012 Order Denying Pls.' Feb. 7, 2012 Mot. (ECF No. 2428/4169).

In May 2012, plaintiffs renewed their objection.  Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction by June 2013 (ECF No. 2435/4180).  Plaintiffs correctly observed that, despite defendants' assurances that the Fall 2011 projections were outdated and unreliable, the Spring 2012

population projections were not substantively different. *Id.* at 3-4.[10]  Plaintiffs also pointed to a new public report issued in the intervening months, titled "The Future of California Corrections" (known as "The Blueprint"), in which defendants stated that they would not meet the 137.5% figure by June 2013 and announced their intention to seek modification of this Court's Order.  *See* CDCR, *The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Court Oversight, and Improve the Prison System*, Apr. 2012 ("CDCR Blueprint").[11]  Based on this evidence, plaintiffs repeated their request that this Court order defendants to demonstrate how they would comply with this Court's June 30, 2011 Order.  Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction by June 2013 at 5-6 (ECF No. 2435/4180). They further contended that defendants' delaying tactics and "failure to take reasonable steps to avert a violation of this Court's Order would amount to contempt of court." *Id.* at 6.

Defendants' responsive filing confirmed their intent to seek modification of the Court's Order from 137.5% design capacity to 145% design capacity.  Defs.' Opp'n to Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction by June 2013 at 2 (ECF No. 2442/4191).  Defendants also stated that they did not believe it was appropriate for them to demonstrate how they will achieve 137.5% if they intended to seek modification of that requirement.  *Id.* at 7-8. Defendants responded to the contempt allegation by stating that there is "no doctrine of 'anticipatory contempt.'" *Id.* at 7 (quoting *United States v. Bryan*, 339 U.S. 323, 341 (1950)).

---

[10] Moreover, plaintiffs submitted a declaration from James Austin, an expert in criminology, who explained why defendants' projections for the decline in prison population were overly optimistic. *Id.* at 5-6.

[11] The Blueprint represents defendants' current plan for the California prison system. It, however, makes no attempt to reduce prison crowding further than Realignment.  To the contrary, it calls for the elimination of California's program that houses approximately 9,500 inmates in out-of-state prisons, which – as explained *infra* – will have the result of increasing prison crowding.  The Blueprint is therefore, in all ways relevant, merely the updated version of the Realignment program, and we use the terms Realignment and Blueprint interchangeably.  The Blueprint can be found at http://www.cdcr.ca.gov/2012plan/docs/plan/complete.pdf.

1    This Court ordered supplemental briefing on defendants' anticipated motion to

2    modify.  June 7, 2012 Order Requiring Further Briefing (ECF No. 2445/4193); Aug. 3, 2012

3    2d Order Requiring Further Briefing (ECF No. 2460/4220).[12]  We asked defendants[13] to

4    identify the legal basis for the intended modification, to set forth the factual basis for their

5    modification request, and to answer additional factual questions.  Aug. 3, 2012 Order at 3-4

6    (ECF No. 2460/4220).  Additionally, because defendants had suggested that they were not

7    currently on track to reduce prison population to 137.5% design capacity, this Court asked

8    the following:

9           [I]f the Court ordered defendants "to begin without delay to
            develop a system to identify prisoners who are unlikely to
10          reoffend or who might otherwise be candidates for early release,"
            *Plata*, 131 S. Ct. at 1947, by what date would they be able to do
11          so and, if implemented, how long would it take before the prison
            population could be reduced to 137.5%?  By what other means
12          could the prison population be reduced to 137.5% by June 27,
            2013?  Alternatively, what is the earliest time after that date that
13          defendants contend they could comply with that deadline?

14   *Id.* at 4.  This Court further stated that, until such time as this Court declares otherwise,

15   "defendants shall take all steps necessary to comply with the Court's June 30, 2011 order,

16   including the requirement that the prison population be reduced to 137.5% by June 27,

17   2013."  *Id.*

18          Defendants' responsive briefing identified Federal Rule of Civil Procedure 60(b)(5) as

19   the legal basis for their intended modification request.  Defs.' Resp. to Aug. 3, 2012 2d Order

20

_____

21   [12] Defendants' initial briefing was unclear and did not satisfactorily respond to this
     Court's question as to what the legal and factual basis for the motion to modify would be.
22   Additionally, their answer raised further factual questions.  For example, defendants assured
     this Court that they would not use modification as a delaying tactic because they would seek
23   modification promptly after the prison population fell to 145%, which they projected would
     happen in December 2012.  Defs.' Resp. to June 7, 2012 Order Requiring Further Briefing at
24   1, 2 (ECF No. 2447/4203).  Their projection, however, appeared to be outdated.  The then-
     current prison population was higher than defendants estimated, as the rate of prison
25   population decline was already slowing considerably.  If defendants failed to take additional
     measures until after they filed a motion to modify and would not file the motion until the
26   prison population fell to 145%, it was unclear whether, if ever, a motion would be filed.
     Accordingly, this Court ordered a second round of briefing.
27
     [13] Our order was directed at both parties, but the answers we sought were from
28   defendants only.

14

Requiring Further Briefing at 1-3 (ECF No. 2463/4226).  As their factual basis, defendants stated that they would seek to prove that Eighth Amendment compliance could be achieved with a prison population higher than 137.5% design capacity.  *Id.* at 6 ("Defendants' motion will demonstrate that a population density of 145% does not prohibit Defendants from providing constitutionally adequate care.").  Defendants defiantly refused to answer the final question as to when they would be able to comply with our June 30, 2011 Order,[14] contending that our inquiry – in which we quoted the Supreme Court opinion – was not authorized by the Supreme Court and that it was not necessary to respond because they believed our Order should be dissolved.  *Id.* at 11-12.  Defendants did appear to state, however, that, if the motion to modify were to be denied, they could comply with a six-month extension.  *Id.* at 12  ("If the Court for some reason disagrees and insists that the final benchmark cannot be modified, Defendants' only method of achieving the 137.5% target, without the early release of prisoners or further legislative action to shorten prison time, would be to maintain the out-of-state program.  If the Court were to order that the current out-of-state capacity be maintained and waived the associated state laws, the prison population should reach 137.5% by December 31, 2013.").  Defendants offered no explanation, however, why they could not release low-risk prisoners early or obtain any necessary legislative action for other measures identified in our June 2011 Order.  Plaintiffs again asked this Court to find defendants in contempt, because defendants refused to answer a material question we asked of them and because "Defendants have all but stated that they have no intention of complying with this part of the Court's Orders."  Pls.' Request for Disc. & Order to Show Cause Re: Contempt at 1 (ECF No. 2467/4230).

---

[14] Defendants did answer our other questions.  First, defendants believed it premature to begin modification proceedings before the prison population reached 145%.  Defs.' Resp. to Aug. 3, 2012 2d Order Requiring Further Briefing at 9-10 (ECF No. 2463/4226).  Second, they conceded that their population projections were flawed and now stated that they believed the prison population would reach 145% by February or March 2013, at which point they would seek modification.  *Id.* at 10-11.  As of this date, the prison population is close to 150%.  *See* CDCR, *Weekly Rpt. of Population*, Apr. 3, 2013, *available at* http://www.cdcr.ca.gov/reports_research/offender_information_services_branch/WeeklyWed /TPOP1A/TPOP1Ad130403.pdf.

15

In September 2012, this Court ruled on the pending motions.  Sept. 7, 2012 Order Granting in Part & Denying in Part Pls.' May 9 and Aug. 22, 2012 Mots. (ECF No. 2473/4235).  We stated that the question whether Eighth Amendment compliance could be achieved with a prison population higher than 137.5% design capacity "has already been litigated and decided by this Court and affirmed by the Supreme Court, and this Court is not inclined to permit relitigation of the proper population cap at this time." *Id.* at 2-3.  Accordingly, this Court stated that we were "not inclined to entertain a motion to modify the 137.5% population cap based on the factual circumstances identified by defendants." *Id.* at 2.  This Court further stated that we will, "however, entertain a motion to extend the deadline for compliance with the June 30, 2011 order." *Id.* at 3.  We also ordered defendants to answer the question to which they had failed to respond, *id.* at 3, and we further asked whether "the Governor has the authority . . . under the existing emergency proclamation concerning prison overcrowding" to implement the methods identified in our prior opinion for reducing the prison population to 137.5% design capacity. *Id.* at 3-4.[15]

Defendants filed a response in which they answered the aforementioned questions.  Specifically, they stated that they would need six months to develop a program for releasing low-risk offenders.  Defs.' Resp. to Sept. 7, 2012 Order at 5 (ECF No. 2479/4243).  Additionally, they contended that the available options to achieve 137.5% prison population were limited, partly because they had implemented many of the methods identified in our prior opinion through Realignment[16] and partly because the remaining methods – sentencing reform and further expansion of good time credits – required legislative approval. *Id.* at 3-5; *see also id.* at 4-5 ("[I]t appears unlikely that the existing emergency proclamation confers the Governor with unilateral authority to implement expansion of good time credits or

---

[15] By this time, Edmund G. Brown Jr. had succeeded Arnold Schwarzenegger as Governor.

[16] This contention is inaccurate, for reasons explained in detail *infra*.  In short, Realignment diverted only those who had committed "non-serious, non-violent, and non-registerable sex crimes."  Additionally, the scope of defendants' current good time credits program is very limited, compared to those other jurisdictions – discussed in our prior Opinion & Order – that have safely reduced prison population through good time credits.

sentencing reform."). Nevertheless, defendants advised us that they could comply with a six-month extension, largely by maintaining the out-of-state program. *Id.* at 6 ("Based on the Spring 2012 population projections, by increasing capacity when the California Health Care Facility in Stockton opens and maintaining the out-of-state program, the prison population will reach 137.5% by December 31, 2013.").

Plaintiffs filed a response in which they contended that compliance was far easier than defendants suggested. Pls.' Resp. to Defs.' Resp. to Sept. 7, 2012 Order (ECF No. 2481/4247). According to plaintiffs, it would not take six months "to identify low risk prisoners and develop a good-time credit program." *Id.* at 3. Plaintiffs contended that defendants already had risk instruments by which they could identify low risk prisoners for release and that implementing a good time credit program was quite straightforward. *Id.* Moreover, plaintiffs noted that defendants "made no effort to seek the needed legislation" on good time credits or sentencing reform. *Id.* at 2.[17]

Nevertheless, it appeared, from the parties' filings, that resolution was not far off. Even defendants acknowledged that they could comply by December 2013. The parties disagreed, but perhaps not irreconcilably, over whether defendants could comply by the original date for compliance, June 2013. Accordingly, in October 2012, this Court ordered both parties to meet and confer, to develop, and to submit (preferably jointly) "plans to achieve the required population reduction to 137.5% design capacity by (a) June 27, 2013, and (b) December 27, 2013." Oct. 11, 2012 Order to Develop Plans to Achieve Required Prison Population Reduction at 1 (ECF No. 2485/4251). We asked the parties to include in their plans a discussion of "all of the alternatives that this Court, affirmed by the Supreme Court, found could be implemented without an adverse impact on public safety or the operation of the criminal justice system." *Id.* at 1-2. We asked how compliance could be

---

[17] Additionally, Proposition 36 – the retroactive elimination of three-strikes for non-serious, non-violent offenses – should result in a substantial reduction in the prisoner population. Defendants stated that approximately 2,800 prisoners "could be eligible for resentencing." Defs.' Resp. to Sept. 7, 2012 Order at 6 (ECF No. 2479/4243). Thus, the enactment of Proposition 36 may by itself reduce the prison population by several percentage points.

achieved if defendants returned out-of-state prisoners.  *Id.* at 2.  We further inquired whether any of these alternatives required the waiving of state law or whether they could be achieved by the Governor under his emergency powers.  *Id.* ("Defendants shall identify in their filing, whether joint or separate, which, if any, state laws would have to be waived for the provisions proposed jointly or by either party.  Defendants shall also specify which of these laws may be waived by the Governor and which, if any, it contends that this Court is without authority to waive.  Defendants shall provide justifications for their assertions, and plaintiffs may state their objections to defendants' contentions.").  Finally, we informed the parties "that the Honorable Peter Siggins remains available to assist the parties during the meet-and-confer process."  *Id.* at 3.[18]  The plans were due on January 7, 2013.

In mid-November 2012, defendants advised this Court that they would miss the third benchmark, i.e., they would not achieve a prison population of 147% by December 2012. Accordingly, they sought modification of our June 30, 2011 Order by extending the 147% and the 137.5% requirement by six months each.  Defs.' Nov. 2012 Status Report & Mot. to Modify June 30, 2011 Order (ECF No. 2494/4259).  Plaintiffs opposed the modification, stating that "Defendants' defiant position is only the latest in a long string of filings in which they announce that they will maintain the prison population above the court-ordered cap." Pls.' Opp'n to Mot. to Modify & Order to Show Cause Re: Contempt at 1 (ECF No. 2497/4264).  Plaintiffs again requested this Court to issue an order to show cause regarding contempt.  *Id.* at 1-3.

This Court, being more interested in the January 7 filings, denied most of both parties' requests.  Dec. 6, 2012 Order Denying Defs.' Mot. for Six-Month Extension & Pls.' Mot. for Order to Show Cause Re: Contempt (ECF No. 2499/4269).  With regard to defendants' request for a six-month extension of the 137.5% benchmark, we denied the request as

---

[18] The Honorable Peter Siggins is presently a state Court of Appeal Justice who previously worked as the lead lawyer for the defense of correctional law cases in the Attorney General's Office of the California Department of Justice and as the Legal Affairs Secretary to Governor Schwarzenegger, the original Defendant-Governor in this case. Earlier in the proceedings, he served in a role as a settlement consultant with the consent of all parties.  Aug. 4, 2009 Op. & Order at 48-49 (ECF No. 2197/3641).

premature because the issue was to be addressed in the January 7 filings. *Id.* at 2. With regard to defendants' request for a six-month extension of the 147% benchmark, we granted defendants' request to be relieved of their obligation to file a report. As we stated:

> While the Court is concerned that defendants have not done everything in their power to achieve the 147% benchmark, the Court is more interested at this time in the additional steps that defendants will take to achieve the final 137.5% benchmark.

*Id.* We then denied plaintiffs' contempt motion as premature. *Id.* In concluding, we stated:

> Defendants correctly observe that substantial progress has been made as a result of this Court's orders and the Supreme Court's affirmance of the population reduction order. However, much work remains to be done, and defendants must take further steps to achieve full compliance. The Court expects the parties' proposed plans to provide a specific means for doing so, while providing all the specific information called for in this Order as well as in the October 11, 2012 Order, including without limitation paragraph four of the October Order [in which we inquired whether any of the population reduction measures could be achieved by the Governor under his emergency powers].

*Id.* at 2-3.

On January 7, 2013, both parties filed plans to meet the 137.5% population cap. Defendants' plan suggested that, although compliance by June 2013 would require the outright release of thousands of prisoners, compliance by December 2013 would require virtually no release of prisoners. Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2511/4284).[19] Plaintiffs disputed this and contended that defendants could easily comply by June 2013. Pls.' Statement in Resp. to Oct. 11, 2012 Order Re: Population Reduction (ECF No. 2509/4283). Defendants further contended that virtually every measure identified in their plans required the waiver of state laws, some of which – they asserted – this Court was

---

[19] In September 2012, Defendants stated that they could achieve compliance by December 2013 based on new construction and maintaining the out-of-state program alone, Defs.' Resp. to Sept. 7, 2012 Order at 6 (ECF No. 2479/4243) ("Based on the Spring 2012 population projections, by increasing capacity when the California Health Care Facility in Stockton opens and maintaining the out-of-state program, the prison population will reach 137.5% by December 31, 2013."). However, in their January 7 filings, defendants advised this Court that compliance by December 2013, although still feasible, would require the combination of approximately ten other measures. App. A to Grealish Decl. in Supp. of Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2512/4285).

1   without power to waive.[20]  Furthermore, despite our explicit reminder that defendants were

2   obligated to advise this Court which, if any, of the potential measures could be implemented

3   under the Governor's emergency powers, defendants made no answer, although they had

4   previously stated that the current out-of-state prisoner placement program was the only

5   method of meeting the 137.5% goal "without the early release of prisoners or further

6   legislative action to shorten prison time."  Defs.' Resp. to Aug. 3, 2012 2d Order Requiring

7   Further Briefing at 12 (ECF No. 2463/4226).  The Governor had the authority to continue the

8   out-of-state program under his then-existing emergency powers.  Instead of answering our

9   question, the Governor terminated his emergency powers, arrogating unto himself the

10  authority to declare, notwithstanding the orders of this Court, that the crisis in the prisons

11  was resolved.  Gov. Edmund G. Brown Jr., *A Proclamation by the Governor of the State of*

12  *California*, Jan. 8, 2013 ("[P]rison crowding no longer poses safety risks to prison staff or

13  inmates, nor does it inhibit the delivery of timely and effective health care services to

14  inmates.") ("Gov. Brown, Jan. 8, 2013 Proclamation").[21]

15         Equally significant for our purposes, defendants also filed on January 7, 2013,

16  motions to terminate the ongoing proceedings.  In this Court, defendants filed the Three-

17  Judge Motion, which did not seek modification of the Order to 145% or renew their request

18  to extend the deadline by six months.  Rather, defendants requested complete vacatur of our

19  Order.  *Id.* at 3.  In the *Coleman* court, defendants also filed a motion to terminate all

20  injunctive relief in that case.  Mot. to Terminate & to Vacate J. & Orders (*Coleman* ECF No.

21  4275).  Notably, defendants did not file a similar motion in the *Plata* court.

22         This Court ordered supplemental briefing and amended our June 2011 Order.  Jan. 29,

23  2013 Order Re: Three-Judge Mot. (ECF No. 2527/4317).  Defendants were ordered to advise

24  the Court whether they intended to file a motion to terminate in *Plata*.  *Id.* at 1-2.  In the

---

25         [20] Despite their assertions that complying with the 137.5% population cap might, in

26  some circumstances, require waiving or modifying state laws, defendants have not sought

27  such change or modification from the Legislature (aside from the 2011 Realignment
    legislation), nor have they requested this Court to take such action.

28         [21] Available at http://gov.ca.gov/news.php?id=17885.

meantime, this Court stayed consideration of the Three-Judge Motion. *Id.* at 2. Plaintiffs, who had failed to respond to the Three-Judge Motion, were ordered to file a response and provide good cause for their failure to do so by the applicable deadline. *Id.* Finally, defendants – who had stated in their January status report that, despite not being in compliance with this Court's order, they would take no further action to comply with it, Defs.' Jan. 2013 Status Report at 1 (ECF No. 2518/4292) ("Based on the evidence submitted in support of the State's motions, further population reductions are not needed . . . .") – were specifically ordered once again to comply with their continuing obligation to follow this Court's Order. Jan. 29, 2013 Order at 2 (ECF No. 2527/4317) ("Neither defendants' filings of the papers filed thus far nor any motions, declarations, affidavits, or other papers filed subsequently shall serve as a justification for their failure to file and report or take any other actions required by this Court's Order."). This Court then granted defendants a six-month extension so that they could more easily comply with this Court's Order. *Id.* at 2-3. In both of defendants' subsequent status reports, however, they have repeated verbatim the statement from their January status report that they would not make any further attempts to comply with the Order. Defs.' Feb. 2013 Status Report at 1 (ECF No. 2538/4342) ("Based on the evidence submitted in support of the State's motions, further population reductions are not needed . . . ."); Defs.' March 2013 Status Report at 1 (ECF No. 2569/4402) (same). Despite our specific reminders, at no point over the past several months have defendants indicated any willingness to comply, or made any attempt to comply, with the orders of this Court. In fact, they have blatantly defied them.

On February 12, 2013, plaintiffs filed a response to the Three-Judge Motion and requested additional relief, which we discuss in greater detail below. Pls.' Opp'n & Cross-Mot. (ECF No. 2528/4331). On the same day, defendants filed a response to our January 29, 2013 order, requesting this Court to lift the stay. Def's Resp. to Jan 29, 2013 Order (ECF No. 2529/4332) ("Defs.' Resp."). On February 14, 2013, plaintiffs filed a motion opposing defendants' request to lift the stay. Pls.' Opp'n to Defs.' Mot. to Lift Stay (ECF No. 2535/4338). On February 19, 2013, defendants filed a reply, in which they moved to strike

21

various portions of plaintiffs' February 12, 2013 response and plaintiffs' February 14, 2013 opposition.  Defs.' Reply Br. in Supp. of Three-Judge Mot. (ECF No. 2543/4345) ("Defs.' Reply").  On February 26, 2013, plaintiffs filed a reply.  Pls.' Reply Br. in Supp. of Counter-Mot. (ECF No. 2551/4355).

On March 11, 2013, plaintiffs filed a request for leave to file a supplemental brief in opposition to defendants' Three-Judge Motion and in support of their Cross-Motion.  Pls.' Supp. Br. Re: Mot. to Vacate or Modify (ECF No. 2562/4373).  On March 18, 2013, defendants filed a response opposing this request.  Defs.' Opp'n to Pls.' Supp. Br. Re: Mot. to Vacate or Modify (ECF No. 2573/4415).  On March 20, 2013, plaintiffs requested that some of their filings in the *Coleman* termination proceedings be included as part of the record in this Court.  Req. for Pls.' *Coleman* Filings to Be Deemed & Considered as Supp. Pleadings in Opp'n to Defs.' Three-Judge Mot. & in Supp. of Pls.' Counter-Mot. (ECF No. 2577/4426).  Defendants filed an opposition to this request.  Defs.' Opp'n to Pls.' Req. (ECF No. 2588/4533).

The pending matters before this Court are as follows:

- Defendants' Three-Judge Motion, filed on January 7, 2013;

- Order to Show Cause against Plaintiffs, filed on January 29, 2013;

- Defendants' Request to Lift Stay, filed on February 12, 2013;

- Plaintiffs' Cross-Motion, filed on February 12, 2013;

- Defendants' Motion to Strike Plaintiffs' Opposition to Defendants' Request to Lift Stay, filed on February 19, 2013;

- Defendants' Motions to Strike Portions of Plaintiffs' Opposition to Three-Judge Motion, filed on February 19, 2013;

- Plaintiffs' Request for Leave to File a Supplemental Brief in Opposition to Defendants' Three-Judge Motion and in support of their Counter-Motion, filed on March 11, 2013; and

- Plaintiffs' Request for *Coleman* Filings to Supplement their Opposition to Defendants' Three-Judge Motion and in support of their Counter-Motion, filed on March 20, 2013.

We decide each of these matters in this Opinion, but withhold for now any order that may be warranted by defendants' contumacious conduct.

22

## II.    PRELIMINARY MATTERS

Defendants' Three-Judge Motion and plaintiffs' Cross-Motion are critical to the outcome of this litigation and we give special consideration to each below.  Before doing so, this Court addresses the other pending matters.  For the reasons discussed below, this Court first DISCHARGES the order to show cause against plaintiffs.  Second, this Court GRANTS defendants' request to lift the stay on consideration of the Three-Judge Motion.  Accordingly, this Court VACATES as moot defendants' motion to strike plaintiffs' opposition to defendants' request to lift the stay and DENIES both of plaintiffs' requests to supplement their opposition to defendants' Three-Judge Motion and in support of their Cross-Motion. Third, this Court DENIES defendants' motions to strike portions of Plaintiffs' Opposition.

### A.    <u>Order to Show Cause</u>

On January 29, 2013, this Court ordered plaintiffs to show cause for their failure to file a timely reply to the Three-Judge Motion.  Jan. 29, 2013 Order at 2 (ECF No. 2527/4317).  Under our April 25, 2008 Order, plaintiffs were required to file a reply by January 21, 2013 but failed to do so.  On February 12, 2013, plaintiffs explained their failure as follows:

> Plaintiffs incorrectly relied on this Court's October 10, 2007 Order (*Plata* Dkt. No. 880) regarding briefing schedules, which [cites to Local Rule 78-230, stating that the court will issue an order establishing a briefing schedule after a motion has been filed].  Plaintiffs neglected to note that the order had been superseded by this Court April 25, 2008 Order.  Plaintiffs regret the inconvenience to this Court and to defendants.

Pls.' Opp'n at 27-28 (ECF No. 2528/4331).  Defendants respond that this excuse is insufficient, and that we should deem the Three-Judge Motion unopposed and submitted. Defs.' Reply at 1 n.1 (ECF No. 2543/4345).

Reviewing the matter, this Court elects not to exercise its discretion to find plaintiffs in contempt and DISCHARGES the January 29, 2013 order to show cause.  Plaintiffs are reminded, however, to follow this Court's deadlines in the future.

//

//

1          **B.      Lifting the Stay and Related Matters**

2          On January 29, 2013, this Court issued an order staying consideration of the Three-

3   Judge Motion.  As we stated in that order, "one of defendants' principal contentions in the

4   Three-Judge Motion is that there are no ongoing systemwide constitutional violations in

5   medical and mental health care." Jan. 29, 2013 Order at 1 (ECF No. 2527/4317).

6   Defendants made that same argument with respect to mental health care in the motion to

7   terminate in *Coleman*.  However, defendants had not made the same argument with respect to

8   medical health care in *Plata*.  As we stated in that order, "[i]t would be a waste of judicial

9   resources for this Court to begin to determine any issue until it is made aware of defendants'

10  filing plans regarding the constitutional question [in *Plata*.]"  *Id.* at 2.  This Court ordered

11  defendants to advise us whether they intended to file a motion to terminate in *Plata* and, if

12  so, when.  Accordingly, we stayed our consideration of the Three-Judge Motion pending an

13  answer as to defendants' intentions regarding the constitutional question in *Plata*.

14         On February 12, 2013, defendants requested that this Court lift the stay on the Three-

15  Judge Motion.  Defs.' Resp. at 1 (ECF No. 2529/4332).  Specifically, defendants modified

16  their Three-Judge Motion such that it is no longer based on the constitutional question but

17  solely on the claim that "the greatly reduced prison population is [no longer] the primary

18  barrier prohibiting the State from providing constitutionally adequate medical and mental

19  health care."  *Id.* at 4.  Defendants also contend that they have provided sufficient evidence in

20  the Three-Judge Motion to prevail on this claim.  *Id.* at 1 ("It is unnecessary for the State to

21  bring a motion to terminate *Plata* for this Court to decide the pending motion because more

22  than enough evidence has already been presented."); *id.* at 5 ("[T]he State must show – as it

23  has in the motion to vacate – that the greatly reduced current population levels do not prevent

24  the State from providing constitutionally adequate medical and mental health care."); *see*

25  *generally* Defs.' Reply at 2-10 (ECF No. 2543/4345) (contending that Defendants have

26  "carried their burden" in the "motion to vacate and accompanying evidence").  In short,

27  defendants assert that, regardless of the state of the health care that is currently being

28  provided, the primary cause of any failure to provide better care is no longer overcrowding.

24

1   Thus, defendants urge this Court not to delay our adjudication of the Three-Judge Motion

2   and, on the record before us, to vacate the Population Reduction Order of June 30, 2011.

3   Defs.' Resp. at 4, 6 (ECF No. 2529/4332); Defs.' Reply at 18-19 (ECF No. 2543/4345)

4   (opposing plaintiffs' request for discovery as "futile" and urging this Court not to delay).

5   Plaintiffs filed an opposition to lifting the stay on February 14, 2013, Pls.' Opp'n to Defs.'

6   Mot. to Lift Stay (ECF No. 2535/4338), and defendants moved to strike this filing on

7   February 19, 2013.  Defs.' Reply at 18-19 (ECF No. 2543/4345).  Additionally, defendants

8   have opposed both attempts by plaintiffs to supplement their briefing.  Pls.' Supp. Br. Re:

9   Mot. to Vacate or Modify (ECF No. 2562/4373); Defs.' Opp'n to Pls.' Supp. Br.  Re: Mot. to

10  Vacate or Modify (ECF No. 2573/4415); Req. for Pls.' *Coleman* Filings to Be Deemed and

11  Considered as Supp. Pleadings in Opp'n to Defs.' Three-Judge Mot. & in Supp. of Pls.'

12  Counter-Mot. (ECF No. 2577/4426); Defs.' Opp'n to Pls.' Req. (ECF No. 2588/4533).

13         This Court agrees with defendants with regard to the procedural status of these

14  matters.  Defendants have modified the Three-Judge Motion such that it is based not on the

15  constitutional question but solely on the crowding question.  The substantive effect of this

16  modification is discussed *infra*.  The procedural effect is to provide a sufficient basis for

17  lifting the stay of the Three-Judge Motion.  This Court therefore GRANTS defendants'

18  request to lift this Court's stay of our consideration of the Three-Judge Motion.  Accordingly,

19  this Court VACATES as moot defendants' motion to strike plaintiffs' opposition to lifting

20  the stay.  Additionally, because the burden of proof in justifying vacatur lies with defendants

21  and because defendants have repeatedly contended that they have met that burden based on

22  the evidence filed in conjunction with the Three-Judge Motion, this Court finds that there is

23  no need for discovery.  Any pending discovery requests are therefore dismissed, and this

24  Court DENIES both of plaintiffs' requests to supplement their briefing.[22]

25

26         [22] To the extent that specific filings in *Coleman* are particularly relevant to the
    crowding question, and to the extent that defendants have not presented a specific objection
27  to those portions of those filings, this Court takes judicial notice of those filings as
    appropriate. *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (taking judicial
28  notice of declarations filed in a related case).

C.      <u>**Motions To Strike**</u>

Defendants also move to strike two portions of Plaintiffs' Opposition to the Three-Judge Motion.  The first is the section of Plaintiffs' Opposition relying on the declaration by Steven Fama, who describes recent reports that defendants had filed with the Receiver in which defendants explain the need for further improvements to treatment space in the California prison system.  Pls.' Opp'n at 12-14 (ECF No. 2528/4331); Exs. B to I to Fama Decl. in Supp. of Pls.' Opp'n (ECF No. 2528-2/4331-2).  Defendants move to strike this evidence as "inadmissible hearsay and irrelevant."  Defs.' Reply at 2, 5 n.2 (ECF No. 2543/4345).  The second is the section of Plaintiffs' Opposition in which plaintiffs argue that the declarations of Robert Barton and Jeffrey Beard are entitled to little weight.  Pls.' Opp'n at 17-18 (ECF No. 2528/4331).  Defendants moved to strike these arguments as "scurrilous attacks . . . which are unsupported by any evidence."  Defs.' Reply at 2, 6-7 (ECF No. 2543/4345).

Defendants' motions border on the frivolous.  With regard to evidence in the Fama declaration, these reports consist of defendants' requests for additional funding to increase healthcare infrastructure.  Any suggestion that these reports – which demonstrate that defendants themselves represented to other agencies that there is insufficient treatment space in the California prison system – are "irrelevant" to assessing the Three-Judge Motion is clearly meritless.

Nor is their admissibility controversial.  To begin, defendants relegated this argument to a mere footnote and failed to provide any legal analysis in support of their contention regarding hearsay.  It is thereby waived.  *See Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.4 (9th Cir.1996) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal.").  Moreover, these CDCR records would appear to fall under an exception to the rule against hearsay – either as the admission of a party opponent under Federal Rule of Evidence 801(d)(2) or as a public record under Federal Rule of Evidence 803(8).  Finally, any attempt to exclude such evidence from this Court's consideration is meaningless in the context of this case.

1    Defendants have *already* provided these reports to the Receiver.  Because the Receiver is an

2    arm of the Court, not only is this Court entitled to consider such evidence, it is prudent for us

3    to do so.

4            With regard to the Barton and Beard declarations, plaintiffs have presented reasoned

5    arguments why some of the statements in these declarations go beyond the expertise and the

6    information available to Barton and Beard – and therefore why this Court should give little

7    weight to those statements.  These arguments require no evidence, just logic.  We thus find

8    unpersuasive defendants' contention that these arguments must be struck because they

9    "present no competent evidence to rebut the factual statements in those declarations."  Defs.'

10   Reply at 7 (ECF No. 2543/4345).

11           Plaintiffs make arguments with which defendants may disagree, but there is simply no

12   legal basis for striking any portion of Plaintiffs' Opposition.  This Court therefore DENIES

13   defendants' motions to strike, and defendants are advised not to again unnecessarily

14   complicate an already complex case of the utmost public interest with arguments that are

15   patently of little merit.  Such arguments serve no purpose other than to consume the Court's

16   time and further delay the ultimate resolution of the legitimate issues raised by the parties.

17

18   **III.    DEFENDANTS' THREE-JUDGE MOTION**

19           This Court now turns to defendants' Three-Judge Motion.  In that motion, defendants

20   move, under Federal Rule of Civil Procedure 60(b)(5), for vacatur of our Order.  They

21   contend that, due to "the greatly reduced prison population," overcrowding is no longer "the

22   primary barrier prohibiting the State from providing constitutionally adequate medical and

23   mental health care."  Defs.' Resp. at 4 (ECF No. 2529/4332); *see also* Defs.' Reply at 11

24   (ECF No. 2543/4345).  Moreover, Defendants contend that this Court can rely solely on the

25   evidence filed in conjunction with the Three-Judge Motion.  Defs.' Resp. at 1, 5 (ECF No.

26   2529/4332); *see generally* Defs.' Reply (ECF No. 2543/4345).  Having reviewed the relevant

27   evidence in support of the Three-Judge Motion, this Court DENIES that motion for the

28   reasons discussed below.

A.    **Legal Standard**

The legal basis that defendants rely on for their Three-Judge Motion is Federal Rule of Civil Procedure 60(b)(5).[23]  Three-Judge Mot. at 5-6 (ECF No. 2506/4280).  In relevant part, Rule 60(b)(5) permits a party to be relieved from a final judgment or order if "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  In *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992), the Supreme Court set forth a two-pronged inquiry for Rule 60(b)(5) motions.  First, as a threshold matter, the party seeking modification "bears the burden of establishing that a significant change in circumstances warrants revision of the decree."  *Id.* at 383.  Second, "[i]f the moving party meets this standard, the court should

---

[23] Defendants cite two provisions of the PLRA, 18 U.S.C. § 3626(a)(1)(A) & § 3626(a)(3)(E), Three-Judge Mot. at 6-7 (ECF No. 2506/4280), but these provisions do not provide a legal basis for modification or vacatur.  Section 3626(a) of the PLRA relates to the initial grant of prospective relief.  By contrast, § 3626(b) of the PLRA relates to the termination of prospective relief.  Defendants are fully aware of the distinction.  Mot. to Terminate & to Vacate J. & Orders (*Coleman* ECF No. 4275) (seeking termination under 18 U.S.C. § 3626(b)).  Accordingly, the sections of the PLRA cited by defendants provide no legal basis for their motion to vacate the relief ordered by this Court.

Moreover, even if defendants had invoked 18 U.S.C. § 3626(b), this would have had no bearing on our analysis of the Three-Judge Motion for two reasons.  First, the operative provision of § 3626(b) comes into effect "2 years after the date the court granted or approved the prospective relief."  18 U.S.C. § 3626(b)(1)(A)(i).  Because this Court's Order was issued in June 2011, those two years have not yet transpired.  Moreover, even were that not the case, the circumstances in this case would not justify termination under 18 U.S.C. § 3626(b)(1).  This provision was intended by Congress to enable defendants who have dutifully complied with a court order to obtain relief and thus "guard against court-ordered caps dragging on and on, with nothing but the whims of federal judges sustaining them."  H.R. Rep. No. 104–21, at 8 (1995).  Here, however, defendants are not in compliance and actually refuse to take appropriate action, as explained further *infra*.  Permitting Defendants to seek termination when they have not achieved compliance would reward intransigence by Defendants, not police against overly intrusive federal courts.  In sum, applying the termination provision in this case would contravene clear congressional intent.

Second, this Opinion would constitute the "written findings based on the record that prospective relief remains necessary" under 18 U.S.C. § 3626(b)(3).  In *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000), the Ninth Circuit held that, under 18 U.S.C. § 3626(b), a district court is "bound to maintain or modify any form of relief necessary to correct a current and ongoing violation of a federal right, so long as that relief is limited to enforcing the constitutional minimum," *id.* at 1000, and that "nothing in the termination provisions can be said to shift the burden of proof from the party seeking to terminate the prospective relief," *id.* at 1007.  Accordingly, for the reasons explained *infra*, this Court finds that defendants have failed to demonstrate that our population reduction order to 137.5% design capacity no longer "remains necessary to correct a current and ongoing violation of the Federal right," "extends [] further than necessary to correct the violation of the Federal right," or "the prospective relief is [not] narrowly drawn [or is no longer] the least intrusive means to correct the violation."  18 U.S.C. § 3626(b)(3).

28

consider whether the proposed modification is suitably tailored to the changed

circumstances." *Id.* "The party seeking relief bears the burden of establishing that changed

circumstances warrant relief, but once a party carries this burden, a court abuses its discretion

'when it refuses to modify an injunction or consent decree in light of such changes.'" *Horne*

*v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Agostini v. Felton*, 521 U.S. 203, 215 (1997))

(other internal citations omitted).

In meeting the threshold inquiry, the moving party "may not . . . challenge the legal

conclusions on which a prior judgment or order rests." *Id.* Rather, it must point to "a

significant change either in factual conditions or in law" that renders continued enforcement

of a final judgment inequitable. *Id.* (quoting *Rufo*, 502 U.S. at 384). For a change in law, the

moving party must generally demonstrate that "the statutory or decisional law has changed to

make legal what the decree was designed to prevent." *Rufo*, 502 U.S at 388.[24] For a change

in facts, the moving party must demonstrate (1) that "changed factual conditions make

compliance with the decree substantially more onerous"; (2) that "a decree proves to be

unworkable because of unforeseen obstacles"; or (3) that "enforcement of the decree without

modification would be detrimental to the public interest." *Id.* at 384.

A moving party alleging a "significant change in facts" faces an additional burden.

Ordinarily, the party may not rely on "events that actually were anticipated at the time it

entered into a decree." *Id.* at 385. Indeed, in *Rufo*, the Supreme Court remanded for the

district court to "consider whether the [changed circumstance] was foreseen by petitioners."

*Id.*; *see also id.* at 385-87 (explaining why, under the facts of the case, it was unlikely that

petitioners anticipated the changed circumstances). Similarly, in *Agostini v. Felton*, the

Supreme Court rejected a claim of changed factual circumstances based on the "exorbitant

costs of complying," because both parties were "aware that additional costs would be

incurred" due to the court's judgment. 521 U.S. at 215-16. "That these predictions of

---

[24] The Supreme Court also stated that, "[w]hile a decision that clarifies the law will
not, in and of itself, provide a basis for modifying a decree, it could constitute a change in
circumstances that would support modification if the parties had based their agreement on a
misunderstanding of the governing law." *Rufo*, 502 U.S. at 390.

1  additional costs turned out to be accurate does not constitute a change in factual conditions

2  warranting relief under Rule 60(b)(5)." *Id.* at 216.  In short, the moving party must

3  demonstrate a significant and unanticipated change in facts.

4         The touchstone of Rule 60(b)(5) analysis is that "a district court should exercise

5  flexibility in considering requests for modification of an institutional reform consent decree."

6  *Rufo*, 502 U.S. at 383.  "A flexible approach allows courts to ensure that 'responsibility for

7  discharging the State's obligations is returned promptly to the State and its officials' when

8  the circumstances warrant."  *Horne*, 557 U.S. at 450 (quoting *Frew v. Hawkins*, 540 U.S.

9  431, 442 (2004)).  However, "it does not follow that a modification will be warranted in all

10 circumstances.  Rule 60(b)(5) provides that a party may obtain relief from a court order when

11 'it is no longer equitable that the judgment should have prospective application,' not when it

12 is no longer convenient to live with the terms of a consent decree." *Rufo*, 502 U.S. at 383.[25]

13        **B.     Defendants' Argument, Evidence, and Choice of Forum**

14        Since the filing of the Three-Judge Motion, defendants have modified their argument.

15 As explained above, one of defendants' principal contentions in the Three-Judge Motion as

16 filed was the lack of ongoing constitutional violations. Jan. 29, 2013 Order at 1 (ECF No.

17 2527/4317) ("One of defendants' principal contentions in the Three-Judge Motion is that

18 there are no ongoing systemwide constitutional violations in medical and mental health

19 care.").  Defendants have now represented to this Court that they do *not* seek vacatur on the

20 basis that there are no longer ongoing constitutional violations.  Defs.' Resp. at 4 (ECF No.

21 2529/4332) ("The issue to be decided by this Court is not constitutional compliance. . . .").

22 As they now assert, the constitutional question is for the individual *Plata* and *Coleman*

23 _____

24        [25] This Court observes that much of the Supreme Court's case law regarding
   modification or vacatur under Rule 60(b)(5) has arisen in the context of consent decrees.

25 *E.g.*, *Rufo*, 502 U.S. at 383.  Here, we deal not with a consent decree, but with a decree that
   defendants vigorously resisted.  It may well be the case that defendants bear a higher burden
   in the latter case.  It matters not in this case as defendants fail under either scenario.  Here,

26 defendants fall short of meeting the conditions warranting modification or vacatur of a
   consent decree, and fall even shorter of meeting the conditions' application to a contested

27 decree, as many of defendants' arguments are simply restatements of the positions they
   adopted in opposing the decree in the first instance and none involves conditions that were

28 not fully anticipated at the time of the issuance of the decree. *See* discussion *infra*.

1    courts.  *Id.* (stating that "constitutional compliance . . . is for the underlying district courts to

2    decide"); *see also* Defs.' Reply at 11 (ECF No. 2543/4345) ("The constitutionality of the

3    mental health and medical care provided in prison will be decided by the *Coleman* and *Plata*

4    courts respectively and individually.").  The question before this Court is purely remedial,

5    specifically whether a population reduction order is justified – or, to put it in terms

6    defendants might employ, the question is whether a population reduction order is no longer

7    justified.  Defendants now state that the sole basis for their vacatur request is that "the greatly

8    reduced prison population is [no longer] the primary barrier prohibiting the State from

9    providing constitutionally adequate medical and mental health care."  Defs.' Resp. at 4 (ECF

10   No. 2529/4332); *see also* Defs.' Reply at 11 (ECF No. 2543/4345) ("Here, the relevant

11   inquiry is whether overcrowding is no longer the primary barrier to the provision of

12   constitutional care.").  In short, defendants have drastically modified their position and are

13   now, in this motion, challenging only the determination that overcrowding is the primary

14   cause of the unconstitutional prison conditions, not that prison conditions are no longer

15   unconstitutional.

16          This modification is significant, in that defendants have effectively abandoned (at

17   least for purposes of this proceeding) a significant portion of their Three-Judge Motion.  For

18   example, Part III of defendants' Three-Judge Motion was devoted to presenting evidence that

19   "California's Prison Health Care System Exceeds the Level of Care Required By the

20   Constitution."  Three-Judge Mot. at 15-19 (ECF No. 2506/4280).  As would be expected, the

21   argument presented in Part III was that defendants have achieved constitutional compliance.

22   *Id.* at 16 (contending that "the State is already providing" "effective mental health care"); *id.*

23   at 17 (arguing that "the State provides quality prison medical care that 'far exceeds'

24   constitutional minima"); *id.* at 18 (citing the most recent statistics on "likely preventable

25   deaths"); *id.* (citing a statement by Dr. Steven Tharratt as "[f]urther evidence of

26   constitutionality").  Nor was this focus on constitutional compliance limited to Part III.  In

27   the introductory section, defendants authoritatively stated that California prisons have

28   achieved constitutional compliance.  *E.g.*, *id.* at 1 ("California's vastly improved prison

health care system now provides inmates with superior care that far exceeds the minimum requirements of the Constitution.").  In Part IV, defendants contended that, because "adequate medical and mental health care is being provided to California's inmates," they have achieved a durable remedy with respect to the provision of care that complies with the Eighth Amendment.  *Id.* at 19.  Defendants concluded by stating:

> The evidence proves that there are no systemic, current, and ongoing federal law violations.  All evidence indicates that at the current population density, inmates are receiving health care that exceeds constitutional standards.

*Id.* at 21.  Defendants have abandoned these arguments before this Court, and this Court is not required to consider any evidence related solely to the constitutional question, i.e., whether prison conditions continue to remain unconstitutional.

The modification also renders inapplicable case law on which defendants relied in the Three-Judge Motion.  Specifically, defendants repeatedly cited *Horne v. Flores*, 557 U.S. 433.  Three-Judge Mot. at 3, 5-6, 19-20 (ECF No. 2506/4280); *see also* Defs.' Reply at 2 (ECF No. 2543/4345) (criticizing plaintiffs for failing to cite *Horne*).  At issue in *Horne* was a consent decree that was more protective than what federal law required.  The question in *Horne* was whether, although the defendants had not complied with the terms of a consent decree, they were permitted to seek modification under Rule 60(b)(5) on the basis that the underlying "violation of federal law ha[d] been remedied" and thus "the objects of the decree ha[d] been attained."  *Horne*, 557 U.S. at 451, 452 (internal citations omitted).  The Supreme Court held that modification was permissible because, in the context of institutional reform litigation, district courts must flexibly analyze changed circumstances.  *Id.* at 455-56.  *Horne* is inapplicable here.  Most obviously, we do not deal with a consent decree that was more protective than what federal law required.  More fundamental, the *Horne*-type argument for modification – that defendants have remedied the underlying constitutional violation – is no longer before this Court, as per defendants' modification of the motion.

Additionally, in the Three-Judge Motion, defendants relied on a particular passage from the Supreme Court opinion in this case:

1

2
> As the State makes further progress, the three-judge court should
> evaluate whether its order remains appropriate.  If significant
3
> progress is made toward *remedying the underlying constitutional*
> *violations*, that progress may demonstrate that further population
> reductions are not necessary or are less urgent than previously
4
> believed.  *Were the State to make this showing, the three-judge*
> *court in the exercise of its discretion could consider whether it is*
5
> *appropriate to extend or modify this timeline.*

6    *Plata*, 131 S. Ct. at 1947 (emphasis added); Three-Judge Mot. at 3 (ECF No. 2506/4280); *see*

7    *also* Defs.' Reply at 3 (ECF No. 2543/4345).  In this passage, the Supreme Court suggested

8    that defendants could seek modification if they had "remed[ied] the underlying constitutional

9    violations."  That contention, however, is no longer the basis for defendants' Three-Judge

10   Motion, as per their own modification.[26]

11       Plaintiffs object to defendants' modification of their motion.  Plaintiffs devoted a

12   substantial portion of their February 12, 2013 response to the question of constitutional

13   compliance.  Pls.' Opp'n at 1-2, 4-8, 15-17, 20-21 (ECF No. 2528/4331).  After defendants

14   modified their argument and disavowed any reliance on constitutional compliance in their

15   February 12, 2013 filing, plaintiffs filed papers objecting to defendants' revised position.

16   Pls.' Opp'n to Defs.' Mot. to Lift Stay (ECF No. 2535/4338).  Specifically, plaintiffs assert

17   that defendants are "attempt[ing] to shift the basis for their motion to vacate the Population

18   Reduction Order."  *Id.* at 2.  They state that defendants' contention – that crowding is no

19   longer the primary cause of any ongoing violations – "was not raised in the motion, nor did

20   Defendants submit evidence to support it."  *Id.*  Accordingly, plaintiffs ask this Court to deny

21   the Three-Judge Motion.

22       Although this Court is sympathetic to plaintiffs' objection, it does not establish a

23   sufficient basis for denying the Three-Judge Motion for two reasons.  First, defendants'

24   contention regarding crowding was, in fact, raised in the Three-Judge Motion.  Specifically,

25   Part II of the motion is devoted to the question of crowding.  Plaintiffs are therefore incorrect

26

27       [26] Even if this passage were applicable to the crowding issue, the proper conclusion to
draw would be that, if defendants can prove crowding is a "less urgent" problem, this Court
should "extend or modify" the two-year timeline – which this Court has already done – not
28   vacate the population reduction order.

to state that defendants are "shifting the basis for their motion." Rather, as explained above, defendants are abandoning a principal argument. Second, plaintiffs are not prejudiced by defendants' modification. In fact, as explained above, the Three-Judge Motion is now more limited in its evidentiary and legal support. Moreover, defendants simultaneously contend that they have provided sufficient evidence in their Three-Judge Motion to prevail. Defs.' Resp. at 1, 5 (ECF No. 2529/4332); *see generally* Defs.' Reply (ECF No. 2543/4345). By abandoning a significant portion of the Three-Judge Motion *and* simultaneously advising this Court that it need look no further than the Three-Judge Motion, defendants have adopted a position that benefits plaintiffs.

Before considering defendants' Three-Judge Motion, as modified, we make clear that we do not decide here whether the question of the continuing unconstitutionality of prison conditions should be presented to this Three-Judge Court, or to the underlying one-judge courts – in this case, the *Plata* and *Coleman* courts respectively – or whether it may be presented to either. Nor do we determine whether the Three-Judge Court may decide, within its discretion, on the basis of the particular circumstances of the litigation involved, which forum or fora are appropriate for making the determination of such claim or claims. Here, after vacillating between this Three-Judge Court and the respective *Plata* and *Coleman* one-judge courts, defendants decided to withdraw the question from this Three-Judge Court and have presented it thus far only to the *Coleman* court, which held on the merits that "ongoing constitutional violations remain" "in the delivery of adequate mental health care." Apr. 5, 2013 Order at 67 (ECF No. 4539 *Coleman*). Plaintiffs protested the withdrawal of the question from the Three-Judge Court only on the ground that defendants were changing the basis of their motion, an argument that we reject *supra*. In this case, under all of the circumstances, this Court offers no objection to the withdrawal of the question whether

//

//

//

//

34

1    medical and mental health care services are still provided at an unconstitutional level or the

2    timely presentation of that question to the *Coleman* court.[27]

3              **C.      Analysis of Three-Judge Motion, as Modified**

4              In light of defendants' modification, this Court now turns to the only relevant portion

5    of the Three-Judge Motion: Part II, in which defendants contend that "the Prison Population

6    Does Not Prevent the State From Providing Constitutionally Adequate Care."  Three-Judge

7    Mot. at 7-15 (ECF No. 2506/4280).  Having closely reviewed the arguments and evidence

8    contained therein, this Court DENIES the Three-Judge Motion for three reasons.  First,

9    defendants have not identified a proper basis for modification or vacatur under Rule 60(b)(5)

10   and are instead seeking to relitigate the 137.5% population cap.  Second, defendants'

11   evidence in support of their request for modification or vacatur fails to demonstrate a

12   significant and unanticipated change in circumstances, as required under Rule 60(b)(5).

13   Third, even if defendants had demonstrated that *current* conditions warranted modification,

14   they have failed to demonstrate a "durable remedy" as they intend to increase the prison

15   population by approximately 9,500 prisoners by eliminating the out-of-state prisoner

16   program.  We address these points in turn.

17              1.      Defendants' Contention Is Not a Proper Basis for Modification or

18                      Vacatur Under Rule 60(b)(5)

19              Defendants' characterization of their argument as relating to "primary cause" obscures

20   their true basis for seeking modification or vacatur of this Court's order.  Defendants state

21   that they seek vacatur because "the greatly reduced prison population is [no longer] the

22   primary barrier prohibiting the State from providing constitutionally adequate medical and

23   mental health care."  Defs.' Resp. at 4 (ECF No. 2529/4332); *see also* Defs.' Reply at 11

24   (ECF No. 2543/4345).  In fact, however, defendants' challenge is to the 137.5% population

25   cap.  *See, e.g.*, Three-Judge Mot. at 7 (ECF No. 2506/4280) (stating that the "evidence relied

26

27              [27] Although we offer no objection to defendants' modification of the Three-Judge
     Motion and analyze it accordingly in Section III.C, we nevertheless briefly discuss the Three-
28   Judge Motion without such modification in Section III.D.

upon by this Court in reaching its 137.5% finding was presented at a trial that began over four years ago").[28]   According to defendants, because constitutional care can be provided at the current level of overcrowding, this Court must have erred in concluding that the prison population must be reduced to 137.5% design capacity in order to resolve the underlying constitutional violations.   Thus, defendants' true basis for seeking vacatur is their contention that (1) this Court erred in choosing the 137.5% figure and (2) the passage of time constitutes a "changed circumstance" sufficient to justify a Rule 60(b)(5) motion.

Defendants cannot seek modification or vacatur on this basis.   In 2009, when the population level in California prisons was at 190% design capacity, this Court made a *predictive judgment* based on the overwhelming weight of expert testimony that Eighth Amendment compliance could not be achieved with a prison population above 137.5% design capacity.   This was not a factual assessment based on current circumstances.   Rather, it was a determination of what population level *would be required in the future* to allow defendants to be able to provide constitutional care.   As the Supreme Court recognized, there are "no scientific tools available to determine the precise population reduction necessary to remedy a constitutional violation of this sort."   *Plata*, 131 S. Ct. at 1944.

If defendants could challenge this Court's predictive judgment on the basis they have identified here, it would undo fundamental principles of res judicata.   A losing party who disagrees with a predictive judgment need only allow some time to pass – thus constituting a "changed circumstance" – and then file a motion alleging that the court's judgment was proven to be wrong.   In short, nothing would prevent continual relitigation of a court's predictive judgments.   For example, although defendants filed this motion after the prison population reached 150% design capacity, nothing in their argument would have prevented them from filing a motion at 160% or 165%.   Indeed, defendants could have immediately requested vacatur a mere month after this Court's Order became effective in June 2011.

---

[28] Defendants fail to note that, had they complied with our order when it was initially issued in August 2009, they would have arrived at the 137.5% population cap almost two years ago.

1   They could have argued then that "the evidence . . . was presented at a trial that began over"

2   two years ago. *Cf.* Three-Judge Mot. at 7 (ECF No. 2506/4280). We would, of course, have

3   rejected any such requests on the merits. That point notwithstanding, permitting unbounded

4   relitigation, based solely on a contention that some time has passed, would fundamentally

5   undermine the finality of predictive judgments. *Sys. Fed'n No. 91 Ry. Employees' Dep't v.*

6   *Wright*, 364 U.S. 642, 647 (1961) ("Firmness and stability must no doubt be attributed to

7   continuing injunctive relief based on adjudicated facts and law, and neither the plaintiff nor

8   the court should be subjected to the unnecessary burden of re-establishing what has once

9   been decided.").[29]

10      This is not to say that parties may never seek modification of a court's predictive

11  judgments. They certainly may do so; they must, however, identify a "changed

12  circumstance" that is more than the mere passage of time and must point to evidence that

13  actually supports invoking this Court's equitable power to modify final judgments. This

14  would ordinarily involve defendants pointing to a change in *background* assumptions on

15  which this Court relied in making its 137.5% determination. For example, if a new Supreme

16  Court decision regarding the Eighth Amendment significantly changed the feasibility and

17  implementation, or even the timeline, of Defendants' intended measures to achieve the

18  137.5% figure, a party could certainly seek modification on this basis. *See Rufo*, 502 U.S. at

19  386-87 (holding that defendants had identified a legitimate basis for modification in pointing

20  to an acceleration in the incarceration rate, which may not have been anticipated by the

21  district court at the time of the consent decree). Alternatively, if defendants found *new*

22  remedies to the overcrowding problem that would permit resolution of the constitutional

23

24      [29] Defendants, citing *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2004), contend that
25  finality is not a relevant concern here because Rule 60(b)(5) is an exception to finality.
    Three-Judge Mot. at 6 (ECF No. 2506/4280). This is generally true, but the Supreme Court
26  has also stated the Rule 60(b) exception to finality cannot be interpreted in such a way that
    "would swallow the rule." *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367,
27  1377 (2010). As explained above, in the context of a predictive judgment, it would
    fundamentally undermine finality if the losing party could seek modification because (1) time
28  had passed and (2) the party simply alleged that the ultimate predictive judgment was wrong.

1    violations without reducing the prison population, that would justify modification as well.

2    As the Supreme Court stated:

3                   As the State implements the order of the three-judge court, time
                    and experience may reveal targeted and effective remedies that
4                   will end the constitutional violations even without a significant
                    decrease in the general prison population.  The State will be free
5                   to move the three-judge court for modification of its order on that
                    basis, and these motions would be entitled to serious
6                   consideration.

7    *Plata*, 131 S. Ct. at 1941.  Here, however, defendants point to no *new* remedies.  Nor do they

8    identify any change in background assumptions on which this Court relied.  Rather, all they

9    point to – as is explained in detail *infra* – is that prison crowding has been reduced.  This,

10   however, was the intended effect of our Order, which required defendants to reduce the

11   prison population over a period of time.  Nothing could be more "anticipated" than the

12   consequent decline in crowding to which defendants point.  In short, defendants have failed

13   to cite any "changed circumstance," as that term was intended to be understood in *Rufo* or,

14   indeed, as it would be construed under any reasonable interpretation of the term.

15        Defendants are simply seeking to relitigate the 137.5% question.  Defendants

16   characterize their claim as one of "error," but they merely disagree with this Court's

17   conclusion on a question that inherently involved uncertainty.  *Plata*, 131 S. Ct. at 1944

18   ("The inquiry involves uncertain predictions regarding the effects of population reductions,

19   as well as difficult determinations regarding the capacity of prison officials to provide

20   adequate care at various population levels.").  Defendants are, in effect, challenging a legal

21   conclusion, which is not a permissible basis for modification.  *Horne*, 557 U.S. at 447 ("Rule

22   60(b)(5) may not be used to challenge the legal conclusions on which a prior judgment or

23   order rests.").  Moreover, defendants have already exercised their right to challenge this

24   Court's conclusion.  Defendants appealed the 137.5% figure to the Supreme Court, and the

25   Court affirmed our conclusion.  *Plata*, 131 S. Ct. at 1945 ("The three-judge court made the

26   most precise determination it could in light of the record before it.").  Defendants have

27   already lost this argument, and they should not be allowed to litigate it once again.

28

1    This Court's conclusion should come as no surprise to defendants.  When defendants

2    first advised this Court that they intended to file a motion to modify, this Court sought

3    extensive briefing on the legal and factual basis for defendants' anticipated modification

4    request.  June 7, 2012 Order Requiring Further Briefing (ECF No. 2445/4193); Aug. 3, 2012

5    2d Order Requiring Further Briefing (ECF No. 2460/4220).  This Court advised defendants

6    that, "based on the factual circumstances identified" by defendants, the Court was "not

7    inclined to entertain a motion to modify the 137.5% population cap."  Sept. 7, 2012 Order

8    at 2 (ECF No. 2473/4235).  We explained:

> Defendants' initial briefing suggested that the only question that
> they would seek to litigate on a motion to modify is whether
> Eighth Amendment compliance could be achieved with a prison
> population higher than 137.5% design capacity.  That question
> has already been litigated and decided by this Court and affirmed
> by the Supreme Court, and this Court is not inclined to permit
> relitigation of the proper population cap at this time.

13   *Id.* at 2-3.  The Three-Judge Motion is, in all relevant ways, identical to what this Court has

14   previously stated is not a proper basis for modification.  If anything, defendants seek greater

15   relief today, in that they seek complete vacatur of this Court's population reduction order, not

16   a modification of the cap to 145%.  Yet defendants have made no argument in their Three-

17   Judge Motion to the effect that this Court erred in holding that defendants had failed to

18   identify a proper basis for modification.  This Court therefore finds that defendants are not

19   permitted to seek modification or vacatur on the basis that they have identified in the Three-

20   Judge Motion now before us.

21          2.    <u>Defendants' Evidence Fails To Demonstrate a Significant Change in</u>

22                <u>Circumstances</u>

23   Even if defendants were not seeking to relitigate the 137.5% figure or even if such a

24   challenge would be permitted, this Court would nevertheless deny the Three-Judge Motion,

25   as modified, because defendants have failed to meet their evidentiary burden in

26   demonstrating that overcrowding is no longer the primary cause of ongoing constitutional

27   violations in the provision of constitutionally adequate medical and mental health care.

28

In the Three-Judge Motion, defendants offer the following six items of evidence in support of their contention that overcrowding is no longer the primary cause of ongoing constitutional violations: (1) that Realignment has reduced the prison population by approximately 24,000 inmates; (2) that California has increased capacity in the prison system through new construction; (3) that California no longer uses gymnasiums and dayrooms to house prisoners; (4) that the Inspector General, Robert Barton, has stated that crowding is no longer a factor in the provision of medical care; (5) that now-Secretary Jeffrey Beard has stated that overcrowding is no longer a barrier to the provision of care; and (6) that neither the Receiver nor Special Master stated, in their most recent report, that overcrowding is a problem.  Three-Judge Mot. at 7-15 (ECF No. 2506/4280).

The burden falls on defendants to demonstrate a "significant and unanticipated change in factual conditions warranting modification."  *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (summarizing *Rufo*, 501 U.S. at 384-86).  This standard imposes a high, but not impossible, bar for defendants to meet.  Defendants must present persuasive evidence that the very aspects of overcrowding that this Court found pernicious in the past – the severe staff shortages, the complete lack of treatment space, etc. – have been remedied through measures that were not envisioned at the time of our Court's order.  Additionally, defendants could – as they have in one instance – supplement this evidence with testimony from the numerous experts in the initial case who, having reviewed the prison system, have concluded that overcrowding is no longer a barrier.  Were such credible evidence presented to this Court, we would, of course, consider modifying the Order.

Defendants, however, have fallen far short of this requirement.  In the Three-Judge Motion, they have presented very little evidence.  Most of this evidence is irrelevant, as it points to partial compliance with this Court's Order and not to a resolution of the problems of overcrowding.  The remaining, relevant evidence is far too minimal to persuade this Court that overcrowding is no longer the primary cause of ongoing constitutional violations.

//

//

40

a.     *Evidence of Reduced Crowding*

Defendants' first, second, and third items of evidence all suffer from the same fatal flaw:  Defendants cannot simply point to a reduction in crowding that was contemplated to occur at the time it did and assert that this provides a sufficient basis for modification. Reduced crowding, after all, was the intended effect of our Order.  The Supreme Court expressly stated that defendants "may choose whether to increase the prisons' capacity through construction or reduce the population."  *Plata*, 131 S. Ct. at 1941.  The evidence that defendants point to – the reduction in the prison population, the elimination of the use of gymnasiums and dayrooms as housing, and new prison construction – demonstrates that defendants have done both in their partial compliance thus far with our Order.  Oddly, defendants appear to read the results of their partial compliance with the Order in a rather unusual manner.  They argue that, because the Order thus far has been effective in making progress toward its ultimate objective, we should terminate it, call off the rest of the plan, and declare victory before defendants can meet the Order's most important objective – to reduce the population to 137.5% design capacity and eliminate overcrowding as the primary cause of unconstitutional medical and mental health conditions.  That is not the way the judicial system, or any other national system, functions.  Indeed, the effectiveness of the Order thus far is not an argument for vacating it, but rather an argument for keeping it in effect and continuing to make progress toward reaching its ultimate goal.

Of course, if defendants had demonstrated that the overcrowding problem has been solved, then vacatur might be appropriate.  However, defendants' evidence merely demonstrates that defendants have eliminated, as one of the declarants represented, the "most egregious and obvious aspects of prison overcrowding."  Haney Decl. ¶ 35 (*Coleman* ECF No. 4378).  Indeed, the current prison population is approximately 150% design capacity, as of April 3, 2013.  *See* CDCR, *Weekly Rpt. of Population*, Apr. 3, 2013.  California still houses far more prisoners than its system is designed to house.  Indeed, according to the most recent national statistics, California's prison system is the second most crowded in the

country with respect to design capacity.[30]  Furthermore, Clark Kelso, the Receiver in the

*Plata* case, reported in January 2013 that "[o]vercrowding and its consequences *are and* have

been a chronic, widespread and continuing problem for almost twenty years."  Receiver's

Twenty-Second Tri-Annual Report at 30 (*Plata* ECF No. 2525) (emphasis added)

("Receiver's 22nd Report").[31]  The Receiver clearly is of the opinion that overcrowding

persists, and this Court credits his expert opinion.  *See Plata*, 131 S. Ct. at 1938-39 (stating

that the Receiver's reports on overcrowding were "persuasive evidence").[32]  Simply put, the

evidence does not demonstrate that "the State has eliminated overcrowding."  Defs.' Reply

at 3 (ECF No. 2543/4345).  It merely demonstrates that defendants have thus far generally

taken actions in compliance with our Order to reduce the extent of overcrowding to 150%

design capacity.  That our Order has been successful thus far cannot constitute a "change in

circumstances" that renders our Order inequitable.

Rather, in order to properly persuade this Court of a "change in circumstances,"

defendants would have to present compelling evidence that there has been a significant

---

[30] Bureau of Justice Statistics, U.S. Dep't of Justice, *Prisoners in 2011*, Dec. 2012, App. 14 at page 31, *available at* http://www.bjs.gov/content/pub/pdf/p11.pdf.

[31] Defendants objected to these statements in the Receiver's Report and moved to have them stricken.  Defs.' Objections to Receiver's 22nd Report (*Plata* ECF No. 2532).  These objections were rejected by the *Plata* court.  Feb. 28, 2012 Order Overruling Defs.' Objections to Receiver's 22nd Report (*Plata* ECF No. 2554).

[32] Although it should go without mention, it bears repeating that both the Receiver and Special Master are officers of the Court and thus deserve the same deference that the parties would provide to this Court directly.  *Plata*, 131 S. Ct. at 1947 (referring to the Special Master and the Receiver in conjunction with this Court).  Defendants have not always maintained appropriate propriety in their filings with regard to their statements regarding these officers.  Feb. 13, 2012 Order to Show Cause at 2 (*Coleman* ECF No. 4335) ("As plaintiffs point out, defendants' attack consists of a raw assertion of unethical conduct, with no supporting evidence nor even any hint that defendants actually believe the attack they make.  This court takes very seriously any allegation of unethical conduct.  It would not countenance any attempt by plaintiffs, or anyone, to prevent defendants from making any non-frivolous assertions having evidentiary support, and made for purposes other than harassment or other improper purpose.  *See* Fed. R. Civ. P. 11(b).  However, the court can only be dismayed by the cavalier manner in which defendants, in objections signed by their attorney of record, level a smear against the character and reputation of the Special Master, without any apparent regard for whether the attack is consistent with defense counsel's obligations under Rule 11 (providing sanctions for presenting pleadings without an evidentiary basis, or made to harass, or for other improper purposes).").

change *in the barriers* that prison crowding raised and that prevented the provision of constitutionally adequate medical and mental health care.  As stated above, in our prior Opinion & Order, we focused on two particular barriers: inadequate treatment space and severe staff shortages.  *See also Plata*, 131 S. Ct. at 1933-34 (focusing on staff and space). Here, we look to evidence of a change in circumstances, and we find none.

With regard to staffing, defendants' Three-Judge Motion is conspicuously silent. Defendants' failure to discuss staffing is glaring in light of the evidence that staff shortages continue to plague the California prison system, specifically with regard to mental health care.  In its April 5, 2013 order, the *Coleman* court found that evidence tendered by defendants showed a 29 percent vacancy rate in mental health staffing at the end of November 2012, a rate "higher than that reported by the Special Master in his Twenty-Fifth Round Report."  Apr. 5, 2013 Order at 57 (*Coleman* ECF No. 4539).[33]  This is nearly as high as it was at the time of the trial.  Aug. 4, 2009 Op. & Order at 76-77 (ECF No. 2197/3641). In fact, as the *Coleman* court found, according to the Special Master California appears to be regressing, as the staff shortages are far worse this year than in prior years.  *Id.* (quoting Special Master's Twenty-Fifth Round Monitoring Report at 44 (*Coleman* ECF No. 4298) ("Special Master's 25th Report")).  Psychiatrists at Salinas Valley State Prison (SVSP) are now writing directly to plaintiffs' counsel to inform them that, due to a patient/doctor ratio that is three to four times higher than the appropriate level, they are unable to provide care. Exs. A & B to Bien Decl. in Supp. of Pls.' Mot. to Take Dep. of Dr. John Brim (*Coleman* ECF No. 4354-1).  Thus, it continues to be the case that "demand for care . . . continues to overwhelm the resources available."  *Plata*, 131 S. Ct. at 1933 (quoting expert testimony from Opinion & Order).

With regard to space, the record supports the conclusion that it continues to be a significant problem.  For mentally ill patients, defendants lack sufficient bed space.  *See* Apr. 5, 2013 Order at 53 (*Coleman* ECF No. 4539); *see also* Special Master's 25th Report at

---

[33] The *Coleman* Special Master's Twenty-Fifth Round Monitoring period ended in September 2012.  *See* Apr. 5, 2013 Order at 6 (*Coleman* ECF No. 4539).

38-44 (*Coleman* ECF No. 4298).  Much of this can be explained by the fact that, although the prison population has declined overall, the mentally ill population is largely unchanged.  *Id.* Defendants have not, however, made sufficient investments to provide more beds for these mentally ill individuals.  As a result, the conditions described in our prior Opinion & Order continue to persist.  Mentally ill individuals face extended delays in receiving treatment.  In some cases, they are left in containment cells for extended periods of time.  *Id.*; *see also* Apr. 5, 2013 Order (*Coleman* ECF No. 4539).

Defendants respond that "the State has invested in substantial construction and renovation projects to more than adequately meet both the present and future health care needs of the State's inmate-patients."  Three-Judge Mot. at 8 (ECF No. 2506/4280); *see id.* at 8-10 (listing individual construction projects).  It is true that there is *more* treatment space today than in 2008.  Defendants, however, fail to demonstrate that there is *enough* treatment space today.  Indeed, this was the "fatal flaw" in defendants' argument at trial.  In our prior Opinion & Order, this Court rejected defendants' preferred percentage – 145% design capacity – because the underlying analysis had a "potentially fatal flaw."  Aug. 4, 2009 Op. & Order at 128 (ECF No. 2197/3641).  Based on the reports and testimony of at least three of plaintiffs' experts, this Court concluded:

> Plaintiffs' experts convincingly demonstrated that, in light of the wardens' failure to consider the provision of medical and mental health care to California's inmates and in light of their reliance on maximum operable capacity, which does not consider the ability to provide such care, the Panel's 145% estimate clearly exceeds the maximum level at which the state could provide constitutionally adequate medical and mental health care in its prisons.

*Id.* at 129.  Defendants now point to renovation and upgrades, but offer *no expert testimony* that the renovations have overcome the previously identified "fatal flaw" or offer any conclusion as to the maximum population consistent with the provision of constitutional medical and mental health care.  In the absence of such testimony, this Court will not simply credit defendants' assertion that there is adequate treatment space today.

1    Moreover, defendants' own reports contradict any conclusion that there is adequate

2  treatment space today.  In the Blueprint, defendants state that the prison infrastructure is

3  "aging" and there is "inadequate treatment space" that "hinder[s] the department's ability to

4  deliver care."  CDCR Blueprint at 35.  Moreover, the reports submitted by defendants,

5  included in Steven Fama's declaration, provide direct evidence that defendants have

6  represented to other agencies that there is inadequate treatment space in the California prison

7  system today:

8              Currently there is insufficient (and in some instances, no) facility
              space and  infrastructure in CDCR institutions to appropriately
9              perform medication distribution activities.  Lack of adequate
              medication distribution rooms and windows does not allow for
10             timely, effective and secure medication distribution. . . .
              [E]xisting space is inadequately sized to accommodate proper
11             distribution protocols and procedures.

12  Ex. I to Fama Decl. at 3 (ECF No. 2528-2/4331-2).  The evidence in these reports

13  overwhelmingly supports the conclusion that defendants themselves recognize the current

14  inadequacy of treatment space in California's prisons.  *See* Exs. B to I to Fama Decl. (ECF

15  No. 2528-2/4331-2).

16    Additionally, defendants' plan to construct the necessary treatment space – the

17  Healthcare Facility Improvement Program ("HCFIP") – is in its early stages and thus

18  continues to be at risk of non-completion.  According to the Receiver, HCFIP "upgrade

19  projects at several locations have now received *initial approval* from the Public Works Board

20  (PWB)."  Receiver's 22nd Report at 23 (*Plata* ECF No. 2525) (emphasis added).  "The

21  remaining HCFIP projects are being sequenced by CDCR for submittal to the PWB upon

22  completion and review of site-specific plans."  *Id.*  Defendants state that the process for

23  construction is streamlined, Three-Judge Mot. at 8 (ECF No. 2506/4280), but – even with

24  such streamlining – the earliest and most optimistic estimate for completing HCFIP is 2017.

25             With the streamlined PWB and legislative oversight processes
              approved through SB 1022, and with the recent progress that was
26             made on seven of the HCFIP projects, it is possible for the
              HCFIP and medication distribution upgrades at existing prisons
27             to be substantially completed by 2017, with the priority focus of
              the upgrades at the "intermediate level-of-care" facilities
28             substantially completed by 2016.  However, these projects require

two approvals by the PWB (one for project authorization and one for approval of preliminary plans) and interim funding by the PMIB.  Thus, if these projects continue to experience delays as they have in the last two months, this program is at risk for completion.

Receiver's 22nd Report at 23 (*Plata* ECF No. 2525).  As the Receiver correctly notes, such long-term plans are always at risk.  Indeed, already "several projects were delayed in the submissions to the PWB."  *Id.*  Given the lack of completion and the inherent risk in defendants' construction plans, defendants cannot demonstrate that there is adequate treatment space *today*.  Moreover, the continuation of this Court's population reduction order can serve only to motivate defendants to continue or redouble their efforts to meet the objectives set forth above.

Finally, even if defendants could demonstrate with surety that their long-term plans will come to fruition, it would still not support vacatur of the population reduction order.  As plaintiffs correctly note, this evidence would at best tend only to support a conclusion that our Order should be modified to a higher design capacity. Pls.' Opp'n at 19 (ECF No. 2528/4331).  Defendants, however, no longer seek such a modification.  They seek vacatur of the Order in its entirety, a conclusion that is not supported by the new construction and an action that would serve only to permit defendants to avoid any further obligation to complete the scheduled construction.

The burden falls on defendants to meet the threshold condition for modification or vacatur.  The partial reduction in crowding and various renovations are, without a doubt, important.  This Court will not, however, modify our Order in the absence of compelling evidence of a resolution to the barriers that overcrowding causes.  Because defendants fail to present evidence on this critical issue, they have not presented evidence of a "*significant change in circumstances.*"  *Rufo*, 502 U.S. at 383 (emphasis added).

b.   *Declaration of Robert Barton, Inspector General*

Turning to the fourth item of evidence, defendants state that, "according to Robert Barton, the Inspector General, population is no longer a factor affecting the State's ability to provide constitutionally adequate medical or mental health care in prison."  Three-Judge

Mot. at 13 (ECF No. 2506/4280).  Barton explains that the Office of Inspector General ("OIG") has instituted a scoring system, by which it evaluates the provision of medical health care in California prisons.  In his concluding paragraph, he states that "some high scoring prisons also have high population densities."  He concludes that "[o]vercrowding is no longer a factor affecting CDCR's ability to provide effective medical care in its prisons."  Barton Decl. in Supp. of Three-Judge Mot. ¶ 15 (ECF No. 2507/4282).

There are many problems with this conclusion.  First, Barton's analysis relies exclusively on the OIG scores, which provide no statistical basis to draw inferences regarding constitutionally adequate care.  In the Receiver's most recent report, he explains that

> the OIG scores cannot be used by themselves to establish the constitutional line.  First, the scale for the OIG scores has never been validated for purposes of making constitutional measurements, and although the parties agreed to use the OIG audit as an indicator of improved performance over time, the parties never agreed to any particular scale.  For management purposes and for convenience, the Receivership established cut-lines for "high adherence," "medium adherence," and "low adherence."  But these lines were never intended to have any constitutional significance at all.  Second, the scores on individual items in the OIG audit frequently depend upon sample sizes so small (e.g., less than 5 items may be examined for a particular question) that the confidence intervals for the items are unusually large (e.g., a score of 70% on an item may have a confidence interval stretching from 50% to 90%).  In short, the OIG audits are a statistically soft measure of performance.

Receiver's 22nd Report at 30 (*Plata* ECF No. 2525).  The Receiver's concerns with the OIG scores may well prove prescient.  The *Plata* court has begun conducting a rigorous review of all prisons with high OIG scores.[34]  Of the four prisons reviewed thus far, Richard J.

---

[34] The *Plata* court's ongoing review of the provision of medical care in the California prison system demonstrates two additional points of significance.  First, contrary to defendants' public representations otherwise, this Court and the individual *Plata* and *Coleman* courts have met our "continuing duty and responsibility," as set forth by the Supreme Court, "to assess the efficacy and consequences" of our orders.  *Plata*, 131 S. Ct. at 1946.  Second, defendants' attempt to terminate these proceedings are wholly premature.  Although the *Plata* court ordered the parties to meet and confer on post-Receivership planning over a year ago because it believed the "end of the Receivership appear[ed] to be in sight," Jan. 27, 2012 Order to Meet & Confer re: Post-Receivership Planning at 2 (*Plata* ECF No. 2417), that does not justify defendants' declaration of "mission accomplished."  To the

1   Donovan Correctional Facility ("RJD") received a very high OIG score – 87.3% – but the

2   *Plata* experts concluded that RJD is "not providing adequate medical care, and that there are

3   systemic issues that present an ongoing serious risk of harm to patients and result in

4   preventable morbidity and mortality."  Health Care Evaluation of R.J. Donovan Correctional

5   Facility by Court Medical Experts at 5 (*Plata* ECF No. 2572).  The striking gap between the

6   OIG scores and adequate care led the experts to state the following:

> These report findings raise questions regarding the OIG Cycle 3
> report that reflected a score of 87.3%.  The question is whether
> the score accurately reflected adequate care that has since
> deteriorated, or whether the OIG review failed to capture
> problems related to poorly functioning systems and quality of
> care issues. . . .
>
> A distinguishing characteristic between RJD and the other 3
> facilities we have evaluated that scored >85% is that the
> population at RJD was 160.9% of design capacity at the time of
> our review, whereas the other 3 facilities ranged between 128 to
> almost 134% of design capacity.

14   *Id.* at 6.  Thus, not only is the OIG scoring system unreliable as a general matter, it may be

15   especially unreliable when the prison suffers from overcrowding.  It is perforce not a reliable

16   basis for drawing any conclusions regarding the relationship between prison crowding and

17   constitutional care.

18

19   ─────────────

20   contrary, the parties took several months to meet and confer, after which time the *Plata* court
     proposed a transition plan and allowed the parties an opportunity to respond.  On
21   September 5, 2012, the *Plata* court issued an order setting forth the framework for
     transitioning away from the Receivership and determining when medical care would be
22   deemed constitutionally adequate.  Sept. 5, 2012 Order re: Receivership Transition Plan &
     Expert Evaluations (*Plata* ECF No. 2470).  The court's order was based in part on the
23   parties' original stipulation that any institution found to be in substantial compliance by the
     court experts – all of whom were appointed pursuant to the parties' stipulation – would be
24   providing constitutionally adequate care.  *Id.* at 4.  As the Receiver has noted, "it will be the
     experts' reports that create the primary factual record from which the *Plata* court can make a
25   finding that medical care is being provided consistent with constitutional minimums."
     Receiver's 22nd Report at 30 (*Plata* ECF No. 2525).  To date, the experts have completed
26   evaluations of only four institutions.  Also, as the record reveals, the confidence of
     defendants in their ability to achieve the required 137.5% population figure by December
27   2013, let alone June 2013, lessened as the results of their Realignment program became
     evident.  At the same time, the willingness of defendants to comply with this Court's Order
28   to reduce the number of prisoners being held in California's prisons lessened
     correspondingly.

Second, even if the OIG scoring system were reliable, Barton's inference would not be. Barton's claim is that the lack of a *perfect* correlation between prison crowding and OIG scores – because *some* prisons with high density have high scores – proves that overcrowding is no longer a factor in the provision of constitutional care. This conclusion in no way follows from the evidence. Were it so – i.e., were the lack of perfect correlation a barrier to drawing statistical inferences – all social science would be discredited. Moreover, the Receiver has explained why there will never be a perfect correlation:

> [T]he key elements of timely access to care and proper distribution of medications are very much influenced by each institution's total population level compared with its design capacity, the precise mix of inmates at different security levels, the precise mix of inmates belonging to various gang groups, the level of violence at a prison, the prevalence of lockdowns at an institution, and other operational factors that play out at both the institution and system-wide levels, all of which are influenced by overcrowding.

Receiver's 22nd Report at 29 (*Plata* ECF No. 2525). For example, Avenal State Prison can achieve a high OIG score, despite a 184% population density, because:

> it is easier to provide care even at higher population densities at a low-security level prison (such as Avenal State Prison) that does not have a gang population prone to violence, includes a significant number of inmates with reduced mobility or who are wheel-chair-bound, and has a very low level of modified program or lockdown.

*Id.* The Receiver concludes, "our experience at that type of prison does not mean that a constitutional level of care can be delivered system-wide at a higher system-wide population density given the differences among the prisons." *Id.* In short, the lack of a *perfect* correlation proves nothing. In light of the Receiver's most recent report, this Court finds defendants' fourth item of evidence to be unpersuasive.

c.   *Declaration of Jeffrey Beard, CDCR Secretary*

Turning to the fifth item of evidence, defendants rely on Jeffrey Beard, the newly appointed Secretary of CDCR. Beard now testifies via declaration that, having visited a majority of California's 33 prisons, "prison population density is no longer a factor inhibiting

1  California's ability to provide constitutionally adequate medical or mental health care in its

2  prisons."  Beard Decl. in Supp. of Three-Judge Mot. ¶¶ 9-10 (ECF No. 2508/4281).

3      Beard was one of seven experts for plaintiffs who testified that overcrowding was the

4  primary cause of ongoing violations.  Suffice it to say that Beard's position at the time of the

5  trial was as an independent expert (who was uncompensated).  Today, he is a party to the

6  proceedings, and accordingly, his testimony must be regarded in that light.  *See United States*

7  *v. Abel*, 469 U.S. 45, 52 (1984) (stating that a "witness' self interest" "might lead the witness

8  to slant, unconsciously or otherwise, his testimony in favor of or against a party").

9      Additionally, the substance of Secretary Beard's declaration is not persuasive in light

10  of the record before this Court.  Much of Beard's declaration repeats the points discussed

11  above; he points to the numerical decline in prison population and the new construction.

12  Beard Decl. ¶¶ 10-12.  He makes no mention whatsoever of staff or treatment space, which –

13  as explained above – are the two most important reasons that overcrowding was the primary

14  cause of constitutional violations.  Accordingly, Beard's declaration fails to rebut the

15  overwhelming evidence before this Court that staff shortages and a lack of physical treatment

16  space continue to plague the California prison system.  Moreover, the evidence that Beard

17  does mention – a safer prison system and reduced spread of disease – has no factual basis in

18  the record.  *Id.* ¶ 12.  Beard cites no evidence of fewer lockdowns, although such information

19  should be readily available.  He makes an assertion about the spread of disease that, while

20  appropriate for an expert declaration, should be made by a medical health professional, or at

21  least supported by facts and figures.  This leaves only one assertion of consequence: reduced

22  crowding in reception areas.  *Id.* ¶¶ 13-14.  This Court credits the Receiver for working

23  closely with defendants to remedy the 300% overcrowding in reception areas.  That said, this

24  singular improvement does not persuade the Court that overcrowding is no longer the

25  primary cause of ongoing constitutional violations.

26      Finally, Beard's testimony is not the only expert testimony available to this Court.

27  The Receiver stated, in his most recent report, that:

28

1

2

3

4

5

> Overcrowding and its consequences are and have been a chronic, widespread and continuing problem for almost twenty years. The overcrowding reduction order entered by the court recognizes that the connection between overcrowding in the prisons and the provision of constitutionally adequate medical and mental health care is complex, with *overcrowding creating a cascade of consequences that substantially interferes with the delivery of care*.

6   Receiver's 22nd Report at 30 (*Plata* ECF No. 2525) (emphasis added). Reviewing the

7   evidence presented by defendants in the Three-Judge Motion, he concludes:

8

9

10

> [A]t present, there is no persuasive evidence that a constitutional level of medical care has been achieved system-wide at an overall population density that is significantly higher than what the three-judge court has ordered.

11   *Id.* at 30-31. Moreover, in the *Coleman* termination proceedings, plaintiffs submitted

12   declarations by four experts, all of whom contend that overcrowding continues to be a

13   serious problem.[35] According to Dr. Craig Haney, the problems of overcrowding are no

14   better than when he visited the prison system in 2008. He writes:

15

16

17

18

19

20

> The CDCR's continuing inability to provide for the mental health needs of its prisoners is produced in large part by a nexus of persistent problems that my inspections made clear have hardly been faced at all, much less satisfactorily addressed. That nexus includes continuing and in some cases even more drastic shortages of mental health and correctional staff; lack of adequate clinical space; and widespread levels of inmate-patient idleness and lack of meaningful treatment opportunities that were as bad and often worse than those I observed at the time of my 2007 and 2008 tours.

21   Haney Decl. ¶ 35 (*Coleman* ECF No. 4378). Dr. Edward Kaufman found severe staffing

22   shortages, insufficient treatment space, and a lack of beds. Kaufman Decl. ¶¶ 22-23

23   (*Coleman* ECF No. 4379). Dr. Pablo Stewart, describes these very problems as "endemic in

24   overcrowded prison systems." Stewart Decl. ¶ 44 (*Coleman* ECF No. 4381). Stewart also

25   explained why California's high rate of suicides (discussed in the recent *Coleman* order, *see*

26   Apr. 5, 2013 Order at 32-43 (*Coleman* ECF No. 4539)) is related to current overcrowding.

27

28   ———————

[35] As stated *supra*, this Court takes judicial notice of these declarations.

51

1    *Id.* ¶ 174.  Finally, with regard to condemned prisoners (death row), former CDCR Secretary

2    Jeanne Woodford declared that "there is insufficient capacity to appropriately house the

3    growing condemned population" and, with respect to mental health needs, "certainly

4    insufficient staffing."  Woodford Decl ¶¶ 37, 43 (*Coleman* ECF No. 4380).  The unanimous

5    opinion of the Receiver and these four experts – each of whom is evaluating current

6    conditions, and none of whom is employed by defendants – is that overcrowding remains a

7    significant barrier to the provision of constitutional care.  Even in the absence of the

8    testimony of these other experts, Secretary Beard's reversal – given his newly-acquired self-

9    interest and the weakness of his arguments – is not persuasive to this Court.

10                              d.      *The Receiver and Special Master*

11              Turning to the sixth item of evidence, Defendants state that "[t]he *Plata* receiver and

12   *Coleman* special master no longer cite crowding as a factor inhibiting the State's ability to

13   provide adequate medical and mental health care."  Three-Judge Mot. at 14 (ECF No.

14   2506/4280).  Defendants' suggestion is that these court-appointed representatives, by failing

15   to discuss crowding, must believe that crowding is no longer a barrier to the provision of

16   care.  In the words of the Receiver, this claim "distorts the content of our reports and

17   misrepresents the Receiver's position."  Receiver's 22nd Report at 29 (*Plata* ECF No. 2525).

18   In his most recent report, filed on January 25, 2013, the Receiver states:

19                  Overcrowding and its consequences are and have been a chronic,
20                  widespread and continuing problem for almost twenty years.  The
                    overcrowding reduction order entered by the court recognizes that
21                  the connection between overcrowding in the prisons and the
                    provision of constitutionally adequate medical and mental health
22                  care is complex, with overcrowding creating a cascade of
                    consequences that substantially interferes with the delivery of
23                  care.

24   *Id.*  The Special Master's January 2013 report supports the same conclusion.  Special

25   Master's 25th Report at 38-44 (*Coleman* ECF No. 4298).  Thus, there is no merit to

26   defendants' sixth item of evidence.

27   //

28   //

e.   *Public Safety*

Finally, although not explicitly listed as an item of evidence in their Three-Judge Motion, defendants repeatedly state that complying with the Order would harm public safety. Three-Judge Mot. at 2, 20 (ECF No. 2506/4280); Defs.' Resp. at 6 (ECF No. 2529/4332); Defs.' Reply at 20-22 (ECF No. 2543/4345).  Modification, however, is not appropriate "where a party relies upon events that actually were anticipated at the time it entered into a decree." *Rufo*, 502 U.S. at 385.  This Court anticipated the issue of public safety in our original Opinion & Order and, after considering extensive evidence, concluded that releasing comparatively low-risk inmates somewhat earlier than they would otherwise have been released has no adverse effects on public safety.  Aug. 4, 2009 Op. & Order at 131-81 (ECF No. 2197/3641).  The Supreme Court affirmed that determination and stated the following:

> The three-judge court, in its discretion, may also consider whether it is appropriate to order the State to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release. Even with an extension of time to construct new facilities and implement other reforms, it may become necessary to release prisoners to comply with the court's order.  To do so safely, the State should devise systems to select those prisoners least likely to jeopardize public safety.

*Plata*, 131 S. Ct. at 1947.  The Supreme Court thus clearly agreed that the early release of low-risk prisoners – if done in a systematic fashion – would be consistent with public safety. Defendants therefore repeat arguments that both this Court and the Supreme Court rejected.[36]

---

[36] Defendants assert, without evidence, that the public safety problem is different today from that which our Court initially considered in the prior Opinion & Order, because Realignment has resulted in the diversion of the low-risk prisoners, leaving only (as they contend) serious or violent offenders in the California prison system.  Three-Judge Mot. at 19-20 (ECF No. 2506/4280); Defs.' Reply at 21-22 (ECF No. 2543/4345). Their assertion, however, is contradicted by their own evidence.  In our prior Opinion & Order, this Court determined that a reduction of approximately 46,000 prisoners – enough to achieve the 137.5% reduction – was feasible without endangering public safety.  Aug. 4, 2009 Op. & Order at 177-81 (ECF No. 2197/3641).  The Supreme Court agreed, in affirming this Court's order. *Plata*, 131 S. Ct. at 1923 (noting that our order might, as an upper limit, involve the release of 38,000-46,000 prisoners).  Realignment, however, has only resulted in the release of 24,000 prisoners from the state prison system.  Thus, as a matter of simple math, Realignment could not have already resulted in the early release of all prisoners that this Court previously determined could be released consistent with public safety.  Defendants should still able to reduce the prison population by at least 10,000 prisoners – which would be sufficient to achieve the 137.5% figure – without adversely affecting public safety.

### 3.   Defendants Have Not Achieved a Durable Remedy

Finally, even if defendants had demonstrated that overcrowding was not *currently* the primary cause of ongoing constitutional violations, their intention to eliminate the out-of-state prisoner program – and thus increase prison crowding by 9,500 prisoners or approximately 12% design capacity – demonstrates that this resolution would very quickly become outdated.  In constitutionally relevant terms, it demonstrates that defendants have not achieved a "durable remedy" to the problem of overcrowding.

The responsibility to modify is one of equity.  When a party has achieved a "durable remedy" and seeks modification on that basis, equity supports granting relief from a final judgment.  *Horne*, 557 U.S. at 447.[37]  Here, however, defendants have achieved no such remedy.  In the Blueprint (which, as explained *supra*, represents defendants' plan for the future of California corrections), defendants state their intention to eliminate the program to house prisoners out-of-state.  *See* CDCR Blueprint at 6-7.  On January 8, 2013, roughly concurrently with filing this Three-Judge Motion, Governor Brown terminated the Emergency Proclamation that provided the legal basis for the out-of-state program.  The unmistakable effect of defendants' decision to eliminate the out-of-state program will be to increase the institutional prison population by approximately 9,500 prisoners.  *Id.* at 6-7 & App. G.  Because California's prison population today is at 150% design capacity, this decision would, in the absence of other changes, increase California's institutional prison population to approximately 162% design capacity.  With such a significant increase in prison population in the near term, it is entirely premature for defendants to seek vacatur.  Whatever resolution defendants contend that they have achieved, that resolution is, without a doubt, not a durable one.

Moreover, defendants are fully responsible for the lack of durability.  This is not a case in which the prison population is expected to increase for unanticipated or

---

[37] As stated *supra*, *Horne v. Flores* relates largely to the resolution of the underlying violation of federal law, here the constitutional question, which is not before this Court. However, to the extent that Defendants contend otherwise, this Court finds that Defendants have not met the conditions identified in that case.

uncontrollable reasons. Rather, defendants have chosen to eliminate the out-of-state program and thus to prevent themselves from achieving a long-term solution to the overcrowding problem without taking a number of steps that they could but are unwilling to take. Perhaps most disturbing is Governor Brown's unilateral termination of the Emergency Proclamation relating to Prison Overcrowding. On the day after he filed the Three-Judge Motion, he proclaimed that "prison crowding [is] no longer . . . inhibit[ing] the delivery of timely and effective health services to inmates." Gov. Brown, Jan. 8, 2013 Proclamation. No convincing evidence to that effect has been submitted to this Court or to the *Plata* or *Coleman* courts, and the Order that governs the actions that the Governor is required by law to take is directly contrary to the representations he has made in his official capacity, as well as to the official actions he has taken in this case. This raises serious doubts as to the Governor's good faith in this matter and in the prison litigation as a whole. For this reason as well, this Court will not exercise its equity power to grant defendants relief.

### 4.    Conclusion as to Three-Judge Motion, as Modified

In sum, defendants' contention that the continued enforcement of the population reduction order would be inequitable fails on numerous levels. First, defendants' true claim – that the mere passage of time demonstrates the error in this Court's choice of a 137.5% figure for the population cap – does not provide a valid basis for modification or vacatur of a predictive judgment. The changes that have occurred thus far represent the intended effect of our Order, as contemplated by this Court and as affirmed by the Supreme Court. The success of our Order thus far therefore provides no basis whatsoever for its vacatur but rather constitutes a reason for its continuance until its goal is met.

Second, and more important, defendants have failed entirely to meet their evidentiary burden. There has, without a doubt, been no significant and unanticipated change in circumstances that warrants vacatur of our Order. Defendants have represented that we may rely solely on their written submissions to demonstrate that there has been a change in circumstances and that the overcrowding that constituted the primary cause of the unconstitutional medical and mental health care conditions no longer is responsible for those

1   conditions.  Having carefully reviewed the evidence contained in those submissions

2   individually and collectively, this Court finds that defendants failed completely to support

3   their contentions.  Defendants point to some changes they have made (e.g., upgrades), but no

4   credible evidence supports a conclusion that these changes have removed the principal

5   *barriers* that prison crowding has raised and that have prevented the provision of

6   constitutionally adequate medical and mental health care: inadequate treatment space and

7   severe staff shortages.  The burden falls on defendants to demonstrate the inequity of our

8   Order, and they have failed to meet that burden here.[38]

9       Third, and finally, defendants have failed to demonstrate that they have achieved a

10  durable remedy.  Even if crowding at its current level – at 150% design capacity – were not

11  the primary cause of ongoing constitutional violations, defendants intend to increase the

12  prison population by 9,500 prisoners, or to 162% design capacity, by eliminating the out-of-

13  state prisoner program.  With such a significant increase in prison crowding planned for the

14  near term, this Court will not exercise its equity power to order vacatur on the basis that the

15  crowding problem has been resolved.

16      **D.      Crowding vis-a-vis Constitutional Violation**

17      There are various interlocking relationships, including the elements of proof, between

18  the issue whether crowding is still the primary cause of the constitutional violations in

19  medical and mental health care and whether there are still constitutional violations regarding

20  the failure to provide the requisite level of care.  We have thus far bifurcated the Three-Judge

21

22      [38] The vast majority of Defendants' arguments are based on the inequitable-
    prospective-application provision of Rule 60(b)(5).  Defendants, however, make stray
23  mention of another provision in Rule 60(b)(5), which permits modification or vacatur if "the
    judgment has been satisfied."  Three-Judge Mot. at 5 (ECF No. 2506/4280).  Defendants
24  further state, in a rather offhand way, that "[b]y any reasonable measure, the intent of the
    population reduction order has been achieved."  *Id.* at 19.
25      Not only have Defendants entirely failed to present any factual argument based on the
    judgment-satisfied provision of Rule 60(b)(5), this provision is wholly inapplicable.  In no
26  way has this Court's judgment been satisfied.  Defendants have failed to prove that (1) there
    are no longer ongoing constitutional violations; (2) overcrowding has been eliminated; (3)
27  overcrowding is no longer the primary cause of ongoing constitutional violations; or (4)
    137.5% is not an appropriate population cap.  For all the reasons explained herein, this Court
28  finds that the judgment has not been satisfied under Rule 60(b)(5).

1    Motion, pursuant to defendants' request, and have attempted to resolve only the former

2    question – i.e., whether, regardless of the existence or non-existence of ongoing

3    constitutional violations, defendants have met their burden of proving that prison crowding is

4    no longer the primary cause.

5         To some extent, however, these questions are inseparable.  For example, crowding

6    could not be the primary cause of continuing constitutional violations if there were no longer

7    such violations, and much of the evidence and argument advanced by defendants in the

8    Three-Judge Motion necessarily addresses the latter question, as well as the former.  *See,*

9    *e.g.*, Three-Judge Mot. at 21 (ECF No. 2506/4280) ("The evidence proves that there are no

10   systemic, current, and ongoing federal law violations.  All evidence indicates that at the

11   current population density, inmates are receiving health care that exceeds constitutional

12   standards.").  Had defendants presented the contention of constitutional compliance to this

13   Court (or rather, had they not abandoned that contention), we would, of course, be required

14   to consider whether they had demonstrated that there was no longer a constitutional violation

15   that warranted the continued imposition of a remedy, i.e., the reduction in the size of the

16   California prison population to 137.5% design capacity.  *Horne*, 557 U.S. at 447.[39]  Thus,

17   while the evidence submitted by defendants does not support a vacatur of the population cap

18   on the ground that overcrowding is no longer the primary cause of the current prison

19   conditions, it could – in theory – support the vacatur of the population cap on the ground that

20   the unconstitutional prison conditions on which our Order was based no longer exist.

21   Because the existence of a constitutional violation is a condition precedent to continued

22   enforcement of this Court's population reduction order, and because we believe it desirable

23   that it be clear that there is a sound legal basis to our Order, we explain briefly the basis for

24   our continuing authority to issue remedial orders and to enforce compliance with them by

25   means of contempt or otherwise.

26

27        [39] We could alternatively have referred the issue to the *Plata* and *Coleman* courts
     separately or collectively, or determined that the question must be directed to them directly.
28   As stated *supra*, we make no decision here as to the procedural issue in question.

It is necessary to first provide some context to this Court's population reduction order. The existence of an ongoing constitutional violation is required for a prisoner release order. *Plata*, 131 S. Ct. at 1929 (" Before a three-judge court may be convened, a district court first must have entered an order for less intrusive relief that failed to remedy the constitutional violation and must have given the defendant a reasonable time to comply with its prior orders."). Here, there had been numerous orders in both *Plata* and *Coleman* for less intrusive relief over a period of many years prior to the convening of the three-judge court, and those orders had failed to remedy the constitutional violations with respect to medical *and* mental health care. Aug. 4, 2009 Op. & Order at 54 (ECF No. 2197/3641) ("The *Plata* and *Coleman* courts years ago identified the constitutional deficiencies underlying this proceeding."). The three-judge court was thus convened to provide remedial relief for two distinct, separate, and independent constitutional violations in failing to provide essential care in the California prison system. Following fourteen days of hearings, this Court found that overcrowding was the primary cause of the ongoing constitutional violations with respect to both medical *and* mental health care. Most important, there was sufficient evidence in *each* case to support a population reduction order.[40] In other words, had there been only a medical health care case, this Court would have ordered defendants to achieve a maximum prison population of 137.5% design capacity. Similarly, had there been only a mental health care case, this Court

---

[40] *See* Aug. 4, 2009 Op. & Order at 58-60 (ECF No. 2197/3641) (discussing how crowding causes "general problems in the delivery of medical and mental health care"); *id.* at 61-63 (discussing how overcrowded reception centers result in insufficient medical care); *id.* at 63-65 (discussing the especially grave consequences of overcrowded reception centers for individuals with mental illness); *id.* at 65-68 (discussing the effect of insufficient treatment space and the inability to properly classify inmates on both medical and mental health care); *id.* at 68-70 (discussing lack of space for mental health beds); *id.* at 70-72 (discussing how conditions of confinement result in the spread of diseases); *id.* at 72-73 (discussing how conditions of confinement exacerbate mental illness); *id.* at 74-76 (discussing shortages in medical health care staff); *id.* at 76-77 (discussing shortages in mental health care staff); *id.* at 79-80 (discussing medication management issues in both *Plata* and *Coleman*); *id.* at 82 (discussing the effect of lockdowns on the provision of medical health care); *id.* at 83 (discussing the effect of lockdowns on the provision of mental health care); *id.* at 83-85 (discussing the need for medical records in medical and mental health care); *id.* at 85-86 (discussing the increasing acuity of mental illness); *id.* at 87-88 (discussing suicides); *id.* at 87-88 (discussing preventable deaths).

would have ordered defendants to achieve that same population cap.[41]  It follows that, even if defendants were able to achieve constitutional compliance in one case, so long as there were ongoing constitutional violations in the other, this Court's Order would be necessary and would remain in effect.

It has recently been determined that there are still ongoing constitutional violations with respect to the provision of mental health care in the California prison system.  On April 5, 2013, the *Coleman* court found that "ongoing constitutional violations remain" "in the delivery of adequate mental health care."  Apr. 5, 2013 Order at 67 (*Coleman* ECF No. 4539).  We accept that holding.  Additionally, nothing presented by defendants here would cause us to question the result found by the *Coleman* court.  The *Coleman* court holding alone is sufficient for this Court to find a continuing constitutional violation, and that holding – together with our holding regarding crowding – requires us to conclude that the primary cause of the continuing constitutional violations in *Coleman* continues to be overcrowding.[42]  Moreover, because the *Coleman* case provides a distinct, separate, and independent basis for our Order, this conclusion compels the continuation in effect of our June 2011 Order and each of its terms and provisions.

The constitutional question is also resolved, at least for the purposes of this proceeding, with respect to the provision of medical health care in the California prison system.  Defendants initially presented this Court with the contention that they have achieved Eighth Amendment compliance with respect to medical health care, Three-Judge Mot. at 16-17 (ECF No. 2506/4280), but later withdrew that contention from this Court's

---

[41] That one three-judge court was convened, instead of two, was for practical reasons only.  The individual district courts recommended consolidation "[f]or purposes of judicial economy and avoiding the risk of inconsistent judgments."  July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *6; July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *8.  The Supreme Court agreed, stating that there was a "certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement."  *Plata*, 131 S. Ct. at 1922.  It was a "limited consolidation" only and, most important, "[t]he order of the three-judge District Court is applicable to both cases." *Id.*

[42] We recognize that, for purposes of the denial of this motion to vacate, we need only determine, as we have *supra*, that defendants failed to show a significant and unanticipated change in circumstances that renders continued enforcement of our Order inequitable.

1    consideration.  Defs.' Resp. at 1 (ECF No. 2529/4332).  Unlike in *Coleman*, however, they

2    have not filed a motion in *Plata* to terminate on the ground that there are no longer

3    continuing constitutional violations with respect to medical health care.[43]  At the same time,

4    defendants have urged this Court to rule promptly on the Three-Judge Motion.  *Id.* at 4.  We

5    do so here and must presume, as the evidence indicates, *see* Receiver's 22nd Report at 30-31

6    (*Plata* ECF No. 2525), that the unconstitutional provision of medical health care continues

7    unabated,[44] and thus *Plata*, like *Coleman*, provides a distinct, separate, and independent basis

8    for our June 2011 Order and each of its terms and provisions.

9          On the basis of the above, we hold that not only must the Three-Judge Motion be

10   dismissed because defendants have failed to carry their burden with respect to the "primary

11   cause" question, but that the constitutional violations with respect to the provision of medical

12   and mental health care are still ongoing.  This Court therefore DENIES the Three-Judge

13   Motion.

14   //

15   //

16   //

17   //

18   //

19   //

20

21          [43] Recently, following our unsuccessful efforts to obtain any answer to our inquiries as
     to whether or when a motion to terminate might be filed, Defs.' Resp. at 1 (ECF No.
22   2529/4332) (stating that they might file a motion to terminate "in a few months"), the *Plata*
     court issued an order in that case requiring 120-day notice before the filing of a motion to
23   terminate.  Feb. 21, 2013 Order Granting in Part & Denying in Part Pls.' Mot. for Disc. at 5
     (*Plata* ECF No. 2546).  Although defendants have filed an interlocutory appeal of that order,
24   the appeal has no effect on our decision here or on defendants' obligation to comply with our
     Order.
25
            [44] The determination that medical care in the California prison system does not meet
26   constitutional standards is set forth in the *Plata* court's 2005 ruling appointing a receiver to
     manage the delivery of medical care for CDCR.  Oct. 3, 2005 FF&CL, 2005 WL 2932253, at
27   *1 ("The Court has given defendants every reasonable opportunity to bring its prison medical
     system up to constitutional standards, and it is beyond reasonable dispute that the State has
28   failed.").  That determination remains in effect.

1    **IV.    PLAINTIFFS' CROSS-MOTION**

2         On February 12, 2013, plaintiffs filed a cross-motion for additional relief.  Plaintiffs

3    contend that, even while overcrowding in the California prison system overall has lessened,

4    overcrowding in certain California prisons has persisted or increased.  Because the severe

5    overcrowding at these prisons prevents compliance with the Eighth Amendment, plaintiffs

6    request that this Court supplement the systemwide population cap and "order defendants to

7    propose a plan for institution-specific population caps, based on the ability of each institution

8    to provide constitutionally adequate care."  Cross-Mot. at 23 (ECF No. 2528/4331).

9         There is some merit to plaintiffs' argument.  As a preliminary matter, this Court

10   observes that plaintiffs are *not* seeking a 137.5% population cap for each prison.  Plaintiffs'

11   requested order would require defendants to "develop a plan for prison-specific caps . . . that

12   includes a discussion of each prison's clinical and custody staffing levels, staffing vacancies,

13   physical plant limitations, prisoner custody level and available programs."  Cross-Mot. at 24

14   (ECF No. 2528/4331).  This request finds some support in the Receiver's most recent report.

15   He describes the differences among various prison institutions and writes that "care at some

16   institutions may require a lower population density while care at other institutions may be

17   constitutional even at higher population densities."  Receiver's 22nd Report at 29 (*Plata* ECF

18   No. 2525).

19        This Court, however, rejects plaintiffs' Cross-Motion for two reasons.  First,

20   plaintiffs' request is premature.  This Court has previously stated, "[u]nless and until it is

21   demonstrated that a single systemwide cap provides inadequate relief, we will limit the relief

22   we order to that form of order."  Aug. 4, 2009 Op. & Order at 121 (ECF No. 2197/3641).

23   Because defendants have not yet met the systemwide cap of 137.5%, it is difficult to

24   determine whether that cap provides inadequate relief.  Indeed, as defendants reduce the

25   prison population from 150% to 137.5% design capacity at a systemwide level, the

26   population levels at specific institutions may decline in unexpected ways.  Accordingly, it is

27   best to wait and reassess the need for institution-specific caps, if they are needed, when

28

61

1  defendants reduce the systemwide prison population to 137.5% design capacity, or at some

2  other time deemed appropriate by the Receiver and Special Master.

3        Second, it undermines state flexibility at a time when the need for such flexibility is

4  paramount.  As this Court stated previously, "an institution-by-institution approach to

5  population reduction would interfere with the state's management of its prisons more than a

6  single systemwide cap, which permits the state to continue determining the proper population

7  of individual institutions."  Aug. 4, 2009 Op. & Order at 121 (ECF No. 2197/3641).  The

8  Supreme Court agreed, stating that our systemwide relief order leaves discretion to state

9  officials to "to shift prisoners to facilities that are better able to accommodate overcrowding,

10 or out of facilities where retaining sufficient medical staff has been difficult."  *Plata*, 131

11 S. Ct. at 1941.  The need for such flexibility has not abated.  Defendants must reduce the

12 institutional prison population by approximately 9,000 more prisoners to comply with this

13 Court's order to reduce the prison population to 137.5% design capacity.  Such a reduction,

14 although certainly feasible (for reasons we discuss *infra*) will involve significant effort.  This

15 Court will not add to those efforts unnecessarily.[45]

16       Accordingly, this Court DENIES plaintiffs' Cross-Motion without prejudice to

17 refiling when defendants reduce the systemwide prison population to 137.5% design

18 capacity, or at such other time as this Court may deem appropriate.

19 //

20 //

21 //

22 //

23 //

24 //

25 ─────────────

26 [45] Contrary to defendants' suggestion, the Supreme Court did not "unambiguously reject[] institution-specific caps."  Defs.' Reply at 19 (ECF No. 2543/4345).  To the contrary, the Supreme Court's discussion was limited to rejecting defendants' argument that our order

27 was overbroad because our order was flexible.  Recognizing the flexibility of our order does not compel, or even imply, the conclusion that institution-specific caps could not

28 subsequently be appropriate.

1  **V.    COMPLIANCE**

2      Having denied the Three-Judge Motion to vacate this Court's population reduction

3  order, we advise defendants once again that they must take all steps necessary to comply with

4  this Court's June 30, 2011 Order, as amended by the January 29, 2013 Order, requiring

5  defendants to reduce the overall prison population to 137.5% design capacity by

6  December 31, 2013.

7      **A.    Defendants' Contumacious Conduct**

8      Defendants have thus far engaged in openly contumacious conduct by repeatedly

9  ignoring both this Court's Order and at least three explicit admonitions to take all steps

10  necessary to comply with that Order.  Although our Order was delayed for two years pending

11  review by the Supreme Court, and thus defendants were effectively afforded four years in

12  which to achieve the reduction in prison population, defendants developed only one solution:

13  Realignment, which became effective in October 2011.  While Realignment was, to

14  defendants' credit, a significant step forward in reducing the prison population, it became

15  clear by early 2012 at the latest, on the basis of defendants' own Blueprint, that Realignment

16  alone could not achieve the necessary reduction to 137.5% design capacity.  Yet defendants

17  took no further steps to achieve compliance.  Defendants did subsequently report to this

18  Court regarding various measures that could reduce the prison population to 137.5% design

19  capacity by June 2013 or December 2013 but explicitly stated that these measures "do not

20  comprise the State's plan because the State has already issued its plan for the future of the

21  State's prison system, the Blueprint."  Defs.' Resp. to Oct. 11, 2012 Order at 8 (ECF No.

22  2511/4284).  Because the Blueprint will not reduce the prison population to 137.5% design

23  capacity by June 2013, or December 2013, the Blueprint is not a plan for compliance; it is a

24  plan for non-compliance.  In other words, the Blueprint describes what defendants have done

25  and what they will do with respect to complying with our Order.  What they have done is

26  make various changes to the state prison system with the expected outcome that California

27  prisons will house 9,000 more inmates than our Order permits at the extended deadline of

28  December 2013.  What further steps they will take in order to comply is equally clear: None.

1    In August 2012, this Court advised defendants that their intention to file a

2    modification motion provided no excuse for their failure to take steps to comply with this

3    Court's Order in the meantime:

4        Pending further order of the Court, defendants shall take all steps
         necessary to comply with the Court's June 30, 2011 order,
5        including the requirement that the prison population be reduced
         to 137.5% by June 27, 2013.
6

7    Aug. 3, 2012 Order at 4 (ECF No. 2460/4220).  Defendants, however, took no such steps.  As

8    plaintiffs correctly observed, despite defendants' own acknowledgment that further steps to

9    achieve the necessary population reduction – such as good time credits or sentencing reform

10   – required legislative authorization, they "made no effort to seek the needed legislation."

11   Pls.' Resp. to Defs.' Resp. to Sept. 7, 2012 Order at 2 (ECF No. 2481/4247).  In December

12   2012, this Court again reminded defendants that they "must take further steps to achieve full

13   compliance."  Dec. 6, 2012 Order at 2-3 (ECF No. 2499/4269).  Instead of doing so,

14   defendants filed a motion to vacate our Order altogether and took no further action.  Three-

15   Judge Mot. (ECF No. 2506/4280).  That same month, defendants filed a status report, in

16   which they admitted non-compliance and made it clear that they had no intention of taking

17   further steps to comply.  Defs.' Jan. 2013 Status Report at 1 (ECF No. 2518/4292) ("Based

18   on the evidence submitted in support of the State's motions, further population reductions are

19   not needed . . . .").  This Court then reiterated, for the third time, that such filings do not

20   excuse defendants from taking steps toward compliance with our Order:

21       Neither defendants' filings of the papers filed thus far nor any
         motions, declarations, affidavits, or other papers filed
22       subsequently shall serve as a justification for their failure to file
         and report or take any other actions required by this Court's
23       Order.

24   Jan. 29, 2013 Order at 2 (ECF No. 2527/4317).  Defendants, instead of taking further steps to

25   comply with our Order, submitted status reports for February and March 2013 that repeated

26   the language of non-compliance verbatim from the January 2013 order.  Defs.' Feb. 2013

27   Status Report at 1 (ECF No. 2538/4342); Defs.' March 2013 Status Report at 1 (ECF No.

28

2569/4402).  In short, for approximately a year, defendants have acted in open defiance of this Court's Order.

Being more interested in achieving compliance with our Order than in holding contempt hearings, this Court has exercised exceptional restraint.  Reserving its right to take whatever action may be appropriate with respect to defendants' past conduct, this Court now orders defendants once more to take steps *beyond* that of Realignment and to do so forthwith. Realignment has been a constructive measure, but its effects have reached their maximum, and it will not reduce the prison population to 137.5% design capacity.  Defendants have been granted a six-month extension, and this Court expects them to use that time to institute additional measures that will serve to reduce the prison population by an additional 9,000 inmates by December 2013.[46]

## B.   Defendants' January 7, 2013 Filings

In a recent filing, defendants identified various measures by which they could achieve the necessary population reduction by December 2013.  Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2511/4284).  They state in that filing, however, that (1) they have "taken major action in all five of the[] areas" listed in our prior Opinion & Order and that therefore any "further actions in these areas could not be implemented without adversely impacting public safety," *id.* at 3, and (2) "[e]ach of the prison population reduction measures described below would require rewriting or waiving state statutes and constitutional provisions," *id.* at 6.  The first statement is inaccurate, and the second is misleading.  What is evident, however, is that defendants do not intend to adopt those measures.

Although defendants may have taken *some* action in the five areas identified in our prior Opinion & Order, they have not taken the *degree* of action in any of them that this Court determined was necessary, and that could be taken without adversely impacting public safety.  For example, with respect to the second and third areas – the diversion of technical

---

[46] We assume, for practical reasons, that defendants will not be able to institute and complete any new construction projects between now and December 2013 that would increase capacity.  Accordingly, we assume that, at this stage, compliance with the 137.5% population cap could be achieved only by reducing the prison population by 9,000 inmates.

1   parole violators and the diversion of low-risk offenders with short sentences – Realignment

2   diverts only a small subset of low-risk prisoners and parolees to county jails.  Significant

3   opportunity for further diversion thus remains.  *See, e.g.*, Defs.' Resp. to Oct. 11, 2012 Order

4   at 11-12 (ECF No. 2511/4284) (identifying a possible population reduction measure

5   involving the diversion to the county jail system of inmates with "nine months or less" time

6   to serve remaining).  With respect to the fifth category – other reforms including changes to

7   sentencing law – defendants have not pursued "release or diversion of certain

8   [s]ub-populations, such as women, the elderly and the sick from prison to community-based

9   facilities."  Aug. 4, 2009 Op. & Order at 154 (ECF No. 2197/3641).  In particular, despite the

10   fact that 14% of California's misnamed "Lifer"[47] population – which consists of over 30,000

11   inmates – are over 55 years old, defendants have taken no meaningful action to release

12   elderly low-risk prisoners in this category.  *See* Robert Weisberg et al., Stanford Criminal

13   Justice Center, *Life in Limbo: An Examination of Parole Release for Prisoners Serving Life*

14   *Sentences with the Possibility of Parole*, Sept. 2011, at 16-17.  It is more than likely that

---

15   [47] "Lifer" refers principally to inmates serving a "term-to-life" sentence with the

16   possibility of parole.  The term "Lifer" incorrectly conveys the impression that any such inmate must have committed a horrendous crime in order to have received a life sentence.

17   To the contrary, under California's determinate sentencing scheme, most Lifers are given a minimum prison term (generally 15-20 years), after which they are eligible for parole unless

18   they are deemed a threat to public safety.  Lifers include, for example, individuals who committed vehicular homicide – individuals who were extremely reckless when younger but

19   are far less so having reached middle age or more.  *E.g.*, *Sass v. California Bd. of Prison Terms*, 461 F.3d 1123 (9th Cir. 2006), *overruled on other grounds by Hayward v. Marshall*,

20   603 F.3d 546 (9th Cir. 2010) (en banc).  Very few Lifers have been released, however, despite their low risk of recidivism.  As a result, the Lifer population now constitutes 20% of

21   the entire California prison system.  *See generally* Robert Weisberg et al., Stanford Criminal Justice Center, *Life in Limbo: An Examination of Parole Release for Prisoners Serving Life*

22   *Sentences with the Possibility of Parole*, Sept. 2011, available at http://blogs.law.stanford.edu/newsfeed/files/2011/09/SCJC_report_Parole_Release_for_

23   Lifers.pdf.
          Although defendants object to the release of elderly Lifers on the ground of public

24   safety, Defs.' Resp. to Oct. 11, 2012 Order at 19-20 (ECF No. 2511/4284), it appears that 75% of these Lifers have been placed in CDCR's lowest risk category, and the historical

25   recidivism rate of Lifers is approximately 1% – in comparison to California's overall recidivism rate of 48%.  *See* Weisberg, *Life in Limbo*, at 16-17.  Moreover, elderly

26   individuals are much less likely to recidivate as they are generally less likely to commit crimes.  *Id.* at 17 ("For most offenses – and in most societies – crime rates rise in the early

27   teenage years, peak during the mid-to-late teens, and subsequently decline dramatically.  Not only are most violent crimes committed by people under 30, but even the criminality that

28   continues after that declines drastically after age 40 and even more so after age 50.").

1  defendants could reduce the deficit with respect to the 137.5% population cap by

2  approximately half, without risk to public safety, were it to make the appropriate assessments

3  and take the appropriate actions with respect to these so-called "Lifers" alone.  Clearly, much

4  benefit could be obtained with respect to the second, third, and fifth categories identified in

5  our prior Opinion & Order were defendants to take even moderate steps in those areas.  Yet,

6  as far as legislative action is required, defendants have not advised us of anything they have

7  done to obtain waivers of legislative obstacles.

8  　　　　Perhaps defendants' greatest failure to act, however, is with respect to the first

9  category identified in our prior Opinion & Order: the expansion of good time credits.

10  Although defendants have expanded the good time credits program somewhat under Senate

11  Bill 18, the current system falls far short of what this Court described as being a feasible

12  means of reducing the prison population without having any adverse impact on public safety.

13  Aug. 4, 2009 Op. & Order at 139-45 (ECF No. 2197/3641).[48]  California continues to limit

14  excessively the length, and to restrict the availability, of good time credits, despite this

15  Court's determination that eliminating these restrictions would enable defendants to safely

16  reduce the prison population.  *Id.* at 177-81 (citing Expert Panel on Adult Offender

17  Recidivism Reduction Programming at 95[49]).  Accordingly, if defendants were to adopt the

18  policies of other jurisdictions and increase the length of good time credits to 4-6 months and

19  award credits to inmates regardless of their offense or strike level, these changes would, on

20  their own, reduce the prison population by far more than the amount necessary to comply

21  with the 137.5% population cap.  Again, even a moderate change in policy would enable

22  

23  　　　　[48] Dr. James Austin, plaintiffs' primary expert on good time credits, submitted a
declaration stating that, if California were to bring its good time credits program in line with
24  other jurisdictions that have safely implemented such programs – i.e., permitting four to six
months of credit – it would reduce the prison population by 7,000 inmates.  Austin Decl.
25  ¶¶ 12-15 (ECF No. 2420-1/4152-1).

26  　　　　[49] This report described various good time credit reforms that had the potential to
reduce the prison population by 32,000 inmates.  Very few of these reforms have been
27  implemented, and thus the opportunity for further reduction in the prison population through
expansion of good time credits remains significant.  The report is available at
28  http://sentencing.nj.gov/downloads/pdf/articles/2007/July2007/document03.pdf

1   defendants to comply with this Court's Order, and, again, defendants have not advised us that

2   they have sought such a change.

3       Contrary to Defendants' representations, not all measures identified in defendants'

4   filing require the waiver of state laws.  For example, the out-of-state prisoner program was

5   initially enacted under the Governor's emergency powers.  It therefore follows that it could

6   be continued or reinstated under those powers.[50]  We note that continuance of the out-of-state

7   prisoner program is not necessary to enable defendants to comply with our Order.  It is, of

8   course, defendants' choice how they will comply.  As we have explained, among the many

9   means for reducing the prison population, the expansion of good time credits would alone

10  enable defendants to comply, and the early release of low-risk elderly "Lifers," in

11  combination with other equally minor reforms, would do the same.  Certainly some

12  combination of some of these low-risk reforms would enable defendants to reduce the prison

13  population to well below 137.5% design capacity even while terminating the out-of-state

14  prisoner program, which defendants have advised us is extremely costly, and which has the

15  further disadvantage of preventing prisoners from maintaining relationships with family

16  members.

17      Although they have done little if anything to obtain various state waivers, defendants

18  have advised this Court that such waivers will be necessary if defendants are to implement

19  some of the measures in question.  Defs.' Resp. to Oct. 11, 2012 Order (ECF No.

20  2511/4284).  This Court is empowered to override the applicable state provisions, if

21  necessary, 18 U.S.C. § 3626(a)(1)(B),[51] but will do so only as a matter of last resort.  It would

22  be more in keeping with principles of federalism, however, were the Governor to use his best

23  

---

24      [50] That the Governor has prematurely declared the overcrowding problem over is of no
    consequence, given the facts established in this case.

25  

26      [51] This provision of the PLRA reads: "The court shall not order any prospective relief
    that requires or permits a government official to exceed his or her authority under State or
    local law or otherwise violates State or local law, unless – (i) Federal law requires such relief
27  to be ordered in violation of State or local law; (ii) the relief is necessary to correct the
    violation of a Federal right; and (iii) no other relief will correct the violation of the Federal
28  right."  18 U.S.C. § 3626(a)(1)(B).

efforts to obtain such waivers.  Nothing in the record to date suggests that he has done so.  In a concurrently filed order, we therefore order defendants to list, *in the order of their preference*, (1) all possible measures to reduce the prison population that have been suggested by this Court or identified as possible prison reduction measures by plaintiffs or defendants in the course of these proceedings; (2) the extent of population reduction that could be accomplished by each measure, including retroactive application where applicable; and (3) which measures require waivers of state law (and which specific laws).  Additionally, because defendants' projections may prove inaccurate, as they have in the past, this Court orders defendants "to begin without delay to develop a system to identify prisoners who are unlikely to reoffend or who might otherwise be candidates for early release."  *Plata*, 131 S. Ct. at 1947.  The details are available in the concurrently filed order.

We note that, although defendants have identified ten patchwork steps – steps that are neither retroactive nor sustained – that in combination would serve to reduce the prison population to the requisite number by December 31, 2013, some of the measures that we have discussed in this Section would be more effective and desirable if adopted as permanent, substantive changes in prison policy.  In one case, the implementation of the measure in itself would enable defendants to achieve compliance; in another, the implementation of the measure, along with only one of a number of other measures, would enable defendants to reach that goal readily.  *See* Pls.' Statement in Resp. to Oct. 11, 2012 Order Re: Population Reduction (ECF No. 2509/4283).  Furthermore, adopting a number of the measures discussed in this Section as substantive changes would benefit the administration of the prison system over the long run.  It is that long-term obligation that defendants must bear in mind in achieving a "durable remedy" to the problem of prison crowding.  Accordingly, in responding to our concurrently filed order that directs defendants to provide us with a plan for compliance with our Order, defendants must provide assurances that those measures will remain in effect for an indefinite future period, and that the prison population will be maintained at 137.5% design capacity pending further order of this Court.

1          ## C.      **Compliance Going Forward**

2          Finally, this Court observes that the prison overcrowding crisis has plagued California

3  for over twenty years and defied the efforts made in good faith by Governor Brown's

4  predecessors, including Governor Deukmejian and Governor Schwarzenegger.  Fully aware

5  of this context, the Supreme Court affirmed this Court's determination that the prison

6  population must be reduced to 137.5% design capacity within a two-year period.

7  Accordingly, Governor Brown has a duty to exercise in good faith his full authority,

8  including seeking any changes to or waivers of state law that may be necessary to ensure

9  compliance with the Supreme Court's judgment.  *See, e.g.*, *Cooper v. Aaron*, 358 U.S. 1, 18

10  (1958); *United States v. Barnett*, 376 U.S. 681 (1964).

11          This Court reminds defendants *yet again* that they continue to be subject to the terms

12  of this Court's order.  As the Supreme Court explained in *Maness v. Meyers*, 419 U.S. 449,

13  458 (1975):

14              We begin with the basic proposition that all orders and judgments
              of courts must be complied with promptly.  If a person to whom a
15              court directs an order believes that order is incorrect the remedy
              is to appeal, but, absent a stay, he must comply promptly with the
16              order pending appeal.  Persons who make private determinations
              of the law and refuse to obey an order generally risk criminal
17              contempt even if the order is ultimately ruled incorrect.

18  *Id.* at 458.  The rule in *Maness* that parties must comply whether or not they believe a court's

19  order is incorrect and must do so during any period that they may be contesting its validity is

20  applicable to public and private parties alike.  Specifically, the rule is applicable to Governor

21  Brown, as well as the lowliest citizen.  That Governor Brown may believe, contrary to the

22  evidence before this Court, that "prison crowding [is] no longer . . . inhibit[ing] the delivery

23  of timely and effective health services to inmates,"[52] will not constitute an excuse for his

24  failure to comply with the orders of this Court.  Having been granted a six-month extension,

25  defendants have no further excuse for non-compliance.  If defendants do not take all steps

26  necessary to comply with this Court's June 30, 2011 Order, as amended by this Court's

27

28          [52] Gov. Brown, Jan. 8, 2013 Proclamation.

January 29, 2013 Order, including complying with the order filed in conjunction with this opinion, they will without further delay be subject to findings of contempt, individually and collectively.  We make this observation reluctantly, but with determination that defendants will not be allowed to continue to violate the requirements of the Constitution of the United States.

**IT IS SO ORDERED.**

Dated:   04/11/13

STEPHEN REINHARDT
UNITED STATES CIRCUIT JUDGE
NINTH CIRCUIT COURT OF APPEALS

Dated:   04/11/13

LAWRENCE K. KARLTON
SENIOR UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF CALIFORNIA

Dated:   04/11/13

THELTON E. HENDERSON
SENIOR UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA