1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:   (510) 280-2621
4
5
6
7
8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
   MEGAN CESARE-EASTMAN – 253845
10 K&L GATES LLP
   4 Embarcadero Center, Suite 1200
11 San Francisco, California  94111-5994
   Telephone:   (415) 882-8200

   MICHAEL W. BIEN – 096891
   JANE E. KAHN – 112239
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LORI E. RIFKIN – 244081
   AARON J. FISCHER – 247391
   MARGOT MENDELSON – 268583
   KRISTA STONE-MANISTA – 269083
   ROSEN BIEN GALVAN &
   GRUNFELD LLP
   315 Montgomery Street, Tenth Floor
   San Francisco, California  94104-1823
   Telephone:   (415) 433-6830

   CLAUDIA CENTER – 158255
   THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
   180 Montgomery Street, Suite 600
   San Francisco, California  94104-4244
   Telephone:   (415) 864-8848

12 Attorneys for Plaintiffs

13

14                    UNITED STATES DISTRICT COURT

15                  EASTERN DISTRICT OF CALIFORNIA

16

17  RALPH COLEMAN, et al.,                Case No. Civ S 90-0520 LKK-JFM

18              Plaintiffs,               **NOTICE OF MOTION AND MOTION
                                          FOR ENFORCEMENT OF COURT
19        v.                              ORDERS AND AFFIRMATIVE
                                          RELIEF RELATED TO INPATIENT
20  EDMUND G. BROWN, Jr., et al.,         TREATMENT**

21              Defendants.               Judge:   Hon. Lawrence K. Karlton
                                          Date:    May 13, 2013
22                                        Time:    10:00 a.m.
                                          Crtrm.:  4
23

24

25

26

27

28

[781493-4]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ........................................................................................ iv

NOTICE OF MOTION .................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 2

INTRODUCTION ........................................................................................................... 2

BACKGROUND ............................................................................................................. 4

ARGUMENT .................................................................................................................. 6

I.      THE COURT SHOULD ISSUE ORDERS NECESSARY TO ENFORCE
        ITS PRIOR ORDERS TARGETED AT PROVIDING ADEQUATE
        INPATIENT CARE AS PART OF THE *COLEMAN* REMEDY,
        INCLUDING DIRECTING THE SPECIAL MASTER TO ASSIST IN THE
        DEVELOPMENT OF  PLANS TO REMEDY CONTINUING
        DEFICIENCIES ..................................................................................................... 6

        A.      Defendants Are Denying Appropriate Levels of Care to Critically Ill
                Patients on Death Row at San Quentin ....................................................... 6

        B.      DSH Facilities are Dangerously Understaffed .......................................... 10

        C.      Custodial Policies at DSH Subject Class Members Newly Admitted to
                SVPP to Excessive, Unnecessary, and Dangerous Deprivations ................. 16

        D.      Defendants Also Deny Class Members at all SVPP Program Levels
                Basic Human Needs .................................................................................. 18

        E.      Defendants Mismanage Discharges and Waitlists for Inpatient Care,
                Resulting in Treatment Failures and Harm to Patients ............................. 20

        F.      Defendants Improperly Discharge Patients from DSH to CDCR in
                Anticipation of Future Parole Dates in Violation of this Court's Prior
                Order .......................................................................................................... 22

        G.      Defendants Should Not Be Shutting Down Temporary Units With
                Patients Still In Them, Nor Haphazardly Transferring Patients to New
                Units That Are Not Yet Staffed ................................................................. 24

                1.      Defendants Should Be Ordered To Keep Temporary Units
                        Fully Staffed Until They Can Demonstrate That They Are No
                        Longer Needed ................................................................................. 24

                2.      The Special Master Should be Ordered to Review the New L-2
                        Unit Activated in March 2013 at VPP, and Any Similar Newly-
                        Activated or Temporary Units ......................................................... 25

        H.      The Welfare of Patients of Vacaville Psychiatric Program (VPP) Must
                be Investigated ........................................................................................... 26

[781493-4]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

II.    THESE PROPOSED ORDERS SATISFY THE REQUIREMENTS OF THE
       PLRA .................................................................................................................. 27

CONCLUSION.................................................................................................................. 28

[781493-4]

# TABLE OF AUTHORITIES

**Page**

## <u>CASES</u>

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ................................................................ 5

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) .......................................................................... 19

*Feliciano v. Rullan*,
    378 F.3d 42 (1st Cir. 2004) .................................................................... 5

*Hoptowit v. Ray*,
    682 F.2d 1237 (9th Cir. 1982) ............................................................... 19

## <u>STATUTES</u>

18 U.S.C. § 3626(a)(1) ................................................................................ 28

Cal. Penal Code § 3600(b)(4) ....................................................................... 9

## <u>OTHER AUTHORITIES</u>

John Q. LaFond & Mary L. Durham, *Back to the Asylum: The Future of Mental
    Health Law and Policy in the United States* (Oxford University Press, 1992) ........ 19

[781493-4]

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

**TABLE OF ABBREVIATIONS**

| CDCR | California Department of Corrections and Rehabilitation |
|------|---------------------------------------------------------|
| CHCF | Stockton Consolidated Health Care Facility |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| CSP | California State Prison |
| CTC | Correctional Treatment Center |
| DMH | Department of Mental Health (now DSH) |
| DSH | Department of State Hospitals (formerly DMH) |
| EOP | Enhanced Outpatient Program |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| LOP | Local Operating Procedure |
| MHCB | Mental Health Crisis Bed |
| MTA | Medical Technical Assistant |
| OHU | Outpatient Housing Unit |
| PLRA | Prison Litigation Reform Act of 1995 |
| RN | Registered Nurse |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| VPP | Vacaville Psychiatric Program |

[781493-4]

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

1

**NOTICE OF MOTION**

2  TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

3          PLEASE TAKE NOTICE THAT on May 13, 2013, at 10 a.m., in Courtroom 4 of

4  the United States Courthouse in Sacramento, or at whatever other time and place the Court

5  directs, Plaintiffs, through their counsel of record, will and hereby do move for

6  enforcement of Court orders and affirmative relief related to inpatient psychiatric

7  hospitalization to remedy the constitutional violations in this case.  Evidence before the

8  Court demonstrates the State's persistent failure to provide constitutionally adequate

9  mental health care to prisoners with serious mental illness.  This motion is specifically

10  directed at enforcing the Court's orders that the State must provide inpatient mental health

11  treatment to prisoners requiring psychiatric hospitalization.  In the Department of State

12  Hospitals ("DSH") inpatient units housed in California Department of Corrections and

13  Rehabilitation ("CDCR") prisons, chronic understaffing, excessively restrictive custodial

14  practices, premature patient discharges, refusal to admit prisoners on death row or with

15  upcoming release dates, and the inappropriate allocation of resources when activating new

16  inpatient units create a dangerous and inhumane environment for inmate-patients that is

17  causing serious harm to *Coleman* class members and denying them their basic needs.  As a

18  result of these deficiencies and others, Plaintiffs move this Court for enforcement of its

19  orders that the State provide constitutionally adequate inpatient psychiatric hospitalization

20  to prisoners with acute mental illness.

21          This Motion is based on this Notice of Motion and Motion, the Memorandum of

22  Points and Authorities filed herewith, the Declarations of Dr. Joel Badeaux, Ernest Galvan,

23  and Lori Rifkin filed herewith, Corrected Plaintiffs' Opposition to Defendants' Motion to

24  Terminate under the PLRA and to Vacate under Rule 60(b)(5) (Docket No. 4422)

25  (hereinafter "Pls' Opp. Br.") and all documents filed in support of Plaintiffs' Opposition,

26  the pleadings and orders on file in the above-captioned matter, and oral argument or

27  evidence permitted at any hearings on this motion.

28

[781493-4]

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Access to and provision of appropriate and adequate inpatient psychiatric hospitalization in the DSH-run inpatient units at CDCR facilities has reached a crisis point, and further orders from this Court are needed to enforce the *Coleman* remedy. Defendants categorically prohibit inmates on death row who need inpatient psychiatric hospitalization from transferring to intermediate care facilities ("ICF") at DSH, although Plaintiffs' expert observed class members on death row who have been languishing for years in need of such treatment. Staffing shortages and under-resourcing are so severe in the DSH-run units at CDCR facilities that DSH psychiatrists and Plaintiffs' expert reported that inmate-patients at Salinas Valley Psychiatric Program ("SVPP") are denied not only appropriate mental health treatment, but even basic needs such as clean clothes, bedding, and soap. Excessively restrictive custodial policies require acutely ill patients to spend their first fourteen (or more) days locked down, deprived of basic programming, without regard for their clinical needs or custodial status. Doctors at SVPP report pressure to prematurely discharge patients from the inpatient psychiatric hospitalization setting in order to artificially keep CDCR's inpatient waitlist down. Plaintiffs' expert observed multiple examples of inmate-patients suffering as a result of premature discharges back to CDCR from various DSH-run programs, and the Special Master has noted mismanagement of discharges from DSH to CDCR in his suicide reports.

These dangerous policies and practices are resulting in grave harm to *Coleman* class members, as evidenced by the first suicide of a class member at SVPP on November 29, 2012. The 35-year-old man with a history of "isolation [and] hopelessness" hanged himself after 21 days in SVPP, a few days after an unsuccessful suicide attempt. (Confidential Declaration of Jane Kahn in Opp. to Mot. to Terminate, Docket No. 4411 ("Kahn Confidential Decl."), Ex. 42 (CDCR Suicide Rpt.), at 12; *see also* Declaration of Pablo Stewart, M.D., Docket No. 4381 ("Stewart Decl.") ¶¶ 436-444.) For the entirety of those three weeks, he was held at severely restricted "Level 1" status, confined to his cell

[781493-4]

1  and denied basic programming.  This lockdown followed a wait time of eight weeks

2  between his referral for admission to inpatient psychiatric hospitalization and his actual

3  transfer.[1]  (Stewart Decl. ¶ 438).  His suicide note, scrawled on the wall of his cell, read:

4  "I came in here [] slightly depressed.  Now I am severely depressed.  This place is

5  hopeless!"  (Kahn Confidential Decl. Ex. 42 (CDCR Suicide Rpt.)  Recently, a 36-year-old

6  patient died at SVPP under circumstances yet to be disclosed by Defendants.  (*See*

7  Transcript of 3/27/13 Hearing at 48:23-49:2l, 52:7-11.)

8        In January 2013, the entire staff psychiatry team at SVPP signed a letter to SVPP

9  Executive Director Charles DaSilva describing the staffing situation as creating "an

10  unacceptable level of risk as far as patient safety."  (Declaration of Joel Badeaux, M.D.

11  ("Badeaux Decl."), Ex. B at 1.)  According to these psychiatrists, while the standard DSH

12  caseload for psychiatrists is fifteen (15) patients and processing approximately two

13  admissions per week, SVPP psychiatrists' caseloads average forty (40) patients and two

14  admissions per week, with some psychiatrists covering sixty (60) patients.  (*Id.*)  The

15  SVPP psychiatrists described the situation as "unsafe" and "perilous."  (*Id.*)  Three weeks

16  later, in February 2013, the SVPP psychiatrists wrote a second letter to Mr. DaSilva stating

17  that "the severe psychiatry … staffing shortage has devolved from serious to crisis level"

18  and "urgent action" was needed.  (Badeaux Decl., Ex. C at 1.)  Meanwhile, the State

19  pursued its motion for termination of the *Coleman* case, claiming to have remedied its

20  serious deficiencies in providing mental health care to prisoners with mental illness.

21        In its April 5, 2013 order, the Court recognized that, based on the fact-finding in

22  connection with Defendants' Motion to Terminate, Plaintiffs had presented evidence of

23  clinical staffing shortages at DSH programs for CDCR inmates and inadequate mental

24  health treatment for death row inmates.  The Court did not reach those issues because of

25

26  _____

27  [1] Moreover, this eight-week wait to be transferred followed a period of 28 days between
   completion of his referral packet and the packet actual being sent to DSH.  *Id.*

28

the time constraints imposed by the PLRA termination process, finding that "it is sufficient that ongoing constitutional violations in other areas remain."  (Docket No. 4539 at 8-9, n.6.)  In light of the State's continued failure to provide adequate inpatient psychiatric hospitalization to *Coleman* class members, even in the face of this Court's previous orders related to inpatient care, Plaintiffs now request further orders of this Court to protect the rights of the *Coleman* class and enforce the remedy in this case.

## BACKGROUND

This Court has repeatedly recognized that appropriate provision of inpatient psychiatric hospitalization to prisoners with acute mental illness is a fundamental element of the remedy for the constitutional violations in this case.  (*See, e.g.,* 4/5/13 Order, Docket No. 4539, at 50 (describing "the unconscionable delays in access to inpatient care" as "one of the most tragic failures in the delivery of mental health care")); 8/30/12 Order, Docket No. 4232, at 5 n.3 (citing with approval and describing as "critically important" the goals identified by the Special Master in the 23rd Report [including ensuring that seriously mentally ill inmates are properly identified, referred, and transferred to DMH]) (23rd Round Monitoring Report, Docket No. 4124, at 74); 8/8/08 Order, Docket No. 2930 at 2 ("Timely access to psychiatric hospitalization is a crucial part of the provision of constitutionally adequate mental health care to persons incarcerated in the Department of Corrections and Rehabilitation (CDCR)."); 5/2/06 Order, Docket No. 1800 at 2 (discussing importance of "access to necessary and constitutionally adequate levels of care for the most seriously mentally ill inmates in the CDCR.").)

The State has long demonstrated particular intransigence in this area, leading to the Court's specific naming of the Department of State Hospitals (formerly Department of Mental Health ("DMH")) as a Defendant in the remedial phase of this case in 2006.  (6/28/06 Order, Docket No. 1855.)  As a result of the State's history of failing to provide sufficient and timely access to psychiatric hospitalizations, the Court has issued numerous orders directed at securing adequate inpatient treatment for prisoners, including orders addressing, *inter alia*: staffing allocations and vacancies at DSH-run programs (*see, e.g.,*

4

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

1   2/6/07 Order, Docket No. 2134), salary and pay parity for DSH clinicians providing care to

2   *Coleman* class members (*see, e.g.*, 5/23/97 Order, Docket No. 2237), sufficiency of

3   treatment and counseling space for inpatient programs (*see, e.g.*, 10/18/07 Order, Docket

4   No. 2461), access to inpatient beds for all members of the *Coleman* class (*see, e.g.*, 8/8/08

5   Order, Docket No. 2930), and transfer timelines for referrals of patients to inpatient care

6   (*see, e.g.*, 7/26/99 Order, Docket No. 1055; 7/4/01 Order, Docket No. 1262).  (*See also*

7   8/08/08 Order at 2-3, n.1 (cataloguing Court's previous orders related to psychiatric

8   hospitalization).)

9        In response to these Court orders, Defendants succeeded in reducing official

10  waitlists for inpatient psychiatric hospitalization from hundreds of patients to dozens of

11  patients, and this Court has recognized that accomplishment.  (7/13/12 Order, Docket No.

12  4214.)  However, discovery connected to the recent termination motion revealed life-

13  threatening problems that risk reversing any recent gains in safety for *Coleman* class

14  members who need inpatient psychiatric hospitalization.  Some of these problems are

15  caused by Defendants' chosen methods of waitlist management—including pressuring

16  DSH clinicians to discharge patients back to dangerous prison settings prematurely.

17  Others result from Defendants' deliberate understaffing of DSH programs, and

18  overzealous cost-cutting that fails to provide basic human needs such as clean clothes and

19  soap.  In addition, Defendants have instituted clinically inappropriate custody practices in

20  some DSH programs that subject patients to similar or even harsher lockdowns and

21  isolation than they faced in the CDCR units from which they were referred.

22        The Ninth Circuit has made clear that, in complex institutional litigation, specific

23  and targeted remedial orders are appropriate when supported by the record.  "Prospective

24  relief for institutions as complex as prisons is a necessarily aggregate endeavor, composed

25  of multiple elements that work together to redress violations of the law."  *Armstrong v.*

26  *Schwarzenegger*, 622 F.3d 1058, 1070 (9th Cir. 2010); *see also Feliciano v. Rullan*, 378

27  F.3d 42, 55 (1st Cir. 2004) (noting that defendants' record of "abject failure" guides the

28  inquiry regarding the appropriateness of relief where defendants had been unable to "cure

the constitutional infirmities plaguing the delivery of health care in the correctional system" for more than two decades).  Even as they concurrently represented to the Court that they are in compliance with constitutional requirements such that this case should terminate, Defendants continued to fail to act to remedy serious and known flaws in the delivery of inpatient treatment.  This Court should take further measures to enforce the *Coleman* remedy's requirement of access to adequate inpatient psychiatric hospitalization.

## ARGUMENT

**I.    THE COURT SHOULD ISSUE ORDERS NECESSARY TO ENFORCE ITS PRIOR ORDERS TARGETED AT PROVIDING ADEQUATE  INPATIENT CARE AS PART OF THE *COLEMAN* REMEDY, INCLUDING DIRECTING THE SPECIAL MASTER TO ASSIST IN THE DEVELOPMENT OF PLANS TO REMEDY CONTINUING DEFICIENCIES**

### A.    Defendants Are Denying Appropriate Levels of Care to Critically Ill Patients on Death Row at San Quentin

Defendants have instituted an unjustified policy of categorically prohibiting death row inmates from transferring from San Quentin to ICF facilities, regardless of their clinical indications or mental health care needs.  (*See* Defs' Reply Memorandum ("Defs' Reply"), Docket No. 4487 at 24.)  This ban denies adequate and appropriate mental health treatment to these *Coleman* class members.  (*See* Pls' Opp. Br. at 73-76.)  Plaintiffs' expert reported that he met individuals at San Quentin who "had been waiting for more than two years in their regressed, isolative, very acutely mentally ill states without being referred and transferred to an inpatient care program."  (Stewart Decl. ¶ 465.)  Some of the condemned inmates whom Plaintiffs' expert attempted to interview were "too psychotic, paranoid and hostile" to speak with Plaintiffs' expert "for more than a few moments."  (*Id.* ¶ 454.)  Others "had been refusing virtually all out of cell treatment for several years" before San Quentin staff decided to establish housing within the Correctional Treatment Center ("CTC") for them, and were acutely mentally ill as a result.  (*See id.* ¶¶ 457-463. )

Severely mentally ill death row inmates have deteriorated and suffered at San Quentin for years because of Defendants' denial of treatment.  Now, instead of using the processes for DSH referral and treatment developed under the oversight of this Court,

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

[781493-4]

1    CDCR has attempted to create a separate, unlicensed program purporting to inpatient

2    psychiatric care for death row inmates.  However, this program lacks oversight and

3    accountability and is failing to provide appropriate treatment to death row inmates in need

4    of ICF level care.  (*See* Stewart Decl. ¶¶ 452-471.)

5        According to Defendants, the "Specialized Care for the Condemned Program,"

6    which opened at San Quentin in November 2010, "provides the equivalent of an ICF-level

7    of care" for death row inmates.  (Reply Declaration of Eric Monthei, Docket No. 4436

8    ("Monthei Decl.") ¶ 28.)  The Special Master's 25th Round Monitoring Report observed

9    that the Specialized Care Program has listed a census of eight to ten inmates since opening,

10   but Defendants have yet to articulate "[b]asic clinical requirements such as admission and

11   discharge criteria" for the program.  (Special Master's 25th Round Monitoring Report,

12   Docket No. 4298, at 177.)  The Special Master also noted that some patients in the

13   Program "did not even have treatment plans or current treatment plans."  (*Id.* at 178.)

14   Where treatment plans did exist, they frequently failed to "describe the nature of the care

15   being given."  (*Id.*)  After reviewing the medical records of the Program's participants, the

16   Special Master concluded that "[m]ost" of the patients in the Specialized Care Program

17   "clearly needed inpatient care and were not receiving it or its equivalent."  (*Id.* at 178.)

18       The Special Master's concerns about the treatment provided at the Specialized Care

19   Program led to a "focused revisit at the institution" in December 2012.  (*Id.* at 179.)  Based

20   on further inspection and review, the Special Master reported ongoing, serious concerns

21   about the Specialized Care Program.  In the 25th Round Monitoring Report, the Special

22   Master observed that "many of the patients in the program had been in the men's

23   condemned unit many years, with long histories of serious mental illness that had not been

24   treated adequately."  (*Id.* at 179-80.)  The Special Master also noted that, while two drafts

25   of Local Operating Procedures (LOPs) for San Quentin's mental health care program had

26   been produced, even the most recent draft was vague and "made no specific reference to

27

28

1   the condemned specialized treatment program or services." (*Id.* at 184.)[2]

2       Plaintiffs' experts echoed the Special Master's concerns about the inadequacies of

3   the Specialized Care Program. Dr. Stewart opined that the Specialized Care Program is

4   not currently delivering the equivalent of inpatient psychiatric hospitalization. (Stewart

5   Decl. ¶ 464.) Consistent with the Special Master's experience, Dr. Stewart noted that he

6   had "not been shown a comprehensive program description, detailed admission and

7   discharge criteria, assessments of staffing needs and space needs, or any of the other

8   program information the Special Master has called upon defendants to develop if they are

9   going to proceed with the new program." (Stewart Decl. ¶ 464.) Plaintiffs' expert Jeanne

10  Woodford, former warden of San Quentin, reported that she saw no evidence that adequate

11  staff had been "designated or trained" for the Specialized Care Program. (Declaration of

12  Jeanne Woodford ("Woodford Decl."), Docket No. 4380 ¶ 45.) She also noted that "San

13  Quentin was still unable to provide specifics regarding the custody staffing or protocols for

14  the specialized care program."[3] (*Id.* ¶ 46.) Although Defendants have for years claimed to

15  Plaintiffs and the Special Master that the Specialized Care Program would remedy the

16  harms caused by refusing ICF transfers to condemned inmates, Ms. Woodford concluded

17  that the program today remains "too vaguely defined to be properly evaluated." (*Id.* ¶ 46.)

18      In February 2013, Defendants began to move death row inmates designated as

19  participants in the Specialized Care Program into beds within San Quentin's CTC, where

20  Defendants intend to operate an unlicensed unit providing services to these individuals.

---

22  [2] To Plaintiffs' knowledge, Defendants have not submitted an addendum to the LOP that

23  would address the Special Master's concerns and recommendations. (*See* 25th Round
    Monitoring Report at 186.)

24  [3] Dr. Stewart and Ms. Woodford also testified that the mental health screening procedures

25  for condemned row inmates are inadequate to meet the mental health care needs of the
    inmate-patients. (*See* Stewart Decl. ¶ 453 (testifying that the percentage of condemned

26  inmates at the EOP level of care is lower than would be expected given the nature of that
    population); Woodford Decl. ¶¶ 30, 31, 32, 55 (identifying particular individuals whom

27  she would have referred for evaluation for a higher level of care).)

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

[781493-4]

1  (*See* Declaration of Lori Rifkin ("Rifkin Decl."), Ex. 1 (Deposition of Diana Toche at

2  111:16-23) (one or two inmate patients had been moved to the designated CTC beds as of

3  February 22, 2013)); Stewart Decl. ¶ 454 (three prisoners housed in the CTC space as of

4  February 26, 2013 site visit).)  However, using existing CTC beds that are not licensed to

5  provide mental health care to prisoners is not a long-term or adequate solution.  The *Plata*

6  Court Medical Experts have noted that the transition of ten of San Quentin's 34 outpatient

7  housing unit ("OHU") beds to housing for the Specialized Care Program would leave an

8  insufficient number of medical beds "for a population of 4,000 that includes 690

9  condemned inmates."  (Rifkin Decl., Ex. 2 at 6.)  Moreover, in an internal e-mail chain

10  produced in discovery, the Standards Compliance Coordinator for the San Quentin

11  Correctional Treatment Center expressed concern that operating an unlicensed ICF

12  program within the CTC may result in "jeopardizing the CTC license" as a whole.  (Rifkin

13  Decl. ¶ 4 & Ex. 3.)  In response, the Chief of Mental Health at San Quentin requested the

14  assistance of the Directory and Deputy Director of CDCR's Statewide Mental Health

15  Program in ensuring that those concerns were not pursued.  *Id.*

16       The only rationale Defendants have ever offered in support of the denial of DSH

17  inpatient care to death row inmates is their reading of Section 3600(b)(4) of the California

18  Penal Code, which they claim "prohibits the transfer" of death row inmates to ICF care.

19  (Defs' Reply at 24.)  This position is legally wrong and based on an erroneous reading of

20  the Code.  The statute to which they refer expressly allows the type of inpatient transfers

21  that these *Coleman* class members need:

22       An inmate whose medical or mental health needs are so critical

23       as to endanger the inmate or others may, pursuant to

24       regulations established by the Department of Corrections, be

     housed at the California Medical Facility or other appropriate

25       institution for medical or mental health treatment.

26  Cal. Penal Code § 3600(b)(4).  This statute does not prohibit transfers from death row to

27  inpatient care—it authorizes them.  If by citing this statute, Defendants are contending that

28  they lack authority because the Secretary (a Defendant in the case) has not yet established

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

[781493-4]

the regulations to which the statute refers, that is further evidence of deliberate indifference to the problem. Defendants need to use the authority provide by this statute to get these *Coleman* class members to the necessary level of care.

Nor is Defendants' refusal to transfer death row inmates to DSH grounded in justifiable custodial concerns. Ms. Woodford concluded that "there is no custodial justification for a categorical ban on transferring condemned inmates to intermediate inpatient care at appropriate, high-security DSH facilities, such as those located inside of Salinas Valley State Prison (SVSP) or California Medical Facility (CMF)." (Woodford Decl. ¶ 47.) She recommended that instead of a blanket ban, Defendants should undertake an "individualized assessment of the mental health needs and security concerns of each individual prior to transfer for ICF care." (*Id.*) She further opined that "were such an assessment conducted of the individuals currently receiving 'specialized care' at San Quentin, many if not all would be deemed both in need of a transfer to ICF care and suitable for such a transfer from a custodial perspective." (*Id.* ¶ 47.)

There is simply no justification for allowing gravely mentally ill condemned inmates to suffer because Defendants refuse to transfer them to ICF care. Defendants have spent years purporting to develop an appropriate treatment program at San Quentin for these individuals, and have proven unable to do so. This Court should order Defendants to immediately rescind the prohibition on referrals and transfers of death row inmates to DSH ICF beds and to evaluate each *Coleman* class member currently on death row and at the EOP level of care to determine if transfer to a higher level of care is appropriate. The Court should also order the Special Master to investigate, monitor and report on usage of OHU beds at San Quentin for the provision of mental health care to ensure that any such usage is temporary and meets constitutional standards.

**B.    DSH Facilities are Dangerously Understaffed**

In addition to categorically denying access to inpatient psychiatric treatment to class members on death row, Defendants are failing to ensure that class members whom they do identify for referral and transfer to DSH programs in CDCR facilities receive appropriate

10

[781493-4]

1   and adequate treatment.  Defendants' own documents and data confirm the alarming

2   staffing shortages at DSH programs in CDCR facilities that the SVPP psychiatrists

3   described in their recent letters.[4]  (*See* Badeaux Decl., Exs. B & C.)   The most recent

4   Monthly Staffing and Vacancies Report, reflecting data from February 2013, reports an

5   overall 32% functional vacancy rate at SVPP.  (Rifkin Decl., Ex. 4 at 9.)  Defendants

6   report an overall functional vacancy rate at Vacaville Psychiatric Program ("VPP") of

7   36%, even higher than at SVPP.  (*Id.*)

8        The staffing problems at DSH inpatient programs in CDCR facilities are not limited

9   to psychiatrists, but also extend to nurses, social workers, and other staff critical to the

10   provision of mental health treatment.  Defendants report functional vacancy rates of 35%

11   for clinical social workers and 75% for psychiatric technicians at SVPP.  (*Id.*)  According

12   to a SVPP psychiatrist who resigned in March 2013, Dr. Joel Badeaux, there are also

13   critical shortages of primary care doctors, Registered Nurses ("RNs"), and Medical

14   Technical Assistants ("MTAs") at SVPP.  (Badeaux Decl. ¶¶ 10-13.)  The MTA shortage

15   prevents other clinicians from doing their jobs, because MTAs are needed to act as escorts

16   to facilitate psychiatric consultations.  Dr. Badeaux explained that because of the shortage

17   of MTA escorts at SVPP, he had to meet with patients in non-confidential locations on

18   some occasions, which meant that he could have no more than "a minimal encounter with

19   [his] patients."  (*Id.* ¶¶ 10-11.)  The psychiatrist and primary care doctor shortage results in

20   risky attempts to deliver mental health care without "important input about the medical

21

22   _____

[4] The monthly data Defendants provide to the Special Master and Plaintiffs' counsel
23   under-reports staffing vacancies.  Defendants themselves have indicated that this data is
     inaccurate and unreliable.  (*See* Declaration of Michael Bien in Opp. to Defs' Mot. to
24   Terminate, Docket No. 4399 ("Bien Decl.") ¶ 105.)  Furthermore, Defendants have
     represented to Plaintiffs' counsel that "staffing is full" at SVPP, but the Special Master,
25   Plaintiffs' experts, and former DSH psychiatrists, all report that it is not fully staffed.  (*Id.*;
     *see also* Pls' Opp. Br. at 41 (in response to Plaintiffs' concerns about understaffing of DSH
26   programs, "Defendants assured the Special Master and Plaintiffs' counsel that there was no
     problem, there were errors in their own monthly staffing data ….").)
27

28

[781493-4]

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

1  needs of [] patients." (*Id.* ¶ 12.)  Another SVPP psychiatrist recently testified about the

2  shortage of social workers, MTAs, and RNs at SVPP.  (Rifkin Decl., Ex. 5 (Deposition of

3  Dr. John Brim ("Brim Dep.") at 24:19-25:22.))

4        The alarming staffing vacancies documented in Defendants' monthly reports and

5  the DSH psychiatrists' accounts were also confirmed by Plaintiffs' expert during

6  inspections connected to Defendants' termination motion. (*See* Stewart Decl. ¶¶ 51-59

7  (describing functional vacancy rate of 36% in DSH programs at SVSP in January 2013,

8  and effects of these staffing shortages on patient care.).)

9        These broad staffing shortages worsened after the Governor imposed a statewide

10  hiring freeze, and then ordered major layoffs associated with criminal justice realignment.

11  (*See* Declaration of Jane Kahn in Support of Pls' Opp. to Defs' Objs. to and Mot. to Strike

12  Portions of Special Master's 2011 Suicide Report, Docket No. 4350-1, Ex. A (Governor

13  Brown's Press Release).)  The State has also imposed limits on the use of registry staff and

14  overtime hours which exacerbates the impact of staffing shortages systemwide in CDCR

15  facilities.  For example, Dr. Stewart reported that mental health administrators at

16  California State Prison Sacramento and other prisons "complained … about the impact of

17  state rules limiting the use of registry workers to 975 hours per year, explaining that the

18  rule means they lose their more experienced registry staff members all the time and have to

19  begin training new employees constantly."  (Stewart Decl. ¶ 84; *see id.* ¶ 73 (SVSP's

20  Acting Chief of Mental Health stated that the 975 hour limit creates "a huge problem with

21  continuity of care"); ¶ 392 (noting that the MHCB psychiatrist at SVSP "is a contractor

22  whose maximum annual hours were due to run out soon"); *see also* Brim Dep. 26:5-13

23  (limits on overtime work for MTAs at SVPP).)

24        Moreover, in addition to DSH's failure to hire and retain clinical staff at allocated

25  levels, DSH intentionally changed its staffing ratio in order to cut costs by eliminating

26  clinicians.  DSH reported that it altered its "ICF Treatment Team Ratio" from 1:25 to 1:35

27  as part of its "actual cost savings" in Fiscal Year 2011-2012.  (Bien Decl., Ex. 108 (DSH

28  Actual Cost Savings Achieved FY 2011-12).)  Defendants have not offered the Court any

12

[781493-4]

1   clinical justification for such change.  (*See* 4/05/13 Order, Docket No. 4539, 61:13-17 &
2   n.47.)

3       In a slew of Declarations filed in support of Defendants' Reply brief on their motion
4   to terminate, Defendants testified that there is "no shortage of clinical staff at SVPP."
5   (Reply Declaration of Charles DaSilva, Docket No. 4442 at 4; *see also* Reply Declaration
6   of Kathryn Radtkey-Gaither, Docket No. 4441 at 3-5.)  In support of that statement, both
7   the Mr. DaSilva, the Executive Director of SVPP and Ms. Radtkey-Gaither, the Chief
8   Deputy Director of DSH represented that there were 12.75 psychiatrists on staff at SVPP.
9   (*Id.*)  However, Dr. Badeaux explains in the attached declaration that the staffing numbers
10  relied upon by Mr. DaSilva and Ms. Radtkey-Gaither were misleading and misrepresented
11  the reality of the psychiatrist shortages at SVPP.  (Badeaux Decl. ¶ 31.)  Among other
12  things, Mr. DaSilva and Ms. Radtkey-Gaither "failed to mention that five [of the 12.75]
13  psychiatrists would be leaving SVPP in the week following the date of the[ir]
14  declarations."  (*Id.*)  Moreover, the staffing numbers they provided "appear[ed] to
15  include[] … a psychiatrist who was hired in February but who had not been physically
16  present and actually performing clinical duties at SVPP," as well as two chief psychiatrists
17  "with primarily administrative duties."  (*Id.* ¶¶ 31, 34.)

18      These staffing shortages are not just statistical deficiencies.  Rather, they prevent
19  acutely ill *Coleman* class members from receiving the care they require in order to avoid
20  needless suffering and decompensation.  (*See* 4/05/13 Order at 57-59 & n.44 (citing effects
21  of staffing vacancies across a variety of clinical staff reported in Special Master's 25th
22  Round Monitoring Report); *see also* Badeaux Decl., Ex. C at 1 ("[T]he psychiatry staff at
23  SVPP have unanimously determined that we cannot safely manage more than 40 patients
24  per psychiatrist.").)  Dr. Badeaux explained that he ultimately resigned because the "high
25  caseload and the conditions [at SVPP] prevented [him] from giving [his] patients the care
26  they needed," and from fulfilling his professional and ethical obligations to his patients.
27  (Badeaux Decl. ¶ 8.)  Similarly, Dr. Brim testified that the enormous caseloads meant that
28  he and his colleagues "couldn't realistically undertake to provide [their patients] with the

1  full range of services that they should receive," and instead "could only respond to crises

2  and emergencies."  (Brim Dep. 35:22-36:5.)

3       Plaintiffs' expert observed that patients at SVPP "uniformly reported that they

4  receive at best one group a day."  (Stewart Decl. ¶ 448).  This observation was confirmed

5  by Dr. Badeaux and Dr. Brim, who both testified that patients at SVPP typically receive

6  about an hour of group activity or therapy per day.  (Badeaux Decl. ¶ 14; Brim Dep. 91:6-

7  23.)  Dr. Brim also explained that "there's not a great deal of individual therapy possible

8  given the staffing."  (Brim Dep. 42:16-20.)  Dr. Badeaux testified that "[g]iven the level of

9  acuity of the patients, I believe our patients required far more care than one hour of group

10  treatment per day in order to stabilize and prevent further decompensation."  (Badeaux

11  Decl. ¶ 14.)  Indeed, the Program Guide requires that EOP patients "shall be offered at

12  least ten hours per week of scheduled structured therapeutic activities."  (Rifkin Decl.

13  Ex. 6 (Program Guide Sections 12-4-8).)  Patients referred for ICF-level psychiatric

14  hospitalization are those who have been "unable to adequately function within the structure

15  of the CDCR EOP level of care."  (Rifkin Decl. Ex. 7 (Program Guide Section 12-6-7).)

16  By offering dramatically *less* treatment to patients transferred to ICF-level psychiatric

17  hospitalization than those patients are supposed to receive at the EOP level of care,

18  Defendants demonstrate deliberate indifference to the needs of *Coleman* class members in

19  need of inpatient psychiatric hospitalization.

20       Dr. Badeaux testified that "deficiencies in the quality and quantity of care provided

21  lead to unsafe conditions for patients."  (Badeaux Decl. ¶ 17.)  Dr. Badeaux explained that

22  "[w]ithout sufficient monitoring and treatment, some patients can become extremely

23  psychotic or paranoid and violent.  They may also become actively suicidal.  These

24  conditions can put the patient himself, as well as other patients and staff members at grave

25  risk."  (*Id.*)  These concerns about patient safety are corroborated by available data, which

26  shows a significant increase in patient injuries in the last several months of 2012.  (Bien

27  Decl., Ex. 107 (DSH Number of Seclusion Episodes by Month and Facility per 1,000

28  Patient Day, 2012) at 5.)

1    Staffing shortages also threaten the safety of clinicians.  Dr. Brim testified that

2   among psychiatrists, "there has been ongoing discussion of the increasing dangerousness

3   of the situation."  (Brim Dep. at 78:23-79:14).  He explained that "assaults by patients on

4   staff" have risen "over the last few months" and that psychiatrists at SVPP have suggested

5   the increased incidence of staff injuries is related to "staff not having the time they once

6   had to maintain contact with the patients, monitor how they're doing, keep us informed so

7   that we can do what we can with their medication to help stabilize them."  (Brim Dep. at

8   77:14-79:14.)  Dr. Badeaux expressed similar concerns, stating that he felt unsafe "because

9   [he] did not have sufficient time with [his] patients to adequately monitor and treat them"

10  and therefore "could not fully understand their needs or accurately access their risk."

11  (Badeaux Decl. ¶ 18.)  These concerns are borne out by DSH's own data, which shows

12  dramatic increases in the incidence of injuries to hospital staff at SVPP toward the end of

13  2012, which is also when Dr. Badeaux stated that "the staffing situation [at SVPP] grew

14  even worse."  (Bien Decl., Ex. 107 at 4; Badeaux Decl. ¶6.)

15    The results of a survey of DSH employees conducted by an independent agency in

16  November 2012 show that concerns about safety are acute and widespread among staff at

17  SVPP.  Of those surveyed, 62% of the staff respondents at SVPP disagreed with the

18  statement that "I feel safe in my work environment."  (Badeaux Decl., Ex. E at 36.)  Over

19  71% of surveyed SVPP employees disagreed with the statement that "DSH is committed to

20  improving safety in its facilities."  (*Id.* at 37.)

21    In light of Defendants' failure to address chronic staffing shortages and evidence of

22  severe harm to patients as a result of understaffing at DSH-operated programs in CDCR

23  facilities, the Court must take action.  The evidence demonstrates that the current staffing

24  data fails to accurately reflect actual patient caseloads and treatment ratios.  Consequently,

25  the Court should order Defendants to provide a full and accurate accounting of current

26  clinical staffing at SVPP and VPP, including any custodial or other non-clinical staffing

27  that affects DSH's ability to provide mental health treatment.  This information should

28  include the size of each psychiatrist's caseload and the number of hours per week the

[781493-4]

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

1   identified psychiatrists are actually present and attending to patients. The information

2   should also detail if and how current staffing levels allow for the provision of confidential

3   clinical contacts at DSH-operated CDCR facilities. Defendants should identify all plans to

4   address staffing vacancies and the individuals responsible for implementing those plans.

5   Defendants should also identify all impediments to fully staffing SVPP and VPP, including

6   hiring freezes. To the extent State hiring freezes have hindered DSH's ability to hire

7   acceptable levels of staff, the Court should order that State hiring freezes cannot apply to

8   DSH employees, and order the suspension of any limitations on registry staff and use of

9   overtime with respect to DSH programs in CDCR facilities. Moreover, because there is

10  evidence of recent changes to the treatment team ratios, Defendants should provide the

11  current treatment ratio at DSH-operated CDCR facilities and the rationale for the adequacy

12  of that ratio and the Special Master should assess the adequacy of that ratio. (*See* 4/05/13

13  Order at 61:13-20 & n.47 (if Defendants choose to modify their staffing requirements, they

14  must meet "their burden of proving that they can meet their constitutional obligations with

15  the existing levels of staffing vacancies").)

16          **C.    Custodial Policies at DSH Subject Class Members Newly Admitted to**
                     **SVPP to Excessive, Unnecessary, and Dangerous Deprivations**
17

18          In addition to DSH's inability to provide minimally adequate care, DSH and CDCR

19  have instituted a policy that uniformly requires newly-admitted patients at SVPP to be held

20  in severely restricted conditions in which they are almost continuously confined to their

21  cells, do not receive mental health programming, and are handcuffed anytime they leave

22  the cell. (*See* Brim Dep. at 41:8-22 (a patient who is in this status "cannot be out of his

23  cell without handcuffs" and is permitted only to leave his cell for "showers, necessary

24  activities for health care, and contacts with his treatment team").) These patients, who

25  have recently been transferred for hospitalization due to their acute psychiatric condition,

26  are denied all "day room, yard, [and] psychoeducational groups." (*Id.* at 42:5-20.) This

27  status, referred to as "Level 1" or "cuff status," amounts to a punishment that is imposed

28  on every patient admitted to SVPP, without regard for the individual's psychiatric needs or

[781493-4]

1  the recommendations of his doctor, until the patient meets with the Institutional

2  Classification Committee (ICC).  Level 1 status appears to be grounded in a Memorandum

3  of Understanding between CDCR and DSH, and Defendants have set a time limit of ten

4  working days, or at least fourteen actual days, for this classification process.  (Rifkin Decl.,

5  Ex. 8 (Memorandum of Understanding, Intermediate Care/Non-Acute Services) at 13, ¶ h;

6  *see also* Brim Dep. 45:2-13; Badeaux Decl. ¶ 25.)

7       Requiring that acutely ill patients languish in conditions of severe deprivation at

8  DSH-operated facilities for up to two full weeks—without regard for their clinical

9  indications and needs—is inappropriate and dangerous.  Level 1 restrictions appear to be

10  based wholly upon asserted custodial concerns, and cannot be overridden by clinicians,

11  despite the fact that DSH programs are intended to be run as psychiatric hospitals.  (*See*

12  Brim Dep. at 43:17-44:22; Badeaux Decl. ¶ 26.)

13       Dr. Badeaux explained that these punitive custodial restrictions in the first few

14  weeks of DSH hospitalization prevent patients from accessing important treatment and can

15  have a damaging impact on the health of vulnerable patients.  (Badeaux Decl. ¶¶ 24-27.)

16  Consistent with common sense, "individuals referred for psychiatric hospitalization need

17  more care and greater attention, not heightened isolation."  (*Id.* ¶ 25.)  Dr. Badeaux

18  described an instance in which a patient left SVPP for less than a month, but was

19  immediately placed on Level 1 status upon his return.  (*Id.* ¶ 28.)  The restricted status

20  lasted for "at least two weeks," and the isolation and lack of treatment were "very

21  detrimental" to the patient's psychiatric condition.  Unsurprisingly, patients perceive these

22  deprivations to be punitive and "typically. . .  complain that they have more privileges at

23  the prisons where they came from than they're finding at Level 1 in our program, and they

24  feel like they've been deprived [of] privileges by being sent to our program."  (Brim Dep.

25  at 55:6-56:7.)

26       Dr. Badeaux also explained that a patient may be subject to significant restrictions

27  even after he is released from Level 1 status.  According to Dr. Badeaux, "[m]any patients

28  have to wait weeks and even months before they are permitted full access to

1    programming." (Badeaux Decl. ¶ 27.)  The process of allowing these patients access to

2    basic human needs, such as time out of their cells and exercise, is "frequently delayed due

3    to scheduling problems or limited availability of treatment team meetings." (*Id.*)  In the

4    meantime, severely ill patients may be denied out-of-cell time and treatment even where

5    they are necessary to alleviate the patient's psychiatric distress. (*See id.*)

6        The negative impact of these blanket restrictions is most vividly and tragically

7    illustrated by the November 2012 suicide at SVPP.  In that case, the patient waited three

8    full weeks for his ICC meeting in order to be released from Level 1 status.  According to a

9    CDCR memorandum, this patient had a history of self-harm and just days earlier had "cut

10   one of his arms because of 'frustration' about still being on Level 1 and confined to his

11   cell." (Kahn Confidential Decl., Ex. 42 at 9-10; *see also* Stewart Decl. ¶¶ 440-441.)  The

12   patient hanged himself in his cell before ever getting a chance to program at DSH.[5]

13       Because of the evidence that harsh custodial restrictions at DSH are harming

14   critically ill patients and preventing doctors from delivering necessary treatment, the Court

15   should order Defendants to stop using Level 1, or any equivalent status, on a blanket basis

16   and require that any custodial restrictions for newly-admitted patients be based on specific

17   individualized assessments that include clinical input, and must be reviewed and renewed

18   in writing every three days.  The Court should further direct the Special Master to

19   investigate the necessity of custodial restrictions for newly-admitted patients and assess

20   whether custody determinations made prior to an inmate-patient's transfer from CDCR to

21   DSH suffice.

   **D.    Defendants Also Deny Class Members at all SVPP Program Levels Basic
22         Human Needs**

23       There is strong evidence that DSH is failing to provide for its patients' most basic

24

25   [5] As previously noted, a 36 year-old patient at SVPP recently died.  Defendants have not
     yet disclosed the circumstances surrounding his death or information about his custodial
26   status at the time of his death. (*See* Transcript of March 27, 2013 Hearing at 48:23-49:2l,
     52:7-11.)
27

28

1  needs in the DSH-run programs at SVSP and SVPP.  Dr. Stewart reported speaking with a

2  half dozen patients on SVPP's C-Yard, who complained about "the lack of clothing in the

3  program, as well as lack of soap and laundry service."  (Stewart Decl. ¶ 448.)  These

4  reports were corroborated by Dr. Brim and Dr. Badeaux.  Dr. Brim confirmed reports of "a

5  severe shortage of clean clothes, bedding, [and] coats."  (Brim Dep. at 62:1-10.)

6  Dr. Badeaux testified that his patients had to wear "soiled clothes" and told him that they

7  were "cold in their cells, but unable to get blankets."  (Badeaux Decl. ¶ 23.)  Dr. Badeaux

8  also confirmed that there were shortages of soap and reported that "some patients had to

9  wear the same underwear for two months due to the unavailability of clean underwear."

10  (*Id.*)  According to Dr. Badeaux, these problems persisted throughout his employment at

11  SVPP, as recently as March 27, 2013.

12         The Court should not tolerate a level of deliberate indifference that allows the

13  CDCR/DSH inpatient psychiatric hospitalization system slip toward conditions like those

14  that plagued mid-twentieth century asylums.  "A prison that deprives prisoners of basic

15  sustenance, including adequate medical care, is incompatible with the concept of human

16  dignity and has no place in civilized society."  *Brown v. Plata*, 131 S. Ct. 1910, 1928

17  (2011); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982) (Eighth

18  Amendment requires an institution to furnish prisoners with basic human needs including

19  clothing and sanitation); John Q. LaFond & Mary L. Durham, *Back to the Asylum: The*

20  *Future of Mental Health Law and Policy in the United States* (Oxford University Press,

21  1992), at 85 (describing the filthy, cold, understaffed insane asylums of the 1940s).

22         The Court should order the Directors of the SVPP and VPP programs, and the

23  Wardens of the prisons where they are housed, SVSP and CMF, to file declarations within

24  seven days confirming that patients are being provided soap and clean and adequate

25  blankets, clothing, and underwear, laundered on a regular basis, consistent with the

26  standards of a licensed inpatient hospital.

27

28

1    **E.    Defendants Mismanage Discharges and Waitlists for Inpatient Care,**
2    **Resulting in Treatment Failures and Harm to Patients**

3        The *Coleman* Special Master's team has recognized general problems with

4    mismanagement of discharges from DSH to CDCR units, and the grave consequences

5    thereof.  For example, in the Report on Suicides Completed in CDCR in Calendar Year

6    2011, Docket No. 4308 ("2011 Suicide Rpt."), Dr. Patterson described a foreseeable and

7    preventable suicide in which the individual had been moved between DSH and CDCR a

8    "staggering" number of times and there was "clear evidence in the record of

9    recommendations that he would have benefitted from a longer length of stay in a consistent

10   program than had been previously provided."  (2011 Suicide Rpt. at 94-95.)  Dr. Patterson

11   determined that "[t]here was clearly a need not only for collaboration between clinicians

12   and custody with regard to his DSH discharge and placement … but also for collaboration

13   between DSH and CMF clinicians as to the inmate's overall management at the

14   appropriate level of care."  (*Id.* at 95.)

15       In order to artificially reduce the appearance of a waitlist resulting from

16   Defendants' insufficient inpatient beds and staffing deficiencies, Defendants are

17   prematurely discharging inmate-patients from inpatient levels of care.  During his January

18   2013 inspection, Plaintiffs' expert Dr. Stewart discovered numerous prisoners in mental

19   health crisis beds (MHCBs) and other CDCR units who had recently been discharged from

20   DSH programs, but were psychiatrically unstable.  (Stewart Decl. ¶ 433 (listing seven

21   cases of apparently premature DSH returns to CDCR encountered in multiple CDCR

22   prisons during recent inspection tours)).  Dr. Stewart also reported that "DSH programs

23   sometime[s] decide to end their treatment of individual patients who may not be

24   responding well to treatment, and send them back to the CDCR facility with no apparent

25   clinical change from when they were initially referred."  (*Id.* ¶ 399).  This practice often

26   results in the placement of the inmate-patient in a crisis bed and another referral to DSH

27   within a very short time, although the patient may then have to wait for an extended period

28   of time to actually transfer back to DSH.  (*Id.* ¶¶ 399, 406-407, 411.)

20

[781493-4]

1   Statements from Dr. Brim and Dr. Badeaux confirm that Defendants pressure DSH

2   doctors to discharge patients as rapidly as possible.  (Badeaux Decl. ¶ 29 ("I also found

3   that pressure to eliminate the waitlist for DSH care led to premature discharge of patients

4   in our care.  During my employment at SVPP, I received an email issued by the SVPP

5   administration stating that psychiatrists should discharge three patients per week per unit—

6   a total of 18 patients each week.  A program assistant verbally confirmed this expectation

7   to me as well."); *id.* ¶ 30 ("Along with all other psychiatrists, I had to attend weekly

8   'utilization review committee' meetings with SVPP administrators any time I had a patient

9   with a long stay (particularly over six months).  At those meetings, I had to justify to

10  administrators why I had not discharged my patient yet and when I expected to do so.  I

11  felt pressure to discharge my patients, even if I did not think they were ready to return to

12  the prison setting.  When I asked my supervisor about the pressure to discharge, I was told

13  that administration wanted to make beds available in order to reduce the waiting list for

14  SVPP to zero."); Brim Dep. at 18:7-19:4 ("My understanding is that there was a general

15  feeling –and … I felt this way—that we were under pressure from administration to move

16  … the old patients out and take in new patients so as to keep our waiting list down.…

17  There was pressure from administration to get them out quickly so that new people could

18  be brought in.").)

19   When asked about premature discharges from DSH, the State's expert Dr. Joel

20  Dvoskin appeared to be under the misapprehension that the length of inpatient

21  hospitalization is circumscribed by California statute.  (*See* Rifkin Decl., Ex. 9 (Deposition

22  of Dr. Joel Dvoskin at 131:13-25).)  In fact, the Program Guide expressly directs that

23  discharges from intermediate care facilities should be based on clinical factors.  According

24  to the Program Guide, inmate-patients should be discharged when they have "improved to

25  a degree that further hospitalization is unnecessary" or there has been "a change of

26  diagnoses such that continued hospitalization is not appropriate or necessary."  (Rifkin

27  Decl., Ex. 10 (Program Guide Sections 12-6-12 to 12-6-13).)  Patients must be able to

28  receive inpatient psychiatric hospitalization for as long as clinically indicated.  Discharges

[781493-4]

1   based on quotas and administrative pressure rather than clinical needs demonstrate

2   dangerous indifference to the treatment needs of prisoners with serious mental illness.

3        In sum, the recent gains Defendants were thought to have made with respect to

4   access to inpatient psychiatric hospitalization (*see, e.g.*, 4/05/13 Order at 46-47, n. 43) may

5   be exaggerated and attributable in part to these flawed clinical and administrative

6   decisions.  Defendants also have tried to disguise the inpatient waitlist problem by

7   redefining how to count the waitlist.  (Pls' Opp. Br. at 44-45; *see also* 4/05/13 Order at 49,

8   n.45.)

9        Plaintiffs request that the Court order Defendants to revise their policies,

10  procedures, and practices to ensure that patients continue to receive inpatient psychiatric

11  hospitalization while clinically indicated.  The Court should further direct the Special

12  Master to investigate Defendants' inpatient discharge and waitlist practices, and make

13  recommendations to the Court regarding additional orders that should be issued to remedy

14  these problems which result in inadequate care, harm, and serious risk of harm to the

15  *Coleman* class.

16  **F.    Defendants Improperly Discharge Patients from DSH to CDCR in Anticipation of Future Parole Dates in Violation of this Court's Prior**
17  **Order**

18       On August 8, 2008, this Court ordered Defendants to provide full access to inpatient

19  psychiatric hospitalization to all inmates irrespective of release date.  (8/8/08 Order,

20  Docket No. 2930, at 5:11-14.)  At that time, the Court found that Defendants had been

21  pursuing an impermissible statewide policy of denying inpatient psychiatric hospitalization

22  to all inmates during the period within 35 days of their release on parole.  (*Id.* at 3:10-15.)

23       In direct violation of this Court's Order, Defendants continue to deny inmates

24  access to necessary inpatient psychiatric hospitalization because of their anticipated

25  releases to parole.  The attached declaration of Ernest Galvan sets forth extensive evidence

26  that patients are being discharged from or denied altogether DSH hospitalization because

27  of impending parole release dates.  (Declaration of Ernest Galvan in Support of Motion for

28  Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

[781493-4]

("Galvan Decl.").) For example, the handwritten notes of Defendants' expert Dr. Charles Scott from his tours of thirteen CDCR institutions in connection with Defendants' Motion to Terminate, reflect Defendants' widespread practice of transferring DSH patients back to CDCR custody for the sole purposes of parole. At no less than five of the prisons he toured—SVSP, CMF, San Quentin State Prison, CSP Sacramento, and California Men's Colony ("CMC")—Dr. Scott made written notations regarding parole-related discharges from DSH. (*Id.* ¶¶ 5-9 & Exs. C, D, E, F, G.) In his notes from CMC, Dr. Scott noted that individuals are returned from DSH "usually 1 week before release onto parole." (*Id.* ¶ 9 & Ex. G.) In notes taken at CMF, Dr. Scott wrote that patients are simply "not allowed to parole from DSH." (*Id.* ¶ 5 & Ex. C.)

Moreover, Defendants' own data demonstrates the persistence of this practice. A document from CMF entitled "Department of Mental Health Non Referral Log" from August 2012, produced by Defendants in discovery, indicates that several prisoners were "transferred from DSH to parole." (*Id.* ¶ 10 & Ex. H.) In two cases, the notations reflect that the patients were placed in the system's scarce MHCBs merely for the purpose of parole. CMF's Department of Mental Health Non-Referral Log from December 2012 reflect the same practice, including using MHCBs for DSH patients awaiting parole. (*Id.* ¶ 11 & Ex. I.)

Individual patient records also reflect Defendants' practice of denying inpatient psychiatric treatment to inmates based on release date. For example, one doctor noted that a patient "was transferred to the crisis bed from DMH for the purposes of parole (pt's cannot parole from DMH.)" (Galvan Decl. ¶ 4 & Ex. B.) Similarly, a DMH clinician wrote that "patients do not parole from DMH." (*Id.* ¶ 12 & Ex. J.)

Defendants' practice of discharging patients from DSH inpatient care to lesser and inappropriate levels of care solely because of their release dates, and denying DSH referral and transfer to inmate-patients set to parole in upcoming months or weeks, causes needless harm to those patients. Defendants' actions risk reversing the progress towards stabilization patients made in the inpatient hospitalization setting, and allowing patients to

1  dangerously decompensate just as they are about to be released back into the community.

2  This Court has already stated in no uncertain terms that it is essential to the *Coleman*

3  remedy that "inpatient mental health treatment shall be determined by an individual's

4  need, not release date." (8/08/08 Order at 4:7-9.) In light of extensive evidence that

5  Defendants are violating this Court's order by denying patients psychiatric hospitalization

6  solely because of their scheduled release dates, this Court should enforce its previous order

7  prohibiting Defendants' practices, and require Defendants to submit evidence of their

8  compliance to the Court within thirty days. The Court should further direct the Special

9  Master to monitor and report on Defendants' compliance with this Court's August 2008

10 Order and any order issued to enforce that order.

11    **G.    Defendants Should Not Be Shutting Down Temporary Units With**
12         **Patients Still In Them, Nor Haphazardly Transferring Patients to New**
         **Units That Are Not Yet Staffed**

13         **1.    Defendants Should Be Ordered To Keep Temporary Units Fully**
14             **Staffed Until They Can Demonstrate That They Are No Longer**
             **Needed**

15      The removal of resources from SVPP, as well as from VPP, appears in part to be a

16 premature winding down of the facility in anticipation of the Stockton Consolidated Health

17 Care Facility (CHCF) activation later this year. Defendants are risking the safety of the

18 patients still at SVPP and VPP by prematurely withdrawing resources from the temporary

19 units at those facilities. This Court has previously ordered that Defendants continue

20 operating all of the temporary, emergency inpatient and MHCB programs unless and until

21 they can demonstrate that they are no longer necessary. (5/2/06 Order, Docket No. 1800,

22 at 6:9-11.) Defendants appear to be out of compliance with that order.

23      During recruiting presentations at SVPP for the new Stockton facility, Defendants

24 explained that it will soon replace the temporary emergency units at VPP and SVPP. As a

25 result, when DSH staff members have left the temporary units at VPP and SVPP (retiring,

26 transferring, or voluntarily resigning), Defendants are not replacing the staff, instead

27 allowing those positions to remain vacant. This means that the existing units continue to

28 operate, and will for many more months at least, but at increasingly larger staffing deficits.

[781493-4]

1   (*See* Brim Dep. at 20:13-23:6; Pls' Opp. Br. at 39:16-22.).  This, in turn, leads to even

2   more staff leaving because of exacerbated problems caused by increased vacancies.  (*See*

3   Badeaux Decl. ¶¶ 6-8.)  It also means that Defendants have apparently decided to under-

4   resource those units even with respect to such basic human necessities as soap and clean

5   clothing, as explained above.

6           **2.      The Special Master Should be Ordered to Review the New L-2
                       Unit Activated in March 2013 at VPP, and Any Similar Newly-
7                      Activated or Temporary Units**

8           In support of their Termination Motion, Defendants made representations about

9   openings and closures of certain DSH units within CDCR prisons, such as the L-2 unit at

10  VPP described in the Declaration of Ellen Bachman, Executive Director for VPP.  (Docket

11  No. 4443) ("Bachman Decl.").  Ms. Bachman's declaration suggests that Defendants'

12  opening and closing of inpatient psychiatric hospitalization units is not dictated by clinical

13  requirements.  Rather, Defendants are shuffling staff and patients between units in a frantic

14  attempt to manipulate their staffing and waitlist data, without actually addressing the

15  critical staffing vacancies and shortages of beds at inpatient levels of care.

16          Ms. Bachman stated in her March 22, 2013 declaration that Defendants would be

17  activating L-2 as a new unlicensed intermediate care unit, to address waitlist issues, and

18  claimed that it would accept its first patient on March 20, 2013.  (Bachman Decl. ¶ 7.)  The

19  decision to open this unit was apparently made only two weeks earlier on March 6, 2013.

20  (*Id.*)  However, as of March 22, 2013, two days after the scheduled acceptance of the first

21  patient, DSH had not yet actually hired the staff necessary for that unit.  (*Id.* ¶¶ 16-17.)

22  Moreover, the L-2 unit, an intermediate care unit, is being opened because of the need for

23  more acute beds.  (*Id.* ¶ 8.)  Defendants' plan therefore relies upon patients currently at the

24  APP level of care in VPP being transferred to an ICF level of care, so that APP beds will

25  open.  (*Id.*)  "In order to expedite this process," DSH has requested "program flexibility"

26  from the California Department of Public Health Licensing and Certification Branch in

27  connection with this plan—meaning that DSH will not have to complete paperwork that

28  would otherwise be required to transfer patients between levels of care.  (*Id.* ¶ 9.)  As

1  articulated above, Defendants' discharge and waitlist practices are not consistently

2  grounded in the clinical needs of the patients.  In order to avoid unnecessary risk of harm

3  to class members, it is crucial that the Special Master investigate and monitor Defendants'

4  DSH discharge practices, both internally to other DSH units, and externally to CDCR

5  units.

6      Plaintiffs request that this Court order DSH to report to the Court on all currently

7  operational DSH units housing *Coleman* class members, including date of activation,

8  number of beds/patient capacity, number of current patients and length of stay for each

9  patient, staffing allocations (including allocated staffing ratios), currently filled staff

10  positions and vacancies, and current staffing ratios.  Plaintiffs also request that the Court

11  order that DSH notify the Court, Special Master, and Plaintiffs' counsel whenever

12  Defendants plan to open or close a DSH unit housing CDCR patients.  Notifications of

13  plans to open new units should include the above-listed data, and a schedule and plan for

14  hiring necessary staff.  Notifications of plans to close units must explain why these units

15  are no longer necessary.

16      To specifically address Defendants' mismanagement of existing units in

17  anticipation of the opening of the Stockton facility, the Court should prohibit Defendants

18  from understaffing or closing SVPP and VPP programs prior to Stockton's activation and a

19  showing that such programs are no longer necessary.  The Court should also direct the

20  Special Master to investigate the newly-activated or temporary DSH units at SVPP and

21  VPP in order to determine whether appropriate treatment is being provided to *Coleman*

22  class members.

23  **H.    The Welfare of Patients of Vacaville Psychiatric Program (VPP) Must**
          **be Investigated**

24

25      During the limited period of discovery recently conducted in connection with

26  Defendants' termination motion, Plaintiffs and their experts had the opportunity to visit

27  eleven prisons, including SVPP.  (*See* Pls' Opp. Br. at 27.)  Plaintiffs were not able to visit

28  VPP in this brief timeframe, but available data for VPP as well as evidence about systemic

[781493-4]

1   under-allocation of resources in units such as L-2, described above, suggest that similar

2   harms are occurring at VPP.  For example, the overall functional staffing vacancy rate at

3   VPP is 36%—higher than SVPP.  (Rifkin Decl., Ex. 4 at 9.)  Plaintiffs therefore request

4   that the Court order the Special Master to investigate the inpatient treatment being

5   provided at VPP and make recommendations to the Court about further orders necessary to

6   enforce the remedy in this case.  In the alternative, Plaintiffs request that the Court permit

7   Plaintiffs and their experts to conduct discovery, including an inspection, of VPP to

8   determine if further enforcement orders are needed.

9   **II.    THESE PROPOSED ORDERS SATISFY THE REQUIREMENTS OF THE**

10          **PLRA**

11          As chronicled in the Background section of this brief, Defendants have a long

12  history of intransigence and failure with respect to providing necessary inpatient

13  psychiatric treatment to the *Coleman* class.  Despite this Court's many prior orders

14  regarding DSH staffing, inpatient waiting lists, and inpatient hospital programs,

15  Defendants continue to deny *Coleman* class members access to adequate and appropriate

16  inpatient psychiatric treatment.  Thus, additional and more targeted orders are necessary in

17  order to remedy Defendants' continued constitutional violations that subject prisoners with

18  serious mental illness to harm and serious risk of harm.  The orders Plaintiffs propose in

19  each of the above-described areas (Access of Death Row Inmates to Inpatient Psychiatric

20  Hospitalization; Staffing Levels for SVPP and VPP; Hiring and Use of Registry and

21  Overtime at SVPP and VPP; Use of Custodial Lockdowns for Newly Admitted SVPP

22  Patients; Provision of Basic Human Necessities; Length of Stay, Discharges, and Waitlists

23  for Inpatient Psychiatric Units; Access to DSH Regardless of Parole Date; Activation and

24  Closure of DSH Units; and Treatment Provided to Class Members at VPP) are narrowly

25  tailored to the constitutionally cognizable harms to class members recognized by the

26  Special Master, Plaintiffs' experts, and Defendants' own experts.  These orders extend no

27  further than necessary to correct the continuing constitutional violations, and are the least

28  intrusive means necessary at this phase in the remedial process to correct the violations.

[781493-4]

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO INPATIENT TREATMENT

1 | *See* 18 U.S.C. § 3626(a)(1).

2 | ## CONCLUSION

3 | In the process of responding to Defendants' Motion to Terminate, Plaintiffs

4 | uncovered substantial, troubling evidence of severe harm to the most acutely ill *Coleman*

5 | class members.  In order to enforce the *Coleman* remedy and to prevent serious harm to

6 | class members in need of inpatient psychiatric hospitalization, this Court should issue

7 | further remedial orders and direct the Special Master to investigate these matters, as set

8 | forth in the Proposed Order filed herewith.

9 |

10 | DATED: April 11, 2013                Respectfully submitted,

11 |                                      ROSEN BIEN GALVAN & GRUNFELD LLP

12 |
                                         By:  */s/ Michael W. Bien*
13 |                                          Michael W. Bien

14 |                                      Attorneys for Plaintiffs