# Exhibit 1



Transcript of the Testimony of:

# Diana Toche

Coleman v. Brown

February 22, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P: 877.771.3312 | F: 877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         ) S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

DIANA TOCHE

FRIDAY, FEBRUARY 22, 2013,  9:00 A.M.

SAN FRANCISCO, CALIFORNIA



REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                    Plaintiffs,      )
                                       )CASE NO.:
 6        vs.                          ) S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                    Defendants.      )
     _____)
 9

10

11

12

13

14           The Deposition of DIANA TOCHE, taken on behalf

15   of the Plaintiffs, before Megan F. Alvarez, Certified

16   Shorthand Reporter No. 12470, Registered Professional

17   Reporter, for the State of California, commencing at

18   9:00 a.m., Friday, February 22, 2013, at the offices of

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

Diana Toche                                          February 22, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3           BY:  KRISTA STONE-MANISTA, ESQ.
               ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 4           315 MONTGOMERY STREET, TENTH FLOOR
               SAN FRANCISCO, CALIFORNIA 94104
 5           415.433.6850
               415.433.7104 FAX
 6           KSTONE-MANISTA@RBGG.COM

 7
     FOR DEFENDANTS:
 8
               BY:  PATRICK RICHARD MCKINNEY, ESQ.
 9           OFFICE OF THE ATTORNEY GENERAL
               STATE OF CALIFORNIA
10           455 GOLDEN GATE AVE., SUITE 11000
               SAN FRANCISCO, CALIFORNIA  94102-7004
11           415.703.3035
               415.703.5843 FAX
12           PATRICK.MCKINNEY@DOJ.CA.GOV

13             BY:  KATHERINE K. TEBROCK, ESQ.
               DEPARTMENT OF CORRECTIONS AND REHABILITATION
14           OFFICE OF LEGAL AFFAIRS
               1515 S STREET, SUITE 314 SOUTH
15           SACRAMENTO, CALIFORNIA 95811
               916.323.2929
16           916.327.5306 FAX
               KATHERINE.TEBROCK@CDCR.CA.GOV

17
18   ALSO PRESENT:

19             MARC SHINN-KRANTZ, PARALEGAL

20
21
22
23
24
25
```

Diana Toche                                    February 22, 2013

1         A.    I believe that it is still in draft format as

2    they are initiating and implementing the program.  And

3    so I believe that it is still considered -- what we

4    would consider draft, as they roll the program out, so

5    they can fine-tune it as, you know, things occur and

6    come up.

7         Q.    And have you -- have you reviewed a draft LOP

8    then?

9         A.    Yes, I have.

10        Q.    Do you have a sense of the timeline for

11   rolling out the program?  Do you have a sense -- is that

12   three months, six months?

13             MR. MCKINNEY:  Objection.  Vague and ambiguous

14   as to the term "roll out."

15   BY MS. STONE-MANISTA:

16        Q.    Do you expect that the program will be fully

17   implemented in the next three months?

18        A.    I -- you know, I'm not sure what you mean by

19   "fully implemented."  I know that Dr. Monthei is -- has

20   transferred one, possibly two inmate patients over to

21   the beds that have been designated.  And we're making

22   sure that we do it, you know, as clinically indicated.

23   And, you know...

24        Q.    Okay.  Have there been any timelines set for

25   moving additional inmates?

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1               CERTIFICATE OF REPORTER

2

3        I, MEGAN F. ALVAREZ, a Certified Shorthand

4   Reporter, hereby certify that the witness in the

5   foregoing deposition was by me duly sworn to tell the

6   truth, the whole truth and nothing but the truth in the

7   within-entitled cause;

8             That said deposition was taken down in

9   shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13            I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the events of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20                 DATED:  March 5, 2013

21

22                    _____

23                    MEGAN F. ALVAREZ

24                    RPR, CSR 12470

25

Exhibit 2

# San Quentin State Prison

# Health Care Evaluation

March 18, 2013

Prepared by the Court Medical Experts

Joe Goldenson MD
Madie LaMarre MN, FNP-BC
Mike Puisis DO

# Contents

Introduction ................................................................................................................... 3

Overall Finding .............................................................................................................. 5

Findings ......................................................................................................................... 9
  Facility Description ...................................................................................................... 9
  Organizational Structure and Health Care Leadership ................................................ 9
  Human Resources, Staffing and Budget .................................................................... 10
  Health Care Operations, Clinic Space and Sanitation ............................................... 15
  Policies and Procedures ............................................................................................ 17
  Medical Reception/Intrasystem Transfer .................................................................. 18
  Access to Care ........................................................................................................... 21
  Chronic Disease Management ................................................................................... 23
  Pharmacy and Medication Administration ................................................................ 24
  Laboratory/Radiology ............................................................................................... 26
  Health Records .......................................................................................................... 26
  Urgent/Emergent Care .............................................................................................. 28
  Specialty Services/Consultations ............................................................................. 30
  Outpatient Housing Unit Care (OHU) ........................................................................ 31
  Internal Monitoring and Quality Improvement Activities ......................................... 34

Recommendations ....................................................................................................... 35

# Introduction

In September 2012, the Federal Court, in <u>Order Re: Receivership Transition Plan and Expert Evaluations</u>, requested that the Court medical experts conduct evaluations at each CDCR prison to determine whether an institution is in substantial compliance. The Order contemplates that an institution "shall be deemed to be in substantial compliance, and therefore constitutionally adequate, if it receives an overall OIG score of at least 75% and an evaluation from at least two of the three court experts that the institution is providing adequate care."

To prepare for the prison health evaluations, in December 2012 the medical experts participated in a series of meetings with Clark Kelso, Receiver, California Correctional Health Care Services (CCHCS) and CDCR leadership and staff to familiarize ourselves with structural changes that have occurred in the health care system since the beginning of the Receivership. Information gained from these meetings was invaluable to us in planning and performing evaluations, and we express our appreciation to Mr. Kelso and CDCR.

In conducting the reviews, the medical experts evaluated essential components to an adequate health care system. These include organizational structure, health care infrastructure (e.g. clinical space, equipment, etc.), health care processes, and the quality of care.

Methods of assessment included:

- Interviews with health care leadership, health care  and custody staff;

- Tours and inspection of medical clinics, medical bed space (e.g. Outpatient Housing Units, Correctional Treatment Centers, etc.), and administrative segregation units;

- Review of the functionality of business processes essential to administer a health care system (e.g., budget, purchasing, human resources, etc.);

- Reviews of tracking logs and health records;

- Review of quality improvement and internal audit reports;

- Observation of health care processes (e.g. medication administration);

- Review of policies and procedures and disease treatment guidelines;

- Review of staffing patterns and professional licensure; and

- Interviews with inmates.

With respect to the assessment of compliance, the medical experts seek to determine whether any pattern or practice exists at an institution or system wide that presents a serious risk of harm to inmates that is not being adequately addressed.[1]

To evaluate whether there is any pattern or practice that presents a serious risk of harm to CDCR patients, our methodology includes review of health records of patients with serious medical conditions using a "tracer" methodology. Tracer methodology is a systems approach to evaluation that is used by the Joint Commission for Accreditation of Health Care Organizations. The reviewer traces the patient through the organization's entire health care process to identify whether there are performance issues in one or more steps of the process, or in the interfaces between processes.

The experts reviewed records using this methodology to assess whether patients were receiving timely and appropriate care, and if not, what factors contributed to deficiencies in care. Review of any given record may show performance issues with several health care processes (e.g. medical reception, chronic disease program, medication issues, etc.). Conversely, review of a particular record may demonstrate a well-coordinated and functioning health care system; as more records are reviewed, patterns of care emerge.

We selected records of patients with chronic diseases and other serious medical conditions because these are the patients at risk of harm and who use the health care system most regularly. The care documented in these records will demonstrate whether there is an adequate health care system.

The tracer methodology may also reflect whether any system wide issues exist. Our methodology includes a reassessment of the systemic issues that were described in the medical experts report to Judge Henderson in April 2006 at the time the system was found to be unconstitutional and whether those systemic issues have been adequately addressed (see attached).[2]

We are available to discuss any questions regarding our audit methodology.

---

[1] Order re: Receivership Transition Plan and Expert Evaluations No. C01-1351 TEH, 9/5/12.
[2] The Status of Health Care Delivery Services in CDCR Facilities. Court-Appointed Medical Experts Report. April 15, 2006.

# Overall Finding

We find that San Quentin State Prison will be providing adequate medical care once the significant problems in medical reception, health care staff access to OHU patients, and first responder initiation of CPR are corrected.

# Executive Summary

On January 7-11, 2013, the Plata Court Medical Experts visited San Quentin State Prison to evaluate health care services. Our visit was in response to the OIG Medical Inspection Results Cycle 3 report showing that San Quentin scored 90.4% in April 2012. This report describes our findings and recommendations. We thank Warden Kevin Chappell, Chief Executive Officer Andy Deems, and their staff for their assistance and cooperation in conducting the review.

Since our last visit in 2006, significant improvements have been made in the health care delivery system to San Quentin. These improvements include:

- an appropriate medical organizational structure with competent leadership
- construction of new clinics and medical bed space
- adequate health care staffing
- competent medical providers
- increased custody to transport patients to on and off-site medical appointments
- timely initial access to care
- an adequate  pharmaceutical system
- timely access to specialty services
- a health records management system

We found that when patients were seen by medical providers, the quality of care was good. However, we found three significant barriers to health care access that present a serious risk of harm to patients. These are found in the areas of medical reception, health care staff access to OHU patients, and first responder initiation of cardiopulmonary resuscitation. We believe, however, that the deficiencies in these areas can be corrected in the relatively near future, and therefore we find San Quentin will be providing adequate care as soon as these deficiencies are corrected.

With respect to medical reception, we found that newly arriving patients with serious medical conditions do not receive an evaluation by a medical provider within seven days as required by the CCHCS policies and procedures. Some medical reception patients are not evaluated by a medical provider for over a month and some do not receive a physical examination by a medical provider at all. This presents a serious risk that newly arriving patients will not be diagnosed and treated in a timely manner. In addition, medical reception forms in use do not include an adequate medical history and review of systems, which are necessary to perform an adequate medical evaluation.

With respect to the Outpatient Housing Unit (OHU), we found that during the past six months, custody staffing has been reduced, so that, as a practical matter, there is only one officer assigned to the OHU to provide health care staff access to 34 OHU patients, including several that require complete care.  As a result, we found patients who developed intravenous access infections that required hospitalization. One incontinent inmate had a diaper and nurses changed the diaper only once a shift. There was an odor of feces when passing the room and it was clear that this inmate needed greater attention than once a shift.

In addition, 10 of the 34 OHU beds are being transitioned to mental health beds, leaving 24 OHU medical beds for a projected population of 4,000 inmates. We are concerned that this is insufficient for a population of 4,000 that includes 690 condemned inmates. Moreover, staff reported that, except for an occasional inmate-patient, the majority of condemned inmate-patients must remain at San Quentin, even if their medical needs exceed what can be provided in the OHU. However, their security classification should not override the serious medical needs of the population. We recommend that consideration be given to dedicating medical beds for this population at the California Health Care Facility in Stockton.

With respect to emergency response, we noted two cases in which custody first responders failed to initiate CPR.  Timely response by health care staff becomes moot if correctional officers do not assess unresponsive patients for signs of life and initiate CPR. This was consistent with the OIG Medical Inspection Results Cycle 3 report showing that first responders initiated CPR 60% of the time.

This review showed other clinical issues that require focused attention. This includes systemic delays in provider follow-up of chronic disease patients, due in part to limitations in the Inmate Appointment and Scheduling System (IMSATS) and the electronic Unit Health Record (eUHR). San Quentin staff has attempted to mitigate the problem by developing workarounds; they have developed an Access database that they use to track the highest risk patients. It is used as a communication tool between providers to promote continuity of care. Normally this would be accomplished through a true electronic health record; however, this is not yet in place. The San Quentin staff is to be commended for developing strategies to mitigate the limitations of the scheduling system and health record. However, despite their efforts, there continue to be delays in care for patients with poorly controlled chronic diseases. Moreover, this system exists solely due to commitment of the San Quentin medical leadership and is not part of the overall health care system.

We note that San Quentin is undergoing a medical mission change with its designation as an Intermediate facility. At the same time, implementation of the Acuity Based Staffing Realignment has resulted in an 18% reduction in health care staffing at the facility.  We are concerned about the potential for this staffing reduction to negatively impact San Quentin's ability to sustain improvements in health care, and we recommend that staffing be reevaluated 6 months after the completion of the reassignment of higher acuity inmates to Intermediate facilities.

We congratulate the San Quentin leadership and staff on the improvements in health care delivery at San Quentin. We attribute this success to at least three factors that have played a major role in the improvements at San Quentin.

The first reason is the Court's Order that established a framework to hire competent physicians.[3] This Order resulted in a major overhaul of the medical staff in CDCR that culminated in the kind of quality medical staff we reviewed at San Quentin. A competent medical staff is the foundation of a sound medical program. Continuation of the spirit and terms of this Order will be instrumental in maintaining the foundation of the medical program. In addition, the Receiver's Plan of Action has resulted in increases in other health staff at San Quentin that has also had a dramatic effect on the medical program.

The second reason that care has improved is that the physical plant improvements initiated under the Receiver have resulted in significant gains and will ultimately result in adequate clinical space at San Quentin upon completion of the few remaining facility upgrades planned by CDCR. Adequate clinical space is a second fundamental part of delivering adequate health care. We are pleased in seeing competent physicians working in improved conditions.

The third reason for improvements in health care at San Quentin is that the Receiver, through the California Correctional Health Care Services (CCHCS) program, assumed operational control of many health care business functions, including development of a statewide network of health care providers, timely execution of business contracts and invoice payments, development of an electronic Unit Health Record (eUHR), an appointment scheduling system, provision of funding to supplement insufficient budgetary allotments and a statewide pharmaceutical operation. The Receiver has made many positive changes in allied support operations, but significant system challenges remain in this area, including purchase and installation of an electronic health record and a more functional appointment scheduling system. The remaining systemic operational challenges are discussed in the applicable sections of the report.

The Court's Order includes a process for the Receiver to transition responsibility for the health care system back to the State to "demonstrate their ability to maintain a constitutionally adequate system of inmate medical care…," while remaining under Court oversight until such time that the State has demonstrated the "will, capacity and leadership" to maintain a system of providing constitutionally adequate medical care. However, at the time of our visit to San Quentin State Prison, the Receivership had delegated authority to CDCR limited to activation of the California Health Care Facility, DeWitt Nelson Facility and Health Care Facility Improvement Program and Health Care Access Units. Therefore, to a large extent, this report reflects the state of health care at San Quentin State Prison under the oversight of the Federal Court. In order to evaluate the performance of CDCR in managing the health care system, we recommend that the Receiver accelerate delegation to CDCR while maintaining oversight of the

---

[3] Order re Quality of Patient Care and Staffing.

health care system until the State demonstrates that it can establish and sustain a constitutionally adequate health care system.

In order to maintain adequate conditions at San Quentin, it is our belief that CDCR must institutionalize and maintain operational changes established during the Receivership regarding the level of compensation and the contract process. In addition, the Receiver must secure appropriate revisions or additions to state law and CDCR's Operations Manual to minimize the need for any waivers of state law following termination of the Receivership.[4]  We find that the areas likely to need such revisions include the CDCR health care organizational structure, creation of new job titles, hiring and progressive discipline.

---

[4]  Plata et al. v. Brown et al. Order Re: Receivership Transition Plan and Experts Evaluations, No. C01-1351 TEH, 9/5/12. Page 7.

# Findings

## Facility Description

San Quentin is CDCR's oldest facility. Facility missions include a reception center for new commitments, a parole violator unit, general population and a minimum-security work crew unit. All CDCR male condemned inmates are housed at San Quentin. On the day of our visit the population of San Quentin was 3,955 inmates, or 128.3% of design capacity.

With respect to health care missions, San Quentin is a medical reception center, and has a 34 bed outpatient housing unit (OHU) for complex medical patients, and an 18 bed Correctional Treatment Center (CTC) dedicated for mental health patients. It also provides an array of on-site specialty services.

San Quentin is currently undergoing changes in its medical mission and population. CDCR is undergoing realignment and has designated 11 of its 33 prisons as Intermediate facilities. Intermediate facilities will have a higher medical acuity population. San Quentin has been designated to be an Intermediate facility and is in process of receiving higher acuity inmate-patients.

Currently there are approximately 12,000 CDCR inmates designated to be assigned to Intermediate facilities. As of the time of our visit, the process of assigning and transferring eligible inmate-patients to an Intermediate facility was not completed. However, in anticipation of mission and population changes, the health services program has realigned staffing to match the medical acuity and clinical needs of the patients. We note that San Quentin is receiving higher acuity inmate-patients, and medical staffing is being reduced by 18%. Because the mission and staffing changes are in process, the impact of these changes on the health care program cannot yet be fully assessed.

## Organizational Structure and Health Care Leadership

**Methodology:** We interviewed facility health care leadership and reviewed tables of organization, health care and custody meeting reports, and quality improvement reports.

**Findings:** Health care delivery at San Quentin is a system of shared governance. Some functions are under the control of the Receivership (e.g., medical services, Receiver's Turnaround Plan) and some are under the control of CDCR (e.g. assignment of inmates to facilities, mental health and dental services). In addition, some business (e.g. purchasing), human resources processes (e.g., disciplinary investigations) and operations (Health Access Teams) are under control of CDCR. This creates less than clear areas of responsibility and authority for local management.

The California Correctional Health Care Services (CCHCS) program is a system in transition. While the Receiver exerts control over the Receiver's Plan of Action, each local facility, like San Quentin, operates somewhat independently. Mr. Deems, Chief Executive Officer, reports to the Receiver, Mr. Clark Kelso for medical issues and to Diana Toche DDS, Undersecretary,

Administration and Offender Services (Acting), on dental and mental health issues. Mr. Kelso has biweekly conference calls with the CEOs. Central office also hosts quarterly meetings with all the CEOs, periodic meetings with the Chief Medical Executives (CMEs) and Chief Nurse Executives (CNEs), and utilization management training for individual institution executive staff on an as needed basis.  There are occasional visits by CCHCS staff to the facility, usually related to specific topics, but no routine CCHCS staff visits or participation in committee meetings (e.g., Quality Improvement meetings). While we believe that this is a less than optimal system for Central Office to provide needed leadership, assistance and guidance to the facilities, it is an acceptable model.

We reviewed the San Quentin Administrative, Nursing and Support Operations' tables of organization and found that they are organized along functional lines of authority and internally consistent.[5] The medical program has stable and capable leadership. All senior management positions, except the Chief Support Executive, are filled.

With respect to policies and procedures, CCHCS produces centralized policies and procedures and each facility develops local operating procedures that provide operational detail to enable staff to adhere to the CCHCS policy. Currently, the local policy and procedures at San Quentin are more updated than CCHCS policy.

With respect to medical autonomy and collaboration with custody, we found that health care leadership has autonomy, in that medical staff is able to make medical decisions without interference from the custody. The CEO reported that he has a good rapport with the Warden and attends his daily meetings. The Warden meets weekly with the CEO to discuss issues related to health care. In addition, representatives from custody attend the medical Quality Improvement meetings; usually this is the Associate Warden and the Captain for Health Services.

## Human Resources, Staffing and Budget

**Methodology:** We interviewed facility health care leadership and human resources staff. We reviewed current and planned Acuity Based Staffing Realignment, vacancy and fill rates. We also reviewed the process for credentialing, peer review and annual performance evaluations.

**Findings:** San Quentin currently has adequate health care staffing. As noted above, the facility has been designated as an Intermediate facility and is receiving higher acuity medical patients. Under the Acuity Based Staffing Realignment, health care positions will be reduced 18%.[6] Because the facility is in the process of receiving higher acuity patients and staffing is being reduced, it is not possible to assess whether the future staffing pattern will be adequate to meet the needs of the population.

---

[5] San Quentin State Prison, dated January 3, 2013.
[6] CCHCS Acuity Based Staffing Realignment. The plan was designed to appropriately distribute staff based upon the acuity of patient-inmates and on basic staffing needs not tied to patient acuity.

San Quentin has 318.2 positions of which 259.9 (82%) are filled, 53.3 (18%) are vacant, and 5 (1.5%) are hired outside of budget authority. Vacancies have not been filled due to the pending implementation of the Acuity Based Staffing Realignment. The proposed lay-offs include both clinical and support staff.

While the CEO and CME do not think that the reduction in clinical staff will have a significant impact, they believe that the reductions in support staff, particularly in management and office technician staff will be a detriment to the program. There were discussions between management and Central Office on issues of clinical staffing, but decisions on reductions in non-clinical staff were largely made without input from local management. Furthermore, it is our understanding that the CEOs have no authority to modify the staffing plan, even if the modification is budget neutral or more cost-effective.

Scheduling and office tasks associated with the primary care model are heavily dependent on having sufficient support staff because automated scheduling and the electronic health record are not yet available. Even then, the concept of keeping one office technician in the primary care team will be jeopardized by these reductions. The facility is not sure how to manage the support of this function. Scheduling, in particular, is very labor intensive and requires manual input. Despite current efforts, scheduling remains a major deficiency at this facility. In addition to these positions, the program is losing its labor relations and employee relations staff. These two positions will become regional positions and no longer work at the site (see Disciplinary Process).

We discussed the nursing staffing plan with the Chief Nurse Executive. The current staffing plan for RNs, LVNs, and CNAs is similar to the proposed Acuity Based Staffing Realignment and is adequate to address the medical needs of the existing population.

The impact of the new staffing model cannot be fully assessed until the new Stockton facility has been completed and occupied. Following the opening of the Stockton facility and reassignment of inmates based on medical acuity, we recommend that the model be reevaluated and staffing adjustments be made as necessary. We believe that the acuity-based staffing model would be improved by discussion with local management so that they can communicate the specific needs of their facilities. There should be flexibility of local leadership to adjust the plan, especially if it is more cost-effective or budget neutral.

### Credentialing and Peer Review

Credentialing, peer review and annual performance reviews are performed by Central Office. The CEO sees the credentialing information and performance reviews for direct reports. There is a report showing performance evaluations which are coming due. We did not review credentialing for this facility because material was unavailable during our visit. Performance evaluations are done annually. These are reviewed with the employee by the supervisor.

**Disciplinary Process**

One of the major issues identified in our 2006 Report was CDCR's lack of an effective disciplinary process. Although some improvement has been made for peer review and discipline of physicians, the progressive discipline process is largely unchanged for other CDCR staff. The current system is an impediment to effective management and detracts from morale.

Discipline adheres to the CDCR procedures as stipulated in CDCR's Operations Manual. In many cases, it requires an internal affairs investigation managed by the Office of Internal Affairs (OIA), which is a custody function. The hiring authority (in this case the CEO of the health unit) is responsible for logging allegations, requesting adverse action, reviewing investigative reports and imposing discipline. But ultimately, the Personnel Board is in charge of determining penalties if the hiring authority's disciplinary decision is appealed by the employee.

After the hiring authority requests an investigation, the OIA makes a determination within 30 days whether an investigation is warranted. An investigative officer, who is a custody officer, is assigned within 10 days. Investigation types include:

- Criminal
- Administrative
- Retaliation
- Workman's Comp
- Deadly Force

This process was not designed with considerations of professional practice standards and patient safety in mind. The rules embedded in the Operation's Manual and the types of investigations mostly pertain to law enforcement discipline.

It is the responsibility of the CEO at each facility to prepare documentation for the OIA to review in the investigation. San Quentin is the only CDCR institution to have an Employee Relations Officer (ERO) collect and prepare all data to give to OIA in preparation for a disciplinary review. In the future, this position will be regionalized and local management feels that less attention will be focused on this effort. San Quentin management feels that the ERO is a major asset in its ability to present properly completed paperwork to the investigator in order to discipline staff. This is particularly important because if paperwork is not properly submitted, staff cannot be effectively disciplined in a timely manner, if at all.

OIA investigators have a dual time frame for the completion of investigations. For custody employees, the OIA investigator must complete their investigation within a year. For non-custody employees the OIA must complete investigations within three years. The hearing and adjudication process is bureaucratic and replete with various types of hearings after the investigation is completed. The fact that discipline investigations may take as long as three years is a barrier to effective discipline and adds a Kafkaesque quality to the procedure. If management's disciplinary decision is appealed by the employee, lawyers from the Personnel

Board adjudicate the matter, sometimes reversing management decisions. As noted in our 2006 report, this discourages managers from effective supervision and discipline.

San Quentin has a management philosophy of undertaking discipline as needed, and they are aided by the fact that they have an ERO to prepare the documents properly for the OIA to move proceedings along. Even with this support, discipline takes an extraordinarily long time. Without this support, it may become discouraging to attempt discipline.

Nineteen employees have had disciplinary charges made against them over a several year period. One employee subsequently transferred to Pelican Bay. Of the remaining 18 cases, 15 cases have been accepted for investigation by OIA. The average time to accept an investigation for these 15 cases is 72 days even though 30 days is the proscribed limit. The remaining three cases have not yet been accepted by OIA for investigation. The average time these cases were submitted is over 50 days. The average time to complete the entire discipline process is 157 days with a range of 62 to 560 days. Only 5 of 18 staff (27%) had an adverse action taken to date. Three were dismissed and two were suspended. Two employees voluntarily resigned or left. If the staff who resigned is included in the numbers with an adverse action taken, only 38% of discipline staff had a completed adverse action. Of course, every case of discipline does not require or deserve an adverse action. However, when the person investigating the employee is a custody staff and is not part of the health program, there is less likelihood of the Investigator understanding the meaning and consequences of the employee's action and whether discipline is warranted.

Employees are not being disciplined for trivial matters. Most of the allegations, if substantiated, would warrant dismissal in non-CDCR health programs. Nevertheless, it is extremely cumbersome to discipline staff. There are cases at San Quentin in which the OIA investigator did not sustain the charges and because of patient safety issues, health care management would not reassign the individual staff to their usual role. One case involves a nurse alleged to have issued medication without a physician order. That nurse is now working in a secretarial role. Management is placed in an uncomfortable and potentially dangerous position of retaining individuals who they deem are dangerous to patients. Reassignment to alternate duties becomes wasteful and effectively reduces staff available for work.

 A further problem with the discipline process is the adverse action template that is used in disciplinary cases. The CDCR operations manual has a matrix for disciplinary action which was not developed for a health program. Causes for adverse action include 24 items which mostly pertain to custody functions such as use of force and failure to secure an environment. The process of investigation, especially of violations of professional practice standards and patient safety, needs to be managed by health program staff, who understand the issues being investigated and who have an interest in promoting the quality of the program. For the protection of patients, the process should be expedited and resemble discipline in non-CDCR settings.

**Health Care Budget**

Having sufficient operating funds in a budget is a matter that is currently protected by the Receiver.  Notwithstanding the Receivership, CCHCS still receives its funding through the same California State budget process as all other state departments and agencies.[7]  When the budget is passed the State legislature approves an initial allotment for each agency including CCHCS. Appropriations are made to the extent that is fiscally possible.[8]  The allotment is modified over the ensuing 6-8 months of the fiscal year and sometime around January a final allotment is settled upon.  The allotment modifications are based on changes to statewide funding needs or changes in statewide revenue.[9]  Almost all of CCHCS's appropriation comes from the State's general fund which is the funding source most impacted during times of declining revenue.[10]

Over the past two fiscal years the initial allotments for San Quentin bore little resemblance to the actual expenditures of the facility.  As example, the initial allotment for San Quentin medical program including pharmacy in fiscal year 2010-2011 was $24,951,906; the final allotment was $44,395,272 and actual expenses were $47,888,057.  In fiscal year 2011-2012 the initial allotment was $39,449,850; the final allotment was $48,262,148; and expenses were $54,236,355.  The allotments varied widely even though the there was not much difference in the operational needs of the medical program during these two years.  From the perspective of the San Quentin management, the differences between the allotment and expenditures at San Quentin can mostly be accounted for because the allotment provided almost no funding for overtime, equipment, or registry.  In addition, the allotment funded salaries and wages at mid-point ranges, rather than at actual costs.  The health care budget should reflect actual operational and personnel expenditures, so the true costs of a constitutionally adequate health care program can be defined and sustained.

The fact that the allotment may change year to year irrespective of expenditures, however, gives us concern. Expenditures in excess of allotment are not permitted.  In these situations, the Receiver must move funding around internally or ask the legislature for more funding.  The Receiver has been a buffer in this process ensuring that the health programs have had sufficient funds to operate.

A positive development is that the allotment for the health program is now separate from the CDCR allotment.  This gives some protection because by state regulation the health program allotment cannot be comingled with the CDCR allotment even though it is anticipated that the CCHCS Agency Director will report to the Director of CDCR.

Capital expenditures are also affected by this allotment process.  In the normal course of events, equipment breaks and must be replaced.  Most health care organizations plan for obsolescence by including replacement costs for capital equipment on a scheduled basis based on the typical obsolescence factor for each type of equipment. In CCHCS, equipment is replaced

---

[7] Budget Process Explained; Mitzi Higashidani, 2/13/13
[8] Budget Process Explained; Mitzi Higashidani, 2/13/13
[9] Budget Process Explained; Mitzi Higashidani, 2/13/13
[10] Budget Process Explained; Mitzi Higashidani, 2/13/13

when it breaks.  When equipment breaks or is no longer functional, local management can request funding from the Receiver.  A planned replacement of equipment has not been a standard practice in creating allotments.  Currently, because of the Receiver's ability to reallocate funding within CCHCS or go to the legislature, this has not affected operations.  How this will work after the Receivership is not clear.

In our opinion, the real issue is whether the medical program has sufficient funding to provide necessary services.  Currently, under the Receiver, the San Quentin program has had sufficient funds to operate.  However, in order to attain sustainability we recommend having a budget that displays the costs of care in a line item manner that is reflective of anticipated expenditures and that is matched by an allotment in line with the budget developed for the site.  The current system of allotment budgeting is different, and is not real in the sense that the allotment does not conform to  anticipated expenditures; may vary dramatically year to year; and is subject to political competition in the budget process.[11]  The allotment gives targets based on State fiscal decisions that may or may not actually provide sufficient funding for operations.

Under the current system of allotment budgeting, we are concerned about what would happen if San Quentin were required to adhere to an allotment that was set too low as in 2010-2011. We are also concerned about what will happen when the CDCR health leadership, instead of the Receiver, has to approach the legislature for necessary funding and whether competing interests within CDCR will adversely affect funding for the medical program.

## Health Care Operations, Clinic Space and Sanitation

**Methodology:** We toured central and housing medical clinics, the Outpatient Housing Unit (OHU), and administrative and ancillary support areas. In addition, we interviewed staff involved in health care operations.

**Findings:** Since our last review in 2006, the Receivership made dramatic improvements in construction of medical clinics and bed space and in health care operations.

San Quentin has undergone major renovation, most of which, was completed early in the Receivership. A Central Health Services Center was constructed that includes clinics for primary care providers and specialty services, a Triage and Treatment Area (TTA), Reception and Receiving area, Correctional Treatment Center (CTC), Outpatient Housing Unit (OHU) and administrative offices space. This area was clean, organized and well maintained.

Medical clinics in the housing areas were either refurbished or newly constructed and clinic space is now more appropriate. Planned construction of new medication rooms for North Block and South Block, included in the San Quentin Health Care Facility Improvement Plan, has not yet begun. With minor exceptions, each of the clinics was appropriately medically equipped and supplied. However, we did find opportunities for improvement. For example, in each of the

---

[11] Budget Process Explained; Mitzi Higashidani, 2/13/13

housing unit clinics, staff reported that there were no schedules for routine sanitation and infection control duties. During inspection, two clinic rooms in West block that are medically-equipped but rarely used were not clean.[12] The medication room counters were cluttered, making disinfection more difficult to maintain. Lack of adequate sanitation and disinfection is a patient safety issue.

In East block where condemned inmates are housed, new clinic space was built that includes four rooms, a significant improvement from our visit in 2006. Each clinic room was equipped with an oto/ophthalmoscope; however, the LVNs do not use this equipment and there was no power cord. This is expensive equipment that should either be maintained fully functional or removed. The two nurses' rooms were cramped and cluttered. There also was no schedule for sanitation and disinfection in the units.

H-unit clinic space was somewhat cramped but well organized and clean, except in the hallway near the medication room. The North Segregation clinic room was acceptably clean and organized. The Adjustment Center clinic is located in the old kitchen and is the least optimal space, as it was formerly the kitchen for the housing unit.

San Quentin has an inventory of medical equipment and a maintenance contract for periodic inspection and repair of broken equipment. There is, however, no replacement schedule based on an obsolescence factor. The equipment inventory was reviewed and inspection dates were present. It appears that routine maintenance of equipment is appropriate; however, a replacement process should be put in place.

There is no formal system to report non-conformances or problems with equipment, clinic space or processes. This is important so that the organization knows when a problem occurs and is able to fix it. Summary data from such reporting can be reported to the quality improvement (QI) Committee so that root cause analysis can be performed on frequent and problem prone areas. If staff does not have a formal mechanism to report such occurrences, reporting will not systematically take place and problems will persist. For example, during our tours we found three oto/ophthalmoscopes had no power cords, rendering them inoperable. Even though there was a semiannual inspection of the equipment, this problem went unrecognized for months.

For the most part, clinical staff has necessary medical supplies. A par level is established for each clinic, but according to staff, excess supplies are stored in the clinics. San Quentin has a warehouse for storing medical supplies. Typically, if a prime vendor were available, a facility of San Quentin's size would require a much smaller storeroom for supplies and the prime vendor would essentially serve as the warehouse. The warehouse workers estimated that inventory in the warehouse turns over every six months to a year. This is a long time. To modify the current

---

[12] These rooms were formerly used by medical providers that now conduct clinics in the new building. If these rooms are going to be maintained for use in emergencies, they should be adequately supplied and kept clean. If there are no plans to use the rooms, the equipment should be removed.

process would require reliable and prompt vendor payment. If this is indeed possible, use of a prime vendor would improve supply management for this facility.

Twenty-three inmate porters clean the health units throughout San Quentin. A cleaning schedule exists for the main clinic, which delineates the cleaning requirements for each clinical area. The schedule is appropriate for central clinical areas; hygiene was adequate in all areas we visited. However, staff in the housing unit clinics did not have a sanitation and disinfection schedule and the clinics were not consistently clean.

The custodian supervisor makes rounds daily. The vocational instructor makes rounds weekly. Quarterly rounds are made in the CTC. A checklist of these environmental rounds is used by the custodial staff. We would recommend that a report from these environmental rounds be incorporated into the Quality Improvement meeting minutes on a quarterly basis. In that way, the leadership can be formally informed of hygiene issues as they arise.

## Policies and Procedures

**Methodology:** We interviewed health care leadership and staff, and reviewed selected statewide and local policies and procedures to determine whether they were periodically reviewed and whether local policy was consistent with statewide policies.

**Findings:** Overall, we found policies and procedures to be adequate, but there are opportunities for improvement. A local operating policy and procedure (LOP) manual is in place; however, not all local operating procedures have been reviewed within the past year. Two policies have not been reviewed since 2010 and the others were reviewed in 2011 or 2012. Notably, there are no consolidated policies on chronic care or appointment scheduling, which are two major program areas. For scheduling, we found that staff has developed a significant number of workarounds. Staff reported that scheduling guidance is offered in individual policies reflecting the type of scheduled appointment, such as specialty, TTA, and medications refusals.

In some cases, there were significant inconsistencies between policy and actual practice. The LOP for the OHU differs from statewide policy and needs to be clarified. The San Quentin LOP specifies that inmates who require activity of daily living assistance can be housed in the OHU for no longer than 30 days. This would require transfer of a significant number of patients on the current unit. A higher level of care is provided on this unit than is described in the policy and the practice should be consistent with the policy or the policy should be modified. Also, pharmacy policy indicates that default length of prescriptions is 180 days. However, we were advised and record review showed that physicians routinely order chronic disease medications up to one year.

With respect to the medical reception process, our review showed that San Quentin's LOP is not in compliance with CCHCS policies and procedures to perform a complete history and physical examination by a medical provider within seven days of arrival. According to the LOP, some inmate-patients do not receive a history and physical by a physician for up 30 days after

arrival, and others do not receive one at all. Actual practice showed that the time frame for completing a history and physical by a physician exceeds 30 days.

Training for staff is less than optimal. There is a new employee orientation and all staff has to sign off that they have read and understand policies. Nursing conducts initial and annual training of: (a) 23 urgent/emergent and sick call protocols according to Headquarters requirements; (b) annual training of CTC staff which meets licensing standards; (c) specific functions such as Wound Vac and PICC line care; and (d) the nurse trainer reviews all statewide and local operating policy revisions to train nursing personnel against those changes.  However, annual training is not completely defined or implemented, and training, other than orientation, is sporadic. This needs to be improved.

## Medical Reception/Intrasystem Transfer
**Methodology:** We toured the San Quentin receiving and release (R&R) area, interviewed facility health care leadership and staff involved in medical reception and/or intrasystem transfer, and reviewed tracking logs, staffing and 21 health records.

### Medical Reception
**Findings:** San Quentin's local policies and procedures (LOP) and actual practice are not in compliance with CCHCS policies and procedures to perform a complete history and physical examination for newly arriving inmates within seven days of arrival, and actual practice shows that inmates with serious medical conditions do not receive a history and physical by a medical provider timely, often not for more than a month.

We note that newly arriving inmates, whether reception or intrasystem transfers, are typically managed in the same manner. All are processed through the Receiving and Release area of the institution, where a nurse performs a medical screening.[13]  If the nurse does not identify any health problems the nurse educates the patient regarding sick call with no referral to a medical provider for a history and physical examination, even if he is new to CDCR.

If the patient has acute or chronic health conditions the nurse is to refer the patient to a medical provider in the Triage and Treatment Area (TTA). However, records show that when referred, a provider does not see all patients at the time of arrival. This is particularly true if the transferring bus arrives late in the afternoon and nurses have not screened all patients by the time the physicians leave at 7 pm, but its also true if the patient arrives during business hours. If a provider does not see the patient, the nurse calls a medical provider to order medications and then places patient health screening forms in the provider's box to be reviewed the next day. Our review showed that providers may order labs, x-rays, blood pressure checks and follow-up with the primary care provider in time frames that range from 2-12 weeks. Therefore, chronic disease patients who are referred but not successfully seen on the day of arrival will not receive a history and physical by a medical provider within seven days and in many cases not for over a

---

[13] Form 7277 Initial Health Screening.

month after their arrival, increasing the risk of harm through lack of timely diagnosis and/or treatment.

If a medical provider does see the patient upon arrival, evaluations range from a brief assessment to a complete dictated medical history and physical examination. There is no standardization to this process.  Components of a comprehensive history and physical include a personal medical history and review of systems (ROS); however, aside from the initial health screening form, neither nurses nor medical providers complete a standardized personal medical history and review of systems for each patient, and practice and quality vary depending on the provider. Ironically, the only CDCR form that includes this complete medical history information and review of systems is a dental history form.[14] The medical reception evaluation should include the same information as is contained in this dental form and should be completed for every new arrival.

The origins of this departure from the statewide policy and procedure date back several years to when San Quentin was inundated with parole revocators that had recently been released from CDCR. In an effort to focus scarce health care resources on the highest acuity patients, the first Receiver implemented a pilot program that resulted in the current San Quentin local operating policy and procedure. Staff reported that since then the volume of parole revocators has significantly declined and the pilot no longer exists; however, medical reception practices are unchanged and are not in compliance with current CCHCS policy.[15]

We found several examples of chronic disease patients who were not seen upon arrival following nurse referral to the TTA. One patient was a 62-year-old patient with a history of hypertension that was poorly controlled on arrival (BP=160/96 mm/hg). A nurse referred him to a medical provider during business hours, but the provider did not see the patient and instead ordered medications and 4-6 week follow-up with a primary care provider. The patient did not have an initial history and physical examination for more than 30 days after his arrival.[16]

In another case, a 61-year-old medically complicated patient with extensive cardiovascular disease arrived at San Quentin with hypertensive urgency (BP=200/100 mm/hg). Instead of referring the patient upon arrival, the nurse ordered blood pressure monitoring for seven days and referred the patient to his primary care provider in 14 days. We found no documentation that blood pressure monitoring was performed. Two weeks later, a medical provider saw the patient for an initial visit. This patient was at risk for a heart attack or stroke and was not evaluated in a timely manner.[17]

---

[14] Dental Health History Record (CDCR 7433 Revised 08/10)
[15] The decline in parole revocators is attributed to implementation of AB109.
[16] Medical Reception/Transfer Patient #7.
[17] Medical Reception/Intrasystem Patient #20

Another example is a 50-year-old patient with sickle cell disease and hypertension. A medical provider did not see him on the day of arrival; instead, the provider reviewed the patient's record, ordered medications and ordered PCP follow-up in 3-4 weeks.[18]

For these patients, not being seen by a medical provider within seven days of arrival creates a risk that serious medical conditions will not be treated in a timely manner, particularly because nurses only perform a health screening and not a complete medical history or review of systems.[19] Moreover, nurses are supposed to complete a physical assessment on all newly arriving patients, but instead of examining the patient and describing physical findings, in most records we reviewed, the nurse simply asked the patient if he had any problems for each anatomical area. Overall, the quality of the nurses' physical assessments was poor.

Alternately, we also found cases in which chronic disease patients received an adequate evaluation by a medical provider at intake but the scheduled follow-up interval with the primary care provider was delayed. For example, a 35-year-old with a history of non-Hodgkin's lymphoma, hypothyroidism and hepatitis C infection arrived at San Quentin on 10/9/12. A provider saw him upon arrival, ordered medications, labs and follow-up with a primary care provider in 10-12 weeks; however, 12 weeks later he still had not yet been seen.[20]

In summary, our review showed that there is no standardization to the medical reception process, and newly arriving patients do not receive a history and physical examination by a medical provider in accordance with CCHCS policy and procedure. Many patients are not seen timely in accordance with the requested follow-up by the medical provider. This places patients at risk of harm.

**Intrasystem Transfers**
**Findings:** As noted above, intrasystem transfers arriving at San Quentin are essentially treated in the same manner as medical reception inmates, including having medical reception laboratory tests performed (e.g. syphilis, HIV, and STD testing). In most cases, this is not medically indicated and incurs unnecessary cost. We discussed this with Dr. Pratt, who agreed that routine testing on intrasystem transfers was medically unnecessary and stated that she would address it.[21]

With respect to the transfer of patients from San Quentin, staff reported that each Thursday, custody provides a list of inmates that are scheduled to transfer the following week. Registered nurses complete an intrasystem transfer form and, just prior to transfer, arrange for health records and medications to be transported with the inmate-patient. Medical providers place inmate-patients on medical hold if they are in the midst of an evaluation or treatment for a serious medical condition that would be disrupted if transferred. Intrasystem transfers occur Monday through Friday with the bulk of transfers occurring Tuesday-Thursday.

---

[18] Medical Reception/Intrasystem Transfer Patient #6.
[19] The only health care form that includes a complete medical history and review of systems is the Dental 4344/43.
[20] Medical Reception/Intrasystem Transfer Patient #4.
[21] Per policy, medical reception lab testing is not to be done on intrasystem transfer patients.

We found cases in which patients transferring into San Quentin were not seen in accordance with the requested or clinically indicated follow-up. This included patients with elevated blood pressure and poorly controlled diabetes.[22]

## Access to Care

**Methodology:** To evaluate access to care, we interviewed health care leadership and reviewed patient tracking and scheduling systems. We also reviewed 35 health services requests (CDCR Form 7362) in 22 records of patients with chronic diseases, including high-risk patients. We also included a sample of records from maximum-security housing units including East block and Adjustment Center.

### Health Care Appointment Scheduling

**Findings:** The current scheduling system is inadequate and poses a potential risk of harm due the possibility that needed appointments will not occur within clinically necessary time frames.

The current patient statewide scheduling system is the Inmate Statewide Appointment Tracking System (IMSATS). It is populated by the Strategic Offender Management System (SOMS) but has no interface with the electronic Unit Health Record (eUHR). There is no means for nurses and clinicians to determine from the eUHR when patients are scheduled for appointments and if appointments did not occur, why they did not take place.

Health care leadership reported significant problems related to appointment scheduling. Due to the demand for health care services, on any given day there may be 185 patients on a housing unit scheduled to see a provider who has 15 available appointment slots (e.g. North and West blocks). These appointments are for a variety of reasons (e.g. chronic care, sick call, emergency or specialty services follow-up, etc.). In order to manage this situation, each day the provider reviews the list of patients scheduled and chooses which patients she or he will see. The rest of the patients are rescheduled. This results in continuous bumping of patients.

To try to ensure that providers see the patients with the highest medical acuity, the San Quentin staff has created an Encounter Log used by the medical providers. This is an Access database system that is pre-populated with all inmates at San Quentin. Medical providers use the database to track important clinical information. Dr. Pratt, the Chief Physician and Surgeon, advised us that it was her practice to focus on the highest acuity patients. If one of the providers is out on vacation and another provider sees a high-risk patient, the covering provider can look at the Encounter Log and can become familiarized with the patient and his highest priority medical needs that are not readily apparent due to the limitations of the eUHR.

The Encounter Log also enables staff to track overdue appointments. Dr. Pratt showed us a report of all patients who are 30 days overdue for their appointments on H-unit. This report

---

[22] Medical Reception Patients #15, #17, and #18.

showed 102 patients who were overdue for appointments ranging from 1 to 623 days. Noting that some patients were overdue by more than a year, we inquired how the log was being used. Dr. Pratt advised us that H unit had the more healthy population at San Quentin and that there had been a change in physicians. Apparently, the new physician was not using the report to find overdue patients and reschedule them. It is also possible that some patients were no longer at San Quentin. We turned this list over to Anthony Laureano, CNE to research the status of each patient and learned that in fact, many had been seen but some were still overdue, including patients with chronic diseases.

The description of the scheduling process explains both our findings and that of the OIG reports, that patients with chronic diseases and those who require follow-up for specialty services are not seen in a timely manner. The delays in care are mitigated by the development of the Encounter Log that medical providers use to identify the needs of the highest acuity patients and to ensure continuity of care. At a statewide level, the master CDCR Registry is intended to serve the same function, but according to San Quentin staff some patients noted on the registry do not in fact have the illnesses that are listed. However, the master CDCR registry also does not allow for the types of detailed information that the San Quentin Encounter Log provides. These issues can be significantly remediated by implementation of a true electronic medical record.

Once patient appointments are scheduled in IMSATS, they must be communicated to custody so they can print appointment notices (Ducats) that are used to notify and enable patients to attend health appointments. Due to limitations in the current eUHR and IMSATS scheduling system, dental and mental health staff forward lists of appointments in a Word document that health records staff inputs into an Access database. This database is then exported to custody staff so that they can print the ducats. This database was internally developed at San Quentin and the Medical Records Director expressed concern that there is no Information Technology (IT) support for the program and if it were to crash, it would significantly impact the ability of custody to notify inmates of their appointments and adversely affect access to care.   Staff advised us that a new scheduling system, Med-SATS, is to be rolled out in the near future.

**Nursing Sick Call (Face to Face Triage)**
**Findings:** Access to care has significantly improved since we last toured San Quentin in 2006. We found that when inmates submit health services request forms, the forms are collected and triaged in a timely manner. We also found that nursing triage decisions regarding urgency of the need for health care were generally appropriate.

A striking observation about the 35 health service request forms was that many were related to minor health problems and requests for over-the-counter medications or dental and mental health complaints. Others were related to acute conditions such as skin or upper respiratory infections and chronic pain. We generally did not find complaints that were linked to poorly-controlled chronic diseases. The majority of these patients were being routinely seen by their primary care providers for management of their chronic diseases. These chronic disease visit

notes are notable for providers consistently addressing each chronic condition at every visit.[23] As a result of appropriate treatment for chronic diseases, it appears that patients are appropriately using the sick call system to address minor and/or acute medical, dental and mental health issues.

When nurses performed patient assessments they usually selected a nursing protocol to complete the assessment which resulted in good assessments. In some cases, however, nurses did not use the protocols and the evaluations were not as thorough. Furthermore, when patients presented for evaluations, nurses did not consistently address incidental findings of abnormal vital signs (usually elevated blood pressures). And, although nursing triage and treatment decisions were usually appropriate, there were exceptions. In addition, one of the nursing protocols does not provide nurses adequate treatment guidance.[24]

## Chronic Disease Management

**Methodology:** We interviewed facility health care leadership and staff involved in management of chronic disease patients. In addition, we reviewed the records of 47 patients with chronic diseases, including diabetes, hypertension, HIV infection, and clotting disorders, as well as other chronic illnesses. We assessed whether patients were seen in a timely manner in accordance with their disease control. At each visit we evaluated whether the quality of provider evaluations were complete and appropriate (subjective, objective, current labs, assessment and treatment plan). We also evaluated whether the Problem List was updated and continuity of medications provided.

**Findings:**   As previously noted in this report, some chronic disease patients are not seen in a timely manner by a medical provider. When patients are seen by the primary care providers for chronic care, the quality of provider evaluations is good and appropriate patient education is being provided. Provider orders and medication administration records show continuity of chronic disease medications. However, follow-up visits do not consistently occur as clinically indicated in accordance with the degree of disease control.

In one case, on 10/15/12, the primary care provider ordered four to six week follow-up of a patient with poorly controlled diabetes. The patient had not been seen as of 1/7/13.  The case was discussed with the medical staff and the patient was seen on 1/9/13.[25]

In another case, on 8/3/12, the primary care provider ordered follow-up in two months for a patient with hypertension and hyperlipidemia.  The patient had not been seen as of 1/7/13. The case was discussed with the medical staff and the patient was seen on 1/30/13.[26]

---

[23] If time prohibits the provider from addressing all chronic diseases, this is noted as well, with a plan to address it at the next visit.
[24] The protocol for allergic and viral rhinitis, and pharyngitis did not have a treatment section for patients with pharyngitis.
[25] Chronic Care Patient #7.
[26] Chronic Care Patient #14.

A third example involved a patient with hypertension whose blood pressure was not controlled. On 4/6/12, the primary care provider saw the patient and ordered blood pressure checks. The provider noted that he would make adjustments to the patient's medication based on the results of those visits and ordered follow-up in four months. Review of the patient's blood pressures revealed that they continued to be elevated on numerous occasions. The patient had not been seen since 4/6/12 and did not have a pending appointment.  The case was discussed with the medical staff and the patient was seen on 2/8/13.[27]

These cases were discussed with the medical staff. For other examples, see Chronic Care patients 1, 2, 5, 9, 10, 22, and 31.  Our findings are consistent with the OIG third round report finding that 48% of chronic disease patients were seen in accordance with the patient's degree of control at the prior visit.

The lack of timely follow-up appears to be primarily related to problems with the scheduling system but there may be other contributing factors that were not apparent during our visit. The CEO, CME and Chief Physician all stated that this problem would be resolved with the implementation of the new medical scheduling system that was expected to occur within the next few months. Another problem is that the log for finger stick blood sugar (FSBS) monitoring is often not available when the providers are seeing patients with diabetes. This is due to the fact that the results of the testing are documented on the medication administration record (MAR) forms and these forms are only to be scanned into the eUHR at the beginning of each month. Compounding this problem is the fact that the nursing supervisors do not send the MARs for scanning in a timely manner because they retain them in order to perform audits. Both the CEO and CMO assured us that this problem would be resolved. In addition to the above issues, the problem list is often not being updated as new problems are identified and some patients noted on the registry do not in fact have the illnesses that are listed.

Despite these concerns, we found that when providers see patients, the quality of care being provided to patients with chronic illnesses at San Quentin is very good. The problem with scheduling is a systemic issue that, as noted above, should be resolved with the implementation of the new medical scheduling system. We will continue to monitor the implementation of the new scheduling system during our future site visits at the other institutions. In addition, the medical administration at San Quentin is aware of the problem related to the MARs and plans to implement changes in the procedure so that providers will have the necessary clinical information when they see patients with diabetes.

## Pharmacy and Medication Administration

**Methodology:** We interviewed Ms. Meredee Crutcher, Pharmacist-in-charge, nurses that administer nurse-administered medications and keep-on-person (KOP) medications, toured the pharmacy, clinic and KOP medication rooms, and reviewed medication administration records in each of the clinics and in health records.

---

[27] Chronic Care Patient #15.

**Pharmacy Services**

**Findings:** Pharmacy services at San Quentin appear to be working well. Record review showed that medical providers order and patients receive medications timely following their arrival at the facility. The pharmacy has a system for medication refills and order renewal that is working well. However, our ability to accurately measure medication continuity and compliance was limited by the fact that medication administration records (MARs) are not scanned into the record in a timely manner.

We reviewed medication reconciliation reports and noted that they may contain active prescriptions for two drugs in the same class when it is not the intention of the clinician for the patient to take both drugs. The pharmacy staff stated that if an inmate does not request a refill of both medications, the pharmacy permits active prescriptions of drugs of the same class. Thus, an inmate can have multiple drugs active of the same class. This is a potentially serious patient safety and polypharmacy issue. This process should be reviewed by the Pharmacy and Therapeutics Committee.

The Receivership purchases pharmaceuticals statewide through AmerisourceBergen. At San Quentin, medications are dispensed to patients through a combination of a licensed in-house pharmacy and Central Fill in Sacramento. The pharmacy is located in the new building and is clean, well organized and sufficiently large to securely store pharmaceuticals and perform pharmacy operations.

**Medication Administration**

**Findings:** Medications are administered through directly observed therapy (DOT), nurse administered (NA) and keep-on-person (KOP). We found several problems with the medication administration process and documentation of medication administration.

The primary issues are in segregation, where nurses take medications from pharmacy dispensed, properly labeled containers, and place them in repeatedly used envelopes with only the inmates name and ID number before delivering the medications to the patients. In addition, often there is more than one medication in the envelope, and if one falls out or is dropped by the patient, the nurse cannot be certain which medication was not given. We discussed our concerns with Tony Laureano, RN, CNE.

Review of MARs showed that they were neat, legible and contained nursing signatures. The time of administration, however, was not consistently documented. Nurses administer medications, both NA and KOP, on the tiers and then return to the medication room and document the administration of the medications. This does not meet generally accepted nursing practice standards to document administration of medication at the time they are given. In addition, nurse-administered medications are typically administered twice daily; however, in several clinics the MARs have no time of administration documented for morning and evening medication passes. Instead, nurses use yellow and red highlighters to differentiate between the morning and evening medication passes. This does not provide the medical-legal

documentation of the time of administration. Nursing practice standards and patient safety concerns require that a medication is administered one hour before or after a designated time; thus, it is important to document the time of administration on the MAR.

We also noted that there is no administration code on the MAR to indicate whether the medication was administered, the patient refused, the patient was at the hospital, etc. Furthermore, the MARS often show blank spaces, indicating errors of omission in administering medications. Discussions with staff reveal that these are not consistently reported as medication errors. These are errors of omission, and should be reported as medication errors to study under the auspices of the Continuous Quality Improvement (CQI) committee. While some medication errors reflect human error, they can also reflect process issues. For example, in East Block, we reviewed over 30 MARs for which there was no documentation of medication administration the evening of 1/8/2013. It is conceivable that the nurse administered the medications and failed to document administration, or alternately, that the medications were not administered that evening for security, staffing or other reasons.

Finally, we note at H-unit, inmate-patients must line up at the medication window that has no protection from the elements. Thus, if there is a torrential downpour, inmates must either stand in line and become drenched, or decide that they are not going to take their medication. This does not promote medication adherence and is not consistent with an adequate health care delivery system. It is not in compliance with medication audit indicator 9C requiring that "Shade and shelter from inclement weather is provided at medication delivery". (Custodial Measure). We discussed the above concerns with Tony Laureano, RN CNE.

## Laboratory/Radiology
**Methodology:**  We interviewed Mr. Angel Llano, Health Program Manager III and reviewed reports and health care records.

**Findings:** In general, laboratory and radiology services are working well. Radiology services are provided on-site, including portable fluoroscopy. In addition, mobile units provide magnetic resonance imaging (MRI), Computerized Tomography and ultrasound a minimum of twice monthly. Our review showed that radiology procedures were performed and reviewed in a timely manner.

Laboratory services are provided by Quest Laboratories. Record review showed that ordered labs were generally obtained, reviewed and scanned into the eUHR in a timely manner.

## Health Records
**Methodology:** We toured the health records unit, interviewed Mr. Raymond Hewett, Medical Records Director and other health records staff, reviewed health records staffing and the health records (eUHR) for organization, ease of navigation, legibility, and timeliness of scanning health documents into the health record.

**Findings:** CDCR has migrated statewide from a paper record to an electronic Unit Health Record (eUHR). This is not a true electronic health record in which information is entered directly into the record, but one in which staff completes paper documents or dictates clinical notes that are transcribed and scanned into the record. Although an improvement over a paper record, it has significant limitations. Most importantly, each encounter is filed as a PDF file that must be opened individually. Because of this, review of a medical record is a very time consuming process and important clinical information can be missed when providers are seeing many patients during a clinic session. In addition, the eUHR does not directly interface with the pharmacy information system (Guardian), laboratory (Quest) information systems, or the CCHCS Health Information Portal. It has limited interface with the Strategic Offender Management System (SOMS). This makes the record inefficient in accessing clinically relevant data such as the ability to know the patient's current medications without exiting the eUHR. The Receiver is in process of procuring a true electronic health record, which will dramatically improve communication between health care staff, reduce opportunity for medical errors, and improve the efficiency of health care service delivery.

Despite the limitations of the eUHR, we find that health records management is working well at San Quentin. The health records unit is clean and well organized. Staff scans received health documents timely into the electronic Unit Health Record (eUHR) and there is no backlog of documents to be scanned into health records.

Although staff timely scans health documents once received, we found recent but systemic delays (14 to 21 days or longer) in the transcription of dictated physician progress notes that have resulted in delayed scanning of primary care, chronic disease, and urgent care progress notes into the eUHR. We also found that medication administration records (MARs) are not forwarded from the housing unit health clinics to health records in a timely manner. This includes MARs that also contain daily finger stick blood sugar (FSBS) results that providers use to assess and treat diabetic patients. The delay in forwarding these MARs to health records adversely affects medical providers' ability to assess and treat poorly controlled diabetics in a timely manner (See Chronic Disease Management). In addition, it negatively impacts medical providers' ability to assess medication compliance and its effect upon the patient's disease control and subsequent treatment plan.

Health records staffing will be reduced from 27 to 14 positions with the implementation of acuity based staffing patterns. The Medical Records Director believes the new staffing pattern will be adequate to manage health records. This reflects efficiencies gained from migration to the eUHR. We anticipate further efficiencies once a true electronic health record is implemented.

## Health Records Space and Operations

The health records unit is located in the new health services building. The area was clean, well organized and sufficiently large to manage health records. The daily processes of health record management include document collection, date stamping, sorting, prepping and scanning into

the health record. Staff also performs quality improvement activities following scanning to ensure that documents are scanned into the correct file in the right location.

**Timeliness of Scanning Health Documents**
Staff receives and scans an average of 3000 health documents per day into the eUHR.

We noted that some records are filed in the eUHR in sections other than those specified in the eUHR Organization (Version 10.0) documentation.  Management should continue to regularly monitor scanning of documents to ensure correct filing of records. If documents are not filed consistently throughout the system, it is more difficult for staff at other facilities to review the records.

Review of health records showed that that Medication Administration Records (MARs) are not scanned into the record in a timely manner because they are not forwarded to health records in a timely manner. In West clinic we found MARs of diabetics on sliding scale insulin from November and December 2012 in the MAR books. These MARs also contain daily fingerstick blood sugar checks that medical providers need to have access to during chronic disease visits. Since the MARs are not available, the providers do not have this important information when seeing the patients (See Chronic Disease Management). In North Segregation, we found a MAR from December that the nurse kept in the MAR book as a reminder to give the patient an injection the following month.

Another reason for delayed scanning of MARs into the eUHR is that Supervising Registered Nurses (SRNs) hold MARs at the end of the month to perform their medication audits prior to sending them to health records. The lack of timely scanning and access to MARs adversely impacts providers' ability to assess patient medication adherence and continuity, as well as diabetes control. All documents need to be scanned into the eUHR as soon as practical.

San Quentin management told us that all OHU paper records are scanned into the eUHR with the exception of nursing care plans.  However during our audit we were not able to locate all paper records in the eUHR even with the assistance of staff.  Staff on the OHU unit use paper records and did not find the eUHR reliable.  This has the potential for error and is a potential patient safety issue because providers and nurses in locations other than the OHU may be unaware of important clinical information contained in the paper record.  We recommend that San Quentin management review this process and make any necessary changes.

## Urgent/Emergent Care
**Methodology:** We interviewed health care leadership and staff involved in emergency response and toured the Triage and Treatment Areas (TTA). We assessed the availability and functionality of emergency equipment and supplies and reviewed the CCHCS Institutional Reports on potentially avoidable hospitalizations. We also reviewed 12 records of patients selected from the on-site urgent/emergent and off-site ED/hospitalization tracking log.

**On Site Urgent/Emergent Care**

**Findings:** Overall, San Quentin health care staff responds timely and appropriately to patients with urgent health conditions. The triage and treatment area (TTA) is a state of the art emergency room that was clean, organized, and adequately equipped and supplied. Medical clinics located in the housing units were also equipped with automatic external defibrillators (AED) and emergency response bags that staff checks daily.

San Quentin has a multidisciplinary Emergency Response Review Committee (ERRC) that reviews institutional staff response to on-site emergencies. This is an excellent quality improvement process. Review of ERRC minutes shows that the committee effectively identifies areas requiring improvement.

One significant area of concern involves instances in which custody staff did not assess the patient and initiate cardiopulmonary resuscitation (CPR) when necessary, and delays in health care access to patients with life threatening conditions, particularly in condemned housing units.[28] These areas will require continued collaboration and coordination of efforts to ensure inmate-patients receive appropriate and timely emergency response. This finding was consistent with the OIG report that first responder initiated CPR only 60% of the time.

Given the age of the institution and physical plant issues and security procedures involving this population, we recommend that custody staff is trained and has access to automatic external defibrillators.

Although overall this area is working well, our record review showed opportunities for improvement. We found some cases where there were problems with the quality of nursing assessments, lack of wound care and clinical follow-up of patients. In one case, a patient with a known history of cholelithiasis (gallstones) presented with burning chest pain that he attributed to his gallstones. The nurse assessed him as having chest wall pain and referred him to a medical provider; however, this visit did not take place.[29]  In another case, a nurse assessed a patient who had experienced a seizure as having 'status epilepticus' or continued seizures, which was inaccurate.[30]

Other issues involve failure to implement physician orders or lack clinical follow-up. In one case, a provider saw a patient for an abscess of his right forearm and performed incision and drainage (I&D). The physician ordered antibiotics and wound care for seven days, but did not request clinical follow-up. There was no documentation that nurses performed the ordered wound care and three weeks later the patient returned to the TTA with a fluctuant abscess that had to be incised and drained a second time.[31]  The patient received appropriate follow-up following the recurrent abscess.

---

[28] See August 27, 2012, September 10, 2012 ERRC Meeting Minutes.
[29] Urgent Care Patient #1.
[30] Urgent Care Patient #2.
[31] Urgent Care Patient #4.

Another serious case involved a delay in sending a high-risk patient to an outside hospital. A 61-year-old patient presented with chest pain, hypertensive urgency and EKG changes. He was kept in the TTA for approximately three hours before being sent to the emergency room. Documentation shows that his blood pressure was not adequately monitored and treated, and by the time he was sent out his blood pressure remained dangerously high (BP= 219/98 mm/hg). At the hospital he was diagnosed with myocardial infarction and underwent angioplasty with stent placement.[32] We discussed this case with medical staff.

**Emergency Department/Hospitalizations**

**Findings:** Access of patients to outside hospital care was good. Arrangements with local hospitals are in place and appear to serve the needs of the facility. Hospital reports were found in all records reviewed, so it is clear that clinical communication is good.

There were no identified cases where a patient needed hospital care and did not get it. There was one case of a patient with asthma who had a preventable hospitalization because of problems with care at the facility.[33]  In this case, the patient care would have been improved if managed in an OHU or CTC. This patient had repeated hospitalizations for asthma and was not appropriately managed in general population as was clinically indicated. While the facility staff believe that management should have been better in general population, it is our opinion that more complicated patients are better managed in a nursing unit with 24 hour coverage. There is some reluctance to place individuals into the OHU because the restrictive environment on that unit is something patients dislike. When custody staffing is low on the OHU, as it is currently, inmates seldom leave their rooms and the OHU essentially becomes similar to segregation. For that reason, patients object to going to the OHU. Patient resistance to placement in the OHU increases the likelihood that patients will be misassigned to general population. There were some nursing issues involving central lines that resulted in hospitalization on two occasions.[34]  This area could be improved by having the OHU physician see the patient upon hospital return as well as training of nurses in management of central lines.

## Specialty Services/Consultations

**Methodology:** We interviewed staff involved in the review, approval and tracking of specialty services and reviewed health care records of 16 patients for whom services were requested.

**Findings:** Specialty services are available and, in most cases, are performed within appropriate time frames. While in many cases the PCP is not seeing patients within the required time frames for follow-up of specialty care, the recommendations of the specialists are being addressed in a timely manner and the patients are receiving appropriate care. Our findings are consistent with OIG reports that scored San Quentin 55% with respect to timely follow-up following specialty services appointments.

---

[32] Urgent Care Patient #3
[33] OHU Patient #7.
[34] OHU Patient #3.

## Outpatient Housing Unit Care (OHU)

**Methodology:** We toured the OHU, interviewed OHU health care and custody staff, and reviewed OHU tracking logs and patient health records.

**Findings:**  There is lack of health care staff access to patients which is due to reduced custody staffing and lack of adequate number of medical OHU beds. This is a significant issue.

With a projected population of 4,000 inmates and 500 high-risk patients, San Quentin has 34 OHU beds and 18 CTC beds for medical and mental health patients, respectively. OHU beds are managed by both San Quentin medical providers and the CCHCS Utilization Management program that assigns patients from other facilities to empty CTC and OHU beds. While the concept of a centralized bed management program is good, San Quentin medical providers need to have sufficient control over medical/mental health beds to manage the needs of its own population and to ensure that patients do not exceed the medical criteria appropriate for an OHU. Central Office Utilization Management needs to work closely with the San Quentin medical staff to ensure that there is sufficient bed capacity for the needs of the San Quentin population.

The 34 OHU beds are almost always at capacity. Staff reported that a decision has been made to rededicate 10 OHU medical beds to mental health. This will require blocking oxygen and suction at the wall and remodeling the rooms to be suicide preventive. This will reduce the OHU capacity from 34 to 24 medical beds. This is a ratio of six OHU beds per thousand inmates, which is low given the medical mission of the facility. This was supported by our finding of general population patients whose medical needs warranted OHU placement. Therefore, we believe the reduction in OHU medical bed capacity is inappropriate.

The problem is compounded because San Quentin houses approximately 690 condemned inmates that are anticipated to age and die at the facility. Currently, except for the occasional patient, when these inmates become disabled or seriously ill, they remain at San Quentin even if they require a higher level of care, which is not medically appropriate. For patients whose medical care exceeds the capacity of San Quentin to appropriately care for them, we recommend that medical beds be designated for this population at the California Correctional Health Care Facility (CHCF).

The California Penal Code, Section 3600 states:

> "An inmate whose medical or mental health needs are so critical as to endanger the inmate or others may, pursuant to regulations established by the Department of Corrections, be housed at the California Medical Facility or other appropriate institution for medical or mental health treatment.  The inmate shall be returned to the institution from which the inmate was transferred when the condition has been adequately treated or is in remission."

Based on this, it is our opinion that this portion of state code should be standardized into a procedure that results in severely disabled condemned patient-inmates being transferred to appropriate levels of care, to include the new CDCR health care facility in Stockton, rather than remain at San Quentin regardless of their medical condition.

Our review of the OHU census showed that patient medical acuity is quite high. At least three of the 34 inmates were total or nearly total care patients. More than half of the patients are disabled and have difficulty walking. San Quentin local operating procedure states that one criterion for OHU placement is for patients needing temporary assistance with activities of daily living (ADLs) and that if the inmate-patient requires assistance longer than 30 days, the patient shall be referred to a higher level of care. The 30-day time restriction is not present in the State-wide policies and procedures. However, clearly the facility is not placing patients on the unit in accordance with its own procedures because there are numerous inmates with ADL problems who are essentially living in the OHU. Based on record reviews, it appears that CTC patients are being transferred from other facilities to San Quentin because of quality of care issues.

**Custody Staffing Resulting in Lack of Access to Patients**
Despite the high level of medical acuity and although the medical staffing currently is at the level of a CTC, the staff have difficulty seeing patients because there are insufficient officers available to open doors and accompany staff when they are seeing a patient. The existing rule is that all doors must remain locked and custody staff must be present when medical staff is seeing a patient, even if the patient is totally disabled and bedridden.

Currently, health care staffing is 2 RNs, 1 LVN, 1 Nurse Assistant, 1.5 medical providers and physical therapy as needed, or approximately seven clinical staff. During the week of our review, there was one correctional officer to open OHU doors to provide health care access and escort inmates to the dayroom. Depending on the shift, there are 7 or 8 officers assigned to the 4th floor; only 1 of them is consistently assigned to the medical OHU.  The remaining officers are assigned to the mental health unit or have other assignments.[35]  As a result, health care staff is not able to complete all necessary work during their shift. During our visit, a nurse waited 25 minutes for an officer to open a door for a clinical need. One incontinent inmate had a diaper and nurses changed the diaper once a shift. There was an odor of feces when passing the room and it was clear that this inmate needed greater attention than once a shift. This is a serious access issue.

---

[35] After our San Quentin visit, we were advised that Custody staffing for the Fourth Floor in the Central Health Building at SQ is not divided between the OHU and the MHCB.  On second watch, there are seven inpatient officers and one sergeant assigned to the entire floor; on third watch there are six officers and one sergeant.  During the week of our visit San Quentin failed to fill one post for the inpatient area at different times.  On Monday and Friday, one third watch post was left vacant.  On Saturday and Sunday, one second watch and one third watch post was left vacant.  All the posts were filled Tuesday through Thursday. The Health Care Access supervisors are responsible for ensuring the custody officers are deployed  appropriately. However, we also note that staff reported that Custody staffing was reduced in the past six months, and that the week of our visit was not atypical.

In addition, physician notes on the unit are mostly every two weeks even when it is clinically indicated to see patients at more frequent intervals. Patients admitted to the unit are not always seen within 72 hours or as ordered by the intake physician and timely care does not always occur.

Custody staff needs to be reallocated to the OHU to permit health care staff greater access to patients. A reasonable recommendation is one officer for every 1.5 clinical staff. With that ratio, clinical staff would have adequate access to patients. Staff reported that at one time they had more officers in the OHU but that Headquarters health care access teams recommended a decrease in custody staffing.

The inmates who live in the OHU maintain food amidst their personal property. Because some inmates are long-term borders on this unit and because the unit houses high acuity medical patients, management should consider development of some rules on hygiene in inmate rooms, in particular as it relates to storage of food items.

**Nursing Care Issues**
With respect to quality of care, we found that nursing care plans are inadequate. The proscribed method of documenting a nursing care plan is to utilize a paper Kardex. This form is embedded in a binder which is kept in the nursing station. These nursing care plans are poorly maintained and instead of using the nursing care plan, most nurses use an informal system of tracking care items on an Excel spreadsheet which is used to maintain census information. In a comment section, nurses will write their care plan for the day. Many nurses we spoke with do not use the Kardex at all; some use both the Kardex and the census sheet. This parallel process diminishes the probability that an accurate care plan will be developed and implemented, and may result in patients not receiving physician ordered care. Nursing care plans need to be standardized made simple for nurses to use, and accurately reflect the needs of the patient consistent with physician orders.

**OHU Patients Require a Greater Level of Care than what is being provided**
Review of patient charts on the OHU reflected patients housed on this unit require a level of care greater than an OHU. [36] These patients require a skilled nursing unit or a nursing home environment. Several patients did not have timely testing or follow up.[37] It was not clear whether this was because by definition OHU patients are seen only every two weeks, because of lack of access to the patients due to insufficient custody staff, or for some other reason. In any case, patients need to be evaluated timely based on their clinical condition. In some patients, nursing care plans did not accurately reflect physician orders or were inadequate for the patient.[38] While we could not identify explicit harm to the patients because of these deficiencies, continuation of these problems may result in harm to patients and therefore need to be corrected.

---

[36] OHU Patients #2 and #8.
[37] OHU Patients #1, #3, #4, #6, and #9.
[38] OHU Patients #2 and #8.

## Internal Monitoring and Quality Improvement Activities

**Methodology:** We reviewed the OIG report, facility Primary Care Assessment Tool, Performance Improvement Work Plan (PIWP), and internal monitoring and quality improvement meeting minutes for the past four months.

San Quentin leadership has instituted several processes related to quality improvement. These include the Quality Management Committee, Emergency Response Review Committee, Morbidity and Mortality Review Committee and Institutional Utilization Management Review Committee.

Review of the QMC committee meeting minutes from July to November 2012 showed that the minutes are essentially an outline of topics that were discussed with reference to subcommittee report handouts. These handouts were not provided to us for review. Moreover, there is no documentation of group discussion regarding the content of the handouts. Thus the meeting minutes are not useful in describing committee activities and progress made in resolving identified problems.

We reviewed Emergency Response Review Committee (ERRC) minutes from June to November 2012. We found the minutes to be very useful in describing the timeliness and quality of emergency response by custody first responders and health care staff. Review of the minutes showed that health care response was generally timely and appropriate. There were instances, however, of failure of custody staff to assess the patient for life signs and initiate cardiopulmonary resuscitation (CPR) when indicated and/or delays in access to the patient by health care staff.[39] We incidentally note a downward trend in attendance from June to December 2012 by committee members.

---

[39] August 27, 2012, September 10, 2012 ERRC Meeting Minutes.

# Recommendations

**Organizational Structure, Facility Leadership, and Custody Functions**

1. CCHCS staff should regularly visit every site. Optimally, this should be at an annual QI meeting in which Central Office would hear and understand the major problems at each facility and get a better sense of operational difficulties.

2. There should be an interagency policy on acuity based classification between CDCR and CCHCS. In a procedure or appendix, there should be reference on how to make classification assignments which are consistent with definitions of Intermediate housing.

3. Prior to finalizing the budget and staffing for a facility, fiscal and operational managers from CCHCS should meet with the facility senior management to discuss the proposed budget and rationale for staffing and budget changes.

**Human Resources: Staffing and Facility Mission Hiring and Firing, Job Descriptions**

1. CCHCS should review the existing Acuity Based Staffing changes with San Quentin health care management following the completion of the classification based reassignment to ensure that staffing types and numbers are appropriate to the new mission.

2. Before reduction of office staffing who perform scheduling, CCHCS should ensure an adequate scheduling system is in place.

3. In keeping with the powers granted by the Transition Plan Order of 9/5/12, the Receiver should secure appropriate revisions to state law and regulations to modify discipline procedures so that:

   a. Investigation of health care staff is under direction and supervision of Health Services

   b. The matrix of discipline is modified to conform to a health care system, not a custody one.

   c. The disciplinary process is initiated and completed in a timely manner, and no greater than 60 days.

4. Health Services management should perform a root cause analysis and process analysis of the discipline process relative to its capacity to effectively discipline staff. This should be reported to QI and to Central Office.

5. Adverse actions should be consistent with health care standards, not custody standards.

6. Regular annual training should be incorporated into the program, especially for nursing.

**Operations: Budget, Equipment, Space, Supplies, Scheduling, Sanitation, Health Records, Laboratory, Radiology**

1. All budget lines should be clearly understood and all expenses incurred by the facility should be accounted for by the facility. Annual budget reviews with each facility should be implemented.

2. A replacement schedule for capital items should be developed. The American Hospital Association has a book detailing a depreciated schedule for various assets which could be used as a resource (Estimated Useful Lives of Depreciable Hospital Assets). This can be modified for existing capital resources within the health system.

3. A system of reporting non-conformances should be developed. This should be an offshoot of the QI committee.
4. Inventory turns should be increased to reduce costs. A prime vendor might be helpful.
5. Environmental rounds should be reported to QI on a quarterly basis.

**Policies and Procedures**
1. All Local Operating Procedures should be reviewed and signed as reviewed annually.
2. The OHU policy should be reviewed in light of current practice and the policy and practice should be consistent.
3. The medical reception policy should be revised to conform to the Statewide policy.
4. The medication prescription policy should be revised to ensure consistent practice in terms of default length of prescription medication.
5. A policy and procedure should be developed on reporting non-conformances.
6. A policy on Self-Monitoring Quality Improvement, Routine Audits, Identification and Resolution of Problems, OIG Reports and CCHCS dashboards should be developed.

**Reception and Intrasystem Transfer**
1. Health care leadership should revise the medical reception policy and procedure to be consistent with the statewide policy and ensure that all newly arriving inmates receive a history and physical examination within 7 days.
2. The medical evaluation should be standardized to include a more complete personal history and review of systems, similar to that found in the Dental Health History Record (CDCR 7433).

**Access to Care:  Nursing Sick Call**
1. Health care leadership should continue to review nursing assessments and provide feedback to nurses to improve performance.

**Chronic Disease Management**
1. Health care leadership should identify and address issues contributing to the lack of timely follow-up care.
2. Blood sugar monitoring logs should be available when providers see diabetic patients in chronic care.
3. The Problem List should be updated with new diagnoses.

**Pharmacy and Medication Administration**
1. Medication administration practices in segregation should be changed so that nurses adhere to generally recognized standards of nursing practice.
2. Nurses should forward MARs to health records in a timely manner.

**Urgent/Emergent Care**

1. Correctional staff should be provided additional training regarding assessing patients for life-signs and initiation of CPR.
2. Conduct more frequent emergency response drills for using cardiac arrest as the medical event.
3. Consideration should be given to the strategic deployment of Automatic External Defibrillators (AEDs) in selected areas of the facility that are accessible to custody and other non-health care staff in the event of cardiac arrest of an inmate, staff or visitor. This is particularly applicable to maximum security housing units where logistics may delay access of health care staff to the patient or staff member.

**Specialty Consultations**

1. Health care leadership should identify and address issues contributing to lack of timely PCP follow-up care.

**Specialized Medical Housing: OHU/CTC/GACH**

1. Due to San Quentin's size, facility medical mission and location of the condemned population, we recommend maintaining the current level of OHU medical beds.
2. Patients requiring a higher level of care, including condemned inmate-patients, should be transferred to a facility capable of providing the needed medical care.
3. To increase health care staff access to patients, establish OHU custody staffing based on a ratio of 1 custody staff for every 1.5 to 1.75 clinical staff. This can be modified during night shift. Another alternative, which is done in other systems, is to allow nursing staff to have keys to the rooms.
4. Review and revise nurse documentation procedures on the OHU. One way to accomplish this is performance of a process flow of documentation with subsequent standardization of nurse care plan development and management.

Court-Appointed Medical Experts Report:

**The Status of Health Care Delivery Services**

**In CDCR Facilities**

Presented to:

Judge Thelton Henderson

Robert Sillen, Court-Appointed Receiver

April 15, 2006



**PLATA MEDICAL EXPERTS**

*Joe Goldenson, MD*
*Madie LaMarre, MN, APRN, BC*
*Mike Puisis, DO*

# <u>*Contents*</u>

**1. Introduction** ......................................................................................................... **5**
   1.1 Purpose of Report ................................................................................................. 5
   1.2 Methods of Assessment ........................................................................................ 6
   1.3 Areas of Assessment ............................................................................................ 6
   1.4 Patient Record Reviews ........................................................................................ 6
   1.5 Glossary of Terms ................................................................................................. 7

**2. Executive Summary** ........................................................................................... **8**
   2.1 General Findings .................................................................................................... 8
   2.2 General Recommendations .................................................................................. 12
   2.3 Status of CDCR Health Care Systems ............................................................... 14

**3. California State Prison at Corcoran** ................................................................ **22**
   3.1 Organizational Structure ...................................................................................... 22
   3.2 Health Care Staffing ............................................................................................ 23
   3.3 Tour of Housing Unit Medical Clinics .................................................................. 24
   3.4 Receiving and Release Medical Screening .......................................................... 26
   3.5 Chronic Care ....................................................................................................... 27
   3.6 Medication Management and Administration ........................................................ 29
   3.7 Specialty Services and Consultation .................................................................... 29
   3.8 Urgent/Emergent Care ........................................................................................ 29
   3.9 Medical Records .................................................................................................. 30
   3.10 Ancillary Services .............................................................................................. 30

**4. San Quentin State Prison (SQSP)** ................................................................... **31**
   4.1 Organizational Structure ...................................................................................... 31
   4.2 Health Care Staffing ............................................................................................ 32
   4.3 Tour of Housing Unit Medical Clinics .................................................................. 34
   4.4 Receiving and Release Medical Screening .......................................................... 40
   4.5 Chronic Care ....................................................................................................... 41
   4.6 Medication Management and Administration ........................................................ 42
   4.7 Specialty Services and Consultation .................................................................... 45
   4.8 Urgent/Emergent Care ........................................................................................ 46
   4.9 Medical Records .................................................................................................. 46
   4.10 Outpatient Housing Unit (OHU) ......................................................................... 47
   4.11 Ancillary Services .............................................................................................. 48
   4.12 Death Reviews ................................................................................................... 49

**5. California Institution for Men (CIM)** ................................................................ **53**
   5.1 Organizational Structure ...................................................................................... 53
   5.2 Health Care Staffing ............................................................................................ 53
   5.3 Tour of Housing Unit Medical Clinics .................................................................. 55
   5.4 Medical Reception Evaluation ............................................................................. 58
   5.5 Receiving & Release Process .............................................................................. 60
   5.6 Chronic Care ....................................................................................................... 61
   5.7 Medication Management and Administration ........................................................ 62
   5.8 Specialty Services and Hospitalizations .............................................................. 62
   5.9 Urgent/Emergent Care ........................................................................................ 63
   5.10 Medical Records ................................................................................................ 64
   5.11 CIM Death Reviews ........................................................................................... 65

**6. Avenal State Prison (ASP)** .............................................................................. **66**
   6.1 Organizational Structure ...................................................................................... 66
   6.2 Health Care Staffing ............................................................................................ 66

6.3   Tour of Housing Unit Medical Clinics ............................................................. 67
6.4   Receiving and Release Medical Screening ...................................................... 68
6.5   Chronic Care .................................................................................................... 69
6.6   Specialty Services and Consultation ............................................................... 69
6.7   Urgent/Emergent Care ..................................................................................... 72
6.8   Medical Records .............................................................................................. 72
6.9   Outpatient Housing Unit .................................................................................. 73

**7.   High Desert State Prison (HDSP)** ...................................................................... **74**
7.1   Health Care Staffing ........................................................................................ 74
7.2   Tour of Housing Unit Medical Clinics ............................................................. 75
7.3   Receiving and Release Medical Screening ...................................................... 79
7.4   Chronic Care .................................................................................................... 79
7.5   Medication Management and Administration .................................................. 80
7.6   Specialty Services and Consultations .............................................................. 81
7.7   Medical Records .............................................................................................. 82
7.8   Death Reviews ................................................................................................. 82

**8.   Pleasant Valley State Prison** ............................................................................. **84**
8.1   Organizational Structure .................................................................................. 84
8.2   Health Care Staffing ........................................................................................ 84
8.3   Tour of Housing Unit Medical Clinics ............................................................. 85
8.4   Receiving and Release Medical Screening ...................................................... 88
8.5   Chronic Care .................................................................................................... 89
8.6   Medication Management and Administration .................................................. 90
8.7   Specialty Services and Consultation ............................................................... 90
8.8   Urgent/Emergent Care ..................................................................................... 93
8.9   Medical Records .............................................................................................. 93

**9.   Substance Abuse and Treatment Facility (SATF)** .......................................... **94**
9.1   Organizational Structure .................................................................................. 94
9.2   Health Care Staffing ........................................................................................ 94
9.3   Tour of Housing Unit Medical Clinics ............................................................. 95
9.4   Receiving and Release Medical Screening ...................................................... 99
9.5   Chronic Care .................................................................................................. 100
9.6   Medication Management and Administration ................................................ 101
9.7   Specialty Services and Consultation ............................................................. 102
9.8   Urgent/Emergent Care ................................................................................... 103
9.9   Medical Records ............................................................................................ 104
9.10  Correctional Treatment Center ..................................................................... 105

**10. Valley State Prison for Women (VSPW)** .......................................................... **107**
10.1  Organizational Structure ................................................................................ 107
10.2  Health Care Staffing ...................................................................................... 107
10.3  Tour of Housing Unit Medical Clinics ........................................................... 108
10.4  Medical Reception ......................................................................................... 110
10.5  Receiving and Release Medical Screening .................................................... 112
10.6  Chronic Care .................................................................................................. 112
10.7  Medication Management and Administration ................................................ 113
10.8  Specialty Services and Consultation ............................................................. 114
10.9  Urgent/Emergent Care ................................................................................... 115
10.10 Medical Records ............................................................................................ 115

**Appendix – Patient Medical Records Review**

## List of Tables

Table 1. Corcoran Nursing Staff Positions and Vacancies ....................................................24
Table 2. SQSP Nursing Staffing ..........................................................................................33
Table 3. Chronic Care Medical Records Audit.....................................................................41
Table 4. High Risk Medical Records Audit ..........................................................................42
Table 5. Antiretroviral Drugs on CDCR Formulary............................................................44
Table 6. Specialty Care Medical Records Audit...................................................................45
Table 7. Off-Site Emergency Care Medical Records Audit ..................................................46
Table 8. CIM Nursing Staff Positions and Vacancies..........................................................54
Table 9. CIM Completion of Scheduled Physical Examinations..........................................59
Table 10. CIM Chronic Care Medical Records Audit ..........................................................61
Table 11. CIM High Risk Medical Records Audit ...............................................................61
Table 12. CIM Specialty Clinic Medical Records Audit ......................................................63
Table 13. CIM Specialty Clinic Medical Records Audit ......................................................63
Table 14. Pending Physician Appointments by Yard ...........................................................67
Table 15. ASP Chronic Care Medical Records Audit...........................................................69
Table 16. ASP High Risk Medical Records Audit ...............................................................69
Table 17. ASP Specialty Services Pending Appointments ...................................................71
Table 18. ASP Specialty Clinic Medical Records Audit.......................................................71
Table 19. ASP Returnees from Outside Hospitalizations Medical Records Audit .................72
Table 20. HDSP Nursing Staff Positions and Vacancies......................................................75
Table 21. HDSP Chronic Care Medical Records Audit ........................................................80
Table 22. HDSP High Risk Medical Records Audit.............................................................80
Table 23. HDSP Specialty Services Medical Records Audit .................................................81
Table 24. HDSP Returnees from Hospital ...........................................................................82
Table 25. PVSP Nursing Staffing and Supervision .............................................................85
Table 26. PVSP Nursing Appointments Scheduled and Seen ...............................................86
Table 27. PVSP Physician Appointments Scheduled and Seen .............................................86
Table 28. PVSP Chronic Care Patient Medical Records Audit .............................................89
Table 29. PVSP High Risk Patients Medical Records Audit .................................................90
Table 30. PVSP Specialty Clinic Medical Records Audit .....................................................92
Table 31. SATF Nursing Staff Positions and Vacancies ......................................................95
Table 32. SATF Chronic Care Medical Records Audi.........................................................100
Table 33. SATF High Risk Medical Records Audit ...........................................................101
Table 34. SATF Specialty Services Request.......................................................................103
Table 35. VSPW Nursing Staff..........................................................................................108
Table 36. VSPW Chronic Care Medical Records Audit ......................................................112
Table 37. VSPW High Risk Medical Records Audit ...........................................................113
Table 38. Onsite Specialty Services Aging Report .............................................................114

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page5 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 50 of 310

*Introduction*

# 1. Introduction

Relative to Plata v. Schwarzenegger, the Federal District Court, with the agreement of the parties, retained the authors of this document as Medical Experts to evaluate medical care provided to inmate/patients in the California Department of Correctional Rehabilitation (CDCR). The court-appointed medical experts are:

- Joseph Goldenson, MD

- Ms. Madie LaMarre, MN, APRN, BC

- Michael Puisis, DO

At a later date, Jackie Clark, RN, was hired by the court experts to assist in the fulfillment of their duties. She also had input into this report.

## 1.1 Purpose of Report

In December 2005, the Federal Court, in Order Re: Interim Measures Related to Clinical Staffing, requested that the Court Medical Experts conduct onsite inspections of those prisons that the parties agreed were in greatest need of clinical staffing, and to prepare a status report concerning the delivery of health care in those prisons. In accordance, the Medical Experts visited the following prisons:

- California State Prison at Corcoran (CSP)

- San Quentin State Prison (SQSP)

- California Institution for Men (CIM)

- Avenal State Prison (ASP)

- Pleasant Valley State Prison

- Substance Abuse and Treatment Facility (SATF)

- Valley State Prison for Women (VSPW)

- High Desert State Prison (HDSP)

In conducting the tours, the Court Medical Experts recognized that the conditions that led to the appointment of the Receiver were substantially unchanged. We therefore endeavored to provide an update regarding the status of health care delivery in CDCR prisons, and to make recommendations that may assist the Court, the Receiver, and the involved parties to improve health care in the system. These recommendations address organizational, infrastructure, system and clinical issues found across the CDCR system. Individual site visit reports are included in this report, as well as an Appendix of patient records that we reviewed.

The Medical Experts recognize the enormity of the changes that are required to create an adequate health care system within CDCR. As Mr. Sillen assumes his role as the Court-appointed Receiver, we wish to express our commitment to this process and offer our assistance as the Receiver deems appropriate.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page6 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 51 of 310

*Introduction*

## 1.2  Methods of Assessment

Assessment methods including the following:

- Tours of the medical units, Correctional Treatment Centers (CTC), yard medical clinics, and administrative-segregation units
- Interviews with medical, nursing, ancillary, correctional staff, and patients
- Review of tracking logs and patient medical records
- Observation of selected health services such as medical reception, nursing triage, and medication administration
- Review of documents including policies and procedures, and treatment manuals
- Review of staffing patterns and professional licensure

## 1.3  Areas of Assessment

The high priority areas of health care delivery that were assessed at each of the eight prisons are listed below. This report is organized according to these categories in each prison.

1. Organizational Structure and Facility Leadership
2. Health Care Staffing: Staffing, Vacancies, and Staff Orientation
3. Housing Unit Medical Clinics: Equipment and Supplies, Nursing Face-to-Face triage, Access to Care issues
4. Receiving and Release (R & R) Medical Screening: Initial Health Screening Process (7277 form), Medical Reception Evaluation, Intrasystem Transfer Process (7371 form)
5. Chronic Care: High Risk Patients
6. Medication Management and Administration: Pharmacy
7. Specialty Services and Consultations
8. Urgent/Emergent Care: Inmate Hospitalizations, Emergency Preparedness and Response
9. Medical Records
10. Outpatient Housing Unit

## 1.4  Patient Record Reviews

The medical experts reviewed numerous individual patient records at each prison for this report. The Appendix of this report contains a list of the records that were reviewed and some demonstrative case histories.

In many places in this report, we will refer you to the Appendix for more details on individual patient records.

Case 3:01-cv-01351-TEH   Document 2570-1   Filed 03/18/13   Page 7 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 52 of 310
*Introduction*

# 1.5 Glossary of Terms

| | |
|---|---|
| **7277 Form** | Health Screening Form |
| **7362 Form** | Health Care Services Request Form |
| **7371 Form** | Medical/Mental Health Information Transfer |
| **AGPA** | Associate Government Program Analyst |
| **CDCR** | California Department or Correctional Rehabilitation |
| **CHSA** | Correctional Health Services Administrator |
| **CTC** | Correctional Treatment Center |
| **DON** | Director of Nursing |
| **Ducating** | Scheduling system used to ensure that patients receive timely notice and access to health care services |
| **FTFT** | Face-to-Face Triage (also known as sick call) |
| **IMSATS** | Inmate Medical Scheduling and Tracking System |
| **HCSD** | Health Care Services Division |
| **HPC** | Health Program Coordinator |
| **IDN** | Infectious Disease Nurse |
| **IST** | In-service training |
| **LVN** | Licensed Vocational Nurse |
| **MAR** | Medication Administration Record |
| **MTA** | Medical Technical Assistant |
| **NP** | Nurse Practitioner |
| **OHU** | Outpatient Housing Unit |
| **OT** | Office Technician |
| **PCP** | Primary Care Provider |
| **PHN** | Public Health Nurse |
| **QMAT** | Quality Management Assessment Team |
| **RN** | Registered Nurse |
| **R&R** | Receiving and Release Medical Screening |
| **SRN** | Supervising Registered Nurse |
| **SSA** | Staff Services Analyst |
| **TTA** | Triage and Treatment Area (equivalent to an Emergency Room) |
| **UHR** | Unified Health Record |

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page8 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 53 of 310

*Executive Summary*

# 2. Executive Summary

## 2.1 General Findings

### 2.1.1   CDCR Organizational Culture

- Throughout our tours, the Court medical experts met a number of Wardens and custody staff who understood the importance of medical care and made efforts to support the program. However, most custody staff does not view medical care as part of their mission and are not held accountable for failure to support the program. The organizational culture that permeates the CDCR does not support, and is often directly oppositional to the provision of inmate/patient health care. This is evidenced by:

  o Custody-led orientation programs for health care staff, which communicate that inmates are worthless, never to be trusted, and that medical staff should not feel compassion for inmates. (If they do, they are suspect.)

  o Failure of custody to escort and transport inmates to medical appointments, especially during lockdowns

  o Reassignment of the Plata officers to non-medically related activities

  o Unilateral custody decisions to arbitrarily limit access to care to only certain times or days

  o Continued business office denial or delay of purchase orders for medical equipment and supplies despite directives from headquarters that orders should not be delayed

  o Custody confiscation and disposal of prescribed medications to inmates for treatment of serious medical conditions

  o Lack of custody commitment to provide and supervise inmate porters for basic clinic sanitation

### 2.1.2   HCSD Organizational Structure, Leadership and Resources

- Historically, the leadership of the Health Care Services Division (HCSD) has been not been adequately positioned within the CDCR organizational structure to provide a voice for the serious health care issues facing the agency. Health care is effectively treated as just another program that CDCR is required to provide to inmates. This underscores a lack of understanding of the enormity of the mission that faces CDCR and commitment to developing an adequate health care program.

- The Health Care Services Division organizational structure is complex and lacks clear lines of authority and accountability. There are insufficient numbers of qualified health care professionals to plan, develop, implement, and monitor the health care program. As a result, staff often does not perform the roles that they were hired to perform (e.g., Regional Medical Directors, QMAT nurses and physicians) and are involved only in crisis management activities.

- There has never been executive nursing leadership with meaningful authority, responsibility, or accountability for nursing services in the CDCR Health Care Services Division. This has resulted in a complete vacuum of professional direction and development for over 2,400 nurses in CDCR.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page9 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 54 of 310
*Executive Summary*

It has contributed greatly to the lack of recruitment and retention, and to the unsuccessful implementation of the health care policies and procedures.

- There are not enough regional medical, nurse, and administrator positions (and ancillary support) to provide meaningful onsite presence, training, supervision, and monitoring to the institutions. There are 33 prisons with over 165,000 inmates divided into three regions. The number, size, and geographical distribution of the facilities make it virtually impossible for three regional medical and nursing directors to provide adequate oversight. It is, therefore, not surprising that institutional staff reported during our site tours that they rarely see the regional medical directors and administrators. The HCSD regional nursing director positions remain unfilled.

- At headquarters and in the institutions, custody staff with no health care training or experience occupies health care management positions (on an acting or permanent basis). Examples of this include correctional Lieutenants being hired into Health Care Services Administrator positions, Associate Wardens appointed as Health Care Managers, and correctional Captains appointed as Regional Medical Administrators. While many of these employees are dedicated and hard working, the majority do not have the qualifications and experience needed to effectively assess, plan, develop, implement, and monitor a health care program.

### 2.1.3   Institutional Organizational Structure

- There is no uniform health care organizational structure. Many prisons have modified the HCSD organizational structure for their own purposes. The organizational models we reviewed virtually ensure that no one is responsible or accountable for various medical operations. For example, there is no single person who is functionally in charge of clinic operations. All four of the employees who typically work in the yard medical clinics (physician, registered nurse [RN], Medical Technical Assistant [MTA], and office technician [OT]) have different supervisors. No single person is identified as being in charge of clinic operations with the authority to direct the activities of other employees. No one is held accountable if supplies are not ordered, appointments aren't scheduled, medications are not renewed, etc.

- Contributing to the lack of accountability described above is an organizational structure that is overly complicated and organized along custody and medical lines. For example, MTAs who are both custody officers and licensed vocational nurses (LVNs) report to the Senior MTAs, who report to the Health Program Consultant (which can only be filled by someone with a custody background). The Health Program Consultant theoretically should report to the Nursing Supervisor but often did not. Our reviews showed that registered nurses, for all intents and purposes, do not functionally supervise the MTAs because they are peace officers and belong to a different bargaining unit. In fact, because Senior MTAs are supervisory positions, they have been assigned to supervise RNs in some facilities. This is a violation of nursing scope of practice and would not be found in any community health care organization.

- As referenced above, certain health care positions serve in dual medical and custody roles. The MTA is a licensed vocational nurse (or occasionally a registered nurse) who is also a peace officer. MTAs are members of the California Correctional and Peace Officer Association (CCPOA) bargaining unit, wear peace officer uniforms and, in our experience, identify primarily with their role as custody staff. An MTA may be involved in subduing an inmate and then called upon to treat him without prejudice. This is an untenable role conflict. Moreover, MTA duties are split between medical and custody functions; thus, the medical program does not obtain the full benefit of their position. Because the MTA is also a custody position, fewer correctional officers are assigned to the clinics to provide supervision of inmate patients or inmate porters.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page10 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 55 of 310

*Executive Summary*

## 2.1.4   Health Care Delivery Infrastructure

The CDCR lacks the infrastructure necessary to provide an adequate health care system. This includes deficiencies in clinic and administrative space, medical housing and bed space, staffing, orientation and training, equipment and supplies, and information technology.

- **Clinic Space -** At virtually every facility we visited there was inadequate space for clinical, administrative, and ancillary support functions. Moreover, the existing space is often in disrepair and unsanitary. In most facilities, the clinic and office furniture was old and falling apart.

- **Medical Housing/Bedspace -**There is insufficient numbers and types of medical housing and beds to match the health care needs of the patient population. The CDCR has four General Acute Care Hospitals (GACH) occupied by patients who are not acutely ill, but require long-term skilled nursing care. A significant proportion of Correctional Treatment Centers (CTC) and Outpatient Housing Unit (OHU) beds are occupied by mental health patients. Most of the remaining beds are occupied by long term care patients. Therefore, if beds are full, medical patients who do not require hospitalization are sent to an outside hospital simply for lack of a bed. In some cases, patients who should be monitored in a CTC bed are sent back to their housing unit, subsequently deteriorate, and must be urgently sent to an outside hospital. The CDCR does not have a medical bed space management system that ensures the appropriate and best use of medical beds.

- **Staffing -** Although the scope of this report does not include a staffing study, we believe that with few exceptions, most facilities are understaffed with respect to clinical, nursing, and ancillary support. There are clearly insufficient numbers of physicians, nurse practitioners, and physician assistants to see patients. There are no established staffing ratios used for planning and budget purposes and that take into consideration the medical and security missions, size of the inmate population, and geography of the institution. Although recent salary increases for clinicians and nurses have improved recruitment, similar increases are necessary for other positions such as pharmacists and medical records staff. The salary structure for supervisors, who often make less than line staff, should be studied and adjusted as necessary to retain staff.

- **Staff Orientation and Training -** Institutional staff orientation and professional development have been inconsistent and inadequate. We learned that custody staff receives 16 weeks of training through a correctional training academy before they begin work at the facility. This is not true for health care personnel. Few institutions have been funded for Nurse Educator positions; therefore, staff orientation and training is less likely to be formalized and more like on-the-job training. This communicates to health care staff that their mission and value as employees is less important than custody staff. The frequent use of registry staff makes the challenge of training more difficult.

  Our reviews showed that the recently developed HCSD orientation manual for health care employees has been welcomed by staff, but it has not been widely implemented due to inadequate training resources. Of note, headquarters staff reported that in the past, there was a centralized training section in the HCSD, but that this was disbanded.

- **Equipment and Supplies -** Staff reported that they are still unable to obtain equipment and supplies in a timely manner. To some extent, this is due to poor health care management and failure to supervise staff responsible for maintaining medical equipment and supply inventories. Medical staff is required to get one to three bids <u>every single time</u> they purchase supplies and equipment, even if there is only one supplier or it is something they purchase regularly (e.g., gauze). This practice is overwhelmingly burdensome to staff.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page11 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 56 of 310

*Executive Summary*

Lack of equipment and supplies are also due to denials, delays, and modifications of purchase orders by the facility business office, despite directives from CDCR Headquarters in early 2005 that medical purchase orders are not to be delayed. Staff reported that the Wardens are still held responsible for the overall budget of the facilities, and monies saved from the health care budget are transferred to the custody budget at the end of the fiscal year. Finally, staff at one facility (CIM) reported that they have provided equipment to the medical clinics several times, only to have the equipment "disappear."

- **Lack of Information Technology -** The CDCR does not currently utilize advances in technology to improve communications and health care delivery. Staff does not have adequate numbers of computers, updated programming (e.g., pharmacy software programs, networked e-mail, and scheduling systems), linkages to clinical laboratories, or an Electronic Medical Record (EMR). In our interviews with staff, one of their strongest complaints was the lack of technology to perform their jobs efficiently.

- In addition, staff are not provided technology tools to maintain their knowledge of current medical, nursing, and pharmacy practices such as Personal Digital Assistants (PDAs) with access to medical software (Epocrates, Up To Date). It should be noted that custody rules and regulations prohibit the use of PDAs -- the very technology that would benefit staff.

## 2.1.5   Personnel Issues

Aside from infrastructure issues, there are a number of personnel issues that prevent effective supervision and management of employees.

- **Management and Supervision -** A theme throughout our tours was a lack of basic management and supervision. This was in part due to vacancies and high turnover in medical and nursing leadership positions. There are insufficient numbers of nursing supervisor positions in most facilities. For facilities with adequate numbers of nursing supervisors, most supervisors worked the day shift instead of having 24-hour coverage. We also found that many supervisors were not aware of the problems in their facilities because they do not get out to the areas for which they are responsible, talk to staff, and monitor compliance with policies and clinical practices.

- **Civil Service Regulations -** For those managers who do actively supervise their employees, many expressed frustration with civil service regulations which, they believe, make it impossible to discipline and if necessary, terminate employees. This is complicated by staff reports that Wardens must sign off on all Letters of Instruction (LOI--the first step in the disciplinary process), and that Wardens often do not support health care management in their disciplinary recommendations. Managers reported that when they initiate the disciplinary process, staff declare "stress" and go out on stress leave for indefinite periods of time. This is demoralizing to both managers and line staff who are working hard. We believe that this eventually results in supervisors failing to supervise or discipline because they believe it is futile.

- **Labor/Bargaining Unit Issues -** Many supervisors we spoke to expressed complete exasperation over bargaining unit requirements that hamstrung their ability to manage. For example, the labor bargaining process has resulted in giving both MTAs and registered nurses the right to a "Post and Bid" process for assignments in the institution. This means that assignments are awarded based upon seniority, rather than experience and training. Thus, a nurse with no emergency training or experience who wanted to work the day shift in the TTA could displace a nurse with less seniority who had such training and experience. Similarly, a nurse with no experience in infection control can replace someone with extensive experience. The Post and Bid process effectively prevents nurse managers from hiring and assigning staff based upon their experience and qualifications. It has also resulted in frequent retraining of staff as they bid for and receive

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page12 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 57 of 310
*Executive Summary*

new assignments, for which they may have no experience or qualifications.

Another example of how bargaining unit concerns can adversely impact the provision of medical care occurred at Valley State Prison for Women VSPW). There are serious issues relating to access to care in administrative segregation at VSPW. Although policy does not require it, custody staff routinely has two officers escort patients for all activities. In an effort to increase patient access to medical appointments, the Warden gave a directive to custody staff to use one officer (unless the inmate was known to be assaultive), but the officers, via CCPOA intervention, refused, and the order was rescinded. There continue to be serious access to care issues at the facility (see section "**10.** Valley State Prison for Women (VSPW)" in this report).

## 2.2  General Recommendations

These deficiencies in organization, culture, infrastructure, and resources are responsible for many of the conditions that have led to the appointment of the Receiver. Although some of these issues are beyond the scope of this report, the Court Medical Experts make the following recommendations for consideration by the Receiver and the CDCR.

### 2.2.1    CDCR Organizational Culture

- Providing safe and secure facilities and adequate health care to inmate/patients are not mutually exclusive, but to do so will require a profound cultural paradigm shift within CDCR. From the highest to the lowest custody levels, staff must be educated and motivated to understand that support of the health care program is part of **their mission**, and not just that of health care staff. Although previous efforts have not been successful, we believe that the Receiver through education, motivation, and the authority of the Federal Court, will bring about this change.

### 2.2.2    HCSD Organizational Structure, Leadership and Resources

- The appointment of the Receiver provides the necessary authority to address the challenges facing the CDCR. However, when sufficient improvements have been made and Federal oversight is no longer required, the HCSD must be properly positioned within the CDCR organizational structure to provide adequate authority to sustain and continue the improvements in health care delivery.

- A study of the HCSD should be conducted to assess the effectiveness of the organizational structure and adequacy of resource allocation. Building an effective HCSD will likely require reallocation of existing resources as well as the creation of additional positions. At both headquarters and the institutional level, health care professional positions should only be filled by qualified health care professionals.

- The Chief Nurse must be positioned within the CDCR HCSD organizational structure to ensure that nursing perspectives and concerns are adequately represented at the leadership level and that nursing issues are appropriately addressed. The organizational chain of command should ensure that the Chief Nurse has real authority and accountability for all nursing services (policy development, budget, training, and field operations) through a chain of command that extends through the regional structure to the nursing supervisor at the institutional level.

- The current crisis demands increased HCSD oversight and monitoring at every facility. Initially, we recommend that a ratio be established of one regional Medical Director, Nursing Director, and Regional Administrator to every three CDCR facilities. The number of regions may be decreased

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page13 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 58 of 310

*Executive Summary*

over time as improvements are made, but in our view, there should not be less than six regions. Facilities may be grouped by geography or mission; however, the women's facilities should comprise their own region, regardless of geographical location. CDCR should also ensure that each region has adequate support to continue roll-out activities. This includes:

- o   Information technology support

- o   Clerical support

- o   Medical records support

- o   Pharmacy consultants who can conduct reviews of pharmacy services and provide technical assistance to the field

### 2.2.3    Institutional Organizational Structure

- The institutional organizational structure should be organized along functional lines of authority, and not along medical and custody chains of command. This organizational structure should be uniform at all institutions. For example, we recommend that RNs be put in charge of the yard clinics and be given the authority to direct the activities of the MTAs, office technicians, and other staff assigned to the clinic.

- MTAs should be under the direct supervision of RNs and only perform health care duties. We recommend that they wear medical attire and no longer wear correctional officer uniforms.

- Consideration should be given to eliminating, either actively or through attrition, medical positions that have dual custody/medical roles. This includes the Health Program Coordinator, Senior MTA positions, and MTAs. As these positions become vacant, they should be converted to LVN, psychiatric or pharmacy technicians, RN positions, or other positions as required.

### 2.2.4    Health Care Delivery Infrastructure

- **Clinic Space -** In the short term, we recommend that at each facility, under the direction of the Receiver and the HCSD (in cooperation with the Wardens) assess the utilization of existing medical and adjacent non-medical space to determine if the maximum benefit is being obtained. Where this proves to be insufficient, we recommend that the placement of modular units be considered. As a long term strategy, some facilities may require new construction to meet the needs of the facility.

- **Medical Housing/Bed Space -** The CDCR should expand its bed space capacity to care for patients with long term care needs. This may involve re-licensing of existing bed space (from an acute care hospital to a CTC), establishment of long term care facilities, or purchase or construction of additional bed space. Consideration should be given to increasing bed space capacity for mental health patients since they frequently occupy medical beds.

- **Staffing -** In the short term, we recommend that the CDCR continue its efforts to hire qualified physicians to care for chronically ill and medically complex ("high risk") patients. We also recommend hiring nurse practitioners (NPs) for every yard clinic to reduce the backlog of clinician appointments. (See section "2.3.3 Nurse Face-to-Face Triage" recommendations.) As an intermediate strategy, we recommend that a system-wide staffing assessment be performed using criteria such as population, medical and mental health missions, and institutional layout.

- **Orientation and Training -** Although the HCSD orientation program developed in response to Judge Henderson's December 1, 2005 court order was a positive step forward, we believe that in the long-term a more structured orientation and training program for staff is necessary. This would best be accomplished through a centralized training academy. We believe that this is the

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page14 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 59 of 310
*Executive Summary*

most effective method to deliver consistent and accurate information regarding CDCR policies and procedures. We also recommend that for ongoing training, resources be allocated for the establishment of regionalized training centers. Every institution should be allocated a funded Staff Training and Development position.

- **Equipment and Supplies -** The HCSD must directly control the purchase of medical equipment and supplies. We recommend establishing statewide contracts and eliminating the requirement to obtain bids each time supplies and equipment are ordered. Equipment and supply inventories should be maintained.

- **Information Technology -** The CDCR should establish a network into which all computers can be linked so that:

  o Staff within the medical programs can communicate to one another

  o SATS or other tracking programs can be linked

  o Laboratory and x-ray results can be available to health care staff in the clinical areas

  o Reference texts can be obtained from computer lookup in all clinical areas

  o An electronic medical record system can be ported

  o A platform for telemedicine is available

### 2.2.5   Personnel Issues

- **Management and Supervision -** The CDCR should continue to search for qualified medical, nursing, and administrative leadership for facilities. We recommend that nursing supervisory positions provide 24-hour coverage. (This may only be possible after completion of the staffing study and the allocation of additional positions.) Management training should be offered to all managers and required for those identified with deficiencies.

- **Civil Service Regulations -** Recommendations regarding civil service regulations are beyond the scope of this report. However, we recommend that the Receiver consider those regulations that present obstacles to effective management of the facilities. We also recommend that approval of progressive discipline be under the direction and supervision of the HCSD and not subject to the approval of the Warden.

- **Labor/Bargaining Unit Issu**es **-** We recommend that the CDCR engage in dialogue with the nursing and MTA union to eliminate the Post and Bid process. If this is not successful, we recommend that the Receiver supersede this process and permit managers to assign staff based upon their education, training, and experience, and not based upon seniority.

## 2.3  Status of CDCR Health Care Systems

### 2.3.1   Medical Reception

The purpose of the medical reception process is to screen and evaluate newly arriving inmates to identify medical, dental, and mental health care problems and to develop an initial treatment plan. The medical evaluation also serves as a baseline for measuring changes in the patient's medical condition throughout the inmate's stay in CDCR.

**Findings:** We evaluated the medical reception process at San Quentin, Correctional Institution for Men (CIM), Valley State Prison for Women, and High Desert State Prison. In general, we found that the

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page15 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 60 of 310
*Executive Summary*

medical reception process fails to appropriately identify and treat inmates with serious medical conditions. There is insufficient space, staff, equipment and supplies, and privacy to adequately perform the process at virtually all the facilities. The process is not completed in a timely manner and patients are often moved into general population yards before their physical examinations are completed. This presents a risk that patients with communicable diseases such as tuberculosis will not be diagnosed promptly, exposing staff and inmates alike. Required laboratory tests are not being performed at all facilities. Moreover, clinicians do not obtain adequate medical histories and physical examinations are cursory, even for patients with serious medical problems. Not unexpectedly, treatment plans are inadequate and patients suffer harm, even death, as a result (see section "5. California Institution for Men (CIM)" in this report).

**Recommendations:** At each of the facilities, space and staffing allocated for the reception process must be addressed. Optimally, the medical reception process would have dedicated space and staff who have no other purpose but medical reception. In the short term, space needs may require the use of adequately equipped modular units or trailers where medical staff could conduct the process. In the medical reception process, clinicians must:

- Perform thorough medical histories and physical examinations
- Document identified medical problems, and
- Develop appropriate treatment plans

### 2.3.2 Receiving & Release (Intrasystem Transfer)

The purpose of the intrasystem transfer process is to ensure continuity of medical care with respect to medications, pending consultations, chronic care, and medical restrictions related to housing or work assignment (i.e., medical chronos). Upon notification that an inmate is to be transferred from one facility to another, the sending facility nurse reviews the inmate's health record and identifies medical problems, pending consultations, and other laboratory or diagnostic tests that should be performed upon arrival at the new facility. The nurse also determines if the patient has medications that should be transferred with the inmate/patient. The receiving facility nurse reviews the record, renews medications, and schedules clinician appointments and any other medical care ordered at the previous facility.

**Findings:** The current intrasystem process does not consistently ensure continuity of care. When inmates transfer from facility to facility, dispensed prescriptions are not transported with the patient or are placed in the inmate's property, which the inmate does not immediately have access to upon arrival at the new facility. Although most institutional pharmacists accept current medication orders from transferring facilities, one pharmacist requires all orders to be rewritten and signed off by a physician (see section "8. Pleasant Valley State Prison" in this report). This requirement effectively interrupts medication continuity. Although nurses do refer patients to clinicians upon arrival, the backlog of physician appointments often results in patients not being seen in a timely manner, or at all.

**Recommendations:** The HCSD, in cooperation with custody staff, should assess the system for providing medication continuity for transferring inmates. An increase in the number of clinicians should help alleviate the current of backlog of patient referral appointments following arrival. However, facility health care leadership should institute Continuous Quality Improvement (CQI) processes to monitor and address this process.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page16 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 61 of 310
*Executive Summary*

### 2.3.3    Nurse Face-to-Face Triage (FTFT)

According to CDCR policy, inmates request health care services by submitting a written request on a 7362 – Health Care Request form. A staff nurse collects the forms each day from a drop-box location on the unit and triages the forms to the appropriate service (e.g., pharmacy, dental, mental health). Staff then schedules patients with medical symptoms requiring evaluation the following business day. Nurses should assess patients in adequately equipped treatment rooms, and treat patients according to written protocols. Nurses refer patients with health conditions beyond their scope of nursing practice to clinicians for further evaluation and care.

**Findings:** We evaluated nursing FTFT at every facility we visited. In general, we found that the process is not working well. Nursing appointments were days to weeks behind and evaluations were generally inadequate. In many cases, nurses did not refer patients to clinicians when clinically indicated. When patients were appropriately referred, they were referred to clinicians whose waiting lists were already weeks or months behind. This resulted in secondary delays in access to care. Nurses performing FTFT receive virtually no supervision or feedback regarding their practice, either from nursing supervisors or clinicians.

**Recommendations:** Given the current crisis in access to care, we recommend temporary suspension of the nurse FTFT process, and that nurse practitioners should be hired for every yard clinic. (The suspension of nurse FTFT should only occur after NPs are hired.) The nurse practitioner should evaluate all patients with symptoms until backlogs are eliminated. The use of nurse practitioners will result in fewer referrals to the physicians and will permit physicians to focus on patients with chronic illnesses and those requiring follow-up of consultations. RNs should be put in charge of the clinic to ensure that all clinic operations are running smoothly (e.g., monitoring patient tracking systems, ensuring equipment and supplies are ordered, etc.).

Once the appointment backlogs are eliminated, we recommend that yard clinics establish physician/nurse practitioner/registered nurse case management teams to triage and manage medically complicated patients. In addition, CDCR should establish a program to provide ongoing education, training, and evaluation of nursing staff who are involved in the clinical assessment of patients.

### 2.3.4    Chronic illness Care/High Risk Patients

Poor access to health care prior to incarceration results in many inmates entering prison with undiagnosed or inadequately treated chronic illnesses. Chronic care programs serve to identify and monitor patients with chronic illnesses in order to initiate appropriate therapeutic regimens that will promote good health and prevent disease complications. Chronic Care programs also provide patient education and counseling to encourage patients to practice healthy behaviors. Qualified primary care providers treat the majority of patients with chronic illnesses; however, some medically complex or "high risk" patients require a higher level of care (e.g., board certified internist or infectious disease specialist).

**Findings:** Most of the facilities have not implemented, or only recently implemented, the chronic illness program. At most prisons, staff have not identified and enrolled all eligible patients into the program. There are insufficient numbers of qualified physicians to treat chronically ill patients and provide medical care, particularly for medically complex patients. This results in patients not being scheduled to see a physician in a timely manner.

Staff attempt to provide continuity of care to the chronically ill patients by retrieving pharmacy lists of patients whose medications will expire soon and reordering the medication. Although it is commendable that staff attempt to provide continuity of medication, it also means that patient medications are being

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page17 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 62 of 310
*Executive Summary*

renewed without an accompanying clinical visit and without regard to whether the patient's disease is well or poorly controlled.

Special attention is needed with respect to the care of patients with diabetes. The quality of care for patients with diabetes in CDCR is variable. Part of this is due to the different experience and knowledge of the primary care physicians in relation to treating diabetes. Another factor is variability of the ability to monitor blood sugar and to give insulin, both in terms of timing and frequency. Due to both custody and health care staffing issues, it is difficult to perform these activities before meals at some facilities, and it is not possible to give insulin more than twice a day. A number of physicians were concerned that, given these restraints, they could not adequately manage complex diabetic patients.

**Recommendations:** With the addition of mid-level practitioners to the clinic staff as discussed above, physician time should be devoted to patients with more complex chronic diseases and medical problems. In addition, the responsibilities of the clinic RNs should include the organization and monitoring of the chronic care program, and case management of medically complex patients.

The Chief Physicians and the Regional Medical Directors should be more involved in training the medical staff in the requirements of the chronic care/high risk programs, and in monitoring and supervising the medical staff to ensure they are providing appropriate care. Finally, tracking systems need to be developed and implemented to ensure that patients with chronic illnesses and complex medical problems are identified, monitored, and evaluated on a regular basis, and that their medications are renewed and/or refilled in a timely manner.

The American Diabetes Association (ADA) recently published guidelines on the management of diabetes in correctional facilities. We suggest that the Court Medical Experts work collaboratively with staff from CDCR and from the ADA in developing a comprehensive program for the care of diabetic patients in CDCR.

## 2.3.5   Specialty Services

Due to the generally high medical acuity of the inmate population, the demand for specialty services is high. This demand requires that the medical contracting process provide a variety of specialty services in relative close proximity to the facility or through telemedicine. It also requires that sufficient custody transport is available to deliver patients to their appointments. The institution must have an adequate tracking system so that inmates can be appropriately scheduled to see a primary care physician for follow-up after their specialty service consult. Finally, it is important that clinicians monitor patients to ensure that the treatment plan is implemented and the desired clinical outcome is achieved.

**Findings:** There were serious problems with access to specialty services, primarily related to the medical contracting process, which is in crisis. The scope of the problem is well detailed in the March 27, 2006 report by John Hagar, the Court-appointed Correctional Expert. (See report "Re: Status of State Contracts and Contract Payments Relating to Service Providers for CDCR Inmate/Patients.")

There is a lack of coordination and sharing of consultation services between facilities. For example, Corcoran State Prison (CSP) provides a number of onsite services, but does not share access to these services with SATF, which is adjacent to CSP. CSP staff reported that this was because monies spent would come out of the CSP budget and they would be penalized for not being within budget. Therefore, SATF takes their inmates offsite for services that could be provided at Corcoran.

At the institutional level, staff are not using computer tracking systems properly and there are insufficient numbers of primary care physicians to clinically monitor patients.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page18 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 63 of 310
Executive Summary

Patients are not being transported to follow-up appointments. As a result, patients are not receiving recommended clinical care and follow-up.

**Recommendations:** The medical contract process is beyond the scope of this report. Fortunately, immediate relief has been provided in Judge Henderson's March 30, 2006 Court order. This court order extended medical contracts that were about to expire and authorized payment to vendors who have provided services.

CDCR should study and improve coordination of specialty services by region, including transport services.

With respect to the institutional process, health care leadership must ensure that staff are trained and monitored regarding compliance with applicable policies, and educated in the use of computer tracking systems. Computer tracking systems should be networked so that the yard clinic staff can monitor the timeliness of scheduled appointments. With increased clinical staffing, the timeliness of clinician follow-up should improve; however, clinicians must take responsibility to monitor patients until the medical condition for which the patient was referred has resolved.

## 2.3.6   Pharmacy/Medication Administration

**Findings:** The pharmacy and medication administration systems do not ensure continuity of medications. At reception centers, medications are being ordered for newly arriving inmates. However, because chronically ill patients are not being monitored appropriately at most facilities, there are frequent interruptions in medication continuity. Compounding this problem, MTA staff should, but does not, systematically monitor medication expiration dates and arrange for the timely renewal of medications.

The system for administering nurse-administered, or directly observed therapy (DOT) medications is inefficient and wasteful. (See sections 4.San Quentin State Prison (SQSP) and 5.California Institution for Men (CIM) in this report.) At most prisons, there is no accountability for the large volumes of stock medications that are in the yard clinics. Nurses in yard clinics often pre-pour medications for the next shift in violation of policy.

Several facilities do not have needle and syringe accountability systems. If inmates obtain access to and share syringes, it presents a risk of widespread transmission of communicable diseases such as HIV and Hepatitis B and C infections.

We reviewed the Statewide HIV antiretroviral formulary and found it does not contain common medications used to formulate treatment regimens (e.g., AZT) or permit simpler dosing regimens (e.g., Combivir, Truvada).

At San Quentin, a policy was established that limited the administration of pain medication to twice daily, even for newly post-operative patients housed in the Outpatient Housing Unit (OHU), which has nursing staff 24 hours a day. We found this practice to be cruel.

Most disturbingly, custody staff confiscates prescribed medication during cell searches and discards the medication. (See sections 4.San Quentin State Prison (SQSP) and 7.High Desert State Prison (HDSP) in this report.) This was reported by Court experts one year ago and still continues today.

**Recommendations:** We understand that the Receiver has contracted, or intends to contract with an outside agency to evaluate the CDCR pharmacy and medication administration systems. We strongly support this decision. Review of pharmacy services was beyond the scope of this report. However, we do

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page19 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 64 of 310
*Executive Summary*

have some preliminary recommendations. Under the direction of the Receiver, CDCR should consider the purchase of automated medication single-dose dispensing systems that eliminate the inefficiencies in nurse-administered medications. These systems would also eliminate the need for majority of bulk medications outside the pharmacy, resulting in increased medication accountability and reducing the potential for waste and theft. It would greatly decrease the amount of time nursing staff devote to preparing medications and prevent the need to pre-pour medications.

Nursing supervisors at every facility must ensure needle and syringe control accountability on every shift. Since the CDCR is a unified system, pharmacists at each facility should accept valid medication orders from other CDCR facilities and not require nurses to obtain new orders immediately upon arrival. Pain management policies and practices must ensure adequate pain control and not arbitrarily limit dosing. Finally, the practice of custody staff discarding legally prescribed medications should be immediately stopped and staff held accountable for adhering to this directive.

The treatment of HIV infection is complex and considerations such as co-existing medical conditions, medication side effect profiles, and the reality that most regimens eventually fail to maintain viral suppression requires that the full spectrum of antiretroviral therapy be available to HIV experts treating CDCR patients.

### 2.3.7    Clinic Sanitation and Infection Control

Sanitation and infection control are essential in any institutional or health care environment.

**Findings:** We found basic sanitation to be nothing short of appalling. There are no sanitation schedules for any of the clinics. The facilities use inmate porters to clean the institutions. However, these porters are not trained (except at facilities with janitorial vocational programs) or supervised by custody staff. Custody staff expects the MTAs to supervise the inmate porters, even as they attend to their medical duties (e.g., administering medications). It is therefore not surprising that the quality of sanitation is often poor. When lockdowns occur (which can last weeks or months), inmate porters are not provided to the clinics. In administrative-segregation units, inmate porters are not allowed, so the medical clinics are never cleaned.

**Recommendations:** We recommend one of two options: 1) Under the direction of the Receiver, the HCSD contracts with sanitation companies to clean medical areas, including Correctional Treatment Centers, and yard medical clinics including administrative-segregation, or; 2) custody staff ensures a sustained commitment to provide trained inmate porters who are under custody supervision at all times.

In all areas where health care services are delivered, custody and medical staff should collaborate to develop a sanitation schedule to be posted in each clinic. Sanitation should address the frequency of terminal cleaning (stripping and waxing of floors, sweeping, cleaning of walls and cabinets, etc.) by inmate porters and tasks that are performed daily by health care staff such as disinfection of countertops, examination tables, and other equipment. The Supervising Nurses on each shift should inspect clinic areas daily to ensure that the sanitation activities are implemented as scheduled

### 2.3.8    Urgent/Emergent Care

The provision of appropriate emergency care requires adequate policies and procedures, staff training, and emergency equipment and supplies.

**Findings:** In general, we found that urgent/emergent preparedness and response was deficient. CDCR policies and procedures currently outline a "one size fits all" arrangement, which places minimal

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page20 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 65 of 310
*Executive Summary*

emergency equipment and supplies in the yard clinics, and directions to transport all onsite medical emergencies to a centralized Triage and Treatment Area (TTA) or to an outside hospital, if necessary. However, these policies do not consider variables such as the size, layout, and mission of the facility. For example, at CIM, three of the yards are outside the main facility complex where the TTA is located. One yard is four miles away from the main complex. Thus, in a life-threatening emergency, the lack of immediate access to emergency equipment and supplies to maintain the ABCs (airway, breathing, and circulation) may be the difference between death and survival.

The problems with emergency care were best exemplified by the stabbing death of a correctional officer at CIM in 2005 (see Office of the Inspector General (OIG) Report: Special Review into the Death of Correctional Officer Manual A. Gonzalez, Jr. on January 10, 2005 at CIM, March 16, 2005). Officer Gonzalez was stabbed in a housing unit in Reception Center Central (RCC), outside the main facility complex.

When Officer Gonzalez was brought to the Reception Center Central medical treatment area, he was laid on the floor because there was no space allocated for emergency treatment in the RCC. The OIG report found that the medical response was disorganized and the facility was ill-equipped to handle the emergency. Medical equipment and supplies necessary to respond to a medical emergency were inadequate: intravenous access supplies and fluids were not available, oxygen tanks were not functional, and emergency supplies were not kept together for ready access. Staff lacked appropriate orientation and training in the location and use of emergency supplies and equipment, and emergency response.

The OIG report made several recommendations related to improving emergency medical response. Although a few improvements were made since the report, the bulk of the recommendations have not been implemented. Most disconcerting is that the report recommended that the facility perform an assessment of emergency supplies and equipment, yet this has not happened. In fact, key emergency supplies, most notably supplies to establish intravenous access were removed from the CIM Reception Center Central treatment area. Court Experts were told that the supplies were removed because it was not in compliance with the CDCR policy. This is an example of adhering to a policy that is not appropriate to the situation. Although the severity of the Officer Gonzalez' injuries was such that his life could not have been saved, the availability of these supplies might save the life of a staff member or inmate in a similar circumstance in the future.

**Recommendations:** Specific recommendations regarding emergency training, preparedness, and response are beyond the scope of this report. However, we concur with the OIG's recommendation that the CDCR "retain the services of a consultant in emergency medicine to provide a comprehensive review of its policies, protocols, procedures, staffing, training, quality assurance/improvement program, supply and equipment requirements, and to provide guidance on implementing improvements. The consultant should be knowledgeable and experienced in establishing and maintaining emergency medical clinics outside a traditional hospital setting."

## 2.3.9   Medical Records

The timely availability of a complete and well-organized health record to clinicians and other staff providing treatment is critical to an adequate health care delivery system.

Clinical staff felt overwhelmed by the amount of paperwork that was required of them. They stated that they often had to fill out a many as 10 different forms for an individual patient. We recommend that HCSD conduct a study of all the required forms to determine if some can either be consolidated or eliminated. In addition, clerical staff should be available to fill out those portions of the forms that do not require clinical information.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page21 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 66 of 310

*Executive Summary*

**Findings:** Most CDCR medical record departments have inadequate space. This is not surprising given that many prison populations are 200% above designed capacity. Despite many hardworking staff, we found that, in general, medical records were disorganized. Progress notes and laboratory and diagnostic tests were often out of chronological order or misfiled in the wrong section. Some prisons have created new sections of the medical record that are not in compliance with CDCR policy. There is no tracking system for consultant and other specialty services reports, and it was not uncommon for medical records to lack reports of patients who have seen a specialist. (See sections 3.California State Prison at Corcoran, 4.San Quentin State Prison (SQSP), and 5. California Institution for Men (CIM) in this report.) The lack of timely reports adversely affects patient care.

Clinicians and nurses report that they often do not have access to the medical record when seeing patients. The process of requesting charts can be time consuming since nurses are required to complete individual request slips for patient records. (See section 4.San Quentin State Prison (SQSP) in this report.) Although a formal staffing study was not conducted, we believe that many of the facilities are understaffed. Recruitment and retention of Health Record Technicians (HRTs) is difficult due to salary issues. (See section 6.Avenal State Prison (ASP) in this report.)

**Recommendations:** In the short term, we recommend that an assessment of both medical record staff salaries and institutional staffing levels be conducted, and CDCR should make adjustments as necessary. CDCR should consider the use of modular units or trailers to increase medical record storage capacity. The HCSD should provide increased training and monitoring of medical record formatting and filing. Finally, under the direction of the Receiver, the CDCR should explore the development of an Electronic Medical Record (EMR).

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page22 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 67 of 310
*California State Prison at Corcoran*

# 3. California State Prison at Corcoran

California State Prison at Corcoran is a level 4 facility with a design capacity of 3,800 and current population of 5,100 inmates. The facility has multiple security, medical, and programmatic missions. With respect to medical and mental health missions, the facility has an acute care hospital, a surgical suite with two operatories, and an HIV housing unit. The facility also conducts multiple on-site specialty clinics, including chemotherapy and dialysis, and serves as a regional consultation center. Each of the seven yards has a medical clinic.

The medical experts visited California State Prison at Corcoran (CSP) on January 10-13, 2006.

## 3.1 Organizational Structure

There is conflict between the registered nurses and medical technical assistants (MTAs) due to the organizational dysfunction. There is a lack of administrative support for clinical programs.

### 3.1.1   Facility Leadership

**Lack of Administrative and Clinical Stability**

There has been turnover in administrative leadership since the death of the Chief Medical Officer (CMO) in Fall 2005. Since then, the Associate Warden (AW) for Health Care has been the Acting Health Care Manager. Although the Assistant Warden for health care is very conscientious, having a custody person to be in charge of medical services does not provide needed professional health care management to the program.

The Health Care Services Division (HCSD) regional medical and administrative leadership has not had a noticeable presence at the facility. The Regional Administrator comes to the facility for Governing Board meetings but has not had a significant impact upon management problems at the facility. The medical staff does not know who their Regional Medical Director is and reported that the Regional Medical Director has never been to the facility. This results in a lack of dialogue and communication between headquarters and facility staff, and results in facility staff making changes in health care practices that are not consistent with health care policy. (See "Medical Records, New dividers established outside of policy.")

There has also been a vacuum of clinical leadership at the facility. The CMO position had been vacant, and the Chief Physician & Surgeon had been on medical leave for several months prior to our visit. The CMO position was vacant until two weeks prior to our visit, when Dr Hassadri was appointed acting CMO. Upon our arrival, Dr. Sanchez and Dr. Reynolds had agreed to share the position of Acting Chief Physician and Surgeon. However, in our opinion, Dr. Sanchez (a surgeon) and Dr. Reynolds (an obstetrician) are not adequately trained to oversee care for patients with complicated medical conditions. Thus, the medical program has no effective clinical leadership.

With the CMO and Chief Physician positions vacant, there is no clear direction and accountability for the program. The physicians currently filling in as Chief Physician do not have the training to undertake that role and are not able to provide necessary clinical guidance and supervision to the staff.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page23 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 68 of 310
*California State Prison at Corcoran*

The Acting Chief Physicians were also not ensuring adequate clinical coverage for all the yard clinics. For example, during our visit, one yard had consistent coverage by a physician and a NP for approximately 800 inmates. Another yard, also with 800 inmates, only had a NP but she had been on sick leave much of the two weeks before our visit there was no one to see patients. Since the NP was not consistently present, appointments were considerably backlogged. There had not been a doctor in this yard clinic for six weeks. Clinical leadership should, on a daily basis monitor clinical coverage in the yard clinics and make adjustments as necessary. This was, and is not occurring.

Another yard had only a NP on a regular basis. She conducts chronic care clinics and a visiting physician sees the "high risk" or more medical complex patients. She brings her own books to the clinic and refers to them when she has a question about patient care. There is no arrangement for her to contact a physician at the time she is with the patient, and it is difficult for her to locate physicians. She tries to locate a physician at a later time, which is not optimal for patient care. Another NP stated that the physicians had not yet accepted NPs and do not engage them as colleagues.

Physician activities are not being prioritized to take care of the sickest patients. Physicians are scheduled for routine sick call, which often means they are seeing patients with minor complaints. The leadership does not recognize the priority of treating those patients with more serious problems. The leadership seems to consider coverage of routine sick call more important than coverage of patients with more serious problems. This is evidenced by the lack of priority given to scheduling chronically ill and high risk patients. As a result, those more likely to experience medical problems receive less coverage than those less likely to experience such problems. Furthermore, the leadership did not recognize the discrepancies in coverage of the different yards and did not attempt to re-schedule practitioners so that there was uniform coverage.

Despite the lack of facility leadership and HCSD Regional/Central Office presence, the, medical staff are doing the best they can within existing conditions. They did express, however, marked frustration with the lack of guidance and support. This is an unacceptable long-term situation.

# 3.2 Health Care Staffing

## 3.2.1    Physician Staffing

The current acting Chief Physician and Surgeon, was not sure how many budgeted physicians there were at Corcoran, but he thought it was 11 or 13. He believed that 7.5 of the 13 positions were filled. Two physicians are on extended sick leave and are thought to be running their sick time down until they quit. One physician is on administrative time off (ATO) and may not return to work. Three NPs fill in some of these vacant physician positions, but there has been poor acceptance of these practitioners by the physicians. One of these NPs will be leaving for military duty within a week of our visit. Thus, whether due to scheduling, management, or lack of staff, this complement of physicians is insufficient to provide yard coverage. There is still a need for Board Certified Internists; only one contract doctor has been hired since November 2005.

There appears to be virtually no communication between clinicians and administrative leadership. At a meeting we held with the clinicians, they identified numerous issues that impacted the delivery of care. The administrative staff we interviewed did not give much consideration to these concerns.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page24 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 69 of 310
*California State Prison at Corcoran*

### 3.2.2    Nursing Leadership and Staffing

During our visit, we interviewed Ms. Gage, the Director of Nursing (DON). She has been in this position for over eight years. She expressed feelings of being overwhelmed and stated that she could use an Assistant DON. Our interview revealed that she is totally disorganized and ineffective. She provides no nursing leadership to the supervising registered nurses (RNs) and line staff. The nursing staff feels that she is a failure as a leader and said that "She is clueless on the nursing needs of the facility." The fact that she only visited the yard clinic the week before our visit indicates a lack of supervision and leadership. It was evident in the yard clinic that there is inadequate supervision, since we observed violations of basic nursing practices. For example, we found nurses maintaining lab specimens and medications in the same refrigerator.

When we asked her how many nursing and MTA staff she had, she was unable to tell us. It took her 24 hours to get the information, and then she was still not sure that the information was accurate. To get a more reliable report, we went to the SRN II, who provides supervision of wing A and B of the Acute Care Hospital (ACH), and who is also the staffing coordinator. She reported a high percentage of vacancies among the RN and MTA staff. The high vacancy rate has resulted in frequent use of registry staff. However, given the recent Court ordered salary increases, the SRN II was positive about the ability to fill the positions, and stated that they have 13 new RNs reporting to work the week of 1/23/06.

*Table 1. Corcoran Nursing Staff Positions and Vacancies*

| Position Title | Total FTEs | Filled | Vacant | % Vacant |
|----------------|------------|--------|--------|----------|
| SRN III | 2.0 | 2.0 | 0 | 0 |
| SRN II | 9.6 | 9.0 | 0.6 | 6% |
| Registered Nurses | 104.56 | 64.0 | 40.56 | 38% |
| MTAs | 46.43 | 30.0 | 16.43 | 35% |

### 3.2.3    Staff Orientation

In response to Judge Henderson's Order regarding "Interim Remedies Related to Clinical Staffing" issued December 1, 2005, HCSD developed an orientation manual for staff. This manual had recently been sent to the prisons, but was not in use at Corcoran. The orientation of a recently hired contract doctor consisted of shadowing the Acting CMO as he conducted his clinics. The orientation seemed reasonable but was ad hoc and not in keeping with the orientation established by Central Office.

During our visit, we monitored the nursing orientation that was being conducted that week and interviewed the nurse educator. She said that she received the statewide orientation manual a week prior to our visit. She also said that she had not had time to review the packet in detail but that she intended to use it. She said that the statewide orientation packet would be helpful to her and other nurse educators in the system since it was the first standardized guideline to assist the field in training. She planned to incorporate the statewide orientation with the local orientation that she had been providing over the past five years.

## 3.3  Tour of Housing Unit Medical Clinics

Our tour of the yard clinics revealed that, in general, the clinic sanitation was poor. The walls and floors were dirty. In some clinics, the linoleum floors need repair or replacement.

*California State Prison at Corcoran*

### 3.3.1    3A Clinic

The RN currently assigned to **3A Clinic** has worked in this role for the past three months. During our site visit, she informed us of some of the ongoing issues with the clinic. There continues to be an issue of no nursing triage coverage on days when she is off duty or sick. Mondays and Tuesdays following long weekends continue to present a problem of large volumes of Health Screening Forms (7362 forms) to be processed. She said that she works well with her Office Technician (OT) Michael Gibbs, who schedules the nursing sick call lines and physician appointments.

During our clinic visit, we selected seven health records from the RN sick call list for the week of December 20, 2005. During that week, there was an average of 12 patients scheduled per day for the face-to-face triage (FTFT). (NOTE: FTFT is the same procedure also known as nursing sick call.) In general, we found that the quality of the nursing assessments was poor. (See Appendix for a list of all patient records reviewed.)

Nurses perform face-to-face encounters in rooms with hand-washing access that are adequately equipped. However, the rooms are not uniformly clean and well-organized. There is inadequate cabinet space that results in clutter of supplies and equipment. Some furniture is broken and/or in poor condition and should be replaced. Review of health records show that the nursing assessments are not adequate. For example, on ▮▮▮▮▮ a patient submitted a health services request form complaining of back pain and painful breathing following a fall the previous week. The patient requested x-rays because he thought he had a serious injury. In the subjective section of the 7362 form, the nurse noted "no resp distress or SOB observed." The nurse did not record vital signs, perform an adequate history or physical assessment, document a disposition, nor document her signature on the 7362.

### 3.3.2    3B Clinic

In **yard clinic 3B**, a refrigerator used by staff to store food was filthy. There is no schedule of sanitation activities posted for the clinic. Staff reported that there had been no inmate sanitation porters since December 2005, yet no effective action has been taken to address this. More importantly, health care leadership has not placed anyone in charge in the clinics to ensure that this and other essential activities are taking place. Staff in the yard clinics have different supervisors, thus, no one is in charge.

Staff reported continued problems with timely purchase of equipment and supplies. This was due in part to poor planning, tracking, and timely ordering of supplies by health care staff. As a result, the institution ran out of 7362 forms that inmates used to request health care services. In the 3B yard clinic, the nurse was out of paper towels. However, the lack of equipment and supplies is also due to denials, delays, and modifications of purchase orders by the institutional business office, which is under the direction of the Warden. For example, staff reported that they ordered 12 vital sign machines in July 2005, but this order was cut in half by the institutional business office, and the equipment was not received until the week of our visit. This represents continuation of a custody culture and practice that interferes with the delivery of health care services.

While in the clinic, we interviewed staff and patients. According to the patients, they have been waiting weeks to see a nurse or physician. One patient in the clinic said that he had submitted multiple 7362 forms and had not yet been seen. When we asked RN Montoya about this issue, she confirmed that she doesn't receive all the 7362 forms, and that patients say they have submitted 7362 forms that she did not receive. This is puzzling since inmates have the ability to place the request forms in locked boxes that are accessed only by medical staff. Staff should explore this problem further.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page26 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 71 of 310

*California State Prison at Corcoran*

### 3.3.3    4B Clinic

**4B** is a level 4-yard, which has five Special Housing Units (SHU) with a population of approximately 700 inmates. The medical clinic is dirty.

With respect to staffing, the clinic is assigned a registered nurse and four MTAs on the day shift and three MTAs on the evening shift with no RN coverage. The RN conducts FTFT. The OT has worked at the clinic for six weeks and is learning the patient scheduling (IMSATS) program. Over the past few months there has been sporadic physician coverage for the clinic. During the past two weeks the clinic had a physician or NP assigned to the clinic only 3 of 10 days. This results in frequent rescheduling of patients and delays in care. At this time, the OT is scheduling routine physician appointments approximately one month in the future.

### 3.3.4    Medical Appeals 602

We met and interviewed the appeals coordinator, who has been in this position for the past year. We also reviewed the past six months of medical appeals. In the past six months, the appeals coordinator has processed over 2,200 inmate medical appeals. On the day of our visit, there were 38 overdue first level appeals and 12 overdue second level appeals. She said that this was the highest number of overdue appeals she had seen since taking this job. She stated that when she took time off, there was no replacement to ensure that the medical appeals were being addressed in a timely manner.

Given the large volume of medical appeals at CSP, it would be beneficial to have clerical support for the appeals coordinator. In most facilities, the appeals coordinator is an Associate Government Program Analyst (AGPA) who has clerical support. At CSP, the appeals coordinator is a Staff Services Analyst (SSA) who had no support. This employee is working very hard and should be given the support needed to keep the program working well.

In reviewing a few recent second level appeals, we noticed that the first level appeals are being addressed by the primary care provider (PCP)--a physician or NP. If the patient disagrees and appeals the first level response, the Health Program Coordinator (HPC), who is an RN, is addressing the second level appeal. It would appear that if the patient is disagreeing with treatment, a higher-level licensed care provider should be addressing the second level. An RN should not be able to override or change the treatment plan of the PCP. The second level response in these cases should be addressed by the Chief Physician.

## 3.4 Receiving and Release Medical Screening

In our review of this area, we found that both receiving and transfer medical screening is occurring at CSP. A tracking system is in place for all new arrivals. Staff use a screening worksheet/tracking log (New Arrival Chart Review Log) to identify key components of receiving. Two of the key components are: 1) Does the patient have a current medication order? and; 2) Was the medication transferred with the patient?

In a three-week period in December 2005, 165 inmates arrived at CSP; 65 inmates had a current medication order. Of those 65 inmates with current medication orders, the New Arrival Chart Log indicated that only one inmate arrived with his medication. The HPC said that this has been an ongoing problem and that they are addressing the issue to ensure medication continuity after arrival at CSP.

A review of seven records showed that the nurses were not consistently referring patients to the emergency room when clinically indicated. Physician referral did not occur in a timely manner, and with

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page27 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 72 of 310
*California State Prison at Corcoran*

the exception of psychotropic medication, essential medication is not renewed in a timely manner. (See the Appendix for a complete list of patient records reviewed.)

The Inmate Medical Scheduling and Tracking System (IMSATS) is a program developed by HCSD to assist the field with scheduling and tracking inmates. However, the system is flawed in that it is not networked to a central system or even locally. For example, the IMSATS computerized patient scheduling system does not automatically update inmate movement into and out of the facility; it must be manually updated each day. The lack of a networked computerized program leads to unnecessary clerical work.

# 3.5 Chronic Care

The HCSD has developed a Chronic Care Program to improve the quality of health care of patients with chronic illnesses, such as diabetes, hypertension, asthma and seizure disorders and HCV and HIV disease. Although these are the most common chronic illnesses, the program should include all patients with chronic illnesses, such as cancer, heart and kidney disease, etc. The major elements of this program include the identification and tracking of patients with chronic diseases, periodic evaluations, appropriate treatment and monitoring, and patient education. Guidelines for appropriate care and monitoring have been developed for a number of chronic illnesses. The program has only been implemented at the Plata 'roll out' facilities.

## 3.5.1    Scheduling and Tracking

The scheduling and tracking of chronically ill patients remains dysfunctional. The HCSD IMSATS program used to schedule patients only includes the six most common chronic illnesses. Anyone who has an illness that is not one of the six diseases tracked will not be followed in the chronic illness clinic. This was previously identified as a problem and the proposed accommodation was that these other chronically ill patients were to be identified and followed in a "high risk" or general medical clinic. This is not occurring.

## 3.5.2    High Risk Patients

High risk patients are those patients with complicated medical problems who need to be taken care of by physicians with more training and experience in family or internal medicine. Currently, only physicians who are board certified in one of these disciplines are to be providing care to these patients.

High risk is not truly an accurate description of many of these patients, as they are only at high risk because of the relative lack of physicians trained in general internal medicine. In an HMO, these patients would not be seen as complicated and would be managed in a general medicine clinic. However, because the complement of qualified internists and family practitioners is so low, these patients end up being managed by practitioners (surgeons, retired obstetricians, anesthesiologists, etc.) who do not have the necessary training and experience to manage complicated medical problems. For this reason, many of these patients have been labeled as "high risk" simply because having inadequately trained physicians manage them, places them at high risk for harm. As more board certified Internists and Family Practitioners are hired, the high risk program can be integrated into the chronic care program. Until that happens, there needs to be a better system of identifying and caring for these patients.

In general, the high risk patients at CSP are:

- Not being seen on a routine basis. Patients with serious problems continue to be seen on an episodic basis when urgent problems arise rather than on a scheduled health maintenance basis.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page28 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 73 of 310
*California State Prison at Corcoran*

As a result, routine management issues turn into urgent medical crises. According to physicians and based on chart reviews, this affects "high-risk" and other chronic care patients.

- Not being seen by a qualified high risk physician. Patients with complex medical problems are not always followed by board certified primary care physicians. The result is poor patient management. In one yard, a NP manages all patients.

- Not being managed appropriately. For example: patients with elevated blood pressure do not have their blood pressure adequately controlled; patients with diabetes do not have their blood glucose controlled or monitored; patients on anti-coagulation therapy do not have therapeutic coagulation tests, etc.

Our main concern is that since there is a lack of physicians who are sufficiently knowledgeable in general internal medicine, the patients labeled as high risk will continue to be managed by physicians who have not been trained to manage those clinical problems. Persons with other medical problems such as thyroid or kidney disease, rheumatoid arthritis, colitis, or cancer are not being enrolled into the program and are not appropriately monitored. Physicians we talked to are not taking an active role in ensuring that these high risk chronically ill patients are identified and enrolled into the program. Instead, they only see the patients who are scheduled for them to see. Thus, the chronic illness and "high risk" programs are really managed by yard clerks who appeared to have inconsistent knowledge of the functions of these programs. Central Office has not communicated the requirements of the high risk program to staff and facility leadership in a manner that results in programmatic change.

### 3.5.3   Medical Record Review

We reviewed 10 randomly selected medical records of high risk and chronic illness patients (seven with high-risk chronic illness and three with chronic illness). None of the patients were receiving adequate care.

Of the seven high risk patients, only three were being managed by a Board Certified Internist or Family Practitioner. All seven were poorly managed. As a result of poor management, two of the seven were hospitalized; one with a stroke and another with diabetic ketoacidosis. "High-risk" patients, if seen at all, were not seen and followed consistently by a qualified physician. Only one of the ten patients was being seen for interval clinic visits in a timely manner and at appropriate intervals. Three patients experienced potentially life-threatening episodes because of delays in care or lack of follow-up. This is significant, since these statistics were obtained from a random selection of records.

We also reviewed three hospital records. Only one of the three charts had a discharge summary from the hospital. All three patients could have had their hospitalization prevented by adequate outpatient management. In all three patients, follow-up either did not occur or was late and of poor quality.

We evaluated two patients who went to local area emergency rooms. One patient was evaluated and released, and the emergency room physician requested a follow-up the following week. This never occurred. The second patient was recorded as having two emergency room visits but we could not find documentation in the record that he was sent to the emergency room. Thus, though he was on the list of patients sent to the ER (as provided by CDCR to us), there is no evidence of what happened to the patient.

We reviewed seven health records of HIV patients. With one exception, clinicians are routinely seeing HIV patients in the chronic care program. Most patients are on 3 to 6 antiretroviral medications and are well-controlled as measured by undetectable HIV viral loads. Medications administration records showed that patient medication adherence is excellent. Due to the high number of patients on 4 to 6 drug regimens (3 to 4 drugs is normal), we would recommend that an HIV expert review a sample of records to assess

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page29 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 74 of 310
*California State Prison at Corcoran*

the appropriateness of the regimens. All patients at risk for pneumocystis carinii pneumonia were on appropriate prophylaxis.

In some cases, laboratory tests that were ordered are not being obtained in a timely manner or at all (lipid panels). In other cases, abnormal test results are not adequately addressed (elevated lipids).

Nurses are reordering medications independent of a clinician visit. In one case, this resulted in a medication transcription error; however, the larger issue is that medications are being ordered independent of a clinical assessment. Clinicians should order medications at the time of the clinical assessment of the patient reveals that the current treatment plan is appropriate to be continued, or changed as necessary.

**NOTE:** See Appendix for more details on these Patient Records.

## 3.6 Medication Management and Administration

The pharmacy does not have an active drug-drug interaction program. Thus, physicians do not have the means to review prescription drug safety as they prescribe, and the pharmacy does not have the means to warn physicians when a prescription may be dangerous based on known drug-drug interactions. Local administration was unaware of this as a problem.

None of the clinics had a current medical reference text or pharmacy references. Given the lack of general internists, this lack of reference material compounds the absence of available resources in understanding how to manage general internal medicine problems.

We were told that Central Office purchased a large number of Personal Digital Assistants (PDA) to provide physicians with a pharmacy reference text they could carry with them. Apparently, dozens of these devices have been sitting in Central Office for over six months, pending delivery of the software. It should be noted however, that custody does not permit PDA's in the facilities. We believe this is detrimental to the medical program.

## 3.7 Specialty Services and Consultation

Administration is not capable of ensuring timely consultation with specialists. All contracting is controlled by Central Office. Those responsible for contracting made an arrangement (according to the acting Chief Physician) with a group in Bakersfield, which does not have a full complement of specialty services needed by patients. As a result, some patient needs are not met. Securing additional services locally has been difficult because local specialists have not always been paid in a timely manner for their services. The needs at the facility do not seem to be met by the Central Office bureaucracy that contracts for services.

## 3.8 Urgent/Emergent Care

We reviewed the Urgent/Emergent Log and five patient records. Staff is not recording all unscheduled appointments on the Urgent/Emergent log. They are only recording events that they identify as true emergencies. This is not consistent with policy.

Of five health records that we selected from the log for review, four had entries in the progress notes. In all cases the nurses conducted assessments and referred the patient to the physician. The quality of the

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page30 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 75 of 310
*California State Prison at Corcoran*

physician assessments varied, and often lacked documentation of the chief complaint and medical history. (See Appendix for more details on these patient records.)

# 3.9 Medical Records

### 3.9.1   New Dividers Established Outside of Policy

Without consulting Central Office, the facility administration embarked on modification of the medical record whereby documentation of chronic care appointments would be placed in a separate bound section of the medical record. Because this is not a standardized policy and practice throughout the CDCR, whenever a person is transferred from Corcoran, clinicians at other facilities will not know where to look for the information.

### 3.9.2   Reports Not Consistently Filed

Reports of specialty consultations, off-site testing, and discharge summaries from hospitalization are seldom filed in a timely manner in the medical record. Thus, clinicians are uninformed as to the clinical status of the patient on a routine basis.

### 3.9.3   Health Records Not Available

There is a consistent failure to provide clinicians with a medical record when they evaluate a patient. Physicians complained that they often see patients without a medical record. This falls well below the accepted standard of care.

# 3.10 Ancillary Services

Two physicians complained that for diabetic patients they could not rely on capillary blood glucose values as being accurate. Therefore appropriate management of persons with diabetes on insulin is not possible. For optimal control insulin-dependent diabetics (both immediate and longer term) should take a capillary blood glucose test (finger stick glucose) before eating and 1.5 to 2 hours after eating.[1] Patients at the prison so seldom have this test at the appropriate time that physicians cannot appropriately adjust insulin dosages. Moreover, lack of timing of receiving insulin in conjunction with meals will either result in hypoglycemia or patient fear of hypoglycemia. This results in poor diabetes control.

There is a consistent failure to obtain laboratory tests and to report laboratory results in a timely manner to clinicians. Both chart reviews and clinician reports confirmed that laboratory results are not getting to the medical record in a timely manner so that a diagnosis can be established and treatment plan can be developed in a timely manner. As an example, one physician cited a two–month delay in receiving lab results. Clinical and administrative leadership have not intervened to address this problem at the facility. Physicians have little or no communication with administration regarding this problem. In our discussions with the administrative staff, they did not seem to be aware that this was a significant problem.

---

[1] Intensive Management of Type 1 Diabetes Mellitus, Suzanne Strowig and Phillip Raskin in Ellenberg and Rifkin's Diabetes Mellitus, 6th Edition, McGraw Hill 2003.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page31 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 76 of 310

*San Quentin State Prison (SQSP)*

# 4. San Quentin State Prison (SQSP)

San Quentin State Prison was built in the 1800s. Its design capacity is 3,500 inmates but it holds approximately 6,000 inmates. Its medical missions include a reception center and an OHU.

The medical experts visited San Quentin State Prison (SQSP) on February 6–9, 2006.

## 4.1 Organizational Structure

### 4.1.1    Facility Leadership

Since the Court medical experts' visit to San Quentin in February 2005, there have been multiple turnovers in the Chief Medical Officer (CMO) position. This resulted in inconsistent management that did not provide a stable environment or adequate supervision of medical staff. The lack of clinical leadership resulted in custody staff and administrators in the Central Office making decisions that should be made by physicians.

The current CMO is Jack St. Clair, M.D., and the Supervising Nurse III is Ms. Cheryl Barkley, RN. They arrived last Fall and both are in acting rather than permanent positions. Normally, the CMO is also the Health Care Manager (HCM), however in the absence of a CMO, Timothy Belavich, Chief Psychologist, was appointed acting HCM. He remained so after the arrival of Dr. St. Clair. (Since our visit, Dr. Belavich has left and Dr. St. Clair was appointed acting HCM.) The Chief Physician and Surgeon is on Administrative Time Off (ATO), and the status of his return is unclear. As we found in other facilities, medical leadership positions such as the Correctional Health Services Administrator (CHSA) I and II are filled by custody staff with have no training or experience in health care.

### 4.1.2    Conflicting Organizational Structure

We found organizational chaos at San Quentin. It was unclear to staff, and to us, who was in charge of the medical program. Contributing to the confusion was a San Quentin Health Services Administration Table of Organization dated 12/7/05, that formalized the conflicting reporting relationships. For example, on page 1 of the table of organization, the Supervising Nurse (SRN III) reported to the Chief Medical Officer (CMO). On the following pages, the SRN III reported to the CHSA II. The CHSA II position is occupied by Mr. Mike Barker, a correctional lieutenant. Mr. Barker has no training and experience in health care, yet staff reported that in the absence of the Health Care Manager, he perceives himself to be in charge of health care operations. Each morning there is a staff meeting which Mr. Barker chairs rather than the Health Care Manager or Chief Medical Officer. Several staff told us that Mr. Barker was in fact, the person in charge.

The confusion about who was in charge has led to power struggles. Staff reported that operational health care decisions were being made by HCM who is a psychologist, the AW for Health Care, and the CHSA II, without consulting the CMO, who is a physician. For example, during our visit the medical reception area had been equipped for four examination areas, but one of the examination tables had been moved to another location at the direction of the CHSA or AW without consulting the CMO. This adversely impacted the ability to perform reception physical examinations in a timely fashion.

The Court medical experts appreciate the extent to which the AW for Health Care and the CSHA II, are trying to facilitate implementation of the medical program at San Quentin. We believe that they are concerned and in fact, have been successful in implementing some aspects of the medical program that

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page32 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 77 of 310
*San Quentin State Prison (SQSP)*

were not previously implemented. **However, it is our belief that their success is primarily due to their status as custody staff; medical professionals would most likely not receive the same level of cooperation from custody staff.** However, even the AW for Health Care informed us of the extreme difficulty in implementing the medical program because of lack of custody cooperation. In our opinion, the culture at San Quentin does not adequately support, and in some cases is openly hostile to the medical program.

### 4.1.3   HCSD Regional Oversight

The Regional Manager comes to San Quentin every two weeks and is involved in staffing, investigations, contracts, and equipment issues at the facility. This involvement does not extend to the significant operational issues at the facility. There is minimal contact with management on operational issues such as pharmacy, cleaning, medical records, medical reception, and other facility programs. These problems appear to be managed by local medical leadership in concert with the custody leadership. There is almost no contact with the Regional Medical Director. When Central Office staff does get involved, they do not fully appreciate the needs of the facility and at times make uninformed decisions that adversely affect medical operations (as described in the following section, 4.2 Health Care Staffing).

## 4.2 Health Care Staffing

At the time of our visit, San Quentin was budgeted for ten physicians. Six of the budgeted positions were filled with state employee physicians, three were filled with registry Internists, and one was filled with a registry Family Practitioner. There were also three nurse practitioners (NPs). The three NPs were not well integrated into the medical staff and were not accepted by all staff members. According to the NPs, only selected physicians were open to collegial consultation and discussions on patient care issues.

The facility staff does not interview candidates for medical or nursing positions. Central Office staff is under time pressures to hire staff and therefore, interviews have not occurred or are poorly performed. As a result, San Quentin staff told us that they have been sent five nurses within the last six weeks, none of whom have been adequate. The facility staff is then told that they must terminate these staff through the disciplinary or probation system. It is the perception of the facility staff that no meaningful interviews are occurring. Furthermore, physicians and registry staff who are hired by Central Office just "show up," often without the facility staff knowing that a physician has been hired for them. This happened with two NPs and two physicians during the two weeks before our arrival. This creates confusion with the facility leadership because they do not even know whether the practitioners were interviewed or if the newly hired staff is qualified. Two of the physicians were not Board Certified. The San Quentin staff believes that Central Office interviews these individuals, but they are not certain. The Regional Medical Director did not know whether Central Office interviewed these individuals or not.

In any case, new Registry staff and new hires show up and just "start working." After supervisors complained that some of these new hires were not qualified, Central Office sent staff to assist them with putting together better documentation for terminating a poorly performing employee. The facility staff told us that they spend a considerable amount of time attempting to terminate employees hired by Headquarters. No one at San Quentin knew whether doctors sent to work had been credentialed. It was assumed that this occurred at Central Office but no one knew. Credential files are not maintained at San Quentin. The Acting Chief Physician does not know the credential status of any of his physicians and does not know if they have any deficiencies. The persons who interview doctors do not share the knowledge they gain in the interview with facility staff.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page33 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 78 of 310
San Quentin State Prison (SQSP)

In addition, there is no reliable timekeeping system. This is especially true for registry staff. Registry staff submit their own timesheets to the agency. The facility does not submit a verified timesheet to the registry. As a result, registry staff can change or modify hours and send these to the agency for payment; these hours will not be verified by the facility. (Recently, CDCR discovered that it had paid over $100,000 to an agency over a period of several months for a physician who was no longer working at the facility.)

## Nursing Staffing

Currently, SQSP has 30.25 FTE RN positions. Of those, only 16.0 are filled with state-employed RNs and 9.0 are filled with long term registry RNs, for a total of 25.0 FTE. The staffing coordinator said that they offer overtime to fill the remaining positions but many positions remain unfilled. According to the SRN III, approximately 50 % of the RN positions are filled. They attempt to fill the remaining positions with registry staff.

Table 2. SQSP Nursing Staffing

| Staffing Level | Total FTE | Filled | Vacant | Registry |
|---|---|---|---|---|
| SRN III | 1.0 | 1.0 | 0.0 | |
| SRN II | 2.0 | 1.0 | 1 Filled 1 acting | |
| SRN I | 1.0 | 1.0 | 0.0 | |
| SR. MTA | 4.0 | 4.0 | 0.0 | |
| RN | 30.25 | 16.0 | 14.25 (47%) | Use registry to backfill |
| MTA | 43.0 | 25.0 | 18.0 (41%) | Use OT and registry to fill |
| LPT | 4.0 | 3.0 | 1.0 | |
| PHN | 1.0 | 1.0 | 0.0 | |
| IDS | 0.0 | 0.0 | 0.0 | |
| Nurse Instructor | 0.0 | 0.0 | 0.0 | |

Nursing Supervisory Staff:

- (1) SRN III - Cheryl Barkley has been in the position since 10/1/05. She is the Director of Nursing and is responsible for all nursing care (RN and licensed vocational nurse [LVN]).
- (2) SRN II - Tonya Church has been in one of the two positions since 9/1/05. She is responsible for staffing, triage and treatment area (TTA), and Specialty clinic. Mary Connell, RN, is in an acting assignment of SRN II since 11/1/05. She is responsible for all seven outpatient clinics, Reception & Release, and medical transfers.
- (1) SRN I - Cynthia Schneider has been in the position for four years. She is responsible for the Outpatient Housing Unit (OHU), Public Health Nurse (PHN) I, and telemedicine.
- (4) SR. MTA

According to Cheryl Barkley, SRN III, she has direct supervisory responsibility for the SRNs and only clinical supervision for the SR. MTAs. She said that the SR. MTAs report administratively to the CHSA II--Lt. Barker. This is an example of how the MTAs have a dual reporting relationship with health care and custody staff. This also has resulted in lack of a cohesive management structure in which supervisors and employees are not held accountable for job performance.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page34 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 79 of 310
*San Quentin State Prison (SQSP)*

## 4.2.1    Staff Orientation

At the time of our arrival, Ms. Cheri Barkley, SRN III was unaware of the newly issued orientation manual and therefore, had not implemented it. The HCSD had forwarded the orientation manual to the Health Care Manager at SQSP, but the information had not been disseminated to staff. Ms. Sandy Fields, RN, who is a member of the HCSD Quality Management Assistance Team (QMAT) was also unaware of the manual and was therefore unable to facilitate its implementation. This reflects poor communication both at the headquarters and facility level. In fact, as of the day of our visit, the Court Experts knew more about the expectations for orientation than did the leadership staff at the facility.

Despite the lack of formal orientation in line with Central Office expectations, the SRN III and CMO have initiated reasonable orientation schedules. This orientation includes a sit-down with the CMO to go through a check list of expectations, a discussion of expectations at San Quentin, a tour through all custody levels of the facility, and several days "shadowing" different providers to learn clinical practice patterns in varying housing units. However, because Central Office orientation policy has not been provided to supervisory staff, the expected orientation is not occurring.

**<u>Nursing Orientation and Training</u>**

The SRN II currently responsible for nursing orientation had not seen or been told about the new statewide orientation booklet. The PHN who also provides training to all new RN/LVN staff, was not aware of the new orientation. According to all the nursing supervisors, they were unaware of the new orientation book and were only seeing it for the first time when we arrived.

Although they had not seen the book, they were excited about the new orientation guidelines. They felt it would help them standardize orientation for new employees. Currently, a new staff member attends a 40-hour in-service training (IST), which is required for all staff regardless of classification. The nurses are also required to attend a five-day class conducted by the PHN. This training consists of physical assessment, urgent/emergent care, and sick call protocols. After the five-day classroom training, the nurses are given a schedule that rotates them through different areas of clinical care and different shifts. After completing classroom and shift orientation, the nurse receives a work assignment.

A registry nurse completes a 4-hour IST training and then a 3-hour orientation that is conducted by the PHN. This 3-hour orientation includes policy and procedures overview.

According to the staff at SQSP, ongoing training updates have been a problem. Currently, they are not receiving the required annual follow-up training. According to John Baron, PHN, he is the only designated trainer for the medical department. He doesn't have help in the form of an infectious disease nurse or an additional PHN to keep up with the required classes, training, and monitoring of public health issues.

Given the mission and the size of SQSP, the institution would benefit from an additional PHN, infection disease nurse, or a nurse instructor. The current workload for the PHN is so great that it prevents him from performing the required duties of both the staff developer and PHN.

# 4.3  Tour of Housing Unit Medical Clinics

At San Quentin there are eight areas of where medical clinic activities are conducted: South Block, East Block (Condemned Inmates), North Block, West Block, The Gym, The Adjustment Center (Administrative Segregation), North Segregation (Condemned Inmates), and H-Unit. Tours of these areas

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page35 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 80 of 310
*San Quentin State Prison (SQSP)*

revealed that sanitation is poor, office spaces are cluttered and cramped, and furniture is old and in disrepair.

In general, the sanitation of the administrative areas and medical clinics is extremely poor. Staff reported that there is no schedule for sanitation activities, and there is apparently **no commitment by custody staff to ensure that the medical clinics are cleaned on a regular basis.** The exception was the hallway in the Neumiller building. The floor appears to be cleaned and buffed on a regular basis; however, the level of sanitation in this building deteriorates in direct proportion to the distance from the hallway.

The physical plant (Neumiller Building) is in disrepair. Ceiling tiles are missing. The SRN III reported that when it rains, the floor of her office is filled with several inches of water. The walls of her office are flaked from water damage. In most offices, the furniture is old and in disrepair. The offices are filled with old books, files, and materials that are no longer used but contribute to a cluttered and unprofessional appearance. Pharmacy staff in the Neumiller building reported that there had been leaks in the ceiling when it rained but they have been recently repaired.

### 4.3.1    Equipment and Supplies

Staff reported extreme frustration at being unable to get needed supplies and equipment. SRN III Cheryl Barkley reported that upon her arrival in October 2005, she ordered mailboxes to improve communication among the nursing supervisors and registry staff. She had yet to receive them. Jack St. Clair, MD, reported that he needed to suture a patient, but did not have the proper supplies such as 1¼ gauge needles. He stated that there was no medical supply inventory system. In South Block, staff reported running out of insulin syringes.

On another occasion, staff report being told by the property and supply room that they could not have any more gloves because six boxes were distributed the day before and disappeared, therefore, they could not have more. The staff person responsible for ordering supplies and materials has not performed her job properly and was on administrative leave at the time of our visit.

The state procurement process requires that staff obtain one to three bids (depending on the amount of the order) for each item, every time they purchase any supplies and equipment. A nurse opened up a new EKG machine and noted that there was only one roll of EKG paper. She immediately ordered more but was told she had to get two bids. The bureaucracy of ordering supplies and equipment is overwhelming to staff.

### 4.3.2    Access to Care / Custody Interface

There is ongoing and severe access to care issues at San Quentin. Due to recent unrest at the prison and in Los Angeles County Jails, much of the facility has been on lockdown and a 'modified movement program' in which inmates are scheduled for activities and appointments according to race and ethnicity. The modified movement program has made it impossible to see all inmates scheduled for medical appointments and has interfered with delivery of care.

In addition, custody staff routinely reassigns correctional officers whose positions were obtained as a result of the litigation (Plata officers) for the express purpose of escorting inmates to medical appointments. For example, during the week of our visit, the Plata officer on East Block was reassigned to other duties by 10 am. This interrupts and delays access to medical care. Staff reported that this is a routine occurrence.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page36 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 81 of 310
*San Quentin State Prison (SQSP)*

In general, nursing FTFT is not working well at San Quentin. Patients are not being seen in a timely manner because of scheduling and custody escort issues; nursing assessments and documentation is poor; and physician referrals are either not being made as clinically indicated or patients are not being seen in a timely manner.

### 4.3.3   South Block

The South Block clinic is located in the Neumiller building (the main administrative building) and serves inmates in four housing units--Alpine, Badger, Carson, and Donner units. The clinic area is cramped, cluttered, and sanitation is poor. Clinic staff reported that when it rains, the roof leaks.

On the date of our visit (2/8/06), we found 89 7362 forms that had accumulated in the clinic, some dating back as far as 1/21/06. Examples of patient complaints included the following:

- Patient 1 is a 44-year-old man who submitted a 7362 form on ███, complaining of a "staph" infection on the left leg for three days that was getting worse. The nurse did not see the patient until ███. The nurse did not record vital signs. She referred the patient to the physician; however, on the day the patient was scheduled, custody staff redeployed the physician to conduct medical clearances for inmates who were fighting. A physician had not yet seen the patient.

- Patient 2 submitted a 7362 on ███ stating that he has back pain radiating down his legs accompanied by intense burning. A nurse triaged the form on ███; however, as of the date of our visit, neither a nurse nor physician had seen the patient.

- Patient 3 submitted a 7362 on ███ stating that he was having stomach problems, the flu, and left knee pain. He indicated that this was his fifth request to see a physician. A nurse reviewed the form on ███, but neither a nurse nor physician had seen the patient.

- Patient 4 submitted a 7362 on ███ stating that he was having a problem with his bladder, felt that he had to urinate all the time, and sometimes awoke with urinary incontinence. A nurse triaged the form on ███ and although the patient's complaints were urgent, neither a nurse nor physician had seen the patient.

- Patient 5 submitted a 7362 on ███ stating that he had just had surgery and the pain medication was not helping him. He complained of being in severe pain and requested help. A nurse triaged the form on ███, but he had not yet been seen.

### 4.3.4   North Block

The nurse assigned to North Block is a registry nurse who has been in this assignment for three months. She said that she has worked at the prison for the past 18 months and has seen some improvements. She is performing her FTFT in a converted office. The clinic sanitation is an improvement from prior visits but could use a regular cleaning schedule to ensure the clinic is clean and has adequate medical supplies.

The RN informed us that she was able to process and perform FTFT on 80-90% of the 7362s within 24 hours. She said that she has a very good working relationship with the correctional staff and this is what allows her to get her patients. According to the RN and the office tech who is responsible for scheduling the clinic appointments, they are about 4-5 weeks behind on routine sick call. They reported that the NP is new and schedules 90% of the patients she sees on sick call for a follow-up appointment regardless of the condition. According to the office tech, this has created a problem because she cannot schedule new appointments in a timely manner, and she is not sure if the return clinic appointments or the new referral appointments take priority.

*San Quentin State Prison (SQSP)*

## 4.3.5    East Block

East Block houses approximately 700 condemned inmates. The clinic room is located on the first floor. The room was filthy. Staff reported there has been no inmate porter assigned since Christmas. The nurse had requested a broom so she could sweep the floors, but the request was refused by custody staff. The clinic contained medical equipment and supplies that were not present at our last visit. This included an examination room, desk and chair, vital sign machine, scale, otoscope, and ophthalmoscope. There was also a supply cabinet that contained supplies and over-the-counter medications. This is an improvement since our last visit.

On the day of our visit, the Plata officers assigned to the area to assist with inmate movement had been reassigned to other areas. The nurse confirmed that this is a frequent occurrence that affects access to care. Tracking logs of sick call encounters in January 2006 showed that on some days, as few as three patients were seen (1/12/2006, 1/17/2006).

We observed a nursing face-to-face encounter. The patient complained of back pain. The patient was handcuffed and the officer remained in the room at all times. It was therefore not possible for the nurse to confidentially interview the patient, nor perform an adequate physical examination. The nurse indicated that she would not feel comfortable with the patient being unhandcuffed.

## 4.3.6    West Block

West Block houses approximately 850 level 2 inmates. The registered nurse is an RN who has worked in this role for three months. According to the nurse, the recent modified movement has adversely impacted the performance of her duties as the nurse assigned to do FTFT. On 2/7/06, she had scheduled 12 patients for her sick call line, but due to the custody activity on the block she was only able to see four patients that day. She stated that this has been a problem since December. She said that she is only able to see people of certain racial or ethnic groups on designated days and time.

During our visit, we witnessed this modified movement. On February 7, the RN had 23 health care requests for FTFT and was only able to see the black inmates. The correctional staff informed us that due to racial issues in the prison, patients of different races cannot be seen on the same day. Another issue that was very concerning was how this modified movement was affecting the insulin dependent diabetics. There were 12 insulin dependent diabetics on West Block. The correctional staffs were feeding the inmates according to race. The morning of 2/8/06, the black inmates on the block were fed first, followed by the white inmates and others. The last to be fed were the Hispanics. As each racial group was released from their cell for meals, an MTA would be waiting to administer the insulin to any insulin dependent diabetics. This process for the morning meal was completed at 1115 that day. The same process took place for the evening meal (starting with the Hispanic inmates), which started at 1700 and was not completed until 2030.

This process of modified movement and feeding was problematic due the diabetic patients not receiving their ordered insulin within the therapeutic timeframe. In the case of the Hispanic patients, some received their twice-daily insulin injections less than six hours apart. This also impacted the work of the MTA, as they were required to stand by and administer insulin as the different racial groups were released. We asked the sergeant why the insulin dependent diabetics couldn't receive their insulin and meals first, prior to the modified feeding of the other inmates. The sergeant informed us that only the warden could make those changes.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page38 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 83 of 310
*San Quentin State Prison (SQSP)*

### 4.3.7   North Segregation

The North Segregation area houses approximately 70 condemned inmates who do not present disciplinary problems. The inmates tend to be older and more medically complicated. The clinic room was dirty. The furniture was old and in disrepair. There were some medical supplies and equipment (exam table, vital sign machine). Needles and syringes are kept in an unlocked cabinet and are not accounted for. The emergency bag does not contain all necessary supplies. There was a large sack of medications in a bag for unknown reasons.

### 4.3.8   Adjustment Center

The Adjustment Center houses approximately 100 inmates who are in administrative segregation due to disciplinary problems. The medical clinic has been moved to the first floor. It was cleaner relative to the other clinics. The room has an open vent to the outside that allows cold air to enter the room during inclement weather. The room was well-equipped (exam table, vital sign machine, otoscope/ophthalmoscope) and supplied (exam gloves, over-the-counter medications, gauze, etc.). There was a sink with paper towels. Needles and syringes are kept in an unlocked cabinet and are unaccounted for. There was an emergency bag that was well equipped and supplied. The clinic contained an Urgent/Emergent Tracking Log but it had only a few entries since December 2005. The nurse does not maintain a Sick Call tracking log in the clinic but keeps a master log in the East Clinic.

### 4.3.9   H Unit

H Unit is a level 2 yard that houses approximately 950 inmates. The assignment of H Unit also covers the firehouse and yard, which adds approximately 200 additional inmates. The clinic is a large space that has separate exam rooms for the physician and the RN. The physician exam room has basic medical equipment and a sink for hand washing. The space the RN uses to perform assessments is a shared office with two desks and three chairs. The medical equipment is limited to a vital sign machine. It has no medical supplies and no sink for hand washing. The cleanliness of the clinic was improved from our prior visit, but the space could benefit from routine cleaning.

The RN currently assigned to H Unit clinic has been in this assignment for the past two months and has been on a long-term assignment at SQSP for two years. She stated that there continues to be an issue of no weekend triage for urgent 7362s and no coverage when she takes time off or calls in sick. According to the RN, she is about three to four days behind on FTFT due to the large number of 7362s she receives daily. However, we found longer delays in our review. She stated that she tries to prioritize the urgent 7362s and defers non-urgent 7362s for one to two days.

She said that she does not have a working relationship with the office tech since she works from 2 to 10 p.m. and the office tech works in the morning. Other than scheduling appointments for MD sick call, the RN was unaware of the role of the office tech. She said the office techs were there to schedule the MD sick call appointments. When we asked her how the nursing triage line gets scheduled, she stated that she schedules her own clinic. She said that she goes to Medical Records office ands retrieves the 7362s and UHRs for the patients scheduled for that day. At the clinic, she looks through the 7362s she retrieved from Medical Records to ensure that she addresses any complaint she deems urgent.

She then contacts the custody staff in the housing units and asks them to send inmates with medical ducats to the clinic. After conducting her nursing FTFT and prioritizing the new 7362s, she gives the office tech a copy of her FTFT log, which lists patients she has referred for follow-up appointments with the primary care provider. The office tech then schedules those patients a physician appointment. She was unable to tell us how far out the physician clinic appointment are being scheduled.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page39 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 84 of 310
*San Quentin State Prison (SQSP)*

The RN keeps paper logs of her sick call and doesn't use the IMSATS to schedule her lines. During our clinic visit, we selected 16 health records from the RN sick call list for the week of December 3, 2005. During that week there was an average of seven inmates scheduled per day for the FTFT, which is a low volume. In the FTFT log, there were a large number of 7362s that were scheduled for nurse's clinic, but were cancelled or did not take place due to lockdown.

On the day of our visit, the RN had only nine inmate appointments scheduled for FTFT. On her desk was a stack of 7362s, which had not yet been scheduled for FTFT dating back to mid-to-late January 2006. The nurse is not scheduling appointments to keep up with FTFT.

While in H Unit, we met and interviewed the regular MTA, who was working a double shift on that day. She stated that her regular shift was the morning shift. When asked how things were in the clinic, she said she did not have much contact with the RN, but felt that the clinic was running fairly well. She did have concerns about the new medication administration record (MAR). She said they had started a new system of using one MAR per patient. She said that prior to our visits, they had separate MARs for different medications (i.e., insulin, psych med, and self-carry medications). According to the MTA, it was more likely for medication to be missed or to make errors in medication documentation when using only one MAR. After reviewing the old and new process it appears that the new system of having all medication on one MAR and in one place is appropriate and consistent with the practice of other health care agencies. However, during our visit a representative of the CCPOA bargaining unit met with the health care leadership regarding the work impact of the changed documentation procedure. After a 45 minutes discussion, he predicted that the new system would be a failure.

## 4.3.10   Gym

The physical space for examinations in the gym area has been reduced. Rooms are not much cleaner than from our last visit. Previously there were two separate clinic areas; one has been closed. Now, there is no examination table for nurse face to face triage. The second clinic that existed is now used by officers as a break room.

We reviewed the 7362 tracking log from the Gym from 1/3/06 to present. The log was completed for the much of January, however, there were some days when no entries were made. When we asked the RN assigned to the yard why the logs were missing entries, she stated that she had taken time off and was not replaced. She explained that with the high number of RN vacancies, whenever an RN wants to take scheduled or unscheduled time off, the position is not filled. This was true of most of the yard clinic positions, which results in backlogged appointments and limits access to care.

We selected a number of health records for review. The records showed that the nurses do not consistently perform timely or adequate assessment, physician referrals are not timely, and potentially serious and urgent medical problems are not being referred to the TTA.

We interviewed an inmate member of the inmate Men's Advisory Council. He indicated that examination tables are seldom used by staff or are unavailable. Examinations most frequently occur in chairs.

## 4.3.11   Medical Appeals 602

During our visit, we spoke to the appeals coordinator, who is an SSA who has been in this role for five years. In the past six months, she stated that she has processed a total of 10,068 medical appeals and closed 9,983 appeals. As of 1/31/06, she has 89 outstanding or overdue appeals. Due to the large volume of medical appeals, she said that she has not had time to input the data into the computer. She has no clerical support and is behind in updating the tracking database. She said that in the past she had clerical

Case3:01-cv-01351-TEH Document2570-1 Filed03/18/13 Page40 of 65
Case 2:90-cv-00520-KJM-SCR Document 4545-1 Filed 04/11/13 Page 85 of 310
*San Quentin State Prison (SQSP)*

assistance. Recently, she had an office assistant one or two days per week. As part of his duty, this office assistant would input data, make copies, sort and route appeals. She stated that the office assistant was redirected to another area in the institution, which leaves her with no clerical support.

With the large volume of medical appeals, it would be beneficial to the institution and the appeals coordinator to have clerical support in a timely manner to reduce the overdue appeals. In reviewing the appeals, we found that access to care is the number one complaint and medication is a close second.

# 4.4 Receiving and Release Medical Screening

### 4.4.1 Medical Reception Evaluation

The purpose of the medical reception process is to identify medical, mental health, and dental problems and develop an initial treatment plan until the inmate transfers to his/her permanent facility. At San Quentin, although recent efforts have been made to improve it, the medical reception process remains completely inadequate.

- Medical reception continues to be conducted in a large room that offers no privacy for patients. There are three stations where nurses interview patients and collect medical information. The medical history form contains a review of symptoms (e.g., chest pain, shortness of breath, headaches, etc.). However, the nurses do not ask about each symptom; they only ask whether the patient has any medical problems. The physicians do not obtain a medical history.

- There are four examination areas separated by thin partitions. However, only three areas contained medical equipment. There is no auditory privacy and very little visual privacy.

- Meaningful physical examinations are not being performed. Inmates are never asked to remove their clothes for examinations and most remain in their chairs throughout the entire examination.

- Portable sinks that are not hooked up to plumbing have been placed in the cubicles, but staff does not use them. Although waterless hand cleansers are available, this is not optimal.

The medical reception process is not occurring in a timely manner because of the modified movement program. For example, on 2/2/06, 59 patients were scheduled for physical examinations but only 14 were seen. We reviewed a log of patients who were scheduled for medical reception during 1/31 to 2/3/06. Of 160 inmates who were scheduled for medical reception, only 46 (29%) were seen as scheduled. Inmates from Badger unit on South Block are scheduled for physical examinations only on Thursdays. This means if their physical examination does not occur as scheduled, they will not be seen for another week.

We reviewed 11 health records of inmates who had undergone the medical reception process. Review of health records showed:

- In 10 of 11 (91%) records, a Health Screening Form (7277 form) was completed on the day of arrival.

- In 4 of 11 (36%) records, the clinician performed an adequate history and physical examination.

- In 3 of 10 (30%) applicable records, the physician adequately addressed problems identified during screening. One patient had no identified health problems.

- In 7 of 11 (64%) records, lab tests were completed.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page41 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 86 of 310
*San Quentin State Prison (SQSP)*

## 4.4.2    Intrasystem Transfer Process (7371 form)

We interviewed Peggy Gaffney, RN, who is responsible for the intrasystem transfer process at San Quentin. She reported that she is supposed to receive a weekly list of inmates to be transferred the following week so that she can complete their 7371 forms, which note the inmates' medical problems and medications. However, she stated that she never receives a complete list and that the list trickles in during the week. The number of inmates to be transferred each day varies. On the day of our interview (2/8/06), she had completed 62 intrasystem transfer records (7371 forms). We reviewed a sample of records of inmates who were to be transferred the following day. Ms. Gaffney's notes were very thorough and we identified no significant problems.

# 4.5 Chronic Care

At SQSP, there is currently no medical program to manage patients with chronics illnesses. Our review of medical records revealed that patients with chronic illnesses are not receiving adequate care. Furthermore when the patient illness is advanced to the point where in-patient care is required, the patient is housed in the OHU even though the OHU is not staffed or equipped like a correctional treatment center (CTC). This results in poor and dangerous care as exemplified by the recent death of patient ████. (See Appendix for details.)

A physician from the University of California, San Francisco comes to the facility in a recently started program to mentor staff, but the patients discussed are not selected according to any acuity scale. This service is seen as being of a consultative nature, rather than actually providing care. The problem with this is that if a physician doesn't know that they don't understand how to appropriately manage a patient, they are unlikely to ask for help. Leadership at the facility recognizes the legacy of not having a chronic care program and intends to initiate chronic care clinics in each area, but this has not yet happened. As a result, our Chronic Care chart audit revealed numerous deficiencies, as shown below:

*Table 3. Chronic Care Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed at appropriate intervals? | 3 (21%) | 9 (64%) | 2 (15%) |
| Is the patient's clinical status appropriately managed? | 2 (15%) | 11 (7%) | 1 (7%) |
| Are appropriate laboratory tests, monitoring, and consultations ordered? | 1 (7%) | 12 (86%) | 1 (7%) |
| Are appropriate laboratory tests, monitoring, and referrals occurring as ordered? | 2 (15%) | 7 (50%) | 5 (35%) |

(See Appendix for a complete list of patient records reviewed.)

## 4.5.1    High Risk Patients

High risk patients are not tracked at San Quentin so whether they see a qualified physician is a matter of chance. Doctors continue to track their own patients based on their perceived assessment of risk. No one is identified as high risk at intake screening. Therefore, a medically complicated patient is no more likely to be closely monitored than someone with a simple illness or someone with no illness at all. There is a chronic disease list but there is no separation by acuity for any condition. This is particularly disturbing

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page42 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 87 of 310
San Quentin State Prison (SQSP)

because San Quentin is an intake facility that receives an estimated two to five new high acuity patients per week.

Our review of 11 high risk patient charts showed the following:

*Table 4. High Risk Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high-risk physician? | 3 (27%) | 8 (73%) | 0 |
| Is the patient being followed at appropriate intervals? | 1 (9%) | 9 (82%) | 1 (9%) |
| Is the patient's clinical status appropriately managed? | 1 (9%) | 10 (91%) | 0 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 2 (18%) | 7 (64%) | 2 (18%) |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 1 (9%) | 7 (64%) | 3 (27%) |

(See Appendix for a complete list of patient records reviewed.)

# 4.6 Medication Management and Administration

To assess pharmacy services, we interviewed David Silacci, the Chief Pharmacist, and toured the pharmacy and areas where medications are stored. Mr. Silacci appears to be very conscientious and tries to exert control over pharmacy operations and budget.

## 4.6.1   Inefficient Pharmacy Practices

Currently, the pharmacy distributes bulk medications to the MTAs to administer in single doses. Thus, the pharmacy does not actually dispense individual, labeled prescriptions for all patients. To administer medications, the MTAs set 10-15 bottles of bulk medications (usually psychotropics) before them, along with the patients' MARs. They pour 20-30 tablets into a cup from a bulk medication container, pick up a pill with an ungloved hand, and place it into an envelope in accordance with the order on the MAR. The envelope displays only the patient's last name and is not labeled with the medications contained in the envelope.

This is an inefficient, unsanitary, and illegal practice. Moreover, there is no accountability for the bulk medications and the system is vulnerable to theft and wastage. The Chief Pharmacist recognizes the weaknesses in this system and wants to purchase equipment for a unit dosing system, which would dispense all single dose medications in a properly labeled container. For example, if a patient were to receive Risperdal and Zoloft in the morning, the system would dispense both pills into a small, opaque bag that is properly labeled with the patient's identifying information as well as the name and dose of each medication. The system would dispense only the doses needed for that day, resulting in greater accountability of medications. This system would also save thousands of hours of nursing time currently spent packaging medications, and reduce the number of staff required to administer medications. However, the system is expensive ($250,000) and at this time, the purchase request is moving through the approval process.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page43 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 88 of 310
*San Quentin State Prison (SQSP)*

### 4.6.2   Twice Daily Pain Medication Administration

A second issue is that the facility has a policy that pain medications may only be administered twice daily, even in the OHU, which houses sick patients. For example, a patient had undergone surgery for an inguinal hernia repair. Upon discharge from the hospital, the surgeon prescribed a narcotic (Vicodin) to be taken every 3 to 4 hours as needed for pain. Upon his return to the facility, the orders were changed to twice daily, which is likely to be insufficient for a post-operative patient. Given that the OHU is staffed with nurses 24 hours a day, this change was unreasonable and punitive.

Staff reported that the change to twice daily administration of pain medications was due to the large volume of patients who have been prescribed narcotics, and that there is insufficient staff to administer pain medications more than twice daily. The pharmacist reported that some physicians were prescribing narcotics without a medical diagnosis, and that they were making efforts to address this by requiring physicians to diagnose the patient before ordering narcotics.

### 4.6.3   Discarding Legally Dispensed Medication During Cell Searches

A third issue is that, as reported a year ago, custody staff who conduct cell searches continue to throw out medications that have been legally dispensed to patients. This not only interferes with access to medical care, but is extraordinarily wasteful. **It also shows a callous disregard by correctional staff to the medical needs of patients**. Under no circumstances should correctional officers throw away medications that have been legally dispensed by the pharmacy**.** If the patient has any medication in his possession that is questionable, the correctional officer should return the medication to the pharmacy for an assessment. Due to inherent delays in receiving prescribed medications, it is likely that patients will have medications in their possession that have exceeded the stop dates of the prescription. Therefore, the health care leadership working in collaboration with custody should grant an automatic grace period of up to ten days for the patient to have expired medications in his possession.

### 4.6.4   HIV Formulary Issues

A fourth issue (although not exclusively a San Quentin issue) is that the Statewide HIV formulary does not provide a sufficient number of anti-retroviral medications in each category to maximize treatment options (see Table 5).

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page44 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 89 of 310
*San Quentin State Prison (SQSP)*

*Table 5. Antiretroviral Drugs on CDCR Formulary*

| Drug Name | Type of Drug | On Formulary? |
|---|---|---|
| Zidovudine (AZT) | NRTI | No |
| Didanosine (ddI) | NRTI | Yes |
| Lamivudine (3TC) | NRTI | Yes |
| Zalcitabine (ddC)* | NRTI | Yes |
| Abacavir (ABC) | NRTI | Yes |
| Stavudine (Zerit) | NRTI | Yes |
| Tenofovir (TDF)** | NRTI | No |
| Emtricitabine (Emt)** | NRTI | No |
| Truvada (3TC + Emt) | NRTI Combination | No |
| Combivir (AZT + 3TC)** | NRTI Combination | No |
| Epzicom (ABC + 3TC) | NRTI Combination | No |
| Efavirenz | NNRTI | Yes |
| Nevirapine | NNRTI | Yes |
| Delavirdine* | NNRTI | Yes |
| Saquinavir (SQV) | Protease Inhibitor | Yes |
| Indinavir | Protease Inhibitor | Yes |
| Nelfinavir | Protease Inhibitor | Yes |
| Ritonavir (Rit) | Protease Inhibitor | No |
| Kaletra (Lop/Rit) | Protease Inhibitor | Yes |
| Amprenavir (AMP) | Protease Inhibitor | Yes |
| Atazanavir | Protease Inhibitor | No |

*Generally not used by HIV Experts
**Recommended as initial therapy for HIV infection

For example, the formulary does not contain key nucleoside reverse transcriptor inhibitors (NRTIs) such as Zidovudine (AZT), nor the newer combination NRTIs (Combivir, Truvada, Epzicom) that would permit once daily dosing. The formulary does include Zalcitabine (ddC) and Delavirdine, which have fallen into disuse by most experts. Among protease inhibitors (PIs), Ritonavir, which is commonly used to boost Crixivan, is absent. A combination of Ritonavir and Crixivan permits twice daily dosing. Without Ritonavir, Crixivan must be given on a strict every 8-hour dosing schedule to avoid viral resistance that is very difficult to achieve in any setting.

The treatment of HIV infection is complex and considerations such as co-existing medical conditions, medication side effect profiles, and the reality that most regimens eventually fail to maintain viral suppression requires that the full spectrum of antiretroviral therapy be available to HIV experts treating CDCR patients.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page45 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 90 of 310
*San Quentin State Prison (SQSP)*

# 4.7  Specialty Services and Consultation

Arranging for patients to be seen for off-site specialty consultations and examinations is very problematic. The problems include the number of consultations, transportation to off-site appointments, and obtaining and maintaining contracts with specialists for these services.

*Table 6. Specialty Care Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Was the request for service form completed appropriately? | 4 (40%) | 6 (60%) | 0 |
| Was the consultation ordered within an appropriate timeframe? | 4 (40%) | 6 (60%) | 0 |
| Did the consultation occur within the appropriate timeframe? | 0 | 9 (90%) | 1 (10%) |
| Were the specialist's recommendations reviewed within an appropriate timeframe? | | 5 (50%) | 5 (50%) |
| Did the PCP see the patient for follow-up within 5 days? | | 4 (40%) | 6 (60%) |
| Did the PCP provide appropriate care at the follow-up visit? | | 5 (50%) | 5 (50%) |

Off-site transportation trips are limited to six to seven per day. For a 6,000 bed intake facility, this is an inadequate number of permitted trips. This results in a queue for specialty services and is a form of rationing. From October 2005 to December 2005, there were 75-100 referrals that could not be scheduled. Many of these patients leave San Quentin before their appointment can be scheduled. During the last month, improvement has occurred. Of the 128 requests, 126 were scheduled. This improvement occurred because of specialists who came to the facility to provide services, thus reducing the need for off-site transportation. Still, this does not satisfy current need.

## 4.7.1    Contracting Problems

Because of contracting problems many potential contractors will not see patients. Physicians from University of California at San Francisco, all local orthopedic surgeons, and others refuse to see prisoners. CDCR contract requirements, such as higher malpractice and car insurance requirements, act as disincentives to potential contractors. Also, timely payment has been a significant issue. Multiple specialist contracts, including the cardiologist, general surgeon, radiologist, and ultrasound contract, are behind in payment. When this occurs, the facility depends on the goodwill of the specialist faced with the prospect of very late or non-payment, to provide care.

The facility leadership was not entirely clear on who in Central Office is responsible for contracting services. There is no communication between those in Central Office responsible for contracting services and the facility leadership who know the needs and unique problems associated with local area specialists. One result of this is extreme dissatisfaction with contract medical services, where need is not matched by the contract. We were told that it is so difficult to get patients in to see a nephrologist that patients have gone into renal failure requiring emergency dialysis after waiting months for elective preparation surgery for dialysis.

We met a contract radiologist who reads chest x-ray films on-site, which is a distinct advantage to the facility. This physician's contract ended September 31, 2005, approximately five months before our visit.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page46 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 91 of 310
*San Quentin State Prison (SQSP)*

He was asked to work six additional months, but hasn't been paid since September 2005. He seemed very frustrated and indicated that he tried to navigate the bureaucracy unsuccessfully in an attempt to get paid. No one at the facility was responsible as a point person in obtaining payment for this individual. He had to go through Central Office, was unsuccessful, and was therefore quitting in frustration. This is to the detriment of the facility since they will now lack radiology reading services. This is of special concern since San Quentin is a Reception Center and is responsible for screening new arrivals for tuberculosis. This physician had no support from the facility management team.

In part, this contracting dilemma exists because all contracts must be approved by the Department of General Services (DGS), which must bid out every contract regardless of the circumstances. In this case, the contracted service is reading x-ray films on a part-time basis one or two days a week. No one would realistically bid on this piece of business. Nevertheless, this service must be bid out. The result will be that the service will probably not be provided or a very high bid will be paid for a service that is most reasonably accomplished by hiring a part-time person to perform the work. These types of poor business practices exist throughout the CDCR.

## 4.8  Urgent/Emergent Care

As with all the sites we visited, there is no retrospective review of patients who have been emergently transferred to an outside medical facility. This utilization data is important information that can assist in reducing waste and errors, and in identifying areas of clinical concern. Health record reviews showed that care prior to the urgent event was not appropriate, nurses did not follow-up on emergency department recommendations, and physicians did not see patients following an emergency in a timely manner.

*Table 7. Off-Site Emergency Care Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Was prior care appropriate? | 2 (29%) | 5 (71%) | 0 |
| Did the RN in the TTA follow-up appropriately on any recommendations from the ER? | 1 (14%) | 4 (57%) | 2 (29%) |
| Did follow-up with the PCP occur in a timely manner? | 0 | 6 (86%) | 1 (14%) |
| Was the follow-up provided by the PCP appropriate? | 2 (29%) | 3 (42%) | 2 (29%) |

## 4.9  Medical Records

The quality of medical records is extremely poor. In interviews with various physicians there was universal agreement that the likelihood of obtaining a medical record when examining a patient was approximately 70% for scheduled visits, but much less for unscheduled visits. Patients in the TTA (the equivalent of the emergency room) are almost always seen without a medical record. Consultation reports or hospital discharge summaries seldom find their way to the medical record in a timely manner, if at all.

We reviewed a record of a patient who had an ultrasound diagnosis of cholecystitis on a report dated ██████. This report was not in the record as of 2/27/2006. When we pressed for the document, it was obtained. Since this report was not in the medical record, doctors were making uninformed decisions regarding his care.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page47 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 92 of 310
*San Quentin State Prison (SQSP)*

When patients are paroled, their medical record is sent to one of several parole offices. After re-incarceration, these records are supposed to return to the facility but often, they do not. Thus, important historical data is often lacking. Also, the space for medical records is insufficient and the system of handling records is inadequate.

An important source of medical information should be the verbal communication of facility physicians with consultant physicians about their patients. This is a customary practice in medicine nationwide. Yet at San Quentin, as with most CDCR facilities, there is no phone availability for physicians and no ability to communicate with outside consultants regarding their patients. Physicians are physically, electronically, and information-wise isolated from the outside world relative to their patients.

According to several staff, Medical Records is in crisis. The space allocated for medical records is insufficient, cramped, and disorganized. As in other areas, furniture is in disrepair. The Nursing Supervisor III reported that three different people are responsible for supervising Medical Records. Staff with custody backgrounds, who have no health care experience, occupy the supervisory positions expected to oversee medical records. The result is that there is no effective supervision.

We interviewed the Health Records Technician (HRT) II, who is the Health Records Supervisor. She reported that she operates primarily with registry staff and retention is difficult because of low salaries and the workload. With high staff turnover, the quality of medical records is poor. There has been no staff on third watch since 2000. Nurses often have to retrieve their own charts.

Nursing staff reported that to obtain medical records, they must fill out individual request forms. They leave the forms in a box in the Medical Records office and return to retrieve the records the next day. However, they reported that upon their return the next day, the request forms often cannot be found and they are expected to again fill out the 20-40 health record request forms.

## 4.10 Outpatient Housing Unit (OHU)

Although it was requested that the OHU be closed in August 2005, it was not closed as of February 2006 when we visited. This unit was not to be used as a CTC, yet because San Quentin is an intake center, inevitably CTC-type patients come into the facility and end up being housed on the OHU, which is not staffed, equipped, or managed at a level sufficient to care for the patients in it. There is now an examination room that is used for some patients on this unit but custody determines if doctors are allowed to see patients in the examination room.

Physicians are also still denied access to examine and review patients in mental health cells based on clinical need and must examine patients based on custody convenience even though this is a medical/mental health unit. Physicians are still required to examine patients through food ports as determined by custody unwritten rules. No medical policies govern this unit.

The physicians we interviewed do not have confidence that nurses will carry out orders. One doctor indicated that nurses only refer patients to physicians if the patient needs to be discharged. Physicians also do not always know whether a patient on the OHU unit is assigned to medical or mental health.

Because the OHU policy calls for physician notes every 14 days, acute patients may get missed. It was estimated to us that about one new acutely ill patient arrives daily. There has been no policy modification to accommodate the existing realities. Thus, patients are not guaranteed to be seen as clinically indicated.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page48 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 93 of 310
*San Quentin State Prison (SQSP)*

The physician on the OHU started in August, almost 6 months prior to our visit. This physician is trained in obstetrics and gynecology, but manages higher acuity patients with internal medicine problems. She received no orientation at the time of her hire. She works until noon seeing mental health patients. She didn't even know that there was such a person as a Regional Medical Director. She had a very poor understanding of the "high risk" concept. She attempts to send anyone with any complicated problem to another facility. Transferring patients to other facilities has not occurred promptly. Because of delays in sending patients to other facilities, but more importantly because San Quentin is an intake facility, she firmly believes that a CTC or something of that nature is necessary at San Quentin because new patients with significant problems are continually incarcerated and need immediate attention.

### 4.10.1   OHU Nursing Staffing

The OHU has 30 beds, 20 of which are used for mental health and 10 are used for medical patients. The staffing for the unit consists of two RNs during the day, one RN and one MTA on the evening shift, and one RN on the night shift. The TTA RN functions as a back-up for the night shift. Staff reported that they believe there should be two RNs and one LVN on days and evenings.

We identified the following issues in our audit:

- Although most of the patients are mental health, there are no mental health nurses assigned to this area.

- Nursing staff reported that when they need to see a patient, it is difficult to get custody to open the door. It may take anywhere from a few minutes to hours, and is often due to a lack of cooperation among custody staff.

- There is no patient call system in the OHU and a nurse is not located in the immediate proximity. Therefore, patients are not able to notify nurses of urgent health care needs.

- There is a medication room in the OHU. It contains bulk medications in containers that are not properly labeled with the lot number and expiration dates. There is no accountability system for these medications.

- According to staff, HCSD instructed them to no longer use inpatient records to document care in the OHU. This is because the OHU is not supposed to house patients of high acuity. However, patients of all acuity levels are admitted to the OHU.

## 4.11 Ancillary Services

There are no laboratory terminals for lab reporting for physician use. All laboratory review is performed manually and laboratory results are frequently not returned. In these cases, it is not clear whether the lab test was performed or if the result was lost.

### 4.11.1   Information Technology

Internet access is not available for physicians. Physicians are not even permitted to bring PDAs into the facility. These devices are now universally used by physicians nationwide. The only computers available are the ones used by certain clerks and administrative staff. Physicians virtually have no assistance from administrative leadership in obtaining any clinical reference material. Apparently, PDAs were ordered months ago but have been sitting in Central Office.

Case3:01-cv-01351-TEH  Document2570-1  Filed03/18/13  Page49 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 94 of 310
*San Quentin State Prison (SQSP)*

Physicians in all clinical areas work without any reference texts of any kind--even a rudimentary pharmacy reference. Any clinical texts in the facility are brought in individually by practitioners.

Medical connectivity is virtually non-existent intra-facility and statewide. The Acting Chief Physician has no Internet connectivity to communicate with Central Office. The HCSD Deputy Director sends an e-mail to a subordinate, who then verbally communicates with the Chief Physician.

These issues have contributed to the physicians' feeling that they are not treated as professionals. If this state of affairs is allowed to continue, it will reduce the long-term ability to attract and retain professional staff within the facility.

# 4.12 Death Reviews

████████████████ was a 44-year-old man who arrived at San Quentin State Prison on ██████████, 2005. He had a history of psychiatric problems with severe decompensations requiring multiple admissions to the acute care hospital at Vacaville, and was under a Keyhea order due to grave disability.

There was a note in his medical record on ████████████ that he had been "observed lying on floor nude. Would not respond when spoken to. Reported to have been eating feces." Mental health staff was notified and he was placed on 5 point restraints and suicide watch. He was kept on 5 point restraints for 48 hours. On ████████████, he was found lying in his cell in feces and urine. He was sent to Novato Community Hospital (NCH) for further evaluation. The physician the NCH emergency department noted:

> "In the last few days he has gotten much more regressed where he is moving very little in the cell. He does not initiate any activity. He will not eat or drink any fluids. Other then a very little eye contact, he does not interact at all with staff."

The physician's diagnosis was "chronic psychosis with a near catatonic state that is recurrent and dehydration." ████████████ was treated with intravenous fluids and discharged back to SQSP with recommendations to decrease his Zyprexa, force fluids, and see a physician. Upon his return to SQSP, ████████████ was re-housed in the OHU in a cell a Video Surveillance Monitoring System and was continued on suicide watch. There was no documentation that he was seen by mental health staff or a physician following his return. In addition, his vital signs were only checked one time.

On ████████████ at 2130 hours, a nurse documented that ████████████ drank 600 cc of Enlive and 350 cc of water. (At that time, staff noted that ████████████ had soiled his mattress and blanket with both feces and urine. The nurse and a correctional officer physically moved him and cleaned up the area). At 2300 hours, another nurse documented that his blood sugar was 87.

Review of the video tape revealed that from the time he was placed in the cell until his death early in the morning of ████████████, ████████████ appeared to be almost totally non-responsive. In his report, Mr. Belavich, the Health Care Manager, stated:

> "Specifically, a review of the Video Surveillance Monitoring System indicated that during the entire 2nd Watch Shift and the 3rd Watch Shift, on Monday, ████████████, Inmate ████████ did not make any unassisted musculatory type of movement. This included but was not limited to the fact that the Video Surveillance Monitoring System appears to indicate that inmate ████████ never moved any extremity (either his hands or feet), never moved his head, and

*San Quentin State Prison (SQSP)*

appeared to lie in exactly the same position (flat on his back, head slightly tilted backward) during the entire course of the 2nd and 3rd Watch."

At approximately 0445 hours on ████████████, staff found ████████████ to be unresponsive and not breathing. Review of the video tape revealed numerous problems with the emergency response and initiation of CPR. Dr. Bui pronounced ████████████ dead at approximately 0515 hours. The medical examiner found that the death was due to a massive pulmonary embolus.

Assessment: Despite the recommendations of the NCH physician, ████████████ was not evaluated by mental health staff or a physician. ████████████ was not monitored appropriately by the nursing staff in the OHU. There were numerous problems related to both the medical and custody staff's emergency response and initiation of CPR by both custody and medical staff.

The alleged activities of the two nurses noted above (hydration and blood sugar monitoring) were not substantiated by the Video Surveillance Monitoring System. There is no evidence that ████████████ took any fluids or that staff checked his blood sugar.

████████████ was a 65 year old man with a history of diabetes, hypertension, COPD, and hyperlipidemia who died on ████████. The cause of death was noted to be an acute myocardial infarction. The medical record revealed the following timeline:

    0520 - TTA notified that patient not responsive and being brought to TTA

    0535 - Patient arrived at TTA

    0537- CPR started

Assessment: There was a delay in the initiation of CPR.

████████████ was a 46-year-old man who came to TTA complaining of chest pain on ████████. He collapsed and CPR was initiated. CPR was not successful. There was no autopsy report.

Assessment: No problems identified.

████████████ was a 32 year-old-man with no known medical problems. He was found unresponsive on the floor of the gym. It appears that CPR was initiated in a timely manner.

Assessment: No problems identified.

████████████ was a 64-year-old man with a history of hypertension and diabetes. He was not being followed on a regular basis in the chronic care program.

On ████████ he submitted a Health Services Request (7362) stating that he had had a cough since December, and was coughing up blood two times per day. He was seen in sick call that day. The physician noted that ████████ was complaining of hemoptysis. The physician's assessment was that ██ ████ probably had pneumonia, for which he ordered antibiotics and a chest x-ray. The chest x-ray was

Case3:01-cv-01351-TEH Document2570-1 Filed03/18/13 Page51 of 65
Case 2:90-cv-00520-KJM-SCR Document 4545-1 Filed 04/11/13 Page 96 of 310
*San Quentin State Prison (SQSP)*

performed on . The radiologist's impression was that there was a mild suspicion of a small infiltrate in the left upper lobe. He recommended shallow right and left oblique views of the chest to further evaluate the left upper lobe and "more fully to rule out the mild suspicion of a small infiltrate." On ▮▮, a physician saw ▮▮▮▮▮ for follow-up and noted that he was feeling much better with a decreased cough and no shortness of breath or chest pain. He did not address the x-ray findings.

There was a handwritten note in the medical record from ▮▮▮▮▮▮ on ▮▮▮▮ stating that he had a cough, spit up blood at night, and was having night sweats. An RN saw ▮▮▮▮▮▮ on ▮▮ and noted that there was no change in his status since his previous visit to the physician and that there was "no acute distress noted at this time." The nurse did not obtain a history related to the patient's hemoptysis. ▮▮▮▮▮ was scheduled to see the physician on ▮▮▮▮.

On ▮▮, an RN saw ▮▮▮▮▮ for a complaint of swollen feet. The nurse noted that he had bilateral swelling of his feet and referred him to see the physician the next day. A physician did not see ▮▮▮▮▮ until ▮▮▮▮ The physician noted that ▮▮▮▮▮▮ "states he is getting night sweats for 2 months, denies decreased appetite or weight loss." The physician did not obtain a history related to cough, shortness of breath, or hemoptysis. The physician's plan was to order laboratory tests and follow-up on the night sweats if they did not resolve. There was a note that ▮▮▮▮▮▮ refused sick call on ▮▮.

On ▮▮, a physician saw ▮▮▮▮▮▮ in chronic care clinic. The physician noted that ▮▮▮▮▮ stated that he had been coughing up blood once/day for 7 to 8 months. The physician ordered a chest x-ray, sputum tests to check for pneumonia and tuberculosis and an urgent pulmonary consult. (The pulmonary consult was not scheduled until ▮▮▮. There was a note on ▮▮ that ▮▮▮▮▮▮ refused the pulmonary consultation). There was a subsequent entry from the physician noting that ▮▮▮▮▮▮ would be transferred to an outside hospital to rule out tuberculosis. ▮▮▮▮▮▮ was sent to the TTA to await transfer. The physician in the TTA noted that ▮▮▮▮▮▮ weight had been stable and that he denied coughing up blood. The physician also obtained a chest x-ray that he noted was stable compared to the prior exam. (The radiologist's report noted that there was no significant change as compared with the x-ray of ▮▮▮, and that there was a stable appearing small, localized collection of markings in left upper lobe. He further noted, "While one cannot rule out an active component, this could be long standing and represent some vascular markings.") The physician decided not to send ▮▮▮▮▮▮ to the hospital for further evaluation.

▮▮▮▮▮▮ submitted a 7362 on ▮▮ that was received on ▮▮. An RN noted that, according to the Plata coordinator, ▮▮▮▮▮ refused triage on ▮▮▮. ▮▮▮▮▮ subsequently submitted another 7362 stating that his feet were very swollen and that he had been too sick to get out of bed. A physician saw ▮▮▮▮▮▮ on ▮▮▮ and noted that he had severe swelling of his lower extremities (a nurse noted that the swelling extended above his knees). The physician's assessment was that ▮▮▮▮▮▮ had acute shortness of breath with a history of an enlarged heart in ▮▮▮ 2005. (▮▮▮▮▮▮ had had a chest x-ray and an echocardiogram in ▮▮▮ 2005, neither of which had revealed an enlarged heart). The physician sent the patient to the TTA to rule out congestive heart failure. A chest x-ray was performed. The physician treated ▮▮▮▮▮▮ with Lasix and sent him back to his housing unit. Another physician saw ▮▮▮▮▮▮ for follow-up on ▮▮▮. He noted that ▮▮▮▮▮▮ was feeling less short of breath and that he still had severely swollen legs. The physician did not examine ▮▮▮▮▮▮'s heart or lungs. He ordered more medications for congestive heart failure and referred ▮▮▮▮▮▮ to the cardiologist.

On ▮▮▮, a physician saw ▮▮▮▮▮▮ for follow-up of the ▮▮▮ x-ray. The radiologist's report had noted the abnormality seen on prior films is still present. The physician noted that ▮▮▮▮▮▮ stated that he was still coughing up blood and decided to send him to Novato Community Hospital (NCH) to rule out tuberculosis. While he was at NCH, ▮▮▮▮▮▮ was diagnosed with metastatic kidney cancer. He was not considered a surgical candidate. His condition rapidly deteriorated and he died on ▮▮▮.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page52 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 97 of 310
*San Quentin State Prison (SQSP)*

Lt. Barker, the CHSA II at SQSP, wrote a memo to the Warden summarizing the clinical issues in this case.

Assessment:

██████████ was not being followed on a regular basis in the chronic care program for his hypertension or diabetes. He was complaining of coughing up blood for many months and did not receive a timely or adequate evaluation. In addition, once his legs became severely swollen, he did not receive a timely or adequate evaluation.

Medical staff did not follow-up on ██████████'s abnormal x-rays in a timely manner.

The urgent consult ordered on ██████ was not scheduled until ████.

A staff person with no medical training wrote the memo summarizing the clinical issues in this case.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page53 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 98 of 310
*California Institution for Men (CIM)*

# 5. California Institution for Men (CIM)

The medical experts visited California Institution for Men (CIM). CIM has an average daily population of approximately 6,530 inmates (250% above its capacity). It is a reception facility with approximately 500 new inmates arriving each week. It has an Acute Care Hospital, a minimum security camp, and four yards:

- Reception Center Central
- East Yard – contains Del Norte Housing unit for HIV-infected inmates
- West Yard
- Minimum Yard – contains Elm Hall, which is a housing unit for inmates with disabilities

The medical experts visited CIM on February 21-24, 2006.

## 5.1 Organizational Structure

### 5.1.1   Facility Leadership

## 5.2 Health Care Staffing

### 5.2.1   Physician Staffing

CIM is allocated 15.5 physician positions. They are all currently filled with 11.5 full-time employees (FTE) civil service physicians, 2 FTE contract physicians, one FTE civil service NP, and one FTE contract NP. Given the size and mission of the institution, this does not appear to be sufficient. For example, there are usually 2.5 physicians per day assigned to the clinic in the Minimum Needs Facility. There are approximately 2,700 inmates housed on this yard. In addition, the physicians are required to conduct sick call for an additional 200 to 400 camp inmates and individuals on work furlough. To provide an appropriate level of care, there should be 3 to 4 physicians assigned to the Minimum Needs Facility clinic on a daily basis.

Staffing for the administrative segregation units (Ad Seg) is also insufficient. There are approximately 250 inmates housed in the three Ad Seg units, which are used for disciplinary housing. A physician performs sick call only 2 half days per week. Given the size of the population and the restricted movement, a physician should be in Ad Seg at least 3 days per week.

### 5.2.2   Nursing Staffing

During our visit, we interviewed the SRN III, who is the acting Director of Nursing (DON). She has been in this position for four months. Prior to this assignment, she was the SRN III over the acute care hospital at the facility. The first day of our visit, she informed us that she would be interviewing for the permanent position. The SRN III stated that they recently hired 13 RNs, which filled 100% of nursing positions for the first time in quite awhile (See Table 8.). She said that recent raises for the RN were beneficial in filling the position.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page54 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 99 of 310
California Institution for Men (CIM)

In interviewing the SRN III, it appeared she was aware of nursing issues and stated that she had been working on a plan to address them. She provided us a copy of a draft nursing organizational chart that she was proposing to the newly-appointed HCM. She appeared to be somewhat organized with a plan to match each supervisor to the area of the prison where she felt they would be best suited. According to the SRN III, all of her supervisory positions were filled and she had met with staff to discuss the plan. When we asked about the supervision of the MTAs, she said that they report to nursing but there continues to be an ongoing issue about RNs supervising the MTAs (LVN).

In speaking to the other nursing supervisors, they feel that they have not had adequate leadership and support from administration for years. They stated that the SRN III has done a good job in her 4 months but may be lacking the leadership skills to effect change. An example of the nursing staff not being supported by the administration is the fact that the supervisor of West clinic doesn't have office space. The other supervisors have small but adequate office spaces that are shared with multiple supervisors. The nursing supervising staff doesn't have computer or internet access.

*Table 8. CIM Nursing Staff Positions and Vacancies*

| Position Title | Total FTEs | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| SRN III | 4.0 | 4.0 | 0 | 0 |
| SRN II | 6.0 | 6.0 | 0 | 0 |
| SRN I | 1.0 | 1.0 | 0 | 0 |
| SR. MTA | 6.0 | 5.0 | 1 | 0 |
| Registered Nurse | 89.2 | 89.2 | 0.2 | 0 |
| MTA | 85.9 | 77 | 8.9 | |
| Nurse Instructor | 1.0 | 0.0 | 1 | 100 |
| Public Health Nurse | 1.0 | 1.0 | 0 | 0 |
| Infection Control Nurse | 0.0 | 1.0 | Not funded | |

## 5.2.3   Inmate Workers

At CIM, inmate workers have been assigned to the medical section and perform duties such as scheduling appointments, handling medical records and working in the medical supply room. This puts inmates in a daily position of overhearing confidential medical information and having access to medical supplies. Other than sanitation duties, inmate workers should not work in medical situations where they have access to confidential medical information or medical supplies.

## 5.2.4   Staff Orientation

During our visit, we reviewed the nursing orientation program that has been in place at CIM for many years. The nurse instructor for the past 4 years has just recently been promoted to a SRN II. We interviewed the acting Nurse Instructor RN, who has been in this acting role for 2 months. On the first day of our visit, she reported that the staff from central office had mailed a box of the statewide orientation manuals weeks prior to our visit, but they were unable to locate them. Despite the staff being unable to locate the manual, it appears that CIM has a somewhat functioning orientation and training program. A review of their training records indicates that staff is receiving an adequate orientation, but could benefit from ongoing training. We reviewed the training calendar for the past year and it had a limited amount of educational classes for the staff. According to the Nurse Instructor RN, she would like to schedule outside speakers to come to the prison and present different updated training courses to the staff, but there is no training budget to pay speakers. She states that she lacks the resources to buy new

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page55 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 100 of 310
*California Institution for Men (CIM)*

training materials such as a TV, DVD player, or computer for PowerPoint® presentations. She stated that given more resources, she could provide a wide range of training and clinical up-dates for the staff.

## 5.3  Tour of Housing Unit Medical Clinics

In general, the yard clinics are dirty and disorganized. Many of the clinics are without necessary medical equipment. Some have never been equipped. Staff who work in the medical supply room reported that equipment has been ordered and delivered numerous times to the clinics, but has disappeared. There is no inventory and accountability system for equipment.

East Yard has a horrible ventilation system. The ceiling has turned black and the vents are matted with a half-inch layer of particulate matter (dirt or mold). Staff has put coverings over the vents to try to prevent the particulate matter from becoming airborne. The staff explained that the air vents have never been cleaned because there is asbestos in the ceiling that cannot be disturbed. They were concerned about the effects on their health. There is no sink in the nurse triage office and no otoscopes in the nurse or NP clinic rooms.

### 5.3.1    Medical Reception Central

In Reception Center Central (RCC), the nurse has been assigned a "clinic" room for the Sycamore/Madrone housing units that is filthy and lacks any medical equipment and supplies except an examination table and a sink.

We interviewed the RCC nurse who performs FTFT. She explained how patients are scheduled and seen, and appeared very conscientious about her work. She is to be commended for her efforts. However, at RCC there are significant issues with access to care, particularly in administrative segregation.

The RCC nurse has been trained in the use of the nursing protocols. She reported that she was told not to use the Nursing Protocol Encounter forms and she does not administer over-the-counter medications, although the reasons why she was told this are unclear. An MTA has been assigned to assist her with collection of Health Care Service Request Forms and patient escort. The nurse recently went on vacation for two weeks. A second nurse was out on jury duty during the same time and FTFT did not take place during her absence. Patients did not have timely access to care during this period.

We found over 40 health service request forms, some dating back to 2/06, that had not been addressed in a timely manner. We spoke to the nursing supervisors who were aware that FTFT was not occurring but one stated that it was hard to find someone willing to work the assignment. Moreover, the same nursing supervisor and the CHSA incorrectly stated that the nurse had up to 14 days to schedule patients for FTFT. This contradicts health care policy, which says that patients should be scheduled for FTFT within one business day. The fact that staff in leadership positions does not know the correct policy is disconcerting.

In Palm Hall, an RCC Ad Seg unit, the examination room is also used as a barbershop and for meetings. Custody staff has routinely not permitted FTFT on Wednesdays due to classification meetings. During our visit, custody notified nursing staff that they would also not be permitted to conduct FTFT on Thursday so that additional classification meetings could be conducted. Physician clinics are scheduled once a week and if these are canceled for any reason, patients are not seen for another week. There are other examples of custody dictating access to care. On ▇▇▇▇▇, a physician ordered an HIV antibody test for an inmate who was housed in Palm Hall. One month later the lab had not yet been drawn. Staff

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page56 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 101 of 310

*California Institution for Men (CIM)*

reported that it was because labs could only be drawn on Mondays and there were two Holidays on Mondays in the intervening period. Therefore, the test had not yet been obtained.

## 5.3.2   East Yard

In the East Yard main medical clinic, there appeared to be no significant issues with access to care, although the modified movement program required considerable coordination between health care and custody staff. The nurse performs FTFT in a dedicated room that is cramped and cluttered. The room is adequately equipped and supplied; however, the room lacks an otoscope and ophthalmoscope, and does not have a sink for hand washing. The nurse does have an antiseptic hand washing lotion. The NPs' clinic room is not adequately equipped and supplied and there is no sink in the room.

On East Yard, HIV-infected patients live in Del Norte Housing unit. There is a clinic in the housing unit. The clinic is dirty, disorganized, and cluttered with old equipment. It is also used to store mops, brooms, and other cleaning supplies. The otoscope/ophthalmoscope was not functional.

## 5.3.3   Minimum Yard/Front Clinic

Front clinic is the Minimum Yard clinic that provides care to approximately 2,700 minimum-security inmates at CIM. The space is a doublewide trailer located directly in front of the acute care hospital. The overall clinic sanitation was poor. The floors were dirty and in need of routine cleaning. Front clinic has four exam rooms for the primary care provider to perform sick call. The rooms were equipped with basic medical equipment. All rooms have an exam table, a sink for hand washing, and an otoscope. There was one vital sign machine shared between the providers. According to the Plata MTA, the second vital sign machine has been broken for two months and has yet to be repaired or replaced. There were no exam lights and the rooms were poorly lit.

The Front clinic is staffed seven days per week with at least one 12-hour RN for FTFT. Three days per week, there are two 12-hour RNs conducting FTFT. There are 3 MTAs on the day and evening shifts, seven days per week. There is one Plata MTA and one office tech, Monday - Friday on the day shift. According to the SRN II responsible for the clinic, they try to staff the clinic 5 days a week with 2.5 physicians. She said that when they have 3 physicians seeing patients, they can stay current with the 14-day appointments for routine sick call. As of our visit, there were 70 backlogged appointments for sick call.

On the day of our visit to Front clinic, two RNs were performing FTFT. They described the sick call process to us. MTAs collect the 7362s daily and give them to the RN to separate. The RN separates out all requests for medication refills and gives them to the office tech. The office tech then schedules the patient for a sick call appointment if they do not have a current medication order. If the patient has a current order, the office tech forwards the 7362 to pharmacy to fill. According to the office tech, she receives the expiring medication list weekly and schedules the patient's appointment three days before the expiration of the medication order.

The RN triages the 7362s with complaints and symptoms. If the complaint appears to be urgent, the patient will be assessed that day. For all non-urgent complaints, the patient will be scheduled for RN FTFT on the following day. They informed us that due to the large number of 7362s, not all requests are seen within the 24-hour timeframe. According to the 7362 log, it appears that they average 55-60 health care requests per day.

The Front clinic has a 4th exam room where the RNs perform FTFT. This room is a converted office. It is equipped with a gurney for exam, a desk, and two chairs. There is no other medical equipment, no sink

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page57 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 102 of 310
California Institution for Men (CIM)

for hand washing, nor any hand sanitizer. The room also lacked counter space to store basic medical supplies such as gauze, bandages, or tongue blades. The nurse also informed us that she was bringing in her own flashlight and portable otoscope. There is also a second work area for the second RN. This area consists of a desk in the hall with two chairs. There is no other medical equipment or supplies. There is no privacy or confidentiality for the patients

A review of the 7362 tracking log indicates that approximately 68% of the patients who submit a 7362 form are seen and assessed within 24 hours. In our review of the unified health record (UHR), not all inmates' complaints are being appropriately assessed. The RN is not using the Nursing Protocol Encounter forms or administering over the counter medication.

### 5.3.4    Minimum Yard/Elm Hall

Elm Hall is part of the Minimum Yard. It houses approximately 170 high risk and frail inmates. Most of these inmates have some type of chronic medical condition. The housing unit has a clinic in the building. This clinic is staffed 7 days per week with one MTA, who has been in this assignment for the past 1.5 years. The clinic is adequately stocked but needs ongoing routine cleaning.

According to the MTA in Elm Hall, the 7362 forms are collected daily. She forwards them to the Front clinic RN. When asked what happens if a patient complaint appears to be urgent, she stated that she calls the physician or sends the patient to the ER. She said that the nurse will not come to Elm Hall to assess the patients. All patients are ducated to Front clinic for FTFT. According to the MTA, they have been able to stay current on routine sick call and chronic care. She stated that Dr. Corcoran, the new HCM, conducts clinic 3 days a week. She said he has been doing 2 jobs and has decreased the number of days he is coming to Elm Hall. According to the MTA, there are 22 patients waiting to see a PCP for routine sick call, and 31 pending chronic care appointments. A review of 15 7362s submitted on 2/13/06, indicated that 8 patients were seen and assessed within the 24-hour timeframe.

### 5.3.5    West Yard

The West Yard clinic serves approximately 1,400 Level 2 general population inmates. The clinic sanitation was poor, the floors were dirty, and the tiles on the floors needed repair. The staff reported that the sink was leaking, the overhead lights were out, and the door lock was broken. They had requested these and other repairs to be completed months ago. The clinic has one exam room, which is poorly equipped. It has one exam table, an otoscope (which staff report has been broken for 6 weeks), a sink for hand washing, 3 desks, and 5 chairs. The main concern about this space is that two physicians share it. On the day of our visit, two physicians were utilizing the space. They each had a patient sitting in chairs; the MTA was sitting at her desk. We observed 7 patients being seen by the physicians in one hour. Of the 7 patients, one was placed on the table for an exam. There was a portable privacy screen used for privacy, but the space still lacked privacy or confidentially. Besides the one exam room for the physicians, there is a large open clinic area that serves as the work area for the nursing staff.

The clinic is staffed with one RN on the day shift Monday - Friday, one RN on the evening shift 7 day per week, 2 MTAs on the day shift 7 days per week, and one MTA on the evening shift 7 days per week. There is also an office tech who works 5 days per week.

The day shift RN is responsible for FTFT. The RN has been assigned to the clinic for 18 months and has worked at CIM for 21 years. The space where he performs FTFT is in the middle of the clinic in an open space. He has a desk, two chairs, and a vital sign machine. There is no other medical equipment or basic supplies. According to the RN, his FTFT consists of an interview and vital signs. If the patient's vital signs are abnormal or he appears to be ill, the RN has the physician see the patient the same day. If the

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page58 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 103 of 310
California Institution for Men (CIM)

patient's vital signs are normal and the patient wants medication, the RN gets a verbal order from one of the physicians. If the patient wants to be seen by the physician, the RN orders a routine appointment regardless of the need.

In reviewing UHRs, we found that the RN is not using the Nursing Protocol Encounter forms. He is not appropriately assessing and referring the patient to the PCP for evaluation. Patients who appear to have urgent medical symptoms are not seen by the physician, but instead, a verbal order is given for medication. In reviewing the 7362s, it appears that the RN is processing 58% of the 7362s within the 24-hour timeframe.

### 5.3.6    Medical Appeals 602

During our visit, we met with the medical appeals coordinator. The coordinator is an office tech, who has been in this acting position since 1/6/06. The previous appeals coordinator had recently been promoted to the institution's Health and Safety officer. The current appeals coordinator had processed 1,678 medical appeals in the past 4-6 months. He stated that all of the appeals are current and there are no overdue medical appeals.

In reviewing the list of medical appeals, we found that the majority of appeals are related to access to care, medication issues, and medical appliances. Unlike most prisons, the CIM medical appeals coordinator has full-time clerical support to process and track appeals, which probably accounts for the lack of overdue appeals at the institution.

# 5.4 Medical Reception Evaluation

The medical reception evaluation process does not result in the identification and appropriate treatment of serious medical conditions. There is inadequate space, staff, medical equipment and supplies, and privacy. Despite the high volume of intakes per day (average 125), only four hours per day are allocated for the physicians to obtain a medical history and perform physical examinations. There are frequent interruptions and down time during these periods. It is therefore not surprising that clinician evaluations are cursory and inadequate, notably for patients with serious medical conditions.

### 5.4.1    Initial Health Screening

The medical reception process takes place in Reception Center Central (RCC). The initial health screening is essentially unchanged from our visit of 2005. It begins in the Receiving & Release area room where custody staff interviews, photographs, and fingerprints inmates. The inmate is then sent to the MTA, who sits at a desk in an open area next to a holding tank full of inmates. It is somewhat noisy and the inmates potentially can overhear conversations between the MTA and patient. The MTA inquires about general health problems, administers a TB skin test, measures vital signs and, if the patient is diabetic, obtains a blood glucose level.

The next step is that the inmate is directed to a small booth where a nurse interviews the inmate and completes the initial health screening form. The nurse sits on one side of the booth. There is a metal grate covered with plexiglas, which separates the nurse from the patient. A small 4 x 6 inch opening in the lower right corner permits sound exchange. It is difficult to see and hear the person on the other side. Thus, observing the general physical condition, affect, and cognitive state of the patient would be difficult at best. There is no chair and the inmate must stand during the entire interview. It is a dehumanizing process.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page59 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 104 of 310
California Institution for Men (CIM)

We asked staff why nurses are interviewing patients in this arrangement. They said that it provided confidentiality and security, since the inmates are new arrivals and they do not yet know the security risk of the inmate. Yet, following this initial health screening, inmates are immediately sent to the RCC medical clinic across the hall to receive mental health and dental screening, and physical examinations. When this occurs, patients are interviewed without any physical barriers between health care provider and patient.

## 5.4.2    Medical Reception Examinations

The medical clinic is adjacent to a main hallway in a high traffic area. Due to the stabbing death of an officer last year, RCC is on a modified movement program, meaning that inmates are scheduled for appointments and activities according to race. If an inmate of another race has to be seen for an urgent medical appointment, the medical reception process completely shuts down. These daily interruptions virtually assure that scheduled physical examinations will not be completed, especially since medical reception physical examination only occurs during a four-hour timeframe.

For example, on 2/3/06, 112 inmates were scheduled and only 14 were completed; on 2/21/06, 102 inmates were scheduled for medical reception and only 26 were completed (see Table 9 below). During our visit, six physicians were assigned one day to perform physicals, yet most of the physicians sat around doing nothing for long stretches of time due to movement issues. Health care management decisions also contribute to the problem. On 1/26/06, 75 inmates were scheduled for medical reception physicals but only two were completed because a physician meeting was scheduled at the same time that physical examinations were scheduled.

*Table 9. CIM Completion of Scheduled Physical Examinations*

| DATE | Number of Patients Scheduled for Examinations | Number of Examinations Completed |
|------|-----------------------------------------------|----------------------------------|
| 2/21/06 | 102 | 26 |
| 2/22/06 | 118 | 73 |
| 2/3/06 | 112 | 14 |
| 1/24/06 | 68 | 25 |
| 1/26/06 | 75 | 2 |

Because of the high volume of newly arriving inmates each week, RCC bed space is maximized and inmates are transferred to other yards before the medical reception process is completed. This has resulted in patients being lost to follow-up examinations. Of 11 records we reviewed, three inmates had not had a physical examination (patient ▯▯▯▯, ▯▯▯▯▯, and ▯▯▯▯▯) and two inmates had not had their TB skin tests read. This presents a risk that inmates with undiagnosed illnesses such as tuberculosis may be transferred into the general population, placing staff and inmates at risk.

Examination rooms are dirty and inadequately equipped and supplied. Of six examination areas, two rooms did not have otoscopes or ophthalmoscopes. When the two clinicians were asked about the lack of equipment necessary to examine patients, both the physician and NP stated that they escorted patients across the across the hall to examine them if necessary. The physician also stated that examinations are "supposed to be cursory" and that in fact only inmates who want to be seen should be examined. The attitude of this newly-hired physician virtually guarantees poor examinations.

Our review of patient health records confirm that reception examinations at CIM are cursory even for patients with serious medical problems.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page60 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 105 of 310
California Institution for Men (CIM)

An example is a 43-year-old man who arrived at CIM on ███. He had a history of hypertension, diabetes, coronary artery disease, hyperlipidemia, low back pain with lower extremity weakness for which he was confined to a wheelchair, and morbid obesity. A physician saw the patient for his reception history and physical examination on ███. He noted that the patient had diabetes and congestive heart failure, but did not note that he had hypertension or coronary artery disease. The physician did not obtain any further history related to the patient's medical problems. On physical examination, the physician checked the boxes indicating that everything was normal. The patient had been receiving Lipitor and aspirin in the past. The physician did not order these medications or otherwise address this issue. **The patient died of an acute myocardial infarction on** ███. This patient did not receive appropriate care at CIM. The fact that he was not receiving aspirin may have affected the outcome in this case.

In another example, in ███, a 40-year-old patient (███) arrived at CIM with a history of cardiomyopathy and was pending a cardiac transplant. The patient also had a recent history of bilateral lower leg blood clots, for which he was being treated with a blood thinner. The physician (referred to above) did not obtain any medical history from the patient. When performing the physical examination, all boxes were checked normal except the extremities. There is no notation of heart sounds or the lungs. He did not order a chest X-ray or EKG. The physician did not document an assessment of the patient or develop a treatment plan.

Finally, a 33 year-old patient (███) who arrived in ███, presented a history of mitral valve replacement in ███ and a myocardial infarction in ███ The physician did not document any meaningful medical history and noted that the physical examination was completely normal. However, another physician who examined the patient 10 days later listened to the patient's chest and noted a metallic click that is associated with having an artificial heart valve.

The medical reception process is meaningless without thorough and medical histories and physical examinations and the development of an appropriate treatment plan.

# 5.5 Receiving & Release Process

We requested 15 records for review. Of the 15 records requested, two inmates had paroled and we were provided six of 13 remaining records. At CIM, the intrasystem transfer process consists of inmates transferring into CIM from other facilities, as well as inmates transferring from RCC into another CIM permanent population yard. A registered nurse sees the patient upon arrival to identify medical, dental, and mental health problems that require continuity of care.

The intrasystem process is taking place, however there are issues related to continuity of care. In two of six records, the nurse referred the patient to a physician; however, the visit did not take place in a timely manner. In one of six records, the nurse failed to refer the patient to a physician.

Another issue is that although an RN at the main complex reviews all records of inmates transferring into the facility, the respective yard clinic nurses are not aware of the medical needs of the newly arriving patients. Contributing to this problem is the fact that medical records of inmates are kept in RCC, a separate building. Therefore, when an inmate is transferred from RCC to another yard, the nurses in the new yard clinic do not review the health record to ensure continuity of care. To further review this, we requested records from East Yard but the records were not provided for our review.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page61 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 106 of 310
*California Institution for Men (CIM)*

## 5.6 Chronic Care

The Chronic Care Program has not been implemented at CIM. There is no system for identifying, tracking, or scheduling chronic care patients. In Elm Hall and on West Yard, patients with chronic illnesses are identified through the use of the medication lists. This is, however, not done on a continuous basis, so the list of chronic care patients is not up to date.

We reviewed the medical records of 19 patients with chronic illnesses. They were identified primarily from medication lists. The data is summarized in the table below (see Appendix for detailed records):

*Table 10. CIM Chronic Care Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed at appropriate intervals? | 2 | 17 | 0 |
| Is the patient's clinical status appropriately managed? | 1 | 16 | 2 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 7 | 9 | 3 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 5 | 6 | 8 |

Only 11% of the patients were being followed at appropriate intervals and only 6% were being appropriately managed.

An infectious disease trained physician sees patients with HIV infection. We reviewed five records of patients with HIV infection. In general, the physician is monitoring patients routinely. However, health records show that the patient medical histories and physical examinations are minimal, and medication side effects and adherence are never discussed. The physician often prescribes prophylaxis for opportunistic infections (PCP pneumonia and Mycobacterium Avium Complex) that are not clinically indicated, and in one case did not change an inappropriate antiretroviral regimen.

### 5.6.1   High Risk Patients

The High Risk Program has not been implemented at CIM. The clinicians have not been trained and there is no system for identifying, tracking, or scheduling high risk patients.

We reviewed the medical records of 11 high risk patients. The patients were identified using the medication lists. The data obtained is summarized in the table below.

*Table 11. CIM High Risk Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high risk physician? | 9 | 2 | 0 |
| Is the patient being followed at appropriate intervals? | 5 | 5 | 1 |
| Is the patient's clinical status appropriately managed? | 2* | 9 | 0 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 6 | 1 | 4 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 4 | 2 | 5 |

*One patient with stomach cancer was being managed by a specialist, without the involvement of the PCP.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page62 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 107 of 310
California Institution for Men (CIM)

As can be seen from this data, while most of the patients were being seen by a qualified high risk physician, only approximately 50% of them were being seen at appropriate intervals and only 18% were receiving appropriate care. (See Appendix for details.)

## 5.7  Medication Management and Administration

Medication administration and management is an ongoing problem at CIM. In reviewing the 7362 forms and talking to both the pharmacy and nursing staff, it was apparent that in many cases, patients are running out of essential medication. The cause of this problem is unclear but it was reported to us that even when a small number of inmates are sent to the prison with self-carry medications, the medications are confiscated. Likewise, when inmates transfer from RCC to other areas in the prison, their medications are not always sent with them.

The West clinic has a satellite pharmacy staffed with one pharmacist and one pharmacy tech. According to the SRN II over West clinic, the pharmacy's hours of business do not fit the needs of the clinic. The pharmacy hours are 0700-1500, Monday thru Friday. She stated the physicians are writing medication orders until 1600 daily. They have been told by the pharmacy staff that all orders must be written and received by the pharmacy by 1400 to have the prescription filled that day. Orders written on Friday afternoon don't get filled until the following Monday. On 3 day weekends, medication orders are not filled until Tuesday, therefore, the patient may not receive his medication until Wednesday.

During the tour of Front clinic, the SRN II informed us of the process for refilling medications. The office tech schedules patients for sick call according to the expiring medication list and also by refill requests from 7362 forms. While this approach would seem to ensure medication continuity, patients reported not receiving their medication in a timely manner. When we raised this issue at the exit conference, nurses reported that about 35% of self-carry medications sent out by the pharmacy are returned unclaimed. This is very time-consuming (for both pharmacy and nursing staff), costly, and concerning since patients are not receiving their prescribed medication.

In RCC, the medication room was dirty. MTAs prepare medications from stock bottles of bulk prescription medications. There is no accountability for these stock bottles and the system is vulnerable to theft. In preparation for each medication administration pass, the MTA takes a pill from a properly labeled container and places it in an envelope labeled with only the patient's last name and location. The practice is unsanitary and results in medications being dispensed into improperly labeled containers, since the envelope is not labeled with information about the medication being dispensed.

On RCC, narcotics are double locked and counted each shift. A random count of several narcotics showed that all counts were correct.

On East yard, the Alpine and Butte housing unit medication rooms were clean and well-organized. Narcotics are kept in single locked cabinets. A random count of several narcotics showed that the counts were correct. However, on Butte, the MTA was pre-pouring medication, and drawing insulin for the afternoon and following morning shifts. This is a dangerous practice that is a violation of policy, basic nursing procedures, and pharmacy laws.

## 5.8  Specialty Services and Hospitalizations

There were problems related to the scheduling of off-site specialty consultations. The aging list revealed that there were 90 routine appointments that were over the 90 days. There was no tracking system for urgent appointments, so it was not possible to determine how many of these appointments were overdue.

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page63 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 108 of 310
*California Institution for Men (CIM)*

The most problematic referrals were for ENT, ophthalmology, GI, and renal. Some of these referrals had been ordered as far back as March and July of 2005. (See Appendix for details.)

We reviewed the medical records of 13 patients who had been seen in specialty clinics in order to evaluate the timeliness and quality of follow-up at CIM. The data obtained is summarized in the table below:

*Table 12. CIM Specialty Clinic Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Were the specialist's recommendations reviewed within an appropriate timeframe? | 3 | 7 | 3 |
| Did the PCP see the patient for follow-up within 14 days? | 1 | 11 | 1 |
| Did the PCP provide appropriate care at the follow-up visit? | 1 | 1 | 11 |

Patients were not receiving appropriate follow-up. Approximately 90% of the patients were not being seen for follow-up by their primary care physicians. (See Appendix for details.)

We reviewed the medical records of 9 patients who had returned to CIM following hospitalization at an outside hospital in order to evaluate the timeliness and quality of follow-up at CIM. The data obtained is summarized in the table below:

*Table 13. CIM Specialty Clinic Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Did follow-up with the PCP occur in a timely manner? | 2 | 7 | 0 |
| Was the follow-up provided by the PCP appropriate? | 6 | 0 | 3 |

Patients were not receiving appropriate follow-up. Approximately 80% of the patients were not seen for follow-up by their PCP in a timely manner and 33% had not been received any follow-up. (See Appendix for details.)

## 5.9 Urgent/Emergent Care

With the exception of the acute care hospital in the main facility complex, there is no space in the yard clinics dedicated to the treatment of medical emergencies. The CDCR policies currently define a "one size fits all" arrangement, which sends all onsite medical emergencies to a centralized emergency area regardless of the size, geography, and mission of the facility. These polices are not optimum for a facility like CIM where yard clinics are not within the main facility complex.

These is best exemplified by the stabbing death of a correctional officer at CIM in 2005 (see Office of the Inspector General (OIG) Report: Special Review into the Death of Correctional Officer Manual A. Gonzalez, Jr. on January 10, 2005 at CIM, March 16, 2005). Officer Gonzalez was stabbed in Reception Center Central, a yard clinic outside the main facility complex. When he was brought to the RCC medical treatment area, he was laid on the floor because there is no room dedicated for emergency treatment in the RCC.

The OIG report found that the medical response was disorganized and the facility was ill-equipped to handle the emergency. Medical equipment and supplies necessary to respond to a medical emergency were not available (intravenous access supplies and fluids), not functional (oxygen tanks), and not kept together for ready access. Staff lacked appropriate orientation training in the location and use of

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page64 of 65
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 109 of 310
*California Institution for Men (CIM)*

emergency supplies and equipment and emergency response. The report made several recommendations related to improving emergency medical response.

Although a few improvements have been made since the OIG's report, the bulk of the recommendations have not been implemented at CIM. Most disconcerting is that although the report recommended that the facility perform an assessment of emergency supplies and equipment and to ensure that they are readily accessible, this has not happened. In fact, key emergency supplies, most notably supplies to establish intravenous access have been removed from Reception Center Central. Staff reported that when the corrective action plan (CAP) was developed following the OIG's report, a decision was made to transport all emergencies either to the Triage and Treatment Area (TTA) located in the main facility complex, or transport the patient to a local hospital. However, RCC, West, and East Yard are all located outside the main facility complex, at least several hundred yards away (East Yard is 4 miles down the road) and through at least two security gates. Thus, in a life-threatening emergency the lack of emergency equipment and supplies to maintain the ABC's (airway, breathing and circulation) may be the difference between death and survival.

Court Experts were told that the supplies were removed because it was not in compliance with the CDCR policy. This is an example of adhering to a policy that is not appropriate to the situation. Although the severity of the Officer Gonzalez' injuries was such that his life could not have been saved, the availability of these supplies might save the life of a staff member or inmate in a similar circumstance in the future.

Of positive note, there is an emergency response bag with limited supplies, (e.g., gauze, tape, etc.)and automatic external defibrillator (AED) in each of the yards, and it is checked daily. In East yard, staff had attached the electrodes to the AED in anticipation of use; however, this may result in the pads drying out and voids the expiration dates. It should not be done.

### 5.9.1   Urgent Care Death Review

We found an example of poor urgent care in our patient record reviews. The patient was a 47-year-old man without any known medical problems. There was an entry in his medical record on ▮▮▮▮▮ from an MTA, noting that the patient's right ear was draining yellowish colored fluid, and that his neck and jaw were discolored and appeared swollen. The MTA further noted that the patient was complaining of pain. The MTA contacted the registered nurse and physician and obtained orders for antibiotics, Tylenol, and for the patient to be seen on Monday. The PCP saw the patient on Monday, ▮▮▮▮▮. There was no progress note but there were orders to transfer the patient to the hospital for a diagnosis of purulent otitis externa. There were no records from the hospital. The cause of death was noted to be a brain abscess.

The patient did not receive timely or appropriate care. The physician should not have ordered antibiotics for a potentially serious infection without having seen the patient. Furthermore, since the physician did not see the patient, he should have had him seen the next day to ensure that the infection was not getting worse. If the patient had received timelier and more appropriate care, his death may have been prevented

## 5.10 Medical Records

The medical records were extremely disorganized. Documents were often filed in the wrong sections of the chart and were not in chronological order.

The physicians stated that they often did not have the medical records when they were seeing the patients. (The medical records department had performed a study that found that approximately 35% of the time the medical record was not available for the physician.) Furthermore, the physicians stated that even when

Case3:01-cv-01351-TEH   Document2570-1   Filed03/18/13   Page65 of 65
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 110 of 310

*California Institution for Men (CIM)*

the medical records were available, necessary information such as laboratory, X-ray, and consultant's reports, was not in the chart.

Outpatient medical records were filed in two different offices – one in the Minimum Yard and one in Central. Staff noted that inmates are often transferred from one yard to another. The medical records supervisor stated that this is an inefficient system that increased the workload on her staff and contributed to the difficulties they had in keeping track of the records.

# 5.11 CIM Death Reviews

<u>Patient 1</u>

The patient was a 51-year-old man who was seen by a physician on ▬▬. The patient was complaining that he had been feeling sick for one to two weeks and that his eyes had been yellow for one week. The PCP noted that the patient had right upper quadrant tenderness and yellow sclera. His assessment was non-viral hepatitis. His plan was to order laboratory tests, rest, increased fluids, and follow-up in one week. There were, however, no orders in the chart and there was no documentation that the laboratory tests were obtained or that the patient was seen for follow-up. On ▬▬, the patient submitted a 7362 form noting that he was having stomach pains and that his urine was changing color. The 7362 was signed by a physician on ▬▬, but there was no accompanying note. Laboratory tests, obtained on ▬▬ revealed increased liver function tests, a bilirubin of 10.5 (normal range 0.1-1.5), and a positive hepatitis C antibody test.

The PCP saw the patient on ▬▬, and performed an appropriate evaluation. His assessment was jaundice and he ordered an abdominal sonogram, blood tests for tumor markers, an urgent GI consult, and follow-up in two weeks. The sonogram was performed on ▬▬. It was normal except for the presence of sludge in the gallbladder and possible stones. The tumor markers were elevated.

The PCP saw the patient on ▬▬ for continued pain and jaundice. On ▬▬, the patient's bilirubin was 22.7. The PCP ordered another GI consult. The gastroenterologist saw the patient on ▬▬ and recommended endoscopy.

On ▬▬, the PCP saw the patient and noted that he had been seen by the gastroenterologists and was supposed to return that week for follow-up. His assessment was jaundice with right upper quadrant tenderness and biliary blockage possibly due to cancer. He noted that the patient was scheduled to see the gastroenterologist and ordered follow-up in two weeks.

On ▬▬ the PCP saw the patient and noted that he was still complaining of abdominal pain and that he was scheduled to see the gastroenterologist for endoscopy and placement of a stent. On ▬▬, the patient presented with confusion, pallor, and jaundice. He was sent to the emergency department at Riverside Community Medical Center for further evaluation. He was diagnosed with sepsis, pancreatic cancer, and acute renal failure. He was subsequently found to have cancer of the pancreas with metastasis to the liver. He died on ▬▬.

Assessment:

The patient did not receive a timely evaluation of his medical problem. While timelier care probably would not have affected the eventual outcome, an earlier diagnosis would have, in all likelihood, prolonged the patient's life.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page1 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 111 of 310
*Avenal State Prison (ASP)*

# 6. Avenal State Prison (ASP)

Avenal State Prison (ASP) is a level 2 facility with approximately 7,200 inmates, which is 268% over design capacity. The prison houses inmates with unique custody, medical, and mental health needs including inmates with disabilities. It has six yards, each with a medical clinic, and an OHU with 29 beds. Approximately 6-8 beds in the OHU are for mental health patients and 6-7 are occupied by long term care patients.

ASP is not due to implement the Plata policies and procedures until 2007. It has also not yet received the additional staff needed to implement the Plata policies.

The facility is severely understaffed with respect to clinical, nursing, and ancillary support services. Of all the facilities the Court medical experts visited, none was more understaffed than ASP. Nursing triage and assessments are for all intents and purposes, not taking place. Access to physician appointments is months behind. For example, inmates who submitted Health Service Request forms (7362) in November 2005 have not yet been scheduled for physician appointments.

Chronically ill and medically complex "high risk" patients have not been identified, tracked, or scheduled for medical care. Medical contracts are in crisis with a number of contracts due to expire at the end of March. The lack of payment to specialists and other medical providers has led providers to be unwilling to provide medical care to this inmate population.

The medical experts visited ASP on March 6-8, 2006.

## 6.1 Organizational Structure

### 6.1.1   Facility Leadership

 The CMO is Dr. William McGuinness, who was assigned to the facility several months ago. Dr. McGuinness appears to be conscientious, but informed us he would be transferring to Corcoran State Prison in the near future. The facility is not allocated a Chief Physician and Surgeon position. Therefore, the medical leadership that is present at this time is transitory.

## 6.2 Health Care Staffing

### 6.2.1   Physician Staffing

In addition to the leadership issues mentioned above, there are major staffing problems at ASP. The institution is allocated 10 physician and surgeon positions. As of March 8, there were five vacancies and one physician was on military leave. In addition to the four physicians who were on site, there were two physician assistants (PAs). (Three of the physicians and one of the PAs were state employees; the others were contractors.) We were also informed that three physicians (two who were currently working and one who was on leave) were under investigation and could be terminated.

Adding to the staffing problem is the fact that the physicians work four 10-hour shifts/week. This results in a staffing pattern where on some days, there are only one or two physicians on site.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page2 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 112 of 310
*Avenal State Prison (ASP)*

## 6.2.2    Nursing Staffing

ASP has two nursing supervisors who report to the Health Care Manager. Ms. Nina Thomas, SRN II, is responsible for clinical matters. She tours the yards to see how the medical clinics are functioning. Ms. Brenda Brown, SRN II, handles administrative functions such as staff hiring, orientation, scheduling, and training.

There are 29.6 registered nurse positions, of which 8.6 (29%) are vacant. There are two senior MTA positions and 29.5 (35%) MTA positions, of which 10 are vacant.

# 6.3  Tour of Housing Unit Medical Clinics

The clinics were generally clean. The examination rooms were generally well-equipped and supplied. Each room had an examination table, otoscope, ophthalmoscope, sink with running water, and medical supplies.

What is striking about the ASP medical clinics is that over 75% of the space is devoted to the dental program. In each yard clinic there is a dental operatory with two chairs, a dental lab, a dentist office, and a biohazardous waste room that contains a compressor for dental use. The remaining space in each clinic consists of one clinical examination room for the physician, an office for the psychologist, a medication room, and a miscellaneous room used for various purposes. In the Yard 2 medical clinic, the psychologist's office is being given to dental office technicians and the miscellaneous room has been assigned to the psychologist. Therefore, there is no space available for nurses to perform FTFT or for a second clinician to see patients.

The space issues have become more critical because the physician clinics are so backlogged, as shown in the following table:

*Table 14. Pending Physician Appointments by Yard*

| ASP Pending Physician Appointments by Yard | |
|---|---|
| Yard 1 | 214 |
| Yard 2 | 426 |
| Yard 3 | 130 |
| Yard 4 | 250 |
| Yard 5 | 470 |
| Yard 6 | 362 |

In each yard, the pending physician appointments are weeks and in several cases, months behind. In Yard 5, which houses approximately 1,000 medically needy inmates, the nurse reported that a physician is present in the clinic only two half-days per week. She acknowledged that there is a backlog of over 470 appointments to see the physician. She had developed her own system for scheduling patients and indicated that she did her best to prioritize patients. However, in reviewing the 7362 forms, it was unclear to us how patients were prioritized. The next date that she was scheduling patients to see the physician was 3/22/06. We looked through the stack of 7632s that she planned to schedule for that date. Many were from November and December 2005, and January 2006. Thus, some patients will not see the physician more than five months after submitting their requests. This is a critical access to care issue.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page3 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 113 of 310
*Avenal State Prison (ASP)*

### 6.3.1   Nursing Face-to-Face Triage (FTFT)

Because ASP is not one of the facilities scheduled to implement the Plata policies this year, the nurses have not been trained in health assessment and use of the nursing protocols. The nurses do attempt to perform a modified FTFT, which is important given the high backlog of physician appointments. However, it appears that each day they are seeing more patients on an unscheduled, urgent basis rather than as scheduled appointments.

## 6.4 Receiving and Release Medical Screening

We interviewed the two nurses responsible for the R & R process, toured the R & R clinic and reviewed records. The nurses are conducting medical screening of inmates transferring into the facility. They informed us that there were problems related to the continuity of medications.

The office used by the nurses to screen inmates transferring into ASP is a former storage closet. There are two desks in the office that make it very cramped and permits only one nurse to interview a patient at a time. This results in ineffective use of the second nurse. The office has a computer, however, it is not networked. The nurses reported that this interferes with their ability to communicate with pharmacy and the PHN.

The nurses report that only 50% of sending institutions complete the 7371 intrasystem transfer forms correctly. Few patients who have been prescribed essential medications have access to those medications when they arrive. For patients on self-carry medications, custody stores the medications with the rest of their property for transport, which is not immediately accessible to the patient. Instead, the officers should collect the self-carry medications from the patient and place them in the white transfer envelope. Upon arrival at the facility, the nurse could verify the medications with the pharmacy profile and return the medications to the patient. This does not happen. Some medications are nurse-administered and must be dispensed by the ASP pharmacy. However, the pharmacy closes at 5 p.m. and the nurses often do not complete their screening until 10 p.m. This invariably results in disruption of medication continuity.

The nurses also report that they conduct TB skin testing on all transferring inmates, even if they have just arrived from a reception center. This is medically unnecessary and a poor use of nursing time. It is only necessary to test individuals annually. We understood that the CDCR policy requiring TB skin testing upon transfer had been discontinued. However, staff are still conducing this test. We also noted that the TB syringes are kept in an unlocked cabinet. There was no accountability system for needles and syringes.

The nurses reported that when patients parole, they provide a supply of medications to take with them. However, the physician order for insulin for diabetic patients has often expired at the time or parole, and the nurse must obtain a new order. However, stocks bottles of insulin are kept in the clinics and are available for administration, regardless of whether a current insulin order exists. This implies that the MTAs in the yard clinics are administering insulin without a valid physician order. This is an illegal practice. The nurses stated that they have reported this practice before, but nothing has changed.

We noted that even when the R & R nurse documented a physician referral on the health screening form (7277), the referral almost never took place.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page4 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 114 of 310
*Avenal State Prison (ASP)*

## 6.5 Chronic Care

The Chronic Care Program has not been implemented at ASP. There is no system for identifying, tracking or scheduling chronic care patients. This is not unexpected since Plata policies and protocols have not been implemented at ASP.

We reviewed the medical records of 15 patients with chronic illnesses. They were identified primarily from medication lists. The data is summarized in the table below:

*Table 15. ASP Chronic Care Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| 1. Is the patient being followed at appropriate intervals? | 2 | 17 | 0 |
| 2. Is the patient's clinical status appropriately managed? | 1 | 16 | 2 |
| 3. Are appropriate laboratory tests, monitoring and consultations ordered? | 7 | 9 | 3 |
| 4. Are laboratory tests, monitoring and referrals occurring as ordered? | 5 | 6 | 8 |

Only 11% of the patients were being followed at appropriate intervals and only 6% were being appropriately managed.

### 6.5.1   High Risk Program

The High Risk program has not been implemented at ASP. The clinicians have not been trained and there is no system for identifying, tracking, or scheduling high risk patients.

We reviewed the medical records of 17 high risk patients. The patients were identified using the medication lists. The data is summarized in the table below:

*Table 16. ASP High Risk Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high risk physician? | 1 | 16 | 0 |
| Is the patient being followed at appropriate intervals? | 1 | 15 | 1 |
| Is the patient's clinical status appropriately managed? | 0 | 13 | 4 |
| Are appropriate laboratory tests, monitoring, and consultations ordered? | 1 | 12 | 4 |
| Are laboratory tests, monitoring, and referrals occurring as ordered? | 2 | 1 | 14 |

High risk patients were not receiving appropriate care. (See Appendix for details.)

## 6.6 Specialty Services and Consultation

### 6.6.1   Medical Contracts

At ASP, the SSA who manages the contract process reported that it is at a standstill in Sacramento. She submitted contract renewals, amendments, and new contracts requests to Sacramento as far back as March 30, 2005, and has not received approval for them.

She has communicated with staff in Sacramento regarding medical contracts, and was told that the Department of General Services (DGS) is holding up the contracts. At one point, medical services at CDCR were exempt from the bidding process but DGS has removed that exemption. The result is that if the facility does not have a contract with a provider, they cannot be paid. For example, if a patient is sent

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page5 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 115 of 310

*Avenal State Prison (ASP)*

to the local hospital with whom the institution has a contract and the patient is seen by a physician with whom the facility does not have a contract, the physician will not be paid. DGS has told all the facilities that they must get competitive bids for every contract.

The SSA provided us with a list of hospitals for which the state contracts will expire on 3/31/06. These hospital contracts will not be renewed due to the DGS competitive bidding requirement. However, the hospitals are not interested in submitting competitive bids for services. The loss of these hospital contracts will severely and adversely impact the ability of the facility to provide health care to inmates since these medical facilities are in close proximity to ASP. For example, one of the most frequently used medical facilities is the Fresno Community Hospital and Medical Center, which is about 90 minutes away. ASP will no longer be able to use this hospital. Instead, ASP will be forced to use medical facilities two-and-a-half hours away such as Alvarado, Madera Community Hospital, etc. In addition, ASP is limited in the care that can be provided at medical facilities like Twin Cities Community Hospital, because the anesthesiologist has not been paid since September 30, 2005, when his contract expired. The paperwork to renew the contract with the anesthesiologist was originally submitted March 30, 2005, **over one year ago,** and has not been approved.

Another example of the futility of the competitive bid process is ambulance services. There is only one ambulance service working with ASP. The facility had a contract with the ambulance service, which expired October 31, 2005. The contract has not been renewed. When the ASP Procurement officer spoke to a Sacramento contract analyst on March 3, 2006, he was told that the contract renewal request was sitting on a manager's desk and had not been processed or submitted to DGS for approval. ASP has continued to use the service; however, the ambulance service has not been paid for invoices that exceed $210,000.

Interviews with ASP staff suggest that the management of the medical contract process in Sacramento is completely disorganized. The SSA stated that she has submitted requests for contract renewals up to five different times because staff at Sacramento had no record of receiving the contract request. She is supposed to receive acknowledgement of received contracts but does not consistently receive such acknowledgement. On February 17, 2006, Sacramento staff sent her a list of 16 contract and amendment requests that she had submitted but were still unprocessed. Many of these requests had been submitted months earlier. Medical contract staff in Sacramento told her that she had to resubmit the contract requests after confirming with each of the 16 providers that they would accept the Relative Value for Physician (RVP) Rates or 125% of Medicare. If they did not agree, she was required to conduct a market survey. She was given 10 calendar days to complete the task. She resubmitted all the contracts requests and then was asked to refax three of the contracts.

The contracting process is completely broken. ASP is at risk of losing multiple outside providers because of lack of contracts and nonpayment of services. It does not make sense to submit medical contracts to the competitive bidding process. During our visit we contacted Mr. John Hagar, Court-Appointed Correctional Expert to advise him of our findings and develop emergent contract remedial measures until the arrival of the Receiver.

## 6.6.2   Off-Site Consults

An OT schedules off-site specialty consultations. She reported that a number of specialty services are seriously backlogged (see Table 17. Specialty Services Pending Appointments). Among the most backlogged are orthopedics consultations because the contract orthopedist had a stroke and has been unable to see patients. As a result, they have been sending patients to University Medical Center in Fresno. However, at the end of the month, that contract will expire and they will have no orthopedic provider.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page6 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 116 of 310
*Avenal State Prison (ASP)*

Ophthalmology is backlogged as well. They used to have three different ophthalmologists but now only have one. Consequently, they used to send 15 patients out per week but now can send out only three patients. Given the current backlog of 120 appointments, the current level of services is inadequate to meet the demand.

The facility no longer has readily available urology services and although the facility has used San Luis Obispo Urology Associates, staff reports that access to appointments is difficult.

*Table 17. ASP Specialty Services Pending Appointments*

| Type of Service | # of Pending Appointments |
|---|---|
| Orthopedics | 150 |
| Ophthalmology | 120 |
| Neurology | 60 |
| Cardiology | 36 |
| Gastroenterology | 35 |
| Urology | 35 |

### 6.6.3   On-Site Consults

Given the physician shortage at ASP and the fact that many patients with chronic illnesses have not yet been seen, it is reasonable to anticipate that the clinical demand for specialty services is much higher than what has to date been identified. Once there are adequate numbers of clinicians at ASP who are seeing these patients, the demand for specialty services will increase. Addressing the need for specialty services will present a significant challenge to ASP.

### 6.6.4   Specialty Services and Hospitalizations

We reviewed the medical records of 13 patients who had been seen in specialty clinics to evaluate the timeliness and quality of follow-up at ASP. The data is summarized in the table below. (See Appendix for more details.)

*Table 18. ASP Specialty Clinic Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Were the specialist's recommendations reviewed within an appropriate timeframe? | 3 | 7 | 0 |
| Did the PCP see the patient for follow-up within 14 days? | 1 | 9 | 0 |
| Did the PCP provide appropriate care at the follow-up visit? | 0 | 5 | 5 |

Patients were not receiving appropriate follow-up. Only 10% of the patients were seen by their PCP within 14 days as required by policy.

We also reviewed the medical records of seven patients who had returned to ASP following hospitalization at an outside hospital in order to evaluate the timeliness and quality of follow-up at ASP. The data obtained is summarized in the table below:

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page7 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 117 of 310
*Avenal State Prison (ASP)*

*Table 19. ASP Returnees from Outside Hospitalizations Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Did follow-up with the PCP occur within 5 days? | 0 | 7 | 0 |
| Was the follow-up provided by the PCP appropriate? | 2 | 0 | 5 |

Patients were not receiving appropriate follow-up. None of the patients were seen by their PCP within 14 days as required by policy.

## 6.7 Urgent/Emergent Care

In Yard 5 medical clinic, the nurse is appropriately using the urgent/emergent log. There is an emergency response bag in the clinic, however, the MTAs do not check the contents of the bag on a daily basis as is required by policy. A log book used to document checks of the emergency response bag showed that it had not been checked since 3/1/06.

Our review of patient health records showed that there are problems with inappropriate nursing assessments and referrals in urgent situations. For example, a 44-year-old patient presented urgently to the clinic on ▮▮▮▮▮ complaining that his testicles were swelling and he was having trouble urinating. An LVN saw the patient. The nurse noted that the patient complained of "severe pain in both testicles," which were red, swollen, and warm to touch. The LVN notified a registered nurse, who ordered Tylenol for the patient. The LVN scheduled the patient to see the RN the next morning.

The following day a physician saw the patient and noted massive scrotal edema with cellulitis. He performed incision and drainage that produced odorous serosanguinous fluid. He ordered antibiotics and sent the patient to the emergency department where he was diagnosed with Fournier's gangrene of the posterior scrotum and anterior perineum. He underwent surgical debridement, received intravenous antibiotics, and was discharged back to ASP where he was admitted to the OHU. This patient's condition was clearly urgent at the time he presented to the LVN. The LVN appropriately consulted a registered nurse who did not examine the patient nor contact a physician for guidance. There is no indication that the physician identified this as a delayed referral or that counseling and guidance were given to the nursing staff who made the decision.

## 6.8 Medical Records

The medical records were fairly well organized. We interviewed the HRT II, who is the Medical Records Supervisor. She appeared to be very conscientious and wanted to do a good job. She reported that, including herself, there are currently 13 medical record positions: three Medical Transcribers, five Health Record Technicians (HRT) I, and four OAs. Of those positions, two (40%) HRT positions and one (25%) OA position are vacant.

The HRT II pointed out that vacancies are due in part to bureaucratic hiring practices, wage issues, and working conditions. OT salaries are higher than HRT salaries and the discrepancy causes HRT staff to leave for higher paying positions. This is unfortunate because many of the new positions created as a result of Plata are OT positions, yet these higher paid positions require no knowledge of medical terminology as do the HRT positions. The week we were at ASP, an HRT left to become an OT because of higher pay.

The HRT II informed us that she was also leaving because medical records staff have not had a raise in seven years. The reason for this is that Bargaining Unit 4 (clerical support) has not had the same pay

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page8 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 118 of 310
*Avenal State Prison (ASP)*

increases as other bargaining units. It was her view that medical records staff should be included in either bargaining unit 20 (a medical support union) or 1 (an analytical union). Moreover, she reported that Department of Mental Health (DMH) Medical Record Directors receive a Recruitment and Retention bonus to stay competitive with community salaries, but CDCR staff do not receive the same bonus. She also reported that in DMH, HRT I positions were upgraded to HRT II, and HRT II positions were upgraded to HRT III.

She had several recommendations:

- Office Assistants in medical records should be upgraded to HRT I after one year because they have learned enough medical terminology to satisfy the minimum requirements for the position.

- HRT I should be upgraded to HRT II, and HRT II to HRT III, as in DMH.

- HRT II Supervisors earn the same salary as HRT II Specialists, yet have supervisory responsibilities. Supervisor salaries should be changed to reflect the increased responsibility.

## 6.9 Outpatient Housing Unit

ASP has an OHU with a 29-bed capacity. Staff reported that it is full most of the time and that the acuity of the patients is high. It is their opinion that many patients should be in a licensed facility such as a CTC.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page9 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 119 of 310
*High Desert State Prison (HDSP)*

# 7. High Desert State Prison (HDSP)

High Desert State Prison (HDSP) has an average daily population of approximately 4,714 inmates. It is a reception facility with approximately 480 new inmates arriving each week. According to Dr. Roach, the Health Care Manager, the Reception Center population has doubled in the last three months.

HDSP has four yards, a standalone Administrative Segregation unit, and a Correctional Treatment Center (CTC). The CTC has 32 beds, of which 10 are designated for mental health patients. Dr. Roach stated that approximately one third of the patients currently in the CTC are long term care patients, who require a skilled nursing facility, not a CTC. There is also a minimum security yard located outside the main prison grounds.

The medical experts visited HDSP on April 4-6, 2006.

## 7.1 Health Care Staffing

### 7.1.1   Physician Staffing and Leadership

HDSP is allocated a Chief Medical Officer/Health Care Manager, a Chief Physician and Surgeon, and six physician positions. The Chief Physician and Surgeon position is vacant.

Currently, five of the six physician positions are filled with three state physicians, one contract physician, and a NP. The contract physician is the only physician who is board certified and he will be leaving within the next couple of months. The remaining physician position is filled by a physician who is on ATO.

Given the size and mission of the institution, the allocated staffing is insufficient. Dr. Roach has done a staffing analysis and believes that the facility requires eight primary care physicians. Based on our observations and discussions with staff, we agree with Dr. Roach's assessment.

**Communication Needs**

The PCPs expressed concerns that they had difficulty communicating with consultants. They stated that in some of the clinics they do not have telephones in their offices. In addition, since they are often called away from their offices for meetings or emergencies, they thought it would be useful to have pagers.

### 7.1.2   Nursing Staffing and Leadership

Norma Acquaviva, RN, is a SRN III who has worked for CDCR since 1991 and has been in her position since 2001. Under her supervision are three SRN II positions, all of which are filled. There is one SR. MTA position, which is also filled. The facility is allocated 33.9 RNs, 28 MTAs, and five Psychiatric Technician positions. (See Table 20. for vacancies.)

According to SRN III Acquaviva, she has been able to fill eight RN positions in the past two months due to the recent salary increases. They continue to fill vacant psychiatric technician (PT) and MTA positions with registry staff.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page10 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 120 of 310
*High Desert State Prison (HDSP)*

Staff reported that all nursing supervisors currently work day shifts, Monday through Friday. Evening and weekend call is provided. SRN III Acquaviva stated that she would like to have a supervisor on all shifts but doesn't have enough supervisors to cover all the needed shifts and areas. The nursing supervision arrangement is not an optimal use of these positions but, given the inadequate number of positions, they are trying to make things work. During our visit and interviews with the supervisory staff, it appeared that they have a working knowledge of their areas of responsibility, but it is clear that closer supervision is needed to address some of the day-to-day issues.

It is required by law that an RN must supervise the clinical work of LVNs. However, at HDSP, this does not happen. The MTAs report to a SR. MTA, who reports to the HPC. However, the HPC is also an LVN. The SRN III does not supervise the HPC. This organizational structure results in inadequate healthcare supervision and should cease. It is also illegal.

The following table illustrates the nursing staffing and vacancies at HDSP:

*Table 20. HDSP Nursing Staff Positions and Vacancies*

| Position Title | Total FTEs | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| SRN III | 1.0 | 1.0 | 0.0 | 0 |
| SRN II | 3.0 | 3.0 | 1.0 | 0 |
| SR. MTA | 1.0 | 1.0 | 0 | 0 |
| RN | 33.9 | 31.0 | 2.0 | 9 |
| MTA | 32.0 | 23.0 | 9.0 | 29 |
| LPT | 5.0 | 1.0 | 4.0 | 0 |
| PHN I | 1.0 | 1.0 | 0.0 | 0 |
| Infectious Disease Nurse | 0.5 | 0.5 | 0.0 | 0 (non-funded) |
| Nurse Educator | 1.0 | 1.0 | 0.0 | 0 (non-funded) |
| Health Program Coordinator | 1.0 | 1.0 | 0.0 | |

### 7.1.3   Staff Orientation and Training

The Nurse Educator has been in his position for several years. He stated that the prison has received the new orientation handbooks and they have been incorporated into the orientation. He has developed a new employee orientation for the nurses, which consists of training in various nursing skills and procedures.

In reviewing his orientation packet, it appears that he is covering the mandatory training. The orientation for clinical staff is one week in a classroom setting. The RN receives an additional five days for the Plata and CTC policies. After the week of classroom training, employees are assigned to work in various areas of the institution to complete their orientation.

## 7.2 Tour of Housing Unit Medical Clinics

We toured yard clinics A, B, C, and Z unit. In general, sanitation of the clinics needs improvement. In some clinics, the floors and countertops were dirty, and the walls needed cleaning and painting. In each of the clinics, there was no schedule for frequency of terminal cleaning, i.e., stripping and waxing floors or cleaning walls cabinets and countertops. Staff reported that they have inmate porters but due to frequent lockdowns, there are days when they are not available to work.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page11 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 121 of 310
*High Desert State Prison (HDSP)*

The allocation of the clinic space should be addressed. In each of the clinics we toured there was only one exam room for patient care. The other non-clinical spaces were break rooms for the correctional officers, offices for nursing supervisors, and storage rooms. We support having break rooms, office space for supervisors, and storage space but with the limited space in the clinic, exam rooms for treatment should be the priority.

On B Yard, staff reported that last month when they had two clinicians examining patients, one clinician was seeing patients in the hallway of the clinic near the back door. The nursing staff in all of the clinics are providing treatment, giving injections, withdrawing blood, and collecting confidential medical data in the halls. This practice is unacceptable and should be addressed.

## 7.2.1   Equipment and Supplies

The examination room for the physicians is not well equipped or organized. The room is equipped with an exam table, chair, desk, otoscope, and exam light.

Nursing supervisors reported that there continues to be an ongoing problem ordering basic medical equipment and supplies. They stated that they place an order for medical supplies such as needles, syringes, and colostomy bags and then receive a call from the procurement office asking why they are ordering different gauge needles and different size colostomy bags.

One SRN II stated that she is the "highest paid MSS I in the state." She said she doesn't have time to focus on nursing since she spends much of her time dealing with equipment and supplies issues. The SRN II supervising the CTC made a similar statement, saying that this was the most frustrating part of her job. Recently, she devotes most of her time to trying to get bids to replace the old and outdated IV pumps. Due to the lack of medical information and Internet access at work, she takes time away from her family at night to research information for medical equipment and special supplies for CTC patients. She said, "The system boxes you in a small window; they don't want you to spend money so they make the system so laborious that the outcome is that you don't get what's needed to provide the appropriate care and treatment for your patients."

We interviewed a SRN II who was working with Washoe Medical Center to transfer a patient who had been hospitalized for months back to HDSP. This patient had a diagnosis of closed head injury with left open depressed skull fracture (facial/head trauma with multiple stab wounds). The patient had a craniotomy and would require extensive treatment after discharge. According to the SRN II, she has been organizing his transfer for a week. The CTC needs special medical equipment to provide care for this patient. According to the Washoe hospital staff, the patient will need specific respiratory and feeding tube equipment. The SRN II has been given no assistance from the business office in acquiring the needed medical supplies. She stated that the only thing she receives is a call requesting written justification and more bids. After jumping though all the required hoops, she arranged to rent the equipment. Due to the lengthy process of arranging CDCR clearance and delivery, she decided to drive her own vehicle to Reno/Carson City to pick up the equipment and supplies. As a result of these inefficiencies, this patient ended up spending more days in an expensive, acute care setting than was necessary.

## 7.2.2   A Yard

**A Yard** is a level 3 yard that houses approximately 1,000 inmates. The clinic is staffed with one RN on days and evenings five days per week, one MTA on days and evenings seven days per week, and one office assistant five days per week. There is no night shift nursing staff; night coverage is provided by the CTC rover MTA. According to the RN and the office assistant, sick call is provided five days per week. Until recently, the clinic has not had a PCP on a daily basis to perform routine and chronic care follow-up

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page12 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 122 of 310
*High Desert State Prison (HDSP)*

appointments. According to the OA, she is scheduling physician appointments three weeks out. On the day of our visit, Dr. Dial was seeing inmates who had been scheduled four weeks prior to our visit.

The RN on A Yard works the evening shift. The major part of her duties is conducting FTFT. The RN utilizes the only exam room, which is not well stocked or organized. The RN is consistently using the Nursing Protocol Encounter forms to document her assessment. Our review of UHRs showed that the majority of the inmates are being seen and assessed within 24 hours.

Although the FTFT is being conducted, not all assessments and referrals are adequate.

## 7.2.3   B Yard

**B Yard** houses approximately 1,200 level 4 general population inmates This includes the mental health inmates, ADA inmates, and a large chronic care population. The physician sick call line is held five days per week. The clinic is staffed with two MTAs, one RN, one office tech, and one Plata correctional officer on day shift. The evening shift is staffed with one RN, one MTA, and a Plata correctional officer. There is no nursing coverage on the night shift.

The clinic has one designated exam room, which is sparsely equipped. It has a sink for hand washing, an otoscope, and an exam light. The counter space is cluttered and disorganized. The other rooms are designated for the SRN II office and a break room.

According to the RN who works the day shift, the MTAs collect the 7362 forms daily and return them to the clinic RN. She then performs a paper triage and checks for any complaint that appears to be urgent. All routine FTFT is performed by the PM shift RN.

There are approximately 900 chronic care patients on B Yard. Nurse Morgan stated that one of her greatest concerns is the unavailability of the UHR when assessing a patient. The nursing staff informed us that they are seeing the majority of inmates without the UHR because the Medical Records office will only deliver records once per day. If a patient walks in the clinic and the UHR is urgently needed, the only way staff can get it is with the permission of the HRT II.

The evening shift RN said she is assigned a Plata officer, who escorts the patients to the clinic. She said that at times, she has to wait until the physician is done with his sick call before she can start seeing patients in the only designated exam room.

Our review of the 7362 logs and UHRs show that a majority of patients are being seen within the 24-hour timeframe. The nurses are utilizing the Nursing Protocol Encounter form to document their assessment and plan of care. OTC medications are being used. The RN is maintaining an accountability system for all OTC medications that are administered to patients.

## 7.2.4   C Yard

**C Yard** houses approximately 1,100 level 4 general population inmates. The clinic is staffed with two MTAs, one RN, one office tech, and one physician on day shift. Physician and RN sick call is performed five days per week. One RN and one MTA are assigned to evening shift.

The RN currently assigned to perform FTFT on the evening shift has worked at HDSP for three months. She appears to be unsure of the routine and states that she is continuing to learn the system. She said that the correctional officer and the MTA assist her with any problems that come up. When we was asked if

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page13 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 123 of 310
*High Desert State Prison (HDSP)*

she brought these issues/concerns up with her supervisor, she said that she rarely has the chance to consult with other RNs so she relies on her co-workers.

In reviewing her 7362 documentation, she is using the Nursing Protocol Encounter forms to document her assessments. Her assessment skills and patient referrals appear to be adequate. She is seeing most of the patients who submit a 7362 form within the 24-hour timeframe. A review of her nursing sick call line on 3/13/06, indicated that of 22 inmates scheduled for FTFT, 17 were seen within 24 hours. According to the office tech, appointments for routine physician sick call are being scheduled within 14 days of request.

## 7.2.5    Z Unit

**Z Unit** is the Administrative Segregation Unit. It is a standalone building that houses approximately 190 inmates who are locked in their cell 23 hours per day.

The clinic was adequately equipped with the required medical equipment and supplies. The room was neat but in need of deep terminal cleaning.

Z Unit has no designated staffing. An MTA on day shift makes daily rounds in Z Unit and conducts sick call with the physician once per week. Physician sick call is scheduled every Friday. The RN assigned to the specialty clinic is responsible for triaging 7362 forms and assessing the inmates Monday through Friday. We asked the MTA working in Z unit about pending sick call appointments. He produced a folder that contained computer printed lists of prior sick call appointments. According to this MTA, there was no backlog or delays for routine sick call appointments.

Our review of the RN sick call log and the 7362s indicated that FTFT is not being conducted daily. There was a 4-5 day delay for FTFT. The RN completing the assessment did not consistently use the Nursing Protocol Encounter forms to document their assessment. The RNs are not using the OTC medications. The nurse informed us that he stopped giving the inmates the OTCs because correctional officers continue to discard them after cell searches. Based on our review of six UHRs, there was a delay of three weeks for routine physician sick call.

## 7.2.6    TTA

The TTA room was organized but needed a deep cleaning. The medical equipment was functional and the daily log checks were current. The TTA is staffed seven days per week, 24 hours per day with one RN each shift.

During our visit, staff expressed concerns over the increasing workload and responsibility. Some of the duties include scheduled and unscheduled EKGs, and assisting with minor procedures (excisions, draining of abscesses and suturing). The TTA RN covers for R&R after hours on the rare occasion when new inmates arrive after the evening shift nurse leaves the yards.

## 7.2.7    Medical Appeals (602)

We met and interviewed the appeals coordinator, who has been in this position for the past five years. She receives assistance from a half-time AGPA from California Correctional Center (CCC).

We reviewed the past six months of medical appeals. In that time, they have processed over 850 inmate medical appeals. On the day of our visit, there were three overdue medical appeals. The three overdue appeals were all on the informal level. The staff reported that they do not have overdue appeals on the first or second level.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page14 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 124 of 310
*High Desert State Prison (HDSP)*

In reviewing the appeals, it appears that the volume of issues rank as follows: 1) ADA issues; 2) disagreement with treatment; 3) medication and; 4) access to care.

# 7.3  Receiving and Release Medical Screening

We toured the Receiving and Release (R&R) area of the prison, interviewed the nurses responsible for the intake process, and reviewed tracking logs and health care records to assess the reception and release medical screening process.

We found that the R&R medical screening process is taking place appropriately at HDSP. The nurses complete both the Receiving Health Screening form (7277) upon the arrival of the inmate into the facility and the intrasystem transfer form (7371) prior to inmate transfer. We interviewed the RN who has been working in the position for the past three years. She appeared to be both knowledgeable and conscientious regarding the intrasystem transfer process.

Although the initial screening process is taking place, there are problems with the referrals to the physician, the timeliness of medication continuity, and enrollment of inmates into the chronic care program.

We requested five health records of inmates who had recently been transferred to HDSP. Of the five records requested, staff retrieved four for our review. Three of the four records showed problems with continuity of medication and lack of timely physician or chronic care program referral.

## 7.3.1    Medical Reception

We reviewed the February 2006 new arrival screening worksheet, which the nurse uses as a tracking system for new arrivals. During this time, 48 new inmates arrived at the facility. The RN reported that she makes entries into the computerized log, but inmates sometimes arrive when she or the other RN assigned to R&R is not present. She said the A Yard nurses screen inmates when she is not present.

Our review of the R&R new arrival tracking list indicated that the patient history and physical exams are being completed within the required 14 days.

# 7.4  Chronic Care

The Chronic Care Program has been implemented at HDSP. Although patients with chronic diseases are being tracked, it did not appear that the lists were kept current. Many patients on the chronic care lists were no longer at the facility.

We reviewed the medical records of 20 patients with chronic illnesses. They were identified primarily from medication lists. The data is summarized in the following table:

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page15 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 125 of 310
*High Desert State Prison (HDSP)*

*Table 21. HDSP Chronic Care Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed at appropriate intervals? | 10 | 10 | 0 |
| Is the patient's clinical status appropriately managed? | 3 | 14 | 3 |
| Are appropriate laboratory tests, monitoring, and consultations ordered? | 10 | 4 | 6 |
| Are laboratory tests, monitoring, and referrals occurring as ordered? | 7 | 2 | 11 |

Only 50% of the patients were being followed at appropriate intervals and only 18% were being appropriately managed.

### 7.4.1   High Risk Program

The High Risk Program has not been implemented at HDSP. There is currently only one board certified physician and he will be leaving soon. There is no system for identifying, tracking, or scheduling high risk patients. Dr. Roach stated that he has been told that due to the lack of board certified physicians, high risk patients would not be housed at HDSP. Despite this, he stated that patients with high risk medical problems continue to arrive and stay at the facility.

We reviewed the medical records of 10 high risk patients. The patients were identified using the medication lists. The data is summarized in the table below.

*Table 22. HDSP High Risk Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high risk physician? | 0 | 10 | 0 |
| Is the patient being followed at appropriate intervals? | 2 | 7 | 1 |
| Is the patient's clinical status appropriately managed? | 1 | 7 | 2 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 4 | 6 | 0 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 4 | 5 | 1 |

As can be seen, high risk patients are not being followed by qualified high risk physicians, and the majority are not receiving timely or appropriate care. (See Appendix for details.)

## 7.5 Medication Management and Administration

Medication continuity and management continues to be problematic at HDSP. There are major problems with the pharmacy system. Patients do not receive their essential medications in a timely manner. This is true for both new prescriptions and medication renewal/refills. A large number of the 7362 Health Service Request forms are related to requests for medications – often multiple requests from the same patient for

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page16 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 126 of 310
*High Desert State Prison (HDSP)*

the same medications. Problems with continuity of medications were confirmed through discussions with clinical and nursing staff. Dr. Roach stated that pharmacy staffing deficiencies, physical plant issues in the pharmacy, and lack of an adequate software system all contribute to the medication management problems. The pharmacy staff echoed these same concerns.

HDSP is allocated three pharmacists and three pharmacy technicians. There is currently one full time pharmacist (contractor), one part-time pharmacist (contractor), and three pharmacy technicians (state employees). Both Dr. Roach and the full-time pharmacist stated that they needed more than the allocated staff; however, they also expressed concerns that the current pharmacy was not large enough to accommodate additional staff.

Another issue is the expiring medication list. According to the **B Yard** nurse, she renews medication on the expiring medication list. She stated that physicians don't have time to review and renew the essential and chronic care medication, so that task has fallen to the clinic RNs. An additional concern is that the inmate's self-carry medications are often confiscated by custody during cell searches.

## 7.6 Specialty Services and Consultations

There were problems related to the scheduling of on and off-site specialty consultations. Our review of the Specialty Services Aging Report revealed that there were 41 routine appointments that were scheduled over 90 days from the date of request. Staff stated that this backlog was a fairly recent occurrence and was likely due to the recent addition of more primary care providers. They also stated that more transportation staff would help alleviate the problem.

Staff said that over the last few months there had been a marked increase in the number of requests, especially urgent ones. There were no urgent appointments that were scheduled over 14 days from request.

We reviewed the medical records of 12 patients who had been seen for off-site specialty care. The data is summarized in the table below:

*Table 23. HDSP Specialty Services Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Were the specialist's recommendations reviewed within an appropriate timeframe? | 8 | 4 | 0 |
| Did the PCP see the patient for follow-up within 14 days? | 5 | 7 | 0 |
| Did the PCP provide appropriate care at the follow-up visit? | 5 | 1 | 6 |

There were problems related to the follow-up of specialty care appointments. An RN was reviewing the consultant's recommendations when the patient returned to the facility in only 67% of the cases. The PCP was seeing the patients for follow-up within the proscribed timeframe in only 42% of the cases. (See Appendix for details.)

In the cases where timely follow-up with the PCP did occur, the specialist's report was often not in the medical record at the time the PCP saw the patient nor at the time of our review.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page17 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 127 of 310
*High Desert State Prison (HDSP)*

### 7.6.1   Returnees from Outside Hospitalizations

We reviewed the medical records of eight patients who had returned to HDSP following hospitalization at an outside hospital to evaluate the timeliness and quality of follow-up at HDSP. The data is summarized in the table below:

*Table 24. HDSP Returnees from Hospital*

| Question | Y | N | N/A |
|---|---|---|---|
| Was prior care appropriate? | 4 | 4 | 2 |
| Did follow-up with the PCP occur in a timely manner? | 2 | 8 | 0 |
| Was the follow-up provided by the PCP appropriate? | 1 | 2 | 7 |

Prior care was appropriate in only 50% of the cases. PCP follow-up occurred in a timely manner in only 20% of the cases. In a majority of the cases, the patient was never seen for follow-up. (See Appendix for details.)

## 7.7 Medical Records

The medical records were disorganized. Documents were often filed in the wrong sections of the chart and were not in chronological order.

The physicians stated that it was common for them to not have a medical record when they saw a patient. Furthermore, the physicians stated that even when the medical records were available, necessary information such as laboratory, X-ray, and consultant's reports was not in the chart. They stated that it usually took one month or longer for X-ray results and consultant's reports to be filed in the medical record.

Our review revealed that important information such as progress notes and records from consultants and outside hospitals, was often not available even several months after the date of the encounter.

Outpatient medical records were filed in two different offices – one in the Minimum Yard and one in Central. Staff noted that inmates are often transferred from one yard to another. The medical records supervisor stated that this is an inefficient system that increased the workload on her staff and contributed to the difficulties they had in keeping track of the records.

## 7.8 Death Reviews

We reviewed the medical records of the following 3 patients who had recently died at HDSP.

Patient 1

The patient was a 32-year-old man who died on ▮▮▮▮▮, as a result of a suicide by hanging. He was found in his cell. CPR was initiated and he was brought to the TTA. He was placed on a cardiac monitor but an AED machine was never used.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page18 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 128 of 310
*High Desert State Prison (HDSP)*

**Assessment:** There was a problem related to the emergency response. An AED should be used in all instances where CPR is initiated.

Patient 2

The patient was a 53-year-old man who died on ████████, as a result of an assault and head trauma. He was found in his cell. CPR was initiated and he was brought to the TTA. He was placed on a cardiac monitor but an AED machine was never used.

**Assessment:** There was a problem related to the emergency response. An AED should be used in all instances where CPR is initiated.

Patient 3

The patient was a 56-year-old man who had been transferred to HDSP from the California Medical Facility in ████. He was housed in CTC during his entire stay at HDSP. He had a complex medical history including hypopituitarism following surgery for a pituitary tumor, stroke with resultant right hemiparesis, coronary artery disease with a prior MI and cardiac surgery, an episode of shock, rhabdomyolysis, and acute renal failure from an adverse drug reaction, chronic renal disease, and hypertension. He was receiving multiple medications including Coumadin. His most recent INR had been obtained in ████.

On ████████, he was transferred from HDSP to St. Mary's Regional Medical Center in Reno for evaluation of an alteration in mental status. He was found to have a subdural bleed and an excessively prolonged INR, and a clotting problem due to Coumadin. He was making slight improvement in the hospital but suddenly died on ████████ from a suspected pulmonary embolus.

Review of his medical records from the CTC revealed multiple entries over the two weeks prior to his hospitalization in which the patient was noted to be lethargic. On the day before his admission, he was noted to be not responding as well as usual and to be somewhat obtunded. The physician noted that the patient did not "look well." Over this period of time, none of the physicians performed a neurological examination. A physician had ordered lab tests on ████████ but did not order an INR.

Assessment: The patient was not appropriately monitored. His INR had not been checked at HDSP since ████ and was found to be very prolonged upon his admission to the hospital. This was the most probable etiology of his bleed and, if not the direct cause, certainly contributed to it.

The patient did not receive appropriate care prior to his hospitalization. There are multiple notes indicating that he was not doing well, yet none of the physicians performed an adequate evaluation.

It is very probable that appropriate care could have prevented this death.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page19 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 129 of 310

*Pleasant Valley State Prison*

# 8. Pleasant Valley State Prison

Pleasant Valley State Prison (PVSP) has a population of approximately 5,000 inmates. There are four yards including a yard for disabled patients. The facility also has a CTC with 20 beds, five of which are designated for mental health patients

At the Court medical experts visit in April 2005, the facility was experiencing a severe shortage of physicians that continued throughout 2005. More recently, the facility has been successful in hiring physicians. However, our review showed that productivity is low among both physicians and nurses. The backlog of physician appointments is high, reaching 540 in one yard at the time of our visit. Nurses are performing FTFT, however, the quality of the assessments are generally poor and PVSP needs increased nursing and medical supervision to help the nurses improve. There is no chronic illness care program.

Specialty services appointment tracking is in disarray and patients are not receiving specialty care appointments in a timely manner, even for serious conditions such as cancer. The medical contract situation is primarily responsible for inadequate access to certain specialty services such as urology and orthopedics. PCP appointments following consultations does not occur with any consistency.

There have been some improvements over the past year. Nurses now have access to well-equipped and supplied rooms to perform FTFT in a confidential setting. Organizationally, psychiatric technicians now report up the nursing chain of command as is true in other prisons.

The medical experts visited ASP on March 8-10, 2006.

## 8.1 Organizational Structure

### 8.1.1   Facility Leadership

Dr. Alvarez, the Chief Psychologist, is the acting Health Care Manager but reported that he has no responsibility or authority over the medical program. Until recently, Robert Chapnick, MD, from HCSD headquarters was the acting CMO but a contract physician, Dr. Igbinosa, now occupies the position. The SRN II and the CHSA II were not present for the site visit and were reported to be at a conference.

## 8.2 Health Care Staffing

The staff at PVSP seemed extremely motivated and concerned about the patients. Many of those we spoke to stated that they were considering applying for permanent state positions. Many of the problems and concerns in this report result from the major staffing problems that existed at PVSP during the fall and the resulting backlog of appointments. We are hopeful that with the recruitment of these new providers, PVSP is on the way to creating a quality health care program.

### 8.2.1   Physician Staff

PVSP is allocated eight primary care physician positions. At the time of our visit, they had 9.5 full-time physicians (7 physicians and 2.5 mid level providers). Most of these positions were filled by contractors.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page20 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 130 of 310
*Pleasant Valley State Prison*

## 8.2.2    Nursing Staff

Although the majority of RN positions are filled, only 45% of MAT positions are filled. The following table shows the current nursing staff at PVSP:

*Table 25. PVSP Nursing Staffing and Supervision*

| Position | Total FTE | Filled | Vacant | Comments |
|----------|-----------|--------|--------|----------|
| SRN III  | 1.0       | 0.0    | 1.0    | 1 acting |
| SRN II   | 3.0       | 0.0    | 3.0    | 3 acting |
| SR. MTA  | 2.0       | 0.0    | 2.0    | 1 acting |
| PHN      | 1.0       | 0.0    | 1.0    |          |
| RN       | 25.62     | 22.0   | 3.62   |          |
| MTA      | 35.3      | 16.0   | 19.3   |          |
| LPT      | 6.5       | 5.0    | 1.5    |          |

## 8.2.3    Staff Orientation

The current nurse educator has been in the role for four years. She has worked hard to develop the training and orientation program at PVSP. In reviewing her orientation outline, it appears that she has done a thorough job covering the mandatory training. The PVSP orientation is two weeks in a classroom setting that covers the local institution,  and Plata and Coleman policies and procedures. As part of the Plata orientation, the RNs are evaluated on competency for all of the nursing protocols. The validation is hands-on with the nurse educator evaluating the patient with the new employee. After the two weeks of classroom orientation, the employee is assigned to work in a different area of the institution to receive on the job training as well.

The nurse educator has also developed an ongoing training program that includes such classes as care of the diabetic patient, skin assessment, lung assessment, what inmates should know about communicable diseases and emergency response. She has developed an annual calendar that lists all scheduled training for the year.

# 8.3  Tour of Housing Unit Medical Clinics

We toured yard clinics A, B, C, and D. In general, sanitation of the clinics was poor and could benefit from routine scheduling of stripping and waxing of the floors. In some clinics, the walls needed cleaning and painting. None of the clinics had a schedule for frequency of terminal cleaning, i.e., stripping and waxing floors, or cleaning walls, cabinets, and countertops by inmate porters. In addition, the clinics do not appear to be well organized with respect to basic supplies and forms.

When the Court medical experts last visited PVSP in April 2005, nurses did not have access to clinic rooms that were adequately equipped and supplied to perform FTFT. This has changed and nurses now perform FTFT in appropriately equipped and supplied rooms.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page21 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 131 of 310
*Pleasant Valley State Prison*

### 8.3.1    A Yard Clinic

**A Yard** clinic was moderately clean, but the clinic had recently lost the inmate porter because he was not supervised by custody staff and reportedly stole things from the clinic. The inmate porter has not been replaced.

The front office used by the MTAs was cluttered and disorganized. A cabinet containing multiple narcotics, needles, and syringes was unlocked. We checked the count for two of the narcotics and found them to be correct. Recently, the pharmacy ordered small lockable wall cabinets to be used to store the narcotics, however, the cabinets were too small to hold all the medications. The needle count was off by ten syringes. Staff reported that they had not yet documented patients who had received insulin that morning. The MTA had not documented the administration of the morning medications. He stated he could try to remember to whom he gave the medications. He said that he thought he gave medications to close to 75 patients that morning. This is not good nursing practice.

We observed the RN using a syringe and then recapping the needle and carrying it around for approximately 10-15 minutes. There was no sharps container in the nurse's or physician's office where the injection was administered.

Prior to our arrival at the clinic, we were informed that the clinic was approximately 540 physician appointments behind. We interviewed the OT who schedules patients using the computer tracking program (SATS Lite). She advised us that that they were current on scheduling registered nurse FTFT. However, upon further discussion we learned if a patient submitted a 7362 that day (Thursday), the nurse would not see the patient until next Monday or Tuesday. This is because the OT schedules only 12 patients per day for both the physicians and the registered nurses. She says that they also see a few unscheduled patients each day. The following tables show a sample of schedules for both physicians and nurses.

*Table 26. PVSP Nursing Appointments Scheduled and Seen*

| Date | Scheduled | Add Ons | Total | Actually Seen |
|------|-----------|---------|-------|---------------|
| 3/3/06 | 6 | 5 | 11 | 9 (81%) |
| 3/6/06 | 11 | 2 | 13 | 13 (100%) |
| 3/7/06 RN 1 | 12 | 1 | 13 | 13 (100%) |
| 3/7/06 RN 2 | 9 | 0 | 9 | 5 (55%) |

*Table 27. PVSP Physician Appointments Scheduled and Seen*

| Date | Scheduled | Add Ons | Total | Actually Seen |
|------|-----------|---------|-------|---------------|
| 2/17/06 | 15 | 3 | 18 | 12 (67%) |
| 2/20/06 | 12 | 2 | 14 | 8 (57%) |
| 2/21/06 | 12 | 1 | 13 | 0 (0%) |
| 2/22/06 | 10 | 1 | 11 | 5 (45%) |

For both nurses and physicians, the number of scheduled appointments is extremely low. For physicians, the number of patients seen is shockingly low given the current backlog. Mr. Steve Fama identified this issue in a previous visit. However, there has been no improvement with respect to productivity. In addition, we were told that the physicians have a daily meeting at 3 p.m., reducing the amount of time available to see patients. We were also told that the physicians were instructed to see all scheduled

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page22 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 132 of 310
*Pleasant Valley State Prison*

patients each day, but the low number of patients being scheduled, combined with counts, meetings, etc., has cut down on the amount of productive time.

## 8.3.2   C Yard Clinic

**C Yard** houses approximately 1,200 level 3-4 general population inmates. The clinic is staffed on day shift with three MTAs, one RN, one LVN, one office tech, and one physician. Physician and RN sick call is performed five days per week. The RN currently assigned to perform FTFT on C Yard has been given a room that is equipped with an exam table, desk, chair, otoscope, blood pressure cuff, thermometer, and stethoscope. The room is not equipped with direct lighting, a pulse oximeter, or a peak flow meter. As a result, the RN is not able to perform a comprehensive assessment. The RN said that she is behind 3-4 days for FTFT. The RN has an LVN to assist her with running the FTFT line. The LVN measures vital signs, requests UHRs, and calls the housing units to ensure the inmates are sent over. When we asked the RN why she was behind in FTFT even with extra help from the LVN, she stated that it was due to the high volume of 7362 forms that she receives. She said that C yard receives 30-40 7362s every day and that she can not keep up with this number of requests. According to the OT, the physician sick call line is being scheduled out 3 to 4 weeks.

## 8.3.3   D Yard Clinic

The RN assigned to **D Yard** is a registry nurse has worked at PVSP for five months and has been assigned to D Yard for the last three months. She said that her primary function was to triage and process the 7362 forms. She has a room where she performs her duties, which is equipped with two chairs, an exam table, otoscope, thermometer, blood pressure cuff, stethoscope, and a sink for hand washing. There is no direct lighting, peak flow meter or pulse oximeter. The room also has a shelf with a nursing reference book, drug handbook, PDR, and a lab value book. When we asked about the books, she stated that she brought then from home since there were no reference books in the clinic.

During the visit, we observed the process for FTFT. On the day of our visit, there were only seven inmates scheduled for FTFT and assessment with the RN. Of those seven appointments, none were in compliance with the 24-hour timeframe. When we asked the RN about the backlog and timelines of the triage, she stated that she was attempting to catch up the backlog from when she was out ill.

We observed stacks of 7362 forms in the clinic that appeared to be for patients already seen by the nurse. The RN had not sent them to medical records to be placed in the charts. We reviewed some of the 7362 forms in the stacks along with the nurse's assessment. The majority of her documentation appeared to be adequate. In most of the cases, the RN took vital signs and appropriate action for disposition. She is administering medications according to protocol but stated that she still refers 60% of the inmates to physician sick call. At this rate, the backlog of patients waiting to be seen by the PCP will keep increasing and nurse-referred patients will not be seen in a timely manner. The OT assigned to D Yard said that she is scheduling routine appointments four to five weeks out.

On the day of our visit to D yard, there was a NP and a physician seeing patients. The NP stated that she is moved around to the different yards to help with the backlogs. The week of our visit, she had been on D yard three of the five days.

We witnessed an event on D Yard, which illustrates how custody issues impact the timely delivery of medical care. We were walking onto D yard toward the medical clinic when, across the yard, we saw a handcuffed inmate also walking toward the medical clinic with a correctional officer. We arrived at the clinic about the same time at 0915. The inmate was placed in the medical holding cell and the correctional officer left the clinic. The MTA proceeded to complete a Report of Injury form (7219). We asked the

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page23 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 133 of 310
*Pleasant Valley State Prison*

MTA what was going on. He explained that the inmate in the holding cell was in a fight and they brought him to the clinic for a body check for injuries.

We proceeded to the clinic exam rooms where there was a physician and a NP with no patients. We interviewed the NP for about 35 minutes. When we returned to the main office, the same inmate was in the holding cell. No other inmate had entered the clinic. We asked the MTA why there were no patients in the clinic for the past 40 minutes when there were two clinicians and an RN available. He stated this was typical. He said they would not allow other inmates in the clinic until the inmate involved in the fight was removed from the holding cell. We asked what else did they need to do with him, and the MTA stated that the 7219 was completed five minutes after the officers had left. The MTA informed us that the inmate must wait there until custody finds him a cell in the administrative segregation (Ad Seg) unit, which could take hours. It was 1 hour and 45 minutes before inmates were allowed into the clinic. Sick call and nursing FTFT could not resume until 1100 a.m.

### 8.3.4    D-4 (Administrative Segregation Unit)

**D-4** is part of the D Yard population. This Ad Seg unit houses up to 180 inmates, who are locked down up to 23 hours per day. This unit is staffed on day shift with one MTA, two Psych Techs and one RN for FTFT. A physician performs sick call line one day per week. At the time of our visit, there were a total of 62 inmates awaiting sick call. Since sick call is only performed one day per week and the average number of inmates seen in ASU each week is 12, it would take about five weeks for the inmates to be seen, assuming no other inmates are added to the list.

In our prior visit, the medical exam space for this area was a converted broom closet. They have recently provided the medical staff with a room in the unit, which has enabled the medical staff to equip the space with an exam table, vital sign machine, sink for hand washing and other medical equipment and supplies needed to provide patient care. Although the space is not ideal, it is a great improvement.

## 8.4 Receiving and Release Medical Screening

To assess the reception and release medical screening process we toured the R&R area of the prison, interviewed the nurses responsible for the process, and reviewed tracking logs and health care records. We found that the R&R medical screening process is appropriately taking place at PVSP. The nurses complete both the Receiving Health Screening form (7277) upon the arrival of the inmate into the facility, and the intrasystem transfer form (7371) prior to inmate transfer.

We interviewed the RN who has been working in the position for the past year. She appeared to be both knowledgeable and conscientious regarding the intrasystem transfer process. We reviewed the new arrival screening worksheet that is used as a tracking system for new arrivals for January 19, 2006. On that day, 46 new inmates arrived at the facility. Although the RN's work hours are 0600 -1430, when she is informed of a bus schedule, she will adjust her hours to meet the bus. She stated that there are a few inmates who will be transferred in after she leaves work. The TTA nurses screen inmates when she is not present. The TTA nurses do not enter the inmates into the screening worksheet, but they do enter the names into SATS Lite when they have time. This process invariably will result in patients being lost to follow-up.

Although the initial screening process is taking place, there are problems with the referrals to the physician, the timeliness of medication continuity, and enrollment of inmates into the chronic care program. We requested a total of 12 health records of inmates who had recently been transferred to PVSP

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page24 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 134 of 310

*Pleasant Valley State Prison*

with a medical problem or who were on medication. Of the 12 records requested, staff retrieved 10 for our review. Eight of the 10 records showed problems with continuity of medication and lack of timely physician or chronic care program referral.

### 8.4.1   Medical Appeals 602

During our visit, we interviewed the appeals coordinator, who has been in this position for the past year. We reviewed the past six months of medical appeals. In the past six months, she has processed over 3,396 inmate medical appeals. On the day of our visit, there were a total of 261 overdue medical appeals. There were 92 informal overdue appeals, 135 overdue first level appeals, and 34 overdue second level appeals. The appeals coordinator said that this was the highest number of overdue appeals he had seen since taking this job. He stated that when he took time off, there was no replacement to ensure that the medical appeals were being addressed in a timely manner.

Given the large volume of medical appeals at PVSP, it would be beneficial to have clerical support for the appeals coordinator. The current appeals coordinator has only recently been provided with clerical support. The office tech currently assigned to assist with processing medical appears is temporary and could be reassigned other duties at any time. A permanent position should be assigned to assist in this area.

## 8.5 Chronic Care

The Chronic Care Program has not been implemented at PVSP. There is no system for identifying, tracking or scheduling chronic care patients. The chronic care forms have not been implemented.

We reviewed the medical records of nine patients with chronic illnesses. They were identified primarily from medication lists. The data obtained is summarized in the table below.

*Table 28. PVSP Chronic Care Patient Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed at appropriate intervals? | 4 | 5 | 0 |
| Is the patient's clinical status appropriately managed? | 1 | 7 | 1 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 5 | 3 | 1 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 5 | 2 | 2 |

Approximately 45% of the patients were been seen at appropriate intervals and only 12.5% were receiving appropriate care. This was largely due to the fact that the physicians had not been received training related to the chronic care program.

### 8.5.1   High Risk Patients

The High Risk Program has not been implemented at PVSP. There is no system for identifying, tracking, or scheduling high risk patients.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page25 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 135 of 310
*Pleasant Valley State Prison*

We reviewed the medical records of 12 high risk patients. The patients were identified using the medication lists. The data obtained is summarized in the table below.

*Table 29. PVSP High Risk Patients Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high risk physician? | 9 | 3 | 0 |
| Is the patient being followed at appropriate intervals? | 4 | 8 | |
| Is the patient's clinical status appropriately managed? | 4 | 7 | 1 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 5 | 3 | 4 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 2 | 4 | 6 |

Seventy-five per cent of the high risk patients were being seen by qualified high risk physicians. However, due in part to the shortage of physicians noted above, approximately 65% were not being seen at appropriate intervals and were not receiving appropriate care. (See Appendix for details.)

## 8.6 Medication Management and Administration

Medication administration and management appears to be an ongoing problem at PVSP. When reviewing 7362 forms, we found that in many cases, the inmates had run out of essential medication and were requesting refills. There are also problems with the pharmacy not honoring the medication profile of inmates arriving at PVSP. We were told that the only profile the pharmacy will honor is from Wasco State Prison, which is stamped with a red stamp stating "prescription on file." The RN assigned to R&R has to rewrite all other orders and then take the charts and the medication order to the physician for review and sign-off. It sometimes takes 1-2 days to track down the physician who is on call. We were told that it sometimes takes 5-6 days to obtain an inmate's medication after arriving at PVSP. The nursing staff also stated that due to the absence of a physician on a daily basis, the nurses have to reorder essential medication without the patient being examined for the condition for which the medication was prescribed.

The yard RNs and MTAs report that the transfer of inmates from one yard to another is a contributing factor to the medication problems. This movement causes delays in medication administration and lack of continuity.

In addition, the physicians are not consistently receiving the expiring medication lists. If the expiring medication list was used more effectively, it would reduce the high volume of inmates running out of essential medication and reduce the number of orders written by the RNs.

## 8.7 Specialty Services and Consultation

To assess specialty services, we interviewed staff and reviewed health records, tracking logs, and Request for Services (7362) forms.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page26 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 136 of 310

*Pleasant Valley State Prison*

Specialty services staff at the facility consists of three RNs, an LVN, and two OTs. The RNs handle Utilization Management, Telemedicine, and Onsite Services. The LVN schedules outside appointments and the OTs enter data into the tracking system.

Specialty services are very chaotic. Due to medical contract issues, there are serious problems with access to specialty services such as urology and orthopedics.

## 8.7.1   Specialty Services Tracking

The OTs responsible for scheduling are not entering consultation requests into the computer until after an appointment has been made. Therefore, there is no reliable tracking system for pending requests. We reviewed several requests that had not yet been entered into the computer. None of the following requests had been appointed or entered into a tracking log:

- An urgent radiation oncology request dated ▮▮▮▮, for a patient with basal cell carcinoma of the face with possible facial bone metastasis.

- An urgent surgery request dated ▮▮▮▮, for a patient with end-stage lung cancer with metastasis so that the patient could receive adequate hydration and pain control.

- A colonoscopy request dated ▮▮▮▮, for a patient with hepatitis C and GI bleeding.

- An urgent ophthalmology request dated ▮▮▮▮, for a diabetic with decreased vision.

Staff also reported that custody staff does not permit the OTs to put the actual date of the appointment into the tracking log. Instead, they are required to enter a code known only to the OTs. **This is the only facility we have audited where custody staff does not permit the actual date of the appointment to be entered into the computer tracking system.** Therefore, if a physician needs to know how long it will be until the patient's appointment, the information is difficult to obtain and impedes the clinical monitoring of patients with pending specialty appointments.

There are other custody issues that adversely impact access to services. Staff reported that for on-site specialty services (e.g., podiatry, MRIs) custody often, for various reasons, does not escort all patients to the clinic who are scheduled for an appointment. This results in missed appointments and delayed access to care. For example, MRIs are performed every Friday. Typically, if ten patients are scheduled for an MRI, only eight are delivered by custody to receive the service. One patient, (▮▮▮▮) had to be rescheduled several times before custody would bring him to the appointment.

There are other reasons for delay in care. For example, the most recent CT scan clinic was cancelled because they did not have IV contrast material or IV injectors.

Specialty services staff reported that they are not notified if an inmate is about to be transferred to another facility. Therefore, an inmate who is scheduled for an urgent MRI may be transferred without the service being completed. This is not in compliance with policy.

## 8.7.2   Specialty Services Health Record Review

Review of health records shows that patients are not receiving consultation services in a timely manner and not receiving appropriate follow-up following the consultation. The following egregious case bears discussion.

On ▮▮▮▮, a 32-year-old inmate (▮▮▮▮▮▮) had a traumatic injury to his right hand. The following day a nurse saw the patient and arranged to send him to an outside hospital. The patient was diagnosed

Case3:01-cv-01351-TEH  Document2570-2  Filed03/18/13  Page27 of 50
Case 2:90-cv-00520-KJM-SCR  Document 4545-1  Filed 04/11/13  Page 137 of 310
*Pleasant Valley State Prison*

with a broken finger and referred to a hand surgeon, who performed surgery involving pin placement and casting on ▆▆▆▆. The orthopedic surgeon requested a follow-up appointment on ▆▆▆▆. A nurse saw the patient upon his return to the facility and referred the patient to a facility physician who saw him the next day. The physician examined the patient and requested that the patient return in two weeks. The follow-up appointment with the surgeon on ▆▆▆▆ did not take place as requested.

According to a nurse's note, the physician removed the patient's sutures on ▆▆▆▆. However, the physician did not write his own note. The patient was concerned about one of the pins catching on the gauze and wanted the cast taken off. The inmate stated that he should have just told the surgeon to amputate his finger because he would not be able to make a fist and fight. Later that day, the inmate took the cast off. Over the next few days, notes in the record document that the patient complained that his finger was infected, however, nurses did not refer the patient to a physician. On ▆▆▆▆ at 2000, an LVN saw the patient and noted that the finger was edematous with white "pustulent" blisters. The note said she would refer the patient to the RN the following day, but this did not take place. Beginning ▆▆▆▆, nursing notes document that the patient was self-mutilating his right index finger and demanding to have it cut off. The nurse advised custody to bring the patient to the TTA but this never occurred. On ▆▆▆▆, an RN tried to contact a physician but was unable to reach one. A NP saw the patient on ▆▆▆▆, and sent the patient out to the hospital where the surgeon amputated the patient's right index finger.

There were multiple problems with this case that led to the patient not receiving appropriate care following his surgery. Staff did not ensure he was returned to the surgeon on ▆▆▆▆ as requested. A physician did not appropriately monitor the patient upon his return to the facility, and failed to document an assessment on ▆▆▆▆. When the patient began requesting to have his finger amputated, mental health staff should have been consulted for case management. Finally, the nurses failed to refer the patient to a physician when the patient showed signs of infection and were unsuccessful in reaching a physician on ▆▆▆5.

We reviewed the medical records of 16 other patients who had been seen for specialty care. The data is summarized in the table below. (One of the patients is listed as Patient 1. His name and CDC # were mistakenly not written down at the time of the review).

*Table 30. PVSP Specialty Clinic Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Were the specialist's recommendations reviewed within an appropriate timeframe? | 9 | 6 | 1 |
| Did the PCP see the patient for follow-up within 14 days? | 3 | 13 | 0 |
| Did the PCP provide appropriate care at the follow-up visit? | 4 | 4 | 8 |

In a majority of cases, the consultants recommendations were being reviewed when the patient returned to PVSP. The patients were not, however, receiving timely follow-up with the PCP. Only approximately 20% of the patients were seen by their PCP within 14 days as required by policy. Of the patients who were ultimately seen for follow-up, only 50% received appropriate care. (See Appendix for details.) In addition, five of the consults had been ordered on an urgent basis. None of these patients were seen within two weeks as required by policy.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page28 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 138 of 310
*Pleasant Valley State Prison*

We also reviewed the medical records of nine patients with pending specialty consultations. Seven of the patients had overdue referrals that had not been scheduled. Six of these referrals had been made on an urgent basis. (See Appendix for more details.)

### 8.7.3    Medical Contract Issues

Currently, PVSP has no physical therapy or optometry services. Staff reported that the vendor who received the physical therapy bid could not fulfill the commitment, but that the contract process did not permit the contract to be awarded to the second place bidder. The same situation applies to optometry services. The bid was awarded to an ophthalmologist who wished to subcontract optometry services. This was not allowed under the contracting process and now the facility has no optometry services. They are currently backlogged 500 appointments. Unfortunately, the RN who schedules optometry consultations is entering appointment dates into the computer even though there are no services available. She is doing this because she hopes that, in the near future, services will be available.

Patients who were scheduled for urology appointments at Corcoran did not receive services because the urology contract expired. Patients with bladder cancer (██████) and possible prostate cancer (██████) have been rescheduled for services.

# 8.8 Urgent/Emergent Care

During our visit we inspected the TTA. The TTA is used to treat patients who present with urgent medical conditions. The room was organized, but needed a deep cleaning. The medical equipment was functional and the daily log checks were current. The TTA is staffed seven days per week, 24-hours per day with one RN on each shift. Recently, an OT has been added on day shift to help with the logs and paper working the TTA.

During our visit the staff expressed concerns over the increasing workload and responsibility. Some of the duties include scheduled and unscheduled EKGs and assisting with minor procedures (excision, draining of abscesses, suturing). In February, over 300 were inmates seen in the TTA.

# 8.9 Medical Records

According to the PCPs, medical records are available approximately 50-75% of the time. They also stated that necessary paperwork such as consultation reports and laboratory/radiology results are almost never in the records when they see patients.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page29 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 139 of 310
*Substance Abuse and Treatment Facility (SATF)*

# 9.  Substance Abuse and Treatment Facility (SATF)

There are approximately 7,200 inmates at Substance Abuse and Treatment Facility (SATF). There are eight yards (including two that are designated for substance abuse treatment) and a CTC. The CTC has 38 beds, 14 of which are designated for mental health patients.

The medical experts visited ASP on March 20-22, 2006.

## 9.1 Organizational Structure

### 9.1.1    Facility Leadership

We met with management staff at SATF. Other than Gail Martinez, CHSA II, and Cathy Allison, the AW over health care, all of the mangers are new.

Perlita McGuinness is the new Chief Medical Officer/Health Care Manager. She has been in the position just a few months. Gary White is the newly appointed SRN III.

## 9.2 Health Care Staffing

### 9.2.1    Physician Staffing

SATF is allocated ten primary care physician positions. In the recent past, SATF has had a severe shortage of physicians. Until two weeks before our visit, there had only been four primary care physicians at SATF. At the time of our visit, eight of the allocated positions were filled with five physicians (two state employees and three contract physicians) and three mid-level providers (two state employees and one contractor).

Most of the staff at SATF seemed extremely motivated and concerned about the patients. Many of the problems and concerns in this report result from the major staffing problems and the resulting backlog of appointments. We are hopeful that with the recruitment of these new providers, SATF is on the way to creating a quality health care program. However, in our opinion, SATF does not have a sufficient number of allocated primary care positions to meet the medical needs of its population.

### 9.2.2    Nurse Staffing

The SRN III had just been appointed the week prior to our visit. It appears that they are attempting to address some of the issues with the system. According to G. White, the SRN III, he is trying to create an organizational structure that includes areas of responsibility for nursing.

*Substance Abuse and Treatment Facility (SATF)*

*Table 31. SATF Nursing Staff Positions and Vacancies*

| Position Title | Total FTEs | Filled | Vacant | % Vacant |
|---|---|---|---|---|
| SRN III | 1.0 | 1.0 | 0.0 | 0 |
| SRN II | 6.0 | 5.0 | 1.0 | 16 |
| SR. MTA | 2.0 | 1.0 | 1.0 (acting) | 0 |
| RN | 56.0 | 54.0 | 2.0 | 3 |
| MTA | 52.0 | 52.0 | 17.0 | 32 |
| LPT | 8.0 | 8.0 | 0.0 | 0 |
| PHN | 1.0 | 1.0 | 0.0 | 0 |
| IDN | 0.0 | 1.0 | 0.0 | 0 not funded |
| Nurse Education | 0.0 | 1.0 | 0.0 | 0 not funded |

### 9.2.3   Staff Orientation and Training

The RN who has been in the role of Nurse Educator for the past 4 years has just recently been promoted to SRN II. She states the prison has received the new orientation handbooks and they have been incorporated into the orientation. She stated she has worked diligently over the years to develop the training and orientation program at SATF. With no budget for training and development she has used her own funds to get equipment and supplies. She said that SATF and CSP have worked together to offer some ongoing training courses for the staff.

In reviewing her orientation outline, it appears that she is covering the mandatory training. The orientation for nurses at SATF is one week in a classroom setting. The RN gets an additional three days for the Plata protocols. After a week of classroom orientation, the employees are assigned to work in various areas of the institution to complete their orientation.

## 9.3  Tour of Housing Unit Medical Clinics

### 9.3.1   A Yard

**A Yard** houses approximately 1,000 level 2 sensitive needs inmates. The clinic is staffed seven days per week with one RN and one MTA on both the day and evening shift. There is also one Plata MTA and one Office Tech, Monday thru Friday on the day shift. There is supposed to be a PCP for routine sick call five days per week. However, according to staff, this has not occurred due to the high number of vacant physician position at the prison.

The RN assigned to **A Yard** for FTFT has been assigned to A Yard for two years and has worked for the department for six years. She had a good system for ensuring the inmate patients are being seen. A review of the RN appointment log indicated that most inmates are being seen within 24 to 48 hours. On 2/23/06, there were 15 inmates scheduled for FTFT. Patients scheduled to be seen on 2/23/05 turned in 7362 forms dated 2/21 and 2/22/05. The types of complaints were medication issues, stomach and headache, and various other types of medical symptoms.

Although the nurse has a functional system for triage and prioritizing of the 7362s, her documentation was not always consistent with policy. She was using the Nursing Protocol Encounter forms, however, the nature and history of the complaint, current medication, vital signs, and physical findings were not consistently assessed and documented. She was using the over the counter medication and had a system to account for the medication being handed out to the inmate patients. She was making appropriate referrals

Case3:01-cv-01351-TEH  Document2570-2  Filed03/18/13  Page31 of 50
Case 2:90-cv-00520-KJM-SCR  Document 4545-1  Filed 04/11/13  Page 141 of 310

*Substance Abuse and Treatment Facility (SATF)*

but due to the lack of physician coverage, the time line for routine physician appointments was not being met. The backlog for routine physician appointments was approximately five to six weeks.

There was a new contract physician assigned to the clinic and the nursing staff said that had made a big improvement in timely access to care. During our visit, we witnessed the team approach in the clinic with the primary care physician and the nursing staff. The nurse assessed a patient with complaints of a painful rash and then conferred with the physician about his symptoms. The nurse assessment was that the patient had shingles. The physician examined the patient, agreed with the nurse, and ordered a course of treatment.

### 9.3.2    B Yard

The sanitation on **B Yard** ranged from fair to poor. The MTA we spoke to could not recall the last time an inmate porter had been in the clinic to clean.

We also spoke to the OT who schedules all medical appointments in the computer tracking system (SATS Lite). The OT reported that physician appointments are behind seven months. She is not provided a schedule for physician clinics in advance, therefore, she schedules patients for physician visits one day a week. If a physician comes to the clinic more than once a week, she simply moves up the next week's scheduled patients. She reported that lately, she has had a physician in the clinic three times a week, so she estimates the actual backlog is two to three months behind rather than seven months. This is a serious access to care issue.

The OT generally schedules 15 patients to see the physician and anticipates there will be add-ons during the day. However, even when patients are scheduled with the physician it does not mean they are actually seen. On 3/20/06, there were 14 patients scheduled; 8 were seen and 6 were rescheduled. Of seven add-on patients, six were seen and one was rescheduled.

The nurse on B Yard was conducting FTFT in an adequately equipped and supplied clinic. On the day of our visit, by 11:30 a.m. she had seen six patients and was unlikely to see all the patients on her list.

We reviewed seven health records of inmates in B Yard, E yard, and Ad Seg and found the following:

- The patient was not evaluated by the nurse in a timely manner in any of the seven cases.

- In 2 of 7 records the nurse did not conduct a face-to-face assessment at all.

- In 1 of 4 records, the nurse performed an adequate assessment

### 9.3.3    D Yard

**D Yard** is a level 3 sensitive-need yard that housed approximately 1,200 inmates. The clinic is staffed with one RN and one MTA on days and evenings, seven days per week. There is also one Plata MTA and one OT, Monday – Friday. Sick call is held five days per week, if there is a physician available. There is no night shift RN or MTA coverage in the yard clinic. The RN in the TTA responds to any emergency on the yard from 2200 – 0600.

During our visit, we were informed that there would be no PCP in the clinic for the week. The office tech said that there is an 8-10 week backlog of sick call appointments. There are approximately 498 pending appointments.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page32 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 142 of 310
Substance Abuse and Treatment Facility (SATF)

The RN who is performing FTFT on D Yard stated that she is current with FTFT and that it is rare when she doesn't meet the 24-hour timeframe. On the day of our visit, however, a review of her nurses sick call line showed that she had a total of 13 inmates scheduled for FTFT. Of the 13, she assessed nine and one urgent walk-in. Our review of her documentation showed that she is using the Nursing Protocol Encounter forms and the over the counter medication (OTC). She is appropriately identifying urgent medical issues and making the correct referrals.

She voiced concern about the lack of available physician coverage for the yard. She feels that there are inmates she has seen who need a follow-up visit in one to two weeks. She is concerned that her license is in danger due to the delay in care. She stated that she knows the waiting list to be seen for routine physician appointments is more than ten weeks. She keeps her own list of high risk/urgent inmates she has assessed. She stated that she monitors the inmates' condition and will have the inmate seen in the TTA if she cannot get them moved up on the list.

During our tour of D Yard on Monday afternoon, we walked in on an RN preparing for evening insulin administration. He was drawing up insulin and placing the syringes in a yellow coin-sized envelope. When we asked what he was doing he became very evasive. He was asked again and said, "You want to know? I'm getting my insulin ready to go and give injections though the cell bars!" He and the MTA informed us that the yard had been on lockdown since Thursday of the previous week. The nursing staff was very upset they have not pulled anyone out for three days. "We are being forced to administer insulin, medication and treatment though the cell bars," they stated. "We know it is wrong but we have no other choice. If we don't do it the patients will not get their insulin or medication."

It was also reported that over the weekend, 45 ordered blood pressure checks did not get completed since the nurses did not have time to go cell-to-cell and have the inmates stick their arms through the bars to measure blood pressures. We asked if they had informed their supervisors and they stated "Yes, but we did not get any support." We had the RN telephone the SRN III and the HCM and inform them that we were in the clinic and what was going on. According to the nurse, the SRN III told him to stop doing what he was doing and he would follow up with the AW of health care. In a matter of 10 minutes, the nurses received a call stating the inmates for insulin would be brought out of their cells. What is very concerning is that this practice would have continued if we had not been there to intervene.

## 9.3.4   E Yard

The overall sanitation of the clinic was good. The clinic had been recently painted, organized, and excess medical equipment (e.g., wheelchairs) is now being stored in a shed outside the clinic. The clinic used by the RN to perform FTFT is clean, and properly equipped and supplied, and the medication room was also well organized and clean. This is a significant improvement from last year.

We spoke the OT who schedules all medical appointments in SATS Lite. She reported that the waiting period for patients to see the nurse in a FTF encounter is seven days. The OT reported that she normally schedules 15 patients to see the nurse and that currently nurse FTFT is behind two days.

The registered nurse in the clinic is relatively new and has recently completed orientation. The nurse has been trained in the use of the nursing protocols and has OTC medications available to administer to patients. It is concerning that the nurse did not triage the Health Services Request Forms that were collected on the day of our visit. The second shift RN informed us that he would triage the forms since she did not do it.

Physician appointments are for nurse referrals: specialty service follow-ups, chronic care, and medical appeals. There is no regularly scheduled physician for E Yard. On days when a physician is present, the

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page33 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 143 of 310
*Substance Abuse and Treatment Facility (SATF)*

physician arrives between 10-10:30 a.m. and stays until 3 or 4 p.m. Staff reported that the physician rarely sees everyone who is scheduled for that day. We were told that the waiting period for routine physician appointments is six to seven weeks. However, we reviewed a stack of documents (7362s, laboratory results, etc.) that the OT was scheduling for the physician in early May. Some of the requests for the physician appointment are dated 2/1/06, so in fact, they are up to three months behind in physician appointments.

When we explored this further, we learned that the MTA who is scheduled to work with the physician works 7 a.m. to 3 p.m. Thus, the hours that the MTA works does not coincide with the physician hours. Furthermore, due to union bargaining agreements, the health care leadership does not believe they have the authority to adjust the MTAs working hours to meet the needs of the clinic. Of greater concern is that the physician does not arrive at the clinic until 10 a.m. each day. This situation suggests a lack of urgency to catch up on the backlog of patients and represents a serious access to care issue.

We interviewed the physician who was at the clinic who started working at SATF in February 2006. She reported that the lack of computerization and other technology (Personal Digital Assistants) severely hampered staff in delivering efficient health care. Staff are required to fill out too many forms. She also complained that they are not permitted to have basic medical equipment necessary to perform medical examinations (e.g., reflex hammer) because of custody concerns that it could be used as a weapon. (Note: A few weeks prior to our visit at SATF, Court medical experts were told of an incident where custody confiscated a reflex hammer from a physician at SATF.)

### Ad Seg Overflow

On **E Yard**, there is an **Administrative Segregation Overflow** housing unit. The nurses conduct FTFT triage once a week on Fridays. This is not in compliance with policy. Nurses reported that they collect and triage the 7362s daily to identify inmates with urgent complaints so they can be evaluated the same day. However, our review of the 7362s showed that inmates with urgent complaints are not being evaluated in a timely manner. For example, on ███████, an inmate (█████████████) submitted a 7362 complaining of a severe sore throat with difficulty swallowing for three days. The form was dated as received on ███████ but the inmate was not scheduled for a nurse FTFT until ███████, the regularly scheduled Friday for Ad Seg.

Patients are also not being seen in a timely manner for routine requests. Two patients (█████████████ and █████████████) who submitted Health Services Request Forms were not seen for 30 days after they submitted their requests. (See Appendix for details.)

## 9.3.5   Administrative Segregation Unit

Administrative Segregation Unit (ASU) is a stand-alone building that houses approximately 190 inmates who are locked in their cells 23 hours per day. The ASU is staffed with one MTA on the dayshift, seven days per week. Physician sick call is scheduled every Thursday. According to the MTA, the 7362s are collected daily. The RN assigned to the TTA is responsible for prioritizing and assessing theses inmates.

The ASU clinic was adequately equipped with the required medical equipment and supplies. The room was neat but was in need of deep terminal cleaning.

During our visit, we asked the MTA who was working in Ad Seg about the pending sick call appointments. She handed us a binder that contained a computer printed list of prior sick call appointments, but the binder appeared to be incomplete. The binder had only a few pages in it and the most current was February 2, 2006. The printout prior to that was dated December 18, 2005. We asked if this was the last time sick call was held in ASU. She said that they had a physician the prior week, but the

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page34 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 144 of 310
*Substance Abuse and Treatment Facility (SATF)*

list was not in the binder. She also said that the binder was not always updated because the office tech from the CTC scheduled patients for sick call in ASU.

We requested the UHRs from both computer printout lists. A review of the routine sick call list showed that nursing FTFT was not conducted daily or in a timely manner. There were inmates who submitted 7362s who were not assessed by the RN for four to five days. The RN completing the assessment did not consistently use the Nursing Protocol Encounter forms to document their assessment. There was no indication that the RN was using the OTC medications. Of the UHRs selected, the time that inmates waited to see the PCP after the referral from the nurse averaged seven weeks.

### 9.3.6   Medical Appeals 602

During our visit we interviewed the medical appeals coordinator, who has been in this position for the past year. We reviewed the past six months of medical appeals. In that time, the appeals coordinator has processed over 3,233 inmate medical appeals. On the day of our visit, there were a total of 203 overdue medical appeals. There were 37 informal overdue appeals, 138 overdue first level appeals, and 28 overdue second level appeals. He said that this was the highest number of overdue appeals since taking this job. The appeals coordinator stated that when she was on vacation or out sick, there was no replacement to ensure that the medical appeals were being addressed timely.

Given the large volume of medical appeals at SATF, it would be beneficial to have clerical support for the appeals coordinator. SATF currently has two appeals coordinators (Kirina Heck SSA and Grey Miller SSA), who have only recently been provided with clerical support to process the large volume of medical appeals. According to the staff, the lack of state physicians to respond to medical appeals impacts their work and accounts for the large number of overdue appeals.

## 9.4  Receiving and Release Medical Screening

Review of this area found that both the reception and transfer screening are occurring appropriately at SATF. The registered nurse assigned to R&R appears to be doing a good job. In reviewing the SATF tracking system and medical records, it appears that the medical needs of inmates newly arriving to SATF are being identified and referred to the appropriate area.

We reviewed ten UHRs of inmates entering SATF the week of January 3, 2006. Our review indicated that all ten inmates arrived with medical records. The sending facility had completed an intrasystem transfer form (7371). Out of the ten inmates whose UHRs we reviewed, six had no documented medical problems. One was identified as being asthmatic and was enrolled into the chronic care program. The inmate had a current order for an inhaler, which was ordered and continued that week.

It was reported that when the TTA nurse covers R&R for employees who are off work, the nurse does not input all arriving inmates into the tracking system. This poses problems since there are no other systems in place to track referral of inmates arriving at SATF who need follow-up treatment or medication. This should be monitored by the supervisor of the TTA and R&R.

Due to the backlog in the yard clinic, inmates referred from R&R are not being seen in a timely manner. The backlog on sick call on the yards also impacts medication continuity.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page35 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 145 of 310
*Substance Abuse and Treatment Facility (SATF)*

# 9.5 Chronic Care

The Chronic Care Program has been implemented.

We reviewed the medical records of 17 patients with chronic illnesses. They were identified primarily from medication lists. The data is summarized in the table below.

*Table 32. SATF Chronic Care Medical Records Audi*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed at appropriate intervals? | 4 | 13 | 0 |
| Is the patient's clinical status appropriately managed? | 1 | 15 | 1 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 2 | 8 | 7 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 2 | 0 | 15 |

As a result of the physician shortages noted above, most of the chronic care patients reviewed were not being receiving timely or appropriate care. (See Appendix for details.)

The following case is an example of an inmate who died and whose medical care was substandard:

The patient was a 45-year-old man. There was an entry in the medical record from a nurse on ▮▮▮▮, noting that the patient was complaining of abdominal pain that the patient rated as being 10 on a scale of 10. The nurse further noted that the patient was complaining of nosebleeds for four days. The PCP saw the patient that day and noted that he "probably twisted his back a few days ago." The PCP noted that the patient was in moderate distress, had a history of hepatitis C, and that he did not have any fever, dysuria, or icterus. He further noted that the pain was at the lateral aspect of the patient's abdomen. The PCP's assessment was that the pain was due to "muscle trauma." The PCP saw the patient again on ▮▮ and noted that he had diarrhea, jaundice, and abdominal distention. He further noted that the patient's platelet count was low. He sent the patient to Corcoran District Hospital for further evaluation. He was admitted to the hospital and subsequently died on ▮▮▮. The cause of death was noted to be multi-organ failure secondary to metastatic liver cancer.

Assessment:

1. The PCP did not perform an adequate evaluation when he saw the patient on ▮▮▮. He did not obtain any history or perform a physical examination related to the patient's complaint of nosebleeds. A patient with a history of liver disease, who is complaining of nosebleeds, requires an evaluation, including laboratory tests, to determine the cause of the nosebleeds.

2. The patient had not been followed in the chronic care program for his hepatitis C.

## 9.5.1   High Risk Patients

The High Risk Program has not been implemented at SATF. There is no system for identifying, tracking, or scheduling high risk patients.

We reviewed the medical records of eight high risk patients. The patients were identified using the medication lists. The data is summarized in the table below.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page36 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 146 of 310
Substance Abuse and Treatment Facility (SATF)

*Table 33. SATF High Risk Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high risk physician? | 2 | 5 | 1 |
| Is the patient being followed at appropriate intervals? | 1 | 7 | 0 |
| Is the patient's clinical status appropriately managed? | 2 | 6 | 0 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 3 | 4 | 1 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 2 | 3 | 3 |

As a result of the physician shortages noted above, most of the high risk patients reviewed were not being receiving timely or appropriate care. (See Appendix for details.)

The following case is an example of an inmate who died and whose medical care was substandard:

The patient was a 70-year-old man with a history of atrial fibrillation, hypertension, severe pulmonary hypertension, and coronary artery disease for which he had had two coronary artery bypass surgeries, who died on ▆▆▆▆. The cause of death was noted to be a myocardial infarction due to atherosclerosis.

The patient had not been followed regularly in the chronic care program. In addition, he was receiving Coumadin, but his INRs were not being appropriately monitored. He had had a therapeutic INR on ▆▆▆▆, but had not had another test until ▆▆▆▆. At that time, his INR was subtherapeutic. This had not been addressed. In addition, on ▆▆▆▆, his cholesterol was very elevated. This was not addressed.

Assessment:

Prior to his death, the patient was not receiving appropriate care for his multiple medical problems.

## 9.6 Medication Management and Administration

With the exception of psych medication, medication administration and management appears to be an ongoing problem at SATF. When reviewing 7362 forms, in many cases the inmates ran out of essential medication and were requesting refills. The nursing staff also stated that due to the absence of a physician on a daily basis, nurses have to reorder essential medication without having the patient examined for the condition for which the medication was prescribed. There are not enough PCPs to monitor the expiring medication list.

We interviewed the MTAs on the yard clinics regarding medication administration. On E Yard, the MTA reported that the pharmacy gives them the list of patients whose medications will expire in the following two weeks, and they use these lists to obtain medication renewal orders. He reported that turnaround time from the pharmacy is anywhere from 4 to 48 hours. When self-carry medications are delivered to the clinics, he posts the names of inmates on the window so inmates will know when their medication has arrived. The nurses document nurse-administered medications onto the MAR. The MARs in the B and E Yard clinics were generally legible and complete.

One significant problem is that the staff is not documenting the administration of self-carry medications onto an MAR generated by the pharmacy. When MTAs deliver the dispensed prescription to the inmate,

Case3:01-cv-01351-TEH  Document2570-2  Filed03/18/13  Page37 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 147 of 310
*Substance Abuse and Treatment Facility (SATF)*

they remove an extra label from the package and place it on a blank sheet of paper in a book used for this purpose. In E Yard, the MTAs do not document the date they gave the medication to the inmate or who gave the medication to the inmate. In B Yard, the MTAs have the **i**nmate initial, but not date the medication label before they put it in the book. Therefore, there is no documentation in the health record of the date when the patient received the medication or which staff member gave it to the patient. Moreover, we found labels of several different inmates on the same piece of paper, complicating the medical record filing process.

The MTAs have stock bottles of Isoniazid and Vitamin B6 in the clinics, which are used to administer to patients being treated for TB infection. However, staff were not keeping the medication in a properly labeled container at all times. Rather, they poured 50-75 pills into unlabeled soufflé cups to be readily available during medication administration. This is not acceptable practice.

There were also stock medications of very expensive drugs in the refrigerator, including Epoetin and Pegylated Interferon used to treat patients with chronic kidney disease and hepatitis C infection, respectively. It was unclear whether there were any patients in the yard currently being treated for these diseases. If not, these drugs should be returned to the pharmacy

The MTAs are responsible for checking narcotic and syringe counts daily. A random count of each showed that all counts were correct.

There is no tracking system to notify staff when a patient's chronic medications need to be re-ordered or re-filled. As a result, there were many references in the progress notes and in Health Care Request Forms to patients who had been without their medications for days to weeks at a time.

# 9.7 Specialty Services and Consultation

## 9.7.1 Specialty Contracting Issues

We met with the Utilization Nurse and the OT who reviews and schedules specialty consultations. As with other CDCR facilities, access to specialty consultations has been adversely affected by the medical contracting process. Many SATF contracts for specialty services expired 9/30/05. They lost the contract with Corcoran District Hospital. As of 3/31/06, their contract with University Medical Center in Fresno will expire. After that date, the only hospitals they will have contracts with are Mercy Hospital, UC Davis, and San Luis Obispo. This places a burden on the facility since it takes four hours to transport inmates to UC Davis.

With the expiration of physician group medical contracts, the facility lost ready access to cardiology, urology, radiology, and gastroenterology. With the expiration of hospital contracts they have lost, or will lose, access to orthopedics, urology, surgery, CT scans, and ultrasounds. Since several CDCR facilities are using fewer hospitals to access services such as ophthalmology, it is more difficult to obtain services in a timely manner. As of the date of our visit (March 20, 2006) ophthalmology appointments were being scheduled into June 2006.

## 9.7.2 Specialty Services Tracking and Scheduling

We reviewed the specialty services tracking system (Offsite Specialty Service Aging Report). The tracking system does not show all approved and scheduled appointments. Apparently, CDCR

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page38 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 148 of 310
Substance Abuse and Treatment Facility (SATF)

headquarters staff made a change in the programming system that resulted in follow-up appointments not being printed on the Aging Report. Thus, the tracking system has been corrupted.

Our review of the Aging Report shows that some specialty services were requested over a year ago and still have not been scheduled (see the following table).

Table 34. SATF Specialty Services Request

| Inmate ID | Type of Service | Date of Request | Date Approved | Date Scheduled | Days since Request |
|---|---|---|---|---|---|
| ▮ | Ophthalmology | 2/28/2005 | 7/21/2005 | Not Scheduled | 444 |
| ▮ | Urology | 8/17/05 | 8/23/2005 | Not Scheduled | 222 |
| ▮ | Urology | 9/6/205 | 9/6/2005 | Not Scheduled | 202 |
| ▮ | Orthopedics | 10/31/2005 | 11/10/2005 | 2/27/2005 | 119 |
| ▮ | Cardiology | 12/7/05 | 1/06/2006 | 3/30/06 | 113 |
| ▮ | Neurology | 12/12/2005 | 3/10/2006 | 3/23/2006 | 101 |
| ▮ | Cardiology | 12/14/2005 | 01/06/2006 | Not Scheduled | 99+ |
| ▮ | Cardiology | 12/21/2005 | 3/14/2006 | Not Scheduled | 92+ |
| ▮ | Heme/Oncology | 1/18/2006 | 1/26/2006 | 4/5/2006 | 77 |

There are also cardiology consultations that were requested in December 2005 and have not yet been scheduled. It is also disturbing that cardiology and neurology consultations requested in December 2005 were not approved until March 2006 (▮ and ▮ – see Appendix for details). This suggests that there are problems with the utilization review process.

## 9.8 Urgent/Emergent Care

Out of the five yards we visited, four were utilizing the Urgent/Emergent Tracking logs (A, B, D, and E). In ASU, the MTA was unable to locate the log. It is the policy of CDC to maintain a log at each clinic and document each urgent/emergent encounter. Also, patients seen in the TTA should have a follow-up visit by the PCP within five days. Due to the backlog on the yards, this is not occurring. With the high number of vacant physician positions at the prison, inmates who would normally be referred to the PCP are being sent to the TTA. Due to the lack of PCP in the yard clinics, the TTA is being over utilized.

Each of the yard clinics contained an emergency response bag and AED. The logs showed that the bags were being checked daily. On B Yard, the electrodes for the AED had expired in December 2005 and should be replaced.

Review of health records revealed issues with urgent care related to nursing assessments and patient transport issues, as related in the following examples.

**Example 1:** The patient was an 88-year-old man with chronic renal failure requiring dialysis. There was an entry in the medical record from the emergency room nurse on ▮ at 0400, noting she had responded to the yard clinic to evaluate a patient who had fallen off his bunk and hit his head, sustaining a laceration to the area of his left eyebrow. The nurse noted that the patient was alert and oriented, was not in distress, and followed commands. She also checked his vital signs and his pupils. She noted that she put pressure on the wound for 20 to 30 minutes in order to stop the bleeding and then applied Steri-Strips. Following this, she sent the patient back to his housing area. At approximately 0645, the patient was

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page39 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 149 of 310
*Substance Abuse and Treatment Facility (SATF)*

found unresponsive in his bed. He was transferred to Corcoran District Hospital, where he died at 0948. The preliminary autopsy report was that the patient died of a CVA.

The nurse did not respond appropriately when she evaluated the patient at 0400. An elderly man who "falls" out of bed requires a thorough evaluation to determine if there is any underlying medical problem that caused him to fall. The actions of the emergency room nurse fall well below the accepted standard of care. This case was discussed with Dr. McGuinness.

**Example 2:** A 24-year-old transferred to SATF on ███████. His medical history included asthma, ulcer, and depression. On ███████ at 2138, an RN was called to the housing unit and found the inmate on the floor complaining of chest pain. The nurse arranged for the patient to be transported to the TTA. The patient's vital signs were abnormal (BP =138/92 mm/hg, pulse = 92/minute, respirations = 22/minute and Temp = 100.2). The patient's oxygen saturation was slightly low at 96%. The nurse did not notify a physician and the patient was returned to the housing unit. On ███████, he again complained of chest pain and was sent to the TTA. A physician saw the patient who diagnosed the patient with pleuritic/pericardial chest pain and requested an urgent cardiology consultation. The consultation took place on ███████ and the cardiologist diagnosed the patient with noncardiac chest pain. The patient has continued to complain of intermittent chest pain.

In this case, the nurse did not appropriately notify the physician of a patient complaining of chest pain who was febrile, and whose blood pressure and pulse were elevated. A physician ultimately evaluated the patient and sent him to a cardiologist.

**Example 3:** A 48-year-old man transferred to SATF on ███████. The patient's medical history included hepatitis C and chronic low back pain. On ███████ at 0845 the patient complained of nausea, vomiting, diarrhea, dizziness, and fainting. A clinic nurse saw the patient and noted that he had a rapid pulse and was unable to stand without fainting. He vomited dark brown emesis, suggesting internal bleeding. The nurse called the physician and the patient was sent to the TTA at 0930. At 1020, a physician examined the patient, diagnosed him with GI bleeding, and ordered the patient sent to Mercy Hospital. However, the patient was not immediately transported. From 0940 to 1230, the patient's blood pressure dropped from 129/70 mm/hg to 95/72 mm/hg and his pulse was 112-124/minute during this period. At 1100, a nurse called transportation and was told they were having difficulty "getting a team together for transport." An ambulance was called and transported the patient to the hospital at 1330, almost five hours after he initially presented. At the hospital, the patient was diagnosed with ulcer disease and received transfusions and medications, and was returned to the facility on ███████. A physician saw the patient on ███████ for follow-up.

In this situation, this nurse performed an appropriate assessment and immediately notified the physician of the patient's unstable vital signs. Although the physician rightly sent the patient to the emergency department, it took far too long for the patient to be transported. Given that this patient's condition was unstable as evidenced by his abnormal vital signs and inability to stand, he should have immediately been sent to the hospital by ambulance. The patient received timely physician follow-up upon his return from the hospital.

# 9.9 Medical Records

Compared to other facilities such as Corcoran State Prison (which has approximately 2,500 fewer inmates), SATF has proportionately significantly fewer medical records staff. Staffing consists of a Health Records Technician II Supervisor plus 13 other positions:

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page40 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 150 of 310
*Substance Abuse and Treatment Facility (SATF)*

3 - Office Assistants
3 - Medical Transcribers
7 - Health Record Technician I

Although we did not meet with health record staff this tour, at our last visit, staff expressed frustration and low morale. Health Records Technician positions are used to courier patient health records to the clinics and staff reported that, as a result, they could not carry out their primary responsibilities of coding charts, etc. CDC Headquarters should evaluate the staffing pattern at SATF and explore other options for transporting records safely, which will allow staff to carry out their primary responsibilities.

According to the primary care physicians, they usually have the medical records when they are seeing patients. However, they stated that necessary paperwork such as consultation reports and laboratory/radiology results, is almost never in the records when they are seeing the patients. In addition, they stated that some of the contract hospitals do not send the patients back with records documenting what was done and what follow-up is required.

# 9.10 Correctional Treatment Center

It is the policy of CDCR that inmates housed in the Correctional Treatment Center (CTC) do not require a general acute care level of services but need professionally supervised health care beyond that normally provided in the community on an outpatient basis.

It is also the policy of CDCR that the medical director is the chief medical officer and is a licensed physician responsible for the daily administration and clinical management of the CTC. During our visit, we were informed of the lack of physician coverage for the prison. This was apparent in the review of medical records in the CTC. It is policy that the admitting member of the medical staff must note the condition and provisional diagnosis of any inmate admitted to the CTC on the order sheet and progress note within 24 hours of admission. Furthermore, within 24 hours after admission every inmate/patient shall have an evaluation including an admission history and physical examination for immediate care planning. In general, the admission history and physicals were not being performed in a timely manner. The required nursing documentation was not consistently charted.

## 9.10.1   CTC Health Record Review

During our visit, we reviewed the following patient's UHRs who were admitted to the CTC:

- Patient ▮▮▮ was admitted to the CTC on ▮▮▮▮ for hunger strike and gastritis. The patient's medical record indicated that his admission history and physical examination were not completed within the required timeframe. There was also no progress note from the attending physician at least every 3 days. We did not find weights or intake and output sheets in the inpatient chart. When a patient is admitted for monitoring for a hunger strike, weight is a critical part of the intake information.

- Patient ▮▮▮ is a 45-year-old inmate admitted to the CTC on ▮▮▮▮ with diabetes and renal failure. His medical record indicated there the attending physician did not perform a physical exam within the first 24 hours of admission. The patient was a diabetic but there was no documentation in the medical record that indicated his blood glucose levels were being monitored on a regular basis. There was a lapse of five days with no documentation from the attending physician in the medical record, which is in violation of the policy.

*Substance Abuse and Treatment Facility (SATF)*

- Patient ■■ was admitted to the CTC on ■■■■. He is a paraplegic with a stage IV ulcer on the right buttock. A review of his medical record indicated that the attending physician performed his history and physical examination on the day of admission. It appears for the first few weeks he was seen regularly by the physician, at least every three days. However, from November to the present, it did not appear that a physician was providing ongoing assessment and treatment. Likewise, nursing documentation is lacking regarding his decubitus. The skin profile (CDC form 7299) had not been updated since early January 2006. It is policy that on each watch, the nurse responsible for the care of the inmate/patient shall complete a system assessment and permanent medical condition. This was not occurring on a regular basis.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page42 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 152 of 310
*Valley State Prison for Women (VSPW)*

# 10.  Valley State Prison for Women (VSPW)

Valley State Prison for Women (VSPW) houses approximately 3,885 female inmates of varying security levels. There are four separate yards. The medical missions of VSPW include a medical reception center, OHU, and obstetrical care for pregnant women. The OHU has 23 beds, eight of which are designated for mental health patients.

The medical experts visited ASP on March 23-24, 2006.

## 10.1 Organizational Structure

### 10.1.1  Facility Leadership

Daun Martin Ph.D, the chief psychologist, is the acting Health Care Manager. The Chief Medical Officer position has been vacant for several months. Judy Tucker is the SRN III at VSPW. She has been in this role since the activation of the prison.

## 10.2 Health Care Staffing

### 10.2.1  Physician Staff

VSPW is allocated seven PCP positions. In the recent past, VSPW has had a severe shortage of physicians. Currently, there are four primary care physicians and three NPs on staff. In addition, there are two board-certified Ob-Gyn physicians on staff. Many of the problems and concerns in this report result from the shortage of clinics and the resulting backlog of appointments. We are hopeful that with the recruitment of these new providers, VSPW is on the way to creating a quality health care program. However, it is our opinion that VSPW does not have a sufficient number of allocated primary care positions to meet the medical needs of its population.

### 10.2.2  Nursing Staff

There are three SRN II positions, all of which are filled. There are two SR. MTA positions, which are also filled. There are 30.86 RN, 28 MTAs, and five Psychiatric Technicians positions (of which three are vacant). According to SRN III Tucker, she has been able to fill 11 positions in the past three months due to the recent salary increase for the RN position. They are using registry staff to fill all vacant nursing positions above the allocated FTE.

With respect to nursing supervision, staff reported that all supervisors currently work day shifts, Monday through Friday. Evening and weekend call is provided. This arrangement is not an optimal use of these positions. During our visit and interviews with the supervisory staff, it appears that they have a very good grasp on the day-to-day functions of their area of supervision. Our review showed some areas of deficiency; however, the supervisors were aware of these deficiencies and had corrective action plans developed with plans to implement them.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page43 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 153 of 310
*Valley State Prison for Women (VSPW)*

*Table 35. VSPW Nursing Staff*

| Position | Total FTE | FTE Filled | Vacant FTE |
|---|---|---|---|
| SRN III | 1.0 | 1.0 | 0.0 |
| SRN II | 3.0 | 3.0 | 0.0 |
| SR. MTA | 2.0 | 2.0 | 0.0 |
| RN | 30.86 | 27.0 | 3.86 |
| MTA | 27.14 | 26.0 | 1.14 |
| PHN | 1.0 | 1.0 | 0.0 |
| INF. Control | 1.0 | 1.0 | Not funded |
| PT | 5.0 | 1.0 | 4.0 |
| Nurse Instructor | 0.0 | 0.0 | Not funded |

### 10.2.3  Staff Orientation

According to the nursing supervisor, they don't have a staff person to provide orientation and training. She stated that over the years the nursing supervisor has conducted training and oriented all new employees. They confirmed that they had received the new statewide orientation handbook and have provided it to new employees. According to the staff, all new staff receive on the job training. This training entails partnering up with a regular state staff member for a few days until they know that area. They rotate through the different areas and also work the different watches. RNs also receive training from the nurse consultants from central office on the Plata protocols. All state employees are required to complete a 40-hour orientation that is provided by In Service Training (IST).

## 10.3 Tour of Housing Unit Medical Clinics

### 10.3.1  A Yard

We interviewed the **A Yard** OT and registered nurse performing FTFT. According to the OT, nurse FTFT is three weeks behind, routine physician appointments are two weeks behind, and chronic care appointments are six weeks behind.

The RN performs FTFT in a small but adequately equipped and supplied room. She has been trained in the nursing protocols and administers over-the-counter medications. She states that she sees about 20 patients per day and refers about 3% of her patients to the physician. This is a low referral percentage and when explored further, she said that she "tries not to refer to the physician." This can be problematic as was evidenced in the review of the health record of a 41-year-old patient (████████), who complained of lower respiratory symptoms. The nurse examined the patient and suspected that she had a ruptured ear drum, but did not refer the patient to the physician.

Review of eight health records showed that the nurse does not consistently perform adequate or thorough assessments. For example, one 33-year-old patient (████████) complained of back pain and spasms. The nurse did not perform an examination of the back or perform a neurological assessment. Another 25-year-old patient (████████) complained of vaginal discharge, however, the nurse treated the patient without examining her. The nurse documents assessments that are often not clinically relevant such as "ineffective breathing pattern related to patient's statements." This nurse needs clinical oversight and guidance.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page44 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 154 of 310

*Valley State Prison for Women (VSPW)*

### 10.3.2   C Yard

C Yard houses approximately 850 to 900 general population inmates. The clinic had adequate medical equipment. The physician examination room was equipped with an exam table, otoscope, ophthalmoscope, and a thermometer. The cabinets had sufficient medical supplies and were well stocked and organized. The nurses' exam room was also equipped with the medical equipment needed for a proper exam and assessment. The vital sign machine is shared between both exam rooms.

A review of the nurse's sick call log indicated that the nurse is scheduling FTFT within 24 to 48 hours. Our review of the clinic log indicated that the RN is scheduling 18-20 inmates per day for FTFT, but is routinely unable to assess the full line and many are rescheduled. On the day of our visit, seven of the 21 patients scheduled were seen within the 24-hour timeframe. However, our review of the log showed that in the first two weeks of February 2006, the majority of the 7362s were being scheduled for FTFT within 48–72 hours, which is not timely. Likewise, according to an OT, routine physician sick call is behind about seven weeks. At the time of our visit, the OT was scheduling patients for the week of May 8, 2006.

### 10.3.3   D Yard

D Yard houses approximately 900 general population inmates with special needs. The clinic is staffed with one RN, two MTAs, an OT, and a physician. Sick call is provided five days per week unless the physician is out sick or on vacation.

The nurse assigned to D Yard has been on this yard since January 2006 and has worked for CDCR since 1999. She is currently working Monday through Friday from 0700 to 1500. She stated that she collects the 7362 forms from the lockbox on the yard five days per week. She documents the date of receipt on the form and makes a quick triage for urgency. If she deems any of the 7362 forms to be urgent she will call the housing unit to have the inmate sent over. She schedules on average 20-25 inmates per day for FTFT. However, a large number are rescheduled due to lockdowns or incidents on the yard. According to the clinic lists dated 2/8/05 and 2/10/05, the nurse sees the majority of inmates for FTFT within 48 hours. On 1/31/06, out of 19 inmates scheduled to be seen, 11 were seen within 24 hours. The others were seen within 48-72 hours, which is untimely. The same was true for 2/1/06. Out of 24 inmates, nine were seen within 24 hours; however, the others were not seen in a timely manner.

The nurses are not using the Nursing Protocol Encounter forms consistently. Regarding the physician sick call line, the OT stated that routine physician sick call line is being scheduled about three months out. At the time of our visit, the OT was scheduling appointments for the week of June 26, 2006.

### 10.3.4   Administrative Segregation/Special Housing Unit (ASU/SHU)

The ASU/SHU unit is located on the A4 housing unit and houses approximately 176 women, with an overflow of approximately 30 women onto A3. There is a medical clinic in A4 that is adequately equipped and supplied with access to a sink for hand washing. The room was dirty and staff reported that because no general population inmates are allowed into the area, it is never cleaned.

Different medical/nursing clinics are scheduled on different days of the week. Nurse FTFT is scheduled on Mondays, Wednesdays, and Thursdays. On other days of the week, the nurses conduct cell front interviews. Physician-conducted chronic care clinics and physician appointments are scheduled on Tuesdays and Fridays, respectively. Nurse FTFT is not conducted daily, thus, the facility is not in compliance with CDCR policy that requires FTFT within one business day of submission of the Health Services Request Form (7362). It is unclear why each morning could not be allocated for Nurse FTFT and the afternoon allocated to physician appointments.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page45 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 155 of 310
*Valley State Prison for Women (VSPW)*

There are serious access to care issues related to custody escort in the ASU/SHU. On the day of our visit, the nurse was scheduled to see 14 patients. Aside from one patient who was brought to the clinic urgently, **not a single patient was escorted by custody to the clinic.** We asked for information regarding other medical appointments and were given the following data:

- On 3/3/06, 14 patients were scheduled to see the physician and 7 (50%) were seen.

- On 3/10/06, 14 patients were scheduled to see the physician and 4 (29%) were seen.

- On 3/17/06, 11 patients were scheduled and 6 (55%) were seen.

In summary, of 39 patients scheduled to see the physician over a two week period only 17 (45%) were seen. Staff reported that patients have been rescheduled multiple times, including one patient who was rescheduled 17 times.

Staff reported that there are not enough custody officers to provide escort to all the medical appointments of the inmates in ASU/SHU. The two Plata officers who are assigned to the building spend the majority of their time escorting patients to the A Yard medical clinic for specialty services, radiology, dental, and other medical appointments. Other correctional officers assigned to the building perform routine escorts for daily activities such as showering, yard exercise, or to other mandated activities such as law library. The lack of custody escorts results in nurses seeing patients at cell front, and taking blood pressures and administering insulin through food ports. This is unacceptable nursing practice and a violation of CDCR policy. However, despite the reported lack of custody escorts, we spent several hours in the unit and observed correctional officers sitting around doing nothing.

The practice in the ASU/SHU is for two custody officers to escort inmates. Staff informed us that the CDCR policy only requires one officer escort unless the inmate is known to be assaultive. Given the need to improve escort capabilities, the Warden issued a memorandum instructing correctional officers to adhere to the policy. However, the CCPOA bargaining unit objected and custody staff continues to use two custody officers per escort. The Court medical experts find it alarming that a Warden could give a directive to correctional staff to adhere to policy, only to have staff ignore the Warden's directive. This is an example of the culture that must be changed to establish accountability for implementation of an effective health care program.

Staff reported that when inmates are examined, an officer is always in the room. Therefore, there is no confidentiality. Moreover, inmates are never unshackled, even when having pap smears. The nurse reported that she would feel uncomfortable if the patients were unshackled because there have been several inmate assaults upon staff.

### 10.3.5   Medical Appeals 602
On the day of our visit, there were 44 overdue medical appeals. There were 35 informal overdue appeals, eight overdue first level appeals, and one overdue second level appeal.

# 10.4 Medical Reception

The medical reception process is not being performed in a timely manner and does not result in identification and treatment of serious medical problems. The facility does not have space or staff to perform the process adequately.

There is currently one NP assigned to perform medical histories and physical examinations for newly arriving inmates. She is, however, currently on worker's compensation leave. The number of women

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page46 of 50
Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 156 of 310
Valley State Prison for Women (VSPW)

arriving at the facility has averaged 110 per week since January 1, 2006, with a range of 71 to 152 per week. To keep up with the volume, this requires that the nurse must see an average of 22 patients a day. Given the medical complexity of the population, it is not realistic for a NP to perform 22 quality evaluations per day. With the current staffing, the facility will fall further behind in performing the medical reception process. The OT reported that she has 321 patients pending medical reception physicals and is scheduling the physicals 4-6 weeks into the future. This is not in compliance with the required 14-day timeframe required by policy. The volume of newly arriving inmates often results in inmates being transferred to another yard before completion of the medical reception process, where staff report it is more difficult to track and access patients.

### 10.4.1   Initial Health Screening

There are two nursing staff assigned to the reception center to process inmates into the prison. There is one RN and one MTA, both of whom work Monday through Friday 06:00 – 14:30, but will adjust their hours when buses arrive late. The nurses share a small office space that has one work station that both are using.

During our visit, we observed the reception process. Both staff appeared to have a good working relationship with each other, the prison custody staff, and the custody staff from the outside agencies. The correctional officers provided the "body sheet," which included the inmate's name, date of birth, and CDC number. The information from the body sheet was entered into the computer, which then would generate the screening forms. A set of pattern questions would be asked of each inmate. The questions included current and past medical problems, date of last menstrual cycle, psychiatric history, and current medications. Any positive answer would generate a referral to the appropriate area such as dental, mental health, or enrollment for chronic care evaluation. If the inmate was on medication, the nurse stated they would write an order for 14 days. If the patient was receiving medication for a chronic condition, the order would be written for 90 days. If the medication were a directly observed therapy (DOT) medication, the inmate would receive it within 24 hours of arrival. If the medication were cold medication (self carry), it could take up to five days to receive the medication, according to the MTA.

### 10.4.2   Medical Reception Health Record Review

We reviewed ten records of inmates who arrived at VSPW for medical reception. The initial health screening process is taking place on the day of arrival. The nurse who completes the screening process generally does a good job documenting the patient's previous medical history, however, there are some exceptions. (See VSPW patient record reviews ███████ and ███████ in the Appendix.)

In none of the ten records we reviewed did a NP or physician complete a physical examination within 14 days. The NP performing the physicals does not address the patient's medical history or consistently address abnormal laboratory tests. For example, a 34-year-old patient (███████) arrived with a history of asthma, anemia, ankle edema, and depression among her medical problems. The NP did not address any aspects of her medical history. Another 29-year-old patient (███████ told the staff she might be pregnant upon her arrival and shortly thereafter, her pregnancy test was positive. The NP examined her and failed to document anything related to the patient's pregnancy. Finally, a 46-year-old patient (███████████) arrived with a history of hepatitis C and significant anemia (hemoglobin <10). The NP did not address her anemia. Later that month, a physician saw the patient and requested a colonoscopy to rule out gastrointestinal bleeding. The NP should have addressed this problem during the reception medical evaluation.

Case3:01-cv-01351-TEH Document2570-2 Filed03/18/13 Page47 of 50
Case 2:90-cv-00520-KJM-SCR Document 4545-1 Filed 04/11/13 Page 157 of 310
Valley State Prison for Women (VSPW)

## 10.5 Receiving and Release Medical Screening

An RN is currently assigned to perform the duties of preparing the chart and summaries for inmates leaving the institution. The RN said that each Thursday she receives a list of inmates who are to be transferred from the facility the following week. The number of inmates leaving averages about 100 to 150 per week. This includes inmates transferring to another CDC prison, out to court, and parole holds. She also receives an amended list on Friday. Using this list, she retrieves the inmates Unit Health Records (UHR) and completes the intrasystem transfer (7371) form. She prints out each inmate's pharmacy profile to obtain the list of current medications. She reviews the UHR for current medical and psychiatric diagnosis, chronic conditions, last physical exam, TB code (if positive, she records the last chest X-ray), and any medical chronos and pending consults. If a patient has a pending medical consultation within three weeks, she contacts a classification and parole representative (C and PR) and places a medical hold on the inmate until the completion of the consult. After observing the process, it appears that she has an adequate system and has experienced no major problems with the process.

## 10.6 Chronic Care

The Chronic Care Program has been implemented at VSPW.

We reviewed the medical records of 12 patients with chronic illnesses. They were identified primarily from medication lists. The data is summarized in the table below.

Table 36. VSPW Chronic Care Medical Records Audit

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed at appropriate intervals? | 5 | 7 | 0 |
| Is the patient's clinical status appropriately managed? | 1 | 10 | 1 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 3 | 7 | 2 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 2 | 1 | 9 |

As a result of the physician shortages noted above, most of the chronic care patients reviewed were not being receiving timely or appropriate care. (See Appendix for details.)

### 10.6.1 High Risk Patients

The PCPs at VSPW received training in the high risk program two weeks ago. Staff are currently in the process of identifying the population of high risk patients. SATS Lite will be used to track and schedule these patients.

We reviewed the medical records of 11 high risk patients. The patients were identified using the medication lists. The data is summarized in the table below.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page48 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 158 of 310
*Valley State Prison for Women (VSPW)*

*Table 37. VSPW High Risk Medical Records Audit*

| Question | Y | N | N/A |
|---|---|---|---|
| Is the patient being followed by a qualified high risk physician? | 1 | 10 | 0 |
| Is the patient being followed at appropriate intervals? | 1 | 10 | 0 |
| Is the patient's clinical status appropriately managed? | 1 | 10 | 0 |
| Are appropriate laboratory tests, monitoring and consultations ordered? | 2 | 9 | 0 |
| Are laboratory tests, monitoring and referrals occurring as ordered? | 2 | 0 | 9 |

As a result of the physician shortages noted above, most of the high risk patients reviewed were not being receiving timely or appropriate care. (See Appendix for details.)

# 10.7 Medication Management and Administration

To review medication administration, we reviewed 7362 forms, MARs, and narcotic and syringe counts. Due to time constraints, our review of this area was limited.

In A Yard, the MTAs appear to be very conscientious. They check narcotic and syringe counts daily. The MARs were generally legible and complete. There is no tracking system to notify staff when a patient's chronic medications need to be re-ordered or re-filled. As a result, there were many references in the progress notes and in 7362 forms about patients who had been without their medications for days to weeks at a time.

## 10.7.1  ASU/SHU Medication Management

We identified significant issues with medication administration in the ASU/SHU unit. Staff reported that it is difficult to obtain custody escort during medication administration and that staff are required to follow along behind offices to administer medications while they pass out food trays. This does not allow them adequate time to perform oral cavity checks. Staff reported that in an effort to keep up with custody staff , a nursing medication error was made when the seizure medication Dilantin was given to the wrong inmate who had the same last name as the inmate for whom the medication was prescribed.

Nurses are administering insulin through the inmate food ports. This is inappropriate and dangerous. On February 16, 2006, a contract LVN suffered a needlestick injury from a contaminated needle while giving insulin through a food port.

There is no dedicated space in the ASU/SHU for nurses to prepare medications. The LVNs use a conference room to prepare medications.

## 10.7.2  Medication Refills

The system for medication storage and accountability is adequate. MTAs are securing and accounting for the medication on each shift. During medical reception, medications are generally ordered on the day of arrival.

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page49 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 159 of 310
*Valley State Prison for Women (VSPW)*

However, due to the lack of timely chronic illness clinic visits, medication continuity continues to be an issue. When reviewing the inmate health records and the 7362 logs, it was evident that a large number of requests are for refills for medication that had run out or expired. This is puzzling considering that the procedure explained to us during our visit should obviate such requests. According to the Pharmacy Tech, his job is to perform weekly audits of each clinic that stores medication. The audit includes checking the MAR for medication that will run out within seven days, expired medications, duplicate medication orders, and CDC 154 form for inmate bed moves.

## 10.8 Specialty Services and Consultation

Review of this area showed that there are significant delays in access to specialty services for some patients. We reviewed the consultation services tracking logs (Specialty Services Aging Reports). The reports do not reflect which specialty requests are routine requests (to be completed within 90 days) and which are urgent requests (to be completed within 14 days). Thus, it was not possible to assess the timeliness of urgently requested consultations.

The Onsite Specialty Report showed that of 278 requested consultations, 67 (24%) are not yet scheduled. Of the unscheduled consultations, some were requested as far back as August 2005 and **still have no date for an appointment.** (See the following table.)

*Table 38. Onsite Specialty Services Aging Report*

| Inmate ID | Type of Service | Date of Request | Date Approved | Date Scheduled | Days since Request |
|-----------|-----------------|-----------------|---------------|----------------|--------------------|
| ███ | Orthopedic | 8/11/2005 | 8/12/2005 | Not Scheduled | 225 |
| ███ | GYN Surgery | 10/27/2005 | 10/27/2005 | Not Scheduled | 148 |
| ███ | Pulmonary | 11/14/2005 | 12/30/2005 | Not Scheduled | 130 |
| ███ | Radiology | 11/30/2005 | 12/07/2005 | Not Scheduled | 114 |
| ███ | Ophthalmology | 12/22/2005 | 01/04/2006 | Not Scheduled | 92 |

We also reviewed the Offsite Specialty Services Aging Report. Of 125 consultation requests, only 11 (9%) were unscheduled. Like the Onsite Specialty Services Aging Report, there was no differentiation between urgent and routine requests. The average length of time between the date of request and date of the scheduled appointment was less than 90 days for most consultations

### 10.8.1 Specialty Services Health Record Review

We reviewed eight health records of patients who have undergone specialty consultations. Review of the records showed that in 4 of 8 records, physicians are not seeing patients in a timely manner following consultation appointments. In 3 of 8 records, the consultant's recommendations were either not implemented in a timely manner, or not at all. In 2 of 8 records, the consultant's report was not in the record (███ and ███).



**Example 1:** A 53-year old patient (███) was diagnosed with chronic lymphocytic leukemia in ███. In ███, an oncologist saw the patient and recommended observation (versus treatment) and periodic blood testing, recommending that she return in 4 months. This visit did not take place. On ███, a physician requested follow-up with the oncologist, which took place on ███. The oncologist recommended continued observation and laboratory monitoring. A physician did not see the patient

Case3:01-cv-01351-TEH   Document2570-2   Filed03/18/13   Page50 of 50
Case 2:90-cv-00520-KJM-SCR   Document 4545-1   Filed 04/11/13   Page 160 of 310
*Valley State Prison for Women (VSPW)*

following the consultation and we found no evidence that the oncologist's recommendation for laboratory testing has been implemented.

**Example 2:** A 39-year-old patient arrived at VSPW in with a history of uterine cancer. On ███████, an oncology consultation was requested and performed on ███████. The oncologist recommended a pelvic ultrasound and D & C (a procedure to scrape the inside of the uterus). A physician did not see her following this consultation. A NP ordered the recommended tests on ███████, but did not fill out the Request for Services until ███████. The oncologist saw the patient again on ███████, however, the consultant's report was not in the patient's medical record.

# 10.9 Urgent/Emergent Care

To review urgent/emergent care, we reviewed tracking logs, emergency response bags, and health records. In A Yard, the MTAs are using the Urgent/Emergent Tracking Logs. There is an emergency response bag that is complete and checked daily.

Record reviews showed that patients with urgent complaints are not seen in a timely manner. For example, according to the A Yard Urgent/Emergent Tracking Log, on ███████, a 43-year-old woman (███████) complained of chest pain and asthma. The log documents that she was not seen.

# 10.10     Medical Records

According to the primary care physicians, they usually have the medical records when they are seeing patients. They stated, however, that necessary paperwork such as consultation reports and laboratory/radiology results is almost never in the records when they are seeing the patients. In addition, the charts are not well organized and many documents are not filed in the appropriate section.

Exhibit 3

| | |
|---|---|
| **From:** | Martin, Kenneth@CDCR |
| **Sent:** | Thursday, January 31, 2013 5:24 PM |
| **To:** | Toche, Diana@CDCR |
| **Cc:** | Belavich, Tim@CDCR |
| **Subject:** | RE: Proposed Unlicensed ICF CHSB 4th Floor |

Diana I had a lengthy conversation with Dr. Monthei regarding SQ's plan to provide specialized care for the condemned utilizing 10 beds in the current CHSB's OHU area (suspended licensed beds). Based upon my conversation with Dr. Monthei and review of Ms. Martinez's email, this continues to be a complex matter.

It is clear to me, based upon how the information is presented to CDPH, the scenario could be interpreted in a number of ways by CDPH. Based upon the email forwarded to me and its information and discussion with Dr. Monthei, I believe it is likely that someone will notify CDPH and present information as they see it. The presentation that out license would be jeopardy if we institute this on Friday, I believe is an overreaction, even if CDPH would believe that we are providing licensed level of care in unlicensed beds (suspended beds). The worse case scenario is that they would review treatment provided and order CDCR to rectify any licensing related deficiencies.

I believe you and I should discuss so you have a full perspective of what the problems may be should any issue arise.

Kenneth Ray Martin
Office: 916-255-3313
Mobile: 916-764-4597
Fax: 916-255-1164
kenneth.martin@cdcr.ca.gov

**From:** Belavich, Tim@CDCR
**Sent:** Thursday, January 31, 2013 12:25 PM
**To:** Martin, Kenneth@CDCR
**Cc:** Toche, Diana@CDCR; Monthei, Eric@CDCR
**Subject:** Re: Proposed Unlicensed ICF CHSB 4th Floor

Great. Thanks.

Timothy G. Belavich, Ph.D., MSHCA, CCHP,
Deputy Director (A),
Statewide Mental Health Program

Office: 1-916-691-0296
Mobile: 1-661-857-1948

On Jan 31, 2013, at 3:03 PM, "Martin, Kenneth@CDCR" <Kenneth.Martin@cdcr.ca.gov> wrote:

> Thanks Tim, it's a long email and will need to "digest." And will reach out to Dr. Monthei for details on what we are planning to do.
>
> Kenneth Ray Martin
> Office: 916-255-3313
> Mobile: 916-764-4597
> Fax: 916-255-1164
> kenneth.martin@cdcr.ca.gov
>
> **From:** Belavich, Tim@CDCR
> **Sent:** Thursday, January 31, 2013 11:53 AM
> **To:** Martin, Kenneth@CDCR
> **Cc:** Toche, Diana@CDCR; Monthei, Eric@CDCR
> **Subject:** Fwd: Proposed Unlicensed ICF CHSB 4th Floor
>
> Kenneth- can you take a look at the email below from the standards and compliance coordinator at SQ? She is against the condemned treatment program and is pulling out all stops to shut it down despite support from the highest levels in CDCR for the program's success.
>
> Let us know your thoughts as soon as possible and reach out to Dr. Monthei of possible for more information. We need to stop these rumors or make changes for the program to succeed.
>
> Bottom line is the program will happen. We just need to make sure we are within our rules.
>
> Thanks, tim
>
> Timothy G. Belavich, Ph.D., MSHCA, CCHP,
> Deputy Director (A),
> Statewide Mental Health Program
>
> Office: 1-916-691-0296
> Mobile: 1-661-857-1948
>
> Begin forwarded message:

**From:** "Monthei, Eric@CDCR" <Eric.Monthei@cdcr.ca.gov>
**Date:** January 31, 2013 2:22:56 PM EST
**To:** "Toche, Diana@CDCR" <Diana.Toche@cdcr.ca.gov>
**Cc:** "Belavich, Tim@CDCR" <Tim.Belavich@cdcr.ca.gov>
**Subject: FW: Proposed Unlicensed ICF CHSB 4th Floor**

Please see below. This report is consistent with my previous concerns toward our current Correctional Treatment Center (CTC) Standards and Compliance Coordinator (SCC). As previously discussed, she does not report to MHSDS and has previously been under progressive discipline at a former institution for same and/or similar actions. Any assistance in, ensuring that the below individual who neither reports to the CTC Medical Director nor the CMH does not pursue this line of reasoning and/or action would be greatly appreciated. Despite operating on a lack of accurate information, Ms. Martinez has previously stated, "...the day you open an ICF for the condemned is the day you lose the CTC license...". As you can see from the below e-mail, my local influence toward this end has not resulted in a favorable outcome. Thank you for your direct influence.

**Eric E. Monthei, Psy.D.**
Chief of Mental Health

**San Quentin State Prison - Mental Health Service Delivery System (MHSDS)**
(415) 721-3540 (Office)
(415) 306-1334 (BlackBerry)
Eric.Monthei@CDCR.CA.GOV (E-Mail)

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Martinez, Diana (SQ)@CDCR
**Sent:** Thursday, January 31, 2013 11:02 AM
**To:** Deems, Andrew@CDCR; Chappell, Kevin@CDCR; Monthei, Eric@CDCR; Tootell, Elena@CDCR; Laureano, Antonio@CDCR; Facio, Jr. Ernest E.@CDCR; Pratt, Lisa@CDCR
**Cc:** Mutha, Marita@CDCR; Wadsworth, Chris@CDCR; Frank, Douglas@CDCR; Rowe, Michael@CDCR
**Subject:** Proposed Unlicensed ICF CHSB 4th Floor
**Importance:** High

Greetings,

This is a summary of my proposed recommendations to the ICF Committee held on 1/17/13 at 11 a.m. in the Belvedere conference room. I am also including regulatory verbiage and other proposed recommendations/considerations for future review, in order to preserve the integrity of the license and the CTC and prevent potential suspension or revocation of the CTC license.

3

The CHSB 4th floor is a licensed Correctional Treatment Center (CTC) in its entirety by the California Department of Public Health, Licensing and Certification (CDPH L&C) division. This license includes 50 beds, 2 observation rooms, and all service, office, treatment, day room, and storage spaces, etc. The license includes an approval under Optional Services for a Mental Health Treatment Program. Currently 33 of the 50 beds are in suspense. Although the beds are in suspense all other areas remain active under the license. In addition the CTC and the CTC kitchen do not provide meals and services to the OHU and Ad Seg areas. By providing CTC approved services to unlicensed areas opens up potential Licensing review by following the service/patient trail.

The active and licensed 17 beds are providing the optional service of a mental health treatment program. It is currently operated as an acute mental health treatment program, aka mental health crisis bed facility (MHCB) in accordance with the MHSDS 2009 Program Guide. According to Title 22 mental health treatment program services may include both acute and non-acute level of care. This is how the ICFs at Salinas Valley (SVSP) and CMF are licensed. They (SVSP & CMF) are both under a CTC license with approved optional services of Mental Health Treatment Program however they chose to run a "non-acute" program and we have chosen to run an "acute" program. Nothing in the regulations says we have to operate one or the other, we can operate both. I proposed that we contact CDPH L&C to activate the 10 beds in the CTC Ad Seg hallway by taking them out of suspense and use them for non-acute mental health treatment. This will maintain a physical separation and allow for the non-acute patients to utilize the service areas of the current MHCB CTC. This will alleviate interference with the OHU inmates in the remaining suspended 23 beds.

According to my review of the schedule and facts presented at the meeting this program could potentially, with some revisions, meet the requirements of non-acute mental health treatment. The schedules, from my perspective, include more aggressive treatment plans than ICF level of care, according to Title 22 which would certainly fit into the non-acute setting, and meet the provisions of our licensure and the approved optional service.

If we open an ICF, especially in a licensed CTC space, we potentially stand to be in direct violation of California Code of Regulations, Title 22, Division 5, Chapter 4 Intermediate Care Facilities, Article 2 License, Section:

73201. License required
(a) No person, firm, partnership, association, corporation, political subdivision of the State or other governmental agency within the State, shall operate, establish, manage, conduct or maintain an intermediate care facility in this State or claim to operate an intermediate care facility, without first obtaining a license from the Department (CDPH L&C).

And

4

Chapter 4 Correctional Treatment Centers, Article 2 section:

79595 Suspension and Revocation

The Department (CDPH L&C) may suspend or revoke any license issued under the provisions of this Chapter upon any of the following grounds:

(a) Violation by the licensee of any of the rules and regulations promulgated under this Chapter of the California Code of Regulations, Title 22.

(b) Aiding, abetting, or permitting the violation of any of the rules and regulations promulgated under this Chapter.

(c) Conduct inimical to the public health, morals, welfare or safety of the people of the State of California in the maintenance and operation of the premises or services for which a license is issued.

Note: Authority cited: Sections 208(a) and 1267.10(a) Health and Safety Code. Reverence: Sections 1250(j), 1254, 1265.2 and 1294, Health and Safety Code.

The following regulations may also apply if any alterations are being considered:

79821 Space Conversion and Remodeling

(a) Spaces approved for specific uses at the time of licensure shall not be converted to other uses or remodeled without the written approval of the Department, and shall also be in compliance with the requirements of the California Building Standards Code and State Fire Marshal.

(b) Where remodeling, space conversion or new construction involves displacement or disruption of services which result in relocating a patient, the facility shall develop an implementation plan. Such plans shall be submitted to and be approved by the Department.

79823 Inmate-patient capacity.

(c) Inmate-patients shall not be housed in areas which have not been approved by the Department for inmate-patient housing and which have not been given a fire clearance by the State Fire Marshal.

79825 Fire Safety

All correctional treatment center shall be maintained in conformity with the regulations adopted by the State Fire Marshal for the prevention of fire and for protection of life and property against fire and panic. All correctional treatment centers shall maintain fire safety clearance from the State Fire Marshal's office or its designee.

We currently have an approval and fire clearance from the State Fire Marshal for the operation of a 50 bed Correctional Treatment Center.

There is also a provision in Title 22 for an unlicensed Intermediate Care Facilities, provided that the institution meets the definition and criteria below, and may fulfill the desire to have an unlicensed ICF however, the location cannot be on the 4th floor CTC. The regulation is as follows:

5

California Code of Regulations, Title 22, Division 5, Chapter 4 Intermediate Care Facilities, Article 2 License, Section:

73201 License Required
   (b) The provisions of this article do not apply to the following institutions:
   (3) Any house or institutions supplying board and room only, or room only, or board only; provided that no resident thereof requires any element of medical care as determined by the Department (CDPH).

There were also discussions regarding having the ICF inmates pass through the CTC to access the Day Room, adjacent to the Food Administrator/Dietitian office, in the OHU. There is a possibility that we will be in violation with our agreements with Licensing when the separation of services was approved separating the CTC from the OHU/Ad Seg areas with the use of fire doors. CTC patient movement and services will have to stop in order to accommodate the passage of condemned and other inmates through the CTC. I have the email copies of the discussions between Licensing and HCFALL available at your request.

In conclusion, I strongly believe that an ICF administered, governed and served by CCHCS Mental Health, without DSH providing the services, is a great concept. However, I have concerns that by bypassing the regulatory agencies and regulations set by the legislature in the California Code of Regulations, we may be jeopardizing the CTC license.

Thank you,

**Diana Martinez**
Standards Compliance Coordinator
CSP – San Quentin Correctional Treatment Center
Mental Health Crisis Beds
1 Main Street, CHSB Healthcare
San Quentin, CA 94964
Office:   (415) 454-1460 Ext. 3712
diana.martinez3@cdcr.ca.gov

<image001.jpg>
I'd rather attempt to do something great and fail

than to attempt to do nothing and succeed.

The truth of the matter is that

you always know the right thing to do.

The hard part is doing it.

~Robert H. Schuller

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communication Privacy Act.  If you are not the intended recipient, please contact the sender and destroy all copies of this communication.  Thank you.

Exhibit 4

STATE OF CALIFORNIA — DEPARTMENT OF STATE HOSPITALS                                    EDMUND G. BROWN JR., GOVERNOR

**DIVISION OF ADMINISTRATION**
1600 Ninth Street, Room 140
Sacramento, CA 95814



February 25, 2013

Matthew A. Lopes, Jr., Esq.              via:      Debbie J. Vorous
Office of the Special Master                       Deputy Attorney General
Pannone, Lopes & Devereaux, LLC                    1300 I Street, Suite 125
317 Iron Horse Way, Suite 301                      P.O. Box 944255
Providence, RI 02908                               Sacramento, CA  94244-2550

## RE: MONTHLY STAFFING AND STAFFING VACANCIES REPORT FOR ALL DSH FACILITIES

In accordance with the February 6, 2007 *Coleman* Court Order on the issue of pay parity for
California Department of State Hospitals' (DSH) clinicians, DSH is providing the following
information on Staffing and Staffing Vacancies for all DSH facilities.

The enclosed report contains the following data for 26 *Coleman* related clinical positions:
total number of budgeted positions; positions filled; positions currently vacant; contracted
full-time equivalents; and the overall percentage of vacancies for each facility as of
February 1, 2013. Please note that DSH has included additional information that identifies
the number of contracted staff employed at DSH facilities.

If you have any questions or concerns, please feel free to contact Candius Burgess,
Coordination and Logistics Unit, at (916) 654-0090.

Sincerely,

ROB COOK
Staff Services Manager III
Administrative Services Division
Department of State Hospitals

Enclosures

DEPARTMENT OF STATE HOSPITALS
*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *COLEMAN* RELATED CLASSES | Facility Totals | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
| 7594/9660 9690/9693 | Medical Director | 6.00 | 3.00 | 3.00 | 0.00 | 3.00 | 50% | 50% |
| 8236 | Psychiatric Technician Assistant (Safety) | 288.00 | 268.00 | 20.00 | 0.00 | 20.00 | 7% | 7% |
| 8238 | Psychiatric Technician Trainee (Safety) | 29.50 | 28.50 | 1.00 | 0.00 | 1.00 | 3% | 3% |
| 8253 | Psychiatric Technician (Safety) | 2,352.40 | 2,086.80 | 265.60 | 34.00 | 231.60 | 11% | 10% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 6.00 | 4.00 | 2.00 | 0.00 | 2.00 | 33% | 33% |
| 8252 | Senior Psychiatric Technician (Safety) | 349.80 | 311.80 | 38.00 | 0.00 | 38.00 | 11% | 11% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 264.60 | 237.25 | 27.35 | 8.00 | 19.35 | 10% | 7% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 29.00 | 28.00 | 1.00 | 0.00 | 1.00 | 3% | 3% |
| 9831 | Senior Psychologist, Health Facility (Supervisor) | 41.20 | 38.40 | 2.80 | 0.00 | 2.80 | 7% | 7% |
| 7619 | Staff Psychiatrist (Safety) | 189.00 | 172.30 | 16.70 | 25.00 | -8.30 | 9% | -4% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 32.50 | 23.50 | 9.00 | 9.00 | 0.00 | 28% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 3.60 | 3.00 | 0.60 | 0.00 | 0.60 | 17% | 17% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 35.10 | 27.00 | 8.10 | 0.00 | 8.10 | 23% | 23% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 5.00 | 3.00 | 2.00 | 0.00 | 2.00 | 40% | 40% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 75.90 | 69.40 | 6.50 | 0.00 | 6.50 | 9% | 9% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 11.00 | 10.00 | 1.00 | 1.00 | 0.00 | 9% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 152.80 | 132.35 | 20.45 | 0.00 | 20.45 | 13% | 13% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 55.00 | 50.50 | 4.50 | 0.00 | 4.50 | 8% | 8% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 7.00 | 7.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker (Health/Correctional Facility) – (Safety) | 293.40 | 256.80 | 36.60 | 0.00 | 36.60 | 12% | 12% |
| 8104 | Unit Supervisor (Safety) | 139.00 | 131.00 | 8.00 | 0.00 | 8.00 | 6% | 6% |
| 9859 | Chief Psychologist | 6.00 | 4.00 | 2.00 | 0.00 | 2.00 | 33% | 33% |
| 9867 | Supervising Psychiatric Social Worker | 20.00 | 17.00 | 3.00 | 0.00 | 3.00 | 15% | 15% |
| | *COLEMAN* GRAND TOTALS | 4,391.80 | 3,912.60 | 479.20 | 77.00 | 402.20 | 11% | 9% |

*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | **COLEMAN RELATED POSITION** | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| \multicolumn DSH Psychiatric Technician Classifications | | | | | | | | |
| | **Department of State Hospitals - Atascadero** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 8238 | Psychiatric Technician Trainee (Safety) | 26.50 | 26.50 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 597.50 | 519.00 | 78.50 | 0.00 | 78.50 | 13% | 13% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 87.00 | 76.00 | 11.00 | 0.00 | 11.00 | 13% | 13% |
| | **DSH-Atascadero SUB-TOTAL** | **714.00** | **623.50** | **90.50** | **0.00** | **90.50** | **13%** | **13%** |
| | **Department of State Hospitals - Coalinga** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 30.00 | 27.00 | 3.00 | 0.00 | 3.00 | 10% | 10% |
| 8238 | Psychiatric Technician Trainee (Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 8253 | Staff Psychiatrist (Safety) | 434.90 | 384.80 | 50.10 | 34.00 | 16.10 | 12% | 4% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 6.00 | 4.00 | 2.00 | 0.00 | 2.00 | 33% | 33% |
| 8252 | Senior Psychiatric Technician (Safety) | 75.80 | 64.80 | 11.00 | 0.00 | 11.00 | 15% | 15% |
| | **DSH-Coalinga SUB-TOTAL** | **549.70** | **482.60** | **67.10** | **34.00** | **33.10** | **0%** | **6%** |
| | **Department of State Hospitals - Metropolitan** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 39.00 | 35.00 | 4.00 | 0.00 | 4.00 | 10% | 10% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 233.00 | 221.00 | 12.00 | 0.00 | 12.00 | 5% | 5% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 38.00 | 31.00 | 7.00 | 0.00 | 7.00 | 18% | 18% |
| | **DSH-Metropolitan SUB-TOTAL** | **310.00** | **287.00** | **23.00** | **0.00** | **23.00** | **7%** | **7%** |
| | **Department of State Hospitals - Napa** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 184.00 | 176.00 | 8.00 | 0.00 | 8.00 | 4% | 4% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 352.00 | 303.00 | 49.00 | 0.00 | 49.00 | 14% | 14% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 72.00 | 63.00 | 9.00 | 0.00 | 9.00 | 13% | 13% |
| | **DSH-NapaSUB-TOTAL** | **608.00** | **542.00** | **66.00** | **0.00** | **66.00** | **11%** | **11%** |

DEPARTMENT OF STATE HOSPITALS
*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *COLEMAN* RELATED POSITION | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **DSH Psychiatric Technician Classifications** | | | | | | | |
| | **Department of State Hospitals - Patton** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 32.00 | 28.00 | 4.00 | 0.00 | 4.00 | 13% | 13% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 688.00 | 651.00 | 37.00 | 0.00 | 37.00 | 5% | 5% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 77.00 | 77.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **DSH-Patton SUB-TOTAL** | **797.00** | **756.00** | **41.00** | **0.00** | **41.00** | **5%** | **5%** |
| | **Department of State Hospitals - Vacaville** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 27.00 | 3.00 | 24.00 | 0.00 | 24.00 | 89% | 89% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **DSH-Vacaville SUB-TOTAL** | **27.00** | **3.00** | **24.00** | **0.00** | **24.00** | **89%** | **89%** |
| | **Department of State Hospitals - Salinas Valley** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 20.00 | 5.00 | 15.00 | 0.00 | 15.00 | 75% | 75% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **DSH-Salinas Valley SUB-TOTAL** | **20.00** | **5.00** | **15.00** | **0.00** | **15.00** | **75%** | **75%** |
| | **Department of State Hospitals - Stockton** | | | | | | | |
| 8236 | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **DSH-Salinas Valley SUB-TOTAL** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** | **0%** | **0%** |
| | **TOTAL VACANCY RATE** | **3,025.70** | **2,699.10** | **326.60** | **34.00** | **292.60** | **11%** | **10%** |

*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **Department of State Hospitals - Atascadero** | | | | | | | |
| 7594 | Medical Director | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236 | Psychiatric Technician Assistant (Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 8238 | Psychiatric Technician Trainee (Safety) | 26.50 | 26.50 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 597.50 | 519.00 | 78.50 | 0.00 | 78.50 | 13% | 13% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 87.00 | 76.00 | 11.00 | 0.00 | 11.00 | 13% | 13% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 51.40 | 41.70 | 9.70 | 0.00 | 9.70 | 19% | 19% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist, Health Facility (Supervisor) | 9.00 | 9.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7619 | Staff Psychiatrist (Safety) | 25.90 | 21.00 | 4.90 | 9.00 | -4.10 | 19% | -16% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 7.00 | 2.00 | 5.00 | 0.00 | 5.00 | 71% | 71% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 13.00 | 13.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 33.70 | 31.00 | 2.70 | 0.00 | 2.70 | 8% | 8% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 44.70 | 41.00 | 3.70 | 0.00 | 3.70 | 8% | 8% |
| 8104 | Unit Supervisor (Safety) | 31.00 | 30.00 | 1.00 | 0.00 | 1.00 | 3% | 3% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| | **COLEMAN TOTAL** | **943.70** | **825.20** | **118.50** | **9.00** | **109.50** | **13%** | **12%** |

Coleman Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| | Department of State Hospitals - Coalinga | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Class Code** | **Coleman Related Classifications** | **Budgeted** | **Filled** | **Vacant** | **Contracted Full-Time Equivalents** | **Functional Vacancy** | **Vacancy Rate (Authorized Positions Vacant)** | **Functional Vacancy Rate (Contractor Offset to Vacancies)** |
| 9693 | Medical Director | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 8236 | Psychiatric Technician Assistant (Safety) | 30.00 | 27.00 | 3.00 | 0.00 | 3.00 | 10% | 10% |
| 8238 | Psychiatric Technician Trainee (Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 8253 | Psychiatric Technician (Safety) | 434.90 | 384.80 | 50.10 | 34.00 | 16.10 | 12% | 4% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 6.00 | 4.00 | 2.00 | 0.00 | 2.00 | 33% | 33% |
| 8252 | Senior Psychiatric Technician (Safety) | 75.80 | 64.80 | 11.00 | 0.00 | 11.00 | 15% | 15% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 45.90 | 39.25 | 6.65 | 8.00 | -1.35 | 14% | -3% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 9.00 | 8.00 | 1.00 | 0.00 | 1.00 | 11% | 11% |
| 9831 | Senior Psychologist, Health Facility (Supervisor) | 6.20 | 5.00 | 1.20 | 0.00 | 1.20 | 19% | 19% |
| 7619 | Staff Psychiatrist (Safety) | 11.80 | 4.00 | 7.80 | 16.00 | -8.20 | 66% | -69% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 0.60 | 0.00 | 0.60 | 0.00 | 0.60 | 100% | 100% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 7.10 | 4.00 | 3.10 | 0.00 | 3.10 | 44% | 44% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 12.00 | 10.00 | 2.00 | 0.00 | 2.00 | 17% | 17% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 14.20 | 12.00 | 2.20 | 0.00 | 2.20 | 15% | 15% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 14.00 | 11.50 | 2.50 | 0.00 | 2.50 | 18% | 18% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 42.90 | 35.00 | 7.90 | 0.00 | 7.90 | 18% | 18% |
| 8104 | Unit Supervisor (Safety) | 23.00 | 20.00 | 3.00 | 0.00 | 3.00 | 13% | 13% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | | | | | | | | |
| | **COLEMAN TOTAL** | **742.40** | **636.35** | **106.05** | **58.00** | **48.05** | **14%** | **6%** |

*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| | Department of State Hospitals - Metropolitan | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
| 9690 | Medical Director | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236 | Psychiatric Technician Assistant (Safety) | 39.00 | 35.00 | 4.00 | 0.00 | 4.00 | 10% | 10% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 233.00 | 221.00 | 12.00 | 0.00 | 12.00 | 5% | 5% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 38.00 | 31.00 | 7.00 | 0.00 | 7.00 | 18% | 18% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 20.00 | 19.00 | 1.00 | 0.00 | 1.00 | 5% | 5% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist,  Health Facility (Supervisor) | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7619 | Staff Psychiatrist (Safety) | 30.00 | 30.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 6.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 7.10 | 5.50 | 1.60 | 0.00 | 1.60 | 23% | 23% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 21.70 | 21.60 | 0.10 | 0.00 | 0.10 | 0% | 0% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 36.00 | 34.00 | 2.00 | 0.00 | 2.00 | 6% | 6% |
| 8104 | Unit Supervisor (Safety) | 13.00 | 13.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 9867 | Supervising Psychiatric Social Worker | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | | | | | | | | |
| | **COLEMAN** TOTAL | 456.80 | 428.10 | 28.70 | 0.00 | 28.70 | 6% | 6% |

6 of 11

*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **Department of State Hospitals - Napa** | | | | | | | |
| 7594 | Medical Director | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236 | Psychiatric Technician Assistant (Safety) | 184.00 | 176.00 | 8.00 | 0.00 | 8.00 | 4% | 4% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 352.00 | 303.00 | 49.00 | 0.00 | 49.00 | 14% | 14% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 72.00 | 63.00 | 9.00 | 0.00 | 9.00 | 13% | 13% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 47.80 | 44.80 | 3.00 | 0.00 | 3.00 | 6% | 6% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 8.50 | 8.50 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist, Correctional Facility (Supervisor) | 6.00 | 6.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7619 | Staff Psychiatrist (Safety) | 50.80 | 47.80 | 3.00 | 0.00 | 3.00 | 6% | 6% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 7.00 | 7.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 11.70 | 10.90 | 0.80 | 0.00 | 0.80 | 7% | 7% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 3.00 | 2.00 | 1.00 | 1.00 | 0.00 | 33% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 17.20 | 15.00 | 2.20 | 0.00 | 2.20 | 13% | 13% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 16.00 | 16.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 46.60 | 41.80 | 4.80 | 0.00 | 4.80 | 10% | 10% |
| 8104 | Unit Supervisor (Safety) | 39.00 | 35.00 | 4.00 | 0.00 | 4.00 | 10% | 10% |
| 9859 | Chief Psychologist | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 9867 | Supervising Psychiatric Social Worker | 5.00 | 4.00 | 1.00 | 0.00 | 1.00 | 20% | 20% |
| | **COLEMAN TOTAL** | **871.60** | **784.80** | **86.80** | **1.00** | **85.80** | **10%** | **10%** |

*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **Department of State Hospitals - Patton** | | | | | | | |
| 9660 | Medical Director | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236 | Psychiatric Technician Assistant (Safety) | 32.00 | 28.00 | 4.00 | 0.00 | 4.00 | 13% | 13% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 688.00 | 651.00 | 37.00 | 0.00 | 37.00 | 5% | 5% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 77.00 | 77.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 64.50 | 62.50 | 2.00 | 0.00 | 2.00 | 3% | 3% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 5.50 | 5.50 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist, Correctional Facility (Supervisor) | 13.00 | 12.40 | 0.60 | 0.00 | 0.60 | 5% | 5% |
| 7619 | Staff Psychiatrist (Safety) | 70.50 | 69.50 | 1.00 | 0.00 | 1.00 | 1% | 1% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 21.10 | 20.00 | 1.10 | 0.00 | 1.10 | 5% | 5% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 5.00 | 5.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 32.50 | 32.25 | 0.25 | 0.00 | 0.25 | 1% | 1% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 9.00 | 9.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 69.00 | 67.00 | 2.00 | 0.00 | 2.00 | 3% | 3% |
| 8104 | Unit Supervisor (Safety) | 33.00 | 33.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **COLEMAN TOTAL** | 1136.10 | 1088.15 | 47.95 | 0.00 | 47.95 | 4% | 4% |

DEPARTMENT OF STATE HOSPITALS
*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **Department of State Hospitals - Salinas Valley** | | | | | | | |
| 7594 | Medical Director | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 8236 | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 20.00 | 5.00 | 15.00 | 0.00 | 15.00 | 75% | 75% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 12.00 | 11.00 | 1.00 | 0.00 | 1.00 | 8% | 8% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist,  Health Facility (Supervisor) | 2.00 | 1.00 | 1.00 | 0.00 | 1.00 | 50% | 50% |
| 7619 | Staff Psychiatrist (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 5.00 | 4.00 | 1.00 | 4.00 | -3.00 | 20% | -60% |
| 7616 | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 2.00 | 1.00 | 1.00 | 0.00 | 1.00 | 50% | 50% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 3.00 | 2.00 | 1.00 | 0.00 | 1.00 | 33% | 33% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 13.00 | 11.00 | 2.00 | 0.00 | 2.00 | 15% | 15% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 6.00 | 4.00 | 2.00 | 0.00 | 2.00 | 33% | 33% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 23.00 | 15.00 | 8.00 | 0.00 | 8.00 | 35% | 35% |
| 8104 | Unit Supervisor (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | **COLEMAN TOTAL** | **90.00** | **57.00** | **33.00** | **4.00** | **29.00** | **37%** | **32%** |

DEPARTMENT OF STATE HOSPITALS
*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **Department of State Hospitals - Stockton** | | | | | | | |
| 7594 | Medical Director | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8236 | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist, Health Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7619 | Staff Psychiatrist (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7616 | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8104 | Unit Supervisor (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| | | | | | | | | |
| | **COLEMAN TOTAL** | 2.00 | 2.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |

DEPARTMENT OF STATE HOSPITALS
*Coleman* Related Clinical Positions
Monthly Staffing and Staffing Vacancies Report
as of February 1, 2013

| Class Code | *Coleman* Related Classifications | Budgeted | Filled | Vacant | Contracted Full-Time Equivalents | Functional Vacancy | Vacancy Rate (Authorized Positions Vacant) | Functional Vacancy Rate (Contractor Offset to Vacancies) |
|---|---|---|---|---|---|---|---|---|
| | **Department of State Hospitals - Vacaville** | | | | | | | |
| 7594 | Medical Director | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| 8236 | Psychiatric Technician Assistant (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8238 | Psychiatric Technician Trainee (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8253 | Psychiatric Technician (Safety) | 27.00 | 3.00 | 24.00 | 0.00 | 24.00 | 89% | 89% |
| 8254 | Pre-Licensed Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8252 | Senior Psychiatric Technician (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9873 | Psychologist, Health Facility (Clinical-Safety) | 23.00 | 19.00 | 4.00 | 0.00 | 4.00 | 17% | 17% |
| 9839 | Senior Psychologist, Health Facility (Specialist) | 4.00 | 4.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9831 | Senior Psychologist,  Health Facility (Supervisor) | 1.00 | 1.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7619 | Staff Psychiatrist (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9758 | Staff Psychiatrist, Correctional and Rehabilitative Services (Safety) | 27.50 | 19.50 | 8.00 | 5.00 | 3.00 | 29% | 11% |
| 7616 | Senior Psychiatrist (Specialist) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9759 | Senior Psychiatrist (Specialist), Correctional and Rehab Services (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 7609 | Senior Psychiatrist (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9761 | Senior Psychiatrist (Supervisor), Correctional and Rehab Services (Safety) | 2.00 | 1.00 | 1.00 | 0.00 | 1.00 | 50% | 50% |
| 9271 | Senior Psychiatrist, Correctional Facility (Supervisor) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8321 | Rehabilitation Therapist, State Facilities (Music-Safety) | 8.00 | 8.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8323 | Rehabilitation Therapist, State Facilities (Occupational-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8324 | Rehabilitation Therapist, State Facilities (Recreation-Safety) | 20.50 | 9.50 | 11.00 | 0.00 | 11.00 | 54% | 54% |
| 8420 | Rehabilitation Therapist, State Facilities (Art-Safety) | 3.00 | 3.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 8422 | Rehabilitation Therapist, State Facilities (Dance-Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9872 | Clinical Social Worker, Health/Correctional Facility (Safety) | 31.20 | 23.00 | 8.20 | 0.00 | 8.20 | 26% | 26% |
| 8104 | Unit Supervisor (Safety) | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9859 | Chief Psychologist | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0% | 0% |
| 9867 | Supervising Psychiatric Social Worker | 1.00 | 0.00 | 1.00 | 0.00 | 1.00 | 100% | 100% |
| | **COLEMAN TOTAL** | 149.20 | 91.00 | 58.20 | 5.00 | 53.20 | 39% | 36% |

Exhibit 5



Transcript of the Testimony of:

# John Brim, M.D.

Coleman v. Brown

March 1, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                    Plaintiffs,       )
                                      )CASE NO.:
          vs.                         )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                    Defendants.       )
_____)



DEPOSITION OF

JOHN BRIM, M.D.

FRIDAY, MARCH 1, 2013,  9:28 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,             )
                                        )
 5                     Plaintiffs,      )
                                        )CASE NO.:
 6          vs.                         )S 90-0520 LKK-JFM
                                        )
 7   EDMUND G. BROWN, JR., ET AL.,      )
                                        )
 8                     Defendants.      )
     _____)
 9

10

11

12

13

14          The Deposition of JOHN BRIM, M.D., taken on

15   behalf of the Plaintiffs, before Megan F. Alvarez,

16   Certified Shorthand Reporter No. 12470, Registered

17   Professional Reporter, for the State of California,

18   commencing at 9:28 a.m., Friday, March 1, 2013, at

19   Rosen, Bien, Galvan & Grunfeld, LLP, 315 Montgomery

20   Street, 10th Floor, San Francisco, California.

21

22

23

24

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3            BY:  MICHAEL BIEN, ESQ.
                  JANE KAHN, ESQ.
 4                AARON FISCHER, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5           315 MONTGOMERY STREET, 10TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
 6           415.433.6850
             415.433.7104 FAX
 7           MBIEN@RBGG.COM
 8
     FOR DEFENDANTS:
 9
              BY:  JAY C. RUSSELL, ESQ.
10           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
11           455 GOLDEN GATE AVENUE, 11TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94102-7004
12           415.703.5717
             415.703.5843 FAX
13           JAY.RUSSELL@DOJ.CA.GOV
14
              BY:  GEORGE MAYNARD, ESQ.
15                FRANCIE D. CORDOVA, ESQ.
             STATE OF CALIFORNIA
16           DEPARTMENT OF STATE HOSPITALS
             1600 9TH STREET, ROOM 400
17           SACRAMENTO, CALIFORNIA 95814
             916.651.5300
18           916.651.3852 FAX
             GEORGE.MAYNARD@DSH.CA.GOV
19
20   FOR JOHN BRIM, M.D.:
21            BY:  KELCIE M. GOSLING, ESQ.
             MENNEMEIER, GLASSMAN & STROUD, LLP
22           PARK TOWER
             980 9TH STREET, SUITE 1700
23           SACRAMENTO, CALIFORNIA 95814
             916.551.2581
24           916.553.4011 FAX
             GOSLING@MGSLAW.COM
25
```

John Brim, M.D.                                              March 1, 2013

1   was your program relatively full of patients?

2        A.   Yes.

3        Q.   Okay.  And was there still pressure on --

4   there's still new patients arriving?  Are there new

5   admissions arriving?

6        A.   Yes.

7        Q.   I note on the top of the second page, in bold,

8   the letter states:  "But we need to inform you that we

9   will be working in a state of protest regarding our case

10  load and the rate of admissions.  We are also extremely

11  concerned about further attrition of psychiatrists which

12  seems very likely considering the present workload and

13  conditions."

14            Did you discuss -- let me just ask:  Why is

15  there a reference to admissions as being a factor?

16            MR. RUSSELL:  Objection.  Vague and ambiguous.

17            THE WITNESS:  My understanding is that there

18  was a general feeling -- and I -- I felt this way --

19  that we were under pressure from administration to move

20  the old people out -- the old patients out and take in

21  new patients so as to keep our waiting list down.

22            And many of the psychiatrists -- well, I would

23  say all -- felt that this was resulting in shorter stay

24  for the patients than historically had been the case.

25  And they felt that it was getting to the point that

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

1    people were not staying in all cases at least as long as

2    they needed to.  There was pressure from administration

3    to get them out quickly so that new people could be

4    brought in.

5                That does impact the workload, because when a

6    new person comes in, there's quite a bit of work to do

7    on the part of the psychiatrist, research assessment, so

8    on.  So as the number of admissions and discharges go

9    up, that means more work for the psychiatrist.

10   BY MR. BIEN:

11        Q.   You suggest in the last paragraph that one way

12   to alleviate some of the pressure on the Salinas Valley

13   psychiatric program would be to reduce the flow of new

14   admissions; is that correct?

15        A.   Correct.

16        Q.   And did you have any response from the

17   administration to that suggestion?

18        A.   Not aware of any.

19        Q.   To your knowledge, are there still new

20   admissions arriving at Salinas Valley psychiatric

21   program?

22        A.   Yes.

23        Q.   In the first paragraph on the first page, you

24   refer to "a third psychiatrist scheduled to leave within

25   the past six weeks."

John Brim, M.D.                                                    March 1, 2013

1          You mentioned two that were leaving by

2     retirement, Drs. Weinstein and Sial?

3          A.    Yes.

4          Q.    Who was the third?

5          A.    Dr. Gaines, Gayle Gaines.

6          Q.    Okay.  And that's someone who signed this

7     letter?

8          A.    Yes.

9          Q.    Okay.  And what was happening with Dr. Gaines?

10         A.    She had accepted a job with the Department of

11    Corrections and was scheduled to leave us the end of the

12    January.

13         Q.    There's also a reference here to -- on the

14    first page, the third paragraph, to the Stockton

15    program.

16         And that -- I'm looking at the third paragraph

17    down.  It says:  "When administration visited our

18    facility recently to present the Stockton program."

19         Did you have a presentation to the staff at

20    Salinas Valley psychiatric program by Department of

21    State Hospital staff about the new program?

22         A.    Yes, we did.

23         Q.    Approximately when was that?

24         A.    I believe late December, early January.

25         Q.    There's also a reference here to -- I'm

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

1  turning to the last paragraph on the second page.  "We

2  understand that since SVPP is being downsized, then it

3  may be difficult to attract new psychiatrists."

4          Had you understood -- what were you told

5  about -- when were you first told that the Stockton

6  program was opening?  Was it in this presentation in

7  late December, or had you heard about that earlier?

8      A.   No, no.  It had been in the works for a least

9  a couple of years.

10     Q.   When do you first recall being informed that

11 the SVPP program was going to be downsized?

12     A.   I believe I found that out in the early part

13 of 2012.  I was not at SVPP at the time, but I had

14 contact with some people that were there, and they

15 mentioned that they had been informed that it would be

16 downsized --

17     Q.   Okay.

18     A.   -- quite radically.

19     Q.   And there's a reference in this, I believe the

20 same last paragraph, to the -- preparing to close C and

21 D yards.

22          Was that what you were informed?

23     A.   Yes.

24     Q.   So the programs on C and D yards would be

25 closed down, but the two 64-bed units would remain

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

1    operating?

2         A.    That's my understanding.

3         Q.    Okay.  Were you given at any time a schedule

4    for when this closure would take place?

5         A.    Yes.

6         Q.    And when were you told that?

7         A.    We were told at the presentation by the

8    Stockton folks that they would begin taking transfers

9    from our program in later part of July 2013.

10        Q.    And did you understand what the pace of the

11   transition -- what did you understand from that

12   presentation about how the Salinas Valley psychiatric

13   program would be impacted by this transfer of patients?

14        A.    Well, we weren't given a firm schedule for how

15   fast the transfer would take place.  Staff was told that

16   they would all have an opportunity to apply for

17   positions with the Stockton program.

18              Those are the two things that stand out in my

19   mind from that meeting, yeah.

20        Q.    Did you understand that at some point in 2013

21   you were going to have to find another job either at

22   Stockton or somewhere else?

23        A.    Well, I don't think it was quite that clear

24   because there obviously would be 128 patients, I think,

25   left at Salinas Valley psych program, so they would

John Brim, M.D.                                                    March 1, 2013

 1    require some staff.  And it wasn't clear, you know, who
 2    might have an opportunity to stay, who might have to go.
 3    That was an assumption that would be probably on a
 4    seniority basis, but I wasn't really too involved in
 5    that because I'm a contractor.  I come and go, you know,
 6    pretty easily.
 7         Q.   Okay.  Back on the first page there's a
 8    reference to other mental health disciplines such as
 9    social work, psychology, and rehab therapy.
10              Were you aware of the staffing levels in these
11    other disciplines at Salinas Valley?
12              MS. GOSLING:  Vague and ambiguous as to time.
13    I'm assuming when they wrote this letter.
14              MR. BIEN:  Yeah, in January 2013.
15              THE WITNESS:  Well, I knew from my own
16    experience on the D yard where I worked that the
17    disciplines were short of staff.  And I understood that
18    to be generally the case in all of the Salinas Valley
19    psych program units.
20    BY MR. BIEN:
21         Q.   Okay.  And did you -- in your personal opinion
22    did you feel that the shortage of other disciplines in
23    psychiatry was greater than it had been in times in the
24    past as of January 2013?
25         A.   It was certainly.

John Brim, M.D.                                                    March 1, 2013

1            MR. RUSSELL:  Objection.  Vague and ambiguous.

2    Lacks foundation.

3            THE WITNESS:  It was certainly greater than

4    two years I had spent in the program from 2009 to 211.

5    BY MR. BIEN:

6        Q.   Did any of the other staff in the other

7    disciplines express to you personally their concern

8    about the level of staffing in the D5/D6 unit where

9    you're working?

10       A.   Yes.

11       Q.   And we're talking about the period since you

12   came back to Salinas Valley?

13       A.   Correct.

14       Q.   And what was said to you and by whom?

15            If you want to tell me just the person's

16   profession, that's fine with me.  I don't care about

17   their name.

18       A.   Okay.  Okay.  I can do that.

19            The social workers in particular were

20   concerned because they were stretched so thin.  It

21   involved having to cover more people than they felt

22   comfortable covering, having to, in some cases, cover

23   more than one case load.

24       Q.   What do you mean by "more than one case load"?

25       A.   One social worker would have to try to cover

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                      March 1, 2013

1  another case load that ordinarily would have its own

2  social worker assigned to it.

3      Q.   Did you discuss with a social worker that

4  spoke with you any strategies to make sure that patient

5  safety was protected in this kind of environment of

6  short staffing?

7      A.   The only strategy that I was aware of that we

8  could pursue was to do the best we could with what we

9  had.

10     Q.   Okay.

11     A.   And, of course, to keep administration

12  informed of the need for more manpower.

13     Q.   Okay.  Are you aware of any other disciplines

14  who, through their unions or groups, expressed concerns

15  about the staffing level at Salinas Valley psychiatric

16  program in December or January?

17     A.   Yes.  I know that nursing was very short.  And

18  I was told by nurses that they were making their concern

19  felt to administration.

20          The MTA staff also was short, and they also

21  were expressing to me concern about the vacancies in

22  their ranks.

23     Q.   Anyone tell you that there was a hiring freeze

24  that was limiting the ability of the institution to fill

25  vacant positions?

John Brim, M.D.                                          March 1, 2013

1        A.    I remember reference to that, and then I

2    remember being told that there were exceptions to that

3    or there were ways of hiring people despite that.  I

4    really didn't know much about that.

5        Q.    Okay.  Were you ever informed that there were

6    limits on overtime work at the facility?

7        A.    Yes, I did hear that.

8        Q.    Okay.  And where did you hear that from?

9        A.    Some of the MTA staff, as I recall.

10       Q.    Okay.  Had it been your experience at DSH that

11   shortages were sometimes addressed by asking employees

12   to work overtime?

13       A.    Yes.

14       Q.    Do you recall who made the presentation about

15   the Stockton program?

16       A.    Well, I recall that Sterling Price, the

17   executive director, was there with some other members of

18   his staff.  I don't recall their names.

19       Q.    At the time of that presentation, did

20   anyone -- were you aware of any communications to

21   Mr. Price or anyone else from, you know, superiors in

22   the Salinas Valley program about the current levels of

23   staffing at the Salinas Valley psychiatric program?

24       A.    I was not aware.

25       Q.    Okay.  At the bottom of the first page of the

John Brim, M.D.                                                    March 1, 2013

1   letter was sent, we were scheduled to lose two more of

2   the eight psychiatrists.  And that would have meant,

3   let's see, five and three-quarter psychiatrists for

4   360 patients, which I believe works out to about roughly

5   60 per psychiatrist.

6          Q.   Who were the two more psychiatrists that were

7   scheduled to leave?

8          A.   Dr. Wei had announced that he was leaving, and

9   Dr. Kapadia had announced that he had a new job and was

10  going to be departing to take that up.

11         Q.   Where was Dr. Kapadia going?

12         A.   He was going to California training

13  facility -- or correction training facility at Soledad,

14  which is one of the CDCR prisons.

15         Q.   Okay.  And what about Dr. Wei?

16         A.   Dr. Wei was returning to China because of

17  family illness.

18         Q.   Okay.  And I assume that these doctors had

19  made the plan known to the administration, to your

20  knowledge?

21         A.   Yes.

22         Q.   What did the group mean by the fact -- the

23  quote in the last sentence, "We can only provide

24  emergency psychiatry services"?

25         A.   Well, we couldn't ethically abandon patients

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                                    March 1, 2013

1    that were in the facility even though we were going to

2    be stretched far too thin, but we couldn't realistically

3    undertake to provide them with the full range of

4    services that they should receive.  So we could only

5    respond to crises and emergencies.

6         Q.   Did Dr. Kapadia and Dr. Wei in fact leave as

7    scheduled?

8         A.   Dr. Wei was persuaded to stay on an additional

9    couple of weeks.  This is his last week.  He's now gone.

10             Dr. Kapadia was planning to be gone this week,

11   but I understand that he's been held over in his

12   position at Salinas Valley psychiatric program for

13   another month by agreement between the Department of

14   Corrections and the Department of State Hospitals.

15        Q.   Okay.  And how do you know that?

16        A.   Dr. Kapadia told me.

17        Q.   Okay.  After -- after you sent this second

18   letter on February 12, 2013, did you receive any

19   communications from Mr. DaSilva or any other official of

20   Department of State Hospitals about the crisis situation

21   at Salinas Valley psychiatric program?

22        A.   Well --

23             MR. RUSSELL:  Objection.  Vague and ambiguous.

24             THE WITNESS:  As this letter indicates, we

25   were able to meet with Mr. DaSilva.  During the meeting

John Brim, M.D.                                        March 1, 2013

```
 1              MR. BIEN:  Sure.  Why don't we take a minute.
 2     We can go off the record.
 3              (Off the record at 10:45 a.m. and back
 4               on the record at 10:53 a.m.)
 5     BY MR. BIEN:
 6         Q.   Have you had a chance to read the document?
 7         A.   Yes.
 8         Q.   This is Exhibit 3.
 9              Can you explain what the Level 1 program is
10     when a patient arrives at Salinas Valley psychiatric
11     program?  What does that refer to?
12         A.   When a patient arrives at SVPP, he cannot be
13     out of his cell without handcuffs until he's cleared by
14     the institutional classification committee, which
15     generally takes a week on two weeks.
16              During that time, he has to remain in his
17     house, coming out only for showers, necessary activities
18     for health care, and contacts with his treatment team.
19     That constitutes Level 1 programming, as I understand
20     it.  Once he is cleared by ICC, typically his treatment
21     team rapidly upgrades his classification so he can start
22     coming on program.
23         Q.   During this Level 1 -- so this is sort of a
24     period of time when a new patient arrives, am I correct,
25     the Level 1?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                                              March 1, 2013

1      A.    Well, it's also programming status in that
2   there's essentially no out-of-cell programming.
3      Q.    Okay.
4      A.    Yeah.
5      Q.    What kind of programming would be out of cell
6   that a Level 1 is not receiving?
7      A.    Day room, yard, psychoeducational groups.
8      Q.    Okay.  What kind of programming or -- what
9   kind of treatment is the Level 1 patient receiving
10  during this period?
11     A.    While he's receiving his psychotropic
12  medications, he will have typically one or two meetings
13  with his treatment team.  There will be some cellside
14  contact by his treatment team members.  He may be given
15  some materials to read in his cell.
16     Q.    What about -- what about individual therapy
17  sessions?  Is that happening during that period?
18     A.    It can.
19           There's not a great deal of individual therapy
20  possible given the staffing.
21     Q.    Okay.  So am I correct that most of the mental
22  health treatment that is not medication --
23     A.    Uh-huh.
24     Q.    -- in the program would be various groups?
25     A.    Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                          March 1, 2013

 1        Q.    Okay.  And the Level 1 patient would not be
 2   eligible for groups?
 3        A.    Correct.
 4        Q.    Okay.  And also not eligible for exercise
 5   yard?
 6        A.    Correct.
 7        Q.    Okay.  Do you have knowledge of what an ICC is
 8   and what it does?
 9        A.    Yes.
10        Q.    Can you explain that?
11        A.    Well, it's a committee composed primarily of
12   correctional officials.  Usually a deputy warden,
13   Correctional Counselor 1 or 2, with a representative
14   from our program in the case of our inmates.  Its
15   purpose is to decide the level of security necessary for
16   that inmate and the privileges that he may have.
17        Q.    Okay.  And is it correct that -- that there
18   has to be an initial ICC to initially clear the inmate
19   from Level 1 status?
20        A.    That's correct.
21        Q.    Okay.  And is -- do you know how -- whether
22   ICC -- do you know who schedules ICC meetings or who --
23   in other words, how do you know when an ICC meeting is
24   happening for one of your Level 1?
25             MS. GOSLING:  I'm sorry to interrupt.

John Brim, M.D.                                              March 1, 2013

```
 1              Can we just specify when you're asking him
 2     questions about these issues, that you're talking about
 3     his -- from November 2011 -- 2012 to present?
 4              MR. BIEN:  Yes.
 5              MS. GOSLING:  Okay.
 6     BY MR. BIEN:
 7         Q.   Do you understand?
 8              MS. GOSLING:  And you're talking specifically
 9     about this facility?
10              MR. BIEN:  Yes.
11     BY MR. BIEN:
12         Q.   Do you understand that, Doctor?
13         A.   I understand.
14         Q.   Okay.
15         A.   My understanding is that the patient is
16     assigned a Correctional Counselor 1 upon his entry to
17     the prison and the Correctional Counselor 1 will be
18     responsible for scheduling the ICC.
19         Q.   Okay.  Have you ever attended an ICC at
20     Salinas Valley psychiatric program since November of
21     2012?
22         A.   No.
23         Q.   Okay.  Who on the treatment team is the
24     clinical professional that tends to do that, if you
25     know?
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                              March 1, 2013

1          A.    Most often the social worker.

2          Q.    Okay.  Since you've been returned to

3     Salinas Valley psychiatric program in 2012, have you

4     personally, for any of your patients, experienced delay

5     in ICC process beyond the 10 business days in the

6     agreement between the department and Department of State

7     Hospitals -- Department of Corrections and Department of

8     State Hospitals?

9               MR. RUSSELL:  Objection.  Lacks foundation.

10              THE WITNESS:  My impression is that it

11    generally does happen within the 10 business days,

12    although it typically does take almost all of those

13    10 business days.

14    BY MR. BIEN:

15         Q.    Okay.  Have you ever as a treating

16    psychiatrist expressed concern about a delay in clearing

17    a patient from Level 1 status?

18         A.    I remember team discussions where this was

19    raised as an issue.  I haven't personally taken it to

20    administration.

21         Q.    Okay.  In the period of November 2012 to the

22    present, in your opinion, does the facility have

23    resources to provide additional treatment services to an

24    inmate on Level 1 status beyond the services that are

25    ordinarily provided?  For example, if someone was having

John Brim, M.D.                                          March 1, 2013

1      A.    Typically not, because there are other staff

2   that do.

3      Q.    Okay.   Is it your understanding that social

4   workers do have alarms?

5      A.    Yes.

6      Q.    When you've -- as a treating psychiatrist at

7   Salinas Valley psychiatric program since November of

8   2012, have you ever had complaints from patients about

9   the lack of privileges and lack of treatment in

10  Level 1 -- when they're on Level 1 status?

11     A.    Yes.

12          MR. RUSSELL:   Objection.   Vague and ambiguous.

13  Overly broad.

14  BY MR. BIEN:

15     Q.    Can you share that with me what?   Do you

16  recall?

17     A.    Typically patients complain that they have

18  more privileges at the prisons where they came from than

19  they're finding at Level 1 in our program, and they feel

20  like they've been deprived privileges by being sent to

21  our program.

22     Q.    Has a patient ever expressed to you that they

23  had more treatment groups, more hours of treatment when

24  they were in the CDCR prison than they had at your

25  program in Level 1?

John Brim, M.D.                                          March 1, 2013

1      A.    Yes.

2      Q.    Do you recall how you responded to these

3   patients?

4      A.    I told them I sympathized, I wished we could

5   start their treatment plan immediately, but that we're

6   required by CDCR to postpone their programming until

7   they have their ICC.

8      Q.    Okay.

9      A.    Typically we offer to provide what we can in

10  the way of in-cell materials to help them occupy their

11  time.

12     Q.    Let me mark as -- I've already marked as

13  Exhibit 5 a document that appears to be a manual given

14  to patients at Salinas Valley psychiatric program.

15          This was mailed to us by a patient, and his

16  name is on the back.  So I'm going to put this in the

17  sealed section too.

18          I'm not going to ask a lot of detailed

19  questions, Doctor, but is this -- this appear to be a

20  copy of a manual that's distributed to patients at

21  Salinas Valley psychiatric program?

22     A.    Yes.

23     Q.    Okay.  And what's the purpose of distributing

24  this to patients, if you know?

25          MR. RUSSELL:  Objection.  Vague and ambiguous.

John Brim, M.D.                                            March 1, 2013

 1        Q.   What can you tell me about them?
 2        A.   The DSH staff that I have talked to who had
 3   personal knowledge of this confirm that there has been a
 4   severe shortage of clean clothes, bedding, coats.  I
 5   believe they've made every possible efforts to address
 6   this.  They place the blame on CDCR, which has the
 7   responsibility for their laundry.
 8        Q.   When you say "they," is the staff, the DSH
 9   staff that you spoke to about the subject?
10        A.   Yes.
11        Q.   Okay.  We've also heard complaints about food
12   service, the volume of food, amount of food, quality of
13   food.  Have you heard complaints about food service also
14   from patients?
15        A.   Yes.
16        Q.   And have you investigated them?
17        A.   Informally.
18        Q.   And what have you heard?
19        A.   Well, I've inspected the meals and I've been
20   around at feeding time.  I've observed the distribution
21   of the meals, the timing.  I haven't found any substance
22   to the inmates' complaint about the food.  I mean, you
23   know, it's a subjective thing how good it is, but it's
24   provided.  It appears to be hygienic.  And I know it's
25   under supervision of a registered dietician, so I assume

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                                      March 1, 2013

1   these were downloaded yesterday from the Department of

2   State Hospital Web site.

3            MS. GOSLING:  Do you want the witness to look

4   through them?

5            MR. BIEN:  Yeah.  Just take a...

6            (Witness reviewing document.)

7   BY MR. BIEN:

8       Q.   Dr. Brim, this isn't a color chart, which is

9   appears on the computer when I looked at it, but are you

10  able to discern the SVPP line on these various charts?

11  Look at the last two charts, staff injuries and patient

12  injuries.

13       A.   Yes, I can discern that.

14       Q.   Okay.  Have you ever had discussions during

15  your work at Salinas Valley psychiatric program about

16  the level of staff and patient injuries?

17            MR. RUSSELL:  Objection.  Vague and ambiguous.

18  Overly broad.

19  BY MR. BIEN:

20       Q.   Since November of 2012?

21       A.   Yes.

22       Q.   And can you tell me about any of those

23  discussions?

24       A.   I have noticed an increase in staff

25  assaults -- assaults by patients on staff -- over the

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                    March 1, 2013

1    last few months.  I've asked my colleagues if they were

2    seeing the same sort of thing and, they agree that it

3    seems to be increasing.

4         Q.   Okay.  And just for the record, these charts

5    cover the period January through September of 2012.

6              Is it -- has it been your experience that --

7    is it your perception that staff injuries have been

8    higher at Salinas Valley than in previous times that

9    you've worked at Salinas Valley?

10        A.   Yes.

11             MR. RUSSELL:  Objection.  Vague and ambiguous.

12   Lacks foundation.

13             MS. GOSLING:  Join.

14   BY MR. BIEN:

15        Q.   In any discussions with staff, did anyone

16   discuss with you perhaps the level of staff injuries

17   reflects understaffing in the Salinas Valley psychiatric

18   program?

19             MR. RUSSELL:  Objection.  Vague and ambiguous.

20   Overly broad.

21             THE WITNESS:  Yes.

22   BY MR. BIEN:

23        Q.   Okay.  And can you describe that conversation

24   and when that took place?

25        A.   No one conversation stands out in my mind; but

John Brim, M.D.                                    March 1, 2013

1   over the last couple of months when the psychiatrists

2   have gotten together in their meetings, there has been

3   ongoing discussion of the increasing dangerousness of

4   the situation, and a number of different psychiatrists

5   have touched on the fact that the injuries appear to be

6   up, relate that to staff not having the time they once

7   had to maintain contact with the patients, monitor how

8   they're doing, keep us informed so that we can do what

9   we can with their medication to help stabilize them.

10          And we ourselves have all, I think, expressed

11  concern that we're not able to take the time to have the

12  number of face-to-face contacts that we really would

13  like to have to feel comfortable that we are monitoring

14  the patients in the -- a safe and responsible way.

15          Q.   Administration ever inform you that

16  Salinas Valley psychiatric program in 2012 had a higher

17  level of staff and patient injuries than all other state

18  hospital programs?

19          A.   No.  Not to my knowledge.

20          Q.   Did Secretary Allenby discuss with you his

21  concern that -- of the high level of staff and patient

22  injuries that were occurring at Salinas Valley

23  psychiatric program at his meeting this week?

24          MR. RUSSELL:  Objection.  Vague and ambiguous.

25  Assumes facts not in evidence.

John Brim, M.D.                                        March 1, 2013

1        Q.   Are the same computers available on -- in the

2   C5/C6 and D5/D6 as are in the T units, to your

3   knowledge?  In other words, if you got the password,

4   could you use it in both places?

5        A.   Yes.

6        Q.   Okay.  Our expert was informed during his tour

7   of Salinas Valley psychiatric program in late January of

8   2013, just a few weeks ago -- a month ago now, that an

9   hour -- only an hour or so of treatment was being

10  provided for patients due to staff and space

11  restrictions.

12       Is that consistent with your understanding of

13  what was going on in the program as recently as last

14  month?

15       MR. RUSSELL:  Objection.  Vague and ambiguous.

16  Lacks foundation.  Calls for speculation.  Overly broad.

17       THE WITNESS:  I don't have any problem

18  believing that.  I haven't, you know, made a study of

19  that, but that sounds about it right.

20  BY MR. BIEN:

21       Q.   Okay.  People are getting about one group a

22  day?

23       A.   Uh-huh.

24       Q.   Okay.  In your opinion, Doctor, is that less

25  than the optimal treatment that your program is designed

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

John Brim, M.D.                                              March 1, 2013

```
 1                  CERTIFICATE OF REPORTER

 2

 3        I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8            That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13            I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                  DATED:  March 4, 2013

21

22                  _____

23                  MEGAN F. ALVAREZ

24                  RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit 6

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

# TABLE OF CONTENTS

CHAPTER 1 .................................................................. Program Guide Overview

CHAPTER 2 ..................................... Reception Center Mental Health Assessment

CHAPTER 3 ................................ Correctional Clinical Case Management System

CHAPTER 4 ........................................................... Enhanced Outpatient Program

CHAPTER 5 .................................................................. Mental Health Crisis Bed

CHAPTER 6 ............................... Department of Mental Health Inpatient Program

CHAPTER 7 ................................................................. Administrative Segregation

CHAPTER 8 ........................................................ Security Housing Unit

CHAPTER 9 .................................................................. Psychiatric Services Unit

CHAPTER 10 ..................................................... Suicide Prevention and Response

APPENDIX A .............................................................................. Glossary of Terms

ATTACHMENT A ....................................................... Confidentiality Guidelines

ATTACHMENT B ..................................................... Inmate Disciplinary Process

ATTACHMENT 1 ......................... Department of Mental Health Contraband List

ATTACHMENT 2 .............. Department of Mental Health Transfer/Discharge List

ATTACHMENT 3 .............. Dept. of Mental Health Day Treatment Referral Form

ATTACHMENT 4 ................................ Other Department of Mental Health Forms

ATTACHMENT 5 .......................................................................... MHSDS Forms

prescription of treatment activities should consider the commitment offenses and current institutional maladjustment.

Inmate-patients who are released from Administrative Segregation Unit (ASU) or the PSU to a GP EOP for continuing mental health treatment may require mental health services related to adjustment to the GP environment. The ASU or PSU PC shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to GP. The receiving EOP IDTT will consider documentation by the ASU or PSU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from ASU or PSU to GP-EOP shall include services provided to aid in the transition to the GP environment. Inmate-patients referred from the ASU or PSU to a GP-EOP Unit shall be retained at EOP level of care for a minimum of 90 days.

**Release after Initial Evaluation**

If, at the conclusion of the initial evaluation process, the IDTT determines that EOP placement is inappropriate, documentation to this effect is placed in the UHR using CDCR 7388, *Mental Health Treatment Plan*. A CDCR 128-MH3, *Mental Health Placement Chrono*, noting the decision and recommending more appropriate placement shall be prepared for classification processing and transfer (if appropriate). If inpatient care is indicated, the assigned PC is responsible for initiating and completing the placement process.

## E. **EOP INMATE-PATIENT TREATMENT SERVICES**

Each EOP inmate-patient will have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs. The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan*. Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan,* must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated.

Exhibit 7

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

# TABLE OF CONTENTS

CHAPTER 1 ................................................................. Program Guide Overview

CHAPTER 2 ......................................Reception Center Mental Health Assessment

CHAPTER 3 ................................ Correctional Clinical Case Management System

CHAPTER 4 ........................................................... Enhanced Outpatient Program

CHAPTER 5 ...................................................................Mental Health Crisis Bed

CHAPTER 6 ................................ Department of Mental Health Inpatient Program

CHAPTER 7 ................................................................. Administrative Segregation

CHAPTER 8 ......................................................................... Security Housing Unit

CHAPTER 9 ....................................................................Psychiatric Services Unit

CHAPTER 10 .....................................................Suicide Prevention and Response

APPENDIX A ............................................................................Glossary of Terms

ATTACHMENT A .......................................................Confidentiality Guidelines

ATTACHMENT B ..................................................... Inmate Disciplinary Process

ATTACHMENT 1 .......................... Department of Mental Health Contraband List

ATTACHMENT 2 .............. Department of Mental Health Transfer/Discharge List

ATTACHMENT 3 ...............Dept. of Mental Health Day Treatment Referral Form

ATTACHMENT 4 ................................ Other Department of Mental Health Forms

ATTACHMENT 5 ...........................................................................MHSDS Forms

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

Custody Level IV male inmates that do not require close or high custody may be referred to ASH or VPP.

The ICF programs have a full complement of mental health staff including psychiatrists, psychologists, clinical social workers, rehabilitation therapists, psychiatric technicians, and registered nurses. Most housing is dormitory-type rooms. The inmate-patients have access to the day room, supervised yard access and are fed in a dining room. The inmate-patients receive a multidisciplinary assessment. From this information an individualized treatment program is developed from a wide variety of treatment modalities including group and individual psychotherapy, medication management, depression and crisis management, training in daily living skills and interpersonal skills, substance abuse, management of assaultive behavior, supportive counseling, modification of maladaptive behaviors, and educational and vocational programs.

### *Admission Criteria*

Referral to an ICF is considered when in the judgment of the CDCR treating clinician the inmate-patient meets the following DMH admission criteria:

1. An Axis I major (serious) mental disorder with active symptoms and any one of the following:

   - As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR EOP level of care.

   - The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.

   - The inmate-patient requires a neurological/neuropsychological consultation.

   - The inmate-patient requires an inpatient diagnostic evaluation.

   - The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e., coping, daily living, medication compliance) development with increased programming and structured treatment environment.

   - The inmate-patient's psychiatric medication history indicates that a clozapine trial might be useful.

Exhibit 8

# *MEMORANDUM OF UNDERSTANDING*
# *Intermediate Care/Non-Acute Services*

CALIFORNIA DEPARTMENT OF CORRECTIONS
AND REHABILITATION
AND
CALIFORNIA DEPARTMENT OF MENTAL HEALTH

California Department of Corrections and Rehabilitation and
Department of Mental Health

TABLE OF CONTENTS

Glossary of Terms ................................................................................................. 2

I.      INTENT ................................................................................................. 4

II.     GENERAL PROVISIONS ...................................................................... 4

III.    DUE PROCESS PROCEDURES FOR ADMISSION TO DMH ............ 10

IV.     DUE PROCESS PROCEDURES FOR INVOLUNTARY MEDICATIONS ........... 11

V.      SAFETY AND SECURITY ISSUES .................................................... 11

VI.     CRITERIA FOR INTERMEDIATE CARE/NON-ACUTE ADMISSION ................. 14

VII.    REFERRAL AND ADMISSION PROCESS-INTERMEDIATE CARE/NON-ACUTE
        ................................................................................................. 17

VIII    COORDINATED CLINICAL ASSESSMENT TEAM ............................ 21

IX      UTILIZATION MANAGEMENT .......................................................... 22

X.      RETURN TO CDCR............................................................................ 23

XI.     TRANSFER ARRANGEMENTS TO AND FROM CDCR ................... 29

XII.    RE-ENTRY SERVICES ...................................................................... 30

XIII.   MEDICAL AND SURGICAL HEALTH CARE ..................................... 34

XIV.    PHARMACY SERVICES FOR PSYCHIATRIC PROGRAMS (VPP and SVPP) .. 35

XV.     PHARMACY SERVICES FOR DMH HOSPITALS.............................. 37

XVI.    IMAGING STUDIES............................................................................ 37

XVII.   CONSULTATIVE SERVICES ............................................................. 38

XVIII.  PUBLIC HEALTH AND INFECTION CONTROL................................. 38

XIX.    HEALTH RECORDS........................................................................... 38

XX.     SPECIALIZED ANTIPSYCHOTIC MEDICATIONS............................. 41

XXI.    SUICIDE ............................................................................................ 41

XXII.   COMPLIANCE .................................................................................... 42

XXIII.  TRAINING .......................................................................................... 42

XXIV.   PROVISION FOR SERVICES UNDER PC §§ 2960-81 ...................... 43

XXV.    TERMINATION ................................................................................... 43

TABLE OF ATTACHMENTS* ................................................................................. 44

California Department of Corrections and Rehabilitation and
Department of Mental Health

## Glossary of Terms

| Acronym | Term |
|---------|------|
| ADC | Admission and Discharge Coordinator |
| APP | Acute Psychiatric Program |
| ASH | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| AWOL | Absence Without Leave |
| BPH | Board of Parole Hearing |
| C&PR | Classification and Parole Representative |
| CAT | Clinical Assessment Team |
| CCAT | Coordinated Clinical Assessment Team |
| CCR | California Code of Regulation |
| CDCR | California Department of Corrections and Rehabilitation |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMH | Chief of Mental Health |
| CMF | California Medical Facility |
| CONREP | Conditional Release Program |
| COR | California State Prison, Corcoran |
| CSH | Coalinga State Hospital |
| CSR | Classification Staff Representative |
| CSU | Classification Services Unit |
| CTC | Correctional Treatment Center |
| DA | District Attorney |
| DAPO | Division of Adult Parole |
| DCHCS | Division of Correctional Health Care Services |
| DGS | Department of General Services |
| DMH | Department of Mental Health |
| DOM | Department Operations Manual |
| EOP | Enhanced Outpatient Program |
| EPRD | Earliest Possible Release Date |
| GAF | Global Assessment of Functioning |
| GC | Government Code |
| GP | General Population |
| H&P | History and Physical |
| HCM | Health Care Manager |
| HC-POP | Health Care Placement Oversight Program |
| HIMD | Health Information Management Department |
| HQ | Headquarters |
| ICF | Intermediate Care Facility |
| IDTT | Interdisciplinary Treatment Team |
| ISRA | Integrated Suicide Risk Assessment |
| LPS | Lanterman-Petris-Short Act |

California Department of Corrections and Rehabilitation and
Department of Mental Health

| Acronym | Term |
|---------|------|
| LTCS | Long Term Care Services |
| MAR | Medication Administration Record |
| MHCB | Mental Health Crisis Beds |
| MHDS | Mental Health Documentation System |
| MOU | Memorandum of Understanding |
| MSH | Metro State Hospital |
| MTA-P | Medical Technical Assistant – Psychiatric |
| MTR | Medication Treatment Record |
| NSH | Napa State Hospital |
| OPPM | Operational Policies and Procedure Manual |
| P&T | Pharmacy and Therapeutics Committee |
| PA | Parole Agent |
| PAC | Pharmacy Advisory Committee |
| PATS | Parole Automated Tracking System |
| PC | Penal Code |
| PCH | Probable Cause Hearing |
| POC | Parole Outpatient Clinic |
| PSH | Patton State Hospital |
| PSU | Psychiatric Services Unit |
| RCCP | Recommended Continuing Care Plan |
| RH | Revocation Hearing |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP | Salinas Valley State Prison |
| TB | Tuberculosis |
| T-CON | Temporary Conservatorship |
| TTA | Triage Treatment Area |
| UHR | Unit Health Record |
| UM | Utilization Management |
| VPP | Vacaville Psychiatric Program |
| WIC | Welfare and Institutions Code |

California Department of Corrections and Rehabilitation and
Department of Mental Health

**MEMORANDUM OF UNDERSTANDING**
**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION**
**AND**
**CALIFORNIA DEPARTMENT OF MENTAL HEALTH**

*Intermediate Care/Non-Acute Services*


**I.   INTENT**

It is the intent of the California Department of Corrections and Rehabilitation (CDCR) and the California Department of Mental Health (DMH) by entering into this Memorandum of Understanding (MOU) to provide the legal framework by which the parties function cooperatively to provide inpatient mental health services to those individuals under CDCR's jurisdiction.  These services shall be clinically appropriate and effective; conform to all legal requirements; and make optimum use of available resources for mental health evaluation and treatment.

Intermediate Care Facility (ICF) mental health services are provided for male inmate-patients at Atascadero State Hospital (ASH), Coalinga State Hospital (CSH), Salinas Valley Psychiatric Program (SVPP), and Vacaville Psychiatric Program (VPP) and for female inmate-patients at Patton State Hospital (PSH).

**II.   GENERAL PROVISIONS**

    A.   This MOU, when signed and approved, is effective from the date this MOU is signed and approved by CDCR and DMH for a period of three years.  Should either or both parties deem it necessary to review and revisit the terms of this agreement, they agree to address their concerns through the addendum process set forth directly below

        1.   Should an addendum to this MOU be required as a result of changes in State statute or regulation, DMH or CDCR policy, or court orders, a sub-committee shall be appointed by the executive staff of DMH and CDCR headquarters.  This sub-committee shall be composed of both DMH and CDCR headquarters staff and shall develop the addendum for presentation to the executive staff of the two Departments.  Upon approval, the addendum shall be signed by the Deputy Director of DMH Long Term Care, the Chief Deputy Secretary of CDCR Division of Correctional Health Care Services, and the *Plata* Federal Receiver, who will continue to sign any addendum    until the *Plata* court terminates the  Receivership or the parties agree that the Receiver no longer needs to be a signatory to the addendum.   The signed addendum shall be forwarded to the Deputy Attorney General for forwarding to the *Coleman* Special Master.

California Department of Corrections and Rehabilitation and
Department of Mental Health

B. Long Term Care Services (LTCS) shall represent DMH in this contractual agreement with CDCR. The Division of Correctional Health Care Services (DCHCS) shall represent CDCR.

C. This MOU refers to Penal Code (PC) §2684 and PC §2685 transfers and returns between CDCR and DMH hospitals. PC §§2960-2981 shall be covered in a separate or separate MOUs. In accord with the joint *Valdivia* and *Coleman* court order of August 8, 2008, a CDCR parolee who is awaiting a revocation hearing is an inmate-patient for purpose of access to mental health care under PC §2684. This MOU also refers to mental health treatment between CDCR and DMH psychiatric programs that do not fall under PC §2684 or PC §2685.

D. DMH may provide treatment services to CDCR parolees prior to their Probable Cause Hearing (PCH) or Revocation Hearing (RH). (*See* Section W below.) Acceptance of the CDCR referral of any such parolees prior to their PCH or RH shall be determined by the clinical and custody criteria stated in the most recent CDCR Mental Health Services Delivery System Program Guide.

E. Revocation hearings will be held either at DMH or CDCR facilities depending upon the unique circumstances of the RH and the parolee's mental health needs. For RHs involving witnesses, the Board of Parole Hearings (BPH) will coordinate with Division of Adult Parole (DAPO), DMH, CDCR, and the parolee's attorney to determine the best location for the RH on a case-by-case basis. Options for RHs may include but are not limited to the use of video-conferencing for witness testimony and holding hearings in non-traditional locations.

F. The Secretary of CDCR holds custodial authority over each CDCR inmate-patient at the DMH operated VPP at California Medical Facility (CMF) and the SVPP at Salinas Valley State Prison (SVSP).

G. Inmate-patients whose primary treatment needs are medical rather than psychiatric shall not be admitted to an intermediate care psychiatric service. In addition, some inmate-patients with psychiatric needs may have medical/nursing conditions that preclude placement in an intermediate care psychiatric service such as serious medical conditions that are chronic/progressive in nature and/or involve cognitive deterioration. If there is disagreement regarding eligibility for admission or continued hospitalization in a psychiatric unit, the following steps shall be taken:

1. The DMH clinician(s) shall discuss the case with CDCR clinician(s). If an agreement is not reached:

California Department of Corrections and Rehabilitation and
Department of Mental Health

2.  The DMH Chief Psychiatrist and Director of Nursing shall discuss the case with the CDCR Chief Medical Officer or Health Care Manager and Director of Nursing.  If an agreement is not reached:

3.  The case shall be referred to the Coordinated Clinical Assessment Team (CCAT) process.

H.  Treatment authority for each DMH program is authenticated by DMH staff prior to admission.  CDCR staff must obtain either a signed informed consent (CDCR form 128-MH9, Transfer to DMH – Due Process Chrono) or documentation that the due process procedures specified in California Code of Regulations (CCR), Title 15 §3369.1,  have been complied with.

I.  Treatment authority for the administration of psychotropic medication in each CDCR institution is established by CDCR staff either by obtaining a signed voluntary informed consent of the inmate-patient or by procedures developed pursuant to the *Keyhea v. Rushen* (Keyhea) injunction, as codified under PC §2600.

J.  Existing Keyhea procedures shall be used, as appropriate, by DMH and CDCR.  The CDCR Legal Affairs Division, or other counsel, in accordance with current State policy, shall represent CDCR at Keyhea hearings involving a CDCR inmate-patient.  DMH shall provide the necessary treatment and clerical resources for the Keyhea process in DMH programs.

K.  An inmate-patient admitted to VPP and/or SVPP does not require PC §2684 authority for placement.  Proposed transfers of an inmate-patient from CDCR to any DMH State hospital shall be accomplished under the authority of PC §2684.

L.  CDCR institutions at the local level shall maintain an administrative liaison function for all DMH hospitals and psychiatric programs specified in this MOU. This liaison is designated as the DMH coordinator.  The DMH coordinator at each CDCR institution is generally a CDCR clinician trained to facilitate referral and transfer to DMH hospitals and psychiatric programs.   DMH facilities shall maintain an administrative liaison function for coordination of inmate-patient care with CDCR.  DMH shall specify in writing any changes in its administrative liaison person to the Statewide Director of Mental Health at DCHCS, CDCR (or designee).  CDCR shall specify, in writing, any changes to its administrative liaison person to DMH headquarters.  The administrative responsibility of each liaison shall include, but not be limited to:

1.  Coordinating the flow of inmate-patient referrals and transfers;

2.  Arranging for the transfer of an inmate-patient;

3.  Ensuring the orderly processing of inmate-patient records;

California Department of Corrections and Rehabilitation and
Department of Mental Health

4.  Communicating any procedural problems affecting the referral and transfer process as appropriate to the Statewide Director of Mental Health at DCHCS, CDCR (or designee), or Assistant Deputy Director, LTCS, DMH;

5.  Proposing such procedures as may be required to facilitate the placement, treatment and transfer of a mentally ill inmate-patient; and,

6.  Communicating issues relating to the quality management system as appropriate to the Statewide Director of Mental Health at DCHCS, CDCR (or designee), or Assistant Deputy Director, LTCS, DMH (or designee), who shall determine an appropriate response.

M.  Office and training space shall be coordinated through the institution Space Committee for VPP and SVPP executive, administrative, and clinical staff within CMF and SVSP.

N.  CDCR and DMH administrative liaisons shall maintain a list of the names and CDCR numbers of each inmate-patient who has been classified and is awaiting transfer to a DMH program.

O.  In order to ensure prompt access to needed care in DMH hospitals and psychiatric programs, CDCR shall maintain expeditious referral and classification procedures.  These referral and classification procedures shall ensure that inmate-patients who meet the admission criteria, as specified in Section III below, are transferred from CDCR facilities to DMH hospitals and psychiatric programs within 72 hours of notification of an available bed.  CSH does not receive direct referrals from CDCR but does accept direct admissions based on referrals from ASH.

P.  If an inmate-patient is hospitalized in a DMH hospital or psychiatric program and is required to be on leave to court or for other legal requirements, DMH hospital or psychiatric program staff should make every effort to assure continuity and proper level of care.

Q.  In the event of escape or Absence Without Leave (AWOL) of a CDCR inmate-patient from a DMH psychiatric program operated inside a CDCR facility, the DMH Executive Director, or designee, shall notify the Institution Watch Commander/custody staff immediately so that the escape procedures can be initiated.  In the event of escape or AWOL of a CDCR inmate-patient from a DMH State hospital, the DMH Executive Director (or designee) shall immediately notify CDCR Identification Unit by telephone at (916) 445-6713. The telephone line is staffed 24 hours per day.  The Identification Unit is responsible for notifying the appropriate CDCR staff.

California Department of Corrections and Rehabilitation and
Department of Mental Health

R. Inmate-patients who commit a crime while hospitalized in a DMH hospital or psychiatric program may be charged with a felony, misdemeanor, or infraction as determined by the District Attorney (DA).

S. If a CDCR inmate-patient dies while housed at a DMH hospital (ASH, CSH or PSH), or if the death occurred following transfer from a DMH hospital to a community medical facility, the DMH hospital responsible shall notify the coroner and local law enforcement agencies of the death according to each hospital's policies and procedures.  Initial notification shall be by telephone, direct communication, or written/faxed notification to the following:

   For Inmate-Patients:

   1. Coroner

   2. County office of the District Attorney

   3. County Sheriff

   4. Chief of Police (if the location of death is within the city limits of an incorporated city)

   5. Mental Health Program Director, DCHCS

   6. Deputy Director, Division of Adult Institutions

   7. Watch Commander of the referring prison

   8. Chief Medical Officer of the referring prison

      Additionally, a written report shall be transmitted within eight hours to the above listed authorities and to the Warden of the CDCR referring institution.  The Warden shall notify the Attorney General within 10 calendar days of a death of all known facts concerning that death.

   For Inmate-Patients who are Parolees:

   1. Local Parole Unit for parolee

   2. Parole Outpatient Clinic Liaison

   3. Chief Psychiatrist for appropriate Parole Outpatient Clinic (POC) Region

T. In the case where a CDCR inmate-patient housed at CMF is found unresponsive, VPP staff shall follow the emergency procedure policy that is in place at CMF, then shall transfer the inmate-patient to the CMF Emergency

California Department of Corrections and Rehabilitation and
Department of Mental Health

Clinic.  In the case where a CDCR inmate-patient housed at SVSP is found unresponsive, SVPP staff shall follow the emergency procedure policy that is in place at SVSP, then shall transfer the inmate-patient to the SVSP Triage Treatment Area (TTA) in the Correctional Treatment Center (CTC). Appropriate clinical staff shall determine whether the inmate-patient is deceased. The involved CDCR institution shall complete all required notifications in accordance with the CDCR Department Operations Manual (DOM) §51070.

U. Inpatient records for all inmate-patients shall be in compliance with CCR, Title 22, Division 5, Chapter 1, Article 7, Administration.  DMH staff shall be responsible for maintaining and completing all DMH inpatient mental health records for each inmate-patient residing in a DMH program, following the Mental Health Documentation System (MHDS).

V. For the psychiatric programs (VPP and SVPP), DMH shall be responsible for recruiting and hiring staff.  Personnel issues of the hospital and psychiatric program staff shall be the responsibility of DMH.  Pursuant to Government Code (GC) §§1029 and 1031, CDCR shall provide an expedited selection process for all Medical Technical Assistant-Psychiatric (MTA-P) applicants. This process includes conducting the written psychological exam; risk assessment and physical abilities test; vision test; fingerprinting; background investigation; pre-employment medical examination; and oral psychological examination process.  DMH shall provide timely and appropriate clinical training for the DMH staff.

W. A parole RH may occur at DMH when the inmate-patient is receiving DMH inpatient care.

   1. The RH is the responsibility of CDCR, and shall be documented by CDCR.

   2. CDCR will coordinate with DMH to schedule the hearing and reserve a hearing room at DMH.

   3. All parolees pending revocation have appointed counsel.  DMH will provide the inmate-patient's counsel with access to their client and to their client's clinical file prior to the hearing in accord with established DMH attorney visiting and file review procedures that exist at each DMH institution.

   4. If the RH is scheduled to be held in a DMH facility, the inmate-patient shall be escorted by DMH staff to the RH unless the hearing is waived by the inmate-patient.

California Department of Corrections and Rehabilitation and
Department of Mental Health

     5. RHs will be held either at DMH or CDCR facilities depending upon the unique circumstances of the RH and the parolee's mental health needs.  For RHs involving witnesses, BPH will coordinate with DAPO, DMH, CDCR, and the parolee's attorney to determine the best location for the RH on a case by case basis.  Options for RHs may include but are not limited to the use of video conferencing for witness testimony and the holding of hearings in non traditional locations.

X. CDCR shall provide admission and discharge dictation and transcription services for CDCR inmate-patients who are admitted to the VPP and SVPP ICF units.

## III.  DUE PROCESS PROCEDURES FOR ADMISSION TO DMH

A. Treatment authority for each DMH hospital and psychiatric program is authenticated by DMH staff prior to admission.  CDCR staff must obtain either a signed informed consent or documentation that the due process procedures (Vitek Hearing or pre Vitek certification) specified in California Code of Regulations, Title 15, Section 3369.1, or in Section 3363, Right to Refuse Treatment, are followed:

B. The emergency certification is described in the Acute MOU and is not a process used for ICF care.

     1. A Vitek hearing provides the due process requirement when the inmate-patient does not provide informed consent for placement in a DMH hospital and/or psychiatric treatment program.

          a) The Vitek hearing shall occur within 72 hours prior to admission to DMH.  This hearing is the responsibility of CDCR, and shall be documented using a CDCR Form 128C.

          b) The hearing officer shall be the Warden or designee.  In no event shall the hearing officer be the referring mental health clinician(s) or that clinician's immediate supervisor.

          c) A staff assistant, usually the inmate-patient's correctional counselor, shall be appointed by the hearing officer to assist the inmate-patient at the hearing.

          d) The inmate-patient shall be present at the due process hearing unless the hearing is waived by the inmate-patient.

          e) The inmate-patient may present evidence, including witnesses, to show he should no longer be involuntarily hospitalized, and he may refute evidence and cross-examine witnesses.

California Department of Corrections and Rehabilitation and
Department of Mental Health

> f) A written decision shall be provided to the inmate-patient no later than 72 hours from the conclusion of the hearing, signed by the hearing officer.  The hearing officer must document all evidence relied upon and the reason(s) for his/her decision.

C. Inmate-patients shall be informed any time they are the object of particular mental health diagnosis or treatment procedures.  Such inmate-patients shall have the right to refuse assignment to such a program for diagnosis or treatment without being subject to discipline or other deprivation, except as indicated in the following:

1. When a mental health evaluation is required by law or ordered by a court;

2. When an inmate-patient is placed in a mental health program for diagnostic study by the action of a classification committee, which acted upon documented information or observations that gave reasonable cause to believe the inmate-patient was suffering from a mental illness that  poses a danger to self or others, or is gravely disabled; or

3. When the diagnostic study has led to a diagnosis of existing or recurrent mental illness that renders the inmate-patient dangerous to self or others, or gravely disabled.

## IV.  DUE PROCESS PROCEDURES FOR INVOLUNTARY MEDICATIONS

A. Treatment authority for the administration of psychotropic medication in each CDCR institution is established by CDCR staff via signed voluntary informed consent of the inmate-patient or by procedures developed pursuant to the *Keyhea v. Rushen* (Keyhea) injunction, as codified under PC §2600.

1. Existing Keyhea procedures shall be used, as appropriate, by DMH and CDCR.  The CDCR Legal Affairs Division or other counsel, in accordance with current state policy, shall represent CDCR at Keyhea hearings involving a CDCR inmate-patient.   DMH shall provide the necessary treatment and clerical resources for the Keyhea process in DMH hospitals and psychiatric programs.

## V.  SAFETY AND SECURITY ISSUES

A. DMH acknowledges that the delivery of mental health treatment in a prison setting entails security considerations.

B. CDCR recognizes that the provision of ICF Psychiatric Inpatient Services in the State hospital setting presents safety and security issues that are

California Department of Corrections and Rehabilitation and
Department of Mental Health

different than DMH inpatient programs and services based within a State prison setting. CDCR shall include a thorough custody review of safety and security factors for each inmate-patient prior to sending a referral. Inmate-patients who are deemed a significant assault risk, have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner), or present a high escape risk, shall not be referred to the State hospitals. In these cases, the psychiatric programs, VPP or SVPP, shall provide mental health services.

C. Any nominal medical and/or surgical care or treatment, except for life-threatening conditions, shall normally be provided within the secure perimeter of the State hospitals; or for the psychiatric programs within the secure perimeters of CDCR designated prisons. Except for emergency care, the transport to any outside medical treatment of any ICF psychiatric inmate-patient shall be the responsibility of CDCR custody officers, and shall require the prior authorization of the CDCR Health Care Manager (HCM).

D. There shall be no temporary community release of a CDCR inmate-patient receiving ICF psychiatric care at a State hospital. If CDCR has a need to exercise a Temporary Removal under the DOM §62070, the inmate-patient shall first be returned to CDCR custody pursuant to PC §2685 procedures.

   1. CDCR inmate-patients remain subject to all regulations and requirements governing CDCR inmate-patients in so far as they may be reasonably applied in the State hospital-based setting in order to permit intermediate psychiatric treatment at ASH, CSH and PSH.

E. CDCR shall maintain a custody counselor liaison for each State hospital and psychiatric program in order to facilitate necessary custody/classification procedures for CDCR inmate-patients receiving ICF psychiatric treatment.

F. If, after admission to a State hospital, it is determined that an inmate-patient is a significant risk to assault, victimize, or escape, the referring prison shall provide emergency custody and transport to California Men's Colony or another CDCR institution. If the threat is considered to be imminent, transport shall be provided on the day of notification. In all other such notifications, the inmate-patient will be picked-up by CDCR within 24 hours. The inmate-patient will be evaluated for transfer to VPP or SVPP by the referring CDCR institution. If necessary, the case will be referred for discussion of appropriate placement at the CCAT.

G. FOR SVPP only

   1. SVSP shall provide "reasonable access equal to that afforded with the free standing treatment center" to inmate-patients receiving ICF level of care in Facility D and in Facility C, once activated.

California Department of Corrections and Rehabilitation and
Department of Mental Health

a) All MTA-Ps on duty shall be issued keys to all inter pod doors, which include A, B, & C pod doors, dining room doors and concrete yard doors that have access to outside group rooms. The same policy shall be afforded to the SVPP staff for Facility C.

b) SVPP clinical and administrative staff shall have "reasonable access" to the D Vocational office area through the D-Vocational sally port in order to provide treatment to SVPP inmate-patients.

c) The treatment hours in Delta Five and Six and in Charlie Five and Six dayrooms shall be extended from 2000 hours to 2100 hours to provide additional inmate-patient treatment.

d) The availability of use of Delta Yard and Charlie Yard shall be extended from one hour per day to a minimum of two hours per day with additional time provided on Sundays and holidays. SVSP shall provide control booth coverage as needed.

e) DMH clinical staff is permitted to provide treatment to DMH inmate-patients on the Delta Yard and Charlie Yard.

f) The Delta Yard and Charlie Yard shall be available to inmate-patients on Confined to Quarters and/or Discretionary Program Status as determined by SVPP inmate-patient treatment needs and not by SVSP determinations.  SVSP shall provide control booth coverage as needed.

g) All Delta Yard and Charlie Yard Post Orders related to SVPP shall be provided to SVPP management for review and input prior to approval by CDCR.  Any requests by SVPP to include a SVSP custody officer in an inmate-patient's treatment team conference (IDTT) shall follow the SVPP Operational Policies and Procedures Manual (OPPM).  The SVPP OPPM shall include a clear statement of the expectations being placed on CDCR staff.  Any resulting changes shall be vetted through the Labor Relations process prior to implementation.

h) The timelines for SVSP classification to clear inmate-patients for programming shall not exceed 10 working days from admission.

California Department of Corrections and Rehabilitation and
Department of Mental Health

## VI.  CRITERIA FOR INTERMEDIATE CARE/NON-ACUTE ADMISSION

A. Criteria for inpatient care in a DMH hospital or psychiatric program requires an Axis I major (severe) mental disorder with active symptoms (the definition of a major mental illness is based on the CDCR Program Guide) and any one of the following:

1. As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of CDCR's Enhanced Outpatient Program (EOP) level of care.

2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior; or stabilization of refractory psychiatric symptoms.

3. The need for neurological and/or neuropsychological consultation services, which are available at ASH, PSH, and VPP.  Referrals for these services may be requested for inmate-patients accepted to SVPP.

4. The inmate-patient requires an inpatient diagnostic evaluation because of the complexity of the case.

5. The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e. coping, daily living, medication compliance) development with increased programming and structured treatment environment; and the need cannot be met by CDCR.

6. The inmate-patient's psychiatric medication history indicates that a Clozapine trial may be useful.

7. Inmate-patients (male only) who are deemed a significant assault risk; have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner); or present a high escape risk; shall be referred to SVPP.  CDCR refers to these inmate-patients as high custody inmate-patients.

8. The inmate-patient's Global Assessment of Functioning (GAF) indicates behavior that is considerably influenced by psychotic symptoms; serious impairment in communication or judgment; or inability to function in almost all areas.

California Department of Corrections and Rehabilitation and
Department of Mental Health

9. For SVPP only, the inmate-patient is medically appropriate as determined by the receiving Prison medical staff. The SVPP Forensic team will determine mental health suitability. If agreement is not reached, CDCR and DMH will follow the CCAT process set forth below in Section VIII. Any denial for medical reasons will be immediately referred to the Director, Statewide Mental Health Program.

B. In addition to a primarily Axis I disorder, admission to a DMH hospital or psychiatric program shall be considered when:

1. The inmate-patient engages in ritualistic or repetitive self-injurious/suicidal behavior that has not responded to treatment in a CDCR facility. And without inpatient mental health treatment the inmate-patient is likely to develop serious medical complications or present a threat to their life.

2. The inmate-patient is chronically suicidal and has had repeated admissions to a Mental Health Crisis Bed (MHCB).

C. Inmate-patients committed to DMH by the courts as being incompetent to stand trial per PC §1370.

Inmate-patients who commit an offense while in CDCR, are referred to the DA for prosecution, and are found by the court to be incompetent to stand trial per PC §1370, will first be considered for the SVPP. If there are no custodial or clinical reasons for admission to the SVPP, the inmate-patients will then be considered for other PC §1370 programs in DMH.

1. Whenever the CDCR institution referring clinician is in doubt concerning the appropriateness of referring a particular inmate-patient, the referring clinician will call the Chief of Health Care Placement Oversight Program (HC-POP) or designee then, if necessary, will call the State Hospital's PC §2684 screening clinician or the psychiatric program's Admission and Discharge Coordinator (ADC) to clarify the adequacy of the referral before formally submitting the referral.

2. When an inmate-patient is admitted to either a State hospital or psychiatric program as a PC §1370, the sending CDCR institution shall provide all the documentation that would be required if the inmate-patient were being admitted to DMH for ICF mental health care. This includes but is not limited to the following:

California Department of Corrections and Rehabilitation and
Department of Mental Health

      a) Updated information involving current treatment, medications, diagnosis, suicide risk, violence risk, Keyhea information, and presentation.

      b) History and Physical (H & P) to determine medical ability to be housed at SVPP.

      c) Updated case factor information, enemies at SVPP/SVSP, updated Earliest Possible Release Date (EPRD), and alert information, etc.

   3. At the time of discharge of a  PC §1370 inmate-patient, the following is needed:

      a) Out-to-court status and discharge clarification.

      b) A Minute Order from the court in charge of the case.

D. For SVPP only: This section specifies additional guidelines to maximize occupancy of the four-man cells.

   1. If there is a waiting list, inmate-patients on the referral waiting list will be reviewed in the daily program meetings.  Prioritization for admission is based upon the clinical acuity of the inmate-patient at the time of referral; the capabilities of the institution to provide mental health treatment and programs; and any change of clinical conditions that justify moving the inmate-patient to the top of the list. The movement on the SVPP waitlist requires that a two or three paragraph note be faxed providing the rationale for the request.

   2. If all clinical factors are equal, priority shall be assigned based on current placement in the following order:  Psychiatric Services Unit (PSU); MHCB; other DMH placement (Vacaville Acute Psychiatric or Intermediate Program or ASH); Administrative Segregation (ASU)-EOP Hub; ASU; EOP; and General Population (GP).

   3. To maximize occupancy within the SVPP four-man cells, the SVPP CAT may elect to accept admissions outside of the placement order as defined above.

   4. SVPP CAT may accept EOP referrals provided such single cell admissions do not occupy more than four cells within SVPP.

California Department of Corrections and Rehabilitation and
Department of Mental Health

## VII. REFERRAL AND ADMISSION PROCESS-INTERMEDIATE CARE/NON-ACUTE

The following CDCR institutions retain Unit Health Records (UHR) for inmate-patients transferred:

> ASH = California Men's Colony (CMC)
> CSH = California State Prison, Corcoran (COR)
> PSH = California Institution for Women  (CIW)

A. REFERRAL PROCESS:

The DMH and CDCR referral system uses documents and telephone conferences for referral and transfer of each CDCR inmate-patient.  CSH does not accept direct referrals from CDCR but does accept direct admissions from CDCR institutions.

1. CDCR shall transmit standardized referral information to the appropriate DMH program (*see* Attachment #1 – DMH Referral Form Intermediate Care/Non-Acute Program).  The referral packet (*see* Attachment #2- DMH ICF/Non-Acute Referral Check List) shall be sent to the DMH Forensic Coordinator or the Admission and Discharge Coordinator (ADC).

2. DMH shall review the referral packet within three working days of receipt.  DMH staff shall immediately notify the referring institution (*see* Attachment #3 – DMH Referral Decision Form) by fax of their decision.  The decision shall provide the detailed reasons for any rejections.

3. Each referral for evaluation to an intermediate/non-acute program shall be the responsibility of CDCR clinical staff.  Referrals to DMH should be based on the need for the ICF level of care.  Determination for admission to the intermediate/non-acute program shall be the responsibility of the DMH Forensic Coordinator or the ADC.

4. All referrals shall include a completed DMH referral form and a referral packet (*see* Attachment #2 – DMH ICF/Non-Acute Referral Check List), which consists of:

   a) H&P for Transfer to DMH.  The H&P must have been completed within 30 days.  If the inmate-patient is placed on a waitlist, the H&P must have been updated within the last 30 days;

   b) Current Treatment Plan (updated within 30 days) – CDCR Form 7388-MH;

California Department of Corrections and Rehabilitation and
Department of Mental Health

    c) Due Process documentation of the hearing or written consent–CDCR Form 128-MH9—or a valid waiver of the due process hearing is required for referral if the inmate-patient refuses to sign a consent to transfer;

    d) Current Medication Administration Record (MAR);

    e) The Clozaril Checklist should be completed for an inmate-patient being referred for a Clozaril trial;

    f) Supporting Keyhea documentation or a Keyhea Order (when relevant);

    g) Interdisciplinary Progress Notes for past 15 days (may be less for new arrival to reception center);

    h) Tuberculosis (TB) chrono from the referring institution;

    i) Abstract of Judgment (for State Hospitals only);

    j) Legal Status Summary (for State Hospitals only);

    k) Chrono History (for State Hospitals only);

    l) Custody Case Factor Sheet (updated within 30 days); and

    m) CDCR Suicide Risk Evaluation.

5. DMH psychiatric programs (VPP and SVPP) shall require the DMH referral form, decision form, and Case Factor Sheet for a DMH State hospital or psychiatric program transfer to another State hospital or psychiatric program. CMF and SVSP, due to their close proximity to VPP and SVPP, shall provide the entire Unit Health Record (UHR) and the Case Factor Sheet for review by the VPP and SVPP ADC in lieu of the documents listed above.

6. If there is a waiting list, inmate-patients on the referral waiting list will be reviewed in the daily program meetings. Prioritization for admission is based upon the clinical acuity of the inmate-patient at the time of referral; the capabilities of the institution to provide mental health treatment and programs; and any change of clinical conditions that justify moving the inmate-patient to the top of the list. The movement on the SVPP waitlist requires that a two or three paragraph note be faxed providing the rationale for the request.

California Department of Corrections and Rehabilitation and
Department of Mental Health

For SVPP:

If there is a waiting list, inmate-patients on the SVPP CAT referral waiting list will be reviewed in the daily Program meetings. Prioritization for admission is based upon the clinical acuity of the inmate-patient at the time of referral; the capabilities of the institution to provide mental health treatment and programs; and any change of clinical conditions that justify moving the inmate-patient to the top of the list. Institutions may petition the SVPP Executive Director, Assistant Director, or Program Director to move an inmate-patient to the top of the waiting list based on clinical need. The CDCR requesting institution shall send a short memo (two or three paragraphs) to SVPP providing the rationale for the inmate-patient to be considered a priority for admission.

For VPP:

If there is a waiting list for the VPP, the referral waiting list will be reviewed in the daily Program meetings. Prioritization for admission is based upon the clinical acuity of the inmate-patient at the time of referral; the capabilities of the institution to provide mental health treatment and programs; and any change of clinical conditions that justify moving the inmate-patient to the top of the list. Institutions may request that an inmate-patient be moved to the top of the waiting list based on clinical need. The CDCR institution should contact the VPP CAT or ADC and verbally request the change followed by an updated referral packet.

7.  At the time the CDCR treatment team determines that a referral to a DMH inpatient program is necessary, only one referral to either the acute program or the ICF program shall be necessary. The team shall not send referrals to both the acute and ICF programs at the same time.

8.  If the condition of the inmate-patient changes while the inmate-patient is on the waitlist, the CDCR treatment team may request a case conference to discuss the case. The inmate-patient may be placed on a different program waitlist as a result of the case conference.

9.  Inmate-patients who have been referred to ICF, and are subsequently admitted to an Acute Psychiatric Program (APP) because of a change in their mental health status before being placed into ICF, shall be considered for ICF placement when discharged from APP. If the APP CAT team determines that return to CDCR without ICF treatment is indicated, the case shall be referred

California Department of Corrections and Rehabilitation and
Department of Mental Health

to the CCAT. The ICF referral shall only be rescinded upon agreement by both CDCR and DMH during the CCAT discussion.

B.  ADMISSION PROCEDURE:

1.  Classification Staff Representatives (CSR) from Classifications Services Unit (CSU) will be responsible for endorsing inmate-patients from the CDCR institution to the DMH program. These endorsements may be done on site when a CSR is available or via Teletype process when a CSR is not available on site.

2.  The following procedures shall take place prior to actual admission of each inmate-patient accepted for treatment or evaluation by the intermediate/non-acute program:

    a)  The DMH Forensic Coordinator or ADC shall determine the location of the bed for the inmate-patient.

    b)  Upon admission, the appropriate psychiatrist shall assume immediate responsibility for the respective inmate-patient's care and treatment.

    c)  The admitting psychiatrist shall document the inmate-patient's mental health status in the medical record at the time of admission.

C.  TREATMENT PLANNING:

1.  Each inmate-patient admitted to an intermediate care psychiatric services program shall be evaluated and have a treatment plan within 72 hours of admission. The treatment plan shall include a plan to stabilize the inmate-patient's symptoms and discharge to a lower level of care. For those inmate-patients residing in a DMH hospital, the treatment plan will be predicated on the outlined criteria in the Administrative Directives of the State hospital.

2.  The treatment plan and the inmate-patient's progress shall be reviewed and updated within 10 days. The treatment plan and the inmate-patient's progress shall again be updated at 30 days, then quarterly or at any time there is a change in the inmate-patient's treatment needs (for SVPP, every 30 days per CTC license regulations).

3.  The inmate-patient's progress shall be clearly documented in the medical record.

Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 241 of 310
California Department of Corrections and Rehabilitation and
Department of Mental Health

4.  Inmate-patients who have been clinically discharged but not yet transferred shall continue to receive all evaluations and treatment procedures appropriate to their clinical needs until they leave the institution.

5.  Except for emergency returns to CDCR (covered in Section X., G. below), all inmate-patients being discharged from ICF psychiatric care services to CDCR shall, subject to the availability of a CDCR bed that is consistent with the *Coleman* mandates and the needs of the inmate-patient, be transported within 72 hours of notification to CDCR that the inmate-patient is being discharged. Emergency returns shall be transferred within 24 hours.

## VIII    COORDINATED CLINICAL ASSESSMENT TEAM

All rejections will be automatically submitted by DMH to the CCAT within 24 hours of rejection. The team will be comprised of the following CDCR staff: senior mental health clinicians from DCHCS; HC-POP representative-DCHCS; CSU representative-CDCR; the institution Warden or designee; referring clinician and supervising clinician from the referring institution-CDCR. The team will also be comprised of the following DMH staff: the Assistant Deputy Director- LTCS (or designee); a senior clinician; CSH; and the Executive Director (or designee) and Program Director (or designee) for the respective hospital or psychiatric program. When reviewing a rejection, all DMH senior clinicians will participate in the review.

A.  DCHCS will notify all CCAT members, as well as the referring institution, to call into a specific phone number at a designated time. It is mandatory that the referring clinician be in attendance at this call as well as the Chief Psychiatrist and/or Psychologist and/or Senior Psychiatrist/Psychologist.

B.  The CCAT will review all pertinent information and seek clarification from the referring clinician as well as the DMH clinicians in order to determine the appropriate outcome for the case. In all cases in which medical or nursing issues are involved, the California Prison Health Care Services representative from the institution and a DMH nursing representative shall be in attendance. Decisions regarding admission or non-admission will be rendered by the CCAT at the conclusion of the meeting unless additional information is required. For those cases where the CCAT cannot come to agreement, the Assistant Deputy Director, LTCS-DMH (or designee), and the Statewide Director, Mental Health, DCHCS-CDCR (or designee), will be contacted and the case turned over to them and their respective Deputy Directors to reach a final decision. The final decision will be rendered within 2 working days from the date all supporting documentation is received.

California Department of Corrections and Rehabilitation and
Department of Mental Health

C. CCAT will also schedule and review all cases where the DMH state hospital or psychiatric program requested additional information and the information has not been received from the referring institution. In these cases, the referring clinician should be prepared to provide, at the time of the CCAT review, any material that has not been provided to DMH.

D. The DCHCS shall schedule case conferences upon request by DMH and/or CDCR clinicians regarding a difficult or perplexing inmate-patient's case, including repeated admissions of the same inmate-patient in a short time frame.

## IX    UTILIZATION MANAGEMENT

A. Utilization Management (UM) is based on an average length of stay of 180 to 240 days for ASH, CSH, PSH, SVPP, and VPP. CDCR reserves the right to inspect, monitor, and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to CDCR's inmate-patients. Such UM reviews shall be undertaken to determine whether the course of treatment or services was previously authorized, medically necessary and performed in accordance with the agreed upon rules and guidelines between DMH and CDCR. DMH agrees to make available, upon request by CDCR, for purposes of UM review, an individual inmate-patient's medical record and any committee reviews and recommendations related to that inmate-patient.

B. DMH acknowledges and agrees that a concurrent UM review shall not operate to prevent or delay the delivery of emergency treatment.

C. DMH acknowledges that the care of an inmate-patient at DMH shall be reviewed by CDCR UM nurses or designated parties and by a joint CDCR and DMH review process.

1. UM will focus on outcome analysis. The optimum outcome for an inmate-patient treated at DMH is to return them to CDCR at the highest possible level of functioning and their being able to remain in the least restrictive environment.

2. To measure outcome, each discharged inmate-patient's use of resources (days in ICF treatment at DMH hospitals and psychiatric programs) will be tabulated to assess the effectiveness of any program innovations, i.e., having a higher percentage of inmate-patients placed on Keyhea with regular renewals, wider use of depo (depo-injectable) medications, and instituting policies in which medication regimens that have been successful in stabilizing inmate-patients in the hospital setting are routinely continued by outpatient clinicians (allowing for changes due to compelling reasons).

California Department of Corrections and Rehabilitation and
Department of Mental Health

3. Information gathered from the data analysis shall be shared between DMH and CDCR. The departments will work together to implement changes indicated by favorable outcome data. The UM staff from each department will collaborate to integrate care between providers and departments in order to achieve bed utilization efficiency, optimal inmate-patient outcomes, and promote continuity across the care continuum.

4. CDCR UM nurses or designated parties will report their findings and make recommendations to the CDCR HCM, CDCR Chief Psychiatrist (or their designee(s)), and the DMH treatment team. CDCR and DMH managers (or their designees) will meet monthly to review the data.

5. Each DMH program also will have a joint CDCR and DMH UM process that will review individual cases.

6. If there is a disagreement about discharge, the UM nurse will review the inmate-patient's record and forward a recommendation to the joint CDCR and DMH UM review process. If there continues to be disagreement, the recommendation will be conveyed to the CCAT. If a CCAT is scheduled by the receiving CDCR treatment team, the UM nurse shall participate in that CCAT.

## X.    RETURN TO CDCR

A. Criteria for return to CDCR:

1. If the inmate-patient has improved to a degree that further hospitalization is unnecessary, or the primary illness or problem for which inpatient care was required is in substantial remission, and the remaining symptoms are those of a disorder for which DMH inpatient care is not necessary, the inmate-patient will be returned to CDCR for ongoing treatment; or

2. Evaluation during inpatient care has resulted in a change of diagnoses such that the DMH program is not appropriate or necessary; or

3. When further involuntary inpatient care is unnecessary, will provide no further benefit, or a court has denied further treatment (*see also* 4. below) and re-incarceration or release to parole is required, the release or re-incarceration shall be coordinated by the Classification and Parole Representative (C&PR). When appropriate, the C&PR shall ensure notice to CDCR DAPO utilizing a CDCR Form 611, Release Program Study.

4. If requested by DMH, an inmate-patient who has withdrawn informed consent for mental health treatment or psychiatric medication, but for

California Department of Corrections and Rehabilitation and
Department of Mental Health

whom continued treatment is otherwise recommended, may be returned to CDCR under PC §2685 after all other avenues to obtain authorization to treat have been exhausted, if the following two criteria have been met:

  a) Withdrawal of informed consent shall be demonstrated by 14 calendar days of continuous refusal to take oral medication or 30 calendar days of continuous refusal to accept scheduled depo-injectable medication, and documentation of discussions between treating DMH psychiatrists and other team members and the inmate-patient regarding the risks and benefits of continuing medication; AND

  b) Documentation that the inmate-patient has not met criteria for involuntary treatment for at least the last 14 calendar days.[1]

B. Inmate-patients returning to CDCR from ASH or CSH will normally return to their sending institution, if that institution has the appropriate level of care (usually EOP).  If the sending institution cannot provide the appropriate level of care (EOP, Clozapine therapy, etc.) or if there are enemy concerns or other custody factors prohibiting return to the sending institution, then the assistance of the Health Care Placement Unit will be requested to endorse the inmate-patient for return to an appropriate CDCR facility.  Emergency or urgent returns to custody from ASH will be routed initially to CMC, and emergency or urgent returns to custody from CSH will be routed initially to COR, where they will remain until transfer to the most appropriate CDCR facility

C. The treatment team for the inmate-patient being considered for discharge from an ICF level of inpatient care shall consider what lower level of care is appropriate to meet the inmate-patient's mental health needs.  The treating physician will clearly document in the Discharge Summary the rationale for their recommendation to a lower level of care, which includes consideration of transfer to the EOP at the receiving CDCR institution.

D. At the time that the DMH Interdisciplinary Treatment Team (IDTT) determines that discharge to CDCR is appropriate and the C&PR's office has designated the receiving CDCR institution, the DMH Forensic office shall contact the DMH Coordinator at the receiving institution to discuss the transfer.

---

[1]  The two 14-calendar day time periods expand the time periods set forth in the Mental Health Services Delivery System Program Guide (2009 Revision) from 7 calendar days to 14 calendar days.  (Program Guide, pg. 12-6-13.) CDCR and DMH agree that CDCR, in making subsequent revisions to the Program Guide, will take steps to include this expansion in such revisions, unless otherwise modified or rescinded by CDCR and DMH.

California Department of Corrections and Rehabilitation and
Department of Mental Health

E. The DMH Coordinator at the CDCR institution shall notify the Chief of Mental Health (CMH) or designee of the probable discharge. The information from the discussion that occurred at the time of the initial notification of the discharge shall be shared with the receiving clinical team.

F. Requirements Prior to Physical Discharge of the Inmate-Patient:

1. The DMH clinical team shall determine that the inmate-patient is ready for discharge and recommend a level of care that is appropriate for that inmate-patient. The DMH Medical Director or designee shall be notified of the team decision and confer with the team about the recommendation.

2. For a Security Housing Unit SHU inmate-patient at the DMH ICF psychiatric programs, the forensic coordinators or CAT Teams shall notify the C&PR Office two weeks prior to the physical discharge of the patient to allow the ICC to determine if the case factors are still appropriate to return the inmate-patient back to the sending institution.

3. The C&PR's office shall review the inmate-patient's custody file and determine to which institution that inmate-patient should be returned. The location of the institution that the inmate-patient will be transported to after discharge from DMH shall be communicated back to the DMH Admission and Discharge Unit as soon as possible.

4. Upon being notified that the C&PR's office has determined the appropriate CDCR institution for the inmate-patient to return, the DMH VPP CAT or the DMH Forensic Office shall notify the CDCR DMH Discharge Coordinator at the receiving institution of the pending discharge.

5. After the C&PR's office has designated the receiving CDCR Institution, DMH shall transmit by fax or electronically (if technologically possible) the following documents to the DMH coordinator at CDCR:

   a) The Discharge Summary Draft Template, which shall include the discussion and recommendation of appropriate level of care following discharge from ICF services.

   b) The Mental Health Summary/Discharge Contact Form (*see* Attachment #4 – Mental Health Summary/Discharge Telephone Contact Form). This form is to be used at the time of the DMH team clinician-to-CDCR team clinician contact as an aid for discussion. This contact shall take place after the inmate-patient has returned to CDCR.

California Department of Corrections and Rehabilitation and
Department of Mental Health

      c) If appropriate, the Non Formulary Drug Request Form (CDCR Form 7374)(*see* Attachment # 6)

6. The institution has 72 hours after the C&PR's office receives the discharge chrono from DMH to pick up the inmate-patient from DMH and transport the inmate-patient to the identified institution.

7. If the required pre-discharge documents are not received by the DMH Coordinator's office, the Coordinator shall contact the DMH State hospital or psychiatric program to have the material faxed.

8. The lack of any one of these documents shall not delay transfer of the inmate-patient to CDCR unless the DMH State hospital or psychiatric program mutually agrees.

G. Emergency Return Criteria:

1. The inmate-patient shall be returned to the CDCR institution on an expedited basis of 24 hours if an emergency exists, and within 72 hours after the time of notification of the discharge to the C&PR's office.

2. Emergency returns to CDCR including POC, shall be accomplished within 24 hours. Such returns will be with prior notification and approval by telephone of the CDCR institution's C&PR staff and Chief of Mental Health or designee. A dictated, typed Recommended Continuing Care Plan (RCCP) and/or discharge summary shall follow as soon as practicable, but not more than 14 days after return.

3 For each inmate-patient returning to CDCR from a DMH program, DMH shall ensure that the following documents shall be transferred with the inmate-patient to the respective CDCR institution (*see* Attachment #5 – ICF DMH Patient Discharge Checklist):

      a) Psychiatric Discharge Summary (shall include the discussion and recommendation of appropriate level of care following discharge from ICF, usually an EOP level);

      b) Nursing Assessment or Discharge Summary;

      c) Current Physician's orders;

      d) Medication Administrative Record (MAR) or the Medication and Treatment record (MTR);

California Department of Corrections and Rehabilitation and
Department of Mental Health

    e)   Current Suicide Risk Assessment; and for VPP, the Integrated Suicide Risk Assessment (ISRA);

    f)   Current Treatment Plan and behavior plans;

    g)   Psychological Assessments (if available); and

    h)   Keyhea Order or supporting Keyhea documentation (if applicable).

    i)   Non-formulary Medication form (if applicable)

4.   The DMH prescriber will document in the discharge summary the necessity of all psychotropic medications by providing justification per the Enhancement Plan requirements and the non-formulary criteria of the CDCR Statewide Pharmacy and Therapeutics (P&T) committee. In addition, a CDCR Non Formulary Drug Request Form will be completed and returned with the discharge summary.

    a)   If a non-formulary medication is in use and it is recommended that it should be used after the discharge back to a CDCR institution, the CDCR Non Formulary Drug Request Form (*see* Attachment #6) shall be completed and returned with the discharge summary.

    b)   If a CDCR non-formulary medication is recommended for use after discharge back to the CDCR institution, the DMH primary psychiatrist for the inmate-patient or designee shall write a prescription for the medication to be used in CDCR. That prescription shall cover five consecutive days allowing CDCR to order and receive the medication from the CDCR pharmacy services.

        (1) If the inmate-patient is being discharged from SVPP, the prescription shall be placed in the CDCR pharmacy services computer system. This same process shall be used at VPP once the CDCR pharmacy services system is available at CMF.

        (2) VPP, ASH, CSH and PSH shall provide the receiving CDCR institution with a written prescription for the non-formulary medications. This shall be part of the discharge packet that accompanies the inmate-patient.

5.   The inmate-patient shall not be placed in the transport vehicle without the above documents. For each parolee returning to DAPO's supervision, DMH shall ensure that the parolee's documents shall be

California Department of Corrections and Rehabilitation and
Department of Mental Health

forwarded to the Parole Outpatient Clinic Liaison of the respective Parole Region.

6.  Notwithstanding paragraph 3. above, a DMH discharge packet shall accompany the inmate-patient at discharge and be faxed to the receiving CDCR institution no later than 2 weeks after discharge. The discharge packet shall include but not be limited to (*see* Attachment #5 – ICF DMH Patient Discharge Checklist):

> a)  Interdisciplinary Notes for past 15 days.
>
> b)  Physician Progress Notes for past 15 days.
>
> c)  Psychological Assessments (if available).
>
> d)  Relevant Consults.
>
> e)  If applicable, forms specific to psych and return, mental health placement, and transfer information for parolees.
>
> f)  In addition, the DMH hospitals and psychiatric programs will include in their discharge packets the forms specific to psych and return, mental health placement, and transfer information for parolees.
>
> g)  All DMH hospitals and psychiatric programs shall provide written copies of the aforementioned cited materials. For VPP and SVPP, due to their close proximity to CMF and SVSP, they shall provide the entire UHR for review by the CMF and SVSP Chief of Mental Health instead of the above.
>
> h)  If the receiving CDCR institution is aware that the inmate-patient has been transferred to another CDCR institution, the discharge documents shall be forwarded by the receiving CDCR institution to the inmate-patient's current residence.

7.  Once the inmate-patient is transferred back to the CDCR institution, the receiving team clinician, on a timely basis but no later than 5 working days after the time of notification and after evaluation of this patient at the receiving institution, shall contact the discharge team clinician for further information and consultation. If the CDCR team clinician does not contact the DMH team clinician within 10 days of the inmate-patient discharge to CDCR, the DMH clinician shall attempt to contact the CDCR team clinician at least once via the DMH Coordinator at the receiving institution. The DMH clinician-to-clinician contact form shall be used as a guideline during this conversation.

California Department of Corrections and Rehabilitation and
Department of Mental Health

## XI. TRANSFER ARRANGEMENTS TO AND FROM CDCR

A. The CDCR institution shall provide for transportation of an inmate-patient between a DMH State hospital and a CDCR institution or DMH psychiatric program. The parole unit or region shall provide for transportation of a parolee inmate-patient between a DMH program and a local detention facility or community placement when mode of transportation is appropriate for the discharging inmate-patient.

B. A transfer schedule shall be established by the CDCR referring institution and the respective DMH program.

C. The referring CDCR institution and DMH shall coordinate a transfer schedule, normally allowing for transfer of an inmate-patient within 72 hours of acceptance, and return from DMH within 72 hours of discharge. DMH facilities are staffed to receive and admit inmate-patients between 8:00 AM and 4:00 PM, Monday – Friday except when a State holiday falls on a weekday.

D. Each inmate-patient admitted to a DMH program shall have with him/her, unless already sent, all documentation listed in Section VII.A.4. If, following the inmate-patient's admission, it is determined by assessments of the DMH staff that the inmate-patient does not meet admission criteria for the inpatient mental health program; CDCR will transport the inmate-patient back to prison on an expedited basis but no more than 72 hours.

E. If the admission was based on a WIC § 5150 evaluation by the State hospital and the inmate-patient does not meet criteria for continued hospitalization or conservatorship, a CDCR Parole Agent will transport the inmate-patient back to prison or to the inmate-patient's county of residence within 24 hours, but only when the mode of transportation is appropriate for discharging the inmate-patient. The State hospital cannot retain an inmate-patient beyond 24 hours and if the inmate-patient is not picked up within this time period, it may become necessary for the State hospital to discharge the inmate-patient to the street.

F. An inmate-patient who has been found to pose an unusual and severe security risk to the DMH program in which he/she is housed shall be transferred by CDCR to a CDCR institution within 24 hours. However, if the security risk is on the basis of mental disorder rather than criminality or personality disorder, DMH shall make every effort to retain and treat the inmate-patient in the DMH hospital.

G. Personal property of inmate-patients admitted to SVPP and VPP ICF units on Psych and Return shall be retained at the sending institution pending return

California Department of Corrections and Rehabilitation and
Department of Mental Health

of the inmate-patient.  Inmate-patients formally endorsed for permanent housing at SVSP and CMF shall be transferred with all personal property.

1. Property, other than legal materials, shall be limited to no more than can be stored within six cubic feet.

2. When an inmate-patient is received by SVPP or VPP with personal property, the property box from CDCR shall be inventoried and sealed. Any Victims Compensation and Government Claims Board claim that results from items missing from an inmate-patient's property upon admission to the DMH hospital is CDCR's responsibility.

3. CDCR shall ensure that items on the DMH Hospital Contraband List (*see* Attachment(s) #7a.,b.,c.- Contraband List(s)) are not transferred to a DMH hospital with the inmate-patient or parolee's personal property.

H. Each inmate-patient or parolee shall be subject to a TB evaluation by DMH upon admittance.

## XII. RE-ENTRY SERVICES

The parties to this MOU concur that planning and preparation is integral and necessary for successful transition to the community for an inmate-patient receiving mental health treatment during their incarceration.

CDCR, except to the extent stated below, is primarily responsible for providing or contracting to provide, services for all CDCR inmate-patients receiving care within DMH. Services will commence at 120 days or less prior to an inmate-patient's scheduled release and return to the community.

Re-Entry Services and responsibilities will consist of the following:

A. Identification of CDCR Inmate-Patients at DMH
   1. Automated to the extent possible, CDCR will identify inmate-patients at DMH that have 120 days or less until their scheduled parole-release date.

B. Benefit Entitlements Application Process

   1. CDCR will utilize contracted or staffed Benefit Workers for the preparation and submittal of benefit entitlement applications.  To the extent possible, inmate-patients identified as potentially eligible shall be provided the opportunity to participate in the pre-release benefit application process.  Such benefits include: Social Security benefits; such as Social Security, Supplemental Security Income (SSI), or Social

California Department of Corrections and Rehabilitation and
Department of Mental Health

Security Disability Income (SSDI), California State sponsored Medi-Cal benefits, and Veterans Affairs (VA) benefits. Inmate-patient participation in this program is voluntary, and requires the inmate-patient to sign both an authorization to release information and an appointment of representative form.

At 120 days or less prior to the scheduled release date, Benefit Workers will initiate the screening process to determine which inmate-patients are potentially eligible for benefit entitlements.

The application process for inmate-patients at DMH requires a collaborative effort by CDCR and DMH. Specifically, the responsibilities of CDCR and DMH include:

C.  CDCR Responsibilities

1.  Identification of inmate-patients admitted to DMH with impending release dates, and disability evidence.

2.  Obtaining a signed Release of Information and Appointment of Representative form from the participating inmate-patient. When an inmate-patient is unable to make a decision for them self, the benefit worker will request the treating psychiatrist write a notation that the inmate-patient applicant is unable to sign and/or make decisions for self due to mental illness and sign below the statement on the required forms.

3.  Determination of which benefit the inmate-patient is most likely eligible for based on medical/mental disability, financial status, and/or age.

4.  Gathering necessary information for the benefit applications, (i.e., data required in the benefit application fields, and supporting disability documentation).

5.  Completion and submission of benefit applications (web based initiation for Social Security).

6.  Facilitation of telephone interviews between the inmate-patient and Social Security staff after a SSI application has been submitted and the inmate-patient is able to participate.

7.  Tracking of application processes and outcomes.

D.  DMH Responsibilities

California Department of Corrections and Rehabilitation and
Department of Mental Health

To assist with the successful implementation of this program and for the Benefit Workers to adequately perform their duties the following must be provided:

1.  Dedicated Office space with;

    a)  Desk.

    b)  Desk chair and guest/inmate-patient chair.

    c)  Internet access.

    d)  Speaker phone with voicemail.

    e)  Locking file drawer or cabinet.

    f)  Interview room with outside phone line and speaker phone if dedicated office space cannot be utilized for inmate-patient telephone interviews with the Social Security Administration.   The room requires confidentiality due to the medical, personal, and financial information disclosure.   However, the room must be located in an area that will be observed by custody staff and have inmate-patient accessibility.

2.  Other needs for the benefits workers are as follows;

    a)  Facility access.

    b)  Access to the inmate-patients.

    c)  Access to fax and copying machine.

    d)  An assigned mail box.

    e)  Use of facility's effective communication resources.

    f)  Access to health records.

    g)  Occasional assistance from DMH treatment staff on completion of documentation describing disabilities.

California Department of Corrections and Rehabilitation and
Department of Mental Health

When CDCR or DMH is unable to provide the office space or other needs for the benefits workers as outlined above, the departments will collaborate to develop a mutually agreeable solution for the provision of these resources.

E.  Pre-Release Disposition Review

    1.  At 60 days prior to the scheduled release date, DMH staff shall complete a pre-release dispositional review of all CDCR inmate-patients in their care and fax the review to the DCHCS headquarters office at (916) 445-0601, and then email the CCAT Coordinator notifying the Coordinator that the dispositional review was sent.

F.  Process for Providing Services Other than Benefit Applications

    1.  The CCAT format will be utilized to develop release plans for paroling inmate-patients at DMH.  DCHCS shall determine the necessity for, and schedule a CCAT for inmates who are within 45 days of paroling upon receipt of the dispositional review from DMH.  DCHCS will coordinate the participants for the individual CCATs, and determine participants on a case by case basis.  Participants shall include representatives from DMH and CDCR; however, the participants may also include representatives from the inmate-patient's county of record, and/or contracted or other potential community-based mental health providers.

    The CCAT will also be utilized to confirm county of residence, parole unit assignment, pending disciplinary actions, law enforcement warrants and holds, and whether an inmate-patient requires Mentally Disordered Offender and/or Sexually Violent Predator Screening. These items shall be referred to the C&PR or designee for an expeditious disposition as needed.

G.  Process to Use When an Inmate-Patient is a Danger to Self or Others/Gravely Disabled

    1.  At 30 days prior to an inmate-patient's scheduled parole date, in cases in which it is determined that an inmate-patient will likely meet the involuntary placement criteria as set forth in the Lanterman-Petris-Short Act, the DMH treatment team shall provide CDCR with a mental health evaluation indicating that the inmate-patient presents a grave disability and/or danger to self or others sufficient to serve as probable cause for WIC §5150 placement, a historical course of the inmate-patient's mental disorder (WIC §5150.05), pertinent copies of medical records (if applicable), and a discharge plan.  During a CCAT, when it is determined that an inmate-patient will likely meet this criteria, CDCR

California Department of Corrections and Rehabilitation and
Department of Mental Health

will identify the location to which DMH will forward the required documentation.

H. Transportation upon Release to Parole

1. For inmate-patients returning to a prison for release processing, transportation shall be coordinated by CDCR.  At no less than 14 calendar days prior to the scheduled release date, DMH staff shall verbally advise the prison clinical liaison if an inmate-patient is unable to navigate public transportation at time of release.  The CDCR clinician shall then document the transportation need and provide it to the C&PR by the next business day.

## XIII.   MEDICAL AND SURGICAL HEALTH CARE

CDCR acknowledges that it refers CDCR inmate-patients to DMH for mental health treatment only.  Medical care that is not routinely provided or available at a State hospital shall be the responsibility of CDCR.  CDCR shall provide medical care for VPP and SVPP.  CDCR and  DMH agree that the transfer of a CDCR inmate-patient from a DMH State hospital to a community health facility for medical care does not vacate the inmate-patient's transfer from CDCR to DMH pursuant to PC §2684.

A. CDCR shall provide a list of CDCR contract community health facilities and identify the ones nearest to each DMH State hospital.  Except when the need for emergency medical care prevents it, DMH State hospitals shall refer CDCR inmate-patients to a CDCR contract community health facility.  CDCR shall instruct CDCR contract community health facilities and providers that all the medical bills for the care of CDCR inmate-patients referred to the contractor by DMH shall be submitted to CDCR for payment pursuant to CDCR's contract.

B. DMH shall obtain prior approval for non-emergency offsite medical care from the CDCR referring institution's HCM (or designee).  If emergency offsite medical care is required, DMH shall notify the CDCR referring institution HCM (or designee), within one working day of the emergency transfer (applies to psychiatric programs only).

C. When the need for emergency medical care prevents a DMH State hospital from transferring a CDCR inmate-patient to a CDCR contract community health facility, the State hospital shall arrange for such emergency medical care at a local non-CDCR contract health facility.  The DMH State hospital shall notify the non-CDCR contract health facility that CDCR is responsible for all emergency care of the inmate-patient and that all medical invoices will

Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 255 of 310
California Department of Corrections and Rehabilitation and
Department of Mental Health

be sent to CDCR.  The DMH State hospital will notify CDCR, and CDCR will attempt to obtain a contract for these services.

D. CDCR's HCM in conjunction with CDCR UM staff shall be responsible for monitoring the inmate-patient's care while in a community health facility. Recommendations regarding care and continued stay may be made to the attending physician at the community facility, the Chief Medical Officer of the referring CDCR institution, and the Medical Director of the referring DMH State hospital.

## XIV. PHARMACY SERVICES FOR PSYCHIATRIC PROGRAMS (VPP and SVPP)

A. CDCR will provide a statewide pharmaceutical care service.  This includes coordination through the CDCR Central Pharmacy Administration, CDCR Statewide Pharmacy and Therapeutics Committee, and CDCR pharmaceutical purchasing contracts to assure continuity of pharmaceutical care consistent with the program provided for all inmate-patients.

B. The CDCR Statewide P&T will establish the formulary of drugs, pharmacy related policies and procedures and disease management medication guidelines. DMH will have representation on the P&T committee as a voting member.

C. Use of formulary medications shall be encouraged.  If a DMH clinician believes that a non-formulary medication is necessary to stabilize the mental health of an inmate-patient, the clinician may request to use the non-formulary medication by completing a CDCR non-formulary request.  In addition, the DMH clinician is required to document the inmate-patient's medication history specific to the mental health condition being treated to include treatment effect, and provide justification for the non-formulary medication.  This non-formulary request shall be approved or denied by the DMH Medical Director or designee.

D. As the inmate-patient's mental health stabilizes, the use of CDCR non-formulary medications will be reviewed to determine if a CDCR formulary medication could be successfully used to maintain the inmate-patient's mental health.  This team discussion shall be documented in the patient's chart and specify the CDCR non-formulary medication discussed and the rationale for use or non-use with the inmate-patient.  All documentation related to use of the CDCR non-formulary medications will be provided to CDCR prior to discharge and at the time of discharge.

E. If a CDCR non-formulary medication is recommended for use after discharge back to the CDCR institution, the DMH facility shall write a prescription for the medication to be used in CDCR.  That prescription shall cover five

California Department of Corrections and Rehabilitation and
Department of Mental Health

consecutive days allowing CDCR to order and receive the medication from CDCR pharmacy services.

F.  Upon admission, based on clinical need, the administration of medication by VPP and SVPP clinical staff shall be prioritized in the following order:

1.  use of injectables;

2.  use of a liquid concentration; and

3.  use of crushed medications with the exception of those medications such as time-released that are not amenable to this form of ingestion.

As the inmate-patient's mental health stabilizes, the delivery of medication will be reviewed for appropriateness.

G.  All pharmacies will be CDCR pharmacies and shall be in compliance with applicable regulations.

H.  The CDCR pharmacies shall be licensed by the California Board of Pharmacy.

I.  The CDCR facility level Pharmacist-In-Charge, who directly supervises the pharmacy staff, shall be under the supervisory direction of the Statewide CDCR Director of Pharmacy and local CDCR supervisor as stipulated in the CDCR Pharmacy Organizational Chart.

J.  A detailed accounting of all pharmaceutical costs, volume ordered, dispensed and to which inmate-patients, will be maintained by the Department of Pharmacy.  Said accounting shall also contain a detail of any supplied pharmaceutical material destroyed and the procedure followed for such destruction.

K.  Access to after-hours pharmaceuticals shall be provided following the CDCR Statewide Pharmacy After-Hours Medication Policy and Procedure.

L.  Controlled Substance records shall be maintained as required by CDCR Statewide Policy and Procedure.

M.  An annual inventory of pharmaceuticals will be conducted consistent with CDCR Statewide Pharmacy Policy and Procedure.

N.  CDCR Pharmacy will be responsible for ordering all pharmaceutical products consistent with CDCR Statewide Pharmacy Policy and Procedure.

O.  CDCR will be responsible to approve the order and the payment of all invoices for pharmaceuticals.

California Department of Corrections and Rehabilitation and
Department of Mental Health

P.  CDCR Pharmacy staff will be responsible for receiving ordered products from the vendor's delivery consistent with CDCR Statewide Pharmacy Policy and Procedure.

Q.  CDCR Pharmacy shall promptly forward the original copies of the invoices received and their corresponding purchase orders/printouts to CDCR Accounts payable consistent with CDCR Statewide Pharmacy Policy and Procedure.

## XV.    PHARMACY SERVICES FOR DMH HOSPITALS

A.  DMH State hospitals utilize the statewide Common Drug Formulary.  DMH, as a member of the Pharmacy Advisory Committee (PAC), will work with the Department of General Services (DGS) to implement and administer a statewide pharmaceutical program and a statewide medical supply program. This includes coordination to develop a governing structure to establish pharmaceutical requirements for DGS contracts that shall be established and implemented.   One goal of the PAC is the development of a statewide Common Drug Formulary.

B.  If the DMH hospital clinician has determined that  a non-formulary medication is necessary to stabilize the mental health of an inmate-patient, the clinician may use the medication but is required to document the inmate-patient's medication history specific to the mental health condition being treated to include treatment effect, and provide justification for the non-formulary medication.

C.  As the inmate-patient's mental health stabilizes, the use of CDCR non-formulary medications will be reviewed to determine if a CDCR formulary medication could be successfully used to maintain the inmate-patient's mental health.   This team discussion shall be documented in the inmate-patient's chart and specify the CDCR non-formulary medication discussed and the rationale for use or non-use with the inmate-patient.    All documentation related to use of the CDCR non-formulary medications will be provided to CDCR at the time of discharge.

## XVI.    IMAGING STUDIES

A.  Imaging studies including but not limited to x-rays, MRI, CT, ultrasound, and Dexa Scan shall only be requested by a clinician, and only when determined to be clinically necessary.  Imaging studies shall be requested utilizing the established CDCR process, and shall include completion of all required forms.  Requests for imaging studies will be subject to established CDCR utilization management criteria.

California Department of Corrections and Rehabilitation and
Department of Mental Health

## XVII.  CONSULTATIVE SERVICES

A.  Specialty consultative services shall only be requested by a clinician, and only when determined to be clinically necessary.  Consultative services shall be requested utilizing the established CDCR process, and shall include completion of all required order forms.  Requests for consultative services will be subject to established CDCR utilization management criteria, to include InterQual

## XVIII.  PUBLIC HEALTH AND INFECTION CONTROL

A.  DMH shall maintain an active public health program.  This program shall collaborate with CDCR public health staff in ensuring compliance with all applicable Infection Control policies, procedures, laws and regulations.

## XIX.  HEALTH RECORDS

A.  ACCESS BY CDCR TO DMH MEDICAL RECORDS

In all cases, the Executive Director of the State Hospital or Psychiatric Program, or designees shall be notified prior to access of medical records.

1.  In medical emergencies or urgent need, the Chief Executive Officer of Medical Services or designees, shall have immediate on-site 24-hour access to the DMH program and/or State hospital health record for each CDCR inmate-patient.  These individuals may also contact the State hospital or psychiatric program by telephone and request that critical portions of the health record be faxed to an appropriate CDCR clinician.

2.  At all other times, the Statewide Director, Mental Health, DCHCS (or designee) shall have access to the DMH program or State hospital health record, or faxed or otherwise copied portions thereof, for each CDCR inmate-patient upon four hours notice.

B.  The CMF Health Records Director is the custodian of all health records for health care rendered at the CMF institution; the SVSP Health Records Director is the custodian of all health records for health care rendered at the SVSP institution.  The VPP and SVPP Health Information Management Department (HIMD) Supervisors shall be the sub-custodians of record for each inmate-patient who is in treatment in intermediate psychiatric care services at VPP and SVPP.  The State hospital Health Records Directors are the custodians of all health records for health care rendered at ASH, CSH and PSH.

Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 259 of 310
California Department of Corrections and Rehabilitation and
Department of Mental Health

C.  DMH staff shall be responsible for maintaining and completing each DMH health record following the MHDS.  Each record shall be legibly handwritten, typewritten or computer stored.

D.  VPP and SVPP maintained records:

1.  VPP and SVPP staff shall be responsible for each inmate-patient's health record, beginning with the admission process and finishing when the inmate-patient is released to CDCR, or other DMH institution, and for ensuring that all discharge materials are completed.

2.  The VPP and SVPP HIMD Offices shall assist DMH clinical staff with documentation requirements through concurrent and retrospective audits.

3.  After the VPP HIMD completes the record, the CMF Health Record Department may audit documentation to ensure complete and accurate records and that each documentation requirement is met. CMF Health Records Director, or designee, shall review final coding and complete all indices.  The completed record and all indices shall be the property and responsibility of the CMF Health Records Department.

4.  After the SVPP HIMD completes the record, the SVSP Health Record Department may audit documentation to ensure complete and accurate records and that each documentation requirement is met. SVSP Health Records Director, or designee, shall review final coding and complete all indices.  The completed record and all indices shall be the property and responsibility of the SVSP Health Records Department.

E.  State hospital maintained records:

1.  The State hospital HIMD staff shall be responsible for each inmate-patient's record, beginning with the admission process and finishing when the inmate-patient is released to CDCR.  The HIMD is to ensure that all discharge materials are completed and assure that the documentation requirements are met through concurrent and retrospective audits.  HIMD is responsible for the final coding and completion of indices.  The competed record shall be maintained by HIMD.

F.  The CMF Health Records Director and VPP HIMD Supervisor shall work together to provide optimal services to the DMH clinical staff.  For each CDCR inmate-patient returning to CMF or another CDCR institution from the VPP, VPP shall ensure that the inmate-patient's complete health record is

California Department of Corrections and Rehabilitation and
Department of Mental Health

transferred to CDCR in accordance with Title 22. VPP shall also prepare an updated Discharge Summary pursuant to Section X above.

If an inmate-patient is a direct transfer from ASH to another State hospital, the complete medical record is transferred to the receiving State hospital. The original record is to remain at ASH if the inmate-patient is transferred to CDCR or to parole. Pertinent photocopies of the medical record are provided to the receiving agencies to assure continuity of care.

G. A copy of the Discharge Summary and any relevant psychological testing reports and other evaluations shall be transferred to the CMF Health Records Manager at the time the inmate-patient is discharged to a CDCR facility. The VPP HIMD Supervisor shall be responsible for ensuring that the Discharge Summary and other relevant reports shall be filed in the inmate-patient's Section of the CDCR Unit Health Record.

A copy of the Discharge Summary/RCPP and any relevant psychological testing reports and other evaluations shall be transferred to the CDCR facility whenever the inmate-patient is transferred from ASH to CDCR.

H. After notifying the DMH Executive Director, CDCR staff shall have continuous physical access to the specific VPP health care records as long as needed to complete the designated task.

Access to State hospital health records is limited to members of the hospital staff and CDCR staff who have legitimate reasons to have the records in their possession (e.g. treatment, payment, health care operation, community placement planning, and benefit entitlement applications).

I. Each VPP Health Record procedure regarding maintenance of VPP health records for the VPP shall be approved through the MHDS Statewide Committee in conjunction with the CMF Health Records Director. CMF Medical Staff shall maintain a current MHDS Manual in the VPP Chief of Staff's Office. Any requirement believed necessary to be implemented in the VPP Health Record procedure by CMF Staff shall be requested in writing to, and reviewed by, the VPP HIMD Supervisor, Medical Director, and must be approved by the VPP Executive Director. After approval, the VPP HIMD Supervisor and CMF Health Record Director shall work in concert to draft a policy for submission to the CMF Health Record Committee for approval prior to implementation.

J. VPP is responsible for MHDS training and Quality Assessment and Improvement auditing to monitor for compliance. The State hospital HIMD and Standards Compliance staff, and other key individuals when indicated, share responsibility fro documentation training, quality assessment and improvement auditing to monitor for compliance.

Case 2:90-cv-00520-KJM-SCR    Document 4545-1    Filed 04/11/13    Page 261 of 310
California Department of Corrections and Rehabilitation and
Department of Mental Health

K.  When the VPP Medical Director determines that an inmate-patient is to be returned to CMF, the Discharge Review staff shall be notified.  At that time, CMF shall be provided with the mental health discharge summary and all other pertinent medical data.

L.  At the time of an inmate-patient's discharge, the VPP Medical Director shall ensure that VPP records are complete pursuant to CDCR Health Record Policy before inclusion in the CDCR health record.

M.  At the time of an inmate-patient's discharge, the HIMD staff at the State hospitals will follow procedures for completing health records in accordance with health record policies.  The State hospital records remain at the hospital; they are not included in the CDCR health record.

## XX.  SPECIALIZED ANTIPSYCHOTIC MEDICATIONS

Inmate-patients who require initiation of Clozapine shall generally be referred for treatment at a DMH program.  To provide continuity of care, CDCR inmate-patients who have been placed on Clozapine while in the DMH program will be returned to the following institutions based on their medical, security, and classification needs:

> California Medical Facility;
> California Medical Facility, Mental Health Crisis Bed Unit;
> California State Prison – Corcoran;
> California State Prison – Sacramento;
> California State Prison – San Quentin;
> North Kern State Prison;
> Mule Creek State Prison;
> California Institution for Women; and
> Central California Womens Facility.

CDCR retains the right to add or delete institutions from the above list.   CDCR shall provide notification of these changes via written communication to concerned parties including DMH.  CDCR Mental Health Program will work with HC-POP and CSU to ensure proper placement.

For inmate-patients who will be discharged to parole on Clozapine therapy, if the parole date is known in advance, clinical staff from Program shall notify a POC liaison from the appropriate parole region clinic at least 30 days in advance of release, to ensure continuity of Clozapine therapy upon parole.

## XXI.  SUICIDE

In the case of an inmate-patient death by suicide, at either a State Hospital or Psychiatric Program, DMH and CDCR shall jointly review the case.  DMH shall furnish to a CDCR reviewer a copy of any reports regarding the suicide that have been provided to the Department of Public Health.  The CDCR reviewer will discuss initial

California Department of Corrections and Rehabilitation and
Department of Mental Health

findings with DMH executive staff prior to leaving the site.  CDCR retains the right to make recommendations that it deems appropriate in keeping with licensing standards concerning the care of suicidal inmate-patients.  The DMH Deputy Director, LTCS, and the Executive Director of the program will be furnished with a copy of the CDCR "Suicide Report" and the "Executive Summary of Suicide" along with attachments.  DMH shall review the CDCR report, and shall include corrective steps if indicated.  The DMH program shall furnish a follow up report along with supporting documents to the CDCR Mental Health Suicide Prevention Coordinator, DCHCS, within 90 days of receiving the Suicide Report (within 180 days of date of death).  The follow up report shall include measurable goals, outcome criteria, and targeted timelines for implementation.

In cases when an inmate-patient has died within 30 days of discharge from a DMH hospital or psychiatric program,  DMH shall be provided the CDCR mortality review as part of DMH's agreement with the United States Department of Justice's Consent Judgment.

> A.  In the case of a suicide of an inmate-patient within a DMH program, CDCR may review and copy the inmate-patient's DMH medical record upon notification to the hospital's Medical Director.  For an inmate-patient who commits suicide at a State hospital, the Senior Special Investigator shall be contacted to make arrangements to review and copy the inmate-patient's medical record.

> B.  In the case of a suicide of an inmate-patient treated within a DMH program, when the suicide occurs within 30 days after discharge, CDCR shall notify the Chief of Correctional Services and Support at DMH Headquarters.  DMH shall complete a death review that includes documentation indicating the level of functioning at the time of discharge from DMH and the justification for the recommended level of treatment at the time of the discharge.

## XXII.  COMPLIANCE

CDCR and DMH shall regularly monitor compliance with this MOU.  Any failure to comply with the terms of the MOU shall be reported for action to the respective department Deputy Directors.

Representatives from the State hospitals, psychiatric programs and prisons making direct referrals shall meet quarterly in Interagency Performance Improvement Meetings.  These meetings may be held by videoconference and will be hosted on an alternate basis by CDCR HQ and DMH HQ.

## XXIII.  TRAINING

CDCR and DMH shall distribute copies of this MOU to all CDCR institutions, Parole Regions and to relevant DMH hospitals and psychiatric programs.  CDCR and DMH shall conduct system-wide training for institutional clinicians on the nature, extent and

California Department of Corrections and Rehabilitation and
Department of Mental Health

availability of inpatient DMH care, and on the admission criteria and procedure for
admission to each DMH program.

## XXIV. PROVISION FOR SERVICES UNDER PC §§ 2960-81

Agreements between CDCR and DMH regarding individuals under PC §§2960-2981 are
covered in a separate or separate MOUs between CDCR and DMH.

## XXV. TERMINATION

CDCR may terminate any program referenced in this MOU in whole or in part, upon 60-
calendar days written notice to DMH. All programs, in whole or in part, not terminated
pursuant to this provision, shall remain in full force and effect.

SIGNATORS

SHARON AUNGST
Chief Deputy Secretary
Division of Correctional Health Care Services
California Department of Corrections and Rehabilitation

$8-23-10$

Date of Signature

CYNTHIA A. RADAVSKY
Deputy Director
Long Term Care Services
California Department of Mental Health

$8-18-10$

Date of Signature

J. CLARK KELSO
Federal Receiver
California Prison Health Care Services

$9-13-2010$

Date of Signature

TERRI MCDONALD
Chief Deputy Secretary
Adult Operations

$8/24/10$

Date of Signature

California Department of Corrections and Rehabilitation and
Department of Mental Health

## TABLE OF ATTACHMENTS*

Attachment  # 1 – DMH Referral Form/Intermediate Care/Non-Acute Program
Attachment  # 2 – DMH ICF/Non-Acute Referral Check List
Attachment  # 3 – DMH Referral Decision Form
Attachment  # 4 – Mental Health Summary/Discharge Telephone Contact Form
Attachment  # 5 – ICF DMH Patient Discharge Checklist
Attachment  # 6 - Non-Formulary Drug Request  (CDCR Form 7374)
Attachment(s)  # 7 a., b., c. - Contraband List(s) for ASH, PSH, and SVPP/VPP
.

**Department Of Mental Health Referral Form**                    ICF MOU Attachment #1

# ~ ~ ~ Intermediate Care/Non-Acute Program  ~ ~ ~

**Referral for**:  ☐ Atascadero State Hospital  (**ASH**)        ☐ Patton State Hospital (**PSH**)
             ☐ Vacaville Psychiatric Program (**VPP**):    ☐ Salinas Valley Psychiatric Program (**SVPP**)
             ☐ Cells ☐ Dorms [*PLEASE specify*]

**Referring Prison**: _____ Date: _____

**Date of Referral IDTT:**_____ *[Attach IDTT as part of Mental Health Treatment Plan]*

**Current Custody/Clinical Placement:**  ☐ CCCMS    ☐ EOP    ☐ Ad-Seg EOP    ☐ PSU    ☐ MHCB    ☐ APP

**Inmate Name**: _____ **CDC#**: _____ **Date of Birth:** _____

**DDP**: _____ **Due Process**: ☐ Yes ☐ No **Date**: _____ **Ethnicity:** _____

**\*KEYHEA**: ☐ Yes ☐ No ☐ In Process (incl. supporting documentation) **Date Initiated:** _____ **Date Expires:** _____

**Housing**: _____ **Education: (years)** _____ **GED:** ☐ YES ☐ NO    **Literate:** ☐ YES ☐ NO

(Please Print)
**Referring Clinician**: _____ Ph _____ Pgr _____ Fax _____

**Tx Psychiatrist:**_____ Ph _____ Pgr _____ MH Secretary Ph _____

| **Current Psychiatric Diagnosis:** | **Current Psych  Medications**:  (name, dosage, freq, duration, target sxs) |
|---|---|
| Axis I _____ | _____ |
| _____ | _____ |
| Axis II _____ | _____ |
| Axis III _____ | _____ |
| Axis IV _____ | _____ |
| Axis V _____ | _____ |

**Reason For Referral**: (check all that apply and supply  *detailed* narrative)

☐ **Inadequate level of  functioning in EOP**:  _____
_____
_____

☐ **Requires 24–hour  nursing care:** _____
_____

☐ **Requires neurological/neuropsychiatric/diagnostic testing:** _____
_____

☐ **Would benefit from focused skills development not currently available in EOP:** _____
_____
_____

☐ **Clozapine trial:** _____

**DMH Referral, continued**

**History of Present Illness and Past Psychiatric History:**    (Must Fill Out Completely)

Hx and Recent **Suicidal Ideation/Attempt:** _____

**Ritualistic or Repetitive Self-Injurious Behaviors**: _____

_____

_____

_____

Hx and Current **Violence and Behavioral Alerts**: _____

_____

_____

_____

Hx and Current **Substance Abuse**: _____

_____

_____

Hx and Current **Psychiatric Treatment / MHCB / Hospitalization**: _____

_____

_____

_____

_____

Hx and current **Medication Compliance** (Document blood level verification of compliance): _____

_____

_____

**Current Mental Status Exam:**
**Please use statements that indicate observed behavior**
**DO NOT USE WNL**

Appearance: _____

Orientation:_____

Speech: _____

Attention/concentration:_____

Memory:_____

**DMH Referral, continued**

Fund of Information:_____

Affect: _____

Mood: _____

Sleep: _____ Appetite: _____

Form of Thought:_____

Content of Thought:_____

Perceptual Disturbance:_____

Reality Contact:_____

Insight & Judgment: _____

Interview Attitude: _____

Reliability (Historian): ☐ Good ☐ Fair ☐ Poor _____
*Suicidal and Homicidal Ideation*:  SEE BELOW

What are desired **Treatment Outcome Expectations**? (be very specific)

_____

_____

_____

**CDCR Referring Clinician:** Comments Regarding *Clinical Criteria / Factors / Signs / Symptoms* for DMH Placement Consideration

_____

_____

_____

_____

_____

_____

What are desired **Treatment Outcome Expectations**? (Be very specific)
_____

_____

**Referring Clinician Signature:** _____  **Date :** _____

ICF MOU Attachment #2
March 2010

# Department of Mental Health <u>ICF/Non-Acute</u> Referral Check List

~ For use *first* by the CDC sending institution, *then* the DMH receiving facility ~

| | |
|---|---|
| Inmate's Name: | |
| CDC No: | |
| Referring CDC Institution: | |
| DMH Facility: | |

This checklist is to be utilized by a CDC institution when compiling a referral packet to DMH.  In order for this process to be the most efficient and expeditious, the referring CDC institution, before sending to DMH, must include **ALL** applicable items. **Incomplete packets are unacceptable.** The process of tracking down missing items wastes valuable clinical and administrative time and resources, *and,* most importantly, it delays the patient getting to the needed level-of-care.  DMH should never have to check the "needed" column because a required document did not arrive in the referral packet.  To ensure that referral packets are completed before sending, a CDC clinical supervisor or manager **shall** co-sign along with the referring clinician, certifying that the packet is complete.  This checklist, with the two required signatures, is then sent to the appropriate DMH facility as part of the referral packet.

N/A = Not Applicable

| | **Required Information: Clinical** | Included √ | N/A √ | Needed √ | Comments: |
|---|---|---|---|---|---|
| 1 | Referral Form for ICF/Non-Acute | | ■ | | |
| 2 | Transfer Medical Summary **or** History and Physical – (must be within 30 days of referral) **H&P is Required for SVPP** | | ■ | | |
| 3 | Current Treatment Plan | | | | |
| 4 | IDTT Screening Checklist | | | | |
| 5 | Due Process – documentation (chrono) or written consent | | | | |
| 6 | Pharmacy Profile (computer printout) | | | | |
| 7 | Keyhea Order - or documentation supporting obtainment of a Keyhea Order  (***CRITICAL***) | | | | |
| 8 | Interdisciplinary Progress Notes – for the past 15 days plus most recent psychiatrist note (RC's may have less for new arrivals) | | ■ | | |
| 9 | Tuberculosis Chrono | | | | |
| 10 | Suicide Risk Assessment – most recent | | | | |
| 11 | This completed checklist form w/ dual sig's | | ■ | | |
| | **Required Information: Central File** | Included √ | N/A √ | Needed √ | Comments: |
| 12 | Placement Screening Form for DMH Placement | | ■ | | |
| 13 | Abstract of Judgment (State Hospital only) | | | | |
| 14 | Legal Status Summary (State Hospital only) | | | | |
| 15 | Chrono History (State Hospital only) | | | | |

| **CDC** Referring Clinician: | Print Name & Title | | Phone number: | |
|---|---|---|---|---|
| | Signature: | | Pager number: | |

| Supervisor or Manager: | Signature Certification: | | **Date sent:** ☐ Fax   ☐ Overnight Mail   ☐ Both |
|---|---|---|---|

| Referral Coordinator | Print Name & Title | | Phone number: | |
|---|---|---|---|---|
| | | | Pager number: | |

| Date Received by **DMH**: | | Date Completed: | |
|---|---|---|---|
| Reviewed by: (Coordinator Signature) | | Comments: | |

ICF MOU Attachment #3

# Department of Mental Health Referral Decision Form

Inmate or Parolee's Name: _____

CDCR No: _____

Referring CDCR Institution or POC Region: _____

DMH Facility: _____

**DMH Reviewing Clinician:** _____

_____

_____

_____

_____

_____

_____

---

**DMH Decision**:  ☐ Clinically Accepted (Pending Custody Approval)     Date: _____

☐ Clinically Accepted but Medically Deferred     Date: _____

☐ Not Accepted     Date: _____

**Detailed Reason for Medical Deferment**
Please indicate expectations of the patient's condition when admission shall be reconsidered.

_____

_____

_____

_____

_____

_____

_____

_____

**Detailed Reason *Not* Accepted**:  Please use official letterhead to write the rationale for the rejection

_____

**DMH Clinician**: _____     Date: _____

**DMH Coordinator**: _____     Date: _____

**Fax to 1) referring CDCR institution and 2) If a <u>REJECTION</u> fax to DMH HQ 916-653-6376**

ICF MOU Attachment #4

## Mental Health Summary/Discharge Telephone Contact Form
Department of Mental Health    &    Department of Corrections and Rehabilitation

| Date: | Time: |
|---|---|
| DMH Clinician: | DMH Facility: |
| CDCR Clinician: | CDCR Facility or Parole Region: |
| Patient Name: | CDCR #: |
| Primary Admitting Dx: | Reason for DMH Admission: |

_Please type information for clarity._  Check that each item has been discussed and provide details/comments when needed:

☐ Primary discharge diagnosis and level of care recommendation:

_____

☐ DMH medication changes/trials and patient's response

_____

☐ Current medications and targeted symptoms, including time sensitive medications that require administration upon arrival:  -

_____

_____

☐ Use of CDCR non-formulary medication rationale:

_____

_____

☐ Therapy provided, individual and/or group, and patient's response: _____

_____

☐ Environmental and behavioral conditions that lead to identified problematic behaviors:-

_____

_____

☐ Symptom and Functioning Change:  ☐ Improved  ☐ No change  ☐ Uncooperative  ☐ Assaultive/Disruptive/Destructive

Describe, and include any Rules Violations or District Attorney referrals:

_____

_____

☐ Continuing MH treatment goals and recommended follow-up (include rationale for change in level of care):

_____

_____

☐ Clinicians agree to follow-up plan:  ——— ☐ Refer to DMH Acute–☐ Refer to DMH Intermediate ☐ Retain in current program

January 2010

TCF MOU Attachment #4

☐ Refer to DMH Intermediate            ☐ Retain in current program

~ or ~

☐ Clinicians do not agree → ☐ Refer to Coordinated Clinical Assessment Team          ☐ Faxed on this date: _____

Notes: _____

# ICF
# DMH PATIENT DISCHARGE CHECKLIST

Patient Name: _____    ID Number: _____

CDCR Number: _____    Discharge Date: _____

|  | **DATE** | **INITIALS** |
|---|---|---|

**Sent  5-7 days prior to discharge (when possible)**

1. The CDCR-DMH summary/phone contact form    _____    _____
2. The non-formulary medication form (if necessary)    _____    _____
3. The Discharge Summary    _____    _____

**Sent with inmate-patient upon discharge:**

1. Psychiatric Discharge Summary    _____    _____
2. Nursing Assessment and/or Discharge Summary    _____    _____
3. Current Physicians Orders    _____    _____
4. MAR    _____    _____
5. Current Suicide Risk Assessment    _____    _____
6. Current Treatment Plan    _____    _____
7. Current Treatment Plan and behavior plans    _____    _____
8. Psychological Assessments if available    _____    _____
9. Keyhea Order (if applicable)    _____    _____
10. "Request for Non-Formulary Medication Use"    _____    _____

**Within 2 weeks of Discharge:**

11. Interdisciplinary Notes for past 15 days    _____    _____
12. Physician Progress Notes for past 15 days    _____    _____
13. Relevant Consults    _____    _____

**If applicable:**

14. Psych and Return (128C)    _____    _____
15  MH Placement (128C)    _____    _____
16  For Parolees Only (CDCR 7371)    _____    _____

Staff member verifying packet contents: _____

Date: _____

Attachment 9:                                          December 2009

**Nonformulary Drug Request Process:**

1. This form must be completed and sent to the Facility Medical Authority (CMO, Chief Psychiatrist, Regional Dentist) along with the prescription (Physicians Order Form 7221).
2. If approved, the Facility Medical Authority shall forward the nonformulary request and the prescription to the pharmacy for dispensing (forms 7374 and 7221). If denied, the request and prescription should be returned to the requesting provider with reason for denial.
3. This form must be completed before the pharmacy can acquire a nonformulary drug for dispensing.
4. A 24 to 48 hour advance notice may be required before approved nonformulary drugs can be obtained by the pharmacy for dispensing.
5. A therapeutically equivalent agent may be available on the formulary. Please consult your pharmacist for assistance in formulary selection.

REQUESTING PROVIDER:                          CONTACT NO.:                    DATE OF REQUEST:

## DRUG REQUESTED

| Medication Requested: | Strength: | Dosage Form(s): |
|---|---|---|

## PATIENT INFORMATION & JUSTIFICATION

| Patient's Name: | CDCR Number: | Housing: |
|---|---|---|

1. Indication:

2. Expected Duration of Therapy:

3. Does the patient have a documented allergy or adverse reaction to the formulary alternative(s) which precludes its use? Document the offending agent(s) and the reaction below.

4. Does the patient have a documented therapeutic failure with the formulary alternative(s)? Document previous medication trials including dose, duration and measures for which failure was based (blood pressure, lab values, etc.).

5. Have other nonformulary medications been tried for this indication? List all previous medications tried including dose, duration and response.

6. Other justification. Please explain below.

7. Does the requested medication require any special monitoring or follow-up by specialist? If yes, please indicate monitoring parameter, frequency and follow-up plan.

## FACILITY REVIEW AND APPROVAL

☐ Approved     ☐ Denied          Length of Approval Granted (if different from that requested on Rx):

Comments:                                                                        [maximum 6 months]

_____                    _____
Facility Medical Authority                                    Date

Atascadero State Hospital                                         OPERATING MANUAL

SECTION - SECURITY
ADMINISTRATIVE DIRECTIVE No. 805

Effective Date:  December 16, 2009

**SUBJECT:**          **CONTRABAND**

Cancellation:     This directive cancels Administrative Directive No. 805 dated November 4, 2009, same subject.

I.      DEFINITION

All material or articles listed in this directive are contraband.  Items that can reasonably be considered dangerous, injurious, or a threat to the security of the hospital shall be temporarily removed from the individual.  Such items shall be submitted to the Hospital Advisory Council (HAC) Prep Workgroup for evaluation and possible addition to this directive.  When any item not listed is restricted from an individual, a Denial of Rights for good cause will be filed (refer to A.D. No. 602.1, Complaint Procedure, Patients).

II.     EMPLOYEES

A.      All staff members shall recognize the importance of the control of contraband.  No employee shall knowingly allow contraband to be in the possession of any individual except under direct supervision, control, prescription, and when necessary, in the performance of duty.

B.      All employees shall receive in-service training on control of contraband during their orientation to the hospital.  Additionally, all employees (including those on probation) shall receive training in accordance with the hospital's mandatory training standards.

C.      Plant Operations employees in conjunction with the Department of Police Services (DPS) will be responsible for instructing outside contractors as to contraband and special precautions that need to be taken.

D.      Staff shall not bring more personal medication into the security area than is required for two shifts, i.e., their scheduled shift and an overtime shift. For prescription medication, a pharmacy-issued prescription slip is to be carried for verification.  Staff shall advise their supervisor of any medication being brought into security.

E.      Any missing contraband or lost items which may cause a breach in security or potential danger to patients and staff shall immediately be reported to the DPS Dispatch Center at 2366.  DPS will maintain a record of all recovered and non-recovered items.

III.    RESTRICTED AND CONTROLLED ITEMS

A.      Class I - Not Allowed on Hospital Grounds:

Unless specifically authorized by the Executive Director, the following items shall not be brought on the hospital grounds:

1. Drugs

   a. All illegal drugs, including but not limited to: narcotics, marijuana, hallucinogenic and unprescribed medications.

   b. Alcoholic beverages.

2. Explosives (excluding combustible fuels).

3. Firearms and ammunition (shall not apply to law enforcement officers).

4. Weapons designed to inflict bodily harm (e.g., swords, spears, daggers, mechanically projected missiles, explosives, etc.)

B.   Class II - Not Allowed Inside Security:

Unless specifically authorized in writing by the Executive Director, the following items shall not be brought inside the sallyport interiors and the Visiting Room by anyone:

1. Chemical dispensing control devices, such as mace, pepper spray, or tear-gas, except as used by DPS in the control of special incidents.

2. Ammonia, in pure form or any other chemicals not approved by Health and Safety.

3. Chewing Gum

4. Combs, metal

5. Fingernail files, metal over l.5 inches long.

6. Fountain pens (bulb type) (except those being utilized with controls in Graphic Arts, or with on-unit controls such as calligraphy pen sets).

7. Knives (except when authorized otherwise by policy, outlining strict control and accountability procedures).

8. Material giving instructions on escape, bomb making, bugging, surveillance, surreptitious entry, acts of violence, or any illegal activity, to include "Shot Gun News" and Maxim magazines.

9. Balloons

10. Umbrella

11. Local, County, Newspapers/Tabloids - any newspapers, magazines, coupon books, etc. originating from the County of San Luis Obispo, or copies obtained from the Internet or other sources.

12. An individual may be allowed to have in his possession a photocopy of an article from a local newspaper about patients or about the hospital with Program Director approval, except for articles that include information about individual staff. He may not have the original article in his possession.

13. Excess clothing: If an employee requires excess clothing inside security, they will have written permission from the Program Director on file with Police Services.

14.     Cell Phones (except for official business with approval by the Executive Director).

15.     Strapping Tape or other tapes containing fiberglass or other reinforcing fibers.

16.     Charcoal lighter fluid (refer to A.D. No. 344, Fire Inspections)

17.     All lighters and lighter fluid.

18.     Personal electronic devices capable of downloading information, including, but not limited to personal computers, palm pilots, and planners, unless provided by the hospital.

19.     All tobacco products, except as authorized by the Executive Director for Native American Spiritual Ceremonies

20.     Eating/cutting utensils containing metal or ceramic materials.

C.     <u>Class III - Not Allowed in Patients' Possession</u>:

At no time will patients be allowed to have in their possession:

1.     Luggage, including gym bags, valises, attaché cases, backpacks, and fanny-packs.

2.     Matches (any type).

3.     Alarm clocks, other than battery operated solid state.

4.     Combs, hairbrushes, and personal care items in an individual's possession should be made of flexible plastic materials and not exceed 7 inches in overall length. No wooden brushes. No personal care items in an individual's possession shall be made of brittle plastic. Personal care product containers - except those purchased in the Canteen, or in containers that do not allow for visual examination of contents.

5.     Drugs or medicated products (except as prescribed by a hospital employed medical doctor).

6.     Herbal teas, other than those brands purchased in the canteen or from an approved vender.

7.     Keys or key rings (see exceptions in Class V).

8.     Legal documents (including, but not limited to):

    a.     Driver's license

    b.     Birth certificates (all kinds)

    c.     Bonds

    d.     Social Security cards and credit cards

    e.     Bank books

    f.     Check books

    g.     Power of Attorney

    h.    Any form of identification, including passports, except hospital issued. If in question, contact the Trust Office.

9.    Letter openers

10.    Make-up, commercial or materials being used as makeup.

11.    Maps of San Luis Obispo County, any source literature, including local maps.

12.    As determined by the treatment team, any sexually explicit image or sexually provocative or nude images of children, or material that is in violation of the condition of parole.

13.    Any material that depicts a rape, beating, sadomasochistic act, child erotica, crime of violence or any photo of the individual's victim(s).

14.    Metal picture frames and metal prong fasteners, paper clips, and staples (except those staples that are intact in magazines)

15.    Mirrors

16.    Sunglasses that are reflective or too dark to assess the individual's eyes; sunglasses with exposed metals (not those encased in plastic).

17.    Money, money orders, or copies of money, including foreign (see A.D. No. 619, Trust Office/Patients' Accounts Functions).

18.    All personal civilian clothing

19.    Pictures of the individual alone or of another hospitalized individual, except for the individual's hospital identification card.

20.    Pressurized dispensers

21.    Products that contain an alcohol content sufficient to be combustible.

22.    Cable boxes, VCR tapes (modified or not), CDs, DVD , or personal cameras.

23.    LCD, Battery-operated appliances, including recording or electronic or mechanical transmitting devices, personal electrical appliances requiring cords, metal antennas, or remote speakers to operate; radios or scanning/monitoring devices capable or receiving law enforcement/fire emergency broadcasts; compact disk players. Allowable items include: personal radios and cassette players that are no larger than 6¼"x6¼""x3", operated with headphones. Headphones are not to be worn or used in the hallways, canteen, kitchen, dining rooms, or the auditorium. Headphones shall not contain: (a) steel in the headband, and the wire from the headsets are limited to 48 inches in length or less; (b) a heavy cord, or (c) cover the ear in such a way as to block out sound from the environment. Calculators, LCD appliances, and program approved electronic games are allowed.

24.    Rubber bands

25.    Saw blades or jeweler's wire (for exceptions see Class IV).

26.    Styrofoam in any form.

27.    Shoehorns

28.  Blank State of California or other hospital-related letterhead or stationery.

29.  Telephone directories

30.  Thermo cups

31.  Concentrated cleaning chemicals

32.  Pens exceeding 3 l/2 inches

33.  Biohazardous waste (as except by the medical needs of the individual)

34.  Hair-care products that have caustic or toxic chemicals

35.  Correcting fluid/tape (White-out)

36.  Battery chargers

37.  Musical or recordable greeting cards

38.  Shoelaces (when removed from the shoe)

39.  Collectable/trading cards.  Not to include "magic" cards or similar cards used to play card games.   (Individuals may have in their possession up to 1,000 "magic" cards.)

40.  Spices and pepper (except in ready-mix packets, or flavor packets as issued in the canteen and dining rooms).

41.  Aluminum foil, plastic wrap

42.  Reinforced envelopes

43.  Adhesive mailing labels

44.  Any altered clothing

45.  Athletic supporters (a suspensory may be prescribed by a physician for a medical need as described in a physician's progress note).

46.  Beading needles, metal

47.  Sleep masks

48.  Plastic binding stays (once removed from legal papers)

49.  Remote control toys

50.  Belts

51.  Corrugated cardboard, and all cardboard that has been altered from its original use.

52.  Any container( including plastic bags) with a solid frozen  content. Individuals assisting staff with ice runs are exempt.

53.  No candy, sucker or other foods with sticks or handles attached or any other similar items

ICF MOU Attachment #7a.

54.    Personal information of any nature (including, but not limited to home addresses, telephone numbers, and photos) of any staff member, volunteer, or contract employee of the Department of Mental Health.

D.    Class IV – Supervised Items:

Responsible individuals under the direct supervision of an employee may use the following materials and tools.  It shall be the responsibility of the employee to assure that all items are used for the purpose intended and accounted for and secured after their use.

1.    The following items may be used on the units by responsible patients under the direct supervision of an employee.

a.    Aerosol dispensers

b.    Sports, recreational, and work assignment equipment that could possibly be used as a weapon or an escape tool.

c.    Any ready to use cleaning substances containing potentially harmful ingredients, such as bleach, ammonia, alcohol, etc.

d.    Compass (drawing)

e.    Dental floss

f.    Ink (marking), pastels (colored chalk)

g.    Hypodermic needles when authorized by a physician's order

h.    Disposable Razors

i.    Sandpaper and emery cloth

j.    Scissors (safety scissors)

k.    Utensils for unit barbecues

l.    Electrical appliances

m.    Gloves for specific work assignments

n.    Pencils, colored and regular, no longer than 3½ inches, only under the direct supervision of a group provider during a planned scheduled treatment activity on the unit.

2.    In addition, the following items may be used by a responsible patient only in the appropriate Recovery and Mall Services (RMS) or Vocational Service area, under the direct supervision of an employee.

a.    Combustible or inflammables

b.    Electronic gear and parts

c.    File (steel construction type)

    d.    Glass, containers, and fragments including ceramics

    e.    Glue and acetone

    f.    Metal containers and scraps

    g.    Paints, lacquers, shellac, and solvents

    h.    Rope, twine, ladders

    i.    Sandpaper and emery cloths

    j.    Tools, except when being transported in a locked box.

    k.    Calligraphy pens

    l.    Pencils: No longer than 3½ inches

    m.    Carbon paper

    n.    Needles:  blunted tapestry, wax thread, leather lacing (Art Center), and upholstery (Upholstery Shop)

E.    <u>Class V - Controlled Items</u>:

Control and accountability will be provided by staff for the items listed in this section so that they are used properly and safely and are dispensed in acceptable quantities.

1.    Denture cleaner

2.    Dice

3.    All musical instruments

4.    Keys:  Locker, bathroom pass keys, cabinet or desk (permitted if duplicate is in the Unit Office, shop office, or Police Services Key Control).

5.    Phonograph records or tapes

6.    Razors (electric), including cords

7.    Shoe polish

8.    Tape of any kind

9.    Toothbrushes longer than 4" in length

10.    All plastic bags (Exception:  Small sandwich-type bags that are currently used for the transfer of coffee and other bottled items.)

11.    Fingernail clippers.

Acceptable methods for controlling the use of the items listed in this section are:

1.  Direct observation/supervision (one-to-one or group activity).

2.  Checking the item out from the nurse's station and in from the individual.

3.  Supervising the amount of the item taken by the individual.

4.  Monitoring the accumulation of items (items: 1, 5, 8, 9 and 10) via random shakedown.

IV.  <u>CONTROLS</u>

A.  Photos or other images depicting sexually explicit material or frontal nudity may be offensive to others and shall not be displayed where individuals or staff might see them and be made uncomfortable.

B.  All donations must be cleared through the HAC Prep workgroup prior to distribution to the patient. Gifts or donations will not be given directly to the individual. All gifts and donations shall be received and handled through one of the three receiving channels: 1) Mail Center, 2) Volunteer Services, and 3) DPS.

C.  Newly admitted individuals shall be thoroughly searched by Nursing Services. DPS will thoroughly search all property and possessions.

D.  All items given to individuals in the visiting room must be approved by the Visiting Room Officer, and individuals will be subject to search when leaving the visiting room.

E.  All persons and property passing through the sallyports are subject to inspection for contraband as per AD No. 803, Security Sallyports.

F.  All areas of the hospital shall be periodically inspected for hidden contraband. Inspections may be made at any time by DPS personnel or other employees in their area of responsibility.

G.  All contraband items shall be confiscated immediately by an employee and turned over to the DPS Watch Sergeant as soon as possible. A record shall be maintained of dates and places of seizure. If confiscated from an individual, a Special Incident Report must be written. If from an employee, appropriate disciplinary action shall be taken.

H.  The Canteen will contact the HAC Prep workgroup when there are proposed or new items to be added to the inventory list.

I.  If, during the course of or as a result of a formal shakedown procedure, specific contraband items are found in an individual's possession, documentation shall be entered in each his medical record and in the body of the Shakedown Report. This documentation shall preclude the necessity for individualized Special Incident Report (SIR) documentation of contraband items found in each individual's possession.

V.  <u>DISPOSITION</u>

A.  <u>Class I and Class II Contraband</u>, not allowed on hospital grounds and not allowed inside security, will be disposed of at the discretion of DPS. (Firearms will be disposed of in accordance with California Penal Code, Sections 799, 800, 801, 802, 1417, 1417.1, 1417.5, 1417.6, 12028 and 12032, as well as the Welfare and Institutions Code, Section 8102.)

B. <u>Class III Contraband</u>, not allowed in an individual's possession, may be stored until returned to the individual at the time of his release, mailed, destroyed, or turned over to his guardian. Determination of disposition will be made by the individual if within the rules and regulations of Atascadero State Hospital.

C. <u>Class IV and Class V Contraband</u>, supervised and controlled items which have been confiscated, shall not be returned until adequate supervision or control has been restored.

D. <u>Money (Cash), or other Legal Tender</u>:  When money, cash, or legal tender is obtained or found through shakedowns or by other means, all moneys will be turned in to DPS to ascertain whether a crime may be involved.  When the source of legal ownership has been determined, the money will be placed in the individual's account.  If the source of legal ownership cannot be determined, the money will be deposited in the Patients' Benefit Fund account.

E. The record will clearly indicate the final disposition of or destruction of all contraband.  If there has been a Denial of Patients' Rights, the material confiscated will be retained.

F. Items retained from patients by Police Services staff as part of an investigation will require a receipt to be given to the individual until the item is returned to him.

VI. <u>PROCESS FOR REVIEWING ITEMS TO BE ADDED TO A.D. NO. 805</u>

A. The item and written justification for making the item contraband is referred to the HAC Prep workgroup.  This can be done by submitting the item to the Chairperson or requesting to attend the HAC Prep meeting.

B. The HAC Prep workgroup will review the justification and discuss the ramifications for making the item contraband, i.e., patients' rights issue, security and legal aspect, etc.  The chairperson will assign a subcommittee if needed.

C. After careful consideration, the Committee will recommend a change in policy and forward the proposal to the Security Committee for recommendation to the Policy Management Conference.

D. If the item is approved, either a new policy will be completed or an addendum will be sent out to all manual holders.

E. Items being referred to the HAC Prep work group for review should be items that, if allowed in an individual's possession, could cause a danger/hazard to others or could be used to breach the security of the hospital.


JON DE MORALES
Executive Director


Updated

<u>Cross Reference(s)</u>:
A.D. No. 602.1 -   Complaint Procedure, Patients
A.D. No. 610    -    Personal Property
A.D. No. 619    -    Trust Office/ Patients' Accounts Functions
A.D. No. 713    -    Visiting Regulations
A.D. No. 803    -    Security Sallyports

Revised 05/07/10

## Allowable Property/Contraband

Any item that constitutes safety or security concerns can be denied and confiscated. Those items received that re not listed are subject to return to sender or donation to charity. All items need to be from an approved source.  (**EXCEPTION** – Personal property received upon admission from a DMH State Hospital may be considered allowable from an approved source after thorough inspection by hospital staff.)

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| ADDRESS BOOK | X | X | X | | | | No metal binding |
| ALBUM, PHOTO | *X | X | *X | US | | | No metal binding, limit one (1) |
| APPLIANCES, ENTERTAINMENT | | | | | | | Appliances MAY be battery operated, come with an attached cord, or come with a detachable cord. |
| Alarm clocks | | X | *X | | | | Wind up or Battery operated only. |
| Calculators, Translator, Hand Held Organizer (e.g. Palm Pilot) | | X | X | US | | | Hand held. No wireless or remote internet capability or camera capability. Limit of one (1) each |
| Detachable Cords | | X | *X | | WRT prior to purchase | C | Individual must have system requiring the detachable cord. Prior to the Individual ordering and/or receiving the item as personal property, the WRT shall assess the Individual's ability to access the item as a controlled item.  If item is denied the WRT will document the reason for the denial on PSH 7130. |
| Detachable Antennas | | | X | | WRT | C | Individual must have system requiring the detachable antenna . Prior to the Individual ordering and/or receiving the item as personal property, the WRT shall assess the Individual's ability to access the item as a controlled item.  If item is denied the WRT will document the reason for the denial on PSH 7130. |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

DCF MOU Attachment #7b.

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| MP3 Player | | X | *X | | | | The only allowed MP3 player are the Archos models (sole source) – which do not have wireless or remote internet capability. |
| Radio, Audio CD/ tape player, | | X | *X | US | | | Limit of one (1) each (max. size limit of 21x10x15 inches – No exceptions for larger size will be allowed) without detachable speakers, external-recording devices (however, audio equipment which can record directly from an internal source-radio or CD to tape only is acceptable). |
| Remote Controls | | X | *X | US | | | Must have own system(s) requiring the remote control. |
| Television/LCD DVD Player | | X | *X | US | WRT prior to purchase of TV | | All TV's must be pre-approved by the WRT prior to purchase and/or delivery.  The WRT will approve type of TV and size (TV must fit in Individual's personal locker).  Individuals must sign a Liability Waiver. Limit one (1) TV.  The TV may have built in radio/DVD player.  No built in VHS player. No individual VHS Players allowed.  Limit of one (1) LCD DVD player. |
| Typewriter/word processor | | X | *X | US | | | Limit of one (1). |
| Typewriter/word processor print wheels and ribbons | | X | *X | US | | | Individual must have typewriter/word processor for use with this item and must turn in used print wheel/ribbon to staff in-order to have access to replacement item. |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

ICF MOU Attachment #7b.

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS<br>C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| USB Memory sticks/cards | | | X | | | | "Kingston" flash drives are the only flash drives which will work on the Unit computers that are available for the Individuals. Individuals may still purchase other brands for use with their own personal equipment. |
| Video games system | | X | *X | US | | | Limit of one (1) each of a hand held and/or console system. Must have own system and TV (if required) to utilize games. No wireless or remote internet capability or that which can be converted into having such capability.<br><br>The XBOX Elite, Play Station PSP, & Nintendo DS are not allowed as they have remote internet capability.<br><br>Currently there is a freeze on all XBOX 360 Pro which is the ONLY is the only model of game system that is allowed.<br><br>Individuals that currently have the XBOX 360 are allowed to keep and use their system but no other Individuals can receive the system at this time |
| Walkman/Discman/DVD type radio/player | | X | *X | US | | | Limit of one (1) of each Walkman, Discman/DVD and/or Walkman Satellite type radio that must not include voice over feature.  No CB amateur radio, walkie-talkie or police band, but alarm functions are acceptable. |
| Walkman type Satellite radio | | | *X | US | | | |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| BATTERIES | *X | X | X | | | | No 6-volt batteries will be allowed.  Only the required number of batteries needed for the appliance will be allowed in the Individual's possession.  One extra set may be kept in the Nurses station. |
| BEANIES (Knit cap) | STATE ISSUE ONLY | | | | | | |
| BELTS OR BELT BUCKLES | | | X | US | | | Belt - Not to exceed one and one-half inches in width, limit one (1) Buckles - 2X3 inch limit, no sharp edges |
| BEVERAGES | | X | X | | | | Ice tea, juice, nectar, and soda.  All plastic containers (no metal lid or tops) |
| LED BOOK LIGHT | | | *X | US | | | For reading at night in bed (limit of 1). |
| CALENDARS | *X | X | X | | | | Without metal binding |
| CARDS, GREETING | *X | X | X | | | | No foil wrappers or parts.  Includes boxes that are factory sealed. No musical or light up cards. |
| CARDS, PLAYING | *X | X | *X | | | | Regular, Pinochle, Old Maid, Uno, etc. |
| CHAP STICK | | X | X | | | | |
| CHARGER, BATTERY (With or Without Cords) | *X | X | X | | | | Kept in Nursing Station and controlled by Nursing Staff. |
| CLOTHING (Shirts/Blouses, Pants, Shorts, Jackets/sweatshirts, etc.) | STATE ISSUE ONLY NO EXCEPTIONS | | | | | | Uniform is provided by the state (see undergarments below for clothing items which can be purchased).  State clothing may not be altered. |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
 **Liability Waiver is required for all items valued at $100.00 or more.**

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| COFFEE/TEA, DECAF, INSTANT, &/OR INDIVIDUAL PACKET/BAGS | | X | *X | | | | Not to exceed three (3) pounds or 100 bags. Decaffeinated only in non-contraband containers. May not contain any pharmaceutically active substance. |
| COLOGNE, PERFUME, AFTERSHAVE | | X | X | | | | No alcohol will be permitted.  Plastic containers only. |
| COMPACT DISKS/DVD'S, FLOPPY DISKS, CARTRIDGE OR CASSETTE TAPES (Audio, Computer, or Video Game) *For the purpose of this directive these items are considered to be media | | X | *X | US | US | | Limit of thirty (any combination totaling 30).  Any media (exception for music CD's), which depicts or encourages sexual acts with children or sexual acts with tissue damage (including penetration of any body cavity) will be considered contraband. Any publication that does not depict or encourage the above behavior may only be denied following procedures for denial of rights for cause. Individuals may have CD's which are provided through PSH Video Productions – these CD will have a Video Productions Label with the Individual's name. |
| BLANK CASSETTE TAPES/ RE-WRITABLE CD's | | X | *X | US | | | |
| CONTAINERS, PLASTIC | X | X | X | | | | Must be able to fit in 1' x 1' x1' locker. |
| CONVERTERS FOR RADIOS, TV'S, GAMES, ETC. | | X | *X | US | | | Must have own system to utilize item |
| CRAFT PROJECTS | | | *X | | | S | Non-contraband containers. |
| CUP OR TUMBLER, SOFT PLASTIC | X | X | X | US | | | Limit of two (2).  Sport containers are permitted.  Thermal cups/tumblers must be plastic with no false bottoms. |
| CURLING/STYLING IRON | | | X | US | | S | Limit of one (1). |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | **Package Received by mail *Factory Sealed** | **Purchased Through Canteen** | **Purchased Through Vendor *Factory Sealed** | **LIMIT ISSUE ONLY Requires US approval via e-mail or FAX** | **APPROVAL BY US OR WRT (as designated) Prior to access** | **C or S** | **COMMENT** (Information on limits, containers, etc.) |
| DENTAL FLOSS | STATE ISSUE ONLY | | | | | C | Staff will issue out one length of floss, as needed and Individual shall return floss when finished. |
| DENTURE ADHESIVE | | X | | | | S | |
| DENTURE CLEANSERS | | X | | | | S | Tablets only. |
| EMERY BOARDS | X | X | X | | | | No metal nail files. |
| EYE GLASSES | X | X | X | US | | | Limit one (1) pair.  Wire frames permitted.  Prescription glasses will be delivered to Medical Services. |
| FOOD, PACKAGED | | | | | | | Must be in Non-Contraband Container and cannot require refrigeration after opening.  All items sold by Canteen are allowed. |
| Cheese/Cheese Spreads | | X | *X | | | | Can Not Require Refrigeration after opening |
| Creamer, Cocoa Mix, Honey | | X | *X | | | | Creamer not to exceed 2 pounds. |
| Vegetables, Beans, Chili, Rice | | X | *X | | | | Non-contraband container (no cans) |
| Dry Meats, Dry Milk, Dry Fruit | | X | *X | | | | Dry milk not to exceed 2 pounds. |
| Nuts, Cereal | | X | *X | | | | No shells (exception for Sunflower seeds). |
| Cake, Candy, Chips, Cookies, Jerky, Popcorn, Ramen Noodles, Gum | | X | *X | | | | |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

CCF MOU Attachment #7b.

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS<br>C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C<br>or<br>S | COMMENT<br>(Information on limits, containers, etc.) |
| Protein Drinks/Powders, Nutrition Supplements, or vitamins | | | *X | | X | | Individual's treating physician must document approval for such items and include the not to exceed information in the approval (e.g. NTE "X" per month) |
| Punch Mix, Soda | | X | *X | | | | Punch Mix not to exceed 3 pounds. Soda in plastic bottles only. |
| Sauces, Condiments | | X | *X | | | | Non-contraband container/can not require refrigeration after opening. |
| Sugar/Substitute Packets | | X | *X | | | | Sugar or substitute not to exceed 1 pound. |
| MISCELLANEIOUS GAMES AND SPORTS EQUIPMENT (Board Games, Chess, Checkers, Hacky Sacs, etc.) | *X | X | *X | | | | For electronic games see appliances. |
| GLOVES, PLAIN (includes mittens) | X | | X | US | | | One (1) pair only.  Cloth only - No leather or simulated leather, studs, jewelry, etc.  Must be only single thickness (one layer). |
| GLOVES, WEIGHT LIFTING | | | X | US | | | Two (2) pairs only.  Leather is allowed. |
| HAIR CARE/GROOMING PRODUCTS | | | | | | | Limit one (1) of each item.  No metal parts.  Items in glass/metal |
| Hair - Brush, Pick, Plastic Comb Grooming Aids (includes body/hand lotion/creams & Vaseline) | | X | X | | | | containers will be transferred to small plastic containers by canteen staff prior to purchase. Vendor items must be received in non-contraband containers.  Hair spray must be non-aerosol, plastic container only. |
| Hair Dryer, Rollers & Spray | | X | X | | | S | Powders (e.g.; baby, talcum) and baby oil are not allowed |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

CF MOU Attachment #7b.

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS<br>C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | **Package Received by mail *Factory Sealed** | **Purchased Through Canteen** | **Purchased Through Vendor *Factory Sealed** | **LIMIT ISSUE ONLY Requires US approval via e-mail or FAX** | **APPROVAL BY US OR WRT (as designated) Prior to access** | **C or S** | **COMMENT**<br>(Information on limits, containers, etc.) |
| HATS | | X | X | US | | | Limit two (2). No offensive logos, wire parts, head wraps, do rag, bandanas, or scarves are allowed.  Cloth hair band are allowed - limit of three (3).  Beanies are state issued ONLY |
| HAT PINS | X | X | X | | | | Logo type pins (e.g. Veterans pins). |
| HEAD PHONES | *X | X | X | US | | | Limit two (2).<br>No longer than six (6) foot cord.  Non-metal banded only. |
| HYGIENE PRODUCTS<br>Soap, Deodorant, Toothpaste, Kleenex, Tampons, Sanitary Napkins | | X | X | | | | Non-aerosol products, plastic container only. |
| INSTRUMENTS, MUSICAL | | X | X | | WRT prior to purchase | C | Prior to the Individual ordering and/or receiving the item as personal property, the WRT shall assess the Individual's ability to access the item as a controlled item.  If item is denied the WRT will document the reason for the denial on PSH 7130. |
| GUITAR | | | | | | S | |
| GUITAR STRINGS | | | X | US | | S | Must have own guitar to utilize item. |
| JEWELRY | X | X | X | | | | Requires a Liability Waver when valued at $100 or more |
| Chains, necklaces | X | X | X | | | | Single strand only.  No sharp edges or lockets. |
| bracelets | X | X | X | | | | No solid metal bracelets allowed, No sharp edges.<br>Only bracelets made of the following: single strand chain, leather, nylon, or plastic are allowed |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

CCF MOU Attachment #7b.

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item  S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| rings | X | X | X | US | | | Limit two (2). |
| Earrings | X | X | X | | | | Must be no larger than a quarter or must be breakaways. |
| watch | X | X | X | US | | | Limit one (1).  Alarm and stop watch features and all band types (including metal) are allowed. |
| MAKE-UP, COSMETICS | | X | X | | | | Compacts may NOT contain glass mirrors. |
| Make up liners (for eyes &/or lips) – retractable type only | | X | X | | | C | Make-up pencils which require sharpening are not allowed |
| MONEY (this does not include checks or money orders) | | X | | | | | Individuals served may only be in possession of a maximum of $15.00 in coin (quarters, dimes, nickels, and pennies only; no paper money) |
| PEN & PENCIL & PLASTIC PAPER CLIPS | STATE ISSUE ONLY | | | | | | Limit one (1) each of pen & pencil.  Plastic paper clips shall be issued as needed – Individuals shall not be given entire box. |
| PHOTOS | X | | | | | | No photos of Individuals served that might pose a threat to security, such as being used to make an employee ID badge. No Polaroid Photos allowed. |
| PIPE, SMOKING | | X | X | | | | No ceramics |
| PLASTIC SPOON | STATE ISSUE ONLY | | | | | | Individuals shall receive approved plastic spoon with each sack lunches.  This spoon is to be thrown away once the lunch is consumed. |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| PLASTIC SPORK | STATE ISSUE ONLY | | | | | | Individuals shall be issued one spork upon admission for use with snack items purchased by the Individual. |
| POLISH REMOVER, NAIL | | X | X | | | S | Clear plastic container only. ACETONE FREE ONLY. |
| POLISH, NAIL | | X | X | US | | S | Limit three (3). Glass containers allowed. |
| PUBLICATIONS (Includes newspapers and religious publications) | | | X | US | | | Any publication, which depicts or encourages sexual acts with children or sexual acts with tissue damage (including penetration of any body cavity) will be considered contraband.  Any publication that does not depict or encourage the above behavior may only be denied following procedures for denial of rights for cause.  Limit of ten (10) total for all publications (exception - clipping are not counted in regards to limit). |
| newspaper clippings | X | | | | | | |
| Books,  magazines, or catalogs | | | X | US | | | |
| PSH Library Books | STATE ISSUE ONLY | | | | | | PSH Library books are not to be included in the amount allowed as they are not the property of the Individual.  Overdue books will be returned to PSH Library when found. |
| PURSE, BOOK BAG, CLUTCH, FANNY PACKS, OR WALLETS | | X | X | US | | | Limit one (1). No metal frame, chains, clasps, or detachable straps on purses/book bags/fanny packs allowed.  Back packs are NOT allowed |
| RAZORS, ELECTRIC | | X | X | | | S | |
| RELIGIOUS ITEMS | X | | X | | | | Includes items allowed on A.D.#15.36 – Native American Spiritual Items and other religious items such as prayer beads. |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS<br>C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT (Information on limits, containers, etc.) |
| SHAMPOO/ CONDITIONER, NON-MEDICATED | | X | X | | | | |
| SHAVING CREAM AND POWDERS | | X | X | | | S | |
| SHOES/ FOOTWEAR | | X | X | US | | | Limit four (4) pairs of shoes including tennis shoes. Limit one (1) pair wedge shoes not to exceed one (1) inch in height. No boots, pointed toe, or heel over one (1) inch. No steel shanks or hollow heels.  No magnetic components allowed in any shoe. |
| SHOE LACES | | X | X | US | | | Must have personally owned shoes requiring laces as state issued shoes do not have laces (except work boots - these laces are supplied by the state) Limit of one (1) set per pair of shoes |
| SOAP BOX | | X | X | US | | | Soft plastic only.  Limit of one (1) |
| STAMPS | | X | X | | | | Equivalent of 20 first-class stamps in possession at any one time. Pre-stamped embossed envelopes may be substituted for stamps. Stamps may not be mailed from family member or friend only from vendor. |
| STATIONERY<br>Note Cards, Envelopes, Writing Paper, etc. | *X | X | *X | | | | Includes boxes that are factory sealed. |
| SUNGLASSES | X | X | X | US | | | Limit one (1) pair.  Wire frames permitted. |
| SUSPENDERS | STATE ISSUE ONLY | | | | | | |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**

DCF MOU Attachment #7b.

A.D.#15.16
ATTACHMENT A
Page 12 of 12
Revised 05/07/10

| Approved Items | SOURCE | | | ACCESS REQUIREMENTS | | MONITORING REQUIREMENTS<br>C = Controlled Item    S = Direct Supervision | |
|---|---|---|---|---|---|---|---|
| | Package Received by mail *Factory Sealed | Purchased Through Canteen | Purchased Through Vendor *Factory Sealed | LIMIT ISSUE ONLY Requires US approval via e-mail or FAX | APPROVAL BY US OR WRT (as designated) Prior to access | C or S | COMMENT<br>(Information on limits, containers, etc.) |
| TOOTHBRUSH | | X | X | | | | Limit one (1) upon exchange |
| TOOTHPASTE | | X | *X | | | | |
| UNDERGARMENTS                    Bras | *X | | *X | US | | | Limit of ten (10), no under wires. |
| Men's Underwear or Women's Panties | *X | | *X | US | | | Limit of twelve (12), non-white is acceptable. |
| Socks | *X | | *X | US | | | Limit twelve (12), no women's nylons or nylon knee highs allowed. |
| Tee Shirt (includes Tank Top or long sleeve type) | *X | | *X | US | | | Limit of ten (10), KHAKI COLOR ONLY |
| Thermal Underwear | *X | | *X | US | | | Limit of two (2), natural color only. |

**(S) Supervised Items – Items which will only be used under the direct supervision of treatment staff.**
**(C) Controlled Items – These items are to be checked out by the individual daily and returned prior to bed time each day.**
**Liability Waiver is required for all items valued at $100.00 or more.**
**For items which require the Unit Supervisor's/Wellness & Recovery Team approval the Unit Supervisor shall send a copy of the approved MH 5216 to the Mailroom – Contraband Desk prior to the purchase and arrival of the item.**

SALINAS VALLEY PSYCHIATRIC PROGRAM

INTERMEDIATE INPATIENT TREATMENT FACILITY

PROGRAM MANUAL

PROCEDURE: 6.15

**SUBJECT:**        PATIENT PROPERTY

**RESPONSIBLE:**    Health Program Coordinator, Sr. Medical Technical Assistant

Signature:

**CROSS-REFERENCE:**                Title:

Program Director

## POLICY

It is the policy of the Salinas Valley Psychiatric Program to establish procedures to allow patients to have their approved personal and state property, which does not impede the safety and security of the institution.

## PROCEDURE

**A.    PROCESSING OF ALLOWABLE PATIENT PROPERTY**

1.  The Salinas Valley Psychiatric Program (SVPP) Property officer will inventory all allowable property and maintain an property log for each SVPP-DMH patient. The property officers shall issue allowable property to the patient upon approval from IDTT..

2.  A 2.5 x 2.5 foot space above the patient's bed area can be utilized for displaying approved pictures or art work.

3.  With the exception of legal property, the total volume of in-cell patient property is limited to that which can be contained in two 10"x 12"x 15" boxes.

4.  Personal possessions exceeding amounts/volume designated in this policy will be stored in the SVPP patient property room.

5.  Additional property may be authorized by Treatment Team, based from individual needs, stage appropriateness, patient behavior and according to SVPP Policy and Procedure.

6.  A copy of all Property Chronos and a record of any other unique property allowance(s), shall be filed in the individual patient chart.

7.  Before confiscating patient property, staff will consult the individual patient chart to ensure that the item to be confiscated has not been allowed via Property Chrono or Treatment Team decision and in accordance with Program Manual policy 6.07.

8.  Food items available to patients through the approved SVPP Incentive Program may require prior approval of the Dietician.  The total amount of

food items allowed in the patient's cell at any given time shall not exceed two (2) cubic feet.

**B.    ALLOWABLE PATIENT PROPERTY**

1. Patients that are assigned to the Salinas Valley Psychiatric Program may be permitted, with the approval of IDTT, to possess the following personal property items :

   a. **STAGE 1/DPS/New Arrival:**

   - (1) Pen fillers (One for one exchange)
   - Inmate 602 forms (2 per week)
   - Inmate request for interview forms (6 per week)
   - (1) Address book
   - (20) Postage stamps, (20) Metered envelopes, (10) Sheets of paper
   - Eyeglasses/Sunglasses/Dentures/Prescribed prosthetics (artificial limbs). Medically prescribed aides such as walkers, crutches, braces, or wheelchairs, only as deemed essential for constant possession by medical staff.
   - State Issued Clothing

     (1) Blue jeans

     (1) Blue shirt

     (1 Pair) Socks

     (1) Undershirt

     (1) Underwear

     (1 Pair) State-Issued Tennis Shoes, unless otherwise medically indicated by a physician.

     (1 Pair) Shower shoes
   - Grooming items (clear only) limited to one (1) of each type (unless otherwise specified)

     1 Shampoo

     1 Bar of soap

     1 Lotion

     1 Deodorant (Stick or roll-on in a clear container only)

     1 Toothbrush (1 for 1 exchange).  Toothbrush must be state issued only.

     1 Toothpaste (1 for 1 exchange).

     1 Roll of toilet paper
   - (1) Soft covered book (1 for 1 exchange).
   - (1) Bible or religious book

   a. **STAGE 1/DPS/New Arrival continued:**

   - (1) Periodicals (to include magazines) (1 for 1 exchange).
   - Miscellaneous personal papers, letters, artwork, personal photos, etc.

- Legal materials limited to those necessary to complete Preferred Legal Users (PLU) cases. This will not exceed one (1) cubic foot of materials without approval by Executive Director or designee.

- Allowable Incentive Store purchases in accordance with the SVPP Stage and Incentive Program policy (3.12).

b. **STAGE 2:**

- All privileges gained in STAGE 1

- (2) Pen fillers (1 for 1 exchange).

- (20) Family photos

- (1) Religious medallion (Chain must have religious medallion)

- Personal Clothing

  (1) Baseball hat

  (1) Sweat suit (one sweatpants and one sweatshirt)

  (1) Long-sleeve T-shirt

  (1) Pair gym shorts

  (1) Pair socks

  (1) Beanie

  (1) Pair of Tennis shoes

  (1) Pair of thermal underwear

- Grooming items (clear only) limitations listed below

  (2) Bars of soap

  (2) Toothpaste (1 for 1 exchange).

  (1) Shampoo

  (1) Conditioner

  (1) Hair Grease

  (1) Baby Powder

- (5) Soft covered books (1 for 1 exchange).

- (10) Periodicals (To include magazines) (1 for 1 exchange).

- (1) Plastic cup

b. **STAGE 2 continued**:

- (1) Plastic bowl

- (1) Wedding band (if married)

- (1) Watch

- (1) Wave cap (Black, white or gray only)

SVPP Program Manual
Revised 1/25/2010

- Allowable Incentive Store purchases in accordance with the SVPP Stage and Incentive Program policy (3.12).

**c.  STAGE 3 (SINGLE CELL):**

- All privileges gained in STAGE 1 and STAGE 2
- Personal Clothing

    (3 Pair) Socks

    (3) Undershirt

    (3) Underwear

    (1 Pair) Tennis shoes

    (1 Pair) Shower shoes

    (1) Baseball hat (White or light gray only)

    (1) Sweat suit (one sweatpants and one sweatshirt) (White, light gray or off white only)

    (1 Pair) Thermals (one shirt and one pant) (White, light gray only or off-white)

    (1) Beanie (White, light gray only or state issue blue)

- (1) Calculator
- Patients designated "Single Cell" status per CDCR Classification Committee may be eligible for a TV loaner upon approval from IDTT.
- Annual Package
- Allowable Incentive Store purchases in accordance with the SVPP Stage and Incentive Program policy (3.12).

**d.  STAGE 3 (DORM):**

- All privileges gained in STAGE 1, STAGE 2 and STAGE 3 (SINGLE CELL)
- (Limited to 2) Electrical appliances.  (1) TV (DMH issued only), (1) CD player with headphones (DMH issued only)
- (5 Total) CD's

Exhibit 9



Transcript of the Testimony of:

# Joel Dvoskin, Ph.D., ABPP

Coleman v. Brown

February 27, 2013

Volume I

THORSNES LITIGATION SERVICES, LLC
P:  877.771.3312  |  F:  877.561.5538
www.thorsnes.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,              )
                                    )
                    Plaintiffs,     )
                                    )CASE NO.:
          vs.                       )S 90-0520 LKK-JFM
                                    )
EDMUND G. BROWN, JR., ET AL.,       )
                                    )
                    Defendants.     )
_____)



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013,  9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3

 4   RALPH COLEMAN, ET AL.,            )
                                       )
 5                   Plaintiffs,       )
                                       )CASE NO.:
 6        vs.                          )S 90-0520 LKK-JFM
                                       )
 7   EDMUND G. BROWN, JR., ET AL.,     )
                                       )
 8                   Defendants.       )
     _____)

 9

10

11

12          The Deposition of JOEL DVOSKIN, PH.D., ABPP,

13   taken on behalf of the Plaintiffs, before Megan F.

14   Alvarez, Certified Shorthand Reporter No. 12470,

15   Registered Professional Reporter, for the State of

16   California, commencing at 9:14 a.m., on Wednesday,

17   February 27, 2013, at Rosen, Bien, Galvan & Grunfeld,

18   LLP, 315 Montgomery Street, 10th Floor, San Francisco,

19   California.

20

21

22

23

24

25
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFFS:

 3             BY:  MICHAEL BIEN, ESQ.
                   AARON FISCHER, ESQ.
 4                 JANE KAHN, ESQ.
             ROSEN, BIEN, GALVAN & GRUNFELD, LLP
 5           315 MONTGOMERY STREET, 10TH FLOOR
             SAN FRANCISCO, CALIFORNIA 94104
 6           415.433.6850
             415.433.7104 FAX
 7           MBIEN@RBGG.COM

 8

     FOR DEFENDANTS:
 9
               BY:  DEBBIE J. VOROUS, ESQ.
10           OFFICE OF THE ATTORNEY GENERAL
             STATE OF CALIFORNIA
11           1300 I STREET
             SACRAMENTO, CALIFORNIA 95814
12           916.324.5345
             916.324.5205 FAX
13           DEBBIE.VOROUS@DOJ.CA.GOV

14             BY:  HEATHER L. McCRAY, ESQ.
             DEPARTMENT OF CORRECTIONS AND REHABILITATION
15           OFFICE OF LEGAL AFFAIRS
             1515 S STREET, SUITE 314 SOUTH
16           SACRAMENTO, CALIFORNIA 95811
             916.324.4123
17           916.327.5306 FAX

18

19

20

21

22

23

24

25
```

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    from his review and from the suicide review committee in

2    headquarters that that was an area of needed

3    improvement.  I can't say it was bad, but it was room

4    for improvement.  It was very clear to me, and I agreed

5    with Dr. Patterson about that.

6        Q.  Some of these are very difficult, right, where

7    someone has a medical issue and also a mental health

8    issue?  I'm sure that happens in the community, too.

9    There's some difficult decisions about "Where's the

10   right place to house this person?" and "Are we going to

11   coordinate both types of care?"  Right?

12       A.  True.

13       Q.  You recall also some cases where there are

14   issues as to whether or not DSH had prematurely

15   discharged a patient or had -- let's just leave that --

16   people complained that DSH may have prematurely

17   discharged a patient that was coming back still unstable

18   or ill?

19           MS. VOROUS:  Objection.  Vague and ambiguous.

20           THE WITNESS:  There were some people that -- I

21   remember one guy was at DSH for -- DSH for a pretty long

22   time where, quote/unquote, it didn't work; that he

23   wasn't any better.  And a phrase I don't like is

24   "maximum benefit," but I found out, sadly, it's in your

25   statute, so...

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

```
 1              CERTIFICATE OF REPORTER

 2

 3         I, MEGAN F. ALVAREZ, a Certified Shorthand

 4    Reporter, hereby certify that the witness in the

 5    foregoing deposition was by me duly sworn to tell the

 6    truth, the whole truth and nothing but the truth in the

 7    within-entitled cause;

 8              That said deposition was taken down in

 9    shorthand by me, a disinterested person, at the time and

10    place therein stated, and that the testimony of the said

11    witness was thereafter reduced to typewriting, by

12    computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14    attorney for either or any of the parties to the said

15    deposition, nor in any way interested in the events of

16    this cause, and that I am not related to any of the

17    parties hereto.

18

19

20                        DATED: March 1, 2013

21

22              _____

23              MEGAN F. ALVAREZ

24              RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Exhibit 10

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

# TABLE OF CONTENTS

CHAPTER 1 .................................................................. Program Guide Overview

CHAPTER 2 ......................................Reception Center Mental Health Assessment

CHAPTER 3 ................................ Correctional Clinical Case Management System

CHAPTER 4 .......................................................... Enhanced Outpatient Program

CHAPTER 5 ...................................................................Mental Health Crisis Bed

CHAPTER 6 ................................ Department of Mental Health Inpatient Program

CHAPTER 7 .............................................................. Administrative Segregation

CHAPTER 8 ......................................................................... Security Housing Unit

CHAPTER 9 ...................................................................Psychiatric Services Unit

CHAPTER 10 ..................................................... Suicide Prevention and Response

APPENDIX A...............................................................................Glossary of Terms

ATTACHMENT A ......................................................Confidentiality Guidelines

ATTACHMENT B ..................................................... Inmate Disciplinary Process

ATTACHMENT 1 .......................... Department of Mental Health Contraband List

ATTACHMENT 2 .............. Department of Mental Health Transfer/Discharge List

ATTACHMENT 3 ..............Dept. of Mental Health Day Treatment Referral Form

ATTACHMENT 4 ................................ Other Department of Mental Health Forms

ATTACHMENT 5 ..........................................................................MHSDS Forms

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

7. Each patient or parolee shall be subject to TB evaluation by DMH upon admittance.

### *Utilization Management (UM)*

1. CDCR reserves the right to inspect, monitor, and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to CDCR's inmate-patient. Such reviews shall be undertaken to determine whether the course of treatment or services was prior authorized, medically necessary and performed in accordance with CDCR rules and guidelines. DMH agrees to make available, upon request by CDCR, for purposes of utilization review, an individual patient's medical record and any committee reviews and recommendations related to a CDCR patient.

2. DMH acknowledges and agrees that concurrent utilization management review shall not operate to prevent or delay the delivery of emergency treatment.

3. DMH acknowledges that the care of a patient at DMH shall be reviewed by CDCR Utilization Management (UM) nurses or designated party and by a Joint CDCR/DMH Review Process.

4. CDCR UM nurses or designated party will gather data and review cases of CDCR inmate-patients in DMH programs. CDCR UM nurses or designated party will report their findings and make recommendations to the CDCR Health Care Manager and CDCR Chief Psychiatrist or their designee(s). CDCR and DMH managers or their designees will meet monthly to review the data. Each DMH program also will have a joint CDCR/DMH UM process that will review individual cases.

   If there is a disagreement about discharge, the UM nurse will review the patient's record and forward a recommendation to the Joint CDCR/DMH UM Review Process. If there continues to be disagreement, the recommendation will be conveyed to the CCAT.

### *Discharge Criteria*

1. The inmate-patient has improved to a degree that further hospitalization is unnecessary, or the primary illness or problem for which hospitalization was required is in substantial remission, and the remaining symptoms are those of a disorder for which continued DMH inpatient care is not necessary, the inmate-patient will be returned to CDCR for ongoing treatment; or

2. Evaluation during hospitalization has resulted in a change of diagnoses such that continued hospitalization is not appropriate or necessary.

| Department of Mental Health | Mental Health Services Delivery System |
|---|---|
| Inpatient Program | |

3. If requested by DMH, an inmate-patient who has withdrawn informed consent for mental health treatment or psychiatric medication, but for whom continued treatment is otherwise recommended, may be returned to CDCR after all other clinical and legal avenues to obtain authorization to treat have been exhausted, if the following two criteria have been met:

- Withdrawal of informed consent shall be demonstrated by seven calendar days of continuous refusal to take oral medication or 30 calendar days of continuous refusal to accept scheduled depo-injectable medication, and documentation of discussions between treating DMH psychiatrists and other team members and the patient regarding the risks and benefits of continuing medication.

- Documentation that the patient has not met criteria for involuntary treatment for at least the last seven calendar days.

### *Discharge Procedure*

1. Inmate-patients will be returned to the institution from which they came per the "psych and return" policy provided that institution can meet the level of care and security needs of the inmate-patient. Generally most inmate-patients will be returned to an institution that has an EOP. The EOP IDTT may decide to discharge the inmate-patient to a lower level of care after the initial 14-28 day evaluation period.

2. Inmates who are paroling and require ongoing treatment will be referred to the Parole and Community Services Division (P&CSD) Transition Case Management Program and to a Parole Outpatient Clinic or to a State hospital per Penal Code 2974.

3. DMH shall fax a copy of the Discharge Summary to the designated "DMH contact", of the receiving institution at the time of notification of discharge. DMH shall also call the receiving institution. The inmate-patient shall then be returned to the CDCR institution within five working days after the time of notification, or resolution of any appeal, whichever occurs later.

4. Appeals for denial of return to CDCR will be reviewed by the Coordinated Clinical Assessment Team (CCAT), Part V of this document.

5. Emergency returns to CDCR, shall be accomplished within twenty-four hours. Such returns will be with prior notification and approval by telephone of the CDCR institution's C&PR staff and Mental Health Program Director, or designee. DMH shall call the receiving institution to provide continuity of care including medication.