DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone: (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California 94111-5994
Telephone: (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California 94104-4244
Telephone: (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **AMENDED DECLARATION OF JOEL BADEAUX, M.D.** |
| v. | Date: 05/23/2013 |
| EDMUND G. BROWN, Jr., et al., | Time: 10:00 a.m. |
| Defendants. | Judge: Hon. Lawrence K. Karlton<br>Crtrm: 4 |

[794454-1]

I, Joel Badeaux, declare:

1.      I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.      I am a physician licensed to practice in California, with a specialty in psychiatry.  A true and correct copy of my *curriculum vitae*, current as of March 27, 2013, my final day at SVPP, is attached hereto as **Exhibit A**.

3.      I worked at Salinas Valley Psychiatric Program ("SVPP") as a staff psychiatrist from August 2012 through March 27, 2013.  Before that, I worked as a staff psychiatrist at Napa State Hospital.  I have also worked as an inpatient attending psychiatrist at the District Medical Group in Phoenix, Arizona, where I treated and evaluated patients for civil commitment based on the danger they posed to themselves or others.

4.      Throughout the approximately seven months I was employed at SVPP, there was a shortage of psychiatrists.  In my role as staff psychiatrist, I was one of approximately nine staff psychiatrists treating a total population of between 350 and 360 inpatients.  My caseload fluctuated between 38 and approximately 60 patients per week, in addition to processing two to three admissions per week.  As a point of comparison, I had a caseload of 15 patients at Napa State Hospital with up to two patient admissions per week, where I worked with a similar inpatient population.

5.      When I started working at SVPP, the C-yard was open and in use, and the overall patient count at the institution had increased as a result.  My colleagues told me that the number of psychiatrists had not risen to accommodate the additional patients.  Consequently, psychiatrists' caseloads had grown substantially.  In fact, my colleagues said there used to be three psychiatrists on each unit before C-yard opened.  From early September 2012, when I started working at SVPP, through early November 2012, I was the only psychiatrist working on my unit.  This translated to caseload of approximately 60 patients per week, in addition to my responsibilities to process two or three patient admissions per week.

6.      In the last few months of 2012, the staffing situation grew even worse.  Two staff psychiatrists retired, and a third psychiatrist, Dr. Gaines, announced that she was leaving at the end of the January 2013.  Faced with the prospect of having only 7.75 psychiatrists on staff to attend to all of our patients, the other staff psychiatrists and I decided that we needed to express our concerns about the impact of psychiatrist shortages on patient safety and quality of care at SVPP.  On January 23, 2013, I co-signed a letter to the Executive Director of SVPP, Charles DaSilva, describing my increasingly urgent concerns about staffing levels and caseloads.  That letter was signed by all the staff psychiatrists at SVPP, as well as our senior psychiatrist.  Attached as **Exhibit B** is a true and correct copy of the letter.

7.      I never received or heard of any written response to the letter.  Three weeks later, as more psychiatrists made plans to leave their positions at SVPP and concerns about patient care increased, our Executive Director met with the staff psychiatrists, including myself.  While he acknowledged the staffing problem and stated that he was making efforts to address it, no concrete steps were proposed to change our situation in the foreseeable future.  My colleagues and I then wrote a second letter explaining that the psychiatrist shortage had become a crisis.  I have never received or heard of any written response the second letter.  Attached as **Exhibit C** is a true and correct copy of the letter.

8.      I gave notice of my resignation in early March 2013.  I decided to leave SVPP and move to the community outpatient setting out of frustration with my experience at SVPP.  My high caseload and the conditions there prevented me from giving my patients the care they needed.  I was unable to see them as often as was clinically indicated.  And although I did my best to respond to every request from a patient for assistance, I often had no choice but to delay my response because of the demands from other patients.

9.      On March 22, 2013, I wrote a letter to United States Attorney General Eric Holder, copying Governor Jerry Brown, to request an urgent investigation into the dangerous conditions at SVPP.  I wrote this letter because I feared for the safety of

1  patients, knowing that five psychiatrists would be departing SVPP the following week.

2  My concerns were heightened by the fact that the SVPP administration continued to deny

3  that there was any shortage of psychiatrists.  I believe the current conditions at SVPP are

4  unconscionable and unacceptable, and that staffing levels are not sufficient to

5  appropriately manage medication and monitor patient safety.  I believe that if people knew

6  about the conditions for the mentally ill at SVPP, action would be taken to remedy the

7  situation rather than allowing patients to suffer on account of lack of treatment and poor

8  conditions.  Attached as **Exhibit D** is a true and correct copy of the letter.

9       10.     The care I was able to provide my patients was also impacted by shortages of

10  Medical Technical Assistants (MTAs) at SVPP.  On some occasions I wanted to see my

11  patients in a treatment room allowing for confidential discussion, but there were no MTAs

12  available to escort the patient from his cell.  As a consequence, I often had to consult my

13  patients at their cell-fronts.

14       11.     As a doctor, I find cell-front contacts highly inadequate.  In my experience, it

15  is not possible to have more than a minimal encounter with patients when they are within

16  earshot of other patients and cannot speak freely about confidential issues.  I have

17  observed clinical contacts at cell-front to be much less effective because patients are not as

18  forthcoming about their psychiatric conditions, concerns about medications, and other

19  needs.  Even when MTAs were available, the escorting process was time consuming and

20  prevented me from seeing other patients on my large caseload, so I frequently felt that I

21  had to do my consultations at cell-front.

22       12.     Shortages of MTAs and Registered Nurses ("RNs") at SVPP also led to

23  delays in holding Interdisciplinary Treatment Team (IDTT) meetings for patients.  I

24  personally observed multiple sessions that were delayed or moved to cell-front due to

25  shortages in escort staff.  RNs sometimes had to leave IDTTs to carry out other clinical

26  duties because there was no other RN available on the floor.  Consequently, nurses were

27  not present to give important input about the medical needs of our patients.  IDTT

28  meetings are an essential component of patient care because they afford a relatively rare

1   opportunity for clinicians at SVPP to learn about and address patients' needs, including

2   medication and treatment issues.  As a result, disruptions to IDTT meetings have a real

3   impact on patient care.

4        13.    Primary care physicians are responsible for initial medical screening and

5   ongoing medical care for all patients in the DSH psychiatric program.  From my

6   observation, caseloads for primary care physicians at SVPP are unacceptably high,

7   potentially jeopardizing patient health and safety.  While I was at SVPP, the total number

8   of patients fluctuated between approximately 351 and 357.  However, there were only two

9   primary care physicians on staff the whole time I was there.  This means the average

10  caseload of each primary care physician was over 175 patients.  By contrast, the caseloads

11  of the primary care physicians that I knew at Napa State Hospital were less than 70.

12       14.    From my observation, my patients were typically offered about one hour of

13  group activity per day, excluding yard.  Sometimes they received less, and occasionally

14  they received more.  These treatment patterns were apparent to me from my patients'

15  medical records and also their accounts to me.  Given the level of acuity of the patients, I

16  believe our patients required far more care than one hour of group treatment per day in

17  order to stabilize and prevent further decompensation.

18       15.    From my training and experience, the therapy of choice for patients with

19  chronic self-injurious behavior or self-harm ideation, including those with Borderline

20  Personality Disorder, is Dialectical Behavioral Therapy ("DBT").  Despite the high

21  prevalence of self-harm ideation and self-harm behavior at SVPP, I did not see this therapy

22  model being implemented appropriately, and I was not aware of any specialized DBT

23  program within the CDCR or DSH where I could refer patients who I felt required it.  I did

24  not see DBT groups or DBT literature being used at SVPP.  By contrast, at Arizona State

25  Hospital, where I did part of my training, I saw DBT fully implemented and heavily

26  utilized.  From my experience, I believe that implementing DBT appropriately within the

27  CDCR and DSH system would significantly reduce the rate of suicides and self-harm

28  events within the CDCR and DSH.

16.     For example, I had one patient whom I believed to be in particular need of DBT.  This patient was repeatedly discharged from SVPP and then returned to DSH custody when he was unable to function in the prison setting.  In my judgment as his treating physician, the primary reason for his "revolving door" experience was the deficiency of care available at SVPP.

17.     I have observed that deficiencies in the quality and quantity of care provided lead to unsafe conditions for patients and clinicians.  My primary concern is for the safety of my patients.  Many of the patients at DSH suffer from very severe mental illness.  Without sufficient monitoring and treatment, some patients can become extremely psychotic or paranoid and violent.  They may also become actively suicidal.  These conditions can put the patient himself, as well as other patients and staff members at grave risk.

18.     As a clinician at SVPP, I also felt unsafe at times because I did not have sufficient time with my patients to adequately monitor and treat them.  As a result, I could not fully understand their needs or accurately access their risk.  These dangers were heightened by my lack of access to my patients' full electronic medical records.  Although I filled out a request to get access to the CDCR electronic medical records system in November of 2012, I never received access, and I was never given an explanation of the status of my request for access.  Without access to CDCR medical records, I had to rely on whatever information happened to be included in the referral forms CDCR completed.  As a result, I felt that I was working with partial information and could not provide sufficient treatment to my patients.

19.     I believe I was not alone in feeling unsafe at SVPP.  Staff members at SVPP received a survey around September 2012, and the results were distributed to DSH employees in November 2012 through the DSH intranet system.  I downloaded the results, which are attached as **Exhibit E**, from the DSH intranet.  The survey shows that 45.3% of the staff at SVPP "strongly disagreed" with the statement that "I feel safe in my work environment."  (Ex. E at 36.)  An additional 16.8% indicated that they "disagreed" with the

1  statement.  (*Id.*)  Similarly, 71.6% of respondents strongly disagreed or disagreed with the

2  statement that "DSH is committed to improving safety in its facilities."  (*Id.* at 37.)

3       20.    The survey also confirmed my observations and experiences about the poor

4  quality of treatment for SVPP patients.  47.4% of the SVPP staff respondents strongly

5  disagreed or disagreed with the statement that "DSH is effective in accomplishing its

6  objectives for patients."  (*Id.* at 17.)  Even more SVPP respondents (50.6%) strongly

7  disagreed or disagreed with the proposition that "DSH is an effective organization for

8  serving its patients."  (*Id.* at 23.)  More than 50% of the SVPP respondents strongly

9  disagreed or disagreed with the statement that "DSH provides effective clinical services."

10  (*Id.* at 38.)

11       21.    The survey results are even more dismal with respect to staff morale, which I

12  experienced to be terrible while working at SVPP.  85.3% of SVPP respondents strongly

13  disagreed or disagreed with the statement that "workplace morale is positive."  (*Id.* at 42.)

14  Only 7.5% of SVPP respondents agreed or strongly agreed that "DSH has established

15  credibility with its staff."  (*Id.* at 33.)

16       22.    I have observed that low morale at SVPP also led to high staff turnover,

17  which negatively impacts patient care.  While I was working at SVPP, many psychiatrists

18  retired, found other jobs, transferred to other DSH institutions, or otherwise left their

19  positions.  High turnover leads to discontinuity of care for patients.  Also, new

20  psychiatrists have to learn the DSH systems and procedures, so it is often difficult for them

21  to responsibly manage large caseloads of clients.

22       23.    I believe the problems with staff retention and morale at SVPP were related

23  to bad conditions for clinicians and patients alike.  I observed significant shortages of basic

24  provisions for patients, such as clean clothes, bedding, and soap.  My patients told me they

25  had to wear soiled clothes.  An MTA told me that patients had no choice but to put on dirty

26  underwear after showering.  Another MTA told me that some patients had to wear the

27  same underwear for two months due to the unavailability of clean underwear.  Patients

28  complained to me that they were cold in their cells, but unable to get blankets.  About two

1   months ago, I received an email from a psychologist, addressed to the whole SVPP

2   psychiatric staff and administration, regarding the shortage of basic supplies including

3   clean clothes for patients. I observed no change in conditions in response to the email. On

4   my final day at SVPP, I asked an MTA about the situation and was told that sufficient

5   clean underwear was still not available.

6         24.    As a psychiatrist at SVPP, I also found that CDCR's custodial policies

7   interfered with the care we were able to provide our patients. When new patients are

8   admitted to SVPP, they are on "cuff status," which means they are confined almost

9   continuously to their cells and cuffed any time they leave their cells. These patients are

10   not allowed to participate in standard groups or therapy when they are on cuff status.

11         25.    This highly restrictive "cuff status" lasts until patients meet with the

12   Institutional Classification Committee (ICC), which typically takes ten full business days.

13   In my experience, this extended lockdown has a negative impact on patients. Based on my

14   experience treating patients, I believe individuals referred for psychiatric hospitalization

15   need more care and greater attention, not heightened isolation.

16         26.    To my knowledge, all incoming patients at SVPP are classified as Stage 1,

17   regardless of whether their custodial records justify such harsh restrictions. As a doctor,

18   there was nothing I could do to remove these restrictions, even if I thought it was clinically

19   indicated.

20         27.    Even when patients are released from "cuff status," they are often not

21   permitted to go to yard right away. Many patients have to wait weeks and even months

22   before they are permitted full access to programming. Advancements in "stage"

23   classifications were frequently delayed due to scheduling problems or limited availability

24   of treatment team meetings.

25         28.    In one case, a patient had left SVPP for about a month to go on "Out to

26   Court" status. When the patient returned, he was forced to go through the entire clearance

27   process again, including at least two weeks in cuffs. The process was very detrimental to

28   his mental health, and I viewed it as highly unnecessary.

29.     I also found that pressure to eliminate the waitlist for DSH care led to premature discharge of patients in our care.  During my employment at SVPP, I received an email issued by the SVPP administration stating that psychiatrists should discharge three patients per week per unit – a total of 18 patients each week.  A program assistant verbally confirmed this expectation to me as well.

30.     Along with all other psychiatrists, I had to attend weekly "utilization review committee" meetings with SVPP administrators any time I had a patient with a long stay (particularly over six months).  At those meetings, I had to justify to administrators why I had not discharged my patient yet and when I expected to do so.  I felt pressure to discharge my patients, even if I did not think they were ready to return to the prison setting.  When I asked my supervisor about the pressure to discharge, I was told that administration wanted to make beds available in order to reduce the waiting list for SVPP to zero.

31.     I read the declarations submitted to the Court by Mr. DaSilva and Ms. Radtkey-Gaither, and the employment numbers they set forth are inconsistent with my observations as a full-time psychiatrist there.  Although the information provided by Mr. DaSilva and others is too vague to confirm or disconfirm, I believe SVPP is misrepresenting its employment numbers.  Both declarations report that 12.75 full-time psychiatrists are working at SVPP.  They appear to be including in their count a psychiatrist who was hired in February, but who had not been physically present and actually performing clinical duties at SVPP.  Critically, these declarations also failed to mention that five psychiatrists would be leaving SVPP in the week following the date of the declarations.

32.     And although the declarations of Mr. DaSilva and Ms. Radtkey-Gaither downplay the seriousness of the staffing situation at SVPP, the DSH chief psychiatrist specifically described the shortage of psychiatrists as a "crisis" when I spoke with her during the last week of my employment.

33.     My last day at SVPP was Wednesday, March 27, 2013.  That week was also the last week of employment at SVPP for four other staff psychiatrists, Dr. Saleem, Dr. Stoller, Dr. Kapadia, and Dr. Brim (who had been working 3/4 time).  To the best of my knowledge, in the last week of March 2013, 4.75 psychiatrists left SVPP.  Dr. Wei has also been on extended family leave and will not be returning to SVPP for at least several months, if at all.  Dr. Wei and Dr. Saleem are contractors on leave and under no obligation to return to SVPP.

34.     The only psychiatrists remaining at SVPP in April 2013 who were there in January are Dr. Aramandla and Dr. Troncoso.  However, they both informed me that they have been hired for other state positions and are pending transfer.  I know of two psychiatrists from Atascadero State Hospital who have started working temporarily at SVPP.  I am also aware that the senior psychiatrist and chief psychiatrist assigned to the Stockton facility have starting working at SVPP.  Therefore, including the newly hired SVPP chief psychiatrist, there are only seven psychiatrists remaining at SVPP who are not out on leave or otherwise unavailable to work.  However, two of these are chief psychiatrists, with primarily administrative duties.  Although the chief psychiatrists are working full-time, and I am not aware of either chief psychiatrist carrying a full SVPP caseload.

35.     As stated in the DaSilva and Radtkey-Gaither declarations, a contractor psychiatrist was hired in February 2013.  However, he went out on sick leave almost immediately and did not work the rest of the time I was there.  If the contractor hired in February 2013 is able to return to fulltime duty, then the total would increase to eight fulltime psychiatrists available to work at the beginning of April 2013.

36.     What is clear to me – and is expressed in the letter I co-signed with my colleagues in February – is that caseloads at SVPP are unacceptably high and do not permit psychiatrists to provide adequate care to their patients.  That situation was still true on the last day of my employment, last week, and I have no reason to believe the staffing

1   numbers at SVPP have since improved to safe levels. Sadly, for SVPP patients, I believe

2   things are moving in the wrong direction.

3

4       I declare under penalty of perjury under the laws of the United States and the State

5   of California that the foregoing is true and correct, and that this declaration is executed at

6   Santa Cruz, California this 22 day of April, 2013.

7

8

Joel Badeaux

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[777999-6]

# EXHIBIT A





# Joel Badeaux, MD, MPH

**Business address:**
**PO Box 1080**
**Soledad, CA 93960**
*Business phone:*
**831-809-6745**
*Personal e-mail:*
**joel.badeaux@gmail.com**

## Qualifications

- Licensed physician in the State of California (through 02/28/15).
- Board Certified Diplomate of Psychiatry and Neurology (through 12/31/21).
- No history of board complaints, violations, or lawsuits.

## Professional Experience

**Salinas Valley Psychiatric Program, California Department of State Hospitals,** *Staff Psychiatrist, Correctional and Rehabilitative (Safety),* Soledad, CA. 08/12-present. Located at Salinas Valley State Prison, currently working as an inpatient correctional psychiatrist, treating PC 2684 status male patients at Salinas Valley State Prison. Stabilizing new ICF (intermediate) level of care patients, with an average of 2 to 3 admissions per week and a caseload ranging from 38 to 60 inpatients.

**Napa State Hospital, California Department of State Hospitals,** *Staff Psychiatrist (Safety),* Napa, CA, 10/11-08/12. Worked on an admissions unit with PC 1370 status (meaning those found not competent to stand trial) male patients in a restoration to competency setting. Stabilized new patients, evaluated competency, and completed initial competency evaluation court letters. Caseload of 15 inpatients. Scored 91% on QAP qualifying exam. Received 'Outstanding' overall rating on initial performance review. Resigned to take new position.

**District Medical Group,** *Psychiatrist*, Phoenix, AZ, 07/10-09/11. Worked as an inpatient attending psychiatrist, treating patients and evaluating them for civil commitment based on danger to self, danger to others, and persistent, acute, or grave disability as a result of mental disorder. Served in an organization affiliated with Maricopa Integrated Health System and was positioned at Desert Vista Behavioral Health, a 100+ bed psychiatric hospital in Mesa, AZ. Worked primarily with a population diagnosed with serious mental illness. Caseload of 11 inpatients. Also participated in peer continuing medical education, training resident physicians, and in precepting medical students. Resigned position to move to California.

**Maricopa Integrated Health System,** *Psychiatry Resident*, Phoenix, AZ, 06/06-06/10. Inpatient and outpatient, trained primarily at Desert Vista Behavioral Health and Maricopa Medical Center, an ACGME accredited psychiatry residency whose institutional affiliations include the University of Arizona and the Mayo Clinic. Studied psychopharmacological, behavioral, and psychodynamic methods–with populations including: geriatric, child and adolescent, and those with serious mental illness. Vice-Chief Resident (Academic and Administrative) in 2008/2009. Passed oral and computer-based psychiatry boards on first attempt (86% Psych, 82% Neuro). In final year led a weekly dialectical behavior therapy (DBT) skills group. Electives included:

• Arizona State University: Provided cognitive behavioral therapy (CBT) and medication management in the campus Counseling and Consultation center.
• VA Medical Center: At the substance clinic and PTSD clinics, provided continuing care for patients with addiction, PTSD, and other psychiatric disorders.
• Community Bridges: Worked in detoxification and recovery from addiction.
• Arizona State Hospital: Evaluated for restoration to competency in a forensic setting.

**KnowledgeBase Marketing, a division of Young & Rubicam,** *Senior Account Coordinator*, Houston, TX, 12/97-08/00. Coordinated the use and maintenance of a marketing database to produce catalog mailings for a major customer. Two-time Employee Excellence Award winner.

**Mental Health and Mental Retardation Authority of Harris County**, Houston, TX.
• *Caseworker*, at the Harris County Psychiatric Center, 07/95-06/97. Referred discharged patients for outpatient care, housing, and other services.
• *Rehabilitation Technician II*, at the Ripley Community Center, 08/92-02/94. Site coordinator for psychosocial rehabilitation for mentally ill adults. Supervised two staff.
• *Case Manager*, 02/91-08/92. Served adult mental health clients, with daily home visits and field work. Worked with a multiple-needs and high hospitalization-risk caseload.

**Achievement Academy of Texas**, *Teacher*, Houston, TX, 12/89-10/90. Taught math and other subjects to 6th-10th grade students, many of whom were psychiatric patients at the affiliated Westheimer Estates Hospital.

## Education

**St. George's University School of Medicine**, Grenada, West Indies. 08/00-05/06. MD/MPH program–Doctor of Medicine received in 05/06 and Master of Public Health received in 12/02. Medical training in Grenada, St. Vincent, NY, CT, MI, the Czech Republic, and the United Kingdom–Public Health training in Grenada and TX. Jonathon Mann Scholarship, Dean's List. All USMLE Steps passed on first attempt (1, 2CK, 2CS, 3).

**Houston Community College**, Houston, TX. 06/90-08/97. 50 credits of biology, chemistry, physics, and music. Dean's List.

**Rice University**, Houston, TX. BA Psychology, May 1989. 08/85-05/89. 120 credits. National Merit Scholarship, Phi Beta Kappa Scholarship, President's Honor Roll. Included a semester abroad in Freiburg, Germany studying at the Institute of European Studies and Albert Ludwigs Universität in a German Studies program from 09/87 to 01/88.

# EXHIBIT B

STATE OF CALIFORNIA – DEPARTMENT OF STATE HOSPITALS                                    EDMUND G. BROWN JR., GOVERNOR

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Wednesday, January 23, 2013

**Name**    Charles DaSilva,
            Executive Director, Salinas Valley Psychiatric Program
**Address**  31625 Highway 101,
            Soledad, CA 93960

Executive Director DaSilva,

As staff psychiatrists, we are writing you collectively to express our serious
concern about the level of staffing at SVPP. At the end of January, we will
have lost our 3rd psychiatrist in the past (6) weeks.

This will leave us only (7) full-time psychiatrists, including a senior, plus 1 part-time
psychiatrist, covering (6) Units that average about 60 beds each. Other disciplines
such as social work, psychology, and rehab therapy have 15 to 16 staff covering the
same number of patients. The SVPP census issued today shows that there are 351
patients in the program. Across the (6) Units we have also been averaging about (2)
to (3) admissions and discharges per Unit per week.

The DSH standard for Stockton and elsewhere is a (15) patient caseload for a
team that does admissions, with about (2) admissions per week. When
administration visited our facility recently to present the Stockton program, we were
told that a 15 patient caseload would also be the standard at SVPP as well as
Stockton. At present we have been averaging a caseload of about (40) with (2)
admissions per week, and all psychiatrists are taking admissions. Some psychiatrists
are already covering (60) patients daily, (4) times the accepted standard. We find a
caseload of (40) to be unsafe, and a caseload of (60) is even more perilous.

As psychiatrists, we are united in our belief that the level of staffing
currently present is not safe or appropriate for an ICF level of patient
care. We believe that it potentially creates an unsafe situation for
both staff and patients. When patient safety is at stake, we cannot in good
conscience continue to take on a higher and higher caseload without making
you aware of our concerns. In November, 2012 SVPP had its first completed
suicide. Current staffing levels will create an unacceptable level of risk as far as
patient safety.

We will continue to do our best for every patient, under every

circumstance. ***But we need to inform you that we will be working in a state of protest regarding our caseload and the rate of admissions.*** We are also extremely concerned about further attrition of psychiatrists, which seems very likely considering the present workload and conditions.

We understand that since SVPP is being downsized that it may be difficult to attract new psychiatrists. However, in the past, staff from other facilities have been brought in on a temporary basis. This would be a tremendous help. We also believe the situation could be made significantly better through a reduction in admissions as we scale back and prepare to close C and D yards.

Thank you for listening to our concerns.

Sincerely,

Joel Badeaux, MD

John Brim, MD

Gayle Gaines, MD

Minhas Kapadia, MD

Muhammad Saleem, MD

Mary Stoller, MD

Ariel Troncoso, MD

Lei Wei, DO

Indu Aramandla, MD

Position  Staff and Senior Psychiatrists
Division  DSH SVPP

cc:    Katherine Warburton, DO, Chief Psychiatrist, DSH
       Nereyda Rivera, UAPD

# EXHIBIT C

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Tuesday, February 12, 2013

**Name**    Charles DaSilva,
            Executive Director, Salinas Valley Psychiatric Program
**Address**  31625 Highway 101,
            Soledad, CA 93960

Dear Executive Director DaSilva,

This letter will confirm our verbal communication to you during the psychiatry meeting today. We alerted you to the severe psychiatry staffing shortage in our letter of three weeks ago. Now, as you know, our psychiatry staffing shortage has devolved from serious to crisis level. With three more psychiatrists leaving in the near future we must take urgent action. After extensive discussion and consideration, the psychiatry staff at SVPP have unanimously determined that we cannot safely manage more than 40 patients per psychiatrist. We will not abandon additional patients beyond this limit, but can provide only emergency psychiatry services for such additional patients.

Thank you.

Sincerely,

Joel Badeaux, MD                    Ariel Troncoso, MD

John Brim, MD                        Lei Wei, DO

Minhas Kapadia, MD                  Indu Aramandla, MD

Muhammad Saleem, MD                 Mary Stoller, MD

cc:    Katherine Warburton, DO, Chief Psychiatrist, DSH
       Nereyda Rivera, UAPD

# EXHIBIT D

**SALINAS VALLEY**
31625 Highway 101 – P.O. Box 1080
Soledad, CA 93960



Friday, March 22nd, 2013

**Name**     The Honorable Eric H. Holder, Jr.
                   Attorney General, U.S. Department of Justice
**Address**  950 Pennsylvania Avenue, NW
                   Washington, DC 20530-0001

Dear Sir,

As a psychiatrist working for the state of California, I am writing you to express grave concern about safety conditions within the California mental health system. Most urgently, I would request that you investigate conditions at the Salinas Valley Psychiatric Program, which is part of the Salinas Valley State Prison.

The Salinas Valley Psychiatric Program is an inpatient level correctional treatment program administered by the California Department of State Hospitals. The program currently treats about 357 patients, admitted from all California state prisons. These patients are referred based on a high level of psychiatric need, requiring an inpatient level of care, and most are at significant risk of danger to themselves or others. In November 2012 the program had its first completed suicide.

In January and February of 2013 all psychiatrists working at this program including myself wrote letters to our Executive Director regarding a critical level of understaffing, which we believe had resulted in perilous conditions as far as safety (see enclosed letters). Since then, timely action was not taken, conditions have worsened, and ***now all nine psychiatrists working at this program just two months ago have either quit, gone on extended leave, or will be transferring to new positions by the end of April***. Five psychiatrists including myself will be leaving by the end of next week. For me, the lack of staff and resulting workload was simply not sustainable.

The administration has been unable to hire replacement psychiatrists and yet continues to admit new patients to the program. The administration has reported to the media that there is no anticipated staffing crisis at our program and has been focused on denying that there is a problem, apparently in an effort to win a major court case against the state (Coleman v. Brown) and end federal oversight of the prison system. One of my colleagues, Dr. John Brim, was deposed as a part of this case (see enclosures).

The Salinas Valley Psychiatric Program has come in millions of dollars under budget, primarily as the result of understaffing at all levels, but there has also been a lack of

basic provisions including clothes, soap, and blankets for the inmates. The oral medication diphenhydramine (Benadryl), which is the 'gold standard' of antihistamine treatment, and which is essential in psychiatry for the prevention and control of severe side effects from some antipsychotics, is not included on the California Department of Corrections and Rehabilitation medication formulary.

A Department of State Hospital staff survey of employees at the Salinas Valley Psychiatric Program conducted in September of 2012 found that 75% of staff either disagreed or strongly disagreed with the statement that the Department of State Hospitals has a desire to serve its staff well, and 86% of staff either disagreed or strongly disagreed with the statement that workplace morale was positive. 72% of staff either disagreed or strongly disagreed that there was a commitment to improving safety at its facilities, and 45% either disagreed or strongly disagreed that Department of State Hospital staff were effective in meeting the needs of their patients. From the results of this survey, you can see why employees, including psychiatrists, might want to leave the program.

As you are certainly aware, the state of California has a long history of inadequate mental health care delivery and has been under federal and Department of Justice supervision in the past. Unfortunately, when not under supervision, the state has shown a consistent pattern of drastically cutting spending on mental health. For example, when released from Department of Justice monitoring less than two years ago, more than a dozen psychiatrist contractors at Atascadero State Hospital were promptly laid off. California mental health care law (Title 22) is written such that there is no minimum psychiatrist-to-patient ratio, because clinical social workers and psychologists are considered to be equivalent to psychiatrists, even though they are not able to prescribe medication.

You should also be aware that mental health treatment outside of the prison system is inadequate to the point of jeopardizing the health and safety of the mentally ill, mental health workers, and the general public. As has been well-documented in the media, the California state hospital system has been plagued with violence. While I was working at Napa State Hospital, I was personally horrified when a psychiatrist friend who I trained with was badly assaulted by a patient and left state service.

According to media reports, the problem of violence in the California state hospitals actually got worse during past Department of Justice oversight. These reports have also documented actions resulting from the so-called 'Enhancement Plan' that could be considered nepotism or corruption. As far as psychiatric practice, I can tell you that recommendations from the Department of Justice court monitor deviated significantly from community standards in psychiatry, standing in contrast to the guidelines of the American Psychiatric Association. The policy changes that resulted from the Enhancement Plan included discouraging the use of an adjunctive antipsychotic medication for those with treatment resistant psychosis (sometimes erroneously labeled 'polypharmacy'), and discouraging the use benzodiazepines,

which are used effectively in psychiatric practice around the world to calm potentially violent, agitated, and psychotic patients.

Another concerning practice at California state hospitals and prisons is the use of the medication clozapine for purposes of restoration to competency, and the reluctance of forensic competency evaluators to declare a person unrestorable to competency without first having a trial of clozapine.

Clozapine is by far the highest risk medication in all of psychiatry. It has five black box warnings and was almost taken off the market due to the alarming number of deaths resulting from its use, which is monitored by a national registry due to its high-risk nature.

Atascadero State Hospital has had multiple patient deaths resulting from clozapine use, and while I was at Napa the majority of emergency medical sendouts resulted from adverse reactions to clozapine. While clozapine can be an effective and well-tolerated medication for some voluntary patients, I would submit to you that involuntary use of clozapine for purposes of restoration competency to stand criminal trial is inappropriate, especially considering the wide variety of safe and effective antipsychotic alternatives available on the market today.

As far as safety to general public, I think there is strong evidence that the current state mental health system allows for an unacceptable level of violence in the community that results from untreated or inadequately treated mental illness. As an example, while working at Napa State Hospital I treated a patient who was transferred to another Department of State Hospitals facility, and then later reportedly released into the community. After months wandering homeless, without adequate medication or support, he reportedly killed an innocent person.

By contrast, I can tell you that in the state of Arizona, where I trained and worked previously, all patients deemed to have serious mental illness and qualifying for Medicaid are provided with free medication, housing, transportation to appointments, and case management services including frequent home visits, assistance in applying for benefits, and close monitoring. **Not providing adequate support, shelter, and medication for those with serious mental illness is inhumane and very dangerous to our society.**

Without adequate treatment or support in the community, it is not surprising that a large number of the mentally ill in California end up in the criminal justice system. Compounding this problem, the state of California has antiquated civil commitment laws (Lanterman-Petris-Short Act in effect since 1972, Mentally Disordered Offender law since 1986). By contrast, civil commitments in Arizona are easier to obtain and last for up to one year of outpatient treatment, and only rarely require the appointment of a conservator or guardian. Arizona law contains the Persistent or

Acute Disability standard, as well as the Danger to Self, Danger to Others, and Grave Disability standards.

Far too often in California a mentally ill individual gets treatment only after committing a violent or nonviolent offense. Apparently under the pretense of individual rights, California state law makes it difficult to get adequate involuntary mental health commitments for those who need help but are unwilling or unable to seek it voluntarily. But rather than preserving the individual's freedom, the effect of this is that the mentally ill are prosecuted by criminal law, rather than given treatment by civil commitment.

As an example from my own experience, I treated an individual at Napa State Hospital who had been criminally prosecuted for making seventy non-emergency phone calls to county 911 operators, with my job being to treat and potentially restore him to competency in order to stand trial. This patient's actions were clearly the result of his mental illness, so this would be an example of the 'criminalization of mental illness' which has resulted in exploding jail and prison population in California and across the United States. An individual like this could spend years hospitalized involuntarily, with no defined release date, at incredible expense to the Californian taxpayer. In Arizona, he would likely have been hospitalized involuntarily for only a few weeks and then committed for up to one year of outpatient treatment as Persistent or Acutely Disabled by Mental Disorder. Criminal charges would not have been pursued.

The current state government approach to mental health care seems to be that cheaper is better. Actually, if civil commitment laws were modernized in California and Assertive Community Treatment (ACT) were properly implemented, cheaper really would be better. The 'criminalization of mental illness' is of one reason why the United States has 5% of the world's population but has 25% of the world's incarcerated prisoners. Psychiatric hospitalization is estimated to cost about $500 per day, not including legal costs. Incarceration in California has been estimated to cost $50,000 per year for each inmate, but the cost for mentally ill inmates is much higher than that.

With a civil commitment a mental health patient might have a relatively short involuntary hospitalization and then get court ordered to have outpatient treatment for one year. With proper outpatient follow-up, this provides a lot of safety and does not cost a lot of tax dollars. Most of the mentally ill are not violent when they are taking their medication. I know if I were mentally ill, I would rather be locked up briefly against my will as opposed to locked up for many years against my will with a felony on my record, likely never able to get a job or have a chance to function in society again. ***Frankly, not providing mental health treatment to those with mental illness before they might commit serious criminal acts, and instead prioritizing criminal prosecution after the fact is a violation of the civil and***

**human rights of the mentally ill and also victimizes the citizens of California.**

Considering the 3rd strike laws, this type of inappropriate prosecution threatens to financially ruin the state of California. On my current caseload I have multiple individuals with serious mental illness serving 25-year sentences for nonviolent 3rd strikes. With the type of inappropriate, disproportionate, and inhumane sentencing that exists in the state of California, is it any wonder why hope runs short and suicide rates are alarmingly high in the California prison system?

Since state government seems unable or unwilling to provide a mental health system that can adequately provide for the health and welfare of the mentally ill, mental health care workers, and the citizenry of California, I am writing in hopes that the U.S. Department of Justice can provide urgent assistance and prevent further needless injury and death. Feel free to contact me at the e-mail address below if you have any questions, since I will no longer be a state employee after next week.

Sincerely,

Joel Badeaux, MD, MPH

Staff Psychiatrist
Department of State Hospitals – Salinas Valley Psychiatric Program

joel.badeaux@gmail.com


cc:    Governor Jerry Brown, State of California
        Senator Diane Feinstein, State of California
        Senator Barbara Boxer, State of California
        Amnesty International
        Mental Health America of California


Enclosures (4)


Revised 3/23/13

# EXHIBIT E



# Strategic Plan Initiative
# Staff Survey

# California Department of State Hospitals
*Salinas Valley Results*

## November 13, 2012

**1**



# Agenda

- Introduction and Overview

- Review Internal Survey Results

- Breakout Groups

- Report-Outs from Breakout Groups

- Final Summary



# Methods

- The survey was comprised of five sections:
  - Customer Service Assessment
  - Employee Assessment
  - Key Issues of Concern
  - Communication
  - Vision, Mission, Values, and Goals

- Completed surveys were submitted online, mailed, faxed, or returned to a on-site hospital dropbox

- The data were coded and frequency distributions were computed for each question

- Non-responses were excluded from the analysis



# Method of Survey Submission (N=1,958)

## Salinas Valley



Fax
50.5%

Online
49.5%

## Statewide



Dropbox
27.2%

Mail
1.5%

Fax
6.1%

Online
65.2%

4



# Response Rates





# Demographics: Department Location



**Salinas Valley 5.1%**

Stockton 0.4%

Vacaville 5.9%

Atascadero 16.6%

Sacramento 6.4%

Coalinga 14.9%

Metro 7.2%

Patton 28.7%

Napa 14.8%



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Demographics: Position Type



**Salinas Valley**

Manager
3.4%

Supervisor
17.2%

Rank and
File
79.3%

**Statewide**

Manager
7.5%

Supervisor
15.9%

Rank and
File
76.6%

7



# Demographics: Job Classification



**Salinas Valley**

Clinical Nursing 45.1%

Clinical - Non-Nursing 23.1%

All Other 31.9%

**Statewide**

Clinical Nursing 31.9%

Clinical - Non-Nursing 26.7%

All Other 41.4%



# Part I: Customer Service Assessment Question 1

The DHS adheres to its core values (Safety, Treatment and Responsibility) when delivering services to its customers.





# Part 1. Customer Service Assessment Question 2

The DSH has a desire to serve its **patients** well.





10

# Part 1: Customer Service Assessment Question 3

The DSH has a desire to serve its **staff** well.





# Part I: Customer Service Assessment Question 4

The DSH has a desire to serve its **stakeholders** well.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part 1: Customer Service Assessment Question 5

The DSH has a clear vision for future outreach towards its **patients**.





# Part 1: Customer Service Assessment Question 6

The DSH has a clear vision for future outreach towards its **<u>staff</u>**.





# Part I: Customer Service Assessment Question 7

The DSH has a clear vision for future outreach towards its **stakeholders**.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part I: Customer Service Assessment Question 8

DSH staff clearly understand the forensic mission of the department.





# Part I: Customer Service Assessment Question 9

The DSH is effective in accomplishing its objectives for its **<u>patients</u>**.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part I: Customer Service Assessment Question 10

The DSH is effective in accomplishing its objectives for its **<u>staff</u>**.





# Part I: Customer Service Assessment Question 11

The DSH is effective in accomplishing its objectives for its **<u>stakeholders</u>**.





# Part I: Customer Service Assessment Question 12

The DSH conveys a clear sense of the organization's mission to its **patients**.





# Part I: Customer Service Assessment Question 13

The DSH conveys a clear sense of the organization's mission to its **staff**.





# Part I: Customer Service Assessment Question 14

The DSH conveys a clear sense of the organization's mission to its **<u>stakeholders</u>**.





# Part I: Customer Service Assessment Question 15

The DSH is an effective organization for serving its **patients**.





# Part 1: Customer Service Assessment Question 16

The DSH is an effective organization for serving its **staff**.





# Part I: Customer Service Assessment Question 17

The DSH is an effective organization for serving its **<u>stakeholders</u>**.





# Part I: Customer Service Assessment Question 18

The DSH actively searches for opportunities to improve the organization for its **patients**.





# Part I: Customer Service Assessment Question 19

The DSH actively searches for opportunities to improve the organization for its **<u>staff</u>**.





# Part I: Customer Service Assessment Question 20

The DSH actively searches for opportunities to improve the organization for its **stakeholders**.





# Part I: Customer Service Assessment Question 21

Case 2:90-cv-00520-KJM-SCR   Document 4560-1   Filed 04/22/13   Page 55 of 82

The DSH staff are effective in meeting their individual commitments to their **patients**.





SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part I: Customer Service Assessment Question 22

The DSH staff are effective in meeting their individual commitments to their **staff**.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part I: Customer Service Assessment Question 23

The DSH staff are effective in meeting their individual commitments to their **stakeholders**.





# Part 1: Customer Service Assessment Question 24

The DSH has established credibility with its **<u>patients</u>**.





# Part 1: Customer Service Assessment Question 25

The DSH has established credibility with its **staff**.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part I: Customer Service Assessment Question 26

The DSH has established credibility with its **stakeholders**.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part I: Summary

| Statement | Most Frequent Response | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Salinas Valley | | | Statewide | | |
| | Patients | Staff | Stake-holders | Patients | Staff | Stake-holders |
| DSH has a desire to serve its: | Agree | Disagree | Disagree | Agree | Disagree | Agree |
| DSH has a clear vision for future outreach toward its: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |
| DSH is effective in accomplishing its objectives for its: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |
| DSH conveys a clear sense of the organization's mission to its: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |
| DSH is an effective organization for serving its: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |
| DSH actively searches for opportunities to improve the organization for its: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |
| DSH staff are effective in meeting their individual commitments to their: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |
| DSH has established credibility with its: | Disagree | Disagree | Disagree | Agree | Disagree | Neither |

35

# Part II: Employee Assessment Question 27

I feel safe in my work environment.





# Part II: Employee Assessment Question 28

DSH is committed to improving safety in its facilities.





# Part II: Employee Assessment Question 29

DSH provides effective **<u>clinical</u>** services.





# Part II: Employee Assessment Question 30

DSH provides effective **<u>non-clinical</u>** services.





# Part II: Employee Assessment Question 31

Communication throughout our system is transparent.





40

# Part II: Employee Assessment Question 32

DSH is committed to improving transparency.



41



# Part II: Employee Assessment Question 33

Workplace morale is positive.



# Part II: Employee Assessment Question 34

DSH is committed to improving workplace morale.





# Part II: Employee Assessment Question 35

I am satisfied with my advancement.





# Part II: Employee Assessment Question 36

I receive adequate training to be successful in my job.



SACRAMENTO STATE
COLLEGE OF CONTINUING EDUCATION

# Part II: Summary

| Statement | Most Frequent Response | |
| --- | --- | --- |
| | Salinas Valley | Statewide |
| I feel safe in my work environment. | Disagree | Agree |
| DSH is committed to improving safety in its facilities. | Disagree | Agree |
| DSH provides effective clinical services. | Disagree | Agree |
| DSH provides effective non-clinical services. | Disagree | Agree |
| Communication throughout our system is transparent. | Disagree | Disagree |
| DSH is committed to improving transparency. | Disagree | Disagree |
| Workplace morale is positive. | Disagree | Disagree |
| DSH is committed to improving workplace morale. | Disagree | Disagree |
| I am satisfied with my advancement. | Disagree | Agree |
| I receive adequate training to be successful in my job. | Disagree | Agree |

46

# Part III: Key Issues of Concern

Issues were ranked from 1 (most important) to 10 (least important) in terms of how important each issue was to the respondent.

| Salinas Valley | |
|---|---|
| **Rank** | **Issue** |
| 1 | Safety |
| 2 | Communication |
| 3 | Staff Morale |
| 4 | Staff Retention |
| 5 | Technology |
| 6 | Funding and Equipment Constraints |
| 7 | Key Vacancies |
| 8 | Facilities Infrastructure |
| 9 | Staff Recruitment |
| 10 | Addressing Forensic Issues |

| Statewide | |
|---|---|
| **Rank** | **Issue** |
| 1 | Safety |
| 2 | Communication |
| 3 | Staff Morale |
| 4 | Staff Retention |
| 5 | Staff Recruitment |
| 6 | Technology |
| 7 | Funding and Equipment Constraints |
| 8 | Facilities Infrastructure |
| 9 | Key Vacancies |
| 10 | Addressing Forensic Issues |

47

# Comparison of Part II and III
# Top 3 Issues

| Ranking | Statewide | |
| --- | --- | --- |
| | Part II (Based on % of Disagreement) | Part III (Based on Ranked Importance) |
| 1 | Workplace Morale | Safety |
| 2 | Communication | Communication |
| 3 | Safety | Staff Morale |

| Ranking | Salinas Valley | |
| --- | --- | --- |
| | Part II (Based on % of Disagreement) | Part III (Based on Ranked Importance) |
| 1 | Workplace Morale | Safety |
| 2 | Improving Morale | Communication |
| 3 | Communication | Staff Morale |

48

# Part IV: Communication

Communication methods were ranked from 1 (most preferred method) to 10 (least preferred method) in terms of how respondents would prefer to be contacted.

| Salinas Valley | |
|---|---|
| Rank | Preferred Communication Method |
| 1 | E-mail |
| 2 | Internet/Intranet |
| 3 | Meetings |
| 4 | Handouts |
| 5 | Mailings |
| 6 | Videos |
| 7 | Bulletin Boards |
| 8 | Webcast |
| 9 | Newsletters/Bulletins |
| 10 | Town Halls |

| Statewide | |
|---|---|
| Rank | Preferred Communication Method |
| 1 | E-mail |
| 2 | Internet/Intranet |
| 3 | Newsletters/Bulletins |
| 4 | Meetings |
| 5 | Handouts |
| 6 | Bulletin Boards |
| 7 | Videos |
| 8 | Mailings |
| 9 | Webcast |
| 10 | Town Halls |

49

# Part V: Vision, Mission, Values and Goals
## Question 57

Vision: Caring Today for a Safe and Healthy Tomorrow





# Part V: Vision, Mission, Values and Goals
# Question 58

Case 2:90-cv-00520-KJM-SCR   Document 4560-1   Filed 04/22/13   Page 77 of 83

Mission: Providing evaluation and treatment in a safe and responsible manner, seeking innovation and excellence in hospital operations, across a continuum of care and settings.





# Part V: Vision, Mission, Values and Goals Question 59

Values: Safety, Treatment, and Responsibility





# Part V: Vision, Mission, Values and Goals
# Question 60

Goals: A safe environment





# Part V: Vision, Mission, Values and Goals
## Question 60

Goals: Responsible stewardship





# Part V: Vision, Mission, Values and Goals
# Question 60

Goals: Excellence in forensic evaluation





# Part V: Vision, Mission, Values and Goals Question 60

Goals: Excellence in treatment





# Part V: Summary

| Statement | Most Frequent Response | |
|---|---|---|
| | Salinas Valley | Statewide |
| Vision | Fully Support | Fully Support |
| Mission | Fully Support | Fully Support |
| Values | Fully Support | Fully Support |
| Goals | Fully Support | Fully Support |

