KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5553
 Fax:  (415) 703-1234
 E-mail:  patrick.mckinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
 425 Market Street, 26th Floor
 San Francisco, California 94105
 Telephone:  (415) 777-3200
 Fax:  (415) 541-9366
 E-mail: pmello@hansonbridgett.com

# IN THE UNITED STATES DISTRICT COURTS

# FOR THE EASTERN DISTRICT OF CALIFORNIA

# AND THE NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

# PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF JENNIFER SHAFFER IN SUPPORT OF DEFENDANTS' RESPONSE TO APRIL 11, 2013 ORDER REQUIRING LIST OF PROPOSED POPULATION REDUCTION MEASURES; COURT-ORDERED PLAN** |

I, Jennifer Shaffer, declare:

1. I am the Executive Officer of the Board of Parole Hearings (BPH or the Board) within the California Department of Corrections and Rehabilitation. I have held this position since June 2011, when I was appointed by Governor Brown. Prior to becoming the Board's Executive Officer, I served as Chief of Hearing Operations for the Northern Region of California. I am competent to testify to the matters set forth in this declaration, and if called upon to do so, I would and could so testify. I submit this declaration in support of Defendants' Response to the April 11, 2013 Order Requiring the List of Proposed Population Reduction Measures and Court-Ordered Plan.

2. As Executive Officer, I am the administrative head of the Board. I am responsible for managing the Board's daily operations and implementing policy. Having worked for the Board since 2011, I am familiar with the parole suitability hearing process for inmates with indeterminate life sentences ("lifers").

3. On page 66, footnote 47, of the Court's April 11, 2013 order, the court expressed its belief that "very few lifers have been released." This is not an accurate assessment of the current state of parole reviews. To the contrary, the Board has granted parole to substantially more life inmates in recent years, increasing from 52 grants in 2000, to 293 grants in 2008, to 670 grants in 2012. In 2013, the Board has thus far granted parole to approximately 200 inmates and is presently on pace to match or possibly exceed last year's grant total. Furthermore, in comparison to his predecessors, Governor Brown has reversed fewer parole grants for life inmates who have served their time and rehabilitated themselves. In 2011 and 2012, Governor Brown reversed approximately 16% of the Board's decisions, whereas Governor Schwarzenegger reversed approximately 74% of the Board's decisions and Governor Davis reversed approximately 98% of parole grants by the Board.

4. I am familiar with the plaintiffs' suggestion to release "low-risk" lifer inmates past their minimum eligible parole dates (MEPDs) as part of the State's population reduction efforts. Specifically, on page 10, Paragraph 28, of the January 7, 2013 declaration of Plaintiffs' expert in support of the plaintiffs' statement regarding the court's population reduction order, Mr. Austin

proposes the release of "low-risk" lifer inmates who are past their MEPDs. Mr. Austin speculates that this will result in a reduction of approximately 9,000 inmates and that public safety will not be compromised by such a release. Specifically, on page 10, lines 6-7, the Austin declaration states there are 9,000 lifers who are past their MEPD. Additionally, on page 10, lines 7-10, the Austin declaration concluded that "[v]irtually all" or 96 percent of lifer inmates past their MEPDs are low risk. In the same lines, Mr. Austin furthermore opined that "[t]his class of inmates by far poses the lowest risk to public safety based on recidivism studies completed by the CDCR." Both Mr. Austin's calculations and his conclusion are erroneous. While, as of February 27, 2013, there were 9,600 lifers who were either within 12 months of, or past, their MEPD, the overwhelming majority are not low-risk offenders. First, Mr. Austin erroneously applied recidivism rates of released lifers to virtually the entire lifer population in the BPH parole suitability hearing cycle. In reality, lifers who have been paroled have been expressly found by a Board panel to "no longer pose an unreasonable risk to public safety." As expected, this is the reason their recidivism rates are so low. In contrast, lifers who have been denied parole have been found, following an extensive review and hearing, to continue to pose a current unreasonable risk to public safety. Consequently, their recidivism rates can be expected to be substantially higher if they were to be released. As such, it is a fallacy to suggest all lifers past their MEPD could be released without seriously compromising public safety. As an example, in the last three years, 2,917 suitability hearings have resulted in a denial length of 5-15 years, meaning the offender needs five years or more of additional incarceration before it is likely he or she will be found to no longer pose an unreasonable risk to public safety. These inmates are clearly not "low risk" and would pose a substantial threat to public safety if released.

5. To identify the number of inmates who could reasonably fall within a category of life-term inmates characterized as posing the lowest risk to public safety, several criteria should be considered:

- First, identify inmates who 1) received the minimum length denial (three years) at their last suitability hearing, 2) will have served at least one year since their last hearing, to allow for additional rehabilitation and development of parole plans, and 3) do not have to register as sex offenders under Penal Code 290. As of April 17, 2013, the number of lifers meeting these criteria is 1,292.

- Second, include only those inmates with an overall risk rating of "LOW." Approximately 43% of inmates who received a three-year denial after a suitability hearing have an overall "LOW" risk rating. Forty-three percent of 1,292 is 556.

- Third, exclude approximately 20% to account for inmates who have either received serious rules violations since their last hearing or who do not have viable parole plans.

Therefore, a more accurate estimate of the life-term inmates posing the lowest risk to public safety is approximately 450.

6. Additionally, to identify the number of life-term inmates in this same total population of 1,292 who could reasonably fall within the category characterized as posing the next lowest risk to public safety ("LOW/MODERATE"), the following calculations would apply:

- Approximately 24% of these 1,292 inmates, or 310, have an overall risk rating of "LOW/MODERATE."

- Subtracting from 310 approximately 20% to account for inmates who have either received a serious rules violations since their last hearing or who do not have viable parole plans, a more accurate estimate of the net number of inmates from this population would be around 250.

Accordingly, only about 700 inmates categorized as "LOW" or "LOW/MODERATE" risk could reasonably fall within the category of inmates that Mr. Austin contemplates in his calculation.

7. The release of these approximately 700 inmates, who can more reasonably be considered a lower risk to public safety, would be administratively arduous and time-consuming. First, individual C-Files would need to be reviewed to identify serious rules violations since each inmate's most recent suitability hearing. This would be especially time-consuming for lifers incarcerated out of state and in federal institutions. BPH and the Division of Adult Parole Operations (DAPO) would also have to verify parole plans for every offender prior to release. Releasing lifers to the community without transitional housing or other strong parole plan is a serious risk to public safety, as lifers have often been incarcerated for decades and experience significant transition issues. Most transitional housing has a monthly fee and bed space is limited. Special arrangements would need to be made for inmates under state or federal witness protection programs. Additionally, for each offender, BPH would also need to individually review the case to identify ICE holds, detainers, and warrants as well as to determine any appropriate special conditions of parole. BPH and DAPO would also need to determine for each case whether a

victim has requested that the offender not be paroled within 35 miles of the victim's residence and work. CDCR would also be required to notify local law enforcement and the victim in advance of an offender's release.

8. In addition to the above, the release of these inmates would raise numerous issues with regard to the statutorily-designated functions of the Board and Governor regarding the process of individually evaluating lifers for suitability to parole as well as the constitutional rights of their victims. First, such release circumvents the expertise and powers of the Board of Parole Hearings, which has the responsibility under the penal code to set a release date for life prisoners unless it determines that public safety requires a longer period of incarceration.[1] The Board developed detailed regulations to govern this process, including Title 15 section 2281 and 2402, which clarify that, regardless of the length of time served, a life prisoner shall be found unsuitable and denied parole if, in the judgment of the Board's hearing panel, the prisoner continues to pose a current unreasonable risk of danger to society if released from prison. In addition, the penal code also grants the Governor the authority to perform an independent review of the Board's grant or denial of parole to any inmate in a state prison.[2] Parole suitability hearings are comprehensive proceedings wherein not only is the prison record considered, but the inmate has counsel and the opportunity to participate and speak on his or her behalf. Without these regulated determinations of risk by the board, plaintiffs' proposed plan could lead to arbitrary and inconsistent determinations of release and endanger public safety, which defies the intent of the public and legislature in granting these powers to the Board and the Governor.

9. Furthermore, releasing life-term inmates without the carefully considered risk determinations of the Board violates the constitutional rights of the victims under California Law. Specifically, consistent with the California Constitution and the Victim's Bill of Rights arising from Propositions 8 and 9 (Marsy's Law), victims are given an opportunity to personally appear at the hearing and to express their views concerning the prisoner and the case, the effect of the

---

[1] See Cal. Pen. Code § 3041.
[2] See Cal. Const. Art. V, § 8(b); Cal. Pen. Code §§ 3041.1 & 3041.2.

crime on the victim and the suitability of the prisoner for parole.[3]  Victims would be stripped of these rights and protections without the risk determination process of the Board, which defies the intent of the public and legislature in enacting these laws.

10.   I am also familiar with page 66 of the Court's Order dated April 11, 2013, in which the court orders Defendants to consider release or diversion of low-risk elderly inmates.  Currently the board does not have jurisdiction to review the parole suitability of elderly inmates who are serving determinate terms.  Even if statutes were amended to give the board such jurisdiction, public safety would be compromised without an individualized assessment of parole suitability consistent with the board's current parole suitability hearing process.  This would trigger the majority of laws and requirements related to this process as noted above.  At this time, parole suitability hearings are scheduled approximately nine months in advance due to the time required for preparing comprehensive risk assessments, ensuring inmate's are afforded their pre-hearing rights, appointing legal counsel, notifying victims and district attorneys, hiring interpreters, and assigning commissioners and deputy commissioners.  Furthermore, as with the lifer population, prior to release on parole, BPH and the Division of Adult Parole Operations would still have to verify parole plans, make special arrangements for inmates under state or

---

[3] See Cal. Const. Art. I, § 28(b); Cal. Pen. Code § 3043 et seq.  Under the California Constitution, Cal. Const. Art. I, section 28. Victims have constitutional rights that include:
- "To have the safety of the victim and the victim's family considered in fixing . . . release conditions for the defendant."
- "To reasonable notice of all . . . parole or other post-conviction release proceedings, and to be present all such proceedings."
- "To be heard, upon request, at any proceeding . . . involving a . . . post-conviction release decision . . ."
- "To be informed, upon request, of the . . . scheduled release of the defendant from custody."
- "To have the safety of the victim, the victim's family, and the general public considered before any parole or other post-judgment release decision is made."
- "To be informed of all parole procedures, to participate in the parole process, to provide information to the parole authority to be considered before the parole of the offender, and to be notified, upon request, of the parole or other release of the offender."

Cal. Const. Art. I, section 28 also provides, "A victim, the retained attorney of a victim, a lawful representative of the victim or the prosecuting attorney upon request of the victim, may enforce the rights enumerated [above] in any trial or appellate court with jurisdiction over the case as a matter of right. The court shall act promptly on such a request."

federal witness protection programs, and individually review each case to identify ICE holds, detainers, and warrants as well as to determine any appropriate special conditions of parole. The Division of Adult Institutions would also need to notify local law enforcement and the victim prior to release and determine whether a victim had requested the offender not be paroled within 35 miles of home or work.

11. On page 66, the court also ordered Defendants to consider additional releases of sick inmates, both lifers and determinately sentenced inmates. The Board currently grants approximately 88% of cases meeting the statutorily designated requirements. Inmates eligible for consideration of medical parole are those who are permanently medically incapacitated with a medical condition that renders them permanently unable to perform activities of basic daily living. The Office of the Federal Receiver, the entity responsible for identifying and referring inmates who medically qualify for medical parole, has referred a total of 74 inmates since the medical parole statutes were implemented in 2011. The Board has the capacity to conduct more hearings before the end of 2013 upon receipt of additional referrals.

12. Though not as onerous as suitability hearings, these cases still require significant preparation. For example, the inmate's medical condition must be certified by the institution's Chief Medical Officer. CDCR is statutorily required to complete the inmate's parole plans,[4] and the Board must review both the central file and parole plans. Additionally, registered victims are still entitled to 90 days' notice prior to the hearing. Because BPH must determine that the conditions under which the inmate would be released would not unreasonably pose a threat to public safety,[5] BPH must also carefully consider the release location and determine all necessary conditions of parole to attach to the parole grant. Prior to release, BPH must still investigate holds, detainers, and warrants. In addition, CDCR must provide required notification to victims, counties, and law enforcement.

13. I estimate that, between August 1, 2013 and December 1, 2013, BPH has the capacity to conduct approximately 888 additional hearings on an expedited basis. This estimate

---

[4] See Cal. Pen. Code § 3550(e).
[5] See Cal. Pen. Code § 3550(a); Title 15, California Code of Regulations, section 3359.1(d).

assumes a full board of 12 commissioners performing four hearings per day, four days a week, with one day for preparation and travel. In addition, I believe the Board could produce approximately 400 additional risk assessments during the same time period with existing staff and resources. However, it is important to note that the above capacities contemplate an extremely rigorous schedule and would not be without detriment to other processes. Timeliness of risk assessments for suitability hearings in 2014 would be compromised and it is likely the turnover rate for commissioners would increase. It is difficult to estimate the number of inmates who would receive a grant of parole were the board to conduct an additional 888 expedited hearings given the disparity of grant rates between parole suitability hearings (currently 14% of scheduled hearings result in a grant) and medical parole hearings (historically 88% of conducted hearings), but a reasonable estimate would fall somewhere between the two grant rates, but would not likely exceed 400 grants.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Sacramento, California on May 2, 2013.

                */s/ Jennifer Shaffer*
                Jennifer Shaffer