KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-3035
 Fax: (415) 703-5843
 E-mail: Patrick.McKinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
MEGAN OLIVER-THOMPSON, SBN 256654
PAUL GRUWELL, State Bar No. 252474
 425 Market Street, 26th Floor
 San Francisco, California 94105
 Telephone: (415) 777-3200
 Fax: (415) 541-9366
 E-mail: pmello@hansonbridgett.com

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF JEFFREY BEARD, Ph.D., IN SUPPORT OF DEFENDANTS' RESPONSE TO APRIL 11, 2013 ORDER REQUIRING LIST OF PROPOSED POPULATION REDUCTION MEASURES; COURT-ORDERED PLAN** |

I, JEFFREY BEARD, Ph.D., declare as follows:

1. I am the Secretary of the California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration, and if called upon to do so, I would and could so testify. I submit this declaration in support of Defendants' response to the Court's April 11, 2013 order requiring list of proposed population-reduction measures and court-ordered plan.

2. I was appointed Secretary by Governor Brown on December 19, 2012, and started on December 27, 2012. As Secretary, I have responsibility for and oversight of CDCR's overall operations. The mission of CDCR is to improve public safety through evidence-based crime prevention and recidivism reduction strategies. CDCR is charged with achieving reform and rehabilitation while maintaining public safety.

3. I served as Secretary for the Pennsylvania Department of Corrections from December 30, 2000 until August 2010. I started my career with the Pennsylvania Department of Corrections in 1972 as a psychologist/corrections counselor at the State Correctional Institution at Rockview, and worked my way through the system. As Secretary, I was responsible for all 27 facilities in the state's correctional system, which housed more than 51,000 inmates, had approximately 16,000 employees, and a budget of more than $1.8 billion.

4. During my tenure, I oversaw completion of a major security upgrade for all correctional facilities, worked to improve staff safety, and completed American Correctional Association accreditation for all facilities. I instituted a mandatory re-entry program for all inmates, and worked on a number of collaborative re-entry projects. I instituted a variety of assessment instruments to ensure the right inmates get in the right programs, made major changes to inmate programming to ensure that programs met the principles of effective intervention, and increased the mandatory education level from fifth grade to the GED level. I also supported an active research agenda and implemented the use of evaluation tools to measure program outcomes and ensure that programs functioned effectively.

5. I am a licensed psychologist, and hold a B.S. in Psychology, and an M.Ed and Ph.D. in counseling, all from the Pennsylvania State University.

1

Decl. Jeffrey Beard Supp. Defs.' Resp. to April 11, 2013 Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

6. I served as a member of the CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs. Members were chosen for their broad experience in rehabilitation, education, correctional administration, psychology, and organizational development. In 2007, the Panel published the report to the California State Legislature entitled "A Roadmap for Effective Offender Programming in California" which recommended, among other things, that California take the necessary measures to reduce overcrowding in its correctional facilities.

7. In its April 11, 2013 orders, the Court ordered Defendants to submit a list of "all prison population reduction measures," and ordered Defendants to submit a population-reduction plan. Defendants submit the accompanying court-ordered list of population-reduction measures and court-ordered plan as ordered by the Court. A number of the population-reduction measures, including many of the reasons Defendants decided to implement or not implement certain of the measures, are discussed in this declaration. Additional measures are discussed in the accompanying declarations of Kathy Allison, Jay Atkinson, Michael Stainer, Tanya Rothchild, and Jennifer Shaffer. Defendants' preference is not to pursue implementation of any measure listed in the court-ordered list and plan, other than the completion of scheduled construction projections and fire camp capacity.

**Defendants Have Significantly Reduced the Prison Population & Now Provide Appropriate Medical Care to the State's Inmates.**

8. As the Court is aware, when the Court held the evidentiary hearing in this matter in 2008, 156,352 inmates were housed in California's 33 institutions, which equaled 195.9% of design bed capacity. As of April 24, 2013, the State housed 119,506 inmates in its institutions, or 149.5% of "design bed capacity." Since realignment went into effect in October 2011, the population in the State's 33 institutions has decreased by approximately 25,000 inmates. The current population is 31,530 fewer inmates than when the Court issued its prisoner reduction order in January 2010, 36,846 fewer inmates compared to the 2008 population in the record at the evidentiary hearing, and 42,555 fewer inmates than when Plaintiffs moved to convene this Court in November 2006.

2

Decl. Jeffrey Beard Supp. Defs.' Resp. to April 11, 2013 Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

9. The Inspector General's medical inspection scores continue to reflect the quality of the State's medical care. Since January 7, 2013, eleven CDCR institutions achieved an inspection score greater than 85%: Folsom State Prison (93.4%), Mule Creek (90.4%), Deuel Vocational Institution (89.3%), Avenal (88.6%), Correctional Training Facility (88.3%), Centinela (88%), Salinas Valley (87.7%), Wasco (87.5%), Calipatria (86.9%), Ironwood State Prison (86.2%), and Chuckawalla Valley State Prison (85.5%). The Inspector General has now completed Third Cycle inspections at 31 of the 33 institutions, and the average score is 86.9%. A current summary of the Inspector General's medical inspection scores is attached as Exhibit 1.

10. Having reviewed the Court's recent orders, it remains my informed opinion that the reduced population, coupled with the State's investment in focused and appropriate facility improvements, makes it possible for the State to provide appropriate, quality health care to its inmates at the current population level.

**Defendants Have Already Successfully Diverted Technical Parole Violators and Low-Risk Offenders Through Realignment and Senate Bill 18.**

11. The State successfully accomplished diversion of technical parole violators and low-risk offenders to the counties through public safety realignment. *See* A.B. 109, 2011-2012 Leg., Reg. Sess. (Cal. 2011). Based on the population reductions achieved through realignment, Defendants do not estimate that additional meaningful reductions can be achieved on this measure.

12. Moreover, attempting to achieve further population reductions through diversion of offenders or reclassifying similar crimes similar to realignment does not reflect sound policy. Although the Supreme Court's order in this case provided an incentive, my experience is that realignment was achieved because it was developed in collaboration with all impacted stakeholders, and because it made sense for sound policy and public safety reasons. Although some of the additional possible measures might be good ideas in the abstract, requesting legislative authority for them now could damage or destroy the coalitions needed to ensure that realignment succeeds.

13. Although realignment has reduced the prison population, it has also increased county jail populations, and placed increased demands on county probation departments and local mental

health and drug treatment services.  Counties are working admirably to handle the big challenges realignment presents, but those challenges are real and substantial.  Realigning additional offenses, and further increasing the parole population by expediting the release of inmates through increased credits, would require the counties to incarcerate and supervise even more offenders.  It would be inappropriate at this time to impose further obligations on counties that are straining to succeed under realignment.

14.  In working with the stakeholders, I have found that realignment currently has no shortage of critics who would like to scale back realignment, or even repeal it.  Many of these criticisms are politically motivated and off-base, but nonetheless exist.  Thus far, the critics have not been successful in passing legislation to shift responsibility for lower-level offenders or parole violators back to the State.  In large part, these efforts have been unsuccessful because Defendants have collaborated with the counties to make realignment a success.  Adding more responsibilities on the counties at this time would jeopardize that coalition, and could in turn jeopardize realignment itself.  Accordingly, pursuing further population reductions through additional sentencing and credit changes at this point could be short lived, if the critics succeed in their effort.

15.  Similarly, seeking further legislative reforms in these areas will work against the tremendous progress the State has already made and jeopardize public safety.  Under realignment, inmates who committed non-serious, non-violent, or non-sexual offenses have been diverted to local custody and supervision.  These inmates who are no longer in prison were the most likely candidates to reduce the prison population.  California's unprecedented efforts to reduce its prison population over the last several years have significantly narrowed the remaining available options that could be accomplished safely.  Accordingly, many of the credit-earning measures proposed by Plaintiffs would result in the immediate release of inmates convicted of serious, violent, or sex offenses.  While it is not surprising that inmates would attempt to maximize the shortening of their prison sentences, these measures pose an undue risk to public safety and do not reflect sound correctional practice.

4

Decl. Jeffrey Beard Supp. Defs.' Resp. to April 11, 2013 Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

16. An example of the unintended consequences of implementing many of the remaining options for reducing the prison population is the potential early release of offenders from county jails who could pose a risk to public safety. Once realigned inmates are under the authority of the counties, the counties have the authority to release them by exercising their sound discretion after considering jail capacity issues and local correctional goals. Defendants, including Governor Brown, will not include any measures in the court-ordered plan that risk the public's safety or put any significant or direct burden on the already strained counties to incarcerate even more offenders.

**New Construction.**

17. The California Health Care Facility in Stockton, an $840 million, 1.2 million square foot facility that will provide 1,722 beds, is set to open in July 2013. This state-of-the-art health care facility will increase design bed capacity by 1,722 beds by December 31, 2013. By housing 1,722 inmates with serious medical and mental health conditions in this new facility, CDCR will lower the acuity in the remaining 33 institutions, which will make it easier to continue to provide quality care. The California Health Care Facility is in addition to the hundreds of millions of dollars the State has spent to upgrade its prison facilities. A true and correct copy of the activation schedule for this facility, which lists the remaining steps and the person or persons responsible for taking each step, is attached as Exhibit 2. The DeWitt Nelson Correctional Annex in Stockton will add 1,133 more beds in early 2014.

**Obtain a Legislative Appropriation of Funds to Expand In-State Contract Capacity.**

18. I am familiar with the population-reduction proposal to obtain legislative appropriations of funds by increasing in-state contract capacity. If funded, this measure would permit CDCR to increase the use of available leased jail capacity. Although the vast majority of counties have no remaining jail space, I am informed that Los Angeles and Alameda counties have 1,600 available beds. Defendants also propose to seek an appropriation from the Legislature to lease available private prison capacity in California which CDCR will operate.

19. Defendants do not currently possess the authority to implement this measure. Moreover, the currently available capacity from privately owned prisons in California is not

sufficiently secure to house state prison inmates, and would need to be retrofitted. These retrofits could not be accomplished before 2014 at the earliest. And certainly, a private prison company would not undertake this work until Defendants possessed the appropriation to enter into a contract.

20. To enter into these contracts, the following specific statutes would need to be amended, modified, or waived:

- Cal. Gov't Code §§ 4525-4529.20, 4530-4535.3, 7070-7086, 7105-7118, & 14835-14837, to amend state contracting requirements;

- Cal. Gov't Code §§ 13332.10, 14660, 14669, 15853, to amend provisions governing acquisition and leading of real property;

- Cal. Gov't Code §§ 13332.19 & 15815, to amend provisions governing plans, specifications, and procedures for major capital projects;

- Cal. Gov't Code § 14616, to amend provisions governing approval of contracts by the Department of General Services;

- Cal. Gov't Code §§ 18500 *et sq.*, the State Civil Service Act;

- Cal. Gov't Code § 19130(a)(3), which prohibits contracts which "cause the displacement of civil service employees";

- Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison);

- Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to served in state prison);

- Cal. Penal Code § 1216 (requiring sheriffs to deliver to the warden of a CDCR institution any felon sentenced to state prison); and

- Cal. Penal Code §§ 2900 & 2901, requiring CDCR to maintain custody of all inmates until the completion of their sentence.

21. Once the Legislature approves the appropriation, and these laws are modified or waived, Defendants estimate that it will take approximately nine months to complete leases with the counties. This time is necessary to permit Defendants to coordinate with the counties to

6

establish a process to determine which inmates meet the criteria for retention in county jails and negotiate contracts. Defendants must also develop policies and procedures to implement this program. Defendants estimate that, if implemented, they would need to negotiate contracts to expand capacity by approximately July 1, 2013 and train staff regarding implementation by approximately August 1, 2013.

**Seek an Appropriation from the Legislature to Use Currently Available, Additional Out-of-State Contract Prison Capacity.**

22. The proposal to implement as part of the court-ordered plan a measure slowing the return of inmates housed in private contract prison in other states in discussed in the Declaration of Michael Stainer. This measure is costly and unnecessary in Defendants' view, but would assist in complying with the population cap in a way that is consistent with public safety. Specifically, these inmates will not return to state prison, except for a brief pre-release planning period. Rather, they will finish their prison terms out of state and simply transition out of the system through attrition. Each month, an average of 110 inmates paroles from the out-of-state program. The gradual return of these inmates will not meaningfully impact the prison population, and will in no way inhibit the State's ability to continue to provide quality health care to the inmates who need it.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Sacramento, California on May 2, 2013.

                              */s/ Jeffrey Beard*
                              Jeffrey Beard
(authorization to file obtained by counsel for Defendants)

CF1997CS0003
20672588.docx