1   KAMALA D. HARRIS                                    Hanson Bridgett LLP
    Attorney General of California                      JERROLD C. SCHAEFER, State Bar No. 39374
2   JONATHAN L. WOLFF                                   PAUL B. MELLO, State Bar No. 179755
    Senior Assistant Attorney General                   WALTER R. SCHNEIDER, State Bar No. 173113
3   JAY C. RUSSELL                                      SAMANTHA D. WOLFF, State Bar No. 240280
    Supervising Deputy Attorney General                 MEGAN OLIVER-THOMPSON, SBN 256654
4   DEBBIE VOROUS, State Bar No. 166884                 PAUL GRUWELL, State Bar No. 252474
    PATRICK R. MCKINNEY, State Bar No. 215228            425 Market Street, 26th Floor
5   Deputy Attorneys General                            San Francisco, California 94105
     455 Golden Gate Avenue, Suite 11000                 Telephone:  (415) 777-3200
6    San Francisco, CA  94102-7004                       Fax:  (415) 541-9366
     Telephone: (415) 703-3035                           E-mail: pmello@hansonbridgett.com
7    Fax:  (415) 703-5843
     E-mail:  Patrick.McKinney@doj.ca.gov
8   Attorneys for Defendants

9

10                  IN THE UNITED STATES DISTRICT COURTS

11              FOR THE EASTERN DISTRICT OF CALIFORNIA

12             AND THE NORTHERN DISTRICT OF CALIFORNIA

13         UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

14            PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

15   **RALPH COLEMAN, et al.,**                         2:90-cv-00520 LKK JFM P

16                                  Plaintiffs,         **THREE-JUDGE COURT**

17        v.

18
     **EDMUND G. BROWN JR., et al.,**
19
                                    Defendants.
20

21   **MARCIANO PLATA, et al.,**                        C01-1351 TEH

22                                  Plaintiffs,         **THREE-JUDGE COURT**

23        v.

24                                                      **DECLARATION OF MICHAEL STAINER
                                                        IN SUPPORT OF DEFENDANTS'**
25   **EDMUND G. BROWN JR., et al.,**                   **RESPONSE TO APRIL 11, 2013 ORDER
                                                        REQUIRING LIST OF PROPOSED**
26                                  Defendants.         **POPULATION REDUCTION
                                                        MEASURES; COURT-ORDERED PLAN**

27

28

1    I, MICHAEL STAINER, declare as follows:

2        1.    I am the Deputy Director-Facility Operations of the Division of Adult institutions

3    (DAI) for the California Department of Corrections and Rehabilitation (CDCR).  I am competent

4    to testify to the matters set forth in this declaration and if called upon to do so, I would and could

5    so testify.  I submit this declaration in support of Defendants' Response to the Court's April 11,

6    2013, Order to Develop Plans to Achieve Required Prison Population Reduction.

7        2.    I began working for CDCR in 1987 as a correctional officer.  Over the years I rose

8    through the correctional ranks to sergeant, lieutenant, captain, associate warden, and chief deputy

9    warden.  In December 2010, I became acting warden at the California Correctional Institution in

10   Tehachapi and was later appointed as warden.  I later became an acting associate director at DAI

11   and was appointed deputy director in July, 2012.  In my current role as Deputy Director, I am

12   responsible for the management and oversight of the male and female adult institutions, including

13   the conservation camps also known as "fire camps."  I directly supervise associate directors, who,

14   in turn, supervise the wardens of the institutions.  I am charged with ensuring that security

15   arrangements are sufficient to ensure the safety of the inmates, staff, visitors, and the public.

16   Included in my duties is the oversight of the security operations of the institutions, including

17   regulations and policies to avoid inmate escape, prevent inmate violence, and protect all

18   individuals inside and outside of the security perimeter of each institution and fire camp.

19       3.    I am familiar with the many proposals put forth by Defendants, Plaintiffs and the

20   Court.  Because many involve credit recalculations, the impact on the correctional case records

21   staff will be significant as discussed below.  As a result, CDCR must only do prospective

22   calculations rather than retroactive ones if it is to meet the Court's December 31, 2013 deadline.

23       4.    The number of inmates who could be released who have serious or violent offenses,

24   including murder, is troubling.  Release of these inmates to the supervision of state parole agents

25   will result in less than appropriate supervision of the entire parolee population, which now

26   consists mainly of serious, violent, and sex offenders, including murderers.  This is due to the

27   reduced number of present parolees and corresponding reduced staffing levels that resulted from

28   passage of Public Safety Realignment.  There is insufficient time between now and December 31,

1    2013 to recruit, hire, and train the number of parole agents necessary to ensure appropriate

2    supervision of this increased parole population.  Without appropriate supervision, these offenders

3    pose an increased threat to the public.

4           5.    Retroactive application of the credit recalculation proposals would result in inmates

5    who have no parole term to serve, as their release dates would be so far in the past that they have

6    already served their complete parole term while in prison.  These discharged inmates would have

7    no transition services and no parole supervision whatsoever, further increasing the recidivism

8    potential and risk to public safety.

9           6.    In any proposal where regulatory amendments are necessary, Defendants must have

10   waiver of the requirements of the Administrative Procedures Act (See Govt. Code section 11340

11   et seq), which requires an approval process of 180 days.  If no waiver is provided, Defendants

12   will seek to promulgate the regulations on an emergency basis pursuant to Penal Code section

13   5058.3.  Under this section, regulations take effect immediately upon submission to the Office of

14   Administrative Law (OAL).  However, drafting of the regulations will take some time and will

15   increase the implementation time frames by whatever time it takes to prepare the submission for

16   OAL.  I estimate that drafting of the regulations could be done within 30 days of obtaining

17   statutory authority. Thus, if no waiver is obtained, implementation time frames may be pushed

18   back by as much as 50 days.

19   **Expand Fire Camp Capacity**

20          7.    I am familiar with the population reduction measure which will permit Defendants to

21   house an additional 1,250 inmates in the conservation camps, also known as fire camps.

22   Implementation of this proposal will require CDCR to identify the inmates who meet the criteria

23   and train staff, which can be completed by approximately August 1, 2013.  CDCR will also need

24   to obtain approval from Classification Staff Representatives for placement of inmates who meet

25   the criteria, which can be completed by approximately September 1, 2013.

26

27

28

**Legislative Changes to State Law to Increase Prison Credits**

8.   I am familiar with the proposals to increase the credits that certain inmate groups may earn, including Minimum Security Facility (MSF) inmates, non-violent and violent second striker inmates, and violent non-strike inmates.

9.   As of April 26, 2013, CDCR had 21,915 second strikers whose commitment offense is a serious offense; 47,781 violent offenders, including both second strikers and others; and 3,021 offenders in MSF.

10.   Recalculation due to increase credit rates takes CDCR staff about an hour to complete for each MSF inmate, and 90 minutes for each second-strike inmate.  Recalculation due to Milestone Completion credits requires an additional 30 minutes to complete.

11.  If implemented prospectively as of July 1, 2013, all files of inmates who qualify for the credit would have to be reviewed, with priority given to those inmates currently slated to parole after January 1, 2014, as these would be potential additional releases prior to the December 31, 2013 deadline.

12.  A total of 1,384 MSF inmates could parole before December 31, 2013 at the increased credit rate, but only 182 are currently slated to parole after that date and therefore would be potential additional releases in time to meet the deadline for population reduction. These inmates' files would be reviewed first, followed by the remaining 1,202 who are currently slated to parole prior to December 31, 2013.

13.  A total of 4,005 non-violent second strikers could parole before December 31, 2013, at the increased credit rate and with Milestone Completion credits, but only 683 are currently slated to parole after that date and therefore would be potential additional releases in time to meet the deadline for population reduction.  These inmates' files would be reviewed first, followed by the remainder who is slated to parole prior to December 31, 2013.

14.   Calculations for the MSF and second striker credits implemented prospectively only for those inmates who are potential additional releases and are included in the Defendants' Plan are set forth in the chart below.  The total to complete the calculations is 1,548 hours, an additional workload that could be absorbed through use of overtime.

3

| Prospective calculations for inmates whose release date would be moved forward to before December 31, 2013 under Court-Ordered Plan | | | |
|---|---|---|---|
| Inmate Group | Increased Credit Rate (1 hour ) | Milestone Completion Calculation (30 minutes) | Total hours for calculations |
| Non-Violent Second Strikers (683 inmates) | 1,024.5 (90 mins/file) | 342.5 (30 mins/file) | 1,366 |
| MSF  (182 inmates) | 182 (60 mins/file) | | 182 |
| Total | | | 1,548 |

15.  If all credit proposals were implemented retroactively, all inmates could potentially be additional releases, so all files would have to undergo calculation. The chart below illustrates that workload.

| Retroactive Calculations | | | |
|---|---|---|---|
| Inmate Group | Increased Credit Rate (1 hour ) | Milestone Completion Calculation (30 minutes) | Total hours for calculations |
| Non-Violent Second Strikers (21,915) | 32,872.5 (90 mins/file) | 10,957.5 (30 mins/file) | 43,830 |
| MSF (3,021) | 3,021 (60 mins/file) | | 3,021 |
| Violent Second Strikers and Violent Offenders (47,781) | 71,671.5 (90 mins/file) | 6,000 (30 mins/file) | 77,671.5 |
| Total | | | 124,522.5 |

16.  The total workload to calculate credits retroactively would be nearly 125,000 hours, or the equivalent workload of 125 individual staff for six months, assuming 1,000 hours worked during that period.  That is a 27.5 percent workload increase for the approximately 450 case records analyst who perform these duties and approximately 100 supervisors who review and confirm the calculations are accurate.  It is unrealistic to expect staff to perform at such a level for six months through overtime, but there is insufficient time to hire and sufficiently train 125 new analysts to the point that they could be relied upon to accurately perform the complex calculations required.  If CDCR was to train more staff, that would require some of the very people who are needed to ensure accuracy of the calculations discussed in this declaration to act as instructors and monitor the new staff's performance to ensure accuracy.  Instead of pulling away experienced

4

17.  staff to conduct training, CDCR instead would need to suspend duties case records analysts normally perform to allow them to concentrate on these calculations.  This will result in impact to efficient processing of new arrivals in reception center and acceptance of the correspondingly longer stays in reception centers, and overdetentions based on inability to timely conduct the parole audits necessary to confirm accuracy of release dates. Even with all of this, it is unrealistic to expect the retroactive work to be accomplished by December 31, 2013.

**Change State Law to Allow Minimum Custody Inmates to Receive 2-for-1 Credits**

18.  I am familiar with the population reduction measure, which, if ordered implemented, would allow minimum custody inmates to receive two-for-one credits.  I have concerns about implementation of this proposal, as the population that fills these beds is low risk offenders who generally were convicted of non-serious, non-violent, non sex offenses and few of those inmates are sentenced to CDCR after Public Safety Realignment.

19.  Defendants do not currently have legal authority to implement this proposal.  The Legislature would need to amend Penal Code section 2933.3 to allow minimum custody inmates to earn two-for-one credit.  This provision could be included in a budget bill that will take effect no later than July 1, 2013, or a separate bill that takes immediate effect no later than that date.  If the Legislature fails to enact such amendments, increasing credits for MSF inmates may not be done unless a waiver of those provisions and California Constitution Article 1 section 28(a)(5) and (f)(5) occurs prior to August 15, 2013.

20.  Implementation of this proposal requires a regulatory change pursuant to the Administrative Procedures Act (APA) (Gov't Code section 11340 et seq) to amend Title 15 section 3042 et seq and 3044(b)(1), issuance of a directive to the field regarding implementation, training of staff, and reviewing of the files, all of which may be implemented within 90 days of obtaining statutory and regulatory  authority.

21.  Defendants estimate, once the necessary authority is obtained, CDCR will need approximately 90 days to implement this measure.  Accordingly, the latest date by which these provisions must be amended in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013.  However, it may not be possible to accomplish

5

retroactive implementation by December 31, 2013 due to the many credit recalculation proposals that the case records staff who is trained to perform them must do.  For this proposal, review of all offenders who have ever been placed in an MSF would be required.

22.  The following additional steps the following additional steps necessary to implement this measure:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

- Train staff regarding implementation (complete by approximately August 1, 2013); and

- Review files for each inmate who meets the criteria and recalculate credits (complete between approximately August 1 and December 1, 2013).

**Change State Law to Increase "Milestone Completion" Credits for Violent and Second-Strike Offenders**

23.  I am familiar with the population reduction measure, which, if implemented, would allow violent and serious offenders, including second strikers, to earn "Milestone Completion" Credits.  I am significantly concerned about implementation of this proposal, as it will be viewed by the public as an early release of dangerous felons.  These offenders are given longer sentences because of the threat to public safety they have demonstrated by virtue of committing serious crimes.  The threat to public safety posed by releasing these inmates early is significant.

24.  Defendants do not currently have legal authority to implement this proposal.  The Legislature would need to amend (1) Penal Code § 2933.1 to permit violent offenders to receive more than 15% credit earning capacity; (2) Penal Code § 667(c)(5) and 1170.12(a)(5) to permit second-strike felons to receive more than 20% credit earning capacity; (3) Penal Code § 2933.05(a) to expand the credit-earning cap to eight weeks; and (4) Penal Code § 2933.05(e) to permit inmates sentenced under the Three-Strike Law, Penal Code section 290 (sexual offenders), and violent offenders, to receive program credits.  Amendment of § 1170.12(a)(5) requires a two-thirds vote of the Legislature under Penal Code § 1170.12(g).

25.   Defendants estimate, once the necessary authority is obtained, CDCR will need approximately 90 days to implement this measure.  Accordingly, the latest date by which these provisions must be amended in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013.  Retroactive application of this proposal would further exacerbate the overdetention problems posed by this proposal, as discussed above.  In addition, it may not be possible to accomplish retroactive implementation by December 31, 2013 due to the workload and staffing limitations.  This proposal would require manual review of approximately 36,000 inmate central files and review of those inmates' education files to ensure a program completion was not inadvertently left out of the central file.

26.   The following additional steps the following additional steps necessary to implement this measure:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

- Train staff regarding implementation (complete by approximately August 1, 2013); and

- Review files for each inmate who meets the criteria and recalculate credits (complete between approximately August 1 and December 1, 2013).

**Change State Law to Increase Credit-Earning for Non-Violent "Second Strike" Felons**

27.  I am familiar with the population reduction measure, which, if implemented, would expand credit earning limits for "Second Strike" Felons who do not have violent commitment offenses.  I am significantly concerned about implementation of this proposal, as it will be viewed by the public as an early release of dangerous felons. Habitual offenders are given longer sentences because of the threat to public safety they had demonstrated by virtue of committing serious and/or violent crimes habitually.  The threat to public safety posed by releasing these inmates early is significant.

28.   Defendants do not currently have legal authority to implement this proposal.  The Legislature would need to amend Penal Code section 667(c)(5) and 1170.12(a)(5) to allow second

7

strikers to earn 34 percent instead of 20 percent.  Amendment of § 1170.12(a)(5) requires a two-thirds vote of the Legislature under Penal Code § 1170.12(g).

29.  Implementation of this proposal requires issuance of a directive to the field regarding implementation, training of staff, and reviewing of the files, all of which may be implemented within 90 days of obtaining statutory authority.

30.  Because the number of releasing inmates under these measures means thousands of additional inmates will be leaving CDCR, additional resources will be needed to work on parole plans prior to release.  The Division of Adult Parole Operations will be inundated with drastically increased new intake for a few months and may be unable to assist paroles with transitional and educational programs or provide effective supervision of the newly released offenders.

31.  Retroactive application of this proposal would further exacerbate the staffing and overdetention problems posed by this proposal, as discussed above.  In addition, it may not be possible to accomplish retroactive implementation by December 31, 2013 due to the many credit recalculation proposals that the case records staff who is trained to perform them must do. This proposal would require manual review of nearly 70,000 inmate central files and review takes a minimum of an hour per file.

**Change State Law to Expand Credit Limits for Violent (Non-Strike) Felons**

32.  I am familiar with the population reduction measure, which, if implemented, would allow violent felons to earn credits at 34 percent.  Currently they are capped at 15 percent.  This proposal is not part of Defendants' Plan.  I am significantly concerned about implementation of this proposal, as it will be viewed by the public as an early release of dangerous felons. Violent offenders are given longer sentences because of the threat to public safety they had demonstrated by virtue of violently committing crimes.   The threat to public safety posed by releasing these inmates early is significant.

33.  Defendants do not currently have legal authority to implement this proposal without significant amendments to statutes and the California Constitution, including Penal Code section 2933.1 to limit violent offenders without a strike to 34 percent instead of 15 percent.  Even if such amendments or waivers were to occur, the inclusion of additional credit calculations beyond those

8

1   included in Defendants' Plan jeopardizes the ability to complete all credit calculations in order to

2   achieve sufficient releases to meet the December 31, 2013, deadline.

3           34.  Nevertheless, Defendants estimate, once the necessary authority is obtained, CDCR

4   will need approximately 120 days to implement this measure.  Accordingly, the latest date by

5   which these provisions must be amended in order for Defendants to be able to implement this

6   measure by December 31, 2013 is August 15, 2013.

7           35.  The following additional steps are necessary to implement this measure:

8       •   Issue directive to the field regarding implementation of this measure (complete by
            approximately July 8, 2013);

9
        •   Identify the inmates who meet the criteria contemplated by this measure (complete by
10          approximately August 1, 2013); and

11      •   Review files for each inmate who meets the criteria and recalculate credits (complete
            between approximately August 1 and December 1, 2013).

12
    **Change State Law to Expand Alternative Custody Program and Work Furlough/**
13  **Restitution Centers**

14          36.  I am familiar with the population reduction measure, which, if implemented, would

15  expand the Alternative Custody Program (ACP) to allow serious and violent female inmates to

16  participate, make male inmates eligible for the program, expand eligibility criteria for restitution

17  centers to allow participation by inmates incarcerated for serious or violent felonies, and using

18  community-based treatment programs such as work furlough to house inmates. I have significant

19  concerns about implementing this proposal, as releasing serious and violent offenders into the

20  community poses a threat to public safety due to the same risk factors detailed above in the fire

21  camp section.  Offenders will be placed in such facilities with no fencing and working at jobs in

22  the community with no custodial supervision whatsoever.  This creates the same public safety

23  concerns discussed above regarding fire camps and ACP.  Because of these increased risks, I

24  oppose release of these female offenders to their own homes because it is unsafe and unnecessary

25  to achieve the goal of reducing population to 137.5 percent of design capacity.  Instead, I would

26  only consent to place these offenders in a transitional or drug treatment community program that

27  included housing to provide some measure of risk mitigation.  At this time Defendants have 100

28  beds available to use for this program. However, inclusion of this higher risk inmate in the

community without custodial supervision significantly increases the risk to any civilian employee of the facility as well as visitors and staff.

37.   Similarly, I have serious concerns about the proposal to resurrect the now defunct work furlough program known as the restitution centers.  If implemented, serious and violent felons will be placed in such facilities with no fencing and working at jobs in the community with no supervision whatsoever.  This creates the same public safety concerns discussed above regarding fire camps and ACP.  Because of these increased risks, I oppose release of these offenders to any community based program because it is unsafe and unnecessary to achieve the goal of reducing population to 137.5 percent of design capacity.

38.  I am also aware that this proposal for work furlough/restitution centers is unlikely to produce any reductions by December 31,2013, as Defendants would have to locate willing providers of the services who have beds in a community program, then negotiate a contract. There is insufficient time to accomplish this prior to December 31, 2013, even if the Court were to waive all statutory timeframes and competitive bidding.

39.  Defendants do not currently have legal authority to implement this measure.  To effect this change, the Legislature would need to amend or waive the following specific statutory provisions:

- Cal. Gov't Code § 14616, to amend provisions governing approval of contracts by the Department of General Services;

- Cal. Penal Code § 1170.05, which limits the Alternative Custody Program to female inmates who volunteer for the program;

- Cal. Penal Code § 6228, to expand the eligibility criteria for restitution center participants;

- Cal. Penal Code § 6260, to delete the first word "appropriate" and the phrase "only for specified types of inmates."

- Cal. Penal Code § 6263, to expand the eligibility criteria for work furlough programs; and

- Pub. Contracting Code §§ 20160 *et seq.*, to permit the State to enter into contracts with restitution centers.

In addition, CDCR would need to amend Cal. Code Regs., tit. 15, § 3078, to permit case-by-case review.  Even if such amendments or waivers were to occur, CDCR does not have conditional use

10

permits to allow such offenders to be placed in these facilities, and the little chance of obtaining them due to anticipated community opposition.

40.   Defendants estimate that, once these laws are modified or waived, it will take between approximately six and twelve months to fully implement this measure.  Defendants have identified the following steps necessary to implement this measure once the necessary statutory and regulatory authority is obtained:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

- Develop contracts to activate additional program beds in the community to house female offenders.  This process will take approximately six to nine months to complete, unless the laws governing state competitive bidding and contracting are waived;

- Develop a proposal for additional position authority (complete before approximately July 1, 2013);

- Recruit and fill new positions (complete between approximately August 1 and December 1, 2013);

- Complete negotiations with the impacted employee organizations (complete by approximately December 1, 2013; and

- Develop training and train staff regarding implementation (complete by approximately December 1, 2013); and

- Review files for each inmate who meets the criteria and recalculate credits (complete between approximately August 1 and December 1, 2013).

**Change State Law to Require County Jails to Retain Inmates With Nine Months Left to Serve on Sentence**

41.  I am familiar with the population reduction measure that would require any inmate with nine months or less to serve at the time of sentencing to remain in the county jail rather than be transferred to state prison.   County jails are already forced to release inmates due to having no beds available.  This proposal would further exacerbate that problem, and result in the counties being forced to release higher risk inmates.  I am opposed to this option being implemented, as it is unnecessarily risks public safety when it is not needed to achieve an inmate population of 137.5 percent by December 31, 2013.

11

42.  Defendants have no authority to implement this proposal, as the Legislature would have to amend Penal Code section 1216 to limit its application to offenders with more than nine months to serve on the prison sentence would serve the remainder of the term in the county jail; amend Penal Code section 2900 for offenders with less than nine months to specify either jail/County Sheriff or prison/Director; amend Penal Code  section 2901 to include County Sheriff/jail; and amend Penal Code sections 1170(a) and 1170(h)(3) to exclude these short timers from serving time in prison.

43.  Defendants estimate that, if the necessary law are modified or waived, it will take approximately nine months to fully implement this measure.  This time is necessary to permit Defendants to coordinate with the counties to establish a process to determine which inmates meet the criteria for placement in county jails, and to negotiate contracts.  Defendants must also develop policies and procedures to implement this program.

44.  Defendants have identified the following additional steps necessary to implement this measure once the necessary statutory and regulatory authority is obtained:

- Negotiate contracts to expand capacity (complete by approximately July 1, 2013);
- Train staff regarding implementation (complete by approximately August 1, 2013); and
- Review files for each inmate who meets the criteria (complete between approximately August 1 and December 1, 2013).

**Change State Sentencing Laws to Expand Realignment by Reclassifying Felony Sentences to be Served in County Jail**

45.  I am familiar with the population reduction measure, which, if implemented, would require certain felons to serve their sentence in county jail rather than prison. I have significant concerns about this proposal, as county jails are already forced to release inmates due to having to beds available.  This proposal would further exacerbate that problem, and result in the counties being forced to release higher risk inmates.  I am opposed to this option being implemented, as it is unnecessarily risks public safety when it is not needed to achieve an inmate population of 137.5 percent by December 31, 2013.

46.  Defendants do not currently possess the authority to implement this measure.  To effect this change, the Legislature would need to amend the following specific statutory provisions:

- Cal. Health & Safety Code § 11350(a), possession of a controlled substance, including cocaine;

- Cal. Health & Safety Code § 11377(a), possession of a controlled substance, including methamphetamine;

- Cal. Penal Code §§ 484 *et seq.*, petty theft;

- Cal. Penal Code §§ 458 *et seq.*, second degree burglary;

- Cal. Penal Code § 473, forgery; and

- Cal. Veh. Code § 10851, vehicle theft.

The only additional step necessary to implement this measure would be for Defendants to issue direction to the field, which could be accomplished by July 8, 2013.

**Change State Law for Diversion of Felony Probation Violators**

47.  I am familiar with Plaintiffs' proposal to divert felony probation violators to county jails to serve their sentences upon revocation.  I have significant concerns regarding implementation of this proposal, as it would remove the incentive for felony probationers to comply with probation conditions.  Further, it may decrease the willingness of superior court judges to place such offenders on probation rather than imposing a prison sentence on the individuals, which could increase the prison population rather than decrease it.  Also, it would overly burden the already burgeoning county jails, resulting in additional inmate releases of higher risk inmates to open up beds for these offenders.  I am opposed to this option being implemented, as it is unnecessarily risks public safety when it is not needed to achieve an inmate population of 137.5 percent by December 31, 2013.

48.  Even if ordered to implement this proposal, Defendants have no ability to do so, as it requires amendment to Penal Code sections 1203.2 and 1203.3 to limit superior court judges' discretion for technical violations of probation by eliminating the option to revoke probation and send person to prison. If the Legislature declines to enact these amendments, this proposal is not possible.

13

Decl. Michael Stainer Supp. Defs.' Resp. to April 11, 2013 Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

**Change State Law to Allow Early Releases of Inmates Convicted to a Life Sentence with the Possibility of Parole**

49.  I am familiar with the population reduction proposal that Defendants could release certain inmates who are serving life sentences with possibility of parole.  Defendants do not currently possess authority to release inmates prior to completion of their prison terms.  To effect this change, the Legislature would need to amend the following specific constitutional provisions and statutes:

- Article I, section 28(f)(5) of the California Constitution would need to be amended or waived to permit sentences to be "substantially diminished by early release policies intended to alleviate overcrowding in custodial facilities."  Amendment of this provision would require a two-thirds vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

- Article I, section 28(a)(5) of the California Constitution would need to be amended or waived.  Amendment of this provision would require a two-thirds vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

- Article I, sections 28(b)(3), (b)(7), (b)(8), (b)(12), (b)(15), (b)(16), and (c)(1) would need to be amended or waived to permit the release of inmates without providing the required notice and opportunity to be heard for victims of crime under Marcy's Law.  Amendment of these provisions would require a two-thirds vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

- Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison;

- Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to served in state prison);

- Cal. Penal Code §§ 3040 *et seq.* would need to be amended or waived to circumvent the parole suitability process; and

In addition , CDCR would need to amend Cal. Code Regs. tit. 15, chapters 1 & 3 of Division 2, to circumvent the parole suitability process.

50.  Should this proposal be implemented after amendment to or waiver of the constitutional provisions involved, DAI will be required to review files to identify serious rules violations that may impact the willingness to release the inmate, identify any holds, warrants, or detainers that would deny the inmate's release but would transfer the inmate into another law enforcement agency's custody should they be ordered paroled, and accomplish notification of victim's and law enforcement in advance of the inmate's release.  The staff who would do these

14

1  duties is the same case records analysts who already are conducting the credit calculations also

2  included in this plan.  If 700 offenders are to be released, this would add between 700 and 1,400

3  hours to their credit calculation duties and further impact the timeliness of their other duties.

4  **Change State Law to Allow Early Release of Other Groups of Inmates**

5      51.  I am familiar with the proposal that Defendants "'release or diversion of certain [s]ub

6  populations, such as women, the elderly and the sick from prison to community-based facilities.'"

7  (Apr. 11, 2013 Order 66 [quoting Aug. 4, 2009 Order 154].)  As enumerated above, Defendants

8  do not have authority to release inmates prior to completion of their prison terms.  To effect this

9  change, the Legislature would need to amend the following specific constitutional provisions and

10  statutes:

11  - Article I, section 28(f)(5) of the California Constitution would need to be amended or
12  waived to permit sentences to be "substantially diminished by early release policies
     intended to alleviate overcrowding in custodial facilities."  Amendment of this provision
     would require a two-thirds vote of the Legislature or voter approval through the
13  initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

14  - Article I, section 28(a)(5) of the California Constitution would need to be amended or
     waived.  Amendment of this provision would require a two-thirds vote of the
15  Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10
     & art. 18;

16  - Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison;
17
18  - Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be served
     in state prison; and

19      52.  Defendants estimate that, once these laws are modified or waived and the Court

20  orders that inmates be released, it will take approximately 120 days for CDCR to begin to

21  implement this measure.  Accordingly, the latest date by which these provisions must be amended

22  or waived in order for Defendants to be able to implement this measure by December 31, 2013 is

23  August 15, 2013.

24      53.  Defendants would use the existing release process, but have identified the following

25  additional steps necessary to implement this measure:

26

27

28

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

- Comply with notification and registration requirements (complete with each release);

- Complete required Mentally Disordered Offenders screenings (complete with each release);

- Address medical and mental health release issues and needs (complete with each release); and

- Coordinate with parole and counties (complete with each release).

**Early Release of Convicted Felons Who Are Not United States Citizens**

54.  I am familiar with Plaintiffs' proposal that the Governor commute the sentences of inmates who are not citizens of the United States with six or less months to serve, and release these inmates to the custody of federal Immigration and Customs Enforcement (ICE) officials.  I have significant concerns about his proposal, as it rewards non-citizens with shorter sentences for victimizing California citizens.  The State has no ability to prevent these felons from returning to California to re-victimize California citizens after deportation.  Further, CDCR's population post-Public Safety Realignment contains fewer inmates with non-serious, non-violent, non-sex offender inmates with ICE holds. The risk to public safety posed by serious and violent offender deportees returning to California is unreasonable and unnecessary.

55.  Defendants do not currently possess the authority to release inmates prior to completion of their prison terms, and the Governor is constitutionally restricted from commuting the sentences of twice-convicted felons without a vote of four justices from the California Supreme Court.  To effect this measure, the Legislature would need to amend the following specific constitutional provisions and statutes:

- Article I, section 28(f)(5) of the California Constitution would need to be amended or waived to permit sentences to be "substantially diminished by early release policies intended to alleviate overcrowding in custodial facilities."  Amendment of this provision would require a two-thirds vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

16

- Article I, section 28(a)(5) of the California Constitution would need to be amended or waived. Amendment of this provision would require a two-thirds vote of the Legislature or voter approval through the initiative process. *See* Cal. Const. art. 2, § 10 & art. 18;

- Article 8 of the California Constitution would need to be amended, which prohibits the Governor from commuting sentences for inmates who have been convicted of more than one felony unless four Supreme Court justices concur. Amendment of this provision would require a two-thirds vote of the Legislature or voter approval through the initiative process. *See* Cal. Const. art. 2, § 10 & art. 18; and

- Cal. Penal Code § 2901 would need to be amended or waived to permit wardens to release inmates before their sentences have been completed.

56. Defendants estimate that, once the necessary authority is obtained, CDCR will need approximately four to six months to implement this measure. Accordingly, the latest date by which these provisions must be amended or waived in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013. Implementation of this proposal would require Defendants to negotiate an agreement with ICE to take these inmates six months before their sentence expires, including an agreement that ICE will retain the inmate in custody until at least the inmate's term is completed. Due to the federal sequester, ICE may not agree to do this. In addition, recent efforts to identify community beds to house inmates outside of prisons has led to direct competition with ICE, as it also has a shortage of beds. Thus, ICE may not be willing to accept hundreds or thousands of inmates, even for a short time much less the six months that CDCR would want. If ICE is agreeable, implementation would be in four to six months.

57. If ICE is unwilling to hold the inmate for six months, an inmate cannot be released early absent waiver of constitutional and statutory obligations to hold a prisoner until his release date discussed earlier are either amended or waived. Should either occur, I estimate implementation of this proposal would take 90 days develop criteria for which inmates to send to ICE, train staff to on the criteria, and review the files of all ICE cases to determine whether they meet the criteria.

1    **Seek an Appropriate from the Legislature to Use Currently Available, Additional Out-of-State Contract Prison Capacity and Forego Returning Inmates to California as Called for in the Blueprint**

2

3        58.   Defendants proposed to implement as part of the court-ordered plan a measure

4    slowing the return of inmates housed in private contract prisons in other states.  Defendants

5    currently have legal authority to involuntarily transfer inmates to out-of-state facilities through

6    June 30, 2013.  After that date, Defendants have no authority for any further involuntary transfers.

7    To lease additional beds, the Legislature would need to authorize an appropriation to pay for them.

8    The Legislature could authorize an appropriation to support an out of state inmate population of

9    8,165 as of December, 2013 and a reduced out of state population of 4,065 as of June, 2014.

10   Rather than incrementally return these inmates to California as called for in the Blueprint,

11   Defendants would continue to house them in out-of-state facilities until they near the completion

12   of their prison terms, to the extent necessary to comply with the population cap.

13        I declare under penalty of perjury that the foregoing is true and correct.  Executed in

14   Sacramento, California on May 2, 2013.

15

16                    */s/ Michael Stainer*
                    Michael Stainer
17                    (authorization to file obtained by counsel for Defendants)

18   CF1997CS0003
     20672588.docx
19

20

21

22

23

24

25

26

27

28