KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5553
 Fax:  (415) 703-1234
 E-mail:  patrick.mckinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
 425 Market Street, 26th Floor
 San Francisco, California 94105
 Telephone:  (415) 777-3200
 Fax:  (415) 541-9366
 E-mail: pmello@hansonbridgett.com

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| **MARCIANO PLATA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF JAY ATKINSON IN SUPPORT OF DEFENDANTS' RESPONSE TO APRIL 11, 2013 ORDER REQUIRING LIST OF PROPOSED POPULATION REDUCTION MEASURES; COURT-ORDERED PLAN** |

I, Jay Atkinson, declare:

1.      I am the Chief of the Offender Information Services Brach for the California Department of Corrections and Rehabilitation (CDCR).  I have been with the Offender Information Services Branch of CDCR since 1999 and have assisted in gathering data maintained by CDCR on numerous occasions.  I am competent to testify to the matters set forth in this declaration and if called upon, I would and could so testify.  I make this declaration in support of Defendants' Response to April 11, 2013 Order Requiring List of Proposed Population Reduction Measures and Court-Ordered Plan.

2.      As Chief of the Offender Information Services Branch, I am responsible for management and oversight of the Offender Information Services Branch that supplies research and analysis to CDCR and outside agencies regarding inmate population estimates and projections.

3.      There are various approaches that could reduce CDCR's inmate population. Offender Information Services Branch was tasked with estimating the impact of some of those approaches.  Each is explained below along with the process of my staff estimated the inmate reductions that could occur under each approach.  Most estimates were first calculated  as an Average Daily Population (ADP) and then converted to numbers of persons.  ADP is the number of full beds utilized within a year (for example, 10 ADP equals 10 occupied beds for 1 year).  ADP provides a tangible unit of measure commonly used for budgetary planning and estimating cost/savings.  ADP is used instead of number of persons because it incorporates the length of time a person stays in prison (for example, 2 persons spending 12 months in prison = 2 ADP; 6 persons spending 4 months in prison = 2 ADP).

4.      We first calculated our estimates in ADP to increase accuracy, and then converted these results to reflect the numbers of persons impacted. This produces a more precise estimate of actual population.  Our conversion method used December 31, 2013—the fiscal year mid-point— as a point in time to  represent the number of people impacted in a stable population during a year-long period.  Lengths of stay vary but CDCR's population has been stable, allowing an assumption that the representation of the number of people at the middle of the fiscal year along

with a discount would accurately reflect the conversion from ADP to actual people.  The discount

we used was 25%, which includes decreases for implementation time as well as varying lengths

of stay.

5.      Using CDCR's Spring 2013 projections as our baseline, we used the latest

available trends up to December 2012 to estimate our anticipated prison population.  Our results

include discounts to prevent over-counting due to overlapping of estimates.  We did not include

sex registrants in most of our estimates on population reduction.

6.      All estimates produced use Spring 2013 population projections and assume a start

date of July 1, 2013 for implementation of the measure, allowing necessary time for

implementation, including program development, staff training, and policy creation.

**Legislative Changes to State Law to Increase Prison Credits**

**Change State Law to Allow Minimum Custody Inmates to Receive 2-for-1 Credits**

7.      We produced an estimate of the impact of prospectively applying two-for-one

credits to offenders in minimum support facilities.  This estimate was developed by calculating a

time-to-serve reduction factor (1.72 months) obtained by changing credit earning from day-for-

day for minimum custody inmates to two-for-one credits.  The credit reduction factor was applied

to future population projections and assumes a stable share of minimum custody inmates within

the prison population and day-for-day for inmates within the minimum support facilities. This

result was then converted from ADP to individuals with a discount was applied due to concerns

that there may be overlap between this and other population reduction estimates.  Accordingly,

CDCR estimates that this potential population reduction measure could reduce the prison

population by 148 inmates by December 31, 2013.

8.      We also produced an estimate of the retroactive impact of applying two-for-one

credits to offenders in minimum support facilities. We separated the population into smaller

subgroups based on sentence length, and then averaged each group to obtain a more

comprehensive sentence average of this population. Once we obtained the comprehensive

average, we took the small subgroups and subtracted pre-prison credits. Then, we calculated the

current day-for-day credit earnings for each subgroup and applied this to each group's sentence

averages to determine the time left on sentences.  Using each groups' mean after we reduced by day-for-day credit earning, we then applied two-for-one credit earning towards each groups' sentence.  This results in projected length of sentence for each group.  Next, we calculated the difference between the day-for-day and two-for-one results for each group, which provides the amount of savings.  Lastly, we split the savings into the appropriate years to each group.  This calculated the number of people who have already served their sentence or are leaving prison by December 31, 2013 through retroactive application of two-for-one credits.  This produced a population reduction of 89 individuals by December 31, 2013.  If this measure is applied retroactively and prospectively, CDCR estimates a population reduction of 237 inmates total by December 31, 2013.

**Change State Law to Increase "Milestone Completion" Credits For Violent and Second-Strike Offenders**

9.     We produced an estimate that revised the "milestone" credits that could be earned by all violent and second-strike inmates who are not sex registrants.  The first part of the estimate included day-for-day credit earners only and used one year of milestone completion credit data.  The ADP reduction was calculated for this group by removing the current six-week cap.  The estimate's second part was developed by allowing violent and second-strike inmates to earn milestone credit for programs completed, and then doubling the credit earned to maximize both near- and long-term reductions.  These doubled credits were applied to future population projections based on estimates of the proportion of the future population expected to be violent and second strikers. The estimate was calculated based on the amount of time each group has to serve, because  no impact is realized until they leave.  The savings for violent and second strikers were calculated separately, and then combined with the estimate for the day-for-day group, creating the final estimate. These results were then converted from ADP to individuals, with a discount again applied to  account for overlap between this and other population reduction estimates.

10.     The estimate accounted for violent and second strike offenders who actually completed academic, vocational, and substance abuse treatment classes. The estimate did not

include offenders completing Prison Industry Authority courses, basic firefighter training, cognitive behavioral therapy courses. Additionally, the estimate does not account for expanded rehabilitative programming that is currently being implemented in the prisons, or for the increased incentive to complete training courses due to "milestone" credit earning. This estimate also does not include offenders who would not come to prison via another population reduction measure, such as diversion of technical parole violators to county jails. Accordingly, CDCR estimates that this measure, if implemented on a prospective basis, could reduce the prison population by 64 violent, non-strike offenders and 62 second-strike offenders, for a total of 126 inmates by December 31, 2013.

11.     CDCR estimates a reduction of 1,134 individuals--575 violent, non-strike offenders and 559 second-strike offenders—if this measure is applied retroactively to the start of each eligible inmate's sentence. If retroactive and prospective measures are combined, this would result in a total reduction of 1,260 individuals by December 31, 2013.

**Change State Law to Increase Credit-Earning for Non-Violent "Second Strike" Felons**

12.     We produced an estimate for increasing credit earning capacity from 20% to 34% for non-violent inmates with two strikes. Then, we produced an estimate for increasing credit earning capacity from 20% to 34% for second-strike offenders convicted of a violent crime.  The process assumed increased credit earning capacity would be applied starting July 1, 2013, to the remainder of this population's sentences.  It excluded parole violators returned to custody, offenders pending parole revocation, sex registrants and lifers.  A discount was applied to the result to account for implementation on July 1, 2013.

13.     CDCR estimates that this measure, if implemented prospectively, could reduce the prison population by 29 second-strike offenders convicted of a violent offense and 37 second-strike offenders convicted of a non-violent offense, for a total of 66 inmates by December 31, 2013. If this measure is applied retroactively to the start of each eligible inmate's sentence, CDCR estimates a reduction of 347 violent second-strikers and 2,043 non-violent second strikers. CDCR estimates the total prospective and retrospective reduction to be 2,081 second-strike

offenders convicted of a non-violent offense and 377 offenders convicted of a violent second-strike offense by December 31, 2013.

**Change State Law to Expand Credit-Earning Limits for Violent (Non-Strike) Felons**

14.    We produced an estimate for increasing credit earning capacity from 15% to 34% for violent inmates without a second strike.  The process assumed that the increased credit earning capacity would be applied starting July 1, 2013 to the remainder of this population's sentences.  It excluded parole violators returned to custody, offenders pending parole revocation, sex registrants and lifers.  A discount was applied to the result to account for implementation time starting July 1, 2013.  Accordingly, CDCR estimates that this measure, if implemented, could reduce the prison population by 317 individuals by December 31, 2013.  In addition, if this measure is applied retroactively to the start of each eligible inmate's sentence, it would reduce the population further by 1,362 individuals, for a total of 1,679 inmates by December 31, 2013.

**Change State Law to Modify Parole for Low-Risk Elderly Inmates**

15.    We produced an estimate of the reduction of population for certain elderly inmates based on criteria CDCR intends to request via statutory enactment. A precise estimate is not possible because this measure would require predicting legislative changes.  However, we created a reliable estimate using the following criteria to calculate eligibility: (1) a threshold age of 60 years, and (2) offenders who have served at least half of their sentences or who are past their minimum estimated parole date if serving a life sentence. Offenders with serious rules violations, gang validation, or deemed as high-risk under the California Static Risk Assessment tool were screened out. Sex offenders and offenders who have served a Security Housing Unit term in the last five years were also screened out. But other  violent offenders are included in this category.

16.    Based on the above criteria, CDCR estimates that 1,307 inmates could qualify for elderly parole in 2013. A discount was applied to achieve a realistic result by simulating actual conditions, such as death, compassionate release or sentence recall, denials or grants of parole, the number of Board hearings that could be held in 2013, and implementation time. Under these discounts, CDCR estimates that the population can be reduced by 250 inmates by December 31, 2013.

**Change State Sentencing Laws to Expand Realignment by Reclassifying Felony Sentences to be Served in County Jail.**

17.     We produced an estimate to determine the amount by which the future prison population would not increase if specified court-ordered felonies, including drug possession, petty theft, second degree burglary, vehicle theft, vandalism, and forgery, are punishable by incarceration in county jail instead of prison.  The estimate included offenders not eligible for realignment because they are sex registrants, strikers, or have a prior serious or violent offense.  It excludes offenders with dual commitment offenses or offenders who would have otherwise served a prison sentence. The process assumed that offenders currently receiving day-for-day credit earning would continue to receive those credits at the local level and that the proposed sentence at the local level is for one year. Then, we converted from ADP to individuals and applied a discount to account for implementation on  July 1, 2013.  CDCR estimates that this measure, if implemented, could prevent the future prison population from increasing.  The net result would reduce the population by 305 inmates by December 31, 2013.

**Change State Law to Require County Jails to Retain Inmates With Nine Months Left To Serve On Sentence.**

18.     We produced an estimate to determine the amount by which the future prison population would not increase if convicted felons with nine months or less left to serve on their sentences were retained in county jails.  It included new admissions and parole violators with new terms sentenced under the determinate sentencing law.  It excluded parole violators returned to custody, all lifers, condemned and inmates with three strikes. It assumed that starting July 1, 2013, this population would serve time in county jail.  Then, we converted ADP to individuals and applied a discount to the result to account for implementation on July 1, 2013.  Accordingly, CDCR estimates that this measure, if implemented, could prevent the future prison population from increasing.  The net result would reduce the population by 1,313 inmates by December 31, 2013.

**Change State Law for Diversion of Felony Probation Violators**

19.     Another population reduction measure is to divert felony technical probation violators to county jails to serve their sentences upon revocation.  We produced an estimate to determine the amount by which the future prison population would not increase if felony technical probation violators served their sentences in county jails instead of prison upon revocation. Then, we converted ADP to individuals and applied a discount to account for implementation on July 1, 2013.  CDCR estimates  the prison population could be reduced by 46 individuals by December 31, 2013 if this measure were implemented.

**Early Releases of Convicted Felons Who are Not United States Citizens**

20.     Plaintiffs propose releasing 1,038 inmates who are not citizens of the United States with six or less months to serve, in the hope that they will be deported.  (Austin Decl. ¶ 25 & Table 4, ECF 2509-1/4283-1.)  If this measure is implemented, we agree with this estimate.

**Additional Releases**

21.     If the Legislature immediately passes the measures in the plan as urgency legislation, and does not pass any other measures that shift prisoners back to the state, then by December 2013, the State will come within 2,570 inmates (*i.e.*, within 2.2%) of satisfying the court-ordered population target, and will fully satisfy the court-ordered target in both June 2014 and June 2015.  For each of the measures in the plan, the resulting reductions will continue to increase over the next several years.

**Plaintiffs' Proposals are Based on Inaccuracies and Would Threaten Public Safety**

22.     From September through December 2012, CDCR staff members in the Offender Information Services Branch spent more than 100 hours working with James Austin, Ph.D., who calculated Plaintiffs' estimates using our data.  We compiled and sent to him data files to use in developing his own estimates, and educated him on how to use the data elements in those files. We also spent time explaining our estimating process and providing estimates to him, some of which were completed at his request according to his specifications.  Information that we provided to him included, but was not limited to, twelve months of prison admissions, current prison population snapshots, twelve months of prison releases, current parole population

snapshots, monthly updates of admissions and releases, recidivism data, probation revocation data, Immigration and Customs Enforcement hold data, number of lifers past their minimum eligible parole dates, milestone completion credit estimate based on an increase from six weeks to three months, CDCR's estimate of increasing credit earning for second-strikers from 20% to 50%, CDCR's estimate of increasing credit earning for violent offenders from 15% to 50%, CDCR's Proposition 36 estimate, and other estimates used to formulate compliance with the October 11, 2012 court order.  Additionally, the data files provided to Dr. Austin were updated several times for him upon his request, with additional data elements added as needed.

23.     In analyzing our data and developing our estimates, we used a highly methodical and extensively detailed approach, based on "tried and true" processes from experience and data trends.  Additionally, CDCR calculated its estimates using a comprehensive and data-driven approach to ensure that we reached the highest possible level of precision.  Moreover, we regularly assess our methods and hire experts to review and evaluate projection models and processes every ten years. With our state-of-the-art system, we are able to project the prison population within a two year time period within two percent of actual population.

24.     Dr. Austin's estimates, while based on our data, differ from ours in several respects.  First, I believe that Dr. Austin applies rounding throughout his estimates, which risks embedding inaccuracies in his final results.  By rounding at each new calculation, inaccuracies could be compounded, which may skew the final results.  Aware of this risk, CDCR took steps to minimize rounding, which resulted in more precise reduction numbers.

25.     Second, due to varying factors in inmate populations, CDCR created subgroups and made calculations for these subgroups based on these variances to reach more accurate estimates for each type of population, whereas Dr. Austin tended to perform less detailed and more global calculations.  For example, when reviewing sentencing factors, I believe that Dr. Austin took the global sentence average of all second-strike admissions during one year despite wide variance in sentence length, whereas my team examined the entire CDCR second-strike population, separated the population into smaller subgroups based on sentence length, and then averaged each group to obtain a more comprehensive sentence average of the whole second-strike

1    population.

2        26.    Lastly, Dr. Austin's calculations include applying credits to sex registrants, which,

3    as noted above, we did not do for most estimates.  Therefore, his calculations incorporate a larger

4    estimated reduction in numbers than those produced by CDCR.

5

6    **A.   Retroactive Application of Credit-Earning Would Result in an Immediate
        Release of Offenders**

7        27.    Retroactive application of these time credits will result in the immediate release of

8    thousands of offenders serving prison terms for second-strike and violent offenses.  Potentially

9    thousands of these classes of felons who are currently incarcerated have already served time

10   sufficient to meet criteria making them eligible under the above measures for immediate release

11   upon implementation of the measures.  A retroactive credit proposal is dangerous because it

12   expedites the release of all violent and repeat offenders without their risk to the public, readiness

13   for release, history of programming or rules violations, and their ability to safely reintegrate into

14   society.

15   **B.   Plaintiffs' Plan is inaccurate**

16       28.    Paragraph 5 of Dr. Austin's declaration dated January 7, 2013 states that the state

17   must reduce the prison population to 109,805. (Austin Decl. ¶ 5 & Table 1, ECF 2509-1/4283-1.)

18   This is incorrect.  The correct number of inmates that meet the 137.5% cap is in fact 109,665.

19   This type of inaccuracy is found in several of Dr. Austin's calculations.

20       29.    Paragraph 6 of Dr. Austin's January 7, 2013 declaration states that there will be

21   120,000 prisoners in 33 prisons in June 27, 2013 if no further steps are taken to reduce

22   population.  (Austin Decl. ¶ 6 & Table 2, ECF 2509-1/4283-1.)  Table 2 refers to design capacity,

23   not actual inmate population. This is another example of some of the inaccuracies in Dr. Austin's

24   calculations.

25       30.    Another significant error in Dr. Austin's estimate is found in Table 2 of his

26   declaration.  He uses a static total inmate population of 132,941 for all points in time ---December

27   2012, June 2013, and December 2013.  Thus, all calculations using this static number are

28   inherently imprecise, which is surprising since he cited CDCR's projections in Paragraph 8 of his

declaration.  We provided our population projections to him and  explained them carefully.  In addition, he validated our projection by making his own calculations.  When he incorporates *The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Court Oversight and Improve the Prison System* population projections, he uses correct numbers, but when he creates tables incorporating his own calculations, he uses this static number.  In addition, he uses this static population projection to calculate the gap between expected reductions in population and the cap at 137.5% in Table 2. The inmate population does not remain static and his calculations, if based on incorrect population projections, will also be incorrect. These calculations can be misleading, especially when considered for future years.

31.     Dr. Austin states in Paragraph 17 of his declaration that, "any population reduction plan should have a discount factor that will provide a sufficient cushion in the estimates and help ensure compliance with the Court's Order."  Furthermore, he states, based on his experience in other states, that the discount factor must be at least 20%, which as he notes was not the discount factor used by CDCR. We concur with Dr. Austin that any population reduction plan should have a sufficient discount factor; however, we do not believe an invariable 20% discount should be used in all estimates.  Our discounts were and are based on trends in population over time of California offenders and the extensive experience of our researchers with that population.  Dr. Austin's experience is with other states and is not tailored to CDCR's population. Moreover, he applies this straight 20% discount for future projections and has not explained why uses 20% or how he came to 20% as an appropriate factor.  An invariable 20 % discount may not be appropriate for every measure

32.     In Paragraph 21 of his declaration, Dr. Austin proposes, "Diversion of Drug Possession Cases. Retroactive and Sustained."  He says, "This reform is the same as the one proposed by the CDCR except that it is made retroactive to the current inmate population and would be sustained. This reform if fully implemented would reduce the current prison population by nearly 2,000."  His proposal is unclear.  Dr. Austin may be advocating transfer of drug possession offenders immediately to county jail to complete their sentences or he could be advocating early release.  He doesn't fully explain his recommendations.  In addition, he does not

1    explain how he arrives at an estimate of 2,000 inmates.

2        33.    Dr. Austin has made inaccurate calculations that are misleading in Table 4 of his

3    declaration.  It appears that Dr. Austin took a CDCR future projection estimate (2,436) that was

4    specific to drug possession offenses decreased to misdemeanors for the fiscal year 2015-2016,

5    and used this in Table 4 as "Current Target Population".  He is mistakenly taking future

6    projections for use in 2013.  In addition, this 2,436 is in ADP and not individuals, so Dr. Austin is

7    misusing this number in his calculations.  Moreover, he uses the estimate 228 "Pure Impact" for

8    drug possession to misdemeanor crimes, but this number was based on another estimate from

9    CDCR that included a variety of crimes not limited to drug possession that was completed at a

10   different time using different effective dates. Lastly, he fails to define "Pure Impact" and it is

11   unclear what this entails or how it is used.

12       34.    The 2,436 inmates Dr. Austin lists in Table 4 of his declaration describing the

13   amount of population reduction that would occur if felony drug possession crimes were reduced

14   to misdemeanors is similarly misleading.  This number was provided to him by my team with the

15   explanation that the population reduction would be a total of 2,436 ADP by 2015.  In Table 4,

16   Austin uses this number as if it would impact today's numbers of actual inmates rather than an

17   estimate of future total reduction.

18       35.    Dr. Austin proposes, in Paragraph 22 of his declaration, that "2nd Strikers serve

19   34% of Sentence versus 20%. Retroactive and Sustained."  He estimates that this measure will

20   reduce prison population by approximately 3,000 by June 27, 2013.  But he does not explain how

21   he arrived at 3,000 or the methodology behind his calculations.  In addition, his plan that "2nd

22   strikers serve 34% of sentence versus 20%" appears to confuse sentence term with credit earning

23   capacity. Second strikers serve 80% of their sentence and his plan would decrease that to 66%.

24   His plan increases the credit earning capacity of these offenders to 34%.

25       36.    Dr. Austin writes in Paragraph 23 of his declaration that "Violent Offense- Non

26   Strikers – serve 34% of Sentence versus 15%. Retroactive and Sustained."  Again, he appears to

27   confuse sentence term with credit earning. He also does not explain the assumptions and

28   methodology of his estimate resulting in his opinion that this measure would reduce the prison

1   population by 6,000 by June 27, 2013.

2       37.    In Paragraph 24 of his declaration, Dr. Austin assumes in his calculations for

3   milestone credit earning that the length of stay for determinate sentences, second strikers and

4   third strikers would be reduced by an average of 6 months.  However, he does not qualify the 6

5   months, and it is unclear if he means six months per year or six months per sentence  In addition,

6   he includes third strikers rather than violent offenders in his plan.   CDCR did not create

7   estimates with third strikers and did not contemplate them in our estimates.

8       38.    At Paragraph 28, Dr. Austin declares "there are approximately 9,315 prisoners

9   who are past their Minimum Eligible Parole Date. Virtually all of them (96%) are low risk."

10  However, he does not explain how he calculated this 96% figure.

11      39.    In Paragraph 30, Dr. Austin discusses California's crime rate and population rate

12  over the years and compares it to national rates. But he fails to cite any study or authority for

13  these statistics. Moreover, if this is an estimate he calculated, he does not cite his source data or

14  explain his methodology.

15      40.    In Paragraph 31, Dr. Austin states that as California's prison population decreases,

16  California's crime rate has also declined.  However, he does not cite to any study or from where

17  he got these statistics.  Again, he fails to cite his sources or explain his methodology if this is his

18  own hypothesis.

19      41.    Table 5 of Dr. Austin's declaration describes the difference in population and

20  crime rate from July 2007 to December 2012. He fails to cite to his crime rate source data or

21  statistics. He fails to explain whether he made any estimates that are included in this chart.  If so,

22  he does not explain his methodology.

23  **C. Plaintiffs' Plan Assumes a Score of Low-Risk Equates to No Crime**

24      42.    It is my understanding that CDCR will use the California Static Risk Assessment

25  and possibly another risk assessment tool if it is ordered to further reduce the prison population.

26  However, even though a low-risk offender is less likely than a high-risk offender to commit a new

27  crime and be convicted, there is still a chance that they will commit and be convicted of a new

28  crime and that crime may be severe in nature. In other words, it is impossible o determine with

100% certainty whether or not a low-risk offender will recidivate.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Sacramento, California on May 2, 2013.


_____/s/ Jay Atkinson_____
Jay Atkinson
*(original signature retained by attorney)*

Decl. Jay Atkinson Supp. Defs.' Resp. to Apr. 11, 2013 Order
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH