1  KAMALA D. HARRIS                          Hanson Bridgett LLP
   Attorney General of California            JERROLD C. SCHAEFER, State Bar No. 39374
2  JONATHAN L. WOLFF                         PAUL B. MELLO, State Bar No. 179755
   Senior Assistant Attorney General        WALTER R. SCHNEIDER, State Bar No. 173113
3  JAY C. RUSSELL                            SAMANTHA D. WOLFF, State Bar No. 240280
   Supervising Deputy Attorney General        425 Market Street, 26th Floor
4  DEBBIE VOROUS, State Bar No. 166884         San Francisco, California 94105
   PATRICK R. MCKINNEY, State Bar No. 215228   Telephone:  (415) 777-3200
5  MANEESH SHARMA, State Bar No. 280084        Fax:  (415) 541-9366
   Deputy Attorneys General                    E-mail: pmello@hansonbridgett.com
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5553
    Fax:  (415) 703-1234
8   E-mail:  patrick.mckinney@doj.ca.gov
   *Attorneys for Defendants*
9

10            IN THE UNITED STATES DISTRICT COURTS

11          FOR THE EASTERN DISTRICT OF CALIFORNIA

12         AND THE NORTHERN DISTRICT OF CALIFORNIA

13     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

14       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

15

16   **RALPH COLEMAN, et al.,**                2:90-cv-00520 LKK JFM P

17                           Plaintiffs,       **THREE-JUDGE COURT**

18        v.

19   **EDMUND G. BROWN JR., et al.,**

20                           Defendants.

21   **MARCIANO PLATA, et al.,**               C01-1351 TEH

22                           Plaintiffs,       **THREE-JUDGE COURT**

23

24        v.                                   **AMENDED DEFENDANTS' RESPONSE
                                               TO APRIL 11, 2013 ORDER REQUIRING**
25   **EDMUND G. BROWN JR., et al.,**          **LIST OF PROPOSED POPULATION
                                               REDUCTION MEASURES; COURT-**
26                           Defendants.       **ORDERED PLAN**

27

28

1

**TABLE OF CONTENTS**

2

Page

3  Introduction ................................................................................................. 1

4  Court-Ordered List of Proposed Population-Reduction Measures ................. 5

5      1.   New Construction. ...................................................... 6

       2.   Expand Fire Camp Capacity. ...................................... 6

6      3.   Obtain a Legislative Appropriation of Funds to Expand In-
           State Contract Capacity................................................ 6

7      4.   Legislative Changes to State Law to Increase Prison Credits........ 8

8          a.   Change State Law to Allow Minimum Custody
               Inmates to Receive 2-for-1 Credits. ...................... 8

9          b.   Change State Law to Increase "Milestone
10             Completion" Credits for Violent and Second Strike
               Offenders.............................................................. 10

11         c.   Change State Law to Expand Credit-Earning Limits
               for Violent and Non-Violent "Second Strike"
12             Felons. .................................................................. 11

13         d.   Change State Law to Expand Credit-Earning Limits
               for Violent (Non-Strike) Felons. ........................... 12

14     5.   Diversion of Technical Parole Violators........................ 13

15     6.   Diversion of Low-Risk Offenders to Community
           Corrections. ................................................................ 14

16     7.   Expansion of Evidence-Based Rehabilitative Programming. ....... 14

17     8.   Proposition 36. ........................................................... 15

       9.   Change State Law to Expand Alternative Custody Program
18         and Work Furlough/Restitution Centers. ...................... 16

19     10.  Change State Law to Require County Jails to Retain
           Inmates With Nine months Left To Serve On Sentence............. 18

20     11.  Change State Sentencing Laws to Expand Realignment by
           Reclassifying Felony Sentences to be Served in County Jail. ...... 19

21     12.  Under a State of Emergency Declaration, Refusing
22         Admission to Prison for Convicted Felons. ................... 20

       13.  The Governor Was Required by State Law to Rescind the
23         Overcrowding Emergency Proclamation, and no
           Circumstances Exist that Would Justify a New Declaration
24         of Emergency. ............................................................ 21

25     14.  Change State Law for Diversion of Felony Probation
           Violators..................................................................... 22

26     15.  Change State Law to Allow Early Releases of Inmates
           Convicted to a Life Sentence with the Possibility of Parole........ 23

27     16.  Change State Law to Allow Early Releases of Other Groups
28         of Inmates.................................................................. 25

i

**TABLE OF CONTENTS**
(continued)

Page

17.    Early Releases of Convicted Felons Who Are Not United States Citizens. ............................................................. 26

Court-Ordered Population-Reduction Plan ................................................................ 28

I.    Measures that defendants have the authority to implement: ................................. 28

    A.    New construction. ....................................................................... 28

    B.    Expand fire camp capacity. ........................................................ 28

II.    Measures that defendants lack the authority to implement: ............................... 29

    A.    Legislative changes to state law to increase prison credits. ..................... 29

        1.    Change State Law to Allow Minimum Custody Inmates to Receive 2-for-1 Credit. ............................... 29

        2.    Change State Law to Allow Non-Violent Second-Strike Offenders to Earn "Milestone Completion" Credits. .................. 30

        3.    Change State Law to Increase the Credit-Earning Limit for Nonviolent "Second Strike" Felons from 20% to 34%. ............... 30

        4.    Change State Law to Expand Criteria for Medical Parole. ........... 31

        5.    Change State Law to Modify Parole for Low-Risk Elderly Inmates. ................................................................ 31

        6.    Obtain a Legislative Appropriation of Funds to Lease Jail Capacity from Counties with Available Capacity ....................... 32

    B.    Seek an appropriation from the legislature to slow the rate of returning inmates to California as called for in the blueprint. ................. 33

    C.    Contingency measures. ................................................................ 33

III.    Reasons for not implementing the remaining measures on the list. .................... 34

    A.    Realigning additional felonies to local jurisdictions, refusing admission to inmates convicted of felonies requiring a prison sentence, and diverting probation violators would threaten public safety. ............................................................................. 34

    B.    Retroactive application of credit-earning and credit increases for violent offenders would threaten public safety. ....................................... 35

    C.    It would be risky to grant the outright early release of thousands of murderers and other serious and violent felons. ...................................... 35

    D.    It would be bad policy to grant the outright early release of elderly, female, or disabled inmates. .......................................................... 37

    E.    It would be ill-advised to grant the outright early release of inmates who are not United States citizens. ....................................................... 37

    F.    Plaintiffs' milestone credit proposal subverts the program's purpose. .......................................................................... 38

IV.    California has achieved a durable remedy. ............................................................. 39

ii

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

# TABLE OF AUTHORITIES

**Page**

**CASES**

*California Corr. Peace Officers' Ass'n v. Schwarzenegger*
 163 Cal.App.4th 802 (2008) ............................................................... 22

*California v. U.S. Dept. of Justice*
 114 F.3d 1222 (D.C. Cir. 1997) .......................................................... 39

*Frew v. Hawkins*
 540 U.S. 431 (2004) ............................................................................ 41

*Horne v. Flores*
 557 U.S. 433 (2009) ............................................................................ 41

*In re Lawrence*
 44 Cal.4th 1181 (Cal. Sup. Ct. 2008) ................................................ 38

*In re Shaputis*
 44 Cal.4th 1241 (Cal. Sup. Ct. 2008) ................................................ 38

*Sass v. California Bd. of Prison Terms*
 376 F. Supp. 2d 975 (E.D. Cal. 2005) ................................................ 23

**STATUTES**

California Code of Regulations, Title 15
 Chapters 1 & 3 .................................................................................... 25
 § 2245 .................................................................................................. 39
 § 3078 .................................................................................................. 17
 §§ 1006 ................................................................................................ 21
 §§ 2281, 2316, 2317, 2402 ................................................................. 38
 §§ 3042 *et seq.* & 3044(b)(1) ......................................................... 9, 30

California Government Code
 §§ 4525-4529.20, 4530-4535.3, 7070-7086, 7105-7118, & 14835-14837 .................. 6, 33, 35
 §§ 8550 et seq. .................................................................................. 21
 § 8629 .............................................................................................. 21, 22
 § 11340 *et seq.* ....................................................................... 9, 17, 25, 30
 §§ 13332.10, 14660, 14669, 15853 ................................................ 6, 33, 35
 § 14616 ........................................................................................ 6, 17, 33, 35
 §§ 18500 ........................................................................................ 6, 33, 35
 § 19130(a)(3) ................................................................................. 6, 33, 35

iii

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

# TABLE OF AUTHORITIES
## (continued)

**Page**

California Health & Safety Code

§ 11350(a) ................................................................................ 20

§ 11377(a) ................................................................................ 20

California Penal Code

§§ 458 *et seq.*, second .............................................................. 20

§ 473 ......................................................................................... 20

§§ 484 *et seq.* .......................................................................... 20

§ 1170.05 ................................................................................. 17

§ 1170.12(g) ....................................................................... 10, 11

§ 1170.126 .......................................................................... 15, 16

§ 1170.126(b) ........................................................................... 16

§ 1170(a) ............................................................................ passim

§ 1170(h)(3) ........................................................................ passim

§ 1216 ................................................................. 7, 19, 33, 35

§§ 2900-01 ............................................................................... 40

§§ 2900 & 2901 ................................................... 7, 19, 33, 35

§ 2901 ................................................................. 28, 39, 40

§§ 2933.1, 667(c)(5) ................................................................. 37

§ 2933.05 ................................................................................. 40

§§ 3040 *et seq.* ...................................................................... 25

§§ 3041(b), 3046 ..................................................................... 38

§ 6228 ...................................................................................... 17

§ 6260 ...................................................................................... 17

§ 6263 ...................................................................................... 17

California Vehicle Code

§ 10851 ..................................................................................... 20

Penal Code

§ 290 .................................................................................. 10, 41

§ 667(c)(5) ....................................................................... 10, 30, 31

§§ 667(c)(5) and 1170.12(a)(5) .......................................... 11, 31

§§ 1203.2 & 1203.3 ................................................................. 23

§ 2900(b)(1) ....................................................................... 20, 21

§ 2933.1 ........................................................................ 9, 10, 12

§ 2933.3 ............................................................................... 9, 30

§ 2933.05(a) .................................................................. 10, 30, 41

§ 2933.05(e) .................................................................. 10, 31, 41

§ 3041 ...................................................................................... 38

§§ 3041.1 & 3041.2 ................................................................. 39

§ 3550 ................................................................................ 31, 32

Public Contracting Code

§§ 20160 *et seq.* .................................................................... 17

# TABLE OF AUTHORITIES
### (continued)

**Page**

United States Code, Title 8
§ 1365(a) ................................................................................................................. 39

United States Code, Title 18
§ 3626(g)(4) ....................................................................................................... passim

**CONSTITUTIONAL PROVISIONS**

California Constitution
art. I, § 28(a)(5) ................................................................................ 24, 26, 27
art. 1, §§ 28(b) ..................................................................................................... 38
art. I, § 28(f)(5) ........................................................................... 24, 26, 27, 40
art. 2, § 10 & art. 18 ................................................................... 24, 26, 27, 39
art. 4 § 8(d) ................................................................................................... passim
art. 8 ......................................................................................................................... 27
art. V, § 8(b) ......................................................................................................... 39

v

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

1

**INTRODUCTION**

2

The Court has ordered Defendants to submit a plan to further reduce the prison population

3

by several thousand inmates by the end of the year.

4

At the outset, it is important to explain the tremendous efforts and investments the State

5

has made over the last several years to transform its prison health care system to not simply meet

6

constitutional standards but also to become one of the best in the nation. The State has spent well

7

over a billion dollars to construct new health care facilities and additional treatment space in

8

prisons throughout the State. Most significantly, a new $840-million, 1,722-bed health care

9

facility is nearing completion and will open this July.

10

In addition, the State has worked to substantially reduce the prison population while

11

improving the system as a whole. Since 2006, the prison population has dropped by

12

approximately 42,000 inmates. In 2009, the previous governor and the Legislature enacted

13

Senate Bill 18 which increased credit-earning capacity for inmates, funded community programs

14

for probationers, expanded drug and mental health reentry courts with treatment programs, and

15

modified sentencing laws to reduce the number of offenders sent to state prison. Under Governor

16

Brown's leadership, the State passed and implemented Public Safety Realignment, which shifted

17

lower-level offenders and parole violators from state prison to county jail. Due to realignment

18

and the work of many local leaders and state officials to implement it, the prison population

19

dropped by about 25,000 inmates in just over a year. Moreover, Governor Brown's

20

administration developed and obtained legislative approval for a new comprehensive prison plan

21

that substantially increases rehabilitative programming, and secures funding for numerous

22

additional construction upgrades to existing prison health care facilities.

23

Governor Brown has also ended the practice of governors routinely rejecting the Board of

24

Parole Hearings' decisions granting parole to "lifer inmates." (Decl. Jennifer Shaffer Supp. Resp.

25

¶ 3.) Where Governor Davis reversed approximately 98% of parole grants by the Board of Parole

26

Hearings, and Governor Schwarzenegger reversed approximately 74% of the Board's decisions,

27

Governor Brown has largely deferred to the Board's decisions to grant parole, reversing only

28

approximately 16% of the Board's decisions in 2011 and 2012. (*See* http://www.sfgate.com/

1  crime/article/Brown-blocks-parole-far-less-often-4283836.php; Shaffer Decl. ¶ 3.)  The Board

2  has also granted parole to many more life inmates in recent years, from 52 in 2000, to 293 in

3  2008, to 670 in 2012.  (*See* Shaffer Decl. ¶ 3; *see also* http://www.cdcr.ca.gov/BOPH/docs/BPH_

4  Suitability_ Hearing_ Summary_1978-2011.pdf.)  In 2013, the Board has granted parole to

5  approximately 200 inmates thus far and is on pace to match or exceed last year's total.  (*See id.*)

6  As such, the Court's view that "very few lifers have been released" and that "defendants have

7  taken no meaningful action to release elderly low-risk prisoners" is not accurate.  (*See* Apr. 11,

8  2013 Order 66 n.47.)

9      In *Coleman*, Defendants retained nationally recognized experts to perform a substantive

10  evaluation of the current state of California's prison mental health care system.[1]  They found that

11  while some further improvements can and should be made, the mental health care system was one

12  of the best they had seen in the country.  (*See* Jan. 7, 2013 Motion, *Coleman* ECF 4275-79.)  In

13  *Plata*, the court-appointed receiver has substantially completed his turn-around plan of action,

14  and is in the process of returning control of the medical care system back to the State.  (*See* Jan. 7,

15  2013 Motion, *Coleman* ECF 4280-82.)  The independent State Inspector General's assessments of

16  the medical system show that prisons now consistently provide inmates with timely and effective

17  medical care.  (Decl. Jeffrey Beard Supp. Resp. ¶ 9 & Ex. 1.)  Based on the overwhelming

18  evidence that the health care system far exceeds constitutional standards, the State moved to

19  terminate *Coleman*, and vacate or modify the population cap imposed by this Court.

20      Unfortunately, neither the *Coleman* court nor this Court gave full or fair consideration to

21  the substantial evidence Defendants presented showing the quality health care system that now

22  exists.  The *Coleman* court improperly excluded the State's expert reports and disregarded over

23  50 other declarations from state officials demonstrating that the State has more than satisfied the

24  _____

25      [1] The mental health experts have unimpeachable credentials.  For example, Dr. Joel
    Dvoskin, a clinical psychologist, has consulted with at least 30 states regarding their public

26  mental health care systems.  In fact, he testified that California's mental health care system fell
    far below constitutional standards at the 1994 trial in *Coleman*.  Dr. Charles Scott, a forensic

27  psychiatrist and Chief of the Division of Psychiatry and Law and the University of California,
    Davis Medical Center, is the author of several publications on prison mental health care,

28  including *The Handbook of Correctional Mental Health Care*.  (*Coleman* ECF 4275.)

2

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

six core elements of a constitutional mental health care system. (*See* Coleman ECF 4275-79, 4429-34, 4436-44, 4446-48, 4450-84 & 4508.) This Court mistakenly declared that Defendants had abandoned their argument that the system fully satisfies constitutional standards when Defendants had done nothing of the sort. It is imperative that the State's motions be decided based on a full examination of the <u>current</u> state of the prison health care system. This is especially true given the significant cost and intrusiveness of these decades-old cases, and the serious public safety issues implicated by the population cap. (*See* Beard & Stainer Decls.) For all these reasons, Defendants are preparing an appeal to the United States Supreme Court.

The Court and Defendants share a commitment to ensure that California provides a constitutional level of health care to its prisoners. As briefly summarized above and set forth in Defendants' prior filings, further court-compelled inmate reductions are no longer needed given population reductions already achieved and the quality of health care now provided. (*See* Termination Motion & Modification Motion.) Further reductions would not improve the quality of health care. (*See* Beard Decl.) And there is an additional reason, not previously considered by this Court, why the legislative remedies urged by the Court should not be implemented: because ordering such changes now ignores the impact that such changes would have on other components of the State's criminal justice system, which carry the serious risk of undermining the gains achieved under realignment. (*See id.* at ¶¶ 11-16.)

Although the Supreme Court order in this case obviously had a significant influence, realignment was achieved because it made sense for sound policy and public safety reasons. (Beard Decl. ¶ 12.) It was also achieved because it was developed in collaboration with all impacted stake-holders, including sheriffs, probation officers, police chiefs, district attorneys, county officials, mental health providers, community leaders, and state legislators. (*See id.*) While realignment has reduced the prison population, it has also increased county jail populations and placed increased demands on county probation departments and local mental health and drug treatment services. (*Id.* at ¶ 13.) Counties are working admirably to handle the big challenges realignment presents, but those challenges are real and substantial. (*Id.*) Realigning the few remaining lower-level but nevertheless serious offenses, and further increasing the parole

3

1  population by expediting the release of prisoners, would require the counties to incarcerate and

2  supervise even more offenders.[2]  (*Id.*)  Now is absolutely *not* the time to impose further

3  obligations on already strained counties.  (*Id.*)

4      Piling more responsibilities on the counties at this point could jeopardize realignment

5  itself by eroding its support and creating a climate that could lead to the law being changed.  (*Id.*

6  at ¶ 14.)  Realignment currently has its critics who would like to scale it back or even repeal it

7  outright.  (*Id.*)  Any time violent crimes are committed, critics try to draw a connection to

8  realignment.  (*Id.*)  Much of this criticism is politically motivated and off base.  (*Id.*)  And thus far,

9  the critics have not been successful in advancing legislation that would shift lower-level offenders

10  or parole violators back to the State.  (*Id.*)  In large part, these efforts have been unsuccessful

11  because Defendants have worked in collaboration with the Legislature and stakeholders to make

12  realignment work.  (*Id.*)

13      Some further prison reform measures might be good ideas in the abstract, but if

14  implemented now, could work against the tremendous progress the State has already made and

15  jeopardize public safety.  (*See generally* Plan Section III; Beard Decl. ¶ 15.)  An example of the

16  unintended and harmful consequences of implementing further steps to reduce the prison

17  population is the risk to public safety caused by the potential early release of offenders from

18  county jails due to limitations on their capacity.  (Beard Decl. ¶ 16.)

19      As compelled by the Court's order, Defendants submit a list of all population measures

20  identified as possible remedies during the course of these proceedings.  And because this Court

21  has compelled them to do so, Defendants submit the required plan.  The Court's directive,

22  however, that Defendants use their "best efforts" to implement the measures in the required plan

23  is inherently vague, especially given that they lack the authority to implement most of the

---

24

25  [2] As recognized experts from the Stanford Criminal Justice Center recently observed, "it is critically important to remember that even those identified as "low" and "medium" risk prisoners using California's Risk Assessment have historically had high recidivism rates."  *See*

26  http://www.law.stanford.edu/publications/looking-past-the-hype-10-questions-everyone-should-ask-about-california%E2%80%99s-prison-realignment at 295.  And 41% of prisoners classified

27  as a "low" risk and 57% of inmates classified as "medium" risk were returned to California prisons.  *Id.*

28

4

1  measures.  (*See* List & Plan.)  Nearly all of the measures would require the Legislature's approval

2  to implement.  (*See id.*)  The Court's "best efforts" directive certainly cannot mean that the

3  Governor must advocate for the Legislature to pass measures that would jeopardize public safety

4  or the population reductions achieved under realignment.  Nonetheless, the Governor and

5  Defendants will comply with the directive in good faith.

6      Defendants will take the unusual step of drafting legislative language for these measures,

7  and will submit that language to the Legislature for its consideration.  (*See id.*)  Once the draft

8  language has been submitted, obviously it will be up to the Legislature to determine whether the

9  language should be introduced as a bill and advanced through the legislative process.[3]  Cal.

10  Const. art. IV.

11  **COURT-ORDERED LIST OF PROPOSED POPULATION-REDUCTION MEASURES**

12      The Court has ordered the State to submit a list of "all prison population measures"

13  identified in this litigation, including possible measures identified in this Court's August 4, 2009

14  and April 11, 2013 orders.  The Court directs Defendants to list the "measures in the order that

15  defendants would prefer to implement them, without regard to whether in Defendants' view they

16  possess the requisite authority to do so."  (Apr. 11, 2013 Prisoner Release Order ¶ 1.)

17      For the reasons set forth in the Introduction, Defendants believe that further population

18  reduction measures are unnecessary because of the constitutional adequacy of the State's prison

19  health care system.  (*See* ECF 2506-08/4275-82, 4429-34, 4436-44, 4446-48, 4450-84 & 4508.)

20  Defendants' "preference" is not to pursue implementation of any measure listed below, other than

21  complete scheduled construction projects and expand fire camp capacity.  (Decl. Jeffrey Beard

22  Supp. Resp. ¶ 7.)  Nevertheless, because the Court compels Defendants to prepare a list of

23  measures, Defendants do so in no particular order of preference.

24

25  _____

26      [3] If the Legislature immediately passes those measures as urgency legislation, and does not pass any other measures that shift prisoners back to the State, then by December 2013, the State will come within 2,570 inmates (*i.e.*, within 2.2%) of satisfying the court-ordered

27  population target, and will fully satisfy the court-ordered target in June 2014 and June 2015. (Decl. Jay Atkinson Supp. Resp. ¶ 21.)

28

5

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

### 1. New Construction.

The California Health Care Facility in Stockton, an $840 million, 1.2 million square foot facility that will provide 1,722 beds, is set to open in July 2013. (Beard Decl. ¶ 17.) This project will increase design bed capacity by 1,722 beds by December 31, 2013. (*Id.*) The DeWitt Nelson Correctional Annex in Stockton will add 1,133 more beds in early 2014. (*See id.*)

### 2. Expand Fire Camp Capacity.

Defendants' January 7, 2013 filing anticipated that the State's prison population would be reduced by 2,500 through fire camp eligibility by December 2013. (Jan. 7, 2013 Decl. Brenda Grealish Ex. A, ECF 2512-1/4285-1.) Defendants will increase the number of inmates placed in fire camps because there are about 1,250 more of these low-level inmates than originally projected. (Decl. Michael Stainer Supp. Resp. ¶ 7.) No further authorization is required to implement this measure, and Defendants estimate that implementation will reduce the prison population by 1,250 inmates by December 31, 2013. (*Id.*) Defendants have identified the following steps necessary to implement this measure:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);
- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);
- Train staff regarding implementation (complete by approximately August 1, 2013); and
- Obtain approval from Classification Staff Representatives for placement of inmates who meet the criteria (complete by approximately September 1, 2013).

(*Id.*)

### 3. Obtain a Legislative Appropriation of Funds to Expand In-State Contract Capacity.

Defendants estimate that the prison population could be reduced by approximately 1,600 inmates by December 31, 2013 by increasing use of available leased jail capacity. (Beard Decl. ¶ 18.)

Defendants do not have the authority to implement this measure. (*Id.* ¶ 19.) To effect this change, the Legislature would need to amend or waive the following specific statutory provisions:

6

- Cal. Gov't Code §§ 4525-4529.20, 4530-4535.3, 7070-7086, 7105-7118, & 14835-14837, to amend state contracting requirements;

- Cal. Gov't Code §§ 13332.10, 14660, 14669, 15853, to amend provisions governing acquisition and leasing of real property;

- Cal. Gov't Code § 14616, to amend provisions governing approval of contracts by the Department of General Services;

- Cal. Gov't Code §§ 18500 *et seq.*, the State Civil Service Act;

- Cal. Gov't Code § 19130(a)(3), which prohibits contracts which "cause the displacement of civil service employees";

- Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison);

- Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be served in state prison);

- Cal. Penal Code § 1216 (requiring sheriffs to deliver to the warden of a CDCR institution any felon sentenced to state prison); and

- Cal. Penal Code §§ 2900 & 2901, requiring CDCR to maintain custody of all inmates until the completion of their sentence.

(*Id.* at ¶ 20.)  For passage as urgency legislation under Article 4, section 8(d) of the Constitution, these statutory changes would require a two-thirds vote of the Legislature.  Cal. Const. art. 4 § 8(d) ("Urgency statutes are those necessary for immediate preservation of the public peace, health, or safety.").

Defendants estimate that, once these laws are modified or waived, it will take approximately 9 months to fully implement this measure.  (Beard Decl. ¶ 21.)  This time is necessary to permit Defendants to coordinate with the counties to establish a process to determine which inmates meet the criteria for retention in county jails and to negotiate contracts.  (*Id.*)  Defendants must also develop policies and procedures to implement this program.  (*Id.*)

Defendants have identified the following additional steps necessary to implement this measure once the necessary statutory and regulatory authority is obtained:

- Negotiate contracts to expand capacity (complete by approximately July 1, 2013);

- Train staff regarding implementation (complete by approximately August 1, 2013).

(*Id.*)

### 4.  Legislative Changes to State Law to Increase Prison Credits.

In its 2009 Order, the Court discussed early releases through expansion of the good-time credits system.  (Aug. 4, 2009 Order 139-45.)  In its April 11, 2013 order, the Court again expressed its strong opinion that the good-time credits system should be expanded.  (Apr. 11, 2013 Order 67-68.)  As the Court acknowledged, in 2009, the Legislature enacted Senate Bill 18, which increased credit-earning capacity by providing eligible inmate or parole violators: (1) up to six weeks of credit per year for completion of approved programs; (2) one day of credit for each day served (for parole violators); (3) two days of credit for every one day served once an inmate is endorsed to transfer to a fire camp (rather than providing such credit after the inmate participates in the camp); (4) one day of credit for every day served for all eligible inmates, regardless of wait-list status, whether the inmate is participating in college, or being processed in a reception center, so long as the inmate is discipline-free; and (5) one day of sentence credit for every day served in county jail from the time of sentencing (rather than one day of credit for every two days served in county jail).  S.B. 18, 2009-2010 Leg., Reg. Sess. (Cal. 2009).

Several additional credit-earning measures have been proposed by the Court and by Plaintiffs, who as inmates have a self-interest in shortening their prison sentences.  (Beard Decl. ¶ 15.)  These measures would amount to an early release of inmates that Defendants believe would pose an undue risk to public safety.  (Stainer Decl. ¶¶ 17, 22, 26, & 31.)

### a.  Change State Law to Allow Minimum Custody Inmates to Receive 2-for-1 Credits.

If inmates housed in minimum custody facilities were to have their credit-earning rate increased to "two-for-one"—the same level of credit earning for inmates in fire camps— Defendants estimate that the population would be reduced by 148 inmates by December 31, 2013.  (Atkinson Decl. ¶ 7.)  If this measure is applied retroactively, the population could be reduced by an additional 89 inmates, for a total reduction of 237 inmates.  (*Id.* at ¶ 8.)  Plaintiffs' expert, James Austin, estimated that retroactive application of this measure would reduce the population by 4,000 inmates within four months of implementation.  (Decl. James Austin 11 & Table 4, ECF

8

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

2509-1/4283-1.)[4]  If implemented, each of these inmates would be "released" as a result of this measure for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

Defendants have no authority to implement this measure.  (Stainer Decl. ¶ 18.)  To effect this change, the Legislature would need to amend Penal Code § 2933.3 to include inmates assigned to minimum support facilities among those who are currently eligible under the law to receive two-for-one credit earning.  (*Id.*)  Violent inmates are currently capped at 15 percent credit earning, so amendment to Penal Code section 2933.1 is also required.  In addition, CDCR would need to amend Cal. Code Regs. tit. 15 §§ 3042 *et seq.* & 3044(b)(1) to permit inmates housed in minimum support facilities to receive two-for-one credit earning.  (*Id.*)  Because this measure requires regulatory changes subject to the Administrative Procedures Act (APA), the Legislature would need to waive the requirements of the APA to enable implementation of this measure before December 31, 2013.  *See* Cal. Gov't Code § 11340 *et seq.*  For passage as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature.  Cal. Const., art. 4, § 8(d).

Defendants estimate that, once the necessary authority is obtained, CDCR will need approximately 90 days to implement this measure.  (Stainer Decl. at ¶ 20.)  Accordingly, the latest date by which these provisions must be amended in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013.  (*Id.*)

Defendants have identified the following additional steps necessary to implement this measure once the necessary statutory and regulatory authority is obtained:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

---

[4] Mr. Austin's estimates of the population reduction effects from credit reform measures are inaccurately high for a variety of reasons: (1) Mr. Austin applied rounding throughout his estimates which embedded inaccuracies throughout his calculations; (2) Mr. Austin did not base his estimates on the "average daily population," which inflated his estimates; (3) Mr. Austin's calculations were less detailed than CDCR's, which tends to increase variance; (4) Mr. Austin did not adequately account for overlap between the population-reduction categories; and (5) Mr. Austin's calculations apply credits to sex offenders, which CDCR did not include for public safety reasons.  (Jan. 7, 2013 Decl. Brenda Grealish ¶ 15, ECF 2512/4285.)

9

- Train staff regarding implementation (complete by approximately August 1, 2013); and

- Review files for each inmate who meets the criteria and recalculate credits (complete between approximately August 1 and December 1, 2013).

(*Id.* at ¶ 21.)

### b.    Change State Law to Increase "Milestone Completion" Credits for Violent and Second Strike Offenders.

Defendants estimate that the prison population could be reduced by 126 inmates by December 31, 2013 by providing "milestone completion" credits to violent, serious, and second-strike inmates who are currently ineligible to receive such credits.  (Atkinson Decl. ¶¶ 9 & 10.) These totals include 64 violent (non-strike) offenders and 62 second-strike inmates.  (*Id.* at ¶ 10.) This measure would also increase the credit-earning cap from six to eight weeks.  (*Id.*)  If this measure is applied retroactively to the start of each eligible inmate's sentence, the population could be reduced by an additional 1,134 inmates, for a total reduction of 1,260 inmates.  (*Id.* at ¶ 11.)  Extending these credits to violent and second-strike inmates would effectuate their "release" for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

Defendants have no authority to implement this measure.  (Stainer Decl. ¶ 23.)  To effect this change, the Legislature would need to amend (1) Penal Code § 2933.1 to permit violent offenders to receive more than 15% credit earning capacity; (2) Penal Code § 667(c)(5) & 1170.12(a)(5) to permit second-strike felons to receive more than 20% credit earning capacity; (3) Penal Code § 2933.05(a) to expand the credit-earning cap to eight weeks; and (4) Penal Code § 2933.05(e) to permit inmates sentenced under the Three-Strike Law, Penal Code section 290 (sexual offenders), and violent offenders, to receive program credits.  (*Id.*)  For passage as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature. Cal. Const., art. 4, § 8(d).  In addition, amendment of these provisions would require a two-thirds vote of the Legislature or voter approval through the initiative process.  Cal. Pen. Code § 1170.12(g).

Defendants estimate that, once the necessary authority is obtained, CDCR will need approximately 90 days to implement this measure.  (Stainer Decl. ¶ 24.)  Accordingly, the latest

date by which these provisions must be amended in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013.  (*Id.*)

Defendants have identified the following additional steps necessary to implement this measure:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

- Train staff regarding implementation (complete by approximately August 1, 2013); and

- Review files for each inmate who meets the criteria and recalculate credits (complete between approximately August 1 and December 1, 2013).

(*Id.* at ¶ 25.)

### c.    Change State Law to Expand Credit-Earning Limits for Violent and Non-Violent "Second Strike" Felons.

Defendants estimate that the prison population could be reduced by 66 inmates by December 31, 2013 if the credit-earning capacity of inmates convicted of "second-strike" felonies (excluding sex offenders) is expanded from 20% to 34%.  (Atkinson Decl. ¶ 13.)  This total includes 29 second-strike inmates convicted of a violent offense, and 37 second-strike inmates convicted of a non-violent offense.  (*Id.*)  If this measure is applied retroactively, it could reduce the population by an additional 347 violent second-strike inmates and 2,043 non-violent second-strike inmates, for a total reduction of 2,456 inmates.  (*Id.*)  Plaintiffs' expert, James Austin, estimated that retroactive application of this measure would reduce the population by 6,034 inmates within four months of implementation.  (Decl. James Austin 11 & Table 4, ECF 2509-1/4283-1; *see* footnote 4.)  Expanding credit-earning capacity for these second-strike inmates would effectuate their "release" for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

Defendants have no authority to implement this measure.  (Stainer Decl. ¶ 27.)  To effect this change, the Legislature must amend Penal Code §§ 667(c)(5) and 1170.12(a)(5) to permit second-strike felons to receive more than 20% credit earning capacity.  (*Id.*)  Amendment of these provisions requires a two-thirds vote of the Legislature or voter approval through the initiative

11

1    process, because they are part of the Three-Strikes Law.  Cal. Pen. Code § 1170.12(g).  Passage

2    as urgency legislation would also require a two-thirds vote of the Legislature.  Cal. Const., art. 4,

3    § 8(d).

4        Defendants estimate that, once the necessary authority is obtained, CDCR will need

5    approximately 90 days to implement this measure.  (Stainer Decl. ¶ 28.)  Accordingly, the latest

6    date by which these provisions must be amended in order for Defendants to be able to implement

7    this measure by December 31, 2013 is August 15, 2013.  (*Id.*)

8        Defendants have identified the following additional steps necessary to implement this

9    measure:

10    • Issue directive to the field regarding implementation of this measure (complete by
      approximately July 8, 2013);

11

12    • Identify the inmates who meet the criteria contemplated by this measure (complete by
      approximately August 1, 2013);

13    • Review files for each inmate who meets the criteria and recalculate credits (complete
      between approximately August 1 and December 1, 2013).

14

      (*Id.* at ¶¶ 28-30.)

15

16            **d.    Change State Law to Expand Credit-Earning Limits for Violent
                      (Non-Strike) Felons.**

17        Defendants estimate that the prison population could be reduced by 317 inmates by

18    December 31, 2013 if the credit-earning capacity of inmates convicted of violent felonies without

19    a strike (excluding sex offenders) is expanded from 15% to 34%.  (Atkinson Decl. ¶ 14.)  If this

20    measure is applied retroactively, it could reduce the population by an additional 1,362 inmates,

21    for a total reduction of 1,679 inmates.  (*Id.*)  Plaintiffs' expert, James Austin, estimated that

22    retroactive application of this measure would reduce the population by 9,364 inmates within four

23    months of implementation.  (Decl. James Austin 11 & Table 4, ECF 2509-1/4283-1; *see* footnote

24    4.)  Expanding credit-earning capacity for these inmates convicted of violent felonies would

25    effectuate their "release" for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

26        Defendants have no authority to implement this measure.  (Stainer Decl. ¶ 32.)  To effect

27    this change, the Legislature would have to amend Penal Code § 2933.1 by a majority vote to

28    permit violent offenders to receive more than 15% credit earning capacity.  (*Id.*)  For passage as

                                        12

urgency legislation, these statutory changes would require a two-thirds vote of the Legislature. Cal. Const., art. 4, § 8(d).

Defendants estimate that, once the necessary authority is obtained, CDCR will need approximately 120 days to implement this measure. (Stainer Decl. ¶ 33.) Accordingly, the latest date by which these provisions must be amended in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013. (*Id.*)

Defendants have identified the following additional steps necessary to implement this measure:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013); and

- Review files for each inmate who meets the criteria and recalculate credits (complete between approximately August 1 and December 1, 2013).

(*Id.* at ¶ 34.)

### 5. Diversion of Technical Parole Violators.

In its 2009 order, the Court discussed diversion of technical parole violators as a population-reduction measure. (Aug. 4, 2009 Order 145-49.) The State successfully accomplished diversion of technical parole violators through realignment. *See* A.B. 109, 2011-2012 Leg., Reg. Sess. (Cal. 2011). Realignment is a major sentencing reform that diverts lower level offenders and parole violators to local authorities while dedicating resources for evidence-based community rehabilitative programs. *See id.* The Legislature implemented these changes by reforming the penal code to shift incarceration and post-release responsibilities for non-violent, non-serious, and non-sex-related offenses from the State to the counties. *Id.* Since October 2011, the in-state prison population has been reduced by nearly 25,000 inmates, and a substantial portion of that reduction has been achieved through the successful diversion of technical parole violators. *Id.* Based on the population reductions obtained through realignment, there are no additional meaningful reductions to be achieved via this measure. (Beard Decl. ¶ 11.)

13

Amended Defs.' Resp. to April 11, 2013 Order; Court-Ordered List of Population Reduction Measures & Plan
Case Nos. 2:90-cv-00520 LKK JFM P & C01-1351 TEH

**6. Diversion of Low-Risk Offenders to Community Corrections.**

In its 2009 order, the Court discussed diversion of low-risk offenders with short sentences for community sanctions. (Aug. 4, 2009 Order 149-52.)  The State successfully accomplished diversion of low-risk offenders to the counties through realignment. *See* A.B. 109, 2011-2012 Leg., Reg. Sess. (Cal. 2011).  Realignment is a major sentencing reform that diverts lower level offenders and parole violators to local authorities while dedicating resources for evidence-based community rehabilitative programs. *See id.*  The Legislature implemented these changes by reforming the penal code to shift incarceration and post-release responsibilities for non-violent, non-serious, and non-sex-related offenses from the State to the counties. *Id.*  Since October 2011, the in-state prison population has been reduced by nearly 25,000 inmates, and a substantial portion of that total reduction is has been achieved through the successful diversion of low-risk offenders. (Beard Decl. ¶¶ 11-16.)  Based on the population reductions achieved obtained through realignment, there are no additional meaningful reductions to be achieved via this measure. (*Id.* at ¶ 11.)

**7. Expansion of Evidence-Based Rehabilitative Programming.**

In its 2009 order, the Court discussed expansion of evidence-based rehabilitative programming as a measure to reduce recidivism. (Aug. 4, 2009 Order 152-54.)  As discussed above, realignment dedicated substantial resources for evidence-based community rehabilitative programs.  The State annually appropriates substantial funding to the counties to compensate them for their additional responsibilities under Realignment. *See* A.B. 109, Leg. Counsel's Digest, at 7.  Local officials may use this funding for rehabilitative programs that more effectively reintegrate lower level offenders into their communities. *See* A.B. 109, 2011-12 Leg., Reg. Sess. (Cal. 2011).

The State has also improved rehabilitative programming in prison.  The State's post-realignment prison plan funds the expansion and improvement of evidence-based rehabilitative programming. (*The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Court Oversight, and Improve the Prison System*, Apr. 23, 2012, available at: http://www.cdcr.ca.gov/2012plan/docs/plan/complete.pdf, at 21-27 and Appx. B & D.)  Under the

14

Blueprint, the State is increasing the percentage of inmates served in rehabilitative programs to reach the goal of 70%.  (*Id.*)  Reentry hubs are being created to provide services to inmates that will ensure successful integration into society.  (*Id.*)  The Blueprint adds academic teachers and vocational instructors, creates programs tailored toward job readiness skills, and establishes career centers.  (*Id.*)  The State is also enhancing substance abuse treatment and is expanding and creating cognitive behavioral therapy programs, such as anger management, criminal thinking, and family relationships.  (*Id.*)  The Blueprint also provides for the development of sex offenders treatment and gang prevention programs, as well as enhanced case management to ensure that inmates are properly placed in programs to meet their needs.  (*Id.* at 24-25.)

Defendants began to implement these measures in Fiscal Year 2012-2013, and continue to expand programs through Fiscal Year 2013-2014 to ultimately reach the 70% goal.  (Decl. Tanya Rothchild Supp. Resp. ¶ 4.)  CDCR began program expansion to academic education in September 2012, and has met the plan in the *Blueprint* to hire 88 teachers in Fiscal Year 2012-2013.  (*Id.*)  With the hiring of these teachers, as well as prior vacant positions, by February 2013 CDCR was able to increase student enrollments by over 8,000 students.  (*Id.*)  CDCR also continues to expand its career technical education programs, substance abuse programs, and pre-release programs.  (*Id.* at ¶¶ 5-7.)

Moreover, in 2009, the Legislature enacted Senate Bill 18 (and subsequently enacted Senate Bill 678) to provide funding to counties to provide community-corrections programs, and implement and expand evidence-based programs for felony probationers.  S.B. 18, 2009-2010 Leg., Reg. Sess. (Cal. 2009).  Senate Bill 18 authorized CDCR to collaborate with the state court system to establish and expand drug and mental health courts for parolees, with highly-structured rehabilitative treatment in lieu of prison time for parole violations.  *Id.*

### 8.  Proposition 36.

In November 2012, California voters passed Proposition 36, which reformed California's "Three Strikes" sentencing law to impose a life sentence only when the third-strike felony conviction is serious or violent.  Cal. Pen. Code § 1170.126.  Proposition 36 also authorizes re-sentencing for inmates currently serving a life term for a third-strike conviction that was not

15

serious or violent, so long as the re-sentencing does not pose an unreasonable risk to public safety. *Id.* No further authorization is required for this measure, and Defendants estimate that this re-sentencing process will reduce the prison population by approximately 900 inmates by December 2013. (Decl. Kathy Allison Supp. Resp. ¶ 8.)

In their January 7, 2013 filing, Plaintiffs proposed circumventing the court-resentencing process established by Proposition 36, and advocated the outright release of eligible third-strike candidates. (*See* Austin Decl. ¶ 27 & Table 4, ECF 2509-1/4283-1.) But the release of inmates via Proposition 36 is entirely outside Defendants' control. (Allison Decl. ¶¶ 5 & 11.) Petitions to the court for resentencing must be initiated by inmates, not the State. Cal. Pen. Code §1170.126(b). Once an inmate files his petition, the court that imposed the original sentence holds a hearing to determine if a new sentence should issue. *Id.* at § 1170.126(f). Even if the inmate is eligible for resentencing, the court may find that he or she poses an unreasonable public safety risk and deny the petition. *Id.* The State has no input as to whether the inmate should be resentenced. Prop. 36, appr. Nov. 6, 2012, eff. Nov. 7, 2012. Thus, the State cannot "expedite" resentencing, as Plaintiffs propose, and certainly cannot ensure that the courts will decide to resentence all of the eligible third-strike petitioners.[5]

### 9. Change State Law to Expand Alternative Custody Program and Work Furlough/Restitution Centers.

Defendants estimate that the prison population could be reduced by approximately 100 inmates by December 31, 2013 by making female inmates incarcerated for serious or violent felonies eligible for the Alternative Custody Program. (Stainer Decl. ¶ 35.) If implemented, each

---

[5] The State recognizes its role in facilitating inmate access to the courts under Proposition 36. Specifically, it has posted information in all prisons with addresses for the courts and county public defenders. (Allison Decl. ¶ 6.) The State has provided lists of eligible offenders to county public defenders and district attorneys. (*Id.*) CDCR has provided the State Administrative Office of the Courts an estimate of the likely number of eligible cases to assist the courts in planning their calendars. (*Id.* ¶ 7.) And the State is working closely with the courts, district attorneys, and defense attorneys to expedite the production of records that will be used in resentencing hearings. (*Id.*)

of these inmates would be "released" as a result of this measure for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

Defendants do not have the authority to implement this measure.  (Stainer Decl. ¶ 38.)  To effect this change, the Legislature would need to amend or waive the following specific statutory provisions:

- Cal. Gov't Code § 14616, to amend provisions governing approval of contracts by the Department of General Services;

- Cal. Penal Code § 1170.05, which limits the Alternative Custody Program to female inmates who volunteer for the program;

- Cal. Penal Code § 6228, to expand the eligibility criteria for restitution center participants;

- Cal. Penal Code § 6260, to delete the first word "appropriate" and the phrase "only for specified types of inmates";

- Cal. Penal Code § 6263, to expand the eligibility criteria for work furlough programs; and

- Pub. Contracting Code §§ 20160 *et seq.*, to permit the State to enter into contracts with restitution centers.

(*Id.*)  In addition, CDCR would need to amend Cal. Code Regs., tit. 15, § 3078, to permit case-by-case review.  (*Id.*)  Because this measure requires regulatory changes subject to the APA, the Legislature would need to waive the requirements of the APA to enable implementation of this measure before December 31, 2013.  *See* Cal. Gov't Code § 11340 *et seq.*   For passage as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature.  Cal. Const., art. 4, § 8(d).

Defendants estimate that, once these laws are modified or waived, it will take between approximately six and twelve months to fully implement this measure.  (Stainer Decl. ¶ 40.)  Defendants have identified the following steps necessary to implement this measure once the necessary statutory and regulatory authority is obtained:

- Issue directive to the field regarding implementation of this measure (complete by approximately July 8, 2013);

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

17

- Develop contracts to activate additional program beds in the community to house female offenders. This process will take approximately six to nine months to complete, unless the laws governing state competitive bidding and contracting are waived;

- Develop a proposal for additional position authority (complete before approximately July 1, 2013);

- Recruit and fill new positions (complete between approximately August 1 and December 1, 2013);

- Complete negotiations with the impacted employee organizations (complete by approximately December 1, 2013;

- Develop training and train staff regarding implementation (complete by approximately December 1, 2013); and

- Review files for each inmate who meets the criteria (complete between approximately August 1 and December 1, 2013).

(*Id.* at ¶ 39.)

**10. Change State Law to Require County Jails to Retain Inmates With Nine Months Left To Serve On Sentence.**

Defendants estimate that the prison population could be reduced by approximately 1,313 inmates by December 31, 2013 if county jails retain all convicted felons currently housed in a jail who have nine months or less time to serve on their sentence. (Atkinson Decl. ¶ 18.) Plaintiffs' expert, James Austin, estimated that this measure would reduce the population by 2,560 inmates within four months of implementation. (Decl. James Austin 11 & Table 4, ECF 2509-1/4283-1; *see* footnote 4.)

Defendants do not have the authority to implement this measure. (Stainer Decl. ¶ 41.) To effect these changes, the Legislature would need to amend the following specific statutory provision:

- Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison;

- Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be served in state prison;

- Cal. Penal Code § 1216, requiring sheriffs to deliver to the warden of a CDCR institution any felon sentenced to state prison; and

- Cal. Penal Code §§ 2900 & 2901, requiring CDCR to maintain custody of all inmates until the completion of their sentence.

18

1  (*Id.*)  For passage as urgency legislation, these statutory changes would require a two-thirds vote

2  of the Legislature.  Cal. Const., art. 4, § 8(d).

3    Defendants estimate that, once the necessary laws are modified or waived, it will take

4  approximately 9 months to fully implement this measure.  (Stainer Decl. ¶ 42.)  This time is

5  necessary to permit Defendants to coordinate with the counties to establish a process to determine

6  which inmates meet the criteria for placement in county jails, and to negotiate contracts.  (*Id.*)

7  Defendants must also develop policies and procedures to implement this program.  (*Id.*)

8    Defendants have identified the following additional steps necessary to implement this

9  measure once the necessary statutory and regulatory authority is obtained:

10  - Negotiate contracts to expand capacity (complete by approximately July 1, 2013);

11  - Train staff regarding implementation (complete by approximately August 1, 2013);
   and

12
13  - Review files for each inmate who meets the criteria (complete between approximately
   August 1 and December 1, 2013).

14  (*Id.* at ¶ 43.)

15  **11. Change State Sentencing Laws to Expand Realignment by Reclassifying Felony
         Sentences to be Served in County Jail.**

16

17    In its 2009 order, the Court discussed sentencing reform as a potential population-

18  reduction measure.  (Aug. 4, 2009 Order 154-57.)  The State accomplished significant population

19  reductions by reclassifying numerous felonies to be punishable by incarceration in county jail

20  through Realignment.  *See supra* Section 5.

21    Defendants estimate that the prison population could be reduced by 305 inmates by

22  December 31, 2013 if additional felonies, which are currently punishable by state prison

23  (including drug possession, petty theft, second degree burglary, vehicle theft, and forgery), were

24  instead treated as punishable by incarceration in county jail only.  (Atkinson Decl. ¶ 17.)

25  Expanding the sentencing laws in this fashion would effectuate the "release" of these inmates for

26  purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

27
28

19

Defendants do not have the authority to implement this measure.  (Stainer Decl. ¶ 45.)  To effect this change, the Legislature would need to amend the following specific statutory provisions:

- Cal. Health & Safety Code § 11350(a), possession of a controlled substance, including cocaine;

- Cal. Health & Safety Code § 11377(a), possession of a controlled substance, including methamphetamine;

- Cal. Penal Code §§ 484 *et seq.*, petty theft;

- Cal. Penal Code §§ 458 *et seq.*, second degree burglary;

- Cal. Penal Code § 473, forgery; and

- Cal. Veh. Code § 10851, vehicle theft.

(*Id.*)  For passage as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature.  Cal. Const., art. 4, § 8(d).  The only additional step necessary to implement this measure would be for Defendants to issue direction to the field, which could be accomplished by July 8, 2013.  (*Id.*)

### 12. Under a State of Emergency Declaration, Refusing Admission to Prison for Convicted Felons.

Plaintiffs have proposed that the Secretary of CDCR declare a state of emergency and apply Penal Code Section 2900(b)(1) to refuse to admit certain convicted felons into prison.  (*See, e.g.,* Pls.' Resp. to Oct. 11, 2012 Order 10, ECF 2509/4283.)  Section 2900(b)(1) states in relevant part, "As an emergency measure, the Director of Corrections may direct that persons convicted of felonies may be received and detained in jails or other facilities … and that any persons previously received and confined for conviction of a felony may be, as an emergency, temporarily housed at such place and the time during which such person is there shall be computed as a part of the term of judgment."  Cal. Penal Code § 2900(b)(1).

Defendants do not have the authority to implement this measure, even under Plaintiffs' strained reading of Penal Code  Section 2900(b)(1).  That emergency provision contemplated natural disasters and major disturbances such as earthquakes and riots that required the temporary housing of inmates in other settings.  *See, e.g.,* Cal. Code Regs. tit. 15 §§ 1006 (defining

20

1  emergency); 3302 (requiring emergency preparedness plan for emergency situations such as war,

2  earthquakes, seismic sea waves, flood, fire, civil disturbance, industrial accident, and pollution).

3  No such condition exists that would permit the State to refuse the admission of individuals who

4  have been duly convicted of felony offenses in state courts punishable by terms of imprisonment.

5  (Jan. 8, 2013 Proclamation by the Governor of the State of California, available at http://www.

6  gov.ca.gov/news.php?id=17886 [last viewed May 1, 2013].)

7       Moreover, even if the Secretary could exercise this emergency power, it would create a

8  public safety risk because it would effectively eliminate the punishment for newly convicted

9  offenders sent to prison for serious or violent felonies.  If turned away by the prison system, no

10  law obligates the counties to then incarcerate these offenders, most of whom would be sentenced

11  to lengthy prison terms.  They would essentially be immediately set free following their

12  convictions.

13       **13. The Governor Was Required by State Law to Rescind the Overcrowding**
14              **Emergency Proclamation, and no Circumstances Exist that Would Justify a New Declaration of Emergency.**

15       The Court's criticism of Governor Brown for having rescinded the prior administration's

16  2006 Emergency Proclamation betrays a fundamental misunderstanding of the Governor's legal

17  obligations under the Emergency Services Act.  (*See* Apr. 11, 2013 Order at 20.)

18       California law compels the Governor to "proclaim the termination of a state of emergency

19  at the earliest possible date that conditions warrant."  Cal. Gov't Code § 8629.  The Governor's

20  power to declare a state of emergency under the Emergency Services Act is a function of statute,

21  limited to situations of "extreme peril" to the public welfare, and must be supported by factual

22  findings.  Cal. Gov't Code §§ 8550 et seq.  In 2006, when Governor Schwarzenegger invoked the

23  Emergency Services Act to declare a prison overcrowding state of emergency, the prison

24  population totaled 166,148 inmates.  *California Corr. Peace Officers' Ass'n v. Schwarzenegger*,

25  163 Cal.App.4th 802, 807 (2008).  Moreover, it was undisputed at the time that overcrowding:

26

27         (1) heightened the risk of inmate violence against other inmates and
       prison staff, (2) caused power failures that jeopardized prison
       security, (3) resulted in sewage spills and environmental
28         contamination that polluted groundwater and increased the risk of

21

1

2

transmission of infectious illnesses, and (4) required the early
release of offenders from county jails because of the inability of the
California Department of Corrections and Rehabilitation (CDCR) to
expeditiously move inmates from jails to state prisons.

3    *Id.* In upholding then-Governor Schwarzenegger's declaration of emergency, the California

4    Court of Appeal emphasized that prison overcrowding had "substantially increased the risk of

5    transmission of infectious diseases" to the general public, overtaxed prison wastewater systems

6    that resulted in "thousands of gallons of sewage spills which polluted the environment and

7    contaminated groundwater," and presented other conditions of "extreme peril" that "[are] likely to

8    affect an area within the jurisdiction of local government." *Id.* at 817, 819.

9        By the end of 2012, all conditions that justified the emergency proclamation ceased to

10    exist. (Jan. 8, 2013 Proclamation by the Governor of the State of California.) In the

11    Proclamation, the Governor specifically addressed the factual underpinnings of the 2006

12    Proclamation and determined that they had subsided. (*Id.*) Moreover, the current prison

13    population of 119,542 inmates bears no resemblance to the population in October 2005 that

14    caused Governor Schwarzenegger to issue the Emergency Proclamation. (See Apr. 15, 2013

15    Report, ECF 2593/4552.) Indeed, the current population is at its lowest level since April 1995.

16    (*See* CDCR May 4, 1995 Monthly Report of Population, available at: http://www.cdcr.ca.gov/

17    Reports_Research/ Offender_Information_ Services_Branch/Monthly/ TPOP1A/

18    TPOP1Ad9504.pdf.)

19        Based on current conditions, California law required the Governor to terminate the

20    Emergency Proclamation. Cal. Gov't Code § 8629. This Court's disagreement with the evidence

21    demonstrating quality medical and mental health care in California's prisons does not alter the

22    Governor's non-discretionary duty to terminate a state of emergency "at the earliest possible date

23    that conditions warrant." *Id*.

24        **14.    Change State Law for Diversion of Felony Probation Violators.**

25        Plaintiffs propose diverting felony technical probation violators to county jails to serve

26    their sentences upon revocation. (Austin Decl. ¶ 26 & Table 4, ECF 2509-1/4283-1.) Defendants

27    estimate that the prison population could be reduced by approximately 46 inmates by December

28    31, 2013 if this measure were implemented. (Atkinson Decl. ¶ 20.) Plaintiffs' expert, James

22

Austin, estimated that retroactive application of this measure would reduce the population by 2,502 inmates within four months of implementation.  (Austin Decl. ¶26 & Table 4, ECF 2509-1/4283-1; *see* footnote 4.)  Diverting technical probation violators who have been sentenced to prison by a state court judge would effectuate their release for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

Defendants do not have authority to implement this measure.  (Stainer Decl. ¶ 47.)  To effect this change, the Legislature would need to amend Penal Code §§ 1203.2 & 1203.3 to limit state judges' discretion to revoke probation and send inmates to prison.  (*Id.*)  For passage as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature. Cal. Const., art. 4, § 8(d).

### 15. Change State Law to Allow Early Releases of Inmates Convicted to a Life Sentence with the Possibility of Parole.

The Court has suggested that Defendants could release convicted felons sentenced to life with the possibility of parole.  (Apr. 11, 2013 Order at 66-67.)  In support of this assertion, the Court states that some "lifers" have not committed "horrendous" crimes.  (*Id.* at n.47.)  As an example, the Court cites the case of Brian Sass, who used his car while driving under the influence to kill a mother and her unborn child.  *See Sass v. California Bd. of Prison Terms*, 376 F. Supp. 2d 975, 977 (E.D. Cal. 2005).

Plaintiffs similarly propose releasing "low risk" inmates sentenced to life with the possibility of parole who are past their "minimum eligible parole date."  (*See* Austin Decl. ¶¶ 28-29 & Table 4, 2509-1/4283-1.)  Plaintiffs' expert estimates that 3,930 inmates in this category could be released within four months of implementation.  (*See id.*)  Plaintiffs' proposal inappropriately circumvents the carefully considered risk determinations of the Board of Parole Hearings, and would violate the constitutional rights of crime victims to be heard in parole proceedings.  (Decl. Jennifer Shaffer Supp. Resp. ¶ 3.)

Mr. Austin's estimate that 96% of eligible life inmates are "low-risk" is simply wrong. Mr. Austin erroneously applied recidivism rates of "lifer" inmates who were released—*i.e.,* the inmates who were already found by a Board of Parole Hearings panel to "no longer pose an

23

1  unreasonable risk to public safety"—to the *entire* "lifer" population.  (*Id.*)  On the contrary, since

2  the vast majority of "lifers" currently eligible for parole consideration have been denied parole by

3  a Board panel following extensive review and hearing, the evidence and indeed logic would

4  dictate that most of these inmates continue to pose an unreasonable risk to public safety.  (*Id.*)

5  Consequently, the recidivism rates of these inmates can be expected to be substantially higher if

6  they were released.  (*Id.*)  A more appropriate calculation yields an estimate of approximately 700

7  eligible inmates in this category.  (*Id.* at ¶ 5-6.)

8         Defendants do not currently possess the authority to release inmates prior to completion of

9  their prison terms.  (Stainer Decl. ¶ 48.)  To effect this change, the Legislature would need to

10  amend the following specific constitutional provisions and statutes:

11  - Article I, section 28(f)(5) of the California Constitution would need to be amended or
    waived to permit sentences to be "substantially diminished by early release policies
12    intended to alleviate overcrowding in custodial facilities."  Amendment of this provision
    would require a three-fourths vote of the Legislature or voter approval through the
13    initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

14  - Article I, section 28(a)(5) of the California Constitution would need to be amended or
    waived.  Amendment of this provision would require a three-fourths vote of the
15    Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10
    & art. 18;

16
17  - Article I, sections 28(b)(3), (b)(7), (b)(8), (b)(12), (b)(15), (b)(16), and (c)(1) would
    need to be amended or waived to permit the release of inmates without providing the
    required notice and opportunity to be heard for victims of crime under Marcy's Law.
18    Amendment of these provisions would require a two-thirds vote of the Legislature or
    voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

19
20  - Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison;

21  - Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be served
    in state prison); and

22  - Cal. Penal Code §§ 3040 *et seq.* would need to be amended or waived to circumvent the
    parole suitability process.

23
24  (*Id.*)  In addition, CDCR would need to amend Cal. Code Regs. tit. 15, chapters 1 & 3 of

25  Division 2, to circumvent the parole suitability process.  (*Id.*)  Because this measure requires

26  regulatory changes subject to the APA, the Legislature would need to waive the requirements of

27  the APA to enable implementation of this measure before December 31, 2013.  *See* Cal. Gov't

28

24

Code § 11340 *et seq.* For passage as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature. Cal. Const., art. 4, § 8(d).

Defendants estimate that implementation of this measure, even if all of the above laws are modified or waived and the Court orders the release of these inmates, will not significantly reduce the population by December 31, 2013. (*See* Shaffer Decl.) Defendants have identified the following additional steps necessary to implement this measure:

- Identify inmates who meet the criteria: (a) received a three-year denial after their last suitability hearing, (b) have served at least one year since their last hearing, (c) are not convicted of a sex offense, and (d) have an overall risk rating of "low" or "low-moderate" based on a determination by forensic psychologists;

- From this list, review individual files to identify serious rules violations committed since the last suitability hearing;

- Develop and verify parole plans for each inmate to be released to ensure there is adequate transitional housing and other elements of an appropriate parole plan;

- Identify outstanding ICE holds, detainers, and warrants;

- Review each case to determine appropriate special conditions of parole;

- Determine whether each inmate's victim or victims have requested that the inmates not be paroled within 35 miles of each victim's residence and work; and

- Notify local law enforcement and victim in advance of the inmate's release.

(Shaffer Decl. ¶¶ 5-7.)

**16. Change State Law to Allow Early Releases of Other Groups of Inmates.**

The Court has requested that Defendants consider "'release or diversion of certain [s]ub populations, such as women, the elderly and the sick from prison to community-based facilities.'" (Apr. 11, 2013 Order 66 [quoting Aug. 4, 2009 Order 154, ECF 2197/3641].) Given the broad and vague nature of these concepts, Defendants have not been able to generate projections about the number of inmates they could potentially impact. (Decl. Diana Toche Supp. Resp. ¶ 3.) As enumerated above, Defendants do not have authority to release inmates prior to completion of their prison terms. To effect this change, the Legislature would need to amend the following specific constitutional provisions and statutes:

- Article I, section 28(f)(5) of the California Constitution would need to be amended or waived to permit sentences to be "substantially diminished by early release policies intended to alleviate overcrowding in custodial facilities." Amendment of this provision

25

would require a three-fourths vote of the Legislature or voter approval through the initiative process. *See* Cal. Const. art. 2, § 10 & art. 18;

- Article I, section 28(a)(5) of the California Constitution would need to be amended or waived. Amendment of this provision would require a three-fourths thirds vote of the Legislature or voter approval through the initiative process. *See* Cal. Const. art. 2, § 10 & art. 18;

- Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison; and

- Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be served in state prison.

(Stainer Decl. ¶ 50.) For passage as urgency legislation, these statutory changes would further require a two-thirds vote of the Legislature. Cal. Const., art. 4, § 8(d).

Defendants estimate that, once these laws are modified or waived and the Court orders that inmates be released, it will take approximately 120 days for CDCR to begin to implement this measure. (Stainer Decl. ¶ 51.) Accordingly, the latest date by which these provisions must be amended or waived in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013. (*Id.*)

Defendants would use the court-ordered release process, but have identified the following additional steps necessary to implement this measure:

- Identify the inmates who meet the criteria contemplated by this measure (complete by approximately August 1, 2013);

- Comply with notification and registration requirements (complete with each release);

- Complete required Mentally Disordered Offenders screenings (complete with each release);

- Address medical and mental health release issues and needs (complete with each release); and

- Coordinate with parole and counties (complete with each release).

(*Id.* at ¶ 52.)

**17. Early Releases of Convicted Felons Who Are Not United States Citizens.**

Plaintiffs propose that the Governor commute the sentences of 1,038 inmates who are not citizens of the United States with six or less months to serve, and release these inmates to the custody of customs enforcement for deportation. (Austin Decl. ¶ 25 & Table 4, ECF 2509-

26

1/4283-1.)  If deported, Plaintiffs' hope is that these inmates do not re-enter the United States illegally to commit more crimes.  (*Id.*)  If implemented, each of these inmates would be "released" as a result of this measure for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

Defendants do not currently possess the authority to release inmates prior to completion of their prison terms, and the Governor is constitutionally prohibited from commuting the sentences of twice-convicted felons without a vote of four justices from the California Supreme Court. (Stainer Decl. ¶ 54.)  To effect this measure, the Legislature would need to amend the following specific constitutional provisions and statutes:

- Article I, section 28(f)(5) of the California Constitution would need to be amended or waived to permit sentences to be "substantially diminished by early release policies intended to alleviate overcrowding in custodial facilities."  Amendment of this provision would require a three-fourths vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

- Article I, section 28(a)(5) of the California Constitution would need to be amended or waived.  Amendment of this provision would require a three-fourths vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18;

- Article 8 of the California Constitution would need to be amended, which prohibits the Governor from commuting sentences for inmates who have been convicted of more than one felony unless four Supreme Court justices concur.   Amendment of this provision would require a two-thirds vote of the Legislature or voter approval through the initiative process.  *See* Cal. Const. art. 2, § 10 & art. 18; and

- Cal. Penal Code § 2901 would need to be amended or waived to permit wardens to release inmates before their sentences have been completed.

(*Id.*)  For passage as urgency legislation, these statutory changes would further require a two-thirds vote of the Legislature.  Cal. Const., art. 4, § 8(d).

Defendants estimate that, once the necessary authority is obtained, CDCR will need approximately four to six months to implement this measure.  (Stainer Decl. ¶ 55.)  Accordingly, the latest date by which these provisions must be amended or waived in order for Defendants to be able to implement this measure by December 31, 2013 is August 15, 2013.  (*Id.*) Implementation of this proposal would require Defendants to negotiate an agreement with ICE to take these inmates six months before their sentence expires, including an agreement that ICE will retain the inmate in custody until at least the inmate's term is completed.  (*Id.*)  Due to the federal sequester, ICE may not agree to do this.  (*Id.*)  In addition, recent efforts to identify community

27

1  beds to house inmates outside of prisons has led to direct competition with ICE, as it also has a

2  shortage of beds.  (*Id.*)  Thus, ICE may not be willing to accept hundreds or thousands of inmates,

3  even for a short time much less the six months that CDCR would want.  (*Id.*)  If ICE is agreeable,

4  implementation would be in four to six months.  (*Id.*)

5       If ICE is unwilling to hold the inmate for six months, an inmate cannot be released early

6  absent waiver of constitutional and statutory obligations to hold a prisoner until his release date

7  discussed earlier are either amended or waived.  (*Id.* at ¶ 56.)  Should either occur, Defendants

8  estimate that implementation of this proposal would take 90 days develop criteria for which

9  inmates to send to ICE, train staff to on the criteria, and review the files of all ICE cases to

10  determine whether they meet the criteria.  (*Id.*)

11                **COURT-ORDERED POPULATION-REDUCTION PLAN**

12       The following is the plan that has been compelled by the Court.  Defendants do not

13  believe that these measures are necessary or prudent at this time for all of the reasons stated in the

14  Introduction.

15  **I.    MEASURES THAT DEFENDANTS HAVE THE AUTHORITY TO IMPLEMENT:**

16      **A.   New Construction.**

17       The California Health Care Facility in Stockton, an $840 million, 1.2 million square foot

18  facility that will provide 1,722 beds, is scheduled to open in July 2013.  (Beard Decl. ¶ 17.)  No

19  further authorization is required for this project, which will increase design bed capacity by 1,722

20  beds by December 31, 2013.  (*Id.*)  The DeWitt Nelson Correctional Annex in Stockton will add

21  1,133 more beds in early 2014.  (*See id.*)  The activation schedule for the California Health Care

22  Facility, which lists the remaining steps and the person or persons responsible for taking each step,

23  is attached as Exhibit 2 to the Declaration of Secretary Beard.  Implementation of this measure

24  will not result in the release of inmates for purposes of the PLRA.

25      **B.   Expand Fire Camp Capacity.**

26       Defendants' January 7, 2013 filing anticipated that the State's prison population would be

27  reduced by 2,500 through fire camp eligibility by December 2013.  (Jan. 7, 2013 Decl. Brenda

28  Grealish Ex. A, ECF 2512-1/4285-1.)  Defendants will increase the number of inmates placed in

28

fire camps because there are about 1,250 more of these low-level inmates than originally

projected.  (Decl. Michael Stainer Supp. Resp. ¶ 7.)  No further authorization is required to

implement this measure, and Defendants estimate that implementation will reduce the prison

population by 1,250 inmates by December 31, 2013.  (*Id.*)  Implementation of this measure will

not result in the release of inmates for purposes of the PLRA.  The person responsible for the

placement of these additional inmates into fire camps is CDCR Secretary Jeff Beard.

**II.    MEASURES THAT DEFENDANTS LACK THE AUTHORITY TO IMPLEMENT:**

Defendants do not have the authority to implement any of the measures set forth in this

section.  To implement any of them, the Legislature would need to change the applicable state

law provisions.  (*See* Stainer Decl.)

**A.  Legislative Changes to State Law to Increase Prison Credits.**

The following measures would, if implemented by the Legislature, expand inmate credit-

earning capacity.[6]

**1.    Change State Law to Allow Minimum Custody Inmates to Receive 2-for-1 Credit.**

To effect this change, the Legislature would need to change Penal Code § 2933.3 to include

inmates assigned to minimum support facilities (excluding inmates convicted of serious, violent,

or second-strike offenses) among those who are eligible under the law to receive two-for-one

credit earning.  (Stainer Decl. ¶ 18.)  Currently, Penal Code section 2933.3 only allows inmates

who have been assigned to fire camps to earn two days of credit for each day of incarceration.

(*Id.*)  A simple majority vote of the Legislature is needed to make this change.  (*Id.*)  For passage

as urgency legislation, these statutory changes would require a two-thirds vote of the Legislature.

Cal. Const., art. 4, § 8(d).  In addition, CDCR would need to promulgate regulatory changes to

Cal. Code Regs. tit. 15 §§ 3042 *et seq.* & 3044(b)(1) to permit inmates housed in minimum

---

[6] Any inmates released early as a result of these credit increases would not be part of
realignment.  They would be supervised by state parole agents until they reached the full length of
their original prison terms, and would be returned to prison for any revocation.  After that time,
these inmates would be supervised through the Post-Release Community Supervision program or
parole, and any revocations during this period would be served in county jail.

29

support facilities to receive two-for-one credit earning.  Because this measure requires regulatory changes, the Legislature would also need to waive compliance with the APA to enable implementation of this measure before December 31, 2013.  *See* Cal. Gov't Code § 11340 *et seq.*

Defendants estimate that implementation of this measure would reduce the in-state prison population by approximately 148 inmates by December 31, 2013.  (Atkinson Decl. ¶ 7.)  If implemented, each of these inmates would be released early as a result of this measure for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

**2. Change State Law to Allow Non-Violent Second-Strike Offenders to Earn "Milestone Completion" Credits.**

To effect this change, the Legislature would need to change the following statutes:

- Cal. Penal Code §§ 667(c)(5) & 1170.12(a)(5) would need to be amended or waived to permit second-strike felons to receive more than 20% credit earning capacity;

- Cal. Penal Code § 2933.05(a) would need to be amended or modified to expand the credit-earning cap to eight weeks; and

- Cal. Penal Code § 2933.05(e) would need to be amended or modified to permit inmates sentenced under the Three-Strike Law to receive program credits.

(Stainer Decl. ¶ 24.)

Defendants estimate that implementation of this measure would reduce the in-state prison population by approximately 62 inmates by December 31, 2013.  (Atkinson Decl. ¶ 10.)  If implemented, each of these inmates would be released as a result of this measure for purposes of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

**3. Change State Law to Increase the Credit-Earning Limit for Nonviolent "Second Strike" Felons from 20% to 34%.**

To effect this change, the Legislature would need to change Penal Code §§ 667(c)(5) and 1170.12(a)(5) to remove the current 20% credit-earning restriction imposed on second-strike offenders.  (Stainer Decl. ¶ 27.)  Changing Section 667(c)(5) would require a two-thirds vote of the Legislature because it was enacted through the Three-Strikes Law voter initiative.  *See* Cal. Penal Code §§ 667(c)(5) & 1170.12(a)(5).  Changes to § 1170.12(a)(5) could be accomplished by

30

a simple majority of the Legislature.  (*Id.*)  For passage as urgency legislation, these statutory

changes would require a two-thirds vote of the Legislature.  Cal. Const., art. 4, § 8(d).

Defendants estimate that the prison population could be reduced by approximately 37

inmates by December 31, 2013 if the credit-earning capacity of inmates convicted of "second-

strike" felonies (excluding sex offenders) is expanded from 20% to 34%.  (Atkinson Decl. ¶ 13.)

If implemented, each of these inmates would be released as a result of this measure for purposes

of the PLRA.  *See* 18 U.S.C. § 3626(g)(4).

### 4.    Change State Law to Expand Criteria for Medical Parole.

Currently, state law provides for a process of medical parole for inmates who are

permanently medically incapacitated, receiving 24-hour care, and unable to perform the activities

of basic daily living.  *See* Penal Code § 3550.  The Legislature can expand the medical parole

program.  (Toche Decl. ¶ 5.).  Specifically, the statute could be modified to remove the exclusion

of offenders whose medically incapacitating condition existed at the time of sentencing.  (*Id.*)  In

addition, Penal Code § 3550 could be amended to include offenders who suffer from a significant

and permanent condition, disease, or syndrome resulting in the offender being physically or

cognitively debilitated or incapacitated.  (*Id.*)

To effect this change, the Legislature would need to expand Penal Code § 3550 to apply to

a larger population of inmates as described above.  (List Item No. 16.)  Since this measure will

require consideration by the Legislature, it is difficult to provide a precise population reduction

estimate.  (Toche Decl. ¶ 6.)  Although it is unknown what action the Legislature will take,

Defendants estimate that this measure will reduce the prison population by 150 inmates by

December 31, 2013.  (*Id.*)

### 5.    Change State Law to Modify Parole for Low-Risk Elderly Inmates.

The Legislature could pass a new state law to establish a process by which elderly inmates

who have served lengthy prison terms and have low risk scores could be assessed for parole

suitability by the Board of Parole Hearings.  (Stainer Decl. ¶ 50.)  If found to no longer be

dangerous, this process would allow the parole board to either grant these inmates parole or place

them in an alternative custody program.  (*See id.* & Shaffer Decl. ¶¶ 8-10.)  For passage as

31

1   urgency legislation, these statutory changes would require a two-thirds vote of the Legislature.

2   Cal. Const., art. 4, § 8(d).

3       The Legislature could consider early release for certain elderly inmates determined to be

4   at low-risk for recidivism.  (Toche Decl. ¶ 3.)  A precise estimate of the potential reduction in

5   population is not possible because this measure would require a change in state law, and the

6   qualification criteria have not been established.  (*Id.*)  Although it is unknown what action the

7   Legislature will take, Defendants estimate that this measure will reduce the prison population by

8   250 inmates by December 31, 2013.  (Atkinson Decl. ¶ 16.)

9           **6.    Obtain a Legislative Appropriation of Funds to Lease Jail Capacity
                    from Counties with Available Capacity.**

10      The Legislature could appropriate funds to lease available jail capacity from the counties

11  with available beds.  (*See* List Item No. 3.)  Although the vast majority of counties have no

12  remaining available jail beds, Defendants are informed that Los Angeles and Alameda counties

13  have available beds to house 1,600 inmates.  (Beard Decl. ¶ 18.)  To lease this jail space, the

14  Legislature would need to waive the following statutes, and regulations would need to be

15  amended, modified or waived:

16      • Cal. Gov't Code §§ 4525-4529.20, 4530-4535.3, 7070-7086, 7105-7118, & 14835-
17        14837, to amend state contracting requirements;

18      • Cal. Gov't Code §§ 13332.10, 14660, 14669, 15853, to amend provisions governing
          acquisition and leasing of real property;
19
        • Cal. Gov't Code § 14616, to amend provisions governing approval of contracts by the
20        Department of General Services;

21      • Cal. Gov't Code §§ 18500 *et seq.*, the State Civil Service Act;

22      • Cal. Gov't Code § 19130(a)(3), which prohibits contracts which "cause the
          displacement of civil service employees";
23
        • Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state
24        prison);

25      • Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be
          served in state prison);
26
        • Cal. Penal Code § 1216 (requiring sheriffs to deliver to the warden of a CDCR
27        institution any felon sentenced to state prison); and

28

                                        32

- Cal. Penal Code §§ 2900 & 2901, requiring CDCR to maintain custody of all inmates until the completion of their sentence.

(*Id.* at ¶¶ 19-21.)

Defendants estimate that the prison population could be reduced by approximately 1,600 inmates by December 31, 2013 by increasing use of leased jail capacity. (*Id.* ¶ 18.)

### B. Seek an Appropriation from the Legislature to Slow the Rate of Returning Inmates to California as Called for in the Blueprint.

The Legislature could appropriate funds to slow the return of inmates housed in private contract prisons in other states. (Stainer Decl. ¶ 58.) Defendants have legal authority to involuntarily transfer inmates to out-of-state facilities through June 30, 2013, and thereafter have no authority to involuntarily transfer inmates. (*Id.*) As of December 2013, the existing appropriation for out-of-state capacity is 4,596 inmates. (*Id.*) The Legislature could authorize an appropriation to support an out of state inmate population of 8,165 as of December, 2013 and a reduced out of state population of 4,065 as of June, 2014. (*Id.*)

### C. Contingency Measures.

As a contingency measure, the Legislature could pass an appropriation to lease available private prison capacity in California. (Beard Decl. ¶ 18.) The available capacity from privately run prisons in California is not currently sufficiently secure to house prison inmates, and would need to be retrofitted. (*Id.* at ¶ 19.) These retrofits could not be accomplished before 2014 at the earliest. (*Id.*) And certainly, the private prison company would not undertake this work until the Legislature appropriated funding for the contracts. (*Id.*) To lease this space, the following specific statutes would need to be amended, modified or waived:

- Cal. Gov't Code §§ 4525-4529.20, 4530-4535.3, 7070-7086, 7105-7118, & 14835-14837, to amend state contracting requirements;

- Cal. Gov't Code §§ 13332.10, 14660, 14669, 15853, to amend provisions governing acquisition and leasing of real property;

- Cal. Gov't Code § 14616, to amend provisions governing approval of contracts by the Department of General Services;

- Cal. Gov't Code §§ 18500 *et seq.*, the State Civil Service Act;

- Cal. Gov't Code § 19130(a)(3), which prohibits contracts which "cause the displacement of civil service employees";

33

- Cal. Penal Code § 1170(a), requiring terms of imprisonment to be served in state prison);

- Cal. Penal Code § 1170(h)(3), requiring felonies enumerated in this section to be served in state prison;

- Cal. Penal Code § 1216 (requiring sheriffs to deliver to the warden of a CDCR institution any felon sentenced to state prison); and

- Cal. Penal Code §§ 2900 & 2901, requiring CDCR to maintain custody of all inmates until the completion of their sentence.

(*Id.* at ¶ 20.)  For passage as urgency legislation under Article 4, section 8(d) of the Constitution, these statutory changes would require a two-thirds vote of the Legislature.  Cal. Const. art. 4 § 8(d).

### III.    REASONS FOR NOT IMPLEMENTING THE REMAINING MEASURES ON THE LIST.

The Court has ordered Defendants' to explain the "reasons, excluding lack of authority, why they do not propose to implement" the remaining measures on the List.  (Apr. 11, 2013 Order ¶ 2.e.)  At least three of the remaining measures—diversion of technical parole violators, diversion of low-risk offenders, and evidence-based rehabilitative programming—have already been implemented through Realignment, Senate Bill 18, and the Blueprint.  The remaining proposed measures, as discussed below, reflect unsound and unnecessary prison policies.

#### A.    Realigning Additional Felonies to Local Jurisdictions, Refusing Admission to Inmates Convicted of Felonies Requiring a Prison Sentence, and Diverting Probation Violators Would Threaten Public Safety.

As a result of Realignment, approximately 25,000 offenders have been shifted to local jurisdictions, including county jails, since October 2011.  (Beard Decl. ¶ 8.)  While the counties are continuing to manage the challenges of realignment, it would be inappropriate to shift hundreds or thousands of additional inmates to local supervision.  (*Id.* at ¶ 13.)  For these reasons, Defendants decided to not place additional undue pressure on local jurisdictions through various population-reduction measures that expand Realignment.  (*Id.*)  These measures include realignment of additional felonies, which are currently punishable by state prison (including drug possession, petty theft, second degree burglary, vehicle theft, and forgery); requiring newly convicted felons with 9 months or less left to serve to remain in county jail; refusing admission of

34

convicted felons into prison to reduce overcrowding; and diverting felony probation violations away from state prison.  (*See* List Item Nos. 10-13.)

### B.  Retroactive Application of Credit-Earning and Credit Increases for Violent Offenders Would Threaten Public Safety.

The credit-earning measures included in the court-ordered plan assume immediate application of credits to the current and future inmate populations, following authorization by the Legislature.  (*See* Plan Section I.C.)  Plaintiffs propose that all second-strike and violent offenders be awarded 34% credits *retroactive* to the beginning of their incarceration.  (Austin Decl. ¶¶ 22-24 & Table 4, ECF 2509-1/4283-1.)  Retroactive application of these time credits will result in the immediate release of thousands of offenders serving prison terms for second-strike and violent offenses.  (Atkinson Decl. ¶¶ 27-41.)  This is because potentially thousands of these classes of felons who are currently incarcerated have already served time sufficient to meet Plaintiffs' criteria.  (*Id.*)  Thus, if Plaintiffs' proposal was adopted, these inmates would all be eligible for immediate release.  (*Id.*)  Plaintiffs' retroactive credit proposal is dangerous because it indiscriminately expedites the release of violent and repeat offenders without regard to their risk assessments or their readiness for release and safe reintegration back into society.  (*Id.*)  Moreover, Plaintiffs' proposal subverts the policy determinations that shape the current state laws that require these more serious felons to serve a greater percentage of their prison terms.  *See*, *e.g.*, Cal. Pen. Code §§ 2933.1, 667(c)(5).  In addition, Defendants believe that legislative credit increases for offenders convicted of violent felonies would jeopardize public safety by expediting their release.  (Beard Decl. ¶ 15.)  Defendants are unwilling to risk public safety by hastening the release of these offenders.  (*Id.*)

### C.  It Would Be Risky to Grant the Outright Early Release of Thousands of Murderers and Other Serious and Violent Felons.

Plaintiffs propose releasing nearly 4,000 inmates sentenced to life with possibility of parole—mostly convicted murderers—who are eligible for parole but have not been found suitable for parole by the state parole board.  (*See* List Item No. 15; Austin Decl. ¶ 28 & Table 4, ECF 2509-1/4283-1.)  Plaintiffs' estimate—which is based on an erroneous calculation that CDCR houses approximately 9,000 "low-risk" inmates sentenced to life with the possibility of

35

1  parole who are past their minimum eligible parole date—is inaccurate.  (Decl. Jennifer Shaffer

2  Supp. Resp. ¶¶ 4-6.)

3      Although the Court has stated all of these offenders may not have committed

4  "horrendous" crimes, the example it cites does not appear to fall into this category.  (Apr. 11,

5  2013 Order 66 & n.47 [citing the case of Brian Sass, a drunk driver who killed a woman who was

6  five months pregnant, and her unborn child].)  The inmates in this category have all been

7  sentenced to indeterminate life terms that require them to remain in prison until the parole board

8  finds them suitable for parole.  (*See* Shaffer Decl.)

9      This proposal calls for the outright release of offenders convicted of murder and other

10  serious crimes who have been found to still be dangerous.  (Shaffer Decl. ¶¶ 3-4.)  Under Penal

11  Code section 3041, the Board of Parole Hearings schedules life-term inmates for periodic parole

12  hearings once they have completed their base terms.  (*Id.*)  At these hearings, the Board is

13  required by state law to grant parole if they determine, based on the record, that the inmates are

14  no longer dangerous.  *See, e.g., In re Lawrence*, 44 Cal.4th 1181 (Cal. Sup. Ct. 2008); *In re*

15  *Shaputis*, 44 Cal.4th 1241 (Cal. Sup. Ct. 2008).  In making these difficult assessments, the Board

16  conducts a comprehensive review that includes examining the crime, the inmate's psychological

17  risk assessments, current mindset, and information about the inmate's history and behavior both

18  before and during prison.  *See* Cal. Pen. Code §§ 3041(b), 3046; Cal. Code Regs., tit. 15, §§ 2281,

19  2316, 2317, 2402.  Plaintiffs' early-release proposal targets life inmates whom the Board has

20  found are still too dangerous to be released back into society.  (*See* Austin Decl. ¶ 28 & Table 4,

21  ECF 2509-1/4283-1; *see also* Cal. Pen. Code §§ 3041(b), 3046; Cal. Code Regs. tit. 15, §§ 2281,

22  2316, 2317, 2402.)

23      A proposal to release "low risk" life term inmates outside of the Board's parole suitability

24  processes will risk public safety.  (*See* Shaffer Decl. ¶ 4 & 8.)  Further, releasing this category of

25  inmates circumvents the expertise and powers of the Board of Parole Hearings, which has the

26  responsibility under the penal code to set a release date for life prisoners unless it determines that

27  public safety requires a longer period of incarceration.  (*Id.* at ¶ 8.)

28

1    This proposal also runs afoul of the California Constitution.  Cal. Const. art. 1, §§ 28(b)

2    (victim rights, including right to be notified prior to scheduled release), 28(f)(5) (sentences shall

3    not be diminished by early release policies so as to alleviate overcrowding).  Plaintiffs' proposal

4    would eliminate victims' rights to personally appear at parole hearings and to express their views

5    concerning the inmates and the case, the effect of the crime on the victim, and the suitability of

6    the inmate for parole.  (Shaffer Decl. ¶ 9.)  The California Constitution may only be modified by

7    a two-thirds vote of the Legislature or voter-approval.  Cal. Const. art. 2, § 10 & art. 18.

8    Additionally, state statutory provisions prohibit the early release of any prison inmate.  *See, e.g.,*

9    Cal. Pen. Code §§ 2901 (duty of wardens to receive inmates), 3041.5 (describing process for

10   parole), 3043 *et seq.* (rights of victims with respect to parole); Cal. Code Regs., tit. 15, § 2245

11   (prisoner rights at parole hearings). This proposal would also circumvent the Governor's

12   constitutional and statutory authority to review parole decisions of life inmates, and block any

13   parole grant to a convicted murderer who he finds to still be dangerous.  *See* Cal. Const. art. V, §

14   8(b); Pen. Code §§ 3041.1 & 3041.2.  For these reasons, Defendants cannot implement this

15   measure unless the Legislature was to change or waive the laws described above.

16   **D.    It Would Be Bad Policy to Grant the Outright Early Release of Elderly, Female,**
     **or Disabled Inmates.**

17

18       The Court has requested that Defendants consider "'release or diversion of certain [s]ub

19   populations, such as women, the elderly and the sick from prison to community-based facilities.'"

20   (Apr. 11, 2013 Order 66 [quoting Aug. 4, 2009 Order 154, ECF 2197/3641].)  This proposal is

21   bad policy for many of the same reasons it is risky to release inmates sentenced to life with

22   possibility of parole discussed in the preceding section.  (*See* Section II.C above; Shaffer Decl. ¶¶

23   10-12.)  Because these policy decisions should be implemented through a transparent democratic

24   process, not by court order, Defendants will request that the Legislature expand medical parole

25   and establish a parole process for certain elderly inmates determined to be at low-risk for

26   recidivism.  (*See* Sections II.A.3 & II.A.4 above.)

27

28

**E.    It Would Be Ill-Advised to Grant the Outright Early Release of Inmates Who Are Not United States Citizens.**

Plaintiffs propose releasing about a thousand inmates who are not citizens of the United States, in the hope that they will be deported.  (Austin Decl. ¶ 25 & Table 4, ECF 2509-1/4283-1.)  However, every person who is subject to deportation is not actually deported since the federal government is not required to accept all criminal aliens into federal custody.  8 U.S.C. § 1365(a); *see also California v. U.S. Dept. of Justice*, 114 F.3d 1222, 1226 (D.C. Cir. 1997).  And often times when people are deported from the United States, they return.  *See* U.S. Dep't Homeland Security Annual Report, "Immigration Enforcement Actions: 2011" (Sept. 2012) at 6, table 7, http://http://www.dhs.gov/sites/default/files/publications/immigration-statistics/enforcement_ar _2011.pdf [indicating that in fiscal year 2012, Immigration and Customs Enforcement removed 86,405 repeat immigration violators].)  The vast majority of illegal immigrants in California's prisons are from Mexico.  (Stainer Decl. ¶¶ 53-56.)  Given Mexico's proximity to California, it is not uncommon for people who have been deported to Mexico to return to California.  U.S. Dep't Homeland Security Annual Report, "Immigration Enforcement Actions:2011" (Sept. 2012) at 6, tables 6 & 7, http://www.dhs.gov/sites/default /files/ publications/immigration-statistics/ enforcement_ar_2011.pdf.  Plaintiffs' proposal could cause numerous serious or violent offenders being released back into California when federal immigration officials decline to deport them, or when they return to California after having been deported.  (Stainer Decl. ¶¶ 53-56.)  And of course, as with Plaintiffs' other early release proposals, the State has no authority to release these inmates prior to the completion of their prison terms.  *See* Cal. Const. art. I § 28(f)(5) & Cal. Penal Code §§ 2900-01.  The Court would have to order their outright early releases, in contravention of California Constitution, article 1, section 28(f)(5), which provides that no inmate may be released prior to the completion of his or her sentence in order to alleviate overcrowding, and Penal Code section 2901, which prohibits CDCR wardens from releasing inmates until their sentences are complete.

**F.    Plaintiffs' Milestone Credit Proposal Subverts the Program's Purpose.**

Plaintiffs propose making all inmates who are sentenced to determinate terms eligible to receive an average of six months' worth of program credits annually via the "milestone" program.

38

Cal. Pen. Code § 2933.05. Plaintiffs' attempt to expand the program ignores the purpose of the milestone credit program, which is to reward life skills improvements that are meant to help prepare the inmate for life in the community and smooth transition into civil society by acknowledging and encouraging *completion* of programs such as education, substance abuse, or anger management programs. Stats. 2009-2010, 3rd Ex. Sess., c. 28 (S.B. 18), § 39, eff. Jan. 25, 2010. Plaintiffs seek to have credits applied for mere participation without completion, subverting the program's purpose and goals. (*See* Austin Decl. ¶ 24, ECF 2905-1/4283-1.) Plaintiffs' proposal applies credits haphazardly without regard to an improvement in life skills or impact on the inmates' ability to successfully transition into the community. (*See id.*)

To implement this proposal, Penal Code section 2933.05(a) would need to be rewritten. It currently requires inmates to complete milestone programs to receive program credits, whereas Plaintiffs seek to reward credits merely for participation, not completion. Penal Code section 2933.05(e) would need to be waived because it bars inmates sentenced under the Three-Strikes law, pursuant to Penal Code section 290 (as a sexual offender), or as a violent offender, from receiving program credits.

## IV.    CALIFORNIA HAS ACHIEVED A DURABLE REMEDY.

By reducing the prison population by nearly 43,000 inmates since 2006 and significantly improving their health care systems, California has already achieved a durable remedy for solving the problems identified by this Court related to overcrowding. (*See* Termination Motion & Modification Motion, *Coleman* ECF 4275-82.) As the Supreme Court held, "when the objects of the decree have been attained . . . responsibility for discharging the state's obligations [must be] returned promptly to the State and its officials." *Horne v. Flores*, 557 U.S. 433, 452 (2009); *Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

If the Legislature immediately passes those measures as urgency legislation, and does not pass any other measures that shift prisoners back to the state, then by December 2013, the State will come within 2,570 inmates (*i.e.*, within 2.2%) of satisfying the court-ordered population target, and will fully satisfy the court-ordered target in June 2014 and June 2015. (Atkinson Decl.

39

1   ¶ 21.)  For each of these measures, the resulting reductions will continue to grow over the next

2   several years.  (*Id.*)

3

4   Dated:  May 2, 2013                           HANSON BRIDGETT LLP

5

6                                                 By: */s/ Paul B. Mello*

7                                                     PAUL B. MELLO

                                                      *Attorneys for Defendants*
8
    Dated:  May 2, 2013                           KAMALA D. HARRIS
9
                                                  Attorney General of California
10
                                                  By: */s/ Patrick R. McKinney*
11
                                                      PATRICK R. MCKINNEY
12
                                                      Deputy Attorney General
13                                                    *Attorneys for Defendants*

14   SF2007200670
     20690592.docx
15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                              40