1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
4
5
6
7

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169602
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:   (415) 433-6830

8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
   MEGAN CESARE-EASTMAN – 253845
10 K&L GATES LLP
   4 Embarcadero Center, Suite 1200
11 San Francisco, California  94111-5994
   Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

12
Attorneys for Plaintiffs
13

14                    UNITED STATES DISTRICT COURT

15                    EASTERN DISTRICT OF CALIFORNIA

16

17 RALPH COLEMAN, et al.,

18            Plaintiffs,

19       v.

20 EDMUND G. BROWN, Jr., et al.,

21            Defendants.

Case No. Civ S 90-0520 LKK-JFM

**NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE: IMPROPER HOUSING AND TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION**

Judge:   Hon. Lawrence K. Karlton
Date:     June 17, 2013
Time:    10:00 am
Crtrm.:  4

22

23

24

25

26

27

28

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ........................................................................ vi

NOTICE OF MOTION AND MOTION ............................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 2

INTRODUCTION AND FACTUAL STATEMENT ......................................... 2

ARGUMENT ................................................................................................. 13

I.  LEGAL STANDARD:  WHERE THERE ARE SERIOUS ONGOING
    CONSTITUTIONAL VIOLATIONS, AND A LENGTHY HISTORY OF
    NON-COMPLIANCE WITH EXISTING REMEDIAL ORDERS,
    FURTHER RELIEF IS NECESSARY. ................................................... 13

II. THE IDENTIFIED CONSTITUTIONAL VIOLATIONS IN
    SEGREGATION SETTINGS REQUIRE FURTHER REMEDIAL
    ORDERS. ............................................................................................. 16

    A.  The Court Should Order An Effective Remedy For The Excessive
        Lengths Of Stay Of Class Members In Segregation ...................... 17

    B.  The Court Should Order An Effective Remedy To Provide
        Appropriate Alternatives To The Use Of Administrative Segregation
        Placements For Non-Disciplinary Reasons .................................... 20

        1.  Defendants' Segregation Units Should Not Be Used to House
            Mentally Ill Prisoners Based on Prisoners' Own "Safety
            Concerns" ............................................................................... 22

        2.  Defendants' Segregation Units Should Not Be Used to House
            Mentally Ill Prisoners Based on "Lack of Beds" ..................... 24

    C.  The Court Should Order An Effective Remedy To Reduce The Risks
        Of Decompensation And Suicide Through Appropriate Screening And
        Exclusions Of Class Members At Heightened Risk Of Harm If Placed
        In Segregation ............................................................................... 28

        1.  Defendants Must End Dangerous Discharges of Inmate-
            Patients from Inpatient and Mental Health Crisis Beds to
            Segregation ............................................................................. 29

        2.  Defendants Must Ensure Adequate Mental Health Screening
            for All Prisoners Entering Segregation and Exclude Those for
            Whom Such Placement is Deemed Clinically Harmful ............ 32

        3.  The Court's Pelican Bay Exclusion Order Should Be Extended
            to Cover All Security Housing Units (SHUs) in the CDCR ...... 34

        4.  There Must Be a Sweep of All Prisoners Currently Housed in
            Segregation for More Than 90 Days to Identify Whether Those

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

Prisoners' Mental Health Is Such That They Require Treatment or Should Be Excluded from Segregation..........................................40

D.   The Court Should Order an Effective Remedy to Address Violations Caused by Inadequate Access to Treatment, Unnecessarily Harsh Conditions, and Insufficient Safety Measures in Segregation ...................42

1.   Inadequate Access to Treatment: Defendants Must Be Ordered to Provide an Appropriate Treatment Program, Including Staffing, Confidential Treatment Space, Treatment Hours, and Out-of-Cell Time in All Segregation Units Where Class Members Are Housed..........................................................43

2.   Harsh Conditions in Segregation: Defendants Must End the Blanket Practice of Strip Searching Mentally Ill Prisoners in Segregation Units Without Individualized Assessment of Actual Security Risk..........................................................47

3.   Harsh Conditions in Segregation: Defendants Must End the Use of Cages for "Holding" or Treating Mentally Ill Prisoners in Segregation Units .............................................................52

(a)   Defendants Should End the Use of Cages to Hold Prisoners in Segregation Units ..............................52

(b)   Defendants Should, at a Minimum, Implement Policies and Practices that End the Indiscriminate Use of Cages on Mentally Ill Prisoners ..........................55

4.   Insufficient Safety Measures: Defendants Must Implement Welfare Checks for All Prisoners Housed in Segregation Units. ......57

CONCLUSION..................................................................................61

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

# TABLE OF AUTHORITIES

**Page**

## CASES

*Armstrong v. Schwarzenegger*,
    622 F.3d 1058 (9th Cir. 2010) ........................................................ 15

*Ashker v. Brown*,
    Case No. C 09-5796 CW, 2013 U.S. Dist. LEXIS 51148 (N.D. Cal. Apr. 9,
    2013) ........................................................................................ 18

*Biselli v. Cty. of Ventura*,
    Case No. CV 09-08694 CAS (Ex), 2012 U.S. Dist. LEXIS 79326 (C.D. Cal.
    June 4, 2012) ............................................................................... 21

*Bounds v. Smith*,
    430 U.S. 817 (1977) ..................................................................... 14

*Brown v. Plata*,
    131 S. Ct. 1910 (2011) ........................................................... passim

*Bull v. City & Cty. of San Francisco*,
    595 F.3d 964 (9th Cir. 2010) ......................................................... 50

*Chao v. Ballista*,
    772 F. Supp. 2d 337 (D. Mass. 2011) ............................................. 51

*Chapman v. Nichols*,
    989 F.2d 393 (10th Cir. 1993) ....................................................... 50

*Coleman v. Wilson*,
    912 F. Supp. 1282 (E.D. Cal. 1995) .......................................... 13, 51

*Coleman v. Wilson*,
    Case No. CIV S-90-0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786 (June
    6, 1994) ................................................................................. 14, 32

*Cruz v. Beto*,
    405 U.S. 319 (1972) ..................................................................... 15

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ..................................................................... 13

*Feliciano v. Rullan*,
    378 F.3d 42 (1st Cir. 2004) ........................................................... 15

*Helling v. McKinney*,
    509 U.S. 25 (1993) ....................................................................... 13

*Hope v. Pelzer*,
    536 U.S. 730 (2002) ..................................................................... 54

[787966-12]

iii

*Hunter v. Auger,*
   672 F.2d 668 (8th Cir. 1982) ................................................................ 50

*Hutto v. Finney,*
   437 U.S. 678 (1978) ................................................................... 15, 18

*Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.,*
   Case No. 1:08-cv-01317-TWP-MJD, 2012 U.S. Dist. LEXIS 182974 (S.D.
   Ind. Dec. 31, 2012) ................................................................... 17

*Jordan v. Gardner,*
   986 F.2d 1521 (9th Cir. 1993) ................................................................ 51

*Lewis v. Casey,*
   518 U.S. 343 (1996) ................................................................... 14

*Mary Beth G. v. City of Chicago,*
   723 F.2d 1263 (7th Cir. 1983) ................................................................ 50

*Olmstead v. L.C. ex rel Zimring,*
   527 U.S. 581 (1999) ................................................................... 20, 55, 56

*Trop v. Dulles,*
   356 U.S. 86 (1958) ................................................................... 54

*United States v. Corozzo,*
   256 F.R.D. 398 (E.D.N.Y. 2009) ................................................................ 39

*Watison v. Carter,*
   668 F.3d 1108 (9th Cir. 2012) ................................................................ 51

## STATUTES

18 U.S.C. § 3626 ................................................................... 15, 62

42 U.S.C. § 12101 ................................................................... 20

42 U.S.C. § 12132 ................................................................... 20, 51, 56

N.Y. Correct. Law § 137 ................................................................... 38

N.Y. Correct. Law § 2(21) ................................................................... 38

## REGULATIONS

28 C.F.R. § 35.130(d) ................................................................... 20, 51, 55, 56

Cal. Code Regs. tit. 15, § 3335 ................................................................... 7, 18

Cal. Code Regs. tit. 15, § 3343(d) ................................................................... 37

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

Cal. Code Regs. tit. 15, § 3343(e) .............................................................................. 37

Cal. Code Regs. tit. 15, § 3343(f) ............................................................................... 37

Cal. Code Regs. tit. 15, § 3343(h) .............................................................................. 37

Cal. Code Regs. tit. 15, § 3343(i) ............................................................................... 37

Cal. Code Regs. tit. 15, §§ 3343(g), (h) ....................................................................... 8

## <u>OTHER AUTHORITIES</u>

Atul Gawande, *Hellhole: The United States holds tens of thousands of inmates in long-term solitary confinement. Is this torture?*, The New Yorker, Mar. 30, 2009 ......................................................................................................................... 39

Chase Riveland, *Supermax Prisons: Overview and General Considerations* (Nat'l Inst. of Corr., U.S. Dep't of Justice, 1999) ................................................................. 39

Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124 (2003) ................................................. 39

H. Sánchez, *Suicide Prevention in Administrative Segregation Units: What is Missing*, Journal of Correctional Health Care, 00(0) 1-8 (2013) ....................... 22, 41

Janet Warren *et al.*, *Psychiatric Symptoms, History of Victimization, and Violent Behavior Among Incarcerated Female Felons: An American Perspective*, 25 Int'l J. of L. & Psychiatry 129 (2002) ....................................................................... 51

Jeffrey Metzner and Joel Dvoskin, *An Overview of Correctional Psychiatry*, 29 Psych. Clin. N. Am. 761 (2006) ...................................................... 37, 38, 46, 47

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| ACA | American Correctional Association |
| ADA | Americans with Disabilities Act |
| ASH or Atascadero | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| CAL or Calipatria | Calipatria State Prison |
| CCCMS | Correctional Clinical Case Manager System |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CDCR | California Department of Corrections and Rehabilitation |
| CIM | California Institute for Men |
| CIW | California Institute for Women |
| CMF | California Medical Facility |
| COR or Corcoran | California State Prison/Corcoran |
| CRC | California Rehabilitation Center |
| CTC | Correctional Treatment Center |
| CTF | California Training Facility/Soledad |
| DSH | Department of State Hospitals |
| DVI or Deuel | Deuel Vocational Institute |
| EOP | Enhanced Outpatient Program |
| EOP ASU Hub | Enhanced Outpatient Program Administrative Segregation Unit |
| HDSP or High Desert | High Desert State Prison |
| ICC | Institutional Classification Committee |
| KVSP or Kern Valley | Kern Valley State Prison |
| LAC or Lancaster | California State Prison/Lancaster |
| LOB | Lack of Bed |
| MCSP or Mule Creek | Mule Creek State Prison |
| MHCB | Mental Health Crisis Bed |
| MHOHU | Mental Health Outpatient Housing Unit |
| MHSDS | Mental Health Services Delivery System |
| OIG | Office of the Inspector General |
| PBSP or Pelican Bay | Pelican Bay State Prison |
| PLRA | Prison Litigation Reform Act |
| PSU | Psychiatrist Services Unit |
| PVSP or Pleasant Valley | Pleasant Valley State Prison |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RVR | Rules Violation Report |
| SAC or Sacramento | California State Prison/Sacramento |
| SATF | California Substance Abuse Treatment Facility (II) |
| SHU | Segregated Housing Unit |

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

| SNY | Special Needs Yard |
| SOL or Solano | California State Prison/Solano |
| SQ or San Quentin | California State Prison/San Quentin |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| TTM | Therapeutic Treatment Module |
| WSP or Wasco | Wasco State Prison |

[787966-12]

## NOTICE OF MOTION AND MOTION

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT *Coleman* Plaintiffs, through their counsel of record, will and hereby do move for further relief to remedy ongoing constitutional violations in this case.  Because of the continuing Eighth Amendment violations related to Defendants' failure to address the substantial harm and risk of harm to class members caused by the overuse and misuse of Defendants' segregation units as well as the unnecessarily harsh and punitive conditions in those units, Plaintiffs request that the Court order further relief necessary to remedy these violations.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities and Declarations of Jane Kahn and Dr. Craig Haney filed herewith, Corrected Plaintiffs' Opposition to Defendants' Motion to Terminate under the PLRA and to Vacate under Rule 60(b)(5), Mar. 19, 2013, Docket No. 4422 ("Pls' Opp. Br."), all pleadings, declarations and evidence filed in support thereof, the pleadings and orders on file in the above-captioned matter, and any oral argument or evidence permitted at any hearings on this motion.

[787966-12]

1

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION AND FACTUAL STATEMENT**

3      "For years the medical and mental health care provided by California's prisons has

4  fallen short of minimum constitutional requirements and has failed to meet prisoners' basic

5  health needs.  Needless suffering and death have been the well-documented result."

6  *Brown v. Plata*, 131 S. Ct. 1910, 1923 (2011).  Constitutional violations that have been

7  found by this Court, the three-judge court, and the United States Supreme Court are current

8  and ongoing.  *See* Order Denying Mot. to Terminate, Docket No. 4539, Apr. 5, 2013.

9  Defendants' policies and practices of housing *Coleman* class members in dangerous

10  segregated housing units[1] violate constitutional standards, leaving thousands of seriously

11  mentally ill prisoners at risk of needless suffering and death.  Existing court orders and

12  Program Guide standards have been insufficient and ineffective in remedying Defendants'

13  unlawful practices, requiring prompt additional relief from this Court.

14      Defendants house thousands of prisoners with serious mental illness in segregated

15  housing units, for unlimited periods of time, despite clear evidence that these are extremely

16  high-risk settings that cause needless psychological suffering.  Despite years of court

17  orders, Defendants still fail to provide minimally adequate treatment for mentally ill

18  prisoners housed in segregation units, creating an astronomical risk of suicide.  *See* Decl.

19  of Jane E. Kahn in Supp. of Pls.' Resp. to Defs.' Mot. to Strike or Modify Portions of the

20  Twenty-Fifth Round Monitoring Report of the Special Master, Docket No. 4325, Feb. 11,

21  2013 ("Kahn Feb. 11, 2013 Decl.") ¶ 8 & Ex. I (CDCR Suicide Rates: ASU vs. System-

22  wide chart) (showing that suicide rate in CDCR ASUs since 2007 has been between 129

23  and 229 per 100,000—that is, between six (6) and nine (9) times greater than the already

24

25  [1] These segregated housing units, described *infra*, include Administrative Segregation

26  Units ("ASUs"), Enhanced Outpatient Program Administrative Segregation Unit hubs

    ("EOP ASUs" or "EOP ASU hubs") Security Housing Units ("SHUs"), Psychiatric

27  Services Units ("PSUs"), and the San Quentin Condemned Units.

28

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

high CDCR system-wide suicide rate); Special Master Report on Suicides Completed in the CDCR in Calendar Year 2011 ("2011 Suicide Report"), Docket No. 4308, Jan. 25, 2013 at 10 ("The most recent round of *Coleman* monitoring found that defendants remained noncompliant with a number of suicide prevention requirements in administrative segregation[.]").  The extraordinarily high rate of suicide in segregation has been an identified deficiency for at least a decade now.  *See* Special Master Report on Suicides Completed in the CDC in Calendar Year 2004, Docket No. 1806, May 9, 2006 at 7 & 12 (finding that, in 2004, 73.1% of the suicides (19 of 26) occurred in segregated housing units, up from an already high 48.5% of suicides (17 of 35) in ASUs in 2003); Order, Docket No. 1830, June 8, 2006 at 2 ¶ 1 (directing Defendants to "develop a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units" and to "provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units").

In 1999, the Special Master reported that "[t]he delivery of mental health care services in administrative segregation has long been recognized as one of the stiffest challenges to defendants' creation of a constitutional health care delivery system."  Special Master's Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding, Docket No. 1008, Jan. 4, 1999 at 1.  At that time, Defendants submitted plans to the Court for providing care and for "meaningful input into the initial placement in administrative segregation of seriously mentally disordered inmates."  *Id.* The Court agreed to "give the defendants the opportunity to deliver mental health services in administrative segregation, with the understanding that serious efforts to limit the duration of stay of seriously mentally disordered inmates in administrative segregation would be undertaken."  *Id.* at 2.  Over the ensuing years, the Court issued a number of specific orders to address the inadequate conditions in segregated housing units for the mentally ill,

[787966-12]

3

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   including orders regarding staffing ratios, programming space needs, length of stay, and

2   even population caps on certain EOP ASU hubs during certain timeframes.[2]  This Court

3   also ordered Defendants to provide daily psychiatric technician rounding of all ASU

4   prisoners and weekly rounding of all SHU prisoners.[3]

5         Most mentally ill prisoners in segregation units are CCCMS and are provided with

6   inadequate mental health services to address the severe stressors of segregated housing.

7   CCCMS prisoners in segregated housing are provided only a psychiatric technician round

8   and a case manager visit, which frequently is a brief, non-confidential encounter at cell-

9   front.  There is no time limit for a CCCMS prisoner's placement in segregated housing

10  _____

11  [2] Staffing Ratios:  Order, 7/26/99, Docket No. 1055 at 5 ¶ 6(f) (requiring one case manager
    for every nine EOP patients housed in administrative segregation); Order, 10/26/01,

12  Docket No. 1309 at 1 ¶ 1 (requiring Defendants to meet staffing ratio of one case manager
    for every nine EOP patients housed in EOP ASU hubs).

13  Programming Space: Order, 12/20/01, Docket No. 1323 at 2 ¶ 3 (requiring Defendants to

14  submit a list of measures "to meet programming space needs" in the EOP ASU hubs and
    directing the special master to report on their adequacy).

15  Length of Stay in EOP ASU Hubs: Order, 1/12/04, Docket No. 1559 at 2 ¶ 2 (ordering

16  Defendants to provide a monthly list to the special master of all EOP inmates who have
    been referred to a PSU and are awaiting endorsement); id. at 2 ¶ 3 (directing Defendants to

17  submit a plan for expediting the endorsement and transfer of EOP inmates who have been
    referred to a PSU); id. at 2 ¶ 5 (ordering Defendants to explain the length of stay for 34

18  EOP inmates held in ASU for six months or more).

19
    Population Cap in EOP ASU: Order, 7/26/04, Docket No. 1598 at 2 ¶ 1A (capping EOP
20  ASU hub population at RJD to 63 inmates).

21  [3] See Order, Docket No. 1309, Oct. 26, 2001 at 2 ¶ 4 (ordering that no EOPs shall be
    transferred to the EOP ASU hub at LAC until the facility can provide adequate psych tech

22  rounds seven days a week); Order, Docket No. 1372, Apr. 25, 2002 (setting forth deficits
    in the EOP ASU hub at LAC and limiting transfers unless special master approves them);

23  Order, Docket No. 1384, June 13, 2002 at 2 ¶ 6 (requiring Defendants to ensure daily

24  psych tech rounding in EOP ASU hubs at COR, SQ, and SVSP).  Plaintiffs have objected
    to the lesser rounding standards for the SHU, preserved these objections, and maintain that

25  SHU inmates should receive at least the same frequency of rounding as ASU inmates –

26  i.e., daily psychiatric technician rounding.  See Pls.' Objs. to the Special Master's Report
    and Recommendations on Defs.' Revised Program Guide, Docket No. 1763, Feb. 17, 2006

27  at 14; Order, Docket No. 1803, May 2, 2006 at 1 (overruling Plaintiffs' objection).

28

1  (ASU or SHU) either in the Program Guide or in CDCR practice or regulations.

2  Group therapy for CCCMS class members is, according to Defendants, not

3  "required," and therefore is almost never provided to CCCMS prisoners in segregated

4  units.  *See* Decl. of Jane Kahn in Supp. of Mot. for Enforcement of Court Orders and

5  Affirmative Relief re: Improper Housing & Treatment of Seriously Mentally Ill Prisoners

6  in Segregation ("Kahn Decl."), filed herewith, Exs. 1 & 2 (*Coleman* Program Guide

7  Chapters 7 (ASU) & 8 (SHU)); Special Master's Twenty-Fifth Monitoring Report, Docket

8  No. 4298, Jan. 18, 2013 ("Special Master 25th Round Report") at 94, 158-59, 213, 218,

9  230, 272, 274, 299, 336, 344, 345, 375, 410 (no groups offered to CCCMS prisoners at

10  SAC SHU, MCSP ASU, WSP ASU, LAC ASU, CCI ASU and SHU, CIM ASU, CCWF

11  ASU, COR ASU and SHU, CMF ASU, SATF ASU, and CTF ASU).

12  The Program Guide requires Defendants to provide EOP prisoners housed in

13  segregated units with a minimum of ten hours of structured therapeutic treatment per week.

14  *See* Kahn Decl. Ex. 3 (*Coleman* Program Guide 12-4-9).  There is no time limit for EOP

15  prisoners' placement in segregated housing (EOP ASU or PSU) either in the Program

16  Guide or in CDCR practice or regulations.  The only applicable Program Guide timeframe

17  regarding administrative segregation housing requires that an EOP prisoner be transferred

18  from an ASU to an EOP ASU hub within 30 days of ASU placement or of referral to EOP

19  level of care.  *See* Kahn Decl. Ex. 4 (*Coleman* Program Guide 12-1-16).  CDCR has not

20  enforced this provision as a mandatory time limit.  There is also no time limit for EOP

21  prisoners' placement in a PSU (which was created for EOP prisoners serving SHU terms).

22  The only applicable Program Guide timeframe requires transfer of an EOP prisoner from

23  an EOP ASU to a PSU within 60 days of endorsement to PSU.  *See id.*  Once an EOP

24  prisoner is placed in an EOP ASU or PSU segregated housing unit, there is no time limit

25  for transfer to that placement, and that mentally ill individual may remain in segregated

26  housing for months or even years.

27  For more than a decade, EOP prisoners in ASU have been the focus of remedial

28  efforts by the Court and the Special Master, in recognition of the substantial risk of harm

5

1    these individuals face in such conditions, as noted by the Special Master:

2                    Much has been written over the past two decades to validate
                 the deleterious impact of confinement in administrative
3                 segregation on sound minds.  Simply to immerse fragile EOP
                 inmates in such an environment for extended periods, even
4                 while providing adequate mental health care, arguably tiptoes
                 on the boundaries of cruel and unusual punishment.  To
5                 immerse them in administrative segregation without providing
                 ready access to a significantly heightened level of mental
6                 health services pretty clearly crosses that boundary.

7    Eighth Interim Monitoring Report of the Special Master on Defendants' Compliance,

8    Docket No. 1303, Sept. 25, 2001 at 52-53.  This led to the creation of designated "EOP

9    ASU hubs," which were meant to provide enhanced staffing and treatment to mentally ill

10   prisoners in the ASUs.  But Defendants have repeatedly failed to provide a minimally

11   adequate level of care to vulnerable EOP prisoners placed in these EOP ASU hubs.  In the

12   last monitoring round, the Special Master found that all eleven of the EOP ASU hubs

13   failed to provide clinical contacts and/or groups in appropriate, confidential settings.  *See*

14   Special Master 25th Round Report at 36.  Ten of the eleven EOP ASU hubs failed to offer

15   at least ten hours per week of structured therapeutic treatment.  *Id.* at 37.  The SAC PSU

16   (which was created to house and treat EOPs serving a SHU term) also failed to offer this

17   basic, minimum level of care to class members in that segregated unit.  *Id.*  These failures

18   have been persistent and confirm that Defendants' "experiment" in providing an EOP level

19   of care in segregated housing has been, and is, a failure.

20           Defendants have also failed to address the Court's longstanding concern over the

21   lengthy stays of seriously mentally ill prisoners in all segregated housing.  Order, Docket

22   No. 2158, Mar. 12, 2007 ¶ 3 (directing Defendants to complete a review process to, *inter*

23   *alia*, "examine more effective ways for reducing the lengths of stay of EOP inmates in

24   administrative segregation").  Ignoring the known risks of segregated housing, Defendants

25   continue to retain prisoners with serious mental illness in these units for extended and even

26   unlimited periods of time.  The practice of retaining prisoners with serious mental illness

27   for extended and unlimited stays in ASUs also conflicts with the State's own regulations

28   that define an ASU as a "*temporary* segregation" setting for prisoners whose "presence in

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    an institution's general inmate population presents an immediate threat to the safety of the

2    inmate or others, endangers institution security or jeopardizes the integrity of an

3    investigation of an alleged serious misconduct or criminal activity," or who are awaiting

4    placement elsewhere.  *See* Cal. Code Regs. tit. 15, § 3335 (emphasis added).  Defendants'

5    own data shows that many seriously mentally ill prisoners are housed in ASU for months

6    or years at a time.[4]  *See* Kahn Decl. ¶¶ 6, 7 & Ex. 5 (*Coleman* March 2013 monthly data

7    showing ASU stays as long as: 387 days at CCI; 732 days at CCWF; 525 days at CTF; 524

8    days at KVSP; 457 days at PVSP; 475 days at SATF; 524 days at SVSP; 421 days at

9    CMF; 333 days at DVI; 494 days at HDSP; 524 days at Mule Creek; 524 days at Pelican

10   Bay; 524 days at SAC; 346 days at Solano; 524 days at San Quentin; 524 days at LAC;

11   and 460 days at RJD).  Class member stays in the SHUs and PSUs are also incredibly long.

12   *Id.* ¶ 7 (Pelican Bay with stays as long as 524 days in PSU; SAC with stays as long as 524

13   days in PSU; CIW with stays as long as 732 days in the PSU; CCI with stays as long as

14   524 days in SHU).[5]

15   _____

16   [4] Defendants underreport the length of stay in segregated housing for many class members.
     For example, Defendants' report itself states that the "[a]ging clock" used in their data

17   "resets when an inmate-patient is moved from one cell to another within the same

18   treatment/custody setting."   In other words, if a prisoner moves within segregation, the
     clock restarts and the prisoner's prior days in segregation are no longer part of the count.

19   This is quite evident from a review of specific prisoners housed in the CCI SHU over two

20   reporting periods (Dec. 31, 2010 and Mar. 14, 2013), which shows that lengths of stay for
     the same prisoners that did not reflect the time that had lapsed between those reporting

21   periods. Kahn Decl. ¶ 8 & Ex. 7 (describing example of CCCMS prisoner with reported
     CCI SHU length of stay of 172 days, when true length of stay is at least 1,273 days (with

22   two brief interruptions)). In addition, Defendants have not included in their *Coleman*
     monthly data any reporting on SHU or PSU lengths of stay at CSP-Corcoran (COR) since

23   October 2011.  Kahn Decl. ¶ 7 & Ex. 6.  In that October 2011 report, stays in the COR

24   SHU were as long as 2,474 days (almost seven years); 23 of the CCCMS prisoners had
     stays longer than two years, and eight had stays longer than three years. *Id.* The COR

25   SHU data also included the note that the aging clock resets for prisoners moved from one

26   cell to another.

27   [5] Curiously, Defendants' data state that approximately 64 male class members had been
     housed in segregation for exactly 524 days as of March 22, 2013, with no male prisoners

28   (footnote continued)

1    In addition to the exceedingly long stays in segregated housing units that are devoid

2    of appropriate treatment, the conditions are excessively harsh and are characterized by

3    extreme isolation and deprivation.  Property permitted in segregated housing is severely

4    limited and prisoners remain locked in their stark cells for up to 23 to 24 hours a day.

5    Access to reading materials, radio, television, or other stimulation is extremely limited in

6    most segregation units.  By regulation, though not necessarily practice, showers are

7    provided three times a week in segregated housing, and prisoners are allowed to go to

8    "yard" for at least one hour per day, five days per week, "unless security and safety

9    considerations preclude such activity," or at least three days per week for a total of not less

10   than ten hours.  Cal. Code Regs. tit. 15, §§ 3343(g), (h).  Shockingly, Defendants objected

11   to the Special Master's finding that only half of the CDCR prisons were providing ASU

12   prisoners with the minimum of ten hours of yard time because the "special master offers

13   no evidence of impact or harm to the *Coleman* class."  Defs.' Objs. and Mot. to Strike or

14   Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master,

15   Docket No. 4312,  Jan. 28, 2013 ("Defs.' Objs. to 25th Round Report") at 22.  Defendants'

16   objection ignores the reality of segregated housing, as well as this Court's longstanding

17   concern over the housing of seriously mentally ill prisoners in these units, with little or no

18   programming opportunities.  The denial of minimum yard time for prisoners with serious

19   mental illness who are confined to their cells essentially 24 hours a day necessarily causes

20   psychological harm and suffering.

21    When Defendants do provide "yard" to prisoners in segregated units, it is restricted

22   to "walk alone" caged areas, which are themselves harsh, restrictive and inhumane.  *See*

23   Expert Declaration of Craig Haney, Docket No. 4378, Mar. 14, 2013 ("Haney Expert

24   _____

25   housed in segregation for even one day longer, and that 5 female class members had been

26   housed in segregation for exactly 732 days as of that date, with no female prisoners housed
     in segregation for even one day longer.  Kahn Decl. ¶ 9 & Ex. 5.  This irregularity

27   confirms that Defendants' data underreport true lengths of stay for these 69 class members.

28

[787966-12]

8
NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Decl.") ¶ 82 (class member comparing cages at MCSP yard to a "dog kennel"), ¶ 250

2   (class member in ASU who was awaiting transfer to SNY bed explaining that he is able to

3   go to yard once a week, but that he is placed in a cage about the same size as his cell that is

4   "like another cell, just outside"), Photo Exs. F, BB, FF, GG, and HH.  Unclothed strip

5   searches are also frequently required for each segregated prisoner on the way to and from

6   yard and even treatment, a fact confirmed by the wardens of several CDCR prisons.

7   Expert Declaration of Edward Kaufman, M.D., Docket No. 4379, Mar. 14, 2013

8   ("Kaufman Expert Decl.") ¶¶ 98, 101, 121, 163-167; Reply Decl. of Kim Holland in Supp.

9   of Defs.' Mot. to Terminate, Docket No. 4438, Mar. 22, 2013 ("Holland Reply Decl.") ¶

10  10 (CCI); Amended Reply Decl. of Deborah K. Johnson in Supp. of Defs.' Mot. to

11  Terminate, Docket No. 4508, Mar. 25, 2013 ("Amended Johnson Reply Decl.") ¶ 6

12  (CCWF); Reply Decl. of Connie Gipson in Supp. of Defs.' Mot. to Terminate, Docket No.

13  4430, Mar. 22, 2013 ("Gipson Reply Decl.") ¶ 19 (COR).  Such blanket punitive practices

14  limit and discourage participation in treatment and the only unstructured out-of-cell time

15  provided for class members in segregation, which can further exacerbate mental illness.

16       Defendants have failed to take simple, low-cost steps to mitigate the harmful effects

17  of extreme sensory deprivation on ASU prisoners.  For example, despite court orders

18  dating back several years on the subject, many segregation units do not have working

19  electrical outlets and in others, local rules and practices place extreme restrictions on

20  access to or use of entertainment appliances like radios or televisions.  Kahn Decl. ¶ 20 &

21  Ex. 18 (April 2007 CDCR Memorandum, "Clarification Regarding Entertainment

22  Appliances in Administrative Segregation Units," noting that provision of entertainment

23  appliances in ASUs are a "response to court concerns over sensory deprivation and suicide

24  trends in the ASUs"); *id.* Exs. 19, 20 (2010 and 2011 CDCR surveys showing that

25  approximately 40 ASUs in CDCR either do not have electrical capacity for radios or TVs

26  or do not provide access despite having such capacity); *id.* ¶ 23 & Ex. 21 (CMF Willis

27  Unit, newly refurbished to house CCCMS inmates in ASU, renovated without installing

28  electrical capacity in 2012; evidence that CMF M-3 unit's electrical outlets were

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  affirmatively covered when converted to an ASU, preventing provision of entertainment

2  appliances to reduce sensory deprivation and harsh ASU conditions).

3        CDCR's segregated housing units are exceedingly harsh, high-risk, non-therapeutic

4  environments for every person placed in those units.  Defendants' experts, staff, and

5  consultants are all in agreement.  *See Dvoskin, Moore, Scott, Clinical Evaluation of*

6  *California's Prison Mental Health Delivery System*, Docket No. 4275-5, Jan. 7, 2013

7  ("Defs.' Joint Expert Report") at 35-36 ("Administrative Segregation Units (including

8  ASU/EOP hubs) remain a high-risk environment , including inmates who were not

9  previously identified as mental health clients, as well as inmates who were assigned to the

10  CCCMS and EOP levels of care.").  Defendants' termination experts recognized that

11  segregation units constitute a "non-therapeutic environment" for prisoners with serious

12  mental illness, and have a "statistical overrepresentation of completed suicides when

13  compared to other housing units" inside CDCR prisons.  *Id.* at 18, 21.  Defendants' experts

14  further identified "obvious physical plant limitations of providing services within an

15  administrative segregation environment" to prisoners with serious mental illness.  *Id.* at 21.

16  They found that "because the environment is not therapeutic," the placement of EOP

17  prisoners in ASUs should occur "only when absolutely necessary for the safety of staff or

18  inmates, and only for as long as is absolutely necessary."  *Id.*; *see also id.* at 23

19  ("Segregation is not a particularly therapeutic environment to house inmates with serious

20  mental disorders, even when EOP level care is provided.  We realize that it is sometimes

21  necessary to house inmates with serious mental disorders in an Administrative Segregation

22  Unit in order to ensure the safety of the inmate, other inmates, or staff. In those cases,

23  *housing inmates with serious mental disorders should be as brief as possible and as rare*

24  *as possible*." (emphasis added)).  Defendants' termination experts further reported with

25  concern on some of the disturbing practices that occur in segregation settings across the

26  system.  *See id.* at 23 (EOP-ASU inmates strip searched upon leaving and returning to their

27  housing unit, a "procedure [that] can be a disincentive to group participation and [that]

28  should be reviewed"); *accord* Kaufman Expert Decl. ¶¶ 88, 98, 101, 121, 163-167

[787966-12]

1  ("dehumanizing" practice of strip-searching mentally ill prisoners prior to receiving

2  treatment found to persist for men in segregation at COR and CIM, and for women at

3  CCWF, even when segregation placement was for non-disciplinary reason, including "lack

4  of [appropriate] bed spaces").

5        Defendants' staff and outside consultants have similarly identified the heightened

6  risk of harm for mentally ill prisoners in segregated housing units. *See* Decl. of Michael

7  W. Bien in Supp. of Pls.' Opp. to Defs.' Mot. to Terminate, Docket No. 4399, Mar. 15,

8  2013 ("Bien Termination Opp. Decl.") at Ex. 3, p. 1 ("CDCR Suicides: Results of Recent

9  Analysis" (dated Jan. 25, 2013); CDCR Suicide Prevention Coordinator's internal

10 memorandum finding that "[s]egregated settings have traditionally been considered higher

11 risk settings when it comes to suicides."); *id* at Docket No. 4400, Ex. 50, p. 2 (memoran-

12 dum by CDCR suicide prevention consultant Lindsay M. Hayes (dated Aug. 16, 2011),

13 finding "a disproportionate number of inmate suicides occurring within ASU cells").

14       The Special Master and Plaintiffs' experts have reached the same conclusion. *See*

15 Special Master Report on Suicides Completed in the CDCR, January 1, 2012 – June 30,

16 2012, Docket No. 4376, Mar. 13, 2013 ("First Half 2012 Suicide Report") at 16 (finding

17 difference between the rate of suicide in segregated housing and the rate in non-segregated

18 housing "staggering"); Haney Expert Decl. ¶¶ 36-43 (criticizing "CDCR's reliance on

19 harsh and dangerous segregation units"), ¶¶ 69-94 (discussing damaging effects of long

20 stays in segregation among mentally ill at MCSP), ¶¶ 143-153 (same at CIM), ¶¶ 219-225

21 (same at COR), ¶¶ 248-273 (same at CCI), ¶¶ 284-286 (noting that "[p]rolonged

22 segregation of inmates with serious mental illness" causes "harm [that] is very real and

23 very serious"); Kaufman Expert Decl. ¶¶ 95, 119-126 (discussing harmful effects of long-

24 term placements of mentally ill inmates in segregation), ¶¶ 127-138 (discussing harmful

25 effects of excessive SHU terms in extreme isolation); Expert Declaration of Pablo Stewart,

26 M.D., Docket No. 4381, Mar. 14, 2013 ("Stewart Expert Decl.") ¶¶ 178-183 (noting high

27 proportion of CDCR suicides occurring in administrative segregation units), ¶¶ 274-277

28 (opining on need to limit mentally ill prisoners' stays in "toxic" segregation environ-

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  ments), ¶¶ 285-347 (finding that EOPs are particularly vulnerable to decompensating in

2  ASUs and PSUs, and recounting observations from SVSP, SAC, LAC, RJD and San

3  Quentin that EOPs were "not receiving even close to" a sufficient treatment program and

4  "appeared to be poorly functioning and exhibiting severe symptoms of mental illness as a

5  result").

6       Defendants have failed to remove known architectural suicide risks, such as

7  ventilation grates with openings large enough to use as hanging attachments, from the vast

8  majority of their segregation cells, limiting renovations to remove these dangerous

9  attachments in only a small number of designated "intake cells."  Special Master's Rep. &

10  Recommendations on Defs.' Plan to Prevent Suicides in Administrative Segregation,

11  Docket No. 2084, Dec. 18, 2006 at 4-6.  Defendants' policy is to place newly arrived

12  prisoners in segregation in "suicide safe" cells only for the first 72 hours of their

13  segregation terms, despite serious concerns expressed by both the Special Master's experts

14  and Plaintiffs.  *Id.* at 6.  Defendants, due to the shortage of these suicide safe intake cells –

15  as most segregation units have just a few such cells – and coupled with the overuse of

16  segregation, Defendants frequently are unable to comply even with this limited 72-hour

17  policy.  *See* Special Master 25th Round Report at 63-64 ("[A]lmost every institution

18  reported that the number of newly arriving inmates [in ASU] generally exceeded the

19  number of available cells throughout the monitoring period."); *see also* Kahn Feb. 11,

20  2013 Decl., Ex. A (Defs.' Amended Aug. 25, 2010 Updated Report at 9 (Defendants

21  reporting that "[u]pon placement into ASU, inmates are housed in retrofitted intake cells

22  for 72 hours: Population pressures have adversely impacted full implementation of this

23  provision.")).

24       Despite the well-known, well-documented risks, Defendants continue to house

25  thousands of prisoners with mental illness in segregated housing units, with extraordinarily

26  long lengths of stay and inadequate mental health treatment, out-of-cell time, and

27  programming.  The Program Guide excludes class members from the Pelican Bay SHU

28  and the stand-alone ASUs only, but permits the placement of prisoners with serious mental

12

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    illness in all other segregated housing units.  Kahn Decl. ¶ 10 & Ex. 8 (*Coleman* Program

2    Guide sections 12-7-11 (Stand-Alone ASUs) and sections 12-8-1 to 12-8-3 (SHU, setting

3    forth the Pelican Bay SHU exclusionary criteria).

4          By any measure, CDCR's policies are failing *Coleman* class members.  This Court

5    recently found serious violations in Defendants' use of segregation, identifying a series of

6    issues that "until remedied, mean that seriously mentally ill inmates placed in continue[] to

7    face a substantial risk of harm" and support a finding of ongoing constitutional violations.

8    Order Denying Mot. to Terminate at 44-46.  In light of the State's continued failures to

9    provide constitutionally adequate mental health care to class members in segregation

10   settings—failures identified by the Court and demonstrated by the evidence but not

11   squarely addressed in the April 5, 2013 order (*see* Order Denying Mot. to Terminate at 8

12   n.6)—Plaintiffs now request further remedial orders to protect the rights of the *Coleman*

13   class and enforce the remedy in this case.

14                                    **ARGUMENT**

15   **I.    LEGAL STANDARD:  WHERE THERE ARE SERIOUS ONGOING**
          **CONSTITUTIONAL VIOLATIONS, AND A LENGTHY HISTORY OF**
16        **NON-COMPLIANCE WITH EXISTING REMEDIAL ORDERS, FURTHER**
          **RELIEF IS NECESSARY.**
17

18         The Constitution does not permit inhumane prisons.  *Coleman v. Wilson*, 912 F.

19   Supp. 1282, 1297-98 (E.D. Cal. 1995) (citing *Farmer v. Brennan*, 511 U.S. 825 (1994) and

20   *Helling v. McKinney*, 509 U.S. 25 (1993)).  Prison officials "must provide humane

21   conditions of confinement … and must take reasonable measures to guarantee the safety of

22   the inmates." *Farmer*, 511 U.S. at 832 (internal quotations and citations omitted).

23         In its 1995 order, this Court found that Defendants' "policies and practices with

24   respect to housing of class members in administrative segregation and in segregated

25   housing units violate the Eighth Amendment rights of class members." *Coleman*, 912 F.

26   Supp. at 1321.  Remarkably, Magistrate Judge Moulds' findings of constitutional

27   violations inflicted on mentally ill prisoners in segregated housing units almost 19 years

28   ago in many ways describe today's situation:

13

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    [P]lacing mentally ill inmates in administrative segregation or segregated housing exacerbates the underlying mental illness, induces psychosis, and increases the risk of suicide....

2    Defendants and their employees recognize the danger to mentally ill inmates from housing in segregated housing units, particularly Pelican Bay SHU. Nonetheless, defendants continue to house mentally ill inmates in these units. Defendants' use of administrative segregation and segregated housing at Pelican Bay SHU and statewide to house mentally ill inmates violates the Eighth Amendment because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental status, because such placement will cause further decompensation, and because inmates are denied access to necessary mental health care while they are housed in administrative segregation and/or segregated housing.

*Coleman v. Wilson*, Case No. CIV S-90-0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786, at *71-*72, *74 (June 6, 1994) (Docket No. 547) (Findings and Recommendations) (citations omitted).

For years and years, this Court has appropriately relied on Defendants to develop and implement plans to address these and other serious constitutional violations. *See Lewis v. Casey*, 518 U.S. 343, 361-63 (1996); *Bounds v. Smith*, 430 U.S. 817, 832-33 (1977). Defendants have repeatedly failed in this endeavor. *See* Order Denying Mot. to Terminate at 43-46, 65 (finding current and ongoing constitutional violations related to, *inter alia*, Defendants' use of segregation, and that "[t]here is overwhelming evidence in the record that much of defendants' progress to date is due to the pressure of this and other litigation."); *Plata*, 131 S. Ct. at 1923; Order, Docket No. 2320 July 23, 2007 at 6. ("[D]efendants' mental health care delivery system has not come into compliance with the Eighth Amendment at any point since this action began."); Three-Judge Court Op. & Order, Docket No. 3641, Aug. 4, 2009 at 22 (finding that Defendants "remain[ ] unable to deliver constitutionally adequate mental health care" to seriously mentally ill inmates).

Defendants' failure to implement an adequate remedy for the constitutional violations in CDCR's harsh segregation units, and the extensive and irreparable harm to the *Coleman* class that results with each day that passes, require further remedial orders by this Court. "If government fails to fulfill [its Constitutional] obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation." *Plata*, 131 S. Ct. at

14

[787966-12]

1928 (citing *Hutto v. Finney*, 437 U.S. 678, 687, n.9 (1978)).  While the Court "must be

sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the

need for deference to experienced and expert prison administrators, it "must not shrink

from [the] obligation to enforce the constitutional rights of all 'persons,' including

prisoners." *Id.* at 1928 (citing *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (per curiam)

(internal quotation marks omitted)).   The Ninth Circuit has made clear that, in complex

institutional litigation, specific and targeted remedial orders are appropriate when

supported by the record because "[p]rospective relief for institutions as complex as prisons

is a necessarily aggregate endeavor, composed of multiple elements that work together to

redress violations of the law." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1070 (9th

Cir. 2010).

This Court "may not allow constitutional violations to continue simply because a

remedy would involve intrusion into the realm of prison administration." *Plata*, 131 S. Ct.

at 1928-29.  The time for patience in allowing Defendants to address the major drivers of

the constitutional violations and the unnecessary risk of serious harm in segregation is at

an end. *See id.*; *Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004) (noting that

defendants' "record of abject failure" informs the appropriateness of court-ordered relief

where defendants had been unable to "cure the constitutional infirmities plaguing the

delivery of health care in the correctional system" for more than two decades).

Based on the Special Master's findings, Defendants' own experts' findings and

recommendations, the evidence gathered and presented by Plaintiffs, and the record in this

case, Plaintiffs seek prompt judicial relief as described below.  Such relief is critically

needed to address the serious constitutional violations that persist and endanger the lives,

safety, and well-being of the *Coleman* class, and is "narrowly drawn," "extends no further

than necessary to correct the violation[s]" of class members Constitutional rights, and "is

the least intrusive means necessary to correct" those violations.  18 U.S.C.

§ 3626(a)(1)(A).

[787966-12]

## II.   THE IDENTIFIED CONSTITUTIONAL VIOLATIONS IN SEGREGATION SETTINGS REQUIRE FURTHER REMEDIAL ORDERS.

In its order denying Defendants' motion to terminate, this Court identified a host of segregation practices – previously set forth by the Special Master – that are putting seriously mentally ill inmates at a "substantial risk of harm" and must be addressed in order to remedy existing constitutional violations.  *See* Order Denying Mot. to Terminate at 45-46.  Those issues include:

- "[R]eduction of lengths of stay in administrative segregation";
- "[A]lternatives to use of administrative segregation placements for non-disciplinary reasons";
- "[R]eduction of risks of decompensation and/or suicide"; and
- "[A]ccess to treatment/mitigation of harshness of conditions in the administrative segregation units."

*Id.* (quoting Special Master 25th Round Report at 38); *see also* Special Master 25th Round Report at 36-38 (chronicling Defendants' failures to implement other critical life-saving measures in administrative segregation units, including 30-minute welfare checks for all segregation prisoners, mental health screening, and basic elements of mental health care such as confidential mental health interviews).

These serious constitutional violations place class members at an unacceptable risk of harm, including death.  Many of these ongoing constitutional violations also violate federal disability law.  The State has agreed that such disability discrimination should be addressed in crafting an appropriate remedy in this case:

> The mental-healthcare system for inmates in California's prisons must comply with federal law, including the Rehabilitation Act and ADA. Thus, such concerns should have been raised and addressed while crafting the remedy in *Coleman*[.]

*Hecker v. CDCR*, E.D. Cal. Case No. 05-CV-02441 LKK GGH, Defs.' Opp'n to Pls.' Renewed Mot. for Relief from Stay, Docket No. 106, Apr. 4, 2013 at 1-2; *see also id.* at 6 ("[T]he *Coleman* court retains jurisdiction over the Program Guides to ensure compliance

[787966-12]

1   with all federal laws, *including disability-access laws.*") (emphasis added).

2       Plaintiffs seek affirmative relief to ensure that an effective and timely remedy for

3   each of these violations is provided.

4       **A.    The Court Should Order An Effective Remedy For The Excessive**
        **Lengths Of Stay Of Class Members In Segregation**
5

6       Defendants have long been directed to take steps to reduce the lengths of stay of

7   class members in segregation units. *See, e.g.*, Order, Docket No. 2158, Mar. 12, 2007 at 2

8   ¶ 3 (directing Defendants to complete a review process to "examine more effective ways

9   for reducing the lengths of stay of EOP inmates in administrative segregation"). Yet

10  lengths of stay in the ASU, SHU, and PSU continue to last for exceedingly long periods of

11  time. *See* Kahn Decl. ¶¶ 6-9.

12      Defendants' termination experts found that CDCR's segregation units are

13  "generally non-therapeutic," and that this is true "even when EOP level care is provided."

14  Defs.' Joint Expert Report at 18, 23. The provision of appropriate care (such as EOP level

15  of care for EOPs) is rarely, if ever, provided in CDCR's segregation units. *See* Pls.' Opp.

16  Br. at 57-62 (presenting evidence of staffing shortages, clinical space deficiencies, and

17  lack of adequate mental health treatment); Special Master 25th Round Report at 36-37.

18      Defendants' termination experts found that placement of prisoners with serious

19  mental illness in segregation should occur "only when absolutely necessary," and even

20  then, such placements should be (1) "as brief as possible" and (2) "as rare as possible."

21  Defs.' Joint Expert Report at 21, 23. This is consistent with the position of the American

22  Psychiatric Association, which has found that "[p]rolonged segregation of adult inmates

23  with serious mental illness, with rare exceptions, should be avoided due to the potential for

24  harm to such inmates." Bien Termination Opp. Decl., Docket No. 4399, Ex. 14. Other

25  courts have recognized that prolonged segregation harms mentally ill prisoners. *See, e.g.*,

26  *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, Case No. 1:08-cv-

27  01317-TWP-MJD, 2012 U.S. Dist. LEXIS 182974, *37-39 (S.D. Ind. Dec. 31, 2012)

28  (finding that "[t]he consensus of opinion in a professional body of literature … is that

17

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   segregation is detrimental for people with serious mental illness because it makes their

2   symptoms worse or because, at best, they do not get any better" and that isolation, sensory

3   deprivation, and enforced idleness in segregation can cause decompensation "as soon as 10

4   days to two weeks after such placement"); *see also Ashker v. Brown*, Case No. C 09-5796

5   CW, 2013 U.S. Dist. LEXIS 51148, at *13-*14 (N.D. Cal. Apr. 9, 2013) ("[T]he length of

6   confinement cannot be ignored in deciding whether the confinement meets constitutional

7   standards.") (quoting *Hutto*, 437 U.S. at 686-87).  As the record shows, these basic

8   principles do not currently guide CDCR's dangerous use of segregation for excessive

9   periods of time.[6]

10      Administrative segregation as it is currently used by Defendants is plainly

11   inconsistent with Defendants' experts' recommendations, and also with its intended

12   purpose of providing a "*temporary* segregation" setting for inmates.  Cal. Code Regs. tit.

13   15, § 3335 (emphasis added).  Defendants have failed to effectively reduce segregation

14   placements or limit their duration.  In the meantime, prisoners placed in ASUs for lengthy

15   periods of time are committing suicide at an alarming rate.  Defendants' recent analysis of

16   segregation unit suicides since 2007 found that more than 30 CDCR suicide victims who

17   died in segregation had been in segregation for a month or longer at the time of their death;

18   11 suicides occurred after the prisoner had been in ASU for more than 100 days.  *See* Decl.

19   of Jane E. Kahn in Supp. of Pls.' Opp. to Defs' Mot. to Terminate ("Kahn Termination

20   Opp. Under Seal Decl."), Ex. 6 (filed under seal), Docket Nos. 4396, 4411, Mar. 15, 2013.

21   The risk of extended segregation placements for CDCR prisoners—including prisoners

22   currently on the caseload and prisoners at risk of decompensation and development of

23   serious mental illness given the harsh segregation environment—is too great for the status

24

25   [6] This Court correctly noted that Defendants' experts "'applaud CDCR's efforts to
    expedite the transfer of EOP inmates out of administrative segregation' but they don't
26   describe what those efforts are."  Order Denying Mot. to Terminate at 44 n.41.  Whatever
    those efforts may be, the results have been inadequate, as demonstrated but the excessive
27   lengths of stay of so many class members in segregation.

28

[787966-12]

18
NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  quo to persist. *See* Kahn Decl. Ex. 14 (Dvoskin Dep. at 73:12-15 (agreeing that "long term

2  housing in segregation" may "cause psychological harm"). The system must ensure that

3  segregation placements are imposed "only when absolutely necessary," and are as brief as

4  possible, as recommended by Defendants' own experts. Defs.' Joint Expert Report at 21;

5  *see also* Haney Expert Decl. ¶¶ 280-289; Kaufman Expert Decl. ¶¶ 119-126, 135-138;

6  Stewart Expert Decl. ¶¶ 274-277.

7       The Court should order strict, and enforceable, time limits for the placement of

8  *Coleman* class members in segregation units. Plaintiffs submit that the following time

9  limits are necessary and appropriate to remedy the great psychological harms to class

10  members caused by lengthy segregation stays:

11  • For EOP class members, a limit of 30 days in any segregated housing unit (EOP ASU or PSU) (with no restarting of the clock based on cell or unit transfers during

12  the segregation term). Placement in any segregated housing unit that has not been found capable of providing a minimally adequate treatment program (*see* Part

13  II.D.1, *infra*) should be limited to no more than 72 hours.

14  • For CCCMS class members, a limit of 60 days in any segregated housing unit (ASU or SHU) (with no restarting of the clock based on cell or unit transfers during the

15  segregation term).[7] Placement in any segregated housing unit that has not been found capable of providing a minimally adequate treatment program (*see* Part

16  II.D.1, *infra*) should be limited to no more than 72 hours.

17       Defendants should further be required to provide monthly reports, prepared and

18  signed by the warden of each respective prison, identifying each case in which a class

19  member's segregation placement exceeds applicable time limits, the reason for the

20  continued placement, and what steps Defendants are taking to promptly transfer the class

21  member to an appropriate placement  and to remedy the barrier that caused the violation of

22  the time limit. *See, e.g.*, Order, Jan. 12, 2004, Docket No. 1559, Jan. 12, 2004 at 2 ¶ 5

23  (ordering Defendants to submit to the Special Master in writing an explanation for the

24  length of stay in ASUs for each of the 34 EOP inmates held for six months or more in

25

26  [7] Plaintiffs have concurrently moved for exclusion of class members from all CDCR SHUs similar to the exclusion order that has long been in place regarding the Pelican Bay SHU.

27  *See* Part II.C.3, *infra*.

28

19

1    segregation).

2         **B.    The Court Should Order An Effective Remedy To Provide Appropriate**
          **Alternatives To The Use Of Administrative Segregation Placements For**
3         **Non-Disciplinary Reasons**

4         The Special Master and the Court have identified Defendants' failure to implement

5    "alternatives to use of administrative segregation placements for non-disciplinary reasons"

6    among the issues that must be addressed to provide a remedy for the constitutional

7    violations in this case.  *See* Order Denying Mot. to Terminate at 45-46 (citing Special

8    Master 25th Round Report at 38).  Defendants must be ordered to stop placing mentally ill

9    prisoners in dangerous segregated housing units for non-disciplinary reasons such as (1)

10   the prisoners' own safety concerns or (2) because there is a lack of appropriate beds for

11   them in CDCR's system.

12        In addition to the constitutional violations and harms caused by placing *Coleman*

13   class members in segregated housing units for non-disciplinary reasons, such a practice

14   runs afoul of federal disability law.  The Americans with Disabilities Act (ADA) requires

15   treatment in the most integrated setting appropriate to a disabled individual's needs and

16   does not permit segregation imposed due to an individual's disability.  *See* 42 U.S.C.

17   § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be

18   excluded from participation in or be denied the benefits of the services, programs, or

19   activities of a public entity, or be subjected to discrimination by any such entity."); 42

20   U.S.C. § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals

21   with disabilities, and, despite some improvements, such forms of discrimination against

22   individuals with disabilities continue to be a serious and pervasive social problem"); 42

23   U.S.C. § 12101(a)(5) ("individuals with disabilities continually encounter various forms of

24   discrimination,  including … segregation, and relegation to lesser services, programs,

25   activities, [etc.]"); 28 C.F.R. § 35.130(d) ("A public entity shall administer services,

26   programs, and activities in the most integrated setting appropriate to the needs of qualified

27   individuals with disabilities."); *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999)

28

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

("Unjustified isolation … is properly regarded as discrimination based on disability."); *cf. Biselli v. Cty. of Ventura*, Case No. CV 09-08694 CAS (Ex), 2012 U.S. Dist. LEXIS 79326, *44-45 (C.D. Cal. June 4, 2012) (finding that placement in ASUs based on conduct specifically linked to mental illness, without input from mental health staff, may constitute violation of the ADA).

This remedy is critically necessary, and in fact is not at all novel to Defendants.  In *Armstrong v. Brown* (Case No. 94-cv-02307-CW, N.D. Cal.), Defendants recently developed a Model Local Operational Procedure to implement CDCR's "policy … not to house *Armstrong* class members in an Administrative Segregation Unit (ASU) due solely to a lack of appropriate accessible General Population (GP) housing (including Sensitive Needs GP)."  Kahn Decl. Ex. 9.

The *Armstrong* policy provides a detailed procedure to address inappropriate placement of prisoners with certain physical disabilities in segregated housing units:

> If ASU housing is the only available accessible housing that can immediately accommodate the disability needs of the inmate, the reasons for exceptional housing shall be clearly documented using the CDC-114-D process.  At the time of the initial 114-D Review, absent any other compelling penological interest, the inmate shall be approved to be released from the ASU to GP housing.  Failure to move the affected inmate out of ASU into appropriate GP housing within 48 hours will require immediate notification to designated headquarters staff ….  This policy shall also apply to <u>Armstrong</u> class members who were placed in ASU for security reasons and who are subsequently reviewed by the Institutional Classification Committee and determined to be eligible for release to GP housing.

*Id.* at 1.

*Coleman* class members now being housed in ASU by reason of their mental health disability, and solely because Defendants have chosen not to place them in appropriate, safe and less restrictive housing, should be treated no different.  As the State has conceded, "[t]he mental-healthcare system for inmates in California's prisons must comply with federal law, including the Rehabilitation Act and ADA."  *Hecker v. CDCR*, Defs.' Opp'n to Pls.' Renewed Mot. for Relief from Stay, Docket No. 106, Apr. 4, 2013 at 1-2; *see also*

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

*id.* at 6 ("[T]he *Coleman* court retains jurisdiction over the Program Guides to ensure compliance with all federal laws, *including disability-access laws.*") (emphasis added).

### 1. Defendants' Segregation Units Should Not Be Used to House Mentally Ill Prisoners Based on Prisoners' Own "Safety Concerns"

The evidence shows that the placement of mentally ill prisoners in segregation for non-disciplinary reasons such as their own "safety"—that is, placement in segregation rather than a more appropriate, less restrictive placement that meets their safety needs— creates a substantial and unacceptable risk of harm.  *See* Pls.' Opp. Br. at 51-55.

It is of serious concern that dozens of human beings are dying in ASUs, known to be dangerous settings with high suicide rates, after being placed there for their own safety. Stewart Expert Decl. ¶¶ 278-282.  Defendants have documented that no less than **39 suicides** that occurred in ASUs between 2007 and 2012 were by prisoners placed in segregation for "safety" concerns.  *See* Kahn Termination Opp. Under Seal Decl. Ex. 6; *see also, e.g.*, First Half 2012 Suicide Report at 80-86 (Inmate N suicide following placement in segregated housing for his own safety); 2011 Suicide Report at 119 (Inmate J placed in ASU for safety reasons and "remained in ASU pending transfer to an SNY institution, which had been approved" at time of death).  It is well known, and Defendants have recognized, that prisoners placed in segregation based on safety concerns are particularly vulnerable to suicide.  *See* Bien Termination Opp. Decl., Docket No. 4399, Ex. 3 (CDCR Suicide Prevention Coordinator noting that "[M]any inmates who [were] housed in ASU at the time of their deaths are placed there not for disciplinary reasons, but for safety reasons.... *[P]lacement in ASU of already fearful inmates may only serve to make them even more fearful and anxious, which may precipitate a state of panicked desperation, and the urge to die.*" (emphasis added)); *id.* Ex. 22 at p. 3 (H. Sánchez, *Suicide Prevention in Administrative Segregation Units: What is Missing*, Journal of Correctional Health Care, 00(0) 1-8 (2013) (CDCR psychologist writing that: "Prisoners placed in the administrative segregation unit for their safety face similar stressors related to

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  being isolated. *They also may experience anxiety, fear, and paranoia associated with the*

2  *initial safety concerns that led to their placement on this unit.*" (emphasis added)).

3      Defendants' former-suicide prevention consultant Lindsay Hayes, in recent

4  deposition testimony, testified about a 2006 conference with CDCR officials concerning

5  the risk of suicides in CDCR segregation settings:

6      [T]here were non-disciplinary inmates being housed within the Ad-Seg units.
       And the concern was that they were being managed as if they were
7      disciplinary inmates.

8      In other words, there was very little movement. In other words, lack of out-
       of-cell time. Their property was limited. So they were being treated as if
9      they were disciplinary inmates, but they did not have disciplinary orders.

10     … [T]here was a discussion that this could also be one reason why there's a
       disproportionate number of suicides in the Ad-Seg unit, because inmates in
11     these units were very frustrated, and their mental health was deteriorating,
       and their stress level was increasing because they're there for reasons other
12     than discipline, and yet they're being treated it as if they were disciplinary
       inmates and being locked down up to 24 hours a day and not being given
13     yard and normal property.

14     … I think it was a general agreement amongst the folks that were at [the
       2006 CDCR] summit conference that this—this could perhaps be one of the
15     reasons why there was this disproportionate number of suicides within the
       Ad-Seg unit.

16

17  Kahn Decl. Ex. 15 (Hayes Dep. at 45:9-46:18). But Defendants failed to address this

18  deficiency in 2006, and it has persisted in the years since then.

19      Defendants' termination expert Steve Martin likewise testified that there is "no

20  need" to impose segregation conditions on a prisoner who "doesn't otherwise represent a

21  threat to anybody, but somebody is a threat to him" and that "if there are onerous or

22  punitive conditions, a de facto type of punishment when the offender hasn't done anything

23  [there would be] [d]ue process implications, if nothing else. If not Eighth Amendment ….

24  If the effect of that is corporally, you know, punitive, then I think there's an issue." Kahn

25  Decl. Ex. 16 (Martin Dep. at 44:8-47:13). Yet Defendants' own evidence confirms that

26  such placements are common practice at numerous institutions across CDCR's system.

27  *See, e.g.*, Gipson Reply Decl. ¶ 17 (COR), Docket No. 4430; Reply Decl. of Brenda M.

28  Cash in Supp. of Defs.' Mot. to Terminate, Docket No. 4459, Mar. 22, 2013 ("Cash Reply

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

Decl.") ¶ 12 (CIM); Reply Decl. of James Telander in Supp. of Defs.' Mot. to Terminate, Docket No. 4480, Mar. 22, 2013 ("Telander Reply Decl.") ¶ 5 (MCSP); Reply Decl. of Lori Williams in Supp. of Defs.' Mot. to Terminate, Docket No. 4446, Mar. 22, 2013 ("Williams Reply Decl.") ¶ 12 (CCWF).

Defendants' experts recommended specific reforms to address this serious problem. Defs.' Joint Expert Report at 19 (finding "some [CIM] inmates waiting for EOP Special Needs Yard beds and reportedly housed in an Administrative Segregation Unit for their own protection; not because they posed a danger to others," and stating "[o]ur recommendation is that inmates with serious mental illness who are housed in an Administrative Segregation Unit while awaiting a Special Needs Yard bed be placed at the front of any waiting list").  Defendants rejected this recommendation.[8]  Bien Termination Opp. Decl., Docket No. 4404, Ex. 92 p. 20 (Defs.' Suicide Compendium, dated Jan. 27, 2013) ("Dvoskin Report" section).

An effective remedy is necessary:  This Court should order that mentally ill prisoners may not be placed in ASUs based on concerns about their safety or Special Needs Yard (SNY) status or because they are a victim of assault, and that when safety issues arise for mentally ill prisoners, Defendants must identify and promptly transfer them to a safe and appropriate alternative placement where they will not be subject to the harsh and restrictive conditions of existing CDCR segregation units and can receive appropriate mental health care.

### 2. Defendants' Segregation Units Should Not Be Used to House Mentally Ill Prisoners Based on "Lack of Beds"

Defendants' current practice of housing mentally ill prisoners in segregation units

---

[8] Defendants also refused to consider a "non-disciplinary segregation" unit that would be less harsh and more conducive to therapeutic objectives for prisoners who are currently being placed in administrative segregation for reasons not related to discipline or alleged misconduct.  Bien Termination Opp. Decl., Docket No. 4404, Ex. 92, (Defs.' Suicide Compendium (second page of chart)).

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[787966-12]

1    while awaiting appropriate non-segregation placements—at some institutions termed

2    "Lack of Beds" prisoners—is inflicting an unnecessary risk of harm on class members.  An

3    order ending this dangerous practice is needed to save lives and prevent needless

4    psychological suffering.

5            In their recent tours of CDCR institutions, Plaintiffs' experts discovered scores of

6    prisoners held in segregation simply because Defendants could not find any available

7    appropriate bed for them.  (Because Defendants for some reason do not "count" these

8    prisoners as being in ASU, even though they obviously are, Plaintiffs have no way of

9    knowing the complete magnitude of this practice.)  At CIM, Plaintiffs' experts observed a

10   giant housing roster board in one administrative segregation unit, on which the vast

11   majority of prisoners were marked "LOB"—"Lack of Beds."  Haney Expert Decl. ¶ 143 &

12   Photo Ex. S.  All these men—many with diagnosed mental illness—were held in

13   segregation not for a disciplinary reason, but because CDCR had nowhere else to put

14   them.[9]  Haney Expert Decl. ¶¶ 143-153; Kaufman Expert Decl. ¶ 96-98, 105, 115-118.

15   The harm to these individuals' mental health and safety is obvious.  *See, e.g.*, Kaufman

16   Expert Decl. ¶ 115 (finding that "LOB" segregation housing to be "especially damaging

17   because of the indeterminate and seemingly arbitrary nature of the placement" and noting

18   four of the five LOB prisoners he encountered "had been to the MHCB because of

19   psychological distress they attribute in large part to their housing situation").

20           Defendants' expert Dvoskin observed the "LOB" problem during his tours, and

21   _____

22   [9] This situation is doubly shocking because prisoners housed in the ASU as "LOB"

23   inmates are, for some reason, *not* provided the thirty-minute welfare checks (for the first
     21 days) or the pre-placement questionnaire that ***all*** prisoners are supposed to receive

24   when they are placed in ASU.  These critical mental health-related practices are, of course,
     designed to protect the safety and well-being of all prisoners who are placed in the harsh

25   segregation environment and to identify those who are at risk of suicide.  Yet, CIM does

26   not designate these prisoners as "ASU prisoners" (as if the designation is what matters)
     and thus does not provide these critical safety measures, further increasing the risk of

27   psychological harm and suicide.  Kaufman Expert Decl. ¶ 98; Haney Expert Decl. ¶ 151.

28

25

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   testified to his serious concerns about the practice: "That's not okay. Put signs on the

2   door. Figure it out. You shouldn't lock me down if I didn't do anything. It's not fair … It

3   ain't right." Kahn Decl. Ex. 14 (Dvoskin Dep. at 260:8-262:18). Defendants' expert

4   Moore observed several EOP prisoners placed in the ASU at CIM solely because there was

5   a lack of appropriate beds in the system. She found that these men were "very sick … they

6   were hearing voices or … were having auditory hallucinations or that one inmate was

7   seeing signs of his grandmother. They were sick inmates; they needed to be somewhere

8   else." Kahn Decl. Ex. 17 (Moore Dep. at 166:4-168:9).

9       This problem is far from unique to CIM; in fact, the problem of prisoners housed in

10  dangerous segregation due to "lack of beds" pervades the system, as acknowledged by

11  Defendants. *See, e.g.*, Holland Reply Decl. ¶ 6, Docket No. 4438 (responding to Plaintiffs'

12  expert finding that "as a result of overcrowding due to transfer backlogs, there was no

13  appropriate place to put inmates awaiting transfer" such that CCI mentally ill prisoners

14  were being placed in segregation but noting that "[t]he issue of inmates waiting for transfer

15  to an appropriate bed … is a statewide one and not just specific to California Correctional

16  Institution"); Gipson Reply Decl. ¶ 19, Docket No. 4430 (explaining that at COR "inmates

17  are housed in ASU for non-disciplinary reasons or are housed while waiting for an opening

18  in another unit," where they are subjected to "unclothed body searches when leaving their

19  cells to go to yard or medical appointments" notwithstanding their placement being due to

20  lack of appropriate beds); Cash Reply Decl. ¶ 11, Docket No. 4459 (explaining that "new

21  intake inmates are sometimes placed in ASU due to lack of bed space" while asserting that

22  "[t]here is no official 'LOB' classification at CIM"); Telander Reply Decl. ¶ 6, Docket No.

23  4480 (explaining that of 90 mentally ill prisoners in segregation unit at MCSP, seven had

24  been awaiting transfer for more than 90 days, and that three were awaiting transfer to

25  placements with a "lesser degree of security").[10]

26

27  [10] Defendants' data does not shed light on the magnitude of the problem, though it is
28  (footnote continued)

[787966-12]

1   CDCR's segregation units have potentially dangerous and devastating effects on

2   anyone who is placed in them, and it is unconscionable to expose prisoners, especially

3   those with mental illness, to such dangers simply because the system cannot or will not

4   timely place them in an appropriate bed.  *See* Stewart Expert Decl. ¶¶ 205, 278-282;

5   Kaufman Expert Decl. ¶¶ 95-118; Haney Expert Decl. ¶¶ 44-50, 280-283; *see also, e.g.,*

6   First Half 2012 Suicide Report at 65-72 (Inmate L suicide in ASU while awaiting transfer

7   to appropriate bed).

8   Defendants have argued that they have "developed a comprehensive bed plan to

9   ensure that California inmates have and continue to receive ready access to appropriate

10  mental health care."  Defs.' Mem. P & A in Supp. of Defs.' Mot. to Terminate, Docket No.

11  4275-1, Jan. 7, 2013 ("Defs.' P & A Mot. to Terminate") at 17.  Defendants should be held

12  to this representation.  The placement of class members in segregation due to "lack of

13  beds" must end.  This Court should order that mentally ill prisoners may not be placed in

14  ASUs for non-disciplinary reasons, including based on "lack of beds" or while awaiting

15  transfer to another CDCR prison or program.  There is no justification for subjecting these

16  prisoners to the harsh and restrictive conditions of segregation.

17

18

19  _____

20  unquestionably substantial.  During the week of February 11, 2013 (the most recent data
    provided by Defendants), CDCR institutions requested the transfer of 234 EOP prisoners

21  to appropriate EOP programs throughout the system; only 32 prisoners (13.7%) could be
    transferred.  *See* Bien Termination Opp. Decl., Docket No. 4399, Ex. 2.  During the same

22  week, of the 1435 CCCMS prisoners for whom transfer to an appropriate bed was

23  requested, just 271 (18.9%) could be transferred.  Defendants' weekly EOP data from
    January 2011 through December 2012 show similar backlogs.  Bien Termination Opp.

24  Decl. Docket No. 4402, Ex. 72.  Plaintiffs have not been provided data as to how many of
    these hundreds of class members waiting for an appropriate bed are being housed in ASUs,

25  but Plaintiffs' experts found these "LOB" prisoners at several institutions, and observed

26  that they were experiencing significant psychological distress.  *See* Haney Expert Decl.
    ¶¶ 107-110 (MCSP); ¶¶ 217-227 (COR); ¶¶ 248-257 (CCI); Kaufman Expert Decl. ¶¶ 95-

27  126 (CCWF, CIM, and COR).

28

27

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

**C.**   **The Court Should Order An Effective Remedy To Reduce The Risks Of Decompensation And Suicide Through Appropriate Screening And Exclusions Of Class Members At Heightened Risk Of Harm If Placed In Segregation**

To address the constitutional violations in Defendants' segregation units, Defendants must "reduc[e] [the] risks of decompensation and/or suicide." *See* Order Denying Mot. to Terminate at 45 (citing Special Master 25th Round Report at 38). This Court has given Defendants enormous time and leeway to develop and implement a remedy for this most serious of constitutional harms. *See, e.g.*, Order, Docket No. 3836, Apr. 14, 2010 (directing Defendants to review their suicide prevention policies and practices to address the problem of inmate suicides); Order, Docket No. 2139, Feb. 12, 2007 (provisionally approving Defendants plan to address problem of suicides in segregation); Order, Docket No. 1830, June 8, 2006 (directing Defendants to develop a plan for "dealing with the escalating percentage of suicides occurring in administrative segregation units"); Order, Docket No. 1559, Jan. 12, 2004 (directing Defendants to take steps with respect to suicide prevention, and extended class member stays in segregation).

The suicide rate among CDCR's administrative segregation population is eye-popping: in 2012, it was 157 per 100,000 (as compared with about 24 per 100,000 systemwide), the same as it was in 2007, and an increase from 2011. *See* Kahn , Feb. 11, 2013 Decl. ¶ 8 & Ex. I. Although the ASU population is about 5.8 percent of the overall prison population, 26.5 percent of the 2011 suicides and 34 percent of the 2012 suicides occurred in ASUs. *See id*. As the recent findings by the Special Master's expert on suicide prevention show, the problem of decompensation and suicide in segregated housing units is extremely alarming. *See* First Half 2012 Suicide Report at 16-17 (finding the rate of suicide in segregated housing to be "staggering" and that "preventable suicide deaths appear to continue at an alarmingly high rate in CDCR segregated housing units").

Defendants fail to exclude from segregated housing mentally ill prisoners with obvious *additional* risks for decompensation and suicide, even beyond the serious risks borne upon all *Coleman* class members. These individuals, based on their current mental

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[787966-12]

health condition or case history, must be identified and excluded from CDCR's dangerous segregation settings.  First, Defendants must stop placing class members discharging from inpatient or crisis-level care to segregation units absent an individualized clinical determination that such prisoners' mental health will not be put at risk by placement in segregation following discharge.  Second, Defendants must take steps to provide adequate mental health screening for all prisoners entering segregation, and exclude those for whom such a placement would be clinically harmful.  Third, the time has come to exclude at-risk mentally ill prisoners from all SHUs in the same way that such prisoners are currently excluded from the similarly dangerous Pelican Bay SHU and stand-alone ASUs.  Finally, Defendants must conduct a comprehensive assessment (*i.e.*, a "sweep") of all prisoners currently in ASU, in SHU, in PSU, and on Death Row who have been housed in such placements for more than 90 days to identify and remove those whose mental health puts them at too great a risk of harm to remain in a segregation setting.

### 1.  Defendants Must End Dangerous Discharges of Inmate-Patients from Inpatient and Mental Health Crisis Beds to Segregation

Suicidal and seriously mentally ill prisoners who are treated at a crisis level (MHCB) or inpatient level (DSH) of care continue to be discharged and placed directly into dangerous segregation settings, without regard for the extraordinarily high risk of psychological harm, including suicide.  This is a very dangerous practice, and is contrary to the Court-approved remedy in this case (*i.e.*, the *Coleman* Program Guide).  *See* Bien Termination Opp. Decl., Docket No. 4399, Ex. 16 (Program Guide 12-5-27 & 28 ("psych and return procedures" designed to ensure that a patient discharging from an MHCB unit is provided an appropriate level of care.) & Ex. 17 (Program Guide 12-6-13 ("psych and return procedures" designed to ensure that a patient discharging from DSH inpatient care is provided an appropriate EOP level of care).

Class members have died, and continue to be at serious risk of harm and death, as a result of this "psych and return" practice.  For example, in January 2013, a *Coleman* class member died at SVSP after spending nearly one year at Atascadero State Hospital (ASH)

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   for inpatient psychiatric hospitalization.  *See* Kahn Termination Opp. Under Seal Decl.

2   Ex. 46.  He was placed directly in segregated housing at SVSP despite clinical

3   documentation that his pre-hospitalization segregation stay was responsible for symptoms

4   that led to his ASH inpatient admission.  *Id.*  Eight (8) days later, this man committed

5   suicide.  *Id.*  In another case, an 18 year old man admitted for MHCB crisis care, based on

6   a finding that he was "overwhelmed by a series of major losses and stresses," was

7   discharged after approximately two weeks.  2011 Suicide Report at 142-151 (Prisoner N).

8   His psychiatrist recommended that he be placed in an EOP program.  *Id.* at 145. He was

9   instead placed back in an ASU that did not provide an EOP level of care.  *Id.*  Fifteen (15)

10  days later, this man committed suicide in the ASU.  *Id.* at 147.

11      Defendants' dangerous psych-and-return practice persists.  Dr. Pablo Stewart found

12  during his recent tours several class members who were returned directly from DSH or

13  MHCB level care to a segregation setting, and noted that "the highly restrictive, anti-

14  therapeutic environments of administrative segregation … are almost certain to undermine

15  the increased level of functioning and treatment compliance generally achieved through an

16  inpatient placement."  Stewart Expert Decl. ¶ 347.  Dr. Craig Haney observed the same

17  problem at multiple CDCR institutions.  *See* Haney Expert Decl. ¶¶ 80, 109  (Prisoner B

18  returned from DSH, placed in MHOHU on suicide observation and then discharged to

19  ASU at MCSP), ¶¶ 165-67 (Prisoner W cycling several times since October 2012 between

20  ASU (for safety concerns) and MHCB at CIM); ¶ 226 (Prisoner JJ cycling between ASU

21  and MHCB at COR, feeling "suicidal and homicidal all the time," with clinician reporting

22  that Prisoner JJ has "been here too long" and "debating" whether to send him back to

23  DSH).[11]

24

25

26  [11] Defendants' Reply declarations that purport to "rebut" Dr. Haney's findings on this issue
    notably do not dispute that these class members were being returned directly from
27  inpatient care to segregation settings.  *See* Colley Reply Decl. ¶ 5, Docket No. 4482
    (confirming that Prisoner B was placed in ASU within one day of discharging from DSH
28  (footnote continued)

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

Defendants' recent half-measure will not solve this serious problem.  *See* Reply Decl. of Kathleen Allison in Supp. of Defs.' Mot. to Terminate ("Allison Reply Decl."), Docket No. 4478, Mar. 22, 2013, Ex. D (CDCR Memorandum, "Case-Work Expectations, Classification Time Frames, and Psychiatric and Return Policy for Department of State Hospital Acute and Intermediate Care Facility Inmate-Patients," which was issued on March 21, 2013 (the day before Defendants' Reply on the Motion to Terminate was due)); *see also* Reply Decl. of Tim Belavich in Supp. of Defs.' Mot. to Terminate, Docket No. 4472, Mar. 22, 2013, ¶ 46 (noting that memorandum was issued "in recognition of the challenges associated with the return of inmates from DSH to ASU and the risk for self-harm which may arise in that circumstance").  The new policy fails to require (or ostensibly even allow) any individualized clinical input into the determination of whether it is safe to return an inmate-patient from a hospital to a segregation setting.  In fact, the policy appears to *require* that such patients be discharged to a segregation setting.  *See* Allison Reply Decl., Ex. D at 9 ("Inmate-patients discharged from DSH treatment with a SHU term, or have case factors that require ASU placement … shall be transferred to the originating/sending institution's primary ASU hub.").  In other words, Defendants' new policy that purports to address the problem ignores the fact that, for some (if not most or all) inmate-patients, it is clinically unsafe to be discharged from inpatient treatment to a

_____

inpatient care in October 2012 and that such ASU placement was due to safety concerns (not for a disciplinary reason), and also explaining that Dr. Haney's "assertions are incorrect" about the lack of treatment in ASU between October 2012 and February 2013 based on assertion that "clinicians visited Prisoner B on December 17, 18, 19, 21, 22, and 23"); Jordan Amended Reply Decl. ¶ 47, Docket No. 4507 (making no reference to Prisoner W's repeated cycling between MHCB and ASU or his mental health condition or treatment needs, and instead stating only that "Prisoner W was screened and evaluated on time.  Prisoner W always sees his primary clinician timely. He is also always seen timely by IDTT."); R. Fischer Reply Decl. ¶ 34, Docket No. 4429 (noting that "Prisoner JJ is a heavy utilizer of mental health services" and not disputing clinician's comments that "staff was 'debating' whether to send Prisoner JJ to DSH again" and that she felt that "[Prisoner JJ]'s been here [in segregation] too long").

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   segregation setting.

2       Plaintiffs request a remedy for this unnecessarily dangerous practice.  The Court

3   should prohibit the discharge of a prisoner from an inpatient or crisis level of care setting

4   into a segregation setting absent a written clinical determination that the individual's

5   mental health will not be put at risk by such placement.  Permitting this practice to persist

6   nearly guarantees further needless suffering, avoidable decompensation, and death.

7       **2.  Defendants Must Ensure Adequate Mental Health Screening for All Prisoners Entering Segregation and Exclude Those for Whom Such Placement is Deemed Clinically Harmful**

8   

9       As Defendants acknowledge, "[b]ecause severely mentally ill inmates often cannot

10  alert staff to their mental health needs, delivery of adequate mental health care to such

11  inmates requires a system for screening and evaluating those who require mental health

12  treatment."  Defs.' P & A Mot. Terminate at 16.  Defendants are fully aware of serious

13  deficiencies in their current ASU screening procedures that they know put lives at risk.

14  Meanwhile, Defendants are placing in ASUs prisoners with clinical factors and case

15  histories that make ASU housing extremely dangerous for them.  This practice evokes the

16  same violations identified at the beginning of this case, and must be remedied.  *See*

17  *Coleman v. Wilson*, Case No. CIV S-90-0520 LKK JFM P, 1994 U.S. Dist. LEXIS 20786,

18  at *71-*72, *74 (June 6, 1994) (Docket No. 547) (finding Eighth Amendment violations

19  regarding placement of mentally ill inmates in segregated housing without appropriate

20  evaluation and consequent decompensation in such placements).

21      Defendants themselves identified the inadequacy of their own ASU 31-item

22  questionnaire used to screen new arrivals to ASU during the review of a suicide which

23  occurred in CSP-Lancaster ASU.  In the Quality Improvement Plan prepared following the

24  August 22, 2010 suicide, the Suicide Prevention and Response Focused Improvement

25  Team ("SPR FIT") discussed the "inadequacy of the 31-item questionnaire to highlight

26  current mental health problems in inmates who are new arrivals to administrative

27  segregation."  Kahn Termination Opp. Under Seal Decl. Ex. 45.  In an email entitled

28  

[787966-12]

32

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    "DRAFT of new ASU screener – comments requested," dated October 10, 2012, more

2    than two years after the suicide, Dr. Canning, CDCR's suicide prevention coordinator,

3    wrote that "[t]he 31-item screener has never been validated in the CDCR setting, takes too

4    long to administer, and does not address what we believe are the most important

5    psychological factors effecting an inmate's behavior soon after entry into ASU:  distress,

6    isolation, loneliness, fear, and possibly thoughts of suicide."  Bien Termination Opp. Decl.,

7    Docket No. 4404, Ex. 98.  The agenda from a January 28, 2013 SPR-FIT meeting shows

8    that implementation of a more appropriate ASU screening tool is still delayed.  *Id.* Ex. 97.

9    Defendants have long known that their current screening tool is inadequate, yet they have

10   failed to replace or revise this tool.  This failure places prisoners at great risk of

11   psychological harm and death in the ASUs, and Defendants should be required to revise

12   their screening forthwith.

13        Meanwhile, Defendants return prisoners with serious mental illness and a history of

14   decompensating in segregated housing back to segregated housing (whether knowingly or

15   due to the insufficient screening described above), despite Program Guide language that

16   requires ASU clinicians to provide necessary mental health services including "input into

17   the classification decision-making process during ICC meetings," with respect to the

18   "inmate-patient's … likelihood of decompensation if retained in ASU, recommendations

19   for alternative placement."  Kahn Decl. Ex. 10 (*Coleman* Program Guide 12-7-2).  Recent

20   ASU suicides included prisoners who had a history of decompensation when housed in

21   segregated housing, yet Defendants failed to prevent their return to these extraordinarily

22   high-risk settings.  *See, e.g.*, 2011 Suicide Report, Inmates N, Q, S, U, V, & FF;  First Half

23   2012 Suicide Report at 58 (Inmate K "presented with poor adjustment to ASU after death

24   of a family member," later released to general population, but received RVR and was

25   returned to ASU where he committed suicide).

26        Defendants must modify their policies and procedures in order to protect vulnerable

27   class members who have decompensated in prior ASU placements, and to prevent ASU

28   placements that will subject such individuals to an unacceptable risk of further

1    decompensation, and even suicide.  The ASU pre-screening process—designed to be

2    conducted by medical personnel for suicide risk, safety concerns, and mental health

3    problems prior to ASU (Kahn Decl. Ex. 10 (*Coleman* Program Guide 12-7-2))—must be

4    enhanced, including a mental health history file review to identify prior segregation

5    placements that resulted in MHCB/DSH placements, self-harm, suicide attempts, or other

6    signs of decompensation.  For prisoners found to "have a likelihood of decompensation if

7    placed or retained in ASU" (*id.*), Defendants must be required to develop a chrono and/or

8    identifier code that will prevent such placements, clearly flag an "ASU exclusion," and

9    identify appropriate alternative placements for these inmate-patients.

10          **3.     The Court's Pelican Bay Exclusion Order Should Be Extended to
11                   Cover All Security Housing Units (SHUs) in the CDCR**

12          For many years, this Court's orders have excluded all prisoners with serious mental

13    illness from the Security Housing Unit ("SHU") at Pelican Bay State Prison, and from the

14    CDCR's stand-alone Administrative Segregation Units scattered throughout the state, in

15    order to protect *Coleman* class members from the high risk of psychological harm linked to

16    placement in those units.  *See* Bien Termination Opp. Decl., Docket No. 4399, Ex. 15,

17    Program Guide 12-8-1 through 12-8-3 (Security Housing Unit SHU exclusion) & Docket

18    No. 4402, Ex. 77, Program Guide 12-7-11 (stand-alone ASU exclusion).  The Pelican Bay

19    SHU exclusion has proven to be a failed half-measure, as Defendants have placed class

20    members—who are at grave risk of psychological suffering or exacerbation of their mental

21    illness if placed in the extreme conditions of the Pelican Bay SHU—in essentially the same

22    extreme SHU conditions elsewhere in the system.  To provide meaningful protection from

23    this grave risk of harm, and to ensure an effective constitutional remedy, the Court must

24    order that the current Pelican Bay SHU exclusion be applied to all SHUs in Defendants'

25    system.

26          More than 17 years ago, the *Madrid* court recognized that "for certain categories of

27    persons, the risk that conditions in the SHU will cause a very serious injury to mental

28    health is unreasonably high," and that "these categories of persons consist of inmates who

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   are already mentally ill, as well as inmates who suffer from certain other mental disorders,

2   chronic depression, or brain damage and retardation." (*Madrid v. Gomez*, N.D. Cal., Case

3   No. C90-3094-THE, Remedial Order re: Exclusion from the Security Housing Unit

4   Dec. 15, 1995 at 3).  The *Madrid* court ordered the exclusion of prisoners "at grave risk of

5   suffering a serious injury to their mental health, or exacerbation of their current mental

6   illness, due to the extreme conditions in the SHU."  *Id.* at 6.  Defendants were further

7   ordered to complete a screening of all inmates in the Pelican Bay SHU to identify those

8   who meet the "at risk" exclusion criteria, and to transfer such individuals from the SHU

9   within 96 hours. *Id.* at 22-23.

10       While the Pelican Bay SHU now has only a very small number of class members,

11   CCCMS prisoners are now simply housed in SHU units at four other CDCR prisons: CSP-

12   Corcoran, CSP-Sacramento, the California Correctional Institution (CCI), and the

13   California Institute for Women (CIW), often for indefinite periods of time.  In March

14   2013, there were some 731 CCCMS prisoners and 3 EOP prisoners housed in CDCR's

15   SHUs, and many had been there for months and even years.  Kahn Decl. ¶¶ 7, 24 & Exs. 5,

16   22.  As explained below, the evidence from Plaintiffs' recent tours of CDCR's SHUs in

17   connection with Defendants' termination motion, along with the broader evidence in this

18   case, demonstrates that the risk of serious harm is essentially no different in the Pelican

19   Bay SHU as compared to these other SHUs, and that it is far too dangerous for prisoners

20   with serious mental illness to continue to be housed in such placements.  *See* Kaufman

21   Expert Decl. ¶ 127; Haney Expert Decl. ¶ 287.

22       As explained in the accompanying Declaration of Dr. Craig Haney re: CDCR

23   Segregated Housing Units ("Haney Decl. re: Segregation"), filed herewith, all of

24   Defendants' SHUs are programmatically indistinguishable to the Pelican Bay SHU, and

25   share the psychologically harmful features of that program, which are especially toxic for

26   individuals with mental illness—including the profound long-term isolation, the lack of

27   human contact, the limited exercise and out-of-cell time, the lack of meaningful treatment

28   activities, and the absence of any opportunity for purposeful activity such as work,

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[787966-12]

1   vocational activities, and education or leisure time activities.  *See* Haney Decl. re:

2   Segregation ¶¶ 17-19.  Moreover, the dangerous conditions and persistent lack of adequate

3   staffing, programming, and treatment space for the programs in these other SHU units

4   demonstrate that Defendants have been unable to adequately ameliorate the basic

5   conditions in these units to make these units tolerable for those with mental illness.  *See*

6   Kaufman Expert Decl. ¶¶ 127-138 (discussing CSP-Corcoran SHU); Haney Expert Decl.

7   ¶¶ 258-268 (discussing CCI SHU); Haney Expert Decl. ¶¶ 185-186 & 206-214 (discussing

8   CSP-Corcoran SHU); *see also* Special Master 25th Round Report at 94 (SAC SHU: no

9   group treatment or group treatment space); *id.* at 111 (Pelican Bay SHU: no therapeutic

10  groups offered); *id.* at 213 (CSP-Corcoran SHU: long wait times for clinical contacts, no

11  group treatment reported, half of clinical contacts at cell-front); *id.* at 345 (CCI SHU: no

12  data as to initial psychiatry and primary clinician contacts; no therapeutic groups during

13  the 25th Round); *id.* at 398 (CIW SHU: no group therapy offered).

14          The conditions and operations in the CDCR SHUs are comparable statewide.  All

15  SHUs are in high-custody housing units where prisoners cannot easily speak with those in

16  adjoining cells, where all movement requires cuffing and escorts by two correctional

17  officers, where many individuals are single-celled and seriously isolated, where all

18  treatment and even activities like law library visits take place in cages or in cell, and where

19  many or most prisoners are held for terms that last for many years or even for decades.

20  Haney Decl. re: Segregation ¶¶ 18-20.  All SHUs in CDCR share the key programmatic

21  features of the Pelican Bay SHU program: prisoners are provided with a maximum of one

22  hour of exercise per day, and at most a total of 1.5 hours per day outside their cells.  *Id.*

23  ¶ 18. The prisoners in these SHU units do not have access to programs or purposeful

24  activity.  There is no work programming, no educational programing, and no opportunities

25  to interact with staff and other prisoners socially.  *Id.*  The prisoners are not given any

26  means of working their way out of these units through good behavior.  *Id.* ¶ 19.

27          There is no significant distinction between the restrictions and conditions imposed,

28  by policy and regulation, on class members in Pelican Bay SHU and other SHUs in the

36

system.  For example:

- Inmates in any SHU have restricted exercise and out-of-cell time.  *See* Cal. Code Regs. tit. 15, § 3343(h).

- Inmates in any SHU are "not normally eligible for contact visits."  California Dep't of Corrections and Rehabilitation Operations Manual (updated through January 1, 2012) ("CDCR Operations Manual") § 54020.22.; *see* Cal. Code Regs. tit. 15, § 3343(f).

- Inmates in any SHU "are permitted to acquire one personal property package per year not to exceed 30 pounds each," and are barred from receiving any personal property package for the first year in SHU.  CDCR Operations Manual § 54030.8; *see also* Cal. Code Regs. tit. 15, § 3343(e).

- Inmates in any SHU are in the lowest "privilege group," and face extensive property restrictions, including with respect to clothing, personal hygiene items, food, and personal items such as reading materials, writing materials, a clock, a calendar, and more.  CDCR Operations Manual §§ 54030.20.2-54030.20.5; *see also* Cal. Code Regs. tit. 15, § 3343(i).

- Inmates in any SHU have restrictions as to their lunchtime meal.  *See* Cal. Code Regs. tit. 15, § 3343(d).

Defendants' SHUs feature far less programming than Defendants' own expert Joel Dvoskin and the Court's expert Dr. Metzner recommended for such programs in a 2006 article on the subject.  In the article, Dr. Dvoskin and Dr. Metzner described in detail the dangers of these harsh units for mentally ill prisoners:

> [I]n some states, inmates find their way into long-term segregation because their mental and intellectual limitations prevent them from following orders and successfully following prison rules.  Placing such inmates, already mentally disabled and psychologically vulnerable, in segregation serves no useful purpose and should not occur.  In other works, *absent the most extraordinary circumstances, no one should ever be placed in long-term segregation because of their serious mental disability or its symptoms.*

> It is the authors' opinion that the use of supermax confinement is overused within correctional facilities in the United States.  *Because of its extreme limitations on liberty and its potential for harm, use of this type of program should be reserved for cases in which there is no less restrictive way to remedy an unsafe situation.*

*See* Kahn Decl. Ex. 12 (Jeffrey Metzner and Joel Dvoskin, *An Overview of Correctional Psychiatry*, 29 Psych. Clin. N. Am. 761, 762 (2006) ("Metzner & Dvoskin Article") (emphasis added); *id.* at 763 (noting "general consensus among clinicians that placement

37

[787966-12]

1  of inmates with serious mental illnesses in these settings is contraindicated because many

2  of these inmates' psychiatric conditions will clinically deteriorate or not improve").

3       According to Dr. Dvoskin and Dr. Metzner, individuals should not be placed

4  indefinitely into these harsh isolation units "without at least some reasonable opportunity

5  of being able to work their way out via a behaviorally oriented system with definable,

6  measurable, and achievable outcomes." *See id.* at 762-63.  Currently in the CDCR, there is

7  no such system by which prisoners can "work their way out" of the SHU setting—and its

8  many deprivations—through good behavior.  Haney Decl. re: Segregation ¶ 18.

9  Dr. Dvoskin and Dr. Metzner also recommended that for the rare mentally ill individual

10 whose security concerns require placement in such units, there "at least 10 to 15 hours per

11 week of out-of-cell structured therapeutic activities in addition to at least another 10 hours

12 per week of unstructured exercise or recreation time." *See* Metzner & Dvoskin Article at

13 764.  Defendants currently provide nowhere near this program to CCCMS prisoners in

14 SHUs.[12]  *See* Special Master 25th Round Report at 94, 111, 213, 345, & 398; Haney Decl.

15 re: Segregation ¶¶ 18-20.

16      The fact that SHUs are a setting defined by deprivation and risks of physical and

17 psychological harm is recognized nationally.  In its 1999 review and recommendations

18 regarding SHU units, the United States Department of Justice's National Institute for

19 Corrections defined the "Security Housing Unit" or "SHU" unit as "a highly restrictive,

20 high-custody housing unit within a secure facility, or an entire secure facility, that isolates

21 _____

22 [12] In contrast, prisoners with serious mental illness in New York's prison system, instead

23 of being placed in the most restrictive segregation units, are generally placed in residential
   mental health treatment units where they receive four hours of structured out-of-cell

24 therapeutic treatment and/or mental health treatment each day.  *See* N.Y. Correct. Law
   § 2(21).  If their individual security needs require more restrictive segregation based on a

25 mental health clinician's finding that "exceptional circumstances" apply, they are still

26 entitled to a minimum of two hours of out-of-cell therapeutic treatment and programming

27 per day.  *See* N.Y. Correct. Law § 137.  Moreover, the individual's confinement in
   segregation must be reviewed and renewed by a mental health clinician every 14 days.  *Id.*

28

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

inmates from the general prison population and from each other."  *See* Kahn Decl. Ex. 11 at 5 (Chase Riveland, *Supermax Prisons: Overview and General Considerations* (Nat'l Inst. of Corr., U.S. Dep't of Justice, 1999)).  The DOJ Report asserts that the criteria for admission to such units should be "explicit and narrow" and that "the use of these facilities for problem inmates for whom lesser levels of control may be satisfactory may deprive them of freedoms, education, treatment, and work opportunities from which they could reap significant benefits and may subject them to pressures detrimental to their physical and psychological health."  *Id.* at 6.  The report also notes that SHUs should not be used to house individuals whose behavior is "uncontrollable due to mental illness."  *Id.*

The DOJ's position is consistent with numerous comprehensive studies in the last fifty years, which have shown that prolonged isolation and sensory deprivation is extremely psychologically harmful and in some instances can be so cruel and intolerable for human beings that it amounts to a form of psychological torture.  *See* Haney Decl. re: Segregation ¶¶ 8-12, 20-21 and n.6-15; *see also United States v. Corozzo*, 256 F.R.D. 398, 401 (E.D.N.Y. 2009) (Weinstein, J.) ("Substantial research demonstrates the psychological harms of solitary confinement and segregation." (citing Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124, 148 (2003))); Atul Gawande, *Hellhole: The United States holds tens of thousands of inmates in long-term solitary confinement. Is this torture?*, The New Yorker, Mar. 30, 2009, at 36 (describing psychological effects of isolation).  This is particularly true for individuals with mental illness, for whom the SHUs frequently trigger forms of regression, psychological de-compensation, psychosis, and other severe mental health symptoms and conditions.  *See* Haney Decl. re: Segregation ¶ 12 & n.8; *see also* Stewart Expert Decl. ¶¶ 303-347 (discussing mentally ill prisoners who had decompensated or experienced severe mental health problems as a result of shorter term segregation placements).

Today, far too many class members in Defendants' SHUs are facing "long-term isolation" that is "dangerous, harmful, and anti-therapeutic."  Kaufman Expert Decl. ¶ 127; *see also* Haney Expert Decl. ¶ 287.  The reasoning of the *Madrid* court in excluding

[787966-12]

1    prisoners at grave risk of psychological harm if placed in the Pelican Bay SHU applies

2    equally to CDCR's other SHUs.  This Court must extend the PBSP and stand-alone ASU

3    exclusion orders to all SHUs in CDCR to protect this extremely vulnerable population.

4.    **There Must Be a Sweep of All Prisoners Currently Housed in Segregation for More Than 90 Days to Identify Whether Those Prisoners' Mental Health Is Such That They Require Treatment or Should Be Excluded from Segregation.**

7        Related to the critical remedy of appropriate segregation exclusion of mentally ill

8    prisoners at heightened risk of serious harm, including suicide, if housed in a segregation

9    setting, the Court should direct Defendants to promptly conduct a comprehensive

10    assessment (or a "sweep") of all prisoners currently in SHU, in ASU, or on Death Row

11    who have been housed in such placements for more than 90 days to determine if their

12    mental status puts them at too great a risk of harm to remain in their current setting.  *See*

13    Haney Expert Decl. ¶ 289 (SHUs and ASUs); Woodford Expert Decl. ¶¶ 24-34 (Death

14    Row).  The evidence shows that severely mentally ill prisoners are too often getting "lost"

15    or effectively ignored in these units.  Defendants' own experts and staff have themselves

16    reached this conclusion.  *See, e.g.*, Kahn Decl. Ex. 17 (Moore Deposition Tr. 166:4-168:9)

17    (finding nine EOP prisoners placed in the ASU at CIM to be "very sick … they needed to

18    be somewhere else").  A CDCR psychologist recently published an article that supports the

19    need for such a sweep to identify mental illness, to protect the very sick, and to prevent

20    suicides:

> The initial mental health screening [in segregation] may not identify any concerns upon admission and this would be a correct assessment.  However, as the prisoner sits in his cell thinking, he may eventually come to understand his predicament.  Since the situation is not static but is constantly changing, the initial assessment may not be correct on the following day.  As the prisoner begins to analyze how [the circumstances leading to his segregation placement] will impact many aspects of his life, his thoughts and emotions will begin to change.  *Thus, the 'life span' and reliability of these mental health screens and suicide risk evaluations are very short in these types of fluid situations.  This might explain why suicides still occur despite prisoners passing these screens and all of the efforts by mental health and custody staff.*

28    Bien Termination Opp. Decl., Docket No. 4399, Ex. 22 at p. 3, H. Sánchez, *Suicide*

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE: IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[787966-12]

1  *Prevention in Administrative Segregation Units: What is Missing*, Journal of Correctional

2  Health Care, 00(0) 1-8 (2013).

3       The evidence shows that, with the lengthy stays of individuals in segregated

4  housing (ASUs, SHUs, and on Death Row), prisoners who may have developed mental

5  illness during the course of their stay are falling between the cracks.  That is, there are

6  fundamental failures to timely identify and treat those requiring psychiatric evaluation and

7  treatment.  Plaintiffs' expert Dr. Haney opined that it is very likely that a substantial

8  number of prisoners in segregated housing who are not currently on the mental health

9  caseload are nonetheless suffering from mental illness that warrants psychiatric evaluation

10  and treatment, and that a "sweep" is badly needed to identify them:

11          A meaningful and effective effort to remove vulnerable inmate-patients at
            high risk of serious harm from segregated housing would also include a
12          comprehensive assessment of all prisoners currently in those units who have
            been housed there for more than 90 days. Absent such a proactive
13          assessment, even severely mentally ill prisoners can get "lost" or ignored in
            these units.  Their activity is so restricted that unit staff have so little
14          opportunity to genuinely interact with them or observe them behave.  Even
            rounding by mental health staff can become little more than a routine and
15          uninformative "check in" that fails to uncover newly emerging or worsening
            mental health conditions.  As a result, mentally ill inmate-patients may
16          languish in segregation without being identified, even as their psychological
            conditions deteriorate further.

17

18  Haney Expert Decl. ¶ 289.

19       Likewise, Plaintiffs' expert Jeanne Woodford identified Death Row inmates with a

20  pattern of behavior that would warrant a mental health assessment but who had not

21  received evaluation or treatment.  *See* Woodford Expert Decl. ¶¶ 29-34 (finding, based on

22  her experience as San Quentin warden, that "many condemned inmates who are not

23  identified as requiring mental health services do in fact require such care" and that "there

24  appears to be no adequate mental health screening mechanism in place on death row").

25       The "sweep" now sought by Plaintiffs should be similar to the screening process

26  that Plaintiffs sought in 2006 when revisions to the Program Guide were negotiated; at that

27  time, Defendants refused to conduct such a sweep.  *See* Special Master's Rep. & Recs. on

28  Defs.' Revised Program Guide, Docket No. 1749, Feb. 3, 2006 at 9; Pls.' Objs. to the

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Special Master's Rep. and Recs. on Defs.' Revised Program Guide, Docket No. 1763, Feb.

2   17, 2006 at 12 (noting that Special Master Keating recommended similar screening in

3   April 2005 for prisoners referred to SHU following long stays in ASU given that

4   "[p]rolonged detention in administrative segregation can have deleterious effects on

5   inmates' mental health, and a requirement is needed … that all inmates not already on the

6   mental health caseload, who have not had a mental health screening within the past 90

7   days, be administered a mental health screening within 72 hours of their placement in a

8   SHU").  A comprehensive mental health screening sweep in the CDCR's segregation units

9   (including Death Row) is essential to protecting those now at serious risk of psychological

10  harm and even death.  The model for such a process should be the assessment that was

11  done pursuant to the Court's Pelican Bay SHU exclusion order in *Madrid v. Gomez*,

12  discussed *supra*.[13]  *See* Kahn Decl. Ex. 8.  Such a process is necessary to identify prisoners

13  who are suffering from mental illness following prolonged detention in segregation—

14  including those who have developed mental illness while in segregation—but are currently

15  not on the mental health caseload, and to refer (and transfer) those prisoners as appropriate.

16  A durable and effective remedy for the constitutional violations relating to segregation

17  requires that such a process be undertaken at once.

18          **D.       The Court Should Order an Effective Remedy to Address Violations
                        Caused by Inadequate Access to Treatment, Unnecessarily Harsh
19                      Conditions, and Insufficient Safety Measures in Segregation**

20          Defendants' treatment of mentally ill prisoners is defined by lack of access to a

21  minimally adequate treatment program, the use of unduly harsh conditions, and the failure

22  to implement nationally recognized standard safety measures (*i.e.*, staggered 30-minute

23  welfare checks for all prisoners in segregation)  in segregation.  Additional relief to ensure

24  _____

25  [13] Dr. Metzner, one of the Special Master's experts, worked in conjunction with CDCR

26  staff to design the *Madrid* screening procedures.  Defendants should be directed to work
    with the Special Master, and in consultation with Plaintiffs, on the design and completion

27  of such a procedure for purposes of the "sweep" now sought.

28

[787966-12]

42

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   an effective remedy for these serious violations is necessary.  *See* Order Denying Mot. to

2   Terminate at 45 (citing Special Master 25th Round Report at 38).

### 1.   Inadequate Access to Treatment: Defendants Must Be Ordered to Provide an Appropriate Treatment Program, Including Staffing, Confidential Treatment Space, Treatment Hours, and Out-of-Cell Time in All Segregation Units Where Class Members Are Housed

6          Defendants' promise to bring appropriate clinical treatment to class members

7   housed in segregated housing units has gone unfulfilled.  An order ensuring that class

8   members held in segregation, at long last, receive an appropriate treatment program—

9   including adequate staffing, confidential treatment space, adequate treatment, and out-of-

10  cell time—is required.

11         As far back as 2001, this Court ordered Defendants to submit to the Special Master

12  a list of measures already completed or projected to meet the programming space needs in

13  the EOP hub units.  Order, Docket No. 1323, Dec. 19, 2001 ¶ 3.  Six years later, in its

14  March 12, 2007 Order (Docket No. 2158), the Court ordered Defendants to work with the

15  Special Master's experts to address treatment issues in the EOP ASU hubs.  Defendants

16  filed two plans in response to the March 12, 2007 Order.  The first plan, dated July 11,

17  2007, included a review of treatment space in EOP ASUs and concluded that 9 of the 10

18  did not have sufficient confidential treatment space.  *See* Defs.' Administrative

19  Segregation Unit EOP Treatment Improvement Plan, Docket No. 2311 at 3.  The July 2007

20  Plan noted that the Mental Health Program would participate in a space survey to be

21  conducted by the Office of the Receiver and would ensure that the space requirements for

22  the ASUs are factored into the survey and will submit space requests to address the needs

23  of the "mental health" program.  *Id*. at 6.  It stated that "[g]iven the recent passage of AB

24  900, funding from this measure may address some of the necessary support and

25  programming space requirements."  *Id.*  On May 1, 2008, Defendants submitted an EOP

26  ASU Status Report to document "efforts by the California Department of Corrections and

27  Rehabilitation to comply with the Administrative Segregation Unit (ASU) Enhanced

28  Outpatient Program (EOP) Treatment Improvement Plan, dated July 11, 2007," which was

1   developed in response to the Court's March 12, 2007 Order.  Kahn Decl. ¶ 15 & Ex. 13 at

2   1.  This EOP ASU Status Report provided a status update to their ASU office and

3   treatment space improvements, which included the completion of surveys at seven prisons,

4   three of which have EOP ASUs.  Kahn Decl. Ex. 13 at 3.  But in 2013, the Special Master

5   noted that many construction projects intended to create necessary clinical treatment and

6   office space in EOP ASUs remain unfinished; many were projected to be finished by now,

7   but their completion was delayed.  *See* Special Master 25th Round Report at 38-44.

8   Notably, the Special Master has found that *all eleven of the EOP ASU hubs* currently fail

9   to provide clinical contacts and groups in a confidential setting.  *Id.* at 36.

10        Plaintiffs' experts toured EOP ASU hub units at RJD, Mule Creek State Prison,

11   Salinas Valley State Prison, CSP-Lancaster, San Quentin, CCWF, CSP-Corcoran, and

12   CSP-Sacramento.  They found that the lack of adequate treatment space at EOP ASU hub

13   institutions limits the amount of treatment that can be provided and has a significant

14   adverse impact on the quality of treatment that is provided.  *See, e.g.*, Stewart Expert Decl.

15   ¶ 112, Photo Exs. B & C (temporary offices on dayroom floor in the EOP ASU at RJD;

16   treatment cages for groups on the floor of dayroom beneath tier of cells); *id.* ¶ 113, Photo

17   Exs. F & G (bare cages on the dayroom floor of the EOP ASU at CSP-Lancaster; non-

18   confidential setting on crowded, noisy, chaotic dayroom floors.); *id.* ¶ 342 (EOP ASU at

19   SQ, located on the first tier of Carson, is dark, dirty, noisy and chaotic without confidential

20   interview space on the unit, so class members were seen in a small office with an open

21   doorway); Haney Expert Decl. ¶¶ 56, 74-76 (no visible progress made in improving

22   treatment space in MCSP's EOP ASU since last visit in 2007, with treatment cages still

23   used on dayroom floor); Kaufman Expert Decl. ¶ 32 (ASU prisoners at CCWF provided

24   non-confidential cell-front contacts, and noting that "[r]egular, confidential appointments

25   with mental health clinicians constitute a key component of mental health care").

26        Defendants' termination expert Dr. Moore agreed that the lack of confidentiality in

27   current treatment settings for mentally ill prisoners in the ASUs compromised the delivery

28   of treatment.  When shown a photograph of the individual treatment provided to mentally

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

ill prisoner in the EOP ASU at Mule Creek State Prison (*see* Figure 1), she testified in some detail about the negative impacts of such a setting on treatment, including the lack of confidentiality, and that the "inmate will not be as truthful or forthcoming with their [mental health] issues." Kahn Decl. Ex. 17 (Moore Dep. at 161:21-164:1 & Dep. Ex. 14).



**Figure 1: Clinical Mental Health Contacts for EOP Prisoners in Treatment Cages on Dayroom Floor, Mule Creek State Prison EOP ASU Hub (C-12 Unit), Feb. 7, 2013. Haney Expert Decl. Photo Ex. E, Docket No. 4378.**

The evidence also shows that Defendants are failing to provide a sufficient amount of treatment to class members in segregation units. Kahn Decl. Ex. 17 (Moore Dep. at 237:25-238:24); Kahn Decl. Ex. 14 (Dvoskin Dep. at 259:1-20); Special Master 25th Round Report at 37 ("Another concerning finding at the hubs was that ten of the 11 hubs failed to offer at least ten hours per week of structured therapeutic activity per week [as required by the Program Guide].… Structured therapeutic activity is a critical part of EOP care in general. This is particularly true in segregation units, where the group dynamic and

[787966-12]

interaction with others can help ameliorate the anti-therapeutic effects of isolation on the mentally ill patient."); Stewart Expert Decl. ¶¶ 312-313 (quoting special master); ¶ 315 (CSP-SAC EOP ASU averaging 5.4 hours of treatment attended per week), ¶ 323 (LAC EOP ASU averaging 6.3 hours attended per week), ¶ 333 (RJD EOP ASU providing only one group per weekday); Haney Expert Decl. ¶ 242 (finding that class members at CCI, including hundreds of CCCMS and EOP segregation prisoners, receive on average approximately .034 hours of group therapy per week).  Defendants have taken the position that group therapy for CCCMS class members is not "required," and thus there is essentially no group treatment provided to CCCMS prisoners in segregation.  *See* Special Master 25th Round Report at 94, 158-59, 213, 218, 230, 272, 274, 299, 336, 344, 345, 375, 410.  Defendants' placement of mentally ill prisoners in segregation without provision of necessary treatment is resulting in serious psychological harm and risk of such harm. *Accord* Metzner & Dvoskin Article at 763 ("[M]any inmates with serious mental illnesses are harmed when placed in a supermax [*i.e.*, segregation] setting, especially if they are not given access to necessary psychological and psychiatric care.").

Given these failures, further relief must be ordered by this Court.  Defendants' current facility upgrade plans fail to satisfy this Court's longstanding concern over housing EOPs in the high-risk segregation setting without adequate treatment space, staffing and limitations on stays.  Defendants should be required to file with the Court a plan to address the space deficiencies in their EOP ASU hubs and PSUs.

In addition, Defendants should not be permitted to place, for more than 72 hours, class members in segregated housing units that are not capable of providing a minimally adequate treatment program as follows:[14]

_____

[14] Plaintiffs have concurrently moved for strict and enforceable time limits for all class members to be housed in any segregation unit.  *See* Part II.A, *supra*.  These time limits are essential to prevent serious harm, even if appropriate treatment can be provided in CDCR's segregation units.  *See, e.g.*, Defs' Joint Report at 23 ("Segregation is not a particularly (footnote continued)

1    Any segregated unit housing EOP prisoners must (1) have sufficient mental health

2 and custody staffing; (2) provide adequate confidential treatment space; (3) offer at least

3 the Program Guide minimum treatment (10 hours per week); and (4) offer at least 10 hours

4 of other out-of-cell time (*e.g.*, for exercise) per week.[15]

5    Any segregated unit housing CCCMS prisoners must (1) have sufficient mental

6 health and custody staffing; (2) provide adequate confidential treatment space; (3) have the

7 capacity to offer clinically indicated treatment hours (including group therapy); and (4)

8 offer at least 10 hours of other out-of-cell time (*e.g.*, for exercise) per week.

9    The Special Master should report to the Court which segregated housing units are

10 capable of providing minimally adequate mental health treatment, and thus which units

11 may house *Coleman* class members.

12         **2.    Harsh Conditions in Segregation: Defendants Must End the
               Blanket Practice of Strip Searching Mentally Ill Prisoners in**
13 **             Segregation Units Without Individualized Assessment of Actual**
               **Security Risk**
14

15    CDCR's uncontroverted practice of strip searching all inmates in ASUs each time

16 they leave their housing unit, including for yard and mental health treatment, is

17 unnecessarily punitive and undermines the delivery of appropriate mental health care.  It

18 harms patients by degrading and humiliating them and by discouraging them from

19 accessing the treatment they require.  These blanket strip search policies, applied without

20 regard to individual risk factors or clinical needs, are ill-advised, counterproductive, and

21 must be ended.

22    Defendants' own experts expressed concern about the strip searching practices they

23 ───────────────────

24 therapeutic environment to house inmates with serious mental disorders, even when EOP
   level care is provided.… [H]ousing inmates with serious mental disorders [in ASU] should
25 be as brief as possible and as rare as possible.").

26 [15] *See* Metzner & Dvoskin Article at 764 (noting segregation units "should offer at least 10
   to 15 hours per week of out-of-cell structured therapeutic activities in addition to at least
27 another 10 hours per week of unstructured exercise or recreation time").

28

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  observed for inmate-patients in ASUs.  The experts noted that EOP inmates housed in

2  ASUs at CSP-Corcoran, for example, are "strip searched upon leaving and returning to

3  their housing unit"—even to attend group therapy sessions.  Defs.' Joint Expert Report at

4  23.  The experts called upon CDCR to take action with respect to these blanket strip search

5  practices, noting that "[t]his procedure can be a disincentive to group participation and

6  should be reviewed."  *Id.*

7          The Reply Declarations of the wardens at CIM, CSP-Corcoran, and CCWF,

8  however, confirm that it remains standard practice to strip search inmates in ASUs each

9  time they leave the building.  In response to Dr. Haney's observation that one patient at

10  CIM did not leave his cell because he did not want to be strip searched, Warden Holland

11  confirmed that "[i]nmates are required to be strip searched for safety and security

12  precautions as is the standard for all Administrative Segregation Units."  Holland Reply

13  Decl. ¶ 10, Docket No. 4438.  CCWF Warden Johnson testified that all women, including

14  mentally ill prisoners, housed in CCWF's administrative segregation units are subjected to

15  strip searches when they go to yard or attend medical appointments.  Amended Johnson

16  Reply Decl. ¶ 6, Docket No. 4508.  Similarly, CSP-Corcoran Acting Warden Gipson stated

17  that inmates housed in ASUs—even those held in segregation for "non-disciplinary

18  reasons"—are subject to "unclothed body searches when leaving their cells to go to yard or

19  medical appointments."  Gipson Reply Decl. ¶ 19, Docket No. 4420.

20          Plaintiffs' experts provided ample evidence of the pervasiveness of these practices

21  and their harmful effects on *Coleman* class members.  Dr. Haney observed that EOP

22  patients in ASUs at Corcoran who wanted mental health treatment first had to endure "a

23  strip search, which occurred in plain view of others and out on the housing unit floor."

24  Haney Expert Decl. ¶ 182.  Dr. Haney described the practice as "unusual and disturbing"

25  and noted that "the Special Master found, *several years ago*, that similar strip search

26  protocols at Corcoran were problematic insofar as they 'thwarted inmate participation' in

27  mental health treatment."  *Id.* ¶ 183 (quoting Special Master's 21st Round Monitoring

28  Report, Docket No. 3638, July 31, 2009, at 163).

[787966-12]

1      Dr. Kaufman observed strip searches for inmates housed in ASUs at all three of the

2  prisons he toured.  Kaufman Expert Decl. ¶¶ 98, 101, 121, 163-166.  Like Dr. Haney, he

3  interviewed mentally ill inmates who refused treatment and recreation opportunities in

4  order to avoid "dehumanizing" and humiliating strip searches.  *Id.* ¶ 163.  Dr. Kaufman

5  observed that strip search policies in CIM segregation units even apply to mentally ill

6  prisoners for non-disciplinary reasons, including safety concerns and because CDCR lacks

7  appropriate bed space.  *Id.* ¶¶ 98, 101.  This is also true at CCWF, where women housed in

8  ASUs for their own protection have to undergo invasive, humiliating strip searches

9  "involv[ing] removing all clothes, bending, and squatting" upon leaving and returning to

10 the building for any purpose.  *Id.* ¶ 163.  In other words, women who want to go to yard or

11 to attend a medical appointment must undergo *two* invasive full-body strip searches for

12 each out-of-cell activity.  Dr. Kaufman expressed serious concern about this practice

13 especially in light of the large number of inmates who "have been the victims of sexual

14 abuse such that the experience of being disrobed in front of a stranger could be particularly

15 distressing and degrading."  *Id.* ¶ 166.  Dr. Kaufman concluded that the blanket strip

16 search policy is harmful and "counterproductive."  *Id.*  He noted that patients in

17 segregation already "have to contend with significant seclusion to the detriment of their

18 mental health."  *Id.*  Imposing custodial practices that "greatly discourage[] patients from

19 taking advantage even of the minimal recreation and therapy they are provided" is

20 dangerous and increases the risk of harm.  *Id.* ¶ 164.

21      CDCR's policies on universal strip searches in segregation units are not justified

22 from a custodial perspective.  Jeanne Woodford, the former warden of San Quentin,

23 observed during her February site visit a sign in the Adjustment Center, San Quentin's

24 administrative segregation unit, indicating that inmates housed there "are subject to strip

25 searches after returning from, e.g., the CTC where many mental health appointments and

26 groups are held."  Woodford Expert Decl. ¶ 56.  In considering this policy, Ms. Woodford

27 opined that it "may create a deterrent to care for some inmates" and, as a security matter,

28 "need not necessarily apply to every Adjustment Center inmate."  *Id.*

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   Even mentally ill prisoners in segregation for alleged misbehavior do not

2   automatically require such extreme security practices.  For example, a mentally ill prisoner

3   in segregation for behavior that did not pose a serious security risk (such as refusing

4   assigned housing or delaying an officer) need not, without additional evidence of a security

5   risk, be subjected to an invasive strip search to protect institutional security.

6   Ms. Woodford opined that such strip search policies, rather than being deliberate responses

7   to actual threats, are more likely effects of overcrowding levels "that preclude custody staff

8   from making individualized housing and security decisions." *Id.*  That is, sound custodial

9   and security policy does not require blanket use of strip searches, which too often serve to

10  undermine delivery of adequate mental health treatment.

11      In a recent *en banc* opinion of the Ninth Circuit, a dissent joined by four judges

12  emphasized the seriousness of strip searches, noting that "[t]he Seventh Circuit has

13  described strip searches as 'demeaning,' 'dehumanizing,' and 'repulsive' [citing *Mary*

14  *Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983)].  The Tenth Circuit has

15  called them 'terrifying' [citing *Chapman v. Nichols*, 989 F.2d 393, 396 (10th Cir. 1993)].

16  The Eighth Circuit has called them 'humiliating' [citing *Hunter v. Auger*, 672 F.2d 668,

17  674 (8th Cir. 1982)]."  *Bull v. City & Cty. of San Francisco*, 595 F.3d 964, 999 (9th Cir.

18  2010) (Thomas, J., dissenting).  In *Bull*, the Ninth Circuit *en banc* majority found that

19  "strip searches are invasive and embarrassing," but that the jail strip search policy at issue,

20  which applied to inmates after contact with outside visitors and was limited to a visual

21  inspection, did not violate the prisoners' Fourth Amendment rights.  *Id*. at 975.  That

22  holding does not bear on the issue here: whether the practice of strip searching mentally ill

23  prisoners placed in segregation—even low-risk, low-custody prisoners in segregation for

24  non-disciplinary reasons—every time they go to, and every time they return from,

25  treatment or exercise violates the Eighth Amendment.  Unlike in *Bull* and similar cases, the

26  Court here must consider whether the practice of repeated and indiscriminate strip searches

27  for all mentally ill prisoners in segregation prevents the provision of, *inter alia*, a "a basic

28  program to identify, treat, and supervise inmates at risk for suicide." *See Coleman*, 912 F.

50

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

Supp. at 1298 n.10; Order, Docket No. 4044, July 21, 2011 at 3 (finding that Defendants must provide suicide-resistant beds in MHCBs and noting that the "question at bar is whether defendants are in compliance with their obligations under the Eighth Amendment concerning suicide prevention in their prison system").

CDCR's blanket strip search policy is unacceptable because it is imposed on all inmates housed in ASUs without any individualized assessment of risk. That is, even if a mentally ill prisoner is placed in ASU for a non-disciplinary reason—including for his own personal safety or because Defendants cannot find an appropriate bed for him in general population—or for behavior unrelated to security (*e.g.*, refusing to house in a double-cell), that individual is forced to undergo a strip search every time he goes to and from yard or a mental health appointment. The blanket practice poses an unjustifiable barrier to treatment by forcing inmates to choose between exposing themselves to invasive search or foregoing treatment. It also implicates the federal law prohibition of discrimination based on an individual's disability. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

Courts have recognized that inmates' "preexisting mental conditions" may render strip search practices in prisons an Eighth Amendment violation. *See Watison v. Carter*, 668 F.3d 1108, 1113 (9th Cir. 2012) (discussing *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir. 1993) (en banc)). A blanket policy of strip searches for all ASU prisoners is particularly harmful to *Coleman* class members, who in many cases have experienced prior trauma and abuse and may suffer from paranoia, severe anxiety, or other psychological vulnerabilities that amplify the adverse impact of strip searches. This is particularly true of CDCR's strip searches in women's facilities, where the same blanket policy applies despite broad recognition that women in prisons have high rates of past sexual abuse and trauma. *See Chao v. Ballista*, 772 F. Supp. 2d 337, 351 (D. Mass. 2011) ("female offenders tend to have a history of sexual, mental, and physical abuse"); Janet Warren *et al.*, *Psychiatric Symptoms, History of Victimization, and Violent Behavior Among Incarcerated Female Felons: An American Perspective*, 25 Int'l J. of L. & Psychiatry 129, 129-30, 132 (2002) (discussing prior victimization of incarcerated women and observing

[787966-12]

1    that "there is general agreement that female prisoners have endured physical and sexual

2    abuse well beyond that of the general population").

3        This Court should order Defendants to prohibit the blanket practice of

4    indiscriminate strip searches for all mentally ill prisoners in segregation.  No mentally ill

5    prisoners placed in segregation should be subject to such a degrading and harmful practice

6    absent a specific, individualized determination that institutional security requires it.

7        **3.    Harsh Conditions in Segregation: Defendants Must End the Use
            of Cages for "Holding" or Treating Mentally Ill Prisoners in
8            Segregation Units**

9            **(a)    Defendants Should End the Use of Cages to Hold Prisoners
                    in Segregation Units**
10

11        In finding that "[p]risoners in California with serious mental illness do not receive

12   minimal, adequate care," the United States Supreme Court noted that mentally ill prisoners

13   may be held "for prolonged periods in telephone-booth sized cages without toilets" and

14   took the rare step of attaching a photograph of one of these cages to the Court's opinion.

15   *See Plata*, 131 S. Ct. at 1924 & App'x C.  The use of these cages (referred to

16   euphemistically by Defendants as "therapeutic treatment modules" or "TTMs") still

17   pervades Defendants' system.  Plaintiffs have presented evidence that mentally ill

18   prisoners housed in ASUs and SHUs are, as a rule, placed in cages for group treatment,

19   individual treatment, and in response to reports of thoughts of self-harm.  *See, e.g.*, Stewart

20   Expert Decl. Photo Exs. A-O, HH-PP; Kaufman Expert Decl. Photo Exs. C, E; Haney

21   Expert Decl. Photo Exs. B, E, Q, CC.  Defendants did not challenge this evidence as to the

22   widespread use of cages, and instead provided evidence confirming it.  *See, e.g.*, Amended

23   Reply Decl. of Victor Jordan in Supp. of Defs.' Mot. to Terminate, Docket No. 4507, Mar.

24   25, 2013 ¶ 7 (confirming that all ASU inmate-patients at CIM are placed in cages to

25   receive group therapy and may also be placed in a cage while they are waiting to see their

26   clinician when group therapy is not occurring); Reply Decl. of William Walsh in Supp. of

27   Defs.' Mot. to Terminate, Docket No. 4439, Mar. 22, 2013 ¶ 13 (describing use of cages

28

[787966-12]

52

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   for group treatment provided to CCI mentally ill prisoners housed in segregation);

2   Williams Reply Decl. ¶ 4, Docket No. 4446 (noting that cages are used for any individual

3   treatment provided to EOP women in CCWF ASU).  Defendants instead have argued that

4   (1) there is no evidence that class members' reporting about the negative effect of the

5   cages on their treatment (including discouraging participation) "is shared universally"; and

6   (2) some class members at Corcoran prefer the cages to the ATOM chair (which is itself

7   extremely restrictive and uncomfortable for many prisoners).  Defs.' Reply Br. on Mot. to

8   Terminate, Docket No. 4487, Mar. 22, 2013, at 31.

9       But the overwhelming evidence shows that cages have a significant impact on the

10  delivery of mental health treatment to *Coleman* class members.  The essentially universal

11  use of treatment and holding cages for mentally ill prisoners in segregation units is

12  counter-therapeutic.  *See* Kaufman Expert Decl. ¶ 86 ("[T]he treatment modules pose a

13  challenge to meaningful therapeutic interactions. To use them for individuals in acute

14  distress, who may be feeling deeply isolated, even when there is no documented need for

15  the modules is counter-therapeutic and inhumane.").

16      With the experiment of installing these treatment and holding cages across

17  California's system, it is clear that their use does direct and serious harm to the mental

18  well-being of mentally ill prisoners; in short, they are inhumane.  *See* Haney Expert Decl.

19  ¶ 83 (Prisoner F, in ASU for safety concerns, stating "I don't like the [treatment] cages.  I

20  feel like a dog, like an animal—so I don't usually go out; if I see my clinician, I see her at

21  my cell front"), ¶ 133 (discussing very high refusal rate for caged treatment at CIM); ¶ 149

22  (Prisoner Q, in CIM ASU due to "Lack of Bed," stating "who wants to come out for

23  'therapy' in a cage?  You feel non-human."), ¶ 179 (COR ASU inmate-patient stating

24  "when I am in a cage I feel like an animal"), ¶ 181 & Photo Ex. Z & AA (COR officer first

25  refusing Plaintiffs' expert's request to take photographs from inside of treatment cage

26  during tour, and his supervisor explaining "you know, our officers don't like to get inside

27  those things"); *see also* Stewart Expert Decl. ¶ 196-197, 209-212, 222-223, 226, 231-235,

28  237-238 (describing standing cages used to hold prisoners who may be suicidal and

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1  prisoners' reluctance to report suicidal feelings due to such punitive suicide watch

2  conditions).

3      The evidence shows that the use of cages to hold and provide treatment to mentally

4  ill prisoners violates the fundamental purpose and protection of the Eighth Amendment.

5  *See Plata*, 131 S. Ct. at 1928 ("Prisoners retain the essence of human dignity inherent in all

6  persons.  Respect for that dignity animates the Eighth Amendment prohibition against

7  cruel and unusual punishment."); *Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic

8  concept underlying the Eighth Amendment is nothing less than the dignity of man."); *cf.*

9  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (holding that the "cuffing an inmate to a hitching

10 post or similar stationary object for a period of time that surpasses that necessary to quell a

11 threat or restore order is a violation of the Eighth Amendment").  Defendants' ubiquitous

12 placement of mentally ill prisoners in cages exacerbates mental illness, compromises

13 delivery of treatment, and denigrates the dignity of human beings in the *Coleman* class.

14     On this matter, California is an outlier.  Defendants' expert Jacqueline Moore, who

15 has worked in adult prisons in nearly a dozen states, testified that she had worked in *no*

16 prisons outside of California that used cages for the delivery of individual treatment.  Kahn

17 Decl. Ex. 17 (Moore Dep. at 154:10-155:14).  The first time she saw them in a California

18 prison, at CSP-Sacramento, she wrote "cages—terrible hard metal stools.  Hard to be in

19 cage for two hours."  Kahn Decl. Ex. 17  (Moore Dep. at 156:10-156:21).[16]

20     This Court should order an end to the use of cages for holding or treating mentally

21 ill prisoners in segregation, and direct Defendants to devise safe, therapeutic alternatives to

22

_____

23 [16] There are available alternatives to the use of cages.  In response to concerns that the

24 Special Master expressed regarding the use of cages for segregation prisoners at CCI, CCI
   successfully changed its procedures for the provision of one-on-one clinical contacts for its

25 mentally ill prisoners in segregation.  CCI stopped using the treatment cages placed in the
   middle of segregated housing units for treatment in favor of confidential non-contact

26 booths, a change that CCI staff rightfully tout.  *See* Haney Expert Decl. ¶ 235; Walsh

27 Reply Decl. ¶ 7, Docket No. 4439; Holland Reply Decl. ¶ 5, Docket No. 4438.

28

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[787966-12]

1     this inhumane practice.

2          **(b)     Defendants Should, at a Minimum, Implement Policies and**
3          **Practices that End the Indiscriminate Use of Cages on**
           **Mentally Ill Prisoners**

4          The record contains substantial evidence that Defendants' use of cages is doing

5     significant harm to mentally ill prisoners in segregation subjected to them on a regular

6     basis, whether to receive treatment or in response to their reports of thoughts of self-harm.

7     Even if the Court declines to order the elimination of the use of these cages for treatment,

8     the Court should, at a minimum, order Defendants to follow their own experts'

9     recommendations and end the indiscriminate use of cages on mentally ill prisoners housed

10    in segregation, which violates the Eighth Amendment as well as federal disability law.  *See*

11    28 C.F.R. § 35.130(d); *Olmstead*, 527 U.S. at 597.

12         Defendants' termination experts, recognizing the harmful effects of cages on mental

13    health treatment and well-being, recommended that: "When a mentally ill inmate is housed

14    in an Administrative Segregation Unit solely for his own protection, we see no appropriate

15    reason to require that the inmate be seen only in a therapeutic module and recommend that

16    this decision be made on an individual basis."  Defs.' Joint Expert Report at 21.

17    Dr. Dvoskin reiterated the point in his deposition, agreeing that was "not necessary for all

18    inmates to be in a module" to receive treatment.  He testified that "[i]f somebody's in ad

19    seg for their personal protection, it makes no sense whatsoever to me to require them to be

20    in a module."  Kahn Decl. Ex. 14 (Dvoskin Dep. at 283:15-284:10).  Dr. Moore also

21    testified that "it was important for the decision as to whether to place the patient in the

22    module or not be driven by the clinician's decision."  Kahn Decl. Ex. 17 (Moore Dep. at

23    159:2-6).  Yet despite their own experts' input, Defendants indiscriminately place mentally

24    ill prisoners housed in segregation in cages.

25         Defendants' indiscriminate use of cages in the provision of treatment to mentally ill

26    prisoners runs counter to the very concept of therapy, and also violates other federal laws

27    protecting individuals with disabilities, including serious mental illness.  There is

28

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

substantial evidence that some CDCR prisoners are being subjected to the harsh, punitive, and non-therapeutic cages *because* of their mental illness.[17]  The blanket requirement that prisoners with serious mental illness receive treatment in a cage (regardless of the reason they were placed in segregation), as compared to the policy of providing treatment (such as medical treatment) to non-mentally ill prisoners outside of a cage, violates the Americans with Disabilities Act (ADA) ban on disability discrimination.  *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the *most integrated setting appropriate to the needs of qualified individuals with disabilities*.") (emphasis added); *Olmstead*, 527 U.S. at 597 ("Unjustified isolation … is properly regarded as discrimination based on disability.").  Placement of prisoners in cages because they are mentally ill, without regard to their actual, individual clinical or security needs, constitutes "unjustified isolation" and is a form of illegal discrimination.

Plaintiffs have long argued against this senseless and harmful practice.  In 2006, as the *Coleman* Program Guide was being revised, Plaintiffs argued that for all EOP prisoners in administrative segregation, "there should be a requirement for an individualized assessment of each patient's specific risk for violence towards others. Based on this assessment, for appropriate inmates, therapy options should include group therapy outside of treatment cages (which defendants call 'treatment modules') as well as individual

---

[17]  For example, at CCI, mentally ill prisoners placed in the OHU are, by policy, placed on the "Max" security side of the unit and treated as segregation prisoners regardless of whether they had been in segregation for a disciplinary reason, had been in segregation for non-disciplinary reasons, or even had not been in segregation housing at all: they *all* are subjected to cages and restraints (and are also forced to sleep on a thin mat on the floor), regardless of actual security or clinical needs.  In contrast, prisoners in the OHU for medical reasons are, absent special circumstances, treated without cages or restraints (and also are given a bed to sleep on).  *See* Haney Expert Decl. ¶¶ 274-275 (describing Prisoner XX as General Population prisoner being placed and treated in a cage for the first time after being moved to OHU due to deterioration in his mental health); Holland Reply Decl. ¶¶ 16-17 (confirming policy of restraints/cages policy on west tier of OHU where "mental health admits" are housed, but not where medical patients are generally housed).

[787966-12]

1  therapy outside of these treatment cages." *See* Pls.' Objs. to the Special Master's Report

2  and Recommendations on Defs.' Revised Program Guide, Docket No. 1763, Feb. 17, 2006

3  at 12.  Defendants "firmly and consistently" refused to implement such a policy; the

4  Special Master did "not elect[] on his own authority to insist on [its] adoption," and

5  referred the issue to the Court.  Special Master's Report and Recommendations on Defs.'

6  Revised Program Guide, Docket  No. 1749, Feb. 3, 2006 at 7-9.  The Court directed

7  Defendants to implement this and other disputed revisions to the program guide, while

8  recognizing that "they remain in dispute."  Order, Docket No. 1773, Mar. 3, 2006 at 3.

9      The Court should order an end to the policy of indiscriminate use of cages on

10  mentally ill prisoners in segregation regardless of individual clinical and security needs.

11  Given the obvious negative impact of cages on treatment—including denying vulnerable

12  mentally ill men and women an appropriate, confidential setting and making them feel like

13  "animals"—the default practice should be for all mental health treatment to be provided in

14  confidential settings without cages or other restraints.  If there is an individualized

15  finding—with clinical input—that a mentally ill prisoner must be treated in a more

16  restricted setting, then there must be a process for that prisoner to "earn out" of such

17  restrictions, with regular reassessment.  The goal of mental health treatment in a

18  segregated setting should be to assist the patient to learn to control any antisocial or violent

19  impulses so he or she can return to the community and reintegrate without restraints or

20  restrictions.

21          **4.**      **Insufficient Safety Measures: Defendants Must Implement**

22                 **Welfare Checks for All Prisoners Housed in Segregation Units.**

23      Defendants have for far too long refused to implement the nationally accepted

24  standard of conducting 30-minute staggered welfare checks for all prisoners housed in

25  administrative segregation, a fundamental safety measure to ensure timely response to

26  suicide and self-harm attempts by this vulnerable population.  *See* Bien Termination Opp.

27  Decl., Docket No. 4402, Ex. 64 (American Correctional Association (ACA) Standard 4-

28  4257, 4th Ed.).  This standard requires that all inmates in administrative segregation be

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1   personally observed by a correctional officer at least every 30 minutes at an irregular

2   schedule, for the duration of their segregation placement.  Defendants have instead

3   employed a half-measure of conducting welfare checks for only the first 21 days of a

4   prisoner's placement in administrative segregation.  The nationally accepted ACA standard

5   (outside CDCR) is based on the "realization that inmates housed in these locked units are

6   at greater risk of suicide, mental health and medical problems and other security issues.

7   The majority of state departments of correction throughout the country, as well as the

8   Federal Bureau of Prisons, have implemented and maintained policies regarding thirty

9   minute Welfare Checks in their respective prison systems."  *See* Declaration of Lindsay M.

10  Hayes in Support of Pls.' Objs. to Defs.' Plan to Address Suicide Trends in ASUs, Docket

11  No. 2011, Oct. 31, 2006 ¶ 10.

12          This issue dates back more than six years.  In 2006, a team of experts raised the

13  need for welfare check in ASUs with Defendants; Plaintiffs brought the matter before the

14  Court after Defendants refused to implement the practice at all.  *See* Pls.' Objs. to Defs.'

15  Plan to Address Suicide Trends in ASU, Docket No. 2006, Oct. 31, 2006 at 12.

16  Defendants then issued a policy that welfare checks would be provided "to newly placed

17  ASU inmates by Correctional Officers at least every 30 minutes, at staggered intervals, *for*

18  *the first three weeks of ASU placement*."  *See* Defs.' Resp. to Pls.' Objs. to Defs' Plan to

19  Address Suicide Trends in ASUs, Docket No. 2061, Dec. 1, 2006, at Ex. D (undated

20  CDCR Memorandum from John Covey re: 30 Minute Welfare Checks of Inmates Placed

21  in Administrative Segregation Units) (emphasis added).  Over Plaintiffs' objections that

22  just three weeks of checks was insufficient, the Court provisionally approved Defendants'

23  plan.  Order, Docket No. 2139, Feb. 12, 2007 at 2.

24          CDCR's provision of welfare checks for only 21 days remains out-of-step with

25  national standards, and has had fatal consequences.  While it is true that prisoners are at

26  enormous risk of suicide in the first days and weeks after being placed in segregation, that

27  risk does not abate after 21 days.  *See* Expert Declaration of Eldon Vail, Docket No. 4385,

28  Mar. 14, 2013 ¶¶ 124-125 (CDCR outlier among U.S. prison systems regarding welfare

[787966-12]

1  checks); *see also* Bien Termination Opp. Decl., Docket No. 4399, Ex. 14 (American

2  Psychiatric Association's Position Statement on Segregation of Prisoners with Mental

3  Illness) (finding "prolonged segregation" creates risk of serious harm).  Defendants' own

4  analysis of ASU suicides since 2007 found that the majority of CDCR suicide victims had

5  been in segregation for *more* than 21 days at the time of their death.  *See* Bien Termination

6  Opp. Decl., Docket No. 4399, Ex. 3 at 2 (CDCR analysis finding that since 2007, "49% of

7  inmates who died by suicide in ASU had spent less than 21 days in ASU at the time of

8  their death").  The Special Master's expert found that in three CDCR suicides occurring in

9  administrative ASU in 2011, "*rigor mortis* had already begun prior to the discovery of the

10  inmate's body," an indication that "at least two to four hours had passed since the time of

11  death before the bodies were discovered, [and] underscoring the importance of timely

12  welfare checks and custodial checks."  2011 Suicide Report at 2.  One of the three inmates

13  found in *rigor mortis* died on the *22nd day of his ASU placement*.  *Id.* at 268 (Inmate EE,

14  died December 6, 2011).

15      Defendants' experts, CDCR's suicide prevention consultant, and Plaintiffs' expert

16  all agree that thirty-minute welfare checks for all prisoners in administrative segregation

17  for their entire segregation placement is essential to ensure patient safety and maintain an

18  adequate system suicide prevention.  *See* Kahn Decl. Ex. 17 (Moore Dep. at 223:14-

19  224:25) (opining that ASU welfare checks "should be continued indefinitely," "[e]very

20  day," "[f]or all inmates in segregation, "[f]or the entire time they're in segregation"); Kahn

21  Decl. Ex. 15 (Hayes Dep. at 41:2-14); Stewart Expert Decl. ¶ 183; Woodford Expert Decl.

22  ¶ 57.  Lives continue to be lost because Defendants deliberately ignore the obvious: lives

23  could be saved if they come into line with the national correctional standard on this issue.

24  *See* Kahn Decl. Ex. 14 (Dvoskin Dep. at 243:20-244:12, 247:22-248:1).

25      There is also evidence of serious problems with the *implementation* of even the

26  current welfare check procedures.  The Special Master has found that "[p]roper staggering

27  of 30-minute welfare-checks in administrative segregation remains an ongoing problem …

28  with only nine institutions completing these checks correctly.  This is particularly

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

[787966-12]

1   concerning, given the increased incidence of suicides within segregated units as compared

2   to non-segregated units."  Special Master 25th Round Report at 38.  In reviewing a June

3   2012 suicide at the Avenal State Prison segregation unit, the Special Master's expert found

4   that "welfare checks either did not occur at least every 30 minutes and/or were not done

5   properly" given the apparent onset of *rigor mortis* by the time the victim's body was

6   found.  First Half 2012 Suicide Report at 152 (Inmate N, who had just recently been placed

7   in the ASU due to safety concerns, not disciplinary reasons).  The logs of welfare checks

8   reviewed by Plaintiffs' expert Dr. Stewart on his recent tours reveal continued problems

9   with implementation of the current policy on staggered welfare checks.  *See* Stewart

10   Expert Decl. ¶¶ 241-254.

11       In their March 22, 2013 Reply on their Motion to Terminate, Defendants point to a

12   new CDCR Memorandum, dated March 20, 2013 and entitled "Revised Administrative

13   Segregation Unit Welfare Check Procedure and Implementation of Security Inspections in

14   Specialized Housing.  *See* Allison Reply Decl. ¶ 8 & Ex. B.  As of March 22, 2013, the

15   memorandum had "not yet been released to the field," and no date for distribution had

16   been set.  *Id.* ¶ 8.  This new memorandum was not shared with Plaintiffs, and Plaintiffs had

17   no opportunity to provide feedback, as has been the practice for other policy memoranda

18   that relate to important remedial matters.  The memorandum, while useful insofar as it

19   clarifies certain important procedures (such as the need for three welfare checks per hour at

20   staggered intervals not to exceed 30 minutes), unfortunately fails to implement the

21   undisputed recommendation that such welfare checks be done for all prisoners for their

22   entire segregation placement.  Instead, Defendants rely on the following new directive:

23   "[C]linical staff may continue welfare checks beyond 21 days on specific ASU inmates

24   when deemed clinically indicated. The requesting clinician shall document the request in a

25   CDCR Form 128-B, Informational Chrono, identifying the inmate, and the requested

26   duration of the extension."  *Id.* Ex. B at 2.  This new directive is meaningless, and

27   insufficient.  What clinical staff is responsible for making such a request? Based on what

28   evaluation? When? What about the many ASU prisoners who are not currently on the

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    MHSDS caseload and thus have no primary clinician but are in a condition warranting

2    continued checks?  A significant number of ASU suicides are by prisoners who were *not*

3    on the mental health caseload.  *See* Bien Termination Opp. Decl., Docket No. 4399, Ex. 3

4    at 1 (CDCR analysis finding that just 63% of overall suicides since 2007 were on mental

5    health caseload); Kahn Termination Opp. Under Seal Decl. Ex. 6 (CDCR data showing

6    approximately 35 non-MHSDS suicides in ASU since 2007).  This revision is smoke-and-

7    mirrors.  The Court provisionally approved Defendants' half-measure on ASU welfare

8    checks in 2006.  That practice has failed to remedy the constitutional inadequacy, and no

9    further half-measures on this critical suicide prevention component should be accepted.

10            The Court should order what all the experts agree is necessary—that is, that

11    Defendants provide staggered welfare checks (through personal observation by a staff

12    member) at least every thirty minutes to all prisoners placed in any segregation unit *for the*

13    *complete duration of such placements*.

14                                        **CONCLUSION**

15            There is an urgent need for the clear, bright-line orders and requirements requested

16    herein, and outlined in Plaintiffs' Proposed Order (filed concurrently herewith) in order to

17    finally remedy the constitutional violations that mentally ill prisoners now suffer, including

18    with respect to excessive lengths of stay in segregation, placements in segregation for

19    inappropriate (i.e., non-disciplinary) reasons, the substantial and unnecessary risks of

20    decompensation and suicide in segregation, the lack of access to minimally adequate

21    mental health treatment in CDCR's segregated settings, and the extremely harsh and

22    unsafe conditions in those settings.

23    / / /

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

[787966-12]

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION

1    These orders extend no further than necessary to correct the continuing

2  constitutional violations identified by this Court, and are the least intrusive means

3  necessary at this phase in the remedial process to correct the violations.  *See* 18 U.S.C.

4  § 3626(a)(1).  Such orders should be issued at once to protect *Coleman* class members

5  from the current and ongoing constitutional violations that exist in Defendants' harsh, non-

6  therapeutic, and extraordinarily overused segregation units statewide.

7

8  DATED:  May 6, 2013                    Respectfully submitted,

9                                         ROSEN BIEN GALVAN & GRUNFELD LLP

10

11                                        By: */s/ Aaron J. Fischer*

                                               Aaron J. Fischer

12                                        Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[787966-12]

62

NOTICE OF MOTION & MOTION FOR ENFORCEMENT OF COURT ORDERS & AFFIRMATIVE RELIEF RE:
IMPROPER HOUSING & TREATMENT OF SERIOUSLY MENTALLY ILL PRISONERS IN SEGREGATION