DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>       Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**EXPERT DECLARATION OF CRAIG HANEY RE CDCR SEGREGATED HOUSING UNITS** |

1

# TABLE OF CONTENTS

2                                                                    **Page**

3    I.      INTRODUCTION ................................................................................. 1

4    II.     FOUNDATION FOR EXPERT OPINION ............................................ 2

5    III.    EXPERT OPINIONS ........................................................................... 11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

1    I, Craig Haney, declare:

2    1.    I have personal knowledge of the matters set forth herein, and if called as a

3 witness, I could competently so testify.

4 **I.    INTRODUCTION**

5    2.    I am a Professor of Psychology, Director of the Legal Studies Program, and

6 director of the Graduate Program in Social Psychology at the University of California at

7 Santa Cruz.  I have been teaching graduate and undergraduate courses in social

8 psychology, research methodology, psychology and law, forensic psychology, and

9 institutional analysis at the University of California for 35 years.  I previously served as the

10 Chair of the Department of Psychology, Chair of the Department of Sociology, and

11 Director of the Graduate Program in Psychology.  I received a Ph.D. in Psychology from

12 Stanford University and a J.D. degree from the Stanford Law School.  I have been the

13 recipient of a number of scholarship, fellowship, and other academic awards and have

14 published approximately one hundred scholarly articles and book chapters on topics in law

15 and psychology, including encyclopedia and handbook chapters on conditions of

16 confinement and the psychological effects of incarceration.  My book on the psychological

17 consequences of imprisonment, <u>Reforming Punishment: Psychological Limits to the Pains</u>

18 <u>of Imprisonment</u>,[1] was published by the American Psychological Association in 2006.

19 (My curriculum vitae is attached to this Report as "**Appendix A**.")

20    3.    I completed a Declaration in support of Plaintiffs' opposition to Defendants'

21 Motion to Terminate in *Coleman* case, which is filed on the *Coleman* Docket Number

22 4378.  My relevant professional background is provided in Paragraphs 3 through 13 of that

23 declaration.

24

25

26

27 [1] Craig Haney, *Reforming Punishment: Psychological Limits to the Pains of Imprisonment*. Washington, DC: APA Books (2006).

28

1    **II.    FOUNDATION FOR EXPERT OPINION**

2        4.    I was retained by counsel for Plaintiffs in *Coleman v. Brown* to review and

3    assess the issues and factual claims raised in Defendants' Motion to Terminate, filed on

4    January 7, 2013.  My review both included and went beyond the specific mental health

5    care and treatment issues raised in Defendants' motion to terminate, covering mental

6    health and treatment issues that have been considered by the *Coleman* single-judge court,

7    the *Coleman/Plata* three-judge court, and the United States Supreme Court in

8    *Coleman/Plata.*  My tasks included reviewing an extensive number of documents provided

9    by Plaintiffs' counsel that pertain to the current nature and quality of medical and mental

10    health care in the California Department of Corrections and Rehabilitation (CDCR) and the

11    conditions of confinement that prevail throughout the State's prison system.

12        5.    I provided my expert opinion and findings during the *Coleman/Plata*

13    overcrowding proceedings.[2]  Given those findings along with the three-judge court's and

14    the Supreme Court's findings that overcrowding was the "primary" cause of the

15    constitutional violations in *Coleman*, my review has necessarily included the impacts of

16    the continued overcrowding in nearly all CDCR institutions.

17        6.    During the month of February 2013, and prior to preparing my Declaration

18    that was filed with Plaintiffs' opposition to Defendants' Motion to Terminate, I conducted

19    tours and interviews in numerous facilities and housing units located in four prisons where

20    *Coleman* class members reside.  The prisons were: Mule Creek State Prison (MCSP), in

21    Ione, California; California Institution for Men (CIM), in Chino, California; California

22    State Prison-Corcoran (COR), in Corcoran, California; and California Correctional

23    Institution (CCI), in Tehachapi, California.  While touring CCI and COR in February of

24

25

---

26

27    [2] Expert Report of Professor Craig Haney ("10/30/08 Haney Report"), *Coleman* Dkt. No. 3201, October 30, 2008.

28

EXPERT DECLARATION OF CRAIG HANEY RE CDCR SEGREGATED HOUSING UNITS

[803852-1]

1  2013, I toured the SHU unit at each of those two prisons and spoke with staff and prisoners

2  housed in those units.[3]

3      7.    My experience, research, and expertise include a great deal of work on the

4  subject of the psychological effects of prisoners in high security or segregation units—

5  what are sometimes called "solitary confinement," "isolated confinement," or "supermax"

6  units.[4]  I have been studying the psychological effects of isolated confinement the late

7  1970s including, specifically, in California prisons, as an expert witness in the *Toussaint*

8  and *Madrid* cases.[5]  I have continued to study and write about these issues since then.[6]  I

9

_____

10  [3] I had previously toured, inspected, and interviewed prisoners at Mule Creek State Prison,
    the California Institution for Men, and the California Correctional Institution in
11  conjunction with the overcrowding proceedings in 2007 and 2008.  I performed the same
    tasks during that time period at Valley State Prison for Women (VSPW) in Chowchilla,
12  California; Salinas Valley State Prison (SVSP) in Soledad California; California Substance
    Abuse and Treatment Facility (SATF) in Corcoran, California; North Kern State Prison
13  (NKSP) in Delano, California; and Wasco State Prison (Wasco) in Wasco, California.

14  4 "Solitary confinement" and "isolated confinement" are terms of art in correctional
15  practice and scholarship. For perhaps obvious reasons, total and absolute solitary
    confinement—literally <u>complete</u> isolation from any form of human contact—does not exist
16  in prison and never has. Instead, the term is generally used to refer to conditions of
    extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is
17  entirely consistent not only with its use in the broader correctional literature but also as it is
    practiced in the Security Housing Units that I discuss later in this Declaration, as:
18

19
        [S]egregation from the mainstream prisoner population in attached housing
20      units or free-standing facilities where prisoners are involuntarily confined
        in their cells for upwards of 23 hours a day or more, given only extremely
21      limited or no opportunities for direct and normal social contact with other
        persons (i.e., contact that is not mediated by bars, restraints, security glass
22      or screens, and the like), and afforded extremely limited if any access to
        meaningful programming of any kind.
23

24  Craig Haney, *The Social Psychology of Isolation: Why Solitary Confinement is*
25  *Psychologically Harmful*, Prison Service Journal, 12 (January, 2009), at n.1.

26  [5] *Toussaint v. McCarthy*, 553 F. Supp. 1365 (N.D. Cal. 1983); *Madrid v. Gomez*, 889 F.
    Supp. 1146 (N.D. Cal. 1995).

27  [6] For example*, see*: Craig Haney, *Infamous Punishment: The Psychological Effects of*

28                                                          (continued…)

1  have also served as a consultant to and witness before various governmental agencies

2  concerning the psychological effects of solitary confinement.  For example, in June, 2012 I

3  testified as invited witness before the United States Senate Judiciary Subcommittee

4  (chaired by Senator Richard Durbin) on the psychological effects of isolated confinement.

5        8.     There is a large body of literature that documents the grave risk of

6  psychological harm to which prisoners in isolated confinement are subjected.  This

7  literature is too extensive to review in detail here, but in-depth and comprehensive analyses

8  are provided in several of my published review articles.[7] This published literature clearly

9  documents the distinctive patterns of psychological harm that can and do occur when

10  persons are placed in solitary confinement.  These broad patterns have been consistently

11  identified in personal accounts written by persons confined in isolation, in descriptive

12  studies authored by mental health professionals who worked in many such places, and in

13  systematic research conducted on the nature and effects of solitary or "supermax"

14  confinement. The studies have now spanned a period of over five decades, and were

15  conducted in locations across several continents by researchers with different professional

16  expertise, ranging from psychiatrists to sociologists and architects.[8]

---

18  (… continued)

19  *Isolation*, 8 National Prison Project Journal 3 (1993); Craig Haney & Mona Lynch,
*Regulating Prisons of the Future: The Psychological Consequences of Solitary and*

20  *Supermax Confinement*, 23 New York University Review of Law and Social Change 477-
570 (1997); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax"*

21  *Confinement*, 49 Crime & Delinquency 124-156 (2003); and Craig Haney, *The Social*

22  *Psychology of Isolation*, *supra* note 5.

23  [7] *See*: Haney and Lynch, 1997, and Haney, 2003, *supra* note 6, for detailed discussions of
this literature.

24  [8] For example, *see*: Arrigo, B., & Bullock, J., *The Psychological Effects of Solitary*

25  *Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should*
*Change*, International Journal of Offender Therapy and Comparative Criminology, 52,
622-640 (2008); Haney, C., *supra* note 7; Haney, C., & Lynch, M., *Regulating Prisons of*

26  *the Future: The Psychological Consequences of Solitary and Supermax Confinement*, New
York University Review of Law and Social Change 23, 477-570 (1997); and Peter Smith,

27  *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the*
*Literature*, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago:

28  (continued…)

9.      In early but important research on this issue, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[9] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[10] Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an

_____

(… continued)

University of Chicago Press (2006). In contrast to the overwhelming empirical consensus that isolated confinement places prisoners at grave risk of psychological harm, as reported and discussed in these reviews of the literature, there are only two outlier studies that report contrary findings: Zinger, I., Wichman, C. & Andews, D. (2001) The psychological effects of 60 days in administrative segregation, *Canadian Journal of Criminology*, 43, 47-88 (2001) reported no ill effects from 60 days in isolation, and O'Keefe, M., Klebe, K., Kelli J., Studer, A., Alysha,Sturm, K., Kristen & Leggett, W.,, William (2010) *One year longitudinal study of the psychological effects of administrative segregation.* University of Colorado, Colorado Springs (2010) reported in an unpublished study that a year in administrative segregation actually benefitted prisoners (although their exact findings were difficult to interpret).  However, in addition to the various methodological problems that plagued both studies, neither are applicable to the CDCR conditions discussed in this Declaration. The Zinger et al. study was limited to 60 days in isolated confinement, far briefer than the normative stay in CDCR SHUs. The O'Keefe et al. study was not only limited to one year's duration but also was based on "administrative segregation" conditions that differed significantly from CDCR SHUs (including a maximum stay of 2 years, a graduated series of increasing privileges that included the opportunity for significant out-of-cell time and work assignments, and so on). For a discussion of the methodological problems that plagued the latter study and rendered its results uninterpretable, see: Grassian, S., & Kupers, T., *The Colorado study versus the reality of supermax confinement*, Correctional Mental Health Report, May/June 2011, 1-4; and Lovell, D. & Toch, H., *Some observations about the Colorado segregation study*, Correctional Mental Health Report, May/June 2011, 3-4, 14.

[9] Hans Toch, *Men in Crisis: Human Breakdowns in Prisons*. Aldine Publishing Co.: Chicago (1975).

[10] *Id.* at 54.

[803852-1]

1  important dichotomy for prisoners: the "distinction between imprisonment, which is

2  tolerable, and isolation, which is not."[11]

3      10.    More recent studies have identified other symptoms that appear to be

4  produced by these conditions. Those symptoms include: appetite and sleep disturbances,

5  anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations.

6  Moreover, direct studies of prison isolation have documented an extremely broad range of

7  harmful psychological reactions. These effects include increases in the following

8  potentially damaging symptoms and problematic behaviors: anxiety, withdrawal,

9  hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control,

10  irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional

11  breakdown, self-mutilation, and suicidal ideation and behavior.[12]

12

13  _____

[11] *Ibid.*

14

15  [12] In addition to the numerous studies cited in the articles referenced *supra* at notes 7 and 8, there is a significant international literature on the adverse effects of solitary confinement. For example, *see*: Henri N. Barte, *L'Isolement Carceral*, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, *Einzelhaft: Eine Literaturubersicht* (Solitary confinement: A literature survey), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, *Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft* (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., *Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung* (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept

16

17

18

19

20

21

22

23

24

25

26

27

28

(continued…)

1    11.    In addition, there are a number of correlational studies that have been done

2    examining of the relationship between housing type and various kinds of incident reports

3    in prison. They show that self-mutilation and suicide are more prevalent in isolated,

4    punitive housing units such as administrative segregation and security housing or SHU,

5    where prisoners are subjected to solitary-like conditions of confinement. For example,

6    clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in

7    solitary confinement-type units to the heightened levels of "environmental stress" that are

8    generated by the "isolation, punitive sanctions, [and] severely restricted living conditions"

9    that exist there.[13]  These authors reported that "the conditions of deprivation in locked

---

(… continued)

in solitary confinement); Boguslaw Waligora, *Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej* (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). *See also* Ida Koch, *Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems*, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125).  *See also*: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, *Long-Term Mental Sequelae of Political Imprisonment in East Germany*, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[13] Raymond Patterson & Kerry Hughes, *Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004*, Psychiatric Services, 59, 676-682 (2008), at p. 678.

1  units and higher-security housing were a common stressor shared by many of the prisoners

2  who committed suicide."[14] In addition, signs of deteriorating mental and physical health

3  (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and

4  property destruction, and collective violence are also more prevalent in these units.[15]

5        12.    These risks are exacerbated in the case of mentally ill prisoners. Virtually

6  every court and every professional mental health and human rights organization that has

7  addressed this question agrees that mentally prisoners should either be totally excluded

8  from such confinement or, if it is absolutely necessary (and only as a last resort) to confine

9  them there, such confinement should be strictly limited in duration and modified to provide

10  significant amounts of out-of-cell time and augmented access to care. For example, the

11  American Psychiatric Association has issued a Position Statement on Segregation of

12  Prisoners with Mental illness stating:

13              Prolonged segregation of adult inmates with serious mental
             illness, with rare exceptions, should be avoided due to the
14              potential for harm to such inmates. If an inmate with serious

---

15  [14] *Ibid. See also*: Lindsay M. Hayes, *National Study of Jail Suicides: Seven Years Later*.
16  Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem,
   Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, *Vulnerability and Prison Suicide*,
17  British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, *Prison Suicide*
18  *and Prisoner Coping*, Crime and Justice, 26, 283-359 (1999).

19  [15] For example, see: Howard Bidna, *Effects of Increased Security on Prison Violence*,
20  Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, *Some Characteristics*
   *of Prisoners Transferred from Prison to a State Mental Hospital*, Behavioral Sciences and
21  the Law, 6, 131-137 (1988); Elmer H. Johnson, *Felon Self-Mutilation: Correlate of Stress*
22  *in Prison*, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973);
   Anne Jones, *Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators*,
23  Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, *The Implications of*
24  *Research Explaining Prison Violence and Disruption*, Federal Probation, 52, 27-32 (1988);
   Ernest Otto Moore, *A Prison Environment: Its Effect on Health Care Utilization*,
25  Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, *Managing Violent*
26  *Individuals in Correctional Settings*, Journal of Interpersonal Violence, 1, 213-237 (1986);
   and Pamela Steinke, *Using Situational Factors to Predict Types of Prison Violence*, 17
27  Journal of Offender Rehabilitation, 17, 119-132 (1991).

28

> mental illness is placed in segregation, out-of-cell structured
> therapeutic activities (i.e., mental health/ psychiatric treatment)
> in appropriate programming space and adequate unstructured
> out-of-cell time should be permitted. Correctional mental
> health authorities should work closely with administrative
> custody staff to maximize access to clinically indicated
> programming and recreation for these individuals.[16]

This statement reflects the accepted reality that mentally ill prisoners are especially

vulnerable to isolation- and stress-related regression, decompensation, psychosis, and other

mental health-related symptoms and maladies (including self harm).

      13.     Segregated housing units in CDCR's system were a particular focus of my

recent review and analysis of CDCR facilities.  Because of the special sensitivity and

vulnerability of mentally ill prisoners to the harsh regimes that have existed in these units

in the past, I made a point of visiting a number of segregated housing units in the course of

my tours. Those units included the EOP Administrative Segregation Unit[17] ("ASU" or "Ad

Seg") at MCSP, the ASU at CIM, the ASU and Security Housing Unit[18] ("SHU") at COR,

and the ASU and Security Housing Unit (SHU) at CCI.

      14.     In the course of touring these four CDCR facilities, institution staff

photographed a number of different areas inside the prisons at my direction.  I have

reviewed and relied on those photographs in developing my opinions in this matter.

---

[16] Declaration of Michael W. Bien in Support of Plaintiffs' Opposition to Defendants' Motion to Terminate ("Bien Decl.") Ex. 14 (*Coleman* Dkt. No. 4399).

[17] Administrative Segregation Units are locked-down units within the prison where prisoners are housed for a wide variety of "administrative" reasons.  Special security procedures are used in the transport of Ad Seg prisoners and their out-of-cell time and other program participation is drastically reduced.  They spend the overwhelming majority of their time locked in their cells.

[18] Security or Secured Housing Units are also locked-down units within the prison where prisoners are housed as a result of disciplinary infractions (specific offenses committed in prison, or gang status), or sometimes for safety-related concerns.  As with AD SEG prisoners, special security procedures are used in the transport of SHU prisoners and their out-of-cell time and other program participation is drastically reduced.  They, too, spend the overwhelming majority of their time locked in their cells.  There are currently five (5) SHUs in CDCR's system.

15.    During the tours, I had numerous conversations with correctional administrators, clinical staff, and line correctional officers, with Defendants' counsel present throughout. I was also able to converse with numerous prisoners who were participants in the CDCR's mental health delivery system, including many who were in the Correctional Clinical Case Management System (CCCMS)[19] as well as those in the Enhanced Outpatient Program (EOP).[20] I also conducted private, one-on-one interviews with individual prisoners who were selected with the assistance of Plaintiffs' counsel and institutional staff from the various lists of mentally ill prisoners at each facility.

16.    As part of my expert review related to Defendants' recent Motion to Terminate, I was asked to formulate expert opinions concerning several issues, including whether the current conditions and treatment provided for prisoners in segregation settings—specifically, Administrative Segregation Units and Security Housing Units—is appropriate or poses undue risk of harm and suffering. I made several findings as to these units, which are provided in my previously filed Declaration.[21]

17.    As a result of these recent CDCR prison tours and the work that I have done evaluating prison conditions in numerous CDCR facilities in the past, I have toured, inspected, and interviewed prisoners in nearly all of the state's Security Housing Units

---

[19] CCCMS prisoners constitute the largest CDCR mental health category. It comprises approximately 27,600 prisoners with mental illness. They are supposed to receive medication management, meet with a clinician at least every 90 days, and receive mental health treatment as clinically indicated. When CCCMS prisoners are housed in Ad Seg, they are supposed to receive enhanced mental health services that include weekly case manager contacts and daily rounding from psychiatric technicians.

[20] EOP includes seriously mentally ill prisoners who require a higher and more intensive level of mental health care. These prisoners are unable to function in a general population prison setting and, as a result, are supposed to be in sheltered treatment programs and live in segregated housing units. They are supposed to receive 10 hours each week of therapy or "structured therapeutic activities." When they are housed in Ad Seg, they are supposed to be provided with weekly case manager contacts and receive daily rounding from psychiatric technicians. There are approximately 4,650 EOP prisoners in the CDCR.

[21] *Coleman* Dkt. No. 4378, filed Mar. 14, 2013.

1   (SHUs) in the CDCR, including at Pelican Bay State Prison (PBSP), California State

2   Prison-Corcoran (COR), California Correctional Institution (CCI), and Valley State Prison

3   for Women (VSPW) (which I understand has since been moved to California Institution

4   for Women).  Thus, I have direct knowledge of the SHUs where the vast majority of

5   CDCR prisoners, and *Coleman* class members, are housed.

6   **III.    EXPERT OPINIONS**

7          18.    The SHUs that I have observed in CDCR's system are architecturally very

8   similar and programmatically identical to one another.  Although the cells in the PBSP

9   SHU (like CDCR's stand-alone ASUs) are windowless and do not face other cells across

10  the pod, and the "yards" consist of concrete enclosed spaces rather than cages, there is

11  otherwise little difference between them. They certainly share all of the other

12  psychologically harmful features that put mentally ill prisoners are especially heightened

13  risk of harm. Those features include housing prisoners nearly around-the-clock inside

14  individual cells where they eat, sleep, and defecate. SHU prisoners in the CDCR are

15  provided approximately one hour per day out-of-cell time for exercise and generally no

16  more than a total of an hour and a half outside their cells (the half-hour of out-of-cell time

17  that is not yard time is generally shower time). These prisoners have no access to

18  meaningful out-of-cell programs or purposeful activity of any kind—no work, vocational

19  or educational training programs, or programming—and no opportunity for even a

20  semblance of normal social interaction with staff or other inmates.[22] All of their visits

21  (including legal visits and visits with spouses, children and other loved ones) are on a non-

22  contact basis (through glass windows).  As a result, SHU prisoners can go for years

23  without touching another human being with affection.  All of their meals are brought to

24  SHU prisoners in their cell by a correctional officer.

25  —————————————————

26  [22] By "normal social interaction" I mean interaction that occurs other than through cell
    bars, through glass and over the phone, from within a cage, or when the prisoner is in (or
27  being placed in) mechanical restraints.

28

[803852-1]

19.     Moreover, because prison staff members generally view residents of the SHU units as particularly high-risk, and dangerous, the relationship between SHU prisoners and custody staff in these units is often particularly tense and stressful.[23]  Like the prisoners at Pelican Bay, a number of the SHU prisoners I met with at COR and CCI had been housed in SHU units for months and even years.  Unlike SHU units in many other states, the CDCR SHUs do not provide prisoners the opportunity to "work their way out" of isolation on the basis of good behavior (for example, through a graduated series of achievable steps or benchmarks that lead to greater levels of privileges and eventual release from SHU).  California has a large percentage of its SHU prisoners serving "indeterminate" SHU terms, meaning there is no set ending time for their SHU placement.  In my opinion, the uncertainty concerning length of stay is one of the particularly harsh stressors for many of the prisoners in California's SHU units.

20.     Other characteristics of the conditions and operations in CDCR SHU units are comparable statewide: all SHUs are in high-custody housing units where prisoners cannot easily speak with each other (even those in adjoining cells), where all movement requires cuffing and escorts by two correctional officers, where many individuals are single-celled and therefore completely isolated, and where mental health treatment and even activities such as visiting the law library visits must take place in cages or in a special cell.  I have observed and understand that when the CCCMS individuals housed in the COR and CCI SHU programs have been provided with therapy groups, those groups have taken place in small cages that the CDCR refers to as "treatment modules."  One-on-one clinical sessions with mental health providers also generally take place with the patient locked in a treatment module or cage.  A significant percentage of SHU prisoners are confined under these extraordinary conditions for terms of years and, in some instances,

---

[23] For a discussion of these tense and stressful interactions and some of the dynamics they generate, *see*: Craig Haney, *A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons*, 35 Criminal Justice and Behavior 956-984 (2008).

[803852-1]

1    even for decades. Among other things, this means that the inmate-patients who are housed

2    in SHU units will receive whatever treatment is made available to them inside one of these

3    cages, and nowhere else.

4        21.    As I noted above, there is near universal recognition of the fact that the risk

5    of psychological harm is simply too great to place vulnerable mentally ill prisoners in

6    isolated confinement. Because of this, the overwhelming consensus among professional

7    mental health and human rights experts and organizations is that mentally ill prisoners

8    should be placed in such units only as an absolute last resort, and for the briefest possible

9    time.  The CDCR policies and practices with regard to SHU are in clear violation of this

10   consensus.  It is my opinion that CDCR does not take the mental illness of inmate-patients

11   appropriately into account when determining whether a SHU placement is necessary and

12   justified.[24]

13       22.    In addition, as I also noted earlier, the overwhelming consensus among

14   professional mental health and human rights experts and organizations is that the rare

15   mentally ill prisoner who absolutely must be placed in isolated confinement should be

16   provided with enhanced access to treatment, and meaningful activities and programming

17   for the presumably short periods of time they are there. The CDCR policies and practices

18   with regard to SHU are in clear violation of this consensus as well.  In my experience, the

19   hundreds of mentally ill prisoners (almost all CCCMS, with a small number of EOP)

20   housed in the CDCR SHUs are treated in ways that are virtually indistinguishable from

21   other SHU prisoners. For example, most receive <u>no</u> therapeutic groups.  As I discussed in

22   my recent Declaration, the delivery of treatment to CCCMS prisoners in the CCI SHU is

23   extremely limited: the schedule provided to us during our February 22, 2013 tour showed

24   that there were three one-hour groups provided in a given week for the nearly 200 CCCMS

25   prisoners in the CCI SHU (only three CCCMS SHU prisoners were at the group I observed

27   [24] *See*: Declaration of Eldon Vail, *Coleman* Dkt. No. 4385 ¶¶ 78-94, filed Mar. 14, 2013.

[803852-1]

1    during my tour).[25]  Similarly, I was told by staff that there is group treatment once a week

2    for CCCMS SHU prisoners at CSP-Corcoran, although prisoners reported that groups were

3    offered even less frequently (between about one group treatment session per month and

4    none at all).[26]

5        23.    Like all SHU prisoners, mentally ill prisoners housed in any of CDCR's

6    SHUs are generally limited to approximately one hour of out-of-cell time per day.

7        24.    In addition, the SHU prisoners at CCI and COR to whom I spoke in my last

8    round of tours complained about inadequate contact with mental health staff, the

9    superficial nature of the psych tech rounding ("breeze-bys"), the non-confidential nature of

10    cell front contact, and the inappropriate nature of the treatment space afforded during

11    otherwise infrequent clinical contacts.

12        25.    The Pelican Bay Exclusion Order, which was entered in the *Madrid* case and

13    which is part of the *Coleman* Program Guide, excludes individuals with specified serious

14    mental disorders, individuals whose mental disorder includes "being actively suicidal,"

15    individuals whose mental disorder includes frequent breaks from reality, individuals who

16    have a diagnosis of mental retardation or organic brain syndrome, individuals with a severe

17    personality disorder  "manifested by frequent episodes of psychosis or depression and

18    results in significant functional impairment," a prior history of doing poorly in the SHU, a

19    history of certain mental health related issues that would make the SHU particularly risky

20    for them.  The Program Guides also exclude EOP prisoners from placement in any SHU

21    units in the state.[27]  It is my opinion that the Pelican Bay Exclusion Order should be

22    applicable in all SHUs in CDCR's system.  As discussed above, there are only minor

23    architectural differences between the Pelican Bay SHU and other SHUs in the State's

24    _____

25    [25] *Coleman* Dkt. Nos. 4378 ¶¶ 240-242; 4399-1 at 242 (Bien Decl. Ex. 12 (Group Therapy
       Schedule, CCI Tehachapi)).

26    [26] *Coleman* Dkt. Nos. 4378 ¶¶ 206-213.

27    [27] *See*: *Coleman* Program Guide at 12-8-1 and 12-8-2.

28

1  prisons; otherwise, the extremely harsh and severe conditions and lack of meaningful

2  activity and out-of-cell time are essentially indistinguishable among all of the SHUs,

3  including Pelican Bay.

4      26.    Based on my experience, it is my opinion that these features of the SHU are

5  extremely harmful and dangerous for mentally ill individuals in the categories listed in the

6  Pelican Bay exclusion order.  These prisoners are particularly vulnerable to the harsh,

7  isolating, conditions in SHU units, to the lack of meaningful activities, and to the tense and

8  stressful custody environment. They are particularly vulnerable to psychological

9  decompensation of various forms when placed into these units.  In addition, persons who

10 suffer from these mental health conditions are likely to have fewer personal resources or

11 "resiliency" available to them for coping with the isolation and the other harsh conditions

12 in the SHU units.

13     27.    Many of the very same harsh conditions and deprivations I describe above

14 regarding CDCR SHUs exist in comparable measure in the ASUs.  I have discussed the

15 harsh conditions and lack of treatment I observed in ASUs in my recent *Coleman*

16 Declaration (filed March 14, 2013).  In my opinion, the segregated and isolated setting of

17 the ASUs also impose substantial risks of psychological harm for the prisoners housed in

18 them. This is particularly true for those prisoners who are mentally ill.

19     28.    It is my opinion mentally ill prisoners cannot be safely and humanely housed

20 in these segregated units (ASU, EOP ASU hub, or PSU) unless they are provided with at

21 least a minimally adequate treatment program, including Program Guide-standard or

22 clinically indicated treatment hours, at least 10 hours of other out-of-cell time (for exercise

23 or other recreation) each week, and adequate confidential treatment space.

24     //

25     //

26     //

27     //

28     //

29.    Even with the provision of a minimally adequate treatment program, such as that described above, it is my opinion that the harsh conditions and deprivations imposed on mentally ill prisoners in CDCR's segregated units still poses a considerable risk of psychological harm.  For this reason, I strongly support a strict time limit for housing mentally ill prisoners in CDCR's segregated units.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration is executed in Santa Cruz, CA on May 4, 2013.

Craig Haney

EXPERT DECLARATION OF CRAIG HANEY RE CDCR SEGREGATED HOUSING UNITS

[803852-1]

# APPENDIX A TO DECLARATION OF CRAIG HANEY

CURRICULUM VITAE


Craig William Haney
Professor of Psychology
Department of Psychology
University of California, Santa Cruz 95064

home address:    317 Ocean View Ave.
                 Santa Cruz, California 95062
phone:           (831) 459-2153
fax:             (831) 425-3664
email:           psylaw@ucsc.edu

PREVIOUS EMPLOYMENT

| | | |
|---|---|---|
| 1985-present | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |

EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

2012    Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States.

Invited Witness, United States Senate, Judiciary Committee.

2011    Edward G. Donnelly Memorial Speaker, University of West Virginia Law School.

2009    Nominated as American Psychological Foundation William Bevan Distinguished Lecturer.

Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors).

2006    Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>).

Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>).

"Dream course" instructor in psychology and law, University of Oklahoma.

2005    Annual Distinguished Faculty Lecturer, University of California, Santa Cruz.

Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient).

Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley).

2004    "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz.

National Science Foundation Grant to Study Capital Jury Decision-making

2002        Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

            United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

            American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

            Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000        Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

            Excellence in Teaching Award (Academic Senate Committee on Teaching).

            Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999        American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

            National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997        National Science Foundation Grant to Study Capital Jury Decision-making.

1996        Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995        Gordon Allport Intergroup Relations Prize (Honorable Mention)

            Excellence in Teaching Convocation, Social Sciences Division

1994        Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992        Psychology Undergraduate Student Association Teaching Award

            SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991        Alumni Association Teaching Award ("Favorite Professor")

3

| | |
|---|---|
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

## UNIVERSITY SERVICE AND ADMINISTRATION

| | |
|---|---|
| 2010-present | Director, Legal Studies Program |
| 2010-present | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |

| 1990-1992 | Committee on Academic Personnel |
|---|---|
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Context and Criminality: Social History and Circumstance in Crime Causation (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| 2006 | Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books. |
|---|---|
| 2005 | Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press. |

Monographs and Technical Reports

| 1989 | Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation. |
|---|---|

Articles in Professional Journals and Book Chapters

2012        "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" West Virginia Law Review, 114, 373-414.

"Prison Effects in the Age of Mass Imprisonment," Prison Journal, in press.

"The Pains of Imprisonment: Prisonization and the Psychological Consequences of Incarceration," in J. Petersilia & K. Reitz (Eds.), Oxford Handbook of Sentencing and Corrections (pp. 584-605). New York: Oxford University Press.

2011        "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," American Criminal Law Review, 48, 121-141. [Reprinted in: S. Ferguson (Ed.), Readings in Race, Gender, Sexuality, and Social Class. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), Law and Society Review, 45, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), Law and Human Behavior, 35, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010        "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

2009        "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), <u>Law and Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>, <u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," <u>University of Missouri-Kansas City Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-814.

2008        "Counting Casualties in the War on Prisoners," <u>University of San Francisco Law Review</u>, <u>43</u>, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," <u>Hofstra Law Review</u>, <u>36</u>, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," <u>Criminal Justice and Behavior</u>, <u>35</u>, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), <u>Psychology and Law: Bridging the Gap</u> (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), <u>Dictionary of Prisons</u> (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 265-293. [Reprinted in: N. Berlatsky, <u>Opposing Viewpoints: America's Prisons</u>. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," <u>Golden Gate Law Review</u>, <u>37</u>, 131-173.

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review, in press.

2002    "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public  Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom

Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001     "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000     "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999     "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998     "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); in <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The</u> <u>American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional</u>

10

Contexts: Contemporary and Classical Readings. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," Hastings Women's Law Journal, 9, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), La Raza Law Journal, 10, 645-690.

1997        "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), New York University Review of Law and Social Change, 23, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," Psychology, Public Policy, and Law, 3, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" Psychology, Public Policy, and Law, 3, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," Stanford Law Review, 49, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995        "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," Indiana Law Journal, 70, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," California Criminal Defense Practice Reporter, 1995(1), 1-7.

1994        "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), Law and Human Behavior, 18, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), Law and Human Behavior, 18, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), Law and Human Behavior, 18, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), Journal of Social Issues (special issue on the death penalty in the United States), 50, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), Journal of Social Issues (special issue on the death penalty in the United States), 50, 149-176. [Reprinted in Koosed, M. (Ed.), Capital Punishment. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), Law and Human Behavior, 18, 619-633.

"Processing the Mad, Badly," Contemporary Psychology, 39, 898-899.

"Language is Power," Contemporary Psychology, 39, 1039-1040.

1993        "Infamous Punishment: The Psychological Effects of Isolation," National Prison Project Journal, 8, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), Correctional Contexts: Contemporary and Classical Readings (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), Correctional Perspectives: Views from Academics, Practitioners,

12

and Prisoners (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992      "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). Forum, 19, 43-47.

          "The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. Behavioral Science and Law, 10, 179-195.

1991      "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," Law and Human Behavior, 15, 183-204.

1988      "In Defense of the Jury," Contemporary Psychology, 33, 653-655.

1986      "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), Journal of Community Psychology, 14, 267-277.

1984      "Editor's Introduction.  Special Issue on Death Qualification," Law and Human Behavior, 8, 1-6.

          "On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," Law and Human Behavior, 8, 121-132.

          "Examining Death Qualification:  Further Analysis of the Process Effect," Law and Human Behavior, 8, 133-151.

          "Evolving Standards and the Capital Jury," Law and Human Behavior, 8, 153-158.

          "Postscript," Law and Human Behavior, 8, 159.

          "Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman,

A. (Eds.), Perspectives in Psychology and Law.  New York:  John Wiley, pp. 43-54.

1983        "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), Personality Theory, Moral Development, and Criminal Behavioral Behavior. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), Personality Theory, Moral Development, and Criminal Behavior.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," Jurimetrics, 23, 321-324.

1982        "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" Law and Human Behavior, 6, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), Law and American History: Cases and Materials. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) Introduction to Criminal Justice: A Sociological Perspective. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), The Analysis of Judicial Reform.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," Industrial Relations Law Journal, 5, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), Polygraph, 11, 185-199.

1981        "Death Qualification as a Biasing Legal Process," The Death Penalty Reporter, 1 (10), pp. 1-5. [Reprinted in Augustus: A Journal of Progressive Human Sciences, 9(3), 9-13 (1986).]

1980        "Juries and the Death Penalty:  Readdressing the Witherspoon Question," Crime and Delinquency, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979    "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977    "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard"  (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society:  Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976    "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975    "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings,"

15

<u>Proceedings</u>, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), <u>Theory and Research in Abnormal Psychology</u>.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), <u>Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving</u>.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) <u>Contemporary Issues in Social Psychology</u>.  Third Edition.  Monterey:  Brooks/Cole, 1977. Calhoun, James  <u>Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships</u>. New York: Random House, 1978.]

1973            "Social Roles, Role-Playing, and Education" (with P. Zimbardo), <u>The Behavioral and Social Science Teacher</u>, Fall, 1(1), pp. 24-45.  [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) <u>Psychology For Our Times</u>. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) <u>Current Perspectives in Social Psychology</u>.  Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), <u>The New York Times Magazine</u>, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), <u>International Journal of Criminology and Penology</u>, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) <u>Examining Deviance Experimentally</u>. New York: Alfred Publishing, 1975, Golden, P. (Ed.) <u>The Research Experience</u>. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) <u>The Sociology of Corrections.</u> New York:  John Wiley, 1977; <u>A kiserleti tarsadalom-lelektan foarma</u>. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. <u>Justice and Corrections</u>. New York: John Wiley, 1978; <u>Research Methods in Education and Social Sciences.</u> The Open University, 1979; Goldstein, J. (Ed.), <u>Modern Sociology</u>. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), <u>Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison.</u> Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), <u>Social Science in Law: Cases, Materials, and Problems</u>. Foundation Press, 1985: Siuta, Jerzy (Ed.), <u>The Context of Human Behavior</u>. Jagiellonian

16

University Press, 2001; Ferguson, Susan (Ed.), <u>Mapping the Social Landscape: Readings in Sociology</u>. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  <u>Naval Research Reviews</u>, <u>1</u>-<u>17</u>.  [Reprinted in Aronson, E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]


# MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency


# INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)


2012        "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

2011        "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010     "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009     "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008     "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing

Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007      "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006      "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on

19

Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005        "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers, United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004        "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference,  After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

20

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003        "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000    "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999    "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998    "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997        "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996        "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995        "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994        "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

24

| | |
|---|---|
| 1992 | "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August. |
| 1991 | "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August. |
| 1990 | "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA. |
| 1989 | "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August. |
| | "Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June. |
| | "The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June. |
| 1987 | "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August. |
| | "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July. |
| 1986 | Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August. |
| | "Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August. |
| 1985 | "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November. |

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983   "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982   "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982   "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982   "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980   "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975   "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2011-present      Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present      Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present      Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present      Editorial Board Member, <u>Journal of Offender Behavior and Rehabilitation</u>.

2004-present      Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003      Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present      Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-present      Editorial Board Member, <u>Psychology, Public Policy, and Law</u>

1991      Editorial Consultant, Brooks/Cole Publishing

1989      Editorial Consultant, <u>Journal of Personality and Social Psychology</u>

1988-      Editorial Consultant, <u>American Psychologist</u>

1985      Editorial Consultant, <u>American Bar Foundation Research Journal</u>

1985-2006      <u>Law and Human Behavior</u>, Editorial Board Member

1985      Editorial Consultant, Columbia University Press

1985      Editorial Consultant, <u>Law and Social Inquiry</u>

1980-present      Reviewer, National Science Foundation

1997      Reviewer, National Institutes of Mental Health

1980-present      Editorial Consultant, <u>Law and Society Review</u>

1979-1985      Editorial Consultant, <u>Law and Human Behavior</u>

1997-present     Editorial Consultant, <u>Legal and Criminological Psychology</u>

1993-present     <u>Psychology, Public Policy, and Law</u>, Editorial Consultant


<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County
     Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974,
     1980-1981 (effects of prison conditions, evaluation of proposed prison
     legislation).

Reviewer, National Science Foundation (Law and Social Science, Research
     Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail
     overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and
     guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982
     (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case
     evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of
     proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes

and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs

29

designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of aliens, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION

Hoptowit v. Ray  [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown  (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy  [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest  (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle  [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital  (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock  (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey  (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson  (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy  [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening

procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 131 S.Ct. 1910 (2011).]