1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
4
5
6
7
8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
   MEGAN CESARE-EASTMAN – 253845
10 K&L GATES LLP
   4 Embarcadero Center, Suite 1200
11 San Francisco, California  94111-5994
   Telephone:    (415) 882-8200
12
   Attorneys for Plaintiffs
13

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

14              UNITED STATES DISTRICT COURT

15            EASTERN DISTRICT OF CALIFORNIA

16

17 RALPH COLEMAN, et al.,

18          Plaintiffs,

19      v.

20 EDMUND G. BROWN, Jr., et al.,

21          Defendants.

22

23

24

Case No. Civ S 90-0520 LKK-JFM

**DECLARATION OF JANE KAHN IN
SUPPORT OF MOTION FOR
ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE
RELIEF RE: IMPROPER HOUSING
AND TREATMENT OF SERIOUSLY
MENTALLY ILL PRISONERS IN
SEGREGATION**

Judge:   Hon. Lawrence K. Karlton
Date:     June 17, 2013
Time:    10:00 am
Crtrm.: 4

25

26

27

28

[804613-1]

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

1    I, Jane E. Kahn, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3    of this Court, and Of Counsel to the law firm of Rosen Bien Galvan & Grunfeld LLP,

4    counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein,

5    and if called as a witness I could competently so testify.  I make this declaration in support

6    of Motion For Enforcement of Court Orders and Affirmative Relief re: Improper Housing

7    and Treatment of Seriously Mentally Ill Prisoners in Segregation.

8    2.    Attached hereto as **Exhibit 1** is a true and correct copy of an excerpt from

9    the 2009 Revision to the *Coleman* MHSDS Program Guide, from Chapter 7

10    (Administrative Segregation) at page 12-7-7.  This section covers required treatment for

11    CCCMS class members in administrative segregation, which does not include group

12    therapy.

13    3.    Attached hereto as **Exhibit 2** is a true and correct copy of an excerpt from

14    the 2009 Revision to the *Coleman* MHSDS Program Guide, from Chapter 8 (Security

15    Housing Unit) at page 12-8-10.  This section covers required treatment for CCCMS class

16    members in the Security Housing Unit, which does not include group therapy.

17    4.    Attached hereto as **Exhibit 3** is a true and correct copy of an excerpt from

18    the 2009 Revision to the *Coleman* MHSDS Program Guide, from Chapter 4 (Enhanced

19    Outpatient Program) at page 12-4-9.  The section covers required treatment for prisoners in

20    the Enhanced Outpatient Program.

21    5.    Attached hereto as **Exhibit 4** is a true and correct copy of an excerpt from

22    the 2009 Revision to the *Coleman* MHSDS Program Guide, from Chapter 1 (Program

23    Guide Overview), at page 12-1-16.  This section outlines the court-ordered timelines for

24    transfers of *Coleman* class members between various levels of care.

25    6.    Attached hereto as **Exhibit 5** is a true and correct copy of an excerpt from

26    the *Coleman* monthly data, dated March 22, 2013, which is provided to the Special Master

27    and to Plaintiffs, via a secure file transfer protocol ("FTP") site created by Defendants.

28    This excerpt is a report entitled, "EOP and CCCMS in Adseg/SHU/PSU Placements

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

1  greater than 90 days," which lists those prisoners who have been placed in these

2  segregated housing units for stays exceeding 90 days at each prison reported on in the

3  document.  The prisoner names and CDCR numbers have been redacted.  Counsel for

4  CDCR have provided Plaintiffs' counsel with log-in information to access portions of the

5  CDCR's FTP site, including the *Coleman* monthly data report, and each month a paralegal

6  in my office downloads this *Coleman* monthly data report.  At the bottom of each page of

7  this report is a note that reads as follows:  "Aging clock resets when an inmate-patient is

8  moved from one cell to another within the same treatment/custody setting."  In other

9  words, if a prisoner is moved to a new cell, goes out-to-court or goes to a crisis unit for

10  suicide observation and is returned to a segregated housing unit, the length of stay tracking

11  begins again at 0.

12        7.        In the most recent *Coleman* monthly data report, the data reporting lengths of

13  stay for prisoners with serious mental illness in administrative segregation ("ASU"),

14  security housing units ("SHU") and psychiatric housing units ("PSU") for March 22, 2013,

15  reported ASU stays as long as: 387 days at CCI ASU; 732 days at CCWF; 525 days at

16  CTF; 524 days at KVSP; 457 days at PVSP; 475 days at SATF; 525 days at SVSP; 421

17  days at CMF; 333 days at DVI; 494 days at HDSP; 524 days at Mule Creek; 524 days at

18  Pelican Bay; 524 days at SAC; 346 days at Solano; 524 days at San Quentin; 732 days at

19  CIW; 524 days at LAC; and 460 days at RJD.  The March 22, 2013 monthly data also

20  shows incredibly long stays in the SHUs and PSUs for prisoners with serious mental

21  illness, with stays as long as 524 days in the Pelican Bay and SAC PSUs; stays as long as

22  732 days in the CIW PSU; and stays as long as 524 days in the CCI SHU.  There was no

23  length of stay data reported for the COR ASU or SHU in the March 22, 2013 Monthly

24  report.  In fact, Defendants have not included in their *Coleman* monthly data any reporting

25  on SHU lengths of stay at CSP-Corcoran since October 2011.  Attached hereto as

26  **Exhibit 6** is a true and correct copy of the *Coleman* monthly data report,  pages R10-8 to

27  R10-16 from the report entitled, "EOP and CCCMS in Adseg/SHU/PSU Placements

28  greater than 90 days" for October 7, 2011.   The prisoner names and CDCR numbers have

[804613-1]

1   been redacted.  In that report, stays in the COR SHU were as long as 2,474 days (almost

2   seven years), 23 of the CCCMS prisoners had stays longer than two years, and eight had

3   stays longer than three years.  This data also includes the note that the aging clock resets

4   for prisoners moved from one cell to another.

5       8.    Attached hereto as **Exhibit 7** is a true and correct copy of excerpts from the

6   *Coleman* monthly data "Report EOP and CCCMS in Adseg/SHU/PSU Placements greater

7   than 90 days," for two time periods:  March 11, 2011 and March 22, 2013, reporting length

8   of stay data for CCI SHU CCCMS class members.   The prisoner names and CDCR

9   numbers have been redacted.  I selected two timeframes where a CCI SHU prisoner

10  appeared on both monthly reports to evaluate whether and how the length of stay data

11  provided by Defendants under-reports stays in the segregated housing units.  This

12  individual prisoner is identified on the March 11, 2011 and March 22, 2013 reports by an

13  asterisk next to his "name."   For example, in the March 11, 2011 Report, this CCCMS

14  inmate-patient is listed in the CCI SHU with a length of stay of 563 days, from bed

15  occupancy on 8/25/09, while in the March 22, 2013 Report, the same individual is listed in

16  the CCI SHU with a length of stay of 172 days, from bed occupancy on 10/1/12.  I directed

17  a paralegal in the office to review the monthly *Coleman* data reports on ASU/SHU/PSU

18  lengths of stay between March 11, 2011 and March 22, 2013, to determine what happened

19  to this inmate-patient between March 11, 2011 and March 22, 2013.  According to the

20  review of the monthly *Coleman* data by my paralegal, the data shows that this individual

21  was in the CCI SHU from August 25, 2009 through March 22, 2013, except for two short

22  timeframes of approximately 10 days in October 2011 and approximately 22 days in

23  September 2012, for a total length of stay of at least 1,273 days.  The March 22, 2013

24  monthly data, which reports a length of stay of only 172 days, is a significant under-report

25  of this individual's SHU placement.

26      9.    In **Exhibit 5**, discussed *infra* at ¶ 6, which lists lengths of stay greater than

27  90 days for female and male prisoners housed in ASU, SHU and PSU settings, no male

28  prisoner has a length of stay greater than 524 days and no female prisoner has a length of

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

1    stay greater than 732 days.  In the March 22, 2013 data, there were approximately 64 male

2    prisoners with stays of 524 days and five female prisoners with stays of 732 days.

3    Plaintiffs understand that this is related to data collection issues and not to the length of

4    stay for these particular prisoners as Plaintiffs have interviewed prisoners and reviewed

5    central file records of prisoners housed in SHU settings with stays exceeding several years.

6    That is to say, there are class members with lengths of stay in segregated housing that

7    exceed the numbers reflected in the monthly data.

8        10.    Attached hereto as **Exhibit 8** is a true and correct copy of excerpts from the

9    2009 Revision to the *Coleman* MHSDS Program Guide.  The first excerpt is from Chapter

10   7 (Administrative Segregation), at page 12-7-11.  This section covers the exclusion of

11   MHSDS participants from the stand-alone ASUs, including the requirements for daily

12   psych tech rounding, clinical assessments of any prisoner referred by the psych tech or

13   other staff, and the rapid removal within 24 hours of any prisoner who meets criteria for

14   the MHSDS.  The second excerpt is from Chapter 8 (Security Housing Unit), at pages 12-

15   8-1 to 12-8-3.  This section sets forth the list of exclusionary criteria to be used for

16   evaluating prisoners for exclusion from the Pelican Bay State Prison, as well as the

17   conditions under which prisoners who are identified with such criteria must be removed

18   within 96 hours of arrival in the SHU.

19       11.    Attached hereto as **Exhibit 9** is a true and correct copy of a CDCR

20   memorandum issued on December 17, 2012 containing a model Local Operational

21   Procedure (LOP) for class members in *Armstrong v. Brown* (Case No. 94-cv-02307-CW,

22   N.D. Cal.), who are housed in Administrative Segregation.  The LOP states that "[i]t is the

23   policy of [CDCR] not to house *Armstrong* class members in an Administrative Segregation

24   Unit (ASU) due solely to a lack of appropriate accessible General Population (GP) housing

25   (including Sensitive Needs GP)."  The LOP also sets forth a detailed procedure for

26   addressing the inappropriate placement of prisoners with certain physical disabilities in

27   segregated housing units.

28

[804613-1]

4

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

12.    Attached hereto as **Exhibit 10** is a true and correct copy of an excerpt from the 2009 Revision to the *Coleman* MHSDS Program Guide, from Chapter 7 (Administrative Segregation) at page 12-7-2, item 5. The section provides for "[m]ental health assessments and input into the classification decision-making process during ICC meetings," with respect to the "inmate-patient's … likelihood of decompensation if retained in ASU [and] recommendations for alternative placement."

13.    Attached hereto as **Exhibit 11** is a true and correct copy of a report by the U.S. Department of Justice's Nation Institute of Corrections, entitled "Supermax Prisons: Overview and General Consideration," dated January 1999. On page 6, the report defines the SHU as "a highly restrictive, high-custody *housing unit* within a secure facility, or an *entire secure facility*, that isolates inmates from the general prison population and from each other due to grievous crimes, repetitive assaultive or violent institutional behavior, the threat of escape or actual escape from high-custody facility(s), or inciting or threatening to incite disturbances in a correctional institution."

14.    Attached hereto as **Exhibit 12** is a true and correct copy of an article by Drs. Jeffrey Metzner and Joel Dvoskin entitled "An Overview of Correctional Psychiatry." The article was published in 2006 in Journal of Correctional Psychiatry. In their article, Dr. Dvoskin and Dr. Metzner describe in detail the dangers of the harsh SHU units for mentally ill prisoners and recommend that "absent the most extraordinary circumstances, no one should ever be placed in long-term segregation because of their serious mental disability or its symptoms" (page 762).

15.    Attached hereto as **Exhibit 13** is a true and correct copy of an excerpt from Defendants' Administrative Segregation Unit Enhanced Outpatient Program Status Report, ("EOP ASU" Status Report), dated May 1, 2008 (attachments not attached hereto). On May 1, 2008, Defendants submitted their EOP ASU Status Report to document "efforts by the California Department of Corrections and Rehabilitation to comply with the Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) Treatment Improvement Plan, dated July 11, 2007," which was developed in response to the Court's

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

March 12, 2007 Order (page 1). The EOP ASU Status Report provided an update on their ASU office and treatment space improvements, which included the completion of surveys by the Receiver's officer at seven prisons, only three of which had EOP ASUs (page 3).

16.    Attached hereto as **Exhibit 14** is a true and correct copy of excerpts from the transcript of the deposition of Joel Dvoskin taken February 27, 2013 in San Francisco, California and lodged with this Court on March 15, 2013.

17.    Attached hereto as **Exhibit 15** is a true and correct copy of excerpts from the transcript of the deposition of Lindsay M. Hayes taken February 18, 2013 in Boston, Massachusetts and lodged with this Court on March 15, 2013.

18.    Attached hereto as **Exhibit 16** is a true and correct copy of excerpts from the transcript of the deposition of Steve J. Martin taken February 28, 2013 in San Francisco, California and lodged with this Court on March 15, 2013.

19.    Attached hereto as **Exhibit 17** is a true and correct copy of excerpts from the transcript of the deposition of Jacqueline Moore taken February 21, 2013 in San Francisco, California and lodged with this Court on March 15, 2013.

20.    Attached hereto as **Exhibit 18** is a true and correct copy of the CDCR Memorandum dated April 27, 2007, entitled "Clarification Regarding Entertainment Appliances in Administrative Segregation Units," and the email from Defendants' counsel to Plaintiffs, dated May 9, 2007, providing this memorandum. The purpose of this memorandum was to clarify CDCR's policy concerning the provision of entertainment appliances in administrative segregation units, described as a "response to court concerns over sensory deprivation and suicide trends in the ASUs." The memorandum signed by the Director of Adult Institutions directed the Associate Directors and Wardens "to remember the restrictive nature of ASU housing and resulting sensory deprivation issues that do not exist in dormitory housing and are of concern in the Coleman case," and consider that "an inmate who was unable to possess an entertainment appliance in GP housing may be able to do so during ASU placement."

[804613-1]

6

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

21.     Attached hereto as **Exhibit 19** is a true and correct copy of CDCR's "ASU Survey" regarding the availability of entertainment appliances in the system's ASUs, and the email sent from Defendants' counsel to Plaintiffs, dated February 10, 2012, providing this survey.  The survey was undertaken in November 2010, and indicates that more than 40 ASUs in CDCR either do not have electrical capacity for ASU prisoners to have access to radios or TVs (either in their cells or on the tiers) or do not provide access despite having such capacity.

22.     Attached hereto as **Exhibit 20** is a true and correct copy of CDCR's "Follow up Survey/Entertainment Appliances in ASU," dated September 21, 2011. This document indicates that two of the approximately 40 ASUs that previously had not provided ASU prisoners to have access to radios or TVs since November 2010 began providing such access in 2011.  This document was provided to Plaintiffs' counsel via email on February 6, 2012.  Plaintiffs' counsel have been informed of no further updates as to the provision of entertainment devices in ASUs since that time.

23.     Attached hereto as **Exhibit 21** is a true and correct copy of Defendants' December 12, 2012 Letter to Special Master Lopes regarding the December 13, 2012 Tour of Willis Unit.  In that letter, Defendants noted that CDCR's long-range mental health bed plan contemplated increasing CMF's capacity to house EOP ASU prisoners by increasing capacity in two of CMF's ASUs located in I-3 and M-3, and "where necessary, transferring CCCMS inmates currently housed there to the refurbished Willis Unit."  In the December 12, 2012 letter, Defendants acknowledged the court and Plaintiffs' concern "that historically, the Willis Unit was a physically unsatisfactory facility for housing mentally ill inmates,"  but described their efforts to resolve the issues related to the physical plant by repainting the unit, retrofitting intake cells, and installing air-conditioning and solid cell doors.  On December 13, 2012, Plaintiffs' counsel, including Michael Bien, Lisa Ells and I toured Willis Unit and M-3 at CMF.  Also attending the tour were members of the Special Master's team, Deputy Attorney General Patrick McKinney and William Downer, and representatives from Defendants, including Jeffrey Beard, Tim Belavich, Diana Toche, and

1  CMF staff.  During the initial meeting before touring the ASUs, CMF staff briefed us on

2  the three major retrofit projects in the unit: repainting of all the cells; retrofitting the intake

3  cells with suicide resistant components; and installing air-conditioning and solid cell doors.

4  When I asked whether electrical capacity in the cells had been added during these

5  renovations, staff reported that they had requested that it be added to the multi-million

6  dollar renovation project three or four years ago, but were told it could not be done.  Staff

7  estimated that it would have only cost $100,000 to $150,000 dollars to rewire the Willis

8  ASU cells.  Willis Unit remains a stark and harsh ASU despite the limited upgrades.  We

9  also toured M-3, an ASU where prisoners on the mental health caseload are currently

10 housed.  During our tour of the unit, we observed electrical boxes on the wall of the cells,

11 which were covered by a metal plate.  We had received letters from clients reporting this

12 and asking why the plates could not be removed so that the prisoners could have electricity

13 in their cells.  Several prisoners had reported to us that they had been housed in M-3 when

14 it was a general population unit and that the outlets in their cells had not been covered and

15 had provided electricity.  The Acting Warden confirmed that there is electrical capacity

16 available, but noted that the metal plates would have to be removed.  CMF staff also

17 confirmed that these plates were put over the outlets when the unit was converted to an

18 ASU, but no one could provide a date for that conversion.  This information, the

19 "hardening of the unit," when it was converted to an ASU was discussed by CMF and

20 headquarters' staff in a matter-of-fact way, with little concern for the impact on the

21 prisoners placed in the unit.  At the end of the day, Plaintiffs raised our concerns over

22 Defendants' decision to cover the electrical outlets in M-3 and asked Defendants to

23 reconsider such action.  Defendants did not agree to uncover the outlets.  During a

24 subsequent meeting with Defendants on ASU issues several weeks later on December 14,

25 2012, Plaintiffs again raised this concern over the decision by CMF staff to cover the

26 electrical outlets in M-3.  To date, we have received no response from Defendants

27 regarding this issue.

28

[804613-1]

DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

24.     Attached hereto as **Exhibit 22** is a true and correct copy of an excerpt from the *Coleman* monthly data for March 22, 2013, entitled "Summary of Outpatient Population." This five- page report summaries the mental health population housed at each prison, including the level of care and housing types (GP, ASU, SHU, PSU and RC). According to the March 22, 2013 Report, there were 731 CCCMS and 3 EOP prisoners housed in the CCI, CIW, COR, Pelican Bay and CSP-Sacramento SHUs. (p. 5 of 5)

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 6th day of May, 2013.


*/s/ Jane E. Kahn*
Jane E. Kahn

9
DECLARATION OF JANE KAHN IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RE: MENTALLY ILL PRISONERS IN SEGREGATION

# Exhibit 1

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Administrative Segregation | Mental Health Services Delivery System |

4. All assessments shall conclude with a five axis Diagnostic and Statistical Manual clinical diagnosis, be documented on CDCR approved forms, and placed in the inmate's UHR.

5. Inmates who are identified as a result of the above process as meeting the clinical criteria for MHSDS placement may be referred to a psychiatrist for possible medication needs and other interventions as deemed appropriate (including placement into a MHCB for initiation of involuntary medication). These referrals shall be made on a CDCR 128-MH5, *Mental Health Referral*.

## G. CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM (CCCMS) CARE

Inmate-patients who were receiving treatment at the CCCMS level of care prior to ASU placement and those who are newly identified as requiring treatment at this level of care are assigned a PC. The IDTT shall include the inmate-patient's Correctional Counselor who shall present case factors of the ASU placement for consideration in development of the treatment plan and initiation of an aftercare plan.

The treatment intervention shall meet the guidelines set forth in the <u>MHSDS Program Guide</u>, *CCCMS, Chapter 3,* and may include the following:

### *Required Treatment*

1. Regular monitoring of symptoms by LPTs through daily rounds.

2. Individual contact every week by the PC, or more frequently as clinically indicated.

3. Medication treatment and monitoring of compliance by psychiatric and nursing staff

### *Other Treatment Activities*

1. Group therapy when deemed clinically appropriate

2. Self-help therapeutic activities such as reading and writing

3. When necessary, supportive care for Activities of Daily Living.

## H. ENHANCED OUTPATIENT PROGRAM CARE

1. The Chief of Mental Health or designee, or the Health Care Manager or designee, shall present the IDTT's recommendation for the Enhanced Outpatient Program (EOP) level of care to the ICC and provide clinical input regarding mental health placement options based on the inmate-patient's clinical needs. Placement options include:

# Exhibit 2

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Security Housing Unit | Mental Health Services Delivery System |
|---|---|

    f.  Provide crisis intervention and referral for a more intensive level of care as needed.

    g.  Perform as liaison with custody and correctional counseling staff regarding overall management of inmates.

3.  Treatment Modalities:  Based on identified needs, the following treatment modalities are available:

*REQUIRED TREATMENT*

- Individual meeting with PC at least every 30 days or more frequently as clinically indicated.

- Quarterly IDTT update of treatment plan.

- Medication evaluation, review, and monitoring of compliance by psychiatric and nursing staff for those inmate-patients receiving medication.

- Regular monitoring of symptoms by LPTs through weekly rounds of all MHSDS inmate-patients and rounds every other week of all non-MHSDS inmates.

*OTHER TREATMENT ACTIVITIES*

- Orientation and supportive counseling for institutional adjustment

- Individual counseling and crisis intervention

- Group therapy such as anger management and relapse prevention

- Social skills training

- Consultation services, such as to education and work programs

- Clinical discharge or clinical pre-release planning


## H. ENHANCED OUTPATIENT PROGRAM

Inmate-patients who are serving an established and approved SHU term and require an EOP level of care shall be referred to a PSU.  While awaiting placement for a PSU, these inmate-

---

**2009 REVISION**                                                                                                    12-8-10

# Exhibit 3

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

| Enhanced Outpatient Program | Mental Health Services Delivery System |

### *Categories of Treatment Services*

REQUIRED TREATMENT

1. Individual Treatment Planning involves a meeting of the IDTT and the inmate-patient at least every 90 days for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress.

2. Weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week.

3. Medication Evaluation and Management

   a) A psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues.

   b) Refer to Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.
   c) Refer to MHSDS Program Guide, *Chapter 5, Mental Health Crisis Bed*, for information on involuntary medication administration.

4. Ten hours per week of scheduled structured therapeutic activities. See below for list of treatment activities.

OTHER TREATMENT ACTIVITIES

1. Group therapy and psycho-educational groups provide inmate-patients with an opportunity to express, explore, and resolve issues with the assistance of clinical staff and other inmate-patient group participants who have similar problems or experiences. Psycho-educational groups focus on cognitive/behavioral skill building as a means of improving inmate-patient interpersonal skills and problem solving abilities.

2. Individual therapy provides inmate-patients with the opportunity to discuss personal problems that may not be adequately addressed in a group setting.

3. Recreational and occupational therapies provide inmate-patients with supervised recreational activities or exercise programs designed to reduce stress, improve self-esteem and physical health, foster positive interpersonal interactions, and promote the constructive use of leisure time. Occupational or recreational therapy is counted as

# Exhibit 4

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| **Program Guide Overview** | **Mental Health Services Delivery System** |
|---|---|

| **From:** | **To:** | |
|---|---|---|
| **Setting/Level of care** | **Setting/Level of Care** | **Timeline for Transfer** |
| RC/CCCMS | Mainline/ CCCMS | Within 90 days of referral; 60 days of referral if clinically indicated |
| RC/EOP | Mainline/EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Any setting/level of care | MHCB | Within 24 hours of referral |
| Any institution/ level of care | Any Acute DMH placement | Within ten days of referral, if accepted to DMH.   (Referral must be completed within two working days of identification. Transport must be completed within 72 hours of bed assignment) |
| Any institution/level of care | Any Intermediate Care DMH placement | Within 30 days of referral, if accepted to DMH.   (Referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required.   Transport must be completed within 72 hours of bed assignment). |
| Mainline (General Population)/ CCCMS | Mainline (General Population) /EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/CCCMS | CCCMS | Within 30 days if inappropriately transferred; otherwise 90 days of referral or 60 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/EOP | EOP | Within 21 days if inappropriately transferred; otherwise 60 days of referral or 30 days of referral if clinically indicated |
| EOP ASU | EOP ASU Hub | Within 30 days of ASU placement or referral to EOP level of care. |
| EOP ASU/ EOP ASU Hub | PSU | Within 60 days of endorsement to PSU |
| Outpatient Housing Unit | EOP | Within 30 days of endorsement to EOP |

# Exhibit 5

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA94283-0001



May 1, 2013

Matthew A. Lopes, Jr. Esquire                    via: Debbie J. Vorous, Esquire
Office of the Special Master                           Deputy Attorney General
Pannone Lopes & Devereaux LLC                         Department of Justice
317 Iron Horse Point Way, Suite 301                   1300 "I" Street, Suite 125
Providence, RI  02908                                 P. O. Box 944255
                                                      Sacramento, CA  94244-2550

**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF
VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of March, 2013, data (or as otherwise
noted). The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and
    Vacancy History.
2.  MHSDS Hiring Activity Report.
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary
    and Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly
    Report for all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center
    (RC) Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient
    Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of State Hospitals (DSH), (including
    admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of State Hospitals (DSH) Monthly Report of CDCR Patients in DSH
    Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN). **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report. **(No Longer Available)**
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative
    Segregated Hub institutions.

Matthew A. Lopes, Jr. Esquire
Page 2

16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison, San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Services and
    Deputy Director (A), Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

cc:  Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
     Linda Holden, Esq., *Coleman* Deputy Special Master
     Jeffrey L. Metzner, M.D., *Coleman* Expert
     Kerry C. Hughes, M.D., *Coleman* Expert
     Raymond F. Patterson, M.D, *Coleman* Expert
     Paul Nicoll, MPA, *Coleman* Monitor
     Mary Perrien, Ph.D., *Coleman* Expert
     Kathryn A. Burns, M.D., MPH, *Coleman* Expert
     Henry A. Dlugacz, Esq., *Coleman* Expert
     Kerry F. Walsh, Esq., *Coleman* Monitor
     Patricia Williams, Esq., *Coleman* Monitor
     Haunani Henry, *Coleman* Monitor
     Debbie Vorous, Esq., Office of the Attorney General
     Heather McCray Esq., Office of Legal Affairs, CDCR
     Michael Stone, Esq., Office of Legal Affairs, CDCR
     Michael Bien, Esq., Rosen, Bien and Galvan
     Donald Specter, Esq., Prison Law Office

Matthew A. Lopes, Jr. Esquire
Page 3


Judy Burleson, Associate Director, Statewide Mental Health Program, Division of
    Health Care Services (DHCS)
Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health
    Program, DCHCS
Teresa Owens, Associate Governmental Program Analyst, Quality Management,
    DHCS

# EOP and CCCMS in Adseg/SHU/PSU
# Placements greater than 90 days

### March 22, 2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| **Central** | | | | | | | | | |
| **ASP** | CCCMS | Ad-Seg | | | | 8/21/2012 | 213 | 8/21/2012 | 214 |
| | | Ad-Seg | | | | 9/4/2012 | 199 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 10/22/2012 | 151 | 10/22/2012 | 152 |
| | | Ad-Seg | | | | 10/23/2012 | 150 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | Ad-Seg | | | | 11/20/2012 | 122 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 2/13/2013 | 38 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/16/2012 | 96 | 12/16/2012 | 97 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-1

Health Care Placement Oversight Program
3/22/2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | Ad-Seg | | | | 2/29/2012 | 387 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 4/26/2012 | 330 | 4/19/2012 | 338 |
| | | Ad-Seg | | | | 6/1/2012 | 294 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 7/5/2012 | 260 | 5/13/2012 | 314 |
| | | Ad-Seg | | | | 7/17/2012 | 248 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/19/2012 | 246 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/25/2012 | 240 | 7/25/2012 | 241 |
| | | Ad-Seg | | | | 7/25/2012 | 240 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 8/20/2012 | 214 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 9/5/2012 | 198 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/14/2012 | 189 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/21/2012 | 182 | 4/15/2012 | 342 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 9/6/2012 | 198 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 10/25/2012 | 148 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 11/6/2012 | 136 | 12/30/2011 | 449 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 11/14/2012 | 129 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 2/5/2013 | 46 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 9/12/2012 | 192 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 5/1/2012 | 326 |
| | | Ad-Seg | | | | 11/29/2012 | 113 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 7/30/2012 | 236 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 3/19/2013 | 4 |
| | | Ad-Seg | | | | 12/15/2012 | 97 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 6/4/2012 | 292 |
| | | Ad-Seg | | | | 12/22/2012 | 90 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 12/22/2012 | 90 | 12/23/2012 | 90 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-2

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 12/6/2012 | 107 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/20/2011 | 519 | 7/18/2012 | 248 |
| | | SHU | | | | 10/26/2011 | 513 | 11/14/2011 | 495 |
| | | SHU | | | | 11/10/2011 | 498 | 11/14/2011 | 495 |
| | | SHU | | | | 12/5/2011 | 473 | 11/14/2011 | 495 |
| | | SHU | | | | 12/27/2011 | 451 | 12/28/2011 | 451 |
| | | SHU | | | | 12/29/2011 | 449 | 7/18/2012 | 248 |
| | | SHU | | | | 1/5/2012 | 442 | 1/6/2012 | 442 |
| | | SHU | | | | 1/12/2012 | 435 | 7/18/2012 | 248 |
| | | SHU | | | | 2/10/2012 | 406 | 4/11/2012 | 346 |
| | | SHU | | | | 2/15/2012 | 401 | 3/4/2012 | 384 |
| | | SHU | | | | 2/24/2012 | 392 | 2/26/2012 | 391 |
| | | SHU | | | | 2/29/2012 | 387 | 7/18/2012 | 248 |
| | | SHU | | | | 2/29/2012 | 387 | 2/20/2012 | 397 |
| | | SHU | | | | 3/5/2012 | 382 | 10/9/2012 | 165 |
| | | SHU | | | | 3/7/2012 | 380 | 3/7/2012 | 381 |
| | | SHU | | | | 3/15/2012 | 372 | 5/15/2012 | 312 |
| | | SHU | | | | 3/30/2012 | 357 | 4/9/2012 | 348 |
| | | SHU | | | | 4/2/2012 | 354 | 7/18/2012 | 248 |
| | | SHU | | | | 4/18/2012 | 338 | 3/21/2012 | 367 |
| | | SHU | | | | 4/24/2012 | 332 | 4/26/2012 | 331 |
| | | SHU | | | | 5/3/2012 | 323 | 5/3/2012 | 324 |
| | | SHU | | | | 5/4/2012 | 322 | 5/2/2012 | 325 |
| | | SHU | | | | 5/16/2012 | 310 | 7/18/2012 | 248 |
| | | SHU | | | | 5/24/2012 | 302 | 5/17/2012 | 310 |
| | | SHU | | | | 5/24/2012 | 302 | 5/24/2012 | 303 |
| | | SHU | | | | 6/4/2012 | 291 | 7/18/2012 | 248 |
| | | SHU | | | | 6/4/2012 | 291 | 6/5/2012 | 291 |
| | | SHU | | | | 6/4/2012 | 291 | 11/14/2011 | 495 |
| | | SHU | | | | 6/21/2012 | 274 | 11/14/2011 | 495 |
| | | SHU | | | | 6/24/2012 | 271 | 7/18/2012 | 248 |
| | | SHU | | | | 6/29/2012 | 266 | 7/18/2012 | 248 |
| | | SHU | | | | 7/3/2012 | 262 | 7/4/2012 | 262 |
| | | SHU | | | | 7/6/2012 | 259 | 7/8/2012 | 258 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 7/6/2012 | 259 | 6/28/2012 | 268 |
| | | SHU | | | | 7/6/2012 | 259 | 6/27/2012 | 269 |
| | | SHU | | | | 7/9/2012 | 256 | 7/18/2012 | 248 |
| | | SHU | | | | 7/9/2012 | 256 | 7/18/2012 | 248 |
| | | SHU | | | | 7/12/2012 | 253 | 7/18/2012 | 248 |
| | | SHU | | | | 7/13/2012 | 252 | 7/18/2012 | 248 |
| | | SHU | | | | 7/17/2012 | 248 | 11/14/2011 | 495 |
| | | SHU | | | | 7/18/2012 | 247 | 7/18/2012 | 248 |
| | | SHU | | | | 7/19/2012 | 246 | 7/22/2012 | 244 |
| | | SHU | | | | 7/23/2012 | 242 | 8/28/2012 | 207 |
| | | SHU | | | | 7/24/2012 | 241 | 7/24/2012 | 242 |
| | | SHU | | | | 7/31/2012 | 234 | 7/18/2012 | 248 |
| | | SHU | | | | 8/7/2012 | 227 | 8/7/2012 | 228 |
| | | SHU | | | | 8/14/2012 | 220 | 8/15/2012 | 220 |
| | | SHU | | | | 8/16/2012 | 218 | 8/19/2012 | 216 |
| | | SHU | | | | 8/17/2012 | 217 | 8/20/2012 | 215 |
| | | SHU | | | | 8/21/2012 | 213 | 8/21/2012 | 214 |
| | | SHU | | | | 8/24/2012 | 210 | 8/26/2012 | 209 |
| | | SHU | | | | 8/29/2012 | 205 | 8/29/2012 | 206 |
| | | SHU | | | | 9/7/2012 | 196 | 9/9/2012 | 195 |
| | | SHU | | | | 9/12/2012 | 191 | 9/12/2012 | 192 |
| | | SHU | | | | 9/13/2012 | 190 | 10/4/2012 | 170 |
| | | SHU | | | | 9/20/2012 | 183 | 9/20/2012 | 184 |
| | | SHU | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | SHU | | | | 9/27/2012 | 176 | 9/27/2012 | 177 |
| | | SHU | | | | 9/28/2012 | 175 | 9/26/2012 | 178 |
| | | SHU | | | | 10/1/2012 | 172 | 10/1/2012 | 173 |
| | | SHU | | | | 10/1/2012 | 172 | 10/1/2012 | 173 |
| | | SHU | | | | 10/2/2012 | 171 | 9/27/2012 | 177 |
| | | SHU | | | | 10/5/2012 | 168 | 10/7/2012 | 167 |
| | | SHU | | | | 10/9/2012 | 164 | 8/26/2012 | 209 |
| | | SHU | | | | 10/9/2012 | 164 | 9/9/2012 | 195 |
| | | SHU | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | SHU | | | | 10/16/2012 | 157 | 10/17/2012 | 157 |
| | | SHU | | | | 10/17/2012 | 156 | 10/18/2012 | 156 |
| | | SHU | | | | 10/18/2012 | 155 | 9/19/2012 | 185 |
| | | SHU | | | | 10/19/2012 | 154 | 10/21/2012 | 153 |
| | | SHU | | | | 10/22/2012 | 151 | 10/23/2012 | 151 |
| | | SHU | | | | 10/23/2012 | 150 | 9/25/2012 | 179 |
| | | SHU | | | | 10/23/2012 | 150 | 10/21/2012 | 153 |
| | | SHU | | | | 10/25/2012 | 148 | 3/7/2013 | 16 |
| | | SHU | | | | 10/25/2012 | 148 | 10/28/2012 | 146 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-4

Health Care Placement Oversight Program
3/22/2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 10/25/2012 | 148 | 10/23/2012 | 151 |
| | | SHU | | | | 10/26/2012 | 147 | 9/10/2012 | 194 |
| | | SHU | | | | 10/26/2012 | 147 | 10/28/2012 | 146 |
| | | SHU | | | | 10/29/2012 | 144 | 10/29/2012 | 145 |
| | | SHU | | | | 10/31/2012 | 142 | 10/21/2012 | 153 |
| | | SHU | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | SHU | | | | 10/31/2012 | 142 | 7/25/2012 | 241 |
| | | SHU | | | | 11/1/2012 | 141 | 11/1/2012 | 142 |
| | | SHU | | | | 11/1/2012 | 141 | 11/1/2012 | 142 |
| | | SHU | | | | 11/1/2012 | 141 | 11/4/2012 | 139 |
| | | SHU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | SHU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | SHU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | SHU | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | SHU | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | SHU | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | SHU | | | | 11/20/2012 | 122 | 11/25/2012 | 118 |
| | | SHU | | | | 11/21/2012 | 121 | 11/25/2012 | 118 |
| | | SHU | | | | 11/21/2012 | 121 | 11/26/2012 | 117 |
| | | SHU | | | | 11/26/2012 | 116 | 11/26/2012 | 117 |
| | | SHU | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | SHU | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | SHU | | | | 11/29/2012 | 113 | 9/9/2012 | 195 |
| | | SHU | | | | 11/29/2012 | 113 | 8/1/2012 | 234 |
| | | SHU | | | | 11/29/2012 | 113 | 9/20/2012 | 184 |
| | | SHU | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | SHU | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | SHU | | | | 12/3/2012 | 109 | 12/5/2012 | 108 |
| | | SHU | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | SHU | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | SHU | | | | 12/7/2012 | 105 | 12/9/2012 | 104 |
| | | SHU | | | | 12/10/2012 | 102 | 12/11/2012 | 102 |
| | | SHU | | | | 12/11/2012 | 101 | 9/20/2012 | 184 |
| | | SHU | | | | 12/18/2012 | 94 | 11/25/2012 | 118 |
| | | SHU | | | | 12/18/2012 | 94 | 11/25/2012 | 118 |
| | | SHU | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | | SHU | | | | 12/20/2012 | 92 | 12/16/2012 | 97 |
| | EOP | Ad-Seg | | | | 10/18/2012 | 155 | 2/11/2012 | 40 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-5

Health Care Placement Oversight Program
3/22/2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCWF | CCCMS | Ad-Seg | | | | 3/21/2011 | 732 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/21/2011 | 732 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/21/2011 | 732 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/21/2011 | 732 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/30/2011 | 723 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/15/2011 | 554 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/3/2011 | 475 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 1/26/2012 | 421 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/13/2012 | 374 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/21/2012 | 366 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/23/2012 | 364 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 3/23/2012 | 364 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/10/2012 | 316 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/14/2012 | 281 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/14/2012 | 281 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/14/2012 | 281 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/12/2012 | 253 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 8/1/2012 | 233 | 8/1/2012 | 234 |
| | | Ad-Seg | | | | 10/28/2012 | 145 | 10/28/2012 | 146 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 11/29/2012 | 114 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/3/2012 | 139 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/18/2012 | 124 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 11/24/2012 | 118 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/15/2012 | 97 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/15/2012 | 97 | 12/16/2012 | 97 |
| | EOP | Ad-Seg | | | | 12/3/2012 | 109 | 3/12/2013 | 11 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CMC | CCCMS | Ad-Seg | | | | 8/2/2012 | 232 | 8/2/2012 | 233 |
| | | Ad-Seg | | | | 9/9/2012 | 194 | 9/19/2012 | 185 |
| | | Ad-Seg | | | | 9/21/2012 | 182 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | 10/1/2012 | 172 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | Ad-Seg | | | | 11/20/2012 | 122 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 11/23/2012 | 119 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 3/20/2013 | 3 |
| | EOP | Ad-Seg | | | | 7/5/2012 | 260 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 7/11/2012 | 254 | 7/11/2012 | 255 |
| | | Ad-Seg | | | | 8/10/2012 | 224 | 8/12/2012 | 223 |
| | | Ad-Seg | | | | 8/27/2012 | 207 | 8/30/2012 | 205 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 9/25/2012 | 179 |
| | | Ad-Seg | | | | 9/28/2012 | 175 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 10/10/2012 | 163 | 10/10/2012 | 164 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/14/2012 | 129 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/14/2012 | 129 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/26/2012 | 117 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/23/2012 | 119 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 11/25/2012 | 117 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 12/1/2012 | 111 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/20/2012 | 93 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 1/16/2013 | 66 |
| COR | CCCMS | Ad-Seg | | | | 12/20/2012 | 92 | 12/25/2012 | 88 |
| CTF | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/8/2012 | 165 | 10/8/2012 | 166 |
| | | Ad-Seg | | | | 10/25/2012 | 148 | 10/25/2012 | 149 |
| | | Ad-Seg | | | | 11/23/2012 | 119 | 11/25/2012 | 116 |
| | | Ad-Seg | | | | 12/2/2012 | 110 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 1/17/2013 | 65 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-7

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| KVSP | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 4/13/2012 | 343 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/10/2012 | 316 | 5/10/2012 | 317 |
| | | Ad-Seg | | | | 5/30/2012 | 296 | 5/30/2012 | 297 |
| | | Ad-Seg | | | | 7/13/2012 | 252 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 8/15/2012 | 219 | 8/15/2012 | 220 |
| | | Ad-Seg | | | | 8/17/2012 | 217 | 8/19/2012 | 216 |
| | | Ad-Seg | | | | 9/26/2012 | 177 | 9/26/2012 | 178 |
| | | Ad-Seg | | | | 10/3/2012 | 170 | 10/3/2012 | 171 |
| | | Ad-Seg | | | | 10/8/2012 | 165 | 10/8/2012 | 166 |
| | | Ad-Seg | | | | 10/19/2012 | 154 | 10/21/2012 | 153 |
| | | Ad-Seg | | | | 10/23/2012 | 150 | 10/23/2012 | 151 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 11/1/2012 | 142 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/12/2012 | 130 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 3/10/2013 | 13 |
| | | Ad-Seg | | | | 11/24/2012 | 118 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/20/2012 | 93 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | EOP | Ad-Seg | | | | 8/29/2012 | 205 | 9/24/2012 | 180 |
| | | Ad-Seg | | | | 10/7/2012 | 166 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 11/18/2012 | 124 | 12/4/2012 | 109 |
| NKSP | CCCMS | Ad-Seg | | | | 8/17/2012 | 217 | 8/19/2012 | 216 |
| | | Ad-Seg | | | | 9/28/2012 | 175 | 10/2/2012 | 172 |
| | | Ad-Seg | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/26/2012 | 147 | 11/1/2012 | 142 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/26/2012 | 117 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/27/2012 | 86 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/19/2012 | 94 |
| | EOP | Ad-Seg | | | | 10/11/2012 | 162 | 1/10/2013 | 72 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PVSP | CCCMS | Ad-Seg | | | | 12/21/2011 | 457 | 12/21/2011 | 458 |
| | | Ad-Seg | | | | 1/7/2012 | 440 | 1/7/2012 | 441 |
| | | Ad-Seg | | | | 1/14/2012 | 433 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 1/16/2012 | 431 | 1/16/2012 | 432 |
| | | Ad-Seg | | | | 1/25/2012 | 422 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 2/9/2012 | 407 | 2/9/2012 | 408 |
| | | Ad-Seg | | | | 2/10/2012 | 406 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 2/10/2012 | 406 | 2/12/2012 | 405 |
| | | Ad-Seg | | | | 2/10/2012 | 406 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 2/21/2012 | 395 | 2/21/2012 | 396 |
| | | Ad-Seg | | | | 3/27/2012 | 360 | 4/3/2012 | 354 |
| | | Ad-Seg | | | | 4/2/2012 | 354 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 4/25/2012 | 331 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 4/26/2012 | 330 | 4/26/2012 | 331 |
| | | Ad-Seg | | | | 5/5/2012 | 321 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/9/2012 | 317 | 5/8/2012 | 319 |
| | | Ad-Seg | | | | 5/17/2012 | 309 | 5/20/2012 | 307 |
| | | Ad-Seg | | | | 5/23/2012 | 303 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/23/2012 | 303 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/30/2012 | 296 | 5/30/2012 | 297 |
| | | Ad-Seg | | | | 6/1/2012 | 294 | 6/3/2012 | 293 |
| | | Ad-Seg | | | | 6/6/2012 | 289 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/12/2012 | 283 | 6/12/2012 | 284 |
| | | Ad-Seg | | | | 6/18/2012 | 277 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/28/2012 | 267 | 6/28/2012 | 268 |
| | | Ad-Seg | | | | 6/28/2012 | 267 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/10/2012 | 255 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/12/2012 | 253 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/13/2012 | 252 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/17/2012 | 248 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/22/2012 | 243 | 7/22/2012 | 244 |
| | | Ad-Seg | | | | 7/23/2012 | 242 | 7/23/2012 | 243 |
| | | Ad-Seg | | | | 7/26/2012 | 239 | 7/26/2012 | 240 |
| | | Ad-Seg | | | | 7/27/2012 | 238 | 7/29/2012 | 237 |
| | | Ad-Seg | | | | 8/12/2012 | 222 | 8/12/2012 | 223 |
| | | Ad-Seg | | | | 8/13/2012 | 221 | 8/16/2012 | 219 |
| | | Ad-Seg | | | | 8/19/2012 | 215 | 8/19/2012 | 216 |
| | | Ad-Seg | | | | 8/23/2012 | 211 | 8/23/2012 | 212 |
| | | Ad-Seg | | | | 8/28/2012 | 206 | 9/6/2012 | 198 |
| | | Ad-Seg | | | | 8/28/2012 | 206 | 8/28/2012 | 207 |
| | | Ad-Seg | | | | 9/4/2012 | 199 | 9/3/2012 | 201 |
| | | Ad-Seg | | | | 9/4/2012 | 199 | 9/3/2012 | 201 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-9

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PVSP | CCCMS | Ad-Seg | | | | 9/13/2012 | 190 | 9/16/2012 | 188 |
| | | Ad-Seg | | | | 9/17/2012 | 186 | 9/17/2012 | 187 |
| | | Ad-Seg | | | | 9/18/2012 | 185 | 10/1/2012 | 173 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | Ad-Seg | | | | 9/25/2012 | 178 | 9/25/2012 | 179 |
| | | Ad-Seg | | | | 9/25/2012 | 178 | 9/25/2012 | 179 |
| | | Ad-Seg | | | | 9/28/2012 | 175 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 9/30/2012 | 173 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 10/8/2012 | 166 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 10/2/2012 | 172 |
| | | Ad-Seg | | | | 10/12/2012 | 161 | 10/17/2012 | 157 |
| | | Ad-Seg | | | | 10/13/2012 | 160 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/20/2012 | 153 | 10/22/2012 | 152 |
| | | Ad-Seg | | | | 10/21/2012 | 152 | 10/21/2012 | 153 |
| | | Ad-Seg | | | | 10/21/2012 | 152 | 10/21/2012 | 153 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 11/14/2012 | 129 |
| | | Ad-Seg | | | | 11/20/2012 | 122 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/25/2012 | 117 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/26/2012 | 116 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-10

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SATF | CCCMS | Ad-Seg | | | | 12/3/2011 | 475 | 12/3/2011 | 476 |
| | | Ad-Seg | | | | 12/20/2011 | 458 | 12/20/2011 | 459 |
| | | Ad-Seg | | | | 2/3/2012 | 413 | 2/7/2012 | 410 |
| | | Ad-Seg | | | | 4/30/2012 | 326 | 4/30/2012 | 327 |
| | | Ad-Seg | | | | 5/6/2012 | 320 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/24/2012 | 302 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/13/2012 | 282 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/10/2012 | 255 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/18/2012 | 247 | 1/10/2013 | 72 |
| | | Ad-Seg | | | | 7/22/2012 | 243 | 7/22/2012 | 244 |
| | | Ad-Seg | | | | 8/1/2012 | 233 | 8/8/2012 | 227 |
| | | Ad-Seg | | | | 8/22/2012 | 212 | 8/22/2012 | 213 |
| | | Ad-Seg | | | | 8/25/2012 | 209 | 8/26/2012 | 209 |
| | | Ad-Seg | | | | 8/25/2012 | 209 | 8/26/2012 | 209 |
| | | Ad-Seg | | | | 9/3/2012 | 200 | 9/3/2012 | 201 |
| | | Ad-Seg | | | | 9/5/2012 | 198 | 9/12/2012 | 192 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 10/2/2012 | 172 |
| | | Ad-Seg | | | | 10/4/2012 | 169 | 10/4/2012 | 170 |
| | | Ad-Seg | | | | 10/20/2012 | 153 | 10/21/2012 | 153 |
| | | Ad-Seg | | | | 10/23/2012 | 150 | 10/23/2012 | 151 |
| | | Ad-Seg | | | | 10/25/2012 | 148 | 10/25/2012 | 149 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 11/5/2012 | 137 | 11/6/2012 | 137 |
| | | Ad-Seg | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/10/2012 | 132 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/12/2012 | 130 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/20/2012 | 93 |
| SCC | CCCMS | Ad-Seg | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/16/2012 | 97 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-11

| Region | | | | | | | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|---|
| Institution | Placement | Setting | CDC # | Last Name | | Bed # | | | | |
| SVSP | CCCMS | Ad-Seg | | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 12/20/2011 | 458 | 12/20/2011 | 459 |
| | | Ad-Seg | | | | | 1/17/2012 | 430 | 1/16/2012 | 432 |
| | | Ad-Seg | | | | | 2/23/2012 | 393 | 2/23/2012 | 394 |
| | | Ad-Seg | | | | | 2/23/2012 | 393 | 2/23/2012 | 394 |
| | | Ad-Seg | | | | | 3/15/2012 | 372 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 3/28/2012 | 359 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 4/22/2012 | 334 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 5/25/2012 | 301 | 5/28/2012 | 299 |
| | | Ad-Seg | | | | | 5/30/2012 | 296 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 6/24/2012 | 271 | 6/24/2012 | 272 |
| | | Ad-Seg | | | | | 6/24/2012 | 271 | 12/27/2012 | 86 |
| | | Ad-Seg | | | | | 6/28/2012 | 267 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 7/3/2012 | 262 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | | 7/10/2012 | 255 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | | 7/27/2012 | 238 | 7/29/2012 | 237 |
| | | Ad-Seg | | | | | 8/2/2012 | 232 | 8/2/2012 | 233 |
| | | Ad-Seg | | | | | 8/8/2012 | 226 | 8/8/2012 | 227 |
| | | Ad-Seg | | | | | 8/10/2012 | 224 | 8/12/2012 | 223 |
| | | Ad-Seg | | | | | 8/19/2012 | 215 | 8/19/2012 | 216 |
| | | Ad-Seg | | | | | 8/23/2012 | 211 | 8/23/2012 | 212 |
| | | Ad-Seg | | | | | 8/23/2012 | 211 | 8/23/2012 | 212 |
| | | Ad-Seg | | | | | 8/23/2012 | 211 | 8/23/2012 | 212 |
| | | Ad-Seg | | | | | 8/25/2012 | 209 | 8/26/2012 | 209 |
| | | Ad-Seg | | | | | 9/1/2012 | 202 | 1/28/2013 | 54 |
| | | Ad-Seg | | | | | 9/4/2012 | 199 | 9/6/2012 | 198 |
| | | Ad-Seg | | | | | 9/4/2012 | 199 | 9/3/2012 | 201 |
| | | Ad-Seg | | | | | 9/7/2012 | 196 | 9/9/2012 | 195 |
| | | Ad-Seg | | | | | 9/8/2012 | 195 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | | 9/11/2012 | 192 | 9/11/2012 | 193 |
| | | Ad-Seg | | | | | 9/11/2012 | 192 | 9/11/2012 | 193 |
| | | Ad-Seg | | | | | 9/19/2012 | 184 | 9/19/2012 | 185 |
| | | Ad-Seg | | | | | 9/25/2012 | 178 | 9/25/2012 | 179 |
| | | Ad-Seg | | | | | 10/9/2012 | 164 | 10/9/2012 | 165 |
| | | Ad-Seg | | | | | 10/9/2012 | 164 | 10/9/2012 | 165 |
| | | Ad-Seg | | | | | 10/11/2012 | 162 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | | 10/11/2012 | 162 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | | 10/16/2012 | 157 | 10/16/2012 | 158 |
| | | Ad-Seg | | | | | 10/20/2012 | 153 | 3/3/2013 | 20 |
| | | Ad-Seg | | | | | 10/22/2012 | 151 | 10/22/2012 | 152 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SVSP | CCCMS | Ad-Seg | | | | 10/22/2012 | 151 | 10/22/2012 | 152 |
| | | Ad-Seg | | | | 10/24/2012 | 149 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 10/24/2012 | 149 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 11/4/2012 | 138 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/10/2012 | 132 | 2/6/2013 | 45 |
| | | Ad-Seg | | | | 11/10/2012 | 132 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/16/2012 | 126 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 11/30/2012 | 112 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/2/2012 | 110 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/2/2012 | 110 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/3/2012 | 109 | 12/3/2012 | 110 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 1/17/2013 | 65 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 3/3/2013 | 20 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | EOP | Ad-Seg | | | | 12/7/2011 | 471 | 2/13/2013 | 38 |
| | | Ad-Seg | | | | 7/22/2012 | 243 | 9/25/2012 | 179 |
| | | Ad-Seg | | | | 7/23/2012 | 242 | 10/4/2012 | 170 |
| | | Ad-Seg | | | | 8/13/2012 | 221 | 8/13/2012 | 222 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 3/14/2013 | 9 |
| | | Ad-Seg | | | | 10/10/2012 | 163 | 10/10/2012 | 164 |
| | | Ad-Seg | | | | 10/23/2012 | 150 | 10/23/2012 | 151 |
| | | Ad-Seg | | | | 11/10/2012 | 132 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/29/2012 | 113 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years. Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-13

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| VSP | CCCMS | SHU | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |
| | | SHU | | | | 11/23/2012 | 119 | 12/5/2012 | 108 |
| WSP | CCCMS | Ad-Seg | | | | 7/15/2012 | 250 | 7/12/2012 | 254 |
| | | Ad-Seg | | | | 9/17/2012 | 186 | 9/16/2012 | 188 |
| | | Ad-Seg | | | | 10/24/2012 | 149 | 10/25/2012 | 149 |
| | | Ad-Seg | | | | 10/26/2012 | 147 | 10/28/2012 | 146 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/23/2012 | 119 | 3/14/2013 | 9 |
| | | Ad-Seg | | | | 12/4/2012 | 108 | 12/3/2012 | 110 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/17/2012 | 96 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 3/21/2013 | 2 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-14

| Region | | | | | | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| Institution | Placement | Setting | CDC # | Last Name | Bed # | | | | |

## North

| CMF | CCMS | Ad-Seg | | | | 1/26/2012 | 421 | 1/26/2012 | 422 |
| | | Ad-Seg | | | | 9/16/2012 | 187 | 9/16/2012 | 188 |
| | | Ad-Seg | | | | 9/25/2012 | 178 | 2/21/2013 | 30 |
| | | Ad-Seg | | | | 10/16/2012 | 157 | 10/16/2012 | 158 |
| | | Ad-Seg | | | | 11/10/2012 | 132 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 11/14/2012 | 129 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 3/6/2013 | 17 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| | EOP | Ad-Seg | | | | 7/27/2012 | 238 | 7/29/2012 | 237 |
| | | Ad-Seg | | | | 9/7/2012 | 196 | 9/26/2012 | 178 |
| | | Ad-Seg | | | | 9/18/2012 | 185 | 9/18/2012 | 186 |
| | | Ad-Seg | | | | 9/26/2012 | 177 | 9/26/2012 | 178 |
| | | Ad-Seg | | | | 9/29/2012 | 174 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/16/2012 | 157 | 2/3/2013 | 48 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/19/2012 | 94 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-15

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| DVI | CCCMS | Ad-Seg | | | | 4/23/2012 | 333 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/6/2012 | 259 | 7/19/2012 | 247 |
| | | Ad-Seg | | | | 7/15/2012 | 250 | 10/1/2012 | 173 |
| | | Ad-Seg | | | | 8/12/2012 | 222 | 8/12/2012 | 223 |
| | | Ad-Seg | | | | 8/20/2012 | 214 | 9/5/2012 | 199 |
| | | Ad-Seg | | | | 9/7/2012 | 196 | 9/9/2012 | 195 |
| | | Ad-Seg | | | | 9/18/2012 | 185 | 9/18/2012 | 186 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | Ad-Seg | | | | 10/3/2012 | 170 | 2/7/2013 | 44 |
| | | Ad-Seg | | | | 10/7/2012 | 166 | 10/7/2012 | 167 |
| | | Ad-Seg | | | | 10/24/2012 | 149 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 10/25/2012 | 148 | 10/25/2012 | 149 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 11/6/2012 | 136 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| FOL | CCCMS | Ad-Seg | | | | 8/31/2012 | 203 | 9/3/2012 | 201 |
| | | Ad-Seg | | | | 10/4/2012 | 169 | 2/19/2013 | 32 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 2/12/2013 | 39 |
| | | Ad-Seg | | | | 11/16/2012 | 126 | 3/10/2013 | 13 |
| | | Ad-Seg | | | | 11/20/2012 | 122 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 12/11/2012 | 102 |
| | EOP | Ad-Seg | | | | 12/11/2012 | 101 | 1/8/2013 | 74 |
| HDSP | CCCMS | Ad-Seg | | | | 11/14/2011 | 494 | 11/17/2011 | 492 |
| | | Ad-Seg | | | | 4/23/2012 | 333 | 4/24/2012 | 333 |
| | | Ad-Seg | | | | 6/24/2012 | 271 | 6/26/2012 | 270 |
| | | Ad-Seg | | | | 9/20/2012 | 183 | 9/20/2012 | 184 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 10/2/2012 | 172 |
| | | Ad-Seg | | | | 10/7/2012 | 166 | 10/7/2012 | 167 |
| | | Ad-Seg | | | | 10/12/2012 | 161 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/15/2012 | 158 | 10/16/2012 | 158 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/24/2012 | 118 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | Ad-Seg | | | | 12/9/2012 | 103 | 12/9/2012 | 104 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-16

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| MCSP | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 11/13/2011 | 495 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 12/12/2011 | 466 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 1/25/2012 | 422 | 1/25/2012 | 423 |
| | | Ad-Seg | | | | 1/31/2012 | 416 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 1/31/2012 | 416 | 1/31/2012 | 417 |
| | | Ad-Seg | | | | 3/25/2012 | 362 | 5/2/2012 | 325 |
| | | Ad-Seg | | | | 5/14/2012 | 312 | 5/14/2012 | 313 |
| | | Ad-Seg | | | | 5/17/2012 | 309 | 5/17/2012 | 310 |
| | | Ad-Seg | | | | 6/6/2012 | 289 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/8/2012 | 287 | 6/10/2012 | 286 |
| | | Ad-Seg | | | | 6/27/2012 | 268 | 6/27/2012 | 269 |
| | | Ad-Seg | | | | 7/3/2012 | 262 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/9/2012 | 256 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 8/3/2012 | 231 | 8/5/2012 | 230 |
| | | Ad-Seg | | | | 8/7/2012 | 227 | 8/7/2012 | 228 |
| | | Ad-Seg | | | | 8/9/2012 | 225 | 8/9/2012 | 226 |
| | | Ad-Seg | | | | 8/10/2012 | 224 | 9/6/2012 | 198 |
| | | Ad-Seg | | | | 8/12/2012 | 222 | 8/12/2012 | 223 |
| | | Ad-Seg | | | | 8/14/2012 | 220 | 8/14/2012 | 221 |
| | | Ad-Seg | | | | 8/15/2012 | 219 | 8/15/2012 | 220 |
| | | Ad-Seg | | | | 8/25/2012 | 209 | 8/26/2012 | 209 |
| | | Ad-Seg | | | | 9/3/2012 | 200 | 9/3/2012 | 201 |
| | | Ad-Seg | | | | 9/15/2012 | 188 | 9/20/2012 | 184 |
| | | Ad-Seg | | | | 9/20/2012 | 183 | 9/20/2012 | 184 |
| | | Ad-Seg | | | | 9/20/2012 | 183 | 9/20/2012 | 184 |
| | | Ad-Seg | | | | 10/9/2012 | 164 | 10/9/2012 | 165 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 11/1/2012 | 142 |
| | | Ad-Seg | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-17

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| MCSP | CCCMS | Ad-Seg | | | | 11/7/2012 | 135 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/16/2012 | 96 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/19/2012 | 94 |
| | EOP | Ad-Seg | | | | 9/5/2012 | 198 | 9/5/2012 | 199 |
| | | Ad-Seg | | | | 9/14/2012 | 189 | 9/13/2012 | 191 |
| | | Ad-Seg | | | | 9/14/2012 | 189 | 2/26/2013 | 25 |
| | | Ad-Seg | | | | 10/8/2012 | 165 | 10/8/2012 | 166 |
| | | Ad-Seg | | | | 11/29/2012 | 113 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-18

Health Care Placement Oversight Program
3/22/2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| **PBSP** | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 10/27/2011 | 512 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 11/9/2011 | 499 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 12/28/2011 | 450 | 11/29/2011 | 480 |
| | | Ad-Seg | | | | 1/4/2012 | 443 | 12/22/2011 | 457 |
| | | Ad-Seg | | | | 1/12/2012 | 435 | 1/12/2012 | 436 |
| | | Ad-Seg | | | | 3/22/2012 | 365 | 3/21/2012 | 367 |
| | | Ad-Seg | | | | 4/24/2012 | 332 | 4/26/2012 | 331 |
| | | Ad-Seg | | | | 4/25/2012 | 331 | 4/29/2012 | 328 |
| | | Ad-Seg | | | | 4/30/2012 | 326 | 4/30/2012 | 327 |
| | | Ad-Seg | | | | 5/16/2012 | 310 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/3/2012 | 262 | 7/4/2012 | 262 |
| | | Ad-Seg | | | | 7/26/2012 | 239 | 7/30/2012 | 236 |
| | | Ad-Seg | | | | 8/24/2012 | 210 | 8/26/2012 | 209 |
| | | Ad-Seg | | | | 8/28/2012 | 206 | 8/30/2012 | 205 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 11/1/2012 | 142 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 10/17/2012 | 157 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 11/11/2012 | 131 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/26/2012 | 116 | 11/26/2012 | 117 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | | PSU | | | | 11/9/2012 | 133 | 3/7/2013 | 16 |
| | | PSU | | | | 12/21/2012 | 91 | 3/21/2013 | 2 |
| | | PSU | | | | 12/21/2012 | 91 | 9/5/2012 | 199 |
| | | SHU | | | | 5/5/2012 | 321 | 7/18/2012 | 248 |
| | | SHU | | | | 8/22/2012 | 212 | 3/12/2013 | 11 |
| | EOP | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | PSU | | | | 11/17/2011 | 491 | 11/17/2011 | 492 |
| | | PSU | | | | 11/18/2011 | 490 | 11/14/2011 | 495 |
| | | PSU | | | | 12/21/2011 | 457 | 12/20/2011 | 459 |
| | | PSU | | | | 1/17/2012 | 430 | 1/16/2012 | 432 |
| | | PSU | | | | 1/18/2012 | 429 | 1/18/2012 | 430 |
| | | PSU | | | | 2/21/2012 | 395 | 2/21/2012 | 396 |
| | | PSU | | | | 3/9/2012 | 378 | 7/18/2012 | 248 |
| | | PSU | | | | 3/27/2012 | 360 | 3/27/2012 | 361 |
| | | PSU | | | | 4/4/2012 | 352 | 4/4/2012 | 353 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-19

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PBSP | EOP | PSU | | | | 4/17/2012 | 339 | 4/17/2012 | 340 |
| | | PSU | | | | 4/24/2012 | 332 | 5/3/2012 | 324 |
| | | PSU | | | | 4/27/2012 | 329 | 7/18/2012 | 248 |
| | | PSU | | | | 5/30/2012 | 296 | 5/30/2012 | 297 |
| | | PSU | | | | 6/5/2012 | 290 | 7/18/2012 | 248 |
| | | PSU | | | | 6/7/2012 | 288 | 6/7/2012 | 289 |
| | | PSU | | | | 6/13/2012 | 282 | 7/18/2012 | 248 |
| | | PSU | | | | 6/13/2012 | 282 | 6/14/2012 | 282 |
| | | PSU | | | | 6/26/2012 | 269 | 6/26/2012 | 270 |
| | | PSU | | | | 6/27/2012 | 268 | 6/27/2012 | 269 |
| | | PSU | | | | 6/27/2012 | 268 | 7/18/2012 | 248 |
| | | PSU | | | | 7/2/2012 | 263 | 7/2/2012 | 264 |
| | | PSU | | | | 7/2/2012 | 263 | 7/18/2012 | 248 |
| | | PSU | | | | 7/17/2012 | 248 | 7/17/2012 | 249 |
| | | PSU | | | | 7/24/2012 | 241 | 7/25/2012 | 241 |
| | | PSU | | | | 7/31/2012 | 234 | 7/31/2012 | 235 |
| | | PSU | | | | 8/7/2012 | 227 | 8/7/2012 | 228 |
| | | PSU | | | | 8/14/2012 | 220 | 8/14/2012 | 221 |
| | | PSU | | | | 8/16/2012 | 218 | 8/16/2012 | 219 |
| | | PSU | | | | 8/21/2012 | 213 | 8/21/2012 | 214 |
| | | PSU | | | | 8/21/2012 | 213 | 8/21/2012 | 214 |
| | | PSU | | | | 8/28/2012 | 206 | 8/28/2012 | 207 |
| | | PSU | | | | 8/28/2012 | 206 | 8/28/2012 | 207 |
| | | PSU | | | | 9/5/2012 | 198 | 9/5/2012 | 199 |
| | | PSU | | | | 9/5/2012 | 198 | 9/5/2012 | 199 |
| | | PSU | | | | 9/19/2012 | 184 | 9/19/2012 | 185 |
| | | PSU | | | | 9/25/2012 | 178 | 9/25/2012 | 179 |
| | | PSU | | | | 9/25/2012 | 178 | 9/25/2012 | 179 |
| | | PSU | | | | 10/9/2012 | 164 | 10/9/2012 | 165 |
| | | PSU | | | | 10/24/2012 | 149 | 10/25/2012 | 149 |
| | | PSU | | | | 10/25/2012 | 148 | 10/25/2012 | 149 |
| | | PSU | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | PSU | | | | 11/2/2012 | 140 | 11/4/2012 | 139 |
| | | PSU | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |
| | | PSU | | | | 11/8/2012 | 134 | 11/1/2012 | 142 |
| | | PSU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | PSU | | | | 11/14/2012 | 128 | 11/14/2012 | 129 |
| | | PSU | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | PSU | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | PSU | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | PSU | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | PSU | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| PBSP | EOP | PSU | | | | 12/19/2012 | 93 | 12/19/2012 | 94 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
*3/22/2013*

*R10-21*

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/25/2011 | 514 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 2/2/2012 | 414 | 1/10/2012 | 438 |
| | | Ad-Seg | | | | 4/21/2012 | 335 | 4/22/2012 | 335 |
| | | Ad-Seg | | | | 4/25/2012 | 331 | 4/26/2012 | 331 |
| | | Ad-Seg | | | | 5/15/2012 | 311 | 5/15/2012 | 312 |
| | | Ad-Seg | | | | 6/8/2012 | 287 | 6/10/2012 | 286 |
| | | Ad-Seg | | | | 6/12/2012 | 283 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/13/2012 | 282 | 5/17/2012 | 310 |
| | | Ad-Seg | | | | 7/31/2012 | 234 | 5/16/2012 | 311 |
| | | Ad-Seg | | | | 8/9/2012 | 225 | 8/12/2012 | 223 |
| | | Ad-Seg | | | | 9/3/2012 | 200 | 9/3/2012 | 201 |
| | | Ad-Seg | | | | 9/25/2012 | 178 | 9/25/2012 | 179 |
| | | Ad-Seg | | | | 10/5/2012 | 168 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/16/2012 | 158 |
| | | Ad-Seg | | | | 10/25/2012 | 148 | 10/25/2012 | 149 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 10/30/2012 | 144 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 10/28/2012 | 146 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/22/2012 | 120 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 12/3/2012 | 109 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |
| | | PSU | | | | 9/10/2012 | 193 | 1/9/2013 | 73 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 3/26/2012 | 361 | 7/18/2012 | 248 |
| | | SHU | | | | 4/10/2012 | 346 | 4/29/2012 | 328 |
| | | SHU | | | | 6/13/2012 | 282 | 7/18/2012 | 248 |
| | | SHU | | | | 7/8/2012 | 257 | 12/30/2011 | 449 |
| | | SHU | | | | 7/17/2012 | 248 | 7/18/2012 | 248 |
| | | SHU | | | | 7/28/2012 | 237 | 7/18/2012 | 248 |
| | | SHU | | | | 9/11/2012 | 192 | 9/3/2012 | 201 |
| | | SHU | | | | 10/17/2012 | 156 | 7/18/2012 | 248 |
| | | SHU | | | | 11/7/2012 | 135 | 4/29/2012 | 328 |
| | EOP | Ad-Seg | | | | 1/20/2012 | 427 | 1/20/2012 | 428 |
| | | Ad-Seg | | | | 10/16/2012 | 157 | 10/17/2012 | 157 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 10/16/2012 | 158 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-22

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | Ad-Seg | | | | 10/23/2012 | 150 | 11/6/2012 | 137 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 12/22/2012 | 90 | 12/23/2012 | 90 |
| | | PSU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | PSU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | PSU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | PSU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | PSU | | | | 10/21/2011 | 518 | 7/18/2012 | 248 |
| | | PSU | | | | 10/31/2011 | 508 | 7/18/2012 | 248 |
| | | PSU | | | | 11/1/2011 | 507 | 11/14/2011 | 495 |
| | | PSU | | | | 11/22/2011 | 486 | 7/18/2012 | 248 |
| | | PSU | | | | 1/3/2012 | 444 | 1/3/2012 | 445 |
| | | PSU | | | | 1/4/2012 | 443 | 1/4/2012 | 444 |
| | | PSU | | | | 1/17/2012 | 430 | 1/16/2012 | 432 |
| | | PSU | | | | 2/7/2012 | 409 | 2/8/2012 | 409 |
| | | PSU | | | | 2/10/2012 | 406 | 2/12/2012 | 405 |
| | | PSU | | | | 2/21/2012 | 395 | 1/21/2012 | 427 |
| | | PSU | | | | 2/24/2012 | 392 | 2/26/2012 | 391 |
| | | PSU | | | | 3/6/2012 | 381 | 2/29/2012 | 388 |
| | | PSU | | | | 3/9/2012 | 378 | 3/11/2012 | 377 |
| | | PSU | | | | 3/14/2012 | 373 | 7/18/2012 | 248 |
| | | PSU | | | | 3/22/2012 | 365 | 7/18/2012 | 248 |
| | | PSU | | | | 3/29/2012 | 358 | 4/1/2012 | 356 |
| | | PSU | | | | 4/18/2012 | 338 | 7/18/2012 | 248 |
| | | PSU | | | | 4/24/2012 | 332 | 4/29/2012 | 328 |
| | | PSU | | | | 4/29/2012 | 327 | 7/18/2012 | 248 |
| | | PSU | | | | 4/30/2012 | 326 | 1/23/2012 | 425 |
| | | PSU | | | | 5/8/2012 | 318 | 7/18/2012 | 248 |
| | | PSU | | | | 5/8/2012 | 318 | 5/8/2012 | 319 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-23

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | PSU | | | | 5/10/2012 | 316 | 2/26/2012 | 391 |
| | | PSU | | | | 5/22/2012 | 304 | 5/23/2012 | 304 |
| | | PSU | | | | 5/29/2012 | 297 | 7/18/2012 | 248 |
| | | PSU | | | | 5/29/2012 | 297 | 5/31/2012 | 296 |
| | | PSU | | | | 5/31/2012 | 295 | 6/3/2012 | 293 |
| | | PSU | | | | 6/4/2012 | 291 | 6/4/2012 | 292 |
| | | PSU | | | | 6/8/2012 | 287 | 6/10/2012 | 286 |
| | | PSU | | | | 6/11/2012 | 284 | 6/11/2012 | 285 |
| | | PSU | | | | 6/11/2012 | 284 | 7/18/2012 | 248 |
| | | PSU | | | | 6/14/2012 | 281 | 7/18/2012 | 248 |
| | | PSU | | | | 6/14/2012 | 281 | 6/14/2012 | 282 |
| | | PSU | | | | 6/29/2012 | 266 | 5/28/2012 | 299 |
| | | PSU | | | | 7/2/2012 | 263 | 7/18/2012 | 248 |
| | | PSU | | | | 7/6/2012 | 259 | 7/8/2012 | 258 |
| | | PSU | | | | 7/10/2012 | 255 | 7/18/2012 | 248 |
| | | PSU | | | | 7/13/2012 | 252 | 7/12/2012 | 254 |
| | | PSU | | | | 7/23/2012 | 242 | 7/24/2012 | 242 |
| | | PSU | | | | 7/25/2012 | 240 | 7/25/2012 | 241 |
| | | PSU | | | | 7/30/2012 | 235 | 7/30/2012 | 236 |
| | | PSU | | | | 8/7/2012 | 227 | 8/8/2012 | 227 |
| | | PSU | | | | 8/14/2012 | 220 | 11/16/2011 | 493 |
| | | PSU | | | | 8/14/2012 | 220 | 7/18/2012 | 248 |
| | | PSU | | | | 8/17/2012 | 217 | 8/19/2012 | 216 |
| | | PSU | | | | 8/20/2012 | 214 | 8/20/2012 | 215 |
| | | PSU | | | | 8/21/2012 | 213 | 8/21/2012 | 214 |
| | | PSU | | | | 8/23/2012 | 211 | 8/26/2012 | 209 |
| | | PSU | | | | 8/24/2012 | 210 | 8/26/2012 | 209 |
| | | PSU | | | | 8/30/2012 | 204 | 8/30/2012 | 205 |
| | | PSU | | | | 9/7/2012 | 196 | 9/9/2012 | 195 |
| | | PSU | | | | 9/18/2012 | 185 | 4/11/2012 | 346 |
| | | PSU | | | | 9/23/2012 | 180 | 9/23/2012 | 181 |
| | | PSU | | | | 9/24/2012 | 179 | 4/16/2012 | 341 |
| | | PSU | | | | 9/24/2012 | 179 | 9/20/2012 | 184 |
| | | PSU | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | PSU | | | | 9/24/2012 | 179 | 7/18/2012 | 248 |
| | | PSU | | | | 9/24/2012 | 179 | 8/14/2012 | 221 |
| | | PSU | | | | 9/26/2012 | 177 | 9/27/2012 | 177 |
| | | PSU | | | | 9/27/2012 | 176 | 9/27/2012 | 177 |
| | | PSU | | | | 9/27/2012 | 176 | 5/29/2012 | 298 |
| | | PSU | | | | 9/28/2012 | 175 | 9/30/2012 | 174 |
| | | PSU | | | | 9/28/2012 | 175 | 9/30/2012 | 174 |
| | | PSU | | | | 10/3/2012 | 170 | 10/3/2012 | 171 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years. Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-24

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SAC | EOP | PSU | | | | 10/4/2012 | 169 | 10/4/2012 | 170 |
| | | PSU | | | | 10/5/2012 | 168 | 10/7/2012 | 167 |
| | | PSU | | | | 10/9/2012 | 164 | 10/9/2012 | 165 |
| | | PSU | | | | 10/11/2012 | 162 | 8/20/2012 | 215 |
| | | PSU | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | PSU | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | PSU | | | | 10/18/2012 | 155 | 10/21/2012 | 153 |
| | | PSU | | | | 10/22/2012 | 151 | 10/22/2012 | 152 |
| | | PSU | | | | 10/22/2012 | 151 | 10/22/2012 | 152 |
| | | PSU | | | | 10/29/2012 | 144 | 9/27/2012 | 177 |
| | | PSU | | | | 10/30/2012 | 143 | 9/27/2012 | 177 |
| | | PSU | | | | 10/30/2012 | 143 | 7/19/2012 | 247 |
| | | PSU | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | PSU | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |
| | | PSU | | | | 11/15/2012 | 127 | 10/15/2012 | 159 |
| | | PSU | | | | 11/15/2012 | 127 | 9/6/2012 | 198 |
| | | PSU | | | | 11/16/2012 | 126 | 11/19/2012 | 124 |
| | | PSU | | | | 11/16/2012 | 126 | 11/19/2012 | 124 |
| | | PSU | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | PSU | | | | 11/20/2012 | 122 | 10/22/2012 | 152 |
| | | PSU | | | | 11/26/2012 | 116 | 10/16/2012 | 158 |
| | | PSU | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | PSU | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | PSU | | | | 11/29/2012 | 113 | 9/9/2012 | 195 |
| | | PSU | | | | 12/3/2012 | 109 | 12/3/2012 | 110 |
| | | PSU | | | | 12/3/2012 | 109 | 12/3/2012 | 110 |
| | | PSU | | | | 12/5/2012 | 107 | 10/17/2012 | 157 |
| | | PSU | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | PSU | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | PSU | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | PSU | | | | 12/13/2012 | 99 | 12/16/2012 | 97 |
| | | PSU | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| | | PSU | | | | 12/14/2012 | 98 | 12/17/2012 | 96 |
| | | PSU | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |
| | | PSU | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |
| | | PSU | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | PSU | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | PSU | | | | 12/19/2012 | 93 | 12/20/2012 | 93 |
| | | PSU | | | | 12/21/2012 | 91 | 12/25/2012 | 88 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-25

Health Care Placement Oversight Program
3/22/2013

| Region | | | | | | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| Institution | Placement | Setting | CDC # | Last Name | Bed # | | | | |
| SOL | CCMS | Ad-Seg | | | | 4/10/2012 | 346 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/21/2012 | 182 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | 9/22/2012 | 181 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | 9/22/2012 | 181 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | 9/23/2012 | 180 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | 10/14/2012 | 159 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 11/12/2012 | 130 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 1/16/2013 | 66 |
| | | Ad-Seg | | | | 11/17/2012 | 125 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/18/2012 | 124 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 12/3/2012 | 109 | 12/3/2012 | 110 |
| | | Ad-Seg | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/9/2012 | 103 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 3/6/2013 | 17 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 1/16/2013 | 66 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |
| | EOP | Ad-Seg | | | | 11/6/2012 | 136 | 12/4/2012 | 109 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/20/2012 | 92 | 2/18/2013 | 33 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| SQ | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/15/2011 | 524 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 10/28/2011 | 511 | 7/10/2012 | 256 |
| | | Ad-Seg | | | | 1/31/2012 | 416 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 2/10/2012 | 406 | 7/24/2012 | 242 |
| | | Ad-Seg | | | | 3/31/2012 | 356 | 4/1/2012 | 356 |
| | | Ad-Seg | | | | 4/2/2012 | 354 | 5/16/2012 | 311 |
| | | Ad-Seg | | | | 5/17/2012 | 309 | 5/17/2012 | 310 |
| | | Ad-Seg | | | | 5/24/2012 | 302 | 5/24/2012 | 303 |
| | | Ad-Seg | | | | 6/5/2012 | 290 | 8/29/2012 | 206 |
| | | Ad-Seg | | | | 7/2/2012 | 263 | 7/23/2012 | 243 |
| | | Ad-Seg | | | | 7/10/2012 | 255 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/23/2012 | 242 | 7/23/2012 | 243 |
| | | Ad-Seg | | | | 8/6/2012 | 228 | 8/7/2012 | 228 |
| | | Ad-Seg | | | | 8/22/2012 | 212 | 11/6/2012 | 137 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | Ad-Seg | | | | 10/3/2012 | 170 | 10/3/2012 | 171 |
| | | Ad-Seg | | | | 10/16/2012 | 157 | 10/16/2012 | 158 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 11/5/2012 | 138 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 11/26/2012 | 117 |
| | | Ad-Seg | | | | 11/16/2012 | 126 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/26/2012 | 116 | 11/26/2012 | 117 |
| | | Ad-Seg | | | | 11/29/2012 | 113 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |
| | EOP | Ad-Seg | | | | 11/16/2012 | 126 | 2/14/2013 | 37 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-27

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| **South** | | | | | | | | | |
| CAL | CCCMS | Ad-Seg | | | | 9/14/2012 | 189 | 1/2/2013 | 80 |
| | | Ad-Seg | | | | 9/25/2012 | 178 | 1/10/2013 | 72 |
| | | Ad-Seg | | | | 12/9/2012 | 103 | 1/10/2013 | 72 |
| CEN | CCCMS | Ad-Seg | | | | 11/28/2012 | 114 | 12/19/2012 | 94 |
| | | Ad-Seg | | | | 12/22/2012 | 90 | 1/10/2013 | 72 |
| CIM | CCCMS | Ad-Seg | | | | 9/5/2012 | 198 | 9/5/2012 | 199 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 10/2/2012 | 172 |
| | | Ad-Seg | | | | 10/11/2012 | 162 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/24/2012 | 149 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 10/28/2012 | 145 | 10/28/2012 | 146 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/5/2012 | 137 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |
| | | Ad-Seg | | | | 11/6/2012 | 136 | 11/6/2012 | 137 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/12/2012 | 130 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/18/2012 | 124 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/18/2012 | 124 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 3/14/2013 | 9 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/17/2012 | 96 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 1/8/2013 | 74 |
| | EOP | Ad-Seg | | | | 7/26/2012 | 239 | 8/22/2012 | 213 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-28

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CIW | EOP | PSU | | | | 3/21/2011 | 732 | 7/18/2012 | 248 |
| | | PSU | | | | 4/20/2011 | 702 | 7/18/2012 | 248 |
| | | PSU | | | | 7/5/2011 | 626 | 7/18/2012 | 248 |
| | | PSU | | | | 8/18/2011 | 582 | 7/18/2012 | 248 |
| | | PSU | | | | 10/5/2011 | 534 | 7/18/2012 | 248 |
| | | PSU | | | | 1/19/2012 | 428 | 7/18/2012 | 248 |
| | | PSU | | | | 3/1/2012 | 386 | 7/18/2012 | 248 |
| | | PSU | | | | 4/4/2012 | 352 | 7/18/2012 | 248 |
| | | PSU | | | | 4/30/2012 | 326 | 7/18/2012 | 248 |
| | | PSU | | | | 5/29/2012 | 297 | 7/18/2012 | 248 |
| | | PSU | | | | 6/1/2012 | 294 | 7/18/2012 | 248 |
| | | PSU | | | | 7/6/2012 | 259 | 7/18/2012 | 248 |
| | | PSU | | | | 7/12/2012 | 253 | 7/18/2012 | 248 |
| | | PSU | | | | 7/16/2012 | 249 | 7/18/2012 | 248 |
| | | PSU | | | | 7/18/2012 | 247 | 7/18/2012 | 248 |
| | | PSU | | | | 7/19/2012 | 246 | 7/19/2012 | 247 |
| | | PSU | | | | 7/24/2012 | 241 | 7/24/2012 | 242 |
| | | PSU | | | | 8/30/2012 | 204 | 9/3/2012 | 201 |
| | | PSU | | | | 9/12/2012 | 191 | 9/30/2012 | 174 |
| | | PSU | | | | 9/13/2012 | 190 | 2/20/2013 | 31 |
| | | PSU | | | | 10/3/2012 | 170 | 10/3/2012 | 171 |
| | | PSU | | | | 10/4/2012 | 169 | 10/4/2012 | 170 |
| | | PSU | | | | 10/16/2012 | 157 | 10/16/2012 | 158 |
| | | PSU | | | | 10/19/2012 | 154 | 10/21/2012 | 153 |
| | | PSU | | | | 10/19/2012 | 154 | 10/21/2012 | 153 |
| | | PSU | | | | 10/21/2012 | 152 | 10/21/2012 | 153 |
| | | PSU | | | | 11/7/2012 | 135 | 11/8/2012 | 135 |
| | | PSU | | | | 11/22/2012 | 120 | 11/25/2012 | 118 |
| | | PSU | | | | 11/23/2012 | 119 | 11/25/2012 | 118 |
| | | PSU | | | | 11/26/2012 | 116 | 11/26/2012 | 117 |
| | | PSU | | | | 12/16/2012 | 96 | 12/16/2012 | 97 |
| | | PSU | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

R10-29

Health Care Placement Oversight Program
3/22/2013

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| LAC | CCCMS | Ad-Seg | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 11/9/2011 | 499 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 1/19/2012 | 428 | 1/29/2012 | 419 |
| | | Ad-Seg | | | | 2/7/2012 | 409 | 2/7/2012 | 410 |
| | | Ad-Seg | | | | 3/3/2012 | 384 | 3/4/2012 | 384 |
| | | Ad-Seg | | | | 4/16/2012 | 340 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 4/20/2012 | 336 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/8/2012 | 318 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/17/2012 | 309 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/18/2012 | 308 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 5/23/2012 | 303 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/1/2012 | 294 | 6/3/2012 | 293 |
| | | Ad-Seg | | | | 6/13/2012 | 282 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/20/2012 | 275 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 6/21/2012 | 274 | 6/21/2012 | 275 |
| | | Ad-Seg | | | | 7/5/2012 | 260 | 7/5/2012 | 261 |
| | | Ad-Seg | | | | 7/6/2012 | 259 | 7/8/2012 | 258 |
| | | Ad-Seg | | | | 7/9/2012 | 256 | 7/9/2012 | 257 |
| | | Ad-Seg | | | | 7/12/2012 | 253 | 7/12/2012 | 254 |
| | | Ad-Seg | | | | 7/12/2012 | 253 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/13/2012 | 252 | 1/21/2013 | 61 |
| | | Ad-Seg | | | | 7/14/2012 | 251 | 7/12/2012 | 254 |
| | | Ad-Seg | | | | 7/30/2012 | 235 | 8/1/2012 | 234 |
| | | Ad-Seg | | | | 8/1/2012 | 233 | 1/2/2013 | 80 |
| | | Ad-Seg | | | | 8/4/2012 | 230 | 8/5/2012 | 230 |
| | | Ad-Seg | | | | 8/5/2012 | 229 | 8/5/2012 | 230 |
| | | Ad-Seg | | | | 8/7/2012 | 227 | 8/7/2012 | 228 |
| | | Ad-Seg | | | | 8/24/2012 | 210 | 8/26/2012 | 209 |
| | | Ad-Seg | | | | 9/7/2012 | 196 | 1/30/2013 | 52 |
| | | Ad-Seg | | | | 9/17/2012 | 186 | 9/20/2012 | 184 |
| | | Ad-Seg | | | | 9/23/2012 | 180 | 9/23/2012 | 181 |
| | | Ad-Seg | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | Ad-Seg | | | | 9/27/2012 | 176 | 9/27/2012 | 177 |
| | | Ad-Seg | | | | 9/27/2012 | 176 | 9/27/2012 | 177 |
| | | Ad-Seg | | | | 9/29/2012 | 174 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 9/30/2012 | 173 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 10/8/2012 | 165 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 10/11/2012 | 162 | 10/22/2012 | 152 |
| | | Ad-Seg | | | | 10/13/2012 | 160 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 10/16/2012 | 157 | 10/22/2012 | 152 |
| | | Ad-Seg | | | | 10/19/2012 | 154 | 10/21/2012 | 153 |
| | | Ad-Seg | | | | 10/23/2012 | 150 | 10/24/2012 | 150 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-30

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| LAC | CCCMS | Ad-Seg | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 1/15/2013 | 67 |
| | | Ad-Seg | | | | 11/4/2012 | 138 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/5/2012 | 137 | 11/5/2012 | 138 |
| | | Ad-Seg | | | | 11/6/2012 | 136 | 11/6/2012 | 137 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/23/2012 | 119 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/24/2012 | 118 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/26/2012 | 116 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 12/27/2012 | 86 |
| | | Ad-Seg | | | | 12/3/2012 | 109 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/3/2012 | 109 | 12/3/2012 | 110 |
| | | Ad-Seg | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | Ad-Seg | | | | 12/6/2012 | 106 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/12/2012 | 101 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 12/23/2012 | 90 |
| | EOP | Ad-Seg | | | | 4/25/2012 | 331 | 4/26/2012 | 331 |
| | | Ad-Seg | | | | 6/27/2012 | 268 | 7/9/2012 | 257 |
| | | Ad-Seg | | | | 8/15/2012 | 219 | 8/15/2012 | 220 |
| | | Ad-Seg | | | | 8/17/2012 | 217 | 8/19/2012 | 216 |
| | | Ad-Seg | | | | 8/28/2012 | 206 | 8/29/2012 | 206 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 10/2/2012 | 172 |
| | | Ad-Seg | | | | 10/10/2012 | 163 | 10/10/2012 | 164 |
| | | Ad-Seg | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 11/15/2012 | 128 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-31

| Region | | | | | | Bed | # Days in | MH Rec. | # Days of |
|---|---|---|---|---|---|---|---|---|---|
| Institution | Placement | Setting | CDC # | Last Name | Bed # | Occupancy | Bed | Date | MH Rec. |
| LAC | EOP | Ad-Seg | | | | 11/16/2012 | 126 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/19/2012 | 123 | 11/19/2012 | 124 |
| | | Ad-Seg | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/4/2012 | 108 | 12/6/2012 | 107 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 12/11/2012 | 102 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/13/2012 | 100 |
| | | Ad-Seg | | | | 12/13/2012 | 99 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/18/2012 | 94 | 12/18/2012 | 95 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-32

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| RJD | CCCMS | Ad-Seg | | | | 12/18/2011 | 460 | 4/4/2012 | 353 |
| | | Ad-Seg | | | | 1/31/2012 | 416 | 2/21/2012 | 396 |
| | | Ad-Seg | | | | 3/30/2012 | 357 | 4/1/2012 | 356 |
| | | Ad-Seg | | | | 6/1/2012 | 294 | 9/9/2012 | 195 |
| | | Ad-Seg | | | | 6/19/2012 | 276 | 6/19/2012 | 277 |
| | | Ad-Seg | | | | 6/28/2012 | 267 | 7/1/2012 | 265 |
| | | Ad-Seg | | | | 7/9/2012 | 256 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 8/22/2012 | 212 | 8/22/2012 | 213 |
| | | Ad-Seg | | | | 8/30/2012 | 204 | 8/30/2012 | 205 |
| | | Ad-Seg | | | | 9/29/2012 | 174 | 9/30/2012 | 174 |
| | | Ad-Seg | | | | 10/23/2012 | 150 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 10/28/2012 | 145 | 10/28/2012 | 146 |
| | | Ad-Seg | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | Ad-Seg | | | | 11/4/2012 | 138 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | Ad-Seg | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | Ad-Seg | | | | 11/15/2012 | 127 | 11/15/2012 | 128 |
| | | Ad-Seg | | | | 11/16/2012 | 126 | 11/17/2012 | 126 |
| | | Ad-Seg | | | | 11/16/2012 | 126 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 11/20/2012 | 122 | 11/20/2012 | 123 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 11/25/2012 | 118 |
| | | Ad-Seg | | | | 11/22/2012 | 120 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 11/23/2012 | 119 | 12/4/2012 | 109 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 12/5/2012 | 108 |
| | | Ad-Seg | | | | 12/7/2012 | 105 | 1/3/2013 | 79 |
| | | Ad-Seg | | | | 12/8/2012 | 104 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/19/2012 | 94 |
| | | Ad-Seg | | | | 12/19/2012 | 93 | 12/19/2012 | 94 |
| | EOP | Ad-Seg | | | | 6/1/2012 | 294 | 6/3/2012 | 293 |
| | | Ad-Seg | | | | 6/29/2012 | 266 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/5/2012 | 198 | 9/5/2012 | 199 |
| | | Ad-Seg | | | | 10/30/2012 | 143 | 11/1/2012 | 142 |
| | | Ad-Seg | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | Ad-Seg | | | | 11/2/2012 | 140 | 11/4/2012 | 139 |
| | | Ad-Seg | | | | 11/26/2012 | 116 | 11/26/2012 | 117 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 11/28/2012 | 115 |
| | | Ad-Seg | | | | 12/2/2012 | 110 | 12/2/2012 | 111 |
| | | Ad-Seg | | | | 12/2/2012 | 110 | 12/4/2012 | 109 |
| | | Ad-Seg | | | | 12/3/2012 | 109 | 12/3/2012 | 110 |
| | | Ad-Seg | | | | 12/9/2012 | 103 | 12/9/2012 | 104 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 12/11/2012 | 102 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-33

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| RJD | EOP | Ad-Seg | | | | 12/14/2012 | 98 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/17/2012 | 95 | 12/17/2012 | 96 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-34

# Exhibit 6

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA94283-0001



December 1, 2011

Matthew A. Lopes, Jr. Esquire          via: Debbie J. Vorous, Esquire
Office of the Special Master                Deputy Attorney General
Pannone Lopes & Devereaux LLC               Department of Justice
317 Iron Horse Point Way, Suite 301         1300 "I" Street, Suite 125
Providence, RI  02908                       P. O. Box 944255
                                            Sacramento, CA  94244-2550


**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND
RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF
VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of October, 2011, data (or as otherwise
noted).  The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy
    History.
2.  MHSDS Hiring Activity Report.
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary
    and Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly
    Report for all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center
    (RC) Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient
    Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of Mental Health (including admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals--Summary and Penal
    Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.

Matthew A. Lopes, Jr. Esquire
Page 2

15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at San Quentin State Prison (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 324-2933.

Sincerely,

JAMES A. SCARAMOZZINO, PH.D.
Deputy Director (A)
Statewide Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc:  Sharon Aungst, Director, Correctional Health Care Services
    Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
    Linda Holden, Esq., *Coleman* Deputy Special Master
    Jeffrey L. Metzner, M.D., *Coleman* Expert
    Kerry C. Hughes, M.D., *Coleman* Expert
    Raymond F. Patterson, M.D, *Coleman* Expert
    Paul Nicoll, MPA, *Coleman* Monitor
    Ted Ruggles, Ph.D., *Coleman* Expert
    Mary Perrien, Ph.D., *Coleman* Expert
    Yong Joo Erwin, LCSW, *Coleman* Expert
    Kathryn A. Burns, M.D., MPH, *Coleman* Expert
    Henry A. Dlugacz, Esq., *Coleman* Expert
    Kerry F. Walsh, Esq., *Coleman* Monitor
    Patricia Williams, Esq., *Coleman* Monitor
    Haunani Henry, *Coleman* Monitor
    J. Ronald Metz, *Coleman* Monitor
    William Alvarez, Ph.D., *Coleman* Monitor

Matthew A. Lopes, Jr. Esquire
Page 3


Debbie Vorous, Esq., Office of the Attorney General
Heather McCray Esq., Office of Legal Affairs, CDCR
Michael Stone, Esq., Office of Legal Affairs, CDCR
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Judy Burleson, Associate Director, Statewide Mental Health Program, Division of
   Correctional Health Care Services
Nathan Stanley, Chief, Operational Program Oversight, Division of Correctional Health
   Care Services
Karen Higgins, M.D., Chief of Behavioral Medicine, Mental Health Program, Division
   of Correctional Health Care Services
Teresa Owens, Associate Governmental Program Analyst, Operational Program
   Oversight, Division of Correctional Health Care Services

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 12/28/2004 | 2474 | 10/10/2006 | 1824 |
| | | SHU | | | | 12/27/2005 | 2110 | 11/29/2006 | 1774 |
| | | SHU | | | | 3/5/2007 | 1677 | 10/10/2006 | 1824 |
| | | SHU | | | | 8/20/2007 | 1509 | 9/30/2008 | 1103 |
| | | SHU | | | | 6/9/2008 | 1215 | 6/8/2008 | 1217 |
| | | SHU | | | | 7/18/2008 | 1176 | 12/19/2007 | 1389 |
| | | SHU | | | | 7/27/2008 | 1167 | 10/10/2006 | 1824 |
| | | SHU | | | | 9/18/2008 | 1114 | 9/16/2008 | 1117 |
| | | SHU | | | | 9/24/2008 | 1108 | 9/24/2008 | 1109 |
| | | SHU | | | | 11/10/2008 | 1061 | 10/13/2007 | 1456 |
| | | SHU | | | | 12/16/2008 | 1025 | 6/29/2010 | 466 |
| | | SHU | | | | 12/22/2008 | 1019 | 10/10/2006 | 1824 |
| | | SHU | | | | 2/18/2009 | 961 | 2/18/2009 | 962 |
| | | SHU | | | | 3/25/2009 | 926 | 2/28/2009 | 952 |
| | | SHU | | | | 4/8/2009 | 912 | 3/28/2009 | 924 |
| | | SHU | | | | 5/12/2009 | 878 | 5/12/2009 | 879 |
| | | SHU | | | | 6/10/2009 | 849 | 6/3/2009 | 857 |
| | | SHU | | | | 7/15/2009 | 814 | 7/18/2009 | 812 |
| | | SHU | | | | 7/26/2009 | 803 | 1/10/2011 | 271 |
| | | SHU | | | | 7/31/2009 | 798 | 7/17/2011 | 83 |
| | | SHU | | | | 9/1/2009 | 766 | 1/7/2009 | 1004 |
| | | SHU | | | | 9/9/2009 | 758 | 9/13/2009 | 755 |
| | | SHU | | | | 9/30/2009 | 737 | 10/27/2009 | 711 |
| | | SHU | | | | 10/10/2009 | 727 | 10/13/2008 | 1090 |
| | | SHU | | | | 11/9/2009 | 697 | 11/7/2009 | 700 |
| | | SHU | | | | 11/10/2009 | 696 | 3/28/2009 | 924 |
| | | SHU | | | | 11/17/2009 | 689 | 10/28/2009 | 710 |
| | | SHU | | | | 12/3/2009 | 673 | 1/18/2009 | 993 |
| | | SHU | | | | 1/18/2010 | 627 | 1/23/2007 | 1719 |
| | | SHU | | | | 1/21/2010 | 624 | 4/12/2008 | 1274 |
| | | SHU | | | | 3/12/2010 | 574 | 3/8/2010 | 579 |
| | | SHU | | | | 3/24/2010 | 562 | 5/18/2010 | 508 |
| | | SHU | | | | 3/25/2010 | 561 | 11/30/2008 | 1042 |
| | | SHU | | | | 4/2/2010 | 553 | 2/9/2008 | 1337 |
| | | SHU | | | | 4/5/2010 | 550 | 4/18/2009 | 903 |
| | | SHU | | | | 4/8/2010 | 547 | 4/11/2010 | 545 |
| | | SHU | | | | 4/8/2010 | 547 | 4/11/2010 | 545 |
| | | SHU | | | | 4/9/2010 | 546 | 7/21/2009 | 809 |
| | | SHU | | | | 4/9/2010 | 546 | 2/7/2009 | 973 |
| | | SHU | | | | 4/13/2010 | 542 | 10/10/2009 | 728 |
| | | SHU | | | | 4/21/2010 | 534 | 3/2/2010 | 585 |
| | | SHU | | | | 4/22/2010 | 533 | 1/24/2010 | 622 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its data systems and is currently working with IT to resolve those issues.

Health Care Placement Oversight Program
10/7/2011

R10-8

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 4/26/2010 | 529 | 1/24/2010 | 622 |
| | | SHU | | | | 4/29/2010 | 526 | 7/18/2010 | 447 |
| | | SHU | | | | 5/12/2010 | 513 | 2/22/2010 | 593 |
| | | SHU | | | | 5/27/2010 | 498 | 7/14/2009 | 816 |
| | | SHU | | | | 6/4/2010 | 490 | 6/6/2010 | 489 |
| | | SHU | | | | 6/8/2010 | 486 | 6/2/2010 | 493 |
| | | SHU | | | | 6/28/2010 | 466 | 10/13/2008 | 1090 |
| | | SHU | | | | 7/1/2010 | 463 | 6/13/2010 | 482 |
| | | SHU | | | | 7/7/2010 | 457 | 7/7/2010 | 458 |
| | | SHU | | | | 7/12/2010 | 452 | 7/13/2010 | 452 |
| | | SHU | | | | 7/25/2010 | 439 | 5/19/2010 | 507 |
| | | SHU | | | | 8/4/2010 | 429 | 6/28/2008 | 1197 |
| | | SHU | | | | 8/5/2010 | 428 | 8/9/2010 | 425 |
| | | SHU | | | | 8/6/2010 | 427 | 5/23/2010 | 503 |
| | | SHU | | | | 8/16/2010 | 417 | 7/4/2009 | 826 |
| | | SHU | | | | 8/21/2010 | 412 | 3/23/2009 | 929 |
| | | SHU | | | | 8/25/2010 | 408 | 11/14/2009 | 693 |
| | | SHU | | | | 8/25/2010 | 408 | 8/24/2010 | 410 |
| | | SHU | | | | 9/2/2010 | 400 | 6/25/2008 | 1200 |
| | | SHU | | | | 9/16/2010 | 386 | 7/21/2010 | 444 |
| | | SHU | | | | 9/22/2010 | 380 | 9/22/2010 | 381 |
| | | SHU | | | | 9/25/2010 | 377 | 9/26/2010 | 377 |
| | | SHU | | | | 9/28/2010 | 374 | 9/28/2010 | 375 |
| | | SHU | | | | 9/29/2010 | 373 | 8/13/2011 | 56 |
| | | SHU | | | | 9/29/2010 | 373 | 11/22/2009 | 685 |
| | | SHU | | | | 10/4/2010 | 368 | 6/20/2010 | 475 |
| | | SHU | | | | 10/4/2010 | 368 | 3/3/2010 | 584 |
| | | SHU | | | | 10/6/2010 | 366 | 4/11/2010 | 545 |
| | | SHU | | | | 10/9/2010 | 363 | 10/10/2006 | 1824 |
| | | SHU | | | | 10/14/2010 | 358 | 10/6/2010 | 367 |
| | | SHU | | | | 10/15/2010 | 357 | 1/27/2010 | 619 |
| | | SHU | | | | 10/16/2010 | 356 | 9/7/2009 | 761 |
| | | SHU | | | | 10/26/2010 | 346 | 10/25/2010 | 348 |
| | | SHU | | | | 11/5/2010 | 336 | 11/7/2010 | 335 |
| | | SHU | | | | 11/11/2010 | 330 | 7/31/2010 | 434 |
| | | SHU | | | | 11/12/2010 | 329 | 11/13/2010 | 329 |
| | | SHU | | | | 11/15/2010 | 326 | 11/23/2009 | 684 |
| | | SHU | | | | 11/17/2010 | 324 | 9/26/2009 | 742 |
| | | SHU | | | | 11/19/2010 | 322 | 10/10/2006 | 1824 |
| | | SHU | | | | 11/21/2010 | 320 | 11/21/2010 | 321 |
| | | SHU | | | | 11/22/2010 | 319 | 4/11/2010 | 545 |
| | | SHU | | | | 11/22/2010 | 319 | 2/28/2009 | 952 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its data systems and is currently working with IT to resolve those issues.

Health Care Placement Oversight Program
10/7/2011

R10-9

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 11/24/2010 | 317 | 11/23/2010 | 319 |
| | | SHU | | | | 11/25/2010 | 316 | 9/29/2010 | 374 |
| | | SHU | | | | 11/27/2010 | 314 | 1/12/2009 | 999 |
| | | SHU | | | | 11/27/2010 | 314 | 6/6/2010 | 489 |
| | | SHU | | | | 11/27/2010 | 314 | 10/25/2009 | 713 |
| | | SHU | | | | 12/2/2010 | 309 | 3/24/2010 | 563 |
| | | SHU | | | | 12/4/2010 | 307 | 8/18/2010 | 416 |
| | | SHU | | | | 12/6/2010 | 305 | 9/27/2010 | 376 |
| | | SHU | | | | 12/8/2010 | 303 | 7/28/2007 | 1533 |
| | | SHU | | | | 12/9/2010 | 302 | 12/8/2010 | 304 |
| | | SHU | | | | 12/14/2010 | 297 | 10/3/2009 | 735 |
| | | SHU | | | | 12/15/2010 | 296 | 7/26/2010 | 439 |
| | | SHU | | | | 12/21/2010 | 290 | 8/23/2009 | 776 |
| | | SHU | | | | 12/22/2010 | 289 | 11/13/2010 | 329 |
| | | SHU | | | | 12/22/2010 | 289 | 7/7/2010 | 458 |
| | | SHU | | | | 12/22/2010 | 289 | 10/10/2010 | 363 |
| | | SHU | | | | 12/22/2010 | 289 | 3/14/2010 | 573 |
| | | SHU | | | | 12/24/2010 | 287 | 12/22/2010 | 290 |
| | | SHU | | | | 12/27/2010 | 284 | 12/1/2010 | 311 |
| | | SHU | | | | 12/28/2010 | 283 | 6/9/2007 | 1582 |
| | | SHU | | | | 12/29/2010 | 282 | 11/20/2010 | 322 |
| | | SHU | | | | 12/29/2010 | 282 | 9/21/2010 | 382 |
| | | SHU | | | | 12/30/2010 | 281 | 1/1/2011 | 280 |
| | | SHU | | | | 12/30/2010 | 281 | 1/2/2011 | 279 |
| | | SHU | | | | 1/1/2011 | 279 | 9/8/2010 | 395 |
| | | SHU | | | | 1/3/2011 | 277 | 3/15/2010 | 572 |
| | | SHU | | | | 1/3/2011 | 277 | 11/7/2010 | 335 |
| | | SHU | | | | 1/4/2011 | 276 | 8/3/2011 | 66 |
| | | SHU | | | | 1/4/2011 | 276 | 1/4/2011 | 277 |
| | | SHU | | | | 1/5/2011 | 275 | 10/20/2008 | 1083 |
| | | SHU | | | | 1/5/2011 | 275 | 10/14/2006 | 1820 |
| | | SHU | | | | 1/6/2011 | 274 | 11/3/2008 | 1069 |
| | | SHU | | | | 1/7/2011 | 273 | 3/14/2011 | 208 |
| | | SHU | | | | 1/10/2011 | 270 | 3/1/2010 | 586 |
| | | SHU | | | | 1/10/2011 | 270 | 1/5/2011 | 276 |
| | | SHU | | | | 1/12/2011 | 268 | 3/7/2011 | 215 |
| | | SHU | | | | 1/14/2011 | 266 | 3/10/2007 | 1673 |
| | | SHU | | | | 1/18/2011 | 262 | 1/17/2011 | 264 |
| | | SHU | | | | 1/18/2011 | 262 | 1/1/2011 | 280 |
| | | SHU | | | | 1/19/2011 | 261 | 12/8/2010 | 304 |
| | | SHU | | | | 1/20/2011 | 260 | 1/19/2011 | 262 |
| | | SHU | | | | 1/25/2011 | 255 | 1/25/2011 | 256 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its
data systems and is currently working with IT to resolve those issues.

Health Care Placement Oversight Program
10/7/2011

R10-10

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 1/29/2011 | 251 | 4/21/2010 | 535 |
| | | SHU | | | | 2/2/2011 | 247 | 12/19/2010 | 293 |
| | | SHU | | | | 2/7/2011 | 242 | 12/27/2010 | 285 |
| | | SHU | | | | 2/8/2011 | 241 | 2/8/2011 | 242 |
| | | SHU | | | | 2/8/2011 | 241 | 1/26/2009 | 985 |
| | | SHU | | | | 2/9/2011 | 240 | 2/7/2011 | 243 |
| | | SHU | | | | 2/10/2011 | 239 | 4/19/2011 | 172 |
| | | SHU | | | | 2/15/2011 | 234 | 1/31/2011 | 250 |
| | | SHU | | | | 2/15/2011 | 234 | 4/6/2011 | 185 |
| | | SHU | | | | 2/15/2011 | 234 | 9/4/2010 | 399 |
| | | SHU | | | | 2/15/2011 | 234 | 4/13/2010 | 543 |
| | | SHU | | | | 2/16/2011 | 233 | 12/10/2008 | 1032 |
| | | SHU | | | | 2/18/2011 | 231 | 11/28/2010 | 314 |
| | | SHU | | | | 2/18/2011 | 231 | 10/30/2010 | 343 |
| | | SHU | | | | 2/18/2011 | 231 | 9/22/2010 | 381 |
| | | SHU | | | | 2/21/2011 | 228 | 11/13/2010 | 329 |
| | | SHU | | | | 2/21/2011 | 228 | 3/28/2010 | 559 |
| | | SHU | | | | 2/23/2011 | 226 | 12/29/2010 | 283 |
| | | SHU | | | | 2/23/2011 | 226 | 1/9/2011 | 272 |
| | | SHU | | | | 2/23/2011 | 226 | 2/23/2011 | 227 |
| | | SHU | | | | 2/24/2011 | 225 | 1/5/2011 | 276 |
| | | SHU | | | | 2/24/2011 | 225 | 10/17/2010 | 356 |
| | | SHU | | | | 2/24/2011 | 225 | 11/28/2010 | 314 |
| | | SHU | | | | 2/25/2011 | 224 | 2/9/2011 | 241 |
| | | SHU | | | | 2/25/2011 | 224 | 10/18/2006 | 1816 |
| | | SHU | | | | 2/25/2011 | 224 | 2/26/2011 | 224 |
| | | SHU | | | | 2/26/2011 | 223 | 12/7/2010 | 305 |
| | | SHU | | | | 2/27/2011 | 222 | 1/15/2011 | 266 |
| | | SHU | | | | 3/1/2011 | 220 | 3/1/2011 | 221 |
| | | SHU | | | | 3/1/2011 | 220 | 5/5/2010 | 521 |
| | | SHU | | | | 3/5/2011 | 216 | 2/19/2011 | 231 |
| | | SHU | | | | 3/7/2011 | 214 | 9/3/2008 | 1130 |
| | | SHU | | | | 3/7/2011 | 214 | 10/27/2010 | 346 |
| | | SHU | | | | 3/8/2011 | 213 | 11/23/2009 | 684 |
| | | SHU | | | | 3/8/2011 | 213 | 3/8/2011 | 214 |
| | | SHU | | | | 3/8/2011 | 213 | 10/13/2010 | 360 |
| | | SHU | | | | 3/11/2011 | 210 | 9/30/2007 | 1469 |
| | | SHU | | | | 3/11/2011 | 210 | 10/10/2006 | 1824 |
| | | SHU | | | | 3/11/2011 | 210 | 9/22/2010 | 381 |
| | | SHU | | | | 3/12/2011 | 209 | 12/22/2010 | 290 |
| | | SHU | | | | 3/12/2011 | 209 | 12/4/2010 | 308 |
| | | SHU | | | | 3/13/2011 | 208 | 12/26/2010 | 286 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its data systems and is currently working with IT to resolve those issues.

Health Care Placement Oversight Program
10/7/2011

R10-11

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 3/13/2011 | 208 | 1/15/2011 | 266 |
| | | SHU | | | | 3/15/2011 | 206 | 2/14/2011 | 236 |
| | | SHU | | | | 3/16/2011 | 205 | 11/22/2010 | 320 |
| | | SHU | | | | 3/17/2011 | 204 | 1/31/2010 | 615 |
| | | SHU | | | | 3/17/2011 | 204 | 6/22/2010 | 473 |
| | | SHU | | | | 3/17/2011 | 204 | 10/10/2006 | 1824 |
| | | SHU | | | | 3/19/2011 | 202 | 3/19/2011 | 203 |
| | | SHU | | | | 3/21/2011 | 200 | 3/21/2011 | 201 |
| | | SHU | | | | 3/25/2011 | 196 | 6/10/2009 | 850 |
| | | SHU | | | | 3/27/2011 | 194 | 3/19/2011 | 203 |
| | | SHU | | | | 3/28/2011 | 193 | 7/21/2009 | 809 |
| | | SHU | | | | 3/28/2011 | 193 | 3/28/2011 | 194 |
| | | SHU | | | | 3/28/2011 | 193 | 5/4/2010 | 522 |
| | | SHU | | | | 3/30/2011 | 191 | 2/13/2011 | 237 |
| | | SHU | | | | 3/31/2011 | 190 | 12/13/2010 | 299 |
| | | SHU | | | | 3/31/2011 | 190 | 2/19/2011 | 231 |
| | | SHU | | | | 3/31/2011 | 190 | 3/6/2011 | 216 |
| | | SHU | | | | 3/31/2011 | 190 | 1/22/2011 | 259 |
| | | SHU | | | | 4/1/2011 | 189 | 10/30/2010 | 343 |
| | | SHU | | | | 4/4/2011 | 186 | 9/22/2010 | 381 |
| | | SHU | | | | 4/4/2011 | 186 | 4/4/2011 | 187 |
| | | SHU | | | | 4/5/2011 | 185 | 9/22/2010 | 381 |
| | | SHU | | | | 4/5/2011 | 185 | 4/4/2011 | 187 |
| | | SHU | | | | 4/5/2011 | 185 | 4/4/2011 | 187 |
| | | SHU | | | | 4/6/2011 | 184 | 4/6/2011 | 185 |
| | | SHU | | | | 4/6/2011 | 184 | 12/12/2010 | 300 |
| | | SHU | | | | 4/6/2011 | 184 | 4/6/2011 | 185 |
| | | SHU | | | | 4/7/2011 | 183 | 1/15/2011 | 266 |
| | | SHU | | | | 4/7/2011 | 183 | 3/21/2011 | 201 |
| | | SHU | | | | 4/7/2011 | 183 | 3/23/2011 | 199 |
| | | SHU | | | | 4/7/2011 | 183 | 7/6/2010 | 459 |
| | | SHU | | | | 4/8/2011 | 182 | 11/2/2010 | 340 |
| | | SHU | | | | 4/8/2011 | 182 | 2/16/2011 | 234 |
| | | SHU | | | | 4/8/2011 | 182 | 12/2/2008 | 1040 |
| | | SHU | | | | 4/10/2011 | 180 | 9/20/2010 | 383 |
| | | SHU | | | | 4/10/2011 | 180 | 4/6/2011 | 185 |
| | | SHU | | | | 4/12/2011 | 178 | 1/25/2011 | 256 |
| | | SHU | | | | 4/12/2011 | 178 | 1/31/2011 | 250 |
| | | SHU | | | | 4/12/2011 | 178 | 12/29/2010 | 283 |
| | | SHU | | | | 4/15/2011 | 175 | 3/20/2011 | 202 |
| | | SHU | | | | 4/16/2011 | 174 | 11/22/2009 | 685 |
| | | SHU | | | | 4/18/2011 | 172 | 5/17/2011 | 144 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its
data systems and is currently working with IT to resolve those issues.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 4/19/2011 | 171 | 4/19/2011 | 172 |
| | | SHU | | | | 4/19/2011 | 171 | 4/19/2011 | 172 |
| | | SHU | | | | 4/21/2011 | 169 | 10/13/2010 | 360 |
| | | SHU | | | | 4/22/2011 | 168 | 7/12/2010 | 453 |
| | | SHU | | | | 4/22/2011 | 168 | 10/20/2010 | 353 |
| | | SHU | | | | 4/22/2011 | 168 | 3/23/2011 | 199 |
| | | SHU | | | | 4/22/2011 | 168 | 7/17/2010 | 448 |
| | | SHU | | | | 4/24/2011 | 166 | 4/6/2010 | 550 |
| | | SHU | | | | 4/25/2011 | 165 | 6/2/2010 | 493 |
| | | SHU | | | | 4/25/2011 | 165 | 4/25/2011 | 166 |
| | | SHU | | | | 4/25/2011 | 165 | 4/25/2011 | 166 |
| | | SHU | | | | 4/25/2011 | 165 | 3/2/2011 | 220 |
| | | SHU | | | | 4/26/2011 | 164 | 4/19/2011 | 172 |
| | | SHU | | | | 4/27/2011 | 163 | 6/27/2009 | 833 |
| | | SHU | | | | 4/27/2011 | 163 | 1/15/2011 | 266 |
| | | SHU | | | | 4/28/2011 | 162 | 2/28/2011 | 222 |
| | | SHU | | | | 4/28/2011 | 162 | 2/28/2011 | 222 |
| | | SHU | | | | 4/28/2011 | 162 | 9/19/2010 | 384 |
| | | SHU | | | | 4/28/2011 | 162 | 2/7/2010 | 608 |
| | | SHU | | | | 4/29/2011 | 161 | 3/9/2011 | 213 |
| | | SHU | | | | 4/29/2011 | 161 | 3/21/2011 | 201 |
| | | SHU | | | | 4/30/2011 | 160 | 5/1/2011 | 160 |
| | | SHU | | | | 5/2/2011 | 158 | 4/9/2011 | 182 |
| | | SHU | | | | 5/2/2011 | 158 | 5/17/2011 | 144 |
| | | SHU | | | | 5/3/2011 | 157 | 8/15/2010 | 419 |
| | | SHU | | | | 5/4/2011 | 156 | 4/6/2009 | 915 |
| | | SHU | | | | 5/4/2011 | 156 | 5/7/2011 | 154 |
| | | SHU | | | | 5/4/2011 | 156 | 6/3/2009 | 857 |
| | | SHU | | | | 5/5/2011 | 155 | 9/13/2010 | 390 |
| | | SHU | | | | 5/8/2011 | 152 | 3/9/2011 | 213 |
| | | SHU | | | | 5/8/2011 | 152 | 9/15/2010 | 388 |
| | | SHU | | | | 5/8/2011 | 152 | 2/23/2009 | 957 |
| | | SHU | | | | 5/9/2011 | 151 | 5/8/2011 | 153 |
| | | SHU | | | | 5/9/2011 | 151 | 4/6/2011 | 185 |
| | | SHU | | | | 5/9/2011 | 151 | 8/15/2011 | 54 |
| | | SHU | | | | 5/9/2011 | 151 | 5/11/2008 | 1245 |
| | | SHU | | | | 5/10/2011 | 150 | 8/2/2010 | 432 |
| | | SHU | | | | 5/10/2011 | 150 | 5/10/2011 | 151 |
| | | SHU | | | | 5/11/2011 | 149 | 5/4/2011 | 157 |
| | | SHU | | | | 5/12/2011 | 148 | 2/23/2011 | 227 |
| | | SHU | | | | 5/14/2011 | 146 | 8/18/2010 | 416 |
| | | SHU | | | | 5/14/2011 | 146 | 2/21/2011 | 229 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years.  Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its
data systems and is currently working with IT to resolve those issues.

Health Care Placement Oversight Program
10/7/2011

R10-13

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 5/14/2011 | 146 | 4/30/2011 | 161 |
| | | SHU | | | | 5/15/2011 | 145 | 4/16/2011 | 175 |
| | | SHU | | | | 5/16/2011 | 144 | 5/15/2011 | 146 |
| | | SHU | | | | 5/17/2011 | 143 | 10/30/2010 | 343 |
| | | SHU | | | | 5/17/2011 | 143 | 11/14/2009 | 693 |
| | | SHU | | | | 5/17/2011 | 143 | 3/24/2010 | 563 |
| | | SHU | | | | 5/18/2011 | 142 | 5/18/2011 | 143 |
| | | SHU | | | | 5/18/2011 | 142 | 4/4/2010 | 552 |
| | | SHU | | | | 5/23/2011 | 137 | 2/5/2011 | 245 |
| | | SHU | | | | 5/24/2011 | 136 | 5/24/2011 | 137 |
| | | SHU | | | | 5/24/2011 | 136 | 9/22/2010 | 381 |
| | | SHU | | | | 5/24/2011 | 136 | 8/2/2010 | 432 |
| | | SHU | | | | 5/24/2011 | 136 | 4/5/2009 | 916 |
| | | SHU | | | | 5/24/2011 | 136 | 4/13/2011 | 178 |
| | | SHU | | | | 5/25/2011 | 135 | 5/24/2011 | 137 |
| | | SHU | | | | 5/26/2011 | 134 | 12/27/2010 | 285 |
| | | SHU | | | | 5/26/2011 | 134 | 9/19/2010 | 384 |
| | | SHU | | | | 5/27/2011 | 133 | 5/28/2011 | 133 |
| | | SHU | | | | 5/27/2011 | 133 | 5/28/2011 | 133 |
| | | SHU | | | | 5/27/2011 | 133 | 3/6/2011 | 216 |
| | | SHU | | | | 5/27/2011 | 133 | 5/28/2011 | 133 |
| | | SHU | | | | 5/28/2011 | 132 | 5/15/2011 | 146 |
| | | SHU | | | | 5/30/2011 | 130 | 3/21/2011 | 201 |
| | | SHU | | | | 5/30/2011 | 130 | 12/27/2010 | 285 |
| | | SHU | | | | 6/1/2011 | 128 | 5/31/2011 | 130 |
| | | SHU | | | | 6/2/2011 | 127 | 10/4/2010 | 369 |
| | | SHU | | | | 6/2/2011 | 127 | 6/4/2011 | 126 |
| | | SHU | | | | 6/2/2011 | 127 | 4/20/2011 | 171 |
| | | SHU | | | | 6/2/2011 | 127 | 5/31/2008 | 1225 |
| | | SHU | | | | 6/2/2011 | 127 | 3/31/2007 | 1652 |
| | | SHU | | | | 6/2/2011 | 127 | 9/22/2010 | 381 |
| | | SHU | | | | 6/3/2011 | 126 | 6/4/2011 | 126 |
| | | SHU | | | | 6/3/2011 | 126 | 6/4/2011 | 126 |
| | | SHU | | | | 6/3/2011 | 126 | 10/21/2009 | 717 |
| | | SHU | | | | 6/6/2011 | 123 | 1/8/2011 | 273 |
| | | SHU | | | | 6/7/2011 | 122 | 6/6/2011 | 124 |
| | | SHU | | | | 6/7/2011 | 122 | 6/6/2011 | 124 |
| | | SHU | | | | 6/7/2011 | 122 | 6/7/2011 | 123 |
| | | SHU | | | | 6/8/2011 | 121 | 6/8/2011 | 122 |
| | | SHU | | | | 6/8/2011 | 121 | 2/26/2011 | 224 |
| | | SHU | | | | 6/8/2011 | 121 | 6/8/2011 | 122 |
| | | SHU | | | | 6/8/2011 | 121 | 6/8/2011 | 122 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its data systems and is currently working with IT to resolve those issues.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 6/9/2011 | 120 | 6/6/2011 | 124 |
| | | SHU | | | | 6/9/2011 | 120 | 6/5/2011 | 125 |
| | | SHU | | | | 6/10/2011 | 119 | 5/14/2011 | 147 |
| | | SHU | | | | 6/10/2011 | 119 | 11/14/2009 | 693 |
| | | SHU | | | | 6/10/2011 | 119 | 11/3/2010 | 339 |
| | | SHU | | | | 6/10/2011 | 119 | 6/12/2011 | 118 |
| | | SHU | | | | 6/10/2011 | 119 | 10/19/2010 | 354 |
| | | SHU | | | | 6/10/2011 | 119 | 6/12/2011 | 118 |
| | | SHU | | | | 6/10/2011 | 119 | 3/20/2011 | 202 |
| | | SHU | | | | 6/11/2011 | 118 | 12/11/2010 | 301 |
| | | SHU | | | | 6/11/2011 | 118 | 10/10/2007 | 1459 |
| | | SHU | | | | 6/13/2011 | 116 | 6/12/2011 | 118 |
| | | SHU | | | | 6/14/2011 | 115 | 11/16/2010 | 326 |
| | | SHU | | | | 6/14/2011 | 115 | 2/6/2011 | 244 |
| | | SHU | | | | 6/14/2011 | 115 | 9/27/2010 | 376 |
| | | SHU | | | | 6/15/2011 | 114 | 4/23/2011 | 168 |
| | | SHU | | | | 6/15/2011 | 114 | 5/31/2011 | 130 |
| | | SHU | | | | 6/16/2011 | 113 | 5/4/2011 | 157 |
| | | SHU | | | | 6/16/2011 | 113 | 7/5/2011 | 95 |
| | | SHU | | | | 6/16/2011 | 113 | 11/2/2010 | 340 |
| | | SHU | | | | 6/16/2011 | 113 | 3/7/2011 | 215 |
| | | SHU | | | | 6/16/2011 | 113 | 10/24/2010 | 349 |
| | | SHU | | | | 6/17/2011 | 112 | 11/18/2008 | 1054 |
| | | SHU | | | | 6/18/2011 | 111 | 7/14/2010 | 451 |
| | | SHU | | | | 6/18/2011 | 111 | 6/13/2011 | 117 |
| | | SHU | | | | 6/18/2011 | 111 | 3/28/2011 | 194 |
| | | SHU | | | | 6/19/2011 | 110 | 6/6/2011 | 124 |
| | | SHU | | | | 6/19/2011 | 110 | 6/6/2011 | 124 |
| | | SHU | | | | 6/19/2011 | 110 | 9/7/2009 | 761 |
| | | SHU | | | | 6/20/2011 | 109 | 9/13/2008 | 1120 |
| | | SHU | | | | 6/20/2011 | 109 | 5/9/2011 | 152 |
| | | SHU | | | | 6/20/2011 | 109 | 6/20/2011 | 110 |
| | | SHU | | | | 6/23/2011 | 106 | 6/22/2011 | 108 |
| | | SHU | | | | 6/23/2011 | 106 | 6/22/2011 | 108 |
| | | SHU | | | | 6/23/2011 | 106 | 6/22/2011 | 108 |
| | | SHU | | | | 6/23/2011 | 106 | 6/25/2011 | 105 |
| | | SHU | | | | 6/23/2011 | 106 | 6/22/2011 | 108 |
| | | SHU | | | | 6/24/2011 | 105 | 7/25/2011 | 75 |
| | | SHU | | | | 6/24/2011 | 105 | 6/26/2011 | 104 |
| | | SHU | | | | 6/24/2011 | 105 | 7/19/2011 | 81 |
| | | SHU | | | | 6/24/2011 | 105 | 8/24/2011 | 45 |
| | | SHU | | | | 6/27/2011 | 102 | 6/27/2011 | 103 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its data systems and is currently working with IT to resolve those issues.

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| COR | CCCMS | SHU | | | | 6/27/2011 | 102 | 6/27/2011 | 103 |
| | | SHU | | | | 6/27/2011 | 102 | 7/1/2011 | 99 |
| | | SHU | | | | 6/27/2011 | 102 | 6/27/2011 | 103 |
| | | SHU | | | | 6/29/2011 | 100 | 6/29/2011 | 101 |
| | | SHU | | | | 6/30/2011 | 99 | 7/1/2011 | 99 |
| | | SHU | | | | 6/30/2011 | 99 | 1/30/2010 | 616 |
| | | SHU | | | | 6/30/2011 | 99 | 6/30/2011 | 100 |
| | | SHU | | | | 7/1/2011 | 98 | 1/30/2011 | 251 |
| | | SHU | | | | 7/1/2011 | 98 | 7/1/2011 | 99 |
| | | SHU | | | | 7/1/2011 | 98 | 7/2/2011 | 98 |
| | | SHU | | | | 7/1/2011 | 98 | 7/1/2011 | 99 |
| | | SHU | | | | 7/5/2011 | 94 | 5/23/2011 | 138 |
| | | SHU | | | | 7/5/2011 | 94 | 7/5/2011 | 95 |
| | | SHU | | | | 7/5/2011 | 94 | 7/6/2011 | 94 |
| | | SHU | | | | 7/5/2011 | 94 | 7/5/2011 | 95 |
| | | SHU | | | | 7/6/2011 | 93 | 7/6/2011 | 94 |
| | | SHU | | | | 7/7/2011 | 92 | 7/7/2011 | 93 |
| | | SHU | | | | 7/7/2011 | 92 | 6/29/2011 | 101 |
| | | SHU | | | | 7/8/2011 | 91 | 7/9/2011 | 91 |
| | | SHU | | | | 7/8/2011 | 91 | 7/9/2011 | 91 |
| | | SHU | | | | 7/8/2011 | 91 | 7/9/2011 | 91 |
| CTF | CCCMS | Ad-Seg | | | | 3/16/2011 | 205 | 5/31/2010 | 495 |
| | | Ad-Seg | | | | 3/23/2011 | 198 | 9/20/2011 | 18 |
| | | Ad-Seg | | | | 3/31/2011 | 190 | 3/28/2011 | 194 |
| | | Ad-Seg | | | | 5/4/2011 | 156 | 10/17/2010 | 356 |
| | | Ad-Seg | | | | 5/29/2011 | 131 | 10/4/2011 | 4 |
| | | Ad-Seg | | | | 6/8/2011 | 121 | 5/9/2010 | 517 |
| | | Ad-Seg | | | | 6/14/2011 | 115 | 6/11/2011 | 119 |
| | | Ad-Seg | | | | 6/15/2011 | 114 | 6/15/2011 | 115 |
| | | Ad-Seg | | | | 6/16/2011 | 113 | 4/23/2011 | 168 |
| | | Ad-Seg | | | | 6/16/2011 | 113 | 4/26/2011 | 165 |
| | | Ad-Seg | | | | 6/17/2011 | 112 | 6/13/2011 | 117 |
| | | Ad-Seg | | | | 6/21/2011 | 108 | 6/20/2011 | 110 |
| | | Ad-Seg | | | | 6/24/2011 | 105 | 6/25/2011 | 103 |
| | | Ad-Seg | | | | 7/5/2011 | 94 | 7/5/2011 | 95 |
| | EOP | Ad-Seg | | | | 6/18/2011 | 111 | 6/19/2011 | 111 |
| | | Ad-Seg | | | | 7/3/2011 | 96 | 8/9/2011 | 60 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

CIW data is currently unavailable. CIW is experiencing problems with its data systems and is currently working with IT to resolve those issues.

Health Care Placement Oversight Program
*10/7/2011*

R10-16

# Exhibit 7

STATE OF CALIFORNIA -- DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**

P.O. Box 942883
Sacramento, CA94283-0001



APR 2 9 2011

Matthew A. Lopes, Jr. Esquire                    via: Debbie J. Vorous, Esquire
Office of the Special Master                           Gregory Gomez, Esq.
Pannone Lopes & Devereaux LLC                          Deputy Attorney General
317 Iron Horse Point Way, Suite 301                    Department of Justice
Providence, RI 02908                                   1300 "I" Street, Suite 125
                                                       P. O. Box 944255
                                                       Sacramento, CA 94244-2550

**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of March, 2011, data (or as otherwise noted). The following is the list of enclosures:

1. Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2. MHSDS Hiring Activity Report.
3. Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4. Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5. California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6. Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7. Referrals for Transfer to the Department of Mental Health (including admissions).
8. Atascadero State Hospital (ASH) Discharges.
9. Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The DMH Monthly Report of CDCR Patients in DMH Hospitals--Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN). **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients. (Please note: Data for California State Prison, San Quentin (SQ) not available, due to MHTS.net conversion).

Matthew A. Lopes, Jr. Esquire
Page 2

14. Medical Technical Assistant (MTA) Vacancy Report.
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.
16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at SQ, California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues. **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 324-2933.

Sincerely,

JAMES A. SCARAMOZZINO, PH.D.
Director (A)
Statewide Mental Health Program
Division of Correctional Health Care Services

Enclosures

cc: Sharon Aungst, Chief Deputy Secretary, Correctional Health Care Services
    Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
    Linda Holden, Esq., *Coleman* Deputy Special Master
    Jeffrey L. Metzner, M.D., *Coleman* Expert
    Kerry C. Hughes, M.D., *Coleman* Expert
    Raymond F. Patterson, M.D, *Coleman* Expert
    Paul Nicoll, MPA, *Coleman* Monitor
    Ted Ruggles, Ph.D., *Coleman* Expert
    Mary Perrien, Ph.D., *Coleman* Expert
    Mary-Joy Spencer, Esq., *Coleman* Monitor
    Yong Joo Erwin, LCSW, *Coleman* Expert
    Kathryn A. Burns, M.D., MPH, *Coleman* Expert
    Henry A. Dlugacz, Esq., *Coleman* Expert
    Kerry F. Walsh, Esq., *Coleman* Monitor
    Patricia Williams, Esq., *Coleman* Monitor
    Haunani Henry, *Coleman* Monitor
    J. Ronald Metz, *Coleman* Monitor
    William Alvarez, Ph.D., *Coleman* Monitor

Matthew A. Lopes, Jr. Esquire
Page 3


Debbie Vorous, Esq., Office of the Attorney General
Gregory Gomez, Esq., Office of the Attorney General
Heather McCray Esq., Office of Legal Affairs
Michael Stone, Esq., Office of Legal Affairs
Michael Bien, Esq., Rosen, Bien and Galvan
Donald Specter, Esq., Prison Law Office
Judy Burleson, Deputy Director, Statewide Mental Health Program, DCHCS
Karen Higgins, M.D., Chief of Behavioral Medicine, Mental Health Program, DCHCS
Teresa Owens, Staff Services Analyst, Operational Program Oversight, DCHCS

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | Ad-Seg | | | | 5/14/2010 | 301 | 8/16/2010 | 208 |
| | | Ad-Seg | | | | 6/7/2010 | 277 | 6/6/2010 | 279 |
| | | Ad-Seg | | | | 7/14/2010 | 240 | 1/11/2011 | 60 |
| | | Ad-Seg | | | | 8/5/2010 | 218 | 8/7/2010 | 217 |
| | | Ad-Seg | | | | 8/16/2010 | 207 | 8/16/2010 | 208 |
| | | Ad-Seg | | | | 8/22/2010 | 201 | 8/22/2010 | 202 |
| | | Ad-Seg | | | | 9/13/2010 | 179 | 9/12/2010 | 181 |
| | | Ad-Seg | | | | 9/16/2010 | 176 | 4/7/2010 | 339 |
| | | Ad-Seg | | | | 10/12/2010 | 150 | 10/12/2010 | 151 |
| | | Ad-Seg | | | | 10/17/2010 | 145 | 10/17/2010 | 146 |
| | | Ad-Seg | | | | 10/29/2010 | 133 | 10/19/2010 | 144 |
| | | Ad-Seg | | | | 11/1/2010 | 130 | 10/31/2010 | 132 |
| | | Ad-Seg | | | | 11/2/2010 | 129 | 11/8/2010 | 124 |
| | | Ad-Seg | | | | 11/3/2010 | 128 | 11/3/2010 | 129 |
| | | Ad-Seg | | | | 11/3/2010 | 128 | 11/3/2010 | 129 |
| | | Ad-Seg | | | | 11/8/2010 | 123 | 3/10/2010 | 367 |
| | | Ad-Seg | | | | 11/10/2010 | 121 | 10/24/2010 | 139 |
| | | Ad-Seg | | | | 11/10/2010 | 121 | 4/13/2010 | 333 |
| | | Ad-Seg | | | | 11/10/2010 | 121 | 8/24/2010 | 200 |
| | | Ad-Seg | | | | 11/14/2010 | 117 | 11/13/2010 | 119 |
| | | Ad-Seg | | | | 11/22/2010 | 109 | 11/21/2010 | 111 |
| | | Ad-Seg | | | | 11/29/2010 | 102 | 9/7/2009 | 551 |
| | | Ad-Seg | | | | 11/30/2010 | 101 | 11/29/2010 | 103 |
| | | Ad-Seg | | | | 11/30/2010 | 101 | 11/29/2010 | 103 |
| | | Ad-Seg | | | | 12/1/2010 | 100 | 12/13/2010 | 89 |
| | | Ad-Seg | | | | 12/1/2010 | 100 | 11/30/2010 | 102 |
| | | SHU | | | | 3/6/2008 | 1100 | 3/8/2008 | 1099 |
| | | SHU | | | | 7/23/2008 | 961 | 7/23/2008 | 962 |
| | | SHU | | | | 8/20/2008 | 933 | 9/7/2009 | 551 |
| | | SHU | | | | 9/8/2008 | 914 | 9/7/2008 | 916 |
| | | SHU | | | | 9/11/2008 | 911 | 6/27/2009 | 623 |
| | | SHU | | | | 3/5/2009 | 736 | 3/8/2009 | 734 |
| | | SHU | | | | 6/25/2009 | 624 | 9/7/2009 | 551 |
| | | SHU | | | | 6/25/2009 | 624 | 9/7/2009 | 551 |
| | | SHU | | | | 7/16/2009 | 603 | 7/18/2009 | 602 |
| | | SHU | | | | 7/21/2009 | 598 | 10/28/2009 | 500 |
| | | SHU | | | | 7/23/2009 | 596 | 7/25/2009 | 595 |
| | | SHU | | | | 8/13/2009 | 575 | 9/7/2009 | 551 |
| | | SHU | | | | 8/25/2009 | 563 | 9/7/2009 | 551 |
| | | SHU | | | | 9/1/2009 | 556 | 9/7/2009 | 551 |
| | | SHU | | | | 9/4/2009 | 553 | 9/29/2009 | 529 |
| | | SHU | | | | 9/28/2009 | 529 | 9/28/2009 | 530 |
| | | SHU | | | | 10/14/2009 | 513 | 10/17/2009 | 511 |
| | | SHU | | | | 10/27/2009 | 500 | 11/22/2009 | 475 |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/11/2011

R10-2

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 1/11/2010 | 424 | 1/24/2010 | 412 |
| | | SHU | | | | 1/18/2010 | 417 | 2/7/2010 | 398 |
| | | SHU | | | | 1/20/2010 | 415 | 1/24/2010 | 412 |
| | | SHU | | | | 2/11/2010 | 393 | 2/10/2010 | 395 |
| | | SHU | | | | 3/27/2010 | 349 | 3/28/2010 | 349 |
| | | SHU | | | | 4/2/2010 | 343 | 4/4/2010 | 342 |
| | | SHU | | | | 4/8/2010 | 337 | 4/7/2010 | 339 |
| | | SHU | | | | 4/9/2010 | 336 | 4/11/2010 | 335 |
| | | SHU | | | | 4/23/2010 | 322 | 4/24/2010 | 322 |
| | | SHU | | | | 4/27/2010 | 318 | 4/27/2010 | 319 |
| | | SHU | | | | 5/6/2010 | 309 | 5/9/2010 | 307 |
| | | SHU | | | | 5/13/2010 | 302 | 5/12/2010 | 304 |
| | | SHU | | | | 5/24/2010 | 291 | 8/30/2010 | 194 |
| | | SHU | | | | 5/25/2010 | 290 | 6/14/2010 | 271 |
| | | SHU | | | | 5/25/2010 | 290 | 8/4/2010 | 220 |
| | | SHU | | | | 5/26/2010 | 289 | 5/26/2010 | 290 |
| | | SHU | | | | 5/27/2010 | 288 | 5/26/2010 | 290 |
| | | SHU | | | | 6/11/2010 | 273 | 8/2/2010 | 222 |
| | | SHU | | | | 6/18/2010 | 266 | 1/24/2010 | 412 |
| | | SHU | | | | 6/19/2010 | 265 | 6/20/2010 | 265 |
| | | SHU | | | | 6/21/2010 | 263 | 6/20/2010 | 265 |
| | | SHU | | | | 6/22/2010 | 262 | 6/22/2010 | 263 |
| | | SHU | | | | 7/1/2010 | 253 | 6/30/2010 | 255 |
| | | SHU | | | | 7/15/2010 | 239 | 7/14/2010 | 241 |
| | | SHU | | | | 7/18/2010 | 236 | 7/18/2010 | 237 |
| | | SHU | | | | 7/20/2010 | 234 | 3/17/2010 | 360 |
| | | SHU | | | | 7/28/2010 | 226 | 7/28/2010 | 227 |
| | | SHU | | | | 8/4/2010 | 219 | 8/9/2010 | 215 |
| | | SHU | | | | 8/25/2010 | 198 | 3/1/2010 | 376 |
| | | SHU | | | | 8/26/2010 | 197 | 8/25/2010 | 199 |
| | | SHU | | | | 8/26/2010 | 197 | 12/27/2010 | 75 |
| | | SHU | | | | 8/30/2010 | 193 | 10/13/2010 | 150 |
| | | SHU | | | | 8/31/2010 | 192 | 2/10/2010 | 395 |
| | | SHU | | | | 9/7/2010 | 185 | 7/13/2010 | 242 |
| | | SHU | | | | 9/14/2010 | 178 | 9/29/2010 | 164 |
| | | SHU | | | | 9/15/2010 | 177 | 9/14/2010 | 179 |
| | | SHU | | | | 9/21/2010 | 171 | 9/20/2010 | 173 |
| | | SHU | | | | 9/27/2010 | 165 | 4/25/2010 | 321 |
| | | SHU | | | | 10/6/2010 | 156 | 10/6/2010 | 157 |
| | | SHU | | | | 10/6/2010 | 156 | 9/7/2009 | 551 |
| | | SHU | | | | 10/8/2010 | 154 | 10/10/2010 | 153 |
| | | SHU | | | | 10/16/2010 | 146 | 1/11/2011 | 60 |
| | | SHU | | | | 10/18/2010 | 144 | 6/16/2010 | 269 |
| | | SHU | | | | 10/18/2010 | 144 | 6/16/2010 | 269 |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/11/2011

R10-3

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 10/20/2010 | 142 | 10/19/2010 | 144 |
| | | SHU | | | | 10/21/2010 | 141 | 10/24/2010 | 139 |
| | | SHU | | | | 10/27/2010 | 135 | 10/26/2010 | 137 |
| | | SHU | | | | 10/27/2010 | 135 | 10/26/2010 | 137 |
| | | SHU | | | | 10/27/2010 | 135 | 10/27/2010 | 136 |
| | | SHU | | | | 10/27/2010 | 135 | 10/26/2010 | 137 |
| | | SHU | | | | 10/30/2010 | 132 | 10/31/2010 | 132 |
| | | SHU | | | | 11/2/2010 | 129 | 11/1/2010 | 131 |
| | | SHU | | | | 11/8/2010 | 123 | 11/8/2010 | 124 |
| | | SHU | | | | 11/8/2010 | 123 | 11/8/2010 | 124 |
| | | SHU | | | | 11/8/2010 | 123 | 11/8/2010 | 124 |
| | | SHU | | | | 11/9/2010 | 122 | 11/9/2010 | 123 |
| | | SHU | | | | 11/16/2010 | 115 | 3/31/2010 | 346 |
| | | SHU | | | | 11/16/2010 | 115 | 2/9/2011 | 31 |
| | | SHU | | | | 11/18/2010 | 113 | 9/22/2010 | 171 |
| | | SHU | | | | 11/19/2010 | 112 | 11/20/2010 | 112 |
| | | SHU | | | | 11/22/2010 | 109 | 11/17/2010 | 115 |
| | | SHU | | | | 11/22/2010 | 109 | 6/20/2010 | 265 |
| | | SHU | | | | 11/23/2010 | 108 | 11/22/2010 | 110 |
| | | SHU | | | | 11/24/2010 | 107 | 11/23/2010 | 109 |
| | | SHU | | | | 11/28/2010 | 103 | 11/28/2010 | 104 |
| | | SHU | | | | 12/2/2010 | 99 | 1/2/2011 | 69 |
| | | SHU | | | | 12/3/2010 | 98 | 12/1/2010 | 101 |
| | | SHU | | | | 12/8/2010 | 93 | 12/8/2010 | 94 |
| | | SHU | | | | 12/8/2010 | 93 | 12/8/2010 | 94 |
| | | SHU | | | | 12/8/2010 | 93 | 12/7/2010 | 95 |
| | | SHU | | | | 12/9/2010 | 92 | 12/8/2010 | 94 |
| | | SHU | | | | 12/9/2010 | 92 | 12/11/2010 | 91 |
| | EOP | SHU | | | | 5/12/2010 | 303 | 2/9/2011 | 31 |
| | | SHU | | | | 10/29/2010 | 133 | 2/23/2011 | 17 |
| CCWF | CCCMS | Ad-Seg | | | | 4/1/2010 | 344 | 3/31/2010 | 346 |
| | | Ad-Seg | | | | 5/3/2010 | 312 | 5/5/2010 | 311 |
| | | Ad-Seg | | | | 5/26/2010 | 289 | 5/25/2010 | 291 |
| | | Ad-Seg | | | | 10/27/2010 | 135 | 11/2/2010 | 130 |
| | | Ad-Seg | | | | 11/23/2010 | 108 | 11/22/2010 | 110 |

Mental Health and HIV numbers are as accurate as the information provided by the respective DDPS identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/11/2011

R10-4

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN, JR., GOVERNOR

**DIVISION OF HEALTH CARE SERVICES**
**STATEWIDE MENTAL HEALTH PROGRAM**
P.O. Box 942883
Sacramento, CA94283-0001



May 1, 2013

Matthew A. Lopes, Jr. Esquire                via: Debbie J. Vorous, Esquire
Office of the Special Master                      Deputy Attorney General
Pannone Lopes & Devereaux LLC                     Department of Justice
317 Iron Horse Point Way, Suite 301               1300 "I" Street, Suite 125
Providence, RI  02908                             P. O. Box 944255
                                                  Sacramento, CA  94244-2550

**RE: COLEMAN MONTHLY REPORT OF INFORMATION REQUESTED AND RESPONSE TO JANUARY 19, 1999, COURT ORDER REGARDING STAFF VACANCIES**

Dear Mr. Lopes:

Enclosed is the Coleman Monthly Report reflective of March, 2013, data (or as otherwise noted).  The following is the list of enclosures:

1.  Mental Health Services Delivery System (MHSDS) Staffing Allocation and Vacancy History.
2.  MHSDS Hiring Activity Report.
3.  Health Care Placement Oversight Program (HCPOP) Information Report, Summary and Administrative Segregation Greater than 60 Days.
4.  Mental Health Contract Services including Summary and Telemedicine Monthly Report for all disciplines.
5.  California Department of Corrections and Rehabilitation (CDCR) Reception Center (RC) Monthly Report.
6.  Monthly Summary of Mental Health Crisis Bed use by Institution Titles Inpatient Psychiatric Aging Report.
7.  Referrals for Transfer to the Department of State Hospitals (DSH), (including admissions).
8.  Atascadero State Hospital (ASH) Discharges.
9.  Weekly Enhanced Outpatient Program (EOP)/Outpatient Psychiatric Program.
10. The Department of State Hospitals (DSH) Monthly Report of CDCR Patients in DSH Hospitals -- Summary and Penal Code 2684.
11. Suicide Report.
12. Statistics on Contracted Registered Nurse (RN).  **(No Longer Available)**
13. RC Processing for MHSDS Inmate Patients.
14. Medical Technical Assistant (MTA) Vacancy Report.  **(No Longer Available)**
15. Allocated Case Manager Positions and Vacancies for the EOP Administrative Segregated Hub institutions.

Matthew A. Lopes, Jr. Esquire
Page 2

16. EOP Inmates Waiting Transfer to a Psychiatric Services Unit (PSU).
17. Audit reports on Psychiatric Technician Rounds in Administrative Segregation at California State Prison, San Quentin (SQ), California State Prison-Corcoran (COR), and Salinas Valley State Prison (SVSP).
18. Mental Health Crisis Beds Wait List.
19. Correctional Treatment Centers and CDCR General Acute Care Hospital Care Placement Issues.  **(No longer available)**
20. Transferred and Rescinded Mental Health Crisis Bed Referrals by Institution and Level of Care.

If you have any questions, please contact me at (916) 691-0296.

Sincerely,

TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Services and
    Deputy Director (A), Statewide Mental Health Program
California Department of Corrections and Rehabilitation

Enclosures

cc: Mohamedu F., Jones, Esq., *Coleman* Deputy Special Master
    Linda Holden, Esq., *Coleman* Deputy Special Master
    Jeffrey L. Metzner, M.D., *Coleman* Expert
    Kerry C. Hughes, M.D., *Coleman* Expert
    Raymond F. Patterson, M.D, *Coleman* Expert
    Paul Nicoll, MPA, *Coleman* Monitor
    Mary Perrien, Ph.D., *Coleman* Expert
    Kathryn A. Burns, M.D., MPH, *Coleman* Expert
    Henry A. Dlugacz, Esq., *Coleman* Expert
    Kerry F. Walsh, Esq., *Coleman* Monitor
    Patricia Williams, Esq., *Coleman* Monitor
    Haunani Henry, *Coleman* Monitor
    Debbie Vorous, Esq., Office of the Attorney General
    Heather McCray Esq., Office of Legal Affairs, CDCR
    Michael Stone, Esq., Office of Legal Affairs, CDCR
    Michael Bien, Esq., Rosen, Bien and Galvan
    Donald Specter, Esq., Prison Law Office

Matthew A. Lopes, Jr. Esquire
Page 3


Judy Burleson, Associate Director, Statewide Mental Health Program, Division of
Health Care Services (DHCS)
Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health
Program, DCHCS
Teresa Owens, Associate Governmental Program Analyst, Quality Management,
DHCS

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | Ad-Seg | | | | 2/29/2012 | 387 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 4/26/2012 | 330 | 4/19/2012 | 338 |
| | | Ad-Seg | | | | 6/1/2012 | 294 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 7/5/2012 | 260 | 5/13/2012 | 314 |
| | | Ad-Seg | | | | 7/17/2012 | 248 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/19/2012 | 246 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 7/25/2012 | 240 | 7/25/2012 | 241 |
| | | Ad-Seg | | | | 7/25/2012 | 240 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 8/20/2012 | 214 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 9/5/2012 | 198 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/14/2012 | 189 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 9/21/2012 | 182 | 4/15/2012 | 342 |
| | | Ad-Seg | | | | 10/2/2012 | 171 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 10/17/2012 | 156 | 9/6/2012 | 198 |
| | | Ad-Seg | | | | 10/18/2012 | 155 | 10/18/2012 | 156 |
| | | Ad-Seg | | | | 10/25/2012 | 148 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 11/1/2012 | 141 | 11/14/2011 | 495 |
| | | Ad-Seg | | | | 11/6/2012 | 136 | 12/30/2011 | 449 |
| | | Ad-Seg | | | | 11/7/2012 | 135 | 11/7/2012 | 136 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 11/14/2012 | 129 |
| | | Ad-Seg | | | | 11/14/2012 | 128 | 2/5/2013 | 46 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 11/21/2012 | 121 | 9/12/2012 | 192 |
| | | Ad-Seg | | | | 11/28/2012 | 114 | 5/1/2012 | 326 |
| | | Ad-Seg | | | | 11/29/2012 | 113 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/5/2012 | 107 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/10/2012 | 102 | 12/10/2012 | 103 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 10/24/2012 | 150 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 7/18/2012 | 248 |
| | | Ad-Seg | | | | 12/11/2012 | 101 | 7/30/2012 | 236 |
| | | Ad-Seg | | | | 12/12/2012 | 100 | 3/19/2013 | 4 |
| | | Ad-Seg | | | | 12/15/2012 | 97 | 12/16/2012 | 97 |
| | | Ad-Seg | | | | 12/21/2012 | 91 | 6/4/2012 | 292 |
| | | Ad-Seg | | | | 12/22/2012 | 90 | 12/23/2012 | 90 |
| | | Ad-Seg | | | | 12/22/2012 | 90 | 12/23/2012 | 90 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years.  Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-2

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 12/6/2012 | 107 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 11/14/2011 | 495 |
| | | SHU | | | | 10/15/2011 | 524 | 7/18/2012 | 248 |
| | | SHU | | | | 10/20/2011 | 519 | 7/18/2012 | 248 |
| | | SHU | | | | 10/26/2011 | 513 | 11/14/2011 | 495 |
| | | SHU | | | | 11/10/2011 | 498 | 11/14/2011 | 495 |
| | | SHU | | | | 12/5/2011 | 473 | 11/14/2011 | 495 |
| | | SHU | | | | 12/27/2011 | 451 | 12/28/2011 | 451 |
| | | SHU | | | | 12/29/2011 | 449 | 7/18/2012 | 248 |
| | | SHU | | | | 1/5/2012 | 442 | 1/6/2012 | 442 |
| | | SHU | | | | 1/12/2012 | 435 | 7/18/2012 | 248 |
| | | SHU | | | | 2/10/2012 | 406 | 4/11/2012 | 346 |
| | | SHU | | | | 2/15/2012 | 401 | 3/4/2012 | 384 |
| | | SHU | | | | 2/24/2012 | 392 | 2/26/2012 | 391 |
| | | SHU | | | | 2/29/2012 | 387 | 7/18/2012 | 248 |
| | | SHU | | | | 2/29/2012 | 387 | 2/20/2012 | 397 |
| | | SHU | | | | 3/5/2012 | 382 | 10/9/2012 | 165 |
| | | SHU | | | | 3/7/2012 | 380 | 3/7/2012 | 381 |
| | | SHU | | | | 3/15/2012 | 372 | 5/15/2012 | 312 |
| | | SHU | | | | 3/30/2012 | 357 | 4/9/2012 | 348 |
| | | SHU | | | | 4/2/2012 | 354 | 7/18/2012 | 248 |
| | | SHU | | | | 4/18/2012 | 338 | 3/21/2012 | 367 |
| | | SHU | | | | 4/24/2012 | 332 | 4/26/2012 | 331 |
| | | SHU | | | | 5/3/2012 | 323 | 5/3/2012 | 324 |
| | | SHU | | | | 5/4/2012 | 322 | 5/2/2012 | 325 |
| | | SHU | | | | 5/16/2012 | 310 | 7/18/2012 | 248 |
| | | SHU | | | | 5/24/2012 | 302 | 5/17/2012 | 310 |
| | | SHU | | | | 5/24/2012 | 302 | 5/24/2012 | 303 |
| | | SHU | | | | 6/4/2012 | 291 | 7/18/2012 | 248 |
| | | SHU | | | | 6/4/2012 | 291 | 6/5/2012 | 291 |
| | | SHU | | | | 6/4/2012 | 291 | 11/14/2011 | 495 |
| | | SHU | | | | 6/21/2012 | 274 | 11/14/2011 | 495 |
| | | SHU | | | | 6/24/2012 | 271 | 7/18/2012 | 248 |
| | | SHU | | | | 6/29/2012 | 266 | 7/18/2012 | 248 |
| | | SHU | | | | 7/3/2012 | 262 | 7/4/2012 | 262 |
| | | SHU | | | | 7/6/2012 | 259 | 7/8/2012 | 258 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-3

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 7/6/2012 | 259 | 6/28/2012 | 268 |
| | | SHU | | | | 7/6/2012 | 259 | 6/27/2012 | 269 |
| | | SHU | | | | 7/9/2012 | 256 | 7/18/2012 | 248 |
| | | SHU | | | | 7/9/2012 | 256 | 7/18/2012 | 248 |
| | | SHU | | | | 7/12/2012 | 253 | 7/18/2012 | 248 |
| | | SHU | | | | 7/13/2012 | 252 | 7/18/2012 | 248 |
| | | SHU | | | | 7/17/2012 | 248 | 11/14/2011 | 495 |
| | | SHU | | | | 7/18/2012 | 247 | 7/18/2012 | 248 |
| | | SHU | | | | 7/19/2012 | 246 | 7/22/2012 | 244 |
| | | SHU | | | | 7/23/2012 | 242 | 8/28/2012 | 207 |
| | | SHU | | | | 7/24/2012 | 241 | 7/24/2012 | 242 |
| | | SHU | | | | 7/31/2012 | 234 | 7/18/2012 | 248 |
| | | SHU | | | | 8/7/2012 | 227 | 8/7/2012 | 228 |
| | | SHU | | | | 8/14/2012 | 220 | 8/15/2012 | 220 |
| | | SHU | | | | 8/16/2012 | 218 | 8/19/2012 | 216 |
| | | SHU | | | | 8/17/2012 | 217 | 8/20/2012 | 215 |
| | | SHU | | | | 8/21/2012 | 213 | 8/21/2012 | 214 |
| | | SHU | | | | 8/24/2012 | 210 | 8/26/2012 | 209 |
| | | SHU | | | | 8/29/2012 | 205 | 8/29/2012 | 206 |
| | | SHU | | | | 9/7/2012 | 196 | 9/9/2012 | 195 |
| | | SHU | | | | 9/12/2012 | 191 | 9/12/2012 | 192 |
| | | SHU | | | | 9/13/2012 | 190 | 10/4/2012 | 170 |
| | | SHU | | | | 9/20/2012 | 183 | 9/20/2012 | 184 |
| | | SHU | | | | 9/24/2012 | 179 | 9/24/2012 | 180 |
| | | SHU | | | | 9/27/2012 | 176 | 9/27/2012 | 177 |
| | | SHU | | | | 9/28/2012 | 175 | 9/26/2012 | 178 |
| | ✳ | SHU | | | | 10/1/2012 | 172 | 10/1/2012 | 173 | ✳ |
| | | SHU | | | | 10/1/2012 | 172 | 10/1/2012 | 173 |
| | | SHU | | | | 10/2/2012 | 171 | 9/27/2012 | 177 |
| | | SHU | | | | 10/5/2012 | 168 | 10/7/2012 | 167 |
| | | SHU | | | | 10/9/2012 | 164 | 8/26/2012 | 209 |
| | | SHU | | | | 10/9/2012 | 164 | 9/9/2012 | 195 |
| | | SHU | | | | 10/15/2012 | 158 | 10/15/2012 | 159 |
| | | SHU | | | | 10/16/2012 | 157 | 10/17/2012 | 157 |
| | | SHU | | | | 10/17/2012 | 156 | 10/18/2012 | 156 |
| | | SHU | | | | 10/18/2012 | 155 | 9/19/2012 | 185 |
| | | SHU | | | | 10/19/2012 | 154 | 10/21/2012 | 153 |
| | | SHU | | | | 10/22/2012 | 151 | 10/23/2012 | 151 |
| | | SHU | | | | 10/23/2012 | 150 | 9/25/2012 | 179 |
| | | SHU | | | | 10/23/2012 | 150 | 10/21/2012 | 153 |
| | | SHU | | | | 10/25/2012 | 148 | 3/7/2013 | 16 |
| | | SHU | | | | 10/25/2012 | 148 | 10/28/2012 | 146 |

Mental Health and HIV numbers are as accurate as the information provided
by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent
condemned inmates.

Because the tracking of the Mental Health Recommendation Date began
on 2/10/98, each Mental Health Level of Care assigned prior to this date
is not reflected.

Validity of this report has not been established in over ten years. Aging
clock resets when an inmate-patient is moved from one cell to another
within the same treatment/custody setting.

Health Care Placement Oversight Program
*3/22/2013*

*R10-4*

| Region Institution | Placement | Setting | CDC # | Last Name | Bed # | Bed Occupancy | # Days in Bed | MH Rec. Date | # Days of MH Rec. |
|---|---|---|---|---|---|---|---|---|---|
| CCI | CCCMS | SHU | | | | 10/25/2012 | 148 | 10/23/2012 | 151 |
| | | SHU | | | | 10/26/2012 | 147 | 9/10/2012 | 194 |
| | | SHU | | | | 10/26/2012 | 147 | 10/28/2012 | 146 |
| | | SHU | | | | 10/29/2012 | 144 | 10/29/2012 | 145 |
| | | SHU | | | | 10/31/2012 | 142 | 10/21/2012 | 153 |
| | | SHU | | | | 10/31/2012 | 142 | 10/31/2012 | 143 |
| | | SHU | | | | 10/31/2012 | 142 | 7/25/2012 | 241 |
| | | SHU | | | | 11/1/2012 | 141 | 11/1/2012 | 142 |
| | | SHU | | | | 11/1/2012 | 141 | 11/1/2012 | 142 |
| | | SHU | | | | 11/1/2012 | 141 | 11/4/2012 | 139 |
| | | SHU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | SHU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | SHU | | | | 11/8/2012 | 134 | 11/8/2012 | 135 |
| | | SHU | | | | 11/9/2012 | 133 | 11/12/2012 | 131 |
| | | SHU | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | SHU | | | | 11/13/2012 | 129 | 11/13/2012 | 130 |
| | | SHU | | | | 11/20/2012 | 122 | 11/25/2012 | 118 |
| | | SHU | | | | 11/21/2012 | 121 | 11/25/2012 | 118 |
| | | SHU | | | | 11/21/2012 | 121 | 11/26/2012 | 117 |
| | | SHU | | | | 11/26/2012 | 116 | 11/26/2012 | 117 |
| | | SHU | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | SHU | | | | 11/27/2012 | 115 | 11/27/2012 | 116 |
| | | SHU | | | | 11/29/2012 | 113 | 9/9/2012 | 195 |
| | | SHU | | | | 11/29/2012 | 113 | 8/1/2012 | 234 |
| | | SHU | | | | 11/29/2012 | 113 | 9/20/2012 | 184 |
| | | SHU | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | SHU | | | | 11/30/2012 | 112 | 12/2/2012 | 111 |
| | | SHU | | | | 12/3/2012 | 109 | 12/5/2012 | 108 |
| | | SHU | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | SHU | | | | 12/4/2012 | 108 | 12/4/2012 | 109 |
| | | SHU | | | | 12/7/2012 | 105 | 12/9/2012 | 104 |
| | | SHU | | | | 12/10/2012 | 102 | 12/11/2012 | 102 |
| | | SHU | | | | 12/11/2012 | 101 | 9/20/2012 | 184 |
| | | SHU | | | | 12/18/2012 | 94 | 11/25/2012 | 118 |
| | | SHU | | | | 12/18/2012 | 94 | 11/25/2012 | 118 |
| | | SHU | | | | 12/20/2012 | 92 | 12/20/2012 | 93 |
| | | SHU | | | | 12/20/2012 | 92 | 12/16/2012 | 97 |
| | EOP | Ad-Seg | | | | 10/18/2012 | 155 | 2/11/2013 | 40 |

Mental Health and HIV numbers are as accurate as the information provided by the respective identifier systems.
Excessive length of stay reflected for SQ and CCWF may represent condemned inmates.

Because the tracking of the Mental Health Recommendation Date began on 2/10/98, each Mental Health Level of Care assigned prior to this date is not reflected.

Validity of this report has not been established in over ten years. Aging clock resets when an inmate-patient is moved from one cell to another within the same treatment/custody setting.

Health Care Placement Oversight Program
3/22/2013

R10-5

# Exhibit 8

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Administrative Segregation | Mental Health Services Delivery System |

- Interact with these inmate-patients daily on scheduled work days (instead of weekly)

- Include in the treatment plan efforts to reduce resistance to participation in group therapy

- Discuss these inmate-patients during the ASU morning meeting with custody

- Consider referral of inmate-patients to higher levels of care and document the results of this consideration.

## I.  INPATIENT PLACEMENT

Inmates who are found to meet the clinical criteria for referral to the MHCB for inpatient care shall immediately be transferred for such treatment, upon authorization by the Chief of Mental Health of the sending institution.  (Refer to Section 5, Mental Health Crisis Bed, for transfer procedure)

If an ASU inmate-patient in an MHCB is determined to meet the clinical criteria for referral to the Department of Mental Health (DMH) program, the Chief of Mental Health or designee, of the sending institution shall initiate the referral process following established procedures to facilitate the admission to a DMH program.

## J.  STAND-ALONE ADMINISTRATIVE SEGREGATION UNITS

1. No participant in the MHSDS shall be housed in a stand-alone ASU.  Any inmate-patient included in the MHSDS, who is inadvertently placed in a stand-alone ASU, shall be transferred out within 24 hours.

2. LPTs shall make rounds seven days a week.

3. A mental health clinician shall conduct an assessment of any inmate in a stand-alone ASU identified and referred by the LPT or any staff immediately or within 24 hours, depending on urgency of the referral.  Any inmate who meets criteria for MHSDS shall be transferred to another ASU as soon as possible but no longer than 24 hours following identification.

## K. PLACEMENT   REVIEW   AND   CLINICAL   INPUT   IN   CLASSIFICATION COMMITTEE

1. The initial IDTT is held prior to the initial ICC and as often as needed thereafter, at a minimum, once every 90 days.  The PC and the Correctional Counselor assigned to the case shall present relevant clinical and custody case factors with recommendations

# CHAPTER 8
# Security Housing Unit

## A. INTRODUCTION

It is the policy of the Department of Corrections and Rehabilitation (CDCR) to provide inmates in a prison setting with prompt access to mental health services, regardless of their housing designation. Provision of mental health services within a Security Housing Unit (SHU) is part of the Mental Health Services Delivery System (MHSDS). Mental health services within a SHU are provided to all SHU inmate-patients in accordance with the inmate-patient's treatment needs and level of care. Services are designed to achieve symptom management through regular case management activities, medication administration and monitoring, crisis intervention, continuous monitoring for signs or symptoms of a serious mental disorder, and referral to a more intensive as needed.

The CDCR currently has four SHUs located at the institutions listed below. Inmates in the MHSDS receive services as indicated.

- Valley State Prison for Women (females only) – Inmates in this unit receive mental health services in conjunction with inmates in the Administrative Segregation Unit (ASU).

- California Correctional Institution – Inmates are provided Correctional Clinical Case Management Services (CCCMS). Inmates requiring the Enhanced Outpatient Program (EOP) are referred to a Psychiatric Services Unit (PSU) and transferred to an ASU EOP hub while awaiting PSU placement.

- California State Prison, Corcoran – Inmates are provided CCCMS in the SHU. Inmates requiring EOP services are referred to a PSU and transferred to the ASU EOP hub while awaiting PSU placement.

- California State Prison, Sacramento – Inmates are provided CCCMS in the SHU. Inmates requiring EOP services are referred to a PSU.

- Pelican Bay State Prison (PBSP) – Per exclusionary criteria from the federal court, inmates with one of the conditions listed below shall not be admitted to the PBSP SHU.

| Security Housing Unit | Mental Health Services Delivery System |
|---|---|

1. Documented diagnosis or evidence of any of the following Diagnostic and Statistical Manual IV – Axis 1 conditions currently in existence or within the preceding three months:

   **Schizophrenia (all sub-types);**
   **Delusional Disorder;**
   **Schizophreniform Disorder;**
   **Schizoaffective Disorder;**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal);**
   **Psychotic Disorder Not Otherwise Specified;**
   **Major Depressive Disorders;**
   **Bipolar Disorder I and II**

2. A diagnosed mental disorder that includes being actively suicidal.

3. A diagnosis of a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality that leads to significant functional impairment.

4. A diagnosis of "organic brain syndrome" that results in a significant functional impairment if not treated.

5. A diagnosis of a severe personality disorder that is manifested by frequent episodes of psychosis or depression and results in significant functional impairment.

6. A diagnosis of mental retardation.

7. A prior history, which suggests that the inmate will do poorly in the SHU. This includes inmates who have experienced psychotic symptoms that appear to be attributable to incarcerations in a SHU environment. These inmates are those for whom evidence exists of a deterioration in mental health which correlates with placement in SHU or SHU-like environments. Such diagnoses as "Brief Psychotic Episode," "Psychosis NOS," and "Major Depression" which have been assigned during periods of placement in SHU may, for example, be indicative of deterioration of mental health which accompanies SHU placement. Inmates whose history suggests such a causal relationship should be excluded from SHU.

8. A history which includes any of the following within the preceding three months:

   a. Medication prescribed to address any of the "at risk" mental health categories listed above.

| Security Housing Unit | Mental Health Services Delivery System |
|---|---|

b. Therapy and/or supportive services to address any of the "at risk" mental health categories listed above.

c. Frequent (e.g. at least weekly) monitoring for deterioration in mental health condition. This does not include situations in which repeated visits by mental health staff are attributable to repeated referral from the inmate or from custody staff but where no mental health condition is noted.

d. A history which includes a recurrent or "cyclic" mental health condition (e.g. Bipolar Disorder) where the inmate has not currently been symptom free for a period of time that is at least **twice as long** as the longest known period of active symptoms or known to demonstrate recurrent symptoms at intervals of approximately 6 months, would be considered as "positive" on this indicator until they had been symptom free for a continuous period of at least 12 months.

Where the results of the Unit Health Record (UHR) review reveal that any of the above conditions exist, the inmate must be removed from SHU within 96 hours of his arrival on that unit.

Where the results of the UHR review **do not** reveal the existence of any of the above conditions **and** there is evidence that the inmate has been evaluated with the existing 31 item mental health screen or other evaluation (documented on a CDCR 7386, *Mental Health Evaluation*) within the preceding 12 month period, the inmate may be housed in SHU.

Where the results of the UHR are equivocal (as where no clear diagnosis is established but where mental health contact and observations have suggested that symptoms consistent with one or more of the above conditions have been observed) or when no mental health evaluation (a 31 item mental health screen or completion of an evaluation documented on a CDCR 7386, *Mental Health Evaluation*) has occurred the preceding 12 month period, a mental health evaluation shall be conducted.

## B. PURPOSE

This chapter outlines program policies and provides institutional operational procedures to assure the effective delivery of mental health services to inmate-patients with serious mental disorders who, for custodial reasons, require housing in a SHU, according to California Code of Regulations, Title 15.

# Exhibit 9

State of California                                    Department of Corrections and Rehabilitation

# Memorandum

Date    :    December 17, 2012

To      :    Deputy Directors, Division of Adult Institutions
             Associate Directors, Division of Adult Institutions
             Wardens

Subject:    **OPERATIONAL PLAN FOR ARMSTRONG CLASS MEMBERS HOUSED IN
            ADMINISTRATIVE SEGREGATION**

As you are aware, the department continues to experience occasions where Armstrong class members are retained in Administrative Segregation solely due to a lack of accessible bed space in the general population. While population pressures drive this problem, we need to be able to demonstrate an aggressive response to these situations when they occur. This response includes a notification process with established timeframes.

The attached model Operational Procedure (OP) regarding Armstrong class members is to be incorporated into your local procedures regarding Armstrong related institution operations. While I understand that you may need to add additional information to tailor the OP for your institution, it is critical that you not change the timelines or the notifications that are required.

If you have any questions or concerns regarding this directive, please contact Mike Knowles, Project Manager, Armstrong Master Plan Unit, at (916) 322-7599. Please submit your revised local OP that will contain this language to the Office of Policy Standardization, Division of Adult Institutions, Attention: Robert Calderon, Chief, no later than January 14, 2013

KATHLEEN L. DICKINSON
Director
Division of Adult Institutions

Attachment

cc:  Bryan Beyer, Deputy Director, Office of Audits and Court Compliance
     Mike Knowles, Project Manager, Armstrong Master Plan Unit, DAI
     Trina Hirsig, Office of Legal Affairs
     R. M. Calderon, Chief, Office of Policy Standardization, DAI
     Julian Martinez, Chief, OACC

# Model Local Operational Procedure

**Prisoners With Disabilities Being Housed In Administrative Segregation Due To The Lack Of Accessible Bed Space**

**POLICY**

It is the policy of the California Department of Corrections and Rehabilitation (CDCR) not to house Armstrong class members in an Administrative Segregation Unit (ASU) due solely to a lack of appropriate accessible General Population (GP) housing (including Sensitive Needs GP). If ASU housing is the only available accessible housing that can immediately accommodate the disability needs of the inmate, the reasons for exceptional housing shall be clearly documented using the CDC-114-D process. At the time of the initial 114-D Review, absent any other compelling penological interest, the inmate shall be approved to be released from the ASU to GP housing. Failure to move the affected inmate out of ASU into appropriate GP housing within 48 hours will require immediate notification to designated headquarters staff as outlined below. This policy shall also apply to Armstrong class members who were placed in ASU for security reasons and who are subsequently reviewed by the Institutional Classification Committee and determined to be eligible for release to GP housing.

**PROCEDURE**

**Initial Housing**

Upon placement or retention of an Armstrong class member in ASU housing due solely to the lack of accessible GP housing, the official making that decision will document the reasons on a CDC 114-D. This official will immediately contact the institutional Americans with Disabilities Act (ADA) Coordinator, and the institution Office of Audits and Court Compliance (OACC) Armstrong Field Correctional Counselor II (CC-II). Notification shall be made using telephone and email during business hours or voicemail and email during non-business hours. Upon receipt of notification, the ADA Coordinator and the OACC CC-II shall work together with the appropriate institution staff to effect the inmate's removal from ASU. The ADA Coordinator shall be responsible to facilitate staff's efforts to rehouse the affected Armstrong class member to a GP setting.

# Model Local Operational Procedure

### Manager Review (114-D) Process

If the manager tasked with reviewing the CDC 114-D determines that an Armstrong class member is to be released from the ASU into a GP setting and accessible housing is not available, they must notify the ADA Coordinator and the OACC CCII of the approved release.

### Institutional Classification Committee (ICC) Review

When the ICC determines that an Armstrong class member is to be released from the ASU into a GP setting and accessible housing is not available, the ASU CCII must notify the ADA Coordinator and the OACC CCII of the approved release.

### First Review – Within 24 Hours (Business Day) From Initial Notification

Upon notification that an Armstrong class member has been ordered released from ASU and there is no available accessible GP housing, the ADA Coordinator will facilitate staff efforts to rehouse the affected Armstrong class member to a GP setting.  The ADA Coordinator will review the class members housing status within 24 hours of the initial notification.  This review is to ensure the inmate has been rehoused in an appropriate GP bed and this information has been recorded on the Strategic Offender Management System (SOMS).

### Second Review – To Occur Between 24 and 48 Hours (Business Days) From Initial Notification

If after 24 hours, the Armstrong class member has not been housed in an accessible GP bed, the ADA Coordinator will notify the Warden and C&PR.  The C&PR will immediately review the case for possible transfer consideration.  In addition, the ADA Coordinator will continue to facilitate staff efforts to utilize all appropriate means to locate an accessible GP bed within the institution and update the Warden of their progress.

# Model Local Operational Procedure

**Third Review – To Occur between 48 and 72 Hours (Business Days) From Initial Notification**

If after 48 hours, the Armstrong class member has not been housed in an accessible GP bed, the C&PR will contact (via email and telephone) the Population Management Unit (PMU), Health Care Placement Oversight Program (HCPOP) and Classification Services Unit (CSU) to possibly identify an accessible GP bed at an alternate institution.  In the event an Armstrong class member will be transferred to another institution, placement must be to an appropriate GP accessible bed and not an ASU bed.  The transfer may require a special transport to facilitate appropriate housing in a timely manner.

**After 72 Hours (Business Days) From Initial Notification**

If the Armstrong class member is still housed in the ASU after 72 hours, the Warden will notify their Associate Director (AD) at Headquarters (via email and telephone).  The AD will work with the institution to use all appropriate means to facilitate accessible GP placement.

You are instructed to update your local ADA Operational Procedure to insure compliance with this directive.  Please submit your revised ADA Operational Procedure to the Office of Policy Standardization, attention Robert Calderon by January 14, 2013.  If you have any questions, please contact Mike Knowles, Project Manager, Armstrong Master Plan Unit, at (916) 322-7599.

# Exhibit 10

# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2009 REVISION



## Division of Correctional Health Care Services

## Department of Corrections & Rehabilitation

| Administrative Segregation | Mental Health Services Delivery System |
|---|---|

*Specific program objectives include:*

1. Continuation of care for inmate-patients with identified mental health treatment needs through regular case management activities and medication monitoring to enable inmate-patients to maintain adequate levels of functioning and avoid decompensation.

2. Daily clinical rounds of ALL inmates.

3. Mental Health screening of inmates who are not currently in the MHSDS caseload to identify mental health needs, and referral for further mental health evaluation as indicated.

4. Referral to a more intensive level of care for inmate-patients whose mental health needs cannot be met in the ASU, including expeditious placement into Mental Health Crisis Beds (MHCB) for inmate-patients requiring inpatient mental health care.

5. Mental health assessments and input into the classification decision-making process during ICC meetings, including the inmate-patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living (ADL), ability to understand Due Process proceedings, likelihood of decompensation if retained in ASU, recommendations for alternative placement, and any other custodial and clinical issues that have impact on inmate-patients' mental health treatment.

6. Mental health assessments and input into the adjudication of Rules Violation Report (RVR) hearing proceedings involving MHSDS inmate-patients. Mental health information includes the quality of the inmate-patients' participation in their current MHSDS treatment plan, mental condition that may have been a contributing factor in the alleged misbehavior, and the ability to comprehend the nature of the charges or participate meaningfully in the disciplinary process. Final housing decisions are made by the ICC after considering all relevant clinical and custody factors.

## D. TREATMENT POPULATION

Refer to the Treatment Criteria for the level of care in the MHSDS, Chapter 1, Overview Program Guide.

*Referral for Mental Health Services*

1. Pre-placement mental health screening: All inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in ASU (see Inmate Medical Services Policy and Procedure, *Volume 4, Chapter 16: CDCR 7219*). If an inmate screens positive on the CDCR 128-MH7, *ASU Pre-Placement*

# Exhibit 11

**U.S. Department of Justice**
National Institute of Corrections



# Supermax Prisons: Overview and General Considerations

# National Institute of Corrections

Morris L. Thigpen, Director

Susan M. Hunter, Chief
Prisons Division

Richard H. Franklin, Project Manager

Photos taken at Washington Department of Corrections' Clallam Bay Corrections Center.

# Supermax Prisons: Overview and General Considerations

by

Chase Riveland

January 1999

This document was developed under Technical Assistance #98P4002 from the National Institute of Corrections, U.S. Department of Justice. Points of view or opinions stated in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.

# Contents

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**Section 1. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Section 2. Survey and Survey Results** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Section 3. History and Definition** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Admission/Release Criteria . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Section 4. Operational Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Classification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    Programming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Length of Stay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Human Contact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Medical Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Mental Health Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Food Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    Property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Hygiene and Sanitation Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    Security . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Policies and Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Use of Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    Documentation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Section 5. Staff Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Personnel Characteristics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Recruitment and Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Stress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    Leadership and Supervision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 6. Siting, Design, and Construction Issues** . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Co-Located vs. Separate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Site Selection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Design Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    Construction Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    Implications for Operating Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    Further Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Section 7. Summary, Conclusions, and Recommendations** . . . . . . . . . . . . . . . . . . . 22

**References and Bibliography** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Appendix. Checklist of Considerations for an Extended Control Facility** . . . . . . . . . . 25

# Acknowledgments

Preparation for the writing of this monograph included several tasks. First, a group of correctional administrators, experienced in the design and/or operation of supermax-type correctional facilities, came together for a couple of days to share their experiences, opinions, and "lessons learned" about these facilities. Thank you to the members of this group: Greg Hershberger, North Central Regional Director, Federal Bureau of Prisons (former Warden of the Ad Max–Florence); Ken McGinnis, Director, Michigan Department of Corrections (former Director, Illinois Department of Corrections); Larry Meachum, Director, Office of Justice Programs/Corrections Program Office (former director of three state corrections systems); James Spalding, Director, Idaho Department of Corrections (former Director, Division of Prisons, Washington State); Mary West, Regional Director, Colorado Department of Corrections; Frank Wood, former Director, Minnesota Department of Corrections (former Warden, Oak Park Heights Correctional Facility); and Richard Franklin, NIC Prisons Division (former Director of Prisons–Alaska). Their knowledge and input were invaluable.

Second, visits were made to several supermax facilities. Particular thanks go to Warden John Hurley and staff at the federal Ad Max–Florence, CO; Superintendent Donice Neal and staff at the Colorado State Penitentiary, Canon City, CO; and Warden Steve Cambra and staff at Pelican Bay State Prison, Crescent City, CA. The author had earlier visited Oak Park Heights Correctional Facility at Stillwater, MN; the U.S. Penitentiary at Marion, IL; and three Intensive Management Units in Washington State, as well as a number of segregation units around the country.

Numerous corrections professionals throughout the country were contacted in a follow-up to an NIC Information Center survey. They were, without exception, generous with their time in responding to questions.

Last, but certainly not least, appreciation is extended to the members of the NIC Advisory Board who recognized an emerging issue and to those at NIC who followed up on that interest: Morris Thigpen, Director; Larry Solomon, Deputy Director; and Susan Hunter, Prisons Division Chief.

# Foreword

Units and programs for the management of dangerous and disruptive inmates have been a source of controversy in the field of corrections for many years. Although correctional approaches such as concentration, dispersal, and isolation are not new, the development of "supermax" prisons is a relatively recent trend. More than 30 states are operating one or more units or facilities created specifically for their corrections systems' most threatening inmates.

This document discusses issues that are germane to planning and operating supermax units. The author has more than 30 years of correctional experience, including planning and operating high-security prisons, and has served as director of two state departments of corrections.

We hope the document will contribute to the development of some common definitions where there is now broad divergence, enhance understanding of the myriad issues related to the management of violent and disruptive inmates, and provide benchmarks by which corrections systems may examine their need for specialized prisons or units for high-risk inmates.

Morris L. Thigpen, Director
National Institute of Corrections

# Section 1. Introduction

"Supermax" prisons—fad, trend, or wise investment?

Prisons historically have had "jails within prisons." Simply because people are in the controlled environment of a prison does not stop some of them from being assaultive or violent, attempting to escape, inciting disturbances, preying on weaker inmates, or otherwise exhibiting disruptive behavior. Such people must be removed from the general population of the prison environment while they threaten any of those behaviors. Order and safety are the priority objectives of any correctional facility.

Prison administrators have traditionally placed persons exhibiting such behaviors into separate housing units—generally called segregation, punitive segregation, disciplinary segregation, or some other name that differentiates the unit from general population housing. In recent years, particularly since the significant involvement of the federal courts in the 1970s and 1980s, this has ordinarily been accomplished after due process hearings and a finding of guilt. In disciplinary placements, the inmate would be given a specific amount of time to serve based on the seriousness and frequency of the violation(s). Other inmates who were repeat offenders or very serious violators of critical institutional rules would be individually confined and segregated from the general population until it was believed they no longer threatened to prey, incite, assault, or escape. Isolated housing has also been used for protective custody inmates who might be at risk from other inmates as well as for other "special" populations, such as inmates who are on death row, HIV-positive, or mentally ill.

In the last few years, many jurisdictions across the country have built or renovated prison facilities or units with the express purpose of incarcerating inmates under highly isolated conditions with severely limited access to programs, exercise, staff, or other inmates. Other jurisdictions are in various stages of considering or planning such units or facilities though a faction made up of corrections officials, inmates, and inmate advocates has raised concerns about, or even condemned, them. They suggest they are "cruel and inhumane," susceptible to abuses, and damaging to the inmates housed in them. Many corrections officials have defended the need for such facilities based on the perceived "toughening" of the inmate population, increased gang activity, the difficulty of maintaining order in severely crowded prisons, and from experience gained over time that suggests such units are beneficial.

Use of such facilities also represents a philosophical change, moving from what Professor David Ward and Mr. Norman Carlson, in their article entitled "Super-Maximum Custody Prisons in the United States," termed the "dispersion" approach to the "concentration" approach for the handling of troublesome inmates. Many agencies in the past would spread their troublemakers around the system or in various units of a prison and, in some instances, house them in other states or with the Federal Bureau of Prisons. This dispersal of problem inmates would be an attempt to prevent them from uniting in their misconduct and also allow staff at a given institution to gain a measure of relief from dealing with the same troublemakers over an extended period of time. This approach also enabled prison officials to break up cliques and gangs, but the success of the approach was—and is—at least partially dependent on the number and types of correctional facilities available at various custody levels.

The more recent "concentration" approach creates specific units or facilities to manage this troublesome type of inmate in a high-security environment, generally isolated from all other inmates. The premise is that general population prisons will be more easily and safely managed if the troublemakers are completely removed.

In some places, these highly focused institutions have been a component of "tough on crime" agendas touted by elected officials, combating the assertions of many observers that "prisons are like country clubs." In other jurisdictions, they have been proposed by corrections officials to meet the existing or projected need to isolate identified individuals or groups of inmates from the general population to enhance the management of their facilities. Whatever the motivation for building such facilities, the number of them already in operation, under construction, planned, or proposed has increased significantly over the last several years. More than 30 states report they are operating one or more such units or facilities.

These units and facilities are significantly more ex-

pensive to build than traditional general population prisons, due in part to the enhanced and extensive security features on locks, doors, and perimeters; reinforced walls, ceilings, and floors; and, frequently, the incorporation of advanced electronic systems and technology. Their operating costs have proven to be much greater also. Providing meals and other services at individual cell fronts, multiple-officer escorts, and maintenance of elaborate electronic systems are examples of things that add up quickly. The number of correctional officers required to assure both internal and external security, movement of inmates, security searches of cells, and the delivery of food and other supplies and services to individual cells generally drives staffing ratios—and therefore operating costs—much higher than those of general population prisons.

The cost, cost-benefit, operating, legal, and ethical/moral issues of such facilities also raise a great deal of debate. Little is known about the impact of locking an inmate in an isolated cell for an average of 23 hours per day with limited human interaction, little constructive activity, and an environment that assures maximum control over the individual. Are potential negative effects greater after an individual has been in such a facility for three months, one year, three years, five years, or more? Do extended isolation, absence of normal stimuli, and a controlling environment result in damage to an inmate's psyche? Research in this area is sparse. That which does exist tends to focus on the eventual recidivist criminal behavior—either in or out of prison—rather than on the potential psychological damage to the inmate.

Very little is known about the effect of these facilities on inmates with existing mental illnesses or developmental disabilities. Are certain types of mentally ill inmates made worse? Can they be treated effectively in this type of environment? Again, little research is available to help us evaluate the efficacy of such placements.

Proponents point to reductions in assaults on inmates and staff and other serious incidents throughout the entire corrections system since the establishment of such facilities. There exists little or no hard data comparing such perceived impacts on entire systems versus the fiscal cost to gain such results, although anecdotal information is common.

## Generally, the overall constitutionality of these programs remains unclear.

The impact of supermax facilities on staff working there has also been a subject of much discussion over the last several years, ranging from the need to pick very experienced staff to the heightened levels of stress that they experience. Having to deal on a daily basis with inmates who have proven to be the most troublesome —in an environment that prioritizes human control and isolation—presents line staff, supervisors, and facility administrators with extraordinary challenges. Correctional administrators with experience in operating supermax facilities talk about the potential for creating a "we/they syndrome" between staff and inmates. The nature and reputation of the inmate and frequently the behavior combined with ultra-control and rigidity magnify the tension between inmates and staff. When there is little interaction except in control situations, the adversarial nature of the relationships tends to be one of dominance and, in return, resistance on both sides.

Generally, the overall constitutionality of these programs remains unclear. As larger numbers of inmates with a greater diversity of characteristics, backgrounds, and behaviors are incarcerated in these facilities, the likelihood of legal challenge is increased. Caution in expanding the types and number of inmates placed in these facilities will serve all parties well. A discussion of legal issues relevant to supermax facilities is contained in a forthcoming National Institute of Corrections (NIC) publication entitled *Supermax Prisons: Legal Issues and Considerations*.

It is important then to assist agencies that are operating such facilities in asking the right questions about how they are operated. It is equally important to assist jurisdictions that are planning such facilities to ask the right questions about who they intend to put there, what design considerations they should explore, and how the facility will be operated. And, finally, it is important to assist jurisdictions that are yet or will be debating the issue, by providing as much information as possible to help frame the debate. A checklist contained in the appendix to this document was developed to guide practitioners' discussions.

# Section 2. Survey and Survey Results

In 1997, the NIC Prisons Division and Information Center released a *Special Issues in Corrections* paper entitled "Supermax Housing: A Survey of Current Practices," based on a December 1996 survey of corrections systems nationwide. Responses were received from the 50 state corrections departments; the Federal Bureau of Prisons; the Correctional Service of Canada; and the New York City, Cook County, and District of Columbia Departments of Corrections. For the purposes of the survey, supermax housing was defined as follows:

*"A freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates who have been officially designated as exhibiting violent or seriously disruptive behavior while incarcerated. Such inmates have been determined to be a threat to safety and security in traditional high-security facilities and their behavior can be controlled only by separation, restricted movement, and limited access to staff and other inmates."*

Survey results revealed that jurisdictions do not share a common definition of supermax due to their differing needs, classification criteria and methods, and operational considerations. It became clear that what may be "supermax" in one jurisdiction may not be in another. Examples of how differently jurisdictions define supermax and its operations follow.

- One jurisdiction with approximately 20,000 inmates anticipates a need for supermax housing for 1% of its inmate population. It currently operates a 50-bed supermax unit within a maximum-security prison and is planning an additional 150 to 175 beds. Inmates housed in this unit have been unable or unwilling to conform to the rules and regulations of administrative segregation and have a history of violent, assaultive, and/or disruptive behavior within the corrections system. The minimum length of stay in supermax is 18 months.

- Another jurisdiction with an inmate population under 15,000 reports a need for supermax housing for 5% of its inmate population. It reports as "supermax" a 500-bed prison for inmates in administrative segregation status. This facility houses inmates in several levels of transition to general population.

- A third jurisdiction, with about 30,000 inmates, projects a need for 20% of its capacity to be supermax beds. It currently operates two facilities, with over 1,000 beds collectively, that it describes as supermax and reports plans to nearly double that number. These facilities house all new arrivals to the prison system, who are placed in maximum confinement requiring movement in restraints and living restrictions akin to segregation conditions. Inmates in the next lower custody classification live in medium-security units under medium-custody restrictions.

- Two other jurisdictions, one with an inmate population of more than 100,000 and the other with nearly 45,000 inmates, each report having a supermax facility of approximately 500 beds designated to house inmates who have threatened or injured other prisoners or staff; possessed deadly weapons or dangerous drugs; disrupted the orderly operation of a prison; or escaped or attempted to escape in a manner that involved injury, threat of life, or use of deadly weapons. These jurisdictions report a need for supermax housing for .5% to 1% of their inmate populations.

The survey revealed that some supermax facilities house only inmates who could not be controlled in traditional administrative segregation conditions. Others are an extension or expansion of traditional segregation or administrative segregation and may house protective custody and/or disciplinary segregation inmates. Yet others house inmates who would reside in close-custody general population in most other jurisdictions.

In some jurisdictions, mentally ill inmates are specifically excluded from the supermax population while, in others, this level of control is considered necessary because of the paucity of mental health resources available in the system. Some agencies include transition programs in their supermax facilities that provide opportunity to earn privileges similar to those available to maximum or close general population inmates. A supermax unit within a high-custody facility does not usually have transition beds as would be found in a free-

3

standing supermax facility.

Several general conclusions can be drawn from the survey:

- There is no universal definition of what supermax facilities are and who should be placed in them.

- The current and projected reasons stated for needing supermax space vary widely among jurisdictions, including increased violence, legislative interest, and availability of federal funds for such construction.

- The reported need for supermax beds ranges from 0% to 20% of the reporting jurisdictions' total bed capacity.

- Some jurisdictions use supermax facilities interchangeably with disciplinary and/or administrative segregation.

- The process for admission to and release from supermax facilities varies widely, with the final approving authority ranging from the institution superintendent/warden to the director/commissioner of the department of corrections.

- Jurisdictions operating supermax housing vary widely in the length of time they hold inmates there. Some have determinate timeframes and some indeterminate.

- The inclusion or exclusion of mentally ill and developmentally disabled inmates differs greatly among jurisdictions.

- Programs available in supermax facilities range from none, to cell front only, to televised programming, to some congregate programming.

- Some jurisdictions provide transition programming to assist those leaving the extended control unit, while others do not.

Supermax as defined in the survey may exist in relatively few jurisdictions. The survey results suggest that in some jurisdictions "supermax" may be primarily a correctional architecture term that describes a type of prison construction and a decision to concentrate higher risk inmates while, in other jurisdictions, it may be a new custody or confinement status associated with a changing inmate profile. The "supermax count" in the reporting jurisdictions includes inmates ranging from the most intractable to those who would reside in close or maximum general population in some other jurisdictions. The lack of a universal definition suggests the need for further examination and determination of whether "supermax" should be a custody/confinement status or a facility/unit security designation.

# Section 3. History and Definition

## History

Various versions of high-custody and high-control prisons have existed in this country over the years. Prisons dating back to the earliest settlers operated a variety of isolation cells or units commonly referred to as "the hole" and generally used as a form of extra punishment for those who violated a prison's rules repeatedly or egregiously.

Commonly recognized as the forerunner of today's supermax facilities, Alcatraz became the high-security penitentiary for "habitual" and "intractable" federal prisoners in 1934. Until its closure in 1963, Alcatraz housed the federal government's most highly publicized offenders, its most sophisticated prison escape artists and riot leaders, and its most assaultive inmates.

Alcatraz was closed in an era in which rehabilitation had become the primary rationale for penal confinement. The "concentration model" was abandoned, and inmates at Alcatraz were dispersed to federal penitentiaries across the country. Then, in 1978, the level of assaults and violence directed toward staff and prison unrest prompted the development of a special high-security control unit at the U.S. Penitentiary in Marion, Illinois. In 1983, the deaths of two officers and an inmate resulted in this prison's conversion to indefinite administrative segregation, or lockdown. Marion housed the Bureau of Prisons' most violent and troublesome prisoners until the opening of the Administrative Maximum Penitentiary in Florence, Colorado, in 1994.

Although many of the state corrections systems have historically targeted one or more of their prisons for the most threatening prisoners, seldom have those prisons operated on a total lockdown basis as normal routine. Even prisons designated as maximum security have generally allowed movement, inmate interaction, congregate programs, and work opportunities.

*They have become political symbols of how "tough" a jurisdiction has become.*

As correctional populations have escalated in recent years, prison crowding has become the norm in most jurisdictions. Most prisons across the country have been operating at well over 100% of design capacity. This crowding aggravated by the increase in street gang members, drug offenders, mentally ill, and youthful offenders has stressed the prisons and corrections systems. Maintaining order has been a daunting challenge for prison wardens and corrections system administrators. One response on the part of prison officials in many jurisdictions, in attempting to maintain control, has been the introduction of supermax units or facilities.

The trend toward proliferation of supermax housing would appear to be at least partially related to the belief that maintaining order in the larger part of a prison—or an entire corrections system—is enhanced by isolating the most serious and chronic troublemakers from the general population. In fact, many corrections officials state that the mere threat of such units is preventative in nature—that many inmates who might otherwise be disruptive are not, due to their fear of placement there.

The fact that such facilities often are politically and publicly attractive (despite the considerable cost to build and operate them) also has had a role in their increase nationwide. They have become political symbols of how "tough" a jurisdiction has become. In some places, the motivation to build a supermax has come not from corrections officials, but from the legislature and—in at least one instance—the governor.

## Definition

As supermax prisons have increased in number, been reported on by the media, and gained popularity with the public, a variety of names have emerged around the country to describe them. Special housing unit, maxi-maxi, maximum control facility, secured housing unit, intensive housing unit, intensive management unit, and administrative maximum penitentiary are but a few of the names used. The term "supermax" is the one heard most frequently in the media and in the field of corrections—the "generic descriptor." Yet, as learned from the NIC survey, the term is applied to a wide variety of facilities and programs handling an equally wide variety of inmate populations.

For purposes of this report, we will describe super-max as "a highly restrictive, high-custody *housing unit* within a secure facility, or an *entire secure facility*, that isolates inmates from the general prison population and from each other due to grievous crimes, repetitive assaultive or violent institutional behavior, the threat of escape or actual escape from high-custody facility(s), or inciting or threatening to incite disturbances in a correctional institution." The term "facility" is used throughout this report for brevity to refer to either or both a *unit* within a facility or an entire *separate facility*. It is assumed that such a facility would be operated with the majority of services and programs provided at cell front, that movement from the cell would be in restraints with multiple-officer escort, and that overall security would be the highest level available in an institution or the corrections system.

It is important for agencies to develop a working definition if they want to properly evaluate an existing supermax facility or if they are planning to build and/or operate one. Differentiating these programs from tradi-tional segregation units is essential if they are to be planned and operated efficiently and defensibly. Ambi-guity in definition inhibits the ability of the corrections profession to develop sound models that may be readily adapted across jurisdictions with relative assurance that they will meet legal challenges, humane expectations, and generally accepted professional standards. In actuality, formal standards (such as those promulgated by the American Correctional Association and American Bar Association for correctional facilities) do not exist for supermax facilities specifically.

## Purpose

The combined best thinking of professionals who have administered, developed, operated, and/or planned such programs would suggest their purpose should be for extended control of inmates known to be violent, assaultive, major escape risks, or likely to promote disturbances in a general population prison and that the criteria for admission to and release from such a facility should be explicit and narrow. The use of these facilities for problem inmates for whom lesser levels of control may be satisfactory may deprive them of freedoms, education, treatment, and work opportunities from which they could reap significant benefits and may subject them to pressures detrimental to their physical and psychological health.

Mixing disciplinary segregation and protective

custody populations with extended control populations runs the risk of overkill in the custody and security provided to inmates who have traditionally been handled without such rigorous and expensive control features. Few inmates serving short disciplinary segregation sanc-tions require the 22-hour-plus lockdown status, the privilege reductions, and the multiple-officer movement practices that extended control units generally employ.

## Admission/Release Criteria

Critical to developing a working definition for an extended control facility is determining who will be in it. "Extended control" suggests that inmates who have demonstrated that they are chronically violent or assaultive, who present a serious escape risk, or who have demonstrated a capacity to incite disturbances or otherwise are threatening the orderly operation of the general population institution may become target populations. Thought should be given to limiting the use of extended control housing to inmates who present a "clear and present danger."

In clearly defining the population that is appropriate for extended control housing, agencies should also iden-tify housing and placement criteria for inmates for whom lesser levels of security and custody may be appropriate, including:

- those who are uncontrollable due to mental illness,

- the incorrigible who are subject to frequent disciplinary segregation,

- those in need of protective custody,

- those in need of administrative confinement for reasons that may require separation but not extended control,

- those requiring observation because of unacceptable or problematic adjustment.

Use of extended control housing for inmates who have only been situationally assaultive, or who commit minor (albeit frequent) infractions, or who cannot control their behavior due to mental illness will simply consume very expensive high-security beds with little overall operational impact.

Prison staff have always had to deal with unco-operative inmates. They continuously test the limits,

frequently break minor rules, and consume an inordinate amount of staff time. As comforting as it may be to an institution staff to be rid of such persons, the use of costly high-custody beds for this population is probably not only inefficient, but arguably overkill. These facilities are inappropriate for the nuisance inmate.

Underlying the challenge of who to put in such facilities is the question of whether placement should rely solely on actual behavior or also include individuals who *could be* troublesome. Attempting to use predictive criteria based on subjective information has led historically to unsatisfactory and possibly indefensible results. Most agencies, therefore, base their criteria on objective behavior-driven information—although that behavior may include only the threat to commit or incite violence, or to escape.

In addition to the target population for which extended control housing is designed, consideration must also be given to the inmates other than the target population who may reside in the facility. Terms of definition are frequently applied to both the facility and the residents. Often, a labeling process takes place and inmates housed in supermax facilities are known, counted, and treated as supermax inmates even though they may be in a transition program or assigned to another program in the facility.

## These facilities are inappropriate for the nuisance inmate.

In large extended control facilities in which a portion of the population is close or maximum custody—with some general population movement capabilities—all inmates are often viewed as supermax or at least more difficult than "regular" maximum-custody inmates in other facilities. They may even view themselves as supermax inmates, and staff may subject them to controls and surveillance well beyond what their particular status demands, ascribing to them levels of threat far beyond reality. Viewing inmates who are not actually in extended control status as such may be a self-fulfilling prophecy that diminishes progress or leads to a deterioration of behavior on the part of the inmates.

Release criteria must also be given serious thought by the agency operating an extended control facility. Whether based on explicit timeframes, behavioral expectations, or combinations of both, it is important that the inmate be informed as to the conditions under which he/she may be released. With the goal of safely transferring inmates to lesser custody as soon as feasible, facility and central administration staff should conduct regular reviews of each inmate to assess the necessity of retaining him/her in the extended control environment. This becomes even more essential as a sentence nears its end and the inmate may be released to the community.

# Section 4. Operational Issues

Many management and operational issues gain heightened importance in extended control facilities. Some of these are:

- The criteria by which inmates are admitted to or excluded from the facilities,

- How inmates are managed,

- The services they are provided,

- The manner in which they are expected to behave,

- The amount of human contact they have,

- The allowable use of force and control of the use of force,

- The criteria and process for release from extended control.

The potential for abuse in an environment that prioritizes control of human beings, who by definition or in reality are the "worst of the worst," can be mitigated by thoughtful attention to the manner in which such facilities are operated.

The agency and facility mission and objectives, which include humane treatment, reduction of anger and violence, and reintegration into general population, should be clearly stated and affirmed in operations, programs, and staff training. The agency planning to operate such a facility, or evaluating its existing operation, should recognize the critical importance of the extended control mission and operational practices, including those discussed next.

## Classification

Most prison classification systems have evolved over the last two decades from very subjective means of classifying inmates to relatively objective systems. This move toward objectivity has occurred mainly to avoid unbridled discretion and to incorporate into classification instruments the philosophical and policy preferences significant to the agency.

Typically the classification process will allow for the orderly determination of the level of custody an inmate requires, based on criminal and behavioral history; the medical, psychological, and programmatic needs and limitations of the inmate; and the type of institution that can best meet those considerations. Objective classification systems have not only helped correctional agencies defend their placement decisions when challenged, but have helped them attempt to place individuals in the least-restrictive facility—and therefore presumably the least costly. Objective classification systems also generally provide inmates with a known path for moving to less secure facilities and incentives for behaving appropriately, working, and pursuing improvement programs.

It is therefore wise for agencies that are operating or planning to operate extended control facilities to assure that the process for identifying inmates for placement there is at least consistent with and preferably an integral part of the agency's classification process. This will probably assist in legal defense of the placements as well as help avoid the overuse—or inappropriate use—of very expensive housing. Inherent in using the classification process to determine an inmate's eligibility for extended control is that the criteria for admission are clearly articulated, non-ambiguous, and consistent with the agency's disciplinary process.

Many agencies operate under administrative rule or policy that provides a mechanism and authorization for placement of an inmate in administrative confinement or segregation when he/she is deemed to be a threat to the safety, security, or orderly operation of the institution. This is often a non-disciplinary status—that is, the placement is not a penalty with a determinate time affixed to it, but is based on a pattern or history of dangerousness or unconfirmed but reliable evidence of pending disruption.

With the advent of extended control facilities and specific criteria for placement, agencies should carefully consider what impact the need or requirement to provide objective or behaviorally based criteria for admission there would have on administrative segregation decisions. In many agencies, administrative segregation of an inmate who may be a threat to safety, security, or order is an approved remedy without application of objective criteria or verified misconduct. Wardens peri-

odically invoke this procedure as a preventative or protective measure based on strong belief that an inmate's continued presence in the general population may create a threat to safety and security. Following periodic reviews, segregation of such inmates may then be continued, despite exemplary behavior in segregation, because of the strong belief that the inmate's violent proclivities and/or intentions to harm others or threaten security of the facility when given the opportunity remain unchanged.

Hans Toch and Kenneth Adams, in *The Disturbed Violent Offender*, discuss the management of offenders who are viewed as having mental health deficiencies and who are violent. They differentiate between the *disturbed* violent offender and the disturbed *violent* offender. Herein lies one of the numerous classification difficulties related to the protection of others by segregation of offenders with a history and potential of violence. Diagnosis, prediction, risk assessment, and identification of causal factors to violent acting out often defy objective criteria and invite a significant degree of subjectivity. Prison administrators should be cognizant of that difficulty in defining admission, release, and length of stay criteria.

Once an inmate is placed in an extended control facility, specific classification review periods are advisable, either chronological or event-driven, or both. The reviews should provide the inmate with the opportunity to offer information that would lead to consideration of a reduced custody placement and to be informed of the conditions that must be met for such consideration.

It would be prudent to have the final authority for approving admission to, retention in, and release from an extended control facility rest at the highest levels of the organization. This would preclude—or minimize—potential abuse of the policy criteria for admission and release and also raise the level of organizational consciousness of the seriousness of such placements.

## Programming

Decisions on what types of programming to provide and how should be well thought out. Obviously the more programs available to the inmates, the less vulnerable the facility will be to legal challenge and the more likely that inmates' negative reaction to isolation will be ameliorated. Programming for this purpose includes education, work opportunities, exercise, and various other programs aimed at improving the inmates' behav-

ior, knowledge, or skills.

*It would be prudent to have the final authority for approving admission to, retention in, and release from extended control rest at the highest levels of the organization.*

Education is provided in a variety of ways in extended control facilities around the country. Some agencies allow television in the cells and provide education or self-help programs through intra-institution cable. Some supplement this with instructors providing assistance through cell-front visits. Others allow small congregate classes in day rooms or special rooms in close proximity to the housing units. Some provide no educational programs at all.

Most allow no work activities, although they might provide some work opportunities in transition programs for inmates being prepared to leave the extended control environment.

Exercise in most extended control facilities is limited to three to seven hours (in one-hour intervals) per week, generally in an indoor space or small, secure, attached outdoor space. Usually exercise is provided to one inmate at a time and the inmate is escorted in restraints by two or more correctional officers to and from the exercise space. Congregate exercise occurs only in transition programs provided in some facilities.

Agencies evaluating their extended control facilities or planning new ones should pay close attention to exercise and how they provide it. It is a critical issue not only because of the human, health, and legal issues it presents, but for the staffing cost and security implications. The number of staff required to move each inmate from a cell to the exercise space and back three to seven times each week is considerable. As these events also constitute the most frequent time that the inmate is out of his/her cell, they also present the most likely opportunity for resistive or combative behavior or the exchange or introduction of contraband.

Most other types of programming offered in extended control facilities, such as substance abuse treatment, anger management, and vocational training, are provided only through television, correspondence, or

written materials. Several agencies operating transition units offer congregate programming, generally concentrating on education, substance abuse treatment, and behavior control (such as anger management).

Agencies planning or evaluating extended control facilities would be well served to thoughtfully address the provision of inmate programs. Legal, human, financial, and security implications attach to each of the choices made. The choices can range from an approach of no more programming than is legally required to provision of as much programming as resources allow, consistent with the security needs of the facility. The choices made will set the tone for the overall nature of the extended control environment and will inevitably have an impact on the quality of the program.

## Religion

Providing for the inmate to practice his/her religion poses particular challenges to extended control facility administrators, since the entry of any person to the housing unit presents additional opportunity for the introduction of contraband. Agencies operating extended control facilities usually provide for religious programming through cell-front visits by staff chaplains; approved clergy; or, in some instances, approved religious volunteers. Several agencies provide religious services and information through closed-circuit television available in the cells. A few allow small groups of inmates to participate in congregate services, normally in or immediately adjacent to the housing unit.

Extended control facilities also tend to have somewhat abbreviated lists of approved religious articles that inmates are allowed to keep in their cells. Those planning such programs should review their intended religious articles allowance lists and try to strike a balance between actual security needs and the inmate's right to practice his/her religion.

## Length of Stay

The length of stay in extended control facilities varies greatly across jurisdictions. Some agencies have determinate periods of time to be served, but most have relatively or wholly indeterminate placements. The amount of time served may depend upon the perceived risk the inmate presents, behavior changes, the amount of time left in the inmate's sentence, changes in the inmate's physical or psychological condition, the inmate's willingness to renounce gang ties, or other factors.

The ongoing agency need for extended control beds requires some movement of inmates out of extended control. To the extent possible, such movement should be based upon clear criteria related to the factors that led to the inmate's placement there. While specific categories of offense or violation, such as homicide, may merit a far-distant date for possible return to lesser custody, most inmates should be considered for reduced custody in the shorter term. The development of release criteria that enable estimating length of stay is of practical importance in maintaining bed availability and projecting the agency's bed needs for operating and capital budget planning purposes.

It is critical that the agency planning or evaluating an extended control facility consciously address the length-of-stay issue. Duration of certain types of confinement, particularly if that confinement is atypical of the norm, has frequently been one of the yardsticks courts have used in evaluating the constitutionality of a program.

Presumably, once the threat that the inmate presented to other people or the orderly operation of the institution has passed, there is no need for him/her to be retained in an extended control environment. Ideally, specific criteria should be developed, along with a process for assessment, that would allow the inmate to transition from an extended control facility to lesser levels of custody and security. Many agencies provide several levels of control and privileges in the same facility, offering the inmate the opportunity to display the ability to adjust and behave in a less-controlled environment. Failure to provide some transition or release mechanism will not only create a sense of hopelessness among many of the inmates, but will cause the overuse of costly high-security beds.

Corrections professionals agree that, ideally, dangerous inmates should not be released directly to the community from extended control and that transition and pre-release programming would prepare them for reintegration. It is difficult, however, to balance the inmate's need for such programming with the agency's responsibility to provide a safe and secure work environment for its staff. An approaching release date seldom, if ever, changes the degree of threat to staff for the better. Most often, inmates who are dangerous pose greater threat to staff as the term of control by the agency decreases. An agency's policies should address this very important but difficult issue.

## Human Contact

One of the most frequent criticisms of extended control facilities is the degree to which the inmate is isolated from contact with other human beings. In the typical facility, cell doors, unit doors, and shower doors are operated remotely from a control center. Human contact may be limited to instances when medical staff, clergy, or a counselor stops at the front of the inmate's cell during rounds. Physical contact may be limited to being touched through a security door by a correctional officer while being placed in restraints or having restraints removed. The bulk of verbal communication may occur through intercom systems. Further minimization of human contact may result from the use of technologies such as cameras; remote listening devices; and remote control devices for televisions, water, and lights.

Care should be taken by those planning and evaluating extended control facilities to balance the need for security, safety, and efficiency with the need to provide adequate human interaction between the inmate and selected staff. Adequate visiting programs for approved visitors—albeit in non-contact visiting areas—can at least partially compensate for the absence of human contact in the housing unit. The frequency of visiting varies greatly among extended control facilities, ranging from one hour to several hours per month. Some facilities tie the frequency of visits to the phase of the program that the inmate is in, with more frequent visits allowed as the inmate progresses through the phases.

Specific scheduling of different staff who check on the inmate regularly and provide some verbal interaction opportunity will help mitigate the "we/them" syndrome that is inherent to an extended control environment. Special training in techniques for communicating with this population is advisable for all staff.

## Medical Services

One of the most vulnerable parts of any correctional operation is the medical care provided to an inmate population. The less freedom an inmate has to seek out medical assistance, the greater the burden on corrections officials to assure that adequate medical care is available and provided. Agencies planning or evaluating extended control facilities must assure that they adequately provide for routine and emergency medical care and that policies, procedures, and training assure that all staff are alert to actual medical problems and needs.

Logistically, providing appropriate medical care in an extended control facility is a special challenge due to the inability of the inmate to move unescorted to a central medical infirmary. Most facilities use a triage process for providing medical services, involving regular cell-front visits by medical personnel to administer medication and listen to inmates' medical concerns. Many facilities regularly schedule medical personnel to perform simple examinations in small exam rooms located in or near the housing units. More extensive medical examinations or procedures usually require movement to a central location within the facility, to a different facility, or even to a community setting. This requires a significant investment of custody staff time —generally two or three correctional officers accompanying the inmate, who is in restraints, at all times.

The inclusion of modern equipment and technology in the facility—such as specially designed video equipment that allows conducting medical examinations from a remote site (telemedicine)—has proven effective in some jurisdictions. Such technology can reduce the need for inmate transport and thereby reduce the cost of custody staff and enhance security.

## Mental Health Services

Prominent in recent legal challenges to extended control facilities are issues around the provision of mental health services. As the percentage of mentally ill offenders represented in correctional populations has grown over the last decade, corrections systems have had to deal with a wide range of mental illnesses and

disorders, frequently without adequate resources. Inmates displaying self-destructive, assaultive, or aberrant behavior often end up being treated solely as disciplinary cases and, in many corrections systems, become prime candidates for extended control. Other inmates become mentally ill while in the extended control environment.

Most corrections officials will agree that the inmate with multiple diagnoses (for example, mental illness, addiction, and violence) poses significant problems in the orderly operation of a prison. It is an unfortunate circumstance that housing, program, and offender management decisions must often be based on options available (driven by the agency's resources) and system needs (safe, secure, and orderly operations), rather than through a prioritization of the multiply diagnosed offender's needs. An offender with a serious history of violence and current propensities that suggest probable reoccurrence of such behaviors might possibly be housed in an extended control environment—absent the availability of a secure mental health treatment unit.

Agencies with extended control facilities manage this population in different ways. Some—generally larger agencies that have the numbers to support consolidation—have created separate segregation units specifically for offenders diagnosed as mentally ill. Others attempt to provide services within the extended control facility. Yet others exclude mentally ill offenders from placement there, at least those who have been clinically diagnosed and/or are receiving psychotropic medications. It is important that prison officials examine their options in managing inmates with special needs.

If extended control becomes the housing of choice (or of necessity) for these populations, care must be taken to assure that services are provided to address their needs. It is critical that, at a minimum, provision is made for mental health professional staff to regularly visit each inmate housed there to assess for signs of mental illness. Provision then must be made to assure that treatment is available in the facility or elsewhere. Security measures in most extended control facilities make such assessment and treatment programs difficult and expensive. To facilitate recognition of symptoms of mental illness, early referral, and proper management, many agencies are now providing basic mental health training to correctional officers.

Insofar as possible, mentally ill inmates should be excluded from extended control facilities. Each inmate

being considered for such a facility should have a mental health evaluation. Although some mentally ill offenders are assaultive and require control measures, much of the regime common to extended control facilities may be unnecessary, and even counterproduc-tive, for this population.

## Food Service

Correctional administrators have learned over the years that providing adequate, nutritionally balanced, properly cooked food is essential—both for the successful management of a prison and to meet constitutional minima when conditions of confinement are challenged.

Extended control facilities provide the ultimate correctional food service challenge. Normally meals are prepared remotely from the extended control housing unit(s). They then must be moved to the housing units and distributed to each cell. A variety of cart and tray systems are currently in use, but all are staff intensive and time consuming. Care must be taken that food is maintained at the proper temperature and that proper hygiene precautions are followed during distribution and cleanup. In most facilities this burden falls entirely on staff—normally the custody staff—and can be a daily source of conflict and resistance if the food and/or procedures are inadequate.

All of the other complexities of correctional food service should also be considered by those evaluating an extended control facility or planning a new one. These include quantity and quality control, religious diets, medical diets, and presentation. Adherence to normally accepted dietary standards should be maintained, and food service and facility managers should monitor this.

## Property

The property an inmate is allowed to possess always poses a challenge for prison administrators, but even more so in extended control facilities. On one hand, allowing the inmate to maintain certain types of property (such as a television, radio, and recreational reading materials) would help mitigate the absence of other stimuli. The more property allowed, however, the more difficult it is for staff to conduct thorough searches. A large amount of property in housing units makes the introduction and concealment of contraband much easier. It may present a fire hazard, as well as make maintenance of sanitation standards more difficult.

Careful evaluation of property to be allowed should strike a balance between the security, safety, and sanitation needs of the facility and a property allowance that supports reasonable human dignity. Particular attention must be given to items that could present a security threat: razors, pens, matches, etc. Agencies vary widely in what and how much they allow. Some allow commissary purchases, some allow them only after certain phases of the program have been completed, and some disallow such purchases entirely. Critical to planning or evaluation efforts is that such decisions must be commensurate with the level of risk presented by the specific population of the facility.

## Hygiene and Sanitation Issues

Inmate personal hygiene and cleanliness of the facility are important when planning or evaluating extended control options. Most facilities have toilet and washbasin fixtures in each cell and showers located centrally within the housing units. Two or more correctional officers move inmates individually in restraints to the shower (normally three or more times per week). This is a staff-intensive process that presents an opportunity for resistance, combativeness, or contraband introduction. Recent designs for extended control facilities include a shower in each cell with the water remotely controlled, thereby eliminating the need for staff-intensive escort to central showers.

Incentives, disincentives, or both should be incorporated as part of the facility's policies to encourage inmates to maintain acceptable levels of sanitation in their cells. Policies should be developed to govern the distribution of materials and equipment to inmates for cleaning their cells.

Efficient, hygienic laundry services must be available, and routine linen and clothing exchange procedures maintained and monitored. Excess linen and clothing in the cells becomes both a sanitation and facility budget issue and makes it difficult to conduct good cell searches.

Sanitation of other parts of the facility and other hygiene issues must also be taken into account. Since extended control inmates are restricted to their cells unless in restraints and under escort, they cannot perform cleaning or other facility maintenance work in common areas that inmates in a general population prison would typically do. Accommodation must then be made for staff to maintain these areas.

## Security

Security issues clearly become the focal point of most extended control facilities. If indeed the inmate population held there is limited to those who have

displayed a propensity for violence or escape, or who present a threat of disruption within a prison, then strict control of all materials, information, and personnel entering or leaving the facility becomes crucial to its orderly and safe operation.

Many security issues are dependent upon the physical design, and proper design can go a long way in ameliorating many security problems. However, the greatest contribution to a sound security program is an alert, well-trained, professional staff. With few exceptions, escapes, disturbances, and homicides in extended control facilities were the result of human error.

The routine inherent to these facilities can become disarming, leading to potential breakdown in critical procedures. Some agencies, by policy or scheduling, attempt to lessen the effects of routine by rotating staff in the housing units, between units, or into other parts of the facility. Frequent shakedowns of the cells and areas of the facility that inmates may use are essential and require extensive staff training and supervision if they are to be conducted properly.

Technology can contribute to a sound security program. A variety of options are now available for staff and visitor screening, and new types of scanners and detectors for examining property and mail. New types of perimeters, security doors, and control mechanisms can enhance security. Particular attention should be paid to those technologies that not only qualitatively improve the facility's security, but also reduce staffing requirements.

## Policies and Procedures

Particularly critical to the operation of extended control facilities are policies that enumerate *what* must be done (or not be done) and procedures that dictate *how* things should be done. The policies should clearly state the correctional agency's philosophy and expectations for the operation of the extended control facility, along with explicit procedures for how and when which things should be accomplished.

Staff must be thoroughly trained on policies and procedures that apply to them and be aware of who, if anyone, can make exceptions. The policies should elaborate on the behavior expected of both staff and inmates, as well as *between* staff and inmates. Operational difficulties in the past generally were the result of inadequate policies and procedures, failure to adequately train staff, or both.

Communication of changes in policies and procedures must be quick and thorough. As in other correctional settings, the legality of operations in extended control facilities will be measured against the facility's or agency's own policies and procedures and whether staff performance is consistent with those policies and procedures.

A formal, official, frequent, and ongoing updating of policies and procedures is essential. Informal exceptions, handwritten modifications, and memoranda at variance with existing policies or procedures quickly render them ineffective, if not useless. If operations or incidents are challenged in court, the facility's policies and procedures will become its greatest ally or greatest adversary.

Routine security audits are excellent tools to ensure compliance with established policies and procedures. A comprehensive audit program and well-designed system checks that assess staff response, equipment, and operational practices will help assure a strong security system. Such a program will also maintain the knowledge and skill levels of the staff and reinforce their attentiveness.

## Use of Force

The use of force is inevitable in extended control settings. Care must be taken in planning or evaluating these facilities to ensure that policies and procedures, techniques, philosophies, and controls of the use of force are thoroughly analyzed. Although a few agencies have officers in control booths armed with firearms and/or gas, most rely on higher numbers of staff as their primary means of physical control, supplemented by a variety of nonlethal weapons.

A case can be made that force is used each time an inmate is moved out of the cell. Typically, two or more officers handcuff the inmate (often supplemented by leg or waist chains) before he/she is allowed out of the cell. The inmate is then moved under the supervision of two or three officers—in some agencies by hands-on escort —to the destination point. Such instances are referred to as routine use of force.

14

Operational policies should require 1) thorough documentation of the use of force through written reports by each staff member present during the use of force, 2) videotaping of each planned use of force, 3) periodic debriefing and examination of practices with involved staff, 4) regular review of all use-of-force incidents by facility administrators, and 5) mandated review of documentation and videotapes of specified levels of use of force by higher authority.

Some agencies are now installing constantly operating panoramic video cameras in their housing units and corridors, taping everything that occurs there. This not only acts as a control measure to prevent abuse or violation of policies and procedures, but documents staff and inmate activities to forestall unfounded claims by inmates.

## Documentation

Routine documentation of the activities and events in extended control facilities, including videotaping cell extractions or other planned uses of force, is essential for several reasons:

- It allows supervisory and administrative staff to monitor the day-to-day performance of staff.

- It reinforces staff observance of policies and procedures and the need for performing certain tasks and activities.

- It creates a record of the completion of required tasks and exceptions to the normal routine that can be used in the event of a legal challenge.

- It allows continuity and communication across work shifts.

It is particularly important to consistently document hearings; use of force; medical and dental services provided; mental health evaluations and contacts; and access to personal hygiene facilities, exercise, and religious and legal resources. It is critical that staff document an inmate's refusal of a proffered service or opportunity, such as a meal, medical or dental care, use of facilities and resources, etc.

Other uses of force that must be anticipated include cell extractions; controlling self-destructive behavior; and dealing with combative, resistive, and assaultive behaviors. Although few facilities have experienced large-scale disturbances, all must be prepared for such an event and be able to respond with specialized, well-trained tactical teams.

Critical to use-of-force planning or evaluation are policies and procedures that clearly articulate what level of authority is required for each level of force used, the steps that must be taken to reduce or eliminate the need for using force, the type of force to be used, and the steps to be taken once the force has been applied.

# Section 5. Staff Issues

## Personnel Characteristics

Corrections officials who have operated extended control facilities agree that, ideally, staff should possess the characteristics of maturity, intelligence, and good judgment, and—at least for custody positions—be physically capable of performing the rigorous duties required of them. They should be even-tempered, consistent, and capable of respecting diversity in the inmate population. The difficulty of working day-to-day in an environment that is a mixture of repetitive routine, unscheduled incidents, and physical/personal challenges requires that the staff be uniquely adaptable to working in an abnormal setting with persons who present inordinate adjustment and management problems.

Agencies vary in the types of pre-employment testing they require. Ideally, such testing would include medical examinations and tests for physical agility, psychological fitness, use of illegal drugs, and special knowledge and skills. Certainly the high-security nature of these facilities requires thorough background investigations.

## Recruitment and Selection

Most professionals agree that the staffing of an extended control facility is the single most important factor in ensuring safe, secure, and humane operations. Although the ability to be highly selective in assignment of staff is very important, it is not always possible because of limitations that may include bargaining agreements, an existing staffing complement, or a requirement to hire displaced staff.

Although some managers prefer to hire new staff and provide them intensive training rather than rely on experienced staff who may have "bad habits" developed in other settings, it is difficult to justify assignment of inexperienced staff to work with the system's most difficult inmates. Most new staff, with or without intensive training, will have difficulty in an extended control environment, and many will "opt out" through resignation or when transfer becomes available to them. Initial assignment to extended control may result in the loss of new staff who otherwise may have promising career potential. An agency should also recognize that the assignment of inexperienced staff to such critical posts may subject them to safety and security risks they can ill afford to take.

Assigning staff to an extended control facility strictly on a seniority basis is also troublesome because seniority (or lack of it) may not relate in any way to requisite interest, temperament, skills, knowledge, and experience. Agencies should be especially mindful of the risks inherent in staffing a unit with predominately low seniority workers, as can happen when seniority prevails and segregation work is unpopular. In such instances, a mismatch of skills, experience, interest, and temperament can negatively impact the operation of the facility and can create a dangerous situation, hinder the adjustment of the inmates to difficult conditions, result in staff turnover, or be detrimental to staff's physical and psychological health.

Agencies should consider establishing special eligibility requirements or, perhaps, a special employee classification for extended control workers that would require successful completion of a specialized training program before regular or relief assignment to extended control posts. In addition to familiarizing staff with the dynamics of violence and disruptive and/or antisocial behavior, such training should prepare them to communicate regularly and positively with inmates in an environment that is structured to make such communication difficult. Selecting staff who choose to work in extended control and have prepared themselves and acquired special knowledge and skills will pay great dividends as opposed to staffing the facility through seniority, rotation, or with those considered the "toughest of the tough."

Many of the extended control facilities built in recent years are located in rural areas far from metropolitan centers. This creates extraordinary challenges in recruitment and retention of staff, particularly in specialty areas such as physicians, dentists, and mental health professionals, and may require recruitment efforts and flexibility in employment practices that are beyond standard practice.

Achieving a diverse workforce is also more difficult when the facilities are located in relatively isolated areas. However, it is important, if not essential, that an agency ensure by whatever means necessary that an appropriate racial, ethnic, and gender balance is

achieved and maintained. Agencies that have required gender balance and provided training to ensure understanding of professional and operational expectations of both men and women have found that gender balance "softens" the environment and encourages the development or maintenance of positive social, hygiene, and behavioral practices by inmates. Racial and ethnic balance is critical in the minimization of anger, creating perceptions of fairness, providing equity in interpersonal dialogue with under-represented inmate groups in the population, and maintaining cultural sensitivity. Although recruiting, hiring, and retaining minority staff for extended control work is difficult in some jurisdictions, specialized training and a special employee classification could prove helpful.

## *Care must be taken to assure that all personnel in an extended control facility are thoroughly trained....*

### Training

Training, which is crucial to any correctional operation, is especially critical for staff working in extended control facilities. Custody staff in particular must perform their duties in an environment in which inmates by reputation—and frequently in reality—are combative, assaultive, or threatening.

Staff must work together and be able to rely on each other to a greater degree than in most other correctional settings. Regular counts, feeding, handling of correspondence and property, delivery of medications, providing escort, and performing cell searches all require specific knowledge and attention to detail. Staff must be able to handle their responsibilities consistently and professionally. Failure to properly restrain an inmate, perform a thorough pat search, or operate control panels precisely can lead to disastrous results.

Only quality training and regular refresher courses can provide the skills essential to carry out these duties in a professional manner and ensure that bad habits are not passed along to new staff members. Top performance levels can only be reached through thorough orientation and basic training, solid on-the-job training with competent supervision, and annual review/refresher training.

Care must be taken to assure that all personnel in an extended control facility are thoroughly trained in

security procedures and requirements and facility operations philosophy, as well as their own job skills. It is particularly important that training be provided to ensure that staff understand the documentation that is required in all aspects of the extended control operation. Cross-training of individuals so they can perform in a number of posts increases the flexibility of the custody staff and enhances their understanding of the total operation. Specialized training also should be planned for special operations teams, search and shakedown teams, emergency medical response teams, and cell extraction teams.

### Stress

Many corrections professionals who have operated or administered extended control facilities express concern that the unique challenges of these facilities can create a great deal of stress for the individuals who work there. A very stressful environment is created by much of the work day being extremely routine while emergencies can occur instantaneously, staff being challenged verbally and/or physically by inmates, and so much emphasis on security and control.

Agencies operating extended control facilities attempt to mitigate the impact of this environment in a variety of ways. Some require rotation of assignments within the unit or facility, some require periodic rotation out of the unit or facility, and others rely on training and stress reduction classes to help employees handle the work environment.

Bargaining unit contracts in some jurisdictions inhibit or prohibit the rotation of staff between shifts, posts, units, or facilities. Agencies that are planning extended control facilities should evaluate existing contracts or agreements and attempt to develop the flexibility to allow management to rotate staff. Contracts should also include provision for staff to have access to counseling, particularly after traumatic incidents such as necessary use of force.

### Leadership and Supervision

Integral to the operation of a quality and legally defensible extended control facility are strong, technically competent, and professional leadership and supervision at all levels—from the line-level supervising custody officer to the administrators of the agency.

Administrators at the central agency level must assure that thorough policy guidance is provided to set

the parameters for the operation of the facility. Policy must clearly outline who will be considered for admission to the facility; what authority may allow such a placement; what reviews will occur, how often, and by whom; and what the release criteria are and who approves. Central agency administrators should also establish a process to review the policies and procedures developed at the local level and to regularly review use-of-force incidents. They also should, on a regular basis, personally review the operation of the facilities onsite to assure that the policies and procedures are indeed being followed.

Administrators and managers at the local level (superintendents, wardens, and their delegates) must assure that the local policies and procedures are consistent with central agency policies and are sufficiently thorough to provide clear guidance to staff working in the extended control facility. It is also incumbent on local managers to observe operations—routine and exceptional—on a regular basis. They also have the responsibility to assure that training time and resources are available, that training is thorough and consistent with their own policies and procedures, and that the training is relevant to the effective and efficient operation of the facility. Local managers must also ensure that support services are coordinated and functioning at a level that permits proper delivery of services to both inmates and staff.

First- and second-level supervisors have critical roles in the proper operation of extended control facilities. They must assure, on a day-to-day, moment-by-moment basis, that the staff know what to do and how to do it. They must see to it that routine tasks are indeed routinely accomplished, yet be able to take an onsite leadership role when incidents occur. Comprehensive training is imperative for this segment of the staff also, as they must be thoroughly knowledgeable of and understand the policies and procedures and how to implement them. In addition, they must be well trained in the supervision of subordinates, crisis management, and use-of-force techniques.

Non-custody staff must also be selected and trained to provide leadership and supervision over their particular specialties. Medical, dental, food service, mental health, religious, program, maintenance, and other support staff must provide leadership and technical knowledge in their areas of expertise to create balance in the facility operation. They must also be thoroughly grounded in knowledge of the mission of the facility and understand and accept the safety and security requirements of the operation.

If the extended control facility is to avoid common pitfalls, it is incumbent on administrators at all levels to think through, adopt, and implement consistent policies, procedures, and behaviors that promote professional operation of these very demanding and challenging places. If successful, the agency may  be able to avoid, or at least reduce, the risks of the "we/they" syndrome between the staff and inmates. If quality leadership and supervision are absent, the program is likely to face major problems and probably litigation.

# Section 6. Siting, Design, and Construction Issues

## Co-Located vs. Separate

Jurisdictions in the planning stages of developing an extended control facility should give a great deal of thought to their decision to either co-locate it with another correctional institution or to site and build a separate facility. Extended control facilities in operation are sited in both ways and in variations of those ways.

Co-location, either through renovation or new construction, usually offers several advantages: less public resistance to the siting process, existing utility extensions and agreements, opportunity for staff at the parent institution to oversee the renovation/construction phase, and availability of logistical support once the new facility is in operation. Co-location also may offer the advantage of a ready source of experienced staff, facilitate rotation of staff from extended control to less stressful units, and provide greater backup capability in an emergency. Those critical of co-located facilities suggest it is difficult to maintain the high level of security and custody when lower custody programs are at the same location.

A separate stand-alone facility at a different site may mitigate that fear. It allows for a "brand new beginning" in the startup of the program and allows for all elements, from security features to housing units to support areas, to be designed in support of the extended control program. However, transition programs within the facility can have an effect similar to having lower custody programs co-located.

## Site Selection

It would be desirable to locate extended control facilities in or near urban areas to facilitate recruiting and maintaining a diverse workforce; recruiting specialty staff and services (medical, dental, and mental health); and reducing logistical costs associated with such things as transportation of people and supplies. Many corrections officials advise against urban sites, however, suggesting they create greater visibility and uninformed criticism of the program, greater public resistance to siting, and a greater threat (real or perceived) to security.

Rural sites have become more of the norm in recent years, as the building of correctional facilities is seen by smaller communities as a means of enhancing the local economy with an "industry" that is relatively environment-friendly and stable. Locating in a community that is accepting rather than resistant is desirable for any endeavor, public or private.

Before initiating a siting process for an extended control facility, agencies should address the issues of staff recruitment and retention; transportation; access to medical, law enforcement, and fire services; availability of affordable housing; and environmental impact. Siting often becomes a political decision with little regard for pragmatic correctional issues, but corrections officials should at least document their concerns.

## Design Issues

The designs of extended control facilities vary greatly, and many agencies with newer facilities have borrowed design ideas from earlier models. As in all new construction, the design should be heavily based on the mission of the facility. Considerations in defining the mission should include the profile of the target population; custody requirements; planned programs and services; the facility's relationship to other parts of the corrections system, particularly in matters concern-ing reception and release; and if transition programs will be housed in the facility. Once these elements are defined, technology requirements and housing, program, and shared spaces can be determined.

An agency should carefully consider the number of extended control beds that are or will be needed. Officials should avoid the approach that "more is better" and limit the size of the facility to the number of beds essential to the management of dangerous inmates for whom no other viable means of control is available. Overbuilding extended control capacity—which will be used by some profile of inmate in this era of burgeoning prison populations—may cause problems operationally and legally as the agency attempts to house inmates in an extended control environment who do not require that level of custody or security. Once constructed, it will be difficult, if not impossible, to use the facility without the intensive staffing characteristic of extended control operations.

Most extended control facility designs incorporate single cells; a relatively small number of cells in each pod; and a remote central control booth that

electronically operates cell doors, shower doors, unit doors, and any number of other functions in several pods. Some new facilities, though considered supermax, are designed for double-celling, which suggests that the target population requires a lesser level of custody than that required by a true extended control population. If the target population is suitable for double-celling, the planning agency should consider whether a lower level of control that is less costly than extended control may be appropriate.

In planning new facilities, inclusion of relatively inexpensive technology can provide amenities that can become incentives for good behavior and support health, safety, and security. Secure, built-in intercoms, radios, and monitors with which to communicate with inmates and provide educational, religious, and treatment programs and access to legal information and current events are among the possibilities for humanizing a sterile environment. Although an agency may choose to provide few programs to inmates in extended control, consideration should be given to including program delivery capabilities in design and construction to accommodate necessary modifications in future years based on changing needs, court decisions, or policy revisions.

If transition programming is to be provided, the design should include adequate day room, program, recreation/exercise, and other shared spaces to facilitate progressively greater freedom of movement for inmates. Housing, programs, out-of-cell opportunity, and staff interaction should all demonstrate that the inmate is making progress, but sufficient custody should be maintained to ensure safety. Space separation from the extended control housing should be apparent and should clearly distinguish transition inmates and staff who supervise them from extended control inmates and staff.

Most extended control designs significantly "harden" and limit the number of access and egress points on the perimeter. Support services are generally near but remote from the housing units. Some designs include an inner perimeter that allows lower custody inmates, normally from an adjacent institution (but possibly inmates in transition programs housed in the extended control facility), to provide support such as food, library, maintenance, and sanitation services but without contact with the extended control inmates. Space for some support services and activities, such as attorney and family visiting areas, hearing rooms, medical examination rooms, and counselor and supervisor offices, is often provided in immediate proximity to or in the housing pods.

Space designed for administrators and managers varies, but normally is split between an "outside" administration building to house support personnel who ordinarily do not have routine inmate contact and "inside" administration areas for staff providing direct inmate services. Limiting the number of staff who enter the secure perimeter to those essential to the daily operation of the institution lessens the potential for security breaches and reduces staff security processing time.

Critical design decisions faced by planners—with varying choices being made—include cell size, windows (or not), types of cell fronts and doors, locking and control systems, types of electronic systems on the perimeter, special relationships of support services, training space for staff, program space (if any), congregate recreation and/or exercise space (if any), and many others. It is important that the experience of extended control managers in other agencies be considered and that policy and operations issues be addressed before planning and design. Poor decisions up front inevitably lead to extensive retrofitting or remodeling at a later date, increased operating costs, and the potential for weakened security.

Agencies planning new facilities should try to avoid designs that are so "tight" that they restrict additions or changes to the facility in the future, when correctional needs may change. For example, some extended control facilities contain little or no space for programs, based on the assumption that the type of population they will house will not be allowed to participate in congregate programs. In the future, either due to court decisions or different system needs, they may encounter serious and probably very costly problems in attempting to meet new challenges if the design is so inflexible as to pre-clude additions to the original facility.

## Construction Costs

During the past decade, the costs of operating prison systems have increased dramatically due to increasing numbers of inmates, new prison construction, and the swelling ranks of corrections staff. As the share of a jurisdiction's budget dedicated to corrections increases, so does attention to correctional operations. This has often resulted in a reduction of critical services.

Construction of extended control facilities is very costly due to the need for high-security components: elaborate perimeters; high-security doors, hardware, and locking systems; heavily fortified walls, ceilings, and floors; and sophisticated electronic systems in master and unit control rooms. Although construction costs are high, they are dwarfed by the costs to staff such facilities over a period of years. Virtually all inmate services, maintenance, and sanitation work are provided wholly or in part by corrections staff in these facilities.

Cost-benefit analysis of construction methods, materials, and equipment and visionary planning of space needs and use are essential in all construction planning. While use of lower-grade materials and equipment, reduction of core space to the minimum footage feasible, and not "footprinting" in space for possible other uses in the future have enabled agencies to reduce initial construction costs, these approaches to cost containment have resulted in significant maintenance, replacement, and retrofitting costs later. A footprint that includes space for expansion, alternate use, or addition of program modules adds little to construction costs and can produce great savings in future years.

## Implications for Operating Costs

In most jurisdictions, operating costs for extended control facilities are generally among the highest when compared to those for other facilities. Facilities that have similar or higher costs tend to be other specialized ones, such as medical or psychiatric facilities.

The location of the facility will contribute to operating costs. Facilities that are distant from supplies and services will ordinarily have greater operating expenditures due to transportation-related factors. Transporting inmates to and from the extended control facility, courts, and community medical services will be more costly.

Design factors will also influence operating costs. The number of inmates per unit, per pod, and in the total facility and the number of staff required to provide adequate security and services are all design-related issues. The number of officers required to staff control centers, monitor housing units, provide escort within and outside the institution, and provide internal and external security will affect the operating costs.

Facilities designed with clear sight lines may be able to operate effectively with less staff than those with obstructed views. Those with showers in the cells may be able to operate with reduced custody staffing as a result of a significant reduction in the number of out-of-cell escorts. Some agencies have been able to reduce the number of security staff through use of video cameras and other electronic equipment, this being particularly effective when their use is incorporated into the original facility design.

One particularly critical factor that has a significant impact on operating costs is the design of the perimeter. Whether (and how many) towers are incorporated has long-term operating budget implications. Maintaining coverage in one tower seven days per week, 24 hours per day requires approximately 5.3 full-time employees. Obviously, staffing multiple towers would consume significant portions of the facility's operating budget.

Agencies operating extended control facilities vary in their response to this issue. Some have chosen towers. Others have chosen lethal fences and few, if any, towers. Yet others rely on heavily "wired" fences with a variety of electronic alarm systems, with or without towers. Those that opted for the fewest towers typically placed the tower(s) at the vehicular or pedestrian entrance, or both.

## Further Considerations

Before (or during) planning or designing an extended control facility, the planning team should observe extended control operations in several jurisdictions. It would be most helpful if those jurisdictions share the same philosophy regarding extended control and operate a facility of the approximate size anticipated.

The visiting team should discuss the strengths and weaknesses of various design features with managers and line staff at the operating facilities. Asking them, "What would you change if you could?" may produce helpful design tips.

To help assess the impact of the design on operational efficiency and costs, the team should review the staffing pattern, post orders, and policy and procedure manuals. The type of inmate misconduct that is most common may also help identify possible improvements in the design and operations. Issues related to constitutional conditions of confinement, including cell size, exercise space, natural light, and air exchange, should be carefully studied.

# Section 7. Summary, Conclusions, and Recommendations

Correctional philosophies shift over time, fads are born, and trends evolve. Large linear prisons emphasizing large industrial plants were the norm up to the 1950s. Smaller prisons emphasizing education and treatment emerged in the 1960s only to be replaced once again by large prisons in the 1980s and even larger prisons in the 1990s. Some of the recent fads and trends include boot camps, privatization, lethal fences, chain gangs, removal of exercise weights and other privileges, sex offender treatment, and inmate co-pay for services. Some of these gained prominence due to political attractiveness, and some because they do present partial solutions for today's correctional problems.

Typically, "new" programs in the field of corrections are not based on extensive research. Some are born out of emerging needs; some are created in reaction to a crisis or emergency; others are the result of political agendas. It would seem that the "supermaxes" have emerged from a blend of these influences, depending on the jurisdiction.

It appears that the purest intent of supermaxes around the country is to isolate inmates who through behavior—or threat of such behavior—are dangerous or chronically violent, have escaped or attempted to escape from a high-security correctional facility, or have incited or attempted to incite disruption in a correctional facility. The physical facility or unit and the program implemented there isolate these individuals in a highly restrictive setting for the primary purpose of protection of staff, other inmates, and the community. The purpose of such facilities is not, or should not be, to exact additional punishment. Nor should such a facility be used as the repository for inmates who are simply bothersome, self-destructive, or mentally ill; who need protection; or who have an infectious disease.

The extended control facility in its purest form is operated with the assumption that the inmate placed in it must be denied access to people that he/she might harm, to the opportunity to incite disturbances or disrupt the operation of a correctional facility, and to materials with which he/she may harm self or others. Some agencies do place many other types of inmates in these facilities. The questions an agency may wish to ask before expanding the criteria beyond the very limited ones, or in planning, building, or operating a new facility, include:

- Do we want to risk the possible legal challenges that may accompany the expansion of placement criteria beyond what is absolutely necessary?

- Do we want to incur the significant expense of placing inmates in extended control who do not actually require that level of control?

- Do we want to subject inmates to the severe and rigid conditions of extended control if they do not clearly meet the narrow criteria for placement there?

- Is a policy of "concentration" rather than one of "dispersal" in the best interest of our agency?

When a jurisdiction has decided to operate an extended control facility, the questions of what to allow (or deny) in programs and services become critical, as do the issues of staffing, staff training, supervision, and administration.

Analysis of existing and planned extended control facilities and a review of concerns and experiences regarding them suggest that the field would benefit from implementation of the following recommendations.

- Initiate research on the effects of such facilities on the inmates housed in them, to include the impact of varying lengths of time and the availability (or absence) of a variety of programs.

- Initiate research on the impact of such facilities on the personnel who work in them.

- Evaluate the options that agencies might use to more effectively manage some types of inmates who they currently place or plan to place in extended control.

- Evaluate more thoroughly the impact of these facilities on the correctional agency and its other facilities.

- Create cost-benefit analysis capability to better assess the value returned by these facilities.

- Adopt a universal definition of the population that would be housed in extended control facilities.

- Develop professional standards specific to extended control facilities that provide a template for agencies to follow in the areas of policies and procedures, training, staffing, and program and service provision.

# References and Bibliography

Barnes, H.E. *The Story of Punishment: A Record of Man's Inhumanity to Man*, 2d Edition. Monclair, NJ: Patterson Smith, 1972.

Bottoms, A.E., and Light, R. eds., *Problems of Long-Term Imprisonment*. Aldershot: Gower, 1987.

Bureau of Justice Statistics. *Sourcebook of Criminal Justice Statistics, 1995*. Washington, DC: U.S. Department of Justice, 1996.

Bureau of Justice Statistics. *Sourcebook of Criminal Justice Statistics, 1996*. Washington, DC: U.S. Department of Justice, 1997.

Bureau of Justice Statistics. *Sourcebook of Criminal Justice Statistics, 1997*. Washington, DC: U.S. Department of Justice, 1998.

Bukstell, L.H. and Kilman, P.R. "Psychological Effects of Imprisonment on Confined Individuals," *Psychological Bulletin* 88(2), 1980.

Camp, G.M. and Camp, C.G. *Prison Gangs: Their Extent, Nature and Impact on Prisons*. Salem, NY: Criminal Justice Institute, 1985.

Carter, Stephen A. "Issues Impacting Supermax Facilities." Presentation to ACA 127th Congress of Correction: August 13, 1997.

Conklin, John F. *Criminology* (Boston, MA: Allyn and Bacon) 6th Edition, 1993.

Federal Bureau of Prisons. *Security Designation and Custody Classification Manual*. Washington, DC: Federal Bureau of Prisons, 1996.

Federal Bureau of Prisons, North Central Regional Counsel. *Legal Issues Regarding Administrative Maximum Institutions and Control Units*. Washington, DC: Federal Bureau of Prisons, July 1997.

Fellner, Jamie and Mariner, Joanne. *Cold Storage: Super-Maximum Security Confinement in Indiana*. Human Rights Watch, NY, October 1997.

Garland, David. *Punishment and Modern Society*. University of Chicago Press, 1990.

Gendreau, P. and Goggin, C. "Principles of Effective Correctional Programming." Forum on Corrections Research.

Grassian, Stuart. "Psychopathological Effects of Solitary Confinement." *American Journal of Psychiatry* 140, 1983.

Haney, Craig. "Infamous Punishment: The Psychological Consequences of Isolation," *National Prison Project Journal* (ACLU), Spring 1993.

Johnson, Robert. *Hard Time: Understanding and Reforming the Prison*. Belmont, CA: Wadsworth, 1987.

King, Roy. "Maximum-Security Custody in Britain and the USA." *British Journal of Criminology*, Volume 31 No. 2, Spring 1991.

Lemov, Penelope. "Roboprison." *Governing*. March 1995.

Mauer, Marc. *The Lessons of Marion*. Philadelphia, PA: The American Friends Service Committee, 1985.

National Institute of Corrections and LIS, Inc. "Supermax Housing: A Survey of Current Practice." *Special Issues in Corrections*, March 1997.

Shelden, R.G. "A Comparison of Gang Members and Non-Gang Members in a Prison Setting." *The Prison Journal* (Fall-Winter 1991).

Toch, Hans and Adams, Kenneth. *The Disturbed Violent Offender*. Washington, DC: American Psychological Association, 1992 (revised).

Ward, David. "A Corrections Dilemma: How to Evaluate Supermax Regimes." *Corrections Today*, July 1995.

Ward, David A. and Carlson, Norman A. "Super-Maximum Custody Prisons in the United States." *Prison Service Journal*, Issue No. 97.  April 1994.

# Exhibit 12



ELSEVIER
SAUNDERS

Psychiatr Clin N Am 29 (2006) 761–772

# PSYCHIATRIC CLINICS
## OF NORTH AMERICA

# An Overview of Correctional Psychiatry

Jeffrey Metzner, MD[a],*, Joel Dvoskin, PhD, ABPP[b]

[a]University of Colorado School of Medicine, 3300 East First Avenue, Denver, CO 80206, USA
[b]University of Arizona School of Medicine, 3911 East Ina Road, Tucson, AZ 85718-1531, USA

The rapidly escalating rate of incarceration in the United States has been associated with an increasing number of imprisoned individuals who suffer from a mental illness [1–3]. Research indicates that as many as 20% of inmates in jail and prison are in need of psychiatric care for serious mental illness [4]. According to the US Bureau of Justice Statistics, an estimated 283,800 mentally ill offenders were incarcerated in US prisons and jails at midyear 1998 [5]. In response to the critical need for substantive discussion and policy development relevant to providing treatment for incarcerated persons with mental illnesses, the Council of State Governments established the Criminal Justice/ Mental Health Consensus Project. A 432-page report was issued by the Consensus Project during June 2002 that included detailed recommendations for improving responses to incarcerated persons with mental illnesses [6,7].

There are numerous agencies and organizations that provide a wealth of information relevant to correctional health care systems, including the US Department of Justice's Bureau of Justice Statistics, The National Commission on Correctional Health Care (NCCHC), and the American Psychiatric Association. It is no longer difficult to find literature specific to correctional mental health care, which will assist administrators and clinicians in establishing adequate mental health services within jails or prisons [4,8–12].

This article focuses on several evolving issues in correctional mental health care that are especially controversial and often inadequately addressed within correctional facilities.

## SERIOUSLY MENTALLY ILL INMATES IN SUPERMAX PRISONS

During the past decade, many prison systems have constructed facilities (often called supermax prisons) or units with the specific purpose of incarcerating inmates under highly isolated conditions with limited access to programs, exercise, staff, or other inmates. Characteristics of such units generally include being locked in a cell for 23 hours per day for many months to years at

*Corresponding author. E-mail address: jeffrey.metzner@uchsc.edu (J. Metzner).

a time. Riveland [13] describes these facilities as representing a philosophical change in correctional management of troublesome inmates from a "dispersion" approach to a "concentration" approach. The underlying premise of the concentration approach is that general population prisons will be safer and more efficiently managed if the troublemakers are completely removed [13,14].

There are several different statuses that can result in segregation. Disciplinary segregation, typically ordered as punishment for an institutional infraction, is often of short duration. In contrast to this status, which is based on what the inmate has done, administrative segregation is typically imposed based on what the inmate might do. That is, administrative segregation is prospective in nature and designed to protect other inmates from a danger believed to be posed by the inmate. It is often administrative segregation, a classification status, which has now commonly led to the imposition of long-term segregation.

There are three situations that result in segregation status, and in our view they require different institutional responses. First are inmates who, either because they are unable or unwilling, fail to abide by institutional rules, thereby creating a danger to institutional order, security, or the safety of staff and inmates. For these segregation inmates, the purpose of segregation ought to be the creation of a safe learning environment in which an inmate can learn how to safely "do time." But today's long-term segregation environments not only fail to facilitate such learning; they virtually preclude it. Inmates are housed in conditions of such extreme control that they get to make few if any decisions, except perhaps whether to obey direct orders.

The second type of segregation inmate is one who knows well how to negotiate a correctional environment but whose wish for power and money lead him to join and even lead prison gangs in the perpetration of organized crime within the prison. These inmates, leaders or "shot-callers" of prison gangs, are believed to pose such an extreme danger to other prisoners that, so long as they remain gang affiliated, they can never return to the general population. This situation is especially common in California, where the gang problem is most severe.

Finally, in some states, inmates find their way into long-term segregation because their mental and intellectual limitations prevent them from following orders and successfully following prison rules. Placing such inmates, already mentally disabled and psychologically vulnerable, in segregation serves no useful purpose and should not occur. In other words, absent the most extraordinary circumstances, no one should ever be placed in long-term segregation because of their serious mental disability or its symptoms.

It is the authors' opinion that the use of supermax confinement is overused within correctional facilities in the United States [15]. Because of its extreme limitations on liberty and its potential for harm, use of this type of program should be reserved for cases in which there is no less restrictive way to remedy an unsafe situation. Further, with few exceptions, inmates should not be placed in long-term lockdown housing units for prolonged periods of time without at least some reasonable opportunity of being able to work their way out via a behaviorally oriented system with definable, measurable, and achievable

outcomes. Such a system should include some ability for each inmate to control, by displaying prosocial behaviors, the conditions of his confinement. These conditions include the ability to watch educational videos, recreation television, to have a radio or a fan in the room, or to have additional time out of cell. At higher levels, it may also include the ability to exercise with other inmates, so long as security concerns (eg, rival gang membership) are taken into account.

There are a small number of inmates whose violence has been so extreme as to preclude the opportunity to ever return to the general population. Examples would be inmates serving life sentences who have assaulted staff with a deadly weapon or attempted to perform contract murders for a prison gang. However, even for these inmates, having some control over their living conditions is desirable for the prison. Abiding by the rules of the segregation environment ought to result in some improvement in the inmate's living conditions; otherwise, inmates may lose any motivation at all to behave properly, thereby endangering the staff who must work with them.

In one state prison system, one of the authors (JD) helped staff to develop such a behavioral system. Before the system was even implemented, the inmate behavior changed so significantly that the incident rate on the segregation unit reportedly dropped by 80%.

There is only sparse literature on the impact of long-term segregation on psychological functioning. There are few, if any, adequate scientific studies concerning the impact of locking an inmate in an isolated cell for an average of 23 hours per day with limited human interaction, minimal or no programming, and in an environment that is designed to exert maximum control over the individual. There is general consensus among clinicians that placement of inmates with serious mental illnesses in these settings is contraindicated because many of these inmates' psychiatric conditions will clinically deteriorate or not improve [16]. In other words, many inmates with serious mental illnesses are harmed when placed in a supermax setting, especially if they are not given access to necessary psychological and psychiatric care. In addition to potential litigation, this is one of the main reasons that many states (eg, Ohio, California, Illinois, and Wisconsin) exclude inmates with serious mental illnesses from admission to supermax facilities [17].

The standard of care relevant to supermax prisons and inmates with serious mental illnesses is becoming clearer as the result of clinical experience and litigation. First, it is clear that, except in the most extraordinary and dangerous circumstances, no one should be housed in segregation while they are acutely psychotic, suicidal, or otherwise in the midst of a psychiatric crisis. Though the response to segregation varies from person to person, there are certain conditions that increase the likelihood that an inmate will have an extreme and negative psychological response to segregation. Foremost among these conditions are serious mental illnesses such as schizophrenia.

Though there may be exceptions, the standard of care appears to now require either exclusion of seriously mentally ill inmates by way of mental health

screening processes or transfer to a specialized mental health program within a supermax. For inmates with a serious mental illness who legitimately need an extremely high level of security, the specialized mental health program should offer at least 10 to 15 hours per week of out-of-cell structured therapeutic activities in addition to at least another 10 hours per week of unstructured exercise or recreation time. Because these inmates may still require supermax classification, the correctional officer staffing should be sufficient to comply with security regulations (eg, two correctional officers may be required to escort each inmate who is removed from their cell) [17–22].

Controversies surrounding these treatment guidelines include the use of metal enclosures that are designed to allow inmates to participate in group social or therapeutic activities while physically separated from other inmates and staff. These holding cells are variously known as "therapeutic modules," "programming cells," or, by their detractors, as "cages." These cells are similar in shape to an old-fashioned telephone booth, but when properly constructed are about twice the size, with ample lighting, a seat, a shelf, adequate ventilation, and good visibility for purposes of group therapeutic activities in a setting with adequate sound privacy. Well-constructed therapeutic cubicles in one large eastern prison system are 4.5 feet deep, 4 feet wide, and 7.5 feet tall, but are expensive (approximately $18,000 each). Typically, 6 to 10 cells are placed in a semicircular fashion to allow appropriate group interaction during scheduled therapeutic activities. Inmates are not cuffed while in these cells, which allows for active participation in various therapies, such as art, music, and journaling, as well as increased physical comfort (in contrast to being cuffed during 1 to 2 hours of continuous therapy). It has been the experience by one of these authors (JM) that these programming cells, when properly constructed and used, have been well accepted by most inmates using them.

Assuming that supermax inmates have been properly classified, the decision regarding the nature of the security required during treatment should be a collaborative one, involving attention to custody and therapeutic concerns. Unquestionably, the safety of staff and inmates is the highest priority, and the ultimate responsibility for institutional safety falls on the institutional warden or equivalent. It is the authors' experience, however, that when there is good interdisciplinary communication, it is easy to accommodate both interests. Ultimately, good treatment enhances institutional security, and vice versa.

For example, it would not be appropriate for custody staff to require the presence of a correctional officer in the room during therapy sessions if such sessions could be safely done without them present. If a traditional therapy setup is deemed to be too dangerous, the therapist and the correctional staff should collaboratively decide on an acceptable alternative, which might include the use of therapeutic modules as previously described, some type of restraint, or even the presence of correctional staff member that is trusted by the inmate.

The authors' recommendation of 10 to 15 hours of structured therapeutic activity in such units is based on experience with six large correctional systems involved in systemwide class-action litigation that focused on the adequacy of

the mental health system. Because of the variability in the conditions of confinement in supermax prisons across the county and the varying needs and capabilities of inmates with serious mental illness, it is meant as a guideline only. Institutional conditions include the nature of the physical plant, staffing, security practices, access to televisions and radios, group recreational yard, duration of confinement, allowable property, and educational and program opportunities. The intention is to provide enough healthy social interaction for treatment purposes as well as to prevent a person with a serious and disabling mental illness from potentially getting worse because of the absence of normal social interaction.

Less clear and more controversial is the psychological impact of long-term confinement on inmates who do not have preexisting mental illness. Despite claims to the contrary, it is not currently clear whether, how often, and under what circumstances such confinement causes persons to develop serious mental illness (eg, psychotic symptoms and disabling depressive or anxiety disorders). The literature, in addition to being sparse, provides conflicting perspectives on this question [23–28]. This question is also appropriately raised in housing units that are essentially lockdown units, even if they are not labeled supermax. Commonly known as administrative segregation, disciplinary segregation, or punitive segregation, it is not uncommon for inmates to be housed in such units for many months or even years at a time.

Mental health clinicians working in such facilities report that it is not uncommon to observe many inmates who do not have preexisting serious mental disorders develop irritability, anxiety, and other dysphoric symptoms when housed in these units for long periods of time. This is consistent with the finding that many non–mentally ill inmates in supermax settings respond favorably to weekly (or more frequent) rounds by mental health clinicians for monitoring purposes, especially when provided with copies of crossword puzzles, reading materials, or simply friendly conversation. Further, these rounds in segregation allow mental health professionals to detect psychological deterioration much earlier and prevent the more severe exacerbations of psychoses, depression, or anxiety that can cause the most severe discomfort to inmates and disruption to the correctional environment.

Claims that long-term segregation necessarily causes particular kinds of psychological harm, often described as being scientifically proven, have been published and presented in journals and educational meetings, and verbalized in legal testimony [24–26]. In the authors' opinion, most of these claims significantly overstate what is known about the psychological impact of long-term supermax confinement, especially on inmates who do not have preexisting mental illness. Though many of these advocates have made a significant contribution to improving mental health services in correctional facilities, in part by raising these issues, the long-term psychological effects of such environments are not known, and the basis for such claims lacks scientific support.

Grassian [25] observed that rigidly imposed solitary confinement may have substantial psychopathological effects, which may form a clinically

distinguishable syndrome. His observations were based on 30-minute interviews of 14 inmates housed in a segregation unit (Block 10) at Walpole Correctional Institution in Massachusetts around late 1979. These interviews were conducted by one of two plaintiffs' psychiatric experts in the context of a class-action suit challenging their conditions of confinement. There was no control group of any kind for this study. Dr. Grassian himself had been retained by counsel for the plaintiffs, a fact that was known to each inmate in the study. Finally, and most importantly, each of these inmates was a plaintiff in class-action litigation against the state of Massachusetts. That is, they had an obvious interest in presenting pathology to their own retained expert witness (Dr. Grassian). Despite the obvious limitations of these observations, Grassian's suggestion that the use of what he called "solitary confinement" carries major psychiatric risks was a significant contribution to the literature in that it raised an important though still unanswered question about the effects of these environments over time.

Despite these possible reasons for reporting symptoms, Grassian [25] noted that inmates denied having these symptoms, but after continued questioning by Dr. Grassian, eventually acknowledged that these symptoms existed.

In a 1986 article, Grassian and Friedman [29] proposed a solitary confinement syndrome based on "the Walpole observations, the recent literature, and the older German reports." The alleged symptoms of this syndrome included massive free-floating anxiety, perceptual distortions and hallucinations in multiple spheres, difficulty with concentration and memory, acute confusional states, persecutory ideation, and motor excitement. This syndrome has subsequently been named the SHU syndrome by Grassian in the context of the supermax Pelican Bay State Prison's security housing unit (SHU) [26]. Kupers [26] has expanded the constellation of symptoms that are consistent with this so-called syndrome, which has also been the theoretical basis for the so-called "Death Row syndrome" [14,30].

Haney [24] provides a review of the literature and cites his own research at the Pelican Bay State Prison's security housing unit to support the concept of a SHU syndrome. Haney's literature review, although useful, is significantly flawed. Specifically, he writes the following: "To summarize, there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hypertension, uncontrollable anger, hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior . . ." [24].

Haney references an article by Suedfeld et al [27] as supporting adverse symptoms occurring in prisoners exposed to supermax confinement. However, closer reading of the article included the following conclusions: "Our data lend no support to the claim that solitary confinement, at least as practiced in this sample of North American prisons, is overwhelmingly aversive, stressful, or damaging to the inmates . . . on the whole, this first attempt at an empirical

evaluation of the effects of solitary confinement indicates that the situation is tolerable and in some cases may even be perceived as beneficial, although it clearly has unpleasant features. Prisoners who have been in solitary confinement showed no deterioration in personality or intellect ... " [27]. The authors do indicate that their study had some shortcomings that make its conclusions less than definitive. It appears, then, that Suedfeld et al [27] have not answered this question; this study is described as an example of the inaccuracy of Haney's claim about the research in this area. At this time, the question has yet to be answered; that is, no one knows the long-term psychological effects of segregation on inmates, especially those with no preexisting serious mental illness.

The January 2001 issue of *Canadian Journal of Criminology* included a 36-page article titled "The Psychological Effects of 60 Days in Administrative Segregation," which concluded that, overall, segregated prisoners had poorer mental health and psychological functioning as compared with nonsegregated prisoners, but "there was no evidence, however, that, over a period of 60 days, the mental health and psychological functioning of segregated prisoners significantly deteriorated" [28]. This issue of the journal also included three articles submitted in response to the study by Zinger, Wichmann, and Andrews [28] that challenged their findings. Admittedly, the 60-day time period is significantly less than in many supermax prisons. It is not clear that these conditions, over time, do not cause psychological harm. It may be that the effects are not yet known.

Whether one agrees with Zinger et al's findings [28], their article, like Haney's 2003 article [24], provides a useful literature review relevant to existing research on the mental health effects of segregation. They point out the literature in this area is conflicting, filled with speculations, and often based on far-fetched extrapolations and generalizations. Methodological shortcomings apparent from reviewing the literature include reliance on anecdotal evidence, wide variation regarding the conditions of confinement present in different prisons, and an overreliance on field and laboratory experiments pertinent to sensory deprivation.

Haney [24] cites his own research to estimate the extent to which prisoners confined in supermax-type conditions suffer resultant adverse effects. He reports that in his Pelican Bay study, a random sample of 100 SHU prisoners were assessed in face-to-face interviews. He asserts that the data was representative of and, within the appropriate margins of error, generalizable to the entire group of prisoners at the supermax facility. His findings were described as being consistent with Grassian's SHU syndrome (also known as reduced environmental stimulation (RES)) in addition to demonstrating adverse psychological effects of supermax confinement. At least two significant flaws in his methodology question the validity of his conclusions. First, this study was performed in the context of class-action litigation challenging the adequacy of the mental health system at the Pelican Bay State Prison (PBSP). Dr. Haney was one of the plaintiffs' experts in this case. Second, a significant percentage of

the SHU inmates had preexisting serious mental illnesses, which should have resulted in separate analyses of adverse psychological effects of supermax confinement for inmates without preexisting mental illnesses as compared with inmates with such illnesses. Haney [24] also cited evidence in his article that it was likely that inmates with serious mental illnesses were overrepresented in supermax housing units, which was likely at PBSP during the time of his study.

Despite the criticism of Haney's article, the authors agree strongly with his conclusion that "there are better and worse supermax prisons, and we should take steps to ensure that all such facilities implement the best and most humane of the available practices. In general, far more careful screening, monitoring, and removal policies should be implemented to ensure that psychologically vulnerable—not just mentally ill—prisoners do not end up in supermax in the first place, and that those who deteriorate once there are immediately identified and transferred to less psychologically stressful environments. In addition, prison disciplinary committees should ensure that no prisoner is sent to supermax for infractions that were the result of pre-existing psychiatric disorders or mental illness."

Another problem in the literature and expert testimony is the comparison between confinement in a supermax-like setting to experimental models related to sensory deprivation, prisoner-of-war (POW) experiences, polar habitation, or nineteenth-century German experience with solitary confinement in prisons [29,31]. Most supermax-like settings are more dissimilar than similar to such conditions. The use of the term "solitary confinement" is a misnomer because in these facilities inmates can see and communicate with correctional officers and fellow inmates. Many inmates in such circumstances are housed with roommates. It is not uncommon to have access to radios and televisions, which contrasts dramatically with sensory deprivation tank experiments and many POW experiences. This of course does not belie the obvious and severely stressful nature of such confinement. As Haney [24] and others have pointed out, the social interactions in such settings are anything but normal. In the authors' opinion, learning about the effects of these settings is important, and requires objective, even-handed, and accurate social science.

Zubek, Bayer, and Shephard [32] conceptualize segregation units to have three main characteristics: social isolation, sensory deprivation, and confinement. Each of these elements can vary significantly as do inmates' responses to the segregation experience. In general, the decreased/altered social interactions for inmates in supermax facilities appear to be more of a problem from a mental health perspective in contrast with sensory deprivation. Many of the milieus in such facilities are characterized by sensory overstimulation (eg, inmates yelling for communication purposes or for other reasons), which causes distress for inmates, especially during evening hours. The conditions of confinement, which include not only the physical plant and imposed property restrictions but also the nature of the inmate's interactions with correctional officers, are obviously important variables relevant to an inmate's adjustment.

## NEEDED RESEARCH

The Colorado Department of Corrections [33] published a useful study that provided basic statistics relevant to the Colorado DOC's administrative segregation population. This study also sought to help shape the design for a subsequent prospective research project to determine if supermax-like confinement causes psychological harm to inmates, with and without preexisting mental illness. The authors recommend that such a study include the following components: (1) Repeated measures designed to determine whether inmates decompensate over long periods of lockdown status, (2) A control group to help assess whether any significant psychological changes are due to the lockdown environment specifically or simply associated with the general prison environment, (3) The repeated measures should cover a variety of psychological dimensions (eg, suicidal ideation, hopelessness, or psychotic symptoms), and (4) Assessments should be based on multiple sources (eg, inmate self-report, clinician, or correctional officer) [33].

## MENTAL HEALTH INPUT INTO THE DISCIPLINARY PROCESS

Dvoskin et al [34] discuss the case of Powell v Coughlin (953 F2d 744 (2d Cir. 1991)) in which the court held that inmates had no right to formal evaluations by prison mental health staff before undergoing disciplinary hearings. Though formal evaluations are not required, however, these authors strongly recommend mental health input into disciplinary proceedings. This is important for three reasons. First, it allows consideration of an inmate's ability to stand hearing. Second, it allows for consideration of the inmate's culpability and thus the appropriateness of the punishment. Finally, mental health input allows identification of those inmates whose mental illness would make the same segregation punishment more unpleasant than it was intended to be.

Except for a useful article by Krelstein [35], little else has been written about mental health clinicians providing input into the disciplinary process, especially when inmates with serious mental illnesses have committed a rule infraction. It is useful for mental health staff to be notified when caseload inmates receive serious (ie, major) rule violations because their actions leading to the violations are often clinically significant. A procedure should be in place that results in timely notification to mental health staff of such occurrences, which should facilitate mental health input to the disciplinary process, when indicated, relevant to issues of competency to proceed with the disciplinary hearing, mitigating factors, and dispositional recommendations. Mental health staff should also be available to the disciplinary hearing officers for consultation purposes, when a non–caseload inmate appears to be demonstrating symptoms of a serious mental illness [36].

The authors recommend that the mental health input into the disciplinary process not address issues related to responsibility (eg, the equivalent of an insanity plea) [34]. Similar to the low rate of successful "not guilty by reason of insanity" pleas in the nonincarcerated population, it is rare that inmates would meet most nonresponsibility standards in prisons that have constitutionally

adequate mental health services if the assessment was made by a forensically experienced mental health clinician. In general, inmates meeting such criteria are usually diverted out of the disciplinary system process to a structured psychiatric setting. The use of valuable clinical resources for these forensic assessments is hard to justify in a correctional mental health system with limited clinical resources [34].

Clinicians providing mental health input into the disciplinary process need special training relevant to such assessments, and hearing officers need training on how to use such information obtained from the mental health clinicians. Though the ultimate issue of competence to stand hearing or culpability is up to the hearing officer, in the authors' experience, relevant, simple, and competent psychological consultation is helpful in reaching a just result. An ongoing training and quality improvement process should occur relevant to this area because of frequent changes in hearing officers and rotation of clinicians to other program areas.

## SUMMARY

Supermax facilities may be an unfortunate and unpleasant necessity in modern corrections. Because of the serious dangers posed by prison gangs, they are unlikely to disappear completely from the correctional landscape any time soon. But such units should be carefully reserved for those inmates who pose the most serious danger to the prison environment. Further, the constitutional duty to provide medical and mental health care does not end at the supermax door.

There is a great deal of common ground between the opponents of such environments and those who view them as a necessity. No one should want these expensive beds to be used for people who could be more therapeutically and safely managed in mental health treatment environments. No one should want people with serious mental illnesses to be punished for their symptoms. Finally, no one wants these units to make people more, instead of less, dangerous. It is in everyone's interests to learn as much as possible about the potential of these units for good and for harm.

Corrections is a profession, and professions base their practices on data. If we are to avoid the most egregious and harmful effects of supermax confinement, we need to understand them far better than we currently do. Though there is a role for advocacy from those supporting or opposed to such environments, there is also a need for objective, scientifically rigorous study of these units and the people who live there.

References
 [1] Harrison P, Beck A. Prison and jail inmates at midyear 2004. Washington (DC): US Department of Justice, Bureau of Justice Statistics Bulletin NCJ 206801; April 2005.
 [2] Harrison P, Beck A. Prisoners in 2004. US Department of Justice, Bureau of Justice Statistics Bulletin NCJ 210677; October 2005.
 [3] Bonczar T. Prevalence of imprisonment in the US population, 1974–2001. Washington (DC): US Department of Justice, Bureau of Justice Statistics Bulletin NCJ 197976; April 2003.

[4] American Psychiatric Association. Psychiatric services in jails and prisons. 2nd edition. Washington (DC): American Psychiatric Association; 2000.

[5] US Department of Justice. Mental health treatment of inmates and prisoners. Washington (DC): US Department of Justice, Bureau of Justice Statistics Bulletin NCJ-174463; 1999.

[6] Criminal Justice/Mental Health Consensus Project. Council of State Governments, June 2002. Available at: http://consensusproject.org/. Accessed November 19, 2005.

[7] Thompson M, Souweine M, Reuland D. Mental health consensus: improving responses to people with mental illness. Crime Delinq 2003;49:30–51.

[8] Dvoskin J, Spiers E, Metzner J, et al. The structure of correctional mental health services. In: Rosner R, editor. Principles and practice of forensic psychiatry. 2nd edition. London: Arnold; 2003. p. 489–504.

[9] Metzner JL, Dvoskin J. Psychiatry in correctional settings. In: Simon RI, Gold LH, editors. Textbook of forensic psychiatry. Washington (DC): American Psychiatric Press; 2004. p. 377–92.

[10] Wettstein RM, editor. Treatment of offenders with mental disorders. New York: Guilford Press; 1998.

[11] National Commission on Correctional Health Care. Standards for health services in jails. Chicago: National Commission on Correctional Health Care; 1996.

[12] Scott CL, Gerbasi JB, editors. Handbook of correctional mental health. Arlington (VA): American Psychiatric Publishing, Inc.; 2005.

[13] Riveland C. Supermax prisons: overview and general considerations. Washington (DC): National Institute of Corrections; 1999.

[14] Collins W. Supermax prisons and the constitution: liability concerns in the extended control unit. National Institute of Corrections, 2004. Available at: http://www.nicic.org. Accessed November 25, 2005.

[15] Toch H. The future of supermax confinement. Prison Journal 2001;81:376–88.

[16] Work Group on Schizophrenia. American Psychiatric Association Practice guidelines: practice guideline for the treatment of patients with schizophrenia. Am J Psychiatry 1997;154(Suppl):1–63.

[17] Metzner J. Class action litigation in correctional psychiatry. J Amer Acad Psychiatry Law 2002;30:19–29.

[18] Bevan G. Offenders with mental illnesses in maximum and super maximum security settings. In: Scott CL, Gerbasi JB, editors. Handbook of correctional mental health. Arlington (VA): American Psychiatric Publishing, Inc.; 2005. p. 209–27.

[19] Haddad J. Treatment for inmates with serious mental illness who require specialized placement but not psychiatric hospitalization. Correctional Mental Health Report 1999;59: 60–2.

[20] Metzner JL. An introduction to correctional psychiatry: part III. J Am Acad Psychiatry Law 1998;26:107–16.

[21] Metzner JL. Mental health considerations for segregated inmates. In: Standards for health services in prisons. Chicago: National Commission on Correctional Healthcare; 2003. p. 241–5.

[22] Metzner JL. Trends in correctional mental health care. In: Moore J, editor. Management and administration of correctional health care. Kingston (NJ): Civic Research Institute; 2003. p. 12-2–12-18.

[23] Pizarro J, Stenius V. Supermax prisons: their rise, current practices, and effects on inmates. Prison Journal 2004;84:248–64.

[24] Haney C. Mental health issues in long-term solitary and "supermax" confinement. Crime Delinq 2003;49:124–56.

[25] Grassian S. Psychopathological effects of solitary confinement. Am J Psychiatry 1983;140: 1450–4.

[26] Kupers T. Prison madness: the mental health crisis behind bars and what we must do about it. San Francisco: Jossey-Bass; 1999.

[27] Suedfeld P, Ramirez C, Deaton J, et al. Reactions and attributions of prisoners in solitary confinement. Crim Justice Behav 1982;9:303–40.

[28] Zinger I, Wichmann C, Andrews DA. The psychological effects of 60 days in administrative segregation. Can J Criminol Crim 2001;43:47–84.

[29] Grassian S, Friedman N. Effects of sensory deprivation in psychiatric seclusion and solitary confinement. Int J Law Psychiatry 1986;8:49–65.

[30] Schwartz H. Death row syndrome and demoralization: psychiatric means to social policy ends. J Am Acad Psychiatry Law 2005;33:153–5.

[31] Affidavit of Stuart Grassian, MD. Lee v Coughlin and Mahoney. Case No. 93-CIV-8417 (SS). US District Court, Southern District of New York, October 10, 1996.

[32] Zubek J, Bayer L, Shephard J. Relative effects of prolonged social isolation and confinement: behavioral and EEG changes. J Abnorm Psychol 1969;74:625–31.

[33] O'Keefe M. Analysis of Colorado's administrative segregation. Colorado Springs (CO): Department of Corrections; 2005.

[34] Dvoskin JA, Petrila J, Stark-Riemer S. Powell v Coughlin and the application of the professional judgment rule to prison mental health. Ment Phys Disabil Law Rep 1995;19:108–14.

[35] Krelstein M. The role of mental health in the inmate disciplinary process: a national survey. J Am Acad Psychiatry Law 2002;30:488–95.

[36] Metzner J. Commentary: the role of metal health in the disciplinary process. J Am Acad Psychiatry Law 2002;30:497–9.

# Exhibit 13

**ADMINISTRATIVE SEGREGATION UNIT**
**ENHANCED OUTPATIENT PROGRAM**
**STATUS REPORT**
**May 1, 2008**

The following is a report of efforts by the California Department of Corrections and Rehabilitation to comply with the Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) Treatment Improvement Plan, dated July 11, 2007. The report follows main headings identified in the plan. After each heading, the plan requirement is summarized, the status is described, and details are provided.

**Length of Stay**

*PLAN REQUIREMENT: Beginning September 3, 2007, all inmate-patients requiring Enhanced Outpatient Program level of care, housed in ASU Hubs for more than 90 days will be reviewed every 30 days.*

*STATUS: Compliant*
Inmate-patients who require ASU EOP Hub placement for more than 90 days are reviewed every 30 days as described below. From December 2007 to March 2008, the number of ASU EOP inmate-patients in the hub institution for more than 90 days decreased more than 22%.

*DETAILS:*
Attachment A includes the December 2007 through March 2008 Length of Stay Reports for inmate-patients at the EOP level of care, housed in ASU Hubs for more than 90 days. This report was compiled after a review of each case, and categorizes reasons for ASU retention. Categories for delays include: Pending Investigation/Other, Pending Rules Violation Report, Pending District Attorney Referral, Pending Court Proceeding, Pending Classification Staff Representative Action, Pending Minimum Eligible Release Date, Endorsed Pending Transfer to Psychiatric Services Unit, and Endorsed Pending Transfer/Special Needs Yard. The cases will continue to be reviewed every 30 days, conducted outside of the Institutional Classification Committee process, by the Facility Captain and Correctional Counselor II. Reports explaining reasons for ASU retention over 90 days shall continue to be compiled and reviewed by the Warden or designee (Chief Deputy Warden or Associate Warden for Health Care). The Warden shall ensure that reviewers take action to resolve any issue that impacts length of stay in EOP. The reports shall continue to be submitted the first week of each month to the Associate Director (General Population III and IV) responsible for management of *Coleman* requirements, and to the respective Division of Adult Institutions, Associate Director at each of the EOP Hub institutions. Statewide issues related to population management are discussed in regularly scheduled bed management meetings.

Several clarifications are necessary regarding data in Attachment A. Initially, there was some confusion at the ASU EOP hubs regarding how to calculate the length of stay. Some institutions restarted the length of stay time-clock when an inmate-patient was

placed into a Mental Health Crisis Bed or went out to court, and then returned to ASU EOP. Other institutions did not re-start the time clock even when an inmate-patient was transferred to a Department of Mental Health inpatient program. Another issue related to data collection was that some institutions initially did not count ASU EOP inmates not directly assigned to the ASU EOP Hub in the data. In order to clarify the requirement, Joseph Moss, Associate Warden General Population III/IV provided the following direction to the field on April 8, 2008:

> "Short interruptions in ASU stay, such as assignment to a Mental Health Crisis Bed, are not to result in restarting the count of days in ASU. Typically, if an inmate has been released from ASU or out of the EOP program for at least thirty days, it may be appropriate to restart counting if they are returned as ASU EOP inmates to ASU. However, if there has not been a significant change in the inmates housing conditions / treatment milieu, he or she should be counted from original date of placement."

> "Every EOP inmate housed in ASU at your institution should be included in this report if they have been in ASU in excess of 90 days. We as a Department elected to focus our attention on the institutions with EOP-ASU Hubs to reduce impact on other institutions. The intent is to gather this information on **_ALL_** ASU EOP inmates in ASU beyond 90 days."

The data indicates a slow reduction in the number of inmate-patients housed in ASU EOP for more than 90 days with a high in December 2007 of 213 inmates, and a low in March 2008 of 166 inmate-patients. This represents a 22% reduction in the number of inmates housed in ASU EOP for more than 90 days. The reduction was achieved even though there were more inmate-patients in the March 2008 sample based on the change in methodology described above than were included in December 2007 through February 2008.

### Stand Alone Pilot

*PLAN REQUIREMENT:*
*CDCR is proposing that a plan be developed in coordination with the Coleman experts and Plaintiffs' Counsel for a new twenty-bed ASU EOP Hub program at California State Prison, Sacramento in the stand-alone ASU building. This plan would be in compliance with the requirements listed (in the summary of October 2002 Coleman Stipulation and Order)*

*STATUS: Progress dependent on coordination with Coleman parties*

*DETAILS:*
After discussion with all parties in *Coleman* the prognosis was not hopeful regarding the ability to reach an agreement and procure resources for this purpose. CDCR will respond

to planning efforts if the *Coleman* Special Master assigns an expert for the purpose of coordination. If a workgroup is formed to develop a plan for a stand alone pilot, monthly updates will be provided.

**Weekly Monitoring**

*PLAN REQUIREMENT:*
*Each institution with an ASU EOP Hub shall charter a Quality Improvement Team (QIT) through the Quality Management Committee to ensure that out-of-cell time and treatment are maximized. A monthly teleconference of all ASU EOPs shall be held with the Regional Chief Psychologist to standardize solutions across institutions, and to reduce any systemic barriers. The QIT shall consider (the following\*) short term remedies for identified treatment needs.*
\*See full plan for details.

*STATUS: Compliant*
The first monthly teleconferences held by Regional Chief Psychologists were held in January 2008. Follow-up teleconferences were held in February and March 2008. Expectations were set for data collection, and the role of the QIT in increasing compliance with the provision of mandated treatment was discussed. All ten institutions have confirmed that they are holding weekly QIT meetings. Teleconferences are scheduled monthly on an ongoing basis.

*DETAILS:*
A summary of the Northern Regional Teleconferences in February 2008 and March 2008 is provided in Attachment B. A summary of the Central and Southern Regional Teleconferences in February 2008 and March 2008 is provided in Attachment C.

**Administrative Segregation Office and Treatment Space**

*PLAN REQUIREMENT:*
*The mental health program will be participating in the Office of the Receiver's space survey.*

*STATUS: Compliant*

*DETAILS:*
The space survey by the Receiver's office has now been completed at Avenal State Prison (ASP), Correctional Training Facility (CTF), California Rehabilitation Center (CRC), California Institute for Women (CIW), Richard J. Donovan Correctional Facility (RJD), California Institute for Men (CIM), and Mule Creek State Prison (MCSP)

This process has included staff from the Mental Health Program (and Dental) from the beginning in a cooperative and coordinated manner. Inclusion of mental health space needs has been incorporated and input is actively solicited and considered. Recent changes to this process have evidenced even greater inclusion of mental health space needs, in addition to those spaces originally considered if mental health staff were

displaced due to acquisition of the space by the medical program, with designated mental health space and buildings now being considered separately.

Dr. Tia Araminta has been a representative to this group on behalf of the Mental Health Program since its inception at ASP and Dr. Steve Clavere participated at Avenal State Prison and Mule Creek State Prison. Dr. Ted Ruggles, Coleman Court Expert, has also been included in the process at each site.

Final plans completed by the team are in the process of submission through the three judge coordination process.

In addition, a summary of other construction projects that will impact ASU EOP treatment and yard space is provided in Attachment D.

## In-Cell Recreation and Group Therapy Resources

*PLAN REQUIREMENT:*
*Beginning January 2008, the CDCR shall standardize therapeutic materials, video library, and in-cell activity resources.*

*STATUS: Compliant*

*DETAILS:*
Attachment D is a list of materials ordered to standardize therapeutic materials for group and in-cell activities in each ASU EOP Hub. The list includes the materials by vendor, quantity ordered per institution, and cost. Staff at each Hub provided clinical input regarding treatment needs, previewed materials, and participated in a statewide videoconference on November 14, 2007, to discuss the final choice of vendors and materials. Since each institution had slightly different needs based on previous purchases, and gender of inmate-patients, a list of materials is provided for each institution. The materials have been delivered and are in use at each ASU EOP Hub.

## Treatment Refusals

*PLAN REQUIREMENT:*
*The designated mental health clinician assigned to inmate patients who refuse more than 50% of offered treatment shall (provide specialized treatment\*).*
*\*See plan for details*

*STATUS: Compliant*
The requirements have been clearly communicated to the supervisory staff at the ASU EOP Hubs.

*DETAILS:*
Details are provided in the monthly teleconference summaries, Attachments B and C.

# Exhibit 14

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                )
                                      )
                Plaintiffs,           )
                                      )CASE NO.:
        vs.                           )S 90-0520 LKK-JFM
                                      )
EDMUND G. BROWN, JR., ET AL.,         )
                                      )
                Defendants.           )
_____   )



DEPOSITION OF

JOEL DVOSKIN, PH.D., ABPP

WEDNESDAY, FEBRUARY 27, 2013, 9:14 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

1    not believe that that study says that there are no

2    long-term effects of segregation that are negative.  We

3    were just, in that study, unable to identify them.  And

4    there are some specific things in Colorado that may have

5    been responsible for those particular findings.

6         Q.   Again, rather than go into the details, is it

7    still correct that at this time you think there's still

8    not definitive research about whether or not long-term

9    housing in segregation is dangerous and can cause

10   permanent harm to people?

11        A.   Yes.  I think that's still true.

12        Q.   Okay.  That means -- would you agree it's

13   possible that long-term housing in segregation does

14   cause psychological harm?

15        A.   Yes.

16        Q.   And you're less -- I think I interpreted this

17   correctly --

18        A.   I'm sorry.  Can I just clarify?  I took your

19   question not to mean that it necessarily does, but that

20   it could on -- for an individual.

21        Q.   Right.  That's correct.

22        A.   So the answer is yes.

23        Q.   And you're less -- I understood this article

24   to say that as to the mentally ill, there already has

25   been research and that it is harmful to -- for the

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

```
 1        Q.   Okay.
 2        A.   It gives people a chance to say if they're in
 3   medical distress also.
 4        Q.   Do you understand that that function is
 5   traditionally performed by custody officers?
 6        A.   Yes.
 7        Q.   And you think that's appropriate?
 8        A.   Yeah.
 9        Q.   Okay.  And in CDCR, are welfare checks
10   performed in ad seg and SHU?
11        A.   Yeah.  I think they go once every hour in
12   ad seg and SHU to make sure the person's alive and to
13   give an opportunity to ask for something.
14        Q.   Okay.  Are you aware of a --
15        A.   Actually -- I'm sorry.  I didn't give you a
16   complete answer.  For the first 21 days in segregation,
17   I think it's every half hour.
18        Q.   Every half hour?
19        A.   Yeah.
20        Q.   Okay.  And Ms. Moore in her deposition
21   recommended --
22        A.   Dr. Moore.
23        Q.   -- sorry -- Dr. Moore, in her deposition,
24   recommended that CDCR adopt 30-minute welfare checks for
25   all prisoners in ad seg consistent with ACA standard
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Joel Dvoskin, Ph.D., ABPP                                    February 27, 2013

1    standards.

2              MS. VOROUS:  Objection.  Lacks foundation.

3    BY MR. BIEN:

4        Q.   Do you agree with that?

5        A.   I don't remember what the ACA standard is

6    about that.  But if Jackie said that, there's a very

7    good chance she's right.  She knows the standards pretty

8    well.

9              I'm not sure how much or what it would help.

10   It's not a bad idea.  It just costs -- you know, it's a

11   lot of staff time to do it.  I'm kind of neutral about

12   it.  Certainly not a bad idea.

13       Q.   You understand that in reviewing suicides,

14   which is one of your jobs, you reviewed some of the

15   completed suicides; is that correct?

16       A.   Yes, sir.

17       Q.   You saw cases where it was reported that the

18   inmate had rigor mortis at the time he was found?

19       A.   Yes.

20       Q.   Okay.  And you did some investigation -- I

21   could see from your notes -- as to what rigor mortis was

22   and what the details were; is that right?

23       A.   Yeah.  I did a little checking of -- my

24   recollection was that -- well, let me back up.

25             Rigor mortis is often misconstrued by lay

1    alive and begins emergency medical response?

2         A.    It theoretically could.  I'm aware of that

3    happening.  Very few times in my career that I've seen

4    that happen.  But it could if they got lucky.

5         Q.    You're -- very few times you've seen someone

6    saved to -- attempted suicide and their lives are saved?

7         A.    No.  No.

8         Q.    I didn't understand your testimony.

9         A.    Where an officer happened to see the guy

10   trying to kill himself and intervened quickly.  It

11   happens all the time when other inmates say, "There's a

12   man down," and they yell, and officers respond quickly.

13   I've seen lives saved many times like that.  But it's

14   much more common it would be an inmate than an officer,

15   unless the person was in an easily visible space.

16          Sometimes -- if there's a guy they're worried

17   about, they'll move him to the most visible cell, or

18   maybe there's a cell with a bigger vision panel and then

19   that, the officer might be likely to catch.

20        Q.    Just focus on the 30-minute welfare checks.

21        A.    Okay.

22        Q.    Do you agree that lives can be saved by -- if

23   California expanded 30-minute welfare checks to include

24   all prisoners who are mentally ill in segregation for

25   the time that they're in segregation?

1      A.    Yeah, I would say it could.

2      Q.    Would you also agree that approximately 40 to

3  50 percent of the suicides are people who are not

4  mentally ill?  Is that correct?

5      A.    I believe that's approximately right, yes.

6      Q.    You also agree it would be beneficial and save

7  lives for California --

8      A.    I'm sorry.  By "not mentally ill," I assume

9  you mean not identified mental health service

10 recipients.

11     Q.    That's correct.  That question was vague.

12           Would you also agree that it might save more

13 lives if California did 30-minute welfare checks for

14 everyone in ad seg?

15           MS. VOROUS:  Vague and ambiguous.  Lacks

16 foundation.

17           THE WITNESS:  It might.

18 BY MR. BIEN:

19     Q.    It's possible that somebody would be

20 identified early enough to open the cell and maybe stop

21 his bleeding or provide CPR or other emergency medical

22 services?

23     A.    It's possible.

24     Q.    Okay.  Do you disagree with the ACA standard

25 being 30 minutes as being an appropriate national

1     Q.    Okay.  Do you remember when you were at CIM

2  that you observed in the ad seg unit a large number of

3  mentally ill inmates who were there because they were

4  designated for sensitive needs?

5     A.    There were 12 of them in CIM in Charlie Unit.

6  And that was a sensitive need unit, and they were --

7  they weren't getting groups.  And I made a pretty strong

8  criticism of that, that -- as I recall, the mental

9  health director said, "Well, the clinicians in that unit

10  are really busy.  They got a lot of CCCs."

11         I said, "Well, you know, these guys are EOP.

12  You've got to give them EOP care."

13         That doesn't mean, by the way, that groups are

14  essential.  Groups are the most cost-effective way of

15  delivering care if you did an equivalent amount of

16  individual, but I didn't think they were doing that.

17     Q.    Okay.

18     A.    So they weren't neglecting the guys, but they

19  weren't giving them the EOP level of care, and they had

20  been deemed to need that.  So I was critical of that.

21         MS. VOROUS:  Can you show him where in the CIM

22  that you're referring to?

23         MR. BIEN:  I wish I could.

24         THE WITNESS:  I actually remember that one.

25

Joel Dvoskin, Ph.D., ABPP                          February 27, 2013

```
 1    BY MR. BIEN:
 2        Q.   If you can find the CIM one, you can look and
 3    refresh your recollection.
 4        A.   CIM is when I was in Charlie yard.
 5        Q.   Let me see if I can help you out here.
 6             MS. VOROUS:   CIM is Exhibit 13.
 7    BY MR. BIEN:
 8        Q.   Okay.  Let's see if I can help you out.
 9        A.   There's a note on page 10, 104449, the fourth
10    checkmark.  It says:  "Move EOPs out of here.
11    Prioritize."
12             That was related to the same observation, and
13    then...
14        Q.   Okay.  So let's look at that page.  Higher up
15    on that page it says:  "LOB no," with an exclamation
16    mark.
17             What were you referring to there?
18        A.   That stood for -- we just go figured that out
19    yesterday.  Just figured that out.
20        Q.   Also, on the next page, I see a reference to
21    LOB again.
22        A.   Got it.  Okay.  Thank you.
23             What that was was -- so if somebody was in
24    segregation for no other reason than there wasn't a bed
25    for them.  Lack of bed.
```

1          Q.    LOB stands for lack of bed?

2          A.    I don't know why I used an acronym.  I hate

3     acronyms.  I think maybe they called it that status.

4                Anyway, on the next page, what it says is -- I

5     said, "Well, wait a second.  If I'm in seg just because

6     I need a place to sleep, why am I confined to my house?

7     Why can't I be treated like a regular old inmate if I

8     haven't done anything?"

9                And they said, "Oh, we do that."  If it's a

10    row of LOBs, they let them all out.

11               If it's interspersed because they didn't have

12    a bed next door to a seg inmate, then they said, "We

13    don't do it for them."

14               I think they were afraid of letting a seg

15    inmate out.

16               I said, "That's not okay.  Put signs on the

17    door.  Figure it out.  You shouldn't lock me down if I

18    didn't do anything.  It's not fair."

19         Q.    You understand when you visited CIM in May of

20    2012 that there was a -- a shortage of the particular

21    kind of beds that were necessary for these men who were

22    in -- called LOB?

23               MS. VOROUS:  Objection.  Lacks foundation.

24    Vague and ambiguous.

25               THE WITNESS:  Yeah.  I don't think they were

1  mentally ill.  They were just regular old inmates.  They

2  may have been CCC or not.  It was just a practice when

3  someone had just moved and there was no bed for them --

4  I don't think it was very long.

5           I said, "It ain't right.  If I didn't do

6  anything, open my cell.  Let me out on the yard, and

7  then I'll sleep in the bed.  Who cares where I sleep?"

8  BY MR. BIEN:

9      Q.   Did you call back to -- when you made

10 checkmarks on this, on 449 and the next page, does this

11 reflect issues you raised with the -- in the exit, or

12 did you call back to the institution?  What do the

13 checkmarks mean?

14     A.   Usually I check them off when I -- it might

15 mean that I want to include it in the mention of the

16 exit conference.  It might mean I want to mention it to

17 somebody.  I don't remember specifically what it was at

18 the time.

19     Q.   And you recall encountering people throughout

20 the system that were waiting for -- who were mentally

21 ill, either CCC or EOP, who were waiting for a transfer

22 to a place that was designed to provide housing and

23 treatment for their level of care?

24     A.   You talking about the ones that we were

25 mentioning before, the EOP inmates?

1    This had to do with the investigation of -- that staff

2    malfeasance was pulled out of the suicide unit and given

3    to internal affairs, and then that's the last that the

4    suicide folks heard of it.

5            And I thought they needed -- they don't need

6    to know all the details, but they at least need to know,

7    "Yeah, that's being investigated.  There was a problem.

8    It's been dealt with."  It can be vague, but they have

9    to -- there has to be some feedback loop.

10        Q.    On the top of -- I think it's page 4583 --

11        A.    Yeah, I got it.

12        Q.    -- when you write "REC," that means

13   recommendation?

14        A.    Yeah.

15        Q.    Okay.  And that -- can you read that

16   recommendation?

17        A.    "Recommendation:  Not necessary for all

18   inmates to be in module."

19        Q.    And did you recommend -- I've seen this a

20   couple times in your notes, Doctor, that CDCR consider

21   an individualized assessment as to whether or not

22   inmates need to be treated in modules rather than having

23   a blanket rule that applied to groups of inmates, like

24   in particular units or areas.

25        A.    Yes.

Joel Dvoskin, Ph.D., ABPP                              February 27, 2013

1        Q.    And why was that?

2        A.    Let me say there may be groups of inmates

3   where it's legitimate.  For example, somebody's in SHU,

4   I'm not particularly offended by putting everybody in

5   the module.  I don't think that you have to do it that

6   way, but it's reasonable.

7            If somebody's in ad seg for their personal

8   protection, it makes no sense whatsoever to me to

9   require them to be in a module.  So it should be an

10  advised assessment.

11       Q.    And the same in -- you have the same opinion

12  about MHCB and the use of modules in the MHCBs?

13       A.    Yes.

14       Q.    That should be individualized assessment?

15       A.    Yeah.  In fact, Dr. Scott did the modules more

16  than I did, but I would think it would be the minority

17  of cases where it would need a module.

18           If somebody's a danger -- the way I did it, if

19  somebody's a danger -- if somebody's a danger to

20  themselves and to others, then it's fine to put them in

21  a module.  But if they're just a danger to themselves,

22  then I don't get it.  I wouldn't do that unless there's

23  a good reason to do it.

24       Q.    If you turn to the next page, is that your

25  interview with an inmate?

```
 1                    CERTIFICATE OF REPORTER

 2

 3        I, MEGAN F. ALVAREZ, a Certified Shorthand

 4   Reporter, hereby certify that the witness in the

 5   foregoing deposition was by me duly sworn to tell the

 6   truth, the whole truth and nothing but the truth in the

 7   within-entitled cause;

 8        That said deposition was taken down in

 9   shorthand by me, a disinterested person, at the time and

10   place therein stated, and that the testimony of the said

11   witness was thereafter reduced to typewriting, by

12   computer, under my direction and supervision;

13        I further certify that I am not of counsel or

14   attorney for either or any of the parties to the said

15   deposition, nor in any way interested in the events of

16   this cause, and that I am not related to any of the

17   parties hereto.

18

19

20                         DATED: March 1, 2013

21

22                   _____

23                   MEGAN F. ALVAREZ

24                   RPR, CSR 12470

25
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 15

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

No. S 90-0520 LKK-JFM

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

RALPH COLEMAN, et al.,

            Plaintiffs

    vs.

EDMUND G. BROWN, JR., et al.,

            Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF LINDSAY M. HAYES

Monday, February 18, 2013 8:53 a.m.

Intelligent Office

265 Franklin Street, Boston, MA 02110

Reporter:  Janet M. McHugh, RMR, CRR, CLR

THORSNES LITIGATION SERVICES, LLC

Lindsay M. Hayes                                    February 18, 2013

```
 1   until December of 2010.
 2          Q.    What are 30-minute welfare checks?
 3          A.    30-minute welfare checks are simply cell
 4   checks made by correctional staff in particular areas
 5   of an institution, normally required in what is
 6   called special housing.  They could be mental health
 7   units.  They could be medical units.  They could be
 8   administrative and disciplinary Seg units.
 9          It's a standard practice in correctional
10   systems around the country, I will say outside of
11   California.  It's been a requirement of the ACA, the
12   American Correctional Association standards for as
13   long as I've read the ACA standards to conduct
14   30-minute checks in special housing units.
15          Q.    And are these -- who conducts these checks
16   under ACA standards?
17          A.    Normally, it's the officers.
18          Q.    Correctional officers?
19          A.    Correct.
20          Q.    And what are they looking for?
21          A.    They're looking for an inmate that's alive,
22   an inmate that's in their cell.  Those are the two
23   main -- main reasons why welfare checks are called.
24   That's why the term is called "welfare."  I think
25   that it's not used as a suicide observation, because
```

Lindsay M. Hayes                                    February 18, 2013

1      So, you know, whether they were uninformed or
2   not, I am not sure.  I just remember there was a
3   tremendous amount of resistance by the CDCR
4   personnel.
5      I think that there were some -- although most
6   of the CDCR representatives were clinicians, I think
7   there were also correctional officials that were at
8   this meeting, as well.
9      Q.   Okay.  Another issue that you discussed in
10  this 2006 declaration was treating non-disciplinary
11  inmates different from disciplinary inmates in
12  Ad-Seg.  Can you explain what that refers to,
13  Mr. Hayes?  I'm referring to Page 7 and 8 of your
14  declaration, beginning at Paragraph 16.
15     A.   I believe that there was a discussion that,
16  for a variety of reasons that I don't recall, that
17  there were non-disciplinary inmates being housed
18  within the Ad-Seg units.  And the concern was that
19  they were being managed as if they were disciplinary
20  inmates.
21     In other words, there was very little
22  movement.  In other words, lack of out-of-cell time.
23  Their property was limited.  So they were being
24  treated as if they were disciplinary inmates, but
25  they did not have disciplinary orders.

Page 45

Lindsay M. Hayes                                    February 18, 2013

1       And we were -- there was a discussion that
2   this could also be one reason why there's a
3   disproportionate number of suicides in the Ad-Seg
4   unit, because inmates in these units were very
5   frustrated, and their mental health was
6   deteriorating, and their stress level was increasing
7   because they're there for reasons other than
8   discipline, and yet they're being treated it as if
9   they were disciplinary inmates and being locked down
10  up to 24 hours a day and not being given yard and
11  normal property.
12      And that this -- and I think that there
13  was -- it wasn't an issue that I necessarily brought
14  up.  I think it was a general agreement amongst the
15  folks that were at this summit conference that
16  this -- this could perhaps be one of the reasons why
17  there was this disproportionate number of suicides
18  within the Ad-Seg unit.
19      Q.   Turning forward in time, could you take a
20  look at what's been marked as Exhibit 3, please,
21  which is the contract between National Center of
22  Institutions and Alternatives and CDCR.
23      A.   Yes.
24           (Witness complies.)
25      Q.   Can you explain how you came to be -- to

1        C E R T I F I C A T E

2   COMMONWEALTH OF MASSACHUSETTS

3   SUFFOLK, SS.

4        I, Janet M. McHugh, a Registered Merit

5   Reporter and a Notary Public within and for the

6   Commonwealth of Massachusetts do hereby certify:

7        THAT LINDSAY M. HAYES, the witness whose

8   testimony is hereinbefore set forth, was duly sworn

9   by me and that such testimony is a true and accurate

10  record of my stenotype notes taken in the foregoing

11  matter, to the best of my knowledge, skill and

12  ability.

13       I further certify that I am not related to any

14  parties to this action by blood or marriage; and

15  that I am in no way interested in the outcome of

16  this matter.

17       IN WITNESS WHEREOF, I have hereunto set my

18  hand this 19th day of February, 2013.

19

20                          _____

                            JANET M. MCHUGH
21                          Notary Public

22

23  My Commission Expires:

24  July 11, 2014

25

# Exhibit 16

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4   RALPH COLEMAN, et al.,          )
                                     )
5                                    )
             Plaintiffs,            )
6                                    )
                  vs.               )   No. Civ S 90-0520 LKK-JFM
7                                    )
    EDMUND G. BROWN, JR., et al., )    Volume I
8                                    )
                                     )   Page 1 - 300
9             Defendants.           )
    _____)

10

11

12                   DEPOSITION OF

13                  STEVE J. MARTIN

14            THURSDAY, FEBRUARY 28, 2013

15

16

17     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19   REPORTED BY:

20   HOLLY THUMAN, CSR No. 6834, RMR, CRR

21   ---------------------------------------------------------

22               JAN BROWN & ASSOCIATES

23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25           (415) 981-3498 or (800) 522-7096

                                                           1

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    represented to me by a fellow team member.

2        Q.   And what was that?

3        A.   **That they were.**

4        Q.   And who was that who told you that?

5        A.   **Joel Dvoskin.**

6        Q.   And what did he say?

7        A.   **Basically that.**

8        Q.   And from your experience, wouldn't it be more

9    appropriate to make decisions based on the individual

10   inmate you're dealing with?

11       MR. McKINNEY:  Objection.  Vague and ambiguous,

12   argumentative.

13       THE WITNESS:  Well, I embraced the proposition

14   that -- well, I don't favor blanket rules applying to

15   segregated populations.  That is to say, if they're in

16   that population because they're recently, seriously,

17   frequently violent, that's one set of protocols.  If

18   they're separated because they need protection from the

19   general population, that's a separate set of protocols.

20       Very different protocols.  Oftentimes, that's

21   not made.  It's -- the overarching ADSEG dictates the

22   protocols.

23       MR. BORNSTEIN:  Q.  And there should be

24   separate protocols for the two populations you're

25   talking about.  Right?

                                                          44

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1      MR. McKINNEY:  Objection.  Vague and ambiguous.

2      THE WITNESS:  What I think I just said.

3      MR. BORNSTEIN:  Q.  I just want to make sure,

4 because I've now got prison noise behind me.

5      And the problem is, when you mix those two

6 populations together in a unit -- which is what CDCR

7 does; isn't that right?

8      MR. McKINNEY:  Objection.  Assumes facts not in

9 evidence, argumentative, vague and ambiguous.

10      THE WITNESS:  What's the question?

11      MR. BORNSTEIN:  Q.  Isn't that what CDCR does,

12 they mix those populations together, at least according

13 to what the other experts told you that you're working

14 with?

15      **A.  That came up at a particular facility in a**

16 **conversation during the day, and I don't even know**

17 **whether I'm recalling it, you know, with accurate**

18 **detail.  So I don't know if there's a -- I certainly**

19 **can't render an observation or opinion on what CDCR is**

20 **doing as a general practice with respect to that issue.**

21      Q.  Assuming they are doing what I just said, is

22 that of concern based on your expertise?

23      MR. McKINNEY:  Objection.  Vague and ambiguous.

24 It's an incomplete hypothetical, argumentative.

25      THE WITNESS:  It would be.

45

1    MR. BORNSTEIN:  Q.  Why?

2    **A.  Well, because other than -- a PC inmate that**

3    **doesn't otherwise represent a threat to anybody, but**

4    **somebody is a threat to him, once you physically**

5    **separate him in a housing unit, then he ought to be**

6    **managed just like any other general population inmate.**

7    **There's no need to keep him locked up, if he's with like**

8    **offenders.**

9    Q.  Is it a sign of overcrowding if you are forced

10    to have your -- your inmate population in one unit in a

11    segregated unit because that's the only way you can

12    protect them?

13    MR. McKINNEY:  Objection.  Vague and ambiguous.

14    THE WITNESS:  Well, the critical operative word

15    there is, if you are forced to do it, that would be a

16    sign.  But I know any number of operations that have no

17    space issues that do it.  So again, you've got to dig

18    deeper.

19    MR. BORNSTEIN:  Q.  So it's both.  It -- it's

20    not right to do it.

21    **A.  It's not in my view correctionally sound and**

22    **appropriate to treat --**

23    Q.  Is it unconstitutional, in your opinion?

24    **A.  I believe it could be, if there are onerous or**

25    **punitive conditions, a de facto type of punishment when**

46

1  the offender hasn't done anything.  Due process

2  implications, if nothing else.  If not Eighth Amendment.

3      Q.  Like being confined in your cell for 23 hours a

4  day, for instance?

5          MR. McKINNEY:  Objection.  Vague and ambiguous,

6  argumentative.

7          THE WITNESS:  Yeah, because you're gay?

8          MR. BORNSTEIN:  Q.  Or because you have special

9  needs --

10     A.  Or because you have special needs or whatever.

11  It could be a whole array of things, yeah.

12          If the effect of that is corporally, you know,

13  punitive, then I think there's an issue.

14     Q.  In your views of the various facilities, you

15  went to some that had SHUs.  Right?

16     A.  Yes.

17     Q.  Did you notice that in -- if you got an inmate

18  in a SHU who comes out and then goes into ADSEG because

19  there's no space available in the SNY yard, isn't that

20  just more punishment for that inmate?

21          MR. McKINNEY:  Objection.  Lack of foundation,

22  lack -- hold on, Steve.  Lack of personal knowledge,

23  compound, vague and ambiguous, argumentative.

24          THE WITNESS:  Again, not just per se, no.

25          MR. BORNSTEIN:  Q.  Why not --

47

## CERTIFICATE OF REPORTER

1

2      I, HOLLY THUMAN, a Certified Shorthand Reporter,

3  hereby certify that the witness in the foregoing

4  deposition was by me duly sworn to tell the truth, the

5  whole truth, and nothing but the truth in the

6  within-entitled cause; that said deposition was taken

7  down in shorthand by me, a disinterested person, at the

8  time and place therein state, and that the testimony of

9  said witness was thereafter reduced to typewriting, by

10  computer, under my direction and supervision;

11      That before completion of the deposition review of

12  the transcript [] was [X] was not requested.  If

13  requested, any changes made by the deponent (and

14  provided to the reporter) during the period allowed are

15  appended hereto.

16      I further certify that I am not of counsel or

17  attorney for either or any of the parties to the said

18  deposition, nor in any way interested in the event of

19  this cause, and that I am not related to any of the

20  parties thereto.

21

22  DATED: March 4, 2013

23

24  _____
                            HOLLY THUMAN, CSR

25

300

# Exhibit 17

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


RALPH COLEMAN, ET AL.,                    )
                                          )
                    Plaintiffs,           )
                                          )CASE NO.:
          vs.                             )S 90-0520 LKK-JFM
                                          )
EDMUND G. BROWN, JR., ET AL.,             )
                                          )
                    Defendants.           )
_____ )



DEPOSITION OF

JACQUELINE MOORE, RN, PH.D.

THURSDAY, FEBRUARY 21, 2013,  8:50 A.M.

SAN FRANCISCO, CALIFORNIA




REPORTED BY:  MEGAN F. ALVAREZ, RPR, CSR NO. 12470

THORSNES LITIGATION SERVICES, LLC

Jacqueline Moore, R.N., Ph.D.                        February 21, 2013

1      frequently.  The first time I saw it, I thought it was

2      good idea.

3            Q.    First time you saw it where?

4            A.    In Connecticut.

5            Q.    Why did you think it was a good idea?

6            A.    Because they could bring inmates out from

7      various classifications and have group therapy with them

8      and the inmates would feel safe, whereas they might not

9      be able to get this grouping of inmates together.

10            Q.    Is it your opinion that the therapeutic

11      modules can be overused, used in situations where

12      they're not required?

13            MS. VOROUS:  Objection.  Vague and ambiguous.

14      Lacks foundation.

15            THE WITNESS:  I don't know that.  I don't know

16      that they -- I'm trying to think if I saw group therapy

17      where they didn't use therapeutic modules.

18      BY MR. FISCHER:

19            Q.    In the California prisons?

20            A.    In the California prisons.

21            Q.    What about in the other states?  Philadelphia,

22      Connecticut, Indiana, North Carolina, Kentucky,

23      New Mexico, Utah, Maine, Delaware, Puerto Rico?

24            A.    Puerto Rico didn't use modules.  There was not

25      an emphasis on group therapy as there has been here in

Page 154

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1    the state of California in many of the other states that
 2    I've gone to.
 3         Q.    What about individual treatment?
 4         A.    Individual treatment, yes.
 5         Q.    And did any of these other states use
 6    therapeutic modules for individual treatment?
 7         A.    No.
 8         Q.    And that's all the states that you --
 9    including Connecticut?
10         A.    I'm sorry.  I didn't hear you.
11         Q.    All the states other than California that
12    you've worked in the adult prisons have not used
13    therapeutic modules for individual treatment?
14         A.    Not that I can remember.
15         Q.    Okay.  First time you saw the therapeutic
16    module -- therapeutic modules here in California, what
17    was your -- what was your response?
18              MS. VOROUS:  Objection.  Vague and ambiguous.
19              If you can, answer that question.
20              THE WITNESS:  I refer to them as a cage.
21    BY MR. FISCHER:
22         Q.    Did you have any other opinions or thoughts
23    about their use?
24         A.    On one of my reports, I made some notations of
25    it.  It was a very early report.
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1              (Plaintiffs' Exhibit 12 was marked for
 2               identification.)
 3              MR. FISCHER:   Exhibit 12.
 4    BY MR. FISCHER:
 5         Q.   Exhibit 12 are handwritten notes.  At the top
 6    it says "SAC Folsom."
 7              Does this refer to your CSP Sacramento tour on
 8    February 29 and March 1st?
 9         A.   Yes.
10         Q.   And I'll direct you to DEXP103015.
11              At the bottom, it says -- last four lines:
12    "Sometimes group's not dynamic.  Cages - terrible hard
13    metal stools.  Hard to be in cage for two hours."
14              Were those your impressions?
15         A.   I knew you were going to find this.
16              Yes.  I knew you were going to find this.
17    This was one of my early, early visits before I
18    understood the therapeutic modules.
19         Q.   This was one of your initial impressions of
20    the modules?
21         A.   Yes.  It may have been the first time.
22         Q.   The first time?
23         A.   That I had seen this -- these therapeutic
24    modules in California.
25         Q.   And so can you tell me a little more about
```

Page 156

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1       A.    Therapeutic module.

2       Q.    I'm sorry.  I'll start again.

3            You felt it was important for the decision as

4   to whether to place the patient in the module or not be

5   driven by the clinician's decision?

6       A.    Yes.

7       Q.    Did you observe instances where it wasn't

8   based on clinical decision making, that decision?

9       A.    The exception was with the ad seg inmates when

10  they would come to IDTT meetings in the crisis bed unit,

11  they were always placed in the therapeutic modules.

12      Q.    That's what you observed at RJD, as you said?

13      A.    Yes.

14      Q.    I believe you said that other than RJD, at all

15  the other institutions they were placed in modules for

16  the IDTT meetings?

17      A.    If they were ad seg inmates?  No, no, no.  I'm

18  confusing it.  I'm confusing it.  Ad seg inmates were

19  always handcuffed.  It had nothing to do with the

20  modules.

21      Q.    Ad seg inmates were always handcuffed for --

22      A.    IDTT.

23      Q.    -- IDTTs?

24      A.    Yes.

25      Q.    Regardless of the reason they were placed in

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1   for the group?
 2       A.   Yes.
 3       Q.   In your opinion, could that confidentiality
 4   also be achieved with separate treatment space for group
 5   therapy?
 6       A.   Yes.
 7       Q.   Would that be a preferred means of achieving
 8   confidentiality for group therapy?
 9            MS. VOROUS:  Objection.  Lacks foundation.
10   Vague and ambiguous.
11            THE WITNESS:  I don't know.  I mean, if it was
12   possible, yes, that would be the preferred method.
13   BY MR. FISCHER:
14       Q.   But as I understand, in some institutions
15   there was not that treatment space available?
16       A.   There was no such space available.
17            MR. FISCHER:  Exhibit 13.
18            (Plaintiffs' Exhibit 13 was marked for
19             identification.)
20   BY MR. FISCHER:
21       Q.   This is a photograph Bates-stamped by
22   defendants, and it's MCSP 14.
23            Dr. Moore, MCSP stands for Mule Creek State
24   Prison, photograph from Mule Creek State Prison ad seg
25   unit.  Did you observe any setting similar to this
```

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    during your tours?

2            MS. VOROUS:  Let me clarify.  During her

3    tours -- not Mule Creek.

4    BY MR. FISCHER:

5        Q.   I recognize that the experts did not go to

6    Mule Creek.  But were there other similar treatments

7    settings that you observed at other institutions?

8        A.   Not that I'm aware of.

9        Q.   Not that you're aware of?

10       A.   Not that I recall.

11       Q.   In this photograph, there are three modules

12   filled with inmates with two clinicians conducting

13   one-to-one treatments.

14           Did you observe individual treatment being

15   conducted in this manner on any of your tours?

16       A.   Not that I recall.  Sorry.

17       Q.   Do you have any concerns about conducting

18   one-to-one treatment in such a setting?

19           MS. VOROUS:  Objection.  Lacks foundation.

20   Argumentative.

21           Go ahead.

22           THE WITNESS:  My concern would be the

23   confidentiality of the interview.

24   BY MR. FISCHER:

25       Q.   Because they're so close?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      A.    Because they're so close.
2            And especially the -- inmate at the end has
3      nothing better to do than to listen.
4      Q.    Inmate on the left side is just listening?
5      A.    Right.
6      Q.    Would a more appropriate treatment space be an
7      individual office for these individual contacts?
8            MS. VOROUS:  Objection.  Lacks foundation.
9      Speculative.  Argumentative.
10           THE WITNESS:  Do you want an answer?
11     BY MR. FISCHER:
12     Q.    Uh-huh.
13     A.    If it was available.
14     Q.    You're aware from some of your tours that
15     individual treatment space is not available at some of
16     the institutions at this time?
17     A.    Yes.
18     Q.    Let me go back for one more minute to
19     Exhibit 13.
20           In your experience what is the impact that --
21     or the effect of having one-to-one contacts in a
22     nonconfidential setting similar to what you see here?
23           MS. VOROUS:  Objection.  Lacks foundation as
24     far as her experience in having this kind of experience.
25           THE WITNESS:  The inmate will not be as

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1    truthful or forthcoming with their issues.
 2    BY MR. FISCHER:
 3        Q.    And that would negatively affect the
 4    treatment?
 5        A.    That would affect the treatment.
 6        Q.    Okay.  Move to page 19 of the report.
 7              Subsection B versus the one EOP section,
 8    states:  "At California Institution for Men, CIM.  There
 9    were some inmates waiting for EOP special needs yards
10    beds reportedly housed in administrative segregation
11    unit for their own protection; not because they posed a
12    danger to others."
13              Did you observe this during your tour of CIM?
14        A.    I didn't look at special needs yards, so I
15    wouldn't be aware of this.
16        Q.    Did you observe any administrative segregation
17    units?
18        A.    Yes.
19        Q.    In any of the ad seg units, were inmates
20    waiting for EOP special need yard beds housed?
21        A.    I would have to look at my notes.  I don't
22    recall.
23              MR. FISCHER:  Exhibit 14.
24              (Plaintiffs' Exhibit 14 was marked for
25                identification.)
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1      A.    Okay.

2      Q.    Are you aware?

3      A.    Yes.  Yes.

4      Q.    Okay.  Did you visit the administrative

5   segregation unit at CIM?  I think you said you did.

6      A.    Um.

7      Q.    Direct you to top of the 10266, top two

8   issues: "EOP not transfer fast enough.  That's not

9   getting 10 hours RX" --

10      A.    Treatment.

11      Q.    "RX" is treatment?

12      A.    Treatment.

13      Q.    "Now nine in seg."

14            Were you documenting that there were nine EOPs

15   awaiting transfer in this segregation unit?

16      A.    Yes.

17      Q.    And they were not there for disciplinary

18   reasons; is that your understanding?

19      A.    Yes.

20      Q.    They were there because they were awaiting for

21   a bed to open?

22      A.    Yes.

23      Q.    Okay.  On the page just before that, 102620,

24   near the bottom you write:  "Lack of beds."

25            Is this related to same issue?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

```
 1        A.    Lack of beds in general population.
 2        Q.    So there were lack of beds for EOP and there
 3   were lack of beds for -- related to the general
 4   population?
 5        A.    Yes.
 6        Q.    Were there more inmates than appropriate beds?
 7        A.    Yes.
 8        Q.    It's your understanding?
 9              Were there more EOPs than appropriate beds in
10   the system?
11              MS. VOROUS:   Objection.
12   BY MR. FISCHER:
13        Q.    Trying to understand what your --
14        A.    More EOPs -- they couldn't transfer EOPs to
15   other institutions.
16        Q.    For lack of available beds?
17        A.    Lack of available beds.
18        Q.    Okay.  Do you recall, did you interview any of
19   the EOPs in segregation awaiting transfer when you were
20   at CIM?
21        A.    This -- these may have been the inmates on
22   page 102626.
23        Q.    Uh-huh.
24              Based on your interviews with these inmates,
25   were you able to reach an opinion as to whether they
```

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1    were receiving appropriate level of care treatment?

 2         A.    They were sick inmates.  They were very sick

 3    inmates.  And --

 4         Q.    Do you remember anyone specifically?

 5         A.    No.  Just by what I'm -- I wrote down about

 6    the fact that -- that they were hearing voices or that

 7    they were having auditory hallucinations or that one

 8    inmate was seeing signs of his grandmother.  They were

 9    sick inmates; they needed to be somewhere else.

10         Q.    In your opinion, was the administrative

11    segregation unit an appropriate area for these inmates?

12              MS. VOROUS:  Objection.  Assumes that these

13    inmates were ad seg.

14              THE WITNESS:  If these inmates were in ad seg.

15    BY MR. FISCHER:

16         Q.    Based on your memory, you interviewed inmates

17    in ad seg?

18         A.    I thought these were the inmates in ad seg.

19    I'm not sure.  I'd have to look at the numbers to be

20    sure.

21         Q.    On the page after which you were reading where

22    it again says "Seg" at the top.  This is 102627.

23              About halfway down, it says "LOB" -- "Make a

24    note LOB."  Does that stand for lack of bed?

25              MS. VOROUS:  Are you asking her whether --

Jacqueline Moore, R.N., Ph.D.                              February 21, 2013

1        Q.    Are you aware of any guidelines as to wellness
2    checks in segregation environments?
3        A.    Done by the LPT or by whom?
4        Q.    Anything about NCCHC or ACA guidelines as to
5    wellness checks in segregation.
6        A.    Done -- performed by -- who do you want them
7    to be performed by.
8        Q.    Are you aware of who the guidelines say --
9    what the guidelines say about that?
10       A.    The only guidelines that I'm aware of relating
11   to checks in segregation for suicide watches, and
12   those -- your inmates are not in segregation if they're
13   on suicide watch.
14       Q.    Are you aware of any national guidelines as to
15   welfare checks for all prisoners in segregation?
16       A.    They vary from 30 minutes to an hour to
17   15 minutes, depending upon -- depending upon the acuity
18   that the inmate is displaying.
19       Q.    Based on your expertise and experience, do you
20   have any opinion as to the appropriate practice as to
21   welfare checks in segregation?
22       A.    It's recommended that they be staggered, that
23   they not be done exactly at 30 minutes, only every half
24   hour.
25       Q.    Did you observe at some institutions problems

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    with staggered welfare checks?

2        A.    I never checked.

3        Q.    You didn't look at that issue?

4        A.    I didn't look at it.

5        Q.    Are you aware of guidelines that welfare

6    checks should be done regularly for all inmates during

7    the entire period that they're in segregation?

8        A.    Yes.  Yes.

9        Q.    You're aware of that guideline?

10       A.    Yes.

11       Q.    Are you aware that CDCR has welfare checks

12   only for first 21 days?

13       A.    No, I'm not.

14       Q.    Do you have any opinion as to the

15   appropriateness of that policy?

16       A.    Based on just what you've told me?

17       Q.    Sure.

18       A.    I think it should be continued indefinitely,

19   that you should have welfare checks.

20       Q.    Welfare checks?

21       A.    Every day.

22       Q.    For all inmates in segregation?

23       A.    Yes.

24       Q.    For the entire time they're in segregation?

25       A.    Yes.

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

 1      A.   Yes.

 2      Q.   You can see that it goes from DEXP102775 to

 3   102784.  Is that right?

 4      A.   Yes.

 5      Q.   And that -- I'm sorry -- one -- yeah.  And

 6   then shortly after that is 102801 on Exhibit 21.

 7           Are you able to -- I know that they're fairly

 8   blank.  Are you able to confirm whether this is the CCWF

 9   audit tool or not?

10      A.   Yes.  It has the CCWF medication -- medication

11   is stapled to the back at the end.

12      Q.   So this is the CCWF audit tool, Exhibit 21?

13      A.   Yes.

14      Q.   Okay.  Can I have you turn to DEXP102813?

15      A.   Yes.

16      Q.   On there, under "Administrative Segregation

17   Unit," did you write:  "No groups at ad seg"?

18      A.   Yes.

19      Q.   Does that remind you whether there are groups

20   in ad seg?

21      A.   Yes.

22      Q.   And there are not groups in administrative

23   segregation at CCWF?

24      A.   Yes.

25      Q.   Is this a barrier to appropriate treatment for

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

1    EOPs in the ad seg unit at CCWF, in your opinion?

2            MS. VOROUS:  Objection.  Misstates the content

3    of the document we're looking at.

4            The section that you're referring to, this

5    page 10283 -- 813 relates to general ad seg.  It does

6    not relate to the EOP ad seg hub.

7    BY MR. FISCHER:

8        Q.   Do you recall whether there was treatment at

9    any of the segregation units at CCWF?

10       A.   The unit that I went to, the ad seg unit that

11   I went to, also held the condemned women in it.  So I

12   don't know if it was the EOP ad seg or the general

13   ad seg.

14       Q.   On the next page of the exhibit, 102814, it

15   says under "EOP ASU Hub," it says:  "Meeting number of

16   hours of structured therapeutic activities offered per

17   week?"  You write "No."

18       A.   "None."

19       Q.   "None"?

20       A.   That's what written, "none."

21       Q.   Do you agree that the lack of structured

22   therapeutic activities in this unit was a barrier to

23   treatment to EOP women?

24       A.   Yes.

25       Q.   And CCCMS women at CCWF?

Jacqueline Moore, R.N., Ph.D.                    February 21, 2013

CERTIFICATE OF REPORTER

I, MEGAN F. ALVAREZ, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the events of this cause, and that I am not related to any of the parties hereto.

DATED: February 25, 2013

*Megan F. Alvarez*

MEGAN F. ALVAREZ

RPR, CSR 12470

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

# Exhibit 18

| | |
|---|---|
| **From:** | Lisa Tillman <Lisa.Tillman@doj.ca.gov> |
| **Sent:** | Wednesday, May 09, 2007 13:21 |
| **To:** | jmichaelkeatingjr@yahoo.com |
| **Cc:** | DocKC99@aol.com; DoctorKoson@aol.com; harconwil@aol.com; mperrien@aol.com; Melissa G. Warren; gmorrison@collaboration-specialists.com; hammujones@comcast.net; rpattersonmd@earthlink.net; gasquetflat@msn.com; paul_nicoll@msn.com; FDoVale@pld-law.com; LBuffardi@pld-law.com; mlopes@pld-law.com; mspencer@pld-law.com; Donald Specter; itrujillo@prisonlaw.com.; Amy E. Whelan; Jane E. Kahn; Lori E. Rifkin; Michael W. Bien; Sarah M. Laubach; Jeffrey.metzner@uchsc.edu; yje@verizon.net; burnshill@wowway.com |
| **Subject:** | Additional Materials/Ad Seg |
| **Attachments:** | adseg.pdf; 070427 Clarification Regarding Entertainment Appliances in ASU.pdf |

May 9, 2007

Re: Coleman v. Schwarzenegger

Greetings:

Please find enclosed additional materials relevant to Defendants' plan to address suicide trends in administrative segregation units:

1.  Picture of electrical outlet;

2.  September 1, 2005 memorandum entitled, "Institution Bed Management";

3.  April 27, 2007 memorandum entitled, "Clarification Regarding Entertainment Policies in Administrative Segregation Units."

Sincerely,

Lisa Tillman
Deputy Attorney General
Office of the Attorney General
Telephone: 916-327-7872
Facsimile: 916-324-5205



>>> <lisa.tillman@doj.ca.gov> 5/9/2007 1:06:22 PM >>>


---------------------------------------------------------------

Please open the attached document.
This document was sent to you using an HP Digital Sender.

| | |
|---|---|
| Sent by: | <lisa.tillman@doj.ca.gov> |
| Number of pages: | 7 |
| Document type: | B/W Document |
| Attachment File Format: | Adobe PDF |

1

To view this document you need to use the Adobe Acrobat Reader.
For more information on the HP Digital Sender, Adobe Circulate,
or a free copy of the Acrobat reader please visit:

http://www.digitalsender.hp.com/reader-en

CONFIDENTIALITY NOTICE: This communication with its contents may contain
confidential and/or legally privileged information. It is solely for the
use of the intended recipient(s). Unauthorized interception, review, use
or disclosure is prohibited and may violate applicable laws including
the Electronic Communications Privacy Act. If you are not the intended
recipient, please contact the sender and destroy all copies of the
communication.

2

State of California

**Memorandum**

Date : April 27, 2007

To : Associate Directors, Division of Adult Institutions
Wardens

WSP-RC Received & Distributed on 4/30/2007 2:17 PM
By Thomas P. Gaines, Executive Assistant

Department of Corrections and Rehabilitation

1 COPY TO CDW
1 COPY TO AW - BS
1 COPY TO AW - C3
1 COPY TO AW - H & P
1 COPY TO AW - RC
1 COPY TO
1 COPY TO
1 COPY TO FILE

Subject : **CLARIFICATION REGARDING ENTERTAINMENT APPLIANCES IN ADMINISTRATIVE SEGREGATION UNITS**

This is to provide clarification regarding the attached memorandum dated March 12, 2007, on the subject of televisions in Administrative Segregation Units (ASU). The Division of Adult Institutions (DAI) has received requests for more specific guidance concerning this inmate privilege.

The California Department of Corrections and Rehabilitation has a commitment to the court in regards to *Coleman vs. Schwarzenegger*. This commitment is in response to court concerns over sensory deprivation and suicide trends in the ASU's. It is important that we take an immediate, active role in addressing these issues rather than waiting for additional direction from the court. With this intent, the DAI is permitting ASU inmates to possess one entertainment appliance, either a television or a radio. Compact disc, cassette players and batteries remain restricted due to safety and security concerns and battery operated appliances are still not permitted in ASU.

The March 12, 2007, memorandum provided for a schedule of increasing temporary loss of entertainment appliances in ASU. The initial Rules Violation Report (RVR) resulting in ASU placement does not apply to this schedule. It would be contrary to the intent of our response to *Coleman* to permit this. Only RVR's received subsequent to ASU placement shall result in loss of an entertainment appliance.

RVR's received in ASU have no time constraints other than those related to Program Failure. While a first and a second RVR may be over one-year apart, the second RVR shall always result in a 60-day loss of entertainment appliance privileges. However, this lack of time limits does not carry over to subsequent ASU placements.

The instances in which an ASU inmate would not be permitted to possess an entertainment appliance include physical plant limitations, the loss of the entertainment appliance as the result of RVR's while in ASU, or if the reason for ASU placement involved the misuse of an entertainment appliance.

The RVR resulting in ASU placement does not impact the inmates' ability to possess an entertainment appliance unless there is a nexus between an appliance and the reason for placement. For example, if placement involved the misuse of an appliance, the Institution Classification Committee may determine that possession of an entertainment appliance poses an unacceptable safety and security risk in ASU. Such a determination must be made on a case-by-case evaluation of the specific circumstances involved.

The memorandum of March 12, 2007, permits inmates housed in ASU to possess one entertainment appliance; however, there may be physical plant limitations. While an inmate's Privilege Group may permit the privilege of possessing an entertainment appliance, this may not be possible without extensive retrofitting of existing buildings by adding

Associate Directors
Wardens
Page 2

additional electrical outlets, and cable connections. If this is the case, the facility shall submit an exemption request to the Standardized Procedures Liaison Unit, as provided in Department Operations Manual Section 54030.17. Please provide a description of the retrofitting required along with a cost estimate in all exemption requests.

Several institutions have exemptions granted for alternating current appliances in dormitory housing, including those institutions whose General Population (GP) housing is exclusively dormitories. Regardless of the exemption granted for dormitory housing, placement in ASU is not subject to this exemption. It is important to remember the restrictive nature of ASU housing and resulting sensory deprivation issues that do not exist in dormitory housing and are of concern in the *Coleman* case. Therefore, an inmate who was unable to possess an entertainment appliance in GP housing may be able to do so during ASU placement.

The ability of an ASU inmate to possess an entertainment appliance, either a television or a radio, also provides inmates with an additional incentive for positive programming and an additional disciplinary tool for staff. The memorandum of March 12, 2007, provides a schedule for temporary loss of entertainment appliances. The classification of the RVR, whether serious or administrative, does not affect this schedule. The loss of an entertainment appliance is in addition to any other assessment deemed appropriate by the hearing official.

If further information is needed, please contact Don C. Price, Facility Captain (A), Standardized Procedures Liaison Unit, at (916) 327-5305.

LEA ANN CHRONES
Director (A)
Division of Adult Institutions

Attachment

cc: Scott Kernan
    Teresa Schwartz
    Tim Virga
    Don Price

State of California

Department of Corrections and Rehabilitation

# **Memorandum**

Date : March 12, 2007

To : Associate Directors, Division of Adult Institutions
Wardens

Subject: **TELEVISIONS IN ADMINISTRATIVE SEGREGATION UNITS**

As the result of pending changes to Title 15 Section 3190(s) and Department Operations
Manual (DOM) Section 54030, inmates housed in Administrative Segregation Units (ASU) may be
permitted to possess one entertainment appliance, physical plant limitations permitting.

Privilege Group (PG) A and B inmates placed in ASU shall have their property inventoried and stored
pending the outcome of Initial Classification Committee review. If the inmate is retained in ASU, all
allowable property as determined by current departmental policy shall be reissued to the inmate.
Inmates in ASU may also purchase an entertainment appliance via the Special Purchase Process.
Eligibility to possess an entertainment appliance commences on the date of PG D assignment.

Retention of an entertainment appliance shall be based upon the inmate's disciplinary free behavior.
Entertainment appliances are subject to temporary removal as the result of a finding of "Guilty" on any
Rules Violation Report (RVR). The loss of an entertainment appliance shall be in addition to any
other assessment deemed appropriate by the hearing official. Temporary loss of entertainment
appliances shall be assessed as follows:

1. 30 days for the first offense

2. 60 days for the second offense

3. 90 days for the third offense

In addition, a guilty finding for two Serious RVRs or one Serious and two Administrative RVRs
within 180-days shall be considered a program failure and result in disposal of the entertainment
appliance in accordance with DOM Section 54030.12.2.

If further information is needed, please contact Don C. Price, Facility Captain (A), Standardized
Procedures Liaison Unit, at (916) 327-5305.

*Original signed by:*

LEA ANN CHRONES
Director (A)
Division of Adult Institutions

cc: Scott Kernan
Teresa Schwartz
Tim Virga
Don Price

# Exhibit 19

| | |
|---|---|
| **From:** | Debbie Vorous <Debbie.Vorous@doj.ca.gov> |
| **Sent:** | Friday, February 10, 2012 10:19 |
| **To:** | Aaron Fischer |
| **Cc:** | Debbie Vorous; William Downer; Coleman Special Master Team; Coleman Team - RBG Only |
| **Subject:** | RE: Defendants' Letter Re: January 19,2012 Policy Meeting    [IWOV-DMS.FID6429] |
| **Attachments:** | ASU SURVEY.pdf |

Aaron,

In response to your first question, Defendants are working to address the issue of length of stay of EOP inmates in regular ASUs.

With respect to the November 2010 survey, we have no record of agreeing to provide that survey. Nonetheless, attached is a copy of the survey.

Thank you,


Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345

>>> Aaron Fischer <AFischer@rbg-law.com> 2/7/2012 12:43 PM >>>

Debbie,

Thank you for this follow-up information. Two quick items:

1.  In your letter, you write that Defendants are "working on a process to reduce the length of stay in ASU hubs and will provide a report at the next meeting." I want to clarify that Defendants' efforts will also address our concerns about the length of stay for EOPs in regular, non-hub ASUs. *See* Pls' January 9, 2012 Letter (attached).

2.  Thank you for providing the September 2011 Follow-up Survey regarding Entertainment Appliances in ASUs. However, I don't think we ever received the original survey from November/December 2010. Can you please provide that document as well?

Again, many thanks.

-Aaron

Aaron J. Fischer, Esq.

1

ROSEN, BIEN & GALVAN, LLP
315 Montgomery Street, Tenth Floor
San Francisco, CA 94104
Tel: (415) 433-6830
Fax: (415) 433-7104
afischer@rbg-law.com
www.rbg-law.com

CONFIDENTIALITY NOTICE
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at rbg@rbg-law.com.

IRS CIRCULAR 230 NOTICE:  As required by United States Treasury Regulations, you should be aware that this communication is not intended by the sender to be used, and it cannot be used, for the purpose of avoiding penalties under United States federal tax laws.

**From:** Debbie Vorous [mailto:Debbie.Vorous@doj.ca.gov]
**Sent:** Monday, February 06, 2012 11:58 AM
**To:** Kerry Courtney Hughes, MD; Patricia M. Williams; Haunani Henry; Mary Perrien; Henry D. Dlugacz; Raymond F. Patterson, MD; Kathryn Burns, MD, MPH; Ted Ruggles, PhD; Paul Nicoll; MLopes@pld-law.com; lholden@pldlaw.com; Kristina Hector; Mohamedu Jones; Steve Raffa; Kerry Walsh; mlopes@pldwlaw.com; Jeff Metzner
**Cc:** Debbie Vorous; William Downer; Steve Fama; Aaron Fischer; Jane E. Kahn; Lisa Ells; Michael W. Bien; Laura Boysen-Aragon <LBoysen-Aragon@rbg-law.com
**Subject:** Defendants' Letter Re: January 19, 2012 Policy Meeting


Dear Special Master Lopes:

Attached is a letter, along with three enclosures, confirming what Defendants agreed to provide following the January 19, 2012 policy meeting.

Please contact me if you have any questions.

Thank you,


Debbie J. Vorous
Deputy Attorney General
State of California
Department of Justice
1300 I Street
Sacramento CA 94244-2550
(916) 324-5345


**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

ASU SURVEY

| PRISON | BUILDING DESIGN | UNIT IS BUDGETED or OVERFLOW | ELEC. IN CELLS (Y/N) | CABLE IN CELLS (Y/N) | ISSUE RADIOS IN ASU (Y/N) | ISSUE TV'S IN ASU (Y/N) | TV'S USED ON TIER (Y/N) | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|---|---|---|
| ASP - UNIT 140 | 270 | B | N | N | N | N | N | n/a |
| CAL - ASU #1 | Stand Alone | B | N | N | N | N | N | n/a |
| CAL - A5 | 270 | B | N | N | N | N | N | n/a |
| CCC - LASSEN, Bldg 4 | 270 | B | Y | Y | N | Y | Y | n/a |
| CCI - UNIT II | Old Style | B | N | N | N | N | N | n/a |
| CCI - 4A Building 6 | 180 | B | N | N | N | N | N | n/a |
| CCI - 4A Building 7 | 180 | B | N | N | N | N | N | n/a |
| CCI - 4A Building 8 | 180 | B | N | N | N | N | N | n/a |
| CCI - 4B1 | 180 | O/F (SHU) | Y | Y | N | N | N | n/a |
| CCI - 4B ASU (SHU) | 180 | SHU | N/A SHU | N/A SHU | N/A SHU | N/A SHU | N/A SHU | n/a |
| CCWF - Building 504 | 270 | B | Y | N | Y | Y | N | n/a |
| CEN - A5 | 270 | O/F | Y | Y | N | N | N | n/a |
| CEN - C6 | Stand Alone | B | N | N | N | N | N | n/a |
| CIM - PALM HALL | Telephone | B | N | N | N | N | N | n/a |
| CIM - CYPRESS HALL | Telephone | B | N | N | N | N | N | n/a |
| CIW - SPHU | 270 | B | Y | N | N | Y | N | n/a |
| CMC - B4 Annex | Quad | BOTH | N | N | N | N | N | n/a |
| CMC - Central ASU | Quad | B | N | N | N | N | N | n/a |
| CMF - IV (WILLIS) | Telephone | B | N | N | N | N | N | n/a |
| CMF - T-WING | Telephone | O/F | Y | Y | Y | Y | N | n/a |
| CMF - 13 | Telephone | B | N | N | N | N | N | n/a |
| CMF - M3 | Telephone | B | N | N | N | N | N | n/a |
| CMF - S3 | Telephone | B | N | N | N | N | N | n/a |
| COR - 3A03 | 270 | B | Y | Y | Y | Y | N | n/a |
| COR - 4B1L | 180 | B | Y | Y | Y | Y | N | n/a |
| COR - ASU1 | Stand Alone | B | N | N | Y | N | N | n/a |
| CTF - O WING | Telephone | B | Y | Y | Y | Y | N | n/a |
| CTF - X WING | Telephone | O/F | Y | Y | Y | Y | Y | n/a |
| CSP - Fac A A5U | 270 | B | N | N | N | N | N | n/a |
| DVI - K WING | Telephone | B | N | N | N | N | N | n/a |
| DVI - L WING | Telephone | B | N | N | N | N | N | n/a |
| FSP - UNIT I (O/F) | Telephone | O/F | Y | Y | N | N | N | n/a |
| FSP - UNIT IV ASU | Telephone | B | Y | N | N | N | N | n/a |
| HDSP - D1 | 180 | O/F | Y | Y | N | Y | Y | n/a |
| HDSP - D5 | 180 | O/F | Y | Y | N | Y | Y | No radios, but audio appliances Yes. |
| HDSP - D6 | 180 | O/F | Y | Y | N | Y | Y | No radios, but audio appliances Yes. |
| HDSP - D7 | 180 | B | Y | Y | N | Y | Y | No radios, but audio appliances Yes. |
| HDSP - D8 | 180 | B | Y | Y | N | Y | Y | No radios, but audio appliances Yes. |

ASU SURVEY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| HDSP - Z UNIT | Stand Alone | B | N | N | N | N | N | None, HDSP denied on 2 Section 6's. Exempted. |
| ISP - A4 | 270 | O/F | Y | Y | N | Y | Y | n/a |
| ISP - A5 | 270 | B | Y | Y | N | Y | N | n/a |
| KVSP - ASU #1 | Stand Alone | B | N | N | N | N | N | n/a |
| KVSP - ASU #2 | Stand Alone | B | N | N | N | N | N | n/a |
| KVSP - B1 | 180 | B | Y | Y | Y | Y | N | n/a |
| KVSP - B2 | 180 | O/F | Y | Y | Y | Y | N | n/a |
| LAC - A4 | 270 | B | N | N | N | N | N | n/a |
| LAC - A5 | 270 | B | Y 149/150 | N | N | N | N | n/a |
| LAC - ASU1 | Stand Alone | B | N | N | N | N | N | n/a |
| MCSP - C-12 | 270 | B | Y | Y | Y | Y | N | n/a |
| NKSP - D6 | Wing Nut | B | N | N | N | N | Y | n/a |
| NKSP - A4 | 270 | O/F | Y | Y | N | N | Y | n/a |
| PBSP - ASU 1 | Stand Alone | B | N | N | N | N | N | n/a |
| PBSP A1 | 180 | B | Y | Y | Y | Y | N | n/a |
| PBSP A2 | 180 | B | Y | Y | Y | Y | N | n/a |
| PBSP A3 | 180 | O/F | Y | Y | Y | Y | N | n/a |
| PBSP A4 | 180 | O/F | Y | Y | Y | Y | N | n/a |
| PVSP - ASU #1 | Stand Alone | B | N | N | N | N | N | n/a |
| PVSP - Fac D | 270 | B | Y | Y | Y | Y | N | n/a |
| RJD - Fac 2, Bldg 6 | 270 | B | N | N | N | N | N | n/a |
| RJD - Fac 2, Bldg 7 | 270 | B | N | N | N | N | N | n/a |
| SAC - A5 | 180 | B | Y | Y | Y | Y | N | n/a |
| SAC - B4 | 180 | B | Y | Y | Y | Y | N | n/a |
| SAC - ASU | Stand Alone | B | Y | Y | Y | Y | N | n/a |
| SATF - ASU | Stand Alone | B | Y | Y | Y | Y | N | n/a |
| SATF - Fac E | 270 | B | Y | Y | Y | Y | N | n/a |
| SCC - Tuolumne 2 | 270 | B | N | N | N | N | N | n/a |
| SOL - F2, BLDG 9 | 270 | B | 65 Y 35 N | N | N | N | N | n/a |
| SOL - F2, BLDG 10 | 270 | B | N | N | N | N | N | n/a |
| SOL - F2, BLDG 11 | 270 | O/F | Y | Y | N | N | N | n/a |
| SQ - CARSON UNIT | Telephone | B | N | N | N | N | N | n/a |
| SQ - DONNER UNIT | Telephone | B | N | N | N | N | N | n/a |
| SQ - ADJ CENTER | Telephone | B | Y | Y | N | N | N | n/a |
| SVSP - D1 | 180 | B | Y | Y | Y | Y | N | n/a |
| SVSP - D2 | 180 | B | Y | Y | Y | Y | N | n/a |
| SVSP - D8 | 180 | B | Y | Y | Y | Y | N | n/a |
| SVSP - D9 | Stand Alone | B | Y | N | N | N | N | n/a |
| VSPW - A4 | 270 | B | Y | Y | Y | Y | N | n/a |
| WSP - D6 | Wing Nut | B | N | N | N | N | Y | n/a |

# Exhibit 20

**FOLLOW UP SURVEY/ Entertainment Appliances in ASU**
<u>September 21, 2011</u>

**Original survey conducted approximately December 2010 identified the following institutions as having the physical plant capability in specific areas/buildings to provide ASU inmates the means to possess and utilize an entertainment appliance (TV/Radio), <u>yet did not allow them at the time.</u>**

Results of follow-up survey received on 9/23/2011

| INSTITUTIONS-UNIT | Physical Plant Capability (Electric/Cable) | Are inmates in identified Unit allowed Entertainment Appliances? | Television on Tier in lieu of in cells? | Has there been any change since December 14, 2010? |
|---|---|---|---|---|
| CCI – 4B1 | BOTH | YES | NO | Do not house ASU inmates in Housing Unit 1. |
| CEN – A5 | BOTH | YES | NO | Allowances have been in effect sin Feb. 2011. |
| FSP- Unit 1 | BOTH | NO | NO | No Change |
| NKSP-A4 | BOTH | NO | TV on Dayroom Floor | No Change |
| SQ- Adjustment Center * | Both (5th tier Carson Unit only) | Carson Unit 5th tier only | NO | Started connecting electric and cable to 5th tier (Carson Unit) sometime in 2011. |
| SOL- Bldg. 11 | BOTH | YES | TV on Dayroom floor | There are no ASU inmates housed in Bldg. 11. |

**\*     San Quentin responded to survey with results of Carson Unit.**

# Exhibit 21



**KAMALA D. HARRIS**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 324-2445
Facsimile: (916) 322-5205
E-Mail: William.Downer@doj.ca.gov

December 12, 2012

<u>**Via E-Mail**</u>

Matthew A. Lopes, Jr.
Special Master
Pannone Lopes & Devereaux, LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908

RE:    December 13, 2012-Tour of Willis Unit at California Medical Facility

Dear Mr. Lopes:

We write to provide information and context for the December 13, 2012-tour of the Willis Unit at California Medical Facility (CMF). The CDCR long-range mental health bed plan contemplates permanently increasing CMF's capacity to house inmates receiving enhanced outpatient programming (EOP) in administrative segregation units by fourteen inmates. (*See* DKT 4196-2.) Defendants plan to achieve that capacity by designating the I-3 and M-3 units as EOP administrative segregation units, and, where necessary, transferring CCCMS inmates currently housed there to the refurbished Willis Unit. The purpose of Thursday's tour is twofold: (1) to showcase the significantly improved conditions at the Willis Unit; and (2) to assure you that transferring CCCMS inmates to the Willis Unit will not adversely impact or diminish the mental health programming they currently receive.

Defendants understand that Plaintiffs and the Court are chiefly concerned that, historically, the Willis Unit was a physically unsatisfactory facility for housing mentally ill inmates, and that it lacked sufficient staff to carry out necessary mental health programming. CDCR has since resolved these issues. CDCR has addressed concerns related to the physical plant of the Willis unit by: (1) repainting the unit; (2) retrofitting the intake cells with suicide resistant components; and (3) installing air conditioning and solid cell doors. Further, moving CCCMS inmates to the Willis Unit will not diminish their access to necessary mental health staffing resources or programming. (*See* attached letter from D. Silbaugh.)

December 12, 2012
Page 2


        We are confident that CCCMS inmates can be moved to the Willis Unit with no
interruption or adverse impact to the mental health care they currently receive.  Please contact
Debbie Vorous or me if you have any questions about the tour or CDCR's plan to move expand
CMF's EOP administrative segregation program.



                                Sincerely,

                                /s/ William H. Downer

                                WILLIAM H. DOWNER
                                Deputy Attorney General

                        For     KAMALA D. HARRIS
                                Attorney General

Enc.
cc:     Kerry Walsh
        Jane Kahn
        Michael Bien
        Steve Fama

# Exhibit 22

# Mental Health Population By Institution
Download Date: March 22, 2013

CONFIDENTIAL

## SUMMARY OF OUTPATIENT POPULATION
### (ASU, GP, RC and SHU Detail on pages 2-4)

| Institution | CCCMS [1] | | | EOP [2] | | | PSU [2] | | | Inst Total Outpatient Pop |
|---|---|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | |
| ASP | 1099 | 1383 | 126% | | 6 | | | | | 1389 |
| CAL | | 22 | | | | | | | | 22 |
| CCC | | 1 | | | | | | | | 1 |
| CCI | 1349 | 1078 | 80% | | 7 | | | | | 1085 |
| CCWF | 899 | 1212 | 135% | 64 | 48 | 75% | | | | 1260 |
| CEN | | 19 | | | 1 | | | | | 20 |
| CIM | 1299 | 1374 | 106% | | 66 | | | | | 1440 |
| CIW | 499 | 800 | 160% | 85 | 67 | 79% | 20 | 15 | 75% | 882 |
| CMC | 1099 | 885 | 81% | 634 | 630 | 99% | | | | 1515 |
| CMF | 599 | 498 | 83% | 391 | 402 | 103% | | | | 900 |
| COR | 949 | 1212 | 128% | 249 | 250 | 100% | | | | 1462 |
| CRC-M | 848 | 990 | 117% | | 3 | | | | | 993 |
| CTF | 845 | 1080 | 128% | | 4 | | | | | 1084 |
| CVSP | | 11 | | | | | | | | 11 |
| DVI | 649 | 427 | 66% | | 17 | | | | | 444 |
| FOL | 599 | 476 | 79% | | 1 | | | | | 477 |
| HDSP | 699 | 851 | 122% | | 2 | | | | | 853 |
| ISP | | 15 | | | | | | | | 15 |
| KVSP | 1000 | 1216 | 122% | 96 | 104 | 108% | | | | 1320 |
| LAC | 1149 | 1321 | 115% | 374 | 388 | 104% | | | | 1709 |
| MCSP | 1149 | 1049 | 91% | 546 | 537 | 98% | | | | 1586 |
| NKSP | 799 | 875 | 110% | | 90 | | | | | 965 |
| PBSP | 349 | 204 | 58% | 66 | 65 | 98% | 128 | 111 | 87% | 380 |
| PVSP | 1499 | 1680 | 112% | | 4 | | | | | 1684 |
| RJD | 1199 | 1434 | 120% | 543 | 527 | 97% | | | | 1961 |
| SAC | 849 | 622 | 73% | 458 | 384 | 84% | 256 | 229 | 89% | 1235 |
| SATF | 1199 | 1524 | 127% | 352 | 350 | 99% | | | | 1874 |
| SCC | 499 | 492 | 99% | | 7 | | | | | 499 |
| SOL | 1199 | 1020 | 85% | | 11 | | | | | 1031 |
| SQ | 899 | 1070 | 119% | 36 | 37 | 103% | | | | 1107 |
| SVSP | 999 | 1294 | 130% | 264 | 230 | 87% | | | | 1524 |
| VSP | 849 | 747 | 88% | | 8 | | | | | 755 |
| WSP | 1049 | 877 | 84% | | 103 | | | | | 980 |
| **TOTAL** | **26118** | **27759** | **106%** | **4158** | **4349** | **105%** | **404** | **355** | **88%** | **32463** |

| Group | CCCMS | | | EOP | | | Subtotal MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|
| Institution (3) | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | |
| **Administrative Segregation Unit (ASU)** | | | | | | | | |
| ASP ASU | | 30 | | | 1 | | 31 | |
| CAL ASU | | 11 | | | | | 11 | |
| CCI ASU | | 103 | | | 2 | | 105 | |
| CCWF ASU | | 37 | 10 | | 2 | 20% | 39 | |
| CEN ASU | | 3 | | | | | 3 | |
| CIM ASU | | 90 | | | 5 | | 95 | |
| CIW ASU | | 38 | 10 | | 6 | 60% | 44 | |
| CMC ASU | | 35 | 54 | 62 | | 115% | 97 | |
| CMF ASU | | 28 | 58 | 38 | | 66% | 66 | |
| COR ASU | | 138 | 99 | 72 | | 73% | 210 | |
| CTF ASU | | 18 | | | | | 18 | |
| CVSP ASU | | 1 | | | | | 1 | |
| DVI ASU | | 55 | | | 4 | | 59 | |
| FOL ASU | | 20 | | | | | 20 | |
| HDSP ASU | | 45 | | | | | 45 | |
| ISP ASU | | 4 | | | | | 4 | |
| KVSP ASU | | 72 | | | 4 | | 76 | |
| LAC ASU | | 166 | 74 | 74 | | 100% | 240 | |
| MCSP ASU | | 57 | 36 | 40 | | 111% | 97 | |
| NKSP ASU | | 40 | | | 5 | | 45 | |
| PBSP ASU | | 73 | | | 5 | | 78 | |
| PVSP ASU | | 139 | | | 2 | | 141 | |
| RJD ASU | | 90 | 63 | 58 | | 92% | 148 | |
| SAC ASU | | 72 | 74 | 47 | | 64% | 119 | |
| SATF ASU | | 109 | | | 1 | | 110 | |
| SCC ASU | | 23 | | | 1 | | 24 | |
| SOL ASU | | 42 | | | 2 | | 44 | |
| SQ ASU | | 71 | 36 | 8 | | 22% | 79 | |
| SVSP ASU | | 156 | 72 | 52 | | 72% | 208 | |
| VSP ASU | | 2 | | | 1 | | 3 | |

| Group | | CCCMS | | | EOP | | | Subtotal MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|---|
| Institution [3] | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | | |
| **Administrative Segregation Unit (ASU)** | | | | | | | | | |
| **WSP ASU** | | 33 | | | 7 | | 40 | | |
| **Group Total for ASU** | | 1,801 | | 586 | 499 | 85% | 2,300 | | |

| Group | | | CCCMS | | | EOP | | | Subtotal MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| Institution [3] | | | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | |
| **General Population (GP)** | | | | | | | | | | |
| ASP | II | | 1,099 | 1,353 | 123% | | 5 | | 1,358 | |
| CAL | I,IV | + | | 11 | | | | | 11 | |
| CCC | I,II,III | | | 1 | | | | | 1 | |
| CCI | I,II,III,IV | * | 1,219 | 781 | 64% | | 4 | | 785 | |
| CCWF | | | 745 | 1,012 | 136% | 54 | 3 | 6% | 1,015 | |
| CEN | III | | | 16 | | | 1 | | 17 | |
| CIM | I | | 666 | 1,192 | 179% | | 45 | | 1,237 | |
| CIW | | | 499 | 665 | 133% | 75 | 59 | 79% | 724 | |
| CMC | I,II,III | | 1,099 | 850 | 77% | 580 | 568 | 98% | 1,418 | |
| CMF | I,II,III | | 599 | 470 | 78% | 333 | 364 | 109% | 834 | |
| COR | I,III,IV | + * | 499 | 650 | 130% | 150 | 178 | 119% | 828 | *SNY EOP=150 beds* |
| CRC-M | II | | 848 | 990 | 117% | | 3 | | 993 | |
| CTF | I,II | | 845 | 1,062 | 126% | | 4 | | 1,066 | |
| CVSP | I,II | | | 10 | | | | | 10 | |
| DVI | I,II | | 85 | 119 | 140% | | 1 | | 120 | |
| FOL | III | | 599 | 456 | 76% | | 1 | | 457 | |
| HDSP | I,III,IV | * | 699 | 806 | 115% | | 2 | | 808 | |
| ISP | I,III | | | 11 | | | | | 11 | |
| KVSP | I,IV | | 1,000 | 1,144 | 114% | 96 | 100 | 104% | 1,244 | *SNY EOP* |
| LAC | I,III,IV | + | 1,149 | 1,155 | 101% | 300 | 314 | 105% | 1,469 | |
| MCSP | I,II,III,IV | + | 1,149 | 992 | 86% | 510 | 497 | 97% | 1,489 | *SNY EOP* |
| NKSP | I,III | | 80 | 105 | 131% | | 3 | | 108 | |
| PBSP | I,IV | * | 349 | 127 | 36% | 66 | 60 | 91% | 187 | |
| PVSP | I,III | | 1,499 | 1,541 | 103% | | 2 | | 1,543 | |
| RJD | I,III | | 1,199 | 1,344 | 112% | 480 | 469 | 98% | 1,813 | *SNY EOP=150 beds* |
| SAC | I,IV | * | 849 | 538 | 63% | 384 | 337 | 88% | 875 | |
| SATF | II,III,IV | * | 1,199 | 1,415 | 118% | 352 | 349 | 99% | 1,764 | *SNY EOP=264 beds* |
| SCC | I,II,III | | 499 | 469 | 94% | | 6 | | 475 | |
| SOL | II,III | | 1,199 | 978 | 82% | | 9 | | 987 | |
| SQ | I,II | | 350 | 790 | 226% | | 24 | | 814 | |

| Group<br><br>Institution [3] | CCCMS | | | EOP | | | Subtotal<br>MH Pop | Comments |
|---|---|---|---|---|---|---|---|---|
| | Capacity | Current Pop | % of Capacity | Capacity | Current Pop | % of Capacity | | |
| **General Population (GP)** | | | | | | | | |
| SVSP                    *LIV*  * | 999 | 1,138 | 114% | 192 | 178 | 93% | 1,316 | |
| VSP | 849 | 745 | 88% | | 7 | | 752 | |
| WSP                    *LIII* | 105 | 116 | 110% | | 2 | | 118 | |
| Group Total for GP | **21,975** | **23,052** | **105%** | **3,572** | **3,595** | **101%** | **26,647** | |
| **Reception Center (RC)** | | | | | | | | |
| CCWF-RC | 154 | 163 | 106% | | 43 | | 206 | *Fac A Bldg 503 is partial RC and partial EOP-GP* |
| CIM-RC | 633 | 92 | 15% | | 16 | | 108 | |
| DVI-RC | 564 | 253 | 45% | | 12 | | 265 | |
| NKSP-RC | 719 | 730 | 102% | | 82 | | 812 | |
| SQ-RC | 549 | 209 | 38% | | 5 | | 214 | |
| WSP-RC | 944 | 728 | 77% | | 94 | | 822 | |
| Group Total for RC | **3,563** | **2,175** | **61%** | | **252** | | **2,427** | |
| **Security Housing Unit (SHU)** | | | | | | | | |
| CCI-SHU | 130 | 194 | 149% | | 1 | | 195 | |
| CIW SHU | | 97 | | | 2 | | 99 | |
| COR-SHU | 450 | 424 | 94% | | | | 424 | |
| PBSP SHU | | 4 | | | | | 4 | |
| SAC SHU | | 12 | | | | | 12 | |
| Group Total for SHU | **580** | **731** | **126%** | | **3** | | **734** | |

**Report Footnotes**
(1) CCCMS capacities have not been adjusted to reflect realignment.

(2) EOP, ASU-EOP, and PSU may not reflect actual program vacancies because beds can be held vacant for inmate-patients temporarily housed in MHCB and OHU.

(3) " + " is a 270 Design Facility.  " * " is a 180 Design Facility.