1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  JONATHAN L. WOLFF
   Senior Assistant Attorney General
3  JAY C. RUSSELL
   Supervising Deputy Attorney General
4  DEBBIE J. VOROUS, State Bar No. 166884
   PATRICK R. MCKINNEY, State Bar No. 215228
5  WILLIAM DOWNER, State Bar No. 257644
   Deputy Attorneys General
6   1300 I Street, Suite 125
    P.O. Box 944255
7   Sacramento, CA 94244-2550
    Telephone: (916) 324-5345
8   Fax: (916) 324-5205
    E-mail: Debbie.Vorous@doj.ca.gov
9
   *Attorneys for Defendants*
10
                  IN THE UNITED STATES DISTRICT COURT
11
              FOR THE EASTERN DISTRICT OF CALIFORNIA
12
                        SACRAMENTO DIVISION
13

14

15  **RALPH COLEMAN, et al.,**              2:90-cv-00520 LKK JFM PC

16                           Plaintiffs,   **DEFENDANTS' OPPOSITION TO
                                            PLAINTIFFS' MOTION FOR**
17         v.                              **ENFORCEMENT OF COURT ORDERS
                                            AND AFFIRMATIVE RELIEF RELATED**
18                                         **TO INPATIENT TREATMENT**
    **EDMUND G. BROWN, JR., et al.,**
19                                         Date:    May 23, 2013
                             Defendants.   Time:    10:00 a.m.
20                                         Dept:    4
                                           Judge:   Hon. Lawrence K. Karlton
21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3
INTRODUCTION ................................................................................................. 1

4
BACKGROUND ................................................................................................. 2

LEGAL STANDARDS......................................................................................... 3

5
    I.     The Standard for Obtaining Prospective Injunctive Relief Under the Prison

6
          Litigation Reform Act. ........................................................................... 3

    II.    Plaintiffs Have the Burden to Prove That Current and Ongoing

7
          Constitutional Violations Require More Injunctive Relief. ..................... 4

8
ARGUMENT ...................................................................................................... 5

    I.     San Quentin Inmates Are Receiving Appropriate Care. ........................ 5

9
         A.     San Quentin Provides Condemned Inmates with Mental Health

10
              Care That More Than Satisfies Constitutional Standards. ........................ 5

         B.     California Penal Code Section 3600, Which Limits the State's

11
              Ability to Transfer Condemned Inmates to DSH Intermediate Care

              Facilities, Serves a Legitimate Penological Interest. ......................... 9

12
              1.     California Penal Code Section 3600 Limits the State's

13
                    Ability to Transfer Condemned Inmates to DSH

                    Intermediate Care Facilities. ........................................................... 9

14
              2.     California Penal Code Section 3600 Serves Legitimate

                    Penological Interests. ..................................................................... 10

15
    II.    Plaintiffs Failed to Demonstrate Any Justifiable Reason for Federal Court

16
          Oversight of Mental Health Programs Operated By The Department of

          State Hospitals in California Prison Facilities. ...................................... 12

17
         A.     There Are No "Severe Clinical Staffing Shortages" Affecting the

              Quality of Care Provided to DSH Patients.................................... 13

18
              1.     DSH Provides Appropriate Care at the Salinas Valley

19
                    Psychiatric Program, Despite Recent Challenges with

                    Retaining Psychiatrists. ................................................................... 14

20
              2.     DSH Programs Operate Safely and Securely.............................. 16

21
              3.     Vacaville Is Adequately Staffed with Mental Health

                    Professionals. ................................................................................ 17

22
          B.     The Clearance of Inmates at the Salinas Valley Psychiatric Program

              for "Unsecured" Programming Takes into Account the Safety

23
              Concerns of Staff and Inmates in the Program. ........................... 18

24
              1.     Plaintiffs Have Not Met Their Burden to Prove a

                    Constitutional Violation. ................................................................ 18

25
              2.     Defendants' Orientation Policy Serves Legitimate

                    Penological Interests. ..................................................................... 20

26
          C.     Plaintiffs' Claims Regarding Soap and Clothing Are Inaccurate. ........... 22

27
          D.     Plaintiffs' Allegations That Defendants "Mismanage Discharges

              and Waitlists For Inpatient Care" Are Unsupported and Further

28
              Orders Will Unnecessarily Intrude into Defendants' Operations. ........... 22

i

**TABLE OF CONTENTS**
(continued)

Page

E.   Plaintiffs Allegations That Defendants Improperly Discharge Patients from DSH To CDCR in Anticipation of Parole Are Unfounded.................................................................................... 24

F.   The State Has and Continues to Appropriately and Consciously Manage Patient Movement Associated with the Opening of New Units. .......................................................................................... 25

G.   No Evidence Justifies a Costly And Intrusive Investigation into the Vacaville Psychiatric Program. ............................................... 27

CONCLUSION ......................................................................................... 27

1

## TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

5

*Armstrong v. Schwarzenegger*
    622 F.3d 1058 (9th Cir. 2010).................................................................. 4, 5, 27

6

*Balla v. Idaho State Board of Corrections*
    595 F. Supp. 1558 (D. Idaho 1984)....................................................... 14

7

8

*Bell v. Wolfish*
    441 U.S. 520 (1979)............................................................................ 18

9

*Birbrower, Montalbano, Condon & Frank v. Superior Court*
    17 Cal.4th 119 (1998)......................................................................... 10

10

*Bowring v. Godwin*
    551 F.2d 44 (4th Cir. 1977)................................................................ 10

11

12

*Capps v. Atiyeh*
    559 F. Supp. 894 (D. Or. 1982) ......................................................... 13

13

14

*City of Canton v. Harris*
    489 U.S. 378 (1989)............................................................................ 1

15

16

*Coleman v. Wilson*
    912 F. Supp. 1282 (E.D. Cal. 1995)................................................... 12

17

18

*Estelle v. Gamble*
    429 U.S. 97 (1976).............................................................................. 5

19

*Farmer v. Brennan*
    511 U.S. 825 (1994)......................................................................... 5, 8

20

21

*Gilmore v. California*
    220 F.3d 987 (9th Cir. 2000).......................................................... 3, 12

22

*Gomez v. Vernon*
    255 F.3d 1118 (9th Cir. 2001)......................................................... 3, 4

23

24

*Hallett v. Morgan*
    296 F.3d 743–45 (9th Cir. 2002)..................................................... 4, 13

25

26

*Hoptowit v. Ray*
    682 F.2d 1237 (9th Cir. 1982)...................................................... 4, 5, 13

27

*Madrid v. Gomez*
    889 F. Supp. 1146 (N.D. Cal. 1995) ................................................... 6

28

iii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Mayweathers v. Newland*
  258 F.3d 930 (9th Cir. 2001)................................................................ 4

4

5

*McGuckin v. Smith*
  974 F.2d 1050 (9th Cir. 1992).............................................................. 6

6

*Plata v. Brown*
  131 S.Ct. 1910 (2011) ................................................................... 7, 18

7

8

*Ramos v. Lamm*
  639 F.2d 559 (10th Cir. 1980)............................................................ 14

9

10

*Redman v. County of San Diego*
  942 F.2d 1435 (9th Cir. 1991).............................................................. 5

11

*Rellergert v. Cape Girardeau Cty, Missouri*
  924 F.2d 794 (8th Cir. 1991).............................................................. 17

12

13

*Ruiz v. Estelle*
  503 F. Supp. 1265 (S.D. Tex. 1980) ................................................... 13

14

15

*Sanchez v. Vild*
  891 F.2d 240 (9th Cir. 1989)........................................................... 9, 24

16

*Toussaint v. McCarthy*
  597 F. Supp. 1388 (N.D. Cal. 1984) ................................................... 13

17

18

*Turner v. Safley*
  482 U.S. 78 (1987) ................................................................... passim

19

*Wellman v. Faulkner*
  715 F.2d 269 (7th Cir. 1983)............................................................ 14

20

21

*Whitley v. Albers*
  475 U.S. 312 (1986)....................................................................... 19

22

23

STATUTES

24

United States Code, Title 18
  § 3626(a)(1).................................................................................... 3
  § 3626(a)(1)(A) ................................................................... 3, 18, 27

25

26

California Code of Regulations, Title 15
  § 3270............................................................................................ 19

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Penal Code
  § 2684 ................................................................................................ 22, 23
  § 2684(a) ................................................................................................... 22
  § 3600 .................................................................................................... 9, 10
  § 3600(b)(4) ...................................................................................... 9, 10, 11

Welfare & Institutions Code
  § 5150 ........................................................................................................ 25

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Eighth Amendment ................................................................... 5, 13, 18, 27

**COURT RULES**

Federal Rules of Evidence
  Rule 801 ..................................................................................................... 23
  Rule 802 ............................................................................................... 16, 23

Defs. Opp'n to Pls.' Mot. For Enf. of Ct. Ord. & Aff. Relief (2:90-cv-00520 LKK JFM PC)

1

2

**INTRODUCTION**

3

Plaintiffs improperly ask this Court to radically reconfigure the state prison system to their

4

liking.  The Court must reject that invitation.  Plaintiffs fail in their burden to prove ongoing

5

constitutional violations supporting further orders, and cannot show that Defendants are acting

6

with deliberate indifference to inmates' mental health care needs.[1]

7

Plaintiffs' second-guessing of the State's programs is not evidence of deliberate

8

indifference, and their requests for orders concerning mental health treatment regimens, custody

9

operations, and staffing would result in the very micromanagement of state prisons that the

10

Supreme Court has instructed federal courts to avoid.  *See City of Canton v. Harris,* 489 U.S. 378,

11

392 (1989) (second-guessing officials "is an exercise we believe the federal courts are ill-suited to

12

undertake, as well as one that would implicate serious questions of federalism").

13

There are "no dangerous polices or practices" that are resulting in "grave harm to class

14

members," as Plaintiffs assert.  (Pls.' Mot. at 2.)  Plaintiffs make generalizations about the

15

specialized care provided to condemned inmates at San Quentin State Prison based on no more

16

than a difference of clinical opinion.  Despite these assertions, condemned inmates receive

17

adequate and appropriate care, including inpatient mental health care when clinically indicated.

18

Similarly, Plaintiffs' assertions concerning inpatient units run by the Department of State

19

Hospitals (DSH) lack merit and are unsupported by admissible evidence.  DSH provides

20

appropriate inpatient treatment, including individual contacts and group treatment, to over 800

21

inmate-patients at the Salinas Valley and Vacaville Psychiatric Programs.  DSH is simultaneously

22

recruiting and hiring personnel to staff the new $840-million, 1,722-bed health care facility in

23

Stockton, at which the Department will operate 514 beds.

24

Plaintiffs' request that this Court overhaul the State's security requirements relating to

25

high-custody inmates admitted to the Salinas Valley Psychiatric Program ignores the prison's

26

essential need to uphold institutional security and would produce a safety risk for inmates and

27

---

[1] Defendants believe that this Court's recent denial of their motion to terminate was in error, and for that reason are appealing it.

28

1

1    staff alike. Plaintiffs inaccurately cite a recent inmate suicide to assert that the State's custodial

2    policy is unwarranted. But Defendants have a legitimate penological basis for the custody levels

3    used within the program, despite Plaintiffs' unsupported assertions. And Plaintiffs' claim that

4    Defendants inappropriately pressure DSH to prematurely discharge inmates lacks merit.

5        Moreover, because Plaintiffs have failed to establish Defendants' noncompliance with the

6    Court's August 2008 order relating to inmates scheduled to parole from state prison, there is no

7    need for the Court to take any action regarding that order. Likewise, because this Court has never

8    found DSH to provide inadequate care, and Plaintiffs have failed to establish Defendants'

9    noncompliance with the Court's July 2012 bed plan order concerning bed capacity, extending the

10   special master's monitoring duties to these programs would not be the least intrusive means to

11   remedy a constitutional violation.

12       In sum, Defendants continue to provide constitutionally adequate inpatient psychiatric care

13   to *Coleman* class members, and no further orders of this Court are necessary or appropriate.

14                                    **BACKGROUND**

15       Plaintiffs ask the Court to issue numerous affirmative orders that are intertwined with

16   programs operated by DSH at California prisons: the Salinas Valley Psychiatric Program at

17   Salinas Valley State Prison and the Vacaville Psychiatric Program at California Medical Facility.

18       DSH provides short-term acute psychiatric and long-term intermediate care to California

19   Department of Corrections and Rehabilitation (CDCR) inmates within the Salinas Valley and

20   Vacaville programs. (Declaration of Kathryn Radtkey-Gaither in Support of Defs.' Opp'n to Pls.'

21   Mot. ("Gaither Decl.") ¶ 4.) All told, DSH operates 876 inpatient beds (acute and intermediate)

22   within the prison system.[2] (*Id.*) At Salinas Valley, DSH operates 370 inpatient mental health

23   beds for high-custody inmates requiring intermediate mental health care. (*Id.*) At Vacaville,

24   DSH operates 506 acute and intermediate inpatient mental health beds for high and low-custody

25   inmates. (*Id.*)

26   _____

27       [2] Defendants opened the L-Wing at California Medical Facility in July 2012. Based on
     need, DSH has only placed inmates in two of the three tiers in L-Wing to date. (Declaration of
     Ellen Bachman Supp. Defs.' Opp'n to Pls.' Mot. ("Bachman Decl.") ¶¶ 10–11.)

28

2

Defs. Opp'n to Pls.' Mot. For Enf. of Ct. Ord. & Aff. Relief (2:90-cv-00520 LKK JFM PC)

1   Defendants' long-range mental health bed plan includes the new $840-million, California

2   Health Care Facility.  (Gaither Decl. ¶ 5.)  This new facility, which opens in July, will add 514

3   more DSH-operated inpatient beds—432 intermediate beds for high-custody inmates and 82 acute

4   beds.  (ECF No. 4196–2, June 2012 Base Male Bed Plan.)[3]

5   Significantly, Defendants' bed plans transfer 242 "temporary" intermediate beds at Salinas

6   Valley to the new Stockton facility, with 128 beds at Salinas Valley remaining permanent.

7   (Gaither Decl. ¶ 6.)  Defendants will also transfer 68 "temporary" acute and 140 "temporary"

8   intermediate beds for high-custody inmates at Vacaville to Stockton, including the recently

9   activated beds in L-Wing, leaving 150 acute and 64 intermediate care beds permanently at

10  Vacaville for high-custody inmates, and 84 permanent intermediate care beds for low-custody

11  inmates.  (*Id.* at 4 & 6.)

12                                  **LEGAL STANDARDS**

13

14  I.   **THE STANDARD FOR OBTAINING PROSPECTIVE INJUNCTIVE RELIEF UNDER THE
         PRISON LITIGATION REFORM ACT.**

15  Congress enacted the Prison Litigation Reform Act (PLRA) to lessen the federal court's

16  role in prisoners' rights cases, specifically restricting the availability and scope of prospective

17  relief.  18 U.S.C. § 3626(a)(1); *see Gilmore v. California*, 220 F.3d 987, 998-99 (9th Cir. 2000).

18  Accordingly, before granting prospective injunctive relief, the district court must make the

19  findings mandated by the PLRA.  18 U.S.C. § 3626(a)(1)(A); *Gomez v. Vernon,* 255 F.3d 1118,

20  1129 (9th Cir. 2001).  Under the PLRA, the court must find that the prospective relief is narrowly

21  drawn, extends no further than necessary to correct the violation of a federal right, and is the least

22  intrusive means necessary to correct the violation.  18 U.S.C. § 3626(a)(1)(A); *Gomez,* 255 F.3d

23  at 1129.  The court must also "give substantial weight to any adverse impact on public safety or

24  the operation of a criminal justice system caused by the relief."  *Gomez,* 255 F.3d at 1129.

25

26          [3] During roughly the same time, the State also developed a comprehensive plan entitled
    "The Future of California Corrections:  A Blueprint to Save Billions of Dollars, End Federal
27  Court Oversight, and Improve the Prison System."  *See*
    http://www.cdcr.ca.gov/2012plan/index.html.
28

In addition, there must be sufficient evidence justifying the relief being ordered. *Armstrong v. Schwarzenegger,* 622 F.3d 1058, 1074 (9th Cir. 2010) (finding that plaintiffs presented insufficient evidence to justify the system-wide relief ordered by the district court). Under the PLRA, the district court must find that "the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." *Armstrong,* 622 F.3d at 1071. "The function of a court is limited to determining whether a constitutional violation has occurred . . . and to fashion a remedy that does no more and no less than correct that particular constitutional violation." *Hoptowit v. Ray,* 682 F.2d 1237, 1246 (9th Cir. 1982) (citing *Rhodes v. Chapman,* 452 U.S. 337 (1981)). When a government agency is involved, that agency must be granted "the widest latitude in the dispatch of its own internal affairs." *Gomez,* 255 F.3d at 1128 (quoting *Rizzo v. Goode,* 423 U.S. 362, 378–79 (1976) (internal quotation marks omitted).) That consideration is heightened when a state agency is involved because of federalism concerns. *Gomez,* 255 F.3d at 1128.

## II. PLAINTIFFS HAVE THE BURDEN TO PROVE THAT CURRENT AND ONGOING CONSTITUTIONAL VIOLATIONS REQUIRE MORE INJUNCTIVE RELIEF.

Ninth Circuit case law reiterates that the PLRA places the burden on plaintiffs to demonstrate that they are entitled to relief affirmatively sought in a motion for prospective relief. *Hallett v. Morgan,* 296 F.3d 743–45 (9th Cir. 2002) (affirming denial of motion to extend relief under consent decree absent proof of current and ongoing violation of a federal right); *Mayweathers v. Newland,* 258 F.3d 930, 936 (9th Cir. 2001) (requiring the party seeking prospective relief to prove current and ongoing constitutional violation).

In addition, injunctive relief against a state agency should only be granted when "irreparable injury" is threatened, and any injunctive relief awarded must avoid unnecessary disruption to the state agency's "normal course of proceeding." *Gomez,* 255 F.3d at 1128–29 (finding the PLRA has not substantially changed the threshold findings and standards required to justify an injunction). To satisfy the irreparable injury requirement, a "plaintiff must demonstrate a real or immediate threat that they will be wronged again—a likelihood of substantial and immediate irreparable injury." *Gomez,* 255 F.3d at 1129 (internal quotation marks omitted); *see*

4

1    *also Armstrong,* 622 F.3d at 1070 (citing to *Gomez* for proposition that the PLRA did "not

2    substantially change [ ] the threshold findings and standards required to justify an injunction").

3                                                **ARGUMENT**

4    **I.    SAN QUENTIN INMATES ARE RECEIVING APPROPRIATE CARE.**

5            Defendants are providing condemned inmates at San Quentin with appropriate care that

6    more than satisfies the Eighth Amendment.  To establish an Eighth Amendment violation, prison

7    inmates must prove "deliberate indifference to serious medical needs."  *Estelle v. Gamble,* 429

8    U.S. 97, 104 (1976).  This Eighth Amendment analysis requires both objective proof that inmates

9    are being deprived of care and a subjective analysis of defendants' state of mind.  *Farmer v.

10   Brennan,* 511 U.S. 825, 846 (1994).  To establish the subjective component, Plaintiffs must

11   establish that state officials are acting with a "sufficiently culpable state of mind" to be held

12   responsible for constitutional violations.  *Id.* at 834, 837–39.  That standard requires state officials

13   to be *criminally* reckless, requiring actual knowledge or willful blindness of impeding harm to

14   inmates that could have easily been prevented.  *Id.; see also Redman v. County of San Diego,* 942

15   F.2d 1435, 1449 (9th Cir. 1991) ("deliberate indifference is conduct [that is] so reckless as to be

16   tantamount to a desire to inflict harm").

17           Condemned inmates at San Quentin State Prison have ready access to adequate mental

18   health care, including crisis and acute inpatient care at the Vacaville Psychiatric Program.

19   (Declaration of Eric Monthei Supp. Defs.' Opp'n to Pls.' Mot. ("Monthei Decl.") ¶¶ 4–10, 16–26

20   & 29–40.)  Consequently, prison officials are not acting with reckless indifference to their mental

21   health needs by failing to transfer them to the Department of State Hospitals for intermediate care

22   treatment, as Plaintiffs assert.  In addition, Plaintiffs are not entitled to the affirmative relief

23   sought because the statute serves legitimate penological interests and Plaintiffs have not

24   established irreparable injury.

25           **A.    San Quentin Provides Condemned Inmates with Mental Health Care That
               More Than Satisfies Constitutional Standards.**

26

27           Prison officials must provide a system of "ready access" to adequate medical care, which is

28   reasonably prompt access to either staff physicians or outside physicians or facilities.  *See*

                                                    5

1  *Hoptowit,* 682 F.2d at 1253.  Although isolated incidents of delay do not give rise to liability,

2  "regular and significant delays in the delivery of medical care may be constitutionally

3  unacceptable."  *Madrid v. Gomez,* 889 F. Supp. 1146, 1257 (N.D. Cal. 1995).  To establish

4  unconstitutional treatment of a medical condition, including a mental health condition, an inmate

5  must show deliberate indifference to a "serious" medical need.  *McGuckin v. Smith,* 974 F.2d

6  1050, 1059 (9th Cir. 1992).  A "serious" medical need exists if the failure to treat a prisoner's

7  condition could result in further significant injury or the "unnecessary and wanton infliction of

8  pain."  (*Id.*)

9      Plaintiffs allege that Defendants are denying "adequate and appropriate mental health

10  treatment" to San Quentin's condemned inmates, and that "[s]everely mentally ill death row

11  inmates have deteriorated and suffered at San Quentin for years because of Defendants' denial of

12  treatment." (Pls.' Mot. at 6:13–17, 6:26–7:17.)  In support, Plaintiffs rely on Dr. Pablo Stewart,

13  who spent only a minimal amount of time  in the condemned unit, briefly met with seven inmates

14  receiving treatment under the Specialized Treatment plan for the condemned, and reviewed select

15  treatment plans and discharge notes for a few of seven inmates.  (Declaration of Pablo Stewart,

16  ECF No. 4381 ("Stewart Decl.") ¶¶ 457–471; Declaration of William Downer Supp. Defs.'

17  Opp'n to Pls.' Mot. ("Downer Decl.") ¶ 2, Ex. 1, Stewart Dep. at 33:12–35:4.)  Dr. Stewart fails

18  to indicate his background working with or evaluating condemned populations, and has never ran

19  a program in a correctional facility for condemned inmates.  (Downer Decl. ¶ 2, Ex 1, Stewart

20  Dep. at 63:8–64:11.)  Although he has published numerous articles, none discuss condemned

21  inmates.  (*See* Stewart Decl. at ¶ 18.)  In addition, Dr. Stewart appears to have based his opinions

22  concerning the condemned inmates on his misunderstanding that the condemned inmates do not

23  have access to acute psychiatric programs.  (*See* Downer Decl. ¶ 2, Ex. 1, Stewart Dep. at 70:1–

24  16; Monthei Decl. ¶ 25.)  Plaintiffs also rely on Jeanne Woodford, a former correctional officer

25  with no advanced degrees or formal mental health training, and who admits that she is "not a

26  mental health professional."  (Woodford Decl. ¶ 2, ECF No. 4380; McKinney Decl. Ex. 8

27  [Woodford Dep.] at 15:12, 121:10, ECF No. 4491-8.)  Plaintiffs' unsubstantiated, unsupported,

28  and inaccurate allegations of inadequate care warrant little if any weight.

6

1   Plaintiffs allege that "Defendants have spent years purporting to develop an appropriate

2   treatment program at San Quentin for the [condemned], and have proven unable to do so" (Pls.'

3   Mot. at 10).  But facts prove otherwise—San Quentin has an established and highly successful

4   program for the severe and chronic condemned inmates, and is providing the condemned inmate

5   population with more than a constitutionally adequate level of mental health care.  (*See* Monthei

6   Decl. ¶¶ 4–10 & 16–40; Declaration of Tim Belavich Supp. Defs.' Opp'n to Pls.' Mot. ("Belavich

7   Decl.") ¶¶ 6–13; Declaration of Kevin Chappell Supp. Defs.' Opp'n to Pls.' Mot. ("Chappell

8   Decl.") ¶¶ 3–7.)  And contrary to Plaintiffs' assertions, San Quentin has sufficient clinical and

9   custody staff to provide services to the condemned inmates under the Specialized Care plan.

10  (Monthei Decl. ¶ 26; Chappell Decl. ¶¶ 5–7.)

11  Condemned inmates in the program who experience mental health crises are referred for

12  consideration for either a Mental Health Crisis Bed or Acute Department of State Hospital

13  placement.  (Monthei Decl. ¶ 25.)  However, timely treatment and response to situations under

14  the Specialized Care plan has resulted in less need for higher levels of care.  (*Id.* ¶ 32.)  And the

15  Positive Behavior Support Team at the DSH-operated acute program at Vacaville offers services

16  to the condemned inmates when needed.  (Bachman Decl. ¶ 22.)  Thus, despite Plaintiffs

17  arguments, condemned inmates are referred to treatment at Vacaville when clinically needed.

18  Plaintiffs fail to raise a constitutional issue.  First, they complain that the 10 designated

19  beds in the Outpatient Housing Unit take away capacity for medical patients.  (Pls.' Mot. at 9.)

20  But the federal receiver in *Plata v. Brown*—who should be able to determine capacity needs for

21  the medical population—agreed to designate these beds for the Specialized Care plan. (Belavich

22  Decl. ¶¶ 11–12.)  Inmate receiving services under the Specialized Care plan also have access to a

23  designated dayroom, two clinical offices, a shower area, and a minimum of four hours of daily

24  yard time.  (Monthei Decl. ¶ 17.)  Second, Plaintiffs question whether using the 10 beds will

25  impact the Correctional Treatment Center license.  (Pls.' Mot. at 9.)  It will not. (Monthei Decl. ¶

26  16.)

27  Plaintiffs also complain that San Quentin lacks a Local Operating Procedure.  (Pls.' Mot. at

28  7–8.)  The special master, his experts, and Plaintiffs' counsel are acutely aware of the extensive

7

1    services that mental health staff at San Quentin provide to the condemned inmates under the

2    Special Care plan.  (Monthei Decl. ¶¶ 4, 7 & 11–15; Belavich Decl. ¶¶ 6–12.)  They are also

3    aware of the policies and procedures governing that care—between December 2010 and

4    December 2012, they received written descriptions of the plan, verbal updates on the plan, reports

5    on condemned inmates receiving services under the plan, and observed the plan firsthand.  (*See*

6    Special Master's Report on 25th Round at 177–86, ECF No. 4298; Belavich Decl. ¶¶ 6–12;

7    Monthei Decl. ¶¶ 4, 7 & 11–15; Chappell Decl. ¶ 4.)  And during a December 2012 meeting, San

8    Quentin mental health staff explained to the meeting attendees, including Plaintiffs' counsel, why

9    the model of assertive community treatment and its emphasis on individualized care are not

10    amenable to formal operating procedures defining admission and discharge criteria.  (Monthei

11    Decl. ¶ 14.)  Regardless, during that same meeting, the parties outlined criteria for the plan.  (*Id.*;

12    Special Master's 25th Report, ECF No. 4298, at 179.)  Nonetheless, contrary to Plaintiffs'

13    assertions, the mental health program has identified additional entrance and discharge, referral,

14    and treatment criteria for the 10 beds.  (Monthei Decl. ¶¶ 17–24.)

15        CDCR has built a program specially designed to meet the unique needs of condemned

16    inmates with average length of stays of 25 years.  (Monthei Decl. ¶ 33.)  Such is not the case with

17    the Department of State Hospitals program for the condemned, which operates in a more

18    restrictive environment.  (*Id.*; Bachman Decl. ¶¶ 23–24.)  Thus, San Quentin staff has superior

19    knowledge, experience and training concerning inmates who remain in their care for years and,

20    perhaps, decades.  (Monthei Decl. ¶ 33.)  San Quentin treating clinicians believe that providing

21    care to this unique class of inmates near their home and within their community is clinically

22    indicated but, when appropriate, refer the inmates to a mental health crisis bed or to the DSH-

23    operated acute psychiatric program.  (Monthei Decl. ¶¶ 4–40.)

24        Plaintiffs fail to show that transferring San Quentin condemned inmates to a DSH-operated

25    Intermediate Care Facility program is necessary to prevent a "substantial risk of serious harm, "or

26    that Defendants are "deliberately indifferent" to these inmates' needs.  *Farmer v. Brennan,* 511

27    U.S. at 834.  To the contrary, Defendants provide the condemned inmate population "ready

28    access" to adequate outpatient and inpatient mental health care.  Dr. Stewart's opinion regarding

8

1    the seven condemned inmates receiving services under the Specialized Care plan does not change

2    this end result.  A difference of medical opinion is not deliberate indifference.  *Sanchez v. Vild,*

3    891 F.2d 240, 242 (9th Cir. 1989) ("A difference of opinion does not amount to deliberate

4    indifference to Sanchez' serious medical needs.").

5            Because Plaintiffs cannot meet their burden under the PLRA to establish a "current and

6    ongoing violation" of a constitutional right, the Court should deny their request for affirmative

7    relief related to the San Quentin condemned population.  And for the same reasons, Plaintiffs'

8    motion to require Defendants to evaluate the condemned Enhanced Outpatient Program

9    population for referrals to intermediate care must also be denied.  Last, Plaintiffs' ancillary

10   request to expand the special master's duties to ensure that use of the San Quentin Mental Health

11   Crisis Beds and Outpatient Housing Unit beds "is temporary and meets constitutional standards,"

12   must also be rejected.

13   **B.    California Penal Code Section 3600, Which Limits the State's Ability to
          Transfer Condemned Inmates to DSH Intermediate Care Facilities, Serves**
14   **a Legitimate Penological Interest.**

15        **1.    California Penal Code section 3600 limits the state's ability to
                transfer condemned inmates to DSH intermediate care facilities.**
16

17           Aside from the question of whether Defendants are providing the condemned inmates with

18   constitutionally adequate care—which they are—California Penal Code section 3600 also limits

19   the State's ability to transfer condemned inmates to DSH Intermediate Care Facilities.  Section

20   3600(b)(4) provides that only emergent inmates whose "needs are so critical as to endanger the

21   inmate or others" may be transferred to other facilities for treatment.  CAL. PENAL CODE §

22   3600(b)(4) (West 2013).  The language "so critical as to endanger the inmate or others," refers to

23   mental illness in an acute or crisis stage, which is consistent with the Program Guide admissions

24   criteria for the acute psychiatric program.  (Downer Decl. ¶ 3, Ex. 2, Program Guide 12-6-2, 12-

25   6-3, e.g., Admissions criteria, "A significant risk of harming himself or others.  Any inmate-

26   patient who has been assessed as a severe suicidal risk.")

27           Plaintiffs assert that this limitation on Defendants' ability to transfer inmates to an

28   intermediate care program is "legally wrong and based on an erroneous reading of the Code."

                                                          9

1  (Pls.' Mot. at 9.)  But as noted, the plain reading of Penal Code section 3600(b)(4) supports

2  Defendants' interpretation.  Defendants' interpretation is further supported by the legislature's use

3  of the word "endanger," which requires that the inmate's mental illness be so severe as to

4  jeopardize the life or safety of either the inmate or others. The statute's plan language indicates

5  that the legislature intended to limit transfer for mental health purposes to crisis situations, and

6  the Court must give these words their usual and ordinary meaning.  *See Birbrower, Montalbano,*

7  *Condon & Frank v. Superior Court,* 17 Cal.4th 119, 131 (1998).

8      Inmates who require intermediate care do not rise to the care level described in the statute.

9  *See*  PENAL § 3600(b)(4).  An Intermediate Care Facility program is meant to operate as a non-

10 acute, inpatient program, affording longer-term intermediate level of care at a less intensive level

11 than the acute program.  (Downer  Decl. ¶ 3 Ex. 2, Program Guide 12-6-7, 12-6-8.)  This reading

12 follows constitutional requirements, because the "essential test" is medical necessity, not that

13 which is merely desirable.  *See Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir. 1977) ("The

14 right to treatment is, of course, limited to that which may be provided upon a reasonable cost and

15 time basis and the essential test is one of medical necessity and not simply that which may be

16 considered merely desirable.").

17         **2.    California Penal Code Section 3600 serves legitimate penological**
           **interests.**
18

19      Penal Code section 3600 is reasonably related to legitimate penological interests.  Even

20 when a prison regulation or policy impinges on an inmate's constitutional rights, the regulation is

21 valid if it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S.

22 78, 86–87 (1987).  This deference "is necessary if 'prison administrators . . . , and not the courts,

23 [are] to make the difficult judgment concerning institutional operations.'" *Turner,* 482 U.S. at

24 86–87 (citing *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 128 (1977)).

25      A review of *Turner's* criteria shows the statute and programs are reasonable and rationally

26 related to legitimate penological interest.  First, there is a "valid, rational connection" between the

27 safety and security of the department-operated programs and transferring the condemned inmates

28 from San Quentin State Prison to a DSH program.  (*Id.*)  Safety and security concerns increase

                                                10

1   any time a condemned inmate is transferred from San Quentin to another prison setting.

2   (Chappell Decl. ¶ 8.)  Given these concerns, housing options for a condemned inmate at Salinas

3   Valley and or Vacaville are extremely limited.  (Bachman Decl. ¶¶ 23–25; Gaither Decl. ¶¶38-40;

4   Declaration of Randolph Grounds Supp. Defs.' Opp'n to Pls.' Mot. ("Grounds Decl.") ¶¶ 15 & 17;

5   Declaration of Brian Duffy Supp. Defs.' Opp'n to Pls.' Mot. ("Duffy Decl.") ¶¶ 5–9.)  A

6   minimum of two correctional officers or one correctional officer and a medical technical assistant

7   must be present whenever a condemned inmate's cell door is opened.  (Bachman Decl. ¶ 23.)

8        Second, there are no readily available means to provide intermediate care to condemned

9   inmates at a DSH-operated facility.  *Turner,* 482 U.S. at 90.  Long-term intermediate care

10  treatment is intended to stabilize an inmate to return him to the general population and eventually

11  to society.  (Downer Decl.) ¶ 3, Ex. 2, Program Guide 12-6-12, 12-6-13; ¶ 4, Ex. 3, Memorandum

12  of Understanding at 22–24.)  But with condemned inmates, when mental illness is treated, or in

13  remission, they return to the condemned housing unit.  Penal Code § 3600(b)(4).  Moreover, the

14  average length of stay for condemned inmates at San Quentin is twenty-five years.  (Monthei

15  Decl. ¶ 33.)  Condemned inmates thus establish a unique association to their homes, housing,

16  neighbors, institutions, and treatment providers, and staff operates with the superior knowledge

17  that the inmates will remain with them for several years and perhaps decades.  (*Id.*)  For the

18  protection of the condemned inmates and the other patients, the condemned inmate cannot come

19  into direct contact with any other patients, and is separated from the other patients by a locked

20  door or grill gate at all times.  (Bachman Decl. ¶¶ 23–25; Gaither Decl. ¶¶ 38-40; Grounds Decl.

21  ¶¶ 14–15 & 17; Duffy Decl. ¶¶ 6–7.)  Therefore, all treatment for condemned inmates is provided

22  individually—condemned inmates cannot participate in groups with other inmates.  (*Id.*)

23        Apart from the above, treating condemned inmates at an intermediate care program will

24  dramatically impact personnel and prison operations.  *Turner,* 482 U.S. at 90.  As noted, treating

25  a condemned inmate in an intermediate program would require enhanced security to prevent

26  mixing of condemned and non-condemned inmates, including additional escort/housing officers

27  in the program.  (Bachman Decl. ¶¶ 23–25; Gaither Decl. ¶¶ 39-40; Grounds Decl. ¶¶ 14–19;

28  Duffy Decl. ¶¶ 10–11.)  Because intermediate treatment is long term, treating even one

11

Defs. Opp'n to Pls.' Mot. For Enf. of Ct. Ord. & Aff. Relief (2:90-cv-00520 LKK JFM PC)

1   condemned inmate would have a significant impact on the provision of care to the other inmates

2   in the unit. (Bachman Decl. ¶ 24–25; Gaither Decl. ¶ 40; Grounds Decl. ¶¶ 14–19; Duffy Decl. ¶

3   7–9.) Providing individual treatment for a condemned patient would require having all other

4   patients behind a locked door or gate before escorting the condemned inmate out to a treatment

5   area. (Bachman Decl. ¶¶ 24–25; Grounds Decl. ¶ 15.) This process would need to be repeated to

6   return the condemned inmate to his cell. (Bachman Decl. ¶¶ 24–25.) Thus, the overall treatment

7   would be significantly slowed. (*Id.*)

8       Finally, there are no ready alternatives apart from treating chronically mentally ill

9   condemned inmates at San Quentin. *Turner,* 482 U.S. at 90. Any order to requiring Defendants to

10  transfer San Quentin condemned inmates to the Salinas Valley or Vacaville  intermediate care

11  programs is neither what is minimally necessary nor is it "narrowly tailored" because, in practice,

12  the order would not remedy the problem. Conversely, such an order would greatly impact the

13  operations of the state agencies. *Gilmore v. California,* 220 F.3d 987, 1005 (9th Cir. 2000)

14  ("[T]he court's exercise of equitable discretion must heel close to the identified violation and

15  respect the interests of state and local authorities in managing their own affairs, consistent with

16  the Constitution.") (quoting *Milliken v. Bradley*, 433 U.S. 267, 281 (1977)).

17      Because of the rational relationship between California statutes and the treatment of

18  mentally ill condemned inmates at San Quentin, the Court should deny Plaintiffs' requests for

19  affirmative relief.

20  **II.   PLAINTIFFS FAILED TO DEMONSTRATE ANY JUSTIFIABLE REASON FOR FEDERAL
        COURT OVERSIGHT OF MENTAL HEALTH PROGRAMS OPERATED BY THE**

21  **    DEPARTMENT OF STATE HOSPITALS IN CALIFORNIA PRISON FACILITIES.**

22      Plaintiffs seek affirmative relief that, if granted, would unnecessarily expand judicial

23  oversight into monitoring of programs administered by DSH in California prison facilities. This

24  Court has never found that DSH is providing inadequate care to class members. *See Coleman v.*

25  *Wilson,* 912 F. Supp. 1282 (E.D. Cal. 1995). (*See also* Order, ECF No. 1855 [joining the director

26  of the Department of Mental Health to the *Coleman* lawsuit under Fed. R. Civ. P. 21].) Because

27  Plaintiffs failed to demonstrate any justifiable reason for this unprecedented expansion of

28  oversight, the Court should deny the substantial, wide-ranging, and intrusive relief sought in their

                                         12

1   motion.  Likewise, the Court should deny Plaintiffs request to expand the Special Master's duties

2   to investigate, monitor, and report to the Court on the Department of State Hospital programs.

3       **A.    There Are No "Severe Clinical Staffing Shortages" Affecting the Quality of
           Care Provided to DSH Patients.**

4

5       A constitutional mental health care system must employ sufficient numbers of staff to meet

6   the basic mental health needs of inmates.  *Hallett,* 296 F.3d at 748.  Adequate staffing requires the

7   employment of "trained mental health professionals . . . in sufficient numbers to identify and treat

8   in an individualized manner those treatable inmates suffering from serious mental disorders."

9   *Ruiz v. Estelle,* 503 F. Supp. 1265, 1339 (S.D. Tex. 1980), *aff'd in part, rev'd in part,* 679 F.2d

10  1115 (5th Cir. 1982).  As several courts have recognized, however, no constitutionally mandated

11  or universally applicable staff-to-inmate ratio exists.  For instance, despite low staffing levels at

12  the prison, the plaintiffs in *Hallett* did not meet their burden to establish an Eighth Amendment

13  violation where the district court found that Defendants were meeting the "basic mental health

14  needs of the prisoners."  *Hallett*, 296 F.3d at 748; *see also Capps v. Atiyeh,* 559 F. Supp. 894,

15  910-12 (D. Or. 1982) (although inmates had infrequent contact with the treatment staff, and

16  treatment was "grievously minimal," treatment satisfied constitutional minima because Plaintiffs

17  were unable to identify more than isolated instances of untreated serious mental illness);

18  *Toussaint v. McCarthy,* 597 F. Supp. 1388, 1404 (N.D. Cal. 1984), *aff'd in relevant part,* 801

19  F.2d 1080, 1111 (9th Cir. 1986) (although the psychiatric staff was "overburdened" and the staff

20  devoted its attention to the treatment of emergency cases, the court found that "Folsom provides

21  most strictly 'necessary' treatment on a timely, medically sound basis"); *Hoptowit v. Ray,* 682

22  F.2d at 1253–54 (reversible error for the district court to order the hiring of specific levels of

23  physician staffing without first determining whether the State's plan could satisfy constitutional

24  minima).

25       / / /

26

27

28

13

1

    **1.    DSH provides appropriate care at the Salinas Valley Psychiatric Program, despite recent challenges with retaining psychiatrists.**

2

3    Salinas Valley continues to provide appropriate and timely treatment to all patients needing

4    intermediate care.  (Gaither Decl. ¶¶ 15–24.)  In December 2012 and the first few months of

5    2013, several psychiatrists at Salinas Valley retired or left for personal reasons or to pursue other

6    job opportunities.  (*Id.* ¶¶ 10–13.)  To replace these clinicians, DSH made concerted recruiting

7    and hiring efforts.  (*Id.*)  Due to DSH's recruitment and hiring efforts, Salinas Valley then and

8    now continues to offer its patients a broad spectrum of services provided by psychiatrists,

9    psychologists, social workers, and recreational therapists.  (*Id.* ¶¶ 14–21.)

10    Plaintiffs' claims are based in large part on the January 23 and February 23, 2013 letters

11    sent by Salinas Valley psychiatrists (including Dr. Badeaux) to the Executive Director.  (*See*

12    Badeaux Decl., Exs. B & C.)  These letters indicated that these psychiatrists were dissatisfied, but

13    are not evidence that any patient's constitutional rights were violated.[4]  Nor is there any evidence

14    that Salinas Valley lacked consistent access to on-site psychiatric care.  *Cf. Ramos v. Lamm,* 639

15    F.2d 559, 578 (10th Cir. 1980) (prison's mental health staffing was "grossly inadequate" when it

16    had no on-site psychiatrist or psychologist); *Balla v. Idaho State Board of Corrections,* 595 F.

17    Supp. 1558, 1577–78 (D. Idaho 1984) (facility staffed with two full-time psychologists but no

18    psychiatrist violated the constitution); *Wellman v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983)

19    (the absence of any on-site psychiatric services at Indiana prison amounted to deliberate

20    indifference).

21    DSH, like every organization, experiences staffing fluctuations when members of the staff

22    decide to depart.  To deal with the psychiatrist departures at Salinas Valley, DSH actively

23    recruited and hired psychiatrists to respond to each departure and minimize the duration that

24    Salinas Valley operated with a reduced numbers of psychiatrists.  (Gaither Decl. ¶¶ 10–14.)

25

26        [4] Plaintiffs assert that the "alleged psychiatrist and primary care doctor shortage results in risky attempts to deliver mental health care without 'important input about the medical needs of [] patients.'" (Pls.' Mot. at 11–12, citing to Badeaux Decl. ¶ 12.)  But Dr. Badeaux's testimony in

27    this regard should be disregarded because it lacks foundation—Dr. Badeaux fails to point to any incident or patient where this allegedly occurred.

28

1    Salinas Valley currently has the equivalent of 8.25 psychiatrists, and expects to have at least a

2    total of 9.25 full-time equivalent psychiatric staff, if not more, by June 2013. (*Id.* ¶ 14.) Most

3    importantly, Salinas Valley has been able to maintain a staffing level that provides psychiatric

4    care on average of one hour per patient per week, in addition to all other services provided, and

5    allows it to meet all Title 22 licensing requirements. (*Id.*) DSH is not refusing to hire more staff

6    or neglecting the staffing challenges it is facing at Salinas Valley. To the contrary, it is working

7    aggressively to recruit and hire additional psychiatrists to remedy the current staffing challenges.

8         Plaintiffs' assertion that patients at Salinas Valley are offered "dramatically" less than EOP

9    patients is false. (*See* Pls.' Mot at 14.) Inmates at Salinas Valley are receiving appropriate and

10   timely inpatient care. (Gaither Decl. ¶¶ 15–24.) The mental health services provided by the

11   interdisciplinary treatment teams, which consists of psychiatrists, psychologists, therapists,

12   nurses, and technicians, go beyond basic psychiatric assessments and medication management.

13   These treatment teams work together to provide a comprehensive variety of mental health

14   services, including one-on-one counseling, group therapy, and rehabilitative programming. (*Id.*

15   ¶¶ 15–18.) Recent data reflects that patients received, on average, between 2.2 and 5.25 hours of

16   group treatment per day, per unit, for the months of March and April. (*Id.* ¶¶ 19–20.) This group

17   therapy does not include the one-on-one counseling provided to inmate-patients by psychologists

18   and social workers on a daily basis. (*Id.* ¶ 21.) In addition, Salinas Valley provides yard time

19   that averages 1 hour a day and dayroom time that averages 6–7 per week. (*Id.*)

20        Nor is there a "hiring freeze" or any other current directive to layoff employees, as

21   Plaintiffs allege. (Gaither Decl. ¶¶ 7–10.) Although Plaintiffs allege there are State-imposed

22   limits on the use of registry staff and overtime hours, that is simply not true. (*Id.* ¶ 10.)[5] Salinas

23   Valley currently is, and for the foreseeable future, is complying with all Title 22 licensing

24   requirements. (*Id.* ¶ 14.)

25        Plaintiffs also rely on Defendants' own data—a monthly vacancy report, staff injury and

26   patient assaults by month report, and an employee survey—to assert that the DSH programs are

_____

27        [5] Use of overtime may be limited by an employee's collective bargaining agreement,
     however. (Gaither Decl. ¶ 10.)

28

1    "dangerously understaffed." (Pls.' Mot. at 11.)  But the data do not support their assertion. On

2    February 7, 2007, the Court issued an order that "defendants shall submit monthly reports to the

3    Special Master on staffing and staffing vacancies in all DMH hospitals with programs providing

4    mental health services to CDCR inmates until such time as the pay differential issue has been

5    resolved." (ECF No. 2134 ¶ 3.)  Even though Defendants believe that the order has expired by its

6    own terms, DSH continued to provide the staffing report in the same format, but the means of

7    data gathering changed in May 2012.  (Declaration of Rob Supp. Defs'. Opp'n to Pls'. Mot.

8    ("Cook Decl.") ¶¶ 2–4.)  More recently, and as noted by Plaintiffs (Pls.' Mot. at 11 n.4), DSH

9    learned that the data gathering methods caused the vacancy and functional vacancy rates to be

10    inaccurate, thus portraying an unfairly negative picture of at least some programs.  (*Id.* at ¶¶ 5–

11    10.)  DSH intends to continue to provide the special master with *Coleman* related-staffing

12    information in its programs providing mental health services to CDCR inmates, but is revising its

13    data collection and reporting methods to capture an accurate staffing picture.  (*Id.*)  Therefore, the

14    most recent Monthly Staffing and Vacancies Report from February 2013 (Rifkin Decl. Ex. 3)

15    does not fairly indicate DSH staffing.

16                    **2.    DSH Programs operate safely and securely.**

17            There is no correlation, as Plaintiffs' suggest, to an increase in violence and a staff shortage.

18    (Pls.' Mot. at 14.)  Instead, the data shows a downward trend in violence.  (Gaither Decl. ¶ 31,

19    Ex. 6.)  The Court should disregard Dr. Badeaux and Dr. Brim's subjective "concerns" regarding

20    patient and staff safety because their testimony constitutes inadmissible hearsay under Federal

21    Rule of Evidence 802—being offered for the truth of the matter asserted—lacks foundation, and

22    is speculative.

23            In their motion, Plaintiffs state that the results of an employee survey DSH conducted last

24    year reflects employee concern with safety.  (Pls. Mot at 15.)  Here, Plaintiffs confuse DSH's

25    effort to re-energize and re-organize its focus on the State Hospitals and the Salinas Valley and

26    Vacaville programs with deliberate indifference.  (Gaither Decl. ¶¶ 25–30.)  DSH conducted the

27    survey to identify areas of critical need and to assess DSH's perception among the employees.

28    (*Id.*)  After conducting this research, DSH has implemented multiple measures to address

                                            16

1   employee morale associated with job uncertainty related to opening the new California Health

2   Care Facility and developed, among other things, specific employee workgroups to identify and

3   propose remedies for employee safety concerns.  (*Id.*)  DSH's efforts to be self-critical and

4   constantly seek to improve, is manifest evidence that state officials are not deliberately indifferent

5   to prisoner's needs.  *C.f. Rellergert v. Cape Girardeau Cty, Missouri,* 924 F.2d 794, 797 (8th Cir.

6   1991) (taking deliberate steps to prevent suicide cannot "have been both deliberately cautious

7   among [inmate's] risk as a suicide and deliberate indifferent about it.  Indifference is apathy or

8   unconcern.  The policy demonstrates the opposite . . . .").

9             **3.     Vacaville is adequately staffed with mental health professionals.**

10        Vacaville is not experiencing a critical shortage of clinical staff and is providing quality

11  care and meeting licensing requirements in all classifications of clinical staff.  (Bachman Decl. ¶¶

12  18–20.)  The report Plaintiffs attempt to use to support their argument does not account for

13  positions that were allocated for units not activated (L-1 in the L-Wing).  (*Id.*)  In addition, the

14  report shows a high number of psychiatric technician vacancies.  Vacaville added this

15  classification to the staffing mix with the L-Wing expansion, including L-2 that is being activated

16  at this time, and unit L-1 that has not been activated.  (*Id.*)  However, Vacaville has not needed to

17  fill many of these positions thus far because it has appropriate levels of staffing coverage with the

18  existing number of medical technical assistants.  (*Id.*)

19        DSH has and continues to appropriately respond to staffing challenges, and it has and

20  continues to provide appropriate and timely treatment to all patients needing acute and

21  intermediate care.  Therefore, the Court should deny Plaintiffs' request for affirmative relief

22  associated with the Salinas Valley and Vacaville programs.  Because DSH is already committed

23  to providing accurate staffing information consistent with the Court's prior order, any further

24  orders exceed that which is necessary to correct a constitutional violation and unduly interfere

25  with DSH's ability to manage its own internal affairs, including the transition of the temporary

26  242 beds at Salinas Valley and 208 beds at Vacaville to the new 514 intermediate and acute beds

27  at the California Health Care Facility.

28        / / /

**B.    The Clearance of Inmates at the Salinas Valley Psychiatric Program for "Unsecured" Programming Takes Into Account the Safety Concerns of Staff and Inmates in the Program.**

As discussed above, the intermediate care program at Salinas Valley for high-custody inmates consists of a comprehensive variety of mental health services, including one-on-one counseling, group therapy, rehabilitation programming, yard time, and dayroom use. Once admitted to Salinas Valley, all inmates are placed on "cuff status" or "orientation status" during intake until they receive their individualized Institutional Classification Committee meetings and are cleared for full participation in programming. (Grounds Decl. ¶ 4; Gaither Decl. ¶ 32.) Plaintiffs, discounting the obvious security concerns associated with new admissions into this type of comprehensive program, request an injunction stopping Defendants from using the orientation process for newly-admitted high-custody patients to the program. (Pls.' Mot. at 16–18.)

The Court must deny Plaintiffs' request because they have not proved that the policy violates the Eighth Amendment. Under the PLRA, the court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A); *see also Plata v. Brown,* 131 S.Ct. 1910, 1944 (2011) (the PLRA requires a court to adopt a remedy that is "narrowly tailored" to the constitutional violation and that gives "substantial weight" to public safety). Even if the Court disagrees with Defendants, the orientation policy is nonetheless valid because it is reasonably related to legitimate penological interests. *See Turner,* 482 U.S. at 84–85. And expanding the special master's duties to investigate CDCR's custodial practices would unduly interfere with the prison's ability to proactively reduce incidences of prison violence.

**1.    Plaintiffs have not met their burden to prove a constitutional violation.**

The Court must grant Defendants wide deference in matters of security. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). This discretion

18

1  applies not only to prison security measures taken in response to an actual confrontation with

2  inmates, but also to "prophylactic or preventive measures intended to reduce the incidences of

3  these or any other breaches of prison discipline." *Whitley v. Albers,* 475 U.S. 312, 322 (1986).

4  This deference requires "that neither judge nor jury freely substitute their judgment for that of

5  officials who have made a considered choice." *Id.*

6      Plaintiffs assert that the "orientation" status is a "punishment." (Pls.' Mot. at 16–17.)

7  Plaintiffs further claim that the orientation status is grounded solely in the memorandum of

8  understanding between CDCR and DSH. (*Id.* at 17.) Neither assertion is true. As Salinas

9  Valley's Warden and DSH's Deputy Director explain in their declarations, CDCR and DSH rely

10  on a fully developed and well-reasoned orientation process to determine when an inmate

11  transferred to the Salinas Valley Psychiatric Program is appropriate for and can safely and

12  participate in full inpatient programming. (Grounds Decl. ¶¶ 3–11; Gaither Decl. ¶¶ 32–35.)

13      While the memorandum of understanding between CDCR and DSH provides for a ten-day

14  period to review inmates' orientation status, the memorandum is not the impetus for the process.

15  (*See* Rifkin Decl. Ex. 8; Gaither Decl. ¶¶ 32 & 34; Grounds Decl. ¶¶ 5–7.) The "cuff-status" or

16  orientation policy is designed to protect staff and patients, and to prevent injuries. (Gaither Decl.

17  ¶¶ 32 & 34; Grounds Decl. ¶¶ 5–9.) "The requirement of custodial security and of staff, inmate

18  and public safety must take precedence over all other considerations in the operation of all the

19  programs and activities of the institutions of the department." Cal. Code Regs. tit. 15, § 3270.

20  Plaintiffs suggest that Defendants complete the evaluation process sooner. (Pls.' Mot. at 17-18.)

21  Although staff strives to conduct the individualized assessments in less than ten days, forcing the

22  institution to hold all meetings in an expedited manner would substantially hinder staff's ability to

23  make well researched and fully informed decisions. (Grounds Decl. ¶¶ 10–11.)

24      Clinicians have a significant role in the Institutional Classification Committee meeting.

25  Contrary to Plaintiffs' allegations, they attend every meeting and provide vital input. (Grounds

26  Decl. ¶ 5–7.) In addition, an individualized clinical assessment process is undertaken

27  concurrently with custodial review. (*Id.*; Cal. Code Regs. tit. 22, § 77073) And during this

28  evaluation, inmate-patients can attend individual or small group activities and therapies, have

19

1    one-to-one cell meetings with their psychiatrist or other clinical and medical staff, and are eligible

2    for the "by-choice" incentive plan.  (Gaither Decl. ¶ 32.)  Plaintiffs' allegations that inmates are

3    not permitted to leave their cells except for "showers, necessary activities for health care, and

4    contacts with his treatment team," and denied all groups, are false.  (*See* Pls. Mot. at 16; Gaither

5    Decl. ¶ 32.)

6        In sum, Plaintiffs have not met their burden to establish a federal rights violation under the

7    PLRA.  Inmates in the intermediate program at Salinas Valley are provided appropriate treatment

8    pending agreement between custodial and clinical staff that the inmate may safely program with

9    the other inmates in the program.  And justification for the process is well-grounded in public

10   safety and the operation of the criminal justice system.

11       **2.    Defendants' orientation policy serves legitimate penological interests.**

12       Even if CDCR and DSH's orientation process impinges on inmates' constitutional rights—

13   which it does not—the process is nonetheless valid because it is reasonably related to legitimate

14   penological interests.  *See Turner*, 482 U.S. at 84–85.  All four *Turner* factors weight heavily in

15   Defendants' favor.  There is a "valid, rational connection" between the prison policy and the

16   safety concerns expressed by CDCR and DSH as detailed above.  *Id*.  Second, as explained by the

17   Warden at Salinas Valley State Prison, mandatorily reducing or eliminating the orientation status

18   time period is not a feasible alternative means to undertaking a comprehensive review of the

19   inmate's ability to safety program in the unit without hand cuffs.  *Id.*  "Where 'other avenues'

20   remain available for the exercise of the asserted right . . . courts should be particularly conscious

21   of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of a

22   regulation.'"  *Id.* (citing *Pell v. Procunier,* 417 U.S. 817 (1974) (internal citation omitted).)  Here,

23   Defendants are not denying inmates during the orientation process the right complained of—

24   mental health treatment.  (Grounds Decl. ¶¶ 6–8; Gaither Decl. ¶¶ 32–34.)[6]

25   ───────────────

26       [6]  Dr. Badeaux declared that he believes additional treatment during the orientation phase
     is clinically indicated.  (Badeaux Decl. ¶ 25.)  However, Dr. Badeaux fails to identify any inmate
     cases to support his assertion, and the Court should disregard this testimony because it lacks

27   foundation.  And the Court must disregard Dr. Brim's similarly unfounded, hearsay testimony
     concerning patient's complaints

28

20

Defs. Opp'n to Pls.' Mot. For Enf. of Ct. Ord. & Aff. Relief (2:90-cv-00520 LKK JFM PC)

1   Plaintiffs cite a Salinas Valley inmate suicide as an alleged example of a negative impact

2   from the orientation status policy. (Pls.' Mot. at 3 & 18.)  But there is no evidence that the timing

3   of this inmate's Institutional Classification Committee meeting contributed to his unfortunate

4   suicide.  In fact, the inmate had been cleared for full programming and was attending groups

5   before he took his life. (*See* Kahn Confidential Decl., Ex. 42 at 9–10.)[7]  And even before he was

6   fully cleared, he would have been able to participate in basic programming, contrary to Plaintiffs'

7   allegations. (*See* Gaither Decl. ¶ 33.)  Even so, Salinas Valley's Warden took action to monitor

8   and ensure that Institutional Classification Committee meetings occur as quickly as reasonably

9   possible and within the ten-working day policy. (Grounds Decl. ¶ 12.)  Since January 2013,

10  100% of the Institutional Classification Committee meetings have been conducted within 10

11  business days, and the average length of time for the meetings to occur is 7.2 days. (*Id.* ¶¶ 10 &

12  12.)

13  Plaintiffs' requests must also be denied under *Turner* given the impact they will have on

14  custodial operations, staff, and inmates. *Turner,* 482 U.S. at 80.  Removing the security

15  protections afforded by the orientation process will unacceptably threaten correctional officers,

16  staff, and inmates who have a constitutional right to be safe.  "When accommodation of an

17  asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts

18  should be particularly deferential to the informed discretion of correction officials." (*Id.*)  Finally,

19  for the reasons stated above, requiring the Institutional Classification Committee to review and

20  renew the assessment in writing every three days is not a reasonable alternative. (Grounds Decl.

21  ¶¶ 8–11.)  The prison already strives to hold each committee meeting as quickly as possible. (*Id.*)

22  Custody factors are the embodiment of the prison system's safety concerns; they are written

23  specifically to protect inmates, staff, and the public from dangerous individuals, regardless of

24  their mental health needs.  Ordering Defendants to modify their safety clearance policy threatens

25  the safety of not only Department of State Hospital clinicians and staff but also the safety and

26

27  ───────────────
    [7] Plaintiffs imply that another death at the Salinas Valley program was related to the
    orientation process. (Pls.' Mot. at 18 n.5.)  It was not. (Gaither Decl. ¶¶ 35 & 36.)

28

1   welfare of the inmates themselves, who will be vulnerable to the violent acts of their fellow

2   patients in the unit.  Plaintiffs failed to meet this burden.

3          **C.     Plaintiffs' Claims Regarding Soap and Clothing Are Inaccurate.**

4          Plaintiffs allege that Defendants are denying inmates in the Department of State Hospital

5   programs at Salinas Valley State Prison and Vacaville Psychiatric Program items such as soap,

6   clothing & bedding.  (Pls.' Mot. at 18–19.)  They are not true.

7          At Salinas Valley, clean clothing, sheets, blankets, coats, and soap are presently available in

8   the prison's warehouse and are distributed as necessary to the inmates.  (Grounds Decl. ¶ 13;

9   Gaither Decl. ¶ 41.)  Although Plaintiffs fail to substantially address Vacaville in their motion, the

10  Warden at California Medical Facility and the Director of the Vacaville Psychiatric Program

11  likewise testify that the institution provides for an adequate supply of clothing and soap, and DSH

12  staff distributes the clothing and soap to their inmate-patients.  (Duffy Decl. ¶¶ 3–4; Bachman

13  Decl. ¶ 21.)

14         **D.     Plaintiffs' Allegations that Defendants "Mismanage Discharges and
                    Waitlists for Inpatient Care" are Unsupported and Further Orders Will**
15                  **Unnecessarily Intrude Into Defendants' Operations.**

16         Plaintiffs assert that Defendants "are "prematurely discharging inmate-patients from

17  inpatient levels of care . . . to artificially reduce the appearance of a waitlist."  (Pls.' Mot. at 20.)

18  Relying on this assertion, Plaintiffs seek an order requiring Defendants to "revise their policies,

19  procedures, and practices to ensure that patients continue to receive inpatient psychiatric

20  hospitalization when clinically indicated."  (Pls.' Proposed Order at 2.)

21         Plaintiffs' arguments are flawed in several respects.  There are no policies and procedures

22  permitting "premature discharges," as Plaintiffs argue.  (Pls.' Mot. at 20.)  To the contrary,

23  Defendants are required by law to house inmates in DSH programs until they reach maximum

24  benefit.  Cal. Penal Code § 2684(a).  Section 2684 provides for transfer to a state hospital

25  program of an inmate if the "rehabilitation of any mentally ill . . . person confined in a state

26  prison *may* be expedited by treatment at any of the state hospitals," and the person is kept until in

27  the hospital's opinion the inmates "has been treated to the extent that he or she will *not benefit*

28  from further care and treatment in a state hospital."  *Id.*; *see also* Downer Decl. ¶ 3, Ex. 2,

                                                 22

1    Program Guide 12-6-12 to 12-6-13 & ¶ 4, Ex. 3, Memorandum of Understanding at 23–24

2    (outlining discharge criteria, including "no further benefit").  Similarly, Dr. Brim's and Dr.

3    Badeaux's assertions of an undefined "turnover" of psychiatric staff is devoid of any evidence

4    that patients have suffered harm from staffing changes.

5        Plaintiffs also rely on Dr. Brim and Dr. Badeaux to argue that Defendants "pressure" DSH

6    clinicians to discharge inmates based on quotas and administrative pressure, "rather than clinical

7    need."  (Pls.' Mot. at 21.) [8]  This is false.  (*See* Bachman Decl. ¶¶ 15–17; Gaither Decl. ¶¶ 22–24.)

8    If Defendants were pressuring DSH clinicians to prematurely discharge patients—which they are

9    not—then all DSH psychiatrists, including Dr. Badeaux and Dr. Brim, arguably would be

10   violating Penal Code section 2684, licensing standards, and their ethical obligations.  Instead,

11   Defendants follow a court-ordered utilization management plan to manage patient movement by

12   and within DSH programs.  As part of this plan, DSH conducts concurrent reviews of inmate

13   admissions to inpatient care that have exceeded the average lengths of stay guidelines (30 to 45

14   days for acute care and 180 to 240 days for intermediate care), reviewing, among other things, the

15   justification for such continued stays.  (ECF No. 3962–1 at 37–38, Defendants' Utilization

16   Management Plan; Downer Decl. ¶ 3, Ex 2, Program Guide 12-6-2 & ¶ 4, Ex. 3 Memorandum of

17   Understanding at 22.)  Even with this review, however, the stays in DSH-operated program often

18   exceed the guidelines.  (*See* Bachman Decl. ¶¶ 16 & 17; Gaither Decl. ¶¶ 23 & 24.) [9]

19       Lastly, Defendants are not "prematurely" discharging inmates from inpatient programs, as

20   Plaintiffs' claim.  (Pls.' Mot. at 20.)  Plaintiffs rely on the declaration of Dr. Stewart where he

21   _____

22       [8] Dr. Badeaux's testimony supporting these allegations is inadmissible hearsay, as it
     describes a conversation with a program assistant and the contents of an unproduced e-mail
23   message. Fed. Rule Evid. 801 & 802.  Similarly, Dr. Brim's testimony that it was his
     "understanding … that there was a general feeling" to move patients out, is vague, lacks
24   foundation, and must be stricken.
         [9] Plaintiffs assert that "Defendants also have tried to disguise the inpatient waitlist
25   program by redefining how to count the waitlist," citing to their opposition to Defendants' motion
     to terminate and this Court's April 5, 2013 order acknowledging this effort.  (Pls.' Mot at 22.)
26   Defendants' addressed Plaintiffs' challenge in their reply brief at page 20.  (*See* ECF No. 4529.)
     Even though Defendants continue to strongly disagree with Plaintiffs' claims that they are trying
27   to "disguise" the inpatient waitlist, Defendants take this opportunity to update the Court on the
     number of inmates currently pending admission to DSH programs.  (*See also* Bachman Decl. ¶¶
28   3–8; Gaither Decl. ¶ 37.)

23

Defs. Opp'n to Pls.' Mot. For Enf. of Ct. Ord. & Aff. Relief (2:90-cv-00520 LKK JFM PC)

1    lists seven inmates whom he describes as "early returns" from Department of State Hospitals.

2    (Stewart Decl. ¶¶ 399, 406–07, 411, 433.)  Plaintiffs' inappropriately describe Dr. Stewart's

3    opinions that the inmates were allegedly returned "psychiatrically unstable" or "unchanged" as

4    "program failures." (Stewart Decl. ¶¶ 399, 433.)  But this is not the standard for when DSH may

5    appropriately discharge an inmate from a DSH hospital, and there is simply no reasonable basis

6    for keeping inmates in inpatient settings when, in the opinion of their treating clinicians, they *will*

7    *not benefit* from any further care in their particular setting.  And, most importantly for this

8    motion, Plaintiffs' attack on the professional clinical judgment rendered in each of the seven

9    cases discussed by Dr. Stewart is unjustified and constitutes—at best—a difference in clinical

10    opinion, not evidence of constitutional violations.  *See Sanchez,* 891 F.2d at 242.

11
12         **E.**    **Plaintiffs Allegations That Defendants Improperly Discharge Patients from**
                **DSH to CDCR in Anticipation of Parole Are Unfounded.**

13         Defendants are not violating this Court's August 2008 order, as Plaintiffs' assert.  (Pls.'

14    Mot. at 22–24.)  Rather, Plaintiffs misinterpret the order and ignore Program Guide requirements

15    requiring inmates to parole directly from CDCR, not DSH.  (Downer Decl. ¶ 3, Ex. 2, Program

16    Guide 12-6-9.)  In its August 2008 order, the Court rejected a policy that would have terminated

17    DSH inpatient mental health treatment "to all inmates during the period within 35 days of a

18    release." (ECF No. 2930 at 3.)  Plaintiffs ostensibly read this order to mean that all inmates

19    within 35 days of a release, whether clinically appropriate or not, must be referred and treated at a

20    DSH facility.  (*See* Pls.' Mot. at 22–23.)  But that is an incorrect reading of the order, in which the

21    Court also states that   "[a]ccess to inpatient mental health treatment shall be determined by an

22    individual's needs, not release date." (ECF No. 2930 at 4.)  The Court did not, nor would it have

23    been proper to, categorically ban clinical judgment from the decision-making process concerning

24    an inmate's referral and transfer to DSH pending their release.

25         Plaintiffs' primarily rely on a declaration from counsel containing alleged "individual

26    patient records" as evidence that Defendants are denying inmates inpatient hospitalization

27    because of their impending parole release date.  (Pls.' Mot. at 22–23; Galvan Decl. ¶¶ 10–11, Exs.

28    H [Prisoners 2–4] & I [Prisoners 5–6].)  But counsel's declaration contains no admissible

1    evidence.  Two separate non-referral logs from California Medical Facility that list reasons why

2    Interdisciplinary Treatment Teams did not refer three inmates to a DSH program are not

3    "individual patient records," and give little, to any, insight concerning the clinical decision made

4    for these inmates.  Even so, Prisoner 2, who was in a Mental Health Crisis Bed, was being held

5    pending a determination under Welfare & Institutions Code 5150 for involuntary treatment.

6    (Galvan Decl. Ex. H.)  Prisoner 3's records show only that he was moved from Atascadero State

7    Hospital to California Medical Facility for parole.  (*Id.*)  And there is nothing in Prisoner 4's

8    records showing that he was returned to CDCR contrary to policy.  Instead, he was being held

9    pending an immigration hearing.  (*Id.*)  As for Prisoners 5 and 6, the notes indicate that the

10   inmates' treating clinicians felt transfer to a DSH program was contra-indicated, consist with the

11   Program Guide and this Court's order.  (*Id.,* Ex. I.)

12       Plaintiffs also identify case conference notes from October 2011 relating to Prisoner 7 to

13   argue this inmate was denied treatment because of a pending parole date.  (Galvan Decl. ¶ 12–14,

14   Exs. J & K.)  Although these 18-month old records may show the impact at that time of a waitlist,

15   they do not prove he was denied inpatient care due to his impending parole date.  (*Id.*)

16       In sum, Plaintiffs presented no credible evidence that Defendants are "allowing patients to

17   dangerously decompensate just as they are about to be released back into the community," and

18   there is no basis to find that Defendants' policies are violating the August 2008 order.

19       **F.    The State Has and Continues to Appropriately and Consciously Manage
            Patient Movement Associated with the Opening of New Units.**
20

21       Plaintiffs request a litany of orders related to the activation and closure of Department of

22   State Hospital operated programs.  (Pls.' Proposed Order ¶ 8.)  Some requests are duplicative of

23   reports already provided.  For the rest, Plaintiffs fail to meet their burden for obtaining affirmative

24   relief.  No further reporting requirements, or other orders, are necessary or appropriate.

25   Specifically:

26       • DSH presently provides a monthly report under seal that identifies all inmates in

27           inpatient programs, including their location and length of stay, and a report that

28           identifies all the intermediate care programs by location, capacity, and census.

25

1    (ECF Nos. 2236 & 2321.)

2    • Despite Plaintiffs' allegation that DSH's placement of inmates into the second tier

3        of the L-Wing was "not dictated by clinical requirements" but instead by

4        "shuffling staff and patients between units in a frantic attempt to manipulate

5        Defendants' staffing and waitlist date," (Pls.' Mot. at 25–26.), Defendants notified

6        the Special Master and Plaintiffs' counsel of the activation of L-Wing in July

7        2012, and Vacaville Psychiatric Program acted appropriately in continuing to

8        admit patients as needed.  (Special Master's 25th Round Report at 40, ECF No.

9        4298; Bachman Decl. ¶¶ 10–14.)

10   • Third, although Plaintiffs argue (without reference to any evidence) that

11       "Defendants are risking the safety of the patients still at SVPP and VPP by

12       prematurely withdrawing resources from the temporary units at those facilities"

13       (Pls.' Mot. at 24–25), DSH is instead replacing staff through various means,

14       including temporary assignments from other hospitals and ongoing recruitment

15       efforts, and is not "allowing those positions to remain open."  (Gaither Decl. ¶¶

16       10–14; *see also* Bachman Decl. ¶¶ 18–21.)[10]

17   • Although Plaintiffs' request that the Special Master investigate any "newly

18       activated or temporary DSH units at SVPP and VPP in order to determine whether

19       appropriate treatment is being provided to *Coleman* class members and to make

20       recommendations to the Court regarding any additional orders that should be

21       issued" (Pls.' Proposed Order ¶ 8), DSH has never been found to have provided

22       inadequate care to any class member.

23       Plaintiffs' requested remedies require the existence of a "constitutional violation in need of

24   correction." 18 U.S.C. § 3626(a)(1)(A).  Dr. Brim and Dr. Badeaux's testimony on staffing

25       [10] This is consistent with the Court's June 2012 order: "No currently operating temporary
         mental health program will be decommissioned unless there is adequate alternative capacity to
26       accommodate future need in that level of care.  In addition, at least thirty days before
         decommissioning any operating temporary mental health program, Defendants shall notify the
27       Special Master of their intent to decommission the program and shall provide a copy of that
         notice to Plaintiffs' counsel."  (ECF No. 4199.)
28

26

1   shortages does not establish that any patients were harmed by the psychiatric turnover, and the

2   evidence presented by Defendants shows that the inmates are receiving adequate mental health

3   care.  (Gaither Decl. ¶¶ 15–24; Bachman Decl. ¶¶ 18–20.)  Therefore, granting Plaintiffs request

4   for an order extending the special master's monitoring duties would not be least intrusive means

5   necessary to correct an alleged violation of a federal right.  18 U.S.C. § 3626(a)(1)(A).  The

6   intrusiveness inquiry is "whether the district court has 'enmeshed [itself] in the minutiae of prison

7   operations,' beyond what is necessary to vindicate plaintiffs' federal rights."  *Armstrong,* 622

8   F.3d at 1071 (quoting *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)).

9
10
      **G.    No Evidence Justifies a Costly and Intrusive Investigation into the
              Vacaville Psychiatric Program.**

11        Plaintiffs ask the Court to direct the Special Master to investigate the inpatient treatment

12   provided at Vacaville Psychiatric Program.  (Pls.' Mot. at 26–27; Pls.' Proposed Order ¶ 9.)  The

13   request to investigate the Vacaville Psychiatric Program has no nexus to an alleged Eighth

14   Amendment violation.  Plaintiffs' request is loosely based on the fact that Plaintiffs elected not to

15   include the program as part of their expert's site visits.  (Pls.' Mot. at 26.)  This is an insufficient

16   reason to order system-wide change.  Likewise, as the Executive Director for Vacaville has

17   explained, Vacaville is not experiencing a shortage of clinical staff and is providing quality care

18   and meeting licensing requirements.  (Bachman Decl. ¶¶18–20.)  Finally, there is no "systemic

19   under-allocation of resources" in the L-2 unit, as Plaintiffs' assert.  (*Id.*)

20        Therefore, the Court should deny Plaintiffs' request for affirmative relief related to the

21   Vacaville Psychiatric Program because they have failed to meet their burden under the PLRA.

22                                     **CONCLUSION**

23        Plaintiffs fails in their burden to prove ongoing constitutional violations supporting further

24   orders, and cannot show Defendants are acting with deliberate indifference to inmates' mental

25   health needs.  Conversely, Defendants continue to provide constitutionally adequate inpatient

26   psychiatric care to *Coleman* class members.

27        / / /

28

                                          27

1        Therefore, this Court must reject Plaintiffs' invitation to radically reconfigure the state

2  prison system to their liking, and deny their motion.

3

4  Dated:  May 9, 2013

                                          KAMALA D. HARRIS
                                          Attorney General of California

5                                        JAY C. RUSSELL
                                        Supervising Deputy Attorney General

6

7                                        */s/ DEBBIE J. VOROUS*

8

9                                        DEBBIE J. VOROUS
                                        Deputy Attorney General

10                                      *Attorneys for Defendants*

11  CF1997CS0003
    31685876.doc

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs. Opp'n to Pls.' Mot. For Enf. of Ct. Ord. & Aff. Relief (2:90-cv-00520 LKK JFM PC)