KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>Defendants. | 2:90-cv-00520 LKK JFM P<br><br>**DECLARATION OF ERIC MONTHEI IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT** |

I, Eric Monthei, declare as follows:

1. I am the Chief of Mental Health at San Quentin State Prison. I am responsible for the oversight of the mental health service delivery system at that institution, including the care provided to the condemned inmate population. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion For Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment.

1

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

2. I have read the Special Master's 25th Round Monitoring Report as it relates to the provision of mental health care at San Quentin, the declarations of Plaintiffs' experts, Pablo Stewart, M.D., and Jeanne Woodford, both dated March 14, 2013, and filed in Opposition to Defendants' Motion to Terminate, and the internal email chain produced in discovery related to the use of the San Quentin Central Health Services Building beds (Rifkin Decl. ¶ 4 & Ex. 3).

3. As the Chief of Mental Health at San Quentin, I am familiar with the subjects Dr. Stewart and Ms. Woodford raise in their declarations concerning the specialized care provided to the condemned inmate population. In addition, I have read the relevant sections of the Unit Health Records related to the inmates referenced by Dr. Stewart and have consulted with each of these inmate's treating clinician in order to provide an assessment of the individual inmates  If called as a witness in this matter, I could and would testify to the matters herein.

## Specialized Care for the Condemned

4. In October 2010, the San Quentin Mental Health Program management was tasked with researching and developing a specialized care regimen tailored to the subcategory of Condemned inmates who may have met criteria identified in the CDCR 7388 form in place at that time for referral to a Department of State Hospital intermediate care facility program. I was personally involved in the research and development of this regimen and on November 8, 2010, mental health staff implemented a Specialized Treatment plan for the condemned inmates at San Quentin. On December 7-9, 2010, our mental health team presented the plan to the Coleman experts and monitors during an on-site visit to the prison.

5. The Specialized Treatment plan is based on a model of assertive community treatment and utilizes a biological, behavioral, and psychosocial model. This model is tailored to promote an inmate's self-management of daily living skills and mental health needs at a sustainable individual optimal level of functioning. In addition, it specifically focuses on monitoring symptoms, providing assistance with and training in daily living skills and medication management, and provides structured opportunities for recreation and socialization.

6. Due to the unique nature of the condemned inmate population, we believe that providing services near the inmate's home and within their community is clinically indicated.

2

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

Therefore, San Quentin mental health staff, under my guidance, developed the Specialized Treatment plan with the clinical rationale that providing care to the severely and persistently mentally ill condemned inmates is analogous to a community based treatment model that provides services within a respective community.

7. I prepared a written version of the Specialized Treatment plan dated January 29, 2011, and entitled, "Specialized Treatment for the Condemned Inmate-Patients at San Quentin State Prison." (*See* Specialized Treatment for the Condemned Inmate-Patients at San Quentin State Prison, dated January 29, 2011, attached as Exhibit 1 to Confidential Declaration of D. Vorous filed in Opposition to Plaintiffs' Motion (Confid. Vorous Decl.).) CDCR submitted this plan to the *Coleman* Special Master on January 28, 2011.

8. As of January 29, 2011, the San Quentin mental health program had identified twenty condemned inmates within the Mental Health Services Delivery System for specialized treatment. Patient indicators for receiving specialized treatment included having significant difficulties with hygiene, medication non-compliance that impaired functioning, rarely leaving one's cell, disruptive behavior, repeated rules violation reports, difficulties in maintaining activities of daily living, and bizarre behaviors.

9. Consistent with the January 2011 written plan, mental health staff developed a menu of specialized services and treatment for each inmate, dependent upon that inmate's individualized treatment needs. The types of services and treatment identified in the plan include: (1) several contacts per day by mental health providers; (2) groups and daily therapy sessions; (3) daily recreational time; (4) assistance with cleaning; (5) in-cell structured therapeutic activity; (6) psychiatric technician rounds; (7) daily encouragement to complete activities of daily living; (8) objective monitoring of multiple areas of functioning; and (9) weekly formal team coordination of care meetings. (*See* Confid. Vorous Decl., Ex. 1.)

10. Since January 2011, the San Quentin mental health program has and continues to provide treatment to condemned inmates consistent with the written plan. The census for inmate-patients receiving specialized treatment has ranged from a low of 6 to a high of 45 over the past two years. Currently, there are seven inmates housed in the designated specialized care beds, as

3

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

discussed below. There are an additional eight inmates receiving specialized care while they continued to be housed on their regular housing unit. All eight of these inmate-patients continue to be evaluated for entrance into the designated specialized care beds.

11. On several occasions since the San Quentin mental health program implemented the Specialized Treatment plan, the *Coleman* special master and his team have reviewed certain aspects of the plan and have provided comments either verbally or in written reports. In addition, I have presented personally about the Specialized Care plan at *Coleman* Policy Meetings both in 2011 and 2012 to the special master, his team, and Plaintiffs' counsel.

12. On July 2, 2012, I provided an update to the special master regarding six condemned inmates who were receiving specialized treatment under the plan. This update specifically noted that the structure of the Specialized Treatment plan allows for providing continued and intensive mental health services to the most vulnerable patients, even during brief disruptions, thereby forestalling the need for higher level of care considerations and providing supporting evidence for the utility, stability and long-term viability of Specialized Care.

13. During the *Coleman* 25th Round Monitoring site visit at San Quentin on August 6 to 8, 2012, the *Coleman* experts reviewed the specialized care provided to the condemned inmates. During that visit, the experts expressed their belief that the Specialized Care plan did not sufficiently articulate admission and discharge criteria. The experts also questioned the appropriateness of permitting inmates who were housed in Outpatient Housing Unit beds to continue to attend therapy groups.

14. On December 3-4, 2012, the *Coleman* special master and selected members of his staff, Department of State Hospital representatives, CDCR representatives, and Plaintiffs' counsel conducted a visit to specifically examine the care being provided to the condemned inmates under the Specialized Care plan. During this visit, I explained why the services provided under the Specialized Care plan were not amenable to formal operating procedures defining admission and discharge criteria. Specifically, I explained that the model of assertive community treatment and its emphasis on individualized care, did not allow for such exacting program definitions given that we were following a model in which the service defined the level of care rather than the level

4

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

of care defining the services provided. The special master's experts also expressed their belief that a separate housing unit should be designated for those inmates receiving specialized care under the Specialized Treatment plan, and that treatment should include the implementation of a behavior based incentive program, emphasis on participation in structured activities, and out-of-cell recreational time.

15. At the conclusion of the December 3-4, 2012 tour, CDCR indicated that it would identify ten flexible beds in the Central Health Services Building at San Quentin and would work to incorporate the special master's expert's recommendations about the services provided to inmates who would be housed in these beds, including attending therapy groups.

16. San Quentin's Central Health Services Building has 17 licensed Mental Health Crisis Beds and 33 Outpatient Housing Unit beds. The ten flexible beds identified for use by inmates receiving specialized care are within the 33 Outpatient Housing Unit portion of the Central Health Services Building and are not part of the 17 licensed Mental Health Crisis Beds. On January 31, 2013, I received an email from Diane Martinez, Standards Compliance Coordinator at San Quentin. In this email, attached to the Rifkin Declaration as Exhibit 3, Ms. Martinez expressed some concerns regarding jeopardizing the licensure of the Correctional Treatment Beds at San Quentin. Ms. Martinez's concerns were discussed by the management team at San Quentin and were also conveyed to both CDCR Mental Headquarters and to the *Plata* Receiver's office in Sacramento. Because the 10 flexible beds are within the Outpatient Housing Unit portion of the Central Health Services Building and are not part of the 17 licensed Mental Health Crisis Beds, everyone collectively agreed that use of the 10 beds would not impact the license.

17. With the addition of the 10 designated Outpatient Housing Unit beds, the Specialized Treatment plan has now expanded beyond what was envisioned in January 2011. In addition to the specialized treatment that mental health staff provide to inmates in the condemned unit as described above, the addition of the 10 designated beds located in the Central Health Services Building (CHSB Rooms 4248-4257) add the following additional components: one designated dayroom (CHSB 4348), two designated clinical offices (CHSB 4233 & 4234), a designated

5

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

shower area (CHSB 4242) and a minimum of four hours daily yard time for specialized care activities.

18. The mental health program has identified specific entrance criteria to determine if inmates currently receiving specialized care should be housed in one of the 10 designated beds. The first is an acute onset of symptoms or significant decompensation due to serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, agitated or vegetative signs, definitive impairment in reality testing and/or judgment. The second is an inability to function in the condemned population based upon any of the following: (1) a demonstrated inability to program in and/or benefit from the Condemned Treatment Program for two consecutive months; (2) a demonstrated inability to program in condemned correctional activities such as education, religious services, self-help programs, canteen, recreational activities, or visiting, as a consequence of a serious mental disorder; or (3) the presence of dysfunctional or disruptive social interaction including withdrawal, bizarre behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior, or inappropriate sexual behavior, as a consequence of a serious mental disorder.

19. Mental Health clinicians may initiate a referral to the specialized care beds in the Outpatient Housing Unit. The baseline and initial specialized care evaluation begins while the inmate is receiving services in the Condemned Enhanced Outpatient Program. A comprehensive Mental Health Evaluation (CDCR Form 7386) is written by the Specialized Care plan Coordinator or designee within 14 days of referral to the designated specialized care beds. After completing the updated 7386 form, the Specialized Treatment Coordinator, or designee, attends the inmate's Condemned Enhanced Outpatient Program Interdisciplinary Treatment Team appointment to formalize a placement decision. The initial evaluation process continues after arrival to the designated specialized care beds and focuses on the inmate's treatment needs.

20. The responsibility for overall treatment planning for inmates housed in the designated beds for specialized treatment rests with the Specialized Treatment plan Coordinator or designee, and is formulated during an Interdisciplinary Treatment Team appointment, which is held within

6

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

14 days of arrival to the bed and monthly thereafter. The treatment team develops an individualized treatment plan, which includes a Therapeutic Activity Schedule and an individualized incentive program. The treatment team process provides an opportunity for coordinated treatment between the clinicians assigned to provide specialized care to the condemned inmates and the Condemned Enhanced Outpatient Program.

21. Interdisciplinary Case Conferences are held monthly for inmates housed in the designated specialized care beds. The purpose of these conferences is to ensure a common understanding of all services received by the inmate and to provide greater collaboration among service providers, for collaborative problem-solving for inmates with complex clinical presentations.

22. The Positive Incentive Program is a reward system that is part of the Specialized Treatment plan that allows inmates in the designated beds to obtain positive reinforcement in the form of incentive credits. Inmate credits can be exchanged for incentives from the incentive menu. The incentive menu includes a variety of additional treatment services, recreational items, food items, and personalized use of time. Inmates can earn incentive credits for treatment participation and for progress toward treatment goals. Incentive credits are recorded on the Therapeutic Activity Schedule and are tallied daily. Inmates have the opportunity to exchange incentive credits on a daily basis.

23. The goal for each inmate in a designated specialized care bed is to engage in a minimum of 10 hours of out of cell weekly activities. Condemned inmates receiving less than 10 hours of out of cell structured activities after 12 weeks in a specialized care bed will be presented to the Interdisciplinary Treatment Team for approval of alternative individual therapeutic activities suitable to the inmate's needs and ability. Treatment activities include weekly clinical contact with the inmate's assigned Condemned Enhanced Outpatient Program primary clinician and the Specialized Treatment plan clinician, daily psychiatric technician contact during both 2nd and 3rd watch, daily recreational therapy contacts, and biweekly psychiatry contacts for medication evaluation and medication management.

7

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

24. Specific treatment services offered to inmates in designated care beds include, but are not limited to: group therapy, out-of-cell milieu groups, targeted group treatment, individual therapy, medication management, recreational therapy, Licensed Psychiatric Technician rounding, 24 hour nursing care as ordered, and therapeutic work activity. Inmates assigned to the designated specialized care beds continue to attend groups with condemned Enhanced Outpatient Program and Correctional Clinical Case Management System inmates.

25. Condemned inmates who experience decompensation in the form of mental health crisis while receiving specialized care or while housed in a designated specialized care bed are referred for consideration for a higher level of care including a Mental Health Crisis Bed or Acute Department of State Hospital placement. Condemned inmates whose level of functioning has improved to the point that they may function adequately in the Condemned Enhanced Outpatient Program without additional support will be integrated back to their condemned housing unit. The reintegration plan will be developed by both the condemned Enhanced Outpatient Program primary clinician and the Specialized Treatment plan primary clinician to ensure continuity of care. At San Quentin, the mental health primary clinicians follow their condemned patients into the designated specialized care beds as well as into any Mental Health Crisis Bed placement to ensure a heightened continuity of care. Moreover, the reintegration plan will be discussed and endorsed by the inmate's interdisciplinary treatment team prior to re-housing the inmate.

26. CDCR has provided staffing to San Quentin for the total Specialized Treatment plan including the designated specialized care beds in the Outpatient Housing Unit. The base staffing for providing specialized care is: 1 Senior Psychologist, 1.5 psychiatrists, 0.5 Senior Licensed Social Worker, 3 psychologists, 1 Licensed Social Worker, and 1 recreational therapist. On February 15, 2013, San Quentin received hiring authority for the following additional staff: 1 Senior Psychiatrist, 1 Senior Licensed Social Worker, 2 psychologists, and 3 recreational therapists. All positions are filled except for 1 Senior Psychiatrist and 1 Senior Licensed Social Worker position, and the 0.5 Senior Licensed Social Worker position, 0.5 psychiatrist position, and 2 recreational therapist positions that are in middle of the hiring process. Some of the staff described above work on East Block and some of the staff work in the designated beds. However,

8

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

most staff follows their patients receiving treatment under the specialized care plan to wherever they may be housed at San Quentin.

27. Ms. Woodford evaluates San Quentin's Specialized Treatment plan beginning on page 19 of her declaration. Ms. Woodford states that she "saw no evidence that such staffing has yet been designated or trained," and that she inquired whether there was adequate staffing "and was told in vague terms that there was 'enough,' but was not offered any specifics." (Woodford Decl. at ¶ 45-46.) As noted above, there is in fact approved mental health staffing for the Specialized Treatment plan.

28. Ms. Woodford further claims, with respect to the Specialized Treatment plan, that if an assessment were conducted of the inmates currently receiving specialized care, it would reveal that "many if not all would be deemed both in need of a transfer to ICF care and suitable for such a transfer from a custodial perspective." (Woodford Decl. at ¶¶ 45-46.) This statement indicates a misapprehension of San Quentin's program, which provides appropriate treatment for this unique class of inmates. In fact, it is my opinion that the mental health services delivery system at San Quentin has been providing the condemned inmate population with at least if not more than a constitutionally adequate level of care. As noted in each of the individual inmate assessments below, all of these inmates have shown substantial improvement in their mental health since they started receiving services under the Specialized Treatment plan. In fact, Ms. Woodford states that she "was given a brief tour of the beds set aside within the CTC for the program, and I believe that it could operate effectively given appropriate trained staffing and resources". (Woodford Decl. at ¶ 45-46.)

29. In addition to the substantial improvement to the individual inmates discussed below, the specialized services have substantially impacted the condemned population overall. The Specialized Treatment plan, based on the principles of the Assertive Community Treatment model, began on the unit of East Block at San Quentin State Prison in November 2010. By treating inmates in their community, the mental health team has gradually become integrated as part of the community. Several trends in the community have emerged in the last two years. There has been a decrease in stigmatization of mental health care in the community. As a result of

9

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

this referrals and/or informal consultation with Specialized Treatment plan clinicians occur on a daily basis with inmate, custody staff, and non-custody staff; medical and Specialized Treatment plan clinicians collaborate closely on inmates presenting with both mental health and medical issues, and hold clinical conferences to address the inmates' needs.

30. Currently, mental health groups and recreational therapy yards are at capacity on most days, which had not been the case prior to the inception of Specialized Treatment plan. In response to the general increased interest in mental health services, and the clinical needs of chronically mentally ill inmates in the community, the Specialized Treatment plan has provided the mechanism to increase the mental health services provided to inmates, including individual therapy, medication management, group therapy, recreational therapy, and wellness checks.

31. Specialized Treatment plan clinicians, as part of the community, are aware of dynamics and trends on the housing unit, which has resulted in early identification and early intervention of potential issues in the community. A recent example is the Specialized Treatment plan's preventative efforts prior to, during, and after November 6, 2012, Election Day to identify inmates who may be negatively impacted by the results of Proposition 34.

32. The Specialized Treatment plan continues to take proactive steps towards resolving potential issues by intervening early and often. In recent years there has been a decline in the number of rules violations in the community, in part due to the fact that Specialized Treatment plan clinicians are available in the housing unit, and can respond to issues prior to any further escalation. Timely treatment and response to situations has also resulted in less need for higher levels of care. There were a number of inmates referred to higher, more restrictive levels of care more frequently for longer durations of stay prior to the inception of the Specialized Treatment plan. At this time, many of these inmates receiving services under the Specialized Care plan are able to live in their community for longer periods of time, requiring less admission to higher levels of care, and utilizing fewer bed days when they are in need of a higher levels of care. Several inmates who had been unresponsive to staff in the past, and/or who have had histories of verbal aggression towards others, are now responding to mental health staff, and exhibiting less verbal hostility towards others. Other inmates are now participating regularly in out-of-cell

10

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

structured activities, improving in both social interactions and self-care, have increased their medication compliance, and are participating in services and functioning at a higher level than prior to the inception of the Specialized Treatment plan.

33. It is my understanding that due, in part, to custody concerns the Department of State Hospital program for the condemned is operated in a more restrictive manner and with potentially less interaction. The average length of stay for our condemned inmates at San Quentin is approximately 25 years. Given this duration, the condemned inmates have established unique associations to their homes, housing, neighbors, and institution and treatment providers. In my opinion, our staff operate with superior knowledge, experience and training associated with the condemned population and we operate with an understanding that they will remain with us for several years and perhaps decades.

## Individualized Inmate Assessments

34. In regards to Dr. Stewart's referenced Prisoner CCC, Dr. Stewart opines that this prisoner "meets DSH referral criteria 1 and 2," and "requires inpatient level of care at the intermediate level for an extended period of time." (Stewart Decl. ¶ 458.) I reviewed Prisoner CCC's files and Interdisciplinary Treatment Team notes whereby it was determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Prisoner CCC is receiving treatment as part of the Specialized Treatment plan and has been since its inception. In addition, he was placed in a designated specialized care bed on February 19, 2013. Furthermore, as part of his Specialized Care regimen, Prisoner CCC is offered the following mental health treatment interventions: individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts, recreational therapy, therapeutic yards, and monthly interdisciplinary treatment team meetings. (*See* Interdisciplinary Treatment Team-Level of Care Decision for Prisoner CCC, attached as Exhibit 2 to Confid. Vorous Decl.) Prisoner CCC is currently on a Penal Code section 2602 involuntary medication order, and has been taking his medication without requiring backup intramuscular injections. For the past month, he has been participating in 15-19 hours of structured activities per week. Prisoner CCC's hygiene/grooming has improved, he participates in most activities offered to him, and he has not exhibited verbal

11

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

and/or physical aggression on the unit. Thus, in my professional judgment, Prisoner CCC is receiving adequate mental health care. (*See* Interdisciplinary Progress Notes from February 19, 2013 to April 18, 2013, attached as Exhibit 3 to Confid. Vorous Decl.)

35. In regards to Dr. Stewart's referenced Prisoner DDD, Dr. Stewart finds that Prisoner DDD should be placed in an inpatient level of care unit. (Stewart Decl. ¶ 459.) However, records indicate that Prisoner DDD has not exhibited an indication for an emergent and involuntary psychiatric hospitalization. He has demonstrated improvements in his grooming and level of service participation while receiving services under the Specialized Care plan. (*See* Summary of Reports and Recommendations, page 6, attached as Exhibit 4 to Confid. Vorous Decl.) I reviewed Prisoner DDD's files and Interdisciplinary Treatment Team notes whereby it was determined that he does not meet DSH referral criteria 1 or 2 and the level of care he is currently receiving is appropriate. Prisoner DDD was housed in a specialized care bed on February 1, 2013. Thus, admission to an inpatient level of care would be inappropriate at this time. Prisoner DDD's grooming and hygiene have been good and he has intermittently began to softly speak. While he also remains intermittently mute during sessions he has been able to communicate non-verbally and has increased his engagement with his Specialized Treatment plan primary clinician. Historically, Prisoner DDD's participation in structured activities has been ten plus hours per week (as high as 16 plus hours). A Specialized Treatment plan primary clinician is currently working with Prisoner DDD to identify new personal incentives that would help him achieve his goals. Prisoner DDD is currently on a Penal Code section 2602 involuntary medication order, has not refused medication, has not refused having his vitals taken, and has not refused having blood drawn for lab work. At this time he is prescribed Clozaril, and has been on a therapeutic dose of 350 mg/day. (*See* Interdisciplinary Progress Notes from March 16, 2013 to April 13, 2013, attached as Exhibit 5 to Confid. Vorous Decl.) Therefore, in my professional judgment, Prisoner DDD is receiving adequate mental health care.

36. In regards to Dr. Stewart's referenced Prisoner EEE, Dr. Stewart opines that this prisoner is not currently taking any psychiatric medications despite the fact that he has a psychiatric diagnosis and has been housed in the Correctional Treatment Center. ( Stewart Decl.

12

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

¶ 460.) Despite the fact that Dr. Stewart believes an inpatient level of care is appropriate for Prisoner EEE, Prisoner EEE is not an acute danger to himself or others, nor is he gravely disabled. (*See* Summary of Reports and Recommendations, page 6, attached as Exhibit 6 to Confid. Vorous Decl.) Inpatient admission is not clinically indicated at this time and could, in fact, hinder the rapport and progress that has been established with his treatment team.  Prisoner EEE was placed in a designated specialized care bed on February 25, 2013, and was receiving specialized care in his housing unit prior to that date. He is currently not prescribed psychotropic medication; he does not express any suicidal ideation, homicidal ideation, and has adequate grooming/hygiene. Prisoner EEE has been attending 15 to 23 hours per week of structured activities, and he attends almost all services offered. He engages in groups and yards, and according to his primary clinician's notes, he is motivated to meet for weekly sessions. His Grade B custody status was changed to Grade A on April 10, 2013 and he is no longer required to wear a spit mask during escort. (*See* Interdisciplinary Progress Notes from March 17, 2013 to April 18, 2013, attached as Exhibit 7 to Confid. Vorous Decl.) Thus, in my professional judgment, Prisoner EEE is receiving adequate mental health care.

37. In regards to Dr. Stewart's referenced Prisoner FFF, Dr. Stewart opines that Prisoner FFF is a high suicide risk and needs a higher level of care than Prisoner FFF is currently receiving. (Stewart Decl.¶ 468.) Prisoner FFF did see improvement within the last several months. (*See* Specialized Care for the Condemned Report, March 16, 2013, attached as Exhibit 8 to Confid. Vorous Decl.; *s*ee Treatment Summary, attached as Exhibit 9 to Confid. Vorous Decl.) Part of the improvement seen by Prisoner FFF is that he has developed a support network that includes mental health staff, an inmate peer group, and community support in the form of letters and visits. (*See* Treatment Summary, Ex. 9 to Confid. Vorous Decl.) However, Prisoner FFF was admitted to a Mental Health Crisis Bed for suicidal ideation and having thoughts of self-mutilation on March 7, 2013. While in the Mental Health Crisis Bed, Prisoner FFF engaged in self-injurious behavior such as head-banging and cutting. Due to this behavior and reported suicidal ideation and depression, his Interdisciplinary Treatment Team determined on March 20, 2013 that a referral to an Acute bed was clinically indicated. Prisoner FFF was referred and transferred to the

13

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

1  DSH-operated acute psychiatric program at California Medical Facility on April 5, 2013. (*See*
2  various eUHR documents including Progress Notes, Suicide Risk Evaluations, and Treatment
3  Plans, attached as Exhibit 10 to Confid. Vorous Decl.)

4      38. In regards to Dr. Stewart's referenced Prisoner GGG, Dr. Stewart opines that this
5  prisoner should be placed in a nursing home level of care, but does not state why that is warranted.
6  (Stewart Decl. ¶ 469.) In addition, Dr. Stewart has also noted that Prisoner GGG is currently not
7  taking any prescribed psychotropic medication for his mental illness. (*Id.*). I reviewed Prisoner
8  GGG's files and his Interdisciplinary Treatment Team whereby it was determined that he does
9  not meet criteria for referral to acute care and that the level of care he is currently receiving is
10 appropriate. As part of this inmate-patient's specialized care regimen, he is offered the following
11 mental health treatment interventions: individual therapy, group therapy, daily wellness checks,
12 bi-monthly psychiatric contacts, recreational therapy, therapeutic yards, and monthly
13 interdisciplinary treatment team meetings. Prisoner GGG is currently not prescribed any
14 antipsychotic medication for his mental illness. (*See* Daily rounds documentation and Progress
15 Notes from March 11, 2013 to April 16, 2013 attached as Exhibit 11 to Confid. Vorous Decl.)
16 Prisoner GGG, although mentally ill, does not meet the criteria for inpatient care or for
17 involuntary medication under Penal Code section 2602, and thus cannot be involuntarily
18 medicated. (*See* Specialized Care for the Condemned Report, March 16, 2013 attached as Exhibit
19 12 to Confid. Vorous Decl.) Therefore, in my professional judgment, Prisoner GGG is receiving
20 adequate mental health care.

21     39. In regards to Dr. Stewart's referenced Prisoner HHH, Dr. Stewart believes that this
22 prisoner requires an inpatient level of care and that he should not remain in a regular housing unit
23 given his mental illness. (Stewart Decl.¶ 470.) However, Prisoner HHH is currently receiving
24 specialized care and was placed in a designated specialized care bed on March 13, 2013. (*See*
25 Summary of Reports and Recommendations attached as Exhibit 13 to Confid. Vorous Decl.) His
26 participation in this program has included the following mental health treatment interventions:
27 individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts,
28 recreational therapy, therapeutic yards, and monthly interdisciplinary treatment team meetings.

14

Monthei Decl. Supp.  Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)

(*Id.*)  Thus, the allegation that Prisoner HHH will "eventually" be placed in an inpatient level of care as is evidenced by the medical records available. (*See* Progress Notes from March 15, 2013 to April 16, 2013, attached as Exhibit 14 to Confid. Vorous Decl.)  Thus, in my professional judgment, Prisoner HHH is receiving adequate mental health care.

40.  Similarly, in regards to Dr. Stewart's referenced Prisoner III, records indicate that this prisoner is receiving services under the Specialized Treatment plan and has been since its inception. (*See* Stewart Decl. ¶ 470.)  I reviewed Prisoner III's files and Interdisciplinary Treatment Team notes whereby it was determined that he does not meet acute referral criteria 1 or 2 and the level of care he is currently receiving is appropriate.  As part of his specialized care, he has been offered the following mental health treatment interventions: individual therapy, group therapy, daily wellness checks, bi-monthly psychiatric contacts, recreational therapy, therapeutic yard, and monthly interdisciplinary treatment team meetings. (*See* Summary of Reports and Recommendations, page 4, attached as Exhibit 15 to Confid. Vorous Decl.)  Since receiving services under the Specialized Treatment plan, Prisoner III has demonstrated a "progressive improvement in his functioning, grooming, and mental health service participation. (*See* Daily Round documentation and Progress Notes from March 11, 2013 to April 17, 2013 attached as Exhibit 16 to Confid. Vorous Decl.)

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.  Executed in San Quentin, California on May 8, 2013

    /s/ Eric Monthei
Eric Monthei, Psy.D. Chief of Mental Health
San Quentin State Prison
***(original signature retained by attorney)***

15

Monthei Decl. Supp. Defs.' Opp'n to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 KLL JFM P)

(2:90-cv-00520 LKK JFM PC)