KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: William.Downer@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **DECLARATION OF WILLIAM DOWNER IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT CARE** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

I, William Downer, declare as follows:

1.   I am a Deputy Attorney General with the California Office of the Attorney General, attorneys of record for Defendants in this case, and I am licensed to practice in this Court. I have personal knowledge of the facts stated in this declaration and if called to testify to those facts, could and would do so competently. I submit this declaration in support of Defendants' Response to Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Care.

1

1        2.    Attached as Exhibit 1 is a true and correct copy of excerpts from the Deposition

2    Transcript of Pablo Stewart, taken on March 19, 2013.

3        3.    Attached as Exhibit 2 is a true and correct copy of excerpts from the Mental Health

4    Services Delivery System Program Guide, 2009 Revision.

5        4.    Attached as Exhibit 3 is a true and correct copy of excerpts from the Memorandum of

6    Understanding between the California Departments of Mental Health and Corrections and

7    Rehabilitation regarding intermediate care and non-acute services.[1]

8        I declare under penalty of perjury under the laws of the State of California and the United

9    States of America that the foregoing is true and correct.  Executed in Sacramento, California on

10    May 9, 2013.

11                                    **/s/ William Downer**
                                          William Downer

12

13

14

15    CF1997CS0003

16

17

18

19

20

21

22

23

24

25

26

27        [1] The California Department of Mental Health is the Department of State Hospitals'
    predecessor in interest.

28                                                    2

# EXHIBIT 1

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,          )
                                )
        Plaintiffs,             )
vs.                             )      No. Civ S 90-0520 LKK-JFM P
                                )
EDMUND G. BROWN, JR.,           )
et al.,                         )
                                )
        Defendants.             )
_____ )
MARCIANO PLATA, et al.,         )
                                )
        Plaintiffs,             )
                                )
vs.                             )      No. C01-1351 THE
                                )
EDMUND G. BROWN, JR.,           )
et al.,                         )
                                )
        Defendants.             )
_____ )

DEPOSITION OF

PABLO STEWART, M.D.

TUESDAY, MARCH 19, 2013, 9:00 A.M.

SAN FRANCISCO, CALIFORNIA

REPORTED BY:  BRENDA L. MARSHALL, RPR, CSR NO. 6939

THORSNES LITIGATION SERVICES, LLC

1  you spent in each of these units?

2      A.    Again, it was -- very similar approach.  I know,

3  at Donovan, I spent a little longer in the MHCB because

4  there was -- I interviewed several people there in the

5  MHCB at Donovan and spoke with staff, and during the

6  course of my day, I discovered things that required me to

7  go back to MHCB in the afternoon.  So I think I went there

8  more than once.

9      Q.    And how much time total would you estimate that

10  you had spent in that --

11      A.    I would say in MHCB, it was several hours.

12      Q.    Okay.  And then what about San Quentin?

13      A.    San Quentin, it was very similar.  It was one

14  day.  We got there early, you know, 8:00, 8:30, for a

15  morning meeting with staff, and then, from there, I went

16  to the MHCB.

17          And in addition to the MHCB, because it was sort

18  of co-located, I went to a program they have for condemned

19  inmates, and I want to call it specialized treatment

20  program, or something to that effect.  I know the word

21  "specialized" was in it and "treatment" was in it.  Spent

22  time there.

23          I went to East Block, which is for condemned

24  inmates, and spent a good amount of time there,

25  interviewing --

```
1      Q.   What does "a good amount of time" mean?

2      A.   I would say, you know, one to two hours --

3      Q.   Okay.

4      A.   -- on East Block.

5           I went to the EOP ad seg -- or -- their units

6  are listed by names, like Donovan -- not Donovan -- Donner

7  and Badger and --

8      Q.   Okay.

9      A.   -- all these different mountain passes I believe

10 is what they're named after.  And one of them was

11 designated for EOPs.  So I went in there and interviewed

12 people in that EOP unit.  I want to say it's -- I forget

13 if it was Badger or Donner or one of those ones.

14     Q.   And how much time did you spend in that one?

15     A.   In that one, I spent over an hour because we

16 interviewed several inmates.

17     Q.   And just for purposes of clarity, was that an ad

18 seg or a GP EOP?

19     A.   I want to say it was ad seg.

20     Q.   Okay.  So you've listed, from San Quentin, the

21 mental health crisis bed unit, the condemned inmates

22 program, and then EOP ad seg?

23     A.   Okay.  But remember, in the condemned inmates

24 program, I went to their housing unit, but there was also

25 what they refer to as specialized treatment program, or
```

1    words something like that, which was co-located near the

2    MHCB.

3         Q.    Okay.

4         A.    So it was two separate units.

5         Q.    So East Block is where they live, and then the

6    specialized treatment program is the separate program that

7    you're talking about?

8         A.    Right.  But people live there now, also.

9         Q.    Okay.  So two units for the condemned?

10        A.    Yeah.  But it's important to make that

11   distinction because they're very separate and very

12   different units.

13        Q.    Okay.  And then anywhere else?

14        A.    Okay.  I said MHCB, specialized treatment unit,

15   the condemned housing unit on East Block, the EOP, which,

16   I believe, was the ad seg unit in one of those Donner or

17   Blitzen units, and then spent time at San Quentin,

18   reviewing medical records.  They had a kiosk there where

19   we could look at records and print records out.

20        Q.    Okay.

21        A.    And that was also an opportunity to speak with

22   staff.

23        Q.    And how long did you spend at the kiosk,

24   reviewing records?

25        A.    I would say we were there for a while.  So over

1   doing it, but I remember that's what the agreement was

2   back then.  They were going to attempt to do that.  I'm

3   not aware of any other jurisdictions.

4          Q.   Okay.  So you said that you were a consultant

5   for the New Mexico Department of Corrections, or in a case

6   involving them; right?

7          A.   Correct.

8          Q.   So have you yourself ever ran a program in a

9   correctional facility?

10         A.   Yes.

11         Q.   And is that the 12-bed unit that you refer to in

12  your report?

13         A.   Well, that was the hospital unit, but, also, for

14  a period of time during the time, I was responsible for

15  the hospital unit.  I was also responsible for the jail

16  psychiatric service for all the jails.

17         Q.   And that was in 1988 and 1989?

18         A.   Yes.

19         Q.   And that was in San Francisco County?

20         A.   Correct.

21         Q.   So you oversaw the operation of mental health

22  care for the jails in Sacramento -- San Francisco County,

23  as well as you were responsible for the 12-bed, locked,

24  inpatient unit?

25         A.   Yes.

THORSNES LITIGATION SERVICES, LLC  |  877.771.3312  |  www.thorsnes.com

1       Q.   Were there any other systems where you were

2   responsible for the oversight of the facility, of a

3   correctional facility?

4       A.   Well, you know, as I list in my report, there

5   were several systems that I was responsible for

6   monitoring.

7       Q.   Yes.  But were you ever -- did you ever work in

8   a system, aside from San Francisco County, in which you

9   were responsible for implementing programs for mental

10  health care for inmates?

11      A.   No.

12      Q.   Okay.  So on page 12 of your report, you refer

13  to your recent tours, and you talk about, quote, locked

14  units.  Can you tell me what you mean by that term,

15  "locked units."

16           MR. NOLAN:  Could you just point to the line?

17           MS. ANDERSON:  I'm sorry.  Yes.  Page 12, line

18  11 and 12.

19           THE WITNESS:  Those units were the ad seg units,

20  including PSU at Sacramento.

21  BY MS. ANDERSON:

22      Q.   Okay.  And you mentioned that you found a number

23  of individuals whose mental illness appeared to be in a

24  state of acute exacerbation.

25      A.   Correct.

1    Q.    How would you suggest that they change what they

2    do with the condemned who are mentally ill?  I'm talking

3    about class members here.

4    A.    Correct.  For reasons that I don't fully

5    understand, the mentally ill condemned inmates don't have

6    access to the same facilities that the noncondemned

7    inmates have in the system, and that's one thing that --

8    that I think that would necessarily need a change because

9    they don't have access to, I want to say, the acute

10   psychiatric programs.  This is the condemned inmates.

11         And I don't understand why, because one could

12   even consider that condemned inmates would have even a

13   higher need for the acute inmates, but, certainly, they

14   would have -- the mentally ill condemned inmates, as a

15   group, would have the same requirements, the same needs,

16   for higher levels of care than the rest of the class.

17   Q.    And do you have any evidence that they might, in

18   fact, have a higher level of acuity?

19   A.    Well, certainly from my tour and interviewing

20   many death row inmates and, also, some of my other

21   noncorrectional psychiatry work.  I work a lot with people

22   on death row and have -- and these are mentally ill people

23   on death row, not just in California, but certainly

24   California, and have been around the country.

25   Q.    Okay.  I thought I understood you to say

# EXHIBIT 2

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

### Inpatient Placement General Requirements

The inmate-patient to be referred must have a Serious Mental Disorder (See Mental Health Services Delivery System [MHSDS] Program Guides, Chapter 1, Program Guide Overview) and:

1. Have marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour inpatient care, or

2. Is a danger to self or others as a consequence of a serious mental disorder, or

3. Meets admission criteria for any of the DMH programs.

## C. DMH ACUTE PSYCHIATRIC PROGRAM (APP)

The APP is a short-term, intensive-treatment program with stays usually up to 30 calendar days to 45 calendar days provided. Actual length of stay shall be determined by the Interdisciplinary Treatment Team on a case-by-case basis. Inmate-patients in the APP who are determined to need long-term mental health inpatient care shall be referred to an appropriate DMH intermediate care program.

Referral to the APP is considered when, in the judgment of the CDCR treating clinician, the inmate-patient meets the following DMH admission criteria:

### Admission Criteria

1. Any inmate-patient (age 18 or older) who suffers impairment of functioning with signs and symptoms that may be attributed to either an acute major mental disorder or an acute exacerbation of a chronic major mental illness, as defined by the current Diagnostic and Statistical Manual of Mental Disorders (DSM). Such signs and symptoms of illness may render the inmate-patient:

   - Unable to carry out adequately the normal routines of the institution,

   - Unable to provide for his basic needs or use the supportive treatment resources available to him, or

   - A significant risk of harming himself or others.

2. Any inmate-patient who has been assessed as a severe suicidal risk.

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

3.  Additional factors that justify consideration for referring an inmate to the APP include:

    - The inmate-patient has symptoms or secondary conditions that require inpatient mental health treatment.

    - The inmate-patient engages in self-injurious behavior that has not responded to treatment in a CDCR facility. Without mental health treatment, the inmate is likely to develop serious medical complications or present a threat to his life.

4.  Each inmate-patient referred from another CDCR institution who is not accepted for direct placement-evaluation to the APP due to lack of an available bed shall be retained at the sending institution until a bed is available.

5.  Inmate-patients admitted to the APP shall be inmates anticipated to be stabilized sufficiently for release from DMH within 30 to 45 days.

### *Referral Procedure*

1.  Each referral to the APP is the responsibility of CDCR clinical staff. Referrals shall be made whenever in the judgment of the treating clinician the inmate-patient's condition warrants inpatient care and meets the admission criteria for APP. Referrals generally are made by a clinician working in a CDCR MHCB Program or Enhanced Outpatient Program (EOP). Referrals must be completed within two working days of identification.

2.  CDCR shall transmit standardized referral information to the appropriate DMH program on the DMH Referral Form/Acute Psychiatric Care. The referral packet shall be sent to the APP Admission and Discharge Coordinator.

3.  DMH shall review the referral packet within one working day of receipt. DMH staff shall immediately notify the referring institution on the DMH Referral Decision Form by fax of their decision. The decision shall provide the detailed reasons for any rejections.

4.  An inmate-patient considered for transfer to the APP must sign a consent to treatment at DMH or is entitled to a hearing in accordance with Title 15, Section 3369.1 (a) unless the inmate waives the hearing. Documentation of the hearing shall be processed in accordance with Department Operations Manual Section 62030.4.2. Written consent shall be obtained, or the hearing shall be conducted by the prison prior to transfer.

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

Custody Level IV male inmates that do not require close or high custody may be referred to ASH or VPP.

The ICF programs have a full complement of mental health staff including psychiatrists, psychologists, clinical social workers, rehabilitation therapists, psychiatric technicians, and registered nurses. Most housing is dormitory-type rooms. The inmate-patients have access to the day room, supervised yard access and are fed in a dining room. The inmate-patients receive a multidisciplinary assessment. From this information an individualized treatment program is developed from a wide variety of treatment modalities including group and individual psychotherapy, medication management, depression and crisis management, training in daily living skills and interpersonal skills, substance abuse, management of assaultive behavior, supportive counseling, modification of maladaptive behaviors, and educational and vocational programs.

### *Admission Criteria*

Referral to an ICF is considered when in the judgment of the CDCR treating clinician the inmate-patient meets the following DMH admission criteria:

1. An Axis I major (serious) mental disorder with active symptoms and any one of the following:

   • As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR EOP level of care.

   • The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.

   • The inmate-patient requires a neurological/neuropsychological consultation.

   • The inmate-patient requires an inpatient diagnostic evaluation.

   • The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e., coping, daily living, medication compliance) development with increased programming and structured treatment environment.

   • The inmate-patient's psychiatric medication history indicates that a clozapine trial might be useful.

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

- Inmate-patients, who are deemed a significant assault risk, have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner) or present a high escape risk, shall be referred to the SVPP Intermediate Program. CDCR refers to these inmate-patients as high custody inmate-patients.

- The inmate-patient's Global Assessment of Functioning indicates behavior that is considerably influenced by psychotic symptoms; OR serious impairment in communication or judgment; OR inability to function in almost all areas.

- For SVPP only, the inmate-patient is medically appropriate as determined by the receiving prison medical staff. The program psychiatrist will determine mental health suitability. If agreement is not reached refer to the Coordinated Clinical Assessment Team (CCAT) process in Section VI. Any denial for medical reasons will be immediately referred to the, Assistant Deputy Director, CDCR, Division of Correctional Health Care Services (DCHCS).

2. In addition to a primary Axis I disorder, admission to VPP and SVPP shall be considered when:

- The patient engages in ritualistic or repetitive self-injurious/suicidal behavior that has not responded to treatment in a CDCR facility. Without inpatient mental health treatment, the inmate-patient is likely to develop serious medical complications or present a threat to his life.

- The patient is chronically suicidal and has had repeated admissions to a Mental Health Crisis Bed (MHCB).

3. Inmate-patient committed to DMH by the courts as being incompetent to stand trial per Penal Code, Section 1370.

    Inmate-patients who commit an offense while in CDCR, are referred to the District Attorney for prosecution, and are found by the court to be incompetent to stand trial per Penal Code, Section 1370 will first be considered for the SVPP. If there are no custodial or clinical reasons for admission to SVPP, they will then be considered for other DMH programs.

4. Whenever the CDCR institution referring clinician is in doubt concerning the appropriateness of referring a particular patient, or the appropriate DMH program to meet the inmate-patient's custody needs, the referring clinician will discuss the case with the

| Department of Mental Health | Mental Health Services Delivery System |
|---|---|
| Inpatient Program | |

interdisciplinary treatment team (IDTT). If the IDTT does not reach consensus, or does not agree regarding the appropriate DMH program, a case conference shall be scheduled with a clinical facilitator from the headquarters DCHCS office. Case conference calls can be requested by calling the Mental Health Program Specialist at DCHCS headquarters.

5. Inmate-patients shall be eligible for admission to a DMH program regardless of parole date. CDCR will provide all discharge and community planning. CDCR will transfer the inmate-patient from the DMH program to a CDCR institution for release at least one calendar day prior to the release date.

6. Inmate-patients who are serving a Security Housing Unit (SHU) term and are clinically appropriate for placement in an ICF, shall be referred to the sending institution's Institutional Classification Committee (ICC). The IDTT/ICC shall consider suspension of the SHU term.

- When the sending institution's IDTT/ICC decides to suspended the SHU term, the inmate-patient shall be eligible to participate in the entire ICF program upon arrival at the receiving institution.

- It is not necessary for the sending institution's ICC to suspend a determinate or indeterminate SHU term prior to transferring the inmate-patient if the ICC is disinclined to take such action due to safety and/or security concerns. The inmate-patient shall be transferred to DMH with the SHU term in place

- In cases where the sending institution's IDTT/ICC elects not to suspend the SHU term, the inmate-patient may participate in only Phase I of the ICF program. The inmate-patient will be evaluated in Phase I and a decision regarding suspension of the SHU term will be made by the receiving institution's IDTT/ICC.

### *Referral Procedure*

Referrals must be completed within five working days of identification by IDTT if inmate-patient consent is obtained and within ten working days of identification if due process hearing is required.

The following CDCR institutions retain Unit Health Records (UHR) for inmate-patients referred to ASH/PSH. California Men's Colony (CMC) shall retain records of inmate-patients referred to ASH. California Institution for Women (CIW) shall retain records for female inmate-patients referred to PSH.

1. All referrals shall be made on the required referral form – Department of Mental Health

| Department of Mental Health Inpatient Program | Mental Health Services Delivery System |
|---|---|

### Utilization Management (UM)

1. CDCR reserves the right to inspect, monitor, and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to CDCR's inmate-patient. Such reviews shall be undertaken to determine whether the course of treatment or services was prior authorized, medically necessary and performed in accordance with CDCR rules and guidelines. DMH agrees to make available, upon request by CDCR, for purposes of utilization review, an individual patient's medical record and any committee reviews and recommendations related to a CDCR patient.

2. DMH acknowledges and agrees that concurrent utilization management review shall not operate to prevent or delay the delivery of emergency treatment.

3. DMH acknowledges that the care of a patient at DMH shall be reviewed by CDCR Utilization Management (UM) nurses or designated party and by a Joint CDCR/DMH Review Process.

4. CDCR UM nurses or designated party will gather data and review cases of CDCR inmate-patients in DMH programs. CDCR UM nurses or designated party will report their findings and make recommendations to the CDCR Health Care Manager and CDCR Chief Psychiatrist or their designee(s). CDCR and DMH managers or their designees will meet monthly to review the data. Each DMH program also will have a joint CDCR/DMH UM process that will review individual cases.

   If there is a disagreement about discharge, the UM nurse will review the patient's record and forward a recommendation to the Joint CDCR/DMH UM Review Process. If there continues to be disagreement, the recommendation will be conveyed to the CCAT.

### Discharge Criteria

1. The inmate-patient has improved to a degree that further hospitalization is unnecessary, or the primary illness or problem for which hospitalization was required is in substantial remission, and the remaining symptoms are those of a disorder for which continued DMH inpatient care is not necessary, the inmate-patient will be returned to CDCR for ongoing treatment; or

2. Evaluation during hospitalization has resulted in a change of diagnoses such that continued hospitalization is not appropriate or necessary.

3. If requested by DMH, an inmate-patient who has withdrawn informed consent for mental health treatment or psychiatric medication, but for whom continued treatment is

| Department of Mental Health | Mental Health Services Delivery System |
| Inpatient Program | |

otherwise recommended, may be returned to CDCR after all other clinical and legal avenues to obtain authorization to treat have been exhausted, if the following two criteria have been met:

- Withdrawal of informed consent shall be demonstrated by seven calendar days of continuous refusal to take oral medication or 30 calendar days of continuous refusal to accept scheduled depo-injectable medication, and documentation of discussions between treating DMH psychiatrists and other team members and the patient regarding the risks and benefits of continuing medication.

- Documentation that the patient has not met criteria for involuntary treatment for at least the last seven calendar days.

### *Discharge Procedure*

1. Inmate-patients will be returned to the institution from which they came per the "psych and return" policy provided that institution can meet the level of care and security needs of the inmate-patient. Generally most inmate-patients will be returned to an institution that has an EOP. The EOP IDTT may decide to discharge the inmate-patient to a lower level of care after the initial 14-28 day evaluation period.

2. Inmates who are paroling and require ongoing treatment will be referred to the Parole and Community Services Division (P&CSD) Transition Case Management Program and to a Parole Outpatient Clinic or to a State hospital per Penal Code 2974.

3. DMH shall fax a copy of the Discharge Summary to the designated "DMH contact", of the receiving institution at the time of notification of discharge. DMH shall also call the receiving institution. The inmate-patient shall then be returned to the CDCR institution within five working days after the time of notification, or resolution of any appeal, whichever occurs later.

4. Appeals for denial of return to CDCR will be reviewed by the Coordinated Clinical Assessment Team (CCAT), Part V of this document.

5. Emergency returns to CDCR, shall be accomplished within twenty-four hours. Such returns will be with prior notification and approval by telephone of the CDCR institution's C&PR staff and Mental Health Program Director, or designee. DMH shall call the receiving institution to provide continuity of care including medication.

A dictated, typed discharge summary shall follow as soon as practicable, but not more than fourteen days after return.

# EXHIBIT 3

# *MEMORANDUM OF UNDERSTANDING*
## *Intermediate Care/Non-Acute Services*

CALIFORNIA DEPARTMENT OF CORRECTIONS
AND REHABILITATION
AND
CALIFORNIA DEPARTMENT OF MENTAL HEALTH

California Department of Corrections and Rehabilitation and
Department of Mental Health

C. CCAT will also schedule and review all cases where the DMH state hospital or psychiatric program requested additional information and the information has not been received from the referring institution. In these cases, the referring clinician should be prepared to provide, at the time of the CCAT review, any material that has not been provided to DMH.

D. The DCHCS shall schedule case conferences upon request by DMH and/or CDCR clinicians regarding a difficult or perplexing inmate-patient's case, including repeated admissions of the same inmate-patient in a short time frame.

## IX    UTILIZATION MANAGEMENT

A. Utilization Management (UM) is based on an average length of stay of 180 to 240 days for ASH, CSH, PSH, SVPP, and VPP. CDCR reserves the right to inspect, monitor, and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to CDCR's inmate-patients. Such UM reviews shall be undertaken to determine whether the course of treatment or services was previously authorized, medically necessary and performed in accordance with the agreed upon rules and guidelines between DMH and CDCR. DMH agrees to make available, upon request by CDCR, for purposes of UM review, an individual inmate-patient's medical record and any committee reviews and recommendations related to that inmate-patient.

B. DMH acknowledges and agrees that a concurrent UM review shall not operate to prevent or delay the delivery of emergency treatment.

C. DMH acknowledges that the care of an inmate-patient at DMH shall be reviewed by CDCR UM nurses or designated parties and by a joint CDCR and DMH review process.

   1. UM will focus on outcome analysis. The optimum outcome for an inmate-patient treated at DMH is to return them to CDCR at the highest possible level of functioning and their being able to remain in the least restrictive environment.

   2. To measure outcome, each discharged inmate-patient's use of resources (days in ICF treatment at DMH hospitals and psychiatric programs) will be tabulated to assess the effectiveness of any program innovations, i.e., having a higher percentage of inmate-patients placed on Keyhea with regular renewals, wider use of depo (depo-injectable) medications, and instituting policies in which medication regimens that have been successful in stabilizing inmate-patients in the hospital setting are routinely continued by outpatient clinicians (allowing for changes due to compelling reasons).

California Department of Corrections and Rehabilitation and
Department of Mental Health

3.  Information gathered from the data analysis shall be shared between DMH and CDCR. The departments will work together to implement changes indicated by favorable outcome data. The UM staff from each department will collaborate to integrate care between providers and departments in order to achieve bed utilization efficiency, optimal inmate-patient outcomes, and promote continuity across the care continuum.

4.  CDCR UM nurses or designated parties will report their findings and make recommendations to the CDCR HCM, CDCR Chief Psychiatrist (or their designee(s)), and the DMH treatment team. CDCR and DMH managers (or their designees) will meet monthly to review the data.

5.  Each DMH program also will have a joint CDCR and DMH UM process that will review individual cases.

6.  If there is a disagreement about discharge, the UM nurse will review the inmate-patient's record and forward a recommendation to the joint CDCR and DMH UM review process. If there continues to be disagreement, the recommendation will be conveyed to the CCAT. If a CCAT is scheduled by the receiving CDCR treatment team, the UM nurse shall participate in that CCAT.

## X.    RETURN TO CDCR

A.  Criteria for return to CDCR:

1.  If the inmate-patient has improved to a degree that further hospitalization is unnecessary, or the primary illness or problem for which inpatient care was required is in substantial remission, and the remaining symptoms are those of a disorder for which DMH inpatient care is not necessary, the inmate-patient will be returned to CDCR for ongoing treatment; or

2.  Evaluation during inpatient care has resulted in a change of diagnoses such that the DMH program is not appropriate or necessary; or

3.  When further involuntary inpatient care is unnecessary, will provide no further benefit, or a court has denied further treatment (*see also* 4. below) and re-incarceration or release to parole is required, the release or re-incarceration shall be coordinated by the Classification and Parole Representative (C&PR). When appropriate, the C&PR shall ensure notice to CDCR DAPO utilizing a CDCR Form 611, Release Program Study.

4.  If requested by DMH, an inmate-patient who has withdrawn informed consent for mental health treatment or psychiatric medication, but for

Case 2:90-cv-00520-KJM-SCR   Document 4595   Filed 05/09/13   Page 23 of 24
California Department of Corrections and Rehabilitation and
Department of Mental Health

whom continued treatment is otherwise recommended, may be returned to CDCR under PC §2685 after all other avenues to obtain authorization to treat have been exhausted, if the following two criteria have been met:

    a) Withdrawal of informed consent shall be demonstrated by 14 calendar days of continuous refusal to take oral medication or 30 calendar days of continuous refusal to accept scheduled depo-injectable medication, and documentation of discussions between treating DMH psychiatrists and other team members and the inmate-patient regarding the risks and benefits of continuing medication; AND

    b) Documentation that the inmate-patient has not met criteria for involuntary treatment for at least the last 14 calendar days.[1]

B. Inmate-patients returning to CDCR from ASH or CSH will normally return to their sending institution, if that institution has the appropriate level of care (usually EOP). If the sending institution cannot provide the appropriate level of care (EOP, Clozapine therapy, etc.) or if there are enemy concerns or other custody factors prohibiting return to the sending institution, then the assistance of the Health Care Placement Unit will be requested to endorse the inmate-patient for return to an appropriate CDCR facility. Emergency or urgent returns to custody from ASH will be routed initially to CMC, and emergency or urgent returns to custody from CSH will be routed initially to COR, where they will remain until transfer to the most appropriate CDCR facility

C. The treatment team for the inmate-patient being considered for discharge from an ICF level of inpatient care shall consider what lower level of care is appropriate to meet the inmate-patient's mental health needs. The treating physician will clearly document in the Discharge Summary the rationale for their recommendation to a lower level of care, which includes consideration of transfer to the EOP at the receiving CDCR institution.

D. At the time that the DMH Interdisciplinary Treatment Team (IDTT) determines that discharge to CDCR is appropriate and the C&PR's office has designated the receiving CDCR institution, the DMH Forensic office shall contact the DMH Coordinator at the receiving institution to discuss the transfer.

---

[1] The two 14-calendar day time periods expand the time periods set forth in the Mental Health Services Delivery System Program Guide (2009 Revision) from 7 calendar days to 14 calendar days. (Program Guide, pg. 12-6-13.) CDCR and DMH agree that CDCR, in making subsequent revisions to the Program Guide, will take steps to include this expansion in such revisions, unless otherwise modified or rescinded by CDCR and DMH.

California Department of Corrections and Rehabilitation and
Department of Mental Health

availability of inpatient DMH care, and on the admission criteria and procedure for admission to each DMH program.

## XXIV.  PROVISION FOR SERVICES UNDER PC §§ 2960-81

Agreements between CDCR and DMH regarding individuals under PC §§2960-2981 are covered in a separate or separate MOUs between CDCR and DMH.

## XXV.  TERMINATION

CDCR may terminate any program referenced in this MOU in whole or in part, upon 60-calendar days written notice to DMH.  All programs, in whole or in part, not terminated pursuant to this provision, shall remain in full force and effect.

SIGNATORS

SHARON AUNGST
Chief Deputy Secretary
Division of Correctional Health Care Services
California Department of Corrections and Rehabilitation

8-23-10
Date of Signature

CYNTHIA A. RADAVSKY
Deputy Director
Long Term Care Services
California Department of Mental Health

8-18-10
Date of Signature

J. CLARK KELSO
Federal Receiver
California Prison Health Care Services

9-13-2010
Date of Signature

TERRI MCDONALD
Chief Deputy Secretary
Adult Operations

8/24/10
Date of Signature