KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA  94244-2550
 Telephone:  (916) 324-5345
 Fax:  (916) 324-5205
 E-mail:  Debbie.Vorous@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,** | 2:90-cv-00520 LKK JFM PC |
| Plaintiffs, | **DECLARATION OF ELLEN BACHMAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT** |
| v. | |
| **EDMUND G. BROWN JR., et al.,** | |
| Defendants. | |

I, Ellen Bachman, declare as follows:

1.    I am the Executive Director for the Vacaville Psychiatric Program and have worked

in this position since late January, 2012.  I have dedicated my career to management of treatment

of mentally ill patients, having worked in supervisory and management positions with the

California Department of State Hospitals (DSH) for approximately 25 years.  Prior to taking on

supervision and management duties, I was a Music Therapist for 5 years, providing music therapy

groups and recreational activities to state hospital forensic patients.  I have personal knowledge of

1

the facts stated in this declaration, except where indicated otherwise, and if called to testify could

and would do so.  I submit this declaration in support of Defendants' Opposition to Plaintiffs'

Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment.

2.       As the Executive Director of the Vacaville Psychiatric Program, I oversee all

clinical programs and administrative services and I work collaboratively with the California

Medical Facility Warden and Chief Executive Officer of Health Care to ensure that we provide

quality patient care in a safe and secure environment.  I am aware of the staffing and treatment

modalities and am committed to maintaining and enhancing the comprehensive, innovative

mental health treatment programs we operate at the Vacaville Psychiatric Program.

**The Vacaville Psychiatric Program is Not "Disguising" the Acute Waitlist or Mismanaging any of its Existing Inpatient Units, Including the L-2 Unit.**

3.       Care in the Acute Psychiatric Program involves a dynamic and constant flow of

patient referrals, evaluations for placement, admissions, and discharges.  When patients are

referred to Vacaville for acute care they must be evaluated for placement, which involves review,

evaluation and determination of appropriate placement within our facility based on clinical and

other factors.

4.       The list of 38 patients as of May 8, 2013, who are pending placement includes 20

individuals who were referred more than 10 days ago.  Those patients have been pending

placement for a longer period because our triage process, which prioritizes suicidal and self-

injurious patients for admission, has required that other patients with urgent needs be admitted

ahead of these less acute patients.

5.       In addition, while we make every effort to expeditiously evaluate and place

referred patients, the triage process requires that inmates' clinical needs dictate placement, rather

than the date of referral.  The triage process is absolutely necessary to ensure patient care,

although this priority means that those patients with less acuity must sometimes wait somewhat

longer for placement.

2

6.      Under the triage process, individuals referred as a result of a suicide attempt, or self-injurious behavior, are the highest priority for admission.  Individuals who are expressing suicidal ideation are the second priority for admission.  Individuals who are referred due to psychiatric or behavioral reasons but are not displaying suicidal or self-injurious behavior or ideation are the third priority for admission.  Those individuals who are in Mental Health Crisis Beds are also granted placement priority over individuals in Enhanced Outpatient Program housing units.  The rationale is that individuals in a Mental Health Crisis Bed have a higher acuity level, and if individuals in Enhanced Outpatient Program require immediate services, they will be referred to a crisis bed.

7.      Moreover, all patients pending acute placement still receive psychiatric treatment, and the majority of patients currently pending acute placement are being treated at Department of Corrections and Rehabilitation crisis bed facilities.  Of the 38 patients who are currently pending acute placement, only one is in an Enhanced Outpatient Program unit.

8.      Because of the constant flow of patients, a static examination of the total number of patients who have been referred, but not yet admitted, on two separate days is incomplete and misleading.  Simply put, the patients who have been referred and are being evaluated on a given date are not the exact same patients who have been referred and are being evaluated two weeks later, because many, if not all, patients will have been admitted and new patients will have been referred for evaluation.

9.      We closely monitor the rates of referrals, admissions, and discharges to determine our ability to expeditiously place referred patients.  When we observe an increase in the numbers of referred, but not yet placed patients, we take all reasonable steps to address the situation.  Plaintiffs' accusation that the opening of an additional unit in the L-Wing was "not dictated by clinical requirements," but rather by "shuffling staff and patients between units in a frantic attempt to manipulate [my] staffing and waitlist data" (Pls.' Mot. at 25), is patently false.  Instead, it was motivated by a desire to provide quality patient care in a safe and secure environment.

10.     The L-Wing is three units (L-1, L-2 & L-3) currently operated by the Vacaville

Psychiatric Program as a temporary unlicensed intermediate care facility.  Because Unit L-2 is not

an acute unit, individuals pending acute admissions are not admitted to L-2.  However, as

explained below, opening up an additional unit in L-Wing (L-2) also addresses inmates pending

admission to acute beds.  Although Plaintiffs criticize Vacaville's opening up of a new unit in L-2

to assist in addressing the acute wait list, this criticism is misplaced and fails to recognize the

discretion necessary for our program to manage patient movement while simultaneously running

the various inpatients programs. CDCR and DSH activated the L-Wing and began patient

admissions on July 2, 2012.  Based on need, CDCR and DSH initially placed patients only on one

floor of L-Wing (L-3).  However, in anticipation of eventually housing inmates in all three floors,

DSH requested, and received, authorized staffing for all three floors, and has been hiring for those

positions as needed.  L-3 was fully occupied by October 31, 2012.

11.     On March 6, 2013, after closely monitoring the referral, placement, and discharge

rates since early January for acute inmates, the department determined that it was necessary to

open up L-2 to, in part, increase capacity for acute inmates discharging to intermediate care.  Our

first patient was accepted on March 20, 2013, and we are now admitting patients on a continuing

basis.  The L-2 census on May 8, 2013, was 23.  L-2 has a full complement of nursing staff and

one interdisciplinary treatment team at this time.

12.     The patients in our acute programs are routinely evaluated and identified for

discharge readiness or transition to intermediate care.  As a result, patients in need of intermediate

care facility placement are routinely transferred from an acute unit to an intermediate care facility

unit on a clinically appropriate basis, which then opens up acute beds for inmates pending

admission. These transfers are in addition to the regular discharge of patients who are ready for

return to an Enhanced Outpatient Program level of care at their sending institution.

13.     When the L-2 unit was activated in March 2013, the first patients admitted were

already in the intermediate care facility units at Vacaville, primarily in the P-3 unit.  This

provided Vacaville with the ability to integrate newly referred patients from the acute program

4

into the treatment milieu in both P-3 and L-2 so that both units would have a mix of more stable, longer-term intermediate care facility patients and new intermediate care facility referrals. Beginning a unit with entirely new admissions can lead to a high acuity level and a less stable environment for the patients. As we have been filling beds on L-2, we have carefully screened referred acute patients for placement in the various intermediate units based on clinical and custody factors to ensure their successful transition from an acute to intermediate level of care.

14.    In addition to carefully determining the appropriate patient mix to admit to L-2, we worked closely with the California Department of Public Health Licensing and Certification Branch on a request for program flexibility. Under licensing requirements, the transfer of a patient from acute to intermediate care would generally require us to close the patient's medical record and open up a new record. The department approved our request for program flexibility with respect to this process, which has allowed us to transfer patients between our acute and intermediate care facility units without closing the medical record and re-opening a new record, in essence avoiding a full discharge and admission process. This significantly reduces the amount of unnecessary paperwork to be completed by our clinicians without negatively impacting patient care. Expediting quality treatment is a priority at Vacaville and we were successful in negotiating this adjustment in documentation requirements with the department in order to facilitate continuity of care as our patients' transition from one level of care to another within the Vacaville Psychiatric Program. Contrary to Plaintiffs' accusation, we have not and are not using this process as a means to transfer patients absent clinical justification. Nor are we "mismanaging" this or any other existing units in our program, as they assert.

**Vacaville Psychiatric Program Bases its Discharges on Clinical Need.**

15.    Discharge planning and determination of discharge readiness is a process that begins at admission to ensure that patient discharges are based on appropriate clinical rationale. A patient's primary treatment needs are identified in the admission assessment process and are outlined in the initial and master treatment team conferences. The interdisciplinary treatment team develops the patient's treatment plan, which includes treatment goals and discharge criteria.

5

Throughout the course of treatment, the treatment plan, including discharge criteria, is reevaluated and revised as clinically appropriate.

16.     When the treatment team determines a patient is ready for discharge the treating psychiatrist prepares a recommended continuing care plan/discharge summary.  The discharge summary includes a thorough history of the patient's treatment at DSH, including the diagnoses on referral and admission, course of treatment pursued and progress made, status at the time of discharge, and an explanation of the clinical determination that discharge is appropriate.  Our Utilization Management processes focus on whether patients have met discharge criteria and are appropriate for transfer or discharge to a lower level of care.  This is a clinically driven process, and should not be portrayed as pressuring clinicians to prematurely discharge patients.

17.     The *Coleman* Program Guide defines the Vacaville acute program as a "short-term, intensive-treatment program with stays usually up to 30 calendar day to 45 calendar days." (Program Guide 12–6–2.)  The memorandum of understanding between CDCR and DSH considers 180 to 240 days as the average length of stay for utilization management purposes. Often times, however, we find that our patients require stays even beyond the 30 to 45 and 180 to 240 days, respectively. Any suggestion that we pressure clinicians to premature discharge patients is belied by the length of stay data.  Length of stay data provided by DSH headquarters reflects that the length of stay for 188 acute patients discharged between February and April 2013 averaged 104 days (with a median of 84), and that 149 patients stayed over 50 days, with 2 patients over 300 days.  The data also reflects that the length of stay for 79 intermediate care patients discharged between February and April 2013  averaged 219 days (with a mean of 188 days), and that 31 of the patients had stays longer than 250 days, with 6 longer than 500 days.

**The Vacaville Psychiatric Program is Adequately Staffed.**

18.     The Vacaville Psychiatric Program is not experiencing a critical shortage of clinical staff and we are providing quality care and meeting licensing requirements in all classifications of clinical staff.  Our current staff psychiatrist allocation is 27.5 positions.  We currently have 20 psychiatrists on staff carrying caseloads, including 5 contract psychiatrists.  We

6

also have an additional 1.0 equivalent provided by 2 contract psychiatrists and 2 state

psychiatrists who work an additional 10 hours per week each.  We have one psychiatrist on long

term medical leave, not reflected in the total numbers above.

19.    A review of our total employee vacancy rates as reported in the monthly vacancy

report attached as Exhibit 4 to the Rifkin Declaration is misleading because it includes positions

associated with unit L-1, which has not been activated.  As a result, the total vacancy rates appear

higher than the actual number of staff needed to meet licensing minimums and staff our units at

the acute and intermediate levels.  In addition, the vacancy rates show a high number of

psychiatric technician vacancies.  Vacaville added the psychiatric technician classification to its

staffing mix with the L-wing expansion, including unit L-2 which is being activated at this time,

and unit L-1 which has not been activated.  We have not needed to fill many of these psychiatric

technician positions thus far because we have appropriate levels of staffing coverage with the

existing number of medical technical assistants.  However, with the L-2 activation we are in the

process of hiring additional psychiatric technicians because the process for hiring medical

technical assistants can take up to a year.  Interviews with 48 applicants occurred the first week of

May.

20.    In order to maintain our staffing and address any anticipated or unanticipated

departures, we actively recruit for clinical classifications including psychiatrists, psychologists,

social workers, rehabilitation therapists, registered nurses, and psychiatric technicians on an

ongoing basis.  We are conducting interviews at this time to fill vacancies.  Some of these

vacancies are related to activating L-2 and others are a result of normal attrition.  Interviews took

place in April for clinical social workers, psychologists, registered nurses, rehabilitation therapists,

and supervising registered nurses.

**The Vacaville Psychiatric Program has the Necessary Supply of Soap, Clothing, and Linens to Meet Patients' Needs.**

21.    Vacaville does not have a shortage of soap.   CMF has established a par level

inventory system for unit medical supplies, which includes soap.  All of our units are issued an

appropriate stock of soap in accordance with the par level system.  The unit Supervising

7

Registered Nurses confirmed that they have adequate supplies of soap in accordance with the par level system.  Historically, Vacaville has experienced shortages of clothing and linens, but this situation was corrected through a collaborative effort involving the California Medical Facility business services and healthcare leadership and Department of State Hospital management staff. Systems were developed to determine the necessary "par level" of clothing and linen for each unit and to ensure that clothing is provided in the appropriate sizes when new patients arrive. Clothing and linen needs are reviewed on a weekly basis.  At my request, a review of each unit's clean linen room on April 19, 2013, indicated that all units have an adequate or more than adequate supply of clothing.

### Treatment of Condemned Inmates at the Vacaville Psychiatric Program.

22.    I am familiar with the acute program operated at Vacaville for the condemned inmates.  It is my understanding that once San Quentin State Prison started providing services to the condemned inmates under their Specialized Treatment plan, acute admissions have substantially decreased.  In addition, the Positive Behavior Support Team at Vacaville offer consultative services to condemned inmates, which include record reviews, extensive interviews with patients, drafting of behavior plans, tours of patients' living units, and consultation with San Quentin staff.  An example is one patient who was referred to San Quentin in April 2011 and provided behavior services, did not require services again until April 2013.

23.    Treating condemned inmates at Vacaville is extremely challenging due to their unique status as death-row inmates.  According to department policy on housing and treating condemned inmates in the Acute Psychiatric Program, condemned inmates can only be housed in the Q-3 unit due to the additional security provided by the grill gates.  The inmate must be housed in a cell between the grill gates.  The inmate cannot come in direct contact with any other patients, and is separated from the other patients by a locked door or grill gate at all times.   A minimum of two correctional officers or one correctional officer and a medical technical assistant must be present whenever a condemned inmate's cell door is opened.  The condemned inmates are escorted with waist constraints and leg irons at all time.  In addition, all treatment for condemned

8

inmates is provided individually and under direct supervision.  Condemned inmates cannot participate in group therapies or other activities with the other patients.

24.     In addition, treating even one condemned patient on the acute unit has a significant impact on the provision of care to the other 29 patients on the unit.  Because the unit has one day room that is used for groups, individual sessions, and treatment team meetings, it is very difficult to provide treatment to a condemned patient within the specifications described above without reducing group or individual treatment for the other patients.  In addition, when the condemned inmate is out of his cell or his cell door is open, the other patients must be locked in their cells or separated from the condemned inmate by a locked grill gate or door.

25.     Applying the same protocols for treatment of condemned inmates in our intermediate care program would reduce access to care for the other patients living on the designed treatment unit.  Given that intermediate treatment is long term, with lengths of stay 180 to 240 days or more, inclusion of even one or more condemned inmates in the intermediate care facility milieu would have a profound impact.  In our 64-bed high custody Intermediate Treatment Center, providing individual treatment for a condemned inmate would require having all 63 other patients behind a locked door or gate (in a cell, group room, or yard) before escorting the condemned patient out to a treatment area.  This process would need to be repeated to return the condemned inmate to his cell.  The overall treatment milieu would slow down significantly during these escort periods.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.  Executed in Vacaville, California on May ___, 2013.

_____/s/ E. Bachman_____

Ellen Bachman

*(original signature retained by attorney)*

Decl. Bachman Supp. Defs.' Opp'n to Pls.' Mot. for Enf. Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)