KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 1300 I Street
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>                              Plaintiffs,<br><br>     v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                              Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**DECLARATION OF BRIAN DUFFY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT CARE** |

I, Brian Duffy, declare as follows:

1. I am the Acting Warden at California Medical Facility (CMF) in Vacaville, California. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Care. I have personal knowledge of the facts stated in this declaration and if called to testify could and would do so.

///

1

2. Prior to my career with CDCR, I worked for five years for a Contract Lobbyist firm representing legislative interests of local government and health care companies before the California State Legislature and State regulatory agencies. In 1993, I started with CDCR as a Correctional Officer, subsequently promoting twice over the next several years. In approximately 2006, I took a training and development position as a Correctional Health Services Administrator II at CMF. In 2007, I promoted to Captain and, in 2009, I promoted again to Associate Warden, serving as the Special Assistant to the Undersecretary of Operations. In July 2011, I transferred back to CMF and took the position of Acting Chief Deputy Warden. In June 2012, I promoted to my present position of Acting Warden of CMF and I have served in this capacity since that time.

3. In my role as an institution Warden, I am committed to ensuring that the inmates within my custody are treated with respect and have access to adequate health care, including mental health care. This includes those inmates who are admitted as inpatients to the Vacaville Psychiatric Program managed by the Department of State Hospitals (DSH) here at CMF. I hold my staff to high expectations in meeting these commitments, and communicate those expectations to them on a continual basis. Each business day, I meet with DSH management and program staff to discuss bed utilization in their programs.

4. On page 18, lines 22-24 through page 19, lines 1-26, of Plaintiff's Motion for Enforcement, filed April 11, 2013, Plaintiffs allege that inmates in some DSH programs are denied basic human needs such as access to soap for showers, clean clothing and bedding, and timely laundering services. At CMF, our institution provides for an adequate supply of clothing and soap, and DSH staff distributes the clothing and soap to their inmate-patients. Laundry is handled by the Prison Industry Authority, which is run out of CSP-Solano. CMF has no issues in these areas at this time.

5. On page 10, lines 15-24, of Plaintiff's Motion for Enforcement, filed April 11, 2013, Plaintiffs suggest that certain condemned inmates presently receiving treatment at San Quentin State Prison should instead be transferred to DSH programs for intermediate care facility inpatient treatment. This proposal raises a number of concerns related to the care and treatment of both the

2

Duffy Decl. Supp. Defs' Opp'n. to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)

condemned inmates and other intermediate care patients as well as to the safety and security of our institution.

6. CMF does presently accept condemned inmates into our acute Vacaville Psychiatric Program. However, because the condemned inmates are often high-notoriety cases, they run a significantly greater risk of being victimized when they are placed in an environment that has general population (non-condemned) inmates. Alternatively, condemned inmates may victimize our other inmates. Thus, for both the protection of the condemned inmates as well as our other acute patients, the condemned inmates in the acute program presently require complete separation from other populations, both in housing and treatment. Specifically, condemned inmates must be physically separated at all times from all other inmates by either a locked door or a grill gate. Additionally, two custodial staff members, who can be either officers or medical technical assistants, are required to open the cell of or provide escort to any condemned inmate and, when out of cell, condemned inmates must be placed either in handcuffs or waist chains, depending on the destination of the escort. As such, CMF is required to hire additional custody staff for both programming and escorts of condemned inmates in the acute psychiatric program due to their custody levels and to provide safety and security for all inmates and staff. I also note that, if a condemned inmate at CMF required outside emergency hospital services, the inmate would be required to transfer in full restraints, escorted by one armed and one unarmed officer and followed by a Sergeant in a separate vehicle.

7. The same would be true if CMF were required to admit condemned inmates into the intermediate care program. CMF would need to provide enhanced security to prevent mixing of condemned and non-condemned inmates, which would require additional escort and housing officers with the intermediate inpatient program. This would require the hiring of additional custody staff for each condemned inmate admitted to the program. In addition, because the populations must be separated, condemned and non-condemned inmates would have to compete for programming space, which could lead to a decrease in program time availability for all inmates in the intermediate care facility units.

///

8. Moreover, even with additional staff, inmate movement would be impacted due to the presence of condemned inmates, which would in turn negatively impact program delivery. At CMF, the institution is constructed with one long corridor connecting all housing units. For an inmate to receive medical and dental appointments or attorney visits, or to be processed in or out of the institution, the inmate must be escorted down the main corridor. For the safety of the condemned inmates as well as the other inmates at CMF, each escort of a condemned inmate down the corridor would necessarily halt the ability of CMF to move general populations inmates to their programs/clinical appointments for a minimum of approximately 10 minutes each time a condemned inmate moved. At present, CMF is able to absorb these additional security requirements for those condemned inmates in the acute psychiatric program because the number of condemned inmates in this program has historically not exceeded two inmates at any one time, and because these inmates do not participate in group treatment, only individualized treatment. In contrast, admitting condemned inmates into the intermediate program raises different concerns in that a higher number of inmates may transfer to CMF, which would increase the number of times the institution's programming would need to be locked down during any condemned inmate movement. As a result, non-condemned inmates in the intermediate care facility programs would be negatively impacted in their ability to program as these inmates would not be allowed to move or program at times the condemned inmates are moving through the institution for programming or appointments. Furthermore, as noted above in paragraph 7, to remain separated from the remaining populations, condemned inmates would compete for treatment space.

9. Additionally, the DSH program utilizes a group system as inmate-patients move through their behavior modification program. Since condemned inmates must be separated from regular population inmates, DSH would have to modify their system to accommodate condemned inmates, thereby further negatively impacting the delivery of services overall. Moreover, since condemned inmates must be single celled in a cell between two grill gates, condemned inmates in the intermediate care program would be limited to the 64-bed unit located outside of our main institution building. This unit is split into four quads, each containing 16 beds. To properly maintain separation, acceptance of condemned inmates would require CMF to designate one

4

entire 16-bed quad for use only by the condemned population. Such designation would reduce the availability of DSH beds for all inmates because it would prevent any unfilled beds in this unit from being utilized by non-condemned inmates referred for DSH treatment.

10. Another concern is that the condemned inmates often have active court cases and, as such, need access to an extensive law library. CMF only has one legal law library. Because the condemned inmates must remain separate from the non-condemned inmates, the use of the library by the condemned inmates would negatively impact the ability of all other inmates at CMF to access these resources.

11. Receiving condemned inmates would also further adversely impact the visiting program for CMF, due to our institution's limited non-contact visiting space and the additional security precautions that would be required to accommodate these inmates. Specifically, the use of our visiting space must already be divided between the enhanced outpatient and general populations, which cannot be mixed. The condemned population creates a third population requiring seclusion from the other populations, who require accommodation in the visiting space. A substantial increase in this population would severely limit the available usage for the remaining inmates, adversely impacting their current access to the visiting program.

 I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Vacaville, California on May 8, 2013.

                                                    /s/ B. Duffy

                                                    Brian Duffy

*(original signature retained by attorney)*

5

Duffy Decl. Supp. Defs' Opp'n. to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)