KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
Supervising Deputy Attorney General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
WILLIAM DOWNER, State Bar No. 257644
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 324-5345
 Fax: (916) 324-5205
 E-mail: Debbie.Vorous@doj.ca.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN JR., et al.,<br><br>                              Defendants. | 2:90-cv-00520 LKK JFM PC<br><br>**DECLARATION OF RANDOLF GROUNDS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT CARE** |

I, Randolf Grounds, declare as follows:

1. I am the Warden at Salinas Valley State Prison (SVSP) in Soledad, California. I submit this declaration in support of Defendants' Opposition to Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Care. I have personal knowledge of the facts stated in this declaration and, if called to testify, could and would testify to the matters herein.

///

1

2. I have worked at CDCR since 1991, and have been the Warden at Salinas Valley State Prison since July 2012. Prior to my career with CDCR, I worked for 11 years with the Eldorado County Probation Department. In 1991, I started with CDCR as a Correctional Counselor, subsequently promoting twice over the next five years. From approximately 1999 to 2003, I worked with Classification issues both at headquarters and in an institution. After promoting to Facility Captain, in approximately 2006, I transferred to SVSP and promoted to Associate Warden. I transferred again to California State Prison – Solano in 2008, where I began working as the Chief Deputy Warden. In December 2008, I transferred to the Correctional Training Facility in Soledad, where I was promoted to Warden, and in July 2012, I accepted my current position as Warden over SVSP.

3. In my role as an institution Warden, I am committed to ensuring that the inmates within my custody are treated with respect and have access to adequate health care, including mental health care. This includes those inmates who are admitted as inpatients to the Salinas Valley Psychiatric Program managed by the Department of State Hospitals (DSH) here at Salinas Valley State Prison. I hold my staff to high expectations in meeting these commitments, and communicate those expectations to them on a continual basis.

4. All inmates admitted to the Salinas Valley Psychiatric Program are placed on a custodial "Orientation" status until they receive an individualized Institution Classification Committee meeting to determine whether they can be cleared for full participation from a custodial perspective, following a complete review of the inmate's institutional record and case factors. These classification committee meetings are required to occur within 10 business days of admission.

5. The Institutional Classification Committee clearing process is extremely important because it protects the safety of the inmate, the other inmates in the program, and the staff who manage the program. Therefore, in preparation for these meetings, the caseworker reviews the placement score, enemy issues, confidential enemy issues, past disciplinary history and related Security Housing Unit terms, substance abuse history, cell status, any ADA assistance requirements, educational levels, time remaining to serve, any possible Security Threat Group

2

Grounds Decl. Supp. Defs' Opp'n. to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)

concerns, arrest history, parole concerns, and numerous other case factors that can present themselves. Additionally, clinical input from DSH clinicians is discussed. This information is all thoroughly reviewed at each inmate's classification committee meeting so that the custodial and clinical staff can together reach an informed decision regarding whether, from a custodial perspective, the inmate can safely fully participate in the Salinas Valley Psychiatric Program.

6. This custodial review process is separate from the individualized clinical assessment process. Upon inpatient admission to the Salinas Valley Psychiatric Program, an inmate begins at Stage 1, the first clinical Stage of the DSH program. The inmate receives two Interdisciplinary Treatment Team meetings, the first within 72 hours and the second within 10 business days, in which the clinical staff conducts initial assessments and determines the treatment plan. During these meetings, clinical staff also works to assess the inmate's clinical ability to participate in the DSH inpatient program, reviewing such factors as behavioral issues and medication compliance, to determine when the inmate can clinically move to Stage 2 of the DSH program.

7. On page 17, lines 9-11, of the Plaintiffs' Motion for Enforcement, filed April 11, 2013, the Plaintiffs stated their belief that "Level 1 restrictions appear to be based wholly upon asserted custodial concerns, and cannot be overridden by clinicians, despite the fact that DSH programs are intended to be run as psychiatric hospitals." This statement is wholly incorrect. As described above in paragraph 6, Level 1 refers to the first clinical stage of programming, decisions about which are made solely by the patient's treatment team. The clinical Interdisciplinary Treatment Team and custodial Institutional Classification Committee reviews are conducted separately as they constitute the review of different factors and serve different purposes. The custodial review ensures that the inmate is correctly and safely housed based on institutional case factors and the clinical review determines when the inmate is clinically ready to progress to the next stage of programming. However, clinicians also have a significant role in the Institutional Classification Committee meetings as the clinical input significantly affects the determinations of safety and security during the custodial review. Consequently, clinical staff attends every Institutional Classification Committee meeting and are expected to ask questions of the inmate and contribute a clinical perspective on the inmate's ability to safely program. Thus,

3

both the clinical and custodial reviews are heavily based on individualized clinical input regarding the inmate.

8. In paragraph 4 of their proposed order, also filed April 11, 2013, Plaintiffs request that the Court mandate that defendants "stop using Level I status, or any equivalent status, on a blanket basis for newly-admitted patient in DSH programs for CDCR prisoners. Any custodial restrictions applicable only to newly-admitted patients must be based on specific individualized assessments that include clinical input and must be reviewed and renewed in writing every three days." This suggestion raises numerous concerns.

9. First, many inmates received into the Salinas Valley Psychiatric Program are the most behaviorally and emotionally challenged inmates in the CDCR. As such, it is vital that the safety and security aspects of due process be acknowledged with a cuff status period until the interdisciplinary treatment team and classification committee evaluations occur. Moreover, these evaluations are best conducted upon the inmate's arrival in the DSH program here in Salinas Valley. The DSH clinicians' specific expertise and familiarity with their program provides them with the best insight into the inmate's ability to safely program from a clinical perspective in their intermediate care program. Likewise, the classification committee evaluations are necessary because they constitute an individualized review of the unique custodial and clinical factors present by Salinas Valley staff, who is most familiar with this institution.

10. Second, my staff already strives to conduct the classification committee meetings for new Salinas Valley Psychiatric Program inmate admissions as quickly as possible. Since January 1, 2013, these classification committee meetings have, in fact, been held in an average of 7.2 business days. However, this is a time-intensive process with several due process time constraints that, for the remaining cases, requires the full 10 business days. For example, a staff assistant must be assigned to the inmate-patient at least 72 hours prior to the classification committee meeting. Additionally, the custodial review process involves the assignment of a caseworker, an interview between the inmate and the Correctional Counselor, a full review by DSH clinical staff, and the time-intensive process of the caseworker reviewing and preparing all of the case factor information I noted above in Paragraph 5 of this declaration. Often, extensive

4

casework must be completed and may involve Teletype coordination with the sending institution via the Classification Services Unit. Moreover, each Institutional Classification Committee meeting involves numerous considerations and dialogues in which all committee members, custodial and clinical, have the opportunity to contribute as well as the inmate himself.

11. While our institution will continue to strive to hold each Institutional Classification Committee meeting as quickly as possible, it is simply not feasible to hold all the meetings in a more expedited timeframe. If forced to expedite timeframes, this would substantially hinder staff's ability to make well researched and fully informed decisions as staff would not have sufficient time to prepare. As explained above, failing to individually assess each inmate's ability to program safely from both a custodial and clinical standpoint greatly endangers not only the individual inmate himself, but also the other inmates and staff in our institution. Thus, if forced to make such a determination without having all of the necessary information to meet expedited timelines, our classification committees would be forced to default to retaining an inmate on Orientation status until the case could be fully researched to best protect all inmates and hospital staff within the Salinas Valley Psychiatric Program. This would, in turn, likely have the unintended affect of delaying the time in which our staff could reasonably clear the inmate-patients for full participation.

12. On page 18, lines 6-11, of plaintiff's Motion for Enforcement, filed April 11, 2013, plaintiffs reference the suicide death of an inmate in the Salinas Valley Psychiatric Program, which occurred on November 29, 2012. It is true that, in this case, the Institutional Classification Committee did not occur within the required 10 business days. In response to this case, I personally conducted an investigation in to our institution's compliance with the timeliness of the initial committee meetings for the new Salinas Valley Psychiatric Programs, and held a meeting with my management staff on or about January 15, 2013, to stress my expectation that all classification committee meetings be conducted as quickly as possible, but no later than within 10 business days. As a result of this meeting, since January 1, 2013, 100% of classification committee meetings for new Salinas Valley Psychiatric Program admissions have been conducted within the required 10 business days. Moreover, though Salinas Valley tracks all Institutional

5

Classification Committee meetings, I have personally continued to monitor this process on a monthly basis by requesting the tracking data so that I can ensure Salinas Valley continues in its efforts to hold these committee meetings as required.

13. On page 18, lines 22-24 through page 19, lines 1-26, of Plaintiff's Motion for Enforcement, filed April 11, 2013, Plaintiffs also allege that inmates in the Salinas Valley Psychiatric Program are denied basic human needs such as access to soap for showers, clean clothing and bedding, and timely laundering services. Clean clothing, sheets, blankets, coats, and soap are all presently available in our warehouse and, upon DSH request for supplies, are distributed to the DSH psychiatric program for distribution to the inmates.

14. On page 10, lines 15-24 of Plaintiff's Motion for Enforcement, filed April 11, 2013, Plaintiffs suggest that certain condemned inmates presently receiving treatment at San Quentin State Prison should instead be transferred to DSH for intermediate care facility inpatient treatment. This proposal raises a number of concerns related to the care and treatment of both the condemned inmates and other patients in the Psychiatric Program as well as to the safety and security of our institution.

15. First, because the condemned inmates are often high-notoriety cases, they run a significantly greater risk of being victimized when they are placed in an environment that has general population (non-condemned) inmates. Alternatively, condemned inmates may victimize our other inmates. Thus, for both the protection of the condemned inmates as well as our other patients, the condemned inmates would require separation from other populations, both in housing and in group treatment. Specifically, condemned inmates must be physically separated at all times from all other inmates by either a locked door or a grill gate. As a result, the prison would need to provide enhanced security to prevent mixing of condemned and non-condemned inmates, which would require additional escort/housing Officers in the program. Additionally, even with additional staff, inmate movement would be impacted due to the presence of condemned inmates, since we cannot mix the populations. For example, inmates can be ducated for medical, dental, or other appointments, attorney visits, or be processed in or out of the institution. For the safety of the condemned inmates as well as the other inmates at Salinas

6

Grounds Decl. Supp. Defs' Opp'n. to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)

Valley, each escort of a condemned inmate through a housing unit would necessarily halt the ability of Salinas Valley to move general population inmates to their programs or clinical appointments each time a condemned inmate moved. Thus, in turn, could negatively impact program delivery.

16. For the same reason, condemned inmate's medical issues could similarly endanger these inmates because, if medical needs are treated in our Correctional Treatment Center where General Population inmates would be present, this would compromise the safety of both the condemned and non-condemned inmates. Additionally, transferring the inmates to an outside hospital increases the risk of harm or a possible escape attempt since neither our correctional officers nor our local hospitals are as familiar with the condemned inmate population as those associated with San Quentin.

17. Additionally, the DSH program utilizes a group system as inmates move through their behavior modification program. Since condemned inmates must be separated from regular population inmates and cannot program with them, DSH would have to modify their system to accommodate condemned inmates, thereby further negatively impacting the delivery of services overall. And due to the security concerns, the Institutional Classification Committees would be unable to allow condemned inmates to program without restraints. Moreover, since condemned inmates must be single celled in a cell between two grill gates, condemned inmates in the intermediate care program would be limited to either the TC1 or TC2 housing units. Housing unit TC1 contains three wings with either 10 or 12 single cells, and housing unit TC2 consists of four 16-bed wings containing mostly single cells and some double cells. To properly maintain separation, acceptance of condemned inmates would likely require Salinas Valley to designate one of the 16-bed single-cell wings in TC2 for use only by the condemned population. Such designation would reduce the availability of DSH beds for all inmates because it would prevent any unfilled beds in this unit from being utilized by non-condemned inmates referred for DSH treatment..

18. Another concern is that the condemned inmates often have active court cases and, as such, need access to an extensive law library. DSH has a limited library in comparison with the

7

Grounds Decl. Supp. Defs' Opp'n. to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)

more extensive law library resources normally available to condemned inmates at San Quentin State Prison, which could negatively hinder these inmates with their respective court cases. Additionally, relocation to Salinas Valley could impede the attorneys of these inmates in visiting with their clients regarding their cases, as these inmates would now be located a significant distance away.

19. Receiving condemned inmates would also adversely impact the visiting program for the Salinas Valley State Prison, due to the additional security precautions that would be required to accommodate these inmates. Specifically, the use of our visiting space must already be divided between the enhanced outpatient and general populations, which cannot be mixed. The condemned population would represent a third population requiring seclusion from the other populations, who require accommodation in the visiting space. This would limit the available usage for the remaining inmates, adversely impacting their current access to the visiting program.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed in Soledad, California on May 8, 2013.

Randolf Grounds

*(original signature retained by attorney)*

8

Grounds Decl. Supp. Defs' Opp'n. to Pls.' Mot. for Enf. of Ct. Ord. & Aff. Relief
(2:90-cv-00520 LKK JFM PC)