DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
REBEKAH EVENSON – 207825
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, California  94107-1389
Telephone:    (415) 864-8848

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
LAURA BOYSEN-ARAGON – 248083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

WARREN E. GEORGE – 053588
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California  94111-4067
Telephone:    (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G BROWN, JR., et al.,<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM P<br><br>**THREE JUDGE COURT**<br><br>**DECLARATION OF JAMES AUSTIN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' POPULATION REDUCTION PLAN**<br><br>Case No. C01-1351 TEH |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>Defendants. | **THREE JUDGE COURT** |

[711135-1]

I, James Austin, declare:

1.    I am a criminologist retained by Plaintiffs' counsel in this action.  I have previously submitted expert reports in this action, and have testified before the Court.  My resume and qualifications are on file with the Court.  I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.  I make this declaration in support of Plaintiffs' Response to Defendants' Population Reduction Plan.

2.    I was asked by Plaintiff's counsel on October 11, 2012 to work with the CDCR research staff (specifically Jay Atkinson, Chief of the Offender Information Services Branch) to develop by January 7, 2013 a range of options that would allow the CDCR to safely reach the Court ordered population level by June 27, 2013.

3.    On January 7, 2013, I submitted a declaration estimating the impact of various population reduction measures.  Those estimates were based on data files that CDCR provided to me initially on November 21, 2012, subsequent updates to these files, and on information about the State's population reduction plan that was presented on December 13, 2012.

4.    CDCR and I differ about the impact of the various options.  On May 2, 2013, CDCR submitted the declaration of Jay Atkinson purporting to describe the differences between CDCR's calculations and my calculations.  Mr. Atkinson's declaration was based on CDCR's Spring 2013 Population Projections, information that was not available at the time I completed my January 7, 2013, declaration.

5.    Overall, the CDCR estimates are considerably lower than mine.  The main reasons for this are 1) that CDCR would restrict the eligibility for the various programs, and 2) the CDCR would make each of the programs prospective only, while my estimates assumed retrospective application.

6.    However, even when the CDCR makes retroactive estimates their numbers are so low they lack credibility.

AUSTIN DECL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFS' POPULATION REDUCTION PLAN
CASE NOS. CIV S 90-0520 LKK-JFM P, 01-1351 TEH

7.     For example, on the proposal to divert people incarcerated for felony probation violations, the CDCR data files showed that as of November 30, 2012 there were 3,128 such prisoners.  The proposal is to not allow these people to be admitted to the CDCR in the future.  Because my proposal is to make the reform retroactive, all 3,128 would be quickly removed from the CDCR and returned to the counties for whatever sanctions they choose to apply.  I use a 20% discount to take into account the possibility the county courts in the future may find a way to resentence some of these people to state prison which reduces the impact to 2,502.  Conversely, the CDCR estimates that the very same policy would only impact the CDCR by 46 inmates if implementation begins on July 1, 2013 and is not retroactive.

8.     Another example is my estimate regarding drug possession cases reclassified as misdemeanors.  There are approximately 2,500 in CDCR today.  Obviously if they were prohibited from being admitted to prison and the law was made retroactive the population would decrease by that amount immediately.  The CDCR estimates of the impact of such a law is only 44 by December 31, 2013.  Eventually they reach my same estimate but not until June 30, 2016.  The CDCR and Mr. Atkinson state that making this reform retroactive would "threaten public safety" although no evidence is provided that supports such a claim.

9.      Mr. Atkinson claims that I erred in my estimates for the impact of the various population reduction measures.  This is incorrect.

10.     In calculating the projected impact of the various population reduction measures, I adhered to methodology I have employed in over 20 states and numerous other jurisdictions around the country, where I have worked to reduce prison and jail populations.  Through my work in those jurisdictions over a period of 30 years, I have honed my methodology for calculating the population impacts to be expected from various population reduction strategies.  My projections have proven accurate, having a documented 1-2 percent error rate.  The United States Government Accountability Office previously reviewed all of my major projection methods and stated that the projection

AUSTIN DECL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFS' POPULATION REDUCTION PLAN
CASE NOS. CIV S 90-0520 LKK-JFM, 01-1351 TEH

1   model I developed with my colleagues and former CDCR employees was one of the most

2   sophisticated micro-simulation models available to correctional agencies.

3       11.     Mr. Atkinson claims that my estimate for population reduction were

4   inaccurate because he believes I used rounding in my calculations which compound the

5   magnitude of certain estimates. (Atkinson Decl., ¶ 24).  I did not use rounding in my

6   calculations.

7       12.     Mr. Atkinson claims that I used simple averages and not distributions for

8   data like sentence length.  (Atkinson Decl., ¶ 25).  He is incorrect.  I did not use averages

9   but micro-simulated changes in good time credits on each individual in the data set for the

10  population I was targeting.  Further, the difference in using distributions versus averages is

11  most useful when estimating the impact of a reform that is only prospective.  Since all of

12  my estimates are retroactive their effects on the estimates are insignificant.

13      13.     Mr. Atkinson states that I incorrectly used the figure of 120,000 as the likely

14  institutional prison population by June 2013.  (Atkinson Decl., ¶ 29).  My statement was

15  that under current trends, the institutional population would be approximately 120,000

16  people.  That was accurate then, and remains accurate.  The current CDCR count is

17  119,586 as of May 1, 2013 and has been constant for many months.  Table 2 is not the

18  basis for this statement.  It is based on Figures 1 and 2.

19      14.     Mr. Atkinson's statement that I used a static inmate population of 132,941

20  for all points in time is inaccurate.  (Atkinson Decl., ¶ 30).  I did not use the static

21  populations for my calculations. My calculations were based on three points of

22  perspectives; prison admissions, releases and current prison population.  These three data

23  series and the trend data suggest that the CDCR population is now stable as noted by Mr.

24  Atkinson in his declaration (Atkinson Decl., ¶ 4).

25      15.     I introduced the concept of a discount factor to the CDCR at our first

26  meeting on 11/29/2012 with no concerns raised by CDCR.   CDCR concurred that such a

27  factor should be used at subsequent meetings but declined to indicate what it would or

28  should be.  I use the 20% factor while CDCR now uses the 25% factor for some and a 12%

1  for others.  CDCR's proposed discount factor is based on subjective but reasonable

2  judgments, as is mine.  Our differences in the actual discount rate are insignificant relative

3  to developing a plan that meets the Court's order.

4      16.    Mr. Atkinson states that I failed to define what "Pure Impact" means.

5  (Atkinson Decl., ¶ 33).  As stated in my declaration I introduced the concept of a discount

6  factor.  The "pure impact" figure is the estimated effect of a policy or law without the

7  discount factor of 20%.

8      17.    The target population for population reduction is 109,665.  The calculations

9  in my January 7 declaration were aimed at achieving this benchmark.  Mr. Atkinson makes

10  much of the fact that I erroneously wrote that the target was 109,805 in one part of my

11  declaration.  That was a typo, but in any event the difference between 109,805 and 109,665

12  is insignificant (0.1%) and has no impact on the population reduction estimates.

13      18.    Mr. Atkinson argues that I failed to explain the methodology for my estimate

14  that increasing the amount of good time credits earned by second strikers would reduce the

15  prison population by 3,000.  (Atkinson Decl., ¶ 35).  As stated in my previous declaration,

16  my estimate assumes that all 2nd Strikers will receive additional credits since the date of

17  their sentence (less jail credits) versus the current amounts.  To reach this number, I

18  computed new release dates for all current and new admissions for a 2nd Strike offense

19  using the 66% of sentence rule versus the current 80% rule.  I also include sex registrants

20  in the calculations which CDCR does not.

21      19.    Mr. Atkinson states that he does not know the basis for my statement that

22  96% of the Lifers who are past their parole eligibility dates are low risk.  (Atkinson Decl.,

23  ¶ 38).  This figure is calculated by tabulating those inmate's CDCR risk level as provided

24  to me by the CDCR in the current prison population data file.

25      20.    CDCR seems to argue that its own risk assessment instrument is not the

26  proper measure of risk, and that a more appropriate measure of risk is what the Parole

27  Board *believes* about an individual Lifer's risk of reoffending.  That is incorrect.  CDCR's

28

1   risk assessment instrument has been validated, and is proven to be a very accurate

2   predictor of behavior.

3          21.    CDCR claims that its internal psychological assessment of Lifers eligible for

4   parole is properly identifying high-risk candidates for parole and is denying them parole.

5   This claim is not supported by the facts.  A study by the Stanford Law School looked at the

6   decision-making process of the Board in 2011.  The Stanford researchers found that the

7   Board does, in a limited way, take into account the psychological assessments of Lifers in

8   making its decisions.  But the data also show that the Board usually (72% -85%) denies

9   parole for people who have been evaluated as low risk by professional psychological

10  screening assessments.  So it is clear the Board is denying release to people who are low

11  risk by several validated risk assessment systems, who have completed all of the programs

12  required of them, and have excellent conduct records.

13         22.    Mr. Atkinson seems to be claiming that it is not true that California's crime

14  rate has been declining as the prison population has declined.  (Atkinson Decl., ¶ 40).  In

15  fact, CDCR data show that the prison population has decreased, and crime rate data

16  published by the FBI and the California Attorney General show that the crimes rates have

17  decreased at the same time.

18         23.    Mr. Atkinson states that he does not know the source for the crime rate data

19  shown in my Figures 4 and 5 and Table 5.  (Atkinson Decl., ¶ 41).  I presented these data

20  to CDCR during a November 29, 2012 meeting.  As I explained at that time, the crime rate

21  data are based on the Uniform Crime Reports data, which is readily available to CDCR.

22         24.    Mr. Atkinson and the State continue to make highly misleading claims that

23  further reductions in the magnitude required to meet the Court's order will jeopardize

24  public safety. These claims have no basis in fact and contradict their own research

25  findings.

26         25.     As noted previously, the prison population has been going down and the

27  crimes rates have also been decreasing.  Currently, more than 40% or over 50,000 people

28  held in California prisons are identified by CDCR as low risk.  There is no reason to

1  believe that reducing California's prison population by 6,330 low risk inmates would have

2  any impact on crime rates.[1]

3      26.    Attached hereto as Exhibit A is a study completed by the Council of State

4  Government (CSG), and in which both I and the CDCR were research partners.  That study

5  found that released parolees in four diverse California cities account for a small percentage

6  (6%) of adult arrests for felony and misdemeanor crime that occurred between January

7  2008 and June 2011. Put differently 94% of all adult arrests for crimes do not involve

8  active parolees. About half of that small number of parolees arrested were people assessed

9  as high risk; only 13% were minimum risk parolees.  That shows that CDCR's risk

10  assessment system is working as intended.

11      27.    Further, since the passage of AB109 the number of people being admitted

12  and released from state prison has dramatically declined. Prior to AB 109 the monthly

13  number of prison admissions averaged approximately 4,700 per month.  Since AB109 the

14  monthly average is approximately 2,800 per month. This means that the contribution of

15  released prisoners on the number of people being arrested for misdemeanor and felony

16  crimes has been reduced even further.

17      28.    CDCR argues that releasing the lowest-risk parolees, or granting good time

18  credits retroactively, would harm public safety because it would result in a large surge in

19  prison releases.  This claim is incorrect for several reasons.

20      29.    First, the surge need not be dramatic if methodically enacted over the

21  remainder of this year and carried forward. Currently, CDCR releases about 2,800

22  prisoners per month which is about 40% below what it was releasing prior to AB109 for

23

24  _____

25  [1] CDCR needs to reduce the prison population by another 9,300.  At least 1,722 of that
   reduction will likely come from the completion of the Stockton prison hospital, and

26  another 1,250 will come from the expansion of fire camps, which CDCR already has the
   authority to do.  Defendants' Response to April 11, 2013, Order at 28-29.  This leaves

27  approximately 6,330 prisoners.

28

AUSTIN DECL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFS' POPULATION REDUCTION PLAN
CASE NOS. CIV S 90-0520 LKK-JFM, 01-1351 TEH

1  many years. The temporary "surge" would still result in fewer releases than were done

2  prior to AB 109.

3      30.  Second, advancing release dates could be done in such a way as to have little

4  impact on the current flow of people out of the prison system.  For example, on any given

5  month there are approximately 12,000 inmates who are within 90 days of being released.

6  Large proportions of these soon to be released inmates are low risk and/or are in minimum

7  custody (Table 1).

8      Table 1.  Number of Inmates in Current Prison Population to be Released in the

9      Next 3-4 Months[2]

| Months Left | Min Custody | Low Risk | All Inmates |
|---|---|---|---|
| Current Month | 986 | 1,049 | 3,300 |
| 1 | 906 | 951 | 3.066 |
| 2 | 832 | 978 | 3.149 |
| 3 | 799 | 959 | 2.971 |
| Totals | 3.523 | 3.937 | 12.486 |

31.    Third, as I have previously discussed in my earlier declarations in this case,

considerable research shows that reducing length of stay through good time programs and

other early release measures does not impact public safety (see NCCD summary report on

Accelerated Release, 2008).

32.    Fourth, I have helped other states accomplish these same objectives without

jeopardizing public safety, as described in my earlier declarations.  In 2007, I assisted the

state of Nevada to formulate and implement a set of population reduction policies that

include extra good time credits and diversion of low risk prisoners.  The Nevada

legislation (AB510) made those policies retroactive to the current prison population.  The

---

[2] CDCR prison population data file as of November 30, 2012

AUSTIN DECL IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFS' POPULATION REDUCTION PLAN
CASE NOS. CIV S 90-0520 LKK-JFM, 01-1351 TEH

legislation had the intended effect, which was to eliminate the substantial increases in prison population that had been projected.  At the same time the crime rate dropped.  So these recommendations have been successfully implemented in other states with no impact on crime rates or recidivism rates.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct, and that this declaration is executed at Washington, D.C., this 15th day of May, 2013.


/s/_____
James Austin
(Approval to e-file on file with Plaintiffs' counsel)

Exhibit A

The **Impact** of
Probation and Parole Populations
on **Arrests** in
Four California Cities

A report prepared by the
Council of State Governments Justice Center



# The **Impact** of Probation and Parole Populations on **Arrests** in Four California Cities

A report prepared by the
Council of State Governments Justice Center



This report was prepared by the Council of State Governments Justice Center. The research and report were made possible with the generous support of the Public Safety Performance Project of the Pew Center on the States, the Fund for Nonviolence, the Public Welfare Foundation, and the Rosenberg Foundation.

The opinions and findings in this document are those of the authors and do not necessarily represent the official position or policies of the Public Safety Performance Project of the Pew Center on the States, the Fund for Nonviolence, the Public Welfare Foundation, the Rosenberg Foundation, members of the Council of State Governments, participating police and probation agencies, the California Department of Corrections and Rehabilitation, or the State of California. The findings have been reviewed by all funders and participating agencies and are in accordance with the California Department of Corrections and Rehabilitation's standards of ethics in research.

Websites and sources referenced in this publication provided useful information at the time of this writing. The authors do not necessarily endorse the information of the sponsoring organizations or other materials from these sources.

Council of State Governments Justice Center, New York 10005

© 2013 by the Council of State Governments Justice Center
All rights reserved.

Cover design and layout by Carrie Cook

# CONTENTS

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      Box: California Downsizes Its Prison Population . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Summary of Key Findings and Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . 6

      Box: The Four Jurisdictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Methodology** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

      Box: California Sentencing and Supervision Policy . . . . . . . . . . . . . . . . . . . . . . . .13

**Research Findings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    **Finding 1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

    **Finding 2** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      Box: About Probation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    **Finding 3** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    **Finding 4** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    **Finding 5** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      Box: What Works in Supervision and Risk Assessment . . . . . . . . . . . . . . . . . . . 26

    **Finding 6** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Appendix A:**

    **Additional Information Regarding Methodology** . . . . . . . . . . . . . . . . . . . . . . . 35

**Appendix B:**

    **Arrests by Supervision Status for Los Angeles** . . . . . . . . . . . . . . . . . . . . . . . . 37

**Appendix C:**

    **Arrests in the Four Jurisdictions by Offense Type and Supervision Status** . . . 38

# ACKNOWLEDGMENTS

**T**HE RESEARCH THAT INFORMS THE CONTENT OF THIS REPORT was made possible by the assistance and support of many people, organizations, and state and local agencies. First and foremost, the chiefs of police who made the original research request deserve considerable acknowledgment: Chief Charlie Beck, Los Angeles Police Department; Chief Rick Braziel (Ret.), Sacramento Police Department; Chief Jim Bueermann (Ret.) Redlands Police Department; and District Attorney George Gascón (former San Francisco Chief of Police). Chief Mark Garcia of the Redlands Police Department and Chief Greg Suhr of San Francisco Police Department continued the support of their predecessors, Chief Bueermann and District Attorney Gascón, and ensured the continuity of this research. In each department, there were several individuals who assisted the research team in bringing the project to completion, including Assistant Chief Michel Moore and Captain Sean Malinowski of the Los Angeles Police Department; Dr. Travis Taniguchi, Police Criminologist with the Redlands Police Department; Ms. Susan Giffin, Chief Information Officer of the San Francisco Police Department; and Officer Corey Brant of the Sacramento Police Department.

The support and partnership of the California Department of Corrections and Rehabilitation was integral to the success of this project and special thanks are owed to former Secretary Matthew Cate, Mr. Lee Seale, Director, Division of Internal Oversight and Research, and Ms. Brenda Grealish, Deputy Director, Office of Research. The project team is particularly grateful to the county probation representatives from each jurisdiction who helped coordinate and support this project. The local probation partners provided tremendous assistance with the support of former Chief Donald Blevins and Deputy Chief Reaver Bingham, Los Angeles County Probation; Chief Donald Meyer, Sacramento County Probation; Chief Michelle Scray, San Bernardino County Probation; and Chief Wendy Still, San Francisco Probation. In addition, the following individuals provided expert research support: Sheriff Lee Baca and Ms. Wendy Harn, Assistant Director, Crime Analysis Program, Los Angeles County Sheriff's Department; Ms. Jenny Anderson, Systems Development Team Leader, San Bernardino Sheriff's Department; Ms. Anesa Cronin, Division Director II, San Bernardino County Probation; Ms. Bella Fudym, IT Manager, San Francisco Probation; and Mr. Scott Porter, Information Technology Manager, Sacramento County Probation. Special thanks to Dr. James Austin, President, JFA Associates, for his invaluable assistance in the early stages of this project.

This study and resulting report would not have been possible without the support that came from the Public Safety Performance Project of the Pew Center on the States, the Fund for Nonviolence, the Public Welfare Foundation, and the Rosenberg Foundation. Particular thanks are owed to Mr. Richard Jerome, Manager, and Mr. Ryan King, Research Director, Public Safety Performance Project of the Pew Center on the States; Ms. Seema Gajwani, Program Officer, Public Welfare Foundation; Mr. Tim Silard, President, Rosenberg Foundation; and Ms. Betsy Fairbanks, President, Fund for Nonviolence. The support of these individuals through the life of the project was invaluable, and we are extremely grateful to them.

The development of this research project and creation of this report were led by the Justice Center's Research Manager Andrew Barbee, Policy Analyst Jennie Simpson, and Director of Local Initiatives Blake Norton. Also involved were Director Mike Thompson, Deputy Director Suzanne Brown-McBride, Research Director Dr. Tony Fabelo, Director of State Initiatives Marshall Clement, Communications Director Robert Coombs, Deputy Director of Communications Karen Watts, and Publications Editor Christopher Boland. Laura Draper, who was formerly with the Justice Center, is owed particular thanks for her work at the beginning of this project.

## About the Organizations and Foundations

### The Council of State Governments Justice Center

The Council of State Governments Justice Center is a national nonprofit organization that serves policymakers at the local, state, and federal levels from all branches of government. It provides practical, nonpartisan advice and evidence-based, consensus-driven strategies to increase public safety and strengthen communities.

### The Public Safety Performance Project, Pew Center on the States

The Public Safety Performance Project works with states to advance data-driven, fiscally sound policies and practices in the criminal and juvenile justice systems that protect public safety, hold offenders accountable, and control corrections costs.

### The Fund for Nonviolence

The Fund for Nonviolence cultivates and supports efforts to bring about social change that moves humanity towards a more just and compassionate coexistence. The organization focuses on social justice for marginalized communities and believes in the transformative power of nonviolence as a means of inspiring progressive social change.

### The Public Welfare Foundation

The Public Welfare Foundation supports efforts to ensure fundamental rights and opportunities for people in need. The foundation looks for carefully defined points where our funds can make a difference in bringing about systemic changes that can improve the lives of countless people. In its 65-year history, the foundation has distributed nearly $500 million in grants to more than 4,500 organizations.

### The Rosenberg Foundation

The Rosenberg Foundation believes that in order for democracy to thrive in our state and nation, every person in California must have fair and equitable opportunities to participate fully in the state's economic, social and political life. Established in 1935, the Foundation has supported a wide range of initiatives to promote economic inclusion and human rights.

# The **Impact** of Probation and Parole Populations on **Arrests** in Four California Cities

## INTRODUCTION

**O**NE OF THE FIRST QUESTIONS A POLICE OFFICER ASKS when arresting someone is "Are you on probation or parole?" and the answer generally expected is "yes." Given this expectation, it is understandable for officers on the beat to believe that it is only a matter of time before people on parole or probation commit a crime. As longstanding and prevalent as this assumption has been, very little research exists quantifying the extent to which people under community supervision are, in fact, driving local law enforcement's arrest activity.

Law enforcement executives across the country have been forced to make deep cuts to their budgets as a result of plunging local tax revenues and shrinking federal funding for local police departments.[1] This has certainly been the case in California. For example, the police departments in Sacramento, Los Angeles, and Redlands experienced significant declines in funding between 2008 and 2012, which have resulted in, among other things, major reductions in personnel.[2]

On top of the fiscal pressures police departments are experiencing, local governments in California are struggling with the transformation of the state corrections system currently underway. Compelled by federal court order to address overcrowding in the California prison system, state policymakers have taken a number of steps to reduce the prison population. For example, they have mandated that non-violent, non-serious and non-sex offenders serve their sentences at the local level rather than in state prisons. In addition, state officials have transferred post-release supervision responsibilities for people convicted of these crimes already in state prison to county probation officers. As a result of these and other actions, the number of people incarcerated in state prison has plummeted by nearly 40,000 people, from more than 173,000 in 2006[3] to fewer than 133,000 in November 2012.[4] During the same timeframe, the state's parole supervision population has declined by nearly 50 percent, from almost 120,000 to fewer than 61,000.[5]

The downsizing of the prison population has enabled the state to address dangerous levels of overcrowding in its system and to reduce state spending on corrections by billions of

---

[1] "Survey indicates easing of budget cuts in some local police departments, but most are still being cut," Police Executive Research Forum, accessed December 1, 2012, http://www.policeforum.org/library/economy/ImpactofeconomiccrisisonpolicingApril2012final.pdf.

[2] As was the case for county probation departments, all four jurisdictions experienced staff reductions from 2008 to 2011. See box on pages 8-9, "The Four Jurisdictions."

[3] "The Future of California Corrections Executive Summary," California Department of Corrections and Rehabilitations (CDCR), accessed December 1, 2012, http://www.cdcr.ca.gov/2012plan/docs/plan/exec-summary.pdf.

[4] "Monthly Total Population Report Archive," CDCR, accessed January 11, 2013, http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Monthly/Monthly_Tpop1a_Archive.html

[5] Ibid.

## California Downsizes Its Prison Population

In 1990 and 2001, two class-action lawsuits were filed against the state of California, challenging the constitutionality of the prison conditions as a result of chronic overcrowding in the state's 33 prison facilities.[6] A federal district court-appointed three-judge panel was convened to review extensive evidence and testimony related to the subject of these lawsuits, and in August 2009, ordered the state to reduce its prison population to 137.5 percent of capacity. In May 2011, the Supreme Court of the United States upheld this ruling, finding that the court-mandated population cap is necessary to remedy the violation of prisoners' constitutional rights. [7]

As the lawsuits wound their way through the federal court system, the legislature took steps to reduce the prison population. Recognizing that parole revocations were a key driver of the prison population, lawmakers enacted Senate Bill (SB) 18 in 2009, which established a new type of "non-revocable" parole (NRP) for individuals, who, according to the validated risk assessment tool used by the California Department of Corrections and Rehabilitation (CDCR), did not pose a high risk to reoffend. Additional criteria were included in the statute that a person had to meet to be placed under NRP.[8] Parole for people under NRP cannot be revoked for any reason; they can only be incarcerated again for a new crime.[9] Also enacted in 2009, SB 678 created the California Community Corrections Performance Incentive Program, which promoted the use of evidence-based strategies for reducing the rate of failure on probation. SB 678 also developed a mechanism for providing additional funding to probation departments via corrections expenditure savings realized through fewer revocations to prison.

When the U.S. Supreme Court decision in 2011 made it clear that the federal district court's earlier rulings would not be vacated, the California legislature passed Assembly Bill (AB) 109 and AB 117. Known as the 2011 Realignment Legislation, this law realigned custody responsibilities for a particular class of offenders—those identified as non-violent, non-serious and non-sex offenders[10]—from state to local jurisdictions and transferred post-release supervision responsibilities for this population from state parole officers to county probation officers.[11] Starting on October 1, 2011, eligible offenders began serving their sentences at the local level rather than in state prisons.[12]

The legislation also stipulated that any parolee whose parole is revoked will serve a term no longer than 180 days in the county jail (this provision excludes people sentenced to life), and parolees who do not incur any infractions will be released from parole after six months. The Board of Parole Hearings (BPH) will continue to have responsibility for holding parole revocation hearings until July 1, 2013, at which time it will become a local, court-based process. There were also several trailer bills passed to provide funding for the Realignment initiative.[13]

---

[6] *Brown v. Plata,* 131 S. Ct. 1910 (2011).

[7] Ibid.

[8] To be eligible, an individual must meet criteria as established under Penal Code section 3000.03. For these eligibility criteria, see http://www.cdcr.ca.gov/Parole/Non_Revocable_Parole/pdf/Non-Revocable_Parole_FAQs.pdf.

[9] "CDCR implements public safety reforms to parole supervision, expanded incentive credit for inmates," CDCR, accessed July 26, 2011, http://www.insidecdcr.ca.gov/2010/01/cdcr-implements-public-safety-reforms-to-parole-supervision-expanded-incentive-credits-for-inmates/.

[10] People who are convicted of serious or violent offenses, including sex offenders, are not affected by Realignment and will continue to serve their sentences in state prison and serve their parole terms under the supervision of state parole officers.

[11] "2011 Public Safety Realignment: Fact Sheet," CDCR, accessed August 23, 2011, http://www.cdcr.ca.gov/About_CDCR/docs/Realignment-Fact-Sheet.pdf.

[12] This legislation only affects offenders sentenced on or after October 1, 2011. It does not allow for inmates currently in state prison to be released early; everyone sent to state prison prior to October 1, 2011 will continue to serve their entire sentence in prison. People who are released from a state prison will serve their parole under the supervision of a state parole officer, not at the county level.

[13] "Governor Brown signs legislation to improve public safety and empower local law enforcement," accessed August 23, 2011, http://gov.ca.gov/news.php?id=16964.

dollars. (See box on page 2, "California Downsizes Its Prison Population.") Some of these savings have been passed along to the county governments, which must decide what to do with people who had previously been incarcerated in a state prison or under state parole supervision. Local law enforcement officials generally have received few of these redirected funds. Many police chiefs and sheriffs have asserted that the growing numbers of people released from state prison, combined with supervision responsibility shifting from state to local government for people convicted of particular offenses, will intensify demands on the resources of local law enforcement, which are already stretched to the breaking point.

In 2010, Chief Charlie Beck of the Los Angeles Police Department, Chief James Bueermann of the Redlands Police Department, Chief Rick Braziel of the Sacramento Police Department, and Chief George Gascón of the San Francisco Police Department asked the Council of State Governments Justice Center (CSG Justice Center) to help them to determine the extent to which people on probation and parole contribute to the demands on the resources of local law enforcement, and to identify what opportunities exist to use data to target their limited resources more effectively. They asked CSG Justice Center to conduct an unprecedented analysis of arrest, probation, and parole data to answer these questions:

- To what extent do people on probation and parole contribute to crime, as measured by arrests?

- What types of crimes are these people most likely to commit?

- Are there particular subsets of people on probation and parole who are most likely to reoffend? If so, what characteristics do they have in common?

- What strategies can law enforcement employ to better respond to the people being released from prisons and jails to community supervision?

Considerable research exists documenting rearrest or reincarceration rates for people under probation or parole supervision.[14] Little research, however, has been published about the extent to which people on probation and parole contribute to the overall volume of arrests in a particular jurisdiction.[15] This groundbreaking study addresses this gap in the research.

Researchers had access to separate information systems maintained by multiple independent agencies. They assembled a vast, comprehensive dataset covering a lengthy time period that

---

[14] "2012 Outcome Evaluation Report," CDCR, October 2012, accessed November 23, 2012, http://www.cdcr.ca.gov/Adult_Research_Branch/Research_Documents/ARB_FY_0708_Recidivism_Report_10.23.12.pdf; "State of Recidivism: The Revolving Door of America's Prisons," Pew Center on the States, (Washington: The Pew Charitable Trusts, April 2011); "Recidivism of Prisoners Released in 1994," Bureau of Justice Statistics, (Washington: Bureau of Justice Statistics, June 2002).

[15] According to peer-reviewed literature, a similar study was conducted in New Orleans in the 1980s. Michael R. Geerken and Hennessey D. Hayes, "Probation and Parole: Public Risk and the Future of Incarceration Alternatives," Criminology 31 (1993): 549. The state of New York currently records comparable data (New York Division of Criminal Justice Services Crimestat Report, April 2011), although the state doesn't publish analysis of this data. The Bureau of Justice Statistics has also presented similar research as part of its series on processing of felony defendants in state courts. "Felony Defendants in Large Urban Counties, 2006," Bureau of Justice Statistics, (Washington: Bureau of Justice Statistics, May 2010). It should be noted that the results of these limited studies should not be compared to one another. As with recidivism studies, slight methodological differences can yield considerable differences in analytical results. A full assessment of these studies' methodological differences was not undertaken, so any differences in the accounting of the share of arrests attributable to those under supervision reflected in these studies is not explained in this report.

is without precedent. Researchers amassed more than 2.5 million adult arrest, probation, and parole supervision records maintained by 11 different agencies over a 42-month period stretching from January 1, 2008 to June 30, 2011. Because California does not mandate the uniform statewide collection of arrest data, each local jurisdiction maintains this information independently and distinctly. Needless to say, the gathering and matching of records for this study proved to be a complex undertaking.

The research presented here is not a recidivism study. Researchers did not follow a particular group of people post-release for a prescribed period of time to determine that group's rates of reoffense and compare that number to another, similar group of people for a similar length of time. The dataset assembled for this study encompassed all people arrested (as opposed to a narrower universe limited to people released from prison or jail) during a three-and-a-half-year time period. By using this cohort, which was far larger than just the number of people under correctional supervision, researchers could learn about the proportion of arrests that involve people under supervision compared to those not under supervision, as well as characteristics of the subset of parolees and probationers who contribute to police arrests.

**Figure 1: Current Study Question**



Several aspects of this study make it a particularly valuable contribution to policy discussions underway not only in California, but in states throughout the country. First, the study focuses not just on a single municipality, but rather on four jurisdictions of different sizes: Los Angeles, Redlands, Sacramento, and San Francisco. The number of residents in each of these cities varies considerably: Los Angeles, for example, has a population of nearly 4 million compared to Redlands, where approximately 70,000 people live. Collectively, they represent

a cross-section of California's diverse populations, police departments, and probation and parole agencies. (See box on pages 8-9, "The Four Jurisdictions.") As a result, although the findings presented here do not reflect a scientific sampling of all jurisdictions in California, they cannot be dismissed as unique to one particular locality.

Second, the study is especially timely. The period it covers immediately precedes the implementation of many of the provisions of California's 2011 Realignment Legislation, which has redefined the role of local government in the California criminal justice system. So, although this study is not an assessment of the impact of Realignment on police arrest activity, the data captured here provide policymakers with a clear understanding of arrest trends up to the point of Realignment. In so doing, the findings in this report establish a baseline for future analyses of the impact of Realignment on state and local corrections, supervision, and law enforcement agencies. (See box on page 2, "California Downsizes Its Prison Population.")

This study does capture data regarding people placed under non-revocable parole (NRP), a policy enacted in 2009 and implemented in January 2010, which allowed for the release of individuals determined to be at low risk of reoffending, on the condition that they could not be revoked to prison for any reason, including for technical violations of the conditions of their parole. When this policy was enacted, as with Realignment two years later, it prompted concern among city and county officials, who predicted frequent situations in which people who would previously have been returned to prison for violations of the conditions of their parole would now be left on the streets despite repeated encounters with law enforcement.[16] By analyzing how the NRP population contributed to arrest activity, this aspect of the study offers useful insight into how populations affected by Realignment might impact arrest activity.

Finally, this study was not simply an academic exercise in number crunching, but instead was the result of an extraordinary and dynamic collaboration among police departments, sheriff's departments and probation agencies spanning four counties, and the California Department of Corrections and Rehabilitation (CDCR). Policymakers and practitioners alike were engaged in the development of the methodology for the study, as well as in the collection of data and review of the data analysis. In addition, line-level officers and supervisors from each of the four police departments participated in eight focus groups that discussed working relationships with parole and probation personnel, cross-agency information sharing, and practical, day-to-day experience with individuals under supervision.

The section following this introduction to the report describes the methodology used to collect and analyze the data assembled to answer the questions posed by local law enforcement leaders. Next, the report presents six findings, each containing an overview

---

[16] Jason Song, "Realignment plan for California prisons causing new friction," *Los Angeles Times*, May 29, 2012, accessed December 1, 2012, http://acreentry.org/wp-content/uploads/2012/05/Realignment-plan-for-California-prisons-causing-new-friction_LATimes_5-31-12ka.pdf.
Heather Tirado Gilligan, "Effects of change in California criminal justice system difficult to discern," *The Sacramento Bee*, October 22, 2012, accessed December 1, 2012, http://www.sacbee.com/2012/10/22/4927963/effects-of-change-in-california.html.

of the issue that the researchers explored, and a concise description of the approach they used to analyze relevant data. Facts, figures, and tables that provide the basis for the finding are also included. The last section of this report provides recommendations that CSG Justice Center staff developed based on these findings. These recommendations, which do not necessarily reflect the views of state and local officials who made this study possible, are intended to help state and local leaders maximize the opportunity presented by the state's recent Realignment Initiative to invest in high-impact, long-term strategies to reduce the strain on law enforcement resources by individuals under supervision who are at high risk of reoffense.

## SUMMARY OF KEY FINDINGS AND RECOMMENDATIONS

### Key Findings

- **Approximately one in five arrests involved an individual under probation or parole supervision; the majority of arrests involved people who were not under supervision.** People under supervision accounted for 22 percent of total arrests. Of those under supervision who were arrested, nearly twice as many were on probation as on parole.

- **The extent to which people under probation or parole supervision contributed to arrest activity varied by jurisdiction.** Arrests involving individuals under supervision varied across the jurisdictions, from 11 percent of all arrests in San Francisco to 30 percent in Sacramento.

- **People under probation and parole supervision were involved in one in six arrests for violent crime. On the other hand, one in three arrests for drug crime involved someone on probation or parole.** Of all types of offenses tracked in this study, people under supervision were more likely to be arrested on drug offenses than either violent, property, or other arrests.[17]

- **From January 2008 to June 2011, the number of arrests made in the four jurisdictions declined by 18 percent, while the number of arrests of people under supervision in these jurisdictions declined by 40 percent.** In this period, the number of arrests involving individuals under parole supervision declined by 61 percent and by 26 percent for individuals under probation supervision.

- **The assessment of a parolee's risk of reoffense was an effective indicator of the likelihood that he or she would be rearrested, although the assessment of a probationer's risk of reoffense did not effectively predict that individual's likelihood to reoffend in three of the four jurisdictions.**[18] Of the total number of

---

[17] Examples of Other offenses include vandalism, fugitive from justice for felony arrest, failure to disclose origin of recording, failure to appear in court (non-traffic), driving without a license, and prostitution.

[18] It should be noted that each of the four probation agencies used different risk assessment tools during the period of this study.

individuals under parole supervision who were arrested, the majority (51 percent) had been assessed as high risk for reoffense. For individuals under probation supervision who were arrested, only 13 percent had been assessed as high risk for reoffense, while the majority of those arrested had been assessed as moderate and low risk (35 percent and 33 percent respectively).

## Recommendations

■ **Promote the implementation of validated risk assessment tools** for each local probation department to determine which people under community supervision are most likely to reoffend.

■ **Improve coordination among law enforcement, probation, and parole agencies;** design policies and practices to facilitate sharing of risk assessment results and to inform how law enforcement professionals use these data.

■ **Provide targeted, evidence-based supervision and treatment strategies** for individuals assessed to be at high risk for reoffense.

■ **Continue analyses of arrest and supervision data** to track how people under supervision are contributing to arrest activity since the implementation of Realignment.

■ **Improve state's capacity to share and analyze data** among local jurisdictions and state corrections agencies.

# The Four Jurisdictions [19]

As population centers positioned throughout the state, Los Angeles, Redlands, Sacramento, and San Francisco present a useful cross-section of California's diverse populations. Similarly, criminal justice policies and practices, and sentencing trends vary from one county to the next.[20]

## Los Angeles

Los Angeles City Population: 3,810,129

Los Angeles County Population: 9,858,989

**Los Angeles Police Department**

| Year | Sworn | Civilian | Total |
|------|-------|----------|-------|
| 2008 | 9,743 | 3,265 | 13,008 |
| 2009 | 9,980 | 3,215 | 13,195 |
| 2010 | 9,858 | 2,896 | 12,754 |
| 2011 | 9,860 | 2,864 | 12,724 |

| Year | Adult Probation Population in Los Angeles County | | Parole Population in Los Angeles County | |
|------|-------------|-------------------|-------------|-------------------|
|      | # Supervised | Per 100K Residents | # Supervised | Per 100K Residents |
| 2008 | 63,237 | 641 | 39,239 | 398 |
| 2009 | 62,794 | 637 | 33,454 | 339 |
| 2010 | 58,769 | 596 | 33,006 | 335 |
| 2011 | 52,641 | 534 | 31,814 | 323 |

## Redlands

Redlands City Population: 69,231

San Bernardino County Population: 2,052,397

**Redlands Police Department**

| Year | Sworn | Civilian | Total |
|------|-------|----------|-------|
| 2008 | 85 | 59 | 144 |
| 2009 | 82 | 58 | 140 |
| 2010 | 77 | 40 | 117 |
| 2011 | 76 | 35 | 111 |

| Year | Adult Probation Population in San Bernardino County | | Parole Population in San Bernardino  County | |
|------|-------------|-------------------|-------------|-------------------|
|      | # Supervised | Per 100K Residents | # Supervised | Per 100K Residents |
| 2008 | 20,289 | 989 | 8,988 | 438 |
| 2009 | 20,077 | 978 | 8,265 | 403 |
| 2010 | 17,931 | 874 | 7,844 | 382 |
| 2011 | 17,925 | 873 | 8,277 | 403 |

[19] The information contained in the tables was adapted from the following sources: County and City Population Estimates, California Department of Finance, accessed February 12, 2012, http://www.dof.ca.gov/research/demographic/reports/view.php#objCollapsiblePanelEstimatesAnchor; U.S. Department of Justice, "Crime in the U.S.," Federal Bureau of Investigation, 2008-11, accessed February 12, 2012, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-us; "FY 2007/08-10/11 Annual Reports," San Bernardino County Probation Department; "FY 2007-2008 Annual Report," San Francisco Adult Probation Department; special reports generated by the California Department of Rehabilitation and Correction, Los Angeles County Probation Department, Sacramento County Probation Department, and San Francisco Adult Probation Department.

[20] In addition to the rate of supervised residents differing among the four jurisdictions represented in this study, it is critical to note that the approaches to probation supervision practice in each location are unique to the jurisdiction as well. For example, some departments may more aggressively move certain offenders to low-intensity levels of supervision, whereas other departments may be less inclined to use administrative forms of supervision.

## Sacramento

Sacramento City Population: 469,566

Sacramento County Population: 1,428,355

**Sacramento Police Department**

| Year | Sworn | Civilian | Total |
|------|-------|----------|-------|
| 2008 | 713 | 365 | 1,078 |
| 2009 | 700 | 327 | 1,027 |
| 2010 | 696 | 323 | 1,019 |
| 2011 | 678 | 269 | 947 |

| Year | Adult Probation Population in Sacramento County | | Parole Population in Sacramento County | |
|------|------------------------|------------------|------------------------|------------------|
| | # Supervised | Per 100K Residents | # Supervised | Per 100K Residents |
| 2008 | 21,029 | 1,472 | 6,074 | 428 |
| 2009 | 21,604 | 1,513 | 5,651 | 396 |
| 2010 | 21,098 | 1,477 | 7,381 | 517 |
| 2011 | 20,533 | 1,438 | 6,665 | 466 |

## San Francisco

San Francisco City and County Population: 805,235

*Note: San Francisco is a consolidated city-county.*

**San Francisco Police Department**

| Year | Sworn | Civilian | Total |
|------|-------|----------|-------|
| 2008 | 2,391 | 382 | 2,773 |
| 2009 | 2,367 | 486 | 2,853 |
| 2010 | 2,250 | 379 | 2,629 |
| 2011 | 2,210 | 440 | 2,650 |

| Year | Adult Probation Population in San Francisco County | | Parole Population in San Francisco County | |
|------|------------------------|------------------|------------------------|------------------|
| | # Supervised | Per 100K Residents | # Supervised | Per 100K Residents |
| 2008 | 6,500 | 800 | 1,528 | 188 |
| 2009 | 6,718 | 827 | 1,557 | 192 |
| 2010 | 6,664 | 820 | 1,550 | 191 |
| 2011 | 6,329 | 779 | 1,519 | 187 |

# METHODOLOGY

**T**HIS STUDY USED THREE DIFFERENT TYPES OF DATA: adult arrest, parole, and probation data.[21] Parole and some arrest data are maintained at the state level; probation data is managed mostly by county governments.[22] No single state agency compiles individual arrest, probation, and parole records. Consequently, obtaining data for these four jurisdictions required the collaboration of 11 different agencies.

Arrest data covered a 42-month timeframe from January 2008 to June 2011 and reflected activity by the Los Angeles, Redlands, Sacramento, and San Francisco Police Departments. The arrest data were obtained from the following sources:

- Los Angeles Police Department and Los Angeles County Sheriff's Department [23]

- Redlands Police Department and San Bernardino County Sheriff's Department [24]

- Sacramento Police Department

- San Francisco Police Department

The arrest datasets totaled almost 650,000 individual arrest records. For the purposes of this study, an arrest was defined as an adult (18 years of age or older at the time of arrest) taken into custody by police and booked into county jail for either a felony or misdemeanor offense.[25] There were no "citation only" events captured, or instances of initially being taken into custody only to be released prior to any actual booking into jail.

Unlike many states, California has mandatory parole supervision, which means everyone exiting prison in California is released to community supervision. Therefore, the parole dataset provided by the California Department of Corrections and Rehabilitation captures adults released from state prison going back to the early 1980s and up to June 30, 2011.

---

[21] This study did not look at any juvenile aspects of arrest activity or parole or probation supervision. Clearly the role of juveniles in crime and supervision is of great importance, but the focus of this study was only on adults.

[22] Parole data are maintained statewide by the CDCR. The Office of the State Attorney General maintains statewide arrest data, which is compiled through information received from individual police departments. The chiefs who commissioned this study made available their departments' arrest data; researchers did not determine to what extent state-level arrest data were maintained in a way that would have allowed for the degree of matching required by this study.

[23] The Los Angeles County Sheriff's Department provided the data used for arrest activity, as the police department does not maintain in electronic data format the critical person identifiers needed for the data matching required by this study. Jail booking data based on Los Angeles Police Department arrests were provided to satisfy the need for arrest data from this jurisdiction. The jail booking data were also vetted with and approved by LAPD research staff.

[24] The San Bernardino County Sheriff's Department provided the data used for arrest activity, as the police department does not maintain in electronic data format the critical person identifiers needed for the data matching required by this study. Jail booking data based on Redlands Police Department arrests were provided to satisfy the need for arrest data from this jurisdiction. The jail booking data were also vetted with and approved by Redlands Police Department research staff.

[25] Arrests made by other law enforcement agents, such as a sheriff's deputy, are not included in this study. In addition, arrest data collected for this study do not include instances in which a probation or parole officer took someone into custody because he or she violated a condition of release. The study does include, however, arrests made by police officers for violations of supervision conditions.

The probation data reflected persons supervised on either felony or misdemeanor probation going back to the 1970s and up to June 30, 2011. Probation data were provided by the county probation departments where the cities providing arrest data were located.[26] The probation data were obtained from the following sources:

- Los Angeles County Probation Department
- San Bernardino County Probation Department
- Sacramento County Probation Department
- San Francisco Adult Probation Department

After receiving the data from the various agencies listed above, CSG Justice Center researchers carefully matched all parole and probation records to any arrest event in which the Criminal Identification Indicator (CII) number was involved.[27] The matching process and method of analysis enabled researchers to identify all instances in which the individual arrested had any parole or probation history (i.e., not just people currently under parole or probation supervision).

**Figure 2: Data Matching Process**



---

[26] Court supervision cases, or cases not assigned to the county probation department for supervision, were not included in this study. Also excluded from this study were cases involving individuals on pretrial supervision, as accessing such datasets was beyond the feasibility of this evaluation.

[27] A Criminal Information Indicator (CII) number is used statewide in California to identify persons coming into contact with the criminal justice system and is assigned according to fingerprint.

In designing this research project, while collecting and analyzing data and in discussing preliminary findings, the Justice Center project staff conducted dozens of meetings with local and state officials. Some of these meetings were among people from a particular perspective (e.g., a meeting among law enforcement officials only) or from a particular jurisdiction. In other instances, they met with a cross-section of law enforcement and corrections agencies involved in the project. For example, in October 2011, the Justice Center brought all the project partners and stakeholders together to review the preliminary analyses. With feedback provided during this review, additional analyses were conducted and focus groups were conducted with each police department in February 2012. Focus groups were held with line-level officers and supervisors from the four participating police departments and were facilitated by Justice Center law enforcement policy staff and an expert consultant. The final analyses were completed in May 2012 and vetted through a series of meetings conducted with the project partners in California in June 2012. In addition to these formal convenings and meetings, numerous calls were held with project partners and stakeholders to solicit feedback and review.

## California Sentencing and Supervision Policy

The state of California has a unique sentencing structure; it combines a determinate sentencing scheme with mandatory parole supervision. Determinate sentencing schemes use sentencing guidelines and mandatory minimum sentences to determine an appropriate sentence. Because of the state's sentencing structure, the majority of the state prison population is automatically released at the end of a sentence (more than 80 percent), while the balance of this population (almost 20 percent) receives indeterminate sentences with release dates determined by the Parole Board.[28] Every person released from state prison is subject to mandatory parole supervision, typically for a period of three years.[29]

As a result of this mandatory parole requirement, parole officers supervise a wide range of people on parole who represent a broad spectrum of risks and needs. Parolees are assigned to one of seven levels of supervision, and the level determines how frequently he or she must meet with the parole officer. In a comprehensive 2006 overview of the state of sentencing and parole in California, researchers reported that 65 percent of parolees saw their parole officer no more than twice every three months and 23 percent saw their parole officer once every three months. Those parolees who had the highest levels of supervision, such as high-risk sex offenders, had two face-to-face contacts per month with their parole officer.[30]

Probation departments are dependent primarily on county funding, so resources for supervision vary by county. As with parole, probation sentences come with conditions, and people who violate these conditions can have their probation sentence revoked and be returned to prison or jail, even if the violation does not involve the commission of a new crime but is instead a technical violation. California probationers fail to complete probation at a rate that is 10 percent higher than the national success rate for people on probation.[31] Each year 19,000 people on probation have their community supervision revoked and are sent to prison, accounting for 40 percent of all new prison admissions.[32]

---

[28] Joan Petersilia, *Understanding California Corrections.* (Berkeley: Regents of the University of California, 2006).
[29] Ibid.
[30] Ibid.
[31] Roger K. Warren, "Probation reform in California: Senate Bill 678," *Federal Sentencing Reporter,* 22 (2010): 186.
[32] Aaron Rappaport and Kara Dansky, "State of emergency: California's correctional crisis," *Federal Sentencing Reporter,* 22 (2010): 133.  Approximately 300,000 people are under probation supervision on any given day in California. See "Crime in California 2011," California Department of Justice, accessed December 3, 2012, *http://oag.ca.gov/sites/all/files/pdfs/cjsc/publications/candd/cd11/cd11.pdf.*

# RESEARCH FINDINGS

## FINDING 1

**Approximately one in five arrests involved an individual under probation or parole supervision; the majority of total arrests involved people who were not under supervision.**

*A key objective of this study was to determine to what extent people under correctional supervision drove arrest activity. To make that determination, researchers matched arrest data with parole and probation supervision data.*

### Supporting Data

**Figure 3:** Supervision Status among All Adult Arrestees

### Total Adult Arrests



= Probationers

= Parolees

= Not on Supervision

| Designation | Adult Arrests | % of Total |
|---|---|---|
| Total | 476,054 | 100% |
| Parolees | 40,476 | 8.5% |
| Probationers | 66,251 | 13.9% |
| Not Supervised | 369,327 | 77.6% |

**Individuals who were not under parole or probation supervision accounted for almost 80 percent of all arrests made.**

- 78 percent of total arrests involved individuals who were not currently under parole or probation supervision.
- 22 percent of total arrests involved individuals under parole or probation supervision.

**The majority of individuals arrested (62 percent) had no parole or local probation history; 38 percent had some history of being under supervision.**[33]

- 6 percent had only parole history.
- 17 percent had only local county probation history.
- 15 percent had both parole and local county probation history.

**Of those under supervision who were arrested, nearly twice as many were on probation as on parole.**

- 8 percent of total arrests involved individuals under parole supervision.
- 14 percent involved individuals under probation supervision.

## Conclusion for Finding 1

The data highlighted above challenge assertions often made that the majority of people arrested are under parole or probation supervision when they come into contact with law enforcement. Part of the reason people on the front lines of the criminal justice system may have this perception is because they are factoring in people who were ever under probation or parole supervision (not just currently under supervision). Even using that more inclusive definition, however, more than 60 percent of adults arrested had no history of probation or parole supervision.

In focus group meetings, police officers described instances in which they arrested the same probationer or parolee on multiple occasions. This experience could also contribute to the sense that arrest activity is driven disproportionately by people on probation or parole. As explained in Finding 3, some empirical data uncovered during this study support this observation, but also raise additional questions as to why people under probation and parole supervision are sometimes arrested multiple times.

Across the four counties represented in the study, there were more than twice as many people on probation (107,000) as on parole (52,000) on any given day during the study.[34] So

---

[33] Local probation history was available only for the county in which the arrest was made.

[34] "FY 2007/08-10/11 Annual Reports," San Bernardino County Probation Department; "FY 2007-2008 Annual Report," San Francisco Adult Probation Department; special reports generated by the California Department of Rehabilitation and Correction, Los Angeles County Probation Department, Sacramento County Probation Department, and San Francisco Adult Probation Department.

the fact that the number of arrests involving people on probation outnumbered the number of people on parole is not surprising. When accounting for their percentage of overall arrests, parolees were slightly more likely than probationers to contribute to arrest activity. As is explained under Finding 3, this was the case because parolees were more likely than probationers to be arrested for a violation of a condition of their supervision.

Although just 22 percent of adults arrested were under community supervision, this still represents a significant number of arrests each year across the four jurisdictions. Over the course of the study, the number of arrests involving people under probation or parole supervision fell from approximately 37,000 in 2008 to 30,000 in 2010 (the decline in the arrests over the study period is explored in Finding 4). In short, the greatest drops in arrests will be realized by reducing crime committed by people who are not already under probation or parole supervision. To that end, learning more about the characteristics of the people not under supervision who are arrested (especially for particular crimes) should be a research priority for these four police departments, and law enforcement agencies everywhere. At the same time, because the number of arrests in which people on probation and parole are involved in a given year is significant, any crime reduction strategy should include targeted efforts to improve success rates among people under probation and parole supervision.

## FINDING 2

### The extent to which people under probation or parole supervision contributed to arrest activity varied by jurisdiction.

*With the matched arrest, probation, and parole data, researchers were able to identify the number of individuals on probation or parole supervision at the time of arrest in each of the four jurisdictions. How common it is for a person to be under probation or parole supervision depends on the jurisdiction.*

*For example, the percentage of the population under probation supervision in Sacramento is nearly 1.5 times the percentage of the population under probation supervision in San Francisco. Likewise, the percentage of the population under parole supervision in Los Angeles is more than 1.5 times greater than the percentage of the population under parole supervision in San Francisco. (See box on pages 8-9, "The Four Jurisdictions.")*

*Another important variable was that, unlike parole, which is administered by the state, probation is county administered. Supervision policies and practices vary significantly from one jurisdiction to the next. (See boxes on pages 8-9, "The Four Jurisdictions," and on page 18, "About Probation.") For these reasons, researchers were interested in exploring whether and to what extent arrest activity involving people under supervision was consistent across the four jurisdictions.*

## Supporting Data

**Figure 4:** Supervision Status among All Adult Arrestees by Jurisdiction



**Arrests of individuals not under parole or probation supervision ranged from 70 percent of all arrests in Sacramento to 90 percent in San Francisco.**

- Almost 10 percent of arrests in Los Angeles, Redlands, and Sacramento involved individuals on parole; in San Francisco, 3 percent of arrests involved individuals on parole.
- In Sacramento, 20 percent of arrests involved individuals on probation; 8 percent of arrests involved individuals on probation in San Francisco.

### Conclusion for Finding 2

The statistics highlighted above reflect that, by some measures, the extent to which people under supervision contributed to arrest activity was somewhat comparable across the four jurisdictions. On the other hand, some differences were noteworthy. For example, probationers and parolees made up as little as 10 percent of all arrests in San Francisco and as much as 30 percent in Sacramento.

At least some of this variation corresponds to the difference in the percentage of people under community supervision in these jurisdictions. But the percentage of people under community supervision does not, by itself, explain the variation. For example, the percentage of people under parole supervision in Los Angeles is 30 percent greater than the percentage of people under parole supervision in San Francisco, but parolees make up three times as many arrests in Los Angeles (9 percent of all arrests) as they do in San Francisco (3 percent).

Nothing from the focus group meetings signaled markedly different philosophies among the departments about how police interact with people on probation and parole, which could have helped explain this disparity. To examine this issue more carefully, further research should be conducted to address the extent to which each of the jurisdictions varied along the following dimensions: parole and, in particular, probation policies and practices; police practices vis-à-vis probation and parole; and the availability, accessibility, and quality of community-based treatment.

## About Probation

Whereas parole is a state function administered by a single state agency (e.g., the CDCR), individual probation agencies are run by county government. Each has distinct approaches to probation supervision, influenced by factors such as how judges in that county use probation and the conditions they set when sentencing someone to probation. Supervision practices also vary. For example, probation departments will often have different supervision levels and different protocols for determining the level of supervision on which an individual is placed. These levels can range from extensive supervision to "banked" or administrative cases and vary considerably across departments. According to interviews with local probation administrators, approximately 96 percent of Sacramento Probation Department's caseload is banked, with 4 percent of the adult probation population receiving what would be considered "active" supervision.

How probation officers are deployed also varies from one probation department to the next. For example, some locales may assign specialized caseloads where only some officers handle high-risk cases, yet others may blend caseloads such that all officers have a general mixture of low- to high-risk clients. Some departments even have probation officers who specialize in assessment of risk/needs factors or are devoted to providing in-house treatment and resources to probation clients.

## FINDING 3

**People under probation and parole supervision were involved in one in six arrests for violent crime. On the other hand, one in three arrests for drug crime involved someone on probation or parole.**

*Law enforcement officials analyzing crime statistics focus much of their attention on violent arrests, especially those involving weapons.[35] Accordingly, researchers sought to determine to what extent people on probation and parole contributed to arrests for violent crime. In conducting this analysis, researchers focused on the most serious offense for which the person was arrested.*

*Another issue of interest to law enforcement and community corrections officials is the extent to which particular individuals are arrested repeatedly. Many of the statistics highlighted in this report describe arrest events. Because many individuals were arrested more than once*

---

[35] Violent offenses are based on the Federal Bureau of Investigation Uniform Crime Reports definitions and also include weapons offenses.

*during this study period, researchers studied those adults arrested on multiple occasions during the study period to determine the extent to which those people were under parole or probation supervision.*

## Supporting Data

### Figure 5: Offense Type by Supervision Status

| Total Adult Arrests (Felony and Misdemeanor) for All Four Jurisdictions* | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **476,054** | **40,476** | **66,251** | **369,327** |
| Violent | 94,179 | 5,195 | 10,084 | 78,900 |
| Property | 56,117 | 4,110 | 8,875 | 43,132 |
| Drug | 120,253 | 12,342 | 28,666 | 79,245 |
| DUI | 40,705 | 538 | 1,394 | 38,773 |
| Other** | 150,554 | 6,995 | 14,282 | 129,277 |
| Par/Prob Violation*** | 14,246 | 11,296 | 2,950 | — |

* While the table above combines felony and misdemeanor arrests, more specific breakdowns of felony and misdemeanor arrests are located in Appendix C to this report.

** Examples of Other offenses include vandalism, fugitive from justice for felony arrest, failure to disclose origin of recording, failure to appear in court (non-traffic), driving without a license, and prostitution.

*** Parole/Probation Violation offenses are arrest events where the violation of a condition of supervision was the sole charge for which an individual was arrested. The violation arrest could have been the result of a parole officer's field observation of the behavior of the parolee or probationer who was in violation of conditions of supervision. The violation arrest could also have been the result of the execution of a warrant issued by the court.

**Among arrests of individuals under supervision, drug arrests represented more than twice the percentage of total arrests as violent arrests.**

- 16 percent of violent offense arrests involved individuals who were under parole or probation supervision.
- 34 percent of drug arrests involved individuals under parole or probation supervision.

**Nearly four out of five arrests made for a violation of a condition of release involved a person on parole.**

- 79 percent of violation arrests involved individuals on parole.
- 21 percent of violation arrests involved individuals on probation.

**Figure 6:** Drug and All Other Arrests by Supervision Status



## Drug Arrests
(120,253)

66%   10%   24%

## All Other Arrests
(355,801)

8%   11%   82%

NO SUPERVISION    ON PAROLE    ON PROBATION

## Conclusion for Finding 3

The data presented above raise an interesting question: why are people on probation and parole contributing to a significantly greater share of drug arrests than they are to violent arrests? One factor to consider is the high prevalence of substance abuse and mental health disorders among people under parole and probation supervision, and the fact that many of these people do not receive treatment for these needs while in the community.[36]

Line-level police officers and supervisors participating in focus group meetings expressed frustration with the insufficient availability of substance abuse treatment and mental health services for people on probation or parole. Focus group meetings with police officers raised another potential reason why people under supervision contributed to a greater share of drug arrests: when coming into contact with a person on probation or parole, police have search and seizure authority, allowing them to search the person for drugs or weapons.

A second question raised by the data described above, and that should prompt additional research, is why parolees are four times as likely as people under probation supervision to be arrested for violations of the conditions of their release. This is notable because probationers constitute twice as many arrests for violent, property, and drug crimes as parolees.

These two questions notwithstanding, the statistics highlighted above point to substantial opportunities for police, probation, and parole to reduce the extent to which people on probation and parole contribute to arrest activity. National research has clearly demonstrated that the right level of probation or parole supervision, combined with substance abuse treatment

[36] Thomas E. Feucht and Joseph Gfoerer, "Mental and Substance Use Disorders among Adult Men on Probation or Parole: Some Success against a Persistent Challenge," *Substance Abuse and Mental Health Services Administration Date Review,* 2011, accessed December 3, 2012, http://oas.samhsa.gov/2k11/NIJ_Data_Review/MentalDisorders.htm).

that corresponds to the severity of that person's addiction, can have a significant impact on the likelihood of a person on probation or parole reoffending.[37] Accordingly, because a large share of the arrest activity of people under parole and probation supervision stems from drug-related issues, there is a significant potential for realizing a reduction in total arrests through the application of evidence-based practices in probation and parole.[38]

## FINDING 4

**From January 2008 to June 2011, the number of arrests made in the four jurisdictions declined by 18 percent, while the number of arrests of people under supervision in these jurisdictions declined by 40 percent.**

*According to the most recent state-published crime data, reported crime in California declined 11 percent between 2008 and 2011.[39] Similarly, each of the four jurisdictions studied experienced drops in crime during the same period, ranging from a decline of 7 percent in Redlands to a decline of 19 percent in Sacramento.[40] In this study, which uses arrests as a measure of crime, researchers sought to determine whether the arrest patterns among people on probation or parole mirrored the decline in arrests generally across the four jurisdictions. Percent change was calculated based on the average number of arrests for the first six months of 2008 (January through June) compared to the average number of arrests for the first six months of 2011 (January through June).*

### Supporting Data



**Figure 7: Arrest Trends in the Four Jurisdictions**



---

[37] Elizabeth K. Drake, Steve Aos, and Marna Miller, "Evidence-Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State," *Victims and Offenders* 4 (2009).

[38] For a detailed analysis of multiple arrests by type of offense and supervision status in Los Angeles, see Appendix B.

[39] "Crime in California 2011," California Department of Justice, accessed December 3, 2012, http://oag.ca.gov/sites/all/files/pdfs/cjsc/publications/candd/cd11/cd11.pdf.

[40] Federal Bureau of Investigation, "Crime in the U.S. 2008 and 2011," accessed October 4, 2012, http://www.fbi.gov/stats-services/crimestats.

**Arrests involving individuals under parole supervision declined by 61 percent. The reduction in arrests of people under probation supervision also outpaced the decline in overall arrests, but not as significantly as for people under parole supervision.**

- From January 2008 to May 2011, the total number arrests across all four jurisdictions declined by 18 percent.
- In the same period, the total number of arrests for all individuals under supervision declined by 40 percent.
- The total number of arrests involving individuals under parole supervision declined by 61 percent and by 26 percent for those under probation supervision.

**Figure 8: Change in Supervision Populations and Related Arrests, 2008, 2011**

| Jurisdiction | | 2008 | 2011 | % Change |
|---|---|---|---|---|
| Los Angeles | Total Arrests (monthly average) | 8,449 | 7,289 | -14% |
| | Parole POP (average) | 12,489 | 10,745 | -14% |
| | Arrests - Parolees | 1,002 | 327 | -67% |
| | Probation Pop (county average) | 63,237 | 52,641 | -17% |
| | Arrests - Probationers | 1,359 | 843 | -38% |
| Redlands | Total Arrests (monthly average) | 135 | 130 | -3% |
| | Parole POP (average) | 241 | 156 | -35% |
| | Arrests - Parolees | 16 | 9 | -48% |
| | Probation Pop (county average) | 20,289 | 17,925 | -12% |
| | Arrests - Probationers | 21 | 15 | -30% |
| Sacramento | Total Arrests (monthly average) | 1,936 | 1,561 | -19% |
| | Parole POP (average) | 3,228 | 3,779 | -16% |
| | Arrests - Parolees | 203 | 128 | -37% |
| | Probation Pop (county average) | 21,029 | 20,533 | -2% |
| | Arrests - Probationers | 401 | 308 | -23% |
| San Francisco | Total Arrests (monthly average) | 2,171 | 1,475 | -32% |
| | Parole POP (average) | 1,171 | 1,680 | +7% |
| | Arrests - Parolees | 64 | 35 | -46% |
| | Probation Pop (county average) | 6,500 | 6,329 | -3% |
| | Arrests - Probationers | 70 | 212 | +201% |
| Four jurisdictions together | Total Arrests (monthly average) | 12,691 | 10,455 | -18% |
| | Parole POP (average) | 17,526 | 16,320 | -7% |
| | Arrests - Parolees | 1,285 | 498 | -61% |
| | Probation Pop (county average) | 111,055 | 97,428 | -12% |
| | Arrests - Probationers | 1,850 | 1,378 | -26% |

Note: The table above presents various trends in arrest activity and supervision populations between 2008 and 2011 across the four jurisdictions represented in this study. In addition to depicting arrests in total and for parole and probationer groups, the average number of people supervised on parole and probation are also shown. This table provides context for understanding the relationship between the changing arrest volume and the changing number of people supervised on parole or probation.

## Conclusion for Finding 4

Although all four jurisdictions experienced a decrease in total arrests over the period of this study, arrests for people under supervision declined much more significantly than for individuals not under supervision. Factoring in the 7-percent decline in the number of people on parole and the 12-percent drop in the probation population over the study period also does not entirely explain the steep reductions in arrests among people under supervision.

Particularly notable was the plummeting number of arrests among people under parole supervision. The implementation of non-revocable parole (NRP), which was not in full effect for more than two-thirds of the study period covered, does not explain this particular trend. Furthermore, for the period when NRP was in effect during the study period, this subset of parolees was a small fraction of the general parole population. (See box on page 2, "California Downsizes Its Prison Population" and Finding 6 on page 27) Instead, what merits closer analysis are the concentrated efforts employed by CDCR administrators that coincided with the drop in arrests. The development and implementation of a validated risk assessment instrument to guide release decisions and the use of risk assessment results informed the allocation of supervision and treatment resources. These efforts were consistent with efforts in other jurisdictions that have improved success rates for people under community supervision.

Although these data suggest the increased effectiveness of local probation departments and state parole in California, focus group meetings with police officers reflected that they did not perceive that these community supervision agencies were becoming more successful in reducing crimes committed by people on probation and parole. Instead, law enforcement officers stated that probation and parole officers were under significant pressure to reduce revocation rates. That pressure in turn meant that, unlike in years past, people on parole and probation supervision who engaged in certain types of criminal behavior were not being returned to prison.

Research has demonstrated that for probation and parole to be successful in changing people's behavior, effective supervision strategies (such as intensive supervision of high-risk individuals, addressing criminal thinking and other needs such as substance abuse, and swift and certain responses to violation behavior) must be applied. But regardless of how rich this research is— and what the data in California may indicate—its practical value depends in no small part on the willingness of law enforcement to partner with probation and parole agencies to help this population succeed in the community. On the other hand, if law enforcement doesn't believe that it's possible for parole and probation officers to have a meaningful impact on the behavior of people under supervision, they will  perceive anyone under probation or parole supervision to be a threat to public safety, to which arrest and revocation are the only effective response.

## FINDING 5

**The assessment of a parolee's risk of reoffense was an effective indicator of the likelihood that he or she would be rearrested, although the assessment of a probationer's risk of reoffense did not effectively predict that individual's likelihood to reoffend in three of the four jurisdictions.**

*Over the past several years, CDCR and local probation departments have taken steps to ensure the use of validated risk assessment tools in targeting supervision strategies and resources. For this study, researchers sought to determine whether risk assessment results were indeed a useful tool to determine which people under supervision were contributing disproportionately to arrest activity.*

*Whereas CDCR had fully implemented a risk assessment instrument and recorded these data consistently in parolees' individual records, local probation departments were at different stages in the implementation of risk assessment over the study period.[41] Probation departments also maintained data about risk assessment results differently.*

*Despite this variation, there were sufficient data for researchers to match individuals' arrest data with data from supervision agencies describing individuals' risk assessment results. Although this analysis did not amount to an evaluation of risk assessment practices, it did provide significant insight into the predictive validity of the risk assessment practices employed by the various departments in the different jurisdictions.*

## Supporting Data

**Figure 9: Risk Levels by Supervision Status across All Jurisdictions**



**For individuals under parole supervision who were arrested, CDCR risk assessment data was a strong indicator of reoffense, particularly for high-risk individuals.**

- The majority of individuals on parole supervision who were arrested had been identified as high risk by CDCR:
  - 51 percent of all parolee arrests were people whom CDCR had categorized as high risk
  - 33 percent as moderate risk
  - 13 percent as low risk

---

[41] The status of the implementation of risk assessment continued to vary from county to county through the close of 2012. See box on page 26, "What Works in Supervision and Risk Assessment."

**In three of the four jurisdictions, risk level was a less effective indicator of reoffense for individuals under probation supervision.**[42]

■ The majority of individuals under probation supervision who were arrested had not been identified as high risk in three of the four jurisdictions:

□ 5 percent were categorized as "high risk" by local county probation departments

□ 38 percent were categorized as moderate risk

□ 37 percent as low risk

■ A clear exception to the overall trend indicated above, San Francisco's risk assessment data was highly predictive of reoffense. Of the individuals on probation supervision in San Francisco who were arrested:

□ 73 percent were categorized as high risk by the San Francisco county probation department

□ 11 percent were categorized as moderate risk

□ 2 percent as low risk

## Conclusion for Finding 5

Since 2006, CDCR has made a concerted effort to employ evidence-based supervision practices, including the use of a validated risk assessment tool to assign individuals on parole to appropriate treatment and supervision. Based on the study data, individuals under parole supervision identified as high risk represented the majority of parolee arrests, which is consistent with their risk-level determination and suggests that CDCR's validated risk assessment instrument was able to successfully identify individuals most likely to reoffend.

Line-level police officers and supervisors in focus groups noted that people under parole coming out of state prison historically have had longer, more violent criminal histories than people sentenced directly to probation supervision.[43] This observation, while accurate, does not justify a conclusion that all people on parole present a similar risk of reoffense. Validated risk assessment instruments enable community supervision authorities to disaggregate that population into approximately three to four tiers of risk, with the distribution of people into these being fairly even across risk levels.[44]

---

[42] During the period of this study, the four probation departments were at various stages in the adoption and use of risk assessment instruments. For example, the Sacramento Probation Department did not adopt a validated risk assessment tool until November 2009.

[43] Law enforcement officers in San Francisco noted in focus group discussions that it was particularly difficult for someone in that city to end up on parole supervision—an observation supported by the data showing that far fewer residents were under parole supervision in San Francisco than in the other four jurisdictions. See box on pages 8-9, "The Four Jurisdictions."

[44] Notably, the arrest distribution of people across risk levels in some probation departments was not even, with a disproportionately large share of probationers clustering in a particular risk level. Such situations do not necessarily reflect that the overall probation population is "high risk," but rather that the risk assessment tool is not effectively disaggregating the population.

Trends in arrest data are less consistent with risk levels determined by probation departments in this study. Since the end of the data collection period in 2011, probation executives have identified the use of validated risk instruments as a priority and are working towards increasing capacity in this area.

This finding points to valuable opportunities for law enforcement to leverage risk assessment information regarding parolees and, as it becomes more reliable, for people under probation supervision. Interestingly, focus group meetings reflected that law enforcement officers were often unfamiliar with risk assessment tools or the value of this information. The community supervision information that police reported receiving was generally limited to whether a person was under supervision and his or her address, although that information was not routinely available. If it was available, it was not necessarily reliable. Furthermore, when law enforcement officers were asked in focus group meetings about risk assessment data, they typically assumed the question referred to a person's custody level while incarcerated, which is useful for determining how a person will behave while incarcerated but is of little value in determining whether a person will reoffend while in the community.

## What Works in Supervision and Risk Assessment

Reviewing a growing body of knowledge and experience about what practices work in supervision, experts point to four core practices that are essential to success in reducing recidivism. Based on current best practices, supervision agencies should:

1. Effectively assess individuals' criminogenic risk and needs, as well as their strengths (also known as "protective factors");
2. Employ smart, tailored supervision strategies;
3. Use incentives and graduated sanctions to respond promptly to clients' behaviors;
4. Implement performance-driven personnel management practices that promote and reward recidivism reduction.[45]

Validated criminogenic risk assessment tools are especially effective in helping to gauge the likelihood that an individual will come in contact with the criminal justice system, either through a new arrest and conviction or reincarceration for violating conditions of release. Use of these instruments allows the corrections system to prioritize supervision and treatment resources for those individuals who pose the greatest risk of reoffense. Risk assessment tools usually consist of 10 to 30 questions designed to ascertain an individual's history of criminal behavior, attitudes and personality, and life circumstances. Risk assessments can be administered at any time during a person's contact with the criminal justice system, from first appearance through presentencing, on admission to a correctional facility, prior to release, and during post-release supervision. Risk assessments help categorize individuals as being at low, medium, or high risk for reoffense, and predict the likelihood of future outcomes according to analysis of static factors (e.g., criminal history) and dynamic factors (e.g., behavioral health or addiction).

---

[45] Tony Fabelo, Geraldine Nagy, and Seth Prins, *A Ten-Step Guide to Transforming Probation Departments to Reduce Recidivism* (New York: Council of State Governments Justice Center, 2011).

## FINDING 6

### Individuals on Non-Revocable Parole (NRP) supervision had almost no impact on overall arrest activity during the study period.

*In January 2010, pursuant to SB18, the CDCR instituted a parole supervision policy known as Non-Revocable Parole (NRP). (See box on page 2, "California Downsizes Its Prison Population.") To be eligible for NRP, a person released from prison had to be assessed as being at a lower-risk of reoffending and could not have a criminal conviction for various serious offenses (e.g., sex offenses, murder, voluntary manslaughter, robbery, 1st degree burglary). Releases of prisoners to NRP began in earnest in March 2010. By the end of April 2010, almost 9,000 people had been released statewide (not just in the four jurisdictions studied) to the community on NRP. Approximately six months later, CDCR reported that NRP had been fully implemented; by that time, there were 16,500 people on NRP in communities across California. Accordingly, this study incorporated NRP data from March 2010 through June 2011, the last month of data collected for this study. Taking into account this context, there were approximately 2,000 people on average under NRP supervision in Los Angeles, Sacramento, San Francisco, and Redlands on a given day during the year-plus period in the study period that overlapped with the implementation of NRP. Because a steady stream of people were released to NRP over the study period and because people concluded their supervision requirements during the time period, the total number of individuals who experienced NRP during the study period far exceeded 2,000.*

### Supporting Data

**Individuals under NRP supervision accounted for less than 0.2% of total arrests.**

- Of the 170,336 adult arrests that occurred in the four jurisdictions during the 15-month period of the study that overlapped with the implementation of NRP, 216 arrests involved people on NRP.

### Conclusion for Finding 6

Data produced elsewhere showing the decline in the state parole population and the number of parole revocations reflect that NRP has likely contributed significantly to reduced crowding in the state prison system. The data described above reflect that for at least the 15 months in which it was in effect during the study period, NRP did not contribute meaningfully to arrest activity in Los Angeles, Sacramento, San Francisco, or Redlands. Based on these data, NRP appeared to be an effective approach to managing a subset of people on parole that resulted in little, if any, impact on crime rates. The

data cited above, however, are insufficient to make any conclusive statements about NRP because the timeframe of this study contemplating NRP was relatively brief. Additional analysis should be conducted to determine whether the outcomes described above persist over a longer time period.

Furthermore, in focus group discussions, line-level officers and supervisors across the four police jurisdictions expressed some frustration with NRP. They observed that people under NRP felt "empowered." Aware that the threshold for returning to prison was considerably higher than if they under traditional parole supervision, they exhibited little concern about their parole status. This dynamic made it particularly frustrating for police, who said they came into frequent contact with people under NRP, but felt there was a certain degree of futility in arresting them for behaviors that would not result in a revocation and for crimes that the District Attorney would be unlikely to prosecute.

As discussed elsewhere in the report, police, parole, and probation officials and prosecutors would clearly benefit from additional efforts to build consensus about what types of responses to what types of behavior would in fact have the greatest impact on public safety. Such consensus-building conversations are especially important as local law enforcement shifts its attention (and concerns) from CDCR's use of NRP to the state's realignment of responsibility for supervising certain categories of offenders to local government.

# RECOMMENDATIONS

**B**ased on the findings of this study, focus groups with line-level officers and supervisors from all four jurisdictions, and discussions with top officials, CSG Justice Center staff has identified five recommendations for state and local officials seeking to maximize the impact of state and local governments' limited resources on public safety:

**1. Promote the implementation of validated risk assessment tools for each local probation department to determine which people under community supervision are most likely to reoffend.**

Findings reflected that risk assessment results generated by CDCR parole and some probation departments appeared to be accurate predictors of reoffense. State and local governments need to ensure that all probation departments get similar value from their risk assessment tools. To that end, these agencies must make a commitment to use risk assessment instruments that are validated, used correctly, and inform the targeting and deployment of supervision resources.

**2. Improve coordination among law enforcement, probation, and parole agencies; design policies and practices to facilitate sharing of risk assessment results and to inform how law enforcement use these data.**

Line-level law enforcement officers reported receiving little, if any, routine information about the people in the communities they patrol who are on probation or parole. Police officers similarly described efforts to retrieve accurate, useful data from existing information systems about individual parolees and probationers as challenging, time-consuming, and generally fruitless.

Police officers interviewed expressed appreciation that parole and probation officers, saddled with high caseloads, were doing the best they could with the limited resources they had. At the same time, they lamented that community supervision officers frequently seemed inaccessible. Because parole and probation officers did not work the same 24-hour shift schedule as their counterparts in police departments, officers working the evening or midnight shifts or on the weekend predictably found it nearly impossible to reach a parole or probation officer at his or her desk during these hours. Furthermore, it came as no surprise that given these unaligned schedules, and the increasingly stretched resources of community supervision agencies generally, police officers described a perception commonly held among law enforcement officers that parole and probation officers were rarely visible in the community.

In short, according to focus groups with police, what information exchange and communication did occur between law enforcement and probation and parole were ad hoc at best, and typically depended on personal relationships. For example, some officers highlighted specific individuals in local parole and probation offices as particularly accessible, noting that they had their cellphone numbers.

Individual police departments across the United States have successfully navigated some of these challenges, working with probation and parole to reduce reoffense rates among people with violent offense histories.[46] But these efforts are isolated and the extent to which they have been replicated varies significantly from one jurisdiction to the next.

Furthermore, few, if any, police departments anywhere have had the opportunity to explore how they might leverage risk assessment data from community corrections agencies, which could be a tremendous resource to local law enforcement. Accurate risk assessment results could enhance significantly the data that law enforcement executives use to deploy resources to prevent criminal activity.

Law enforcement leaders in California have received national recognition for their application of intelligence-led and hot-spot policing. This emphasis on data to inform the allocation of limited policing resources, coupled with the new pressures that Realignment has created for local governments, make California an ideal laboratory to design and test new approaches to coordinating the work of police and community supervision agencies and to sharing risk assessment data and police intelligence to inform the deployment of patrol and supervision resources.

**3. Provide targeted, evidence-based supervision and treatment to adults assessed to be at high risk for reoffense.**

Although people under supervision contribute to just over one out of every five arrests, this fraction still translates into thousands of arrests in these four jurisdictions annually. Analyses conducted for this study highlighted that a disproportionately large share of those arrests are for drug crimes, which in turn generate significant costs for jails, courts, and supervision agencies.

National research has demonstrated the potential that parole and probation departments have to reduce re-arrest rates of people who are at high risk of reoffending. Equipped with effective risk assessment tools, local jurisdictions and supervision agencies must use this information to inform supervision strategies that provide, for example, high-risk

[46] Anthony Braga, "Controlling Violent Offenders Released to the Community: An Evaluation of the Boston Reentry Initiative," *Journal of Research in Crime and Delinquency* 46 (2009): 411-436. Adam K. Katz, Matthew T. DeMichele, and Nathan C. Lowe, "Police-Probation/Parole Partnerships: Responding to Local Street Gang Problems," *The Police Chief* 79 (October 2012): 24-38. Bitna Kim, Jurg Gerber, and Dan Richard Beto, "Listening to Law Enforcement Officers: The Promises and Problems of Police-Probation Partnerships," *Journal of Criminal Justice* 38 no. 4 (2010): 625-632.

people with closer supervision and treatment programming. Such approaches have been shown to reduce recidivism by up to 20 percent.[47] Most community supervision agencies in California are quick to say that they are in the process of employing such evidence-based approaches to intensive supervision and treatment. Policymakers, in partnership with community corrections officials and local law enforcement, should take steps to assess, objectively, the progress local governments are making in adopting these strategies and the results they are getting. In doing so, they should identify gaps in resources at the local level that impede the employment of evidence-based approaches to community supervision and treatment.[48]

**4. Continue analyses of arrest and supervision data to track how people under supervision are contributing to arrest activity since the implementation of Realignment.**

Extraordinary collaboration among four police departments, four probation departments, CDCR, and other agencies made the unprecedented collection and analysis of data for this study possible. The insights that this study yielded are invaluable. In addition, this study has established a baseline of arrest data essential to determine to what extent trends evolve in the years following this study. Local and state officials reading this study will likely speculate how arrest patterns among people under supervision have changed since June 2011 (the last month of data collected for this study), particularly given the subsequent implementation of Realignment. To ensure such observations are not based on anecdotal information, but instead are data-driven, local and state officials should leverage the investment made to date to continue these analyses and to inform the deployment of resources in both policing and supervision.

**5. Improve state's capacity to share and analyze data among local jurisdictions and state corrections agencies.**

The collection and analysis of the data for this report was an especially complex undertaking. No comprehensive statewide standards exist in California to ensure that individual jurisdictions or supervision agencies collect and maintain data uniformly. Nor is there a practical system for sharing data among the organizations that maintain separate data systems. Consequently, obtaining and matching the data required for an analysis such as the one conducted in this study requires a Herculean effort. For this project alone, eleven different databases had to be tapped to study four jurisdictions. Given the challenges associated with collecting the data, expanding this study to cover the entire state would have been even more daunting.

---

[47] Elizabeth K. Drake, Steve Aos, and Marna Miller, "Evidence-Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State," *Victims and Offenders* 4 (2009): 170.

[48] Various publications provide guidance on how such assessments might be conducted. See, for example: Tony Fabelo, Geraldine Nagy, and Seth Prins, *A Ten-Step Guide to Transforming Probation Departments to Reduce Recidivism* (New York: Council of State Governments Justice Center, 2011).

In contrast, other big states such as New York and Texas would be well positioned to conduct statewide versions of this analysis. There, robust statewide information systems, which maintain law enforcement and community supervision data, make it possible to match individual arrest, parole, and probation records and to track trends involving these populations on a regular basis.

California should make the investment necessary to build an infrastructure for collecting and storing these critical criminal justice data. Such infrastructure would include requirements for law enforcement agencies, probation departments, and the CDCR to submit data regularly that include electronic case records reflecting arrest activity and supervision by parole and probation departments. To ensure information can be shared effectively among these agencies, for research and operational purposes, data need to be recorded consistently. For example, individual CII numbers need to be maintained consistently to support data matching undertaken for research purposes.

Even with commitments by law enforcement, probation, and parole agencies to share these critical data, it is likely that a single entity would have to be designated as a central point of collection for the data. There may already exist multiple candidates for acting as the repository of the data, but they would have to be responsible for the dissemination of the data to appropriate parties for basic reporting and other research purposes, such as analyses relating to the findings presented in this report.

# CONCLUSION

**T**HIS STUDY WAS COMMISSIONED BY LEADING LAW ENFORCEMENT OFFICIALS IN CALIFORNIA to determine how individuals under probation and parole supervision impact law enforcement resources. Their willingness to make available hundreds of thousands of arrest records and to dedicate staff at all levels of their agencies to inform the study's methodology and to review preliminary findings is a testament to these executives' commitment to ensure that data and research, not just anecdotal experience, drive policy and practice. The cooperation provided by the CDCR and local probation officials in this study—through their willingness to share data, advise on analyses, and review drafts of this report—demonstrates just how much they value their partnership with local law enforcement agencies. In short, this undertaking is a model for joint ventures for state and local governments everywhere.

A key takeaway from this report is that about one in five people arrested in four metropolitan areas in California were under parole or probation supervision when they came into contact with police. And when compared to the almost 80 percent of arrests that did not involve people under community supervision, people under probation and parole supervision made up a disproportionately large share of drug arrests. These figures may surprise law enforcement officials and people on the front lines of the criminal justice system who, prior to seeing these findings, perceived people on probation and parole to be a primary driver of police arrest activity. In fact, these findings illustrate that, to achieve the largest reductions in crime, resources must effectively target the 80 percent of people arrested (and the places where they are committing crimes) who are not under community supervision.

At the same time, the findings demonstrate that there is a subset of people on probation and parole contributing disproportionately to drug, property, and violent crime. Research presented here reflects that risk assessment instruments employed by community supervision agencies provide an invaluable tool to predict which of the hundreds of thousands of people under parole and probation supervision on any given day are most likely to reoffend. This is a critically important development: Law enforcement resources are already stretched past the breaking point and must not be diluted further by approaching probationers and parolees as a monolithic group to be policed similarly. Working with community supervision agencies to use risk assessment information to inform their policing strategies could help law enforcement accomplish the twin objectives of using existing resources more efficiently and increasing public safety. Because research demonstrates that community supervision of people at high risk of reoffending is most likely to reduce reoffense rates when paired with evidence-based treatment, law enforcement officials will want to ensure that probation has the resources it needs to be effective.

Another interesting trend that this research revealed was the sharp decline in recent years of the number of arrests of people under parole supervision, which has significantly outpaced the decline in arrests generally. Is this because CDCR has improved how it supervises and serves this population? Or have police increasingly refrained from arresting people on parole for low-level crimes? Whatever the case, this is a trend worth exploring further, as it has contributed to hundreds of millions of dollars in savings as parole revocations have declined.

Finally, this study illustrates why this type of research and analysis is so important. Realignment will continue to evolve over the next several years, having an impact that goes beyond reducing the state prison population and into areas such as, for example, pretrial or sentencing practices. Continuing this research can vitally inform state and local decision making as policies are developed and provide great value in measuring the impact of these policies as they are implemented.

California is undergoing a remarkable restructuring of the relationship between state and local corrections, supervision, and law enforcement agencies. This study not only helps policymakers navigate next steps, but also informs the dialogue between other state and local governments, as what is happening in California is a harbinger of things to come in states across the country.

# APPENDIX A.
## ADDITIONAL INFORMATION REGARDING METHODOLOGY

**F**OR EACH ARREST RECORD PROVIDED, the data elements included unique person identifiers (state and county criminal justice identification numbers),[49] date of arrest, type of offense charged, and the degree of offense charged (felony or misdemeanor). For the type of offense charged, a general description was provided (e.g., possession of controlled substance, burglary, etc.) as well as a specific statutory citation. To categorize types of offense, six different categories were used: Violent,[50] Property, Drug, DUI, Other,[51] and Parole/Probation Violations. The last category—Parole/Probation Violations—is comprised of arrest events in which the violation of a condition of supervision was the sole charge for which an individual was arrested. The violation arrest could have been the result of a police officer's field observation of the behavior of the parolee or probationer who was in violation of conditions of supervision. The violation arrest could have also been the result of the execution of a warrant issued by the court.

Given the varied nature of arrest events (such as an individual being taken into custody on multiple offense charges), arrest data typically capture all charges associated with the arrest event. For example, if an individual was arrested by LAPD on a certain day during the time period and charged with five different offenses, the dataset contained five unique arrest records for that person all with the same arrest date. In these instances, researchers consolidated the entries into one record using the most serious offense charged. For example, if someone was arrested and charged with both felony aggravated assault and felony possession of a controlled substance, the only offense from that arrest event that was represented in the study was the felony aggravated assault charge. The final arrest dataset contained more than 475,000 arrest events.

For each parole record provided, the data elements included unique person identifiers (state criminal justice identification), date of admission to prison, date of prison release, date of parole begin, date of parole end, type and degree of offense for which they were imprisoned and later released to parole, and the risk level of the parolee. For the type of offense for which they were placed on parole, a general description was provided (e.g. possession of controlled substance, burglary, etc.) as well as a specific statutory citation. As with the arrest data, for instances in which an individual was sentenced to prison for multiple offenses (and subsequently released to parole), the combination of elements provided allowed for the creation of a parole dataset that reflected the most serious offense.

---

[49] A Criminal Information Indicator (CII) number is used statewide in California to identify persons coming into contact with the criminal justice system and is assigned according to fingerprint. Sacramento and San Francisco counties also have their own unique numbering system for identifying persons coming into contact with the local county criminal justice system, with numbers also assigned according to fingerprint.

[50] Violent offenses are based on the Federal Bureau of Investigation Uniform Crime Reports definitions and also include weapons offenses.

[51] Examples of Other offenses include vandalism, fugitive from justice for felony arrest, failure to disclose origin of recording, failure to appear in court (non-traffic), driving without a license, and prostitution.

**Figure 10: Data Elements Provided for This Study**

| Arrest Data | Parole Data | Probation Data |
|---|---|---|
| ☐ State CII and County ID | ☐ State CII | ☐ State CII and/or County ID |
| ☐ Arrest Event ID | ☐ CDCR Case ID | ☐ Probation Case ID |
| ☐ Demographics | ☐ Date(s) of Admission to Prison—may be multiple for in/out on violations | ☐ Date of Probation Begin |
| ☐ Date of Arrest Offenses Charged—Type/Description, Degree, and Statute Citation | ☐ Offense of Record—Type/Description and Statute Citation | ☐ Offense of Record—Type/Description and Statute Citation |
| | ☐ Date(s) of Release from Prison—may be multiple for in/out on violations | ☐ Date of Probation End |
| | ☐ Date(s) of Parole Begin—may be multiple for in/out on violations | ☐ Supervision Level and Change Date—including all for changing levels |
| | ☐ Supervision Level and Change Date—including all for changing levels | ☐ Risk Level and Assessment Date—including all for multiple assessments |
| | ☐ Risk Level and Assessment Date—including all for multiple assessments | |

# APPENDIX B.
# ARRESTS BY SUPERVISION STATUS FOR LOS ANGELES

People under community supervision made up 17 percent of all adult arrests in Los Angeles during the study period, but this 17 percent of adults arrested accounted for 24 percent of all arrest events that occurred during the study period, which points to the multiple arrest factor.

An in-depth analysis of individuals on parole and probation who were arrested on multiple occasions in Los Angeles showed that drug arrests were the principal reason why that subset of people were arrested twice or more during the study period. The figure below illustrates the number of individuals arrested during the period of the study by supervision status, as well as the total number of arrest events by supervision status.

If the rate of arrests for drug offenses for those under supervision was similar to that for those who were not under supervision, the total volume of arrests for individuals under supervision would have declined by more than 25,000 arrests. Such a decrease would have brought the overall rate of arrests per person down to levels roughly equal to those for individuals not under supervision.

**Figure 11: Arrests by Supervision Status for Los Angeles**



# APPENDIX C.
# ARRESTS IN THE FOUR JURISDICTIONS BY OFFENSE TYPE AND SUPERVISION STATUS

**Figure 12:** Arrests in the Four Juristictions by Offense Type and Supervision Status

| Total Adult Arrests - All Four Jurisdictions | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **476,054** | **40,476** | **66,251** | **369,327** |
| Violent | 94,179 | 5,195 | 10,084 | 78,900 |
| Property | 56,117 | 4,110 | 8,875 | 43,132 |
| Drug | 120,253 | 12,342 | 28,666 | 79,245 |
| DUI | 40,705 | 538 | 1,394 | 38,773 |
| Other | 150,554 | 6,995 | 14,282 | 129,277 |
| Par/Prob Vio | 14,246 | 11,296 | 2,950 | — |

| Felony Adult Arrests - All Four Jurisdictions | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **267,006** | **31,391** | **47,133** | **188,482** |
| Violent | 71,829 | 4,406 | 8,330 | 59,093 |
| Property | 45,683 | 3,961 | 8,170 | 33,552 |
| Drug | 92,218 | 9,484 | 23,811 | 58,923 |
| DUI | 2,432 | 38 | 96 | 2,298 |
| Other | 40,621 | 2,212 | 3,793 | 34,616 |
| Par/Prob Vio | 14,223 | 11,290 | 2,933 | — |

| Misdemeanor Adult Arrests - All Four Jurisdictions | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **209,048** | **9,085** | **19,118** | **180,845** |
| Violent | 22,350 | 789 | 1,754 | 19,807 |
| Property | 10,434 | 149 | 705 | 9,580 |
| Drug | 28,035 | 2,858 | 4,855 | 20,322 |
| DUI | 38,273 | 500 | 1,298 | 36,475 |
| Other | 109,933 | 4,783 | 10,489 | 94,661 |
| Par/Prob Vio | 23 | 6 | 17 | — |

| Total Adult Arrests - Los Angeles | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **326,659** | **31,031** | **46,214** | **249,414** |
| Violent | 65,152 | 4,214 | 7,026 | 53,912 |
| Property | 35,117 | 3,014 | 5,775 | 26,328 |
| Drug | 74,193 | 9,879 | 20,159 | 44,155 |
| DUI | 32,893 | 412 | 1,069 | 31,412 |
| Other | 110,156 | 5,480 | 11,069 | 93,607 |
| Par/Prob Vio | 9,148 | 8,032 | 1,116 | — |

| Felony Adult Arrests - Los Angeles | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **176,035** | **23,471** | **32,479** | **120,085** |
| Violent | 51,749 | 3,653 | 6,001 | 42,095 |
| Property | 30,447 | 2,927 | 5,419 | 22,101 |
| Drug | 59,898 | 7,735 | 17,464 | 34,699 |
| DUI | 1,955 | 28 | 77 | 1,850 |
| Other | 22,847 | 1,102 | 2,405 | 19,340 |
| Par/Prob Vio | 9,139 | 8,026 | 1,113 | — |

| Misdemeanor Adult Arrests - Los Angeles | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **150,624** | **7,560** | **13,735** | **129,329** |
| Violent | 13,403 | 561 | 1,025 | 11,817 |
| Property | 4,670 | 87 | 356 | 4,227 |
| Drug | 14,295 | 2,144 | 2,695 | 9,456 |
| DUI | 30,938 | 384 | 992 | 29,562 |
| Other | 87,309 | 4,378 | 8,664 | 74,267 |
| Par/Prob Vio | 9 | 6 | 3 | — |

| Total Adult Arrests - Redlands | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **6,236** | **534** | **810** | **4,892** |
| Violent | 824 | 55 | 63 | 706 |
| Property | 972 | 108 | 179 | 685 |
| Drug | 2,188 | 116 | 384 | 1,688 |
| DUI | 755 | 7 | 36 | 712 |
| Other | 1,272 | 71 | 100 | 1,101 |
| Par/Prob Vio | 225 | 177 | 48 | — |

| Felony Adult Arrests - Redlands | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **2,947** | **429** | **633** | **1,885** |
| Violent | 421 | 41 | 53 | 327 |
| Property | 799 | 101 | 166 | 532 |
| Drug | 891 | 70 | 299 | 522 |
| DUI | 24 | 0 | 1 | 23 |
| Other | 587 | 40 | 66 | 481 |
| Par/Prob Vio | 225 | 177 | 48 | — |

| Misdemeanor Adult Arrests - Redlands | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **3,289** | **105** | **177** | **3,007** |
| Violent | 403 | 14 | 10 | 379 |
| Property | 173 | 7 | 13 | 153 |
| Drug | 1,297 | 46 | 85 | 1,166 |
| DUI | 731 | 7 | 35 | 689 |
| Other | 685 | 31 | 34 | 620 |
| Par/Prob Vio | 0 | 0 | 0 | — |

| Total Adult Arrests - Sacramento | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **61,847** | **6,374** | **12,456** | **43,017** |
| Violent | 13,329 | 726 | 2,333 | 10,270 |
| Property | 9,858 | 676 | 2,014 | 7,168 |
| Drug | 17,871 | 1,413 | 4,977 | 11,481 |
| DUI | 5,572 | 118 | 270 | 5,184 |
| Other | 11,091 | 520 | 1,657 | 8,914 |
| Par/Prob Vio | 4,126 | 2,921 | 1,205 | — |

| Felony Adult Arrests - Sacramento | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **31,634** | **5,085** | **8,411** | **18,138** |
| Violent | 9,037 | 526 | 1,752 | 6,759 |
| Property | 6,515 | 625 | 1,754 | 4,136 |
| Drug | 8,017 | 789 | 3,129 | 4,099 |
| DUI | 295 | 10 | 15 | 270 |
| Other | 3,658 | 214 | 570 | 2,874 |
| Par/Prob Vio | 4,112 | 2,921 | 1,191 | — |

| Misdemeanor Adult Arrests - Sacramento | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **30,213** | **1,289** | **4,045** | **24,879** |
| Violent | 4,292 | 200 | 581 | 3,511 |
| Property | 3,343 | 51 | 260 | 3,032 |
| Drug | 9,854 | 624 | 1,848 | 7,382 |
| DUI | 5,277 | 108 | 255 | 4,914 |
| Other | 7,433 | 306 | 1,087 | 6,040 |
| Par/Prob Vio | 14 | 0 | 14 | — |

| Total Adult Arrests - San Francisco | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **81,312** | **2,537** | **6,771** | **72,004** |
| Violent | 14,874 | 200 | 662 | 14,012 |
| Property | 10,170 | 312 | 907 | 8,951 |
| Drug | 26,001 | 934 | 3,146 | 21,921 |
| DUI | 1,485 | 1 | 19 | 1,465 |
| Other | 28,035 | 924 | 1,456 | 25,655 |
| Par/Prob Vio | 747 | 166 | 581 | — |

| Felony Adult Arrests - San Francisco | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **56,390** | **2,406** | **5,610** | **48,374** |
| Violent | 10,622 | 186 | 524 | 9,912 |
| Property | 7,922 | 308 | 831 | 6,783 |
| Drug | 23,412 | 890 | 2,919 | 19,603 |
| DUI | 158 | 0 | 3 | 155 |
| Other | 13,529 | 856 | 752 | 11,921 |
| Par/Prob Vio | 747 | 166 | 581 | — |

| Misdemeanor Adult Arrests - San Francisco | | | | |
|---|---|---|---|---|
| Offense Type | Total Arrests | Active Parolee | Active Probationer | Not Supervised |
| **Total** | **24,922** | **131** | **1,161** | **23,630** |
| Violent | 4,252 | 14 | 138 | 4,100 |
| Property | 2,248 | 4 | 76 | 2,168 |
| Drug | 2,589 | 44 | 227 | 2,318 |
| DUI | 1,327 | 1 | 16 | 1,310 |
| Other | 14,506 | 68 | 704 | 13,734 |
| Par/Prob Vio | 0 | 0 | 0 | — |

