DONALD SPECTER – 083925
WARREN E. GEORGE – 053588
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
REBEKAH EVENSON – 207825
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
KRISTA STONE-MANISTA – 269083
MARGOT MENDELSON – 268583
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California 94104-1823
Telephone:   (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, California 94107-1389
Telephone:   (415) 864-8848

GEOFFREY T. HOLTZ -- 191370
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, California 94111-4067
Telephone:   (415) 393-2000

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>         Plaintiffs,<br><br>     v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>         Defendants. | Case No. Civ S 90-0520 LKK-JFM P<br><br>**THREE JUDGE COURT**<br><br>**DECLARATION OF ALISON HARDY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' APRIL 11, 2013 POPULATION REDUCTION PLAN** |
| MARCIANO PLATA, et al.,<br><br>         Plaintiffs,<br><br>     v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>         Defendants. | Case No. C01-1351 TEH<br><br><br>**THREE JUDGE COURT** |

1

I, Alison Hardy, hereby declare:

1.      I am a member of the Bar of this Court and a staff attorney at the Prison Law Office, one of the counsel of record for the plaintiffs in this action.  I have personal knowledge of the matters set forth herein and if called as a witness I could and would competently so testify.

2.      Attached hereto as Exhibit A is a true and correct copy of a Sacramento Bee article posted by Jerry Siders on April 12, 2013, entitled "Jerry Brown defiant of contempt of court threat in prison case."  It reports that Governor Brown pledged to litigate "until the Supreme Court tells us that we're not on the right track."

3.      Attached hereto as Exhibit B is a true and correct copy of a San Jose Mercury article by Howard Mintz dated May 3, 2013, entitled "California Prisons: Gov. Jerry Brown offers plan for overcrowding crisis 'under protest.'"  In the article, Jeff Beard, the Secretary of California Department of Corrections and Rehabilitation states, "We think this is an ugly plan, and anything we do is going to cause some problems.  We don't thing we should have to do that."  The article further states, "Democratic lawmakers signaled that Brown's plan may be dead on arrival in the Legislature, which the governor does not appear to mind."

4.      Attached hereto as Exhibit C is a true and correct copy of a Los Angeles Times article by Paige St. John and Seema Mehta on May 8, 2013, entitled "Former Lt. Governor Maldonado Criticizes Brown's Prison Policy."

5.      Attached hereto as Exhibit D are true and correct copies of an email exchange between Governor Brown's attorney Steve Acquisto, Inspector General Robert Barton, and Chief Deputy Inspector General Roy Wesley.  Inspector General Barton produced these emails to plaintiffs on April 30, 2013 in response to plaintiffs' subpoena.

6.      Attached hereto as Exhibit E is a true and correct copy of a CDCR Fact Sheet dated February 24, 2012 that I downloaded from the CDCR website.  It is available

at http://www.cdcr.ca.gov/news/docs/fs-actions-reduceinmatepop.pdf (website last viewed May 15, 2013).

7. Attached hereto as Exhibit F is a true and correct copy of an excerpt from the California Department of Corrections and Rehabilitation Prison Capacity Planning Final Report, prepared by Pulitzer/Bogard and Associates, LLC, dated October 3, 2011. Defendants produced this report to plaintiffs in March 2013 in response to plaintiffs' request for production of documents.

8. Attached hereto as Exhibit G is a true and correct copy of a Los Angeles Times article dated today, May 14, 2013, by Los Angeles Times Staff, stating that Governor Brown says he "included no money to pay for the changes he told federal judges he would reluctantly make if ordered to continue shrinking the state's prison population."

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed May 15, 2013, in Berkeley, California.


_____
/s/
Alison Hardy

DECLARATION OF ALISON HARDY IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' APRIL 11 2013 POPULATION REDUCTION PLAN

Exhibit A



THE SACRAMENTO BEE    sacbee.com

**The latest on California politics and government**

April 12, 2013

## Jerry Brown defiant of contempt of court threat in prison case



SHANGHAI - Gov. **Jerry Brown** said Friday his administration will not comply with a federal court order rejecting his effort to avoid reducing California's prison population, pledging to litigate "until the Supreme Court tells us that we're not on the right track."

The Democratic governor, in China for a week-long trade mission, said he was unaware that a three-judge federal court on Thursday had threatened to hold him and top prison officials in contempt of court, though he appeared unfazed by the prospect.

"I'm sure the people in L.A. would like to see more prisoners out on the streets," Brown said. "See, we have two problems here: Some are saying there are too many people being let loose, and then we have the judges saying, not enough, we need another 10,000 out there. So somewhere we're going to find the golden mean, and I will do my best to make it work."

The dispute follows a U.S. District Judge **Lawrence K. Karlton** decision in April denying Brown's bid to get prison health care out from under federal control.

A special panel consisting of Karlton and two other judges ordered the state in 2009 to reduce its prison population to improve health care in the prison system.

Brown has refused to decrease the prison population by the required 9,000 inmates to reach the court-ordered level.

"Look, California prisons are run by honorable men and women," Brown said. "They're doing the best job possible. We have, I believe from what I'm being advised, among the best healthcare in America and probably in the world. Now the judge sees it differently, and all I can say is I respect his differences, but we will take our case to the higher courts."

Brown said he plans to personally inspect the prisons at issue.

"I'm personally going to be taking my own personal inspection tour of those prisons which the judge feels are not up to snuff, and I will certainly listen and read what the critics say," Brown said. "But I have to tell you the constitutional standard is deliberate indifference, and as far as I know there is no one deliberately indifferent to the health needs of California prisoners, and if I find such a person, he will be fired on the spot."

***PHOTO CREDIT***: *Gov. Jerry Brown speaks at the opening of a foreign trade office in Shanghai on Friday, April*

*12, 2013. David Siders / Sacramento Bee*

**Categories:** Gov. Jerry Brown

Share    Facebook    Share    StumbleUpon    Twitter    Email

 Posted by **David Siders**
7:07 AM | 52 Comments

*© Copyright The Sacramento Bee. All rights reserved.*

Exhibit B

http://www.mercurynews.com/politics-government/ci_23164686/gov-jerry-brown-proposes-plan-california-prison-crisis

## California prisons: Gov. Jerry Brown offers plan for overcrowding crisis 'under protest'

*By Howard Mintz hmintz@mercurynews.com San Jose Mercury News*
*Posted:*

MercuryNews.com

The showdown between three federal judges and Gov. Jerry Brown over California's overcrowded prison system is headed once again to the U.S. Supreme Court.

With the threat of contempt proceedings hanging over his administration, Brown and top prison officials on Friday reluctantly offered a plan to meet a court-ordered deadline for ending the state's prison overcrowding crisis while at the same time vowing to appeal to the Supreme Court. Jeff Beard, the state prisons chief, told this newspaper the state plans to move within nine days to push the case to the high court.

In a 46-page brief filed shortly before midnight Thursday, state officials outlined how they would reduce the prison population by about 10,000 inmates over the next year, hoping to satisfy a three-judge panel that last month blasted the governor for failing to comply with a 2009 order requiring California to reduce its prison population to about 110,000 by this summer.

"We think this is an ugly plan, and anything we do is going to cause some problems. We don't think we should have to do that," said Beard, secretary of the California Department of Corrections and Rehabilitation.

In the April order, the federal judges threatened the governor with contempt if he did not by Thursday devise a plan that would at least meet the cap by December. The judges previously found the state's prisons are so far over capacity that they failed to provide adequate medical and mental health care for the nation's largest prison population.

The administration's response presented options, such as slowing the rate of return for inmates held in out-of-state prisons, leasing beds from larger county jails, increasing good-conduct credits for nonviolent inmates and housing more inmates at firefighting camps.

But state officials made it clear that all of the proposals, which would have to be approved by the Legislature, were undesirable, and rejected some of the suggestions from the three-judge panel, including the call to expand the governor's realignment program. As a result, the state will present the plan to the Legislature "under protest," as Beard put it Friday.

In court papers, the governor and prison leaders told the judges California has addressed concerns that its medical and mental health care for inmates fall below constitutional standards, spending billions of dollars to expand medical facilities and improve treatment.

Democratic lawmakers signaled that Brown's plan may be dead on arrival in the Legislature, which the governor does not appear to mind. Senate President Pro Tem Darrell Steinberg said he supports Brown's appeal to the Supreme Court, accusing the federal court of "ignoring the massive reform and reduction in prison population" over the past few years.

The state's response is the latest twist in a legal standoff that pits California's power to control its prisons against the federal courts' ability to force a state prison system to correct problems that date back decades. The judges in 2009 ordered the state to reduce its inmate population to about 110,000 inmates at its 33 prisons, well below highs that have reached 160,000 in the past.

The Supreme Court upheld those orders in 2010, although in a sharply divided 5-4 decision. Legal experts say that close vote may indicate some justices would be receptive to Brown's appeal, but predict the court may be reluctant to jump into the prison controversy again.

"Because it's fact-specific and always evolving, I'd be surprised if they take it again," said Doug Berman, an Ohio State University law professor.

May 10, 2013 05:18:32PM MDT

But state officials now argue they've done enough to comply with constitutional standards, shedding more than 30,000 inmates, primarily through realignment, which has shifted many low-level offenders, such as probation violators, to county jails to relieve state prison overcrowding.

The federal judges found the prisons remain overstuffed, warning the state that "California still houses far more prisoners than its system is designed to house."

However, the governor and prison officials argue that further steps could jeopardize public safety and cost the state hundreds of millions of dollars. The governor's plan would cut the number of inmates by about 7,000 by the December deadline, still a few thousand short of the federal judges' demands.

In court papers, the administration told the court that it would present the options to the Legislature, which would have to take emergency action to put any measures in place by a court-ordered December deadline to further reduce the prison population. But the governor made it clear it would do so without advocating actively for the solutions.

"The court's 'best efforts' directive certainly cannot mean that the governor must advocate for the Legislature to pass measures that would jeopardize public safety," the state said in court papers.

Lawyers for the inmates have accused the governor of defying the court orders and dragging his feet on the final steps needed to fix the state's prison overcrowding problem.

Michael Bien, a lawyer for the inmates, said the governor and prison officials are trying to reopen issues they've "already lost," rather than comply with the prison overcrowding orders.

"We've come a long way, yet there is more to do," Bien said. "Instead of doing it, we're at war."

Howard Mintz covers legal affairs. Contact him at 408-286-0236 or follow him at Twitter.com/hmintz.

May 10, 2013 05:18:32PM MDT

Exhibit C

latimes.com/news/local/la-me-ff-maldonado-20130509,0,6611032.story

# latimes.com

## Former Lt. Gov. Abel Maldonado criticizes Brown's prison policy

**Maldonado calls Brown's handling of prison crowding an early-release 'shell game.' The Republican says there's a 'good shot' he'll run for governor.**

By Paige St. John and Seema Mehta, Los Angeles Times

10:57 PM PDT, May 8, 2013

SACRAMENTO — Saying there is a "pretty good shot" he'll run for governor, former Lt. Gov. Abel Maldonado on Wednesday kicked off a drive against Gov. Jerry Brown's handling of prison crowding, labeling Brown's policies an "early release" program.

advertisement

The Republican from Santa Maria, who lost a bid for Congress last year, said he was launching a campaign to repeal the governor's prison policies, implemented in late 2011 to meet court-ordered population limits in state lockups.

"Today will be the beginning [of the] end of early release," Maldonado declared at a news conference staged on the windy top of a parking garage, a made-for-TV shot of the state Capitol behind him. Beside him was an oversized placard bearing the image of an accused murderer whose case, it turned out, was unrelated to the new corrections law.

Maldonado said he was forming a political committee to gather signatures to put a repeal measure on next year's ballot. He is seeking to capitalize on the controversy over Brown's requirement that counties begin housing lower-level felons and parole violators who in the past would have done that time in prison.

Maldonado acknowledged that he does not have the financial backing for a statewide signature drive. Nor does he have his own plan to address prison crowding, although he said such a plan would probably include construction of new facilities.

That was a strategy pursued by then-Gov. Arnold Schwarzenegger, who appointed Maldonado to the empty lieutenant governor post in 2009. Though the Legislature approved $4.1 billion in borrowing, when Brown took office amid a budget crisis, he canceled most of those planned projects.

The 2011 law that Maldonado denounces is called "realignment" by the Brown administration. In areas where the jails are full, it has led to early releases, though there is no statewide tally of those because county jail reports collected in Sacramento have not been updated since June 2012.

Maldonado blamed Brown, along with the Democratic-controlled Legislature, for what he said was a rise of violent crime in California, though he offered no statistics to support the claim.

"This is the biggest issue — it threatens the lives of Californians," he told The Times. "This notion of families being afraid to go out on the street, being afraid of parking garages, families who are just afraid.

"The governor uses a fancy word called realignment," Maldonado said. "At the end of the day, it's early release.... A shell game is what it is."

On Wednesday, Maldonado pointed to a larger-than-life police mug of Jerome Anthony Rogers, 57, who is accused of murdering a 76-year-old San Bernardino woman, and recounted Rogers' history of "sodomizing a 14-year-old girl."

Rogers' alleged crime appeared to have little or no connection with realignment. California corrections officials said he was released from state prison in 2000 and finished parole in 2003, eight years before Brown's policy change took effect.

San Bernardino County corrections officials confirmed that Rogers, who has pleaded not guilty to murder in the woman's slaying, had no other criminal record in San Bernardino until December 2012, when he was sentenced to, and served, 13 days in jail for failing to register his address as a transient sex offender. That time behind bars occurred one month after the slaying.

A Maldonado advisor said Wednesday that Rogers' case was touted because "he is a prime example" of the public safety threat created by prison realignment.

"It's people like him who are being released," said the advisor, Jeffrey Corless. He could not specify, however, what about Rogers would put him in that category.

Maldonado's event attracted a representative from the Brown administration, corrections department spokesman Jeffrey Callison, who took issue with use of the term "early release."

"It's quite simple," Callison said. "There is no early release program called realignment. Realignment is not an early release program. There are no early releases as part of it."

*paige.stjohn@latimes.com*

*seema.mehta@latimes.com*

*St. John reported from Sacramento and Mehta from Long Beach.*

Copyright © 2013, Los Angeles Times

Exhibit D

| | |
|---|---|
| **From:** | Wesley, Roy |
| **Sent:** | Monday, December 31, 2012 1:22 PM |
| **To:** | 'stephen.acquisto@gov.ca.gov' |
| **Cc:** | Barton, Robert |
| **Subject:** | Barton Declaration |
| **Attachments:** | 3JC - DRAFT OIG Decl for modification motion (2) edited by OIG.docx |

Good afternoon Mr. Acquisto

Bob asked me to forward the edited declaration to you. He is available to discuss while he is on the road if need be. He also said he would be available Wednesday morning if needed.


Roy W. Wesley
Chief Deputy Inspector General
Office of the Inspector General
w- (916) 830-3626
c- (916) 708-2360

| | |
|---|---|
| **From:** | Barton, Robert |
| **Sent:** | Monday, December 31, 2012 11:40 AM |
| **To:** | Wesley, Roy |
| **Subject:** | FW: 3JC - DRAFT OIG Decl for modification motion |
| **Attachments:** | 3JC - DRAFT OIG Decl for modification motion.docx |

**From:** Steve Acquisto [mailto:stephen.acquisto@gov.ca.gov]
**Sent:** Monday, December 31, 2012 11:02 AM
**To:** Barton, Robert
**Subject:** 3JC - DRAFT OIG Decl for modification motion

Hi Bob,

Here's a draft for your review.  Please let me know what you think.  Thanks, and Happy New Year.

Steve

Steve Acquisto
Chief Deputy Legal Affairs Secretary
Office of Governor Edmund G. Brown Jr.
(916) 445-0873

**From:** Barton, Robert
**Sent:** Wednesday, January 02, 2013 8:49 AM
**To:** Steve Acquisto
**Cc:** Boccalon, Jana; Wesley, Roy
**Subject:** RE: Barton Declaration

Steve,
Feel free to call me when you want to discuss. I have a couple other questions about the numbers since Roy sent you the revision. I have a meeting at 10:30 but am free until then. My desk number is 830-3657.
Bob.

**From:** Steve Acquisto [mailto:stephen.acquisto@gov.ca.gov]
**Sent:** Monday, December 31, 2012 2:00 PM
**To:** Wesley, Roy
**Cc:** Barton, Robert
**Subject:** RE: Barton Declaration

Thanks very much. Wednesday morning will be fine to talk about it and finish it up. Happy New Year!

Steve


Steve Acquisto
Chief Deputy Legal Affairs Secretary
Office of Governor Edmund G. Brown Jr.
(916) 445-0873



**From:** Wesley, Roy [mailto:wesleyr@oig.ca.gov]
**Sent:** Monday, December 31, 2012 1:22 PM
**To:** Steve Acquisto
**Cc:** Barton, Robert
**Subject:** Barton Declaration

Good afternoon Mr. Acquisto

Bob asked me to forward the edited declaration to you. He is available to discuss while he is on the road if need be. He also said he would be available Wednesday morning if needed.


Roy W. Wesley
Chief Deputy Inspector General
Office of the Inspector General
w- (916) 830-3626
c- (916) 708-2360

1

OIG CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

| From: | Wesley, Roy |
| Sent: | Wednesday, January 02, 2013 11:45 AM |
| To: | 'stephen.acquisto@gov.ca.gov' |
| Cc: | Barton, Robert |
| Subject: | Barton Declaration |
| Attachments: | 3JC - DRAFT OIG Decl for modification motion (2) edited by OIG (2).docx |

Good Morning Mr. Acquisto

Attached is the latest edit on the Barton declaration. I believe you and Bob have already spoken about some of the changes

Roy W. Wesley
Chief Deputy Inspector General
Office of the Inspector General
w- (916) 830-3626
c- (916) 708-2360

1

| From: | Steve Acquisto <stephen.acquisto@gov.ca.gov> |
|---|---|
| Sent: | Friday, January 04, 2013 2:49 PM |
| To: | Barton, Robert |
| Cc: | Wesley, Roy |
| Subject: | Declaration for review |
| Attachments: | 3JC.Barton Decl.clean.docx |

Bob,

As I indicated in my earlier email, I made some edits to your draft declaration. The noteworthy changes are in paragraphs 14, 15, and 16. I also used a chart that is organized slightly differently. It's organized by highest to lowest current score, and includes all three cycles.

Please let me know what you think. Thanks.

Exhibit E



**California Department of**
**Corrections and Rehabilitation**

# fact sheet
★ ★ ★ ★ ★

**For informational Purposes**                                    (916) 445-4950
February 24, 2012

## Actions CDCR Has Taken to Reduce Overcrowding

**Inmates Placed Out of State:** CDCR has transferred inmates to out-of-state correctional facilities as authorized by AB 900, a historical correctional overhaul bill, enacted in May 2007. These temporary transfers have allowed prison officials to reduce the number of inmates sleeping in gymnasiums, dayrooms and other places not intended for housing.

**Parole Reform:** CDCR implemented SB 3x 18, which went into effect on Jan. 25, 2010, and authorizes the placement of eligible parolees (no serious or violent felony or sex-offender) onto Non-Revocable Parole (NRP). NRP removes low-level offenders from parole supervision, allowing CDCR to focus parole supervision on the most serious and violent parolees, reducing the number of parolees returned to custody for parole violations and thereby reducing the need for bed space in county jails and state prisons. The all-time parole population high was met on August 15, 2007 at 128,108 parolees.

**Increases in Prison Healthcare Bed and Treatment Capacity:** In May 2007, AB 900, historic correctional overhaul legislation, was enacted to address  health care space deficiencies and overcrowding.  Since its passage, CDCR has developed a number of projects to increase prison bed and healthcare treatment capacity, including the addition of over 1,800 health care and mental health prison hospital beds. CDCR planning and construction staff are reviewing future capacity needs to ensure that any additional construction projects satisfy the needs of the remaining inmate population and the mandates of the three-judge panel.

**Senate Bill 678:** Under this 2009 statue, the state funded probation departments using federal funds to provide additional supervision and treatment of probationers in the counties. As a result, the state saw 6,000 fewer probation failures than the year before. The state split the savings with the counties in hopes of seeing even greater results in the future.

**Realignment to Place Lower-Level Offenders in Local Jurisdictions:** On April 4, 2011, Governor Brown signed AB 109 to realign certain responsibilities for lower-level offenders, and adult parolees, from state to local jurisdictions. The Governor is working to secure constitutionally protected funding for realignment. CDCR is expected to reduce its inmate population to 128,921 by June 30, 2013 and to 124,039 by June 30, 2017.

**Reduction of Non-Traditional Beds:** The all-time high of non-traditional bed use was met in August 2007 at 19,618. In October 2011, CDCR was able to deactivate 898 nontraditional beds, 3,223 in November, and 844 in December 883 in January 2012, and the final 380 non-traditional beds deactivated in February.

# # #

Exhibit F



# California Department of Corrections and Rehabilitation Prison Capacity Planning

## FINAL REPORT

### ATTORNEY-CLIENT WORK PRODUCT

## October 3, 2011



**Pulitzer/Bogard & Associates, LLC**
8 Saratoga Street
Lido Beach, NY  11561
Tel (516) 432-5177
Fax (516) 432-3414
www.pulitzerbogard.com

Attorney-Client Work Product – Confidential

# Table of Contents

| Chapter/Section Heading | Page # |
|---|---|
| *List of Tables* | 1 |
| *Executive Summary* | 2-4 |
| I.   Introduction | 5-8 |
| II.  Capacity Methodology | 9-31 |
| III. Pilot Reviews | 32-38 |
| IV.  Systemwide Application | 39-44 |
| V.   Recommendations and Next Steps | 45-47 |
| VI.  Participants/Resources | 48-49 |
| *Appendices* | 50-119 |

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
FINAL REPORT – OCTOBER 3, 2011

Attorney-Client Work Product – Confidential

# List of Tables

| Table Number and Title | Page # |
|---|---|
| Table 1-1: Summary of Capacity Analysis | 4 |
| Table 2-1: ASCA Out of Cell (OOC) Time Survey Results | 18 |
| Table 2-2: CDCR Housing Capacity Standards and Potential Mitigation Matrix | 28 |
| Table 3-1: Receiver's Access to Care Data Applied to Pilot Tests | 35 |
| Table 3-2: Pilot Capacity Analysis Summary Table | 38 |
| Table 4-1: Summary of Capacity Analysis | 43 |
| Table 4-2: Summary of Capacity Analysis – Other Capacities | 44 |

Attorney-Client Work Product – Confidential

# Executive Summary

The California Department of Corrections and Rehabilitation (CDCR) has for several decades measured its capacity using an approach referred to as Design Capacity. This approach is based on one inmate per cell, single bunks in dormitories, and no beds counted in capacity if the space was not designed for housing. When the State added 23 institutions to the correctional system between 1985 and 2005, the capacity of the new and expanded institutions was predicated on the Design Capacity concept.

The design capacity measure, however, has proven to be flawed for a variety of reasons. First, even with an enormous increase in capacity, single celling and bunking was never a reality, and from shortly after CDCR embarked on the major systemwide expansion the agency recognized that it would have to put more than one inmate in many cells and rely on double (and frequently triple) bunks in many dormitories as the systemwide population increased substantially. Second, national standards governing single celling, particularly those promulgated by the American Correctional Association (ACA), have changed markedly from the 1980's until today. Previous requirements for single celling and single bunking have been modified over time to the point that they are no longer considered to be the norm. In lieu of broad rules identifying which stratifications of inmates must be single celled (e.g., maximum custody, segregation, etc.), standards now emphasize decision making on an individual inmate basis, based on classification factors in determining the appropriate housing assignment.

In 2009, the Three Judge Panel in the *Coleman and Plata* cases issued a decision to limit systemwide overcrowding to 137.5% of Design Capacity as a primary mechanism designed to bring about improvements to health care.[1]

It was with this history that CDCR decided in 2010 to pursue a new, alternative approach to measuring capacity. In June of 2010, CDCR contracted with Pulitzer/Bogard & Associates (P/BA) to obtain expert advice and assistance "in determining a Manageable Operational Capacity (MOC)[2] for each prison based on established criteria and recognized industry standards." This effort was intended to provide CDCR with new management tools and established systems to better assess and measure the capacity of its 33 prisons individually, and as a system.

This approach was intended to be methodical, evidence based, supported by the ACA national standards, and consistent with (although not necessarily identical to) approaches used by other large state prison systems and the Federal Bureau of Prisons. The new approach would draw upon concepts and principles used by Federal Courts throughout the country. It was also to reflect key concerns of the *Coleman* and *Plata* courts concerning crowding in general, and also regarding access to medical and mental health care.

---

[1] *Coleman & Plata v. Schwarzenegger*, 2009 U.S. Dist. Lexis 76943 (Aug. 4, 2009)
[2] This term was subsequently changed to Prison Operating Capacity (POC).

Attorney-Client Work Product – Confidential

This new methodology yields a primary capacity measurement-- Prison Operating Capacity (POC). POC is based first on the application of applicable ACA standards, but then allows for an adjustment to the standard based calculation where mitigation thresholds of out-of-cell activity are achieved. Although not all classifications are eligible for mitigation, most are and the potential impact of this paradigm on agency wide policy, operations and capacity planning and measurement is substantial. The main premise is that the sufficiency of living space is directly impacted by the number of hours an inmate is confined to that space and that increased out-of-cell activity has multiple benefits, including the positive effect of reducing density.

In 2011 the U.S. Supreme Court, in *Brown v. Plata*, accepted the use of Design Capacity as the measurement of capacity as it affirmed the Three Judge Panel's adoption of 137.5% of design capacity as the constitutional limit on capacity for the CDCR.[3] As such, this new approach to capacity planning is not intended to be indicative of a constitutional standard for defining the capacity of the CDCR's prisons. Rather, the results of this effort would represent solely a professional, standards-driven, policy informed approach to calculating capacity.

P/BA collaborated with a CDCR Working Group, which consisted of experienced staff representing decades of experience in institutional management, classification, facility design, mental health care, inmate programs, and security. P/BA took the lead in analyzing the current capacity methodology's shortcomings, conceptualizing the alternative approach, developing the information to support and inform the new approach, and in developing key documents to support the process of redefining how capacity may be viewed and measured in CDCR's institutions.  Members of the Working Group took the lead on developing all the data collection tools, capturing the data during pilot tests at six prisons, and analyzing the data of those pilot tests. The Working Group also enlisted the support of a large group of officials from the Division of Adult Institutions (DAI), who provided the lion's share of the field work necessary to survey CDCR's 33 prisons using the tools associated with the new capacity methodology.  The bulk of the quality assurance work and data analysis was performed by the Working Group as well.

CDCR executive and legal staff were briefed at key points in the developmental process relative to the methodology, the results of the pilot surveys at six institutions, and the findings obtained after application of the new methodology at all 33 CDCR prisons.

This report represents a first phase of the CDCR's new approach to capacity measurement and planning—the "what is."   Beyond this point, should the State decide to fully pursue this methodology and adopt it as CDCR policy, there are myriad steps that need to be taken to achieve full implementation of both the methodological components of this approach as well as the inherent policy components. Recommendations for the next phase are included in Chapter V of this report.

Table 1-1 below illustrates how three calculated capacity figures- ACA, POC, and Potential Prison Operating Capacity (the maximum possible capacity that could be obtained if full mitigation was achieved at all housing units at all institutions) - compare with the existing CDCR's design capacity, the Supreme Court's cap (137.5% of design capacity) and the Department's current "overcrowding capacity."

---

[3] 563 U.S. __(2011)

Attorney-Client Work Product – Confidential

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
FINAL REPORT – OCTOBER 3, 2011

### Table 1-1: Summary of Capacity Analysis

| Prison | ACA | POC | PPOC | Health Care Adjustment |
|---|---|---|---|---|
| CIW | 997 | 1,668 | 1,767 | 0 |
| CCWF | 1,999 | 1,996 | 2,558 | 0 |
| VSPW | 2,068 | 2,056 | 2,562 | 0 |
| **Female Sub Total** | **5,064** | **5,720** | **6,887** | **0** |
| CIM | 3,399 | 3,713 | 4,553 | 0 |
| SQ | 3,249 | 3,501 | 3,501 | 0 |
| DVI | 1,743 | 1,868 | 2,683 | 0 |
| RJD | 2,220 | 2,282 | 3,762 | 0 |
| NKSP | 2,984 | 3,094 | 4,899 | 0 |
| WSP | 3,431 | 3,540 | 5,507 | 0 |
| LAC | 2,392 | 2,494 | 4,034 | 0 |
| CCI | 2,838 | 3,326 | 3,776 | 0 |
| COR | 4,391 | 4,139 | 5,269 | 0 |
| SAC | 3,412 | 2,957 | 2,957 | 0 |
| HDSP | 3,434 | 3,379 | 4,279 | 0 |
| KVSP | 4,576 | 4,352 | 4,352 | 0 |
| PBSP | 3,384 | 3,275 | 3,275 | 0 |
| SVSP | 3,287 | 3,180 | 4,060 | 0 |
| CMF | 2,400 | 2,571 | 2,933 | 0 |
| CMC | 4,268 | 4,895 | 4,895 | 0 |
| SATF | 4,044 | 4,536 | 5,390 | 0 |
| CAL | 2,400 | 2,506 | 4,216 | 0 |
| CEN | 2,361 | 2,452 | 4,162 | 0 |
| MCSP | 1,796 | 1,909 | 3,039 | 0 |
| PVSP | 2,365 | 2,452 | 4,162 | 0 |
| ASP | 4,147 | 5,769 | 5,769 | 0 |
| CCC | 1,870 | 2,330 | 2,690 | 0 |
| CRC | 3,819 | 5,233 | 5,243 | 0 |
| SOL | 3,264 | 4,023 | 4,923 | 0 |
| CVSP | 2,531 | 3,428 | 3,428 | 0 |
| CTF | 3,553 | 3,886 | 4,998 | 0 |
| FSP | 2,132 | 2,244 | 2,532 | 0 |
| ISP | 2,286 | 2,386 | 4,096 | 0 |
| SCC | 1,651 | 2,030 | 2,390 | 0 |
| **Male Sub Total** | **89,627** | **97,750** | **121,813** | **-** |
| **Institution Sub Total** | **94,691** | **103,470** | **128,700** | **-** |
| **Off Site Camps*** | | | | |
| CIW | 320 | 320 | 320 | 0 |
| CCC | 2,150 | 2,150 | 2,150 | 0 |
| SCC | 2,010 | 2,010 | 2,010 | 0 |
| **Camps Sub Total** | **4,480** | **4,480** | **4,480** | |
| **Grand Total** | **99,171** | **107,950** | **133,180** | |

Exhibit G

latimes.com/news/local/political/la-me-pc-gov-jerry-brown-unveils-revised-spending-
plan-20130514,0,5938717.story

# latimes.com

## Gov. Brown vows to take hard line on budget

By Los Angeles Times Staff

10:53 AM PDT, May 14, 2013

**Spending 'in a wise way' | 10:53 a.m.**

advertisement

As lawmakers debate more than a dozen different plans for
raising additional taxes on things like cigarettes, marijuana,
and oil, California Gov. Jerry Brown said he will take a hard
line with his budget.

"We just got a nice tax," he said of the tax increases voters
approved in November. "I think we ought to take a deep
breath and show we are spending it in a wise way before we
start looking for money."

Brown said he is not surprised by the latest rush of tax
proposals, though.

"Everybody wants more spending," he said. "That's what this place is, the big spending machine. … They
can push, and I can push back. At the end of the day they need the governor's signature."

**Jerry Brown says no money in budget for prison changes | 10:47**

Brown, laying out his budget, says he included no money to pay for the changes he told federal judges he
would reluctantly make if ordered to continue shrinking the state's prison population.

"We have to make our budget on what we know," Brown said, launching into a protest of court orders for
further changes despite a 43,000-inmate drop in the prison population since 2006 and the construction of a
new prison medical facility to open this summer.

He cited "real big money, and not money thrown down a rathole, but money for state-of-the-art health
facilities at San Quentin, at Stockton, hiring of psychiatrists, psychologists, a system of record keeping. The
prisons have really invested a lot of money here."

Brown this month told federal judges he would, under protest, ask the Legislature to fund the continued use
of out-of-state prisons and to lease new prison space from unused jails in Los Angeles and Alameda counties.
If federal courts order him to take those acts, Brown said he would figure out how to pay for them then. But
he already has started the process of appealing those orders to the U.S. Supreme Court.

"We have a plan, and if the Legislature votes for it, then we'll have to find money," Brown said. "Relative to

the total budget , I'm sure we could find funds."

**'Fracking' concerns | 10:41 a.m.**

The governor said he was conflicted on whether there should be an expansion of "fracking" in California.

"I have to balance my strong commitment to dealing with climate change, renewable energy, to what could be a fabulous economic opportunity," he said. "This could be good. But there are issues. And I want to look at it."

The governor would not say whether he supports a moratorium on fracking that is being contemplated by lawmakers. Brown said energy companies are still developing their strategies for an expansion of the practice, and there is time for the state to review their plans.

"There are a lot of technical engineering issues," he said. "I think we have time to do it right."

**Getting Legislature on board | 10:40 a.m.**

Brown was asked if the Legislature will go along with his plan to shift more education money to less-advantaged students. He responded that it is a natural move for a Legislature controlled by Democrats.

"I think the idea in a Democratic Legislature of helping the less advantaged is very persuasive," he said.

If the tea party were in control, he said, lawmakers "might look at it more skeptically." But he said he believed Democrats, in their "heart of hearts," support the concept.

Pressed on the fairness of the plan, the governor joked that well-off families living in comfortable suburbs could always move to Compton or Watts to be eligible for the extra money.

**Support for counties housing former inmates | 10:37 a.m.**

California counties struggling to cover the cost of housing former state prison inmates in their jails deserve a $72-million increase in state support, Brown said. He said the added money is not a sign that his prison realignment program is struggling, but an acknowledgment that the cost incurred by counties has turned out to be higher than the state calculated in 2011.

"We think that is a fair representation of the cost of inmates who are now being handled locally," the governor said of the increased funding. "Like everything in life, we learn from life and we adjust accordingly."

State parole costs have dropped dramatically, by more than $50 million, as California has put on county probation most of the state prison inmates who are freed.

**Indigent care payments unchanged | 10:33 a.m.**

Brown's budget plan leaves unchanged about $1.5 billion in funds the state pays to counties to care for the indigent.

Brown said that over time, he expects to reduce that money, as more of the state's uninsured obtain insurance coverage under the new federal law. His budget says "a mechanism will be established to determine the level of county savings based on actual experience."

The decision is a win for locals who feared the proposal would cut their healthcare funding.

Brown also said he wants to take a state-based approach to expanding the Medi-Cal, the state's health insurance program for the poor.

In January, Brown said he was also considering a county-based system, but has since scrapped those plans.

**DOCUMENT: Gov. Jerry Brown's revised budget**

**"A lot of give and take" | 10:26 a.m.**

"I'm sure there will be a lot of give and take as we go through the process," Brown said when asked about no increased funding for courts, which are struggling financially.

"Obviously their costs are going up and we've got to figure out ways to control it," he said. "It is not that easy."

But Brown said courts are just one institution that has grown accustomed to getting more funding than the state can afford.

"Everybody has to get used to managing," he said "We have been used to this over-commitment."

Brown said the state is turning now to "honest budgeting" and "careful budgeting."

**Brown willing to negotiate | 10:24 a.m.**

Asked whether he was "drawing a line in the sand" with his education plan, Brown said he was willing to negotiate.

"There have been governors before who drew lines in the sand," he said. "I don't do that."

But he said he felt strongly about his plans.

"I believe in this formula," he said. "I believe it is just. … I am going to do everything I can to get it. I am pretty confident we have got a powerful principle. There is the political power of all those affected and there is the moral power" of bringing equality to those who are treated unequally.

**Amount for schools | 10:22 a.m.**

Brown's budget includes $39.9 billion in general-fund spending for K-12 schools.

Schools received $2.9 billion more than originally anticipated because of stronger-than-projected economic growth over the first six months of this year.

Brown is pushing to change the way schools are funded, hoping to direct more money to school districts that serve non-native English speakers and poorer students.

**General fund spending | 10:20 a.m.**

Gov. Jerry Brown proposed general-fund spending of $96.4 billion in the coming fiscal year, $1.3 billion less than he called for in his initial budget proposal in January.

The May revision also includes $41.9 billion in spending from dedicated funds and $7.4 billion from bond funds, for a total of $145.7 billion.

Administration officials said Brown downgraded his general fund spending projection because the federal government did not extend the payroll tax credit, and the state reduced by half its projection for personal income growth.

**Unanticipated tax revenue going to schools | 10:17 a.m.**

"We have a balanced budget and it is solid," Gov. Jerry Brown said as he unveiled his budget plans. "We got more money because people voted for it and most of that money is going to schools."

But he warned that the state needs to be cautious. Nobody anticipated the budget issues created by the federal sequester.

"This is a prudent budget," he said. "It is one that unlike those of the past is going to be very prudent, because we are dialing into some uncertain times."

Trying to interpret budget numbers can be dizzying. In this case, the size of the budget the governor is proposing is actually smaller than the budget he proposed in January. Yet the state would spend billions more on schools. How? California accounting. The flood of unanticipated tax revenue that arrived in state coffers over the last six months is not being put on the books for the upcoming budget year. It is instead being given to schools retroactively. So the money would be reflected in adjustments to the size of previous years budgets, even though it would be spent in the fiscal year starting July 1 2013.

**Times live updates**

Gov. Jerry Brown on Tuesday morning will lay out his vision for spending a windfall of about $4.5 billion in revenue that has landed in state coffers over the last several months.

As the economy has improved, so have the state's fortunes. But the governor's options for using the unexpected money, to be detailed in a revised budget plan at 10 a.m., will be limited by laws put in place by voters decades ago.

The Times' Sacramento Bureau will have live coverage.

**ALSO:**

California lawmakers approve blank budget bills

Jerry Brown files notice to appeal prison ruling to Supreme Court

Jerry Brown's budget 'surplus' could be used entirely for schools

Copyright © 2013, Los Angeles Times