DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:   (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:   (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:   (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,

Plaintiffs,

v.

EDMUND G. BROWN, Jr., et al.,

Defendants.

Case No. Civ S 90-0520 LKK-JFM

**PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT**

Judge:  Hon. Lawrence K. Karlton

[818804-5]

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS ................................................................................................ iv

INTRODUCTION ................................................................................................................... 1

I.    PLAINTIFFS HAVE SATISFIED THE APPLICABLE LEGAL
      STANDARDS ............................................................................................................. 2

II.   DEFENDANTS' DELIBERATE INDIFFERENCE TO THE MENTAL
      HEALTH NEEDS OF DEATH ROW INMATES NECESSITATES RELIEF
      FROM THE COURT ................................................................................................... 3

      A.    Defendants Are Not Providing Appropriate Inpatient Psychiatric
            Treatment to *Coleman* Class Members on Death Row .................................... 3

      B.    Defendants Have Offered No Valid Evidence in Support of Their
            Refusal to Transfer Class Members on Death Row to Appropriate
            Intermediate Care Facilities ............................................................................ 4

III.  THE EVIDENCE SUBMITTED BY BOTH PARTIES ESTABLISHES
      THE NEED FOR FURTHER ENFORCEMENT OF COURT ORDERS
      AND FURTHER RELIEF REGARDING INPATIENT TREATMENT IN
      CDCR DSH-RUN FACILITIES .................................................................................. 7

      A.    Staffing Levels at DSH-Operated Units in CDCR Continue to
            Plummet, Subjecting Class Members to Substantial Harm and Risk of
            Harm ................................................................................................................ 7

            1.    Staffing Levels Are Worsening .......................................................... 7

            2.    Severe Staffing Shortages Compromise Treatment and Safety
                  of Patients and Staff and Result in Harm to the *Coleman* Class .......... 9

      B.    Defendants Subject Newly-Admitted Patients to Excessive,
            Unnecessary, and Dangerous Restrictions ..................................................... 11

      C.    Defendants Have Deprived Patients in DSH-Operated Inpatient Units
            of Basic Necessities ...................................................................................... 12

      D.    Defendants Mismanage Discharges and Waitlists for Inpatient Care,
            Resulting in Treatment Failures and Harm to Patients .................................. 13

      E.    Defendants Deny Inpatient Care in Anticipation of Future Parole
            Dates .............................................................................................................. 14

      F.    Defendants Are Improperly Staffing Units Anticipated to Close in the
            Future and Improperly Transferring Patients to New Units That are
            Not Yet Staffed .............................................................................................. 14

      G.    Uncontroverted Evidence Demonstrates That Investigation into VPP's
            Inpatient Program Is Necessary ..................................................................... 15

[818804-5]

i

1

CONCLUSION.................................................................................................. 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[818804-5]

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

1

**TABLE OF AUTHORITIES**

2

**Page**

3

<u>**CASES**</u>

4

*Coleman v. Brown,*
  428 Fed. Appx. 743 (9th Cir. 2011) .......................................................................... 11

*Johnson v. California,*
  543 U.S. 499 (2005) ...................................................................................... 2, 5, 12

*Jordan v. Gardner,*
  986 F.2d 1521 (9th Cir. 1993) ......................................................................... 2, 5, 12

*Overton v. Bazzetta,*
  539 U.S. 126 (2003) ............................................................................................. 2

*Turner v. Safley,*
  482 U.S. 78 (1987) ....................................................................................... 2, 5, 12

5
6
7
8
9
10
11
12

13

<u>**STATUTES**</u>

14

18 U.S.C. § 3626(a)(1) ................................................................................................ 2

15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

1

**TABLE OF ABBREVIATIONS**

2

3

| ASU | Administrative Segregation Unit |
|-----|--------------------------------|
| CDCR | California Department of Corrections and Rehabilitation |
| CMF | California Medical Facility |
| COR or Corcoran | California State Prison/Corcoran |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| ICC | Institutional Classification Committee |
| ICF | Intermediate Care Facility |
| PLRA | Prison Litigation Reform Act |
| RVR | Rules Violation Report |
| SVPP | Salinas Valley Psychiatric Program |
| SVSP or Salinas Valley | Salinas Valley State Prison |
| VPP | Vacaville Psychiatric Program |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iv

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

1

**INTRODUCTION**

2       Defendants' opposition  confirms that further orders are needed to address

3  constitutional inadequacies in inpatient psychiatric care.  The opposition consists mainly of

4  arguments to bar death row prisoners from appropriate levels of inpatient treatment.

5  Untreated mental illness requiring Intermediate Care Facility ("ICF") level hospitalization

6  puts these individuals at risk of harm, and Defendants' own evidence demonstrates that

7  they are, in fact, decompensating in Defendants' ill-defined "Specialized Care" program.

8  Moreover, as confirmed by Defendants, multiple "ready alternatives" already exist through

9  which death row inmates can safely be provided ICF care.

10      Defendants also fail to rebut the evidence of ongoing constitutional violations in the

11  provision of inpatient psychiatric treatment at the Salinas Valley Psychiatric Program

12  (SVPP) and the Vacaville Psychiatric Program (VPP).  In arguing that inpatient treatment

13  is not a part of the *Coleman* case, Defendants ignore the long history of previous orders

14  issued by this Court directed at securing adequate inpatient treatment for class members.

15  (*See* Pls.' Notice of Mot. & Mot. For Enforcement of Court Orders & Affirmative Relief

16  Related to Inpatient Treatment, Doc. No. 4543 ("Pls.' Mot.") at 4-5.)  Defendants do not

17  dispute that staffing levels at SVPP continue to plummet, including a 36.5% decrease in

18  psychiatrists over the last month-and-a-half; treatment team ratios fall short, even based on

19  DSH's recently-reduced target ratios; and DSH staff members have expressed grave

20  concerns about patient and clinician safety.  Defendants do not offer testimony that refutes

21  the testimony of Drs. Brim and Badeaux, psychiatrists who have treated class members in

22  DSH units, about dangerous practices at DSH.  Defendants admit that they impose extreme

23  restrictions on all incoming patients at SVPP on a blanket basis for two weeks following

24  admission.  Defendants do not even contest failure to provide patients basic human

25  necessities, conceding that VPP has experienced shortages of clean clothes and linens.

26  Defendants offer no rebuttal to documentary evidence that patients are being denied DSH

27  treatment due to upcoming parole dates, in direct contravention of this Court's order.

28  Plaintiffs have clearly established that further Court-ordered relief is required to finally

1

1    procure an effective and durable remedy for the *Coleman* class.

2    **I.      PLAINTIFFS HAVE SATISFIED THE APPLICABLE LEGAL
3                STANDARDS**

4              As Plaintiffs recognized in their moving papers, the standards set forth in the Prison

5    Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a)(1), apply to orders for prospective

6    relief issued by this Court.  (Pls.' Mot. at 27-28.)  Defendants' long history of

7    intransigence and failure with respect to inpatient care establishes the necessity of the

8    requested relief.  Plaintiffs have narrowly targeted the proposed order to address the

9    inpatient care issues causing class members serious harm and risk of harm, and have

10   carefully tailored the level of specificity or intrusiveness requested to the prior history of

11   Court involvement—and Defendants' recalcitrance—in each area.  (Pls.' Proposed Order,

12   Doc. No. 4543-1.)

13             In support of their denial of inpatient care to class members on death row and

14   severe restrictions for newly-admitted patients at SVPP, Defendants cite *Turner v. Safley*,

15   482 U.S. 78 (1987), and argue that the Eighth Amendment right of prisoners with serious

16   mental illness to be free from cruel and unusual punishment must give way to prison

17   policies that Defendants claim are "reasonably related to legitimate penological interests."

18   (Defs.' Opp'n to Pls.' Mot., Doc. No. 4592 ("Defs.' Opp'n") at 10-12, 20-21.)  Defendants

19   ignore controlling decisions of the United States Supreme Court and Ninth Circuit holding

20   that the "deliberate indifference" standard, rather than the *Turner* standard, applies to

21   evaluate alleged violations of the Eighth Amendment.  *See Johnson v. California*, 543 U.S.

22   499, 511 (2005); *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993).  This is because

23   the *Turner* analysis applies "only to rights that are 'inconsistent with proper

24   incarceration.'"  *Johnson*, 543 U.S. at 510 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131

25   (2003)).  "Eighth Amendment rights do not conflict with incarceration; rather, they limit

26   the hardships which may be inflicted upon the incarcerated as 'punishment.'"  *Jordan*, 986

27   F.2d at 1530.  In short, "the integrity of the criminal justice system depends on full

28   compliance with the Eighth Amendment."  *Johnson*, 543 U.S. at 511.

2

1  Moreover, even if *Turner* applied, Defendants have established no legitimate

2  penological interest that could justify blocking people from hospital treatment in a way

3  that prolongs suffering and creates needless risk of harm, or subjecting critically ill inmates

4  to extreme deprivations on a blanket basis unjustified by individualized consideration of

5  the clinical and safety needs of each patient.

6  **II.     DEFENDANTS' DELIBERATE INDIFFERENCE TO THE MENTAL
        HEALTH NEEDS OF DEATH ROW INMATES NECESSITATES RELIEF**

7  **FROM THE COURT**

8        **A.     Defendants Are Not Providing Appropriate Inpatient Psychiatric
              Treatment to *Coleman* Class Members on Death Row**

9

10  The Program Guide, developed by Defendants to remedy Eighth Amendment

11  violations found by this Court, requires that "[r]eferral to an ICF [be] considered when in

12  the judgment of the CDCR treating clinician the inmate-patient meets" enumerated criteria.

13  (Decl. of William Downer in Supp. of Def.'s Opp'n, Doc. No. 4595 ("Downer Decl.") Ex.

14  1, Program Guide 12-6-7.)  Although the Program Guide makes no exception for death

15  row inmates, Defendants deny inmates on death row access to clinically-indicated ICF

16  care.  As a result, class members "suffer in very regressed, psychotic, and/or gravely

17  disabled states with very little intervention for years at a time."  (Reply Declaration of

18  Pablo Stewart, M.D. in Support of Pls.' Mot., filed herewith ("Stewart Reply Decl.") ¶ 16.)

19  No evidence supports barring *Coleman* class members on death row from

20  psychiatric hospital units.  Declarant Dr. Eric Monthei discusses patients whom Plaintiffs'

21  expert, Dr. Pablo Stewart[1] reported on his declaration in opposition to termination.  (Expert

22  Declaration of Pablo Stewart, M.D. in Support of Pls.' Opp'n to Defs.' Mot. to Terminate,

23  Doc. No. 4381.)  Dr. Monthei attaches new medical records for these patients that had not

24  previously been provided to Dr. Stewart for review.  These records confirm that the ICF

25

26  [1] Contrary to Defendants' assertions, Dr. Stewart has extensive experience with
   condemned individuals, and has frequently been qualified as an expert regarding the

27  mental health conditions of death-row inmates.  (Stewart Reply Decl. ¶ 18.)

28

[818804-5]

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

bar is harming patients, and that the "Specialized Care" program" offered as a substitute is inadequate:

- Prisoner DDD:  Dr. Monthei reports "good" hygiene as a sign of this patient's improving health in the Specialized Care program.  The records, however, show that Prisoner DDD has lost control of excretory functions, soiled himself during group sessions, and presented catatonic symptoms.  (Stewart Reply Decl. ¶¶ 6-7.)  Prisoner DDD is languishing in the Specialized Care Program, despite a CDCR treating physician's recommendation for inpatient care in February 2013.  (*Id. ¶* 8.)

- Prisoner EEE:  Dr. Monthei reports that Prisoner EEE is no longer on psychotropic medications, as if that reflected the success of the Specialized Care program.  The records, however, show that he is no longer receiving medication because he chronically refuses medication.  (*Id.* ¶ 9.)

- Prisoner FFF:  Dr. Monthei's declaration confirms Dr. Stewart's observation from a February 2013 tour that Prisoner FFF needed inpatient care.  Stewart Decl. 3/14/13 ¶ 468.  Whatever "improvement" Dr. Monthei refers to "within the last several months" must be evaluated in light of the fact that, on March 7, 2013, Prisoner FFF was admitted to a Mental Health Crisis Bed for suicidal ideation, where he engaged in self-injurious behavior, and was then referred to an acute inpatient treatment program on March 20, 2013, and transferred on April 5, 2013.  (Declaration of Eric Monthei in Support of Defs.' Opp'n, Doc. No. 4593 ("Monthei Decl.") ¶ 37.)

- Prisoners GGG, HHH, and III:  For all three of these prisoners, Dr. Monthei's declaration gives the impression that the Specialized Care program provides them with a range of treatment activities.  The records that Dr. Monthei attaches, however, show that these patients' psychiatric conditions and levels of functioning prevent them from participating in the treatment offered and San Quentin, and they rarely leave their cells to participate.  (Stewart Reply Decl. ¶¶ 11-15.)

### B.    Defendants Have Offered No Valid Evidence in Support of Their Refusal to Transfer Class Members on Death Row to Appropriate Intermediate Care Facilities

Defendants' reading of California Penal Code section 3600 to prohibit transfers of death row inmates to ICF facilities relies on an unfounded interpretation of the term "endanger" that limits its meaning to "a significant risk of harming [self] or others" (the Program Guide criterion for acute level of care).  (*See* Defs.' Opp'n at 9:22-26.)  But an inmate may also be "endanger[ed]" if he is "unable to adequately function within the structure of the CDCR EOP level of care" and "requires structured inpatient psychiatric care with 24 hour nursing supervision," as stated in the Program Guide criteria for ICF

[818804-5]

1    care.  (*See* Downer Decl. Ex. 1, Program Guide 12-6-7.)  Defendants' further assertion that

2    access to ICF care is not constitutionally required but "merely desirable" is baseless, as

3    such care is an essential part of the system set forth in the Program Guide, designed to

4    provide a remedy for the constitutional violations in this case.  (*See, e.g.,* 2/28/13 Order,

5    Doc. No. 4361, at 6:15-16 ("[D]efendants' Program Guides have been defendants' plan,

6    approved by this court, to remedy the Eighth Amendment violations identified in this

7    court's 1995 order.").)

8        Defendants' argument that the prohibition on ICF care for the condemned "is

9    reasonably related to legitimate penological interests" is unavailing.  As explained above,

10   the *Turner* standard does not apply to Eighth Amendment claims.  *See Johnson*, 543 U.S.

11   at 510; *Jordan*, 986 F.2d at 1530.  Even if *Turner* applied, Defendants offer no evidence in

12   support of their asserted penological interests, but, rather, conclusory statements that

13   assume the facts at issue.  For example, Defendants state that "[s]afety and security

14   concerns increase any time a condemned inmate is transferred from San Quentin to another

15   prison setting," citing to an unspecified "protocol" for transport of condemned inmates,

16   with no explanation as to why this heightened security is necessary or justifies denial of

17   necessary psychiatric care.  (*See* Defs.' Opp'n at 10:28-11:2 & Declaration of Kevin

18   Chappell in Support of Defs' Opp'n, Doc. No. 4601, ¶ 8.)  Similarly, they assert that "[a]

19   minimum of two correctional officers or one correctional officer and a medical technical

20   assistant must be present whenever a condemned inmate's cell door is opened," again

21   citing to an unspecified "protocol," but fail to explain why such a protocol requires denial

22   of necessary treatment.  (Defs.' Opp'n at 11:5-7 & Declaration of Ellen Bachman in

23   Support of Defs.' Opp'n, Doc. No. 4598 ("Bachman Decl.") ¶ 23.)  Defendants' entire

24   argument rests on the reasoning that death row inmates require greater security because

25   they are on death row.  (*See id.* ("Treating condemned inmates at Vacaville is extremely

26   challenging due to their unique status as death-row inmates.").)  But death row inmates

27   who require psychiatric hospitalization are *already* being treated by DSH at VPP, albeit

28   only after they have decompensated to the point that they require acute level psychiatric

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

1    hospitalization, as occurred for Prisoner FFF, described *supra*.  (*See* Bachman Decl. ¶ 23

2    (explaining current protocols for treating condemned inmates in the acute care DSH

3    program at CMF); Declaration of Brian Duffy in Support of Defs.' Opp'n, Doc. No. 4599

4    ("Duffy Decl.") ¶ 6 (same); Monthei Decl. ¶ 37.)

5         To the extent that condemned inmates do have particularly high risk profiles,

6    Defendants offer no response to Plaintiffs' expert Jeanne Woodford's opinion that "a

7    policy requiring individualized assessment of the mental health needs and security

8    concerns of each individual prior to transfer for ICF care should be developed and

9    implemented" and disregard Ms. Woodford's finding that there is "nothing in [the RVR]

10   histories" of a significant number of individuals in the Specialized Care program

11   "supporting the conclusion that these individuals could not be safely transferred to ICF

12   care if in need of such care."[2]  (Expert Declaration of Jeanne Woodford in Support of Pls.'

13   Opp'n to Defs.' Mot. to Terminate, Doc. No. 4380 ("Woodford Decl.") ¶¶ 47-48.)

14        Finally, Defendants assert in conclusory fashion that "there are no ready alternatives

15   apart from treating chronically mentally ill condemned inmates at San Quentin" and that

16   an order directing Defendants to transfer such inmates to ICF care "would not remedy the

17   problem."  (Defs.' Opp'n at 12:8-16.)  But Defendants' declarations demonstrate that there

18   are ready alternatives.  SVSP Warden Grounds testifies that there is a 16-bed single-cell

19   wing within SVPP that would allow the institution "[t]o properly maintain separation" of

20   condemned inmates.  (Declaration of Randolph Grounds, Doc. No. 4604 ("Grounds

21   Decl.") ¶ 17.)  CMF Acting Warden Duffy testifies that CMF could "properly maintain

22   separation" by designating a 16-bed unit within the facility for the condemned ICF

23   program.  (Duffy Decl. ¶ 9.)  Defendants also concede that there is unused space within the

---

[2] Defendants' evidentiary objections to Ms. Woodford's Declaration are unfounded for the
reasons explained in Plaintiffs' Response to Defendants' Objections to Evidence Offered
to Support Plaintiffs' Motion Regarding Inpatient Treatment, filed herewith.  Plaintiffs
also object to Defendants' summary dismissal of the qualifications of Ms. Woodford, who
is a former Warden of San Quentin and Secretary of the CDCR.  (Defs.' Opp'n at 6:24.)

[818804-5]

1    L-Wing unit at CMF (Defs.' Opp'n at 2 n.2), but do not explain why such a space could

2    not accommodate an ICF program for condemned inmates, as Ms. Woodford has

3    previously suggested. (*See* Woodford Decl. ¶ 50.) Defendants dismiss these alternatives

4    because they would allegedly "reduce the availability of DSH beds for all inmates."

5    (Grounds Decl. ¶ 17; Duffy Decl. ¶ 9). This does not make sense: Defendants'

6    constitutional obligation is to provide necessary psychiatric treatment to *all* class members,

7    including those on death row. If providing appropriate inpatient placements to prisoners

8    on death row would result in a shortage of necessary DSH beds, then Defendants are

9    failing to provide adequate numbers of beds to address the needs of the incarcerated

10    population. Defendants' other arguments against transfer of condemned inmates to ICF

11    care (for example, that ICF programs have limited access to law library facilities and

12    visiting spaces (*see* Grounds Decl. ¶¶ 18-19; Duffy Decl. ¶¶ 10-11)), may highlight other

13    deficiencies in those facilities, but do not justify the denial of access to treatment.

**III.    THE EVIDENCE SUBMITTED BY BOTH PARTIES ESTABLISHES THE NEED FOR FURTHER ENFORCEMENT OF COURT ORDERS AND FURTHER RELIEF REGARDING INPATIENT TREATMENT IN CDCR DSH-RUN FACILITIES**

**A.    Staffing Levels at DSH-Operated Units in CDCR Continue to Plummet, Subjecting Class Members to Substantial Harm and Risk of Harm**

18    Defendants' DSH-operated units at SVPP and VPP are staffed at dangerously

19    inadequate levels. Far from rebutting the evidence of understaffing and dangerous

20    conditions, Defendants' data and declarations demonstrate that major staff shortages

21    persist, and that DSH staff concerns about patient and clinician safety are widespread.

**1.    Staffing Levels Are Worsening**

23    The staffing crisis is growing more, not less, acute. On March 27, 2013,

24    Defendants' counsel Patrick McKinney represented to this Court that there were 13

25    psychiatrists on staff to serve the 352 patients at SVPP. (3/27/13 Hr'g Tr. at 53.) A week

26    earlier, DSH Chief Deputy Director Kathryn Radtkey-Gaither testified that "SVPP

27    currently has the equivalent of twelve and ¾ [12.75] full time psychiatrists." (Reply

28    Declaration of Kathryn Radtkey-Gaither in Supp. of Defs.' Mot. to Terminate, Doc. No.

[818804-5]

4441, ¶ 5.)  Yet, Ms. Radtkey-Gaither now testifies "the present total of full-time-equivalent staff psychiatrists at Salinas Valley is 8.25, which is a combination of full time, part time, and second assignments."  (Declaration of Kathryn Radtkey-Gaither in Supp. of Defs.' Opp'n , Doc. No. 4602 ("Radtkey-Gaither Opp'n Decl.") ¶ 8.)  According to Defendants, SVPP has thus lost 4.75 staff psychiatrists – 36.5% of the total staff as of March 27, 2013 – in the past month-and-a-half.  There has been no concurrent decrease in patients at SVPP that would offset the reduced number of psychiatrists, as SVPP continues to operate all 370 inpatient mental health beds.  (*Id.* ¶ 4.)  This means that the staffing situation is similar to the level that the SVPP psychiatrist team stated in January 2013 was not "safe or appropriate" and created "an unacceptable level of risk as far as patient safety."  (Amended Declaration of Joel Badeaux, M.D., Doc. No. 4560 ("Badeaux Decl."), Ex. B; *see also id.* ¶ 6.)  The recent losses in staff contradict Defendants' assertion that DSH has been able to "quickly respond to each departure" due to its "serious attention and efforts to recruit."  (Radtkey-Gaither Opp'n Decl. ¶¶ 12-13.)

The staffing deficits have ballooned treatment provider ratios.  Defendants report that DSH altered its "ICF Treatment Team" ratio from 1:25 to 1:35 in FY 2011-2012 as a cost-saving measure.  Ms. Radtkey-Gaither now describes the reduced 1:35 ratio as a "goal" and acknowledges that the current caseloads at SVPP exceed even the altered ratio. (Radtkey-Gaither Opp'n Decl. ¶ 14.)  According to Ms. Radtkey-Gaither, the current ratio is 1:40.7, a 62.8% increase in caseload from the FY 2011-2012 ratio.  (*Id.*)  Defendants' response does not address the effects of these shifting treatment ratios on patient care.

Defendants' denials of a hiring freeze (*id.* ¶ 10) are contradicted by their public documents.  The DSH website posting for a senior psychiatrist position at SVPP confirms the existence of the freeze, with capital letters reading:  "PENDING DEPARTMENTAL HIRING FREEZE EXEMPTION APPROVAL."  (Declaration of Krista Stone-Manista in Support of Pls.' Mot., filed herewith ("Stone-Manista Decl."), Ex. 3.)

Defendants concede that their staffing data lacks reliability.  (*See* Declaration of Rob Cook in Support of Defs.' Opp'n, Doc. No. 4597, ¶ 7 ("vacancy and functional

1  vacancy rates were not always accurate").)  Defendants have no estimate of when they will

2  have accurate staffing data.  (*See id.* ¶ 12 ("a revised prototype of the full monthly report

3  will take at least another month to develop and test").)  Defendants' demonstrated inability

4  to produce meaningful staffing data is further evidence that the Special Master should be

5  directed to investigate.

6      **2.  Severe Staffing Shortages Compromise Treatment and Safety of Patients and Staff and Result in Harm to the *Coleman* Class**

7

8     Defendants' treatment of staff and patient injury data from August and September

9  2012 makes no sense.  Ms. Radtkey-Gaither asserts—without explanation—that the

10  publicly released data "was incorrect."  (Radtkey-Gaither Opp'n Decl. ¶ 31.)  The "new"

11  figures she provides with her declaration revise the number of staff injuries at SVPP

12  substantially downward, from 17 to 2 in August 2012, and from 12 to 1 in September

13  2012.  (*Id.* Exs. 3 & 4.)  The new figures also revise the number of patient injuries at SVPP

14  from 18 to 2 in July, 2012, from 9 to 2 in August, 2012, and from 10 to 2 in September,

15  2012.  Defendants provide no supporting data for these new summaries to show how the

16  vast majority of staff and patient injuries simply vanished into thin air.

17     Declarant Radtkey-Gaither states that she asked her staff to calculate the group

18  hours provided in SVSP units in March and April 2013, and reports the treatment hours

19  allegedly provided in each unit per week.  (Defs.' Opp'n at 15:15-16 (citing Radtkey-

20  Gaither Opp'n Decl. ¶¶ 19-20).)  Ms. Radtkey-Gaither does not explain how staff

21  calculated these hours, presumably retroactively, or what information they relied upon to

22  ensure that their calculations were accurate.  (*Id.*)  Nor does the data provided—treatment

23  hours offered per housing unit—indicate the number of treatment hours actually received

24  by individual patients.  Defendants' inability to provide contemporaneous and reliable

25  treatment data is not surprising, as SVPP staff represented to Plaintiffs' experts that such

26  data was not tracked in at least some of the units.  (3/14/13 Stewart Expert Decl. ¶ 159.)

27     The record is replete with evidence of harm and serious risk of harm because of

28  inadequate staffing.  Dr. Brim and Dr. Badeaux were joined by *every psychiatrist on the*

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT

[818804-5]

*SVPP staff* in expressing that they were "united in [their] belief" that staffing levels were dangerous and inadequate for the level of care required by patients. (Badeaux Decl. Ex. B.) As psychiatrists who directly treated patients in DSH-run inpatient units, these doctors are qualified to testify about their experiences and concerns for their patients' safety and well-being. Their testimony is unambiguous: inpatient units suffer from alarming staff shortages (Badeaux Decl. ¶¶ 10-13; Deposition Testimony of John Brim, M.D. (Bien Decl. in Opp'n to Defs.' Mot. to Terminate, Doc. No. 4403, Ex. 82) ("Brim Dep.") at 24:19-25:22, 35:22-36:5); vastly insufficient levels of treatment for patients (Badeaux Decl. ¶¶ 14, 36; Brim Dep. at 42:16-20, 91:6-23); and unsafe conditions for doctors and patients alike (Badeaux Decl. ¶¶ 17-19; Brim Dep. at 77:14-79:14, 78:23-79:14). Defendants' declarations, by CDCR and DSH administrators who make sweeping and unsupported assessments about the quality of care provided by DSH (*see* Pls.' Resp. to Defs.' Objs. to Evidence, filed herewith), are conspicuously lacking in testimony from treating clinicians that disputes the facts set forth by Dr. Badeaux and Dr. Brim.

The testimony of Dr. Badeaux and Dr. Brim is further supported by data from a survey of SVPP employees about safety issues. (Badeaux Decl. Ex. E, at 37.) Ms. Radtkey-Gaither authenticated this data by describing the methodology underlying the survey and the means by which she distributed the results to employees. (Radtkey-Gaither Opp'n Decl. ¶¶ 25-28.) Her testimony confirms widespread concern about safety at SVPP, and that survey findings have been "echoed" in meetings with staff members. (*Id.* ¶ 28.) Defendants' platitudes about how mental health services "go beyond basic psychiatric assessments and medication management" (Defs.' Opp'n at 15:12) do not rebut the concrete evidence in both parties' filings of serious DSH staffing and treatment deficiencies.

Defendants mention the two recent deaths at SVPP but do not rebut the evidence that connects these deaths to staffing and management problems. Defendants do not dispute that the death of a patient in November 2012 was a suicide, and they concede that his classification was delayed, prolonging his time on severely restrictive "cuff status."

1   (Grounds Opp'n Decl. ¶ 12.)  Defendants assert that the second death, in March 2013, was

2   "accidental."  (Radtkey-Gaither Opp'n Decl. ¶ 36.)  The report that Ms. Radtkey-Gaither

3   refers to but does not attach shows that the patient died of acute water intoxication due to

4   psychogenic polydipsia, a serious psychiatric condition.  (Stone-Manista Decl., Ex. 2

5   (Coroner's Report).)  He had been previously hospitalized at SVPP for this condition,

6   manifested in "compulsively consuming large volumes of water, negatively impacting his

7   body chemistry."  (*Id.*)  A proper inpatient system would appropriately monitor such cases.

8   (Stewart Reply Decl. ¶ 25.); *see also* Special Master's Rpt. on Suicides Completed in the

9   CDCR in 2007, Doc. No. 3677-4, at 171-177 (reviewing suicide by water intoxication in

10  the EOP ASU at CSP-Corcoran by prisoner who had also had similar previous incident).

11  These deaths, along with the other evidence of the ongoing risk of substantial harm

12  described above, warrant further relief from this Court.  *See Coleman v. Brown,* 428 Fed.

13  App'x. 743 (9th Cir. 2011).

14       **B.    Defendants Subject Newly-Admitted Patients to Excessive, Unnecessary,**
           **and Dangerous Restrictions**
15

16       Defendants admit that all inmates arriving at SVPP are placed on "cuff status,"

17  regardless of individual case factors, until they can be re-classified.  (Gounds Decl. ¶ 4.)

18  They do not deny that persons on cuff status get no yard or dayroom access, and are

19  confined almost continuously to their cells for 14 or more days.  (*See id*. ¶ 6; Bachman

20  Decl. ¶ 34.)  Defendants do not, and cannot, justify this type of non-therapeutic isolation,

21  but simply claim not to be able to process patients more rapidly.

22       Defendants fail to explain why CDCR inmates, who have already been classified

23  for security purposes prior to transfer to SVPP, have to be treated in the inpatient hospital

24  as if they had not previously been classified during the two or more weeks of cuff status.

25  Nor do Defendants explain why any additional classification cannot be completed before a

26  patient is transferred for DSH-operated inpatient psychiatric hospitalization.  Warden

27  Grounds asserts that this process is "best conducted" after transfer because "DSH

28  clinicians' specific expertise and familiarity with their program provides them with the

1  best insight into the inmates' ability to safely program from a clinical perspective."

2  (Grounds Decl. ¶ 9.)  Warden Grounds' claim that clinical input from DSH staff is critical

3  in the classification process is directly contradicted by Dr. Badeaux, who participated in

4  ICC meetings as a DSH treating psychiatrist and testified that clinical input was not taken

5  into account as custodial classification.  ((Badeaux Decl. ¶ 26) ("As a doctor, there was

6  nothing I could do to remove these restrictions, even if I thought it was clinically

7  indicated.")

8       Defendants' reliance on *Turner* to excuse these constitutional violations is

9  misplaced because the Eighth Amendment does not permit Defendants to subject prisoners

10  to cruel and unusual punishment and deprivations of adequate mental health treatment in

11  the service of asserted penological interests (which are in any event unpersuasive).  *See*

12  *Johnson*, 543 U.S. at 510; *Jordan*, 986 F.2d at 1530.  The Court should therefore order

13  Defendants to immediately cease their imposition of blanket restrictions for newly-

14  admitted DSH patients, and order the Special Master to investigate the necessity of

15  custodial restrictions.

16       **C.   Defendants Have Deprived Patients in DSH-Operated Inpatient Units of**
        **Basic Necessities**

17

18       The opposition declarations demonstrate the need for this Court to ensure the

19  provision of basic human necessities to *Coleman* class members at DSH-Operated CDCR

20  Inpatient Units.  Plaintiffs requested that the Court order the Directors of SVPP and VPP

21  programs and the Wardens of SVSP and CMF to file declarations "confirming that patients

22  are being provided soap and clean and adequate blankets, clothing, and underwear,

23  laundered on a regular basis, consistent with the standards of a licensed inpatient hospital."

24  (Pls.' Proposed Order at 2.)  This should be an unremarkable minimum standard to meet.

25  However, in her declaration, the VPP Executive Director testified that VPP "has

26  experienced shortages of clothing and linens."  (Bachman Decl. ¶ 21.)  She states that the

27  "situation was corrected," but provides no information about when this situation occurred,

28  when it was corrected, or for how long VPP patients were provided inadequate clothing

1  and linens.  SVPP Warden Randy Grounds did not affirm that SVPP patients are, in fact,

2  being provided soap and clean and adequate blankets, clothing, and underwear, laundered

3  on a regular basis.  Rather, he testified only that these are "presently available" in SVPP's

4  warehouse and are distributed "upon DSH request for supplies."  (Grounds Decl. ¶ 13.)

5  Similarly, Ms. Radtkey-Gaither did not rebut testimony that patients at SVPP have been

6  denied basic necessities like soap and clean linens, but, rather, stated that she has now

7  "directed the executive staff to make sure that our employees are properly trained on how

8  to access these supplies from CDCR."  (Radtkey-Gaither Opp'n Decl. ¶ 41.)  It should not

9  require Plaintiffs' filing of a motion or an order by this Court to ensure these basic human

10 needs of patients who are supposed be housed in a licensed inpatient facility.  Based on

11 these less-than-straightforward declarations, such relief is needed.

**D.  Defendants Mismanage Discharges and Waitlists for Inpatient Care, Resulting in Treatment Failures and Harm to Patients**

14 Plaintiffs provided evidence of mismanagement of discharges and waitlists for

15 inpatient programs based on the Special Master's Suicide Report, Plaintiffs' expert report,

16 sworn testimony from treating psychiatrists at DSH inpatient psychiatric units, and

17 evidence of Defendants' manipulation of how the waitlist is counted.  (Pls.' Mot. at 20-22.)

18 In response, Defendants cited state law regarding provision of inpatient care to CDCR

19 prisoners, and submitted unsupported statements from DSH headquarters administrators

20 generally declaring that "discharges are based on appropriate clinical rationale."  (Radtkey-

21 Gaither Opp'n Decl. ¶ 22; Bachman Decl. ¶ 15.)  Plaintiffs agree with Defendants that

22 state law requires Defendants to maintain CDCR prisoners in DSH programs as long as

23 clinically indicated, and this requirement is consistent with the standards provided in the

24 Program Guide, cited by Plaintiffs in their Motion at 21:22-27.  Plaintiffs further agree

25 with Defendants that "[i]f Defendants were pressuring DSH clinician to prematurely

26 discharge patients," they would be promoting a system that violates state law, licensing

27 standards, and ethical obligations.  (Defs.' Br. at 23:8-10.)  Given the evidence presented

28 by Plaintiffs that this has, in fact, occurred, the Court should order Defendants to revise

[818804-5]

1  their policies, procedures, and practices to ensure that patients continue to receive inpatient

2  psychiatric hospitalization while clinically indicated, and direct the Special Master to

3  investigate Defendants' discharge and waitlist practices.

4  **E.    Defendants Deny Inpatient Care in Anticipation of Future Parole Dates**

5  Defendants nonsensically attempt to characterize Plaintiffs' argument that the

6  Court's August 8, 2008 Order requires Defendants "to provide full access to inpatient

7  psychiatric hospitalization to all inmates irrespective of release date" (Pls.' Mot. at 22:18-

8  19) to mean that Plaintiffs contend that "all inmates within 35 days of a release, whether

9  clinically appropriate or not, must be referred and treated at a DSH facility." (Defs.'

10  Opp'n at 24:18-20). The rest of Defendants' opposition to this point is a smokescreen of

11  irrelevant additional case factors for each patient example. (Defs.' Opp'n at 24-25.)

12  Whatever the other case factors might have been, Defendants' staff continue to cite parole

13  status as the reason for denying access to care. (Declaration of Ernest Galvan in Support

14  of Pls.' Mot., Doc. No. 4564 ("Galvan Decl.") ¶¶ 10-14.) Nor do Defendants respond at

15  all to the notes of their own expert, Dr. Scott, regarding patients he found who were

16  transferred from DSH to crisis beds "for the exclusive purpose of parole." (*Id.* ¶¶ 3-9.)

17  **F.    Defendants Are Improperly Staffing Units Anticipated to Close in the
        Future and Improperly Transferring Patients to New Units That are Not
18      Yet Staffed**

19  In response to Plaintiffs' request that the Court order Defendants to fully report on

20  the staffing and capacity of DSH units housing *Coleman* class members, and direct the

21  Special Master to investigate the newly-activated or temporary DSH units at SVPP and

22  VPP, Defendants simply offer a declaration by Ms. Bachman re-stating similar testimony

23  from her previous declaration and adding assertions that Defendants are not mismanaging

24  units or acting absent clinical justification. (*Compare* Reply Declaration of Ellen

25  Bachman in Support of Defs.' Mot. to Terminate, Doc. No. 4598 ¶¶ 3-14; 18-20 *with*

26  Bachman Opp'n Decl. ¶¶ 7-9; 16-17.) Plaintiffs presented substantial evidence in their

27  Motion of staffing in these units without regard to clinical requirements and adequate of

28  care, of improper discharge practices, and of inaccuracies and/or manipulation in data

[818804-5]

1   provided by Defendants, including evidence from Special Master Reports and Plaintiffs'

2   expert.  Defendants' self-serving declaration is inadequate to rebut the need for further

3   investigation by the Special Master.

4        **G.      Uncontroverted Evidence Demonstrates That Investigation into VPP's
             Inpatient Program Is Necessary**

5

6        Despite uncontroverted evidence of inadequate staffing and denial of basic human

7   necessities such as linens and clothing at VPP, Defendants ask that the Court decline to

8   direct the Special Master to investigate VPP's inpatient programs.  Defendants argue that

9   such evidence is insufficient "to order system-wide change."  (Defs.' Opp'n at 27:15-16.)

10  Plaintiffs did not request an order for "system-wide change" at VPP, but, rather, an

11  investigation by the Special Master of the treatment and conditions being provided at VPP,

12  given the existing evidence of deficiencies, and the likelihood that conditions at VPP

13  reflect similar failures to those at SVPP.  Pls.' Mot. at 26:25-27:8.  In the alternative,

14  Plaintiffs request that the Court permit Plaintiffs and their experts to conduct discovery of

15  VPP to determine if further enforcement orders are needed.

16                                   **CONCLUSION**

17       Plaintiffs have presented evidence demonstrating ongoing constitutional violations

18  with respect to the denial of access to adequate inpatient psychiatric hospitalization.

19  Defendants' evidence does not rebut, and in large part confirms, the facts established by

20  Plaintiffs.  The relief sought by Plaintiffs is necessary to correct existing constitutional

21  violations, and is narrowly tailored to remediate these violations.

22

23  DATED:  May 16, 2013              Respectfully submitted,

24                                   ROSEN BIEN GALVAN & GRUNFELD LLP

25
                                     By:  */s/ Lori E. Rifkin*
26                                        Lori E. Rifkin

27                                   Attorneys for Plaintiffs

28

[818804-5]

PLAINTIFFS' REPLY REGARDING MOTION FOR ENFORCEMENT OF COURT ORDERS AND
AFFIRMATIVE RELIEF RELATED TO INPATIENT TREATMENT