FUTTERMAN DUPREE DODD CROLEY MAIER LLP
MARTIN H. DODD (104363)
180 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
mdodd@fddcm.com

*Attorneys for Receiver*
J. Clark Kelso

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCIANO PLATA, et al., | Case No. C01-1351 TEH |
| *Plaintiffs*, | |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| *Defendants*. | |
| | |
| RALPH COLEMAN, et al., | Case No. CIV S-90-0520 LKK JFM P |
| *Plaintiffs*, | |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| *Defendants*. | |
| | |
| JOHN ARMSTRONG, et al., | Case No. C94-2307 CW |
| *Plaintiffs*, | |
| v. | |
| EDMUND G. BROWN, JR., et al., | |
| *Defendants*. | |

## NOTICE OF FILING OF RECEIVER'S TWENTY-THIRD TRI-ANNUAL REPORT

1    PLEASE TAKE NOTICE that the Receiver in *Plata v. Schwarzenegger*, Case No. C01-

2    1351 TEH, has filed herewith his Twenty-Third Tri-Annual Report.

3    Dated:  May 22, 2013                          FUTTERMAN DUPREE DODD CROLEY
                                                    MAIER LLP
4

5                                                   By:_____/s/ Martin H. Dodd_____
                                                             Martin H. Dodd
6                                                            Attorneys for Receiver J. Clark Kelso

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28


**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

# Achieving a Constitutional Level of Medical Care in California's Prisons

**Twenty-third Tri-Annual Report of the Federal Receiver's Turnaround Plan of Action**
**For January 1 – April 30, 2013**

**May 22, 2013**

# California Correctional Health Care Receivership

**Vision:**

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

**Mission:**

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1.  **Executive Summary**.................................................................................... **1**

2.  **The Receiver's Reporting Requirements**.................................................. **3**

3.  **Status and Progress Toward the Turnaround Plan Initiatives**.................... **4**

    **GOAL 1    Ensure Timely Access to Health Care Services**.......................... **4**

    *Objective 1.1*    Screening and Assessment Processes................................... 4

    *Objective 1.2*    Access Staffing and Processes............................................. 4

    *Objective 1.3*    Scheduling and Patient-Inmate Tracking System................... 5

    *Objective 1.4*    Standardized Utilization Management System....................... 5

    **GOAL 2    Establish a Prison Medical Program Addressing the Full Continuum
    of Health Care Services**.......................................................... **6**

    *Objective 2.1*    Primary Care...................................................................... 6

    *Objective 2.2*    Chronic Care..................................................................... 6

    *Objective 2.3*    Emergency Response.......................................................... 6

    *Objective 2.4*    Specialty Care and Hospitalization...................................... 7

    **GOAL 3    Recruit, Train and Retain a Professional Quality Medical Care
    Workforce**.......................................................................... **8**

    *Objective 3.1*    Physicians and Nurses......................................................... 8

    *Objective 3.2*    Clinical Leadership and Management Structure..................... 8

    *Objective 3.3*    Professional Training Program............................................. 8

    **GOAL 4    Implement a Quality Assurance and Continuous Improvement
    Program**.............................................................................. **9**

    *Objective 4.1*    Clinical Quality Measurement and Evaluation Program............. 9

    *Objective 4.2*    Quality Improvement Programs.......................................... 14

    *Objective 4.3*    Medical Peer Review and Discipline Process......................... 17

    *Objective 4.4*    Medical Oversight Unit...................................................... 17

    *Objective 4.5*    Health Care Appeals Process............................................. 17

i

*Objective 4.6*      Out-of-State, Community Correctional Facilities and Re-entry Oversight.................................................................................. 18

**GOAL 5**      **Establish Medical Support / Allied Health Infrastructure......................** **19**

*Objective 5.1*      Pharmacy............................................................................. 19

*Objective 5.2*      Medical Records.................................................................. 19

*Objective 5.3*      Imaging/Radiology and Laboratory Services...................... 19

*Objective 5.4*      Clinical Information Systems................................................ 20

*Objective 5.5*      Telemedicine....................................................................... 20

**GOAL 6**      **Provide for Necessary Clinical, Administrative and Housing Facilities.........................................................................** **21**

*Objective 6.1*      Upgrade Administrative and Clinical Facilities................... 22

*Objective 6.2*      Expand Administrative, Clinical, and House Facilities........ 23

*Objective 6.3*      Finish Construction at San Quentin State Prison............... 25

**4.**      **Additional Successes Achieved by the Receiver......................................** **26**

       A.      Office of the Inspector General – Update on the Medical Inspections of California's 33 Adult Prisons......................................................... 26

**5.**      **Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented By Institutions Or Individuals......................................** **28**

       A.      State's Response to Cocci at Pleasant Valley and Avenal State Prisons............ 28

       B.      Overcrowding and Its Solutions................................................... 30

       C.      The Substance and Tone of Leadership........................................ 34

**6.**      **An Accounting of Expenditures for the Reporting Period..........................** **36**

**7.**      **Other Matters Deemed Appropriate for Judicial Review..........................** **37**

       A.      Coordination with Other Lawsuits................................................ 37

       B.      Master Contract Waiver Reporting............................................... 37

       C.      Consultant Staff Engaged by the Receiver.................................. 37

       D.      Overview of Transition Activities and Court Expert Evaluations.......... 37

**8.**      **Conclusion.......................................................................................** **50**

# Section 1: Executive Summary

In our second Tri-Annual report for 2013, the accomplishments for the period of January 1 through April 30, 2013 are highlighted. Progress continues toward fully implementing the Vision and Mission outlined in the Receiver's Turnaround Plan of Action (RTPA). Highlights for this reporting period include the following:

- RTPA – Work on remaining action items continues, including completion of a system-wide scheduling function, full definition of medical processes for primary care, implementation of a quality improvement program, with 13 institutions having completed a draft Performance Improvement (PI) work plan, bringing the total to 25 institutions with an established plan, and implementation of RIS/PACS imaging/radiology services at 13 institutions with full statewide implementation by the end of June 2013, with on-site exams interpreted by one radiology group and report turnaround times reduced from days to hours.
- Office of the Inspector General (OIG) Inspections – Continuation of round three inspections with scores improved.
- California Correctional Health Care Services (CCHCS)  Registries – CCHCS staff developed two new patient-inmate registries, one for patient-inmates receiving treatment for HCV and one for patient-inmates treated for active or latent TB, with anticipated release in May 2013.
- CCHCS provided a number of tools and services to help institutions appropriately place and manage high-risk patients. Among them are:

In the key areas of timely access to primary care physicians and timely access to medications, the OIG scores showed a modest improvement between round two and round three of the inspections, although the scores in these areas still lag behind other improvements, demonstrating that we have more work to do to solve the challenges of providing timely access to care and ensuring that medications are timely delivered to all who need them.  The OIG overall scores show steady improvement from round two to round three with 31 completed and 24 out of the 31 final reports thus far having a score of 85 percent or better.

The CHCF in Stockton is on schedule to open later this year, with the first patient-inmates scheduled to arrive in July 2013, and construction at DNCA began in July 2012.  The DNCA is continuing under an aggressive construction schedule in order to begin patient-inmate occupancy in February 2014.  In addition, CDCR's published plan, *The Future of California Corrections (Blueprint)*, proposed the upgrades of the existing facilities: HCFIP, HCFIP projects continue to progress through the PWB approval process and the PMIB funding process.  Despite some early delays in receiving PWB and PMIB approvals, projects are again proceeding on a sequential submittal schedule to the PWB and PMIB.  To date, 13 projects (all of the intermediate level-of-care facilities and male reception centers) have received PWB project level approvals.  Ten of these (the intermediate level-of-care) have received subsequent interim financing loans from the PMIB.  Contracts for developing site-specific designs for these ten

projects have been negotiated and are in the process of being negotiated. Since these projects still require PWB approval of the completed preliminary plans, and DOF approval once the working drawings are complete before CDCR may proceed to bid, they also continue to carry significant risk. The statewide medication distribution projects which are funded with general funds are scheduled to have preliminary plans completed by May 2013 and submitted for PWB design approval in July 2013.

Format of the Report
To assist the reader, this Report provides three forms of supporting data:

*Metrics*: Metrics that measure specific RTPA initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions that are not completed.

*Appendices*: In addition to providing metrics, this report also references documents in the Appendices of this report.

*Website References*: Whenever possible website references are provided.

RTPA Matrix
In an effort to provide timely and accurate progress reports on the RTPA to the Courts and other vested stakeholders, this format provides an activity status report by enterprise, for statewide applications/programs, and by institution, as appropriate for and in coordination with that operation.

The Enterprise Project Deployment worksheet and the Institution Project Deployment worksheet provide an illustration of the progress made toward each action item outlined in the RTPA and reported in the Tri-Annual Report. The Enterprise Project Deployment worksheet captures projects specifically assigned to the Receiver for broad administrative handling, analysis or testing. The Institution Project Deployment captures the status of all other activity by institution. Reporting will reflect activity that is completed, on schedule, delayed or not progressing, with corresponding dates. The Tri-Annual Report will continue to provide a narrative status report.

Due to the size of the document, the Matrix is included as Appendix 1.

Information Technology Project Matrix
In addition to the RTPA Matrix, a separate chart has been created to specifically illustrate the major technology projects and the deployment of those projects. This document is included as Appendix 2.

## Section 2: The Receiver's Reporting Requirements

This is the twenty-third report filed by the Receivership, and the seventeenth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:
1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.
2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.
3. Particular success achieved by the Receiver.
4. An accounting of expenditures for the reporting period.
5. Other matters deemed appropriate for judicial review.

(Reference pages 2-3 of the Appointing Order at http://www.cphcs.ca.gov/docs/court/PlataOrderAppointingReceiver0206.pdf)

In support of the coordination efforts by the three federal courts responsible for the major health care class actions pending against the CDCR, the Receiver files the Tri-Annual Report in three different federal court class action cases: *Armstrong, Coleman, and Plata*. An overview of the Receiver's enhanced reporting responsibilities related to these cases and to other *Plata* orders filed after the Appointing Order can be found in the Receiver's Eleventh Tri-Annual Report on pages 15 and 16. (http://www.cphcs.ca.gov/receiver_tri.aspx)

Court coordination activities include: facilities and construction; telemedicine and information technology; pharmacy; recruitment and hiring; credentialing and privileging; and space coordination.

# Section 3: Status of the Receiver's Turnaround Plan Initiatives

## Goal 1: Ensure Timely Access to Health Care Services

**Objective 1.1.** Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*
This action is completed.

*Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons*
Based on the court's experts' review of San Quentin's reception center processes in March 2013, a review of optimizing further reception center processes in light of redistribution of reception center missions is underway.

*Action 1.1.3. By January 2010, begin using the new medical classification system at each reception center prison.*
This action is completed.

*Action 1.1.4. By January 2011, complete statewide implementation of the medical classification system throughout CDCR institutions.*
This action is completed.

**Objective 1.2.** Establish Staffing and Processes for Ensuring Health Care Access at Each Institution

*Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution.*
This action is completed.

*Action 1.2.2. By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions.*
This action is completed.

Refer to Appendix 3 for the Executive Summary and Health Care Access Quality Reports for December 2012 through March 2013.

**Objective 1.3.** Establish Health Care Scheduling and Patient-Inmate Tracking System

*Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System (SOMS) with a scheduling and inmate tracking system as one of its first deliverables.*

This action is ongoing.  Development of a coordinated scheduling system is now being realized. Development, testing, and deployment of the three health care scheduling systems have been achieved at 17 institutions. The deployment has been done at the same time that SOMS central inmate assignment module is rolled out. The net result is an interfaced scheduling process that reduces conflicting patient-inmate appointments by means of a shared calendar and provides the potential for improving patient-inmate access to care.

Progress during this reporting period is as follows:

- User acceptance testing was completed for all scheduling disciplines, the health care central data store and SOMS.

- Training programs, user manuals and job aids were developed for the medical scheduling system (MedSATS) and dental scheduling system (DSTS). The Mental Health program has provided an abbreviated training program on the mental health scheduling system's (MHTS) new functionality to train current users in use of the shared calendar.

- A pilot of the integrated system was initiated in February 2013 at Sierra Conservation Center (SCC).

- Full roll out began in March 2013 at the women's institutions. To date, 17 institutions have been successfully migrated to the new system.

- The roll out schedule as currently planned will have all institutions (with the exception of Pelican Bay) on the integrated system by June 2013.

We expect the Health Care Scheduling and Tracking Systems (HCSTS) to be fully deployed in all institutions by the end of May 2013.

**Objective 1.4.** Establish a Standardized Utilization Management System

*Action 1.4.1. By May 2010, open long-term care unit.*

This action is completed.

*Action 1.4.2. By October 2010, establish a centralized UM System.*

This action is completed.

## Goal 2: Establish a Prison Medical Program Addressing the Full Continuum of Health Care Services

**Objective 2.1.** Redesign and Standardize Access and Medical Processes for Primary Care

> ***Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models.***

This action is ongoing. Progress during this reporting period is as follows:

Elements of the draft Episodic Care Policy and Procedure are being considered for inclusion in the revision to the Primary Care Model Policy and Procedure (IMSP&P Volume 4, Chapter 4a). The Primary Care Model Policy and Procedure is being examined and revised by a workgroup presently and, in addition to Episodic Care, the workgroup is considering inclusion of elements of the following IMSP&P policies and procedures into the Primary Care Model Policy and Procedure: Chronic Care Disease Management (Volume 7, Chapters 1a and 1b); Preventive Clinical Services (Volume 4, Chapter 7); and Access to Care (Volume 4, Chapter 4). The extent to which the draft Episodic Care Policy and Procedure will be incorporated into the Primary Care Model Policy and Procedure is unknown at this time, but the workgroup and Clinical Operations Team (COT) are conceptually supportive of incorporating into the Primary Care Model elements of the Draft Episodic Care Policy and Procedure. A separate group has also convened to revise the CDCR 7362, Health Care Services Request Form. Revisions are underway presently and will, in part, be determined by the modifications made to the Primary Care Model Policy and Procedure.

> ***Action 2.1.2. By July 2010, implement the new system in all institutions.***

This action is ongoing. Please see action item 2.1.1.

**Objective 2.2.** Improve Chronic Care System to Support Proactive, Planned Care

> ***Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered.***

This action is completed.

**Objective 2.3.** Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

> ***Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions.***

This action is completed.

> ***Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff.***

This action is completed.

> ***Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response.***

This action is completed.

**Objective 2.4.** Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

> ***Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals.***

This action is completed.

> ***Action 2.4.2. By October 2010, establish on a statewide basis approved contracts with specialty care providers and hospitals.***

This action is completed.

> ***Action 2.4.3. By November 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner.***

This action is completed.

## Goal 3: Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1** **Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions**

For details related to vacancies and retention, refer to the Human Resources Recruitment and Retention Reports for December 2012 through March 2013. These reports are included as Appendix 4.

*Action 3.1.1. By January 2010, fill ninety percent of nursing positions.*
This action is completed.

*Action 3.1.2. By January 2010, fill ninety percent of physician positions.*
This action is completed.

**Objective 3.2** **Establish Clinical Leadership and Management Structure**

*Action 3.2.1. By January 2010, establish and staff new executive leadership positions.*
*Action 3.2.2. By March 2010, establish and staff regional leadership structure.*
These actions are completed.

**Objective 3.3.** **Establish Professional Training Programs for Clinicians**

*Action 3.3.1. By January 2010, establish statewide organizational orientation for all new health care hires.*
This action is completed.

*Action 3.3.2. By January 2009, win accreditation for CDCR as a Continuing Medical Education provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.*
The action is completed.

## Goal 4: Implement Quality Improvement Programs

<u>**Objective 4.1.**</u> **Establish Clinical Quality Measurement and Evaluation Program**

> *Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs.*

This action is ongoing.  Progress during this reporting period is as follows:

<u>Patient Safety Program</u>

In May 2012, CCHCS adopted policies and procedures to establish a statewide Patient Safety Program.  Implementation of the new Patient Safety Program requires establishing infrastructure elements statewide, such as an incident reporting system, as well as orienting CCHCS staff at all levels of the organization to multiple new concepts and skills.  As a result, CCHCS has adopted phased approach to program implementation, with updates provided in the bullets below.

- **Annual Patient Safety Plan.**  Specific patient safety strategies and objectives, such as objectives for reducing potentially avoidable hospitalizations and improving laboratory monitoring for patients on psychotropic medications, have been incorporated into the CCHCS Performance Improvement Plan for 2013-2015, which is in the final stages of vetting and approval.

- **Statewide Surveillance System.**  The new Patient Safety Policy requires CCHCS to create a statewide system that integrates and analyzes data from a number of sources – death reviews, suicide case studies, inmate appeals, reports from stakeholders, adverse events and "near misses" captured in the Health Care Incident Reporting System – as a means of identifying and addressing risks to patient safety.  As a first step in developing this system, CCHCS began work on a taxonomy appropriate for the California prison system, drawing from models used in the broader health care industry.  The taxonomy offers a set of standardized categories and data points that can be used to package different types of narrative reports into a format that can be analyzed and trended.

- **Health Care Incident Reporting System and Daily Triaging Process.**  The Patient Safety Policy calls for CCHCS to establish a process for reporting adverse/sentinel events and "near misses".  A reporting system was developed in early 2013, and members of the Adverse/Sentinel Event Committee (ASEC) provided training statewide on the new system in March and April 2013.  A copy of the presentation is attached as Appendix 5. A group of clinicians representing all major disciplines meet daily to review health care incidents that have been reported, directing institution staff on appropriate follow-up action, including root cause analysis.

- **Technical assistance, staff development programs, and decision support tools**.  During this reporting period, CCHCS created a Root Cause Analysis Tool Kit to walk institution

staff through the process of root cause analysis, which is required for certain types of adverse events per policy. The tool kit contains links to tools to support institution staff as they complete each procedural step. CCHCS commenced testing the new tool kit in April of 2013, and will continue refining the tool kit on-site at institutions with actual patient cases through the month of May. The draft tool kit is attached as <u>Appendix 6</u>.

- **Headquarters Patient Safety Committee and Adverse/Sentinel Event Committee (ASEC).** Since its inaugural meeting in August 2012, the Patient Safety Committee has convened nine times; the Adverse/Sentinel Event Committee has met sixteen times. With the Patient Safety Program still in phased implementation, both committees have primarily focused on activities required to fully implement the new program, such as the development and approval of tools and training programs.

- **Statewide Patient Safety Initiative – High-Risk Patients.** CCHCS produces reports and patients lists that identify high risk patients currently housed at Basic Institutions who may be more appropriately managed at an Intermediate Institution. Please see Figure 1 for a sample of the High Risk Transfer Summary Report produced monthly to track progress in moving high risk patients to Intermediate Institutions. These monthly reports draw patient-specific data that custody and health care staff must consider when determining placement, such as custody level and disability status, consolidating information from multiple databases in a single report. As part of the effort to appropriately house high risk patients, CCHCS staff at headquarters and at institutions has identified individual high risk patients whose health care needs make them candidates for transfer to the new California Health Care Facility in Stockton, coming online in 2013. Health care and custody staff meet regularly to effect transfers of high risk patients.

Figure 1. High Risk Transfer Summary – Monthly Report



| CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES | | | | | | | | | | | | | | | | | | | Statewide Basic Institutions Summary |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |

Summary - Basic | Summary - Interm. | HIGH @ Basic | HIGH @ Interm. | MED/LOW @ Interm. | Patient Search | Movement Report

| Basic Institution | Current Population | Medical Risk | | | | # HR that are | | Number of High Risk Retained at Basic and Reason | | | | | | | | | | | Interim Goal | |
| | | Low | Med | High | % High Risk | SNY | Lvl I/II Close | Custody Override | Parole <6 mth | EOP | ICF | Dialysis | DPW | RC <6mth | OHU CTC GACH | ADSEG SHU PSU | Stockton Eligible | Temp HR | Adjusted High Risk | % High Risk |
| ASP | 4,595 | 1,948 | 2,285 | 362 | 7.9% | 154 | 0 | 6 | 37 | 0 | 0 | 15 | 0 | 17 | 8 | 20 | 40 | 219 | 4.8% |
| CAL | 3,445 | 2,688 | 674 | 83 | 2.4% | 30 | 0 | 3 | 4 | 0 | 0 | 0 | 0 | 9 | 8 | 0 | 18 | 41 | 1.2% |
| CCC | 4,719 | 4,077 | 582 | 60 | 1.3% | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 9 | 36 | 0.8% |
| CCI | 4,579 | 2,348 | 2,054 | 177 | 3.9% | 133 | 0 | 5 | 20 | 0 | 0 | 0 | 0 | 3 | 34 | 4 | 18 | 93 | 2.0% |
| CCWF | 3,607 | 1,589 | 1,687 | 331 | 9.2% | 0 | 0 | 24 | 32 | 4 | 0 | 2 | 10 | 10 | 6 | 0 | 48 | 183 | 5.1% |
| CEN | 2,923 | 2,222 | 627 | 74 | 2.5% | 7 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 9 | 8 | 4 | 8 | 41 | 1.4% |
| COR | 4,422 | 1,842 | 2,260 | 320 | 7.2% | 130 | 0 | 18 | 14 | 36 | 0 | 11 | 8 | 0 | 33 | 77 | 10 | 91 | 2.1% |
| CRC | 3,439 | 1,717 | 1,475 | 247 | 7.2% | 89 | 0 | 0 | 45 | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 61 | 128 | 3.7% |
| CTF | 5,273 | 2,384 | 2,365 | 524 | 9.9% | 219 | 62 | 0 | 34 | 0 | 0 | 0 | 0 | 6 | 2 | 47 | 48 | 387 | 7.3% |
| CVSP | 2,640 | 1,820 | 687 | 133 | 5.0% | 91 | 0 | 0 | 14 | 0 | 0 | 0 | 0 | 3 | 2 | 5 | 16 | 88 | 3.3% |
| DVI | 2,412 | 1,533 | 768 | 111 | 4.6% | 0 | 0 | 0 | 14 | 0 | 0 | 2 | 43 | 13 | 3 | 1 | 6 | 29 | 1.2% |
| HDSP | 3,357 | 2,003 | 1,208 | 146 | 4.3% | 51 | 0 | 1 | 1 | 1 | 0 | 0 | 15 | 0 | 3 | 7 | 10 | 24 | 2.5% |
| ISP | 3,419 | 2,488 | 808 | 123 | 3.6% | 57 | 0 | 0 | 4 | 0 | 0 | 0 | 3 | 0 | 6 | 0 | 6 | 42 | 1.8% |

- **Statewide Patient Safety Initiative - Polypharmacy.** CCHCS has selected polypharmacy as one of its first statewide patient safety initiatives, with special emphasis on potentially harmful drug-drug interactions associated with HCV and psychotropic medications. Among other activities, CCHCS has developed on-demand reports identifying patients taking 10 or more medications, and will be creating more detailed patient registries alerting care teams about possible drug-drug interactions.

- **Institution-Level Patient Safety Initiatives.** In the course of developing an annual improvement plan, many institutions have chosen patient safety issues as priorities for improvement, including systematic medication regimen reviews of patients on 10 or more medications (polypharmacy reviews), falls prevention, and initiatives to reduce medication errors.

- **Patient Safety Culture.** Ted Fox, member of the statewide Patient Safety Committee and Chief Executive Officer at California Men's Colony (CMC), tested the use of a patient safety survey tool to proactively identify issues or weakness with care processes or the work environment that could eventually place patients at risk. CMC adapted a survey tool developed by the federal Agency for Healthcare Research and Quality (AHRQ) that is employed by health care organizations nationwide. In response to the survey findings, CMC staff created action plans to mitigate risk to patients. The Patient Safety Committee is considering broader application of the survey tool within the California prison system as part of the Patient Safety Program implementation.

Revisions to the Health Care Services Dashboard

During this reporting period, CCHCS continued to release the monthly Health Care Services Dashboard, which consolidates strategic performance information across all clinical program areas into a single report, allowing health care staff to identify improvement opportunities and assess progress toward local and statewide performance objectives.

Dashboard measures are drawn directly from the priority areas and objectives in the statewide Performance Improvement Plan. This year, CCHCS will update the Performance Improvement Plan with the most current priorities and objectives. The Dashboard will be modified commensurate with the changes in the Performance Improvement Plan. In addition, Dashboard measures will be organized under the seven major components of the CCHCS Primary Care Model:

- Consistent care teams
- Population and care management
- Scheduling and access to care
- Medication management
- Health information management
- Resource management
- Continuous evaluation and improvement

CCHCS will continue to work on providing performance measure data at care team and provider levels, to support recognition of best practices and identification of particular clinics or patient panels that require additional support to reach performance goals.

<u>Patient-Inmate Registries</u>

During this reporting period, CCHCS developed two new patient registries, one for patients receiving treatment for Hepatitis C viral infection (HCV), and one for patients treated for active or latent tuberculosis (TB), with anticipated release in May 2013.

Health care staff carefully monitors patients on treatment for TB and HCV for a number of reasons. Medications used to treat these conditions may cause serious side effects, and could be harmful when taken in combination with other types of medication. In addition, it is important that patients treated for TB or HCV receive medication doses consistently, without the lapses that can occur when a patient transfers from one institution, housing unit, or level of care to another. Patient registries make critical clinical information readily accessible to public health nurses and primary care teams. Movement data in patient registries is updated daily, so registries are also an effective means for tracking patients as they move between and within institutions. Figures 2 and 3 show screenshots from the new registries.

*Figure 2: Screen Shot of TB Registry with Clinical Data Points Highlighted*

*Figure 3.  Screen Shot of HCV Registry with Clinical Data Points Highlighted*



CCHCS has made it a priority to promote the use of patient registries, which make critical clinical information, such as a patient's health risk status, easily accessible to care teams working to manage an assigned patient panel.  The flags imbedded in the patient registries prompt care teams to follow CCHCS guidelines, which both improves patient outcomes and helps to reduce costs.   Widespread and consistent registry use is required for full implementation of the Population and Care Management elements of the CCHCS Primary Care Model, and necessary for compliance with certain Inmate Medical Services Program (IMSP) Policies and Procedures.

Registry usage has steadily increased statewide since the May 2012 release of on-demand patient registries, which allow users to select from drop-down menus to customize registry reports for a particular patient population, care team, or other data element.   Please see Figure 4.  Registry usage increased from 785 unique users per month in May of 2012 to more than 1,400 unique users per month in April of 2013.



Figure 4. Average Number of On-Demand Master Registry Reports Run per Quarter by CCHCS Users, May 2012 through April 2013

In the next reporting period, CCHCS will continue to provide registry demonstrations at scheduled site visits and at the request of any institution staff.

>*Action 4.1.2. By July 2009, work with the Office of the Inspector General to establish an audit program focused on compliance with Plata requirements.*

This action is completed.  However, the parties, the Receiver and the OIG, recently held a preliminary meeting to discuss possible refinements to the OIG's inspection program. Discussions are ongoing, and the next scheduled meeting will include the Court's experts as previously suggested by the Court.  *See* April 18, 2013 Order Extending Time for Court Experts to Complete Written Evaluations, pg. 2, fn. 1 (in which the Court suggested that "it may be helpful for the OIG to meet with the court experts with the goal of refining the OIG audit instrument to more accurately measure the adequacy of care").

**Objective 4.2.** Establish a Quality Improvement Program

>*Action 4.2.1.(merged Action 4.2.1 and 4.2.3): By January 2010, train and deploy existing staff--who work directly with institutional leadership--to serve as quality advisors and develop model quality improvement programs at selected institutions; identify clinical champions at the institutional level to implement continuous quality improvement locally; and develop a team to implement a statewide/systems-focused quality monitoring/measurement and improvement system under the guidance of an interdisciplinary Quality Management Committee.*

This action item is ongoing. Progress during this period is as follows:

Quality Management Policy and Procedures

In December 2012, CCHCS issued updated Quality Management Program Policies and Procedures. This new policy and associated procedures replace Volume 3, Chapters 1 through 4, of the IMSP Policies and Procedures, dated January 2002. Training on certain aspects of the new policy, such as institution improvement plans and use of patient registries, has already commenced and will continue into summer of 2013.

CCHCS will continue to add training modules to support implementation of the new policy for the next 6 to 12 months, including use of specific improvement models and tools to analyze quality problems and redesign health care processes.

As part of policy implementation, the Quality Management (QM) Section offers QM Academy training approximately every two months, a two-day training to orient staff to the statewide Quality Management and Patient Safety Programs, as well as available quality improvement resources and processes. Institutions send staff of all disciplines and classifications that play a leadership role in the institution Quality Management Program to the training, which also links participants to contacts within the QM Section. A sample agenda from the QM Academy is provided in Appendix 7.

To date, six QM Academy training sessions have been offered. During this reporting period, one QM Academy session occurred, serving fifteen institution staff, with another session scheduled in early May 2013.

Statewide Performance Improvement Plan

Three years ago, CCHCS established its first statewide Performance Improvement Plan, which outlines the organization's major improvement priorities, lists statewide performance objectives, and describes strategies that will be used to achieve the stated objectives. The Performance Improvement Plan is updated periodically as performance objectives are met and new priorities emerge. The Performance Improvement Plan is posted on the Intranet.

CCHCS is in the process of updating the Performance Improvement Plan for 2013-2015. Review and revisions to the statewide plan continued during this reporting period under the auspices of the Quality Management Committee.

Institution Performance Improvement Work Plans and the CCHCS Primary Care Model

In 2012, CCHCS modified the corrective action process that follows each Office of the Inspector General (OIG) medical inspection to promote a system-wide approach to improvements and full implementation of the primary care model. As institutions complete the 3rd Round OIG medical inspection, the institution develops a Performance Improvement (PI) Work Plan, which places priority on core processes in the primary care model, such as medication management and timely access to health information, to improve overall health care system performance and address deficiencies noted by the OIG.

Institutions are encouraged to describe all improvement priorities that will be the focus for the next six months in their PI Work Plan, including mental health, dental, and allied health projects. By producing this plan, institutions also satisfy as major element of the new QM Policy. To assist institutions in developing their PI Work Plan, Quality Management Section staff created a tool kit that guides institutions through the process. Institutions receive an orientation to the tool kit by Webinar, and have the option of having QM Section staff facilitate leadership team discussions that determine PI Work Plan content.

Once the institution has submitted a draft PI Work Plan, the plan is disseminated to the Joint Clinical Executive Team (JCET) at headquarters and the Prison Law Office for comment, and comments forwarded on to the institution. Institutions are required to update the PI Work Plan monthly, and the most current version of the Work Plan is posted on the QM Portal for view by all health care staff.

During this reporting period, fifteen institutions completed a draft PI Work Plan, bringing the total statewide to twenty-seven institutions with an established plan. The remaining six institutions have received a draft OIG report and will receive a site visit in May and June 2013. CCHCS is on track to accomplish its goal of establishing an improvement plan at every institution by the end of Fiscal Year 2012-2013. Please see Figure 5.

*Figure 5: Status of PIWP Completion at CDCR Adult Institutions*

| PIWP Complete (N=27) | Draft OIG Report Received, Site Visit Pending in May and June 2013 (N=6) |
|---|---|
| • SAC<br>• RJD<br>• CMF<br>• SQ<br>• CMC<br>• CRC<br>• SCC<br>• PVSP<br>• KVSP<br>• CIW<br>• CCWF<br>• VSP<br>• LAC<br>• CCI<br>• CCC<br>• HDSP<br>• SATF<br>• COR<br>• DVI<br>• CAL<br>• FSP<br>• NKSP<br>• **ASP (pending PLO/JCET review)** | • MCSP<br>• WSP<br>• ISP<br>• CVSP<br>• SOL<br>• CIM |

| | |
|---|---|
| • **CEN (pending FINAL received)**<br>• **PBSP (pending FINAL received)**<br>• **SVSP (pending sending DRAFT to institution)**<br>• **CTF (pending sending DRAFT to institution)** | |

*Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.*
This action is completed.

*Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors.*
This action is combined with Action 4.2.1.

<u>Objective 4.3.</u> **Establish Medical Peer Review and Discipline Process to Ensure Quality of Care**

*Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care.*
This action is completed.

<u>Objective 4.4.</u> **Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations**

*Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations.*
This action is completed.

<u>Objective 4.5.</u> **Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

*Action 4.5.1. By July 2008, centralize management overall health care patient-inmate appeals, correspondence and habeas corpus petitions.*
This action is completed.
Refer to Appendix 8 for health care appeals, and habeas corpus petition activity for January through April 2013.

*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver.*
This action is completed.

**Objective 4.6.** Establish Out-of-State, Community Correctional Facilities (CCF) and Re-entry Facility Oversight Program

> ***Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities.***

This action is completed.

## Goal 5: Establish Medical Support / Allied Health Infrastructure

**Objective 5.1.** Establish a Comprehensive, Safe and Efficient Pharmacy Program

> ***Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications.***
This action is completed.

Refer to Appendix 9 for Top Drugs, Top Therapeutic Category Purchases, and Central Fill Pharmacy Service Level for January through April 2013.

> ***Action 5.1.2. By March 2010, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system.***
This action is completed.

> ***Action 5.1.3. By May 2010, establish a central-fill pharmacy.***
This action is completed.

**Objective 5.2.** Establish Standardized Health Records Practice

> ***Action 5.2.1. By November 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions.***
This action has been completed.

**Objective 5.3.** Establish Effective Imaging/Radiology and Laboratory Services

> ***Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants.***
This action is ongoing. Progress during the reporting period is as follows:

Imaging/Radiology Services

In mid-March 2013, Medical Imaging Services began the implementation of the RIS/PACS at Folsom State Prison, California State Prison, Sacramento, and Mule Creek State Prison. By the end of this reporting period, RIS/PACS will be implemented at 13 institutions and is scheduled to be fully implemented statewide by the end of June 2013.  The use of RIS/PACS will eliminate film and chemical supply costs, film jacket transportation costs to an off-site radiology group for interpretation, transfer of film jackets between institutions and the losing films and film jackets in transit.  With RIS/PACS, all institutions will have their on-site exams (general radiography and mobile services) interpreted by one radiology group.  Report turn-around-times will be reduced from days to hours due to the radiologists reviewing the exams electronically by using voice recognition software, and radiologic technologists will only need to follow one exam protocol standard.

In November 2012, the centralized Imaging Record Center (IRC) opened. The IRC will maintain the master film jackets for all patient-inmates regardless of their location.  As institutions transition to RIS/PACS, the IRC will be responsible for uploading those institutions' relevant prior exams into the system, will respond to requests for prior x-rays, and will handle their off-site provider and legal requests for records.

Laboratory Services
In January 2013, the statewide Enterprise Laboratory Information System (LIS) project was approved. The LIS will enable clinicians' access to real-time lab testing results and reduces duplicate testing at the institutions. The system will also enable clinicians to access a single repository of lab data in for all lab testing results, logistic tracking of specimens and testing runaround time, and management reporting.

To standardize the Point of Care Testing devices, a workgroup was convened to address and evaluate the glucose and anticoagulation testing devices. The outcome findings will improve testing quality and  patient-inmate safety. Additionally, a workgroup was established to provide guidelines on the ordering of lab tests pursuant to the CCHCS Care Guides on infectious, communicable, and chronic diseases, and preventive health diagnostic testing.

In February 2013, the contracted referral lab began utilizing an electronic order entry for the remaining institutions.  The compliance rate has improved from 82 percent in December 2012 to 88 percent in April 2013.

**Objective 5.4.** **Establish Clinical Information Systems**

*Action 5.4.1. By September 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems.*
This action is completed.

**Objective 5.5.** **Expand and Improve Telemedicine Capabilities**

*Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure.*
This action is completed.

## Goal 6: Provide for Necessary Clinical, Administrative and Housing Facilities

The two major projects planned for the purpose of adding new medical and mental health beds to the CDCR system are under construction and advancing, according to CDCR's aggressive construction schedule. The first of these, the CHCF, is under construction with activation staff being hired and is on schedule to accept the first patient-inmates in July 2013.  The second project, the DNCA, which is a remodel of the DeWitt Nelson juvenile facility (located adjacent to the CHCF), is under construction and is scheduled to receive patient-inmates beginning in February 2014.  In addition, CDCR has completed several mental health projects at existing prisons, which provide additional mental health beds and/or office and treatment space. Several other projects are also under design or construction.

As it relates to the HCFIP, which includes upgrades to add/renovate exam rooms and related healthcare space, as well as improvements to medication distribution at existing prisons, upgrade projects at 13 locations have now received initial approval from the PWB, and ten of these have also received funding from the PMIB.  Three are scheduled for funding approval at the June 2013 PMIB meeting.  Due to delays in receiving PWB and PMIB approvals, five of these 13 projects (FSP, SAC, MCSP, CMC and LAC) are reflecting one-to-two month delays in the start of construction.  CDCR is continuing to seek methods to accelerate design and/or construction in order to recover some of these schedule delays. The remaining basic level-of-care HCFIP projects are being sequenced for submittal to the PWB upon completion and review of site specific plans. It appears that the current schedule for obtaining PWB and PMIB approvals for these projects has been extended by three to seven months.  This would also affect completion of construction unless methods to accelerate design and construction are identified. The statewide medication distribution projects have received initial PWB approval and do not require PMIB approval since they are being funded from State General Funds.  These projects remain on schedule.

Thus far, CDCR and the state continue to demonstrate the commitment, focus, and ability to complete the construction of the CHCF and DNCA projects pursuant to the previously signed revocable letter-of-delegation. The new medical and mental health beds added pursuant to Goal Six will be substantially completed by 2014.  With the streamlined PWB and legislative oversight processes approved through SB 1022, and with the recent progress that was made on ten of the HCFIP projects, it is possible for the HCFIP and medication distribution upgrades at existing prisons to be substantially completed by 2017, with the priority focus of the upgrades at the intermediate level-of-care facilities substantially completed by 2016.  However, these projects require two approvals by the PWB (one for project authorization and one for approval of preliminary plans) and interim funding by the PMIB. Thus, if these projects experience additional delays in receiving approval and interim funding, this program will be at risk for completion.

**Objective 6.1.** Upgrade administrative and clinical facilities at each of CDCR's thirty-three prison locations to provide patient-inmates with appropriate access to care.

CDCR's published plan, *The Future of California Corrections (Blueprint)*, proposed the upgrades of the existing facilities (with the exception of California Rehabilitation Center, which is scheduled for closure) along with a streamlined legislative review process allowing oversight and approval to be retained by the PWB. These changes required legislative support and were approved with the passing of Senate Bill 1022 on June 27, 2012, allowing these projects to follow an approval process similar to other State capital outlay projects. CDCR has and indicates they will continue to submit projects to the DOF to be scheduled for the soonest PWB meeting available for project approval, with informational letters sent simultaneously to the Joint Legislative Budget Committee.

CDCR has received PWB project-level approvals for the ten intermediate level-of-care facilities and three male reception centers. CDCR has also received PMIB interim funding loans for the intermediate level-of-care facilities and is scheduled for PMIB loan approvals for the male reception centers at the June 2013 PMIB meeting.  PWB approval for the statewide medication distribution projects was also received at the September PWB (PMIB financing is not required since these projects are being funded by State General Funds). CDCR is proceeding with sequential submittals for the remaining basic level-of-care projects from May 2013 through October 2014 as site-specific plans are developed. While HCFIP projects are again proceeding through the PWB approval and PMIB funding processes, some delays have occurred and additional risks of delay remain.

As the plaintiffs and CDCR present their respective positions relative to the population limitations before this Court and the Three Judge Panel, it is important to note that the scope of medical improvements provided through the HCFIP is aligned with the Blueprint.  This document presented a standardized staffing model to replace the previous staffing model, which provided marginal ratio-driven staffing adjustments as patient-inmate populations increased or decreased. The new staffing model provides a staffing compliment to allow a prison to safely operate housing units, programs, and services with a wide range of patient-inmate population densities from 100 percent design-bed capacity to 160 percent design-bed capacity. HCFIP improvements are planned and will be designed to ensure adequate medical care can be provided within this same range of patient-inmate population densities. In some instances, due to factors such as physical plant or patient-inmate acuity, the improvements will accommodate an even greater population density. With the additional spaces added and renovated through the HCFIP projects, the number of exam rooms and related health care space in existing prisons statewide will accommodate the prison population proposed by the state in the Blueprint as well as providing the ability to fluctuate up or down to meet operational needs relative to mission changes.

   *Action 6.1.1. By January 2010, completed assessment and planning for upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.*
This action item is ongoing. Progress during this reporting period is as follows:

Initial project-level PWB approvals have been secured for all of the intermediate level-of-care projects (CMF, SOL, CIM, CIW, RJD, SAC, MCSP, FSP, CMC and LAC), and the reception center projects (DVI, NKSP and WSP), along with the statewide medication distribution projects. Delays in obtaining PWB project approval and/or PMIB loans have resulted in projected delays of one-to-two months in the start of construction for five of these projects (FSP, SAC, MCSP, CMC and LAC) unless methods of acceleration are identified.  Submission of basic level-of-care projects will be scheduled through October 2014 in sequence following completion and review of site-specific plans. These site reviews are now occurring.  Plans are not being developed for CRC due to the planned closure.

### Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's thirty-three institutions.

This action item is ongoing. Progress during this reporting period is as follows:

The design, bid, and construction phase for projects at each of the 32 institutions begins once PWB project approvals and PMIB loan approvals have been obtained. Following PWB and PMIB approval, architectural/engineering contracts for site-specific preliminary plans at the intermediate level-of-care facilities have been negotiated and are in the process of being executed.  As with all state capital outlay, additional approval from the PWB for the completed preliminary plans will be required before the architect/engineers can proceed to preparation of the working drawings.  DOF approval is also required before the CDCR is allowed to bid these projects for construction. While delays in obtaining approvals and funding have occurred, and additional delays may be encountered in seeking the additional approvals, possibilities for schedule recovery during the design and construction are still possible.  Preliminary designs for the statewide medication distribution projects are scheduled to be completed by May 2013 and be submitted for PWB design approval in July 2013.  The typical project duration for design and construction is three to four years from PMIB loan approval. CDCR has provided schedules for the remaining HCFIP projects not previously reported. The new schedule shows that the last HCFIP upgrade project (Chuckawalla Valley State Prison) will be completed in September 2017.


**Objective 6.2.** Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs.

The initial plan to expand facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs was based upon studies and population projections developed in 2007 by Abt Associates. Approximately half of the beds were to serve patient-inmates with mental health needs, and half were to provide medical beds for patient-inmates needing long-term nursing care and those with clinically complex and high-risk medical conditions (high acuity, low acuity, and Specialized General Population [SGP] intermediate level-of-care).

Since 2007, the patient-inmate population has declined, first due to changes in the parole program and secondly (and more significantly) through changes in sentencing law referred to as

AB 109 realignment. The Receiver has continued being committed to ensuring the healthcare capacity needs are met while remaining accountable for the judicious use of taxpayer funds Thus, the projected need and resulting recommendations for a construction program have undergone continuous scrutiny by the Receiver as well as by CDCR and DOF as the impacts from realignment occurred.

Taking into account the projected patient-inmate population reductions resulting from the AB 109 realignment, the medical capacity needs for the high and low-acuity patient-inmates will be fully met by the CHCF, which will add 1,010 high and low-acuity beds. The CHCF is scheduled to begin accepting patient-inmates in July 2013. A portion of the medical bed needs for the SGP intermediate level-of-care patient-inmates will be met through the 528 beds added by the remodeled DNCA facility, which is scheduled to receive patient-inmates beginning in February 2014. The remaining SGP needs will be accommodated in those existing hub prisons designated to house SGP intermediate level-of-care patient-inmates. These intermediate level-of-care prisons are scheduled to receive a larger number of additional and/or remodeled exam rooms and associated spaces through the HCFIP program. With the state now proceeding with the approval, funding and design development for these upgrades and with the pending completion of the CHCF and DNCA projects, adequate medical capacity will exist to serve the patient-inmate population.

Relative to mental health needs, 1,037 new beds are being built at the CHCF and DNCA to provide crisis, acute, and intermediate levels of mental health care. In addition, numerous projects at existing prisons have already been initiated by CDCR to add bed capacity and treatment and office space. This revised mental health construction plan has been submitted to and approved by the Coleman Court.

### Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible.
This action item is ongoing. Progress during this reporting period is as follows:

CHCF is on schedule to receive the first patient-inmates in July 2013. Construction is underway and state lease-revenue bonds have been sold for this project. In addition to the construction progress being made, activation staff continues to be hired to support the 2013 activation date. The DNCA project is also proceeding in construction and is scheduled to receive the first patient-inmates in February 2014.

### Action 6.2.2. By February 2009, begin construction at first site.
This action item is ongoing. Progress during this reporting period is as follows:

CHCF is on schedule for construction completion and for the first patient-inmate to be received in July 2013. All of the buildings have been fully erected with interior work either completed or nearing completion.

### Action 6.2.3. By July 2013, complete execution of phased construction program.
This action item is ongoing. Progress during this reporting period is as follows:

Receipt of the first patient-inmates at CHCF is scheduled for July 2013 and construction is expected to be complete by January 2014. Receipt of the first patient-inmates at DNCA is expected to occur in February 2014 and construction is expected to be completed by June 2014.

**Objective 6.3.** **Complete Construction at San Quentin State Prison**

*Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility.*
This action is completed.

*Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility.*
This action is completed.

# Section 4: Additional Successes Achieved by the Receiver

### A.    Office of the Inspector General – Update on the Medical Inspections of California's 33 Adult Prisons

To evaluate and monitor the progress of medical care delivery to patient-inmates at each prison, the Receiver requested that the OIG conduct an objective, clinically appropriate, and metric-oriented medical inspection program. To fulfill this request, the Inspector General assigns a score to each prison based on multiple metrics to derive an overall rating of zero to 100 percent. Although only the federal court may determine whether a constitutional standard for medical care has been met, the Receiver's scoring criteria for adherence to medical policies and procedures establish the minimum score for moderate adherence to the policies and procedures to be 75 percent. Scores below 75 percent denote low adherence, while those above 85 percent reflect high adherence.

Using this tool, the Inspector General rated California's 33 adult institutions for the first round of inspections (September 2008 – June 2010) at 72.9 percent, on average. High Desert State Prison scored lowest, at 62.4 percent, and Folsom State Prison received the highest score, at 83.2 percent. The Inspector General found that nearly all prisons were not effective in ensuring that patient-inmates receive their medications. In addition, prisons were generally not effective at ensuring that patient-inmates are seen or provided services for routine, urgent, and emergency medical needs according to timelines set by CCHCS policy. However, the Inspector General did find that prisons generally performed well in areas involving duties performed by nurses, and continuity of care.

Second round inspections began September 2010 and the OIG completed 33 inspections as of April 30, 2012 and issued 33 final inspection reports. Summary results of these final reports show that four of the 33 institutions achieved a score higher than 85 percent placing them in the category of high adherence and 25 of the 33 institutions achieved a score of 75 percent or higher placing them in the moderate adherence area. California Correctional Center achieved the highest score of 89.5 percent. Of the four institutions scoring less than 75 percent, RJD scored the lowest at 73 percent but improved by 5 percent over their previous score of 68 percent. With 33 finalized inspections reports, the overall statewide average for the second round inspections is 78.9 percent which reflects an improvement of seven percent over the first round statewide average of 71.9 percent.

The OIG began the third cycle of inspections in February 2012, and completed them in March 2013. As of May 2, 2013 the OIG has issued 31 of 33 final medical inspection reports. The average overall score for the 31 institutions with final third round inspection scores is 86.9 percent, an 8 percent increase over the 78.9 percent overall average score for the second round.  To date, no institution has scored in the low adherence category of less than 75 percent compliance.  All 31 institutions have obtained a score above 75 percent, with seven institutions achieving a score in the moderate adherence category between 77.6 percent and 84.9 percent.

Twenty-four institutions received a compliance score in the high adherence category of 85 percent compliance and above. In addition, 11 institutions scored more than ten percent improvement from second to third cycle, and 18 scored more than five percent improvement. Appendix 10 illustrates the difference in scores from round two and round three for each institution.

While the improving OIG scores described above reflect the prisons' success in improving performance, it should be reiterated that these scores themselves do not necessarily mean that constitutional requirements have been satisfied.  As recently explained by the Court, "[u]nfortunately, as demonstrated by the court experts' review of R.J. Donovan Correctional Facility [where several inadequacies were identified], these relatively high OIG scores do not mean, in all cases, that inmates at those institutions are receiving adequate care." April 18, 2013 Order Extending Time for Court Experts to Complete Written Evaluations, pg. 2, fn. 1.   In light of the "disconnect" between the OIG scores and the court expert's findings, the Court suggested that "it may be helpful for the OIG to meet with the court experts with the goal of refining the OIG audit instrument to more accurately measure the adequacy of care." *Id.*  In accordance with the Court's suggestion, the parties, the Receiver and the OIG, recently held a preliminary meeting to discuss possible refinements to the OIG's inspection program. Discussions are ongoing and the next scheduled meeting will include the Court's experts.

# Section 5: Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

**A.    State's Response to Cocci at Pleasant Valley and Avenal State Prisons**

As the Court is aware, on March 20, 2013, Plaintiffs filed a motion, seeking an order implementing certain recommendations previously made by the Receiver to address the grave risk of inmate morbidity and death from Coccidioidmycosis ("cocci" or "Valley Fever") in the Central Valley generally, and especially at Pleasant Valley State Prison ("PVSP") and Avenal State Prison ("ASP").  As the Receiver informed the Court in his Report and Response of Receiver Regarding Plaintiffs' Motion Re Valley Fever, filed on May 1, 2013 ("Receiver's May 1 Report"), he has recently issued an updated policy which, when implemented, will result in the exclusion of specific at-risk populations from the two institutions most severely impacted by cocci—PVSP and ASP.   In the Receiver's May 1 Report, the Receiver also described CDCR's "anemic response" to the serious cocci problem at PVSP and ASP over the last several years. Unfortunately, rather than cooperate to implement the Receiver's updated policy, on May 5, 2013, Defendants announced they will delay any decision regarding implementation until the hazardous conditions are further reviewed by the Centers for Disease Control ("CDC") and the National Institute for Occupational Safety & Health ("NIOSH").   Moreover, Defendants contend that they cannot implement the Receiver's updated exclusion criteria on the grounds that the policy is allegedly "ambiguous."  Defendants' Opposition to Plaintiffs' First Motion to Require Defendants to Comply with the Receiver's Recommendation Regarding Valley Fever ("Defendants' Opposition"), pgs 14-15.

Rather than file a supplemental response in connection with Plaintiffs' pending motion, the Receiver deems it necessary and appropriate to provide additional information regarding Defendants' response to his updated cocci policy in this Tri-Annual Report.  The Receiver does so for two reasons.  First, the February 14, 2006 Order Appointing Receiver requires him to call to the Court's attention in his regular reports particular problems he encounters in implementing the remedy.  Second, he has an obligation to consult with the Court regarding the Defendants' will, capacity and leadership to maintain the prison medical system.  *See* February 14, 2006 Order Appointing Receiver, pg. 4 ("The Receivership shall remain in place no longer than the conditions which justify it make necessary, and shall cease as soon as the Court is satisfied, and so finds in consultation with the Receiver, that Defendants have the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to class members.").  Defendants' objections to the Receiver's updated cocci policy and their refusal even to take preliminary steps to implement the policy suggest that they may not yet possess the requisite concern for preventing unnecessary morbidity and death among inmates to justify further transition of the prison medical system back to Defendants' control.  In addition, significant factual omissions from the Defendants' Opposition,

described below, suggest the Defendants continue to lack the transparency and accountability necessary for self-regulation.

As discussed more fully in the Receiver's May 1 Report, significant study of the risks associated with cocci disease at PVSP and ASP has been completed over the last several years, including recent detailed assessments of the inmate populations most at risk of contracting and suffering from Valley Fever.   Despite these studies and analyses, and the resulting recommendations made by health care professionals, Defendants assert that the Receiver's updated policy is premature and was "issued without meaningfully consulting with experts." Defendants' Opposition, pg. 2.  Nothing could be further from the truth.  First, it has been the policy for several years that at-risk inmates should be excluded from PVSP and ASP.  The Receiver's updated recommendation simply builds on, and has refined, that previous policy.  Second, as the Defendants know, the Receiver employs a team of Public Health experts who have consulted with both the Court's experts and public health experts from the California Department of Public Health ("CDPH").  No medical professional or public health authority disputes the disproportionately high rates of infection, morbidity and/or death among specific groups, such as African-Americans, at PVSP and ASP, and no medical professional or public health authority disputes the effectiveness of the Receiver's solution to the problem:  excluding specific populations from PVSP and ASP known to be at increased risk of contracting cocci or increased risk of morbidity and mortality from cocci.  Indeed, the Receiver's recommendations are consistent with observations and recommendations made by the State's own public health professionals.  Thus, for example, in an April 4, 2013 letter to the CDCR, CDPH advised the CDCR that "[t]he populations at risk are well known" and "[t]he populations/groups at risk for severe cocci factor can be addressed by reducing the number of inmates belonging to these groups in these prisons."  This is precisely the strategy the Receiver would be implementing but for the Defendants' obstruction of his progress.[1]   The Defendants' claim that they cannot act because more study is needed or because the Receiver's policy is "ambiguous" is, therefore, disingenuous at best.   At worst, Defendants' troubling refusal to implement the policy suggests they do not take sufficiently seriously the ongoing threat to the health and safety of the at-risk populations at PVSP and ASP.  It is also worth noting that the CDCR failed to share the April 4 letter with the Receiver.  Instead he obtained it from CDPH when inquiring if CDPH had yet advised CDCR.

To be sure, the Receiver applauds and strongly agrees with Defendants' request for assistance from CDC and NIOSH.  (In fact, the Receiver's staff, on the recommendation of the Plata Court Experts, pressed for federal assistance, and independently sought assistance from NIOSH on April 4, 2013.)  If subsequent studies materially change the information that is available, the Receiver will modify his policy.   But waiting for federal assistance (assistance which Defendants requested only after Plaintiffs' filed their motion, the Receiver's staff contacted NIOSH, the draft cocci policy had been released, and the Receiver declared he would contact CDC himself)

---

[1] CDPH further suggested that, if the CDCR wished to choose only some of the well-known risk groups for exclusion, academic cocci experts should be invited to assist making the determination.  Such assistance from CDC, as described herein, has already been requested.

should not be used as an excuse to avoid taking steps now which everyone agrees will substantially mitigate the risk to inmates at PVSP and ASP.

In addition to their outright refusal to cooperate to implement the Receiver's policy, there are glaring omissions and misleading statements in the Defendants' Opposition which the Receiver feels compelled to point out because they call into serious question Defendants' assertion that they are now, and have been, promptly addressing cocci at PVSP and ASP.   For example, notably absent from Defendants' Opposition is any discussion of their previous – and aborted – engagement of NIOSH in 2009.   Defendants retained NIOSH but then turned it away before NIOSH could begin its field work.   In a December 4, 2009 letter from NIOSH to CDCR ("NIOSH Letter"), NIOSH wrote "We had planned a visit to both PVSP and ASP for May 18-20, 2009. However, our trip was cancelled the week prior at your request."  According to NIOSH, the field work had been cancelled, among other reasons, because the CDCR's "Office of Risk Management, which had overseen occupational health issues for the prison system, was disbanded" and due to "the lack of support from CDCR management …"  NIOSH Letter, pg. 4. This turn of events stands in stark contrast to Defendants' representation that "Defendants took immediate steps to investigate the cause of Valley Fever and mitigate its impact at the affected prisons to the extent possible . . ." (Defendants' Opposition, pg. 1).

Defendants' Opposition also seeks to mislead the Court into believing that they have been responsible for remediation efforts which the Receiver initiated.  For example, Defendants represent that in 2007 "CDCR implemented a policy excluding certain inmate-patients at an increased risk of infection of Valley Fever from Central Valley prisons" (Defendants' Opposition, pg. 3);  and "CDCR commenced a two-part soil stabilization program in an attempt to reduce the spread of dust at PVSP" (Defendants' Opposition, pg. 4).   While these statements are literally true, the Defendants fail to acknowledge that it was the Receiver's staff that has driven these efforts, and in the case of the soil stabilization project, that the Receiver also paid the costs of the project.

As reported elsewhere, the Receiver continues to press ahead with preparations for the transition of control of the prison medical system back to the Secretary.   However, the Defendants' approach to the Valley Fever problem described above and in the Receiver's May 1 Report is of concern and will be taken into account before additional elements of the prison medical system are returned to the Secretary's control.

## B.    Overcrowding and Its Solutions

California's prisons remain significantly overcrowded as of the date of this filing and that overcrowding continues to interfere with the ability to deliver constitutionally acceptable medical and mental health care.  The multiple impacts which overcrowding has on healthcare operations have been repeatedly chronicled by the courts, the Special Master, and the Receivership, and those impacts need not be rehearsed again in detail.

California's prisons were carefully designed when built to serve a so-called design population capacity. Every aspect of prison design – from the size of cells, to the size of food services operations, to the space available for recreation, education and vocation, to the space available for administrative segregation, to the number of showers and toilets, to the amount and quality of basic infrastructure such as electricity and plumbing – every aspect (except health care) was designed for a specified population level.  The vast majority of California's prisons were built before prison officials took healthcare seriously, and as a result, the amount and quality of healthcare space was insufficient even before overcrowding seriously took hold in the mid-1980s and 90s.

As soon as the prison population began to quickly exceed 100% of design capacity in the early 1980s (an unintended consequence of changing from indeterminate to determinate sentencing), prison operations immediately started to suffer. The prisons just were not designed for more prisoners, and overcrowding has been accomplished only by compromising operations, making make-do alterations to space, and imposing greater risks of violent inmate behavior on custody officers, healthcare personnel and all other staff who work directly with prisoners. Excessive population directly impacts access to healthcare care, requires additional healthcare staffing that is hard to recruit and even more difficult to retain, complicates medication distribution, and in general stresses every aspect of the healthcare system (just as it stresses every other operational system within the prisons).

Sufficient additional space for healthcare has been added by the Receiver only at San Quentin and Avenal, and some additional space and beds for mental healthcare have been added pursuant to court orders in *Coleman*.  As reported below, however, the State has *not* completed promised improvements and upgrades to healthcare space at the remainder of the prisons, and even though a plan to complete such construction was completed and agreed to four years ago, not a single upgrade project has broken ground and not even a single contract for design services has been entered into. The completion dates for these projects stretch into 2016 and 2017, far enough into the future that there is no reliable guarantee the projects will ever be undertaken.

Simply put, we do not have appropriate and adequate healthcare space at the current population levels.  We need population levels to reduce to 137.5% of design capacity as ordered by the Three Judge Panel, *and* we need the State to complete its promised construction.

Contrary to the Three Judge Panel's recent order, the State has announced that it will not use its "best efforts" to implement the population density order, and by its own admission, it did not submit a plan to the Court complying with the requirement that the plan reach 137.5% of design capacity by the end of 2013.  Most of the items listed in the State's brief require legislative action, and legislative leaders have already announced their opposition to the plan. It appears that population reduction as an approved State policy has come to an abrupt end.

To date, the Receivership has not suggested to the Three Judge Panel any particular course of action with respect to overcrowding reduction, preferring to leave that to the parties and various amici in the cases. However, since the State has not put before the Three Judge Panel all of the options that are available, and overcrowding continues to interfere with our ability to deliver healthcare, it is now incumbent upon us to suggest some additional alternatives.

In the first place, the Three Judge Panel should understand that the various population reduction strategies that are available have had differing impacts upon the prison healthcare system. In particular, strategies that result mostly in the reduction of younger and healthier inmates are not as helpful as strategies that result in the reduction of older and sicker inmates. We saw precisely this situation with the State's realignment program, which targeted mostly younger, healthier inmates. Although overall population reduced by approximately 16%, we have actually seen a 5% increase in our high-risk patients over the same time period. While the overall population reduction has reduced some of the burdens on the prison healthcare system, the reduction in those burdens has not been commensurate with the reduction in population. In general, we have in California an "aging prisoner" problem that complicates efforts to deliver healthcare and makes it much more expensive (since aging prisoners as a group generally have a greater number of more serious healthcare needs).

Second, one of the long-standing problems in California's prisons was the policy of requiring that *all* inmates serve a period of parole following release. The result of this policy was that a very large percentage of the prison population at any one time consisted of parolees whose parole was violated for mostly technical reasons (e.g., missing an appointment with a parole officer). These revocations of parole generally resulted in relatively short stays in prison (e.g., under six months), but the number of revocations was so large, that the constant churn of inmates increased the overall population by some 10-15%. Realignment solved this problem by transferring responsibility for these parolees to local government and refusing to permit a parole revocation to result in a return to state prison. While there has been a substantial reduction in the inmate count as a result of this change, the impact on prison healthcare has mostly been confined to the reception centers where these inmates spent most of their short time in prison. The burden on healthcare presented by these short-time inmates is qualitatively different than the burden presented by felons sentenced to long terms.

Third, an even more fundamental problem in California's prisons has been that policy-makers and the public have insisted on imposing longer sentences, and insisted that a greater proportion of those sentences actually be served in prison, without simultaneously committing sufficient resources to CDCR to house, guard and care for those who are sent to prison. California is, of course, not unique in this. Following the leadership of the American Bar Association, other states have learned that one of the most direct and durable solutions to this problem is to establish some form of sentencing commission that is expressly charged with aligning sentencing policies to available correctional resources. California has no such commission.

With a functioning sentencing commission, when the lengths of sentences are adjusted to match available correctional resources, there is no need for so-called "early releases" to solve overcrowding.  Instead, inmates serve their time and then are released when their sentence has concluded (subject to appropriate adjustments for good time credits or program completion while in prison).  Prison resources are not stretched beyond acceptable levels, and the correctional system remains in balance.  In addition to solving the overall population problem, these systems can directly address the "aging prisoner" problem mentioned above.  The "early release" and "threat to public safety" objections arise in California primarily because the State has deliberately established sentences that are longer than the State can afford to implement constitutionally.

Needless to say, establishing a sentencing commission is not something that a federal court should order in the first instance (and, in the interest of comity, it may well be beyond the power of a federal court to order such a remedy).  However, it is worth noting that a strong sentencing commission may be the best bet for permanently solving the mismatch between sentencing policy and correctional capacity in a way that would reduce a significant amount of stress on the prison healthcare system.  Nothing stands in the way of state officials proposing this to the Legislature.

Absent state action to establish a sentencing commission, the simplest, most direct and most durable remedy would be for the Three Judge Panel to waive to the extent necessary to reach the 137.5% population density level, Penal Code Sections 1170, 2900 & 2901 which currently require that inmates generally be housed in state prison until the end of their sentences.  By waiving these few statutes (or, more precisely, giving the Secretary the ability to act contrary to those statutes as necessary to reach 137.5%),[2] the department would be able to implement administratively a program of risk evaluation and release without any further legislative action.[3] That program could include many of the concepts set forth in the State's brief as requiring legislative action, including expanding credits for minimum custody inmates, expanding milestone credits to include violent and second strikers,[4] increasing credit earning limits on certain inmates, as well as a number of ideas not included in the State's brief, such as geriatric release, 30-60-90 day early release for low risk inmates, and increasing the amount of milestone credits available for successful completion of programs.  And all of these could be implemented retroactively to the time of sentencing to achieve maximum benefit.

Entering this suggested order would not force the State to choose releases over expansion of capacity. The department owns approximately 3,800 beds which currently stand vacant, including the vacant women's facility in Stockton (NCWF), and facilities at Preston, Stark, and

---

[2] To avoid technical disputes, the Three Judge Panel could frame its order as waiving any and all state laws that require that persons convicted of a felony be housed in state prison until the end of the term of sentence.

[3] The Three Judge Panel would be well advised to waive application of the State's Administrative Procedure Act which would otherwise stand as a clear obstacle to timely implementation of such a program.

[4] SBx3-18 authorizes CDCR to grant inmates a reduction of their incarceration time by actively participating in and completing components of in-prison rehabilitation programs.  As the inmate progresses through the programs, certain components or "milestones" of the program are completed.

Paso.  The women's facility in Stockton (approximately 500 beds) could be opened relatively quickly; the other facilities would require more time and investment in renovations, but they could be opened within a year or two. (Environmental reviews have already been completed on some of these locations; they would only need some updating.)

In the meantime, to give the State maximum flexibility, consideration should be given to permanently waiving state laws that restrict housing inmates involuntarily out-of-state. (Penal Code Section 11191 and Government Code Section 19130)  The out-of-state program has been simple to implement, and because we screen inmates so that only healthy inmates are eligible for out-of-state placement, there has been only a modest monitoring burden.  If the State, as a matter of policy, chooses to house its inmates in-state, there is nothing wrong with that policy choice *so long as that policy choice does not result in having too many inmates in California's prisons.* In other words, the out-of-state program should be a safety valve that is *always* available to the department.  While not the best solution to overcrowding, it may be necessary if the State is unable otherwise to choose between population reductions or capacity expansion.

These three suggestions would give the department the flexibility required to comply easily with the Three Judge Panel's order and would establish a durable remedy.  It would also properly place accountability for reaching the 137.5% target entirely within the hands of State officials and correctional leaders, giving them a range of choices between expanding capacity and reducing population.

## C.    The Substance and Tone of Leadership

As noted above in subsection (A), the Receiver is required to assess the State's will, capacity and leadership to maintain the prison medical system as part of the process of deciding when the Receivership should transfer responsibility for the system back to the State.  Over the course of the last two reporting periods, the substance and tone of leadership set by State officials has changed from acquiescence bordering on support for the Receiver's work, to opposition bordering on contempt for the Receiver's work and for implementation of court orders, including the orders of the Three Judge Court.

Some of the change in tone is clearly related to statements by State officials pertaining to the State's ongoing litigation efforts.  The State certainly has a right to challenge court orders and to seek relief that it thinks is appropriate, and explaining those legal filings to the public inevitably involves taking positions that may be contrary to court orders or to the positions of the Receiver.  At the same time, however, it is not appropriate to refuse or fail to follow court orders that have not been stayed during the pendency of those legal challenges.

Unfortunately, we have more here than mere statements by State officials in support of litigation.  As noted in the recent decision by the District Court *Coleman v. Brown* and in the Three Judge Court's April 11, 2013, Opinion and Order Denying Defendants' Motion to Vacate

or Modify Population Reduction Order, the State has crossed the line into unprofessional conduct by its lawyers and contumacious conduct by the State.

Of greatest concern to the Receivership, the State has deliberately planned not to comply with the Three Judge Court's order to reduce population density to 137.5% of design capacity, a decision that directly impacts our ability to deliver a constitutional level of care.  The fact that the State has missed the court ordered targets in recent months was not accidental.  In early 2012, only ten months after the United State Supreme Court's decision in *Brown v. Plata*, 131 S.Ct. 1910 (2011), affirming the Three Judge Court's population density order, and without having filed a motion for modification of that order or for a stay, State officials simply decided not to implement the Three Judge Court's order, a decision clearly reflected in CDCR's *Blueprint* document released last year which showed the prison population never reaching 137.5% design capacity.

As noted above, the most recent example of deliberate noncompliance is the State's May 2, 2013, filing in the Three Judge Court proceeding which, notwithstanding the clear order of the Court, does not propose a plan to achieve 137.5% of design capacity and, instead, proposes a plan requiring unlikely statutory changes (a plan coincidentally rejected by legislative leaders the same day as the filing).  In fact, as already shown above, there are other alternatives that would achieve 137.5%, and would do so in a way that makes it easier to deliver medical and mental health care, but the State has chosen not to present any feasible alternatives to the Court.

The clear message to the field, from at least early 2012 until the present, is that court orders in *Coleman* and *Plata*, and orders from the Three Judge Court, are to be implemented only to the extent that State officials and their legal counsel deem desirable.  This message of deliberate non-compliance undermines the legitimacy and integrity of all court orders in these cases and of the Receiver's turnaround plan initiatives.  And when that message is reinforced by repeated statements by State leaders that reports from the Special Master in *Coleman* are not worth reading or following, that too many resources and too much money has been spent improving prison healthcare (which ignores the 20% reduction in the cost of prison medical care which the Receivership has achieved over the last four years), and that the State stands ready immediately to take over prison medical care from the Receiver notwithstanding the State's shortcomings, the result has been to freeze and ossify improvement efforts in the field. Clinicians and healthcare leaders in the field are naturally concerned that, when the Receiver leaves, CDCR leadership will tend to favor those who have supported the Administration's position over the Receiver's position and that hard fought changes will be immediately rolled back.

In short, the tone from the top of the Administration that improvements in prison healthcare have gone too far and that necessary reductions in population density have gone too far interferes with our progress towards a final transition of prison medical care back to the State. We have lost at least six to nine months of time while the State seeks essentially to relitigate claims that it previously lost before the trial courts and the Supreme Court of the United States.

# Section 6: An Accounting of Expenditures for the Reporting Period

**A.   Expenses**

The total net operating and capital expenses of the Office of the Receiver for the four month period from January through April  2013 were $829,674 and $0 respectively. A balance sheet and statement of activity and brief discussion and analysis is attached as Appendix 11.

**B.   Revenues**

For the months of January through April 2013,  the Receiver requested transfers of $725,000 from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the Receiver. Total year to date funding for the FY 2012/2013 to CPR from the State of California is $1,825,000.

All funds were received in a timely manner.

# Section 7: Other Matters Deemed Appropriate for Judicial Review

### A. Coordination with Other Lawsuits

During the reporting period, regular meetings between the three courts, *Plata, Coleman,* and *Armstrong* (Coordination Group) class actions have continued.  A Coordination Group meeting was held on April 29, 2013.  Progress has continued during this reporting period and is captured in meeting minutes.

### B. Master Contract Waiver Reporting

On June 4, 2007, the Court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the Court's Orders, and therefore, the Receiver will not reiterate those details here.

During the last reporting period, the Receiver has used the substitute contracting process for various solicitations relating to services to assist the Office of the Receiver in the development and delivery of constitutional care within CDCR and its prisons. However, those solicitations have not yet resulted in fully executed and approved contracts. Therefore, those contracts will be reported in subsequent Reports to the Court.

### C. Consultant Staff Engaged by the Receiver

During this reporting period, the Office of the Receiver has not engaged any consultant staff.

### D. Overview of Transition Activities and Court Expert Evaluations

On September 9, 2012, the Court entered an order entitled "Receivership Transition Plan and Expert Evaluations."  In terms of transition from the Receivership, the court stated that in order to "provide defendants with an opportunity to demonstrate their ability to maintain a constitutionally adequate system of inmate medical care," the Receiver would meet and confer with the parties to determine when the State would assume the responsibility for particular "tasks."  The court ordered for expert evaluations to be conducted because "Defendants and the Receiver have expressed their opinion that at least some institutions may now be providing adequate care."

#### Receivership Transition

As a result of the Court's September 9 order, the Receivership and the State began discussions in order to identify, negotiate, and implement "revocable delegations of authority" for specific operational aspects of the Receiver's current responsibility—a practice that had already been

used in the past (construction had previously been delegated to the State in September 2009). On October 26, 2012, the Receivership and the State reached agreement and signed the first two revocable delegations of authority:  Health Care Access Units and Activation.

In addition, the Receivership has produced draft delegations of authority for other operational aspects of its responsibility, and provided the State with those drafts, as shown below:

| **Pending CDCR review and approval:** | **Date Sent to CDCR** |
| --- | --- |
| • Quality Management | 1-14-13 |
| • Medical Delivery | 1-28-13 |
| • Healthcare Invoice, Data, and Provider Services (Admin) | 2-13-13 |
| • Information Technology Services | 3-12-13 |
| • Legal Services | 3-12-13 |
| • Allied Health Services | 3-12-13 |
| • Nursing Services | 3-12-13 |
| • Fiscal Management | 3-18-13 |
| • Policy and Risk Management | 3-25-13 |
| • Medical Contracts | 3-26-13 |

Two remaining operational aspects, Business Services and Human Resources, are in the final stages of being drafted by the Receivership.

On April 17, 2013, the Receivership and CDCR met to discuss CDCR's initial feedback on Quality Management and Medical Delivery; met on April 25 to discuss Allied Health Services and Nursing; and met on May 1 to discuss Health Care Invoice, Data, and Provider Services; Fiscal Management and Medical Contracts.  Meetings will continue on a weekly basis until all of the draft delegations have been reviewed.

Below is a discussion of the performance to date of the operations previously managed by the Receivership that have been subsequently delegated to CDCR:  Health Care Access Units, Activation, and Construction.

**Post Delegation Report for Health Care Access Units**

On October 26, 2012**,** the Receiver delegated authority for Health Care Access Unit (HCAU) custody staff at all 33 institutions to the Secretary of the CDCR.  Under the terms of the delegation, each Warden maintains local control of the institution's HCAU, and will work collaboratively with the institution's Chief Executive Officer ("CEO") in fulfilling the HCAU's mission.

The delegation contained several provisions.  Wardens no longer need the Receiver's approval regarding any change in the deployment of HCAU staff or their assigned duties; however, any change to the post assignment schedule, master assignment roster or duties of HCAU Captains and Associate Wardens will require notification upon making the change.

Under the delegation, the institutions are required to submit a monthly Access Quality Report (AQR) which is used to measure custody performance.  The Receiver established an AQR performance goal of access to care specific to the custody HCAU of 99% (this was the baseline performance under the Receivership).  The institutions are subject to on-site audits of the HCAU and again, the Receiver established a performance goal of 85% in each chapter of the Operations Monitoring Instrument (OMA). The OMA is an audit instrument developed to measure custody performance with key indicators.  An audit schedule has been initiated which ensures each institution is audited once approximately every 180 days.

The Secretary also accepted the responsibility for the statewide medical transportation fleet. This includes a responsibility to maintain and replace medical transportation vehicles for the HCAUs statewide as necessary to provide inmate access to medical care in the community or in other institutions.

**Access Quality Report**

The Monthly Health Care Access Quality Report (AQR) tracks the number of health care ducats issued for scheduled appointments and the number of unscheduled appointments involving the use of HCAU staff resources, the outcomes of those appointments, the reasons why inmates are not seen, and the HCAU resources (staffing and vehicles) allocated and utilized in the process.

The *function* of the AQR is to serve as a tool for the identification and tracking of HCAU custody resources, as well as the tracking and monitoring of custody functions as they relate to facilitating access to health care services.  The *objective* of the AQR is to identify barriers to access to health care, monitor, and report data elements used to consistently improve performance and establish accountability.

The published AQR remains unchanged from the report in place at the time of the delegation. The Receivership continues to receive institution AQRs on a monthly basis in accordance with the AQR Instruction Guide and Counting Rules as outlined under the terms of the delegation.

Through the Operations Monitoring Audit process, CCHCS Field Operations staff assesses and validates AQR data, a process which involves a detailed analysis of an institution's ability to collect custody tracking sheets of health care appointment outcomes and reconcile AQR data on a daily basis.

<u>Custody Access to Care Success Rate</u> - Under the terms of the delegation, each institution must achieve an access to care rate of 99.00% or better.  This rating is a measure of the institution

HCAU performance in facilitating inmate/patient access to care. The Custody AQR Performance Indicator titled *Custody Access to Care Success Rate* is a score based on the total number of ducats issued and add-on appointments, less the number of patient-inmate refusals shown as a percentage of success.

During the one year period preceding the delegation from November 2011 through October 2012, the average Custody Access to Care Success Rate was 99.12%. In the five months following the delegation from November 2012 through March 2013, the average Custody Access to Care Success Rate was 99.56%.

The chart on the next page illustrates pre and post delegation success rates:



As a provision of the delegation of authority, any institution that fails to achieve 99% will complete a corrective action plan, provide the Receiver with a copy of the action plan and notify the Receiver when the corrective actions are completed. The chart above indicates the number of institutions that have failed to meet the required 99%. To date, one corrective action plan has been received out of the 17 institutions (November through February) that were required to complete them.

**Operations Monitoring Audits**

As of the date of this report, Field Operations has audited seven institutions, with final findings published for Solano, Calipatria, Centinela, Ironwood and Sierra Conservation Center. Quantitative findings of the audits conducted to date are as follows:

| Institution Audited | Dates of Audit | Final Score |
|---|---|---|
| CSP, Solano | December 10-13, 2012 | 80.0% |
| Calipatria State Prison | January 7-9, 2013 | 82.5% |
| Centinela State Prison | January 14-17, 2013 | 88.8% |
| Ironwood State Prison | January 28-31, 2013 | 87.8% |
| Central California Women's Facility | March 4-7, 2013 | 89.7% |
| Sierra Conservation Center | March 18-20, 2013 | 96.1% |
| San Quentin State Prison | April 2-4, 2013 | 75.8% |

Because of changes to the audit instrument prior to the delegation, we are unable to quantify changes in performance pre and post delegation.  While many of the standards being measured remain the same, many revisions to the audit instrument have been made. Questions have been removed for a variety of reasons: some were troublesome to consistently quantify, and were included instead in the revised audit's qualitative analysis section; others were moved or combined to afford a more comprehensive review of health care access throughout all disciplines. The remaining questions were reworded to improve clarity resulting in a condensed audit instrument.

Of the seven institutions audited during the reporting period, the following common issues appear to have emerged;

- Inconsistent completion of hourly checks of inmate-patients for the first 24 hours after discharge from a mental health crisis bed (MHCB) for suicidality.
- Failure to maintaining a complete suicide cut-down kit in housing units.
- Non-attendance of HCAU managers in suicide prevention and response focused improvement team (SPR FIT) meetings.
- Custody staff unaware of the procedures for ensuring that an inmate-patient's medication is transferred to another facility when the inmate-patient actually moves.
- Mental health "check-in" meetings not being documented in the administrative segregation unit (ASU) log book.  The overall average level of compliance with this standard is 61.2%.
- Inaccurate AQR data reporting specific to ducats and ducat outcomes.  The overall average level of compliance with this standard is 69.6% as it pertains to total ducats, 55.1% as it pertains to add-on appointments, and 49.8% as it pertains to "not-seen" appointment outcomes.

There have been no audit findings to date that would indicate there has been any abrupt change in operational performance following the delegation.

In an effort to improve the validity of AQR data, the CCHCS Field Operations staff has worked with CDCR to standardize the health care access appointment tracking sheet and require custody staff to share the tracking sheet with their clinical colleagues at the end of the shift. Clinical staff is to review the sheets and ensure they accurately reflect the activity occurring in the clinic during the shift, including a review of the outcome codes which are used to reflect why an inmate-patient was not seen. Once this step transpires, the sheets are provided to the HCAU supervisor for review and submitted to the institution AQR analyst. This change was announced to the field on February 14, 2013, and the new process was to be implemented no later than March 1, 2013.

In another effort to standardize the method by which the AQR data is received and processed, institution staff who are assigned as AQR analysts were provided formal classroom training to improve the overall continuity of the data collection process. Training was held on five of the days between March 23 and 29, 2013.

Within the next couple of months, the health care scheduling system will have completed its statewide rollout. This system will give us substantial additional data – this time from the clinical perspective – regarding the number of clinical appointments made, the percentage of appointments completed and reasons why appointments were not completed. As this information becomes available, we will be in a position to provide additional validation of the AQR data that we already receive.

**HCAU Staff Utilization Review**

In March, 2013, the CCHCS Field Operations unit conducted a utilization review of HCAU staffing at all 33 institutions. The review consisted of examining a one-week period of Fair Labor Standards Act (FLSA) sign-in sheets drawn from February, 2013. The review evaluated whether each budgeted HCAU post was filled or left vacant on a shift-by-shift basis.

Overall, the review indicated institution management decisions when HCAU posts are redirected were appropriate. The vast majority of HCAU vacancies were in positions assigned to hospital guarding and offsite transportation. These positions are tied to an inherently fluctuating workload, and as such their redirection to other duties is wholly appropriate.

The Staff Utilization Review identified that one institution was unable to locate or produce approximately 30% of the FLSA sign-in sheets, another institution was found to have allowed staff at off-site hospital guarding positions to conduct a telephone "check-in" rather than have them sign the FLSA sheets as required, and numerous institutions were unable to account for individual post utilization due to incomplete sign-in sheets or missing staff signatures.

All of the issues were reported to the Division of Adult Institutions for their review and follow-up as necessary.

**Transportation Vehicles**

On October 23, 2012, staff from the Receiver's office met with DAI regarding the transition of responsibility for managing the medical vehicle fleet. An update was provided on the number and anticipated delivery of recently purchased medical transportation vans, an update regarding redeployment of a medical transportation bus from one location to another and a status on the collection and management of medical transportation vehicle mileage data.

On March 26, 2013, Field Operations provided an update to DAI regarding medical transportation vehicles. There were 33 Receiver-purchased vehicles used for inmate-patient medical transportation that have either exceeded or will have exceeded the Office of Fleet Administration (OFA) replacement criteria by the end of fiscal year 2012/13. In addition, there are a total of 178 additional CDCR-purchased patient-inmate transportation vehicles which have exceeded the OFA replacement criteria.

As of the date of this report, a response from DAI with regard to a plan for managing medical transportation vehicles has not been received. The issue will continue to be closely monitored as to DAI's success in developing a plan to meet its obligations under the delegation.

**CDCR Performance Under the October 26, 2012 Revocable Delegation of Authority For HCAU**

Since the signing of this revocable delegation, there have been positives and negatives regarding CDCR performance. Of note is the success CDCR has had in maintaining the performance benchmark on the "custody access to care success rate". Prior to delegation, the success rate for the previous year was 99.12%, whereas since delegation, CDCR's success rate has risen to 99.58%. HCAU staff utilization has also been adequate to date. In terms of the HCAU audits, the information stated previously points to some common occurrences present in many of the institutions that should be addressed system wide to make sure institution HCAUs are operating effectively.

In terms of management of CDCR's transportation fleet, the State has not provided the Receivership with information as of this writing to demonstrate it can meet its obligations under the delegation. Further reporting on the status of the transportation fleet will be the subject of the next tri-annual report this fall.

**Post Delegation Report for Facility Planning and Activation**

On October 26, 2012, the Receiver delegated authority for the Facility Planning and Activation Unit (FPAU) to the Secretary of CDCR. Under the terms of this delegation, the Secretary of CDCR assumed control of medical facility activation and agreed to provide monthly updates to

the Receiver regarding activation schedules for the CHCF, DNCA, and the HCFIP projects. As with the other revocable delegations, the Receiver retained the right to revoke this delegation.

While the delegation is specific to medical facility activation, FPAU has also continued responsibility for managing activation of the other health care projects at existing prisons which provide additional housing for mental health inmate-patients and treatment and office space to support mental health programs and operation. The first of these activations completed pursuant to this delegation was the new building completed at CMF which now supports administration, treatment and custody services for 443 EOP inmate-patients. This 44,000 square foot, three story building was activated on schedule in mid-January 2013. Activation activities are also currently occurring for additional mental health projects which will provide inmate-patient housing and/or treatment and administrative spaces at COR, CMC, SAC and LAC.

The first free-standing medical facility project scheduled for activation is the 1,722 bed CHCF at Stockton. The activation of the CHCF involves extensive coordination among all of the project disciplines, including construction contractors, construction management, medical, nursing, allied services, mental health, dental, licensing, custody, transportation and support services. Since the CHCF includes a Department of State Hospitals (DSH) facility for inmate-patients who require licensed intermediate or acute level of mental health care, coordination between CDCR, DSH and CCHCS is particularly critical for successful activation. With a project of this magnitude and complexity being completed on a very aggressive construction schedule, the activation team continues to engage and address a myriad of challenges in order to secure facility licensure by the Department of Public Health and be prepared to accept the first inmate-patients by July 2013. These challenges include but are not limited to the timely procurement and delivery of large quantities of equipment and supplies, coordination with construction contractors so that activation staff can ensure the placement of equipment and stocking of supplies without adversely affecting construction completion, the timely recruitment and hiring of facility staff in all disciplines in time to prepare and implement operational procedures and ensure licensure, the development and provision of training for CHCF staff, and the development of an inmate-patient intake and transportation plan. While challenges and issues arise on a daily basis, FPAU continues to effectively use trained project management staff, critical path management tools, regular coordination and status reporting and close management oversight. Most importantly, the FPAU, on-site construction team and the CHCF management team continue to work collaboratively to identify and resolve issues.

Although the construction of DNCA is following that of CHCF by approximately eight months, activation activities and management by the FPAU has begun. An activation schedule has been drafted based on the current baseline construction schedule. A list of the Group II (movable) equipment has been prepared and sent to DOF for approval, and a purchase order has been issued for Group I (contractor-installed) welded equipment. Hiring activities have begun for pre-activation staff. Again, FPAU continues to apply sound project management and critical path scheduling skills and tools to this project.

Under the delegation of authority, FPAU was required to provide a project schedule in its April 2013 monthly report for the remainder of the Health Care Facility Improvement Projects (HCFIP) not previously available when the delegation was signed last November.  In their April 2013 report, they provided schedules for the remaining HCFIP projects.  The new schedule shows that the last HCFIP upgrade project (Chuckawalla Valley State Prison) will be completed in September 2017.

**CDCR Performance Under the October 26, 2012 Revocable Delegation of Authority For FPAU**

Since the signing of this revocable delegation, FPAU has continued to perform with the same rigor, focus and skills they had demonstrated prior to the delegation. Activation of projects as complex and accelerated as these healthcare facilities poses many challenges as well as potential delays, in both construction and activation. The coordination and collaboration of the FPAU with the construction management team and the application of sound project management tools and skills continues to be effective, with the first patient-inmate to arrive at the CHCF on July 22, 2013.  To facilitate success, CDCR has created a team environment with active involvement from members of the Project Management firm (Vanir Construction Management, Inc.), the Construction Management firm (URS/Lend Lease), CCHCS and DSH. The team has continuously used appropriate project management tools, such as dashboards, critical path schedules, regular team meetings and reports to maintain open lines of communication and to track and monitor the necessary activation activities. CDCR has further demonstrated their commitment by providing constant oversight and management at all levels of the activation for these projects.

**Post Delegation Report for Construction Oversight**

In order to streamline and coordinate health care construction, on September 21, 2009, the Receiver and the Secretary of the California Department of Corrections and Rehabilitation (CDCR) issued a revocable delegation of their respective authorities related to the construction of the new Consolidated Care Center, now known as the CHCF, and the HCFIP to CDCR's Senior Chief of Facility Planning, Construction and Management (FPCM). Under the direction of the Senior Chief, FPCM became responsible for the study, planning, design, development, management, and construction of the CHCF (and DNCA) and HCFIP. These projects comprise the elements of Goal 6; to expand administrative, clinical and housing facilities for inmate-patients with medical and/or mental health needs and to upgrade administrative and clinical facilities at CDCR's existing prisons.

**Expand Administrative, Clinical and Housing Facilities**

The two major construction projects to add medical and mental health beds and provide for necessary clinical, administrative, and housing facilities are the 1,722 bed CHCF and the conversion of the DeWitt Nelson Youth Correctional Facility (located adjacent to the CHCF) to serve as a 1,133 bed facility annex to the CHCF.

CDCR continues to meet its project schedule for completion of CHCF.  Site preparation commenced on this project in December 2010 and CDCR has continued to manage an aggressive design and construction schedule in order to accept the first inmate-patients in July 2013.  The 1.2 million square foot CHCF project is comprised of 54 buildings; 23 of those will house inmate-patients with medical and/or mental health treatment needs and one will house inmate work crews.  The remaining buildings provide treatment and office space or support facilities (e.g. guard towers, central plant, material services center, kitchen, etc.).  A 144,000 square foot shared services building is at the core of the facility and contains elements typical of outpatient clinics, including a laboratory, pharmacy, exam and treatment rooms, diagnostic imaging, dental clinic, dialysis clinic, triage and treatment clinic, and therapy rooms. The project remains on schedule. Since construction by the design-build firms began in June 2011, all of the buildings have been fully erected with interior work either completed or nearing completion. Of the 54 buildings, 48 have had punch walk inspections and of those, 29 are being readied for turnover to CDCR for occupancy.

    

- Figure 1  CHCF in February 2012        - Figure 2  CHCF in March 2013

As indicated, the 1,133 bed DNCA is adjacent to the CHCF and will serve as an annex to the CHCF.  DNCA will house Specialized General Population patient-inmates needing enhanced medical services and EOP inmate-patients with mental health needs.  After delays due to legislative concerns about the project, interim project funding was received from the PMIB in May 2012.  In order to minimize schedule delays, CDCR had proceeded through the contractor selection process and thus construction began in July 2012. This project is continuing under an aggressive construction schedule in order to begin inmate-patient occupancy in February 2014. To date, design is approximately 99% complete and construction is approximately 28% complete.



**Figure 3  DNCA in March 2013**

**Upgrade Administrative and Clinical Facilities in CDCR's Existing Prisons**

The HCFIP projects continue to progress through the PWB approval process and the PMIB funding process.  Despite some early delays in receiving PWB and PMIB approvals, projects are again proceeding on a sequential submittal schedule to the PWB and PMIB. To date, thirteen projects (all of the intermediate level-of-care facilities and male reception centers) have received PWB project-level approvals.  Ten of these (the intermediate level-of-care projects) have received subsequent interim financing loans from the PMIB. Contracts for developing site-specific designs for these ten projects have been negotiated and are in the process of being executed.  The three male reception center projects are currently planned for consideration at the June PMIB meeting.  Although these thirteen projects are proceeding, the earlier delays in obtaining PWB and PMIB approval has resulted in projected construction start delays ranging from one to two months for five of the projects (two of the early projects are one month ahead of schedule).  It is possible that methods to accelerate design and/or construction may mitigate past approval delays. Since these projects also still require PWB approval of the completed preliminary plans and DOF approval once the subsequent working drawing are completed before CDCR may proceed to bid for construction, they also continue to carry significant risk. Current CDCR plans reflect project authorization and funding submittals to the PWB and PMIB for the remaining 18 projects sequenced from May 2013 through October 2014 (originally these submittals were to be completed in February 2014).

The statewide medication distribution projects received PWB approval in September 2012 (they are funded with state general funds and therefore do not require PMIB interim bond loans). These projects are scheduled to have preliminary designs completed by May 2013 and be submitted for PWB design approval in July 2013.

It is important to note that each of the projects will again be required to receive PWB approval once the preliminary plans are completed and Department of Finance approval once the subsequent working drawings are completed before they can be bid for construction.

**CDCR Performance under the September 21, 2009 Revocable Delegation of Authority For Construction Oversight**

CDCR's performance under the September 21, 2009, construction management delegation is mixed. CDCR continues to demonstrate a high level of commitment, focus and ability to effectively manage the health care construction projects in Stockton.  FPCM has done an exceptional job in effectively managing the design and construction of the CHCF.  This project is nearing completion and an aggressive schedule has been maintained despite the various challenges that occur in any project of this magnitude.  While the DNCA project still has considerable construction work remaining, FPCM is demonstrating the same abilities and commitment to a timely and successful completion of this project.

With regard to HCFIP, we remain cautiously optimistic regarding completion of the HCFIP projects.  However, while FPCM is demonstrating the same project management discipline as with the CHCF and DNCA, these projects are very early in the initiation stages and still require additional external approvals and thus, carry significant risk.  After nearly four years since construction was delegated, the State has yet to break ground on one HCFIP project.

<u>**Court Expert Evaluations**</u>

Under the court's September 9 order, court-appointed experts are required to complete a thorough review and written evaluation of any institution that receives an overall third-round Office of the Inspector General (OIG) score of 85% or higher.  Under the Receiver's and expert's discretion, any institution receiving a third-round OIG score of 75% or higher could also be evaluated.

The order stated that an institution "…shall be deemed to be in substantial compliance, and therefore constitutionally adequate, if it receives an overall OIG score of at least 75% and an evaluation from at least two of the three court experts that the institution is providing adequate care."   The order further stated that once an institution was found to be in substantial compliance, monitoring visits by the Plaintiff (Prison Law Office) would cease. Finally, the order stated that the experts would notify the Court, if at any time, they develop confidence that any particular OIG score or sub-set of scores is sufficient to establish the adequacy of care without a subjective evaluation, or if they conclude at any time that they need not examine every institution individually to determine that the overall system is adequate.

After input from the parties, the Receiver worked with the Court experts to establish a schedule for evaluating eligible institutions.  For this reporting period, the experts visited the following institutions and provided written evaluations:  San Quentin (January 7-11, 2013), California Men's Colony (January 22-25, 2013), Richard J. Donovan (February 4-8, 2013), and Sierra Conservation Center (February 19-22, 2013).

The following are findings specific to health care access and facility/construction issues.

**Health Care Access**

At San Quentin, the experts found that custody staffing had been reduced so that there was only one officer assigned to the Outpatient Housing Unit (OHU) to provide health care access to 34 OHU patients, including several that required complete care.  Under the local rules, a custody officer must be present to open doors and provide health care access and escort patients to the dayroom.  Also, custody officers must accompany health care staff when they are seeing a patient.  Because of the lack of custody coverage, the experts found that some patients had developed infections that required hospitalization.  They observed one nurse who had to wait 25 minutes for an officer to open a door for a clinical need.  The experts recommended that CDCR increase custody staff available for the OHU to correct the issues they observed.

Custody access to health care was not raised as an issue in the remaining institutions.

**Facility Construction**

With the exception of San Quentin, which had physical plant upgrades constructed under the Receivership to address lack of treatment and clinic space, the court experts found that all of the facilities they visited had serious physical plant issues.  Their observations underscore the importance of completing the HCFIP program as quickly as possible, as the experts stated that in some cases (such as Sierra Conservation Center), only physical plant issues stand in the way of declaring that an institution is providing adequate care.

## Section 8: Conclusion

Notwithstanding the State's recent court filings, which inevitably create a more confused and chaotic work environment for staff in the field and in headquarters, we will do our best to continue our work to conclude the remaining unfinished elements of the Turnaround Plan of Action, to cooperate and support CDCR in finishing the capital construction in Stockton and the institution upgrades, to implement the Court's September 5, 2012 Order Re: Receivership Transition Plan and Expert Evaluations, and to continue the transition from a Receiver-led medical program to a CDCR-led medical program.