DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES** |
| v. | |
| EDMUND G. BROWN, Jr., et al., | |
| Defendants. | Judge:  Hon. Lawrence K. Karlton<br>Date:   July 8, 2013<br>Time:   10:00 am<br>Crtrm:  4 |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.   INTRODUCTION ................................................................................................. 1

II.  SUMMARY OF ARGUMENT ............................................................................ 3

    A.   Defendants' Unconstitutional Use of Force Against *Coleman* Class
Members ....................................................................................................... 3

    B.   Defendants' Unconstitutional Disciplinary Process for *Coleman* Class
Members ....................................................................................................... 5

III.  SUMMARY OF REQUESTED RELIEF ............................................................. 6

IV.  STATEMENT OF FACTS .................................................................................... 8

    A.   Use of Force Against *Coleman* Class Members .......................................... 8

        1.   Original Use of Force Findings ......................................................... 8

        2.   Defendants' Ongoing Use of Force Against *Coleman* Class
Members ............................................................................................ 9

            (a)   Documentation of Use of Force by the Special Master ............ 9

            (b)   Plaintiffs' Documentation of Use of Force and 2007
Motion ................................................................................. 11

        3.   Documentation of Current Use of Force Violations by
Plaintiffs' and Defendants' Experts in the Termination
Proceeding ...................................................................................... 12

    B.   Discipline of *Coleman* Class Members ...................................................... 17

        1.   Original Discipline Findings ........................................................... 17

        2.   Development of the Current Discipline Process for *Coleman*
Class Members ................................................................................ 19

        3.   Documentation of Current Violations in the Disciplinary
Process by Plaintiffs' and Defendants' Experts in the
Termination Proceeding .................................................................. 23

ARGUMENT ............................................................................................................. 26

V.   DEFENDANTS' USE OF FORCE POLICIES, PROCEDURES, AND
PRACTICES VIOLATE THE EIGHTH AND FOURTEENTH
AMENDMENTS AND THE ADA AND CAUSE GRAVE HARM TO
PRISONERS WITH MENTAL ILLNESS ......................................................... 26

i

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

A.   Defendants Use OC Spray and Batons on Prisoners With Mental Illness Without Penological Justification or Necessity and Without Regard to Effects on Mental Health .................................................. 27

B.   Defendants' Policies and Procedures Are Inadequate to Prevent Harm to Class Members Resulting From Unnecessary and Excessive Use of Force ........................................................................................................ 30

1.   Defendants' Written Policies Governing Use of Force Against Prisoners with Mental Illness are Inadequate ...................................... 31

(a)   "Immediate" Versus "Controlled" Uses of Force .................. 32

(b)   Force Against Inmates Manifesting Symptoms of Mental Illness ...................................................................... 33

(c)   Use of OC Spray ..................................................................... 34

(d)   Use of the Expandable Baton .................................................. 36

2.   Defendants Provide Woefully Inadequate Training to Custody Staff Concerning Use of Force and Mental Illness ........................... 37

3.   Supervisory Review of Use of Force is Ineffective and Inconsistent ............................................................................................ 37

4.   The Current Investigation Process Is Not Meaningful and Investigation Requirements for Use of Force Incidents are Underinclusive ........................................................................................ 38

5.   No Meaningful Discipline Is Imposed on Staff for Misusing Force Against Coleman Class Members ............................................ 40

C.   This Court Should Issue Specific Remedial Orders Directing Defendants to Cure Their Dangerous and Unconstitutional Use of Force Practices ........................................................................................ 40

1.   The Court Should Order Defendants to Revise Current Policies and Procedures to Minimize the Potential for Excessive Use of Force Events ................................................................................. 41

2.   The Court Should Order Defendants to Provide Training to Custody Officers and Mental Health Clinicians Related to Use of Force and Mental Illness .................................................................. 43

3.   The Court Should Order Defendants to Revise Policies and Procedures to Ensure Accountability Through a Meaningful Investigative Process ............................................................................ 43

4.   The Court Should Order the Special Master to Review Use of Force Against Mentally Ill Inmates and to Help Defendants Develop Meaningful Tracking and Quality Assurance Systems To Monitor Use of Force Against Coleman Class Members ............. 44

VI.   DEFENDANTS' DISCIPLINARY POLICIES, PROCEDURES, AND PRACTICES VIOLATE CLASS MEMBERS' RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS AND THE ADA AND CAUSE HARM TO PRISONERS WITH MENTAL ILLNESS ............................ 45

  A.   Defendants' Punish *Coleman* Class Members for Mental Illness and Fail to Appropriately Mitigate Disciplinary Sanctions .................................. 46

  B.   This Court Should Issue Specific Remedial Orders Directing Defendants to Cure Their Unfair and Harmful Disciplinary Practices With Regard to *Coleman* Class Members ...................................................... 50

    1.   The Court Should Order Defendants to Create a Mental Health Diversion Process Prior to Issuance of a Rule Violation Report ....... 50

    2.   The Court Should Order Defendants to Develop Formal Procedures to Create Communication Between Custody and Mental Health Staff Regarding the Disciplinary Process .................. 50

    3.   The Court Should Order Defendants to Revise Their Disciplinary Policies, Procedures, and Forms to Meaningfully Incorporate Mental Health Input, Stop Referring Class Members to Classification and/or the District Attorney for Behavior Arising from Mental Illness, and Allow for Tracking and Quality Assurance .......................................................................... 52

    4.   The Court Should Prohibit Defendants From Using the Dangerous and Abusive "Management Status" Instead of Formal Disciplinary Procedures ........................................................ 53

VII.  THE PROPOSED ORDERS SATISFY THE REQUIREMENTS OF THE PLRA ............................................................................................................. 54

CONCLUSION ............................................................................................................. 55

# TABLE OF AUTHORITIES

**Page**

## CASES

*Biselli v. Cty. Of Ventura*,
 2012 U.S. Dist. LEXIS 79326 (C.D. Cal. June 4, 2012)..........................................45

*Coleman v. Wilson*,
 912 F. Supp. 1282 (E.D. Cal. 1995) ............................................................... passim

*Coleman v. Wilson*,
 1994 U.S. Dist. LEXIS 20786 (June 6, 1994) ................................................. passim

*Gates v. Gomez*,
 60 F.3d 525 (9th Cir. 1995) ........................................................................................3

*Hallet v. Morgan*,
 296 F.3d 732 (9th Cir. 2002) ...................................................................................30

*Lewis v. Casey*,
 518 U.S. 343 (1996) ..................................................................................................45

*Madrid v. Gomez*,
 889 F. Supp. 1146 (N.D. Cal. 1995)............................................................... passim

*Olmstead v. L.C. ex rel Zimring*,
 527 U.S. 581 (1999) ..................................................................................................45

*Plata v. Brown*,
 131 S. Ct. 1910 (2011)........................................................................................45, 55

*Soto v. Dickey*,
 744 F.2d 1260 (7th Cir. 1984) ..................................................................................27

*Thomas v. Bryant*,
 614 F.3d 1288 (11th Cir. 2010) ................................................................................27

*Williams v. Benjamin*,
 77 F.3d, 756 (4th Cir. 1996) .....................................................................................27

## STATUTES

18 U.S.C. § 3626(a)(1) ......................................................................................................55

28 C.F.R. § 35.130(d) ........................................................................................................45

42 U.S.C. § 12101..............................................................................................................45

42 U.S.C. § 12132..............................................................................................................45

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

Cal. Code Regs. Tit. 15 § 3268(b) ........................................................................................ 3

### **OTHER AUTHORITIES**

*Standards and Guidelines for Internal Affairs:  Recommendations from a
    Community of Practice*, Community Oriented Policing Services, U.S. Dep't.
    of Justice at 27, available at:  http://ric-zai-inc.com/Publications/cops-p164-
    pub.pdf.) ........................................................................................................................ 44

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

**TABLE OF ABBREVIATIONS**

| ADA | Americans with Disabilities Act |
|---|---|
| AOD | Administrative Officer of the Day |
| ASH or Atascadero | Atascadero State Hospital |
| ASU | Administrative Segregation Unit |
| BRD | Barricade Removal Device |
| CCCMS or 3CMS | Correctional Clinical Case Manager System |
| CDCR | California Department of Corrections and Rehabilitation |
| DA | District Attorney |
| DOM | Department of Corrections and Rehabiliation Operations Manual |
| DSH | Department of State Hospitals |
| EOP | Enhanced Outpatient Program |
| ICC | Institutional Classification Committee |
| LAC or Lancaster | California State Prison/Los Angeles County |
| LVN | Licensed Vocational Nurse |
| MHA | Mental Health Assessment |
| MHCB | Mental Health Crisis Bed |
| MHSDS | Mental Health Services Delivery System |
| OC | Oleoresin Capsicum |
| OIG | Office of the Inspector General |
| RJD or Donovan | Richard J. Donovan Correctional Facility |
| RVR | Rules Violation Report |
| SHU | Security Housing Unit |
| UOF | Use of Force |

**NOTICE OF MOTION**

TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT Plaintiffs, through their counsel of record, will and hereby do move for enforcement of Court orders and affirmative relief related to the use of force and disciplinary process against *Coleman* class members to remedy constitutional violations in this case.  This motion is specifically directed at securing remedies for two of the fundamental elements of the constitutional violation found by this Court in 1995:  evidence before the Court demonstrates the State's persistent pattern and practice of using unreasonable force against inmates with mental illness, and imposing discipline on inmates with mental illness in a manner that violates the Eighth and Fourteenth Amendments and the Americans with Disabilities Act.  Defendants' continued use of unnecessary and excessive force, and inappropriate punitive disciplinary measures against *Coleman* class members causes them grave physical and psychological harm.  Plaintiffs request enforcement of Court orders and affirmative relief from this Court in order to protect class members from these ongoing violations.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declarations of Eldon Vail, Lori Rifkin, and Jane Kahn, and the exhibits thereto, filed herewith, Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Re:  Improper Housing and Treatment of Seriously Mentally Ill Prisoners in Segregation, Plaintiffs' Opposition to Defendants' Motion to Terminate under the PLRA and to Vacate under Rule 60(b)(5) (hereinafter "Pls.' Opp. Br."), the Declaration of Eldon Vail in Opposition to Defendants' Motion to Terminate Prospective Relief, and all exhibits thereto, and all other documents filed in support of Plaintiffs' Opposition, the pleadings and orders on file in the above-captioned matters, and oral argument or evidence permitted at any hearings on this motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Despite almost twenty years of work in the remedial phase of this case to reform

1   CDCR's approach to prisoners with mental illness, one of the fundamental constitutional

2   violations perpetuated by Defendants remains unchanged:  "mentally ill inmates who act

3   out are typically treated with punitive measures, without regard to their mental status."

4   *Coleman v. Wilson*, 1994 U.S. Dist. LEXIS 20786 at *71 (June 6, 1994).  Defendants

5   continue to inflict severe physical and psychological punishment disproportionately on

6   prisoners for behaviors related to mental illness through unnecessary and excessive uses of

7   force and harsh and inappropriate disciplinary sanctions.  Defendants refuse to shift their

8   perspective to view these behaviors through the lens of mental illness, instead meting out

9   punishment for rules violations even when behavior is the result of mental illness, and the

10  punishment may exacerbate rather than ameliorate the behavior.  An EOP prisoner

11  experiencing symptoms of mental illness such that he is responding to internal stimuli,

12  hallucinating, and out of touch with reality, and who commits a minor infraction, such as

13  refusing to return a food tray or come out of his cell, can trigger an entire chain of punitive

14  consequences.  The series begins with custody officers' immediate, repeated, and

15  unregulated blasts of massive amounts of OC spray into the inmate's cell via a device

16  designed for crowd control, and is followed by physical restraint of the inmate, possibly

17  including the use of a triangle device to restrain the inmate's wrists and lock him to

18  holding cage.  A Rules Violation Report will also be issued, resulting in imposition of

19  disciplinary sanctions that may include prolonged segregation.  After examining the use of

20  force and discipline against *Coleman* class members in CDCR, Plaintiffs' expert, Eldon

21  Vail, a former director of Washington's prison system, concluded, "I am left with the

22  overwhelming conclusion that they just don't get it. . . .  CDCR runs an insular system that

23  has sold themselves a delusion that inmates in California are somehow different and more

24  difficult than those in other states.  They are not different; they are just treated that way

25  and the results are predictable."  (*See* Declaration of Eldon Vail, Dkt. No. 4385 ("Vail

26  Rpt.") at ¶ 139.)

27       The level, nature, and scope of force that Defendants currently employ against

28  prisoners with mental illness, and the disproportionate effect of Defendants' current

2

disciplinary process are especially shocking given the length of time this case has been in the remedial phase, ongoing monitoring by the Court and the Special Master, and multiple findings by this Court and others that identical or similar actions are unconstitutional, dangerous, and inappropriate.[1]  It is time to fully and finally remedy these fundamental constitutional violations.  Plaintiffs seek targeted remedial orders to redress Defendants' continued unreasonable, unnecessary, and excessive use of force against *Coleman* class members, and to ensure that mentally ill inmates are not further victimized by cruel and inappropriate disciplinary policies and procedures.

## II.    SUMMARY OF ARGUMENT

### A.    Defendants' Unconstitutional Use of Force Against *Coleman* Class Members

Today, *Coleman* class members — individuals with *identified* serious mental illness — are regularly and routinely subjected to unreasonable, unnecessary, and excessive uses of force by correctional officers in California prisons.  The impetus for excessive use of force is often a minor infraction or a failure to follow orders that poses no serious threat to the safety and security of the institution.  Rather than using force only when truly necessary,[2] CDCR tolerates and even encourages officers to use force as retaliation for perceived disrespect for custodial authority or out of frustration when dealing with a difficult prisoner.  The State's persistent use of unreasonable force against

---

[1] *See, e.g., Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995); *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995).

[2] *See* Cal. Code Regs. Tit. 15 § 3268(b) ("It is the policy of the California Department of Corrections and Rehabilitation (CDCR) to accomplish the departmental functions with minimal reliance on the use of force."); Department of Corrections and Rehabilitation Operations Manual ("DOM") Ch. 5, Art. 2, § 51020.4 (defining  "Immediate Use of Force" as force used to respond without delay to inmate behavior that constitutes an imminent threat to institution/facility security or the safety of persons, and "Controlled Use of Force" as the force used when an inmate's presence or conduct poses a threat to safety or security).

1    CDCR prisoners with mental illness causes grave harm to the *Coleman* class.

2    　　　Defendants' termination use of force expert, Steve Martin, outlined the "essential

3    components of systematic administration of force by staff in a confinement setting,"

4    including adequate policies, effective training, strict compliance with use of force

5    reporting requirements, effective supervisory review, complete investigation of use of

6    force incidents, and meaningful discipline for staff who violate use of force policies.  (*See*

7    Report of Steve Martin, Ex. 2 to Declaration of Debbie Vorous, Dkt. No. 4279 ("Martin

8    Rpt.") at 11-13)*; see also Madrid*, 889 F. Supp. at 1181.  Assessed under Martin's own

9    criteria, Defendants' current policies and procedures fail every single one.  Although

10   Defendants may have made some progress on force and discipline issues since the

11   *Coleman* case was tried in 1994, the severe overcrowding during the past decade reversed

12   any such gains:  the culture in California prisons today is one of force and violence,

13   dominated by punitive means of control, at the expense of all other methods of operation.

14   (Vail Rpt. at ¶¶ 104-107, 144 ("The overwhelming dominance of custody staff throughout

15   the CDCR and the structure and practices they have adopted during the years of severe

16   overcrowding result in a culture of lockdown.  This approach is counterproductive to the

17   precise goals the agency wishes to achieve:  safe institutions with proper treatment for the

18   mentally ill.").)  Moreover, decisions by custody staff continue to trump medical and

19   mental health input, even when contraindicated and unconnected to serious safety threats,

20   just as they did at the time of the *Coleman* trial.  (Vail Rpt. ¶ 113.)

21   　　　The evidence shows that the force Defendants use against class members today

22   parallels the force applied in 1995, when this Court found "substantial evidence in the

23   record of seriously mentally ill inmates being treated with punitive measures by the

24   custody staff to control the inmates' behavior without regard to the cause of the behavior,

25   the efficacy of such measures, or the impact of those measures on the inmates' mental

26   illnesses." *Coleman*, 912 F. Supp. at 1320.  Defendants' policies, procedures, and

27   practices cause shocking and gratuitous harm, both physical and psychological, to the

28   *Coleman* class.  While correctional officers are no longer meting out punishment via tasers

and 37mm guns, they have simply substituted crowd control-sized OC spray canisters, expandable batons, and chemical grenades.  These are weapons that Defendants' own expert testified he has not seen issued to line officers in any other correctional system in the country.  (*See* Declaration of Lori E. Rifkin in Support of Notice of Motion and Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force and Disciplinary Measures, filed herewith ("Rifkin Decl.") ¶ 3 & Ex. 2 at 141:3-18 (Excerpts from Deposition of Steve Martin, Feb. 28, 2013) (hereinafter "Martin Dep.").)

Custody officers throughout CDCR wield these weapons frequently and disproportionately against *Coleman* class members locked in housing cells, holding cages, or even mental health crisis beds and inpatient units.  And this is done with shocking frequency in response to the precise types of activity this Court and others have held does not warrant such response.  One-third of CDCR prisons report that the rate of force incidents against prisoners with mental illness is more than double the representative population of mentally ill prisoners on site.  (*See* Supplemental Declaration of Eldon Vail, filed herewith ("Vail Suppl. Decl.") ¶ 9.)  Three institutions apply force against prisoners with mental illness at a rate that is ***triple*** their representative population.  (*Id.* ¶ 10.)  In four institutions, use of force against prisoners with mental illness comprised ***87-94 percent of all such incidents***, whereas the population of prisoners with mental illness at those institutions ranged from only 30-55%.  (*Id.* ¶ 11.)  Specific remedial orders from this Court are warranted to resolves this violation.

### B.   Defendants' Unconstitutional Disciplinary Process for *Coleman* Class Members

The same approach and attitude that leads Defendants to employ unnecessary and excessive force to punish inmates despite — or because of — mental illness, also results in unduly harsh discipline of inmates for behavior arising from or related to their illnesses.  Defendants' disciplinary process does not provide sufficient accommodation or consideration of mental illness, from the initial decision to issue a disciplinary charge through the adjudication of guilt and determination of punishment.  This leads to

1   inappropriate, severe, and disproportionate punishment of *Coleman* class members.  Even

2   when Defendants' mental health assessment framework for disciplinary proceedings is

3   "successful" because a hearing officer decides to mitigate discipline for an infraction,

4   based on the finding of "guilt," the inmate remains at risk of being referred to the

5   classification committee for segregation/SHU placement and to the district attorney for

6   additional prosecution.  Defendants' disciplinary policies and practices violate the Eighth

7   Amendment, the Fourteenth Amendment and the Americans with Disabilities Act, because

8   they result in discrimination and punishment against the *Coleman* class on the basis of

9   mental illness.

10          After almost two decades, Defendants have been unable or unwilling to remedy this

11   issue, despite the many opportunities the Court and Special Master have afforded them.

12   Specific remedial orders from this Court are needed and warranted to protect class

13   members' fundamental rights whenever the disciplinary process is employed.

14   **III.   SUMMARY OF REQUESTED RELIEF**

15          Affirmative relief is necessary to alleviate the excessive and unreasonable use of

16   force against MHSDS inmates, and the inappropriate and disproportionate discipline of

17   inmates for behaviors arising from mental illness.  Both Plaintiffs' and Defendants' experts

18   agree that changes should be made to CDCR's current use of force policies and practices

19   and to the disciplinary process as applied to MHSDS inmates.

20          Based on prior findings of the Special Master, and the recommendations of

21   Defendants' and Plaintiffs' experts, Plaintiffs request that the Court require that

22   Defendants take the following actions regarding use of force against *Coleman* class

23   members:

24      •   Revise current Use of Force policies and procedures to minimize the
            potential for excessive uses of force against class members, especially with
25          respect to use of the expandable baton, OC spray, and "immediate" or
            emergency uses of force.
26

27      •   Provide training for custody staff on use of force policies and procedures,
            identification of symptoms of mental illness, and communication with
28

---

6

persons in a mental health crisis; and for all custody and mental health staff on de-escalation methods for resolving situations without use of force. Develop criteria for training and assigning custody staff to mental health treatment units in order to ensure that they have the appropriate capacity to supervise prisoners with serious mental illness.

- <u>Revise investigatory policies and procedures</u> to expand mandatory investigations for use of force events to include the categories recommended by Plaintiffs' and Defendants' experts; and require independent and meaningful review of use of force by creating a unit of trained and dedicated investigators, outside the institutional chain of command.

- <u>Implement a meaningful tracking and quality assurance system</u> for use of force incidents and review.

The Court should further order the Special Master to conduct a comprehensive review of use of force against *Coleman* class members and authorize the Special Master to hire his own use-of-force expert.

Plaintiffs request that the Court order Defendants to take the following actions regarding the disciplinary process for *Coleman* class members:

- <u>Modify the disciplinary process</u> to create a mental health diversion or mitigation prior to the issuance of a Rule Violation Report ("RVR") and increase the role of mental health staff in the RVR process, including developing formal procedures for regular communication between custody and mental health staff regarding the disciplinary process.

- <u>Provide training</u> to custody officers and mental health staff regarding mental illness, including the ways in which mental illness may affect inmates' behavior and ability to comply with rules and regulations; Develop criteria for training and assigning custody staff to mental health treatment units.

- <u>Revise disciplinary policies and procedures</u> including mental health assessment forms, staff assistant assignment, and classification/DA referral processes.

- <u>Implement meaningful tracking and quality assurance systems</u> that monitor the use of the mental health assessments and the degree to which mental health information is considered by hearing officers during the disciplinary process, both in terms of adjudicating guilt and in terms of mitigating punishment.

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

- Ban the use of the informal "Management Status" practice in lieu of formal disciplinary procedures.

## IV.   STATEMENT OF FACTS

### A.   Use of Force Against *Coleman* Class Members

#### 1.   Original Use of Force Findings

In 1994, following the original trial in this case, Magistrate Judge Moulds made factual findings in support of the Court's conclusion that "use of tasers and 37mm guns upon mentally ill inmates without regard to the impact of such measures on an underlying mental illness violates the Eighth Amendment." *Coleman*, 1994 U.S. Dist. LEXIS 20786 at *84.  Judge Moulds found:

- Insufficient training of custody staff on mental illness:  "Custody staff within CDC lack sufficient training to differentiate between an inmate who is acting out as a result of mental illness and an inmate who is acting out for other reasons.  As a result, mentally ill inmates who act out are typically treated with punitive measures, without regard to their mental status."  *Id.* at *71 (internal citations omitted).

- Use of weapons without regard to mental illness:  "Inmates who act out are . . . subjected to the use of tasers and 37mm guns, without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition."  *Id.* at *74-75.

- Escalation by staff leading to use of force rather than de-escalation:  "[C]ustody staff escalated the conflict by demanding compliance to orders."  When the inmate refused to comply, staff used force.  *Id.* at *75.

- Use of force exacerbating decompensation of mental health:  In addition to physical injuries, "use of these weapons could, and often did, cause further damage to and deterioration of the inmate's mental condition.  It also reduced the possibility that future mental health treatment would be successful."  *Id.* at *76 (internal citations omitted).

- Inappropriate use of force to forcibly administer medication:  "There are several deficiencies in the use of involuntary medications throughout the California Department of Corrections and at particular institutions in the class."  *Id.* at *77-83 (describing multiple examples of uses of force to involuntarily administer medication and corresponding problems).

- Policies permitting custody staff to override medical and/or mental health considerations: "[D]eficiencies are attributable to policies which permit custody staff to use these measures in the absence of consultation with, or against the considered advice of, medical and/or mental health professionals." *Id.* at *83-84.

Adopting the findings of the Magistrate Judge, this Court noted that Defendants appeared to draw "some unaccountable distinction between mental patients being subjected to physical as contrasted with psychological injury." *Coleman*, 912 F. Supp. at 1322 n.58. However, the Court also found that "there is nothing of record suggesting a penological justification for the distinction between inflicting physical as contrasted with mental injury." *Id.* at 1323. The Court held:

> It is . . . plain from the undisputed evidence before the court that use of either tasers or 37mm guns on members of the plaintiff class can cause, and has caused, serious and substantial harm to mentally ill inmates, whether or not the inmate is on psychotropic medication. This harm to the inmate can be both immediate and long lasting. Moreover, continuation of the present practices permitting these weapons to be used against inmates with serious mental disorders without regard to the impact on those disorders will cause serious harm to members of the plaintiff class so long as those practices remain in existence.

*Id.* at 1322 (internal citations omitted).

### 2. Defendants' Ongoing Use of Force Against *Coleman* Class Members

As documented by the Special Master and Plaintiffs throughout the remedial phase of this case, Defendants have continued to use force in a manner that disproportionately harms prisoners with mental illness.

### (a) Documentation of Use of Force by the Special Master

In 2001, the Special Master identified the inappropriate and excessive use of force against inmates with mental health disabilities as a concern during the eighth round of monitoring: "The monitor reviewed incident reports involving seriously mentally disordered inmates and found that most of the reported incidents described repeated and

9

1  long bursts [of pepper-spray] (up to five or ten seconds each, instead of the one to two

2  second bursts called for in confined spaces in CDC policy), with burst totals reaching over

3  half a minute in some cases and requiring the exhaustion of multiple canisters."  (Eighth

4  Monitoring Rpt. of the Special Master, Dkt. No. 1317, at 84.)

5        Later in 2001, the Special Master found that excessive use of OC spray against

6  prisoners on the mental health caseload continued, with more than half of the reports

7  involving multiple applications of spray, "each ranging from seven to 47 seconds in

8  duration."  (Ninth Monitoring Rpt. of the Special Master, Dkt. No. 1373, at 72.)

9        In 2003, the Special Master again documented inappropriate and excessive use of

10  OC spray on prisoners with mental illness, finding that OC spray "was used to stop

11  apparent suicide attempts, compel compliance with ordered blood tests and force inmates

12  to relinquish food trays.  In some incidents, particularly when inmates were held in small

13  holding cells or locked in the shower, excessive amounts of OC spray appeared to have

14  been applied.  In other cases, OC spray was used on an inmate already forced to a prone

15  position on the floor."  (Twelfth Monitoring Rpt. of the Special Master, Dkt. No. 1553 at

16  92.)

17        In 2004, the Special Master reported that at CSP-Corcoran, although inmates on the

18  MHSDS caseload comprised only 25 percent of the prison's population, they were the

19  subjects of over half the incidents involving uses of force.  Moreover, "incidents resulting

20  from non-contact offenses resulted in the use of force against MHSDS caseload almost

21  three times more often than against non-caseload inmates."  (Fourteenth Monitoring Rpt.

22  of the Special Master, Dkt. No. 1648 at 41-42.)  The vast majority of the incidents

23  involving use of force were "deemed to be emergencies by the custody personnel initiating

24  the application of force, thereby superseding the rules for the calculated use of force,

25  which embrace the bulk of procedures designed to protect MHSDS inmates from abuse

26  when force is utilized."  (*Id.*)  Finally, there was no meaningful accountability through the

27  use of force review process, which was seriously backlogged.  (*Id.*)

28        Consequently, in 2005, this Court ordered Defendants to closely monitor and report

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   to the Special Master situations involving use of force at CSP-Corcoran.  CSP-Corcoran's

2   2005 self-study of the use of force concluded that "86 percent of incidents involving the

3   use of force against seriously mentally disordered inmates occurred on an emergency

4   basis, precluding any opportunity for the intervention of mental health clinicians to calm

5   agitated caseload inmates before force was applied."[3]  (Fifteenth Monitoring Rpt. of the

6   Special Master, Dkt. No. 1746 at 142-145.)  In his Sixteenth Monitoring Report, the

7   Special Master reported that MHSDS inmates continued to be disproportionately subjected

8   to force:  in locked housing units where MHSDS inmates were approximately 32 percent

9   of the population, they were involved in 61 percent of the incidents.  (Dkt. No. 2081 at

10  151-52.)

11              **(b)       Plaintiffs' Documentation of Use of Force and 2007 Motion**

12          In 2007, Plaintiffs requested remedial orders to address Defendants' longstanding

13  abuses of force.  (Pls.' Request for Relief Based on the Eighteenth Monitoring Rpt. of the

14  Special Master on the Defs.' Compliance with Provisionally Approved Plans, Policies, and

15  Protocols ("Pls.' Request"), Dkt. No. 2357, filed Aug. 9, 2007.)  At that time, Plaintiffs'

16  expert, Walter "Kip" Kautzky, documented ongoing practices of unnecessary and

17  excessive use of force against inmates on the MHSDS caseload by correctional officers in

18  CDCR, including OC-spraying inmates who were either kicking cell doors or hitting cell

19  windows, and using expandable batons during calculated uses of force in the mental health

20  crisis unit in order to forcibly administer psychotropic medications.  (Decl. of Walter L.

21  Kautzky in Support of Pls.'  Request ("Kautzky Decl."), Dkt. No. 2358-4 at ¶¶ 13-14, 17,

22  25.)  Mr. Kautkzy also documented, *inter alia*, custody officers' escalation of mentally ill

23  _____

24  [3] Use of force at Corcoran is still used disproportionately against mentally ill inmates.

25  According to data Corcoran reported to the Special Master in 2012, 68 percent of the uses
    of force were against *Coleman* class members, who compromise only 32.2 percent of the

26  population.  (Twenty-Fifth Monitoring Rpt., Dkt. No. 4298 at 219-220.)  The previous
    monitoring period, 74 percent of the uses of force were against *Coleman* class members.

27  (*Id.*)

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

inmates' agitation rather than attempting to de-escalate; Defendants' failure to provide meaningful clinical interventions prior to engaging in a use of force; over-use of "emergency" use of force when no "immediate, serious threat to safety" existed; failure of supervisory and command staff to provide meaningful review or accountability for uses of force. (*Id.*) The Court concluded that, while "Plaintiffs' request keeps on the table an issue that must, and will, be the subject of remedial relief if there is not a change for the better," the Court also agreed with the Special Master that Defendants had so many remedial tasks to complete at that moment that additional recommendations and orders regarding use of force might "impos[e] more tasks that the parties' resources cannot reasonably be expected to manage." (Aug. 27, 2007 Order, Dkt. No. 2388 at 2-3.) Thus, the Court denied Plaintiffs' motion without prejudice.

### 3. Documentation of Current Use of Force Violations by Plaintiffs' and Defendants' Experts in the Termination Proceeding

Six years later, Defendants filed their Motion to Terminate, proclaiming all constitutional issues in the case resolved.[4] However, Defendants' own use of force expert found CDCR's use of crowd-control sized OC canisters, OC grenades, and expandable batons against prisoners with mental illness to be alarming. (*See, e.g.,* Martin Dep. 130:12-133:6; 141:3-18.)

Defendants' policies affirm the use of these weapons, do not require or provide guidance that they be used in any particular sequence, and even denote OC as "the preferred option for carrying out the immediate use of force" when immediate force "is necessary for inmates confined in their cells." DOM, Art. 2, Ch. 5, § 51020.11; *see id.*

---

[4] Despite this Court's recent denial of Defendants' motion to terminate all relief in this case and finding that constitutional violations remain ongoing, Defendants continue to maintain that they are providing constitutionally adequate care. (*See*, *e.g*., Defs.' Opp. to Pls.' Motion for Enforcement of Court Orders and Affirmative Relief Related to Inpatient Treatment, Doc. 4592 at 1, n.1 ("Defendants believe that this Court's recent denial of their motion to terminate was in error.").)

1  § 51020.5 (use of force options available to CDCR staff include chemical agents, hand-

2  held batons, physical strength and holds, less-lethal weapons and lethal weapons, and "use

3  of force options do not have to be utilized in any particular sequence, but should be the

4  force option staff reasonably believes is sufficient.").

5       Although Defendants provided only limited responses to Plaintiffs' termination

6  discovery requests regarding use of force, Plaintiffs' expert documented incident after

7  incident of excessive force used against *Coleman* class members.  For example:

- In a "controlled" use of force incident,[5] an MHSDS inmate housed in the SHU was naked, yelling that he was the creator and threatening to kill himself.  It was determined he needed to come out of his cell.  He was sprayed with OC approximately *forty* times, in addition to *four* OC grenades being thrown into his cell.  (Vail Suppl. Decl. ¶ 30.);

- In a "controlled" use of force incident, an EOP inmate placed in a holding cage on "Management Status"[6] because of verbal disruption in the

_____

[5] The implementing rules for Title 15 § 3268, which governs use of force in CDCR, are contained in Chapter 5, Article 2 of the DOM.  Section 51020.4 of the DOM defines "Controlled Use of Force" as "the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and in the inmate is located in an area that can be controlled or isolated."  Controlled uses of force require the authorization and presence of a supervisor.  For controlled uses of force, staff "shall make every effort to identify disabilities and note any accommodations that may need to be considered."  *Id.*  Controlled uses of force are to be video recorded, and a verbal warning is to be issued prior to the controlled use of force that includes an order for the inmate to comply and a warning that force will be used if the inmate does not comply.  *Id.*  Section 51020.12.2, "Controlled Use of Force Involving the Seriously Mentally Ill," and Section 51020.15.1, "Chemical Agents Restrictions," require that when inmates "are housed in departmental hospitals, infirmaries, Correctional Treatment Centers (CTC), Enhanced Outpatient Program Units (EOP), or Psychiatric Services Units (PSU), or have an EOP level of care designation," prior to a controlled use of force that involves chemical agents or a cell extraction for a change in housing for treatment purposes, a licensed health care practitioner be consulted and a clinical intervention attempted.  The custody supervisor makes the final decision about use of chemical agents.  DOM § 51020.15.1.

[6] During recent inspections undertaken in connection with termination discovery, Plaintiffs' expert observed Defendants' use of a disciplinary procedure called "Management Status."  This is "an informal disciplinary procedure where the inmate can be summarily disciplined by being removed from his cell, stripped to his underwear and (footnote continued)

13

administrative segregation unit refused to come out of the cage. Although he was securely held in a holding cage, requires a cane to walk, and was not medically cleared for OC spray because of asthma, the Incident Commander approved this application of OC spray because of "institutional safety and security." The inmate was ultimately transferred to an MHCB. (Vail Suppl. Decl. ¶ 15.);

- In a "controlled" use of force incident against a prisoner housed in an MHCB and refusing medication, in order to forcibly administer medication, correctional staff administered three blasts of OC in large dosages in less than four minutes. Although the inmate was screaming for help, he was not lucid or coherent enough to be able to follow the officer's orders to back up to the cell and "cuff up." When the inmate eventually managed to get his hand near the food port, he was cuffed by officers on the other side of the cell door, attached to a triangle device, and then sprayed with OC spray again from approximately two feet away. The inmate broke away from the grasp of the officers, who were still outside the cell, leaving him chained to the door by a single cuff attached to the chain and triangle at the cuff port. At this point, the inmate was continuing to scream and cry for help. Finally the officers decided to enter the cell, which was completely wet from the massive amounts of spray; all of the officers immediately slipped and fell to the floor. (Vail Suppl. Decl. ¶ 14; Vail Rpt. ¶ 52.)

- In a "controlled" use of force incident, an inmate who was decompensating needed to be moved to a crisis cell and was refusing. "Intervention" by a psychiatric technician lasted less than twenty seconds. Even though the inmate had asthma and was deemed a "medium risk" for exposure to OC, the Incident Commander decided to proceed. Officers administered four bursts of OC spray. Although the inmate appeared ready to comply, staff elected to spray the cell a fifth time, via a Barricade Removal Device.[7] Staff became verbally aggressive with the prisoner as the incident went on. When the inmate was finally out of the cell and complained he could not breathe, staff placed a spit mask on him. (Vail Suppl. Decl. ¶ 16.)

- Two MHSDS inmates in Administrative Segregation refused to return their food trays. In a "controlled" use of force, they were sprayed with massive amounts of OC (one had asthma but the medical concern was overruled), and

_____

have all his property removed from his possession." (Vail Rpt. ¶ 96.) Plaintiffs address Defendants' inappropriate use of this procedure in Section (VI)(B)(4), *infra*.

[7] A Barricade Removal Device (BRD) is a system that puts a massive amount of spray in a cell. (Vail Suppl. Dec. ¶ 16.)

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

after being pulled out of the cell, were thrown to the ground, dragged with unnecessary and excessive force, and a spit mask was placed on one of them despite any clear evidence that it was necessary.  (Vail Suppl. Decl. ¶ 19.)

- Another "controlled" use of force was inflicted on two MHSDS inmates in a SHU who had been denied yard time and requested to speak to the Sergeant to find out the reason.  Their request was refused, and the inmates blocked their cell window in an attempt to get a response.  In return, the correctional officers infused their cell with OC spray delivered via the Barricade Removal Device four times, followed by an OC vapor grenade, removed them from their cell, and locked them in a holding cage attached to a triangle device chained to the cuff port in positions that did not allow them to stand.  (Vail Suppl. Decl. ¶ 21.)

Both Plaintiffs' and Defendants' experts noted a widespread problem with "controlled" force incidents where MHSDS inmates, decompensating in locked housing cells, were repeatedly sprayed with OC from large crowd-control dispensers, Barricade Removal Devices, or OC grenades, with each successive spraying occurring within one or two minutes or even seconds of the preceding spray.  (Vail Suppl. Decl. ¶¶ 16-18; Vail Rpt. ¶ 58; *see also* Martin Dep. at 84:12-19 (it is apparent from videos and incident reports that there are issues with guards using weapons successive times, or different weapons successively, without giving it a chance to work before next application was applied).)  The "controlled" uses of force reviewed by Plaintiffs' expert include no meaningful intervention attempts by a mental health clinician, nor provision of a real "cooling off period" between the officers' orders, threats of force, and use of force.  (Vail Rpt. ¶ 62; Vail Suppl. Decl. ¶¶ 15-19.)[8]  These observations are consistent with those made by Plaintiffs' expert Kautzky in 2007, including the failure to provide clinical intervention, the failure to provide a "cooling off period," and the use of inappropriate weaponry such as OC spray or the expandable baton against inmates who are secured in their cells.  (Kautzky Decl. ¶¶ 14 & 17.)

---

[8] Defendants refused to provide copies of the videos reviewed by Plaintiffs' expert. Plaintiffs will seek a court order requiring the production of the videos so that they can be reviewed by the Court at the evidentiary hearing.

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

While Plaintiffs' expert could view the incidents described above on video recordings because they were so-called "controlled" uses of force, the vast majority of the uses of force in CDCR are categorized as "immediate" (emergency) and thus there is no video record, no prior supervisor authorization, and no meaningful accountability.[9,10]  (*See* Fourteenth Rpt. at 41-42.)  Custody officers routinely employ "immediate" force against class members locked in their cells who commit minor infractions, such as refusing to return a food tray or close a food port.  (*See,* Vail Suppl. Dec. ¶ 33; *id.* ¶ 34 (MHSDS inmate asking to speak with Sargent and refusing to remove her arms from food port sprayed); *id.* ¶ 35 (EOP inmate threw his food tray out of the food port, hitting an officer in the side, and refused to close the port.  In an "immediate" use of force, he was sprayed with OC.  The psychologist described the inmate as "[s]everely mentally ill," "out of touch with reality," and responding to internal stimuli on a frequent basis); *Id.* ¶ 36 (EOP inmate on suicide watch put his arm through the food port when an officer opened it.  He was sprayed with OC in an "immediate" use of force); Rifkin Decl. ¶ 4 (emergency use of OC spray against an EOP inmate who threatened to break his food tray, stating "I have the Warden in my pocket! I have paper on all of you fuckers!"  The custody officer "dispersed an approximate four second burst of pepper spray from my MK-9 to [inmate's] upper body from an approximate distance of three feet).)  In *Madrid*, the Court noted that prior to February 1992, Defendants used full scale cell extractions for relatively minor infractions including not promptly giving up a meal tray.  The Court was "not persuaded that the meal tray extractions were primarily motivated by a genuine concern that inmates were

---

[9] Section 51020.4 of the DOM defines "Immediate Use of Force" as force used to respond to "inmate behavior that constitutes an imminent threat to institution/facility security or the safety of persons."  Immediate use of force may be used without authorization from a supervisor.  *Id.*

[10] Except for the 2005 Corcoran self-study, Defendants do not appear to track how many uses of force are "immediate" versus "controlled" for Coleman class members, or do not provide that information to Plaintiffs.  (Rifkin Decl. ¶ 14.)  However, the Special Master has noted that the majority of uses of force are "immediate."  (Fourteenth Rpt. at 41-42.)

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   converting meal trays into weapons." 889 F. Supp. at 1173, n.39. Plaintiffs' expert

2   documented evidence of repeated custody overrides of medical recommendations against

3   the use of OC spray, usually for inmates with asthma. (Vail Rpt. ¶ 65.) Plaintiffs' expert

4   also found the attitude of custody officers throughout the CDCR institutions he visited

5   strikingly unprofessional in their disregard and disparagement of prisoners with mental

6   illness (Vail Rpt. ¶¶ 129-139.)

7        **B.**      **Discipline of *Coleman* Class Members**

8             **1.**      **Original Discipline Findings**

9          In his original *Coleman* findings, Magistrate Judge Moulds found Defendants'

10  disciplinary procedures problematic because they led to inappropriate and disproportionate

11  placement of *Coleman* class members in administrative segregation. *See Coleman*, 1994

12  U.S. Dist. LEXIS 20786 at *71-72 ("In all institutions, placement in segregated housing

13  occurs as a result of disciplinary proceedings. . . . [P]lacing mentally ill inmates in

14  administrative segregation or segregated housing exacerbates the underlying mental

15  illness, induces psychosis, and increases the risk of suicide."). This Court found that

16  although State law at the time required Defendants to conduct case reviews and

17  psychological assessments for inmates assigned to segregated housing units, "evidence of

18  acutely psychotic and otherwise serious mentally ill inmates placed in administrative

19  segregation and segregated housing units for significant periods of time demonstrates that

20  the regulation has had little or no effect on practice." *Coleman*, 912 F. Supp. at 1320 n.55.

21  *Coleman* class members continue to be relegated to segregated housing at elevated rates,

22  and languish there for extended periods of time. (*See* Twenty-Fifth Rpt. at 38; Pls.' Mot.

23  for Enforcement of Court Orders and Affirmative Relief Re: Improper Housing and

24  Treatment of Seriously Mentally Ill Prisoners in Segregation, Dkt. No. 4580 at 6-7).

25  Defendants' failure to resolve the serious flaws in their administration of discipline relative

26  to prisoners with mental illness continues to result in overrepresentation of *Coleman* class

27  members in segregated housing units.

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

Magistrate Judge Moulds found that:

> Defendants' use of administrative segregation and segregated housing . . . to house mentally ill inmates violates the Eighth Amendment because mentally ill inmates are placed in administrative segregation and segregated housing without any evaluation of their mental health status, because such placement will cause further decompensation, and because inmates are denied necessary mental health care while they are housed in administrative segregation and/or segregated housing."

*Coleman*, 1994 U.S. Dist. LEXIS 20786 at *74.  This Court affirmed  these findings as "fully supported by the evidence" and held that Defendants' "policies and practices with respect to housing of class members in administrative segregation and segregated housing units violate the Eighth Amendment rights of class members." *Coleman*, 912 F. Supp. at 1320-1321.  In support of his legal conclusion, Magistrate Judge Moulds made the following factual determinations:

- <u>Failure to determine whether misconduct is the result of mental illness</u>: "Defendants make no effort to determine when [bizarre or inappropriate] behavior is the result of decompensation as a result of mental illness." *Coleman*, 1994 U.S. Dist. LEXIS 20786 at *71.

- <u>Failure to train officers resulting in punitive responses to prisoners with mental illness</u>:  "Custody staff within CDC lack sufficient training to differentiate between an inmate who is acting out as a result of mental illness and an inmate who is acting out for other reasons.  As a result, mentally ill inmates who act out are typically treated with punitive measures, without regard to their mental status." *Id*. at *71 (internal citations omitted).

- <u>Failure to provide appropriate treatment to address misconduct connected to mental illness</u>:  "[I]nmates who act out as a result of mental illness are often treated only as custody problems and subjected solely to punitive measures rather than provided with necessary care in conjunction with appropriate discipline." *Id*. at *49 n.29.

The cumulative impact of Defendants' approach to discipline, which ignored the role of mental illness in inmates' misbehavior, resulted in severely punitive and disproportionate discipline and segregation of prisoners with mental illness, and exacerbation of their symptoms.  This, in turn, made it even more challenging for

18

1  Defendants to provide mental health treatment, which then again exacerbated mental

2  illness and decompensation.  (*See* Seventeenth Round Monitoring Rpt. of the Special

3  Master, Part B, Dkt. No. 2180-3 ("17B") at 105 ("As seriously mentally ill inmates

4  incurred repeated disciplinary convictions, their lengths of stay in administrative

5  segregation and eventually Security Housing Units (SHUs) grew even longer.  Seriously

6  mentally disordered inmates grew to occupy a percentage of administrative segregation

7  and SHU cells considerably out of proportion to their presence in the overall population,

8  yet the defendants still needed to provide them with mental health services, only now in an

9  environment that tended to accelerate their illness and was inimical to the provision of

10  such services.  The approach bred increased illness, requiring ever more treatment that was

11  exponentially more expensive and difficult to provide.").)

### 2.        Development of the Current Discipline Process for *Coleman* Class Members

14          Since the beginning of the monitoring process, the Special Master recognized that a

15  key part of providing adequate and appropriate mental health treatment is "keeping

16  seriously mentally disordered inmates out of administrative segregation as often as

17  possible and moving them out of administrative segregation as rapidly as possible once

18  they are housed there."  (Declaration of Jane E. Kahn in Support of Notice of Motion and

19  Motion for Enforcement of Court Orders and Affirmative Relief Related to Use of Force

20  and Disciplinary Measures, filed herewith ("Kahn Decl.") ¶ 3 & Ex. 2 at 10 (5/12/99

21  Suppl. Recommendations of Special Master on Staffing Ratios and Admin. Segregation).)

22  In 1998, Defendants implemented new procedures for adjudication of RVRs for MHSDS

23  participants.  Although these procedures would, in theory, incorporate "appropriate clinical

24  input from Mental Health clinicians" for all RVRs involving an inmate on the MHSDS

25  caseload, regardless of level of care, such a remedy has never actually come to fruition.

26  (Kahn Decl. Ex. 1 (8/14/98 CDCR Memorandum)); (Twenty-Third Round Monitoring

27  Rpt. of the Special Master, Dkt. No. 4124 at 20-28 (summarizing history of efforts to

28  improve mental health assessments of CCCMS inmates subject to disciplinary process).)

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1        In 1999 the Special Master noted that "more work needed to be done before the

2    procedures can have their anticipated impact" and Defendants needed to "develop a plan

3    for training mental health staff, staff assistants, and hearing officers."  (Kahn Decl. Ex. 2 at

4    10.)  In the same Report, the Special Master determined that the method defendants

5    adopted to limit the stay of MHSDS inmates in administrative segregation, once placed

6    there— mental health participation in the ICC process—also had "yet to live up to its

7    potential."  (*Id.* at 11.)  The Special Master observed the critical role of cooperative

8    relations between custody and mental health staff, which he noted is a function of

9    institutional leadership, and something Defendants needed to improve at the institutional

10    level.  (*Id.*)

11        By 2001, Defendants complained that completing mental health assessments for all

12    MHSDS inmates in the RVR process was too burdensome, and proposed a new two-tiered

13    system that would refer all EOP/MHCB patients for a mental health assessment, and refer

14    only those CCCMS inmates whose behavior is "bizarre, unusual and uncharacteristic."

15    (Kahn Decl. ¶ 4.)  Plaintiffs objected and proposed that mental health assessments continue

16    to be made for CCCMS inmates, especially those with a serious rule violation that could

17    result in a SHU term or DA referral.  (Kahn Decl. ¶¶ 5-7 & Ex. 4 (10/25/02 Kahn Ltr.).)

18    Defendants maintained the two-tiered standard.  (Kahn Decl. ¶¶ 6-7 & Ex. 3 (9/26/11 Ltr.)

19        Following Defendants' implementation of the new disciplinary procedures for

20    mentally ill inmates in 2002, Plaintiffs continued to note their concerns, particularly as to

21    whether mitigation of penalties for infractions connected to mental illness was actually

22    occurring, whether appropriate training had been provide to hearing officers so that they

23    could apply the mitigation policy, whether custody staff responsible for issuing RVRs in

24    had enough training to use appropriate discretion about whether to issue the RVR for

25    violations resulting from mental illness, and the effects of failure to mitigate penalties on

26    inmates who were charged with serious rule violations that could result in referrals to SHU

27    and the DA.  (Kahn Decl. ¶ 9 & Exs. 5 & 6 (10/10/2003 & 3/4/2004 letters).)

28        Plaintiffs also continued to object to the standard adopted by Defendants for

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  referrals of CCCMS inmates.  (Kahn Decl. ¶ 10.)  Although CCCMS inmates comprised

2  87% of the *Coleman* class, almost no CCCMS inmates were being referred for mental

3  health assessments, which would, in theory, lead to the doubtful conclusion that there were

4  virtually no CCCMS patients in the CDCR whose mental illnesses contributed to the

5  behavior that led to the RVR which they were issued.  (*Id*. ¶ 10 & Ex. 7 ( Kahn 12/12/2005

6  Objections to Draft 15th Monitoring Rpt.).)  This conclusion was belied by the

7  disproportionate number of CCCMS inmates placed and retained in ASUs and SHUs

8  systemwide.  (*Id.*)  Plaintiffs again proposed that all CCCMS inmates be referred for a

9  mental health assessment if charged with a serious rules violation that could result in a

10  SHU term or District Attorney referral, and also proposed that any CCCMS patients with

11  multiple RVRs during a specified period of time be referred.  (*Id.*)  Again, Defendants

12  refused to change their policies.  (*Id.*)

13       In his Fifteenth Monitoring Report, the Special Master found that "the overall

14  impact of the still-developing revised mental health assessment process has not yet been as

15  significant as was hoped."  (Dkt. No. 1746-3, at 375.)  In his Seventeenth Monitoring

16  Report, the Special Master found that identification of inmate misconduct that might have

17  been caused or affected by mental illness, and appropriate institutional response was

18  "unsatisfactory" in all seven institutions reviewed for this issue.  (17B at 92-93.)  "The rate

19  of referral of inmates for assessment was exceptionally low" and "referral rates for 3CMS

20  inmates remained uniformly extremely low," at under five percent of 3CMS inmates

21  receiving RVRs.  (*Id.* at 93.)  Even among the few CCCMS referrals, many of the

22  assessments "contained errors and inconsistencies and suggested strongly that clinicians

23  involved in their preparation had lost all sight of the objectives and purpose of the

24  process."  (*Id.*)  For the mental health assessments for RVRs generally, the quality was "at

25  best, inconsistent and marginal everywhere."  (*Id.*)  In addition to the poor quality of the

26  assessments, hearing officers demonstrated "a significant lack of understanding of the

27  process."  (*Id.* at 94.)

28       Moreover, the Special Master concluded that the very low number of CCCMS

21

referrals was not reflective of whether mental illness was contributing to the  behavior leading to the RVR because "too many inmates not referred for an assessment end up immediately or shortly thereafter in MHCBs or with referrals to more intensive levels of care or referrals for medication non-compliance, acute situational stressors or other indices of decompensation, all of which suggest that intervening mental health issues may well have played a significant role in their cited misbehavior." (17B at 107.)  Part of the problem was that "the decision to refer is entirely in the hands of the correctional officer who writes up the RVR and that individual's custody supervisor, both of whom are often ill-equipped or unwilling to determine whether a mental health evaluation is needed."  (*Id.*)  The Special Master concluded that "the mental health assessment process in disciplinary matters for 3CMS inmates has been completely marginalized" and recommended that Defendants develop a plan for revising the policy, including making the criteria for referral "more objective, or if left subjective, applied by, or in consultation with, mental health clinicians."  (*Id.* at 108.)  In August 2007, this Court ordered Defendants to develop this plan within sixty days.  (Dkt. No. 2345.)

On October 1, 2007, Defendants submitted a plan that included assigning a RVR coordinator who was an experienced mental health clinician at each institution, developing a system to track CCCMS RVRs, increasing accuracy with regard to language and nature of mental health evaluations, modifying the RVR to standardize and more readily identify the degree to which the mental health referral was considered in the findings and whether the disposition was mitigated, and modifying training of staff on completion of RVRs for CCCMS inmates.  (Kahn Decl. ¶ 15.)  Defendants' plan also included a proposal for a pilot project for the new RVR process at RJD, which was to begin on February 5, 2008.[11]  (*Id.*)

_____

[11] Plaintiffs submitted comments on January 24, 2008, which included an objection that Defendants' plan revisions did not target the main problem in the existing RVR process, which was that the system did not actually result in mitigation of remedies for behavior related to mental illness.  (Kahn Decl. ¶ 16.)

On May 1, 2008, Defendants submitted a revised plan proposing that a plan be finalized (but not implemented) by November 1, 2008. (Kahn Decl. ¶ 17.) Defendants' new 2008 RVR Plan was never further revised or implemented in any form. (*See* Twenty-Third Monitoring Rpt. at 23-24.) Defendants did not submit any further information regarding revisions to the disciplinary process for more than three years. (*Id.* at 23.) In 2011, Plaintiffs learned that Defendants had unilaterally implemented a new RVR Policy by means of a May 2011 memo distributed to the field with a July 1 implementation date. (Kahn Decl. ¶ 20.) The new policy directed automatic referral for a mental health assessment of some CCCMS inmates depending on the class of violation. (*Id.*) In late 2011, following discussion by the parties, Defendants modified the policy to also direct referral of all CCCMS inmates who received a RVR that may result in being assessed a SHU. (*Id.*) Defendants also represented that they would hire RVR Coordinators at every institution no later than July 2012. However, to Plaintiffs' knowledge, they have not done so. (*Id.*)

> ### 3.   Documentation of Current Violations in the Disciplinary Process by Plaintiffs' and Defendants' Experts in the Termination Proceeding

After almost two decades, Defendants have failed to address the fundamental constitutional violation found by this Court regarding discipline of class members: Defendants still discipline prisoners with mental illness without giving meaningful consideration to the role of mental illness in alleged misconduct, and subject them to harsh punitive measures without appropriate mitigation and without providing appropriate treatment.

Both Plaintiffs' and Defendants' recent expert reports identify numerous and ongoing deficiencies in Defendants' administration of discipline of prisoners with mental illness, echoing the findings and reports of the Special Master over the past two decades.

Plaintiffs' expert Vail concluded that "CDCR's RVR process is seriously compromised for mentally ill inmate patients, and does not systematically account for their mental illness when adjudicating prison rule violations." He also found that "CDCR

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

allows custody staff to dominate and interfere with mental health treatment." (Vail Rpt. ¶ 34. Although Defendants do not consistently track the rates of RVRs for inmates with mental illness on a system-wide basis, Vail found that several prisons issued vastly disproportionate RVRs to inmates with mental illness. (Vail Suppl. Dec. ¶ 50.) Kern Valley State Prison issued 99% of its total RVRs to mentally ill inmates, who comprise only 34% of its prison population. (*Id.*) LAC issued 84% of its RVRs to mentally ill inmates, who comprise 43% of its prison population. (Vail Rpt. ¶ 78.)

Defendants' own expert identified substantial shortcomings in CDCR's disciplinary process, including a widespread lack of communication between custody staff and mental health clinicians with respect to the RVR process. (Rifkin Decl. ¶ 3, Ex. 2 at DEXP 105141 (Martin Best Practice Recommendations for Use of Force and RVR Process) (hereinafter "Martin Recommendations")); concern about the objectivity and "detachment" of staff assistants assigned to help inmates in the disciplinary proceedings (Martin Dep. 181:8-12, 241:8-24.); ambiguity as to whether hearing officers actually modified or mitigated penalties based on mental health assessments (Martin Recommendations at DEXP 105141; Martin Dep. 177:3-24;180:19 -181:3; 218:13-20.); and failure to track outcomes of RVR proceedings "in relation to the [clinical] recommendations made on the assessment form." (Martin Dep. at 221:2-18.) After reviewing RVR records for "between probably 50 and 75 hours," Mr. Martin could not recall a single instance where a mentally ill class member was found not guilty of a disciplinary infraction on account of his mental health. (Martin Dep. at 175:1-19, 195:16-196:1.)

Defendants' approach to discipline and mental illness continues to be primarily punitive, focusing on punishment for rules violations rather than considering whether additional treatment or a different intervention incorporating meaningful mental health input would be more appropriate and effective. For example:

- In the incident described *supra*, in which an EOP inmate housed in an administrative segregation unit threw his food tray through the food port, striking an officer on his side and the officer OC sprayed the inmate, the inmate was charged with a Rule Violation for battery on a peace officer with

24

a weapon.  The clinician completing the mental health assessment wrote that the inmate is "severely mentally ill," "out of touch with reality" and "responding to internal stimuli on a frequent basis."  Although the hearing officer agreed that mitigation was appropriate, the inmate was found guilty of battery on a peace officer, referred to ICC for SHU assessment and referred to the District Attorney for local criminal charges.  (Rifkin Decl. ¶ 5 & Ex. 4.)

- An EOP inmate who was being involuntarily medicated after stating that God did not want her to take her medication kicked an LVN administering the second shot of medication in the buttocks and was charged and found guilty of battery on a non-prisoner.  She was referred to the ICC for SHU assessment.  (Rifkin Decl. ¶ 6 & Ex. 5.)

- An EOP inmate housed in an MHCB and who had been referred to an inpatient level of care in DSH was charged and found guilty of a Rule Violation for disrespect to staff for making sexually inappropriate comments to a psychiatric technician during her rounds.  The mental health assessment stated that he was "manic with disorganized thoughts, bizarre behavior." (Rifkin Decl. ¶ 7 & Ex. 6.)

- An EOP inmate housed in an MHCB who was being transferred to an inpatient level of care at ASH refused to sign his conditions of parole.  He was charged with a Rule Violation for refusal to sign conditions of parole. (Rifkin Decl. ¶ 8 & Ex. 7.)

- An EOP inmate became disruptive in group by shouting and banging on the holding cell door.  He was charged with a Rule Violation for refusing to obey orders.  (Rifkin Decl. ¶ 9 & Ex. 8.)

- An EOP inmate asked staff in the medical unit when his dressing was going to be changed.  After being told that it was not changed on a daily basis, the inmate lay down on the ground, "refusing staff's orders to get up until he received the medical attention he desired."  The mental health assessment described the inmate as having a disorganized mental state and a compromised ability to comprehend what he is being told.  He was charged with a Rule Violation for willfully obstructing staff in performance of duties. (Rifkin Decl. ¶ 10 & Ex. 9.)

Although, as described *supra*, Defendants have tinkered around the edges of their disciplinary policies as they relate to *Coleman* class members, they have largely continued to ignore the primary issue:  many of the behaviors for which CDCR disciplines inmates result from mental illness.  Because Defendants' refuse to shift their focus to view these

behaviors through the lens of mental illness rather than a solely punitive orientation, they continue to punish inmates for mental illness and the symptoms thereof, in ways that do not address the underlying issues — and, often, exacerbate them.  Consistent with this approach, Plaintiffs' expert noted the marked dominance of custody staff throughout the CDCR system.  (Vail Rpt. ¶¶ 34, 110, 113.)

Defendants' refusal to reform their disciplinary practices is a deliberate choice.  In 2002, the Special Master advised Defendants:

> Appropriate clinical involvement in disciplinary dispositions has rich potential for an overloaded mental health caseload.  In some instances, it can reduce the number of seriously mentally ill inmates serving longer sentences than necessary and hasten their discharge from CDC.  For other long-term caseload inmates, sustained and thoughtful intervention in the handling of their institutional offenses can result in their placement in less restrictive, and often far less costly, programs and custody settings.

(Rifkin Decl. ¶ 15 & Ex. 13 (2/7/2002 Special Master Ltr.).)  While Defendants may attempt to characterize the Special Master's recommended approach as "best practice" rather than a constitutional floor, the reality is that Defendants' refusal to shift their approach has resulted in sustained violations of Plaintiffs' constitutional rights.

**ARGUMENT**

**V.   DEFENDANTS' USE OF FORCE POLICIES, PROCEDURES, AND PRACTICES VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS AND THE ADA AND CAUSE GRAVE HARM TO PRISONERS WITH MENTAL ILLNESS**

The deliberate indifference standard applies to systemic claims that use of force policies, procedures, and practices violate the Eighth Amendment.  *Coleman*, 912 F. Supp. at 1321-23 (applying deliberate indifference standard to claim concerning use of tasers and 37mm guns against inmates with serious mental disorders).  When correctional administrators and staff use force in a manner that inflicts pain without penological justification or necessity, or for the very purpose of punishment or harm, that is considered to be "unnecessary and wanton" in violation of the Eighth Amendment.  *Thomas v. Bryant*,

26

614 F.3d 1288, 1307-11 (11th Cir. 2010); *accord Williams v. Benjamin*, 77 F.3d, 756, 761 (4th Cir. 1996) (it is "generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas, or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.") (internal quotations omitted); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("[I]t is a violation of the Eighth Amendment for prison officials to use mace or other chemical agents in quantities greater than necessary or for the sole purpose of punishment or the infliction of pain.").

Defendants' disproportionate use of excessive force against prisoners with mental illness also violates class members' rights under the Fourteenth Amendment and the Americans with Disabilities Act ("ADA") because it discriminates on the basis of behaviors related to mental illness, and fails to provide appropriate accommodation for disability.  One-third of CDCR prisons report use of force incidents against class members at a rate that is double the representative population of mentally ill prisoners at the respective institutions.  (Vail Suppl. Decl. ¶ 9.)  Three institutions apply force against mentally ill prisoners at a rate that is triple their representative population, and, in four institutions, use of force against prisoners with mental illness comprised 87-94 percent of all such incidents, despite class members comprising only 30-55% of the populations.  (*Id.* ¶ ¶ 10-11; *see also* Fourteenth Monitoring Rpt. at 41-42; Fifteenth Monitoring Rpt. at 142-145; Sixteenth Monitoring Rpt. at 151-152; Martin Rpt. at ¶ 11 (approximately 70% of use of force incidents he reviewed involved inmates with diagnosed mental illness).)

**A.    Defendants Use OC Spray and Batons on Prisoners With Mental Illness Without Penological Justification or Necessity and Without Regard to Effects on Mental Health**

In 1995, this Court found that Defendants' practice of using tasers and 37mm guns on members of the Plaintiff class "without regard to whether their behavior was caused by a psychiatric condition and without regard to the impact of such measures on such a condition" violated the Eighth Amendment.  *Coleman*, 912 F. Supp. at 1321-23 (internal quotations omitted).  In 2013, Defendants have updated the weapons used to inflict force on the Plaintiff class to OC crowd-control canisters, OC grenades, and expandable batons.

27

Both Plaintiffs' and Defendants' experts noted that CDCR is an outlier nationwide in the weapons provided to line officers to carry on their belts.[12]  Providing line officers with this "formidable arsenal" results in an increased "likelihood that those weapons will be used when they are not needed" and "an overreliance on force as opposed to improving and refining the officers' verbal de-escalation skills."  (Vail Rpt. ¶ 38)*; see also Madrid*, 889 F. Supp. at 1160-1163 (Custody personnel "have powerful weapons and enormous manpower at their disposal, and exercise nearly total control over the inmates under their supervision. . . .  [I]mmediate [] resort [] to gas, guns, and tasers… reflects a pattern of using the maximum, rather than the minimum, amount of force necessary to accomplish a goal.").

The examples described in detail in Mr. Vail's supplemental declaration illustrate officers' excessive use of these weapons on inmates confined in locations such as holding cages and mental health crisis units.  (*See* Vail Suppl. Decl. ¶¶ 14-15.)  Several of these examples show serious uses of force used to perform cell extractions, "employed, not to address imminent threats to security, but to respond to relatively minor infractions," and "performed without *any* indication that the situation presented an imminent security risk" — a phenomenon Defendants' termination expert Steven Martin found untenable when testifying on behalf of plaintiffs in *Madrid v. Gomez*.  *See* 889 F. Supp. at 1173

---

[12] (Vail Rpt. ¶ 37 ("Line officers throughout the CDCR are routinely equipped with weapons more typically found in prison armories in other states . . .  In other jurisdictions, these weapons are restricted to either very few staff or made available only when necessary to control a group disturbance or riot."); Martin Dep. 141:16-18 ("California has both, you know, lethal weaponry and non-lethal weaponry to an extent with which I'm not familiar in other systems."); Martin Dep. 132:13-133:6 (has been to correctional institutions in "40 of the 50 states" and has never seen the MK-9 [classified as a "crowd management delivery system"] being "standard issue" or "carried on a person on line level" outside of California); Martin Dep. 130:12-132:12 (expandable batons routinely deployed at all facilities Martin observed in California, but other systems don't deploy batons "except in rare instances at very, very, serious bodily injury, you know, great bodily injury threat, that type of thing. . . .  [T]ypically you don't see a baton present among the line staff in a confinement setting.").)

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   (emphasis in original).  In finding CDCR's use of force in Pelican Bay State Prison

2   unconstitutional in that case, the Court cited the use of force in full-scale cell extractions

3   for failure to return meal trays and abuse of batons.  *Id.* at 1173 n.39 & 1176.

4         In terms of CDCR's current weapon of choice, Martin stated in his recent

5   recommendations to CDCR that, "[w]hile I don't question the tactical deployment of a

6   MK-9 canister in an open area (yard, dayroom, gym, etc.) to intervene in a inmate/inmate

7   assault, I do question the use of crowd-control delivery systems into a cell of an unarmed

8   or unbarricaded inmate."  (Martin Recommendations at DEXP 105139.)  In his deposition,

9   Mr. Martin elaborated that in situations "in which the inmate was inside his cell, secured in

10  his cell and was not armed or barricaded, that I had concerns that sometimes, occasionally,

11  quite a lot of chemical agents used that — used with applications that weren't necessary

12  appropriate for that setting."  (Martin Dep. at 77:24-78:19.)  According to Mr. Martin, the

13  disbursement of the crowd control MK-9 in the close quarters of a cell is unnecessary and

14  increases safety risk.  (*Id.* at 78:19-79:9.)  Plaintiffs' expert also personally observed

15  correctional officers' response to an alarm in a mental health treatment building at

16  Corcoran, in which "several dozen staff exited their posts and ran towards the source of the

17  alarm.  We witnessed that about a third of the officers had removed the batons from their

18  duty belts and carried them in their hands, raised and ready.  With absolutely no

19  knowledge of the situation they were about to encounter, they were posed and ready to use

20  their batons — hardly a defensive posture."  (Vail Rpt. ¶ 42.)

21        While Plaintiffs are not suggesting that the Court find that the use of OC spray or

22  expandable batons constitutes *per se* excessive force, the record here reveals the routine

23  use of unnecessary and excessive levels of force against inmates with mental illness

24  without regard to the level of threat posed or the mental illness factors involved.  *See*

25  *Madrid,* 889 F. Supp. at 1178 ("We need not, and do not, find that any particular weaponry

26  or cell extraction strategy constitutes a *per se* use of excessive force.  What the record does

27  reveal, however, is the disturbing pattern — an apparent *modus operandi* — of routinely

28  using the same extremely high level of force, no matter the level of threat posed or the

1    particularities of the situation."); *cf. Hallet v. Morgan*, 296 F.3d 732, 747 (9th Cir. 2002)

2    (institution's use of pepper spray in a single instance where staff were properly trained in

3    use of pepper spray, could not employ it without first being personally subjected to its use,

4    and use of spray "is carefully considered in advance of its authorization, restricted and

5    confined for limited purposes, and used only very sparingly.").

     **B.**    **Defendants' Policies and Procedures Are Inadequate to Prevent Harm**
6               **to Class Members Resulting From Unnecessary and Excessive Use of**
7               **Force**

8         Defendants' woefully inadequate policies and procedures enable, and, even

9    encourage, systemic misuse of force.  Despite repeated court findings, expert

10   recommendations, and even recommendations from the California Office of the Inspector

11   General ("OIG") for reform,[13] Defendants have refused to establish adequate policies and

12   procedures during the past two decades that would appropriately regulate use of force

13   against prisoners with mental illness.  Even Defendants' own termination expert made

14   "best practice recommendations" to change CDCR use of force policies and procedures

15   because where uses of force are "not controlled, not checked, not monitored, not

16   supervised, not managed, this is what you see in the pattern or practice of excessive and

17   unnecessary force."  (Martin Dep. 150:22-151:7.)

18        The *Madrid* Court identified five components of "[a] system that adequately

19   monitors and regulates the use of force" and Defendant's expert Martin identified similar

20   "essential components of systematic administration of force by staff in a confinement

21   setting."  *Madrid,* 889 F. Supp. at 1181; (Martin Rpt. at 11-13).  These components are:

22   1) Written policies that clearly identify for line staff when and how much force is

23   appropriate under different circumstances; 2) Effective training (both pre-service and in-

24   service) for all correctional staff on proper use of force and proper reporting of force;

25   3) Effective supervisory review of all use of force to ensure that it is consonant with

26   _____

27   [13]The OIG issued four reports on the use of force within CDCR in 2011-2012.

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

departmental and institutional policies and procedures; 4) Proper and complete investigation of use of force incidents when appropriate; and 5) Meaningful disciplinary measures imposed on staff for the misuse of force. *Id.*[14] Defendants' current policies and procedures fail in each and every one of these respects, and inexcusably maintaining their constitutional violations against *Coleman* class members.

### 1. Defendants' Written Policies Governing Use of Force Against Prisoners with Mental Illness are Inadequate

CDCR's written policies regarding the use of force fail to clearly guide staff in appropriate use of force with regard to inmates with mental illness. Plaintiffs' expert Vail found:

> There is a discernible pattern and practice with respect to use of force which is sometimes based on written policy provided to custodial staff, and at other times based on absence of written policy or a complete disregard for the recommendations of CDCR's own expert consultants. As a result, both formally and informally, the CDCR has bound itself to an approach which systemically inflicts unnecessary and excessive use of force on class members.

(Vail Rpt. ¶ 142); *see also Madrid,* 889 F. Supp. at 1182 ("It is also clear that the absence of authoritative written guidelines allows policy to shift according to the predilections of individual mid-level staff.").

─────────────────

[14] Martin additionally identified a sixth essential component: strict compliance with reporting requirements when force is used. This is also a problematic area for CDCR. The OIG recommended that "the Department should ensure all use-of-force reports are complete, accurate, and documents are submitted timely prior to final review decisions…The OIG recommends that the department provide better training for report writing and insist on greater accountability for its reviewers." (Nov. 2011 OIG Initial Rpt. on Use of Force Within CDCR, Exec. Digest, available at: http://www.oig.ca.gov/pages/reports/bir-semi-annual-sar.php ("Nov. 2011OIG Rpt.").) In its January-June 2012 Use of Force Report, the OIG found that 29 percent of the use of force reports did not appropriately describe the actual force used during an incident. (Oct. 2012 OIG Use-of-Force Within the CDCR Jan-June 2012 at 5, available at: http://www.oig.ca.gov/pages/reports/bir-semi-annual-sar.php. ("Oct. 2012 OIG Rpt.").)

1

### (a)   "Immediate" Versus "Controlled" Uses of Force

2   CDCR policy sets forth a general definition allowing for "immediate" use of force

3   when inmate behavior constitutes "an imminent threat to institution/facility security or the

4   safety of persons."  DOM, Art. 2, Ch. 5, § 51020.4.  However, this definition plainly does

5   not provide sufficient guidance to custody officers for determining whether an immediate

6   use of force is required.  Officers routinely use "immediate" uses of force to respond to

7   inmate behavior such as failing to close their food port, or failing to return their food tray

8   upon demand.  (Vail Rpt. ¶ 67.)  The consequences of the overuse of immediate, rather

9   than controlled, force are numerous and extremely problematic for monitoring, reviewing,

10   and preventing excessive uses of force.  *See Madrid*, 889 F. Supp. at 1172-1173 (cell

11   extractions performed without any indication that situation presented an imminent security

12   risk and "clear that minor infractions were used as a pretextual justification for inflicting

13   physical, and often brutal, punishment.").  Concerns regarding inappropriate and

14   disproportionate use of "immediate" or emergency use of force procedures against

15   MHSDS inmates have been raised by the Special Master in his monitoring reports, and

16   were highlighted by Plaintiffs' expert Kautzky in 2007.  (15th Rpt at 143-144; 14th Rpt. at

17   41; Kautzky Decl. at ¶¶ 18-20.)  Immediate uses of force allow officers to bypass

18   supervisor authorization, as well as intervention by clinical staff in the case of prisoners

19   with mental illness, both of which are safeguards against employing force against inmates

20   with mental illness in the first instance.  (*See* 14th Rpt. at 41 ("[T]he overwhelming

21   majority of incidents involving use of force in CSP/Corcoran were deemed emergencies by

22   custody personnel initiating the application of force, thereby superseding the rules for

23   calculated use of force which embrace the bulk of procedures designed to protect MHSDS

24   inmates from abuse when force utilized.").)  In fact, all limitations imposed by CDCR's

25   policies on use of force against inmates with mental illness apply only to controlled uses of

26   force.

27   There is also no present requirement that officers videotape immediate uses of

28   force.  This makes it difficult for a reviewer to determine what actually happened and what

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   force was actually used, or for an inmate to prevail on a complaint of excessive force.

2   (Vail Rpt. ¶¶ 67-70.)  Video recording safeguards against use of excessive levels of force,

3   once force is employed.  (*Id.* ¶ 70 ("A stern requirement for the use of a camera in a

4   potential use of force situation wherever and whenever possible is a profound protective

5   measure for line staff, inmates and the prison administration.").)  This lack of video

6   accountability allows for, and tacitly encourages, officers to use force with impunity.  (*See*

7   *id.* ¶ 68 (failure to use video "permits officers to inflict physical punishment when insulted

8   or disrespected by inmates, without creating a record that is available for review.  This

9   practice says a great deal about how CDCR's officers view inmates and their own role

10  within the prisons, and how CDCR permits them to treat mentally ill inmates.").)  There is

11  ample evidence that officers routinely use "immediate" uses of force in situations that do

12  not warrant force at all, much less emergency uses of force that bypass the protocols of the

13  controlled use of force procedure.

14              **(b)      Force Against Inmates Manifesting Symptoms of Mental Illness**

15

16          CDCR policy provides insufficient guidance governing uses of force involving

17  inmates who are experiencing psychiatric decompensation or exhibiting other symptoms

18  related to mental illness.  Custody officers in CDCR do not understand mental illness and

19  are not able to discern when an inmate's failure to comply with an order or to conform

20  behavior to prison rules may be the result of mental illness.  (Vail Suppl. Decl. ¶ 12; Vail

21  Rpt. ¶ 127.)  Yet, the only mental health input CDCR policies currently require is that, at

22  some undefined point prior to a controlled use of force involving chemical agents or a cell

23  extraction for a change in housing for treatment purposes, a licensed health care

24  practitioner be consulted and a clinical intervention attempted.[15]  These policies do not

25  _____

26  [15] *See* DOM § 51020.12.2 ("Controlled Use of Force Involving the Seriously Mentally Ill"
27  requiring attempt at clinical intervention by a licensed practitioner, and compliance with
    § 51020.15.1); DOM § 51020.15.1 ("Chemical Agents Restrictions" requiring a licensed
28  (footnote continued)

1   provide guidance about the preferred use of force options when dealing with an inmate

2   manifesting symptoms of mental illness, and thus possibly unable to comply with an order

3   being issued.  Nor do current policies guide custody officers to apply appropriate de-

4   escalation or intervention techniques; the absence of this guidance too often results in

5   escalation of the situation by custody officers.  *See Coleman*, 1994 U.S. Dist. LEXIS

6   20786 at *75; Kautzky Decl. ¶¶ 13-14.

7          Another common use of force against inmates with mental illness in CDCR is the

8   forcible administration of psychotropic medication.  In fact, a 2008 news video available

9   publicly online follows CDCR officers proudly showing off their use of multiple sprays

10   from a crowd-sized OC canister through the food port in a locked hospital unit cell in order

11   to gain "compliance" from an inmate who refused to take medication.  (Rifkin Decl. ¶ 11

12   & Ex. 10.)  CDCR's current regulations do not even address use of force for this purpose

13   even though it is something which Magistrate Judge Moulds explicitly discussed and found

14   inappropriate in 1994.  *Coleman*, 1994 U.S. Dist. LEXIS 20786 at *77-83.

15                          **(c)      Use of OC Spray**

16          As the examples described above show, unnecessary and excessive use of OC spray

17   against inmates with mental illness is widespread and routine in CDCR.  After previous

18   decisions by this Court, CDCR added a provision to its Department Operations Manual

19   prohibiting use of "less lethal impact munitions" in controlled use of force situations for

20   EOP inmates and inmates housed in departmental hospitals, infirmaries, and other CDCR

21   medical facilities unless authorized by the Institution Head, Chief Deputy Warden, or

22   Administrative Officer of the Day and when circumstances call for "extreme measures to

23   protect staff or inmates."  DOM § 51020.14.1.  Since this rule was added, Defendants have

24   merely exchanged impact munitions for OC spray and expandable batons and left their

25   _____

26   health care employee be consulted for inmates in departmental hospitals, infirmaries, or
     other CDCR medical facilities or who are EOP, and stating that the custody supervisor
27   makes the final decision).

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    new weapons of choice essentially unregulated.

2    　　　Defendants' own expert concluded that "the current reg[ulation]s offer no guidance

3    regarding when OC delivery systems may be used."  (Martin Recommendations at DEXP

4    105139.)  In 2011, the OIG recommended that CDCR "ensure appropriate training for

5    pepper spray use during cell extractions and should include guidelines for assessing

6    exposure elements, time, and effectiveness."  (Nov. 2011 OIG Report)  The OIG also

7    reported that chemical agents were the most common type of force employed by CDCR

8    officers and were used in approximately half of the applications of force.  (*Id.* at 6; Oct.

9    2012 OIG Rpt. at 4.)  Nevertheless, OIG's May 2012 Report notes that CDCR rejected

10   such recommendations and maintained that its "current use of force policy adequately

11   controls the use of pepper spray." (May 2012 OIG Use-of-Force Within CDCR July-Dec.

12   2011, available at:  http://www.oig.ca.gov/pages/reports/bir-semi-annual-sar.php.)

13   　　　Subsequently, in 2012, Defendants' expert Martin made specific recommendations

14   to limit Defendants' use of OC spray, which he states is unmatched in the country.  Martin

15   Dep. 132:21-133:6.  The only action CDCR appears to have taken on this issue was to

16   promulgate a memo on September 12, 2012 from M.D. Stainer, Deputy Director of

17   Facility Operations, directing all Wardens "to initiate On the Job Training for Incident

18   Commanders and managers with regard to" the "expectations" that "sufficient time" must

19   be provided between application of OC products and "the review process at all levels be

20   thorough and meaningful."  (Rifkin Decl. ¶ 13 & Ex. 12 (Stainer Memo).)  As Plaintiff's

21   expert observed, this memo "fails to address the use of crowd-control sized OC dispensers

22   for cell extractions, and offers no additional guidance to CDCR custody officers.  CDCR

23   also failed to incorporate Mr. Martin's recommendations concerning the need to restrict

24   the use of crowd-control OC dispensers in individual cell extractions and to weigh all

25   canisters before and after their use."[16]  (Vail Rpt. ¶ 48.)  Put succinctly, CDCR appears to

_____

27   [16] Mr. Vail describes additional deficiencies of the memo, including the low likelihood that
28   (footnote continued)

1   have no serious interest in even establishing a policy which would effectively limit use of

2   unnecessary weaponry against mentally ill inmates.

3                       **(d)     Use of the Expandable Baton**

4            Both Martin and Vail expressed concern about standard issue of expandable batons

5   to line officers without sufficient instruction regarding appropriate use.[17]  (Martin

6   Recommendations, DEXP 105138 (currently, there is virtually no guidance in § 51020

7   regarding the use of the expandable baton); Martin Dep. 152 (no current guidance on use

8   of expandable baton in CDCR); Vail Rpt. ¶¶ 39-43 (sharing Martin's concern and noting

9   that "ready availability of the baton, without guidance to the staff in its deployment,

10  contributes to an atmosphere of violence between CDCR staff and inmates.").)  According

11  to Mr. Martin, the expandable baton "is a tactical impact weapon deployed for self-defense

12  typically when an officer is subject to active or targeted aggression by an inmate."  (Martin

13  Recommendations, DEXP 105138.)  However, although CDCR officers use the baton

14  "with disturbing frequency," Mr. Vail did not see a single report documenting use "for

15  defensive purposes."  (Vail Rpt. ¶ 41.)  "The ready availability of the baton, without

16  guidance to the staff in its deployment, contributes to an atmosphere of violence between

17  CDCR staff and inmates."  (*Id.*)

18  _____

19  a memo to wardens will produce systemic change, and his own observations that the use of
    OC spray by CDCR staff did not change as a result of or since the dissemination of the
20  memo.  (Vail Rpt. ¶¶ 49-51.)

21  [17] Section 51020.14.1 of the DOM provides guidelines for "Use of Less Lethal Weapons
    for Inmates Identified as Seriously Mentally Ill":  "In controlled use of force situations for
22  inmates who are housed in departmental hospitals, infirmaries, or other CDCR medical
23  facilities, or who have an EOP level of care designation, the use of less lethal impact
    munitions is prohibited for direct or indirect use, i.e., body or barricade removal, unless the
24  Institution Head, Chief Deputy Warden, or AOD [Administrative Officer of the Day]
    authorize their use.  Circumstances must be serious in nature, calling for extreme measures
25  to protect staff or inmates, i.e. the inmate may be armed with a deadly weapon.  This does
26  not preclude staff from using impact munitions in immediate force situations to gain
    control of a disturbance in an exercise yard, dayroom, dining room, or work area,
27  involving inmates who may or may not be known to be seriously mentally disordered."

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 2.   Defendants Provide Woefully Inadequate Training to Custody Staff Concerning Use of Force and Mental Illness

The abject failure of CDCR to adequately train custody staff is a predictable corollary to the lack of adequate and specific guidelines for use of force against inmates with mental illness.  Plaintiffs' expert Vail found that "CDCR staff do not demonstrate an understanding of what a mentally ill person might be experiencing during a use of force incident, or of how mental illness may make it difficult for an inmate to immediately conform his or her behavior in response to an order."  (Vail Suppl. Decl. ¶ 12.)  Plaintiffs' 2007 expert Kautzky previously opined that "when institutions do not train officers for specialized assignments such as medical, mental health and special housing, the past experience of other correctional officers will fill the training void.  Correctional officers often learn on the job from other officers how to respond in Use of Force situations with less than acceptable results for the institution."  (Kautzky Decl. ¶ 9.)

The manner in which force is systemically being used by correctional officers throughout CDCR against *Coleman* class members demonstrates inadequate training on mental illness and appropriate use of force, including but not limited to:  instruction as to how to recognize and distinguish between situations where force may be necessary and appropriate; how to attempt to de-escalate rather than escalate situations; how to effectively use the least amount of force necessary; and how to identify, understand, and interact with inmates who are experiencing or manifesting symptoms of mental illness.

### 3.   Supervisory Review of Use of Force is Ineffective and Inconsistent

The OIG found substantial deficiencies in the review process for use of force reports and recommended in 2011 that CDCR "insist on greater accountability for its reviewers."  (Nov. 2011 OIG Rpt., Exec. Digest)  In 2012, the OIG found that "every level of the department's review process made errors in identifying deficiencies in use-of-force reports.  Of the incidents we reviewed [783], 222 contained reports with missing or conflicting information *after* institutional incident commanders performed the initial level of review."  (Oct. 2012 OIG Rpt. at 5 (emphasis added).)  Defendants' expert Martin

37

1 agreed that supervisory review of use of force is incomplete, and further review and

2 inquiry needed.  (Martin Dep. 90:17-91:23; 93:16-94:7.)  In 2007, for example, Plaintiffs'

3 expert Kautzky found that "senior staff reviewing … incidents in the critique process did

4 not question" the officers' use of emergency force in situations involving application of

5 pepper spray to class members housed in their own cells in response to minor disturbances

6 which posed no threat of harm.  (Kautzky Decl. ¶ 13.)  As the Court noted in *Madrid*,

7 "[t]he fact that such reports are routinely accepted leaves the clear inference that senior

8 prison administrators not only have little concern as to what actually occurred, but that

9 they affirmatively approve of such reports."  889 F. Supp. at 1187.

10         **4.**      **The Current Investigation Process Is Not Meaningful and**
                       **Investigation Requirements for Use of Force Incidents are**
11                        **Underinclusive**

12       Plaintiffs' expert Vail reviewed numerous video interviews of inmates who made

13 allegations of unnecessary or excessive use of force, and concluded that the investigation

14 process has no credibility.  (Vail Suppl. Decl. ¶ 22.)  He found that inmate interviews are

15 usually conducted by sergeants or lieutenants, whose "lack of skill as investigators is

16 appalling.  They frequently cut the inmate off when his answers don't follow [their

17 predetermined] script and sometimes castigate the inmates for trying to tell a more

18 complete story."  (Vail Rpt. ¶ 76.)  Further, custody staff interviewing inmates who allege

19 excessive uses of force were often argumentative, did not appear to fully document

20 inmates' versions of events, and did not explore inconsistencies between the officers'

21 versions and inmates' clearly visible injuries.  (Vail Suppl. Decl. ¶¶ 23-28.)

22       The California OIG also concluded that CDCR investigations of force are unreliable

23 and that the process "did not comply with policy and lacked transparency."  (Oct. 2012

24 OIG Rpt. at 8.)  The OIG "suggested the process include the OIG as a reviewer to provide

25 transparency, and include a provision to allow the OIG to request any case be brought

26

27

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  before the committee if there was a concern."[18]  (*Id.*)  At the time of the October 2012 OIG

2  Report, that proposal "was under consideration."  (*Id.*)

3         Not only is the current investigation process inadequate, but it is also

4  underinclusive, according to both Plaintiffs' and Defendants' experts.  Defendants' expert,

5  Mr. Martin, observed that "full-scale investigations appear to be low" and there is a "very,

6  very high bar of cases that have to be referred."  (Martin Dep. at 103:6-11; 105:18-106:19.)

7  Accordingly, Mr. Martin recommended that Defendants should expand referral criteria for

8  use of force incidents beyond death, deadly force, and great/serious bodily injury, to

9  include:  unexplained injuries, impact strikes to lethal target areas regardless of seriousness

10  of injury, incomplete/conflicting reports, and application of non-lethal weaponry that

11  exceed what would normally be expected for the type of force reported.  (Martin

12  Recommendations at DEXP 105138; *see also* Martin Dep. at 278:3-279:11 ("Certain kinds

13  of weaponry, when they are employed, absent an obvious reason for them to be deployed,

14  should always be [investigated].  In other words, if you use an MK-46 inside of a cell, and

15  it's not real obvious as to why you did, then it needs to be investigated.  Or if you used,

16  you know, a combination of MK-9, grenades, a Z505 . . .and a T-16.").)  Mr. Martin

17  further specified that any referred incident should be subject to "an operating presumption

18  that it will be investigated."  (*Id.*)

19         Plaintiffs' expert "wholeheartedly" endorsed Mr. Martin's recommendation.  (Vail

20  Rpt. ¶ 74.)  However, neither Mr. Martin nor Plaintiffs are aware of any proposal by

21  _____

22  [18] Although the California OIG purported to conduct an in-depth review of the use of force

23  in CDCR in 2011 and 2012, none of the reports on use of force issued by OIG contains any
analysis of whether the force used by correctional officers was reasonable (i.e. whether it

24  was necessary or excessive).  (*See* Vail Suppl. Decl. ¶ 43.)  Assessing reasonableness of
the use of force should be the central purpose and question of a use of force review, but

25  OIG apparently did not conduct this inquiry.  Rather, OIG focused on whether the force

26  was "effective."  Clearly, OIG's review was not designed to analyze the legality and
constitutionality of CDCR's use of force policies, procedures, and practices, and, therefore,

27  is not an appropriate substitute for a meaningful external investigation process.  (*Id.*)

28

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   Defendants to expand the criteria by which they refer use of force incidents for

2   investigation.  (Martin Dep. at 107:25-108:15; Vail Rpt. ¶ 75.)  Rather, the latest OIG

3   Report states that the OIG actually recommended that CDCR investigate *fewer* incidents,

4   and CDCR appears leaning toward implementing this recommendation.  (Jan. 2013 OIG

5   2012 Annual Rpt. at 8-9, available at:

6   http://www.oig.ca.gov/media/reports/OIG/annual/2012%20OIG%20Annual%20Report.pdf

7   ("[W]e have temporarily discontinued our UOF reporting to give the department time to

8   implement a new use-of-force process.  The new process was designed by CDCR

9   following a recommendation by the OIG to streamline the use-of-force incidents allowing

10  greater scrutiny of the more serious incidents.").)

### 5.   No Meaningful Discipline Is Imposed on Staff for Misusing Force Against Coleman Class Members

13      A key component of effective use of force policies and procedures is discipline for

14  staff who misuse force.  However, Defendants' own expert "was not able to document a

15  fully realized imposition of a disciplinary sanction for [any] excessive use of force" that he

16  reviewed.  (Martin Dep. 95:18-96:1.)  Nor did he find any investigation sustaining use of

17  force violations in his review of CDCR uses of force system-wide.  (Martin Dep. 101:10-

18  13.)  Plaintiffs' expert Vail agreed that this was a serious deficiency:

> That Mr. Martin, in more than a year of work with full access
> to CDCR documents and officials, was unable to locate even
> one example of an officer disciplined for excessive UOF is
> powerful evidence that the UOF review and employee
> discipline system is badly broken and ineffective.  The absence
> of a transparent and effective review and employee discipline
> system is, in and of itself, a message to line staff that they will
> likely suffer no consequences for the unnecessary and
> excessive use of force against inmate patients.

25  (Vail Rpt. ¶ 72.)

### C.   This Court Should Issue Specific Remedial Orders Directing Defendants to Cure Their Dangerous and Unconstitutional Use of Force Practices

28      Based on the longstanding history and continuing evidence of abuse of force against

40

*Coleman* class members, as well as Defendants' refusal to acknowledge ongoing constitutional violations that must be addressed, this Court should issue specific remedial orders directing Defendants to cure their dangerous and unconstitutional use of force practices with respect to mentally ill prisoners.[19]

**1.    The Court Should Order Defendants to Revise Current Policies and Procedures to Minimize the Potential for Excessive Use of Force Events**

Experts on both sides of this litigation agree that CDCR's current policies and practices governing the use of force are problematic, and result in unnecessary and excessive uses of force against class members, especially with respect to use of the expandable baton and OC spray. Defendants must revise their use of force policies to minimize the potential for excessive use of force events associated with these weapons. (*See* Vail Suppl. Decl. at ¶¶ 6, 41; Martin Recommendations at DEXP 105138-105139.) Defendants must also revise their procedures to enforce the restriction of "immediate" uses of force to those enumerated in their policy: "inmate behavior that constitutes an imminent threat to institution/facility security or the safety of persons." DOM, Ch. 5, Art. 2 § 51020.4. These policy and procedure changes must be paired with enumerated restrictions and guidelines for using force against prisoners with mental illness.

Because of evidence of specific abuse and harm, the Court should:

- Prohibit Defendants from using OC spray and expandable batons against inmates with mental illness in housing units, holding cages, mental health crisis bed units, EOP units, and inpatient hospitalization units, except when

---

[19] The need for orders from this Court to correct these violations was explained by Defendants' own expert, Mr. Martin. Mr. Martin described his concerns about problems with the large amount of force CDCR routinely uses on inmates and the unnecessary risk of harm it creates, stating, "[t]his has not been secret, what I've identified here. This has been out there for everybody to see. But people count beans. The Special Master just counts events. They haven't looked at actual applications." Martin Dep. at 81:23-88:4. In fact, Martin expressed surprise that the Special Master, the Court, and Defendants had not already addressed these problems: "I'm just wondering, you know, where's everybody else been in this thing?" *Id.*

circumstances call for extreme measures to protect staff or inmates.[20]

- Prohibit Defendants from using corporeal punishment on class members who commit minor violations which do not present an imminent threat to institution security or the safety of persons. Examples include, but are not limited to, inmates who fail to give up a food tray, fail to close the food slot in a cell door, or who kick a cell door. (*See* Vail Suppl. Decl. ¶¶ 6, 41.)

- Prohibit Defendants from administering OC spray through the use of crowd-size canisters or grenades, and cease providing OC spray and expandable batons to all line officers as part of routine weapons issue. (*See* Martin Recommendations at DEXP 105138 ("MK-9 OC canisters are standard issue to line-level CO's. The MK-9 is classified as a 'crowd management' delivery system.'").) Any OC canisters or expandable batons that are issued should be based on an officer's assignment to a particular post, and as determined by the security needs of a particular unit.

  - OC canisters should have a wand attachment, and should be weighed before and after each use in order to monitor and regulate the amount of chemical spray being used against inmates. Defendants must promulgate clear guidelines regarding the amount of OC spray to be dispensed, the distance from which it should be dispensed, and required waiting periods between subsequent applications. (*See* Vail Suppl. Decl. ¶ 41; Martin Recommendations at DEXP 105139.)

  - Expandable batons should be restricted to defensive (rather than offensive) use, and limited to use in situations involving the safety of the officer or in which there is risk of death or serious bodily harm to staff or another inmate. (*See* Vail Suppl. Decl. ¶ 41; Martin Recommendations at DEXP 1015138.)

- Require implementation of a policy that enumerates specific reasons for using a spit mask on a prisoner subsequent to the application of OC spray, and requires strict reporting and investigation any time a spit mask is so used.

- Order Defendants to supply every security station with a handheld camera which is to be used whenever possible during "immediate" or emergency uses of force, and any subsequent uses of force. Specific officers in each shift should be designated to be responsible for video recording uses of force

---

[20] This proposed restriction is similar to Defendants' current restriction on using less lethal munitions against inmates with mental illness in specified units. *See* DOM § 51020.14.1; (*see also* Vail Suppl. Decl. ¶ 41.)

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

occurring on the unit.

**2.      The Court Should Order Defendants to Provide Training to Custody Officers and Mental Health Clinicians Related to Use of Force and Mental Illness**

The Court should order Defendants to provide training for all custody staff regarding changes to policies and procedures concerning use of force outlined above, and education about mental illness generally, including identification of symptoms of mental illness and communication with persons in mental health crisis.  (*See* Vail Suppl. Decl. ¶ 42.)  The Court should also order Defendants to provide training for all custody and mental health staff on de-escalation methods for resolving situations without use of force.  (*Id.*) The Court should further require Defendants to develop criteria for training and assigning custody staff to mental health treatment units in order to ensure that they have the appropriate capacity to supervise prisoners with serious mental illness.[21]  (*See* Vail Rpt. ¶ 146.)

**3.      The Court Should Order Defendants to Revise Policies and Procedures to Ensure Accountability Through a Meaningful Investigative Process**

Plaintiffs' and Defendants' experts agree that Defendants' current use of force investigation policy too narrowly limits uses of force that trigger mandatory investigation to events that result in death, deadly force, and great or serious bodily injury.  The Court should order Defendants to expand mandatory investigations for use of force events to include the categories recommended by Vail and Martin:  those uses of force which result in 1) unexplained injuries; 2) impact strikes to lethal target areas (head, eyes, throat, spine or groin) regardless of the seriousness of the injury; 3) incomplete or conflicting reports; 4) application of non-lethal weaponry that exceeds what would normally be expected for

---

[21] Plaintiffs' expert Vail described a successful program in which line officers for mental health units "were replaced by a new job category, correctional mental health counselors, who were part of the treatment team."  (Vail Rpt. ¶ 116.)  This may be an effective model for Defendants to use in some of the inpatient, MHCB, and/or EOP housing units.

1  the type of force reported; or 5) allegations by inmates of excessive use of force.  (Martin

2  Recommendations at DEXP 105138; Vail Rpt. ¶ 74; Vail Suppl. Decl. ¶ 39.)

3      To ensure actual accountability for misuse of force, the Court should also require

4  Defendants to revise their investigation policies and procedures to allow for independent

5  and meaningful review.  (*See* Vail Suppl. Decl. ¶¶ 40, 43.)  Defendants should create a unit

6  of trained and dedicated investigators, outside the institutional chain of command, to

7  review uses of force, which would provide true accountability for excessive force

8  practices.[22]  (*Id.*)  This investigative unit should report their findings, including whether

9  uses of force were found to be unreasonable or excessive, and recommend disciplinary

10  measures where appropriate, to CDCR headquarters and, for those uses of force involving

11  *Coleman* class members, to the Special Master.

**4.      The Court Should Order the Special Master to Review Use of Force Against Mentally Ill Inmates and to Help Defendants Develop Meaningful Tracking and Quality Assurance Systems To Monitor Use of Force Against *Coleman* Class Members**

15      As this Court and the Special Master have recognized over this lengthy remedial

16  process, development of tracking and quality assurance mechanisms are key components

17  for remediating systemic constitutional violations.  The Court should order the Special

18  Master to undertake a comprehensive review of use of force against MHSDS inmates, and

19  authorize the Special Master, at his discretion, to hire one or more experts on custodial use

20  of force in the context of inmates with mental illness.  (*See* Vail Suppl. Decl. at ¶ 43.)  This

21  expert and the Special Master should work with Defendants and Plaintiffs to develop a

22  plan to remedy the systemic and ongoing use of force abuses in this case, including

_____

[22] The recommendation for review of use of force incidents by an autonomous unit is consistent with recommended practices for police forces throughout the country, which use separate Internal Affairs units that report directly to the agency head or deputy.  (*See*, *e.g.*, *Standards and Guidelines for Internal Affairs:  Recommendations from a Community of Practice*, Community Oriented Policing Services, U.S. Dep't. of Justice at 27, available at: http://ric-zai-inc.com/Publications/cops-p164-pub.pdf.)

1  implementation of meaningful tracking and quality assurance systems.

2  **VI.   DEFENDANTS' DISCIPLINARY POLICIES, PROCEDURES, AND PRACTICES VIOLATE CLASS MEMBERS' RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS AND THE ADA AND CAUSE HARM TO PRISONERS WITH MENTAL ILLNESS**

3

4

5  Defendants' disciplinary practices violate the Eighth Amendment rights of class

6  members by punishing prisoners for behavior resulting from mental illness, including

7  subjecting them to lengthy punitive placements in severe and isolated segregated housing

8  environments.  Defendants' disciplinary practices also violate the Fourteenth Amendment

9  and the ADA because they disproportionately punish and segregate prisoners with mental

10 illness, based on symptoms of mental illness, and because Defendants' cause class

11 members to be housed in more restrictive settings than needed for treatment.  *See*

12 *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999); 42 U.S.C. § 12132; 42 U.S.C.

13 § 12101; 28 C.F.R. § 35.130(d); *Biselli v. Cty. Of Ventura*, 2012 U.S. Dist. LEXIS 79326,

14 *44-45 (C.D. Cal. June 4, 2012) (rejecting jail's motion for summary judgment on ADA

15 claim where plaintiff was placed in the administrative segregation unit based on conduct

16 specifically linked to mental illness, without input from the mental health staff at the jail,

17 and despite indications that segregation was adverse to mental health condition).

18 For years, Defendants have engaged in half-hearted (at best) and inadequate

19 revisions of their disciplinary process with respect to mentally ill inmates.  While it was

20 appropriate for the Court to give deference to Defendants to determine what policy and

21 practice changes should be made remediate their constitutional violations with respect to

22 discipline of *Coleman* class members, nearly twenty years is long enough.  *Compare Lewis*

23 *v. Casey*, 518 U.S. 343, 361-63 (1996) *with Plata v. Brown*, 131 S. Ct. 1910, 1923 (2011).

24 Rather than having made meaningful progress, Defendants continue to subject *Coleman*

25 class members to punitive disciplinary measures for behavior related to mental illness and

26 to impose punishments that further exacerbate mental illness.  Accordingly, it is

27 appropriate for this Court to issue further and more specific remedial orders to finally

28 rectify Defendants' continued violation of class members' rights with respect to

1  disciplinary practices.

2  **A.    Defendants' Punish *Coleman* Class Members for Mental Illness and Fail**
   **to Appropriately Mitigate Disciplinary Sanctions**

3

4       Defendants' continued failure to address constitutional violations perpetuated

5  through their disciplinary process is rooted in a refusal to meaningfully incorporate an

6  awareness of mental illness into their approach and to change their basic orientation from

7  exclusively punitive.  The alternative would be an approach that acknowledges the role

8  mental illness plays in behavior, as well as the role actual treatment (alone or in

9  combination with discipline) can have in addressing such behavior.  Plaintiffs' expert Vail

10 concluded that the marginalized role of mental health staff "is a fundamental flaw in

11 CDCR's approach to managing the mentally ill."  (Vail Rpt. ¶ 113.)

12      The factors contributing to the failure of the current RVR process to remediate the

13 constitution violation are the same factors identified by this Court and the Special Master

14 over the years:

15  • Failure to provide adequate training to custody staff regarding mental illness,
      resulting in punitive responses to persons with mental illness: "Custody staff
16    in the living units where the mentally ill inmates are housed, especially in the
      EOP units, are not sufficiently trained to work with the mentally ill on a day
17    to day basis."  (Vail Rpt. ¶ 127); "Custody staff need to be trained to
18    understand that some mentally ill inmate patients will not be able to conform
      quickly to their orders. … Inmates wind up being disciplined and react
19    accordingly — some with aggression and some who choose to withdraw to
20    their cells rather than face more confrontation.  Neither option works to
      improve the mental health of inmate patients."  (*Id.*)
21

22  • Failure to appropriately refer inmates charged with rule violations for mental
      health assessment:  Under the current system, the officer who writes up a
23    CCCMS inmate for RVR decides whether the inmate should be referred for
      mental health assessment, without any input from a clinician.  Consistent
24    with the Special Master's observations in his Seventeenth Monitoring
25    Report, Plaintiffs' expert Vail found that CCCMS inmates are still almost
      never referred for mental health assessments when the referral is
26    discretionary, "likely because a custody officer does not have sufficient
      training or skill to evaluate the behavior of mentally ill inmates."  (Vail Rpt.
27    ¶ 80; *see also* 17B at 92-93.)  Consistent with the Special Master's prior
28    observations, Plaintiffs' expert further opined that, "[g]iven the very fine line

46

between an inmate who is categorized as EOP and one who is not, it is likely additional inmates would benefit" from a referral, and in order to have sufficient information to make this judgment, mental health staff should be involved.  (Vail Suppl. Decl. ¶ 50.)

- <u>Lack of meaningful or effective mental health input into the disciplinary process</u>:  The forms used by clinicians for mental health assessment and by hearing officers for reporting the outcome of disciplinary procedures are not useful tools for meaningful information sharing between clinical and custody staff.  (Vail Suppl. Decl. ¶ 54.)  They are unclear, can largely be completed via check boxes and rote language, and do not provide enough information to communicate between mental health and custody or to track results.  (Vail Rpt. ¶¶ 82-83; Martin Recommendations at DEXP 105141-105142.)  Moreover, because there is no communication between mental health staff and custody staff about the disciplinary process or outcomes, clinicians appear not to put much stock in the mental health assessment process.  (*See, e.g.,* Vail Suppl. Decl. ¶ 51 (clinicians have no idea if their recommendations in mental health assessments are ever paid attention to or valued or are simply "lost in the ether").)

- <u>Failure of the hearing officer to properly consider mental illness in determining culpability, and, subsequently, in determining mitigation</u>.  Defendants' expert Martin did not recall finding any instances where the mental health status of an inmate led to a finding of not guilty.  (Martin Dep. at 175:1-19.)  Hearing officers routinely use formulaic language "I took the MHA into consideration" without any further explanation.  (Vail Rpt. ¶ 85.)  For this reason, Defendants' expert "believed after doing [his] review that there should be a requirement or a strong recommendation that they articulate specifically how they [hearing officers] incorporated the clinician's recommendation of including that consideration in the disposition."  (Martin Dep. 177:8-12.)

Further, there are additional problems with the disciplinary system which prevent remediation of constitutional and federal law violations, including:

- <u>Failure to provide appropriate accommodation in the RVR Hearing Process</u>:  Although Defendants' policy requires an assigned staff assistant for disciplinary hearings as an accommodation for prisoners with serious mental illness, the staff assistant does not actually serve the function that was envisioned.  This results from numerous problems with the assignment of staff assistants, including assignment of custody officers who are subordinates in the same chain of command or unit as the hearing officer, assignment of custody officers who do not understand mental illness and assignment of custody officers who were involved in the incident giving rise

to the RVR or complete the investigation of the incident.  (*See* Vail Rpt. ¶ 93; Rifkin Decl. ¶  6 & Ex. 5.)  Plaintiffs' expert concluded that "the current process for selecting staff assistants renders them essentially meaningless." (Vail Rpt. ¶ 93.)  As a result, inmates with mental illness are not able to participate meaningfully in the disciplinary hearing.

- <u>Punishment of prisoners with mental illness for behavior related to mental illness even after mitigation is determined to be warranted</u>:  Even when a hearing officer determines that mitigation is warranted based on a determination that mental illness contributed to or caused the offending behavior, inmates are referred to classification committee for possible SHU terms and to the District Attorney for possible local criminal charges. Plaintiffs reviewed multiple examples of these referrals in the documents provided by Defendants.  (Rifkin Decl. ¶¶ 5-6, 12 & Exs. 4-15, 11; *see also* Kahn Decl. ¶ 18 & Ex. 8 (5/19/2008 Kahn Ltr.).

- <u>Failure of Defendants to create a meaningful tracking system</u>:  Defendants have repeatedly chosen not to implement a tracking system that would allow for meaningful analysis of the outcomes of the mental health assessment process.  In 2002, the Special Master wrote to Defendants:

  > Evaluation of the impact of the current version of the mental health assessment process has been severely handicapped by the absence of a requirement that institutions track the outcome of disciplinary cases involving assessment.  Credible and comparable data from 33 institutions on the revised assessment process requires the department to develop a uniform procedure and instrument for its collection in each facility before institution use of the revised process begins. . . . In the absence of such data, the institutions, the department and the monitor are all incapable of assessing the impact and utility of the process.

(Rifkin Decl. ¶ 13 & Ex. 12 (2/7/2002 Special Master Ltr.).)  Defendants have declined to rectify their failure to gather appropriate data.  The only data point Defendants track in the Mental Health Assessment process is whether a mental health assessment was completed, not what it recommended, whether it was considered, or whether it was followed or disregarded.  (*See* Vail Decl.  ¶ 89, *id.* at ¶ 79 (very little aggregate data available to track the outcomes of RVRs issued to mentally ill inmates, which is serious limitation in being able to judge efficacy of any accommodations for mentally ill inmates); Martin Dep. at 193:16-194:17 (no tracking of what happens with mental health assessments in RVR

48

1   process); *id.* at 192:11-22 (while CDCR tracks whether MH assessment was done, do not

2   drill down to how it was applied).)

3        Overall, Defendants' disciplinary practices reflect continued systemic dominance of

4   custody over clinical determination, and the same critical failure in the relations between

5   mental health staff and custody staff at the institutional level that the Special Master

6   identified in 1999.  Both custody and clinical staff need to understand how mental illness

7   contributes to or causes behavior, what custodial ramifications that may have, and how

8   custodial measures may further affect mental illness and potentially make behavior worse

9   rather than better.  For example, Defendants' expert Mr. Martin discussed the difference

10  between an approach to accommodating a disability that considers only "mitigation"

11  versus one that also allows for "tailoring":

12          I think it's important, as a policy matter would be, if I'm a
        warden or a manager, to be given guidance on both of these.

13          The latter, of tailoring so as not to complicate or aggravate the
        condition, is extremely important, and I want that—I'm

14          warden, I say, I want that done.  Any time a clinician says, if
        you take away his TV he's going to decompensate, you better

15          not be taking away his TV.  Take away something else.

16          Mitigation, on the other hand, I think is an appropriate
        discretionary decision to the hearing officer you know.  You

17          got the clinician's input, but I'm not going to tell him he has to
        mitigate.  I'm going to require him to seriously consider

18          mitigating.  So there's two kind of functions there that I would

19          want to manage fairly carefully.

20

21  (Martin Dep. at 177:25-179:1.)  Such adjustments are not currently possible in the CDCR

22  system, where "[t]he dominance of custody staff in the RVR process is built into its very

23  structure."  (Vail Rpt. ¶ 92.)

24       Defendants' long-standing failure and refusal to institute an appropriate disciplinary

25  process to remediate their constitutional violations necessitates further and specific relief

26  from this Court.

27

28

**B.** **This Court Should Issue Specific Remedial Orders Directing Defendants to Cure Their Unfair and Harmful Disciplinary Practices With Regard to *Coleman* Class Members**

**1.** **The Court Should Order Defendants to Create a Mental Health Diversion Process Prior to Issuance of a Rule Violation Report**

This Court should order Defendants to revise their policies and procedures to provide for the possibility of a mental health diversion or mitigation prior to the issuance of an RVR.  This is an accommodation that is warranted based on class members' mental health disability and can significantly prevent the vast over-disciplining of class members that presently occurs.  (*See* Rifkin Decl. ¶ 13 & Ex. 12 (2/7/2002 Special Master Ltr.).)  The disciplinary process should include both custodial and clinical input, and should be paired with training, including training about the ways in which mental illness may affect inmates' behavior and ability to comply with rules and regulations.  (*See* Vail Suppl. Dec. ¶ 56.)  As with the requested relief regarding use of force, *supra*, Defendants should also develop criteria for training and assigning custody staff to mental health treatment units in order to ensure that they have the appropriate capacity to supervise prisoners with serious mental illness.

**2.** **The Court Should Order Defendants to Develop Formal Procedures to Create Communication Between Custody and Mental Health Staff Regarding the Disciplinary Process**

The Court should order Defendants to institute formal procedures to generate productive communication between custody and mental health staff.   Defendants' own expert concluded this key element of disciplinary practice was lacking throughout most of the CDCR system with the exception of RJD.[23]  (Martin Recommendations at DEXP

---

[23] As previously noted, in 2007, Defendants proposed a pilot program to reform the disciplinary process at RJD.  Although this program allegedly began in February 2008, Plaintiffs never received further information, and it appears that Defendants deliberately chose not to expand these changes to other institutions.  However, Mr. Martin's observations about some of the successes of the RJD program offer hope that Defendants may be able to successfully enact change if ordered to do so.  Without further investigation (footnote continued)

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  105141; *see also* Vail Suppl. Decl. ¶ 56.)

2        During party discussions in 2002, the Special Master noted that Defendants had

3  originally included a procedure for the hearing officer to confer with a clinician on the

4  appropriateness of a disposition whenever an assessment indicated that the inmate's

5  behavior was influenced by mental illness:

> 6  From its earliest, appearance, I thought the deleted provision
> was a vehicle cleverly calculated to promote understanding
> 7  between clinicians and those responsible for institutional
> discipline about the difficult and delicate relationship between
> 8  mental illness and behavior…I can think of no better way than
> this compulsory dialogue to enhance understanding between
> 9  mental health and custody staffs at the institutional level on
> this issue.  I lament its excision and urge its reinstatement.
> 10

11  (Rifkin Decl. ¶ 3 & Ex. 12 (2/7/2002 Special Master Ltr.).)  Unfortunately, the lack of

12  engagement between custody and mental health staff remains a primary barrier to

13  remediating violations in this area.  (*See* Vail Rpt. ¶ 103 ("mentally ill patients in the

14  CDCR are receiving a disproportionate number of RVRs and are being subjected to

15  disproportionate UOF because of the lack of integration of custody and mental health

16  staff."); *id.* ¶ 113("Mental health staff are treated as visitors to the units, not as co-workers

17  who belong and share the workload of managing inmate behavior."; Martin Dep. 198:7-12

18  (no systemic mechanism for communicating between custody and clinical mental health

19  staff about results of RVR process).)

20

21

22

_____

23

24  by the Special Master or Plaintiffs, or results from the pilot that Defendants allegedly
implemented there, but did not report on for more than three years, it is unclear the extent

25  to which this assessment is accurate.  (*See* Twenty-Third Round Monitoring Rpt. of the
Special Master, Dkt. No. 4124, at 22-26.)  If Defendants propose to create a disciplinary

26  process based on the local operating procedures at RJD, the Court should order Defendants
to provide the Special Master and Plaintiffs' counsel access to inspect the program at RJD

27  for the purposes of determining whether it could be an appropriate model for the system.

28

1
2
3
4

     **3.**     **The Court Should Order Defendants to Revise Their Disciplinary Policies, Procedures, and Forms to Meaningfully Incorporate Mental Health Input, Stop Referring Class Members to Classification and/or the District Attorney for Behavior Arising from Mental Illness, and Allow for Tracking and Quality Assurance**

5           Defendants must significantly revise and restructure their system for administering

6    discipline, including their policies, training, forms, staff assistant assignment, and

7    classification/DA referral processes.  (Vail Suppl. Decl. ¶¶ 55-58, 62.)  Defendants must

8    also implement meaningful tracking and quality assurance systems that monitor the quality

9    of the mental health assessments and the degree to which mental health information is

10   considered by hearing officers during the disciplinary process, both in terms of

11   adjudicating guilt and in terms of mitigation of punishment.  (Vail Suppl. Dec. ¶¶ 59.)

12          Experts for both sides agree that the current mental health assessment form is

13   ambiguous and unclear, which leads clinicians to fill it with inconsistent categories of

14   information that vary widely in their utility for hearing officers.  (*See* Vail Rpt. ¶¶ 81-84;

15   Martin Recommendations at DEXP 105141-105142.)  The Court should order Defendants

16   to revise their forms for the disciplinary process in order to ensure meaningful mental

17   health input and consideration.  For example, as Defendants' expert recommended, CDCR

18   should revise the form to eliminate "yes/no" check boxes to answer questions as to

19   whether mental illness played a role in the underlying violation, and, instead, require

20   narrative explanations in layman's terms of any mental health factors involved.  (*See* Vail

21   Suppl. Decl. at ¶ 57; Martin Recommendations at DEXP 105141-105141)  Similarly,

22   Defendants' expert also recommended that hearing officers be required to affirmatively

23   state whether and how they modified and/or mitigated their findings based on the

24   information contained in the mental health assessment.

25          The Court should also order CDCR to develop a new protocol for the provision of a

26   staff assistant to ensure that this is actually a meaningful and effective accommodation.

27   This protocol should include a prohibition of the assignment of a staff assistant who is in a

28   direct reporting line to the hearing officer or who was involved in or who investigated the

1   incident giving rise to the RVR.  The category of staff assistant should also be expanded to

2   include mental health staff.  (*See* Vail Suppl. Decl. at ¶ 58; Martin Dep. at 181:8-12

3   (recognizing the absence of mental health staff at RVR proceedings); *id*. at 241:8-24

4   (noting that staff assistants lack "separation" from their superiors.)

5        The Court should also order the Special Master tp investigate and make

6   recommendations to the Court concerning Defendants' practice of referring inmates to

7   classification for SHU consideration and to the District Attorney for potential criminal

8   charges, even when the hearing officer has determined that mental illness contributed to or

9   caused the offending behavior.  (*See* Vail Suppl. Decl. ¶ 62.)

10       The Special Master recommended in 2002 that Defendants develop a uniform

11  procedure and instrument to track the outcome of disciplinary cases involving MHSDS

12  inmates and mental health assessments.  As Plaintiffs' and Defendants' experts observed,

13  Defendants have still failed to institute a tracking procedure.  Similar to the requested

14  order for use of force, *supra*, the Court should authorize the Special Master, at his

15  discretion, to hire an expert on discipline of inmates with mental illness.  This expert and

16  the Special Master should work with Defendants and Plaintiffs to develop a meaningful

17  tracking and quality assurance systems regarding consideration of mental illness in the

18  disciplinary process.  (*See* Vail Suppl. Decl. at ¶ 59.)

19              **4.    The Court Should Prohibit Defendants From Using the
                       Dangerous and Abusive "Management Status" Instead of Formal**
20                     **Disciplinary Procedures**

21       During Plaintiffs' inspections during termination discovery, Plaintiffs' expert

22  observed Defendants' widespread use of a disciplinary procedure called "Management

23  Status."  This appears to be "an informal disciplinary procedure where the inmate can be

24  summarily disciplined by being removed from his cell, stripped to his underwear and have

25  all his property removed from his possession."  (Vail Rpt. ¶ 96.)  Plaintiffs' expert opined

26  that "[s]uch a serious limitation on the conditions of confinement as management status

27  should be highly regulated and monitored," and, if not rationally related to the behavior

28  being demonstrated by the inmate, the practice is "unnecessary, dehumanizing, degrading,

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   and likely to incite the inmate." (*Id.* ¶ 97.)  Similarly, Defendants' expert opined that

2   "[A]ny time you place somebody in a situation where you've got this deprivation of

3   essential elements—you know, health, hygiene, clothing, whatever—that you'd better

4   doggone sure have rationale that is documented and transparent." (Martin Dep. at 119:16-

5   20.)

6        Yet, Management Status is imposed "outside the normal RVR process and without

7   an obligation on the part of the staff to draw a clear nexus between the behavior of the

8   inmate and the limitations on conditions of confinement." (Vail Rpt. ¶ 100.)  The Warden

9   at Corcoran told Plaintiffs' expert that Management Status requires only the approval of

10  the Captain, "after unit staff have placed the inmate in the holding cell, and can last up to

11  72 hours." (*Id.* ¶ 98.)  At LAC, the Local Operating Procedure permits the imposition of

12  Management Status with the approval of a unit sergeant. (*Id.* ¶ 100.)  Plaintiffs' expert

13  viewed a use of force video in which an inmate in a cage on Management Status at

14  Corcoran "was subjected to OC spray while in the holding cell as the officers held up their

15  shields and dispensed a large volume of pepper spray into the cage until the inmate

16  capitulated." (*Id.* ¶ 96.)  This ad hoc procedure developed by Defendants in lieu of

17  following their policies and procedures, and without any due process or accountability is

18  inexcusable, degrading, and must be ended immediately.

19  **VII.   THE PROPOSED ORDERS SATISFY THE REQUIREMENTS OF THE
20          PLRA**

21       As extensively chronicled in the Background section of this brief, Defendants have

22  a long history of intransigence and failure with respect to correcting use of force and

23  disciplinary violations of the constitutional rights of *Coleman* class members.  Despite this

24  Court's and the Special Master's efforts to induce Defendants to implement policies,

25  procedures, and practices that would end these abuses, Defendants continue to subject

26  *Coleman* class members to unreasonable and dehumanizing uses of force and punitive

27  measures.  Additional and more targeted orders from this Court are necessary to protect the

28  class from Defendants' abuse of force and inappropriate punishment because of, or without

due consideration of, their mental illness.  The orders Plaintiffs propose in these areas are narrowly tailored to the constitutionally cognizable harms to class members recognized by the Special Master, Plaintiffs' expert, and Defendants' own expert.  These orders extend no further than necessary to correct the continuing constitutional violations, and are the least intrusive means necessary at this phase in the remedial process to correct the violations. *See* 18 U.S.C. § 3626(a)(1).

## CONCLUSION

Defendants' use of force and disciplinary practices subject *Coleman* class members to grave physical and psychological harm on a routine basis.  It is reprehensible that Defendants continue to utilize such practices, almost two decades after this Court held that they violate federal law.  Allowing the abuse to continue is incompatible with the concept of human dignity and has no place in civilized society.  *See Brown*, 131 S. Ct. 1910, 1928 (2011).

DATED:  May 29, 2013                    Respectfully submitted,

                                        ROSEN BIEN GALVAN & GRUNFELD LLP


                                        By:  */s/ Lori E. Rifkin*
                                             Lori E. Rifkin

                                        Attorneys for Plaintiffs

NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE
RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES