1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  PRISON LAW OFFICE
   1917 Fifth Street
3  Berkeley, California  94710-1916
   Telephone:    (510) 280-2621
4

5

6

7

8  JON MICHAELSON – 083815
   JEFFREY L. BORNSTEIN – 099358
9  LINDA L. USOZ – 133749
   MEGAN CESARE-EASTMAN – 253845
   K&L GATES LLP
10 4 Embarcadero Center, Suite 1200
   San Francisco, California  94111-5994
11 Telephone:    (415) 882-8200

12 Attorneys for Plaintiffs

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
LISA ELLS – 243657
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN
GALVAN & GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>        Plaintiffs,<br><br>   v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>        Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**EXPERT DECLARATION OF ELDON VAIL IN SUPPORT OF MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES** |

[752643-6]

1

# TABLE OF CONTENTS

2
**Page**

3    I.    ASSIGNMENT .................................................................................... 1

4    II.   EXPERT OPINIONS ........................................................................... 1

5          A.    Summary of Expert Opinions .................................................... 1

6          B.    Foundation for Expert Opinion ................................................. 4

7          C.    Unreasonable Use of Force Against MHSDS Inmates .................... 4

8          D.    Expert Opinions Regarding Necessary Affirmative Relief to Limit
                 Unreasonable Use of Force Against MHSDS Inmates ................... 14

9

10         E.    The Disciplinary Process ........................................................ 17

           F.    Expert Opinions Regarding Necessary Affirmative Relief to Rectify
11               the Disciplinary Process ......................................................... 20

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT DECLARATION OF ELDON VAIL

I, Eldon Vail, declare:

1.    I have personal knowledge of the matters set forth herein, and if called as a witness, I could competently so testify.

# I.    ASSIGNMENT

2.    I have been retained by Plaintiffs to evaluate and offer my opinion of the Mental Health Services Delivery System ("MHSDS") in the California Department of Corrections and Rehabilitation (CDCR) pursuant to the requirements of *Coleman v. Brown*.

3.    The particular focus of my review has been on the internal discipline process ("RVR" process) and use of force ("UOF") policy and practice with respect to mentally ill inmates within the CDCR.  I have also been asked to offer opinions on the role and influence of custody staff in the care and treatment of the mentally ill within the CDCR.

4.    My work on this matter is ongoing.  This report summarizes my current opinions given the available information I have reviewed to date.  If additional information is produced, I may modify or supplement my analyses and opinions accordingly.

# II.    EXPERT OPINIONS

## A.    Summary of Expert Opinions

5.    I submitted a Declaration in Opposition to Defendants' Motion to Terminate Prospective Relief ("Termination Declaration," Docket No. 4385). In the Termination Declaration, from the materials made available to me, on the basis of my interviews and inspections, my expertise and experience, I found that:

- The CDCR, as a matter of practice and sometimes by policy, engages in unnecessary and excessive use of force with mentally ill inmate patients.

- The CDCR's RVR process is seriously compromised for mentally ill inmate patients, and does not systematically account for their mental illness when adjudicating prison rule violations.

- The CDCR allows custody staff to dominate and interfere with mental health treatment.

6.      Based upon my review of the documents outlined in the Termination Decl., as well as my tours of numerous CDCR prisons and the interviews I conducted, I find significant evidence that current procedures and regulations allow excessive, unreasonable and unnecessary use of force to be used against MHSDS inmates.  With regard to CDCR's current use of force practices and procedures pertaining to MHSDS inmates, based upon the materials made available to me, my interviews and inspections, and my expertise and experience, I further opine that:[1]

- The definition of use of force events that give rise to mandatory investigation should be expanded, and CDCR should use specially trained and dedicated investigators to review these events.

- In practice, CDCR overuses "immediate" or emergency force when there is no imminent threat to institution security or the safety of persons.  CDCR should change its procedures and practices so that "controlled" force is used when appropriate and there will be more emphasis placed on intervention and de-escalation before any force is used.  The requirement of making a video record in a "controlled" use of force will make oversight and review more effective.  There should be additional reporting requirements to increase the transparency of use of force investigations.

- The UOF policy should be revised to minimize the potential for excessive use of force events by providing training and guidance on the proper use of OC spray and the expandable baton. The policy should also be amended to eliminate the ability of custody officers to inflict immediate corporeal punishment with OC on inmates who commit minor violations such as failing to give up a food tray or close the food slot in the cell door.

- CDCR should provide training and guidance to all custody staff regarding UOF de-escalation methods when confronted with a potential UOF situation.

- The Special Master should comprehensively review use of force against MHSDS inmates, including the ability to hire his own use of force expert.

_____

[1] My specific opinions and recommendations regarding use of force are spelled out in greater detail in paragraphs 38 to 43 of this declaration.

2

7.    With regard to current disciplinary practices and procedures pertaining to MHSDS inmates, based upon the materials made available to me, my interviews and inspections, and my expertise and experience, I further opine that[2]:

- The role of mental health staff in the RVR process should be increased by providing additional training, allowing trained clinicians to be part of the determination of guilt and the assignment of sanctions and to play the role of staff assistants, and establishing protocols for hearing officers and clinicians to meet periodically to discuss and resolve issues related to the RVR Mental Health Assessment (MHA).

- The RVR hearing process should be restructured so that hearing officers are independent of the immediate custody chain of command for a particular inmate.

- Hearing officers should be required to affirmatively state whether they modified or mitigated the penalties based on the MHA to include how they do so and if not, why.

- CDCR should track outcome data to determine whether MHA information is being utilized or disregarded, and should require the hearing officer to affirmatively state whether he utilized or disregarded the information in the MHA and the manner he/she utilized the information.

- The practice and regulation of "management status" should be defined and limited to true emergency situations. Any immediate limitation of conditions of confinement must be rationally and clearly related to an actual and serious threat to inmate or staff safety and be subject to prompt warden and CDCR oversight.

- Each institution should be required to have a single RVR Coordinator for the entire prison.

- The Special Master should review current CDCR policies concerning classification, and how it impacts MHSDS inmates. Whether inmates have been found guilty or not guilty or if punishment was otherwise mitigated during the RVR process, they can still be referred to classification for placement in segregation or a Special Housing Unit. There is considerable evidence, including concerns expressed by CDCR mental health staff, that

---

[2] My specific opinions and recommendations regarding use of force are spelled out in greater detail in paragraphs 55 to 62 of this declaration.

EXPERT DECLARATION OF ELDON VAIL

1   such placements are harmful to the mentally ill inmate, can disrupt treatment
2   and exacerbate their mental health condition.

3   **B.     Foundation for Expert Opinion**

4       8.      My qualifications and the foundation for my opinions are outlined the
5   Termination Declaration, submitted herewith.

6   **C.     Unreasonable Use of Force Against MHSDS Inmates**

7       9.      Based on information reported to the Special Master in 2012, a third of the
8   institutions have a rate of UOF incidents against mentally ill inmates that is more than
9   double their representative population.  Avenal State Prison ("ASP"), California
10  Corrections Institute ("CCI"), California Institute for Men ("CIM"), California Institute for
11  Women ("CIW"), California Men's Colony ("CMC"), San Quentin ("SQ"), Central
12  California Women's Facility ("CCWF"), North Kern State Prison ("NKSP"), Pelican Bay
13  State Prison ("PBSP"), Sierra Conservation Center ("SCC"), Valley State Prison ("VSP"),
14  and Wasco State Prison ("WSP") all reported a percentage of UOF incidents that occurred
15  against mentally ill inmates that was more than double the MHSDS inmate population at
16  the respective institution.  For example, at CIM 63% of the total UOF incidents during the
17  reporting period occurred against MHSDS inmates, who comprise only 28% of the total
18  prison population.  Other prisons provided the following data:  Avenal - 55% of the UOF
19  incidents, 24% of the population; CCI – 50% of the UOF incidents, 23% of the population;
20  CMC – 87% of the UOF incidents, 30% of the population; SQ – 53% of the UOF
21  incidents, 25% of the population; CCWF – 72% of the UOF incidents, 33% of the
22  population; NKSP – 60% of the UOF incidents, 25% of the population; PBSP – 49% of the
23  UOF incidents, 14% of the population; SCC – 36% of the UOF incidents, 11% of the
24  population; VSPW – 81% of the incidents, 43% of the population; WSP – 49% of the UOF
25  incidents, 22% of the population.  Notably, Mr. Martin only visited and/or reviewed
26  documents from four of these prisons.

27      10.     Three institutions demonstrated a rate of UOF incidents against the mentally
28  ill that is triple their representative population.  Three institutions, CMC, PBSP, and SCC

all reported a percentage of UOF incidents that occurred against mentally ill inmates that was ***triple*** the MHSDS inmate population at the respective institution.  CMC – 87% of the UOF incidents, 30% of the population; PBSP – 49% of the UOF incidents, 14% of the population; SCC – 36% of the UOF incidents, 11% of the population.

11.    In several prisons the percentage of total UOF incidents that occurred against the mentally ill reached 87-94%.  These institutions were: California State Prison, Sacramento ("SAC") (94% incidents, 55% MHSDS population), CIW (90% incidents, 40% MHSDS population), Mule Creek State Prison ("MCSP") (88% incidents, 54% MHSDS population), and CMC (87% incidents, 30% MHSDS population).  At SAC, all but 10 of the 178 reported UOF incidents occurred against the mentally ill.

12.    CDCR staff does not demonstrate an understanding of what a mentally ill person might be experiencing before or during a use of force incident, or of how mental illness my make it difficult for an inmate to immediately conform his or her behavior in response to an order.

13.    Throughout my inspections of CDCR facilities, and my review of the documents requested by Plaintiffs and Defendants in this matter, I encountered the following examples of use of force incidents involving MHSDS inmates.  Based upon my review of the use of force videos provided to me by CDCR, these examples are not outliers of the use of force practice with mentally ill inmates, but are typical of what I observed in California prisons.

14.    On March 13, 2013, I viewed a UOF video from Corcoran taken in the summer of 2012.  The inmate patient was in a state of de-compensation and was refusing his medication.  He was being housed in the Mental Health Crisis Bed (MHCB) unit.  Mental health staff had appropriately decided it was time to administer his medication and to use force if need be.  What I witnessed were three blasts of OC, quickly administered in large dosages, in less than four minutes.  The chemical clearly had an effect as the inmate screamed for help to try and stop the pain it was causing him.  However, he was not lucid or coherent enough to be able to follow the officer's orders to back up to the cell and "cuff

up." He turned in circles near the cell door but did not appear to comprehend that relief might begin if he could back up to the cell door and then manage to place his hands through the cuff port. During this time, one officer's voice can be heard on camera urging that he be sprayed again. At one point the inmate does manage to get his hand near the cuff port and it is grabbed by an officer. A handcuff is quickly applied to the one hand. Attached to the cuff is a chain. Attached to the chain is a triangle device that is designed to not fit through the cuff port itself. During this scuffle the inmate is sprayed with OC again, this time from about two feet away. The inmate then breaks away from the grasp of the officers and ends up inside the cell, essentially chained to the door by the triangle that is wedged in the outside of the cuff port. He continues to scream and cry for help. Finally the officers decide they are going to enter the cell to subdue the inmate. Upon entry into the cell, the inmate and the floor of the cell are soaked from the massive amount spray that the officers deployed. All parties immediately slip and end up in a pile on the floor. The pile moves from inside the cell to outside the cell, with the inmate's wrist still attached to the cuff that is now attached to the open door. Eventually, the officers put the inmate on a gurney and take him to a restraint room, where he is further restrained and medicated. This was a disorganized, ill planned, and poorly executed use of pepper spray on a decompensating inmate patient.

15.     I watched an incident from December 3, 2012 with an EOP inmate housed in Administrative Segregation at Corcoran. I was unable to speak with him because he had been transferred to SAC. The inmate was in a holding cage and was obviously upset because he had been placed on "Management Status" for disruptive behavior. I understand that to mean that there is an informal Rules Violation Procedure whereby an inmate can be summarily disciplined and have all of his personal belongings removed. It appears to be a very punitive and loosely regulated practice, but it has potentially damaging effects on inmates. The inmate refused to come out of the holding cage. A technician briefly tried to calm the inmate but invested very little time and made only the most cursory effort to defuse the situation. The inmate states that the officers will spray him to get him out of the

1   cell, then put him in handcuffs, and move him back to his cell.   He claims that once he

2   gets back in his cell, he will still be suicidal and they will spray him again.   And that's

3   exactly what happened.  At one point the inmate says "when you can't breathe, you can't

4   scream."  The inmate was not medically cleared for spray because he has asthma.  The

5   Incident Commander, however, decided to use spray regardless.  Prison administrators told

6   me the Incident Commander could do so, at his discretion, if medical personnel (a nurse)

7   and an emergency vehicle are present.  The Incident Commander overruled medical staff

8   based on "institutional safety and security" but did not clarify what that meant in this

9   context. This inmate uses a cane to walk, and was in a holding cage when the incident

10  occurred. In my judgment the inmate presented no real or immediate threat to facility

11  security and OC was used unnecessarily and gratuitously to inflict immediate punishment

12  on an inmate who was only verbally defiant to the staff.  Ultimately the inmate was

13  transferred to MHCB.

14        16.     At Kern Valley I witnessed a video of an inmate who was decompensating

15  and needed to come out of his cell to be moved to a crisis bed.  The "intervention" by the

16  psychiatric technician lasted less than twenty seconds.  Even though the inmate had asthma

17  and was deemed a "medium risk" for exposure to OC, the Incident Commander decided to

18  proceed. A short burst was first administered, lasting about five seconds.  The second burst

19  came about fifty seconds later, the third at seventy seconds and the fourth after another

20  forty seconds had elapsed.  At that moment the inmate appeared ready to comply but staff

21  elected to spray into the cell a fifth time, this one via a Barricade Removal Device (BRD),

22  a system that puts a massive amount of spray into the cell.  The longer the event went on,

23  the more verbally aggressive the staff became with the prisoner.  Staff did not listen to or

24  recognize the inmate's cues that he was willing to comply with their request.  It is very

25  possible, in my experience, that this inmate could have been coaxed out of his cell, without

26  using OC a total of five times.  I believe the amount of force used in this incident was

27  excessive.  The inmate, when he was finally out of his cell, complained that he could not

28  breathe, yet the staff then placed a spit mask on him which further restricted his air flow.

1    If staff were better trained and prepared to respond to a mentally ill inmate in distress, this

2    incident could have ended sooner and with less distress to the inmate patient.

3        17.     In another video I viewed at Kern Valley, an inmate refused to exit his cell

4    because he was refusing a transfer to another prison. There was no documented attempt on

5    camera to de-escalate the situation. Officers quickly deployed OC spray. After an initial

6    burst, the second came twenty-eight seconds later and was about three times the amount of

7    the first burst. One minute later the BRD was used, putting a large amount of OC into the

8    cell. About fifty seconds later the fourth burst came, via an OC grenade thrown into the

9    cell. The fifth and final burst came about three minutes later and it was massive. The

10    inmate was clearly overcome from the amount of spray he experienced; yet the staff would

11    not permit him to exit his cell until he took off all of his clothes. He was then escorted,

12    naked, to an outside yard for decontamination. Female staff members were clearly present.

13    I believe the amount of spray used in this situation was excessive.

14        18.     I witnessed similar behavior on the part of CDCR staff at other facilities. In a

15    video I witnessed from Corcoran an inmate refused to exit his cell. The de-escalation

16    attempt lasted less than 15 seconds. OC was deployed three times in intervals about fifteen

17    seconds apart. Ninety seconds later a fourth blast of OC spray was delivered and the fifth

18    came about two minutes later via the BRD, again administering a massive amount of

19    spray. The inmate subjected to this treatment wound up on the floor of the day room,

20    appearing to me to be completely delirious. In my opinion the amount of spray used in this

21    situation was excessive.

22        19.     At Lancaster two inmates being held in Administrative Segregation were

23    protesting and would not return their food trays. They began to damage their cell and it

24    was determined they needed to be extracted. There was no intervention by mental health

25    staff to get them to come out of their cell. One inmate had asthma, but the Incident

26    Commander once again overruled the medical concern. A massive amount of OC was

27    used, which was sufficient for the inmates to give up. Because of the poor use of the

28    camera, it was impossible to view what happened in the cell. However, once the inmates

1  were pulled out of the cell they were thrown to the ground and dragged with unnecessary

2  and excessive force.  A spit mask was placed on one of them despite any clear evidence

3  that it was necessary.  Placing a spit mask on any person, let alone a person suffering from

4  mental illness, who has just experienced a massive dose of OC will make their breathing

5  more difficult and increase their fear and distress. From what I could see from this event

6  on camera, the amount of force used in this situation was excessive.

7       20.   Poor use of cameras is a major problem in documenting controlled use of

8  force incidents within the CDCR. At Corcoran (although this was a problem at other

9  facilities as well) I viewed several incidents where the camera was so far away that none of

10  the verbal interaction with the inmate could be heard at all.  It appears that CDCR officials

11  do not take this documentation process seriously, and are not truly focused on capturing

12  the entire event.

13       21.   The lack of proper camera work was clearly exhibited in an example I

14  viewed from the Special Housing Unit ("SHU") at Corcoran involving two CCCMS

15  inmates.  Two inmates in a cell asked to speak to the Sergeant to determine why they had

16  been denied their yard time.  After this request was repeatedly refused, they blocked their

17  cell window, trying to get a response.  There was only a cursory attempt at de-escalation

18  prior to proceeding to use of force.  There was no evidence of any attempt to comply with

19  the simple request the inmates were making — to speak with the Sergeant.  If an attempt

20  had been made to respond to their request, use of force in this situation may well have not

21  been necessary.  The amount of spray put into the cell was clearly excessive, and

22  illustrated the most OC spray (delivered via the barricade removal device ("BRD") into a

23  cell) that I observed in all of the videos provided to me. The BRD was used four times and

24  was followed with an OC vapor grenade.  These two inmates, (who I also interviewed

25  before watching their use of force video), made an allegation that after the incident, they

26  were put into a holding cell with the triangle attached to the cuff retainer in such a way that

27  they wound up chained to the cuff port in positions that did not allow them to stand for

28  about two hours.  The video of this incident concludes with precisely that scene on the

1  record but the camera is shut off after a few seconds, and did not show the inmates coming

2  out of the restriction of the triangle.  When I asked the staff about the inmate's allegation

3  that the triangle was left on, they denied it.  Had the camera stayed on the inmates until the

4  triangle was removed, there would have been no question what occurred.  As it stands

5  today, there is no evidence to show that the triangle was removed.  If it was not removed, I

6  believe the amount of force used in that situation was also excessive and the behavior of

7  CDCR staff was abusive.  Cameras, when properly utilized, protect the staff and the

8  prisoners and improve the transparency of their process.

9          22.     I also viewed more video interviews of inmates who had either alleged

10  excessive use of force who had been injured during a use of force incident than I viewed of

11  use of force incidents themselves. The current interview process for mentally ill inmates

12  has no credibility and is not seriously designed to uncover the truth regarding any

13  particular incident.

14          23.     At Kern Valley, an inmate who had received injuries to his head, shoulder

15  and knee reported that after OC was used on him he could not see or identify any witnesses

16  to the event and he did not know how he received such serious injuries.  The investigator

17  made no attempt to help the inmate understand what had occurred.

18          24.     At Kern Valley, the interviewer told the inmate that since the witnesses he

19  had identified no longer worked at the institution (one had retired and one was transferred),

20  he would not interview them. This was clearly a signal to the prisoner that his concerns

21  were not going to be taken seriously.

22          25.     In another interview from Kern Valley, an inmate alleged excessive force

23  when he was cuffed with his hands behind his back.  He said he had medical instruction

24  saying he should not be cuffed in that manner due to a dialysis shunt in his arm.  He also

25  alleged that an officer elbowed him in the head.  During the interview with the investigator

26  he was asked for the names and numbers of inmate witnesses.  The inmate was still in

27  cuffs and there is no way he could be expected to know the numbers of other inmates.

28

26.     In an interview at Lancaster, an Enhanced Outpatient (EOP) inmate being housed in Administrative Segregation alleged he had his finger amputated as a result of it being slammed in the cuff port of the cell door by an officer.  The interviewer was repeatedly argumentative with the inmate. The inmate attempted to explain his version of the event but he is continually interrupted when his story is not consistent with the interviewer's pre-determined script, which clearly upset the interviewer.  In this case, the inmate was put back into his cell even though it was known he had asthma and his cell was still full of OC.  The interviewer becomes so agitated because he cannot control the interview that he declares he is not an investigator but is only a fact finder.  Based upon my experience, I don't believe he is either.

27.     Also from Lancaster, I observed an interview with an inmate that began in a staff office. The inmate was subjected to use of force after he had spoken with the Sergeant about a problem he was having.  He alleged that after that conversation three to six officers took him to the ground where he was assaulted.  The inmate is still dizzy from what has just happened to him, and begins to pass out. The next scene he is in the hospital and the inmate has a collar around his neck and injuries to his neck, face, eyes and ears are clearly visible.  The interviewer rushes through the interview without appearing to fully document the prisoner's version of events.  The extent of his injuries is clearly serious and is excessive given what would be expected from a normal takedown of a resisting inmate.

28.     Again from Lancaster, an inmate with injuries to an eye and to his head alleged that officers took him to the ground because he asked to speak to the Sergeant.  He was asking to be placed in segregation because he was afraid to go back to his cell. The interviewer, inexplicably, makes no effort to ask him about the source of his fear.  Having poorly-trained staff interview inmates who allege unnecessary or excessive use of force, or who have suffered injury as a result of a use of force, adds nothing to the understanding of what may or may not have occurred in any particular incident.

29.     CDCR's written reports illustrate similar problems regarding use of force over recent years.  Based on the documents I have reviewed, and the interviews and

1   inspections I conducted, I found no evidence that CDCR use-of-force policies and

2   practices have changed or improved over the past few years, and the examples cited in my

3   declaration appear consistent with current practices.

4         30.    At Corcoran in December of 2011, an inmate patient housed in the SHU was

5   demonstrating bizarre behavior and it was determined he needed to come out of his cell.

6   He was naked, yelling that he was the creator and threatening to kill himself. He held a

7   piece of plastic to his throat and had a cable wrapped around his neck. An extraction team

8   was assembled and went through the proper procedures of attempting a clinical

9   intervention and admonishing the inmate to cuff up so he could be safely removed. Then

10  the spraying commenced. According to the written report the inmate was sprayed with OC

11  approximately forty times, plus there were four OC grenades thrown into his cell before

12  the event was finally over.  The staff was cleared to do a physical cell entry after the

13  failure of the first three OC bursts, yet inexplicably the rest of the OC was delivered after it

14  had already been determined that OC wasn't working.  In the end, the correctional staff

15  entered the cell and used traditional shield and take-down techniques to cuff the inmate

16  and remove him from the cell.  The inmate was then strapped to a wheelchair but kept

17  slipping out of it, likely because he was drenched in OC spray.  The volume of spray used

18  in this incident astounds me.  According to the notes made available to me from Mr.

19  Martin's files, the Institution Executive Review Committee commented on this situation,

20  acknowledging that the spray was used closer than from the recommended six-foot

21  distance, but that it was justified because of the threat represented by the inmate.  There

22  was no more criticism or questioning regarding this incident.  Also according to Mr.

23  Martin's notes, it appears this incident was not referred for further investigation.  The use

24  of OC spray in this example is excessive to the point of abuse.  The lack of further

25  investigation is appalling.

26        31.    Also from Mr. Martin's files, he counts 11 baton strikes from three different

27  officers to break up a fight between a class member and a non-class member at Corcoran in

28  November of 2011.  The incident report says the baton was used "to get both inmates to

1  comply with staff orders."  This is not a proper justification for use of the baton because it

2  should only be used for defensive purposes.  The report gives no indication that the

3  officers felt threatened by the situation.

4       32.    In another incident at Corcoran, an inmate with a long history of suicidal

5  ideation covered up his cell windows and refused to exit.  According to the report, he was

6  on a five-day follow up from mental health.  Officers decided to enter the cell

7  immediately.  They used OC spray when the cell door was open, and the inmate charged

8  the officers.  He was taken down with the use of a shield but it was a struggle to get

9  handcuffs on him.  One of the officers reported that he struck the inmate three times in the

10  ribs with his baton to gain compliance.  This was not a defensive use of the weapon.  A

11  spit mask was also put on the inmate "as a precaution" and not because of any indication in

12  the record that it was necessary.

13       33.    From the reports I have reviewed, a common practice in the CDCR is to

14  administer OC as an immediate use of force when inmates refuse to close the food ports in

15  their cells.

16       34.    At the Central California Women's Facility in 2012, a class member was

17  asking to speak with the Sergeant and would not remove her arms from the food port.  Her

18  request was ignored and she was sprayed.

19       35.    At Salinas Valley in 2011, an EOP inmate threw his food tray out of the food

20  port and then refused to close the port.  He was warned once and then sprayed with OC

21  while in his cell.  The psychologist describes the inmate as, "severely mentally ill.  His

22  condition renders him 'out of touch with reality' and responding to internal stimuli on a

23  frequent basis.  His perceptions are distorted."

24       36.    At Lancaster in 2011 an EOP inmate on suicide watch put his arm through

25  the food port when an officer opened it.  He was warned by the officer and a Sergeant and

26  then sprayed.  The Institution Executive Review Committee reviewed the incident and

27  determined that "staff actions during the use of force comply with Department standards

28  and policy."

37.    CDCR's policy needs to change.  These situations present no immediate or pressing threat to institution security and using OC spray should not be allowed.  The use of spray in these circumstances inflicts unnecessary pain and suffering on mentally ill patients.  While the described inmate behavior cannot be ignored, if force is deemed necessary in these situations, it should be defined as controlled.  Staff should follow existing protocols before using force by attempting to de-escalate the situation with the assistance of trained mental health professionals, and videotaping the entire incident should be required so it can be subjected to further oversight and review.

**D.    Expert Opinions Regarding Necessary Affirmative Relief to Limit Unreasonable Use of Force Against MHSDS Inmates**

38.    Affirmative relief is necessary to alleviate the excessive and unreasonable use of force against MHSDS inmates.  Furthermore, CDCR's expert, Steve Martin, also recommended that CDCR make certain changes to the existing program.  Although Mr. Martin characterized his requested changes as "best practices," I believe that they are necessary to rectify the constitutional violations I have identified.  In order to rectify the situation, CDCR must implement the following:

39.    Expand the definition of use of force events giving rise to mandatory investigation, and use trained and dedicated investigators to review them.  Given the seriousness and extent of the problem of use of force with mentally ill inmates in the CDCR I recommend the investigators report their findings to a supervisor in Sacramento CDCR headquarters, or otherwise outside the institutional chain of command.  I also recommend that the Special Master hire a use-of-force expert to help him analyze and monitor use of force incidents to ensure that there is accountability for improper, unnecessary or unreasonable use-of-force incidents involving MHSDS inmates.

- Referral criteria should not be limited to death, deadly force, and great bodily injury or serious bodily injury.  It should be expanded to include: 1) unexplained injuries; 2) impact strikes to lethal target areas (head, eyes, throat, spine or groin) regardless of the seriousness of the injury; 3) incomplete or conflicting reports; and 4) application of non-lethal weaponry

EXPERT DECLARATION OF ELDON VAIL

that exceeds what would normally be expected for the type of force reported (e.g. unarmed inmate in cell subjected to great amounts of chemical agents via multiple delivery systems). Mr. Martin made the same recommendation. (*See*, Exh. 1 to the Declaration of Lori Rifkin, submitted herewith ("Rifkin Decl."), Steve Martin's Use of Force Best Practice No. 1.)

40. Increase the transparency of investigations of alleged excessive uses of force.

• Require the Institutional Appeals Coordinator to notify the UOF Coordinator of all inmate appeals containing allegations of excessive use of force. Mr. Martin made the same recommendation. (Rifkin Decl. at Exh. 1, Martin's Use of Force Best Practice No. 4.)

• Require the UOF Coordinator to report outcomes to the Special Master where use of force was found to be unnecessary or excessive against MHSDS inmates.

• Require the UOF Coordinator to report all informal or formal reprimands or other disciplinary actions taken against staff for use of force against MHSDS inmates to be reported to the Special Master.

• Make video cameras available in all elevated booths or towers. Amend post orders so that if the officer is not engaged with a weapon to help control a situation, they be required to use a camera to document an incident and any subsequent use of force, even if "immediate."

• Change CDCR's policy and provide training to all correctional supervisors with the goal of increasing the number of controlled use of force incidents instead of allowing so many incidents to be classified as "immediate" or "emergency." The CDCR is too quick to authorize "immediate" force against the mentally ill without first attempting to control incidents through verbal, instead of physical, tactics.

41. Revise CDCR's UOF policy to minimize the potential for excessive use of force events.

• Require CDCR to provide training and guidance on the use of the expandable baton. Mr. Martin made the same recommendation. (Rifkin Decl. at Exh. 1, Martin's Use of Force Best Practice No. 2.)

• Provide clear written guidance in CDCR policies that restricts the use of the expandable baton to situations that are defensive, for the safety of the officer, or in which there is a risk of death or serious bodily harm. Require CDCR to provide extensive training to implement this policy change.

EXPERT DECLARATION OF ELDON VAIL

- Remove the expandable baton as an item of standard issue to custody staff, and instead make it post specific, determined in part by the security level of the inmate population.

- Require CDCR to provide training and guidance on the use of OC spray. Mr. Martin made the same recommendation. (Rifkin Decl. at Exh. 1, Martin's Use of Force Best Practice No. 3.)

- Prohibit the use of crowd-control delivery systems into the cell of an unarmed inmate. Require the use of wand applicator when OC spray is used in cells. Mr. Martin made the same recommendation. (Rifkin Decl. at Exh. 1, Martin's Use of Force Best Practice No. 3.)

- Weigh canisters before and after use to determine whether the amount of spray used was appropriate for the situation. Mr. Martin made the same recommendation. (Rifkin Decl. at Exh. 1, Martin's Use of Force Best Practice No. 3.)

- Provide clear written guidance and expectations in CDCR's policy for the use of OC that address the amount dispensed and requires waiting periods between subsequent applications. Require CDCR to provide extensive training to implement this policy change.

- Change CDCR's policy so that OC spray is used as a last resort on MHSDS inmates, and only after meaningful non-physical intervention has failed, and only in a serious emergency calling for extreme measures to protect staff or inmates.

- Remove the authority of officers to inflict immediate corporeal punishment on inmates who fail to give up a food tray, close the food slot in cell doors, when a prisoner simply kicks his cell door (as evidenced from the documents made available from Pelican Bay), or other such violations that do not present an immediate threat to institution security.

- Establish a rigid requirement for documenting specific reasons why a spit mask is placed on a prisoner and police the use of spit masks diligently.

42.    Require CDCR to provide training regarding non-UOF de-escalation methods to all custody and mental health staff to improve efforts, through training and practice, to de-escalate situations that are likely to result in a use of force. Provide additional training to custody staff regarding mental illness, including identification of

EXPERT DECLARATION OF ELDON VAIL

symptoms of mental illness and de-escalation methods for inmates with mental illness. CDCR should consider cross-training hostage negotiators for de-escalation efforts.

43.     The Special Master should undertake comprehensive review and oversight of use of force against MHSDS inmates, and the Special Master should be enabled to hire his own use-of-force expert.

- The current oversight report from the Office of the Inspector General (OIG), although helpful, is inadequate. From the reports I have reviewed, the OIG does not examine the substantive issue of whether or not particular use of force incidents were necessary, reasonable, or excessive to the threat being presented. Currently, the primary focus of the OIG appears to be whether or not CDCR staff followed their existing policies. Therefore, the OIG report, is not sufficient to comprise external or supervisory review of CDCR use of force practices.

- From my perspective as an expert, there needs to be independent external review of California's use of force against MHSDS inmates, especially where excessive or unnecessary use-of-force allegations have been made. Such complaints should be subject to investigation by the Special Master, at his discretion, as well as any use of force incident consistent with the recommended expanded list of mandatory investigations listed above. I do not believe the CDCR has the internal capacity or willingness to review and determine whether or not alternate and less dangerous means could have been used to resolve use of force complaints regarding mentally ill inmates.

- The Special Master's use-of-force expert should have specific experience with use of force in the corrections environment and some experience working with the mentally ill.

- The Special Master and his expert should have access to any and all written reports generated by the CDCR, the ability to interview staff and inmates and access videos of use of force events, including those captured on prison surveillance cameras.

**E.      The Disciplinary Process**

44.     Based upon my review of the documents outlined in my Termination Declaration, as well as my tours of numerous CDCR prisons, I find significant evidence that the RVR process, as practiced, is seriously compromised for MHSDS inmates, does not systematically account for their mental illness when adjudicating prison rule violations, violates MHSDS inmates' due process rights and lacks adequate accountability.

45.    In more than a third of CDCR institutions, mentally ill inmates receive RVR's at a higher rate than non-class members, as reported by the institutions to the Special Master in 2012.

46.    Chuckawalla Valley State Prison ("CVSP"), Folsom State Prison ("FOL"), Ironwood State Prison ("IRON") and Valley State Prison for Women ("VSPW") provided insufficient information to determine what percentage of the total RVRs issued were issued to the mentally ill during the reporting period.

47.    During the reporting period, Kern Valley State Prison ("KVSP") issued 99% (417/422) of its total RVRs to mentally ill inmates, who comprise only 34% of the total prison population.  Also noteworthy was California State Prison, Los Angeles County ("LAC"), who issued 84% of its RVRs to the mentally ill, double their 43% representative population.

48.    The CDCR has no system in place to track whether or not these aberrant results are legitimate or are due to reasons that could be corrected if proper data was available to look closer at the practice of individual hearings officers or institutions.  For example, when the Warden at LAC was asked whether the RVR process, as implemented, disproportionately affected mentally ill inmates, he was unaware of the problem, responding that it did not, despite the disturbing numbers at his own prison. Neither wardens, mental health staff nor administrators in Sacramento appear to know whether or not their RVR system takes into account the needs of mentally ill prisoners.

49.    Throughout my inspections of CDCR facilities, my review of the documents requested by Plaintiffs and Defendants in this matter, and the interviews I conducted, I encountered the following concerns involving the RVR process as applied to MHSDS inmates:

50.    I interviewed Psychologists and other mental health staff at every facility I visited.  At Corcoran, and echoed by mental health staff in each institution, they told me that the officer who writes up a CCCMS inmate for RVR decides whether they should be referred for a mental health assessment (MHA) due to "bizarre" behavior – the clinicians

have no say in making the MHA referral.  Current CDCR policy requires that an MHA be prepared for all Enhanced Outpatient (EOP) and MHCB inmates who receive a RVR.  For other inmates, who also suffer from mental illness, the MHA is required only in certain and very rare circumstances.  Given the very fine line between an inmate who is categorized as EOP and one who is not, it is likely additional inmates would benefit greatly from having a MHA prepared for their disciplinary hearing, but do not receive one. Only mental health staff has sufficient information to make this judgment.  They should be an integral part of the RVR process.

51.    The psychologists and mental health workers I interviewed expressed frustration when they told us that they have no knowledge of the outcome of RVR hearings.  A psychologist at Kern Valley told me he does not know if his input is even valued. Another psychologist at Kern told me she doesn't know if her recommendations of mitigation, based on mental health assessments, are "ever paid attention to." "More often than not" they recommend mitigation of some kind, but they have "no idea" how frequently mitigation recommendations are adopted by the hearing officers.  The hearing officers "rarely" (some reported "never") call them for clarification.  Another psychologist told me that he felt that most mental health evaluations are "lost in the ether" during the RVR review process

52.    Because the stakes are so high, CDCR should require increased involvement in the RVR process by mental health staff. A finding of guilt in an RVR hearing can result in a referral to a classification committee to consider a long-term, maybe even indeterminate, assignment to a Special Housing Unit or administrative segregation.  There was strong consensus among the mental health staff about the danger of placing some mentally ill patients in such an isolated environment.  Every psychologist I asked said they believe such a placement can exacerbate a prisoner's mental illness.  Psychologists at San Quentin added that they believe it can also interrupt a prisoner's treatment.

53.    More than one mental health worker made it a point to tell me that they did not advocate for the mentally ill.  Based on my experience in the State of Washington, who

EXPERT DECLARATION OF ELDON VAIL

1  better to advocate for an individual suffering from mental illness than a trained clinician?

2  If the CDCR had mental health treatment units that were focused on actual treatment rather

3  than on perpetuating a lockdown culture and were administered by correctional

4  professionals who respected the work of clinicians, any potential danger from such

5  advocacy could be managed quite easily. It is a disservice to the prisoners and ultimately a

6  risk to the citizens of the State of California that such units do not exist within the CDCR.

7       54.    My interviews with prison psychologists who prepare the MHA made it clear

8  that the current MHA form is ambiguous, and should be revised.  It is unclear to

9  psychologists whether the "mitigation" referred to in the MHA means mitigation of

10  punishment based upon an inmate's treatment limitations due to mental illness, or a

11  mitigation of the underlying rule violation, based upon the inmate's behavioral limitations.

12  Both of these subjects should be separately addressed in the MHA form and subsequent

13  hearing.

14      **F.    Expert Opinions Regarding Necessary Affirmative Relief to Rectify the**
15             **Disciplinary Process**

16       55.    Affirmative relief is necessary to rectify the current RVR process as it is

17  applied to MHSDS inmates.  CDCR's expert, Steve Martin, also recommended that CDCR

18  make certain changes to the existing program.  Although Mr. Martin characterized his

19  changes as "best practices," I believe that they are necessary to rectify the constitutional

20  violations I have identified.  In order to rectify the situation, CDCR must implement the

21  following:

22       56.    Increase the role of mental health staff in the RVR process.

23      •    Provide training for both mental health staff and custody officers regarding
24          the RVR process as it impacts and is applied to MHSDS inmates.

25      •    Require the involvement of mental health staff in the decision about whether
26          to make a referral of a CCCMS inmate for a mental health assessment.

27      •    Expand the types of staff who can perform the staff assistant function at an
        RVR hearing to include mental health staff.

28

- Allow trained clinicians to be part of the determination of guilt and the assignment of sanctions phase in the RVR process, so that hearing outcomes enhance instead of undermine treatment goals.

- Establish protocols for hearing officers and clinicians to meet periodically to discuss and resolve issues related to the RVR process generally, and the MHA specifically.  Mr. Martin made the same recommendation.  (Rifkin Decl. at Exh. 1, Steve Martin's RVR Best Practice No. 1.)

57.    Revise the MHA form.  Mr. Martin made the same recommendation.  (Rifkin Decl. at Exh. 1, Martin's RVR Best Practice No. 4.)

- The MHA form should clarify the difference between mitigation of punishment and mitigation of the underlying offense.

- A fourth question should be added to the MHA form regarding necessary limitations on punishment, because of an inmate's MHSDS condition, which will not negatively impact the inmates treatment progress.

58.    Restructure the RVR hearing process so that hearing officers are independent of the custody chain of command.  Mr. Martin made the same recommendation.  (Rifkin Decl. at Exh. 2, deposition testimony of Steve Martin at p. 241:8-243:13.)  Also prohibit the assignment of an officer in a direct reporting line to the hearing officer as a staff assistant.

59.    Require CDCR to track outcome data to determine whether MHA information is being utilized or disregarded, including requiring the hearing officer to affirmatively state whether he modified or mitigated the penalties based on the MHA to include how he does so and if not, why.  Mr. Martin made a similar recommendation.  (Rifkin Decl. at Exh. 1, Steve Martin's RVR Best Practice No. 3.)

60.    Better define and limit the practice of "management status" to emergency situations.

61.    Require each institution to have a single RVR Coordinator for the entire prison.  Currently several, if not most, prisons do not have one, or assign the Coordinator function to several different individuals.

1    62.    The RVR process must also be evaluated in the context of what is happening

2  to class members in the classification committee when they are referred as a result of

3  receiving RVRs, information that I believe should be tracked and made available to the

4  Special Master. I recommend that the Special Master review CDCR policies concerning

5  classification, and how it impacts MHSDS inmates who have been found not guilty or

6  were found guilty but whose punishment was otherwise mitigated during the RVR process.

7

8    I declare under penalty of perjury under the laws of the United States that the

9  foregoing is true and correct and that this declaration is executed in $\underline{Olynpia, WA}$ on

10  $\underline{May\ 29}$ , 2013.

11

12                                        _____
                                          Eldon Vail

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT DECLARATION OF ELDON VAIL