DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, Jr., et al.,<br><br>Defendants. | Case No. Civ S 90-0520 LKK-JFM<br><br>**DECLARATION OF LORI E. RIFKIN IN SUPPORT OF NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES**<br><br>Judge:   Hon. Lawrence K. Karlton<br>Date:    July 8, 2013<br>Time:    10:00 am<br>Crtrm:   4 |

[832639-1]

1    I, Lori E. Rifkin, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3    of this Court, and an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP,

4    counsel of record for Plaintiffs Ralph Coleman.  I have personal knowledge of the matters

5    set forth herein, and if called as a witness I could competently so testify.  I make this

6    declaration in support of Notice Of Motion And Motion For Enforcement Of Court Orders

7    And Affirmative Relief Related To Use Of Force And Disciplinary Measures.

8    2.    Attached hereto as **Exhibit 1** is a true and correct copy of a document Bates-

9    numbered DEXP 105138-105143, which was produced by Defendants during termination

10   discovery.  This document was authenticated by Steve Martin as his "Coleman Audit Best

11   Practice Recommendations" for Use of Force and RVR Process during Mr. Martin's

12   deposition on February 28, 2013 (Martin Dep. at 122:24-123:18 & Ex. 6).

13   3.    Attached hereto as **Exhibit 2** are true and correct excerpts from the

14   deposition of Steve Martin, taken on February 28, 2013.

15   4.    Attached hereto as **Exhibit 3** is a true and correct copy of a Rules Violation

16   Report dated March 26, 2013 (prisoner name and identification number redacted).  This

17   RVR is for a charge of "Disobeying a Direct Order/Attempting to Break a Food Tray."  It

18   describes the emergency use of OC spray against an EOP inmate who threatened to break

19   his food tray, stating "I have the Warden in my pocket! I have paper on all of you

20   fuckers!"  The custody officer "dispersed an approximate four second burst of pepper

21   spray from my MK-9 to [inmate's] upper body from an approximate distance of three

22   feet."

23   5.    Attached hereto as **Exhibit 4** is a true and correct copy of a Rules Violation

24   Report dated July 2, 2011, and Bates-stamped DEXP 108024-108035 (prisoner name and

25   identification number redacted).  This RVR is for a charge of "Battery on a Peace Officer

26   With a Weapon."  It describes an incident in which an EOP inmate housed in an

27   administrative segregation unit threw his food tray through the food port, striking an

28   officer on his side and the officer sprayed the inmate with his MK-9 OC Fogger.  The

[832639-1]

1  clinician completing the mental health assessment wrote that the inmate is "severely

2  mentally ill," "out of touch with reality" and "responding to internal stimuli on a frequent

3  basis." Although the hearing officer agreed that mitigation was appropriate, the inmate

4  was found guilty of battery on a peace officer, referred to ICC for SHU assessment and

5  referred to the District Attorney for local criminal charges.

6       6.    Attached hereto as **Exhibit 5** is a true and correct copy of a Rules Violation

7  Report dated March 22, 2012, and Bates-stamped DEXP 107681-107682 (prisoner name

8  and identification number redacted). This RVR is for a charge of "Battery on a Non

9  Prisoner." It describes an incident in which an EOP inmate who was being involuntarily

10  medicated after stating that God did not want her to take her medication kicked a licensed

11  vocation nurse (LVN) who was administering the second shot of medication in the

12  buttocks. The inmate was charged and found guilty of battery on a non-prisoner. The

13  hearing officer stated that, based on consideration of her "mental health factor," she was

14  issued the lowest possible forfeiture of credit. She subsequently was referred to the ICC

15  for SHU assessment and to the District Attorney for possible felon prosecution. The same

16  correctional officer who was assigned as the investigative employee was also assigned as

17  the staff assistant at the hearing.

18       7.    Attached hereto as **Exhibit 6** is a true and correct copy of a Rules Violation

19  Report dated March 28, 2012 and Bates-stamped DEXP 105638-105644 (prisoner name

20  and identification number redacted). This RVR is for a charge of "Disrespect Towards

21  Staff." It describes an EOP inmate housed in an MHCB and who had been referred to an

22  inpatient level of care in DSH for making sexually inappropriate comments to a psychiatric

23  technician during her rounds. The mental health assessment stated that he was "manic

24  with disorganized thoughts, bizarre behavior" at the time of the incident, and had since

25  been placed on a *Keyhea* order, was taking his medications regularly, and had been

26  accepted to DMH. The hearing officer found the inmate guilty.

27       8.    Attached hereto as **Exhibit 7** is a true and correct copy of a Rules Violation

28  Report dated February 17, 2012, and Bates-stamped DEXP 105634-105636 (prisoner name

1    and identification number redacted).  This RVR is for a charge of "Refusal to Sign

2    Condition of Parole."  It describes an EOP inmate housed in an MHCB who was being

3    transferred to an inpatient level of care at ASH and refused to sign his conditions of parole.

4    The mental health assessment states that he was "very psychotic," hearing voices, had

5    paranoid and grandiose delusions, and was irrational and illogical.

6         9.    Attached hereto as **Exhibit 8** is a true and correct copy of a Rules Violation

7    Report dated April 26, 2012, and Bates-stamped DEXP 108088-108089 (prisoner name

8    and identification number redacted).  This RVR is for a charge of "Refusal to Obey

9    Orders."  It describes an incident in which an EOP inmate became disruptive in group by

10   shouting and banging on the holding cell door.  The psychiatric technician running the

11   group told him "he needed to stop his actions and that if he did not stop a 115 disciplinary

12   report would have to be filed."  The RVR reports that the inmate "considered this for a

13   moment, then returned to the banging and shouting with a greater intensity and volume,"

14   so the psychiatric technician asked the custody officers to remove him from the group

15   room.  The mental health assessment states that the records "clearly show inmate was

16   actively psychotic prior to and after the incident," and that the inmate "had medications

17   changed and inmate was not stable."

18        10.    Attached hereto as **Exhibit 9** is a true and correct copy of a Rules Violation

19   Report dated April 3, 2012, and Bates-stamped DEXP 108059-108061.  This RVR is for a

20   charge of "Willfully Obstructing Staff in Performance of Duties."  It describes an incident

21   in which an EOP inmate asked staff in the medical unit when his dressing was going to be

22   changed.  After being told that it was not changed on a daily basis, the inmate lay down on

23   the ground, "refusing staff's orders to get up until he received the medical attention he

24   desired."  The mental health assessment described the inmate as having a disorganized

25   thoughts and poor comprehension, and a mental condition that includes auditory

26   hallucinations and paranoia.

27        11.    Concurrently filed with the Court as **Exhibit 10** is a true and correct copy of

28   a 2008 news video available publicly online and downloaded from:

[832639-1]

DECLARATION OF LORI RIFKIN ISO NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  https://www.youtube.com/watch?v=64sWzzhSWEE&playnext=1&list=PL625BA00AD88

2  70541.  It takes place at CSP-Corcoran and at 2 minutes and 30 seconds, follows CDCR

3  officers deploying a crowd-sized OC Barricade Removal Device canister through the food

4  port in a locked hospital unit cell multiple times in less than two minutes (according to

5  report's narration) in order to gain "compliance" from an inmate who refused to take

6  medication.  A copy of a screen capture is attached hereto as **Exhibit 10**.

7        12.    Attached hereto as **Exhibit 11** is a true and correct copy of a Rules Violation

8  Report dated December 6, 2011, and Bates-stamped DEXP 105506-105507 (prisoner name

9  and identification number redacted).  This RVR is for "Battery on an Inmate."  It describes

10  an incident in which an EOP inmate struck another inmate in the upper torso with closed

11  fists.  The hearing officer stated in the RVR that the mental health assessment reported that

12  the inmate's mental disorder did appear to contribute to the behavior that led to the RVR

13  and that the inmate did not receive medication that morning and was feeling on edge.  The

14  inmate was described as having serious mental illness that results in paranoia, poor

15  judgment, misperception of reality and assaultive behavior.  The mental health assessment

16  stated that the inmate was not a good candidate for the administrative segregation

17  environment because "he becomes overwhelmed there due to his mental illness and has

18  trouble coping."  The inmate was found guilty, reprimanded and counseled, and referred to

19  classification for SHU term consideration.

20        13.    Attached hereto as **Exhibit 12** is a true and correct copy of a memorandum

21  dated September 12, 2012, and Bates-stamped DEXP 009657-009658, which Defendants

22  produced as part of termination discovery.  This memorandum is from M.D. Stainer,

23  Deputy Director of Facility Operations, regarding "Use of Chemical Agents During

24  Controlled Use of Force Situations and Review of Use of Force Incidents."  The memo

25  stated that there was a "need to clarify expectations with regard to the application of

26  Oleoresin Capsicum (OC) products during controlled use of force situations."  It states an

27  "expectation" that "sufficient time" must be provided between applications of OC

28  products.  It also states an "expectation" that "the review process at all levels be thorough

[832639-1]

4

DECLARATION OF LORI RIFKIN ISO NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1    and meaningful, and staff involved in reviewing use of force incidents are sufficiently

2    knowledgeable in current policy."  The memo directs all Wardens "to initiate On the Job

3    Training (OJT) to all Incident Commanders and managers with regard to the above

4    expectations."

5          14.    I have reviewed the institutional management reports provided by

6    Defendants as part of termination discovery that report use of force statistics involving

7    MHSDS inmates.  These reports do not track how many uses of force against MHSDS

8    inmates are "immediate" versus "controlled," and Plaintiffs' counsel is unaware of any

9    other data provided by Defendants that tracks this information, except for the 2005

10   Corcoran self-study.

11         15.    Attached hereto as **Exhibit 13** is a true and correct copy of Special Master

12   Keating's February 7, 2002 Letter to Michael Pickett, Deputy Director, Health Care

13   Services Division, CDCR, which was copied to Plaintiffs' counsel.

14

15         I declare under penalty of perjury under the laws of the United States and the State

16   of California that the foregoing is true and correct, and that this declaration is executed at

17   San Francisco, California this 29th day of May, 2013.

18

19                                    _/s/ Lori E. Rifkin_____
                                      Lori E. Rifkin
20

21

22

23

24

25

26

27

28

[832639-1]

DECLARATION OF LORI RIFKIN ISO NOTICE OF MOTION AND MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

# Exhibit 1

8/8/12
8/10/12

**COLEMAN AUDIT BEST PRACTICE RECOMMENDATIONS FOR USE OF FORCE**

**1) Revisit referral/investigation requirements per Use of Force Regs 51020**

> Discussion: Currently, pursuant to 51020.17.7, the only mandatory referral of an UOF incident must involve deadly force, death, great bodily injury (GBI), or serious bodily injury (SBI), see 51010.4 for definitions of GBI/SBI.
>
> Currently, pursuant to 51020.20, the only mandatory investigations conducted are for deadly force, death, GBI or SBI.
>
> Referral criteria should not be limited to death, deadly force, GGBI/SBI. Criteria should be expanded to include: unexplained injuries, impact strikes to lethal target areas (head, eyes, throat, spine or groin) regardless of seriousness of injury, incomplete/conflicting reports, and application of non-lethal weaponry that exceeds what would normally be expected for the type of force reported, e.g., unarmed inmate in cell subjected to great amounts of chemical agents via multiple delivery systems such as MK-9, MK-46 and Grenades (see Corcoran, COR-04B-11-12-0793). Once one of these incidents is referred there should be an operating presumption that it will be investigated.

**2) Currently, there is virtually no guidance in 51020 regarding the use of the expandable baton.**

> Discussion: The expandable baton is a tactical impact weapon deployed for self-defense typically when an officer is subject to active or targeted aggression by an inmate. If misused it is often converted into offensive weapon used for pain-compliance or an instrumentality of corporal punishment. I did not review any incidents in which I detected any such misuse; however, there were numerous instances in which it was used to intervene in inmate/inmate assaults (see RJD 101-11010-53). I take no firm position on such use other than to suggest adoption of some standard or training that will limit its use in such situations where other less potentially injurious means have been exhausted or are impractical or there is an immediate threat of SBI/GBI.

**3) Currently, MK-9 OC cannisters are standard issue to line-level CO's. The MK-9 it is classified as a "crowd management" delivery system (Defense Technology® Product Spec Manual).**

2

DEXP 105138

<u>Discussion</u>: 51020.15 Chemical Agents provides that: "Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the control objective." While I don't question the tactical deployment of a MK-9 cannister in an open area (yard, dayroom, gym, etc.) to intervene in a inmate/inmate assault, I do question the use of crowd control delivery systems into a cell of an unarmed or unbarricaded inmate. The current regs offer no guidance regarding when OC delivery systems may be used (51020.15.1 does suggest that when the MK-46 is used in cells that it be used with the wand applicator attachment in order to avoid soft tissue damage to the inmate). Finally, I suggest some consideration be given to adopting a procedure whereby OC cannisters are weighed before and after use.

4) I strongly endorse the recommendation made in the OIG Report on Use of Force, May 2012, wherein it was recommended that the Institutional Appeals Coordinator should notify the Use of Force Coordinator of all inmate appeals containing use of force allegations (see Report Recommendation #5, at page 21).

<u>Discussion</u>: "The OIG examined 268 allegations of unreasonable force reported through the adult institutions' inmate appeal process or through written or oral complaints from staff, members of the public, or inmates. Nearly half (121) of the allegations of unreasonable force in our examination escaped executive committee review..." (see OIG Report, at page 16).

3

DEXP 105139

COLEMAN AUDIT RVR PROCESS OBSERVATIONS

Audit Methodology:
–Reviewed approximately 440 RVR packets from 10 facilities
–Interviewed RVR hearing officers, RVR Coordinators, and clinicians at 8 of 10 facilities
–Reviewed all relevant LOPs and CDCR regs related to Mental Health Assessment Process
  for Rule Violations (RVR MH Process)
–Reviewed CDCR memoranda and local memoranda related to RVR MH Process
–Reviewed facility training materials and training records related to RVR MH Process
–Reviewed facility RVR reporting data
–Reviewed 22nd, 23rd, & 24th Monitor Reports related to RVR MH Process
–Reviewed CDCR Program Guide for MH Services Delivery System (2009 Revision),
  Attachment B-Inmate Disciplinary Process

Observations:
–The CDCR RVR MH Process establishes structured mechanisms to reasonably
accommodate inmates who while receiving mental health services, or may need such
services, are charged with disciplinary rule violations.
–The CDCR has established and implemented a correctional sound training program for
both hearing officers and clinicians who administer the RVR MH Process.
–Both hearing officers and clinicians routinely and consistently provide reasonable
accommodation to inmates whose mental health status requires consideration in
determining a fair disposition of the RVR.
–Of the approximately 440 RVR packets reviewed, only on rare occasions (less than 10),
did I find instances in which the Mental Health Assessment Request had not been
completed when required.
–Of the approximately 440 RVR packets reviewed, when clinicians determined that the
inmate's mental disorder appeared to contribute to the behavior that led to the RVR, and
that the hearing officer should consider mental health factors in assessing the peanlty,
reasonable accommodation was made to the charged inmate.

4

DEXP 105140

COLEMAN BEST PRACTICE RECOMMENDATIONS RVR PROCESS

**1) Establish protocols for hearing officers and clinicians to meet periodically to discuss and resolve issues related to the RVR MH Assessment.**

> **Discussion:** It is evident from interviews with the hearing officers and clinicians that they don't communicate in any ongoing fashion to address MH Assessment issues. Both hearing officers and clinicians related that they sometimes lack information about the respective assessment practices of the other group, e.g., some clinicians related they are not well acquainted with all the penalty options available to hearing officers. It is noted that the two groups at RJD routinely meet/confer and it was reflected in the quality of their RVR MH assessments.

**2) The model for the RVR process at RJD should be closely examined for possible replication at all facilities.**

> **Discussion:** RJD officials have developed a very comprehensive set of local operating procedures for the MH Assessment Process (see RJD Operational Plan #66, December 2011). Moreover, based on an interview with the RVR Coordinator (the Senior Psy Supervisor), he chose to create an Assessment Unit in order to have dedicated specialists in making such assessments. The benefits of such specialists were evident in both the consistency and quality of the RJD assessment process. The RVR Coordinator intends to conduct continuing in-service training for both hearing officers and clinicians at the facility.

**3) The hearing officers should affirmatively state whether they modified or mitigated the penalties based on the MH Assessment (see also Recommendation #4, below).**

> **Discussion:** In my review of the hearing packets it was not always clear whether the hearing officer modified or mitigated the penalties.

**4) Consider revising the RVR: Mental Health Assessment Request (CDCR 115-MH (Rev. 06/06).**

> **Discussion:** Question 2 on the form requires the clinician to express an opinion on whether the inmate's mental disorder appeared to contribute to the behavior that led to the RVR. Question 3 asks the clinician if there are any mental health factors the hearing officer should consider in assessing the penalty. My interview with both hearing officers and clinicians produced inconsistent answers on what the hearing officer should do when Question 2 is answered in the affirmative, and in turn, whether those mental health

5

DEXP 105141

factors had to be considered for purposes of Question 3.

I offer two possible recommendations to simply suggest ways to bring more clarity to the form. The second option would likely be the easiest to implement.

1). Revise Question #3 as follows: "If the answer to Question #2 is yes, explain the MH factors that the hearing officer should consider in assessing the penalties." This revisions would be accompanied by a requirement for the hearing officer in the Disposition Section of the Rules Violation Report-Part C, to document what, if any, modifications were made to the penalties assessed in response to the MH factors as identified in Question #2.

2) Currently, Question #3 requires the clinician to "Explain" only if he/she answers "yes." The "yes" should be deleted and an explanation should be provided regardless of whether the clinician answers "yes" or "no." This would be a means to address those situations in which the answer to Question #2 is in the affirmative.

DEXP 105142

*COLEMAN* AUDIT USE OF FORCE OBSERVATIONS

<u>Audit Methodology:</u>
–Reviewed approximately 220 use of force incident packets from 10 facilities
–Interviewed Use of Force Coordinators at 8 of 10 facilities
–Attended IREC meetings at 4 facilities
–Reviewed all relevant LOPs and CDCR regs related to use of force
–Reviewed OIG Use of Force Reports (2) which covered incidents from Sept 2010-Dec 2011
–Reviewed UOF data system-wide from 22nd, 23rd & 24th Monitoring Rounds
–Reviewed CDCR Program Guide for MH Services Delivery System (2009 Revision) and
  CDCR compliance reports re same

<u>Observations:</u>
–No pattern/practice of unnecessary/excessive force as relates to *Coleman* class inmates
–Identified 5 use of force incidents at 3 facilities (RJD/Corcoran/CSP-LA) in which there
  appeared to evidence of unnecessary/excessive force.
–None of the 5 incidents were referred for investigation
–3 of the 5 involved baton strikes, 2 of which resulted in injuries to inmates
–2 of the 5 involved possibly unnecessary/excessive OC spray
–All 8 Use of Force Coordinators are competent and perform their assigned tasks in timely
  fashion and are absolutely essential to the IERC review process
–The IERCs regularly meet and engage in substantive review of UOF incidents
–While the UOF administrative review process is multi-tiered and comprehensive, it results
  in very few referrals for investigation (see also, OIG Use of Force within CDCR, July-
  December 2011, at page 5)

*distngbisl vnneces( vis-a-vis exessin*

*refern*

1

DEXP 105143

# Exhibit 2

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4   RALPH COLEMAN, et al.,        )
                                  )
5                                 )
            Plaintiffs,           )
6                                 )
                vs.               )   No. Civ S 90-0520 LKK-JFM
7                                 )
    EDMUND G. BROWN, JR., et al., )   Volume I
8                                 )
                                  )   Page 1 - 300
9            Defendants.          )
    _____)

10

11

12                 DEPOSITION OF

13                STEVE J. MARTIN

14          THURSDAY, FEBRUARY 28, 2013

15

16

17     CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

18

19  REPORTED BY:

20  HOLLY THUMAN, CSR No. 6834, RMR, CRR

21  ---------------------------------------------------------

22              JAN BROWN & ASSOCIATES

23      WORLDWIDE DEPOSITION & VIDEOGRAPHY SERVICES

24   701 Battery Street, 3rd Floor, San Francisco, CA 94111

25            (415) 981-3498 or (800) 522-7096

                                                          1

```
 1                        --o0o--

 2         Deposition of STEVE J. MARTIN, taken by the

 3    Plaintiffs, at K&L GATES LLP, Four Embarcadero Center,

 4    Suite 1200, San Francisco, California 94111, commencing

 5    at 9:27 a.m., on THURSDAY, FEBRUARY 28, 2013, before me,

 6    HOLLY THUMAN, CSR, RMR, CRR.

 7                        --o0o--

 8                      APPEARANCES

 9    FOR THE PLAINTIFFS:

10         K&L GATES LLP
           Four Embarcadero Center, Suite 1200
11         San Francisco, California 94111
           415.249.1059
12         By:  JEFFREY BORNSTEIN, Attorney at Law
                jeff.bornstein@klgates.com
13              MEGAN F. CESARE-EASTMAN, Attorney at Law
                megan.cesare-eastman@klgates.com
14              RANJINI ACHARYA, Attorney at Law

15         ROSEN BIEN GALVAN & GRUNFELD LLP
           315 Montgomery Street, Tenth Floor
16         San Francisco, California 94104-1823
           By:  MICHAEL W. BIEN, Attorney at Law
17              415.433.6830
                (Present when indicated.)

18

19    FOR DEFENDANTS:

20         ATTORNEY GENERAL OF CALIFORNIA
           455 Golden Gate Avenue, Suite 11000
21         San Francisco, California 94102-7004
           By:  PATRICK RICHARD McKINNEY II
22              Deputy Attorney General
                415.703.3035
23              Patrick.McKinney@doj.ca.gov

24    ALSO PRESENT:  ELDON VAIL

25
```

4

1    MR. BORNSTEIN:  Q.  Well, let's go back to

2   Exhibit 4, your email.  And at the top, in your response

3   to Mr. McKinney, you say:

4        Patrick, thanks for sharing this memo.  I

5        think the Deputy Director was spot-on in

6        addressing two of my major concerns and his

7        direct involvement in moving this forward when

8        coupled with the OJT provided by the Wardens

9        should bear fruit and serve as timely refinements

10       to the system.  Steve.

11   **A.  Correct.**

12       Q.  So it -- obviously, it sounds like you thought

13   that this was a good development.  Right?

14   **A.  Correct.  Correct.**

15       Q.  And you thought that it needs to be coupled

16   with the on-the-job training that this memo suggests

17   needs to happen.  Right?

18   **A.  Correct.**

19       Q.  And then, as you put it, it should bear fruit.

20   What does that mean?

21   **A.  That we should see maybe some diminution,**

22   **reduction, in the use of OC spray in controlled**

23   **use-of-force situations.**

24       Q.  Why is it that you wanted there to be a

25   reduction in the use of OC spray, or why did you make

77

Case 2:90-cv-00520-KJM-SCR    Document 4638-2    Filed 05/29/13    Page 18 of 117
STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1   that recommendation?

2       A.  I was concerned about the amounts in some of

3   the deployment applications that -- you know, the

4   different kinds of dispersal agents used in a controlled

5   use-of-force situation in which the inmate was inside

6   his cell, secured in his cell and was not armed or

7   barricaded, that I had concerns that sometimes,

8   occasionally, quite a lot of chemical agents used in

9   that -- used with applications that weren't necessarily

10  appropriate for that setting.

11      Q.  I believe you described the -- is it MK?

12      A.  MK?

13      Q.  MK-9?

14      A.  Yes.

15      Q.  Is that right?  That's the big canisters that

16  most of the guards have?

17      A.  Yeah, it's a crowd control -- a crowd control

18  contaminant size OC canister.

19      Q.  And that's -- you observed that that seemed to

20  be one of the weapons of choice in terms of cell

21  extractions?

22          MR. McKINNEY:  Objection.  Argumentative.

23          THE WITNESS:  Yeah, certainly, oftentimes, yes.

24          MR. BORNSTEIN:  Q.  In California?

25      A.  In California.

78

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    Q.  And you were concerned that, in particular, in

2    the close quarters of a cell, that particular crowd

3    disbursement MK-9 canister might put a lot of gas in

4    there that might be overwhelming?

5    **A.  A lot of gas, yes.**

6    Q.  Unnecessary?

7    **A.  Yes.**

8    Q.  Unsafe?

9    **A.  Certainly increases risk.**

10    Q.  And you wanted the policy to change so that

11    that wouldn't be the weapon the choice?

12         MR. McKINNEY:  Objection.  Assumes facts not in

13    evidence, misstates prior testimony, it's vague and

14    ambiguous, it's argumentative.

15         THE WITNESS:  I had multiple discussions on the

16    appropriateness of MK-9 being the standard issue to line

17    officers.  And I also had concerns that -- about the

18    lack of guidance of when to deploy this weaponry versus

19    that weaponry, chemical agents.

20         MR. BORNSTEIN:  Q.  But in particular, what is

21    addressed in this memo and what you had recommended was

22    that there needed to be more control at the

23    institutional level about when and how they used OC

24    spray, especially in connection with cell extractions,

25    but not limited to that.

79

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1        MR. McKINNEY:  Objection.  Vague and ambiguous,

2    argumentative.

3        THE WITNESS:  That I have concerns?  I -- what

4    does that mean, Counsel?

5        MR. BORNSTEIN:  Q.  Well, I'm trying to

6    understand why you made the recommendation.  Why did you

7    make the recommendation you made?  That's what I'm

8    trying to understand.  Because you're a thoughtful

9    person, and it seems to me, if you said it, there was

10    something behind it.  And I'm trying to figure out what

11    that was.

12        A.  It was this:  That MK-9 is a crowd control

13    contaminant size.  It disperses and is intended to

14    disperse large amounts of -- depending on the style, but

15    typically liquid OC spray across a open space.

16        When -- and one press of an MK-9 versus one

17    press of an MK-3, you're talking about two entirely

18    different amounts of OC spray.  And to disperse that in

19    a fully enclosed area routinely just creates a higher

20    risk of harm than tactically you need to create, because

21    the MK-3 or MK-4 could be equally effective in that

22    setting and disperse a lot less, but yet be as

23    effective.

24        So I was concerned that it could be suggested

25    that we're using excessive -- or they're using excessive

82

1  **amounts of chemical agent than is tactically called for,**

2  **and then that is a short step to somebody coming in and**

3  **saying, well, that's excessive force, or -- and**

4  **especially if some harm accrues or results from that**

5  **direct application, and it's 9 ounces of OC when half an**

6  **ounce is a typical application in that setting,**

7  **obviously, that creates issues.**

8      Q.  Well, you yourself would have concerns about

9  constitutional issues for that, wouldn't you?

10     **A.  I would.**

11     Q.  And you would -- you wouldn't hesitate to go in

12 and say, if that was happening, that it was

13 unconstitutional, would you?

14     **A.  No, I wouldn't, and I -- I did -- I had these**

15 **discussions with counsel and agency officials, expressed**

16 **myself.**

17     Q.  And said that, look, what you guys are doing is

18 wrong.

19         MR. McKINNEY:  Objection.

20         THE WITNESS:  No.  No, I didn't say that.  What

21 I said is, if you're using what some might consider to

22 be this device inappropriately, you better doggone well

23 have some safeguards that attach to it of when you use

24 it, under what circumstances are -- there's potential

25 for all kinds of different potential, both

83

1   correctionally and legally and so forth.

2          MR. BORNSTEIN:  Q.  So this memo, Exhibit 5,

3   is, in your -- is this like the first step in that

4   process?

5       **A.   It was a step.**

6       Q.  Okay.  And what it says is -- one of the things

7   that it does is, it tries to ensure that the people in

8   the field give enough time between different

9   applications of the spray so that it has a chance to

10  work.  Right?

11      **A.   Yes.**

12      Q.  And was that because you saw from the videos

13  that you watched there were times where there were

14  successive use of spray, maybe grenades, and other

15  things, without really giving it a chance to work before

16  the next application was applied?

17         MR. McKINNEY:  Objection.  Vague and ambiguous.

18         THE WITNESS:  We saw that not only in videos,

19  but in incident reports and so forth, yes.

20         MR. BORNSTEIN:  Q.  And that clearly raised

21  those issues of excessive force in your view?

22         MR. McKINNEY:  Objection.  Argumentative.

23         THE WITNESS:  It raised issues of -- at that

24  point -- I don't reach those kind of conclusions doing

25  this work -- oh, that's excessive force, yeah --

                                                        84

1    especially in a pattern and practice.

2            What I would do is, say, that's a problem here.

3    That's an issue here --

4            MR. BORNSTEIN:  Q.  Okay.  Well, in fact --

5        A.  -- that will come back to bite you type of --

6        Q.  That's how you do it?

7        A.  Well, at the time, on an individual case, yeah,

8    until I have an understanding of whether it's a pattern

9    and practice.

10        Q.  It is true --

11        A.  What would you have me do?  Go around arresting

12    these people or something, accusing them, or --

13        Q.  Well, I don't know.  You tell me.  What do you

14    think should be done if somebody's using excessive

15    force?

16        A.  Well, they'd be enjoined to stop it in a class

17    action.  Don't talk to me about that.  I've reformed

18    more facilities in this country on that than you'll ever

19    even think about.

20        Q.  So you agree with --

21        A.  Don't even question that.

22        Q.  I'm not.  I'm asking you --

23        A.  I've put myself in harm's way physically,

24    politically, and every other way to stop this kind of

25    thing.

85

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1      Q.  Because it's very hard to do, isn't it?

2      A.  **It's difficult to do.  But more than that, it**

3  **hurts people.  It's inhumane, it's immoral.**

4      Q.  What's inhumane?

5      A.  **To hurt somebody when it's not necessary.**

6      Q.  Right.  I agree with you.

7          But my question to you, though, is, this

8  particular policy that you helped to create -- or

9  inspire, let me put it that way -- I mean, this should

10 have been done long before they hired you, shouldn't it?

11         MR. McKINNEY:  Objection.  Vague and ambiguous,

12 it's argumentative.

13         THE WITNESS:  Well, I would answer this by

14 saying, where have all your experts been and the Special

15 Master's experts been and the Court been while this has

16 been going on in plain view?

17         MR. BORNSTEIN:  Q.  So they should have --

18     A.  **I mean, you want to always focus on the agency.**

19 **This has not been secret, what I've identified here.**

20 **This has been out there for everybody to see.  But**

21 **people count beans.  The Special Master just counts**

22 **events.  They haven't looked at actual applications.**

23 **Your people haven't.  I mean, there's got to be some**

24 **equity in these things here.  This is unfair.**

25     Q.  It's unfair for outsiders to run the

86

1   institution?

2        **A.   No.   No.   It's unfair to hold them to a high**

3   **standard that y'all don't seem to have to meet.**

4        Q.   Whose prison is it?

5        **A.   It's the public's.**

6        Q.   But who runs it?

7        **A.   The public trustees.   The agency officials.**

8        Q.   Well, those are CDCR people.

9        **A.   Yes.   No, I'm not trying to diminish their**

10  **responsibility.   They -- it is their responsibility.**

11       Q.   Okay.   They're the ones --

12       **A.   I'm just wondering, you know, where's everybody**

13  **else been in this thing?**

14       Q.   Well, I don't know.   But I know -- I'm trying

15  to find out where you're at and where they're at, and

16  that's what I'm trying to figure out.

17       **A.   And I'm trying to answer that.**

18       Q.   And I appreciate that.   But my question to you

19  is, it seems like what you've suggested here and what

20  they have adopted is something that should have been

21  adopted a long time ago.

22            MR. McKINNEY:   Objection.   Calls for --

23            MR. BORNSTEIN:   Q.   Would you agree with that?

24            MR. McKINNEY:   Objection.   Calls for

25  speculation, it's argumentative.

87

1    THE WITNESS:  Well, I -- it should have been

2    adopted when they had enough information to know that,

3    through their reviews, their investigations, and their

4    oversight, that there is a potential problem here.

5    MR. BORNSTEIN:  Q.  All right.  And you

6    would -- does it surprise you -- well, let me ask it

7    this way.  Hypothetically, have you heard -- no, let me

8    do it this way:

9    In your tours, when you interviewed command

10   staff at whatever prison you were at, did they tell you

11   that they prefer using spray as opposed to other means

12   to extract prisoners from cells?

13   **A.   Yes.  I think that's generally true.**

14   Q.   And that's because of what they call officer

15   safety?

16   **A.   And inmate safety, likewise.**

17   Q.   And in general, there's nothing wrong with that

18   as far as you're concerned, so long as they do it in a

19   sensitive way and not an excessive way.

20   **A.   Well, I would couch it more in terms of a**

21   **tactical, sound manner.**

22   Q.   Okay.

23   **A.   That accomplishes the objective of the force,**

24   **which is to neutralize aggression.  I look at it very**

25   **coldly, very objectively.**

88

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    actions which may not be in compliance with policy."

2        A.   Yes.

3        Q.   All right.  So there's two things that

4    Mr. Stainer has said, which is, one, give it time, don't

5    go overboard when you use these OC products.  Right?

6        A.   Yes.

7        Q.   And the subpart of that is, I expect my

8    incident commanders and on-site managers to utilize

9    their knowledge, training, and experience as well as

10   common sense.  Right?

11       A.   Yes.

12       Q.   And then, he says, "and beyond that, I expect

13   our review processes to be thorough and meaningful."

14       A.   Correct.

15       Q.   Right?

16       A.   Correct.

17       Q.   Now, the -- you've read the Inspector General's

18   report about the review processes.  Correct?

19       A.   Yes.

20       Q.   And you've seen that there are errors that are

21   made at every level.

22       A.   Yes.

23       Q.   And there's incomplete information at every

24   level.

25       A.   Yes.

90

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1     Q.  Right?

2     A.  **Well, there's -- I think that's stated a bit**

3  **harshly, "at every level."**

4     Q.  Well, okay.  Well, I'm -- in the review

5  process --

6     A.  **It says what it says.  I mean, we can all get**

7  **it.**

8     Q.  Do you agree with what the Inspector General

9  said?

10     MR. McKINNEY:  Objection.  With respect to

11  what?  Vague and ambiguous.

12     MR. BORNSTEIN:  Q.  To the review of the use of

13  force that's being done.

14     MR. McKINNEY:  Objection.  Vague and ambiguous.

15     THE WITNESS:  I found their findings in some

16  respects consistent with some observations I had made in

17  the review process.

18     MR. BORNSTEIN:  Q.  What were those?

19     A.  **That certain issues that I thought should have**

20  **been more flushed out and identified as maybe requiring**

21  **some level of further inquiry were not always so**

22  **identified at, you know, various levels.  Either first**

23  **level, second level, IERC.**

24     Q.  How do you explain that?  Isn't that a problem?

25     MR. McKINNEY:  Objection.  Argumentative, vague

91

1          MR. BORNSTEIN:  Q.  Right?

2          MR. McKINNEY:  Argumentative.  Vague and

3     ambiguous, mischaracterizes the OIG, it calls for

4     speculation.

5          THE WITNESS:  Well, I would have to revisit

6     that to see that, because I don't quite frankly -- I

7     recall most of the kind of critical findings of the OIG,

8     especially where they kind of dovetail with mine.  I

9     don't recall that particular finding, because I found,

10    for the most part, the officers' reports do very clearly

11    set out what force was used.  I mean, whether it's an

12    MK-9, whether it's an expandable baton, whether it's a

13    Stinger grenade, whatever it was.  Now, that's all I can

14    testify to, is what I observed in my review of the

15    report.

16         MR. BORNSTEIN:  Q.  In terms of the review,

17    though, you need to know why force was used.  Right?

18    **A.   That's the inquiry.**

19    Q.   And how much force was used.

20    **A.   Yes.**

21    Q.   And whether -- therefore, then you can make the

22    judgment as to whether it was reasonable or not.  Right?

23    **A.   Yeah.  I mean, it's threat, need, amount,**

24    **moderation, et cetera.  Yeah, you -- you first establish**

25    **what precipitated the need to apply force.  What was the**

93

1  **threat.  You know, some relation between**

2  **resistance/response.  Then you move to what amount of**

3  **force was used in that given situation.  You have a**

4  **need, you have an act, you have a threat, and you have**

5  **a -- and then you move on through.  And did they temper**

6  **that, or did they keep using it, or did they use too**

7  **much or whatever.**

8       Q.  And it's still a work in progress for

9  California to get that process right.  Isn't it?

10           MR. McKINNEY:  Objection.  Misstates prior

11  testimony; it's argumentative.

12           THE WITNESS:  They certainly have identified

13  that process.  I mean, you can see on their forms, you

14  know, need, et cetera.

15           There were some isolated instances that --

16  incidents that I reviewed where I believe that there

17  should have been further inquiry.

18           MR. BORNSTEIN:  Q.  They've got -- the policies

19  seem to be the right, I don't know -- they have got the

20  right paperwork requirements.

21       **A.  Yes, I believe they do.**

22       Q.  The way in which they use the paper and review

23  the paper and implement the sort of review is still not

24  quite right.

25           MR. McKINNEY:  Objection.  Asked and answered.

94

1          MR. BORNSTEIN:  Q.  Isn't that true?

2          MR. McKINNEY:  Asked and answered.  Misstates

3     prior testimony.  It's argumentative.  It's compound.

4     It's unintelligible.

5          THE WITNESS:  My findings are that the system

6     is effective.  Can the system be improved?  Of course.

7     Of course it can.  Any system can.  Is it -- could it

8     stand some significant retooling and so forth?

9     Certainly.  I think I would make suggestions that would

10    be cast as significant.

11         But is it -- is it failing to in most cases

12    flush out and identify instances of plainly excessive or

13    unnecessary force?  The system is structured to do that.

14         MR. BORNSTEIN:  Q.  Okay.  And the fact that it

15    is structured to do that is something that's important

16    to you.  Right?

17    **A.  Yes.**

18    Q.  Did -- have you -- in the year plus that you've

19    been an expert for the State, have any use-of-force

20    referrals resulted in discipline of any staff?

21         MR. McKINNEY:  Objection.  Calls for

22    speculation.

23         MR. BORNSTEIN:  Q.  To your knowledge.

24    **A.  I was not able to document a fully realized**

25    **imposition of a disciplinary sanction for an excessive**

95

1    use of force that I looked at.

2         Q.  Or an unnecessary use of force?

3         A.  Unnecessary, excessive.

4         Q.  And that's one of the hallmarks, one of the

5    criteria that you insist upon in terms of being a viable

6    part of a use of force system and process, don't you?

7         A.  Yes.

8         Q.  And so we don't know, is really the answer,

9    because you couldn't figure it out from your work.  Is

10   that right?

11        A.  There were always -- they were in varying

12   stages of progression toward some resolution.

13        Q.  But none of them have been resolved.

14        A.  I couldn't find one where, yes, we imposed this

15   penalty through the formal disciplinary process for this

16   violation.

17        Q.  Did you have the opportunity to look at any of

18   the sort of -- what do they call it, Internal Affairs?

19   Is that who does these investigations?

20        A.  Well, they're an entity that does, the agency,

21   Internal Affairs.

22        Q.  Did you get any of their reports about what

23   they were doing?

24        A.  You mean particular investigations?

25        Q.  Yeah.

96

1   of that, because I can't see it.

2       **A.   Where they were referred for investigation, the**

3   **investigations I reviewed -- few in number,**

4   **admittedly -- were conducted in a professional,**

5   **appropriate manner.**

6       Q.   But there weren't enough referred.

7           MR. McKINNEY:  Objection.  Vague and ambiguous.

8           THE WITNESS:  I raised that issue with the

9   agency, that, in my view, in my experience, that the

10  number of cases referred for full-scale investigations

11  appeared to me to be low.

12          MR. BORNSTEIN:  Q.  And you in fact found some

13  specific examples where you said to the secretary --

14  Mr. Beard, right, he's the secretary?

15      **A.   Yes.**

16      Q.   You should -- here's four, five, six cases that

17  I found, I think these should be investigated?

18      **A.   There were a number of cases that I identified,**

19  **after having reviewed the full packets, that I concluded**

20  **there were some unanswered issues.  And that's what an**

21  **investigation is for, is to answer those.**

22      Q.   No, I understand that.

23      **A.   Once they're framed.**

24      Q.   But they raised issues in your mind of

25  excessive or unnecessary --

                                                        103

1      Q.  Who was that, do you know?

2      A.  I don't recall.  It's -- I mean, it's one of

3   the --

4      Q.  All right.

5      A.  It will probably be in my notes, because I

6   noted that she was going to route the -- take that back

7   for further look-see and possibly referral for

8   investigation.

9      Q.  Okay.  Aside from that one, do you think the

10  other ones were referred?

11     A.  No, I don't think they were.

12     Q.  Okay.  You also say there should be effective

13  supervisory review of all use-of-force reports, and at

14  least, given all the paperwork we've seen, there are

15  supervisors reviewing all these reports in the various

16  institutions.  Correct?

17     A.  Yes.

18     Q.  Now, I guess the issue is the term "effective,"

19  and I guess that gets to maybe what the Inspector

20  General is getting at, which is, well, why are there so

21  many errors or missing information or unresolved issues,

22  why aren't the supervisors catching this sooner.  It

23  sounds like the issue that the Inspector General has

24  raised.  Right?

25     A.  Well, there's some consistency between the

105

 1   OIG's conclusions and observations on this issue in

 2   terms of, you know, what you just raised, and my

 3   observations that the referral rate appears to me to be

 4   low.

 5        There's various explanations for that.  OIG has

 6   some, I've got some, and so forth.  But there's --

 7   there's something that needs -- really needs to be

 8   focused on to explain whether that rate is so low as to

 9   reflect on the integrity of the system.  I mean, it's --

10        Q.  And why do you think that it is so low?

11        A.  The definitions in the regs that define GBI and

12   SBI for referral is a starting place, I can tell you, is

13   not -- I think I can tell you that one of the issues is,

14   it's a very, very high bar of cases that have to be

15   referred.  Great bodily injury or serious bodily injury

16   that's defined as really serious.  I mean, like

17   concussions and stuff.

18        Well, that -- it all has to be referred.  If it

19   ain't that, it ain't going to get referred.

20        Q.  When they shoot an inmate with one of those

21   block gun things, is that something that should be

22   referred?

23        MR. McKINNEY:  Objection.  Vague and ambiguous.

24        THE WITNESS:  There are certain levels of

25   weaponry, in certain scenarios, that, yes, I -- in other

                                                        106

1    words, if he's not barricaded and he's unarmed and

2    you're putting Stinger grenades in there or 37

3    millimeter block guns or whatever, yeah, I'd question

4    that.  I think that needs to be addressed.  Why was that

5    used as opposed to MK-3, or why did you not consult, or

6    why did you not do -- I mean, that's how you control use

7    of force.  That's how you minimize it, is calling into

8    questions tactics.

9          Now, often they're perfectly appropriate, and

10   most of the time are, yeah.  The lieutenant says, this

11   is why I did that and so forth.  But there are -- you

12   know, when you've got inconsistencies between the force

13   described and injuries -- no hard-impact strikes, but

14   you've got knots -- it needs to be addressed.

15         So there's -- you know, there's things that

16   should be and merit further inquiry, whether that's a

17   full-blown investigation, whether it's preliminary

18   inquiry, related to an incident of force.

19   Q.  If you've got --

20   **A.  I mean, other than great bodily injury, near**

21   **death, or unconsciousness?**

22   Q.  Right.

23   **A.  But I have articulated that, and I think,**

24   **hopefully, that there's -- they're looking at that.**

25   Q.  But they haven't accepted your recommendations

1  on that yet.

2          MR. McKINNEY:  Objection.  Calls for

3  speculation.

4          THE WITNESS:  Yeah, I don't know what the

5  status of those are.

6          MR. BORNSTEIN:  Q.  I can only ask you what you

7  know.

8      **A.  Yeah, I know.  I mean, I've had discussions,**

9  **pretty high levels.**

10      Q.  But it hasn't happened yet, to your knowledge?

11          MR. McKINNEY:  Objection.  Calls for

12  speculation.

13          THE WITNESS:  No, I have not seen any proposed

14  change in the criteria by which you refer use-of-force

15  incidents for investigation, no.

16          MR. BORNSTEIN:  Q.  Have you been provided with

17  any of the training materials that are being used for

18  staff in terms of use of force?  Have you reviewed those

19  training materials?

20      **A.  I did some local training materials, and then**

21  **some systemwide.**

22      Q.  And did you think that there should be some

23  improvements in those training materials?

24          MR. McKINNEY:  Objection.  Vague and ambiguous.

25          THE WITNESS:  There would certainly be things

108

1        A.   Yes.

2        Q.   And does that include going -- are you still

3   going into the institutions?

4        A.   No.

5        Q.   Are you still meeting with the State officials?

6        A.   No.

7        Q.   So what kind of work are you doing?

8        A.   This kind of work.

9        Q.   Oh, just sitting for depositions?

10            Okay.  This would be a good time to take a

11   break for lunch.

12            MS. CESARE-EASTMAN:  Off the record.

13            (Lunch recess from 12:12 p.m. to 1:01 p.m.)

14                         --o0o--

15                    AFTERNOON SESSION

16            (Deposition Exhibit 6 was marked for

17            identification.)

18            MR. BORNSTEIN:  Q.  Okay.  We're back on the

19   record.

20            Mr. Martin, anything from our morning session

21   that you wanted to clarify or change as a result of the

22   break?

23        A.   No.

24        Q.   So, I want to talk about your recommendations

25   regarding use of force, and I've handed you what's been

                                                    122

1   marked as Exhibit 6, which are -- actually, I believe,

2   are your notes.  So you typed them up.  Right?

3       **A.  Yes, I did.**

4       Q.  And the first 2 pages are with respect to

5   use-of-force recommendations.  Correct?

6       **A.  Correct.**

7       Q.  And then the last -- I see it's actually out of

8   order.  So we also -- the first 2 pages and the last

9   page are use of force, and the middle pages are RVR.

10  That's where page 1 is.  This is not stapled correctly,

11  probably because of the way it was copied.

12          Okay.  So let me go back and do it this way.

13          Bates number DEXP 105138, -139, and -143 are

14  the three pages in this exhibit that deal with your

15  use-of-force recommendations.  Correct?

16      **A.  Yes.  Certainly -138 and -139.  -143 more is**

17  **just an accounting, audit methodology and observations.**

18  **That's to say, those were not recommendations.**

19      Q.  Got it.  So let's start with -143, so the last

20  page.

21      **A.  Okay.**

22      Q.  And talk about your -- you know, in this

23  document, you call it audit methodology.  But earlier

24  you told us you really didn't do that.

25      **A.  Right.**

                                                        123

1   pretty much the same here, there, everywhere, if the

2   facilities -- I mean, if it's a prison and it's medium

3   security, whatever, you can pretty well predict the

4   types of events that you're going to have.  You know,

5   inmate-on-inmate assaults, inmate refusal to obey orders

6   and inmates going off and so forth.

7        So you can tailor, you know, your tactical

8   equipment to those events, and I believe that -- I don't

9   believe in like every time you have an inmate-on-inmate

10  assault that any threat level constitutes a threat

11  sufficient to use a whole array of weaponry.

12      Q.  Well, so I'm just trying to understand, from

13  your perspective, you're on a yard, an alarm goes off in

14  one of the buildings just outside the yard, and all

15  of -- you know, and then I guess staff is told how to --

16  they respond in great numbers running across the yard

17  and --

18      **A.  Oftentimes, yeah.**

19      Q.  -- from everywhere else to respond to that

20  alarm.

21      Is having your baton drawn and ready for use

22  one of the things that they should be taught?

23      MR. McKINNEY:  Objection.  Vague and ambiguous,

24  calls for speculation.

25      THE WITNESS:  Again, I don't know -- I don't

                                                        130

1   think that that is a tactically sound to show up,

2   irrespective of what your observations dictate or tell

3   you, with a drawn baton, because it's obviously going to

4   be more often deployed if it's more often in the ready

5   position.

6          MR. BORNSTEIN:  Q.  So is that a warning flag

7   or a red flag that maybe there needs to be more

8   training, assuming that it happened in the manner I'm

9   describing?

10         MR. McKINNEY:  Objection.  Argumentative, calls

11  for speculation.

12         THE WITNESS:  In my view, it's a flag for me to

13  more closely scrutinize that event or that incident when

14  it's in use, when I know, number one, it's carried on

15  their belt, and that I see it frequently looking down at

16  a log sheet, EB, EB, EB, that I'm going to start

17  scrutinizing more closely, because I know it's

18  ever-present and it's often deployed.  And I know other

19  systems where they don't deploy batons except in rare

20  instances at very, very, serious bodily injury, you

21  know, great bodily injury threat, that type of thing.

22  But it's not deployed in a common yard fight in my

23  experience.

24         MR. BORNSTEIN:  Q.  What institutions or

25  facilities are you thinking about when you make that

131

1    comment?

2        A.    It's pretty routinely deployed at all

3    facilities I looked at.

4        Q.    In California?

5        A.    In California.

6        Q.    But that's different than what you're used to

7    seeing?

8        A.    Yes.    Yeah, in a lot of systems they -- without

9    batons will be a factor in the operation.    They

10   certainly don't carry them.    Some do, supervisors -- but

11   typically you don't see a baton present among the line

12   staff in a confinement setting.

13       Q.    And what about that MK-9 standard issue?    Is

14   that also unusual?

15       A.    It's also unusual to see -- you have all

16   variations, but, you know, you have some chemical agent

17   arsenals that are only carried by supervisors, only

18   carried in certain parts of the facility, you have some

19   that don't carry it at all, but it's available in

20   central locations, and you have some where all -- so you

21   have -- but I have not seen MK-9 be a standard issue on

22   a Sam -- you know, on-the-person belt, anywhere but

23   California.    I've never seen it.    I've seen it in other

24   systems that they deploy it frequently.    I mean, it's

25   accessible, and when they have an incident, regardless

132

1  of what that incident is, they use MK-9, but I've not

2  ever seen that being carried on a person on line level.

3      Q.  And you're comparing it to what kinds of other

4  systems?  I mean, is California --

5      A.  I've been in so many.  I've probably been in

6  confinement operations in 40 of the 50 states.

7      Q.  So nobody else does it like this.

8      A.  Not that I recall.  I've never seen an MK-9

9  being standard issue on a line level.

10     Q.  What about in the last 5 years?

11     A.  No.

12     Q.  How many different kinds of institutions have

13 you been to in the last 5 years?

14     A.  I'd have to study that, but I typically during

15 a 12-month period find my way in between, you know, 5

16 and 10 facilities a year, so I -- you know, I could very

17 well have been in 30 to 50 facilities in the past 5

18 years, easily.

19     Q.  And you said you -- I think during the past

20 year you've been working on 20 different cases or

21 something?  Sorry, I didn't --

22     A.  It went down wrong.  I've got 20 different

23 client -- cases, yeah, if you will.

24     Q.  And are some of them -- I mean, are the -- can

25 you discuss which ones they are?

133

1    the standard-issue weaponry that the custody officers

2    have.

3         There are also a lot of guns in the California

4    prisons, aren't there?

5         A.  Yes.

6         Q.  And that's unusual too, isn't it?

7         A.  Yes.

8         Q.  They're in the housing units?

9         A.  Yes.

10        Q.  They're in the yards?

11        A.  Yes.

12        Q.  It seems like, in fact, the whole prison seems

13   to be controlled by armed guards with live weapons.

14   Right?

15        MR. McKINNEY:  Objection.  Argumentative.

16        THE WITNESS:  California has both, you know,

17   lethal weaponry and non-lethal weaponry to an extent

18   with which I'm not familiar in other systems.

19        MR. BORNSTEIN:  Q.  It seems as though -- I

20   mean, doesn't that sort of lead to more violence?

21        MR. McKINNEY:  Objection.  Calls for

22   speculation.

23        THE WITNESS:  If it's not vigorously monitored,

24   vigorously controlled, a lot of oversight, strict, you

25   know, good solid protocols, policies and procedures, it

141

1          MR. McKINNEY:  Objection.  Vague and ambiguous.

2          MR. BORNSTEIN:  Q.  Right?

3     **A.  Sure it could.  He or she is going to have to**

4  **have support, some kind of basis to do that.  I can**

5  **assure you, if I had a constitutional basis to**

6  **recommend, it's incumbent on me as an officer of the**

7  **court to do it, and I've been doing that my entire life**

8  **without hesitancy at great risk, as I said earlier,**

9  **sometimes to myself.**

10         **Now, I firmly believe these are best practice.**

11     Q.  I understand that.  And I think it's clear what

12  you said in here.  You're not saying that you should do

13  it.  You're saying you're not taking a position, but

14  you're saying it's clearly what you would do if you were

15  the decision-maker.  Right?

16     **A.  I think that's pretty clear that I -- yes, I --**

17  **well, I can tell you that I would have more detailed**

18  **guidance in the use of the expandable baton in the CDCR**

19  **than is currently in their regs.**

20     Q.  Well, right now, there isn't any.

21     **A.  That's pretty much --**

22     Q.  Right.

23     **A.  Pretty -- pretty accurate.**

24     Q.  And that, even though it doesn't necessarily

25  for you, could raise constitutional issues in any

                                                          152

1    Q.  Did you see any instance in the 440 packets

2    that you reviewed where the mental health status of the

3    inmate led to a finding of not guilty?

4    **A.  Let me be careful there, because I monitored**

5    **this in several systems.**

6    Q.  If you remember.

7    **A.  I don't know that the finding was not guilty.**

8    **I know there were some instances where the disciplinary**

9    **hearing officers did not impose any penalty.**

10    Q.  Right.  And I'm going to get to that.

11    **A.  But as far as a finding of not guilty --**

12    Q.  Right.

13    **A.  It -- I don't know.  I've been monitoring this**

14    **in several other systems, and I -- I would have to**

15    **either look at my notes or go back through my source**

16    **documents, because I'm hesitant to say that I did.  I**

17    **know I have in some of the cases I've been monitoring.**

18    Q.  Okay.  But as you sit here today --

19    **A.  I can't think of any.**

20    Q.  All right.  Is -- did you see some cases where

21    an inmate had a seizure and was cited for assault on

22    staff?

23    **A.  I don't specifically recall that situation.**

24    Q.  Would that be something that would be unusual

25    in your opinion for that to happen?

175

 1    consideration in terms of how you punish them?

 2        **A.  Yes.**

 3        Q.  Okay.  Did you find in the system adequate

 4    discussion by the hearing officer about why they're

 5    doing what they're doing and what they're basing it on?

 6            MR. McKINNEY:  Objection.  Vague and ambiguous.

 7            THE WITNESS:  Well, I don't want to speak in

 8    terms of "adequate."  I believed after doing my review

 9    that there should be a requirement or a strong

10    recommendation that they articulate specifically how

11    they incorporated the clinician's recommendation of

12    including that consideration in the disposition.

13            Simply because I could not always tell when I

14    was reviewing the forms that they had done that.

15            MR. BORNSTEIN:  Q.  Why not?  Why couldn't you

16    tell?

17        **A.  It just -- they didn't say anything.**

18        Q.  Well, they said they took it into

19    consideration.

20        **A.  Right.**

21        Q.  So why isn't that enough?

22        **A.  Well, because I think it needs to be**

23    **systematically tracked, and the only way you can is if**

24    **you articulate that.**

25            **But of equal importance is, there's -- it can**

                                                        177

1    be incorporated, in my view, in two basic ways.  One is

2    a pure mitigation.  You simply mitigate the disposition

3    because he's impaired.  He's got impulse control, and he

4    said, go screw yourself.  That's what people with

5    impulse control have a problem with.  So that's just

6    mitigation.  And then the officers are empowered to do

7    that.

8            Then there's another disposition that we're not

9    going to really mitigate; we're going to tailor.

10           They're both accommodation.  It all requires

11   accommodation.  I think it's important, as a policy

12   matter it would be, if I'm a warden or a manager, to be

13   given guidance on both of those.  The latter, of

14   tailoring so as not to complicate or aggravate the

15   condition, is extremely important, and I want that --

16   I'm warden, I say, I want that done.  Any time a

17   clinician says, if you take away his TV he's going to

18   decompensate, you better not be taking away his TV.

19   Take away something else.

20           Mitigation, on the other hand, I think is an

21   appropriate discretionary decision to the hearing

22   officer, you know.  You got the clinician's input, but

23   I'm not going to tell him he has to mitigate.  I'm going

24   to require him to seriously consider mitigating.

25           So there's two kind of functions there that I

178

1    **would want to manage fairly carefully.**

2        Q.  Okay.  So what you're saying, if I understood

3    you correctly, is, when you look at the law, you've got

4    to accommodate the special needs of prisoners, including

5    those with mental health, in how you impose punishment.

6    Is that right?

7        A.  **That's my understanding.  That's what I embrace**

8    **and act on.  I haven't been told it was wrong yet.**

9        Q.  What's that?

10       A.  **I haven't been told it was wrong yet.**

11       Q.  Well, he's sitting right next to you.  I don't

12   know, ask him.

13           MR. McKINNEY:  Do you want to take a break?

14           MR. BORNSTEIN:  In a few minutes.  You can go

15   out and ask him.

16       Q.  In that context, the idea that you've just

17   articulated is, you want to make sure not just that the

18   punishment fits the crime, but that it fits the

19   individual circumstances of the person if they have got

20   a mental illness or other special need that is going to

21   make it cruel or unusual or further cause pain or

22   unnecessary deterioration by certain punishments you

23   might impose.  Do I have that right?

24           MR. McKINNEY:  Objection.  That misstates the

25   testimony.

                                                        179

 1          THE WITNESS:  It's -- I believe so.  I'm not --

 2     that got a little bit convoluted.

 3          MR. BORNSTEIN:  Q.  Well tell me again -- I'm

 4     trying to understand it as a layperson, and I thought

 5     that's what you were saying.

 6          **A.   I think you're close.**

 7          **That the accommodation is that the actors,**

 8     **clinician and disciplinary hearing officers, be informed**

 9     **as to what possible impact the mental health condition**

10     **had on his behavior, and to be informed of that.**

11          **And if that -- having been informed, that that**

12     **may require, may suggest -- you know, it's kind of --**

13     **you know, it's not absolute, but it may -- in some**

14     **cases, I guess it could mandate, again, if it's one of**

15     **those situations to where if you take his TV he can go**

16     **off on you, that that, you know, be taken into**

17     **consideration in reaching the disposition.  Not tell**

18     **them what they have to impose.**

19          Q.  But just that if they're going to do certain

20     things, they need to know what's going to happen?

21          **A.   Yeah, to be able to articulate that.  I mean, I**

22     **might elect not to mitigate, as a hearing officer, an**

23     **inmate that has impulse control.  But -- I may have a**

24     **very concrete reason for not mitigating.  I just think**

25     **it's incumbent on me to write what that is if I'm not**

                                                          180

1    **going to mitigate and a clinician has said his impulse**

2    **control had an impact on this and it had something to do**

3    **with him telling you to go screw yourself.**

4    **And I don't think the Court's set to tell him**

5    **that he's got to do it, but to render -- take into**

6    **consideration that, and to make a rational, supportable**

7    **decision as to "yes" or "no."**

8    Q.  In the RVR process, aside from the paper that's

9    filled out by the mental health clinicians, there's no

10   mental health staff present during the hearing.

11   Correct?

12   **A.  Typically not.**

13   Q.  And all of the hearings are conducted by

14   lieutenants in the -- who have charge of the particular

15   facility -- you know, that area of the facility where

16   the inmate was?

17   **A.  Typically, yes.**

18   Q.  And doesn't that create a sort of a built-in

19   problem of the hearing officer being also responsible

20   for the staff that's there?

21   MR. McKINNEY:  Objection.

22   MR. BORNSTEIN:  Q.  And as their supervisor?

23   MR. McKINNEY:  Objection.  It calls for

24   speculation, vague and ambiguous.

25   THE WITNESS:  You're asking a question, is he,

181

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1   mental health is taken into consideration in the RVR

2   process that you found?

3          MR. McKINNEY:  Objection.  Vague and ambiguous.

4          THE WITNESS:  I know one of my recommendations

5   was that -- to require a little bit more clarity as to

6   that issue.

7          MR. BORNSTEIN:  Q.  One of the things that you

8   said was that -- well, you've got a number of

9   recommendations, and I want to go to your

10  recommendations.

11         But did you find any oversight or review by

12  CDCR in terms of whether or not hearing officers were in

13  fact taking into consideration mental health concerns;

14  and if so, how?

15         MR. McKINNEY:  Objection.  Vague and ambiguous.

16         THE WITNESS:  They certainly track the issue of

17  whether an assessment was required and done.

18         MR. BORNSTEIN:  Q.  In the review that -- yes,

19  they'll say, was there an assessment done, was it not

20  done.  Correct?

21      **A.  Drilling down to concretely how it was applied,**

22  **less so.**

23      Q.  Well, in fact, I think you called it before

24  bean counters versus -- in another context, they're just

25  looking to see, was it done, and they say, okay -- they

192

1    check the box off, and they say, okay, it was done in

2    this case.

3         MR. McKINNEY:  Object.

4         MR. BORNSTEIN:  Q.  Isn't that the only review

5    that's done in terms of how mental health was used in

6    the RVR process?

7         MR. McKINNEY:  Objection.  That misstates the

8    prior testimony.  The prior testimony related to the

9    Coleman monitor, not to the CDCR.

10        THE WITNESS:  Thank you.  You're actually

11   right.

12        I did not see from reported material

13   information that would flush out how that officer

14   applied the information suggested by the form in his

15   disposition.

16        MR. BORNSTEIN:  Q.  Okay.  In addition to that,

17   there's no tracking done by the institution of, there's

18   440 RVRs, and of those, there were 250 that had Mental

19   Health Assessments, and of those, the officer took into

20   consideration mental health in ten of them, or five of

21   them, or a hundred of them.  They don't keep track of

22   that, do they?

23        MR. McKINNEY:  Objection.  Compound, misstates

24   prior testimony.

25        THE WITNESS:  I did not see or -- did not see

193

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1   that that was done in a way where I could use it.  I

2   know when I was reviewing the individual disciplinary

3   packets, that's what I was seeking, not only that it was

4   executed, but, depending on what the answers were, if

5   the answers to 2 and 3 were "yes" and "yes," I really

6   scrutinized carefully as to what the disposition was, in

7   terms of those answers being "yes" and "yes."

8       MR. BORNSTEIN:  Q.  But you had to do that

9   manually.

10      **A.  Yes.  I had to dig it out of the document.**

11      Q.  Right.  So you had to go through the packet,

12  whatever -- however big the packet was, for each

13  individual person who had an RVR in order to see that.

14  Right?

15      **A.  Yes.  And consequently, that's why I made a**

16  **recommendation that it be affirmatively stated.  And**

17  **once you start doing that, then you can track.**

18      Q.  Because it's important to track, isn't it?

19      MR. McKINNEY:  Objection.  Argumentative, vague

20  and ambiguous.

21      THE WITNESS:  I believe it is, because -- well,

22  it just helps you monitor that it's --

23      MR. BORNSTEIN:  Q.  Well, it's the same way

24  that you talked about use of force.  If you're not able

25  to have real supervisory oversight and review and you're

194

1   not able to kind of drill down and see what's really

2   going on, then you can't effectively implement or

3   monitor the implementation of a program.  Right?

4        MR. McKINNEY:  Objection.  Improper

5   characterization of prior testimony, vague and

6   ambiguous.

7        THE WITNESS:  I think you can.  It's just it

8   makes it more difficult and it puts a greater emphasis

9   on the hard work of drilling down, which, if you don't

10   have the staff and the resources or you don't have

11   external monitors or you don't have some reason to track

12   it, it sometimes -- form overtakes substance, you know.

13   You're filling them out, you're -- it's one of the

14   reasons I'm hesitant about audit instruments.  They

15   don't really allow you to drill down.

16        MR. BORNSTEIN:  Q.  How many hours did you

17   spend reviewing these 440 packets?

18     **A.  Quite a -- I mean, quite a number of hours,**

19   **because, I mean, I'd take a stack and sit there for**

20   **hours at a time doing it.**

21     Q.  10 hours?

22     **A.  For the total, more than that.**

23     Q.  A hundred hours?

24     **A.  I don't know.  I would -- I'd say two to**

25   **three -- I'd say somewhere between probably 50 and 75**

1    **hours.**

2        Q.  In those -- in those -- in that review that you

3    did, even when you found a hearing officer saying he was

4    taking into consideration mental health, could you

5    figure out from the form how or what he did?

6        MR. McKINNEY:  Objection.  Vague and ambiguous,

7    calls for speculation.

8        THE WITNESS:  I could once I became really

9    familiar with the -- you know, the dispositional options

10   and what was typically given for this level of offense

11   and so forth.

12       MR. BORNSTEIN:  Q.  How did you become familiar

13   with that?

14       **A.  Primarily, interacting with the disciplinary**

15   **hearing officers.**

16       Q.  So through your interviews with them?

17       **A.  Yeah.  I had them explain to me how to do that.**

18   **I couldn't have done it without that.**

19       Q.  Okay.  And they would tell you, well, normally

20   they would get 30 days loss of privileges, but here,

21   they got 15 days?

22       **A.  Exactly.**

23       MR. McKINNEY:  Objection.  Vague and ambiguous.

24       MR. BORNSTEIN:  Q.  Is that right?

25       **A.  Yes.**

                                                        196

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    A.  I would --

2         MR. McKINNEY:  Objection.  Compound.

3         THE WITNESS:  I came to routinely ask that

4    question.

5         MR. BORNSTEIN:  Q.  And what did you find?

6    A.  Oftentimes not.

7    Q.  Did you find any systemic mechanism for

8    communicating between custody and clinical mental health

9    staff about the results?

10   A.  No.  That's again why I made a recommendation

11   that they create a formal, you know, means to

12   periodically meet, confer, communicate.

13   Q.  Did you talk to the psychologists that fill out

14   the Mental Health Assessments?

15   A.  Yes.  I tried to every time I could.

16   Q.  And you found, I think you said, in Donovan,

17   that was the best one because they had a special unit

18   that was trained to do it?

19   A.  Well, more important, I think, the RVR

20   Coordinator, or the coordination that really just felt

21   strongly and took it seriously, and had especially good

22   rapport with his -- with the hearing officers, and I

23   think there was even kind of close physical proximity,

24   or they had, you know, kind of frequent access, and they

25   just conferred fairly frequently.

198

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    Q.  And you also mention that the RVR Coordinator

2    chose to create an assessment unit in order to have

3    dedicated specialists making the Mental Health

4    Assessments, which you think is it a very good thing.

5    **A.  Yes.**

6    Q.  And you also said that the RVR Coordinator

7    intended to conduct continuing in-service training for

8    both hearing officers and clinicians.

9    **A.  Yes.**

10   Q.  Did that happen?

11   **A.  I didn't follow up, but there was no doubt in**

12   **my mind that they would be doing that.**

13   Q.  Your third recommendation was that the hearing

14   officer should affirmatively state whether they modified

15   or mitigated the penalties based on the Mental Health

16   Assessment.  Right?

17   **A.  Yes.**

18   Q.  And you said in your review of the packets, it

19   wasn't always clear whether they did that.

20   **A.  Correct.**

21   Q.  And so that's why you want to revise the form.

22        MR. McKINNEY:  Object.

23        MR. BORNSTEIN:  Q.  And that's your fourth

24   recommendation.  Correct?

25   **A.  Correct.**

218

1    A.  Yes.

2    Q.  You would also agree that there should be some

3  communication between -- or after whatever the decision

4  is made letting the clinical staff know, here's what

5  happened, and here's why.

6    **A.  I don't know in each instance, but there should**

7  **be some -- the RVR Coordinator position, there should be**

8  **some tracking of those dispositions in relation to the**

9  **recommendations made on the assessment form.**

10    Q.  Why?

11    **A.  Well, to ensure that they're properly being**

12  **incorporated, consistent with the aim of the form, which**

13  **is obviously to try -- it's a mechanism simply to try to**

14  **say, when the mental health condition is in play, try to**

15  **make a judgment of how it is in play, and how it should**

16  **impact the disposition of this charged disciplinary**

17  **violation.  That's the substance of what you're trying**

18  **to do.**

19    Q.  And from an oversight or review perspective,

20  aren't you also trying to ensure that there is

21  consistency in the way that hearing officers are

22  approaching these things?  Right?

23    **A.  Yes, well, if there's an understanding between**

24  **the two parties as to what this form is and how it's to**

25  **be applied -- executed and applied, you get that**

221

1  **A.  Right.  If I was charged with reviewing the**

2  **entire disciplinary process, yes.**

3  Q.  You would make sure that there was something

4  that was consistent across the board, wouldn't you?

5  **A.  I'm actively monitoring that in a statewide**

6  **system now, and my record speak for itself on that, that**

7  **it's adequately monitored.**

8  Q.  Okay.  And would you think it adequate if the

9  hearing officer, the lieutenant, assigns his -- I don't

10  know, one of his deputies or one of his people that

11  works directly under him to be the Staff Assistant for

12  inmates?  Do you think that that would be a good thing?

13  MR. McKINNEY:  Objection.  Lack of foundation,

14  vague and ambiguous.

15  THE WITNESS:  I'd want a bit more detachment

16  and probably create a system that's different than what

17  you just described.

18  MR. BORNSTEIN:  Q.  Why?

19  **A.  Well, you want some freedom for that Staff**

20  **Assistant to adequately represent that inmate, and it --**

21  **you know, the more separation you get between that Staff**

22  **Assistant and his immediate superior, probably the more**

23  **you move towards ensuring some vigorous advocacy if it**

24  **should come into play.**

25  Q.  Hard to do when you're working for the guy

241

1    mouth.  Not that you would let me anyway.

2        A.  So that's --

3        Q.  Okay.  So you're saying the presumption ought

4    to be that when there are -- when there's a -- well,

5    tell me the criteria that should go into when it is

6    referred.

7        A.  You know, I think I somewhere made some

8    reference, but I would certainly, if there's

9    inconsistent statements --

10       Q.  Right.

11       A.  -- between -- I mean, officer statements, if

12   there's inconsistency between what force is used and

13   injury -- in other words, you have impact injuries, but

14   no impact blows are chronicled -- that needs to be

15   explored.

16       Q.  Okay.

17       A.  Certain kinds of weaponry, when they are

18   employed, absent an obvious reason for them to be

19   deployed, should always be.  In other words, if you use

20   an MK-46 inside of a cell, and it's not real obvious as

21   to why you did, then it needs to be investigated.  Or if

22   you used, you know, a combination of MK-9, grenades, a

23   Z505, and --

24       Q.  BRD --

25       A.  -- a T-16.

278

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

1    Q.  And the BRD thing, too?

2    A.  **Right.  And there's no barricading, and there's**

3    **no weapons, that that should be investigated.  I -- so**

4    **that weaponry would drive some, if there's suggestion of**

5    **any course -- I think I said, any unexplained injuries.**

6    **Not only just inconsistent, any unexplained injury,**

7    **that -- certainly in the red zone areas -- I mean, your**

8    **groin, head, neck, so forth -- should be investigated.**

9    **Failure to video a controlled use of force or a**

10   **video that doesn't capture some critical stage of**

11   **that --**

12   Q.  Which includes, if I may, the planning, the

13   briefing.  Right?

14   A.  **Yeah.  But Jeffrey, what I was talking about**

15   **is, let's say you're filming, the camera is knocked**

16   **away, and when you come back, you know, you've missed --**

17   **they have gone from cell entry, you know, to placing an**

18   **inmate under a shield, that you've missed some critical**

19   **stage of that.  And let's say the inmate says, they hit**

20   **me when they came in --**

21   Q.  Well, the briefing --

22   A.  **-- and the camera -- that just needs to be**

23   **investigated.**

24   Q.  Okay.  What about the failure to have clinical

25   intervention in the case of mental health?

279

STEVE J. MARTIN - CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER - February 28, 2013

```
1                    CERTIFICATE OF REPORTER

2         I, HOLLY THUMAN, a Certified Shorthand Reporter,

3    hereby certify that the witness in the foregoing

4    deposition was by me duly sworn to tell the truth, the

5    whole truth, and nothing but the truth in the

6    within-entitled cause; that said deposition was taken

7    down in shorthand by me, a disinterested person, at the

8    time and place therein state, and that the testimony of

9    said witness was thereafter reduced to typewriting, by

10   computer, under my direction and supervision;

11        That before completion of the deposition review of

12   the transcript [] was [X] was not requested.  If

13   requested, any changes made by the deponent (and

14   provided to the reporter) during the period allowed are

15   appended hereto.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties thereto.

21

22   DATED: March 4, 2013

23

24                          _____
                            HOLLY THUMAN, CSR
25

                                                        300
```

# Exhibit 3

STATE OF CALIFORNIA                                                          DEPARTMENT OF CORRECTIONS

## RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|---|
| ▉ | ▉ | | | SAC | ▉ | ▉ |

| VIOLATED RULE NO(S). | SPECIFIC ACTS | | LOCATION | DATE | TIME |
|---|---|---|---|---|---|
| 3005(a) | DISOBEYING A DIRECT ORDER / ATTEMPTING TO BREAK A FOOD TRAY | | ▉ | 3/26/13 | 1630 Hrs. |

CIRCUMSTANCES

On Tuesday, March 26, 2013, at approximately 1630 hours, while working position #347314, Correctional Officer J. Lewis and I were collecting evening trays and trash in C Section. When we arrived at cell FA3-130, solely occupied by inmate ▉▉▉▉▉ inmate ▉▉ yelled, "Fuck you! You are going to get a Sergeant and a Lieutenant to come in here tonight!" ▉▉ motioned to his tray as he dumped the contents on the ground ▉▉ then place the tray on the ground against the wall at a forty-five degree (45°) angle. ▉▉ then stated ▉"I'll break this tray!" I ordered ▉▉ to give me the tray, and I would get the Sergeant to come talk to him. I pulled my MK-9 O.C. Pepper Spray and put it to the open food port. I told ▉▉ "Don't do it, or I'll use my OC Pepper Spray." ▉▉ stated "I have the Warden in my pocket! I have paper on all of you fuckers! I'll see him at committee." ▉▉ then raised his right foot and leaned in to break the tray with his foot ▉ I dispersed an approximate four (4) second burst of pepper spray from my MK-9 to ▉▉ upper body from an approximate distance of three feet (3') ▉ The pepper spray struck ▉▉ in the chest ▉ Officer Lewis sounded his Personal Alarm Device (PAD) and then utilized the institutional radio to

| REPORTING EMPLOYEE (Typed Name and Signature) | | | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|---|---|
| ▶ A. BRANNEN, Correctional Officer # 63593 | | | 3-31-13 | 347314 | TH/F |

| REVIEWING SUPERVISOR'S SIGNATURE | | DATE | INMATE SEGREGATED PENDING HEARING | | |
|---|---|---|---|---|---|
| ▶ J. BAKER, Correctional Sergeant | | 3/31/13 | DATE      N/A      LOC.    N/A | | |

| CLASSIFIED | OFFENSE DIVISION: | DATE | CLASSIFIED BY (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|---|
| ☐ ADMINISTRATIVE | | | | |
| ☑ SERIOUS | F | 4/1/13 | | ☐ HO  ☐ SHO  ☐ SC  ☐ FC |

### COPIES GIVEN INMATE BEFORE HEARING

| ☐ CDC 115 | BY: (STAFF'S SIGNATURE) | | DATE | TIME | TITLE OF SUPPLEMENT |
|---|---|---|---|---|---|
| | ▶ | | | | CDCR 115MH |

| ☐ INCIDENT REPORT LOG NUMBER: | BY: (STAFF'S SIGNATURE) | | DATE | TIME | BY: (STAFF'S SIGNATURE) | | DATE | TIME |
|---|---|---|---|---|---|---|---|---|
| SAC-PSU-13-03-0227 | ▶ | | | | ▶ | | | |

HEARING

| REFERRED TO ☐ CLASSIFICATION   ☐ BPT/NAEA | | | | |
|---|---|---|---|---|
| ACTION BY: (TYPED NAME) | | SIGNATURE | DATE | TIME |
| | | ▶ | | |

| REVIEWED BY: (SIGNATURE) | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE | DATE |
|---|---|---|---|
| ▶ | | ▶ | |

| | BY: (STAFF'S SIGNATURE) | DATE | TIME |
|---|---|---|---|
| ☐ COPY OF CDC 115 GIVEN INMATE AFTER HEARING | ▶ | | |

CDC 115 (7/88)

STATE OF CALIFORNIA                                                        DEPARTMENT OF CORRECTIONS
**RULES VIOLATION REPORT - PART C**                                              PAGE __2__ OF __2__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| ▓▓▓▓ | ▓▓▓▓ | ▓▓▓▓ | SAC | 3/26/13 |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☒ 115 CIRCUMSTANCES   ☐ HEARING   ☐ IE REPORT   ☐ OTHER_____

### CONTINUATION OF CIRCUMSTANCES

announce the alarm. I ordered ▓▓▓▓ to hand me the food tray. ▓▓▓▓ refused again. I ordered ▓▓▓▓ to remove his clothes for an unclothed body search in order to remove ▓▓▓▓ from the cell. ▓▓▓▓ refused. Responding Staff arrived. Correctional Sergeant J. Baker informed us to leave ▓▓▓▓ in his cell for self-decontamination. I exited C Section. This concludes my involvement in this incident. ▓▓▓▓ is a participant in the Mental Health Services Delivery System at the EOP level of care. Inmate ▓▓▓▓ was not listed on the Institution T.A.B.E. Reading List.

*Lt. MR FeR is oRdeRed in cell DecoNtamiNatioN Not sgt. OMR.J. BAKeR.*

| | | | |
|---|---|---|---|
| | SIGNATURE OF WRITER<br>A. BRANNEN, Correctional Officer | | DATE SIGNED<br>3-31-13 |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED<br>4/2/13 | TIME SIGNED<br>0647 |

CDC 115-C (5/95)                                                           OSP 11 123876

# SERIOUS RULE VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| | | 3005(a) | 3/26/13 | SAC | |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT ☐ YES ☒ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ **I DO NOT REQUEST** my hearing be postponed pending outcome of referral for prosecution. | ▶ N/A | N/A |
| ☐ **I REQUEST** my hearing be postponed pending outcome of referral for prosecution. | ▶ N/A | N/A |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION | |
|---|---|---|
| N/A | | N/A |

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ **I REVOKE** my request for postponement. | ▶ N/A | N/A |

## STAFF ASSISTANT

| STAFF ASSISTANT | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | ▶ ███████ | 4/3/13 |
| ☑ ASSIGNED | DATE | NAME OF STAFF | |
| ☐ NOT ASSIGNED | REASON | | |

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | ▶ ███████ | 4/3/13 |
| ☑ ASSIGNED | DATE | NAME OF STAFF | |
| ☐ NOT ASSIGNED | REASON | | |

EVIDENCE / INFORMATION REQUESTED BY INMATE:

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)

☐ REPORTING EMPLOYEE ☐ STAFF ASSISTANT ☐ INVESTIGATIVE EMPLOYEE ☐ OTHER _____ ☐ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

| | INVESTIGATOR'S SIGNATURE | | DATE |
|---|---|---|---|
| | ▶ | | |
| ☐ COPY OF CDC 115-A GIVEN INMATE | BY: (STAFF'S SIGNATURE) ▶ | TIME | DATE 4/3/13 |

**SERIOUS RULES VIOLATION REPORT**

| CDC NUMBER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| ▉ | ▉ | 3005(a) | 3/26/13 | SAC | ▉ |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT ☐ YES ☒ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | | DATE |
|---|---|---|---|
| ☐ **I DO NOT REQUEST** my hearing be postponed pending outcome of referral for prosecution. | ▶ N/A | | N/A |
| ☐ **I REQUEST** my hearing be postponed pending outcome of referral for prosecution. | ▶ N/A | | N/A |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION | |
|---|---|---|
| N/A | | N/A |

| | INMATE'S SIGNATURE | | DATE |
|---|---|---|---|
| ☐ **I REVOKE** my request for postponement. | ▶ N/A | | N/A |

## STAFF ASSISTANT

| STAFF ASSISTANT | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☑ REQUESTED | ☐ WAIVED BY INMATE | ▶ X ▉ | 4/9/13 |
| ☑ ASSIGNED | DATE 4/8/13   NAME OF STAFF   K. Pinkard | | |
| ☐ NOT ASSIGNED | REASON   Dme per 3315 d 12/ | | |

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☑ REQUESTED | ☐ WAIVED BY INMATE | ▶ ▉ | 4/9/13 |
| ☑ ASSIGNED | DATE 4/8/13   NAME OF STAFF   S. Fears | | |
| ☐ NOT ASSIGNED | REASON   Dme per 3315 d 11/ | | |

EVIDENCE / INFORMATION REQUESTED BY INMATE:

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)

☐ REPORTING EMPLOYEE   ☐ STAFF ASSISTANT   ☐ INVESTIGATIVE EMPLOYEE   ☐ OTHER _____   ☐ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| _____ n/p | ☐ | ☐ | _____ n/p | ☐ | ☐ |
| _____ n/p | ☐ | ☐ | _____ n/p | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

On 4/08/13, I completed the duties of Investigative Employee for CDC 115 Log # ▉ in regard to inmate ▉. I informed inmate ▉ of my assignment, and that my role as I.E. is as a fact finder for the Senior Hearing Officer. Inmate ▉ stated that he had no objection to my serving in this capacity.

**DEFENDANT'S STATEMENT**: Inmate ▉ stated, "I decline an I.E."

**REPORTING EMPLOYEE'S STATEMENT**: Correctional Officer A. Brannen stated, "While collecting food trays, inmate ▉ started yelling, "Fuck you, you are going to get a Sergeant and Lieutenant to come in here tonight." ▉ then threw the contents of his tray onto the ground and placed the tray at a forty-five degree (45°) angle between the floor and the wall and stated he was going to break the tray. I ordered ▉ to give me back the tray. I told ▉ not to try to break the tray, or I was going to pepper spray him. ▉ started saying that he has paper on "All you fuckers," and that he has the Warden in his back pocket. ▉ then raised his foot and leaned in to break the tray. I dispersed pepper spray to ▉'s upper body area. I ordered ▉ to give back the tray again and ▉ again refused. Responding Staff arrived and we were informed by the Sergeant to leave ▉ in his cell for self-decontamination."

**I.E. NOTE**: Inmate ▉ did not request for the I.E. to interview any witnesses, staff or inmate. It should be noted that I conducted my interview with ▉ in the presence of the assigned Staff Assistant, Correctional Officer K. Pinkard.

**END OF INVESTIGATIVE EMPLOYEE'S REPORT**

SF:ah

| ISSUED TO INMATE ON: 4/9/13 AT: 1007 | | INVESTIGATOR'S SIGNATURE ▶ C/O S. FEARS | DATE 4/9/13 |
|---|---|---|---|
| BY: _____ | | | |
| ☐ COPY OF CDC 115-A GIVEN INMATE | BY: (STAFF'S SIGNATURE) ▶ | TIME 0617 | DATE 4/3/13 |

CDC 115-A (7/88)    — *If additional space is required use supplemental pages* —

# Exhibit 4

*CY'S    DISPO*

STATE OF CALIFORNIA                                          DEPARTMENT OF CORRECTIONS AND REHABILITATION

# RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | RELEASE/BOARD DATE EPRD:04/24/2014 | INST. S.V.S.P. | HOUSING NO. | LOG NO. FD-11-07-0002 |
|---|---|---|---|---|---|

| VIOLATED RULE NO(S). C.C.R. § 3005(d)(1) | SPECIFIC ACTS BATTERY ON A PEACE OFFICER WITH A WEAPON | LOCATION D2 'C' POD | DATE 07/02/11 | TIME 1622 HOURS |
|---|---|---|---|---|

CIRCUMSTANCES

On Saturday, July 02, 2011, I was assigned as Facility D Building 2 S&E #1.  At approximately 1622 hours, during trash and tray pick-up, Officer E. Brown and I approached cell 123, solely occupied by Inmate ██████.  Officer Brown opened the food/cuff port.  I extended my right hand to retrieve the food tray from ████ at which time ████ threw his food tray through the opened food port, striking me in the right side, lower abdomen.  ████ reached out of the food port with his left hand and grasped the food port door.  ████ then reached down and appeared to pick up an unknown object from the floor.  I activated my personal alarm and ordered ████ to release the food port or O.C. Pepper spray would be used.  ████ did not comply with my orders.  I utilized my MK-9 O.C. Fogger, spraying ████ in the upper torso.  ████ withdrew his hand and released control of the food port.  I secured the food port as responding staff arrived.  I advised Sgt. R. Machuca of the situation.  Following the incident, I received a 7219 Medical Evaluation by D2 medical staff noting no injuries.  Sgt. Machuca offered me EAP/EPTP, to which I declined.

Inmate ████ is a participant in the Mental Health Service Delivery System at the E.O.P. level of care.

| REPORTING EMPLOYEE (Typed Name and Signature) ► J. VINSON, Correctional Officer | DATE 7/14/11 | ASSIGNMENT D2 S&E #1 | RDO'S T/W |
|---|---|---|---|

| REVIEWING SUPERVISOR SIGNATURE ► E Black Sgt | DATE 07/13/11 | ☐ INMATE SEGREGATED PENDING HEARING DATE _____ LOC. _____ |
|---|---|---|

| CLASSIFIED ☐ ADMINISTRATIVE ☒ SERIOUS | OFFENSE DIVISION A1 | DATE 7/15/11 | CLASSIFIED BY (Type Name and Signature) ► R.Bush, CCII | HEARING REFERRED TO ☐ HO  ☒ SHO  ☐ SC  ☐ FC |
|---|---|---|---|---|

COPIES GIVEN INMATE BEFORE HEARING

| CDCR-115 | BY: (STAFF'S SIGNATURE) ► ▓▓ | DATE 7/15/11 | TIME 1725 | TIME OF SUPPLEMENT ① S.A.  ② 115 NH  ⑤ I.E.  ④ 2nd IE |  |
|---|---|---|---|---|---|
| INCIDENT REPORT LOG NUMBER: SVSP FDY-11-07-0566 | BY: (STAFF'S SIGNATURE) ► ▓▓ | DATE 7/15/11 | TIME 1725 | BY: (STAFF'S SIGNATURE) ① M.WADE  ② M. WADE  ③ M.WADE  ④ M.WADE | DATE 7/15/11  7.26.11  8.10.11 | TIME 1725  1520  1925 |

HEARING

**(DISPOSITION CONTINUED PLEASE SEE CDCR-115C)**

ILC 10/2V/1?

18 men/Mo

7/3/11          8/17/12

REFERRED TO ☐ CLASSIFICATION ☐ BPT/NAEA

| ACTION BY: (TYPE NAME) R. L. MARTINEZ, CORRECTIONAL LIEUTENANT (SHO) | SIGNATURE | DATE 9/16/11 | TIME 0600 |
|---|---|---|---|
| REVIEWED BY: SIGNATURE J. McCALL, FACILITY 'D' CAPTAIN | DATE 9/4/2011 | CHIEF DISCIPLINARY OFFICER'S SIGNATURE L TREXLER, COMP-II A.W. | DATE 9/7/11 |
| A COPY OF CDCR-115 GIVEN INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) ► | DATE 9/19/11 | TIME 1400 |

DEXP 108024

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE __1__ OF __5__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER FD-11-07-0002 | INSTITUTION SVSP | TODAY'S DATE 08/14/2011 |
|---|---|---|---|---|

☐SUPPLEMENTAL    ☒CONTINUATION OF:    ☐CDC 115 CIRCUMSTANCES    ☒HEARING    ☐I.E .REPORT

**Plead:** Inmate ███ entered a plea of **NOT GUILTY** at this RVR hearing.

**Findings:** Inmate ███ was found **NOT GUILTY** of CCR §3005(d) (1), specifically **"Battery on a Peace Officer with a Weapon,"** a Division "(A1)" offense. However, Inmate ███ was found **GUILTY** of a lesser but included charge of **"Battery on a Peace Officer,"** a Division "(B)" offense. This finding is based on the preponderance of evidence presented at the hearing which **does** substantiate the charge. The evidence presented at the hearing included: (Findings Con't See CDCR-115C)

**Disposition:** Inmate ███ was assessed **121** days Forfeiture of Credits, consistent with a Division "(B)" offense per CCR §3323(d) (3).

**Additional Disposition:** Inmate ███ was counseled, warned and reprimanded regarding future behavioral expectations.

**Mental Health Assessment-Mitigation:** Recommended by Clinician/ CDCR-115-MH:    **YES [X]    NO [ ]**
⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱⸱SHO Agrees With Clinician:    **YES [X]    NO [ ]**

**Mental Health Assessment:** The SHO **agrees** with the Mental Health Assessment authored by D. Zimmerman, Ph.D., which states the inmate mental health disorder **did** appear to contribute to the behavior that led to the RVR.

**Classification Referral:** Refer to ICC for Program Review.

| SIGNATURE OF WRITER R. L. MARTINEZ | TITLE Correctional Lieutenant (SHO) | DATE NOTICE SIGNED 08/14/2011 | |
|---|---|---|---|
| ☒COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | DATE SIGNED: 9/19/11 | TIME SIGNED: 1400 |

DEXP 108025

STATE OF CALIFORNIA                                DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                    PAGE __2__ OF __5__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER FD-11-07-0002 | INSTITUTION SVSP | TODAY'S DATE 08/14/2011 |
|---|---|---|---|---|
| ▇ | ▇ | | | |

| ☐SUPPLEMENTAL | ☒CONTINUATION OF: | ☐CDC 115 CIRCUMSTANCES | ☒HEARING | ☐I.E. REPORT |

**Hearing:** 08/14/2011                **Time:** 1100 Hours.        **Hearing Postponement:** N/A.

**Effective Communication:** Inmate ▇ made a personal appearance before this Senior Hearing Officer (SHO), Correctional Lieutenant R. L. Martinez, for the purpose of adjudicating Rules Violation Reports (RVR) Log #FD-11-07-0002, for the specific act of **"on a Peace Officer with a Weapon,"** dated 07/02/2011. Effective communication was achieved by Senior Hearing Officer (SHO) explaining the disciplinary charge(s) to Inmate ▇ by reading the document, speaking slowly and rephrasing in simple English. Inmate ▇ is able to understand and effectively articulate both the nature of the charge(s) and the disciplinary process. This was determined by allowing Inmate ▇ to verbally articulate the charge(s) and the consequences to the Senior Hearing Officer's (SHO) satisfaction. Inmate ▇ stated he understood and was prepared to begin with the RVR hearing process.

**Inmate's Health:** Inmate ▇ was identified by his State I.D. and stated he is in good health, acknowledge receipt of all reports and evidence, and is ready to proceed with the hearing.

**Inmate Plea and Statement:** Inmate ▇ entered a plea of **NOT GUILTY** and stated: "The Officer is lying. No further comment." The SHO utilized the Inmate's I.E. statement from the I.E. Report as part of his written statements, which states "I'm ▇ On 07/09/2011, Saturday, about 16:18 P.M. dinner time. The C/O Vinson bring the tray for dinner. He told me go back window and then he open the food ports door and then he dump the food tray in the toilet. And clear up, 5 minutes later. He came back pick up the tray. I give the tray to C/O Vinson; he dropped back in my cell 3 times. The time he hold the tray and walk away and then he threw the tray on day room in front of my cell and pray me hold bottle while I'm stand back of window. He told the C/O in tower put the alarm on. The C/O Vinson by himself at that time not get to pick the tray in Unit get. That happen on 07/09/2011. (My English broken I try to write this statement when they put me in the gate. The nurse do 7219. The C/O Vinson told the nurse do 7219.)"

**MHSDS:** Inmate ▇ is a participant in the Mental Health Services Delivery System at the E.O.P. / level of care. The circumstances of the RVR **do** require a Mental Health Assessment to be completed. At the Hearing, Inmate ▇ **did not** demonstrate any strange, bizarre, or irrational behavior.

**A Mental Health Assessment was completed by D. Zimmerman, Ph.D. on 07/08/2011 and revealed the following information:**

**Q1)** Are there any Mental Health factors that would cause the Inmate to experience difficulty in understanding the disciplinary process and representing his interest in the Hearing that would indicate the need for the assignment of a Staff Assistant?
**A1)** N/A.

**Q2)** In your opinion, did the Inmate's mental disorder appear to contribute to the behavior that led to the RVR?
**A2)** Yes. I/P is severely mentally ill. His condition renders him "out of touch with reality" and responding to internal stimuli on a frequent basis. His perceptions are distorted. He has very limited interpersonal skills.

| SIGNATURE OF WRITER R. L. MARTINEZ | TITLE Correctional Lieutenant (SHO) | DATE NOTICE SIGNED 08/14/2011 |
|---|---|---|
| ☒COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | DATE SIGNED: 9/19/11  TIME SIGNED: 1400 |

DEXP 108026

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE __3__ OF __5__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER FD-11-07-0002 | INSTITUTION SVSP | TODAY'S DATE 08/14/2011 |
|---|---|---|---|---|

☐SUPPLEMENTAL    ☒CONTINUATION OF:    ☐CDC 115 CIRCUMSTANCES    ☒HEARING    ☐I.E .REPORT

**Q3)** If the Inmate was found Guilty of the offense, are there any mental factors that the Senior Hearing Officer (SHO) should consider in assessing the penalty.

**A3)** Yes. Offense / R.V. could have taken place due to I/P's perception of events.

**DUE PROCESS:** Date of Discovery: 07/02/2011.    Hearing Started on: 08/14/2011.
Initial RVR copy served on: 07/15/2011.    CDCR-115-MH served on: 07/15/2011.
Incident Package served on: 07/15/2011.    S.A. served on: 07/15/2011.
D.A. Results issued date: Pending.    Last document served on: 08/10/2011.

**D.A. Referral:** This matter was referred to the Monterey County District Attorney's Office for possible Felony Prosecution. However, the outcome of the D.A. referral is not yet known at the time of RVR hearing.

**D.A. Postponement:** Inmate ▮▮▮ did not request the Hearing be postponed, pending the outcome of the D.A. referral, by refusal to sign the D.A. Postponement request on the CDCR-115A. Inmate ▮▮▮ was informed by SHO at the time of the hearing that any information developed through the disciplinary process can be used against him as evidence in the prosecution, pursuant to CCR §3318 (b)(2)(B). Inmate ▮▮▮ stated that he understood and chose to proceed with the hearing.

**Time Constraints:** All time constraints have been met pursuant to CCR §3320(b). Inmate ▮▮▮ was provided a copy of the CDCR-115 within fifteen (15) days after the discovery of information leading to the charges. Hearing was held within thirty (30) days of the date the Inmate was provided a copy of the CDCR-115. Inmate ▮▮▮ acknowledged receiving all documents used for this Hearing 24 hours prior to the hearing.

**TABE Score:** Inmate ▮▮▮ TABE Reading Score is **below 4.0** as noted in the Central File.

**Staff Assistant (SA):** Inmate ▮▮▮ **does meet the criteria** for a Staff Assistant per CCR §3315(d) (2) (A). Correctional Officer J. Spaulding was assigned as Staff Assistant (S.A.); however, Officer J. Spaulding was not available at the time of RVR hearing. Inmate ▮▮▮ confirmed S.A. Officer J. Spaulding met with him 24 hours prior to hearing and explained the hearing process to him. Inmate ▮▮▮ agreed to have Officer J. Ceja act as his substitute S.A. at the time of RVR hearing.

**Investigative Employee (IE):** Inmate ▮▮▮ **does meet the criteria** for the assignment of an Investigative Employee per CCR §3315(d) (1) (A). Inmate ▮▮▮ requested and does meet the criteria for assignment of an Investigative Employee. Correctional Officer J. Spaulding was assigned as Inmate ▮▮▮ I.E. Officer J. Spaulding interviewed Inmate ▮▮▮ as part of the investigative process, gathered information from witnesses, asking each witness specific questions posed by Inmate ▮▮▮ for clarification purposes. Officer J. Spaulding prepared his report, to include his summation of the facts, and provided a copy of the report to Inmate ▮▮▮ more than 24 hours prior to this Hearing.

**Evidence Requested or Used:** There was no evidence requested or used at this RVR Hearing.

**Video Tape Evidence:** No video tape evidence was utilized in the adjudication or fact finding process of this CDCR-115 Rules Violation Report.

| SIGNATURE OF WRITER | TITLE | DATE NOTICE SIGNED |
|---|---|---|
| R. L. MARTINEZ | Correctional Lieutenant (SHO) | 08/14/2011 |
| ☒ COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE)    DATE SIGNED: 9/19/11    TIME SIGNED: 1400 | |

DEXP 108027

STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                        PAGE ___4___ OF ___5___

| CDC NUMBER | INMATE'S NAME | LOG NUMBER<br>FD-11-07-0002 | INSTITUTION<br>SVSP | TODAY'S DATE<br>08/14/2011 |
|---|---|---|---|---|

| ☐SUPPLEMENTAL | ☒CONTINUATION OF: | ☐CDC 115 CIRCUMSTANCES | ☒HEARING | ☐I.E. REPORT |
|---|---|---|---|---|

**Witnesses Requested or Provided:** Inmate ▇▇▇ did not request witnesses for this hearing at the time he was issued a copy of the CDCR-115A.

**Witness Testimony at Hearing:** No witnesses were requested or Granted by the SHO at the time of RVR hearing.

**Confidential Information:** Confidential information was not used in the adjudication of this RVR-115.

**Enemy Concerns:** There were no enemy concerns related with this disciplinary Hearing.

**Findings:** Inmate ▇▇▇ was found **NOT GUILTY** of CCR §3005(d) (1), specifically **"Battery on a Peace Officer with a Weapon,"** a Division "(A1)" offense. However, Inmate ▇▇▇ was found **GUILTY** of a lesser but included charge of **"Battery on a Peace Officer,"** a Division "(B)" offense. This finding is based upon the following preponderance of evidence:

A) The testimony of Correctional Officer J. Vinson, presented in the circumstances portion of the RVR which states in part: "...I was assigned as Facility D Building 2 S&E #1. At approximately 1622 hours, during trash and tray pick-up, Officer E. Brown and I approached cell 123, solely occupied by Inmate ▇▇▇. Officer Brown opened the food/cuff port. I extended my right hand to retrieve the food tray from ▇▇▇, at which time ▇▇▇ threw his food tray through the opened food port, striking me in the right side, lower abdomen. ▇▇▇ reached out of the food port with his left hand and grasped the food port door. ▇▇▇ then reached down and appeared to pick up an unknown object from the floor. I activated my personal alarm and ordered ▇▇▇ to release the food port or O.C. Pepper spray would be used. ▇▇▇ did not comply with my orders. I utilized my MK-9 O.C. Fogger, spraying ▇▇▇ in the upper torso. ▇▇▇ withdrew his hand and released control of the food port..."

B) CDCR-837-C Crime/ Incident Report authored by Correctional Officer E. Brown which states in part: "...I opened the food port to cell 123, solely occupied by Inmate ▇▇▇). As Officer Vinson went to collect the tray ▇▇▇ forcefully and aggressively threw his food tray out of the food port striking Officer Vinson in his midsection/stomach area of the body..."

C) Inmate ▇▇▇ did not provide a defense to the charge "The Officer is lying". The Subject did not provide witnesses nor did he provide any evidence to refute the charge. The SHO notes with the absence of evidence during the RVR process; the SHO only has the written reports to rely upon to render a decision of innocence or guilt.

D) The Mental Health Assessment authored by D. Zimmerman, Ph.D., which states, "I/P is severely mentally ill. His condition renders him "out of touch with reality" and responding to internal stimuli on a frequent basis. His perceptions are distorted. He has very limited interpersonal skills." The SHO further agrees that the inmate mental health disorder did appear to contribute to the behavior that led to the RVR.

| SIGNATURE OF WRITER<br>R. L. MARTINEZ | TITLE<br>Correctional Lieutenant (SHO) | DATE NOTICE SIGNED<br>08/14/2011 | |
|---|---|---|---|
| ☐ COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | DATE SIGNED:<br>9/19/11 | TIME SIGNED:<br>1402 |

DEXP 108028

STATE OF CALIFORNIA
RULES VIOLATION REPORT - PART C

DEPARTMENT OF CORRECTIONS
PAGE ___5___ OF ___5___

| CDC NUMBER | INMATE'S NAME | LOG NUMBER FD-11-07-0002 | INSTITUTION SVSP | TODAY'S DATE 08/14/2011 |
|---|---|---|---|---|
| ▓ | ▓ | | | |

☐ SUPPLEMENTAL   ☒ CONTINUATION OF:   ☐ CDC 115 CIRCUMSTANCES   ☒ HEARING   ☐ I.E. REPORT

**CONCLUSION:** Additionally, due to the Subject mental health status, the SHO elects to mitigate the penalties by not imposing any loss of privileges and assessed the low end of credit forfeiture. Based on the aforementioned facts, this SHO finds the preponderance of the evidence has been met to render and sustain a finding of guilt of a lesser included charge of CCR §3005(d) (1); specifically, **"Battery on a Peace Officer,"** a Division "(B)" offense per CCR §3323(d) (3).

**Appeal Rights:** Inmate ▓ was advised of his right to appeal per CCR §3084.1(a). Inmate ▓ was informed that he would receive a copy of the completed RVR upon final review of the Chief Disciplinary Officer. Inmate ▓ was further advised of his rights to appeal the findings of this hearing, the methods of appealing, and credit restoration rights pursuant to CCR §3327 & §3328, governing the restoration of forfeited credits.

| SIGNATURE OF WRITER R. L. MARTINEZ | TITLE **Correctional Lieutenant (SHO)** | DATE NOTICE SIGNED 08/14/2011 |
|---|---|---|
| ☐ COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) | DATE SIGNED: 9/19/11   TIME SIGNED: 1400 |

DEXP 108029

STATE OF CALIFORNIA          DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C      PAGE __1__ OF __1__

| CDC NUMBER | INMATE'S NAME | LOG NUMBER FD-11-07-0002 | INSTITUTION SVSP | TODAY'S DATE 07/20/2011 |
|---|---|---|---|---|
| ███ | ███ | | | |

☐SUPPLEMENTAL   ☐CONTINUATION OF:    ☐CDC 115 CIRCUMSTANCES    ☐HEARING    ☒I.E. REPORT    ☐OTHER

On 07/20/2011, I, Correctional Officer J. Spaulding was assigned as Investigative Employee for CDCR-115, Log #FD-11-07-0002. I informed Inmate DINH of my assignment, and that as Investigative Employee, my duties were as fact finder for the Senior Hearing Officer. Inmate ███ stated that he had no objections to my serving in this capacity.

**DEFENDANTS STATEMENT:** On 07/20/2011, I interviewed Inmate ███████████ regarding the disciplinary charges and asked him if he had a statement or questions, he stated: "I'm ████████████. On 07/09/2011, Saturday, about 16:18p.m. dinner time. The C/O Vinson bring the tray for dinner. He told me go back the window and then he open the food ports door and then he dump the food tray in the toilet. And clear up, 5 minute later. He came back pick up the tray. I give the tray to C/O Vinson, he dropped back in my cell 3 times. The time he hold the tray and walk away and then he threw the tray on day room in front of my cell and pray me hold bottle while I'm stand back of window. He told the C/O in tower put the alarm on. The C/O Vinson by himself at that time not get to pick the tray in Unit get. That happen on 07/09/2011. (My English broken I try to write this statement when they put me in the gate. The nurse do 7219. The C/O Vinson told the nurse he did.)

**INVESTIGATIVE EMPLOYEE REPORT:** On 07/20/2011, I interviewed both ███ and C/O Vinson and took statements. ███ did not call any witnesses or request any questions of anybody else.

| SIGNATURE OF WRITER J. Spaulding | TITLE Correctional Officer | DATE NOTICE SIGNED 7/26/10 |
|---|---|---|
| ☑COPY OF CDC-115-C GIVEN TO INMATE | GIVEN BY: (STAFF'S SIGNATURE) M .WADE | DATE SIGNED: 7/26/11    TIME SIGNED: 1500 |

DEXP 108030

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS
## SERIOUS RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | VIOLATED RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| | | CCR §3005(d)(1) | 07-02-2011 | SVSP | IID-11-07-0002 |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT    ☒ YES    ☐ NO

### POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☒ I DO NOT REQUEST my hearing be postponed pending outcome of referral for prosecution. | ► RTS | 7/15/11 |
| ☐ I REQUEST my hearing be postponed pending outcome of referral for prosecution. | ► | |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION | | |
|---|---|---|---|
| ☐ I REVOKE my request for postponement. | | ► INMATE'S SIGNATURE | DATE |

### STAFF ASSISTANT

| STAFF ASSISTANT | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | ► | |
| ☒ ASSIGNED | DATE 7/15/11   NAME OF STAFF V. FRANCO | | |
| ☐ NOT-ASSIGNED | REASON DOES/DOES NOT MEET CRITERIA PER CCR§ 3315(d)(2)(A) | | |

### INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☒ REQUESTED | ☐ WAIVED BY INMATE | ► RTS | 7/15/11 |
| ☒ ASSIGNED | DATE 7/20/11   NAME OF STAFF C/O J. Spaulding | | |
| ☐ NOT-ASSIGNED | REASON DOES/DOES NOT MEET CRITERIA PER CCR§3315(d)(1)(A) | | |

EVIDENCE / INFORMATION REQUESTED BY INMATE:

### WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)
☒ REPORTING EMPLOYEE    ☐ STAFF ASSISTANT    ☐ INVESTIGATIVE EMPLOYEE    ☐ OTHER    ☒ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employees must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

| | INVESTIGATOR'S SIGNATURE | DATE |
|---|---|---|
| | ► | |

| ☒ COPY OF CDC 115-A GIVEN INMATE | BY: (STAFF'S SIGNATURE) ► | TIME 1725 | DATE 7/15/11 |
|---|---|---|---|

CDC 115-A (7/88)                              If additional space is required use supplemental pages.

DEXP 108031

## RULES VIOLATION REPORT: MENTAL HEALTH ASSESSMENT REQUEST
### REVIEWING CUSTODY SUPERVISOR

A CDC 115, Rules Violation Report (RVR), has been written on the following inmate, who requires a mental health assessment.

Inmate Name: ▮▮▮▮▮    CDC Number: ▮▮▮▮

RVR Log Number: FD-11-07-0002    Date of Violation: 07-02-2011    Housing: ▮▮▮

Specific Act Charged: _____ CCR §3005(d)(1) BATTERY ON A PEACE OFFICER _____

The inmate's current Mental Health Level of Care is: (check one)

☐ NOT IN MHSDS PROGRAM*   ☐ CCCMS*   ☒ EOP   ☐ MHCB   ☐ DMH

*CCCMS AND NON-MHSDS PROGRAM PARTICIPANTS WILL BE REFERRED FOR A MENTAL HEALTH ASSESSMENT FOR BEHAVIOR THAT IS BIZARRE OR UNUSUAL FOR ANY INMATE, OR THAT IS UNCHARACTERISTIC FOR THIS INMATE.

Sent to Mental Health: 7/6/11    By: A. LYONS    *A.P.*
                       Date          Print Name        Signature

Return this form to: D. DISPO EXT. 6784    *By: 7/7/11*
                     Print Name                      Date

*(CCCMS and non-MHSDS, 5 working days; EOP/MHCB/DMH, 15 calendar days)

### MENTAL HEALTH CLINICIAN

Conducted non-confidential interview: _____ (Inmate informed of non-confidentiality).
                                         Date

1. CCCMS/NON-MHSDS only. Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant?   ☐ Yes   ☐ No

   Explain "yes" response: _____

   _____

   _____

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR?

   ☒ Yes   ☐ No   Explain "yes" response: I/P is severly mentally ill. His condition renders him "out of touch with reality" and responding to internal stimuli on a frequent basis. His perceptions are distorted. He has very limited interpersonal skills.

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?   ☒ Yes   ☐ No   Explain "yes" response: Offense/R.V. could have taken place due to I/P's perception of events.

   _____

   _____

INSTITUTION: SVSP    CLINICIAN NAME (Print): D. Zimmerman, PhD    SIGNATURE: DZ___, PhD    DATE: 7/8/11

RECEIVED BY: CUSTODY STAFF NAME (Print): M. WADE    SIGNATURE: ▮▮▮    DATE: 7/13/11

DISTRIBUTION:
Original : Central File With Adjudicated CDCR
Blue : 115 Unit Health Record
Pink : Inmate    CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

**RULES VIOLATION REPORT:**
**MENTAL HEALTH ASSESSMENT REQUEST**

CDCR 115-MH (Rev. 06/06)
STATE OF CALIFORNIA    DEPARTMENT OF CORRECTIONS AND REHABILITATION

**DEXP 108032**

# FACILITY
# STAFF ASSISTANT

RVR Log #: FD-11-07-0002

Inmate Name: ▉▉▉

Inmate CDCR #: ▉▉▉

Housing: ▉▉▉

Staff Assistant Printed Name: C/o J. Spaulding

Staff Assistant Signature: _____

S.A. RDO's/Watch/Ext. F/S

Completed/Copy Provided to Inmate on (date) 2-10-11

Staff Member Issuing (name): M. Wade

Staff Member Issuing (signature): _____

---

**INSTRUCTIONS:** Meet with Inmate. Check off each item completed as applicable. Return the form to the Disciplinary Officer's or Facility Lieutenant for issuance. Be aware that the disciplinary hearing **CANNOT** be held until the document has been completed and return for issuance to the Inmate. The same **Staff Assistant MUST** be present at the disciplinary hearing.

---

## CCR 3318 (b) (1): The assigned Staff Assistant shall:

☐ (A) Inform the Inmate of their rights and of the disciplinary hearing procedures.

☐ (B) Advise and assist in the Inmate's preparation for a disciplinary hearing, represent the Inmate's position at the hearing, ensure that the Inmate's position is understood, and that the Inmate understands the decisions reaches.

☐ (C) Refrain from giving legal counsel or specifying the position the Inmate should take in any disciplinary, classification or criminal proceeding.

## CCR 3318 (b) (2): The Inmate shall be informed that:

☐ (A) Upon the Inmate's request, the Staff Assistant shall keep confidential any information the Inmate may disclose concerning the charges for which the Staff Assistant was assigned.

☐ (B) All evidence and information obtained and considered or developed in the disciplinary process may be used in court if the same charges have been or are to be referred for prosecution.

CCR 3318(b) (3): If the Staff Assistant becomes aware that the Inmate is contemplating future criminal conduct; the Staff Assistant shall disclose this information if necessary to protect potential victims and prevent the contemplated crime.

DEXP 108033

1st S.A

# FACILITY
# STAFF ASSISTANT

RVR Log #: ___FD-11-07-0002___

Inmate Name: ▆▆▆▆

Inmate CDCR #: ▆▆▆▆

Housing: ▆▆▆▆

Staff Assistant Printed Name: V FRANCO

Staff Assistant Signature: _____

S.A. RDO's/Watch/Ext. 05  3w  6722

Completed/Copy Provided to Inmate on (date) 7/15/11

Staff Member issuing (name): M. WADE

Staff Member issuing (signature): _____

> INSTRUCTIONS: Meet with Inmate. Check off each item completed as applicable. Return the form to the Disciplinary Officer's or Facility Lieutenant for issuance. Be aware that the disciplinary hearing CANNOT be held until the document has been completed and return for issuance to the Inmate. The same Staff Assistant MUST be present at the disciplinary hearing.

## CCR 3318 (b) (1): The assigned Staff Assistant shall:

☐ (A) Inform the Inmate of their rights and of the disciplinary hearing procedures.

☐ (B) Advise and assist in the Inmate's preparation for a disciplinary hearing, represent the Inmate's position at the hearing, ensure that the Inmate's position is understood, and that the Inmate understands the decisions reaches.

☐ (C) Refrain from giving legal counsel or specifying the position the Inmate should take in any disciplinary, classification or criminal proceeding.

## CCR 3318 (b) (2): The Inmate shall be informed that:

☐ (A) Upon the Inmate's request, the Staff Assistant shall keep confidential any information the Inmate may disclose concerning the charges for which the Staff Assistant was assigned.

☐ (B) All evidence and information obtained and considered or developed in the disciplinary process may be used in court if the same have been or are to be referred for prosecution.

CCR 3318(b) (3): If the Staff Assistant becomes aware that the Inmate is contemplating future criminal conduct, the Staff Assistant shall disclose this information if necessary to protect potential victims and prevent the contemplated crime.

**DEXP 108034**

STATE OF CALIFORNIA                                  CALIFORNIA DEPARTMENT OF CORRECTIONS and REHABILITATION

NOTICE OF CLASSIFICATION HEARING
CDCR-128-B1 (Rev 7/06)

| INMATE NAME: | CDCR NUMBER: | TODAY'S DATE: 08/14/2011 |
|---|---|---|
| ▮▮ | ▮▮ | |

YOU WILL APPEAR BEFORE A CLASSIFICATION COMMITTEE ON _____ FOR CONSIDERATION OF A MAJOR PROGRAM CHANGE AS FOLLOWS:

☐ TRANSFER               ☐ INCREASE IN CUSTODY          ☐ ASSIGNMENT TO SECURITY HOUSING

☐ REMOVAL FROM PROGRAM   ☐ OTHER:                       ☑ PROGRAM REVIEW

REASON:
Rules Violation Report (RVR), CDCR-115, Log Number FD-11-07-0002, issued to Inmate ▮▮ on 08/14/2011, was adjudicated on 07/02/2011 by Correctional Lieutenant R. L. Martinez, Senior Hearing Officer (SHO). Inmate ▮▮ was found Guilty of a lesser included charge of CCR §3005(d) (1), specifically, **"Battery on a Peace Officer,"** a Division "(B)" offense per CCR §3323(d) (3), and is being referred to ICC for Program Review.

| STAFF NAME: R. L. MARTINEZ | CORRECTIONAL LIEUTENANT | DATE: 08/14/2011 |
|---|---|---|

ROUTING INSTRUCTIONS: ORIGINAL – CLASSIFICATION COMMITTEE          COPY - INMATE

# Exhibit 5

STATE OF CALIFORNIA                                                                                                 DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                                                          PAGE _1_ OF _2_

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| | | 12-A-03-015 | C.C.W.F. | 04-01-2012 |

☐ SUPPLEMENTAL   ☐ CONTINUATION OF:   ☐ 115 CIRCUMSTANCES   ☐ HEARING   ☐ IE REPORT   ☐ OTHER_____

Inmate ████, ████ appeared before the Senior Hearing Officer (SHO) on Sunday, April 01, 2012. This hearing commenced at approximately 0850 hours. Inmate ████ was present at this hearing and stated she is in good health. Inmate ████ is not part of the Disability Placement Program (DPP). Inmate ████ is a participant in the Mental Health Delivery System (MHSDS) at the Enhanced Outpatient Program (EOP) Level of Care. Based on this level of care, Dr. Oleksy completed a mental health assessment and inmate ████ was assigned a staff assistant. Based on the CDC 115MH completed by Dr. Oleksy on 03-28-12, it was determined that, in his opinion, the inmate's mental disorder did appear to contribute to the behavior that led to the Rules violation Report. Dr. Oleksy further stated if Inmate ████ is found guilty of the offense there are mental health factors that the SHO should consider in assessing the penalty. Inmate ████ TABE Score is 3.6. Correctional Officer D. Brown was assigned, as the Staff Assistant was present at the hearing. Due to Inmate ████ TABE Score and EOP Status the primary method of communication was utilized Simple English spoken clearly. Inmate ████ was asked to repeat the charges and she was able to articulate in her own words an understanding of the charge against her. Inmate ████ was advised that this matter was referred to the Madera County District Attorney's Office for possible felon prosecution. She was also advised if that her hearing be postponed pending the outcome of the referral for prosecution. Inmate ████ refused to sign as noted on the CDC 115A. She also was advised that any further information obtained during the hearing could be used during criminal proceedings, should the District Attorney accept the case. Inmate ████ was asked if she still wish to proceed with the hearing and she stated, "I want to be heard right now". Correctional Officer C. Lopez. Correctional Officer D. Brown was assigned as the Investigative Employee due to Inmate ████ housing status in Administrative Segregation.

Inmate ████ does acknowledge receipt of all charges and all pertinent and non-confidential reports relative to the charges at least 24 hours prior to this hearing, to include the following: CDC 115, CDC 115-A, CDC 115-C Investigative Employee Report, CDCR 837-A (Log # CCWF-FAA-12-03-0058), (1) CDCR 7219, CDC 115-C Mental Health Assessment Request, and Miranda Warning.

INMATE'S PLEA: The charges were read to Inmate ████, who pled not guilty. She stated, "I pushed her with my right foot. She was giving medication illegally. I told her I that I don't need the medication or a shot".

WITNESSES:        Inmate ████ was advised of her right to have witnesses present during the hearing. She did not request witness(es) present. The SHO is utilizing the attached Investigative Employee's Report of witnesses: (Inmate ████ and LVN Jackson).

Inmate ████ on 03-17-12, at approximately 0830 hours, stated in part, "I didn't want the LVN to touch me".

LVN Jackson, on 03-20-12, at approximately 1000 hours, stated in part, "I gave Inmate ████ her first injection and when I was retrieving the second one Inmate ████ kicked me".

The SHO asked Inmate ████ the following question:
Q. Did you tell LVN Jackson that you were going to push/or kick?
A. No, I warned her, I am EOP, she brought it upon herself.

Confidential information was not part of the evidence considered by this SHO in reaching a decision.

FINDINGS:        Inmate ████ is found GUILTY of violating CCR, Section 3005(d)(3) for the specific act of, "Battery On A Non Prisoner". The evidence substantiates the charges for the following reasons:

| SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|
| D. ROGERS, CORRECTIONAL LIEUTENANT | | 4-8-12 |
| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | | | |

**DEXP 107681**

STATE OF CALIFORNIA

**RULES VIOLATION REPORT - PART C**

DEPARTMENT OF CORRECTIONS

PAGE ___ OF ___

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| ▮ | ▮ | 12-A-03-015 | C.C.W.F. | 04-01-2012 |

| ☐ SUPPLEMENTAL | ☐ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☐ HEARING | ☐ IE REPORT | ☐ OTHER_____ |

1. The CDC 115 by LVN Jackson, indicating on Wednesday, March 07, 2012, at approximately 0748 hours, Inmate ▮ was escorted to the medication room. I had administered ▮'s first injection and was preparing her second. As I retrieved the second shot, ▮ lifted her right leg and kicked me in my left buttocks.

2. The Investigative Employee's Report collected by Correctional Officer C Lopez staff witnesses (LVN Jackson), states in part, that Inmate ▮ had kicked me in the buttocks, while receiving her injections.

3. Correctional Officer J. Galindo's, CDCR 837-C report stated, Correctional Officer I. Trevino, and I retrieve Inmate ▮, ▮, from ▮ for escort to the Medication Room. ▮ was upset and stated that God does not want her to take medication. Officer Trevino placed handcuff on ▮ for our safety. Trevino maintained a hold on ▮ left arm, and I maintained hold on her right arm. After receiving her first injections, LVN Jackson stated there was one more injection. ▮ became upset and kicked LVN Jackson in the buttock area with her right foot, stating to LVN Jackson, "You fucking bitch"!

4. Correctional Officer I. Trevino's, CDCR 837-C report stated, I and Correctional Officer J. Glaindo retrieve Inmate ▮, ▮, from ▮ for escort to the Medication Room. ▮ was clinching her hands, flinging her arms and was agitated. ▮ stated that God told her not to take her medication and the drugs are bad. I ordered ▮ to place her hands behind her back and she complied. I maintained a hold on ▮ left arm, Glaindo maintained hold on her right arm. After receiving her first injections, LVN Jackson stated there was one more injection. ▮ suddenly kicked her right foot towards the medication cart. Due to my location outside the Medication Room and behind ▮, I did not see the battery on LVN Jackson.

5. During the hearing, the SHO asked Inmate ▮ did you tell LVN Jackson that you were going to push/or kick? ▮ stated, No, I warned her, I am EOP, she brought it upon herself, which is a admission of guilt.

6. Inmate ▮ did not proved any evidence to refute the not guilty plea.

7. Based on the totality of circumstances, the information provided during the hearing, and the information contained in the reports, the SHO believes that there is a preponderance of evidence that supports the charge and the finding of guilt.

8. Due to Inmate ▮ EOP status, Dr. Oleksy advised the SHO to take into consideration her mental health factor. Therefore, the SHO issued the lowest possible forfeiture of credit.

DISPOSITION: Inmate ▮ is assessed 121 days forfeiture of credits consistent with CCR 3323(d)(1). Inmate ▮ was counseled and reprimanded regarding her responsibility to refrain from violent behavior. Inmate ▮ was advised that she will receive a copy of the completed CDC 115 upon final audit by the Chief Disciplinary Officer. Inmate ▮ was advised that per CCR 3327 (a)(1), forfeited credits will not be restored Division B. She was advised of her right, and the procedure for, appeal of this action as outlined in CCR 3084. Inmate ▮ is being referred to ICC for SHU assessment.

J. SCOTT, HCA, CAPTAIN          4/17/12
                               DATE

B. J SIMON, C.D.O. Londingham   4/17/12
SIGNATURE OF WRITER             DATE

D. ROGERS, CORRECTIONAL LIEUTENANT    DATE SIGNED
                                      4-B-12

| ☐ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|

DEXP 107682

# Exhibit 6

*m, FAD*

HC

☒ MHCB  ☐ EOP  ☐ CCCMS  ☐ CLEAR  G.P.C.  ☐ NO T.A.B.E. SCORE ON RECORD  ☒ ABOVE  ☐ BELOW  4.0

STATE OF CALIFORNIA                                                                                    DEPARTMENT OF CORRECTIONS
**RULES VIOLATION REPORT**  804 to Records on 4|3|12  by RM                              DM 2/W

| CDC NUMBER | INMATE'S NAME | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|
| ▓▓ | ▓▓▓▓▓ | 10-04-12 EPRD | CIM-D | D OHU▓▓ | FAD-H-12-03-091 |

| VIOLATION RULE NO(S) | SPECIFIC ACTS | LOCATION | DATE | TIME |
|---|---|---|---|---|
| CCR §3004(b) RIGHTS AND RESPECTS OF OTHERS | DISRESPECT TOWARDS STAFF | INFIRMARY CELL 110 | 03-28-12 | 0640 Hours |

CIRCUMSTANCES

On 03-28-2012 at approximately 0640 hours, while I was assigned as the Infirmary Psychiatric Technician the following occurred: As I was going cell to cell conducting mental health assessments to the inmates housed in the Infirmary on Station One Tier. As I approached Cell 110 which is occupied Inmate ▓▓▓ (▓▓▓▓▓▓) I asked Inmate ▓▓▓ how he was feeling, Inmate ▓▓▓▓ answered, "Give me head." I was not positive if I heard him correctly and asked him again. Inmate ▓▓▓▓ again answered, "Give me head." I repeated that he said back to clarify what he had stated to me. Inmate ▓▓▓ stood in front of the cell door clenching his fist and teeth and looked directly at me through the door. I counseled him and told him he would get written up for his inappropriate behavior. I again asked Inmate ▓▓▓▓ how he was feeling. Inmate ▓▓▓▓ replied, "Kissy, kissy, kissy" as he smiled at me. The assessment was then terminated.

Inmate ▓▓▓ is aware of this report.

Inmate ▓▓▓ is a participant in the Mental Health Services Delivery System at MHCB level of care.

| REPORTING EMPLOYEE (Typed Name and Signature) | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|
| ► K. RIGGSBY, Psych Tech.  *Riggsby LPT-DPC* | 4|8|12 | D YARD INFIRMARY | S/M |

| REVIEWING SUPERVISOR'S SIGNATURE | DATE | INMATE SEGREGATED PENDING HEARING | |
|---|---|---|---|
| ► A. PADILLA, Correctional Sergeant | 4-8-12 | DATE _____ LOC. _____ | |

| CLASSIFIED | OFFENSE DIVISION | DATE | CLASSIFIED BY (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|---|
| ☐ ADMINISTRATIVE  ☐ SERIOUS | "F" | 4/6/12 | ► R. MONTES, Correctional Lieutenant | ☐ HO  ☒ SHO  ☐ SC  ☐ FC |

COPIES GIVEN TO INMATE BEFORE HEARING

| ☐ CDC 115 | BY: (STAFF'S SIGNATURE) | DATE | TIME | TITLE OF SUPPLEMENT |
|---|---|---|---|---|
| FAD-H-12-03-091 | ► Boozman | 4/12/12 | 1000 | SUMMARY OF DISCIPLINARY PROCEDURES (CDC-115) INMATE RIGHTS (CDC-115A) |
| ☐ INCIDENT REPORT  LOG NUMBER | BY: (STAFF'S SIGNATURE) ► | DATE | TIME | BY: (STAFF'S SIGNATURE) ► Boozman | DATE 4/12/12 | TIME 1000 |

| HEARING | | | MENTAL HEALTH ASSESSMENT |
|---|---|---|---|
| | | | ► | 5/9/12 | 1300 |

## FOR HEARING RESULTS SEE SUPPLEMENTAL, CDC-115 PART-C PAGE(S)

| REFERRED TO: CLASSIFICATION ☐    ☐ BPT/NAEA | SIGNATURE | DATE | TIME |
|---|---|---|---|
| ACTION BY: (TYPED NAME)  J. PAREDES, Correctional Lieutenant (SHO) | ► _____ | 5/11/12 | 1245 |
| ► S. MOORE, Facility Captain  WED BY: (SIGNATURE)  DATE 5/13/12 | CHIEF DISCIPLINARY OFFICER'S SIGNATURE  ► D. KING, Associate Warden | DATE 5/15/12 | |
| ☐ COPY OF CDC-115 GIVEN TO INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) ►  Trans To SVSP | DATE | TIME |

CDC 115 (7/89)

**DEXP 105638**

STATE OF CALIFORNIA
~~SERIOUS RULES VIOLATION REPORT~~

DEPARTMENT OF CORRECTIONS

| | | CCR §3004(b) | 03-28-12 | UNM-D | FAC-H 12-03-08 |
|---|---|---|---|---|---|

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT ☐ YES ☒ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I DO NOT REQUEST my hearing be postponed pending outcome of referral for felony prosecution. | ► N/A | |
| ☐ I REQUEST my hearing be postponed pending outcome of referral for felony prosecution. | ► | |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION | | |
|---|---|---|---|
| ☐ I REVOKE my request for postponement | | INMATE'S SIGNATURE ► | DATE |

## STAFF ASSISTANT

| STAFF ASSISTANT | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | Refused To sign | |
| ☒ ASSIGNED | DATE 4/12/12 NAME OF STAFF L Bearchan 2nd S/A Assigned J. Moreno | | |
| ☐ NOT ASSIGNED | REASON MHCB Level of Care | | |

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | | INMATE'S SIGNATURE | DATE |
|---|---|---|---|
| ☐ REQUESTED | ☐ WAIVED BY INMATE | X Refused To sign | |
| ☒ ASSIGNED | DATE 4/12/12 NAME OF STAFF J. Burgin | | |
| ☐ NOT ASSIGNED | REASON | | |

EVIDENCE / INFORMATION REQUESTED BY INMATE

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)

☐ REPORTING EMPLOYEE    ☐ STAFF ASSISTANT    ☐ INVESTIGATIVE EMPLOYEE    ☐ OTHER _____    ☐ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |
| | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employee must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

| | INVESTIGATORS SIGNATURE | DATE |
|---|---|---|
| | ► | |

| ☒ COPY OF CDC 115-A GIVEN TO INMATE | BY: (STAFF'S SIGNATURE) ► L Bearchan | TIME 1000 | DATE 4-12-12 |
|---|---|---|---|

CDC 115-A (7/88)

— *If additional space is required use supplemental pages* —

DEXP 105639

STATE OF CALIFORNIA
RULES VIOLATION REPORT – PART C

DEPARTMENT OF CORRECTIONS
MC 2/W    PAGE 1 OF 1

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| ▇ | ▇ | FAD-H-12-03-091 | CIM-D | 04-12-12 |

☐ SUPPLEMENTAL    ☐ CONTINUATION OF:    ☐ 115 CIRCUMSTANCES    ☐ HEARING    ☒ IE REPORT    ☐ OTHER_____

**STATEMENT OF INVESTIGATIVE EMPLOYEE:** On April 12, 2012, I Correctional Officer J. BURGIN, was assigned as an Investigative Employee, for CDC-115, Log# FAD-H-12-03-091 for the specific act of Disrespect Toward Staff for a CDC-115 issued to Inmate ▇ I conducted a face-to-face interview with Inmate ▇ on 05-08-12 at the California Institution for Men Infirmary, Cell ▇ at approximately 1055 hours. I asked Inmate ▇ if he had any objections to my assignment. Inmate ▇ waived assignment of an Investigative Employee. The Staff Assistant was present during the I.E. interview.

**STATEMENT OF INMATE:** Inmate ▇ made the following statement(s) for inclusion into this I.E. report. "I don't want an I.E., I just want to do my time and get out of here."

**STATEMENT OF REPORTING EMPLOYEE:** My report stands as is. Nothing further to add.

**INMATE WITNESS(ES):** Inmate ▇ did not request any witnesses.

**STAFF WITNESS(ES):** There were no Staff Witnesses at this time.

This concludes this investigative report.

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| J. BURGIN, Correctional Officer | 5·8·12 |

| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
| ☑ COPY OF CDC 115-C GIVEN TO INMATE | | 5·9·12 | 1300 |

CDC 115-C (5/95)

DEXP 105640

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS

| | | FAD-H-12-03-091 | CIM FACILITY "D" | 05-11-12 |
|---|---|---|---|---|
| ☐ SUPPLEMENTAL | ☐ CONTINUATION OF: ☐ CIRCUMSTANCES ☒ HEARING | ☐ INVESTIGATIVE EMPLOYEE | ☐ STAFF ASSISTANT | ☐ OTHER: |

PLEA: Guilty                    FINDINGS: Guilty

On May 11, 2012, at approximately 1245 hours, This Senior Hearing Official (SHO), Correctional Lieutenant J. PAREDES, conducted a hearing with Inmate ███████ who had been transferred to Salinas Valley State Prison on 05-10-12, via a speaker telephone for the purpose of adjudicating this Rules Violation Report. Inmate ███████ stated he was in good health.

Inmate ███████ acknowledged that he had received copies of the following documents at least twenty-four (24) hours prior to this hearing:

- CDC-115 Description of Circumstances
- CDC-115A
- Summary of Disciplinary Procedures and Inmate Rights
- Mental Health Assessment

These reports as well as the disciplinary charge of Disrespect Towards Staff were reviewed with Inmate ███████ and stated he is ready to proceed with the hearing.

**EFFECTIVE COMMUNICATION:** SHO notes Inmate ███████ is designated: MHCB. As a result, Effective Communication methods were employed as follows: A Staff Assistant was present both here with the SHO and with Inmate ███████.

- Simple English, Spoken Slowly
- Read Documents Aloud to Inmate

SHO determined communication was effective and Inmate ███████ is able to understand and effectively articulate both the nature of the charge(s) and the disciplinary process. This was determined by:

- Inmate ███████ reiterated in his own words what was explained.
- Inmate ███████ provided appropriate substantive responses to questions asked.
- Inmate ███████ asked appropriate question(s) regarding the information provided.

**MENTAL HEALTH ASSESSMENT:** Inmate ███████ is a participant in the Mental Health Delivery System at the Crisis Bed Level of Care. Inmate ███████ received a psychological assessment. The results of the assessment indicated: It did appear that the behavior resulting in the RVR may have been influenced by Mental Illness. The inmate did not show evidence of impairment in his ability to comprehend the nature of the charges and the disciplinary process.

**DISTRICT ATTORNEY REFERRAL:** This matter was not referred for criminal prosecution.

**DUE PROCESS:** The RVR was served within fifteen (15) days of discovery. The hearing was held within thirty (30) days of service. Time constraints have been met. There are no due process issues.

**STAFF ASSISTANT:** A Staff Assistant was assigned due to Inmate ███████ being a participant in the Mental Health Services Delivery System (MHSDS). Officer J. MORENO was assigned on 04-12-12. Inmate

| SIGNATURE OF WRITER | | DATE SIGNED |
|---|---|---|
| J. PAREDES, Correctional Lieutenant (SHO) | | 5-11-12 |
| | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | Trans To SVSP | | |

CDC 115-C (11/11)                                                    CLK: DS 2/W

DEXP 105641

STATE OF CALIFORNIA                                                                  DEPARTMENT OF CORRECTIONS
RULES VIOLATION REPORT - PART C                                                     PAGE 2   OF 3

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
| | | FAD-H-12-03-091 | CIM FACILITY "D" | 05-11-12 |

☐ SUPPLEMENTAL  ☐ CONTINUATION OF:  ☐ CIRCUMSTANCES  ☒ HEARING  ☐ INVESTIGATIVE EMPLOYEE  ☐ STAFF ASSISTANT  ☐ OTHER:

_____ verified that Officer MORENO met with him more than twenty-four (24) hours prior to the hearing. Officer MORENO explained to _____ the nature of the charges, the disciplinary process and the evidence against him. Officer MORENO was present at the hearing with this SHO in the 'D' program office. Correctional Officer REYES was present as a Staff Assistant with Inmate _____ at Salinas Valley State Prison.

SHO notes Inmate _____ is designated: MHCB. As a result, the Staff Assistant employed Effective Communication methods as follows:

- Simple English, Spoken Slowly
- Read Documents Aloud to Inmate

The Staff Assistant determined communication was effective and Inmate _____ was able to understand and effectively articulate both the nature of the charge(s) and the disciplinary process. This was determined by:

- Inmate _____ reiterated in his own words what was explained.
- Inmate _____ provided appropriate substantive responses to questions asked.
- Inmate _____ asked appropriate question(s) regarding the information provided.

**INVESTIGATIVE EMPLOYEE:** An Investigative Employee (IE) was assigned. Officer J. BURGIN was assigned on 04-12-12. Inmate _____ received a copy of the completed IE and was satisfied with the report. SHO reviewed the IE report and finds it to contain an adequate investigation in accordance with CCR Section §3318(a). Inmate _____ did not request the presence of the IE at this hearing. The Staff Assistant, Correctional Officer J. MORENO was present at the interview.

SHO notes Inmate _____ is designated: MHCB. As a result, the Investigative Employee employed Effective Communication methods as follows:

- Simple English, Spoken Slowly
- Read Documents Aloud to Inmate

The Investigative Employee determined communication was effective and Inmate _____ was able to understand and effectively articulate both the nature of the charge(s) and the disciplinary process. This was determined by:

- Inmate _____ reiterated in his own words what was explained.
- Inmate _____ provided appropriate substantive responses to questions asked.
- Inmate _____ asked appropriate question(s) regarding the information provided.

**PLEA/STATEMENT:** The charges contained in the RVR were read aloud to _____ who entered a plea of Guilty and provided the following statement, "I was just ill all the time. I know it wasn't the right thing to do. I just saw a pretty girl."

**WITNESS(ES):** Inmate _____ was advised he may request witnesses for this hearing. No witnesses were requested at the hearing.

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| J. PAREDES, Correctional Lieutenant (SHO) | 5-11-12 |
| GIVEN BY: (Staff's Signature)  Trans To SVSP | DATE SIGNED | TIME SIGNED |

☐ COPY OF CDC 115-C GIVEN TO INMATE

CDC 115-C (11/11)                                                                    CLK: DS 2/W

DEXP 105642

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

| ☐ SUPPLEMENTAL | ☐ CONTINUATION OF: | ☐ CIRCUMSTANCES | ☒ HEARING | ☐ INVESTIGATIVE EMPLOYEE | ☐ STAFF ASSISTANT | ☐ OTHER: |

FAD-H-12-03-091    CIM FACILITY "D"    05-11-12

**FINDINGS:** Inmate ████████ is being found **'Guilty'** of Disrespect Towards Staff. This charge requires evidence that the inmate took an action or made a comment or remark that was intended to offend, insult or otherwise disrespect the intended victim. This SHO's finding is based on the following evidence:

1.  The Reporting Employee's written report, wherein Psych. Tech. K. RIGSBY stated in part: "On 03-28-2012 at approximately 0640 hours, while I was assigned as the Infirmary Psychiatric Technician the following occurred: As I was going cell to cell conducting mental health assessments to the inmates housed in the Infirmary on Station One Tier. As I approached Cell ███ which is occupied Inmate ████████ (████████), I asked Inmate ████████ how he was feeling, Inmate ████████ answered, "Give me head." I was not positive if I heard him correctly and asked him again. Inmate ████████ again answered, "Give me head." I repeated what he said back to clarify what he had stated to me. Inmate ████████ stood in front of the cell door clenching his fist and teeth and looked directly at me through the door. I counseled him and told him he would get written up for his inappropriate behavior. I again asked Inmate ████████ how he was feeling. Inmate ████████ replied, "Kissy, kissy, kissy" as he smiled at me."

2.  The admission of guilt by Inmate ████████ wherein he pled Guilty to the charges at the hearing. A finding of guilty is appropriate under the circumstances present in this disciplinary.

3.  SHO reviewed the mental health evidence, available via the Mental Health Assessment Form. The Mental Health Clinician C. BERNARDING, LCSW concluded that mental illness may have influenced the behavior resulting in the RVR. Also considered was that if found guilty of the offense, there are mental health factor that the hearing officer should consider in assessing the penalty. This SHO finds the evidence of mental illness, insufficient to exonerate Inmate ████████. This SHO does, however, considered the mental health evidence in assessing the penalty.

**DISPOSITION:** Found **'Guilty'** of a Division F Offense. SHO assesses 30-days loss of Behavioral/Work Credits, consistent with the schedule provided in CCR Section §3323 (Disciplinary Credit Forfeiture Schedule) for a Division F Offense.

Counseled, warned and reprimanded regarding future behavioral expectations.

**APPEAL RIGHTS:** Inmate ████████ has been apprised of the above findings and his right to appeal this decision per CCR Section §3084. Inmate ████████ was further advised that he would receive a completed copy of this Rules Violation Report upon final audit by the Chief Disciplinary Officer (CDO).

**CREDIT RESTORATION:** Inmate ████████ was advised of his right to restoration of credits under CCR Section §3327 and Section §3328.

| SIGNATURE OF WRITER | DATE SIGNED |
| --- | --- |
| J. PAREDES, Correctional Lieutenant (SHO) | 5-11-12 |

| | GIVEN BY (Staff's Signature) | DATE SIGNED | TIME SIGNED |
| ☐ COPY OF CDC 115-C GIVEN TO INMATE | Travis To SVSP | | |

CDC 115-C (11/11)

CLK: DS 2/W

**DEXP 105643**

STATE OF CALIFORNIA
CDC 115-MH (12/03)
DEPARTMENT OF CORRECTIONS

## RULES VIOLATION REPORT: MENTAL HEALTH ASSESSMENT REQUEST

### REVIEWING CUSTODY SUPERVISOR

A CDC 115, Rules Violation Report (RVR), has been written on the following inmate, who requires a mental health assessment.

Inmate Name: _____    CDC Number: _____

RVR Log Number: FAD-H-1205091    Date of Violation: 3-28-12    Housing: OHU.____

Specific Act Charged: Disrespect Toward Staff

The inmate's current Mental Health Level of Care is: (check one)

☐ NOT IN MHSDS PROGRAM*    ☐ CCCMS*    ☐ EOP    ☐ MHCB    ☐ DMH

*CCCMS AND NON-MHSDS PROGRAM PARTICIPANTS WILL BE REFERRED FOR A MENTAL HEALTH ASSESSMENT FOR "BIZARRE, UNUSUAL OR UNCHARACTERISTIC" BEHAVIOR.

Sent to Mental Health: 5/8/12    By: Beauchamp _____ / _____
                       Date            Print Name         Signature

Return this form to: ASAP    Beauchamp ux+ 4451    *By: ASAP
                              Print Name                    Date

*(CCCMS and non-MHSDS, 5 working days; EOP/MHCB/DMH, 15 calendar days)

### MENTAL HEALTH CLINICIAN

Conducted **non-confidential** interview: 5-8-12 _____ (Inmate informed of non-confidentiality).
                                         Date

1. CCCMS/NON-MHSDS only. Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant?    ☐ Yes    ☐ No
   Explain "yes" response: _____ N/A _____

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR?
   ☒ Yes    ☐ No    Explain "yes" response: Pt. was manic w/ disorganized thoughts, bizarre behavior, tangential & loose thought process. He has since been put on Keyhea, taking meds regularly & referred to DMH & accepted to DMH.

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?    ☒ Yes    ☐ No    Explain "yes" response: Pt. has been referred to highest LOC (DMH) due to severity of his mental illness. He needs significant MH support to function well.

| INSTITUTION: C I M | CLINICIAN NAME (Print) C. Bernarding LCSW | SIGNATURE CB___ LCSW | DATE 5-8-12 |
|---|---|---|---|
| RECEIVED BY : | CUSTODY STAFF NAME (Print) | SIGNATURE | DATE |

DISTRIBUTION:
Original : Central File With Adjudicated CDC 115
Blue : Unit Health Record
Pink : Inmate

TABE! 8

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

**RULES VIOLATION REPORT:**
**MENTAL HEALTH ASSESSMENT REQUEST**

CDC 115-MH (12/03)
STATE OF CALIFORNIA        DEPARTMENT OF CORRECTIONS

**DEXP 105644**

# Exhibit 7

☒ MHCB    ☒ EOP    ☐ CCCMS    ☐ CLEAR    G.P.L. ☒ NO T.A.B.E. SCORE ON RECORD    ☐ ABOVE    ☐ BELOW 4.0

STATE OF CALIFORNIA                                                                                              DEPARTMENT OF CORRECTIONS
**RULES VIOLATION REPORT    804 to Records on 2/22/12 by S___o**                                                **KJ 2/W**

| CDC NUMBER | INMATE'S NAME | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|
| ▓▓▓ | ▓▓▓ | 02-17-12 EPRD | CIM-I | B BH-▓▓ | FAD-H-12-02-087 |

| VIOLATION RULE NO(S) | SPECIFIC ACTS | LOCATION | DATE | TIME |
|---|---|---|---|---|
| CCR §3005(b) OBEYING ORDERS | REFUSAL TO SIGN CONDITION OF PAROLE | FACILITY D HOSPITAL | 02-17-12 | 1500 Hours |

CIRCUMSTANCES

On February 17, 2012, at approximately 1500 hours while performing my duties as a Correctional Counselor II (Mentally Disordered Offender Coordinator), I interviewed and presented Inmate ▓▓▓ B BH-▓▓ with his "Notice of Conditions of Parole" (CDCR-1515), to which Inmate ▓▓▓ refused to sign. Inmate ▓▓▓ was advised the conditions were a directive from the Board of Prison Hearing (BPH), requiring his transfer to Atascadero State Hospital for further treatment and evaluation, pursuant to Penal Code Section 2962. Inmate ▓▓▓ stated, "I am not signing" and refused to sign the CDCR-1515. I explained in depth to Inmate ▓▓▓ that his refusal to sign the CDCR-151 would result in a disciplinary report and possible revocation of his current parole date of 02-17-2012, but Inmate ▓▓▓ continued to refuse to sign the CDCR-1515. I fully explained the possible consequences to Inmate ▓▓▓ if he refused to sign the CDCR-1515. Inmate ▓▓▓ stated he understood and was not going to sign anything.

Inmate ▓▓▓ is a participant in the Mental Health Services Delivery System at the EOP level of care.

Inmate ▓▓▓ is aware of this report.

| REPORTING EMPLOYEE (Typed Name and Signature) | | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|---|
| ► S. NERIO, Correctional Counselor II | | 2/22/12 | CORRECTIONAL COUNSELOR | S/S |

| REVIEWING SUPERVISOR'S SIGNATURE | DATE | INMATE SEGREGATED PENDING HEARING | |
|---|---|---|---|
| ► T. RIGSBY, Correctional Counselor III | 2-22-12 | DATE _____ LOC. _____ | |

| ___ IFIED | OFFENSE DIVISION | DATE | CLASSIFIED BY (Typed Name and Signature) | HEARING REFERRED TO |
|---|---|---|---|---|
| ___MINISTRATIVE | 030 | 2/23/12 | ► M. VELASCO, Correctional Lieutenant | ☐ HO ☐ SHO ☐ SC ☐ FC |
| ☒ SERIOUS | | | | |

COPIES GIVEN TO INMATE BEFORE HEARING

| ☐ CDC 115 | BY: (STAFF'S SIGNATURE) | DATE | TIME | TITLE OF SUPPLEMENT |
|---|---|---|---|---|
| FAD-H-12-02-087 | ► ▓▓ | 2/24/12 | 1030 | SUMMARY OF DISCIPLINARY PROCEDURES (CDC-115) INMATE RIGHTS (CDC-115A) |

| ☐ INCIDENT REPORT LOG NUMBER | BY: (STAFF'S SIGNATURE) | DATE | TIME | BY: (STAFF'S SIGNATURE) | DATE | TIME |
|---|---|---|---|---|---|---|
| ___ | ► | | | ► ▓▓ | 2/24/12 | 1030 |

| HEARING | | |
|---|---|---|
| | MENTAL HEALTH ▓▓ 2/24/12 1030 | |

*Paroled 3/12/12*

...ARING RESULTS SEE SUPPLEMENTAL, CDC-115 PART-C PAGE(S)

REFERRED TO: CLASSIFICATION    ☐ BPT/NAEA

| ACTION BY: (TYPED NAME) | SIGNATURE ► | DATE | TIME |
|---|---|---|---|
| ...VED BY: (SIGNATURE) ► L. MENDOZA, Facility Captain | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE ► B. PAHEL, Associate Warden | DATE |
| ☐ COPY OF CDC-115 GIVEN TO INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) ► | DATE | TIME |

CDC 115 (7/89)

DEXP 105634

STATE OF CALIFORNIA                                                                    DEPARTMENT OF CORRECTIONS
SERIOUS RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | VIOLATES RULE NO(S). | DATE | INSTITUTION | LOG NO. |
|---|---|---|---|---|---|
| | | CCR §3005(b) | 02-17-12 | CIM-I | FAD-H-12-02-087 |

REFERRAL FOR FELONY PROSECUTION IS LIKELY IN THIS INCIDENT ☐ YES ☑ NO

## POSTPONEMENT OF DISCIPLINARY HEARING

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I DO NOT REQUEST my hearing be postponed pending outcome of referral for felony prosecution. | ▶ | |
| ☐ I REQUEST my hearing be postponed pending outcome of referral for felony prosecution. | ▶ | DATE |

| DATE NOTICE OF OUTCOME RECEIVED | DISPOSITION |
|---|---|

| | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ I REVOKE my request for postponement | ▶ | |

*N/A*

## STAFF ASSISTANT

| STAFF ASSISTANT | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ REQUESTED  ☐ WAIVED BY INMATE | ▶ X | 2/24/12 |
| ☑ ASSIGNED    DATE 2/24/12   NAME OF STAFF Miles | | |
| ☐ NOT ASSIGNED   REASON NU TABE Scoros | | |

## INVESTIGATIVE EMPLOYEE

| INVESTIGATIVE EMPLOYEE | INMATE'S SIGNATURE | DATE |
|---|---|---|
| ☐ REQUESTED  ☐ WAIVED BY INMATE | ▶ X | 2/24/12 |
| ☐ ASSIGNED    DATE    NAME OF STAFF | | |
| ☐ NOT ASSIGNED   REASON | | |

EVIDENCE / INFORMATION REQUESTED BY INMATE

## WITNESSES

WITNESSES REQUESTED AT HEARING (IF NOT PRESENT, EXPLAIN IN FINDINGS)
☐ REPORTING EMPLOYEE   ☐ STAFF ASSISTANT   ☐ INVESTIGATIVE EMPLOYEE   ☐ OTHER _____   ☑ NONE

| WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED | WITNESSES (GIVE NAME AND TITLE OR CDC NUMBER) | GRANTED | NOT GRANTED |
|---|---|---|---|---|---|
| | ☐ | ☐ | | ☐ | ☐ |
| | ☐ | ☐ | | ☐ | ☐ |

INVESTIGATIVE REPORT: Investigative Employee must interview the inmate charged, the reporting employee, and any others who have significant information, documenting the testimony of each person interviewed. Review of files, procedures, and other documents may also be necessary.

| | INVESTIGATORS SIGNATURE | DATE |
|---|---|---|
| | ▶ | |

| BY: (STAFF'S SIGNATURE) | TIME | DATE |
|---|---|---|

— *if additional space is required use supplemental pages* —

DEXP 105635

02/22/2012  11:46                                                            PAGE  02/05

**1. Disability Code:**
☐TABE score ≤ 4.0
☐DPH ☐DPV ☐LD
☐DPS ☐DNH
☐DNS ☐DDP

**2. Accommodation:**
☒Additional time
☐Equipment ☐SLI
☒Louder ☒Slower
☒Basic ☐Transcribe
☐Other*

**3. Effective Communication:**
☒P/I asked questions
☒P/I summed information
Please check one:
☐Not reachable ☒Reached
*See chrono/notes

STATE OF CALIFORNIA
CDC 115-MH (12/03)

4. Comments: ∅ TABE SCORE

DEPARTMENT OF CORRECTIONS

∅ TABE

## RULES VIOLATION REPORT: MENTAL HEALTH ASSESSMENT REQUEST
### REVIEWING CUSTODY SUPERVISOR

A CDC 115, Rules Violation Report (RVR), has been written on the following inmate, who requires a mental health assessment.

Inmate Name: ▮▮▮▮▮▮▮▮▮▮▮▮   CDC Number: ▮▮▮▮▮▮▮

RVR Log Number: FAD-A-1202-087  Date of Violation: 2-17-12  Housing: B BH

Specific Act Charged: REFUSAL TO SIGN CONDITION OF PAROLE

The inmate's current Mental Health Level of Care is: (check one)
☐NOT IN MHSDS PROGRAM*   ☐CCCMS*   ☒EOP   ☐MHCB   ☐DMH

*CCCMS AND NON-MHSDS PROGRAM PARTICIPANTS WILL BE REFERRED FOR A MENTAL HEALTH ASSESSMENT FOR "BIZARRE, UNUSUAL OR UNCHARACTERISTIC" BEHAVIOR.

Sent to Mental Health: 2/22/12  By: Miles RD / ▮▮▮
                        Date        Print Name      Signature

Return this form to: Miles 4454  FAX 7121  *By: ASAP
                     Print Name                    Date

*(CCCMS and non-MHSDS, 5 working days; EOP/MHCB/DMH, 15 calendar days)

### MENTAL HEALTH CLINICIAN

Conducted **non-confidential** interview: 2/23/2012 (Inmate informed of non-confidentiality).
                                         Date

1. CCCMS/NON-MHSDS only.  Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant?  ☒Yes  ☐No
Explain "yes" response: EOP INMATE — VERY PSYCHOTIC.

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR?
☒Yes  ☐No   Explain "yes" response: NOTES IN PRIOR DAYS SHOW INMATE TO BE PSYCHOTIC & HEARING VOICES, POOR REALITY CONTACT, TODAY HE IS PSYCHOTIC WITH PARANOID AND GRANDIOSE DELUSIONS, AND IRRATIONAL AND ILLOGICAL

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?  ☒Yes  ☐No  Explain "yes" response: SAME REASONS AS FOR QUESTION #2.

| INSTITUTION: CIM | CLINICIAN NAME (Print) MICHAEL FLESOCK, MD | SIGNATURE | DATE 2/23/12 |
| RECEIVED BY : | CUSTODY STAFF NAME (Print) | SIGNATURE | DATE |

DISTRIBUTION:
Original : Central File With Adjudicated CDC 115
Blue     : Unit Health Record
Pink     : Inmate

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

## RULES VIOLATION REPORT:
MENTAL HEALTH ASSESSMENT REQUEST

CDC 115-MH (12/03)
STATE OF CALIFORNIA            DEPARTMENT OF CORRECTIONS

**DEXP 105636**

# Exhibit 8

# RULES VIOLATION REPORT: MENTAL HEALTH ASSESSMENT REQUEST

## REVIEWING CUSTODY SUPERVISOR

A CDC 115, Rules Violation Report (RVR), has been written on the following inmate, who requires a mental health assessment.

Inmate Name: ████████████████                          CDC Number: ████████

RVR Log Number: FD-12-04-0072 ____ Date of Violation: 04/26/12 ____ Housing: ████

Specific Act Charged: 3005(b) REFUSING TO OBEY ORDRES

The inmate's current Mental Health Level of Care is: (check one)

☐ NOT IN MHSDS PROGRAM*    ☐ CCCMS*    ☐ EOP    ☐ MHCB    ☐ DMH

*CCCMS AND NON-MHSDS PROGRAM PARTICIPANTS WILL BE REFERRED FOR A MENTAL HEALTH ASSESSMENT FOR BEHAVIOR THAT IS BIZARRE OR UNUSUAL FOR ANY INMATE, OR THAT IS UNCHARACTERISTIC FOR THIS INMATE.

Sent to Mental Health: 5·1·12 ____ By: M. Wade ____ / ____ M____
                          Date                    Print Name              Signature

Return this form to: D. Diepo _____  *By: 5·12·12 ____
                                    Print Name                          Date

*(CCCMS and non-MHSDS, 5 working days; EOP/MHCB/DMH, 15 calendar days)

## MENTAL HEALTH CLINICIAN

Conducted non-confidential interview: ____ 5/9/12 ____ (Inmate informed of non-confidentiality).
                                              Date

1. CCCMS/NON-MHSDS only. Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant? ☒ Yes    ☐ No

Explain "yes" response: I/m is EOP LoC

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR?
☒ Yes    ☐ No    Explain "yes" response: RECORDS CLEARLY SHOW I/m was actively psychotic prior to and after the incident. I/m had medication changed & I/m was not stable.

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty? ☒ Yes    ☐ No    Explain "yes" response: Strongly recommend administrative 115 or mental counseling if found guilty. I/m has severe mental illness & was psychotic w/ auditory hallucinations.

INSTITUTION: SVSP    CLINICIAN NAME (Print)        SIGNATURE    DATE 5/9/12
RECEIVED BY:    **D. Hamlin, Ph.D.**    D. Hamlin. PhD    
                **Staff Psychologist - S.V.S.P.**    SIGNATURE    DATE

DISTRIBUTION:
Original : Central File With Adjudicated CDCR
Blue    : 115 Unit Health Record
Pink    : Inmate

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

RULES VIOLATION REPORT:
MENTAL HEALTH ASSESSMENT REQUEST

CDCR 115-MH (Rev. 06/06)
STATE OF CALIFORNIA          DEPARTMENT OF CORRECTIONS AND REHABILITATION

DEXP 108088

STATE OF CALIFORNIA                    H              DEPARTMENT OF CORRECTIONS AND REHABILITATION
# RULES VIOLATION REPORT

| CDC NUMBER | INMATE'S NAME | | RELEASE/BOARD DATE<br>EPRD:10/02/2033 | INST.<br>S.V.S.P. | HOUSING NO. | LOG NO.<br>FD-12-04-0072 |
|---|---|---|---|---|---|---|
| VIOLATED RULE NO(S).<br>C.C.R. § 3005(B) | SPECIFIC ACTS<br>REFUSAL TO OBEY ORDERS | | | LOCATION<br>Group Room<br>A | DATE<br>04/26/12 | TIME<br>1150 HOURS |

CIRCUMSTANCES

On Thursday the 26th, 2012 at approximately 1150 hours, Inmate ▇▇▇▇▇▇▇ became disruptive in group. I redirected him to the topic and appropriate volume for group. Inmate ▇▇▇▇ resumed his behavior; shouting and banging on the holding cell door. I told him he needed to stop his actions and that if he did not stop a 115 disciplinary would have to be filed. ▇▇▇▇▇ considered this for a moment, then returned to the banging and shouting with a greater intensity and volume. I asked the custody officers to remove ▇▇▇▇ from the group room and they did so.

Inmate DAVIS **is** a participant in the Mental Health Service Delivery System at the **E.O.P.** level of care.

| REPORTING EMPLOYEE (Typed Name and Signature) | | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|---|
| ► G. ANDREOLI, Psych Tech | | | D2 LPT | S/S |
| REVIEWING SUPERVISOR SIGNATURE<br><br>► | DATE | ☐ INMATE SEGREGATED PENDING HEARING<br><br>DATE_____ LOC._____ | | |
| CLASSIFIED<br>☐ ADMINISTRATIVE<br>☒ SERIOUS _____ | OFFENSE DIVISION | DATE | CLASSIFIED BY (Type Name and Signature)<br><br>► | HEARING REFERRED TO<br>☐ HO  ☒ SHO  ☐ SC  ☐ FC |

| COPIES GIVEN INMATE BEFORE HEARING | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ CDCR-115 | BY: (STAFF'S SIGNATURE)<br>► | DATE | TIME | TITLE OF SUPPLEMENT | | | |
| ☐ INCIDENT REPORT<br>LOG NUMBER: | BY: (STAFF 'S SIGNATURE)<br>► | DATE | TIME | BY: (STAFF SIGNATURE) | | DATE | TIME |

HEARING

## (DISPOSITION CONTINUED PLEASE SEE CDCR-115C)

REFERRED TO ☐ CLASSIFICATION ☐ BPT/NAEA

| ACTION BY: (TYPE NAME) | | SIGNATURE | DATE | TIME |
|---|---|---|---|---|
| REVIEWED BY: SIGNATURE<br>J. McCALL, FACILITY 'D' CAPTAIN | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE<br>L. TREXLER, COMP-II A.W. | DATE | |
| ☐ COPY OF CDCR-115 GIVEN INMATE AFTER HEARING | | BY: (STAFF'S SIGNATURE)<br>► | DATE | TIME |

DEXP 108089

# Exhibit 9

# RULES VIOLATION REPORT: MENTAL HEALTH ASSESSMENT REQUEST

## REVIEWING CUSTODY SUPERVISOR

A CDC 115, Rules Violation Report (RVR), has been written on the following inmate, who requires a mental health assessment.

Inmate Name: ▓▓▓▓▓▓    CDC Number: ▓▓▓▓▓▓

RVR Log Number: A1204 0001    Date of Violation: 4/3/12    Housing: ▓▓▓▓▓▓

Specific Act Charged: WILLFULLY OBSTRUCTING STAFF IN PERFORMANCE OF DUTIES

The inmate's current Mental Health Level of Care is: (check one)

☐ NOT IN MHSDS PROGRAM*    ☐ CCCMS*    ☒ EOP    ☐ MHCB    ☐ DMH

*CCCMS AND NON-MHSDS PROGRAM PARTICIPANTS WILL BE REFERRED FOR A MENTAL HEALTH ASSESSMENT FOR BEHAVIOR THAT IS BIZARRE OR UNUSUAL FOR ANY INMATE, OR THAT IS UNCHARACTERISTIC FOR THIS INMATE.

Sent to Mental Health: 4-11-12    By: V. LIZAOLA    V. ▓▓▓▓
Date    Print Name    Signature

Return this form to: FAC "A" DISPO    FAX #5601    *By: 4-19-12
Print Name    Date

*(CCCMS and non-MHSDS, 5 working days; EOP/MHCB/DMH, 15 calendar days)

## MENTAL HEALTH CLINICIAN

(Inmate informed of non-confidentiality).

Conducted non-confidential interview: 4/16/12
Date

1. CCCMS/NON-MHSDS only: Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant? ☒ Yes    ☐ No

Explain "yes" response: thoughts are disorganized.

2. In your opinion, did the inmate's mental disorder appear to contribute to the behavior that led to the RVR? ☒ Yes    ☐ No    Explain "yes" response: If mental state is disorganized and his ability to comprehend what he is being told is compromised.

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty? ☒ Yes    ☐ No    Explain "yes" response: what all passed and what he was told may be different.

| INSTITUTION: SVSP | CLINICIAN NAME: (Print) A. Wingfield | SIGNATURE: [signature] | DATE 4/16/12 |
|---|---|---|---|
| RECEIVED BY: | CUSTODY STAFF NAME: (Print) | SIGNATURE | DATE |

DISTRIBUTION:
Original : Central File With Adjudicated RVR
Blue : 115 Unit Health Record
Pink : Inmate

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

### RULES VIOLATION REPORT:
MENTAL HEALTH ASSESSMENT REQUEST

CDCR 115-MH (Rev. 06/06)
STATE OF CALIFORNIA    DEPARTMENT OF CORRECTIONS AND REHABILITATION

**DEXP 108059**

JF-115

304 TO RECORDS on _____ by _____                    DEPARTMENT OF CORRECTIONS

**STATE OF CALIFORNIA**
**RULES VIOLATION REPORT**

| CDC NUMBER | INMATE NAME | | RELEASE/BOARD DATE EPRD: 10/15/2032 | INST. SVSP | HOUSING NO. ▇▇▇ | LOG NO. A12-04-0001 |
|---|---|---|---|---|---|---|
| VIOLATED RULE NO(S). CCR §3005 | SPECIFIC ACTS WILLFULLY OBSTRUCTING STAFF IN PERFORMANCE OF DUTIES | | | LOCATION Facility "A" Medical | DATE 04/03/12 | TIME 0950 Hours |

CIRCUMSTANCES
On Tuesday, April 03, 2012, at approximately 0950 hours, Inmate ▇▇▇▇▇▇▇▇▇▇ approached staff in the Facility "A" Medical to inquire about his dressing change. Inmate ▇▇▇▇ was informed that his dressing change was not on a daily basis, but was to be done every three (3) days. Inmate ▇▇▇▇ verbally expressed his displeasure and at that time was ordered by staff to leave. Inmate ▇▇▇▇ then chose to lie down on the ground, refusing staff's orders to get up until he received the medical attention he desired. Due to the actions of Inmate ▇▇▇▇ the yard was ordered down for staff to respond to the area where Inmate ▇▇▇▇ was lying. Inmate ▇▇▇▇ was subsequently placed into a wheelchair and escorted to Facility "A" Medical with no further incident. Inmate ▇▇▇▇ was informed that he would be issued a CDCR-115 for Willfully Obstructing Staff in the Performance of their Duties.

Inmate ▇▇▇▇ is a participant in the MHSDS at the EOP level of care and is aware of this report.

| REPORTING EMPLOYEE (TYPE Name and Signature) D. Allen, Registered Nurse   *D. Allen RN* | DATE 4/10/12 | ASSIGNMENT Facility "A" Medical | RDO'S S/S |
|---|---|---|---|
| REVIEWING SUPERVISOR'S SIGNATURE | DATE 8-10-12 | ☒ INMATE SEGREGATED PENDING HEARING | |

| CLASSIFIED | OFFENSE | DATE | CLASSIFIED BY (Name and Signature) | | |
|---|---|---|---|---|---|
| DIVISION: ☐ ADMINISTRATIVE ☒ SERIOUS | D 6-90 | 4/10/12 | R. MARTINEZ | LOC _____ | HEARING REFERRED TO ☐ HO ☐ SHO ☐ SC ☐ FC |

COPIES GIVEN INMATE BEFORE HEARING

| ☒ CDC 115 A12-04-0001 | BY: (STAFF'S SIGNATURE) | DATE 4/10/12 | TIME 2560 | TITLE OF SUPPLEMENT | | |
|---|---|---|---|---|---|---|
| ☐ INCIDENT REPORT LOG NUMBER: N/A | BY: (STAFF'S SIGNATURE) | DATE | TIME | BY: STAFF'S SIGNATURE | DATE | TIME |

HEARING:

| REFERRED TO   ☐ CLASSIFICATION   ☐ BPT/NAEA | | SIGNATURE | DATE | TIME |
|---|---|---|---|---|
| ACTION BY: (TYPED NAME) | | | | |
| REVIEWED BY: (SIGNATURE) | DATE | CHIEF DISCIPLINARY OFFICER SIGNATURE | DATE | |
| ☐ COPY OF CDC 115 GIVEN INMATE AFTER HEARING | | BY: (STAFF SIGNATURE) | DATE | TIME |

CDC 115 (7/88)

**DEXP 108060**

# Exhibit 10



https://www.youtube.com/watch?v=64sWzzhSWEE&playnext=1&list=PL625BA00AD88870541

# Exhibit 11

804 to Records on: ▮▮▮ by: ▮ MARQUEZ

STATE OF CALIFORNIA

# RULES VIOLATION REPORT

SENT UP ON: JAN/23/2012

| CDC NUMBER | INMATE'S NAME | | | RELEASE/BOARD DATE | INST. | HOUSING NO. | LOG NO. |
|---|---|---|---|---|---|---|---|
| ▮▮ | ▮▮ | (3) | | | RJDCF-RC | D-11-327 |

| VIOLATED RULE NO(S). | | SPECIFIC ACTS | | | | | |
|---|---|---|---|---|---|---|---|
| CCR 3005(d)(1) | FORCE & VIOLENCE | BATTERY ON INMATE | | | LOCATION ▮▮ | DATE 12-6-11 | TIME 0720 HRS. |

CIRCUMSTANCES

On Tuesday, December 6, 2011, at approximately 0720 hours, while performing my duties as HU-20 Floor Officer, supervising the pill line in the Dayroom, I heard a commotion on the upper tier, in front of cell 250. I looked up and observed Inmates ▮▮▮, and ▮▮▮ striking Inmate ▮▮ in the upper torso with closed fists. As I was responding to the area, I saw Inmate ▮▮ running away, and Inmates ▮▮▮ in pursuit. I ordered the inmates to stop and get down, to which they complied. Responding staff arrived, handcuffed the inmates, and escorted them to the dayroom for a medical evaluation.

MHSDS: EOP
TABE SCORE: 5.6

| REPORTING EMPLOYEE (Typed Name and Signature) | | DATE | ASSIGNMENT | RDO'S |
|---|---|---|---|---|
| ▶ E. DE DIOS, Correctional Officer | | 12-6-11 | HU-20 Floor | F/S |

| REVIEWING SUPERVISOR'S SIGNATURE | DATE | ☐ INMATE SEGREGATED PENDING HEARING | |
|---|---|---|---|
| M. LASIEWSKI, C/Sergeant | 12-6-11 | 12-6-11 NXX | |

| CLASSIFIED | OFFENSE DIVISION | DATE | CLASSIFIED BY (Typed Name and Signature) | LOC. | HEARING REFERRED TO |
|---|---|---|---|---|---|
| ☐ ADMINISTRATIVE ☑ SERIOUS | D | 12/7/11 | J. WILLIAMS, Facility Captain(A) | | ☐ HO ☑ SHO ☐ SC ☐ FC |

| ☐ CDC 115 | BY: (STAFF'S SIGNATURE) | DATE | TIME | TITLE OF SUPPLEMENT |
|---|---|---|---|---|
| | ▶ | 12/12/11 | 1150 | 115 MH |

| ☐ INCIDENT REPORT LOG NUMBER: | BY: (STAFF'S SIGNATURE) | DATE | TIME | BY: (STAFF'S SIGNATURE) | DATE | TIME |
|---|---|---|---|---|---|---|
| N/A | ▶ | | | ▶ R. Seagren | 12-28-11 | 0922 |

HEARING

Inmate ▮▮ appeared before this Senior Hearing Officer on 1-12-12, at approximately 1450 hours. Inmate ▮▮ was present for this hearing and stated he was in good health. He received all pertinent copies 24 hours prior to this hearing, and was ready to proceed. Effective communication was achieved by speaking clearly and concisely, using simple language, with continuous prompts to the inmate to repeat, in his own words, his understanding of the issues presented. The hearing was held in the Administrative Segregation Unit. He is a participant in the Mental Health Services Delivery System (MHSDS), at the EOP level of care. A CDC 115-MH was completed on 12-22-11 by R. McKnight, Psy.D.. The CDCR 115-MH evaluation indicated Subject's mental disorder did appear to contribute to the behavior that led to the RVR. Specifically, I/M did not receive medication in the morning and was feeling on edge. I/M claims ▮▮ attacked him and he defended himself. I/M has a serious mental illness that results in paranoia, poor judgment, misperception of reality and assaultive behavior. Not having his medication likely played a role as well.

STAFF ASSISTANT: Correctional Officer Williams was assigned due to EOP level of care. The assigned Staff Assistant was present at the hearing and met with the Subject more than 24 hours prior to the hearing.

INVESTIGATIVE EMPLOYEE: Correctional Officer J. Marquez was assigned and the report was taken into consideration. The inmate received a copy of the IE on 12-15-11.

| REFERRED TO ☐ CLASSIFICATION ☐ BPT/NAEA | | | | | | |
|---|---|---|---|---|---|---|
| ACTION BY: (TYPED NAME) | | SIGNATURE | | | DATE | TIME |
| M. OLIVEROS, Correctional Lieutenant | | ▶ | | | 1-12-12 | 1450 Hrs. |

| REVIEWED BY: (SIGNATURE) | | DATE | CHIEF DISCIPLINARY OFFICER'S SIGNATURE | | DATE | |
|---|---|---|---|---|---|---|
| ▶ J. WILLIAMS, Facility Captain(A) | | 1/18/12 | B. KOEN, JR, Associate Warden(A) | | 1/19/12 | |

| ☐ COPY OF CDC 115 GIVEN INMATE AFTER HEARING | BY: (STAFF'S SIGNATURE) | | DATE | TIME |
|---|---|---|---|---|
| | ▶ FHSmith | | 1/21/12 | 1115 |

CDC 115 (7/88)

DEXP 105506

STATE OF CALIFORNIA                                                      DEPARTMENT OF CORRECTIONS

**RULES VIOLATION REPORT - PART C**                                     PAGE 2 OF 2

| CDC NUMBER | INMATE'S NAME | LOG NUMBER | INSTITUTION | TODAY'S DATE |
|---|---|---|---|---|
|  |  | D-11-327 | RJDCF-RC | 1-12-12 |

| ☒ SUPPLEMENTAL | ☒ CONTINUATION OF: | ☐ 115 CIRCUMSTANCES | ☒ HEARING | ☐ IE REPORT | ☐ OTHER |
|---|---|---|---|---|---|

HEARING:  (CONTINUED)

WITNESSES:  No witnesses were requested.

INMATE PLED:  GUILTY, and stated, "I was the only one hitting ▮▮▮▮."

FINDINGS:  GUILTY of CCR 3005(d)(1), specifically, Battery on Inmate; a Division "D" offense, based on the following:

Statements contained in the RVR, dated 12-6-12, authored by C/O E. DE DIOS, indicated in part: On Tuesday, December 6, 2011...I...observed Inmates ▮▮▮▮▮▮▮▮..and ▮▮▮▮..striking Inmate ▮▮▮▮...in the upper torso with closed fists.

The Subject's plea statement of "GUILTY" was also considered.

Taken together, the preponderance of the evidence supports the finding of GUILTY.

DISPOSITION:  The SHO considered the information contained in the CDC-115-MH that reflected the Subject's mental health factors should be considered when assessing penalties, if found guilty of the violation.  Specifically, I/M is not a good candidate for Ad Seg environment. He becomes overwhelmed there due to his mental illness and has trouble coping.

Assessed 0 days' time credit forfeiture for a Division "D" offense.  Subject was served with a copy of the CDC-115 within 15 days of discovery; however, the hearing was not held within 30 days of notice of service. Per CCR 3320(f)(3), time constraints have not been met and credit forfeiture cannot be assessed.

Subject was reprimanded and counseled that this type of behavior will not be tolerated, and did appear receptive to counseling.

Refer to Classification for SHU term consideration.

The inmate was advised that a final copy of the disciplinary report would be issued after audit by the Chief Disciplinary Officer, and his right to appeal this action per CCR 3084.1.

| SIGNATURE OF WRITER | DATE SIGNED |
|---|---|
| M. OLIVEROS, Correctional Lieutenant | 1-12-12 |

| ☑ COPY OF CDC 115-C GIVEN TO INMATE | GIVEN BY: (Staff's Signature) | DATE SIGNED | TIME SIGNED |
|---|---|---|---|
|  |  | 1/21/12 | 1115 |

CDC 115-C (5/95)                                                     OSP 99 25082

**DEXP 105507**

# Exhibit 12

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date    :    September 12, 2012

To      :    Associate Directors – Division of Adult Institutions
             Wardens

Subject:    USE OF CHEMICAL AGENTS DURING CONTROLLED USE OF FORCE
            SITUATIONS AND REVIEW OF USE OF FORCE INCIDENTS

The purpose of this memorandum is to reiterate expectations relative to the use of force.

The Department Executive Review Committee (DERC) recently reviewed incidents involving the controlled use of force during cell extractions. The review highlighted the need to clarify expectations with regard to the application of Oleoresin Capsicum (OC) products during controlled use of force situations.

Although policy does not restrict the amount or number of applications of OC product used, it is my expectation during controlled use of force situations that sufficient time is provided between applications to allow the product to be effective. Should it become evident the application of OC products are not effective, rather than continued deployment of chemical agents; alternate use of force options shall be considered. Incident Commanders and on-site managers must utilize their knowledge, training and experience, as well as exercise common sense in choosing the appropriate use of force option during these situations.

Additionally, these same DERC reviews highlighted incidents wherein the actions of staff were not in compliance with current policy, yet the issues were not identified nor addressed until reaching the Second Level Manager Review, or in some cases, the Institution Executive Review Committee. It is my expectation that the review process at all levels be thorough and meaningful, and staff involved in reviewing use of force incidents are sufficiently knowledgeable in current policy, Department Operations Manual, Chapter 5, Article 2, Section 51020, in order to identify and address actions which may not be in compliance with policy. It should not require upper level review to identify training or non-compliance issues. Additionally, it is my expectation that any significant non-compliance issue be referred for investigation.

To assist in clarifying expectations, I ask that Wardens provide On the Job Training (OJT) to all Incident Commanders and managers with regard to the above expectations. Proof of practice of the required OJT is to be provided to the respective Associate Director no later than October 12, 2012. If you have any questions or concerns relative to this directive, please contact your Mission's Associate Director.

DEXP 009657

Associate Directors – Division of Adult Institutions
Wardens
Page 2


Thank you for your consideration and attention in this matter.


M.D. STAINER
Deputy Director, Facility Operations
Division of Adult Operations


cc:  Terri McDonald, Undersecretary
     Kathleen Dickinson, Director - DAI
     Kathleen Allison, Deputy Director (A), Facility Support – DAI

# Exhibit 13

LITTLE, BULMAN,

MEDEIROS & WHITNEY, P.C.

*ATTORNEYS*

Christopher H. Little *
John E. Bulman*
Matthew F. Medeiros*
Christopher C. Whitney*
Henry R. Kates*
Fredrika Quinn Little†
Norma P. D'Apolito
Scott K. Pomeroy
Kristen K. Mead*

J. Michael Keating, Jr.
John D. Deacon, Jr.*
*Of Counsel*

*Also admitted in Massachusetts
†Also admitted in Connecticut

72 Pine Street
Providence, Rhode Island 02903
(401) 272-8080
Facsimile (401) 521-3555
Email: info@lbmwlaw.com

February 7, 2002

```
RECEIVED
FEB 1 1 2002
ROSEN BIEN & ASARO
```

**VIA FACSIMILE**

Michael Pickett, Deputy Director (A)
Health Care Services Division
California Department of
    Corrections
501 J Street, Suite 602
P.O. Box 942883
Sacramento, CA 94283-0001

Re    **Mental Health Assessments in the Disciplinary Process**

Dear Mr. Pickett:

Over a year ago in late January, 2001, in a policy meeting among parties and counsel in
Coleman, the department reported that it was finalizing its training materials on mental
health input into the disciplinary process. That announcement coincided with emerging
concern about some of the unanticipated consequences of the assessment process. Initial
experience with the process, which required the preparation of a mental health
assessment for each MHSDS inmate charged with a rule violation, suggested that the
assessments had only marginal impact on the disposition of offenses and consumed an
inordinately large proportion of limited case management resources. It was early hoped
that effective training might remedy problems with the process, but it became
increasingly obvious that the process itself needed some revision.

The main thrust of suggested revisions was to reduce the huge volume of mental health
assessments by limiting somehow their preparation to cases involving serious rule
violations. Everyone agreed that the principal objective of the assessment process was to
avoid the pyramiding of penalties for mental illness-driven infractions that often lead to
long terms in SHUs and administrative segregation units for severely mentally ill
inmates.

In the full year that has elapsed since the need for revisions became evident, several versions of a revised process have been formulated, circulated and dissected by the plaintiffs and the master. The defendants' most recent version was delivered on the eve of the latest mid-January policy meeting, and responded to my letters of November 9 and 19, which, in turn, responded to the department's September version, which, in turn, responded to . . . .etc., etc., etc.

Principle changes in the latest version included the following:

- Deletion from the first paragraph in Section 52080.3 of the phrase, "distinguishing right from wrong," which expressly cited the McNaghten Rule and suggested the need for forensic standards and judgments way beyond the experience of most CDC mental health clinicians.

  Eliminating the phrase, while leaving the requirement for a clinical determination of whether "the inmate was incapable of knowing or understanding the nature or quality of his/her act," provides no better guidance for clinicians. Who makes this decision and when and under what circumstances? A clearly articulated process for initiating this judgment is needed, as well as sharply focused training for those clinicians (few in number, one hopes) required to make it.

- In the first paragraph of Section 52080.3, referrals to the District Attorney of A, B or C level offenses are now discretionary rather than mandatory. That is an improvement.

- The note on the treatment of attempted suicides in Section 52080.3 is a welcome addition. An express reference to Dr. Steinberg's March 15, 2000 Memorandum (a copy is attached) on the subject would have been even more welcome. The procedure spelled out in that 3/15/00 memorandum presumably will be included in the training for personnel involved in the revised process.

- The note in Section 52080.3.5 adds a paragraph requiring that a clinician other than the accused inmate's primary/treating clinician prepare the assessment, although the preparing clinician is required to consult with the primary/treating clinician before completing the assessment. I have no objection to this addition.

- Previous versions of Section 52080.3.8 contained both a requirement and a process for the Chief Disciplinary Officer to

Michael Pickett
February 7, 2002
Page 3

confer with a clinician on the appropriateness of a disposition whenever an assessment indicated that the inmate's behavior was influenced by his/her mental disorder. The requirement and the process, unfortunately, have been eliminated in the latest version of the policy.

From its earliest appearance, I thought the deleted provision was a vehicle cleverly calculated to promote understanding between clinicians and those responsible for institutional discipline about the difficult and delicate relationship between mental illness and behavior. I saw it being invoked primarily, perhaps only, when a hearing officer disregarded a clinician's assessment that the accused inmate's behavior was affected by mental illness. I can think of no better way than this compulsory dialogue to enhance understanding between mental health and custody staffs at the institutional level on this issue. I lament its excision and urge its reinstatement.

- The additional requirement in Section 52080.10.1 that the hearing officer specifically explain the impact of the mental health assessment on the disposition and how the information in the assessment was used in determining the accused inmate's guilt is also welcome.

- Finally, the added note in Section 52080.10.2 apparently requires hearing officers to consider, and document their consideration of, the mental health assessment when imposing penalties. Clarity about a hearing officer's need to consider the clinical assessment when imposing a sanction was absent in earlier versions of the policy, and this change is helpful. I would suggest a simple language change for the purpose of clarity. The first phrase in the note, "For a finding of guilt," should read, "Upon a finding of guilt," or "After a finding of guilt."

This final policy exhibits pretty clearly the difficulty of striking the appropriate balance between an excessively inclusive process and one that seeks to limit assessments. The initial policy was probably too broadly inclusive to have much impact. It remains to be seen whether this new version is too narrowly exclusive.

The extent to which the initial policy was doomed to failure because it was introduced with so little preparation is unclear. The need for training all institutional personnel with key roles in the revised process before its introduction should now be painfully evident. The training offered needs to focus on all of the following players and their roles:

Michael Pickett
February 7, 2002
Page 4

- Clinicians, who are called on to decide under Section 52080.3 whether a particular offense ought to be removed from the disciplinary process because the charged inmate is incapable of knowing or understanding the nature or quality of his or her act: How such a determination will be made, and by whom, and on the basis of what standards are all critical issues that must be addressed in any meaningful training effort.

- Classifying officials, who appoint staff assistants and refer 3CMS and other inmates, whose behavior would "reasonably be considered bizarre, unusual, or uncharacteristic for that inmate": The referral task will represent a distinct challenge for non-clinicians, and the need for clear standards is obvious. This decision will determine largely whether the new process, in contrast to the overbroad reach of the current process, can avoid excessive exclusiveness.

- Clinicians, who will prepare the mental health assessments: What are the requirements for reviewing records and interviewing an accused inmate? What needs to be included in the narrative responses on the mental health assessment forms? What are the standards or measures for deciding whether an inmate's mental disorder significantly contributed to the offending behavior?

- Hearing officers, who must interpret and apply the mental health assessments in specific cases: What guidance can be provided for hearing officers on how to understand and interpret assessments? How does the hearing officer distinguish between the use of assessments in adjudicating guilt and imposing penalties?

- Chief Disciplinary Officers, who must oversee the process in each institution: These local architects and guardians of the process will need training in all of the above roles if they are to ensure the adequate performance of all the key players in the process.

One other issue needs to be addressed. Evaluation of the impact of the current version of the mental health assessment process has been severely handicapped by the absence of a requirement that institutions track the outcome of disciplinary cases involving assessments. Credible and comparable data from 33 institutions on the revised assessment process requires the department to develop a uniform procedure and instrument for its collection in each facility before institutional use of the revised process begins. The number of cases to be recorded will be much smaller, and data collection for the new process should not be especially burdensome. In the absence of such data,

Michael Pickett
February 7, 2002
Page 5

institutions, the department and the monitor are all incapable of assessing the impact and utility of the process.

The single most perplexing issue I have encountered in 30 years of involvement in prisons and jails is the development of fair and effective disciplinary procedures. A proper equilibrium between the need for order and control and respect for due process and the rule of law is difficult enough to establish for mentally fit inmates. When mental illness is thrown into the equation, the difficulty of striking a meaningful balance becomes exponentially complex.

Discussion of the details of the department's proposed revisions has gone on long enough. There is no existing court order, provisional or otherwise, in this case on this issue. There is no point for yet another round of critiques; it is time to move ahead with the implementation of a revised policy. I remain concerned, as indicated above, by some of the provisions and language of the latest version. I am even more concerned that its implementation may lack the thoughtful training sessions and materials and documentation requirements that are so essential for its success. The department needs to work with the master's experts and plaintiffs' counsel in the development of the requisite training and documentation. The master's experts bring a unique breadth of understanding and experience to the intersection of mental illness with prison discipline, while the plaintiffs' counsel are the indisputable champions of due process and the rule of law. The exclusion of either from participation in the development of training for the new process would be a mistake.

I will end with an observation I have made before in this context. Appropriate clinical involvement in disciplinary dispositions has rich potential for an overloaded mental health caseload. In some instances, it can reduce the number of seriously mentally ill inmates serving longer sentences than necessary and hasten their discharge from CDC. For other long-term caseload inmates, sustained and thoughtful intervention in the handling of their institutional offenses can result in their placement in less restrictive, and often far less costly, programs and custody settings.

If you have any questions in regard to any of this, please call.

Sincerely yours,

J. Michael Keating, Jr.
Special Master

Enclosure

Michael Pickett
February 7, 2002
Page 6


cc.     Matthew A. Lopes, Esq.
        Michael Bien, Esq.
        Donald Specter, Esq.
        Rochelle Holzmann, Esq.
        Jennifer Neill, Esq.
        John Sugiyama, Esq.
        Judi Lemos, Esq.


Mastering/letters/25mp115assessrevsns.doc

State of California                                                    Department of Corrections

# Memorandum

Date    :   MAR 1 5 2000

To      :   Health Care Managers
            Chief Psychiatrists
            Staff Psychologists
            Senior Psychologists

Subject :   CDC FORM 115 FOR ATTEMPTED SUICIDE

The California Code of Regulations (CCR) 3317, Mental Health Evaluations for Disciplinary Hearings addresses the documentation of attempted suicides for possible issuance of a Rules Violation.

Per the January 10, 2000 memorandum (Attachment 1) from David Tristan, Deputy Director, Institutions Division, "...if mental health staff cannot make a clear evaluation that it was an actual suicide attempt, a CDC 115 shall not be written."

The decision about whether a suicide attempt is genuine or not is a very difficult clinical decision. In order to preserve an inmate's due process rights, any decision that a suicide attempt was not a genuine one must be supported by the following:

1. A thorough review of the Medical Record and Central File.
2. A complete mental health evaluation including a complete history, current mental status examination, and diagnosis.
3. Appropriate Psychological Testing to include both objective and projective testing.
4. A detailed summary supporting the conclusion that the suicide attempt was not genuine.
5. Prior to the issuance of a CDC 115, this report must be approved and co-signed by the institution's Mental Health Manager.

If you have any questions, please contact Sal Mennuti, Ph.D., Chief, Mental Health Services, Health Care Services Division (HCSD), at (916) 327-0236.

SUSANN J. STEINBERG, M.D
Deputy Director
Health Care Services Division

Attachment

cc:   Steven Cambra, Jr., Chief Deputy Director, Field Operations
      J. Michael Keating, Jr., Coleman Special Master
      Jennifer Weck, Deputy Attorney General, Department of Justice
      Diane de Kervor, Deputy Attorney General, Department of Justice
      David Tristan, Deputy Director, Institutions Division
      Nadim Khoury, M.D., Assistant Deputy Director, Clinical Policy and Programs, HCSD
      Albert Coión, Assistant Deputy Director (A), Fiscal and Program Support, HCSD
      Sal Mennuti, Ph.D., Chief, Mental Health Services, HCSD