DONALD SPECTER – 083925
STEVEN FAMA – 099641
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
KRISTA STONE-MANISTA – 269083
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:    (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:    (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, California  94104-4244
Telephone:    (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. Civ S 90-0520 LKK-JFM |
| Plaintiffs, | **DECLARATION OF JANE E. KAHN IN SUPPORT OF PLAINTIFFS' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES** |
| v. | |
| EDMUND G. BROWN, Jr., et al., | |
| Defendants. | Judge:   Hon. Lawrence K. Karlton<br>Date:    July 8, 2013<br>Time:    10:00 am<br>Crtrm:   4 |

[824711-1]

1    I, Jane E. Kahn, declare:

2    1.    I am an attorney admitted to practice law in California, a member of the bar

3    of this Court, and Of Counsel to the law firm of Rosen Bien Galvan & Grunfeld LLP,

4    counsel of record for Plaintiffs.  I have personal knowledge of the matters set forth herein,

5    and if called as a witness I could competently testify.  I make this declaration in support

6    of Plaintiffs' Motion for Enforcement of Court Orders and Affirmative Relief Related to

7    Use of Force and Disciplinary Measures.

8    2.    In 1998, Defendants implemented new procedures for adjudication of rule

9    violation reports ("RVRs") for Mental Health Services Delivery System ("MHSDS")

10    participants.  These procedures were supposed to incorporate "appropriate clinical input

11    from Mental Health clinicians" for all RVRs involving an inmate on the MHSDS caseload,

12    regardless of level of care.  Attached hereto as **Exhibit 1** is a true and correct copy of the

13    August 14, 1998 CDCR Memorandum regarding "Adjudication of Rule Violation Reports

14    Involving Mental Health Services Delivery System Inmate Program Participants/Patients"

15    provided to Plaintiffs' counsel by Defendants.

16    3.    In May 1999, the Special Master reported on Defendants' RVR process for

17    *Coleman* class members in his May 12, 1999 Supplemental Recommendations of the

18    Special Master on Staff Ratios and Administrative Segregation.  A true and correct copy of

19    that report is attached hereto as **Exhibit 2**.  The Special Master recognized that a key part

20    of providing adequate and appropriate mental health treatment is "keeping seriously

21    mentally disordered inmates out of administrative segregation as often as possible and

22    moving them out of administrative segregation as rapidly as possible once they are housed

23    there."  *Id.* at 10.  The Special Master also made the following observations:

24    a.    "More work needed to be done before the procedures can have their

25    anticipated impact" and Defendants needed to "develop a plan for training mental health

26    staff, staff assistants, and hearing officers."  *Id.*

27

28

1

1         b.    The method defendants adopted to limit the stay of MHSDS inmates

2    in administrative segregation, once placed there – mental health participation in the ICC

3    process – had "yet to live up to its potential."  *Id.* at 11.

4         c.    The role of cooperative relations between custody and mental health

5    staff is critical to this process and is a function of institutional leadership.  Defendants

6    needed to improve this cooperation at the institutional level.  *Id.*

7        4.    By 2001, Defendants complained that completing mental health assessments

8    for all MHSDS inmates in the RVR process was too burdensome and proposed a new two-

9    tiered system that would refer all EOP/MHCB patients for a mental health assessment, but

10   refer only those CCCMS inmates whose behavior is "bizarre, unusual and

11   uncharacteristic."  Attached hereto as **Exhibit 3** is a true and correct copy of

12   September 26, 2001 Memorandum: Final Draft RVR Policy, which Defendants provided

13   to the Special Master and Plaintiffs' counsel.

14       5.    In 2001 and 2002, the parties and the Special Master engaged in dialogue

15   about Defendants' proposal.  Plaintiffs proposed that mental health assessments continue

16   to be made for all CCCMS inmates, especially those with a serious RVR that could result

17   in a SHU term or District Attorney ("DA") referral (class A, B, and C).

18       6.    However, Defendants asserted that "provision of assessments to all CCCMS

19   inmates would prove overly burdensome on clinical staff" and that "it was improper to

20   treat the mental health of CCCMS inmates differently based on the seriousness of their

21   rules violations.  The Department does not think that the seriousness of the violation is

22   indicative of whether the inmate's mental illness influenced his or her behavior."

23   Exhibit 3 (September 26, 2001 Memorandum)

24       7.    Plaintiffs then proposed a three-tiered system that would refer all

25   EOP/MHCB patients, CCCMS patients with a serious rule violation, and any CCCMS

26   inmate referred by a staff person for "bizarre, unusual or uncharacteristic" behavior for that

27   inmate.  Attached hereto as **Exhibit 4** is a true and correct copy of the 10/25/02 Kahn

28   Letter, (prisoner name redacted).  Defendants maintained the two-tiered standard, rejecting

[824711-1]

2

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLS.' MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1  Plaintiffs' proposal to provide a mental health assessment to CCCMS inmates issued a

2  serious rule violation.

3       8.      Plaintiffs provided additional comments regarding the problems with using

4  custody staff to make referrals using the "bizarre, unusual and uncharacteristic" standard

5  because of custody staff's limited understanding or familiarity with mental illness and in

6  light of evidence that custody staff verbally harassed mentally ill inmates.  Exhibit 4

7  (10/25/02 Kahn Letter).  Defendants rejected Plaintiffs' comments and suggestions on this

8  aspect of the policy as well.

9       9.      Following Defendants' implementation of the new disciplinary procedures

10 for mentally ill inmates in 2002, Plaintiffs continued to raise concerns about the process,

11 particularly about whether mitigation of penalties for infractions connected to mental

12 illness was actually occurring, whether appropriate training had been provide to hearing

13 officers so that they could apply the mitigation policy, whether custody staff responsible

14 for issuing RVRs in the first place had enough training to use appropriate discretion about

15 whether to issue the RVR for violations resulting from mental illness, and the effects of

16 failure to mitigate penalties on inmates who were charged with serious rule violations that

17 could result in referrals to SHU and the DA.  Plaintiffs expressed these concerns in letters

18 and in discussions with Defendants and the Special Master.  Attached hereto as **Exhibits 5**

19 and **6** are true and correct copies of Kahn 10/10/2003 & 3/4/2004 letters (prisoner names

20 redacted).

21       10.     Plaintiffs also continued to object to the standard adopted by Defendants for

22 referrals of CCCMS inmates.  Although CCCMS inmates comprised 87% of the *Coleman*

23 class, almost no CCCMS inmates were being referred for mental health assessments,

24 which would, in theory, lead to the doubtful conclusion that there were virtually no

25 CCCMS patients in the CDCR whose mental illnesses contributed to the behavior that led

26 to the RVR which they were issued.  Attached hereto as **Exhibit 7** is a true and correct

27 copy of  Plaintiffs' 12/12/2005 Objections to Draft 15th Monitoring Rpt. at 23-25(prisoner

28 names redacted).  This conclusion was belied by the disproportionate number of CCCMS

1    inmates placed and retained in ASUs and SHUs systemwide.  *Id.*  Plaintiffs again proposed

2    that all CCCMS inmates be referred for a mental health assessment if charged with a

3    serious rules violation that could result in a SHU term or District Attorney referral, and

4    also proposed that any CCCMS patients with multiple RVRs during a specified period of

5    time be referred.  *Id.*  Plaintiffs' proposals were not adopted.

6        11.    In his Fifteenth Monitoring Report, the Special Master reported on the wide

7    variation of mental health assessment practices and their effects occurring throughout

8    CDCR institutions, and concluded that "the overall impact of the still-developing revised

9    mental health assessment process has not yet been as significant as was hoped."  Fifteenth

10   Monitoring Report of the Special Master on the Defendants' Compliance with

11   Provisionally Approved Plans, Policies and Protocols, ("15th Report") Docket No. 1746-3,

12   at 375.

13       12.    In the Seventeenth Monitoring Report, the Special Master found that

14   identification of inmate misconduct that might have been caused or affected by mental

15   illness, and appropriate institutional response was "unsatisfactory" in all seven institutions

16   reviewed for this issue.  Seventeenth Monitoring Report of the Special Master on

17   Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part

18   B ("17B Report"), Docket No. 2180-1 at 92-93.  For the mental health assessments for

19   RVRs generally, the quality was "at best, inconsistent and marginal everywhere."  *Id.*  The

20   Special Master found that in addition to the poor quality of the assessments, hearing

21   officers demonstrated "a significant lack of understanding of the process."  *Id.* at 94.

22       13.    "The rate of referral of inmates for assessment was exceptionally low," and

23   "referral rates for 3CMS inmates remained uniformly extremely low" at under five percent

24   of 3CMS inmates receiving RVRs.  *Id.* at 93.  The Special Master found that even among

25   the few 3CMS referrals, many of the assessments "contained errors and inconsistencies

26   and suggested strongly that clinicians involved in their preparation had lost all sight of the

27   objectives and purpose of the process."  *Id.*  Moreover, the Special Master concluded that

28   the very low number of 3CMS referrals was not, in fact, reflective of whether their mental

[824711-1]

4

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLS.' MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

illness was contributing to the behavior for which they were charged because "too many inmates not referred for an assessment end up immediately or shortly thereafter in MHCBs or with referrals to more intensive levels of care or referrals for medication non-compliance, acute situational stressors or other indices of decompensation, all of which suggest that intervening mental health issues may well have played a significant role in their cited misbehavior." 17B Report at 107.

14.     The Special Master identified as part of the problem that "the decision to refer is entirely in the hands of the correctional officer who writes up the RVR and that individual's custody supervisor, both of whom are often ill-equipped or unwilling to determine whether a mental health evaluation is needed" and concluded that "the mental health assessment process in disciplinary matters for 3CMS inmates has been completely marginalized." *Id.* The Special Master recommended that Defendants develop a plan for revising the policy and making operational adjustments, including making the criteria for referral "more objective, or if left subjective, applied by, or in consultation with, mental health clinicians." *Id.* at 108. In August 2007, this Court ordered Defendants to develop this plan within sixty days. August 2, 2007 Order, Docket No. 2345.

15.     Following the Court's August 2, 2007 Order, the parties and the Special Master engaged in another iteration of meeting and conferring about revisions to Defendants' RVR and mental health assessment process for CCCMS inmates. On October 1, 2007, Defendants submitted a plan that included assigning a RVR coordinator who was an experienced mental health clinician at each institution, developing a system to track CCCMS RVRs, increasing accuracy with regard to language and nature of mental health evaluations, modifying the RVR 115 to standardize and more readily identify the degree to which the mental health referral was considered in the findings and whether the disposition was mitigated, and modifying training of staff on completion of RVRs for CCCMS inmates. Included in Defendants' October 1, 2007 Plan was a proposal for a pilot project for the new RVR process at Richard J. Donovan Correctional Facility (RJD), which was to begin on February 5, 2008.

[824711-1]

5

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLS.' MOTION FOR ENFORCEMENT OF COURT ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

16.      Plaintiffs submitted comments on Defendants' plan on January 24, 2008, which included the objection that Defendants' plan revisions did not target the main consequence of the problems in the existing RVR process, which was that the system did not actually result in mitigation of penalties for behavior related to mental illness.

17.      On May 1, 2008, Defendants submitted a revised plan acknowledging problems with the October 1, 2007 Plan, and proposing that a Plan be finalized (but not implemented) by November 1, 2008.

18.      Plaintiffs provided comments on May 19, 2008, again noting that Defendants had not addressed the issue of whether discipline was actually mitigated even when referrals and mental health assessments were properly completed.  Plaintiffs particularly noted that one important part of effective mitigation is consideration of mental health input at the time the behavior occurs, so that in some cases, an RVR would never be written. Plaintiffs explained that one of the problems with considering mental health only after the RVR is written and heard is that even if mitigation of the penalty occurs during the RVR hearing, a prisoner may still be referred to classification for a SHU term as a result of being found guilty on the charge.  Plaintiffs provided an example of an EOP inmate who was issued an RVR for patting the buttock of a licensed vocational nurse (LVN) in his housing unit.  The hearing officer found that the inmate's mental illness contributed to his behavior, but he was referred to classification and given a SHU term, which was then aggravated from 6 to 18 months.  He served the entire 18 months in the Pelican Bay PSU, despite the finding of the hearing officer that his mental illness contributed to his behavior. Attached hereto as **Exhibit 8** is a true and correct copy of the 5/19/2008 Kahn Letter (prisoner name redacted).

19.      Defendants' May 1, 2008 Plan, which included a pilot to be completed by August 31, 2008, and an implementation plan to be developed by November 1, 2008, was never completed.  In the Twenty-Third Monitoring Report, the Special Master discussed Defendants' failure to complete their pilot for more than three years, despite repeated requests from the Special Master.  Twenty-third Monitoring Report of the Special Master

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLS.' MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

1   on Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols

2   ("23rd Report"), Docket No. 4124 at 37.  The pilot was finally produced on June 3, 2011,

3   but did not follow the plan in Defendants' May 1, 2008 Plan, and "suggested that little was

4   accomplished during the three-year interim," while "[p]recious time to refine the plan and

5   resolve the problem was lost." *Id.*  Equally as concerning as wasted years was the plan's

6   five-year roll-out period "for appointment of RVR coordinator and support staff positions."

7   *Id*.  The plan's timetable appeared to overlook  Defendants' blatant violation of the "[t]he

8   court's order of August 2, 2007[which] required defendants to develop their plan within 60

9   days, or by October 1, 2007 … not merely by weeks or months, but literally by years." *Id*.

10   at 38.

11        20.    On May 10, 2011, several months before providing their late report on their

12   RVR pilot, Defendants circulated a policy memo directing institutions to complete mental

13   health assessment for all CCCMS prisoners receiving Division A, B, or C rule violations.

14   23rd Report at 38.  The parties and the Special Master had several meetings to discuss this

15   memo and Defendants submitted a revised policy memorandum that directed referral of all

16   CCCMS inmates receiving an A, B, or C level RVRs for a mental health assessment, as

17   well all CCCMS inmates who received a RVR that may result in SHU term.  *Id*.

18   Defendants distributed the new policy memo to the field in early November 2011.  *Id*.  It is

19   my understanding that training on this new policy was completed by March 2012.  I am

20   unaware of whether training is provided to employees who are hired after that date.

21   Defendants also represented that they would hire RVR Coordinators at every institution no

22   later than July 2012, although, to Plaintiffs' knowledge, they have not done so.

23        I declare under penalty of perjury under the laws of the United States and the State

24   of California that the foregoing is true and correct, and that this declaration is executed at

25   San Francisco, California this 29th day of May, 2013.

26

27                                  */s/ Jane E. Kahn*

                                  Jane E. Kahn

28

7

DECLARATION OF JANE E. KAHN IN SUPPORT OF PLS.' MOTION FOR ENFORCEMENT OF COURT
ORDERS AND AFFIRMATIVE RELIEF RELATED TO USE OF FORCE AND DISCIPLINARY MEASURES

# EXHIBIT 1

RECEIVED

AUG 03 2000

Department of Corrections

State of California

# Memorandum

Date : AUG 1 4 1998

ROSEN BIEN & ASARO
Post-It® Fax Note    7671

| To Jane Kohn | From Keith Wattley |
| Co./Dept. RBA | Co. Prison Law Office |
| Phone # | Phone # |
| Fax # | Fax # |

To : Wardens
Health Care Managers

Subject: ADJUDICATION OF RULE VIOLATION REPORTS INVOLVING MENTAL HEALTH SERVICES DELIVERY SYSTEM INMATE PROGRAM PARTICIPANTS/ PATIENTS

Effective immediately, the Department expects appropriate clinical input from Mental Health clinicians to be incorporated into the Rules Violation Report (RVR) hearing process when a charged inmate is a program participant/patient in the Mental Health Services Delivery System. This procedure shall also apply to inmates who exhibit bizarre behavior or signs of possible mental illness at the time of, or subsequent to, alleged misbehavior. Outlined in the attached *Procedures For Inclusion of Mental Health Assessments in the Rules Violation Report Hearing Process* is the requirement that Mental Health clinical staff provide an assessment of the inmate prior to disposition of the RVR. The assessment is designed to assist staff in determining a need for assignment of a Staff Assistant, and to acknowledge the inmate's level of functioning and mental stability at the time of the alleged offense.

The California Code of Regulations, Title 15, Section 3315(d)(2), states in part: "The inmate shall be assigned a staff assistant . . . to assist in the . . . disciplinary hearing, if the chief disciplinary officer or designee determines . . . the complexity of the issues are such that assistance is necessary so the inmate comprehends the nature of the charges or the disciplinary process." Effective with the issuance of this memorandum, an Enhanced Outpatient Program (EOP) or Mental Health Crisis Bed (MHCB) inmate shall be assigned a Staff Assistant as part of the disciplinary process. This is done in order to ensure compliance with the inmate's right to due process. When the inmate is in the Correctional Clinical Case Management System (CCCMS) or exhibited bizarre behavior at the time of the incident, the need for a Staff Assistant shall be determined by the Chief Disciplinary Officer (CDO), or designee, after consultation with clinical staff. The attached *Assessment Request* is to be utilized by the CDO and Hearing Officer in soliciting clinical staff input.

Effective with the issuance of this memorandum, the Reporting Employee shall determine if the charged inmate is a Mental Health program participant/patient. If the inmate is a CCCMS, EOP, or MHCB program participant/patient, the Reporting Employee shall include this information at the conclusion of the narrative portion of the RVR (e.g., *It appears Inmate Smith is a Mental Health program participant/patient at the CCCMS level-of-care*). The Reviewing Supervisor shall complete the Reviewing Supervisor's portion of the Assessment Request, attach a copy to the RVR, and submit the original Assessment Request to the Clinical Director of the Mental Health program in which the inmate has been placed.

Wardens
Health Care Managers
Page 2


Each institution is to establish a contact person who will process assessment inquiries
and ensure the Assessment Request is forwarded to staff designated to complete the
form. This will facilitate the processing of Assessment Requests submitted during both
business and non-business hours.  The contact person shall be designated in, the
institution's supplement to the Department Operations Manual.

Upon receipt of the form, the inmate's primary clinician, or designee, shall complete the
lower portion of the Assessment Request form, return the original within four working
days (or five calendar days when a weekend or holiday is involved) to the staff
member indicated in the upper portion of the form, and forward a copy to the CDO.  The
CDO, or designee, shall review the mental health assessment and determine whether to
assign a Staff Assistant. If the level-of-care indicated is EOP or MHCB, a Staff Assistant
shall be assigned.  If the charged inmate is at the CCCMS level-of-care or exhibited
bizarre behavior, the assignment of a Staff Assistant shall be based on a case-by-case
determination.    Please note that the staff member making the Staff Assistant
determination shall be precluded from ultimately hearing the RVR.

The CDO shall document the information relied upon (including the Assessment Request
findings) in determining a need for a Staff Assistant, and the decision rendered, on a CDC
Form 128B, *General Chrono*, which shall then be forwarded to the designated Facility
Captain.  The Facility Captain shall review the CDC Form 128B and designate staff to
perform as a Staff Assistant if the CDO has determined that assistance is warranted.  The
name of the staff person selected as Staff Assistant shall be added to the CDC 128B.
The completed CDC Form 128B shall be forwarded by the Facility Captain for attachment
to the RVR.

The determination to assign or not assign a Staff Assistant shall be documented on the
CDC Form 115A by the Hearing Officer.  Immediately prior to the documentation of the
inmate's physical health at the hearing, the Hearing Officer shall document within the
hearing portion of the RVR whether assignment of a Staff Assistant was deemed
necessary, and the information relied upon in making the determination.

It is clearly in the Department's interest that Mental Health issues, which may have an
impact or effect on the Hearing Officer's findings, are given consideration prior to final
adjudication of the charge.  As with any evidence to be considered in a disciplinary
hearing, the Hearing Officer shall provide a copy of the completed Assessment Request
form to the inmate no less than 24 hours prior to the hearing of the RVR.  The original
Assessment Request form shall be attached to the RVR as it remains a permanent part of
the evidence considered at the hearing.  The Hearing Officer shall document within the
hearing portion of the RVR any pertinent information the clinician stated the
Hearing Officer should consider as part of the fact-finding.  The information solicited shall,
be of the type that would alert the Hearing Officer of the inmate's level-of-care and
participation in the Mental Health program, recent mental state, and the inmate's level of
functioning.

Wardens
Health Care Managers
Page 3

It is left to the discretion of the Hearing Officer to determine how the information provided
by the clinician affects the appropriate disposition of the charges. The Hearing Officer
has the discretion to evaluate the mental health information within the overall
circumstances of the alleged misconduct. It remains the responsibility of the Hearing
Officer to determine the inmate's guilt or innocence.

The attached *Procedures For Inclusion of Mental Health Assessments in the Rule
Violation Report Hearing Process* and *Assessment Request* forms are designed to assist
in implementing hearing procedures that meet these requirements. Additionally, the CDO
shall ensure adjudicated RVRs are audited to ensure compliance. Failure to comply with
this directive shall result in the Chief Disciplinary Officer ordering the RVR to be reissued
and reheard. Additionally, this requirement shall be incorporated into the 1999
Compliance Review Instrument used to evaluate institutional disciplinary and classification
actions.

If you have questions or require additional information, please contact Ruth S. Melrose,
Chief, Institution Operations, at (916) 323-4108 or CALNET 8-473-4108. Institution
staff may contact Marilyn Kalvelage, Chief, Classification Services Unit,
at (916) 322-2544 or CALNET 8-492-2544, or Leonti Thompson, M.D., Chief (A), Mental
Health Services, Health Care Services Division, at (916) 327-0671 or
CALNET 8-467-0671.

DAVID TRISTAN
Deputy Director
Institutions Division

SUSANN J. STEINBERG, M.D.
Deputy Director
Health Care Services Division

Attachment

cc: Steven Cambra, Jr., Chief Deputy Director, Field Operations
    M. T. Pickett, Regional Administrator-North
    Lewis N. Jones, Regional Administrator-Central
    K. W. Prunty, Regional Administrator-South
    Tom Voss, Regional Administrator, Region III, HCSD
    Roger Hagen, Ph.D., Regional Administrator, Region I, HCSD
    Richard Malan, D.D.S., Regional Administrator (A), Region II, HCSD
    Leonti Thompson, M.D., Chief (A), Mental Health Services, HCSD
    Ruth S. Melrose, Chief, Institution Operations, Institutions Division
    Marilyn Kalvelage, Chief, Classification Services Unit

Wardens
Health Care Managers
Page 4

bcc: Bill Dioball, Assistant Deputy Director, Institutions Division
William B. Anderson, Chief, Institution Services Unit
Gloria Rea, Facility Captain, Classification Services Unit
Joseph Isola, Correctional Counselor II, Classification Services Unit
Institutions Chief Psychiatrists
Institutions Supervising Mental Health Clinicians

ISOLA:lw:in-process:mhrvrs

SEP 09

ROSEN BIEN & ASARO

# PROCEDURES FOR INCLUSION OF MENTAL HEALTH ASSESSMENTS IN THE RULE VIOLATION REPORT HEARING PROCESS

Prior to adjudication of a Rule Violation Report (RVR) involving an inmate participant/patient in the Mental Health program, or an inmate exhibiting bizarre behavior, a mental health assessment of the inmate shall be provided to the Chief Disciplinary Officer (CDO) and Hearing Officer. The following is the step-by-step process to be undertaken, and by whom.

## Reporting Employee
- Becomes aware of and documents an inmate's misconduct on a RVR.
- Accesses available information, determines whether the charged inmate is a participant in the Mental Health Services Delivery System, and identifies level of care.
- Documents the inmate's level of care as the last line in the narrative portion of the RVR.

## Reviewing Supervisor
- Completes the upper portion of the Assessment Request form.
- Attaches a copy of Assessment Request to the RVR
- Expedites the original Assessment Request to the Clinical Director of the mental health program in which the inmate is place within one working day after submission of the RVR for typing.

## Primary Clinician
- Completes the Assessment Request form within four working days (or 5 calendar days when a weekend or holiday is involved after receipt).
- Returns the original Assessment Request to the staff member identified to receive.
- Forwards a copy of the Assessment Request to the CDO.

## Chief Disciplinary Officer
- Reviews the mental health assessment.
- Determines whether a staff assistant shall be assigned. EOP and MHCB inmates shall be assigned a staff assistant; CCCMS inmates, and/or those exhibiting bizarre behavior, shall be evaluated on a case-by-case basis.
- Documents determination for Staff Assistant on a CDC Form 128B.
- Forwards the Assessment Request form and CDC 128B to the designated Facility Captain.
- Upon completion of the disciplinary hearing, audits the adjudicated RVR. Ensures that the disposition of the charges is appropriate, the information provided by clinical staff has been clearly documented, and the effect the mental health assessment had on the Hearing Officer's determinations is explained.

## Facility Captain
- Reviews the CDC 128B, and if so ordered by the CDO, selects a Staff Assistant.
- Documents the Staff Assistant's name on the CDC 128B, and ensures the Staff Assistant is notified of the assignment.
- Ensures the original CDC 128B is attached to the RVR.

## Hearing Officer
- Documents the Staff Assistant determination on the CDC-115A.
- Issues a copy of the Assessment Review form to the charged inmate no less than 24 hours prior to the disciplinary hearing.
- Convenes the disciplinary hearing. The first line in the Hearing portion of the RVR shall read as follows: "Inmate _____ appeared before the (Senior) Hearing Officer on _____. Inmate _____ is / is not (circle one) an inmate participant in the Mental Health Services Delivery System at the CCCMS / EOP / MHCB (circle one) level of care. Subject was / was not (circle one) assigned a staff assistant. Information provided by clinical staff indicates ........"
- Adjudicates the RVR. Information provided on the Assessment Request form by clinical staff, as well as how the information affected the final disposition of the RVR, shall be documented within

# ASSESSMENT REQUEST

## *REVIEWING SUPERVISOR*

A Rule Violation Report has been written on the following inmate who exhibited bizarre behavior and /or is a Mental Health program participant/patient.

Inmate's Name: _____     CDC #: _____

Facility: _____     RVR Log Number: _____     Date of Violation: _____

Specific Act Charged: _____

Mental Health clinicians shall be contacted, via this form, and information sought as to:
1. The inmate's ability to understand the charge, effectively present his/her position at a disciplinary hearing and understand the decision reached.
2. The inmate's level of care and participation in the Mental Health program, his/her recent mental state and his/her current level of functioning.

Staff Member this form shall be returned to: _____

Delivered to _____ , by _____ , on _____

## *MENTAL HEALTH CLINICIAN*

A Rule Violation Report has been written on the above named inmate. The inmate's current Mental Health Level of Care, if any, is (according to Mental Health records):

[ ] CCCMS          [ ] EOP          [ ] CRISIS BED          [ ] NOT IN MENTAL HEALTH PROGRAM

It is CDC policy that clinical staff provide general information relative to the inmate's ability to understand and participate in the disciplinary process. Please document below any information you are aware of which might assist in making these determinations.

1. Based on information from the inmate's health care record and brief contact with him or her, it does / does not (circle one) appear that the behavior resulting in the RVR may have been influenced by mental illness.

2. The inmate does / does not (circle one) evidence impairment in their ability to comprehend the nature of the charges or the disciplinary process.

3. It does / does not (circle one) appear that this inmate would benefit from staff assistance.

- Describe the inmate's level of care and participation in the Mental Health program; his/her recent mental state and level of functioning; and if the mental condition may have been a contributing factor in the alleged misbehavior.

_____

_____

**RETURN TO THE STAFF MEMBER INDICATED ABOVE WITHIN 4 WORKING DAYS (or 5 calendar days when a weekend or holiday is involved).**

Delivered to _____ , by _____ , on _____

cc: Chief Disciplinary Officer

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.

    Plaintiffs,

    vs.                                    No. CIV S-90-0520 LKK JFM P

PETE WILSON, et al.,

    Defendants.

## SUPPLEMENTARY RECOMMENDATIONS OF THE SPECIAL MASTER ON STAFFING RATIOS AND ADMINISTRATIVE SEGREGATION

On November 16, 1998, the master filed with court and parties a report and an initial set of recommendations on staffing ratios approving the defendants' current mental health staffing ratios for reception, MHCB (Mental Health Crisis Bed) units, EOP (Enhanced Outpatient Program) and the PSU (Psychiatric Services Unit) at Pelican Bay State Prison. The report also recommended specific increases in the staffing of the defendants' 3CMS (Correctional Clinical Case Management System) program and urged the court to require the defendants to adopt for budgetary and staffing purposes a so-called prevalence rate accurately reflecting the actual percentage of CDC inmates in need of mental health services. Finally, the report suggested a postponement of a judgment on the adequacy of the defendants' staffing ratios for administrative segregation pending a full report on mental health services in administrative segregation then underway.

On December 31, 1998, the special master filed with the court and the parties his report on the delivery of mental health services in administrative segregation, which identified significant deficiencies in the treatment of EOP and 3CMS inmates in administrative segregation. His recommendations included an expansion of mental health clinical staff in administrative segregation, the continued development of a PSU at the California State Prison at Sacramento (CSP/SAC) and the articulation of a plan for training personnel in the effective use of recently introduced procedures for providing information on the mental health status of seriously mentally disordered inmates in the adjudication of disciplinary infractions.

Almost immediately after the first of these two reports was filed, the parties commenced negotiations on efforts to address staffing deficiencies. The defendants, in particular, agreed with the master's finding and recommendation on the need to expand the staffing of mental health services at a rate commensurate with actual demand for such services in CDC. The defendants have requested through the budgetary process for FY 1999-2000 sufficient staffing allocations to meet the mental health needs of all seriously mentally disordered inmates on the mental health caseload, with annual updates to ensure that future staffing matches changing needs. If this initiative, always subject to the possible vagaries of the legislative budgetary process, is ultimately successful, CDC's mental health staffing, as of the date of approval of the State budget, will be based on a 10.6 percent prevalence rate. The rate is scheduled to increase to 11.1 percent as of January, 2000.

This encouraging development stands to address directly one of the trio of staffing difficulties affecting the defendants. Its adoption would mean that the chronic 15 to 20 percent shortfall between capacity and the population of the defendants' various mental health programs could be erased. Other staffing difficulties include staffing ratios and vacancies, both of which the defendants are working to address. Vacancies are the subject of a separate report, due to be submitted to the court by the master in the next few days. Staffing ratios are the subject of the supplementary recommendations in this report.

The master's initial recommendations on staffing ratios focused almost exclusively on the defendants' 3CMS program. Staffing ratios for the 3CMS program provided a half-time psychiatrist for up to 300 inmates and a case manager, typically either a psychologist or a psych social worker, for each 100 inmates. In the opinion of the master's psychiatric experts, this staffing ratio was inadequate to provide all of the services mandated in the defendants' 3CMS Program Guide, provisionally approved by the court in mid-1997. The master's November 16, 1998 report spelled out the reasons for this conclusion in depth, which do not need to be repeated here. The observations and findings of the master's monitors and experts in the monitoring round completed at the end of 1998, as well as in the current round of review now underway, confirm those earlier findings.

One principal cause for the inadequacy of 3CMS clinical resources identified in both the master's November report on staffing ratios and the December report on administrative segregation was the need for case

managers and psychiatrists to provide services not just to their respective

voluminous caseloads in the general population, but also to inmates from their

caseloads transferred for whatever reason to administrative segregation.  The

program guide for the delivery of mental health services in administrative

segregation, in turn, requires case managers to visit these inmates weekly,

provide individual counseling as required, participate in ICC and IDTT

proceedings and prepare appropriate treatment and discharge plans.  Not

surprisingly, the stress of transfer to administrative segregation often reflects and

frequently creates complicating difficulties for seriously mentally disordered

inmates, involving anxiety and decompensation, non-compliance with

medication and the need for intensive medication monitoring and adjustment.

Not infrequently, removal to administrative segregation elevates an inmate from

the general run of a case manager's and a psychiatrist's caseload to the

neediest inmate/patient of all.  The current practice of requiring 3CMS case

managers and psychiatrists to provide services to inmates from their caseload

transferred to administrative segregation simply does not work.  Even in those

instances where needed services are delivered in administrative segregation, the

cost is often the neglect of other 3CMS inmate/patients in the general

population.

      The defendants responded to the master's proposal for an increase

in the ratios of clinical staff for the 3CMS program with an alternative plan to

bolster mental health staffing in all administrative segregation units throughout

the system.  The proposal included the following elements:

     1. Expansion of the current five-day weekly coverage in each
       administrative segregation unit by a psych tech to seven days

4

by adding a 0.61 psych tech position to each of the 30 positions now authorized to provide the daily week-day coverage.

2. The allocation of a half-time psychiatrist to each administrative segregation unit.

3. The allocation of a full-time case manager (psychologist or psych social worker) to each administrative segregation unit to handle ICC and IDTT hearings and meetings and provide individual counseling as needed.

4. The addition of another full-time psych tech to each administrative segregation unit to extend the services of the unit case manager and offer sessions in activities of daily living or other therapeutic activities.

5. The allocation of a full-time clerical position to support the work of the administrative segregation clinical team.

The defendants also proposed an enhancement of a full-time case manager (psychologist or psych social worker) for every nine EOP inmates in administrative segregation, with a goal of providing ten hours a week of structured therapeutic activities for EOP inmates in administrative segregation units. The proposal, with enhancements, totals some 100 clinicians, 30 clerical workers and 60 custody staff (two per administrative segregation unit) to provide the physical custody presence and supervision required to deliver services.

The numerical differences between the master's initial recommendations for increasing staffing ratios for the 3CMS program and the defendants' alternative proposal focusing on administrative segregation are not substantial, nor are they easy to summarize. Under the master's proposed changes to staffing ratios for 3CMS, a total of 80.6 psychiatrists would be required to meet the 1:175 ratio for the 14,105 inmates actually on the 3CMS caseload on March 12, 1999 (the latest figures available). Other programs collectively require 36.82 psychiatrists (EOP: 17.82, based on the March 12, 1999 population of 1,782

5

EOP inmates; MHCB: 17.0, based on 17 MHCB units; and PSU: two for Pelican

Bay). The PSU being introduced at CSP/SAC will have its own additional staffing;

the CMF transition plan presently calls for an allocation of 12 psychiatrists. The

total, CSP/SAC's PSU aside, comes to 129.4 psychiatrists.

  These figures do not paint the complete picture. The defendants'

current 3CMS staffing formula includes a variety of staffing enhancements that

dictate additional psychiatric positions in designated situations. See Exhibit A.

The application of these institutionally specific enhancements to March 12, 1999

caseloads results in a requirement for 27 additional psychiatrist positions,

including eight for reception centers; eight for the Corcoran and Pelican Bay

SHUs (Security Housing Units); seven for Level IV facilities; and four for EOP

institutions. The master's proposed new staffing formula for 3CMS did not

address explicitly these supplemental enhancements. It sought, rather, to

replace and simplify the existing formula, but also recognized implicitly the need

for at least some of the enhancements. If all of the enhancements are added to

the 129.4 total psychiatrist positions identified above as necessary to staff all of

the defendants mental health programs, the number of required psychiatrists

increases to 156.4.

  The defendants currently have 135.5 allocated psychiatrist

positions, including 23.5 chief psychiatrists, nine senior psychiatrists and 103 staff

psychiatrists. The addition of 15 psychiatrists pursuant to the defendants'

proposal would bring the number to 150.5, just six positions shy of the master's

suggested total. The defendants' figures do not reflect the as yet unrealized

increases that will flow from the change in the prevalence rate from the present

6

nine percent to 10.6 percent, once the FY99-00 budget is approved, nor do they recognize the largely administrative role of chief psychiatrists.

The master's recommendations for a change in the 3CMS staffing formula suggested the need for a total of 189.06 case managers, based on a 3CMS population of 14,105 (one case manager per 75 3CMS inmates), plus 14.5 enhancements for the women's and hub camp facilities, for a total of 203.56 case managers. The defendants currently authorize 345 case manager (psychologists and psych social workers) positions. Other programs require 163 case managers (MHCB: 51; EOP: 62; and reception: 50). Under the defendants' proposal, full case manager staffing for all 3CMS inmates in the caseload pursuant to the present formula requires 155.5 case managers (141 for 14,105 3CMS inmates, plus 14.5 enhancements). The addition of 30 case managers for administrative segregation units would bring the total to 185.5 or within 18 positions of the total recommended by the master.

These numbers may suggest more precision than the reality justifies, but the point is that the numerical difference between what the defendants proposed and the master suggested are not substantial. The real difference lies in the use to which the defendants seek to put the reinforcements. They argue persuasively that by relieving 3CMS clinicians of responsibility for inmates in administrative segregation and meeting actual prevalence rates, psychiatrists and case managers will be much better able to meet program guide requirements for services for 3CMS inmates. They deserve a chance to implement their plan and prove their argument.

7

More importantly, the defendants' plan seems to address more
directly the serious deficiencies in mental health services provided in
administrative segregation cited by the master. As of March 12, 1999, three
administrative segregation units in CDC housed more than 60 seriously mentally
disordered inmates. The largest of those, San Quentin with 22 EOP and 82 3CMS
inmates, would be entitled under the defendants' proposal to an enhancement
of two case managers for its EOP population. A clinical staff of a half-time
psychiatrist, a full-time case manager and two full-time psych techs arguably is
adequate to meet program guide requirements for the roughly 30 to 35 seriously
mentally inmates typically housed in an administrative segregation unit. It
certainly represents a quantum leap in improvement over clinical resources
currently dedicated to administrative segregation. Again, the defendants
deserve an opportunity to implement their plan and prove its worth.

Although the actual number of clinicians added in the two
proposals is not radically different, acceptance of the defendants' proposal
would leave intact one element of the defendants' staffing formula that is
deeply troubling to the master's psychiatric experts. Under the current 3CMS
staffing ratio a half-time psychiatrist may be required to assess, monitor and
review medication of and treat as many as 300 inmates; a full-time psychiatrist
may be responsible for as many as 600 3CMS inmates. For a system that relies so
heavily, at least heretofore, on medication for the treatment of seriously mentally
disordered inmates, that ratio is simply inadequate.

The inadequacy, moreover, is not just theoretical. In SCC (Sierra
Conservation Camp), where the 3CMS population regularly hovers around 300, a

8

half-time psychiatrist, exceedingly competent and dedicated, simply cannot meet program requirements for the caseload. At ASP (Avenal State Prison), where a recently acquired full-time, competent and dedicated contract psychiatrist provides psychiatric services for a 3CMS population that regularly exceeds 600 inmates, program guide requirements cannot be met. The addition of a half-time psychiatrist pursuant to the defendants' proposal might help to lighten somewhat the loads of the psychiatrists in both of these facilities, where the population of seriously mentally disordered inmates in administrative segregation is typical (ASP) or low (SCC).

The defendants respond, in part, with the observation that overall clinical deficiencies, which they feel they are on the threshold of conquering, have tended to skew the department's treatment of seriously mentally disordered inmates in the direction of over-reliance on medication, a trend they hope to correct with a greater emphasis on psychotherapy made possible through acquisition, at last, of adequate clinical staffing.

The master, nonetheless, remains unwilling to ratify permanently a staffing formula for 3CMS that endorses a ratio of one psychiatrist for up to 600 inmates in the program. Instead, he recommends provisional approval of the defendants' current staffing ratio for all positions in the 3CMS program except for psychiatrists, with the reservation of a final recommendation on staffing requirements for psychiatrists program for six months to give the defendants an opportunity to engage and deploy their additional staff resources and the master an opportunity to gauge whether the additional resources suffice to allay continuing concerns about compliance with program guide requirements.

As indicated in the master's earlier report on administrative segregation, the provision of services to seriously mentally disordered inmates housed in these units is only part of the solution. The other part consists of keeping seriously mentally disordered inmates out of administrative segregation as often as possible and moving them out of administrative segregation as rapidly as possible once they are housed there. The defendants have taken steps to limit the number of seriously mentally disordered inmates in administrative segregation, but the results to date are, at best, mixed.

Since the master's report on administrative segregation was filed, the defendants completed a survey on the use of new procedures to encourage input into the adjudication process for disciplinary infractions, the 115 process, of information on the mental health status of seriously mentally disordered inmates or inmates who appear to be behaving irrationally at the time of the infraction. The survey indicated that more work needed to be done before the procedures can have their anticipated impact and confirmed the master's recommendation that the defendants develop a plan for training mental health staff, staff assistants and hearing officers involved in the 115 process for adjudicating rule violations.

Both plaintiffs and the master have expressed concern about the appropriateness of delivering mental health services in administrative segregation to seriously mentally disordered inmates, particularly to EOP inmates or to any mentally ill inmates for long periods of time. The defendants' response to this concern has been, in part, a willingness to explore the feasibility of consolidating in a few institutions the bulk of long-term EOP and 3CMS inmates in

10

administrative segregation. Of 399 EOP and 3CMS inmates who, as of March 12,

1999, had spent more than 90 days both in administrative segregation and on

the mental health caseload, all but 128 were housed in CSP/Corcoran (mostly

3CMS inmates), Pelican Bay (mostly EOP inmates) or San Quentin (death row).

Of the 128, only 13 were EOP inmate/patients. Most of these 128 appeared to

be inmates whose intra-institutional offenses were referred to local district

attorneys for prosecution. The addition of the 64-bed PSU unit in CSP/SAC should

permit some further consolidation of seriously mentally disordered inmates

presently housed for long periods in administrative segregation units.

        The method adopted by the defendants to limit the stay of

seriously mentally disordered inmates in administrative segregation, namely, the

aggressive participation of mental health clinicians in ICC hearings in

administrative segregation, has yet to live up to its potential. In a few institutions,

characteristically where the relations between custody and mental health staffs

are most cooperative, inmates who fail to comply with their medication and

decompensating inmates are relatively quickly relocated within the institution or

transferred elsewhere. The key here is often also the ability of the local mental

health staff to exploit aggressively opportunities and channels for the referral of

inmates who need a higher level of care to appropriate programs and

institutions. More often than not, the status of the critical relationships between

custody and mental health staffs and between local clinicians and mental

health administrators elsewhere is a function of institutional leadership, rather

than plans and policies or resources. The defendants at the institutional level

need to work on this piece of the solution to the extended tenure of seriously mentally disordered inmates in administrative segregation.

The master's initial report on staffing ratios also addressed clerical staffing for the 3CMS program, suggesting a ratio of one clerical worker for each four clinicians in this program, which embraces roughly 80 percent of the defendants' entire mental health caseload. Adoption of the suggested staffing ratio for administrative segregation, with its inclusion of 30 clerical positions, would bring the ratio of clinicians, including all psychiatrists, psychologists, psych social workers, therapists, psychometrists and psych techs, to one clerical worker for each 4.6 clinician. If the clinician category were expanded to include nurses, MTAs and pharmacists, the ratio would be one clerical worker for each 5.1 clinicians. It is difficult, if nor impossible, to track within each institution the division of clerical duties among different levels of care, but presumably sheer numbers would require a much greater proportion of clerical support to local 3CMS programs. The master is willing at this point to accept the defendants' allocation of clerical positions.

### Recommendations

The special master makes the following recommendations, which incorporate and supercede those made earlier in the November report on staffing ratios and December report on administrative segregation:

1. The defendants' current ratios for reception, MHCB, EOP, PSU and 3CMS programs should be provisionally approved by the court, with the exception of the existing ratio of psychiatrists to

12

inmates in the 3CMS program, which the master suggests should
be subject to further review.

2.  The court should direct the defendants to adopt and
    implement within 90 days the staffing ratio for administrative
    segregation described in this report.

3.  The court should direct the defendants to adopt an actual
    prevalence rate of 10.6 in their FY 99-00 budget and a
    prevalence rate of 11.1 percent as of January 1, 2000.
    Thereafter, the defendants ought to be required to review and
    adjust the projected prevalence figure annually based on the
    then current actual prevalence rate.

4.  The defendants should be directed to develop and implement
    a plan to train mental health staff, staff assistants and hearing
    officers involved in the new policy on mental health input into
    the adjudication of disciplinary infractions, the 115 process.

The defendants' adoption of the actual prevalence rate to
determine authorized positions and the addition of staffing positions for providing
mental health services in administrative segregation are critical elements in
advancing the defendants towards full implementation of the program guides
and other plans and policies provisionally adopted by the court in mid-1997.

Respectfully submitted,

J. Michael Keating, Jr.
Special Master

May 12, 1999

13

## EXHIBIT A

### MENTAL HEALTH SERVICES DELIVERY SYSTEM

| | <100 CSLD | <150 CSLD | <200 CSLD | <250 CSLD | <300 CSLD | <350 CSLD | <400 CSLD | <450 CSLD | <500 CSLD | <550 CSLD | <600 CSLD | <650 CSLD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1.5 | 1.5 |
| R PHD | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1.5 | 1.5 |
| H.D. | 0 | 0 | 0 | 0 | 0 | 0.5 | 1 | 1 | 1 | 1 | 1 | 1 |
| W | | 0.5 | 1 | 1.5 | 2 | 2 | 1 | 1 | 1 | 1.5 | 1.5 | 1.5 |
| ERK | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 2 | 2.5 | 3 | 3 | 3.5 | 4 |
| TAL | 2 | 2.5 | 3 | 3.5 | 4 | 5 | 6 | 6.5 | 7.5 | 8 | 9 | 10 |

**CCCMS PROGRAM STAFFING (Not cumulative)**

### AUGMENTATIONS TO STANDARD CCCMS STAFFING RATIOS (Not cumulative)

1    ADD .5 MD FOR LVL IV INSTITUTIONS (100-500 CSLD) AND 1 MD (501-900 CSLD); or

2    FOR RC INSTITUTIONS, ADD .5 MD FOR 100-250 CSLD/ 1 FOR 251-500/ 1.5 FOR 501-750; or

3    FOR EOP INSTITUTIONS ADD .5 MD FOR 100-250 CSLD/ 1 FOR 251-500/ 1.5 FOR 501-750.
     NOTE: FOR MULTIPLE PROGRAMS (1-3) ADD ONLY FOR 1 PROGRAM

4    THE ONLY STAFF ALLOCATION FOR CCCMS AT NON-HEAT MED INSTITUTIONS IS: .5 MD AND .5 PHD (<500 CSLD) OR
     1 MD AND 1 PHD (501-900 CSLD).

5    FOR SHU INSTITUTIONS ADD 1 PH.D. FOR EACH 300 SHU INMATES
     (CORC SHU CURRENTLY HAS 822 INMATES, 3 ADD'L PH.D.)
     (PBSP SHU CURRENTLY HAS 1572 INMATES, 5 ADD'L PH.D.)

6    FOR WOMEN'S INSTITUTIONS, ADD 1 PH.D. FOR 100-200 CSLD/ 2 FOR 201-300 CSLD/-3 FOR 301-400 CSLD

7    FOR WOMEN'S INSTITUTIONS, ADD .5 PSW FOR < 200 CSLD/ 1 PSW FOR <300/ 1.5 PSW FOR < 400.

8    FOR CRC, BECAUSE OF THE MISSION OF THE INSTITUTION, WE ANTICIPATE A SMALLER CCCMS CSLD.  FOR TOTAL CSLD
     (MEN AND WOMEN) FOR MED NEEDS ALLOW .5 MD / FOR CASE MANAGEMENT ALLOW 1 PHD AND 1 PSW.

9    FOR CAMP HUB INSTITUTIONS, ADD .5 PH.D.. (CCC & SCC)

10   CLERICAL STAFF:

                          UP TO 4.5 CLINICAL STAFF = .5 CLERICAL
                          5 - 5.5 CLINICAL STAFF = 1 CLERICAL
                          6 TO 7.5 CLINICAL STAFF = 1.5 CLERICAL
                          8 OR MORE CLINICAL STAFF = 2 CLERICAL

DISKETTE: 1996/97 EXCEL DOCUMENTS
FILE: CCCMSSTF.XLS
REVISED: 09/25/95

# EXHIBIT 3

State of California

Department of Correction

# Memorandum

LEGAL AFFAIRS DIVISION
P.O. Box 942883
Sacramento, CA 94283
(916) 445-0495
(916) 327-5306 FAX

Date:    September 26, 2001

Subject: **FINAL DRAFT OF RVR POLICY RELATING TO <u>COLEMAN V. DAVIS</u> AND RESPONSE TO PLAINTIFFS' CONCERNS**

Attached is the proposed draft RVR policy for Special Master Keating's final courtesy review prior to the Department taking steps to incorporate it into Department Operations Manual (DOM). You will note that the policy has not been revised from the previous version sent prior to the June all parties meeting. Specifically, the Department considered but rejected the suggestion made by Plaintiffs at the June meeting that clinicians provide assessments for CCCMS inmates, especially those with more serious violations (class A, B, and C). The Department also considered but chose not to include within the text of the policy the suggestion that we provide specific instructions to refine for staff the definition of "bizarre" behavior.

The provision of assessments to all CCCMS inmates would prove overly burdensome on clinical staff, diverting their efforts from the provision of clinical treatment. The Department previously considered providing assessments to those CCCMS inmates charged with serious rules violations, ultimately concluding that it was improper to treat the mental health of CCCMS inmates differently based on the seriousness of their rules violations. The Department does not think that the seriousness of the violation is indicative of whether the inmate's mental illness influenced his or her behavior.

The Department does intend to incorporate the comments of the Special Master to narrow down the "bizarre behavior" standard for referrals of CCCMS inmates without broadening it to the point that we are doing assessments of every CCCMS inmate. The suggestion was not incorporated into the text of the policy because the Department felt that it would be better to leave the standard flexible and to rely on the correctional officers' familiarity and experience with the inmates. Institutions Division believed that any kind of rigid standard would be under-inclusive. To avoid these concerns, it was the consensus of CDC staff that guidelines for determining which CCCMS inmates should be referred for an assessment should be discussed in training rather than in policy.

JUDI L. LEMOS
Staff Counsel
Major Litigation Unit

Enclosure

Chapter 5
Article 23 – Inmate Discipline

**52080.3        Disciplinary Methods**

It is recognized that there may be instances in which an inmate, who has been identified as
severely mentally or developmentally disabled and where a Mental Health Clinician has
determined and documented that the inmate was incapable of knowing or understanding the
nature or quality of his/her act or distinguishing right from wrong, commits an act which would
normally result in disciplinary action.   In these situations, the use of the inmate disciplinary
process may not be the most effective means of promoting desirable changes in behavior and an
alternative means of documenting the behavior may be pursued.        EXCEPTION:   If the
misbehavior constitutes a division A, B or C level offense, the violation will be reported on a
CDC 115 and the case shall be referred to the District Attorney for possible felony prosecution,
per established procedures.

**Policy Change:   Currently all serious violations are to be reported via CDC Form 115.
This change will provide staff with an alternative means of documenting inmate
misbehavior if the inmate suffers from a serious mental disorder.**

**52080.3.5        Classification of CDC Form 115**

The classifying official shall determine the need for an Investigative Employee (IE) or Staff
Assistant (SA) and shall so document this determination on the CDC Form 115A.   If it is
determined by the classifying official that an SA is required for an administrative level report, a
CDC Form 115A shall be used to document this information and shall be included as a
supplement to the administrative CDC Form 115.  On reports classified as serious, if the inmate
does not meet the criteria for assistance, the classifying official shall document this on the CDC
Form 115A by noting DNMC per 3315(d)(1) or (d)(2), respectively, in the IE and SA areas of
that form.

Classifying officials shall research the following before determining the need for an IE or SA:
• Inmate's mental health status.
...inmates who are participants in the departmental MHSDS at the level of EOP or MHCB shall
be assigned an SA.

The classifying official shall refer inmates, including CCCMS, for a mental health assessment,
via a CDC Form 115X, whose behavior would reasonably be considered bizarre, unusual, or
uncharacteristic for that inmate The classifying official shall not classify a CDC Form 115 where
he/she has referred the inmate for an assessment under those circumstances, until a licensed
mental health clinician has reported on the inmate's need for assistance and whether a mental
health disorder may have contributed to the inmate's behavior. The clinician shall respond to the
classifying official within five calendar days of receipt of the referral.   Upon receipt of the
completed assessment, the classifying official shall determine the need for staff assistance, order
the assignment of staff assistance if needed, classify the CDC Form 115, and forward it for
processing. The original mental health assessment shall be retained with the 115 package and a

1

completed copy of this assessment must be provided to the inmate at least 24 hours prior to a hearing of the charges.

Inmates identified as EOP or MHCB participants shall be assessed to determine if the behavior of the inmate resulting in the rule violation was influenced by a mental disorder. A psychiatric social worker, clinical psychologist, or psychiatrist who has received training in the disciplinary process...shall complete an assessment of EOP and MHCB inmates within 15 calendar days and return the completed assessment to the requesting staff member. This assessment shall provide a description as to what extent the inmate's mental health may have contributed to the behavior resulting in the violation report. Due to the requirement to provide a staff assistant to inmates at the EOP/MHCB level of care, the classification and issuance of the initial copy of the 115 shall not be delayed pending a mental health assessment. The original mental health assessment shall be retained with the 115 package and a completed copy of this assessment must be provided to the inmate at least 24 hours prior to a hearing of the charges.

NOTE: The classifying official shall consider the severity of the inmate's mental disorder and seriousness of the offense, as addressed in Section 52080.3, whereby an alternative means of documentation may be more appropriate.

If it is determined that an SA is required, the initial copy of the CDC Form 115 will not be issued until the SA has been assigned. The SA shall be responsible for issuing the initial copy and all other relevant documents to the inmate.

## 52080.3.6     Hearing Procedures and Time Limitations

The hearing of the charge shall be completed within 30 days of the date of the inmate's receipt of the initial prehearing copy of the CDC Form 115. This period may be extended if:
Extraordinary circumstances prevent the hearing from being conducted. The inmate shall be notified, by the CDO of the reason for this extension within 30 days of receiving the initial prehearing copy of the CDC Form 115. Extraordinary circumstances are:
A psychiatric social worker, clinical psychologist, or psychiatrist who has received training on the disciplinary process has determined that the inmate is suffering from a mental disorder to the point that he/she is unable to understand or participate in the hearing process and there is no compelling reason to proceed with the hearing without the inmate present. The hearing may be delayed until the inmate's mental health allows for participation.

## 52080.3.8     CDO Review of CDC Form 115

Upon receipt, the CDO shall review the CDC Form 115 pursuant to DOM 52080.3.2. The CDO shall also do the following:

When reviewing a CDC Form 115, confer with a licensed mental health clinician regarding the appropriateness of the action taken by the SHO prior to affirming, modifying, or dismissing the action taken ...in those cases where a mental health assessment was completed as part of the

2

disciplinary process and the clinician indicated in that assessment that the mental disorder may have influenced the inmate's behavior. The participating clinician shall co-sign the CDC Form 115 in the CDO signature block on the CDC Form 115. If the CDO and clinician disagree, the CDO shall retain the final authority in rendering a decision. The clinician may note his/her reason(s) for disagreement on the CDC Form 115 prior to signing it. The clinician's role in this process is to provide the CDO with advice as to the effectiveness of the action taken by the HO/SHO in correcting the inmate's behavior. The inmate's mental health ... may be considered on a case by case basis.

If no staff assistance had been provided in the original hearing and the CDO becomes aware that the charged inmate's mental or physical health decompensated...to the point that staff assistance would be necessary to ensure due process at any point during the disciplinary process, the CDO shall order the CDC Form 115 reissued and reheard and order a Staff Assistant (SA) be assigned for the reissue and rehearing.

**Policy Change: The CDO need only confer with the clinician in those cases where the mental health assessment indicates the inmate's behavior was influenced by a mental disorder.**

## 52080.4.2   Staff Assistant

A SA shall be assigned for any CDC Form 115 if any of the following conditions are present:
The complexity of the circumstances surrounding the charge are beyond the inmate's ability to understand; the inmate is under treatment by the MHSDS at the EOP or MHCB level of care; ...; or the issues are such that assistance is necessary so the inmate comprehends the nature of the charges or the disciplinary process.
An inmate who...is assigned to the MHSDS at the level of EOP or MHCB may not refuse the assignment of an SA.
An assigned SA for an inmate who is a participant in the MHSDS at the CCCMS, EOP, or MHCB level of care ...shall possess the necessary training and skills to effectively communicate with mentally disordered...individuals.

## 52080.10   Hearing Procedures

All inmates who have been charged with a violation which has been documented on a CDC Form 115, have a right to a fair and impartial hearing of the charges by either an HO, in the case of administrative violations, or an SHO, in the case of serious violations. The following shall be addressed in the hearing summary of the CDC Form 115:
- A statement by the inmate of the inmate's physical health (if present).
- A statement addressing the inmate's documented mental health....
- A statement as to how effective communication was achieved during the issuing of documents and other prehearing due process procedures and what methods the HO/SHO used to achieve effective communication during the hearing, if the inmate has been identified as requiring such assistance.

3

- Explanation of any time constraint extensions, postponements, violations, or other due process discrepancies.
- The identities of all persons present in the hearing and the purpose of their presence.
- The inmate's plea. If the inmate is not present or refuses to enter a plea, a not guilty plea shall be entered for the inmate by the HO/SHO.

## 52080.10.1   Findings

The findings in a disciplinary hearing shall be based upon the preponderance of specific evidence toward either a finding of guilty or not guilty. The official conducting the hearing shall weigh all available evidence, including, but not limited to, the facts presented by the reporting employee, any information contained in supplemental reports, statements provided by the inmate, witness's testimony, and any physical evidence.

The information leading to the decision made by the hearing official shall be fully explained, in detail, in the hearing summary of the CDC Form 115.

All evidence used shall be referenced, including CDC Form 837, medical/mental health reports, laboratory test results, confidential information, video/audio recordings, and any other written or physical evidence.

The inmate's mental disorder…shall be evaluated on a case by case basis.

## 52080.10.2   Disposition

The disposition of adjudicated CDC Form 115s shall include the following:
- Assessment of a penalty as directed by CCR 3314 or 3315, as appropriate.
- Assessment of a credit forfeiture, (serious only) as directed by CCR 3323. Credit forfeiture shall be assessed at the mid range for Division A-1 through F offenses, unless there are factors of aggravation justifying an assessment of the high range or mitigating factors justifying a low range assessment.

Factors in Mitigation include, but are not limited to:
- A Licensed Mental Health Clinician has provided documentation indicating that the behavior may have been influenced by a mental disorder at the time of the violation.

4

# EXHIBIT 4

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

MARJORIE K. ALLARD **
ERNEST GALVAN
JANE KAHN
THOMAS NOLAN
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN ***

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rb@rbalaw.com



October 25, 2002

VIA FACSIMILE AND U.S. MAIL

J. Michael Keating, Jr.
Little, Bulman, Medeiros & Whitney P.C.
72 Pine Street
Providence, Rhode Island 02903

    Re:    Coleman v. Davis
          Our File No. 489-3

Dear Mr. Keating:

    Plaintiffs have the following comments regarding the Defendants' Rules Violation Report Policy and training materials which were provided to the Special Master and to plaintiffs on October 2, 2002. First, let me say that we appreciate the addition of the clinical information provided in the training materials which should be very useful to the custody staff receiving this training module.

General Comments

    The RVR process proposed by defendants as applied to 3CMS and general population inmates makes the assumption that the mental health delivery system works well. It does not yet. The monitoring teams continue to find that inmates receive delayed follow-up to positive bus screens and untimely treatment planning upon arrival in administrative segregation and receiving institutions. (See Tenth Monitoring Report at 63, 86, 108, 151, 160, 171, 186, 188, 201 and 217.) During the 11th Round tour of CIM monitors found examples of mentally ill inmates missed during bus screenings. The medication delivery system has failures in every point of the system. (See Tenth Monitoring Report at 241-247). These continuing failures mean that the RVR assessment process should provide safeguards that protect mentally ill inmates who face the most serious consequences as a result of their behaviors that may arise out of untreated mental illness.

    In light of this, plaintiffs propose a three tiered system for evaluating the need to provide clinical assessments to inmates charged with rules violations. The first group of inmates who should receive clinical assessments would be all EOP patients charged with rules violations. This is currently part of defendants' proposed policy. The second group of inmates should be those charged with serious rules violations that could result in SHU terms or DA referrals for criminal prosecutions. This is similar to a proposal made by defendants in their earlier training materials, except that it is more narrowly drawn. (See

J. Michael Keating, Jr.
October 25, 2002
Page 2

Mental Health Assessment Rules Violation Reports Video Materials, March 21, 2002, at
p.5. )  The third group of inmates should be those charged with rules violations who are
referred by a staff person for "bizarre, unusual or uncharacteristic" behavior under the
standard proposed in the new training materials, with our recommended changes below.

Although we have concerns about the use of custody officers to make clinical
referrals after observing, and presumably writing the rules violation, we believe that this
three tiered system will protect mentally ill inmates who face the greatest penalties for in-
prison offenses.  Below are our specific comments regarding defendants' training
materials.

Specific Comments

1.    Reporting Staff's Role:  Bizarre, Unusual or Uncharacteristic

The first section of the training materials focus on the point where the misconduct
occurs and the observing staff (most frequently a correctional officer) must determine
whether the behavior is bizarre, unusual or uncharacteristic for the inmate.  The materials
emphasize that this behavior is "behavior that has not been previously demonstrated by
the inmate or has rarely been demonstrated by the inmate." (at p. 5).  One of our
concerns with this standard is that an inmate who has not yet been properly screened or
medicated would not appear bizarre, unusual or uncharacteristic if he or she acted out
regularly (i.e. in a manic phase).  The behavior would likely be seen as "bad" and not
"manic".  (Note:  Our poster boy for this example is  [NAME REDACTED]  , who
received multiple 115s for gassing officers, prior to being medicated under a Keyhea
Order.  He is now at CCI serving multiple SHU terms.)  The examples in the training
materials should include this type of inmate who might be refusing his medications,
cheeking his medications or not yet been identified by mental health.

A second concern that we have using custody staff is that the reporting office may
be new to the unit or be an overtime officer.  Many of these custody positions rotate
every six months.  The inmate may be unknown and, thus, the officer's ability to judge
the inmate's behavior would be limited.  There is nothing in the training materials to
address this fact.  We believe that if it is unclear, then a clinical assessment should be
requested.  The training materials should clearly address that situation.

Finally, as recent as the 11th round tour of CIM, the monitors were told by mental
health staff that custody officers continue to verbally harass mentally ill inmates.  These
are the same officers that may be called upon to refer these inmates for a mental health
evaluation when the inmate acts out, often against them.  Because of these very real
concerns, we feel strongly that all inmates charged with rule violations that can result in
SHU terms and/or DA referrals for criminal prosecutions should have mental health
assessments.  With respect to all other rules violations, we express our reservations about
using custody officers to evaluate the need for a clinical assessment.

<u>Reviewing Custody Supervisor</u>

It is unclear in the materials whether the reviewing supervisor can determine that a mental health assessment should occur even if the reporting staff did not submit a referral for a mental health evaluation. The training materials do not appear to provide an opportunity for this, which we believe is appropriate in the situation where the supervisor has their own knowledge of the inmate, including any disciplinary history. We would like to have language in the training materials that would permit the supervisor to refer an inmate for a mental health evaluation even if the reporting staff did not find that the inmate's behavior at the time of the violation was "bizarre, unusual or uncharacteristic". (Training Materials at p. 12).

Furthermore, the materials do not address what happens when an inmate is placed in the crisis unit within close proximity to the misconduct and the reviewing supervisor is notified? A mental health assessment should occur at that point. A review of the UHR may indicate medication non-compliance, medication expiration, medication delivery problems, all possible contributors to the inmate's misconduct and important considerations. There should also be a provision for a mental health referral if there is information provided that sheds light on the inmate's mental health status at the time of the offense (i.e., family circumstances, including notification of death, illness, divorce proceedings.)

<u>Mental Health Assessments</u>

The review of the UHR, central file and other records required as part of the decision-making process in determining whether the inmate's mental disorder appeared to contribute to the behavior that led to the rules violation is very good. Obviously in evaluating whether the behavior is unusual or out of character, the clinician will also be looking at the UHR for medication orders and medication compliance. The extent of this evaluation, which also includes an inmate interview and mental status exam, discussion with the inmate's case manager, and a careful look at the inmate's cell and his or her appearance, is valuable information that should be ultimately shared with the inmate's case manager and treatment team. This type of evaluation serves ultimately as a mini-review of treatment and may very well be where medication non-compliance, missed prescriptions or a missed initial screening are caught. Although the mental health assessment uses resources, it is not a waste of resources if the information obtained is well documented and shared with the appropriate clinical staff.

The training materials are very detailed about the types of documents that the clinician should review and the type of information that the clinician should try to elicit from the inmate. However, the Instructions for the Mental Health Assessment Request. which is attached to the training materials, are not. It will be these instructions that the clinician is likely to refer to prior to doing the assessment. We strongly recommend that a form be developed for use by the clinician that would list the questions identified in the

training materials and provide space for answers. (Training Materials at 20-23.) It would be this completed form that could be placed in the inmate's UHR for review by the case manager and treatment team. The areas identified for review in the training materials were as follows:

      1.      Evaluation of the CDC 115 Report: Irrational statements by inmate? Behavior unprovoked or disproportionate to situation? Bizarre or out of character?

      2.      Central File Review: Other 115s? Pattern in type and circumstances?

      3.      UHR Review: LOC? Recent changes in mental status, behavior, treatment compliance? Medication compliance? Recent medication changes? Recent psychological stressors?

      4.      Case manager consultation regarding the inmate.

      5.      Inmate Interview: Observe dress and condition of cell. Explain not confidential. Establish if can give informed consent to interview. Understand charges? Do mental health status exam. Document in unit health record. Note affect and mood. Ask about eating, sleeping. Delusional, hearing voices, etc.

This information is extremely valuable beyond its use in the disciplinary process and should be documented in some format in the inmate's records.

Classifying Official

This section discusses the discretion of the Classifying Officer and the Chief Disciplinary Officer to reduce and/or reclassify charges. It is unclear in the training materials whether there are serious 115s that cannot be reduced to a lesser included charge and must be referred for prosecution. If there are such charges, they should be discussed in the training materials. For example, are all batteries against officers charged and DA referred regardless of what the clinical assessment determines, and if that is the case, what is the purpose of the assessment? We would like clarification on this issue and a list of charges that cannot be dismissed through this process. We believe that this is critical information to provide in the training materials as well, if for no other reason than for the clinicians to understand in which cases their role has a limited function – whether mental health factors should be considered in mitigation of in-prison penalties, like loss of phone privileges, restriction on canteen, etc. – and not for purposes of dismissing the disciplinary charges.

Attempted Suicides and Disciplinary Process

This section is an excellent addition to the RVR training materials. The process provides that an inmate can only be charged for a suicide attempt that is determined not genuine after a mental health evaluation that requires a thorough examination that includes components described in the training materials. Although the training materials do not specifically state this, we assume that this underlying documentation, including the

detailed summary supporting the conclusion, will be attached to the 115 disciplinary report.

Although this procedure has existed for years within the CDC, well prior to the June 15, 2002 memo from Warden Duncan referred to in the training materials, we have yet to see this documentation in any file we have reviewed where an inmate was issued a 115 for a suicide attempt or for self-mutilation. (See Memo from Dr. Steinberg, dated March 15, 2000, attached to Letter from Keating to Pickett, dated February 7, 2002.) Attaching this documentation will both ensure that the process is followed after so many years of its existence, and will also permit the efficacy of the policy to be tracked and evaluated, a concern of yours in previous correspondence to the defendants. (See February 7, 2002 letter, at p. 4.)

We welcome further discussion regarding our comments concerning the defendants' proposed training materials, as well as our proposal for a three tiered system for evaluating when to provide mental health assessments to inmates charged with disciplinary violations.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:nr
cc:   Matthew A. Lopes
      Jon Wolff
      Co-counsel

# EXHIBIT 5

ORD JAY ROSEN *
HAEL W. BIEN
NDREA G. ASARO

ERNEST GALVAN
RICHARD HARDACK
JANE KAHN
NAJEEB KHOURY
THOMAS NOLAN
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

October 10, 2003

J. Michael Keating, Jr.
Special Master
285 Terrace Avenue
Riverside, RI 02195


Jennifer A. Neill
Deputy Attorney General
1300 I Street
Sacramento, CA 95814

        Re:    Coleman v. Davis
               Our File No. 489-3

Dear Michael and Jennifer:

    This letter addresses plaintiffs' continuing objections to the defendants' RVR
mental health assessment policy as written and as applied to individual <u>Coleman</u> class
members.  Although <u>Coleman</u> class members are approximately 16% of the total prison
population, almost one-third of the inmates housed in ad.seg. and SHU units are mentally
ill.  (<u>See</u> HCSD docs, dated 7/18/03, reporting 2,459 of 7,222 inmates housed in ad.seg.
and SHU housing units as 3CMS or EOP.)  By any measure, the policy does not remedy
defendants' unconstitutional practices that the Court ordered defendants to change.

    The Court found that "mentally ill inmates who act out are typically treated with
punitive measures, without regard to their mental status."  (Findings and
Recommendations of Magistrate Judge at 51, adopted by the Court, <u>Coleman v. Davis</u>,
912 F. Supp. 1282, 1320.).  Several years later, the Court ordered defendants to complete,
within thirty days of the order, the review and revision of their policies and procedures
for conducting assessment of mental health delivery system inmates charged with
disciplinary infractions, and to develop a plan for training clinicians and hearing officers
in the revised policies and procedures.  (Court Order dated December 19, 2001.)  This
order was entered after a lengthy delay by defendants in developing a draft procedure for
mental health input into the RVR process.

    The process of developing and implementing this new RVR policy has dragged on
despite the court order, and in the interim, mentally ill inmates have continued to receive
115s without adequate mental health input into the disciplinary process.  These 115s have
resulted in SHU terms, DA referrals, loss of credits resulting in longer prison terms, and

Jennifer A. Neill
October 10, 2003
Page 2

increased classification scores resulting in transfers to higher security prisons. It is only
in the Fourteenth Round of Monitoring that there will be focused scrutiny by the Special
Master on defendants' RVR policy. It remains unclear to plaintiffs exactly how the
Special Master will monitor the policy's application to the 22,000 3CMS inmates who are
now only entitled to a mental health evaluation if their behavior at the time of the RVR is
deemed by custody to be "bizarre, unusual or uncharacteristic." [Note: According to the
13th Round phone exit from CTF, RVR assessments of 3CMS inmates declined from 25-
30 per month to 2-5 per month.] Unfortunately, our clients' lives have not been put on
hold during defendants' prolonged process of developing policies, procedures and
training for mental health assessments of mentally ill inmates who receive RVRs.
Mentally ill prisoners who "act out" continue to be punished for behavior caused by their
mental illness.

Plaintiffs have no remedy for individual class members who have been found
guilty of 115s despite evidence that mental illness contributed to their behavior.
Although plaintiffs' counsel have advised class members to exhaust their administrative
remedies through the 602 process while the RVR policy was negotiated and finalized,
plaintiffs also wrote letters on behalf of some individual Coleman class members whose
medical records clearly established that they were psychotic at the time of their
"misbehavior" and who were facing SHU terms and possible Third Strikes. (See, e.g.
Letter to Wolff re[NAME REDACTED]          , dated January 16, 2003, attached hereto;
Letter to Holzmann re[NAME REDACTED]     ', dated January 9, 2003, attached hereto; Letter
to Minutti, dated January 24, 2001 and Letters to Holzmann, dated December 17, 2001
and January 24, 2002, re[NAME REDACTED]          , attached hereto.) Plaintiffs have never
received a response to the concerns raised in these letters.

We write today concerning[NAME REDACTED]       ', an individual class member
whose situation vividly illustrates the harsh consequences of the defective RVR policy
adopted by defendants. [NAME REDACTED], an EOP inmate currently housed at Lancaster, was
found guilty of an RVR for battery and was assessed a credit loss of 121 days. The RVR
was also DA referred. Although [NAME REDACTED] appealed his 115, including the failure to
permit him to call his treating mental health clinician as a witness at his 115 hearing, his
appeal was denied at all levels of administrative review. (See copy of his Director's
Level Appeal, Case No.[REDACTED], dated[REDACTED] , attached hereto.)

The RVR assessment and hearing that[NAME REDACTED] was provided with was defective
for the following reasons: First, there is clear medical evidence, discussed below, which
shows that[NAME REDACTED] was psychotic and unable to fully comprehend his actions at the
time his RVR behavior occurred. Second, the hearing officer did not properly consider
this evidence at the time of his hearing. Third, even if he had considered this evidence
and had been persuaded by it, defendants' current RVR policy does not permit the
hearing officer to dismiss the 115 or to charge [NAME REDACTED] with a lesser offense. Fourth,

Jennifer A. Neill
October 10, 2003
Page 3

under the defendants' RVR policy, the hearing officer could not mitigate the credit loss below the mandated credit loss established by Title 15, Section 3323(d)(A)(1), even if the hearing officer found that [NAME REDACTED] mental illness was the critical determining factor in his behavior at the time of the RVR. And <u>finally</u>, defendants' policies mandate that [NAME RED.] RVR offense, if he were found guilty, had to be referred to the DA despite clear medical evidence that he was acutely psychotic at the time of the behavior and required involuntary medications and in-patient care.

Plaintiffs request that Health Care Services Division review [NAME REDACTED] RVR for Battery on a Peace Officer and his 602 appeal of this RVR, and determine whether this RVR should be reissued and reheard, or dismissed with restoration of credits, after a complete review of his medical records.

A careful review of [NAME REDACTED] medical records indicates the following circumstances prior to his RVR offense: [NAME REDACTED] was recommended for MHCB admission on June 14, 2002 by a psychiatrist who met with him after a group session at CSP-SAC and described him as paranoid with active delusions. (<u>See</u> MH3, dated 6/14/02, attached hereto.) He was transferred to the CTC at PVSP on June 19, 2002 and remained there for three weeks until he was considered stabilized for return to the EOP program at SAC. (<u>See</u> History and Physical Examination, attached hereto.) At no time during his three-week stay at PVSP was he considered for referral to DMH despite a three-week hospital stay that was characterized by several episodes of agitation, statements of suicidality, and medication non-compliance. (<u>Id.</u>)

[NAME REDACTED] returned to SAC on July 8, 2002, and on July 9, 2002, he was brought to the emergency room after a serious suicide attempt where he jumped from his bunk with a sheet tied to the vent and his neck. (<u>See</u> MH3, dated 7/9/02, attached hereto.) He had been discharged from the CTC at PVSP to the EOP at SAC, but his admission to the emergency room at SAC came from Facility C, which is not an EOP unit. (<u>See</u> Narrative Discharge and Transfer Summary, dated 7/9/02, attached hereto.) He was discharged from the infirmary the same day to ad.seg. housing. (See Physician Order, dated 7/9/03, attached hereto.) On June 10, 2002, he was admitted to the infirmary after a second attempted hanging. (<u>See</u> Narrative Discharge and Transfer Summary, dated 7/10/02, attached hereto.) On July 11, 2002, he was discharged to the EOP ad.seg. unit with a DOT chrono noted. During the MHCB IDTT it was noted that he had not taken his medication for three days. (See MH3, dated 7/11/02, attached hereto.)

On the first day of the five day follow-up he was seen by a psychiatrist who made the following notes: "Inmate didn't want to talk to anyone, said get away from my door before I pull my gun out and shoot you; animated, irrational, delusional; the doctors are trying to kill me." The doctor wrote as a plan to check his Dilantin level and follow-up in 2-4 weeks. (<u>See</u> MH3, dated 7/12/02, attached hereto.)

Jennifer A. Neill
October 10, 2003
Page 4

On the third day of the follow-up on July 14, 2002, the log note states that [NAME RED] is "very hostile and sarcastic". (See Follow-up to MHCB Discharge, attached hereto.)

On the fourth day of the follow-up on July 15, 2002, [NAME REDACTED] became agitated when the psych tech came to his cell to deliver insulin to his cellmate. His cellmate told him to mind his own business and [NAME REDACTED] asked to be removed from his cell because he might kill his cellie. According to the Progress Note, [NAME REDACTED] was placed in wrist restraints and put in a holding cell where he became self-injurious, slamming himself against the cell. He was initially calmed by the psych tech, but later became agitated and started threatening officers and spit on a correctional officer. He then stated that he was suicidal. (See MH3, dated 7/15/02, attached hereto.). Because of the spitting incident, [NAME REDACTED] was issued a CDC 115, Rules Violation Report, for Battery on a Peace Officer. (See copy of the RVR, dated 7/15/02, attached hereto.). He remained in the MHCB for ten days during which time he was certified for a Keyhea Order. (See Certification Hearing Decision Notice 7/23/02, attached hereto.)

A mental health assessment done on July 18, 2002, noted that his RVR behavior may have been the result of a severe mental disorder. (See Assessment Request, dated 7/18/02, attached hereto.) [NAME REDACTED] was assigned a staff assistant because the evaluator also found that there was evidence that he had impairment in his ability to comprehend the nature of the charges and/or the disciplinary process. On July 21, 2002, while [NAME REDACTED] was still housed in the MHCB where the staff had initiated a Keyhea proceeding, his staff assistant met with him and reportedly explained the rules violation, advised him of the procedural steps regarding rules violations, explained that his 115 was being referred to the DA for possible felony prosecution and that he had a right to postpone his 115 hearing, and asked [NAME REDACTED] if he understood everything. The staff assistant reported that [NAME REDACTED] had no questions. (See Staff Assistant Report, page 1, attached hereto.)

On July 18, 2002, [NAME REDACTED] was started on involuntary medications while housed in the MHCB because of rages, and because he was refusing medications and food. (See MH3, dated 7/16-18). On July 23, 2002, he was found to be a danger to himself and gravely disabled in the Keyhea certification hearing. [NAME REDACTED] writes that he was medicated involuntarily under a Keyhea Order until August 2003.

The RVR hearing took place on August 15, 2002; [NAME REDACTED] had been medicated for approximately one month under the Keyhea Order. [NAME REDACTED] was found guilty of Battery on a Peace Officer and was assessed 121 days credit loss, with no credit restoration. Although the hearing officer noted that the mental health assessment submitted by clinical staff stated that [NAME REDACTED] behavior may have been the result of a severe mental disorder, he elected to hold [NAME REDACTED] accountable for his actions. (See RVR, at page 2.)

Jennifer A. Neill
October 10, 2003
Page 5

[NAME REDACTED] filed a 602 appeal requesting that his RVR be reissued and reheard for the following reasons: that he was mentally unstable at the time of the RVR incident, that the SHO did not permit him to call his treating mental health clinician to testify at the 115 hearing, that he was misled by his staff assistant to say that he understood what was happening at the time of the hearing, and that he did not understand what was happening during the disciplinary hearing because he was heavily medicated. [NAME REDACTED] appeal was denied at each level of review. (See 602 appeal, Log No. [REDACTED]    , attached hereto.)

[NAME REDACTED] medical records demonstrate that on July 15, 2002, at the time of his RVR, he was acutely psychotic and delusional. He had just returned from the CTC at PVSP and had not stabilized. He had two crisis bed admissions at SAC between July 8, 2002, when he returned to SAC, and July 15, 2002, when he was issued the RVR. His behavior in the holding cell just prior to spitting on the officer was the same behavior that was described by clinicians who observed him for three weeks in the CTC at PVSP when he was medication non-compliant and exhibited paranoia and agitation. The hearing officer failed to permit [NAME REDACTED] treating mental health clinician to testify at the 115 hearing about his condition at the time of his RVR. In their review of his administrative appeal of his RVR, the department also failed to consider the ample medical evidence of [NAME REDACTED] mental illness at the time of his RVR and the impact that mental illness had upon his behavior at the time that he "acted out" on July 15, 2002. At each level of review, the reviewer found that there was due process and ample evidence to support the finding of guilty.

At the time of the hearing, the hearing officer assessed [NAME REDACTED] mental health condition at the time of the RVR incident based upon the mental health assessment and upon [NAME REDACTED] appearance at the hearing. The hearing took place 30 days after the incident and 27 days after the initiation of involuntary medication. [NAME REDACTED] had requested the presence of his treating mental health clinician as a witness to testify about his mental health condition at the time of his admission to the crisis bed when staff determined that he was in need of involuntary medications.

We believe that [NAME REDACTED] case should be reviewed for all of the reasons raised by [NAME REDACTED] in his 602 appeal. The 115 hearing should have included the critical testimony of [NAME REDACTED] treating mental health clinician that would have further informed the hearing officer as to his mental health state at the time of his RVR "misconduct". Absent this critical witness, the hearing officer ignored the only clinical evidence in the record, the RVR assessment, and found [NAME REDACTED] guilty.

In cases, however, where the hearing officer has a clear understanding of an inmates' mental health issues and wants to mitigate, if the offense is a Division A or B, such as [NAME REDACTED] offense, the hearing officer cannot reduce the charge to an administrative offense. (Title 15, Section 3314(2)(A)). And if the charged offense is a Division A or B offense, the hearing officer cannot mitigate the credit loss by assessing a minimum or zero credit loss but must assess the mandated credit loss for a Division A or

Jennifer A. Neill
October 10, 2003
Page 6

B offense, which includes no chance of credit restoration for good behavior.  (Title 15, Section 3323(d)(A)(1.)

Defendants' RVR policy does not permit a hearing officer to mitigate Division A and B offenses even in the case of class members who meet involuntary medication standards at the time of their offenses.  This is the major flaw in defendants' RVR policy. As [NAME REDACTED] case demonstrates, defendants' RVR policy wholly permits and even requires that mentally ill inmates be punished for behavior, which results from their mental illness.  This is contrary to the <u>Coleman</u> decision and the intent of the December 2001 Court Order.  Plaintiffs have objected to this policy when it was initially proposed and at every stage of review for this reason.  (<u>See</u> Letter to Keating from Nolan, dated May 30, 2001; <u>See</u> Letter to Keating from Kahn, dated October 25, 2002; All-parties meetings 6/28/01, 2/27/03, 4/21/03, Meeting on 115 policy on 5/22/02.)

In this letter we make two distinct requests:  First, plaintiffs request that the Health Care Services Division review [NAME REDACTED] RVR and the issues raised in his 602 and direct that his RVR be either reissued and reheard, or dismissed with a restoration of credits, after a complete review of his medical records.

Second, we request that defendants clarify the power of the hearing officer under defendants' RVR policy to mitigate penalties assessed against mentally ill inmates charged with Division A and B offenses when it is determined that their RVR behavior may have been or was the result of their mental illness.  When we refer to mitigation we include dismissing 115s, reducing serious 115s to administrative 115s and assessing credit losses that are less than those mandated by Title 15.  We request that this information be provided in time for a discussion of the defendants' RVR policy at the All-Parties meeting scheduled for January 22, 2004.  We would appreciate a timely response to this request.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:ts

cc:   Matthew A. Lopes, Jr.
      Dr. Melissa Warren
      Dr. Jeffrey Metzner
      Coleman Co-counsel

# EXHIBIT 6

SANFORD JAY ROSEN *
MICHAEL W. BIEN
ANDREA G. ASARO

HOLLY BALDWIN
ERNEST GALVAN
JANE KAHN
NAJEEB KHOURY
THOMAS NOLAN
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN **

**ROSEN, BIEN & ASARO, LLP**
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA 94104

JK
COPY

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

March 4, 2004

BY FACSIMILE AND BY REGULAR MAIL
Jennifer A. Neill
1300 I. Street, Suite 125
P.O. Box 944255
Sacramento, CA 94244-2550

    Re:    Coleman v. Schwarzenegger
           Our File No. 489-3

Dear Jennifer:

I am writing in response to your letter of February 26, 2004, which addressed the questions raised in my letter of October 10, 2003. Plaintiffs were very happy to receive a response to this letter and to learn of the many points throughout the RVR process at which mitigation can occur. We remain concerned, however, that such mitigation rarely occurs and base this concern on the factors discussed below.

The mitigation points that you identify in your letter have long been provided for under Title 15 for all inmates, whether mentally ill or not. In order for mitigation to be a real option in the RVR process for mentally ill inmates, hearing officers must be provided with adequate training as well as with specific standards for applying mitigation when mental illness is found to impact on behavior. Defendants' RVR policy, procedure and training remains inadequate.

The Special Master and plaintiffs reviewed the written training materials and video-taped training at the All-Parties Meeting on April 21, 2003, and the consensus was that the sections discussing "mitigation" were weak and confusing. There were inconsistent statements made in the video-taped training and no concrete examples were provided to either correctional staff or hearing officers on when mitigation would be appropriate. In response to the concerns raised, a follow-up memorandum was distributed to the institutions and provided to the Special Master and plaintiffs. (See Letter to Keating from Neill, dated November 20, 2003, with Memorandum dated November 18, 2003.). In response to Mr. Keating's concern that there was not enough information and direction provided on "mitigation" of penalties in the training, the Memorandum restated the broad policy regarding mitigation with no specific clarification about when to apply it. As far as we know, there has been no additional training provided in this area. This is of great concern to us.

*   MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
**  MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

Jennifer A. Neill
March 4, 2004
Page 2

We believe that additional training that would provide staff with a flow chart that details the points of mitigation is critical and that providing concrete examples of how and when to mitigate is essential for ensuring that hearing officers and correctional staff will utilize this important part of the revised RVR policy as applied to mentally ill inmates.

As you are well aware, the mitigation points that you cite to in Title 15 in your February 26, 2004 letter are not newly implemented for mentally ill inmates. This is why hearing officers need special training about how mental illness should be considered when they evaluate these "old" Title 15 sections that have governed their hearing process. Our concern is that the training materials and the Revised DOM Sections do not provide guidance to the hearing officer or the Chief Disciplinary Officer in how to evaluate factors in considering mitigation. (Memorandum, dated January 18, 2002, with attached Revised DOM sections 52080.3-52080.10.2).

In your letter of February 26, 2004, you state that a hearing officer can reduce a serious RVR to a counseling chrono, a 128A. This statement appears to conflict with the Revised DOM provided to plaintiffs, which states that all Division A, B and C level offenses must be reported on a CDC 115 form, but other offenses may be documented in an alternative manner, such as a counseling chrono. (DOM Section 52080.3). Please clarify whether such mitigation can occur with Division A, B and C offenses, and if so, whether training has been appropriately provided to staff regarding this.

In the case presented to you for review in our letter of October 10, 2003, [NAME REDACTED], there were many points in his RVR process where the housing officer, hearing officer and Chief Disciplinary Officer could have provided mitigation, but did not. Title 15, as you have pointed out, provided the authority to do so. We believe that absent careful training, the same staff will continue to write up mentally ill inmates for rules violations rather than use their discretion to refrain from issuing an RVR and will find EOP patients (who are psychotic at the time of their offenses) guilty, assess credit losses, SHU terms and refer them for criminal prosecution.

We know that the Special Master and his team of experts will be closely evaluating this RVR policy, including whether there is serious consideration of mitigation in cases of EOP and 3CMS patients who had decompensated at the time of their misbehavior. We plan to do the same. We believe that a RVR policy that seriously weighs mitigation when appropriate benefits everyone. PSU, EOP ad.seg and Level IV EOP programs are the most costly and over-crowded programs in the system. Mitigation permits mentally ill patients to be housed in less restrictive and lower cost mental health programs.

We request information regarding any additional training that has been provided to staff regarding the new RVR policy, as well as clarification regarding the ability of

Jennifer A. Neill
March 4, 2004
Page 3

hearing officers to mitigate Division A, B and C offenses to counseling chronos.  Please
feel free to contact me if you have any questions.

Sincerely yours,

ROSEN, BIEN & ASARO, LLP

By: Jane E. Kahn

JEK:pj

cc:    J. Michael Keating, Jr.
       Matthew A. Lopes, Jr.
       Coleman Co-counsel

# EXHIBIT 7

SANFORD JAY ROSEN •
MICHAEL W. BIEN
ANDREA G. ASARO

JOLLY BALDWIN
ERNEST GALVAN
GAY C. GRUNFELD
JANE KAHN
MEGHAN LANG
ANNE MANIA
THOMAS NOLAN
KATHERINE SHER
JANET TUNG
AMY WHELAN
MARAKA L. WILLITS
SARAH OLSON ZIMMERMAN ••

ROSEN, BIEN & ASARO, LLP
ATTORNEYS AT LAW
EIGHTH FLOOR
155 MONTGOMERY STREET
SAN FRANCISCO, CALIFORNIA  94104

TELEPHONE
(415) 433-6830

FAX
(415) 433-7104

EMAIL
rba@rbalaw.com

December 12, 2005

BY EMAIL AND REGULAR MAIL

J. Michael Keating, Jr.
Special Master
2351 Sussex Lane
Fernandina Beach, FL 32034

     Re:    *Coleman v. Schwarzenegger*
           Plaintiffs' Objections to the Draft 15th Monitoring Report
           Our File No. 489-3

Dear Mr. Keating:

      Plaintiffs' objections to the Draft Fifteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols ("Draft Report") are made at a time of crisis in the CDCR and increasing danger to the plaintiff class.  Our extensive comments and objections reflect the current state of the CDCR's mental health system – the system is extremely strained by overcrowding, resulting in clinical and custody staff shortages, and insufficient beds at the critical DMH inpatient and MHCB levels-of-care.  CDCR reception centers are backlogged and unable to adequately process inmates, causing the mentally ill to languish in RC environments where they are locked in their cell most of the time and do not receive meaningful mental health care.  Suicides in the CDCR have reached an all time high rate.

      The overcrowding crisis has led CDCR officials to characterize the current situation in internal memoranda as a "severe bed crisis," and a "population crisis," which is creating "an imminent and substantial threat to the public safety…requiring immediate action" and "unprecedented recommendations."  *See* Attached October 25, 2005 Memorandum from John Dovey to Roderick Hickman (**Exhibit A**); September 1, 2005 Memorandum to Wardens from Mike Knowles (setting forth various procedures for reducing population pressures including expedited reviews of ASU and SHU cases, encouraging movement of inmates to lower security levels, and requiring reviews of single-celled cases in all ASU units) (**Exhibit B**).  Yet defendants have failed to acknowledge this "crisis" in the *Coleman* process or in any filings with the Court or the

•  MEMBER OF THE CONNECTICUT AS WELL AS THE CALIFORNIA BAR
•• MEMBER OF THE ILLINOIS AS WELL AS THE CALIFORNIA BAR

J. Michael Keating
December 12, 2005
Page 2

Special Master. The only CDCR responses to the crisis that plaintiffs have been made aware of are the lock downs caused by staff shortages, the delays in access to treatment and higher levels of care, and the mass transfers of inmates throughout the CDCR designed to squeeze even more human beings into the already overcrowded system.

Severe clinical and custodial staffing shortages are one measure of the current crisis. In a recent letter to the Prison Law Office, the CCPOA Chapter president at CMF candidly describes the dangerous situation created by these shortages:

> CMF is a medical and psychiatric prison hospital. . . . Most of our programs are court mandated and/or court monitored. Due to this, CMF is not allowed to shut down programs as other institutions have done to alleviate correctional staffing shortages. CMF is running over 60 vacant correctional positions. Adding together these vacancies and additional coverage needs, one can see the vacancy rate climb to unmanageable levels. CMF is heading for disaster. All staff members and inmates are at great risk and this institution will not be safe to work or live in. CMF will no longer be able to provide services as required by the courts and state laws.

December 8, 2005 Letter from CCPOA CMF Chapter President Steve Cox to the Prison Law Office (**Exhibit C**).

Defendants are unable or unwilling to take the actions necessary to control overcrowding in the system. Defendants' decision to abandon the parole reforms set forth in the Valdivia stipulated injunctions directly contributed to the current population crisis. As a result, the CDCR, rather than moving towards compliance with *Coleman* Court Orders and Program Guide standards, is falling further behind. These dire conditions require that the Special Master and the Court consider additional remedies including population caps and fines based, for example, on ongoing violations of the Court-mandated staffing ratios. *See Morales-Feliciano v. Parole Board of Commonwealth of Puerto Rico*, 887 F.2d 1 (1st Cir. 1989) (approving the use of daily per inmate fines as a remedy for defendant's failure to reduce prison overcrowding). Only by controlling population and limiting overcrowding will defendants be able to move, once again, towards compliance with the minimum standards of mental health care required by the Eighth Amendment to the United States Constitution.

Plaintiffs' specific objections to the Draft Report focus first on modifications to the four recommendations made by Special Master Keating at the end of the Report. Each of the four recommendations requires defendants to develop a new plan to remedy an area of significant and longstanding difficulty: (1) psychiatric vacancies at remote prisons, (2) expansion and retention of central office mental health management staff, (3) expansion of DMH inpatient bed capacity, and (4) expansion of MHCB bed capacity. As the Special Master notes in the Draft Report, defendants have already developed

J. Michael Keating
December 12, 2005
Page 3

remedial plans for each of these areas in response to prior court orders.  *See* Draft Report
at 413-414.  Defendants' prior efforts in these areas have all failed, and in most of these
areas they have repeatedly failed.  When a defendant proves incapable of correcting
longstanding Constitutional violations, it is both necessary and appropriate for Courts and
monitors to require a more intrusive level of supervision in the process of remedial
development and implementation.  *See Stone v. City and County of San Francisco*, 968
F.2d 850, 864 (9th Cir. 1992) (approving highly intrusive remedy after defendant
repeatedly failed to address constitutional problems); *Hutto v. Finney*, 437 U.S. 678, 687
(1978) ("In fashioning a remedy, the Court had ample authority to go beyond earlier
orders and to address each element contributing to the violation.  The District Court had
given the Department repeated opportunities to remedy the cruel and unusual
conditions…").

    In our comments below, plaintiffs propose a series of modestly more intrusive
remedial measures and implementation deadlines designed to focus and guide defendants
in their efforts to develop and implement effective strategies to address these problems.

    Plaintiffs also request additional recommendations to address a number of the
persistent, long-standing, and serious problems documented in the Draft Report,
including: (1) the CDCR's failure to comply with the court-ordered transfer timelines for
EOP patients in reception centers; (2) the CDCR's system-wide medication problems,
including poor continuity of medication, failure to implement DOT, failure to provide HS
medications, failure to follow up on medication non-compliance, failure to order and
follow up on laboratory testing of inmates on mood stabilizers, and the collapse of the
statewide Keyhea tracking system; (3) the failure of the existing RVR policy to provide
for a meaningful mental health assessment to 3CMS patients; (4) the documented,
persistent and preventable PSU transfer delays of EOP patients housed in the
administrative segregation and SHU units at Corcoran State Prison; (5) concerns raised
by the "pilot program" proposed for the PBSP administrative segregation unit ; (6)
defendants' failure to comply with the court-ordered seven-day-a-week psych tech
rounding in at least eight CDCR institutions; (7) the need for a series of focused orders
regarding RJD, including a population cap and focused assistance to enable the institution
to address its long term, on-going failures; and (8) the need for an order requiring DMH
and the CDCR to work together to create a procedure that ensures that discharge
summaries accompany all CDCR inmates discharged from DMH and that these
summaries end up in each inmate's UHR.

J. Michael Keating
December 12, 2005
Page 4

I.   **Modifications to Special Master's Recommendations in the Draft Report**

   A.   **Recommendations One and Two – Psychiatry Staffing and Headquarters Staffing:**

   Recommendations One and Two require defendants to submit plans within 60 days from the entry of the Court's order. Recommendation One concerns psychiatrist vacancies system-wide, singles out Avenal State Prison, High Desert State Prison, and Valley State Prison, and requires a plan for reducing vacancies to no more than ten percent. Recommendation Two addresses the need to expand DCHCS central office mental health staff so that it is commensurate with the present size of the CDCR mental health staff and caseload. Recommendation Two also requires defendants to address the issue of inadequate compensation for headquarters staff.

   While plaintiffs wholeheartedly agree that Court Orders are necessary to address these problems, we disagree with the form of the proposed orders: In the past, orders that only require defendants to develop a plan have not been effective. Experience has shown that only orders that also require implementation can ensure a prompt and effective remedy.[1]

_____

[1]   For example, on July 26, 2004, the Court directed defendants to develop a plan within 60 days from the date of the order, for providing care in the SHU at CSP/Corcoran meeting the standards in the revised Program Guides. July 26, 2004 Order at ¶ 1B. Defendants prepared a plan and submitted it on September 26, 2004. The Plan lay dormant for many months until the conclusion of the next monitoring round produced another set of recommendations ordering defendants to include in the FY2005-006 budget a request for sufficient clinical staff to implement the new services. March 7, 2005 Order at ¶ 8. More than a year later, with clinical vacancy rates close to 50%, Corcoran is no closer to realizing the goal of the July 26, 2004 Order. In fact, it remains unclear whether the necessary custody positions were ever requested. The additional clinical and custody staffing required in order to provide for the standard of care in the Revised Program Guides are only now being recruited. As recently as September 16, 2005, the court monitors reported that there was no psych tech rounding of general population inmates housed in the SHU despite the fact that the Revised Program Guides mandated rounding of general population inmates at least every other week. Revised Program Guides, Chapter 8, 12-8-6.

   In another example, on June 9, 2005, the Court ordered defendants to submit to the Special Master within 30 days a plan for dealing with the hazard of large-mesh ventilation screens in the administrative segregation cells of caseload inmates. June 9, 2005 Order at ¶ 1. The timeline of this Order conveyed a sense of urgency about the required plan. The Plan submitted by defendants, however, demonstrates no such urgency – it includes a several year timeframe to study the issue and no commitment to replace even a single large-mesh ventilation screen. The final bullet of the Plan states: "Based upon the outcome of the feasibility study, the

(continued on next page)

J. Michael Keating
December 12, 2005
Page 5

Recommendation One should be amended to require that defendants develop and implement a plan to achieve full compliance with existing staffing ratios for psychiatrists, system-wide, at no more than ten percent vacancy rate, by March 1, 2006. This requirement was already ordered by the District Court in its June 12, 2002 Order. *See* 6/12/02 Order at ¶ 1. If defendants cannot bring their programs into compliance with this critical court-ordered staffing ratio by April 1, 2006, then it is clear that harsher and more intrusive remedial measures are necessary and justified. If defendants do not correct their ongoing violation of the June 12, 2002 Order by April 1, 2006, then the Special Master should recommend that the Court place a cap on the population at each particular institution that is out of compliance, and, if necessary, impose a system-wide population cap. It would also be appropriate at that time to consider a system of fines based on population in excess of the Court-ordered ratios.

Defendants' own memoranda suggest that such a population cap may be necessary given the current staffing crisis. *See* Exhibit A, October 25, 2005 Dovey Memo (noting that "even when general population beds are available for transferring reception center inmates, there are often limitations to the number of inmates with mental health or medical needs that a given institution can accept in a given week due to court imposed sanctions"). Such a recommendation gives the defendants ultimate control over the situation in that the appropriate ratio can be achieved either by hiring the required psychiatrists or by reducing the prison population.

For similar reasons, Recommendation Two should be amended to require three critical components that will enhance accountability and speed implementation of the remedy. First, the Recommendation must require that defendants develop and submit a plan for the expansion of DCHCS central office mental health staff no later than 60 days from entry of the court's order and in any event in time for inclusion in the FY2006-2007 Budget. Defendants should also be required to obtain any necessary authority from all applicable agencies as soon as possible and no later than 60 days after the FY2006-2007 Budget is approved to hire the DCHCS expanded central office mental health staff.

Second, the Recommendation must require defendants to provide a monthly update on the status of their compliance with the staffing ratios for psychiatrist and all other clinical positions and with the implementation of the plan for expansion of DCHCS central office staff.

Third, as part of their staff expansion, defendants must be required to create three specific DCHCS staff positions with management control and supervisory authority over

---

(continued from previous page)
CDCR will develop recommendations and pursue their implementation. To be determined, dependant on decisions made in aforementioned tasks." July 8, 2005 Letter to Michael Keating from George Sifuentes and John Dovey, at 4.

J. Michael Keating
December 12, 2005
Page 6

certain key remedial issues.  Defendants should be required to hire an individual with extensive experience in hospital or mental health administration to manage the CDCR's current system of inpatient hospitalization and also to manage the future expansion of the inpatient system.  In connection with the ongoing problem with access to MHCB care, discussed further in connection with Recommendation Four below, defendants should be required to hire an experienced administrator to manage the MHCB system and the expansion of that system.  Finally, in connection with plaintiffs' request below for a new recommendation on medication management issues, defendants should be required hire an experienced manager to oversee the CDCR's medication management systems.

## B.     Recommendation Three: Acute and Intermediate Inpatient Beds

Plaintiffs object to the recommendation concerning DMH inpatient care as insufficiently specific about the plan requirements and lacking implementation timelines.

Defendants have already been given numerous opportunities to develop an adequate plan to address the severe current shortages of inpatient beds – and they have repeatedly failed to do so.  As the Draft Report notes, the process of getting defendants to produce an accurate assessment of unmet need for inpatient care started during the *Gates-Coleman* merger negotiations and led to "a seven-year effort to determine the existence and extent of any such unmet need." *See* Draft Report at 377.  After seven years of failed efforts, an adequate assessment was finally completed last spring:

> The so-called UNA study found 512 as yet unreferred CDCR inmates clinically appropriate for referral to an inpatient DMH level of care, including 425 inmates in need of intermediate care and 77 in need of acute inpatient care, representing respectively 14 and two percent of the department's total EOP population.  Subsequent classification data from the UNA study indicated that two-thirds of the inmates identified for referral to intermediate inpatient care required Level IV custody, as did 60 percent of those identified for referral to acute inpatient care.

Draft Report at 377.

Unfortunately, after taking more than seven years and conducting more than four failed studies of the need for inpatient care before completing an accurate study, defendants have now caused further delay by submitting two inadequate plans to address the need identified in the study.

The first plan, produced on March 30, 2005, did not adequately address the identified need, and unduly delayed building necessary inpatient beds at every level.  On April 29, 2005, plaintiffs sent a letter outlining the extensive problems with this first plan, including its failure (1) to address the identified need for acute inpatient care (APP beds), (2) to include enough Level III ICF beds, (3) to include enough Level IV ICF beds, (4) to address the unmet need identified in the study for inpatient care for women, (5) to

J. Michael Keating
December 12, 2005
Page 7

provide meaningful short-term and medium-term remedial measures to address the
shortage of inpatient beds and (6) to remedy the training and supervision issues behind
the ongoing failure of CDCR clinicians to refer all appropriate cases for inpatient care.
*See* Plaintiffs' April 29, 2005 Objections to UNA Plan (**Exhibit D**). Plaintiffs also
objected to the failure of the CDCR to adequately enlist DMH in providing ICF care to
CDCR inmates in the short term. Id.  In conference calls and meetings with defendants
and plaintiffs after the plan was produced, the Special Master and his experts raised these
and many similar concerns.

The second plan was dated August 15, 2005. The second plan was again
inadequate. Plaintiffs set forth extensive objections to the plan in letters dated August 17
and August 23, 2005 (**Exhibit E**). In addition, the Special Master provided extensive
comments to defendants in his August 30, 2005 Letter to CDCR Undersecretary
Woodford, which identified many of the same problems:

- Once again, the plan did not address the projected shortfall of acute APP
beds.

- The plan did not adequately address Level I, II, and III needs for ICF beds.

- Once again, the plan did not address the needs of female inmates.

- The plan did not address the identified shortfall in Level IV ICF beds.
Indeed, the plan did not provide for significant new numbers of Level IV
ICF beds until the middle of 2008, except for 36 new beds beginning this
fall at CMF.

- The plan did not address the needs of inmates currently waiting for transfer
to the SVPP ICF program.

- The plan contained numerous "caveats about the availability of funding for
both the construction and operational costs of the plans' various elements."
August 30, 2005 Letter at 5. *See also*, Draft Report at 385 ("The 39-month
estimate [for building the 112 bed ICF unit in D-Quad at SVSP] it turns
out, will be hard to meet.")

August 30, 2005 Letter from Michael Keating (**Exhibit F**). In the Special Master's
August 30 letter, he also objected to the defendants' proposed slow pace of construction,
stating, *"defendants must treat this issue as the genuine emergency that it is."* August 30,
2005 Letter at 5.

It is now abundantly clear that defendants have not done so. Defendants have
known that their latest plan was inadequate since the end of August, but have allowed
three more months to pass without correcting any of the identified problems. Given this
lack of diligence, we request that the length of time for the development of plans be
shortened to 45 days from the date of the ultimate Court Order, while keeping the

J. Michael Keating
December 12, 2005
Page 8

requirement in the existing Recommendation Three that defendants "ensure that
construction and financial elements of the plan are sufficiently timely for inclusion in the
FY2006-2007 Budget." *See* Draft Report at 413.

One area where the evidence of lack of diligence by the State of California is
overwhelming is in the unwillingness of DMH to participate in solving this crisis – even
though DMH is under the direction of the Governor, the lead defendant in this case. The
Draft Report makes clear that DMH has played a central role in development of the
current crisis situation:

> DMH has also repeatedly held out to the CDCR, and the
> court, the prospect that the new DMH facility with 1,500 beds under
> construction at Coalinga and currently accepting patients would
> allow DMH to accommodate more Level IV CDCR inmates. This
> prospect also turned out to be illusory. Coalinga may be able to
> absorb some CDCR inmates in need of intermediate inpatient care,
> but the facility is not much more secure than Atascadero State
> Hospital (ASH), where most intermediate inpatient care is presently
> provided by DMH to CDCR inmates. DMH did not share with
> CDCR, or the court, information about the security limitations of its
> Coalinga facility until early 2005. . . . <u>DMH has long operated under
> the protective assumption that it had no obligation to provide mental
> health services for CDCR inmates who might represent a danger to
> DMH programs and staff, although it knew well it was the only
> source of inpatient care available to the CDCR.</u>

Draft Report at 384-385 (emphasis added). This history of DMH placing its own
bureaucratic ends before the welfare of mentally ill CDCR prisoners continues to this
day. Attached hereto is a memo and some tracking documents with ASH population
projections that were recently obtained by plaintiffs from DMH through a California
Public Records Act request. These documents show an ongoing unwillingness of DMH
to participate in the solution to this crisis, even as their own population crisis eased in
recent months. The first attached document is a March 30, 2005 Letter from John
Rodriguez to Renee Kanan explaining that DMH will place the goal of reductions in
DMH population ahead of serving CDCR inmates, even as it enjoys a surplus of beds in
the wake of the opening of CSH:

> As the beds are vacated at ASH [by Coalinga-bound
> departures], DMH management will develop and follow a population
> management plan to reduce the over-bedding at the hospitals by
> redistributing the population back into the state hospitals' licensed
> bed capacity. Once this occurs and there is adequate staffing and
> funding, then DMH can provide the additional 125 beds to the CDC.
> Until DMH management completes the redistribution, DMH will not

J. Michael Keating
December 12, 2005
Page 9

> know where in the system these beds will be available – CSH or
> ASH. It should be noted that based on the DMH ten-year population
> projections, after the 125 beds are provided to the CDC, the
> remaining beds in the system will be needed for growth in the
> populations that DMH is legislatively authorized to serve.

March 30, 2005 Rodriguez letter at 1 (**Exhibit G**). Clearly, treating CDCR inmates is not an important priority for DMH. Indeed, also attached hereto is a October 27, 2005 e-mail from Cindy Radavsky to Tom Voss and others discussing the need to go back to the *Coleman* court and seek approval to remove the 50 CDCR inmates that are to be housed in CSH in fiscal year 2006-2007. *See* 10/20/05 Radavsky E-mail (**Exhibit H**).

Also attached hereto are several population charts that show ASH's population crisis has eased considerably in recent months and is projected to drop precipitously in the coming months (**Exhibit I**). It is clear from these charts that ASH currently has the ability, with overbedding, to house as many as 1528 inmates. Despite this ability, ASH appears committed to reducing overbedding rather than treating decompensated, severely ill CDCR inmates.[2] In fact, population figures from October 10, 2005 show ASH with a population of 1315. The same chart shows that ASH is permitted an over-bedded capacity of 1526 – meaning that at the present time ASH has more than 200 available beds that could be used to treat CDCR ICF patients. (*See* Exhibit I at 10/10/05 Chart) These beds were available on October 10, 2005, and presumably remain available now. This is true even though the same chart shows that only 47 SVPs had been transferred to CSH as of October 10, 2005. The number of available beds at ASH should increase substantially in the next few months as CSH comes on line more fully.

Given the misrepresentations made to the Court and the Special Master over the years by DMH officials, see Draft Report at 383-384, it is clear that DMH must be required by court order to actively participate in this round of inpatient planning along with the CDCR. DMH, along with DHS, should be named in the ultimate order from the Court on this issue and required to submit plans and reports to the Court and the Special Master alongside the CDCR.

---

[2]     Interestingly, these documents show that the DHS official primarily responsible for pressuring DMH to limit the duration of its overbedding to within one year of the opening of CSH is the same DHS official responsible for trying to force the closure of the ICF program at CMF last year – Paul Hendrix. See Attached December 17, 2004 e-mail from Michael Tucker to Cindy Radavsky, discussing meeting with Paul Hendrix, at ¶ 4 (stating that Paul Hendrix insisted in a December 14, 2004 meeting that overbedding at ASH must cease with 1 year of the opening of CSH) (**Exhibit J**).

J. Michael Keating
December 12, 2005
Page 10

  Plaintiffs request that the Special Master's existing recommendation be augmented as follows to focus and guide defendants development of a remedial plan and to give defendants a deadline for implementation:

  3.  Defendants, in conjunction with DMH, and DHS, should be required to submit within 45 days from entry of the court's order a plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill male and female inmates in CDCR clinically determined to be in need of these levels of inpatient care. The plan must address 100% of the identified interim and long-range needs based on up-dated population projections and the results of the UNA study, detail any financial and construction plans, timetables and staffing requirements needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 2006-2007 Budget. All identified needs must be addressed by programs to be fully operational no later than January 1, 2008.

In addition, the plan must include the following:

  (a)  Defendants and DMH shall prepare a report concerning the feasibility of hardening a portion of the new CSH facility and providing care to Level III and Level IV CDCR patients therein. Defendants shall provide detailed documentation concerning any alleged security problems that prevent them from doing so, including written reports by qualified security professionals explaining why this newly built maximum security state hospital for sexually violent predators is not capable of housing Level III and IV CDCR prisoners and what staffing or construction, if any, is necessary to permit such housing at CSH.

  (b)  Defendants, the Department of Health Services ("DHS") and DMH shall report on the feasibility of immediately expanding the ICF treatment program at ASH for CDCR inmates rather than reducing overbedding there. This report should include the steps necessary to add a minimum of 75 new beds in addition to the 175 new beds previously promised by DMH for CDCR inmates at ASH and CSH by mid-2006.

  (c)  Defendants and DMH shall develop a plan that sets forth the feasibility and cost of accelerating the pace of construction so that (1) the planned 112-bed Level IV ICF in the current SVSP D-yard EOP space is available to begin treating inmates by December 31, 2006 rather than mid-2008, and (2) the planned 64-bed expansion of the SVPP program is open and ready for occupancy by July 1, 2007, rather than 2009. This plan shall include reports from

J. Michael Keating
December 12, 2005
Page 11

the various contractors responsible for the projects and should
consider options such as working 2-3 shifts a day and seven days a
week.

(d)     Defendants' plan shall include an ongoing training and
supervision component for ensuring that CDCR clinicians refer all
appropriate cases to inpatient care and that CDCR headquarters
monitors and supervises the process of referral.

(e)     DMH and CDCR should be directed to jointly submit a
plan or procedure within 30 days from the entry of the court's order
that will ensure that DMH discharge summaries for all CDCR
inmates sent to DMH are promptly provided and placed in the
inmate's UHR when they return from DMH.[3]

Defendants' seven-year delay in assessing and addressing the need for inpatient
care is outrageous and irresponsible. The result is that extremely ill individuals suffer in
severely decompensated states. This denial of care amounts to an severe, ongoing,
knowing violation of the Eighth Amendment. The denial of care to such individuals is
widespread. For example, the Draft Report explains that at CSP-COR, the UNA study
identified 25 cases that should have been referred for inpatient care. When visiting
Corcoran several months later, the monitors reviewed these cases and found that just 12
of these 25 cases had been referred to inpatient care, and that only 4 of the 25 cases were
actually transferred. *See* Draft Report at 152; see also Draft Report at 192 (similar
problems at SVSP). This situation is unacceptable. Defendants must not be permitted to
take another seven years to implement an adequate remedy.

C.     **Recommendation 4: Provision of Adequate MHCB Beds**

The Draft 15th Report contains ample documentation of the widespread problems
caused by the severe shortage of MHCB beds that has existed since at least mid-2004 at

---

[3]     The 15th Report notes problems with access to DMH inpatient discharge summaries at
many institutions. *See* Draft 15th Report at 10 (SAC: DMH discharge summaries often
missing); 26 (PBSP: problems obtaining discharge summaries); 65 (MCSP: DMH discharge
summaries found in just one of three charts reviewed for recently returned inmates from DMH);
118 (SQ charts of "some inmates returned to SQ from DMH contained discharge summaries,
others did not"); 232 (WSP: "DMH did not always send required discharge summaries"); 251
(LAC: discharge summaries missing from 5 of 7 charts reviewed for inmates returned from
DMH); 295 (RJD: "Some inmates returned [from DMH] without any discharge summaries at
all"); 231 (CCWF: problems with DMH discharge summaries getting into UHRs; summaries
sent to CIW instead of CCWF). This problem was noted frequently during the UNA reviews and
was a reported problem in the recent November 2005 SVSP monitoring tour.

J. Michael Keating
December 12, 2005
Page 12

almost every CDCR institution.  In addition to revealing the severity of the shortage, the
report documents serious management problems at many MHCB units.[4]  As noted in the

---

[4]      *See* 15th Draft Report at 8, 9, 12 (CSP-SAC: beginning in the summer of 2004, MHCB
access at CSP-SAC "*erratic*," overflow inmates who were waiting for MHCB beds in the SAC
OHU "*sometimes spent four to seven days in the OHU waiting for a MHCB to become
available;*" by October 2004, MHCB access at SAC "*slowed even further due to a system-wide
shortage of beds in MHCB units*" with the result that "*temporary housing arrangements for local
inmates awaiting access to a MHCB unit were becoming increasingly unacceptable and
dangerous*"); 25 (PBSP: "*The number of MHCB beds reportedly was inadequate*" and the
"*shortage of bed space was compounded by the use of the MHCB unit for long-term nursing
care.*"); 40, 48 (HDSP:  long psych and return delays in discharging MHCB inmates, reports that
EOP inmates downgraded to 3CMS by HDSP MHCB staff in order to facilitate removing them
from MHCB); 63-64 (MCSP: excessive MHCB lengths of stay worsening "*with about half of the
extended stays lasting three to five weeks;*" also extensive use of "potty" cells when space in
MHCB unavailable, starting in March 2004; these "potty" cells were used on 14 occasions
between August and December 2004. "*The cells had no beds and, although monitored by
security, were not located in a clinical area where inmates requiring stabilization could be
monitored and treated adequately.*"  As a result of the shortages, "*some clinicians felt pressure
not to admit inmates to the MHCB unit.*"); 99 (CSP-SOL: 13 bed MHCB closed in early Summer
2005 for six months, resulting in "*a serious setback to CDCR's overall MHCB capacity*"); 114-
115 (SQ: "*Only 40 percent of referred inmates were transferred on time due to increased delays
in MHCB acceptance.  According to institutional logs, it took three days or more, typically five
to seven days, for a MHCB unit elsewhere in CDCR to accept half of the referred inmates; the
longest acceptance time was 12 days.*"  Also, "*inmates frequently were not referred promptly to a
higher level of care*"); 135 (DVI: timeliness of MHCB transfers again became a problem starting
in the summer of 2004); 156 (COR: inadequate MHCB logs made reporting difficult); 166
(SATF: 68 of 161 MHCB admissions stayed longer than 10 days); 172, 174 (PVSP: crowding
causing quality of care problems in MHCB, some excessive lengths of stay in MHCB); 180
(ASP: timeliness of MHCB transfers "erratic"); 192 (SVSP: difficult to review because "*the
institution's ability to account for its use of crisis beds appeared to have deteriorated*"); 220-221
(CMC: "*Beginning in July 2004, the overall number of MHCB referrals throughout the CDCR
began to outpace available beds in MHCB units,*" and once a new ASH referral process for acute
care intended to remedy the problem at CMC began, the new referral process was overly
bureaucratic and many Level III CMC inmates were rejected by ASH for custody reasons,
resulting in there being only a few transfers); 274-75 (CIM: problems with repeat admissions to
the MHCB unit and "*The MHCB caseload was generally high, and treatment services in the
MHCB unit suffered.  The hospital was licensed for 18 MHCB inmates, but the average daily
census ranged from 24 to 32 inmates.*"); 286 (CRC: increasing problems accessing MHCB care
resulted in increased use of OHU); 296-297, 300 (RJD: noting some excessive lengths of stay
and noting quality problems with "*identification and handling of decompensating and high-risk
inmates,*" and failure to conduct required suicide risk assessments, missing records from MHCB
stays); 303 (ISP: "*Lengths of stay in the MHCB unit were excessive.  The average length of stay*

(continued on next page)

J. Michael Keating
December 12, 2005
Page 13

conclusion of the Draft Report, this "situation represents an extremely serious and continuing violation of the orders of the court in this case." Draft Report at 394.

Although the biggest problem with MHCB care is simply the shortage of beds, some portion of the MHCB crisis can be addressed through short-term policy changes. For example, MHCB beds are being used for long-term medical care patients in some institutions. *See* Draft Report at 25. The CDCR should be ordered to immediately issue a policy forbidding institutions from using MHCB beds for medical patients, and reserving all CTC "swing" beds for MHCB usage. (Plaintiffs understand that the CDCR has plans to open a new program for long-term medical care cases at CMF in a portion of the GACH there. As part of their response, defendants should provide detailed information about this unit and its impact on access to MHCB beds).

Similarly, in some institutions, inmates are waiting in MHCB units for many days after their clinical discharge, needlessly filling scarce beds. For example, at ISP, the Draft Report indicates inmates remain in the MHCB unit for an average of six days after their clinical issues are resolved. Draft Report at 303. Defendants should also be ordered to expedite transfers of such cases out of MHCB units.

The shortage of MHCB beds, although severely exacerbated during the last year, is not a new problem. Defendants should have foreseen this shortfall and planned for it. MHCB care is an essential part of defendants' mental health system, and it is the subject of numerous court orders and many reports of the Special Master. *See* 11/15/01 Special Master's Report on Defendants' Expedited Process for Transfers to a Mental Health Crisis Bed Level of Care at 1, 7 (noting "*system-wide shortfall of MHCB beds.*"); 12/20/01 Order (requiring a plan for improved MHCB access within 30 days); 10/8/02 Order at ¶ 3 (requiring within 30 days a plan to provide "*both immediate and long-term access*" to MHCB care) and at ¶ 4 (requiring plans for long-term MHCB access at both CMC and CMF within 90 days). In response to these orders, defendants produced three plans for improving access to MHCB care, and each has proved inadequate over the long term. *See* 1/18/02 Letter and Plan; 12/6/02 Letter and Plan; 1/3/03 Letter and Plans.

It has now been clear for at least eighteen months that these plans for improving MHCB access have been a total failure.[5] DCHCS has done little while this problem has

_____

(continued from previous page)
*for MHCB inmates was 15 days, with stays ranging from four to 34 days. The average length of stay for clinical reasons was about nine days*," no system in place for 5-day follow up of suicidal inmates released from the MHCB). By way of contrast, women's institutions generally reported good access to MHCB care. See Draft Report at 324 (CIW), 331-32 (CCWF), 339 (VSPW).

[5]      As we explained in our July 7, 2005 letter, these plans relied heavily on a series of assumptions that have not turned out to be true, including: (1) the assumption that "when the new SVSP DMH program opens in early 2003 . . . some patients in the Acute Psychiatric Program

(continued on next page)

J. Michael Keating
December 12, 2005
Page 14

become a full-blown crisis. The time has come for closer supervision and more intrusive orders regarding MHCB issues.

Recent monthly data from DCHCS confirms the extent of the current crisis:

Referrals to External MHCBs

| Month | Total # Ref | Sent | Not Sent |
| --- | --- | --- | --- |
| April 2005 | 228 | 48 (21%) | 180 (79%) |
| May 2005 | 300 | 41 (14%) | 259 (86%) |
| June 2005 | 320 | 55 (17%) | 265 (83%) |
| July 2005 | 239 | 30 (13%) | 209 (87%) |
| August 2005 | 310 | 38 (12%) | 272 (88%) |

These figures demonstrate that problems with MHCB access are growing worse with each passing month.

The lack of MHCB beds is a product of a series of ongoing management failures:

- Eighteen months ago, when DCHCS first learned of this crisis, it should have attempted to respond to it immediately with additional funding in this year's budget. Nor did defendants bring the crisis to the attention of the Special Master. The failure to act at that time means inmates will wait at least a year longer for even short-term relief. The next budget cycle is already well underway. Defendants must act now to secure additional MHCB resources.

- This crisis was foreseeable. In 2002, defendants' own Tucker Alan Study projected a need for 224 MHCB beds in 2005 (based on a projected male inmate population of 150,409). *See* July 29, 2002 Revised Tucker Alan

---

(continued from previous page)
(APP) at CMF/DMH will be transferred there" and that "this should free up MHCB beds statewide" (12/6/02 Plan at 2); (2) the assumption that the new Coalinga State Hospital would free up beds at ASH and SVPP that CDC could use for MHCB Care (12/6/02 Plan at 3); (3) the assumption that the department could open "20 or more" MHCB beds at Corcoran, (12/6/02 Plan at 2), a plan that defendants announced at the June 2005 All parties meeting that they had abandoned because they do not believe they can staff such a unit at Corcoran, and (4) the assumption that the CDC could provide MHCB-type care for up to five inmates in the CMC hospital, which has been abandoned, according to defendants' 6/3/05 HCPU report on MHCB availability. Moreover, all of defendants' past MHCB capacity projections included the 5-bed MHCB unit at Centinela, which was shut down (with no announcement to plaintiffs or the Special Master) at some undisclosed time in the past.

J. Michael Keating
December 12, 2005
Page 15

Study at 46, Exhibit 4. As of this week, the CDC's website reports a current male inmate population of 156,315. *See* November 28, 2005 Weekly Population Report (**Exhibit K**). Adjusted for this jump in population, the CDC currently needs to have at least 233 MHCB beds for men. However, according to the most recent available monthly data, there are only 153 male MHCB beds available. 9/12/05 HCPU Report (SOL, NKSP and CEN closed) (**Exhibit L**). Thus, there is a present shortfall of 80 MHCB beds. Almost this entire shortfall was projected by defendants' own experts in 2002.

- Even now, this life-threatening crisis in mental health care is not being addressed with the necessary sense of urgency by defendants. For example, the HCPU data for August shows that across the system, there are 111 inmates housed in CTC beds for long term medical care. *See* 9/12/05 HCPU Report (attached hereto). The use of CTC beds for long term care cases is expensive and wasteful

Inadequate MHCB management and planning may also be costing inmates' lives. During the past year, a number of completed suicides took place when the inmate should have been transferred to an MHCB but was not, or under circumstances where there is no explanation for the failure to refer the inmate to an MHCB.[6] Moreover, in the year to date, there has been a surge in suicides. So far in 2005 there have been at least 39 suicides and two additional suspicious deaths by overdose that are still being investigated.

The MHCB crisis alone is more than ample justification for the Draft 15th Report's recommendations concerning improvements in central office staffing. The existing Recommendation Four on page 413 of the Draft Report should be expanded in the manner set forth below:

---

[6]    *See* Suicide Report for [NAME REDACTED](11/12/04 MCSP suicide took place the day after inmate placed in a body cavity search cell rather than the MHCB unit for suicidal ideation), Suicide Report for [NAME REDACTED](roughly a month before his October 2004 suicide at CSP-Sacramento, inmate placed in a strip cell on his ad seg unit for suicidal concerns but not referred to MHCB unit); [NAME REDACTED] Suicide Report (1/3/05 suicide of SVSP inmate on five day follow-up after treatment for several days in "treatment and triage area" following suicide attempt); Suicide Report for [NAME REDACTED]       Folsom inmate moved into holding cell after saying he "couldn't take it anymore" in his ASU cell; he was subsequently considered for MHCB referral to SAC but referral not made; the LPT who decided not to refer indicated the inmate appeared to be improving, but also admitted that such referrals are very difficult to make, discouraging such referrals).

J. Michael Keating
December 12, 2005
Page 16

4.      The defendants should be required to submit within 45 days from the entry of the court's order a plan for the provision of Mental Health Crisis Beds for all seriously mentally ill male and female inmates in CDCR within 24 hours of a clinical determination that they require that level of mental health care.  The plan must address interim and long-range needs based on updated population projections; detail any financial and construction plans, timetables and staffing requirement needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 006-2007 Budget.   The plan shall also include the following elements:

        (a)     A plan and schedule for maximizing the use and availability of all MHCB beds in the short term by (1) moving long term medical care cases out of CTCs, (2) expediting discharges from MCHB units of inmates whose clinical need for MHCB placement has ended, (3) expanding the MHCB swing beds available in the short-term through staffing augmentations, (4) continuing to operate the eight overflow MHCB beds at Corcoran that were used for NKSP inmates while the NKSP MHCB unit was closed recently.

        (b)     As part of the plan, defendants should provide updated Tucker-Allen MHCB capacity projections for the next six years.  These updated projections shall take into account the current overflow MHCB population that is inappropriately housed in OHUs, administrative segregation units, and ZZ cells, and should include a plan to phase out of dangerous and unauthorized current use of OHUs, administrative segregation units, and ZZ cells used for these patients.  The overall MHCB expansion plan should provide for enough new MHCB beds to meet the needs identified in this projection by January 1, 2008.

        (c)     A plan for accelerating the staffing and licensing of the new MHCB unit at Kern Valley State Prison, and the new MHCB beds at CSP-SAC, so that they are both licensed and operational by June 30, 2006, and a plan for accelerating the construction, staffing, and licensing of the new MHCB unit at CMF so that it fully licensed and operational by January 1, 2008.  Defendants shall also cease their current practice of removing patients from CTC units in order to facilitate licensing surveys.  Defendants shall also meet with DHS officials and the Special Master and Plaintiffs' counsel to explore ways of accelerating licensing of the remaining CTC units and new units built in the future.

        (d)     A plan to ensure that DCHCS population management staff are available 7-days-a-week to coordinate placements of inmates needing MHCB care.

J. Michael Keating
December 12, 2005
Page 17

## II.   Plaintiffs' Request For Additional Recommendations

### A.   The CDCR's On-going Failure to Comply with Court-Ordered Reception Center Transfer Timelines

The CDCR's inability to transfer EOP patients housed in reception centers within sixty days to EOP programs has been identified as a serious problem during numerous monitoring reports with little, or no progress over time.[7]  Plaintiffs have repeatedly sought recommendations to address these delays.  To date, none of these have been adopted.  It is time to act.

In Plaintiffs' Objections to the Special Master's Eleventh, Twelfth, and Thirteenth Draft Monitoring Reports, we requested a requirement that defendants develop a plan to identify and remedy system-wide factors contributing to the failure to timely transfer reception center EOPs, and track individual EOP inmates in reception centers. *See* Plaintiffs' Objections to the Draft Eleventh Report, May 29, 2003; Plaintiffs' Objections to the Draft Twelfth Report, November 25, 2003; Plaintiffs' Objections to the Draft Thirteenth Monitoring Report, May 26, 2004.  None of these requests were adopted.

The Fourteenth Monitoring round was reduced in scope and covered only eleven institutions, including six reception centers.  Although plaintiffs did not request another recommendation addressing reception center delay, the Report did include documentation of transfer delays at all of the receptions except for Valley State Prison.[8]

The current reception center data provided monthly by the Department of Correctional Health Care Services ("DCHCS") is incomplete.  The data generally does not indicate the reason for delays in transfers of EOP RC inmates.  Without this critical data, DCHCS cannot begin to develop a remedy that will bring defendants into

---

[7]       *See* Eleventh Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 256; Twelfth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 63, 144, 153-54, 176, 179 and 196; Thirteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 26, 68-69, 76, 149, 157, 176-7, 180, and 193;  Fourteenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 125.  See 11th Report at 256 (reception centers "have neither the staff nor physical facilities to provide the level of treatment and monitoring these inmates need, and the failure to provide needed treatment, sometimes for months, imposes severe hardship and suffering on some of those left waiting.")

[8]       CCI: 12% took longer than 60 days; CIM:  40% took longer than 60 days; SQ: 41% were waiting longer than 60 days at the time of the visit; HDSP: Data still not entirely reliable or complete but it appeared that timeliness of EOP transfers slightly improved with 21% delayed; RJD: % of EOPs remaining longer than 60 days increased slightly from 31% to 35% and back to 32% in June).

J. Michael Keating
December 12, 2005
Page 18

compliance with Court-ordered time frames.  Moreover, there is a need to determine whether there is a shortage of SNY or EOP beds system wide causing the delays.[9]

The 15th Draft Report again documents the on-going and persistent delays in transferring EOPs from reception centers.  *See* Draft Report at 116, 134, 230, 240, 264, 274, and 339.  The treatment given to EOP patients while they reside in these reception centers is minimal, with the best institutions providing only a weekly case manager contact.  At many RCs, EOP patients receive less.  *See* Draft Report at 117 (SQ: only half of the EOP patients in reception were seen weekly by case managers, with compliance varying from 23 to 80 percent some months); 241 (NKSP: 17% of the EOP patients in reception were not seen weekly); 264 (CCI: 22% of the EOP patients in reception were not seen weekly); 40 (HDSP: treatment of RC EOP patients deteriorated; EOPs did not consistently receive weekly contacts); 295, 298 (RJD: 137 of 373 caseload inmates in reception had been there overlong…EOP inmates were not provided adequate treatment).

The RC transfer timelines and the minimal RC treatment requirements were developed in tandem and are interdependent – the parties clearly envisioned that rapid reception processing would make a full-fledged RC EOP treatment program unnecessary.  Unfortunately, RC processing delays have worsened significantly in recent years, making the promise of rapid transfer illusory.  Given the current population crisis, this situation is likely to continue to deteriorate in the foreseeable future.

This situation necessitates additional orders to prevent further injury to vulnerable class members who face extended RC stays in stressful, locked-down conditions.  Plaintiffs request a requirement that defendants develop and implement a plan within 30 days from the entry of the court's order for creation of several reception center EOP units that can provide at least ten hours of structured therapeutic treatment to (1) all EOP reception center patients that have been waiting longer than 60 days in a reception center and (2) all "at risk" EOP reception center patients who have been determined to need enhanced care while they wait to be transferred.

**B.    Medication Issues – Continuity of Medication, DOT, HS Medication Administration, Follow Up on Medication Non-Compliance, Lab Testing and Statewide Keyhea Tracking System**

The Draft Report documents widespread ongoing problems with medication management and laments the "painfully slow" progress that has been made on the

---

[9]    *See* Monthly Reports file in response to January 19, 1999 court order, dated October 18, 2005, RC Processing for MHSDS Inmates, attached hereto (CCI RC EOP, reporting no delay codes; NKSP RC EOP, reporting no delay codes; CCWF RC EOP, reporting error codes; CIM RC EOP, reporting "Other Delay" for delay code; DVI RC EOP, reporting no delay codes; SQRC-47 EOP overdue, 2 Delay codes provided; Wasco RC EOP-28 overdue, 1 delay code of "Other delay code").

J. Michael Keating
December 12, 2005
Page 19

provision of HS medications, DOT medications, and in addressing medication non-compliance. *See* Draft Report at 367. These and other medication problems have been found consistently in prior reports[10], and the time has come for more aggressive intervention in the management of defendants' medication efforts.

In particular, a remedy is needed to address each of the following longstanding, widespread problems:

> (a)   Poor Follow-Up on Medication Non-Compliance. The Draft Report documents problems with referrals for and the scheduling of follow-up appointments for medication non-compliant inmates at nearly every institution.[11] Given the longstanding and near universal existence of these problems (albeit with some minor

---

[10]   *See* Fourteenth Report at 170: "These findings reflected accurately that the institutions monitored during this round continued to experience some serious problems in delivering and managing medications effectively"; *see* Thirteenth Report at 248: "Again, for a system that relies so heavily on the use of psychotropic medications to treat mental illness and stabilize mentally disordered inmates, effective medication management is critical. The ability of the newly implemented policy, now supposedly fully installed in all CDC institutions, to assure such effective management needs to be assessed."

[11]   *See* Draft 15th Report at 15 (FOL: "The lack of psychiatric resources created some problems with follow-up to medication non-compliance."); 23 (PSBP: "Follow-up to medication non-compliance remained problematic"); 35 (HDSP: "Follow-up to medication non-compliance remained problematic."); 61 (MCSP: Follow up "improved but remained erratic."); 70 (SCC: "Follow up to medication non-compliance was poor"); 83 (CMF: Follow up "remained problematic in the 3CMS program"); 95 (SOL: Follow up "erratic."); 110 (SQ: "Timeliness of psychiatric response to referrals for non-compliance was still poor" and some inmates waited four to seven weeks for an appointment); 130 (DVI: "erratic" follow up to medication non-compliance); 179 (ASP: "follow up to medication non-compliance was weak."); 188 (SVSP: "response to medication non-compliance was inconsistent... Non-compliance with medication did not always elicit a response"); 205 (CTF: "Follow up to medication non-compliance remained problematic."); 227 (WSP: "Follow up to medication non-compliance was extremely poor."); 238 (NKSP: follow up "inadequate"); 246 (LAC: "MTAs did not reliably refer inmates who were non-compliant with their medications to mental health"); 261 (CCI: "Follow up to medication non-compliance was poor."); 270 (CIM: poor follow up); 291 (RJD: "pervasive deficiencies" apparent in medication management generally, with problems with expiration of medication orders and continuity of medication "prominent" problems); 321 (CIW: "some inmates reported problems with follow-up to medication non-compliance"); 238 (CCWF: follow-up to medication non-compliance may have "slipped during the period"); 336 (VSPW: "poor auditing made it difficult to determine the extent of follow-up to medication non-compliance."). *See also* Summary Section at 359-360 (noting ongoing nature of problem and generally abysmal performance in this area).

J. Michael Keating
December 12, 2005
Page 20

variations in the extent of the problems), it is clear that the time has come to address this issue systemically.

(b)   <u>HS Medications</u>.  HS medications do not appear to be an option for clinicians and patients at the majority of CDCR institutions.[12]  This problem persists despite clear direction from the Special Master and his monitors and from the Court.[13]  In the summary section on this issue, the monitor notes that *"Neither institutions nor DCHCS appeared willingly to take on this issue, initially ignited by a careless and obtuse central office directive and vastly complicated by local shortages of MTAs and RNs."*  Given this unwillingness to correct the issue, it is clear that defendants must be given a clear order to do so by a date certain.

(c)   <u>Continuity Upon Arrival, Changes In Housing Units or Upon Renewal of Medication Orders</u>.  The area of medication continuity is another area of widespread, well-documented problems.[14]  The problems with continuity have been identified in

_____

[12]   *See* Draft Report at 7 (SAC: number of inmates on HS medications increased to 80 in June 2004 but decreased to about 9 in July 2004); 15 (FOL: "HS medications were rarely provided; only four caseload inmates at Folsom received psychotropic medications on an HS basis"); 23 (PBSP "HS medications were not administered at PBSP"); 36 (HDSP: "HS medications were not prescribed at the institution."); 79 (SCC: difficulty providing HS medications); 84 (CMF: no HS medications); 97 (SOL: no HS medications); 105 (SOL: no HS meds procedure); 132 (DVI: no HS medications); 147 (COR: HS medications delivered before 8 p.m.); 173 PVSP (HS medications a problem);  179 (ASP did not provide HS meds); 188 (SVSP: HS meds provided before 7:00 pm); 208 (CTF: only one inmate on HS meds at the institution); 217 (CMC provides HS to only a few inmates); 228 (WSP: no HS medications, last pill line of the day conducted at 2:30); 238 (NKSP: HS meds "not generally administered"); 262 (CCI: some inmates on HS medications, but difficulties in the administration of HS meds; also, all HS meds delivered before 8:00 pm); 271 (CIM: HS provided to a small number of inmates); 283 (CRC: no HS medications prescribed); 302 (ISP – no HS meds for general population inmates); 321 (CIW: no inmates on HS meds); 329 (CCWF: no HS medications); 343 (VSPW: no HS medications being administered)

[13]   June 25, 2003 Order directing defendants to include in their new medication policy a provision that requires evening distribution of HS medications no earlier than 8 p.m. and a supervisory psychiatric oversight or peer review structure that is not so burdensome that it precludes or unnecessarily discourages the prescription of HS medications when clinically appropriate.  ¶5. Also reported on extensively in the Thirteenth Monitoring Report at 246-249; Fourteenth Report at 170.

[14]   *See* Draft Report at 15 (FOL: "somewhat of a problem"); 34 (HDSP: "continuity of medication on renewal of medication orders was a widespread problem that showed no sign of

(continued on next page)

J. Michael Keating
December 12, 2005
Page 21

previous monitoring rounds.[15] The time has come to order a more
focused, statewide remedy.

(d)     DOT medication distribution. This is another critical
medication area where defendants' efforts are lagging.[16] As noted in

---

(continued from previous page)
improvement"); 59-60 (MCSP: Chart reviews by experts "found some gaps in medication
ranging from one day to a week" and continuity upon renewal of orders remained problematic);
82 (CMF: "CMF still had major problems with the delivery of medications"); 94, 95 (SOL:
"Most aspects of medication delivery and management at CSP/Solano were inadequate.
Continuity of medication upon arrival was particularly problematic" and "Continuity of
medication for inmates moving between housing units was also deficient"); 129-130 (DVI: poor
continuity upon arrival and upon renewal]; 147 (COR: "medication deliveries were often
interrupted by changes in location."); 173 (PVSP: despite good performance on medication
issues in other areas, medication continuity upon internal transfers remained a problem.); 178
(ASP: "Continuity of medication was problematic for inmates on arrival, changes in intra-
institutional housing locations, and renewal."); 226 (WSP: "continuity of medication for arriving
inmates was erratic" and continuity "for those whose housing location changed was poor."); 247
(LAC: continuity a problems for arriving inmates, and when inmates moved housing within the
institution; also problems with medication continuity for inmate returning from DMH; continuity
of medications when prescriptions renewed was not reviewed); 260 (CCI: continuity on arrival
and on changes in housing "remained problematic"); 269 (CIM: continuity on arrival a problem,
other continuity issues unclear); 321 (CIW: noting "gaps in medication for new arrivals" to the
EOP unit and noting erratic medication administration for inmates on Keyhea); 328 (CCWF:
problems with medication gaps on arrival); 335-336 (VSPW: continuity for newly arriving
inmates "retrogressed;" continuity on the renewal of medications "remained an intermittent
problem"). See also Summary Section at 359 (noting widespread problems at many institutions
and a lack of data elsewhere).

[15]     See Fourteenth Report at 167 ("Because the continuity of medications associated with
changes in location within a facility involves inmates totally within the control of CDC and the
institution at both ends of the movement, one expected substantially fewer interruptions than on
inmates' arrival from outside the institution or CDC. The incidence of such interruptions,
contrary to expectation, was considerable…administrative segregation units, administrative
segregation overflow units and SHUs, typically involved the longest delays in medication
delivery."); See Thirteenth Report at 249.

[16]     See Draft Report at 35 ("Medication was not administered DOT at HDSP"); 61 (MCSP:
"The monitor observed one evening EOP pill line where no DOT procedures and few nurse-
administered procedures were followed."); 105 (SOL: no DOT procedures); 131 (DVI: DOT
procedures only partially implemented); 188 (SVSP: failure to provide medications DOT to all
Keyhea inmates); 188 (SVSP: noting "troubling signs that medication administration was neither
well observed nor well documented in the EOP units" and "anecdotal reports of hoarding, both
oral and written."); 228 (WSP: "all medications, however, were actually delivered as nurse-

(continued on next page)

J. Michael Keating
December 12, 2005
Page 22

the summary section, "[t]he department needs to do much more educational work with institutions to ensure the ultimate implementation of its new approach to DOT, nurse-administered medication." *See* Draft Report at 358. Defendants are unable to act without clear guidance and specific deadlines.

     (e)    Laboratory Testing. This is another area where statewide training and oversight is needed to correct widespread problems.[17] The failure to do this testing places inmates at great risk. Defendants must be required to address this issue quickly and systemically.

     (f)    Keyhea Tracking: Finally, the inability of the CDCR to effectively track MHSDS inmates for whom Keyhea Orders are obtained is quite serious, and requires immediate attention. In at least one suicide, the failure to track a Keyhea Order, which expired after the inmate transferred to Corcoran, was identified as a problem in the Suicide Report's Corrective Action. *See* Suicide Report of [NAME REDACTED].

     Plaintiffs request the following recommendations to address the medication management issues discussed above: (1) defendants should be directed to provide

---

(continued from previous page)
administered, even though the staff referred to some medication delivery as DOT."); 312 (CEN: "inmates complained that DOT was performed inconsistently"); 329 (CCWF: "development of DOT procedures continued to lag"); 357 (VSPW "had appropriate procedures in place, but they had not yet been implemented.")

[17]    *See* Draft Report at 23 (PBSP: "Clinicians did not consistently order appropriate laboratory testing for inmates on mood-stabilizing medications . . .. Clinicians did not always respond to abnormal test results."); 37 (HDSP: "appropriate blood tests were not always ordered"); 62 (MCSP: "some continued problems with laboratory testing"); 70 (SCC: The institution had difficulty providing laboratory testing for inmates on mood-stabilizing medications."); 105 (SOL: lab tests untimely); 111 (SQ: problems with lab testing); 131 (DVI: "the monitor reviewed 10 charts of inmates on mood-stabilizing medications and found that the laboratory testing protocol had been followed fully in only one of the ten reviewed cases."); 189 (COR: lab tests "frequently were not ordered as needed" and "responsive reaction occurred in only about half of the cases of abnormal results"); 228 (WSP: unable to review issue because data on issue collected by WSP badly organized); 238 (NKSP: no audit done of whether appropriate lab testing being done); 261 (CCI: "Laboratory blood work was not consistently provided for inmates on mood stabilizing medications."); 293 (RJD: no report on whether lab testing being done appropriately); 337 (VSPW: "The extent to which laboratory testing was provided for inmates on mood-stabilizing medications was uncertain.")

J. Michael Keating
December 12, 2005
Page 23

additional system-wide training within sixty days to all CDCR institutions on each of
these issues, (2) defendants should be directed to implement within sixty days an
accurate, updated Keyhea Tracking List that is the responsibility of an actual, named
person within CDCR who will provide the updated list monthly to all CDCR institutions,
and (3) defendants should be required, as part of its expansion of DCHCS staff, to create
a position for a person with experience in correctional health care management to manage
the CDCR's medication efforts system-wide.

C.   **Modification of the RVR Policy Is Required to Provide A Mental
     Health Assessment Component to Appropriate 3CMS Patients**

In 2001, Judge Karlton ordered defendants to revise their policies and procedures
for conducting the assessment of MHSDS inmates charged with RVRs, and to implement
the new procedures. 12/19/01 Order at ¶ 4.

Nearly five years later, the CDCR has implemented an RVR policy that provides
some but not all of EOP and MHCB patients with mental health assessments. In roughly
one-third to one-half of the assessed cases, the procedure results in "some sort of
modification in the outcome of the disciplinary process, whether through dismissal of or
reduction in the sanction imposed." Draft Report at 373. For this small group of
*Coleman* class members, the RVR Policy, while imperfect and a work in progress, offers
some hope of addressing the Court's concern that "mentally ill inmates who act out are
typically treated with punitive measures without regard for their mental status." *Coleman
v. Wilson*, 912 F.Supp.1292, 1320 (E.D.Cal. 1995).

The Draft Report, however, clearly documents the inaccessibility of the mental
health assessment component of the RVR process for 87% of the *Coleman* class –
namely, those 3CMS patients who are charged with a rules violation:

> In CSP/LAC, with a 3CMS population in excess of a thousand inmates, no
> 3CMS inmates were referred during the monitoring period…At SVSP, also
> with a 3CMS population of roughly a thousand inmates, only a handful of
> 3CMS inmates with RVRs were referred for a mental health assessment.
> MCSP had just five referrals of 3CMS inmates in all of 2004, while CIW
> referred three of 144 inmates charged with infractions for an assessment.
> CRC referred five 3CMS inmates in the year preceding the monitor's visit
> and ASP made none in all of 2004.

*See* Draft Report at 270-271. Despite these findings, the Draft Report does not conclude
that the current process is inadequate for 3CMS inmates. Rather, a "test" was developed
at five sites to determine whether there are 3CMS patients charged with RVRs who
**should** have been referred. The "test" was limited to a review of the face of the RVR.
Based only upon the facts alleged in the RVR, it was determined that in the five prisons
where a "sampling" of 3CMS patients were reviewed, only **one** additional 3CMS patient

J. Michael Keating
December 12, 2005
Page 24

was identified who "arguably" should have been referred but was not. *See* Draft Report at 371. The actual size of the "sampling" was not indicated in the Draft Report.

Plaintiffs have strong objections to this finding. First, this type of sampling is on its face inadequate to test whether 3CMS patients at these institutions were appropriately referred for a mental health assessment. The current standard for a referral is whether the particular inmate's behavior is unusual, uncharacteristic or bizarre *for that inmate*. But reviewing the face of an RVR is an impossible way to tell whether the inmate should have been referred.[18]

Moreover, such a test misses the point: Almost no 3CMS inmates are being referred for mental health assessments despite the Draft Report which documents the CDCR's lack of compliance with basic Program Guide requirements at all institutions, including medication management, which for the majority of 3CMS patients is the only mental health care provided to them. Under such conditions it is absurd to accept that there are virtually **no** 3CMS patients in the CDCR whose mental illnesses contributed to the behavior that led to the RVR which they were issued.

From a broader policy perspective, the facts in the Draft Report speak for themselves. 3CMS patients, who comprise 87% of the Coleman class, have been excluded from the mental health assessment process. That process was identified by the Court as the most effective means of remedying two serious problems of a constitutional dimension -- punishment when behavior results from mental illness and excessive placements of mentally ill inmates in isolated and therapeutically damaging administrative segregation units. *See* 12/21/98 Special Master's Recommendations on Administrative Segregation, Involuntary Medications and Identifier Coding at 4.

Plaintiffs have previously proposed modifications to the RVR policy to ensure that more 3CMS patients would receive mental health assessments. *See* Plaintiffs 10/25/02 Letter to Keating. We proposed the following expansions of the class of persons automatically given an assessment to include (1) all 3CMS inmates charged with a serious rules violation that could result in a SHU term or DA referral and (2) any 3CMS patient with multiple RVRs during a specified period of time. The numbers of 3CMS patients in administrative segregation and SHU, and the deterioration experienced by these patients supports an extension of this remedy. We have also suggested requiring that a certain percentage of 3CMS patients at each institution to be automatically referred for a mental health assessment when issued an RVR in order to ensure that some of these

---

[18]    At a minimum, testing the appropriateness of 3CMS referrals should include a review of the inmate's UHR (to review medication compliance, recent crisis bed admissions, recent clinical notes, chronos re recent behavior) and the inmate's central file (to look for a counseling chrono re unusual behavior, pattern of recent RVRs, note re recent death in the family, recent court decision, etc.).

J. Michael Keating
December 12, 2005
Page 25

MHSDS inmates are provided with this remedy and to provide institutions with an incentive to develop appropriate screening tools.

Plaintiffs request (1) a recommendation that within 90 days from entry of the court's order defendants provide additional system-wide training to all custody staff, including hearing officers on the mental health component of the RVR Policy and file a report with the Special Master on the completion of this training, and (2) that the Special Master direct defendants to modify the existing RVR policy to provide mental health assessments to the group of 3CMS patients who are issued serous rules violations that could result in a SHU term or DA referral and to all 3CMS patients who have been issued three or more RVRs within a three month period of time.

### D.   Persistent PSU Transfer Delays at CSP-Corcoran

Corcoran's failure to transfer EOP patients housed in their Administrative Segregation Hub and SHU unit into PSU beds is not a new issue. Transfers to the PSUs slowed during the Fourteenth Round. *See* Fourteenth Report at 178.

During the 15th Round monitoring at Corcoran, the monitor found that the "defendants' policy commitment in April 2004 to move inmates in need of a PSU placement in spite of pending disciplinary charges was <u>essentially inoperative</u>." *See* Draft Report at 154. According to the monitor who reviewed the numerous cases of EOPs waiting at Corcoran for PSU transfer:

> Preventable delays accounted for a significant number of long stays in administrative segregation or the SHU. In several cases, a lack of CSR endorsement added three or four months to the wait. Breakdowns in the institution's processing of cases occurred regularly, and it appeared that processing was stalled by pending disciplinary charges in other instances. The transfer of one EOP inmate was delayed six months because a classification services representative (CSR) withheld endorsement to a PSU until a BPT hearing was held. In the same case, nearly six months more elapsed between endorsement and transfer. In another case, an inmate with SHU status was designated EOP, but his case was not referred to the CSR for endorsement for over three months.

*See* Draft Report at 155. The process to expedite PSU transfers developed by defendants in response to the January 12, 2004 Order has not been implemented at CSP-Corcoran. *See* Defendants' Plan filed in response to January 12, 2004 Order, attached hereto (referencing timelines for PSU endorsements) (**Exhibit M**).

Plaintiffs request a recommendation that CSP-Corcoran immediately implement the process developed by defendants in response to the January 12, 2004 Order. In addition, the Warden of CSP-Corcoran should be directed to prepare a monthly report which is filed with the Special Master listing all EOP patients housed in their SHU and

J. Michael Keating
December 12, 2005
Page 26

administrative segregation units, along with the status of any SHU term, pending RVR hearing, CSR endorsement, BPT hearing and an explanation for each EOP patients' retention at CSP-Corcoran. The Warden at CSP-Corcoran shall be directed to transfer EOP patients endorsed for a PSU bed within sixty days.

**E.**    **Modification of the "Pilot Project" in the Administrative Segregation Unit at Pelican Bay State Prison.**

The Draft Report addresses defendants' PBSP "Pilot Project" to provide expanded services in administrative segregation for inmates discharged from the PSU and for inmates placed in administrative segregation for non-disciplinary reasons. *See* Draft Report at 27-28. Plaintiffs were provided with a copy of the "Pilot Project" by Madrid Special Master John Hagar and have had an opportunity to review it.

Although plaintiffs' comments address some specific concerns about the Pilot Project, we fully support the general concept that these inmates should be provided with increased clinical programming and property so that they will not decompensate. There are also patients housed in administrative segregation for disciplinary purposes, who for clinical reasons will require the increased services of the Pilot Project and should be included in the program, and defendants should implement staffing ratios that will permit services to at least some inmates in this additional group.

However, plaintiffs object to the Pilot Project's failure to comply with existing Coleman Program Guide Standards that mandate weekly case manager contacts in administrative segregation. *See* Program Guides, Section 8-7, May 1997. The Pilot substitutes weekly case manager contacts with a case manager contact every two weeks and an unspecified amount of group therapy (the specific amount to be determined by the patients' Level, an IDTT process which may find the patient ineligible due to a compelling clinical or custody reason and by the number of patients refusing groups). The program makes no provision for patients who refuse group therapy or who are found ineligible for group therapy by their IDTT. At the very least, these excluded patients must be provided with a private, confidential weekly session with their case manager. All other patients should also be provided with a private, confidential weekly case manager session, as well as the "enhanced mental health services".

The Pilot Project uses a Level System in order to encourage participation in treatment and good behavior within the administrative segregation unit. Patients who do not participate actively will have their Step Levels reduced without reference to their own treatment plan. However, for a treatment resistant patient, 50% participation may be full participation. Under the Pilot Project, such a level of participation would not be rewarded, but instead would likely result in a removal of the patient's appliances and a drop in his Level to reduced group therapy. The Pilot Project should be modified to require an IDTT decision regarding any Step reduction for lack of participation-- reductions in Step Levels must be approved by an IDTT rather than by custody staff.

J. Michael Keating
December 12, 2005
Page 27

The Pilot Project -- with the modifications discussed above -- is an important step in recognizing the increased clinical needs of EOP patients discharged from PSU programs, as well the clinical needs of 3CMS patients housed in administrative segregation units for long periods of time while they wait for SNY placements, investigations or DA referrals.

The same clinical concerns that underlie the program at PBSP apply to inmates discharging from the CSP-SAC PSU. Similar clinical concerns also support expansion of this protocol to cover 3CMS patients who are housed in SAC's administrative segregation. The Monthly DCHCS documents list one hundred and three (103) 3CMS patients in SAC's administrative segregation unit with lengths of stay greater than 180 days. (**Exhibit N:** Health Care Placement Unit, 9/2/05, provided December 8, 2005.) By way of contrast, PBSP only has twenty-one (21) such inmates. *See* **Exhibit N**.

Plaintiffs request a recommendation that defendants amend the PBSP Pilot Project to provide weekly case manager contacts to meet existing <u>Coleman</u> Program Guides standards. Plaintiffs also request a recommendation that defendants be directed to develop and implement a plan in time for inclusion in the FY2006-2007 Budget for expansion of the Pilot Project at PBSP to CSP-Sacramento's administrative segregation unit.

F.  <u>Psych Tech Rounding in Administrative Segregation Units</u>

On July 23, 1999, the Court ordered defendants to provide seven-day a week psych tech coverage in each administrative segregation unit. 7/23/99 Order at ¶ 6(a).

Due to persistent problems implementing this Order, the Court has issued several subsequent orders on the same issue. First, on April 24, 2002, the Court issued an order directed at CSP-Lancaster when it was determined that the institution was in violation of the Court's July 1999 Order. 4/24/02 Order. The April 2002 Order forbade any transfers of EOP administrative segregation inmates to CSP-Lancaster until the Special Master determined that psych tech rounding was occurring seven days a week and that CSP-Lancaster had developed an adequate plan for providing structured therapeutic activities for its EOP patients. *See* 4/12/02 Order at ¶ 4.

Later, the Court addressed inadequate psych tech rounding at fifteen CDCR prisons in the June 12, 2002 Order. 6/12/02 Order at ¶ 5. That Order also directed defendants to ensure that daily rounds were actually provided in the administrative segregation hubs at CSP-Corcoran, San Quentin and Salinas Valley State Prison. *See* 5/12/02 Order at ¶ 6. This data is reportedly monthly in the DCHCS documents.

The Draft Report identifies renewed problems with psych tech rounding system-wide that must be addressed immediately. Hopefully these new problems do not indicate any recent institutional expectations that psych tech rounding requirements will be changing because of the Revised Program Guides. This issue is contested and will be

J. Michael Keating
December 12, 2005
Page 28

litigated by plaintiffs.  The existing Court orders remain in place.  The Draft Report does not include data on psych tech rounding at many of the institutions monitored during the 15th round monitoring period.  (Corcoran, SATF, CCI, CMC, SVSP, CIM, RJD, CRC, ISP, WSP, LAC, CTF).  Presumably psych tech rounding at these institutions remains resolved.  However, the Draft Report documents psych tech rounding failures at eight institutions.[19]  Subsequent monitoring at RJD revealed that staff may actually be falsifying documentation to show compliance.

The population pressures currently being experienced within CDCR, which frequently require the use of administrative segregation overflow units, presents a challenge to institutions that must comply with existing court orders without additional staffing resources.

Plaintiffs request a recommendation that defendants be directed to issue a memorandum within 30 days from the entry of the court's order to all CDCR institutions setting forth the court-ordered psych tech rounding requirements for administrative segregation units, including overflow units.  To the extent that any institution fails to comply with the court ordered requirement and knowingly misrepresents their compliance to the court monitors, there should be sanctions sought against the Warden of that institution and the CDCR.  The Wardens at those institutions that failed to comply with psych tech rounding during the 15th round monitoring or were unable to show compliance (Avenal, CSP-Sacramento, SCC, San Quentin, Calipatria, CCWF, Solano, and Valley State) should be directed to certify through a report filed with the Special Master monthly that psych tech rounding seven days a week is currently occurring in the administrative segregation units at their institution.  If psych tech rounding is not occurring seven days a week, the Warden must provide an explanation and a timeline for coming into compliance.

---

[19]    At Avenal there was 43% compliance with daily psych tech rounding for January through August 2004 with some improvement said to have occurred after June 2004 with no documentation to support it (at 182); at CSP-Sacramento daily psych tech rounds not conducted in newly activated ASU (at 11); at SCC the frequency of psych tech rounds was unclear with departmental audits reporting only 60 percent compliance with daily rounding and staff audits showing near compliance (at 75); at Solano documentation of psych tech rounds in administrative segregation and the overflow unit were deficient (at 103); at SQ psych tech rounds in administrative segregation, an issue previously resolved, were problematic once again (at 125); at CAL the time spent rounding was inadequate to complete comprehensive and interactive meetings (at 310); at CCWF the frequency of psych tech rounds in administrative segregation, which had been resolved, was problematic again (at 332); and at VSPW problems with psych tech rounding, which had been resolved, resurfaced due in part to staffing vacancies and turnover. (at 342).

J. Michael Keating
December 12, 2005
Page 29

### G.     SHU Psych Tech Rounding Report

The Draft Report is silent on the quality and quantity of psych tech rounding that the monitors observed during the 15th round tours in the CCI and Corcoran SHUs. Both institutions have CAP items that address psych tech rounding in their SHU units. *See* Corcoran CAP Item 31; CCI CAP Item 33.

The monitors visited Corcoran three times during the monitoring period and during two of the phone exits psych tech rounding in the SHU was discussed. Plaintiffs request that information regarding Corcoran's provision of psych tech rounding to inmates housed in the Corcoran SHU be reported in the Final Fifteenth Report.

The Coleman monitors toured CCI in November 2004. The 14th Monitoring Report noted that psych techs conducted daily rounds of the administrative segregation unit, but there was no report on SHU rounding. *See* Fourteenth Report at 10. However, during the phone exit after the 14th round visit to CCI, the monitors reported on psych tech rounding practices in the SHU, yet this data was not included in the Fourteenth Monitoring Report. Similarly, there is no report on the status of psych tech rounding in the CCI SHU in the current Draft Report. The Draft Report does identify increased caseloads at CCI and a staffing vacancy rate of 40 percent but no data on whether psych tech rounding in the SHU has been maintained at required levels. *See* Draft Report at 258. Plaintiffs request that information regarding the status of psych tech rounding to inmates housed in the CCI SHU be reported in the Final Fifteenth Report.

### H.     Specific Order to Address RJ Donovan

In the past the Court has issued specific orders designed to assist individual institutions in need of focused attention by DCHCS staff.[20] RJD has previously been the subject of this type of order. *See* 7/26/04 Order at ¶¶1A, C, and D (imposing a population cap on its hub EOP administrative segregation program, requiring the development of a plan for replicating in RJD strategies for the procurement of permanent and contracted clinical staff used effectively at PBSP, and requiring the development of a plan to provide focused assistance from headquarters).

The Plan submitted to the Court in response to the July 26, 2005 Order did not adopt the proposal for bonuses which were effectively used at PBSP in filling staffing vacancies. According to the Plan submitted

---

[20]     *See, e.g.*, July 26, 2004 Order ¶ 1: Defendants shall develop brand new plans to bring Corcoran, HDSP. RJD, and SVSP into compliance with their respective corrective action plans (CAPs), the program guides, and the plans, policies and protocols provisionally approved by this court in mid-1997.

J. Michael Keating
December 12, 2005
Page 30

> [t]he current situation at RJD is unlike what prevailed earlier at PBSP, or
> that prevails now at HDSP, which justify the application of special
> compensation.  RJD is located in what is considered one of the premier
> places in California to work and live, due to its tropical weather and close
> proximity to a major urban environment, complete with multiple
> universities.

September 27, 2004 Letter to Keating at 3 (**Exhibit O**).  Instead, the Plan identified lack
of proper management and a general shortage of licensed psychiatric technicians as the
reasons for the staffing shortages at RJD and noted that these factors were being
addressed.  No specifics were provided in the Plan.  (Id.)

   The Draft Report documents serious staffing vacancies that have not been
sufficiently addressed by the plan developed in response to the July 26, 2004 Order.
Vacancies in psychiatry (30%), case managers (22%), senior psychologists (33%), and
recreational therapists (50%) adversely affect the program. *See* Draft Report at 289-290.
The institution does not use contractors to fill most vacant positions and the staffing
vacancies impact on medication management, adequacy of treatment for caseload
patients in reception centers and administrative segregation, and on staff relationships
with each other and with inmates in the EOP unit.  *See* Draft Report 291-298.

   The Draft Report concludes with the hope that "this monitoring round marked
both the nadir of RJD's compliance efforts and a critical turning point." *See* Draft Report
at 301.  Unfortunately, the report during the 16th Monitoring period does not indicate a
turn-around for RJD.  According to the Phone Exit on November 7, 2005, over-crowding
in the reception center, the mainline and the administrative segregation units has
seriously impacted on the ability of the institution to provide adequate mental heath care.
Despite the July 26, 2004 Order capping the Hub population at 63, the institution
reportedly violated this order repeatedly -- on May 16, July 5-8, July 14, August 22, and
September 12-15, 2005.  Phone Exit, November 7, 2005.  In addition to the
administrative segregation overflow unit that has consistently failed to provide adequate
mental health care (Building 7, Facility 2), the institution has also created an
administrative segregation overflow unit (Building 16), which is located on a reception
center yard and has no access to a recreational yard.  Mentally ill inmates housed in this
"ad hoc" ad seg unit have not been provided with required daily psych tech rounds
despite reports from the institution, including apparently falsified documentation.
Similarly, although the heat log in the housing units indicated that the temperature was 70
degrees every day, the thermometers in the units were broken and could not have
registered these temperatures.  These revelations regarding the institution's
documentation of psych tech rounding and heat logs raise serious concerns and indicate a
need for closer scrutiny by DCHCS while the institution struggles with its multiple
missions, understaffing, overcrowding and leadership concerns.

J. Michael Keating
December 12, 2005
Page 31

RJD needs at least as much focused attention as that given to CSP-Lancaster following the March 11-13, 2002 monitoring tour there and the discovery that the institution was not conducting psych tech rounding seven days a week as reported. In that case, the Special Master recommended specific orders directed at Lancaster to ensure that the institution was carefully monitored by both DCHCS and the monitors before additional caseload inmates could be transferred to the institution. These orders ensured that the CDCR and CSP-Lancaster understood the seriousness of the reporting responsibilities and staffing obligations imposed by the Court. Furthermore, it ensured that the EOP patients housed at the facility had a chance at receiving adequate mental health services. Defendants were not permitted to resume expansion of the EOP population at Lancaster until certification to the court by the Special Master that the institution had met certain requirements of the April 24, 2002 Order.

RJD cannot solve its current crisis without Court-ordered direct assistance from CDCR. Such assistance must include reduction in the institution's overall population, reduction of the caseload population and directed assistance in hiring. Furthermore, there must be consequences for the institution's failure to participate in the monitoring process in good faith. Plaintiffs request that the Special Master direct defendants to develop and implement within 60 days from the entry of the Court's order a plan for reducing the population – both total prison and caseload population – at RJD to ensure that the institution has adequate mental health staff to meet its staffing ratios for its current caseload population, including its reception center population. Furthermore, the Warden of RJD and the Director of CDCR shall be directed to file with the Special Master certified monthly reports detailing the institution's compliance with the following: (1) July 26, 2004 Order limiting the Hub Population to a maximum of 63 patients; (2) daily psych tech rounding in all of its administrative segregation units, including all overflow units; (3) accurate temperature logs for all housing units during the spring and summer 2006; and (4) no EOP patients are housed in the overflow administrative segregation units.

Finally, the Special Master should direct defendants to develop a plan sufficiently timely for inclusion in the FY2006-2007 Budget for replicating in RJD the strategies for the procurement of permanent and contracted clinical staff used effectively at Pelican Bay State Prison, as previously ordered on July 26, 2004. 7/26/04 Order at ¶ 1C.

## I.    Report on Video-Monitoring

Defendants informed plaintiffs on May 16, 2005 that they had replaced one-on-one suicide watch of inmates by an officer sitting at the inmate's cell door with video-monitoring at a minimum of nineteen different CDCR institutions. At that time, plaintiffs requested copies of the institutional operating procedures as well as any statewide directives regarding video monitoring. Through the review of the CDCR Memorandum to the field, as well as a review of the institutional procedures, it became evident that

J. Michael Keating
December 12, 2005
Page 32

video monitoring of inmates on suicide watch was first implemented in 2001 to save officer overtime pay. *See* January 19, 2001 Memorandum to All Wardens from Larry Witek, attached hereto (**Exhibit P**).

Suicide watch procedures, OHU and MHCB facilities have been monitored in Coleman for years. Plaintiffs requested that the Fifteenth Report include the court monitors' observations of the video-monitoring practice being utilized by defendants in their OHUs and MHCBs system-wide. To the extent that monitors observed this during their current round tours, we requested that this data be included in the Final Fifteenth Report.

It is our understanding that the implementation of the Video-Monitoring Policy recommended by the court monitors at the June 16, 2005 Policy meeting and distributed to the field in the July 22, 2005 Memorandum is being reviewed during the 16th Round monitoring visits. Plaintiffs request that an interim report on video-monitoring practices be issued so that any necessary modifications of the Policy recommended by the court monitors or recommendations regarding the current practices at institutions can be made without waiting for the completion of the Special Master's Sixteenth Monitoring Report.

## CONCLUSION

Plaintiffs recognize that these lengthy comments and requested recommendations place additional duties upon defendants at a time that CDCR is facing multiple demands. It is clear, however, that absent Court orders, defendants cannot act. Unfortunately, the issues identified above all require attention to prevent class members from continued harm. Many of these issues have been flagged repeatedly and the time for action is now and not at some speculative time when CDCR becomes better organized or populations decrease or staffing improves. Prevention and aggressive preservation of what Coleman has achieved is critical at this point. Plaintiffs' recommendations, including the revisions to the Draft Report's Recommendations are listed below:

### Draft Report Recommendations with Modifications

1.       The defendants shall develop and implement a plan to achieve full compliance with existing staffing ratios for psychiatrists, system-wide, at no more than ten percent vacancy rate, by March 1, 2006. Included shall be a plan for maintaining the rate of vacancies among psychiatrists at ASP, HDSP and VSP also at a maximum of ten percent. If defendants are not in compliance with the court-ordered staffing ratios for psychiatrists by April 1, 2006, the Special Master shall make recommendations to cap the caseload population at particular institutions or system-wide. The plan shall consider the need for increases in R & R differential payments, the reduction of MHSDS population and/or programs offered in the facilities, the relocation of programs in those facilities elsewhere or any combination of these approaches.

J. Michael Keating
December 12, 2005
Page 33

2.     The defendants shall develop and submit no later than 60 days from entry of the court's order a plan for the expansion of DCHCS central office mental health staff commensurate with the growth and present size of the CDCR mental health staff and caseload in time for inclusion in the FY2006-007 Budget and should include in the plan the creation of three specialized DCHCS positions to address DMH inpatient, MHCB, and Medication Management efforts system-wide.  Defendants should also be required to obtain any necessary authority from all applicable agencies as soon as possible and no later than 60 days after the FY2006-2007 Budget is approved to hire the DCHCS expanded central office mental health staff positions.  The plan must address the issue of compensation for headquarters staff and provide a scale of pay that assures that clinicians (including psychiatrists, psychologists, psych social workers, psych techs and RNs), policy and program developers and supervisors (including health program specialists and analysts) and correctional counselors, who work at central office receive a level of salary higher than that of any comparable institutional clinicians, including whatever R&R differential pay such institutional clinicians may be entitled to.  Defendants shall be required to provide a monthly update to the Special Master on the status of their compliance with the staffing ratio for psychiatrists and all other clinical positions and with the implementation of the plan for expansion of the DCHCS central office mental health positions.

3.     Defendants, in conjunction with DMH, and DHS, should be required to submit within 45 days from entry of the court's order a plan for the provision of acute and intermediate inpatient beds for all seriously mentally ill male and female inmates in CDCR clinically determined to be in need of these levels of inpatient care.  The plan must address 100% of the identified interim and long-range needs based on up-dated population projections and the results of the UNA study, detail any financial and construction plans, timetables and staffing requirements needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 2006-2007 Budget.  All identified needs must be addressed by programs to be fully operational no later than January 1, 2008.

In addition, the plan must include the following:

(a)     Defendants and DMH shall prepare a report concerning the feasibility of hardening a portion of the new CSH facility and providing care to Level III and Level IV CDCR patients therein.  Defendants shall provide detailed documentation concerning any alleged security problems that prevent them from doing so, including written reports by qualified security professionals explaining why this newly built maximum security state hospital for sexually violent predators is not capable of housing Level III and IV CDCR prisoners and what staffing or construction, if any, is necessary to permit such housing at CSH.

J. Michael Keating
December 12, 2005
Page 34

     (b)     Defendants, the Department of Health Services ("DHS") and DMH shall report on the feasibility of immediately expanding the ICF treatment program at ASH for CDCR inmates rather than reducing overbedding there. This report should include the steps necessary to add a minimum of 75 new beds in addition to the 175 new beds previously promised by DMH for CDCR inmates at ASH and CSH by mid-2006.

     (c)     Defendants and DMH shall develop a plan that sets forth the feasibility and cost of accelerating the pace of construction so that (1) the planned 112-bed Level IV ICF in the current SVSP D-yard EOP space is available to begin treating inmates by December 31, 2006 rather than mid-2008, and (2) the planned 64-bed expansion of the SVPP program is open and ready for occupancy by July 1, 2007, rather than 2009. This plan shall include reports from the various contractors responsible for the projects and should consider options such as working 2-3 shifts a day and seven days a week.

     (d)     Defendants' plan shall include an ongoing training and supervision component for ensuring that CDCR clinicians refer all appropriate cases to inpatient care and that CDCR headquarters monitors and supervises the process of referral.

     (e)     DMH and CDCR should be directed to jointly submit a plan or procedure within 30 days from the entry of the court's order that will ensure that DMH discharge summaries for all CDCR inmates sent to DMH are promptly provided and placed in the inmate's UHR when they return from DMH.

    4.     The defendants should be required to submit within 45 days from the entry of the court's order a plan for the provision of Mental Health Crisis Beds for all seriously mentally ill male and female inmates in CDCR within 24 hours of a clinical determination that they require that level of mental health care. The plan must address interim and long-range needs based on updated population projections; detail any financial and construction plans, timetables and staffing requirement needed to meet the needs; and ensure that construction and financial elements of the plan are sufficiently timely for inclusion in the FY 006-2007 Budget. The plan shall also include the following elements:

     (a)     A plan and schedule for maximizing the use and availability of all MHCB beds in the short term by (1) moving long term medical care cases out of CTCs, (2) expediting discharges from MCHB units of inmates whose clinical need for MHCB placement has ended, (3) expanding the

J. Michael Keating
December 12, 2005
Page 35

MHCB swing beds available in the short-term through staffing augmentations, (4) continuing to operate the eight overflow MHCB beds at Corcoran that were used for NKSP inmates while the NKSP MHCB unit was closed recently.

(b)     As part of the plan, defendants should provide updated Tucker-Allen MHCB capacity projections for the next six years. These updated projections shall take into account the current overflow MHCB population that is inappropriately housed in OHUs, administrative segregation units, and ZZ cells, and should include a plan to phase out of dangerous and unauthorized current use of OHUs, administrative segregation units, and ZZ cells used for these patients. The overall MHCB expansion plan should provide for enough new MHCB beds to meet the needs identified in this projection by January 1, 2008.

(c)     A plan for accelerating the staffing and licensing of the new MHCB unit at Kern Valley State Prison, and the new MHCB beds at CSP-SAC, so that they are both licensed and operational by June 30, 2006, and a plan for accelerating the construction, staffing, and licensing of the new MHCB unit at CMF so that it fully licensed and operational by January 1, 2008. Defendants shall also cease their current practice of removing patients from CTC units in order to facilitate licensing surveys. Defendants shall also meet with DHS officials and the Special Master and Plaintiffs' counsel to explore ways of accelerating licensing of the remaining CTC units and new units built in the future.

(d)     A plan to ensure that DCHCS population management staff are available 7-days-a-week to coordinate placements of inmates needing MHCB care.

**Additional Recommendations**

5.     The defendants shall develop and implement a plan within 30 days from the entry of the court's order for the creation of several reception center EOP units that can provide at least ten hours of structured therapeutic treatment to (1) all EOP reception center patients that have been waiting longer than 60 days in a reception center and (2) all "at risk" reception center patients who have been determined to need enhanced care while they wait to be transferred.

6.     The defendants shall be directed to provide additional system-wide training within 60 days from the entry of the court's order to all CDCR institutions regarding the following medication management concerns: Medication non-compliance standards, HS medication prescriptive indicators, DOT procedures, medication continuity and laboratory testing requirements.

J. Michael Keating
December 12, 2005
Page 36

7.      The defendants shall be directed to implement within 60 days from the
entry of the court's order an accurate, updated Keyhea Tracking list that is the
responsibility of an actual, named person within CDCR who will provide the updated
Keyhea Tracking List monthly to all CDCR institutions. Defendants shall be directed, as
part of their expansion of DCHCS staff, to create a position for a person with experience
in correctional health care management to manage the CDCR's medication efforts
system-wide.

8.      The defendants shall be directed to provide additional system-wide training
to all custody staff, including hearing officers, on the mental health component of the
RVR Policy, and file a report with the Special Master on the completion of the training.
This training shall occur within 90 days from the entry of the court's order.

9.      The defendants shall be directed to modify the existing RVR policy to
include the provision of mental health assessments to 3CMS patients who are issued
RVRs for serious rules violations that could result in a SHU term or DA referral and to
3CMS patients who have been issued 3 or more RVRs within a 3 month period of time.

10.     Defendants shall be directed to immediately implement the process to
expedite PSU transfers developed by defendants in response to the January 9, 2004
Order. The Warden of CSP-Corcoran shall be directed to prepare a monthly report which
is filed with the Special Master listing all EOP patients housed in their SHU and
administrative segregation units, along with the status of any SHU term, pending RVR
hearing, CSR endorsement, BPT hearing, and an explanation for each EOP patient's
continued retention at CSP-Corcoran. The Warden shall be directed to transfer EOP
patients endorsed for a PSU bed within 60 days.

11.     Defendants shall be directed to amend the PBSP Pilot Project to provide
weekly case manager contacts to meet existing Coleman Program Guide standards.
Plaintiffs also request a recommendation that defendants be directed to develop and
implement a plan for expansion of the Pilot Project developed for PBSP to CSP-
Sacramento's administrative segregation unit in time for inclusion in the FY2006-2007
Budget.

12.     Defendants shall be directed to issue a memorandum within 30 days from
the entry of the court's order to all CDCR institutions setting forth the Court-ordered
requirement for seven-day a week psych tech rounding in all administrative segregation
housing units, including overflow units. The Wardens of Avenal, CSP-SAC, SCC, San
Quentin, Calipatria, CCWF, Solano and Valley State shall be required to certify through a
report filed with the Special Master that psych tech rounding is occurring seven days a
week in the all of the administrative segregation units at their institutions. If psych tech
rounding is not occurring, the Warden must provide an explanation and a timeline for
coming into compliance in the report filed with the Special Master.

J. Michael Keating
December 12, 2005
Page 37

     13.    The defendants shall be directed to develop and implement within 60 days from the entry of the court's order a plan for reducing the population at RJD to ensure that the institution has adequate mental health staff to meet its staffing ratios for its current caseload population, including its reception center population. The Warden of RJD and the Director of CDCR shall be required to file with the Special Master certified monthly reports detailing the institution's compliance with the following: (1) the July 26, 2004 Order limiting the Hub population to a maximum of 63 patients, (2) daily psych tech rounding in all of its administrative segregation units, including all overflow units, (3) accurate temperature logs for all housing units during the spring and summer 2006; and (4) no EOP patients are housed in the overflow administrative segregation units. Defendants shall be directed to develop a plan sufficiently timely for inclusion in the FY2006-2007 Budget for replicating in RJD the strategies for the procurement of permanent and contracted clinical staff used effectively at PBSP, as previously ordered on July 26, 2004. 7/26/04¶1C.

     Please feel free to contact me if you have any questions regarding our comments and objections.

                     Sincerely,

                     ROSEN, BIEN & ASARO, LLP

                     By: Jane E. Kahn

JEK:ts
cc:   Matthew A. Lopes, Jr.
      Lisa Tillman, AG
      Michael Stone, CDCR Legal
      Kerry Hughes
      Mohamedu Jones
      Dennis Koson
      Jeff Metzner
      Ginny Morrison
      Paul Nicoll
      Ray Patterson
      Melissa Warren
      Tricia Williams

# EXHIBIT 8

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

# ROSEN, BIEN & GALVAN, LLP

ATTORNEYS AT LAW
POST OFFICE BOX 390
SAN FRANCISCO, CALIFORNIA  94104-0390
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
LISA ELLS
SHIRLEY HUEY[3]
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LORI RIFKIN[5]
LOREN STEWART
KENNETH WALCZAK[6]
AMY WHELAN
SARAH O. ZIMMERMAN[6]

May 19, 2008

VIA EMAIL

Matthew A. Lopes, Jr.
Coleman Special Master
Pannone Lopes & Devereaux LLC
317 Iron Horse Way, Suite 301
Providence, RI  02908
mlopes@pldlaw.com

Lisa A. Tillman
Deputy Attorney General
Office of the Attorney General
1300 I Street
PO Box 944255
Sacramento, CA  95814
lisa.tillman@doj.ca.gov

Re:   *Coleman v. Schwarzenegger*
       Plan to Improve Mental Health Assessments of CCCMS Prisoner-Patients
       Subject to RVRs
       Our File No. 489-3

Dear Matty and Lisa:

Plaintiffs set forth below our comments on the May 1, 2008 Revised Plan to Improve Mental Health Assessments of CCCMS Prisoner-Patients Subject to RVRs ("May 1, Revised RVR Plan").  Defendants originally filed a plan with the Court on October 1, 2007 [Docket 2440] in response to the Court's August 2, 2007 Order [Docket 2345]. This Order was based upon recommendations made by Special Master Keating in the Seventeenth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols at 105-109, filed 4/2/07 [Docket 2180].

In this Report, the Special Master noted that the mental health assessment process was first introduced in 1998 in response to the *Coleman* court's finding that:

> seriously mentally disordered inmates were often subjected to
> punitive discipline even when their misconduct was attributable to
> their mental illness...As seriously mentally ill inmates incurred
> repeated disciplinary convictions, often for conduct they were barely
> able to control or incapable of controlling, their lengths of stay in

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
[6]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[212197-1]

Matthew A. Lopes, Jr.
Lisa A. Tillman
May 19, 2008
Page 2

> administrative segregation and eventually Security Housing Units
> (SHUs) grew ever longer. Seriously mentally disordered inmates
> grew to occupy a percentage of administrative segregation and
> SHU cells considerably out of proportion to their presence in the
> overall population, yet the defendants still needed to provide them
> with mental health services, only now in an environment that tended
> to accelerate their illness and was inimical to the provision of such
> services. Docket 2180 at 105.

Indeed, in 1998, the Special Master had reviewed the defendants' plan for mental
health input into the disciplinary process and made the following finding:

> It was recognized early that the most efficient way of dealing with
> seriously mentally disordered inmates in administrative segregation
> was, as often as possible, to keep them out of it both for their own
> good and that of the order and security of administrative
> segregation. As of early 1997, however, the defendants' position
> was that mental health considerations should not intrude into
> determinations of guilt for institutional disciplinary infractions. Any
> input on the mental health of an adjudicated offender was deemed
> appropriate only after the determination of guilt, during the
> formulation of an appropriated disposition. Plaintiffs' counsel and
> the master reluctantly acceded to this position, but were skeptical of
> defendants' ability to translate the proposed dispositional input into
> any meaningful reduction in the number of seriously mentally
> disordered inmates confined in administrative
> segregation...Subsequent monitoring confirmed the skepticism.
> <u>Special Master's Recommendations on Administrative Segregation,</u>
> <u>Involuntary Medications, and Identifier Coding</u> ("SM 1998
> Recommendations") at 3, dated December 31, 1998.

Current data on the percentages of CCCMS and EOP prisoners housed in the
administrative segregation and SHUs system-wide confirm the Special Master's concern
that a disproportionate number of MHSDS prisoners are placed and retained in these
locked housing units. We appreciate the efforts made by defendants to review and revise
their mental health assessment process within the disciplinary process so as to increase
the possibility that mitigation will be provided to CCCMS prisoners. However, any
revision to the mental health assessment process must include the goal of significantly
reducing the percentage of mentally ill prisoners housed in the segregated housing units
within CDCR.

[212197-1]

Matthew A. Lopes, Jr.
Lisa A. Tillman
May 19, 2008
Page 3

1.   <u>October 1, 2007 Plan [Docket 2440]</u>

Defendants filed their original plan in response to the August 2, 2007 Order on October 1, 2007. [Docket 2440] This Plan set forth the following process:

(1)    In August 2007, a review of the existing RVR process utilizing both quantitative and qualitative analysis was initiated at CMC-E (200 RVRs randomly selected) and PVSP (2000 RVRs, including the entire sample of RVRs written on CCCMS and some general population prisoners).   At the time that the first plan was filed, the process had commenced and was partially completed. Docket 2440 at 4.  No further updates on the results of the completed data analysis have been provided, although the conclusions were presumably used to develop the May 1, 2008 Revised RVR Plan.

**We request that the final data analysis be provided to the Special Master and the plaintiffs, including any conclusions based upon the analysis?**

(2)    Based upon the partial review, it was determined that the RVR process was not "broken" but required some modifications and a "pilot' was recommended.  Docket 2440 at 2.  The "pilot" would run for six months, and at the conclusion a report would be generated outlining "an analysis of the efficacy of the procedure as well as an analysis of the workload impact." *Id* at 6.

**Was a report prepared concerning the pilot?  We request that any such report and any information derived from the pilot be provided to the Special Master and the plaintiffs.**

(3)    The RVR training module developed in 2003 was reviewed and modifications to the training module were suggested that would include:

a.    Emphasizing to custody staff the importance of specificity when writing the original RVR.

b.    Providing additional training to the hearing officers on identifying prisoners who might benefit from a mental health evaluation based upon information gathered during the RVR process.

c.    Providing training for the clinician RVR coordinator on factors to consider in reviewing the RVR and completing specific training to clinicians who will do the evaluations.  Docket 2440 at 3-4.

**Were these changes made to the training material?  If so, we request that defendants provide the new training materials to the Special Master and plaintiffs' counsel?**

Matthew A. Lopes, Jr.
Lisa A. Tillman
May 19, 2008
Page 4

    2.    <u>Plaintiffs' Comments on October 2007 Plan</u>

    Plaintiffs provided comments on the October 1, 2007 in the form of a letter to Special Master Lopes on January 24, 2008. *See* Trujillo letter dated January 24, 2008 attached hereto. In that letter, we renewed our request that CDCR provide automatic mental health evaluations to CCCMS prisoners who receive multiple rule violations during a short period of time, who receive serious rule violations (including SHUable or other offenses referred to the DA) and for behavior that is "unusual, uncharacteristic, or bizarre" **for that prisoner**. We also provided specific critiques of the proposed Needs Assessment Methodology and asked questions about the design of the Pilot. We did not receive a response to these comments.

    3.    <u>Revised May 1, 2008 RVR Plan</u>

    The Revised May 1, 2008 RVR Plan implements the proposed RJD pilot project, which was initiated on February 5, 2008, and adds several additional review elements which are intended to increase the likelihood that CCCMS prisoners experiencing decompensation or "bizarre, unusual or uncharacteristic behavior" will be referred for a mental health assessment.[1] The additional review requirements include:

    (1)    ASU clinicians will screen each newly admitted CCCMS prisoner during the initial weekly contact in ASU to determine whether or not a referral for a mental health assessment is indicated. This will include a UHR review and a review of the ASU Placement notice.

    (2)    Custody staff will send a copy of each RVR issued to a CCCMS prisoner to the Mental Health Program for distribution to the primary case manager. The primary case manager will review the RVR and make a determination as to whether the prisoner should be referred for a mental health assessment, which would be completed by a clinician other than the primary case manager.

    (3)    Custody staff will be required to review RVR logs for CCCMS prisoners to determine which prisoners have five or more RVRs in a four-week period of time and shall refer those prisoners for a mandatory mental health assessment.

---

[1] Plaintiffs have significant concern regarding the impact of the mental health assessment even if a CCCMS prisoner is referred. We continue to object to a policy whereby the mental health input is considered after the RVR is written and heard, rather than at the point that the behavior occurs and can be evaluated for referral to disciplinary action. Furthermore, even when there is a finding that the prisoner's mental illness contributed to the behavior, mitigation provided during the RVR hearing does not necessarily extend if the prisoner is referred for a SHU term based upon the RVR. For example,[NAME REDACTED]   , a long-term EOP patient, was issued an RVR on 2/23/06 for patting the buttock of an LVN in his housing unit. The 115X found that his mental illness contributed to his behavior, but he was found guilty, and referred for a SHU. Not only was his SHU not mitigated, it was aggravated from 6 to 18 months. Plaintiffs wrote on[NAME REDACTED] behalf to defendants, however, he served his entire SHU term at Pelican Bay PSU despite his positive programming the entire time. Other examples abound.

Matthew A. Lopes, Jr.
Lisa A. Tillman
May 19, 2008
Page 5

These expanded review and referral criteria are positive additions to defendants' Revised May 1, 2008 RVR Plan. We have several suggestions/questions regarding these expanded review and referral criteria. <u>First</u>, we suggest that timeframes be added to these new requirements to ensure that a timely mental health assessment occur for these CCCMS prisoners. <u>Second</u>, we request the basis for the selection of the automatic referral criteria and suggest that they be tightened up to require referral of prisoners with fewer RVRs during a four week period of time or to require review of the RVR log every two-weeks for automatic referral of prisoners with a specified number of RVRs.[2] <u>Third</u>, we suggest that defendants consider implementing these expanded criteria prior to the completion of the Pilot, if it becomes clear that the expanded review is identifying CCCMS prisoners who should have, but were not, appropriately referred by custody officers for "bizarre, unusual, or uncharacteristic behaviors."

<u>Finally</u>, we note the absence of any timeline for the "implementation of recommendations" in Table 1 of the May 1st Plan. We urge that defendants adopt an implementation timeline that reflects the serious concerns expressed by Special Master Keating so eloquently years ago when discussing the goals of the mental health assessment process. *SM 1998 Recommendations* at 3.

It is our understanding that the Special Master will be reporting on defendants' Plan to Improve Mental Health Assessments of CCCMS Inmate-Patients Subject to Disciplinary Processes in the 20th Monitoring Report. We request the following recommendations to the Court:

(1)    Defendants shall provide to the Special Master and plaintiffs the final report on the pilot project on August 31, 2008.

(2)    Defendants shall provide to the Special Master and plaintiffs any modifications made to the RVR training module originally developed in 2003 for correctional staff.

(3)    Defendants shall provide to the Special Master and plaintiffs their CCCMS RVR Mental Health Assessment implementation plan, with specific timeframes for implementation that include, any necessary budgetary requests, by November 1, 2008.

(4)    Defendants shall revise their May 1, 2008 RVR Plan to include timeframes for the new referral criteria. The Plan shall require that custody staff send a copy of each RVR issued to a CCCMS prisoner to the institution's mental health program the same day that it is issued. The prisoner's case manager shall review that RVR within 5 calendar days to determine whether the prisoner shall be referred for a mental health assessment. The Plan shall also require that custody review all CCCMS prisoners on

---

[2] Was the automatic referral criteria based upon conclusions from the study conducted at CMC-E and PVSP?

Matthew A. Lopes, Jr.
Lisa A. Tillman
May 19, 2008
Page 6

RVR logs every week and refer for a mental health assessment those CCCMS prisoners who have at least 5 RVRs in a four-week period of time.

(5)    Defendants shall evaluate the impact of their revised May 1, 2008 RVR Policy system-wide for six months, and shall report to the Special Master on the total number of mental health assessments provided to CCCMS prisoners, the percentage of mental health assessments provided to CCCMS prisoners issued RVRs, the outcome of the assessments on the dispositions of the hearing and penalty, the number of CCCMS prisoners provided mental health assessment because of multiple RVRs in four-week timeframe, and the impact of the new policy on the numbers of CCCMS prisoners housed in administrative segregation units and SHUs system-wide.

We thank you for your consideration of these comments.  Please feel free to contact us with any questions regarding these comments.

Sincerely yours,

ROSEN, BIEN & GALVAN, LLP


By: */s/ Jane E. Kahn*
Jane E. Kahn

JEK:cg
cc:    *Coleman* Co-counsel
       *Coleman* Deputy Masters/experts/monitors
       Michael Stone
       Misha Igra

[212197-1]