KAMALA D. HARRIS
Attorney General of California
JONATHAN L. WOLFF
Senior Assistant Attorney General
JAY C. RUSSELL
JAY M. GOLDMAN
Supervising Deputy Attorneys General
DEBBIE VOROUS, State Bar No. 166884
PATRICK R. MCKINNEY, State Bar No. 215228
JANELLE M. SMITH, State Bar No. 231801
MANEESH SHARMA, State Bar No. 280084
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5553
 Fax:  (415) 703-1234
 E-mail:  patrick.mckinney@doj.ca.gov
*Attorneys for Defendants*

Hanson Bridgett LLP
JERROLD C. SCHAEFER, State Bar No. 39374
PAUL B. MELLO, State Bar No. 179755
WALTER R. SCHNEIDER, State Bar No. 173113
SAMANTHA D. WOLFF, State Bar No. 240280
 425 Market Street, 26th Floor
 San Francisco, California 94105
 Telephone:   (415) 777-3200
 Fax:  (415) 541-9366
 E-mail:  pmello@hansonbridgett.com

IN THE UNITED STATES DISTRICT COURTS

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AND FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARCIANO PLATA, et al.,**<br><br>                                    Plaintiffs,<br><br>**v.**<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                                    Defendants. | C01-1351 TEH<br><br>**DEFENDANTS' RESPONSE TO THE RECEIVER'S 23rd TRI-ANNUAL REPORT** |
| **RALPH COLEMAN, et al.,**<br><br>                                    Plaintiffs,<br><br>**v.**<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                                    Defendants. | CIV S-90-0520 LKK JFM P |
| **JOHN ARMSTRONG, et al.,**<br><br>                                    Plaintiffs,<br><br>**v.**<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>                                    Defendants | C94-2307 CW |

# TABLE OF CONTENTS

**Page**

I.  Introduction. ........................................................................................... 1

II.  The Receiver's Broad, Unsupported Assertion About the Impact of the
Prison Population on Health Is Contrary to the Record. ......................... 3

    A.  The Receiver's report contradicts his argument that the current
population level impedes the delivery of health care. ................................. 3

    B.  The Inspector General's recent evaluations of the prison medical
program confirm that the system is providing quality care. ..................... 5

    C.  Although the court-appointed expert reports are employing a flawed
methodology not designed to assess compliance with the relevant
deliberate indifference standard, the substance of their reviews
confirms that inmates receive a constitutional level of care. ..................... 7

    D.  The Receiver has denied defendants access to the State's health
care clinicians to confirm the quality of care. ........................................... 11

III.  The Receiver's Factually Unfounded Allegations That Defendants are
Refusing to Comply With Court Orders Are False. ................................ 11

    A.  A sentencing commission is not a population reduction measure. ........... 13

    B.  The Receiver's belief that available prison capacity exists is
mistaken. ....................................................................................................... 14

IV.  The Report Fails to Identify Steps the Receivership Can Take to Minimize
the Impact of Cocci. ............................................................................... 15

V.  The Receiver's Account of the Transition Process Contains Inaccuracies. ........... 17

VI.  There Is No Basis for the Receiver's Statements Concerning the Status of
Construction Projects. ............................................................................ 18

VII.  Conclusion. ........................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

CASES

*Brown v. Plata*
   131 S. Ct 1910 (2011) ................................................................. passim

*Estelle v. Gamble*
   429 U.S. 97 (1976) ........................................................................... 8

*Farmer v. Brennan*
   511 U.S. 825 (1994) ................................................................. 8, 9, 10

*Frew v. Hawkins*
   540 U.S. 431 (2004) ................................................................. 13, 14

*Helling v. McKinney*
   509 U.S. 25 (1993) ........................................................................... 8

*Horne v. Flores*
   557 U.S. 433 (2009) ....................................................................... 13

*Hudson v. Palmer*
   468 U.S. 517 (1983) ....................................................................... 10

*Madrid v. Gomez*
   889 F. Supp. 1146 (1995) ................................................................. 8

*Seaton v. Mayberg*
   610 F.3d 530 (9th Cir. 2010) .......................................................... 10

*Three-Judge Court*.
   (Report 30-35.) ............................................................................... 11

CONSTITUTIONAL PROVISIONS

Eighth Amendment ................................................................................. 8

COURT RULES

Federal Rule of Civil Procedure,
   Rule 66 ................................................................................... 2, 3

1    **I.    INTRODUCTION.**

2          Section 5 of the recently issued Twenty-Third Tri-Annual Report of the Federal Receiver's

3    Turnaround Plan of Action (Report) contains misstatements, false allegations, and inappropriate

4    policy arguments.  The Receiver makes the unsupported assertion that the current prison

5    population, which has been reduced by more than 42,000 inmates since its high in 2006,

6    interferes with the delivery of constitutionally adequate health care.  (Report at 30.)  This

7    assertion is not true, and is undermined by the evidence—including the court experts' reports, the

8    Inspector General's reports, and even other segments of the Receiver's Report.[1]  Defendants

9    believe that the Receiver's own doctors and chief medical executives who work in the prisons

10   would disagree with the Receiver's view that the medical care system is deliberately indifferent to

11   inmates' serious medical needs.  (*See* Decl. Diana Toche ¶ 4.)  Unfortunately, the Receiver has

12   barred Defendants from talking with them.  (*See Id.* ¶ 3, Ex. A.)

13         The Receiver also makes unsupported allegations that Defendants are willfully not

14   complying with court orders, and working in "opposition bordering on contempt" for his work.

15   (Report at 34.)  These harsh accusations are not true.  In fact, Defendants have worked

16   collaboratively with the Receiver to achieve the significant improvements to the prison medical

17   care system.  (Toche Decl. ¶ 5.)  And although the prison population has not fallen as far the

18   Three-Judge Court has directed, numerous state laws restrict the executive branch from

19   unilaterally implementing measures that would be necessary to meet the population cap by the

20   end of the year.  (*See* Defs' Reply Pls.' Resp. & Req. for Order to Show Cause, ECF No. 2640.)  It

21   is unfair to criticize Defendants for failing to take actions they lack the authority to take.  (*Id.*)

22         Defendants also respond to the Receiver's discussion of the State's response to

23   coccidioidomycosis (commonly called cocci or Valley Fever) at Pleasant Valley and Avenal State

24   _____

25             [1] As will be explained, the court-appointed experts have adopted a review methodology
     that is not aimed at assessing compliance with the governing constitutional standard of deliberate
26   indifference to a substantial risk of serious harm.  (*See, supra,* Section II. C.)  Although the flaws
     in their methodology muddle the ability to attach constitutional significance to their conclusions,
27   their factual findings are inconsistent with the notion that the prison population interferes with the
     delivery of quality medical care.  (*Id.*)

28

1

Defs.' Resp. to the Receiver's 23rd Tri-Annual Report, Case No. C01-1351 TEH

Prisons. Valley Fever is an infection spread by fungal spores (called Coccidioides) arising from soil in arid regions. (*See* http://www.cdc.gov/fungal/coccidioidomycosis/.) People who live in California, Arizona, and New Mexico are at increased risk of being exposed to the spores. (*Id*.) Most people who are exposed to the spores do not develop symptoms, or have very mild flu-like symptoms that go away without medical treatment. (*Id*.) Some people, though, develop more severe symptoms, including pneumonia, which require medical treatment. (*Id*.) In severe cases, Valley Fever can sometimes be fatal if left untreated. (*Id*.) The Receiver's Report omits any acknowledgement that the Receiver can and should take immediate steps to reduce unnecessary morbidity and mortality by training medical providers. Although it is very difficult to prevent exposure to the spores, the Receiver is seeking to address the issue by a race-based exclusionary policy at these prisons. (May 1, 2013 Report and Response of Receiver Regarding Plaintiffs' Motion Re Valley Fever, ECF 2601.) The Court should instead encourage the Receiver to permit experts from the Center for Disease Control and the National Institute for Occupational Safety and Health to complete their study and evaluation before prematurely implementing such a drastic remedy. (*See* May 6, 2013 Opp. to Pls.' Mot., ECF 2618). The Court should further encourage the Receiver to focus on the errors in timely diagnosis and proper treatment noted by Plaintiffs' expert and the court-appointed experts. (Decl. J. Galgiani Supp. Pls.' Mot. Re Valley Fever ¶ 19, ECF 2579-2; Coccidioidomycosis in California State Prisons, May 13, 2013 12-13, ECF 2638.)

Defendants also respond to inaccuracies in the Report concerning the transition of health care to CDCR and the status of the facilities improvement projects.

This Court long ago recognized the Receiver's role as a neutral court officer charged with administrative control over the prison health care system. (Oct. 3, 2005 Findings of Fact and Conclusions of Law re Appointment of Receiver 22, ECF 371; *see also* Fed R. Civ. Proc. 66 [providing district court with control over appointment and dismissal of receivers].) Defendants object to the improper argument and numerous misstatements in the Report, and ask the Court to take these objections into account when considering the Report.

///

///

2

## II. THE RECEIVER'S BROAD, UNSUPPORTED ASSERTION ABOUT THE IMPACT OF THE PRISON POPULATION ON HEALTH IS CONTRARY TO THE RECORD.

The Receiver's assertion that "overcrowding continues to interfere with the ability to deliver constitutionally acceptable medical and mental health care" is not credible.  (Report 30.) It is telling that he does not support it with any facts, or even an explanation of *how* the prison population is supposedly interfering with the delivery of health care.  (*See* Report.)  It is also notable that no facts in the Report or in the record today support the notion that inmates in the *Plata* class face a systemic, substantial risk of serious harm, much less that doctors or Defendants are deliberately indifferent to the needs of inmates with serious medical conditions.  (*See id.* & Docket generally.)  In fact, the Receiver's assertion that overcrowding interferes with the delivery of health care is undermined by the remainder of the Report, the findings of the court-appointed experts and Inspector General, and the factual record.  The undisputed evidence is that the State has reduced the prison population by more than 42,000 inmates, and the current population level is not interfering with the quality health care that is now being provided.  (*See* Report & Docket generally.)  Nor is there any evidence that this population level will interfere with the provision quality health care in the future as systemic improvements continue to be made.

### A. The Receiver's Report Contradicts His Argument that the Current Population Level Impedes the Delivery of Health Care.

Contrary to the Receiver's anomalous assertion that "overcrowding" is interfering with the delivery of constitutionally acceptable health care, elsewhere in his report he indicates that the new prison staffing model, which the State adopted last year as part of the Blueprint, will allow CDCR to accommodate a greater prison population than it currently has.  As the Receiver explains:

> [t]he new staffing model provides a staffing compliment to allow a prison to safely operate housing units, programs, and services with a wide range of patient-inmate population densities from 100 percent design-bed capacity *to 160 percent design-bed capacity*. HCFIP improvements are planned and will be designed to ensure adequate medical care can be provided within this same range of patient-inmate population densities.

3

(Report 22 [emphasis added].)  This standardized staffing model has been rolled out to all of the institutions, and Defendants understand that the Receiver is evaluating its impact and will report on the model later this year.  (Toche Decl. ¶ 8.)  The Report demonstrates the Receiver's belief that constitutional medical care can be delivered at the current population density, and he fails to cite any specific areas where the current population density in any way interferes with the delivery of effective medical care.

In fact, the remainder of the Receiver's report documents the tremendous improvements to CDCR medical care, and demonstrates that the system has surpassed the minimal requirements imposed under the Constitution.  (Report 1-27.)  The Receiver notes continued progress toward "fully implementing" his Turnaround Plan of Action, including: (1) ensuring timely access to health care services by redesigning screening and assessment; (2) completing a system-wide scheduling function; (3) creating a standard utilization management system; (4) fully implementing medical processes for primary care; (5) recruiting, training, and retaining a professional quality medical care workforce; (6) establishing medical support and infrastructure, having created a safe and efficient central-fill pharmacy, standardized health records, and expanded and improved telemedicine; (7) implementing a quality improvement program; and (8) implementing state-of-the-art imaging/radiology services.  (*Id.*)  The Report reflects that all essential elements of a constitutional health care system have been implemented and are succeeding in providing a level of care that does not pose a substantial risk of serious harm to inmates, let alone *all* inmates with serious medical conditions or mental health conditions.  Indeed, the substance of the Report offers no hint that population levels are impacting the Receiver's ability to provide quality care.  (*Id.*)

In view of the tremendous, systemic improvements that have been achieved, the Receiver's unsubstantiated arguments about the impacts of "overcrowding" are puzzling.  Indeed, of the 42,000 inmate reduction, more than 24,000 has occurred just since October 2011 due to the State's implementation of the historic public safety realignment under Assembly Bill 109.  (May 15, 2013 Population Report, ECF 2629.)  This dramatic population reduction allowed the State to stop using beds in areas not designed for housing, such as in gymnasiums and dayrooms.  (Jan. 7,

4

1    2013 Decl. Jeffrey Beard ¶ 12 & Exs. 1-7, ECF 2508.)  The credible evidence before this Court

2    continues to demonstrate that the State's inmates receive appropriate health care at the current

3    population levels.  (May 2, 2013 Decl. Jeffrey Beard ¶¶ 8-10, ECF 2603; Feb. 19, 2013 Decl.

4    Jeffrey Beard ¶¶ 3-7, ECF 2544; May 29, 2013 Decl. Robert Barton, ECF 2642.)

5    **B.    The Inspector General's Recent Evaluations of the Prison Medical Program Confirm that the System is Providing Quality Care.**

6

7    The Receiver reports that the Office of Inspector General (OIG) completed its third cycle

8    of inspections in March 2013, and had issued 31 final reports as of May 2, 2013.  (Report 26-27.)

9    All reports are available at http://oig.ca.gov/.  In the third inspection cycle, the institutions

10   achieved an average inspection score of 87.0%, reflecting "high adherence" (in the Receiver's

11   own terms) to medical policies and procedures.  (*Id.*)  Moreover, as the Receiver notes, "no

12   institution has scored in the low adherence category of less than 75 percent compliance."  (*Id.*)

13   The Receiver repeats an observation that the consistently high and improving OIG scores

14   "do not necessarily mean that constitutional requirements have been satisfied."  (*Id.* at 27.)  While

15   it is literally true that the OIG reports do not make express determinations about constitutional

16   compliance, the legal significance of the OIG's findings cannot be dismissed.  In fact, it was the

17   Receiver who originally "requested that the OIG conduct an objective, clinically appropriate, and

18   metric-oriented medical inspection program."  (*Id.*)  And the Receiver and Plaintiffs' counsel

19   provided significant input and direction in the OIG's development of the assessment tool.  (Oct.

20   23, 2008 Stip. Regarding Approval of the OIG's Proposed Medical Inspection Program, ECF

21   1602; Decl. Robert A. Barton Supp. Defs.' Mot. to Vacate or Modify Population Reduction Order

22   ¶ 6, ECF 2507.)

23   Until recently, the Receiver acknowledged that "efforts to meet federal court [*i.e.,*

24   constitutional] mandates are working" beginning with the OIG's second round inspections.  (May

25   5, 2011 Press Release, *available at*: http://www.cphcs.ca.gov/docs/press/PRESS_20110505_

26   Press_Release.pdf.)  The Receiver also stated that the first cycle of OIG inspections "established

27   a benchmark of performance by institution measuring the quality of medical care and compliance

28   with medical policies and procedures."  (Seventeenth Tri-Annual Report 43, May 15, 2011, ECF

5

2352.)  Before the Supreme Court, when the medical inspection scores were not as high as they are today, Plaintiffs stated that deficiencies noted in the OIG's reports "cut to the core of the medical system." (*Plata* Appellees' Br. 14.)  The Court also stated that the OIG "scores unquestionably provide some guidance as to whether the care being provided at an individual institution is constitutionally adequate." (Jan. 17, 2012 Order 2, ECF 2417.)  Today, the scores show that the health care system is functioning well and providing timely and effective medical care that exceeds constitutional standards.  The Receiver provides no substantial reasons why that only now, when the OIG scores are confirming the quality medical care system resulting from the Receiver's and the State's efforts, is the OIG's "objective, clinically appropriate, and metric-oriented" evaluation tool coming under attack.

The third-round OIG scores, which show systemwide "high adherence" to the Receiver's medical policies and procedures, provide strong evidence that there is no systemic substantial risk of harm to inmates' serious medical needs.  This evidence is corroborated by testimony from the Inspector General that his monitoring and inspections "do not show a deliberate indifference to medical needs of inmates" as he defines that term.  (May 29, 2013 Barton Decl. ¶ 7, ECF 2642.)

The Receiver's challenge to the OIG's methodology based on a "disconnect" at one prison (RJ Donovan) between the OIG score and the court-appointed experts' findings is unpersuasive. (Report 27.)  The Receiver fails to acknowledge that in between the OIG's review of RJ Donovan and the court experts' review, the Receiver directed that the institution change from a reception center to an intermediate health care facility.  The OIG last reported on its systemic findings at RJ Donovan in July 2012 based on an audit that occurred in April 2012; 10 months prior to the court experts' review.  (*See* Office of Inspector General, *Richard J. Donovan Correctional Facility Medical Inspection Results Cycle Three*, July 12, 2012, *available at: http://www.oig.ca.gov /media/reports/MIU/ Richard%20J.%20Donovan%20Correctional%20Facility%20Medical%20 Inspection%20Results%20Cycle%203.pdf*.)  The court-appointed experts observed that in August 2012 RJ Donovan "ceased to be a reception center, converting 600 medical reception and 150 general population beds to a Level III Sensitive Needs Yard.  In addition, in October RJ Donovan was designated to be an intermediate facility and began receiving inmates of higher medical

6

acuity." (*R.J. Donovan Correctional Facility Health Care Evaluation*, Mar. 18, 2013, 5, ECF 2572.)  The Inspector General described this as a "drastic change in mission for [RJ Donovan] that significantly impacted their medical care . . . ." (Decl. Robert Barton ¶ 7.)  The court-appointed experts conducted their review in February 2013, and based on this mission change it is to be expected that their observations would differ from the OIG's review.

It is unclear why the Receiver failed to explain the impact of this drastic mission change and instead tried to undermine the OIG's methodology.  It is CDCR's standard practice to monitor any drastic changes, such as a mission change, and provide support to the extent that any changes would impact asepcts of the system under CDCR's control.  (Toche Decl. ¶ 6.)  Based on the court expert's report, it appears that the Receiver and his executive staff were not aware of the issues described in the court experts' evaluation prior to their visit.  Although the Receiver's internal dashboard showed poor performance at RJ Donovan, there is no indication that the Receiver took action to address significant impacts to medical care.  (*Id.* ¶ 6.)  If the findings of the court experts regarding the adequacy of care at RJ Donovan are not temporary but reflect a true inadequacy of care, then the Court should instruct the Receiver to immediately correct these deficiencies.

**C.    Although the Court-Appointed Expert Reports Are Employing a Flawed Methodology Not Designed to Assess Compliance with the Relevant Deliberate Indifference Standard, the Substance of Their Reviews Confirms that Inmates Receive a Constitutional Level of Care.**

The court-appointed experts describe a system that more than satisfies the constitutional requirements that health care does not create a "substantial risk of serious harm" to inmates and that Defendants not be deliberately indifferent to any such harm.  Yet, they somehow found that each institution reviewed does not meet their undefined view of adequacy.  (*See San Quentin Prison Health Care Evaluation*, Mar. 18, 2013, 5, ECF 2570; *California Men's Colony Health Care Evaluation*, Mar. 18, 2013, 5, ECF 2571; *Sierra Conservation Center Health Care Evaluation*, Mar. 26, 2013, 5, ECF 2586; *California Correctional Institution Health Care Evaluation*, May 31, 2013, 5, ECF 2643 [all describing the key elements of an adequate health care system].)

7

1    Regrettably, the court-appointed experts have made no attempt to assess the system using

2    the governing constitutional standard.  Instead, they have written five reports based on a cherry-

3    picked handful of medical records of the sickest patients at each institution using a methodology

4    that judges any flaw as evidence of "inadequacy."  (*See* ECF 2572 at 4; 2586 at 4; 2643 at 3-4

5    [rather than evaluate systemic issues, the court experts employ a modified "tracer" methodology

6    that traces individual patients "through the organization's entire health care process to identify

7    whether there are performance issues in one or more steps of the process, or in the interfaces

8    between processes."].)  In so doing, the court-appointed experts hold the system to a skewed

9    standard higher than that agreed to by the parties, and indeed higher than any standard known to

10    the Constitution or American corrections.

11    The review methodology employed by the experts is of limited usefulness in litigation

12    alleging violations of the Eighth Amendment of the United States Constitution, which prohibits

13    the "wanton infliction of unnecessary pain."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  The

14    "Eighth Amendment does not require that prison officials provide the most desirable medical and

15    mental health care; nor should judges simply 'constitutionalize' the standards set forth by

16    professional associations . . . ."  *Madrid v. Gomez*, 889 F. Supp. 1146, 1256 (1995); *see also* Aug.

17    4, 2009 Three-Judge Court Order 6:17-19, ECF 2197.  An inmate must prove that he or she faces

18    "a substantial risk of serious harm" to demonstrate a violation of the Eighth Amendment.  *E.g.*,

19    *Farmer v. Brennan*, 511 U.S. 825, 828, 834, 842 (1994).  These conditions must be "sure or very

20    likely to cause serious illness and needless suffering."  *Helling v. McKinney*, 509 U.S. 25, 33

21    (1993).  Even if an inmate is subject to such a "substantial risk of serious harm," no constitutional

22    violation exists unless the inmate has proven "acts or omissions sufficiently harmful to evidence

23    *deliberate indifference* to serious medical needs."  *Estelle*, 429 U.S. at 106 (emphasis added).

24    That is, the inmate must demonstrate that prison officials "know[] of and disregard[] an excessive

25    risk to inmate health or safety."  *Farmer*, 511 U.S. at 837; *see id.* at 837-38 (recognizing that even

26    "objectively inhumane prison conditions" do not alone create an Eighth Amendment violation);

27    *id.* at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may

28

8

be found free from liability if they responded reasonable to the risk, even if the harm ultimately was not averted").

The reviews conducted by the court-appointed experts to date demonstrate that the medical care in the State's prisons far exceeds this standard. For example, at San Quentin, the court-appointed experts found that the health care delivery system includes:

- an appropriate medical organizational structure with competent leadership;
- construction of new clinics and medical bed space;
- adequate health care staffing;
- competent medical providers;
- increased custody to transport patients to on and off-site medical appointments;
- timely initial access to care;
- an adequate pharmaceutical system;
- timely access to specialty services; and
- a health records management system.

(*San Quentin State Prison Health Care Evaluation*, Mar. 18, 2013, 5, ECF 2570.) Moreover, the court-appointed experts found that "when patients were seen by medical providers,[2] the quality of care was good." (*Id.*) The experts made similar findings in their reports on the health care delivery systems at the California Men's Colony. (*California Men's Colony Health Care Evaluation*, Mar. 18, 2013, 5, ECF 2571.) Similarly, the experts made no negative systemic findings with respect to medical care at Sierra Conservation Center or the California Correctional Institution. (*Sierra Conservation Center Health Care Evaluation*, Mar. 26, 2013, 5, ECF 2586; *California Correctional Institution Health Care Evaluation*, May 31, 2013, 5, ECF 2643 [finding the key elements of an adequate health care system].)[3]

---

[2] It is indisputable that inmate-patients are being seen by their medical providers. The Report states that approximately 171,939 medical and diagnostic/specialty appointments were completed in December 2012; 189,169 in January 2013; 162,484 in February 2013; and 183,719 in March 2013. (Report, Appx. 3, ECF 2636-2). The Report further reflects that approximately 90% of all inmates were seen for their medical appointments during this same time period. (*See id.*)

[3] The only exception is the evaluation of health care at RJ Donovan, but the reasons why the quality of care temporarily declined at this institution are discussed in detail in Section II.B.

9

The alleged "inadequacies" identified by the court-appointed experts do not relate to population, nor do they relate to issues that have ever been identified as necessary in a constitutionally adequate system. Instead, the experts criticize the Receiver's medical staff for isolated, individual failures in diagnosis, treatment, or management that do not satisfy their ideals. (E.g., ECF 2570 at 5; ECF 2571 at 5, 17; ECF 2586 at 5; ECF 2643 at 5.) For example, the experts' primary complaint at San Quentin was that the Receiver did not ensure that newly-arriving inmates patients always receive a health evaluation within the policy guideline of seven days (ECF 2570 at 5), but they fail to show that this presented a serious risk of harm to any inmate. Similarly, the experts critiqued medical staff for "deficiencies" in the care provided at San Quentin's Outpatient Housing Unit, but admit "we could not identify explicit harm to the patients." (*Id.* at 33.) At California Men's Colony, the experts found that the Receiver and his staff did not properly update their policies, but do not connect this finding with any substantial risk of medical harm. (*See, e.g., California Men's Colony Evaluation* 17, ECF 2571 ["Management has recognized that the current status of the policies [at CMC] is problematic . . . "].) Similarly, the experts' findings of individual "problems" or "opportunities for improvement" are not of constitutional concern. (*See, e.g.,* ECF 2643 at 5 ["systems are generally working well but some require focused improvement"]; ECF 2571 at 5 [same]; ECF 2586 at 5 [after noting the adequacy of the system, stating: "We did, however, find opportunities for improvement."].)

The court-appointed experts similarly cite lack of privacy as factor in evaluating "adequacy." (*See, e.g.,* CMC Report 12, ECF 2571 ["The lack of privacy is evident"]; RJ Donovan Report 14, ECF 2572; SCC Report 10, ECF 2586, CCI Report 10, ECF 2643.) But the Supreme Court has held "that prisoners have no legitimate expectation of privacy." *Hudson v. Palmer*, 468 U.S. 517, 530 (1983); *see also Brown v. Plata*, 131 S. Ct 1910, 1964 (2011) (Alito, J., dissenting) ("this Court has never suggested that the failure to provide private consultation rooms in prisons amounts to cruel and unusual punishment"); *Seaton v. Mayberg*, 610 F.3d 530, 534 (9th Cir. 2010) ("[l]oss of privacy is an 'inherent incident[] of confinement'") (quoting *Bell v. Wolfish*, 441 U.S. 520, 537 (1979)). The experts present no analysis or explanation of how this

purported lack of privacy is relevant to this Court's analysis, let alone that it negatively impacts patient care or poses a serious risk of harm.

The court-appointed experts' failure to evaluate medical care consistent with constitutional requirements is problematic because, as this Court has acknowledged, "the parties intended for their original stipulation to provide the minimum level of care that is constitutionally adequate." (Sept. 5, 2012 Order 5, ECF 2470.) The flaws in the experts' methodology must be taken into account when assessing whether their findings and conclusions have relevance to the constitutional inquiry that is at the core of this case.

**D.    The Receiver Has Denied Defendants Access to the State's Health Care Clinicians to Confirm the Quality of Care.**

To better assess the court-appointed experts' evaluations, Defendants have asked to meet with clinicians working for the Receiver, especially those who provided the care discussed in the reports. (Toche Decl. ¶ 2, *see also* Ex. A.) Defendants believe that the medical executives under the Receiver would conclude that the care delivered in the State's prisons is not just adequate but compares favorably with medical care available in the community. (*Id.* ¶ 4.) The Receiver, however, has barred Defendants from seeking this information from any "employees within the Receiver's chain of command." (*Id.* ¶ 3, Ex. A.) This Court has further limited disclosure of non-privileged communications between Plaintiffs and the Receiver. (Apr. 15, 2013 Order, ECF 2594.) These restrictions impede Defendants' ability to bring relevant and helpful information to the Court's attention.

**III.    THE RECEIVER'S FACTUALLY UNFOUNDED ALLEGATIONS THAT DEFENDANTS ARE REFUSING TO COMPLY WITH COURT ORDERS ARE FALSE.**

The Receiver accuses Defendants of willfully not complying with orders issued in *Plata*, *Coleman*, and the *Three-Judge Court*. (Report 30-35.) He further asserts without explanation that Defendants have issued a "clear message[s] to the field, from at least early 2012 until the present, [] that court orders in *Coleman* and *Plata*, and orders from the Three Judge Court, are to be implemented only to the extent that State officials and the legal counsel deem desirable." (Report 35.) These vague, unsubstantiated allegations are utterly false. The Receiver also states

11

that "the State has announced that it will not use its 'best efforts' to implement the population density order[.]" (Report 31.) Defendants did no such thing. To the contrary, when Defendants submitted the population-reduction plan, they told the Court that they would comply with the directive that they use their best efforts in good faith, and that they would even take the unusual step of drafting legislative language to submit to the Legislature for the legislative measures in the plan. (Defs.' Resp. to Apr. 11, 2013 Order, ECF 2602-09 & 2640-42.)

The Receiver then criticizes Defendants for not submitting a plan that reduces the prison population by approximately 9,000 inmates in less than a year. (Report 31.) But as Defendants have repeatedly explained, the executive branch lacks the legal authority to implement sufficient measures to achieve a reduction of this magnitude; the bulk of the measures would need to be enacted by the Legislature. (Defs.' Resp. to Apr. 11, 2013 Order, ECF 2602-09; Defs.' Reply Re Resp. to Apr. 11, 2013 Order, ECF 2640-42.) It is both unfair and inappropriate for the Receiver to criticize Defendants for not implementing measures they lack the legal authority to implement. (*See id.*)

The Receiver states that "the substance and tone of leadership set by State officials has changed from acquiescence bordering on support for the Receiver's work, to opposition bordering on contempt for the Receiver's work and for implementation of court orders, including the orders of the Three Judge Court." (Report 34.) Again, this factually unsupported accusation by the Receiver is false. More than a year ago, Defendants presented a post-receivership plan to successfully complete the remaining projects and maintain a quality prison health care system into the future. (May 17, 2012 Joint Report & Decl. Martin Hoshino Ex. 4, ECF 2433 & 2434-8.) Defendants have also consistently worked collaboratively with the Receiver to improve the prison medical care system, and the areas in which there have been disagreements are relatively few. (Toche. Decl. ¶ 5.)[4]

---

[4] For example, Defendants opposed the Receiver's $8 billion prison construction plan in 2008. (ECF 1483.) And most recently, Defendants have questioned the Receiver's decision to pursue what appears to be an extreme race-based inmate-restriction policy to deal with Valley Fever, when the available information suggests that it would be better to permit nationally-recognized experts to evaluate the issue, and to focus on timely diagnosis, effective treatment, and training for clinicians. (ECF 2618.)

12

Defs.' Resp. to the Receiver's 23rd Tri-Annual Report, Case No. C01-1351 TEH

1    The Receiver asserts that "the State has deliberately planned not to comply with the Three

2    Judge Court's order to reduce population density to 137.5% of design capacity [and t]he fact that

3    the State has missed the court ordered targets in recent months was not accidental." (Report 35.)

4    In fact, Defendants have been making a herculean effort to comply with the population cap in

5    good faith. (*See, e.g.,* Defs.' Resp. to Apr. 11, 2013 Order, ECF 2602-09; Defs.' Reply Re Resp.

6    to Apr. 11, 2013 Order, ECF 2640-42.) These efforts have yielded unprecedented results, having

7    reduced the prison population by more than 42,000 inmates. (*See* Jan. 7, 2013 Mot. to Modify

8    Pop. Reduction Order, ECF 2506-08.) At the same time, the prison health care systems has

9    experienced tremendous improvements in all area. (*See id.*) Based on these changed

10   circumstances Defendants asked the Court to modify the population cap on the grounds that

11   prison health care now exceeds and will continue to exceed constitutional standards, and that

12   further population reductions are not needed. (*See id.*) The Receiver points to the Blueprint as

13   evidence of Defendants' noncompliance. (Report 35.) But in reality, the Blueprint simply

14   recognizes that Defendants would seek a modification of the population cap based on the

15   improved prison health care system coupled with the historic reductions in the prison population.

16   (*See The Future of California Corrections, available at*: http://www.cdcr.ca.gov/

17   2012plan/docs/plan/complete.pdf.)

18        Defendants did not stop complying with the population reduction order as the Receiver

19   asserts. It seems the core of the Receiver's criticism is that while seeking the modification,

20   Defendants should have implemented additional measures to further reduce the prison population.

21   (*See* Report 30-35.) But as Defendants have repeatedly explained, the executive branch lacks the

22   authority to implement the measures needed to yield an additional 9,000 inmate reduction. (Defs.'

23   Resp. to Apr. 11, 2013 Order, ECF 2602-09; Defs.' Reply Re Resp. to Apr. 11, 2013 Order, ECF

24   2640-42.) The discussion of the court-ordered population reduction plan on pages 31-34 of the

25   Report demonstrates a disregard for both his role in this proceeding and principles of federalism.

26   *See Horne v. Flores,* 557 U.S. 433, 450-51 (2009); *Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

27   The Court appointed the Receiver to correct constitutional deficiencies in California's prison

28   medical care system. (Order Appointing Receiver; *see also* Federal Receiver's Turnaround Plan

13

1  of Action at ii, ECF 1229.)  By mischaracterizing the court-ordered plan and offering his own

2  plan, the Receiver has strayed from his obligations to this Court and the parties.

3       **A.    A Sentencing Commission Is Not a Population Reduction Measure.**

4       The Receiver states that "other states have learned that one of the most direct and durable

5  solutions to this problem is to establish some form of sentencing commission that is expressly

6  charged with aligning sentencing policies to available correctional resources." (Report 32.)  The

7  Receiver correctly notes, after arguing for a sentencing commission, that it "is not something that

8  a federal court should order in the first instance (and, in the interest of comity, it may well be

9  beyond the power of a federal court to order such a remedy)." (*Id.* 33.)  Moreover, as Defendants

10  recently pointed out, a "sentencing commission" is not a population-reduction measure itself, but

11  a means for the government to consider the effectiveness and social value of penalties imposed by

12  criminal courts. (May 29, 2013 Decl. Jeffrey Beard ¶ 5, ECF 2641.)  Even if a commission was

13  established, it is not certain the prison population would decrease. (*Id.*)  Depending on its

14  decisions about reforms, a commission could recommend that the Legislature increase, reduce, or

15  leave unchanged the population. (*Id.*)  And any changes promulgated by a commission to "align[]

16  sentencing policies to available correctional resources"—as the Receiver narrowly assumes

17  would happen—almost certainly could not take effect by the end of the year as is required to

18  satisfy the Court's orders. (*Id.*)  Therefore, a sentencing commission is not a measure for

19  achieving timely compliance with the Court's population cap.

20       **B.    The Receiver's Belief that Available Prison Capacity Exists Is Mistaken.**

21       The Receiver incorrectly contends that the State owns approximately 3,800 beds, 500 of

22  which "could be opened relatively quickly." (Report 33-34.)  The referenced facilities are

23  designed to house low-level juvenile and female offenders. (Hysen Decl. ¶ 4.)  These facilities

24  are not safe to house adult male inmates without extensive renovations to enhance security. (*Id.*)

25  These renovations could not be completed by the end of the year as is required to satisfy the

26  Three-Judge Court's orders. (*Id.*; *see also* Report 34 [acknowledging that all facilities except the

27  women's facility in Stockton "could be opened within a year or two"].)   Although the Receiver's

28  capacity proposal is not feasible, Defendants have identified viable capacity options, including

14

1    expanded fire camp capacity.  (ECF 2609 at 28-29, 32-33 & ECF 2629-31.)

2    **IV.   THE REPORT FAILS TO IDENTIFY STEPS THE RECEIVERSHIP CAN TAKE TO MINIMIZE THE IMPACT OF *COCCI*.**

3

4        In the Report, the Receiver attacks the State's response to the incidence of cocci at Pleasant

5    Valley and Avenal State Prisons, and unilaterally concludes that Defendants' objection to the

6    Receiver's policy on the subject "suggest[s] that they may not yet possess the requisite concern

7    for preventing unnecessary morbidity and death among inmates to justify transition of the prison

8    medical system back to Defendants' control."  (Report 34.)  While the Receiver acknowledges the

9    State's mitigation efforts to date, the Report nonetheless concludes that because the State objects

10   to immediate implementation of the Receiver's cocci policy, CDCR is unconcerned with

11   unnecessary morbidity and mortality.  (*Id.* at 28-30.)  Nothing could be further from the truth, and

12   the State's efforts to reduce the incidence of cocci at Pleasant Valley and Avenal, which were

13   detailed in Defendants' Opposition to Plaintiffs' Motion to Require the Defendants to Comply

14   with the Receiver's Recommendations Regarding Valley Fever, are incorporated by reference

15   rather than repeated here.  (*See* ECF 2618.)

16       What is most striking about the Receiver's discussion of Valley Fever, however, is the

17   omission of any acknowledgment that the Receiver can and should take immediate steps to

18   reduce unnecessary morbidity and mortality by training medical providers in the cocci-endemic

19   region.  (Toche Decl. ¶ 7.)  Timely diagnosis of cocci-related illness, appropriate treatment, and

20   training of medical staff are all within the exclusive control of the Receiver.  (*Id.*)  As the

21   Plaintiffs' expert, Dr. John Galgiani, determined, "medical staff [*i.e.,* the Receiver's staff] at

22   prisons in the Coccidioides endemic zone are still slow to recognize the early signs of Valley

23   Fever, particularly in African-American men, and are slow to begin timely and proper treatment

24   for the disease.  *As a result, needless suffering and death were inflicted on these men*."  (Decl. J.

25   Galgiani, M.D. Supp. Pls.' Mot. Re Valley Fever (Galgiani Decl.) ¶ 19, ECF 2579-2 (emphasis

26   added).)  Dr. Galgiani reached this conclusion after reviewing the medical charts of four male

27   prisoners for whom disseminated cocci was a primary cause of death.  (*Id.* ¶ 18.)  Per Dr.

28   Galgiani's review, in each of the four cases, delays in diagnosis likely resulted in death.  (*Id.*)

15

Defs.' Resp. to the Receiver's 23rd Tri-Annual Report, Case No. C01-1351 TEH

The *Plata* court experts agreed with Dr. Galgiani's assessment with respect to delayed diagnosis and treatment of cocci, stating that their review of health records raised "similar concerns." (Coccidioidomycosis in California State Prisons, May 23, 2013, 12-13, ECF 2638.) The court experts noted the Death Review Committee's conclusion with respect to one inmate who died of disseminated cocci and AIDS, which determined that "a refresher course in cocci would be beneficial for all providers." (*Id.* at 13.) Among the court experts' recommendations was to "[p]rovide training to all CDCR medical and nursing staff in recognition, diagnosis and treatment of cocci." (*Id.* at 15.)

While there are no preventative measures for cocci, certainly quicker diagnosis and treatment could greatly reduce the risk of mortality. ("Increase in Reported Coccidioidomycosis – United States, 1998-2011," Morbidity and Mortality Weekly Report, Centers for Disease Control and Prevention, Mar. 29, 2013, available at: http://cdc.gov/mmwr/preview/mmwrhtml/mm6212a1.htm?s_cid=mm6212a1_w.) Indeed, the Centers for Disease Control and Prevention noted in a "Morbidity and Mortality Weekly Report" dated March 29, 2013, that "patients often experience delays in testing and diagnosis and receive unnecessary antibiotics" and therefore, "promoting increased community and health-care provider awareness of this infection continues to be an important role for public health officials." (*Id.*) Similarly, an August 2011 study in *Medical Mycology* found that "education will close knowledge gaps and improve provider confidence in diagnosis and treatment in coccidioidomycosis. Healthcare providers who received coccidioidomycosis CME in the prior 12 months were almost twice as likely to answer all of the treatment questions correctly." (Chen, Sanny et al., "Coccidioidomycosis: knowledge, attitudes, and practices among healthcare providers – Arizona, 2007," *Medical Mycology*, Aug. 2011 at p. 654.)

As these medical studies and expert opinions demonstrate, provider education is needed in cocci endemic areas to improve diagnosis and treatment time, and reduce the risk of unnecessary mortality. The Receiver's failure to account for medical providers' role in the unnecessary and preventable deaths as a result of Valley Fever is troubling. (Toche Decl. ¶ 7.) At a minimum, the

Receiver must identify and address this critical, less-intrusive means of mitigating the impact of Valley Fever.  (*Id.*)

## V.    THE RECEIVER'S ACCOUNT OF THE TRANSITION PROCESS CONTAINS INACCURACIES.

As the Report indicates, the State has worked closely with the Receiver to effectuate the delegations of authority.  (Report at 44.)  To date, three revocable delegations of authority have been completed, and by the Receiver's account, CDCR has performed well in assuming operations previously managed by the Receivership.  (*Id.* at 38-46.)  However, the Report includes several inaccuracies that require clarification.

First, the Receiver has mischaracterized the exchange of draft delegations of authority back to the State, implying that CDCR has been dilatory in its response.  (Toche Decl., ¶ 9.)  This is not true.  (*Id.*)  The parties have been working together amicably exchanging information on an agreed-upon schedule.  (*Id.*)

Additionally, the Report notes on page 46 that since CDCR has assumed responsibility for the Health Care Access Units (HCAU), the average Custody Access to Care Success Rate improved from 99.12% under the Receiver to 99.56% under CDCR.[5]  The Report also indicates, however, that institutions that fail to meet the required 99% success rate in a given month must submit a corrective action plan, and "[t]o date, one corrective action plan has been received out of the 17 institutions (November through February) that were required to complete them."  (Report at 46.)  While this statement is technically accurate, it is entirely misleading.  CDCR's Acting Undersecretary of Administration and Offender Services, Dr. Toche, was only informed by the Receiver's office of this omission in mid-May, and was previously unaware that the information reported in the monthly Access Quality Reports (which include the same elements required in a corrective action plan) was insufficient.  (Decl. Toche ¶ 10.)  Because the delegation pertaining to HCAU did not contain instructions for submitting Access Quality Reports corrective action plans, CDCR was unaware of this obligation.  (*Id.*)  Upon learning of this requirement, direction was

---

[5] In either case, the custody access to care rates exceeding 99% strongly suggest that there is no substantial risk of serious harm or deliberate indifference to inmates' serious medical needs.

17

1   promptly issued by CDCR to each institution to implement a process to ensure the completion of

2   a corrective action plan when necessary.  (*Id.*)

3   **VI.   THERE IS NO BASIS FOR THE RECEIVER'S STATEMENTS CONCERNING THE STATUS OF CONSTRUCTION PROJECTS.**

4

5        The record before this Court demonstrates the State's substantial investment in construction

6   and renovation projects to increase the State's capacity to meet health care needs.  Contrary to the

7   Report, *see* Report at 31 (erroneously suggesting that Defendants have made meaningful

8   improvements in space at only two facilities), Defendants submitted undisputed evidence about

9   19 completed medical and mental health projects at San Quentin, Avenal, the California Medical

10  Facility, Salinas Valley, Mule Creek, the Substance Abuse Treatment Facility at Corcoran, the

11  California Institution for Women, Los Angeles County, and Sacramento.  (Decl. Chris Meyer ¶¶

12  3-4, 7-9, 11-13 & 15; Exs. 1-2, 5-9, 11-13 & 15, *Coleman* ECF 4278.)

13       The Receiver's complaints about the progress of construction are contrary to his own

14  statements in the Report.  Indeed, on the first page of the Report, the Receiver reflects positively

15  on the status of construction:

16           The CHCF in Stockton is on schedule to open later this year, with
             the first patient-inmates scheduled to arrive in July 2013, and
17           construction at DNCA began in July 2012.  The DNCA is
             continuing under an aggressive construction schedule in order to
18           begin patient-inmate occupancy in February 2014.  In addition,
             CDCR's published plan, *The Future of California Corrections*
19           *(Blueprint)*, proposed the upgrades of the existing facilities: HCFIP,
             HCFIP projects continue to progress through the PWB approval
20           process and the PMIB funding process.  Despite some early delays
             in receiving PWB and PMIB approvals, projects are again
21           proceeding on a sequential submittal schedule to the PWB and
             PMIB.  To date, 13 projects (all of the intermediate level-of-care
22           facilities and male reception centers) have received PWB project
             level approvals.  Ten of these (the intermediate level-of-care) have
23           received subsequent interim financing loans from the PMIB.

24  (Report 1-2, 21-22.)  The Receiver notes approvingly that the Public Works Board and legislative

25  approval processes for construction have been "streamlined" and "the priority of the focus of the

26  upgrades at the intermediate level-of-care facilities substantially completed by 2016."  (Report

27  21.)  Moreover, the Receiver notes appropriately "that the scope of medical improvements

28  provided through the HCFIP is aligned with the Blueprint."  (Report 22.)

18

1    The Receiver's current position regarding the population levels at which appropriate care

2    can be provided is especially puzzling given his statements that his staffing model at individual

3    institutions will allow the State "to safely operate housing units, programs, and services *with a*

4    *wide range of patient-inmate population densities from 100 percent design-bed capacity to 160*

5    *percent design-bed capacity . . . In some instances, due to factors such a physical plant or*

6    *patient-inmate acuity, the improvements will accommodate an even greater population density*."

7    (Report 22 [emphasis added].)

8    To the extent certain health care facilities improvement projects have not yet been

9    completed, the schedule was agreed to by Defendants and the Receiver.  (Hysen Decl. ¶ 2.)  In

10   2009, the Receiver and CDCR jointly delegated authority for study, planning, design,

11   development, management, and construction of all ongoing health care facility improvement

12   projects to a single executive manager, Chris Meyer.  (*Id*. & Ex. A.)  Mr. Meyer reports directly

13   to the CDCR Secretary, and the Receiver is "one of Mr. Meyer's primary clients . . . ."  (*Id.*)  The

14   Receiver has thus long worked with the State to define the scope and schedule for completing the

15   facilities improvement projects.  (Hysen Decl. ¶ 2.)

16   The Report also acknowledges that Defendants have performed as well or better than the

17   Receiver under the delegation of authority for activating projects.  (Report 21 & 43-45.)  The

18   Receiver acknowledges that "CDCR and the state continue to demonstrate the commitment, focus,

19   and ability to complete the construction of the CHCF and DNCA projects pursuant to the

20   previously signed letter-of-delegation.  *The new medical and mental health beds added pursuant*

21   *to Goal Six will be substantially completed by 2014*."  (Report 21.)  Yet, just 10 pages later, the

22   Receiver's advocacy ignores these factual statements (and other improvements to the health care

23   system and the quality of care received) and instead engages in advocacy that is irreconcilable

24   with the record.  (*See* Report 31.)[6]

25       [6] This misrepresentation bears a striking similarity to the misrepresentations Plaintiffs
26   made on this issue in their Opposition to the Motion to Modify the Population Reduction Order.
     Defendants, however, have been unable to determine the extent to which the Receiver and
     Plaintiffs' counsel collaborated on their filings because the Court has effectively blocked
27   Defendants from obtaining communications between the Receiver and Plaintiffs' counsel, despite
     the lack of any applicable privilege.  (Apr. 15, 2013 Order Re: Confidentiality of
28
                                                                              (continued…)

                                            19

Moreover, the HCFIP projects remain on track to be built pursuant to the agreed-upon schedules. (Hysen Decl. ¶¶ 2, 3.) The Receiver cites no evidence to support his claim that "there is no reliable guarantee the projects will ever be undertaken" because it simply is not true. (*Id.*) Fifteen HCFIP projects alone have been established by the Public Works Board. (*Id.* ¶ 3.) For these projects, CDCR has initiated contracts for environmental review and has executed nine design contracts, with one additional contract currently pending execution. (*Id.*) In addition, the Statewide Medication Distribution project has Public Works Board approval and CDCR has executed the design contract. (*Id.*) The Receiver cites historical delays in obtaining funds that occurred prior to Governor Brown's administration, seemingly without understanding that the Blueprint and availability of funding resolved these obstacles. (Report at 1, 21; *see also* Hysen Decl. ¶ 3.) Funding through the Pooled Money Investment Board has been forthcoming, and a request for a Pooled Money Investment Board loan for health care construction has not been denied in years. (Hysen Decl. ¶ 3.) Thus, there is no cause for concern that the remaining construction projects will be delayed. (*Id.*)

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

_____

(…continued)
Communications with Receiver, ECF 2594.)

1    **VII.  CONCLUSION.**

2        The discussion in the Report of overcrowding, Valley Fever, the transition process, and the

3    ongoing construction projects is misleading, unsubstantiated, and contrary to numerous other

4    reports, including the remainder of the Report, which highlights the tremendous improvements

5    and upgrades achieved systemwide.  Defendants object to the above mentioned statements,

6    including the Receiver's improper advocacy on several positions, and request that the Court reject

7    the unsubstantiated claims made in the Report.

8    Dated:  June 14, 2013                 HANSON BRIDGETT LLP

9                                     By: */s/ Paul B. Mello*
                                 PAUL B. MELLO

10                                    *Attorneys for Defendants*

11   Dated:  June 14, 2013                 KAMALA D. HARRIS
                                 Attorney General of California

12

13                                  By: */s/ Patrick R. McKinney*
                                 PATRICK R. MCKINNEY

14                                    Deputy Attorney General
                                 *Attorneys for Defendants*

15

16

17   CA2001CS0001
    20701638.docx

18

19

20

21

22

23

24

25

26

27

28