1   IN THE UNITED STATES DISTRICT COURTS

2   FOR THE EASTERN DISTRICT OF CALIFORNIA

3   AND THE NORTHERN DISTRICT OF CALIFORNIA

4   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5   PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6

7   RALPH COLEMAN, et al.,

8                        Plaintiffs,

9          v.                                    NO. 2:90-cv-0520 LKK JFM P

10  EDMUND G. BROWN JR., et al.,                  **THREE-JUDGE COURT**

11                       Defendants.

12

13  MARCIANO PLATA, et al.,                       NO. C01-1351 TEH

14                       Plaintiffs,              **THREE-JUDGE COURT**

15         v.                                     OPINION AND ORDER
                                                  REQUIRING DEFENDANTS TO
16  EDMUND G. BROWN JR., et al.,                  IMPLEMENT AMENDED PLAN

17                       Defendants.

18

19          On April 11, 2013, this Court issued an opinion and order denying defendants' motion

20  to vacate or modify our population reduction order.  Apr. 11, 2013 Op. & Order Denying

21  Defs.' Mot. to Vacate or Modify Population Reduction Order (ECF No. 2590/4541).[1]  In that

22  opinion and order, defendants were required to take all steps necessary to comply with our

23  population reduction order issued on June 30, 2011, in compliance with the Supreme Court's

24  decision of May 23, 2011, which (as amended) requires defendants to reduce the overall

25

26          [1] All filings in this Three-Judge Court are included in the individual docket sheets of
    both *Plata v. Brown*, No. C01-1351 TEH (N.D. Cal.), and *Coleman v. Brown*, No. 90-cv-
27  520-LKK (E.D. Cal.).  In this Opinion, when we cite to such filings, we include the docket
    number in *Plata* first, then *Coleman*.  When we cite to filings in the individual cases, we
28  include the docket number and specify whether the filing is from *Plata* or *Coleman*.

1   prison population to 137.5% design capacity by December 31, 2013 (sometimes referred to

2   as "Order").  To ensure that they did so, this Court ordered defendants to submit a list of all

3   prison population reduction measures identified in this litigation ("List") and a plan for

4   compliance with our Order ("Plan").  Apr. 11, 2013 Order Requiring List of Proposed

5   Population Reduction Measures (ECF No. 2591/4542).  On May 2, 2013, defendants

6   submitted this List and their Plan, although their Plan does not comply with our Order.

7   Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2609/4572) ("Defs.' Resp.").  On May 15,

8   2013, plaintiffs submitted a responsive filing, in which they requested this Court to issue an

9   order to show cause why defendants should not be held in contempt.  Pls.' Resp. & Req. for

10   Order to Show Cause Regarding Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2626/4611).

11   On May 29, defendants submitted a reply.  Defs.' Resp. to Pls.' Resp. & Req. for Order to

12   Show Cause Regarding Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2640/4365).  On

13   June 17, defendants submitted their monthly status report.  Defs.' June 2013 Status Report

14   (ECF No. 2651/4653).

15        Because defendants' Plan does not comply with our Order, this Court hereby orders

16   defendants to implement an additional measure along with its Plan that will bring defendants

17   into compliance: the expansion of good time credits, as set forth in Item 4 of defendants' List

18   submitted on May 2, 2013.  This measure, expanded good time credits, in conjunction with

19   the measures included in the Plan submitted by defendants, will constitute an amended Plan

20   ("Amended Plan") – a plan that will, unlike defendants' Plan, reduce the overall prison

21   population to 137.5% design capacity by December 31, 2013.  Defendants are ordered to take

22   all steps necessary to implement all measures in the Amended Plan, commencing forthwith,

23   notwithstanding any state or local laws or regulations to the contrary. 18 U.S.C.

24   § 3626(a)(1)(B).  All such state and local laws and regulations are hereby waived, effective

25   immediately.

26        This Court desires to continue to afford a reasonable measure of flexibility to

27   defendants, notwithstanding their continued failure to cooperate with this Court.  To this end,

28   this Court offers defendants three ways in which they can amend the Amended Plan.  First,

1  defendants may, if they prefer, revise the expanded good time credit program, so long as

2  defendants' revision results in the release of at least the same number of prisoners as does the

3  expanded measure.  This Court will not specify the changes defendants must make in order

4  to meet this requirement.  Defendants must inform this Court in a timely manner, however,

5  of their decision to make such changes.

6  　　　　Second, defendants may at their discretion substitute for prisoners covered by any

7  measure or measures in the Amended Plan an equivalent number of prisoners by using the

8  "system to identify prisoners who are unlikely to reoffend or who might otherwise be

9  candidates for early release" (the "Low Risk List").  *Brown v. Plata*, 131 S. Ct. 1910, 1947

10  (2011).  Although defendants need not obtain prior approval for this substitution, they must

11  inform this Court that they intend to make such substitution.

12  　　　　Third, defendants may, with the prior approval of this Court, substitute any measure

13  or measures on the List for any measure or measures in the Amended Plan, as long as the

14  number of prisoners to be substituted equals or exceeds the number of prisoners to be

15  substituted for and defendants provide this court with incontestable evidence that the

16  substitution of prisoners to be released will be completed by December 31, 2013.  The filing

17  or pendency of any such request, or of any appeal from any order of this Court, shall not

18  relieve defendants of their continuing obligation to take forthwith all steps ordered herein or

19  necessary for the purpose of achieving compliance with this Order and the Amended Plan.

20  　　　　If for any reason the measures in the Amended Plan will not reach the 137.5%

21  population ceiling by December 31, 2013, defendants shall release the necessary number of

22  prisoners to reach that goal by using the aforementioned Low Risk List, a list that we have

23  previously ordered them to develop, and that they have advised us they can develop in

24  sufficient time to allow its use for purposes of compliance with the Order.

25

26  **I.     PROCEDURAL HISTORY**

27  　　　　The history of this litigation is of defendants' repeated failure to take the necessary

28  steps to remedy the constitutional violations in its prison system.  It is defendants'

3

1    unwillingness to comply with this Court's orders that requires us to order additional relief

2    today and to reiterate the lengthy history of this case, notwithstanding the fact that we set

3    forth much of this history in our April 11, 2013 Opinion & Order.

4          **A.**      **The *Plata* and *Coleman* cases**

5          We begin where the Supreme Court began in its June 2011 decision: "This case arises

6    from serious constitutional violations in California's prison system.  The violations have

7    persisted *for years*.  They *remain* uncorrected."  *Plata*, 131 S. Ct. at 1922 (emphasis added).

8    The constitutional violations at issue concern the Eighth Amendment's ban on cruel and

9    unusual punishment and are the subject of two separate class actions.  The first, *Coleman v.*

10   *Brown*, began in 1990 and concerns California's failure to provide constitutionally adequate

11   mental health care to its mentally ill prison population.  The second, *Plata v. Brown*, began in

12   2001 and concerns California's failure to provide constitutionally adequate medical health

13   care to its prison population.  In both cases, the district courts found constitutional violations

14   and ordered injunctive relief.[2]

15         In *Coleman*, defendants proved unable to remedy the constitutional violations despite

16   over a decade of remedial efforts.  The case was initiated in 1990, and – following a trial

17   overseen by Magistrate Judge John Moulds – the *Coleman* court found in 1995 that

18   defendants were violating the Eighth Amendment rights of mentally ill prisoners.  *Coleman*

19   *v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).  Defendants were ordered to remedy the

20   constitutional violations under the supervision of a Special Master.  *Id.* at 1323-24.  One

21   decade later in 2006, however, the Special Master's reports stated that defendants had wholly

22   failed to remedy the constitutional violations.  Worse yet, there was a backward slide in

23   progress, attributable largely to the growing overcrowding problem in the California prison

24   system.

25

26   _____

27       [2] We provide here only a brief review of the extensive (and unsuccessful) remedial efforts in both the *Plata* and *Coleman* cases.  For those interested in a detailed summary of

28   these efforts, see our August 4, 2009 Opinion & Order at 10-36 (ECF No. 2197/3641).

1    In *Plata*, defendants' inability to make progress in remedying the constitutional

2    violations resulted in the imposition of a drastic remedy: placing the prison medical care

3    system in a receivership.  The case was initiated in 2001, and defendants agreed to a

4    stipulated injunction in 2002.  Three years passed, however, during which defendants made

5    virtually no progress in implementing the necessary injunctive relief to remedy the

6    underlying constitutional violations.  As the *Plata* court wrote in 2005:

7               The prison medical delivery system is in such a blatant state of
              crisis that in recent days defendants have publicly conceded their
8             inability to find and implement on their own solutions that will
              meet constitutional standards.  The State's failure has created a
9             vacuum of leadership, and utter disarray in the management,
              supervision, and delivery of care in the Department of
10            Corrections' medical system.

11   May 10, 2005 OSC, 2005 WL 2932243, at *1-2.  After an extensive fact-finding process, the

12   *Plata* court established the Receivership, concluding that there was "nowhere else to turn."

13   Oct. 3, 2005 FF&CL, 2005 WL 2932253, at *31.  The Receiver was able to implement

14   substantial changes in the prison healthcare system but, ultimately, was unable to remedy the

15   constitutional errors in light of the severe overcrowding in the California prison system.[3]

16   "After years of litigation, it became apparent that a remedy for the constitutional

17   violations would not be effective absent a reduction in the prison system population."  *Plata*,

18   131 S. Ct. at 1922.  Congress, however, had restricted the ability of federal courts to enter a

19   population reduction order in the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L.

20   No. 104-134, 110 Stat. 1321 (codified in relevant parts at 18 U.S.C. § 3626); Aug. 4, 2009

21   Op. & Order at 50-51 (ECF No. 2197/3641) (explaining why a population reduction order is

22   a "prisoner release order," as defined by the PLRA, 18 U.S.C. § 3626(g)(4)).  Under the

23   PLRA, a population reduction order can be issued only by a specially convened three-judge

24   court which has made specific findings described in the statute.  18 U.S.C. § 3626(a).

25   In 2006, the plaintiffs in *Coleman* and *Plata* independently filed motions to convene a

26   three-judge court capable of issuing a population reduction order.  Both district courts

---

27            [3] The current Special Master in the *Coleman* case is Matthew A. Lopes, Jr.  The
28   current Receiver in the *Plata* case is J. Clark Kelso.

granted plaintiffs' motions and recommended that the cases be assigned to the same three-judge court "[f]or purposes of judicial economy and avoiding the risk of inconsistent judgments."  July 23, 2007 Order in *Plata*, 2007 WL 2122657, at *6; July 23, 2007 Order in *Coleman*, 2007 WL 2122636, at *8; *see also Plata*, 131 S. Ct. at 1922 ("Because the two cases are interrelated, their limited consolidation for this purpose has a certain utility in avoiding conflicting decrees and aiding judicial consideration and enforcement.").  The Chief Judge of the United States Court of Appeals for the Ninth Circuit agreed and, on July 26, 2007, convened the instant three-judge district court pursuant to 28 U.S.C. § 2284.  The court was composed of the two district judges who had many years of experience with the *Coleman* and *Plata* cases and one circuit judge appointed by the Chief Judge of the Circuit, in accordance with the circuit's regular procedure for the assignment of circuit court judges to special matters (the next judge on the list for such assignments who is available to serve).

### B.    This Court's August 2009 Opinion

In August 2009, after a fourteen-day trial, this Court issued an Opinion & Order designed to remedy the ongoing constitutional violations with respect to both medical and mental health care in the California prison system.  The order directed defendants, including the Governor, then Arnold Schwarzenegger,[4] and the Secretary of the California Department of Rehabilitation and Corrections ("CDCR"), then Matthew Cate,[5] to reduce the institutional prison population to 137.5% design capacity within two years.  This Court made extensive findings, as set forth in our 184-page opinion.  We repeat here only those findings that are necessary or relevant to the determination of the issues before us.

Because the PLRA makes the entry of a prisoner release order the "remedy of last resort," H.R. Rep. No. 104-21, at 25 (1995) (report of the House Committee on the Judiciary on the Violent Criminal Incarceration Act of 1995), we were required to find that "no other relief will remedy the violation of the Federal right." 18 U.S.C. § 3626(a)(3)(E)(ii).

---

[4] Edmund G. Brown Jr. was elected Governor to succeed Arnold Schwarzenegger on November 2, 2010.

[5] Jeffrey Beard was appointed successor to Matthew Cate on December 27, 2012.

6

1    Defendants contended that a prisoner release order was unnecessary because defendants

2    *could* construct new prisons, construct re-entry facilities at existing prisons, or expand

3    medical facilities at existing prisons.  Aug. 4, 2009 Op. & Order at 101-08 (ECF No.

4    2197/3641).  We recognized the theoretical possibility of such measures but found them

5    entirely unrealistic.  California had thus far failed to fund prison expansion and, in light of its

6    ongoing fiscal crisis, the prospect of any additional funding for prison expansion was

7    "chimerical."  *Id.* at 106.  We further concluded on the basis of expert testimony that all other

8    remedies suggested by defendants or defendant-intervenors were either insufficient or

9    required some level of prisoner release.  *Id.* at 112-118.  Accordingly, we concluded that "no

10   relief other than a prisoner release order is capable of remedying the constitutional

11   deficiencies at the heart of these two cases."  *Id.* at 119.  In short, we would not delay

12   remedying the constitutional violations in the prison system simply because defendants made

13   unrealistic and unfounded assertions regarding alternative remedies to the problem of

14   overcrowding.

15        This Court gave "substantial weight to any adverse impact on public safety or the

16   operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).  In

17   fact, we devoted 10 days out of the 14-day trial to the issue of public safety; we also devoted

18   approximately 25% of our Opinion & Order – 49 out of 184 pages – to it.  We heard from the

19   country's leading experts in the field of incarceration and crime, who based their opinions on

20   the experience of various jurisdictions that had successfully reduced prison population

21   without adversely affecting public safety or the operation of the criminal justice system.  On

22   the basis of this testimony and many state-commissioned reports that proposed various

23   measures for safely reducing the overcrowding in California's prison system, we identified a

24   variety of measures to reduce prison population without a significant adverse effect on public

25   safety or the criminal justice system's operation: (1) early release through the expansion of

26   good time credits; (2) diversion of technical parole violators; (3) diversion of low-risk

27   offenders with short sentences; (4) expansion of evidence-based rehabilitative programming

28   in prisons or communities; and (5) sentencing reform and other potential population

7

1    reduction measures.  Aug. 4, 2009 Op. & Order at 137-57 (ECF No. 2197/3641).  We did

2    not, however, select specific measures for defendants to implement.  Instead, defendants

3    were ordered to submit a plan for reducing California's prison population to 137.5% design

4    capacity within two years, and we stated that "[a]ny or all of these measures may be included

5    in the state's plan.  Whichever solutions it ultimately chooses, the evidence is clear that the

6    state can comply with our order in a manner that will not adversely affect public safety."  *Id.*

7    at 132.  Indeed, "[t]here was overwhelming agreement among experts for plaintiffs,

8    defendants, and defendant-intervenors that it is 'absolutely' possible to reduce the prison

9    population in California safely and effectively."  *Id.* at 137.  The question of *how* to do it was

10   left to defendants.

11         The most promising measure, it was generally agreed, was early release through the

12   expansion of good time credits.  This measure would in some cases reduce the prison

13   population by allowing prisoners to shorten their lengths of stay in prison by a few months.

14   Plaintiffs' experts – Doctors Austin and Krisberg; Secretaries Woodford, Lehman, and Beard

15   – were unanimous in their agreement that "such moderate reductions in prison sentences do

16   not adversely affect either recidivism rates or the deterrence value of imprisonment."  *Id.* at

17   140.  According to Dr. Austin (who continues to provide expert testimony on behalf of

18   plaintiffs in the present proceedings), criminologists have known "for many, many, many

19   years" that generally "there is no difference in recidivism rates by length of stay" in prison,

20   so reducing the length of stay by a "very moderate period of time" – four to six months –

21   would have no effect on recidivism rates. Tr. at 1387:1-11.  We considered extensive

22   testimony on the question of whether early release through good time credits increases the

23   crime rate, concluding that it does not and that it "affects only the timing and circumstances

24   of the crime, if any, committed by a released inmate."  *Id.* at 143.  Defendants presented only

25   one expert in opposition, Dr. Marquart, but his opposition (if it can be called that) was feeble.

26   Marquart testified that, while he criticized generic early release, he did not in fact oppose

27   good time credit measures.  *Id.* at 139-40.  Further, he agreed that there was no statistically

28   significant relationship between an individual's length of stay in prison and his recidivism

1   rate. *Id.* at 140-41.  His only criticism – that good time credits expansion might reduce the

2   opportunity for prisoners to complete rehabilitation programming – was, in our final

3   determination, "a note about the factors that should be considered in designing an effective

4   expanded good time credits system. It is entitled to little, if any, weight as an observation

5   about the possible negative effect on public safety of such a system." *Id.* at 141.  Thus, there

6   was essentially agreement among all experts – for plaintiffs and for defendants – that the

7   expansion of good time credits was consistent with public safety.  We concluded as follows:

8   "We credit the opinions of the numerous correctional experts that the expansion of good time

9   credits would not adversely affect but rather would benefit the public safety and the

10  operation of the criminal justice system." *Id.* at 145.

11      This conclusion was supported by the experience in many jurisdictions that had

12  successfully and safely implemented early release through good time credits.  California was

13  one such jurisdiction.  "Dr. Krisberg reviewed data provided by California and the FBI and

14  concluded that such programs, which were instituted in twenty-one California counties

15  between 1996 [and] 2006, resulted in approximately 1.7 million inmates released by court

16  order but did not result in a higher crime rate." *Id.* at 144.  Washington expanded its good

17  time credits program and Secretary Lehman, the former head of corrections for Washington,

18  testified that "these measures did not have any 'deleterious effect on crime' or public safety."

19  *Id.* at 174.  Dr. Austin – who has thirty years of experience in correctional planning and

20  research and has personally worked with correctional systems in eight states to reduce their

21  prisoner populations – testified that Illinois, Nevada, Maryland, Indiana, and New York all

22  successfully implemented good time credits expansion without adversely affecting public

23  safety. *Id.* at 175.  In New York, in particular, "the prison population decreased due in part

24  to the expansion of programs awarding good time credits, and not only did the crime rate not

25  increase, it 'declined substantially.'" *Id.*   Dr. Marquart attempted to point to Texas as an

26  example of a jurisdiction that unsuccessfully implemented good time credits expansion, but

27  he ultimately presented such equivocal testimony that it was of little use to this Court. *Id.* at

28  176-77.  We concluded that "the CDCR should implement population reduction measures

9

1   mirroring those of the jurisdictions that have successfully and safely reduced their inmate

2   populations." *Id.* at 177.

3        Not only did this Court find the expansion of good time credits to be safe, but we

4   found that it had the potential for significant reduction in the prison population. The state-

5   sponsored CDCR Expert Panel on Adult Offender Recidivism Reduction Programming

6   ("CDCR Expert Panel"),[6] on which we relied heavily, recommended that expansion of good

7   time credits could result in the release of 32,000 prisoners. *Id.* at 177-81. Such estimates, in

8   conjunction with our findings regarding other safe and effective population reduction

9   measures, led us to conclude that "the state has available methods by which it could readily

10  reduce the prison population to 137.5% design capacity or less without an adverse impact on

11  public safety or the operation of the criminal justice system." *Id.* at 181.

12       Defendants were thus ordered to submit a plan for compliance within 45 days of our

13  order. *Id.* at 183. They failed to do so, however; instead, they submitted a plan for achieving

14  the 137.5% reduction within five years, not two. Defs.' Population Reduction Plan (ECF No.

15  2237/3678). This Court ordered defendants to comply with the terms of the August 2009

16  Order by providing a plan for the reduction of the prison population to 137.5% capacity

17  within two years. Oct. 21, 2009 Order Rejecting Defs.' Proposed Population Plan (ECF No.

18  2269/3711). Defendants responded by submitting a plan for compliance within two years in

19  which defendants would reduce the prison population to 167%, 155%, 147%, and 137.5% at

20  six-month benchmarks. Defs.' Response to Three-Judge Court's Oct. 21, 2009 Order (ECF

21  No. 2274/3726). On January 12, 2010, this Court issued an order accepting defendants' two-

22  year timeline for compliance. That is, rather than ordering defendants to implement any

23  specific population reduction measures, we ordered defendants to reduce prison population to

24  167%, 155%, 147%, and 137.5% at six-month benchmarks. Jan. 12, 2010 Order to Reduce

25

26  _____

27       [6] CDCR Expert Panel, *A Roadmap for Effective Offender Programming in California:
     A Report to the California Legislature*, June 2007. The report is available at

28  http://sentencing.nj.gov/downloads/pdf/articles/2007/July2007/document03.pdf

1  Prison Population at 4 (ECF No. 2287/3767).  This Court stayed the effective date of our

2  order while defendants appealed to the Supreme Court.  *Id.* at 6.

3  **C.   The Supreme Court's June 2011 Opinion**

4       In June 2011, the Supreme Court affirmed this Court's order in full.  Again, we repeat

5  here only those portions of the Supreme Court opinion that are relevant to the motions

6  pending before us.

7       The Supreme Court framed the central question before it as whether resolving the

8  ongoing constitutional violations necessitated the entry of a prisoner release order.  The

9  Court fully recognized that the order was "of unprecedented sweep and extent" and that the

10  possible release of 37,000 prisoners was a matter of "undoubted, grave concern."  *Plata*, 131

11  S. Ct. at 1923.  The Court continued:

12
13  Yet so too is the continuing injury and harm resulting from these
    serious constitutional violations.  For years the medical and
14  mental health care provided by California's prisons has fallen
    short of minimum constitutional requirements and has failed to
    meet prisoners' basic health needs.  Needless suffering and death
15  have been the well-documented result.  Over the whole course of
    years during which this litigation has been pending, no other
16  remedies have been found to be sufficient.  Efforts to remedy the
    violation have been frustrated by severe overcrowding in
17  California's prison system.  Short term gains in the provision of
    care have been eroded by the long-term effects of severe and
18  pervasive overcrowding.

19  *Id.*  The Court thus recognized that, at some point when a state actor has proven unwilling or

20  incapable of remedying a constitutional violation, the deprivation of constitutional liberties

21  demands a more forceful solution.  Here, as "overcrowding is the 'primary cause of the

22  violation of a Federal right,' 18 U.S.C. § 3626(a)(3)(E)(i), specifically the severe and

23  unlawful mistreatment of prisoners through grossly inadequate provision of medical and

24  mental health care," that solution was a population reduction order.  *Id.*  The Supreme Court

25  affirmed our order in full, holding "that the court-mandated population limit is necessary to

26  remedy the violation of prisoners' constitutional rights."  *Id.*

27       One of defendants' principal arguments before the Supreme Court was that the Three-

28  Judge Court was prematurely convened, as defendants had been afforded insufficient time to

achieve a solution on their own to the problem of prison overcrowding. The Supreme Court

rejected this argument, stating that defendants had been given "ample time to succeed" in

resolving the constitutional violations. *Id.* at 1930. At the time that the Three-Judge Court

was convened, twelve years had passed since the appointment of the Special Master in

*Coleman*, and five years had passed since the stipulated injunction in *Plata*. The Supreme

Court stated that, given defendants' continuing inability to remedy the overcrowding

problem during that time, "the District Courts were not required to wait to see whether their

more recent efforts would yield equal disappointment." *Id.* at 1931. In short, decades of

failure by defendants justified the convening of this Three-Judge Court.

Defendants also repeated their challenge that a population reduction order was not

required, as the overcrowding problem could be resolved through construction and other

efforts. The Supreme Court flatly rejected each option presented by defendants, affirming

our determination that these options were "chimerical," ineffective, or demanded some level

of prisoner release. *Id.* at 1938-39. When defendants attempted to assert, without evidence,

that they could resolve the problem through some combination of these options, the Supreme

Court explained why defendants' troubled history in this litigation belied placing any trust in

them:

> The State claims that, even if each of these measures were
> unlikely to remedy the violation, they would succeed in doing so
> if combined together. Aside from asserting this proposition, the
> State offers no reason to believe it is so. Attempts to remedy the
> violations in *Plata* have been ongoing for 9 years. In *Coleman,*
> remedial efforts have been ongoing for 16. At one time, it may
> have been possible to hope that these violations would be cured
> without a reduction in overcrowding. A long history of failed
> remedial orders, together with substantial evidence of
> overcrowding's deleterious effects on the provision of care,
> compels a different conclusion today.

*Id.* at 1939. Again, decades of failure justified rejecting defendants' reassurances that, with

more time, they could resolve the problem.

Defendants also insisted that achieving a prison population of 137.5% design capacity

would adversely affect public safety. The Supreme Court recognized that defendants

maintained this belief but found it unpersuasive in light of this Court's explicit factual findings to the contrary:

> This inquiry necessarily involves difficult predictive judgments regarding the likely effects of court orders. Although these judgments are normally made by state officials, they necessarily must be made by courts when those courts fashion injunctive relief to remedy serious constitutional violations in the prisons. These questions are difficult and sensitive, but they are factual questions and should be treated as such. Courts can, and should, rely on relevant and informed expert testimony when making factual findings. It was proper for the three-judge court to rely on the testimony of prison officials from California and other States. Those experts testified on the basis of empirical evidence and extensive experience in the field of prison administration.

*Id.* at 1942. In other words, defendants' beliefs about public safety are not to be credited over the contrary findings of this Court, which were supported by extensive expert testimony and which the Supreme Court affirmed. In so doing, the Supreme Court specifically endorsed the good time credits expansion measure:

> The court found that various available methods of reducing overcrowding would have little or no impact on public safety. Expansion of good-time credits would allow the State to give early release to only those prisoners who pose the least risk of reoffending.

*Id.* at 1943. The Supreme Court also approvingly discussed the empirical and statistical evidence from other jurisdictions that had successfully implemented good time credits. *Id.* at 1942-43 (listing the experience in certain California counties, Washington, etc.). The Supreme Court was in clear agreement with this Court that defendants could reduce the prison population to 137.5% design capacity without adversely affecting public safety, specifically through the expansion of good time credits.

In its final section, the Supreme Court addressed the issue of timing. Defendants objected to the fact that our Order required them to achieve the prison population cap within two years. The Supreme Court held that there was nothing problematic about our two-year time frame, especially as defendants had not raised an objection to the two-year deadline at trial; nor had they formally requested an extension from the Supreme Court. *Id.* at 1946. The Court further observed that, because our Order was stayed during the pendency of the

13

1   Supreme Court proceedings, defendants "will have already had over two years to begin

2   complying with the order of the three-judge court." *Id.*  The Supreme Court stated that, to

3   the extent that additional time was necessary, defendants could seek modification, a request

4   which this Court "must remain open to." *Id.* (We have, in fact, done so, granting defendants

5   a six-month extension, the most that they even suggested might be necessary.)  Just as the

6   Supreme Court advised this Court to be open to accommodating defendants' possible need

7   for additional time, it also reminded us of the "the need for a timely and efficacious remedy

8   for the ongoing violation of prisoners' constitutional rights." *Id.* at 1946-47.  To the extent

9   that this Court granted defendants an extension, it should be "provided that the State satisfies

10   necessary and appropriate preconditions designed to ensure that measures are taken to

11   implement the plan without undue delay," including "the State's ability to meet interim

12   benchmarks for improvement in provision of medical and mental health care." *Id.* at 1947.

13   The Supreme Court then stated that, while it approved of the fact that our order "left the

14   choice of how best to comply with its population limit to state prison officials," *id.* at 1943,

15   circumstances may call for further relief:

16           The three-judge court, in its discretion, may also consider
             whether it is appropriate to order the State to begin without delay
17           to develop a system to identify prisoners who are unlikely to
             reoffend or who might otherwise be candidates for early release.
18           Even with an extension of time to construct new facilities and
             implement other reforms, it may become necessary to release
19           prisoners to comply with the court's order.  To do so safely, the
             State should devise systems to select those prisoners least likely
20           to jeopardize public safety.  An extension of time may provide
             the State a greater opportunity to refine and elaborate those
21           systems.

22   *Id.* at 1947.  The Supreme Court concluded its opinion by recognizing that, while

23   modification was certainly permissible, the serious constitutional deprivations in the

24   California prison system must be resolved in a timely fashion:

25           The medical and mental health care provided by California's
             prisons falls below the standard of decency that inheres in the
26           Eighth Amendment. This extensive and ongoing constitutional
             violation requires a remedy, and a remedy will not be achieved
27           without a reduction in overcrowding.  The relief ordered by the
             three-judge court is required by the Constitution and was
28           authorized by Congress in the PLRA.

14

1  *Id.* The final words of the Supreme Court's opinion leave no room for ambiguity: "The State

2  shall implement the order without further delay." *Id.*

3      **D.**    **Three-Judge Court Proceedings since June 2011**

4        Having been affirmed, our Court issued an order setting the following schedule by

5  which defendants were required to reduce the prison population to 137.5% design capacity

6  within two years after the Supreme Court's decision:

7      Defendants must reduce the population of California's
thirty-three adult prisons as follows:

8

9      a.    To no more than 167% of design capacity by
December 27, 2011.

10      b.    To no more than 155% of design capacity by June 27,
2012.

11

12      c.    To no more than 147% of design capacity by
December 27, 2012.

13      d.    To no more than 137.5% of design capacity by June 27,
2013.

14

15  June 30, 2011 Order Requiring Interim Reports at 1-2 (ECF No. 2374/4032).  Defendants

16  informed this Court that they would accomplish the population reduction primarily through

17  Assembly Bill 109, often referred to as "Realignment."  Defs.' Resp. to Jan. 12, 2010 Court

18  Order (ECF No. 2365/4016).[7]  Realignment would shift responsibility for criminals who

19  commit "non-serious, non-violent, and non-registerable sex crimes" from the state prison

20  system to county jails.  This would apply both to incarceration and parole supervision and

21  revocation, and to current and future prisoners convicted of those crimes.  Defs.' Resp. to

22  June 30, 2011 Court Order (ECF No. 2387/4043).  Realignment became effective in October

23  2011, and its immediate effects were highly beneficial, as thousands of prisoners either

24  serving prison terms or parole revocation terms for "non-serious, non-violent, and non-

25  registerable sex crimes" were shifted to county jails.  Defendants were thus able to comply

26  with the first benchmark, albeit shortly after the deadline.  Defs.' Jan. 6, 2012 Status Report

27      [7] California had also enacted Senate Bill 18, which made various minor reforms to its
good-time credits, parole policy, community rehabilitation programs, and sentences.  Defs.'

28  Resp. to Jan. 12, 2010 Court Order at 4-5 (ECF No. 2365/4016).

1   (ECF No. 2411/4141).  It also appeared that Defendants would easily meet the second

2   benchmark and would likely meet the third.  *Id.*

3        It soon became apparent, however, that Realignment was not sufficient in itself to

4   achieve the 137.5% benchmark by June 2013 or to meet the ultimate population cap at any

5   time thereafter, in the absence of additional actions.  In February 2012, plaintiffs filed a

6   motion requesting this Court to order defendants to demonstrate how they intended to meet

7   the 137.5% figure by June 2013.  Pls.' Mot. for an Order Requiring Defs. to Demonstrate

8   How They Will Achieve the Required Population Reduction by June 2013 (ECF No.

9   2420/4152).  Plaintiffs argued that, based on CDCR's own population projections (as of Fall

10  2011), it was evident that defendants would not achieve a prison population of 137.5% by

11  June 2013.  *Id.* at 2-3.  Defendants responded that, because their Fall 2011 projections

12  predated the implementation of Realignment, they were not reliable.  Defs.' Opp'n to Pls.'

13  Mot. for Increased Reporting in Excess of the Court's June 30, 2011 Order at 2-3 (ECF No.

14  2423/4162).  They stated that the forthcoming Spring 2012 population projections would

15  give a more accurate indication of whether defendants would meet the 137.5% figure by June

16  2013.  *Id.* at 4.  This Court accepted defendants' representations and denied plaintiffs' motion

17  without prejudice to the filing of a new motion after CDCR published the Spring 2012

18  population projections.  Mar. 22, 2012 Order Denying Pls.' Feb. 7, 2012 Mot. (ECF No.

19  2428/4169).

20       In May 2012, plaintiffs renewed their motion.  Pls.' Renewed Mot. for an Order

21  Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction

22  by June 2013 (ECF No. 2435/4180).  Plaintiffs correctly observed that, despite defendants'

23  assurances that the Fall 2011 projections were outdated and unreliable, the Spring 2012

24  population projections were not significantly different.  *Id.* at 3-4.  Plaintiffs also pointed to a

25  new public report issued in the intervening months, titled "The Future of California

26  Corrections" (known as "The Blueprint"), in which defendants stated that they would not

27  meet the 137.5% figure by June 2013 and announced their intention to seek modification of

28  this Court's Order.  *See* CDCR, *The Future of California Corrections: A Blueprint to Save*

*Billions of Dollars, End Federal Court Oversight, and Improve the Prison System*, Apr. 2012 ("CDCR Blueprint").[8]  In fact, the Blueprint called for a substantial increase in the California prison population.  Based on this evidence, plaintiffs repeated their request that this Court order defendants to demonstrate how they would comply with this Court's June 30, 2011 Order.  Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction by June 2013 at 5-6 (ECF No. 2435/4180). They further contended that defendants' delaying tactics and "failure to take reasonable steps to avert a violation of this Court's Order would amount to contempt of court."  *Id.* at 6. Defendants' responsive filing, dated May 2012, confirmed their intent not to comply with the Order but instead to seek its modification from 137.5% design capacity to 145% design capacity.  Defs.' Opp'n to Pls.' Renewed Mot. for an Order Requiring Defs. to Demonstrate How They Will Achieve the Required Population Reduction by June 2013 at 2 (ECF No. 2442/4191).

        This Court, being of the opinion that it could not grant plaintiffs' request to order defendants to demonstrate how they would meet the 137.5% goal if defendants actually had a legitimate basis for seeking modification, ordered two rounds of supplemental briefing regarding the basis for defendants' anticipated (but unfiled) motion to modify.  June 7, 2012 Order Requiring Further Briefing (ECF No. 2445/4193); Aug. 3, 2012 2d Order Requiring Further Briefing (ECF No. 2460/4220).[9]  Additionally, because defendants[10] had suggested

---

        [8] The Blueprint represents defendants' current plan for the California prison system. It, however, makes no attempt to reduce prison crowding further than Realignment.  To the contrary, it calls for the elimination of California's program that houses approximately 9,500 prisoners in out-of-state prisons, which – as explained *infra* – will have the result of increasing prison crowding substantially.  The Blueprint is therefore in all ways relevant, as it is in effect the updated version of the Realignment, and we use the terms Realignment and Blueprint interchangeably.  The Blueprint can be found at http://www.cdcr.ca.gov/2012plan/docs/plan/complete.pdf.

        [9] Defendants' initial responsive briefing was unclear and did not satisfactorily respond to this Court's question as to what the basis for the motion to modify would be. Additionally, their answer raised further factual questions.  For example, defendants assured this Court that they would not use modification as a delaying tactic because they would seek modification promptly after the prison population fell to 145%, which they projected would happen in December 2012.  Defs.' Resp. to June 7, 2012 Order Requiring Further Briefing at 1, 2 (ECF No. 2447/4203).  Their projection, however, appeared to be outdated or simply

1    that they were not currently on track to reduce prison population to 137.5% design capacity,

2    this Court asked the following:

> [I]f the Court ordered defendants "to begin without delay to
> develop a system to identify prisoners who are unlikely to
> reoffend or who might otherwise be candidates for early release,"
> *Plata*, 131 S. Ct. at 1947, by what date would they be able to do
> so and, if implemented, how long would it take before the prison
> population could be reduced to 137.5%? By what other means
> could the prison population be reduced to 137.5% by June 27,
> 2013? Alternatively, what is the earliest time after that date that
> defendants contend they could comply with that deadline?

8    *Id.* at 4. This Court further stated that, until such time as we declare otherwise, "defendants

9    shall take all steps necessary to comply with the Court's June 30, 2011 order, including the

10   requirement that the prison population be reduced to 137.5% by June 27, 2013." *Id.*

11       In their response, defendants stated that they would seek to prove that Eighth

12   Amendment compliance could be achieved with a prison population higher than 137.5%

13   design capacity. Defs.' Resp. to Aug. 3, 2012 2d Order Requiring Further Briefing at 6 (ECF

14   No. 2463/4226). Defendants defiantly refused, however, to answer the set of questions

15   quoted above. Defendants stated, somewhat astonishingly, that our suggestion that we *might*

16   order defendants to develop a system to identify low-risk prisoners, a system that the

17   Supreme Court had suggested we might consider ordering defendants to develop "without

18   delay," "is a prisoner release order that vastly exceeds the scope of any of the Court's prior

19   orders." *Id.* at 11. In tortured logic, defendants suggested that the Supreme Court's

20   statement ("The three-judge court, in its discretion, may also consider whether it is

21   appropriate to order the State to begin without delay to develop a system to identify prisoners

22   who are unlikely to reoffend or who might otherwise be candidates for early release.") "did

23   not authorize the early release of prisoners," or even the consideration of that question. *Id.*

24   _____

25   erroneous. The then-current prison population was higher than defendants estimated, and the
     rate of prison population decline was already slowing considerably. If defendants failed to
     take additional measures until after they filed a motion to modify and would not file the

26   motion until the prison population fell to 145%, it was unclear when, if ever, a motion would
     be filed. Accordingly, this Court ordered a second round of briefing.

27

28       [10] Our order was directed at both parties, but the answers we sought were from
     defendants only.

1   More to the point, our questions were about the timing of the development of such a system,

2   not the actual imposition of it.  Defendants, nevertheless, refused to answer our questions.[11]

3         We had asked other factual questions, which defendants did answer.  In response to

4   this Court's question whether modification proceedings could commence before the prison

5   population reached 145%, defendants replied that they believed it would be premature to

6   begin modification proceedings before the prison population reached 145%.  Defs.' Resp. to

7   Aug. 3, 2012 2d Order Requiring Further Briefing at 9-10 (ECF No. 2463/4226).  In response

8   to the question whether their population projections were flawed, defendants conceded that

9   point and stated that they believed the prison population would reach 145% design capacity

10  by February or March 2013, at which point they would seek modification.  *Id.* at 10-11.  As

11  of the date of this order, the prison population is at 149.8% design capacity.  CDCR, *Weekly*

12  *Rpt. of Population*, June 12, 2013, *available at*  http://www.cdcr.ca.gov/reports_research/

13  offender_information_services_branch/WeeklyWed/TPOP1A/TPOP1Ad130612.pdf.

14  Plaintiffs again asked this Court to find defendants in contempt, asserting that "[d]efendants

15  have all but stated that they have no intention of complying with this part of the Court's

16  Orders."  Pls.' Request for Disc. & Order to Show Cause Re: Contempt at 1 (ECF No.

17  2467/4230).

18        In September 2012, this Court ruled on plaintiffs' pending motions, including their

19  request that defendants be held in contempt, which we denied without prejudice.  Sept. 7,

20  2012 Order Granting in Part & Denying in Part Pls.' May 9 and Aug. 22, 2012 Mots. (ECF

---

21          [11] Defendants did appear to state, however, that, if the motion to modify were to be
22  denied, they could comply with our Order with a six-month extension.  *Id.* at 12 ("If the
    Court for some reason disagrees and insists that the final benchmark cannot be modified,
23  Defendants' only method of achieving the 137.5% target, without the early release of
    prisoners or further legislative action to shorten prison time, would be to maintain the
24  out-of-state program.  If the Court were to order that the current out-of-state capacity be
    maintained and waived the associated state laws, the prison population should reach 137.5%
25  by December 31, 2013.").  Defendants offered no explanation, however, why they could not
    release low-risk prisoners early or obtain any necessary legislative action for other measures
26  identified in our August 2009 Opinion & Order.  As to the out-of-state prisoner program,
    which had been authorized under an Emergency Proclamation issued by Governor
27  Schwarzenegger but still remained in effect, Governor Brown without prior notice
    subsequently terminated the Emergency Proclamation while announcing that the
28  overcrowding problem had been solved.

No. 2473/4235).  In the course of ruling on those motions, we commented that the question whether constitutional compliance could be achieved with a prison population higher than 137.5% design capacity "has already been litigated and decided by this Court and affirmed by the Supreme Court, and this Court is not inclined to permit relitigation of the proper population cap at this time."  *Id.* at 2-3.  Accordingly, this Court stated that we were "not inclined to entertain a motion to modify the 137.5% population cap based on the factual circumstances identified by defendants."  *Id.* at 2.  This Court further stated that it would, "however, entertain a motion to extend the deadline for compliance with the June 30, 2011 order."  *Id.* at 3.  We also ordered defendants to answer the questions to which they had failed to respond.  *Id.*

Defendants filed a response in which they answered our questions.  Specifically, they stated that they would need six months to develop a system for identifying low-risk offenders for early release.  Defs.' Resp. to Sept. 7, 2012 Order at 5 (ECF No. 2479/4243).  Furthermore, defendants advised us that they could comply with our Order with a six-month extension, largely by maintaining the out-of-state program.  *Id.* at 6.  It appeared, from the parties' filings, that resolution was not far off:  Even defendants acknowledged that they could comply by December 2013.  The parties disagreed, but perhaps not irreconcilably, over whether defendants could comply by the original date for compliance, June 2013.  Accordingly, in October 2012, this Court ordered both parties to meet and confer, to develop, and to submit (preferably jointly) "plans to achieve the required population reduction to 137.5% design capacity by (a) June 27, 2013, and (b) December 27, 2013."  Oct. 11, 2012 Order to Develop Plans to Achieve Required Prison Population Reduction at 1 (ECF No. 2485/4251).  The plans were due on January 7, 2013.

On January 7, 2013, both parties filed plans to meet the 137.5% population cap.  Defendants suggested in their plan that, although compliance by June 2013 would require the outright release of thousands of prisoners "without a structured program," compliance by December 2013 would require virtually no such release of prisoners.  Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2511/4284).  Three other more significant events occurred, however,

20

on or around that date, all indicating a troubling change in position on the part of defendants. First, in their monthly status report, defendants stated that despite not being in compliance with this Court's order, they would take no further action to comply with it.[12]  Defs.' Jan. 2013 Status Report at 1 (ECF No. 2518/4292) ("Based on the evidence submitted in support of the State's motions, further population reductions are not needed . . . .").  Second, defendants filed a *motion to vacate or modify* this Court's Order.  Defs.' Mot. to Vacate or Modify Population Reduction Order (ECF No. 2506/4280) ("Three-Judge Motion").  This motion did not await the defendants' reaching a 145% population cap, as they had said they would, *see supra* at n.9, or renew defendants' request to extend the deadline by six months. Rather, defendants requested complete vacatur of this Court's Order.  *Id.* at 3.  On the same day, defendants filed, in the *Coleman* court, a motion to terminate all injunctive relief in that case.  Mot. to Terminate & to Vacate J. & Orders (*Coleman* ECF No. 4275).  Notably, defendants did not file a similar motion in the *Plata* court.  The *Coleman* court denied defendants' motion to terminate.  Apr. 5, 2013 Order Denying Defs.' Mot. to Terminate (*Coleman* ECF No. 4539).  Third, the Governor terminated his emergency powers, while arrogating unto himself the authority to declare, notwithstanding the orders of this Court, that the crisis in the prisons was resolved.  Gov. Edmund G. Brown Jr., *A Proclamation by the Governor of the State of California*, Jan. 8, 2013 ("[P]rison crowding no longer poses safety risks to prison staff or inmates, nor does it inhibit the delivery of timely and effective health care services to inmates.").[13]  This termination eliminated the legal authorization that permitted defendants to form contracts to house approximately 9,500 California prisoners in out-of-state prisons.[14]  As the existing contracts expire, they will not be reauthorized.

---

[12] In defendants' two subsequent status reports, they repeated verbatim the statement from their January report that they would not make any further attempts to comply with the Order.  Defs.' Feb. 2013 Status Report at 1 (ECF No. 2538/4342) ("Based on the evidence submitted in support of the State's motions, further population reductions are not needed."); Defs.' March 2013 Status Report at 1 (ECF No. 2569/4402) (same).

[13] Available at http://gov.ca.gov/news.php?id=17885.

[14] The appropriations for housing California prisoners in out-of-state prisons had already been terminated by the Blueprint.

1   Consequently, the state prison population will increase by approximately 9,500 prisoners

2   over the next several years.  The Governor's declaration that the constitutional crisis in the

3   prisons had ended and that overcrowding no longer posed health risks to prisoners or safety

4   risks to prisoners or staff was contrary to fact and served no legal purpose other than, by

5   terminating his own authority with regard to out-of-state prisoner housing, to make it more

6   difficult for defendants to comply with this Court's orders while publicly proclaiming

7   "Victory," or "Mission Accomplished."

8           On January 29, 2013, this Court stayed its consideration of the Three-Judge Motion.

9   Jan. 29, 2013 Order at 2 (ECF No. 2527/4317).  However, we granted defendants a six-

10  month extension, even though no formal request had been made to this Court.  *Id.* at 2-3.

11  Finally, we once again ordered defendants to comply with our Order.  *Id.* at 2 (ECF No.

12  2527/4317) ("Neither defendants' filings of the papers filed thus far nor any motions,

13  declarations, affidavits, or other papers filed subsequently shall serve as a justification for

14  their failure to file and report or take any other actions required by this Court's Order.").

15          **E.**      **This Court's April 11, 2013 Opinion & Order Denying Defendants' Three-**
            **Judge Motion and April 11, 2013 Order Requiring List of Population**
16          **Reduction Measures**

17          On April 11, 2013, this Court denied defendants' Three-Judge Motion and ordered

18  them to "immediately take all steps necessary" to comply with our Order.  Apr. 11, 2013 Op.

19  & Order at 2 (ECF No. 2590/4541).  This Court explained its rationale for rejecting

20  defendants' modification request in a lengthy 71-page opinion.  We briefly repeat our

21  rationale here, noting one instance in which evidence available subsequent to the filing of our

22  April 11, 2013 Opinion & Order confirms our conclusions.

23  //

24  //

25  //

26  //

27  //

28  //

1    We denied the Three-Judge Motion (as modified[15]) for three reasons.  First, it was

2    barred by res judicata principles as an improper attempt to relitigate the 137.5% figure, a

3    predictive judgment that this Court had made and that the Supreme Court had specifically

4    affirmed.[16]  Second, defendants presented insufficient evidence to meet their burden under a

5    Rule 60(b)(5) motion, which is to prove a "significant and unanticipated change in factual

6    conditions warranting modification."  *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th

7    Cir. 2005) (summarizing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384-86 (1992)).

8    The Receiver's 23rd Report, which was filed on May 23, 2013, subsequent to our April 11,

9    2013 Opinion & Order, further supports our conclusion that defendants failed to demonstrate

10   that their various renovation projects, although adding some treatment space, have added

11   *adequate* treatment space to conclude that the overcrowding was no longer the primary cause

12   of the ongoing constitutional violations:

13            Sufficient additional space for healthcare has been added by the
              Receiver only at San Quentin and Avenal, and some additional
14            space and beds for mental healthcare have been added pursuant to
              court orders in *Coleman*.  As reported below, however, the State
15            has not completed promised improvements and upgrades to
              healthcare space at the remainder of the prisons, and even though
16            a plan to complete such construction was completed and agreed
              to four years ago, not a single upgrade project has broken ground
17            and not even a single contract for design services has been
              entered into.  The completion dates for these projects stretch into
18            2016 and 2017, far enough into the future that there is no reliable
              guarantee the projects will ever be undertaken.

19 _____

20        [15] Defendants' Three-Judge Motion presented two arguments for vacatur: that there
     are no longer ongoing constitutional violations regarding the failure to provide the requisite
21   level of medical and mental health care and, even if there are, crowding is no longer the
     primary cause of those constitutional violations.  Defendants later modified the Three-Judge
22   Motion by withdrawing their request for this Court to decide either constitutional question
     and asked us to answer only the overcrowding question.  Defs.' Resp. to Jan 29, 2013 Order
23   at 4 (ECF No. 2529/4332) ("The issue to be decided by this Court is not constitutional
     compliance."); Defs.' Reply Br. in Supp. of Three-Judge Mot. at 11 (ECF No. 2543/4345)
24   ("Defendants' motion did not seek a determination of constitutionality.").

25        [16] To the extent that defendants continue to insist that 137.5% design capacity is too
     low a figure, we note that the Receiver's 23rd Report calls for the opposite conclusion.  He
26   states that Realignment has transferred a disproportionately younger and thus healthier prison
     population to county jails.  Receiver's 23rd Report at 32 (ECF No. 2636/4628).  This
27   proposition supports the conclusion that, if anything, the population cap should be lower, as
     the remaining prison population is less healthy than this Court assumed when it adopted the
28   137.5% figure in August 2009.

1

> Simply put, we do not have appropriate and adequate healthcare
2  space at the current population levels.  We need population levels
   to reduce to 137.5% of design capacity as ordered by the Three
   Judge Panel, and we need the State to complete its promised
3  construction.

4   Receiver's 23rd Report at 31 (ECF No. 2636/4628).[17]  Third, in light of defendants' stated

5   intention to increase the state prison population by 9,500 prisoners by eliminating the out-of-

6   state prison program, defendants failed to demonstrate a "durable" solution that would justify

7   this Court exercising its equity power to vacate a prior order.  We denied the Three-Judge

8   Motion and ordered defendants to comply with our Order and reduce the overall prison

9   population to 137.5% design capacity by December 31, 2013.

10          To ensure that defendants complied, this Court entered a separate order consisting of

11  five parts.  Apr. 11, 2013 Order (ECF No. 2591/4542).  First, we ordered defendants to

12  "submit a list ('List') of all prison population reduction measures identified or discussed as

13  possible remedies in this Court's August 2009 Opinion & Order, in the concurrently filed

14  Opinion & Order, or by plaintiffs or defendants in the course of these proceedings (except for

15  out-of-state prisoner housing . . .).  Defendants shall also include on the List any additional

16  measures that they may presently be considering."  *Id.* at 1-2.  Defendants were to list these

17  measures "in the order that defendants would prefer to implement them, without regard to

18  whether in defendants' view they possess the requisite authority to do so," and to provide

19  various additional information for each measure on the List.  *Id.* at 2.  For example, we asked

20  for "[d]efendants' best estimate as to the extent to which the measure would, in itself, assist

21  defendants in reducing the prison population to 137.5% design capacity by December 31,

22  2013, including defendants' best estimate as to the number of prisoners who would be

23  'released,' *see* 18 U.S.C. § 3626(g)(4), as a result of the measure."  *Id.*  These estimates were

24  to include both prospective and retroactive implementation of the measure, where applicable.

25  *Id.*

26

27
        [17] We have received and reviewed Defendants' Response to the Receiver's 23rd Tri-
28  Annual Report (ECF No. 2647/4650).

Second, we ordered defendants to submit "a plan ("Plan") for compliance with the Order:[18]  The Plan was to identify measures from the List that defendants propose to implement, without regard to whether in defendants' view they possess the requisite authority to do so." *Id.* at 3.  Defendants were specifically ordered to explain:

> For the measures included in the List but not in the Plan: defendants' reasons, excluding lack of authority, why they do not propose to implement these measures.  Other reasons that shall be excluded are all reasons that were previously offered at the trial leading to this Court's August 2009 Opinion & Order and rejected in that Opinion & Order.

*Id.* at 3.  If defendants included a measure to slow the return of out-of-state prisoners, they were required to "include an estimate regarding the extent to which this measure would assist defendants in reducing the prison population to 137.5% design capacity by December 31, 2013" and to explain whether any such measure would provide a durable solution.  *Id.* at 4.

Third, we ordered defendants to "use their best efforts to implement the Plan."  *Id.* at 4.  For measures for which they possessed the requisite authority, this meant "[d]efendants shall immediately commence taking the steps necessary to implement the measure."  *Id.*  For measures for which they lacked such authority, this meant "[d]efendants shall forthwith attempt in good faith to obtain the necessary authorization, approval, or waivers from the Legislature or any relevant administrative body or agency."  *Id.*

Fourth, we ordered defendants to update us on their progress towards implementing the Plan in their monthly reports.  *Id.*  For measures for which they possess the requisite authority, defendants were to commence taking all necessary steps immediately and, if they failed to do so, explain who is responsible and why.  For measures for which they lacked such authority, we asked for information regarding their progress in acquiring legislative and administrative authorization.

---

[18] "Order" was defined in the April 11, 2013 order the same way as "Order" is defined in this Opinion & Order.  It refers to defendants' obligation to reduce the prison population to 137.5% design capacity by December 31, 2013.

1       Fifth, we ordered defendants "to develop a system to identify prisoners who are

2   unlikely to reoffend or who might otherwise be candidates for early release, to the extent that

3   they have not already done so." *Id.* at 5.  "If defendants fail to reduce the prison population

4   to 137.5% design capacity in a timely manner, this system will permit defendants to

5   nevertheless comply with the Order through the release of low-risk prisoners." *Id.*

6   Defendants were ordered to submit the List and Plan within 21 days of our April 11, 2013

7   order.

8

9   **II.      DISCUSSION**

10      Defendants timely submitted the List and a Plan, although – as will be explained in

11  detail *infra* – defendants' Plan does not comply with our Order.  This Court therefore orders

12  defendants to implement the Plan plus an additional population reduction measure as well.

13  This additional measure, in conjunction with the measures included in the Plan submitted by

14  defendants, will constitute the Amended Plan – a plan that will, unlike defendants', reduce

15  the overall prison population to 137.5% design capacity by December 31, 2013.

16          **A.      <u>Defendants' Plan for Non-Compliance</u>**

17      Defendants again directly defied this Court's orders, this time our April 11, 2013

18  order.  By the terms of our April 11, 2013 order, defendants were required to submit a Plan

19  for compliance with our Population Reduction Order as amended, i.e., to reduce the prison

20  population to 137.5% design capacity by December 31, 2013.  Apr. 11, 2013 Order at 3 (ECF

21  No. 2591/4542).  Under Realignment and the Blueprint (which was defendants' earlier

22  "effort" to comply with the Order), the prison system is projected, on December 31, 2013, to

23  contain 9,636 prisoners more than permitted by the Population Reduction Order.  This

24  includes several thousand prisoners who, under the Blueprint, are due to be returned to the

25  state prison system sometime this year.  *Id.*; *see also* CDCR Blueprint at 6-7 & App. G.

26  Consequently, on December 31, 2013, the prison population was projected to be 149.3%

27

28

design capacity rather than 137.5%.[19]  Accordingly, we directed defendants in our April 11, 2013 order to propose a new Plan that would reduce the state prison population by 9,636 more prisoners by December 31, 2013.

It is clear that defendants failed to comply with our April 11, 2013 order, and they have now conceded as much. Defs.' Resp. to April 11, 2013 Order at 5 n.3, 37 (ECF No. 2609/4572) (acknowledging that its latest Plan will not achieve the 137.5% figure by December 31, 2013).  Defendants, however, understate the extent of their own non-compliance.  Defendants assert that their Plan would achieve a prison population of 140.7% design capacity by December 31, 2013.  In fact, however, at best defendants' latest Plan would result in a prison population of 142.6% design capacity by December 31, 2013, assuming that the out-of-state prisoners are actually not to be returned (despite the Governor's termination of his authority to order them housed outside of California).  In other words, Defendants submitted a Plan that at best would achieve essentially only half of the prisoner reduction required by our April 11, 2013 order.  Demonstrating the discrepancy between defendants' assertions and the reality of their proposed Plan requires some explanation.

Defendants' Plan has five components: (1) expanding the use of fire camps; (2) leasing jail capacity from Los Angeles and Alameda county; (3) expanding good time credits

---

[19] The calculations throughout this Opinion & Order are based on projections for prison population and design capacity that defendants have either reported to us in various filings or stated in published reports (e.g., the Blueprint).  We accept defendants' reported numbers because, not only does this Court have no independent method to determine such figures, but also plaintiffs have not objected to these numbers.  Accordingly, we credit defendants fully with the additional design capacity resulting from construction to be completed between now and December 31, 2013.

We note, however, that defendants' previous estimate for the shortfall between the Blueprint and the 137.5% population figure was 8,790 prisoners.  App. A to Grealish Decl. in Supp. of Defs.' Resp. to Oct. 11, 2012 Order (ECF No. 2512/4285).  Based on defendants' May 2, 2013 filing, it is apparent that the shortfall is now 9,636 prisoners.  Defendants have failed to explain why or how this estimate has changed by almost 1,000 prisoners.  It appears to be attributable to an upward revision in the State's general population projections.  Defendants' Spring 2013 population projections show the prison population to be higher than was expected in the Fall 2012 projections.  Spring 2013 Adult Population Projections at 11, http://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/ Projections/S13Pub.pdf.

for non-violent offenders prospectively (despite the agreement of all experts that the full expansion of good time credits, retroactively and for all prisoners, was the most promising population reduction measure); (4) expanding some parole categories; and (5) slowing the return of out-of-state prisoners.  Defendants estimate the prisoner reduction from each of these measures as follows:[20]

| Component | Reduction by December 31, 2013 |
|---|---|
| 1) Fire camps | 1,250 |
| 2) Leasing jail space | 1,600 |
| 3) Good time credits (limited) | 247 |
| 4) Expanding parole | 400 |
| 5) Out-of-state prisoners not to be returned | 3,569 |
| Total achieved by Plan | 7,066 |
| Shortfall relative to 9,636 reduction required by population reduction order | 2,570 |

Thus, if defendants were able to implement all the measures included in its Plan and if these estimates accurately reflected the prisoner population reduction that would be achieved under those measures, defendants would fail to comply with our April 11, 2013 order by a total of 2,570 prisoners – i.e., it would fall 27% short of the 9,636 reduction required by that order. Put another way, it would result in a prison population of 140.7% design capacity on December 31, 2013.

Defendants' estimates, however, include reductions that would not be attainable by December 31, 2013.  Specifically, the second item on defendants' Plan is not attainable by that date because defendants concede that, even with complete authorization, they will need nine months to negotiate the necessary contracts and thus cannot "fully implement this measure" by the end of the year.  Defs.' Resp. to April 11, 2013 Order at 7 (ECF No.

---

[20] Because our April 11, 2013 opinion ordered defendants to ensure that the estimated reductions from the measures in its Plan did not double count the same prisoners, Apr. 11, 2013 Op. & Order at 3 (ECF No. 2591/4542), we assume that the total reduction from the Plan is the simple sum of the individual measures in the Plan.

2609/4572). In fact, defendants do not assert that by December 31, 2013 their Plan would achieve any specific reduction in the prison population as a result of the reassignment of prisoners to leased jail space. Consequently, we cannot credit the Plan with the 1,600 prisoner reduction as a result of leasing jail capacity by December 31, 2013. With this adjustment, defendants' Plan is as follows:

| Component | Reduction by December 31, 2013 |
|---|---:|
| 1) Fire camps | 1,250 |
| 2) Leasing jail space (1,600) | 0 |
| 3) Good time credits (limited) | 247 |
| 4) Expanding parole | 400 |
| 5) Out-of-state prisoners not to be returned | 3,569 |
| Total achieved by Plan | 5,466 |
| Shortfall relative to 9,636 reduction required by population reduction order | 4,170 |

Eliminating the effect of the proposed jail leasing measure, defendants' Plan fails to comply with our April 11, 2013 order by a total of 4,170 prisoners – i.e., it falls 43% short of the 9,636 reduction required by that order. Put another way, defendants' Plan would actually result in a prison population of 142.6% design capacity on December 31, 2013. In short, defendants' Plan clearly fails to meet the design capacity limit ordered by this Court – and affirmed by the Supreme Court – by a significant amount.

Although defendants' Plan does not come close to meeting the population reduction required by our order, defendants also advise us that this deficient Plan cannot be immediately implemented because all but one of the measures included therein are contrary to state law. This includes the measure to slow the return of out-of-state prisoners, even though the legal authorization to house these prisoners out of state in the first place was provided by Governor Schwarzenegger's Emergency Proclamation, which Governor Brown terminated earlier this year on the erroneous legal ground that no constitutional violation existed any longer in the California prison system. In other words, defendants must now

1  seek authorization (from the Legislature, or from this Court in the form of a waiver of state

2  law) for a new measure that is required only because of the Governor's own prior action in

3  terminating his own emergency authority, and his refusal to reinstate this authority.

4  Defendants' June 17, 2013 status report indicates that they have proceeded no further in

5  making the necessary preparations to implement the measures in the Plan other than to draft

6  proposed legislation.[21]  Defs.' June 2013 Status Report (ECF No. 2651/4653).  Moreover,

7  with regard to all measures that require authorization, the leader of the State Senate has

8  declared them DOA, dead on arrival.  Hardy Decl., ¶ 3, Ex. B (ECF No. 2628/4612).  In sum,

9  there is more than merely a substantial numerical deficiency with regard to defendants'

10  Plan.[22]

11        **B.**      **The Need for Further Relief**

12        In responding to defendants' submission of a "Plan" that fails to comply with our

13  Order, we begin again with the Supreme Court's prior decision:

14              If government fails to fulfill its obligation [to provide care
                consistent with the Eighth Amendment], the courts have a
15              responsibility to remedy the resulting Eighth Amendment
                violation.  *See Hutto v. Finney*, 437 U.S. 678, 687, n. 9, 98 S. Ct.
16              2565, 57 L. Ed.2d 522 (1978).  Courts must be sensitive to the
                State's interest in punishment, deterrence, and rehabilitation, as
17              well as the need for deference to experienced and expert prison
                administrators faced with the difficult and dangerous task of
18              housing large numbers of convicted criminals.  *See Bell v.*

19

─────────────────────

20  [21] The two exceptions are that they have (a) continued with construction of the
    California Health Care Facility in Stockton and the DeWitt Nelson Correctional Annex in
21  Stockton; and (b) revised the 2013-2014 budget to include appropriations to increase fire
    camp capacity. Defs.' June 2013 Status Report 1-2 (ECF No. 2651/4653).
22
    [22] There are many other, although more minor, examples of how defendants have
23  failed to follow the clear terms of our April 11, 2013 order.  For example, defendants: failed
    to list the total number of prisoners who would be released as a result of the Plan (violating
24  provision (2)(d) of the order); cited an excluded reason for failing to include various
    measures on the Plan (e.g., cited public safety as reason for not including expansion of good
25  time credits for all prisoners) (violating provision (2)(e) of the order); failed to provide a
    substantive explanation as to how the Plan would provide a durable solution to the problem
26  of overcrowding (violating provision (2)(f) of the order); failed to provide an estimate
    regarding the effect on durability of slowing the return of out-of-state prisoners (violating
27  provision (2)(g) of the order); and failed to use their "best efforts" to implement the Plan.
    Additionally, defendants failed to provide the necessary information in their May monthly
28  report required by provision (4)(b) of our order.

1

2

3

4

> *Wolfish*, 441 U.S. 520, 547-548, 99 S. Ct. 1861, 60 L. Ed.2d 447
> (1979).  Courts nevertheless must not shrink from their obligation
> to "enforce the constitutional rights of all 'persons,' including
> prisoners." *Cruz v. Beto*, 405 U.S. 319, 321, 92 S. Ct. 1079, 31 L.
> Ed. 2d 263 (1972) (per curiam).  Courts may not allow
> constitutional violations to continue simply because a remedy
> would involve intrusion into the realm of prison administration.

5 *Plata*, 131 S. Ct. at 1928-29.  There can be no reasonable dispute that Defendants have failed

6 to meet their obligations.  In August 2009, this Court found that defendants must reduce the

7 prison population to 137.5% design capacity in order to resolve the underlying constitutional

8 violations, and we ordered defendants to do so within two years.  Aug. 4, 2009 Op. & Order

9 at 183 (ECF No. 2197/3641).  In June 2011, the Supreme Court affirmed that determination

10 in full, stating that defendants "shall implement the order without further delay." *Plata*, 131

11 S. Ct. at 1947.  Defendants have now had almost four years to comply with this Order, and

12 we have afforded them another six months for ease of compliance.  Defendants have not

13 requested a further extension, yet they submitted a Plan that they concede will not achieve

14 the necessary population reduction by December 31, 2013.  Further, there is no indication

15 that the Legislature will enact the necessary authorization for the Plan.  Consequently, in the

16 absence of further action by this Court, defendants have guaranteed what would be the

17 perpetuation of constitutional violations in the California prison system for the indefinite

18 future.  *See* Receiver's 23rd Report at 35 ("Of greatest concern to the Receivership, the State

19 has deliberately planned not to comply with the Three Judge Court's order to reduce

20 population density to 137.5% of design capacity, a decision that directly impacts our ability

21 to deliver a constitutional level of care.") (ECF No. 2636/4628).  This Court cannot permit

22 such a result.  We are compelled to enforce the Federal Constitution and to "enforce the

23 constitutional rights of all 'persons,' including prisoners." *Cruz v. Beto*, 405 U.S. 319, 321

24 (1972) (per curiam).  Here, that means ensuring that defendants implement additional

25 measures to reduce the prison population to 137.5% design capacity by December 31, 2013.

26     Thus far, this Court has taken care to limit the extent to which its orders tell

27 defendants how to administer their prison system.  Defendants, however, have continually

28 responded to this Court's deference with defiance.  Over the course of the last eighteen

31

months, even as we recognized that defendants were not taking the steps necessary to comply with our Order and repeatedly ordered them to come into compliance, this Court has not ordered defendants to take particular steps or implement particular measures.  We left such choices to defendants' discretion.  Defendants, however, have refused to take the necessary additional steps beyond Realignment and the Blueprint.  Despite this deliberate failure to comply with this Court's repeated orders, we have nevertheless recently granted defendants a six month extension, to afford them yet another opportunity to come into compliance. Additionally, when this Court rejected defendants' Three-Judge Motion, we again granted defendants discretion to design a Plan that would comply with our Order, notwithstanding the fact that the Three-Judge Motion was largely duplicative of defendants' prior request that we had previously advised them we were not inclined to grant.  We also asked for a List of possible prison population reduction measures based on the expert testimony in the 14-day trial or on any other suggestion they might have, to be listed in defendants' order of preference.  Defendants, however, submitted a Plan that clearly violated the terms of our April 11, 2013 order and refused to express any preference among the various other prison population reduction measures that had been suggested by national prison experts and others, including California prison officials.  Regretfully, we are compelled to conclude that defendants must mistake the scope of their discretion.  We are willing to defer to their choice for *how* to comply with our Order, not *whether* to comply with it.

Defendants have consistently sought to frustrate every attempt by this Court to achieve a resolution to the overcrowding problem.  In February 2012, we initially dismissed plaintiffs' request to investigate defendants' ability to comply with the population reduction order because we accepted defendants' assurances that the Fall 2011 population projections were unreliable.  Then, the Spring 2012 projections proved to be largely identical.  In May 2012, we did not order defendants to present a plan for complying with our Order, because defendants advised us that they would seek to modify our order.  After inquiring closely into the basis for defendants' proposed modification, we explained why we were not inclined to grant any such modification.  Rather than ordering defendants to submit a plan for

1  compliance, however, we indicated our receptivity to a six-month extension and ordered

2  settlement talks, by which we hoped that the parties could agree on a solution that would be

3  to their mutual satisfaction.  Defendants, however, refused to accede to any solution other

4  than that of the Blueprint and filed a motion to vacate the population reduction order in its

5  entirety.  When we rejected this motion, we ordered defendants to submit a Plan for

6  compliance within 21 days.  Defendants responded in 21 days, but with a Plan for non-

7  compliance.  In proposing the deficient Plan, the Governor declined to reinstate the

8  emergency powers that he had recently ended erroneously and that would have enabled him

9  to implement by far the largest of the proposed population reduction measures, insisting

10  instead that legislation would be necessary (legislation that would later be declared "dead on

11  arrival").  Defendants' responses to our questions, as well as their actions, have consistently

12  been confusing, contradictory, and unhelpful.[23]  Defendants have thus made it clear to this

13  Court that they will not, on their own, comply with our Order.

14       The Receiver has observed the same, if not worse, type of behavior in his own

15  experience with defendants and their subordinates.  We recite his report at length because it

16  too demonstrates the need for further action by this Court:

17              Over the course of the last two reporting periods, the substance
              and tone of leadership set by State officials has changed from
18              acquiescence bordering on support for the Receiver's work, to

19

20       [23]Two examples come from defendants' May 29, 2013 filing.  First, defendants assert
     that they have reduced the prison population by "more than 42,000 inmates since 2006."
21   Defs.' Resp. to Pls.' Resp. & Req. for Order to Show Cause Regarding Defs.' Resp. to
     Apr. 11, 2013 Order at 3 (ECF No. 2640/4365).  They have made similar statements in the
22   past.  *See, e.g.*, Defs.' Resp. to Apr. 11, 2013 Order at 39 (ECF No. 2609/4572).  This
     statistic is misleading, as it includes reductions made between 2006 and 2009, before we
     issued our initial population reduction order.
23       Second, defendants claim that they have "taken all of the actions in [their] power" to
     reach the December 2013 population cap, arguing that they are either without authority to
24   take further measures or that such measures would threaten public safety.  *Id.* at 1.
     Defendants fail to acknowledge that they could have met the 137.5% cap by increasing
25   capacity – a measure that would have reduced overcrowding without releasing prisoners – or,
     assuming that their representations concerning their inability to take the necessary actions is
26   correct, they could have requested this court to waive restrictions upon which they now rely.
     Finally, we question the good faith of their arguments, as in January of this year Governor
27   Brown terminated his own emergency authority with respect to the 9,500 prisoners housed
     out of state on the purported basis that the crisis in the prisons was over.

28

1    opposition bordering on contempt for the Receiver's work and
2    for implementation of court orders, including the orders of the
     Three Judge Court.

3         . . .

4    The clear message to the field, from at least early 2012 until the
5    present, is that court orders in Coleman and Plata, and orders
     from the Three Judge Court, are to be implemented only to the
6    extent that State officials and their legal counsel deem desirable.
     This message of deliberate non-compliance undermines the
7    legitimacy and integrity of all court orders in these cases and of
     the Receiver's turnaround plan initiatives.  And when that
8    message is reinforced by repeated statements by State leaders that
     reports from the Special Master in *Coleman* are not worth reading
9    or following, that too many resources and too much money has
     been spent improving prison healthcare (which ignores the 20%
10   reduction in the cost of prison medical care which the
     Receivership has achieved over the last four years), and that the
11   State stands ready immediately to take over prison medical care
     from the Receiver notwithstanding the State's shortcomings, the
12   result has been to freeze and ossify improvement efforts in the
     field.  Clinicians and healthcare leaders in the field are naturally
13   concerned that, when the Receiver leaves, CDCR leadership will
     tend to favor those who have supported the Administration's
14   position over the Receiver's position and that hard fought
     changes will be immediately rolled back.

15   In short, the tone from the top of the Administration that
16   improvements in prison healthcare have gone too far and that
     necessary reductions in population density have gone too far
17   interferes with our progress towards a final transition of prison
     medical care back to the State.  We have lost at least six to nine
18   months of time while the State seeks essentially to relitigate
     claims that it previously lost before the trial courts and the
19   Supreme Court of the United States.

20   Receiver's 23rd Report at 35 (ECF No. 2636/4628).  It is therefore pellucidly clear that if our

21   Population Reduction Order is to be met, this Court must prescribe the specific actions that

22   defendants must take in order to come into compliance.  As the Supreme Court stated,

23   "[c]ourts may not allow constitutional violations to continue simply because a remedy would

24   involve intrusion into the realm of prison administration."  *Plata*, 131 S. Ct. at 1928-29.  At

25   this point, this Court's "intrusion" into state affairs is necessitated by defendants' own

26   intransigence.  Furthermore, the degree of "intrusion" is minimal in this case.  This Court

27   asked defendants to list the possible prison population reduction measures in the order of

28   their preference.  Apr. 11, 2013 Order at 1-2 (ECF No. 2591/4542).  Defendants, however,

34

1   chose to submit their List of possible prison population reduction measures "in no particular

2   order of preference."  Defs.' Resp. at 5 (ECF No. 2609/4572).  Because defendants have

3   expressed no preference at all among the measures on the List, they have forfeited any

4   challenge to this Court's selection of the particular measures that we have ordered.

5       Our conclusion that we must order defendants to implement additional population

6   reduction measures is compelled by *Hutto v. Finney*.  In that case, the district court ordered a

7   30-day limit on solitary confinement to remedy ongoing Eighth Amendment violations.  The

8   Supreme Court fully recognized that such a specific remedy was rare, but affirmed.  It did so

9   because the state had repeatedly failed to correct the constitutional violations on its own

10  accord:

11          In fashioning a remedy, the District Court had ample authority to
12          go beyond earlier orders and to address each element contributing
            to the violation.  The District Court had given the Department
13          repeated opportunities to remedy the cruel and unusual conditions
            in the isolation cells. If petitioners had fully complied with the
14          court's earlier orders, the present time limit might well have been
            unnecessary.  But taking the long and unhappy history of the
15          litigation into account, the court was justified in entering a
            comprehensive order to insure against the risk of inadequate
16          compliance.

17  437 U.S. 678, 687 (1978).  Here, too, we face a "long and unhappy history of litigation."

18  The underlying constitutional violations are the subject of cases that date back between

19  twelve and twenty-three years, and this Court's current population reduction order dates back

20  approximately four years.  More important than the length of the litigation, however, has

21  been defendants' conduct throughout.  Defendants have continually equivocated regarding

22  the facts and the law, and have consistently sought to delay the implementation of our Order.

23  At the time of the population reduction order, defendants asked this Court to wait for

24  "chimerical" possibilities.  As the order was appealed to the Supreme Court, defendants

25  insisted that the Three-Judge Court had been convened prematurely and that alternative

26  remedies to a prisoner release order existed.  The Court unhesitatingly rejected these

27  arguments in light of defendants' decade-long failure to remedy the constitutional violations

28  and expressly ordered defendants to "implement the order without further delay."  *Plata*, 131

1    S. Ct. at 1947.  That was hardly what followed.  Within a year of the Supreme Court's

2    decision, even though it was apparent that Realignment and the Blueprint would be

3    insufficient to comply with our Order, defendants refused to take the necessary additional

4    steps to reduce the prison population to 137.5% design capacity.  Rather, they have used this

5    Court's patience and good-faith attempts to achieve a resolution as an excuse for protracting

6    these legal proceedings to a time that could hardly have been imagined when the litigation to

7    constitutionalize California's prison conditions commenced over two decades ago.  This

8    Court has nevertheless afforded defendants "repeated opportunities" to bring its prison

9    system into compliance by issuing multiple orders directing defendants to take all steps

10   necessary to satisfy our Order.  Most recently, after the filing of our April 11, 2013 Opinion

11   & Order, defendants filed a notice of appeal, in which they stated that they would appeal our

12   order in part because we "did not fully or fairly consider the evidence showing that the

13   State's prisoner health care now exceeds constitutionals standards," Defs.' Notice of Appeal

14   to the Supreme Court at 3 (ECF No. 4605/2621) – notwithstanding the fact that defendants

15   expressly withdrew the question of constitutional compliance from this Court's

16   consideration, *see* discussion *supra* at n.15.  Despite all of our efforts, defendants' conduct to

17   date has persuaded this Court that anything short of an order to implement specific

18   population reduction measures would be futile.  Therefore, we issue the order we do today,

19   although we would have greatly preferred that defendants had themselves chosen the means

20   by which California's prison system would be brought into compliance with the Constitution.

21            **C.     This Court's Amended Plan for Compliance**

22            As explained above, the Plan defendants proffered would, if it could overcome the

23   legal obstacles defendants continually foresaw, achieve a prison population reduction of only

24   5,466 prisoners between the date of our latest order in April 2013 and December 31, 2013.

25   This is 4,170 prisoners short of the 9,636 necessary to achieve compliance with the

26   Population Reduction Order by December 31, 2013.  Thus, for the Amended Plan to comply

27   with our Order, defendants must implement an additional measure or measures that will

28   achieve a reduction of another 4,170 prisoners by the end of the year.

1          1.      Expansion of Good Time Credits

2          A single measure is sufficient to remedy the 4,170 prisoner deficiency: the full

3   expansion of good time credits set forth in Item 4 of defendants' List, submitted on May 2,

4   2013.  The Plan defendants propose to implement includes a highly limited version of good

5   time credits that applies prospectively only and applies to a limited number of prisoners.

6   This limited version would result in the reduction of only 247 prisoners by December 31,

7   2013.  Defs.' Resp. at 35 (ECF No. 2609/4572).  If, however, defendants were to implement

8   the full expansion of good time credits set forth in Item 4 of their List – i.e., prospectively

9   and retroactively, for all prisoners – the measure would result in the additional reduction of

10  as many as 5,385 prisoners by December 31, 2013.  This is more than sufficient to remedy

11  the 4,170 prisoner deficit and achieve the reduction in the prison population to 137.5%

12  design capacity by December 31, 2013.

13         Defendants state their reasons for not including the full expansion of good time credits

14  in their Plan as follows: (1) retroactive expansion results in the immediate release of some

15  prisoners, threatening public safety; and (2) expansion of good time credits to prisoners

16  convicted of violent offenses threatens the public safety.  Defs.' Resp. at 35 (ECF No.

17  2609/4572).

18         We reject these arguments because they are contrary to the express factual findings

19  that this Court has already made and that have been affirmed by the Supreme Court.  As

20  explained at length *supra* Section I.B, this Court carefully considered the question of whether

21  the expansion of good time credits was consistent with public safety in our August 2009

22  Opinion & Order.  We heard extensive testimony from the leading experts in the country, all

23  of whom – including the now Secretary of CDCR Dr. Beard – testified that the expansion of

24  good time credits could be implemented safely, both prospectively and retroactively.  Even

25  defendants' expert agreed that there was no statistically significant relationship between early

26  release through good time credits and recidivism.  Furthermore, many jurisdictions

27  (including a number of counties in California) had safely used the expansion of good time

28  credits to reduce their prison populations.  We therefore concluded that the expansion of

37

1   good time credits is fully consistent with public safety, and the Supreme Court affirmed this

2   determination.

3          That the Supreme Court affirmed our factual findings with respect to good time

4   credits is alone a sufficient basis for ordering defendants to implement their full expansion.

5   As stated above (but worth repeating nevertheless), the Supreme Court has already stated that

6   this Court's factual findings on public safety are to be credited over the contrary views of

7   defendants:

8               This [public safety] inquiry necessarily involves difficult
                predictive judgments regarding the likely effects of court orders.
9               Although these judgments are normally made by state officials,
                they necessarily must be made by courts when those courts
10              fashion injunctive relief to remedy serious constitutional
                violations in the prisons.  These questions are difficult and
11              sensitive, but they are factual questions and should be treated as
                such.  Courts can, and should, rely on relevant and informed
12              expert testimony when making factual findings.  It was proper for
                the three-judge court to rely on the testimony of prison officials
13              from California and other States.  Those experts testified on the
                basis of empirical evidence and extensive experience in the field
14              of prison administration.

15   *Plata*, 131 S. Ct. at 1942. We could stop here and order defendants to implement the full

16   expansion of good time credits as set forth in Item 4 of their List.  We nevertheless explain

17   why neither of defendants' arguments casts any doubt on our prior factual findings.

18          Defendants' first argument is that the prospective application of good time credits for

19   prisoners convicted of non-violent offenses is safe but that the retroactive application of these

20   credits to these same prisoners is somehow not safe.  In order to present a sound argument of

21   this sort, defendants must demonstrate that individuals who benefit from retroactive

22   application are more likely to commit crimes or recidivate than those who benefit from

23   prospective application.  They have, however, provided no support for this highly dubious

24   proposition.  Moreover, the evidence before this Court is to the contrary.  The Receiver, for

25   example, has endorsed the retroactivity of good time credits expansion as provided in Item 4

26   on defendant's List submitted on May 2, 2013.  Receiver's 23rd Report at 33 (ECF No.

27   2636/4628) (stating that "expanding credits for minimum custody inmates, expanding

28   milestone credits to include violent and second strikers, increasing credit earning limits on

38

1   certain inmates" "could be implemented retroactively to the time of sentencing to achieve

2   maximum benefit").  Additionally, the state's own CDCR Expert Panel (*see* discussion *supra*

3   at 10) recommended making the good time credits changes "retroactive" in the interest of

4   achieving a more timely reduction in the prison population.  CDCR Expert Panel, *A*

5   *Roadmap for Effective Offender Programming in California: A Report to the California*

6   *Legislature*, June 2007, at 95.  Presumably, as a report commissioned by the CDCR, no such

7   recommendation would have been made had it been inconsistent with public safety.  As such,

8   to the extent that defendants state their reason for not implementing the retroactive expansion

9   of good time credits as "public safety," this Court rejects that reason as unfounded and

10  contradicted by the evidence.

11          Defendants' next argument – that good time credits should not be afforded to

12  prisoners convicted of violent offenses – fares only slightly better.  Not a single expert we

13  heard drew any distinction between inmates convicted of violent and non-violent crimes for

14  purposes of good time credits.  The CDCR Expert Panel, on which we relied heavily,

15  specifically recommended expanding good time credits for all prisoners, "including all

16  sentenced felons regardless of their offense or strike levels."  CDCR Expert Panel, *A*

17  *Roadmap for Effective Offender Programming in California: A Report to the California*

18  *Legislature*, June 2007, at 92.[24]   That CDCR itself recommended extending good time

19  credits to all prisoners further strongly supports the conclusion that there is no significant risk

20  to public safety.  In sum, defendants' arguments fail to call into question this Court's prior

21  conclusion that the expansion of good time credits – retroactively and for all prisoners –

22  would be fully consistent with public safety.[25]

23

24          [24] The members of the CDCR Expert Panel included various leading experts in crime
        and incarceration, such as Doctors Petersilia, Krisberg, and Austin; current CDCR Secretary
25      Jeffrey Beard; and many other senior officials of correctional programs throughout the
        country.

26
            [25] In implementing any good time credits program, the CDCR authorities presumably
27      have the authority to prescribe regulations that ensure that good time credits may be withheld
        through the application of objective standards when necessary to avoid the premature release
28      of individuals deemed to be particularly serious threats to the public safety.

39

1   This Court therefore orders defendants to implement the full expansion of good time

2   credits, as set forth in Item 4 of their List submitted on May 2, 2013.  There are, however,

3   modifications that the defendants could make to the good time credits program that would

4   result in the release of the same number of prisoners without releasing prisoners convicted of

5   violent offenses.  As a practical matter, none of these changes would affect the inclusion of

6   retroactivity.  They would only affect aspects such as the amount of good time credit to be

7   received by various categories of offenders, all non-violent, and the amount of credit to be

8   received for the various activities for which good time credit is awarded.  For example,

9   defendants could extend 2-for-1 credit earning to prisoners other than those held in fire

10  camps and minimum custody facilities, increase the available credit ratio for fire camp and

11  minimum custody prisoners to over 2-to-1, increase the credit earning limit for milestone

12  completion credits, or increase the credit earning capacity of non-violent offenders above 34

13  percent.[26]  Plaintiffs' experts and defendants' experts disagree strongly on the changes in

14  prison population that the good time credit measures on Item 4 of defendants' List would

15  produce.  Neither party's figures are satisfactorily allocated between violent and non-violent

16  offenders; however, it seems clear from projections made using the numbers provided that

17  moderate changes to the good time credit program could result in the release of an adequate

18  number of prisoners to meet the December 31, 2013 benchmark of 137.5% without the

19
        [26]Other states have taken similar measures to expand their good time credit programs
20  for non-violent offenders without a subsequent increase in recidivism.  For example, in 2003,
    Washington increased the amount of good time credit available to certain nonviolent drug
21  and property offenders from 33 percent to 50 percent of those offenders' sentences while
    lowering recidivism and crime rates.  *See* Nat'l Conference of State Legislatures, *Cutting*
22  *Corrections Costs: Earned Time Policies for State Prisoners* at 3 (July 2009), *available at*
    http://www.ncsl.org/documents/cj/earned_time_report.pdf.
23       Another example is Indiana, which awards six months to two years of credits to
    prisoners who complete education programs.  In contrast, defendants propose a credit-
24  earning cap of six to eight weeks for similar "milestone completion."  Defs.' Resp. to
    Apr. 11, 2013 Order at 10 (ECF No. 2609/4572).  Dr. James Austin, plaintiffs' primary
25  expert on good time credits, states that if defendants awarded prisoners four to six months of
    milestone completion credit and increased the number of programs available to prisoners to
26  earn such credits, they could reduce the prison population by 7,000 prisoners with no adverse
    impact on public safety.  Austin Decl. ¶¶ 12-15 (ECF No. 2420-1/4152-1). The CDCR's
27  expert panel similarly recommended an average of four months for milestone completion
    credits.  CDCR Expert Panel, *A Roadmap for Effective Offender Programming in California:*
28  *A Report to the California Legislature*, June 2007, at 92.

1   release of violent offenders.  Thus, if defendants prefer to amend the good time credit

2   program and not release violent offenders, this Court offers them that option, provided that

3   their amendments result in the release of at least the same number of prisoners as does the

4   full expansion of good time credits, as outlined in Item 4 on their List.  We leave it to

5   defendants, however, to determine what modifications they wish to make to the expanded

6   good time credit program in order to achieve the result contemplated by Item 4.

7                     2.      <u>List of Low-Risk Prisoners</u>

8          On April 11, 2013, this Court ordered defendants "to develop a system to identify

9   prisoners who are unlikely to reoffend or who might otherwise be candidates for early

10  release."  Apr. 11, 2013 Order at 5 (ECF No. 2591/4542).  We further specified that the

11  system should be designed "such that it will be effective irrespective of defendants' partial or

12  full implementation of some or all measures in the Plan."  *Id.*  This part of our order was

13  based on the Supreme Court's statement that we may "in our discretion" consider whether to

14  order defendants to begin to develop such a system, to be used in the event that it becomes

15  "necessary to release prisoners to comply with the court's order."  *Plata*, 131 S. Ct. at 1947.

16  Under the terms of our April 11, 2013 order, defendants are to report to us on their progress

17  in approximately two months, Apr. 11, 2013 Order at 5 (ECF No. 2591/4542), and Secretary

18  Beard acknowledged in his May 3 press conference that defendants are making some

19  progress in developing a list of low-risk prisoners to release ("the Low-Risk List"), if

20  necessary or desirable, CDCR Press Conference May 3, 2013, *available at*

21  http://www.cdcr.ca.gov/News/3_judge_panel_decision.html.  We now order defendants to

22  use the Low-Risk List to remedy any deficiency in the number of prisoners to be released in

23  order to meet the 137.5% population ceiling by December 31, 2013, if for any reason

24  defendants do not reach that goal under the Amended Plan as implemented.

25         This Court wishes to make it perfectly clear what this means: Defendants have no

26  excuse for failing to meet the 137.5% requirement on December 31, 2013.  No matter what

27  implementation challenges defendants face, no matter what unexpected misfortunes arise,

28  defendants shall reduce the prison population to 137.5% by December 31, 2013, even if that

1   is achieved solely through the release of prisoners from the Low-Risk List.  This Court

2   acknowledges that requiring defendants to create such a list may prove unnecessary should

3   defendants' implementation of the Amended Plan otherwise result in a reduction in the

4   prison population to 137.5% design capacity by December 31, 2013.  However, in the past,

5   defendants have repeatedly found new and unexpected ways to frustrate this Court's orders.

6   Accordingly, the Low-Risk List is intended to obviate any such action.  We repeat,

7   defendants shall reduce the prison population to 137.5% by December 31, 2013, in the

8   manner specified in the Amended Plan or through the use of the Low-Risk List, if that proves

9   necessary or desirable.

10               3.    Reporting

11          Instead of submitting monthly reports, defendants shall hereafter submit reports every

12   two weeks that include all of the information that we have previously ordered be given in the

13   monthly reports as well as the specific steps defendants have taken toward implementing

14   each measure in the Amended Plan, any proposed substitutions, and the status of the

15   development of the Low-Risk List.  The first report shall be submitted two weeks from the

16   date of this Order.  Defendants are to submit a "benchmark" report for December, detailing

17   defendants' progress in meeting the 137.5% population cap, as set forth in our previous order

18   explaining the requirements for such reports.  *See* June 30, 2011 Order Requiring Interim

19   Reports at 1-2 (ECF No. 2374/4032).  This report shall be submitted no later than

20   December 15, 2013.  Defendants shall include in this report (a) the total number of prisoners

21   in California institutions as of December 1, 2013, (b) the number of prisoners permitted

22   under the 137.5% population cap on December 31, 2013, and (c) the number of prisoners, if

23   any, whom defendants expect to release between December 1, 2013 and December 31, 2013.

24   Defendant shall include any additional information necessary for this Court to determine how

25   many prisoners must be released prior to December 31, 2013, and whether defendants plan to

26   release them through the use of the Low-Risk List or some alternative vehicle, such as the

27   adoption of another measure or measures contained on the List that defendants submitted on

28

1    May 2, 2013.  If the latter, there shall be sufficient factual data to prevent this Court to accept

2    or reject the proposal without further inquiry.

3                          4.    Waiver of State and Local Laws and Regulations

4          With respect to all measures in the Amended Plan, this Court provides the necessary

5    authorization for defendants to begin implementation immediately.  Under the PLRA, this

6    Court may order "prospective relief that requires or permits a government official to exceed

7    his or her authority under State or local law or otherwise violates State or local law" so long

8    as "(i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the

9    relief is necessary to correct the violation of a Federal right; and (iii) no other relief will

10   correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(B).  All three conditions

11   have been met, as explained in our August 2009 Opinion & Order and our April 11, 2013

12   Opinion & Order.  To reiterate, defendants have advised us that none of the measures in the

13   Amended Plan (except for the expanded use of fire camps) may be implemented without

14   waiving state laws.  The implementation of these measures is required by federal law

15   notwithstanding the violation of state or local laws, and no other relief will correct the

16   violation of plaintiffs' constitutional rights.  Accordingly, defendants and their subordinates

17   are ordered to implement the Amended Plan, or any actions authorized by it, notwithstanding

18   any state or local laws or regulations to the contrary.

19          It appears to us that the simplest, most direct, and most effective remedy is for us to

20   waive, to the extent necessary to implement the Amended Plan, Penal Code Sections 1170,

21   2900, and 2901, and any other local and state laws and regulations requiring that persons

22   convicted of a felony be housed in a state prison until the end of the term of sentence.  We

23   also waive – to the extent necessary to implement the Amended Plan – the State's

24   Administrative Procedure Act and any and all local and state laws and regulations regarding

25   the housing of California prisoners in other states.[27]

26   

27        [27] This waiver is limited to the 3,569 out-of-state prisoners that defendants wish not to
     be returned to California as scheduled.  It is not a permanent waiver of all state laws and
28   regulations regarding housing California prisoners in other states.

1    Although we do not believe that further waivers are necessary, the state has advised us

2    of additional laws and regulations that it believes must be waived in order to carry out the

3    Amended Plan.  *See* Defs.' Resp. to Apr. 11, 2013 Order (ECF No. 2609/4572).  We waive

4    these additional laws and regulations, which we list in Appendix A to this Opinion & Order.

5    To the extent that any other state or local laws or regulations impede the immediate

6    implementation of the Amended Plan, we waive those as well, and direct defendants to

7    provide us with a list of such laws and regulations within 20 days of this Opinion & Order.

8    Our purpose for waiving these laws and regulations is to enable defendants to implement or

9    commence implementation of all measures in the Amended Plan immediately.  We will

10   therefore not accept as a reason for non-compliance any contention that our Order failed to

11   waive the necessary laws or regulations.  Defendants must act forthwith as if they have full

12   legal authorization to do so.

13   We recognize that defendants have stated that they are seeking legislative approval of

14   the measures in their Plan and that therefore we should delay our issuance of this order, or

15   more specifically our waiver of contrary state laws and regulations, until such efforts have

16   been exhausted.  However, as of the date of this Order there is nothing to suggest that

17   defendants have made any progress beyond preliminarily drafting proposed legislation, *see*

18   Defs.' June 2013 Status Report at 2 (ECF No. 2651/4653), Toche Decl., ¶ 3 (ECF No.

19   2652/5655), and it is entirely unrealistic to believe that the drafted legislation, once

20   submitted, will be approved.  Governor Brown has stated that he will prepare the necessary

21   legislation but will not urge its adoption.  The leader of the State Senate has announced that

22   defendants' Plan will be DOA, "dead on arrival." Hardy Decl., ¶ 3, Ex. B (ECF No.

23   2628/4612).  Much like defendants' argument that a prisoner release order is unnecessary as

24   the Legislature might fund additional construction, any notion that the California Legislature

25   will authorize the measures in the Plan is "chimerical."  The Supreme Court refused to

26   "ignore the political and fiscal reality behind this case," *Plata*, 131 S. Ct. at 1939, and we

27

28

44

1   will follow that lead.[28]  Waiting months for what is unlikely legislative authorization will

2   simply amount to yet another unnecessary delay in the resolution of the ongoing

3   constitutional violations in the California prison system.  This Court will not accept such

4   needless delay.

5       **D.    The Problem of Durability, the Need for Further Information, and the
           Retention of Continuing Jurisdiction**

6

7       The Amended Plan that we order defendants to implement today necessarily entails a

8   problem that we cannot resolve at this time.  Simply achieving a prison population at 137.5%

9   design capacity on December 31, 2013, will not cure the constitutional violations if the

10  population increases substantially the next day or over the next few months.  What is

11  necessary is that the prison population remain at or below 137.5% design capacity so that

12  defendants may then remedy (as they are currently unable to do) the underlying

13  constitutional violations.  In other words, what is necessary is a "durable" solution to the

14  problem of overcrowding if the underlying problem of the deprivation of prisoners'

15  constitutional rights is to be resolved.  *Cf. Horne v. Flores*, 557 U.S. 433, 447 (2009).

16      The Amended Plan, which should result in a maximum prison population of 137.5%

17  design capacity on December 31, 2013, will likely not in itself provide a "durable" solution

18  to the problem of overcrowding and therefore of unconstitutional medical and mental health

19  care, for three reasons.  First, the measure that is significantly responsible for reducing the

20  prison population to 137.5% design capacity on December 31, 2013 – the measure to "slow

21  the return of inmates housed in private contract prisons in other states," Defs.' Resp. at 33

22  (ECF No. 2609/4572) – appears to be temporary and its effects likely to be counteracted

23  when the prisoners now housed in other states are returned to California in 2014 or later.

24  Second, it appears that the state prison population is growing in excess of defendants'

25  _____

26      [28] The challenger in the next gubernatorial campaign is making the topic of prison
    reform already accomplished, i.e., Realignment, a central component of his platform.  Phil
    Willon, *Abel Maldonado Takes On Jerry Brown, Prison Realignment*, Los Angeles Times,
27  May 25, 2013, http://www.latimes.com/news/local/la-me-maldonado-prisons-
    20130526,0,5415462.story.  This makes it even less likely that Governor Brown will urge the
28  passage of the Plan or that the Legislature will grant its approval.

1   projections.  Third, defendants assume that they will shortly be able to construct minor

2   facilities that will provide additional design capacity, despite the fact that, in the past, the

3   timely building of such construction projects has proven unreliable due to a lack of

4   administrative approvals and legislative appropriations.

5        Our concern regarding durability begins with the Blueprint, in which defendants

6   acknowledge that the prison population as a ratio of design capacity is projected to *increase*

7   progressively from years 2014 through 2016.  *See* CDCR Blueprint at App. G.  Much of this

8   projected increase appears to be attributable to the fact that the Blueprint eliminates funding

9   for defendants' program that housed 9,500 prisoners out-of-state.  *Id.* at 6-7.  Defendants

10  have repeatedly objected to the expense of such a program, which they advised us costs $300

11  million a year.  *See* Defs.' Resp. to Aug. 3, 2012 2d Order Requiring Further Briefing at 12

12  (ECF No. 2463/4226).  Accordingly, defendants' Blueprint eliminated funding for the out-of-

13  state program.  The necessity to house in the California prison system the large number of

14  prisoners who would have been confined in other states over the next two years, but for the

15  termination of the out-of-state prison housing program, will result in a significant increase in

16  the state prison population.  This increase will significantly exceed the additional design

17  capacity that defendants project from the construction of additional prison facilities during

18  that period.

19       Defendants do *not* describe the measure in their Plan regarding slowing the return of

20  prisoners housed out of state as one to "restore the out-of-state prison program."  Rather, they

21  describe the measure as "slow[ing] the returning inmates to California as called for in the

22  Blueprint."  Defs.' Resp. at 33 (ECF No. 2609/4572).  Defendants do not explain what

23  "slowing the return" means with respect to the prisoners due to be returned between now and

24  December 31, or those due to be returned in 2014.  If the planned return this year is slowed

25  down, defendants will likely bring back all the prisoners scheduled to be returned this year

26  and next year during 2014, including the 3,569 due to be returned this year.  If so, the slowed

27  down return does not contribute to a durable solution – quite the contrary.

28

In order to assess accurately the full long-run effect of the elimination of the out-of-state prisoner program on the durability of the Amended Plan, we require much more information from defendants.  It appears quite likely, however, that under the Amended Plan the prison population will rise significantly over the next two years, both as an absolute number and as a ratio of design capacity.

Furthermore, the California prison population is likely to increase faster than defendants' projections suggest.  We have already noted in this opinion the numerous instances in which defendants have initially reported to us an estimate for the prison population that later proved inaccurate when compared to subsequent reports.  In short, defendants' projections consistently underestimated the state prison population.  There are many possible reasons for this.  One might be that Realignment is having a less significant effect in reducing the population of prisoners than defendants expected it to have.  Another might be that the state of California's general population is growing at a faster rate than defendants anticipated.  Whatever the reasons, the inaccuracy in defendants' prison population projections are reflected in the Amended Plan, because we have relied on defendants' reported numbers in all of our calculations.  Accordingly, if – as is likely – the prison population grows faster than defendants expect, the Amended Plan will fail to maintain the 137.5% design capacity necessary to remedy the constitutional violations.

Finally, defendants intend to add design capacity through two major construction projects and various minor upgrades.  Defendants' intention is generally a positive one, and we have credited defendants with the 1,722 beds that they expect to add and thus to increase design capacity this calendar year.  We must recognize, however, the continuing problems with respect to administrative approvals and legislative appropriations that defendants have faced in making progress with their construction projects.  Indeed, as the Receiver recently reported, some of these minor upgrade projects have already been subject to delays in funding and approval. *See* Receiver's 23rd Report at 21 (ECF No. 2636/4628).  It is therefore possible that defendants' anticipated construction plans for 2014 may be similarly delayed, which would certainly exacerbate the durability issues under the Amended Plan.

47

1    It will be necessary to see how these many factors affect the 137.5% design capacity

2  ratio that is necessary to achieve constitutional compliance.  This Court will retain

3  jurisdiction for at least some reasonable period of time to determine how the Amended Plan

4  and the various factors will affect the prison population and the design capacity ratio.  This

5  Court may have to determine, based on information to be provided by defendants, what

6  additional steps may be necessary to maintain that ratio, and whether defendants have an

7  adequate plan for doing so.  Sometime before the end of the year, defendants shall provide

8  this Court with updated population projections for 2014-2015 under various conditions,

9  including those contemplated in the Blueprint and the Amended Plan, and with whatever

10  other information may be useful to this Court in assessing the conditions inside and outside

11  the state prison system that explain why and how the prison population is changing.  We will

12  inform defendants when this information should be submitted and the precise nature of the

13  information we desire to receive at a later date.

14    **E.    Order**

15    Defendants are hereby ordered to implement the Amended Plan that shall consist of:

16  (a)   the measures proposed in defendants' Plan submitted on May 2, 2013;[29] and

17  (b)   a measure consisting of the expansion of good time credits, prospective and

18        retroactive, set forth in Item 4 of defendants' List submitted on May 2, 2013.

19  If for any reason the implementation of the measures in the Amended Plan does not result in

20  defendants reaching the 137.5% population ceiling by December 31, 2013, defendants shall

21  release enough additional prisoners to do so by using the Low-Risk List.  Defendants are

22  ordered to take all steps necessary to implement the measures in the Amended Plan,

23  commencing forthwith, notwithstanding any state or local laws or regulations to the contrary.

24  18 U.S.C. § 3626(a)(1)(B).  All such state and local laws and regulations are hereby waived,

25  effective immediately.  This includes all laws that defendants identified in their May 2, 2013

26
27        [29] Defendants are not required, however, to implement the "Contingency Measures"
   listed in their Plan because, as defendants acknowledge, these measures cannot be
   implemented by December 31, 2013.  Defs.' Resp. to Apr. 11, 2013 Order at 33 (ECF No.
28  2609/4572).

filing as impeding the implementation of the measures in the Amended Plan.  We list those laws in Appendix A.  To the extent that waiver of any laws and regulations other than those listed in Appendix A is necessary to effectuate the Amended Plan, those laws are also waived, and defendants shall provide us with a list of such laws within 20 days of this Order.

Instead of submitting monthly reports, defendants shall hereafter submit reports every two weeks that shall include all the information that we have previously ordered given in the monthly reports as well as the specific steps defendants have taken toward implementing each measure in the Amended Plan, and the status of the development of the Low-Risk List. The first report shall be submitted two weeks from the date of this Order.  Defendants shall also submit a benchmark report, as explained *supra* at 43-44, by December 15, 2013.

This Court desires to continue to afford a reasonable measure of flexibility to defendants, notwithstanding their failure to cooperate with this Court or to comply with our orders during the course of these proceedings.  Accordingly, defendants may, if they wish, make any or all of three substitutions.  First, in place of subsection (b) defendants may, if they prefer, revise the expanded good time credit program such that it does not result in the release of violent offenders, so long as the revision results in the release of at least the same number of prisoners as would the expanded good time credit program.  We leave it to defendants to determine the particular modifications they wish to make.  Defendants must inform this Court, however, of their decision to make such changes.

Second, defendants may substitute for any group of prisoners who are eligible for release under the Amended Plan a different group consisting of no less than the same number of prisoners pursuant to the Low-Risk List.  Any substitution or release of prisoners from the Low-Risk List shall be in the order in which they are listed, individually or by category. Defendants need not obtain prior approval for such a substitution, but they must inform this Court that they intend to make it.

Third, defendants may, with this Court's approval, substitute any group of prisoners from the List (i.e., the list of all population reduction measures identified in this litigation, submitted by defendants on May 2, 2013) for any groups contained in a measure listed in the

49

1   Amended Plan, should defendants conclude by objective standards that they are no greater

2   risk than the prisoners for whom they are to be substituted.  Defendants must provide this

3   Court with incontestable evidence that the substitution will be completed by December 31,

4   2013.  An example of such a substitution would be the substitution of those "Lifers" who,

5   due to age or infirmity, are adjudged to be "low risk" by CDCR's risk instrument.  *See* Apr.

6   11, 2013 Op. & Order at 67-69 (ECF No. 2590/4541).  Another example is prisoners who

7   have nine months or less to serve of their sentence and, rather than being sent to state prison,

8   could serve the duration of their sentences in county jails.  *See* Aug. 4, 2009 Op. & Order at

9   149-52 (ECF No. 2197/3641).  Or to the extent that defendants are able to reassign prisoners

10  to leased jail space before December 31, 2013, they can substitute members of this group of

11  prisoners for an equal number of prisoners on the Amended Plan.

12         Absent the three categories of substitutions described above, defendants are ordered to

13  implement the Amended Plan as is.  This Court retains jurisdiction over these proceedings

14  pending further order of the Court.

15

16  **III.   CONTEMPT**

17         Plaintiffs have again requested that this Court issue an order to show cause why

18  defendants should not be held in contempt.  Pls.' Resp. & Req. for Order to Show Cause

19  Regarding Defs.' Resp. to Apr. 11, 2013 Order at 2 (ECF No. 2626/4611).  Their request has

20  considerable merit.  We explained at length in our April 11, 2013 Opinion & Order how

21  defendants' conduct between June 2011 and March 2013 has included a series of

22  contumacious actions.  Apr. 11, 2013 Op. & Order at 63-65 (ECF No. 2590/4541).  The most

23  recent, and perhaps clearest, example of such an action is defendants' failure to follow the

24  clear terms of our April 11, 2013 order, requiring them to submit a Plan for compliance with

25  our Order, not a Plan for non-compliance.  This Court would therefore be within its rights to

26  issue an order to show cause and institute contempt proceedings immediately.  Our first

27  priority, however, is to eliminate the deprivation of constitutional liberties in the California

28  prison system.  To do so, we must first ensure a timely reduction in the prison population to

1  137.5% design capacity by December 31, 2013.  We will therefore **DEFER** ruling on

2  plaintiffs' motion, and defer instituting any contempt proceedings related to defendants' prior

3  acts until after we are able to determine whether defendants will comply with this order,

4  including the filing of bi-weekly reports reflecting the progress defendants have made toward

5  meeting the requirements of the Order issued June 30, 2011.  The Supreme Court has stated

6  that contempt proceedings must be a remedy of last resort.  *Spallone v. United States*, 493

7  U.S. 265, 276 (1990) (stating that a federal court must "use the least possible power adequate

8  to the end proposed" in exercising its remedial powers (internal citations omitted)).  We

9  leave that problem for another time.  Today, we order defendants to immediately take all

10  steps necessary to implement the measures in the Amended Plan, notwithstanding any state

11  or local laws or regulations to the contrary, and, in any event, to reduce the prison population

12  to 137.5% design capacity by December 31, 2013, through the specific measures contained in

13  that plan, through the release of prisoners from the Low-Risk List, or through the substitution

14  of prisoners due to other measures approved by this Court.  Failure to take such steps or to

15  report on such steps every two weeks shall constitute an act of contempt.

16

17  **IT IS SO ORDERED.**

18

19  Dated:  06/20/13

20  STEPHEN REINHARDT
UNITED STATES CIRCUIT JUDGE
NINTH CIRCUIT COURT OF APPEALS

21

22

23  Dated:  06/20/13

24  LAWRENCE K. KARLTON
SENIOR UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF CALIFORNIA

25

26

27  Dated:  06/20/13

28  THELTON E. HENDERSON
SENIOR UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF CALIFORNIA

51