DONALD SPECTER – 083925
STEVEN FAMA – 099641
ALISON HARDY – 135966
SARA NORMAN – 189536
REBEKAH EVENSON – 207825
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

MICHAEL W. BIEN – 096891
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LORI E. RIFKIN – 244081
AARON J. FISCHER – 247391
MARGOT MENDELSON – 268583
ROSEN BIEN GALVAN &
GRUNFELD LLP
315 Montgomery Street, Tenth Floor
San Francisco, California  94104-1823
Telephone:   (415) 433-6830

JON MICHAELSON – 083815
JEFFREY L. BORNSTEIN – 099358
LINDA L. USOZ – 133749
MEGAN CESARE-EASTMAN – 253845
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, California  94111-5994
Telephone:   (415) 882-8200

CLAUDIA CENTER – 158255
THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
600 Harrison Street, Suite 120
San Francisco, California  94107-1389
Telephone:   (415) 864-8848

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURTS

EASTERN DISTRICT OF CALIFORNIA

AND NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G BROWN, JR., et al., <br><br> Defendants. | Case No. Civ S 90-0520 LKK-JFM P <br><br> **THREE JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., et al., <br><br> Defendants. | Case No. C01-1351 TEH <br><br> **THREE JUDGE COURT** <br><br> **DECLARATION OF ERNEST GALVAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY THREE-JUDGE COURT'S JUNE 20, 2013 ORDER REQUIRING DEFENDANTS TO IMPLEMENT AMENDED PLAN PENDING APPEAL** |

I, Ernest Galvan, declare:

1.    I am an attorney admitted to practice law in California, a member of the bar of this Court, and a partner in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for the *Coleman* Plaintiffs. I have personal knowledge of the matters set forth herein, and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion to Stay Three-Judge Court's June 20, 2013 Order Requiring Defendants To Implement Amended Plan Pending Appeal. I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.

2.    Attached hereto as Exhibit A is a true and correct copy of Legislative Analyst's Office document dated April 17, 2013,  titled "Complying With the Three-Judge Panel Prison Population Limit," downloaded from the Legislative Analyst's Office website, and available at http://www.lao.ca.gov/handouts/crimjust/2013/Complying-Three-Judge-Panel-041713.pdf, last accessed July 1, 2013.

3.    Attached hereto as Exhibit B is a true and correct copy of a page from the "CDCR Today" website, dated May 2, 2013, and titled "California Files Court-Ordered Prison Plan, Vows Supreme Court Appeal," available at http://cdcrtoday.blogspot.com/2013/05/california-files-court-ordered-prison.html, last accessed July 1, 2013.

4.    Attached hereto as Exhibit C is a true and correct copy of the deposition reporter's transcript from the May 21, 2013 deposition of Kathy Black Dennis, the Director of Standards and Accreditation at the American Correctional Association.

5.    Attached hereto as Exhibit D is a true and correct copy of a CDCR Report dated January 2013, titled "CDCR'S LIFER REPORT SERIES, LIFER PAROLEE RECIDIVISM REPORT," printed from the web page of CDCR's "Adult Research Branch," available at http://www.cdcr.ca.gov/Adult_Research_Branch/Research_Documents/FINAL_06_07_Lifer_Parolee_Recidivism_1_14_13.pdf, last accessed July 2, 2013.

1        I declare under penalty of perjury under the laws of the United States and the State

2    of California that the foregoing is true and correct, and that this declaration is executed at

3    San Francisco, California this 2d day of July, 2013.

4

5                                                    /s/ Ernest Galvan
                                                     Ernest Galvan
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



70 YEARS OF SERVICE

April 17, 2013

# Complying With the Three-Judge Panel Prison Population Limit

**L E G I S L A T I V E   A N A L Y S T ' S   O F F I C E**

Presented to:
Assembly Budget Subcommittee No. 5 on Public Safety
Hon. Reginald B. Jones-Sawyer, Sr., Chair





# Background

 **Federal Courts Order State to Reduce Prison Population**

- In 2009, a federal three-judge panel declared that overcrowding was the primary reason that the California Department of Corrections and Rehabilitation was unable to provide constitutionally adequate inmate healthcare.

- In a subsequent order, the panel directed the state to reduce the population of its 33 prisons to 137.5 percent of design capacity by December 2013.

 **Administration Must Submit Plan to Reduce Prison Population**

- On April 11, 2013, the federal court rejected the administration's request to modify or vacate the population reduction order, requiring the state to comply with the December 2013 population limit.

- The three-judge panel has ordered the administration to submit a plan by May 2, 2013 to reduce the prison population to 137.5 percent of design capacity by December 31, 2013. The order gives the administration flexibility to choose *how* to reduce the population.

April 17, 2013



# Prison Population Projected to Exceed Court-Ordered Limit



☑ Despite the 2011 realignment, the inmate population is likely to exceed the court-ordered limit by around 6,900 inmates in December 2013.

☑ Current projections indicate that the inmate population will continue to increase. Absent changes, the prison population in 2017-18 would be around 14,000 inmates above the limit.

April 17, 2013



## Issues for Legislative Consideration

 ***Administration's Plan Will Likely Require Legislative Changes.*** The administration may ask the Legislature to pass legislation to implement aspects of its population reduction plan. The Legislature could choose to modify the plan so that it is consistent with the Legislature's priorities.

**Criteria for Considering Proposals to Comply With Prison Population Limit**

- ***Public Safety.*** Can any negative impacts to public safety be mitigated by the use of evidence-based correctional practices, such as risk assessments and rehabilitation programs?

- ***Budget Impact.*** What impact does the option have on state costs?

- ***Prison Overcrowding.*** How much does the option reduce the prison population? How permanent is the reduction?

- ***Ease of Implementation.*** Does the option require simple actions (like statutory changes) or something more complicated (like implementing a new program)? Would the option apply to current inmates or just future offenders?

- ***Shift of Responsibilities to Local Governments.*** Will the option increase local costs or jail overcrowding?



# Options to Comply With the Prison Population Limit by December 2013

 In previous court filings, the administration and plaintiffs have proposed various measures that could be used to reduce overcrowding and meet the population limit imposed by the federal court.

 **Reduce Prison Admissions**

- Realign additional offenses to county jurisdiction.

- Reclassify certain offenses as misdemeanors.

- Prohibit the admission of probationers admitted to prison for technical probation violations.

- Divert more offenders from prison to community-based sanction and treatment programs.

 **Reduce Inmate Length of Stay in Prison**

- Release certain inmates early.

- Transfer inmates to federal immigration authorities.

- Reduce sentences for certain crimes or enhancements.

- Increase the amount of credits inmates can earn.

 **Modify Inmate Housing Options**

- Increase the use of in-state and out-of-state contract beds.

- Expand alternative custody programs for inmates.

- Place more offenders in fire camps.

# EXHIBIT B

# CDCR Today

THURSDAY, MAY 2, 2013

## California Files Court-Ordered Prison Plan, Vows Supreme Court Appeal

SACRAMENTO – The California Department of Corrections and Rehabilitation (CDCR) today submitted a court-ordered list of prison reduction measures, under protest, warning that public safety could be jeopardized and progress under realignment seriously undermined.

"We respect the court's authority to order the list of measures, but we submitted it under protest," said CDCR Secretary Jeff Beard. "The court ordered the population reduced so as to allow for medical and mental health care that complies with the Constitution. We are already providing that level of care and so further population reduction is not needed."

The court-ordered list complies with an April 11, 2013 federal court order requiring the state to explain how it will reduce the adult prison population to 137.5 percent of design capacity. Meeting this order requires the state to reduce its prison population by another 9,300 inmates. The order stems from cases filed by inmates dating back to 1991 that claim the state's prison medical and mental health care is inadequate and unconstitutional.

While required to file this list of measures, the state still intends to appeal the court order for further prison population reductions to the U.S. Supreme Court.

The court order persists despite more than $1 billion dollars of investment in new health care facilities and new treatment space, including a new, 1,722-bed facility that will open in July; hundreds of new doctors, nurses, psychiatrists and other medical and mental health care staff in California's prisons; and historic prison reform under realignment – supported by local law enforcement and the Legislature – that has already reduced the prison population by more than 25,000 inmates, in addition to a 17,000 inmate reduction under the previous administration.

The court-ordered list focuses on increasing capacity to house prisoners, but also includes provisions to increase good-conduct credit. Virtually every action identified on the list requires legislative approval with the exception of the expanded fire camp capacity. All legislative changes must be urgency measures in order to meet the December 2013 court-ordered deadline.

The list includes the following measures:
• Expanding the capacity of fire camps by allowing certain inmates who are currently ineligible to participate.
• Slowing the rate of returning out-of-state inmates to California.
• Leasing beds from county jails and other facilities where there is sufficient capacity.
• Increasing good-conduct credit for non-violent inmates.
• Expanding medical and elderly parole.

The increase in credits for good conduct will not impact realignment. Prisoners who are released under the new good-conduct rules would serve their parole under state supervision. If they violate parole prior to the end of what their sentence would have been without the increased good-conduct credits, they will return to state prison.

A lengthier listing of all possible prison population reduction ideas is also included in the filing as



SEARCH PRESS RELEASES

[              ] [ Search ]

SUBSCRIBE FOR DAILY UPDATES VIA EMAIL

Enter your email address:

[                    ]

[ Subscribe ]

Delivered by FeedBurner

PRESS RELEASE ARCHIVES

▼ 2013 (28)
  ▼ May (1)
     California Files Court-Ordered Prison Plan, Vows S...
  ► April (4)
  ► March (8)
  ► February (8)
  ► January (7)
► 2012 (139)
► 2011 (139)
► 2010 (113)
► 2009 (75)
► 2008 (72)
► 2007 (98)
► 2006 (43)
► 2005 (10)
► 2004 (8)
► 2003 (1)
► 2002 (4)
► 2001 (8)
► 2000 (11)
► 1999 (20)

Case 2:90-cv-00520-KJM-SCR     Document 4676     Filed 07/02/13     Page 12 of 57

compelled by the court.

To read a copy of the population reduction list, a timeline of the lawsuits and court actions to this point, click here.

### ###

FOR IMMEDIATE RELEASE

May 3, 2013

Contact: Jeffrey Callison

(916) 445-4950

POSTED BY CDCR_STAR AT 11:58 PM

Home          Older Post

► 1998 (33)

► 1997 (35)

► 1996 (37)

SUBSCRIBE BY RSS

Posts

Comments

CDCR NEWS BLOGS

**CDCR Star**
Daily Corrections Clips
*1 day ago*

**External Affairs**
New Report Shows
Recidivism Rate Continues
to Decline
*6 months ago*

# EXHIBIT C

[783437-1]

Case 2:90-cv-00520-KJM-SCR    Document 4676    Filed 07/02/13    Page 14 of 57

KATHY BLACK-DENNIS                                                                    May 21, 2013
PLATA vs. BROWN                                                                            1—4

Page 1

1              UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF VIRGINIA

3     ----------------------------x

4   MARCIANO PLATA,            )

5        Plaintiff    ) Civil Action No.:

6        V.             ) C-01-1351 TEH

7   EDMUND G. BROWN, JR., et al.,)

8        Defendants    ) Pages 1-130

9     ----------------------------x

10

11

12

13          DEPOSITION OF KATHY BLACK-DENNIS

14            Tuesday, May 21, 2013

15               Washington, DC

16

17

18

19   Reported by:  Sherry L. Brooks, CLR

20   Job No.  436019

21

22

Page 2

1                 May 21, 2013

2                  1:00 p.m.

3

4

5   Deposition of Kathy Black-Dennis was held at:

6

7        BINGHAM MCCUTCHEN, LLP

8        2020 K Street, NW

9        Washington, DC  20006

10       (202) 373-6026

11

12       Pursuant to notice, before Sherry L. Brooks, CLR

13   and Notary Public, in and for the District of

14   Columbia.

15

16

17

18

19

20

21

22

Page 3

1   On BEHALF OF THE PLAINTIFF:

2        Donald Specter, Esquire

3        Prison Law Office

4        1917 Fifth Street

5        Berkeley, CA  94710-1916

6        (510) 280-2621

7        E-mail:  Dspecter@prisonlaw.com

8

9   ON BEHALF OF DEPONENT:

10       C. Michael Deese, Esquire

11       Howe & Hutton, LTD.

12       1901 Pennsylvania Avenue, NW

13       Suite 1007

14       Washington, DC  20006

15       (202) 466-7252

16       (202) 466-5829 (Fax)

17       E-mail:  Cmd@howehutton.com

18

19

20

21

22

Page 4

1                C O N T E N T S

2  EXAMINATION OF KATHY BLACK-DENNIS        PAGE

3  BY MR. SPECTER                    5

4

5

6

7  EXHIBITS                    PAGE

8  1    Declaration of Kathy Black-Dennis        5

9  2    Visiting Committee Members - 3/11-14/13    58

10 3    Visiting Committee Report & Hearing Minutes 75

11 4    Visiting Committee Report & Hearing Minutes105

12 5    Visiting Committee Report & Hearing Minutes114

13

14

15

16       (Exhibits attached to transcript.)

17

18

19

20

21

22



Page 5

1         P R O C E E D I N G S
2         *   *   *   *   *
3         KATHY BLACK-DENNIS
4  was called for examination by counsel and, after
5  having been duly sworn by the Notary, was examined
6  and testified as follows:
7         (Exhibit Number 1 was marked for
8  identification and was attached to the deposition.)
9         EXAMINATION BY COUNSEL FOR PLAINTIFFS
10
11        (Exhibit Number 1 was marked for
12 identification and was attached to the deposition.)
13        BY MR. SPECTER:
14 Q.   Hi.  My name is Donald Specter, as I
15 mentioned before.  Can you please state your name and
16 spell your last name for the record?
17 A.   Kathy Black-Dennis.  Kathy, with a "K" and
18 a "Y", Black-Dennis, B-L-A-C-K - D-E-N-N-I-S.
19 Q.   Alright.  So Ms. Dennis, as you may know,
20 I'm the director of the prison office -- I'm also a
21 lawyer -- and we're representing the prisoners in the
22 Coleman and Plata matters in which you submitted a

Page 6

1  declaration.
2         So this deposition is to ask you questions
3  about your declaration and the ACA accreditation
4  process which you referred to in your deposition.
5         Do you understand that?
6  A.   Yes, I do.
7  Q.    So I'm going to go over some of the rules
8  for the depositions.
9         Have you ever had your deposition taken
10 before?
11 A.   I have not.
12 Q.   Okay.  Have you had a chance to speak with
13 Mr. Deese about the procedures governing depositions?
14 A.   Yes.
15 Q.   Okay.  I'm going to just go over some of
16 the rules.  He probably told you this already, but
17 just so we have it on the record.
18        First of all, as you just learned, you
19 were just sworn in.  That means you're testifying
20 under oath under penalty of perjury.
21        Do you understand that?
22 A.   Yes.

Page 7

1  Q.   Okay.  And what you're doing very well is
2  answering every question I ask orally, so I would ask
3  you to continue to do that as we go forward with the
4  deposition, okay?
5  A.   Yes.
6  Q.   The deposition transcript, which the court
7  reporter is taking down our words, will be put into a
8  booklet which will be sent to you for review, and
9  you'll be given the opportunity to review that and
10 make any changes.
11        Do you understand that?
12 A.   Yes.
13 Q.   And you should also understand that if
14 this case comes to trial and you're called as a
15 witness by one of the parties, then I would be able
16 to question you about any changes that you make.
17        Do you understand that?
18 A.   Yes.
19 Q.   Okay.  Good.
20 Q.   You're also doing very good at letting me
21 finish the questions before you answer, so please
22 let's let each other finish.

Page 8

1         I actually have a problem with that.
2  Sometimes I might interrupt you, but I'll try to let
3  you finish your answer if you try to let me finish my
4  question.  Then the court reporter can take down what
5  each of us are saying.
6         Do you understand that?
7  A.   Yes.
8  Q.   Good.  Probably the most important rule
9  for this deposition is, if you don't understand a
10 question that I ask, I'll ask you to let me know.
11 Otherwise, I'm going to assume you understand the
12 question.
13        Is that agreeable?
14 A.   Yes.
15 Q.   Okay.  Great.  So in terms of preparing
16 for this deposition, you had a chance to speak with
17 your attorney, Mr. Deese, correct?
18 A.   Yes.
19 Q.   And did you talk to anybody else about the
20 substance of the deposition?
21 A.   No.
22 Q.   Okay.  Did you review any documents in



Page 9

1 preparation for the deposition?

2     A.    Please repeat.

3     Q.    Did you review any documents in

4 preparation for the deposition today?

5     A.    Yes.

6     Q.    And which documents did you review?

7     A.    I looked at the declaration that I signed

8 again.

9     Q.    Okay.  Were there any others?

10     A.    I reviewed our agency manual.  I reviewed

11 the commissioner's manual.

12     Q.    Okay.  And when you say the agency manual,

13 could you be more specific? because I assume the

14 agency has more than one manual.

15     A.    The manual is -- the agency manual is the

16 manual that ACA gives to each agency who is pursuing

17 the accreditation process.  It outlines the process.

18     Q.    I see.

19     A.    The commissioner manual outlines the

20 process for the commissioners.

21     Q.    I see.  And the commissioners are people

22 who are appointed as commissioners by the ACA or

Page 10

1 somebody?  Who are commissioners?  How does one

2 become a commissioner?

3     A.    They are elected by the membership of the

4 organization.

5     Q.    I see.  And are they something of a Board

6 of Directors like or do they just do the

7 accreditation process?

8     A.    They are the final decision makers on

9 accreditation only.

10     Q.    Okay.  Great.  And could you -- before we

11 get into the ACA too much, could you give me a very

12 brief description of your educational background

13 starting after high school, if there is any?

14     A.    I received my Bachelor of Science in law

15 enforcement in social work.  I received my Master of

16 Arts degree -- I'm sorry -- Master of Science degree

17 in correctional administration from Xavier University

18 in Cincinnati, Ohio.

19         I did postgraduate work at the University

20 of Louisville in occupational training and

21 development.

22     Q.    And what about a brief summary of your

Page 11

1 work history before you came to the ACA?

2     A.    Approximately, 35 years of experience.  I

3 was a corrections officer for approximately two years

4 in female facilities.  I was a caseworker at two male

5 facilities.  I was a unit director in a male

6 facility.  This is all in the state of Kentucky.

7         After the unit director, I was the branch

8 manager for research planning for approximately five

9 years.  I was the director of quality assurance for

10 the Kentucky Department of Juvenile Justice.

11         I was superintendent for our maximum

12 security male juvenile facility.  I was with the

13 National Institute of Corrections as a specialist for

14 two years -- a little over two years.

15         After juvenile justice, I was on the

16 faculty at the University of Louisville for

17 approximately three to four years and then I've been

18 at ACA for 7 1/2 years.

19     Q.    And your job title at the ACA?

20     A.    Director of standards and accreditation.

21     Q.    Okay.  And what did you teach at the

22 University of Louisville?

Page 12

1     A.    Criminal justice, specifically,

2 corrections.

3     Q.    Okay.  And can you provide me with a brief

4 description of your job description for -- I forget

5 the title that you just gave me.

6         MR. REESE:  At ACA?

7         MR. SPECTER:  Yes.

8         THE WITNESS:  Director of standards and

9 accreditation.  Supervise eight people.  Basically,

10 we work with agencies that are pursuing accreditation

11 who are seeking to be reaccredited.

12         We work with auditors who are independent

13 auditors who go out to do the audits for the

14 agencies.  I'm a member of the management team at the

15 association.  I get involved with training of the

16 commissioners, training of the auditors, and I just

17 take care of the daily managerial operations of the

18 department.

19     Q.    Of the standards department?

20     A.    Of the standards department.

21     Q.    I see.  And how long have you been doing

22 that?



Page 13

1    A.    Three years, approximately.
2    Q.    Okay.  And do you do audits yourself?
3    A.    I do not.
4    Q.    Have you ever done an ACA audit?
5    A.    No.
6    Q.    Okay.  So let's go to your declaration.
7  I've asked the court reporter to mark this as Exhibit
8  1.
9          Should I call you Ms. Black-Dennis or
10  Kathy or Ms. Dennis?  Which one do you prefer?
11   A.    Whatever is easiest for you will be fine.
12   Q.    How about Kathy?
13   A.    That would be fine.
14   Q.    And you can call me by my first name, if
15  you choose to.
16          Is this the copy of the declaration you
17  filed in the Coleman/Plata matter?
18   A.    Yes.
19   Q.    And how did you come to offer this
20  declaration?
21          MR. REESE:  Excuse me.  Before the witness
22  answers, I'm not sure -- did you mean to hand me the

Page 14

1  one with the highlighting on it?
2          MR. SPECTER:  Thanks.  I appreciate that.
3          BY MR. SPECTER:
4    Q.    Okay.  So how did you come to submit this
5  declaration in our case?
6    A.    I was asked to sign it by our executive
7  office.
8    Q.    I see.  And is that a person or an entity
9  who asked you to sign it?  Did a person ask you to
10  sign it?
11   A.    Yes.
12   Q.    Who was the person who asked you to sign
13  it?
14   A.    Jeff Washington.
15   Q.    And what's his title?
16   A.    Deputy executive director of ACA.
17   Q.    And so is he kind of the second in command
18  for the ACA?
19   A.    Yes.
20   Q.    Okay.  And what were you told?  What was
21  the reason you were told for signing the declaration?
22   A.    I was asked to sign it.

Page 15

1    Q.    Okay.  Were you told what the case was
2  about?
3    A.    No.
4    Q.    Okay.  Did you have any role in drafting
5  the declaration?
6    A.    I provided my years of experience.
7    Q.    I see.
8    A.    That was it.
9    Q.    So that's on page 2, paragraph 2, line 6?
10   A.    Yes.
11   Q.    Okay.  Did you read the declaration before
12  you signed it?
13   A.    Yes.
14   Q.    Okay.  Is it true and correct?
15   A.    There is one typographical error on page
16  3, line 17.  It should read "90 percent of the
17  nonmandatory standards."
18   Q.    Did you -- okay.
19          So besides adding the 35 years experience,
20  you didn't make any revisions to the declaration?
21   A.    No.
22   Q.    And Mr. Washington handed you the

Page 16

1  declaration?
2    A.    Yes.
3    Q.    Okay.  Let's go through it a little bit.
4  If you can look at page 7 -- I'm sorry -- paragraph
5  7, page 3, it says:  "The standards promulgated by
6  the ACA are used by lawyers, judges, county
7  administrators, academia and advocacy groups
8  throughout the country as a tool to ensure the basic
9  constitutional rights of the offender, while serving
10  to protect staff and the public at large."
11          Do you see that?
12   A.    Yes.
13   Q.    And is that a true statement in your
14  opinion?
15   A.    Yes.
16   Q.    Okay.  And tell me the basis upon which
17  you believe that the ACA standards are used as a tool
18  to ensure the basic constitutional rights by lawyers
19  around the country.
20   A.    Our standards are voluntary, that agencies
21  voluntarily enter into the process.  We would hope
22  that them following our standards would mean that the



KATHY BLACK-DENNIS
PLATA vs. BROWN

Page 17

1 constitutional rights are being followed. I'm not an
2 attorney.
3      Q.   I understand that, and I'm trying not to
4 ask you legal questions, but I'm going to get close
5 to the line as we go -- as we move ahead here.
6           You say they're actually used by lawyers,
7 and I'm asking if you have any factual basis to say
8 that the standards are actually used by lawyers to
9 ensure the basic constitutional rights of prisoners.
10          Do you know of any such case personally?
11     A.   Our standards have been used. I do not
12 know specifics.
13     Q.   Okay. So you don't know of any case in
14 which a lawyer has used the ACA standards to ensure
15 the basic --
16          MR. REESE: Objection. Her testimony was
17 that the standards were used. She does not know
18 specifics. So if you want to say you do not know of
19 any specifics, she can agree with that.
20          BY MR. SPECTER:
21     Q.   So you don't know of any specific case in
22 which a lawyer used these standards?

Page 18

1      A.   No.
2      Q.   Do you know of any specific case in which
3 a judge used these standards?
4      A.   Yes.
5      Q.   What case?
6      A.   There has been a case in juvenile justice
7 in Kentucky. A federal judge released the state from
8 a federal court order because of compliance with the
9 ACA standards.
10     Q.   Do you know the name of that case? Do you
11 know what facility it involved?
12     A.   It was a class action suit. I do not
13 recall.
14     Q.   Okay. Do you know about when it was?
15 That's probably an even harder question.
16     A.   It was the last -- it was one of the last
17 actions that Attorney General Janet Reno did before
18 leaving office was to release the Kentucky Department
19 of Juvenile Justice from the federal consent decree.
20     Q.   Because they complied with the ACA
21 standards?
22     A.   It was an element, yes.

Page 19

1      Q.   And you also say that advocacy groups used
2 these standards.
3           Do you know of any specific advocacy
4 groups that used these standards?
5      A.   No.
6      Q.   And what about academia? I assume you
7 meant by that the person who wrote this meant
8 professors and the like. Is that your understanding,
9 too?
10     A.   I do not know --
11     Q.   What they meant?
12     A.   -- what they meant.
13     Q.   Did you know what you meant when you read
14 it?
15     A.   Yes.
16     Q.   What did you mean?
17     A.   That professors, including myself, have
18 used it in classrooms teaching introduction to
19 corrections, corrections administration.
20     Q.   I see. Okay. And did you -- before you
21 signed this declaration, did you discuss it with
22 anybody else except Mr. Washington?

Page 20

1      A.   Repeat that, please.
2      Q.   Before you signed this declaration, did
3 you discuss it with anybody else but Mr. Washington?
4      A.   No.
5      Q.   Okay. And did you discuss the declaration
6 with Mr. Washington or did you just sign it?
7      A.   In generalities, yes, I discussed it.
8      Q.   Okay. And what was the substance of that
9 discussion?
10     A.   He said this is a declaration. I want you
11 to read over it. If you agree with it, sign it. I
12 did.
13     Q.   Okay. Great. So if you could turn the
14 page, please, and go to paragraph 14, it says: "ACA
15 was aware of the class action litigation against the
16 California Department of Corrections and
17 Rehabilitation when it began its accreditation
18 inspections of California correctional facilities."
19          Do you see that sentence?
20     A.   Yes.
21     Q.   And were you aware of the class action
22 litigation in California?



Page 21

1    A.    Yes.

2    Q.    Okay.  And what is your understanding of

3  the case?

4    A.    I just know it exists.

5    Q.    I see.

6    A.    I do not know specifics.

7    Q.    Okay.  And it says:  "As a consequence of

8  that awareness, we selected our most experienced

9  auditors to review California's prisons."

10          Did you make that selection?

11    A.    I was involved in the selection, yes.

12    Q.    And so how did the fact that there was a

13  class action case affect your selection of the

14  auditors?

15    A.    That in itself did not -- that was not the

16  only thing that we looked at when we were assigning

17  auditors.

18    Q.    Right.  Well, it said it was one of the

19  things.

20          Was that one of the things in your mind

21  when you selected the auditors?

22    A.    What was in my mind was that we wanted

Page 22

1  experienced auditors because this was an initial

2  accreditation.  We do that for every agency.

3    Q.    I see.  But it would have been difficult

4  for you to determine who to select based on this case

5  when you didn't know anything about it, right?

6    A.    As I said, that really wasn't -- I mean,

7  we knew it existed.

8          When we have initial accreditations, we

9  always send out our more experienced auditors.

10    Q.    I see.

11    A.    I'm not going to send someone out who has

12  only been auditing for a month.

13    Q.    I understand.  So this paragraph then

14  gives a different impression than what you've just

15  testified to.  Would you agree with that?  It seems

16  to suggest that they selected auditors because --

17  experienced auditors because of the case.

18    A.    As I said, that really wasn't -- I mean,

19  initial accreditation.  We were aware there was --

20  like we were aware there was class action litigation.

21    Q.    Right.

22    A.    That's just one element of what we look

Page 23

1  at.

2    Q.    Okay.  So the prisons that were accredited

3  by the ACA were the California State Prison in

4  Solano, California, Central California Women's

5  Facility and the California State Prison in

6  Sacramento; is that correct?

7    A.    Correct.

8    Q.    And in paragraph 17, it says on line 8

9  that two other California prisons are likely to be

10  accredited.

11          Do you see that?

12    A.    Yes.

13    Q.    And which two prisons were you referring

14  to?

15    A.    I don't recall.  We're accrediting

16  several.  I don't recall which two were mentioned

17  here.

18    Q.    I see.  Do you know how many prisons

19  you've audited in California for accreditation?

20    A.    We audited three mentioned in this in

21  2012.  We have audited -- in 2013, I do not recall

22  the number.

Page 24

1    Q.    Okay.  Did you read the reports of all the

2  audits in 2013?

3    A.    No.

4    Q.    So how did you know that two of them are

5  likely to be accredited?

6    A.    We hope that agencies who are going

7  through the process -- once we understand what our

8  process is and the assistance that we give to

9  agencies, we look at agencies as being capable

10  because they understand what the process is about,

11  that they know what they have to do to comply with

12  the standards.

13          They had already been through the process

14  with three institutions.

15    Q.    So --

16    A.    We had provided technical assistance.

17          MR. REESE:  You need to listen to his

18  question.  His question was -- you say in here:  "The

19  initial audit results for two other California

20  prisons indicate that it's likely that those

21  facilities will be accredited in the future."

22          You also testified you haven't read any of

KATHY BLACK-DENNIS
PLATA vs. BROWN

May 21, 2013
25–28

Page 25

1 the reports. He wants to know how it is that you are

2 able to say that -- you must have had an awareness of

3 the audit results --

4       BY MR. SPECTER:

5    Q.   How did you know --

6       MR. REESE: -- whether it was a pass or a

7 fail.

8       THE WITNESS: Well, the other three

9 mentioned in here passed.

10      MR. REESE: Okay.

11      BY MR. SPECTER:

12   Q.   So you think because the other three

13 passed it was likely that the two more were going to

14 pass. Is that what you're saying?

15   A.   I meant that based on what they had done

16 in these three audits that had passed that they were

17 aware of what needed to happen in order to be -- for

18 other facilities to be accredited.

19      I don't make the decision on who is

20 accredited.

21   Q.   Yes, but you made a prediction. I'm

22 asking not about the decision. I'm asking about your

Page 26

1 prediction.

2       If you want to just say you didn't have

3 really a basis for making that prediction, that would

4 be fine, too, but --

5    A.   Then I will say that.

6       MR. REESE: If that's the case.

7       BY MR. SPECTER:

8    Q.   Okay. If that's the case, we're here to

9 tell the truth.

10      MR. REESE: Well, we are here to tell the

11 truth, and I think the question that -- I mean, if

12 we're here to tell the truth, the question would be:

13 Without reading a report, one of the reports, was the

14 witness aware of whether or not the auditors had

15 found the two facilities in compliance with the

16 standards?

17      MR. SPECTER: That's a good question.

18 Your attorney posed a very good question.

19      BY MR. SPECTER:

20   Q.   And I think -- what's your answer to that

21 question?

22      MR. REESE: If you remember.

Page 27

1       THE WITNESS: I didn't read the reports.

2       BY MR. SPECTER:

3    Q.   Then just say that.

4       MR. REESE: The question is: Were you

5 aware of what the result was even without reading the

6 report?

7       THE WITNESS: They were accredited, yes.

8       MR. REESE: That they had passed, not that

9 they haven't been accredited. The two facilities in

10 2013 that had not been accredited yet had been

11 audited, had been audited.

12      And the question was: Were you aware of

13 the results of the audit?

14      THE WITNESS: Of the 2013, no.

15      BY MR. SPECTER:

16   Q.   Okay. Then it would seem impossible for

17 you to make a prediction about whether they were

18 likely to pass. Isn't that true?

19      MR. REESE: Answer his question. This is

20 not a memory game here.

21      I mean, the question -- whatever you

22 recall. I mean, personally, I think Mr. Specter's in

Page 28

1 possession of documents that show that you were aware

2 of the results of the audit, but if you don't

3 remember it, that's okay.

4       MR. SPECTER: Well, I don't know. I'm not

5 -- I have the audits, but I don't have anything

6 linking her to them.

7       BY MR. SPECTER:

8    Q.   So --

9    A.   I don't read audit reports at all, 2012 or

10 2013.

11   Q.   Okay. I'm just trying to tie the -- just

12 close the little loop that's left, which is that you

13 really didn't have enough -- or any information

14 that's sufficient for you to make the statement you

15 did in the paragraph; isn't that right?

16      MR. REESE: Other than what she's already

17 testified to?

18      BY MR. SPECTER:

19   Q.   Yes or no, Ms. --

20      MR. REESE: You don't have to answer yes

21 or no.

22      MR. SPECTER: I would appreciate it.



Page 29

1       MR. REESE:  You don't.

2       MR. SPECTER:  Okay.  Let the record

3   reflect that there's a long pause.

4       THE WITNESS:  I'd like to confer with you.

5       MR. REESE:  And the record will reflect

6   that as well.  I won't give her testimony.

7       MR. SPECTER:  Thank you.  I appreciate

8   that.

9       (A break was taken.)

10      BY MR. SPECTER:

11      Q.   Okay.  Kathy, do you have an answer for my

12  question after you've conferred with Mike?

13      A.   I do.

14      Q.   What's your answer?

15      A.   The answer is that based on the training

16  that we had done with the agency, based on the mock

17  audits that were done, based on the audit results of

18  the other institutions, optimistically, we would like

19  to say that agencies are capable of being accredited.

20      Q.   Okay.  And so that -- you make that

21  prediction without knowing anything about the

22  conditions in those institutions, right?

Page 30

1       A.   I will say the same answer.  Based on what

2   we had done, that -- and -- we are optimistic that

3   when we go in and we do training with the agency,

4   when we have mock audits done, when we have technical

5   assistance, that the agency knows what the

6   expectations are.

7       And they are capable of being -- and I

8   will use the word "capable" of being accredited.

9       Q.   Okay.  I think we've beaten that horse to

10  death.

11      A.   I don't know any other way to say it.

12      Q.   Okay.  I'll just -- okay.

13      This is a -- I can't let it go.  I have to

14  ask one more question.

15      I don't want to know anything about the

16  process, the accreditation process, but you did not

17  know what the conditions were in these institutions

18  from any source before you signed this declaration

19  about these two prisons, right?

20      The conditions I'm talking about, not the

21  ACA process.

22      A.   No.

Page 31

1       Q.   Okay.  That's all I wanted to know.

2       Now, let's talk about the accreditation

3   process for a minute.  So you don't review any of the

4   reports, is that right, the audit reports?

5       A.   I review occasionally.

6       Q.   But not --

7       A.   Not as a matter of my job, no.

8       Q.   Okay.  I've reviewed too many of these

9   reports because Mike sent me boatloads of them.  And

10  to me, they all seem to be written in the same style

11  even though they were audited by a lot of different

12  individuals.

13      Can you explain that?

14      A.   Yes.

15      Q.   Please do.

16      A.   We have a template in terms of what

17  information needs to be included in each audit

18  report.

19      Q.   I see.

20      A.   And we ask the auditors to follow that

21  template.

22      Q.   I see.  So they kind of fill in the

Page 32

1   blanks.  Is that it?

2       A.   It's more than fill in the blanks.  We

3   give them broad categories.

4       Q.   But you also give them language because

5   some of the -- as I'll show you as we progress in the

6   deposition, some of the language or some of the

7   sections is almost identical throughout all the

8   reports; is that right?

9       A.   I haven't read them.

10      Q.   Okay.  Have you seen the template that you

11  just referred to?

12      A.   Yes, not recently.

13      Q.   Do you recall what it looks like or what

14  information is in it?

15      A.   Broad categories, yes.

16      Q.   So does it have like just categories or

17  does it have suggested language as well?

18      A.   I don't recall.

19      Q.   Okay.  Is there somebody in the ACA who --

20  well, who fills in the blanks for the template?

21      A.   The auditors will fill in the report.

22      Q.   I see.  And do they send that copy of that



KATHY BLACK-DENNIS                                           May 21, 2013
PLATA vs. BROWN                                                   33—36

Page 33

1  to the ACA?

2    A.    Yes.

3    Q.    And does somebody besides yourself review
4  it?

5    A.    Yes.

6    Q.    What do they review it for?

7    A.    Each specialist reviews for -- they look
8  at the grammar.

9        They look to make sure that the correct
10  name of the agency is there.  They look for correct
11  spelling.  They format.

12        They look to make sure that the standards
13  that are referenced are, indeed, the correct
14  standards.  They send it back to the auditor if there
15  are questions about the content.

16        It also goes to the agency to make sure
17  there are no glaring errors.  The agency is not
18  allowed to change anything in the report other than
19  if it says we hold 150 inmates when, indeed, they
20  hold 1500 inmates, errors like that, but there's a
21  process where it goes between the auditor, the
22  agency, and the specialist.

Page 34

1    Q.    And what kind of qualifications does the
2  specialist have?

3    A.    Each specialist has a different set of
4  qualifications.

5    Q.    Well, are there any -- so would you hire
6  the court reporter to be a specialist?

7        I mean, are there any standards to be a
8  specialist?

9    A.    Our specialists have, as I said, varying
10  backgrounds working in juvenile justice, adult
11  corrections.

12    Q.    Okay.  I get it.  So are they supposed to
13  do a quality review?  In other words, if there are
14  unanswered questions or things that are important
15  that should be included in the report that aren't in
16  the report, are they supposed to do that?

17    A.    Yes.

18    Q.    And if they find that things aren't in the
19  report that should be in the report, they send it
20  back to the auditors?

21    A.    Yes.

22    Q.    And are the auditors expected to revise

Page 35

1  their report accordingly?

2    A.    Yes.

3    Q.    So once the report is approved by the
4  specialist, where does it go then?

5    A.    The report starts with the auditor.  It
6  goes to the specialist.  The specialist sends it back
7  to the auditor.  The auditor sends it back to the
8  specialist.  The specialist sends it to the agency.
9  The agency sends it back to the specialist.

10        When it's completed, a copy goes back to
11  the agency.  A copy goes to the commission for the
12  accreditation hearing.

13    Q.    I see.  And there are three commissioners
14  at the accreditation hearing; is that right?

15    A.    The panels will consist of anywhere from
16  three to five commissioners.

17    Q.    And it takes a majority vote to accredit a
18  prison?

19    A.    Correct, of the panel.

20    Q.    Of the panel.  And are these reports
21  supposed to be consistent -- well, let me ask it
22  another way:  Are these ACA standards that you have

Page 36

1  supposed to be applied consistently throughout the
2  country?

3    A.    We have 24 books of standards.  If an
4  agency is going through accreditation using a certain
5  manual, the adult correctional institution manual,
6  for example, then yes.

7        Every adult prison going through the
8  accreditation process would use the same manual with
9  the same standards.

10    Q.    Okay.  So should the report list both the
11  things that the agency is doing well in terms of
12  complying with the standards and also list the things
13  that the agency is deficient in?

14    A.    There are -- there's noncompliance and
15  there's compliance noted for each standard.

16    Q.    Okay.  There's also something in your
17  documents which say that the auditors are supposed to
18  look at the quality of life in the facilities.

19        Do you recall that part of your process?

20    A.    Yes.

21    Q.    And what does that mean exactly?

22    A.    They -- when the auditors go into the



Case 2:90-cv-00520-KJM-SCR    Document 4676    Filed 07/02/13    Page 23 of 57

KATHY BLACK-DENNIS                                    May 21, 2013
PLATA vs. BROWN                                              37–40

Page 37

1 facility, there are several elements.
2       One is file review.  One is they tour the
3 facility.  Another is that they interview staff,
4 inmates in a -- when they interview the staff or the
5 inmates, it could be out in the open or they could
6 have a private area set aside for interviews.
7       They look at programming.  They look at
8 education.  They look at recreation.  They look to
9 see if there are religious programs, volunteer
10 programs, industry programs.
11       They eat meals to test the quality of the
12 food, in addition to looking at, you know, the
13 degrees of the refrigerator or the degrees on the
14 stove.
15       They look to see if it's pleasing or not.
16 They taste the food.  They look at the totality.
17     Q.   So would it be fair to say that they're
18 there to give the Commission a full picture of the
19 conditions of the institution?
20     A.   They are there to take a snapshot of while
21 they were there this is what they observed, this is
22 what they heard, but it's a snapshot because they are

Page 38

1 there based on the size of the facility three to four
2 days.  It's a snapshot.
3     Q.   Okay.  And they're supposed to look at
4 health care as well, right?
5     A.   Yes.
6     Q.   And so as you know, from working in
7 institutions for so long, mental health care is a
8 part of health care in institutions, correct?
9     A.   Yes.
10     Q.   And part of mental health care is making
11 sure or doing what's reasonably practical to prevent
12 the inmates or prisoners or juveniles from committing
13 suicide, right?
14     A.   Yes.
15     Q.   And so if the prisoner or the juvenile or
16 the inmates in one of the facilities commits suicide
17 during the period that the ACA is looking at the
18 institution -- like, they don't just look at a day.
19       They look at various reports from some
20 time back; isn't that correct?
21     A.   Correct.
22     Q.   Should the report contain an analysis of

Page 39

1 the -- whether the institution, you know, could have
2 taken reasonable steps to prevent the suicide?
3     A.   When our auditors go in, they look to see
4 if there is a policy, if there is a procedure, if
5 there is a post order that corresponds to our
6 standards.
7       We look for documentation of that.
8     Q.   Okay.  Now, could you answer my question?
9     A.   Could you repeat it, please?
10     Q.   Should the report contain an analysis of
11 whether the institution could have taken reasonable
12 steps to prevent the suicide?
13     A.   No.
14     Q.   Okay.  Another example, the reports also
15 catalog, for lack of a better word, the litigation
16 that's -- that the institution has against it mostly
17 by prisoners, right?
18     A.   Repeat that one more time, please.
19     Q.   Sure.  The reports contain a summary of
20 the litigation that's been filed against the
21 institution?
22     A.   They should, yes.

Page 40

1     Q.   Right.  And so, for example, if the
2 summary -- if the institution reports that a prisoner
3 or prisoners sued the prison and won a judgment
4 against the prison for conditions-related issues,
5 should the report contain information about the
6 lawsuit and what the court found?
7     A.   Not necessarily, no.
8     Q.   Okay.  And you know, our -- so in that way
9 -- okay.  I'll just let that stand.
10       So when -- you mentioned that the auditors
11 would interview prisoners, correct?
12     A.   Correct.
13     Q.   And now are they supposed to -- with these
14 reports, are they supposed to summarize what the
15 prisoner said?
16     A.   They give a summary.  They do not break it
17 down, typically, what each inmate said, no.  They
18 take a snapshot of the comments --
19     Q.   They summarize the comments?
20     A.   They summarize the comments.
21     Q.   And are they supposed to report on
22 negative as well as positive comments?



Page 41

1    A.   Yes.

2    Q.   So if the prisoner is making complaints,
3 they're supposed to put them down in the report?

4    A.   Not specifically.

5    Q.   No?

6    A.   Not specifically, no.

7    Q.   If the prisoners made positive comments --
8 I've seen a lot of positive comments that are made.

9         Are they supposed to put positive comments
10 down?

11   A.   They are to give a summary of what the
12 inmate said that they interviewed, positive,
13 negative.

14   Q.   Okay.  So the commissioners read these
15 reports, right?

16   A.   Yes.

17   Q.   And this is -- the commissioners don't go
18 to the prisons themselves, do they?

19   A.   They do not.

20   Q.   So really the basis of the accreditation
21 decision is the report, correct?

22   A.   Yes.

Page 42

1    Q.   So without details on any negative
2 comments that might have been made by the prisoners,
3 the commissioners wouldn't really know full
4 information, would they?

5         MR. REESE:  I'm going to object to your
6 question because it assumes she testified that
7 negative comments aren't included in the report.

8         MR. SPECTER:  I'm asking a hypothetical
9 question.

10        MR. REESE:  Okay.  This is a hypothetical
11 question.  The question is:  If the negative -- if
12 the good and the bad aren't in the comments, how
13 would the commissioners know about the bad, in
14 essence?

15        BY MR. SPECTER:

16   Q.   If the bad is not in, then the
17 commissioners wouldn't really have any way of knowing
18 about the complaints, would they?

19   A.   The other thing that's taken into
20 consideration --

21   Q.   No.  You have to answer my question.

22   A.   No.

Page 43

1    Q.   Okay.  Then also do the commissioners do
2 their own independent research on the institution --
3 well, you just testified they rely on the reports for
4 the basis of their decision, right?

5    A.   Correct.

6    Q.   So if the reports don't describe in detail
7 the litigation that's been, you know, against the
8 institution, the commissioners wouldn't know about
9 it, right?

10   A.   Correct.

11   Q.   Okay.  So this goes back to the issue we
12 were beating to death or I was beating to death, but
13 I hope you can answer it easily.

14        What percentage of the institutions that
15 are -- applied for accreditation and that go through
16 an audit are eventually accredited?

17   A.   I don't know that percentage.

18   Q.   Give me your best ballpark estimate.

19   A.   The majority.

20   Q.   A large majority or, you know -- you're
21 already saying half.

22   A.   A large majority.

Page 44

1    Q.   So the general expectation is that
2 institutions will be able to pass; is that right?

3    A.   I wouldn't use the word general.

4    Q.   What would you use?

5    A.   I would say the vast majority of agencies
6 who enter into the process are capable of being
7 accredited.

8    Q.   Okay.  And there's a fee for the
9 accreditation process, right?

10   A.   Yes.

11   Q.   And what's the -- is it on a schedule or
12 is there a flat fee or what?

13   A.   There are fees associated depending upon
14 the size of the facility and the number of facilities
15 that are going through the process.

16        It is also -- we try to save agencies
17 money if we can do a back-to-back audit.

18        For example, the fee would be less.  We
19 offer discounts for -- we offer discounts to agencies
20 based on the number that they contract with.

21   Q.   I see.  Do you know what California paid,
22 by any chance?



Page 45

1    A.   I do not.

2         MR. SPECTER:  I think you sent me the

3  contract, but I forgot to look at it before I left.

4         MR. DEESE:  Oh, okay.

5         BY MR. SPECTER:

6    Q.   So the auditors, do they go through any

7  training?

8    A.   Yes.

9    Q.   Do you make sure that their training is

10  consistent with each other?  Is that one of the

11  purposes of the training?

12    A.   Yes.

13    Q.   And how many -- do they have to go get

14  trained in person?

15    A.   That is a component, yes.

16    Q.   Do they have to pass a test or anything?

17    A.   Yes.

18    Q.   Okay.  And they have a manual that they

19  use to help them audit?

20    A.   Yes.

21    Q.   And the manual like for adult institutions

22  is the same one for the whole entire country,

Page 46

1  correct?

2    A.   The book of standards manual?

3    Q.   Yes.

4    A.   Yes.

5    Q.   Okay.  And how does the ACA or you

6  maintain quality assurance with so many different

7  people going to so many different facilities?

8    A.   We have an evaluation process.  The

9  institution receives an evaluation form.  They are

10  asked to fill it out and send it to me at the end of

11  the audit.

12         I read every one of those.  The audit

13  Chair is asked to fill out an evaluation on his or

14  her team members as well.  The results of those are

15  put into our auditor database.

16    Q.   I see.  So you've got the quality

17  assurances from the people who are being audited and

18  the Chairperson of the audit team; is that right?

19    A.   That's correct, yes.

20    Q.   And do the people fill out those

21  evaluations before the Commission accredits them or

22  after?

Page 47

1    A.   Before.

2    Q.   Okay.  Let's talk about the ACA standards

3  for a little bit.

4         You're familiar with them?

5    A.   Yes.

6    Q.   Okay.  In your declaration, if you could

7  take a look at that, paragraph 6 on page 3.  It said

8  you attached as Exhibit B the supplements to the

9  ACA's 2012 standards.

10         And I looked at the supplement and it's

11  just a supplement to the standards themselves, so

12  they're not the complete set of standards, right?

13    A.   Correct.

14    Q.   Why did you attach the supplement and not

15  the standards themselves?

16    A.   Standards are revised over the years and

17  the standards supplement will indicate which

18  standards have changed since the original manual came

19  out.

20    Q.   Right.  I understand that is what a

21  supplement is.  My question is:  Why didn't you

22  include the standards themselves?

Page 48

1    A.   I don't know.

2    Q.   Okay.  That's a good answer.  As I

3  understand it, there are 61 mandatory standards?

4    A.   I don't recall exactly the number.  We

5  have 24 manuals.  I do not know specifics without

6  looking at the manuals.

7    Q.   Fair enough.  When I looked at these

8  reports -- I'll show you one of them -- they talked

9  about 61 mandatory standards for adult institutions.

10  Let me see if I can find them.

11         Do you see where it says mandatory?

12    A.   Yes.

13    Q.   Do you see where it says 61?

14    A.   Yes.

15    Q.   That's what I'm referring to.  Does that

16  refresh your recollection?

17         MR. REESE:  This was at the time of -- the

18  document you handed the witness is at the time of the

19  2010 standard supplement?

20         MR. SPECTER:  Yes.  It's the same for all

21  the ones.

22         BY MR. SPECTER:



Page 49

1    Q.    Does that refresh your recollection?
2          MR. REESE:  Do you have any reason to
3    believe that 61 is not the correct number?
4          THE WITNESS:  No.
5          MR. REESE:  Okay.  That's fine.
6          BY MR. SPECTER:
7    Q.    Can you explain to me what the difference
8    is between a mandatory and a discretionary standard,
9    please?
10   A.    We don't use the term discretionary.
11   Q.    I'm sorry.  What term do you use?
12   A.    Nonmandatory.
13   Q.    Okay.  Explain the difference between a
14   mandatory and a nonmandatory standard.
15   A.    Typically, the mandatory standards are
16   those that are concerned with life safety issues.
17   Q.    Okay.
18   A.    Nonmandatory -- it would be nice, but it
19   is not considered to be a life threatening type of
20   standard.
21   Q.    I see.  So let me ask you a question about
22   that.  You have shower standards?

Page 50

1    A.    Yes.
2    Q.    And there are ratios, correct?
3    A.    Yes.
4    Q.    And you have toilet standards, correct?
5    A.    Yes.
6    Q.    There are ratios?
7    A.    Yes.
8    Q.    So many toilets for prisoners for so many
9    prisoners, right?
10   A.    Yes.
11   Q.    I think showers is one to eight for adult
12   facilities.  Would that sound right to you?
13   A.    I don't recall.
14   Q.    I'll represent to you that it's right.
15         So showers are -- you think their showers
16   are important --
17   A.    Yes.
18   Q.    -- to maintaining personal hygiene,
19   correct?
20   A.    Yes.
21   Q.    And toilets are essential?  Don't you
22   think?

Page 51

1    A.    Yes.
2    Q.    Neither of those are mandatory standards,
3    right?
4    A.    Correct, to my knowledge.
5    Q.    The square footage that prisoners have in
6    dayrooms, there's a standard for that, right?
7    A.    I don't know in dayrooms specific.
8    Q.    Well, I'll represent to you that there is
9    for adult institutions just from my review of your
10   own documents.  Take my word for it for the purpose
11   of this deposition, would you?
12         There are also standards for the amount of
13   space that's supposed to be in a cell for prisoners.
14   Do you understand that?
15   A.    Yes.
16   Q.    And do you think those things are
17   important for the well-being of prisoners?
18   A.    Yes.
19   Q.    Yet the prisons -- the showers, the
20   toilets, the space for prisoners -- exercise is
21   another standard, right, how many hours a week
22   prisoners get out for exercise, correct?

Page 52

1    A.    Yes.
2    Q.    How many days per week that is included in
3    that standard, correct?
4    A.    Yes.
5    Q.    That's important for the well-being of
6    prisoners as well, isn't it?
7    A.    Yes.
8    Q.    All the standards are not mandatory,
9    right?  They're nonmandatory?
10   A.    To my knowledge, that is correct.
11   Q.    And you understand that prisoners are
12   entitled as a matter -- well, do you -- I'm going to
13   ask you not for your legal conclusion, but you worked
14   in corrections for 35 years and you've taught
15   corrections, so I'm going to ask you for your
16   understanding of the constitutional issues.
17         Do you understand that as a matter of
18   Constitutional Law that prisoners are entitled to
19   have minimum requirements for showers every week?
20         MR. REESE:  Are you asking her whether a
21   court has held --
22         MR. SPECTER:  No, I'm not.  I'm just



Page 53

1  asking her whether she --
2       MR. REESE:  I'm going to object.  She
3  can't tell you what is required as a matter of
4  Constitutional Law.
5       MR. SPECTER:  Well, I'm not asking her
6  that question.  I'm asking her whether she knows that
7  whether showers are required under the -- well, let
8  me back up for a second.
9       I don't want her to draw a legal
10 conclusion, but it is fair of me to ask what her
11 understanding of --
12      BY MR. SPECTER:
13 Q.   You know what, it doesn't matter what your
14 understanding of the Constitution is, okay.  I'll
15 just -- so I also understand that you can get waivers
16 of nonmandatory standards; is that right?
17 A.   Correct.
18 Q.   And what's the criteria for waivers?
19 A.   You can apply for a waiver to a
20 nonmandatory standard if there is no way you can meet
21 this because of your state statute.
22      Something like that would take -- that

Page 54

1  would be an example where it would take precedence.
2       You would ask -- another instance would be
3  if it would require major renovation or major
4  building of a facility, you have asked for that, and
5  it has been denied by the legislature.
6       You could say we've tried.  There's no way
7  we can receive this.  We are requesting a waiver.
8  Q.   So for example, if, for example, the ratio
9  for showers in a prison is one to eight under the ACA
10 nonmandatory standards and a prisoner -- and a prison
11 has a ratio, say, of 20 to one instead of eight to
12 one -- that's 20 prisoners per shower instead of
13 eight prisoners for shower -- and the prison says,
14 look, it will cost too much for us to renovate the
15 institution to build more showers, that would be
16 grounds for a waiver; is that right?
17 A.   They could request the waiver.  I have no
18 way of knowing if the Commission would grant the
19 waiver.
20 Q.   I see, but it would be grounds for a
21 waiver?
22      MR. REESE:  I think her testimony was it

Page 55

1  would be grounds for a request for a waiver.
2       MR. SPECTER:  Yes.  I'm sorry.
3       BY MR. SPECTER:
4  Q.   More precisely, right?
5  A.   They could request, yes.
6  Q.   And when the Commission grants -- or
7  decides on a waiver, the standards they use are the
8  ones you've just articulated?
9  A.   The standards that they use are the
10 manuals that the agency has applied under for
11 accreditation.
12 Q.   And as I read this material, one of the
13 criteria for a waiver was if there was a departmental
14 rule like -- so you have a local prison that's doing
15 things according to a departmental rule, which was
16 inconsistent with the ACA standards, then that would
17 be grounds for a waiver as well; is that right?
18 A.   They could request a waiver, yes.
19 Q.   And the Commission when it's deciding
20 whether to grant a waiver, one of the criteria for
21 granting a waiver is that same thing, right?  is
22      It's that there's a departmental rule; is

Page 56

1  that right?
2  A.   The Commission -- as I said, they can
3  request the waiver.
4  Q.   Right.  And the Commission can grant that
5  waiver on that ground, right?
6  A.   They can.
7  Q.   And so Kathy since -- well, the -- are the
8  standards drafted, to your understanding, so that
9  they comply with Constitutional standards, U.S.
10 Federal Constitutional standards?
11 A.   The standards are drafted according to
12 what we would say promising practices in the
13 correctional field.
14 Q.   That the corrections -- the members of the
15 ACA adopt, right?
16 A.   The standards -- any ACA member can
17 propose a standard for adoption, deletion, revision.
18      The standards committee is the body that
19 considers and will either approve or deny the
20 standard revision, deletion, or addition.
21 Q.   I see.  So it's possible then because
22 there's no -- so lawyers don't go over the standards



KATHY BLACK-DENNIS
PLATA vs. BROWN

May 21, 2013
57–60

Page 57

1 to make sure that they're consistent with the
2 Constitution; is that right?
3    A.   I don't know.
4    Q.   You never heard of anything like that
5 before, right?
6    A.   Not that I recall.
7    Q.   So then it seems possible that a facility
8 can be accredited by your organization yet be found
9 unconstitutional by a court, right?
10    A.   Yes.
11    Q.   And, in fact, there have been occasions
12 where that's happened, right?
13    A.   I don't know specifics.
14    Q.   Okay.  Would it -- as the manager of the
15 accreditation -- I forget your title again.  I'm
16 sorry -- as the manager for the accreditation process
17 --
18    A.   Director of standards and accreditation.
19    Q.   Yes -- if the -- a facility was granted
20 accreditation that a court found unconstitutional,
21 would that come to your attention?
22    A.   It may.

Page 58

1    Q.   But not necessarily?
2    A.   Not necessarily.
3    Q.   Because it's not -- because they're
4 different -- I hate to use the word standards.
5        They use different criteria; is that
6 right?
7    A.   Exactly.  You're correct.
8    Q.   Well, that may shorten things up a little
9 bit.
10        MR. SPECTER:  I'm going to give you --
11 make this Number 2, please.
12        (Exhibit Number 2 was marked for
13 identification and was attached to the deposition.)
14        BY MR. SPECTER:
15    Q.   So Kathy, before you look at this document
16 too closely, I'm going to go through it with you, but
17 I'm going to explain what it is so you understand
18 what you're looking at.
19    A.   Okay.
20    Q.   As I mentioned before, we subpoenaed
21 various documents from the ACA.  Someone in the ACA
22 provided a bunch of them to Mike who sent them off to

Page 59

1 me.  I reviewed them.
2        What these are is -- you know, they're
3 accreditation audit reports that he sent to me.  They
4 all have these little numbers in the right-hand
5 corner which indicates that, you know, he had sent
6 them and numbered them on pages.
7        And for this particular exhibit, what I
8 did was I copied the face page -- the first page of
9 the report, plus the relevant pages in each report
10 and I stapled five or six different reports -- I
11 stapled them altogether.
12        There are going to be a very small section
13 about the offender interviews with all of these
14 different institutions.
15        Do you understand all of that?
16    A.   Okay.
17    Q.   Okay.  So let's go through it.  So Mule
18 Creek State Prison is the first page.  The audit was
19 done in March of 2013.
20        Do you see that?
21    A.   Yes.
22    Q.   Now, if you turn the page, you'll see down

Page 60

1 at the bottom where it says interviews.
2        Do you see that?
3    A.   Yes.
4    Q.   It says:  "During the course of the audit,
5 team members met with both staff and offenders to
6 verify observations and/or to clarify questions
7 concerning facility operations," right?
8    A.   Correct.
9    Q.   Now, turn the page.  "During the audit
10 period, team members talked with approximately 50
11 offenders.  There were very little, if any,
12 complaints.  Certainly, there were no persistent
13 complaints regarding basic services of food and
14 medical care.  No offenders stated that they did not
15 feel safe in the facility."
16        Do you see that?
17    A.   Yes.
18    Q.   Okay.  That's from Mule Creek.
19        Now, if you can turn the page, now this
20 was a report done for Chowchilla --
21        Do you see that?
22    A.   Yes.



Case 2:90-cv-00520-KJM-SCR    Document 4676    Filed 07/02/13    Page 29 of 57

KATHY BLACK-DENNIS                                                    May 21, 2013
PLATA vs. BROWN                                                         61–64

Page 61

1    Q.    -- April 23rd, 2012.
2          Do you see that?
3    A.    Yes.
4    Q.    Okay.  Turn the page, please.  And at the
5    bottom of the next page, it says interviews and
6    offender interviews.
7          Do you see that?
8    A.    Yes.
9    Q.    And then it says -- if you turn the page,
10   please, it says:  "Approximately 75 offenders were
11   interviewed informally during the course of the
12   audit.  The majority of the offenders reported that
13   they felt safe in the facility and were afforded all
14   services required by the standards."
15         Do you see that?
16   A.    Yes.
17   Q.    So it says the majority, right?
18   A.    Yes.
19   Q.    So there are 75 people they interviewed.
20   The majority would be 37 prisoners, right?
21   A.    If your math is correct.
22   Q.    If my math is correct.

Page 62

1    A.    Yes.
2    Q.    My math is often not correct.
3          MR. REESE:  38 of 75 would be --
4          MR. SPECTER:  38, right.
5          BY MR. SPECTER:
6    Q.    So that means that there could have been
7    36 prisoners who did not report that they felt safe
8    and were afforded all services required by the
9    standards.
10         Do you see that -- not do you see it, but
11   do you understand that?
12   A.    Yes.
13   Q.    But the report does not explain what any
14   of those minority -- what any of those in the
15   minority said, right?
16   A.    That is correct.
17   Q.    And so the commissioners when they're
18   looking at accreditation wouldn't have had that
19   information in front of them to -- when they made
20   their decision to accredit this facility, correct?
21   A.    Correct.
22   Q.    And I'll just represent to you -- your

Page 63

1    declaration says this, but this is one of the
2    facilities that has been accredited, the Central
3    California Women's Facility?
4    A.    Yes.
5    Q.    So it doesn't seem by your prior testimony
6    that you said the report should include all the
7    information, both the negative and the positive, that
8    this report was complete, correct?
9    A.    It would be difficult because I don't know
10   if there were comments in other sections of the
11   report.
12   Q.    I have the whole report if you want to
13   look at it, but this is the place where they're
14   supposed to put those comments, right?
15   A.    As I said, they summarize it.
16   Q.    Right.  They do.  Well, let me just ask
17   you this:  Assuming that there weren't any negative
18   comments in any other parts of the report -- assuming
19   that fact for the moment --
20         MR. REESE:  Any negative comments at all
21   about anything?
22         MR. SPECTER:  No, from the offenders.

Page 64

1          BY MR. SPECTER:
2    Q.    -- would you consider this report
3    incomplete?
4    A.    No.
5    Q.    Okay.  And why is that -- well, never
6    mind.  You don't have to answer that.  Let's go to
7    the next page.
8          BY MR. SPECTER:
9    Q.    This is a report by -- about the
10   California state prison at Soledad.
11         Do you see that?
12   A.    Yes.
13   Q.    And if you turn the page, you'll see
14   offender interviews.
15         Do you see that?
16   A.    Yes.
17   Q.    And it said they interviewed 175 to 200
18   inmates individually and some in groups.
19         Do you see that?
20   A.    Yes.
21   Q.    And no specific complaints about
22   conditions or staffing facilities by these inmates



Page 65

1 with the exception of one or two who suggested they
2 were not getting appropriate care.
3        Do you see that?
4    A.   Yes.
5    Q.   So there are no details about what the
6 medical complaint was, correct, in that paragraph,
7 right?
8    A.   That's correct.
9    Q.   And there's no details about why the
10 auditors concluded that they were getting proper and
11 adequate care, right?
12    A.   They reviewed the case.
13    Q.   Well, right.  Can you turn back to the
14 first page?  Do you see the people who are
15 consultants?
16    A.   Yes.
17    Q.   They're all correctional consultants,
18 right?
19    A.   Correct.
20    Q.   None of them have an RN or an MD or any
21 medical designation after their names, right?  Is
22 that right?

Page 66

1    A.   They don't have it listed after their
2 names.  No.
3    Q.   Are any of these people a doctor or a
4 nurse?
5    A.   I know that Barbara Denison is the health
6 care auditor.
7    Q.   Is she a nurse?
8    A.   I don't know her qualifications off the
9 top of my head.
10    Q.   So you wouldn't know whether -- if you
11 don't know her qualifications, you wouldn't know
12 whether she's qualified to appropriately review
13 medical care, would you?
14        MR. REESE:  She said she doesn't know off
15 the top of her head.  Do you want her to go back and
16 look at her files and find out what this person's
17 qualifications were?  This is not a memory contest.
18        MR. SPECTER:  I'm not asking for a memory
19 contest.  I'm just saying based on the information in
20 this report she wouldn't know that the review was
21 adequate because she didn't know what the person's
22 qualifications were.  Yes or no.

Page 67

1        MR. REESE:  She doesn't know sitting here
2 today.
3        MR. SPECTER:  That's all I'm asking.
4        MR. REESE:  It's irrelevant to whether she
5 knew when she was assigned to be a part of this panel
6 or a part of the audit committee.
7        MR. SPECTER:  She -- who, Kathy?  Kathy
8 was never part of the audit committee.
9        MR. REESE:  Kathy's knowledge today is not
10 relevant.
11        MR. SPECTER:  To what?
12        MR. REESE:  Ask her how she determined
13 who's assigned to the audit committee.
14        BY MR. SPECTER:
15    Q.   Did you know -- have any idea -- did you
16 have a role in assigning any of these people to an
17 audit committee?
18    A.   Yes.
19    Q.   Okay.  Why did you assign Ms. Denison?
20    A.   Every audit team where health care is a
21 part of the facility has a health care auditor
22 assigned to the committee.

Page 68

1    Q.   Okay.  And what are the qualifications for
2 health care auditor?
3    A.   The health care auditor can be someone who
4 is the health care administrator.  It could be for
5 the state agency or the local agency.  It can be a
6 medical doctor.  It can be a registered nurse.  It
7 can be someone who has -- who's been licensed as a
8 nurse.
9    Q.   Okay.  So let's assume she's a nurse for a
10 second.  You understand that there are certain
11 procedures that a nurse can review and determine
12 whether the care is adequate and there are some
13 situations where a nurse -- or a doctor would have to
14 review it to determine whether the care was adequate,
15 right?
16    A.   Yes.
17    Q.   But you don't know -- well, okay.
18        So going to the next question:  The 175 to
19 200 prisoners -- you worked in corrections for 35
20 years, right?
21    A.   Yes.
22    Q.   Does it surprise you that in a prison when



Page 69

1 they interviewed 200 prisoners that there would only
2 be one or two complaints?
3     A.    No.
4     Q.    Okay.  Do you know how old Soledad is, the
5 facility?
6     A.    No.
7     Q.    It was built in the 1950s.  Would it still
8 surprise you that -- and it's overcrowded.
9           By that, I mean there are more prisoners
10 than it was designed to hold.  Would it still
11 surprise you that there were only one or two
12 complaints?
13    A.    No.
14    Q.    Okay.  In the second paragraph -- let's go
15 to the next page.
16           Delano, North Kern State Prison.
17           Do you see that?
18    A.    Yes.
19    Q.    I'm just going to tell you that's a
20 reception center.
21    A.    Okay.
22    Q.    You understand what that means, right?

Page 70

1     A.    Yes.
2     Q.    So if you turn to the next page,
3 interviews.  And it said the audit team interviewed
4 and spoke with approximately 75 inmates that said
5 they generally felt secure -- I'm just going to
6 paraphrase, okay? -- and were treated fairly by
7 staff.
8           Their basic needs were being met and they
9 felt they were making positive process towards
10 eventual successful release.  They also felt that
11 their basic medical needs were being met.
12           Eligible inmates had access to telephones,
13 mail, and the library, and inmate morale appeared to
14 be good and they were cooperative and respectful.
15           Do you see that?
16    A.    Yes.
17    Q.    And you see the rest of the paragraph is
18 all very positive as well.
19           Do you see that?
20    A.    Yes.
21    Q.    Does it surprise you that the 75 inmates
22 that they interviewed at this prison in North Kern --

Page 71

1 that they didn't note one complaint from an inmate?
2     A.    No.
3     Q.    It doesn't?  So in your experience, your
4 35 years of experience -- well, never mind.  Okay.
5           If you'll go to the next page, this is
6 Solano, which occurred last year around this time,
7 May 12th -- May of 2012.
8           They interviewed 30 inmates, and all of
9 them said they felt safe in the facilities.  Stated
10 they were able to go out to recreation, and medical
11 was good at this facility.  A few complaints
12 regarding the meals, but it was mostly they were not
13 getting large enough portions.
14           And then in the next paragraph it was
15 similar about medical care.
16           Do you see that?
17    A.    I see it.  I have not read it.
18    Q.    Okay.  Please take your time.
19    A.    Yes.
20    Q.    In here, again, the comments besides the
21 few complaints about the meals, the prisoners had all
22 positive things to say.  There are no negative things

Page 72

1 by the auditors.  Does that give you any concern?
2     A.    No.
3     Q.    Is that because they -- you didn't expect
4 the auditor to note the negative concerns or because
5 you are not surprised that every inmate said
6 everything was fine except for the meals?
7           MR. REESE:  Do you understand his
8 question? because I'm not sure I do.
9           THE WITNESS:  I'd like to have it
10 rephrased.
11           BY MR. SPECTER:
12    Q.    Sure.  Well, actually I'm going to
13 withdraw that and I'm going to do something else.
14           If you turn to the next page, please,
15 we're at Folsom, Sacramento, California State Prison.
16           They interviewed 26 inmates.  And
17 similarly, there's the same phrase.  When asked about
18 the safety, they felt that staff at Sacramento did a
19 good job in acting swiftly and with force to ensure
20 safety, but, again, there were no negative
21 complaints.
22           Do you see that paragraph?



Case 2:90-cv-00520-KJM-SCR    Document 4676    Filed 07/02/13    Page 32 of 57

KATHY BLACK-DENNIS
PLATA vs. BROWN
May 21, 2013
73–76

Page 73

1    A.   I'd like to read it.

2    A.   Sure.  Okay.

3    A.   Okay.  I've read it.

4    Q.   And I added up -- and I hope my addition
5 is better than my division, but there are 456
6 prisoner interviews that we just went through.

7         Of those one in CCWF, Central California
8 Women's Facility, they said that the majority
9 indicated that there are positive comments.

10        They didn't say anything about the
11 negative comments -- they didn't say what the
12 negative comments were or how many of the minority
13 there were.

14        There were two complaints about medical
15 care and a few complaints about the meals.

16        Do you have that in mind?

17   A.   Yes.

18   Q.   Then I also added the number of prisoners
19 at those facilities at the time of the audit, because
20 in each audit, as you know, they list the population
21 of the prison on the day that they visit, right?

22   A.   Correct.

Page 74

1    Q.   So that came out to 23,164.  I'm just
2 telling you that.

3         Do you have that in mind?

4    A.   Okay.

5    Q.   So do you have any concerns about the
6 completeness of the reports with so few negative
7 comments from prisoners about the conditions?

8    A.   No.

9    Q.   Okay.  Would you have a concern about the
10 lack of negative comments if I told you that the
11 courts have held that the conditions in California
12 prisons were unconstitutional?

13        MR. REESE:  In these facilities,
14 specifically?

15        MR. SPECTER:  Well, the entire system.

16        THE WITNESS:  No.

17        BY MR. SPECTER:

18   Q.   Okay.  And can you explain why you
19 wouldn't have any concerns about that?

20   A.   This is a snapshot of three days by three
21 auditors in an institution.  They followed what they
22 were supposed to do.  They talked to the offenders.

Page 75

1 This is what they were told.  This is what they
2 reported.

3         Ours is a voluntary process.  It stands on
4 its own.  I believe the report stands on its own.

5    Q.   I see.  So just to be a little more
6 specific, this might be -- get the same answer, but
7 are you at all concerned about the reliability of the
8 information presented from the offender interviews
9 based on the fact that they found so few complaints
10 or reported so few complaints even when they
11 indicated that there were -- some prisoners didn't
12 share the view that everything was positive, they
13 didn't report those in any kind of detail?

14   A.   My answer would be that the report is
15 based upon what the auditors saw and heard.  These
16 are experienced auditors, and I stand by the report.

17   Q.   Okay.

18        (Exhibit Number 3 was marked for
19 identification and was attached to the deposition.)

20        MR. SPECTER:  Here's the next exhibit.

21        BY MR. SPECTER:

22   Q.   Kathy, this is a -- I didn't the -- the --

Page 76

1 this is excerpts from the audit report for the
2 California -- Central California Women's Facility.

3         Do you see that?

4    A.   Yes.

5    Q.   What I'll represent to you is, because the
6 audit reports are like 70 pages long, I didn't want
7 to bother copying the whole thing, so I just had them
8 copy the pages that I wanted to talk to you about.

9         If you want to see other parts of the
10 report, just let me know.  I think I have it here.

11   A.   Okay.  Thank you.

12   Q.   So you'll see, first of all, then -- this
13 prison we call it CCWF.  You'll understand why when
14 you look at the name.

15   A.   Okay.

16   Q.   So on the first page -- well, second page,
17 you'll see the actual population is 2,805.

18        Do you see that?

19   A.   Yes.

20   Q.   And it's rated capacity is 2,002, right?

21   A.   Yes.

22   Q.   So it's 800 above its rated capacity,



Page 77

1 correct?

2     A.    Yes.

3     Q.    Okay.  My math is that good at least, 803

4 to be exact.

5         So if you'll turn to page 7 -- well,

6 before we go there, your declaration had information

7 about double-celling in it, right?  It starts on page

8 3 -- I mean, paragraph -- I'm sorry.  Page 3,

9 paragraph 11.

10    A.    Yes.

11    Q.    Okay.  And do you agree with the

12 information in paragraphs 11 and 12?

13    A.    Yes.

14    Q.    Okay.  So what that says is -- well, the

15 last sentence in paragraph 11 says:  Double-celling

16 will not by itself prevent an institution from

17 receiving an ACA accreditation, right?

18    A.    Correct.

19    Q.    But it's important if you're going to have

20 two prisoners in one cell for them each to have

21 enough space, right?  That's why there's an ACA

22 standard on space, right?

Page 78

1     A.    Correct.

2     Q.    So now if you look at page 7 of the

3 document I gave you as Exhibit 3 and you look at the

4 first -- or the second paragraph, it says:  "There

5 are 200 cells with double-cell status.  These cells

6 have 20.1 square feet of unencumbered space."

7         And then if you look at the next

8 paragraph, it says:  "While the facility is over

9 design capacity and lacks adequate square footage in

10 the cells as previously noted" -- which refers to the

11 paragraph immediately above it.

12        So even though the prisoners were

13 double-cell -- from this report, you could conclude

14 that even though the prisoners were double-celled and

15 even though they didn't have adequate square footage

16 in their cells, it was still -- it was still

17 accredited by the ACA, right?

18    A.    Correct.

19    Q.    Does that give you any concern?

20    A.    No.

21    Q.    And you said that in paragraph 7 the ACA

22 standards were used by lawyers, judges, etc., as a

Page 79

1 tool to ensure basic Constitutional rights of the

2 offender.

3         Since the institution was accredited

4 without meeting the ACA standards, how are the judge

5 -- how are the judges supposed -- judges or lawyers

6 or anybody supposed to use this as a tool for

7 Constitutional rights?

8     A.    Well, that's a pretty general question

9 about all attorneys and judges.  I don't know.

10    Q.    I don't know either.  You're the one that

11 wrote it.  I didn't.  It's a pretty general

12 statement, wouldn't you agree, that you made?

13    A.    I'm responding to your specific question.

14    Q.    Yes.  So maybe instead of standards you

15 meant the accreditation process.  Is that what would

16 be a better way to frame paragraph 7?

17    A.    I stand by the statement in Number 7.  How

18 they're used would be left to them.

19    Q.    Right.

20    A.    I don't know how that would be.

21    Q.    Okay.  If you go down to the next

22 paragraph in Exhibit Number 3, please, it says:  "The

Page 80

1 special housing units were very clean and quiet.

2 Cells were maintained in a clean and orderly fashion.

3 Inmates interviewed indicated that they receive all

4 services required by the ACA standards."

5         Do you see that?

6     A.    Yes.

7     Q.    And then right below it, it says that:

8 "Cell check logs documented hourly checks on some

9 inmates in segregation instead of the minimum checks

10 at 30 minutes as required by the ACA standards."

11        Do you see that?

12    A.    Yes.

13    Q.    Okay.  So those two sentences are a little

14 inconsistent, wouldn't you agree?

15    A.    Let me read the entire paragraph.  Yes.

16    Q.    And you understand that the -- so, again,

17 this is the report that went to the Commission, which

18 accredited the institution, right?

19    A.    Correct.

20    Q.    And they accredited the institution,

21 right?

22    A.    Correct.



Page 81

1   Q.   And you understand that -- do you
2   understand the reason why there should be 30-minute
3   checks upon prisoners in segregation?
4   A.   Yes.
5   Q.   Explain that, please.
6   A.   If an individual is in special housing,
7   they're there for -- it could be for a number of
8   reasons.
9       And our standards state that they should
10  be checked twice within an hour period.
11  Q.   And the reason why you check them is to
12  make sure they're safe, to make sure they're not
13  doing anything to harm themselves or other people,
14  correct?
15  A.   Correct.
16  Q.   And in this institution -- and the
17  30-minute standard was based on the best judgment of
18  the correctional standards committee of the ACA,
19  right?
20  A.   The standards committee made that
21  decision, yes.
22  Q.   And that was their best judgment, right?

Page 82

1   A.   Apparently, since they passed it.
2   Q.   Yes, right. And so California -- this
3   California prison was doing checks double the length
4   of time that the standards recommend, right?
5       MR. REESE: That's not what it says. On
6   some inmates.
7       MR. SPECTER: Okay. Fair enough.
8       BY MR. SPECTER:
9   Q.   Right? At least on some inmates, the ones
10  that they noted, it was double the time required by
11  the standard, right?
12  A.   Correct.
13  Q.   So does that give you any concern about
14  the ability of the institution to protect the
15  well-being of the prisoners in segregated housing
16  units -- special housing units at this prison?
17  A.   I believe, but I'm not positive, that this
18  is a nonmandatory standard.
19  Q.   You're right. It's a discretionary
20  standard, but my question is the same.
21  A.   In terms of the standard, it's a
22  nonmandatory standard.

Page 83

1   Q.   I know, but I'm forgetting about the
2   standards for a moment. I'm asking you about the
3   well-being of prisoners.
4   A.   I would be concerned, yes.
5   Q.   Okay. Then the next sentence -- the next
6   to last sentence in that paragraph states that:
7   "California policy states that inmates have to have
8   recreation ten hours a week, but does not specify
9   five days a week."
10      And then it says: "Inmates may have three
11  hours one day and two hours the next."
12      Do you see that?
13  A.   Yes.
14  Q.   So instead of getting out of their cell
15  five days a week -- this is in the segregated housing
16  unit, you understand, right?
17  A.   If that is how they qualify the special
18  housing unit.
19  Q.   Yes. I'll represent to you that this is a
20  segregated housing unit. That's what special housing
21  unit means.
22  A.   Different states can define it

Page 84

1   differently.
2   Q.   Yes, but I'm from California. I know what
3   I'm talking about. You just take my word for it for
4   the purposes of our discussion here, okay?
5       So they're not -- the inmates are not
6   getting out of their cells for exercise five days a
7   week. They're only getting out two. That's what you
8   take from that -- those two sentences, right?
9   A.   "California policy states that inmates
10  have" --
11      That is the California state policy, yes.
12  Q.   Okay. And so the next sentence says they
13  can have the exercise in two days -- you know, never
14  mind. Let's go on to something else.
15      So if you'll turn to page 14, it says that
16  on -- the first full paragraph, the last sentence
17  says: "On January 29th, 2005 the court announced
18  that it was placing CDCRs health care delivery system
19  in receivership."
20      Do you see that?
21  A.   Yes.
22  Q.   Do you know what that means?



Page 85

1    A.   No.

2    Q.   Okay.  Do you think it's important --

3 well, I'll tell you what it means, and then you tell

4 me whether you think that it's important that the

5 Commission understand.

6        MR. REESE:  Tell you what, why don't we

7 ask the witness -- you asked her to read one sentence

8 of a paragraph in a document that she might not have

9 ever seen before.

10       Why don't you at least have her read the

11 paragraph -- two paragraphs that deal with this

12 matter so it starts at the bottom of page 13?

13       MR. SPECTER:  That would be terrific.

14       MR. REESE:  Because I do believe that that

15 is your case, is it not, the one that we're here

16 about?

17       MR. SPECTER:  You're exactly correct.

18       BY MR. SPECTER:

19    Q.   So could you please --

20    A.   Plata?

21       MR. REESE:  Yes.

22       THE WITNESS:  Okay.

Page 86

1        BY MR. SPECTER:

2    Q.   So what the receivership -- the

3 receivership occurred because the court found that

4 the California prison system or California prison

5 officials were unable to provide adequate medical

6 care to the prisoners -- this is a systemwide case,

7 you understand.  It's a class action?

8    A.   Yes.

9    Q.   So the court found that they were so bad

10 at it, to use a colloquial phrase, that it appointed

11 a receiver, a person, who is an agent of the court to

12 run the medical care system apart from the Department

13 of Corrections.

14       So it wasn't the Secretary of Corrections

15 who was running the medical care system.  It was the

16 receiver who reported to the court, not to the

17 governor.

18       Do you understand that?

19    A.   Yes.

20    Q.   So --

21       MR. REESE:  On June 29th, 2005?

22       MR. SPECTER:  Yes.

Page 87

1        BY MR. SPECTER:

2    Q.   And I'll represent to you that the

3 receivership is still in existence and was in

4 existence at the time of this report, okay?

5    A.   Okay.

6    Q.   So do you think those facts were important

7 for the Commission to know, the ones I just described

8 to you orally, before they accredited the

9 institution?

10    A.   Yes.

11    Q.   Okay.  But they're not in the report?  I

12 mean --

13       MR. REESE:  Do you disagree with that?

14       THE WITNESS:  Well, I do disagree because

15 the litigation is included, and it states that this

16 is what the original order is and it states that on

17 June 29th they were going to put the health delivery

18 system in receivership, so they were aware.

19       BY MR. SPECTER:

20    Q.   Okay.  So if you look at page 18, please,

21 this is the Standard 4-4132 and it is a standard of

22 25 square feet of unencumbered space per occupant for

Page 88

1 cells, right?

2        Do you see that statement?

3    A.   Yes.

4    Q.   And you see the findings which say that

5 it's only 20.1 square feet of unencumbered space?

6    A.   Yes.

7    Q.   And then if you turn the page, they ask

8 for a waiver of that request, right?

9       MR. REESE:  They, being the agency?

10      MR. SPECTER:  Thank you for that, yes, the

11 agency.  My wife does that to me all the time.  When

12 I say they, she -- even though I'm talking about --

13 off the record, please.

14      (Discussion held off the record.)

15      THE WITNESS:  Yes.

16      BY MR. SPECTER:

17   Q.   Okay.  Back to real life here.

18       So the agency requested a waiver, right?

19   A.   Correct.

20   Q.   And the auditors didn't give them --

21 didn't want -- agree that they should get a waiver,

22 right?



Page 89

1    A.   I have not read this, so --
2    Q.   Okay.  Take your time.
3    A.   Okay.
4    Q.   So the auditor said that they recommended
5    that shouldn't waive it and instead should request a
6    plan of action, right?
7    A.   Correct.
8    Q.   And if you turn to page -- the next to the
9    last page in the document --
10        MR. REESE:  Not in our copy.
11        MR. SPECTER:  I'll give you mine.  I'll
12   show you mine.
13        MR. REESE:  It's got the panel minutes,
14   I'm sure.
15        MR. SPECTER:  Yes.
16        MR. REESE:  We don't.  These copies don't
17   have that.  They end at the page that was numbered
18   ACA 1151.
19        BY MR. SPECTER:
20   Q.   Okay.  So if you look at my copy, it says
21   that they approved the motion to accredit.  And on
22   that specific standard, 4-4132, it said they required

Page 90

1    a plan of action, right?
2    A.   Correct.
3    Q.   So what does plan of action mean?
4    A.   It means that -- obviously, the
5    commissioners read the report.  They read that the
6    auditors did not support the waiver.
7         Based on that, they requested a plan of
8    action.  That is a -- a plan of action is basically,
9    we want more information on this.
10        What are you going to do?  How are you
11   going to do it?  Who is going to do it?  How much
12   time is it going to take?  And we want you to
13   establish a plan of action to be in compliance with
14   this specific standard.
15   Q.   Right.  Okay.  So if you could go back to
16   page 19, please.  And do you see the word the waiver
17   request?
18   A.   Yes.
19   Q.   I mean, basically what they're -- I'll
20   give you a chance to read it, but basically what
21   they're saying is, in order to make these cells
22   bigger, it would be an incredible -- it would be

Page 91

1    incredibly expensive and time-consuming and take a
2    long time?
3    A.   So we're still above the auditor's
4    response, which is above 4133?
5    Q.   Yes.
6    A.   It just basically says that the audit team
7    isn't supporting this because you didn't tell us how
8    you're going to do it.  That's why the commissioner
9    then requested the plan of action.
10   Q.   I see.  And then would the plan of action
11   have to include -- this is my question after all of
12   this.
13        Would the plan of action have to include
14   the fact that they have the budgeted amount -- I'm
15   sorry.
16        Would the plan of action have to include a
17   commitment by the state to actually fund the remedy
18   that the standard would require?
19   A.   No.
20   Q.   Okay.  If you'll just review standard --
21   the Standard 4-4133.  It's on the bottom of page 19.
22   If you could just take a moment to review that,

Page 92

1    please.
2    A.   Okay.
3    Q.   So this is another similar issue where the
4    unencumbered space was supposed to be 35 square feet
5    for certain types of prisoners with special needs.
6         The facility documentation indicates that
7    it was only 33 square feet, right?
8    A.   Correct.
9    Q.   The agency requested a waiver, right?
10   A.   Correct.
11   Q.   The auditor said the audit team does not
12   support the request for a waiver as the facility does
13   not spell out any ongoing or planned efforts to
14   mitigate the effects of overcrowding on the offender
15   population caused by this lack of square footage in
16   the cells.
17        It is recommended that a plan of action be
18   requested, right?
19   A.   Correct.
20   Q.   And then the committee on accreditation
21   approved that accreditation and required a plan of
22   action, right, for 4133, right?



Page 93

1   A.   Yes.

2   Q.   Okay.  Now, if you'll look at just above

3 the auditor's response, it says a major capital -- do

4 you see that? -- a major capital --

5   A.   What page number?

6   Q.   Page 20.

7   A.   Yes.

8   Q.   "A major capital outlay request would have

9 to be approved by the Department of Finance and the

10 Legislature, and given the current fiscal climate in

11 California, impossible to justify."

12        Do you see that?

13   A.   Yes.

14   Q.   So basically, what they're saying is even

15 if we requested it, we're not going to get the money

16 to do this, right?

17   A.   Correct.

18   Q.   But the Commission accredited them anyway,

19 right?

20   A.   Correct.

21   Q.   Okay.  On the next page, page 21, it's a

22 similar issue.  This time for cells and segregation.

Page 94

1 If you just review that page quickly or however long

2 you need.  You don't have to read on page 22.

3   A.   Just kind of continuing.  Yes.  I've read

4 it.

5   Q.   This standard ends on page 21.

6   A.   Okay.

7   Q.   Alright.  So it's basically the same

8 thing, just another type of cell, right?

9   A.   Yes.

10   Q.   So the standard is 80 square feet for

11 segregation cells, 35 square feet of which is

12 unencumbered, right?

13   A.   Correct.

14   Q.   The findings were that the segregation

15 cells measure 60 to 67 square feet, right?

16   A.   Correct.

17   Q.   And typically, 70 percent of those are

18 double-celled.  So for the double-celled prisoners,

19 there would be, obviously, less than 35 feet of

20 unencumbered space, correct?

21   A.   Correct.

22   Q.   And, again, the agency requests a waiver.

Page 95

1 The audit team says we recommend a plan of action,

2 right?

3   A.   Yes.

4   Q.   And the agency says that it's going to be

5 impossible to justify the cost of meeting that

6 standard, right?

7   A.   Correct.

8   Q.   So if you'll turn to the next page,

9 please.  I'm not sure you have this.  This is page

10 22.  I don't think you have it.

11   A.   Right.

12   Q.   It has a bunch of check boxes for the

13 criteria for waivers.

14        Do you see that, right in the middle

15 there?

16   A.   Yes.

17   Q.   Right.  And one of the --

18        MR. REESE:  That's in a section called

19 Discretionary Compliance.

20        BY MR. SPECTER:

21   Q.   And it's the same -- for all nonmandatory

22 standards, they can ask for a waiver, right, based on

Page 96

1 that criteria?

2   A.   Yes.

3   Q.   Okay.  And one of them is for if the

4 department has a department level policy --

5   A.   Yes.

6   Q.   -- which is inconsistent with the ACA

7 standards, right?

8   A.   Correct.

9   Q.   Can you explain the rationale for that?  I

10 don't understand that.

11        If you're going to -- if the ACA believes

12 and its standards committee believes in its best

13 professional judgment that a certain standard is

14 required to meet the needs of the institution and the

15 offender and they go to an institution and they find,

16 well, it's not -- this policy isn't consistent with

17 that standard then they can request a waiver because

18 every institution in the department is not consistent

19 with that standard.

20        Why is that okay?

21   A.   Again, our process is a voluntary process.

22 We can't make them -- we can't say to the California



Case 2:90-cv-00520-KJM-SCR    Document 4676    Filed 07/02/13    Page 38 of 57

KATHY BLACK-DENNIS                                    May 21, 2013
PLATA vs. BROWN                                          97–100

Page 97

1 legislature or any other legislature you must do
2 this.
3    Q.   Well, you can make them change their --
4 they don't have to change anything, right, but the
5 only question that you have to ask, as I understand
6 it, is whether they're complying with your standards.
7        They cannot comply or comply.  That's
8 their choice, right?
9    A.   Correct.
10    Q.   So what this discretionary policy does is
11 say if it's a statewide policy, then that's okay,
12 even though it's our standard, right?
13    A.   Correct.
14    Q.   And it may be a statewide policy because
15 it's a rule or regulation of the department, right?
16    A.   Correct.
17    Q.   It may be a statewide policy because it's
18 legislation, right?
19    A.   Correct.
20    Q.   You understand that rules typically the
21 department can change itself.  If doesn't have to go
22 to the legislature to do it, right?

Page 98

1    A.   I don't know what California does --
2    Q.   I'll represent to you that that's the case
3 in California.
4    A.   -- because it varies from state to state.
5    Q.   Okay.  In California, the department can
6 change its own rules without going to legislature,
7 okay?  Do you have that understanding?
8    A.   I will trust you on this.  It's not true
9 in all states.
10    Q.   It's true in California, and that's all I
11 care about right now.
12    A.   Okay.
13    Q.   So, again, I just don't understand how you
14 can accredit an institution because you're giving a
15 waiver to an institution based on a policy that
16 affects the entire system even though that policy is
17 inconsistent with your standards.
18        Could you explain that to me?
19    A.   Yes.  Because while all the agencies have
20 to be 100 percent compliant with mandatories, only 90
21 percent of nonmandatories -- if this is a
22 nonmandatory and they miss it, yet they're still

Page 99

1 above the 90 percent, they can still be accredited.
2    Q.   Okay.  So I thought -- maybe I'm not
3 understanding the waiver process correctly, but I
4 thought that if they get a waiver, then it doesn't
5 count to the 90 percent.
6        Am I wrong about that?
7    A.   There are several different processes, but
8 this specifically, they requested a waiver.  It was
9 denied.  The Commission said we want to see a plan of
10 action, and then it's incumbent upon the agency to
11 come back with a plan of action.
12    Q.   Right.  But my question is different.  My
13 question is is that you have to meet 90 percent of
14 the nonmandatory standards, right?
15    A.   Correct.
16    Q.   So if they get a waiver, does that count
17 within the 10 percent or not? because I wouldn't
18 understand why you would -- well --
19    A.   I'd have to -- off the top of my head, I
20 would have to -- I cannot answer that off the top of
21 my head.
22    Q.   Okay.  Thank you.

Page 100

1        MR. DEESE:  We should have the record
2 reflect what you were showing her because it's not in
3 the exhibit.  It was the page marked 1133, ACA 1133.
4        MR. SPECTER:  Yes.
5        MR. REESE:  And it wasn't a request for a
6 waiver.  It was a request for discretionary
7 compliance, which I believe is different.
8    BY MR. SPECTER:
9    Q.   Is it different from a waiver?
10    A.   Yes.
11    Q.   How so?
12        MR. SPECTER:  Thank you.
13        THE WITNESS:  That would be outlined in
14 our agency manual, which I believe you have a copy
15 of.
16        BY MR. SPECTER:
17    Q.   Yes.  Do you know?
18    A.   Off the top of my head, no.
19    Q.   Okay.  But I thought you could get a
20 waiver for clear policy in place of a higher level,
21 too.  Is that your understanding as well?
22    A.   You can receive a systemic waiver if



Page 101

1 something is true in all of your institutions.

2    Q.   Well, this says clear policy at a higher

3 level.  That would be true in --

4    A.   It would be true.

5    Q.   Okay.  So whatever the discretionary

6 compliance is, we know what the waiver is, okay.

7 Fair enough.

8         THE WITNESS:  Can we take a short break?

9         MR. SPECTER:  Sure.

10        (A break was taken.)

11        BY MR. SPECTER:

12    Q.   Do you have page 39 in your packet?

13    A.   Yes.

14    Q.   So if you go down to the next to last box,

15 it says:  "The number of offender grievances related

16 to health care services found in favor of the

17 offender in the past 12 months."

18        Do you see that?

19    A.   Yes.

20    Q.   "418 partially granted?"

21    A.   Yes.

22    Q.   "233 fully granted?"

Page 102

1    A.   Yes.

2    Q.   But it doesn't explain anything about why

3 they were granted or what the grievances were about.

4         It would seem to me -- tell me if you

5 agree -- that that information would be important to

6 know if you were trying to assess the quality of life

7 -- you know, the health care -- the adequacy of the

8 health care approach?

9         MR. REESE:  Have we established what page

10 39 is and what it's a part of and do we even know

11 what it is?

12        MR. SPECTER:  Yes.  It's a part of the

13 same audit for CCWF.

14        MR. REESE:  But it's a part of kind of a

15 subdocument within that audit package.

16        MR. SPECTER:  Right.  It is.

17        MR. REESE:  I mean, if the witness knows,

18 then she can answer the question.  If she doesn't

19 know what it is, then -- whether this is all of it.

20        MR. SPECTER:  Well, it's in every audit,

21 so that's why I assumed since she's the head of the

22 department she would know, but if she doesn't --

Page 103

1         MR. REESE:  Well, I don't know.  Let's

2 find out.

3         BY MR. SPECTER:

4    Q.   Tell us.

5    A.   It's the outcome measures report.

6    Q.   It's the standard part of every audit?

7    A.   That's correct.

8    Q.   Okay.  So now that you know -- we know

9 that you know what you're talking about, my question

10 is:  It says 418 plus 233.  That's 651 appeals were

11 granted partially or fully.

12        So prisoners were complaining about

13 something, right?

14    A.   I would assume that they are grieving

15 something, yes.

16    Q.   But you don't know what?

17    A.   Correct.

18    Q.   And you don't know what the prison found

19 to be justified, right?

20    A.   Correct.

21    Q.   So, I mean, they could have been

22 complaining that they never get to see a doctor,

Page 104

1 right?

2    A.   They could.

3    Q.   They could have been complaining about the

4 lab for the test results is broken and they don't get

5 test results that they need to assess their

6 condition, right?

7    A.   Correct.

8    Q.   So wouldn't this be something that you'd

9 want to know before you accredit an institution as

10 having good health care?  Or maybe you don't care

11 about what the outcomes are.  You just care about the

12 fact that they have policies and procedures.

13    A.   There are standards that are related to

14 grievances, and this is one of the outcome measures.

15 I do not know what questions specifically the

16 auditors will ask.

17        Some may ask, if it relates to a certain

18 area -- this was related to health care, but in terms

19 of what they are -- I don't know if there's a

20 narrative in the report that discusses the

21 grievances.

22    Q.   No, there is not.



Page 105

1    A.    I don't know that, so --

2    Q.    So assuming there's not, isn't that a

3 deficiency in your process?

4    A.    I would not call it a deficiency

5 necessarily.

6    Q.    Okay.  What would you call it?

7    A.    I would say that that's something that the

8 standards committee -- I don't know if they chose to

9 address it or not.  I don't know.  I've been there

10 for three years.  I can't speak to that.

11        MR. SPECTER:  Can we go off the record for

12 a second?

13        MR. REESE:  Sure.

14        (Discussion held off the record.)

15        MR. SPECTER:  I'm going to hand you

16 another exhibit about Solano prison, Number 4, I

17 believe.

18        (Exhibit Number 4 was marked for

19 identification and was attached to the deposition.)

20        BY MR. SPECTER:

21    Q.    So if you turn to page 72 --

22        MR. REESE:  Do you have a copy for me?

Page 106

1        MR. SPECTER:  Oh, yes, I do.

2        MR. REESE:  Thanks.

3        BY MR. SPECTER:

4    Q.    -- it should be the last page in your

5 packet.

6    A.    Yes.

7    Q.    So you see those two boxes?  It says

8 number of health code violations corrected during a

9 12-month period.

10    A.    Yes.

11    Q.    And then number of health code violations

12 during a 12-month period.

13        Do you see that?

14    A.    Yes.

15    Q.    So the first box, the number of health

16 code violations corrected is 11, right?

17    A.    Correct.

18    Q.    But there were 14, right?

19    A.    Correct.

20    Q.    That leaves three uncorrected, right?

21    A.    Correct.

22    Q.    So don't you think before the Commission

Page 107

1 should accredit this institution they should know

2 what those three health code violations that weren't

3 corrected are?

4    A.    My question to you would be:  Were they in

5 the body of the report?

6    Q.    Assuming they were not -- well, it doesn't

7 matter.

8        If they were in the report, then they were

9 made aware of it.  If it wasn't in the report, then

10 they weren't aware of it.

11        My only question to you is regardless of

12 whether it was in the report:  Do you think this is

13 information that the Commission panel should know

14 about before they vote to accredit an institution?

15    A.    My answer would be they might know about

16 them.  It's a question they might ask.

17    Q.    I'm not asking you whether they know or

18 they don't know.  I'm asking you whether they should

19 have this information before they vote?

20    A.    Again, my response will be I would also

21 want to know if it is a mandatory or a nonmandatory.

22    Q.    You don't even know that, do you?  You

Page 108

1 don't know what it is --

2    A.    Based on looking at these boxes, no, but

3 this is an incomplete report.

4    Q.    Well, I'm asking you to assume that the

5 rest of the report doesn't discuss health code

6 violations.

7    A.    I cannot speak for the Commission.

8    Q.    I'm not asking you.  I'm just asking you,

9 in your opinion, do you think this is information the

10 panel should have when they're voting on

11 accreditation?

12    A.    I would want to know, but that is -- I

13 cannot speak for the Commission.

14    Q.    Okay.  So I'm just looking at the whole

15 report, which I'll give you in a sec.  I can't find

16 it.

17        I'm looking in the environmental

18 condition, sanitation, fire safety, food service,

19 medical care.  Do you think it would be -- and

20 laundry.

21        You'd think it would be one of those,

22 wouldn't you?  If you can find it, let me know.



Page 109

1        MR. REESE:  Do you want her to take the
2  time to go through the whole thing?  You're going to
3  ask her do you see it anywhere in the report, and
4  it's like 50 pages.  I mean, it's either in here or
5  it's not.
6        MR. SPECTER:  Fair enough.
7        MR. REESE:  You can establish that.
8        MR. SPECTER:  You're right.  Fair enough.
9        BY MR. SPECTER:
10    Q.   So my quick review of the report, just for
11 whatever it's worth, is that it's not in here.  They
12 do say there was a health inspection, but they don't
13 mention what it was -- what the health inspection
14 found.
15    A.   Okay.
16    Q.   Here you go.  So this is on page 11 of the
17 full report, ACA 925.  Do you see just above medical
18 care what it says?  Could you read that sentence,
19 please?
20    A.   "The last health care" (sic) -- I'm sorry.
21       "The last health department inspection was
22 conducted on April 4 through 6, 2011 by a Facility

Page 110

1  Planning Construction and Management."
2    Q.   Okay.  So let's go on to another topic.
3  Thanks.  I'll take that back.
4        I know your department covers a lot of
5  facilities.  Are you familiar with the Walnut Grove
6  Youth Correctional Facility in Walnut Grove,
7  Mississippi?
8    A.   I am familiar that there is a Walnut Grove
9  in Mississippi, yes.
10    Q.   Okay.  And apparently the facility was
11 accredited in 2012, but the accreditation was revoked
12 -- in January of 2012 it was accredited and then it
13 was revoked in May of 2012.
14       Are you familiar with that at all?
15    A.   I'm a little confused.  There are two
16 Walnut Grove -- I believe there are two Walnut Grove
17 facilities in Mississippi.  One is adult and one is
18 juvenile.
19    Q.   This is Walnut Grove Youth Correctional --
20    A.   The youth correctional, so am I familiar
21 with --
22    Q.   With the fact that its accreditation was

Page 111

1  revoked last year.
2    A.   I'd have to look at the report.
3    Q.   It doesn't ring a bell, huh?  That
4  wouldn't come to your attention if the accreditation
5  was revoked?
6    A.   I don't recall it being revoked, no, I do
7  not.
8    Q.   Okay.  Well, Mike said that it was.
9        MR. REESE:  You know, for the record, let
10 me also state something, which has kind of gone
11 unstated so far, and that is this is not a 30(b)(6)
12 deposition of the American Correctional Association.
13 This is a deposition of Ms. Black-Dennis.
14       And a lot of the documents that were
15 produced in response to the subpoena -- I think four
16 separate productions -- are documents that this
17 witness has never seen, and that may explain why
18 she's not able to answer all of your questions.
19       MR. SPECTER:  That's -- I understand.
20 Thank you for that clarification.
21       MR. REESE:  I didn't show her documents
22 that she'd never seen.

Page 112

1        MR. SPECTER:  That's fair enough.  She's
2  the head of the department, so it seems like maybe
3  you'd know.
4        BY MR. SPECTER:
5    Q.   I mean, the -- is revoking the
6  accreditation status a common occurrence?
7    A.   It is not a common occurrence, no.
8    Q.   Okay.  That's why I thought maybe you
9  would have heard about it if it happened.  Did you
10 hear about it?
11    A.   Of a revoking, no.
12    Q.   Okay.  Then you can't answer any questions
13 about it.
14       Are you familiar with the accreditation of
15 the Westchester County Jail in New York state?
16    A.   No.
17    Q.   Just going back to the fact that you -- in
18 your declaration you said that two other prisons
19 might be likely to be accredited in the future.
20       Did I ask you before which those two are,
21 if you know, or did you not know?  I can't remember.
22    A.   You didn't ask and I would not know.



Page 113

1    Q.    Okay.  So it's good I didn't ask, huh?
2  You don't know what the difference between a waiver
3  and discretionary compliance is; is that correct?
4    A.    I have to refresh my memory through the
5  agency manual.
6    Q.    Is it sort of like a waiver?  Can we shed
7  any light -- is this the manual?  I think I left that
8  at home or in the office.
9          Can you give me some sense of what it is?
10 I won't hold you to the exact thing.
11   A.    At the Commission's discretion, we can
12 grant you a waiver on this one incidence, and they
13 will vote to grant it or not.  It's not a systemwide
14 necessarily.  It's just with one institution or one
15 probation or parole office, whatever.
16   Q.    Oh, I see.  One facility?
17   A.    Yes.
18   Q.    Okay.  I see.
19         MR. REESE:  I think the witness's
20 testimony is that the distinction between them, to
21 the extent it exists, is set forth in a document that
22 we've produced to you.

Page 114

1          MR. SPECTER:  Yes.  I'm just trying to --
2  since I don't have the document --
3          MR. REESE:  I don't want her to speculate
4  based on her incomplete recollection of what that is.
5          MR. SPECTER:  Okay.  Fair enough.
6          Okay.  I'm going to do one more.
7          (Exhibit Number 5 was marked for
8  identification and was attached to the deposition.)
9          BY MR. SPECTER:
10   Q.    So I just gave you the Visiting Committee
11 Report and Hearing Minutes of the compliance audit
12 for California State Prison, Sacramento in April
13 2012.
14         So what I'm going to do here -- I just
15 want to try and get to some of this relatively
16 quickly.
17         You'll see on this page, which is ACA
18 1018, which I didn't give you -- I don't think.  It's
19 not in your packet.
20         MR. REESE:  No.
21         BY MR. SPECTER:
22   Q.    -- the Commission granted accreditation.

Page 115

1          Do you see that?
2    A.    Yes.
3    Q.    And there are various standards which they
4  required a plan of action for, right?
5    A.    Yes.
6    Q.    Okay.  So I just want to go over those
7  with you.  And the plan of action is only required
8  when they don't meet the standard, right?
9    A.    Correct.
10   Q.    Okay.  So the first standard is 4-4134.
11         MR. REESE:  It's not in here.
12         MR. SPECTER:  I'll get it later.
13         BY MR. SPECTER:
14   Q.    4135 is on page --
15         MR. REESE:  We don't have that.
16         MR. SPECTER:  Okay.  I'll put that away.
17         BY MR. SPECTER:
18   Q.    So --
19         MR. SPECTER:  Oh, I have it.
20         BY MR. SPECTER:
21   Q.    Okay.  Here we go.  I thought -- I just
22 wasn't quite sure.  Okay.

Page 116

1          So 4135 -- this is the standard for
2  dayroom space having a minimum of -- dayrooms having
3  a minimum of 35 square feet.
4          Do you see that?
5    A.    Yes.
6    Q.    And the findings are that they don't have
7  35 square feet, right?
8    A    Correct.
9    Q.    Okay.  So then the next standard was 4154,
10 which is on page 39 and they had another standard for
11 -- that's outside exercise areas for --
12         MR. REESE:  That's 4155.  You said 4154.
13         MR. SPECTER:  I'm sorry.
14         MR. REESE:  One page back --
15         MR. SPECTER:  Okay.
16         MR. REESE:  -- I think, if you had it.
17 There it is.  Okay.
18         BY MR. SPECTER:
19   Q.    And that's for outdoor exercise, right?
20         MR. REESE:  And we're looking at the
21 document marked ACA 1055, 1056.
22         MR. SPECTER:  Yes.



Page 117
1      BY MR. SPECTER:
2      Q.   And we're going to go to 1057.  And then
3  it's found that they do not provide access to yard
4  daily as required, right?
5      A.   Okay.
6      Q.   Then the next standard is -- and they got
7  now 4154 -- 4-4155.  They have a waiver on and that
8  is on page 39, which is ACA 1057.
9          And that's for inmates in segregation,
10  units in the space required, correct?
11      A.   Okay.
12      Q.   And then 4-4417, which is page 42, and
13  this standard requires medical housing unit to be
14  able to bathe daily, right?
15      A.   Um-hum.
16      Q.   And the auditors found that they're only
17  allowed to bathe three times a week?
18      A.   Okay.
19      Q.   So that's less than half -- about half of
20  the time that the standard requires, right?  Seven
21  days a week versus three days a week, correct?
22      A.   Correct.

Page 118
1      Q.   Okay.  And the auditors rejected the
2  appeal from the state, right?
3      A.   Correct.
4      Q.   And said, therefore, the request or appeal
5  cannot be supported, right?
6      A.   That is correct.
7      Q.   Okay.  So despite all of those things, the
8  Commission -- well, those areas of noncompliance that
9  -- despite all of those areas of noncompliance with
10  the standards, the Commission voted to accredit the
11  institution, correct?
12      A.   Correct.
13      Q.   Okay.  Does anyone check to see whether
14  the department or facility complies with its plan
15  of action?
16      A.   Yes.
17      Q.   And how is that done?
18      A.   After the accreditation hearing, if a plan
19  of action is requested, the agency prepares the plan
20  of action.  It's sent to the ACA specialist and it is
21  made a part of their file.
22          Before the auditors go out again for the

Page 119
1  reaccreditation --
2      Q.   Three years later?
3      A.   It would be three years from -- yes, from
4  when the accreditation was initially granted.
5          That is made a part of the information
6  that the auditors are given to go out and check to
7  make sure that, yes, they did it and they're
8  continuing to comply with that.
9      Q.   So with the plan of action as we've seen
10  before where they're basically saying we're going to
11  give you a plan of action but it's impossible --
12  we're not going to get the money -- they said it's
13  impossible to justify getting the money for some of
14  these.
15          What effect would they have on
16  reaccreditation?
17      A.   As long as the -- if the agency meets 90
18  percent of the nonmandatories, they are accredited.
19      Q.   Okay.  So they must want this plan of
20  action -- if you have a plan of action, it doesn't
21  count towards the 10 percent?
22          Do you know that?

Page 120
1          MR. REESE:  Let's go off the record for a
2  second.
3          (Discussion held off the record.)
4          BY MR. SPECTER:
5      Q.   Can you tell me whether that plans --
6  standards that they get plans of action for count
7  towards the 10 percent?
8      A.   Now I'm confused.  Jesus.  As long as the
9  agency -- in this case, the agency missed six
10  nonmandatories.
11          As long as they were still above 90
12  percent, even missing those six, they could be
13  accredited.
14      Q.   Okay.  So they could miss -- the auditors
15  found that 440 nonmandatories were applicable in this
16  case, Sacramento.
17          So as long as they were under 44
18  noncompliance, they could get accredited, right?
19      A.   Trusting that math, that would be correct.
20      Q.   Well, I'm pretty sure 44 is 10 percent of
21  440.  That I'm positive of.
22          MR. REESE:  Your question was they could



Page 121

1 get accredited. I think if you ask the witness does
2 that guarantee that they would be accredited, I think
3 you'd get a different answer because I think the
4 panel has discretion.
5        BY MR. SPECTER:
6    Q.   Does the panel have discretion?
7    A.   Yes, they do.
8    Q.   These standards are not weighted, are
9 they? Do you know what I mean by weighted?
10   A.   Give me your definition and I'll tell you.
11   Q.   Weighted means you're assigned different
12 values to a standard --
13   A.   No, they're not.
14   Q.   Okay. And it seems like from reading
15 these reports that a lot of the information that the
16 auditors get are coming from the facility personnel.
17   A.   Part of it does, yes.
18   Q.   Right. It doesn't seem to be -- there's
19 so much information in these reports. It seems like
20 it would be difficult for the auditors to spot check
21 everything.
22        Are they supposed to spot check everything

Page 122

1 or do they spot check nothing or something in
2 between?
3    A.   They go through every -- there is a file,
4 either electronic or written, on every standard. And
5 in that file there's written -- I mean, there's
6 primary and secondary documentation to support the
7 standard compliance or not.
8    Q.   I see.
9    A.   So if there are 440 nonmandatory files,
10 they're going to go through 440 files based on those
11 standards looking for the primary and secondary
12 documentation. That could include policy, the
13 procedure, post orders, and examples practice.
14   Q.   I see.
15   A.   If they want additional information, they
16 can request additional information, and it's expected
17 that the agency will supply it.
18   Q.   So, you know in California -- like, we've
19 been there for 30 years and we have our -- we have
20 lawyers and legal assistants go through the prisons
21 almost every day of the working time.
22        We write reports to the department about

Page 123

1 what they're doing wrong, which --
2        MR. REESE:  By we, do you mean the prison
3 law office?
4        MR. SPECTER:  Yes, the prison law office.
5        BY MR. SPECTER:
6    Q.   And there are signs actually in every
7 prison telling about the litigation, telling that we
8 represent the prisoners, giving our address, not our
9 phone number, but our address.
10        And the auditors would have to have seen
11 these as they go through, but they never called us to
12 find -- get our perspective on the conditions in
13 these prisons.
14        Why is that?
15   A.   I don't know.
16   Q.   Wouldn't you think -- I'm trying to be
17 humble here, but wouldn't you think there'd some
18 relevant information that we might have about whether
19 the quality of -- what did you call it? -- what do
20 you guys call it? -- the quality of life?
21   A.   The quality of life. Well, their primary
22 concern is -- when they go in is looking for

Page 124

1 compliance with the ACA standards in those manuals.
2        And to gauge compliance, they have the
3 files to go through, the tour, the interviews with
4 staff and inmates, as well as any correspondence that
5 has come in from inmates or loved ones at that
6 particular facility.
7    Q.   But not lawyers? We write them reports
8 every single time we go on a tour. We tell them what
9 they're doing wrong or sometimes we tell them what
10 they're doing right. They don't look at stuff that
11 we --
12   A.   If the agency supplies it or if an
13 attorney sent in correspondence, that would be made a
14 part of the file.
15   Q.   Well, we don't even know you're there, so
16 can you send -- you don't notify us.
17        Why don't you --
18        MR. REESE:  Off the record for a second.
19        (Discussion held off the record.)
20        BY MR. SPECTER:
21   Q.   And there are -- you know, other than us,
22 there are advocacy groups -- other advocacy groups in



Page 125

1 California that are focused on the conditions in the
2 prisons, but the procedure in the ACA is not to
3 notify them that you're coming either?
4     A.    No.
5         MR. SPECTER:  Okay.  That's about all.
6     Anything from you?
7         MR. REESE:  No questions.
8         THE REPORTER:  Reading and signing?
9         MR. REESE:  Not waived.  Can you send it
10 to me?
11        THE REPORTER:  Yes, sir.  Would you like a
12 copy, Mr. Reese?
13        MR. REESE:  No.  We don't need a copy.
14    (Discussion held off the record.)
15        MR. REESE:  Okay.  Yes, I would like a
16 copy, the least expensive, please.
17        THE REPORTER:  Ten business days?
18        MR. REESE:  Yes, please.
19        MR. SPECTER:  Regular delivery, no rough
20 ascii.
21    (Signature having not been waived, the
22 deposition of Kathy Black-Dennis was concluded at

Page 126

1  4:07 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 127

1         CERTIFICATE OF NOTARY PUBLIC
2         I, SHERRY L. BROOKS, a Notary Public in
3  and for the DISTRICT OF COLUMBIA, before whom the
4  foregoing deposition was taken, do hereby certify
5  that the witness whose testimony appears in the
6  foregoing deposition was duly sworn by me; that the
7  testimony of said witness was taken by me in
8  Shorthand at the time and place mentioned in the
9  caption hereof and thereafter transcribed by me; that
10 said deposition is a true record of the testimony
11 given by said witness; that I am neither counsel for,
12 related to, nor employed by any of the parties to this
13 action in which this deposition was taken; and
14 further, that I am not a relative or employee of any
15 counsel or attorney employed by the parties hereto,
16 nor financially or otherwise interested in the
17 outcome of this action.
18         _Sherry L. Brooks_
         SHERRY L. BROOKS
19        Notary Public in and for
         DISTRICT OF COLUMBIA
20
   My commission expires:
21 November 14, 2015
22

Page 128

1         ACKNOWLEDGMENT OF DEPONENT
2
3  ASSIGNMENT NO.:  436019
4  CASE CAPTION:  MARCIANO PLATA, et al. - V -
         EDMUND G. BROWN, et al.
5
6  DEPONENT:  KATHY BLACK-DENNIS
7         DECLARATION UNDER PENALTY OF PERJURY
8         I declare under penalty of perjury that I
9  have read the entire transcript of my Deposition
10 taken in the captioned matter or the same has been
11 read to me, and the same is true and accurate, save
12 and except for changes and/or corrections, if any, as
13 indicated by me on the DEPOSITION ERRATA SHEET
14 hereof, with the understanding that I offer these
15 changes as if still under oath.
16
17 Signed on the ____ day of _____, 20___.
18 _____
19    Witness Name
20
21
22



**EXHIBIT D**



# *CDCR'S LIFER REPORT SERIES*

# LIFER PAROLEE RECIDIVISM REPORT

## January 2013

# Department of Corrections and Rehabilitation Representatives

_____

## Executive Office

**Matthew Cate**
*Secretary*

**Martin Hoshino**
*Undersecretary*

**Terri McDonald**
*Undersecretary*

**Lee E. Seale**
*Director*

## Office of Research

**Brenda Grealish**
*Deputy Director*

| | |
|---|---|
| **Jay Atkinson**<br>*Research Manager III* | **Tina Fitzgerald**<br>*Research Manager II* |
| **Jacqui Coder**<br>*Research Manager II* | **Denise Allen**<br>*Research Manager II* |
| **David Weishahn**<br>*Staff Information Systems Analyst* | **Kevin Grassel**<br>*Research Program Specialist II* |
| **Loran Sheley**<br>*Research Program Specialist II* | **Dionne Maxwell**<br>*Research Program Specialist II* |
| | **Alice Chen**<br>*Research Analyst II* |

*Special thanks to the CDCR Division of Adult Parole Operations for providing all requested case study information.*

# LIFER PAROLEE RECIDIVISM REPORT

This report focuses on the recidivism of individuals who were released to California Department of Corrections and Rehabilitation (CDCR) parole after serving a sentence of *life with the possibility of parole*, hereafter referred to as "lifer parolees" or "lifers."[1]  It provides an in-depth recidivism analysis of lifer parolees who were released during fiscal year 2006-07 and followed for a period of three years.  These analyses expand on those which were first presented in the CDCR *2011 Adult Institutions Outcome Evaluation Report*[2] by further exploring information related to the circumstances surrounding the infractions of those who recidivated within the three-year follow-up time frame.

In order to provide a broad context to the overall performance of lifers on parole, lifers who have been released to parole are compared to their counterparts who were released after having served a determinate sentence in prison.   Accordingly, we employ a recent historical cohort for each group because we seek to examine not only those offenders who have successfully reintegrated into the community, but also those who have recidivated and may now be in custody.

*Defining Recidivism*

Since there is no single definition of recidivism agreed upon by all correctional experts, we compare the parole performance of each group through two different lenses of recidivism. First we compare the two groups by setting forth the rates at which they were convicted of new crimes, whether misdemeanors or felonies. We then compare the two groups by measuring the rates at which they returned to prison, whether for new crimes or for parole violations. These two measures partially overlap in that they both capture recidivists who returned to prison after being convicted of new crimes. The former measure, however, also includes misdemeanants who did not return to prison; the latter measure, on the other hand, includes parole violators who were never convicted in a court of law for the offenses that resulted in their return to prison. Both measures show

---

[1] See R. Weisberg, D. A. Mukamal, and J. D. Segall, *Life In Limbo: An Examination of Parole Release For Prisoners Serving Life Sentences With The Possibility Of Parole In California*, 2011.
Retrieved March 6, 2012, from
http://blogs.law.stanford.edu/newsfeed/files/2011/09/SCJC_report_Parole_Release_for_Lifers.pdf.  This report, produced by the Stanford Criminal Justice Center, is a valuable bulletin on California's lifer population.
[2] The full report may be downloaded at:
http://www.cdcr.ca.gov/adult_research_branch/Research_Documents/ARB_FY_0607_Recidivism_Report_(11-23-11).pdf.

that lifers recidivate at markedly lower rates than those who serve determinate sentences.

Because we track performance for three years, our most recent available data involves a cohort of offenders who were released in fiscal year 2006-07. Of this group, the vast majority – over 112,000 offenders -- were released after having served a determinate sentence.  A much smaller group – 83 offenders – were released after having served an indeterminate sentence.

*Demographic and Offender Characteristics*

Tables 1a and 1b show the characteristics for those released from CDCR in fiscal year 2006-07.  Nearly 90 percent of the determinant sentence releases were males while approximately 95 percent of the indeterminate sentence releases were male.  Black/African American and those categorized as "Other" account for a higher proportion of indeterminately sentenced releases than those with a determinate sentence.  Conversely, White and Hispanic/Latino offenders make up a small proportion of the indeterminately sentenced released than those with a determinate sentence.

The indeterminate sentence population was much older than those with a determinate sentence.  The indeterminate sentence population had no one younger than 30 years old and nearly a quarter of the population was 55 or older.  Approximately 35 percent of the determinate sentence population were younger than 30 years old and only 2.7 percent were 55 or older.

Both the determinate and indeterminate sentence releases had few felons with developmental disabilities. Both populations contained few sex offenders, although felons with a determinate sentence (6.8 percent) had higher proportion than those with an indeterminate sentence (3.6 percent).  All 83 felons with an indeterminate sentence were committed for a crime against a person.  Nearly 23 percent of the felons with a determinate sentence committed a crime against a person.

Indeterminately sentenced felons committed for Murder Second (44.6 percent), Kidnapping (32.5 percent), Attempted Murder First (14.5 percent), Murder First (7.2 percent), and Assault with a Deadly Weapon (1.2 percent).

Table 1a.  FY 2006-07 Characteristics

| Characteristic | DETERMINATE SENTENCE | | INDETERMINATE SENTENCE | | TOTAL | |
|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % |
| **Total** | 112,590 | 100.0% | 83 | 100.0% | 112,673 | 100.0% |
| **Sex** | | | | | | |
| Male | 100,696 | 89.4% | 79 | 95.2% | 100,775 | 89.4% |
| Female | 11,894 | 10.6% | 4 | 4.8% | 11,898 | 10.6% |
| **Race/Ethnicity** | | | | | | |
| White | 36,145 | 32.1% | 23 | 27.7% | 36,168 | 32.1% |
| Hispanic/Latino | 42,453 | 37.7% | 19 | 22.9% | 42,472 | 37.7% |
| Black/African American | 29,030 | 25.8% | 28 | 33.7% | 29,058 | 25.8% |
| Other | 4,962 | 4.4% | 13 | 15.7% | 4,975 | 4.4% |
| **Age at Release** | | | | | | |
| 18-19 | 735 | 0.7% | 0 | 0.0% | 735 | 0.7% |
| 20-24 | 15966 | 14.2% | 0 | 0.0% | 15966 | 14.2% |
| 25-29 | 22,721 | 20.2% | 0 | 0.0% | 22,721 | 20.2% |
| 30-34 | 17,777 | 15.8% | 4 | 4.8% | 17,781 | 15.8% |
| 35-44 | 34,671 | 30.8% | 30 | 36.1% | 34,701 | 30.8% |
| 45-54 | 17,716 | 15.7% | 29 | 34.9% | 17,745 | 15.7% |
| 55+ | 3,004 | 2.7% | 20 | 24.1% | 3,024 | 2.7% |
| **Developmental Disability** | | | | | | |
| Yes | 1,682 | 1.5% | 1 | 1.2% | 1,683 | 1.5% |
| No | 110,908 | 98.5% | 82 | 98.8% | 110,990 | 98.5% |
| **Sex Offenders** | | | | | | |
| Yes | 7,633 | 6.8% | 3 | 3.6% | 7,636 | 6.8% |
| No | 104,957 | 93.2% | 80 | 96.4% | 105,037 | 93.2% |
| **Offense Category** | | | | | | |
| Crimes Against Person | 25,741 | 22.9% | 83 | 100.0% | 25,824 | 22.9% |
| Property Crimes | 37,976 | 33.7% | 0 | 0.0% | 37,976 | 33.7% |
| Drug Crimes | 35,753 | 31.8% | 0 | 0.0% | 35,753 | 31.7% |
| Other Crimes | 13,120 | 11.7% | 0 | 0.0% | 13,120 | 11.6% |

Table 1b.  FY 2006-07 Characteristics (Continued)

| Characteristic | DETERMINATE SENTENCE | | INDETERMINATE SENTENCE | | TOTAL | |
|---|---|---|---|---|---|---|
| | Number | % | Number | % | Number | % |
| **Offense** | | | | | | |
| Murder First | 0 | 0.0% | 6 | 7.2% | 6 | 0.0% |
| Murder Second | 3 | 0.0% | 37 | 44.6% | 40 | 0.0% |
| Manslaughter | 470 | 0.4% | 0 | 0.0% | 470 | 0.4% |
| Vehicular Manslaughter | 234 | 0.2% | 0 | 0.0% | 234 | 0.2% |
| Robbery | 4,958 | 4.4% | 0 | 0.0% | 4,958 | 4.4% |
| Assault with a Deadly Weapon | 5,604 | 5.0% | 1 | 1.2% | 5,605 | 5.0% |
| Attempted Murder First | 4 | 0.0% | 12 | 14.5% | 16 | 0.0% |
| Attempted Murder Second | 324 | 0.3% | 0 | 0.0% | 324 | 0.3% |
| Other Assault/Battery | 9,206 | 8.2% | 0 | 0.0% | 9,206 | 8.2% |
| Rape | 354 | 0.3% | 0 | 0.0% | 354 | 0.3% |
| Lewd Act with Child | 1,790 | 1.6% | 0 | 0.0% | 1,790 | 1.6% |
| Oral Copulation | 195 | 0.2% | 0 | 0.0% | 195 | 0.2% |
| Sodomy | 49 | 0.0% | 0 | 0.0% | 49 | 0.0% |
| Sexual Penetration with Object | 101 | 0.1% | 0 | 0.0% | 101 | 0.1% |
| Other Sex Offenses | 2,246 | 2.0% | 0 | 0.0% | 2,246 | 2.0% |
| Kidnapping | 203 | 0.2% | 27 | 32.5% | 230 | 0.2% |
| Burglary First | 3,389 | 3.0% | 0 | 0.0% | 3,389 | 3.0% |
| Burglary Second | 7,281 | 6.5% | 0 | 0.0% | 7,281 | 6.5% |
| Grand Theft | 3,447 | 3.1% | 0 | 0.0% | 3,447 | 3.1% |
| Petty Theft with Prior | 6,212 | 5.5% | 0 | 0.0% | 6,212 | 5.5% |
| Receiving Stolen Property | 5,130 | 4.6% | 0 | 0.0% | 5,130 | 4.6% |
| Vehicle Theft | 7,839 | 7.0% | 0 | 0.0% | 7,839 | 7.0% |
| Forgery/Fraud | 3,579 | 3.2% | 0 | 0.0% | 3,579 | 3.2% |
| Other Property Offense | 1,099 | 1.0% | 0 | 0.0% | 1,099 | 1.0% |
| CS Possession | 19,344 | 17.2% | 0 | 0.0% | 19,344 | 17.2% |
| CS Possession for Sale | 9,929 | 8.8% | 0 | 0.0% | 9,929 | 8.8% |
| CS Sales | 3,126 | 2.8% | 0 | 0.0% | 3,126 | 2.8% |
| CS Manufacturing | 888 | 0.8% | 0 | 0.0% | 888 | 0.8% |
| Other CS Offense | 715 | 0.6% | 0 | 0.0% | 715 | 0.6% |
| Hashish Possession | 52 | 0.0% | 0 | 0.0% | 52 | 0.0% |
| Marijuana Possession for Sale | 1,103 | 1.0% | 0 | 0.0% | 1,103 | 1.0% |
| Marijuana Sale | 450 | 0.4% | 0 | 0.0% | 450 | 0.4% |
| Marijuana Other | 146 | 0.1% | 0 | 0.0% | 146 | 0.1% |
| Escape/Abscond | 169 | 0.2% | 0 | 0.0% | 169 | 0.1% |
| Driving Under the Influence | 2,576 | 2.3% | 0 | 0.0% | 2,576 | 2.3% |
| Arson | 289 | 0.3% | 0 | 0.0% | 289 | 0.3% |
| Possession of a Weapon | 6,148 | 5.5% | 0 | 0.0% | 6,148 | 5.5% |
| Other Offense | 3,938 | 3.5% | 0 | 0.0% | 3,938 | 3.5% |

Only 5.2 percent of the determinately sentenced population committed these same offenses, with the vast majority of them being Assault with a Deadly Weapon.

*New Convictions*

For this measure, we define a recidivist as an individual who, after serving a felony sentence in a CDCR adult institution, was released to parole between July 1, 2006 and June 30, 2007, and subsequently convicted of a misdemeanor or a felony. The recidivism rate is calculated using the ratio of the number of offenders who were returned to prison during the follow-up period to the total number of offenders in the recidivism cohort, multiplied by 100. Results presented are cumulative over one, two, and three years.

As Table 2 and Figure 1 show, more than half of the offenders who were released after having served determinate sentences were subsequently convicted of new crimes within three years of release, a much higher rate than that seen in the lifer cohort. Indeed, the re-conviction rate of lifers was approximately one-tenth the rate of those who served determinate sentences. Of the 83 lifers released in the fiscal year 2006-07 cohort, only 4 were convicted of new crimes within 3 years of release.

Table 2. FY 2006-07 Three-Year Conviction Recidivism Rates by Sentence Type

| | | One Year | | Two Years | | Three Years | |
|---|---|---|---|---|---|---|---|
| | | **FY 2006/07 Release Cohort** | | | | | |
| | | **Convictions** | | | | | |
| Sentence Type | Number Released | Number Convicted | Recidivism Rate | Number Convicted | Recidivism Rate | Number Convicted | Recidivism Rate |
| Determinate Sentence Law* | 112,590 | 26,657 | 23.7% | 46,106 | 41.0% | 57,980 | 51.5% |
| Indeterminate Sentence Law | 83 | 2 | 2.4% | 4 | 4.8% | 4 | 4.8% |

* Those who have a Department of Justice automated criminal history record

Figure 1. FY 2006-07 Three-Year Conviction Recidivism Rates by Sentence Type



6

*Returns to Prison*[3]

For this measure, we define a recidivist as an individual who, after serving a felony sentence in a CDCR adult institution, was released to parole between July 1, 2006 and June 30, 2007, and subsequently returned to CDCR for a parole violation or a new conviction. The recidivism rate is calculated using the ratio of the number of offenders who were returned to prison during the follow-up period to the total number of offenders in the recidivism cohort, multiplied by 100. Results presented are cumulative over one, two and three years.

The recidivism rates for both groups are higher under this measure because it includes returns to prison for technical parole violations. Beyond that, we see again that lifers recidivate at a much lower rate than those who received determinate sentences. After three years, 65 percent of determinately sentenced inmates are returned to prison, while only 13 percent of lifers are returned to prison.  Of the 83 lifers released in the fiscal year 2006-07 cohort, only 11 were returned to prison within 3 years of release (see Table 3 and Figure 2).

---

[3] These numbers differ from what was reported in the *2011 Adult Institutions Outcome Evaluation Report* because three individuals were erroneously included in the report as lifer parolees.

Table 3. FY 2006-07 Three-Year Return to Prison Recidivism Rates by Sentence Type

| Sentence Type | Number Released | One Year | | Two Years | | Three Years | |
|---|---|---|---|---|---|---|---|
| | | Number Returned | Recidivism Rate | Number Returned | Recidivism Rate | Number Returned | Recidivism Rate |
| Determinate Sentence Law | 115,170 | 55,163 | 47.9% | 69,683 | 60.5% | 75,008 | 65.1% |
| Indeterminate Sentence Law | 83 | 4 | 4.8% | 9 | 10.8% | 11 | 13.3% |

Figure 2. FY 2006-07 Three-Year Return to Prison Recidivism Rates by Sentence Type



## Conclusion

Examination of lifer parolee recidivism rates for a fiscal year cohort that was followed for a period of three years from release to parole shows that lifer parolees receive fewer new convictions within three years of being released to parole (4.8 vs. 51.5 percent, respectively). They also have a markedly lower return to prison recidivism rate than non-lifer parolees (13.3 vs. 65.1 percent, respectively).

## Next Steps

This report is part of a series that identifies and examines additional attributes that contribute to the parole performance of released lifers. Future reports will be forthcoming as additional data become available, more time elapses to expand the parole follow-up period, and interest is expressed regarding particular aspects of lifer parolees.