**EXHIBIT E**

[783437-1]



# California Department of Corrections and Rehabilitation
# Prison Capacity Planning

## FINAL REPORT

**ATTORNEY-CLIENT WORK PRODUCT**

## October 3, 2011



**Pulitzer/Bogard & Associates, LLC**
8 Saratoga Street
Lido Beach, NY 11561
Tel (516) 432-5177
Fax (516) 432-3414
www.pulitzerbogard.com

# Table of Contents

| Chapter/Section Heading | Page # |
|---|---|
| *List of Tables* | 1 |
| *Executive Summary* | 2-4 |
| I.   Introduction | 5-8 |
| II.   Capacity Methodology | 9-31 |
| III.   Pilot Reviews | 32-38 |
| IV.  Systemwide Application | 39-44 |
| V.   Recommendations and Next Steps | 45-47 |
| VI.  Participants/Resources | 48-49 |
| *Appendices* | 50-119 |

Attorney-Client Work Product – Confidential

# List of Tables

| Table Number and Title | Page # |
|---|---|
| **Table 1-1: Summary of Capacity Analysis** | **4** |
| **Table 2-1: ASCA Out of Cell (OOC) Time Survey Results** | **18** |
| **Table 2-2: CDCR Housing Capacity Standards and Potential Mitigation Matrix** | **28** |
| **Table 3-1: Receiver's Access to Care Data Applied to Pilot Tests** | **35** |
| **Table 3-2: Pilot Capacity Analysis Summary Table** | **38** |
| **Table 4-1: Summary of Capacity Analysis** | **43** |
| **Table 4-2: Summary of Capacity Analysis – Other Capacities** | **44** |

Attorney-Client Work Product – Confidential

# Executive Summary

The California Department of Corrections and Rehabilitation (CDCR) has for several decades measured its capacity using an approach referred to as Design Capacity. This approach is based on one inmate per cell, single bunks in dormitories, and no beds counted in capacity if the space was not designed for housing. When the State added 23 institutions to the correctional system between 1985 and 2005, the capacity of the new and expanded institutions was predicated on the Design Capacity concept.

The design capacity measure, however, has proven to be flawed for a variety of reasons. First, even with an enormous increase in capacity, single celling and bunking was never a reality, and from shortly after CDCR embarked on the major systemwide expansion the agency recognized that it would have to put more than one inmate in many cells and rely on double (and frequently triple) bunks in many dormitories as the systemwide population increased substantially. Second, national standards governing single celling, particularly those promulgated by the American Correctional Association (ACA), have changed markedly from the 1980's until today. Previous requirements for single celling and single bunking have been modified over time to the point that they are no longer considered to be the norm. In lieu of broad rules identifying which stratifications of inmates must be single celled (e.g., maximum custody, segregation, etc.), standards now emphasize decision making on an individual inmate basis, based on classification factors in determining the appropriate housing assignment.

In 2009, the Three Judge Panel in the *Coleman and Plata* cases issued a decision to limit systemwide overcrowding to 137.5% of Design Capacity as a primary mechanism designed to bring about improvements to health care.[1]

It was with this history that CDCR decided in 2010 to pursue a new, alternative approach to measuring capacity. In June of 2010, CDCR contracted with Pulitzer/Bogard & Associates (P/BA) to obtain expert advice and assistance "in determining a Manageable Operational Capacity (MOC)[2] for each prison based on established criteria and recognized industry standards." This effort was intended to provide CDCR with new management tools and established systems to better assess and measure the capacity of its 33 prisons individually, and as a system.

This approach was intended to be methodical, evidence based, supported by the ACA national standards, and consistent with (although not necessarily identical to) approaches used by other large state prison systems and the Federal Bureau of Prisons. The new approach would draw upon concepts and principles used by Federal Courts throughout the country. It was also to reflect key concerns of the *Coleman* and *Plata* courts concerning crowding in general, and also regarding access to medical and mental health care.

---

[1] *Coleman & Plata v. Schwarzenegger*, 2009 U.S. Dist. Lexis 76943 (Aug. 4, 2009)

[2] This term was subsequently changed to Prison Operating Capacity (POC).

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

This new methodology yields a primary capacity measurement-- Prison Operating Capacity (POC). POC is based first on the application of applicable ACA standards, but then allows for an adjustment to the standard based calculation where mitigation thresholds of out-of-cell activity are achieved. Although not all classifications are eligible for mitigation, most are and the potential impact of this paradigm on agency wide policy, operations and capacity planning and measurement is substantial. The main premise is that the sufficiency of living space is directly impacted by the number of hours an inmate is confined to that space and that increased out-of-cell activity has multiple benefits, including the positive effect of reducing density.

In 2011 the U.S. Supreme Court, in *Brown v. Plata*, accepted the use of Design Capacity as the measurement of capacity as it affirmed the Three Judge Panel's adoption of 137.5% of design capacity as the constitutional limit on capacity for the CDCR.[3] As such, this new approach to capacity planning is not intended to be indicative of a constitutional standard for defining the capacity of the CDCR's prisons. Rather, the results of this effort would represent solely a professional, standards-driven, policy informed approach to calculating capacity.

P/BA collaborated with a CDCR Working Group, which consisted of experienced staff representing decades of experience in institutional management, classification, facility design, mental health care, inmate programs, and security. P/BA took the lead in analyzing the current capacity methodology's shortcomings, conceptualizing the alternative approach, developing the information to support and inform the new approach, and in developing key documents to support the process of redefining how capacity may be viewed and measured in CDCR's institutions. Members of the Working Group took the lead on developing all the data collection tools, capturing the data during pilot tests at six prisons, and analyzing the data of those pilot tests. The Working Group also enlisted the support of a large group of officials from the Division of Adult Institutions (DAI), who provided the lion's share of the field work necessary to survey CDCR's 33 prisons using the tools associated with the new capacity methodology. The bulk of the quality assurance work and data analysis was performed by the Working Group as well.

CDCR executive and legal staff were briefed at key points in the developmental process relative to the methodology, the results of the pilot surveys at six institutions, and the findings obtained after application of the new methodology at all 33 CDCR prisons.

This report represents a first phase of the CDCR's new approach to capacity measurement and planning—the "what is." Beyond this point, should the State decide to fully pursue this methodology and adopt it as CDCR policy, there are myriad steps that need to be taken to achieve full implementation of both the methodological components of this approach as well as the inherent policy components. Recommendations for the next phase are included in Chapter V of this report.

Table 1-1 below illustrates how three calculated capacity figures- ACA, POC, and Potential Prison Operating Capacity (the maximum possible capacity that could be obtained if full mitigation was achieved at all housing units at all institutions) - compare with the existing CDCR's design capacity, the Supreme Court's cap (137.5% of design capacity) and the Department's current "overcrowding capacity."

---

[3] 563 U.S. __(2011)

Attorney-Client Work Product – Confidential

### Table 1-1: Summary of Capacity Analysis

| Prison | ACA | POC | PPOC | Health Care Adjustment |
|---|---|---|---|---|
| CIW | 997 | 1,668 | 1,767 | 0 |
| CCWF | 1,999 | 1,996 | 2,558 | 0 |
| VSPW | 2,068 | 2,056 | 2,562 | 0 |
| **Female Sub Total** | **5,064** | **5,720** | **6,887** | **0** |
| CIM | 3,399 | 3,713 | 4,553 | 0 |
| SQ | 3,249 | 3,501 | 3,501 | 0 |
| DVI | 1,743 | 1,868 | 2,683 | 0 |
| RJD | 2,220 | 2,282 | 3,782 | 0 |
| NKSP | 2,984 | 3,094 | 4,899 | 0 |
| WSP | 3,431 | 3,540 | 5,507 | 0 |
| LAC | 2,392 | 2,494 | 4,034 | 0 |
| CCI | 2,838 | 3,326 | 3,776 | 0 |
| COR | 4,391 | 4,139 | 5,269 | 0 |
| SAC | 3,412 | 2,957 | 2,957 | 0 |
| HDSP | 3,434 | 3,379 | 4,279 | 0 |
| KVSP | 4,576 | 4,352 | 4,352 | 0 |
| PBSP | 3,384 | 3,275 | 3,275 | 0 |
| SVSP | 3,287 | 3,180 | 4,080 | 0 |
| CMF | 2,400 | 2,571 | 2,933 | 0 |
| CMC | 4,268 | 4,895 | 4,895 | 0 |
| SATF | 4,044 | 4,536 | 5,390 | 0 |
| CAL | 2,400 | 2,506 | 4,216 | 0 |
| CEN | 2,361 | 2,452 | 4,162 | 0 |
| MCSP | 1,796 | 1,909 | 3,039 | 0 |
| PVSP | 2,365 | 2,452 | 4,162 | 0 |
| ASP | 4,147 | 5,769 | 5,769 | 0 |
| CCC | 1,870 | 2,330 | 2,690 | 0 |
| CRC | 3,819 | 5,233 | 5,243 | 0 |
| SOL | 3,264 | 4,023 | 4,923 | 0 |
| CVSP | 2,531 | 3,428 | 3,428 | 0 |
| CTF | 3,553 | 3,886 | 4,998 | 0 |
| FSP | 2,132 | 2,244 | 2,532 | 0 |
| ISP | 2,286 | 2,386 | 4,096 | 0 |
| SCC | 1,651 | 2,030 | 2,390 | 0 |
| **Male Sub Total** | **89,627** | **97,750** | **121,813** | **-** |
| **Institution Sub Total** | **94,691** | **103,470** | **128,700** | **-** |
| | | | | |
| **Off Site Camps*** | | | | |
| CIW | 320 | 320 | 320 | 0 |
| CCC | 2,150 | 2,150 | 2,150 | 0 |
| SCC | 2,010 | 2,010 | 2,010 | 0 |
| **Camps Sub Total** | **4,480** | **4,480** | **4,480** | |
| | | | | |
| **Grand Total** | **99,171** | **107,950** | **133,180** | |

Attorney-Client Work Product – Confidential

# I. INTRODUCTION

Attorney-Client Work Product – Confidential

# I. Introduction

In June of 2010 the California Department of Corrections and Rehabilitation (CDCR) contracted with Pulitzer/Bogard & Associates (P/BA) to obtain expert advice and assistance "in determining a Manageable Operational Capacity (MOC)[4] for each prison based on established criteria and recognized industry standards." This effort was intended to provide CDCR with management tools and established systems to better assess and measure the capacity of its 33 prisons individually, and as a system.

Prior to the inception of this process, CDCR's capacity had long been determined using an approach referred to as "design capacity." This approach is based on one inmate per cell, single bunks in dormitories, and no beds counted in capacity if the space was not designed for housing. When the State added 23 institutions to the correctional system between 1985 and 2005, the capacity of the new and expanded institutions was predicated on the design capacity concept. All cells were assumed to be for only one inmate and all dormitories were assumed to house inmates on single bunks. During the course of this expansion program, a policy decision was made to expand infrastructure such as water, waste water and electrical systems to accommodate short-term overcrowding. In addition, two bunks and two lockers were placed in each cell. However, no additional program, support, treatment and/or health care space was included in the designs to accommodate an inmate population above design capacity.

Even with an enormous increase in capacity, single celling and bunking was not to become a reality, however, and from the start the CDCR recognized that it would have to put more than one inmate in many cells and rely on double (and frequently triple) bunks in many dormitories as the systemwide population increased substantially. The Department then began using a second capacity figure—Overcrowding Capacity—whereby inmates would be housed in excess of design capacity based on the application of a series of "overcrowding" percentages. These percentages of overcrowding permitted housing inmates in lower custody dormitories at 200%, higher custody general population and reception at 190% of design   capacity, while others would be housed at 100% of design   capacity based on the various classifications.

This has been the capacity measurement and institutional planning approach employed by CDCR for almost 30 years.  There are, however, several problems and limitations inherent in this approach.

The first problem is the fact that the design capacity was based on outdated notions of capacity determinations.  When the institutions were planned and built in the 1980s-1990s there was still some degree of acceptance that single celling was preferred and, in fact, national standards strongly encouraged that approach.  The 1990 edition of the Standards for Adult Correctional Institutions Standards of the American Correctional Association (ACA), on which CDCR based its designs, required single cells for all security levels, except for minimum custody.[5]  Since that time, the standards governing capacity of cells have changed significantly.  In 1991, the standards were

---

[4] This term was subsequently changed to Prison Operating Capacity (POC).
[5] ACA Third Edition ACI Standard 3-4128-1.

Attorney-Client Work Product – Confidential

changed to allow multiple occupancy cells for medium custody inmates;[6] the requirement for single celling segregation inmates was deleted in 2004; [7]and by 2005 the requirement to house maximum custody inmates in single cells was also eliminated.[8] ACA replaced the imperatives for single celling with a requirement that single cells be available when indicated by "a determination made by the classification system, medical diagnosis, or other professional conclusions."[9]

In other words, the foundation on which CDCR based its design capacity in the 1980s no longer existed by the 1990s and mid-2000s. Single celling is no longer the default expectation for measuring capacity according to national standards, yet it remains at the core of the CDCR's capacity measurement system. Thousands of cells that were rated for one inmate under the older standards could now potentially be used for two persons if the classification system deemed it appropriate and if certain space requirements were satisfied regarding unencumbered space.

A second significant problem with the CDCR's capacity measurement approach is the application of the "overcrowding" percentages. The use of the term overcrowding suggests that housing any more than one inmate in a cell is per se "overcrowding." But that, of course, is based on now defunct readings of national standards. Moreover, the allowable overcrowding percentages, as reflected in the CDCR's Overcrowding Capacity (OC), are arbitrary, with no foundation in contemporary standards or evidence based principles. Across the board percentages have served as a practical means to adjust the capacity to something that reflects actual inmate population needs, and wardens and other CDCR professionals have learned to live with these percentages, but those are different issues than defining capacity.

Compounding the inherent problem with relying on design capacity as a baseline and applying arbitrary overcrowding percentages is the fact that that this approach was used in the litigation arena, with the force of law. The August 2009 Opinion and Order of the Three Judge Panel cited extensive testimony concerning the "correct overcrowding percentage" that should be used, with some individuals arguing for 130%, others for 145%. The testimony before the Three Judge Panel focused, however, on percentages of crowding not based on design capacity but rather based on capacity measurements as used in other correctional systems that almost uniformly are higher than what they would be under strict application of design capacity. The Three Judge Panel, in turn, considered the various opinions about the "correct" percentage and decided to limit systemwide overcrowding to 137.5% of design capacity.[10] The Supreme Court's recent decision in *Brown v. Plata* accepted the use of design capacity without comment, and then affirmed the Three Judge Panel's adoption of 137.5%.[11]

It was with this history that CDCR decided in 2010 to pursue a new, alternative approach to measuring capacity. This approach was intended to be methodical, evidence based, supported by the ACA national standards, and consistent with (although not necessarily identical to) approaches

---

[6] ACA Fourth Edition ACI Standard 4-4132

[7] ACA 2006 Supplement clarifying ACI 4-4141

[8] ACA 2010 Supplement states that the standard 4-4131, which required single cells for maximum custody inmates, was deleted by the Standards Committee.

[9] ACA 2006 Supplement ACI 4-4133

[10] *Coleman & Plata v. Schwarzenegger*, 2009 U.S. Dist. Lexis 76943 (Aug. 4, 2009)

[11] 563 U.S. __(2011)

Attorney-Client Work Product – Confidential

used by other large state prison systems and the Federal Bureau of Prisons.  The new approach would draw upon concepts and principles used by Federal Courts throughout the country.  And, it was also to reflect key concerns of the *Coleman* and *Plata* courts concerning crowding in general, and also regarding access to medical and mental health care.

This new approach to capacity planning was not intended to suggest that it would be indicative of a constitutional standard for defining the capacity of the CDCR's prisons; the results of this effort represent solely a professional, standard driven, policy informed approach to calculating capacity.

For the past year, P/BA has been working in collaboration with a Working Group of CDCR professionals in developing a new paradigm for realistically calculating capacity within CDCR prisons. P/BA took the lead in analyzing the current capacity methodology's shortcomings, conceptualizing the alternative approach, developing the information to support and inform the new approach, and in developing key documents to support the process of redefining how capacity may be viewed and measured in CDCR's institutions.

The Working Group consisted of experienced CDCR staff, representing decades of experience in institutional management, classification, facility design, mental health care, inmate programs, and security. P/BA and the Working Group met numerous times and had myriad conference calls over the year and worked closely in all aspects of this effort.  Members of the Group were not only partners in all aspects of the conceptual process, but they also took the lead on developing all the data collection tools, capturing the data during the pilot tests, and analyzing the data of those pilot tests. The Working Group also enlisted the support of a large group of officials from the Division of Adult Institutions (DAI), who provided the lion's share of the field work necessary to survey CDCR's 33 prisons using the tools associated with the new capacity methodology.  The bulk of the quality assurance work and data analysis was performed by the Working Group as well.

CDCR executive and legal staff were briefed at key points in the developmental process relative to the methodology and results of the pilot surveys at six institutions.

This Report is the final product of the year-long effort. Subsequent sections of this Report will discuss the research into best national practices and national standards, the principles underlying the proposed capacity approach, the process of field testing the approach and the tools that were developed to measure capacity consistent with the new approach, the results of the pilot tests, the systemwide measurements and calculations of capacity, and the next steps required to institutionalize the new approach within CDCR.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

# II. CAPACITY METHODOLOGY

Attorney-Client Work Product – Confidential

# II. Capacity Methodology

### Goals and Objectives

In the early stages of the capacity planning project, P/BA and the Working Group discussed goals for the new capacity methodology. The goals that were mutually agreed to were as follows:

- Performance Standards Based on national standards- The Working Group determined that the methodology employ standards that were not merely static and quantitative, but also included a measure of "performance" i.e., that it be based on achieving certain levels of positive correctional performance that could be measured. In doing so, the idea was that the capacity methodology could serve as a catalyst to bring about positive changes in the prison system. At the same time, it was agreed that the performance measures and the standards developed or employed, should be based on national standards, most notably those promulgated by the American Correctional Association.

- Build on other systems' approaches- A goal for which there was unanimous consent was that the CDCR methodology draw upon and build on the experience of other large correctional systems. This would serve the dual purposes of allowing CDCR to benefit from the experiences of other like agencies, but also providing a measure of defensibility.

- Applicable to unique California issues and context- While the Working Group aimed to draw upon national standards and the experience of other correctional agencies, at the same time it was agreed that the methodology needed to be responsive and sensitive to the unique circumstances and context present in California. Positive (and negative) historical lessons learned needed to be considered along with issues such as the myriad consent decrees and court orders that govern or impact on many aspects of the CDCR's prisons' operations. Moreover, while this capacity methodology project was not viewed as a direct response to the Coleman/Plata case, at the same time there was a recognition that concerns or key concepts that emerged in that litigation should be incorporated into the methodology where appropriate.

- Safety of staff and inmates- Paramount in the minds of members of the Working Group was that the capacity methodology not jeopardize staff and inmate safety and, conversely, that it potentially be able to contribute to creating a safer environment in the prisons. These goals clearly took precedence over any ideas pertaining to achieving a particular target number for future bed capacity or any notions of maintaining the status quo relative to how the prisons currently operate.

- Fiscally sound/practical- While fiscal concerns were not the overarching concern driving the general concepts and specific decisions, at the same time the Working Group was clearly cognizant of and expressed concern about how to appropriately (and safely) maximize existing resources. One example of this concern arose during discussions about the continued use of very small cells. The CDCR currently has more than 8,000 cells that are less than 55 square feet, including more than 2,800 cells that are less than 40 square feet. In most cases, these

Attorney-Client Work Product – Confidential

cells hold two inmates, even though they would not be large enough (per ACA standards) for even one inmate. The decision was made early on that while these cells would not be considered eligible for double bunking under the new methodology, at the same time they could not just be considered unusable and taken off line.

- Replicable- The Working Group identified replicability as another key requirement. CDCR staff, or outside entities, should be able to review the data on which capacity calculations were based and arrive at the same conclusions as staff that conducted the field assessments. This requires that the field documentation and calculation methods be relatively simple and that policies and procedures and automated systems be developed to support the system of assessing capacity.

- Focus on "what is"- One final note of introduction—CDCR will initially apply this methodology to assess the current state of capacity and out-of-cell activity in the prisons -- the "what is." In the course of applying the tools at each prison, it will become apparent that there may or may not be opportunities in the near future  to alter practices related to out-of-cell time, or to repurpose housing areas for different classifications in order to increase capacity.  The impediments to increased capacity, or the opportunities available to increase capacity -- the "what if," -- will be identified in the course of the initial round of capacity measurement at all institutions. The opportunities will then become the subject of policy decisions relative to resources and sound practices at each prison.

Ultimately, it was one additional goal that in many respects became the defining feature of the resultant capacity methodology. That goal was to have an essential component of the capacity methodology driven by program opportunities, access to services and out-of-cell activity. This focus proved to be  unique relative to other large correctional agencies' approaches to measuring capacity, although substantial support was identified for it from a variety of other sources, including national standards, the California litigation, fiscal concerns, and staff and inmate safety considerations.  Moreover, it was determined that there was a long history of Federal Courts considering out-of-cell time as an important consideration in crowding cases.

Each of these goals will be referred to or discussed further in subsequent discussions within this section of the Report.

## Survey of other System's Approaches

Prior to recommending a methodology to determine CDCR's capacity, P/BA proposed that a survey be conducted of the approaches to measuring capacities that are employed by other large states and the Federal Bureau of Prisons (FBOP). Review of these systems' approaches helped to inform the process that would be developed for CDCR by building on the experience of these other large correctional systems. This survey would also serve the dual purposes of allowing CDCR to benefit from the experiences of other like agencies and also providing a measure of defensibility.

Attorney-Client Work Product – Confidential

P/BA began its research on capacity analysis approaches in other states by first reviewing the states identified in a Bureau of Justice Statistics (BJS) data report on State Prison Capacities for 2008.[12] The BJS list is limited by the fact that all states were not respondents (or only completed segments of their survey).

There were a number of state systems we identified for purposes of culling their methodological approach to capacity that also responded to the BJS survey using the BJS definitions and approaches in determining institutional capacity, namely:

<u>Rated Capacity</u>: the number of beds or inmates assigned by a rating official(s) within the jurisdiction.

<u>Operational Capacity</u>: the number of inmates that can be accommodated based on a facility's staff, existing programs, and services.

<u>Design Capacity</u>: the number of inmates that planners and architects intended for the facility.

Of the 10 states with the largest prison populations, the breakdown of how they determined their capacities as reflected in their responses to the BJS survey and definitions were as follows:

- California:  Operational and Design
- Florida: Operational and Design
- Georgia: Operational
- Illinois: did not respond to the survey
- Louisiana: Rated and Operational capacities
- Michigan: Operational
- New York: Rated, Operational and Design Capacities
- Ohio: Rated capacity
- Pennsylvania:  Responded to each category for capacity with the same figures/totals
- Texas: Rated, Operational, Design Capacities

Because the respondents may not have totally conformed with BJS's definitions for rated, operational or design capacity, P/BA proceeded to gather additional information from each of these states to determine:

- what specific methodology they utilized in arriving at their prison system capacities and,
- under what authority (state law/penal code, court orders, etc) were they  acting

P/BA queried those same states with the following questions:

1. What is your agency's definition of capacity?

---

[12] Sabol, William J. et al (April 2010). Prisoners in 2008, BJS Bulletin.

Attorney-Client Work Product – Confidential

2.  How has your agency determined its institutional capacities?
3.  What are the specific criteria or formulas used in determining the capacity of your agency's institutions?
4.  What is the particular type of analysis and/or process that your agency uses in determining its institutional capacity?
5.  Are there any lessons learned concerning your agency's process in determining capacity?

P/BA received information from Florida, Michigan, Tennessee and Pennsylvania. Massachusetts was also included as P/BA had been a team member in a Statewide Master Plan that included establishing new capacities for all of the state's institutions.

In addition, P/BA researched how the Federal Bureau of Prisons calculates institutional capacity.

Two particularly salient findings emerged from the research that was conducted by P/BA.  First, no other state or the FBOP relies exclusively on original design capacity at single celling to define institutional capacity as does California. Second, none of the states surveyed or the FBOP have a methodology that directly factors in health care to the overall equation in determining institutional capacity.

Additional general findings from this limited survey include:

- There is no standard definition of capacity or how an agency calculates its systemwide bed capacity
- Other states do not count short-term health care beds in calculations of their permanent capacity.
- Several states have different levels of capacity calculations that may exclude and/or include medical and segregation beds
- ACA standards are the basis of determining systemwide capacity for the majority of agencies surveyed
- All the agencies surveyed have facilities with a variety of inmate housing configurations including planned double or multiple occupancy cells and dormitories

Agency specific findings include the following:

- While Florida uses the term "Design Capacity" it is a measure derived as a result of litigation. The calculation uses a formula primarily based on available square footage per inmate and is not based on the number of cells or dormitory beds as originally constructed, as is the case with CDCR's Design Capacity.
- Massachusetts recently modified its design capacity definition and is moving to a new method of capacity calculation based on ACA standards and life safety.
- Pennsylvania employs four capacity calculations: "Operational Bed Capacity," "Maximum Bed Capacity," "Emergency Bed Capacity" and, "Fill to Bed Capacity." All are grounded in a set of ACA driven policy standards.
- Michigan uses "Rated," "Actual" and "Current" capacity to define their systemwide prison bed capacity. While their rated capacity is based on design capacity, their 'true' capacity calculations are based on several variables including the structure of the facility, its security

Attorney-Client Work Product – Confidential

needs and capabilities, the type/custody of prisoner to be housed in that institution and how much space each prisoner needs to have based on ACA standards.

- Tennessee officially uses "Operating" (Designated) capacity which is based upon the number of total beds and their designated usage available to house inmates. Excluded from operating capacity special purpose beds such as medical, mental health, disciplinary segregation, protective custody, etc.

- The following are key factors that the Federal Bureau of Prisons utilizes in computing their systemwide bed capacity:

  - "Rated" capacity excludes beds designated for hospital/infirmary, administrative detention, and disciplinary segregation. Their "Total" capacity includes all beds.

  - The FBOP capacity calculations are grounded in the ACA standards but set overall square footage parameters depending on custody level. For example, for high security inmates, rooms, cells and cubicles, are rated as single occupancy if they are less than 75 square feet. If they are 75 square feet or more, but less than 120 square feet, 25% of rooms, cells and cubicles are rated for double occupancy, and 75% for single occupancy. If they are 120 square feet or more, the rated capacity is computed by dividing the total space of each sleeping area or unit by 80 square feet.

  - In multiple occupancy housing areas, if the room or dormitory is 120 square feet or more, rated capacity is computed by dividing the total space of each sleeping area or unit by 80 square feet.

  - Permanently converted housing (e.g. office space converted into housing) counts in the capacity calculations while temporary housing does not.

  - In planning new facilities, the FBOP provides adequate infrastructure, treatment, program and support spaces to accommodate the maximum rated capacity for the proposed facility, although this was not necessarily the case for some of its older prisons.

**Overview of the Proposed Methodology**

P/BA and the Working Group reviewed the results and key findings of the survey of other systems to arrive at a methodology that was grounded in the experience of other large correctional systems yet tailored for the unique needs of the CDCR. The proposed methodology is described herein.

American Correctional Association (ACA) standards are the most widely accepted source of national standards and best practices.[13] Many state correctional departments rely on ACA standards as a basis for operational policies and procedures and physical plant design criteria, and a large number are also participating in the ACA accreditation process. In fact, CDCR has committed to seeking accreditation for three of its prisons. As such, a great deal of emphasis was placed on incorporating these standards into this CDCR capacity development process.

The three core components of the proposed methodology are as follows:

1. Determination of capacity using application of selected ACA standards;

---

[13] State prisons are governed by the Adult Correctional Institution standards (4th Edition and 2010 Supplement) of the American Correctional Association.

Attorney-Client Work Product – Confidential

2.  A process of adjusting (expanding) ACA capacity based on mitigation of living space standards via out-of-cell activity for selected inmate classifications;
3.  Adjustments to capacity (limiting) where current medical and mental health care resources are deemed insufficient to meet the demands of the proposed capacity.

This approach draws directly on ACA standards concerning housing space and measurement of capacity.  It also incorporates and expands the application of a long-standing construct in the ACA standards, which recognizes that the minimum amount of living space required is affected by the amount of time the inmate remains in his cell, i.e., the more time an inmate is confined to his cell or living area, the more space is needed for individual exercise and movement. The precise interplay and application of these standards in this methodology is unique and has been tailored to meet the CDCR's needs for a measurable and defensible baseline calculation of institutional (and systemwide) capacity.

Two key components of the ACA standards form the foundation for this methodology— unencumbered square footage and out-of-cell time as a mitigating factor.  While the early versions of ACA standards for inmate housing established minimum cell sizes, for the past two decades there has been a shift towards requiring a certain amount of unencumbered square footage per inmate in cells or in multiple occupancy living environments such as dormitories and locked wards. Unencumbered square footage is defined by ACA as, "the amount of space available for each occupant that is free of equipment and fixtures and therefore available for circulating and in-cell exercise".[14]

Additionally, there has also been a long-standing premise in the ACA standards that more space is required in cells when inmates are confined to their cells for longer periods. Standards manuals dating back to the 1980s called for larger cells when inmates were confined to their cells for more than 10 hours a day because it was deemed necessary to allow for in-cell activity if out-of-cell time was limited. This has been reflected directly in the language of specific standards as well as a theme consistently incorporated in the comments accompanying standards, especially those governing segregation cells.[15] In fact, over time there has been a distinct trend in the standards to virtually eliminate any specific requirements for single cells, except under very broadly defined circumstances at the discretion of prison classification officials.[16]

The focus on out-of-cell access also has roots in the approach that many Federal Courts have applied in crowding litigation.  Courts have consistently looked at out-of-cell time as a vital factor in determining whether crowding in housing areas is unconstitutional, i.e., they have been more likely to find unconstitutional crowding when inmates are double or triple celled in substandard sized

---

[14] This approach differs from that employed by the Federal Bureau of Prisons (FBOP), which establishes a set gross cell size for rooms and cells. The FBOP approach, set forth in a June 1997 BOP Program Statement, does not reflect the current ACA/ACI Standards' emphasis on unencumbered space.

[15] See ACA/ACI Standard 4-4132, which states: "When confinement exceeds ten hours per day, there are at least 80 square feet of total floor space per occupant."

[16] See ACA/ACI Standard 4-4133, which requires single cells "when indicated" for inmates with severe medical disabilities, seriously mentally ill inmates, sexual predators, and inmates likely to be exploited or victimized.

Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

cells for many hours of the day with limited out-of-cell opportunities.[17] In other words, out-of-cell time has been found to be an important mitigating factor relative to cell size and multiple occupancy (or even single occupancy) of substandard sized cells.

The American Correctional Association is not the only professional organization that has emphasized the importance of out-of-cell activity and integrated this into specific standards. Drawing on the concerns articulated by many courts, the American Bar Association in 2010 issued a new set of standards governing correctional institutions.[18] Those standards specifically address the importance of out-of-cell time.[19]

The Working Group fully realized that there are barriers to maximizing out-of-cell activity in the CDCR prisons as a result of staff shortages, physical space limitations, and current practices that often interfere with out-of-cell opportunities. Nevertheless, the Group elected to proceed with out-of-cell activity as a critical component of the capacity measurement process despite the fact that these limitations would initially have a negative effect on expanding capacity.

Key aspects of the methodology described, include:

- It incorporates significant elements and long-employed constructs of the ACA Standards
- It draws on elements of capacity measurement approaches employed by the Federal Bureau of Prisons and several large state corrections systems.
- It reflects essential California regulatory and court driven requirements.
- It establishes a mechanism for mitigation of sub-standard living space based on out-of-cell activity.
- It establishes a capacity for each prison (Prison Operational Capacity or POC). and for the CDCR system as a whole. .
- In light of the *Plata/Coleman* litigation focusing on crowding and the impact it has on health care, this methodology includes access to medical and mental health care as an important capacity driving element of the Operational Capacity.

---

[17] Boston, J., & Manville, D., (2010) *Prisoners' Self Help Litigation Manual*. New York: Oceana. Pages 19-20.

[18] American Bar Association Standards on the Treatment of Prisoners, Third Edition, February 2010.

[19] Standard 23-3.6 Recreation and out-of-cell time

(a) To the extent practicable and consistent with prisoner and staff safety, correctional authorities should minimize the periods during the day in which prisoners are required to remain in their cells.

(b) Correctional authorities should provide all prisoners daily opportunities for significant out-of-cell time and for recreation at appropriate hours that allows them to maintain physical health and, for prisoners not in segregated housing, to socialize with other prisoners. Each prisoner, including those in segregated housing, should be offered the opportunity for at least one hour per day of exercise, in the open air if the weather permits.

(c) Correctional authorities should whenever practicable allow each prisoner not in segregated housing to eat in a congregate setting, whether that is a specialized room or a housing area dayroom, absent an individualized decision that a congregate setting is inappropriate for a particular prisoner. Prisoners should be allowed an adequate time to eat each meal.

Attorney-Client Work Product – Confidential

- It excludes from capacity "non-traditional beds", i.e., living spaces that are currently in place in gymnasiums, day spaces and other areas not intended or designed for housing purposes.
- It also excludes from capacity specialized medical and mental health beds in which inmates typically spend 30 days or less.

While physical space is, of course an important component of capacity, this approach is a dynamic and multi-faceted one in that the calculation of capacity can expand or retract based on policy and resource decisions concerning out-of-cell time activities and health care resources. The new methodology views capacity not as a static figure, determined exclusively by reference to decades-old prison policy and design decisions, but rather it is dynamic in that it incorporates operational decisions and policies into the equation. It is intended to replace design capacity as the baseline against which overcrowding is measured with a more contemporary standard and best practices driven approach. While design capacity is a fixed measure, the determination of operational capacity is a more fluid one, subject to periodic changes as policy decisions, operational practices and physical resources impact on the core criteria.

### The ASCA Out of Cell Time Survey

In view of the Working Group's commitment to using out-of-cell time as an essential component of the new capacity methodology, it was decided that research into national approaches and norms relative to out-of-cell time would inform the process and decisions to be made concerning applicable thresholds. As such, the Working Group designed a survey instrument to capture information pertaining to policies and practices employed by other large correctional systems concerning the number of hours of out-of-cell activity afforded minimum, medium and maximum custody general population inmates (comparable to CDCR's Levels I-IV).

With the assistance of the Association of State Correctional Administrators (ASCA), the surveys were developed and sent to 49 states and the FBOP in October 2010. Preliminary responses were received back in December 2010 and additional follow up calls were made by CDCR Working Group team members and staff of DAI to gain additional information and clarifications. The follow-up process was important from a quality assurance perspective and that process concluded in March 2011. At the conclusion of this effort, CDCR received complete information from 13 states and the FBOP. This represented a 27% response rate, but more importantly the survey was able to capture out-of-cell data from those agencies housing the largest number of inmates in the Unites States, including Florida, New York, Pennsylvania, Texas and the FBOP. The results of the survey appear in the following table:

Attorney-Client Work Product – Confidential

**Table 2-1: ASCA OUT-OF-CELL (OOC) TIME SURVEY RESULTS**

| Agencies | Maximum Custody OOC (avg.in hrs) | Medium Custody OOC (avg.in hrs) | Minimum Custody OOC (avg.in hrs) |
|---|---|---|---|
| NY DOC | 15 | 16 | 16 |
| MI DOC | 8 | 11 | 15 |
| IN DOC | 10 | 16 | 16 |
| PA DOC | 8 | 9 | 9 |
| MO DOC | 9 | 14 | 14 |
| MN DOC | 13 | 13 | 15 |
| ID DOC | 6 | 13.5 | 14 |
| SC DOC | 14.5 | 14.5 | 14.5 |
| WV DOC | 15 | 15 | 15 |
| FL DOC | 11 | 11 | 11 |
| WY DOC | 10.5 | 12.5 | 12.5 |
| KS DOC | 12 | 14.5 | 15 |
| TX DOC | 8.5 | 10.5 | 12 |
| FBOP | 15 | 15 | 15 |
| **Average** | 11.11 | 13.25 | 13.86 |

The data was thoroughly reviewed by the Working Group and a recommendation was made to the Secretary and the Executive Management team of CDCR that the average hours of out-of-cell time received in the survey (rounded) be adopted for those inmate populations where mitigation of the space standards was applicable. In those instances the minimum out-of-cell time threshold would be:

- Minimum Custody: 14 hours
- Medium Custody: 13 hours
- Maximum Custody: 11 hours

Attorney-Client Work Product – Confidential

### Detailed Description of the Methodology

#### *What is Included in Capacity*

A condition precedent to measuring Prison Operating Capacity was for the CDCR Working Group to identify which classifications would be included in the determination of operational capacity. Drawing on the approaches used by other correctional agencies and professional organizations[20] it was decided that all classifications and housing categories would be included in determining the systemwide capacity with the exception of the following health care related housing:

- Mental Health Crisis Beds
- CTC or Infirmary Medical Outpatient Housing
- Mental Health Observation Cells
- Correctional Treatment Centers
- DMH state hospitals[21]
- General Acute Care Hospitals
- Hospice Beds

These categories were excluded either because of their temporary nature (generally less than 30 day placements) or because the beds are located within Department of Mental Health State hospitals or community public or private hospitals.

However, the decision was made to count Administrative Segregation beds as part of systemwide capacity.  While some correctional systems do and others do not count this category as part of their capacities, the fact that inmates in these housing areas are generally not short-term or temporary placements in CDCR was a key reason for including them. Given the complexities of operating prisons in California, including the very long sentences, lack of statutory incentives for program participation due to mandatory sentencing and the high incidence of gangs, administrative segregation beds generally remain filled and are long-term placements.

Also excluded from capacity are those beds that are "temporary" in nature and have been located in gymnasiums, dayrooms or other locations that were not designed for or otherwise legitimately converted to appropriate housing space—the non-traditional or "bad beds." This decision by the Working Group mirrors the language which was incorporated into the AB 900 legislation. [22] In

---

[20] The Association of State Correctional Administrators (ASCA) defines operational capacity as follows**:**  Total bed capacity across all DOC facilities throughout the agency on the last day of a given month.  The capacity of a facility is the number of beds authorized for safe and efficient operation of the facility. Do not include beds reserved for discipline, investigations, infirmary, or other temporary holds because these beds are used for temporary or special purposes. When the special purpose(s) or circumstances do not apply, the beds are not occupied. Source: "ASCA Performance Standards, Measures, and Key Indicators, May 27, 2008" obtained at http://www.nicic.gov/Library/023147.

[21] These hospitals include ASH (Atascadero State Hospital), PSH (Patton State Hospital) and CSH (Coalinga State Hospital).

[22] http://www.leginfo.ca.gov/pub/07-08/bill/asm/ab_0851-0900/ab_900_bill_20070503_chaptered.html.  The legislation noted that: "The purpose of beds constructed pursuant to this section is to replace the temporary beds currently in use, and they are not intended to house additional inmates. For the purposes of this section, "temporary beds" shall be defined as those that are placed in gymnasiums, classrooms, hallways, or other public spaces that were not constructed for the purpose of housing inmates."

---

Attorney-Client Work Product – Confidential

addition, the former Governor, in an official proclamation, voiced serious objections to and concerns about the use of prison areas that were not intended for housing to be used as such.[23]

### *Calculating Prison Operating Capacity (POC)*

The foundation of this methodology is housing capacity and the availability of appropriately sized single cell or multiple occupancy living space. The proposed methodology here draws heavily on the ACA standards in that the focus is on unencumbered square feet per inmate (USF) requirements for each housing type and category of offender.

The first step in determining Prison Operating Capacity under this methodology is the application of ACA living space standards to existing housing areas for eligible classifications. The Working Group identified the current and/or more appropriate housing configurations (type of living arrangement) and the applicable corresponding ACA standard to be applied for each classification category. Architectural plans and field surveys were used to determine the capacity of each living space (cell, multiple occupancy cells, dormitory) in each housing unit in each of CDCR's 33 prisons. For single, double and multiple occupancy cells, scaled drawings (with field verifications) of the cells were used to analyze and calculate the amount of USF. For dormitories, the capacity is measured by applying a formula for total square footage required for each occupant, assuming ACA's 25 USF per person plus allocations for double stacked bunks, individual lockers and circulation areas to access the bunks. This calculated out to an average of 50 square feet total per inmate, including both unencumbered space and beds, lockers and a desk. [24]

The second step of the analysis focuses on out-of-cell time and corresponding mitigation impacts. In certain cases the ACA standard represents a floor, below which it would be inadvisable or inappropriate to suggest less space per person—in these cases the ACA standard for assessing capacity remains the standard and no adjustment is possible. A number of classification categories were determined to be exempt from mitigation because the nature of their confinement suggests that extensive out-of-cell activity is not practical. This is not to say that out-of-cell opportunities are not essential for inmates in administrative segregation, condemned housing, hospice, psychiatric services units (PSU) and for inmates in secure housing units (SHU). Rather, the methodology assumes that feasible out-of-cell procedures and practices will not be sufficiently extensive as to provide the mitigation necessary to adjust the ACA standard driven housing requirements. For these populations, then, the ACA standard becomes the POC, with no mitigation based adjusted space standard. It bears repeating, however, where no out-of-cell mitigation is feasible pursuant to this methodology that does not mean that out-of-cell time and activity should not be provided — it only means that the ACA standard-based housing capacity should not be adjusted as a result of that activity.

For other classifications of inmates, however, this methodology incorporates an element of mitigation based on out-of-cell activity in that it permits an adjusted (lesser) requirement for unencumbered square footage when the inmates are routinely allowed access to out-of-cell

---

[23] See, Prison Overcrowding State of Emergency Proclamation, October 4, 2006. ttp://gov.ca.gov/news.php?id=4278
[24] See Appendix 1 for an illustration of how the 50 square foot figure was calculated,

Attorney-Client Work Product – Confidential

activities for a pre-determined number of  hours a day.  This approach recognizes that the potentially negative impacts of excessive spatial density[25], the result of putting too many people in too little space, can be mitigated by reducing the amount of time that people are actually in that space. By increasing out-of-cell activity, the inmates are less affected by density, even if the living space may be less than that called for in the ACA standards. It also reflects an awareness of the positive aspects of constructive activities in a prison setting and places a value on rehabilitation and reentry programming.

For purposes of the mitigation aspects in this approach, the following activities comprise out-of-cell time activity:

- "Inmate Services"- yard time, gym, dining, dayroom use, hobby crafts, visiting, family visiting, canteen, religious services and library.
- "Program Assignments"-substance abuse, education, vocational education, prison industries, support services jobs, self help groups and treatment services.
- "Healthcare"- group counseling, individual counseling, IDTT, sick call, treatment, medication management, dental, pill line, specialty services and recreation therapy.

The emphasis here is on *access* to *out-of-cell* activities as a means of mitigating density.  As such, in-cell dining, education or any other activity that may be performed in the cell or cell-side does not meet the criteria set forth here.  While there is clearly value associated with certain forms of in-cell programming, in-cell activities do not reduce housing density and, as such, they do not constitute mitigation and are not counted for these purposes.

One population potentially eligible for mitigation-EOPs-was carefully considered by the Working Group in terms of clinical indicators and amenability to double celling, whether under the applicable ACA standard or due to mitigation as a result of out-of-cell activity. Evidence based practice data was collected and showed that approximately 48% of EOPs were categorized as requiring a single cell ("S Suffix") by classification staff with input from clinical professionals.  As such, the Working Group determined that double celling of EOPs in any housing unit, whether a function of ACA standards or achieved mitigation, would be limited to 50%.

It is important to note that other classifications were determined to not be eligible for mitigation because extensive out-of-cell opportunities are not practical or advisable, e.g., Administrative

---

[25] *Spatial density* refers to crowding that is mostly related to decreases in available space for any individual or group of individuals.  *Social density* refers to conditions where increased crowding is a function of an increase in the numbers of people in a space and with whom any individual has to face and deal.  These two concepts are clearly overlapping, e.g., housing two hundred inmates in a dormitory designed for 100 impacts both *Spatial* density (the available living space is reduced by half placing inmates very close to each other and minimizing circulation space) and *Social* density (one inmate has to interact and navigate among almost two hundred others rather than one hundred). Research on crowding has found that increased social density has more profound effects, especially on issues of special concern in corrections facilities, such as tension and aggression. That assumes, however, that spatial density is not also severe or unduly limited. Source: "Assessment of Strategies to Manage Crowded Direct Supervision Jails," *Unpublished Monograph prepared for the National Institute of Corrections*, D. Bogard and R. Wener, 2007.

Attorney-Client Work Product – Confidential

Segregation.[26]    Although evidence based analysis of single cell requirements suggested that almost three quarters of this classification could be double celled, the Working Group determined that double celling for these populations, if permitted by ACA standards, would be limited to 50%, consistent with current CDCR policy.

Members of the Working Group developed an approach to calculating out-of-cell time as follows:

- It is to be determined on a housing unit by unit basis, within each facility and within each prison;
- It is based on the typical number of hours of "access" to out-of-cell activities;[27]
- It is measured by documenting typical out-of-cell time periods as derived from interviews with unit officers, review of unit logs, daily movement sheets, and program documents;
- It focuses on the "typical" inmates in a unit, not those on program restrictions or program enhancements

The precise method of calculating out-of-cell access for each eligible population involves a number of activities performed in each applicable housing unit of each prison.  Trained staff use a variety of techniques, including interviews, unit schedules, institutional schedules, post orders, unit logs and inmate assignment lists to collect and cross verify data in each location.  An out-of-cell data collection instrument was designed to capture this data and to guide the actual calculation of the average (mean) out-of-cell access for all inmates in the respective housing units.  A copy of this form is included with this report as an attachment.

When the calculated average out-of-cell time access for the inmates in a particular housing unit meets or exceeds the thresholds as set forth in the methodology , then the capacity of that specific area is adjusted accordingly (beyond the ACA capacity).  Conversely, when the average out-of-cell time falls below the threshold, the official capacity of the housing unit is limited to the ACA capacity.

An additional consideration, as discussed previously, is that some classes of housing will not be factored into the Prison Operating Capacity. "Non-traditional housing" areas including gymnasiums, dayrooms, warehouses, etc. will not be counted as capacity. In addition, housing that is considered temporary in nature—the agreed upon criteria was for 30 days or less—would be excluded from capacity.  Exclusion of these types of highly specialized, temporary medical and mental health beds is a routine practice in capacity calculating approaches employed by other jurisdictions.

---

[26] Administrative Segregation units all have an intake process that involves complex due process elements, disciplinary and classification hearing processes and investigative and case factor evaluations. Inmates are single celled during these intake processes as well as on a case-by-case basis using established Title 15 criteria after the intake process is completed.

[27] The Working Group determined that calculations would be based on weekdays only.  This is because the majority of staffing resources for inmate rehabilitation and program activities are assigned during weekdays and because other out-of-cell activities are available during weekends.

Attorney-Client Work Product – Confidential

In the case of adjusted USF standards predicated on out-of-cell time, the analysis was performed and sketches created to develop a reduced USF requirement that would still allow for sufficient space for inmates to circulate and engage in routine in-cell activities safely and appropriately.   For example, the ACA space standard for a single cell is 80 total square feet, including 35 USF[28] ; this figure is based on an assumption that the inmate is confined to the single cell for many more hours per day than those housed in a multiple occupancy living space.[29] By contrast, the current ACA standard for multiple occupancy cells[30] requires a minimum of 25 USF per inmate. Although a lesser USF per person was used by ACA in the case of multiple occupancy cells, the fact that plumbing fixtures and desks are shared by the cell occupants still results in a significant amount of available space for in-cell activities such as exercise using that standard. In the case of this methodology, where out-of-cell time meets certain thresholds, an adjusted standard is applied in recognition of the economies of the shared space.   Therefore, in a mitigated scenario with adequate out-of-cell time, a *total* of 25 USF (as opposed to that amount per person) is proposed in double and multiple occupancy cells to allow for sufficient room for circulation, in-cell exercise, sitting at a writing surface and for personal hygiene needs.

Therefore, while a cell might provide a total of 35 USF, which under strict application of ACA standards would mean its capacity was only one, this approach says that two inmates can be safely and appropriately housed in that cell (using a total of 25 USF) *if* they are routinely and typically permitted access to out-of-cell activities for a certain number of hours a day.  In other words, out-of-cell mitigation would in effect expand the capacity of that cell from one to two inmates.

As stated above, the ACA standards require 25 unencumbered square feet per inmate in large multiple occupancy cells (those that are larger than a two-person cell) as well as in dormitories. In addition to the unencumbered square feet, the Working Group agreed that additional square feet per inmate be allocated in the calculations that accounts for the circulation area immediately adjacent to the inmate bunks and that provide direct access to these sleeping areas. Primary circulation corridors that access hygienic facilities, for example, were not included in these calculations.   To facilitate the calculations in a variety of dormitory configurations that exist throughout CDCR, a formula was developed that incorporated the unencumbered square footage, as well as the space occupied by the bunks, lockers and a writing surface. The diagram in Appendix 1 illustrates the calculations based on a typical dormitory configuration, which resulted in an ACA compliant calculation of 50 square feet per inmate.

Similar, to the approach taken with inmates housed in cells, a mitigation formula was developed for application in housing areas with large multiple occupancy cells and/or dormitories in which out-of-cell eligibility thresholds are achieved.   Appendix 2 is an illustration of how the calculations were performed for a dormitory where mitigation is achieved. The major difference between the ACA calculations and the mitigation formula is the unencumbered square foot per inmate. The

---

[28] ACA ACI-Standard 4-4133, revised August 2005.
[29] In fact for many years, ACA linked standard 4-4133 to be limited to those inmates who were confined for greater than 10 hours per day, including those inmates spending upwards of 23 hours per day in a cell where most daily living activities including eating, exercising and even programming would be occurring within the cell.
[30] ACA ACI-Standard 4-4132, revised January 2007.

Attorney-Client Work Product – Confidential

assumption is that a seven foot (7'-0") clearance between a pair of double bunks is sufficient to allow inmates from opposite bunks to perform a variety of physical actions when they are not in their bunks or in an adjacent day room area. These include sitting on the lower bunk, allowing two inmates to climb down from opposing bunks at the same time, or space to allow two inmates to exercise at the same time in the circulation spaces between the bunks. This translates into 14.2 unencumbered square feet per inmate. The total square feet per inmate, including the unencumbered square feet, bunks, lockers, a writing surface and adjacent circulation, is 37 square feet per inmate.[31]

The steps associated with the assessment of housing capacity are as follows:

1.    Identify classification of all housing spaces within a particular unit
2.    Exclude beds in temporary medical/mental health categories
3.    Exclude any non-traditional housing
4.    Measure dorm capacity and double/multiple occupancy cell capacity based on ACA's USF standard (25 s.f.) to determine ACA housing capacity
5.    Measure single cells based on ACA's 80 s.f./35 USF standard to determine ACA housing capacity
6.    Identify which housing areas and units, by classification, are eligible to be measured under the adjusted capacity due to the out-of-cell time mitigation standard for that classification category
7.    Quantify out-of-cell time access for eligible classifications
8.    Determine whether units are subject to special considerations as a result of lockdowns or modified programs
9.    Where a unit's occupants meet the out-of-cell mitigation standard, identify adjusted capacity (POC) by classification; if not, the ACA standard becomes the POC
10.   Apply any health care adjustments as required (see discussion to follow)

A number of special methodological considerations were identified before and after the Pilot Tests (see Chapter III). These important issues were fully discussed within the Working Group and with the Executive Team. The issues were as follows:

*Calculation of Reception Capacity*- Subsequent to the pilot studies, the Working Group decided that there should be one departure from the use of out-of-cell time as the sole mitigating factor for cell size in reception housing areas. Reception housing was determined to be not easily amenable to out-of-cell activities and, in many respects, excessive out-of-cell activity can be viewed as undesirable from a security and safety perspective given how little is known about inmates during this portion of their incarceration. As such, the Working Group determined that adopting a standard that aims to minimize the overall duration that inmates spend in this status was preferable and potentially more practical than focusing on the issue of how many hours a day these inmates

---

[31] Since this mitigation standard falls below the 25 square feet per occupant required by ACA/ACI 4-4132, an accreditation audit will likely make a finding of non-compliance with that standard. However, CDCR will have sufficient justification (as set forth in this report) to qualify for a waiver or to select this standard as one eligible for "Discretionary Compliance."

Attorney-Client Work Product – Confidential

can be out-of-cell.  The decision, made in concert with the leadership of DAI, was to strictly apply ACA housing standards for reception inmates unless the institution is able to move inmates out of reception status and into a permanent institutional placement within 30 days, in which case adjustments could be made to cell capacity so as to expand capacity beyond the actual ACA standard. This approach draws directly on ACA Standards that require the reception process be completed within 30 days after admission.[32]

*Measuring capacity of small cells-* The CDCR currently has more than 8,000 cells that are less than 55 square feet, including more than 2,800 cells that are less than 40 square feet. In most cases, these cells currently hold two inmates, even though they would not be large enough (using USF per ACA standards) for even one inmate.  These cells currently are used to house inmates in the following classifications: General Population, Administrative Segregation, and EOP's.

While use of these small cells is not acceptable in principle, the reality is that it is not practical to simply take them off line and remove them entirely from inclusion in CDCR's systemwide capacity. In this instance, this methodology would permit them to be used for *one inmate only*, even though they fall below the ACA standard and even where there is very limited out-of-cell time and no potential mitigation.

*Measurement of capacity in units subject to lockdowns or modified programs-* A difficult question arose during the field testing of the out-of-cell access instrument—how to calculate out-of-cell time when the unit is on lockdown or modified programming as a result of investigations of significant incidents,  post-investigation limited movement control mechanisms   or budgetary cutbacks respectively. Although only one prison (SVSP) was subject to such restrictions during the pilot tests, and the approach used there was to count out –of-cell activity as it currently existed due to the length of the limitations on movement. During the field tests at 33 sites, however, these circumstances were found at several prisons. The approach employed there was to focus on the duration of the out-of-cell limitations--when the restrictions had been imposed very recently (within the past few days), the out-of-cell activity schedule in place prior to the restrictions was used, while units that had been on restrictions for a longer time were evaluated based on the more limited out-of-cell activity schedule in place at the time of the field visit. In considering the results and evaluating the methodology after the pilot tests and field visits, P/BA and several members of the Working Group raised concerns about the need to better define and standardize the approach to evaluating out-of-cell activity in units subject to short-term or longer restrictions due to lockdowns or modified programs.

For purposes of calculating capacities for this Final Report and future capacity assessments, a decision was reached that a distinction be drawn between lockdowns and modified program and that the impact on capacity be determined differently.  *Lockdowns* should refer to the limited timeframe during which inmates are confined to their cells or bunks in order to allow for a criminal investigation to occur.  These investigations should normally require seven days or less to be completed, and units in this status during a capacity audit would be evaluated as if the "normal" schedule was in effect, i.e., out of cell time assessments for mitigation purposes would be

---

[32] ACA ACI-Standard 4-4287, revised January 2006.

measured based on the actual practice and documentation in place prior to the lockdown. *Modified program*, in contrast, would refer to restrictions placed on inmate out of cell activity and movement imposed for operational reasons such as security concerns and post-investigation separations of inmate subgroups or due to budget restrictions, staffing reductions, etc. Modified program is a program change that typically is of a significant duration, and thus out of cell time assessments for inmate housing units on modified program status would be determined by the out of cell activity levels observed and documented during the actual timeframe of the capacity assessment.

*Calculation of capacity in 270 degree dormitories*- Subsequent to the pilot studies a modification was made relative to the calculation of the 25 unencumbered square foot per inmate in dormitories, specifically those in the 270 degree configuration.  In the case of a 270 degree dormitory, the tier space in front of the pony walls is included in the calculations, which has the effect of increasing the capacity of those areas.

*Inclusion of a factor for operational flexibility*- The Working Group determined that there was a need to incorporate into the POC a factor for "operational flexibility" to reflect the reality and accepted correctional practice that every bed cannot and should not be filled at all times.  This is due to a variety of factors, including: the classifications and behavior profiles of inmates do not match perfectly with bed inventory or cell-mate compatibility; cells will occasionally be unusable due to maintenance reasons; and, because some bed space must be reserved to accommodate peaks in population levels.  As such, a 5% operational flexibility factor[33] was applied to all general population celled and multiple occupancy celled housing units *that achieve maximum mitigation*. The 5% factor was also applied to any housing units where mitigation is not feasible yet where the strict application of the ACA standards would result in 100 % double occupancy, resulting in a scenario where no beds would be available for operational flexibility.[34]   The 5% factor was <u>not</u> applied to POC for housing units that did not achieve maximum mitigation, nor was it applied in dormitories because of the potential availability of sufficient second bunks to provide the necessary flexibility.

**Mitigation Matrix**

The "CDCR Housing Capacity Standards and Mitigation Matrix."  appears on the following page. This Matrix provides the essential criterion that is applied to determine both the ACA housing capacity and the Prison Operational Capacity for each classification and inmate sub-grouping, including:

---

[33] CDCR's current policy is to use a 5% vacancy/operational flexibility factor for celled general population housing, with no factor for dorms and program-specific figures for unique populations such as Security Housing Unit, Administrative Segregation Unit, and Enhanced Outpatient Program.

[34] For example, this situation arises primarily in the 180-design celled housing units where ACA capacity, due to the larger cell size, would allow for all cells to house two inmates in conformance with the ACA 25 square foot/inmate unencumbered square footage standard.  Accordingly this would result in a maximum capacity of 256 inmates in a typical "180" housing unit that has 128 cells.  Therefore, applying the 5 % Operational Flexibility factor in this scenario would result in housing a maximum of 243 inmates, leaving 13 available beds for operational flexibility.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

FINAL REPORT – OCTOBER 3, 2011

- All current CDCR  housing assignment categories that are included in the capacity calculations
- Applicable ACA space standard for each housing type (except for reception where it is a duration in status driven standard)
- The required number of hours of out-of-cell time required for mitigation eligibility
- The adjusted space standard applied when mitigation eligibility is satisfied

It is worth noting that a number of the housing assignment categories have a N/A shown in the columns designating the number of hours of out-of-cell activity necessary for mitigation and the corresponding column identifying the adjusted space standard.  As has been pointed out previously, certain housing categories are not eligible for this mitigation for a variety of reasons as follows:

- Requirements for space and programming for Mental Health housing operated by the Department of Mental Health (DMH) is governed by and licensed pursuant to Title 22;

- Housing categories including Administrative Segregation and Behavior Modification  are not subject to mitigation because of the inherent limits on out-of-cell time that cannot reasonably be increased to a point that it would be significant enough to qualify for mitigation;

- Housing categories including condemned housing, Psychiatric Services Unit (PSU) and Secure Housing Unit (SHU) must be single celled so additional out-of-cell time will not lead to adding a second inmate to the cell;

- The capacity of Camp program beds is driven not by square footage but rather by programmatic requirements established for fire fighting.

We must reiterate that ineligibility for mitigation does not suggest that out-of-cell opportunities are unnecessary or should not be maximized for inmates in that category based on programmatic and security considerations. It only means that, regardless of out-of-cell activity, additional inmates should not be added to a living area beyond what would be permitted under ACA standards or CDCR policy.

It is also noteworthy that two populations, EOPs and Administrative Segregation inmates (those housed in 180 design units), are subject to a policy derived cap of 50% double celling.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

| Table 2-2: CDCR Housing Capacity Standards and Potential Mitigation Matrix | | | | | |
|---|---|---|---|---|---|
| **CLASSIFICATION** | **Short hand** | **CURRENT CDCR HOUSING TYPE (Typical)** | **ACA HOUSING TYPE** | **ACA Standard** | **# HOURS OUT OF CELL FOR MITIGATION ADJUSTMENT** | **Adjusted Space Standard** |
| Acute Psychiatric Program (DMH) | APP | Single cell | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| Administrative Segregation Unit | ASU | Single cell | Special Management Single (ACI: 4-4131) | 35 USF/occupant | N/A | N/A* |
| | ASU | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | N/A | N/A* |
| Behavior Modification Unit | BMU | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | N/A | N/A |
| Camp Program Beds | CMP | Dorm | Dorm (ACI: 4-4132) | N/A (per program need) | N/A | N/A |
| Condemned Housing | DR | Single Cell | Special Management Single (ACI: 4-4133) | 35 USF/occupant | N/A | N/A |
| Enhanced Outpatient Program | EOP | Double Cell | Double cell (ACI: 4-4132) | 25 USF / occupant | 11,13 or 14 depending on custody level | 25 USF/cell* |
| | EOP | Multiple Occup. Cell | Mult. Occup. (ACI: 4-4132) | 25 USF/ occupant (50 total sf/occupant) | 11,13 or 14 depending on custody level | 37 SF/person* |
| LI-GP | LI-GP | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 14 | 25 USF/cell |
| | LI-GP | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant (50 total sf/occupant) | 14 | 37 SF/person |
| LII-GP | LII-GP | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 14 | 25 USF/cell |
| | LII-GP | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant (50 total sf/occupant) | 14 | 37 SF/person |
| LIII-GP | LIII-GP | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 13 | 25 USF/cell |
| LIV-GP | LIV-GP | Double cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11 | 25 USF/cell |
| Intermediate Care Facility (DMH) | ICF | Single cell | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| | ICF | Double cell | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| | ICF | Dorm | Licensed Under Title 22 | Licensed Under Title 22 | N/A | N/A |
| Protective Housing Unit | PHU | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11,13 or 14 depending on custody level | 25 USF/cell |
| Psychiatric Services Unit | PSU | Single Cell | Special Management Single (ACI: 4-4133) | 35 USF/occupant | N/A | N/A |
| Reception | RC | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | <30 days | 25 USF/cell |
| | RC | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant (50 total sf/occupant) | <30 days | 37 SF/person |
| Substance Abuse Treatment Unit | SATU | Multiple Occup. Cell | Mult. Occup. (ACI: 4-4132) | 25 USF/ occupant | 11,13 or 14 depending on custody level | 37 SF/person |
| Secure Housing Unit | SHU | Single Cell | Special Management Single (ACI: 4-4133) | 35 USF/occupant | N/A | N/A |
| Transitional Housing Unit | THU | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11 | 25 USF/cell |
| Women | W | Double Cell | Double cell (ACI: 4-4132) | 25 USF/occupant | 11,13 or 14 depending on custody level | 25 USF/cell |
| | W | Dorm | Dorm (ACI: 4-4132) | 25 USF/ occupant (50 total sf/occupant) | 11,13 or 14 depending on custody level | 37 SF/person |
| | W | Multiple Occup. Cell | Mult. Occup. (ACI: 4-4132) | 25 USF/occupant | 11,13 or 14 depending on custody level | 37 SF/person |

* No more than 50% of cells can be double cells

Attorney-Client Work Product – Confidential

**Prison Health Care Capacity Adjustments (PHCC)**

ACA's approach to capacity is predicated solely on housing space.  While the CDCR capacity methodology reflects that approach in the first instance, the new methodology takes into account the *Plata* and *Coleman*[35] cases and the concerns that have been articulated by the courts relative to facility capacity and how it affects the delivery of healthcare services.  Healthcare capacity is integrated here in several different contexts.

First, participation in medical and mental health activities is considered an out-of-cell activity for purposes of mitigation in the housing capacity analysis.  Second, designated housing spaces for specialized medical and mental health offenders/patients are included as categories of housing and subject to a mitigation analysis. And third, access to health care will be considered an overriding capacity driver that can potentially limit housing capacity.  In other words, once the Prison Operational Capacity (POC) is calculated, the issue then becomes whether the *existing* health care resources are sufficient to provide the required access for the proposed capacity. Health care capacity would be based on <u>current</u> space, staffing and availability of services and measured using access to medical and mental health care data currently measured and produced by the Health Care Receiver.[36]

While there are limitations to the data contained in the Health Care Receiver's Monthly Healthcare Access data, nevertheless this data has been determined to be useful by the courts and the Office of Inspector General as long as the limitations to it are acknowledged, namely:

- The Receiver's data measures that an inmate arrived to a scheduled appointment; it does not measure ordered treatment that has not been scheduled.
- The access to care data collection methodology is inconsistent across CDCR in that some facilities ducat only scheduled appointments while others also include treatment that occurs within the housing unit.
- The Mental Health Tracking System, developed by CDCR, no longer captures access to care for individual mental health populations such as EOP or CCCMS.

Formulas were developed to calculate if and how much the access to care data will affect the POC if current healthcare resources (space, staffing, etc.) remain in place. The formulas include medical and mental health care access.

Once measured and the formula applied, if the health care resources and access to care data showed that resources are sufficient for the prison's current population/capacity, then it will be deemed likewise sufficient for a reduced capacity if that is the result of the new POC capacity calculation.  If it is lower, then downward adjustments would be made to the POC only *in those areas and classifications where the access to care is insufficient.*

---

[35] The working group took the position that the *Perez* case, addressing dental care, does not impact on overall capacity or is not impacted by capacity in a manner that is directly measurable or sufficiently direct as to become an overall capacity driver.

[36] Monthly Health Care Access Quality Report, a report published by the Health Care Receiver on health care access for medical, mental health, diagnostic/specialty services and dental services.

Attorney-Client Work Product – Confidential

The Working Group, with the advice of P/BA, determined that using 80% and above (moderate adherence) as an acceptable level of access to care; any percentage below this was considered unacceptable. Typically, the methodology required an average of three months of the Receiver's data (March through May 2011) to avoid making a determination based on an atypical one month percentage for that facility. If the percentages for that time period were considered unacceptable, further inquiries were made to determine the reason.

The calculation of current healthcare capacity in each facility included separate measures for medical and mental health care. To measure impact on the POC, it was important to identify the specific populations that are assigned to specific housing types or services.

## Healthcare Calculation If Applicable will be an Adjustment

The calculation is based on a proportional change equal to the proportion of the beds for that particular population. Therefore, if all inmates including those who are in designated medical or mental health beds receive ducats to go to sick call, then 100% of the occupancy of the facility was included in access to medical care with a focus on sick call. However if only a portion of the population is expected to have a particular access to care, and there are designated beds for that population, then access to that care was based only on the designated beds for that population or population specific capacity. Therefore, if there is an impact on the operational capacity it is likely to require adjustments of particular types of beds, not the entire population of the facility.

## Healthcare Calculations

Four separate calculation formulas were developed to address the access to health care for those inmate population groups in the prison system that could affect the final POC based on the capacity methodology:

- access to sick call for inmates housed in the general population;

- access to mental health care for CCCMS for those inmates receiving outpatient mental health care who are housed in general population;

- access to mental health care for EOP population, a specialized housing area of general population;

- access to care when there is overlap between medical and mental health care such as sick call and mental health care.

A decision tree was developed for each of the calculations,[37] including two calculations that address when there is an overlap between medical and mental health populations (such as sick call and CCCMS) to address any duplication.[38]

---

[37] See Appendices 4-9.
[38] See Appendices 10-11.

Attorney-Client Work Product – Confidential

Before applying any calculation, the Receiver's access to care statistics for a designated three month period are averaged to determine medical and mental health access to care statistics for each facility.

If the access to either medical or mental healthcare statistic is below the 80% threshold, the appropriate calculation for each population is then performed to assess whether there is a healthcare impact on the POC.

For each calculation, the essential question is whether the averaged percentage is 80% or above. If it is, there will be no impact on the POC. However, if the average is below 80%, further analysis of the Receiver's data is required to determine if the reason that access to care is below the acceptable percentage is due to custody issues, healthcare provider issues, other issues or a combination thereof.

A distinction must be drawn between the one population that has designated beds, i.e., EOP, and CCCMS that do not have designated beds but rather are simply a component of general population or other specialized housing categories. In keeping with the overall healthcare methodology, the premise is that if there is a reduced density of CCCMS, the existing staff will be better positioned to provide the necessary access to care for this population.  As such, a reduction in the POC will presumably serve as a means to increase access to care for this population beyond the 80% threshold.

# III.  PILOT TESTS

Attorney-Client Work Product – Confidential

# III. Pilot Tests

Once there was general agreement concerning the new methodology to be employed for measuring institutional capacity, the Working Group decided that a series of pilot field surveys should be used to test the efficacy of the methodology. These pilot tests would allow for the identification of potential flaws in the process as well as offer an opportunity to test the instruments that would be used and set the stage for the full implementation of the methodology at all 33 institutions.

Six prisons were selected, comprising a sample of approximately 20% of all institutions. The sites were selected to satisfy several criteria, including representing different architectural styles, both male and female facilities, degrees of specialized healthcare environments, ranges of custody levels, and different facility sizes. The six prisons selected for the pilot tests were:

- Mule Creek
- Salinas Valley
- Duel Vocational Institute
- CCWF
- Avenal
- California Medical Facility

Prior to initiating the field tests, substantial preparation work was undertaken, including developing out-of-cell questionnaires and survey forms, collecting all available architectural plans for the subject prisons, and compiling advance measurements of dorms and cell areas from the plans so that the field component would serve as field verification. Wardens of the six prisons were notified that survey teams would be visiting and out-of-cell questionnaires were submitted ahead of time to allow for a degree of preparation by the prisons in advance of the actual site visit. Wardens were requested to have their executive teams available for an introductory meeting and to assign the necessary number of escorts to accommodate the survey teams.

The field tests were conducted jointly by representatives of the Working Group and P/BA staff in October and November 2010. The pilot teams were divided into two groups, with one group focusing on physical plant measurements and verifications and the other for interviews and data collections relative to out-of-cell activity and potential mitigation. Two to three days were allotted for each field visit, although it became apparent that longer periods would be required for certain prisons where there are numerous housing types and diverse inmate populations such as at CMF; in fact, pilot teams returned to CMF after the initial site visit to obtain additional information required to complete the pilot surveys.

All field tests began with a meeting with the warden and the executive team. A representative of the pilot team, a person with decades of line and top level operations experience, led the briefing which explained the purposes of the pilot tests, the activities that would occur, the locations to be visited, how prison staff would be affected by the survey work and what was required from officers assigned as escorts.

The "physical plant team," consisting of a P/BA representative, at least one Working Group/CDCR architect and typically accompanied by a representative of the prison's maintenance/physical plant staff,  visited all housing areas to measure typical cells and dormitories and to validate information contained on architectural plans. The team also visited healthcare areas to review existing clinical and support spaces. (see discussion below)The "out-of-cell team," also comprised of a P/BA representative and two or more Working Group/CDCR operations representatives visited all housing areas that could potentially be eligible for mitigation due to out-of-cell activity time pursuant to the Capacity Methodology Matrix. The out-of-cell team interviewed unit officers (2nd and 3rd shift officers who had been assigned to that post and watch tour for at least 30 days) at their posts or in supervisor's offices when relief was available.  The team reviewed the responses to questionnaires that had been submitted ahead of the filed visit, explained the objectives of the pilot tests, and queried the officers about a myriad of issues concerning out-of-cell activity and opportunities in that unit.  The team did not rely exclusively on representations made by the officers and while in the unit, the team reviewed or requested secondary documentation of out-of-cell time, including:

- Log books
- Inmate assignment rosters
- Post orders
- Movement sheets
- Ducat lists
- Unit schedules
- Institutional schedules
- Program schedules
- Daily activity reports
- Inmate orientation manuals
- Group treatment schedules
- Master population count reports
- Architectural plans of all housing units

Salinas Valley State Prison (SVSP) was the only pilot test site prison with units on lockdown status or on a restricted modified program.  Interviews determined both the current out-of-cell activities as well as what the unit schedule was before the lockdown/program modification was implemented. Because SVSP's lockdowns/program modifications had all been in place for several months, the out-of-cell time assessment was based on the program at the time of the site visit, i.e., very limited out-of-cell time, which was below the mitigation threshold.

Inquiries about access to medical and mental healthcare services were made at each pilot site. Of particular interest was which healthcare activities were ducated and which were not. The ducat lists are an important driver of the Receiver's data collection process. All health care areas were toured; clinicians and officers were interviewed about access to care, waiting lists, scheduling processes, barriers to inmate access to care, and improvements in access to care within the last year.  Health care spaces were reviewed with attention to whether healthcare spaces were adequate for the number of inmates; whether healthcare space was being used for its original intent (healthcare spaces being used to provide healthcare services) and whether the healthcare spaces in use had

Attorney-Client Work Product – Confidential

been converted from space that had been designed for other purposes (such as program space, offices, closets, storage) but were now being used to provide healthcare services. While on-site, the field team collected schedules of medical and mental health care services and treatment programs, and lists of scheduled appointments and where available the most recent access to care data for that facility.

Following the field tests, numerous activities were conducted by the Working Group, in concert with P/BA, including initiation of an internal quality assurance process to review the validity of the data collected.[39] Once there was confidence in the validity of the data, the Working Group:

- Developed accurate CAD drawings for square footage data
- Calculated out-of-cell time based on primary and secondary documentation
- Calculated ACA capacities
- Calculated adjusted capacities (where applicable) based on mitigation criteria and healthcare adjustments

With respect to the health care adjustments, P/BA relied on the Receiver's access to medical and mental health care data for August, September and October (the most recent available) and calculated each facility's mean access to care percentages. All six facilities were above the 80% threshold for medical care. Only one, SVSP, was below the threshold for mental health care at an average of 70%. When applying the healthcare adjustment to the proposed POC for EOP beds, it was determined that a further reduction of 26 EOP beds would be necessary to increase the access to care to the 80% threshold.

**Table 3-1: Receiver's Access to Care Data Applied to Pilot Tests**

| Prison | | ASP | CCWF | CMF | DVI | MCSP | SVSP | |
|---|---|---|---|---|---|---|---|---|
| **Medical** | | | | | | | | |
| | *Aug-10* | 90 | 94 | 96 | 91 | 98 | 88 | |
| | *Sep-10* | 90 | 90 | 94 | 91 | 98 | 89 | |
| | *Oct-10* | 89 | 94 | 97 | 92 | 98 | 88 | |
| | **Avg.** | 89.7 | 92.7 | 95.7 | 91.3 | 98.0 | 88.3 | |
| | | | | | | | | |
| **Mental Health** | | | | | | | | |
| | *Aug-10* | 88 | 86 | 97 | 97 | 91 | 72 | |
| | *Sep-10* | 88 | 88 | 95 | 97 | 94 | 67 | |
| | *Oct-10* | 87 | 87 | 93 | 96 | 91 | 71 | |
| | **Avg.** | 87.7 | 87.0 | 95.0 | 96.7 | 92.0 | 70.0 | |

---

[39] This quality assurance effort was significantly expanded during the actual field survey of 33 institutions. See Chapter IV for additional details in this regard.

Attorney-Client Work Product – Confidential

**Lessons Learned**

In addition to compiling the actual results of the pilot tests, the Working Group and P/BA used the pilot test process as a means of identifying lessons learned to be applied when the process was to be extended to all 33 institutions. Accordingly, a report was prepared by the Working Group and P/BA in December 2010 describing the results of the pilot tests and recommendations concerning any refinements that were required to enhance the methodology. The report was then presented to Secretary Cate and the executive staff showing the results of the capacity analyses for the five[40] pilot sites. It is also noteworthy that the preliminary findings as to mitigation for eligible categories of inmates and respective housing areas were based on an across the board threshold of ten hours for all eligible categories; this was because information from the ASCA surveys was still pending.

At the conclusion of the presentation, Secretary Cate asked the Working Group to identify what the potential Prison Operational Capacity would be for the six pilot prisons if all eligible out-of-cell mitigation could be realized. In other words, while the pilot effort identified the current POC based on existing mitigation practices (i.e., "what is"), the inquiry asked "what if" out-of-cell activities for eligible inmate classifications could be maximized in conformance with the mitigation matrix methodology and the capacity thereby fully realized. This theoretical construct was referred to as Potential Prison Operating Capacity (PPOC).

The Working Group and P/BA were also directed to establish unique out-of-cell mitigation thresholds for each of three primary custody levels, with fewer hours required for higher custody levels and more for lower ones, once the ASCA survey was finalized.[41]

In its efforts to calculate a PPOC for the six pilot institutions, the Working Group determined that there was a need to incorporate into the POC a factor for "operational flexibility" to reflect the reality and accepted correctional practice that every bed cannot and should not be filled at all times. This was due to a variety of factors, including: the classifications and behavior profiles of inmates do not match perfectly with bed inventory or cell-mate compatibility; cells occasionally are unusable due to maintenance reasons; and, because some bed space must be reserved to accommodate peaks in population levels. As such, the 5% factor was to be applied to any housing units where mitigation is not feasible yet where the strict application of the ACA standards would result in 100% double occupancy, resulting in a scenario where no beds would be available for operational flexibility (Prison Operational Capacity). For example, this situation arises primarily in the 180-design celled housing units where ACA capacity, due to the larger cell size, would allow for all cells to house two inmates in conformance with the ACA 25 square foot/inmate unencumbered square footage standard. There would be no mitigation possible because the cell already meets ACA standards for double capacity. Accordingly this would result in a maximum capacity of 256 inmates in a typical "180" that has 128 cells. Therefore, applying the 5% Operational Flexibility factor in this scenario would result in housing a maximum of 243 inmates, leaving 13 available beds for operational flexibility.

---

[40] Data for the California Medical Facility (CMF), the sixth pilot site, was not complete at that time.
[41] Based on the ASCA survey data, the methodology established the following custody-specific mitigation thresholds for out-of-cell time: 11 hours for maximum (Level IV), 13 hours for medium (Level III), and 14 hours for minimum (Level I and Level II)

Attorney-Client Work Product – Confidential

The Potential Prison Operational Capacity reflects the highest possible capacity attainable if CDCR were to achieve full mitigation for eligible populations in every unit within a prison.  For the same reasons expressed above, the Working Group decided that an operational flexibility factor would also need to be included in any PPOC calculation.  (Note: the 5% factor was <u>not</u> applied to POC or PPOC for housing units that did not achieve maximum mitigation or to housing units not subject to mitigation).  The summary table on the following page includes each of the capacity figures for the six pilot prisons, including the 5% operational factor where applicable.

Additional lessons learned fell into two groups: process changes and methodology changes. Process changes included:

- Consistency of field survey teams was essential to obtaining valid data
- Information obtained via interviews had to be verified through multiple forms of secondary data and documentation
- Consistent scripts and verbal instructions were necessary for interviews with line and supervisory institutional staff participating in the field surveys
- More time had to be budgeted for field surveys of larger and more complex prisons
- Adequate preparation time had to provided before the field surveys, and sufficient debriefing time after the field work was completed
- The six pilot prison sites needed to be reassessed along with the remaining 27 due to changes in methodology and processes.

Methodology changes included the following items, previously discussed in Chapter II:

- *Calculation of Reception Capacity*

- *Measurement of capacity in units subject to lockdowns or modified programs*

- *Calculation of capacity in 270 degree dormitories*

Attorney-Client Work Product – Confidential

### Table 3-2: Pilot Capacity Analysis Summary Table

| Prison Acronym | Census (# inmates) on Day of Field Review | CDCR's Existing Design Capacity | CDCR's Existing Overcrowd. Capacity | ACA Capacity | Current Prison Operational Capacity (POC) | Current Prison Operational Capacity w/ 5% Operational Flexibility | Potential Prison Operational Capacity w/ 5% Operational Flexibility | Bed Differential Design Capacity vs. PPOC w/ 5% Operational Flexibility |
|---|---|---|---|---|---|---|---|---|
| MCSP | 3,742 | 1,700 | 3,138 | 1,797 | 1,909 | 1,888 | 3,138 | 1,438 |
| SVSP | 3,734 | 2,452 | 4,400 | 3,148 | 3,250 | 3,230 | 4,130 | 1,678 |
| DVI | 3,829 | 1,673 | 3,037 | 1,738 | 1,867 | 1,846 | 2,675 | 1,002 |
| CCWF | 3,810 | 2,004 | 3,921 | 2,002 | 2,002 | 2,002 | 2,472 | 468 |
| ASP | 6,113 | 2,920 | 5,776 | 3,225 | 4,413 | 4,197 | 4,197 | 1,277 |
| CMF | 2,575 | 2,297 | 3,680 | 2,430 | 2,580 | 2,551 | 3,050 | 753 |
| Totals | 23,803 | 13,046 | 23,952 | 14,340 | 16,021 | 15,714 | 19,662 | 6,616 |

Column headings are as follows:

Column 1: Prison Acronym – The six pilot institutions surveyed.

Column 2: Census (# Inmates) on Day of Field Review – The number of inmates at the prison on the first date the field review was conducted for each of the six pilot prisons.

Column 3: CDCR's Existing Design Capacity – For celled housing, one person per cell, regardless of the size of the cell.  Per CDCR's Design and Policy Construction Guidelines, the minimum cell size is 80 square feet for new construction; CDCR's existing design capacity for dormitory housing is a single bed on the floor and, for new construction, 25 square feet of unencumbered floor space per occupant.

Column 4: CDCR's Existing Overcrowding Capacity – By policy, CDCR's existing prison capacity is derived by applying CDCR's standard overcrowding rates against design capacity.  The standard overcrowding rate is 190% for celled general population housing and 200% for dormitories.  Unique overcrowding rates also exist for various programs, housing types, and inmate populations.

Column 5: ACA Capacity – The calculated capacity based on the methodology as defined in standards 4-4129, 4-4132, 4-4133 and 4-4141 for Standards Compliant Bed Capacity (2010 *Standards Supplement, Adult Correctional Institutions*, 4th edition).

Column 6: Current Prison Operational Capacity (POC) – The calculated POC is the capacity based on application of the ACA standards coupled with mitigation variables for out-of-cell time for eligible inmate populations and inclusive of operational flexibility on the date the field review was conducted for each of the six pilot prisons.

Column 7: Current Prison Operational Capacity (POC) with 5% Operational Flexibility – The POC inclusive of a 5% factor for operational flexibility.

Column 8: Potential Prison Operational Capacity (PPOC) with 5% Operational Flexibility – The PPOC inclusive of a 5% factor for operational flexibility. The calculated PPOC is the capacity figure that would reflect the maximum possible mitigation adjustments for out-of-cell time and inclusive of operational flexibility.

Column 9: Bed Differential of Design Capacity vs. PPOC with 5% Operational Flexibility.

Attorney-Client Work Product – Confidential          **FINAL REPORT – OCTOBER 3, 2011**

# IV. SYSTEMWIDE APPLICATION

Attorney-Client Work Product – Confidential

# IV. Systemwide Application

**The Process**

In December 2010, with the pilot test process complete and numerous lessons learned and methodological refinements made, the Secretary authorized the Working Group to commence with the capacity review at all 33 institutions. The field work was slated to begin in February 2011 with a June deadline established for a Final Report.

It was determined that staff of the Division of Adult Institutions (DAI) would take the lead on collection of out-of-cell information, while CDCR architectural staff assigned to the Working Group would continue to conduct the work associated with field measurements and confirmations relative to cell and dormitory sizes and occupancies. Members of the Working Group who led efforts to measure out-of-cell time during the six pilots were assigned to train DAI staff who would be conducting the extensive field work. This training not only focused on describing the activities that needed to occur at all institutions, but was intended to insure consistency of methods employed among and between teams in the field.

Between February and May, teams moved across the state to conduct capacity evaluation data collection. Four teams of DAI personnel completed site evaluations at seven prisons, while one team completed five institutions.  Working Group representatives attended the initial field visits to continue the training process and then turned the work over completely to DAI teams.

The out-of-cell time information collection phase entailed site visits to each institution, collection of prison program information, collection of out-of-cell time data for each housing unit within the institutions, and collection of information on cell or dormitory conversions to accommodate disability placement program/disability placement wheelchair (DPP/DPW) inmates, mental health observation functions, or other uses such as office space, conference rooms, storage, etc.

At the conclusion of each site evaluation, the teams returned to their assigned prisons to evaluate the data collected and to transpose the out-of-cell time data into the OOC calculation worksheets. Once completed, the worksheets were submitted, along with all supporting documents to members of the Working Group who were charged with conducting the quality assurance process (see the description of this process below).

**Quality Assurance Program**

A vitally important component of the process was the establishment and implementation of a quality assurance process for data collected in the field.  The Working Group was fully cognizant of the fact that the information that would be generated about capacity would only be as good as the quality of the underlying data. As such, a process of reviewing the data collected from the field and the preliminary calculation performed by the DAI staff was established.

The CDCR architect assigned to the Working Group reviewed all architectural plans and dimensions received from the field, verifying the information and measurements.  The quality assurance process revealed many discrepancies between plans and actual field conditions, even

Attorney-Client Work Product – Confidential

among facilities that were allegedly identical. Valid information was crucial to the calculation of cell sizes, dormitories and establishing mitigated occupancies for eligible classifications. Additionally, this process resulted in creating an extraordinary data base of all the prisons surveyed as housing floor plans were accurately documented and dimensioned on CADD.

Members of the Working Group used the QA Checklists[42] to validate the field visit team calculations and supporting documentation. Conference calls were then conducted with each team to address discrepancies and areas requiring recalculation or follow-ups, after which documents were returned to the teams to make the necessary corrections. As each team completed their site evaluations, they met with the Working Group's QA leaders to finalize the QA process, which included a peer review process.

The quality assurance phase for out-of-cell data collection included the following tasks:

- Validating that all supporting documents for each institution were collected and available.

- Validating that all OOC worksheets and OOC calculation worksheets were completed and available.

- Completing a quality review of the OOC worksheets and OOC calculation worksheets.

- Comparing the data collected at the housing unit level with the institutions' inmate assignment rosters.

- Comparing the cell conversion information collected during the institution site visits with the building design information provided by the institutions' plant operations departments.

- Finalizing the OOC time calculations for each housing unit by inmate classification groups, program groups, release/recall times and meal/recreation functions.

- Validating the average number of OOC hours per inmate for each housing unit within each institution.

- Crosschecking the number of inmates listed on the housing unit OOC worksheets against the inmate assignment rosters to ensure that the number of inmates listed on the OOC calculation worksheet by classification category and program group was accurate.

- Crosschecking all release/recall times listed on the housing unit OOC worksheets with meal, recreation, and inmate assignment release/recall schedules to validate all OOC time calculations documented on the OOC time calculation worksheets.

An important component of this quality assurance process was that copious notes were taken to document all reviews of data, calculations that were returned to field reviewers for corrections or

---

[42] See Appendix 12.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

recalculations and all data validation steps and associated documentation were preserved for the record during this process.

**Findings**

Once the quality assurance process was completed, members of the Working Group initiated the painstaking work of applying the methodology to calculate the ACA capacity, POC and PPOC for each of the 33 CDCR institutions. This process occurred during July through August 2011. CDCR staff collected, organized and analyzed all of facility data and determined the three capacity calculations for each housing unit of every institution and provided this information to P/BA. P/BA provided overview support for the quality assurance process and identified areas for which further inquiry or analysis was necessary. Once the POC's were finalized, P/BA then reviewed the corresponding access to care data for each institution to determine whether any healthcare adjustments to the POC were necessary for any prison with medical and/or mental health access to care falling below the acceptable threshold of 80% during the three month period of March through May, 2010.

In fact, only two prisons presented possible capacity adjustments due to sub-par access to care statistics—SVSP and Corcoran- and in both only access to mental health care were concerns. In both cases POC related capacity reductions already resulted in a revised capacity below the adjustment required to meet the 80% access to care threshold. At SVSP, the three month average access to mental health care was very low at 57.3% requiring a 22.7% reduction in EOP beds to meet the 80% threshold; however, the POC reduction was 72 beds or a 30.7% reduction. Therefore no further reduction was necessary to meet the access to care threshold.

An important caveat is necessary as it concerns the use of this data. Specifically, the capacity calculations prepared in this report have not considered the quality and condition of current housing areas in the prisons. While a substantial portion of CDCR's bed inventory is relatively new and in reasonable condition, there are also housing areas that are substandard. This could affect future POC or PPOC calculations and therefore should be further evaluated for during the next phase of the capacity planning project.

Table 4-1 below presents the results of the three types of capacity calculations for all 33 prisons.[43] It reveals that, based on the initial application of the new capacity methodology, the systemwide Prison Operating Capacity is currently 103,570. It also suggests that if full out-of-cell mitigation could be achieved systemwide, the PPOC could be as high as 128,700. While we recognize that this PPOC number exceeds the capacity of 109,519 beds in the *Plata* decision, it nonetheless serves to illustrate that CDCR can, by increasing out-of-cell activity, increase the current calculated POC at least as high as the systemwide population cap via application of this new methodology at all or selected CDCR prisons. Note that all three capacity figures above exclude 4,480 beds in off-site fire camps because the *Plata* decision did not address these beds.

---

[43] Summary calculation sheets for each of 33 prisons appear in Appendix 15.

Attorney-Client Work Product – Confidential

## Table 4-1: Summary of Capacity Analysis

| Prison | ACA | POC | PPOC | Health Care Adjustment |
|--------|-----|-----|------|------------------------|
| CIW | 997 | 1,668 | 1,767 | 0 |
| CCWF | 1,999 | 1,996 | 2,558 | 0 |
| VSPW | 2,068 | 2,056 | 2,562 | 0 |
| **Female Sub Total** | **5,064** | **5,720** | **6,887** | **0** |
| CIM | 3,399 | 3,713 | 4,553 | 0 |
| SQ | 3,249 | 3,501 | 3,501 | 0 |
| DVI | 1,743 | 1,868 | 2,683 | 0 |
| RJD | 2,220 | 2,282 | 3,782 | 0 |
| NKSP | 2,984 | 3,094 | 4,899 | 0 |
| WSP | 3,431 | 3,540 | 5,507 | 0 |
| LAC | 2,392 | 2,494 | 4,034 | 0 |
| CCI | 2,838 | 3,326 | 3,776 | 0 |
| COR | 4,391 | 4,139 | 5,269 | 0 |
| SAC | 3,412 | 2,957 | 2,957 | 0 |
| HDSP | 3,434 | 3,379 | 4,279 | 0 |
| KVSP | 4,576 | 4,352 | 4,352 | 0 |
| PBSP | 3,384 | 3,275 | 3,275 | 0 |
| SVSP | 3,287 | 3,180 | 4,080 | 0 |
| CMF | 2,400 | 2,571 | 2,933 | 0 |
| CMC | 4,268 | 4,895 | 4,895 | 0 |
| SATF | 4,044 | 4,536 | 5,390 | 0 |
| CAL | 2,400 | 2,506 | 4,216 | 0 |
| CEN | 2,361 | 2,452 | 4,162 | 0 |
| MCSP | 1,796 | 1,909 | 3,039 | 0 |
| PVSP | 2,365 | 2,452 | 4,162 | 0 |
| ASP | 4,147 | 5,769 | 5,769 | 0 |
| CCC | 1,870 | 2,330 | 2,690 | 0 |
| CRC | 3,819 | 5,233 | 5,243 | 0 |
| SOL | 3,264 | 4,023 | 4,923 | 0 |
| CVSP | 2,531 | 3,428 | 3,428 | 0 |
| CTF | 3,553 | 3,886 | 4,998 | 0 |
| FSP | 2,132 | 2,244 | 2,532 | 0 |
| ISP | 2,286 | 2,386 | 4,096 | 0 |
| SCC | 1,651 | 2,030 | 2,390 | 0 |
| **Male Sub Total** | **89,627** | **97,750** | **121,813** | **-** |
| **Institution Sub Total** | **94,691** | **103,470** | **128,700** | **-** |
| | | | | |
| **Off Site Camps\*** | | | | |
| CIW | 320 | 320 | 320 | 0 |
| CCC | 2,150 | 2,150 | 2,150 | 0 |
| SCC | 2,010 | 2,010 | 2,010 | 0 |
| **Camps Sub Total** | **4,480** | **4,480** | **4,480** | |
| | | | | |
| **Grand Total** | **99,171** | **107,950** | **133,180** | |

---

Pulitzer/Bogard & Associates, LLC

Table 4-2 below illustrates how the three calculated capacity figures-ACA, POC, and PPOC- compare with the existing CDCR's Design Capacity, the systemwide cap (137.5% of design capacity) and the Department's current "overcrowding capacity."

## Table 4-2: Summary of Capacity Analysis – Other Capacities

| Prison | DC | 137.5% of DC | OC | ACA | POC | PPOC | PPOC / DC (%) |
|--------|-----|-----|-----|-----|-----|-----|-----|
| CIW | 1,036 | 1,425 | 2,012 | 997 | 1,668 | 1,767 | 171% |
| CCWF | 2,004 | 2,756 | 3,921 | 1,999 | 1,996 | 2,558 | 128% |
| VSPW | 1,980 | 2,723 | 3,897 | 2,068 | 2,056 | 2,562 | 129% |
| **Female Sub Total** | **5,020** | **6,903** | **9,830** | **5,064** | **5,720** | **6,887** | **137%** |
| CIM | 2,976 | 4,092 | 5,410 | 3,399 | 3,713 | 4,553 | 153% |
| SQ | 3,082 | 4,238 | 5,230 | 3,249 | 3,501 | 3,501 | 114% |
| DVI | 1,681 | 2,311 | 3,053 | 1,743 | 1,868 | 2,683 | 160% |
| RJD | 2,200 | 3,025 | 4,027 | 2,220 | 2,282 | 3,782 | 172% |
| NKSP | 2,694 | 3,704 | 5,193 | 2,984 | 3,094 | 4,899 | 182% |
| WSP | 2,984 | 4,103 | 5,775 | 3,431 | 3,540 | 5,507 | 185% |
| LAC | 2,300 | 3,163 | 4,150 | 2,392 | 2,494 | 4,034 | 175% |
| CCI | 2,783 | 3,827 | 5,139 | 2,838 | 3,326 | 3,776 | 136% |
| COR | 3,116 | 4,285 | 5,288 | 4,391 | 4,139 | 5,269 | 169% |
| SAC | 1,828 | 2,514 | 3,020 | 3,412 | 2,957 | 2,957 | 162% |
| HDSP | 2,324 | 3,196 | 4,350 | 3,434 | 3,379 | 4,279 | 184% |
| KVSP | 2,448 | 3,366 | 4,500 | 4,576 | 4,352 | 4,352 | 178% |
| PBSP | 2,380 | 3,273 | 3,426 | 3,384 | 3,275 | 3,275 | 138% |
| SVSP | 2,452 | 3,372 | 4,400 | 3,287 | 3,180 | 4,080 | 166% |
| CMF | 2,297 | 3,158 | 3,680 | 2,400 | 2,571 | 2,933 | 128% |
| CMC | 3,838 | 5,277 | 6,450 | 4,268 | 4,895 | 4,895 | 128% |
| SATF | 3,424 | 4,708 | 6,635 | 4,044 | 4,536 | 5,390 | 157% |
| CAL | 2,308 | 3,174 | 4,318 | 2,400 | 2,506 | 4,216 | 183% |
| CEN | 2,308 | 3,174 | 4,368 | 2,361 | 2,452 | 4,162 | 180% |
| MCSP | 1,700 | 2,338 | 3,138 | 1,796 | 1,909 | 3,039 | 179% |
| PVSP | 2,308 | 3,174 | 4,368 | 2,365 | 2,452 | 4,162 | 180% |
| ASP | 2,920 | 4,015 | 5,776 | 4,147 | 5,769 | 5,769 | 198% |
| CCC | 1,733 | 2,383 | 3,384 | 1,870 | 2,330 | 2,690 | 155% |
| CRC | 2,491 | 3,425 | 4,849 | 3,819 | 5,233 | 5,243 | 210% |
| SOL | 2,610 | 3,589 | 5,070 | 3,264 | 4,023 | 4,923 | 189% |
| CVSP | 1,738 | 2,390 | 3,443 | 2,531 | 3,428 | 3,428 | 197% |
| CTF | 3,312 | 4,554 | 6,333 | 3,553 | 3,886 | 4,998 | 151% |
| FSP | 2,469 | 3,395 | 4,322 | 2,132 | 2,244 | 2,532 | 103% |
| ISP | 2,200 | 3,025 | 4,185 | 2,286 | 2,386 | 4,096 | 186% |
| SCC | 1,726 | 2,373 | 3,377 | 1,651 | 2,030 | 2,390 | 138% |
| **Male Sub Total** | **74,630** | **102,616** | **136,657** | **89,627** | **97,750** | **121,813** | **163%** |
| **Institution Sub Total** | **79,650** | **109,519** | **146,487** | **94,691** | **103,470** | **128,700** | |
| | | | | | | | |
| **Off Site Camps\*** | | | | | | | |
| CIW | 320 | 320 | 320 | 320 | 320 | 320 | |
| CCC | 2,150 | 2,150 | 2,150 | 2,150 | 2,150 | 2,150 | |
| SCC | 2,010 | 2,010 | 2,010 | 2,010 | 2,010 | 2,010 | |
| **Camps Sub Total** | **4,480** | **4,480** | **4,480** | **4,480** | **4,480** | **4,480** | |
| | | | | | | | |
| **Grand Total** | **84,130** | **113,999** | **150,967** | **99,171** | **107,950** | **133,180** | |

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

# V. RECOMMENDATIONS AND NEXT STEPS

# V.  Recommendations and Next Steps

In the wake of the decision by the U.S. Supreme Court in *Brown v. Plata*, it is a challenge at this juncture to clearly determine the next steps concerning the application of the methodology described herein and applied systemwide in the first half of 2011. That said, there are numerous directions that CDCR can possibly take relative to the application of this methodology.  These include:

- Approach the Three Judge Panel to urge that this methodology be substituted for Design Capacity as the means by which to measure the capacity of the CDCR system;
- Apply the new methodology to the design of and determination of capacity for any new prisons to be constructed by the state or when significant renovations or modifications are made;
- Apply the lessons learned and the prison operational underpinnings of this new methodology, irrespective of whether it directly or indirectly impacts on calculations of capacity, to the CDCR system.

In addition, because the Supreme Court approached the 137.5% cap as a systemwide limit, leaving discretion to the State as to how to determine capacity at each institution, this new methodology may be used by CDCR to decide how to apportion inmates at individual institutions. By way of illustration, CDCR could allow for higher numbers above design capacity in prisons that meet the out-of-cell mitigation criteria while limiting those that do not.

In the event that CDCR determines that it can or will proceed with systemwide adoption and implementation of the new capacity methodology, there are a number of steps that must be considered.  Since this is a point-in-time approach to measuring capacity, the process needs to be nimble so that re-calculations can occur pursuant to a schedule but also at reasonable junctures when changed circumstances dictate that a reassessment is appropriate and necessary due to changes in operations or physical plant.  The following twelve major recommendations should be considered by CDCR:

1. We recommend that CDCR utilize the POC's developed through this process as a basis for establishing minimum staffing levels for all CDCR prisons for budgetary planning for the upcoming fiscal year. Some adjustments may be necessary due to re-purposing of several prisons as a result of the re-alignment process.

2. We recommend that CDCR identify an official or entity within the Department that will be responsible for maintaining the capacity measurement system and overseeing its ongoing implementation in practice.

3. We recommend that responsibility for data collection rest with DAI but review, approval and reporting of CDCR's operational capacity rest with FPCM.

4. We recommend that CDCR develop policy and procedures to govern the use of the capacity methodology and affix internal responsibility for the components of the process (e.g., capacity assessments/ data collection, approval, reporting) on an ongoing basis. Furthermore, we recommend that:

Attorney-Client Work Product – Confidential

   a. there be a routine process by which  wardens advise DAI on an annual basis of any operational or physical changes that would trigger a new capacity assessment
   b. wardens be able to request on a quarterly basis a new capacity reassessment based on changed operational or physical plant considerations;
   c. institutions being considered for a mission change be re-evaluated based on the resources necessary to implement the PPOC for the new mission and population level;
   d. CDCR develop standardized forms to be used for out-of-cell time calculations, housing unit capacity calculations, and prison capacity calculations and that they are included in CDCR's operational capacity policy.

5. We recommend that CDCR's Office of Audits and Compliance complete the quality control assessment of any operational capacity assessments completed by DAI.

6. We recommend that CDCR develop a sustainable data base to manage this process.

7. We recommend that CDCR develop a training program to train staff at each prison, the associate directors and their staff, and selected staff within the Office of Audits and Compliance and FPCM to continue the updates of POC and PPOC.  If possible the DAI personnel who conducted the initial surveys would be assigned to this effort on an on-going basis.

8. We recommend that CDCR complete a survey and analysis of all existing program space, support space and health care space to determine what enhancements are required to accommodate the POC or PPOC at each prison.

9. We recommend that CDCR consider the impact of how the original 12 prisons, with some original housing units more than 50 years old, will ultimately fit into the POC and PPOC capacity assessment process.

10. We recommend that CDCR conduct a staffing analysis at each prison to determine staffing requirements necessary to achieve the out-of-cell time mitigation thresholds with a target of reaching PPOC capacity levels at each prison.

11. We recommend that CDCR develop an overall strategy and departmental policy to minimize inmate idleness.

12. We recommend that CDCR revise the CDCR *Design & Construction Policy Guidelines* to establish housing standards in conformance with the criteria delineated in this report and establish thresholds for program, support and health care space to be incorporated into all new and existing facilities to support the potential prison operating capacity (PPOC).

Attorney-Client Work Product – Confidential

# VI. PARTICIPANTS/ RESOURCES

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential                                      FINAL REPORT – OCTOBER 3, 2011

# VI. Participants/Resources

The following professionals were active and essential participants in the development of the work that is described in this Final Report.

### CDCR Working Group

Carl Larson, Project Executive
James Derby, Project Coordinator
Steve Cambra
David Espinoza
David White
Ross Meyer
Suzanne Streater
Fountain Hutchison
Brian Lueth
George Giurbino
Mark Bertacchi
James Sammut

### CDCR Executive Staff

Mathew Cate, Secretary
Martin Hoshino, Undersecretary
Scott Kernan, Undersecretary
Ben Rice, Assistant Secretary
Chris Meyer, Senior Chief Deputy Secretary
Deborah Hysen, Chief Deputy Secretary
Terri McDonald, Director

### Pulitzer/Bogard & Associates

David Bogard
Curtiss Pulitzer
Judith Regina-Whiteley
Michael Gatling

Attorney-Client Work Product – Confidential

# APPENDICES

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

FINAL REPORT – OCTOBER 3, 2011

# Appendices

| Appendix # | Name of Appendix | Page # |
|---|---|---|
| Appendix #1 | 50 square feet/Inmate Illustration/ACA Standard | 54-55 |
| Appendix #2 | 37 square feet /Inmate Illustration/Mitigation | 56-57 |
| Appendix #3 | Sample Housing Unit Out-of-Cell Time Calculation Worksheet | 58-59 |
| Appendix #4 | Health Care Adjustment to POC Medical Methodology | 60-61 |
| Appendix #5 | Health Care Adjustment to POC Sick Call Example | 62-63 |
| Appendix #6 | Health Care Adjustment to POC Mental Health CCCMS Methodology | 64-65 |
| Appendix #7 | Health Care Adjustment to POC-CCCMS Example | 66-67 |
| Appendix #8 | Health Care Adjustment to POC Mental Health EOP Methodology | 68-69 |
| Appendix #9 | Health Care Adjustment to POC EOP Example | 70-71 |
| Appendix #10 | Health Care Adjustment with Overlap between Medical and Mental Health Populations | 72-73 |
| Appendix #11 | Health Care Adjustment with Overlap between Medical and Mental Health Populations | 74-75 |
| Appendix #12 | Out-of-Cell worksheet and questionnaire instruction | 76-77 |
| Appendix #13 | Out-of-Cell Time Worksheet: Questions for Second Watch | 78-85 |
| Appendix #14 | Quality Assurance Review | 86-87 |
| Appendix #15 | Summary of the Capacity Calculations for all 33 Prisons | 88-121 |

Attorney-Client Work Product – Confidential

# APPENDIX #1

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

Appendix #1



Attorney-Client Work Product – Confidential

# APPENDIX #2

Case 2:90-cv-00520-KJM-SCR     Document 4678-2     Filed 07/03/13     Page 58 of 122
California Dept. of Corrections and Rehabilitation – Prison Capacity Planning
Attorney-Client Work Product – Confidential     FINAL REPORT – OCTOBER 3, 2011

Appendix #2



SCALE: 1/4"=1'-0"

CALCULATION METHODOLOGY
1. MAINTAIN 7'-0" CLEAR BETWEEN BUNKS.
2. INCLUDE CIRCULATION IN ACHEIVING 100 USF.

USF CALCULATIONS: 7.0 x 8.832' (−5 SQ. FT. FOR DESK) = 56.824 SQ. FT.
3.598' x 12.0' = 43.176 SQ. FT.
TOTAL USF = 100 USF
TOTAL SF/ INMATE: 12.43' x 12.0' = 149.16 SQ. FT. / 4 = 37.29 SQ. FT.
~ 37 SQ. FT./
INMATE

| 37 SQ. FT. PER INMATE ILLUSTRATION |  |
| --- | --- |
| STATE OF CALIFORNIA DEPT. OF CORRECTIONS AND REHABILITATION - RATED CAPACITY ASSESMENT | |

Attorney-Client Work Product – Confidential                          **FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #3

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential        **FINAL REPORT – OCTOBER 3, 2011**

Appendix #3

**Housing Unit Out of Cell Time Calculation Worksheet**

Prison ___SVSP___
Facility ___D___
Unit ___4___
Date of Review ___10-20-10 & 11-17-2010___
Reviewer's Name ___D. Espinosa___
Officer Interviewed ___Gibbons___

| Out of Cell Release Period | Full-Time Assigned Program/work schedule | Full-time Assigned schedule OOC Time | Part-Time Assigned/Academic Ed/Leisure schedule | Part-time Assigned/Academ/Leisure schedule OOC time | Notes |
|---|---|---|---|---|---|
| Early Dayroom Activity | | | | | |
| Morning chow | 0700-0730 | 0.5 | 0700-0730 | 0.5 | Fed in dining room |
| Support Services - Treatment | 0900-1130/1300-1530 | 5 | | | Majority of workers return to H.U. |
| Morning Dayroom/Yard/Academics | | | 0900-1130 | 1.25 | Program every other day |
| Afternoon Dayroom/Yard/Academics | | | 1300-1530 | 1.25 | Program every other day |
| Evening Chow | 1600-1630 | 0.5 | 1600-1630 | 0.5 | Fed in dining room |
| Evening Dayroom/Yard | | | | | |
| Late Dayroom Activity | | | | | |
| TOTAL | | 6 | | 3.5 | |

| Unit Population Data | Total Number | Out of Cell Time | Notes | Calculation: # inmates x out of cell time |
|---|---|---|---|---|
| Classification (s) | Level 4 | | EOP General Population | |
| Total Number of Inmates | 104 | | | |
| | | | | |
| Number of Orientation Inmates | 3 | 3.5 | | 10.5 |
| Number of Close A Inmates | 10 | 3.5 | | 35 |
| Number of A2B Status Inmates | | | | 0 |
| Number of C Status Inmates | | | | 0 |
| Full Time Assigned Inmates (Daytime Workers) | 27 | 6 | Support Services-Treatment | 162 |
| Full Time Assigned Inmates Early/Late Workers | 29 | 8 | Support Services-Treatment | 232 |
| Part Time - Unassigned Inmates | 35 | 3.5 | Part time assignments (Academics)-Unassigned inmates | 122.5 |
| | | | | 562 |

| | |
|---|---|
| **Average # Out of Cell Hours/Inmate** | 5.4 |
| **Mitigation standard** | 10 |
| **Mitigation Standard Met (Yes/No)** | No |

**Notes / Assumptions**

Attorney-Client Work Product – Confidential

# APPENDIX #4

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

Appendix #4



### Appendix 4: Sick Call Adjustment to POC Methodology

Institution:                                    Date:

Targeted Population: *Sick Call*              Prison's Current Operational Capacity____

What is the average of the last 3 month's medical access to care percentage? _____

Is the percentage 80% or above?    **Yes** / **No**

Yes → No impact on POC

No → Reason Percentage Below 80%?

Custody/Provider/Other? Explain:

Yes → What number of beds is impacted?

Was the prison's operational capacity (POC) reduced from current operational capacity (OC)?

**No** / **Yes**

Yes → Proposed GP POC: _____

Step 1: [Threshold %] minus [3 Month Average %] = XX %

Step 2a: Multiply today's population by the XX% = reduction in beds required to meet the access to care threshold (80%).

Step 2b: [Current GP OC] minus [POC GP Population)] = POC GP Bed Reduction

Step 2c: Compare POC Bed Reduction to Access Threshold Requirement

Yes → No Healthcare Adjustment to POC

No → Step 3: [Required Reduction to Meet Threshold] – [POC Reduction] = Healthcare Adjustment to POC

Step 4: [Proposed POC] – [Healthcare Adjustment to POC] = Adjusted POC

The Adjusted POC is _____

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

# APPENDIX #5

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

Appendix #5



Appendix 5: Sick Call Adjustment to POC EXAMPLE

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential                **FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #6

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

Appendix #6



Appendix 6: CCCMS Adjustment to POC Methodology

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #7

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

Appendix #7



**Appendix 7: CCCMS Health Care Adjustment Example**

Institution: **SVSP**                                    Date: **Spring 2011**

*Targeted Population: 1278 CCCMS MH Population*     *Prison's Current Operational Capacity: 4400*

What is the average of the last 3 month's mental health access to care percentage? **57.3%**

Yes     Is the percentage 80% or above?     No

No impact on POC

Reason Percentage Below 80%?

Custody/Provider/Other? **Combination**

Was the prison operational capacity (POC) reduced from current operational capacity (OC)?

What number of CCCMS are impacted? [**1278 CCCMS**]
Current OC [4400] minus EOP [264] = **4136**
1278 CCCMS/4136  GP = **.308% of GP is CCCMS**

No     Yes

**Step 1:** Proposed GP POC?   [**3180-192 EOP = 2988**]
CCCMS population **2988 x .308 = 920 Proportional CCCMS population**

**Step 2:** (Threshold **80%**) minus (3 Month Average **57.3%**) = **22.7 %**

No Healthcare Adjustment to POC

**POC Reduction of 358 exceeds threshold requirement of 290**

Yes

**Step 3a:** **1278** CCCMS population x **.227** = **290** reduction in beds required to meet the access to care threshold.

**Step 3b:** (Current Pop **1278**) minus (Proposed Pop **920**) = **358** Reduction

**Step 3c:** Does POC bed Reduction **358** exceed Access Threshold of **290**?

No

**Step 4:** (Required Reduction to Meet Threshold) - (POC Reduction) = Healthcare Adjustment to POC

The Adjusted POC is **0**

**Step 5:** (Proposed POC) - (Healthcare Adjustment to POC ) = Adjusted POC

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential                              **FINAL REPORT – OCTOBER 3, 2011**

# APPENDIX #8

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential                                    **FINAL REPORT – OCTOBER 3, 2011**

Appendix #8



Appendix 8: EOP Health Care Adjustment to POC Methodology

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #9

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

Appendix #9



**Appendix 9: EOP Health Care Adjustment to POC**

Institution: **SVSP**    Date: **Spring 2011**

Designated EOP Beds: **264**

Three month average from access to care statistics published in Receiver's Monthly Reports March-May, 2011.
OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #10

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

Appendix #10

**Appendix 10: Medical and Mental Health Population Overlap Adjustment to POC Methodology**

Institution:                                                        Date:

*Targeted Population: Overlapping Populations*          Prison's Current Operational Capacity _____



Based on Sick Call, EOP and CCCMS populations previously calculated (Appendices 4-10) demonstrate that a POC adjustment is required for more than one healthcare population there is an assumption that populations overlap. The largest adjustment will be used with specific population(s) adjustments subsumed within that larger adjustment to avoid duplicating reductions. OC and POC statistics from CDCR Prison Calculations.

Attorney-Client Work Product – Confidential

# APPENDIX #11

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

# Appendix 11

### Appendix 11: Medical and Mental Health Population Overlap Adjustment to POC Methodology

Institution:                                                    Date:

*Targeted Population: Overlapping Populations*          Prison's Current Operational Capacity_____



If Sick Call, EOP and CCCMS populations previously calculated (Appendices 4-10) demonstrate that a POC adjustment is required for more than one healthcare population there is an assumption that populations overlap. The largest adjustment will be used with specific population(s) adjustments subsumed within that larger adjustment to avoid duplicating reductions. Despite adjusting for overlap, the bed reduction strategy will still need to meet the threshold requirement of the CCCMS and EOP populations pursuant to those calculations.

OC and POC statistics from CDCR Prison Calculations.

# APPENDIX #12

Attorney-Client Work Product – Confidential                              **FINAL REPORT – OCTOBER 3, 2011**

Appendix #12

There are three questionnaires attached to this e-mail titled 'out-of-cell tool worksheet'. There is a questionnaire for a first, second and third watch officer to complete. The questionnaires need to be printed out and delivered to each of the prison's housing units for completion. Since this is a snapshot in time, <u>the three questionnaires need to be completed on the same date for all housing units</u>. The day selected shall be a week day – not Saturday or Sunday. Have the staff member complete the questionnaire reflecting the inmate movement on the date of review. The supporting documents listed below need to reflect the same date as when the questionnaire is filled out.

- Master count sheet – snapshot of prison population
- Daily Movement Sheet – inmate program movement/work release
- Daily Activity Report – overview of prison activity (counts, meals, yard, etc.)
- Master ducat list – depicts inmate participation in various medical/non medical programs
- EOP program schedule
- Weekly/monthly education schedule, religious and self help program schedules, dayroom or yard schedules for the week of the site visit
- Prisons 3% reduction plan – details inmate program modification due to staff redirection
- Unlock Report (Inmate assignment roster) sorted by housing unit – verify work schedules, work hours and number of participants per housing unit

Please place the completed questionnaires and supporting documents in binders grouped in the following manner:

- Questionnaires - first, second and third watch together for each housing unit, separated by facility and housing unit in alphabetical/numerical order
- Supporting documents in a separate binder or binders in the order listed above

In addition to completing the three questionnaires, please have the institution's DPP coordinator or other appropriate resource fill out the DPW and Modifications template (attachment titled DPW and Modifications Template). The purpose of this form is to identify and confirm all DPW beds in the prison (by specific location) and to identify any non standard modifications for the DPW beds (ex. two standard cells converted to one DPW cell, bunks removed, other). The other half of this template should be used to identify any unique physical plant modifications for non-DPW cells/dorms (ex. cells modified as observation/suicide watch cells, cells conversions to other uses). Please have this template completed and available to the mission-based team that will be touring the prison. The team will be validating the data during their field review of the housing units.

Attorney-Client Work Product – Confidential

# APPENDIX #13

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

Appendix #13

# Out of Cell Time Worksheet

The intent of this Out of Cell Time Worksheet is to capture an accurate assessment of inmate out-of-cell time, or the time inmates are not restricted to their bunk areas for dormitory housing units.  This information is important to CDCR in determining the actual (housing/program) capacity of this prison.  It is requested that the staff member who is most familiar with the housing unit program complete this worksheet.  Please print your name legibly on the bottom of the worksheet.   A follow up interview could be necessary to verify the information you have provided.

**Date of review: _____ / _____ / _____**

**Prison: _____ Facility: _____ Housing Unit: _____** (Name/Number)

## Questions for _Second_ Watch:

### Early morning culinary workers

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out the cell/dorm is? _____
6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Breakfast release

1.  Do you cell feed the inmates? (Yes / No)  If no, complete the following questions:
2.  Breakfast release for this housing unit is at what time? _____
3.  How many days of the week does this activity occur? _____
4.  How many inmates are released for the breakfast meal? _____
5.  What time do the inmates return from breakfast? _____
6.  The duration of time out of the cell/dorm for the breakfast meal is? _____

7.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## PIA Release

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Academics

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Work

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

**Work**

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____
6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

**Porters**

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____
6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

**Dayroom**

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____

**Dayroom**

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

### Yard

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower? (Yes / No)  Length of time? _____

### Yard

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower? (Yes / No)  Length of time? _____

### Religious Services

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

3.  How many inmates are released? _____

4.  What time do the inmates return? _____

5.  The duration of time out of the cell/dorm is? _____

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Canteen

1.  Release for this housing unit is at what time? _____

2.  How many days of the week does this activity occur? _____

Attorney-Client Work Product – Confidential                                    **FINAL REPORT – OCTOBER 3, 2011**

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Visiting Program

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Diabetic / Medication Line

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Diabetic / Medication Line

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Diabetic / Medication Line

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____
6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Medical / Mental Health Treatment

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____
6.  When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

### Medical / Mental Health Treatment

1.  Release for this housing unit is at what time? _____
2.  How many days of the week does this activity occur? _____
3.  How many inmates are released? _____
4.  What time do the inmates return? _____
5.  The duration of time out of the cell/dorm is? _____

Attorney-Client Work Product – Confidential

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Medical / Mental Health Treatment

1. Release for this housing unit is at what time? _____

2. How many days of the week does this activity occur? _____

3. How many inmates are released? _____

4. What time do the inmates return? _____

5. The duration of time out of the cell/dorm is? _____

6. When the inmates return to the housing unit are they required to return to their cells/bed areas when they enter the housing unit? (Yes / No)  Are they allowed to shower or access the yard/dayroom (Yes / No)?  Length of time? _____

## Housing Unit Information:

***Number of cells:* _____    *Number of dorms:* _____    *Total bed count:* _____**

## Inmate Information:

Please answer the below questions regarding the inmate population in the housing unit:

Total inmate count for the building/housing unit: _____.   Of the total count, how many are:

A1/A (assigned to a job) _____    A1/A (unassigned) _____    A2/B _____    Close A _____    C Status _____

CCCMS _____    GP _____    R/C GP _____    R/C SNY (SPU) _____

Name of person completing form: _____

Attorney-Client Work Product – Confidential

# APPENDIX #14

Attorney-Client Work Product – Confidential                                      **FINAL REPORT – OCTOBER 3, 2011**

Appendix #14

# Criteria for Quality Control Review

**OOC Time Calculation Worksheets (typed forms)**

- Full-Time Assigned Program/Work Schedule
    - Are morning/evening chow times clearly identified?
    - PIA-Vocation-Support Services-Treatment hours accurately documented?
    - Dayroom/Yard opportunities accurately documented?
    - Is the 3% redirection (cost savings) factored in to the OOC times?
    - Did the notes clarify any discrepancies?
    - Are the notes clear and understandable?
    - Did the hours total up correctly?
- Part-Time Assigned/Academic Education/Leisure Schedule
    - Are morning/evening chow times clearly identified?
    - Morning/afternoon dayroom/yard/academic OOC accurately documented?
    - Are the education/academic days/hours accurately documented?
    - Is the 3% redirection (cost savings) factored in to the OOC times?
    - Did the notes clarify any release/recall time discrepancies?
    - Are the notes clear and understandable?
    - Did the hours total up correctly?
- Unit Population Data section
    - Is the prison classification level correct?
    - Does the total number of inmates listed match the Master Count Sheet?
    - Do the numbers in the Total Number column match the total number of inmates for the housing unit?
    - Are the OOC times accurate for each column (Ort/Close A/A2B/C)?
    - Are the full time assigned inmates clearly identified?
    - Are the part time / unassigned inmates clearly identified?
    - Are the notes clear and understandable?
- Notes / Assumption section
    - Do the notes clarify any discrepancies listed in the above categories?
    - Are the lockdown/modified program changes noted?
    - Is the 3% redirection (cost savings) explained in this area?
    - Does the number of inmates recorded on the OOC Time Calculation Worksheet, for each category, reconcile with the inmate assignment roster?
        - Orientation
        - Close A
        - A2B
        - C Status
        - Full Time Assigned (Daytime Workers)
        - Full Time Assigned (Early/Late Workers)
        - Part Time – Unassigned Inmates

# APPENDIX #15

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential     **FINAL REPORT – OCTOBER 3, 2011**

Appendix #15
(33 pages)

| | | | **Avenal State Prison** | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 4,132 | 5,659 | 5,659 | Level II General Population | Achieved mitigation threshold |
| 15 | 10 | 10 | Firehouse Dorm | Capacity Established by CDCR Program |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 4,247 | 5,769 | 5,769 | BED Totals | |
| | | 28 | Short-Term Health Care Beds | |
| | | 5,797 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**AVENAL STATE PRISON NOTES:**
A 18 Bed Infirmary is available for Short-Term Health Care needs.
Non-Traditional Housing Unit beds are not counted in capacity calculations.

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

| | | | Calipatria State Prison | |
| | | | Capacity Calculations | |

| ACA | POC | PPOC | Custody Level & Program | Comments |
|---|---|---|---|---|
| 200 | 200 | 200 | Administrative Segregation | Not subject to mitigation |
| 1,900 | 1,900 | 3,610 | Level IV General Population | Did not achieve mitigation threshold |
| 292 | 396 | 396 | Minimum Support Facility | Achieved mitigation threshold |
| 8 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| 2,400 | 2,506 | 4,216 | BED Totals |
|---|---|---|---|
| | | 18 | Short-Term Health Care Beds |
| | | 4,234 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**

**DEFINITIONS**

ACA Beds: Bed Capacity calculations based on American Correctional Association square footage standards for all types of inmate housing units.

POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].

PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].

Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.

Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**

POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.

ASU overflow beds are calculated as General Population beds in the PPOC Calculation.

EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.

ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.

Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIPATRIA STATE PRISON NOTES:**

An 18-bed infirmary is available for short-term health care needs.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

| | | | California Correctional Center | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Adminstrative Segregation | Not subject to mitigation |
| 400 | 400 | 760 | Level III General Population | Did not achieve mitigation threshold |
| 1,140 | 1,520 | 1,520 | Level II General Population | Achieved mitigation threshold |
| 220 | 290 | 290 | Minimum Support Facility | Achieved mitigation threshold |
| 10 | 20 | 20 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 1,870 | 2,330 | 2,690 | BED Totals | |
| | | 19 | Short-Term Health Care Beds | |
| | | 2,709 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA CORRECTIONAL CENTER NOTES:**
A 19 Bed OHU is available for Short-Term Health Care needs.
Non-traditional housing unit beds are not included in capacity calculations.

Attorney-Client Work Product – Confidential                                   **FINAL REPORT – OCTOBER 3, 2011**

| | | | California Correctional Institution | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 185 | 185 | 185 | Administrative Segregation Unit | Not subject to mitigation |
| 810 | 810 | 810 | Security Housing Unit | Not subject to mitigation |
| 500 | 500 | 950 | Reception Center Processing | Did not achieve mitigation threshold |
| 720 | 972 | 972 | Level II General Population | Achieved mitigation threshold |
| 605 | 849 | 849 | Level I General Population | Achieved mitigation threshold |
| 18 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 2,838 | 3,326 | 3,776 | BED Totals | |
| | | 21 | Short-Term Health Care Beds | |
| | | 3,797 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations.

**CALIFORNIA CORRECTIONAL INSTITUTION NOTES:**
A 16 Bed Infirmary provides 16 OHU-swing beds for Short-Term Health Care needs.
Facility IV-A, housing unit H-48, Ad Seg, Section B, Cells 101, 102, 103, 104 & 105 have all furnishings removed for use as short term mental health crisis rooms.
Non-traditional housing unit beds are not included in capacity calculations.

Attorney-Client Work Product – Confidential                              **FINAL REPORT – OCTOBER 3, 2011**

| | | | Central California Women's Facility | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 45 | 45 | 45 | Administrative Segregation Unit/Condemned | Not subject to mitigation |
| 356 | 356 | 510 | Reception Center Processing | Did not achieve mitigation threshold |
| 49 | 49 | 73 | Medium Security Enhanced Outpatient Program | Did not achieve mitigation threshold |
| 1,536 | 1,536 | 1,920 | Medium Security General Population | Did not achieve mitigation threshold |
| 13 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 1,999 | 1,996 | 2,558 | BED Totals | |
| | | 45 | Short-Term Health Care Beds | |
| | | 2,603 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CENTRAL CALIFORNIA WOMEN'S FACILITY NOTES:**
A 39 Bed Skilled Nursing Facility is available for Short-Term Health Care needs.
Facility A, Building 504 EOP/ASU/Condemned has 6 cells with furnishings removed and are used as Mental Health Crisis Beds. These cells are not counted in the Capacity Calculations.

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Centinela State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 200 | 200 | 200 | Adminsrative Segregation | Not subject to mitigation |
| 500 | 500 | 950 | Level IV General Population | Did not achieve mitigation threshold |
| 1,400 | 1,400 | 2,660 | Level III General Population | Did not achieve mitigation threshold |
| 254 | 342 | 342 | Minimum Support Facility | Achieved mitigation threshold |
| 7 | 10 | 10 | Firehouse Dorms | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 2,361 | 2,452 | 4,162 | Bed Totals |
| | | 18 | Short-Term Health Care Beds |
| | | 4,180 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CENTINELA STATE PRISON NOTES:**
An 18 Bed Correctional Treatment Center is available for Short-Term Health Care needs.
Non-Traditional housing unit beds are not included in capacity calculations.

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

| California Institution for Men | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 204 | 204 | 204 | Administrative Segregation Unit | Not subject to mitigation |
| 2,384 | 2,384 | 3,224 | Reception Center Processing | Did not achieve mitigation threshold |
| 630 | 849 | 849 | Level II General Population | Achieved mitigation threshold |
| 176 | 266 | 266 | Level I General Population | Achieved mitigation threshold |
| 5 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| 3,399 | 3,713 | 4,553 | BED Totals |
|---|---|---|---|
| | | 80 | Short-Term Health Care Beds |
| | | 4,633 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA INSTITUTION FOR MEN NOTES:**
• 80 beds are available at CIM for short-term health care needs as follows:
o 44 medical out patient beds
o 36 mental health crisis beds

• Non traditional housing unit beds are not included in these capacity calculations.

• The second floor of South Dorm, CIM - minimum, is condemned, thus, will not be included in these capacity calculations.

• Pine Hall, CIM - minimum, was deactivated at the time of the DAI team review but will be included in these capacity calculations.

• Mariposa Dorm, CIM – West, was used as a recreation/education space at the time of the DAI team review, therefore, it will not be included in these capacity calculations as an inmate housing unit.

• Willow Hall, CIM – minimum, was used for RC processing/ad. seg. inmates.  Willow Hall will be included as RC processing dorm in these capacity calculations.

• Birch Hall and Madrone Hall, CIM – RC Central, have cells with 47.8 gross square feet each, thus, can house a maximum of one inmate per cell.

• Birch Hall, CIM – RC Central, house RC processing/Level III general population inmates at the time of review.  Birch Hall will be included as RC processing in these capacity calculations.

Attorney-Client Work Product – Confidential                                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | California Institution for Women | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Ad Seg/R.C. Overflow | Not subject to mitigation |
| 110 | 110 | 209 | R.C. Processing | Did not achieve mitigation threshold |
| 47 | 70 | 70 | Medium security EOP (SCU) | Achieved mitigation threshold |
| 20 | 20 | 20 | Psychiatric Services Unit | Capacity established by CDCR, single celled unit |
| 720 | 1,368 | 1,368 | Medium security G.P. | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 997 | 1,668 | 1,767 | BED Totals | |
| | | 25 | Short-Term Health Care Beds | |
| | | 1,792 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA INSTITUTION FOR WOMEN NOTES:**
CIW has 25 beds available for short-term health care needs as follows: 7 OHU-swing beds, 8 correctional treatment center beds, and 10 mental health crisis beds. Non-traditional housing unit beds are not included in capacity calculations.

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | California Men's Colony | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 314 | 309 | 309 | Administrative Segregation Unit | Not subject to mitigation |
| 570 | 570 | 570 | Level III Enhanced Outpatient Program | Small cells. |
| 1,500 | 1,500 | 1,500 | Level III General Population | Small cells. |
| 1,595 | 2176 | 2,176 | Level II General Population | Achieved mitigation threshold |
| 212 | 288 | 288 | Level I Minimum Support Facility | Achieved mitigation threshold |
| 64 | 40 | 40 | CDF Firecamp Dorm | Capacity established by CDF/CDCR Program needs. |
| 13 | 12 | 12 | Firehouse Dorm | Capacity established by CDCR Program needs. |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 4,268 | 4,895 | 4,895 | BED Totals | |
| | | 57 | Short-Term Health Care Beds | |
| | | 4,952 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA MEN'S COLONY NOTES:**
37 Bed General Acute Care Hospital is available for Short-Term Health Care needs.
42 Beds in Bldg D-7 are assigned as Mental Health Crisis Beds.  20 have all furnishings removed and therefore counted as Short-Term Health Care beds.
Cells 101 through 112 in ASU Central and all Cells in Bldgs 1-8 have 38.59 gross square feet each, thus, can only house one inmate per cell.
CMC West Dorms 28 and 34 were Deactivated during the DAI review, but are included in the Capacity Calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| California Medical Facility | | | | |
|---|---|---|---|---|
| **Capacity Calculations** | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 330 | 330 | 330 | Administrative Segregation | Not subject to mitigation |
| 332 | 332 | 332 | DMH Licensed APP, ITP, ICF | Capacity established by licensure standards |
| 162 | 162 | 162 | Medical Out Patient Units | Capacity established by CDCR policy |
| 283 | 302 | 422 | Level IV EOP | Only N-3 achieved mitigation threshold |
| 904 | 919 | 1,161 | Level III G.P./Medical/CCCMS | Only 4 dorms achieved mitigation threshold |
| 185 | 250 | 250 | Level II G.P. | Achieved mitigation threshold |
| 190 | 260 | 260 | Minimum Support Facility | Achieved mitigation threshold |
| 14 | 16 | 16 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 2,400 | 2,571 | 2,933 | BED Totals |
| | | 121 | Short-Term Health Care Beds |
| | | 3,054 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA MEDICAL FACILITY NOTES:**
• 121 rooms at CMF are available for short-term health care needs as follows:
    o Correctional Treatment Center    47
    o General Acute Care Hospital      7
    o Hospice Care          17
    o Mental Health Crisis Care     50
          Total    121

• DMH licensed APP, ICF, and ICF high security unit's capacities, at CMF, are established by licensure standards.

• Medical out patient housing unit's capacities, at CMF, are established by CDCR policy.

• Cells in T, U, and V wings have 37.55 gross square feet each, thus, only house a maximum of one inmate per cell.

• Typical cells in W wing have 42 gross square feet each, thus, only house one inmate per cell.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

| | | | California State Prison Corcoran | |
|---|---|---|---|---|
| | | | Capacity Calculations | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 300 | 300 | 300 | Adminstrative Segregation | Not subject to mitigation |
| 2,048 | 1,536 | 1,536 | Security Housing Units/PHU | 50% Cells double bunked per CDCR policy |
| 100 | 100 | 150 | Level III & IV EOP | 50% Cells double bunked per CDCR policy |
| 300 | 300 | 570 | Level IV General Population | Did not achieve mitigation threshold |
| 400 | 400 | 760 | Level III & IV General Population | Did not achieve mitigation threshold |
| 500 | 500 | 950 | Level III General Population | Did not achieve mitigation threshold |
| 727 | 995 | 995 | Minimum Supporty Facility | Achieved mitigation threshold |
| 16 | 8 | 8 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 4,391 | 4,139 | 5,269 | BED Totals | |
| | 75 | 75 | Short-Term Health Care Beds | |
| | 4,214 | 5,344 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations.

**CALIFORNIA STATE PRISON-CORCORAN**
A 75-bed General Acute Care Hospital is available for short term health care needs.
Non traditional housing unit beds are not included in capacity calculation
MSF buildings H01 and H03 were deactivated during the DAI field review. These two dorms are included in these capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

| | | | **California Rehabilitation Center** | |
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 28 | 28 | 38 | Reception Center Processing | Deactivated |
| 3,700 | 5,070 | 5,070 | Level II General Population | Achieved mitigation threshold |
| 66 | 126 | 126 | CDF Fire Camp | Capacity established by CDCR/CDF Program needs |
| 25 | 9 | 9 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 3,819 | 5,233 | 5,243 | BED Totals | |
| | | 10 | Short-Term Health Care Beds | |
| | | 5,253 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA REHABILITATION CENTER NOTES:**
A 10 Bed Infirmary is available for Short-Term Health Care needs.
The second floor of building 104 (Dorm 400) has been converted to health care space, thus is not included in these capacity calculations.
Dorms 105, 112, 114, 206,208 and 302 were deactivated at the time of the DAI review. These dorms are included in these capacity calculations.

| Correctional Training Facility | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 144 | 144 | 144 | Administrative Segregation Unit | Not subject to mitigation |
| 2,456 | 2,456 | 3,568 | Level III | Did not achieve mitigation threshold |
| 292 | 396 | 396 | Level II | Achieved mitigation threshold |
| 651 | 878 | 878 | Level I | Achieved mitigation threshold |
| 10 | 12 | 12 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 3,553 | 3,886 | 4,998 | BED Totals | |
| | | 16 | Short-Term Health Care Beds | |
| | | 5,014 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CORRECTIONAL TRAINING FACILITY NOTES:**
16 Bed Infirmary is available for Short-Term Health Care needs.
All cells in Lassen, Rainier, Shasta, and Whitney Halls have 45.15 gross square feet each, thus, have a maximum of one inmate per cell.
East Dorm, CTF Central, is not included in Capacity Calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Chuckawalla Valley State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 2,112 | 2,904 | 2,904 | Level II General Population | Achieved mitigation threshold |
| 300 | 412 | 412 | Minimum Support Facility | Achieved mitigation threshold |
| 19 | 12 | 12 | Firehouse Dorm | Capacity Established by CDCR Program |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 2,531 | 3,428 | 3,428 | BED Totals | |
| | | 14 | Short-Term Health Care Beds | |
| | | 3,442 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CHUCKAWALLA VALLEY STATE PRISON NOTES:**
A 14 Bed Infirmary is available for Short-Term Health Care needs.

Attorney-Client Work Product – Confidential      **FINAL REPORT – OCTOBER 3, 2011**

| | | Deuel Vocational Institution | |
|---|---|---|---|
| | | **Capacity Calculations** | |

| ACA | POC | PPOC | Custody Level & Program | Comments |
|---|---|---|---|---|
| 240 | 240 | 240 | Administrative Segregation | Not subject to mitigation |
| 1,221 | 1,221 | 2,036 | Reception Center Processing | Did not achieve mitigation threshold |
| 49 | 93 | 93 | Level II General Population | Achieved mitigation threshold |
| 224 | 304 | 304 | Minimum Support Facility | Achieved mitigation threshold |
| 9 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 1,743 | 1,868 | 2,683 | BED Totals | |
| | | 26 | Short-Term Health Care Beds | |
| | | 2,709 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**DEUEL VOCATIONAL INSTITUTION NOTES:**
• A 26-bed infirmary is available for short-term health care needs.
• Cells in East Hall and West Hall have 44.61 gross square feet each thus can only house a maximum of one inmate per cell.
• Non traditional housing unit beds are not included in capacity calculations.

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

| | | | Folsom State Prison | |
|---|---|---|---|---|
| | | | Capacity Calculations | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 138 | 138 | 138 | Administrative Segregation Unit | Not subject to mitigation |
| 1,661 | 1,661 | 1,949 | Level III General Population | Did not achieve mitigation threshold |
| 322 | 433 | 433 | Minimum Suport Facility | Achieved mitigation threshold |
| 11 | 12 | 12 | Firehouse Dorm | Capacit established by CDCR Program Needs |
| | | | | |
| | | | | |
| 2,132 | 2,244 | 2,532 | Bed Totals | |
| | | 0 | Short Term Health Care Beds | |
| | | 2,532 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**FOLSOM STATE PRISON NOTES:**
No short-term health care beds available
Cells in Building #1 have 47.62 gross square feet each, thus can only house a maximum of one inmate per cell.
Cells in Building #2 & #3 have 48.37 gross square feet each, thus can only house a maximum of lne inmate each

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning

Attorney-Client Work Product – Confidential                    FINAL REPORT – OCTOBER 3, 2011

| | | | **High Desert State Prison** | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 356 | 292 | 292 | Administrative Segregation | Not subject to mitigation capacity per CDCR |
| 300 | 300 | 570 | Reception Center Processing | Did not achieve mitigation threshold |
| 2,492 | 2401 | 3,031 | Level IV General Population | Did not achieved mitigation threshold |
| 286 | 386 | 386 | Minimum Support Facility | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 3,434 | 3,379 | 4,279 | BED Totals | |
| | | 35 | Short-Term Health Care Beds | |
| | | 4,314 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq.ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq.ft gross, will be considered single cells for all Capacity Calculations

HIGH DESERT STATE PRISON
A 35-bed Correctional Treatment Center is available for short term health care needs
Non traditional housing unit beds are not included in capacity calculations
MSF dorm 2 was deactivated at the time of the DAI review. Dorm 2 is included in these capacity calculations
Ad. Seg. overflow beds and R.C. overflow beds are counted as level IV general population beds in these capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Ironwood State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 400 | 400 | 760 | Level IV General Population | Not subject to mitigation |
| 1,500 | 1,500 | 2,850 | Level III | Did not achieve mitigation threshold |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 286 | 386 | 386 | Minimum Support Facility | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 2,286 | 2,386 | 4,096 | BED Totals | |
| | | 14 | Short-Term Health Care Beds | |
| | | 4,110 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**IRONWOOD STATE PRISON NOTES:**
14 Bed Infirmary is available for Short-Term Health Care needs.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Kern Valley State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 456 | 392 | 392 | Administrative Segregation Unit | Only 50% of the cells are doubled per CDCR policy |
| 256 | 192 | 192 | Level IV EOP | Only 50% of the cells are doubled per CDCR policy |
| 3,584 | 3388 | 3,388 | Level IV General Population | Did not achieve mitigation threshold |
| 280 | 380 | 380 | Minimum Support Facility | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 4,576 | 4,352 | 4,352 | BED Totals | |
| | | 20 | Short-Term Health Care Beds | |
| | | 4,372 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**KERN VALLEY STATE PRISON NOTES:**
• A 20-bed Correctional Treatment Center is available for short-term health care needs.
• Non traditional housing unit beds are not included in capacity calculations.
• MSF Dorm 2 was deactivated at the time of the DAI field review, however, the dorm's capacity is included in these calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

| California State Prison - Los Angeles County | | | | |
|---|---|---|---|---|
| **Capacity Calculations** | | | | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 300 | 300 | 300 | Administrative Segregation Unit | Not subject to mitigation |
| 200 | 200 | 300 | Level IV EOP | Did not achieve mitigation threshold |
| 800 | 800 | 1,520 | Level IV G.P. | Did not achieve mitigation threshold |
| 800 | 800 | 1,520 | Reception Center Processing | Did not achieve mitigation threshold |
| 292 | 394 | 394 | Minimum Suport Facility | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 2,392 | 2,494 | 4,034 | Bed Totals | |
| | | 18 | Short Term Health Care Beds | |
| | | 4,052 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CSP-LOS ANGELES NOTES:**
18-bed Correctional Treatment Center is available for short-term health care needs.

| Mule Creek State Prison | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 100 | 100 | 100 | Administrative Segregation | Not subject to mitigation |
| 300 | 300 | 450 | EOP, Level III and IV | Did not achieve mitigation threshold |
| 1,089 | 1089 | 2,069 | General Population, Level III and IV | Did not achieve mitigation threshold |
| 300 | 412 | 412 | Minimum Support Facility | Achieved mitigation threshold |
| 7 | 8 | 8 | Firehouse dorm | Capacity established by CDCR program needs |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| | | | | |
|---|---|---|---|---|
| 1,796 | 1,909 | 3,039 | BED Totals | |
|  |  | 21 | Short-Term Health Care Beds | |
|  |  | 3,060 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**MULE CREEK STATE PRISON NOTES:**
• 11 cells in building Y-13, C Facility, have the cell furnishings removed.  They are used as mental health crisis rooms.  These cells are not counted in capacity calculations.
• A 10-bed Correctional Treatment Center is available for short-term health care needs.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | North Kern State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 100 | 100 | 190 | Level III General Population | Did not achieve mitigation threshold |
| 2,476 | 2476 | 4,191 | Reception Center Processing | Did not achieve mitigation threshold |
| 300 | 408 | 408 | Minimum Support Facility | Achieved mitigation threshold |
| 8 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 2,984 | 3,094 | 4,899 | BED Totals | |
| | | 26 | Short-Term Health Care Beds | |
| | | 4,925 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**NORTH KERN STATE PRISON NOTES:**
16 Bed Correctional Treatment Center is available for Short-Term Health Care needs.
10 Celled Beds in Facility A, Bldg 4 (101 - 110) provide Mental Health Crisis Beds and Short-Term Health Care needs.
Nontraditional housing unit beds are not included in the Capacity Calculations.
Dorm 901/E-1 was deactivated at the time of the Field Review. This facility is included in the Capacity Calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Pelican Bay State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 612 | 484 | 484 | Administrative Segregation Unit | CDCR Policy only allows 50% of cells doubled |
| 1,056 | 1,056 | 1,056 | Security Housing Unit | Not subject to mitigation |
| 128 | 128 | 128 | Psychiatric Services Unit | CDCR Policy requires single celling |
| 128 | 96 | 96 | Level IV EOP | CDCR Policy only allows 50% of cells doubled |
| 1,152 | 1089 | 1,089 | Level IV General Population | Did not achieve mitigation threshold |
| 300 | 412 | 412 | Minimum Support Facility | Achieved mitigation threshold |
| 8 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 3,384 | 3,275 | 3,275 | BED Totals | |
| | | 20 | Short-Term Health Care Beds | |
| | | 3,295 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**PELICAN BAY STATE PRISON NOTES:**
A 20 Bed Correctional Treatment Center is available for Short-Term Health Care needs.
Non-traditional housing unit beds are not included in capacity calculations.
Ad Seg Overflow cells are calculated as Level IV G.P. in these capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                    FINAL REPORT – OCTOBER 3, 2011

| Pleasant Valley State Prison | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 200 | 200 | 200 | Administrative Segregation | Not subject to mitigation |
| 500 | 500 | 950 | Level IV General Population | Did not achieve mitigation threshold |
| 1,400 | 1400 | 2,660 | Level III General Populatin | Did not achieve mitigation threshold |
| 254 | 342 | 342 | Minimum Support Facility | Achieved mitigation threshold |
| 11 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| 2,365 | 2,452 | 4,162 | BED Totals |
|---|---|---|---|
| | | 15 | Short-Term Health Care Beds |
| | | 4,177 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**PLEASANT VALLEY STATE PRISON NOTES:**
An 15-bed Correctional Treatment Center is available for short-term health care needs.
Non-Traditional housing unit beds are not included in capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential                    FINAL REPORT – OCTOBER 3, 2011

| | | | Richard J. Donovan Correctional Facility | |
|---|---|---|---|---|
| | | | Capacity Calculations | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 200 | 200 | 200 | Administrative Segregation Unit | Not subject to mitigation |
| 300 | 300 | 450 | Level III & IV EOP | Did not achieve mitigation threshold |
| 800 | 800 | 1520 | Reception Center Processing | Did not achieve mitigation threshold |
| 300 | 300 | 570 | Level III General Population | Did not achieve mitigation threshold |
| 400 | 400 | 760 | Level IV General Population | Did not achieve mitigation threshold |
| 208 | 272 | 272 | Minimum Support Facility | Achieved mitigation threshold |
| 12 | 10 | 10 | Firehouse Dorm | Capacity Established by CDCR Program |
| | | | | |
| 2,220 | 2,282 | 3,782 | BED Totals | |
| | | 28 | Short-Term Health Care Beds | |
| | | 3,810 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double ceiling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**RICHARD J. DONOVAN CORRECTIONAL FACILITY NOTES:**
A 28 Bed Corectional Treatment Center is available for Short-Term Health Care needs.
Non-Traditional Housing Unit beds are not counted in capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential                                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | California State Prison, Sacramento | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 356 | 292 | 292 | Administrative Segregation Unit | Only 50% of the cells can be doubled per CDCR policy |
| 128 | 96 | 96 | Security Housing Unit | Only 50% of the cells can be doubled per CDCR policy |
| 512 | 384 | 384 | Level IV EOP | Only 50% of the cells can be doubled per CDCR policy |
| 512 | 256 | 256 | Psychiatric Services Unit | One inmate per cell per CDCR policy |
| 20 | 20 | 20 | Medical Out Patient Housing Unit | Capacity established per CDCR Health Care Services |
| 1,584 | 1497 | 1,497 | Level IV GP | Did not achieve mitigation threshold |
| 300 | 412 | 412 | Minimum Support Facility | Achieved mitigation threshold |
| | | | | |
| 3,412 | 2,957 | 2,957 | BED Totals | |
| | | 46 | Short-Term Health Care Beds | |
| | | 3,003 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA STATE PRISON, SACRAMENTO NOTES:**
• 46 short-term health care beds are available for use as follows: CTC #1 has 15 beds available; CTC #2 has 11 beds available; and Building H-59 Section B has 20 mental health crisis beds available for a total of 46 beds
• Medical out patient beds located in cell blocks are included in ACA, POC, and PPOC capacity calculations.
• Non traditional housing unit beds are not included in capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Substance Abuse Treatment Facility | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 200 | 200 | 200 | Adminstrative Segregation | Not subject to mitigation |
| 1,524 | 1,472 | 1,922 | Level IV General Population | Did not achieve mitigation threshold |
| 400 | 400 | 760 | Level IV General Population | Did not achieve mitigation threshold |
| 352 | 396 | 440 | Level IV Enhance Outpatient Program | F-3 achieved mitigation threshold G-1 did not |
| 1568 | 2068 | 2068 | Level II General Population | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| 4,044 | 4,536 | 5,390 | BED Totals | |
| | | 34 | Short-Term Health Care Beds | |
| | | 5,424 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**SUBSTANCE ABUSE TREATMENT FACILITY NOTES:**
A 34 Bed Correctional Treatment Center is available for Short-Term Health Care needs.
Non-Traditional Housing Unit Beds are not included in capacity calculations.
Building 321, A Facility, was deactivated during the DAI Field reviw. This building is included in these capacity calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential                                   **FINAL REPORT – OCTOBER 3, 2011**

| | | | Sierra Conservation Center | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 400 | 400 | 760 | Level III General Population | Did not achieve mitigation threshold |
| 570 | 760 | 760 | Level II General Population | Achieved mitigation threshold |
| 570 | 760 | 760 | Level I General Population | Achieved mitigation threshold |
| 11 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR Program needs |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 1,651 | 2,030 | 2,390 | BED Totals |
| | | 13 | Short-Term Health Care Beds |
| | | 2,403 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA CORRECTIONAL CENTER NOTES:**
A 13 Bed Infirmary is available for Short-Term Health Care needs.
Non-traditional housing unit beds are not included in capacity calculations.

| California State Prison Solano | | | | |
|---|---|---|---|---|
| **Capacity Calculations** | | | | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 200 | 200 | 200 | Administrative Segregation Unit | Not subject to mitigation |
| 1,000 | 1,000 | 1,900 | Level III General Population | Did not achieve mitigation threshold |
| 2,064 | 2,823 | 2,823 | Level II General Population | Achieved mitigation threshold |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| | | | |
|---|---|---|---|
| 3,264 | 4,023 | 4,923 | BED Totals |
|  |  | 18 | Short-Term Health Care Beds |
|  |  | 4,941 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**CALIFORNIA STATE PRISON, SOLANO NOTES:**
A 18 Bed Correctional Treatment Center is available for Short-Term Health Care needs.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*

Attorney-Client Work Product – Confidential

**FINAL REPORT – OCTOBER 3, 2011**

| | | | San Quentin State Prison | |
|---|---|---|---|---|
| | | | Capacity Calculations | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 591 | 591 | 591 | Condemned | Not subject to mitigation |
| 102 | 102 | 102 | ASU/Condemned | Not subject to mitigation |
| 362 | 362 | 362 | ASU/Carson and Donner | Not subject to mitigation |
| 414 | 414 | 414 | Level III General Population | Small Cells |
| 1,037 | 1037 | 1,037 | Reception Center Processing | Small Cells |
| 580 | 784 | 784 | Level II General Population | Achieved mitigation threshold |
| 145 | 196 | 196 | Minimum Support Facility | Achieved mitigation threshold |
| 18 | 15 | 15 | Firehouse Dorm | Capacity established by CDCR program needs |
| | | | | |

| | | | | |
|---|---|---|---|---|
| 3,249 | 3,501 | 3,501 | BED Totals | |
| | | 50 | Short-Term Health Care Beds | |
| | | 3,551 | Total Potential Capacity | |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double ceiling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double ceiling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**SAN QUENTIN STATE PRISON NOTES:**
50 Bed in the Health Care Facility are available for Short-Term Health Care needs.
Cells in North, East, South, and West Blocks have 49.1 Gross Square Feet. Therefore, they can only house 1 inmate per cell maximum.
Nontraditional housing beds are not included in Capacity Calculations.

*California Dept. of Corrections and Rehabilitation – Prison Capacity Planning*
Attorney-Client Work Product – Confidential    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Salinas Valley State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 484 | 388 | 388 | Administrative Segregation | CDCR policy for 180 Ad Seg units = 50% cells doubled |
| 359 | 359 | 359 | ICF licensed mental health | Capacity established by licensure standards |
| 256 | 192 | 192 | Level IV EOP | Capacity established by CDCR policy |
| 1,896 | 1,847 | 2,747 | Level IV general population | Did not achieve mitigation threshold |
| 292 | 394 | 394 | Minimum support facility | Achieved mitigation threshold |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | | | |
|---|---|---|---|
| 3,287 | 3,180 | 4,080 | Bed Totals |
| | | 57 | Short-Term Health Care Beds |
| | | 4,137 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**SALINAS VALLEY STATE PRISON NOTES:**
A 22-bed correctional treatment center is available for short-term health care needs. 35 cells in ICF housing units designated for short-term crisis patients.
DMH-ICF housing unit cells designated for crisis patients are not included in ACA, POC, or PPOC capacity calculations.

| Valley State Prison for Women | | | | |
|---|---|---|---|---|
| Capacity Calculations | | | | |
| ACA | POC | PPOC | Custody Level & Program | Comments |
| 356 | 356 | 510 | Reception Center Processing and ASU Overflow | Did not achieve mitigation threshold |
| 176 | 132 | 132 | ASU/SHU | Large cell capacity cap per CDCR policy |
| 1,536 | 1568 | 1,920 | Medium Security General Population | Building D-1 achieved mitigation threshold |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

| 2,068 | 2,056 | 2,562 | BED Totals |
|---|---|---|---|
|  |  | 20 | Short-Term Health Care Beds |
|  |  | 2,582 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**

**DEFINITIONS**

ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.

POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].

PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].

Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.

Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**

POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.

ASU overflow beds are calculated as General Population beds in the PPOC Calculation.

EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.

ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.

Small cells with less than 50 sq ft gross, will be considered single cells for all Capacity Calculations

**VALLEY STATE PRISON FOR WOMEN NOTES:**

20 Bed Infirmary is available for Short-Term Health Care needs.

California Dept. of Corrections and Rehabilitation – Prison Capacity Planning
Attorney-Client Work Product – Confidential                    **FINAL REPORT – OCTOBER 3, 2011**

| | | | Wasco State Prison | |
|---|---|---|---|---|
| | | | **Capacity Calculations** | |
| **ACA** | **POC** | **PPOC** | **Custody Level & Program** | **Comments** |
| 100 | 100 | 100 | Administrative Segregation Unit | Not subject to mitigation |
| 100 | 100 | 190 | Level III General Population | Did not achieve mitigation threshold |
| 2,922 | 2922 | 4,799 | Reception Center Processing | Did not achieve mitigation threshold |
| 300 | 408 | 408 | Minimum Support Facility | Achieved mitigation threshold |
| 9 | 10 | 10 | Firehouse Dorm | Capacity established by CDCR program needs |

| | | | | |
|---|---|---|---|---|
| 3,431 | 3,540 | 5,507 | BED Totals | |
| | 18 | 18 | Short-Term Health Care Beds | |
| | | 3,558 | 5,525 | Total Potential Capacity |

**STANDARD DEFINITIONS AND NOTES**
**DEFINITIONS**
ACA Beds: Bed Capacity calculations based on American Correctional Association (ACA) square footage standards for all types of inmate housing units.
POC Beds: Current Prison Operational Capacity (POC) calculations based on the Prison's ability to achieve mitigation thresholds [5% Management Flexibility Factor for celled housing units].
PPOC Beds: Potential Prison Operational Capacity (PPOC) calculations assume achieving all mitigation thresholds [5% Management Flexibility Factor for celled housing units].
Short-Term Health Care Beds: Health Care beds programmed for treatment typically requiring inmate stay of 30 days or less.
Total Potential Capacity: The PPOC plus all Short-Term Health Care Beds

**NOTES**
POC and PPOC capacities for: Firehouse, Dorms, and CDF Fire Camps are established by CDCR and CDF per program requirements.
ASU overflow beds are calculated as General Population beds in the PPOC Calculation.
EOP celled housing units are capped at a double celling rate of 150% of Design per CDCR policy.
ASU/SHU cells with 50 sq ft or more of unencumbered space available in each cell are capped at a double celling rate of 150% per CDCR policy.
Small cells with less than 55 sq ft gross, will be considered single cells for all Capacity Calculations

**WASCO STATE PRISON NOTES:**
• An 18-bed correctional treatment center is available for short-term health care needs.

• Non traditional housing unit beds are not included in capacity calculations.

• Ad seg overflow is counted as RC processing in capacity calculations.

• MSF, Dorm E-1 was deactivated during the DAI field review but the capacity is included in these calculations.