1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---O0O---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6  RALPH COLEMAN, et al.,

7          Plaintiffs,

8  Vs.                          CASE NO. CIV. S-90-0520 LKK

9  EDMUND G. BROWN JR., et al.,
   et al.,

10

11         Defendants.

12  _____/

13

14

15                      ---o0o---

16

17                REPORTER'S TRANSCRIPT

18         RE:  EXCERPT OF EVIDENTIARY HEARING

19            TESTIMONY OF PAMELA AHLIN

20           JUNE 19TH, 20TH, 21ST, 2013

21

22                      ---o0o---

23

24

25  Reported by:              CATHERINE E.F. BODENE,
                              CSR. No. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                        APPEARANCES

 2                        ---o0o---

 3

 4   FOR THE PLAINTIFF:

 5          ROSEN, BIEN, GALVAN & GRUNFELD, LLP
            315 MONTGOMERY STREET, TENTH FLOOR
 6          SAN FRANCISCO, CALIFORNIA  94104

 7          BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8          BY:  LORI RIFKIN, ATTORNEY AT LAW

 9          BY:  TOM NOLAN, ATTORNEY AT LAW

10          BY:  AARON J. FISCHER, ATTORNEY AT LAW

11          BY:  MARGOT MENDELSON, ATTORNEY AT LAW

12

13

14   FOR THE DEFENDANTS:

15           STATE OF CALIFORNIA, DEPT. OF JUSTICE
             OFFICE OF THE ATTORNEY GENERAL
16           1300 I STREET
             SACRAMENTO, CALIFORNIA  95814
17
            BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
            BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
            BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
20
            BY:  PATRICK MCKINNEY, II, DEPUTY ATTORNEY GENERAL
21
            BY:  WILLIAM DOWNER, DEPUTY ATTORNEY GENERAL
22

23

24

25                        ---o0o---
```

1                        EXAMINATION INDEX

2                           ---o0o---

3

    FOR THE DEFENDANTS:

4

        EXAMINATION:                                    PAGE

5

6     PAMELA AHLIN

7         (Wednesday, June 19th, 2013)

8         Direct Examination by Ms. Vorous              1

9

          (Thursday, June 20th, 2013)

10

          Cont'd Direct Examination by Ms. Vorous       23

11        Cross-Examination by Ms. Rifkin               37

12

          (Friday, June 21st, 2013)

13

          Cont'd Cross-Examination by Ms. Rifkin        119

14        Redirect Examination by Ms. Vorous            156

          Recross-Examination by Ms. Rifkin             165

15        Further Redirect Exam. by Ms. Vorous          175

16

17

18                          ---o0o---

19

20

21

22

23

24

25

```
 1                          EXHIBIT INDEX

 2                            ---o0o---

 3

 4    PLAINTIFFS'
      EXHIBIT NO            DESCRIPTION              EVD
 5

 6      1                   Document                  22

 7      2                   Docment                   54

 8      3                   Document                 118

 9      4                   Document                 119

10      5                   Docment                  119

11      6                   Document                 119

12      7                   Document                 123

13

14

15

16    DEFENDANTS'
      EXHIBIT NO            DESCRIPTION              EVD
17

18      A                   Document                 162

19

20

21

22

23

24

25                            ---o0o---
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

```
 1                    SACRAMENTO, CALIFORNIA

 2          WEDNESDAY, JUNE 19TH, 2013 - AFTERNOON SESSION

 3                         ---o0o---

 4          (EXCERPT FROM HEARING.)

 5          THE COURT:  Defendant.

 6          MS. VOROUS:  Defendants call as their first witness

 7    Miss Pamela Ahlin.

 8               THE CLERK:  Raise your right hand.

 9                         PAMELA AHLIN,

10    was thereupon called as a witness herein by the Defendants,

11    and having been sworn to tell the truth, the whole truth and

12    nothing but the truth, was thereupon examined and testified

13    as follows:

14               THE CLERK:  Please, take a seat.

15               State and spell your name, and speak directly into

16    the microphone.

17               THE WITNESS:  My name is Pamela Ahlin, P-a-m-e-l-a,

18    A-h-l-i-n.

19                         DIRECT EXAMINATION

20    BY MS. VOROUS:

21    Q.    Good afternoon, Miss Ahlin.

22          Would you please state your current employer?

23    A.    I currently work for the Department of State

24    Hospitals.

25    Q.    Miss Ahlin, if I understand correctly, you currently
```

2

1   hold two titles for the Department of State Hospitals?

2   A.      Yes, I do.

3   Q.      What are your titles?

4   A.      I am the deputy director for the Department of State

5   Hospitals for strategic planning.  And I am currently the

6   interim executive director at Salinas Valley Psychiatric

7   Program.

8   Q.      How long have you been the interim executive director

9   at Salinas Valley Psychiatric Program?

10  A.      A little over five weeks.

11  Q.      How long have you been the deputy director for the

12  Department of --

13          THE COURT:  I'm sorry.  Did you say five weeks or

14  five years?

15          THE WITNESS:  Five weeks.

16          THE COURT:  Thank you, ma'am.

17  BY MS. VOROUS:

18  Q.      How long have you been the deputy director for the

19  Department of State Hospitals strategic planning, I believe

20  you said?

21  A.      Since April of 2012.

22  Q.      Would you please describe your duties as the deputy

23  director for the Department of State Hospitals?

24  A.      Yes.  I currently evaluate all of the state hospital

25  programs, and we do enterprise state strategic planning,

3

1    looking at processes for merging all of our five state

2    hospitals and two psychiatric programs and the new Stockton

3    program into one unified enterprise.

4         And I work with each of the hospitals and prioritize

5    our plan and make sure that it's within our mission and

6    vision.

7    Q.    Before you became the interim executive director at

8    the Salinas Valley Program, did your duties as the deputy

9    director -- or as a deputy direct for Department of State

10   Hospitals include visits to inpatient programs within the

11   CDCR prisons?

12   A.    Yes.

13   Q.    Including Salinas Valley Psychiatric Program?

14   A.    Yes, it did.

15   Q.    Would you describe what those visits involved?

16   A.    One of our primary focuses as we developed the new

17   Department of State Hospitals was to go out and survey all

18   our staff as far as how they felt about how the department is

19   running.

20        So we did an internal staff survey.  And from that

21   survey we went out and physically met with all the staff that

22   wanted to participate, and talked about the employee morale.

23   So we did town halls with each one of those hospitals, with

24   the staff, and we came up -- and that's how we're developing

25   our statewide strategic plan.

4

1    Q.      Miss Ahlin, if I can ask you to back up just a little

2    bit.

3           Can you please explain what you meant by your

4    comment, "in the process of developing the new Department of

5    State Hospitals"?

6    A.      As of July 1, 2012, we changed from the Department of

7    Mental Health to the Department of State Hospitals.  We

8    downsized our department, and with that we created a new

9    mission and vision.  And we wanted to go out to the hospitals

10   and find out what it is we need to work out and prioritize as

11   our mission.

12   Q.      Were you working for the Department of State

13   Hospitals prior to starting as deputy director for the new

14   Department of State Hospitals?

15   A.      Yes, I was.

16   Q.      I should have said "working for the Department of

17   Mental Health."  I apologize.  I assume you understand what I

18   meant?

19   A.      Yes.

20   Q.      In what capacity?

21   A.      I was the executive director at Coalinga State

22   Hospital.

23   Q.      How long were you the executive director at Coalinga

24   State Hospital?

25   A.      Since 2007.  Approximately five years.

5

1   Q.      Prior to working as the executive director at

2   Coalinga State Hospital, were you working at the hospital in

3   a different capacity?

4   A.      Yes, I was.  I was a hospital administrator and

5   assistant hospital administrator since 2005.

6   Q.      Would you describe -- please describe your duties at

7   Coalinga Hospital as the, I believe you said, the executive

8   director?

9   A.      Yes.  I was responsible for the overall management of

10  the entire facility, which is a 1500 bed mental health

11  hospital.

12          I ensured that the administrative and clinical

13  processes were developed and implemented and running

14  smoothly.  I was responsible for the staffing models and

15  making sure delivery of care was adequate.

16  Q.      At any point during your work at Coalinga State

17  Hospital was the hospital going through a change in

18  management?

19  A.      Yes.  In 2007 we had our entire -- our entire

20  executive team was removed, and we were -- I was put in place

21  as an interim, as well as acting executive director at that

22  point in time.  And I had to rebuild the team that is there

23  now.

24  Q.      Are you familiar with the program at Coalinga State

25  Hospital for the Coleman class members?

6

 1    A.      Yes, I am.

 2    Q.      Can you describe what that program is?

 3    A.      We have a 50 bed Coleman Unit for Level I/Level II

 4    inmates.  It serves -- our length of stay is usually between

 5    six and nine months.  It is an ICF program.  We serve them.

 6    They get transferred in from Atascadero State Hospital.  We

 7    treat them, and then they are released back to the prison.

 8    Q.      Before beginning your work with Department of State

 9    Hospitals were you employed?

10    A.      Yes, I was.

11    Q.      Would you briefly describe your prior employment?

12    A.      I worked for the Department of Corrections.  I worked

13    as a correctional officer.  I also worked as an associate

14    program analyst, staff manager, business manager, for

15    approximately 15 years.

16    Q.      What was your purpose in going to the Salinas Valley

17    Psychiatric Program as the interim executive director?

18            THE COURT:  I don't understand what the question is.

19            Did you volunteer for the program or were you

20    assigned?

21            I don't know what the question means.

22            THE WITNESS:  I actually volunteered to go over there

23    as interim executive director as there was a current vacancy.

24            THE COURT:  I think now she wants to know what your

25    motivation was.

7

BY MS. VOROUS:

Q.      That's correct.  What was your motivation for going?

        THE COURT:  Aside from the fact it was a promotion.

        Go ahead.

        THE WITNESS:  It wasn't a promotion.

        Well, I worked for Department of State Hospitals.
And one of our sister facilities was going through some
transition -- proposed transitions, and I felt that I could
go and help assist with taking a look and assessing the
program and hopefully building a core executive team there,
as I did at Coalinga State Hospital, and get it running the
way that our expectations are.

BY MS. VOROUS:

Q.      What are your duties currently as interim executive
director at Salinas Valley Psychiatric Program?

A.      Currently I am out assessing all the programs,
looking at how they are functioning, whether or not there are
policies and procedures that are current and effective for
the program needs.

        I also am meeting with all staff, the chiefs of
staffs, all the disciplines, talking to them and finding out
what their assessments are, what their needs are, what the
patients' needs are.

        I am visually inspecting all of our areas and
departments, going in observing treatment teams and groups

8

1   and looking at the conditions of the facility itself, looking

2   at how the facility is integrated in with the prison, how it

3   works, how we communicate with them.

4          And I am ensuring that we have the protocols in place

5   to do the job we're supposed to be doing per Title 22, per

6   our own departmental standards, and to ensure that our

7   processes are flowing smoothly.

8   Q.     As the interim executive director, have you put in

9   place an executive team?

10  A.     Yes, I have.

11  Q.     What does your team look like?

12  A.     I have an interim assistant executive director.  That

13  is George Maynard.  I have a interim hospital administrator,

14  Deborah Landrum.  She comes from Atascadero State Hospital.

15         I have an interim clinical administrator, Dante

16  Karas.  He comes from Atascadero State Hospital.  I have a

17  permanent medical director, Dr. Bleman.  I have a permanent

18  nurse administrator which is Julie Misling, M-i-s-l-i-n-g.

19  Q.     What was your motivation in putting together this

20  type of team?

21  A.     Well, I was looking at how it functions.  I looked

22  for expertise in these areas to be able to go in and assess

23  based on their experience.

24         I wanted an experienced executive team in there to be

25  able to identify if there are any holes in our system, if

1    there is any policies that are there that are not being

2    implemented correctly or practiced, to be able to identify

3    performance improvements basically in a timely manner, and

4    for us to work as a team and to work with the staff that are

5    currently there to ensure they understand what the policies

6    are, what the policies mean, their input on the policies, and

7    to make sure that they are actually working as they should.

8    Q.      Miss Ahlin, would you please describe the physical

9    structure of the program?  And what I mean by that is the

10   facilities, the unit itself.

11   A.      Sure.  There's six units.  There's Treatment Center 1

12   and Treatment Center 2.  Treatment Center 1 has 64 beds.

13   Treatment Center 2 has 74 beds.

14           We have temporary beds which are in Delta yard, which

15   is D-5 and D-6.  Each one of those yards have 58 beds each.

16   And we also have two units on C-yard, Charlie yard, which has

17   50 beds.  Each one of those -- each one of our temporary beds

18   or temporary units have pods A, B, and C within them.

19   Q.      Do all the housing units have what we refer to as a

20   "celled environment" as compared to dormitory housing?

21   A.      No.  We have -- TC-1 and TC-2 are our mental health

22   designed mental health units.  Those have two-man dorms in

23   TC-2.  Then there is some four-man dorms in TC-1.  But they

24   also have the cells in those units as well or single rooms.

25   Q.      Will you describe the type of inmates that are in the

10

1    Salinas Valley Program in general?

2    A.       In general it's the highest level of security from

3    Department of Corrections that comes into Salinas Valley,

4    coupled with their mental illness.

5            They are -- they have gone through -- as the

6    plaintiffs have described, they have gone through the Triple

7    CMS Program, the Enhanced Outplacement Program, or they're

8    general population and they've come to us when they've

9    exhausted their means of mental health.

10   Q.       What is the current census of the Salinas Valley

11   Program?

12   A.       It's approximately 342 patients as of yesterday.

13   Q.       So 342 is the current census, but the numbers that

14   you just gave a few minutes ago add up to more in terms of

15   available capacity for the program.  By making that statement

16   is it accurate that not all your beds are full?

17   A.       Not all our beds are full.  That is correct.

18   Q.       Do you have any -- are any of the beds full in units,

19   cells?

20           Can you explain which ones are empty, which ones are

21   full?

22   A.       All our cells, our single rooms are full.  When we

23   discharge, those are immediately filled.  So those are all

24   full.

25           The ones that are vacant, I think we have

11

1   approximately 20 beds available in the four-man dorms and

2   approximately seven beds available in the two-man dorms.

3   Zero in the cells.

4   Q.      Is it typical that you have similar numbers in terms

5   of vacancies on a month-to-month basis?

6   A.      Yes.

7   Q.      What clinical classifications do you currently have

8   at the Salinas Valley Program?

9   A.      We have a variety of clinical classifications.  For

10  our treatment teams we have registered nurses, rehab

11  therapists, clinical social workers, psychologists and

12  psychiatrists.

13          On the units we utilize psychiatric technicians,

14  registered nurses and medical technical assistants.

15          We also have support staff that also engage in

16  treating the individuals as well -- or who are instrumental

17  in the treatment, I say, such as medical transcribers, stock

18  clerks, food service technicians, clothing distribution.

19  Q.      Miss Ahlin, are you familiar with the current

20  staffing --

21          THE COURT:  I'm having trouble hearing.  I think if

22  you lift the microphone a little you will be better off.

23  BY MS. VOROUS:

24  Q.      Miss Ahlin, are you familiar with the current

25  staffing levels for psychiatrists at Salinas Valley

12

1   Psychiatric Program?

2   A.      Yes, I am.

3   Q.      How many psychiatrists are there currently working in

4   the program?

5           I have equivalent to 10.25 full-time psychiatrists.

6   And I also have equivalent to a .9.  I have two psychiatrists

7   that work approximately .45 value on the weekends to do the

8   discharges.

9   Q.      Can you explain what you mean --

10          THE COURT:  Stop for a moment, please.

11          What does it mean to have equivalent of 10.25

12  full-time?

13          How do you arrive at that number?

14          What does it mean?

15          THE WITNESS:  That means I have -- let's see -- ten

16  full-time -- well, ten bodies, ten psychiatrists there.  One

17  of my psychiatrists works three-quarters position and two of

18  the other psychiatrists work 1.25, meaning they pick up an

19  extra quarter-time position.

20          THE COURT:  That would be true of the other numbers

21  that vary?

22          THE WITNESS:  Correct.

23          THE COURT:  You may proceed.

24  BY MS. VOROUS:

25  Q.      Can you explain the two positions that you mentioned

13

1    that totaled, I believe, you said .9?

2    A.    Point nine.  We have two psychiatrists that currently

3    are employed by Patton State Hospital that come on the

4    weekend.  They do either -- I think they both work Saturday,

5    Sunday and Monday.  And they are helping prepare all of the

6    discharge packages for the patients that will be preparing to

7    migrate to the new Stockton facility.

8    Q.    What's the purpose in having the psychiatrists come

9    from Patton and undertake this task?

10    A.    Normally we discharge approximately 40 patients a

11    month.  And the additional workload with the migration, we

12    take that into consideration, and did not want to impact our

13    current psychiatrists that work with the current caseload

14    that are there.  So we asked for other psychiatrists to come

15    and help, to help prepare those packages, review the files,

16    talk to the patients and get the discharge plan in

17    preparation for the move so it is not impacting the daily

18    duties that our psychiatrists need to do.

19    Q.    Is completion of the discharge packets something that

20    you are required -- you, being Salinas Valley, required to do

21    under Title 22?

22    A.    Yes.

23    Q.    Okay.  Have you recently brought on any new

24    additional full-time psychiatrists?

25    A.    Yes.

14

1   Q.      Can you identify the psychiatrists that you have

2   brought on, as well as when you brought them on?

3   A.      Okay.  Let's see.  We brought on several

4   psychiatrists since I've been there -- since the last five

5   weeks.

6           One has returned from -- one of -- he was there

7   previously and came back several weeks ago.  And then another

8   one returned again on Tuesday.  And then another one returned

9   on Tuesday.  So actually I have two returning on this

10  Tuesday.  One was on a leave of absence.  One had transferred

11  to another facility and returned.

12  Q.      Are you, being the executive director for Salinas

13  Valley Psychiatric Prison, refusing to hire more staff than

14  what you have?

15  A.      Absolutely not.

16  Q.      To your knowledge are any of the psychiatrists

17  currently working at Salinas Valley Psychiatric Program

18  scheduled to leave anytime in the near future?

19  A.      Yes.  I have one full-time psychiatrist that is

20  planning to transfer August 19th.

21  Q.      Is that psychiatrist leaving due to dissatisfaction

22  with the program?

23  A.      No.  She will be going closer to home.

24  Q.      Are you taking any steps at this point in time to

25  continue the hiring and retention of psychiatrists?

15

1  A.    Yes.  Actually, we've hired a recruiter.  And I have

2  one candidate that's in the pipeline right now coming from

3  the recruiter we recently hired statewide.

4        I also have been in contact with another psychiatrist

5  that's possibly going to come within the next 60 days, a

6  contract employee.

7        So, yeah, we are constantly reaching out trying to

8  recruit, whether through the contracts, we've made sure we've

9  tapped into every state contract we could.

10       We have ten viable contracts that we are canvassing.

11 We are calling them every week to see if we can get

12 additional psychiatrists in.

13       Again, we did the recruiter.  We canvassed out for

14 additional positions from any of the other hospitals.  We

15 also asked CDCR if they have any psychiatrists they can

16 canvass to see if they wanted to do additional positions as

17 well.

18 Q.    In looking for additional psychiatrists to hire into

19 the psychiatric program, is the program subject to any state

20 hiring freeze?

21 A.    No.

22 Q.    Miss Ahlin, you talked a little bit about a migration

23 to Stockton.  Can you explain what you're referring to when

24 you mention that?

25 A.    Yes.  As hopefully everybody knows, we are opening up

16

1  a new joint facility between CDCR and Department of State

2  Hospitals.

3      The new Stockton facility will have, I believe, 514,

4  around there, beds.  We will be migrating and transferring

5  242 patients currently at Salinas Valley Psychiatric Program

6  to the new Stockton facility beginning July 22nd -- the week

7  of July 22nd.

8  Q.    And the 242 patients that you referred to, are those

9  patients that are currently in what you referred to as the

10 temporary units, the C-5 and C-6, the D-5 and D-6?

11 A.    Correct.

12 Q.    The new Stockton facility includes both intermediate

13 care beds and acute beds?

14 A.    Yes.

15 Q.    So if I'm understanding how this is going to work

16 correctly, what you'll be left with at the Salinas Valley

17 Program, once the migration occurs, is the 128 permanent beds

18 that are currently at in TC-1 and TC-2.

19      Is that accurate?

20 A.    Yes.  We will have remaining 128 permanent beds.

21 Q.    What is the current plan to transfer the patients?

22      I know you mentioned that you were starting on July

23 22nd when we've all indicated that's when the new Stockton

24 facility will be activated and start taking intermediate care

25 patients, but what is the plan in how you are going to

17

1    transfer the patients to the new facility?

2    A.    We've been working hand in hand with the Stockton

3    facility.  What we've done is their doctors have come over

4    and have worked at our facility, meeting the individuals,

5    looking at their medical files, looking at their charts,

6    assessing and triaging.

7          All the individuals, all the patients on D-5, D 6,

8    C-5 and C-6, they are putting them in a transfer order.  So

9    they've identified three levels of transfers.

10         What we're doing is we have a plan, and we will be

11   taking approximately 20 patients per week beginning July 22nd

12   and migrating them over, transferring -- preparing their

13   packages and so forth and getting ready.  Then CDCR is

14   coordinating the transfers, and they will be transferring

15   over to Stockton.

16   Q.    What is that -- the transfer of approximately 20 per

17   week equate to in terms of numbers for units that are

18   opening?

19         I may not have asked that question very well.

20         THE COURT:  I'm sorry.  I don't understand the

21   question.

22   BY MS. VOROUS:

23   Q.    How many units, do you -- if you know, are opening up

24   at Stockton?

25   A.    From what I understand it will be opening four units

18

1   a week.  So the first week of migration, when we send 20

2   patients over, there will be -- You know what?  I'm not sure

3   if it is four or two.  But there should be 20 patients going

4   between four units I believe.  So five patients per week will

5   be going into each one of their units as they activate.

6   Q.      Is the plan then to transfer one per day per unit?

7   A.      For the receiving end, yes.

8   Q.      Over what period of time will the migration occur?

9   A.      I'm sorry.  What was that?

10  Q.      What is the period of time --

11          THE COURT:  What is presently contemplated is the

12  period of time for the transmission to take place?

13          THE WITNESS:  If everything goes as planned, it will

14  begin on July 22nd.  And they will migrate over 20 per week

15  approximately until the end of December.

16          December 31st of 2013 we should be migrated out of

17  the DSH current psychiatric programs into the new Stockton

18  facility.

19   BY MS. VOROUS:

20  Q.      Will transitioning the patients over to the new

21  facility impact the staffing at the Salinas Valley

22  Psychiatric Program?

23  A.      After the migration?

24  Q.      During the migration.

25  A.      We are maintaining our staffing levels during

19

1    migration and do not plan on making any staffing adjustments

2    until January of 2014 as long as all the migration goes as

3    planned.

4    Q.    Miss Ahlin, are you familiar with the Title 22

5    licensing requirements that apply to the psychiatric program

6    in Salinas?

7    A.    Yes.

8    Q.    What are the requirements?

9    A.    Well, the requirement is to have an interdisciplinary

10   team.  It also requires that you have the appropriate nursing

11   coverage for the units themselves.

12   Q.    Is the program meeting licensing requirements as we

13   sit here today?

14   A.    Yes.

15   Q.    Beyond requiring an interdisciplinary treatment team,

16   does Title 22 have any further requirements with respect to

17   treatment hours or how often a treatment team must meet?

18   A.    No.

19   Q.    Beyond interdisciplinary treatment team meetings are

20   there other types of programming that the psychiatric program

21   provides to the patients that are in your program?

22   A.    Could you say that one more time?

23   Q.    Beyond the interdisciplinary treatment team meetings

24   that occur, are there other types of treatment that the

25   program provides to the patients?

20

1    A.        Oh, yes.  Yes.

2    Q.        Can you describe what the other types of treatment

3    entail?

4    A.        Well, you can have -- as we spoke earlier you can

5    have treatment programs which are designed through -- usually

6    you have clinicians that design all the treatment programs

7    for the types of individuals that you treat within your

8    hospital.  And those are held in either small groups, large

9    groups or actually a discretionary program which would be, as

10   referenced earlier, a solo program.

11            There are rehabilitation therapists.  And we have a

12   variety of those, different disciplines, that will do art,

13   music, recreation-type activities, including the yard,

14   structured programs where you go and try to get them to

15   engage in social activities.

16            We also have engagement of our patients 24/7, around

17   the clock.  We do rounds every 15 minutes.  That's the

18   nursing staff that are on the units.  They are constantly

19   observing the individuals, where they live, in their housing

20   units.

21            They go to their visiting doctor's appointments,

22   dental appointments.  There is a lot of activities that go on

23   besides just the team and just the watching on the 24/7.

24            THE COURT:  It is 4:30.  We'll reconvene tomorrow

25   morning at?

21

1          THE CLERK:  9:15.

2          THE COURT:  Tomorrow at 9:15.

3          (Off the record at 4:30 p.m.)

4                    ---o0o---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

22

1                    SACRAMENTO, CALIFORNIA

2                THURSDAY, JUNE 20TH, 2013 - 9:15 A.M.

3                          ---o0o---

4           THE CLERK:  All rise.

5           Court is now in session.  The Honorable Lawrence K.

6    Karlton, United States District Court Judge, presiding.

7           THE COURT:  Please, be seated.

8           THE CLERK:  Calling Civil Case 90-520, Coleman,

9    et al., versus Brown, et al.

10          THE COURT:  You were inquiring, ma'am?

11          Hang on.

12          Yes, sir.

13          MR. BIEN:  Your Honor, plaintiffs -- it wasn't clear

14   in the record and so without objection from defendants, we

15   wanted to move into evidence Plaintiffs' Exhibit 1, which was

16   Exhibit H to the binder.  It was marked as Plaintiffs'

17   Exhibit 1.

18          I think it is without objection.

19          THE COURT:  Without objection, ma'am?

20          MS. VOROUS:  Yes, Your Honor.

21          THE COURT:  Received.

22              (Whereupon, Plaintiffs' Exhibit Number 1 received

23               into evidence.)

24          THE COURT:  You may proceed, Miss Vorous.

25          MS. VOROUS:  Defendants are calling Miss Ahlin back

23

1  to the witness stand.

2           THE COURT:  I remind you, you are under oath, ma'am.

3           (HAVING BEEN PREVIOUSLY SWORN, PAMELA AHLIN RESUMES

4            THE WITNESS STAND.)

5                    CONTINUED DIRECT EXAMINATION

6  BY MS. VOROUS:

7  Q.     Could I please have the last question read and the

8  answer read where we ended.

9           You don't have that?

10          THE COURT:  I do.

11          (Court Reporter explains a new file has been opened.)

12  BY MS. VOROUS:

13  Q.     Miss Ahlin, are you familiar with what we've been

14  referring to -- we referred to yesterday as the "orientation

15  process" at Salinas Valley Psychiatric Program?

16  A.     Yes, I am.

17  Q.     Can you please describe what that is?

18  A.      It is -- when the patients arrive, it is the first

19  ten days of arrival at Salinas Valley Psychiatric Program.

20  It consists of the first initial admission reports, admission

21  assessments, which are done by a psychiatrist, a

22  physician/surgeon, a registered nurse, and the other

23  disciplines.  They do that upon immediate intake of the

24  patients.

25           Then they go into their -- they're checked out, and

24

1    the treatment protocols start to be developed -- a treatment

2    plan begins to be developed.  Then within 72 hours the

3    treatment team meets with the individual as a team, and then

4    within ten days they are met by the ICC.

5             THE COURT:  I'm sorry.  Met by the?

6             THE WITNESS:  ICC.  Institutional Classification

7    Committee.

8             THE COURT:  That's fine.

9             THE WITNESS:  Okay.

10   BY MS. VOROUS:

11   Q.      What is the purpose of the Institutional

12   Classification Committee meeting?

13   A.      Generally it is the institutional side of the review.

14   They have -- they do know that the patient is coming, and

15   they have accepted the patient to Salinas Valley's program.

16           However, they update.  They review the C-File.

17   Anything that has changed since the initial referral, and

18   then the point of intake, which can be up to 30 days, they'll

19   review any current documentation to make sure he can be

20   safely housed, whether it's a single room, a dorm setting.

21   They review any enemy concerns.

22           It's more of the environmental and safety and

23   security protections that are placed upon the patient's

24   movement within the facility, how they're going to be moved,

25   what type of precautions we use and so forth.

25

1   Q.      As the executive director for the program, do you

2   believe this orientation process is important?

3   A.      Absolutely.

4   Q.      Why do you believe that?

5   A.      Well, first of all you're transferring an inmate from

6   one facility to another.  So you need to make sure that

7   nothing was missed in the initial referral package.  So you

8   are responsible for that individual now at your facility.

9          He's now under your authority so you want to make

10  sure that everything there is appropriate, current, and that

11  you take a thorough review on the placement.  It is for the

12  safety of the patient itself, the other patients, and all the

13  staff that will be providing treatment for that individual.

14         It's a part of the orientation that has to

15  collaborate with DSH because we're not privy to the safety

16  and security as far as the C-File goes.  That's their

17  responsibility.  We're here to provide treatment to that

18  individual, but we need to be able to have that individual

19  treated in a very safe environment for our clinicians, for

20  the other patients and for the patient their self (sic).

21  Q.      Are you familiar with the current process at Salinas

22  Valley Psychiatric Program for providing inmates with a

23  sufficient amount of clean laundry and bedding?

24  A.      Yes, I am.

25  Q.      And can you please explain that process?

26

1    A.       You want to know what the current process is?

2    Q.       Yes.   The current process.

3    A.       Okay.   All individuals that are committed to the

4    department are entitled to every basic need for living,

5    including clothing.

6             I had heard, just as everybody else had heard, that

7    there could possibly be issues surrounding clothing, whether

8    it was quantity of clothing, type of clothing, clean

9    clothing, et cetera.

10            So one of the first things that I did when I went

11   over there was went out, observed, talked to staff, asked for

12   the appeals to come in.   I asked the appeals coordinator to

13   give me any of the last quarter's appeals.   I wanted to see

14   what the patients were complaining about.

15            I also asked to see the patient counsel meeting

16   minutes to see if any concerns were brought up through there.

17   And I talked to some of the staff about the alleged clothing

18   issues.

19            There was some sporadic concerns that made me think

20   that maybe there might be some instances that maybe patients

21   didn't have the appropriate clothing at any particular time.

22   I don't know if that was absolutely sure because what I saw,

23   they did have clean clothing when I was observing.

24            However, it was such an issue that I decided that

25   what we wanted to do was find out what the institution has

27

1    done since the alleged complaint came forward.

2         The staff there, administrators there had already

3    started with working with PIA.  They had already did a

4    complete assessment of the clothing inventory.

5         THE COURT:  What is PIA?

6         THE WITNESS:  I'm sorry.  Prison Industry Authority.

7    It is the agency that cleans the clothes on a regular basis.

8    It's a contract that we entered, an agency contract that

9    every facility has.

10         So they had done an inventory of the clothing.

11         MS. RIFKIN:  Objection, Your Honor.  Hearsay.

12         THE COURT:  Well, it goes to explain what this

13    witness did in light of the complaints.  And I'll receive it

14    not for the truth of the matter, but as an explanation of

15    her -- what she understood the current program was and what

16    she did in response to it.

17         You may proceed, ma'am.

18         THE WITNESS:  Thank you.

19         I observed many boxes of new clothing in the

20    assistant hospital administrator's office and asked where

21    they had received this clothing.  And they said they had done

22    an inventory and purchased many clothes to restock the entire

23    facility for Department of State Hospitals.

24         So there -- looking at this issue we wanted to make

25    sure, one, we had enough supplies, which that was verified.

28

1   We did have enough supplies at the facility when I arrived.

2           I asked how is the relationship with the Prison

3   Industry Authority as far as cleaning the supplies, getting

4   them from our facility as soiled laundry to the Prison

5   Industry Authority, PIA, and returning.  What we're sending

6   out, is it coming back?

7           There were some discrepancies on what was coming

8   back.  So I said, have you met with the Prison Industry

9   Authority?  At that time it was with the Chowchilla Facility

10  and the Women's Facility, PIA was doing it there.

11          They had had meetings, and they had rectified the

12  problem at that point in time.

13          In the interim, in the last three weeks, we switched

14  to Avenal State Prison's PIA to do the laundry.  So again we

15  set up a rapport with the district managers to make sure -- a

16  meeting with them to make sure that we had an inventory of

17  what was going out and what was coming in.

18          That has set up.  The meeting is going to be set next

19  week.  They have a meeting set up to meet with them.  At the

20  same time we are inventorying everything going out.  And

21  everything coming in is inventoried.

22          So first we have clean clothing on site.  Two, it is

23  now properly being laundered and there is an accountability

24  process for that process.

25          Then what we wanted to do is go out see once it comes

29

1    into the warehouse, how does it get out to the facilities

2    themselves, the four different -- six different units.

3            So the hospital administrator went and observed the

4    intake of the laundry.  How does it get to the units, watched

5    how it is tracked, how it is inventoried, and started

6    drafting up a process from that point on.

7            That has such been drafted into a draft policy.

8            Then once it gets to the unit, we have to make sure

9    that it gets prepared and to the patient.  That's the most

10   important part, is to make sure that we have all these in

11   place and that the laundry can get delivered to the

12   individual.

13           Individuals are sized upon admission.  Their clothing

14   size is marked onto a laundry cart.  That laundry cart goes

15   with the individual to the unit.  So the unit staff know what

16   type of clothing and what size this individual gets.

17           That is placed on the unit.  There is a cabinet there

18   that the clothes are now rolled -- clean clothes rolled and

19   individually labeled for those individuals.

20           They are handed out when they go to their showers.

21   So upon their shower they get a clean roll of all clothes and

22   they turn in their soiled clothing.

23           That process is now in place.  It has been in place,

24   but we memorialized it.  It is now in the draft policy to

25   ensure that all staff will understand the process, understand

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

30

1    where the policy is, and for new staff coming on, they will

2    understand the process as well.

3        Now, we understand that these are mentally ill

4    patients and at times they will soil their clothing in

5    between their shower times.

6        So we have to have another process to how does the

7    laundry get exchanged in between their shower.  So we have

8    also drafted in this policy that there is excess clothing,

9    all sizes and types, that are in another cabinet.

10        And that is for all staff on the unit to exchange

11   clothing any given time of the day.  So 24 hours, seven days

12   a week staff have access to that.  If a patient goes to a

13   team and says they have dirty socks, they have access to

14   exchange the socks at that time.

15        If the patient has an accident at 4:00 in the

16   morning, the staff can check with them, get the clothes

17   without disturbing their personal roll they'll be issued on

18   shower day.

19        Sheets and pillow cases are exchanged on a weekly

20   basis as well.

21        So what we've done is we have a draft policy.  We're

22   working it out.  The units have been trained on it.  We're

23   making sure everything is complete, and we will have it in a

24   finalized policy within two weeks.  We want to make sure we

25   don't have to tweak it any more as it is rolled out.

1  BY MS. VOROUS:

2  Q.      Miss Ahlin, are you familiar with the discharge

3  process at Salinas Valley Psychiatric Program?

4  A.      Yes, I am.

5  Q.      Explain what that process is.

6  A.      Patients are normally sent to Department of State

7  Hospitals for an average length of stay for ICF, intermediate

8  care, usually around six to nine months.  However, there are

9  patients that can receive their treatment and meet treatment

10  needs and be discharged sooner.  And there are patients also

11  that will go beyond the average length of stay, and that is

12  fine with us as well.

13      What we did was we do track a patient's length of

14  stay.  We track our census every single day.  And when the

15  patients come up to the nine month mark, if they're still in

16  our system and haven't met their mental health needs and are

17  ready for discharge, we have what is called a utilization

18  management meeting.  And they -- I let the team know this

19  person is coming up to the nine month mark, would you please

20  review to see if they've met their needs, and give us

21  documentation to say that they either need to be retained at

22  Salinas Valley for further treatment, or yes, they're ready

23  for discharge.

24      Those notations are noted in the treatment file, and

25  there is a notation that is made on the file.  And they will

32

1    continue their stay at Salinas Valley until they complete

2    their treatment.

3          Once a patient is ready for discharge, the

4    psychiatrist will make the order for discharge, and the other

5    disciplines will do the discharge paperwork, prepare it and

6    get it ready to go back to the clinicians at CDCR as they are

7    transferred back.

8          THE COURT:  I'm sorry, ma'am.  I didn't hear you?

9          (Court Reporter requests the witness repeat the last

10          sentence.)

11          THE WITNESS:  Once the psychiatrist orders the

12    discharge, the other clinicians, the other disciplines will

13    prepare the discharge paperwork as well.

14    BY MS. VOROUS:

15    Q.      Are you familiar with the average length of stay in

16    the psychiatric program?

17    A.      At Salinas Valley?

18    Q.      Yes, at Salinas Valley.

19    A.      Yes, I am.

20    Q.      And taking the first -- since were in the middle of

21    June, the first five months of 2013, what's the average

22    length of stay?

23    A.      The average length of stay on the patients that have

24    been discharged for the first part of 2013 is about 220 days.

25    Those are individuals that have been discharged.

33

1          However, we do have individuals that are currently in

2    our system that -- there's three individuals that have been

3    in our system well over 500 days.  And there's approximately

4    eight that have been well over a year that are currently

5    still receiving services.

6    Q.      Are you aware of the psychiatrists at Salinas Valley

7    Psychiatric Program ever being told they need to discharge a

8    certain number of inmates per week?

9    A.      I am not aware of that.

10   Q.      Have you ever told the psychiatrists that they need

11   to meet certain quotas in discharging patients?

12   A.      No.

13   Q.      I believe, as you've already testified, the

14   clinicians are the ones who make the determination as to when

15   a patient is ready to discharge?

16          MS. RIFKIN:  Objection, Your Honor.  Leading.

17          THE COURT:  It is, but so what?  It is just repeated

18   evidence.  You may answer, ma'am.

19          THE WITNESS:  The psychiatrists are the only ones

20   that can discharge a patient at Salinas Valley or any state

21   hospital.

22   BY MS. VOROUS:

23   Q.      Miss Ahlin, are you familiar with how many patients

24   that are currently pending admission to the Salinas Valley

25   Psychiatric Program?

34

1   A.      As of today we have 34 accepted referrals at Salinas

2   Valley ready for admission.

3   Q.      Do you know how long -- I don't know if you want to

4   break it down by category, do you know how long those

5   patients have been pending admission?

6   A.      Yes.   That's another thing that I reviewed once I

7   arrived at Salinas Valley, was to observe how the admission

8   process is handled, how is the admission and discharge

9   coordinator prioritizing the admissions, are we meeting the

10  requirements of the Memorandum of Understanding between the

11  two agencies.

12         So we looked at, first and foremost, are we reviewing

13  the packets within the 72 hours and to ensure that we had a

14  process set up that we are reviewing within 72 hours and

15  providing a response.

16         The second part was are we intaking the patients 30

17  days -- within the 30-day window of once we've accepted the

18  patients.

19         So what we do, we have them tracked.   They have been

20  tracked all along.   And we currently have 34 that are on the

21  referral list.   Three would be considered -- or four -- I'm

22  sorry -- four would be considered beyond the 30 days that

23  would be considered the waitlists.

24         However, those four individuals, there are notations

25  on them that they cannot transfer to Department of State

35

1    Hospitals.  One is waiting for a Clozaril effect to take

2    place.  One is waiting for a Keyhea.  One has an orthopedic

3    appointment follow-up.  And one CMC, California Men's Colony,

4    has put a medical hold on his transfer.

5         All the other 30 are within the 30-day window.

6         What we do is this week we had nine individuals

7    discharging.  And immediately -- they discharged on Monday

8    and Tuesday.  Wednesday and Thursday all nine beds are being

9    filled.  And those are the top guys waiting, coming in.

10   Q.    When the Department of State Hospitals receives a

11   referral packet, is that referral packet always to the point

12   where you can make a determination as to whether to accept or

13   reject the patient?

14        MS. RIFKIN:  Objection.  Lack of foundation, "whether

15   they're always appropriate."

16        THE COURT:  I have no idea what your objection is.

17   You may answer, ma'am.

18        I'm sorry.  I don't mean to be disrespectful.  I just

19   don't know what you're saying.

20        You may proceed, ma'am.

21        THE WITNESS:  There are referrals that do come in, I

22   do not have an exact percentage of referrals that come in as

23   what we call "incomplete referrals."

24        We have -- most of the referrals come in as a

25   completed package.  Once the referral is -- once it is

36

1    received -- we have a complete referral received, that is

2    sent to the psychiatrist, the physician/surgeon and the

3    registered nurse and our discharge unit to review the packet

4    and provide an acceptance or denial based on the information

5    that's received.

6           There are, on occasion, where a package will come in

7    with -- more documentation may be needed before it is

8    reviewed by the clinician.  That would be more of a technical

9    document that is not in the package, or when a physician

10   reviews it and needs a little bit further clarification from

11   the sending/referring physician if it is a medical issue, or

12   from the psychiatrist if it is regarding a mental health

13   issue, or even sometimes if it is a nursing care issue.  We

14   need to make sure we can handled those medical and nursing

15   care issues at Salinas Valley Psychiatrist Program because

16   our focus is primarily mental health.

17          We don't want to accept a patient where we take him

18   based on his mental health needs, yet we're not able to care

19   for his nursing care or his medical concerns.

20          So we have a few of those.  But on those occasions

21   they're noted of why we're asking for it, then we follow up

22   to make sure we receive the follow-up documentation.

23          MS. VOROUS:  Just a moment, Your Honor.

24          (Cocounsel confer.)

25          MS. VOROUS:  Nothing further, Your Honor.

37

```
 1              THE COURT:  I'm sorry, Counsel.  Remind me of your
 2    name.
 3              MS. RIFKIN:  Lori Rifkin, Your Honor.
 4              THE COURT:  Rifkin.  Thank you.
 5                          CROSS-EXAMINATION
 6    BY MS. RIFKIN:
 7    Q.      Good morning, Miss Ahlin.
 8    A.      Good morning.
 9    Q.      You testified that you started as the interim
10    executive director at Salinas Valley Psychiatric Program five
11    weeks ago?
12    A.      Yes.
13    Q.      When was your first day?
14              THE COURT:  You mean on the job or at the institution
15    or what?
16    BY MS. RIFKIN:
17    Q.      When was your first day on the job at the
18    institution?
19    A.      May 9th, I think, if that was a Monday.  I don't have
20    a calendar in front of me, but I believe it was around then.
21    Q.      Are you aware that Miss Radtkey filed a declaration
22    in this case on May 9th, 2013?
23    A.      No, I'm not aware that it was filed on May 9th.
24    Q.      Are you aware that she filed a declaration with
25    regard to this motion?
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

38

1    A.      I believe so, yes.

2    Q.      Have you reviewed that declaration?

3    A.      No, I have not.

4    Q.      You testified that when you took the position, the

5    position was vacant; is that correct?

6    A.      The executive director position is vacant, yes.

7    Q.      It is currently vacant?

8    A.      Yes.

9    Q.      So your assignment is temporary?

10   A.      Yes.

11   Q.      How long is your assignment?

12   A.      Until further notice.

13   Q.      And you were preceded by Robert Withrow as executive

14   director at Salinas Valley Psychiatric Program; is that

15   correct?

16   A.      Yes.  He was an interim executive director as well.

17   Q.      He was appointed on April 25th, 2013, correct?

18   A.      I suppose.

19   Q.      What was his last day?

20   A.      The Friday before the Monday I started.

21   Q.      So if Miss Radtkey gave -- testified in her

22   declaration on May 9th, 2013, that Mr. Withrow was presently

23   the interim executive director, that wouldn't be correct?

24   A.      Do you have a calendar I can look at?

25   Q.      I do not have a calendar.

39

1   A.      I'm just going off speculation.

2   Q.      The question is, if Miss Radtkey-Gaither testified on

3   May 9, 2013, that Mr. Withrow was still the interim executive

4   director, would that be incorrect?

5   A.      What day is May 9th?

6           THE COURT:  You mean what day of the week?

7           THE WITNESS:  Yes.

8           THE COURT:  Does anybody have a calendar?

9           Thank you.

10          MR. BIEN:  Thursday.

11          THE WITNESS:  Then my dates are wrong.  Miss Gaither

12  is correct.

13  BY MS. RIFKIN:

14  Q.      What date did you start, ma'am?

15  A.      What day is Monday?

16          MR. BIEN:  May 6th or 13th.

17          THE WITNESS:  May 13th I started I believe.  Without

18  looking at my calendar, I believe it was around May 13th.  It

19  was a Monday.

20  BY MS. RIFKIN:

21  Q.      When did you receive notice that you would be

22  starting as the interim executive director at Salinas Valley

23  Psychiatric Program?

24  A.      Either Saturday or Sunday.

25  Q.      Saturday or Sunday before the day that you started?

40

1   A.      Yes.

2   Q.      Had you applied for the position?

3   A.      No.

4   Q.      You said that you volunteered for the position.  When

5   did you volunteer?

6   A.      The day Miss Radtkey asked me.

7   Q.      Which day was that?

8   A.      Saturday or Sunday.

9   Q.      Why did Miss Radtkey ask you at that time?

10  A.      She told me Dr. Withrow no longer was going to be in

11  the interim position.

12  Q.      Why did Mr. Withrow leave?

13  A.      I do not know that.

14  Q.      So you're the third executive director at Salinas

15  Valley Psychiatric Program in the last two months; is that

16  correct?

17  A.      That would be correct.

18  Q.      You're the third executive director at Salinas Valley

19  Psychiatric Program since plaintiffs filed this motion about

20  care at Salinas Valley Psychiatric Program?

21          THE COURT:  She doesn't know when plaintiffs filed

22  this motion.

23          Is that right, ma'am?

24          THE WITNESS:  That's correct.

25          THE COURT:  Nor frankly do I.

41

1          Go ahead.

2     BY MS. RIFKIN:

3     Q.      There have been three executive directors at Salinas

4     Valley Psychiatric Program since April 11th, 2013?

5     A.      That would be correct.

6     Q.      And you haven't reviewed plaintiffs' briefs in this

7     case?

8     A.      No, I have not.

9     Q.      Have you reviewed the declarations of Dr. Badeaux in

10    this case?

11    A.      Not word for word, no.

12    Q.      Have you reviewed the declaration of Dr. Badeaux in

13    this case?

14    A.      No, I have not.

15    Q.      Have you read it?

16    A.      No.

17    Q.      What did you mean when you said "not word for word"?

18    A.      I've seen it in a book, but I haven't read it.

19    Q.      Did you review the deposition testimony of Dr. Brim

20    in this case?

21    A.      No, I have not.

22    Q.      So before taking the job as the third executive

23    director of Salinas Valley Psychiatric Program in the last

24    two months, you didn't review the testimony of two

25    psychiatrists who were complaining about a crisis in staffing

42

1   and treatment at this institution?

2   A.      No.

3   Q.      You didn't think this was relevant information in

4   investigating the conditions at the institution?

5   A.      I have an assistant executive director who read them

6   verbatim.  He did the assessment on them for me.

7   Q.      What programs have you assessed yourself personally?

8   A.      The clothing program.  Social work.  Psychology.

9   Psychiatry.  Nursing.  Looked at the administrative

10  directives, when they were last updated.  Getting some of the

11  back to basics in place.  Working with the executive team to

12  have them look at their divisions as well.

13  Q.      You testified that you personally investigated the

14  psychiatric program; is that correct?

15  A.      I looked -- I met with all the psychiatrists in a

16  meeting and talked with them about their concerns.

17  Q.      But you didn't think it was relevant to review the

18  two complaints of two psychiatrists who said they resigned

19  from their positions because of problems in psychiatry?

20  A.      No.

21  Q.      Besides meeting with the psychiatrists one time to

22  review their concerns, what else did you do to investigate

23  the psychiatry program?

24  A.      I met with the psychiatrists more than one time.  I

25  meet with the psychiatrists on a regular basis actually.

43

1   Q.      How often do you meet with psychiatrists?

2   A.      When they come to my office.  Daily.

3   Q.      How often do you meet with the psychiatrists as a

4   team?

5           THE COURT:  Ma'am, it is impolite to interrupt.

6           MS. RIFKIN:  Sorry, Your Honor.  Sorry, ma'am.

7           Go ahead.

8           THE WITNESS:  The psychiatrists have a weekly meeting

9   with the physicians and surgeons.  I have gone to two of

10  their meetings and talked to them as a group.  I speak to the

11  psychiatrists many times on a one-on-one basis.

12          THE COURT:  I think the question really is -- or if

13  it isn't, I'm interested -- has there been -- in your

14  experience has there been a formal meeting with the

15  psychiatrists in which the psychiatrists discussed the

16  program with you and tell you what their concerns are?

17          THE WITNESS:  Yes.

18          THE COURT:  How many of those has there been?

19          THE WITNESS:  I've had one formal meeting with them,

20  and we talked about it.

21          THE COURT:  All right.

22  BY MS. RIFKIN:

23  Q.      In your position as interim executive director of the

24  program, is it your responsibility to correct any problems

25  with the program?

44

1    A.      Yes.

2    Q.      Are you aware of the two letters the psychiatry team

3    submitted to your predecessor, Charles DaSilva, concerning

4    staffing treatment?

5    A.      Yes, I am.

6    Q.      They submitted those letters to Charles DaSilva

7    because he was the executive director of the program; is that

8    correct?

9           THE COURT:  You're asking her to speculate as to why

10   they were submitted.  That objection --

11          MS. RIFKIN:  Let me rephrase.

12   BY MS. RIFKIN:

13   Q.      The psychiatrists submitted the letters to the

14   executive director of the program; is that correct?

15   A.      That is correct.

16   Q.      You said that you personally reviewed the social work

17   program; is that correct?

18   A.      I met with the group of social workers and their

19   supervisor and discussed, for several hours, what their

20   concerns were, yes.

21   Q.      That's a meeting with the team, one time formally; is

22   that correct?

23   A.      With -- Yes.  They meet once a month.  And I met with

24   them.

25   Q.      What else did you do to investigate the social work

45

1   program?

2   A.      Personally?

3   Q.      Personally.

4   A.      Can you -- can you describe what you're

5   specifically -- when you say "investigate," what do you mean?

6   Q.      Well, ma'am, you testified that it was your job to

7   come in and investigate the various programs that were going

8   on.  And when I asked you which programs you investigated,

9   you listed social work as one of the programs you

10  investigated.

11          Did you do anything else to investigate the program

12  besides one formal meeting with the social work team?

13  A.      I spoke to the social workers as a group, asked them

14  what their concerns were --

15  Q.      You already stated that.  Did you do anything else,

16  ma'am?

17  A.      I wasn't finished.

18          MS. RIFKIN:  I'm sorry, Your Honor.

19          Go ahead.  Sorry, ma'am.

20          THE COURT:  Deep breath, ma'am.

21          I'm going to tell you once more because I'm the soul

22  of patience.  Do not interrupt the witness.  You may move to

23  strike after the witness has spoken -- has testified if you

24  think that is appropriate, or you may further investigate if

25  you think that is appropriate.

46

1          You may not interrupt.

2          MS. RIFKIN:  Yes, Your Honor.

3          THE COURT:  Now, ask your next question.  I'm sorry.

4    I think the question is, as a formal matter is the one

5    meeting the only meeting that you have had with the social

6    workers?

7          THE WITNESS:  No, it is not.

8    BY MS. RIFKIN:

9    Q.     What else have you done to investigate the social

10   work program?

11   A.     Okay.  I have a clinical administrator who works

12   daily with the social work department.  The clinical

13   administrator's responsibility is to oversee that.  I meet

14   with him on a regular basis.  Every morning we talk about

15   what is going on in social work, as well as psychology, along

16   with rehabilitation therapy, as well as psychiatry.  That

17   occurs every morning at 8:30.  Okay.

18         On a weekly basis, on Wednesdays we meet at ten

19   o'clock.  That is with all department heads, including social

20   work as well.

21         What we discuss is what is going on, in the morning

22   meetings, what occurred in the past 24 hours.  In the weekly

23   meetings we discuss what has occurred with your department

24   the week before.  We also discuss any barriers on delivery of

25   services.  That is what I call "an investigation."

47

1          I also met with the group and disciplines by

2     themselves.  I met with social work.  I met with rehab

3     therapy.  I met with psychology and the psychiatrists as a

4     group so they could explain to me what is happening with

5     their disciplines, their perspective, with the psychologists,

6     psychiatrists and social workers that are currently there

7     working.

8          To me that is real live data.  That is what I want to

9     know, what is going on in the facility right now?  What are

10    their concerns?  What can I do as the executive director?

11    What can the clinical administrator do from his perspective?

12         We have a nurse administrator.  What can the other

13    chiefs, what can the other executives do to assist you in

14    delivering your services to your people, to those patients.

15         That is what I do.

16         Not only do I do that, I seeked (sic) out a chief

17    psychologist who has previous experience as a treatment

18    enhancement coordinator at one of our other state hospitals.

19         What that person does, is they worked with what we

20    call the Clinical Oversight Advisory Council, which has every

21    discipline, including social work.

22         They come into the hospitals.  We've used them in

23    every one of our hospitals.  They come and do a review of

24    clinical services, and they give verbal reports back to the

25    discipline chiefs upon exiting on how they can improve.

48

1          She has now started with our department the beginning

2     of June.  That is a psychologist.  She has met with the

3     social workers, the rehab therapists, the psychologists, the

4     psychiatrists, to find out how she can bring quality of care

5     into our hospital.

6          Also, what standards are we meeting?

7          So when I say "investigate," I'm saying what is being

8     done, what can we do to help you, and how do we go about it.

9     Q.     And you testified that you investigated whether basic

10    needs, such as clean clothing, are currently being provided

11    at Salinas Valley; is that correct?

12    A.     Yes.

13    Q.     And you testified that you resolved this problem; is

14    that correct?

15    A.     It is in the process of being resolved.  I think I

16    said I would have the final policy within two weeks.

17    Q.     Are patients currently receiving clean clothing?

18    A.     Yes.

19    Q.     How do you know?

20    A.     Because I've gone out and observed the process.  I've

21    gone out and observed the laundry carts, where the rolled

22    clothing are.

23         I have a hospital administrator who has followed and

24    shadowed every step of the way.

25    Q.     Have you checked the cells of the patients to make

49

1    sure they are receiving clean laundry?

2    A.      Not all 338, no.

3    Q.      How many cells have you personally checked?

4    A.      I've gone into the treatment unit.  Not every single

5    one of them.  I've spot-checked to see.  And the patients

6    that I observed in their cells, the patients I have observed

7    in the treatment groups that I have observed, the teams, the

8    ones that are being escorted when I am in the units, they all

9    seem to have clean clothing.

10           THE COURT:  Did you speak to any of the patients and

11   ask them:  Are you getting clean clothing?

12           THE WITNESS:  No, I have not spoke to them

13   personally.  I did ask to be invited to the next patient

14   counseling meeting on those units to discuss that with the

15   patients themselves.

16   BY MS. RIFKIN:

17   Q.      As of what date were patients in Salinas Valley

18   Psychiatric Program getting clean laundry on a regular basis?

19   A.      I believe they have been getting clean clothing.

20   Q.      As of what date, ma'am?

21   A.      All along.  There may have been sporadic cases where

22   a patient may not have had clean clothing.  For

23   what circumstances, I'm not sure.

24           We went back and revamped the entire process to make

25   sure -- I don't want to say revamp it.  Went back and looked

50

1    at the entire process to make sure that our policies were

2    up-to-date and that the process was working.  That's what we

3    did.

4    Q.    Are you aware that a new laundry policy was put in

5    place in 2012?

6    A.    No.

7    Q.    Did you review the most recent laundry policy at

8    Salinas Valley Psychiatric Program?

9    A.    No.

10   Q.    So it's your testimony that you're in charge of

11   changing policies to make sure they work and understand why

12   they don't work, but you didn't review the most recent

13   laundry policy that was in place at Salinas Valley

14   Psychiatric Program when you arrived?

15   A.    No.

16   Q.    Do you remember receiving an email on June 4th, 2013,

17   from a social worker at Salinas Valley Psychiatric Program?

18   A.    Yes.

19   Q.    Do you remember that that email said that the men in

20   the Salinas Valley Psychiatric Program still do not have

21   clean laundry and appropriate sizes?

22   A.    Yes.

23   Q.    Do you disagree with that social worker?

24   A.    I instantly asked the social worker and the

25   supervising social worker what steps have they done to

51

1    rectify that.

2    Q.      Did you ask them if patients are receiving clean

3    laundry?

4    A.      That specific social worker?

5    Q.      Yes.

6            Did you ask that specific social worker who emailed

7    you about ongoing problems with clean laundry whether the

8    patients were receiving clean laundry?

9    A.      I asked her for details surrounding that case.  I

10   said:  Can you please provide me with the details surrounding

11   that particular case?

12           I had the hospital administrator go out to C-yard,

13   which that social worker came from, that particular day, to

14   go out and speak to the staff to find out exactly what was

15   going on with that particular unit on that day.

16   Q.      Ma'am, as the executive director of the program are

17   you responsible for ensuring that patients in your program's

18   basic needs are being met?

19   A.      Yes.

20   Q.      Do you think that clean underwear is a basic human

21   need?

22   A.      Yes.

23   Q.      So it would be important, wouldn't you agree, as the

24   person responsible for ensuring that patients are treated

25   with basic human dignity, to ensure personally that they're

52

1    receiving clean underwear?

2    A.      As I said, I had the hospital administrator go out

3    that particular day, out to that particular unit, to follow

4    up on that particular complaint.

5    Q.      Is it your testimony, ma'am, that the social worker

6    was complaining about one single incident on that particular

7    day?

8    A.      That's what the hospital administrator was going out

9    to find out.

10          MS. RIFKIN:  May I approach the witness, Your Honor?

11          (Exhibit handed to witness.)

12    BY MS. RIFKIN:

13    Q.      For the record I've handed the witness what has been

14    marked Plaintiffs' Exhibit 2, as well as opposing counsel and

15    the Court.

16          This is an email dated -- two emails.  One is

17    forwarding an email dated June 10, 2013.  That contains

18    another email from Pamela Rogers on June 14, 2013.

19          This email from Pamela Rogers was sent to you, wasn't

20    it, ma'am?

21    A.      Yes.

22          MS. VOROUS:  Objection, Your Honor.  The first part

23    of the email is inadmissible hearsay.

24          THE COURT:  I'm not even looking at that.  I mean, I

25    assume this is some order, but I have no idea.  I assume that

53

1    as of now you're talking about that portion of this document

2    which begins "Good morning, Ms. Ahlin and Ms. Landrum."

3            Is that where you want me to look?

4            MS. RIFKIN:  Yes, Your Honor.

5            THE COURT:  And following that?

6            MS. RIFKIN:  Yes, Your Honor.

7            THE COURT:  All right.  Your question is?

8    BY MS. RIFKIN:

9    Q.    Whether this email was sent to the witness.  Whether

10   that's --

11           Ma'am, this email was sent to you, correct?

12   A.    It was sent to me and Deborah Landrum, yes.

13           THE COURT:  Give me a moment.

14           (Brief pause.)

15           THE COURT:  All right.

16   BY MS. RIFKIN:

17   Q.    Ma'am, a minute ago you testified you remember

18   receiving this email; is that correct?

19   A.    Yes.

20           MS. RIFKIN:  Your Honor, plaintiffs move to admit

21   into evidence Plaintiffs' Exhibit 2.

22           THE COURT:  Well, there is apparently material on

23   this -- I say "apparently" because I haven't read it with

24   requisite attention, but there appears to be other

25   communications beginning with what's on the top now.

54

1          MS. RIFKIN:  Your Honor, that email was a forwarding
2     email sent to an attorney at my law firm.
3          THE COURT:  Okay.  So you want to strike that portion
4     which begins "Mr. Bien" and ends "Monterey County"; is that
5     right?
6          I'm asking you, not telling you.
7          MS. RIFKIN:  Yes, Your Honor.  That would be fine.
8          THE COURT:  Let me do that first.  I don't have the
9     Court's copy.  I expect you handed the witness the marked
10    copy?
11         MS. RIFKIN:  Yes.
12         THE COURT:  Ma'am, do you have a pencil?
13         THE WITNESS:  No.
14         (Pencil handed to witness.)
15         THE COURT:  Just mark out from "Mr. Bien" down
16    through "Subject:  FW updates."
17         No.  That's wrong.  I'm sorry.  Down to "Monterey
18    County Herald."
19         With that in mind, Miss Vorous, are you satisfied it
20    is appropriate?
21         MS. VOROUS:  Yes, Your Honor.
22         THE COURT:  Received.
23              (Whereupon, Plaintiffs' Exhibit Number 2 received
24               into evidence.)
25    ///

55

1   BY MS. RIFKIN:

2   Q.      Ma'am, directing your attention to the bottom of the

3   first page of this exhibit where Miss Rogers wrote to you:

4           (Reading:)

5           The men still don't have clean clothes of the correct

6           sizes.  There are clean clothes, but not enough to go

7           around and not in the correct sizes.  Many of the

8           clothes that are available to men are size XL and

9           above.  We have patients who are size small, medium

10          or large.

11          (Reading concluded.)

12          Is Miss Rogers talking about a single incident to a

13  single patient of a lack of clean, appropriate clothing?

14          MS. VOROUS:  Objection.  Speculation.

15          THE COURT:  Overruled.  I mean, the document says

16  what it says.

17          You have no doubt she was speaking in a more general

18  fashion, do you, ma'am?

19          THE WITNESS:  No.  I think she was specifically to

20  C-yard -- the men on C-yard.  I think she specifies 29 or 28.

21  BY MS. RIFKIN:

22  Q.      Twenty-nine men?

23  A.      Correct.

24  Q.      So it is your understanding that what Miss Rogers

25  meant by this was referring to 29 men who were having

56

1  problems receiving clean laundry?

2  A.      Of the correct size, yes.

3          THE COURT:  Then if you turn to the second page

4  you'll see an entry that says "I made a mistake."

5          You see that?

6          THE WITNESS:  Yes.

7          THE COURT:  It increases to 58; is that correct?

8          THE WITNESS:  Yes.

9          THE COURT:  You may proceed, ma'am.

10  BY MS. RIFKIN:

11  Q.      Ma'am, directing your attention to the third page of

12  the exhibit, Miss Rogers made a statement that says:

13          (Reading:)

14          It is difficult, if not impossible, to focus on a

15          patient's mental health treatment needs when his

16          basic needs have not been met.

17          (Reading concluded.)

18          Do you agree with that statement?

19  A.      I think clean clothes definitely are part of mental

20  health treatment.

21  Q.      You testified earlier that the primary purpose of

22  your program is mental health treatment?

23  A.      Yes.

24  Q.      As executive director do you find it concerning that

25  58 men in your program are not receiving clean laundry?

57

1   A.      I would find that if that was the case, that 58 did

2   not have clean clothing.

3   Q.      Do you personally know if that was the case?

4   A.      No.  I do not know that they all did not have clean

5   laundry.

6   Q.      Do you know they all had clean laundry?

7   A.      I do.  As of June 5th they all have clean laundry.

8   Q.      How do you personally know that?

9   A.      Well, as I said, on June 4th I had the hospital

10  administrator go out to Charlie yard and investigate this to

11  see where the clothes were because they had been purchased.

12  I knew they were purchased.  Had they been inventoried and

13  had they gone out to the patients.

14  Q.      Ma'am, you testified that you were previously

15  executive director of Coalinga State Hospital; is that

16  correct?

17  A.      Yes.

18  Q.      How many years were you executive director of

19  Coalinga State Hospital?

20  A.      I was interim and then appointed a little over four,

21  almost five.

22  Q.      Based on your experience running institutional

23  programs --

24          THE COURT:  I'm sorry.  I don't know whether it is

25  four or five months, weeks --

58

1          THE WITNESS:  I'm sorry.  Years.

2     BY MS. RIFKIN:

3     Q.     Based on your experience running institutional

4     programs, do you think it is a problem that an institutional

5     program that's been running for ten years wouldn't be able to

6     provide its patients with clean laundry on a regular basis?

7     A.     I would think that over ten years processes fall

8     apart.  I think that there are policies that are developed.

9     And I think that sometimes the turnover in staff, that

10    they're not trained appropriately.  There can be something

11    that runs for many years just fine, and then all of a sudden,

12    for some reason or another, it gets overlooked or the staff

13    aren't trained appropriately for some anomaly -- enormous

14    amount of reasons that things can change.

15          When we find an issue of this sort, the first thing

16    you can do is to go out, assess what is going on, what was

17    going right, what was not going right, and figure out how to

18    put it back together and bring it back up to a standard.

19          THE COURT:  I'm not certain I understand your

20    testimony.

21          You indicated that upon receipt of this email you

22    directed the hospital administrator -- I think that's who you

23    said -- to go out and find out what was going on.  And

24    therefore on June the 4th, the day that he went out,

25    everything was solved.

59

1           Is that your testimony?

2           THE WITNESS:  What I'm saying is on this particular

3    issue I was very concerned when it came in.

4           THE COURT:  I'm sorry.  I meant to say on Charlie

5    yard that it had all been taken care of.

6           THE WITNESS:  Yes.  They went out there.  The clothes

7    were there.  They made sure that all the men in that yard had

8    clean clothes as of that time.

9           We went back, and at that point started going back

10   and getting the policy redrafted from the point of delivery

11   to the units to the patients.  That's why I'm saying the

12   policy is still in a working order.

13          THE COURT:  I expect I'm about to elicit hearsay, but

14   at least I want to know why you think everything is

15   hunky-dory.

16          You sent out the doc -- the hospital administrator.

17   He did whatever he did.  He came back and reported to you; is

18   that correct?

19          THE WITNESS:  Yes.  Along with the program assistant

20   from Charlie yard.

21          THE COURT:  What did they tell you?

22          THE WITNESS:  They said the clothes are there.  The

23   patients have them.

24          THE COURT:  So you concluded that Miss Rogers' email

25   was not true?

60

1          THE WITNESS:  I concluded that in her perception

2     there may have been a few individuals that she had seen or

3     her perception was that they still were not getting clean

4     clothes.

5          THE COURT:  But you knew she was wrong because your

6     hospital administrator told you so?

7          THE WITNESS:  I'm not saying she was wrong.  I am

8     saying they went out to make sure they had them.

9          I can't say she was wrong.  It sounds like there may

10    have been a few.  I didn't get that there were five patients

11    on that Charlie yard that didn't have clean clothing and they

12    issued them.

13         They went out there.  They talked to the program

14    assistant, made sure the clothes were there and that they

15    were -- in fact, I did receive other emails after this, which

16    is not included, from another social worker saying that they

17    don't agree with this email.

18         But we went out to make sure the patients on Charlie

19    yard had clean clothes.  They reported back to me they do, in

20    fact, have them.

21         THE COURT:  Are you aware that the question of the

22    availability of clean clothes was a problem troubling to the

23    psychiatrists who ultimately resigned?

24         THE WITNESS:  Yes.

25         THE COURT:  And you think they were just wrong too?

61

1          THE WITNESS:  No.  No, I don't.  I don't think that

2     they were wrong.  I think that there are specific cases where

3     individuals may have had holed socks from going out to the

4     yard.  They don't wear their shoes.  I think there are

5     occasions where all 300 individuals -- there is times when

6     they don't have --

7          THE COURT:  Sure.  It is all patients --

8          THE WITNESS:  To me it is a systemic problem.  We

9     have to go in and make sure the process is corrected because

10    it is not okay for the patients to have dirty laundry.

11         I don't agree with that whatsoever.  I mean, they do

12    not need to sit there in soiled laundry, dirty laundry or

13    even too big of laundry.  I believe they need that.

14         All I can say is I know that there were allegations,

15    not just from a psychiatrist, but from other staff as well.

16    And that it is our duty to make sure that we go out, review

17    it and put things in place, processes in place make sure the

18    supply and resources are there for staff to do their job to

19    exchange the laundry and get it corrected.

20         THE COURT:  You may proceed, ma'am.

21    BY MS. RIFKIN:

22    Q.     You testified earlier that you are the interim

23    executive director; is that right?

24    A.     Yes.

25    Q.     And your appointment doesn't have a set end date; is

62

1    that right?

2    A.      That is correct.

3    Q.      The position is still officially vacant; is that

4    right?

5    A.      Yes.

6            THE COURT:  I'm sorry, ma'am.  Will you speak into

7    the microphone?

8            THE WITNESS:  Yes.

9            THE COURT:  Go ahead.

10   BY MS. RIFKIN:

11   Q.      Is Salinas Valley Psychiatric Program actively

12   recruiting for a new executive director at this time?

13   A.      An executive director is being actively recruited,

14   canvassed right now.  It is on the website for testing for

15   executive director.  But they're getting ready to put the

16   specific flier out for that specific position in the near

17   future.

18   Q.      So you don't know how long you'll be there, right,

19   ma'am?

20   A.      No.

21   Q.      And are you still holding your position as Department

22   of State Hospital deputy director for strategic planning?

23   A.      Yes, I still have that title.

24   Q.      Are you still acting in that position?

25   A.      No, I'm not.

63

1    Q.      Has anyone replaced you?

2    A.      No.

3    Q.      And you testified that Mr. Maynard is your interim

4    assistant executive director?

5    A.      That is correct.

6    Q.      And his permanent position is assistant deputy

7    director of strategic planning for DSH?

8    A.      Yes.

9    Q.      Is anyone currently filling the position for

10   assistant deputy director of strategic planning for DSH?

11   A.      No.

12   Q.      So both of those headquarters' positions are

13   currently going unfilled?

14   A.      You are correct.

15   Q.      Who is the primary person in the Department of State

16   Hospitals headquarters responsible for planning the

17   transition to the Stockton facility?

18            THE COURT:  If you know.

19            THE WITNESS:  I would say Sterling Price.

20   BY MS. RIFKIN:

21   Q.      What is his position?

22   A.      Executive director at the new Stockton facility.

23   Q.      Is there anybody in headquarters whose job it is to

24   oversee that transition?

25   A.      Kathy Gaither.

64

1   Q.      Prior to your appointment as interim executive

2   director, were you part of that process?

3   A.      No.

4   Q.      You testified that you took this interim executive

5   director position in order to rebuild the program at Salinas

6   Valley; is that right?

7   A.      Correct.

8   Q.      Help it meet expectations, right?

9   A.      Yes.

10  Q.      Because there had been serious problems there before

11  you arrived; is that right?

12  A.      I am not aware.  I can't validate serious problems,

13  no.

14  Q.      Because you didn't personally observe conditions at

15  Salinas Valley Psychiatric Program before you arrived in May;

16  is that right?

17  A.      I went there for two weeks as a mentoring team --

18  part of a mentoring team.

19  Q.      When was that?

20  A.      I should have brought a calendar.  I do not have my

21  calendar.  Two weeks -- I don't have the dates.

22  Q.      What month was that?

23  A.      April maybe.  March.  April.

24  Q.      March or April of this year; is that correct?

25  A.      Yes.

65

1    Q.      When you went there as part of the mentoring team,

2    which positions specifically were you supposed to be

3    mentoring?

4    A.      The executive director.

5    Q.      And during this mentoring process of executive

6    director, you didn't talk to him about current problems at

7    that time that the program was experiencing?

8    A.      We talked about preparing for the transition plan or

9    transitioning of patients to the Stockton facility.

10           THE COURT:  So when you said "mentoring," you weren't

11   talking about mentoring as to the current problems, if any,

12   at Salinas Valley, but rather you were there talking about

13   how people were going to be transferred, et cetera.

14           Is that right or wrong?  I don't know.

15           THE WITNESS:  It's kind of both.  He was a new

16   executive director, and transition of patients from one

17   facility to another is a pretty big task.

18           Just to ensure that he was preparing for the

19   discharging on the Salinas Valley side, getting the patients

20   ready, did he need our help, what does he need, what to plan

21   for.  He hadn't gone through a transition like this before.

22           THE COURT:  So I think what you are telling me, but

23   if I misunderstand, just tell me.  It is okay.  Your primary

24   purpose was dealing with the transfer rather than dealing

25   with what was going on at Salinas Valley.

66

1              Is that right or wrong?

2              THE WITNESS:  That's probably like a third of it, a

3    half of it I would say.  The other half is that he had a new

4    executive team as well.  He had some acting hospital

5    administrators, newly appointed clinical administrator, and

6    just to make sure the team solidified as a team, to make sure

7    they got through that role.

8              THE COURT:  Okay.  So you had two functions at that

9    time?

10             THE WITNESS:  Right.

11             THE COURT:  One is dealing with the transfer, the

12   other is dealing with the establishment of an appropriate

13   executive team?

14             THE WITNESS:  Correct.

15             THE COURT:  But you weren't there -- I'm sorry.  I'm

16   leading you.

17             Were you there for the purpose of trying to examine

18   the delivery of care and so forth at Salinas Valley?  That

19   was not your job?

20             THE WITNESS:  That was not my job.  It was more of

21   the processes that they had set in place to be able to do

22   that as a team.

23             THE COURT:  Thank you, ma'am.

24   BY MS. RIFKIN:

25   Q.    So to clarify about half your job on that mentoring

67

1   mission was to help Mr. DaSilva plan for discharge to the

2   Stockton facility; is that right?

3   A.      Correct.

4   Q.      A couple of minutes ago you testified that you were

5   not involved in planning for the move to the new Stockton

6   facility; is that right?

7   A.      Not as a deputy director.  I went there as a mentor.

8   Q.      What was your official position with the Department

9   of State Hospitals at that moment?

10  A.      Deputy director.

11  Q.      So you were going to mentor, but not in your capacity

12  as deputy director?

13          THE COURT:  No.  I'm sorry.  You may answer, ma'am.

14          THE WITNESS:  As the deputy director of strategic

15  planning you do a lot of different things.  My focus hadn't

16  been for the last two years to be part of that Stockton

17  activation.

18          I did go there to mentor, which I guess you could say

19  is part of two weeks of being in the deputy director role.

20  You could say that, I guess.  It wasn't part of my normal

21  duties as being part of the opening and migration of

22  Stockton.

23  BY MS. RIFKIN:

24  Q.      As the current interim executive director, is it part

25  of your duties to plan for the transition for patients from

68

1   Salinas Valley to the Stockton facility?

2   A.      Yes.

3   Q.      Do you work with staff at headquarters to plan for

4   that?

5   A.      I work mostly with Sterling Price, executive

6   director.

7   Q.      So you work with Sterling Price to plan for the

8   transfer of patients from Salinas Valley to the Stockton

9   facility?

10  A.      Yes.

11  Q.      So that would involve planning for the transition to

12  the Stockton facility; is that right?

13  A.      Okay.  Could you say your question one more time.  Is

14  what?

15  Q.      Working with Sterling Price to plan for the discharge

16  of patients from Salinas Valley to the Stockton facility,

17  that would be part of planning for the transition to the

18  Stockton facility; is that right?

19  A.      The two executive directors from both facilities work

20  together to transfer patients between the facilities.

21  Q.      Have you transferred any patients yet?

22  A.      No.  We're preparing to do so.

23  Q.      So right now you are planning the transition from the

24  Salinas Valley program to the Stockton program; is that

25  correct?

69

1          MS. VOROUS:  Objection.  Asked and answered.

2     Harassing the witness.

3          THE COURT:  Well, it is not asked and answered.  I

4     mean it is a question of, I think, semantics.

5          The question is whether you are planning or

6     preparing.  I don't know that it makes much difference, but

7     counsel seems to think that is important.

8          MS. RIFKIN:  I'm sorry, Your Honor.  I'm confused

9     because to me prepare and plan also mean the same thing.  So

10    I'm just trying to understand the witness' answer.

11         THE COURT:  Well, your question didn't reflect that.

12    But as I understand it, the opening -- as I understand it

13    now, the opening of Stockton is imminent?

14         THE WITNESS:  Yes.

15         THE COURT:  And you have a -- do you have a plan in

16    place so that when it opens you can transfer patients?

17         THE WITNESS:  Yes.

18         THE COURT:  Does that help?

19         MS. RIFKIN:  Yes, Your Honor.

20         THE COURT:  You know what, I think we're -- No.

21    We'll go another ten minutes before we have to break.

22         You may proceed.

23    BY MS. RIFKIN:

24    Q.    Is that plan that you have in place for the

25    transition a written plan?

70

1   A.      Yes.

2   Q.      Have you shared that plan with the Court and the

3   Special Master in the Coleman case?

4   A.      I have not, no.

5   Q.      To your knowledge has anyone at the Department of

6   State Hospitals or CDCR shared that plan with the Court and

7   the Special Master in the Coleman case?

8   A.      I have no knowledge of that.

9   Q.      Did you agree with state counsel's statement in her

10  opening that the reporting on staffing numbers to this court

11  and the Special Master has been wrong for years?

12          MS. VOROUS:  Objection, Your Honor.

13          THE COURT:  I don't know that you made that

14  statement.  Is that the basis of the objection?

15          MS. VOROUS:  Yes.

16          THE COURT:  I mean, I don't know that she did or

17  didn't either because I don't remember.

18          However, are you aware that CDCR in some fashion has

19  informed Mr. Bien that the staffing reports that have been

20  made are in error?

21          MS. VOROUS:  I'm sorry, Your Honor.  It would be

22  Department of State Hospitals.

23          THE COURT:  I'm sorry.  DSH.

24          THE WITNESS:  I'm not aware of that.  No.

25          THE COURT:  Okay.

71

1    BY MS. RIFKIN:

2    Q.      To your knowledge has the reporting of staffing to

3    the Court and the Special Master of mental health positions

4    at Salinas Valley Psychiatric Program been accurate?

5    A.      I'm not aware of that either.

6    Q.      To your knowledge has this reporting been inaccurate?

7    A.      I'm not aware of that either.

8    Q.      So help me understand, as the executive director of

9    the Salinas Valley Psychiatric Program, you're not aware of

10   whether your reporting on staffing is accurate or inaccurate?

11          THE COURT:  You didn't ask that question.  You didn't

12   ask since she's been executive director.

13          You asked that for years there has been

14   inappropriate -- an inaccurate report.

15          Those are two different questions, you know.

16          MS. RIFKIN:  Let me rephrase, Your Honor.

17   BY MS. RIFKIN:

18   Q.      Are you aware of recent problems with staffing

19   reports about Salinas Valley Psychiatric Program to the Court

20   and the Special Master?

21   A.      Do you have one you can show me?

22   Q.      As executive director have you reviewed --

23          THE COURT:  She's asked you do you have something.

24   If the answer is no, it is fine.  Or yes, it is fine too.

25   Either way.

72

1           MS. RIFKIN:  Sure.  Yes, I can do that.

2           THE COURT:  All right.

3           I suppose the answer is, as you sit here now while

4    she's looking for the document, do you have an independent

5    understanding that there have been recent inaccuracies in the

6    staffing reports?

7           THE WITNESS:  Only what I heard in the opening

8    statement from Mr. Bien that there were reported.

9           THE COURT:  That's what you know.

10           THE WITNESS:  That's all I know.

11           THE COURT:  All right.

12           Now, ma'am, if you want to show her something, that's

13    fine.

14           MS. RIFKIN:  Thank you, Your Honor.

15           May I approach the witness?

16           THE COURT:  Of course.

17           (Exhibit handed to witness.)

18    BY MS. RIFKIN:

19    Q.    Ma'am, I've handed you what's been marked Plaintiffs'

20    Exhibit 3.  It has a cover page which is an email conveying

21    this to the Special Master and to plaintiffs' counsel.  And

22    on the second page it's a staffing report for the Department

23    of State Hospitals.

24           Have you seen this report before?

25    A.    I just recently saw this one this week.

73

```
 1          THE COURT:  Are you aware -- apparently I don't know
 2     who Jane E. Kahn is.  Do you?
 3          MS. RIFKIN:  That is Jane Kahn, one of Plaintiffs'
 4     counsel.
 5          THE COURT:  I'm sorry.
 6          Oh, I see.  This is from Debbie Vorous.
 7          No, it is not either.
 8          MS. RIFKIN:  This is an email from Jane Kahn, one of
 9     Plaintiffs' counsel, forwarding the transition from Debbie
10     Vorous, defendants' counsel, to the rest of plaintiffs'
11     counsel.
12          THE COURT:  Okay.  Have you seen this cover email
13     before?
14          THE WITNESS:  I have not seen this cover email, but I
15     have seen this attachment.
16          THE COURT:  I understand you have seen the
17     attachment, but the issue apparently that you're being
18     inquired about is that portion of the cover which says:
19     As you know, DSH has been working, et cetera, et cetera, but
20     these reports may be fouled up.
21          You see that there?
22          THE WITNESS:  I see that now, yes.
23          THE COURT:  Have you ever seen that before?
24          THE WITNESS:  No.
25          THE COURT:  All right.
```

74

1          MS. RIFKIN:  Your Honor, I'm sorry, but can I

2     clarify?

3          THE COURT:  You can do anything you like.  I mean, I

4     probably fouled it all up.

5          Go ahead.

6          MS. RIFKIN:  No.  Thank you, Your Honor.

7          I think plaintiffs would really like to admit the

8     underlying staffing report.

9          THE COURT:  I'm not suggesting you don't do that.

10         MS. RIFKIN:  Okay.

11         THE COURT:  All I was asking her was whether -- I'm

12    sorry, I didn't mean "her" in any fashion -- whether she was

13    aware of the comments in the cover.  And the answer was no.

14         And we'll take our morning recess, 15 minutes.

15         (Off the record at 10:30 a.m.)

16         (On the record at 10:49 a.m.)

17         THE CLERK:  Please, remain seated.

18         Court is now in session.

19         THE COURT:  Miss Rifkin.

20    BY MS. RIFKIN:

21    Q.    Miss Ahlin, we were looking at what's been marked

22    Plaintiffs' Exhibit 3.  This is a staffing report, Monthly

23    Staffing and Staffing Vacancies Report, from the Department

24    of State Hospitals that was sent to the Special Master by the

25    Attorney General's office on June 5th, 2013.

75

1           On the second page there is a transmitting letter to

2    the Special Master.

3           I would like to direct your attention to -- Let's

4    see, there's no number.  It's the third page from the end of

5    this exhibit.  At the top of the page it says "Department of

6    State Hospitals - Salinas Valley."

7           Is that page in front of you, ma'am?

8    A.     Yes.

9           THE COURT:  It's not in front of me yet.

10          Hang on.  I'm sorry.

11          Monthly Staffing -- Mine says "Department of State

12   Hospitals - Coleman Related Clinical Positions."

13          Wrong page?

14          MS. RIFKIN:  They all say that at the top.  The third

15   page from the end at the top, first row -- in the first row

16   of the report it will say "Department of State Hospitals -

17   Salinas Valley" on each page.

18          THE COURT:  Department of State Hospitals - Patton.

19          MS. RIFKIN:  Go a couple more pages.

20          THE COURT:  Salinas Valley.

21          Yes.  Okay.  I'm with you.  Thank you, ma'am.

22   BY MS. RIFKIN:

23   Q.     Miss Ahlin, you said that you reviewed this report

24   last week?

25   A.     I saw it this week, yes.

76

1  Q.      Did you see this report before it went to the Special

2  Master and the Court?

3  A.      No.

4  Q.      Directing your attention to the line that is marked

5  "Class Code 9758, Staff Psychiatrist, Correctional and

6  Rehabilitative Services (Safety)," for psychiatrists it lists

7  five authorized positions for Salinas Valley; is that

8  correct?

9  A.      No.  That number is not correct.

10  Q.      How many authorized psychiatrist positions are there

11  at Salinas Valley State Hospital?

12          THE COURT:  Authorized or there?

13  BY MS. RIFKIN:

14  Q.      Authorized.

15  A.      As far as authorized, you're talking about in the

16  governor's budget as being authorized?

17  Q.      Yes.  How many authorized in the governor's budget?

18  A.      I would have to look.  This is not correct.  I mean,

19  it could be five that are authorized as full-time in the

20  budget, but we also have ones that are authorized in the

21  blanket as well.

22  Q.      How many -- to your knowledge how many staff

23  psychiatrist positions are there in the Salinas Valley

24  Psychiatric Program?

25  A.      How many do we need, or how many are there?

77

1          You combine blanket positions with authorized.

2    Q.      How many vacancies are there right now in the staff

3    psychiatry position?

4    A.      Civil Service vacancies?

5          THE COURT:  Look, take it all, however --

6          THE WITNESS:  It's very complicated.  We have some

7    positions that are authorized in the actual governor's

8    budget.

9          Other positions are authorized and are in the blanket

10   due to budgetary reasons.  We also use full-time contractors,

11   borrowed positions.

12         It would take ten full-time psychiatrists to meet the

13   needs of our current census.

14         THE COURT:  So your need is ten?

15         THE WITNESS:  Correct.

16         THE COURT:  However --

17         THE WITNESS:  However --

18         THE COURT:  How many are there presently pressently?

19         THE WITNESS:  10.25 working plus -- 10.25 working,

20   plus an additional two working almost half time positions.

21   So I have over 11.15 equivalence.

22         THE COURT:  You have one-and-a-half more than you

23   need?

24         THE WITNESS:  Correct.  If we were at the average of

25   1 to 35 ratio, yes.

78

1          THE COURT:  So the ratio that you are operating under

2     is for every 35 patients you need a psychiatrist?

3          THE WITNESS:  Yes.

4          THE COURT:  How, if you know -- I'm sorry.  This is

5     something I do care about.

6          MS. RIFKIN:  Please, Your Honor.

7          THE COURT:  How was that 1 to 35 arrived at, if you

8     know?

9          THE WITNESS:  I do know.  It is a standard for

10    intermediate care through the Department of State Hospitals

11    to have a 1 to 35 average for psychiatry services for ICF

12    care, which is intermediate care.

13         THE COURT:  So this is a statewide average derived

14    how?

15         THE WITNESS:  Correct.

16         THE COURT:  If I were to tell you that at least one

17    of the psychiatrists who testified here today said that he

18    had come from a state facility in Arizona where it was 1 to

19    15, and he felt comfortable that was doable, since you don't

20    know how it was arrived at or -- Never mind.  I'm just

21    talking off my head.

22         THE WITNESS:  Well, there is a 1 to 15 ratio in the

23    Department of State Hospitals as well.  That's for the

24    admissions unit.

25         I think the doctor speaking yesterday spoke that he

79

1    was on an admissions unit that had 1 to 15.  That is an

2    appropriate ratio for admissions unit.  That's all they do is

3    admissions.

4            THE COURT:  All right.

5            You may proceed, ma'am.

6    BY MS. RIFKIN:

7    Q.      Yesterday, Miss Ahlin, you testified that the number

8    of psychiatrists at Salinas Valley Psychiatric Program were

9    10.25; is that right?

10   A.      That is correct.

11   Q.      Today you just testified that the number of

12   psychiatrists is 11.5?

13   A.      I testified yesterday that we have 10.25 doing the

14   caseloads, doing the patient care.  We have an additional .9

15   doing discharge summaries only for the patients that will be

16   transferring over to Stockton.

17           THE COURT:  So that .9 is just a temporary blip

18   because you've got --

19           THE WITNESS:  For discharge.  Correct.  We have 10.25

20   serving the population census.

21   BY MS. RIFKIN:

22   Q.      I'm sorry.  I'm confused.  Yesterday I thought you

23   said that you had 10.25 total and 9.35 if you don't count

24   those .9 doing just discharge summaries?

25   A.      No.  That is not correct.

80

1   Q.      Okay.

2   A.      We have 10.25 doing patient care and .9 doing the

3   discharge summaries.

4   Q.      Do each of those 10.25 psychiatrists currently carry

5   a caseload?

6   A.      Yes.

7   Q.      Do each of them currently carry a full caseload?

8   A.      Yes.

9   Q.      Going back to the document in front of you, when --

10  direct your attention to the same line that starts with "9758

11  Staff Psychiatrist (Safety)."

12          Looking at the column under Filled Positions, it says

13  4.37 staff psychiatrists as of May 1, 2013.  That's the date

14  of this document.

15          Was that accurate?

16  A.      I'm assuming so.

17  Q.      So in the past month-and-a-half you've hired six more

18  psychiatrists; is that correct?

19  A.      No, I don't think this document covers physicians or

20  psychiatrists that are on loan.

21          There is two full-time psychiatrists on loan from

22  Atascadero.  There is one that is at Patton that does .75, a

23  three-quarters position that is not reflected in here as

24  well.

25          These are ones that are on -- I believe this is

81

1    just -- I'm just speculating at this time.  I believe the

2    4.37 positions are only the civil service ones that are on --

3    in our -- ran through our system.

4         It is not the ones that are on loan or there is

5    another column.  The contractors aren't there either.

6    Q.    Directing your attention to the column that reads

7    Contracted Full-time Equivalents .22, is that accurate?

8         Would that reflect -- I'm sorry.

9         Would that number, .22, reflect any contracted

10   psychiatrists?

11   A.    It should, yes.

12   Q.    So is this number inaccurate?

13   A.    For May 1st I'm not sure.  I didn't create this

14   report so...  Mr. Maynard -- George Maynard is the one that

15   worked -- or had reviewed this report.  He would be more

16   inclined to answer this particular report.

17   Q.    Ma'am, yesterday you testified about the number of

18   psychiatrists and current staffing in your program; is that

19   right?

20   A.    Yes, I did.

21   Q.    Are you aware that the Department of State Hospitals

22   is under court order to report staffing numbers and vacancies

23   to this Court and the Special Master in the Coleman case?

24   A.    Just like this report here?

25   Q.    Are you aware that the Department of State Hospitals

82

1   is under a court order to report staffing and staffing

2   vacancies to the Court and Special Master in the Coleman

3   case?

4           MS. VOROUS:  Objection.  Lack of foundation.

5           THE COURT:  I don't know why everybody objects to

6   lack of foundation as if it means something.

7           The objection is overruled.  Do you know?

8           THE WITNESS:  I know now.

9           THE COURT:  Did you know before you looked at this

10  document?

11          THE WITNESS:  No.

12          THE COURT:  Okay.

13  BY MS. RIFKIN:

14  Q.      Were you aware before today that the Department of

15  State Hospitals has reporting obligations at all in the

16  Coleman case to this Court and the Special Master?

17  A.      Could you repeat that?

18  Q.      Were you aware, before today, that the Department of

19  State Hospitals has any reporting obligations to this Court

20  and the Special Master?

21  A.      Yes.

22  Q.      What reporting obligations were you aware of?

23  A.      I have no specifics.

24  Q.      So you just knew that the Department of State

25  Hospitals had to report something to the Court and Special

83

1    Master?

2    A.      Yes.

3    Q.      How many psychiatrists are you still recruiting for

4    at Salinas Valley?

5    A.      We are continually recruiting for full-time

6    psychiatrists.  Eventually we would like to have all of our

7    civil service -- ten full-time civil service positions

8    filled.

9            So as long as we have loaned positions and contractor

10   positions, we will continually recruit for those, and also

11   for the ones that -- or the one that is planning on leaving.

12   Q.      How many full-time civil service psychiatrists do you

13   currently have at Salinas Valley Psychiatric Program?

14   A.      Five.

15   Q.      What are you basing that number on?

16   A.      That I have 10.25 currently working.  Two are loaned

17   from Atascadero, .75 are -- is loaned from another facility,

18   and two are contractors.

19   Q.      Which facility?

20   A.      CDCR Lancaster.

21   Q.      Is there a document that reflects the numbers that

22   you just stated?

23   A.      I have a daily document that I review.

24   Q.      If you know, why would the numbers in that daily

25   document not be the ones reported to this Court and the

84

1    Special Master?

2    A.      They probably may have been used for this report back

3    in May.

4            THE COURT:  Or may not.

5            THE WITNESS:  I don't know.

6            THE COURT:  Exactly.

7    BY MS. RIFKIN:

8    Q.      Turning your attention to page 2 of this exhibit,

9    ma'am --

10           THE COURT:  I'm sorry.  Turning to what?

11           MS. RIFKIN:  The second page of the exhibit.

12   BY MS. RIFKIN:

13   Q.      I'm sorry.  Turning your attention to page 1 of this

14   exhibit.  I'm sorry.  The first page, the cover email.

15           The cover email contains an email from the State

16   Attorney General's Office, Debbie Vorous, to the Special

17   Master in the Coleman case.  And it is dated June 15th, 2013.

18           This is the email transmitting the May 1st data that

19   was calculated in June 2013; is that right?

20           THE COURT:  It says of May 1st, not June.

21           MS. RIFKIN:  Yes, Your Honor.  The data is for May

22   1st, but this -- my understanding is, and Miss Ahlin please

23   correct me -- or can you confirm this data was actually

24   calculated in June 2013?

25           THE COURT:  Do you know when the calculations took

85

1    place that were --

2              THE WITNESS:  I did not do these calculations.

3    BY MS. RIFKIN:

4    Q.      Do you know when these calculations took place?

5    A.      No.

6    Q.      Do you know what month they took place?

7    A.      I would assume, looking at the report, just an

8    assumption, it was as of May 1st.

9              They may have done it in June, but it was as of a

10   reporting period of May 1st.

11   Q.      Do you know when the calculations in this report were

12   made?

13   A.      No.

14   Q.      You testified that two of your current psychiatrists

15   are on loan from ASH; is that correct?

16   A.      Yes.

17   Q.      How long are they on loan from ASH?

18   A.      I don't have an end date on that at this time.

19   Q.      Do they have end dates?

20   A.      No, they do not.

21   Q.      How long have they been on loan?

22   A.      For several months.

23   Q.      Do you know which month they started?

24   A.      I do not.  They were there when I arrived.

25   Q.      And you testified that .75 psychiatrist's time is of

86

1    a psychiatrist from Lancaster; is that right?

2    A.      That is correct.

3    Q.      How long is that psychiatrist at Salinas Valley?

4    A.      He was there also when I arrived.

5    Q.      When is his end date?

6    A.      I don't have an end date.

7    Q.      And these psychiatrists that are on loan from other

8    institutions, are they still working at their originating

9    institutions?

10   A.      The two that are on loan from Atascadero, no, they

11   are not.  I believe the one that is working at Lancaster is.

12   Q.      I'm sorry.  Are you aware of how many psychiatrists'

13   positions are budgeted for at Salinas Valley in the

14   governor's budget?

15   A.      No.

16           MS. RIFKIN:  Your Honor, may I approach the witness?

17           (Document handed to witness.)

18   BY MS. RIFKIN:

19   Q.      Miss Ahlin, I've handed you a document that's been

20   marked Plaintiffs' Exhibit 4.  This is a document titled

21   "Department of State Hospitals" reflecting the budget of the

22   Department of State Hospitals.

23           Are you familiar -- have you seen this document

24   before?

25   A.      Yes.

87

1    Q.    Directing your attention to page 166 of this

2    document --

3         THE COURT:  I'm sorry.  166?

4    BY MS. RIFKIN:

5    Q.    Strike that.  Page 165 of this document, please?

6         Do you have that page before you, ma'am?

7    A.    Yes.

8    Q.    In the middle of the page it says "Salinas Valley

9    Psychiatric Program"; is that right?

10   A.    That is correct.

11   Q.    And below that is the budget for the Salinas Valley

12   Psychiatric Program and it continues onto the next page, 166.

13        If you could, turn to that page please?

14        Directing your attention to about two-thirds of the

15   way down on the "Level of Care Professional," and under that

16   is a line that says "Chief Psychiatrist," "Staff

17   Psychiatrist," "Senior Psychiatrist Supervisor."

18        Do you see where I am?

19   A.    Yes, I do.

20   Q.    And for staff psychiatrist for authorized positions

21   in 2011-2012 it lists 17 psychiatrists.

22   A.    Yes.

23   Q.    Is that number right?

24   A.    That was for fiscal year '11-'12.

25   Q.    And under the next column proposed for 2012-2013 it

88

1   lists 17 staff psychiatrists.

2          Is that number accurate?

3   A.     I can't validate that.  There have been changes with

4   our budget so I don't know that that's accurate at this point

5   in time.

6   Q.     Do you know how many positions were authorized in the

7   governor's budget for 2012-2013?

8   A.     That is something that Miss Gaither could probably

9   answer better because we had taken all of our clinical

10  positions for the teams and moved them into the blanket

11  positions so they won't show up as authorized.

12         But that is more of a technical aspect you might want

13  to ask Miss Gaither.

14         THE COURT:  I don't even know what your answer means.

15  I'm sure it has some meaning within the system, but in any

16  event, you're satisfied that for 2012-2013 you were not

17  authorized 17 psychiatrists.

18         Is that right?

19         THE WITNESS:  I would be speculating.  I'm operating

20  off the ratio 1 to 35 for the current census.  That's what I

21  need to focus in on in filling the needs.

22  BY MS. RIFKIN:

23  Q.     The 1 to 35 ratio that you just mentioned, that

24  reflects a ratio of 35 patients to one psychiatrist; is that

25  accurate?

89

1    A.        An average of 1 to 35, yes.

2    Q.        And you mentioned that the Department of State

3    Hospitals had changed this ratio from the previous ratio; is

4    that right?

5    A.        I did not say that.

6    Q.        Are you aware if the Department of State Hospitals

7    changed this ratio to make it 1 to 35?

8    A.        Yes, I am aware.

9    Q.        What was the previous ratio?

10   A.        Several years ago it was a 1 to 25 ratio for ICF on

11   an average and a 1 to 15 ratio for admissions.

12   Q.        And why was that number changed?

13   A.        I don't have a specific answer for that.  I would be

14   speculating.

15   Q.        Was that number changed based on a clinical

16   determination, if you know?

17   A.        I don't know.

18            MS. RIFKIN:  Your Honor, may I approach the witness?

19            (Exhibit handed to witness.)

20            THE COURT:  While counsel is passing out the papers,

21   ma'am, if a budget is adopted by the -- proposed by the

22   executive, adopted by the legislature, it doesn't change

23   thereafter unless there is a statutory change, correct?

24            THE WITNESS:  I would assume so, yes.

25            THE COURT:  And you have no information that such a

90

1    statutory change actually took place; is that right?

2              I'm asking you, not telling you.

3              THE WITNESS:  I don't know.

4              THE COURT:  Well, you're there.  You know what is

5    going on.  You've never heard that?

6              THE WITNESS:  Right.

7              THE COURT:  All right.

8              You may proceed, Counsel.

9    BY MS. RIFKIN:

10   Q.    Miss Ahlin, I've handed you what's been marked

11   Plaintiffs' Exhibit 5, which is a document that's previously

12   been filed with this Court under Docket Number 4404, filed on

13   March 15th, 2013, as part of the declaration of Michael Bien.

14             And it contains on the front an email transmitting

15   that letter from Michael Bien to the Special Master's team,

16   as well as the government defendants in this case.

17             THE COURT:  This says it's from Krista Stone.

18             MS. RIFKIN:  She's one of Plaintiffs' counsel, Your

19   Honor.

20             THE COURT:  All right.

21   BY MS. RIFKIN:

22   Q.    And beginning on what's listed as page 141 of 266 of

23   this document in the court record is the Department of State

24   Hospitals' Report on State Hospital Financial Activity.

25             THE COURT:  Where is it to be found here?

91

1          MS. RIFKIN:  On page 141 of the pages marked at the

2    top of the document, Your Honor.

3    BY MS. RIFKIN:

4    Q.     This is a report on Department of State Hospitals

5    Financial Activity Fiscal Year 2011-12 Through Fiscal Year

6    2012-13.

7          THE COURT:  You might want me to find it.  I mean if

8    you don't, just keep on going.

9          MS. RIFKIN:  Your Honor, sorry.

10         (Brief pause.)

11         THE COURT:  I've got it.

12   BY MS. RIFKIN:

13   Q.     Are you familiar with this document, Miss Ahlin?

14   A.     No.  This is the first I've seen this.

15   Q.     Turn to what's page 144 marked on the top of the

16   document.

17         Are you on page 144, ma'am?

18   A.     Yes.

19   Q.     In the middle of the page it states that effective

20   December 2011, DSH treatment team ratios for fiscal year

21   2012-2013 are 1 to 35 on average.

22         Is December 2011 when the treatment team ratio was

23   changed?

24   A.     Yes.

25   Q.     To your knowledge did the Department of State

92

1    Hospitals notify this Court or the Special Master of this

2    treatment team change?

3    A.        I do not know.

4    Q.        Just to clarify, you said earlier that you don't know

5    the basis for this change; is that right?

6    A.        No.

7              THE COURT:  Yes, it is right that you don't know the

8    change -- the basis for the change?

9              THE WITNESS:  Correct.

10             MS. RIFKIN:  Thank you.

11   BY MS. RIFKIN:

12   Q.        Going to keep asking you to flip one more page, to

13   page 158 of 266 in this document, and that will page number

14   will be along the side because the orientation of the pages

15   changes.

16   A.        What page number?

17   Q.        158.

18             And in the document that was filed with the Court,

19   this chart is very small.  So for the purposes of this

20   hearing plaintiffs' counsel has made a larger copy of this

21   page 158 which you can pull out and it is a little bit easier

22   to read at least.

23             Do you see that page, ma'am?

24   A.        I do.

25   Q.        That page is titled "Department of State Hospitals

93

1    Actual Cost Savings Achieved Fiscal Year 2011-12" and it

2    reports costs savings in the millions of dollars.

3            Now, directing your attention to the first column

4    under "Staffing Ratios," there's a part that's marked "Revise

5    ICF Treatment Team Ratio from 1 to 25 to 1 to 35."

6            Do you see that?

7    A.      Yes.

8    Q.      Then following that row over to under Salinas Valley,

9    it says "SVPP."  Towards the end of that column -- or that

10   row there is a column marked "SVPP."

11           Do you see that?

12   A.      Yes.

13   Q.      And it lists for Salinas Valley that revising that

14   treatment team ratio from 1 to 25 to 1 to 35 achieved a cost

15   savings of 9.79 million dollars.

16           Is that accurate?

17   A.      I don't know that.  I can't validate that.

18   Q.      Are you aware that changing the treatment team ratio

19   from 1 to 25 to 1 to 35 resulted in significant cost savings

20   to the state?

21   A.      Yes.

22   Q.      Were you aware of that before looking at this

23   document?

24   A.      I was working at Coalinga at the time, and I didn't

25   have any ratio changes.  Well, I didn't have any cost savings

94

1   so I didn't pay attention to this portion of it.

2          But, yeah, I have seen this document before.  And I

3   am aware that the ratio change did result in savings.

4   Q.      Is Coalinga what's listed under "CSH"?

5   A.      Correct.

6   Q.      And it says that 2.55 million dollars were achieved

7   in cost savings by this revision of the treatment team ratio;

8   is that right?

9   A.      We didn't adjust our psychiatrists.  We didn't

10  have -- we don't -- it's a whole different category.  So it

11  might have been for the teams, yes, for the social workers,

12  psychologists, rehab therapists, part of the team.

13  Q.      So to understand, changing the treatment team ratio

14  from 1 to 25 to 1 to 35 changes the caseload for everyone,

15  all the mental health clinicians who are part of that

16  treatment team; is that right?

17  A.      Yes.

18  Q.      So a psychiatrist would now have a caseload of 35; is

19  that right?

20  A.      Yes.

21  Q.      And a social worker would now have an increased case

22  load of 35; is that right?

23  A.      Yes.

24  Q.      And a psychologist would then have an increased

25  caseload of 35; is that right?

95

1    A.       Yes.

2    Q.       And let's see.  Rehabilitation therapist, would that

3    also have gone up from 1 -- to 1 to 35?

4    A.       Yes.  That's what it says, treatment team.

5    Q.       And what other positions are part of that treatment

6    team?

7    A.       A registered nurse is part of a team.

8    Q.       So the registered nurse's caseload also went up?

9    A.       Only the treatment team nurse, not the direct patient

10   care nurse.

11           THE COURT:  I really don't understand at all.

12           You have made a distinction -- Let me reread it.

13              (Brief pause.)

14           What I hear you -- I think what I hear you saying --

15   if I don't get it, just tell me -- is that there are two

16   classifications of nurses, one on treatment teams and one on

17   direct patient care.

18           Is that right?

19           THE WITNESS:  It is more duties, not classifications.

20   We use registered nurses to provide the direct patient care

21   on the units, and we also use a registered nurse as part of a

22   treatment team.  It's more of an assignment.

23           THE COURT:  Is that nurse also doing direct patient

24   care, and it is just an additional duty or a different duty?

25           THE WITNESS:  It depends on the facility.

96

1           THE COURT:  I'm almost afraid to ask.  What do you

2    understand the duties of a nurse assigned as a member of the

3    treatment team as contrasted with direct patient care?

4           What does she do?

5           THE WITNESS:  She's not counted in the minimum

6    staffing on the units, and she is part of the treatment

7    planning, making sure the patient takes the medications and

8    incorporates all of the daily living activities from a

9    nursing perspective into the treatment team plan.

10          THE COURT:  I don't know what it all means.

11          Go ahead.  You may proceed.

12          MS. RIFKIN:  Your Honor, I'm confused too.  I would

13   like to ask a few more questions on that topic.

14   BY MS. RIFKIN:

15   Q.     You said the nurse isn't counted as part of the

16   minimum staffing.  Can you explain that?

17   A.     It fluctuates between facility to facility.

18   Q.     Can you explain at Salinas Valley, please?

19   A.     At Salinas Valley we are now incorporating the RNs

20   into the treatment team.  They have been part of the team,

21   but they were also doing the daily activities.

22          Part of our reviewing and assessment is we're giving

23   specific RNs assignments to be the dedicated team member as

24   an RN for that team.

25   Q.     When was that change made?

97

1    A.        We're in the process of making that change.

2    Q.        So it hasn't --

3    A.        It hasn't been fully implemented, no.

4              THE COURT:  When we talk about 1 to 35, are we

5    talking about patient care, the treatment team

6    responsibilities, or something else entirely?

7              THE WITNESS:  The treatment team sees the individual

8    once a month, and they do the treatment team.  The daily care

9    is provided by the nursing staff on the unit 24/7.

10             (Break taken for Court Reporter due to computer

11              issue.)

12             THE COURT:  Ma'am, we talked about psychiatrists

13   having a ratio now of 1 to 35.

14             Is that treatment people?

15             Is that the treatment teams or both or what?

16             THE WITNESS:  The psychiatrists have them on their

17   treatment team.  That is who they care for.  That is a direct

18   patient care of 1 to 35.

19             THE COURT:  So the nurses have -- there are two kinds

20   of nurses, those on the team and the 24/7.  But

21   psychiatrists -- the only function of the psychiatrist is

22   through the treatment team?

23             THE WITNESS:  It mirrors that.  I can see where I

24   made that confusing.

25             It is 1 to 35 ratio on our census for the patients

98

1    that the psychiatrists care for, which includes being part of

2    that team.  They meet once a month, as we spoke earlier.

3         THE COURT:  All right.  You may proceed, ma'am.

4    BY MS. RIFKIN:

5    Q.    To clarify the psychiatrists, those 35 people are the

6    psychiatrist's caseload they're responsible to care for on a

7    daily basis; is that correct?

8    A.    That is correct.

9    Q.    And does that treatment ratio apply to the other

10   members of the treatment team for their caseload?

11   A.    Yes.  Well --

12        THE COURT:  With the exception of nurses.

13        THE WITNESS:  With the exception.  Yeah.

14        Yes.  They care for those individuals, the other

15   disciplines as well, for the 35 on an average.

16   BY MS. RIFKIN:

17   Q.    And when you said before that the nurses hadn't been

18   counted as part of a minimum staffing, does that mean part of

19   the minimum staffing considered necessary to run a unit?

20   A.    That would be the minimum staffing, yeah.  Some

21   facilities pull them out of the count or in the count,

22   depending on the unit.

23        The typical unit, what is going on in the unit, the

24   nurse can be a part of the treatment team member and also be

25   part of the daily care.  Or is the unit too busy, that they

99

1    need to be pulled out so they don't miss the teams, and we

2    have them focus in on the treatment team.

3    Q.       If a unit were too busy, that would mean there

4    weren't enough staff to treat the patients in that unit; is

5    that correct?

6    A.       No.  It just depends on the patients needs at that

7    time, the activities that are going on, sick call.  They do

8    quite a bit of things on the unit.

9    Q.       When you refer to patients activities like sick call

10   and those others, those are part of treatment needs, correct?

11   A.       Yes.

12   Q.       And those are part of predictable treatment needs of

13   patients at an inpatient hospital, right?

14   A.       Yes.  There are some that are scheduled needs, and

15   then there's other things that -- your sick call might grow

16   and be busy during the winter months.  There are just certain

17   things that change daily.

18   Q.       Sorry.

19   A.       On every shift -- the needs of the patients change on

20   every shift.  So you can plan for your baseline staffing,

21   which is the minimum staffing levels for your intermediate

22   care nursing staff.

23           Then there's additional duties that go on such as

24   sick call, how many days a week do you have sick call on the

25   units.  The nurses will assist the doctors in line.  There is

100

1   many things that they'll do.

2   Q.      But those examples, sick call, things sometimes

3   getting busier and sometimes being slower, those would be

4   accounted for in a planning process for the needs of a normal

5   inpatient treatment unit; isn't that right?

6   A.      Yeah.  When you assess a unit, does this unit need

7   one nurse in the count or out of the count based on the

8   average activities that go on in there, yes.

9   Q.      Let me try to be clear about what I'm asking for.

10          In the generic planning process, in your experience

11  for the staffing needs for an inpatient treatment unit,

12  wouldn't busier times than others or unscheduled visits be

13  factored into that total staff plan?

14  A.      Yeah.  It could be.  Yeah, it should be.

15  Q.      It should be?

16  A.      Uh-huh.

17  Q.      Is there a separate admissions unit at Salinas Valley

18  Psychiatric Program?

19  A.      No.

20  Q.      So the psychiatrists who have the caseload of 1 to 35

21  are also responsible for doing admissions; is that right?

22  A.      That is correct.

23  Q.      And you testified, I believe, that the admissions

24  units in the Department of State Hospitals typically have a

25  patient ratio or -- I'm sorry -- a treatment ratio of 1 to

101

1    15; is that right?

2    A.    Yes.  On their admissions unit where they do only

3    admissions.

4    Q.    And psychiatrists --

5         THE COURT:  That means in other institutions because

6    that's not true of Salinas Valley?

7         THE WITNESS:  That is correct.

8    BY MS. RIFKIN:

9    Q.    So psychiatrists at Salinas Valley have a caseload of

10   1 to 35, and in addition they do admissions for additional

11   patients?

12   A.    Well, they can only do admissions if they have a

13   vacancy within their 1 to 35.

14   Q.    Do any psychiatrists -- do you know if any

15   psychiatrists currently at Salinas Valley have a vacancy on

16   their caseload?

17   A.    A patient vacancy on their caseload?

18        I wouldn't know.  That would fluctuate.  For example,

19   we had nine going out on Monday and Tuesday this week.  So

20   for a couple of days if those -- that would have a couple

21   vacancies there.  But we fill them back on Wednesday and

22   Thursday so I would not think that they would stay vacant

23   very often.

24   Q.    What happens if a psychiatrist's caseload is full and

25   you have an admission?

102

1  A.      If their caseload is full, they don't have a bed for

2  admission.

3  Q.      So -- so you -- so Salinas Valley would never accept

4  a patient that would cause a psychiatrist's caseload to be

5  more than 35; is that right?

6          MS. VOROUS:  Objection.  Misstates her testimony.

7  Lacks foundation.

8          THE COURT:  She just said -- she's asking is that

9  right.

10         THE WITNESS:  What I'm saying is, in a perfect

11  planning world you would have --

12         THE COURT:  She's not talking about perfect planning

13  world.  She's asking as a practical matter would you accept a

14  patient which would cause a psychiatrist to have a caseload

15  of more than 1 to 35?

16         THE WITNESS:  We accept patients, yeah, on vacant

17  beds.  So if we had a vacancy -- a psychiatry vacancy, of

18  course they would have more than 1 to 35.  It fluctuates.

19  BY MS. RIFKIN:

20  Q.      Help me understand.  I'll try to ask more discreet

21  questions.

22         The caseload for psychiatrists is 1 to 35, right?

23  A.      In a perfect world it is a 1 to 35 average, yes.

24  Q.      I'm not asking about a perfect world.  I'm asking

25  about Salinas Valley as it is currently staffed and running.

103

1              What is the psychiatrist caseload?

2     A.     With all ten staffed there it should be 1 to 35.  I

3     don't -- Go ahead.

4     Q.     I'm not asking about what it should be.  I'm asking

5     about what it is, if you know?

6     A.      I haven't looked today.  I haven't looked yesterday.

7     As of this week we came up to 10.25.  So I have to go back,

8     when I get to the facility, and look and see how the

9     caseloads have been distributed.

10    Q.     What was the psychiatry staffing last week?

11    A.     We had 8.25 so of course they had more than 35 on

12    their caseload.

13    Q.     Of course.

14    A.     Yes.

15    Q.     Was Salinas Valley closed to admissions last week?

16    A.     No.

17    Q.     So sometimes you -- Salinas Valley admits patients

18    that cause a psychiatrist's caseload to be more than 35,

19    right?

20    A.     Based on the psychiatry coverage, yes.

21    Q.     So in that instance, when that happens, as it does,

22    psychiatrists have a caseload of 35, and they would be doing

23    admissions in addition to their caseload; is that right?

24    A.     That would be correct.

25    Q.     Okay.  If we can go back to the exhibit that's in

104

```
 1   front of you, turning to page 144 marked at the top of the
 2   page.
 3              THE COURT:  Back on 5?
 4              MS. RIFKIN:  Back to 5.  Yes, Your Honor.
 5   BY MS. RIFKIN:
 6   Q.      Page 144.  Top of the page.
 7           I'm sorry.  Before we look at that page, I just
 8   realized I didn't ask a question about what you were saying.
 9           You said that sometimes the caseload is higher than 1
10   to 35, and you didn't look at the numbers this week.
11           Did you look at the caseload numbers last week?
12   A.      Yes.  They were on an average of 1 to 42 for
13   psychiatry.
14   Q.      One to 42?
15   A.      Yes.
16   Q.      And how many admissions on average would each of
17   those psychiatrists be doing?
18   A.      We get nine a week so we distribute the admissions
19   amongst the psychiatrists.
20   Q.      How many psychiatrists were working last week -- on
21   call during that week?  Not just your eight total, but how
22   many psychiatrists had working hours in the institution last
23   week?
24   A.      I believe there were eight on duty.
25   Q.      So some of them were doing at least two admissions;
```

105

1    is that right?

2    A.        That would be correct.

3    Q.        In addition to the caseloads of 42?

4    A.        Correct.

5    Q.        Do you consider that a staffing shortage?

6    A.        I would say that ideally we would have two additional

7    psychiatrists to cover the 342.

8    Q.        Do you consider that a staffing shortage?

9    A.        We are short two staff, yes, as of last week.

10   Q.        Okay.  Now, I'm sorry, to go back to the page that I

11   think we're all on, 144 of 266, under the title "State

12   Hospital Position Detail," it talks about how the state

13   hospital vacancy rate has decreased from fiscal year 2011 to

14   2012.

15           That's the same -- this is the same time period when

16   treatment ratios were increased.

17           So directing your attention to fiscal year 2011-2012

18   for Salinas, it lists 733 authorized positions and for fiscal

19   year 2012 to 2013 under Salinas it lists 561.5.

20           So that's a reduction of about 170 staff; is that

21   right?

22   A.        Yes.

23   Q.        Do you know why the staff were reduced so much

24   between that year?

25   A.        No, I do not.

106

1          THE COURT:  Meanwhile, of those that are now

2    authorized, there are 20.21 percentage vacancies; is that

3    right?

4          Am I reading that correctly?

5          THE WITNESS:  Yeah.  That's what it says.

6    BY MS. RIFKIN:

7    Q.    Do you know if the census number of patients at

8    Salinas Valley went down between those two years?

9    A.    I do not know.

10   Q.    If it didn't go down, do you think it would make

11   sense to decrease the staff?

12         MS. VOROUS:  Objection.  Lack of personal knowledge.

13   Foundation.

14         THE COURT:  Well, no.  I mean that objection is

15   overruled because she's asking her opinion as the person who

16   is now the, even though temporary, the executive director.

17         You may answer that question.  Do you remember it

18   after all that?

19         THE WITNESS:  I don't recall why it went down.  And I

20   don't know if they did an assessment on the staffing ratios

21   at Salinas prior to making that adjustment.

22         I don't know if it was reduction of services.  I

23   couldn't tell you what it is.

24   BY MS. RIFKIN:

25   Q.    If it were reduction of services, would that be

107

1    because patients were getting too much care?

2    A.    I couldn't say that.

3    Q.    Okay.  If you can flip two pages back to page 142,

4    just two pages before the page we were just on.

5         There's a chart here that talks about population

6    growth in the Department of State Hospital, population from

7    2009 to 2010 to present.

8         Under Salinas Valley there is a chart that shows that

9    from 2010 to 2011 there was an average daily census of 232,

10   but from 2011 to 2012 there was an average daily census of

11   347.

12        So would I be correct that the staffing positions

13   were reduced following a year in which the census went up by

14   over 100?

15   A.    You would be correct in stating that in 2011-12 there

16   was a census average of 347 and a year later that there was a

17   position reduction.

18   Q.    As you sit here now, given your experience running

19   hospitals, does that make sense to you?

20   A.    I would have to find out the reason why before I

21   would speculate if it made sense or not.

22   Q.    Since you became executive director at Salinas

23   Valley, facing, as you agree, staffing shortages, have you

24   inquired why the staffing numbers were reduced?

25   A.    What I did was looked at what the staffing needs are,

108

1    not where they were two fiscal years ago.

2    Q.    And that is based on a 1 to 35 treatment team ratio,

3    your staffing needs assessment; is that right?

4    A.    That is correct.

5    Q.    Are you aware of two letters, in January and February

6    of this year, from the psychiatry team at Salinas Valley to

7    the previous executive director of Salinas Valley, Charles

8    DaSilva?

9    A.    Yes, I am aware of those letters.

10   Q.    Have you seen those letters?

11   A.    Yes, I have.

12   Q.    So you're aware that in those letters the psychiatry

13   team said that there was a staffing shortage?

14   A.    Yes.

15   Q.    Are you aware of whether they were correct?

16         THE COURT:  Well, what the authors were talking about

17   is whether or not they could accurately -- appropriately

18   treat people with the caseloads they were faced with.

19         This witness would not be -- I assume you wouldn't

20   know whether that was correct or not.  You only know what

21   you're authorized?

22         THE WITNESS:  Correct.

23         THE COURT:  And if you were authorized 1 in 100, your

24   best judgment is that's what somebody decided?

25         THE WITNESS:  That's correct.

109

1          Whether we were authorized and what was filled would

2     be two different things as well.

3     BY MS. RIFKIN:

4     Q.     Do you remember the average caseloads that the

5     psychiatrists stated they were carrying in that letter?

6     A.     I believe it was 1 to 60, 1 to 70 were their cases.

7     I believe they were higher.

8     Q.     And do you know how many psychiatrists Salinas Valley

9     had on staff at that point?

10    A.     I do not know.

11    Q.     You said that last week Salinas Valley had 8.25

12    psychiatrists; is that right?

13    A.     Yes.

14    Q.     So at the time that the psychiatrists wrote the

15    letters, January and February of this year,

16    Miss Radtkey-Gaither said in a declaration to this Court that

17    Salinas Valley had nine psychiatrists during one of those

18    months, and eight psychiatrists during one of those months.

19          Were you aware of that?

20    A.     Not accurately, no, I'm not aware of that.

21          MS. RIFKIN:  May I approach the witness, Your Honor.

22          (Exhibit handed to witness.)

23    BY MS. RIFKIN:

24    Q.     I've handed the witness what's been marked

25    Plaintiffs' Exhibit 6, which is Document 4602 filed in this

110

1     court record on May 9, 2013.

2          It is the Declaration of Kathryn Radtkey-Gaither in

3     Support of Defendants' Opposition to Plaintiffs' Motion for

4     Enforcement of Court Orders and Affirmative Relief Related to

5     Inpatient Treatment.

6          Turning your attention to page 7 of this declaration,

7     paragraph 13, bullet point 2, Miss Radtkey-Gaither stated:

8          (Reading:)

9          At the end of January 2013 another psychiatrist

10         left Salinas Valley.  The number of psychiatrists was

11         briefly reduced to eight.  But because of our

12         continuous attention to hiring, a new permanent

13         psychiatrist started working at Salinas Valley on

14         February 7th, 2013.  This permanent hire returned the

15         number of psychiatrists on staff to a total of nine.

16         (Reading concluded.)

17         The letters the psychiatrists wrote were dated in

18    January -- the end of January 2013 and February 2013, when

19    Miss Radtkey-Gaither testified in this declaration that the

20    staffing of psychiatrists was respectively eight and nine.

21         Do you have any reason to doubt her numbers?

22    A.    No.

23    Q.    So the number of psychiatrists as of last week, at

24    Salinas Valley, was approximately the same number of

25    psychiatrists as when these psychiatrists wrote their letter

111

1    stating they had caseloads of 1 to 60, 1 to 70 as you just

2    said; is that right?

3    A.       I assume so, yes.

4    Q.       Has the census at Salinas Valley gone down since

5    February?

6    A.       No.

7    Q.       So how is it that as of last week the same number of

8    psychiatrists had caseloads of 1 to 42 approximately, as the

9    psychiatrists in February and January had of 1 to 60 or 1 to

10   70 if the population is the same?

11   A.       I don't believe the letters reference that all

12   psychiatrists had a caseload of 1 to 60 or 1 to 70.  I

13   believe they said that there was a couple.

14          THE COURT:  When you are talking about -- while

15   counsel is looking at the documents, when you are talking

16   about averages, do you presently have psychiatrists with

17   caseloads of 60 or 70?

18          THE WITNESS:  We have -- yes.  We had one that had a

19   higher -- I won't say 60, but we did have one psychiatrist.

20          Depending how the units are designed, you have 58

21   patients in one particular unit and right next to them

22   another 58.  So you have 116 patients in one general area.

23   So we have three psychiatrists working with those three.

24          It is not a perfect match of 35 patients per unit or

25   70, so we give them to location.

112

1          We have had one psychiatrist on one of our units that

2     had a higher caseload, approximately 1 to 50, 1 to 60.  And

3     then her relief came in and covered the rest of those units

4     for a small period of time.  It's not the ideal situation,

5     but that's what we're working on.

6          THE COURT:  No kidding.

7          THE WITNESS:  That's what we are working on, trying

8     to get all of it balanced and have enough psychiatrists on

9     board, coming in.  We have two more coming next week as well

10    working during the week to reduce those caseloads.

11         THE COURT:  I don't know who decided to have this

12    hearing.  I mean, I decided to have the hearing.  Who created

13    the situation to have this hearing?

14         Never mind.  Never mind.  I'm sorry.  Go ahead.

15    BY MS. RIFKIN:

16    Q.    Let's move on to talking about the treatment being

17    provided at Salinas Valley.

18         You testified yesterday that the treatment being

19    provided meets all the licensing standards applicable to the

20    state; is that right?

21    A.    Yes, that's correct.

22    Q.    Do those licensing standards account for the orders

23    of this Court, if you know?

24    A.    I don't know.

25         THE COURT:  It would be consistent with the licensing

113

1   standards that a psychiatrist have a patient load of 60

2   patients; is that your understanding?

3         THE WITNESS:  The standards say they have to have a

4   treatment team.  I don't think there is a number associated

5   with that.

6         THE COURT:  They have to have a treatment team?

7         THE WITNESS:  Yeah.

8         THE COURT:  So the treatment team could have 150

9   patients?

10         THE WITNESS:  I think that's --

11         THE COURT:  And it wouldn't be inconsistent with the

12   licensing?

13         THE WITNESS:  I don't believe so, no.

14         THE COURT:  Thank you, ma'am.

15   BY MS. RIFKIN:

16   Q.      You're not a psychiatrist, are you?

17   A.      No, I am not.

18   Q.      You're not a psychologist?

19         THE COURT:  Ma'am, I don't want argument.  Ask

20   questions.

21         MS. RIFKIN:  Okay.

22   BY MS. RIFKIN:

23   Q.      Do you have a graduate degree in mental health?

24   A.      No, I do not.

25   Q.      Do you have a graduate degree in public health

114

1  administration?

2  A.      No, I do not.

3  Q.      You testified that you put in place a new clinical

4  team recently; is that right?

5  A.      Yes.

6  Q.      To supervise the clinicians at Salinas Valley; is

7  that correct?

8  A.      I have a new clinical administrator, and I have a new

9  medical director.

10  Q.      And a new nursing director; is that right?

11  A.      No.  The nursing administrator is the same that was

12  there.

13  Q.      When did the new clinical director come on board?

14  A.      I believe in April.

15  Q.      That would be prior to your arrival there?

16  A.      Yes, it was.

17  Q.      When did the new medical director come on board?

18  A.      That was prior to my arrival as well.

19  Q.      Neither of them are going to testify in today's

20  proceedings about treatment; is that right?

21  A.      I wouldn't know that.

22  Q.      How many hours on average is a patient in an

23  intermediate care program at Salinas Valley -- let me start

24  over.

25          How many treatment programming hours is a patient in

115

1    Salinas Valley receiving per week on average?

2    A.      On average approximately seven to ten, I believe.

3    Q.      What are you basing that number on?

4    A.      We had done a review some time ago so I don't have

5    the current numbers.  I know that -- I don't have that.  I

6    just knew I saw a report several months ago, that it was on

7    an average of seven to ten.

8    Q.      Is there a procedure that you're aware of for

9    tracking the number of treatment programming hours that each

10   patient receives at Salinas Valley?

11   A.      We're in the process of implementing new technology

12   which Mr. Maynard can speak about.  It's been in the works

13   for some time so that we can have an automated system of

14   tracking all of the treatment hours, the groups, the

15   attendance and so forth.  Right now it is all done manually.

16   Q.      So right now, to the best of your knowledge, the

17   patients at Salinas Valley are currently receiving on average

18   seven to ten treatment programming hours per week; is that

19   correct?

20   A.      I believe so.  That's just my speculation.

21   Q.      Are you aware that the program guide covering

22   treatment of patients in the EOP program at the California

23   Department of Corrections requires a minimum number of ten

24   hours per week?

25   A.      I'm not aware of that.

116

1          MS. VOROUS:  Objection.  Beyond the scope of direct

2     examination.

3          THE COURT:  I don't really know.

4          MS. RIFKIN:  Your Honor, may I explain?

5          THE COURT:  Yeah.

6          MS. RIFKIN:  So Miss Ahlin has testified that the

7     treatment programs at Salinas Valley are appropriately

8     providing intermediate inpatient care.

9          THE COURT:  Fine.  You may proceed.

10    BY MS. RIFKIN:

11    Q.     So you don't know the standard number of hours

12    required for EOP care; is that right?

13    A.     No, I do not.

14    Q.     Are you aware that EOP programs are considered a

15    lower level of acuity than intermediate care facilities?

16    A.     I know that's what is utilized in the California

17    Department of Corrections prior to coming to DSH, so yes.

18    Q.     So are you aware that you would be receiving patients

19    at Salinas Valley that have been referred from the EOP

20    program for a higher level of care?

21    A.     Yes.

22         THE COURT:  We'll take our noon recess.

23         Oh, we're not in session this afternoon.

24         We'll reconvene Friday at?

25         THE CLERK:  9:15.

117

1          THE COURT:  Off the record.

2          (Discussion held off the record.)

3          THE COURT:  Stand in recess.

4          (Off the record at 11:56 a.m.)

5                     ---o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

118

                        SACRAMENTO, CALIFORNIA

1

2                   FRIDAY, JUNE 21ST, 2013 - 9:15 A.M.

3                             ---o0o---

4           THE CLERK:  All rise.

5           Court is now in session.

6           The Honorable Lawrence K. Karlton, presiding.

7           THE COURT:  Please, be seated everyone.

8           Good morning.

9           THE CLERK:  Calling S-90-520, Coleman, et al., versus

10   Brown, et al.

11          THE COURT:  You were inquiring, Miss Rifkin.  I think

12   you were.

13          MS. RIFKIN:  Yes.

14          Your Honor, plaintiffs would like to move into

15   evidence some of the exhibits introduced yesterday beginning

16   with Plaintiffs' Exhibit 3 which is the Department of State

17   Hospitals monthly staffing data for May 2013.

18          THE COURT:  Received.

19              (Whereupon, Plaintiffs' Exhibit Number 3 received

20               into evidence.)

21          MS. RIFKIN:  And marked Plaintiffs' Exhibit Number 4,

22   which is identified as the Department of State Hospitals

23   budget.

24          MS. VOROUS:  Objection, Your Honor.  Lack of

25   foundation.  I believe that the -- Miss Rifkin hasn't

119

1    established this is the governor's budget for 2012-2013.

2                MS. RIFKIN:  Miss Ahlin authenticated the document.

3                THE COURT:  In any event, it is self-authenticating.

4    Received.

5                    (Whereupon, Plaintiffs' Exhibit Number 4 received

6                     into evidence.)

7                MS. RIFKIN:  Plaintiffs' Exhibit 5, which was Exhibit

8    105 to the declaration of Michael Bien already in the record

9    as Docket 4404.

10               THE COURT:  Received.

11                   (Whereupon, Plaintiffs' Exhibit Number 5 received

12                    into evidence.)

13               MS. RIFKIN:  And Plaintiffs' Exhibit 6, which is the

14   declaration of Miss Radtkey-Gaither, Docket 4602.

15               THE COURT:  Received.

16                   (Whereupon, Plaintiffs' Exhibit Number 6 received

17                    into evidence.)

18              (HAVING BEEN PREVIOUSLY SWORN, PAMELA AHLIN RESUMES

19                THE WITNESS STAND.)

20                      CONTINUED CROSS-EXAMINATION

21   BY MS. RIFKIN:

22   Q.      Good morning, Miss Ahlin.

23   A.      Good morning.

24   Q.      One of the topics we discussed yesterday was the

25   change in the treatment team staffing ratio that we talked

120

1    about occurred at the end of 2011.

2            Is that right?

3    A.      Yes.

4    Q.      The Department of State Hospitals has been subject to

5    a consent degree with the United States Department of

6    Justice; is that right?

7    A.      Yes, I believe so.

8    Q.      And that consent decree ended in late 2011; is that

9    right?

10           MS. VOROUS:  Objection, Your Honor.  Beyond the scope

11   of direct.

12           THE COURT:  That appears to be correct, Miss Rifkin.

13           MS. RIFKIN:  The consent decree with the

14   United States Department of Justice --

15           THE COURT:  The objection is going to be anything

16   about that consent decree as beyond the scope of direct.

17           MS. RIFKIN:  That consent --

18           THE COURT:  Wait.  Is that right, Miss Vorous?

19           MS. VOROUS:  Yes, it is, Your Honor.

20           THE COURT:  Miss Rifkin.

21           MS. RIFKIN:  That consent decree required a treatment

22   team ratio of 1 to 25.

23           THE COURT:  I have no doubt, but it is beyond -- oh,

24   I see.  You say it is not beyond the scope because it is

25   really impeaching.

121

1           MS. RIFKIN:  So the Department of State Hospitals

2     changed the treatment ratio immediately upon the end of

3     federal oversight which --

4           THE COURT:  Overruled.

5           You may answer, if you know.

6           If you know.

7           THE WITNESS:  I do not know.

8           MS. RIFKIN:  I've lost track of which question was

9     pending.

10          THE COURT:  You asked if the consent decree required

11    a treatment team of 1 to 25 was the question.  And the

12    witness says "I don't know."

13          MS. RIFKIN:  Your Honor, may I approach the witness?

14          THE COURT:  You may.

15          (Exhibit handed to witness.)

16    BY MS. RIFKIN:

17    Q.    Miss Ahlin, I've handed you what's been marked for

18    identification as Plaintiffs' Exhibit 7 which is a Consent

19    Judgment between the United States of America and the State

20    of California and the Department of Mental Health entered in

21    2006 which governs treatment in what was the Department of

22    Mental Health and is now the Department of State Hospitals.

23          MS. VOROUS:  Objection, Your Honor.  The document

24    speaks for itself.

25          THE COURT:  Well, it certainly does.  But that is not

122

1   an objection.  It is simply a description to inform the

2   witness about where we're going, I assume.

3           You may proceed, ma'am.

4   BY MS. RIFKIN:

5   Q.     Miss Ahlin, if you can turn to page 8 of this

6   document, bullet point "i" on page 8.

7           Is that in front of you?

8   A.     Yes, it is.

9   Q.     It says that the Department of State Hospitals shall

10  ensure the team shall not --

11          THE COURT:  It says what it says.  I can read it.

12  You can read it.  The witness can read it.

13          MS. RIFKIN:  All right.

14  BY MS. RIFKIN:

15  Q.     The ratio described in this document of 1 to 25 for

16  treatment teams, is that the same -- that's the same kind of

17  ratio we were talking about yesterday with staffing treatment

18  team ratios; is that right?

19  A.     I would have to read the entire document to make

20  sure.

21  Q.     Okay.

22          THE COURT:  Have you ever seen this document before,

23  ma'am?

24          THE WITNESS:  No, I have not.

25  ///

123

1  BY MS. RIFKIN:

2  Q.    Were you aware there was a treatment team ratio that

3  was mandated by the agreement with the U.S. Department of

4  Justice?

5  A.    No.

6         MS. RIFKIN:  Plaintiffs move to --

7         THE COURT:  Go ahead.  You want to move it in?

8         MS. RIFKIN:  Yes.

9         THE COURT:  Received.

10        MS. RIFKIN:  Plaintiffs' --

11        THE COURT:  Received.

12            (Whereupon, Plaintiffs' Exhibit Number 7 received

13             into evidence.)

14        THE COURT:  Ma'am, let me ask you, I'm really not

15  clear when was this entered into, Miss Rifkin.

16        MS. RIFKIN:  2006.

17        THE COURT:  2006.  What were your duties in 2006?

18        THE WITNESS:  I was assistant hospital administrator

19  for Coalinga State Hospital.

20        THE COURT:  And in that capacity it was not brought

21  to your attention that there were limitations to the number

22  of patients that the team could have?

23        Is that really true?

24        THE WITNESS:  Yes.  Coalinga State Hospital was not

25  in the consent decree.

124

1          THE COURT:  I thought it was against all State

2     Hospitals.  I better read it.

3          Hang on a moment, ma'am.

4              (Brief pause.)

5          MS. RIFKIN:  Your Honor, I would be happy to clarify

6     to the Court.

7          THE COURT:  Go ahead.

8          MS. RIFKIN:  At the time in 2006 Coalinga State

9     Hospital was not yet activated so this consent decree covered

10    the other State Hospitals that didn't exist within the CDCR

11    prisons.

12         THE COURT:  Ma'am, is it correct that Coalinga in

13    2006 was not yet accepting patients?

14         THE WITNESS:  We were accepting patients beginning

15    August of 2005.  Yes, we were.

16         THE COURT:  Now, as I read this document, each State

17    Hospital -- well, I don't know.  I don't want to read the

18    whole thing, but I think I may have to.

19             (Brief pause.)

20         MS. RIFKIN:  May I ask the witness a question to

21    clarify, Your Honor?

22         THE COURT:  You may.

23    BY MS. RIFKIN:

24    Q.    What hospitals did this consent decree cover?

25         THE COURT:  How does she know?

125

1        She hasn't ever seen this document.  That's the whole

2   point.

3   BY MS. RIFKIN:

4   Q.      Do you know what hospitals this covered?

5            THE COURT:  Do you know that such a decree existed?

6            THE WITNESS:  I was activating.  I wasn't aware.

7   This was in 2006.  No.  I was busy activating the hospital.

8   BY MS. RIFKIN:

9   Q.      In general did you know this consent decree existed?

10           THE COURT:  Ma'am, she just said no.  Correct?

11           THE WITNESS:  I was activating a hospital so I wasn't

12  involved in this part of it.

13           THE COURT:  But the problem with that, ma'am -- I

14  don't mean this disrespectfully, I just don't understand --

15  you're activating a hospital.  There is a decree which says

16  what shall and shall not be done at that hospital, and nobody

17  brought it to your attention?

18           Is that fair?

19           THE WITNESS:  That is fair.  I was -- I personally

20  was not involved with that.

21           THE COURT:  I understand.

22           MS. VOROUS:  If I could clarify?

23           The consent decree has never applied to Coalinga

24  State Hospital, and it doesn't apply to the DSH programs

25  within the CDCR prisons.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

126

1          THE COURT:  I don't know why you say that.  Maybe it

2    is true.  Can you point me to the place where is says that

3    because it says that each State Hospital shall use a Recovery

4    philosophy.

5          MS. VOROUS:  The facilities within CDCR --

6          (Court Reporter requests counsel use the microphone.)

7          THE COURT:  Why don't you come to the microphone.

8    I'm finding this very troubling.

9          Yes.

10         MS. VOROUS:  Miss Gaither will testify to this when

11   she testifies as well, but the State Hospitals -- the term

12   "State Hospitals" has never been defined to include the

13   Salinas Valley Psychiatric Program or the Vacaville Program.

14   They have never been subject to the consent decree.  And

15   Coalinga State Hospital has not either.

16         THE COURT:  I understand that somebody thinks that is

17   true.  I'm looking at the decree, and the decree says at B,

18   in the Introduction, "Each State Hospital."

19         I mean, that's what it says.

20         MS. RIFKIN:  Your Honor, it is plaintiffs'

21   understanding that the decree also did not apply within DSH

22   hospital run facilities in CDCR.  The relevance is that DSH

23   as a whole changed its treatment ratio.

24         THE COURT:  Ma'am -- well, everybody agrees to

25   something that seems to me -- maybe you're right, but I don't

127

```
 1    know where and I don't know how.

 2         There is apparently an understanding -- I mean, the

 3    suit is against Governor Schwarzenegger and Stephen W.

 4    Mayberg, Director of the California Department of Mental

 5    Health.  That appears to cover everybody.

 6         MS. VOROUS:  Your Honor, we would be prepared to

 7    provide testimony on the fact that this does not cover those

 8    programs or Coalinga State Hospital.

 9         THE COURT:  Very good.  Thank you, ma'am.  I'll stop

10    worrying about it for the time being until you provide me

11    with the appropriate information.

12         You may proceed, Miss Rifkin.

13    BY MS. RIFKIN:

14    Q.    Are you aware of whether the treatment team staffing

15    ratio that changed as you testified yesterday from 1 to 25 to

16    1 to 35 at the end of December applied throughout the DSH

17    system?

18    A.    I am only aware that it applied to the State

19    Hospitals.

20    Q.    That it applied to the Department of State Hospitals,

21    State Hospitals?

22    A.    No.  The five stand-alone State Hospitals.  That was

23    my impression at the time.

24         THE COURT:  Just stop.

25         THE WITNESS:  I'm sorry.  Let me make that clear.
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

128

1          THE COURT:  Sure.  Go ahead.

2          THE WITNESS:  Yeah.  When the Department of State

3    Hospitals changed the ratios, the average from previous, it

4    was applied across to the hospitals itself.  Coalinga was a

5    little different.  We have residential recovery units there

6    which have a different ratio as well.  So it wasn't applied

7    directly to all units at Coalinga State Hospital.

8          THE COURT:  Okay.  You have never seen the document

9    so you don't know that it was ordered by a stipulated decree

10   apparently, but, in any event, whether it was or not, whether

11   it reached Coalinga or not, whether it reached Salinas or

12   not, at least at Coalinga there were exceptions to the status

13   to begin with?

14         THE WITNESS:  Correct.

15         THE COURT:  All right.

16   BY MS. RIFKIN:

17   Q.     Let me clarify.  I'm talking about at the end of

18   2011.  Yesterday we discussed that the Department of State

19   Hospitals changed its treatment ratios from 1 to 25 to 1 to

20   35.

21         Were you aware of whether that change applied to

22   Department of State Hospitals across the board?

23   A.     I am not aware.

24   Q.     Did it apply to Salinas Valley?

25   A.     I'm not aware.

129

1  Q.       Yesterday you testified, correct, that Salinas Valley

2  change its treatment ratio from 1 to 25 to 1 to 35 at the end

3  of 2011?

4           MS. VOROUS:  Objection.  Assumes facts not in

5  evidence.

6           THE COURT:  I don't know whether it is or not.  I

7  thought that that's what she said, but I may be wrong.

8           THE COURT:  Did Coalinga --

9           MS. RIFKIN:  Salinas Valley.

10          THE COURT:  I'm sorry.  Thank you.

11          Did Salinas Valley change its ratio in 2011?

12          THE WITNESS:  I do not know about Salinas Valley, no.

13  BY MS. RIFKIN:

14  Q.       When I asked you earlier at the start of the

15  proceedings this morning about the change in the treatment

16  ratio from 1 to 25 to 1 to 35 at the end of December 2011,

17  and you agreed that that changed, what hospital were you

18  talking about?

19  A.       The four hospitals.

20  Q.       We hadn't yet discussed the consent decree, ma'am,

21  so what hospitals were you talking about?

22  A.       The four hospitals:  Napa State Hospital,

23  Metropolitan, Atascadero and Napa.

24          MS. RIFKIN:  Does the Court have what's been marked

25  Plaintiffs' Exhibit 5 and admitted into evidence available?

130

1          THE COURT:  I can get it.

2          Go ahead.  Yes.

3          MS. RIFKIN:  Your Honor, may I approach the witness?

4          THE COURT:  You may.

5          (Exhibit handed to witness.)

6    BY MS. RIFKIN:

7    Q.    Miss Ahlin, I've handed you what's already been

8    admitted into evidence as Plaintiffs' Exhibit 5.

9          Is that in front of you?

10          If you can, turn to the page that at the top reads

11    page 144 of 266.

12          To refresh your memory, we're looking at the

13    Department of State Hospitals Report on State Hospital

14    Financial Activity, Fiscal Year 2011-2012 through Fiscal Year

15    2012-2013.

16          We're looking at page 144 of 266.

17          THE COURT:  Do you have a question?

18    BY MS. RIFKIN:

19    Q.    Under staffing ratios this states that the DSH

20    treatment team ratios for fiscal year 2012-2013 are 1 to 35

21    on average effective December 2011.

22          Did that change apply to Salinas Valley?

23          THE COURT:  If you know.

24          THE WITNESS:  I do not know that.

25          THE COURT:  You know, I don't mean this in any way

131

1    critically, I just don't understand.

2            What was your job -- this was issued when?

3            Do you know, ma'am?

4            December 10th?

5            No.  It was conveyed then.  But sometime in December

6    this thing was issued.  What was your job at that time?

7            THE WITNESS:  December of what year?

8            THE COURT:  2012.  It covers 2012 to 2013.  So 2013.

9            THE WITNESS:  In 2013 I was the deputy director.

10           THE COURT:  For strategic planning?

11           THE WITNESS:  Yes.

12           THE COURT:  In that position -- I mean, in order to

13   strategically plan, you got to know where you are right now,

14   right?

15           THE WITNESS:  Correct.

16           THE COURT:  And this document was -- did you see this

17   document in 2013?

18           I don't mean this critically.  I'm just trying to

19   understand how the State works.

20           Did you see this document in 2013?

21           THE WITNESS:  No, I did not.

22           THE COURT:  Thank you, ma'am.

23   BY MS. RIFKIN:

24   Q.      When did you become aware of what treatment team

25   ratios are supposed to be, the 1 to 35 number you mentioned

132

1    many times in this proceeding?

2    A.        For what facility?

3    Q.        Any facility in the Department of State Hospitals.

4    A.        I don't know.

5    Q.        All right.  Let's move on.

6              Yesterday when we stopped we were talking about the

7    treatment being provided at Salinas Valley.

8              You're interim executive director at Salinas Valley?

9    A.        That is correct.

10   Q.        You testified yesterday one of the areas that you are

11   in charge of investigating is whether adequate treatment is

12   being provided; is that right?

13   A.        I am inquiring about it.  I don't -- I think we

14   should define "investigating."

15   Q.        You're inquiring --

16   A.        Thank you.

17   Q.        -- about whether treatment --

18             THE COURT:  One of your responsibilities is to ensure

19   there is adequate treatment?

20             THE WITNESS:  Yes.

21             THE COURT:  In that capacity, because you have just

22   come on board, you're trying to find out what's been going

23   on?

24             THE WITNESS:  Correct.

25             THE COURT:  And in that sense there is an

133

1    investigation?

2            Never mind.  Go ahead.

3    BY MS. RIFKIN:

4    Q.      Are you aware that one-to-one clinician contacts are

5    provided cell front at Salinas Valley?

6    A.      There are some occasions that does occur.

7    Q.      One-on-one clinical contacts are often provided at

8    cell front at Salinas Valley; isn't that right?

9    A.      I won't -- I can't validate the quantity of them.  I

10   have a clinical administrator that tracks all of the

11   one-to-one treatments and all of the treatment that's

12   provided.

13   Q.      Is that clinical administrator testifying here today?

14   A.      That clinical administrator will be a witness, yes.

15   Q.      Who is that clinical administrator?

16   A.      Dante Karas.

17   Q.      If you know, how does that -- how does Mr. Karas

18   track the cell front visits?

19   A.      He has staff that do it for him.  So he would --

20   Q.      Is it a written document?

21   A.      You would have to ask him.  I don't know.

22   Q.      Have you ever reviewed how many clinical contacts at

23   Salinas Valley are happening cell front?

24   A.      No, I have not.

25   Q.      If I told you that almost all the clinical contacts

134

1    are happening cell front, would you be surprised?

2              MS. VOROUS:  Objection.  Assumes facts not in

3    evidence.

4              THE COURT:  Objection is sustained.

5    BY MS. RIFKIN:

6    Q.        To your knowledge -- Let me start over.

7              Providing one-on-one clinician contact cell front is

8    not the standard of care, is it?

9              MS. VOROUS:  Objection.  Calls for speculation.  Lack

10   of foundation.

11             THE COURT:  If it means -- if your question means as

12   a matter of professional -- well, no.  She's responsible for

13   the institution.

14             You may answer the question, if you can.

15             Do you know whether cell front clinical interviews

16   are in accordance with the standard of care?

17             If you know.

18             THE WITNESS:  I don't know.  And I have a medical

19   director that would be in charge of ensuring that all of the

20   clinical care is professional.

21             THE COURT:  Let me ask you this:  You've got all of

22   these subordinate people who are supposed to be taking care

23   of these problems, you're ultimately responsible, but if the

24   situation were that there was ongoing clinical violations of

25   the standard of care, would you expect that they would report

135

1    that to you?

2             THE WITNESS:  Yes, I would.

3             THE COURT:  You may proceed.

4         MS. RIFKIN:  Your Honor, plaintiffs move to strike

5    Miss Ahlin's testimony regarding whether adequate treatment

6    is being provided at Salinas Valley as without foundation.

7             THE COURT:  Ma'am, I understand what you are saying.

8    The objection is overruled because the testimony will stand,

9    and in the context of this hearing that testimony is

10   important.

11            It may not be true, and again I don't mean -- again I

12   don't mean that disrespectfully.  People may not be doing the

13   job they're supposed to do either.

14            The objection -- the motion is denied.

15   BY MS. RIFKIN:

16   Q.    Have any of your subordinates ever reported to you

17   that clinical contacts at Salinas Valley are occurring cell

18   front?

19   A.    I don't know.  I don't know.

20   Q.    You don't know if any of them have ever reported that

21   to you?

22   A.    No.  My medical director has not reported that to me.

23   Q.    So none of your subordinates have reported that these

24   things are happening to you?

25   A.    Not that I'm aware of, no.  Hu-huh.

136

1    Q.      How do you know if -- you just testified that
2    sometimes the cell front visits are happening.  How do you
3    know that?
4    A.      I know we do that, but none of them have told us --
5    told me that.
6    Q.      So were you there when those were taking place?
7    A.      No, I have not seen those.
8            THE COURT:  Well, there has got to be some way that
9    you learned that information.
10           THE WITNESS:  Right.  To be accurate, I don't know
11   how I learned about it.
12           THE COURT:  Fair enough.  That's fair enough.
13   BY MS. RIFKIN:
14   Q.      During your time at Coalinga was an orientation
15   status similar to cuff status used?
16   A.      There is an orientation period at Coalinga, yes.
17   Q.      Does that require patients to be in handcuffs any
18   time they are released from a cell?
19           MS. VOROUS:  Objection.  Beyond the scope of
20   direct.
21           THE COURT:  Overruled.  You may answer.
22           THE WITNESS:  The individuals that come to Coalinga
23   are not the same individuals that come to Salinas Valley.
24   BY MS. RIFKIN:
25   Q.      That's not the question I asked.

137

1          What I asked was, at Coalinga, when someone is on

2     orientation status, are they required to be in handcuffs any

3     time they leave the cell?

4     A.      No.

5     Q.      Are they restricted from yard during orientation

6     status at Coalinga?

7     A.      No.

8     Q.      Are they restricted from dayroom status during

9     orientation status at Coalinga?

10    A.      No.

11    Q.      How long is the maximum period orientation can last

12    at Coalinga?

13    A.      It's a different program, of course, so it lasts --

14    they can be on the orientation unit up to 60 days.

15    Q.      Can patients in the orientation status at Coalinga

16    attend group treatment?

17    A.      Yes.

18    Q.      At Coalinga are people locked in their cells?

19    A.      No.  Unless they're on seclusion.

20    Q.      Are they locked in their cells as punishment at

21    Coalinga?

22    A.      Nobody is locked in their cells for punishment, no.

23    Q.      But at Salinas Valley patients are locked in their

24    cells as punishment?

25              THE COURT:  Now, ma'am --

1     MS. VOROUS:  Objection.  Lacks facts not in

2  evidence.

3     THE COURT:  I don't think that's true.  I think -- I

4  don't know whether this witness did so, but somebody -- I

5  think somebody did.

6     Ma'am, has somebody so testified?

7     MS. RIFKIN:  Yes.

8     THE COURT:  Do you know who?

9     MS. RIFKIN:  Doctor Stewart testified cuff status

10  applies to patients on orientation and that when -- and --

11  well, I'm not sure if it was Dr. Stewart or Miss Woodford.

12     THE COURT:  I believe that somebody testified at

13  least that happened, but I don't remember who.  And I have

14  not been taking notes because I intend to have this

15  transcribed.

16     MS. RIFKIN:  I can establish foundation, Your Honor.

17     THE COURT:  Go ahead.

18  BY MS. RIFKIN:

19  Q.    At Salinas Valley, in addition to being put on cuff

20  status during orientation, patients are sometimes put --

21  returned to cuff status; is that correct?

22  A.    That is correct.

23  Q.    What conditions occur in order for them to be

24  returned to cuff status?

25  A.    It would be a behavior issue that jeopardized the

139

1    safety of others.

2    Q.      Would you consider that punishment?

3            THE COURT:  Oh, I don't care.

4            Overruled.

5            I mean, the objection you were about to voice,

6    Miss Vorous, is sustained.

7    BY MS. RIFKIN:

8    Q.      Are you aware if any other inpatient care units run

9    by the Department of State Hospitals use an orientation

10   status that is substantially similar to cuff status at

11   Salinas Valley?

12   A.      I would think Vacaville would have a similar program.

13   Q.      If you know, are you aware that there is a difference

14   between the mental health acuity of patients in the

15   intermediate care program at Salinas Valley and patients in

16   other intermediate care programs run by the Department of

17   State Hospitals?

18           MS. VOROUS:  Objection.  Assumes facts not in

19   evidence.

20           THE COURT:  She's just asking whether that is true.

21           You did -- actually you did ask it as a fact.

22           As far as you know is there a difference between the

23   mental health acuity of patients in intermediate care

24   programs at Salinas Valley and the patients in other

25   intermediate care programs run by the Department of State

140

1    Hospitals?

2         Are you aware of such a thing?

3         THE WITNESS:  I don't have factual knowledge that

4    they are different.

5         THE COURT:  Thank you, ma'am.

6    BY MS. RIFKIN:

7    Q.    You testified yesterday that -- strike that.

8         When the ICC is reviewing patients at Salinas Valley

9    during their orientation phase, they don't have access to the

10   CDCR file; is that correct?

11        THE COURT:  Who doesn't?

12        MS. RIFKIN:  The ICC.

13        THE WITNESS:  I don't know if -- The ICC should have.

14   I don't know for a fact if they do or do not.

15        You're saying our staff?

16        Could you repeat the question?

17   BY MS. RIFKIN:

18   Q.    Sure.  I did ask about the ICC.

19        Your staff that participates on the review to clear

20   someone from orientation status, do they have access to the

21   C-File?

22   A.    I'm not aware of that.

23        THE COURT:  I thought I understood something, which

24   maybe I don't understand.  I thought the ICC committee was

25   not within your staff but within the CDCR staff.

141

1           Is that wrong?

2           THE WITNESS:  No.  ICC is with the institutional

3   staff, yes.

4   BY MS. RIFKIN:

5   Q.      You testified yesterday that somebody in the process

6   of reviewing orientation status doesn't have access to the

7   patient's C-File so an extended review is needed.

8           Is that correct?

9   A.      Could you say that one more time?

10  Q.      Yesterday you testified that someone in the process

11  of reviewing -- clearing a patient from orientation status

12  doesn't have access to the underlying C-File so an extended

13  review is needed; is that correct?

14  A.      I'm not -- I'm not sure if that's what I said.

15          THE COURT:  Is it correct, whether you said it before

16  or not?

17          Ma'am, can you answer that question?

18          Does the ICC staff have available to it the C-File?

19          THE WITNESS:  The ICC staff, the institutional staff

20  have access to the C-File.  DSH staff don't typically have

21  access, from my knowledge, of the C-File.

22          THE COURT:  I am completely at sea.  I thought you

23  just finished telling me --

24          THE WITNESS:  ICC is the warden's committee.  And him

25  and his staff, his counselors, have access to the C-File.

142

1          THE COURT:  They're outside of your system?

2          THE WITNESS:  Correct.

3          THE COURT:  That's what I thought I said.

4          I think I understand.  Let me see.

5          So the ICC staff is the warden's staff.  That is

6    outside DSH?

7          THE WITNESS:  Correct.

8          THE COURT:  Wherever they perform the duties

9    connected with ICC, whether within the hospital or within the

10   correctional institution or wherever, they have -- they have

11   available to them the C-File.  And they do the clearing --

12   asking you, not telling you -- they do the clearing of new

13   patients at Salinas, right?

14         THE WITNESS:  Correct.

15         THE COURT:  Thereafter, State Hospital staff have

16   some further duty in connection with the orientation period?

17         Is that right or wrong?

18         THE WITNESS:  DSH staff does the clinical review in

19   the first ten days as well.

20         THE COURT:  All right.  But among other things the

21   clinical review purpose is to try and figure out what is

22   wrong -- I mean it's purpose is to try and figure out what is

23   wrong with the patient and how to treat the patient?

24         THE WITNESS:  Correct.

25         THE COURT:  Now, if the ICC has cleared the patient,

143

1    is there any reason for the patient to still be in cuffs?

2              THE WITNESS:  Not if the ICC clears them.

3              THE COURT:  All right.

4              You may ask your next question, Miss Rifkin.

5              Let me wind this up.

6              So whether or not the DSH staff has available to it

7    the C-File is simply irrelevant to the function that they

8    have in the orientation period; is that right?

9              THE WITNESS:  Right.  We depend on CDCR to do that

10   review.

11             THE COURT:  Of course.  Okay.

12             Miss Rifkin.

13   BY MS. RIFKIN:

14   Q.    You're familiar with the suicide that occurred in

15   Salinas Valley in November 2012; is that right?

16             MS. VOROUS:  Objection.  Beyond the scope of

17   direct.

18             THE COURT:  Ma'am?

19             MS. RIFKIN:  Well, Miss Ahlin testified about

20   treatment and the steps she's taking to change the procedures

21   and policies at Salinas Valley.

22             THE COURT:  And you intend to use this as an example

23   or explanation of the procedures or demonstration concerning

24   them?

25             MS. RIFKIN:  After suicides take place there is

144

1    usually reviews and recommendations.

2         THE COURT:  I understand you want to testify.  You're

3    not allowed to.

4         MS. RIFKIN:  Yes.  Sorry.

5         THE COURT:  Tell me your purpose in asking the

6    question and the questions that are obviously going to

7    follow.

8         You've already suggested to me that this -- What am I

9    doing?

10        If you can't answer the question, I'll sustain the

11   objection.

12        I'll ask you once more.  I am the soul of patience.

13   My patience is being tried.

14        Ma'am, is your purpose in answering this question --

15   and the answer is yes or no -- is your purpose -- at least

16   one of your purposes in answering -- asking this series of

17   questions to explore the procedures and rules as applied at

18   Salinas Valley?

19        Yes or no?

20        MS. RIFKIN:  Yes.

21        THE COURT:  You may proceed.

22   BY MS. RIFKIN:

23   Q.    You're familiar with the suicide that occurred in

24   Salinas Valley in November 2012; is that correct?

25   A.    I have heard about it, yes.

145

1    Q.        You reviewed a report about the suicide?

2    A.        I have -- yes, I have reviewed a report.

3    Q.        You reviewed the CDCR report about the suicide?

4    A.        No.  I reviewed a summary.

5              If you show me the report, I can tell you if I saw

6    that or not.

7              MS. RIFKIN:  Your Honor, may I approach the witness?

8              THE COURT:  Yes, of course.

9              (Exhibit handed to witness.)

10   BY MS. RIFKIN:

11   Q.        Miss Ahlin, I've handed you what's been marked as

12   Plaintiffs' Exhibit 8 for identification.

13             Because this document is a suicide report for an

14   inmate, it is subject to the protective order in this Court

15   and is confidential, and I request that when answering any

16   questions you don't refer to the inmate by name.

17   A.        Okay.

18   Q.        This is a suicide report for an inmate from Salinas

19   Valley State Prison for a suicide that occurred in November.

20             Looking at the first page of this exhibit, in the cc

21   line as to who this report was copied to, that's your name on

22   the first line, right?

23   A.        That is correct.

24   Q.        And you reviewed this report, right?

25   A.        Yes, that is correct.

146

1    Q.      Have you investigated -- have you made an inquiry

2    into whether the recommendations in this report have been

3    followed up on at Salinas Valley?

4           Strike that.

5           Do you remember the recommendations that were made in

6    this report about Salinas Valley?

7    A.      I'm reviewing them right now.

8    Q.      Do you have an independent recollection of the

9    recommendations made as a result of this report at Salinas

10   Valley?

11          MS. VOROUS:  Objection, Your Honor.  The witness said

12   she needs to review.

13          THE COURT:  She's asking if she hadn't reviewed it

14   would she remember, and the answer is no, that's why she's

15   reviewing it.

16          THE WITNESS:  That is correct.

17          THE COURT:  No kidding.

18          (Brief pause.)

19          MS. RIFKIN:  So since there is no question pending,

20   I'll move on.

21          THE COURT:  No, ma'am.  She's reviewing.  You asked

22   her about the recommendations.  She's reviewing them to

23   determine what they are and whether they've been implemented.

24   That's a perfectly appropriate thing for the witness to do in

25   light of your question, unless you want to withdraw the

147

1    question.

2              (Brief pause.)

3         Having reviewed the matter, now can you answer as to

4    whether or not the recommendations have been implemented?

5         MS. RIFKIN:  Sorry.  My question was whether you made

6    inquiry as to whether the recommendations --

7         THE COURT:  I'm sorry.  I thought you had asked a

8    broader question.

9         You may answer that.

10        THE WITNESS:  I have not checked to see if the chief

11   deputy director or designee provide documentation that a

12   tracking system for referral and communications has been

13   constructed.

14   BY MS. RIFKIN:

15   Q.   So you mean you haven't checked to make sure

16   that the -- when patients are referred from the Department of

17   Corrections for admission at Salinas Valley, to make sure

18   that that is being tracked appropriately?

19        MS. VOROUS:  Objection.  Misstates her testimony.

20        THE COURT:  It's argument.  I promise you, if we ever

21   get to the end, somebody is going to argue on behalf of the

22   plaintiff.  You can make that argument.  The witness stated

23   what she's done and not done.

24        You may proceed.

25   BY MS. RIFKIN:

148

1    Q.      Did DSH produce its own suicide review report of this

2    suicide?

3    A.      I'm not aware of that.

4    Q.      Who would be aware of that?

5    A.      Probably the executive director or medical director

6    that was in place at this time.

7    Q.      And Charles DaSilva was executive director at that

8    time?

9    A.      Yes, it was.

10   Q.      He still works for the Department of State Hospitals;

11   is that correct?

12   A.      That is correct.

13   Q.      And he was removed from his position as executive

14   director in approximately April 2013; is that right?

15   A.      That is correct.

16   Q.      Where is Mr. DaSilva currently working?

17           MS. VOROUS:  Objection.  Beyond the scope of

18   direct.

19           THE COURT:  Overruled.  I don't know why we care.

20           Go ahead and answer.

21           THE WITNESS:  He works for the Department of State

22   Hospitals Salinas Valley.

23   BY MS. RIFKIN:

24   Q.      What is his position there?

25           THE COURT:  Actually, it is relevant.

149

1          THE WITNESS:  Program assistant.

2     BY MS. RIFKIN:

3     Q.     Who does he report to?

4     A.     The program director.

5     Q.     Who is the program director?

6     A.     Albani Goodall.

7     Q.     Who did the program director report to?

8     A.     The clinical administrator.

9     Q.     So Mr. DaSilva was demoted?

10    A.     Correct.

11    Q.     Are you aware of the reasons why?

12    A.     I am not.  I know that he was removed because they

13    wanted a more experienced team in there to deal with the

14    migration of Stockton.  But that is all I know.  There may

15    have been more.  I don't know.

16    Q.     Do you know the date that Mr. DaSilva was removed

17    from his position as executive director?

18    A.     Not off hand, no.

19    Q.     Do you know the approximate date?

20    A.     I think you said it just a few minutes ago.

21    Q.     April 2013?

22    A.     That would sound around right.

23    Q.     Do you have any idea if it was before or after April

24    11th, 2013?

25    A.     If you said it is April 20th, that is after April

150

1    11th.

2    Q.       I didn't give a specific date.

3    A.       I thought you said April 20th.  I'm confused.

4    Q.       Do you have any idea if it was in the first half or

5    the second half?

6    A.       I don't know.

7    Q.       You're currently overseeing the process of reducing

8    beds at Salinas Valley; is that right?

9    A.       Correct.

10   Q.       And 242 intermediate care facility beds are going to

11   be eliminated over the next six months; is that correct?

12   A.       Yes.  They will be transferring over to Stockton.

13   Q.       After patients are moved from those beds to Stockton,

14   those beds remaining at Salinas Valley will then be closed;

15   is that right?

16   A.       I'm not sure if they're going to be closed.  They

17   will not be activated -- they will not have patients in them

18   unless we have a need for them to be.

19   Q.       So after a patient is transferred from Salinas Valley

20   to Stockton, will you be admitting a new patient into that

21   bed?

22   A.       No.

23   Q.       There are patients currently on the ICF waitlist,

24   correct?

25   A.       That is correct.

151

1    Q.      The transfers are set to begin in one month, on July

2    22nd, 2013; is that correct?

3    A.      That is correct.

4    Q.      Are you aware if defendants have provided notice to

5    this Court of the decommissioning of beds at Salinas Valley?

6    A.      I'm not aware of that.

7    Q.      Do you know whether or not defendants have provided

8    notice?

9            THE COURT:  She just said "I don't know."

10           MS. RIFKIN:  I thought my question was confusing.  I

11   was trying to rephrase.

12   BY MS. RIFKIN:

13   Q.      So as patients migrate to Stockton, those beds at

14   Salinas Valley are being shut down, correct?

15   A.      They will not be filled.

16   Q.      As of July 22nd will patients be accepted to Stockton

17   off the ICF waitlists?

18   A.      Yes.

19   Q.      Do you know which units are being activated first at

20   the Stockton facility?

21   A.      I do not know.

22   Q.      Do you know if an ICF unit is being activated on July

23   22nd at the Stockton facility?

24   A.      I would assume so.  That's just speculation.

25   Q.      What is that based on?

152

1    A.      That I'm transferring ICF patients to them.

2    Q.      You're working closely with the executive director in

3    Stockton on the migration plan; is that right?

4    A.      That is correct.

5    Q.      Are ICF beds at Stockton currently licensed?

6    A.      I am not aware of that.

7    Q.      Have you asked the executive director where you'll be

8    transferring your patients whether the beds are currently

9    licensed?

10   A.      The plan is that they will be transferred into

11   licensed units on July 22nd.

12   Q.      But you don't know whether the beds are licensed as

13   of now?

14   A.      I do not know that.

15   Q.      Do you know whether the beds are staffed as of now?

16   A.      I do not know that either.

17   Q.      Do you know how many psychiatrists they've hired for

18   Stockton?

19   A.      I do not know that.

20   Q.      Do you know if they've hired any psychiatrists at

21   Stockton?

22   A.      I know they have hired some, yes.

23   Q.      How many do you know they've hired?

24   A.      I do not know the number.

25   Q.      So when you say you know that they've hired some, how

153

1    many are you aware of?

2    A.      I know that they hired some because they come over

3    and provide services to us.

4    Q.      How many provide services to you?

5    A.      We have had one that have come over to provide

6    services to us on a partial time basis which was counted as

7    part of our ratios at one point.

8    Q.      Was it counted as part of your ratios yesterday?

9    A.      No, it was not.

10   Q.      Is that person providing care now at Salinas Valley?

11          THE COURT:  The objection is sustained.  You may

12   proceed to something that has something to do with the case.

13          Actually, that has something to do with the case.

14   I'm sorry.

15          What was your question, ma'am?

16          I lost it.

17   BY MS. RIFKIN:

18   Q.      I'm trying to understand if that --

19          THE COURT:  I don't care what you are doing.

20          (Reading:)

21          Was it counted as part of your ratio yesterday?

22          No, it was not.

23          Is that person providing care now at Salinas Valley?

24          (Reading concluded.)

25          That's an appropriate question.

154

1      THE WITNESS:  He comes over to assess the patients

2  that are going to be discharged.

3  BY MS. RIFKIN:

4  Q.      Discharged to Stockton?

5  A.      Yes.

6  Q.      How many staff will Salinas Valley be cutting when it

7  deactivates its 242 ICF beds?

8      MS. VOROUS:  Objection.  Assumes facts not in

9  evidence, the fact that they are deactivating.

10      THE COURT:  I suppose you're right.  The witness

11  hasn't said that yet.

12      Upon transfer will you be cutting staff at Salinas?

13      THE WITNESS:  Yes.  There will be a reduction in

14  staff at Salinas.

15      THE COURT:  You may now ask the next question,

16  ma'am.

17  BY MS. RIFKIN:

18  Q.      How many staff will be reduced?

19  A.      I don't have the charts in front of me.

20  Q.      Would you object to providing those charts to the

21  Court and Special Master?

22      MS. VOROUS:  Objection, Your Honor.

23      THE COURT:  Whether she objects or not is beside the

24  point.  That objection is sustained.

25  ///

155

BY MS. RIFKIN:

Q.      A utilization committee review is done as to whether

a patient should be discharged at nine months; is that right?

A.      Between six and nine months, yes.

Q.      Is there a policy about when the utilization

committee meets to review the patients, at what time length

of stay?

        THE COURT:  Well, they do that.

        Is there a written policy?  Is that what you mean?

        MS. RIFKIN:  Yes.

        THE WITNESS:  There is a memorandum of understanding

that has them reviewing between six and nine months.

BY MS. RIFKIN:

Q.      In her declaration filed May 9th, 2013,

Miss Radtkey-Gaither testified that the utilization review

committee reviews patients who have length of stays longer

than six months.

        Is that correct?

A.      You should probably ask her, but yeah, we review them

six to nine months.

Q.      The memorandum of understanding that you referred to

discusses a predicted or average length of stay for the ICF

program as 180 to 240 days.

        Is that correct?

A.      Do you have the memorandum of understanding

156

1    available?

2            We can confirm that.

3    Q.     Do you know as you sit here what the length of stay

4    for an ICF program --

5    A.     I believe --

6    Q.     -- such as the one you run is?

7    A.     I believe it is six to nine months, which would be

8    180 days to 240, I believe, without doing the calculations.

9            MS. RIFKIN:  No further questions.

10           THE COURT:  Redirect, Miss Vorous?

11           MS. VOROUS:  Yes, Your Honor.

12                      REDIRECT EXAMINATION

13   BY MS. VOROUS:

14   Q.     Good morning, Miss Ahlin.

15   A.     Good morning.

16   Q.     In your testimony yesterday you testified to a formal

17   meeting that you had with the psychiatrists at the Salinas

18   Valley Psychiatric Program once you arrived at the program as

19   the new interim executive director.

20           Is that right?

21   A.     Yes, that is correct.

22   Q.     Do you remember when that meeting took place?

23   A.     It was the first week that I was on the job.  It was

24   probably -- they have their meetings on Thursdays, I believe,

25   so it was probably the following Thursday.

157

1    Q.      Would you describe what took place during that

2    meeting?

3    A.      I introduced myself to the clinicians that were

4    there.  It was not only the psychiatrists, but the

5    physician/surgeons as well.  And we talked about staffing.

6    We talked about concerns that they may have had, and we

7    actually worked out where they -- they described to me where

8    they were working and what their days off were, what their

9    caseloads were.

10          And what they requested was how that they could cover

11    the facility with the amount of physicians and psychiatrists

12    that were there at that point in time. So they demonstrated

13    that to me.  And they also said that we -- this is how we do

14    it now, and this is what we would like to look for in the

15    future.

16          MS. VOROUS:  Your Honor I, may I approach the

17    witness?

18          (Exhibit handed to witness.)

19    BY MS. VOROUS:

20    Q.     Miss Ahlin, do you recognize what has been marked as

21    Defendant's Exhibit 1?

22    A.      Yes, I do.

23    Q.      Describe what that is?

24    A.      This was the whiteboard that was in the room at the

25    meeting with the physicians.  And this was what they

158

1    described to me as -- I was the one that put it on the board

2    so that I could have a good understanding of how the coverage

3    was occurring with the psychiatrists at that time.

4          And what we have on the top is the days of the week,

5    Monday through Sunday.  And down on the left-hand side is the

6    units that we have; Treatment Center 1, Treatment Center 2,

7    D-5, D-6, C-5 and C-6.  It also had the current census of the

8    patients on their units.

9          All the doctors were there, and they described what

10   units they were working, what days they were working.  And

11   we're talking about this is how the current coverage was for

12   the facility.

13         What we did was we said, okay, so where are our

14   holes?  Where do we want to get to have better coverage?

15         So what they came up with is they worked with me.

16   They asked me if we could go forward with recruiting and

17   filling.

18         There is five additional doctors there.  One, because

19   Dr. Aramandla was leaving.  So they wanted me to cover that

20   one as well.  So they gave me the guideline of looking for

21   ten full-time psychiatrists to cover the facility.  And they

22   felt that would be appropriate for them.

23         We had additional people working at this time, two to

24   three days, which are not on the schedule, which assisted

25   them.  But they were telling me they prefer the additional

159

1    coverage to be -- to start doing discharge planning.

2        So we talked about how are we going to do the

3    migration, how is it -- how are they going to maintain their

4    caseloads, how are they going to do the discharge planning.

5    And we discussed it as a group.  So this is where we came up

6    with the idea of the additional positions focusing in on the

7    discharge planning.

8        So this is basically just a working tool I had with

9    them the first week that I was there.  And I discussed it

10   with the clinicians so that they can come up with solutions

11   on how to cover the facility so that they, as professionals,

12   can deliver the care that is needed for the patients.

13       So this is what they worked with me with.  So since

14   this time we have filled all ten positions.

15   Q.    At this time do you have -- strike that.  Start that

16   question over, please.

17       Currently do you have any other psychiatrists lined

18   up to start working at the Salinas Valley Psychiatric

19   Program?

20   A.    Yes, I do.  I have two -- this goes back to the other

21   question we had.  We have two psychiatrists that are being

22   fully credentialed by today that are actually credentialed as

23   contract psychiatrists for the Stockton facility that are

24   going to come over and work half time during the week with

25   us, helping with admissions, and also get familiar with the

160

1    patients that will be transferring over to the Stockton

2    facility.  That will equate to one full-time position.

3         I also have a retired annuitant who is coming back to

4    the facility -- or coming to our facility July 1st as a

5    retired annuitant and will be working full-time.

6         I also have one in the works that is a current state

7    psychiatrist that is putting in her credential package to get

8    that process started.  That will be a full-time person.

9         And we have one that is a recruiter -- through the

10   recruiting services that we just began doing services with

11   that is in the process of getting through the paperwork,

12   whether a contractor or civil service.

13        So that is what I have in the pipeline as we speak.

14   Q.   Miss Ahlin, you were asked some questions earlier

15   about your education.

16        Do you have a bachelor's degree?

17   A.   Yes, I do.

18   Q.   What is your degree in?

19   A.   Business Administration.

20   Q.   Do you have a master's degree?

21   A.   Yes, I do.

22   Q.   What is your master's degree in?

23   A.   Leadership and Organizational Development.

24   Q.   Where did you receive your master's degree?

25   A.   Fresno Pacific University in Fresno, California.

161

1  Q.      If we can go back to -- I apologize -- to Defendants'

2  Exhibit 1.

3          Can you explain how this document we're looking at

4  was created in terms of your blackboard?  How did your

5  blackboard end up --

6          THE COURT:  Whiteboard.

7  BY MS. VOROUS:

8  Q.      Whiteboard.  I'm sorry.

9  A.      First I wanted to make sure I understood how the

10 coverage was being applied throughout the facility.  And

11 then, again, I wanted to make sure what their recommendations

12 were, have the clinicians have input on the coverage and how

13 it works for them.

14 Q.      Miss Ahlin, I don't mean to interrupt you.  Did you

15 take a photograph of this?

16 A.      Yes.  We took a photograph of this, and then I put it

17 into an Excel spreadsheet.

18 Q.      And printed it out for purposes of this hearing,

19 correct?

20 A.      Correct.

21         MS. VOROUS:  Your Honor, I would like to admit

22 Defendants' Exhibit 1 into evidence.

23         THE COURT:  Received.

24         I'm sorry.  It should be letters.

25         MS. VOROUS:  I'm sorry.

162

1              THE COURT:  Exhibit A.  It is received.

2                  (Whereupon, Defendants' Exhibit A was received

3                   into evidence.)

4              MS. VOROUS:  Can I ask the Court for Plaintiffs'

5    Exhibit 4 in order to show Miss Ahlin the exhibit, please?

6              THE CLERK:  It is probably in here somewhere.

7              (Exhibit handed to witness.)

8    BY MS. VOROUS:

9    Q.      Miss Ahlin, do you recall being asked questions

10   yesterday about Exhibit 4 in front of you?

11   A.      Yes, I do.

12   Q.      Was your testimony yesterday that you believed that

13   this was the governor's budget for 2012-2013?

14   A.      Yes.

15   Q.      After looking at it again, do you know that this, in

16   fact, was the governor's budget for 2012-2013?

17   A.      It is not the governor's budget after looking at it.

18   Q.      To your understanding, what is this document?

19   A.      It's the January document that goes to -- gets

20   submitted from our headquarters -- or is part of the January

21   budget process, not the final process.

22   Q.      Is it a proposed budget?

23   A.      It's a proposed budget, yes.

24   Q.      Miss Ahlin, you were asked a question yesterday about

25   the licensing requirements of Title 22 in the context of a

163

1    treatment team.

2         Do you remember being asked those questions?

3    A.    Yes.

4    Q.    When you were asked whether the licensing standards

5    would allow essentially an infinite number of patient

6    treatment team ratios, and I believe the example that was

7    given yesterday was somewhere 1 to 120, was it your testimony

8    that you believe that would be an appropriate ratio at the

9    Salinas Valley Psychiatric Program?

10   A.    No.    That's not my testimony.    My testimony -- what I

11   assumed was asked of me was is there a number tied to Title

12   22 that would require you to have it.

13        What it says is an adequate number for the services

14   that need to be provided.    There is no -- there is no

15   quantifying number.

16   Q.    So if a particular program lent itself to a 1 to 120

17   ratio, for instance, on treatment teams, that might be

18   appropriate for a particular program?

19   A.    It could, yes.

20   Q.    You had previously testified on direct, I believe,

21   and cross, that you have knowledge regarding the 50-bed unit

22   at Coalinga State Hospital for Coleman class members.

23        Do you recall that testimony?

24   A.    Right.

25   Q.    So what level of inmates to your understanding --

164

1   your knowledge are admitted to that program, the 50-bed

2   program at Coalinga?

3   A.      The custody level would be Level I and Level II.

4   Q.      Does Coalinga State Hospital have the same type of

5   housing environment that the Salinas Valley Psychiatric

6   Program has?

7   A.      No, they do not.

8   Q.      Explain what the difference is?

9   A.      Coalinga State Hospital has 50-person dorms.  They

10  have ten single rooms and ten rooms that have four men per

11  dorm.  None of the doors are locked.

12          There is no custody coverage of correctional officers

13  on the unit.  It is a locked unit.  They are escorted to and

14  from their treatment areas.  But it is a different lower

15  level of custody inmate which requires us to have a less

16  restrictive environment.

17          THE COURT:  I'm sorry.  It is my fault.  I'm sure I

18  don't understand.

19          You testified they have ten single rooms and ten

20  rooms that have four men per dorm and none of those doors are

21  locked?

22          THE WITNESS:  None of them are locked.  No.

23          THE COURT:  Then you said in the most recent response

24  that there is no custody coverage, that it is a locked unit.

25          I don't know what "it" is.

165

1          THE WITNESS:  Okay.  They are free to roam within the

2    unit itself, which has a dayroom they can use.  It's a

3    general restroom.  They don't have restrooms inside their

4    rooms.  They have quiet rooms and recreation rooms on the

5    unit itself.

6          The door on the front of the unit, which maintains

7    the 50 beds, is locked from the rest of the facility.

8          THE COURT:  Okay.

9          MS. VOROUS:  Just a moment, Your Honor.

10         (Cocounsel confer.)

11         THE WITNESS:  I also want to make a clarification.

12         THE COURT:  Go ahead.

13         THE WITNESS:  We have hospital police officers on

14   that unit.  We do not have correctional officers.  Okay.

15         MS. VOROUS:  No more questions, Your Honor.

16         THE COURT:  Recross?

17         MS. RIFKIN:  Yes, Your Honor.

18                         RECROSS-EXAMINATION

19   BY MS. RIFKIN:

20   Q.    Miss Ahlin, you just clarified Plaintiffs' Exhibit 4

21   is the budget that the Department of State Hospitals proposed

22   in January; is that right?

23         MS. VOROUS:  Objection, Your Honor.  Beyond the scope

24   of --

25         THE COURT:  No.  That's exactly what you questioned

166

1    her about.

2            MS. VOROUS:  Oh, I'm sorry.  I misunderstood the

3    question.

4            THE COURT:  Okay.

5            THE WITNESS:  This is the proposed budget for the

6    state.

7    BY MS. RIFKIN:

8    Q.      You said it is the budget that the Department of

9    State Hospitals submitted to the State?

10   A.      I made a mistake.  This is the proposed budget for

11   all hospitals.

12   Q.      Okay.  The budget proposed by the Department of State

13   Hospitals for its hospitals?

14   A.      This happens in Sacramento.  This is not something

15   I'm very familiar with myself.  I mean, I've seen it, but it

16   is not something that I put together.

17           THE COURT:  Is it your understanding that this is the

18   budget that the governor proposes to the legislature, or is

19   this some other document, if you know?

20           THE WITNESS:  I don't know.  It is a proposed budget.

21   I don't deal with this.

22   BY MS. RIFKIN:

23   Q.      When you're in your role as deputy director, where

24   are you located?

25   A.      Specifically which floor?

167

1    Q.    What building?

2    A.    In the Bateson building.

3    Q.    In Sacramento?

4    A.    Yes.

5    Q.    So when we talk about the number of positions being

6    proposed as 17 psychiatrists for Salinas Valley, that's the

7    number of psychiatrists that the Department of State

8    Hospitals was proposing be budgeted?

9    A.    I wouldn't be able to answer that question.

10   Q.    Turning to what's been introduced as Defendants'

11   Exhibit A, looking down the left side, the number "46," does

12   that refer to the caseload for that doctor whose name I can't

13   quite read, Mohaupt?

14   A.    That refers to 46 patients being on Treatment Center

15   1.

16   Q.    And which doctor does this chart show works on

17   Treatment Center 1?

18   A.    Mohaupt.

19   Q.    Any other doctors?

20   A.    Yes.  Dr. Argullo.

21   Q.    Are they ever working at the same time?

22   A.    No.  They work different days.

23   Q.    So when each one of them works they cover 46

24   patients; is that what this means?

25   A.    They have a divided caseload.  If there's an

168

1    emergency with the other caseloads, they would cover that.

2    Q.      So on the days that Dr. Mohaupt is covering TC-1,

3    Monday for example, does this document reflect that he has 46

4    patients?

5    A.      No.  He serves whatever the divided number is for

6    him, and he would respond to emergencies for the others.

7            THE COURT:  And there is no doctor on call -- I'm

8    sorry -- present who is serving the other people in 1; is

9    that right?

10           THE WITNESS:  They're not going unserved.  The

11   psychiatrist -- if there was an emergency with the other

12   patients, Dr. Mohaupt would cover that.

13           THE COURT:  I understand.

14           If there is an emergency, the doctor -- Deep breath.

15           You have TC-1, and you have one doctor on duty,

16   whatever it is, Monday through Wednesday; is that correct?

17           THE WITNESS:  That's correct.

18           THE COURT:  Then another doctor is on duty --

19           THE WITNESS:  Friday and Saturday.

20           THE COURT:  It says Tuesday?

21           Is that right?

22           That is TC-2.  I see.

23           Where is the other doctor for TC-1?

24           THE WITNESS:  Over to the right under the "F."

25   Dr. Argullo.

169

1      THE COURT:  I'm afraid I just can't read it is what

2  the problem is.  All right.

3      But the effect, as I understand what you are

4  testifying to -- and it is all right if I don't get it --

5  there's really throughout the week one doctor on duty at

6  TC-1?

7      THE WITNESS:  On that -- yes, on that unit.

8      THE COURT:  Yeah.  And that doctor has a patient load

9  of some 46; is that right?

10     THE WITNESS:  There's 46 patients on the unit, but

11  he's only responsible for the amount that is assigned to him.

12     THE COURT:  All right.  So there are 46 in TC-1.  He

13  has a caseload of half of that?

14     THE WITNESS:  Approximately, yes.

15     THE COURT:  So that would be 23.  Yes?

16     THE WITNESS:  Yes, approximately.

17     THE COURT:  If there's -- and there's no servicing of

18  patients -- of the balance of patients unless there is an

19  emergency?

20     THE WITNESS:  From the psychiatrist.

21     THE COURT:  Right.

22     THE WITNESS:  Correct.

23     THE COURT:  Is that correct?

24     THE WITNESS:  That would be correct, but -- yes.

25     THE COURT:  I understand there are nurses on --

170

1          THE WITNESS:  There are psychologists, nurses and
2     other services that go on.
3          THE COURT:  All right.
4          THE WITNESS:  This is what the doctors came up with,
5     that they told me that this is how they could provide
6     appropriate care.
7          THE COURT:  I thought you told me this is what they
8     had and --
9          THE WITNESS:  This is what they had, and this is what
10    they've come up with.  This is what they had, and this is
11    what we worked towards getting.  The other ones over to the
12    left there is -- right under the number 46 there's one with a
13    schedule Tuesday through Friday.
14          So they were asking to me to recruit another doctor
15    to work Tuesday through Friday.  I needed to know what we
16    were recruiting for.  So this was when I got there, and this
17    is what they were currently working.
18          THE COURT:  I'm sorry.  I'm sure it is my fault, but
19    I simply don't understand.
20          Is this what existed at the time or what was proposed
21    to be?
22          THE WITNESS:  It is a combination.  Because it
23    contains exactly what was going on when I arrived, and then
24    it also contains --
25          THE COURT:  The proposal.

171

1          THE WITNESS:  -- the proposals to the left of what

2     they had requested.

3          Again, this is just the permanent full-time.  There

4     were some supplemental doctors providing additional coverage.

5     They're not on here, but this is --

6          THE COURT:  You may proceed, ma'am.

7     BY MS. RIFKIN:

8     Q.     So at the time, and try to be clear, this meeting

9     would have been at the end of May 2013; is that right?

10    A.     I think it was the first week that I arrived.

11    Q.     You testified -- or you arrived in the last couple of

12    weeks of May 2013?

13    A.     I believe I arrived May 13th or 14th.  Whatever that

14    Monday was.

15    Q.     This meeting happened in the second half of May 2013?

16    A.     Yes.

17    Q.     So at the time of this meeting, for example, when you

18    look under Thursday on the first line of this for TC-1 and

19    there's a sign with a circle with a slash through it, does

20    that mean no doctor, no psychiatrist was covering TC-1?

21    A.     No.  The other -- they have an arrangement where if

22    there's not a doctor on that unit, there's another doctor

23    that responds.

24    Q.     So let me clarify.  So there was no -- on Thursday's

25    there would be no doctor actually on the unit or for TC-1,

172

1    and a doctor from one of the other units would be covering

2    TC-1 in addition to their own caseload?

3    A.        If there was an emergency, yes.

4              THE COURT:  Well, if there is no -- but there is no

5    doctor on duty at all --

6              THE WITNESS:  No.  There's doctors on duty on the

7    grounds, yes.

8              THE COURT:  I'm saying TC-1.

9              THE WITNESS:  Right.

10             THE COURT:  Is that right?

11             THE WITNESS:  There is a physician/surgeon that is

12   there, but not a psychiatrist, yeah.

13             THE COURT:  Okay.

14   BY MS. RIFKIN:

15   Q.        So looking under TC-2, that's the unit that this

16   reflects Dr. Gaines was assigned to at that point in May

17   2013; is that right?

18   A.        That is correct.

19   Q.        And the number 68 next to that means the number of

20   patient Dr. Gaines would have been assigned to as a doctor on

21   TC-2; is that right?

22   A.        That is correct.

23             So on Monday is when there is a no sign next to TC-2,

24   that means no psychiatrists would have been on the unit with

25   those 68 patients; is that right?

173

1   A.      As I said, there were other doctors that were working

2   two to three days.  I don't have them listed on here, and I

3   don't know what their RDOs were.

4           This was a working document.  This isn't to show the

5   exact coverage.  This was me meeting with the physicians and

6   doctors to say these are my full-times, not my supplemental

7   doctors, not my additionals.  They're not on here.  There

8   were additional positions in addition to this.

9           These were the full-time that were there.  This is to

10  show that I was working with the doctors to come up with a

11  plan for coverage for the future.  And since that time we

12  have filled all ten spots.

13          This isn't totally conclusive of all the coverage

14  that was being provided there.

15  Q.      When you say the numbers on the left-hand column,

16  like Tuesday through Friday under TC-1, Monday through

17  Thursday under TC-2, you are saying that's the additional

18  coverage that the psychiatrists were telling you they needed

19  in order to be able to serve the patients at Salinas Valley?

20          THE COURT:  No.  That is what there was at the time.

21          I don't know.  You may answer the question.

22          THE WITNESS:  The one on the left are ones that they

23  are saying if you recruit five additional doctors, this is

24  what we would like them to work.

25          THE COURT:  Look at TC-2.  It shows you had no doctor

174

1    on Monday at all.

2            THE WITNESS:  Uh-huh.

3            THE COURT:  You had a Dr. Gaines from Tuesday to

4    Friday; is that correct?

5            THE WITNESS:  That is correct.

6            THE COURT:  Nothing on Saturday.

7            THE WITNESS:  We have a POD.  Doctors on duty

8    Saturday and Sunday 24 hours a day.

9            THE COURT:  What does POD stand for?

10           THE WITNESS:  Psychiatrists on duty.

11           THE COURT:  Okay.  And then you have a second line

12   which I don't know what it means.  Below Gaines there's a

13   second line.

14           Is that the proposal to put a new doctor or future

15   doctor?

16           THE WITNESS:  Yes.  It correlates with the Monday

17   through Thursday schedule.

18           THE COURT:  Okay.  So looking at this there is

19   nobody --

20           THE WITNESS:  There is no name there.

21           THE COURT:  All right.  Go ahead, ma'am.

22   BY MS. RIFKIN:

23   Q.      And the POD doctor you said who is on duty, that is

24   somebody who is on call; is that right?

25   A.      They're on call, on duty, yeah.

175

1    Q.       Are they actually at the facility at that time?

2    A.       They have to be within 30 minutes of response.

3            MS. RIFKIN:  No further questions.

4            THE COURT:  Further redirect?

5            You'll never get off the stand, ma'am.

6                    FURTHER DIRECT EXAMINATION

7    BY MS. VOROUS:

8    Q.       Miss Ahlin, is it your goal to eventually replace all

9    of the part-time second position psychiatrists that you

10   currently have at Salinas Valley and had working in May of

11   2013 with permanent civil service?

12   A.       Yes.

13           MS. RIFKIN:  Objection, Your Honor, leading.

14           THE COURT:  Oh, it is very leading.  And it is --

15   objection sustained.  And the question isn't what her hopes

16   and dreams are.

17           Well, I don't know.  Maybe that is relevant.  You may

18   ask that question if you think it is going to be helpful.

19   BY MS. VOROUS:

20   Q.       What is your goal in hiring future psychiatrists for

21   the Salinas Valley Psychiatric Program?

22   A.       My goal would be to have all civil service, full-time

23   employees.

24           MS. VOROUS:  No more questions, Your Honor.

25           MS. RIFKIN:  No more questions.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

176

1          THE COURT:  Get off before somebody changes their

2     mind.

3          We'll take our morning recess, 15 minutes.

4          (Off the record at 10:45 a.m.)

5          (Excerpt concluded.)

6                          ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                              ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5

6
            I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8

9

10                  IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California.
11

12

13      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
14          Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25