1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3                          ---O0O---

4       BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    RALPH COLEMAN, et al.,

7          Plaintiffs,

8    Vs.                          CASE NO. CIV. S-90-0520 LKK

9    EDMUND G. BROWN JR., et al.,
     et al.,
10

11          Defendants.

12   _____/

13

14

15

16                          ---o0o---

17

18                     REPORTER'S TRANSCRIPT

19          RE:  EXCERPT OF EVIDENTIARY HEARING - Day 1

20                      JUNE 19TH, 2013

21

22                          ---o0o---

23

24

25   Reported by:              CATHERINE E.F. BODENE,
                               CSR. No. 6926

```
 1                          APPEARANCES

 2                          ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5            ROSEN, BIEN, GALVAN & GRUNFELD, LLP
              315 MONTGOMERY STREET, TENTH FLOOR
 6            SAN FRANCISCO, CALIFORNIA  94104

 7            BY:  MICHAEL BIEN, ATTORNEY AT LAW

 8            BY:  LORI RIFKIN, ATTORNEY AT LAW

 9            BY:  TOM NOLAN, ATTORNEY AT LAW

10            BY:  AARON J. FISCHER, ATTORNEY AT LAW

11            BY:  MARGOT MENDELSON, ATTORNEY AT LAW

12

13

14    FOR THE DEFENDANTS:

15             STATE OF CALIFORNIA, DEPT. OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
16             13OO I STREET
               SACRAMENTO, CALIFORNIA  95814
17
              BY:  DEBBIE VOROUS, DEPUTY ATTORNEY GENERAL
18
              BY:  JAY C. RUSSELL, DEPUTY ATTORNEY GENERAL
19
              BY:  MANEESH SHARMA, DEPUTY ATTORNEY GENERAL
20
              BY:  PATRICK MCKINNEY, II, DEPUTY ATTORNEY GENERAL
21
              BY:  WILLIAM DOWNER, DEPUTY ATTORNEY GENERAL
22

23

24

25                          ---o0o---
```

1                        PROCEEDINGS INDEX

2                           ---o0o---

3

4    PROCEEDINGS:                                    PAGE

5        Opening Statement by Plainitffs              6

6        Opening Statement by Defendants             17

7

8

9

10

11

12

13                          ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    EXAMINATION INDEX

 2                       ---o0o---

 3   FOR THE PLAINTIFFS:

 4       EXAMINATION:                            PAGE

 5

 6    DR. PABLO STEWART

 7        Direct Examination by Mr. Nolan          26
          Cross-Examination by Ms. Vorous          52
 8        Redirect Examination by Mr. Nolan        77

 9

10    DR. JOEL BADEAUX

11        Direct Examination by Ms. Rifkin         80
          Cross-Examination by Mr. Russell        110
12

13

14    JEANNE WOODFORD

15        Direct Examination by Ms. Mendelson     126

16

17

18

19                       ---o0o---

20

21

22

23

24

25
</pre>

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

```
 1              SACRAMENTO, CALIFORNIA

 2        WEDNESDAY, JUNE 19TH, 2013 - 10:15 A.M.

 3                    ---o0o---

 4        (Excerpt from evidentiary hearing.)

 5        THE CLERK:  All rise.

 6        Court is now in session.

 7        The Honorable Lawrence K. Karlton presiding.

 8        THE COURT:  Please, be seated everyone.

 9        THE CLERK:  Calling Civil S-90-520, Coleman, et al.,

10   v. Brown, et al.

11        THE COURT:  Counsel, approach the podium.  State your

12   appearance for the record.  If you are arguing the case,

13   remain at the podium.

14        MR. BIEN:  Good morning, Your Honor.  Michael Bien on

15   behalf of plaintiff class.

16        THE COURT:  Who are all those other folks?

17        MR. BIEN:  Your Honor --

18        THE COURT:  I mean, they can come forward and state

19   their appearance.

20        MR. BIEN:  Okay.

21        THE COURT:  I know I'm speaking some foreign

22   language.

23        MR. NOLAN:  Tom Nolan for the plaintiff class.

24        MS. RIFKIN:  Lori Rifkin for the plaintiff class.

25        MR. FISCHER:  Aaron Fischer for plaintiffs.
```

                                                                    2

1              MS. MENDELSON:  Margot Mendelson for plaintiffs.

2              MS. VOROUS:  Debbie Vorous for the State defendants.

3              MR. MCKINNEY:  Good morning, Your Honor.  Patrick

4     McKinney for the State defendants.

5              MR. SHARMA:  Good morning, Your Honor.  Maneesh

6     Sharma for the State defendants.

7              MR. RUSSELL:  Good morning, Your Honor.  Jay Russell

8     for defendants.

9              MR. DOWNER:  Good morning.  William Downer for

10    defendants.

11             THE COURT:  Before we get started I am now faced with

12    the defendants' objections to the Court taking the testimony

13    of various plaintiffs through deposition.

14             It is my firm recollection, but I will accept, if

15    there is some doubt about it, but it is my firm recollection

16    at the status conference I said what I would like to do is to

17    proceed in the manner that we did with the three-judge court,

18    which is to take the plaintiffs' and the defendants' filings

19    as evidence in the case subject to amplification and

20    cross-examination.

21             Isn't that what I said?

22             MR. BIEN:  Yes, Your Honor.

23             THE COURT:  Ma'am?  You weren't there, were you?

24             MS. VOROUS:  No, I was there, Your Honor.  My

25    understanding was that you indicated you would take the

3

1  declarations of the witnesses, but I didn't have any

2  recollection of you mentioning anything about complying with

3  the same process as --

4         THE COURT:  I don't have -- I don't have the

5  transcript of the proceedings.  I'm not even sure we had a

6  court reporter present.

7         Did we?

8         MS. VOROUS:  Yes, Your Honor.  I actually have a copy

9  of the transcript.

10        THE COURT:  Why don't you let me have that.

11        (Document handed to Court for review.)

12        Why don't you guys sit down.  It is going to take me

13  a minute or two to read all of this.

14        MR. BIEN:  Can we address that at the end briefly?

15        THE COURT:  Do it now if you think --

16        MR. BIEN:  First of all, Dr. Brim is a party when he

17  was deposed and it comes in anyway.  He was employed at the

18  moment he was deposed.  He was introduced as part of the

19  record before.

20        And we also -- defendants -- I talked to defendants'

21  counsel about whether they wanted him here live, and my

22  understanding is they didn't.  I didn't serve a subpoena for

23  that reason.  I didn't know about it until they served this

24  motion.

25        THE COURT:  Right.  It is a shock that this motion

4

1    came in the day before the hearing.

2         MR. BIEN:  So I could have served a subpoena on him,

3    but I didn't.

4         Also his deposition was taken.  They asked him all

5    the questions.  There is no prejudice either way.

6         THE COURT:  I mean, there is a problem with when you

7    can use deposition testimony.  I thought we had agreed to it.

8    If it turns out we hadn't, we'll have to work -- think --

9         MR. BIEN:  Except it comes in, we would say, as a

10   party admission.  He was employed at the time.

11        THE COURT:  Employed by who?

12        MR. BIEN:  By the state.  He was their employee.  He

13   was their psychiatrist at the time I deposed him.

14        THE COURT:  But there are other people that are

15   proposed to be --

16        MR. BIEN:  No.  That's the only issue as to

17   deposition testimony.

18        THE COURT:  Oh.  Is that right, ma'am?

19        MS. VOROUS:  That he was a party?

20        MR. BIEN:  That the only one you are moving to

21   exclude who is not here because of --

22        MS. VOROUS:  Your Honor, we filed three motions.

23   We're moving to exclude the deposition testimony of Dr. Brim.

24   The other two motions relate to other issues outside of

25   deposition testimony.  So that's correct.  It just relates to

5

1  one deposition.

2          THE COURT:  And as to that one you admit he was your

3  employee at the time?

4          MS. VOROUS:  At the time yes, he was.

5          THE COURT:  All right.  The objection is overruled.

6  You may proceed.

7          As to the other two, I'm sorry, I don't remember.

8  That dealt with what?

9          MS. VOROUS:  One motion related to expert testimony

10  that would be presented by Miss Woodford for the reason that

11  there was no report that was submitted in the context of her

12  testimony.

13          And the second related to the supplemental reply

14  declaration that was filed by Dr. Stewart in the context of a

15  death that occurred in March of 2013.

16          MR. BIEN:  They both go to the weight.  We would be

17  glad to respond afterwards.  The witnesses are here to

18  testify.

19          THE COURT:  The objection as to one is that you

20  didn't provide a report.  And, of course, that would be true

21  if this were a trial.  This is an evidentiary hearing.  It is

22  not clear to me -- I'll be frank with you, either way it is

23  not clear to me that the rule pertaining to reports would

24  apply to an evidentiary hearing, but it may.

25          I think that the simplest way of proceeding as to

6

1    that matter is I'm going to take the evidence.  And if

2    defendants request it, I will continue the hearing long

3    enough for defendants to prepare whatever response they

4    believe is appropriate or whatever evidence -- other evidence

5    they want to put in which is subject to rebuttal in some way.

6            That seems to me the -- I mean, this is a critically

7    important matter, and it seems to me that I do not want to

8    delay unless necessary.

9            With that in mind, that's going to be the order of

10   the Court.

11           Do you continue to object, ma'am?

12           MS. VOROUS:  Yes, Your Honor, we do.

13           THE COURT:  All right.  That's noted for the record.

14           All right.  Let me give you back the transcript

15   because apparently I don't need it.

16           (Document handed back to defendants.)

17           THE COURT:  You may proceed, Mr. Brim (sic).

18           MR. BIEN:  Your Honor --

19           THE COURT:  Yeah.  You've only been in this court 100

20   years.  Why should I know your name?

21           MR. BIEN:  Your Honor, this hearing addresses

22   critical issues affecting the lives of Coleman class members

23   in inpatient psychiatric hospitals run by the Department of

24   State Hospitals for the Department of Corrections.

25           This is an issue that this Court, despite defendants'

7

1  objections, has had to deal with repeatedly over the years.

2  We've dealt before with a staffing crisis at Atascadero, cuts

3  in budgets, problems in opening programs, obstacles to care,

4  licensing issues.

5        The theme has been that this critical level of care

6  has been a critical obstacle to the remedy in this case.

7  Lives have been lost in the past, and unfortunately lives

8  have been lost in the last six months.

9        The Salinas Valley Psychiatric Program has operated

10  for ten years without a suicide, yet in the last six months

11  there have been two deaths that we think are related to

12  serious understaffing.

13        The understaffing crisis is really not in dispute.

14  Defendants admit there is an understaffing problem at Salinas

15  Valley.

16        They also admit that their reports to this Court are

17  defective.  They do not show accurate staffing information.

18  They don't show how many positions are authorized accurately.

19  They don't show how many people are working there.  They

20  don't know what's wrong.  For months and months they've said

21  something is wrong, but they can't come up with an accurate

22  number.  They have trouble even counting the number of

23  psychiatrists working at any given moment in time.

24        What we do know is that the psychiatrists at this

25  facility, remarkably, and to their credit, have written

8

1    letters to their superiors, gone to the press, two of them

2    have testified in this proceeding, one is here live today,

3    and Dr. Brim, by deposition, about the serious ethical and

4    moral problems posed as professionals being asked to work in

5    an environment that was understaffed, understaffed to the

6    point where the risks to patient safety were obvious to all

7    concerned and the doctors felt they were unable to deliver

8    this very high level of care that these patients were

9    there for.

10           We think the evidence is clear that these programs,

11   at Salinas Valley especially, are not able to deliver the

12   level of care required.  They're delivering a very small

13   number of hours, just emergency care.

14           The remedy here is certainly more than we've done

15   before, but a simple step more.  First, we're asking that the

16   Special Master be authorized to investigate these problems,

17   to find out what is going on with staffing, to find out what

18   is going on with the programs there, to investigate the

19   custodial restrictions on patient care.

20           One of the deaths that occurred unfortunately in late

21   November, early December of last year, was a man who was

22   restricted to his cell and denied treatment because of delays

23   in clearing by CDCR officials, who are responsible for

24   clearing him for treatment.

25           We think this system needs to be revamped and looked

9

1    at and speeded up.  Custodial obstacles should not stand in

2    the way of clinical care.  It is a big theme in our case, and

3    it certainly should not stand in the way of clinical care in

4    an inpatient psychiatric facility.

5            How did these problems come about at Salinas Valley?

6            There has always been problems in hiring

7    psychiatrists, and that has always been a theme, but we think

8    the State cut the budget to Salinas Valley in the last year

9    without coming to this Court, without coming to the Special

10   Master, and hiding the information in their monthly

11   reports.

12           They changed the treatment ratio for this program and

13   reduced the staffing.  In addition, they have had tremendous

14   difficulties in hiring and keeping people at that facility.

15           One of the reasons is they mismanaged the opening of

16   Stockton.  We're all waiting for this Stockton program to

17   open.  It is going to be a massive mental hospital and mental

18   facility.  It is going to require hundreds and hundreds of

19   clinical staff.

20           Defendants admit that they've gone out, sent emails,

21   had meetings with the staff at Salinas Valley and at CMF in

22   other places and told them that half your program is going to

23   be shut down, half of you are going to be laid off or more.

24   We can't tell you who is going to be laid off and who is not

25   going to be laid off.  We're hoping to be able to transfer

10

1    you to other jobs.  And guess what?  A lot of people left.

2              It is very hard to hire people into those programs.

3              Defendants may tell you that's the only choice they

4    had under the state labor law, all of this.  I don't know why

5    it happened.  All I know is it happened.  Patients are there

6    in an environment with too few staff, and defendants don't

7    seem to be able to do anything to solve that problem.

8              We may need, and we'll ask the Special Master to

9    investigate whether we need special orders to assure

10   appropriate staffing is in place, that there is right funding

11   in place to make sure there is enough people there to take

12   care of these patients.

13             Your Honor, these programs finally are full.  There

14   are still waiting lists, by the way, for all the programs.

15   And they're full.  And they want to transition to Stockton.

16             This is going to be a very delicate process.  How do

17   they shut down programs and open new ones and we make sure we

18   have enough staff at each place?

19             This needs to be supervised by this Court.

20   Unfortunately, these defendants cannot be trusted.  They have

21   not been transparent.  They tell you today that their

22   staffing numbers are inaccurate, the ones they are filing

23   with the  Court every month.

24             We need to know how many real vacancies are there,

25   which programs are full, which ones do you not have enough

11

1    staff.

2            We also need to know have they reduced the clinical

3    staffing ratio for ICF programs, the same ratio that is going

4    to be apply to Stockton, to a level that's unsafe.

5            We've never seen any justification for this reduced

6    staffing ratio.  I don't know what it is based on.  None of

7    defendants' evidence that they submitted in response to this

8    motion explains why they reduced the staffing ratios, who

9    justified it, other than to say they saved a lot of money.

10           They take a lot of credit for saving a lot of money.

11   They saved $9,000,000 in one year at Stockton.

12           These are serious issues --

13           THE COURT:  Stop.  Not at Stockton.  At Salinas.

14           MR. BIEN:  I'm sorry.  At Salinas.

15           THE COURT:  So again, the remedy we're asking for is

16   requiring defendants to do what they are supposed to do all

17   along, report accurately on how many positions are authorized

18   for each facility, what the ratio is, who is supposed to be

19   working there, accurately report on how many positions are

20   filled and unfilled, and if they need help, if they need an

21   order to get past some restriction of hiring or overtime,

22   they need to come forward and ask for it because people's

23   lives are at stake.

24           We also need to know what the plans are for managing

25   this transition, which I think is going to be very

12

1    challenging.  We need to make sure in this process more lives

2    are not lost.

3          I think we're all on the same page here, but this is

4    a very serious, dangerous, complex transition.  And these

5    parties, unfortunately, have not been able to manage it so

6    far.  They've shown tremendous difficulty managing it.

7          One other point I wanted to make about this process,

8    this Court has issued an order which is very critical to keep

9    in mind, that none of these temporary programs can be shut

10   down unless defendants can demonstrate that the need for that

11   level of care can be satisfied with the new program.  We

12   don't need both.

13         Again, as I mentioned to the Court, the most recent

14   data from defendants show there are waitlists at each and

15   every program.

16         In addition, in May the latest projections for

17   population were issued for mental health beds, and they show

18   a 10 percent increase for ICF beds.  These beds that we're

19   talking about here.  So since from last fall until now, the

20   projection has gone up by 10 percent.

21         Have defendants taken that into account in their

22   planning?

23         Where are the additional beds?

24         Which beds are going to stay open?

25         They're not telling us.

1          Is it really possible to open Salinas -- I'm sorry --

2     to open Stockton by December 31st?

3          Can they really move -- safely move hundreds and

4     hundreds and hundreds of patients?

5          THE COURT:  I don't know that that's the proposal.

6     Miss Vorous, I know that you're going to have an opening

7     statement, but I really want to ask you where we are on this

8     thing.

9          Will you come forward.

10          This is a -- I just want to be sure I know what we

11     are talking about.  I had understood, but I may be wrong, and

12     I'm perfectly willing to be told I'm wrong, that opening

13     Stockton on a specific date, hopefully by December 31st, God

14     willing and the river don't rise, doesn't mean that you're

15     going to be fully -- have moved everybody in.  That's when

16     you -- it was my understanding that's when you would start

17     moving patients to Stockton.  You didn't intend to be

18     fully -- to be full and fully staffed by December 31st.

19          Is that right or wrong?

20          MS. VOROUS:  No, that's incorrect, Your Honor.

21          THE COURT:  Okay.

22          MS. VOROUS:  Actually --

23          THE COURT:  Tell me.

24          MS. VOROUS:  Starting July 22nd defendants will be

25     moving patients into the new facility and plan to have it

14

1    fully staffed and occupied by the end of December.

2            THE COURT:  Let me process that for a minute.

3                (Brief pause.)

4            All right.  Well, I mean, you know, it is perfectly

5    okay that I'm wrong.  You may retire.

6            I wanted to make sure I knew what was going on.

7            MR. BIEN:  So --

8            THE COURT:  Mr. Bien, before you go forward --

9            MR. BIEN:  Sure.

10           THE COURT:  -- I am amazed that I don't have all of

11   these facts at my fingertips.  Maybe just because there is

12   just so information I just forget, just like this last item.

13           My recollection, which may be faulty, is that you

14   have never asked heretofore that the defendants prepare a

15   plan so that you can review it, and if you find it faulty,

16   come to the Court.

17           Is that right or wrong?

18           MR. BIEN:  For the manner in which they're going to

19   transition?

20           I have not asked for that, but --

21           THE COURT:  Now you are.

22           MR. BIEN:  Now I am.  But I think also that it is

23   not -- we haven't -- the activation of this unit is covered

24   by this Court's orders.  It includes staffing, operations.

25   And just like we did with C-5, C-6 and D-5, D-6, and other

15

1    programs, we have been involved in the process of opening

2    them.

3            I'm hoping there is not going to be any problems, but

4    the way -- the manner it has been happening so far gives us

5    concern, which is why we thought this was something to be

6    brought to the Court's attention right away.

7            In addition, there is some -- I'll just state the

8    obvious.  There is some reluctance to allow the Special

9    Master into various places and into various issues.

10           And I think that this motion comes out of the

11   termination proceeding.  We need a clear statement by this

12   Court that the Special Master has the power and

13   responsibility to look at this process and to report back.

14   We're not asking to take over the State Hospitals, but --

15           THE COURT:  I understand.

16           MR. BIEN:  That's all we're asking for.

17           THE COURT:  But that, it seems to me -- I mean,

18   again, my recollection may be faulty, but I have never

19   understood -- again, maybe Miss Vorous will help me here,

20   that I have ever suggested that the Special Master's

21   responsibilities do not extend to operations of the State

22   Hospitals when they are treating Coleman class members.

23           It may well be that the Special Master has been so --

24   I was about to use a bad word -- so busy that he has not

25   extended himself frequently to the State Hospitals, but I

16

1    know of no basis under which they, meaning the defendants,

2    could restrict the Special Master.

3         Am I --

4         MR. BIEN:  First of all, there is a long history of

5    the Special Master looking at ASH, Coalinga, all these

6    programs.

7         THE COURT:  I know.  Miss Vorous, again I'm sorry to

8    keep asking you to step up.  You're going to have an

9    opportunity to make an opening statement, but is there some

10   doubt on the part of the defendants as to the scope of the

11   responsibilities of the Special Master as relates to State

12   Hospitals?

13        MS. VOROUS:  I think the issue with respect to the

14   State Hospitals relates to the Court's findings in the

15   context of this case.

16        The Court has never found the State Hospitals were

17   providing inadequate care.  So to the --

18        THE COURT:  Okay.  That's easy.  That's easy.

19        Thank you, Ma'am.

20        Are you finished?

21        MR. BIEN:  I just want to introduce that we'll be

22   calling this morning Dr. Pablo Stewart, Dr. Joe Badeaux and

23   Jeannie Woodford, if we can get them.  Those are our three

24   witnesses.

25        THE COURT:  Miss Vorous, do you desire to make an

17

1  opening statement?

2       You don't have to if you don't want to, but feel

3  free.

4       MS. VOROUS:  Thank you, Your Honor.

5       I'll just provide a couple of comments in response to

6  the plaintiff's opening statement.

7       Plaintiffs are asking the Court to issue numerous

8  orders, a request for affirmative relief regarding the

9  Salinas Valley Psychiatric Program, the Vacaville program at

10  California Medical Facility.  And both of those, as the Court

11  knows, are programs that are operated by the Department of

12  State Hospitals within CDCR prisons.

13       And as we've just discussed, this Court has never

14  found that the Department of State Hospitals has or is

15  providing inadequate care to the Coleman class members that

16  are housed within these programs.

17       The evidence will show today that the plaintiffs will

18  not be able to meet their burden under the Prison Litigation

19  Reform Act to require or authorize the Court to issue

20  additional affirmative orders in the context of the

21  Department of State Hospital programs within CDCR prisons.

22       Department of State Hospitals, like all

23  organizations, has experienced staffing fluctuations when

24  employees depart, but that is not the same as deliberate

25  indifference.

18

1          The witnesses that defendants will be presenting

2     today include witnesses from Salinas Valley, as well as

3     Vacaville.

4          For instance, we will be presenting the new interim

5     executive director of the Salinas Valley program, as well as

6     the assistant interim executive director from Salinas Valley.

7     Both witnesses will present evidence that shows that they are

8     actively recruiting and are continuing to recruit and place

9     staff.

10          In addition, the evidence will show that there are

11     sufficient numbers of psychiatrists at the facility, and that

12     there is no intention in the future to staff those programs

13     with inadequate numbers of staff.

14          Title 22 governs the numbers and ratios with respect

15     to the Salinas Valley Psychiatric Program and the evidence

16     will show that the staff that is currently at the program,

17     Salinas, as well as Vacaville, meet the Title 22

18     requirements.

19          In addition, defendants will be providing evidence

20     from Dr. Troncoso, a current and now newly returning

21     psychiatrist at Salinas Valley Psychiatric Program.

22     Dr. Troncoso will be testifying to the quality of care that

23     was provided while he was previously employed at Salinas

24     Valley Psychiatric Program at the same time that Dr. Brim and

25     Dr. Badeaux were also employed by Department of State

19

1   Hospitals.

2          With respect to the two deaths that the plaintiffs

3   have brought up, one death, the November 2012 suicide,

4   there's no evidence, and the plaintiffs will not be able to

5   present any evidence today, to show that that death had any

6   relation whatsoever to the orientation process.

7          It's true that there was a one-week -- approximately

8   a one-week delay in processing the inmate for clearance for

9   what is described as "cuff status," the orientation process,

10  but there is no evidence that delay in processing his

11  clearance resulted in his committing suicide.  In fact, he

12  was provided care while he was on the orientation status.

13         With respect to comments concerning the budget cuts,

14  we also have today, as one of defendants' evidence,

15  Miss Gaither.

16         Miss Gaither will discuss the budget that has been in

17  place at Salinas Valley and at Vacaville and will explain to

18  the Court the change in the ratios between 1 to 25 and 1 to

19  35 that the plaintiffs are referring to when they are

20  asserting that there was a $9,000,000 budget saving at

21  Salinas Valley.

22         The evidence will show that that is not an accurate

23  picture of the actions taken by the Department of State

24  Hospital and the impact to the Salinas Valley program.

25         It is accurate that the staffing reports that the

20

1   Department of State Hospital has been providing from multiple

2   years to the Special Master and the plaintiffs have some

3   challenges in reporting the number of staff.  The defendants

4   have been very forthcoming with that.  The defendants have

5   spoken with plaintiffs.

6          We've presented in the opposition motion an

7   explanation for why there's challenges with those numbers.

8   The Department of State Hospitals is moving to work with the

9   Controller's Office to provide accurate -- more accurate data

10  to be able to come up with accurate numbers.

11         In addition we have witnesses that will be discussing

12  the staff today and explain why the numbers that are

13  reflected in those reports do not show an accurate picture of

14  the staffing.

15         As defendants explained in their opposition papers,

16  due to staffing challenges that have been occurring in the

17  context of the Salinas Valley Psychiatric Program and the

18  migration that is coming up with respect to Stockton, there

19  have been -- there has been a need for the Department of

20  State Hospital to use what is called "second positions."

21         They've brought people over to fill in from other

22  hospitals.  They've done all of that in a good-faith effort

23  to comply with Title 22 license requirements to provide

24  adequate care to the patients that are in those programs,

25  and, in fact, have been using second positions, overtime,

21

1    other types of very creative strategies to meet appropriate

2    ratios -- staffing ratios for psychiatrists and other

3    positions.  And they are, in fact, providing adequate and

4    appropriate care to patients currently in those programs.

5         With respect to the new program, as we've already

6    mentioned and discussed, that program is opening up on July

7    22nd.  As part of that program there will be patients that

8    will be transferring from both Salinas Valley Psychiatric

9    Program as well as the Vacaville program.

10         Currently there are, I believe, 242 temporary beds at

11    Salinas Valley that will eventually be migrated over to

12    Stockton.  That will leave a remaining, I believe, 128 beds

13    at the program.

14         There is no intention and there never has been any

15    intention to not fully staff that program appropriately.

16    There will be testimony today that explains how that process

17    will work.  There is absolutely no evidence that has not been

18    handled appropriately, that it will not continue to be

19    handled appropriately.

20         The Court's most recent order with respect to bed

21    plan -- the bed planning process indicates that the

22    defendants are not allowed to decommission any temporary beds

23    until they determine that there is adequate capacity within

24    the system and at that point to provide 30-day notice to both

25    the Special Master and a copy to the plaintiffs.

22

1          We are not at that point yet.  Defendants fully

2     intend to comply with the Court's order.  And once they

3     determine that there is adequate capacity for the inmates

4     that need intermediate care, as well as acute care, at that

5     point they will make a determination -- they will notify

6     plaintiffs and the Special Master.

7          That process is currently in place.  There is

8     absolutely no reason at this point in time for the Court to

9     put any further processes or issue additional orders with

10    respect to opening or closing of any of the temporary --

11    closing any of the temporary facilities or opening up any of

12    the new facilities.

13         Defendants have always provided notice and have been

14    more than accommodating in providing tours of the facilities.

15    In fact, a tour just recently occurred of the new Stockton

16    facility.

17         So with respect to that facility, as well as the

18    migration and decommissioning of the current temporary

19    programs, we would request the Court not grant plaintiffs'

20    request to issue any further orders.

21         At this point defendants, as you will hear, are

22    working extremely hard to try to bring those programs up, and

23    need to focus their attention and energy on ensuring they can

24    continue to meet adequate staff in the current programs,

25    provide new staff, staff the programs at Salinas Valley and

23

1    transfer the inmates to ensure those inmates continue to

2    receive adequate and appropriate care once they go to

3    Stockton.

4          In addition to the items that we've already

5    discussed, the evidence today will show that defendants are

6    not mismanaging the waitlist.  They're not mismanaging

7    discharges.

8          Contrary to the plaintiffs' assertion with respect to

9    the admission and discharge processes, the defendants are

10   complying with Penal Code Section 2684 that requires that the

11   department treat an inmate in a Department of State Hospital

12   program within CDCR prisons until that inmate reaches maximum

13   benefit, and at that point the inmate will go back to CDCR.

14   There is absolutely no evidence that that is not occurring.

15         With respect to the number of inmates currently

16   pending admission, both Miss Ahlin from Salinas Valley

17   Psychiatric Program, as well as Miss Bachman from Vacaville,

18   will present testimony on how many numbers -- the numbers of

19   patients pending admission.

20         It is accurate at this point in time that there are a

21   considerable number of inmates that are waiting for acute

22   care.  We will explain what the State is doing right now to

23   try to come up with emergency care for acute until the

24   Stockton facility opens.

25         In sum, Your Honor, plaintiffs will not be able to

24

1    show today that there is an ongoing and continuing violation

2    of the constitution sufficient to justify any further

3    affirmative release -- excuse me -- any further affirmative

4    relief under the Prison Litigation Reform Act.  And the

5    evidence defendants will present today will show that the

6    State is providing appropriate and adequate care to the

7    inmates in the Salinas Valley Psychiatric Program.

8            In addition, that while the inmates that are pending

9    clearance by an Institutional Classification Committee are

10   receiving basic mental healthcare while their safety and

11   security is being determined by clinicians at the program, as

12   well as CDCR custodial officials in order to ensure that

13   those inmates can safely program with other inmates in the

14   program and continue -- so that the State can continue

15   providing appropriate care into the future.

16           THE COURT:  Thank you, ma'am.

17           MS. VOROUS:  Thank you.

18           THE COURT:  Call your first witness, Mr. Bien.

19           MR. NOLAN:  Your Honor, plaintiffs would like to call

20   Dr. Pablo Stewart as our witness on behalf of the Coleman

21   class.

22           THE COURT:  Sir, I apologize.  Your name is?

23           MR. NOLAN:  Tom Nolan.

24           THE COURT:  Come around and be sworn.

25           MR. NOLAN:  Your Honor, we have binders with exhibits

25

1    that will be in the record that we'll be using with our

2    direct exam of Dr. Stewart.

3            THE CLERK:  Please, raise your right hand.

4                        DR. PABLO STEWART,

5    was thereupon called as a witness herein by the Plaintiffs,

6    and having been sworn to tell the truth, the whole truth and

7    nothing but the truth, was thereupon examined and testified

8    as follows:

9            THE CLERK:  Thank you.  You may be seated.

10           Please state your name for the record and spell your

11   last and speak directly into the microphone.

12           THE WITNESS:  Pablo Stewart, S-t-e-w-a-r-t.

13           MR. NOLAN:  We previously have offered a number of

14   Dr. Stewart's expert reports into evidence in this case and

15   in the overcrowding proceedings, most recently Coleman Docket

16   Number 4381, which is his March 14th, 2013 report in the

17   termination proceedings and his reply declaration in support

18   of this motion was Docket 4617.

19           His qualifications and experience are set forth in

20   the first of those declarations at paragraphs 2 to 25.  And

21   his expert testimony has been relied upon by the three-judge

22   court and the Supreme Court and, of course, by this court in

23   the past.

24           THE COURT:  Does counsel desire to voir dire the

25   witness concerning his qualifications?

26

1          MR. NOLAN:  Not unless the Court would like it -- Oh.

2          THE COURT:  It is not your business.

3          MS. VOROUS:  No.  Defendants do not, Your Honor.

4          THE COURT:  You may proceed, Mr. Nolan.

5          MR. NOLAN:  Also I just want to point out that the

6  paragraphs in Dr. Stewart's declaration in the termination

7  proceedings that concern DSH are paragraphs 51 to 56, 377 to

8  391, 398 to 408, 411 to 451.

9                    DIRECT EXAMINATION

10  BY MR. NOLAN:

11  Q.     Dr. Stewart, your report discusses problems with

12  premature discharges from inpatient care at Department of

13  State Hospitals' programs and with the quality of care in DSH

14  hospital programs.  Why are these serious problems?

15  A.     Well, they're serious problems in that hospital-based

16  care in a given system is where the sickest patients go to

17  receive care.

18          THE COURT:  Sixth?

19          THE WITNESS:  Sickest.

20          Most impaired, Your Honor.  Excuse me.

21          THE COURT:  That's all right.  I just didn't hear

22  you.

23          THE WITNESS:  You can liken it to a medical hospital

24  where the sickest patients would go to something like the

25  intensive care unit.

27

1          In a psychiatric system the inpatient hospital

2    programs are where the people that are suicidal, that due to

3    mental illness are suicidal, a danger to others, and are

4    gravely disabled, such as not eating or drinking properly,

5    and need to receive this level of care.

6    BY MR. NOLAN:

7    Q.      In your report you discuss the problem of premature

8    returns, premature discharges from DSH hospitals.

9          How did you learn about this problem?

10   A.      As you're aware, I did a number of tours of five

11   facilities; Salinas Valley, the State Prison Sacramento,

12   Lancaster, R.J. Donovan and San Quentin.  In each one of

13   these facilities I toured and spent a lot of time in the

14   mental health crisis bed unit areas.

15          There, speaking with staff, the staff brought up to

16   me, when I asked about the patients that they were taking

17   care of in the mental health crisis bed units, that the staff

18   were complaining that many of these people had recently been

19   treated at the Department of State Hospital facilities,

20   either intermediate care facilities or acute facilities, and

21   had been sent back to the facility.

22          THE COURT:  Sent back to?

23          THE WITNESS:  To the state prison, Your Honor, from

24   the DSH.  And that the clinicians found that these

25   individuals were in a similar psychiatric condition that they

28

```
 1    had when they were sent.  So they were unable to be housed in
 2    the general housing units, in the Ad. Seg. Units, et cetera.
 3    So they had to house them, for their own safety, in the
 4    mental health crisis bed units.
 5            And then shortly thereafter, they were re-referred
 6    back to the Department of State Hospital.  And this
 7    occurred -- this occurred in every mental health crisis bed
 8    unit I toured in the five facilities that I mentioned.
 9    Q.      Doctor, did you interview and evaluate some
10    individuals who fall into this category of "Individuals
11    Prematurely Discharged"?
12    A.      Yes.  And then as part of my tour in the mental
13    health crisis bed, I did spend time and had these particular
14    patients pulled out.  And I interviewed them, and I had the
15    opportunity to review their records also.
16    Q.      Do you recall how many individuals you evaluated who
17    were in this category of recently returned from Department of
18    State Hospitals and going back?
19    A.      In my tours that occurred at the end of January,
20    beginning of February, there were six individuals who had
21    recently been discharged from the state hospital, had been
22    returned to the sending institutions, and at the time -- at
23    that time CDCR staff, not myself, but CDCR had determined
24    that they needed to be sent back to the state hospital.  And
25    they were being housed in the mental health crisis beds.
```

29

1   That was six individuals.

2          There was another individual whom I felt needed to be

3   re-referred after a recent stay in a state hospital.  And at

4   the time when I evaluated him, he was not on the waiting

5   list.

6          Subsequently, a couple of weeks after my evaluation,

7   he, in fact, was placed on the waiting list by CDCR staff.

8   Q.      For those other six individuals, did you agree that

9   they needed to go back to DSH for inpatient care?

10  A.      Yes.  I think an important thing to point out is

11  that, you know, I've been working with seriously mentally ill

12  all my career.  And these individuals are among the sickest,

13  if not the sickest individuals that I had seen.

14         Severe psychotic disorders, complicated by mood

15  disorders, often on multiple meds, more than one

16  antipsychotic medication, often in combination with mood

17  stabilizer, antidepressants.  These were very sick

18  individuals.

19  Q.      Doctor, were the crisis beds that you visited on your

20  tours full?

21  A.      The crisis beds that I reviewed during my tours were

22  full with the exception of R.J. Donovan which on the day of

23  my tour had two vacancies.

24  Q.      Is it a problem that the crisis beds are all full?

25  A.      When the crisis beds are full -- remember we're

30

1   talking about a system where the crisis beds serve as a

2   psychiatric emergency room, where acutely suicidal or acutely

3   psychotic, danger to self, others, et cetera, patients would

4   need to go for acute stabilization.

5          When the beds in the crisis beds are filled with

6   people waiting to go back to DSH because of inadequate

7   treatment, in my opinion that they received at DSH, it bogs

8   the whole system.

9          That is shown by the use of the alternative housing

10  for people that should be admitted directly to a mental

11  health crisis bed.

12         MR. NOLAN:  Your Honor, I just want to say that in

13  speaking about individual class member cases, we have a code

14  system.  We've shared the code with defendants.  It is also

15  in the pocket of the binder.

16         THE COURT:  That's fine.

17         MR. NOLAN:  For prisoner names.

18         THE COURT:  Did you make -- I'm sorry to interrupt

19  you.  I don't know what the answer to this is.  Did you make

20  an evaluation as to whether or not DSH had rooms for the

21  people who were on the waiting list or were they full?

22         THE WITNESS:  Well, these people were waiting, Your

23  Honor, so --

24         THE COURT:  I understand that, but they may be

25  waiting because there are no beds, they may be waiting

31

1    because they haven't been properly evaluated, or they may be

2    waiting because the system failed to identify them and get

3    them in.  Who knows why.

4              I'm asking you, if you know -- if you don't, you

5    don't -- but if you know whether or not the state hospitals

6    had sufficient room to accept these people and they just

7    weren't being referred?

8              THE WITNESS:  Sir, what I do know is that these

9    people had all been re-referred by the CDCR staff from local

10   institutions to DSH.  Now the reason why they weren't being

11   moved immediately into the hospitals is unclear to me.

12             THE COURT:  Thank you, sir.

13   BY MR. NOLAN:

14   Q.    Dr. Stewart, was there a particular case involving a

15   premature discharge, a particular patient that stands out in

16   your mind?

17   A.    You know, all of them stand out in my mind, but this

18   one in particular, patient RR.  Patient RR is an individual

19   who's been at CDCR for a while.  He's been on a Keyhea

20   involuntary medication order since 1999.

21             He has had multiple stays in DSH programs, as well as

22   different levels of care at the sending institution.

23             He had recently been in, according to his medical

24   records, in the APP program at CMF and was returned back to

25   CSP Sacramento on January 7th, 2013.

32

1        The medical records state that he came to the
2   receiving and release unit at CSP Sacramento and was noted to
3   be almost in a catatonic state.  He was not speaking, was
4   psychotic, responding to internal stimuli.

5        He was in such a state where the staff, again based
6   on their medical records, say that the staff had to encourage
7   him to drink water because he wasn't able to do that.  They
8   also stated they needed to encourage him to flush his toilet
9   because he was unable to care for himself to that degree.

10        So the people at CSP Sacramento, when he returned to
11   the R&R unit, admitted him directly to the MHCB unit.

12        Straight from DSH, R&R, MHCB.

13        When I went to the MHCB unit at CSP Sacramento, I
14   went on January 29th.  So it was a couple weeks after he
15   returned from DSH.

16        He remained in an exceedingly psychotic state.  He
17   was almost mute.  He was standing in his cell looking very
18   confused and dazed, clearly in need of inpatient psychiatric
19   care.

20        I had the opportunity to speak with his treating
21   physician, a Dr. Robert Johnson.  And just a side note,
22   Dr. Johnson is one of these temporary state employees.  I
23   don't really understand.  They have a certain number of hours
24   they can work in a given year.

25        And he told me that he could only work for about

33

1    another week.  But Patient RR and Dr. Johnson were working in

2    the unlicensed MHCB unit.

3          Dr. Johnson came up to me, and I introduced myself to

4    him.  And he asked me, he says:  You need to help me out on

5    this case.

6          So we started to consult in a more collegial clinical

7    manner.  I had sort of done my observing role as far as what

8    I was doing for Coleman class members.  So Dr. Johnson and I

9    consulted clinically on this case because Patient RR had been

10   returned from the state hospital on the highest possible dose

11   of two very power antipsychotic medications, Clozaril and

12   Haldol Decanoate, in addition to being on other psychiatric

13   medications.

14         Dr. Johnson was at a loss as what to do because here

15   he was, he was returned back from the hospital in this

16   exceedingly decompensated psychotic state on the

17   clinically -- on the maximum clinically allowable dose for

18   these two antipsychotic medications.  He was wondering if I

19   had any thoughts on how to proceed psycho-pharmacologically

20   with this patient.

21         So that's why this patient particularly sticks out in

22   my mind.  The other ones had similar issues, but this one

23   went immediately from the state hospital to receive and

24   release to MHCB where he was re-referred to the hospital.

25   Q.       Did you see, Doctor, any examples of -- other

34

1    examples or this example --

2         THE COURT:  Before you get to that, what, if

3    anything, could the patient's treatment in a DSH facility be

4    any different, better or otherwise more appropriate?

5         I mean, here he was.  He was on the maximum dosage

6    not responding.  What could the hospital do?

7         I'm not saying he shouldn't be referred, but does

8    it -- did it really make any difference?

9         THE WITNESS:  Well, that's a very good question, Your

10   Honor.  I think the hospital could do a lot.  They could --

11   they would, in a case like this, where the person remained

12   exceedingly psychotic, on these high doses of antipsychotic

13   medication -- the one medication was Clozaril, which I don't

14   want to sound too dramatic about it, but it is like the

15   antipsychotic of last resort.  Someone is not responding to

16   the others, you put them on Clozaril.

17        At that point where I saw this patient, and was

18   looking at his medical records and consulting with

19   Dr. Johnson, it was clear that a large part of his clinical

20   presentation was due to inappropriate use of psychotropic

21   medication.

22        So the hospital would be in the best position to then

23   take this gentleman -- and this happens sometimes -- you take

24   them off all of his medications.  And you basically have to

25   start from scratch.

35

1          So that's what the hospital could do at a minimum,

2     Your Honor, in addition to trying to engage him in some sort

3     of psychosocial treatments and therapy.  That is not

4     available to him where he was housed.

5          THE COURT:  I understand.  Thank you.

6     BY MR. NOLAN:

7     Q.     Doctor, did you see any examples of prematurely

8     discharged individuals who likely require permanent DSH care?

9     A.     You know, in that group of seven there were a couple.

10    There was one in particular, Patient ZZ.  And Patient ZZ,

11    again, was -- I have to watch when I say elderly.  He was in

12    his 50s.

13         THE COURT:  Young man.

14         THE WITNESS:  Young man.  Very spry.  Young man.  Had

15    his whole life ahead of him actually.

16         He suffered from the diagnosis in the chart

17    schizoaffective disorder bipolar type, which is a combination

18    of chronic psychotic disorder, like schizophrenia, with

19    superimposed mood symptoms.  He also was on very high doses

20    of two different antipsychotic medications.

21         He had recently been in DSH.  He had been returned

22    back to R.J. Donovan.  They attempted to house him in an

23    Ad. Seg. unit where he quickly decompensated, started having

24    hallucinations to kill himself.  He returned back to the MHCB

25    where then he was re-referred to DSH.

36

1        This happened in the course of several weeks.

2   BY MR. NOLAN:

3   Q.      Doctor -- Sorry.

4   A.      Looking at his record, he has not been able to be

5   maintained for any significant periods of time outside of a

6   DSH setting, even when he goes to an EOP Ad. Seg. setting.

7   He's not able to be held there before decompensating and

8   needing to be sent back to the hospital.

9        So in a case like that, one would seriously need to

10  consider whether or not we're doing anyone any good by

11  continuing this cycle we knew failed him in the past.

12  Q.      Doctor, do you have any understanding whether it is

13  even permitted for somebody to be a permanent DSH CDCR

14  prisoner?

15  A.      My understanding is that is currently not allowed.

16  Q.      Doctor, did you also hear complaints about this

17  issue, premature discharges from CDCR staff during your

18  tours?

19  A.      Yes.  The staff were very concerned because they get

20  these guys back from the hospital.  And, you know, quite

21  frankly, the expectation when you send somebody to the

22  hospital, they're going to come back and be able to be housed

23  back in the regular housing unit if they were EOP or triple

24  CMS.  Most of these were in EOP status.

25       So you would expect after a period of hospital

37

1    stabilization they can go back and program in the EOP which

2    is designed to keep people from going to the hospital.

3         But they get these people back on these really

4    complicated poly drug regimens, and they were in really bad

5    shape so that the staff were very concerned about that.

6    Q.    Doctor, another opinion in your report is that DSH

7    programs are understaffed.

8         What is the basis for that opinion?

9    A.    Well, I heard about that from a couple of sources.

10   When I went to Salinas Valley State Prison on January 28th of

11   this year, at the morning meeting, where we meet with all the

12   staff and people go around and give little reports, the

13   acting chief psychiatrist -- I don't have his name on my

14   tongue -- he talked about staffing problems at Salinas Valley

15   State Prison, among psychiatrists in particular.

16        Then in my tours of the intermediate care facilities

17   at Salinas Valley, I happened to be speaking briefly with one

18   of the psychiatrists there.  It was actually Dr. Troncoso who

19   related to me the very high patient-to-psychiatrist ratios

20   that were currently going on in the ICF programs.

21   Q.    Do you have an understanding what those ratios had

22   been?

23   A.    My understanding at the time of my tours, which was

24   the end of January, the ratios were anywhere from one

25   psychiatric to 40 patients or one psychiatric to 60 patients.

38

1   Q.      Does a staffing ratio 1 to 40 or 1 to 60 allow for a

2   psychiatrist to meet the standard of care for an inpatient

3   unit?

4           MS. VOROUS:  Objection.  Lack of foundation.

5           THE COURT:  Overruled.

6           THE WITNESS:  The standard of care for inpatient

7   hospital -- remember, this is the most intensive care you

8   would have in the system.  It calls for the physician to meet

9   with their patients on a daily basis, evaluate how they're

10  doing, evaluate their medications, make any changes, address

11  any concurrent medical problems going on, medication side

12  effects, et cetera, then write a note about it.

13          If you have -- that's not even counting if you have

14  admissions that day or if you have discharges to do.  So that

15  doesn't allow for that.  That's an amazingly high ratio.

16          THE COURT:  I understand you think it is an amazingly

17  high ratio.  Do you have any understanding of what -- Strike

18  that.

19          Is there a standard ratio for psychiatrist-to-patient

20  care outside of the prison system?

21          THE WITNESS:  I'm not aware, Your Honor, of a

22  standard ratio or if this is the absolute ratio.

23          THE COURT:  Okay.  The expected ratio, comfortable

24  ratio?

25          THE WITNESS:  In dealing with, again, hospitalized

39

1    patients, I've been working in settings where the ratio is

2    one psychiatrist to 12 patients.  Something like that.  Maybe

3    1 to 10 or maybe even a little higher.  But that's still a

4    lot, 1 to 15, something like that.

5         THE COURT:  I think what you have just testified to

6    is that a ratio of 1 to 40 or 1 to 60 simply precludes

7    adequate care?

8         THE WITNESS:  Yes, Your Honor.  I don't see how a

9    ratio of 1 to 40, that you would be able to round on all your

10   patients.

11        Let's back off for a second and say:  Okay.  So now

12   because of this ratio I'm only going to see my patients once

13   a week.  And if you were working 40 hours, that means you

14   have one hour per week per patient.  That's unacceptable for

15   an inpatient unit, let alone the expectation you're supposed

16   to see people daily.

17        THE COURT:  One problem that has occurred to me, and

18   I've discussed with my Special Master, is what I perceive to

19   be the difficulty just because of real world expectations of

20   the prison system hiring psychiatrists.

21        In a jocular fashion I used to say that you have to

22   be a crazy psychiatrist to want to work in a prison.  And

23   therefore, you know, it just seems to me some other kinds of

24   arrangements have to be made.

25        Is that equally true in your view because it's not

40

1    occurred to me, I don't know, is that equally true in state

2    hospitals?

3            Am I right?

4            Let's start by saying am I right?

5            In your view am I right that there is an additional

6    difficulty in hiring psychiatrists in a prison system?

7            THE WITNESS:  In my experience, Your Honor, prison

8    systems are challenging places to work.  But they're also

9    very exciting places to work.

10           As a psychiatrist, in the prison system, you have

11   these amazing cases if you are looking at it from a

12   psychiatric illness standpoint.  You have cases that you

13   don't usually see in other settings.

14           Like some of the ones I talked about that, that case,

15   Patient RR, I would love to be involved with a case like that

16   because it provides clinical challenges that I don't have

17   that opportunity.

18           However, the settings can be so oppressive.  And in

19   my touring of the California system, it's one of the more

20   oppressive settings where the custodial arrangements -- and

21   I'm very clear about needing to have good security to provide

22   good care in a correctional setting so I'm not saying do away

23   with security measures -- but there is a way to do it that

24   would facilitate someone's working in a setting like that.

25           And I think in my experience of touring with the

41

1    California Department of Corrections, that the heavy-handed

2    correctional aspect of it really is a deterrent for

3    psychiatrists to work there.

4          THE COURT:  I don't mean to interrupt you, but I am

5    trying to understand what I am hearing.

6          Do you find -- is it your experience that the

7    security circumstances in DSH facilities equally impede

8    appropriate care and the hiring of psychiatrists which is

9    what we're now talking about?

10          THE WITNESS:  I couldn't answer about the hiring of

11   psychiatrists in DSH, Your Honor, but I can tell you that my

12   experience with DSH hospital, like Atascadero, I have visited

13   several times, Napa State Hospital, very familiar with, I

14   used to be a consultant there years ago, it is a very

15   different setting.

16          THE COURT:  Thank you.  You may proceed.

17   BY MR. NOLAN:

18   Q.      Doctor, in your supplemental declaration you

19   discussed the death of a class member at SVPP on March 22nd

20   from a condition known as psychogenic polydipsia?

21   A.      Yes.

22   Q.      What documents did you review to learn about the

23   death?

24   A.      I reviewed the Monterey County Coroner's Report on

25   the death.

42

1    Q.      If you could, look behind Exhibit Tab B.

2           Is that a copy of the coroner's report that you

3    reviewed?

4    A.      Yes.

5    Q.      This document was previously attached as Exhibit 1 to

6    the Declaration of Krista Stone-Manista from our office,

7    Docket 4618.

8           Doctor, what is psychogenic polydipsia?

9    A.      Psychogenic polydipsia is a condition where a patient

10   drinks large volumes of water to the point where they dilute

11   essential serum electrolytes, such as sodium chloride

12   potassium.

13          The causes of this condition are -- it is interesting

14   that it is seen in association with chronic mental illness,

15   like schizophrenia or bipolar disorder, but it is also

16   thought to be or at least have a contributing factor to

17   long-term use of atypical antipsychotic medications.  So it

18   is usually seen in association with mental illness.

19   Q.      Doctor, what's the standard of care for this

20   condition?

21   A.      The standard of care, first and foremost, is to

22   restrict fluid intake for the patient.  There are many ways

23   to do that depending on severity of the condition.

24          I've treated patients in hospital settings where

25   we've had to keep a person in seclusion and turn off the

43

1    water in the particular secluded area to prevent them from

2    drinking, and then the nursing staff would provide a set

3    amount of water on a daily basis and record that.  So we

4    would have very strict concerns about how to give them

5    fluids.

6           In addition, you know, since it is associated with

7    chronic mental illness, you would want to do an evaluation of

8    whether or not your treatment is doing any good for them, the

9    schizophrenia or bipolar disorder or schizoaffective

10   disorder.

11          And finally you want to do a good comprehensive

12   medication evaluation to make sure the meds you are

13   administering to the patient weren't contributing to this.

14          Also I failed to mention that you need to do frequent

15   serum electrolyte checks, even daily blood draws on a

16   patient.

17   Q.      Doctor, are deaths from this condition preventable?

18   A.      They're 100 percent preventable.

19   Q.      Do you think this death was foreseeable and

20   avoidable?

21   A.      Well, his condition was certainly known, or at least

22   should have been known to the staff at the Salinas Valley

23   Psychiatric Program.  This individual who died from water

24   intoxication, poly -- excuse me -- psychogenic polydipsia,

25   had a bout of this in November of 2012 so severe he needed to

44

1    be treated in an outside hospital.

2         So one would think that the psychiatric staff would

3    be acutely aware of this person's condition when he returned

4    back to where this had originally occurred after having gone

5    to an outside hospital.  So in that sense I believe it was

6    very well-known and very preventable.

7    Q.    Was there anything in the toxicology report attached

8    to the coroner's report that caused you to have concerns?

9    A.    The toxicology report included a measurement of the

10   decedent's serum electrolytes at the time of death.  And the

11   one electrolyte that is considered most important to treating

12   this condition is serum sodium.

13        Now, on a normal day our serum sodium is somewhere in

14   the 140 to 150 range.  And the units for that are millimoles

15   per liter.

16        At the time of his death, this patient had 99

17   millimoles per liter of sodium in his serum, which means that

18   not only had this been going on for a while, but it had been

19   going on for quite a while.  And that he was allowed to drink

20   himself that low sodium because it just happens because

21   you're diluting your blood.  It is a real straightforward

22   situation clinically.  So you just restrict the amount of

23   fluids, you prevent dilution.

24   Q.    Doctor, were you able to review any medical records

25   or any other reports about this case?

45

1    A.        You know, I had requested through counsel to review

2    medical records.  And my understanding is that defendants

3    didn't make them available, along with if there were -- if

4    this was considered a suicide by CDCR staff, if there were a

5    suicide report.

6    Q.        Doctor, switching focus somewhat, did you review the

7    suicide report for Prisoner A, the class member who committed

8    suicide in the SVP program in November 2012?

9    A.        Yes.

10   Q.        So I want to call your attention to Exhibit C at Tab

11   C.  This was previously Exhibit 42 to the Confidential Kahn

12   Declaration, Docket 4411.

13             Is this the report you reviewed, Doctor?

14   A.        Yes.

15   Q.        Does the fact that Prisoner A was able to

16   successfully complete suicide in an inpatient unit raise

17   concerns for you about staffing in this program?

18   A.        Well, first of all I hate to state the obvious, but

19   psychiatric hospitals are where you send suicidal patients to

20   ensure their safety.  So when a suicide occurs in a hospital,

21   it's a big deal.  There is something up there.  And so that's

22   just on a macroscopic level here's what I was thinking, a

23   person was able to kill themselves while they were a patient

24   in a hospital setting.

25   Q.        Are you aware, Doctor, of whether there have been any

46

1    other suicides in the SVPP program since it opened in 2003?

2    A.    My understanding -- again, I got this information

3    from the morning meetings that we had prior to my tour of the

4    Salinas Valley Prison -- was that this was the first

5    successful suicide in the ten years of the intermediate care

6    program's existence.

7    Q.    Did this prisoner have a prior suicide attempt?

8    A.    He had multiple suicide attempts.  He had a serious

9    suicide attempt while he was at CSP Sacramento which was the

10   cause for his initial referral to the Department of State

11   Hospitals.

12        And after a significant delay, while he was at CSP

13   Sac. before he was admitted to the intermediate care

14   facility, he was then made to wait for an additional three

15   weeks before he had any treatment.

16        And to answer your question about the suicide, he had

17   a suicide attempt a week prior to his hanging himself.  He

18   cut his arm, and it required medical intervention.  And the

19   record -- the suicide report says that he was placed in a

20   safety cell overnight, then was returned back to his cell.

21   Q.    Doctor, do you know how long he waited between being

22   referred and transferred to SVPP?

23   A.    My understanding is that was a period of 80 days.

24   Q.    Do you have any concerns based on this suicide about

25   his staying in orientation status?

47

1   A.      Again, I hate to state the obvious, but, you know,

2   we're talking about severely mentally ill individuals.  We

3   got to remember that's who our discussion is about.  So we

4   have the seriously mentally ill individual who attempted to

5   take his life while waiting to come to the hospital.  And

6   then he shows up at the hospital where I think it was a fair

7   assumption that he would begin treatment immediately.

8           Now, I understand about needing to do classification

9   works and these sorts of things, but I mean, come on.  Even

10  just the two-week thing is way too long because these are

11  seriously mentally ill individuals.

12          They show up and due to some administrative error or

13  however it is -- I don't mean to characterize it in any way

14  because I don't know exactly why he had additional delay --

15  but the result was he had a delay of 21 days and then he hung

16  himself.

17  Q.      Doctor, did this patient leave a suicide note?

18  A.      The suicide report talks about a note written on the

19  walls of his cell.  And it was something to the effect of:  I

20  came here slightly depressed.  I am now severely depressed.

21  This place is hopeless.

22  Q.      Doctor, do you have any -- do you have an opinion

23  about the quantity of care being delivered in the SVP

24  programs you visited?

25  A.      Yes, I do.  It was not much, to give you the short

48

1    answer.  In my tours I was struck by -- you know, we went to

2    permanent units there at Salinas Valley, nice facility, it

3    was a nice building, these treatment spaces, but there was no

4    treatment going on.  They were empty.  They were empty rooms.

5    And I noticed that everybody was locked in their cells.

6         And the patients that I was able to -- I was able to

7    speak with through a door, they were complaining to me that

8    they spend the overwhelming majority of the time locked in

9    their cells.

10        And just to set the context, Your Honor, that was a

11   Monday.  And it was -- by the time I made it to the

12   intermediate care facility, it must have been 10, 11 o'clock

13   in the morning.  So it wasn't some obscure time.  You would

14   think there would be treatment going on on a weekday at 10,

15   11 o'clock in the morning.

16        So then I walked over to the temporary units, and I

17   found the same thing, that there were people locked in their

18   cell.  They had -- they didn't have treatment rooms there

19   because temporary units is just a prison pod.  And so they

20   had chairs set up in a semicircle, but there was nobody

21   sitting in them, no treatment going on.

22        I did find that on the temporary units there was some

23   individuals who were on the yard so I was able to speak to

24   some of them, which they confirmed that -- they said that the

25   most we get was around one group a day, five days a week.

49

1          So they were getting -- they confirmed they were

2    getting maybe five hours a week, which was later brought up

3    with both Dr. Brim and Dr. Badeaux's declaration and in their

4    deposition testimony.

5    Q.        Doctor, I want to call your attention to the Exhibit

6    D in your binder.  These are photographs that were attached

7    to your declaration, Docket 4381 at pages 245 through 247 --

8    I'm sorry -- through 250.

9          And it's appendix UU, VV and WW and XX, photographic

10   appendixes.

11         Does this capture what the rooms looked like when you

12   were touring?

13   A.        Yes.  The first two photos are of the permanent unit

14   and the last two are of the temporary unit.  See, this is

15   exactly how they were.  They were empty.

16         Sometimes when we go on tours, we take pictures of

17   the units, we have to move patients out for confidentiality

18   reasons.  But there was no reason to do that in the pictures

19   because there was nobody getting any treatment.

20   Q.        In your opinion, Doctor, is five hours a week of

21   therapeutic group activity sufficient for patients at the

22   intermediate level of care?

23   A.        I want to go back to this.  These are the most

24   severely ill people in the system.  They're in the hospital

25   where every moment of their waking hours should be

50

1    therapeutic in nature, from the time they get up to the time

2    they go to bed.  And these people were getting around five

3    hours a week.

4          In the next lower level of care in the CDCR system,

5    which is EOP, the program guide calls for a minimum of ten

6    hours of treatment.

7          So this thing was all turned upside down.  From the

8    lower level, from a referring level to the hospital where

9    you're supposed to get more care, they ended up getting less.

10   So to answer your question, five hours is very inadequate in

11   my opinion.

12   Q.    Do you have an opinion about what level of treatment

13   should be provided in an intermediate inpatient care program?

14   A.    I believe that, as I was saying, the entire day

15   should be therapeutic.  People need to be out of their cells,

16   they need to be attending recreation or therapy groups,

17   meeting with clinicians, meeting with therapists, maybe even

18   just going to yard, these sorts of things.

19         So given that, you know, a fair estimate would be 40

20   hours a week of some sort of activity, including recreation,

21   including yard time.

22   Q.    So tab E in the exhibit binder that I have given you

23   is a declaration previously filed by defendants in this case

24   in September of 2010.  It was Docket 3913-3.  The document is

25   a declaration by Victor Brewer.

51

1          Doctor, have you review this document?

2     A.     Yes.

3     Q.     Do you understand Victor Brewer was executive

4     director of the SVPP program at the time of this document?

5     A.     Yes.

6     Q.     What's the significance of this document for your

7     opinion?

8     A.     Well, Mr. Brewer, I don't know who confirmed whose

9     opinion, but we're of the same mind, where in an intermediate

10    care facility he's talking about 35 to 40 hours of

11    therapeutic time a week, including recreation.

12    Q.     Doctor, just a few more questions.

13         Another area you mentioned in your report concerns

14    problems with basic conditions in the program such as

15    inadequate supplies of soap, clean clothing and other hygiene

16    supplies.

17         How did you learn about this issue and why is it

18    important?

19    A.     Well, I would hope needing clean clothes and hygiene

20    supplies in a hospital, the answer to that is pretty obvious.

21    But when I was touring the temporary units -- again, that was

22    the only place I saw anybody out of their cells.  And so I

23    spoke to a group of individuals on the yard, and that's where

24    I got the information about one group a day, and also they

25    were talking about not having enough bedding, not having

52

1   enough underwear, not having enough towels.  Real basic

2   stuff.  Not having enough soap in the units.

3        And, you know, how do you expect anybody's mental

4   illness to get better when they don't have clean clothes,

5   they don't have soap.  I think it is pretty obvious, I

6   think.

7        MR. NOLAN:  Thank you, Doctor.

8        No further questions.

9                    CROSS-EXAMINATION

10  BY MS. VOROUS:

11  Q.     Good morning, Doctor.

12  A.     Good morning.

13  Q.     You indicated that you visited the Salinas Valley

14  Psychiatric Program; is that correct?

15  A.     Correct.

16  Q.     How long did you spend visiting the program?

17  A.     I would say, in both permanent and the temporary

18  unit, it would have been a couple of hours, around that range

19  approximately.

20       THE COURT:  Two hours?

21       THE WITNESS:  In that range, yes, Your Honor.  Maybe

22  a little less, maybe more.

23  BY MS. VOROUS:

24  Q.     Doctor, do you remember your deposition being taken

25  on March 19, 2013 in the context of defendants' termination

53

1   motion?

2   A.      Yes.

3   Q.      And in your deposition do you recall estimating that

4   the time that you spent in the Salinas Valley Psychiatric

5   Program was approximately an hour, "an hourish"?

6   A.      No, I don't recall that.

7           Now that you remind me I do, yes.

8   Q.      Doctor, have you ever worked for the Department of

9   State Hospitals?

10  A.      I was a consultant for many years at Napa State, but

11  I wasn't an employee.

12  Q.      Have you ever worked inside of the Salinas Valley

13  Psychiatric Program or the Vacaville Psychiatric Program?

14  A.      I have not worked inside.  I was the court-appointed

15  expert in the Gates v. Gomez case where -- it was involving

16  the California Medical Facility.

17          Part of my responsibilities was being aware of what

18  was going on in the Vacaville inpatient programs.  Yes.

19  Q.      And at what point were you involved in the Gates

20  case?  What year was that?

21  A.      Roughly, I want to say, 1990 to 2000.

22  Q.      Doctor, isn't it correct that other than the hourish

23  or so that you spent inside the Salinas Valley Psychiatric

24  Program, you've had no other opportunities to observe the

25  care that's provided by the Department of State Hospitals

54

1    within that facility?

2    A.      Well, it was on that day that's how much time I spent

3    there.  But, you know, it is not the first time I've visited.

4    During the course of my previous tours I've been -- I've

5    toured the intermediate care facility, and I've been to the

6    inpatient units at Vacaville a lot.

7            THE COURT:  When you say "a lot," what would your

8    estimate be?

9            THE WITNESS:  Well, over the ten-year-period, Your

10   Honor, during the Gates case, you know, I was there once a

11   week.

12           THE COURT:  Since that time have you spent any time

13   at either Salinas or elsewhere within the system?

14           THE WITNESS:  During the course of the overcrowding

15   tours, Your Honor, I inspected the facilities at the

16   Vacaville inpatient hospital, as well as Salinas Valley.

17   BY MS. VOROUS:

18   Q.      You inspected the care provided by Department of

19   State Hospitals at Salinas -- at the Salinas Valley

20   Psychiatric Program during your work you did in the

21   overcrowding trial; is that what you're testifying to?

22   A.      That's my memory.  I toured the Salinas Valley

23   program and the Vacaville program, yes.

24   Q.      What year would that have been in, Doctor?

25   A.      You got me on that one.  I wouldn't guess.  Prior to

55

1    the overcrowding litigation.

2    Q.      Approximately 2008?

3    A.      Something like that.  Maybe 2007-2008.

4    Q.      Doctor, when you were in the Department of State

5    Hospital program at Salinas Valley Psychiatric Program in the

6    context of your work, in January I believe is when you said

7    you were at the prison, isn't it correct that you only looked

8    at a few of the medical -- paper medical records of inmates

9    that were being treated in that program?

10   A.      I don't remember exactly the number of charts I might

11   have reviewed of patients there.  I'm sorry.  I just don't

12   remember that.

13   Q.      Do you remember reviewing any patient charts while

14   you were inside the Department of State Hospitals' program at

15   Salinas Valley Psychiatric Program?

16   A.      I know I didn't review any medical records of

17   inpatients in the permanent unit.  I think going to the

18   temporary unit, they don't have electric records.  I noted

19   they had, you know, the old-fashioned paper charts.  And I

20   know I looked at a few.  I couldn't answer that question.  I

21   just don't remember.

22   Q.      Doctor, you spoke about six individuals that you

23   believed had been, if I'm using the correct term, premature

24   discharges from the Department of State Hospital program,

25   correct?

56

1    A.      Yes.  The term CDCR staff used was DSH failures.

2    Q.      With respect to any of those six inmates, did you

3    read the Department of State Hospital medical record for

4    those patients?

5    A.      As part of the medical review, I did look at their

6    records, including the state hospital records.

7    Q.      And were those records that you looked at while you

8    were at San Quentin State Prison with plaintiffs' attorneys

9    and looking at records as part of the termination proceeding?

10   A.      You know, it was that.  I spent some time at

11   San Quentin where they had a computer set up for me, and

12   Mr. Nolan and I were able to access them that way.

13           But also there were records that I reviewed while I

14   was actually in the inmate CB units.  And the inmate CB units

15   had some big paper charts.  So they had -- some of them had

16   records from the state hospital in there from previous

17   admissions.  And they had referral packets, these sorts of

18   things there that I saw.

19           And in addition I had, you know, the records from the

20   patients that I had seen.  I looked at them, yes.

21   Q.      When you talk about the records that you looked at,

22   are you referring to the discharge records from the

23   Department of State Hospitals, or are you talking about the

24   underlying treatment records, while the patient was at the

25   State Hospital?

57

1    A.        Certainly the discharge records.  I can't answer that

2    one.  I don't know if I looked at the day-to-day treatment.

3    Probably not.

4    Q.        Doctor, what is the basis of your testimony that your

5    understanding is that the department is currently not allowed

6    to keep patients in the intermediate care programs?  I think

7    you used the term "permanently."

8    A.        Well, again, I can't tell you exactly how I know

9    that.  I think it is through the course of my association

10   with the department.  I've asked that question in the past to

11   other people:  Why not keep these guys in the hospital?

12              They come back.  You send them back.  They come back

13   again, et cetera, et cetera.

14              It is my understanding that people couldn't be kept

15   there for, you know, indefinitely.  And I believe you used

16   the term earlier in your opening about receiving the "maximum

17   treatment benefit" or words to that effect.  So I believe

18   that's what was the basis of my understanding.

19              THE COURT:  Let me interrupt for a moment.

20              The words "maximum benefit" suggests that further

21   retention in the hospital -- this is how I would read it, I

22   don't know what it means -- but I think it is common

23   understanding it would mean further hospitalization would not

24   be of any use.

25              Assume that's what it means for a moment.

58

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  In your view are there patients of such

3    severity that they must be retained in the hospital setting

4    under that standard, namely, that it is not maximum to let

5    them go no matter what because they're so sick?

6            THE WITNESS:  Yes, Your Honor.  I believe there are

7    patients that way.

8            THE COURT:  All right.  Thank you.

9    BY MS. VOROUS:

10   Q.      Doctor, are you aware that decisions on placement and

11   discharges -- are you aware that decisions on patients'

12   discharges from the Department of State Hospitals are made by

13   treatment teams?

14   A.      I believe so, yes.

15   Q.      And would you also agree that it is common for

16   clinicians to -- treating clinicians have a difference of

17   opinion as to whether a patient is appropriate for discharge

18   or not?

19   A.      Yes.  To answer your question, absolutely.  Working

20   in inpatient hospitals myself, that certainly is the case

21   where some clinicians want to keep somebody longer or

22   somebody wants to get somebody out earlier.

23           But in the cases that I reviewed, you know,

24   regardless of what they were saying up there at the state

25   hospital, when these people were at the prison, they were

59

1    sick.  They were --

2    Q.      Doctor, I'm not disagreeing with the fact that your

3    conclusion was the patients were sick.  What I'm asking is

4    whether it is -- in your experience is it common for

5    clinicians to have a difference of opinion as to whether

6    someone is appropriate for discharge from an inpatient

7    program or not?

8    A.      I wouldn't say common, but it certainly does occur.

9    Q.      Thank you.

10           THE COURT:  Let me ask you this:  In your view, if

11   there were no reasons to discharged people other than their

12   condition, would these people have been retained in the

13   hospital?

14           THE WITNESS:  The people that I saw, Your Honor, the

15   six -- the six -- well, actually seven people that I saw, I

16   would think, if given the situation you just described, that

17   they would have been kept at the hospital because of their

18   clinical -- based on their clinical conditions.

19           THE COURT:  So your conclusion -- I don't want to put

20   words in your mouth, but I think this is the import of your

21   testimony -- these folks were so sick that it had to be some

22   reason other than their clinical condition for them to have

23   been discharged?

24           Is that your view?

25           THE WITNESS:  Your Honor, I'm not able to go that far

60

1   only because I just don't know.  I just know, based on their

2   clinical condition, there was no reason to discharge them

3   from the hospital.  And so what the reasons are to discharge,

4   I would only be speculating.

5   BY MS. VOROUS:

6   Q.      So one of the patients that you gave an example of,

7   Patient RR, Doctor, you don't know what treatment that

8   patient received within the Department of State Hospital, do

9   you?

10  A.      I know that he was receiving, at a minimum, the high

11  doses of two antipsychotics.

12  Q.      Beyond that you don't know anything more in terms of

13  what kind of treatment he was receiving while at Department

14  of State Hospital?

15  A.      By "treatment" you mean his group participation and

16  hygiene groups, and these sorts of things like that?

17  Q.      In addition to one-on-one clinical consultations with

18  a psychiatrist, rehab therapy, yes, the whole --

19          THE COURT:  I think that this is a problem.  You're

20  assuming I know something that I don't know.

21          In your view what would be an appropriate treatment

22  of Patient RR at the hospital level?

23          What would he need?

24          THE WITNESS:  Patient RR in particular, Your Honor,

25  was so psychotic, and also had evidence of serious medication

61

1   side effects, that his treatment, as I testified earlier,

2   would be to keep him in a hospital setting and slowly taper

3   away his medications and to see what we really have

4   underneath all of this.  And to have a consultation.  Maybe

5   even have an expert outside consultation to come in and say,

6   okay, now we've done this, we've added this, now let's look

7   at it this way.  That's what I think should have been done,

8   Your Honor.

9           THE COURT:  In terms -- I don't mean to interrupt,

10  but I just don't know what the consequences of the testimony

11  is.

12          In terms of adequate medical care, psychiatric care,

13  can you give me a reasonable estimate as to how much

14  treatment per week a person in those conditions would

15  require?

16          THE WITNESS:  Well, Patient RR is a different

17  scenario, Your Honor, in that he is acutely ill so he

18  probably wouldn't be able to attend therapy groups or

19  recreation groups.

20          It would be nice to maybe try to get them in there at

21  some point, but based on the condition I saw, his -- the

22  major treatment intervention for him would be

23  psychopharmacological and medical and nursing.

24          THE COURT:  Okay.  How long?  How often?

25          What would the hospital staff -- I know what you said

62

1    they need to do.  What would that take?

2           THE WITNESS:  That would take daily contacts with the

3    psychiatrist and intensive nursing contacts on a daily basis,

4    Your Honor.

5           THE COURT:  Okay.  I'm sorry to have interrupted,

6    ma'am.

7    BY MS. VOROUS:

8    Q.      Doctor, is it your opinion that a program, such as

9    the program at the Department of State Hospitals Salinas

10   Valley Psychiatric Program, should have a minimum of one hour

11   of psychiatry contact per patient per day?

12   A.      No, I didn't say that.

13   Q.      Maybe I misunderstood.

14   A.      I gave the example of patient ratio of 40 patients to

15   one doctor.  Even over a given week, the most the person

16   could spend would be one hour a week with the patients.

17   Q.      You don't -- is it your opinion that one hour per

18   week with the psychiatrist on average is an inappropriate

19   standard of care?

20   A.      I think it is very inadequate.  Again, the only

21   reason I came up with that number was based on my

22   understanding of what the doctor-patient ratio was at the

23   time of my tour.

24   Q.      Doctor, have you ever worked in a program similar to

25   the Salinas Valley Psychiatric Program where the

63

1    psychiatrists were able to provide one hour per day of

2    psychiatric care to all of the inmates in the inpatient

3    program?

4         MR. NOLAN:  Misstates his evidence.

5         THE COURT:  I'm sorry?

6         Did somebody say something?

7         MR. NOLAN:  Sorry.  She said that -- she misstated

8    his evidence.  She was saying that he again said one hour per

9    day of care.

10        THE COURT:  She's asking that.  I don't think that

11   reflects the witness's testimony.  But to the extent that she

12   wants to know whether that would be appropriate and adequate,

13   the question stands.

14        You may answer, sir.

15        THE WITNESS:  Again, I don't have an absolute minute

16   or hour requirement.  In a case like Mr. RR you would need to

17   spend a significant amount of time with him, and that

18   includes face-to-face patient contact, reviewing records,

19   maybe getting expert consultation.  So that may take an hour

20   or maybe even more.

21        In a patient that isn't as acutely ill as Patient RR,

22   you might be able to get by with less to do adequate work.

23   So I don't mean to give you any absolute figure.

24   BY MS. VOROUS:

25   Q.    And again, for Patient RR you don't know what

64

1    treatment he actually received at the Salinas Valley

2    Psychiatric Program, correct, other than the medications that

3    you mentioned earlier?

4    A.      I don't know what absolute treatment groups,

5    et cetera, he was participating in.

6    Q.      Thank you.

7            THE COURT:  Doctor, we're about to recess for noon.

8    I want to ask you one question, which I should have asked you

9    earlier, but I didn't want to interrupt counsel.

10           It appears to the Court that counsel has suggested

11   that your visit to Salinas, constituting an hour, plus or

12   minus, was insufficient for you to base your opinions on.

13           I don't know whether that's what you meant to say or

14   not, but at least that's what's suggested to the Court.

15           May I have your view as to that conclusion?

16           THE WITNESS:  Your Honor, the time that I spent

17   touring the facility was literally that, to tour the

18   facility, to remind myself what the physical plant was, to

19   see if treatment was going on.

20           And the basis of my opinion is not based on just that

21   60 minutes or so or however much time I was there, but based

22   on the suicide and the suicide report that I reviewed, based

23   on the coroner's report from Monterey County about the death

24   that occurred in that unit, based on the people that I had

25   seen in the various MHCB units in the various prisons in the

65

1    state that I toured who had recently been returned from the

2    Salinas Valley Psychiatric Program.  The combination of all

3    of that is the basis for my opinion, Your Honor.

4              THE COURT:  We'll take our recess.  We'll

5    reconvene -- unfortunately I made a commitment which I wish I

6    hadn't so 1:30 p.m.  See you at that time.

7              (Off the record at 12:00 p.m.)

8              (On the record at 1:33 p.m.)

9              THE CLERK:  Please, remain seated.

10             Court is now in session.

11             THE COURT:  Please, be seated.

12             Doctor, resume the stand.

13             Miss Vorous.

14   BY MS. VOROUS:

15   Q.       So Doctor, during the lunch break did you review any

16   further documents in preparation for continuing with your

17   testimony?

18   A.       No.

19   Q.       So Doctor, on your direct examination you talked a

20   little bit about a November 2012 suicide that occurred in the

21   Salinas Valley Psychiatric Program.

22             Do you recall that testimony?

23   A.       Yes.

24   Q.       If you would, please, turn to Exhibit C in your

25   binder.

66

1          This a copy of the suicide report for Inmate A, as

2     you referred to in your declaration, and testimony that was

3     filed under seal with the Court?

4     A.        Correct.

5     Q.        Doctor, is it correct that other than what is stated

6     in the suicide report, you don't have any knowledge of any

7     other treatment that may or may not have been provided to

8     this particular patient while housed at Salinas Valley

9     Psychiatric Program; isn't that correct?

10    A.        I do not.

11    Q.        Doctor, if you would, turn to page 10 of the suicide

12    report.

13    A.        Yes.

14    Q.        If you'll look at the first full paragraph on that

15    page, isn't it correct that --

16          THE COURT:  Beginning with "On November the 28th,

17    2012."

18          MS. VOROUS:  Yes.  Correct.

19          THE COURT:  All right.

20    BY MS. VOROUS:

21    Q.        The second sentence -- the third paragraph of -- that

22    paragraph states that on the evening of the 28th -- again,

23    I'm not paraphrasing because I do not want to indicate the

24    name of the inmate -- but the inmate attended a group on his

25    unit and appeared to socialize appropriately?

67

1    A.        Yes.

2    Q.        The next sentence states that the next morning he

3    attended a group from 800 to 850 hours on his unit and then

4    was rehoused in his cell?

5    A.        Correct.

6    Q.        Third sentence says that at 901 hours a social worker

7    was gathering inmates for another group and came in the

8    inmate's cell and discovered that he had taken his life?

9    A.        Yes.  He was hanging at that point.  He didn't die

10   for a few days later.

11   Q.        Yes.  So isn't it true that this inmate had been

12   cleared for programming prior to his suicide?

13   A.        He had, yes.  He had attended two groups prior to his

14   suicide.

15   Q.        In fact, he was discovered within -- if I'm

16   calculating correctly -- within ten minutes of returning from

17   a group, correct?

18   A.        Correct.

19             THE COURT:  Well, it is not just that he was

20   attending these groups, but he appeared to be responsive and

21   socializing in an appropriate way.

22             Isn't that right?

23             THE WITNESS:  That's what the report says, Your

24   Honor.  It says, "He attended one group on the evening before

25   he hung himself where he appeared to socialize

68

1    appropriately."

2           THE COURT:  Is it your view -- I'm sorry.

3           MS. VOROUS:  It's fine, Your Honor.

4           THE COURT:  It is your view that having been

5    hospitalized, and having a history of suicide attempts, there

6    was something more that should have been done by the hospital

7    than was done?

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  What else could they have done or should

10   they -- well, should they have done?

11          THE WITNESS:  Well, I think first of all they should

12   have engaged him in treatment a lot earlier because when he

13   did attend his first group, it was after he had been on the

14   unit for three weeks --

15          THE COURT:  Okay.

16          THE WITNESS:  -- for one.

17          And since we know that he killed himself the next

18   day, then I would suspect that he was showing -- I don't know

19   this for a fact because I don't have the medical record in

20   front of me -- that it was something else going on that might

21   have been picked up by staff.

22          THE COURT:  Okay.  The fact of the matter is not

23   having the medical records is beside the point because he

24   wasn't in treatment so it wouldn't have reflected anything;

25   is that right or wrong?

69

1          THE WITNESS:  You're right, Your Honor.

2          THE COURT:  Is it your view -- I'm asking you, not

3    telling you, I want to make clear, you're the expert, not

4    me -- is it your view that any time somebody is sent to the

5    hospital, that's an indication of a requirement for urgent

6    care and something must be done relatively early in order to

7    ensure that something like the suicide doesn't occur?

8          THE WITNESS:  Yes, Your Honor.

9          THE COURT:  Is that an ideal requisite or is that

10    something that is realistically what happens in hospitals?

11          THE WITNESS:  I think it is very realistically what

12    happens in hospitals.

13          THE COURT:  Other than prison hospitals?

14          All right.  Thank you.

15    BY MS. VOROUS:

16    Q.    Doctor, isn't it correct that you don't have any

17    knowledge what treatment that this inmate was receiving prior

18    to being cleared for programming?

19    A.    What I do know is that for the three weeks there, the

20    only thing that was pointed out as far as treatment that he

21    received was the two groups, the one the night before he hung

22    himself and the one the morning before he hung himself.

23    Q.    Doctor, would you look at page 9 of the suicide

24    report.

25    A.    Yes.

70

1  Q.      Please refer to the last paragraph on page 9 that

2  begins with the word "During" and continues on "the first two

3  weeks."

4          If you look further down in that paragraph, isn't it

5  correct that at the very least he was seen by his treatment

6  team for 72 hours and a seven day team meeting?

7  A.      That's what it says, yes.

8  Q.      Doctor --

9          THE COURT:  I'm sorry.  I don't have any idea what

10 those words mean.  Do those words mean -- (Reading:)

11         During his orientation period he was described as

12         pleasant and frequently asked staff for books.  He

13         has been seen by his treatment team for 72 hours and

14         seven-day team meetings.

15         (Reading concluded.)

16         Do you know what that means?

17         THE WITNESS:  How I understand what that is, Your

18 Honor, is that within 72 hours the treatment team would meet

19 with the patient to have --

20         THE COURT:  So they would have one meeting?

21         THE WITNESS:  One meeting.  Then have another meeting

22 at the end of seven days.

23         THE COURT:  Excuse me, Miss Vorous.  I'm just trying

24 to read and understand it.

25         He was seen by his treatment team.  Doesn't that

71

1   indicate to you there was a treatment team?

2         I don't know what it means, but there was something

3   called the "treatment team"?

4         THE WITNESS:  Yes.

5         THE COURT:  Do you have any idea what that means?

6         THE WITNESS:  The treatment team, as I understand it

7   from reading the records of other cases, it includes a

8   psychiatrist, as well as other members of the staff that

9   would provide -- that work in that particular unit that

10  provides some sort of care.

11        THE COURT:  And as far as you can tell what that

12  means is he met with them once -- met once within 72 hours;

13  is that correct?

14        Is that the same thing?

15        THE WITNESS:  He met with them for a 72 hour and

16  seven day team meeting.

17        Now, we don't know exactly when that occurred, but

18  they're calling it so I'm assuming this was within the 72

19  hours, the first meeting, then seven days -- within seven

20  days for the second meeting.

21        THE COURT:  In your opinion would that be sufficient

22  for somebody who was being hospitalized for acute care?

23        THE WITNESS:  No, Your Honor, it isn't, to answer

24  your question.

25        THE COURT:  Tell me what else.

72

1          THE WITNESS:  When a person first comes into the

2     hospital, they need to be met at the door almost.  Once

3     they're processed and made sure that, you know, they have the

4     clothing and whatever, assigned to a room, they need to be

5     seen then for an initial assessment to make sure that they're

6     not at risk or what is going on with them or what kind of

7     meds, all these sort of things.

8          They need to be met initially by, at a minimum, a

9     psychiatrist and probably members of the nursing staff or

10    other members of the staff that are there so you can get an

11    idea.

12         And then once you have the person in the facility,

13    and you get some initial idea of what is going on, based on

14    what the initial eval included and reviewing the records,

15    then you may have a little more leisurely time to have a more

16    comprehensive team meeting.

17         So if they wish to initiate treatment right away,

18    when he comes in, which they should, then they want to wait

19    for three days to have a more comprehensive treatment

20    meeting, then I don't see anything wrong with that.

21         But they need to be seen immediately when they step

22    in the door, and the treatment needs to begin right then.

23         THE COURT:  In an ideal situation that may be the

24    most desirable procedure, but you're not in an ideal

25    situation.  You're in a prison situation, a prison hospital,

73

1    but still a prison situation.  Do you believe that by virtue

2    of that some other procedure would be acceptable?

3              THE WITNESS:  Given that it is in a prison hospital,

4    Your Honor, no, I don't.  Because what they basically

5    admitted to here is that for three days this guy was on his

6    own.  And fortunately nothing bad happened during that

7    three-day period, but it wasn't because of anything the staff

8    did.  They had no idea what was going on with this guy for

9    the first three days.

10             He needed -- in any hospital setting, be it a prison

11   hospital or at the university hospital, when the people come

12   into the room, come into the hospital, they're seen initially

13   so that the staff, especially the psychiatrist, has an idea

14   of what's going on with the person and can initiate a

15   treatment plan that is then subject to modification when they

16   see him more thoroughly, maybe a couple days later.

17             THE COURT:  You may proceed, Miss Vorous.

18   BY MS. VOROUS:

19   Q.       Dr. Stewart, I would like to clarify the record, if I

20   may.

21             The question that you were asked related to acute

22   care.  The Salinas Valley Psychiatric Program is an

23   intermediate care facility, correct?

24   A.       It is intermediate care.  I was referring to

25   hospital-based care.

74

1    Q.      You understand there is an acute program at the

2    Vacaville Psychiatric Program at the California Medical

3    Facility?

4    A.      I understand that there is a program you named

5    "acute" that's at Vacaville.  But it is a hospital program

6    and so is the program at Salinas Valley.  It is run by the

7    Department of State Hospital.  It is a hospital program.  It

8    is where the sickest people go.

9          THE COURT:  Let me understand what you just said.  Is

10   there some meaningful distinction between what's designated

11   by the prison system as "intermediate care" and "acute care"?

12         Is there some meaningful distinction?

13         THE WITNESS:  My understanding, Your Honor, is that

14   the acute care was designed for people like, say, Patient RR

15   who was acutely psychotic, needing immediate intensive care.

16   And then once he stabilized, he could then possibly be

17   transferred for a longer period of hospital care, into what

18   they call an intermediate care facility.

19         THE COURT:  Okay.  Thank you.

20   BY MS. VOROUS:

21   Q.      Doctor, if you would, please look at what you have in

22   front of you, Exhibit B in the binder you have in front of

23   you, please?

24         THE COURT:  B as in boy?

25         MS. VOROUS:  Yes.

75

1    BY MS. VOROUS:

2    Q.       This is the coroner's report?

3    A.       Yes.

4    Q.       Doctor, is it correct that the coroner determined

5    this inmate died of acute water intoxication?

6    A.       Where are you pointing out?

7    Q.       Look at page 4, which would be page 15 of 21 if you

8    are looking at the page numbers at the top of the report.

9    A.       Okay.  The question?  I'm sorry.

10   Q.       Whether it was -- the coroner determined this

11   inmate's death was due to water intoxication?

12   A.       Well, they have it listed "Cause Of Death," which is

13   "Hyponatremia," which means low serum sodium level.  So

14   that's listed as the cause of death.

15           Then they have -- underneath they have "Due To."  So

16   they have "Hyponatremia Due To Acute Water Intoxication Due

17   To Psychogenic Polydipsia."

18   Q.       What does the term "acute" mean?

19   A.       In general the term "acute" can mean a lot of things.

20   It can be something in a time frame or it could be a

21   severity.

22   Q.       How would you interpret the use in the context of

23   "acute water intoxication"?

24   A.       That he became water intoxicated in a relatively

25   short period of time.

76

1    Q.      Doctor, isn't it correct that the coroner's report

2    does not state that the diagnosis of psychogenic polydipsia

3    was ever confirmed?

4    A.      Well, I don't know confirmed, but they do list it as

5    a cause of -- if I understand this last page you pointed out,

6    that his acute water intoxication was due to psychogenic

7    polydipsia.  So that's what the coroner is stating there.

8            So I don't know if that is confirmed or not, but

9    that's what is stated here in the record.

10   Q.      Isn't it accurate that the coroner's report does not

11   indicate anywhere that the Department of State Hospital

12   clinicians had diagnosed this inmate with psychogenic

13   polydipsia?

14   A.      No.  I think that's the problem.  They didn't

15   diagnose him.  They weren't aware of the fact that he had

16   gone out -- I mean, it is not apparent from this because this

17   is all I reviewed in this case, the coroner's report.  And

18   the coroner's report said this person was at a hospital in

19   November for the same situation but survived.

20           And so that's one of my points on direct testimony,

21   is that it appeared to me the staff wasn't aware that this

22   gentleman had psychogenic polydipsia.

23   Q.      It is true that there is nowhere in the coroner's

24   report that states that his death had anything to do with

25   staffing shortages, correct?

77

```
 1            THE COURT:  With what?

 2            MS. VOROUS:  Staffing shortages.

 3            THE WITNESS:  The coroner's report doesn't list --

 4    doesn't state anything about staffing shortages.

 5            MS. VOROUS:  Nothing further, Your Honor.

 6            MR. NOLAN:  Your Honor, just one quick point on

 7    redirect.

 8                        REDIRECT EXAMINATION

 9    BY MR. NOLAN:

10    Q.      Doctor, if you would, look at the Prisoner A suicide

11    review which is Exhibit C in the binder.

12    A.      Yes.

13            THE COURT:  C as in Charlie?

14            MR. NOLAN:  C as in Charlie.

15    BY MR. NOLAN:

16    Q.      On page 12 in the second full paragraph under

17    Discussion Conclusions?

18    A.      Yes.

19    Q.      So we talked about the treatment given to Patient A

20    in his first 21 days at the program.  Could you read the

21    second -- starting with the second sentence, read those two

22    sentences and please try not to use his name.

23    A.      The second sentence?

24    Q.      Second and third sentence --

25            The next one, "The delay"?
```

78

```
 1   A.      (Reading:)

 2           The delay in transfer to the Department of State

 3           Hospital Salinas Valley may have frustrated him, but

 4           certainly the delay in his ability to program out of

 5           his cell aggravated him.  Inmate A had been

 6           programming on the yard at State Prison Sacramento,

 7           but when transported to DSH Salinas Valley, he

 8           was placed alone in his cell and was not allowed to

 9           program as he had at Sacramento.

10           (Reading concluded.)

11           Do you wish me to continue?

12   Q.      One more sentence.

13   A.      (Reading:)

14           This was compounded by the one week delay of the ICC.

15           (Reading concluded.)

16   Q.      So Doctor, in your opinion what would be an

17   appropriate time to start group treatment and out-of-cell

18   treatment for this individual?

19   A.      I think after you have your initial assessment of him

20   and the initial treatment plan and whatever custody things

21   need to occur, they need to occur in that same time frame

22   simultaneously.  And the treatment should begin, you know,

23   literally the same day or the next day at the latest.

24           MR. NOLAN:  Thank you, Doctor.

25           THE COURT:  Further cross, ma'am?
```

79

1          MS. VOROUS:  No.

2          THE COURT:  You may step down, Doctor.

3          THE WITNESS:  Thank you, Your Honor.

4          MS. RIFKIN:  Good afternoon.  Lori Rifkin for

5     plaintiffs.  We would like to call our next witness.

6          THE COURT:  You may proceed.

7          MS. RIFKIN:  Plaintiffs call Dr. Joel Badeaux.

8          THE CLERK:  Please, remain standing and raise your

9     right hand.

10                    DR. JOEL BADEAUX,

11    was thereupon called as a witness herein by the Plaintiffs,

12    and having been sworn to tell the truth, the whole truth and

13    nothing but the truth, was thereupon examined and testified

14    as follows:

15         THE CLERK:  Please, take a seat.  State your name and

16    spell your last name for the record.

17         THE WITNESS:  Joel Badeaux, my last name is spelled

18    B-a-d-e-a-u-x.

19         MS. RIFKIN:  Your Honor, Dr. Badeaux is a

20    psychiatrist who worked at Salinas Valley Psychiatric Program

21    from August 2012 through March 27, 2013.

22         He submitted a declaration to the Court in support of

23    plaintiffs' motion.  The amended version of that declaration

24    is Document Number 4560-1 in the record, filed on April 22nd,

25    2013.

80

1          Dr. Badeaux is also the signatory of two letters to

2     the executive director of Salinas Valley Psychiatric Prison

3     from the entire psychiatry staff that are in the records as

4     Exhibits B and C to the Badeaux Declaration.

5          He also wrote a letter to U.S. Attorney General

6     Holder regarding the situation at Salinas Valley.  That is in

7     the record as Exhibit D at the Badeaux Declaration.

8                         DIRECT EXAMINATION

9     BY MS. RIFKIN:

10    Q.    As a preliminary matter, Doctor, is anybody paying

11    you to be here today?

12    A.    No.

13          THE COURT:  I'm sorry.  Do we have information

14    concerning his ability to be an expert witness?

15          MS. RIFKIN:  We're not presenting Dr. Badeaux as an

16    expert witness but as a percipient witness, Your Honor.

17          THE COURT:  But he's going to be a percipient witness

18    about -- Well, until there is an objection, you may proceed.

19    BY MS. RIFKIN:

20    Q.    As a preliminary matter, Doctor, is anybody paying

21    you to be here today?

22    A.    No.

23    Q.    Have any of the parties paid you in connection with

24    your testimony in this case?

25    A.    No.

81

1    Q.      Are you here voluntarily?

2    A.      Yes.

3            THE COURT:  May I ask you to pull up just a bit to

4    the microphone, sir.

5            THE WITNESS:  Sure.

6            THE COURT:  Thank you.

7    BY MS. RIFKIN:

8    Q.      Doctor, can you summarize the concerns that led you

9    to write the letter to Attorney General Holder and to sign on

10   to the letters in the record from the psychiatric staff to

11   executive director DaSilva?

12           MR. RUSSELL:  Objection, Your Honor.  Compound.

13           THE COURT:  Is there any difference in the -- My

14   goodness.  Overruled.

15           THE WITNESS:  The primary reason was understaffing --

16   concerns about understaffing at the Salinas Psychiatric

17   Program.

18           THE COURT:  Is that true as to your motivation as to

19   both letters?

20           THE WITNESS:  Yes.  That was our motivation.  We

21   wrote two group letters.  Then my letter to the Attorney

22   General, that was the primary reason.  I listed a lot of

23   concerns in the letter, but that was, you know, the acute,

24   and the departure of five or 4.75 psychiatrists in one week.

25   I was very concerned about the situation there.

82

1    BY MS. RIFKIN:

2    Q.      When you say "situation," were there any other large

3    areas of concern that motivated you to sign on to these

4    letters?

5    A.      Also the conditions for the inmates, the lack of

6    basic supplies, specifically underwear, blankets, you know,

7    skin cream, soap, things like that.  But the underwear and

8    blankets I found very disturbing, as well as the lack of -- I

9    mean, there were, you know, a number of problems with the

10   program and just a frustration because they didn't seem --

11   the problems didn't seem to be addressed in a timely manner.

12   Q.      So let's take those points one by one.  You mentioned

13   a staffing shortage.

14           Can you describe the staffing shortage that you

15   experienced?

16   A.      Yes.

17           MR. RUSSELL:  Objection, Your Honor.  Lacks

18   foundation.

19           THE COURT:  Foundation about what he experienced?

20           MR. RUSSELL:  Foundation as to whether or not he can

21   opine if there are staffing shortages.

22           THE COURT:  Overruled.  You may answer.

23           THE WITNESS:  Yes.  When I arrived at the program the

24   typical caseload was about 40 patients per psychiatrist.  And

25   I did a few weeks of training where I wasn't on the unit,

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

83

1    where I later came to be assigned, which was in Delta-6 or

2    D-6.

3            But during -- before I -- or actually in my first

4    week of being assigned on Delta-6, first one psychiatrist

5    left, it was her last week, then another.  I ended up being

6    the only psychiatrist on all of Delta-6 for my first two

7    months on the unit.  My caseload at that time was 60

8    patients.

9            THE COURT:  Let me go back.  One in 40 -- you know,

10   nobody wants to tell me who you are, but you're a

11   psychiatrist?

12           THE WITNESS:  Yes.

13           THE COURT:  How long have you been a psychiatrist?

14           THE WITNESS:  Sure.

15           THE COURT:  Why don't you give me your general

16   background so we can get through with this.

17           THE WITNESS:  I'm a psychiatrist.  Board-certified.

18   I have been in California about two years now.  And first,

19   you know, I worked at Napa State Hospital.  And I ended up

20   almost getting laid off so I found a position at

21   Salinas Valley Psychiatric Program and went down there and

22   worked for another six months.

23           I'm currently doing temporary-type work for

24   Santa Cruz County in community mental health.

25           THE COURT:  Let me ask you this:  In your experience,

84

1   given the level of psychiatric problems that you encountered

2   while at Salinas, is a caseload of 1 to 40 acceptable for the

3   ability to provide adequate treatment?

4            THE WITNESS:  No.  Definitely not.

5            THE COURT:  How about 1 to 60?

6            THE WITNESS:  Absolutely not.  Even worse.

7            THE COURT:  You may proceed.

8            Sometimes you have to ask really silly questions so

9   they're in the record, sir.

10           You may proceed.

11  BY MS. RIFKIN:

12  Q.       Doctor, just to clarify, can you explain a little bit

13  more about the circumstances when you said that you were

14  almost laid off at Napa State?

15  A.       Yes.  That was the big budget crisis, state layoffs.

16  And I was the psychiatrist with the least seniority at Napa

17  State Hospital.

18           I had moved out from Arizona where I trained and did

19  residency, then worked.  I worked in civil commitments in

20  Arizona similar to 5150s -- or actually the 5250s.  I did

21  that for about a year at the same hospital I trained with in

22  the Phoenix area.

23           And so, yeah, I moved to Napa.  Then all of a sudden

24  the layoffs hit.  And my layoff was cancelled with a week to

25  go, but I had made plans to move to Salinas Valley so I went

85

1    ahead and moved and took the new position.

2    Q.      To return to talking about your caseload, Doctor, you

3    said when you started many of the psychiatrists had 1 to 40.

4    You were the only person on your unit so you had 1 to 60.

5    Were there occasions when your caseload was higher?

6    A.      Yes.  There were only -- I was -- I had 60.  And my

7    coworker on Delta-5 had 60.  So when he was out, you know,

8    sick or also on Fridays he wasn't scheduled, we do four-day

9    workweek, I would cover for his patients.

10          So that doesn't mean they're assigned to me, they

11   weren't, his 60.  It would be emergency-type coverage,

12   whatever, acute situations.  And so that would be another 60.

13   So it would be 60 of my own and 60 coverage.

14   Q.      To clarify, is it your testimony that happened every

15   Friday?

16   A.      Basically.

17   Q.      Regularly on Fridays?

18   A.      Yes.

19   Q.      Dr. Badeaux, are there any other -- or can you

20   describe what the components of your job as a psychiatrist

21   were while you were at Salinas Valley?

22   A.      Yes.  Primarily the clinical care of the patient.  I

23   didn't do forensic evaluations or anything like that.  So it

24   was basically admissions, you know, identifying the patient's

25   needs, including medication, which was, you know, certainly

86

1    our primary responsibility as a physician.

2         And, you know, we were the ones with prescribing

3    abilities.  So medication, if they needed it and, you know,

4    reviewing lab work, all things associated, identifying

5    symptoms.  Of course problems, you know, and listening to the

6    patient, establishing rapport, seeing what is going on.

7         And, you know, most importantly, you know, danger to

8    themselves or others, you know, is always what we were

9    looking out for, you know, above all else, safety.

10   Q.    When you talk about the patients on your caseload,

11   what does that mean?

12        What kind of care would you provide them?

13   A.    Right.  So we had our monthly IDTTs so, you know, the

14   entire treatment team would meet with them.  So that's a

15   given.  But patients generally, especially recent admissions,

16   they need to be seen more than that.  So pretty much it would

17   be based on clinical judgment how often you would see them.

18        I would see them as often as I could based on how

19   often I felt they needed to be seen.  And, you know, a lot of

20   it is if they made a request and the little slip was in my

21   box that they were requesting to be seen, as well as nursing

22   staff and others alerting me that a patient is not doing well

23   or something else because I pretty much could not, with that

24   caseload, go around and check on patients, you know,

25   constantly.

87

1          If I didn't -- if someone didn't alert me, you know,

2     I would be at risk of not seeing them, not knowing they're

3     even having a problem.

4     Q.     When you say "with that caseload" you weren't able to

5     do that, can you explain more what you mean how that is

6     connected to your caseload?

7     A.     Well, for instance --

8          THE COURT:  He's busy doing what he could do.  With

9     that level you just didn't have time to see anybody, right?

10          THE WITNESS:  Right.  I mean, not as often as I think

11     they should have been seen.

12          By contrast, at Napa, I saw everyone and wrote on

13     everyone weekly.  That would be the minimum there.  For

14     the -- I saw people at Napa, and I did the admissions unit.

15          Typically I wrote them weekly.  I think we had to for

16     the first two months, but I wrote on them weekly for three

17     months.  And, you know, I would see patients daily if they

18     needed it.  Because a lot of times, when they first arrive,

19     they're doing very badly.  They haven't been on medication.

20     They're acutely psychotic and unstable and maybe dangerous to

21     themselves or others.  And, you know, they may need to be

22     seen every day.

23     BY MS. RIFKIN:

24     Q.     What was your caseload at Napa?

25     A.     Fifteen.

88

1    Q.      And when you say that you would see patients at

2    Salinas Valley, where would these -- where would your

3    meetings with patients take place?

4    A.      Well, IDTT were in the treatment room with privacy.

5    Relative, you know.  The MTAs were there.  No COs.  That was

6    policy.  But many of -- the majority of my trips to see

7    patients -- to see the patients for evaluations and

8    assessments of the patients were done at cell front.

9    Q.      Why were they done at cell front?

10   A.      Basically, the amount of time to pull a patient -- to

11   have the MTA and staff resources required to have them pulled

12   out, to sit down and talk to me...  You know, several times I

13   tried this, and it's:  Well, we'll see later, you know.  That

14   type of thing.

15          You know, eventually I just, you know, had the habit

16   of doing cell front unless in the cases of the most dangerous

17   or acute patients.

18          And when we, as a treatment team, you know, we really

19   need to talk to them about safety issues, and usually it was

20   then multiple staff involved seeing them.  That's when we

21   pull them out.

22          THE COURT:  Let me be clear.  I think I understand,

23   but maybe I don't.

24          You were seeing people at cell front because, for

25   whatever reason, staff was not responsive to having pulled

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

89

1    out patients so that you could see them in a more appropriate

2    setting.

3            Is that right or wrong?

4            THE WITNESS:  That's correct.

5            Any time staff were used to pull patients for me,

6    those are staff not available to participate in groups, to

7    pull patients for groups and activities.

8            So if I use those resources, they wouldn't be

9    available for groups or elsewhere.  It is a very limited

10   resource, the MTAs and pulling patients.

11           So, you know, I used that resource only when I really

12   felt it was necessary.  Unfortunately, you know, the

13   patients -- the problem with seeing them cell front, you

14   know, their neighbors through the cell can, you know, hear

15   them basically.  So there's a lack of confidentiality.

16   They're not going to tell you the same things they would if

17   you pulled them out.  They may have -- they don't want their

18   peers to know what is going on.  And, you know, without that

19   confidentiality...

20   BY MS. RIFKIN:

21   Q.      Without the confidentiality -- what could the

22   consequences be of the lack of confidentiality of seeing your

23   psychiatrist cell front in your experience?

24   A.      Well, they may not feel comfortable telling me at

25   cell front they're suicidal or homicidal or something, you

90

1    know, very concerning.  You know, that's very important.

2    Or that their voices have gotten worse.

3         You know, there's all kinds of -- or that they're

4    having a problem with their peer, their peer is right there

5    within earshot.

6         There are all manner of, you know, issues that they

7    may not be willing to disclose, you know, at cell front.

8    Q.    You talked about the scarce resources of the MTAs.

9    Were you aware, while you were there, if there was -- if the

10   MTA position was fully staffed at Salinas Valley Psychiatric

11   Program?

12        MR. RUSSELL:  Objection.  Lacks foundation.

13        THE COURT:  If you know?

14        Do you have any way of responding to that question?

15        THE WITNESS:  I really don't.  I was not kept

16   informed of the MTA staffing situation.  I heard more from

17   the nursing, but the -- you know, as far as how many open

18   positions or that type of thing...

19        I knew about the general layoff plan.  Obviously, if

20   people are being laid off, they may leave and look for new

21   jobs.

22        I was not aware of how many open positions, you know,

23   there might be or might not be with the MTAs.

24   BY MS. RIFKIN:

25   Q.    So when you talked at the beginning about a staffing

91

1   shortage, what categories of staff were you aware of a

2   shortage in the Salinas Valley Psychiatric Program while you

3   were there?

4   A.      Nursing I was acutely aware.  Particularly the

5   biggest problem was some period -- after several months of

6   being there from all of a sudden there would only be one RN

7   for the entire floor in the morning shift.

8           That's when we did IDTTs.  So if that RN was sitting

9   in with us, they weren't out on the floor, you know, seeing

10  patients, managing medication, writing their -- doing

11  whatever, covering the entire floor.

12          So they were either with us or -- and they would have

13  to leave and cover the floor.  So they would be in and out of

14  the treatment team meetings.

15          And they were very upset and very vocal about the

16  lack of coverage having only one RN on the floor.  And, you

17  know, it seemed to be a regular trend in the day shift.  It

18  happened regularly.

19  Q.      What about were there any staffing shortages you were

20  aware of with mental health staff positions?

21          MR. RUSSELL:  Objection.  Lacks foundation.

22          THE COURT:  Overruled.   You may answer.

23          THE WITNESS:  Let's see.  I would --

24          THE COURT:  You knew there were an insufficient

25  number of psychiatrists.

92

1          THE WITNESS:  Yeah.  That I knew.  Yeah.  That I knew

2     very well.

3          Social workers.  I went through three or four social

4     workers.  They kept quitting and leaving, and so I was very

5     aware of that.  I mean, we were like, okay, the next social

6     worker.  It was kind of a running joke.

7          They were -- the turnover rate, at least on our unit,

8     was, you know, even higher than the psychiatrists or -- you

9     know, it was very high.

10          That was very concerning because then basically the

11     RT would have to like or would be asked to like do social

12     work things, which was not really appropriate.  But other

13     needs were just not met.  You know, things the RT wasn't

14     trained for, you know.

15          THE COURT:  What is an "RT"?

16          THE WITNESS:  Recreation therapist.

17          THE COURT:  What about psychologists?

18          THE WITNESS:  Psychologists?  No.  We had

19     psychologists.  We were staffed on our unit.  You know, they

20     had problems, you know.  I mean, I know -- I know -- I mean I

21     think they had staffing problems.  But I was never without a

22     psychologist during my time there.  So I didn't have a lot of

23     staffing problems as far as psychologists.

24     BY MS. RIFKIN:

25     Q.     After you wrote the letters with the other

93

1    psychiatrists to Executive Director DaSilva about the

2    shortage of psychiatrists, did the staffing situation for

3    psychiatrists change?

4    A.    No.  We didn't get a response.  We wrote the letter,

5    and three weeks later we still had not gotten, you know, any

6    response, either written or in person, talking to us until

7    the date of our second letter.

8         On that date, three weeks later, Dr. Troncoso, who

9    was our senior psychiatrist, or acting senior, went to

10   Mr. DaSilva's office and invited him in.  Again, he came in

11   to come in and talk to us.  But he had been invited several

12   times in the weeks leading up to that and had not attended so

13   we were glad to hear from him.  And he talked to us.

14        But at that point, unfortunately, I know from talking

15   to my colleagues, many of them had made plans to leave and

16   were very disillusioned.  Our morale as a department had

17   plummeted.  Our faith in the administration and leadership

18   had, you know, also plummeted.  And it seemed very much too

19   little too late.

20   Q.    And in your letters with the other psychiatrists to

21   Executive Director DaSilva, besides the shortage of

22   psychiatrists, you also requested that admissions be reduced

23   or stopped; is that right?

24   A.    That's correct.

25   Q.    And were admissions reduced or stopped as a result of

94

1    the letters?

2    A.      No.

3    Q.      Why are admissions sort of a key thing to focus on?

4    A.      In inpatient psychiatry the things that take up a lot

5    of time are admissions.  Discharges also take up a

6    considerable amount of time.

7            The paperwork, it's a typed report that we're

8    supposed to do and -- you know, for the admission as well

9    as -- the admission is the most time intensive and important.

10   Identifying the needs.  You know, getting the patient started

11   on medications, changing medications.

12           Typically the reason why they're there is because

13   they were not doing well where they came from.  The

14   medication they were on was not working.  If it was working

15   that well -- or maybe they weren't on medication for that

16   symptom.

17           You know, they probably wouldn't have come to us if

18   they were doing well.  So it's that -- you know, it is

19   very -- and those are the patients at the greatest risk,

20   typically of danger to themselves or others.  They're the

21   most unstable.

22           Studies have shown that suicides is the greatest

23   risk -- you know, is at the highest risk, you know, in the

24   period just after admission.  And so those are the most time

25   intensive.  So the more of those you have, the more your

95

1    workload goes up tremendously.  And, you know -- so that's a

2    big factor for the number of admissions, as well as, you

3    know, what your caseload is.

4    Q.      Doctor, in your declaration you talked about feeling

5    a sense of pressure to discharge a certain number of patients

6    every week so that there could be more admissions.

7           Can you talk more about that?

8    A.      Yes.  This came up many times in our psychiatry

9    departmental meeting, complaints particularly from the

10   psychiatrists on C-yard, Charlie-yard, having felt they were

11   under a lot of pressure.  And the administrative staff were

12   very aggressive in, you know, trying to dictate whether

13   patients, you know, should be discharged.

14          And they were -- the three psychiatrists over there

15   were very upset about that situation.  And I felt the

16   pressure on our yard.  The administrative staff was more --

17   you know, I don't think they pressured us as much as my

18   colleagues were really feeling.  So I thought we had it

19   better on that front.

20          But I did -- the program administrator, she, you

21   know, had an email.  And I mean the target was three

22   discharges per week per unit.  So six units so that would be

23   18.

24          And, you know, we had some weeks we had 18 admissions

25   and things.  But typically, fortunately, we did not.  But a

96

1    lot of that was felt to be, you know, that we were putting up

2    resistance, not discharging people so there were no beds so

3    we were not -- you know, therefore, you know, having 18

4    admissions.

5            THE COURT:  So these program administrators, they're

6    not psychiatrists?

7            THE WITNESS:  No.

8            THE COURT:  Do you know how they -- what their

9    background is?

10            THE WITNESS:  It varies.  You know, some -- I mean,

11    that's one thing I find concerning with the state.  You know,

12    where I came from, originally when I was back in Harris

13    County in the Houston, Texas area, I was a supervisor in a

14    psychosocial rehabilitation program.  They told me, you know,

15    I could not be any type of supervisor without a master's

16    degree.

17            And for the state, I mean you have people reaching

18    the highest levels of administration with only a bachelor's

19    degree.  So many of the administrators have only bachelor's

20    degrees.

21            I don't know the educational background of every

22    administrator, but I found that concerning.  Some can be very

23    good without the degree, but some, you know, are not.

24            And so -- but I found that very, you know, out of

25    step with everything I had heard coming from elsewhere of,

97

```
 1    you know, the degree requirements to be -- to work in
 2    administrative healthcare.
 3          MR. RUSSELL:  Your Honor, move to strike as
 4    nonresponsive and lacks foundation.
 5          THE COURT:  Overruled.  You may proceed.
 6    BY MS. RIFKIN:
 7    Q.    Dr. Badeaux, going back to the standards -- or the
 8    target you described of three patients per unit per week, was
 9    it ever communicated to you why this was the expectation?
10    A.    Yes.  To reduce the waiting list to zero.
11    Q.    Was it ever communicated to you why that was
12    important?
13    A.    Yes.  To satisfy the Coleman requirements.
14    Q.    And Dr. Badeaux, are you aware of the staffing
15    situation regarding psychiatrists now at Salinas Valley?
16    A.    I'm not aware of the details of it.  I have quite a
17    few friends there.  I'm aware of some of the details.  But
18    it's all secondhand.  I'm aware of some of, you know, who is
19    coming and who is going.
20    Q.    Have you been back inside Salinas Valley since you
21    resigned?
22    A.    No.
23    Q.    But some current employees you said have told you
24    about the staffing?
25    A.    Yes.
```

98

1          MR. RUSSELL:  Objection, Your Honor.  Calls for

2     hearsay.

3          THE COURT:  She's going to ask that question, and

4     then that objection will be sustained.

5          THE COURT:  I suggested you not ask the question,

6     ma'am.

7          MS. RIFKIN:  For the record, Your Honor, these

8     psychiatrists whom he was deposed about work -- are current

9     employees of defendants.

10          THE COURT:  Thank you, ma'am.  The objection is

11     sustained.

12     BY MS. RIFKIN:

13     Q.    Dr. Badeaux, going back to the letters, you testified

14     that the staff didn't increase and the admissions were

15     not reduced or stopped.

16          Did you ever see any changes in the psychiatric

17     program in response to your letters?

18     A.    The first changes we saw were, unfortunately, after

19     our letter -- you know, our letters were leaked to the

20     Coleman attorneys, the inmates' attorneys.  And then we saw

21     an immediate response and, you know, listening to our

22     concerns, et cetera.

23     Q.    Dr. Badeaux, in your declaration and earlier you

24     articulated concerns about supplying inmates in your units

25     with basic needs such as underwear.

99

1          Can you describe this more for the Court?

2    A.      Yes.  I had several MTAs tell me, you know, about the

3    lack of supplies, as well as inmates themselves, you know.

4          For some reason they were not able to get clean

5    underwear.  That's the thing that disturbed me the most.

6    Socks also.

7          And one psychologist, you know, in Delta-5 and 6,

8    wrote an email about the supplies.  At that time it was the

9    winter months.  And on Delta-6, C-pod got very cold.  You

10   know, there is some problems with -- you know, I don't know

11   what it is, the insulation or something.  It was getting very

12   cold, you know.  And blankets were a big problem.  That kind

13   of resolved itself, then the weather got warmer.

14         But I was, you know, really glad to see -- you have a

15   lot of caring staff, you know, who work there.  And he's one

16   of them.  I mean, he immediately wrote an email about those

17   concerns.  I just -- you know, for some reason the concerns

18   didn't seem to be getting addressed unfortunately.

19         MR. RUSSELL:  Move to strike, Your Honor, based on

20   hearsay.

21         THE COURT:  Overruled.  You may proceed.

22   BY MS. RIFKIN:

23   Q.      When you said the underwear was what bothered you

24   most, why is that?

25   A.      Basic human dignity.  You know, I think any one of

100

1  us, if we had to wear the same pair of underwear, wash it

2  ourselves in the sink, perhaps dry it out, would -- it just

3  lessens your sense of self.

4       It is such an inexpensive thing.  You know, it seems

5  like, you know, that is something very fixable, you know, in

6  the short-term, just buying the supplies, getting them,

7  transporting them there.  And for whatever reason, you know,

8  the problem just persisted.

9  Q.    How long did it persist while you were a psychiatrist

10  in Salinas Valley?

11  A.    I would say -- let's see.  It was my last -- I would

12  have to look at the date of the psychologist --

13       THE COURT:  Is it fair to say --

14       THE WITNESS:  Three months or more.

15       THE COURT:  How long were you employed there?

16       THE WITNESS:  Six months.

17       THE COURT:  So you became aware of it about three

18  months into your stay; is that correct?

19       Roughly?

20       THE WITNESS:  Yes.  I believe when we wrote the

21  letter it was wintertime still.  Yeah.  I stayed until the

22  end of March.  So my best guess would be about three months.

23  BY MS. RIFKIN:

24  Q.    Had the underwear problem been resolved by the time

25  you left?

101

1    A.        No.  Not on Delta-6 where I worked.

2              THE COURT:  Let me ask you this:  Was there any

3    acknowledgment by supervisors to you that there was a

4    problem?

5              THE WITNESS:  I asked about it later.  This was --

6    well, I had heard indirectly from other staff there seemed to

7    be a problem where our supplies would be sent out for laundry

8    and we would get back not what we sent.

9              THE COURT:  You didn't have that experience yourself?

10             THE WITNESS:  I mean, I don't know.  This is what I

11   heard from other staff, that somehow there was a problem.

12   But -- you know, I can understand that, but then over time

13   they should still be fixed.

14             THE COURT:  You move to strike?

15             MR. RUSSELL:  Yes, Your Honor.

16             THE COURT:  Motion granted.

17             You may proceed.

18   BY MS. RIFKIN:

19   Q.        Earlier Dr. Stewart testified about orientation

20   status.  How long does this orientation or cuff status last

21   when a patient first comes to Salinas Valley?

22   A.        I would estimate the typical time was ten days.

23   Q.        And do you know how long the standard period of time

24   it's allowed to last is?

25   A.        I know mine I had some two weeks.  And we had one

102

1    case, I think I wrote about it in my declaration, of an

2    inmate coming back after court that was -- it was more than

3    two weeks that he had to wait.

4              THE COURT:  I don't understand how cuff status works.

5              When the person is in the cell, he's not in cuffs, is

6    he?

7              THE WITNESS:  That's correct.

8              THE COURT:  He's only in cuffs when?

9              THE WITNESS:  Coming to IDTT team treatment meetings

10   or really out in the unit, at all --

11             THE COURT:  In other words, if he's in his cell, he's

12   not cuffed.

13             THE WITNESS:  Right.

14             THE COURT:  If he's out of his cell, he's cuffed?

15             THE WITNESS:  That's correct.

16   BY MS. RIFKIN:

17   Q.    What other restrictions are involved with what is

18   referred to as "cuff status" and defendants call "orientation

19   status"?

20   A.    The problem is, you're not able, if you're on cuff

21   status, to participate in most groups and activities.

22             Matter of fact, almost all groups and activities you

23   won't be able to participate in if you're in cuff status.

24   Q.    When you say "groups," "therapeutic groups"?

25   A.    Yes.

103

1  Q.      What about yard?

2  A.      Also yard.

3  Q.      To clarify, you're not allowed to participate?

4  A.      You're not allowed if you're cuff status.

5  Q.      Are you allowed to participate on dayroom?

6  A.      Sometimes solo dayroom is given when you're out on

7  your own.  You can go around, you know.  But not with the

8  other -- their peers, the other inmate patients.

9  Q.      If a cuff status patient were out in dayroom, would

10 that require additional staff to be out on the dayroom with

11 that patient?

12 A.      Correct.

13 Q.      Did that happen often while you were there?

14 A.      It happened.  Still, the patient is not able to go to

15 any groups involving his peers.  So it is, you know, not

16 really therapeutic.  More like making a phone call or, you

17 know, being out, stretching around.  I mean, you know, it's

18 not the same as participating in the groups.

19 Q.      How long would you guess that someone -- or not would

20 you guess.

21         How long in your experience would an inmate in cuff

22 status be in their cell per day?

23 A.      Almost all the day.  I mean, they might come out for,

24 you know, treatment team meetings, or if they had solo they

25 might come out for that.  Otherwise, I mean, they would

104

1    spend -- or if they had a medical appointment.  But typically

2    they, you know, they wouldn't come out.

3            Trying to think when they would come out.

4            You know, I don't think they would a lot of times if

5    they -- if there wasn't a specific reason.

6            MR. RUSSELL:  Move to strike, Your Honor.  Lacks

7    foundation.

8            THE COURT:  Overruled.

9    BY MS. RIFKIN:

10   Q.      In the treatment teams you testified earlier, that's

11   the once-a-month treatment meeting?

12   A.      Yes.

13   Q.      Can clinicians remove someone from cuff status?

14   A.      Oh, by the way, the other reasons to be brought out,

15   to go to nursing, you know, room, to be evaluated, things

16   like that.  For medical reasons they might be brought out.

17           But can you repeat the question?

18   Q.      Sure.  Can clinicians remove someone from cuff

19   status?

20   A.      No.  Cuff status, the final call on that is made by

21   the senior MTA.  And we do -- the entire treatment team,

22   including the psychiatrist, gives input -- important input.

23   But they make the final call.

24           And, you know, you might have disagreements or you

25   might not.  But it was, in my experience, when the senior

105

1    MTAs they're safety conscious and conservative making the

2    calls.  They're not just, you know, going to release somebody

3    from cuff status, you know, without very careful

4    consideration.  And they're conservative on making that call.

5    Q.      In your experience if a clinician observed someone

6    decompensating while on cuff status, can that clinician

7    override cuff status?

8    A.      No.

9    Q.      In your opinion should any changes be made to cuff

10   status based on your experience as a treating psychiatrist at

11   Salinas Valley?

12          MR. RUSSELL:  Objection, Your Honor.  Calls for

13   expert testimony and opinion.

14          THE COURT:  I'm now more than satisfied he can answer

15   the question.

16          You may proceed, sir.

17          THE WITNESS:  I think ideally -- I mean, if you could

18   get the whole delay -- I mean, it's CDCR staff rather than

19   DSH coming over to do the evaluation, the ICC.

20          If you could, you know, lower the time, that would

21   be, you know, much better for the treatment for the patients.

22   It would be nice by coming into the community after a 72-hour

23   hold on a 5150 or something like that.  I mean, if it could

24   be done in that amount of time or something like that, that

25   would be like ideal.

106

1          Something like that, after 72 hours, or by a week,
2    would be great.  If, you know, it takes longer -- there is
3    limitations on staffing.  But sometimes, just when a patient
4    is doing well and ready to go to groups, it is very
5    frustrating watching the patient decompensate and start
6    yelling out.
7          My patient that went to court and came back, weeks
8    went by.  He was, like, really getting agitated.  And all of
9    the staff felt bad.  There was nothing we could do.
10          THE COURT:  The problem with extended time for making
11    a cuffing decision in your experience or in your view is
12    inadequate staff to make that judgment within 72 hours?
13          THE WITNESS:  I'm not sure why they couldn't come
14    over more often or every week, like by the next week.  After
15    admissions one week, maybe the next week they would be
16    cleared.  But, you know, it just didn't happen.
17          I'm not aware of what the staffing situation is on
18    the other side.  But it was frustrating for us, mainly when a
19    patient is doing well.  Because, you know, if somebody is not
20    doing well, you know, they might be dangerous to themselves
21    or others, maybe they need to be on cuff status longer.
22          But if somebody is doing well, ready to program and,
23    you know, they're having to wait for those arbitrary reasons,
24    it is frustrating for staff and the patient.
25    ///

107

BY MS. RIFKIN:

Q.      Can those decisions be made on an individual basis?

A.      Not on the initial clearance.  Not on cuff status.
Later they might be put on for behavior -- aggressive
behavior.  They might be put on cuff status.  Then the senior
MTA would make the call.  But they have to be cleared by ICC
initially.

Q.      To clarify, that was -- that's the policy as you
experienced it?

A.      That's the policy.  And even the senior MTA on the
unit cannot make that call if they have not cleared yet.

Q.      Since you left, have you been contacted by any
managers of the Department of State Hospitals or California
Department of Corrections and Rehabilitation?

A.      I have.  So I think one of my colleagues gave my
number to one of the psychiatrists in Sacramento.  And she
called me and asked if it was okay for the new chief
psychiatrist/medical director, Dr. Bleman, to contact me.

        I said it would be okay, it would be fine, and he
emailed me.  Then I called him.

Q.      Is that the new chief of psychiatry at the Salinas
Valley Psychiatric Program?

A.      Yes.  So --

        THE COURT:  There is no question pending.  I bet you
she's going to ask you a question, although she indicated she

108

1    just wanted you to keep talking.

2            He only answers questions, ma'am.

3            MS. RIFKIN:  Absolutely.

4            THE COURT:  Oh, right.

5            Sorry.  Go ahead.

6    BY MS. RIFKIN:

7    Q.      Why did he contact you?

8            MR. RUSSELL:  Objection.  Calls for speculation.

9            THE COURT:  Why did he tell you he contacted you?

10   BY MS. RIFKIN:

11   Q.      Why did he tell you he contacted you?

12   A.      Basically staffing.  They're really trying to get

13   psychiatrists in there.  And, you know, since I left I'm

14   impressed that they really are trying to get people and bring

15   in staff now that the problem has kind of been put in the

16   spotlight.

17           And so I talked to Dr. Bleman.  And, you know, he

18   wasn't sure whether or not it would be okay for me to come

19   back because of my involvement in the Coleman case and

20   things.

21           But we talked.  And, you know, I told him at this --

22   at that time I wouldn't be ready to come back anyway, but it

23   is something, you know -- it's -- you know, someday, I mean

24   hopefully, you know, I don't want to close any doors,

25   although they may be closed for me.  I don't know.  Anyway,

109

1   that's what he was inquiring about.

2   Q.      Why wouldn't you want to go back to work at Salinas

3   Valley Psychiatric Program today?

4   A.      Well, I asked him a number of things.  I mean, at

5   that time he -- I asked him about the underwear thing and he

6   didn't really answer so I assumed that hadn't been fixed.

7          Then I'm very concerned still with the proposed plan

8   to move patients from the Salinas Valley Psychiatric Program

9   to the new Stockton facility, in particular the rate that was

10  planned, as far as how many inmate patients were going to

11  moved in how short a period of time.

12         Specifically, Director DaSilva in a big meeting in

13  front of all the staff in Delta -- you know, outside the

14  Delta yard in a meeting hall, his timeline was two months.

15  That would be 242 patients.

16         So, you know, basically you're talking 30 patients a

17  week at that rate.  That was his target.  You know, it

18  sounded like, well, it may be okay if it runs a little over

19  that.

20         But basically that's a rate that I don't think is at

21  all doable.  And trying to transfer patients -- inmate

22  patients at that rate, considering the large amounts of

23  documentation required for each transfer, if that much time

24  is spent on that, you're not spending the time with the

25  patient.  I think it is going to create real safety problems

110

1    trying to move people so fast.

2          And, you know, I just think it's a terrible plan to

3    move, you know, at that rate.  And, you know, I don't think

4    it is workable at all.

5          So until I hear otherwise that there is a more

6    realistic plan, you know, that would be like my biggest

7    concern as far as the situation there now.

8          MS. RIFKIN:  No further questions, Your Honor.

9                         CROSS-EXAMINATION

10   BY MR. RUSSELL:

11   Q.     Good afternoon, Dr. Badeaux.

12   A.     Good afternoon.

13   Q.     When you were answering questions, you talked about

14   the time-intensive work that is required when you do intake

15   or admissions into Salinas Valley Psychiatric Program; is

16   that right?

17   A.     That's correct.

18   Q.     And you need to spend time ID-ing the patient's

19   needs, correct?

20   A.     Correct.

21   Q.     You also have to review the medications that the

22   patient is on when they first get to the program, correct?

23   A.     Yes.

24   Q.     You need to consider whether or not those medications

25   might need to be changed; is that correct?

111

1    A.      That's correct.

2    Q.      You also recognize that this is a period of time in

3    which the patient is potentially at the greatest threat to

4    themselves as well as other inmates and staff; is that

5    correct?

6    A.      That's correct.

7    Q.      It's also the period of time in which you're most

8    concerned about suicide; is that correct?

9    A.      Yes, that's correct.

10   Q.      So that's the reason why during that period of time

11   you spend the most intensive treatment, I guess, on these

12   patients; is that correct?

13   A.      Yes.  Suicide risk, potential danger to themselves or

14   others, and stabilizing the patient's symptoms.

15   Q.      You're doing all of this right when they first get to

16   the facility, correct?

17   A.      Yes.

18   Q.      You don't wait to do that, right?

19   A.      We see them pretty much immediately when they arrive.

20   Q.      The day they get there, correct?

21   A.      The day they get there.

22   Q.      Then continuing on from that time, correct?

23   A.      Yes.  I mean, you have the 72-hour evaluation, you

24   know.  Now, sometimes, I mean, you can kind of do that on

25   their admission if you have enough treatment team members to

112

1    do that.  And then, you know, you see them on the week, the

2    ten-day.

3           But really, I mean, if they're not doing well, you

4    need to see them more than that.  That's the thing.  You

5    know, I wouldn't want to stick to the minimums.

6           You know, personally, you know, you just have to

7    spend as much time and use your own clinical judgment

8    because, you know, one patient, it may be fine for them.

9    They may be safe, you know, doing pretty well.  And, you

10   know, you don't need to see them really extra.  Then other

11   patients you really do.

12   Q.     These are all the things that you were doing when you

13   worked at Salinas Valley Psychiatric Program, correct?

14   A.     That's correct.

15   Q.     Those things went on despite the fact the inmate was

16   on either orientation or what you have been calling cuff

17   status, correct?

18   A.     Yeah.  Now, you know, cuff status, we would see them

19   come in.  They would be brought in.  Right upon admission we

20   would see them quickly.  Not at cell front.

21          On admission -- you know, basically I never did a

22   cell-front admission except for maybe a patient that refused

23   to come.  They had already been seen, and like maybe the

24   medical doctor saw them, then was put back in his cell, then

25   refused to come.  And I would talk to them briefly.  But

113

1   usually those are patients that they don't want to talk to

2   you anyway.  So it was very -- there wasn't much to say.

3   Q.      So you would make it your point to go see that inmate

4   even at cell front, correct?

5   A.      Sure.

6           THE COURT:  I think I understand, but maybe I don't.

7           When you do your initial admission, the patient is in

8   cuff status; is that right?

9           THE WITNESS:  Yes.

10          THE COURT:  Okay.  And if you have to see him for a

11  longer period or after, until such time as he's released from

12  cuff status, he's -- you see him cuffed?

13          THE WITNESS:  Yes.

14          THE COURT:  And what is your best recollection as to

15  how long cuff status determinations take?

16          THE WITNESS:  Ten days.

17          THE COURT:  All right.  Roughly for ten days he's on

18  cuff status.

19          In your judgment, all things being considered, is ten

20  days a significant problem one way or the other?

21          THE WITNESS:  I do think it is too long.  To contrast

22  that, at Napa there was no cuff status period.  And the

23  patient, upon admission, was immediately released from cuffs.

24          And some of them, frankly, needed to be uncuffed.  So

25  like a happy medium between no period of time at all and ten

114

1   days, you know, might be nice.

2           Because, I mean, there are patients that -- it is

3   just that period of evaluation you see how they are doing.

4   And, you know, I don't think cuff status is a bad thing at

5   all.  Just like a shorter period.  Just to where some

6   patients when doing well, maybe -- pretty much when everybody

7   thinks they are doing well, when they can be maybe, you know,

8   able to program.  You know, go to groups and activities

9   sooner.  That would be a big improvement I think.

10  BY MR. RUSSELL:

11  Q.      I think you mentioned that the cuff status is

12  actually reviewed by a group; is that correct?

13  A.      That's correct.

14  Q.      I think that group, the acronym for it, is the ICC.

15          Do you recall what ICC stands for?

16          I don't right now.

17  A.      I don't.

18  Q.      But it is reviewed by a team, correct?

19  A.      Yes, that's correct.

20  Q.      And that's a team in which clinicians have input,

21  right?

22  A.      I never have sat in on ICC.  So I know nursing did.

23  Nursing definitely has input.  I'm pretty sure they get

24  input.  The senior MTA is there.  I have never participated

25  in one.  I can't really attest to who was in ICC and who is

1    not so I really wouldn't be able to give a good answer.

2    Q.      Okay.  But you had earlier testified that you -- I

3    thought you had testified that the clinicians cannot remove

4    an inmate from cuff status.

5            Did I understand that correctly?

6    A.      No cuff status is different from initial.  The

7    initial clearance has to be the ICC committee.

8            Okay.  Later they may get put back on cuff status for

9    behavioral.  Maybe, you know, aggressive agitation, threats,

10   they may be put on cuff status.

11           They don't need to be reviewed by the ICC again.

12   That one senior MTA makes the final call depending how

13   they're doing with input from the treatment team.

14           THE COURT:  ICC stands for Institution Classification

15   Committee.

16           MR. RUSSELL:  Thank you, Your Honor.

17   BY MR. RUSSELL:

18   Q.      So what you are talking about is a subsequent event?

19   A.      Sure.

20   Q.      When somebody has a behavioral problem or some event

21   where correctional staff might think they're either a threat

22   to themselves or to other inmates or staff and they are

23   placed back on cuff status, correct?

24   A.      Yes.  I should clarify that.  The initial clearance

25   with ICC, that is ten days.  The cuff status later, it would

116

1  be really hard to put a number on it.  It very much depended

2  on, you know, the circumstances.

3        It might be just a couple of days or a day.  It might

4  be -- it could be a couple of weeks.  Just totally depended

5  on the circumstances.  You know, what's happening.  You know,

6  also, you know, who the senior MTA is and what, you know,

7  other staff felt about whatever the behavior was or incident.

8  So it would be hard to put a number on that.

9  Q.     But I think you also said even in those instances the

10  clinicians have input as to whether or not the inmate-patient

11  remains in cuffs, correct?

12  A.     Sure.

13  Q.     As far as the initial Institutional Classification

14  Committee meeting goes, that's the initial orientation or

15  cuff status, clinicians have input into that process as well,

16  correct?

17        MS. RIFKIN:  Objection.  Misstates the testimony.

18        THE COURT:  He's asked him "correct."  If it is

19  incorrect, the witness will say, "No, that's not right," or

20  whatever.

21        THE WITNESS:  We don't have input as far as, you

22  know, how soon they get reviewed by ICC at all, but we have

23  input of how well they are doing.  And so that when they

24  do -- when the committee does see them, you know, they

25  hopefully will get cleared if they are doing well, or not get

117

1    cleared if they are making threats, you know.  Or it will

2    be -- you know, help make a good decision.

3    BY MR RUSSELL:

4    Q.    Well, you never had an instance yourself on the

5    initial orientation status where it was overridden by a

6    custody staff, correct?

7        MS. RIFKIN:  Objection, Your Honor.  Calls for

8    hearsay.  The witness testified he never attended an ICC.

9        THE COURT:  I think the question is different, but I

10   may be wrong.  Give me a moment.

11       The objection is that he never had any participation

12   in the initial -- were you involved in any way in the initial

13   determination?

14       THE WITNESS:  There was -- well, in the initial one

15   we gave feedback, which, I mean, I didn't directly give to

16   the ICC committee.  It was passed along by whoever attended,

17   I believe the senior MTA and the RN.

18       That's my understanding.  I could be wrong.

19       There was one time I remember the treatment team's

20   recommendations was basically overridden.  The nighttime

21   senior MTA did not agree.  We took him off cuff status.  The

22   inmate-patient was not cleared.  That's -- thinking back I

23   can only think of the one time.

24   BY MR. RUSSELL:

25   Q.    But in your experience, given the input that you

118

1    provided, except for the one occasion, there's never any

2    instance in which custody staff overrode a clinical

3    determination that somebody could be taken off the initial

4    orientation cuff status, correct?

5            MS. RIFKIN:  Objection.  Lacks foundation.

6            THE COURT:  He's asking in his experience.

7            You're both making -- Never mind.

8            You may answer, sir.

9            THE WITNESS:  That's the only time in my recollection

10   now when there was an overriding of the treatment team's

11   decision.  And that senior MTA had worked with the

12   inmate-patient before and had concern based on previous

13   admissions.  But the treatment team, we felt otherwise.  But,

14   you know, that was how that went, and he stayed on cuff

15   status for a while longer.

16   BY MR. RUSSELL:

17   Q.    I believe that you started at Salinas Valley in early

18   September of 2012; is that correct?

19   A.    I came in August.  Yeah.  I started on the units in

20   September.  I came on.  I started, I think, August 20th.

21   Q.    And I believe during your deposition you testified

22   that although your last day at Salinas Valley -- your last

23   day within the facility was March the 27th, that technically

24   your last day working for -- working for Salinas Valley

25   Psychiatric Program was April 4; is that correct?

119

1   A.      Yes.  I think that's correct.

2   Q.      My understanding is that you signed your initial

3   declaration in this case which was filed as ECF Document

4   4544, you signed that first declaration that same day, April

5   4, 2013?

6   A.      If that's the date on there, that would be correct.

7   Q.      And I think that you also testified during deposition

8   that for the week prior to that you worked with plaintiffs'

9   counsel to prepare that declaration; is that correct?

10  A.      I wouldn't say -- not necessarily a week prior.

11  Mainly, to be honest with you, the night before, you know,

12  before it was signed.  I stayed up very late and typed up

13  most of it.

14  Q.      Your last day actually on the premises at Salinas

15  Valley being March the 27th, you have no knowledge today, do

16  you, of the number of psychiatrists that are working at

17  Salinas Valley, correct?

18  A.      No direct knowledge.  I have what my peers have told

19  me.

20  Q.      You don't know how many registered nurses are working

21  at Salinas Valley, do you?

22  A.      No.

23  Q.      You don't know how many recreational therapists are

24  working at Salinas Valley, correct?

25  A.      Correct.

120

1    Q.      Nor do you know how many social workers are working

2    at Salinas Valley; is that correct?

3    A.      That's correct.

4    Q.      Nor do you know how many psychiatric technicians are

5    working at Salinas Valley, correct?

6    A.      I do know that.  We don't use psychiatric

7    technicians.

8    Q.      There are no --

9    A.      We use MTAs.  That's correct.

10    Q.      You don't know how many of them are on staff right

11    now, do you?

12    A.      No.

13    Q.      You talked about the challenges that you had in

14    having the MTAs pull patients for individual sessions; is

15    that correct?

16    A.      That's correct.

17    Q.      And I think part of what you described was some of

18    the other things that the MTAs had to do to transport inmates

19    around the facility, such as taking them,

20    particularly inmates that are on cuff status, to doctors

21    appointments, to nursing appointments, to interdisciplinary

22    team treatment meetings; is that correct?

23    A.      That's correct.

24    Q.      Would it be fair to say that in order to be able to

25    have an MTA available to pull a patient, you would need to

121

1    coordinate your efforts with what the MTAs were doing on all

2    of these other things that they were responsible for within

3    the unit?

4    A.       That's correct.

5    Q.       And so really it was -- it would be very difficult in

6    any circumstance to immediately see a patient, you know, on a

7    moment's notice given the other responsibilities the MTAs

8    had?

9    A.       It would be difficult.  And, you know, sometimes they

10   wouldn't be able to accommodate and sometimes, you know, they

11   would.  It just depends what else they had to do, their other

12   duties.

13   Q.       Nevertheless, there was never an instance in which

14   you had a patient that was in acute distress that you were

15   not able to see them; isn't that correct?

16           THE COURT:  See them is one thing because he would

17   see them at cell.  You mean outside of the cell?  Is that

18   what you mean?

19           MR. RUSSELL:  Well, either way, Your Honor.  Let's

20   say outside the cell.

21           THE COURT:  All right.  Go ahead.  You may answer.

22           THE WITNESS:  I initially, when I first started,

23   asked.  And there were -- you know, I asked probably a couple

24   of patients maybe to be pulled.  And quickly I was so

25   overloaded with the caseload, I had 60 patients at that time,

122

1    I immediately abandoned that strategy and started doing cell

2    front just so I could see everybody, you know, at all.

3           And I realized there was no way I could see that many

4    people and have them pulled out.  It was not workable.  So I

5    abandoned that strategy.

6           And, you know, I mean sometimes when I asked,

7    initially some people were pulled out.  And some of the -- if

8    staff -- I know one psychologist, he didn't see them all the

9    time, but he -- I mean, generally he had patients pulled out

10   so...  But then again, he wasn't seeing, you know, 60

11   patients and doing -- you know, just depends what you're --

12   if you have time to wait, you know, a half an hour, then, you

13   know, hopefully they'll be able to pull them out or whatever

14   the time period, you know.  Otherwise, you know, it's just

15   generally, with that many patients to see, you have to, you

16   know, develop a workable plan.  And a lot of that meant

17   cell-front visits unfortunately.

18   Q.     There was never an instance in which you recognized

19   that you had a patient who was in acute need of care and left

20   them untreated, correct?

21   A.     That's correct.  The general -- I had all the time

22   inmates, when I walk by their cell to see another patient,

23   ask to be seen or asked to have IDTT.  They want IDT now.

24   They have all kinds of types of concerns, "Are you going to

25   see me this week?"

123

1          And, you know, plenty of those patients were not

2    pulled out early for IDTTs.  I talked to them and, you know,

3    tried to assess why they wanted to be seen.  But, you know, I

4    would see them at cell front.  You know, if there wasn't any

5    acute reason to have them pulled out and use those staff

6    resources, I very much had to, you know, allow those staff

7    resources to be utilized elsewhere because otherwise MTAs are

8    going around looking for patients that might be hanging

9    themselves, that type of thing, if you use their time up, you

10   know, when you really don't need to.  I mean, bad things

11   could happen so I tried to be very considerate of their time.

12         THE COURT:  Sir, is it true that if you had enough

13   MTAs you wouldn't be faced with this problem?

14         THE WITNESS:  Well, yeah, I think that would be

15   correct.

16         THE COURT:  Obviously so.  Go ahead.

17   BY MR. RUSSELL:

18   Q.    Doctor Badeaux, you also talked about hearing of

19   instances in which inmates didn't receive appropriate

20   clothing or other supplies.

21         You don't know the status of the provision of

22   supplies at Salinas Valley Psychiatric Program today, do you?

23   A.    Not directly, no.

24         MR. RUSSELL:  I don't think I have any other

25   questions.

124

1           Thanks, Dr. Badeaux.

2           MS. RIFKIN:  No redirect, Your Honor.

3           THE COURT:  May the witness be released?

4           MS. RIFKIN:  Yes.

5           THE COURT:  Yes or no?

6           MS. RIFKIN:  Yes.

7           THE COURT:  Sir?

8           MR. RUSSELL:  No further cross, Your Honor.

9           THE COURT:  May the witness be released?

10          I'll ask you once more.

11          MR. RUSSELL:  Yes.

12          THE COURT:  Thank you, sir.  You are free to go.

13          I know it is very difficult, but you have to listen

14    to the Court.

15          We're going to take a recess because otherwise I'll

16    say something I shouldn't.

17          Fifteen minutes, Ladies and Gentlemen.

18          (Off the record at 3:00 p.m.)

19          (On the record at 3:15 p.m.)

20          THE CLERK:  Please, remain seated.

21          Court is now in session.

22          THE COURT:  Call your next witness.

23          MS. MENDELSON:  Your Honor, Margot Mendelson for the

24    plaintiffs.  Plaintiffs would like to call Jeanne Woodford.

25          THE CLERK:  Please, remain standing.

125

```
 1              Raise your right hand.
 2                         JEANNE WOODFORD,
 3      was thereupon called as a witness herein by the Plaintiffs,
 4      and having been sworn to tell the truth, the whole truth and
 5      nothing but the truth, was thereupon examined and testified
 6      as follows:
 7              THE CLERK:  Please, have a seat.
 8              State your name and spell your last name.  Speak into
 9      the microphone.
10              THE WITNESS:  Thank you very much.  My name is Jeanne
11      Woodford.  My last name is spelled W-o-o-d-f-o-r-d.
12              MS. MENDELSON:  Your Honor, Miss Woodford has offered
13      testimony in this matter at Document Number 4380 filed on
14      March 14, 2013.
15              THE COURT:  Sir?
16              MR. SHARMA:  Objection.  Counsel is testifying.
17              THE COURT:  Please.
18              Give me a moment.
19              You may proceed, Miss Mendelson.
20              MS. MENDELSON:  Her relevant qualifications can be
21      found in paragraphs 2 through 13 in that declaration.
22              As Your Honor knows, she has previously been
23      qualified as a custodial expert and offered testimony in this
24      proceeding and proceedings before the three-judge court.
25              THE COURT:  You may proceed.
```

126

DIRECT EXAMINATION

BY MS. MENDELSON:

Q.      Ms. Woodford, plaintiffs' counsel has asked you to
provide an opinion concerning defendants' policy of placing
all newly admitted patients on cuff status for up to ten
business days upon admission for inpatient hospitalization at
Department of State Hospitals' inpatient units in CDCR
facilities.

        Is this correct?

A.      That is correct.

Q.      Miss Woodford, you have been provided additional
documents to review on this subject since you completed your
declaration in March; is that correct?

A.      That is correct.

Q.      Specifically, you were given the pleadings and
evidence filed by plaintiffs and defendants, as well as
Salinas Valley's Manual Procedures 3.08, 3.09, 6.12 and 6.15.

        Is that correct?

A.      That is correct.

Q.      Did you rely on any other documents in formulating
your opinion?

A.      The declaration of the doctor and the deposition of
another doctor that worked at Salinas Valley.

        THE COURT:  Let me interrupt for a moment because I
know this is going to take at least 14 hours.

127

1          My law clerk informs me -- and I have not looked at

2     it so I'm not sure it is right -- my law clerk informs me

3     there is a CDCR requirement of some kind that a full

4     report -- or evaluation, including danger to others and

5     mental status, be prepared by CDCR in referring patients to

6     Salinas Valley.

7          Do you know about that?

8          THE WITNESS:  No, I do not.  I know that there's

9     documentation and reports that are provided, but I don't know

10    that it meets what you're describing, damage to yourself or

11    danger to others.

12         THE COURT:  You may proceed.

13    BY MS. MENDELSON:

14    Q.    Miss Woodford, do you have before you at Tab H the

15    SVPP Program Manual Procedure 6.12?

16    A.    Yes, I do.

17    Q.    Defendants have stipulated to the authenticity of the

18    document.

19         Can you describe the document for the Court?

20    A.    So it's the Salinas Valley Psychiatric Program

21    Intermediate Inpatient Treatment Facility Program Manual.  In

22    this case it is the cuff status and temporary suspended

23    program.

24    Q.    Can you summarize its contents?

25    A.    Yes.  What it describes is the orientation process on

128

1    a patient arriving into the Salinas Valley inpatient program.

2    And that's described as cuff status.

3            And the way that it is described is that an inmate

4    patient will be on cuff status for up to 14 days, ten

5    business days, and that only the Institutional Classification

6    Committee can clear them from cuff status.

7    Q.      Does the policy apply to all incoming patients?

8    A.      It applies to all incoming patients, whether from a

9    general population or the EOP program or from a security

10   housing unit.

11           MS. MENDELSON:  Plaintiffs offered Plaintiff's

12   Exhibit 1 to be introduced into evidence.

13           May I approach?

14           THE COURT:  You may.

15           (Exhibit handed to witness.)

16           MS. MENDELSON:  That's Tab H in the binder provided

17   to the Court and opposing counsel.

18   BY MS. MENDELSON:

19   Q.      Miss Woodford, have you formed an opinion on the

20   policy described in that directive?

21   A.      Yes, I have.

22   Q.      What is your opinion?

23   A.      Well, you know, it's very clear that when you have a

24   hospital program within a prison that you need some kind of

25   custody classification process.  But it appears that this

129

1  custody classification process has been designed more

2  following the administrative segregation process that's

3  typical within the Department of Corrections.  It has the

4  same timelines involved.

5       And in my opinion it's unnecessary in a hospital

6  setting to take ten days to do the kind of clearance they

7  talk about in this document because from the custody point of

8  view you do need to know the inmate's enemy situation, his

9  gang status, you need to know whether he's had recent

10  disciplinaries and some other information that's mentioned in

11  here.  And all of this is contained in the Central File.

12  That review can actually happen in a very short amount of

13  time.

14       I imagine the ten days is developed because -- is

15  utilized because that's what the Department of Corrections

16  utilizes for administrative segregation processes.

17  Q.    What restrictions apply to patients on cuff status?

18  A.    Well, as I understand it, any time they're out of

19  their cell they must be in cuffs.  And they're rarely out of

20  the cell because of cuff status.  They can't participate in

21  the treatment programs.  They are not allowed to go to

22  exercise yard with other inmates.

23       It's really a very sterile environment.  They are in

24  their cell with little, if any, property at all.

25  Q.    What is your understanding of the purpose of a

130

1   custodial review for newly arrived inmate-patients?

2   A.      Well, the purpose of a custodial review is really to

3   ascertain whether the inmate has any problems that might

4   jeopardize his safety or the safety of others.  So that is

5   looking at things like enemy situations, whether recent

6   disciplinary history, whether he's been assaulted or had

7   assaults against staff or other inmates.

8           You also review to determine whether the inmate has

9   had a history of in-cell assaults so you might place them on

10  single cell status.  You look at gang status.  You review the

11  confidential file to see if there is anything in the

12  confidential file that might impact security.

13  Q.      Miss Woodford, have you reviewed the Declaration of

14  Salinas Valley State Prison Warden Randolf Grounds filed in

15  this case?

16  A.      Yes, I did.

17  Q.      Do you agree with Warden Grounds that inmates should

18  be released to programming as quickly as possible?

19  A.      That should be the goal of any program, but

20  particularly in a hospital setting where you are trying to

21  get an individual into treatment as quickly as possible.

22  Q.      Why is that the goal?

23  A.      Well, sitting in a cell with very little property and

24  nothing to do --

25          MR. SHARMA:  Objection, Your Honor.

131

1          THE COURT:  Sir?

2          MR. SHARMA:  I don't believe this witness has been

3    qualified as an expert on mental healthcare or hospital

4    settings.

5          THE COURT:  Overruled.

6          You may proceed, ma'am.

7          THE WITNESS:  So for any inmate to sit in his cell

8    without -- with very little property, if any at all, is very

9    difficult.  But an inmate who has mental health issues can

10   deteriorate so quickly, and they can act out in so many ways

11   that are harmful to themselves and others.  It is often when

12   a staff are gassed by inmates, as an example, because they

13   get frustrated and deteriorate in their cells when they're

14   not in program, not receiving treatment.

15   BY MS. MENDELSON:

16   Q.    Miss Woodford, are you familiar with the declaration

17   of former SVPP Executive Director Victor Brewer found at Tab

18   E of the binder?

19          This was referenced previously by Dr. Stewart.

20   A.    Yes.  I'm familiar with the declaration.

21   Q.    On page 3 of the declaration, paragraph 6, can you

22   read the first sentence please?

23   A.    Certainly.

24          THE COURT:  I think she wants you to read it out loud

25   because she's convinced I don't know how.

132

1          THE WITNESS:  Okay.

2          (Reading:)

3          The safety and security issues for inmate-patients

4          being placed on constant cell restrictions are

5          abundant.  Patients may withdraw their consent to

6          treatment, leaving without having received care.  The

7          availability of custody staff to ensure safety and

8          security is reduced given that staff will be

9          primarily escorting individual inmate-patients to

10         either IDTTs or Institutional Classification

11         Committees.  Inmate-patients may decompensate and

12         inmate-patients may become violent or act out towards

13         staff, other inmates or themselves.  On the other

14         hand, releasing the inmate-patient to group or yard

15         without adequate available clinical or escort staff

16         creates in and of itself a safety risk to not only

17         staff but other inmates.

18         (Reading concluded.)

19    Q.   Do you agree with Mr. Brewer?

20    A.   Absolutely.

21    Q.   Why?

22    A.   Well, you know, I've spent many years working inside

23    a prison, and within San Quentin State Prison we had

24    reception center.  Within the reception center we had many

25    inmates who came in very mentally ill.

133

1        Many of those inmates had to be placed Ad. Seg.

2   because we had no other options for them, and you could just

3   see them deteriorate.  And the violence against staff really

4   would escalate because we didn't have the kind of treatment

5   they needed.

6   Q.      Am I correct that you're comparing this to constant

7   cell restrictions?

8   A.      Yes.

9   Q.      Miss Woodford, based on your review and experience,

10  what are the components of the custodial review that takes

11  place during cuff status?

12  A.      The components are reviewing really everything in the

13  Central File.  It is really a rereview of what occurred to

14  prepare that case for transfer.

15        So it is re-looking at enemy status, at the enemy

16  list, and maybe rerunning the enemies to be sure none of them

17  had been transferred to Salinas State Prison.

18        It is looking at current disciplinaries.  It is

19  looking at prior placement, were they on general population,

20  were they serving a SHU term.  It is looking at the

21  confidential file to see if there is any information there

22  that could impact placement.  Gang status.  I think that

23  pretty much covers what you would look at.

24  Q.      Who conducts that review?

25  A.      Well, the case is prepared generally by a

134

1    Correctional Counselor I.  Then the Correctional Counselor 1,

2    in some cases, in some cases a 2, presents the case to the

3    Institutional Classification Committee.

4    Q.      The ICC?

5    A.      The ICC.

6    Q.      Approximately how long would you say the review

7    takes?

8    A.      Preparing the case for Institutional Classification

9    Committee --

10          MR. SHARMA:  Lack of foundation.  Calls for

11   speculation.

12          THE WITNESS:  Actually, I was a correctional

13   counselor so I have done this many times.  I was a

14   Correctional Counselor 1, 2 and 3.

15          THE COURT:  Objection overruled.  You may answer.

16          THE WITNESS:  So typically to prepare the case for

17   ICC can take -- if really experienced you can do this in

18   about 30 minutes, complicated cases an hour.  And then it is

19   scheduling for the committees.  And generally an ICC action,

20   at the most you get to spend about 15 minutes per inmate.

21   BY MS. MENDELSON:

22   Q.      And does this involve an interview with the inmate

23   typically?

24   A.      You know, it's always optimum to have an interview

25   with the inmate, but it really depends on your caseload.

135

1    Oftentimes you're preparing the case just from what

2    is in the Central File, and the first meeting with the inmate

3    might be at the Institutional Classification Committee.

4    But if there is complicated issues, you, as the

5    correctional counselor, would go to the inmate and have a

6    conversation with that individual.

7    Q.    In your opinion could any of the components of this

8    custodial review take place before an inmate's physical

9    transfer?

10   A.    Well, you know, in fact it does.  This really is a

11   rereview.  And, you know, there's -- I know there's

12   discussion about couldn't this be done before they got there.

13   Well, why would you need to do that because, in fact,

14   it really can be done so quickly at the receiving

15   institution.  It is just really a rereview of the material in

16   the Central File.

17   Q.    Is it your understanding that all patients at Salinas

18   Valley come from the same custodial status?

19   A.    No.  In fact, they come from general population, from

20   EOP programs, they come from security housing units, from

21   administrative segregation.  So from very different

22   classification statuses throughout the department.

23   Q.    Do they present different custodial risks?

24   A.    Absolutely.  An inmate who's been programming

25   appropriately in the general population, it is very clear

136

1    that they can manage themselves without risking -- being a

2    danger to others.  So that's a very different classification

3    decision than an inmate coming from a security housing unit.

4    Q.      Is an ICC process required for patients who are not

5    serving SHU terms, that is terms in a security housing unit?

6    A.      So only the Institutional Classification Committee,

7    ICC, can suspend a SHU term.  So you need ICC for that.  Or

8    an inmate who was placed in Ad. Seg., it requires ICC review.

9            But an inmate who is arriving at an institution from

10   a general population can be cleared by a UCC, which is a Unit

11   Classification Committee.

12   Q.      How is that different?

13   A.      Well, an ICC, Institutional Classification Committee,

14   is chaired by the warden or a warden designee.  A UCC is

15   chaired generally by a captain or sometimes a CC2 acting as

16   captain.

17   Q.      Based on your review of the policies, is it UCC

18   meetings that take place at Salinas Valley or ICC?

19   A.      In their policy all inmates are cleared from cuff

20   status by ICC.

21   Q.      Does it take a different amount of time to review the

22   files depending whether an inmate is serving a SHU term?

23   A.      Well, if an inmate was serving a SHU term, it is a

24   little more complicated, the case is more complicated.  And

25   you certainly would want to spend more time having a

137

1    discussion with the inmate about their behavior, where they

2    are now, and have a lot more input from psychiatric staff.

3    Q.    How long do you think that custodial review would

4    take?

5    A.    Well, again, preparing the case is, you know, 30

6    minutes to an hour.  The conversation in ICC is generally ten

7    or 15 minutes because most of the work is done outside of

8    that classification committee.

9    Q.    Miss Woodford, does the size of a population the

10   inmate will enter affect the security concerns involved?

11   A.    Well, I think that's true.  I mean, if you are

12   placing inmates into a general population where they're going

13   to be around 500, 1,000, 2,000 inmates, you really have to be

14   much more careful and know a lot more about the inmate.

15         When you're placing an inmate into a program like you

16   have at Salinas Valley, I think the largest program is 72

17   beds, I think the others are around 50 beds, it is a much

18   smaller unit so it's much easier to understand how the

19   inmate's behaving and to recognize changes in the inmate's

20   behavior.

21   Q.    In your opinion is the ten business day cuff status

22   period necessary for incoming patients?

23   A.    No, I don't think it is necessary at all.  I mean, I

24   think it is really driven by what the department generally

25   does for inmates who are in orientation or classification.

138

1    And it is not being driven by a patient model.

2          I mean, this really should be driven by what meets

3    the needs of the inmate patient.  In my opinion it really

4    could be done in 72 hours along with the IDTT.

5    Q.      Can you explain what the IDTT is?

6    A.      That's the Interdisciplinary Treatment Team meeting

7    that occurs at 72 hours in the Salinas Valley program.

8    Q.      So would you set the maximum amount of time necessary

9    for this review as 72 hours; is that correct?

10   A.      I think in most cases, yeah.  Certainly there would

11   be more complicated cases where information might be missing

12   from the file and you would need to contact the sending

13   institution to gather that information.  But that really

14   should be the exception, not the rule.

15         The whole purpose really, we all have the same

16   mission in mind really, is to get that patient into treatment

17   as quickly as possible because it makes it safer for that

18   patient, it makes it safer for the other inmates, it makes it

19   safer for staff.  So with the right resources all of that

20   could be done in a much shorter amount of time.

21   Q.      What changes would you recommend to implement these

22   changes?

23   A.      Well, I would recommend that the case be prepared for

24   review the next business day after his arrival and that

25   classification be set within the 72 hours.  It might

139

1    necessitate having the classification committee meeting

2    within the hospital setting on a daily basis, you know, an

3    hour a day when there is an ICC that occurs each day within

4    the hospital setting.

5    Q.      To your knowledge is there precedent within CDCR for

6    an expedited orientation process?

7    A.      Well, having run a reception center, you cannot close

8    the doors to intake.  And we often had to do emergency

9    classifications and holds.  You know, custody staff and

10   classification staff were on overtime to review cases so that

11   the very next day we could review inmates who were in Ad.

12   Seg. in an effort to clear them out of Ad. Seg. so that we

13   would have room for the incoming inmates into the reception

14   center.  So that's one example.

15          Also after, you know, riots, other problems within

16   the prison, we've had to hold emergency classifications to

17   make room to move inmates around appropriately to provide for

18   safety.

19          So when there is a will there is a way.  And it can

20   be done when you have the right amount of resources.

21   Q.      Does that necessitate changes to the staffing model

22   in the example you referenced?

23   A.      Well, in the examples that I referenced, those are --

24          MR. SHARMA:  Objection.  Lack of foundation.  Calls

25   for speculation.

140

1          THE COURT:  Well, those don't work.

2          Objection overruled.   You may answer.

3          Do you remember the question?

4          THE WITNESS:  No, I don't.  I'm sorry.

5     BY MS. MENDELSON:

6     Q.      In the example you referenced to effectuate an

7     expedited orientation process, were changes in the staffing

8     model required?

9     A.      Well, the examples I gave were emergency situations

10    where we would have to hold staff over on overtime.  So yes,

11    it required putting additional staff to that process.

12          But, you know, in another example I can give, I think

13    it is the Marin case we had at San Quentin that covered

14    healthcare for many years, in that case every Central File

15    had to be reviewed the very next business day to determine if

16    there was any evidence of prior suicide attempts.  And so the

17    Department of Corrections had to put a correctional counselor

18    in place just to do that review.

19          That was outside of our typical processing, but it

20    was mandated because of the high suicide rate that

21    San Quentin had during that period of time.

22    Q.      Miss Woodford, have you reviewed evidence in the

23    record about the provision for basic needs at Salinas Valley

24    and Vacaville?

25    A.      Yes.  I've read the declarations filed, yes.

141

1    Q.       When you were a warden at San Quentin, did you review

2    the policies and procedures for laundry and distribution of

3    clean clothes and hygiene products?

4    A.       Yes.  I took that issue very seriously.

5    Q.       Why?

6    A.       Well, there's just basic needs inmates have.  And

7    they expect to receive their mail on time.  They expect to

8    receive decent food and clothing.  And it's just important

9    for everyone's safety they have those basic needs met.

10   Because when they don't, they often act out in ways that are

11   harmful to our staff.

12            It is just the right thing to do.  Inmates should

13   have clean clothing.

14   Q.       What steps could a warden take to ensure patients are

15   receiving clean laundry and adequate -- receiving clean

16   laundry and adequate hygiene products?

17   A.       Well, when you're aware that there is a problem, then

18   sometimes you have to take extra steps to be sure that's

19   happening.

20            One of things that you can do is to have staff

21   provide documentation that the laundry is being ordered and

22   that it is the quantity that's necessary to meet the needs of

23   the inmates in the area where that laundry is being ordered

24   for.  And then you can also provide proof that it was

25   delivered.

142

1          So sometimes you have to put those extra steps into

2     place until it becomes part of the routine.

3          You know, one of the things we say about the

4     Department of Corrections is it is very difficult to

5     implement, but once you implement you can't stop it.  So

6     sometimes you have to take those extra steps to make sure

7     things are implemented appropriately.

8     Q.     Would the presence of clean laundry and bedding in a

9     prison's warehouse provide adequate assurances to you as a

10    warden that the inmates are receiving them in a timely

11    manner?

12    A.     No.  You know, from time to time things would go

13    wrong at San Quentin.  It is a very large prison, very

14    difficult missions.  For that reason I would meet weekly with

15    my appeals coordinators.  And they would sometimes alert me

16    to problems in a unit, such as clean clothing.  And then I

17    would get up from my desk and go into those housing units to

18    find out what the problem was.

19         So you have to be constantly vigilant that what is

20    happening in your prison is the way that you intend it to

21    happen and that your warehouse is getting the items that

22    inmates need to those housing units.

23         MS. MENDELSON:  Nothing further, Your Honor.

24         THE COURT:  What is your name, Counsel?

25         MR. SHARMA:  Maneesh Sharma.

143

1          THE COURT:  You may proceed.

2                    CROSS-EXAMINATION

3     BY MR. SHARMA:

4     Q.      Good afternoon, Miss Woodford.

5     A.      Good afternoon.

6     Q.      Miss Woodford, you have been the warden at

7     San Quentin State Prison; is that correct?

8     A.      I was the warden at San Quentin State Prison.

9     Q.      Were you a warden at any other CDC California

10    Department of Corrections and Rehabilitation institutions?

11    A.      No, I was not.

12    Q.      So you've never been a warden at Salinas Valley State

13    Prison?

14    A.      No, I was not.

15          THE COURT:  I bet you that follows from the answer to

16    the last question.

17          MR. SHARMA:  That's correct, Your Honor.

18          THE COURT:  You may proceed, sir.

19          MR. SHARMA:  Thank you, Your Honor.

20    BY MR. SHARMA:

21    Q.      Miss Woodford, have you ever participated in a ICC at

22    Salinas Valley Psychiatric Program?

23          THE COURT:  If she's never been there -- Oh, no.  I'm

24    sorry.  I was about to raise my voice.  I apologize, Counsel.

25          Common sense suggests the answer.

144

1          You may proceed.

2          THE COURT:  Well, I suppose there might be some odd

3    circumstances in which you were there.

4          Have you ever participated in a ICC at Salinas

5    Valley?

6          THE WITNESS:  Well, as Director of Corrections I

7    toured all the prisons, but I did not participate in a ICC at

8    Salinas Valley.

9    BY MR. SHARMA:

10   Q.    And so the basis for your testimony today is your --

11   I believe you testified was the review of the deposition of a

12   doctor from the Salinas Valley Psychiatric Program and the

13   declarations that have been submitted on the docket in this

14   matter?

15         THE COURT:  And all of her own experience.

16         THE WITNESS:  My own experience -- thank you, Your

17   Honor -- as well as the program guides that are included in

18   this binder that describe the program at Salinas Valley State

19   Prison.

20   BY MR. SHARMA:

21   Q.    Miss Woodford, could you -- I believe you stated that

22   there are certain members, based on your experience of an

23   ICC -- I'm sorry -- Institutional Classification Committee,

24   and those are Correctional Counselor 1, 2 -- I'm sorry.  I am

25   forgetting the -- if you could please remind me of the other

145

1    participants in the Institutional Classification Committee?

2    A.    It varies by prison.  So at some prisons, a

3    psychiatrist is on the Institutional Classification

4    Committee.  But from the prior testimony of the doctor on the

5    stand it sounds like that is being done in Salinas Valley by

6    a nurse.

7         So the committee members can vary.  But typically it

8    is the warden or warden designee, Correctional Counselor 2,

9    Correctional Counselor 1, and psychiatric staff, sometimes a

10    psychiatric social worker, a psychologist or a psychiatrist.

11    Q.    And in the -- what was the typical composition of an

12    Institutional Classification Committee that you participated

13    in while you were employed by the Department of Corrections?

14    A.    Again, it varied by prison, but --

15         THE COURT:  He's asking about your personal

16    experience apparently.

17         THE WITNESS:  At San Quentin?

18    BY MR. SHARMA:

19    Q.    That's correct.

20    A.    So at San Quentin the Institutional Classification

21    Committee would be myself or the chief deputy warden or

22    associate warden and a Correctional Counselor 1 and a

23    Correctional Counselor 2 and a psychiatrist.

24         If a psychiatrist was not available, a psychologist

25    would be present, along with unit staff.

146

1    Q.      And Miss Woodford, you also testified that it is your

2    belief that the Institutional Classification Committee could

3    be done, I believe, you said within 72 hours?

4    A.      Yes, it could be done within 72 hours.

5    Q.      Do you recall how long the Classification Committees

6    at San Quentin State Prison while you were there usually

7    took?

8    A.      Well, again, this is in a prison that is a general

9    population and reception center so the purpose of the ICC was

10   generally because inmates were placed in Administrative

11   Segregation so those timelines are ten days.  But in a much

12   larger program.  You're talking about a reception center that

13   had over 3,000 inmates and a general population that had over

14   2,000 inmates.

15           That's very different than when you are talking about

16   a small inpatient program within a prison where your goal is

17   very different than the goal of ICC trying to clear inmates

18   or review them during Administrative Segregation.

19   Q.      And Miss Woodford, correct me if I'm wrong, but

20   didn't you also testify that there would be a ICC for inmates

21   who had been entered into the CDCR system?

22   A.      Not for all inmates, no.

23           So if an inmate arrived from another prison in the

24   general population at San Quentin State Prison, that inmate

25   would be cleared by UCC.

147

1    Q.        Thank you.

2            You know what, Miss Woodford, I have to reask my

3    question.

4            Do you recall the average length of time it would

5    take while you were warden at San Quentin State Prison to

6    complete an ICC in the conditions that you described?

7    A.        It could take up to ten days.

8    Q.        Thank you.

9            And Miss Woodford, you described some of the

10   considerations that go into the ICC status.  I believe you

11   said one of those is enemy concerns; is that correct?

12   A.        Yes.  The case is reviewed for enemy concerns.

13   Q.        You said that usually during the Institutional

14   Classification Committee you get that information from the

15   C-File about enemy concerns?

16   A.        That information is in the Central File.  That's

17   correct.

18   Q.        Have you ever had a situation -- I'm sorry.  Can I

19   retract, Your Honor?

20           Miss Woodford, you also testified that in certain

21   Institutional Classification Committees you would meet with

22   the inmate and have a discussion with the inmate; is that

23   correct?

24   A.        Not exactly.  That's what a Correctional Counselor 1

25   does in preparing the case for classification.  That's not --

148

1    that doesn't happen all the time.  Most of the time you can

2    review the Central File, and it's a very clear picture of

3    what you are presenting to the ICC.  But if there are

4    questions, you might go see the inmate to ask the inmate some

5    questions about their case to clarify problems that exist in

6    the case.

7    Q.    And from those meetings with the inmates -- I'm

8    sorry.

9          Miss Woodford, again, you previously served as a

10   Correctional Counselor 1?

11   A.    Yes, I did.

12   Q.    And you worked on ICC as a Correctional Counselor 1?

13   A.    Yes, I did.

14   Q.    So you have previously had a situation where you

15   might have talked to an inmate during the process of

16   preparing for an Institutional Classification Committee?

17   A.    Yes, that's true.

18   Q.    Would you say the information you gleaned from those

19   meetings was valuable and important to the Institutional

20   Classification Committee?

21   A.    Yes, that's true.

22   Q.    Okay.  Miss Woodford, while you were serving as

23   Correctional Counselor 1, did you ever face a situation where

24   that meeting with the inmate gave you some kind of

25   information that was not contained in the Central File?

149

1   A.      Yes, that's true, from time to time.

2   Q.      So then it would be safe to say that sometimes not

3   all relevant information will be contained in the Central

4   File?

5   A.      Well, as inmates' situations change, you might -- it

6   might not have been documented in the Central File.  As an

7   example, you might interview an inmate.  He might tell you

8   that he had a new enemy.  And you would ask him about that,

9   and you would add that enemy to the enemy list if there was

10  justification for doing so.

11  Q.      One moment, Your Honor.

12          (Brief pause.)

13          Miss Woodford, do you have any training in the

14  provision of mental healthcare?

15          THE COURT:  You just faded out.

16  BY MR. SHARMA:

17  Q.      Miss Woodford, do you have any training in the

18  provision of mental healthcare?

19  A.      I received training during my time in the Department

20  of Corrections on the Coleman case, yes.

21  Q.      Do you have any formal training or advanced degrees

22  in the provision of mental healthcare or a bachelor's degree

23  in the provision of mental healthcare?

24  A.      No, I do not.

25  Q.      And Miss Woodford, you testified that the

150

1  Institutional Classification Committee's base -- the process

2  can vary based on the needs of the different institutions?

3         THE COURT:  The process changes or you mean the time

4  it takes?

5  BY MR. SHARMA:

6  Q.     The time it takes?

7  A.     Well, the time it takes can vary, yes, depending

8  on -- what I described was the difference between clearing

9  somebody from administrative segregation as a part of a

10 larger prison population, compared to clearing somebody who

11 is in a treatment program, in a much smaller confined

12 setting.

13 Q.     And Miss Woodford, have you ever served on an ICC

14 that's in a hospital-like situation that you have described,

15 a smaller, confined setting?

16 A.     Yes.  You know, I was at San Quentin State Prison for

17 26 and a half years.  We had a hospital, and then we had

18 outpatient housing units.  And we held ICC within the

19 hospital units for patients that were held there, yes.

20        MR. SHARMA:  Your Honor, may I have a moment.

21        (Cocounsel confer.)

22 BY MR. SHARMA:

23 Q.     Thank you, Your Honor.

24        I apologize, Miss Woodford.

25        Based on your experience within the California

151

1    Department of Corrections, are you familiar with the

2    differences between what's referred to in inmate security

3    classification as Level I through Level IV?

4    A.      Yes, I am.

5    Q.      And is it safe to say that Level IV are considered

6    the highest security inmates?

7    A.      That's true.

8    Q.      And based on your experience in the California

9    Department of Corrections, are the needs for a population

10    that is -- an institution that serves a Level IV population

11    different than the needs of an institution that serves a

12    Level I population?

13    A.      That's true.

14    Q.      And Miss Woodford, you stated that Level IV inmates

15    are considered higher security?

16          THE COURT:  Do you want to object as beyond the scope

17    of direct?

18          MS. MENDELSON:  Yes.

19          THE COURT:  What a good objection.  It is sustained.

20          MS. MENDELSON:  Thank you.

21    BY MR. SHARMA:

22    Q.      Miss Woodford, you testified -- I'm sorry.  Retract,

23    Your Honor.

24          Miss Woodford, based on your review and your

25    experience, do you know what you -- Actually, I'm sorry.

152

1          Do you know what level inmates are usually sent to

2     Salinas Valley Psychiatric Program?

3     A.     I think typically most of the inmates are probably

4     Level IV.  I'm sure that there's been Level III sent there.

5     It is really based on -- the higher security inmates are sent

6     there.  That's true.

7     Q.     And Miss Woodford, have you ever had any experience

8     in the Department of Mental Health or Department of State

9     Hospitals as an employee or consultant?

10    A.     No, I have not been employee or consultant in the

11    Department of State Hospitals.

12          MR. SHARMA:  Nothing further at this time, Your

13    Honor.

14          THE COURT:  Redirect?

15          MS. MENDELSON:  No, Your Honor.

16          THE COURT:  May the witness be released?

17          MS. MENDELSON:  Yes, Your Honor.

18          MR. SHARMA:  Yes, Your Honor.

19          THE COURT:  Thank you, ma'am.

20          You may step down.  You are free to go or stay, as

21    you choose.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  Plaintiff rests?

24          MR. BIEN:  We have no further witnesses, Your Honor.

25          (Excerpt concluded.)

153

1          (Further testimony previously transcribed.)

2                        ---o0o---

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
    STATE OF CALIFORNIA  )
4   COUNTY OF SACRAMENTO )

5

6
         I certify that the foregoing is a correct transcript
7
    from the record of proceedings in the above-entitled matter.
8

9

10                   IN WITNESS WHEREOF, I subscribe this
    certificate at Sacramento, California.
11

12

13   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
14        Official United States District Court Reporter

15

16

17

18

19

20

21

22

23

24

25